**Exhibit 5**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (TUCSON) (SD MSJ NO. 2)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3   IN RE:  SOCIAL MEDIA ADOLESCENT )
     ADDICTION/PERSONAL INJURY       )
 4   PRODUCTS LIABILITY LITIGATION,  )
     _____ )
 5                                   )CASE NO.:
     This Document Relates to:       )4:22-MD-03047-YGR
 6                                   )
     Tucson Unified School District  )MDL NO.:
 7   v. Meta Platforms Inc., et al.  )3047
                                     )
 8   Member Case No.: 4:24-cv-01382  )
     _____ )
 9
10
11      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
12              VIDEOTAPED DEPOSITION OF
13                  CLARINDA RUBIO
14         The Westin La Paloma Resort & Spa
                 3800 East Sunrise Drive
15              Tucson, Arizona 85718
16               September 17, 2025
17                    8:34 a.m.
18
19
20
21
22
23
24   REPORTED BY:  CORI A. BRICKEY, RPR
                 Arizona CR No. 51030
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

1     The videotaped deposition of CLARINDA RUBIO,
2  noticed by the Defendant Snap, Inc., was taken on
3  September 17, 2025, from 8:34 a.m. to 1:40 p.m.,
4  Mountain Standard Time, at The Westin La Paloma Resort
5  & Spa, 3800 East Sunrise Drive, Tucson, Arizona 85718,
6  before Cori A. Brickey, Arizona Certified Reporter No.
7  51030.
8          APPEARANCES OF COUNSEL
9  FOR THE PLAINTIFF:
10     WAGSTAFF & CARTMELL, LLP
       By:  Michael P. Cutler, Esq.
11          Austin Brane, Esq.
       4740 Grand Avenue, Suite 300
12     Kansas City, Missouri 64112
       mcutler@wcllp.com
13     abrane@wcllp.com
       (816)701-1145
14
15  FOR THE DEFENDANT SNAP, INC.:
16     MUNGER, TOLLES & OLSON LLP
       By:  Stephany Reaves, Esq.
17     601 Massachusetts Avenue, NW
       Suite 500 E
18     Washington, D.C. 20001-5369
       stephany.reaves@mto.com
19     (202)220-1100
20        ~and~
21     MUNGER, TOLLES & OLSON LLP
       By:  Victoria A. Degtyareva, Esq.
22          Mohamed Said, Esq. (Remote)
       350 South Grand Avenue, 50th Floor
23     Los Angeles, California 90071
       victoria.degtyareva@mto.com
24     mohamed.said@mto.com
       (213)683-9205
25

Page 3

1  APPEARANCES OF COUNSEL (cont'd...)
2      ~and~
3  KIRKLAND & ELLIS LLP
       By:  Lauren Reynolds, Esq. (Remote)
4  601 Lexington Avenue
   New York, New York 10022
5  lauren.reynolds@kirkland.com
   (212)446-4743
6
7  FOR THE DEFENDANTS META PLATFORMS, INSTAGRAM, SICULUS:
8     SHOOK, HARDY & BACON, LLP
       By:  Dana L. Strueby, Esq.
9     2555 Grand Boulevard
       Kansas City, Missouri 64108
10    dstrueby@sbh.com
       (816)559-2749
11
12  FOR THE DEFENDANTS GOOGLE LLC, YOUTUBE LLC:
13    WILLIAMS & CONNOLLY LLP
       By:  Armani J. Madison, Esq. (Remote)
14    680 Maine Avenue, SW
       Washington, D.C. 20024
15    amadison@wc.com
       (202)434-5374
16
17  FOR THE DEFENDANT TIKTOK:
18    KING & SPALDING LLP
       By:  Matthew Rowan, Esq. (Remote)
19    621 Capital Mall, Suite 1500
       Sacramento, California 95814
20    mrowan@kslaw.com
       (630)204-4118
21
22  ALSO PRESENT:  Daniel Lawlor, Videographer
23
24
25

Page 4

1          INDEX OF EXAMINATION
2  WITNESS: CLARINDA RUBIO
3  EXAMINATION                     PAGE
4  By Ms. Reaves                    5
5          INDEX OF EXHIBITS
6  DEFENDANTS' EXHIBIT NO.:         PAGE
7  Exhibit 1   Clarinda Rubio Resume       12
8  Exhibit 2   TUSD Schools by Region      30
9  Exhibit 3   Dean of Students Job Description   38
10  Exhibit 4   Manifestation Determination      48
          Bates SM_TUSD_00596806
11
    Exhibit 5   ILA October 2023            63
12          BATES SM_TUSD_00047055
13  Exhibit 6   2022-23 Site-Based MDR       71
          BATES SM_TUSD_00598989
14
    Exhibit 7   Discipline Summary by Ethnic Code   77
15          BATES SM_TUSD_00598993
16  Exhibit 8   2023-2024 Site-Based MDR     79
          BATES SM_TUSD_00598823
17
    Exhibit 9   SM_TUSD_00598831            84
18
    Exhibit 10   Governing Board Policy       118
19          BATES SM_TUSD_00595989
20  Exhibit 11   School Level Quarterly Report   148
          BATES SM_TUSD_00337172
21
    Exhibit 12   School Level Quarterly Report   161
22          BATES SM_TUSD_00214537
23  Exhibit 13   Root Cause Analysis Fishbone     165
          BATES SM_TUSD_00596000
24
    Exhibit 14   Email Chain             169
25          BATES SM_TUSD_00595993

Page 5

1          INDEX OF EXHIBITS (cont'd...)
2  DEFENDANTS' EXHIBIT NO.:         PAGE
3  Exhibit 15   Bryan Daniel Message       176
          BATES SM_TUSD_00595998
4
    Exhibit 16   Email Chain             178
5          BATES SM_TUSD_00353725
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1          THE VIDEOGRAPHER:  We're now on the
2 record.  My name is Dan Lawlor.  I'm the videographer
3 for Golkow, a Veritext division.  Today's date is
4 September 17th, 2025, and the time is 8:34 a.m.  This
5 video deposition is being held in Tucson, Arizona, in
6 the matter of Social Media/CA MDL 3047, Tucson Unified
7 School District versus Meta.
8          The deponent is Clarinda Rubio.  Counsel
9 will be noted on the stenographic record.  The court
10 reporter is Cori Brickey and will now swear in the
11 witness.
12          CLARINDA RUBIO,
13 of lawful age, having been first duly sworn to testify
14 to the truth, the whole truth, and nothing but the
15 truth in the case aforesaid, deposes and says in reply
16 to oral interrogatories propounded as follows, to wit:
17          DIRECT EXAMINATION
18 BY MS. REAVES:
19    Q.  Good morning.
20    A.  Morning.
21    Q.  My name is Stephany Reaves, and I'm going to
22 be asking questions for the defendants; okay?
23    A.  Okay.
24    Q.  Could you state your name for the record,
25 please.

Page 7

1    A.  Clarinda Rubio.
2    Q.  And do you understand today that you're
3 testifying under oath?
4    A.  I do.
5    Q.  Is there any reason that you can't give
6 truthful and accurate testimony?
7    A.  No.
8    Q.  Where are you employed?
9    A.  Tucson Unified School District.
10    Q.  So if I say TUSD or the school district, you
11 know that I'm referring to Tucson Unified School
12 District?
13    A.  Yes.
14    Q.  And do you know who the defendants in this
15 case are?
16    A.  I believe it's social media, Facebook,
17 TikTok, Snapchat.  The most common ones, at least.
18    Q.  Okay.  Any other companies that you know are
19 defendants in this case?
20    A.  Instagram.
21    Q.  So when I say "defendants' platforms," I'm
22 referring to Facebook, Instagram, TikTok, YouTube and
23 Snapchat; okay?
24    A.  Okay.
25    Q.  Have you ever been deposed before?

Page 8

1    A.  No.
2    Q.  And have you ever testified in court?
3    A.  No.
4    Q.  So just so you know, depositions aren't like
5 normal conversations.  I have to try to speak more
6 slowly than I usually do.  You should try to as well
7 if you're a fast talker.  And when you give answers,
8 you should try to say yes or no so that the record is
9 clear or whatever your answer is.
10          Does that make sense?
11    A.  Yes.
12    Q.  What did you do to prepare for this
13 deposition today?
14    A.  Met with my lawyer.  The lawyers, a few
15 times.
16    Q.  How many times did you meet with him?
17    A.  I would say about three times.
18    Q.  And did you meet with anyone other than with
19 lawyers to prepare for the deposition?
20    A.  No.
21    Q.  Did you review any documents to prepare for
22 the deposition?
23    A.  No.
24    Q.  Did anything that you looked at on your own
25 help you prepare for this deposition?

Page 9

1          MR. CUTLER:  Object to form.
2    A.  No.
3    Q.  So when Mr. Cutler objects, unless he tells
4 you not to answer, you can still answer the question
5 after his objection.
6    A.  Understood.
7    Q.  Did you take any notes to prepare for this
8 deposition?
9    A.  No.
10    Q.  And have you spoken with any of the other
11 individuals who have been deposed in connection with
12 this deposition?
13    A.  No.
14    Q.  Did you bring any notes or documents with
15 you today?
16    A.  No.
17    Q.  When did you first learn that TUSD was suing
18 social media companies?
19    A.  I would say it was towards the end of last
20 school year.
21    Q.  And when you say "towards the end of last
22 school year," you mean towards the end of the
23 2024-2025 school year?
24    A.  Correct.
25    Q.  Do you remember which month?

3 (Pages 6 - 9)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1     A.   April.
2     Q.   And without -- well, how did you learn that
3 TUSD was suing social media companies?
4     A.   It was a couple of students that were being
5 interviewed at my school.
6     Q.   And did you speak to the students about the
7 interviews that they were doing at your school?
8     A.   No.
9     Q.   What did you learn about the students being
10 interviewed at your school?
11         MR. CUTLER:  Object to form, and also
12 object to the extent that if you're asking anything
13 that you learned from attorneys, you can't discuss
14 that.  I'm instructing you not to disclose that.  If
15 it's something separate than that, then that's fair.
16         So with that, would you mind repeating?
17         MS. REAVES:  Sure.
18     Q.   What, if anything, did you learn from the
19 students who were being interviewed at your school?
20     A.   I didn't learn anything, just sat there and
21 made sure that they were safe is what my job was.  I
22 wasn't asked to do anything else other than sit in
23 there.
24     Q.   So you were present for conversations that
25 students had about this litigation?

Page 11

1     A.   For some.  Not all.
2     Q.   And is any of your testimony today relying
3 on information that you learned from students who were
4 talking about this litigation?
5     A.   No.
6     Q.   Now, without telling me the content of any
7 conversation, when did you first speak with lawyers
8 about this case?
9     A.   I would say it was end of April.
10     Q.   And did you volunteer to be a witness in
11 this case?
12     A.   Yes.
13     Q.   Why did you volunteer to be a witness in
14 this case?
15     A.   Many years of experience in dealing with
16 students that have been affected by social media.
17     Q.   And when you say you have many years of
18 dealing with students who have been affected by social
19 media, what do you mean by that?
20     A.   I've been with the district 28 years, so
21 I've seen what it's like before cell phones, social
22 media to where we're at now, presently.
23     Q.   And when do you define the period before
24 cell phones and social media to what it's like now?
25     A.   When it first started back in 1998, was my

Page 12

1 first job.
2     Q.   And so is it fair to say that you think you
3 can compare what schools looked like in 1998, to what
4 schools look like in 2025?
5     A.   Not necessarily schools.  More like
6 students.
7     Q.   So let's talk about your experience in
8 schools; okay?
9     A.   Okay.
10         MS. REAVES:  I want us to pull up what's
11 marked in the exhibit chair as Tab 1, and we'll mark
12 the exhibit Exhibit 1.
13         (Whereupon, Exhibit 1 was marked for
14 identification.)
15     Q.   And the way this will work is that we'll see
16 the documents a few different ways.  We'll give you a
17 paper version of the document, and then the document
18 will come up over the screen.
19         So do you recognize Exhibit 1?
20     A.   Yes.
21     Q.   Exhibit 1 is your resume?
22     A.   Correct.
23     Q.   And is this resume up-to-date?
24     A.   No.
25     Q.   So as we go through, I want to talk about if

Page 13

1 there are any corrections.  We can start with the
2 education section first, and then we'll go back to
3 your teaching experience; okay?
4     A.   Okay.
5     Q.   So you have a bachelor's degree in criminal
6 justice?
7     A.   Yes.
8     Q.   And you've completed emergency certification
9 coursework?
10     A.   Yes.
11     Q.   Can you describe what that coursework
12 entails?
13     A.   Making sure that I took the -- the required
14 courses in order for me to be able to obtain a
15 teaching certification, so reading, writing, math,
16 some science classes.
17     Q.   And so the emergency certification refers to
18 teaching certification?
19     A.   Correct.
20     Q.   This isn't, for instance, medical or mental
21 health training?
22     A.   No.
23     Q.   And then it says that you've had some
24 education at University of Phoenix?
25     A.   Yes.

4 (Pages 10 - 13)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1    Q.   Can you explain what education you've had at
2  the University of Phoenix?
3    A.   It was, again, some reading courses.
4  Phonics, basically, were the classes that I took at
5  the University of Phoenix.
6    Q.   Do you have any post-secondary education
7  that's not reflected on your resume?
8    A.   No.
9    Q.   You're not a medical professional?
10    A.   No.
11    Q.   You don't have any specialized training in
12  psychology?
13    A.   No.
14    Q.   Do you have any specialized training in
15  psychiatry?
16    A.   No.
17    Q.   Do you have any specialized training in
18  addiction?
19    A.   No.
20    Q.   Do you have any specialized training in
21  mental health?
22    A.   Through school we were trained in working
23  with students with social/emotional learning.  We've
24  had many trainings on that.
25    Q.   Can you tell me what you mean by many

Page 15

1  trainings in social/emotional learning?
2    A.   Working with students that have trauma,
3  working with students that have some type of
4  addictions in regards to alcohol, drugs.  Training --
5  go ahead.
6    Q.   No.  You finish.
7    A.   Training with children in regards to social
8  family structures.
9    Q.   Anything else as part of the
10  social/emotional learning training?
11    A.   I would say just to -- you know, how to work
12  with students and be able to provide resources for
13  them and guide them to staff members that can support.
14    Q.   And when did you first have any sort of
15  training in social/emotional learning?
16    A.   I can honestly say that it started back
17  when -- about 2020, is when they really pushed for
18  that.  And when I say "they," I refer to the district.
19    Q.   Prior to 2020, in your experience in TUSD
20  schools, did you have any other training on working
21  with students that have been through trauma?
22    A.   Yes.
23    Q.   When was that?
24    A.   I would say it would be in about 20- --
25  between the school years of 2015-2018.  I was at

Page 16

1  Mansfeld.
2    Q.   Okay.  And prior to 2020, did you have any
3  training in working with students who had addiction to
4  drugs or alcohol?
5    A.   I would have to say, no.
6    Q.   Prior to 2020, did you have any experience
7  in learning resources to provide students to support
8  their needs?
9        MR. CUTLER:  Object to form.  You can
10  answer.
11    A.   Can you repeat the question, please?
12    Q.   Sure.  So you testified that your training
13  for social/emotional learning was how to work with
14  students and be able to provide resources for them and
15  to guide staff members that can support.
16        Do you remember that?
17    A.   So it was students that needed support and
18  who they can go to is how we were trained.
19    Q.   And prior to 2020, when it was called
20  social/emotional learning training, was that the sort
21  of thing that schools did?  Did you learn about
22  resources that you can provide students or resources
23  for other staff members to provide students?
24        MR. CUTLER:  Object to form.  You can
25  answer.

Page 17

1    A.   Every school year, for me since I started,
2  there was sessions in professional development within
3  the school that would kind of guide us and tell us who
4  was available for resources, whether it was a social
5  worker, whether it was other staff members that are on
6  campus that could support children in different ways.
7    Q.   And so there were student support trainings
8  starting back in 1998, when you started at the
9  district?
10    A.   Yes.
11    Q.   And those trainings on how to provide
12  resources for students continued through your time
13  with the district?
14    A.   Yes.
15    Q.   But is it accurate to say that in 2020, the
16  district started framing those trainings as
17  social/emotional learning?
18    A.   I don't know if that's what they would -- I
19  just know that that's when there was more support.
20    Q.   More support.  Okay.  And let me ask it a
21  different way.
22        Prior to 2020, did any of the aspects of
23  student support services, were those things that you
24  had provided to students before 2020?
25    A.   Yes.

5 (Pages 14 - 17)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1    Q.   Now, when you're getting this training on
2  support services, you're not training in diagnosing
3  particular mental health or behavioral disorders;
4  correct?
5    A.   No.
6    Q.   Now, let's talk about the experience section
7  of your resume.  Now, it looks like from 1998 through
8  2010, you worked in elementary schools?
9    A.   Correct.
10   Q.   And then between 2010 and 2018, it looks
11 like you taught fifth through sixth grade?
12   A.   It was a combination.  There was sixth
13 grade -- fourth, fifth, and six grade.
14   Q.   So between 2010 and 2018, you taught fourth,
15 fifth, and sixth grade?
16   A.   Correct.
17   Q.   Do you have any experience teaching students
18 in seventh or eighth grade?
19   A.   No.
20   Q.   And then in 2018, you became a magnet
21 coordinator at Roskruge Bilingual K-8?
22   A.   Yes.
23   Q.   How do I pronounce the school?
24   A.   Roskruge Bilingual K-8.
25   Q.   And your resume says that you're there to

Page 19

1  present; is that accurate?
2    A.   No.
3    Q.   When did you leave Roskruge?
4    A.   In 20- -- May of 2022.
5    Q.   Now, what is a magnet coordinator?
6    A.   So magnet school is a school that draws
7  students in based on a specific theme.  The theme
8  there was dual -- dual language.  Children are
9  taught -- primary grades, they're taught Spanish
10 first, and then they are then taught English.
11   Q.   And so as a magnet coordinator, what is your
12 role?
13   A.   My role was to bring in families to be able
14 to meet what Tucson Unified School District was
15 looking for as far as making sure that the school was
16 integrated with non-Hispanic children, mostly.  So my
17 job was to go out to daycares, preschools, and explain
18 and talk to parents about the program.
19   Q.   And so were you responsible for recruitment
20 and retention of students?
21   A.   Correct.
22   Q.   And one of the goals of your role was to
23 make sure -- or to promote the district schools in
24 terms of the desegregation plan?
25   A.   Correct.

Page 20

1    Q.   As a magnet coordinator, did your role
2  involve student discipline?
3    A.   No.
4    Q.   An did your role involve student mental
5  health?
6    A.   No.
7    Q.   Why did you leave Roskruge Bilingual K-8?
8    A.   Wanted to learn and gain more knowledge as
9  far as moving up and understanding the role of what it
10 would be like to become an administrator.
11   Q.   And so in 2022, you became dean of students
12 at Morgan Maxwell K-8?
13   A.   Correct.
14   Q.   And again, your resume says 2022, to
15 present; is that accurate?
16   A.   No.
17   Q.   When did you leave Morgan Maxwell K-8?
18   A.   In 20- -- in May of 2024.
19   Q.   Why did you leave Morgan Maxwell?
20   A.   I wanted more experience with older
21 students.  I've always been with children from kinder
22 to eighth grade.
23   Q.   Was there any particular reason why you
24 wanted experience with older students?
25   A.   Just so that I could have a broader

Page 21

1  knowledge of what it all entailed as far as me wanting
2  to become an administrator if I pursued that.
3    Q.   And are you currently the dean of students
4  at Tucson High Magnet School?
5    A.   Correct.
6    Q.   And that's not reflected on your resume?
7    A.   No.
8    Q.   You started at Tucson High Magnet School in
9  May of 2024?
10   A.   In August of 2024, yes.
11   Q.   August of 2024.  Now, have you had -- have
12 you held any roles in education that we haven't
13 discussed?
14   A.   No.
15   Q.   And in any of your roles at TUSD, have you
16 been a supervisor for other TUSD staff?
17   A.   When I was at Morgan Maxwell, yes.
18   Q.   And who did you supervise?
19   A.   The school.  I was principal designee when
20 the principal wasn't there.
21   Q.   What is the role of a principal designee as
22 compared to assistant principal?
23   A.   So I became what they call the active
24 principal, so I take on the roles of what the
25 principal would assume if she were there, or he.

6 (Pages 18 - 21)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1    Q.   And that's even if assistant principals are
2  also there?
3    A.   No.  If an assistant principal is there, the
4  assistant principal is the designee.
5    Q.   During your time at Morgan Maxwell, did you
6  ever have to take on the role as the designee?
7    A.   Yes.
8    Q.   And when was that?
9    A.   Specific dates, don't -- I don't remember.
10    Q.   How frequently did you have to take on the
11  role as principal designee at Morgan Maxwell?
12    A.   Maybe once or twice a month.
13    Q.   And when you took on the role as principal
14  designee once or twice a month, how long would you be
15  the principal designee?
16    A.   For the day.
17    Q.   And when you took on the role as principal
18  designee, what was the reason that you would need to
19  be principal designee?
20    A.   The principal would be out on training
21  sessions, what they call ILA, which is the district
22  sessions.  And then very rarely, on occasion, she
23  would be sick.
24    Q.   And in your role as principal designee, did
25  you have to -- did you deal with student discipline?

Page 23

1    A.   Yes.
2    Q.   Now, from 1998 to 2025, it looks like you
3  changed schools 10 times; is that right?
4    A.   You're asking from 1998 to 2010?
5    Q.   To 2025.
6    A.   2025.  That looks about right.
7    Q.   So because there are nine school changes
8  reflected on your resume, plus the tenth is moving to
9  Tucson High Magnet School; is that correct?
10    A.   Correct.
11    Q.   And so if we average in those 27 years,
12  every 1 to 3 years you'd switch schools?
13        MR. CUTLER:  Object to form.
14    A.   I would have to disagree.  I was -- I was at
15  the second school for quite some time.
16    Q.   So one of the school years you stayed for --
17  Lynn Urquides Elementary School, you were at for seven
18  years; is that right?
19    A.   Correct.
20    Q.   But for many of the other school years, you
21  switched schools after one to three years; is that
22  right?
23    A.   Yes.
24    Q.   High-level question.  Is it common in your
25  experience for teachers or administrators to switch

Page 24

1  between TUSD schools?
2    A.   I don't know.  Common?  I'm not sure I
3  understand.
4    Q.   You don't understand what I mean by is it
5  common for teachers to switch schools after one to
6  three years?
7        MR. CUTLER:  Object to form.
8    A.   Everybody is different.  They have their
9  reasons for moving or leaving or staying.  I can't
10  answer that for anybody else but myself.
11    Q.   And so every school year, there are some
12  teachers who leave the school; is that right?
13        MR. CUTLER:  Object to form.
14    A.   Again, I only focus on myself.  I don't
15  think about who else is leaving or why or where
16  they're going.  It's just me.
17    Q.   So I didn't ask who was leaving or why or
18  where they're going.  I'm just asking, in your
19  experience at TUSD schools, does it happen that, at
20  the end of a school year, some teachers leave?
21        MR. CUTLER:  Object to form.
22    A.   I would have to say, again, that it's
23  just -- I know why I was leaving.  I know why I wasn't
24  there.
25        MR. CUTLER:  She's not asking why.

