**Exhibit 33**


**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)**


Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

2

   ******************************

3                              Case No.

   IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
4  ADDICTION/PERSONAL INJURY
   PRODUCTS LIABILITY LITIGATION
5                              MDL No. 3047

   ******************************

6

   This Document Relates To:

7

   Tucson Unified School District
8  v. Meta Platforms Inc., et a
9  Case No. 4:24-cv-1382
10 ******************************
11      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
12           VIDEOTAPED DEPOSITION OF
13              BRIAN A. LAMBERT
14
15

       Held At:  JW Marriott Tucson
16               Starr Pass Resort & Spa
                 3800 W. Starr Pass Blvd
17               Tucson, Arizona
18
19               May 14th, 2025
                    1:17 p.m.
20
21
22
23
24 Reported By:
25 MAUREEN O. POLLARD, CA CSR #14449, RDR

CONFIDENTIAL

Page 2

```
1
2
3           Videotaped Deposition of BRIAN A.
4   LAMBERT, held at JW Marriott Tucson Starr Pass
5   Resort & Spa, 3800 W. Starr Pass Blvd., Tucson,
6   Arizona, commencing at 1:17 p.m., on the 14th of
7   May, 2025, before Maureen O'Connor Pollard,
8   Registered Diplomate Reporter, Realtime Systems
9   Administrator, California CSR #14449.
10
11
12              – – –
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1   APPEARANCES:
2
    ON BEHALF OF THE PLAINTIFFS:
3
       WAGSTAFF & CARTMELL
4      4740 Grand Avenue, Suite 300
       Kansas City, Missouri 64112
5      816-701-1145
       BY: MICHAEL P. CUTLER, ESQ.
6         mcutler@wcllp.com
7
    ON BEHALF OF META PLATFORMS, INC. f/k/a
8   FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC;
       INSTAGRAM, LLC; FACEBOOK PAYMENTS, INC.;
9   FACEBOOK OPERATIONS, LLC; FACEBOOK TECHNOLOGIES,
       LLC; SICULUS, INC.; and MARK ELLIOT ZUCKERBERG:
10
       SHOOK, HARDY & BACON LLP
11     2555 Grand Boulevard
       Kansas City, Missouri 64108
12     816-474-6550
       BY: DANA STRUEBY, ESQ.
13        dstrueby@shb.com
       BY: MARTINA FLORIDO, ESQ. (Zoom)
14        mflorido@shb.com
15
16   ON BEHALF OF DEFENDANTS TIKTOK, LTD.; TIKTOK,
       LLC; TIKTOK INC.; BYTEDANCE LTD.; and BYTEDANCE
17   INC.:
18     KING & SPALDING LLP
       110 N Wacker Drive, Suite 3800
19     Chicago, Illinois 60606
       312-764-6929
20     BY: ELLEA LAMB, ESQ. (Zoom)
          elamb@kslaw.com
21
22
23
24
25
```

Page 4

```
1   APPEARANCES (Continued):
2
    ON BEHALF OF SNAP, INC.:
3
       MUNGER, TOLLES & OLSON
4      350 South Grand Avenue, 50th Floor
       Los Angeles, California 90071-3426
5      213-683-9516
       BY: VICTORIA A. DEGTYAREVA, ESQ.
6         victoria.degtyareva@mto.com
       BY: JULIA KONSTANTNINOVSKY, ESQ. (Zoom)
7         julia.konstantninovsky@mto.com
8      and
9      MUNGER, TOLLES & OLSON
       601 Massachusetts Avenue NW
10     Suite 500E
       Washington, DC 20001
11     202-220-1126
       BY: STEPHANY REAVES, ESQ.
12        stephany.reaves@mto.com
13
14  ON BEHALF OF ALPHABET INC., GOOGLE LLC,
    and YOUTUBE, LLC:
15
       WILSON SANSONI GOODRICH & ROSATI
16     650 Page Mill Road
       Palo Alto, California 94304-1050
17     480-550-0259
       BY: SAVANNAH GRANT, ESQ. (Zoom)
18        sgrant@wsgr.com
19     and
20     WILLIAMS & CONNOLLY LLP
       630 Maine Avenue, S.W.
21     Washington, DC 20024
       202-434-5380
22     BY: CAMILA BAYLY, ESQ. (Zoom)
23
    Also Present:
24
    Videographer and Trial Tech:  Dan Lawlor
25
```

Page 5

```
1            INDEX
2   EXAMINATION              PAGE
3   BRIAN A. LAMBERT
4     BY MS. REAVES          10
5
6
7        E X H I B I T S
8   NO.     DESCRIPTION        PAGE
9   Tucson-
    Lambert-1   Brian A. Lambert's resume.....  14
10
    Tucson-
11  Lambert-2   Chart of school districts....  26
12  Tucson-    Plaintiff's Amended Answers
    Lambert-3    to Defendants'
13            Interrogatories to Tucson
            Unified School District
14            (Set 3)....................   30
15  Tucson-    TUSD 2022-23 Top 5
    Lambert-4   Violations of all Students
16            at 10 Schools in Silverbell
            Region, Bates
17            SM_TUSD_00174217 through
            4218......................    50
18
    Tucson-    2022-23 Site-Based
19  Lambert-5  Discipline Monthly Report
            (MDR), Bates
20            SM_TUSD_00434287 through
            4293......................    56
21
    Tucson-    2022-23 Site-Based
22  Lambert-6  Discipline Monthly Report
            (MDR), Bates
23            SM_TUSD_00598989 through
            8992......................    64
24
25
```

2 (Pages 2 - 5)

Page 6

1    Tucson-    Cycle 12 - 2014 21st
2    Lambert-7    Century Community Learning
         Centers Grant Application,
3        Bates SM_TUSD_00375968
         through 6035................ 68
4
     Tucson-    Letter, Bates
5    Lambert-8    SM_TUSD_00195950 through
         5955........................ 85
6
         ..............................
7
     Tucson-    2/7/2020 e-mail, Bates
8    Lambert-9    SM_TUSD_00212442............ 97
9    Tucson-    November 15, 2022 Agenda
     Lambert-10    for Regular Board Meeting.... 101
10
     Tucson-    5/14/2021 e-mail, Bates
11   Lambert-11    SM_TUSD_00107993............ 105
12   Tucson-    Excel spreadsheet, Bates
     Lambert-12    SM_TUSD_00107999............ 107
13
     Tucson-    3/21/2024 e-mail, Bates
14   Lambert-13    SM_TUSD_00206635............ 121
15   Tucson-    E-mail chain, Bates
     Lambert-14    SM_TUSD_00367147 and 7148.... 125
16
     Tucson-    Valencia Middle School
17   Lambert-15    Faculty and Staff Handbook,
         Bates SM_TUSD_00145482
18       through 5504................ 129
19   Tucson-    Slide deck, Valencia Middle
     Lambert-16    School, Welcome Vesey
20       Elementary Parents, Bates
         SM_TUSD_00464074............ 132
21
     Tucson-    11/3/2020 e-mail, Bates
22   Lambert-17    SM_TUSD_00142655............ 133
23   Tucson-    Excel spreadsheet, Bates
     Lambert-18    SM_TUSD_00142656............ 134
24
     Tucson-    2/11/2019 e-mail, Bates
25   Lambert-19    SM_TUSD_00142658............ 136

Page 7

1
     Tucson-    E-mail chain, Bates
2    Lambert-20    SM_TUSD_00149897 and 9898.... 140
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1              - - -
              DEPOSITION SUPPORT INDEX
2              - - -
3
     Direction to Witness Not to Answer
4    PAGE       LINE
     None.
5
6
7
8    Request for Production of Documents
     PAGE       LINE
9    None.
10
11
     Stipulations
12   PAGE       LINE
     None.
13
14
15   Questions Marked Highly Confidential
     PAGE       LINE
16   None.
17
18
19
20
21
22
23
24
25

Page 9

1              P R O C E E D I N G S
2
3         THE VIDEOGRAPHER:  We're now on the
4    record.  My name is Dan Lawlor, I'm a
5    videographer representing Golkow, a
6    Veritext division.
7         Today's date is May 14, 2025, and
8    the time is 1:17 p.m.  This video
9    deposition is being held in Tucson,
10   Arizona, in the matter of Social Media MDL
11   3047, Tucson Unified School District
12   versus Meta Platforms Inc., et al.
13        The deponent is Brian Lambert.
14        Counsel will be noted on the
15   stenographic record.
16        The court reporter is Maureen
17   Pollard, and will now swear in the
18   witness.
19              *   *   *
20   Whereupon,
21        BRIAN A. LAMBERT,
22   being first duly sworn to testify to the truth,
23   the whole truth, and nothing but the truth, was
24   examined and testified as follows:
25              ///

3 (Pages 6 - 9)

CONFIDENTIAL

1          EXAMINATION
2 BY MS. REAVES:
3     Q.  Could you please state your name for
4 the record?
5     A.  Brian Lambert.
6     Q.  And you understand that today you're
7 testifying under oath?
8     A.  Yes, ma'am.
9     Q.  And so it's as if you were in court.
10 Yes?
11    A.  Yes.
12    Q.  And then so that our court reporter
13 can take down what we're saying, we have to make
14 sure we verbally say "yes" or "no" or whatever
15 your response is.
16    A.  All right.
17    Q.  Is there any reason you can't give
18 truthful and accurate testimony today?
19    A.  No.
20    Q.  Do you understand if I say "TUSD" or
21 "the district," I'm talking about Tucson Unified
22 School District?
23    A.  Correct.
24    Q.  And if I say "defendants'
25 platforms," I'm referring to Facebook,

1 Instagram, TikTok, YouTube, and Snapchat.  Okay?
2     A.  Yes.
3     Q.  Where are you employed?
4     A.  Tucson Unified School District.
5     Q.  And what's your current title?
6     A.  Regional assistant superintendent.
7     Q.  Now, as a regional assistant
8 superintendent, what are your primary
9 responsibilities?
10    A.  I oversee 17, 18 schools, their
11 day-to-day operations, supporting both the
12 principals -- any of the administration as well
13 as staff on those campuses, working with
14 families, community as well.
15    Q.  How much time do you spend in
16 schools?
17    A.  I would say a majority of my time,
18 so 75 percent of my day.
19    Q.  And do you work directly with
20 students?
21    A.  No.
22    Q.  Are there -- can you tell me which
23 positions report directly to you?
24    A.  Principals.
25    Q.  And are there any -- you can finish

1 your answer.
2     A.  Interscholastic's director as well.
3     Q.  And interscholastic's director, is
4 that school sports?
5     A.  Yeah.
6     Q.  Is it anything besides school
7 sports?
8     A.  No, it's just all the athletics.
9     Q.  And aside from the principals who
10 report to you directly and the interscholastic's
11 director, is there anyone else that you
12 supervise in the district?
13    A.  My assistant, Darlene Matus.
14    Q.  How long have you been a regional
15 assistant superintendent?
16    A.  I think this is coming at year
17 seven.
18    Q.  Do you have any role with respect to
19 student discipline?
20    A.  Yes.
21    Q.  What's your role with respect to
22 student discipline?
23    A.  I support principals with
24 discipline.
25    Q.  And do you have any role with

1 respect to school safety?
2     A.  Yes.
3     Q.  What is your role with respect to
4 school safety?
5     A.  Working with principals about
6 keeping their campuses safe.
7     Q.  Do you have any role in managing a
8 budget?
9     A.  Yes.
10    Q.  What budget do you manage?
11    A.  You said a role, so...
12    Q.  So what is your role in managing
13 school budgets?
14    A.  So I work with principals who manage
15 a budget for their site as well as the
16 interscholastic's director.
17    Q.  So do you have a budget that you
18 directly manage?
19    A.  I have a very small budget that I
20 would manage -- that's in our department for
21 supplies.
22    Q.  Okay.  And do you have any role in
23 the districtwide budget?
24    A.  I'm going to say not directly, no.
25    Q.  Do you have any role with respect to

CONFIDENTIAL

1 student mental health?
2     A.   Yes.
3     Q.   And what's your role with respect to
4 student mental health?
5     A.   Working with principals, working
6 with their students.
7         MS. REAVES:  All right.  I want to
8     mark for identification as Exhibit 1, this
9     is Tab 1.
10     Q.   And we're going to give you a paper
11 copy, and then you're going to see the document
12 come up on the screen in front of you.
13         (Whereupon, Tucson-Lambert-1 was
14         marked for identification.)
15 BY MS. REAVES:
16     Q.   Do you recognize Exhibit 1?
17     A.   I do.
18     Q.   All right.  This is your résumè?
19     A.   Yes.
20     Q.   And is this résumè up to date?
21     A.   Yes.
22     Q.   I want to just get a high level
23 overview of your educational and career
24 background before you got to this current
25 position.

1         So just to start, you have a degree
2 in elementary education from the University of
3 Arizona?
4     A.   Correct.
5     Q.   And then you have a master's degree
6 in educational leadership from Northern Arizona
7 University?
8     A.   Yes.
9     Q.   All right.  Do you have any other
10 postsecondary education?
11     A.   No.
12     Q.   In either of these degrees, was
13 there any specialization in mental health?
14     A.   No.
15     Q.   And then I think it will be easiest
16 if we start at the back of your résumè, kind of
17 move forward.
18         It looks like you started your
19 career as an elementary school teacher in Tucson
20 Unified School District?
21     A.   Correct.
22     Q.   Okay.  And when you started in 1997
23 to 2006, what school were you teaching in?
24     A.   Jefferson Park and Booth Fickett.
25     Q.   What did you teach?

1     A.   Jefferson Park, I taught fourth
2 grade for two years and first through fifth
3 grade.  And then at Booth Fickett I taught sixth
4 grade social studies, language arts.
5     Q.   Was Booth Fickett also an elementary
6 school?
7     A.   It's a K-8.
8     Q.   And then your next role from
9 2006-2008 was at John B. Wright Elementary, is
10 that right?
11     A.   Yes.
12     Q.   That was as an assistant principal?
13     A.   Correct.
14     Q.   Is John B. Wright also a school in
15 Tucson Unified School District?
16     A.   Yes.
17     Q.   It looks like 2009 to 2012 you were
18 a deck supervisor?
19     A.   Correct.
20     Q.   What is that?
21     A.   Swim school, so supporting teachers
22 in the water with their students.
23     Q.   And was that role separate from your
24 role in Tucson Unified School District?
25     A.   Yes.

1     Q.   And then from 2008 to 2012, you were
2 a middle school assistant principal, is that
3 right?
4     A.   Correct.
5     Q.   Okay.  At Utterback Fine Arts Magnet
6 Middle School?
7     A.   Correct.
8     Q.   That is a school in Tucson Unified
9 School District?
10     A.   Yes.
11     Q.   Moving forward, the next role from
12 2012 to 2014, it says you were assistant
13 director of student equity and intervention, is
14 that right?
15     A.   Correct.
16     Q.   Can you tell us what that role is?
17     A.   I oversaw parts of the unitary
18 status plan, working with PBIS, restorative
19 practices, rights and responsibilities at that
20 time.
21     Q.   Okay.  At just a high level, what is
22 a unitary status plan?
23     A.   It was a lawsuit.  It was part of
24 the deseg lawsuit with Tucson Unified School
25 District.

CONFIDENTIAL

Page 18

1    Q.    And what is the deseg lawsuit?
2    A.    It was a lawsuit from the '70s
3 brought on by the Fishers and the Mendozas for
4 the Mexican American students and African
5 American students working for getting equal
6 rights in education here in Tucson.
7    Q.    Okay.
8    A.    In TUSD.
9    Q.    And in 2012 to 2014, you said you
10 were working on a unitary status plan?
11    A.    Mm-hmm.
12    Q.    And what were you doing in that plan
13 with relation to the desegregation litigation?
14    A.    I was helping to develop the
15 positive behavior intervention plan that we had.
16    Q.    Okay.  And what is -- you mentioned
17 PBIS.
18        Is that a positive behavioral --
19    A.    Intervention.
20    Q.    -- intervention --
21    A.    System.
22    Q.    -- system.
23        Okay.  And what is that?
24    A.    It's looking for the positives about
25 things rather than the negatives, and

Page 19

1 celebrating student success when they do the
2 right things.
3    Q.    Did that role involve working
4 directly with students?
5    A.    No.
6    Q.    Who did you work with in that role?
7    A.    I would work with administrators on
8 their campuses.
9    Q.    And did that role involve student
10 discipline?
11    A.    It could.
12    Q.    In what way could it involve student
13 discipline?
14    A.    When you're working with students
15 and working on the positive behavior, you may
16 have to work with discipline as well, so there's
17 times that student discipline came up.
18    Q.    Did that role involve student mental
19 health?
20    A.    I don't remember that part.
21    Q.    Okay.  And then you also mentioned a
22 restorative practice plan.
23        What is that?
24    A.    This is when you have -- restorative
25 practice is when someone has done something

Page 20

1 wrong, it's restoring and fixing the issue.  So
2 we would work with students if they've wronged
3 another student to repair that, and we sit down
4 and we work through that problem.  So we repair
5 it.  We don't just give the discipline and move
6 on, that we work through the problem as well to
7 restore it.
8    Q.    And with the restorative practice
9 plan, were you working directly with students
10 or, again, working with administrators?
11    A.    No, working with administrators.
12    Q.    All right.  And then this role of
13 assistant director, student equity intervention,
14 were you working with administrators
15 districtwide or in a particular region?
16    A.    No, districtwide.
17    Q.    Okay.  So in, turning to the next
18 page, 2014 to 2018 you were the principal of
19 Hollinger PK through 8 School, is that right?
20    A.    That's correct.
21    Q.    Okay.  And then in the summer 2024
22 you were an AVID staff developer?
23    A.    That's correct.
24    Q.    What does that mean?
25    A.    I provided staff development

Page 21

1 utilizing AVID strategies to teach elementary
2 administrators, that's what I did last summer,
3 about the AVID program.
4    Q.    All right.  And then the next line
5 on your rèsumè says Project Momentum Principal
6 Coach 2024-2025 school year.
7        What is that?
8    A.    That was coaching a principal in
9 Page about working to improve their school's
10 academics aligning with the state and, like,
11 improvement plans.
12    Q.    Okay.  And you said coaching a
13 principal in Page.
14        What does that mean?
15    A.    The school that I was working with,
16 it was in Page, Arizona.
17    Q.    I see.  Okay.
18    A.    So I worked with the principal.
19    Q.    You were supporting a principal
20 outside of Tucson Unified School District?
21    A.    Right.  I'm a principal coach, like
22 I'm a support.
23    Q.    And then that brings us to present,
24 where you are the regional assistant
25 superintendent, is that right?