Page 25

1  She's asking do they.  So if you know --
2        THE WITNESS:  Do they --
3        MR. CUTLER:  -- you can answer.
4    A.   I mean, I don't -- I think I would say I
5  guess, I suppose.
6    Q.   Okay.  So you don't know whether or not
7  teachers have left?
8        MR. CUTLER:  Object to form.
9    A.   Yes.
10    Q.   So let's talk about some of the challenges
11  that students at the schools sometimes face; okay?
12    A.   Okay.
13    Q.   Now, in your experience in TUSD schools, did
14  the schools where you've worked have students who
15  received free or reduced lunch?
16    A.   Yes.
17    Q.   Did the schools where you've worked have
18  students who would be the first in their families to
19  graduate from high school?
20    A.   I would have to say in some cases, yes.
21    Q.   Did the schools where you've worked have
22  students who would be the first in their families to
23  graduate from college?
24    A.   I don't know.
25    Q.   Did the schools where you've worked have

7 (Pages 22 - 25)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

1  students who experience crime in their communities?
2      MR. CUTLER:  Object to form.
3      A.  I would say all communities have crime.
4      Q.  Did the schools where you've worked have
5  students who experienced abuse in their households?
6      A.  I would have to say probably.
7      Q.  Did the schools where you've worked have
8  students who experienced homelessness?
9      A.  In some cases, yes.
10     Q.  Did the schools where you've worked have
11  students who transferred in and out of school during
12  the school year?
13     A.  Yes.
14     Q.  Did the schools where you've worked have --
15  serve students from immigrant or refugee families?
16     A.  Yes.
17     Q.  And I want to ask you some questions
18  focusing on the period of time when you were a
19  teacher; okay?
20     A.  Okay.
21     Q.  And so I think we talked about your teaching
22  experience is between 1998 and 2018; is that correct?
23     A.  With the exception of 2006 to 2007.  And,
24  actually, 2006 to 2008.
25     Q.  So with the exception of 2006 to 2008, you

Page 27

1  were a teacher from 1998 to 2018?
2      A.  Correct.
3      Q.  And in that period between 1998 and 2018,
4  did you have students who were sometimes distracted in
5  class?
6      MR. CUTLER:  Object to form.
7      A.  Yes.
8      Q.  From 1998 to 2018, did you have students who
9  sometimes disrupted class?
10     A.  Yes.
11     Q.  From 1998 to 2018, did you have students who
12  either were bullied or who bullied other students?
13     A.  Yes.
14     Q.  And from 1998 to 2018, did you have students
15  who had any mental health needs?
16     A.  I suppose they would or could.  I mean, I'm
17  not -- there was issues, and they were referred
18  through what we would call Child Find or MTSS.
19     Q.  So you weren't necessarily aware of
20  students' mental health diagnoses; is that right?
21     A.  Correct.
22     Q.  And when you say students were referred
23  through Child Find, that's a process to identify
24  students who might have a learning disability; is that
25  right?

Page 28

1      A.  Correct.
2      Q.  And when you refer to MTSS, what is that?
3      A.  Multi-tier support systems.
4      Q.  And so that is a process that TUSD has used
5  to identify other supports for students?
6      A.  Correct.
7      Q.  And MTSS can support students' behavioral
8  and emotional needs?
9      A.  If, once they go through the process and
10  that's something that is identified, then I would say,
11  yes.
12     Q.  As a teacher in that role, are you always
13  made aware of a student's mental health diagnoses?
14     A.  No.
15     Q.  And as a teacher in that role, are you
16  always made aware of any trauma that a child might be
17  experiencing?
18     A.  Not always.
19     Q.  And so how did you decide when to refer a
20  child to Child Find or MTSS?
21     A.  If I noticed that their learning wasn't up
22  to par or in comparison to other students, then I knew
23  that they needed a little more support.
24     Q.  And in all those examples that I asked you
25  about from 1998 to 2018, were there any periods of

Page 29

1  time when students had none of those problems that we
2  identified?
3      MR. CUTLER:  Object to form.
4      A.  No.  I don't know.  That wouldn't -- that
5  would be -- like the students that I was --
6      Q.  Yes.
7      A.  I don't know.
8      Q.  So to ask it differently, in the period from
9  1998 to 2018, there were always some students who were
10  distracted in the class; correct?
11     MR. CUTLER:  Object to form.
12     A.  I wouldn't say always.
13     Q.  Was there any period of time when you never
14  had distracted students?
15     MR. CUTLER:  Object to form.
16     A.  I would say I've always been pretty good at
17  engaging students in their learning.
18     Q.  One of the factors that plays into student
19  behavior in class is the engagement of the teacher; is
20  that right?
21     A.  I'm sorry.  Can you say that again?
22     Q.  A teacher's engagement in class is a factor
23  that can play into whether or not students are -- have
24  behavioral issues in class?
25     A.  Not necessarily, but engagement is a key

8 (Pages 26 - 29)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1 role in helping students learn.
2    Q.   So in TUSD there are almost 90 schools; is
3 that right?
4    A.   I don't know.
5    Q.   Let me help you out.
6         MS. REAVES:  Let's go to -- this will be
7 Tab 2.  We'll mark it as Exhibit 2.
8         (Whereupon, Exhibit 2 was marked
9 for identification.)
10    Q.   And Tab 2 is a graphic from TUSD's website
11 that lists the regions and the schools.  Do you
12 recognize this school and region list?
13    A.   I've seen this before, yes.
14    Q.   And does the school region list appear to be
15 accurate to you?
16    A.   I don't know.
17    Q.   And so it's fair to say you're not -- you
18 can't recite, off the top of your head, all the
19 schools in Tucson Unified School District?
20    A.   That is correct.
21    Q.   You have worked in nine of the schools on
22 this list?
23    A.   One of the schools is no longer listed.  It
24 was a closure.
25    Q.   So you have worked in nine schools with

Page 31

1 TUSD?
2    A.   Yes.
3    Q.   And so you have no personal experience in
4 the majority of the schools on this list?
5    A.   Correct.
6    Q.   Have you ever worked in a school in the
7 Arcadia region?
8    A.   No.
9    Q.   Have you ever worked in a school in the
10 Pantana region?
11    A.   No.
12    Q.   Do you regularly visit other -- other TUSD
13 schools where you don't work?
14    A.   Regularly, no.
15    Q.   How frequently do you visit other TUSD
16 schools where you don't work?
17    A.   I would have to say when I was doing jobs
18 outside of my classrooms is when they would make us do
19 visits of other schools to see what they were doing.
20 But I would -- frequently, no.  Often, no.
21    Q.   What do you mean by jobs outside of your
22 classroom?
23    A.   So as magnet coordinator, I would get to
24 visit other magnet schools.
25    Q.   Do you know how many magnet schools you

Page 32

1 visited?
2    A.   I don't recall.
3    Q.   And in your role as magnet coordinator, did
4 you visit non-magnet schools?
5    A.   No.
6    Q.   In your role as dean, do you visit other
7 schools?
8    A.   No.
9    Q.   How many other TUSD schools, besides the one
10 that you currently work at, have you visited in the
11 last 12 months?
12    A.   One.
13    Q.   Which school did you visit in the last 12
14 months?
15    A.   Project MORE.
16    Q.   And why did you visit Project MORE?
17    A.   That's where we have our ISID meetings, our
18 monthly meetings.
19    Q.   What is ISID?
20    A.   ISI, in-school intervention.  So it's a
21 group of us, in-school interventions is deans and
22 restorative practices.  We have a meeting once a
23 month.
24    Q.   And in this monthly in-school intervention
25 meeting, are you observing the school where the

Page 33

1 meeting is held?
2    A.   No.
3    Q.   Did you observe any classrooms within that
4 school?
5    A.   No.
6    Q.   Did you observe any teachers within that
7 school?
8    A.   No.
9    Q.   Are there any other schools, besides the
10 ones you've worked at, that you visited in the past 12
11 months?
12    A.   No.
13    Q.   So for the majority of classrooms across the
14 district, you don't have firsthand knowledge of what's
15 happening in the classrooms?
16    A.   No.
17    Q.   And for the majority of schools throughout
18 the district, you don't have firsthand knowledge of
19 what's happening in those schools?
20    A.   No.
21    Q.   Have you conducted any classroom
22 observations of schools outside the ones that you work
23 in or have worked in, in the district?
24    A.   Throughout my years of experience with the
25 district?

9 (Pages 30 - 33)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

1  Q.  Yes.
2  A.  I would say there were some school visits
3 that we did to visit classrooms, what they call
4 walk-throughs.
5  Q.  And what is a walk-through?
6  A.  When I was the magnet coordinator, we'd go
7 and observe classrooms to see a checklist of what they
8 were doing and if it met the magnet pillars within the
9 program.
10  Q.  And when was the last time you did a
11 walk-through?
12  A.  In about 2022.
13  Q.  And when you say you're checking to see if
14 they met the magnet pillars, what are you checking
15 for?
16  A.  There's a list, a checklist that's made and
17 created for magnet walk-throughs.
18  Q.  Is part of your magnet walk-through
19 assessing student behavior?
20  A.  No.
21  Q.  Is part of your magnet walk-through
22 assessing student mental health?
23  A.  No.
24  Q.  Is part of your magnet walk-through
25 assessing student emotional or social needs?

Page 35

1  A.  No.
2  Q.  Now, have you made any public statements
3 about the conditions in TUSD as a whole?
4         MR. CUTLER:  Object to form.
5  A.  No.
6  Q.  So for example, have you been on any
7 podcasts or interviews about how TUSD is as a
8 district?
9  A.  No.
10  Q.  And have you written any blog posts or
11 articles or other media about how TUSD is as a
12 district?
13  A.  No.
14  Q.  Have you made any statements or been
15 interviewed about TUSD students?
16  A.  No.
17  Q.  Is there any place that I could go to find a
18 time where you've either written down or recorded
19 before your thoughts about TUSD or TUSD students?
20  A.  No.
21  Q.  So we talked a little bit about your role as
22 a teacher and as a magnet coordinator.  I'm going to
23 ask you a little bit about your role as a dean.
24  A.  Okay.
25  Q.  So what is a dean of students?

Page 36

1  A.  A dean of students is considered under the
2 administrative lower-level end of the role.  I work
3 with students based on discipline with what we
4 consider level ones and twos, according to our code
5 of -- district code of conduct.
6  Q.  And what is a level one versus a level two
7 in the code of conduct?
8  A.  So level ones would be, for example,
9 truancy, tardies, absenteeism.  Those are mainly the
10 ones that fall under -- the dress code violations, at
11 least off the top of my head.
12  Q.  I'm sorry.  Do you have any other level one
13 violations?
14  A.  There's many other ones.  I just can't
15 recall them all.  I'd have to look at the book.  We
16 have a code of conduct book, yes.
17  Q.  In the code of conduct levels, is level one
18 the least serious or the most serious or is there some
19 other categorization?
20  A.  It's the least, what we consider the least.
21  Q.  And in the code of conduct, are level one
22 violations the most frequent violations?
23  A.  Yes.
24  Q.  What about level two violations?  What are
25 those?

Page 37

1  A.  Level twos would fall under, for example,
2 student leaving school grounds without permission,
3 disruptions.
4  Q.  And how do you define a disruption?
5  A.  Interrupting the learning in the classroom.
6  Q.  As compared to level one violations, how
7 common are level two violations?
8  A.  Very common.
9  Q.  And in your role as dean, do you deal with
10 other levels besides level one, level two?
11  A.  Those are pretty much all I deal with.
12  Q.  Are there other levels in the code of
13 conduct?
14  A.  Yes.
15  Q.  What are the other levels?
16  A.  Threes, fours, and fives.
17  Q.  And who within TUSD -- or strike that.
18      Who within Tucson High Magnet School, or
19 within Morgan Maxwell K-8, dealt with the threes,
20 fours, and fives?
21  A.  The assistant principals or the principal.
22  Q.  And when assistant principals and principals
23 are dealing with threes, fours, and fives, could it be
24 either dealing with either role, or is a specific
25 category assigned as assistant principals versus

10 (Pages 34 - 37)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

1 principals?
2    A.  No.  They all deal with them.
3    Q.  Now, did your role, as a dean of students at
4 Morgan Maxwell K-8, differ from your roles with
5 students at Tucson High Magnet School?
6    A.  Different in what sense?
7    Q.  Was the substance of your job the same in
8 both schools, or has it changed now that you're in
9 Tucson High Magnet School?
10    A.  It's about the same.
11        MS. REAVES:  I'm going to mark as
12 Exhibit 3, this is Tab 3.
13        (Whereupon, Exhibit 3 was marked for
14 identification.)
15    Q.  I'll give a chance to look at it.
16        So Exhibit 3 is a posting online of a dean
17 of students job.  Do you see that?
18    A.  Yes.
19    Q.  Are you familiar with the job postings for
20 the dean of students position?
21    A.  For this school year?
22    Q.  Let's start with for any school year.
23    A.  2025.  The one I'm looking at has 2025-2026,
24 no, I have not reviewed the one for this school year.
25    Q.  Do you know whether the dean of students job

Page 39

1 description is consistent across schools in the
2 district?
3    A.  Within the same district?
4    Q.  This is for TUSD.  So my question is do you
5 know whether the job description, dean of students,
6 across TUSD schools is the same job description?
7    A.  I suppose I would have to say, yes.
8    Q.  You are currently a dean of students;
9 correct?
10    A.  Yes.
11    Q.  Is this job description consistent with your
12 job responsibilities?
13        MR. CUTLER:  Take your time and read it.
14    A.  Well, according to how it's written here, it
15 looks like there's stuff that's still missing.  Its
16 asking for full job description to visit the website,
17 so I don't know what else they added on the website.
18    Q.  Okay.
19    A.  But as far as what's in front of me, then I
20 would have to say, yes, to your question.
21    Q.  So there may be additional information on
22 the website, but the content that you see, in this
23 dean of students job description, is consistent with
24 your understanding of the role?
25    A.  Yes.

Page 40

1    Q.  So one of the first thing is it says under
2 the summary is "Collaborates with district staff,
3 parents, and students to identify high-risk students
4 for future prevention services."
5        Do you see that?
6    A.  Yes.
7    Q.  And is collaborating with district staff,
8 parents, and students in this way part of your role as
9 dean of students at Tucson Magnet High School?
10    A.  Yes.
11    Q.  And was that part of your role at Morgan
12 Maxwell K-8?
13    A.  Yes.
14    Q.  In that role, collaborating with district
15 staff and parents, do you work with all the students
16 at a school or just the high-risk students?
17    A.  I engage and talk to many, many, many
18 students, not necessarily only the ones that are sent
19 to me or that I need to speak with.  I tend to build
20 strong relationships with all students on my campus.
21    Q.  And are there particular students who are
22 sent to you or that you need to speak with?
23    A.  Yes.
24    Q.  And what are the circumstances when there
25 are students who are sent to you or you need to speak

Page 41

1 with them?
2    A.  Chronic tardiness, chronic absenteeism,
3 chronic truancies.  Which, those are the higher ones.
4 Those are the ones that are, you know, pretty much
5 nonstop in my case where I'm at, at Tucson High.
6    Q.  And you're familiar with the term high-risk
7 students?
8    A.  Yes.
9    Q.  What does that mean?
10    A.  Students that are probably not likely or not
11 on the path to be able to complete their education.
12 For example, graduate.
13    Q.  And are high-risk students, students who are
14 at risk of having higher rates of mental health
15 problems?
16        MR. CUTLER:  Could you repeat that?
17 Sorry.  I didn't catch it.
18    Q.  Do high-risk students have higher rates of
19 mental health problems?
20        MR. CUTLER:  Thank you.
21    A.  I don't know.
22    Q.  Do high-risk students have higher rates of
23 behavioral problems?
24    A.  Not necessarily.
25    Q.  Do high-risk students have higher rates of

11 (Pages 38 - 41)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1  academic problems?
2      A.   In most cases.
3      Q.   Do high-risk students have higher rates of
4  needing IEPs, or individualized education programs?
5      A.   Not necessarily.
6      Q.   You identified chronic tardiness, chronic
7  absenteeism, and chronic truancy as some of the
8  priority issues that you deal with?
9      A.   Yes.
10     Q.   Are those factors that are common to
11  high-risk students?
12     A.   Most of the time.
13     Q.   And are there any other factors that
14  indicate to you that a student may need more support
15  from the dean?
16     A.   It depends.
17     Q.   What does it depend on?
18     A.   Some students may need just to kind of
19  review their grades and see if they're going -- if
20  they're on track.  So they'll come and ask me, you
21  know, where they stand with their course requirements.
22     Q.   Are there other examples of -- are there any
23  other examples of issues you deal with, with students
24  directly?
25     A.   Yes.  A lot of them is use of their cell

Page 43

1  phones, constant use of cell phones.  A lot of those
2  tardiness and truancies that I referred to a minute
3  ago are due to students creating their videos for
4  their TikToks to upload, and just trying to get them
5  to get back to class.
6      Q.   And when you say that some of the tardiness
7  and truancy is due to students creating videos, how do
8  you know that?
9      A.   Because when I approach them and they're
10  recording themselves and they're dancing, they're
11  saying Ms. Rubio, do you want to be in our TikToks is
12  the most common ones.  As I mentioned earlier, I
13  create a lot of -- you know, build a lot of strong
14  relationships with students so I don't want them to
15  fear me.  So when I do approach them, they're honest.
16     Q.   And so you observe students using cell
17  phones to record videos when they should be in class?
18     A.   Correct.
19     Q.   And the students tell you that they are
20  doing it for social media?
21     A.   Correct.
22     Q.   Is there any other way you know what
23  students are doing on their phones?
24     A.   For the most part, yes.  They will honestly
25  say that they were checking their streaks or checking

Page 44

1  to see if their video has received -- or their post,
2  as they refer to it, have received a lot of likes and
3  comments and whatnot.  Again, they're very honest with
4  me.
5      Q.   So students tell you that they have been
6  looking at aspects of social media?
7      A.   Yes.
8      Q.   And is there any other way that you know
9  what students are doing on their cell phones?
10     A.   Teachers, when they send students out for
11  cell phone violations, will say that, as they're, you
12  know, walking around the classroom, that they're
13  noticing the kids are on social media.
14     Q.   And so teachers tell you what's happening in
15  their classrooms?
16     A.   Yes.
17     Q.   Is there any other way you know what
18  students are doing on their cell phones?
19     A.   Other than the constant notifications that
20  are being received when they're in my office and then
21  talking to them about discipline.  Then, I mean, it's
22  a constant dinging sound, which tells me it's more
23  than just a text coming through is what I would say.
24     Q.   And so when there are students in your
25  office, you hear a dinging sound from their cell

Page 45

1  phones; is that right?
2      A.   Yes.
3      Q.   And how do you know what application that
4  dinging sound is coming from?
5      A.   I wouldn't know what application, but the
6  sound is familiar when students actually have to show
7  me their phone sometimes to say, "No, miss, it's not.
8  It's not this," or, "I'm not trying to interrupt."
9           It's just, you know, they'll on occasion
10  show me that it's a post that's receiving a lot of
11  comments or follows or likes or whatever app they're
12  on.  Mostly TikTok, mostly Instagram is what I've
13  observed.
14     Q.   And so your testimony is that you assume
15  that they are getting notifications from social media
16  because you're familiar with dinging sounds?
17          MR. CUTLER:  Object to form of her
18  testimony.  It's already on the record.  You can
19  answer if you can.
20     A.   I would just say that it's a sound that's
21  very familiar when students have been open enough to
22  show me what it is they're looking at.  That familiar
23  sound.  I don't know if they can change the sound.
24     Q.   So you don't know, on a cell phone, what
25  settings there are to change the sounds for different

12 (Pages 42 - 45)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1 notifications?
2      A.   I do not know.
3      Q.   And you don't know on particular
4 applications what sounds one application has versus
5 another?
6      A.   They all sound the same to me.  Sorry.
7      Q.   But what you know is that you've heard
8 notifications?
9      A.   Correct.
10      Q.   Or heard a sound that you assume is a
11 notification?
12      A.   Right.
13      Q.   And just so that we have a full
14 understanding, is there any other way that you believe
15 you know what students are doing on their cell phones?
16      A.   Other than when there's an issue or
17 something about to happen on campus and students pull
18 out their phones to record.  I mean, it's mostly a
19 recording feature.
20      Q.   So you've observed students using their cell
21 phones to record something that's happening in the
22 school?
23      A.   And most likely it will wind up on
24 somebody's social media, yes.
25      Q.   Breaking it down, when you observe students

Page 47

1 recording something on their cell phones, do you know
2 how -- do you know whether the students are using the
3 native camera app versus some other application?
4      A.   I do not know.
5      Q.   And when you say that the video ends up on
6 social media, how do you know that it ends up on
7 social media?
8      A.   A lot of those videos will surface later
9 when we're dealing with discipline.  Administrators
10 will get ahold of some of those videos.
11      Q.   So we're going to go back to a little bit of
12 that later, but I want to turn back, for a little bit,
13 to some of the behaviors you've observed in your time
14 of students in classrooms; okay?
15      A.   Uh-huh.
16      Q.   We were talking earlier about high-risk
17 students and some of the issues that you deal with.
18 One of the things I want to ask you about is a
19 manifestation determination.
20      A.   Okay.
21      Q.   Do you know what a manifestation
22 determination is?
23      A.   Yes.
24      Q.   And what is it?
25      A.   When a student has an individualized

Page 48

1 educational plan and has violated something in the
2 code of conduct.  And if it's something that requires
3 more than 10-day suspension for a student with an IEP,
4 then it needs to be manifested through meeting first.
5      Q.   And do you participate in manifestation
6 determination meetings?
7      A.   I have in some, yes.
8      Q.   And is it your understanding that the
9 manifestation determination has to be documented?
10      A.   Correct.
11      Q.   And that's because part of the manifestation
12 determination is to determine whether the violation of
13 the code of conduct is a manifestation of the
14 student's disability?
15      A.   Correct.
16      Q.   Is that right?
17      A.   Correct.
18      Q.   Because if it's related to their IEP, then
19 that's not necessarily something they can be suspended
20 for long term?
21      A.   Yes.
22           MS. REAVES:  So let's turn to this is
23 going to be Exhibit 4, it's Tab 4.  I'll give you a
24 copy.
25           (Whereupon, Exhibit 4 was marked

Page 49

1 for identification.)
2      Q.   So you see, at the top of Exhibit 4, it says
3 "Manifestation Determination"?
4      A.   Yes.
5      Q.   And then there's student information, but
6 the personal information is redacted.
7      A.   Okay.
8      Q.   I want you to go to the last page because
9 this is the first document we have like this.  I'll
10 wait until you turn to the last page of the document.
11           So this is a page to show you kind of the
12 data of how defendants got the document from Tucson
13 Unified School District; okay?
14           So if we look at the "Prod Begin," there's a
15 number that's assigned to the document just so that we
16 can all keep track of what document we're on.
17           You see the field that says "All custodians,
18 Clarinda Rubio"?  I'm sorry.  I'm mispronouncing your
19 name.  Ms. Clarinda Rubio.
20      A.   Yes.
21      Q.   This says that it came from your custodial
22 file from the documents that you had in your file at
23 TUSD.  And then file date, we see that this last was
24 modified on November 16th, 2023, and then there's some
25 additional information.  Just a file name and file

13 (Pages 46 - 49)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

1 path.
2      Do you see that?
3      A. Yes.
4      Q. And so when I refer to a document in your
5 custodial file, do you understand that means a
6 document that the district gave us from the documents?
7 Does that make sense?
8      A. Yes.
9      Q. So I want to talk about manifestation
10 determinations, and we'll use this document as an
11 example.
12      So sometimes a student's special education
13 needs can lead to some behavioral problems?
14      A. Yes.
15      Q. And if we look at this particular student,
16 if we turn to Page 2 -- and take whatever time you
17 need to look at it, just let me know -- Page 2, Part
18 1, can you take a minute and look at the summary in
19 Part 1?
20      A. (Witness complies.)
21      Q. And let me know when you're ready.
22      A. Okay.
23      Q. So this particular manifestation meeting,
24 the issue is that a student had been vaping at the
25 school; is that correct?