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1    A.    Correct.
2    Q.    Okay.  Do you have any educational
3  employment -- strike that.
4        Do you have any employment that is
5  not reflected in your rèsumè?
6    A.    I would say yes, as a younger kid.
7    Q.    Postsecondary employment?
8    A.    Oh, no.
9    Q.    And then at the back, the beginning
10  of the rèsumè, again, there's a section that
11  says Conferences, Committees, and In-services.
12        Do you see that section?
13    A.    Mm-hmm.
14    Q.    Okay.  Can you tell me what is ASCD
15  Conferences?
16    A.    Arizona School for -- it's like an
17  administrator conference.
18    Q.    And then Inclusion Model Training,
19  what is that?
20    A.    Working with exceptional ed students
21  and mainstreaming them into the general ed
22  classroom.
23    Q.    And in Tucson Unified School
24  District, exceptional education includes special
25  education students?

Page 23

1    A.    Exceptional ed, yes.
2    Q.    National At Risk Conference, what is
3  that?
4    A.    That's a conference that works to
5  support schools and leaders on addressing issues
6  with students that are most at risk, and that
7  could be based on socioeconomic or their, like,
8  demographics as well.
9    Q.    And then attended TUSD's DIBELS --
10    A.    DIBELS.
11    Q.    -- DIBELS training.
12        What is that?
13    A.    That's a reading program.  That's
14  usually K-3.
15    Q.    The SIOP training, what --
16    A.    SIOP.  SIOP training is working with
17  students as they learn a second language, so
18  English.  So it's strategies that you utilize to
19  support those students.
20    Q.    And what about SEI/ELL?
21    A.    Those are the students are SEI and
22  ELL students.  So that's going to be knowing
23  what we have to do by law to support those
24  students.
25    Q.    The Bully Prevention Workshop in

Page 24

1  2004?
2    A.    I'm not going to remember exactly
3  everything about that.
4    Q.    Okay.  Was that related to
5  preventing bullying?
6    A.    Yes, that's what it says.
7    Q.    And then do you remember the Bully
8  Proofing Your School Committee 2004 to 2005?
9    A.    No.
10    Q.    Do you agree that that was also
11  relating to --
12    A.    Bully proofing, mm-hmm.
13    Q.    Okay.  And then the last question I
14  have is about the Booth Fickett Discipline
15  Committee.
16        What was that?
17    A.    That was before I was an
18  administrator.  That was being on a committee
19  that reviews discipline on a campus.
20    Q.    Now, do you have any specialized
21  training in mental health?
22    A.    No.
23    Q.    And you're not a medical doctor?
24    A.    No.
25    Q.    You're not a psychologist?

Page 25

1    A.    No.
2    Q.    Do you have any specialized training
3  in addiction?
4    A.    No.
5    Q.    Have you ever been deposed before
6  today?
7    A.    No.
8    Q.    Have you ever testified in court?
9    A.    No.
10    Q.    And did you do anything to prepare
11  for this deposition today?
12    A.    We met together.
13    Q.    You met with counsel?
14    A.    Mm-hmm.
15    Q.    Okay.  Did you do anything besides
16  meet with counsel to prepare for this
17  deposition?
18    A.    No.
19    Q.    Did you review any documents to
20  prepare for this deposition?
21    A.    (Nodding in the negative).
22    Q.    You have to say verbally.
23    A.    No.  Sorry.  No.
24    Q.    Did you take any notes in
25  preparation for this deposition?

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1    A.   No.
2    Q.   And did you bring any documents or
3  notes with you today?
4    A.   No.
5        MS. REAVES:  I want to mark for
6    identification as Exhibit 2, it's going to
7    be Tab 2.
8        (Whereupon, Tucson-Lambert-2 was
9        marked for identification.)
10 BY MS. REAVES:
11   Q.   And, again, we'll give you a
12 physical copy and then pull it up on the screen.
13       I want to ask you some questions to
14 get an overview of the Silverbell Region.  Okay?
15       Now, Exhibit 2 is the list of the
16 regions, schools, and associated superintendents
17 in Tucson Unified School District, right?
18   A.   That's correct.
19   Q.   Does this accurately list the
20 schools that you supervise in the Silverbell
21 Region?
22   A.   Yes.
23   Q.   Could you describe at a high level
24 the socioeconomic status of the schools in your
25 region?

Page 27

1    A.   I don't think I could give a -- I
2  don't have the -- that data that I could do --
3    Q.   Do you know how many schools in your
4  region are Title I schools?
5    A.   All of them.
6    Q.   And do you know if there are any
7  schools in your region that are significantly
8  more or less economically disadvantaged than the
9  others?
10   A.   Yeah.  I have a variety of, mm-hmm.
11   Q.   Are there -- could you tell us if
12 there are any outliers here?
13       MR. CUTLER:  Object to form.
14       THE WITNESS:  I'm going to say -- I
15   think I -- I don't know if I -- I'm going
16   to say Robins likely could be a higher
17   socioeconomic than the rest of them.
18 BY MS. REAVES:
19   Q.   And do you know which is the lowest
20 socioeconomic status?
21   A.   No.
22   Q.   Are there differences between the
23 schools in terms of their socioeconomic status?
24   A.   I think there could be.
25   Q.   What differences are you thinking of

Page 28

1  that it could be?
2    A.   The free and reduced lunch rates,
3  which I don't know, but I imagine there's going
4  to be a difference in free and reduced lunch.
5    Q.   Are there any schools that you know
6  have recently or over the time as a regional
7  assistant superintendent that have not had
8  Title I status?
9    A.   They've all.
10   Q.   Could you describe the demographic
11 makeup of the schools in your region?
12   A.   I don't think I could do that
13 specifically.  I think I'd have to go to the
14 district to get that information.
15   Q.   Are there any schools that are a
16 majority of a particular demographic group?
17       MR. CUTLER:  Object to form.
18       THE WITNESS:  Again, I think I
19   just -- it would be a generalization, so I
20   don't want to say.
21 BY MS. REAVES:
22   Q.   All right.  Are there differences in
23 between the schools in terms of their
24 proportions of students of different
25 ethnicities?

Page 29

1        MR. CUTLER:  Object to form.
2        THE WITNESS:  There could be, but I
3    don't have that information.
4  BY MS. REAVES:
5    Q.   And are there differences between
6  the schools in terms of the proportion of
7  students who are immigrants or children of
8  immigrants?
9    A.   There could be.
10   Q.   All right.  Do you know if there are
11 any schools that have refugee students in your
12 region?
13   A.   There could be.
14   Q.   Could you describe the academic
15 performance of the schools in your region?
16   A.   I could tell you Wakefield Middle
17 School, at the bottom, is an A school.
18       My D schools are going to be
19 Maldonado, I think Valencia, and Pistor.  And
20 then Cs and Bs for the rest.
21       I don't have any F schools right
22 now.
23   Q.   So there are differences between the
24 academic performance of the different schools?
25   A.   According to the state, yes.

8 (Pages 26 - 29)

Page 30

1    Q.   And you're referring to state letter
2  grades.
3        Is that the letter grades assigned
4  by the Arizona State Board of Education?
5    A.   Mm-hmm.
6    Q.   I want to talk a little bit about
7  how the staff in your region spend their time,
8  okay?
9        MS. REAVES:  So I'm going to mark
10    for identification Exhibit 3.  This is
11    going to be Tab 3.
12        (Whereupon, Tucson-Lambert-3 was
13    marked for identification.)
14  BY MS. REAVES:
15    Q.   And we'll give you a copy and then
16  have it up on the screen.
17        All right.  Do you recognize
18  Exhibit 3?
19    A.   Not really, no.
20    Q.   So I'll represent to you that this
21  document is the responses that TUSD provided to
22  defendants as part of this -- questions
23  defendants asked in this litigation, okay?
24    A.   Mm-hmm.
25    Q.   And so the document is called

Page 31

1  Plaintiff's Amended Answers to Defendants'
2  Interrogatories to Tucson Unified School
3  District (Set 3).
4        And if we can turn to page 4 of the
5  document?
6        And actually if we go back for a
7  second to page 2 of the document where it says
8  Interrogatory 5, the question that defendants
9  asked was, "For each category of damages for
10  which You are seeking damages in this action" --
11  and then if you jump to the end of it -- "please
12  describe what the category includes, explain how
13  You performed or arrived at Your computation,
14  and identify each cost or other input that You
15  used in Your computation."
16        Do you see that?
17    A.   No.  I'm trying to find it.
18    Q.   Okay.  If you look on the screen,
19  it's also highlighted.
20    A.   Oh, okay.
21    Q.   No worries.
22    A.   Okay.
23    Q.   Okay.  And so if we turn now to
24  page 4, you see Tucson Unified School District's
25  response, okay?

Page 32

1    A.   All right.
2    Q.   And the response in the second
3  paragraph was, "In calculating damages
4  associated with Category 1, Plaintiff identified
5  costs associated with certain staff, including
6  teachers, assistant principals, principals, and
7  staff providing mental health and related
8  student support services.  A percentage was then
9  applied to each staff category or position for
10  each respective year to reach an approximate
11  total of this category of damages."
12        Do you see that?
13    A.   Mm-hmm.  Yes.
14    Q.   Thank you.
15        Do you understand what "damages"
16  means in this context?
17    A.   Yes.
18    Q.   So damages is the amount of money
19  that the school district is asking for from
20  defendants, right?
21    A.   Correct, yes.
22    Q.   And if we turn to Exhibit 1, there
23  are two tables, and let's look at the first
24  table.  And it's a little bit easier to see on
25  the screen.

Page 33

1        All right.  So Exhibit 1 in the
2  first column lists certain positions for which
3  TUSD is claiming a portion of the costs for the
4  positions as allegedly caused by defendants'
5  platforms, okay?
6    A.   Okay.
7    Q.   All right.  Did you have any role in
8  determining the positions that would be included
9  in this chart?
10    A.   No.
11    Q.   And then do you know how the
12  positions included in this chart were
13  determined?
14    A.   No.
15    Q.   Now, if you look at the
16  second-to-last column, there is a column called
17  Weight, and then underneath there are
18  percentages.
19        Now, did you have any role in
20  determining the percentages to assign to each
21  staff position?
22    A.   No.
23    Q.   And do you know how TUSD determined
24  the percentages to assign to each staff
25  position?

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1    A.   No.
2    Q.   Do you supervise any of these
3 positions listed?
4    A.   No.
5    Q.   Let's turn to the next page.  The
6 next page again has a chart of positions.  It's
7 a little bit easier to see on the screen.  It's
8 very small.
9         Now, again there's a list of
10 positions in the second column.  Did you have
11 any role in determining the positions to include
12 here?
13    A.   No.
14    Q.   And then again we see in the
15 third-to-last column there's Weight and then
16 percentages.  Did you have any role in
17 determining the percentages assigned to these
18 positions?
19    A.   No.
20    Q.   Do you know how the positions were
21 chosen for this table?
22    A.   No.
23    Q.   And do you know how the percentages
24 were assigned to these roles?
25    A.   No.

Page 35

1    Q.   Do you supervise any of the roles on
2 this table?
3    A.   Yes.
4    Q.   Which roles do you supervise?
5    A.   The principals.
6    Q.   Okay.  And have you ever studied
7 what percentage of time principals in your
8 region spend on issues allegedly related to
9 defendants' platforms?
10        MR. CUTLER:  Object to form.
11        THE WITNESS:  No.
12 BY MS. REAVES:
13    Q.   Okay.  Are you aware of any data on
14 how principals spend their time in the district?
15    A.   No.
16    Q.   Are you aware of any data on how
17 assistant principals spend their time in the
18 district?
19    A.   No.
20    Q.   Are you aware of any data on how
21 teachers spend their time in the district?
22    A.   No.
23    Q.   Okay.  Do you agree that there's
24 variation in how teachers in your region spend
25 their time throughout a school year?

Page 36

1        MR. CUTLER:  Object to form.
2        THE WITNESS:  I don't say that about
3    my teachers in my region.
4 BY MS. REAVES:
5    Q.   So setting aside the chart, I'm
6 asking, for teachers in your region, do they all
7 spend their time in the exact same way
8 throughout a school year?
9    A.   I wouldn't know.
10    Q.   Okay.  What about assistant
11 principals in your region, do they spend their
12 time in the exact same way?
13    A.   I wouldn't know.
14    Q.   Okay.  And then for principals in
15 your region, do they spend their time in the
16 exact same way?
17    A.   I'm going to say no.
18    Q.   Do you know if anyone from the
19 district collected data from teachers, assistant
20 principals, or principals regarding how much
21 time they spend on issues relating to
22 defendants' platforms?
23    A.   I don't know that.
24    Q.   Now, for the schools that you
25 supervise in your region -- and we're turning

Page 37

1 away from this document -- do you conduct any
2 analysis of disciplinary trends at the schools
3 in your region?
4    A.   I don't do analysis of discipline.
5    Q.   Do you review any data or reports on
6 disciplinary trends for schools in your region?
7    A.   I do review reports.
8    Q.   Okay.  What do you review?
9    A.   Reports given by our student
10 relations department on student discipline.
11 Those are usually like monthly or quarterly.
12    Q.   And do those monthly or quarterly
13 reports give you data on discipline in
14 individual schools?
15    A.   Yes.
16    Q.   Do the monthly or quarterly reports
17 give you data on discipline across your region?
18    A.   I'm going to need you to clarify
19 that.
20    Q.   Is there -- the reports that you
21 receive from the student relations department,
22 do they look at regional trends or districtwide
23 trends in code of conduct violations?
24    A.   Not in the report.  Mine is just
25 going to go by individual schools.

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1    Q.   Okay.  Are you aware of any report
2  or analysis of districtwide or regional-wide
3  disciplinary trends?
4    A.   I think they do, but I don't know
5  that.  That's not something given to me.
6    Q.   In any of the disciplinary reports
7  that you received from the student relations
8  department, have any conducted -- have any
9  contained information about the number of
10  disciplinary incidents related to social media?
11        MR. CUTLER:  Object to form.
12        THE WITNESS:  I don't remember that.
13  BY MS. REAVES:
14    Q.   And do you know of any other data or
15  analysis of discipline that assesses the number
16  of code of conduct violations that are related
17  to social media?
18    A.   Not -- no.
19    Q.   Now, you mentioned receiving these
20  reports from the student relations department.
21  Do you meet with school-based administrators to
22  discuss any disciplinary trends at particular
23  schools?
24    A.   We'll have conversations, yeah.
25    Q.   Okay.  And how often do you have

Page 39

1  those conversations?
2    A.   Whenever they're needed, so could be
3  monthly, could be quarterly, could be yearly --
4  annually.  It just depends on each campus.
5    Q.   Okay.  And when you're having those
6  conversations, who is included in the
7  conversation?
8        MR. CUTLER:  Object to form.
9        THE WITNESS:  Usually it's the
10    principal and I.
11  BY MS. REAVES:
12    Q.   Okay.  And when you have these
13  conversations with the principal about
14  discipline at their school, is there any
15  documentation or summary of the conversation?
16        MR. CUTLER:  Object to form.
17        THE WITNESS:  No.  It's usually a
18    conversation.
19  BY MS. REAVES:
20    Q.   Are there any presentations or
21  reports that are made in conjunction with this
22  conversation?
23        MR. CUTLER:  Object to form.
24        THE WITNESS:  No.
25        ///

Page 40

1  BY MS. REAVES:
2    Q.   Are you familiar with the term
3  "monthly behavior management meetings"?
4    A.   Yes.
5    Q.   And what are those?
6    A.   I think those are the site monthly
7  meetings that they have on each of the campuses.
8    Q.   Okay.  And when you say "site
9  monthly meetings that they have," who is
10  involved in these meetings?
11    A.   The site discipline teams.
12    Q.   Okay.  And the site discipline team,
13  who does that include?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  Administrators,
16    counselors, and whoever else they choose
17    to have on the committee.
18  BY MS. REAVES:
19    Q.   And when you refer to a site
20  administrator, are you referring to principal
21  and assistant principal?
22    A.   It could.
23    Q.   Are there other roles that are site
24  administrators?
25    A.   Not that I'm aware of.