Page 51

1      A. That's what it says, yes.
2      Q. In your experience as a dean, is vaping an
3 issue that you sometimes have with students?
4      A. Yes.
5      Q. And when you are working at a school at
6 TUSD, you-all use the Synergy system to track
7 behavioral violations?
8      A. Yes.
9      Q. And I want you to turn to the third page,
10 Part 2 that says "Current Special Education
11 Information," and look at the top for the specific
12 diagnoses for the student. And let me know when
13 you're ready.
14      A. Okay.
15      Q. Now, this student's eligibility category was
16 emotional disability. Do you see that?
17      A. Yes.
18      Q. Now, what is an emotional disability?
19      A. It's based on the psychologist that does
20 these tests on him that determines that.
21      Q. And in your experience as a dean, when a
22 student as an IEP for emotional disposability, what
23 sorts of behaviors does that present?
24      MR. CUTLER: Object to form.
25      A. A few things, anger issues, a student not

Page 52

1 able to have the social skills to be able to handle
2 certain situations is mostly what I've experienced.
3      Q. So there are some students, in schools where
4 you've worked, who have anger issues or problems with
5 social skills that are part of the disability
6 diagnosed by a psychologist; is that correct?
7      MR. CUTLER: Object to form.
8      A. I suppose, yes.
9      Q. And have you also, in your time at TUSD,
10 worked with students who have a physical health
11 impairment?
12      A. Yes.
13      Q. Do behavioral and physical health
14 impairments, can those impact a student's academic
15 performance?
16      A. I don't know. I don't tend to work with
17 students that have physical disabilities.
18      Q. Well, what about mental and behavioral
19 health issues? Do mental and behavioral health issues
20 impact a student's academic performance?
21      A. Depends on the circumstances for the
22 students.
23      Q. Okay. So --
24      A. It doesn't always have a factor in it.
25      Q. Whether or not it's always a factor, are

Page 53

1 behavioral and mental health issues sometimes factors
2 that impact a student's academic performance?
3      A. I would say, yes, it could sometimes.
4      Q. Now, in terms of mental and behavioral
5 health concerns, genetic issues can impact mental
6 health?
7      MR. CUTLER: Object to form.
8      A. I don't know.
9      Q. Have you ever worked with a family that has
10 a history of mental illness?
11      A. When you say "worked with," meaning?
12      Q. So in your role as a dean, you work on
13 interventions with students; is that right?
14      A. Yes.
15      Q. And in those interventions, are you ever
16 working with students who have a family history of
17 mental illness?
18      MR. CUTLER: Object to form.
19      A. Those usually get sent to -- if that's what
20 the issue is, they get sent to social workers and to
21 counselors, not me.
22      Q. When you're working with students as a dean,
23 do you work with students who have family members who
24 have a mental illness and that's something that the
25 student has to deal with?

14 (Pages 50 - 53)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1    MR. CUTLER: Object to form.
2    A. I don't know. I don't know.
3    Q. Do you work with students who've experienced
4 adverse childhood events or adverse childhood
5 experiences?
6    A. Give me an example of that.
7    Q. Sure. So examples of adverse childhood
8 experiences are things like sexual assault, domestic
9 violence, school shootings, abuse, neglect,
10 experiencing a house fire, trauma that an individual
11 experiences before they turn 18.
12    A. Again, those go to social workers and
13 counselors.
14    Q. And so when -- are you aware of TUSD
15 students who have experienced adverse childhood
16 events?
17    A. Sometimes, not all the time.
18    Q. But when there are students who've
19 experienced trauma, you're not the person who is
20 dealing with those students?
21    A. Correct.
22    Q. I want to ask you a few questions about the
23 impact of the COVID-19 pandemic.
24    MR. CUTLER: Can we take a break?
25    MS. REAVES: Sure, we can take a

Page 55

1 break. Do you want to take a break?
2    THE WITNESS: Yes, please.
3    THE VIDEOGRAPHER: We are going off
4 record. The time is 9:40.
5    (Whereupon, a recess was taken.)
6    THE VIDEOGRAPHER: We're back on
7 record. Time is 9:53.
8 BY MS. REAVES:
9    Q. So I actually want to go back to Exhibit 3.
10 You still have that in front of you? It's the dean of
11 students posting.
12    A. Yes.
13    Q. So the second line in the summary
14 description is "May visit student and parents in the
15 home to determine causes for absenteeism, academic, or
16 discipline problems."
17    Do you see that?
18    A. Yes.
19    Q. Are home visits something that you do as
20 dean?
21    A. Very rarely.
22    Q. What are the circumstances under which you
23 do a home visit?
24    A. That I need to have another adult with me.
25 I cannot do the visit on my own. And sometimes there

Page 56

1 isn't another personnel or person that can go with
2 me. Most of the time, it's a student that has chronic
3 absences, and we're trying to check in on the family
4 and see what's going on with them, pretty much.
5    Q. And so on the occasions when you do do a
6 home visit, who do you do to check in about chronic
7 absences?
8    A. Well, the first thing we do is we check in
9 with the attendance personnel, the ladies or whoever
10 is running the attendance office. And then they print
11 out -- they have a printout for us to kind of look to
12 see that there is some, you know, absences that are
13 unexplained, because a lot a lot of them are
14 unexcused, and that's what's kind of a red flag.
15    Q. And when you find that there is a
16 student who has -- let me take step back.
17    Is there a particular threshold for this is
18 the number of unexcused absences that you as dean need
19 to get involved?
20    A. I would say that it has to be done before
21 the 10-day drop. So if it's 9 unexcused absences,
22 then that would be the flag for us to kind of go check
23 in. Sometimes, when it's just the drop, we won't go
24 check in because the drop's already occurred.
25    Q. And when you say "check in," what do you

Page 57

1 actually do to check in with the student who has --
2 who is close to the drop in terms of number of
3 absences?
4    A. The first thing that is done mostly is a
5 phone call is made to see if they can get in contact
6 with the guardian or the adult, the parent. If there
7 is no response, then it kind of prompts us to like
8 let's go see and check in. Again, it depends on who
9 else is available.
10    I tend to, when I have done on a vary rare
11 occasion, it would be either the principal or
12 assistant principal that would accompany me.
13    Q. And so when the description says "You may
14 visit students and parents to determine a cause for
15 absenteeism," how do you determine what the cause is
16 for a student's chronic absences?
17    A. If we are able to get in connection with the
18 parent or the guardian, they'll sometimes tell us
19 what's going on. A lot of it is, you know, family
20 issues, sickness, a student is really sick. They're
21 trying to determine what's really going on. Those are
22 the ones that come off the top of my head that I
23 recall.
24    Like I said, it's vary rare that we actually
25 leave school campus to visit a family. It's

15 (Pages 54 - 57)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1 interesting that it would be in this because it's not
2 something that happens very often.
3    Q.   Okay.  Good to know.
4        You said more often you check in with
5 families by calling them over the phone?
6    A.   Correct.
7    Q.   And when you check in with them over the
8 phone, how do you -- do you try to determine the cause
9 for why the student is absent?
10    A.   Yeah.  I'll ask them like, "Is there
11 something that we should know as a school?  How can we
12 provide support?  Do you want me to refer the student
13 to a social worker or counselor?"  If it's something
14 they feel the student needs to talk to somebody, per
15 se.
16    Q.   And what sorts of -- what are reasons why
17 you would refer a student to social work or counselor?
18    A.   If, for example, a parent is saying, "I'm
19 struggling to get the student to school.  Like the
20 student just doesn't want to go to school."  Because I
21 don't -- I'm not one to, you know, I guess, ask too
22 many questions.  I'm more of, "Can you give me an
23 understanding as so why your student is not in
24 school?"
25        And then from there, I'll email the

Page 59

1 counselor.  Say, "Hey, there's something going on with
2 the family.  Can you reach out?"  In some cases the
3 parent is just, you know, "Student turned" -- now that
4 I'm in high school, "The student is 18.  I can't make
5 them go to school."  You know, it's things like that.
6    Q.   And so in your experience, are you able to
7 get families to tell you everything that's going on
8 that's leading to an absence?
9        MR. CUTLER:  Object to form.
10    A.   No, I don't know.  I mean, I'm sure they're
11 not telling me everything.
12    Q.   And if you think that there is an additional
13 way to support the student, you often refer them to
14 other staff members at TUSD?
15    A.   Correct.
16    Q.   And could you tell us which staff members
17 those would be?
18    A.   Like names of other --
19    Q.   The positions.
20    A.   The positions?
21    Q.   Yes.
22    A.   Social workers, drop-off prevention officer,
23 counselors.  Those are the main ones that I submit.
24 And then the social workers do whatever other
25 resources they have to offer.

Page 60

1    Q.   When you're determining the cause, trying to
2 figure out why a student is chronically absent, do you
3 document your conversations with families or visits
4 with families somewhere?
5    A.   No.
6    Q.   When you are assessing a student's truancy,
7 do you make a final decision on why the student has
8 been chronically absent?
9    A.   No.  I just put down like if it's constant.
10 And the kids don't give me -- example for truancy.  A
11 lot of times, it's just them not wanting to get to
12 class.  And students, again, very honest with me will
13 tell me just, "I don't like the class.  I want to
14 switch my schedule."
15        And so that's when I look into either making
16 them connect with the counselor to see if there's a
17 possibility for a schedule change.  Those are the main
18 things that I deal with when it comes to like
19 truancies and tardiness.
20    Q.   Do you keep any data on the outcomes of your
21 conversations of what supports you provided or
22 interventions you provided for students who had
23 chronic absences?
24        MR. CUTLER:  Object to form.
25    A.   What do you mean when you say "data"?

Page 61

1    Q.   So for example, do you keep track of how
2 many students you then refer to a social worker?
3    A.   No.
4    Q.   Do you keep track of how many students told
5 you, "I just don't want to go to school"?
6    A.   No.
7    Q.   Do you keep track of how many parents said,
8 "My child is now 18.  I'm not going to make them go to
9 school"?
10    A.   No.
11    Q.   Do students ever -- strike that.
12        It's fair to say there are a lot of
13 different reasons why students don't go to school?
14    A.   Correct.
15    Q.   Do you have any comprehensive documentation
16 of all of the reasons that have stopped students from
17 coming to school?
18        MR. CUTLER:  Object to form.
19    A.   No.  I mean, I wouldn't know where to start.
20 I'm sure some of the staff and faculty document
21 somewhere something, right.  But as far as me, I
22 wouldn't be able to tell you.
23    Q.   And when you say you're sure that some staff
24 or faculty document, are you aware of any specific
25 position or department that documents the reasons why

16 (Pages 58 - 61)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

1 students are chronically absent?
2    A.   The attendance ladies will tend to put in
3 stuff sometimes under reason, and they're the only
4 ones that have access to that.
5    Q.   When you say "under reason," what system are
6 they putting it into?
7    A.   In Synergy.
8    Q.   Going back to this job description briefly,
9 so the third sentence says "Monitors these students as
10 they enter and go through school to determine impact
11 of prevention activities."
12       Do you see that?
13    A.   Yes.
14    Q.   And what are prevention activities?
15    A.   Good question.  I don't know what they could
16 possibly mean by that.
17    Q.   So aside from this job description -- and
18 you've also told us that you work in particular with
19 students who have chronic truancy, chronic absences --
20 are there any other categories that we haven't covered
21 that are included in your job as a dean?
22    A.   I would just turn back to the whole cell
23 phone policy violations that I deal with on a daily
24 basis.
25    Q.   And I'm going to ask you more about that, so

Page 63

1 I'll just make a note.
2       In your role as a dean of students, do you
3 analyze disciplinary data?
4    A.   Not on a daily basis, no.  When we meet for
5 deans, is when we -- in our meetings that I mentioned,
6 that's when they kind of show us what -- you know,
7 what's going on within all the schools in the
8 district.
9    Q.   And so you participate in meetings with
10 other deans of students about behavioral and
11 disciplinary trends in the district?
12    A.   Correct.
13    Q.   How frequent are those meetings?
14    A.   Once a month.
15    Q.   I want to ask you about some documentation
16 related to disciplinary and behavioral trends.
17       MS. REAVES:  So let's go to this is
18 Tab 7.  And I'll give you a copy of it.  This is going
19 to be Exhibit 5.
20       (Whereupon, Exhibit 5 was marked
21 for identification.)
22    Q.   And this one, the document that I have just
23 says "Produced in native format."  That means that the
24 document we got was a PowerPoint, and so I'm going to
25 ask to pull up the actual PowerPoint on the screen.

Page 64

1       But if you look at the physical document
2 that you have in front of you, you can see again that
3 this is a document from your custodial file.  In all
4 custodians, you're listed as one of the people who is
5 a custodian of this document.  The file was modified
6 October 5th, 2023.  File name is "ILA October 2023
7 Middle-High PowerPoint."
8       Do you see that?
9    A.   Yes.
10    Q.   And so while we pull up the actual
11 PowerPoint, can you tell me what is ILA?
12    A.   That is the leadership academy for
13 principals and assistant principals, and I don't
14 partake in any of that.
15    Q.   You don't participate in this?
16    A.   No.
17    Q.   Do you know what the "I" stands for?
18    A.   No.
19    Q.   Do you know why this is in your custodial
20 file?
21    A.   I believe I was placed in there because I
22 was principal designee, but not -- I never was asked
23 to attend these when I was at Morgan Maxwell.
24    Q.   That's fine.  This may be very quick.  I
25 want to turn to Page 3 in the PowerPoint.

Page 65

1       Do you know what a monthly behavioral
2 management committee is?
3    A.   Yes.
4    Q.   And what is a monthly behavioral management
5 committee?
6    A.   It's a team, a group of people that gather
7 together to discuss, you know, what's going on on
8 campus trends, things that are of concern that need to
9 be brought up to the attention so that we can all kind
10 of figure out strategies to address the issues at
11 hand.
12    Q.   And when you talk about discussing trends,
13 are you talking about trends in behavioral issues or
14 disciplinary violations or something else?
15    A.   It could just be anything that's affecting
16 the school at the time.
17    Q.   Have you ever been part of the monthly
18 behavioral management committee?
19    A.   Yes.
20    Q.   And when have you been a part of the monthly
21 behavioral management committee?
22    A.   When I was at Morgan Maxwell, and currently
23 in my position now.
24    Q.   So in your role as dean, you're part of this
25 monthly behavioral management committee?

17 (Pages 62 - 65)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1   A.  Correct.
2   Q.  Now, the upper right box says "Discuss
3   challenges and what is working with the new code of
4   conduct."
5        Does the monthly behavioral management
6   committee discuss challenges and what is working with
7   the code of conduct?
8        MR. CUTLER:  Object to form.
9   A.  In the meetings that we take part in, no,
10  that's not what we discuss.  But when we meet for the
11  monthly meetings, we do bring up in, once in a while,
12  what's going on with the code, if it's changed and
13  what the changes are and...
14  Q.  And when you meet with your -- I'm sorry.
15  Can you remind me what the name of the group that you
16  meet with monthly is?
17  A.  The behavioral management committee.
18  Q.  Yes.  Is that the same as the meeting you
19  told us you have with other deans throughout the
20  district?
21  A.  No.
22  Q.  That's a different meeting?
23  A.  Correct.
24  Q.  So the monthly behavioral management
25  committee meeting, is that within your school?

Page 67

1   A.  Correct.
2   Q.  And in those meetings, do you discuss
3   challenges that the school is facing?
4   A.  Yes.
5   Q.  And do you document the challenges that the
6   schools facing in those meetings?
7   A.  I personally don't document anything.
8   Q.  Does anyone else in the meeting document the
9   challenges the school is facing?
10       MR. CUTLER:  Object to form.
11  A.  I don't know.
12  Q.  So you have never seen any written
13  documentation of the specific challenges that your
14  monthly behavioral management team identified in a
15  meeting?
16       MR. CUTLER:  Object to form; it's
17  argumentative; misstates testimony.
18  A.  I would assume somewhere.  It might be
19  somewhere.  I don't know who is documenting or for
20  what purposes.  No, I don't know.  I don't document.
21  Q.  Okay.  But so --
22  A.  I just participate in what -- what I see are
23  trends that are causing disruptions and whatnot in
24  school.
25  Q.  Do these meetings happen in person or

Page 68

1   remotely?
2   A.  Either or.  Depends.
3   Q.  And when the meetings happen in person, have
4   you ever observed someone taking notes?
5   A.  I don't know.  Everybody has their laptop,
6   so I'm not sure.
7   Q.  And when the meetings happen in person or
8   remotely, does anyone send out a summary of the
9   meeting afterwards?
10  A.  No.
11  Q.  And it's fair to say you don't know
12  precisely what other people are doing on their
13  computers?
14  A.  Correct.
15  Q.  So for the monthly behavioral management
16  meetings that happen within the school, how often are
17  those meetings?  Just monthly or are they more than
18  once a month?
19  A.  Some schools go monthly.  Some schools go
20  bi-monthly.  Some schools -- I mean, that's what the
21  reports say when we look at them and we review them in
22  our dean meeting.
23  Q.  And what is the purpose of holding those
24  meetings?
25       MR. CUTLER:  Object to form.

Page 69

1   A.  For my school, specifically?
2   Q.  Yes, for your school.
3   A.  Again, to try to figure out what trends;
4   what's happening; what are we dealing with; what can
5   we improve on; what -- what are the needs of students;
6   what are we noticing that they are -- what are the
7   major distractions, pretty much, of what's causing
8   them not to be in their classrooms to learn, because
9   that's the biggest one we deal with every single time.
10  Q.  Are you familiar with the monthly discipline
11  report data?
12  A.  Yes.
13  Q.  What's the monthly discipline report data?
14  A.  That's where you track to see -- you're
15  looking at the discipline reports that are logged into
16  Synergy for your school, for your specific school.
17       And so you kind of take note of, for
18  example, each ethnic group and how many of those
19  students within your school are, you know, issued some
20  type of violation.  If they've committed some kind of
21  violation that has placed them on exclusionary, what
22  we call exclusionary discipline, which is suspended.
23       And so it tracks that information, and then
24  you kind of, you know, report on it, and then you
25  give -- you analyze it, in a sense.

18 (Pages 66 - 69)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1    Q.  And so there's specific data that you-all
2  analyze as part of the monthly discipline -- part of
3  the monthly discipline reports; correct?
4    A.  Yes.
5    Q.  And one data point is race and ethnicity of
6  students?
7    A.  Correct.
8    Q.  Another data point is specific code of
9  conduct violations?
10   A.  Yes.
11   Q.  You analyze whether particular violations
12 are increasing or decreasing?
13   A.  Yes.
14   Q.  Okay.  Are there any other data points that
15 you analyze as part of this report?
16       MR. CUTLER:  Object to form.
17   A.  I know another piece was what type of
18 professional development is being offered to address
19 certain things like code of conduct, and that's what
20 comes off the top of my head right now.
21   Q.  So there's also data on professional
22 development that's offered to teachers and staff
23 within a school?
24   A.  And students.
25   Q.  And students?

Page 71

1    A.  Yeah.  And families.  So it's all in there
2  somehow.  How are you getting information out to your
3  families type of thing is what I recall what's on the
4  form.
5    Q.  And this is quantitative data?
6    A.  As far as the numbers of students and
7  numbers of meetings?
8    Q.  Numbers and violations.
9    A.  It gives us just a total.  It doesn't say --
10 you have to break down the data.  The data that says
11 what the violation was.  Does that make sense?  But it
12 does give us the number of violations.
13       MS. REAVES:  So let's look at an
14 example, what I think is a monthly discipline
15 report.  We're going to mark this as Exhibit 6.  It is
16 Tab 8 in your binder.
17       (Whereupon, Exhibit 6 was marked
18 for identification.)
19   Q.  So what we've marked as Exhibit 6 at the top
20 says "2022-2023 Site-Based Discipline Monthly Report
21 (MDR)."
22       Do you see that?
23   A.  Yes.
24   Q.  And is this what you were talking about when
25 you refer to a monthly discipline report?

Page 72

1    A.  Yes.
2    Q.  And then if you go to the back page again,
3  you can see that this is a document from your
4  custodial file.  You're listed as one of the
5  custodians.  This was last modified December 9th,
6  2022, and the file name is "Maxwell MDR-November
7  2022."
8        Do you see that?
9    A.  Yes.
10   Q.  And so do you recognize this as a document
11 from when you worked at Morgan Maxwell K-8?
12   A.  Yes.
13   Q.  And after -- as a dean, after you and others
14 would have the monthly discipline committee meetings,
15 would you generate reports like this?
16   A.  Yes.
17   Q.  Who actually creates this report?
18   A.  It depends on school sites.
19   Q.  And at the school sites where you have been
20 involved in the monthly discipline committee meetings,
21 who was been responsible for creating the reports?
22   A.  At Morgan Maxwell, it was mostly me.  At
23 Tucson High, it's not me.
24   Q.  And so in this monthly discipline report, we
25 see some of the data that I think you were discussing.

Page 73

1        So for example, there's a list of discipline
2  by week, broken down by students' race and ethnicity?
3    A.  Correct.
4    Q.  And there's a question that says "Is there a
5  trend?"
6        Do you see that?
7    A.  Yes.
8    Q.  And then there's an opportunity to explain,
9  if there is a trend, what the trend is.  Do you see
10 that?
11   A.  Yes.
12   Q.  If you go to Page 2 of this document, I want
13 you to take a look at the summary at the top.
14       Do you recall whether, in fact, you are the
15 person who created this specific summary?
16   A.  Yes.
17   Q.  And were you the person who created the
18 summary?
19   A.  Yes.
20   Q.  And when you, at Morgan Maxwell K-8, created
21 the monthly discipline reports, who else received
22 these reports?
23       MR. CUTLER:  Object to form.
24   A.  They went back to student relations.  That's
25 who we we're supposed to log it into a file for.