Page 41

1    Q.   And you mentioned a committee.  What
2  committee are you referring to?
3    A.   A discipline committee.
4    Q.   And what's a discipline committee?
5    A.   The committee that reviews the site
6  discipline monthly.
7    Q.   Okay.  Does every school have a
8  discipline committee?
9        MR. CUTLER:  Object to form.
10        THE WITNESS:  Yes.
11  BY MS. REAVES:
12    Q.   Do you know whether the discipline
13  committee has any reports or presentations that
14  they create as part of their work?
15    A.   I can't say for sure.
16    Q.   Do you attend these site-based
17  monthly meetings?
18    A.   No.
19    Q.   Do you receive a report or an update
20  about these site-based monthly meetings?
21    A.   No.
22    Q.   Now, do you discuss trends in
23  student mental health with other administrators?
24    A.   I could.
25    Q.   Okay.  And when you say "I could,"

CONFIDENTIAL

Page 42

1 when would you discuss student mental health
2 with other administrators?
3     A.   In conversations with administrators
4 or with principals or assistant principals.
5     Q.   And when you're having those
6 conversations with administrators, do you
7 discuss student mental health in the context of
8 an individual student or in terms of broader
9 trends, or something else?
10    A.   It could be both.
11    Q.   When do you discuss student mental
12 health in the context of broader trends?
13    A.   If a principal brings it up to me
14 and says, We're noticing, then we talk about it.
15    Q.   Okay.  Are there any notes or
16 documentation of these conversations with
17 principals about student mental health trends?
18        MR. CUTLER:  Object to form.
19        THE WITNESS:  No, not from me.
20 BY MS. REAVES:
21    Q.   All right.  During these discussions
22 of student mental health with principals, do you
23 discuss social media?
24    A.   We could.
25    Q.   And when would you discuss social

Page 43

1 media?
2     A.   When they brought it up.
3     Q.   Okay.  And is there any
4 documentation of the discussion about how social
5 media is connected to mental health trends?
6        MR. CUTLER:  Object to form.
7        THE WITNESS:  Not that we're
8     creating.
9 BY MS. REAVES:
10    Q.   Now, when you are discussing trends
11 in behavior or discipline with principals in
12 your school, do you or does anyone on your team
13 create a written plan of how to address behavior
14 or discipline going forward?
15    A.   Not -- I don't.
16    Q.   Okay.  And do you know if any
17 site-based administrators create written plans
18 about how to address behavior or discipline
19 going forward?
20    A.   I don't know if they do.
21    Q.   All right.  So you mentioned that in
22 your role you sometimes review behavior or
23 discipline reports that you receive from the
24 student relations department, is that right?
25    A.   Mm-hmm.

Page 44

1     Q.   Okay.  So when you do review those
2 reports, what sort of data are you reviewing?
3        MR. CUTLER:  Object to form.
4        THE WITNESS:  Number of incidents,
5     risk ratio, maybe if we see an increase in
6     something.
7 BY MS. REAVES:
8     Q.   What is "risk ratio"?
9     A.   That's the number of incidents to
10 number of students.
11    Q.   And you mentioned that data you
12 might be looking at is increase of something.
13 Does the data that you review track code of
14 conduct violations involving social media use?
15        MR. CUTLER:  Object to form.
16        THE WITNESS:  It may.
17 BY MS. REAVES:
18    Q.   In what way does it track code of
19 conduct violations?
20    A.   If it's in Synergy, I guess it's in
21 there.
22    Q.   And when you say "if it's in
23 Synergy," where in Synergy would a connection to
24 social media be documented?
25        MR. CUTLER:  Object to form.

Page 45

1        THE WITNESS:  It could be in there
2     with use of technology, you know, social
3     media threat.
4 BY MS. REAVES:
5     Q.   Okay.  And so starting with "use of
6 technology," improper use of technology is a
7 code of conduct violation category?
8     A.   Mm-hmm.
9     Q.   Yes?
10    A.   Yes.
11    Q.   And improper use of technology
12 includes more than just use of social media,
13 right?
14    A.   Yes.
15    Q.   Okay.  It could also include
16 cellphone use more broadly?
17    A.   Yes.
18    Q.   Okay.  And it could also include
19 improper use of a computer?
20    A.   Yes.
21    Q.   All right.  And then you mentioned
22 "social media threat."  Is it your testimony
23 that there's a code of conduct violation called
24 social media threat?
25        MR. CUTLER:  Object to form.

12 (Pages 42 - 45)

CONFIDENTIAL

1        THE WITNESS: No, I don't think
2    there is one that's called social media
3    threat. I think it's like school threat.
4    You may in there say -- they might put in
5    there that it's a social media threat, but
6    I think it's school threat or threat.
7 BY MS. REAVES:
8        Q.   Okay. So the "school threat" or
9    "threat" category includes threats that are
10   made, for example, by phone?
11       A.   Are you saying like someone calls?
12       Q.   Yes.
13       A.   I guess it could. I have not had
14   one of those.
15       Q.   And the school threat category could
16   include threats that are made in person?
17       A.   Yeah, verbal, mm-hmm.
18       Q.   And then when you said that Synergy
19   could document that it is a social media threat,
20   where would it be documented that it's a social
21   media threat if there's not a category for
22   social media threat?
23       A.   So in their notes they can put those
24   kind of things.
25       Q.   And are you able to review the notes

1    that would show documentation of a connection to
2    social media?
3        A.   I could, but I don't go into them.
4    I don't get into that.
5        Q.   Are you able to run reports that
6    would provide the notes?
7        A.   I could, but I don't.
8        Q.   Okay. Now, are there any
9    differences in disciplinary rates between the
10   schools in your region?
11       MR. CUTLER: Object to form.
12       THE WITNESS: There could be.
13   BY MS. REAVES:
14       Q.   When you say "there could be," what
15   do you mean?
16       A.   There could be -- I don't know the
17   specifics, so there could be, yeah.
18       Q.   Okay. Are there any particular
19   schools that consistently have a high percentage
20   of disciplinary incidents?
21       A.   Yes.
22       Q.   What schools are those?
23       A.   I would say Pistor, Valencia, and
24   Cholla.
25       Q.   And are there any schools in your

1    region that consistently have a lower number of
2    disciplinary incidents?
3        A.   I would say yes.
4        Q.   Which schools would those be?
5        A.   But I wouldn't know exactly which
6    ones. I would just assume elementary.
7        Q.   And have you done any analysis of a
8    connection between mental health and social
9    media?
10       A.   No.
11       Q.   Have you -- do you know of any data
12   that the district has that looks at whether
13   there's a connection between mental health and
14   social media in the district?
15       A.   Not that I'm aware of.
16       Q.   Now, when you talk about social
17   media threats, does social media threat mean
18   that a video or a photo was posted on an online
19   platform?
20       MR. CUTLER: Object to form.
21       THE WITNESS: It could.
22   BY MS. REAVES:
23       Q.   All right. And what else could it
24   mean?
25       A.   Could be someone posting on social

1    media a threat to the school or that there could
2    be something.
3        Q.   Okay. But it refers to posting a
4    video or a message or a photograph?
5        MR. CUTLER: Object to form.
6        THE WITNESS: It could.
7    BY MS. REAVES:
8        Q.   And in terms of social media
9    threats, have you ever tried to determine what
10   percentage of threats that the school addresses
11   that are related to social media?
12       A.   No.
13       Q.   And have you ever tried to determine
14   what percentage of threats that the school
15   addresses are particularly related to one of
16   defendants' platforms?
17       A.   No, I have not.
18       Q.   So you've never analyzed how many
19   code of conduct violations involve social media
20   use?
21       A.   I have not.
22       Q.   Okay. And you've never analyzed how
23   many code of conduct violations involve
24   cellphones?
25       A.   I have not.

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    Q.   Have you ever analyzed how many code
2 of conduct violations involve Facebook?
3    A.   No.
4    Q.   Have you ever analyzed how many code
5 of conduct violations involve Instagram?
6    A.   No.
7    Q.   Have you ever analyzed how many code
8 of conduct violations involve TikTok?
9    A.   No.
10    Q.   Have you ever analyzed how many code
11 of conduct violations involve Snapchat?
12    A.   No.
13    Q.   Have you ever analyzed how many code
14 of conduct violations involve YouTube?
15    A.   No.
16        MR. REAVES:  I want to mark for
17    identification -- I think we're on
18    Exhibit 4.  And this is going to be Tab 5.
19        (Whereupon, Tucson-Lambert-4 was
20        marked for identification.)
21 BY MS. REAVES:
22    Q.   Exhibit 4 is a document that says at
23 the top, 2022-23 Top 5 Violations of all
24 Students at 10 Schools in Silverbell Region.
25        Do you see that?

Page 51

1    A.   Mm-hmm, yes.
2    Q.   Do you recognize this as a
3 disciplinary report with data from Synergy?
4    A.   Yes.
5    Q.   Okay.  And this particular report
6 shows the top ten schools in your region that
7 have disciplinary -- or code of conduct
8 violations, is that right?
9    A.   According to this report.
10    Q.   And this report is from 2022-2023.
11        Are there changes over time in which
12 schools are the top ten schools with code of
13 conduct violations?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  I would assume yes.
16    It's fluid.
17 BY MS. REAVES:
18    Q.   Okay.  Now, the last column here, we
19 see it says "Discipline Percentage of
20 Population."
21        Do you see that?
22    A.   Mm-hmm.
23    Q.   Now, these percentages represent the
24 percentage of students at a school who have been
25 disciplined for a code of conduct violation?

Page 52

1        MR. CUTLER:  Object to form.
2        THE WITNESS:  Is that a question?
3 BY MS. REAVES:
4    Q.   It is a question.
5    A.   Okay.  Yes.
6    Q.   Okay.  And so according to this
7 report, as of 2022-2023, Pistor had 22.6 percent
8 of its students with a discipline percentage of
9 population?
10    A.   That's what it says.
11    Q.   Okay.  And Manzo had 5.1 percent of
12 its students with a discipline population?
13    A.   That's what it says.
14    Q.   Fair to say some schools have a much
15 higher discipline percentage of population than
16 others, correct?
17        MR. CUTLER:  Object to form.
18        THE WITNESS:  There's a difference
19    in numbers.
20 BY MS. REAVES:
21    Q.   Now, has TUSD conducted any analysis
22 of why some schools have significantly higher
23 rates, or have higher rates of disciplinary
24 violations than others?
25        MR. CUTLER:  Object to form.

Page 53

1        THE WITNESS:  Not that I have done.
2 BY MS. REAVES:
3    Q.   Okay.  Are you aware of any analysis
4 of why some schools have higher disciplinary
5 rates than others?
6    A.   I would say we could assume, but not
7 that I could analyze or say.
8    Q.   Okay.  In your experience, with
9 decades of experience in Tucson Unified School
10 District, why do some schools have higher
11 disciplinary rates than others?
12        MR. CUTLER:  Object to form.  It's
13    vague.
14        THE WITNESS:  The number of schools
15    on a campus, age of students.  There could
16    be a variety of factors.
17 BY MS. REAVES:
18    Q.   What are some of the other factors?
19        MR. CUTLER:  Object to form.
20        THE WITNESS:  There could be
21    multiple factors.  Number of -- like, do
22    we have vacancies, do we have -- you know,
23    is there a turnover in administration.
24    There's just a variety of things that
25    could be playing into increase in

14 (Pages 50 - 53)

Page 54

1    discipline.
2 BY MS. REAVES:
3        Q.   Now, this report also lists top
4 violations.
5            Do you see that?
6        A.   Mm-hmm.
7        Q.   Okay.  And the violations that are
8 listed in this report are aggression, alcohol,
9 tobacco and other drugs, and then there's a
10 category that's Minor Violations, Minor-Minor
11 Aggression.
12           Do you see that?
13       A.   Yes.
14       Q.   This report does not identify
15 improper use of technology as a top violation,
16 right?
17           MR. CUTLER:  Object to form.
18           THE WITNESS:  It doesn't say that.
19 BY MS. REAVES:
20       Q.   And it doesn't identify anything
21 relating to social media as a top violation,
22 right?
23       A.   It doesn't say that.
24       Q.   Now, are you familiar with Awareity?
25       A.   Yes.

Page 55

1        Q.   Okay.  And Awareity is a reporting
2 system that TUSD has available for anyone to
3 report into the district?
4        A.   Correct.
5        Q.   Okay.  Do you have access to the
6 reports in Awareity for schools in your region?
7        A.   I can get an Awareity complaint,
8 mm-hmm.
9        Q.   All right.  And when the Awareity
10 complaints come in, do you get a notice of that?
11       A.   Mm-hmm.
12       Q.   Yes?
13       A.   Yes.
14       Q.   Okay.  Have you ever analyzed what
15 proportion of Awareity reports are related to
16 social media?
17       A.   No.
18       Q.   Are you aware of anyone else in the
19 district analyzing how many Awareity reports are
20 related to social media?
21       A.   I'm not aware.
22       Q.   Are you familiar with the term
23 "site-based monthly discipline reports"?
24       A.   Yes.
25       Q.   What's a monthly discipline report?

Page 56

1        A.   Those are the discipline committee
2 reports that they turn in to, I believe, student
3 relations.
4        Q.   Those are reports generated by that
5 school-based discipline committee that we
6 discussed?
7        A.   Yes.
8            MS. REAVES:  I want to mark for
9 identification -- I think this is
10 Exhibit 5.  It's going to be Tab 6.
11       Q.   And we'll get you a copy.
12           (Whereupon, Tucson-Lambert-5 was
13           marked for identification.)
14 BY MS. REAVES:
15       Q.   Exhibit 5 says at the top, 2022-23
16 Site-Based Discipline Monthly Report (MDR).
17           Do you see that?
18       A.   Yes.
19       Q.   And then the school name is Valencia
20 Middle School.
21           Do you see that?
22       A.   Yes.
23       Q.   Valencia Middle School is one of the
24 schools in your region?
25       A.   Yes.

Page 57

1        Q.   And then on Table 2, Table 2 is
2 titled, Total Number of Discipline by Week.
3            Do you see that?
4        A.   Yes.
5        Q.   And then the data is broken down by
6 race or ethnicity.
7            Do you see that?
8        A.   Yes.
9        Q.   Okay.  And then underneath the table
10 it says, "Is there a trend?  Yes."  And then,
11 "If yes?  Either explain below."
12           Do you see that portion?
13       A.   Yes.
14       Q.   All right.  So according to this
15 report, for Valencia Middle School, September 9,
16 2022, it says the trend was "Hispanic students
17 are being disciplined more often than other
18 ethnicities."
19           Do you see that?
20       A.   Yes.
21       Q.   Okay.  Why does TUSD analyze
22 disciplinary data broken out by race or
23 ethnicity?
24       A.   It was part of the deseg order.
25       Q.   Okay.  And then if we turn the page

15 (Pages 54 - 57)

CONFIDENTIAL

1 in this document, it also discusses weekly
2 trends. Okay?
3        So if you go to page 3 where it says
4 weeks of August 4, 2022 to August 15, 2022, do
5 you see that? It's a little bit easier to see
6 on the screen, if we can make it bigger.
7     A.   Okay. Yeah.
8     Q.   Okay. And it says the principal at
9 the school is Stacey Gist.
10    A.   Gist.
11    Q.   Is that the principal at Valencia?
12    A.   Mm-hmm.
13    Q.   And then in the Notes/Behavior
14 Trends portion, it lists a number of things.
15       Do you see that?
16    A.   Yes.
17    Q.   Okay. So aggression.
18       Do you see aggression?
19    A.   Yep. Yes.
20    Q.   Anger?
21    A.   Yes.
22    Q.   Tardies?
23    A.   Yes.
24    Q.   Vaping/Marijuana Use?
25    A.   Yes.

1     Q.   Improper use of technology is not
2 listed as one of the behavior trends, correct?
3     A.   It's not listed there, but it could
4 be a part of them.
5     Q.   And when you say -- strike that.
6        Social media is also not listed as
7 one of the behavior trends, right?
8     A.   It's not listed there, but it could
9 be part of them. Mm-hmm.
10    Q.   Okay. And this Behavior Management
11 Team: Attendance, you mentioned earlier that
12 there could be a group of school-based
13 individuals who are involved in the Behavior
14 Management Committee, is that right?
15    A.   Yes.
16    Q.   Are the roles reflected in this
17 table the types of roles that would be
18 participating in the discipline community?
19       MR. CUTLER: Object to form. It's
20 vague.
21       THE WITNESS: It could be.
22 BY MS. REAVES:
23    Q.   Now, when you say that improper use
24 of technology or social media could be a part of
25 these notes or behavior trends, which ones could

1 it be a part of?
2        MR. CUTLER: Object to form.
3        THE WITNESS: Could be just about
4     any of those. I'm just speculating.
5 BY MS. REAVES:
6     Q.   Okay. Do you have any data to
7 support your speculation that social media was a
8 part of these behavior trends?
9        MR. CUTLER: Object to form,
10    characterization.
11       THE WITNESS: No.
12 BY MS. REAVES:
13    Q.   And when we see the category of
14 Future To-Do's -- do you see that section?
15    A.   Mm-hmm.
16    Q.   All right. Now, that section is a
17 list of some things that the behavior management
18 committee has decided could address the behavior
19 trends that they're seeing, right?
20    A.   Mm-hmm.
21    Q.   Is that yes?
22    A.   Yes.
23    Q.   Now, these future to-do's, none of
24 them mention anything related to social media,
25 right?

1     A.   It doesn't say that.
2     Q.   Let's look at the next week. So the
3 next week is for August 15, 2022 to August 19,
4 2022.
5        Do you see that?
6     A.   Yes.
7     Q.   Okay. And then, again, we have
8 "Notes/Behavior Trends (where are the areas of
9 focus this week)."
10       Do you see that?
11    A.   Yes.
12    Q.   Some of the areas of focus, behavior
13 trends are increasing tardies. "There are
14 situations where students are using very
15 homophobic language targeting specific
16 students."
17       Do you see that?
18    A.   Yes.
19    Q.   Social media is not listed as one of
20 the behavior trends here?
21    A.   It's not listed. But, again, it
22 could be a part of those things. We have girl
23 drama continuing, very likely social media.
24    Q.   Okay. Was there girl drama when you
25 were a teacher in the '90s?