19 (Pages 70 - 73)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    Q.   So when you say "student relations," you
2  mean someone within the school or the student
3  relations person, department for the district?
4    A.   Department for the district.
5    Q.   And were there any other individuals besides
6  you who had input into what information goes into the
7  monthly discipline report?
8    A.   When you say "input," do you mean the person
9  adding the information in or -- I'm just trying to get
10  confirmation.  Sorry.
11    Q.   Sure.  Sure.  By "input" I don't mean,
12  necessarily, who was physically typing but where you
13  gathered the information that you then put into the
14  report.
15    A.   No.  It was the team.  It was the behavior
16  management team that you see on the next page.
17    Q.   And that's helpful.  And so the next page of
18  this document, that's Page 3, this document lists the
19  members of the behavioral management team?
20    A.   Correct.
21    Q.   So in this particular report from November
22  of 2022, the trends that you noted were -- included
23  "An increase in behaviors could have a direct
24  correlation to increase in staffing, especially
25  teacher absences.  Principal has reached out to the

1  district for support many times."
2      Do you see that?
3    A.   Yes.
4    Q.   So one of the issues that your school was
5  experiencing was that there was an increase in
6  staffing absences or teacher absences; is that right?
7      MR. CUTLER:  Object to form.
8    A.   That is what I wrote, yes.
9    Q.   And you attributed the increase in staffing
10  absences -- or strike that.
11      You attributed the increase in behaviors as
12  potentially due to or having correlation with the
13  increase in staffing absences?
14      MR. CUTLER:  Object to form.
15    A.   I would say, yes, because it becomes
16  difficult to try to figure out who is going to cover
17  those classes when teachers aren't there.  And then,
18  sometimes it was more than one class, so we would have
19  to figure out where we would place them or offer them
20  the support in order to get through that class period
21  or that class.
22    Q.   And you also indicated in this report that
23  the principal had reached out to the district for
24  support many times.  Do you see that?
25    A.   Yes.

1    Q.   And what did you mean by that?
2    A.   The principal would call in and say if they
3  can send anybody, any resources, any other support
4  staff within the district that could come and support
5  and help when we had teachers that weren't going to
6  work or showing up to work.
7    Q.   And when you wrote this trend in your
8  behavior management report, had the district sent the
9  support you needed to account for the absent teachers?
10    A.   Many times, yes, we would get support staff
11  from the district that would come and help us cover
12  classes.
13    Q.   And when you wrote this report, did you
14  still need additional support from the district?
15    A.   What do you mean "additional support"?
16    Q.   So when you wrote "Principal has reached out
17  to the district for support many times," were you
18  indicating that you still needed support from the
19  district?
20    A.   That probably was just from a note that I
21  took when we met in our meeting, and so I just wanted
22  to make sure I added it in there.
23    Q.   So this report, for the month of November
24  2022, at Morgan Maxwell K-8, social media was not
25  included in any of the trends that you identified in

1  the report; is that right?
2      MR. CUTLER:  Object to form.
3    A.   I don't see the words social media directly
4  in here.
5      MS. REAVES:  I want to turn to -- this
6  will be Tab 9.  We'll mark it as Exhibit 7.  Let me
7  give you a copy.
8      (Whereupon, Exhibit 7 was marked
9  for identification.)
10    Q.   And so Tab 9, Exhibit 7 at the top says
11  "Morgan Maxwell K-8, Discipline Summary by Ethnic
12  Code," and the date range is November 1st, 2022,
13  through November 30th, 2022.
14      Do you see that?
15    A.   Yes.
16    Q.   And if you go back to the last page again,
17  there's a sheet that shows that this is a document
18  from your custodial file and the file path.  And I'll
19  represent to you that this document was attached to
20  the one we were just looking at; okay?
21    A.   Okay.
22    Q.   So you already shared that as part of the
23  monthly behavioral discipline team, the team looks at
24  a number of quantitative data points in determining
25  behavioral trends at the school; is that right?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 78

1    A.  Yes.
2    Q.  And so this document shows that some of the
3  data points that you-all analyze are various code of
4  conduct violations broken down by gender and also by
5  race.  Do you see that?
6    A.  Yes.
7    Q.  But in terms of the quantitative data that
8  you-all analyzed, none of the quantitative categories
9  involve social media, specifically?
10      MR. CUTLER:  Object to form.
11    A.  It doesn't say social media, directly, but
12  doesn't necessarily mean that it didn't have anything
13  to do with social media.
14    Q.  But in terms of the quantitative data that
15  the monthly behavioral discipline team is analyzing,
16  there's no quantitative category for social media?
17    A.  Social media doesn't have its own category,
18  no.
19    Q.  And are you aware of any time that monthly
20  behavioral discipline teams have tried to quantify the
21  involvement of social media and any disciplinary
22  trends?
23    A.  We've had discussions about how it is, for
24  example, disrupting the learning environment, causing
25  disrespect.  But as far as quantitative, where we

Page 79

1  would note it somewhere, I don't see it.
2      MS. REAVES:  Let's turn to this is
3  Tab 11 in my binder, and I'll give you a copy.  It
4  will be marked as Exhibit 8.
5      (Whereupon, Exhibit 8 was marked for
6  identification.)
7    Q.  Exhibit 8 is, again, a site-based discipline
8  monthly report.  This one is from 2023 to 2024, for --
9  it looks like date and month categories are switched,
10  but the date is February 12th, 2024, and I think this
11  is for the month of January 2024.
12      Does that make sense with your
13  understanding?
14    A.  That's -- yeah, that's what it looks like.
15  It looks like the date --
16    Q.  Essentially, the person was reporting on
17  February 12th about January, 2024; correct?
18    A.  Yes.  Yes, correct.
19    Q.  And if we look at the last page, which is
20  the metadata sheet, it says the file date is
21  February 12, 2024, and file name is "MDR Maxwell
22  January 2024"?
23    A.  Yes.
24    Q.  And so in January 2024, were you still at
25  Morgan Maxwell?

Page 80

1    A.  Yes.
2    Q.  Again we see there is a place to document
3  trends in behavior.  Do you see that?
4    A.  Yes.
5    Q.  And in this report, the first line we see,
6  "This month had less major violations than last
7  month."
8      Do you see that?
9    A.  Yes.
10    Q.  So is it fair to say that the number of
11  violations at a school vary from month to month?
12    A.  Yes.
13    Q.  If we keep reading there, it says "Most of
14  the violations were for aggression, either assault or
15  engagement.  This month also had a violation for
16  bullying, which is not very common on our campus."
17      Do you see that?
18    A.  Yes.
19    Q.  And so do you agree that at Morgan Maxwell
20  K-8, bullying was not a common -- was not common on
21  your campus?
22    A.  For that month, yes.
23    Q.  So even something like bullying varies by
24  month?
25    A.  Correct.

Page 81

1    Q.  And something like bullying might vary by
2  school?
3    A.  Yes.
4    Q.  Now again, in the trends that you chose to
5  document here, there's no mention of social media?
6    A.  No.  The word social media was not used.
7  But again, if you look at the disruptions, there was
8  12 of them.  The aggressions, all of that tend to come
9  from some aspects, most of the time, social medical
10  media.  Either kids sending each other something
11  through social media was the most common thing that
12  happened at Morgan Maxwell when I was there.
13    Q.  When you say the most common thing happening
14  at Morgan Maxwell was students sending each other
15  something through social media, you mean students
16  messaging each other on a social media platform?
17    A.  Correct.
18    Q.  Or students sending a video on a social
19  media platform?
20    A.  Correct.
21    Q.  Or students sending a photograph over a
22  social media platform?
23    A.  Yes.
24    Q.  And it's your impression that those students
25  sending messages or videos or photos to each other

21 (Pages 78 - 81)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

1  causes disruptions within the school?
2      A.  Yes.
3      Q.  How do you know that the students are
4  sending messages, videos, or photos on defendants'
5  platforms?
6      A.  Because students would show me.  If they
7  were the victims in that case, they would come and
8  show me what was being posted about them or what was
9  being sent out to others.  Students would show me like
10  the videos.
11      Q.  Did you document, as a matter of course, the
12  videos, messages, or photos that students show you?
13      A.  When you say "document," do you mean like
14  have a copy of it somewhere or?
15      Q.  Do you have a way to go back and know what
16  particular platform was being shown?
17          MR. CUTLER:  Object to form.
18      A.  Particular platform, I would have to say it
19  was either TikTok or Instagram or Snapchat.  Those
20  were the ones that I dealt with the most when students
21  would show me.
22      Q.  And my question was do you have a way to go
23  back and look at a document or some sort of record of
24  what platform you remember students showing you?
25      A.  No.

Page 83

1      Q.  And do you have any sort of documentation or
2  record of the content of the messages or posts or
3  videos that the students were showing you?
4      A.  If it was added to the disciplinary action
5  form if they were suspended for it, then it would note
6  something in there.
7      Q.  And so if the conduct of -- let me go back
8  for a second.
9          So when students are showing you messages or
10  videos or photos that you believe are on social media,
11  are these messages, videos, or photos sent by other
12  students?
13      A.  Yes.
14      Q.  And you're saying that if the student who
15  sent the problematic content is then disciplined, it
16  would be in that student's disciplinary file?
17          MR. CUTLER:  Object to form.
18      A.  I would say in some cases, yes, if it was
19  like blatantly, yes, that it was there.  It was social
20  media that caused the issue, it would say it.
21      Q.  And so if your understanding is that if
22  social media a blatantly caused the issue, that should
23  be documented in the disciplinary file?
24          MR. CUTLER:  Object to form; it's vague.
25      A.  It depends on the person that's writing the

Page 84

1  discipline.  Because the violation in that case would
2  be either bullying or fighting or other aggression.
3      Q.  Now, just to go back briefly to this
4  specific Morgan Maxwell example we're looking at, if
5  you look at Page 2 at the top, in this month, fights
6  and aggression did not increase; is that right?
7      A.  In comparison to the previous month.  That's
8  how we were told to document that.
9      Q.  And if you look at Page 3 at the bottom,
10  there are particular behave trends that you noted.
11  You did not note social media, but you did note
12  continued issues of vaping on campus.  Do you see
13  that?
14      A.  Yes.
15          MS. REAVES:  I want to mark as
16  Exhibit 9, this is gonna be Tab 12.
17          (Whereupon, Exhibit 9 was marked for
18  identification.)
19      Q.  And again this is one that we're going to
20  have to look at on the computer because it's an Excel
21  spreadsheet; okay?
22      A.  Okay.
23      Q.  So if we look at the custodial file, the
24  physical page that I gave you, again you are one of
25  the custodians.  This file was last modified

Page 85

1  February 12, 2024, which is the same date as report we
2  were just looking at.  And this file is called
3  "Microsoft Excel Worksheet."
4          Do you see that?
5      A.  Yes.
6      Q.  And I'll represent to you that this Excel
7  spreadsheet was attached to the document we were just
8  looking at.
9      A.  Correct.
10      Q.  Now, does this spreadsheet -- this
11  spreadsheet is a reflection on MTSS observations?
12      A.  Yes.
13      Q.  And what are MTSS observations?
14      A.  That is where teachers were asked to
15  document any type of violations that are occurring
16  within their classroom.
17      Q.  And in terms of the violations that are
18  happening within their classrooms, there's a lot of
19  different types of violations that could happen; is
20  that right?
21      A.  Correct.
22      Q.  And these are violations to the code of
23  conduct, or is it broader than that?
24      A.  It's broader than that.
25      Q.  But in all of these behavioral violations or

22 (Pages 82 - 85)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

---

Page 86

1 academic violations, different types of violations --
2 and you can ask to scroll through -- none of these
3 violations mention social media?
4    A.  No.  The word social media does not, no.
5    Q.  Now, the analysis of discipline involves a
6 lot of data.  Are you aware of any time, prior to this
7 lawsuit, when your behavioral teams have analyzed data
8 in terms of number of social media violations?
9        MR. CUTLER:  Object to form.
10    A.  Which lawsuit again are you referring to?
11    Q.  The lawsuit in this case.
12    A.  Can you repeat the question?  Sorry.
13    Q.  Sure.  Prior to the lawsuit in this case,
14 are you aware of any time that your behavioral
15 management teams analyzed quantitative data about
16 social media violations?
17        MR. CUTLER:  Object to form.
18    A.  Not quantitative, no.  But it was brought up
19 on all of our conversations every time we discussed
20 what was -- what were kids -- why was a phone
21 confiscated.  Why is the improper use of technology.
22 Like, you know, the majority of time it was real
23 associated that was something that was linked to
24 social media.
25    Q.  In your roles at TUSD, has there ever been a

---

Page 87

1 time when you can specifically document that social
2 media is related to whatever other issue that the
3 student is having?
4        MR. CUTLER:  Object to form; it's vague.
5    A.  I don't know.  I mean, I don't know
6 other than, like I said, when it would be something
7 that was considered the cause of an issue where it
8 would get documented.  I'm not sure what other schools
9 do.  I'm not sure what.  But I was aware of some of
10 them where it did state that it was due to a social
11 media post or.
12    Q.  And when you say that something is due to a
13 social media post, where it would state that, where
14 are you stating that's documented?
15    A.  In their disciplinary action for a student
16 that was exclusionary, like suspended.
17    Q.  And who is making the determination that the
18 behavior was due to a social media post?
19        MR. CUTLER:  Object to form.
20    A.  It's just something that's just noted in
21 there so that they would know that that's what's
22 causing the issue or the concern or that would start
23 the fight or would start the disruption.
24    Q.  And can you provide an example of what you
25 say -- strike that.

---

Page 88

1        Can you provide an example of social media
2 causing a fight or causing a disruption?
3    A.  Considering that social media has many
4 features where students can create as many accounts as
5 they want, they will come at a student by posting a
6 meme or making fun of someone, and then the student
7 then, of course, getting upset and wanting to get --
8 find out who is causing all this.
9        And then, you know, students will tell on
10 each other.  So a student will tell somebody else this
11 is the account created by, you know, the student.  And
12 then that's what causes that student to confront,
13 right, the student on campus.  Like, "Why are you
14 posting this or why is this happening?  And what are
15 you doing?  What do you want?"  They would always say
16 that.  "Face the student."
17        And so in many cases, you know, that
18 involved, you know, some of these fights it was social
19 media that -- you know, that something was posted
20 about them.  Or what was the term that the student
21 would use?  Talking smack.  Or, you know, just causing
22 the issue at hand.
23    Q.  And so you've observed that -- you believe
24 that there's students who get into fights because of a
25 post on social media?

---

Page 89

1    A.  Yes.
2    Q.  And the post is something that another
3 student has posted on social media?
4    A.  Yes.
5    Q.  And how do you know what social media
6 platform it's posted on?
7    A.  The students show me.
8    Q.  And in every instance the students show you,
9 or are you ever relying on what students tell you?
10    A.  No.  I mean, you always have to base it on
11 evidence.  The student has to be able to show or
12 provide proof.  And so many of them will show a
13 screenshot or, you know, it's to be able to show that,
14 or an actual video footage.  So they will show it.
15    Q.  And when you're saying that students show
16 you the video or the photos, you're talking about
17 evidence that has to be provided to document the
18 disciplinary violation?
19        MR. CUTLER:  Object to form; misstates
20 testimony.
21    A.  Not to necessarily document but to
22 understand the why.  Why the fight or why the
23 confrontation or why the disruption, why it took
24 place.
25    Q.  So I want to talk a little bit in more

---

23 (Pages 86 - 89)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 90

1  detail.  Now, your testimony is that students
2  sometimes show you the particular video or post that
3  has caused a problem?
4      A.  Yes.
5      Q.  And in your role as dean, do you always
6  document that?
7      A.  I report it.
8      Q.  Who do you report it to?
9      A.  Administrators.
10      Q.  Which administrators?
11      A.  Whichever one is available depending on the
12  student.
13      Q.  When you say "administrator," what roles are
14  you including in the word administrator?
15      A.  The assistant principals, mostly.  That's
16  who I turn to in my time at Tucson High.
17      Q.  And when you were at Morgan Maxwell, who did
18  you report to?
19      A.  Ms. Nido, the principal.
20      Q.  The principal.  So when there is an issue --
21  when there's a disciplinary violation with a student,
22  is someone at the school required to report it?  To
23  document it?
24          MR. CUTLER:  Object to form; it's vague;
25  incomplete hypothetical.

Page 91

1      A.  I don't know if somebody else would, in that
2  sense.  All I do is, when the student shows me, I ask
3  them if they're comfortable enough to share it with
4  somebody else so that then we can make sure that there
5  is disciplinary action followed up with through code
6  of conduct.
7      Q.  And so when a student shows you a post or a
8  video, you report it to another administrator, and you
9  don't know whether or not it's been documented?
10      A.  I don't know.  What do you mean
11  "documented"?  Are you like -- I'm sorry.  Go
12  ahead.  What do you mean when you say "documented"?
13      Q.  So for example, we have just looked at a
14  chart of MTSS violations; right?
15      A.  Correct.
16      Q.  And MTSS violations include an option for
17  the person to enter in -- put a narrative; is that
18  right?
19      A.  Yes.
20      Q.  And in that narrative, the person could say,
21  "This aggression was due to a social media post";
22  correct?
23      A.  Not necessarily when it comes to teachers.
24  That's a higher level so they wouldn't document.
25  Level ones and twos is what they document.

Page 92

1      Q.  And so it if it's -- I think you said level
2  ones and twos involve disruptions in the classroom?
3      A.  Correct.
4      Q.  So teachers will document disruptions in the
5  classroom; right?
6          MR. CUTLER:  Object to form.
7      A.  Yes.  Well, they will document a disruption,
8  but they don't necessarily have to tell us in detail,
9  form example, what causes the disruption.  Most of the
10  disruptions will be just, for example, students not
11  doing their work in that sense, if they label it as a
12  disruption.
13          If it's something that has to do with social
14  media, they will put it in as a minor -- as an
15  inappropriate use of technology.  That's what they
16  mostly will call for those.
17      Q.  And what level is an inappropriate use of
18  technology?
19      A.  Good question.
20      Q.  If you know.
21      A.  Off the top of my head, I would say it's a
22  level one, but after the third or fourth offense, it
23  can be elevated to a level two, and then so on and so
24  forth.  So the progression of it if it's constant.
25      Q.  Stepping back for a minute, MTSS violations

Page 93

1  are the violations recorded by the teachers; is that
2  right?
3      A.  Correct.
4      Q.  And for the category of violations that a
5  teacher records, they can include a narrative of what
6  caused the violation?
7      A.  Correct.
8      Q.  And so if there are violations that a
9  teacher believes are caused by social media, the
10  teacher could document that in their MTSS
11  observations?
12      A.  Not if it winds up being an level three,
13  four, or five.  A three, four, or five goes to an
14  administrator.
15      Q.  My question is whether, if a teacher is
16  documenting a level one or level two, such as a
17  disruption or an improper use of technology, does the
18  teacher have the opportunity to document that in an
19  MTSS observation?
20          MR. CUTLER:  Object to form; incomplete
21  hypothetical.
22      A.  I mean, they can document it how they see
23  it, yes.
24      Q.  And you say higher than level one or
25  level two, it might be another administrator getting

24 (Pages 90 - 93)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1 involved in documenting; right?
2    A.  It has to be an administrator getting
3 involved, according to our code of conduct.
4    Q.  And so if it's a higher violation than a
5 level one or level two, then an administrator is the
6 person who is documenting the violation?
7    A.  Is documenting the incident, correct.  The
8 violation that occurred, correct.
9    Q.  And that administrator also has the
10 opportunity to input what they believe is the cause of
11 the violation?
12    A.  Correct.
13    Q.  And so between the documentation from
14 teachers and MTSS data and the documentation from
15 administrators in --
16       Is it Synergy?
17    A.  Correct.
18    Q.  -- are you aware of, for any of schools that
19 you've worked in, if there is an analysis of
20 violations that relate to social media, the percentage
21 of violations that relate to social media?
22       MR. CUTLER:  Object to form; vague.
23    A.  I don't know.
24    Q.  So you're not aware, one way or the other,
25 if there's any analysis of the data in MTSS for

Page 95

1 connections to social media?
2       MR. CUTLER:  Asked and answered.  You
3 can answer it again.
4    A.  I don't know.
5    Q.  You don't know, one way or the other,
6 whether Synergy has been analyzed for any connection
7 to social media?
8       MR. CUTLER:  Asked and answered.
9    A.  I don't know.
10    Q.  Are you familiar with a platform call
11 Awarity?
12    A.  No.
13    Q.  So fair to say you're not -- you don't know,
14 one way or the other, whether Awarity has been
15 analyzed for any incidents related to social media?
16    A.  Correct.  I don't know.
17    Q.  Are you ever involved in creating school
18 safety reports?
19    A.  I'm sorry?
20    Q.  Are you ever involved in documentation of
21 school safety reports?
22    A.  School safety reports?
23    Q.  For example, the department of school
24 safety.
25    A.  No.

Page 96

1    Q.  And so you're not aware, one way or the
2 other, of whether school safety reports document any
3 connection to social media?
4    A.  I don't know.
5    Q.  As part of the monthly behavioral management
6 team or in your role as a dean, are you aware of any
7 effort by your schools to analyze how many code of
8 conduct violations involve cell phones?
9    A.  Analyze, no.  It is brought up in every
10 single meeting.  And considering that there was a
11 phone policy that was sent out this year by our
12 principal interim, he wanted to be very clear that
13 considering it was becoming a law, I believe in this
14 month, that cell phone usage in classrooms was going
15 to be, you know, prohibited or not allowed.
16    Q.  So in your behavior meetings, you discussed
17 policies about banning cell phones in the classroom
18 altogether?
19    A.  Not discuss policies, no.  But have had the
20 discussion of how we were going to -- if it goes
21 into -- it becomes the law, what as a school are --
22 you know, is going to happen.  How are we going to
23 handle that.
24    Q.  As part of the -- as dean or as part of the
25 behavior team, have any of the schools that you worked

Page 97

1 at analyzed how many code of conduct violations
2 involve social media more broadly?
3    A.  Just in discussions.  Like I said, when it's
4 brought up that there is like a high alert for, you
5 know, TikTok challenges, because that's what they're
6 called.  High alert for making sure students are safe
7 because a lot of them are trying to up the challenge
8 or whatnot.  Just discussions, but not where it's
9 somewhere, I would say, it would be logged in or
10 documented.
11    Q.  So you don't have any data that
12 quantitatively breaks down particular social media
13 platforms?
14       MR. CUTLER:  Object to form.
15    A.  I don't know have one, no.  I don't.
16    Q.  And as part of the behavioral management
17 team, you haven't seen others analyze any data that
18 breaks down school concerns by particular platforms?
19    A.  I don't know if others.
20    Q.  When you talk about TikTok challenges, what
21 does that mean to you?
22    A.  A challenge that has been running through on
23 social media and students wanting to partake in that
24 by creating their own and adding to.  That's how they
25 titled it.

25 (Pages 94 - 97)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 98

1    I can give you a specific one, when I was at
2 Morgan Maxwell, called "The devious challenge," and
3 that's where they had to either steel or destroy
4 school property and post it, that that's what they
5 were doing.
6    Q.  And so when we're talking about -- I think
7 you said "The devious challenge," your understanding
8 is that students saw post or videos of other people
9 destroying school property, and so they made their own
10 posts or videos of themselves destroying school
11 property; is that correct?
12    A.  Yes.
13    Q.  I want to stay a little bit more on the data
14 that you look at as the dean and part of the
15 behavioral management team; okay?
16    A.  Okay.
17    Q.  And so in your experience at TUSD schools,
18 have your schools collected data to help determine how
19 to best support their students?
20        MR. CUTLER:  Object to form; it's vague.
21    A.  I'm not sure I understand.
22    Q.  Sure.  We can break it down.
23    The schools where you've worked at TUSD, do
24 they collect data on student achievement?
25        MR. CUTLER:  Object to form.