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1     A.   There could have been.  I don't
2   remember.
3     Q.   What about in the 2000s, was there
4   girl drama?
5     A.   There could have been, mm-hmm.
6     Q.   Do you have any data showing that
7   social media is connected to these behavior
8   trends?
9     A.   I don't have data, no.
10    Q.   Are you aware of any data that
11  connects social media to these behavior trends?
12    A.   Not that I'm aware of.
13    Q.   And then, again, when we look at the
14  future to-do's that the behavior management
15  committee came up with, social media is not
16  mentioned?
17    A.   No.
18    Q.   Let's look at the next page.  It's
19  August 22, 2022 through August 26, 2022.
20        Again, under the Notes/Behavior
21  Trends, social media is not mentioned?
22    A.   Correct.
23    Q.   And in the Future To-Do's, no
24  mention of social media?
25    A.   Correct.

Page 63

1     Q.   And then the final week in this
2   month is August 29, 2022 through September 2,
3   2022.
4        Do you see that?
5     A.   I see that.
6     Q.   Okay.  And we see dress code
7   violations becoming common, undermining PBIS.
8        Do you see that?
9     A.   Yes.
10    Q.   We see inappropriate language - N
11  word used frequently?
12    A.   Yes.
13    Q.   Social media is not mentioned?
14    A.   No, it's not.
15    Q.   Okay.  And then in Future To-Dos,
16  social media is not mentioned, right?
17    A.   I'm reading it.
18    Q.   Okay.  I'm sorry.  Take your time.
19    A.   No.
20    Q.   Okay.  And this type of monthly
21  discipline report, does every school's behavior
22  management committee create one of these?
23        MR. CUTLER:  Object to form.
24        THE WITNESS:  Yes, I believe so.
25        ///

Page 64

1   BY MS. REAVES:
2     Q.   And they create it on a monthly
3   basis?
4        MR. CUTLER:  Object to form.
5        THE WITNESS:  I believe they do.
6   BY MS. REAVES:
7     Q.   Do you know how long TUSD schools
8   have been creating these monthly discipline
9   reports?
10    A.   I don't.
11    Q.   Do you know if it started --
12    A.   I don't remember.
13    Q.   Have these monthly discipline
14  reports existed during your entire time as a
15  regional assistant superintendent?
16        MR. CUTLER:  Object to form.
17        THE WITNESS:  I believe so.
18        MS. REAVES:  All right.  I want to
19  look at another monthly discipline report.
20  We're going to mark this as Exhibit 6, and
21  this is Tab 37.
22        (Whereupon, Tucson-Lambert-6 was
23        marked for identification.)
24  BY MS. REAVES:
25    Q.   All right.  This one, again, is

Page 65

1   2022-2023 Site-Based Discipline Monthly Report.
2        Do you see that at the top?
3     A.   Yes.
4     Q.   Okay.  And this one is from Morgan
5   Maxwell K-8?
6     A.   Yes.
7     Q.   And the date of this report is
8   December 7, 2022?
9     A.   Yes.
10    Q.   Is Morgan Maxwell K-8 a school in
11  your region?
12    A.   Yes.
13    Q.   And, again, we see there's a
14  question of "Is there a trend?"
15        Do you see that question?
16    A.   Yes.
17    Q.   And then if we turn to the next
18  page, the description is, "An unexpected
19  increase in aggression among students this
20  month, especially with Hispanic students.
21  Several of the students are on Student Behavior
22  Support Plans.  Increase in behaviors could have
23  a direct correlation to an increase in staffing,
24  especially teacher, absences.  Principal has
25  reached out to the district for support many

17 (Pages 62 - 65)

CONFIDENTIAL

1  times."
2        Do you see that?
3     A.  Yes.
4     Q.  You agree that staff absences,
5  especially teacher absences, can lead to
6  behavioral problems with students?
7     A.  It could.
8     Q.  And also in this report, social
9  media is not mentioned as part of a disciplinary
10  trend?
11     A.  Not in this part, no.
12     Q.  And you can take a look at the
13  report.
14        (Witness reviewing document.)
15     A.  I don't see anything.
16     Q.  So social media is not mentioned in
17  this report?
18     A.  No.
19     Q.  All right.  Has TUSD conducted any
20  analysis of how many of its monthly discipline
21  reports discussed trends that are related to
22  social media?
23        MR. CUTLER:  Object to form.
24        THE WITNESS:  I have not.
25        ///

1  BY MS. REAVES:
2     Q.  And are you aware of any analysis
3  conducted of the monthly discipline reports to
4  see whether they discuss trends related to
5  social media?
6     A.  Not that I'm aware of.
7     Q.  Okay.  And same question for weekly
8  discipline reports, are you aware of any --
9     A.  I have not, and I'm not aware of
10  any.
11        MS. REAVES:  Can we take a quick
12  break?
13        MR. CUTLER:  Sure.
14        THE VIDEOGRAPHER:  We are going off
15  record.  Time, 2:16.
16        (Whereupon, a recess was taken.)
17        THE VIDEOGRAPHER:  We're going back
18  on record.  The time is 2:24.
19  BY MS. REAVES:
20     Q.  Do you agree that there are multiple
21  factors that can impact students' mental health?
22        MR. CUTLER:  Object to form.
23        THE WITNESS:  There could be.
24  BY MS. REAVES:
25     Q.  And you agree that there are

1  multiple factors that impact students' academic
2  performance?
3        MR. CUTLER:  Object to form.
4        THE WITNESS:  There could be.
5  BY MS. REAVES:
6     Q.  You agree that problems in a
7  student's community is one of the factors that
8  can impact students?
9        MR. CUTLER:  Object to form.
10        THE WITNESS:  Say it again?
11  BY MS. REAVES:
12     Q.  Problems in a student's community
13  can impact students?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  I guess that's really
16  vague, so I guess it could, depending on
17  what the issue was.
18  BY MS. REAVES:
19     Q.  All right.  So let's get a little
20  bit more concrete.
21        MS. REAVES:  I want to mark as
22  Exhibit 7, this is Tab 38.
23        (Whereupon, Tucson-Lambert-7 was
24        marked for identification.)
25        ///

1  BY MS. REAVES:
2     Q.  And we'll give you a copy and then
3  pull it up on the screen.
4        So before we get into the document,
5  schools or the district sometimes submit grant
6  applications, right?
7     A.  Yes.
8     Q.  Okay.  And grant applications -- in
9  grant applications, the school has to ascribe
10  why the school needs funding, right?
11     A.  Why they would be a good candidate
12  for the funding, yes.
13     Q.  All right.  And this document at the
14  top is Century Community Learning Centers Grant
15  Application.
16        Do you see that?
17     A.  Yes.  21st Century.
18     Q.  21st Century.  Thank you.  Okay.
19  And this is back in 2014.
20        Are you familiar with the 21st
21  Century Community Learning Centers Grant?
22     A.  Yes.
23     Q.  What is it?
24     A.  It's a grant for before or after
25  school opportunities for schools.

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    Q.   Okay.  And on this page, on line 14,
2  it says, "Coordinator's E-Mail Address,
3  carol.myers@tusd1.org."
4         Do you know who Carol Myers is?
5    A.   No.
6    Q.   Were you involved in putting
7  together this 21st Century Community Learning
8  Centers Grant Application?
9    A.   This is for Hollinger.  I don't
10  remember.
11   Q.   Okay.  Let's go through the
12  document.
13        MR. CUTLER:  You can take as much
14   time as you need to review it --
15        MS. REAVES:  Of course.
16        MR. CUTLER:  -- before you're asked
17   any questions on it if you'd like.
18        THE WITNESS:  Okay.  You can go
19   ahead.
20  BY MS. REAVES:
21   Q.   All right.  Now, if we turn to
22  page 4 of the document, do you see that there's
23  a portion at the top that says Program Need?
24   A.   Mm-hmm.
25   Q.   And I think you said typically grant

Page 71

1  applications require a school to show why
2  they're a good candidate for the grant funds, is
3  that right?
4    A.   Yes.
5    Q.   All right.  And this grant was
6  asking about risk factors, the impact of risk
7  factors, and specific needs for a TUSD school,
8  right?
9    A.   It's for the school that's applying,
10  which happens to be a TUSD school.
11   Q.   Yes.  Okay.
12        And so do you see that Community
13  Risk Factors is one of the categories in the
14  TUSD school response?
15   A.   Yes.
16   Q.   And underneath Community Risk
17  Factors, some of the sub-bullets are Crime.
18        Do you see Crime?
19   A.   Yes.
20   Q.   Okay.  Do you agree that crime in
21  the community can be a risk factor for students?
22        MR. CUTLER:  Object to form.
23        THE WITNESS:  It could be.
24  BY MS. REAVES:
25   Q.   And what does "risk factor" mean to

Page 72

1  you?
2    A.   It could be a risk for the students,
3  for the families.
4    Q.   Okay.  And in terms of grant
5  applications, when you're providing information
6  about a risk factor, what's the purpose of
7  talking about risk factors?
8         MR. CUTLER:  Object to form and
9    foundation.
10        THE WITNESS:  I don't think I wrote
11   this, so I wouldn't know that much about
12   this.  It looks like Tiffany McKee did,
13   who is the principal at Wakefield.
14  BY MS. REAVES:
15   Q.   All right.  Not focusing on this
16  specific application, you agree that crime is a
17  community risk factor?
18   A.   It could be.
19   Q.   Okay.  And you agree that crime can
20  impact students?
21        MR. CUTLER:  Object to form.  It's
22   vague.
23        THE WITNESS:  I would say it could,
24   but it's so -- there's lots of parts of
25   crime.

Page 73

1  BY MS. REAVES:
2    Q.   And so, for example, if students are
3  witnessing violence in their community, that can
4  impact students, right?
5    A.   It could.
6    Q.   It could impact their mental health?
7    A.   It could.
8    Q.   It could impact their sense of
9  safety?
10   A.   It could.
11   Q.   Okay.  The next bullet here is Lack
12  of safety for children.
13        Do you see that?
14   A.   Yes.
15   Q.   And so again, if students or
16  children don't feel safe in their community,
17  that could impact their mental health?
18        MR. CUTLER:  Object to form.
19        THE WITNESS:  I don't know where it
20   says that they don't feel safe in their
21   community.
22  BY MS. REAVES:
23   Q.   So this bullet says, "Lack of safety
24  for children."
25        Do you see that bullet?

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 74

1    A.   Yeah.
2    Q.   "Within the past two weeks, the
3  school has sent out Stranger Danger letters to
4  the community regarding an attempted child
5  abduction in one of the apartment complexes and
6  reports of suspicious vehicles around the school
7  playground area during recess time.  There are 7
8  registered sex offenders who live near our
9  school."
10       Do you see that?
11   A.   Yes.
12   Q.   Okay.  Understanding that you didn't
13 write this application, you agree that if there
14 are attempted child abductions in a child's
15 neighborhood, that could impact their sense of
16 safety?
17       MR. CUTLER:  Object to form.  Vague,
18   incomplete hypothetical, speculative.
19       THE WITNESS:  It could.
20 BY MS. REAVES:
21   Q.   And you agree that if there are
22 numerous registered sex offenders nearby a
23 school, that could impact both parents' and
24 children's sense of safety?
25       MR. CUTLER:  Object to form.  It's

Page 75

1    vague.
2        THE WITNESS:  It could.
3  BY MS. REAVES:
4    Q.   Okay.  On the next page we see
5  "Unstable family situations."
6        Do you see that?
7    A.   Mm-hmm.
8    Q.   And then it describes a little bit
9  more.  "We have a continual stream of children
10 entering and exiting our school with a mobility
11 rate of 46 percent."
12       Do you see that?
13   A.   Yes.
14   Q.   What does "mobility rate" mean?
15   A.   Students coming in and out of the
16 school.
17   Q.   All right.  And when students are
18 coming in and out of the school, that means
19 they're not spending an entire school year at
20 the school?
21   A.   Correct.
22   Q.   And if there's a high mobility rate,
23 that can impact academic performance?
24       MR. CUTLER:  Object to form.
25       THE WITNESS:  It could.

Page 76

1  BY MS. REAVES:
2    Q.   That could impact the school's
3  ability to provide continuous education to
4  students?
5        MR. CUTLER:  Object to form.
6        THE WITNESS:  It could.
7  BY MS. REAVES:
8    Q.   You see the next bullet says
9  "Pervasive poverty"?  "Pervasive poverty affects
10 our school community as 84 percent of our
11 students are enrolled in the Federal Free and
12 Reduced Lunch program."
13       Do you see that?
14   A.   Yes, I do.
15   Q.   "According to our district School
16 Quality Survey, 90 percent of students are not
17 able to complete homework assignments because
18 they do not have a computer with internet access
19 at home."
20       Do you see that?
21   A.   Yes.
22   Q.   And so you agree that poverty can
23 impact students' academic performance?
24       MR. CUTLER:  Object to form.
25       THE WITNESS:  I think it's really

Page 77

1    vague.  That's a big -- all of these are
2    really big, but it could be in a big
3    umbrella.
4  BY MS. REAVES:
5    Q.   You agree that students living in
6  poverty might have more difficulty accessing the
7  resources they need to focus at school, right?
8        MR. CUTLER:  Object to form.
9        THE WITNESS:  I need you to clarify
10   that.  They can't focus at school?
11 BY MS. REAVES:
12   Q.   So, for example, if a student is
13 coming to school hungry because their parents
14 can't afford enough money for food, that could
15 impact their performance at school, right?
16   A.   It could.  We provide every student
17 free breakfast and lunch at every school, so...
18   Q.   Right.
19       And in this example if a student is
20 not able to complete homework assignments
21 because they can't access the internet at home,
22 that could impact students' performance, right?
23       MR. CUTLER:  Object to form.
24       THE WITNESS:  According to this at
25   this time.  I mean, this is 2014, so yeah.

20 (Pages 74 - 77)

Page 78

BY MS. REAVES:
1
2    Q.   So you agree that these are factors
3  that could impact students?
4    A.   They could.
5    Q.   Okay.  Continuing on the next page,
6  do you see at the bottom it says, "Impact of
7  risk factors"?
8    A.   Yes.
9    Q.   "The multiple family and community
10 risk factors impact our students in deleterious
11 ways including low achievement and aggression.
12 The social disturbances and aggression that our
13 student witness in their community is,
14 unfortunately, then translated into anti-social
15 school behavior."
16       Do you agree that for some students
17 when they witness aggression or violence in
18 their community, that can result in antisocial
19 school behavior?
20       MR. CUTLER:  Object to form.  It's
21    vague.
22       THE WITNESS:  I don't know what --
23    what do you mean by that?  That's what it
24    says here.
25       ///

Page 79

1  BY MS. REAVES:
2    Q.   So in your experience as an
3  educator, if there are students who have, for
4  example, lived in a home where there's domestic
5  violence, does that sometimes result in
6  behavioral problems with the student at school?
7       MR. CUTLER:  Object to form.
8       THE WITNESS:  It could.
9  BY MS. REAVES:
10    Q.   Okay.  Or if there are students who
11 have experienced trauma like witnessing a crime,
12 a violent crime, does that sometimes result in
13 behavioral problems?
14       MR. CUTLER:  Object to form.
15       THE WITNESS:  It could.
16 BY MS. REAVES:
17    Q.   And it sometimes results in academic
18 problems?
19       MR. CUTLER:  Object to form.
20       THE WITNESS:  I mean, I guess it
21    could.  We're making a lot of assumptions.
22 BY MS. REAVES:
23    Q.   Now, if we keep reading, it says,
24 "Thus far during the 2013-2014 School Year we
25 have had 80 in-school and out of school

Page 80

1  suspensions.  On the district 2013 School
2  Quality Survey, almost a third (31 percent) of
3  students reported that they had been bullied or
4  harassed at school."
5       Do you see that?
6    A.   Mm-hmm.
7    Q.   Do you know what the School Quality
8  Survey is?
9    A.   Yes.
10    Q.   What is that?
11    A.   It's a survey that goes out to
12 parents and students as well as teachers about
13 the school and the leadership, and they get to
14 provide their feedback.
15    Q.   Okay.  And so this was a survey that
16 was conducted in 2013?
17    A.   Okay.
18    Q.   I'm asking.
19       MR. CUTLER:  Object to form.
20       THE WITNESS:  That's what it says.
21       MR. CUTLER:  Lacks foundation.
22 BY MS. REAVES:
23    Q.   But you were in the district in
24 2013, right?
25    A.   Did we do School Quality Surveys, is

Page 81

1  that what you're asking?
2    Q.   Yes.
3    A.   We did.
4    Q.   Okay.  And has TUSD done School
5  Quality Surveys since 2013?
6       MR. CUTLER:  Object to form.
7       THE WITNESS:  I don't know when they
8    started, but they've been doing them for a
9    long time.
10 BY MS. REAVES:
11    Q.   And does TUSD currently do --
12    A.   Yes, we do.
13    Q.   -- School Quality Surveys?
14       All right.  And according to this
15 document, the 2013 School Quality Survey said
16 almost a third of students reported they had
17 been bullied or harassed at school, is that
18 right?
19    A.   That's what it says.
20    Q.   All right.  Now, if students are
21 bullied and harassed at school, that can impact
22 students' mental health, right?
23    A.   It could.
24    Q.   Okay.  And if students are bullied
25 or harassed at school, that could impact the

21 (Pages 78 - 81)

Page 82

1  students' academic performance?
2      A.   It could.
3      Q.   "Moreover" -- continuing reading --
4  "students also reported hearing students say
5  negative comments about racial/ethnic background
6  of others (31 percent) and/or special needs of
7  others (22 percent) at school.  This data
8  reveals that about a third of our students do
9  not feel safe at our school and are exposed to
10 negative attitudes."
11         Do you see that?
12     A.   I see that.
13     Q.   Do you agree that if students are
14 hearing negative comments about racial and
15 ethnic background, that could make them feel
16 unsafe at school?
17     A.   It could.
18     Q.   And do you agree that if students
19 with special needs are hearing negative comments
20 about having a disability, that can also impact
21 whether they feel safe at school?
22     A.   It could.
23     Q.   Now, when you were a teacher in your
24 earlier career in TUSD schools, did you ever
25 have students who were bullied?