Page 99

1    A.  Yes.
2    Q.  And to you, what does student achievement
3 mean?
4    A.  Being able to show progress in reading,
5 writing, math based on, for example, that we used to
6 do quarterly benchmarks.  They'd also look into what
7 they would consider midterms for their classrooms to
8 see if there's improvement on a subject or topic.
9    Q.  And the schools that you've worked in in
10 TUSD, have they collected data on student recruitment
11 or retention?
12    A.  I know, when I worked at Morgan Maxwell,
13 that was my job, yes.  But I don't know if every
14 school has a person in my position to do that.
15    Q.  Does every magnet school have a person in
16 your position who is working on recruitment and
17 retention?
18    A.  My understanding is, yes.
19    Q.  We've talked about a lot of data that the
20 school -- that TUSD schools collect about student
21 behavior.  Are there any other categories of data on
22 student behavior that we haven't discussed?
23        MR. CUTLER:  Object to form; it's vague.
24    A.  I don't know.
25    Q.  So there are no additional --

Page 100

1        MR. CUTLER:  Object to form; misstates
2 testimony.
3    A.  I don't know.
4    Q.  I didn't finish the question so let me
5 finish it.
6    So are there any additional categories of
7 data about student behavior or student code of conduct
8 violations that we haven't discussed?
9        MR. CUTLER:  Object to form; it's
10 compound; it's vague.
11    A.  I don't know.
12    Q.  Now, are you aware of whether the schools
13 that you've worked in at TUSD conduct any surveys on
14 school climate or culture?
15    A.  Yes.
16    Q.  And what surveys do the school conduct on
17 school climate and culture?
18    A.  They send out a survey link.  I believe it
19 goes to -- I know I've gotten it.  I've received one.
20    Q.  And what's the survey -- what's the
21 substance of the survey that you've received?
22    A.  Oh, my goodness.  I don't remember.  It's
23 been a while since I've done one.  Off the top of my
24 head, do students in school feel safe, I believe, is
25 one of the questions.  Do teachers treat students with

Page 101

1 respect and then vice versa.  Do students treat
2 teachers with respect.
3    Those are like the ones that pop off the top
4 of my head right now that are on that survey.
5    Q.  And so as part of your job, it's fair to say
6 that there are a number of quantitative data points
7 that you use as a dean or in the behavioral management
8 teams; is that right?
9        MR. CUTLER:  Object to form.
10    A.  It goes beyond, in my mind, beyond just
11 paperwork.  It's my everyday, everyday experiences
12 since I've worked in schools since I started.
13    To me, that's data for me.  It may not be,
14 you know, in written form or on an online document or
15 anything, but it's all those experiences that I've
16 dealt with on a day-to-day basis.
17    Q.  I understand that.  So one question I have
18 is, in your experience, what is the purpose of
19 documenting data when it is something that's
20 documented?
21        MR. CUTLER:  Object to form; it's vague;
22 it's incomplete.
23    A.  I'm not sure I understand the question.  I'm
24 sorry.
25    Q.  So if every school in the district is using

26 (Pages 98 - 101)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 102

1 the same data, does that make is easier to be able to
2 compare schools against each other?
3         MR. CUTLER: Object to form; it's vague.
4     A. I don't know. I mean, every school deals
5 with, you know, what they deal with. However they
6 tackle or target issues, you know, I don't know.
7     Q. Let's focus on your role when you were the
8 dean at Morgan Maxwell and you were the person doing
9 the monthly data reports; right?
10     A. Yes.
11     Q. So when you're the person doing the monthly
12 data reports, you're able to compare trends in your
13 school from one month as to the next; right?
14     A. Yes.
15     Q. And you're able to use the data to identify
16 things that you could change to support students;
17 right?
18         MR. CUTLER: Object to form.
19     A. Not change, but at least bring to the
20 attention so that we can have a discussion about it.
21     Q. Right. You're able to identify areas that
22 even if you -- areas that you want to work on within
23 the school?
24         MR. CUTLER: Object to form.
25     A. What do you mean when you say "areas"?

Page 103

1 Like --
2     Q. Disciplinary trends.
3     A. I think what we try to establish, when we
4 have those meetings, is to try to bring to the
5 attention of where we need support and how to be more
6 vigilant of students. Where more problems and issues
7 occur, lunchtime, recess time. That's what we're
8 looking at.
9     Q. In at least monthly, you created a report so
10 that you could look historically at what had happened
11 in the past when you were making decisions about what
12 steps you should take in the future; is that right?
13     A. Decisions are more of steps moving forward,
14 right, like next steps, per se.
15     Q. And because you created monthly reports, you
16 were able to look at school's data from the past to
17 inform the next steps?
18         MR. CUTLER: Object to form.
19     A. School's data within the same school?
20     Q. Yes.
21     A. I would say it's just -- yeah, it's a way
22 for us to discuss a platform to discuss what we need
23 to do to improve where we found areas of concern.
24 Again mostly, where we had students miss behaving
25 more.

Page 104

1     Q. And you've also used this data to be able to
2 identify whether there are any disparities between how
3 students of different races are being treated?
4         MR. CUTLER: Object to form.
5     A. Disparities, meaning?
6     Q. Why did you document -- why did you analyze
7 behavioral data broken down by race and ethnicity?
8     A. I think that the main reason why that's the
9 way it's put into the system, so it's already in a
10 report, which is the ones that I would attach.
11         It wasn't necessarily to show one ethnic
12 group higher than the other, per se. It was more of,
13 you know, if we have a small group of, say,
14 multiracial students on our campus. Are we -- are
15 they an issue or a concern for us to kind of look at,
16 into, is the way we were asked to look at the data.
17     Q. So you look at data broken down by race so
18 that you could know whether there are particular
19 trends within groups of students?
20     A. Correct. Because the trend would turn red,
21 then that means that we have more within that racial
22 ethnicity group that were getting in trouble for
23 whatever violations we were looking at.
24     Q. And when you look at a trend turning red for
25 a particular group, you then want to be able to take

Page 105

1 steps to correct that trend?
2     A. To take some type of action plan, yes, to
3 work with those students.
4     Q. And so in all the ways that you use data in
5 your job, quantitative data like that, have you ever
6 collected data about how much time students are
7 spending on defendants' platforms?
8     A. Collected data, no.
9     Q. And do you have any data? Have you seen any
10 data of how much time students are spending on
11 defendants' platforms?
12     A. On my end, no.
13     Q. Are you aware of any other data of that --
14 the school as of how much time students are spending
15 on defendants' platforms?
16     A. I don't know.
17     Q. In any of the schools where you've worked,
18 are you aware of any data that tracks the age of
19 students who are using defendants' platforms?
20     A. Not tracks. You know, again, paper that's
21 in front of us or online system. But in my experience
22 in working in a K-8 school, I have seen very, very
23 young children on social media platforms.
24     Q. But you don't have any quantitative data
25 tracking how many students or the age of students

27 (Pages 102 - 105)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 106

1  using social media platforms?
2      A.  No.
3      Q.  And you don't have any quantitative data of
4  the particular platforms the students were using?
5      A.  No.
6      Q.  Are you aware of any attempts, within the
7  schools where you've worked, to survey students
8  themselves about the impact they believe social media
9  has?
10     A.  I don't know.
11     Q.  And are you aware of any attempts, within
12  the schools where you've worked, to survey parents
13  about the impact that they believe social media has?
14     A.  I don't know.
15     Q.  Now, we talked a little bit about how, as a
16  dean of students, you see students using different
17  devices; is that right?
18     A.  Different devices as far as logging into use
19  of phone, or are we talking about a laptop?  A
20  computer?  What?
21     Q.  So what devices do you see students using in
22  schools?
23     A.  All of them.
24     Q.  So you tell me.
25     A.  Cell phones, smart watches, laptops,

Page 107

1  desktops.
2      Q.  And are any of those devices, devices
3  provided by the school?
4      A.  Yes.
5      Q.  Which devices -- in the schools that you've
6  worked in, which devices does the school provide?
7      A.  The laptops.
8      Q.  And when does TUSD provide laptops to
9  students?
10     A.  In the beginning of the school year.
11     Q.  And are there any age restrictions on when
12  TUSD provides laptops to students?
13     A.  I wouldn't know if there's like any age
14  limitations.  But for example, schools I worked at,
15  each student were one-on-one technology so they each
16  get a laptop.
17     Q.  So for example, is that also true in the
18  elementary school, middle school years that younger
19  students are provided laptops by the school?
20     A.  Yes.  When I was at Morgan Maxwell K-8, they
21  were provided a laptop, yes.
22     Q.  And how frequently do the students, in the
23  TUSD schools where you've worked, use the laptops in
24  the school?
25         MR. CUTLER:  Object to form.

Page 108

1      A.  I don't know.
2      Q.  Are the devices that are provided by the
3  school, in the schools where you've worked, are those
4  laptops that the students bring home with them?
5      A.  They are allowed to if they sign a release
6  form by the parent, yes.
7      Q.  And when you say the device policy is
8  one-to-one, does that mean that the school provides
9  every child with a laptop?
10     A.  Depending on the school, yes.
11     Q.  Now, are you aware of whether the TUSD
12  schools where you've worked track what students are
13  doing on their laptops, the school-issued laptops?
14         MR. CUTLER:  Object to form.
15     A.  When you say "track," like check in on all
16  the devices or?
17     Q.  So for example, does TUSD or the schools
18  where you've worked, do you track which websites
19  students are accessing on the school-issued laptop?
20     A.  Oh.  I don't know.
21     Q.  Do you track how often schools are using
22  school-issued laptops?
23         MR. CUTLER:  Object to form.
24     A.  I don't know.
25     Q.  Are there any parental controls or time

Page 109

1  limitations placed on the school-issued laptops?
2      A.  I don't know.  All I know is that they put
3  in a block for certain websites that students are not
4  allowed to get on.  However, it's very easy for a
5  student, especially within tech savvy students, that
6  know how to, you know, get through, you know, the
7  blocks.
8      Q.  And so setting aside the school-issued
9  laptops, you said the students have other devices at
10  school; is that right?
11     A.  Correct.
12     Q.  Do you have any -- strike that.
13         Do any TUSD schools where you've worked
14  track what websites students use on the other devices,
15  the non-school-issued devices?
16     A.  Can you repeat the question?  I'm sorry.
17     Q.  Sure.  On the non-school-issued devices that
18  students use, does TUSD track what websites students
19  are accessing?
20     A.  There's no way for them to be able to track
21  that.  That's their own personal devices.
22     Q.  So on non-TUSD devices, does TUSD track what
23  apps students are using?
24     A.  Again there's no way that TUSD would know
25  what they're using on their phones or what they're

28 (Pages 106 - 109)

Page 110

1 using on their other personal devices.
2 Q. So TUSD has no way of knowing what students
3 are actually doing on these devices?
4 MR. CUTLER: Object to form.
5 A. I mean, I don't know other than when
6 students, again, come and show me what is going on on
7 their own personal devices.
8 Q. And so aside from students who directly show
9 you something that's on their device, you as an
10 administrator don't have a way to know what students
11 are doing on their device?
12 A. Yeah. I don't know. I don't know.
13 Q. Do you know if, for any of the platforms
14 that students are using, TUSD tracks what particular
15 features they're using on those platforms?
16 A. I don't know.
17 Q. Do you know of anyone who has done an
18 analysis of what features students are using on what
19 particular platforms?
20 MR. CUTLER: Are you talking about on
21 their own devices still?
22 MS. REAVES: On students' personal
23 devices.
24 MR. CUTLER: Asked and answered.
25 A. I don't know.

Page 111

1 Q. Do you know which of your students have
2 parental controls on their personal devices?
3 A. I don't know.
4 Q. Do you know which of your students have time
5 limits set on their personal devices?
6 A. I don't know.
7 Q. Do you track what video games your students
8 play?
9 A. I don't know.
10 Q. When you say you don't know, does that mean
11 you don't know whether or not you track it, or does it
12 mean that you don't track it?
13 A. I don't know if anybody is tracking it. I
14 don't know.
15 Q. Do you track what move movies or television
16 streaming apps that students in TUSD schools use?
17 A. I guess I'm just getting a little bit
18 confused with you saying you, because then if it's me,
19 then no, I don't -- I don't track.
20 Q. That's fine. And are you aware of anyone
21 else in the school that tracks any data about how
22 students are actually using their personal devices?
23 A. I don't know.
24 MR. CUTLER: Can we take a quick break?
25 MS. REAVES: You want to take a break?

Page 112

1 That's fine.
2 THE VIDEOGRAPHER: We are going off the
3 record. Time is 11:09.
4 (Whereupon, a recess was taken.)
5 THE VIDEOGRAPHER: We're back on the
6 record. Time is 11:23.
7 BY MS. REAVES:
8 Q. I want to ask you a little bit about, in
9 your role or the roles you've had at TUSD, what
10 information you have about student mental illness;
11 okay?
12 A. Okay.
13 Q. Now, in any of the roles you've had at TUSD,
14 do you get information about students' mental health
15 diagnoses?
16 A. Information as far as if it's discussed or
17 if it's brought up?
18 Q. So you tell me. Are there circumstances
19 when you have -- when you know that a particular
20 student has a mental health diagnosis?
21 A. On occasion, I will be informed.
22 Q. And on those occasions, who is informing you
23 about a mental health diagnosis?
24 A. Either a school psychologist or a caseworker
25 for a student.

Page 113

1 Q. And what's the reason that you are being
2 informed about a student's mental health diagnosis?
3 A. So in some cases, it would be so that I
4 would know how to approach the student if I'm dealing
5 with a discipline issue with a student.
6 Q. And do you have -- for students, in general,
7 is there any way that you're able to see which of your
8 students have a mental health diagnosis?
9 A. My school is so big, and I'm only one person
10 for the entire school, so it would be very difficult
11 for me to know which ones unless it's brought to my
12 attention somehow.
13 Q. And is your role focused on -- strike that.
14 Is knowing a student's mental health
15 diagnosis, or if there is one, that necessary to
16 your role?
17 A. Again, just in the sense of me finding a way
18 to approach the student in discussion or knowing, you
19 know, for example, the student can go from zero to 100
20 because, you know, they're -- it's part of what has
21 been diagnosed for them, right, as far as OD or ODC,
22 oppositional defiant disorder or something like
23 that. And I'll know, for example, don't approach them
24 in a way where it's very stern. Be a little more
25 welcoming in that sense.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 114

1    Q.   And on the occasions when you're informed
2  about a student's mental health diagnosis, is that
3  information coming that's from -- that's part of the
4  student's IEP or?
5    A.   As far as, yes, if it's a diagnosis that's
6  listed on there, then there would be a way for me to
7  know that based on their IEP.
8    Q.   Or to ask it a different way:  If a student
9  has a mental health diagnosis from a private provider
10 that is not part of an IEP, are you made aware of that
11 diagnosis?
12          MR. CUTLER:  Object to form.
13   A.   I mean, if it's listed on there, then it
14 would show where it's coming from.  Other than that,
15 there would be no other way for me to know.
16   Q.   So for students who don't have an IEP, you
17 don't have any source of information about their
18 mental health?
19   A.   No.
20   Q.   Do you know what percentage of students at
21 your school currently have a diagnosed mental illness?
22   A.   I don't know.
23   Q.   And do you -- have you known that percentage
24 for any of the schools where you've worked?
25   A.   I don't know, no.

Page 115

1    Q.   Aside from IEPs, do you ever have access to
2  students' 504 plans?
3    A.   Access in being able to look a student up if
4  I need to, yes.
5    Q.   Do 504 plans include information about a
6  student's mental health diagnosis if they have any?
7    A.   If it's a mental health issue, it should be
8  noted on there, yes.
9    Q.   So aside from IEPs and 504 plans, there are
10 no other sources that you have for knowing a students'
11 member health illness?
12   A.   That I would be able to look up a student,
13 no.
14   Q.   And if you don't have access of their -- to
15 documentation in either a 504 plan or an IEP, you
16 would only know the mental health diagnosis if someone
17 happened to tell you?
18   A.   That would be correct.
19   Q.   Now, on the occasions when you have been
20 informed about a student's mental health diagnosis,
21 have you also received information about the cause of
22 that diagnosis?
23   A.   No.
24   Q.   Are you aware of whether other staff, at the
25 schools where you've worked, receive information about

Page 116

1  the cause of a particular mental health diagnosis?
2    A.   I don't know.
3    Q.   Have you ever seen documentation of a
4  student who is diagnosed by a psychologist with social
5  media addition?
6    A.   Me personally have seen something like that,
7  no.
8    Q.   A few minutes ago you were talking about how
9  TUSD may need to implement a different cell phone
10 policy; is that right?
11   A.   It's one policy for the district.  Each
12 school was given the discretion of how they wanted to
13 roll that out.
14   Q.   So I want to talk a little bit about the
15 district-wide policy; okay?
16          Before we talk about that, I think you
17 mentioned that there might be a statewide law or
18 policy that's being implemented?
19   A.   Yes.
20   Q.   Can you tell us what that is?
21   A.   I don't remember the numbers or name of that
22 law.  I just know that it was brought up in one of our
23 meetings prior to school starting this year, stating
24 that it would be in effect if passed or something the
25 28th of this month is the dates that I remember for

Page 117

1  that.
2    Q.   And we don't need to know the code number or
3  the implementation date.  In terms of the substance of
4  the law, what's your understanding of how it will
5  impact TUSD schools?
6    A.   That it is not supposed to be used during
7  instructional time in the classrooms at all.  The only
8  time that a student can use it is before school
9  starts.  For high schools, during lunch and after
10 school.  I'm not sure what the policy would be for
11 like kinder through eighth grade, but that's how it
12 was presented to us.
13   Q.   And when you say "it," the it that can't be
14 used, is that referring to cell phones, electronic
15 devices, or something else?
16   A.   It's strictly cell phones.
17   Q.   And this is a statewide law that has not yet
18 been implemented?
19   A.   It's been brought up or mentioned.  I'm not
20 sure.  I mean, politics.  But that's the only thing I
21 remember from that is that the 28th will be the actual
22 date.
23   Q.   So I just want to be clear.  Your saying
24 that your understanding is the 28th of September,
25 2025, is when this new policy is supposed to be

30 (Pages 114 - 117)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

1 implemented?
2    A.  Correct.
3    Q.  So let's talk about what the policy
4 currently is in the district, and we'll talk about the
5 schools where you worked.
6        MS. REAVES:  So I want to mark -- I
7 think we're on Exhibit 10.  This is going to be
8 Tab 14.  I'm going to give you a paper copy and
9 pulling it up on the screen.
10       (Whereupon, Exhibit 10 was marked or
11 identification.)
12   Q.  So do you recognize Exhibit 10 as the
13 "Tucson Unified School District Governing Board Policy
14 of Student Use of Cell Phones and Other Electronic
15 Devices"?
16   A.  I'm reading that right now.  Yes, that's
17 what it says.
18   Q.  And so when you said there's a district-wide
19 policy, is this the policy that you're referring to?
20   A.  That's the one that the district tends to
21 put in place, yes.
22   Q.  Are you familiar with this policy?
23   A.  To say that I have seen it and read through
24 it thoroughly, no.
25   Q.  So I can give a minute to look at that and

Page 119

1 let me know when you're ready.
2    A.  Thank you.  Okay.
3    Q.   So have you read through the district-wide
4 policy on student use of cell phones and electronic
5 devices before today?
6    A.  Not thoroughly.
7    Q.  And have you been trained on the
8 district-wide policy on student use of cell phones and
9 other electronic devices?
10   A.  Just on campuses that I've worked on, which
11 is why it says in Bullet Number 3, "The principal
12 shall establish," and that's where it's brought to our
13 attention how the policy is getting rolled out in our
14 school.
15   Q.  So let's go through this policy.  So the
16 second paragraph, "Students may possess and use
17 cellular telephones and/or electronic signaling
18 devices, subject to the limitations of this and other
19 policies in the district under the following
20 conditions and guidelines."
21      So as a baseline, TUSD's school-wide policy
22 does allow student to bring cell phones to school; is
23 that right?
24   A.  Yes.
25   Q.  And there are conditions and guidelines that

Page 120

1 the district policy sets out; is that right?
2    A.  Correct.
3    Q.  So one of the conditions or guidelines is
4 that "Cell phones and/or electronic devices are to be
5 kept out of view in a student's locker, pocket, or
6 carrying bag."
7      Do you see that?
8    A.  Yes.
9    Q.  Are you aware of a district-wide policy on
10 where exactly a student should keep their cell phones?
11   A.  District-wide policy aware of that, no.
12   Q.  The next bullet is "Such devices shall not
13 be turned on or used during instructional time, except
14 as authorized by the teacher."
15      Are you aware of a district-wide policy on
16 how this language should be implemented?
17   A.  District wide, no.
18   Q.  So for example, is there a district-wide
19 definition of what counts as instructional time where
20 students should not have their cell phones on?
21   A.  So I'm going to switch into the role of when
22 I was a teacher.  And the way this would -- and what
23 it would mean for me is, from bell to bell, students
24 should not be on their devices unless I give them
25 authorization for something educational related would

Page 121

1 be the only exception.
2    Q.  And when you say "bell to bell," what does
3 that mean?
4    A.  Well, coming from my experience being in
5 middle school, it would be from beginning of the class
6 period to the end of the class period.
7    Q.  And so in your experience as a teacher, did
8 the middle schoolers have a change period where they
9 went to a different classroom?
10   A.  Yes.
11   Q.  In that change period, was that considered
12 instructional time where cell phones were prohibited?
13   A.  Transition period?
14   Q.  Yes.
15   A.  On the transition periods, the student
16 could, you know, reply to a text to a parent or
17 whatnot.  That would be the exception.  But if they
18 were with their phones recording or filming or doing
19 something they shouldn't be doing, then it was brought
20 to the attention of the administration.
21   Q.  And do you know whether this bell-to-bell
22 policy, where students are allowed to use their
23 devices during transition periods, do you know if that
24 applies district wide or just from your experience at
25 your schools?

31 (Pages 118 - 121)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1    A.   Again that was just for the principal
2 because the principal was the one that was able to
3 establish those guidelines for us and provide clarity.
4    Q.   And there's a fourth sentence, "Except as
5 authorized by the teacher."
6        Do you know if there is a district-wide
7 policy on when teachers are allowed to authorize
8 device use during instructional time?
9    A.   District wide, I don't know.
10   Q.   The next bullet is "The principal shall
11 establish additional guidelines appropriate to campus
12 needs."
13       Do you see that?
14   A.   Yes.
15   Q.   And so in your experience, different
16 principals have established different guidelines?
17   A.   Correct.
18   Q.   And we're going to talk through that once we
19 finish the district-wide policy.
20       "Students violating the policy may have the
21 electronic device confiscated and be subject to
22 disciplinary action."
23       Do you know if whether there is a
24 district-wide policy on when to confiscate an
25 electronic device?