Page 83

1          MR. CUTLER:  Object to form.
2          THE WITNESS:  I don't remember.  I
3      would assume yes, but I don't know.
4  BY MS. REAVES:
5      Q.   You noted earlier that back in 2004
6  you participated in bullying prevention
7  trainings, is that right?
8      A.   Mm-hmm.
9      Q.   Yes?
10     A.   Yeah -- yes.
11     Q.   And when you were a principal in
12 TUSD schools, did you ever have students who
13 were bullied?
14     A.   Yes.
15     Q.   What about students who didn't pay
16 attention in class?
17     A.   Yes.
18     Q.   Students who were stressed?
19     A.   Yes.
20     Q.   Okay.  Did you have students who
21 vandalized school property?
22     A.   Yes.
23     Q.   And when you were a teacher or a
24 principal in TUSD schools, did students in your
25 classes ever bully each other?

Page 84

1      A.   Did students bully each other?
2      Q.   Yes.
3      A.   Yes.
4      Q.   When you were a teacher or principal
5  in TUSD schools, did students ever get
6  distracted in class?
7      A.   Yes.
8      Q.   Now, do you agree that racial
9  discrimination can impact students' mental
10 health?
11         MR. CUTLER:  Object to form.
12         THE WITNESS:  It could.
13 BY MS. REAVES:
14     Q.   Do you agree that racial
15 discrimination can be disruptive in the learning
16 environment?
17     A.   It could.
18     Q.   And do you agree that racial
19 discrimination can impact students' academic
20 performance?
21     A.   It could.
22     Q.   Now, you mentioned earlier TUSD's
23 desegregation litigation.
24         Do you remember that?
25     A.   Mm-hmm.

Page 85

1      Q.   Okay.  And I --
2      A.   Yes.
3      Q.   Thank you.
4          And I think you said that the
5  desegregation litigation started in the '70s?
6      A.   That's correct.
7      Q.   All right.  And TUSD was under court
8  supervision as a part of that litigation until
9  mid-2022, is that right?
10     A.   That's correct.
11         MS. REAVES:  Okay.  I want to mark
12     as Exhibit 8 -- this is going to be
13     Tab 15.
14         (Whereupon, Tucson-Lambert-8 was
15         marked for identification.)
16 BY MS. REAVES:
17     Q.   Do you have it up on your screen?
18     A.   No, but I have it here.
19         It is now.
20     Q.   All right.  And so Tab 15 is a
21 letter that was addressed to Kinasha Brown and
22 you with the subject Request for Immediate
23 Appeal of Unwarranted and Discriminatory
24 Suspension of" -- and then the student's name is
25 redacted, and it says, "Tucson High Magnet

CONFIDENTIAL

1  School."
2          Do you see that?
3      A.   Yes.
4      Q.   Who is Kinasha Brown?
5      A.   She was the assistant superintendent
6  for equity, diversity and inclusion.
7      Q.   Is she no longer the assistant
8  superintendent?
9      A.   She's no longer in TUSD.
10     Q.   Now, do you remember receiving this
11  letter?
12     A.   No.
13     Q.   Do you remember the subject of this
14  letter?
15     A.   Vaguely, but not really.
16     Q.   Let's read the first portion.  It
17  starts out, "This letter is to appeal the
18  unwarranted and discriminatory interscholastic
19  suspension of my son" -- name redacted -- "from
20  participating on the Tucson High Magnet School
21  Varsity Basketball team for one month.  As I
22  hope to make clear in this letter, the imposed
23  suspension is unjustified and discriminatory
24  based on race.  As an African American student,"
25  redacted name "belongs to a protected racial

1  class; one which has for decades suffered at the
2  hand of severe over-representation in the area
3  of discipline within TUSD."
4          Do you see that?
5      A.   Yes.
6      Q.   Okay.  Do you agree with the
7  statement that African American students have
8  been overrepresented in the area of discipline
9  within TUSD?
10         MR. CUTLER:  Object to form.
11         THE WITNESS:  I think that's really
12     general.  I think we're doing a better
13     job.
14  BY MS. REAVES:
15     Q.   Okay.  Historically have African
16  American students been overrepresented in
17  discipline within TUSD?
18         MR. CUTLER:  Object to form.
19         THE WITNESS:  Again, like when are
20     we talking?  Like what dates?
21  BY MS. REAVES:
22     Q.   In --
23     A.   The '70s?
24     Q.   In your time as an educator in
25  Tucson Unified School District, have African

1  American students been overrepresented in the
2  area of discipline within the district?
3      A.   I think we've done a very good job
4  as a district.
5      Q.   Okay.  So earlier we were looking at
6  some of the discipline reports, is that right?
7      A.   Yes.
8      Q.   And one of the ways that those
9  discipline reports break down disciplinary
10  information is by race, is that right?
11     A.   That's correct.
12     Q.   Okay.  And the reason why those
13  reports break down discipline by race is to look
14  at whether there is discrimination or disparate
15  rates of discipline against particular races,
16  right?
17     A.   Yeah.  Disproportionality.  Not
18  discrimination, disproportionality.
19     Q.   And the reason that TUSD started
20  analyzing that data was because of this
21  litigation where African American and Latino
22  students accused the district of discriminating
23  against them?
24     A.   Correct.
25     Q.   Now, do you agree that if students

1  feel that their school is discriminating against
2  them, that can impact the students' mental
3  health?
4          MR. CUTLER:  Object to form.
5          THE WITNESS:  It could.
6  BY MS. REAVES:
7      Q.   And do you agree that if a student
8  feels that their school is discriminating
9  against them, that can impact the student's
10  academic performance?
11         MR. CUTLER:  Object to form.
12         THE WITNESS:  It could.
13  BY MS. REAVES:
14     Q.   Now I want to turn to the next page
15  of this document.
16     A.   Are we going to go to -- I see in
17  here it talks about -- the kid literally posted
18  on TikTok.  That's what this is all about.
19  That's the issue, is the kid was on social
20  media.
21     Q.   Okay.  So let's go to that section
22  of this page.  It's the third paragraph.  All
23  right?
24          "After the game," redacted "made a
25  statement in response to the taunting while in

CONFIDENTIAL

Page 90

1 the locker room.  He said, 'Who is the 'N' -
2 b____now?'  His action was videotaped by another
3 student, who subsequently posted it on TikTok.
4 Let me stress that" redacted "did not post the
5 video.  He understands that his verbiage was
6 inappropriate and has sincerely apologized for
7 his actions.  I believe the student who posted
8 the video received a one-day suspension."
9        Do you see that?
10    A.  Mm-hmm.
11    Q.  Okay.  And so you're talking about
12 the fact that this document references a video
13 that was posted on TikTok of the student using
14 vulgar language, right?
15    A.  Correct.
16    Q.  And in terms of TikTok, there was a
17 video that was posted, right?
18    A.  Right.  And then they have said --
19    Q.  That's the connection to TikTok?
20    A.  Right.
21        And then this would be a perfect
22 example of an administrator having to
23 investigate, as well as now I've got the
24 interscholastic director investigating as over
25 social media.

Page 91

1    Q.  Okay.  And so you are investigating
2 an incident where there was a video posted
3 online, right?
4    A.  On TikTok, mm-hmm.
5    Q.  Okay.  And the subject, though, of
6 this parent's letter is that the parent believes
7 that the school has discriminated against her
8 son because he is African American, right?
9        MR. CUTLER:  Object to form.
10 Vague --
11        (Cross-talking.)
12        THE WITNESS:  Because he posted or
13 because --
14        MR. CUTLER:  Let me finish my
15 objections first.
16        THE WITNESS:  Sorry.
17        MR. CUTLER:  Go ahead.  I'm
18 finished.
19        THE WITNESS:  Okay.
20        It's because he was videotaped and
21 it was posted on TikTok about saying
22 something inappropriate.
23 BY MS. REAVES:
24    Q.  Right.
25        Okay.  And so if we go to the

Page 92

1 paragraph before that, the parent provided
2 background facts.
3        Do you see that section?
4    A.  Mm-hmm.
5    Q.  All right.  And the parent said,
6 "During the game, the Buena High School team
7 members and several Buena High School spectators
8 taunted the THMS Varsity Team players by
9 screaming racially dehumanizing slurs
10 (monkey/ape).  I witnessed the conduct
11 firsthand, as did the THMS staff and players.  I
12 sat close to spectators who were uttering racist
13 taunts, which forced me to move to another area.
14 No staff member from Buena High School
15 intervened to stop the racial taunting.  My son
16 did not respond to the taunting during the
17 game."
18        Do you see that?
19    A.  That's what it says here.
20    Q.  Okay.  And so the background for
21 posting -- for some student posting this video
22 on TikTok was that a TUSD student was being --
23 was having racially dehumanizing slurs screamed
24 at him while playing a basketball game?
25    A.  According to this --

Page 93

1        MR. CUTLER:  Object to form,
2 foundation.
3        THE WITNESS:  According to this
4 statement --
5 BY MS. REAVES:
6    Q.  According to this statement.
7    A.  -- of the parent.
8    Q.  All right.  And so this parent is
9 writing about their concerns about the
10 district's response given that underlying
11 background?
12    A.  Yes.
13    Q.  And if we go to the next page,
14 there's a category that says -- or heading that
15 says The Inconsistency in Consequences for the
16 Use of Profanity/Racial and Gender Slurs.
17        Do you see that?
18    A.  Yes.
19    Q.  All right.  And the second paragraph
20 down, this parent says, "For example, currently,
21 the 'N' word is regularly uttered in classrooms
22 and on the campus by students (likely inclusive
23 of athletes) at THMS, and teachers and staff
24 mostly ignore the misconduct.  This situation
25 seems widespread throughout TUSD schools, and I

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 know of no instance when a suspension has been a
2 consequence."
3         Do you see that?
4     A.  That's what she said.
5     Q.  So what the parent is complaining
6 about is the use of racial slurs that she
7 contends is widespread throughout TUSD schools,
8 right?
9     A.  That's what she's saying.
10         MR. CUTLER:  Object to form,
11     foundation.
12         THE WITNESS:  Sorry.
13         That's what she's saying.
14 BY MS. REAVES:
15     Q.  That's the concern that this parent
16 is bringing to you and to Ms. --
17     A.  Kinasha Brown.
18     Q.  -- right?
19     A.  Mm-hmm.
20     Q.  You have to say "yes."
21     A.  Yes.
22     Q.  And then if we look at the bolded
23 and underlined portion, this parent says, "Last
24 school year, a THMS coach referred to a male
25 student as a 'b' and also used a defaming

Page 95

1 homophobic slur.  The incident was videotaped
2 and widely circulated.  The coach remained in
3 his position for months until the video found
4 its way to individuals who complained that the
5 same coach had been terminated from Sunnyside
6 School District for similar behavior."
7         Do you see that?
8     A.  I do.
9     Q.  So, again, what this parent is
10 complaining about to TUSD administrators is the
11 use of slurs against TUSD students?
12         MR. CUTLER:  Object to form,
13     foundation.
14         THE WITNESS:  That's what she's
15     stating, mm-hmm.
16 BY MS. REAVES:
17     Q.  Now, setting aside this particular
18 incident, you agree that an environment when
19 racial slurs are made -- when racial slurs are
20 widespread, that can impact students' mental
21 health?
22         MR. CUTLER:  Object to form, vague,
23     speculative.
24         THE WITNESS:  It could.
25         ///

Page 96

1 BY MS. REAVES:
2     Q.  Okay.  And a school environment
3 where racist slurs are widespread can impact a
4 student's academic performance?
5         MR. CUTLER:  Object to form, vague,
6     speculative.
7         THE WITNESS:  It could.
8 BY MS. REAVES:
9     Q.  And the use of homophobic slurs in
10 schools can also impact students' mental health
11 and academic performance?
12         MR. CUTLER:  Object to form.  It's
13     vague.
14         THE WITNESS:  It could.
15 BY MS. REAVES:
16     Q.  Now I want to turn to a different
17 type of disciplinary issue that sometimes occurs
18 in TUSD schools.  Okay?
19         Now, do you agree that schools in
20 your region sometimes have problems with
21 students abusing substances such as alcohol,
22 tobacco, or drugs?
23     A.  They have, mm-hmm.
24     Q.  And do you agree that substance use
25 is widespread in schools in your region?

Page 97

1         MR. CUTLER:  Object to form.
2         THE WITNESS:  I don't know if we're
3     going to say "widespread."  I think kids
4     use it.
5 BY MS. REAVES:
6     Q.  Do you agree that vaping is a
7 significant problem at schools in your region?
8     A.  At some schools it's -- yeah.
9         MS. REAVES:  I have what I will mark
10     as Exhibit 9.  This is going to be Tab 18.
11         (Whereupon, Tucson-Lambert-9 was
12         marked for identification.)
13 BY MS. REAVES:
14     Q.  All right.  So Exhibit 9 is an
15 e-mail from Gabriel Trujillo.
16         That's the superintendent of TUSD,
17 right?
18     A.  Yes.
19     Q.  Okay.  Sent on February 7, 2020.
20         So that's before the COVID-19
21 pandemic?
22     A.  Yes, right before.
23     Q.  And it's sent to Frank Armenta.
24 You're one of the people who is copied.
25         Who is Frank Armenta?

25 (Pages 94 - 97)

Page 98

1    A.   He was the principal at the time at
2  Cholla.
3    Q.   And the subject is Cholla Student
4  Focus Group Feedback.
5         Do you see that?
6    A.   Yes.
7    Q.   Are you familiar with this focus
8  group with Cholla students?
9    A.   Not totally.  I don't remember.
10   Q.   Okay.
11   A.   But I can understand it.
12   Q.   Does the superintendent conduct
13 focus groups with students at particular
14 schools?
15   A.   He has.
16   Q.   Okay.  How frequently are there
17 focus groups with students at schools?
18        MR. CUTLER:  Object to form.
19        THE WITNESS:  I can't say.
20 BY MS. REAVES:
21   Q.   Do you conduct focus groups with
22 students at schools?
23   A.   No.
24   Q.   In this document, Superintendent
25 Trujillo is writing, "Good afternoon, I had a

Page 99

1  very productive focus group meeting with your
2  students earlier this week."
3         And then if we look at one of the
4  first issues that are bulleted, "Vape Detectors
5  - The students noted vaping as a major issue on
6  campus and would be supportive of vape
7  detectors, which might lead to better bathroom
8  security.  Let me know if you would like to
9  pilot these at Cholla."
10        Do you see that?
11   A.   Yes.
12   Q.   Cholla is one of the schools in your
13 region?
14   A.   Yes.
15   Q.   And you were assistant --
16   A.   Superintendent, mm-hmm.
17   Q.   -- at the time?  Okay.
18        Do you agree that back in February
19 of 2020 vaping was a major issue on campus at
20 Cholla?
21   A.   It was an issue, mm-hmm.
22   Q.   Was vaping an issue on any other
23 schools in your region back in 2020?
24   A.   I don't remember.  I could assume.
25   Q.   Is vaping an issue at any of the

Page 100

1  schools in your region currently?
2         MR. CUTLER:  Object to form.
3         THE WITNESS:  It could be.
4  BY MS. REAVES:
5    Q.   Do you have any reason to doubt
6  Dr. Trujillo's conclusion that vape detectors is
7  an area where the administration could support
8  Cholla High School?
9         MR. CUTLER:  Object to form,
10   characterization.
11        THE WITNESS:  I mean, no.
12 BY MS. REAVES:
13   Q.   Now, in this e-mail about the
14 results of a focus group there's no mention of
15 social media?
16   A.   Not in this e-mail.  Seems very
17 bathroom focused.
18   Q.   And I think we discussed earlier --
19   A.   What was that?
20   Q.   I was just allowing you to read the
21 document.  I was going to turn to something
22 else.
23   A.   Oh, no.  Go ahead.
24   Q.   Now, do you agree that if schools in
25 your region don't have sufficient staff, that

Page 101

1  can impact academic performance?
2    A.   By that you mean -- like what kind
3  of staff?
4    Q.   So, for example, if there are
5  teacher vacancies at a school, that can impact
6  student academic performance?
7    A.   Definitely could.
8         MS. REAVES:  I want to mark for
9    identification Exhibit 10.  This is going
10   to be Tab 22.
11        (Whereupon, Tucson-Lambert-10 was
12        marked for identification.)
13 BY MS. REAVES:
14   Q.   Now, I think you mentioned earlier
15 that there was recently a board meeting, is that
16 right?
17   A.   Yes.
18   Q.   Were you referring to a Tucson
19 Unified School District governing board meeting?
20   A.   Yes.
21   Q.   And from time to time do you attend
22 or present at those meetings?
23   A.   Yes.
24   Q.   Now, Exhibit 10 is the agenda for
25 the November 15, 2022 regular board meeting

26 (Pages 98 - 101)

Page 102

1 before the governing board.
2        Do you see that?
3    A.   Yes.
4    Q.   Okay.  And I'm going to direct you
5 to page 13, which these pages aren't actually
6 numbered, so I'll let you count it.
7    A.   I see it.
8    Q.   Okay.  And on page 13 there's a
9 portion that says Public Content.  And then,
10 "Purpose:  To approve the University of Arizona
11 Pathways Program for implementation beginning
12 January 2023."
13        Do you see that?
14    A.   Mm-hmm.  Yes.
15    Q.   All right.  So -- and if we look
16 down, there's a line that lists internal
17 presenters.  And Brian Lambert, you're listed as
18 one of the --
19    A.   Presenters.
20    Q.   -- presenters, is that right?
21    A.   Yes.
22    Q.   Do you remember presenting to the
23 board about the University of Arizona Pathways
24 Program?
25    A.   Vaguely, mm-hmm, yes.