Page 123

1    A.   District-wide policy, no.
2    Q.   And do you know whether there is a
3 district-wide policy on what disciplinary action a
4 student would be subject to for violating this policy?
5    A.   Following code of conduct.
6    Q.   Following the code of conduct, what do you
7 mean by that?
8    A.   The code of conduct will say if it's the
9 violation for cell phone or misuse of technology,
10 which always falls under cell phone, unfortunately.
11 That's what they're referring to.
12   Q.   And I think you said earlier that the actual
13 disciplinary action might depend on the number of
14 times you have violated that code of conduct?
15   A.   Yeah.  First offense, second offense, third
16 offense.  Yes, it's progressive.
17   Q.   So you talked about there's a district-wide
18 policy on use of cell phones during transition
19 periods.  Is there a district-wide policy on use of
20 cell phones during, for example, assemblies?
21       MR. CUTLER:  Object to form.
22   A.   District wide, I don't know.
23   Q.   And do you know of any district-wide
24 policies on the use of cell phones for
25 extra-curricular activities that happen at school?

Page 124

1    A.   I don't know.
2    Q.   Do you know of any district-wide policies
3 for the use of cell phones on school buses?
4    A.   I don't know.  But my experience has shown
5 that students are always on their phones on school
6 buses and fieldtrips and that's been my experience.
7    Q.   And are you aware of whether the district
8 considers that a violation of this policy, if on a
9 fieldtrip or on a school bus, students are using cell
10 phones?
11   A.   Yeah.  Again it's in the discretion of the
12 principal for that school.
13   Q.   So you've worked at a few different TUSD
14 schools?
15   A.   Yes.
16   Q.   Is it, in fact, your experience that
17 different principals implement this policy
18 differently?
19       MR. CUTLER:  Object to form.
20   A.   The general understanding of what the policy
21 is is pretty much the same, but they can then add
22 something else or implement the use and where within
23 the campus.
24   Q.   So let's talk about a few specific schools
25 just so that we can get more concrete.

Page 125

1        Starting with Mansfeld Middle School, and
2 that's the one where I think you worked there were
3 2015 to 2018?
4    A.   No.  Mansfeld.  I'm sorry.  Yes, correct.
5    Q.   So Mansfeld Middle School, where you worked
6 as a teacher from 2015 to 2018.
7    A.   Correct.
8    Q.   Now, at Mansfeld Middle School when you
9 worked there, was a school-wide approach to enforcing
10 the cell phone policy?
11   A.   Yes.
12   Q.   And what was that approach?
13   A.   Students should not be on their phones
14 during instructional time.
15   Q.   And how was that policy enforced?
16   A.   Students in my classroom knew that they
17 could not have their phones out, that it was time to
18 learn.  I would say 99.9 percent of the time students
19 comply because they wanted to do well in my classroom.
20   Q.   And when we're talking about 2015 to 2018,
21 you were a veteran teacher at this point; right?
22   A.   Yes.
23   Q.   You had been teaching for a couple decades?
24   A.   Yes.
25   Q.   Did you ever have very new teachers in your

32 (Pages 122 - 125)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 126

1 school?
2     A.   New teachers meaning first time?
3     Q.   First-time teachers or second-year teachers.
4     A.   I would say, yeah, a couple times.
5     Q.   So in your classroom, how did you get almost
6 99 percent compliance with the cell phone policy?
7     A.   Students knew, when they'd come in, that I
8 didn't want to hear the phones go off. I didn't want
9 to see their cell phones at all. They knew that if it
10 was an exception, that something was going on, that a
11 parent, for example, would want to get in contact with
12 them, that they would just have to come up and like
13 let me know. And there was, you know, very rare
14 occasion where there would be an interruption for
15 that.
16        But most of the parents understood, when we
17 would do open house, I made it part of my agenda, when
18 I would explain to the parents, you know, what my
19 expectations were for learning in the classroom, and
20 cell phones were just not part of it.
21     Q.   And sounds like, by communicating very clear
22 expectations, your students kept their cell phones
23 away during class?
24        MR. CUTLER:  Object to form.
25     A.   That could be part of it. Could be other

Page 127

1 things. I would say other factors that took place
2 with it. In my mind it was about, you know, getting
3 students to -- there was no need for the phone to be
4 used or brought out. It was the learning happening
5 within my classroom.
6        It did change a lot of my teaching
7 techniques, I would say, from when I first started
8 because, you know, in this time a lot of students had
9 cell phones. And so it goes back to how do you engage
10 them in the learning? And they have to be through
11 videos. They have to be through, you know, showing
12 and projecting something on the screen because that's
13 what they were used to. They were used to being on
14 their phones for long periods of time. So I kind of
15 had to change my teaching strategy and techniques with
16 them.
17     Q.   So when you talk about the cell phone policy
18 at Mansfeld Middle School, obviously you can speak to
19 what was happening in your classroom.
20     A.   Correct.
21     Q.   Can you speak to how the cell phone policy
22 was implemented in other classrooms within the school?
23     A.   I mean, it was a school-wide policy. I
24 would think everybody was doing the same, but I don't
25 know if teachers used exceptions or got permission to

Page 128

1 use phones. But I was just responsible for my
2 classroom and my students.
3     Q.   Do you know if there are any teachers who
4 are more or less effective at enforcing this policy
5 within their classrooms?
6        MR. CUTLER:  Object to form.
7     A.   I don't know.
8     Q.   And were there any specific strategies or
9 practices that teachers were instructed that they
10 should use in order to implement the policy?
11     A.   We were all just pretty much told that
12 that's the policy we were going to implement and that
13 that was how we would follow it so that we could apply
14 code of conduct when violations would occur.
15     Q.   Did you have to confiscate cell phones in
16 your classroom when you worked at Mansfeld Middle
17 School?
18     A.   I did not.
19     Q.   Do you know whether or not there were other
20 teachers who had to confiscate cell phones in their
21 classrooms?
22     A.   Yes, there were.
23     Q.   Do you know the frequency at which other
24 teachers had to confiscate cell phones?
25     A.   Off the top of my head, I can't say, but it

Page 129

1 was happening in other classrooms. Through our
2 meetings, when we would have our grade-level meetings,
3 that was a hot topic.
4     Q.   Would you place yourself in terms of
5 teachers who are able to eliminate cell phone use from
6 the classroom? Sounds like you're at 99 percent.
7     A.   Right.
8     Q.   How many -- what percentage of classrooms
9 were at 99 percent like you?
10        MR. CUTLER:  Object to form.
11     A.   I don't know. I don't know.
12     Q.   How frequently did you, in your broader team
13 meetings, have to discuss other classrooms where cell
14 phone use was an issue?
15     A.   It was brought up every meeting.
16     Q.   And did other teachers ever come to you to
17 ask what you're doing in your classroom to prevent
18 cell phone use within the classroom?
19     A.   Other teachers were asked to come and
20 observe my classroom, yes, to see how I would start
21 from beginning to end of my class.
22     Q.   So you were considered a model for somebody
23 who could effectively implement this policy?
24        MR. CUTLER:  Object to form.
25     A.   I mean, I don't know a model, but some

33 (Pages 126 - 129)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1 teachers would come and visit, yes.
2      Q.  What about when you were at Roskruge
3 Bilingual K-8?  My understanding is when you worked at
4 Roskruge Bilingual, you were the magnet coordinator;
5 correct?
6      A.  Correct.
7      Q.  So you didn't have your own classroom at
8 this point?
9      A.  Correct.
10     Q.  Did you observe what implementation of the
11 cell phone policy looked like at Roskruge Bilingual?
12     A.  The implementation of it?
13     Q.  Yes.
14     A.  I worked with the principal hand-in-hand to
15 make sure that we created the actual policy.
16     Q.  What was the policy at Roskruge Bilingual
17 when you worked there?
18     A.  I knew you were gonna say that.  First
19 offense was a warning.  Second offense, the phone
20 would be confiscated.  Third offense, I believe the
21 parent had to show up for it; it was put under lock
22 and key.  And then fourth offense, and so on and so
23 on.  It just progressed from there was typically how
24 it was set up.
25     Q.  And at Roskruge Bilingual, was this also a

Page 131

1 bell-to-bell policy, the same as at Mansfeld?
2      A.  Yes.
3      Q.  And did you observe whether or not teachers
4 were able to actually implement the policy in their
5 classrooms?
6      A.  Observe, meaning being in the rooms when
7 they were discussing the policy, no.
8      Q.  Did you have any other way of knowing
9 whether or not teachers were able to implement the
10 cell phone policy at the school?
11     A.  They were given the exact same policy and
12 were expected to share with the classrooms, yes.  But
13 I know that there was many, many violations of cell
14 phones during my time at Roskruge.
15     Q.  Now, when there were these many violations
16 of the cell phone policy, what did the school do about
17 it?
18         MR. CUTLER:  Object to form.
19     A.  As far as the school, I wasn't discipline at
20 the time.  My position had nothing to do with how, you
21 know, that was handled or by whom.  All I know is
22 teachers, it was brought up in discussions when we had
23 our professional development days on Wednesdays.
24     Q.  Were there differences between Mansfeld
25 Middle School and Roskruge Bilingual in the

Page 132

1 school-wide approach to cell phones?
2      A.  Differences, I would say generally it was
3 about the same.
4      Q.  And were there differences in the
5 effectiveness of the school-wide policy at Mansfeld
6 Middle School versus Roskruge Bilingual?
7      A.  I can only speak for myself in the
8 effectiveness.  For others, I know that it was an
9 issue.
10     Q.  All right.  So let's talk about Morgan
11 Maxwell K-8.  What was the cell phone policy at Morgan
12 Maxwell when you worked there?
13     A.  Very, Very similar to Roskruge cell phone
14 policy.  First violation, warning.  Second violation,
15 the -- it would be confiscated and sent to the office,
16 and the phone was returned to the student at the end
17 of the day.  And then third violation was confiscated
18 and put in -- again sent to the office, but parent
19 would have to come pick it up.
20     Q.  And you said it was very similar to
21 Roskruge.  Did Mansfeld Middle also have this system
22 of number of violations have different disciplinary
23 reactions?
24     A.  Okay.  Can you restate that?
25     Q.  Let me rephrase.

Page 133

1         So you said that Morgan Maxwell's policy was
2 similar to Roskruge Middle's policy.  Was it also
3 similar to Mansfeld's Middle policy, or was it
4 different from Mansfeld?
5      A.  Oh, my goodness.  Mansfeld, again very
6 vaguely can I remember it because it didn't really
7 apply to me.  Like, I don't think it was an issue that
8 I had that I had to kind of, you know, recall it,
9 exactly.  I'm sorry.  No, I don't recall exactly how
10 it was for Mansfeld.
11     Q.  So at Morgan Maxwell, was there any
12 school-wide approach to enforcing this bell-to-bell
13 policy?
14     A.  Enforcing in the sense of parent
15 notification, there was what we would call robo calls
16 sent out to parents about making sure students
17 weren't, you know, using their cell phones during
18 instructional time.
19         There was an effort, I would say, to stop
20 kids from using their phones while they're in school.
21     Q.  And at Morgan Maxwell, you are now your role
22 as a dean; correct?
23     A.  Correct.
24     Q.  So you actually do have involvement with
25 disciplinary issues?

34 (Pages 130 - 133)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 134

1    A.  Yes.
2    Q.  So did you have insight into whether this
3  policy was being consistently enforced across
4  classrooms within Morgan Maxwell?
5    A.  If we're gonna say enforced, effort, it was
6  there.  Unfortunately, what students would do is
7  complete, you know, opposite.  We're talking middle
8  school are age students.
9        That was my time where there was a lot of
10  those TikTok challenges, you know, that I mentioned.
11  And, you know, students destroying school property,
12  stealing stop signs, stealing just things off
13  teachers' desks as part of, you know, this challenge.
14  Several fights.
15        Another challenge, you know, that was
16  happening there was what they called, I guess, a
17  "Black out challenge."  That was a couple times, too,
18  when I was there.  But, you know, students on their
19  phone constantly was definitely an issue at Maxwell.
20    Q.  I want to break that down a little bit.  So
21  again you mentioned what you're calling challenges?
22    A.  Yes.
23    Q.  And your understanding is these challenges
24  are students see posts or videos online and try to
25  make their own posts or videos?

Page 135

1    A.  Just to understand, yes, because they would
2  call them that:  "TikTok challenge."  So yeah, to me,
3  that's what it, you know, meant.
4    Q.  And students had told you that that is a
5  challenge?
6    A.  Yes.
7    Q.  And you also said that there were students
8  destroying school property, stealing stop signs,
9  stealing things off teachers' desks, fights, and you
10  believe that those issues were related to cell phone
11  use?
12        MR. CUTLER:  Object to form.
13    A.  They had to use their phone to be able to
14  record and video themselves.
15    Q.  And so the reason that these issues are
16  related to cell phone use is because students are
17  using their phones to take videos to send messages to
18  create posts?
19    A.  Yes.  To record them, yes.
20    Q.  And going back to specifically the policy, a
21  question was is the policy on cell phone use enforced
22  differently in classrooms within Morgan Maxwell when
23  you were the dean there?
24    A.  The policy was created and placed and
25  explained, just like as in other schools I've worked

Page 136

1  at.  So there was -- it was set, you know, to be
2  followed, but there was a lot of violations of the
3  phones.
4        So we collected anywhere from -- and it was
5  a smaller school.  I would say we collected anywhere
6  from 10 to 20 phones on a daily basis from students.
7    Q.  Now in Morgan Maxwell, were there classrooms
8  where, like your classroom, teachers 99 percent of the
9  time did not have a problem with the violation of the
10  cell phone policy?
11        MR. CUTLER:  Object to form.
12    A.  I mean, I knew there were some teachers that
13  didn't have issues with the phones, maybe, yeah.  But
14  it was, again, just during those periods of times when
15  students were going to the restroom or lunchtime or
16  recess time.  That's when.
17    Q.  So I'm going to break this down into
18  parts.  So there were classrooms at Morgan Maxwell,
19  like your classroom, where the teacher was able to
20  effectively enforce the no cell phone use policy in
21  the classroom?
22        MR. CUTLER:  Object to form; misstates
23  testimony.
24    A.  I mean, I would say that there might have
25  been a class or two that we didn't get a lot of the

Page 137

1  cell phone violations within the classroom.
2    Q.  So there was some classrooms where you
3  didn't get a lot of cell phone violations?
4    A.  Correct.
5    Q.  And there are others where you might have
6  gotten more cell phone violations?
7    A.  Yes.
8    Q.  And then you said that there were also
9  sometimes cell phone violations that were occurring
10  when students went to the restroom or lunchtime or
11  recess; is that right?
12    A.  Correct.
13    Q.  The restroom, lunchtime, and recess, were
14  those considered instructional time?
15    A.  The student was in the classroom.  That
16  should have been considered instructional time, yes.
17    Q.  Well, so we're talking about when the
18  student is in the restroom, in lunchtime, or in recess
19  and so they're not in the classroom.
20        So under TUSD's policy, if you're in the
21  restroom, lunchtime, or recess, is that considered
22  instructional time?
23        MR. CUTLER:  Object to form; misstates
24  testimony.  Argumentative.  Go ahead.
25    A.  The restroom again is part of instructional

35 (Pages 134 - 137)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1 time. They're requesting a little break off within
2 the classroom, and there's not supervision of what the
3 student could be doing with their phone or any other
4 device, per say.
5        So there's -- yes, they shouldn't have their
6 phone on them.
7     Q.  And how was it -- or was it communicated to
8 students that using cell phones in the restroom is a
9 violation of a policy against using cell phones during
10 instructional time?
11        MR. CUTLER:  Object to form.
12     A.  It was explained to them when the cell phone
13 policy was explained to the parents and within the
14 classrooms.  You know, how it read was that they
15 should not have their phones with them.  And the
16 restroom was considered a private area, so they should
17 definitely haven't been having their phones while they
18 were into the restroom.
19     Q.  Was there anything that you know of that
20 Morgan Maxwell did as a school to try to enforce the
21 policy that students were not supposed to use cell
22 phones when they went to the restroom during class?
23     A.  Just in the way that it was explained to
24 them that they shouldn't, but there was violations
25 because students were recording each other in the

1 restroom.
2     Q.  Let's talk about lunchtime.  Is lunchtime
3 considered instructional time?
4     A.  No.
5     Q.  And so in any of the schools that you've
6 been at, has cell phone use been banned during
7 lunchtime?
8     A.  Any of the schools I was at during
9 lunchtime, no.
10     Q.  And you also mentioned recess.  At any of
11 the schools where you have worked, has cell phone use
12 been banned during recess?
13     A.  Recess is considered a short little break
14 from the instructional time.  It's still under
15 supervision of the teachers, so that was their
16 responsibility to monitor and make sure students
17 weren't doing something inappropriate with their
18 phones, if they had them on them.
19     Q.  So for the teachers who were able to enforce
20 the cell phone policy within their classroom, do you
21 know what those teachers were doing to enforce the
22 cell phone policy?
23     A.  No.
24     Q.  Let's talk about Tucson High Magnet School.
25 Now, what is the school-wide cell phone policy at

1 Tucson High?
2     A.  They just sent it out, too.  I believe first
3 offense, a warning.  Again, they all start with a
4 warning.  Second offense, the monitor -- school
5 monitor or an administrator is, you know, called to
6 the classroom.  This is within the same -- let's just
7 say the same class period, right.  The student is told
8 to put the phone away, student does it for a little
9 bit, then is caught with the phone out again.  Then
10 that's when the teacher would call for a monitor.  The
11 student's phone is taken away.  It is locked away in
12 the administrator's office.  Student can go and
13 collect their phone at the end of the day.
14        That's on the first offense, let's say,
15 Monday.  And then Tuesday comes around, same student,
16 right.  Comes back out with the phone, teacher can,
17 you know, issue a warning if they like and say, "Hey,
18 can you put the phone away?"  Student does it again,
19 and that would be considered a second offense.  So the
20 second offense again is noted either by the
21 administrator.  If they're placing it into either an
22 observation, the teacher could be noting it as an
23 observation, second time, student is, you know,
24 violation for inappropriate use of cell phone.
25        Then from there is when the parent is then

1 called and said this is the second violation, you
2 should come pick up the phone.
3     Q.  That's a description of the, kind of,
4 disciplinary responses to the violation of the policy?
5     A.  Correct.
6     Q.  In terms of the actual policy, is it bell to
7 bell?  Is it something else?  When are students
8 allowed or not allowed to use cell phones?
9     A.  Instructional time.  Again period to period,
10 bell to bell, unless the teacher is using the phone
11 for educational purposes within the classroom,
12 monitored by the teacher again.
13     Q.  And on what occasions is a teacher using a
14 phone for educational purposes?
15     A.  I know, for example -- I'm going to give you
16 an example.  The student, for example, that does not
17 have access to a laptop, and so they can access the
18 platform of where they're supposed so submit an
19 assignment, they can access it through their phone as
20 well.  So a teacher may say, "Yeah.  Go ahead and do
21 your assignment on the phone and submit it because
22 it's due today."  That's an example.
23     Q.  And so on those occasions, the student might
24 be allowed to use their personal cell phone device to
25 be able to complete the assignment?

36 (Pages 138 - 141)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

1    A.   Correct.
2    Q.   Are there any other examples that come to
3 mind of times when teachers authorize cell phone use
4 within a classroom?
5    A.   No.
6    Q.   Do you know of any teachers who allow the
7 students to use their personal devices, say, if they
8 finish their work early?
9    A.   That was something that was explained to us
10 at the beginning of this school year that they did not
11 want happening because then that opens up the
12 opportunity for students to be on their devices and
13 doing things that we're not aware what they're doing.
14    Q.   So at the beginning of the 2025-2026 school
15 year, teachers and staff were instructed to not allow
16 students to use cell phones in class, even if they
17 finished their work?
18    A.   Correct.  For downtime.  That's what they
19 described it.  No use of cell phones for downtime in
20 the classroom.
21    Q.   And before the 2025-2026 school year, was
22 there a policy on whether teachers could authorize
23 students to use their cell phones for downtime in
24 class?
25    A.   Not that I'm aware, no.

Page 143

1    Q.   So as far as you're aware, that would have
2 been left up to the individual teacher?
3    A.   That would have been left up to the
4 principal.  Again the principal creating that plan.
5 In the school that I worked at, that wasn't part of
6 the policy that they could use their phones.
7    Q.   You worked at Tucson High Magnet School this
8 past school year; correct?
9    A.   Correct.
10    Q.   And so there wasn't a policy on downtime
11 this past school year; correct?
12    A.   Policy where it was like emphasized and
13 stressed like it was this year, not that I'm aware of,
14 no.
15    Q.   And so do you know what the practice was in
16 classrooms, whether there are any teachers who allowed
17 students to use their personal devices during
18 downtime?
19    A.   I don't know.
20    Q.   So at Tucson High Magnet School, you're
21 aware they recently piloted the Yondr pouch program?
22    A.   I'm sorry.  What was it again?
23    Q.   Are you aware that TUSD previously used
24 Yondr pouches in Tucson High Magnet School?
25    A.   No, I'm not aware.