Page 103

1    Q.   What is the University of Arizona's
2 Pathways Program?
3    A.   It's a way to get teachers certified
4 to become teachers by working in the classroom.
5 They essentially do two teachers one semester,
6 and then they split off and they each take their
7 own class the next semester.
8    Q.   And so in this presentation you were
9 providing, there's a description justification,
10 and it lists, "Currently there is a state-wide
11 teacher shortage that significantly impacts the
12 ability of the district to fill vacant teacher
13 positions."
14        Do you see that?
15    A.   Yes.
16    Q.   Do you agree that back in -- I guess
17 this was the 2022-2023 school year, there was a
18 statewide teacher shortage that impacted the
19 district?
20    A.   That's what it says.
21    Q.   Do you agree that's what was
22 happening in '22-2023?
23    A.   Yeah.
24    Q.   And a teacher shortage means that
25 there were teacher vacancies at TUSD schools?

Page 104

1    A.   That's correct.
2    Q.   All right.  And if there are teacher
3 vacancies, that means that there are higher
4 student-to-teacher ratios in schools?
5    A.   Could.
6    Q.   If there were higher
7 student-to-teacher ratios, that could impact
8 student academic performance?
9        MR. CUTLER:  Object to form.
10        THE WITNESS:  Could, not always, but
11    yeah.
12 BY MS. REAVES:
13    Q.   Teacher vacancies could also mean
14 that TUSD has to offer fewer course options to
15 students?
16        MR. CUTLER:  Object to form.
17        THE WITNESS:  I mean, it could, if
18    we didn't have teachers to teach them.
19 BY MS. REAVES:
20    Q.   Now, aside from 2022-2023, when you
21 were providing this presentation to the board,
22 during your time as an educator in the district,
23 have there been other years where there are
24 teacher shortages?
25    A.   Yes.

Page 105

1    Q.   And during your time as an educator
2 in the district, have there been other positions
3 besides teachers where there are also vacancies?
4    A.   Yes.
5    Q.   Now, do you recall in 2021 the
6 district conducted a survey of employees to
7 determine what employees thought about using
8 ESSER funds?
9    A.   I don't recall that.
10    Q.   That's fine.
11        MS. REAVES:  I want to mark for
12    identification, this is Exhibit 11, and
13    we're going to look at Tab 23.
14        (Whereupon, Tucson-Lambert-11 was
15        marked for identification.)
16 BY MS. REAVES:
17    Q.   All right.  So Exhibit 11 is a
18 document from Jon Lansa.
19        Who is Jon Lansa?
20    A.   He's the director of Title I funds.
21    Q.   And what are Title I funds?
22    A.   I'm sorry.  He's in charge of all,
23 like, grants, all federal grants.  So Title I is
24 one of the federal grants.
25    Q.   And do you see that you are one of

CONFIDENTIAL

Page 106

1  the people CC'd on this e-mail?  I think you're
2  in the second line of the CC.
3      A.   Yeah.
4      Q.   As attachments, it has Employee
5  Survey Response Summary and FINAL TUSD Staff
6  ESSER Survey data.
7          Do you see that?
8      A.   Yes.
9      Q.   It also -- below the two bullets, it
10  says, "Also attached is a summary of ESSER
11  survey information from employees as well as
12  suggestions that they provided."
13          Do you see that?
14      A.   Yes.
15      Q.   Okay.  Now, first off, what is
16  ESSER?  Do you know what ESSER is?
17      A.   It was -- I'm guessing it's federal
18  funds, it might be state funds, that -- out of
19  COVID.
20      Q.   So does this refresh your
21  recollection of an employee survey that was
22  conducted about how to spend these pandemic
23  funds?
24      A.   I don't remember that.  I don't
25  remember it exactly.

Page 107

1      Q.   All right.  That's fine.
2          MS. REAVES:  I want to mark for
3      identification Exhibit 12.  This is
4      Tab 24.
5          (Whereupon, Tucson-Lambert-12 was
6          marked for identification.)
7  BY MS. REAVES:
8      Q.   And we have it -- you see it's
9  produced as native, and I can explain what that
10  means.
11          So Exhibit 12 we have as an Excel
12  spreadsheet, so we don't have a printed-out
13  version for you.  But if you look at the second
14  page of this, you see in the metadata that you
15  were one of the custodians, which means it was
16  produced to us by the district as a document
17  that was in your file.
18      A.   Okay.
19      Q.   Okay?  And then we want to pull up
20  the actual survey to look at.
21          So I'll represent to you that this
22  is the native document, the attachment to the
23  e-mail that was in Exhibit 11.
24          And we know from Exhibit 11 that
25  John Lansa said that this was the summary of the

Page 108

1  ESSER survey information from employees as well
2  as suggestions that they provided.
3          Okay?
4      A.   Okay.
5      Q.   All right.  And I want us to look at
6  the Mental Health tab, and make it a little bit
7  bigger so we can see it.  All right.
8          And so when we look at this we can
9  see responses that TUSD employees provided
10  regarding mental health in the district.
11          Do you see that?
12          MR. CUTLER:  Object to form,
13      foundation.
14          THE WITNESS:  Yes.
15  BY MS. REAVES:
16      Q.   Okay.  And when we see some of the
17  responses, looking at row number 5, "We need
18  more and real counselors in every school."
19          Do you see that?
20      A.   Yes.
21      Q.   Okay.  Let's look at row number 11.
22  "We need more counselors and mental health
23  professionals."
24          Looking at row number 17, "Hiring
25  more counselors and reducing the load

Page 109

1  expectations per counselor."
2          We look at rows 24 through 27, all
3  of those are mentioning needing additional
4  counselors.
5          Do you see that?
6      A.   Yes.
7          MS. REAVES:  And if we could scroll
8      so that Mr. Lambert can look through all
9      of the responses that we have here.
10          (Witness reviewing document.)
11      Q.   All right.  Fair to say there are a
12  number of responses where TUSD employees were
13  concerned about needing more counselors in the
14  district?
15          MR. CUTLER:  Object to form and
16      foundation.
17          THE WITNESS:  There is a number of
18      requests for counselors and mental health.
19  BY MS. REAVES:
20      Q.   In 2021 as a regional assistant
21  superintendent, were you concerned about the
22  number of counselors that you had in your
23  region?
24      A.   I don't think we had a whole lot of
25  vacancies.  I think we would take -- schools

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  would always ask for more if they could get more
2  of anything.
3      Q.   Do you agree that many employees
4  were concerned about counselor caseloads being
5  too high?
6          MR. CUTLER:  Object to form and
7      foundation.  Calls for speculation.
8          THE WITNESS:  I didn't see that in
9      -- I saw that a couple times in here.
10 BY MS. REAVES:
11     Q.   And you saw a number of times when
12 TUSD employees were asking for more counselor
13 support, correct?
14         MR. CUTLER:  Object to form,
15     foundation.
16         THE WITNESS:  And more social
17     workers.  Sorry.
18 BY MS. REAVES:
19     Q.   And more social workers?
20     A.   Yes.
21     Q.   Do you agree that having access to
22 more counselors and more social workers is
23 something that can be beneficial for students?
24     A.   It could be for their mental health,
25 yeah.

Page 111

1      Q.   And you agree that some students, if
2  they don't have access to counseling services or
3  social work services at school, they don't
4  necessarily have another avenue for accessing
5  those services?
6          MR. CUTLER:  Object to form.  It's
7      vague.
8          THE WITNESS:  I would assume, maybe,
9      that's right.
10 BY MS. REAVES:
11     Q.   You agree that, if there are too few
12 counselors at a particular school site for the
13 students that they serve, that can impact
14 student mental health?
15     A.   It could.
16     Q.   Now, in this list, and let me know
17 if you need to look at it again, social media is
18 not mentioned by any of the employees as a
19 mental health concern?
20         MR. CUTLER:  Object to form,
21     foundation.
22         It's 368 rows.  Do you want him to
23     read through each one of them, or are you
24     just going to represent that?
25         THE WITNESS:  I think that they're

Page 112

1      asking for people to support the students,
2      which then could be because of social
3      media.
4  BY MS. REAVES:
5      Q.   But social media is not listed as
6  one of the -- is not listed in the responses
7  that employees provided about mental health?
8          MR. CUTLER:  Object to form.  Asked
9      and answered.
10         THE WITNESS:  No.  I didn't see
11     anybody asking for social media, like
12     these are needs, like let's go buy social
13     media.
14 BY MS. REAVES:
15     Q.   You didn't see anyone asking for
16 tools to address social media, right?
17         MR. CUTLER:  Object to form and
18     foundation, asked and answered.
19         THE WITNESS:  I didn't see that
20     specifically.  I believe that the request
21     of mental health with social workers and
22     counselors may have been because of that.
23 BY MS. REAVES:
24     Q.   And do you have any data to support
25 your belief that the request for additional

Page 113

1  mental health support right after the pandemic
2  was related to social media?
3          MR. CUTLER:  Object to form.  Object
4      to the characterization of the question,
5      the premise.
6          THE WITNESS:  I would say I don't
7      have specific data.  I have -- you know,
8      I've heard, I have my own from speaking
9      with students and families.
10 BY MS. REAVES:
11     Q.   But you have no data that connects
12 the proportion of mental health needs to social
13 media specifically?
14         MR. CUTLER:  Object to form.  Asked
15     and answered, argumentative.
16         THE WITNESS:  No specific data
17     that's -- like that I have that's
18     concrete, but my data would be my
19     expertise and my conversations with
20     families and students and administrators.
21 BY MS. REAVES:
22     Q.   Now, do you see from this, the
23 metadata sheet that we gave you, that these
24 responses were provided in May 2021?
25         MR. CUTLER:  Object to form.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    This says it's the date modified of
2  the file.
3        THE WITNESS:  It says it was May 3,
4  2021.
5  BY MS. REAVES:
6    Q.   And then --
7    A.   It says the data is from April 27,
8  2021.
9    Q.   Okay.  So spring of 2021 was the
10  year after the pandemic started, right?
11    A.   Correct.
12    Q.   And in spring of 2021, had schools
13  in your region been impacted by the COVID-19
14  pandemic?
15    A.   Yes.
16    Q.   And you agree that the pandemic had
17  an impact on students' mental health?
18    A.   Yes, and social media was a big part
19  of that.
20    Q.   Do you have any data supporting your
21  belief that social media was connected to mental
22  health during COVID?
23    A.   My data is going to be my expertise,
24  my conversations with families, with
25  administrators, with students, with teachers,

Page 115

1  community.
2    Q.   Now, whether or -- well, do you have
3  any data on social media use of your -- the
4  students in your region during the pandemic?
5    A.   No specific data, but data from --
6  again from having conversations with students
7  and teachers and administrators.
8    Q.   Okay.  And when you talk about your
9  expertise, you agree that you don't have any
10  expertise in diagnosing mental illness, right?
11    A.   That is correct.
12        MR. CUTLER:  Object to form.
13        THE WITNESS:  That's correct.
14  BY MS. REAVES:
15    Q.   And so you agree that you don't have
16  any training in psychology?
17    A.   That's correct, but I have over
18  25 years of working with kids.
19    Q.   And do you have any data analyzing
20  whether students in your region have any mental
21  health diagnoses?
22    A.   I do not.
23    Q.   Do you have any data analyzing
24  whether students in your region have mental
25  health diagnoses that are connected in some way

Page 116

1  to social media?
2    A.   I do not.
3    Q.   Now, during the COVID-19 pandemic
4  students were concerned about their health?
5        MR. CUTLER:  Object to form.  Vague,
6  speculative.
7        THE WITNESS:  Meaning -- help me
8  clarify that.
9  BY MS. REAVES:
10    Q.   During the COVID-19 pandemic a lot
11  of people died, right?
12        MR. CUTLER:  Object to form.
13        THE WITNESS:  That's true.
14  BY MS. REAVES:
15    Q.   And during the COVID-19 pandemic a
16  lot of people got sick, right?
17        MR. CUTLER:  Object to form.
18        THE WITNESS:  Yeah.
19  BY MS. REAVES:
20    Q.   And people -- certain people were
21  particularly high risk for getting a serious
22  illness or death as a result of contracting
23  COVID-19, right?
24        MR. CUTLER:  Object to form.
25        THE WITNESS:  Yeah.  I mean, I'm not

Page 117

1  a medical doctor, but yeah.
2  BY MS. REAVES:
3    Q.   Okay.  And so experiencing -- or if
4  students had family members or loved ones who
5  were sick or had passed away during the COVID-19
6  pandemic, that's something that impacted
7  students' mental health?
8    A.   It could.
9    Q.   All right.  And fear of personally
10  getting sick or having a loved one get sick,
11  that can impact students' mental health --
12        MR. CUTLER:  Object to form.
13  BY MS. REAVES:
14    Q.   -- right?
15    A.   It could.  That's an assumption, but
16  yeah.
17    Q.   And during the COVID-19 pandemic,
18  TUSD schools had to switch to remote learning
19  for a period of time, right?
20    A.   Yes.
21    Q.   And so students were limited in
22  their ability to engage in person with other
23  people during the COVID-19 pandemic, right?
24    A.   True physical, mm-hmm.
25    Q.   And so the stressors of the COVID-19

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1 pandemic existed regardless of whether or not a
2 student used social media, right?
3        MR. CUTLER: Object to form. Vague.
4        THE WITNESS: It could, but I think
5     social media may have expedited that
6     stress and that fear.
7 BY MS. REAVES:
8     Q. And when you say social media may
9 have expedited the stress or the fear, do you
10 have any data that for TUSD students social
11 media expedited the stress or fear?
12    A. I think we're all making assumptions
13 here, and so mine is just based on my
14 experience.
15    Q. And so you don't have any data that
16 says that students during the pandemic had
17 increased stress or fear because of social
18 media?
19        MR. CUTLER: Object to form,
20     foundation, calls for speculation.
21        THE WITNESS: It would just be my
22     data that I've collected on my own
23     through -- but I wouldn't say I have any
24     hard data.
25        ///

Page 119

1 BY MS. REAVES:
2     Q. And when you refer to the data that
3 you've collected, you're referring to anecdotal
4 conversations?
5     A. That's correct.
6     Q. All right. And then my question
7 was, for students who don't use social media,
8 they still experienced the stressors of being
9 isolated or having loved ones get sick during
10 the pandemic?
11    A. They could have.
12        MR. CUTLER: Object to form.
13        THE WITNESS: Sorry.
14        MR. CUTLER: That's all right.
15 BY MS. REAVES:
16    Q. Now, during the pandemic TUSD
17 schools also experienced some academic loss?
18    A. Yes.
19    Q. And the pandemic was disruptive to
20 TUSD's ability to educate its students?
21    A. Is that a question?
22    Q. It is a question.
23    A. Okay. It could be, yeah,
24 disruptive. It could have been.
25    Q. Now, separate from the pandemic,

Page 120

1 absenteeism in general can lead to academic
2 loss, right?
3     A. It could.
4     Q. If a student is chronically absent,
5 they have less access to the educational
6 opportunities that TUSD is offering, right?
7     A. That's correct.
8     Q. And if a student is chronically
9 absent, they also have less access to the social
10 emotional and mental health supports that TUSD
11 provides students, right?
12    A. If they aren't there, mm-hmm.
13    Q. So chronic absences can exacerbate
14 mental health problems?
15        MR. CUTLER: Object to form.
16        THE WITNESS: I guess it could.
17 BY MS. REAVES:
18    Q. And chronic absenteeism within the
19 district also impacts the district's funding --
20    A. Yes.
21    Q. -- because the district's funding is
22 tied to student --
23    A. Attendance.
24    Q. -- attendance, right?
25    A. Yes.

Page 121

1     Q. Now, during your time as a regional
2 assistant superintendent, have you had schools
3 where students are chronically absent?
4        MR. CUTLER: Object to form.
5        THE WITNESS: I would say yes.
6 BY MS. REAVES:
7     Q. Now, another factor that can impact
8 student mental health -- and we discussed this a
9 little bit before -- is violence, right?
10    A. It could.
11    Q. Okay. And separate from violence in
12 the community, violence specifically within
13 schools can impact students' mental health,
14 right?
15        MR. CUTLER: Object to form,
16     foundation. And as he pointed out, he's
17     not a mental health professional.
18        THE WITNESS: It could.
19        MS. REAVES: Now I want to mark for
20     identification -- we're on Exhibit 13.
21     This is going to be Tab 12.
22        (Whereupon, Tucson-Lambert-13 was
23        marked for identification.)
24 BY MS. REAVES:
25    Q. All right. Exhibit 13 is an e-mail

Page 122

1 from Joseph Hallums.
2        Joseph Hallums is TUSD's director of
3 school safety, is that right?
4     A.   That's correct.
5     Q.   And this was sent on March 21st,
6 2024, copying a number of people including you,
7 is that right?
8     A.   That's correct.
9     Q.   All right.  And then the subject was
10 Today's Lockdown's and More.
11        Do you see that?
12    A.   Yes.
13    Q.   All right.  Now, Mr. Hallums says,
14 "Sorry for the delay in sending this out.  It
15 was a busy afternoon in School Safety as we
16 handled three major incidents."
17        Do you see that?
18    A.   Yes.
19    Q.   All right.  And then Mr. Hallums's
20 lists three different schools that are schools
21 in TUSD, is that right?
22    A.   Correct.
23    Q.   Cholla is one of the schools that's
24 in your district?
25    A.   In my region, yes.