Page 144

1    Q.   And so in your time at Tucson High Magnet
2 School, has there ever been a proposal to have a
3 physical location where every student could put their
4 cell phone when they arrive at school?
5        MR. CUTLER:  Object to form.
6    A.   I don't know.
7    Q.   Is there any TUSD school where you've worked
8 where there has been a physical locker, cell phone
9 locker, other another place for students to place
10 their cell phones at the beginning of the school day
11 and come get it again at the end of the school day?
12    A.   The schools I've worked at?
13    Q.   Yes.
14    A.   No.
15    Q.   And in the schools that you've worked at,
16 sticking with the middle schools and high schools, do
17 students have lockers?
18    A.   No.
19    Q.   And in the schools that you've worked at,
20 the middle schools and high schools, have the students
21 carried backpacks?
22    A.   Yes.
23    Q.   Has there ever been -- in any of the schools
24 that you've worked at, has there ever been a policy
25 that your cell phone needs to be in your backpack for

Page 145

1 the entire day?  You need to get permission to take it
2 out of your backpack?
3    A.   There are certain teachers that would do
4 that, but I don't -- I don't know like to be for sure,
5 like.
6    Q.   So you don't know -- you're aware of
7 particular teachers who have had an even more strict
8 cell phone policy than the school-wide one?
9    A.   The only reason I could say that is when my
10 own children were in school.  Certain teachers
11 wouldn't allow them to take their phones out at all.
12 They couldn't even be on their person.  It had to be
13 in their backpack.
14    Q.   And do you know whether the students
15 complied with that policy?
16    A.   I don't know.
17    Q.   Do you know whether your students complied
18 with that policy?
19    A.   Mine had to.
20    Q.   A couple of times you've testified about
21 challenge videos or challenge posts.  Do you remember
22 that?
23    A.   Yes.
24    Q.   In your understanding of these challenges,
25 are you ever aware of the defendants' platforms, the

37 (Pages 142 - 145)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 146

1 makers of these social media platforms, offering cash
2 prizes so that students would participate in these
3 challenges?
4      A.   Cash prizes I would have to say, no.
5 However, in the students having their little
6 conversations about what their goal is is to out do
7 one another, creating more followers, creating more
8 likes.  A lot of them, under this understanding, that
9 if they create a video that is, I don't know, X long
10 and viewers can watch it for the entirety of it, that
11 there would be some kind of monetary compensation is
12 how these kids would talk, you know.  That there was a
13 way for them to become rich or reach famous status or
14 become, what's the term I'm gonna use, influencers.
15      So those were the things that students would
16 discuss when it came to the content or what they were
17 trying to upload or what they were trying to out-do
18 one another with, and the challenges was a very
19 popular one during that time when I was at Maxwell.
20      Q.   So you are not aware of any of these
21 challenges that had a platform, specifically, giving
22 students money, but students have told you that they
23 were motivated to participate in these challenges for
24 various reasons?
25      MR. CUTLER:  Object to form; misstates

Page 147

1 testimony.  Go ahead.
2      A.   I mean, that's just what they would say.
3 You know, as far as me knowing that there was
4 something with a cash prize or anything, no.
5      Q.   You're relying on what they told you?
6      A.   Yes.  Pretty much in that case.
7      Q.   And are you aware -- are you aware of any of these
8 challenges, are you aware of whether one of the
9 defendants' social media platforms themselves created
10 the challenge in the first place, or whether the
11 challenge initiated from some other person in the
12 world?
13      A.   I could not say.  Again, you know, when I
14 would just hear the titles of the challenges and a lot
15 of them had the actual title from the students, right,
16 calling it a TikTok challenge, I never did research
17 myself to see where it was coming from.  But I knew
18 that's where they were trying to post and upload it.
19      Q.   And so you are basing your understanding on
20 what students told you about what they were doing?
21      MR. CUTLER:  Object to form; misstates
22 testimony.
23      A.   Just in the fact of them trying -- of where
24 they were going to post it is what, you know, was of
25 concern.  And it was taking up school time.  It was

Page 148

1 disruptive.  It was taking away from their learning in
2 the classroom.  So that's my bigger concern.
3      Q.   Yes.  So my question -- I understand you're
4 telling me your concern.
5      My question is about how you know what the
6 students were going to do, and is it correct that
7 students are telling you what they are planning to
8 post or where they're planning to post?
9      MR. CUTLER:  Object to form.
10      A.   A lot of them would show me their videos
11 that they uploaded.
12      Q.   Do you have any documentation of the
13 percentage of students who showed you a video as
14 opposed to told you about a video?
15      A.   I don't have documentation other than just
16 my experience with students.
17      Q.   I want to talk about some of the academic
18 challenges in some of the schools that you've worked;
19 okay?
20      A.   Okay.
21      MS. REAVES:  So I think we are on
22 Exhibit 11.  This is going to be Tab 22 in our binder.
23      (Whereupon, Exhibit 11 was marked for
24 identification.)
25      Q.   So Tab 22 at the top says "Magnet 2019-20

Page 149

1 School Level Quarterly Report."  If we go to the very
2 back page, it has again this metadata sheet which
3 shows that you were one of the custodians.  The date
4 modified is January 22, 2020, and the file name is
5 "Roskruge.Quarterly.Report.Q2.2019.20."
6      Do you see that?
7      A.   Yes.
8      Q.   Are you familiar with school level quarterly
9 report?
10      A.   Yes.
11      Q.   What is this?
12      A.   It's been a while.  I have to read.
13      MR. CUTLER:  Take your time if you need
14 it.
15      Q.   So at a high level, what is a school level
16 quarterly report?
17      A.   Kind of like a snippet of what the school is
18 doing that meets the magnet pillars within the
19 district as far as academics and any outside
20 extra-curricular activities.  Ensuring that there is a
21 way to track that the students -- how the students are
22 doing benchmark to benchmark in reading and math.
23      Q.   When you say "benchmark to benchmark," what
24 does that mean?
25      A.   So the district would issue an assessment

38 (Pages 146 - 149)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 150

1  for students each quarter.
2      Q.  By "assessment," do you mean a test?  A
3  standardized test?
4      A.  Quarterly benchmark from the district is
5  what -- the way they were called.
6      Q.  Yes.  But is it what's commonly understood
7  as standardized test, or is it something else?  What
8  is the benchmark?
9          MR. CUTLER:  Object to form.
10     A.  It's a formal test that was issued to
11  students district wide per quarter.
12     Q.  Every quarter?
13     A.  Based on what standards they were supposed
14  to be taught during that quarter.
15     Q.  And so then every quarter, the magnet
16  schools summarize how their students did on that
17  district-wide exam?
18     A.  Yes.  But it wasn't just magnet schools that
19  took that benchmark.  It was district wide.  All the
20  schools.
21     Q.  District wide?
22     A.  Yes.
23     Q.  And you also mentioned the pillars of magnet
24  schools.  What are the pillars of magnet schools?
25     A.  Goodness gracious.  Integration was one,

Page 151

1  communication was another, innovation.  I can't
2  remember the fourth one off the top of my head.
3      Q.  Were you involved in creating the school
4  level quarterly report for any of the schools where
5  you've worked?
6      A.  Creating it as far as implementing
7  information into the document?
8      Q.  Yes.
9      A.  Yes.
10     Q.  And which portions of the school level
11  quarterly report did you input information into?
12     A.  Anything that had to do with my recruitment,
13  which was the communication and the logs, my mailers.
14  It says it under communication.  That was mainly my
15  part.
16     Q.  And did you, in your role at any of your
17  schools, review the entire school level quarterly
18  report?
19     A.  Review in sense of like knowing everything
20  that was in there?
21     Q.  Yes.
22     A.  When I was at Roskruge, yes.
23     Q.  What happens with this report once it's
24  created?  Where does it go?
25     A.  It goes to the district.

Page 152

1      Q.  Where within the district?
2      A.  Magnet department.
3      Q.  And so the district magnet department uses
4  this to, I think you said, have a snippet of how that
5  magnet school was doing?
6      A.  Correct.
7      Q.  So if we look through this, I think you
8  mentioned there is a category that looks at
9  integration data.  And does that refer to the
10  district's goals towards desegregation or something
11  else?
12     A.  In other words, the integration piece was a
13  part of the desegregation?
14     Q.  Yes.
15     A.  Yes.
16     Q.  And there are -- it looks like the bulk of
17  it is sections on student achievement, which you said
18  is the benchmark data of the district-wide benchmark
19  assessments; is that right?
20     A.  Yes.
21     Q.  And then there's a section that's
22  professional learning communities.  What is that?  Its
23  towards the end.
24     A.  Towards the end.  This is on walk-throughs
25  that were done within the school.

Page 153

1      Q.  When you say walk-throughs done within the
2  school, what does that mean?
3      A.  That's the principal and her team going to
4  classrooms to make sure students are meeting these --
5  or where they fall under the categories of what they
6  were looking at when they were going to observe.
7      Q.  And then the categories were learning,
8  literal, refined, and internalized; is that correct?
9      A.  Correct.
10     Q.  Whereas is it accurate that learning is the
11  lowest score, and internalized is the highest score in
12  the system?
13     A.  I believe -- I'm sorry.  Let me -- yes.
14     Q.  And then it looks like the next section is
15  partnerships.  Do you know what that refers to?
16     A.  Yes.
17     Q.  What are partnerships?
18     A.  The outside agencies or communities that
19  would help out within our school.
20     Q.  And then the last section is celebrations
21  and challenges.  Do you see that?
22     A.  Yes.
23     Q.  What are celebrations and challenges?
24     A.  This would be where we would kind of --
25  well, the intention was to highlight things in our

39 (Pages 150 - 153)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

1 school can that were positives, per se. Things that
2 were happening in our school that we were celebrating,
3 as far as bringing in more community members, bringing
4 in families to engage in the learning of students and
5 activities that were held at our school.
6    Q.  What's the intention of the challenges
7 portion?
8    A.  Just understanding where we're falling --
9 we're having some areas of improvement that needed to
10 take place.
11    Q.  And so this is a report that four times a
12 year went to the district for each school?
13    A.  For magnet -- for my magnet school at this
14 time, yes.
15    Q.  And when we look at the site level
16 challenges, can you take a look at the site level
17 challenges?
18    A.  Okay.
19    Q.  So some of the site level challenges
20 included in this report are things like "Many teachers
21 are overwhelmed with college coursework completion for
22 their ESL or bilingual endorsements."
23        Do you see that?
24    A.  Yes.
25    Q.  What does that mean?

Page 155

1    A.  So there was many teachers on what they call
2 a probationary period because they need to complete
3 their ESL bilingual endorsement to be a part -- to
4 continue as a teacher in the school.
5    Q.  And going back, "Full comprehension of the
6 magnet pillars in order to apply for awards."
7    A.  And that was being able to explain those
8 magnet pillars to the staff so that they would
9 understand what would take place if we were to apply
10 for any of the recognition awards.
11    Q.  Budget cuts, what does that mean?
12    A.  That was most likely done by administration.
13    Q.  Do you agree that budget cuts can be a
14 challenge for a school?
15        MR. CUTLER:  Object to form.
16    A.  I think budget cuts in general affect, you
17 know, people's jobs, so.
18    Q.  And in this report, budget cuts was one of
19 the challenges that the school noted in their report
20 and sending to the distribute?
21    A.  That's what it says.
22    Q.  And culture and climate was also a challenge
23 that this school noted in the report that it was
24 sending to the district?
25    A.  Yes.  That's what I'm reading, yes.

Page 156

1    Q.  Do you have a recollection of what culture
2 and climate challenges Roskruge Bilingual was facing
3 at this time?
4    A.  Other than if it's connected to that third
5 bullet that says there was a division between
6 elementary and middle school.
7    Q.  And so the third challenge, though, is "A
8 division between elementary middle school staff
9 faculty."
10        Do you have any recollection of what
11 challenges the school was facing?
12    A.  I think it's -- if I recall correctly, it
13 was elementary and the middle school teachers saying
14 they needed to do more to integrate.  For example,
15 they had discussed bringing in reading buddies so the
16 older middle school students could go in and have a
17 connection with the elementary students.  That was
18 something that I recall.
19        Now that I'm reading that division part that
20 they were saying that they needed to become more
21 integrated working together so that it seemed like
22 elementary portion and the middle school portion.  It
23 was more of a whole K-8 type school.
24    Q.  And so the school itself decided what to
25 include in terms of celebrations and challenges in

Page 157

1 this report; is that right?
2        MR. CUTLER:  Object to form.
3    A.  Not the school.  Within the team, which is
4 submitted on the front.
5    Q.  So this team on the first page, which
6 included you --
7    A.  Yes.
8    Q.  -- determined which challenges and
9 celebrations to give in this report to the district;
10 right?
11    A.  Yes.
12    Q.  But of the challenges that you all
13 identified, in at least this report, social media or
14 reacting to social media was not one of the
15 challenges?
16    A.  Not that I read.  I did not see social
17 media.
18    Q.  Now, this report was written -- I think we
19 looked at the custodial data.  It was January 22,
20 2020, so it was right before COVID-19 pandemic; is
21 that right?
22        MR. CUTLER:  Object to form; misstates
23 the document.
24    A.  My gosh.  I just remember, you know, 2020 as
25 when COVID started, I mean.

40 (Pages 154 - 157)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 158

1    Q.    January of 2020 was before --
2    A.    It all started.
3    Q.    -- everything shut down; right?
4    A.    Yes, yes.
5    Q.    So I just want to ask you about your
6  experience as a TUSD employee during COVID-19; okay?
7    A.    Okay.
8    Q.    So when the pandemic happened and shut
9  everything down, where were you working?
10    A.    At Roskruge.
11    Q.    And was Roskruge middle impacted by the
12  pandemic?
13          MR. CUTLER:  Object to form.
14    A.    I think everybody was impacted by the
15  pandemic.
16    Q.    What was the approach that Roskruge middle
17  school had to in terms of remote versus in-person
18  learning?
19    A.    We -- all schools were told we were going
20  remote.
21    Q.    And how did you -- what did that look like
22  in practice?  How did you implement that?
23    A.    Making sure that we issued devices to every
24  single student, every family.
25    Q.    When students went home, when schools were

Page 159

1  first closed, did all students have a device that was
2  issued by the school?
3    A.    No.
4    Q.    And so how did the school get students
5  devices?
6    A.    A group of us were still working on site,
7  and we -- there was parent link, email that was sent
8  out to the families to say that they could come and
9  collect a laptop that was gonna be issued to them.
10          And so we had a drive-by-type, you know,
11  service for them to collect that and sign off a waiver
12  that they were taking a laptop and they were
13  responsible for it.
14    Q.    And at the beginning of the pandemic, did
15  you have any insight into like how the pandemic was
16  impacting students' social/emotional mental health?
17    A.    Impacting in the sense of?
18    Q.    So for example, were you aware of whether
19  students were concerned about their health?  Their
20  physical health due to COVID-19?
21    A.    I was aware of the concerns that a lot of
22  the teachers were bringing up on our Zoom meetings
23  that we had on Wednesdays that the students weren't
24  logging on, students weren't participating, per se.
25          There was a couple of discussions that were

Page 160

1  had about some of the parents voicing their worries
2  about their children just kind of, you know, worried
3  was the word that was used quite a bit.  Because,
4  unfortunately, people were losing their life for it.
5    Q.    Do you know how many of the students at your
6  school lost a loved one from the COVID-19 pandemic?
7    A.    I don't know.
8    Q.    Do you know whether the school provided any
9  opportunities for students to interact in person when
10  you were doing remote learning?
11    A.    That wasn't -- my understanding is that
12  wasn't an option until we were given the okay to
13  reopen our schools.
14    Q.    And so when TUSD was under entirely remote
15  learning, do you know how much in-person interactions
16  students had with each other?
17    A.    I don't know.
18    Q.    You just have to say is verbally.
19    A.    Yeah.  No, I don't know.
20    Q.    And it's fair to say that the COVID-19
21  pandemic was a stressor for students?
22          MR. CUTLER:  Object to form; it's vague.
23    A.    It's a stressor for many, not just students.
24    Q.    Schools lost -- TUSD schools where you
25  worked experienced academic loss during the pandemic?

Page 161

1          MR. CUTLER:  Is that a question?
2    A.    So you're asking if there was a loss in
3  academic learning?
4    Q.    Yes.
5    A.    During the pandemic?
6    Q.    Yes.
7    A.    I don't know if I would consider it a loss.
8  It was definitely a change.
9    Q.    And a change where, for many students, you
10  were concerned about a decline in academic performance
11  because of the COVID-19 pandemic; is that right?
12    A.    We had to go to remote, which changed the
13  way students had to adapt to learn.  So I would say
14  that it was -- it affected it, most definitely.
15          MS. REAVES:  So I want to turn to
16  another quarterly report for Roskruge Bilingual.
17  We're going to mark this as Exhibit 12.  This one is
18  Tab 23.
19          (Whereupon, Exhibit 12 was marked for
20  identification.)
21    A.    Okay.
22    Q.    Ready?
23    A.    Yes.
24    Q.    So this again is a "Magnet 2021 -- 2020-2021
25  School Level Quarterly Report."  It's again for

41 (Pages 158 - 161)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 162

1 Roskruge Bilingual. If we look at the data at the
2 back, it's in your custodial file, but this is a year
3 later than the own we were looking at. About a year
4 later. It's dated February 5, 2021.
5      Do you see that?
6 A. Yes.
7 Q. And again on that first page, you're listed
8 as one of the people who, I guess, was working on this
9 report that was submitted to the district; is that
10 right?
11 A. Yes.
12 Q. I want to turn you to Page 6. They're not
13 numbered, but it's the one that ends in the numbers at
14 the bottom 542. And at the top it says "Integration
15 Student Retention."
16      Do you see?
17 A. Yes.
18 Q. And there's a portion that says "Are there
19 any noteworthy differences or trends that you notice
20 when analyzing this data on student
21 retention? Reflection day 40th, 40 COVID-19 has
22 affected our student retention drastically this
23 quarter on our school site and the entire district."
24      Do you see that?
25 A. Yes.

Page 163

1 Q. So do you agree that COVID-19 affected
2 retention in your school and across the district?
3 A. In my school it did because we were losing
4 many of these students to charters that were offering
5 in-school -- in-person teaching. And I think I noted
6 that somewhere in my summary.
7 Q. And can you remind us. At this point in
8 time, were you the person working on retention and
9 recruitment?
10 A. Yes.
11 Q. And you also wrote "It has been a difficult
12 time for many families in our community and having to
13 learn online versus in person. Constant technology
14 issues such as computers, Internet hotspots, and
15 school platforms, Zoom, Teams have played a factor in
16 families making decisions to withdraw from our school
17 as well as from the district."
18      Is that the portion you're talking about?
19 A. Yes.
20 Q. So there were a lot of families that
21 struggled with the remote learning format; is that
22 right?
23 A. Yes. Because it was new to a lot of them.
24 Q. And some of the problems were due to needing
25 to be able to access technology?

Page 164

1 A. Right. The hotspots.
2 Q. The hotspots. So not all students had a
3 good Internet connection at home, for example?
4 A. Yeah. Not all students had Internet at all
5 at home, so we were offering hotspots.
6 Q. If you switch to Page 9, this is the page
7 that ends in 545, this is a "Student Achievement Math
8 Quarter 1 Benchmark."
9      Do you see that?
10 A. Yes.
11 Q. "Reflection here on noteworthy trends and
12 differences. It's evident that learning remotely has
13 impacted all stakeholders."
14      Do you see that?
15 A. Yes.
16 Q. And so do you know who in your school does
17 the student achievement portion of these reports at
18 this time?
19 A. This was the principal, assistant principal,
20 and myself.
21 Q. And you-all believed that learning remotely
22 also impacted the benchmark achievement results?
23 A. Only because it was the validity of the
24 tests. We didn't know if parents were helping the
25 students take assessments or if students were even

Page 165

1 completing it as they were supposed to.
2      A lot of them were incomplete assessments, I
3 recall. They didn't finish it or they skipped a page
4 or, you know, they're doing it all online.
5 Q. So the remote format made it more difficult
6 for you as educators to know where students actually
7 are in terms of their academic achievement?
8 A. Right. To make the results valid or the
9 validity of it, yes.
10      MS. REAVES: I want to mark for
11 identification, this is gonna be Exhibit 13. It's
12 Tab 24.
13      MS. REAVES: Actually, let's take a
14 quick break.
15      MR. CUTLER: Sure.
16      THE VIDEOGRAPHER: We're going off the
17 record. The time is 12:37.
18      (Whereupon, a recess was taken.)
19      THE VIDEOGRAPHER: We're going back on
20 record. Time is 12:59.
21      MS. REAVES: All right. So when we
22 broke, I was marking for identification as Exhibit 13,
23 which will be Tab 24. Handing you all a copy.
24      (Whereupon, Exhibit 13 was marked for
25 identification.)

42 (Pages 162 - 165)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 166

1 BY MS. REAVES:
2    Q.  So you see on the back again this is a
3 bottom from your custodial file, dated February 20,
4 2023, titled "Fishbone Diagram."  And at the top, it
5 says "Root Cause Analysis Fishbone Template, Morgan
6 Maxwell K-8," and it has a little diagram of
7 fishbones.
8       Do you see that?
9    A.  Yes.
10    Q.  And then the box underneath, "Overall Root
11 Cause Statement.  The synthesis of the most powerful
12 root cause."  And it says "Morgan Maxwell K-8 teachers
13 will increase academic, behavioral, and social
14 emotional learning expectations for all students."
15       Do you see that?
16    A.  Yes.
17    Q.  So is this -- do you recognize this
18 document?
19    A.  Vaguely.
20    Q.  Have you worked with root cause analysis
21 fishbones before?
22    A.  In teams with groups of teachers I have
23 facilitated and kind of just stood by and listened.
24    Q.  And so this document is documentation of
25 Morgan Maxwell K-8 teachers' analysis root causes;

Page 167

1 right?
2       MR. CUTLER:  Object to form.
3    A.  I would think that that's who put this
4 together because it was -- it was not me.
5    Q.  Do you have any reason to doubt the
6 authenticity of this document in your custodial file?
7    A.  No.
8    Q.  So when we see it says root causes in the
9 box at the top, it says "These are the most
10 influential contributing factors.  Why is the problem
11 existing?  What is contributing to the problem?  Who
12 plays a role in contributing to the problem."
13       Do you see that?
14    A.  Yes.
15    Q.  And when you said that you think that you,
16 in teams with groups of teachers, you facilitated,
17 sometimes you'd sit by and listen.
18       Are there professional development sessions
19 where teachers have an opportunity to talk about the
20 causes, the root causes of problems at your school?
21       MR. CUTLER:  Object to form; and
22 leading.
23    A.  I mean, it looks like that's what this was.
24    Q.  And if we look at some of the root causes
25 that were written down, under expectations, it says

Page 168

1 "There's no follow through.  There are no agendas."
2       Do you see that?
3    A.  Yes.
4    Q.  Some other root causes that are included
5 here under attendance, we see "Low teacher attendance,
6 low teacher retention, low student attendance, and
7 motivation is also an issue."
8       Do you see that?
9       MR. CUTLER:  Object to form; misstates
10 the document.
11    A.  I can see that that's what it says under
12 attendance, yes.
13    Q.  And for root causes as a whole, there are
14 six different categories where potential problems
15 could be identified.  Expectations, PD, curriculum,
16 planning, attendance, and systems.
17       Do you see that?
18       MR. CUTLER:  Object to form and
19 foundation.
20    A.  Yes, I see that.
21    Q.  And none of the root causes identified in
22 this document are social media; is that right?
23       MR. CUTLER:  Object to foundation.
24    A.  It doesn't say social media, no, it does
25 not.

Page 169

1    Q.  I want to talk about -- let's move to --
2       MS. REAVES:  I'll mark for
3 identification Exhibit 14, I think we're on.  And
4 Exhibit 14 is going to be Tab 27 in the electronic
5 folder.
6       (Whereupon, Exhibit 14 was marked for
7 identification.)
8    Q.  So again, this document is a document from
9 your custodial file.  If we go back to the back page,
10 we see you're one of the custodians.  It has a date
11 modified as December 6, 2022, and then the file name
12 is a series of numbers and letters.
13       Do you see that?
14    A.  Yes.
15    Q.  And if you look at the document itself, it
16 appears to be an email and a response.  And there are
17 two emails in this chain, so I want you to start with
18 the first one that starts on Page 2 is the header for
19 the email, and then a content of the email is Page 3.
20       And to orient us, the email is from Clarissa
21 Nido.  Do you know who that is?
22    A.  She was the principal at Morgan Maxwell.
23    Q.  Sent on Thursday, December 1, 2022.  Were
24 you working at Morgan Maxwell at that time?
25    A.  Yes.

43 (Pages 166 - 169)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 170

1    Q.  And then the to list, do you recognize the
2  names in that to list?
3    A.  Oh, lord.
4         MR. CUTLER:  Object to form.  Are you
5  asking if she recognizes every name?
6    Q.  Do you have a general understanding of who
7  the Morgan Maxwell principal was emailing here?
8    A.  I mean, it looks like -- looks like it's
9  staff.  Teachers, staff.
10   Q.  And you are one of the people listed who was
11 receiving this email.  If you will look --
12   A.  Yes.
13   Q.  -- six lines above the subject line.  Do you
14 see that?
15   A.  I see my name on this, yes.
16   Q.  And that subject is "MMK8 Behavior Support
17 Plan Draft."
18       Do you see that?
19   A.  Let me look at the screen.
20   Q.  Whichever works for you.
21   A.  I see it.
22   Q.  Now, I want you to take a look at this
23 email.  Let me know when you're ready to answer
24 questions.
25   A.  Okay.  Okay.