Page 123

1     Q.   In your region.
2        And the incident, the description of
3 Cholla says, "A School Safety and TPD officer
4 were on campus due to reports of a teenage
5 non-student, with a history of violence
6 involving firearms, seen on campus earlier in
7 the week."
8        Do you see that?
9     A.   Yes.
10    Q.   All right.  And do you recall this
11 incident where there was a teenage non-student
12 with a history of violence involving firearms on
13 Cholla's campus?
14    A.   Not totally.
15    Q.   If we keep reading, it says, "The
16 non-student had allegedly made threats to
17 students.  When a teacher reported seeing the
18 subject attempting to enter her class, a
19 lockdown was initiated."
20        Do you see that?
21    A.   Yes.
22    Q.   All right.  And so this is an
23 example of a lockdown that occurred at one of
24 the schools in your district because of the
25 presence of a potentially violent student on

Page 124

1 campus, right?
2        MR. CUTLER:  Object to form,
3     foundation.
4        THE WITNESS:  That's what it says,
5     yeah.
6 BY MS. REAVES:
7     Q.   Okay.  And this example of an
8 incident that required a lockdown on campus does
9 not mention anything about social media, right?
10       MR. CUTLER:  Object to form,
11    foundation.
12       THE WITNESS:  No.
13 BY MS. REAVES:
14    Q.   And even the other examples that
15 Mr. Hallums provides of major incidents in the
16 district on this day, none of these incidents
17 involve social media?
18       MR. CUTLER:  Object to foundation.
19       THE WITNESS:  I can't really speak
20    to the others because I don't know them
21    and I don't know the details to these.
22 BY MS. REAVES:
23    Q.   Okay.  But social media is not
24 mentioned in Mr. Hallums' e-mail, right?
25    A.   It's not listed here.

Page 125

1     Q.   And then let's talk about another
2 example of an incident in TUSD schools.
3        MS. REAVES:  I want to mark for
4     identification -- this is Exhibit 14, and
5     it's going to be Tab 13.
6        (Whereupon, Tucson-Lambert-14 was
7     marked for identification.)
8 BY MS. REAVES:
9     Q.   Exhibit 14 is another e-mail from
10 Mr. Hallums that was sent on March 30th, 2022,
11 and to you and a number of other people.  The
12 subject is Ongoing Prank Calls/Threats to
13 Schools.
14        Do you see that?
15    A.   Yes.
16    Q.   All right.  And this e-mail says,
17 "This week several schools have experienced
18 calls threatening various forms of violence that
19 usually involving subject(s) bringing guns to
20 the school.  We believe there have been at least
21 twelve including seven at Grijalva just today."
22        And then if we skip a sentence,
23 "Unfortunately this has caused a significant
24 disruption to the school and necessitated a
25 Parentlink being sent to the school community."

CONFIDENTIAL

Page 126

1        Do you see that?
2    A.   Yes.
3    Q.   All right.  You'd agree that a
4 school receiving 12 threats of violence in one
5 day is a significant number of threats, right?
6        MR. CUTLER:  Object to form,
7    foundation.
8        THE WITNESS:  It could be, yeah.
9 BY MS. REAVES:
10    Q.   And according to Mr. Hallums, the
11 response was that these schools had to be placed
12 in lockdowns, right?
13    A.   That's what it says.
14    Q.   And that these threatening phone
15 calls caused a significant disruption to the
16 school.
17        Do you see that?
18    A.   That's what it says.
19    Q.   Do you agree that if there are phone
20 calls threatening violence to a school, that can
21 impact students' mental health?
22        MR. CUTLER:  Object to form.  Vague.
23        THE WITNESS:  It could.
24 BY MS. REAVES:
25    Q.   And do you agree that if there are

Page 127

1 lockdowns -- that if in response to these calls
2 the school institutes lockdowns, that can
3 disrupt academic instruction?
4    A.   It could.
5    Q.   Do you agree that the concern of a
6 potential shooting at a school could impact
7 student mental health?
8        MR. CUTLER:  Object to form.  Vague.
9        THE WITNESS:  It could.
10 BY MS. REAVES:
11    Q.   And do you agree that the presence
12 of guns on a campus can impact student mental
13 health?
14        MR. CUTLER:  Object to form.  Vague.
15        THE WITNESS:  It could.
16 BY MS. REAVES:
17    Q.   And you agree that unfortunately in
18 the US every year there are a number of school
19 shootings?
20        MR. CUTLER:  Object to form.
21        THE WITNESS:  Sadly there is.
22 BY MS. REAVES:
23    Q.   I want to switch gears for a little
24 bit and talk about the cellphone policies for
25 schools in your region, okay?

Page 128

1    A.   Mm-hmm.
2    Q.   Now, TUSD as a district has a
3 cellphone policy, is that right?
4    A.   Yes.
5    Q.   And there is also a regulation
6 regarding cellphones, right?
7    A.   Yes.
8    Q.   According to that cellphone policy,
9 students are allowed to keep their cellphones,
10 the districtwide policy, either in their bags or
11 their pockets or their lockers, right?
12    A.   Correct.
13    Q.   So the districtwide policy doesn't
14 require students to put their cellphones
15 somewhere where they can't physically access it,
16 right?
17    A.   Correct.
18    Q.   And the districtwide policy allows
19 teachers to authorize students to use their
20 cellphones?
21    A.   That's correct.
22    Q.   Now, TUSD doesn't have a written
23 policy on social media use?
24    A.   No.
25    Q.   Now, is it accurate that TUSD also

Page 129

1 allows individual schools to make more specific
2 cellphone policies?
3    A.   Not that I'm aware of.
4    Q.   Okay.  Do any of the schools in your
5 region have more restrictive cellphone policies
6 than the districtwide policy?
7    A.   No.  We follow the districtwide
8 policy.
9    Q.   Okay.  And do any schools in your
10 region use physical methods of restricting
11 access to cellphones?
12    A.   No.
13    Q.   So none of the schools in your
14 region have cellphone lockers or Yondr pouches?
15    A.   No.
16        MS. REAVES:  I want to mark for
17    identification as Exhibit 15.  This is
18    Tab 39.
19        (Whereupon, Tucson-Lambert-15 was
20        marked for identification.)
21 BY MS. REAVES:
22    Q.   All right.  So Exhibit 15 says
23 Valencia Middle School Staff Handbook for School
24 Year 2023-2024.
25        Do you see that?

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1    A.   Yep.
2    Q.   And is Valencia Middle School a
3 school in your region?
4    A.   Yes.  Yes.
5    Q.   All right.  Let's turn to page 4 --
6 I'm sorry, page 3.  It's the page ending in
7 -485.
8         And do you see there's a section in
9 the student handbook that addresses phones?
10    A.   I thought this was a staff handbook.
11    Q.   Yes.  Did I misspeak?
12    A.   You said "student."
13    Q.   I meant staff handbook.  Yes, it's a
14 staff handbook.
15         There's a section that addresses
16 phones?
17    A.   Correct.
18    Q.   And that section says, "In the
19 building - Use of personal cellphones during
20 class time is poor modeling though not
21 prohibited.  Use good judgment."
22         Number 2, "More teachers are
23 incorporating the use of cellphones in the
24 classroom, please be aware that one teacher may
25 have students using while others are against so

Page 131

1 make sure you have clear expectations for your
2 students and follow through."
3         Do you see that?
4    A.   Yes.
5    Q.   Okay.  And so there are schools in
6 your region where teachers incorporate the use
7 of cellphones into classrooms?
8    A.   That's correct.
9    Q.   All right.  And schools in your
10 region don't prohibit teachers from using their
11 personal cellphones during class?
12    A.   That's what it says here, but --
13 yeah.
14    Q.   That's also accurate?
15    A.   I would say as far as I know.
16    Q.   Now, schools in your region have
17 social media accounts?
18    A.   Yes.
19    Q.   The district has a social -- number
20 of --
21    A.   Yes.
22    Q.   Sorry.  I didn't make a clear
23 question.
24         The district has several social
25 media accounts?

Page 132

1    A.   Yes.
2    Q.   And specifically schools in your
3 region have Facebook accounts?
4    A.   Yes.
5    Q.   And Instagram accounts?
6    A.   I believe so, yes.
7    Q.   Do schools in your region have
8 YouTube accounts?
9    A.   I'm not going to know.  I'm not a
10 YouTube person.
11         MS. REAVES:  Okay.  I want to mark
12    for identification as Exhibit 16, this is
13    Tab 40.
14         (Whereupon, Tucson-Lambert-16 was
15         marked for identification.)
16 BY MS. REAVES:
17    Q.   And this one also says Produced in
18 Native Format, but we also printed out a PDF so
19 you could have it in front of you.
20    A.   Okay.
21    Q.   Now, this is a welcome presentation
22 for Valencia Middle School.
23         Do you see that?
24    A.   Mm-hmm.
25    Q.   All right.  And Vesey Elementary, is

Page 133

1 that the elementary school that feeds into
2 Valencia?
3    A.   Vesey, yes.
4    Q.   Vesey.  Okay.
5         And do you see on page 5 of the
6 PowerPoint the last bullet says, "Parent
7 notification:  website, Instagram, Facebook, and
8 Twitter of daily happenings."
9         Do you see that?
10    A.   Yes.
11    Q.   Okay.  And so schools in your region
12 use social media to notify parents of daily
13 events at the school?
14    A.   They could.
15    Q.   And schools in your region use
16 social media to promote positive school culture?
17    A.   They could.
18         MS. REAVES:  I want to mark for
19    identification Exhibit 17, which is
20    Tab 25.
21         (Whereupon, Tucson-Lambert-17 was
22         marked for identification.)
23 BY MS. REAVES:
24    Q.   All right.  So this is an e-mail --
25 Exhibit 17 is an e-mail from Frank Larby sent to

34 (Pages 130 - 133)

CONFIDENTIAL

1 Frank Armenta, copying you and Jon Lansa.
2        Do you see that?
3    A.   Yes.
4    Q.   Okay.  And the subject is Cholla
5 High School - Staff Survey Data.
6        Do you see that?
7    A.   Yes.
8    Q.   And Cholla High School is one of the
9 schools in your region, right?
10   A.   Yes.
11   Q.   Do you see that there are also
12 attachments to this e-mail that say Cholla High
13 School - ADE School Staff Survey (Responses)?
14   A.   Yes.
15   Q.   All right.  And ADE is the Arizona
16 Department of Education?
17   A.   Correct.
18       MS. REAVES:  I want to pull up that
19   attachment to that.  Again this is an
20   Excel spreadsheet so we're going to look
21   at it on the screen.
22       We'll mark for identification
23   Exhibit 18, and this is Tab 26.
24       (Whereupon, Tucson-Lambert-18 was
25       marked for identification.)

1 BY MS. REAVES:
2    Q.   Okay.  So I'll represent to you that
3 this is the document produced to us that was
4 attached to the e-mail we just looked at, okay?
5    A.   Yes.
6    Q.   And if we look over to column 20 of
7 this.
8    A.   A letter or column 20?
9    Q.   The number 20.
10   A.   Okay.
11   Q.   But it's in the column.
12       Do you see how at the top --
13   A.   Yeah.
14   Q.   -- there are numbers with questions?
15 All right.
16       MS. REAVES:  And so if we could make
17   that column a little bit bigger so that he
18   can see it.
19       And can you expand the column,
20   please?  Thank you.
21   Q.   All right.  So the survey question
22 to Cholla staff was, "What steps have leadership
23 and staff taken to help foster a positive
24 culture and climate?"
25       Do you see that?

1    A.   Yes.
2    Q.   All right.  And then do you see on
3 rows 3, 4 -- 3 and 4 it says, "Weekly Facebook,"
4 "Weekly Facebook Live Event"?
5    A.   Yes.  And "e-mail communications,"
6 mm-hmm.
7    Q.   And so staff in schools in your
8 region consider it a positive when school
9 leadership use social media with them?
10       MR. CUTLER:  Object to form,
11   foundation, vague.
12       THE WITNESS:  We have seen that,
13   mm-hmm.
14       MS. REAVES:  Now I want to mark for
15   identification, this is Exhibit 19, and
16   it's Tab 30.
17       (Whereupon, Tucson-Lambert-19 was
18       marked for identification.)
19 BY MS. REAVES:
20   Q.   We'll provide you with a hard copy.
21       Exhibit 19 is an e-mail from Leslie
22 Lenhart, sent on February 11, 2019, and it says
23 To: TUCSON UNIFIED SCHOOL DISTRICT Recipients.
24 Subject is, Please review:  TUSD Social Media
25 Policies.

1        Do you see that?
2    A.   Yes.
3    Q.   And if you look at the second page,
4 we see in the metadata that this was a document
5 in your custodial file produced to us by the
6 district.
7    A.   Okay.
8    Q.   Okay?
9    A.   Yes.
10   Q.   Who is Leslie Lenhart?
11   A.   She was the head of media.
12   Q.   Okay.  And in this e-mail we also
13 see at the bottom it looks like it's signed by
14 Vivian Colter.  And it says Ms. Colter's title
15 is Communications & Media Relations,
16 Communications Specialist, Social Media, is that
17 right?
18   A.   Yes.
19   Q.   Does the district have a
20 communications role that's specific to social
21 media?
22       MR. CUTLER:  Object to form.
23       THE WITNESS:  I believe so.  It's in
24   communications.
25       ///

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

BY MS. REAVES:

1  Q.  All right.  If we look at this
2  e-mail, it says, "Good morning, Tucson Unified
3  principals!  Our Communications Office would
4  like to take this time to make you aware (if
5  you're not already) of our social media
6  policies.  As you know, social media allows us
7  to share the wonderful things happening in our
8  district with a wide audience, as well as
9  interact with students, parents and community
10  members."
11      Do you see that?
12  A.  Yes.
13  Q.  Do you agree that social media
14  allows the district to share wonderful things
15  that are happening with a wide audience?
16  A.  Yes.
17  Q.  And that audience includes students,
18  parents, and community members?
19  A.  Yes.
20  Q.  Then in the second paragraph, you
21  see that the social media policy of the district
22  includes, "Specifically, you should allow for
23  audiences to share, comment and post on the
24  information you share on social media."

Page 139

1      Do you see that?
2  A.  Yes.
3  Q.  All right.  And so the TUSD
4  communications staff are saying that TUSD social
5  media should allow audiences to share, comment,
6  and post on information?
7      MR. CUTLER:  Object to form and
8  foundation.  Misstates the document.
9      THE WITNESS:  That's what it says,
10  but it also then turns around and talks
11  about working with people posting
12  inappropriate and harassing content on the
13  page.  So as much as there's going to be
14  positive, we always have to look out for
15  the negative.
16  BY MS. REAVES:
17  Q.  So at times people can post
18  inappropriate content onto social media, right?
19  A.  Mm-hmm.
20  Q.  And the district suggestion is that
21  you have the right to hide or ban a user if
22  there is inappropriate content posted, right?
23  A.  If they can, mm-hmm.
24      MS. REAVES:  Now let's look at --
25  I'm going to mark for identification, this

Page 140

1  is Exhibit 20.
2      (Whereupon, Tucson-Lambert-20 was
3      marked for identification.)
4      MS. REAVES:  It's Tab 31 in our
5  binder.
6  BY MS. REAVES:
7  Q.  All right.  And Exhibit 30 -- I'm
8  sorry.  Not Exhibit 30.
9      Exhibit 20 is an e-mail from Leslie
10  Lenhart, again, sent on May 28, 2021, to you and
11  a number of other people.
12      Do you see that?
13  A.  Mm-hmm.
14  Q.  All right.  And the subject is RE:
15  social media/Summer School, is that right?
16  A.  Yes.
17  Q.  And then if we see the original
18  e-mail at the bottom, you sent an e-mail saying,
19  "Congratulations on a great graduation...night.
20  I have heard from parents and community members
21  about how impressed they were.  I have a
22  request.  Could you please share on social media
23  the link for students and families to register
24  for Summer School or Freshman Academy?  Parents
25  are having a difficult time finding things on

Page 141

1  the web page for TUSD."
2      Do you see that?
3  A.  Yes.
4  Q.  So in this e-mail you were
5  encouraging TUSD employees to share information
6  on social media, right?
7  A.  Yes.
8  Q.  And you're going to use social media
9  to communicate with students and families about
10  Summer School or Freshman Academy?
11  A.  In a positive way.
12  Q.  And Leslie Lenhart responds,
13  reminding individuals to tag Tucson Unified so
14  that the district can reshare on the district
15  Facebook or Twitter.
16      Do you see that?
17  A.  I do.
18  Q.  All right.  So you agree that there
19  are positive uses to social media for the school
20  district?
21  A.  Yes.
22  Q.  And in here this reference "District
23  FB," you understand that's a reference to TUSD's
24  Facebook page?
25  A.  Yes.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1    Q.   Now, for TUSD's social media,
2  students and members of the community can like,
3  share, comment on TUSD's social media?
4    A.   I believe so.  I don't know if I
5  have really done much with it, but yeah.
6    Q.   And in terms of TUSD students'
7  social media use, have you ever analyzed how
8  much time TUSD students are spending on social
9  media?
10   A.   I have not.  Just analyzed -- just
11 collected data from talking with students and
12 families.
13   Q.   And, again, the data you're
14 referring to is anecdotal conversations?
15   A.   Correct.
16   Q.   Have you ever analyzed which
17 features of social media TUSD students are
18 using?
19   A.   I have not.  Just, again,
20 conversations.  I would definitely say it would
21 not be Facebook.  It would be like Instagram,
22 Snapchat.
23   Q.   Okay.  So my question was about
24 features, the particular features within a
25 platform.