Page 171

1    Q.  So in this email, the one that Ms. Nido
2  sends to the staff, she's emailing out about a
3  behavioral support plan draft; is that right?
4    A.  That's what it said, yes.
5    Q.  And in the email she notes that She's
6  included the behavioral support plan for everyone's
7  review.  "Please read, review, and share your feedback
8  with me and members of the student support team."  And
9  then you're listed as one of the people on the student
10 support team.
11       Do you see that?
12   A.  Yes.
13   Q.  And then it says "As members of the student
14 support team, we have continued to seek outside
15 support from the district and vendors."
16       And did you have a chance to read the rest
17 of that paragraph?
18   A.  Yes.
19   Q.  So at the time Ms. Nido sent this email at
20 Morgan Maxwell, you-all were continuously hearing that
21 there were struggles that you had at Morgan Maxwell
22 that were occurring at other sites; is that right?
23   A.  That's what it says.
24   Q.  Do you know what Ms. Nido was referring to
25 as struggles?

Page 172

1    A.  No.  She's referring to other sites.  I
2  wouldn't know that.
3    Q.  Well, she goes on to say "There's a labor
4  shortage, a teacher shortage, and student behaviors
5  are very challenging.  This is the reality that we're
6  living with."
7       Do you see that?
8    A.  Yes.
9    Q.  And at the end she says "We're sharing a
10 draft behavioral support plan and sharing your
11 feedback.  Our goal is to begin this procedure on
12 Monday, December 5, 2022."
13       Do you see that?
14   A.  Yes.
15   Q.  And so this is the principal, on behalf of
16 the behavioral support team, saying we know that
17 things have been challenging at the school, here's our
18 plan for addressing; is that fair?
19   A.  Yes.
20   Q.  And then if we see the email on the first
21 page, someone named Elena Ash responds to, looks like,
22 everyone.  Do you see that?
23   A.  Yes.
24   Q.  And is Elena Ash a teacher?
25   A.  She was a teacher there, yes.

Page 173

1    Q.  She was a teacher.  Did she leave your
2  school?
3    A.  Yes.
4    Q.  And in her response, she points out a number
5  of concerns that she has had and that she's hearing on
6  behalf of teachers of the school.
7    A.  That's what she says, yes.
8    Q.  Did you receive this email when she sent it?
9    A.  I mean, it says I did.  I don't recall
10 reading it at the time, but.
11   Q.  So some of the concerns, for example, were
12 that -- if we look at the third paragraph -- "We
13 understand that there is a learning curve with new
14 admin that we're short staffed and that coverage is
15 difficult.  However, we have been available and more
16 than willing to assist in planning and participating
17 in policies and procedures but have not been asked to
18 participate in them."
19       Do you see that portion?
20   A.  Yes.
21   Q.  So she felt that teachers weren't getting
22 enough input on the policies and procedures of how the
23 school was running?
24        MR. CUTLER:  Object to form; calls for
25 speculation.

44 (Pages 170 - 173)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 174

1     A.   That is what she's saying.
2     Q.   And on the next page, she says "We don't
3 need more time to come up with ideas, as we have been
4 ready for meetings since the start of the school
5 year."
6          And essentially, she's complaining about
7 delay implementation of plans at your school; is that
8 right?
9          MR. CUTLER:  Object to form; foundation.
10    A.   I mean, that is what she's saying, yes.
11    Q.   And she says "Students do not feel MM,"
12 which I think is Morgan Maxwell, "is a safe place.
13 They have expressed that to us.  We teachers do not
14 feel MM is a safe place to work in light of how our
15 concerns have been handled or not addressed
16 effectively in the ability of students to run the
17 school, because we have little to no authority backed
18 up in higher authority."
19         Do you see that?
20    A.   Yes.
21    Q.   And so she's expressing concerns about how
22 safe teachers and students feel at the school?
23         MR. CUTLER:  Object to form and
24 foundation; the document speaks for itself; calls for
25 speculation.  Go ahead.

Page 175

1     A.   Yes, that is what she wrote.
2     Q.   And she indicated that because of how she
3 felt the administration was responding to the
4 concerns, the school was going to lose teachers; is
5 that right?
6          MR. CUTLER:  Object to form; document
7 speaks for itself.
8     A.   Yes, that is what she wrote.
9     Q.   And you said that she, in fact, did leave
10 the school?
11    A.   She did, yes.
12    Q.   And do you know if any other teachers left
13 the school after the school year?
14         MR. CUTLER:  Object to form.
15    A.   I don't recall.  I believe she was the only
16 one at the time.
17    Q.   Do you know what, if anything, the
18 behavioral support team did to address the concerns
19 about safety that Ms. Ash expressed?
20         MR. CUTLER:  Object to form; object to
21 foundation.
22    A.   I mean, I -- honestly speaking for myself, I
23 don't know why she felt not safe or that it wasn't a
24 safe place.  I don't know what students were telling
25 her.

Page 176

1     Q.   So I want to talk a little bit more about
2 TUSD's use of social media.
3          So there are some teachers that use, for
4 example, YouTube as part of a classroom assignment in
5 the schools where you've worked?
6     A.   I don't know.
7     Q.   So, for example, if we go to --
8          MS. REAVES:  I'll mark for
9 identification Exhibit 15, and it's going to be
10 Document Number 32 in the binder.
11         (Whereupon, Exhibit 15 was marked for
12 identification.)
13    Q.   So again at the back, we see that this is a
14 document in your custodial file.  The author is Bryan
15 Daniel.  Do you know who Bryan Daniel is?
16    A.   No.
17    Q.   Do you recognize this messaging platform?
18    A.   It's just a general message through TUSD.
19    Q.   And it says "I was informed that many of the
20 emails I sent out did not contain a link for the
21 YouTube video assignment from December 1 to 2.  Here
22 it is.  Mr. Daniel."
23         Do you see that Mr. Daniel?
24    A.   Yes.
25    Q.   And so you testified you're not aware

Page 177

1 whether or not teachers use YouTube in the classroom.
2 Do you have any reason to doubt that TUSD teachers use
3 YouTube in the classroom?
4     A.   It shows this teacher did.
5     Q.   And are you aware of any policy against TUSD
6 teachers using YouTube in the classroom?
7     A.   I don't know.
8     Q.   And in your time working at TUSD, you've
9 also been -- used social media on behalf of TUSD; is
10 that right?
11    A.   On behalf of TUSD, on behalf of a school I
12 worked at.
13    Q.   On behalf of a school within TUSD?
14    A.   Correct.
15    Q.   So you have been sometimes tasked with being
16 the person to post on the school's social media
17 accounts; is that right?
18    A.   Yes.  When I was the magnet coordinator at
19 Roskruge.
20    Q.   That was a role as magnet coordinator.
21         And in some of the school level quarterly
22 reports we talked about, when you were documenting
23 retention, recruitment data, sometimes what you do is
24 record whether you used social media to reach parents
25 or families; is that right?

45 (Pages 174 - 177)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 178

1    A. Correct.
2    Q. And there's also a stipend that TUSD has
3 given staff that they call social media facilitators.
4 Are you aware of that?
5    A. No. I never received a stipend for any.
6        MS. REAVES: So I want to mark as
7 Exhibit 16. This is Tab 34 in the binder.
8        (Whereupon, Exhibit 16 was marked for
9 identification.)
10    Q. Again, we can go to the -- if we go to the
11 metadata, this one is not in your custodial file.
12 It's in Michael Konrad's case file and author is
13 Leslie Lenhart.
14       Do you know who Michael Konrad or Leslie
15 Lernhart are?
16    A. I don't know who Michael is, but Leslie,
17 yes.
18    Q. And who is Leslie Lernhart?
19    A. She was the one responsible for media
20 relations. She was the person that was the head of
21 that department.
22    Q. And so if we go to the beginning of the
23 email message, which is a long list, you see at the
24 top it's from Leslie Lnhart, sent on August 5, 2022.
25       And then if you go to the second page of the

Page 179

1 recipient list, you'll see that about 10 lines from
2 the subject, your email address is listed.
3       Do you see that?
4    A. Yes.
5    Q. And then the email itself says, three lines
6 down, "I wanted to share some information updates
7 regarding the added duty stipends for the school
8 webmasters and social media facilitators."
9       Do you see that?
10    A. Yes.
11    Q. And so were you aware that TUSD offered
12 stipends for school webmasters and social media
13 facilitators?
14       MR. CUTLER: Asked and answered.
15    A. No.
16    Q. Do you have any reason to believe that this
17 notice from Ms. Lernhart that social media stipends
18 are available is inaccurate?
19       MR. CUTLER: Lacks foundation.
20    A. I remember that a lot of these sin role
21 principal emails would come my way, but it wasn't
22 pertaining to anything having to do with me, so I just
23 wouldn't read them.
24    Q. My question is do you have any reason to
25 believe that there was not a social media stipend?

Page 180

1    A. I mean, this is what it says, that there
2 was so, I wouldn't have an argument against that, no.
3    Q. And from time to time, because at least at
4 Morgan Maxwell -- not at Morgan Max, at Roskruge
5 Bilingual, since your role was the social media
6 facilitator; is that right?
7    A. No.
8    Q. Your role was to manage the social media
9 accounts of the school when you were at --
10    A. No. I was able to log in to upload some
11 stuff time and time again, but the main person
12 responsible for that was our social media person. It
13 was not me.
14    Q. And someone else was your social media
15 person?
16    A. Yes.
17    Q. There was a social media person who was
18 responsible for posting consistent on the school's
19 social media websites?
20    A. Yes.
21    Q. And do you know who that person was?
22    A. Oh, gosh. If I have to read through this
23 whole list, I could probably refresh my memory.
24    Q. You don't need to read through the whole
25 list.

Page 181

1    A. Okay.
2    Q. Was there ever a time -- strike that.
3       Besides at Roskruge Bilingual, did the other
4 schools that you've worked at in TUSD have social
5 media accounts?
6    A. I'm not sure. I don't know. I know that
7 the schools -- schools I've worked at have attempted
8 to put out some type of page on one of the social
9 media platforms.
10    Q. So do you know whether Tucson High Magnet
11 School has social media accounts?
12    A. I know that Tucson High does.
13    Q. And is there a staff person who has the role
14 of managing Tucson High's social media accounts?
15    A. I believe that would be, yes. Somebody has
16 to be able to access it, yes.
17    Q. And then when you were at Morgan Maxwell
18 Middle, did Morgan Maxwell Middle have social media
19 accounts?
20    A. Yes.
21    Q. And was there a person whose role was
22 managing the Morgan Maxwell social media accounts on
23 behalf of the school?
24    A. Yes.
25    Q. Now, since TUSD filed its lawsuit against

46 (Pages 178 - 181)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 182

1  defendants in 2024, do you know if TUSD schools still
2  use social media?
3      A.  I know Tucson High does.
4      Q.  And since filing the lawsuit against
5  defendants in 2024, do you know whether Tucson High,
6  or any other school, has posted a warning on its
7  social media account saying that Tucson Unified School
8  District believes that social media could harm its
9  students?
10     A.  I don't know that.  I don't read every post
11 or I don't see every post.  No, I don't know.
12     Q.  Are you aware of any post that Tucson
13 Unified School District, or any communication that
14 Tucson Unified School District has put out, warning
15 students about using Tucson Unified School District's
16 social media pages?
17         MR. CUTLER:  Object to form.
18     A.  Warning -- like warning in the sense of like
19 use?  Using social media?
20     Q.  Any TUSD page or a school within TUSD
21 posting a warning that using social media could be
22 harmful to the students, including using their pages?
23     A.  I've seen posts that say there's been social
24 media alerts for parents to be cautious of what
25 students are looking at as far as social media when it

Page 183

1  pertains, for example, to threats or something, you
2  know, bigger coming that's being exposed or being put
3  out there.  We've received warnings on that.
4      Q.  Are you aware of any effort by Tucson
5  Unified School District to stop using, for example,
6  Facebook or Instagram or YouTube itself?
7      A.  I don't know.
8      Q.  Do you use social media?
9      A.  On occasion.
10     Q.  Which types of social media do you use?
11     A.  The one I've used the most has been
12 Facebook.
13     Q.  Do you use Instagram?
14     A.  I did.  I deleted the account.
15     Q.  Do you use Snapchat?
16     A.  Rarely.  It's to take -- use of filters, I
17 guess.  You know, the fun filters that are on there.
18 But not to send messages or anything like that, no.
19     Q.  Do you use TikTok?
20     A.  No.
21     Q.  Do you use YouTube?
22     A.  No.
23     Q.  And when you say no to using YouTube, do you
24 watch videos on YouTube?
25     A.  If it's something that's being presented

Page 184

1  like in a presentation for a class or a professional
2  development, that's what they're using is YouTube, so.
3      Q.  You mentioned that you have children?
4      A.  Yes.
5      Q.  How old are your kids?
6      A.  I have a 26-year-old, a 21-year-old, and an
7  18-year-old.
8      Q.  So all adults?
9      A.  Yes.
10     Q.  In the period from when they were teenagers,
11 did you give your children smartphones?
12     A.  My oldest didn't get one until she was way
13 older, but my son had one when he was in eighth grade.
14 That's when he was -- I had got him a phone.
15     Q.  And did you implement any screen time limits
16 or parental controls on the cell phone?
17     A.  Yes.
18     Q.  What limits did you implement?
19     A.  They couldn't have their phones with them at
20 night.  They had to physically give me their phones at
21 night?
22     Q.  And how did you enforce that?
23     A.  Just "Hand me your phone."
24     Q.  On the device itself, did you use any
25 parental controls?

Page 185

1      A.  No.  But I did monitor what they were
2  downloading.
3      Q.  And how did you monitor what they were
4  downloading?
5      A.  At random.  Every once a week, I'd ask them
6  for their phone, and if I couldn't log into it, then
7  they would lose their phone privilege for a month or
8  two.
9      Q.  Aside from nighttime or when they lost their
10 phone privileges, were there any other restrictions on
11 when your children were allowed to use their cell
12 phones as teenagers?
13     A.  Just they were not allowed to download any
14 kind of social media without having a discussion with
15 me first about it.
16     Q.  And when your children were teenagers, were
17 there any social media platforms that you did allow
18 them to download?
19     A.  No.
20     Q.  So when your children were teenagers, they
21 didn't use Snapchat?
22     A.  I'm sure they found their way around to
23 getting it, downloading it, and using it when I wasn't
24 aware, but then it wasn't there when I would check
25 their phones.

47 (Pages 182 - 185)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 186

1   Q.   Did your children use Instagram?
2   A.   I believe my daughter did at one point, yes.
3   Q.   And did your children use Facebook?
4   A.   No.
5   Q.   Did your children use TikTok?
6   A.   They do now.
7   Q.   When they were teenagers, did they use
8 TikTok?
9   A.   No.  I never saw the app on their phones.
10   Q.   And did your teenagers use YouTube when they
11 were teenagers?
12   A.   That, they would use, yes.
13   Q.   Do you know how they used YouTube?
14   A.   I'm sorry?
15   Q.   Do you know how they used YouTube?
16   A.   To look up videos.  They were always looking
17 at assignment work, things that would help them, you
18 know, complete an assignment.  Math mostly was what my
19 children struggled with, so they would look at videos
20 on how to complete a certain math problem or
21 assistance with that.
22       But that was -- I mean, every now and then,
23 they'd look at something silly or goofy.  Mostly, what
24 I recall with my son, he was the main one that was
25 always on his phone with YouTube, was looking at

Page 187

1 videos on how to put together things that would fall a
2 part.  Like for example, if the toaster wasn't working
3 or whatnot, he would figure out how to put it back
4 together to get it to work.  He was very hands-on.
5 Scientific stuff, mostly.
6   Q.   Did you restrict your son's use of YouTube?
7   A.   There were certain things that I told him he
8 was not allowed to look at, yes.
9   Q.   And how did you implement that restriction?
10   A.   Just letting him know that if he was ready
11 to look at something, that it wasn't allowed, that we
12 would have a discussion first.
13   Q.   Did you ever, as a parent, make any reports
14 on any defendants' platforms?
15   A.   I'm sorry.  Can you give me an example?
16   Q.   Did you ever ask any of the defendants to
17 change or modify something on their platforms?
18   A.   No.
19   Q.   And in terms of going back to TUSD's use of
20 social media, do you know whether students in TUSD can
21 access YouTube?
22   A.   On their school devices?
23   Q.   On their school devices.
24   A.   I'm sure they have found ways to log in and
25 see YouTube videos, yes.

Page 188

1   Q.   Do you know whether or not YouTube -- TUSD
2 uses any particular versions of YouTube for
3 instructional purposes?
4   A.   I don't know.
5   Q.   I want to ask you some questions about how
6 you communicate for work.  Do you have a work cell
7 phone or personal cell phone?
8   A.   No.  Just a personal cell phone.
9   Q.   And do you use text messaging to communicate
10 for work?
11   A.   Very, Very rarely and occasionally.
12   Q.   What occasion would you use text messages
13 for?
14   A.   For example, like I'm not going to be at
15 work like today.  I sent a message to my
16 administrators telling them I wouldn't be on site
17 today.
18   Q.   Do you take work-related notes?
19   A.   Meaning, like?
20   Q.   So for example, if you're in a behavioral
21 management meeting or if a student comes to talk to
22 you because of a truancy issue, do you take notes
23 about those meetings?
24   A.   I mean, they're very, very limited notes.
25 What I will mostly notate is the student's name, grade

Page 189

1 level, because then that will prompt me to look up
2 information on them like as far as their attendance
3 and their grades at the moment and if they're up to
4 par with their course requirements.  Like if they're
5 on track to graduate.
6   Q.   And so those are the notes you would take if
7 you're meeting with an individual student?
8   A.   Mostly the name, that I met with them and
9 that they came to me at what time or the date.  That's
10 about it.
11   Q.   If you're doing one of the either
12 school-based behavioral management monthly meetings or
13 the district-based meeting of the deans, do you take
14 notes at any of those meetings?
15   A.   No.
16   Q.   Do you use Microsoft Teams?
17   A.   Very rarely.  I used it more when I had to
18 upload the reports that we've kind of looked at today.
19 That's the only one.
20   Q.   Do you or your colleagues use the messaging
21 feature on Teams?
22   A.   A few times I think I remember.  I was able
23 to ask a question about why I couldn't access
24 something or that's about it for Teams.
25   Q.   And I think you testified earlier that it

48 (Pages 186 - 189)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 190

1 was probably April of this year that you learned you
2 might be a witness in this case; is that right?
3    A.   Yes.
4    Q.   Now, were you informed at some point that
5 you should not delete or save any documents that you
6 create in relation to your work?
7    A.   No.
8    Q.   Do you have access to all of your documents
9 form the past 10 years?
10    A.   No.
11    Q.   Where would your documents, for the past 10
12 years, be stored?
13         MR. CUTLER:  Object to form; it's vague.
14         MS. REAVES:  I can break it down.
15    Q.   For example, do you have the same email
16 account that you've had for your time at TUSD?
17    A.   Yes.
18    Q.   And do you personally delete any emails from
19 your email account?
20    A.   Delete in the sense of when I get overloaded
21 with some messages that come in?  For example,
22 reminders of meeting and stuff there taking up a lot
23 of space, yes, I will delete those.
24    Q.   Were you ever instructed not to delete my
25 messages after you were becoming part of this lawsuit?

Page 191

1    A.   No.
2    Q.   In terms of other documents that you have,
3 from your couple of decades at TUSD, let's focus on
4 electronic documents, is there someplace on the TUSD
5 network or your computer where you -- where your
6 documents are kept?
7    A.   Documents as far as?
8    Q.   So for example, if there's a draft of one of
9 the quarterly school reports or a monthly discipline
10 report, any of these reports that you've been involved
11 in creating, where are those stored?
12         MR. CUTLER:  Object to form; foundation.
13 Go ahead.
14    A.   I mean it was to the departments where
15 they're supposed to be submitted.  That's where we
16 would have those.
17    Q.   Do you have an individual folder or file of
18 your documents related to school?
19    A.   When I moved from schools, they swipe.  So a
20 lot of my documents that were there, if it wasn't
21 stored on what they call OneNote, then it's -- were
22 it's pretty much not with me anymore because they map
23 me to my new site.
24    Q.   I see.  And so when you transfer between
25 schools, if you're documents aren't in a shared file,

Page 192

1 then they'll be deleted.
2    A.   You know, but important documents or
3 documents of this nature, where I had to do reports
4 and whatnot, that's stored within the department in
5 the district.
6         MS. REAVES:  Can we take a quick break?
7         MR. CUTLER:  Okay.
8         THE VIDEOGRAPHER:  We're going off the
9 record.  The time is 1:33.
10         (Whereupon, a recess was taken.)
11         THE VIDEOGRAPHER:  Going back on record.
12 Time is 1:39.
13         MS. REAVES:  I don't have any more
14 questions.  I appreciate your time.
15         THE WITNESS:  Thank you.
16         MR. CUTLER:  Anything on the Zoom?  Is
17 there anybody?
18         MS. REAVES:  Can we just double-check?
19 I don't think so.
20         THE VIDEOGRAPHER:  Counsel on Zoom, is
21 there anybody that has any questions?
22         MR. CUTLER:  No questions for me.
23         THE VIDEOGRAPHER:  All right.  Stand by.
24         This concludes today's deposition.  Total
25 time on the record used by counsel for Snap is four

Page 193

1 hours 12 minutes.  We are going off record.  Time is
2 1:40 minutes.
3         (Off the record at 1:40 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

49 (Pages 190 - 193)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 194

1          CERTIFICATE OF REPORTER
2   STATE OF ARIZONA    )
                        ) ss:
3   COUNTY OF PIMA      )
4       I, CORI BRICKEY, a Certified Reporter in the
    State of Arizona, do hereby certify that the foregoing
5   deposition was taken before me in the County of Pima,
    State of Arizona; that an oath or affirmation was duly
6   administered by me to the witness; CLARINDA RUBIO,
    pursuant to A.R.S. 41-324(B); that the questions
7   propounded to the witness and the answers of the
    witness thereto were taken down by me in shorthand and
8   thereafter reduced to typewriting; that the transcript
    is a full, true, and accurate record of the
9   proceeding, all done to the best of my skill and
    ability; that the preparation, production and
10  distribution of the transcript and copies of the
    transcript comply with the Arizona Revised Statutes
11  and in ACJA 7-206(F)(3); ACJA 7-206J(1)(g)(1) and (2);
    and ACJA 7-206 J(3)(b).
12      The witness herein, CLARINDA RUBIO, DID NOT
    SPECIFY review and signature.
13      I FURTHER CERTIFY that I am in no way related
    to any of the parties nor am I in any way interested
14  in the outcome hereof.
        IN WITNESS WHEREOF, I have set my hand in my
15  office in the County of Pima, State of Arizona, this
    19th day of September, 2025.
16
17
18  _____
        CORI A. BRICKEY, RPR, CR NO. 51030
19
20
21
22
23
24
25

877-370-3377                Golkow Technologies,
                           A Veritext Division                www.veritext.com