Page 143

1      Do you know which portions of a
2  platform TUSD students are using?
3    A.   No.  I'm not going to know, no.
4    Q.   And I think you were also testifying
5  that you don't have any data on which particular
6  platforms on social media that students are
7  using?
8        MR. CUTLER:  Object to form.  It's
9    vague.
10       THE WITNESS:  I don't have specific,
11   just that's what students and people have
12   told me that's what kids use.
13 BY MS. REAVES:
14   Q.   And you're aware that students use
15 social media platforms besides the platforms
16 that are involved in this case?
17       MR. CUTLER:  Object to form.
18       THE WITNESS:  I guess they could.  I
19   don't know those.
20 BY MS. REAVES:
21   Q.   Because you don't have data on which
22 platforms students are using?
23       MR. CUTLER:  Object to form.
24   Misstates testimony.
25       Go ahead.

Page 144

1        THE WITNESS:  I'm not aware of other
2    ones, so...
3  BY MS. REAVES:
4    Q.   Are you aware of whether students
5  use Twitter?
6    A.   Yeah.  It says right here.
7    Q.   And Twitter is not a defendant in
8  this case.
9    A.   Okay.  They use Twitter, I guess,
10 yeah.
11   Q.   Are you aware of whether students
12 use Discord?
13   A.   I've never even -- I don't know what
14 Discord is.
15   Q.   Are you aware of whether students
16 use Reddit?
17   A.   Never even heard of it.
18   Q.   And when you were talking about
19 negative social media use, you're talking about
20 when there are posts or messages with negative
21 content?
22       MR. CUTLER:  Object to form,
23   foundation, it's vague.
24       THE WITNESS:  Yeah, I think it could
25   be those things, but it also could be the

Page 145

1    likes and the pictures and the pressure
2    that goes in with all those kind of
3    things.
4  BY MS. REAVES:
5    Q.   And do you have any data on how
6  frequently TUSD students like or use pictures on
7  social media?
8    A.   Just my own data that I've
9  collected.
10   Q.   The anecdotal conversations?
11   A.   Correct.
12       MR. CUTLER:  Can we take a break?
13       THE WITNESS:  Great timing.  I've
14   got to go.
15       THE VIDEOGRAPHER:  We're going off
16   record.  The time is 3:40.
17       (Whereupon, a recess was taken.)
18       THE VIDEOGRAPHER:  We're going back
19   on record.  The time is 3:48.
20 BY MS. REAVES:
21   Q.   Mr. Lambert, do you personally use
22 social media?
23   A.   I do.
24   Q.   Which platforms do you use?
25   A.   Facebook, I now have an Instagram,

37 (Pages 142 - 145)

Page 146

1  and I have Snapchat.
2      Q.  Do you have a TikTok account?
3      A.  Oh, I do.
4      Q.  And do you have a YouTube account?
5      A.  I don't know how to -- I do have
6  YouTube.  I don't know if it's an account.  I
7  download soccer games, and I can view them,
8  so...
9      Q.  Do you post content on YouTube?
10     A.  I hope not.
11     Q.  So you said you use YouTube to
12  download soccer games.
13         Is there anything else you typically
14  use YouTube for?
15     A.  No.  I have to be able to take the
16  soccer games and share them with the kids.
17     Q.  So you mean school soccer games?
18     A.  No.  Club.
19     Q.  Club soccer games.  Okay.
20         How often do you use YouTube?
21     A.  Not often.  Like maybe eight times
22  in a year.
23     Q.  Do you have children?
24     A.  I do.
25     Q.  How many children do you have?

Page 147

1      A.  Two.
2      Q.  And how old are they?
3      A.  20 and 21.
4      Q.  Do they still live with you?
5      A.  No.
6      Q.  When your -- let's start with your
7  21-year-old, your older child.
8         When your older child was a minor,
9  did they have a cellphone?
10     A.  She did.
11     Q.  Okay.  And was it a smartphone?
12     A.  Yeah.
13     Q.  When did she get a smartphone?
14     A.  Sometime in middle school.  Might
15  have been her freshman year of high school.
16     Q.  When your -- do you have two
17  daughters?
18     A.  I have a son who is younger.
19     Q.  So when your daughter was a minor,
20  did you implement any screen-time limits on her
21  phone?
22     A.  Yeah, we had rules.
23     Q.  What were the rules?
24     A.  Her Instagram was shared with me, so
25  it was "Lexi and Daddy."  And then we had

Page 148

1  filters put on their phone so I could see, ping,
2  sent me a message if there was any inappropriate
3  language or anything in there.
4      Q.  In terms of the amount of time that
5  your daughter spent on her cellphone, did you
6  put any restrictions on the amount of time she
7  could spend on her cellphone?
8      A.  We had rules, like they weren't
9  allowed to take them upstairs into their rooms.
10     Q.  Were there restrictions on the hours
11  of the day in which your daughter was allowed to
12  use her cellphone?
13     A.  No.  Our kids are pretty involved in
14  a lot of activities, so I didn't have to -- the
15  phone was used more for communication, We need
16  to be picked up, blah, blah, blah.
17     Q.  And did you put any restrictions on
18  the apps that your daughter was able to put on
19  her cellphone?
20     A.  I don't know how to do that.
21     Q.  Okay.  So no restrictions on the
22  apps?
23     A.  We had filters.  Somehow I knew
24  things.
25     Q.  And when you say you had filters,

Page 149

1  you had some sort of application that allowed
2  you to get notices of what your daughter was
3  viewing?
4      A.  Yep.  If they said like the word --
5  I got pinged one time on "ass," and I remember
6  that.
7      Q.  Okay.  So you mentioned that your
8  daughter had an Instagram account that she
9  shared with you?
10     A.  (Nodding in the affirmative).
11     Q.  Okay.  Did your daughter have a
12  Snapchat account as a minor?
13     A.  I think she did.
14     Q.  And did your daughter have a
15  Facebook account as a minor?
16     A.  No.  She does now.
17     Q.  And did your daughter have a TikTok
18  account as a minor?
19     A.  I believe she may have.
20     Q.  And did your daughter use YouTube as
21  a minor?
22     A.  I don't know that.  I mean, she may
23  have used YouTube.
24     Q.  Do you know if your daughter was
25  ever assigned homework assignments that involved

38 (Pages 146 - 149)

Page 150

1 using YouTube for educational purposes?
2     A.   Not that -- I don't know.  She never
3 told me that.  I don't remember that.
4     Q.   Did you ever restrict the amount of
5 time that your daughter could spend on YouTube?
6     A.   No.  We didn't have issues with the
7 phones.
8     Q.   And did you ever restrict the type
9 of content that your daughter could watch on
10 YouTube?
11     A.   Again, I don't remember doing that.
12     Q.   All right.  So I'm going to ask
13 similar questions for your son when he was a
14 minor.  Okay?
15          Now, when did your son get -- or did
16 your son have a cellphone?
17     A.   Yes.
18     Q.   All right.  When did your son get a
19 cellphone?
20     A.   Like in middle school.
21     Q.   Was your son's cellphone a
22 smartphone?
23     A.   Yes.
24     Q.   Did you implement screen-time limits
25 on your son's cellphone?

Page 151

1     A.   Same kind of thing.  It wasn't
2 screen time.  They just were not allowed to take
3 them upstairs.  That was where their rooms are.
4     Q.   Were the restrictions that you
5 testified about for your daughter, are those
6 consistent with the restrictions that you had
7 for your son?
8     A.   Yeah.  But I didn't have an
9 Instagram that said "Braden and Daddy."  I
10 didn't do that.
11     Q.   When your son was a minor, did he
12 have a Snapchat account?
13     A.   We really didn't have Snapchat much
14 until maybe they were -- like much later into
15 high school.
16     Q.   Okay.
17     A.   That was not a --
18     Q.   And so during high school did your
19 son have a Snapchat account?
20     A.   He may have, yeah.
21     Q.   And did your son have an Instagram
22 account?
23     A.   Yeah.
24     Q.   Did your son have a Facebook
25 account?

Page 152

1     A.   Now he does, but no.
2     Q.   Did your son have a TikTok account?
3     A.   I would guess he did.  I don't know
4 if they had them, like, when they were younger,
5 though, like being a minor.  I know they have
6 them now, but I don't know -- I don't remember
7 those things for them.
8     Q.   And does your son -- did your son,
9 when he was a minor, use YouTube?
10     A.   I mean, maybe he looked at things on
11 YouTube, but it was not a big thing in our
12 house.  We didn't play video games.  We
13 didn't --
14     Q.   Did you ever restrict the amount of
15 time that your son could spend on YouTube?
16     A.   No.
17     Q.   And did you ever restrict the
18 content that your son could view on YouTube?
19     A.   Nope.
20     Q.   Do you know if your son used YouTube
21 for educational purposes?
22     A.   I would just be assuming.  I don't
23 know that.
24     Q.   Aside from the joint account that
25 you had with your daughter on Instagram, do you

Page 153

1 use social media to communicate with your
2 children?
3     A.   Now.
4     Q.   When your children were minors did
5 you use social media to communicate with them?
6     A.   No.
7     Q.   And now, which platforms do you
8 use -- which --
9     A.   To communicate?
10     Q.   -- social media platform do you use
11 to communicate with your children?  Yes.
12     A.   I Snap both my kids every day, and
13 that's probably about it.
14     Q.   Okay.
15     A.   And then I text them.
16     Q.   Do you have a Snapstreak with your
17 kids?
18     A.   I'm not good at that.  But yes, I'm
19 aware of what that is.
20     Q.   Switching to your work
21 communications, do you use text messaging for
22 work?
23     A.   Yes.
24     Q.   And who do you text for work?
25     A.   I text my assistant, my principals,

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1 and I would say I don't text them for me. It
2 might -- I get more text messages that just say
3 like "Call me," like they would send that to me.
4 And I turn around and say "Urgent or can it
5 wait?" I'm a very talk, or I'm going straight
6 to your school.
7      So my assistant, I might type, you
8 know, I'm running late or -- what I'm trying to
9 get good at is saying what schools I'm at, so
10 I'll text her a list of schools.
11     Q.   Do you text other assistant
12 superintendents?
13     A.   Yeah, if we're running late for a
14 meeting or something.
15     Q.   And do you text Anna Schwartz
16 Warmbrand?
17     A.   I might text her and just say "call
18 me," but I'm not going to text her like --
19 it's -- I'm going to call you. I drive too
20 much, and I'm trying not to text and drive,
21 so...
22     Q.   Do you text Julie Shivanonda?
23     A.   No.
24     Q.   Do you text Rebecca Carrier?
25     A.   Zero.

Page 155

1     Q.   And do you text Joseph Hallums?
2     A.   Yeah, I might text him. I would
3 rather call him, because I don't think he's a
4 good texter either.
5     Q.   What are the nature of the text
6 messages with Mr. Hallums?
7     A.   "Call me."
8     Q.   And do you text Superintendent
9 Trujillo?
10    A.   I don't -- I might text him to give
11 me a call. He texts me to say "could you please
12 give me a call." That would be his. And I
13 might text him. I would rather put it in an
14 e-mail for him just because I think he gets
15 those better.
16    Q.   Have you ever used your personal
17 e-mail address for work communication?
18    A.   No.
19    Q.   And do you take notes for work?
20    A.   I mean, not really. I'm a talker,
21 so it's all right here, and then it usually
22 goes, like, I might follow up with an e-mail.
23 Or like if I'm doing an evaluation, then I just
24 type it into the evaluation. But no, not a lot
25 of notes.

Page 156

1     MS. REAVES:  So I don't think I have
2 further questions. If we could check
3 whether or not anyone on the Zoom has
4 questions.
5     THE VIDEOGRAPHER:  Counsel on Zoom,
6 will there be any questions?
7     MS. GRANT:  None for YouTube and
8 Google. Thank you.
9     THE VIDEOGRAPHER:  All right. This
10 concludes today's deposition.
11    Our total time used on the record
12 for counsel for Snap is two hours,
13 26 minutes.
14    The time is 3:59. We are going off
15 the record.
16    (Whereupon, the deposition was
17    concluded.)
18
19
20
21
22
23
24
25

Page 157

1     CERTIFICATE OF COURT REPORTER
2
3      I, MAUREEN O'CONNOR POLLARD,
4 Registered Diplomate Reporter, CSR No. 14449 for
5 the State of California, the officer before whom
6 the foregoing deposition was taken, do hereby
7 certify that the foregoing transcript is a true
8 and correct record of the testimony given; that
9 said testimony was taken by me stenographically
10 and thereafter reduced to typewriting under my
11 direction; and that I am neither counsel for,
12 related to, nor employed by any of the parties
13 to this case and have no interest, financial or
14 otherwise, in its outcome.
15      Dated this 14th day of May, 2025.
16
17      _Maureen O. Pollard_
18      MAUREEN O'CONNOR POLLARD
19      CSR No. 14449
20
21
22
23
24
25

Golkow Technologies,
A Veritext Division
877-370-3377                                                      www.veritext.com

CONFIDENTIAL

1              INSTRUCTIONS TO WITNESS
2
3           Please read your deposition over
4 carefully and make any necessary corrections.
5 You should state the reason in the appropriate
6 space on the errata sheet for any corrections
7 that are made.
8           After doing so, please sign the
9 errata sheet and date it. It will be attached
10 to your deposition.
11           It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you. If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

1
2           ACKNOWLEDGMENT OF DEPONENT
3
4      I, _____, do
Hereby certify that I have read the foregoing
5 pages, and that the same is a correct
transcription of the answers given by me to the
6 questions therein propounded, except for the
corrections or changes in form or substance, if
7 any, noted in the attached Errata Sheet.
8
9 _____
WITNESS NAME            DATE
10
11
12
13
14
15
16 Subscribed and sworn
To before me this
17 _____ day of _____, 20_____.
18 My commission expires: _____
19
_____
20 Notary Public
21
22
23
24
25

1      - - - - - -
          E R R A T A
2      - - - - - -
3 PAGE LINE CHANGE
4 ____ ____ _____
5    REASON: _____
6 ____ ____ _____
7    REASON: _____
8 ____ ____ _____
9    REASON: _____
10 ____ ____ _____
11    REASON: _____
12 ____ ____ _____
13    REASON: _____
14 ____ ____ _____
15    REASON: _____
16 ____ ____ _____
17    REASON: _____
18 ____ ____ _____
19    REASON: _____
20 ____ ____ _____
21    REASON: _____
22 ____ ____ _____
23
24
25

1           LAWYER'S NOTES
2 PAGE LINE
3 ____ ____ _____
4 ____ ____ _____
5 ____ ____ _____
6 ____ ____ _____
7 ____ ____ _____
8 ____ ____ _____
9 ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25

| | | | |
|---|---|---|---|
| 121:5,18 124:4 | 115:18 139:11 | 151:8,20,23 | **zuckerberg**  3:9 |
| 124:12,19 | **works**  23:4 | 154:13 155:2 | |
| 126:8,23 127:9 | **workshop** | **year**  12:16 21:6 | |
| 127:15,21 | 23:25 | 32:10 35:25 | |
| 136:12 137:23 | **worries**  31:21 | 36:8 75:19 | |
| 139:9 143:10 | **wright**  16:9,14 | 79:24 94:24 | |
| 143:18 144:1 | **write**  74:13 | 103:17 114:10 | |
| 144:24 145:13 | **writing**  93:9 | 127:18 129:24 | |
| 158:1 160:9 | 98:25 | 146:22 147:7 | |
| **witnessed** | **written**  43:13 | 147:15 | |
| 92:10 | 43:17 128:22 | **yearly**  39:3 | |
| **witnessing**  73:3 | **wrong**  20:1 | **years**  16:2 | |
| 79:11 | **wronged**  20:2 | 104:23 115:18 | |
| **wonderful** | **wrote**  72:10 | **yep**  58:19 | |
| 138:8,15 | **wsgr.com**  4:18 | 130:1 149:4 | |

| x |
|---|
| **x**  5:7 |

| y |
|---|

| | | | |
|---|---|---|---|
| **word**  63:11 | **yeah**  12:5 | **ygr**  1:3 | |
| 93:21 149:4 | 27:10 38:24 | **yondr**  129:14 | |
| **work**  11:19 | 46:17 47:17 | **younger**  22:6 | |
| 13:14 19:6,7 | 58:7 74:1 | 147:18 152:4 | |
| 19:16 20:2,4,6 | 77:25 83:10 | **youtube**  4:14 | |
| 41:14 111:3 | 88:17 97:8 | 11:1 50:14 | |
| 153:20,22,24 | 103:23 104:11 | 132:8,10 146:4 | |
| 155:17,19 | 106:3 110:25 | 146:6,9,11,14 | |
| **worked**  21:18 | 116:18,25 | 146:20 149:20 | |
| **workers**  110:17 | 117:1,16 | 149:23 150:1,5 | |
| 110:19,22 | 119:23 124:5 | 150:10 152:9 | |
| 112:21 | 126:8 131:13 | 152:11,15,18 | |
| **working**  11:13 | 135:13 142:5 | 152:20 156:7 | |
| 13:5 14:5,5 | 144:6,10,24 | | |

| z |
|---|

| | | | |
|---|---|---|---|
| 17:18 18:5,10 | 147:12,22 | **zero**  154:25 | |
| 19:3,14,15 | | **zoom**  3:13,20 | |
| 20:9,10,11,14 | | 4:6,17,22 | |
| 21:9,15 22:20 | | 156:3,5 | |
| 23:16 103:4 | | | |