**Exhibit 36**


# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2

    ******************************
 3                                    Case No.
    IN RE:  SOCIAL MEDIA ADOLESCENT   4:22-MD-03047-YGR
 4  ADDICTION/PERSONAL INJURY
    PRODUCTS LIABILITY LITIGATION
 5                                    MDL No. 3047
    ******************************
 6

    This Document Relates To:
 7
    Tucson Unified School District
 8  v. Meta Platforms Inc., et a
 9  Case No. 4:24-cv-1382
10  ******************************
11       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
12            VIDEOTAPED DEPOSITION OF
13            ANNA SCHWARTZ WARMBRAND
14
15     Held At:  JW Marriott Tucson
                  Starr Pass Resort & Spa
16                3800 W. Starr Pass Blvd
                  Tucson, Arizona
17
18
                  May 13th, 2025
19                  9:27 a.m.
20
21
22
23
24  Reported By:
25  MAUREEN O. POLLARD, CA CSR #14449, RDR
```

CONFIDENTIAL

Page 2

1
2
3          Videotaped Deposition of ANNA
4   SCHWARTZ WARMBRAND, held at JW Marriott Tucson
5   Starr Pass Resort & Spa, 3800 W. Starr Pass
6   Blvd., Tucson, Arizona, commencing at 9:27 a.m.,
7   on the 13th of May, 2025, before Maureen
8   O'Connor Pollard, Registered Diplomate Reporter,
9   Realtime Systems Administrator, California CSR
10  #14449.
11
12
13          – – –
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  APPEARANCES:
2
   ON BEHALF OF THE PLAINTIFFS:
3
       WAGSTAFF & CARTMELL
4      4740 Grand Avenue, Suite 300
       Kansas City, Missouri 64112
5      816-701-1145
       BY:  MICHAEL P. CUTLER, ESQ.
6           mcutler@wcllp.com
7
8  ON BEHALF OF META PLATFORMS, INC. f/k/a
   FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC;
9  INSTAGRAM, LLC; FACEBOOK PAYMENTS, INC.;
   FACEBOOK OPERATIONS, LLC; FACEBOOK TECHNOLOGIES,
10 LLC; SICULUS, INC.; and MARK ELLIOT ZUCKERBERG:
11     SHOOK, HARDY & BACON LLP
       2555 Grand Boulevard
12     Kansas City, Missouri 64108
       816-474-6550
13     BY:  DANA STRUEBY, ESQ.
            dstrueby@shb.com
14     BY:  MARTINA FLORIDO, ESQ. (Zoom)
            mflorido@shb.com
15
16
   ON BEHALF OF DEFENDANTS TIKTOK, LTD.; TIKTOK,
17 LLC; TIKTOK INC.; BYTEDANCE LTD.; and BYTEDANCE
   INC.:
18
       KING & SPALDING LLP
19     50 California Street, Suite 3300
       San Francisco, California 94111
20     415-318-1205
       BY:  TROY D. MCMAHAN, ESQ.
21          tmcmahan@kslaw.com
22
23
24
25

Page 4

1  APPEARANCES (Continued):
2
   ON BEHALF OF SNAP, INC.:
3
       MUNGER, TOLLES & OLSON
4      350 South Grand Avenue, 50th Floor
       Los Angeles, California 90071-3426
5      213-683-9516
       BY:  VICTORIA A. DEGTYAREVA, ESQ.
6           victoria.degtyareva@mto.com
       BY:  ROWLEY RICE, ESQ.
7           rowley.rice@mto.com
       BY:  JULIA KONSTANTNINOVSKY, ESQ. (Zoom)
8           julia.konstantninovsky@mto.com
9
10 ON BEHALF OF ALPHABET INC., GOOGLE LLC,
   and YOUTUBE, LLC:
11
       WILSON SANSONI GOODRICH & ROSATI
12     1301 Avenue of the Americas, 40th Floor
       New York, New York 10019
13     212-453-2803
       BY:  PRAATIKA PRASAD, ESQ.
14          pprasad@wsgr.com
15
16 Also Present:
17 Videographer and Trial Tech:  Dan Lawlor
18
19
20
21
22
23
24
25

Page 5

1            INDEX
2  EXAMINATION                    PAGE
3  ANNA SCHWARTZ WARMBRAND
4    BY MR. RICE                    10
5
6
7         E X H I B I T S
8  NO.     DESCRIPTION           PAGE
9  Tucson-
   Warmbrand-1   Ms. Warmbrand's resume.....  16
10
   Tucson-     Some of the Reports used
11 Warmbrand-2   by Administrators, Bates
               SM_TUSD_00234340 and 4341..  32
12
   Tucson-     The Code of Conduct for
13 Warmbrand-3   TUSD.....................  50
14 Tucson-     Synergy Excel
   Warmbrand-4   spreadsheet, Bates
15             SM_TUSD_00365959..........  70
16 Tucson-     Synergy Excel
   Warmbrand-5   spreadsheet, Bates
17             SM_TUSD_00365958..........  72
18 Tucson-     Synergy Excel
   Warmbrand-6   spreadsheet, Bates
19             SM_TUSD_00595044..........  73
20 Tucson-     12/22/2022 e-mail, Bates
   Warmbrand-7   SM_TUSD_00174197..........  74
21
   Tucson-     Chart, 2022-2023 Top 5
22 Warmbrand-8   Violations of all
               Students at 10 Schools in
23             all Regions, Bates
               SM_TUSD_00174203 and 4204..  75
24
25

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 6

1   Tucson-      District Discipline
2   Warmbrand-9  Summary: December 22nd,
        Bates SM_TUSD_00174200
3       and 4201.................... 75
4   Tucson-      District Discipline
    Warmbrand-10 Summary: 2023-2024 School
5       Year, March 27, 2024...... 79
6   Tucson-      Substance Misuse Task
    Warmbrand-11 Force Meeting Minutes,
7       November 14, 2023, Bates
        SM_TUSD_00131552 through
8       1556..................... 82
9   Tucson-      Plaintiff's Amended
    Warmbrand-12 Answers to Defendants'
10      Interrogatories to Tucson
        Unified School District
11      (Set 3)................... 84
12  Tucson-      Unitary Status Plan,
    Warmbrand-13 Bates SM_TUSD_00429081
13      through 9167.............. 96
14  Tucson-      Slide deck, TUSD
    Warmbrand-14 Discipline Committee,
15      March and April Review,
        May 17, 2017, Bates
16      SM_TUSD_00102321.......... 101
17  Tucson-      Slide deck, TUSD
    Warmbrand-15 Discipline Report, May
18      23, 2023, Bates
        SM_TUSD_00234343.......... 104
19
    Tucson-      Discipline Report, 12/12
20  Warmbrand-16 - End of First Semester.... 112
21  Tucson-      Slide deck, TUSD District
    Warmbrand-17 Behavior Management Team
22      1/22/24, Bates
        SM-TUSD_00046949.......... 115
23
24
25

Page 7

1
    Tucson-      Department of Equity,
2   Warmbrand-18 Diversity, and
        Inclusiveness (EDI)
3       Culture and Climate
        Support Report, Bates
4       SM_TUSD_00047051 through
        7053..................... 118
5
    Tucson-      10/4/2023 e-mail, Bates
6   Warmbrand-19 SM_TUSD_00047033.......... 120
7   Tucson-      EDI Month at Sabino -
    Warmbrand-20 9/14/21, Bates
8       SM_TUSD_00047034 through
        7039..................... 121
9
    Tucson-      Focus Group Sabino high
10  Warmbrand-21 school: 9/10/21, Bates
        SM_TUSD_00047040 and 7041.. 121
11
    Tucson-      September 10, 2021
12  Warmbrand-22 document, Bates
        SM_TUSD_00047042 through
13      7044..................... 121
14  Tucson-      September 14, 2021
    Warmbrand-23 document, Bates
15      SM_TUSD_00047045 through
        7048..................... 122
16
    Tucson-      Performance Impact
17  Warmbrand-24 Analysis: Proposed
        Revisions to the Code of
18      Conduct 2023-2024........ 139
19  Tucson-      TUSD Code of Conduct
    Warmbrand-25 Revision Process, May
20      2023..................... 150
21  Tucson-      Video clip from March 26,
    Warmbrand-26 2023 board meeting......... 152
22
    Tucson-      TUSD Code of Conduct
23  Warmbrand-27 Revision Process, Spring
        2023..................... 153
24
25

Page 8

1           - - -
            DEPOSITION SUPPORT INDEX
2           - - -
3
    Direction to Witness Not to Answer
4   PAGE     LINE
    None.
5
6
7
8   Request for Production of Documents
    PAGE     LINE
9   None.
10
11
    Stipulations
12  PAGE     LINE
    None.
13
14
15  Questions Marked Highly Confidential
    PAGE     LINE
16  None.
17
18
19
20
21
22
23
24
25

Page 9

1           P R O C E E D I N G S
2
3           THE VIDEOGRAPHER:  We are now on the
4   record.  My name is Dan Lawlor.  I'm a
5   videographer for Golkow, a Veritext division.
6           Today's date is May 13, 2025, and the
7   time is 9:27 a.m.
8           This video deposition is being held in
9   Tucson, Arizona, in the matter of Social
10  Media/CA MDL 3047, Tucson Unified School
11  District versus Meta Platforms Inc., et al.
12          The deponent is Anna Schwartz
13  Warmbrand.
14          Counsel will be noted on the
15  stenographic record.
16          The court reporter is Maureen Pollard,
17  and will now swear in the witness.
18          *  *  *
19  Whereupon,
20          ANNA SCHWARTZ WARMBRAND,
21  being first duly sworn to testify to the truth,
22  the whole truth, and nothing but the truth, was
23  examined and testified as follows:
24          EXAMINATION
25          ///

CONFIDENTIAL

1 BY MR. RICE:
2     Q.   Good morning, Ms. Warmbrand.
3     A.   Good morning.
4     Q.   Could you please state your name for
5 the record?
6     A.   Anna Schwartz Warmbrand.
7     Q.   Do you understand you're testifying
8 under oath today?
9     A.   Yes.
10     Q.   Is there any reason you cannot give
11 truthful and accurate testimony today?
12     A.   No.
13     Q.   You're employed by Tucson Unified
14 School District, correct?
15     A.   Yes.
16     Q.   And you understand that that's often
17 abbreviated to be TUSD?
18     A.   Yes.
19     Q.   And so you understand that if I say
20 "TUSD" or "the district" in my questioning
21 today, you understand I'm referring to the
22 Tucson Unified School District --
23     A.   Yes.
24     Q.   -- correct?
25     A.   Yes.

1     Q.   And do you understand that if I say
2 "defendants' platforms," I'm referring to
3 Facebook, Instagram, TikTok, YouTube, and
4 Snapchat?
5     A.   Yes.
6     Q.   Have you ever previously been
7 deposed, Ms. Warmbrand?
8     A.   No.
9     Q.   Have you ever testified in court?
10     A.   Yes.
11     Q.   What was the nature of the matter
12 where you testified?
13     A.   Custody dispute among students and
14 parents.
15     Q.   And what did you do to prepare for
16 this deposition today?
17     A.   I worked with Michael.
18     Q.   Did you meet with anyone else?
19     A.   I worked with Michael.
20     Q.   Other than Mr. Cutler, though, you
21 didn't meet with anyone else?
22     A.   No, I met with Michael.
23     Q.   Did you review any documents in
24 preparation for the deposition today?
25     A.   Only the documents that Michael has

1 presented.
2     Q.   And did you take any notes?
3     A.   No, I have not taken notes.
4     Q.   Have you brought any notes or
5 documents with you today?
6     A.   No.
7     Q.   How long have you been employed by
8 TUSD?
9     A.   I've been employed by Tucson Unified
10 School District in this particular position for
11 three years.
12     Q.   And what is your current title?
13     A.   I'm the director of student
14 relations.
15     Q.   And what are your responsibilities
16 as director of student relations?
17     A.   I oversee all behavior management
18 systems for the district.
19     Q.   And could you explain what you mean
20 by "behavior management systems"?
21     A.   PBIS systems, restorative practice
22 systems, and all disciplinary systems.
23     Q.   And what does PBIS stand for?
24     A.   Positive behavior intervention
25 supports.

1     Q.   And could you just explain briefly
2 what that is?
3     A.   Essentially it's an incentive
4 program that we utilize in all of our schools
5 that builds both intrinsic and extrinsic
6 motivation for students to do what's right
7 behaviorally.
8     Q.   And what are restorative practice
9 systems?
10     A.   Restorative practice systems are
11 when a conflict occurs between students, student
12 to student, student to adult, or adult to adult,
13 it's a series of protocols that is mediation
14 that we utilize and strategies we utilize for
15 mediation to resolve conflict.
16     Q.   And what are behavior management
17 systems?
18     A.   PBIS and restorative practice and
19 our disciplinary systems that we utilize in the
20 district.
21     Q.   Okay.  And what do you mean by
22 "disciplinary systems"?
23     A.   All of our code of conduct policy
24 documents, and everything in Synergy as well,
25 all of our reporting in those spaces, and

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1 monitoring, as well as all of our hearings that
2 I oversee.
3    Q.   And who do you report to?
4    A.   I direct report to Frank Armenta,
5 assistant superintendent for student success and
6 leadership, and I also report as a designated
7 district LEA to Dr. Trujillo as well.
8    Q.   What does LEA stand for?
9    A.   It's basically the educational
10 liaison.
11    Q.   And who reports to you in your
12 department?
13    A.   I have eight restorative practice
14 facilitators, I have eight hearing officers, I
15 have two program specialists, one executive
16 assistant, one program coordinator, and the
17 district's compliance liaison.
18    Q.   What is the role of the restorative
19 practice facilitators?
20    A.   They're housed at our schools that
21 have high need where there's been specific
22 levels of conflict, and they house there either
23 part-time or a half-time split between two
24 sites.  And they work directly in service to
25 students.

Page 15

1    Q.   And then what's the role of the
2 hearing officers?
3    A.   The hearing officers are
4 decision-makers for the district for all level 4
5 and 5 offenses that students have, and they go
6 before our hearing officers, and the hearing
7 officers make a determination on consequence.
8    Q.   And do you attend disciplinary
9 hearings in your role as director of student
10 relations?
11    A.   No, I do not attend the hearings.  I
12 have attended a few in certain instances, but
13 it's not protocol for me to be in that space.
14 My hearing officers are there.
15    Q.   And what's the role of the program
16 specialist in the student relations department?
17    A.   So the program specialists oversee
18 and monitor all of the initiatives for PBIS and
19 restorative practices that my department
20 oversees and any other MOUs that are held by the
21 district for behavior.  So they're all over the
22 place.  They go to lots of schools.
23    Q.   What's the role of the program
24 coordinator in the student relations department?
25    A.   Her role for me is basically like my

Page 16

1 right-hand woman, and she handles all -- she
2 oversees all of the restorative practice
3 facilitators, and she manages our PBIS
4 initiative for the district.
5    Q.   What's the role of the compliance
6 liaison?
7    A.   The compliance liaison schedules all
8 of our hearings.  She ensures that all of our
9 disciplinary paperwork for long-term suspensions
10 is done correctly.  She monitors all of our
11 hearing decision letters.  She monitors and
12 oversees all of the expulsion packets.  And she
13 provides data through the Synergy system to
14 departments, regional superintendents, director
15 of safety and security, assistant
16 superintendents, Dr. Trujillo, and to the board.
17        MR. RICE:  Let's mark as Exhibit 1
18    Tab 2.
19        (Whereupon, Tucson-Warmbrand-1 was
20        marked for identification.)
21 BY MR. RICE:
22    Q.   And, Ms. Warmbrand, this one we do
23 not have a paper copy.  For the majority of
24 documents we'll have paper copies.  Tab 2,
25 Exhibit 1, is just your rèsumè.

Page 17

1    A.   Yeah, that's me.
2    Q.   So, Ms. Warmbrand, this is your
3 rèsumè, correct?
4    A.   Yes, it is.
5    Q.   And everything here is truthful?
6    A.   Yes.
7    Q.   And with respect to your role as
8 director of student relations, do you have any
9 role with respect to TUSD's desegregation
10 efforts?
11    A.   My budget is partially funded
12 through deseg allocation dollars.  So when we
13 had a unitary status plan, there were parts of
14 my job responsibilities that were dictated by
15 that in the desegregation order.
16        As that is no longer in place
17 currently.  That isn't as applicable as it was
18 before.
19    Q.   When the desegregation order was in
20 place, what were your responsibilities with
21 respect to the unitary status plan?
22    A.   My responsibilities currently still
23 remain the same, because we are no longer under
24 that unitary status plan as of mid January, and
25 we have been directed not to change any of our

CONFIDENTIAL

Page 18

1  systems midway through the year.
2      So all of what I do still matches
3  what my obligation was in the unitary status
4  plan for this year.
5      Q.   And could you explain further what
6  those responsibilities are with respect to the
7  unitary status plan, how that intersects with
8  your role as director of student relations?
9      A.   Yes.  So part of what the unitary
10  status plan asks us to track, one of the big
11  pieces of my department is disproportionality in
12  disciplinary systems and practices districtwide.
13      And so we monitor risk ratios, is
14  what we call them, which is whether school sites
15  in particular are disproportionately suspending
16  or having incidents with students who are
17  African American and Hispanic.
18      And so that is part of my
19  department's responsibility, is to consistently
20  monitor risk ratios, work with regional
21  superintendents at school sites to analyze those
22  practices and support so that we do not have
23  disproportionality for African American and
24  Hispanic students.
25      Q.   And how do you calculate the risk

Page 19

1  ratios for a particular school site or for the
2  district as a whole?
3      A.   So what we do is we look at incident
4  numbers, not suspension, it's based upon
5  incident numbers, and we compare it to
6  white/Anglo students, and white/Anglo students
7  carry a point assignment of 1.00.  And if the
8  number of incidents for a certain ethnicity
9  raises above a 1.00, or in the case of African
10  American and Hispanic students a 1.48 right
11  now -- and this is all based upon enrollment,
12  right, it's proportional so it changes just a
13  little bit depending on the year -- then there's
14  a disproportionality in incidence.
15      If you have higher than a 1.50
16  currently, then you will show a yellow, for
17  example, for disproportionality.  If we get into
18  like the 1.97 range, then you're going to start
19  to see red.
20      So my job is to ensure that we
21  mostly see green, or that there's some
22  variability week to week so that you'll have
23  disproportionality perhaps one week but not
24  another, and that all of the ethnicities either
25  have no color or some at some point.

Page 20

1      There should never be one race
2  ethnicity that carries red for any consistent
3  period of time if we're documenting and
4  supporting appropriately.
5      Q.   And so if a certain ethnicity has
6  higher than a 1.5 risk ratio, that would mean
7  that for every one disciplinary incident with
8  respect to a white student, there's 1.5 or more
9  incidents with respect to that ethnic group?
10      A.   Yes, that it's disproportionate.
11      Q.   And if the range is between 1. --
12  you mentioned -- so the cutoff for -- excuse me.
13      You said if the ratio is above 1.48,
14  it's yellow.
15      A.   That changes depending on
16  enrollment.
17      Q.   Okay.
18      A.   So it's proportional based upon how
19  many white/Anglo students we have enrolled, and
20  then how many Hispanic or African American.  So
21  there's some variation, you know, a range of
22  maybe .10 -- like if it's 1.48, it could be, you
23  know, in six months it's a 1.52, which will get
24  you disproportionate.
25      So it's very specific to enrollment

Page 21

1  numbers as they fluctuate.
2      Q.   And how is that calculated?
3      A.   It's calculated through our Synergy
4  system and through our team, and they monitor
5  and they code specifically for enrollment for
6  all of our ethnicities, so...
7      Q.   And is it the same for the red
8  ratio, that that number is calculated through
9  Synergy?
10      A.   Yeah, yes.  All of these are all
11  Synergy reporting systems we have.
12      Q.   As director of student relations, do
13  you have any role with respect to TUSD's
14  budgets?
15      A.   I manage my own budget, yes.  I
16  manage my own budget, for sure, and I do work
17  with the senior director for title funding if
18  there are certain initiatives that need
19  additional funding, to request for title
20  funding.
21      And I do support our department led
22  by Julie Shivanonda in regards to her allocation
23  for JUUL funds.  I do sit on a committee that
24  vets the allocation of that funding.
25      Q.   And as director of student

6 (Pages 18 - 21)

CONFIDENTIAL

1 relations, do you have any role with respect to
2 student mental health?
3     A.   In terms of restorative practice
4 facilitators, we do work closely with the
5 behavior specialists and the counselors on site.
6         My restorative practice
7 facilitators, as I stated, their role is to
8 really mediate.  They are peacemakers in this
9 space, but during that time with students they
10 may find that that student is struggling with
11 deeper psychological issues.
12         They are not the counselor, they're
13 not the behavior specialist, but they will work
14 with those people on site for referrals and
15 check-in support.
16     Q.   And then before joining TUSD, you
17 were a principal at Sunnyside Unified School
18 District?
19     A.   Yes.
20     Q.   And you were principal at a fine
21 arts magnet middle school, is that correct?
22     A.   Yes.
23     Q.   And then before joining Sunnyside,
24 you were a principal at Vesey Elementary School
25 in TUSD?

1     A.   Yes, Vesey.
2     Q.   Vesey.
3     A.   Yes.
4     Q.   Thank you.
5         Did you have teaching experience
6 before becoming a principal?
7     A.   Yes, I did.  I taught for seven and
8 a half years.
9     Q.   And where did you teach?
10     A.   I taught at Craycroft Elementary
11 School in the Sunnyside Unified School District,
12 and I taught at Cragin Elementary in the Tucson
13 Unified School District, and I taught at
14 Esperanza Elementary, also in the Sunnyside
15 Unified School District.
16     Q.   And other than director of student
17 relations, the principal at Vesey Elementary and
18 Cragin Elementary School, have you had any other
19 roles at TUSD?
20     A.   Not in Tucson Unified School
21 District, no.
22     Q.   And when you taught elementary
23 school, what grades did you teach?
24     A.   I taught -- I was a reading
25 specialist, so I worked with kinder, first,

1 second, and third graders, and then I've taught
2 third grade, fourth grade, and fifth grade.
3     Q.   And which of those did you teach in
4 TUSD as opposed to Sunnyside?
5     A.   I was the reading specialist in
6 Tucson Unified, so kinder, first, second, third.
7     Q.   And then, Ms. Warmbrand, you're not
8 a medical doctor, correct?
9     A.   I am not.
10     Q.   And you're not a certified
11 psychologist, correct?
12     A.   I am not.
13     Q.   You're not a specialist in
14 addiction?
15     A.   No.
16     Q.   And you're not a specialist in
17 mental health?
18     A.   No.
19     Q.   What are the primary ways you
20 communicate for work?
21     A.   So there's about every way you can
22 imagine people communicate with each other.
23 E-mail, text message, phone calls, are the three
24 primary ways.  Zoom meetings, plenty of Zoom
25 meetings.  In-person meetings.

1     Q.   With respect to e-mail, what e-mail
2 address do you use?
3     A.   My work e-mail.
4     Q.   Do you ever use your personal e-mail
5 address for work?
6     A.   No, never.  No, no.
7     Q.   And what about text messaging?  Do
8 you have a work phone?
9     A.   No, I do not have a work phone.
10     Q.   And then who do you text for work?
11     A.   Oh, so many folks.  So I serve all
12 89 schools, so I communicate with site
13 administrators, regional superintendents,
14 district level leadership on a consistent basis.
15         I will note that those
16 communications do translate themselves into our
17 Synergy system in the end, because it's all
18 giving guidance, counsel, and directive on
19 disciplinary issues that will be documented in
20 Synergy.  Nobody calls me for the small stuff.
21 I'm not that person, so...
22     Q.   And then the communications
23 themselves are not logged in Synergy, right?  No
24 one's text messages are in Synergy?
25     A.   No.

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 26

1    Q.    So what you mean is that they're the
2  Synergy -- or explain what you mean, then, a
3  little more.
4    A.    So site administrators will contact
5  me that they have an incident, something has
6  occurred, and they need some guidance on how to
7  proceed to manage it.
8         And so I will give them directive on
9  how I want them to manage these disciplinary
10  incidents, and then I will track myself and my
11  compliance liaison that my directive is followed
12  and that they've done what needed to be done,
13  because I'll be able to then see it in our
14  disciplinary system in Synergy, typically in our
15  03 report, which is our student summary.
16         So there's not an incident that I'm
17  communicating on that I don't require that
18  there's a follow-up in our documented systems,
19  because these are the most serious offenses.
20    Q.    But the initial guidance would be
21  through text message in some cases?
22    A.    Yeah.
23    Q.    And then do you keep any notes
24  yourself?
25    A.    I keep agendas for what I'm going to

Page 27

1  do each day, but I definitely don't have like a
2  running log of all of the disciplinary systems
3  in a notebook or, you know, each incident.
4         There's an expectation that site
5  administrators are documenting what they need to
6  document in their own investigations, because I
7  serve 89, there's about 120 administrators, so
8  that definitely has to fall on them.
9    Q.    And would they document those in
10  Synergy then?
11        MR. CUTLER:  Object to form.
12        THE WITNESS:  They should be, yes.
13  BY MR. RICE:
14    Q.    Do you use Microsoft Teams at all?
15    A.    Yes, we do use Teams.
16    Q.    Do you use the chat function?
17    A.    No, I have not used the Microsoft
18  Teams chat function.
19    Q.    And a few times now you've referred
20  to site administrators.  Who do you mean with
21  that term?
22    A.    Principals and assistant principals.
23    Q.    And you mentioned earlier you serve
24  as Dr. Trujillo's designee on certain issues?
25    A.    Mm-hmm.

Page 28

1    Q.    Could you explain a little more what
2  you mean by that?
3    A.    He will designate me to manage
4  certain incidents and communications on his
5  behalf at his directive.  Our code of conduct
6  policy document does state that the director of
7  student relations does have the authority to
8  approve requests to elevate discipline, waiver
9  down disciplinary action, or have executive
10  decision-making for suspensions and expulsion.
11    Q.    And so what types of disciplinary
12  decisions would you make as opposed to a site
13  administrator?
14    A.    So we have in our code of conduct
15  the ability for site administrators to request
16  an elevation for disciplinary consequences, we
17  call it an RAD, and they have to submit that to
18  myself and the regional superintendent, and
19  those can only be approved by either myself or
20  the regional superintendent, and we work in
21  partnership.
22        We also have in our code of conduct
23  that you can waiver down consequences.  If you
24  feel that the consequence assigned within our
25  policy document, the code of conduct, is too

Page 29

1  severe, then you can submit a waiver form to
2  myself or the regional superintendent, and then
3  myself or the regional will make an executive
4  decision as to whether we will allow you to
5  waiver down that consequence.
6         Also, I have decision-making power
7  when it comes to K-4 suspensions.  Here in the
8  state of Arizona, we max out at ten days for
9  suspensions for kindergarten through fourth
10  grade students.  It's Noah's arc, two days at a
11  time, and if they want to exceed past that
12  ten-day mark, then they need my permission to do
13  so, and there's a set of questions that statute
14  requires that I go through and then I can
15  approve that or not.
16         And if something is done incorrectly
17  per due policy -- due process, excuse me, for
18  students and I find that their due process has
19  been violated, then I can override the decision
20  of the site administrator because due process
21  has been violated for students, and that's
22  something that I'm in charge of as well.
23    Q.    What type of work do you do with the
24  regional assistant superintendents?
25    A.    We communicate frequently about

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1  high-need sites, sites that have high
2  disciplinary rates or high rates of
3  disproportionality, so the risk ratios are in
4  the red, for example, and we'll communicate on
5  creating a comprehensive plan of support and
6  monitoring for those sites.
7         We also will discuss particular
8  requests to elevate discipline that come
9  through, waivers, hearing decision letters, if
10 they need counsel or support in that way.  And
11 then we meet on all district initiatives on a
12 weekly basis.
13     Q.   And then are there certain reports
14 that the department of student relations
15 regularly prepares?
16     A.   Mm-hmm.
17         MR. CUTLER:  Object to form.
18 BY MR. RICE:
19     Q.   What types of reports?
20     A.   So those are all going to be in our
21 Synergy system.  We have 21 of those reports
22 that are specialized for all sorts of needs.
23         But we provide reports about illicit
24 drug use suspensions to Julie Shivanonda's
25 department.  We provide for African American

Page 31

1  Student Services a list of African American
2  students that have been suspended for the week.
3  We provide to the school board their list of
4  suspensions, their hearing schedule and the risk
5  ratios.
6         We provide summary reports to my
7  assistant superintendent, the director of safety
8  and security, and our superintendent every other
9  week.  The regionals are provided with their
10 incident reports every other week along with
11 their disproportionality reports and their
12 violation reports as well every other week.
13         Oh, and we provide for our Title IX
14 department our report of all sexual offenses
15 that have occurred in the district so that they
16 can monitor for their purposes.
17         And we provide for Dr. Salmon any
18 exceptional education suspensions that have
19 exceeded ten days.  And we provide for our focus
20 sites all of their disciplinary summaries every
21 Friday.  And we provide for -- every month we
22 provide every regional, our legal counsel, and
23 every single school site their K-4 reports.
24         And that's all specialized in
25 Synergy.  This isn't -- you know, everything, I

Page 32

1  don't come up with it on the top of my head
2  here, it's all systematic, and that data is in
3  our system.
4         MR. RICE:  Let's mark as Exhibit 2
5      Tab 4.
6         (Whereupon, Tucson-Warmbrand-2 was
7         marked for identification.)
8         MR. RICE:  And Exhibit 2 will be a
9      document produced by TUSD with the Bates
10     00234340.
11 BY MR. RICE:
12     Q.   Ms. Warmbrand, have you seen this
13 document before?
14     A.   I have definitely seen lists of our
15 reporting systems.  Yes, I believe I have.
16     Q.   And does this document list some of
17 the reports that you were just mentioning in
18 your testimony?
19         (Witness reviewing document.)
20     A.   Yes, it does.
21     Q.   Is this an exhaustive list, or are
22 there reports that you prepared that are not
23 listed in Exhibit 2?
24         MR. CUTLER:  Object to form.
25         THE WITNESS:  These -- the IDS

Page 33

1      reports will cover what I shared.
2  BY MR. RICE:
3      Q.   When you say "IDS," what do you mean
4  by that?
5      A.   So all of our reporting is coded
6  dependent on access.  So I operate under IUDS
7  reporting, and that's internal reports that run
8  through my department, but what you will see is
9  that, like, the IDS for 03 is comprehensive in
10 that it covers what is specialized for my
11 department.
12         So all of these will cover all of
13 the information that I've shared with you that I
14 use; it just front-faces in articulation a
15 little bit differently than some of my IUDS
16 reporting.  But this is all -- all of it is the
17 same coding foundation that Synergy uses.
18     Q.   And for all these types of reports
19 you prepare, do the reports contain aggregate
20 data on student incidents?
21     A.   What it will provide is numerical
22 summary typically.
23         (Phone interruption.)
24         THE WITNESS:  Sorry.  I won't get
25 it.

9 (Pages 30 - 33)

CONFIDENTIAL

1     MR. CUTLER: Turn it off.
2     THE WITNESS: Do you want me to turn
3  it off?
4     MR. CUTLER: Yeah.
5     THE WITNESS: Thank you. Okay. We
6  should be good. Excuse me.
7     Could you repeat the question,
8  please?
9  BY MR. RICE:
10    Q.  Yes.
11    So for the types of reports that you
12 prepare, do the reports contain aggregate
13 numerical information?
14    A.  Yes, typically.
15    Q.  And what other types of other
16 information would they contain?
17    MR. CUTLER: Object to form.
18    THE WITNESS: The -- you can see
19 that there's a student discipline profile,
20 and in that student discipline profile the
21 IDS201 is particular where it carries
22 narratives per incident.
23 BY MR. RICE:
24    Q.  And what about for the summary
25 reports you prepare for the assistant

1  superintendent, director of safety and security,
2  and superintendent, do those contain a narrative
3  information on particular disciplinary
4  incidents?
5     A.  No, they will not. No.
6     Q.  Do those contain information beyond
7  aggregate numerical information?
8     A.  No.
9     MR. CUTLER: Object to form.
10 BY MR. RICE:
11    Q.  And does the student relations
12 department analyze the causes of disciplinary
13 issues in TUSD?
14    A.  Yes, we do.
15    Q.  How do you do that?
16    A.  Well, because we're able to see
17 narrative for each and every single incident
18 that occurs, whether it be in the student
19 profile reporting or in the disciplinary action
20 form, which is what is generated when suspension
21 occurs, we call it the DAF, that also provides
22 narrative, and that information in the DAF is
23 taken right through that 201 report.
24    So it's not different information in
25 a DAF, it's just a much more consolidated

1  articulation because it also holds the amount of
2  suspension days and general demographics, and
3  so -- and that's within our Synergy system.
4     So between the 201, the DAF, and
5  then if there is a chronology provided for
6  long-term suspension hearings, we are also able
7  to see root causes of incidents. So those are
8  the documented pieces.
9     And also the nature of my position
10 is to do the initial intakes verbally with site
11 administrators. I'm a thought partner in their
12 space. Before they begin their comprehensive
13 investigation, during their comprehensive
14 investigation or at the end, I'm the person that
15 they can call to talk through.
16    And the question why surfaces often
17 when I ask them, What's happening, Why do you
18 think this is happening, Why is this child doing
19 what they're doing, and that why won't always
20 articulate always into a chronology or into a
21 report. It's the nature of them having that
22 safe space with a director who has the authority
23 to guide and direct, to talk through these
24 incidents in this space so that they understand
25 what they need to do to guarantee due process

1  and follow policy moving into whatever stage
2  they are in that incident.
3     Q.  Does your department take the
4  information you were discussing in that prior
5  question and then attempt to evaluate the causes
6  of aggregate disciplinary trends in TUSD?
7     A.  We do. We do. The longer I'm in
8  this position, the more categories of violation
9  matching and detail I require the Synergy team
10 to create.
11    You know, when I started I think we
12 had like six reports up to the 06, and now we
13 have 21 in this space.
14    And so we do track violations,
15 though. It's not always the why in that same
16 documented space. Although, the longer I'm in
17 this position, the more ideas I get about
18 influence and how important that is for our
19 mental health professionals in the district.
20    Q.  So other than the Synergy data, what
21 other sources of information do you consult in
22 your work?
23    MR. CUTLER: Object to form.
24    THE WITNESS: I'm the rules lady, so
25 the folks that I work closely with and who

Page 38

1    I consult are our legal counsel, our
2    internal legal counsel.
3 BY MR. RICE:
4    Q.   And then what types of files do you
5 keep regarding student disciplinary incidents?
6    A.   Well, we keep all files on long-term
7 suspensions in Teams.  That's probably our
8 largest file base.
9         We also house some of the discipline
10 reports, our MDR reports, for the district as
11 well.
12        And then if there are particular
13 e-mail-documented incidents for particular
14 students where the parents are appealing
15 disciplinary decisions, I monitor all appeals
16 through the district beginning from the
17 assistant principal all the way up to
18 Dr. Trujillo, and so I will keep files on those
19 particular incidents in which they are going
20 through the process of appeals.
21        So those are probably the three
22 major categories.
23    Q.   For the monthly discipline reports,
24 where are those stored?
25    A.   Those are stored in Teams folders.

Page 39

1 We began documenting them significantly last
2 year.  I'm only in my third year and so I'm very
3 particular about documentation and how that
4 houses.
5    Q.   And then the files on long-term
6 suspensions, what information is contained in
7 those files?
8    A.   Those are my hearing officer
9 worksheets.  So that's essentially all of their
10 documentation and script for the incident, and
11 their decision.  Also in there is their hearing
12 decisions, and a tape recording of all hearings.
13    Q.   Have you done any analysis of the
14 cause of aggregate discipline trends in TUSD?
15        MR. CUTLER:  Object to form.
16        THE WITNESS:  Yes.
17 BY MR. RICE:
18    Q.   Where is that analysis documented?
19        MR. CUTLER:  Object to form.
20        THE WITNESS:  The analysis is
21    documented in the reporting and
22    presentations that are provided in summary
23    to the superintendent's office.
24 BY MR. RICE:
25    Q.   Are those the biweekly reports you

Page 40

1 mentioned earlier in your testimony?
2    A.   Yeah.  That provides summary, and
3 district leaders are able to see which schools
4 are struggling in that space, so that creates a
5 narrative for district leadership so that they
6 know where the best supports are.
7    Q.   And what types of information would
8 be contained in that analysis?
9    A.   Risk ratios for the district, if
10 there are any that exist for that time period,
11 for that ten-day period.  The violations that
12 drive district disciplinary action for that
13 ten-day period.  Top violations, top ten sites
14 that have the highest level of incidents
15 districtwide, the highest level of incidents for
16 aggression, and the highest level of incidents
17 for illicit drug use, sale, and share.
18    Q.   Do your analyses evaluate the reason
19 behind the particular violations in the report?
20        MR. CUTLER:  Object to form.
21        THE WITNESS:  Yes.  I'll give you an
22    example of this past week.
23        So this past week we have a TikTok
24    challenge happening here, nationally, in
25    which students take a pencil or a piece of

Page 41

1    metal wire and they stick it into the side
2    of the Chromebook where their port is, and
3    it causes smoke and sometimes fire.  It
4    destroys our machines.
5         And so I'm currently working with
6    the IT department to document all of our
7    broken Chromebooks, which are substantial
8    in comparison to our normal numbers, and
9    ensuring that both the students are fined,
10   as well as I gave the directive via e-mail
11   to all site administrators this week that
12   this is a TikTok challenge that is
13   occurring, this is what is happening to
14   the Chromebooks, this is the fines we know
15   that we need to fine the students, and
16   this is the violation that this particular
17   TikTok challenge will match under, which
18   is vandalism, and in the case of it causes
19   actual fire, then that will be a level 4
20   arson and they will go to a hearing in the
21   space.
22        So that's an example of a really
23   clear direct cause of something occurring,
24   a directive that's given, and then the
25   analysis of the impact.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1     And that was just this last week
2   that we've been managing it. I know
3   that's true for many districts.
4 BY MR. RICE:
5     Q.   How did you conclude that a TikTok
6 challenge was responsible for these violations?
7     A.   Because our site administrators have
8 actual videos and photographs of the students
9 doing this, and then repost it on TikTok. So,
10 you know, we'll get videos and videos of people
11 videoing and then having it posted. And then in
12 their investigation notes, they'll state the
13 students will share that they were doing it for
14 TikTok.
15     And that rhythm is pretty consistent
16 with most of the TikTok challenges, if not all,
17 that I've had to manage both as a site
18 administrator and a director of student
19 relations.
20     Q.   And so in this case the violations
21 were caused by videos that other people posted
22 on TikTok?
23     A.   The violations are caused by
24 students wanting to participate in the TikTok
25 trend of sticking pencils and wire into

Page 43

1 computers to see if they'll smoke or catch on
2 fire, and posting that onto their story.
3     And TikTok challenges we know are --
4 people will nominate other people for those
5 challenges oftentimes, and so either a child is
6 nominated, or they want to get more attraction
7 in their TikTok space, and so they'll engage in
8 that space.
9     And the children are very articulate
10 in that, and even if they aren't, it's very
11 clear that they're literally recording it. You
12 have people recording them recording it.
13     This is how our children operate in
14 our school system these days. Whether we -- you
15 know, whether we had more common sense when we
16 were young or not, we didn't have cellphones.
17 They love to document everything that they do.
18     Q.   So they watch the videos that others
19 post online?
20     MR. CUTLER:  Object to form.
21 Misstates testimony.
22     THE WITNESS:  Whether they watch the
23 videos or not, the fact of the matter is
24 we can see them recording, and then we see
25 their posts as the site administrators

Page 44

1 meet with kids for the documentation. And
2 oftentimes the parents will say, Show me,
3 and I'll have to show their parents what
4 they've done. It's very clear that the
5 Chromebook is destroyed.
6     And they are doing it in the
7 classroom in front of large groups of
8 students, and of course the adult in the
9 room. So these are not situations in this
10 particular instance I shared where this is
11 being done in a secret space and we're
12 just relying on social media. It's very
13 clear, the device literally begins to
14 smoke, so it's not subtle.
15 BY MR. RICE:
16     Q.   And then students post their own
17 videos of the devices afterwards?
18     A.   Yes, or they post the other student
19 doing whatever that is.
20     Q.   Do you have any reason to believe
21 that TikTok particularly promoted this
22 challenge?
23     A.   I think that when we have a social
24 obligation as organizations, whether you're a
25 social media organization, a school district, an

Page 45

1 adult, a parent, that you absolutely have an
2 obligation for the safety of the human beings in
3 your space.
4     And if by allowing challenges to
5 continue and being complacent in that space, to
6 me that would be a promotion. This isn't one of
7 those situations when you have literal fires
8 starting in schools and devices being destroyed
9 where the right thing to do if you care about
10 the safety of children is to say, Well, we're
11 not promoting this, but the allowance of and the
12 existence of it is very troubling for those of
13 us that manage the aftermath of these
14 situations.
15     Q.   Do you have any reason to believe
16 that TikTok offered prizes to students for
17 participating in the challenge?
18     A.   I don't have reason to believe that
19 there were prizes, unless you consider the likes
20 and the views that give children that
21 endorphin -- that endorphin high and that social
22 validation a prize.
23     Which, you know, managing PBIS
24 systems for the district, I do understand that
25 there are extrinsic factors that will promote

12 (Pages 42 - 45)

Page 46

1  student behavior, good or bad in consequence.
2       And for sure there has to be some
3  type of incentive. Otherwise, why would
4  students take that opportunity to vandalize
5  equipment in plain sight if there wasn't
6  something that they were getting out of it,
7  whether or not it's a, you know, monetary check
8  or a gift card that social media provides.
9       Q.   Apart from challenges, does your
10  analysis of disciplinary causes include anything
11  else related to social media?
12       MR. CUTLER:  Object to form.
13       THE WITNESS:  Well, we have -- when
14  we look at violations in TUSD, we look at
15  what the driving violation is for
16  consequence. That does not mean that
17  there hasn't been social media presence in
18  areas of harassment, bullying, sexual
19  harassment, computer misuse, illicit drug
20  sale and share, simulated firearms.
21       And one of our more recent this year
22  situations of multiple incidents involve
23  school threats, threats and intimidation
24  towards staff, school interruption and
25  school threats.

Page 47

1       And so we can find in those
2  violations -- and that's not every single
3  violation in which we see a social media
4  presence, but those are some of the more
5  prevalent instances where we see it.
6       And oftentimes the reason we know
7  it's happening is because parents or
8  students will report off of Insta Stories,
9  Snapchat communications, postings. Not so
10  much Facebook with our younger folks, but
11  definitely on Instagram, definitely on
12  Snapchat, definitely on TikTok. And then
13  YouTube, there are possession of firearms.
14       We've had instances of students that
15  literally have an online drugstore and
16  they're posting what their wares are and
17  their pricing.
18       So parents will call and they will
19  report either their student is engaged in
20  those spaces, or that that's been sent
21  through a social media platform to their
22  child and they're concerned for their
23  child's safety.
24       In the case of the rampant school
25  threats, that was very obviously posted

Page 48

1  through social medias. We could see on
2  what platform that it was being shared
3  within and those screenshots got sent to
4  school safety/law enforcement in those
5  spaces, and I get that data as well.
6       And so you can see even in some
7  instances those platforms were so user
8  friendly that you could literally just
9  template what schools you were going to
10  come and kill people and what site
11  administrators you were going to kill, and
12  that circulated for sure.
13       So it's not that you're going to
14  find in our Synergy reporting that there
15  is a social media violation. Although
16  after this grand experiment, I might
17  have -- I might be adding one, right,
18  because I see how specific we need to be.
19       But it's that part of the
20  investigation involves a social media
21  platform, and that's often how we're aware
22  that these things are occurring. Again,
23  kids document everything these days.
24  BY MR. RICE:
25       Q.   So at the aggregate level you don't

Page 49

1  track whether a particular violation is related
2  to social media?
3       A.   Unless it's in a chronology or a
4  narrative, or they've attached computer network
5  violation or cellphone violation to it, which
6  some of our site administrators will if it's
7  happening on campus.
8       Q.   And the chronology or the
9  narratives, those are tied to particular student
10  disciplinary incidents --
11       A.   Correct.
12       Q.   -- correct?
13       A.   Mm-hmm.
14       Q.   You mentioned school threats. Those
15  are threats that are posted in videos or
16  messages on the social media platforms, correct?
17       MR. CUTLER:  Object to form.
18       THE WITNESS:  Yes.
19  BY MR. RICE:
20       Q.   Other than the information contained
21  in chronologies or narratives for particular
22  student incidents, you've not conducted an
23  aggregate analysis of whether violations in the
24  district are linked to social media, correct?
25       MR. CUTLER:  Object to form.

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1      THE WITNESS: We don't have a
2  violation tab currently that says "social
3  media."
4  BY MR. RICE:
5      Q.  So the answer is no?
6      MR. CUTLER:  Object to form.
7      THE WITNESS:  No.
8      MR. RICE:  Let's mark as Exhibit 3
9  Tab 7.
10     (Whereupon, Tucson-Warmbrand-3 was
11     marked for identification.)
12  BY MR. RICE:
13     Q.  And Exhibit 3 is the TUSD Code of
14  Conduct, Revised 2024?
15     A.  Yes.
16     Q.  And, Ms. Warmbrand, do you track the
17  costs TUSD incurs in responding to any
18  particular violation of the code of conduct?
19     A.  No.
20     Q.  Do you know of anyone else at TUSD
21  who would do that?
22     A.  Mm-hmm.  Both our IT team tracks
23  when a violation has occurred that impacts their
24  devices, and Ricky our CFO.
25     Q.  Do you know whether either the IT

Page 51

1  team or Mr. Hernandez, the CFO, tracks the costs
2  associated with responding to particular
3  violations?
4      A.  Oh, yes, yes.  In relation to
5  anything involving devices, the IT team
6  absolutely tracks it, and they work with finance
7  because they issue fines for families.
8      Q.  And those are TUSD-issued devices?
9      A.  Mm-hmm, yes.
10     Q.  Do you track the time spent by TUSD
11  staff in responding to particular categories of
12  violations in the code of conduct?
13     A.  I know that there are violations
14  that drive our discipline districtwide that just
15  based upon the number of suspensions will have
16  taken more time than others.  But, no, I don't
17  have a clock clicking through everything that my
18  department processes.  You know, there's 89
19  schools.
20     Q.  And you don't know of anyone else at
21  TUSD who would track those times?
22     A.  No.
23     Q.  And now, looking at Exhibit 3, this
24  is the TUSD code of conduct, correct?
25     A.  Yes.

Page 52

1      Q.  And you're familiar with the code of
2  conduct in your work as director of student
3  relations?
4      A.  I am responsible for writing,
5  revising, and approving the code of conduct,
6  yes.
7      Q.  So let's turn to page 32.
8      MR. RICE:  I'm going by --
9  Mr. Lawlor, I'm going by the pages at the
10  bottom.
11     Q.  You see page 32 has Aggression as a
12  category of violation?
13     A.  Yes.
14     Q.  What types of incidents are included
15  in aggression?
16     A.  Aggression covers everything from
17  reckless behavior all the way to aggravated
18  assaults.  And so anytime there's any behavior
19  that could threaten the physical safety of
20  students or staff from a student, all the way up
21  to substantial and irreversible physical harm is
22  covered under our aggression categories.
23     Q.  And what types of incidents are
24  included in the physical conflict category?
25     A.  Fights are covered, and that is

Page 53

1  mutual physical engagement where each party has
2  the opportunity to walk away if need be.
3      Other aggression, which is usually
4  one or two incidents of physical contact that
5  can leave marks, bruising, but not substantial
6  or temporary injury.
7      Endangerment, minor aggressive act,
8  provocation and recklessness do not leave marks
9  but they are behaviors that could cause physical
10  harm.
11     And then you have assault and
12  aggravated assault.  And assault really relies
13  on two anchor points, temporary disfigurement
14  and the ability of the alleged victim to fight
15  back or defend themself or lack thereof.
16     And then aggravated assault, which
17  covers your most serious physical injuries as
18  well as protected classes, which is the adults
19  that they mention.
20     Q.  And moving to page 33, we see the
21  category Alcohol, Tobacco, and Other Drug
22  Violations?
23     A.  Yes.
24     Q.  What types of incidents are included
25  in that category?

14 (Pages 50 - 53)

CONFIDENTIAL

1    A.   Every type of drug use you could
2 imagine from over-the-counter drug misuse all
3 the way up to, for example, the sale of
4 fentanyl.
5         So from some of your most serious
6 offenses to a child bringing in their own cough
7 medicine or inhaler and having it on campus.  So
8 vape, tobacco, marijuana, the use of alcohol,
9 the sale or the share of any of those
10 substances, that's covered.
11    Q.   Let's go to the next page, page 34.
12 And you see a category Other Violations of
13 School Policies.  What types of incidents are
14 included in other violations of school policies?
15    A.   Other violations of school policies
16 will catch instances that are not terribly
17 prevalent, like, for example, a child brings a
18 bullet to school and is showing other students.
19 It's not endangerment.  It can't harm anyone.
20         The school administration has not
21 specifically stated to the student that they
22 can't bring a bullet, but it concerns the
23 community and so they violated a safety standard
24 that the site administration, for example, has
25 set.

1         Another violation that sits under
2 other violations of school policy is our
3 defiance and disrespect towards authority, our
4 level 3.
5    Q.   And then moving to page 35.
6    A.   Yes.
7    Q.   You see Dishonesty there.  What
8 types of incidents are included in dishonesty?
9    A.   Your typical type of forgery
10 behaviors, you know, going into another
11 student's computer and forging their work.
12 Cheating.  Lying about what's happening, either
13 kid to kid or with adults.  Plagiarism.
14    Q.   Then if we go to page 38 we see the
15 category Harassment and Threat, Intimidation?
16    A.   Mm-hmm.
17    Q.   The first subcategory there is
18 bullying?
19    A.   Correct.
20    Q.   What types of incidents are
21 included -- well, actually, before I ask that.
22         So all of the incidents listed on
23 this page, bullying, harassment, non-sexual,
24 hazing, threat or intimidation, and threat or
25 intimidation towards staff, all of those

1 subcategories are included within the category
2 of harassment and threat, intimidation, correct?
3    A.   Yes.
4    Q.   What types of incidents would be
5 included in bullying?
6    A.   Any kind of communication that
7 involves continued threatening, intimidating,
8 insulting behavior.  And it doesn't have to be
9 just to one student, it can be one particular
10 alleged offender who is intimidating,
11 threatening, insulting students of any kind, but
12 it's repeated behavior versus harassment.
13         And you'll see, you know, in that
14 particular violation we do address
15 electronically transmitted pieces in that,
16 because for all of these incidents that we've
17 covered, and in particular the harassment,
18 threats and intimidation category, it's not just
19 a face-to-face.  These are the instances I
20 referred to earlier where parents will
21 oftentimes notify us that this bullying, this
22 harassment, threats and intimidation is
23 occurring, because they'll find it on their
24 student's personal devices, their phones,
25 oftentimes their social media platforms.

1         So in this particular suite of
2 violations, you'll see that those cover all the
3 different ways that humans communicate with each
4 other now, whether it be social media, whether
5 it be text message, whether it will be
6 face-to-face.  Even, you know, at some of our
7 sites where they don't have cellphones they'll
8 write it on pieces of paper.
9         So you can just go through the list
10 of ways humans communicate, and children will
11 communicate in all of those ways through all of
12 these violations and definitely in this
13 category.
14    Q.   And then if we go to page 39, you
15 see School Threat or Interference?
16    A.   Yes.
17    Q.   What types of violations are
18 included in that category?
19    A.   School threats will come in two
20 different spaces, verbally during interactions
21 physically on the campus, students will threaten
22 the school, and then through electronic devices.
23 Sometimes text messages, but typically off of
24 social media platforms they'll post it.  They
25 know that that can spread a lot quicker than

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 just simply who was in their telephone that they
2 can text message.
3        And so those threats will come
4 through, and they can become widespread because
5 they move so quickly through the platforms that
6 we can have whole schools shut down and media
7 responses that we have to engage in with school
8 threats.
9        That also is applicable to school
10 interruption. When law enforcement and school
11 safety has determined that it's a transient
12 threat, meaning there isn't an actual threat,
13 but the implications of what that threat did
14 interrupted our educational environments.
15    Q.   And the school threats category also
16 includes pulling a fire alarm, right?
17    A.   Yes. Fire alarms, bomb threats,
18 anything that has a schoolwide impact on the
19 physical safety of staff and students.
20    Q.   And it covers threats that are made
21 in person, correct?
22    A.   Yes. All the different ways that
23 someone could communicate an intention, it's
24 covered. The intention or vehicle of
25 communication is part of what's investigated,

Page 59

1 but the consequences are issued based on the
2 violation.
3    Q.   And then if we go to page 30 -- go
4 back to page 37, we see the category of Sexual
5 Offenses?
6    A.   Mm-hmm.
7    Q.   What's included in that category of
8 violations?
9    A.   Anything that occurs between kids
10 that are of a sexual nature, whether it be
11 graphic, verbal, written. In that written piece
12 we include sexting, we include tweeting, we
13 include network sites, anything that houses
14 within a telecommunication device.
15        Definitely, you know, I can say that
16 I've worked with instances that fall under the
17 sexual offense category in which, for example,
18 there was a lot of sexting occurring through
19 Snapchat, because if you didn't place the
20 setting so that you could save the picture, the
21 pictures, the sexually explicit images would
22 disappear.
23        And so it was very difficult for our
24 school resource officer, for myself, for school
25 safety to track the pornography that was being

Page 60

1 shared.
2        And there's even a feature, right,
3 where you can't screenshot, which we had so
4 heavily relied on when we were dealing with
5 cases of child pornography.
6        And so encountering those features
7 on Snapchat was quite a dismaying situation, as
8 we are literally having 12 and 13 year old girls
9 with sexually explicit images, and then, you
10 know, we're calling -- for example, we're
11 calling Snapchat saying, Do you have like a bank
12 of these things? We have law enforcement here.
13        In one instance a young lady we
14 believed was being sexually trafficked, right?
15 So she's being trafficked. We're tracking
16 everything from these e-mails from this person,
17 and then she says, Oh, he also hits me up on
18 Snap. Have you sent pictures? I did, but
19 they're gone now.
20        So in the area of sexual offenses,
21 there are definitely like Snapchat social media
22 platforms that are much more utilized because
23 the features are directly conducive to hiding
24 what's occurring, and that's highly concerning,
25 of course, is for processing child pornography

Page 61

1 offenses. And that, you know, that also
2 includes indecent exposure.
3        So we've definitely had cases where
4 the young ladies or -- oftentimes it's young
5 ladies, I'll just be real in this space -- have
6 a young man who is exposing his penis to them
7 and he's sending it, and then it's disappearing.
8        And so what you'll often get to
9 counteract the filters that have been set on
10 these social media platforms, Snapchat in
11 particular in these instances, is that you will
12 get a child that will take a picture of the
13 image before it disappears, even if it's timed
14 out, and so then that picture of the image is
15 what is then given to law enforcement in that
16 space.
17        And so, you know, kids are smart,
18 parents are smart. Site administrators, you
19 know, we say, Well, you don't want that -- you
20 don't want child pornography, indecent exposure
21 pictures of kids on your phone.
22        And so we're then having to take the
23 time to be able to obtain these documented
24 occurrences of sexual offenses and really having
25 to take a variety of different measures to

CONFIDENTIAL

Page 62

1  counteract these very specific types of settings
2  that are designed to literally erase the
3  documentation of the incident.
4       And this is -- this is the reality
5  of what the public schools deal with in the area
6  of sexual offenses.  And it's really -- I'll
7  just say it's very disturbing, and for parents
8  it's heartbreaking, because we literally cannot
9  track where the pictures are.
10       One time we were able to get ahold
11  of Snapchat on the phone with law enforcement
12  there, and they were able to provide a
13  confirmation of an existing account, and that's
14  as much as we could get.  Otherwise, any phone
15  calls with the parents, you know, right there,
16  you know, in tears, there's nothing.  There's
17  literally no way to follow up, and their child
18  has nude pictures circulating online.
19       So this is the reality of these
20  sexual offenses.
21    Q.    And so in these instances you're
22  discussing, the problem is the sexually explicit
23  photo?
24       MR. CUTLER:  Object to form.
25       THE WITNESS:  The problem is that

Page 63

1     you have a platform -- it's not the action
2     of it.  It's that you have a platform and
3     a situation where children are engaging in
4     a space, and they can literally set
5     filters to hide their behaviors from the
6     exact people that are supposed to be there
7     to help them from harm.
8          And so we know kids will do things
9     that are not appropriate.  That's part of
10    development.  They will spread their
11    boundaries.  If you're a 13 year old young
12    lady and you are -- this is your first
13    love and he is 16 years old and he just
14    wants to see your body just a little bit,
15    but don't worry about it, baby, you know
16    we're going to do it through Snap, this is
17    going to disappear.  I'm going to teach
18    you how to put your filters on.
19         That is -- that is the problematic
20    piece.  We deal with the worst behaviors
21    that children engage with all the time.
22    That's my job.  We're here to heal them,
23    guide them, direct them, support them.
24         What makes it really difficult to
25    keep kids safe is that you have a whole

Page 64

1     other set of companies and agencies in
2     this space that, and I understand the
3     laws, that say we accept no responsibility
4     in this space, but you, as the school
5     district, for sure can take care of and
6     manage all of the implications of the
7     filters and the choices we make as a
8     company.
9          And for myself, as a director of
10    student relations, I think that it's
11    critical that we have shared
12    responsibility for student safety and for
13    child safety, just plain and simple as a
14    society, and that's where my moral code
15    sits having been in education for 24 years
16    serving kids.
17  BY MR. RICE:
18    Q.    In addition to the ability to share
19  images, the other concern you're expressing is
20  that images on social media platforms may
21  disappear, is that correct?
22       MR. CUTLER:  Object to form.
23       THE WITNESS:  It's not just the
24    disappearing of the images.  It's that the
25    way that you can set platforms is

Page 65

1     conducive to hiding behaviors that are
2     illegal or against policies that school
3     districts have, or just plain laws.  It's
4     not just the disappearing, it's that there
5     are systems set up so that you don't have
6     to be found engaging in these behaviors.
7          And so, yes, the disappearing is
8     definitely problematic.  The fact that you
9     can set filters so that nothing is saved,
10    right, is problematic.
11         And I'm a Title IX decision-maker
12    for the district, so I work with, you
13    know, these cases in this space, and to
14    keep kids safe, it is difficult when you
15    know they're strategically using a
16    platform where you can't always track the
17    behaviors.
18         Now, the good news for me and my job
19    is that we conduct our investigations
20    student to student.  We take their
21    testimony, site administrators do.  They
22    place that in chronologies, they have that
23    documented.
24         And so we're not in a court of law,
25    and we don't have to show beyond the same

Page 66

1    reasonable doubt as you lawyers have to go
2    to court and do.  We just need to prove
3    that we believe the violation occurred
4    according to our code of conduct to issue
5    consequence.
6    BY MR. RICE:
7        Q.    So what social media systems other
8    than disappearing images are you referring to?
9            MR. CUTLER:  Object to form.
10           THE WITNESS:  We know there's
11    features on Insta.  We know that there's
12    features on Snapchat.  YouTube doesn't
13    have the same type of features.  And then,
14    you know, you have TikTok.
15           TikTok, however, mostly for our
16    school impact, will engage in challenges
17    and the implications in that space.  So if
18    kids want to hide things, they're not
19    typically putting it on YouTube, for
20    example.
21    BY MR. RICE:
22       Q.    Other than the ability of features
23    to disappear, what features on Snapchat and
24    Instagram are you referring to?
25           MR. CUTLER:  Object to form.

Page 67

1            THE WITNESS:  The ability to save
2    particular images.  I know that's the
3    disappearing --
4    BY MR. RICE:
5        Q.    Do you mean -- sorry, I didn't mean
6    to interrupt.  Do you mean screenshot?
7            MR. CUTLER:  Well, hang on.  You let
8    him finish -- let her finish her answer.
9    I know you want to argue with her, but let
10    her finish.
11           MR. RICE:  That's not true at all.
12           THE WITNESS:  So it's the
13    disappearing, it's the inability to save,
14    and it's the inability to do screenshots.
15    Those are three factors that have
16    contributed to the inability for law
17    enforcement to find the actual images of
18    child pornography.
19    BY MR. RICE:
20       Q.    And you're not in law enforcement,
21    right?
22       A.    No, as it turns out, I'm not.
23       Q.    And you're not involved in every
24    aspect of law enforcement investigations,
25    correct?

Page 68

1            MR. CUTLER:  Object to form.
2            THE WITNESS:  No, definitely not.
3    BY MR. RICE:
4        Q.    Earlier in your testimony you
5    referred to an instance of trafficking that
6    involved Snapchat communications, and you also
7    stated that instance also involved e-mails,
8    correct?
9        A.    Correct.
10       Q.    With respect to the category of
11    sexual offenses we've been discussing, this
12    category also includes public urination, right?
13       A.    Yes.
14       Q.    It includes things like two students
15    having physical sexual intercourse on campus,
16    right?
17       A.    Yes.
18       Q.    It includes sexual assaults,
19    correct?
20       A.    Yes.
21       Q.    And it includes sexual harassment
22    with physical contact, correct?
23       A.    Yes.
24       Q.    Let's go to page --
25           MR. CUTLER:  Can we take a break?

Page 69

1            MR. RICE:  Yeah, that's fine.
2            THE VIDEOGRAPHER:  We are going off
3    record.  The time is 10:43.
4            (Whereupon, a recess was taken)
5            THE VIDEOGRAPHER:  We're going back
6    on record.  The time is 11:01.
7    BY MR. RICE:
8        Q.    Welcome back, Ms. Warmbrand.  Let's
9    go back to Exhibit 3, the code of conduct we
10    were just discussing.
11           On page 36 we have the offense
12    Trespassing; Vandalism or Criminal Damage.  What
13    types of violations are included in that
14    offense?
15       A.    Entering campus when you should not
16    be on campus or any other TUSD property.
17    Graffiti, tagging, or vandalizing, which can
18    include any type of school property, anything
19    that the school district has paid for.
20       Q.    Now let's go to page 35.  And we see
21    the offense for improper use of technology.
22       A.    Mm-hmm.  Yes.
23       Q.    And this offense includes the
24    possession of cellphones or other electronic
25    devices in violation of TUSD policy, right?

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    A.   Yes.
2    Q.   But it's not limited to that,
3 correct?
4    A.   It is very specific for cellphones,
5 but it can include, as it says, gaming systems,
6 iPods, iPads, tablets, any type of electronic
7 device.
8    Q.   And the overall violation for
9 improper use of technology also includes
10 computer or network violations, right?
11   A.   It does.
12   Q.   And that would include something
13 like downloading malware to a school computer?
14   A.   It could, yes.
15       MR. RICE:  Let's mark as Exhibit 4
16   Tab 6.
17       (Whereupon, Tucson-Warmbrand-4 was
18       marked for identification.)
19 BY MR. RICE:
20   Q.   And this will be a spreadsheet, so
21 you'll be -- so you'll see it come up on the
22 screen in front of you.
23       MR. CUTLER:  These here with the
24   sticker on them you can just set to the
25   side and the court reporter will take

Page 71

1    them.
2        THE WITNESS:  Okay.
3        MR. CUTLER:  So that one you can
4    just put there because this is the
5    actual -- on the screen is the actual
6    exhibit.
7        THE WITNESS:  Got it.
8        MR. RICE:  And Exhibit 4 is a
9    document produced by TUSD with the Bates
10   00365959.
11 BY MR. RICE:
12   Q.   And, Ms. Warmbrand, do you see this
13 is a spreadsheet of -- from Synergy that shows
14 different categories of code of conduct
15 violations for a particular year?
16   A.   Yes.
17   Q.   And looking at the first category
18 listed, aggression, are you able to provide a
19 specific number as to how many of the violations
20 for aggression listed relate to social media?
21   A.   Not based upon this spreadsheet.
22   Q.   And that's -- you haven't conducted
23 an analysis of how many specific violations in
24 that subcategory relate to social media, right?
25   A.   Not from this spreadsheet, no.

Page 72

1    Q.   And you haven't conducted an
2 analysis elsewhere, right?
3    A.   No.
4    Q.   And then let's scroll down to
5 harassment, threat and intimidation.
6        And for this category, harassment,
7 threat and intimidation, are you able to
8 identify a specific number of how many
9 violations relate to social media?
10   A.   No.
11       MR. RICE:  And then let's scroll
12   further down.  Scroll down.
13   Q.   For any of the offenses listed on
14 this spreadsheet, are you able to identify how
15 many violations relate to social media?
16   A.   No.
17       MR. RICE:  Let's mark as Exhibit 5
18   Tab 8.
19       (Whereupon, Tucson-Warmbrand-5 was
20       marked for identification.)
21       MR. RICE:  And this will be another
22   spreadsheet.  And Exhibit 5 is a document
23   produced with the Bates 00365958.
24 BY MR. RICE:
25   Q.   And, Ms. Warmbrand, you see that

Page 73

1 this is another spreadsheet generated from
2 Synergy, correct?
3    A.   Yes.
4    Q.   And this contains the same
5 information we just looked at, but has
6 additional information on the action taken by
7 the district?
8    A.   Yes.
9    Q.   And that action is explained in the
10 Action column, correct?
11   A.   Yes.
12   Q.   And then the column that's labeled
13 "acode," what does that refer to?
14   A.   acode?  I don't know.
15       MR. RICE:  Let's mark as
16   Exhibit 5 -- or Exhibit 6 Tab 9.
17       (Whereupon, Tucson-Warmbrand-6 was
18       marked for identification.)
19       MR. CUTLER:  Did you respond to the
20   question?
21       THE WITNESS:  I said I don't know.
22       MR. RICE:  And Exhibit 6 is a
23   document produced with the Bates 00595044.
24 BY MR. RICE:
25   Q.   And, Ms. Warmbrand, this is

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1 another -- it will come up on the screen in
2 front of you, but this is another spreadsheet
3 generated from Synergy, correct?
4    A.   Yes.
5    Q.   And this document adds the
6 information on the school name associated with
7 the particular violation, correct?
8    A.   Yes.
9    Q.   And you see there's a column labeled
10 actionId?
11    A.   Yes.
12    Q.   Do you know what that refers to?
13    A.   No.
14    Q.   For both Exhibits 5 and 6, neither
15 exhibit includes information about how many of
16 the violations listed in the spreadsheet were
17 related to social media, correct?
18    A.   Correct.
19        MR. RICE:  Let's mark as Exhibit 7
20 Tab 10.
21        (Whereupon, Tucson-Warmbrand-7 was
22        marked for identification.)
23        MR. RICE:  And Exhibit 7 is a
24 document produced by TUSD with the Bates
25 00174197.

Page 75

1 BY MR. RICE:
2    Q.   And then, Ms. Warmbrand, do you see
3 that this is an e-mail sent to you by
4 Superintendent Trujillo?
5        MR. CUTLER:  Object to form.
6 Misstates the document.
7 BY MR. RICE:
8    Q.   Excuse me, this is an e-mail sent by
9 you to Superintendent Trujillo?
10    A.   Yes.
11    Q.   And do you see there are several
12 documents listed in the Attachments line?
13    A.   Yes.
14    Q.   And the subject is December
15 Discipline Reports, correct?
16    A.   Yes.
17    Q.   Is this an example of the regular
18 reports you send Dr. Dr. Trujillo?
19    A.   Yes.
20        MR. RICE:  Let's mark as Exhibit 8
21 Tab 11, and Exhibit 9 as Tab 12 -- excuse
22 me, Exhibit 9 Tab 12.
23        (Whereupon, Tucson-Warmbrand-8 and
24        Tucson-Warmbrand-9 were marked for
25        identification.)

Page 76

1 BY MR. RICE:
2    Q.   And I'll represent to you that these
3 are the attachments to that e-mail that you sent
4 to Dr. Trujillo.
5        And Exhibit 9, titled top -- 2022-23
6 Top 5 Violations of all Students at 10 Schools
7 in all Regions.
8        Do you see that?
9    A.   Mm-hmm.
10    Q.   Is this an example of the type of
11 report you say you sent to Dr. Trujillo and the
12 regional assistant superintendents of the top
13 violations in the district?
14    A.   Yes.
15    Q.   And then let's go to Exhibit 9,
16 titled District Discipline Summary:
17 December 22nd.
18        And, now, you prepared this
19 document, correct?
20    A.   Yes.
21    Q.   And in the middle of the page you
22 write, "Top 10 schools for all violations of all
23 Students in all regions based on percent of
24 population:  The list has not changed except the
25 order of the same schools."

Page 77

1        Do you see that?
2    A.   Yes.
3    Q.   In your experience, do the same
4 schools tend to consistently have more
5 discipline area violations than others?
6    A.   It depends on the school year.
7 We -- this year we have seen more variability
8 than previous years, and this is from 2022 I
9 see.
10    Q.   In 2022 to 2023, did certain schools
11 consistently exhibit a higher number of
12 disciplinary violations by percent of
13 population?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  Yes.  Yes.
16 BY MR. RICE:
17    Q.   Were those -- did these schools --
18 are these some of the schools that experienced
19 that listed here?
20        MR. CUTLER:  Object to form.
21        THE WITNESS:  Some of them, yes.
22 BY MR. RICE:
23    Q.   And in your experience, why do you
24 believe that certain schools tend to be the ones
25 that have the most violations by percent of

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1  population?
2      A.   They have higher rates of illicit
3  drug use and aggression.
4      Q.   And those are the two violations
5  that then --
6      A.   Those are the top --
7      Q.   -- are more prevalent?
8      A.   Those are the top two violations
9  that the district carries typically.  And so
10 when a school site is in that top ten, those two
11 violations are going to be driving their
12 entrance into this list typically.
13     Q.   Do you have an understanding as to
14 why a particular school site would have higher
15 rates of illicit drug use?
16     MR. CUTLER:  Object to form.
17     THE WITNESS:  There are many factors
18 that can contribute to a school site
19 having higher drug use.  We look at the
20 level of income that -- students that we
21 serve.  Folks that have less money need
22 more money.  Oftentimes that will lead to
23 sale or share in these spaces.
24     School leadership always contributes
25 to climate and culture on a school campus.

Page 79

1      Systems of operations on site at school
2  campuses can lead to this.
3      So there's a lot of different
4  factors.  There isn't always just one
5  thing that means that the school has
6  higher violations.
7  BY MR. RICE:
8      Q.   Would those same factors you just
9  mentioned also be a reason a school would have
10 higher rates of aggression?
11     A.   Aggression rates are impacted by
12 safety and security, systems, protocols and
13 measures that happen on campus.  Climate and
14 culture in terms of how we treat each other.
15 How they utilize all of their resources.  What
16 particular rules they put in place on top of
17 what the code of conduct may ask, which they can
18 do.  And leadership, community involvement.
19     MR. RICE:  Let's mark as Exhibit 10
20 Tab 31.
21     (Whereupon, Tucson-Warmbrand-10
22 was marked for identification.)
23 BY MR. RICE:
24     Q.   And, Ms. Warmbrand, Exhibit 10 is
25 another District Discipline Summary for the 2023

Page 80

1  to 2024 school year?
2      A.   Yes.
3      Q.   And this document also lists the top
4  ten schools for all violations of all students
5  in all regions, right?
6      A.   Yes.
7      Q.   And then if we compare this list to
8  Exhibit 9, so comparing Exhibit 10 to Exhibit 9,
9  the two Top 10 lists, you see that several of
10 the schools here are on both lists, correct?
11     A.   Yes.
12     Q.   And, for instance, Booth Fickett is
13 on both the Top 10 lists, right?
14     A.   Yes.
15     Q.   And Doolen is on both the Top 10
16 lists?
17     A.   Yes.
18     Q.   And then this lists -- the document
19 lists the top categories of violations in the
20 top left, correct?
21     A.   Could you repeat the question?
22     Q.   Sorry.  By "this" document,
23 Exhibit 10, referring to Exhibit 10?
24     A.   Okay.
25     Q.   Exhibit 10 lists top categories of

Page 81

1  violations for all schools in the top left here?
2      A.   Yes.
3      Q.   And the top three violations are
4  "Aggression," "Other Violations," and "Defiance
5  and Disrespect Towards Authority."
6      Correct?
7      A.   Yes.
8      Q.   Improper use of technology is not
9  listed as one of the top three violations?
10     A.   No.
11     Q.   And in -- you mentioned earlier that
12 one of the common violations that you see is the
13 use of drugs, alcohol, and tobacco, correct?
14     A.   Yes.
15     Q.   And one issue TUSD has had with
16 tobacco involves vaping, correct?
17     A.   Yes.
18     Q.   And TUSD sued JUUL and Altria -- the
19 Altria Group related to vaping, right?
20     A.   Yes.
21     Q.   And TUSD then settled with JUUL and
22 Altria?
23     A.   Yes.
24     Q.   And TUSD created a task force to
25 distribute the settlement funds?

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1    A.   Yes.
2    Q.   And you participated in that task
3  force, correct?
4    A.   Yes.
5         MR. RICE:  So let's mark as
6  Exhibit 11 Tab 35.
7         (Whereupon, Tucson-Warmbrand-11
8         was marked for identification.)
9         MR. RICE:  And Exhibit 11 was a
10  document produced by TUSD with the
11  Bates 00131552.
12  BY MR. RICE:
13    Q.   Ms. Warmbrand, these are minutes
14  from a meeting the substance abuse task force
15  held on November 14, 2023.
16         Do you see that?
17    A.   Yes.
18    Q.   And do you see, if you look under
19  Members Present, you were present at this
20  meeting?
21    A.   Yes.
22    Q.   And do you see under -- the section
23  labeled Chair Updates?
24    A.   Okay.  Yes, I found it.  So up here.
25    Q.   The second bullet states, "TUSD

Page 83

1  wants to participate in a class action lawsuit
2  to attempt to match the funds of the JUUL
3  settlement."
4         Do you see that?
5    A.   Yes.
6    Q.   Do you remember what that bullet
7  refers to?
8    A.   I'm not sure exactly what it refers
9  to, in that at that point in time I believe that
10  Dr. Gaw was working with his chief of
11  operations, his CEO, in that space.  Now I think
12  I know what it means, but at that time, being in
13  an entire different department, I actually was
14  not sure that that was applicable to.
15    Q.   What do you understand the bullet to
16  mean now?
17    A.   Well, I think that the -- well, let
18  me just put it this way.
19         The only litigation I know that I am
20  participating in on behalf of the district is
21  the one I'm engaged in now.  If there's another
22  class action lawsuit that's occurring in the
23  district, I would not be aware of it.  This is
24  the only one I know of.
25         But I cannot substantiate that this

Page 84

1  is what Dr. Gaw was talking about, and we are
2  two different sides of the house so I don't know
3  if this is what he's speaking about.
4         MR. RICE:  Let's mark as Exhibit 12
5  Tab 3.
6         (Whereupon, Tucson-Warmbrand-12
7         was marked for identification.)
8         MR. RICE:  And Tab -- Exhibit 12 are
9  TUSD's Amended Answers to Defendants'
10  Interrogatories (Set 3).
11  BY MR. RICE:
12    Q.   Ms. Warmbrand, are you familiar with
13  this document?
14    A.   I do not... I viewed a lot of
15  documents, so give me a moment here to go
16  through this particular one.
17         (Witness reviewing document.)
18    A.   I am familiar with Exhibit 1.
19    Q.   Okay.  And Exhibit 1 are the two
20  charts --
21    A.   Yes.
22    Q.   -- at the back?
23    A.   That I can say confidently I've seen
24  before.
25    Q.   And what was the context in which

Page 85

1  you saw Exhibit 1?
2    A.   It was in collaboration with
3  Michael.  He --
4         MR. CUTLER:  All right.  So that's
5  the context that you've seen it in?
6         THE WITNESS:  Yeah, that was it.
7         MR. CUTLER:  I don't think you can
8  proceed past that.
9         THE WITNESS:  Okay.
10  BY MR. RICE:
11    Q.   Let me ask you this way.
12         Exhibit 1 lists certain positions
13  for which TUSD is claiming that a portion of the
14  costs of the positions are caused by defendants'
15  platforms, correct?  Is that your understanding?
16    A.   My understanding is that this is a
17  comprehensive list of employees that engage with
18  students in the area of behavior.
19    Q.   And when you refer to "a
20  comprehensive list of employees that engage with
21  students in the area of behavior," are you
22  referring to both pages of exhibit -- both pages
23  of Exhibit 1, the first chart and the second
24  chart?
25    A.   Yeah.  Our administrators and

22 (Pages 82 - 85)

Page 86

1 teachers definitely engage with students with
2 behavior, yes.
3     Q.    And were you consulted in selecting
4 the positions that appear on either chart?
5     A.    I was consulted in selecting the
6 positions that I've shared that I directly
7 oversee.
8     Q.    And which ones are those?
9     A.    Restorative practice facilitators.
10     Q.    Are there any other positions listed
11 in Exhibit 1 that you were consulted in
12 selecting?
13     A.    No.
14     Q.    Other than being consulted on
15 selecting the positions, did you have any other
16 role in creating Exhibit 1?
17         MR. CUTLER:  Object to form.
18         THE WITNESS:  No.
19 BY MR. RICE:
20     Q.    Were you consulted in assigning
21 weights to the positions?
22     A.    No.
23     Q.    Do you know how the weights were
24 calculated?
25     A.    No.

Page 87

1     Q.    For restorative practice
2 facilitators, have you ever studied how that
3 position spends its time?
4         MR. CUTLER:  Object to form.
5         THE WITNESS:  Yes.
6 BY MR. RICE:
7     Q.    How have you studied that?
8     A.    My department, my program
9 coordinator, receives literal weekly reports
10 from every restorative practice facilitator
11 literally documenting how they spend their time.
12     Q.    Do they keep time sheets?
13     A.    They clock in and clock out, but the
14 document is basically a summary of their week.
15 It's not an hour-to-hour accounting of what they
16 do.
17     Q.    And have you ever interviewed any
18 restorative practice facilitators to determine
19 what percentage of their job relates to
20 defendants' platforms?
21         MR. CUTLER:  Object to form.
22         THE WITNESS:  We meet with
23     restorative practice facilitators, and
24     they summarize what they've been doing and
25     the challenges that occur at their

Page 88

1     position every week, myself and my direct
2     supervisor and my program coordinator, and
3     so if there is an issue involving social
4     media platforms, it will surface in that
5     discussion space.
6 BY MR. RICE:
7     Q.    Do you or anyone else in your
8 department keep notes of those meetings?
9     A.    What they're sharing with us should
10 be documented in their weekly notes.  If there's
11 something of major concern or a follow-up that
12 needs to be done with their site administrator,
13 then, yes, I will take notes.
14     Q.    And those weekly notes are the ones
15 that are sent to the program coordinator?
16     A.    Yes.
17     Q.    Have you ever analyzed those weekly
18 notes to determine how much time restorative
19 practice facilitators spend on defendants'
20 platforms?
21     A.    We have looked at instances like I
22 referred to previously when we have had, say,
23 TikTok challenges or school threats, and we have
24 discussed how much of their time has taken up --
25 has been taken up in mitigating the effects of

Page 89

1 those instances.
2     Q.    Other than discussing particular
3 TikTok challenges or school threats, have you
4 ever collected and analyzed all of the
5 facilitators' weekly reports to determine how
6 much time they spend on defendants' platforms?
7         MR. CUTLER:  Object to form.
8         THE WITNESS:  No.
9 BY MR. RICE:
10     Q.    And have you analyzed their time
11 they spent on every TikTok challenge?
12     A.    Could you repeat the question?
13     Q.    Sure.
14         For every TikTok challenge that a
15 restorative practice facilitator has dealt with,
16 have you analyzed the amount of time they spent
17 on that challenge?
18         MR. CUTLER:  Object to form.
19         THE WITNESS:  So I think what's
20     important to understand, when you have
21     TikTok challenges, for example, that
22     impact schoolwide systems, whether it be
23     the soap dispenser challenge, or the
24     pulling the sink off of the wall
25     challenge, or taking your mask and cutting

23 (Pages 86 - 89)

Page 90

1 through the plastic chairs challenge, or
2 this most recent one that I referred to
3 with our Chromebooks, our restorative
4 practice facilitator, in addition of
5 course to working in that mediation space,
6 if there is a schoolwide concern or
7 something that impacts the larger student
8 population, it is my directive that they
9 support the school site.
10      And so that may mean that they're
11 letting my program coordinator know, Hey,
12 I'm not going to be seeing kids for the
13 next, you know, hour and a half, I
14 actually have to monitor this bathroom
15 because we have no sink and so I can only
16 let one kid in at a time.
17      Or, You know what, I just want to
18 let you know that I'm going to be staying
19 after in this space because I need to
20 assist the leadership team with walking
21 room to room and collecting all the chairs
22 that have been ruined, and then moving
23 chairs from other classrooms into the
24 space.
25      In the area of the Chromebook, it's,

Page 91

1 you know, literally standing in the
2 hallway with the kids while the teacher is
3 able to go and assist with the
4 investigation with the site administrator
5 or taking the class into another
6 alternative setting.
7      And so I expect that my RPFs
8 function as part of the leadership team,
9 and so if there's schoolwide impact from
10 any space, whether it be a TikTok
11 challenge or anything else, that they are
12 hands on for the safety of the kids.
13 BY MR. RICE:
14      Q.   Have you analyzed the amount of time
15 they spent on the tasks you just listed?
16      A.   Yes.  They will put them in their
17 logs and we will discuss them in the space.
18      Q.   And for every TikTok challenge, have
19 you analyzed the total amount of time or the
20 percentage of time that they spent on those
21 activities?
22      MR. CUTLER:  Object to form.
23      THE WITNESS:  No, we have not
24 analyzed the time.  Although, we're not
25 out of the woods with this latest one, so

Page 92

1 perhaps that's a summer job of mine.
2 BY MR. RICE:
3      Q.   But so far you haven't done that
4 analysis, right?
5      A.   No, not so far.
6      Q.   And for school threats have you
7 analyzed the amount of time facilitators spend
8 responding to school threats?
9      A.   When we have school threats, it's
10 another one of those instances where it's all
11 hands on deck, and so they will typically clear
12 whatever they had scheduled and they will become
13 available to intake scared students because they
14 are trained in deescalation strategies.
15      And so when there is school threat,
16 then I do expect that 100 percent of their time
17 is engaged in that response, and that should
18 reflect on their logs.
19      Q.   But you haven't gone back and
20 analyzed those reports to determine the overall
21 percentage of time they spend on school threats?
22      MR. CUTLER:  Object to form.
23      THE WITNESS:  No, no.  That is
24      definitely not our biggest concern.  Our
25      children are scared at that point.

Page 93

1 BY MR. RICE:
2      Q.   And where are the weekly reports for
3 the restorative practice facilitators stored?
4      A.   With my program coordinator.  She
5 has a Teams, submitting into Teams folder.
6      Q.   And do you receive those also via
7 e-mail?
8      A.   I have access to all of the files,
9 yeah.  Too many e-mails.
10      Q.   To your knowledge does TUSD have any
11 data on the amount of time students spend on
12 their cellphones?
13      A.   We know that in middle school --
14 it's less than high school, that I know, because
15 our middle schools do not allow cellphones out
16 during instruction time.
17      Q.   So does TUSD maintain any data on
18 the amount of time students spend on their
19 cellphones in middle school?
20      A.   From my department, the way that we
21 would analyze it is by looking at the
22 violations, if there are cellphone violations.
23      Q.   And those would be in the improper
24 use of technology?
25      A.   Yes, in Synergy.

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1    Q.    But your department doesn't have
2  data on the number of minutes students in TUSD
3  spend on their cellphones?
4    A.    No, my department does not.
5    Q.    And your department doesn't have
6  data on the number of minutes students spend on
7  social media?
8    A.    No.
9    Q.    And your department doesn't have
10 data on the number of minutes that students
11 spend on a particular social media platform?
12   A.    No.
13   Q.    Do you agree that racial disparities
14 with respect to discipline could harm students'
15 mental health?
16      MR. CUTLER:  Object to form.
17      THE WITNESS:  Could you repeat that
18   question?
19 BY MR. RICE:
20   Q.    Sure.
21      Do you think a racial disparity in
22 discipline could harm students' mental health?
23      MR. CUTLER:  Object to form.
24      THE WITNESS:  Like all the students
25   or the particular students involved in the

Page 95

1    disproportionality?
2  BY MR. RICE:
3    Q.    Let's start with a particular
4  student.
5      Do you think it could harm a
6  particular student's mental health if they
7  received disproportionate discipline because of
8  their race?
9    A.    Well, I think that any type of
10 discipline, depending on the situation, could
11 harm a student's mental health.  If they're
12 aware that there's disproportionality going,
13 then that can affect their mental health.  But I
14 would never assume that they would be
15 necessarily always aware that there's
16 disproportionality happening for them.
17   Q.    And for the student body as a whole,
18 do you believe it could harm mental health if
19 students observe that students of certain racial
20 groups receive disproportionate discipline?
21   A.    Yes.
22      MR. CUTLER:  Object to form.
23      THE WITNESS:  Yes.
24 BY MR. RICE:
25   Q.    And you agree that those types of

Page 96

1  aggregate disparities in discipline could also
2  affect students' performance in school?
3      MR. CUTLER:  Object to form.
4      THE WITNESS:  I don't monitor
5    academic data in the way that I do
6    discipline, so I can't really speak to
7    that space in the same way.
8  BY MR. RICE:
9    Q.    So earlier we were discussing TUSD's
10 desegregation plan, correct?
11   A.    Yes.
12      MR. RICE:  Let's mark as Exhibit 13
13 Tab 32.
14      (Whereupon, Tucson-Warmbrand-13
15      was marked for identification.)
16 BY MR. RICE:
17   Q.    And Tab 32 is the TUSD Unitary
18 Status Plan?
19   A.    Yes.
20   Q.    And so, Ms. Warmbrand, have you seen
21 this plan before?
22   A.    Yes.
23   Q.    And this is the plan TUSD agreed to
24 with plaintiffs in desegregation litigation to
25 implement desegregation in the district,

Page 97

1  correct?
2    A.    Yes.
3    Q.    And until recently, TUSD was under
4  this Court-ordered desegregation plan, correct?
5    A.    Yes.
6    Q.    Was improving racial disparity in
7  student discipline part of the unitary status
8  plan?
9    A.    Yes.
10   Q.    And what was the goal of the unitary
11 status plan with respect to racial disparities
12 in student discipline?
13      MR. CUTLER:  Object to form.
14      THE WITNESS:  The goal is that one
15   ethnicity doesn't show consistent
16   disproportionality in incidents.
17 BY MR. RICE:
18   Q.    And --
19   A.    Particularly African American and
20 Hispanic students.  It actually isn't applicable
21 to our Native students, our Asian students, or
22 any other ethnicity actually.
23   Q.    And at the time -- TUSD entered into
24 this consent decree in 2014.  Does that sound
25 correct?

25 (Pages 94 - 97)

CONFIDENTIAL

1        MR. CUTLER:  Objection.
2        THE WITNESS:  Whatever it says on
3    the document.  I believe I was in a
4    different district at the time.
5 BY MR. RICE:
6    Q.   If we turn to page 43 --
7        MR. CUTLER:  Take as long as you
8    want to review the whole document if you
9    need.  He's going to turn to specific
10   pages of a 60-page document and ask you
11   questions.
12       THE WITNESS:  Yes.
13 BY MR. RICE:
14   Q.   By 43, I mean the -- excuse me.
15       MR. CUTLER:  You can look at the
16   whole thing if you'd like.
17 BY MR. RICE:
18   Q.   So you see on page 43 there's a
19 section on student discipline?
20   A.   Yes.
21   Q.   Could you just read the first
22 paragraph under Overview?
23   A.   This is nice, hold on.  It's
24 coming up.  It's so pretty right there.
25       "The Parties acknowledge that the

1 administration of student discipline can result
2 in unlawful discrimination when students are
3 disproportionately impacted or treated
4 differently by virtue of their race or
5 ethnicity.  The Parties further acknowledge that
6 the punitive use of serious disciplinary
7 sanctions for low-level offenses creates the
8 potential for negative educational and long-term
9 outcomes for affected students."
10   Q.   And then further down in the second
11 paragraph under 2, the unitary status plan
12 states, "The District shall reduce racial and
13 ethnic disparities in the administration of
14 school discipline," correct?
15   A.   Yes.
16   Q.   And so at the time TUSD entered into
17 this consent degree, there were racial and
18 ethnic disparities in the administration of
19 school discipline in TUSD, correct?
20       MR. CUTLER:  Object to form.
21   Foundation.
22       THE WITNESS:  I wasn't employed in
23   this position at this time, so if it
24   states so in this document, then that
25   would be the basis of your response.

1 BY MR. RICE:
2    Q.   Do you have an understanding as
3 director of student relations now about whether
4 racial disparity in TUSD existed in 2014?
5        MR. CUTLER:  Object to form.
6        THE WITNESS:  Yes.  I have looked at
7    historical documentation.
8 BY MR. RICE:
9    Q.   And so based on your review of
10 historical documentation, do you understand that
11 racial disparities existed in TUSD in 2014 at
12 the time the unitary status plan was created?
13   A.   Yes.
14       MR. CUTLER:  Object to form.
15       THE WITNESS:  Yes.
16 BY MR. RICE:
17   Q.   And do you see under the
18 District-Wide Policies and Practices, the next
19 is, 1, "Restorative Practices and Positive
20 Behavioral Interventions and Supports"?
21   A.   Yes.
22   Q.   And so restorative -- earlier we
23 were discussing restorative practice
24 facilitators, correct?
25   A.   Yes.

1    Q.   And so restorative practices are
2 also part of the unitary status plan, correct?
3    A.   Yes.
4        MR. RICE:  Let's mark as Exhibit 14
5    Tab 30.
6        (Whereupon, Tucson-Warmbrand-14
7        was marked for identification.)
8        MR. RICE:  And Tab 30 is a document
9    produced by TUSD with the Bates 00102321.
10 BY MR. RICE:
11   Q.   And, Ms. Warmbrand, I understand
12 this presentation predates when you were at the
13 district.
14   A.   Yes.
15   Q.   Could you go to slide 7?
16   A.   They are not numbered.
17   Q.   It's the slide labeled TUSD Monthly
18 Discipline - Three Year Comparison.
19   A.   Yes, found it.
20   Q.   And in your experience as director
21 of student relations, you see that this slide
22 shows monthly discipline rates for all students
23 from 2014 to 2017?
24       MR. CUTLER:  Object to form.
25       THE WITNESS:  Yes.

26 (Pages 98 - 101)

Page 102

1 BY MR. RICE:
2    Q.   And I want to put this in the
3 context of our conversation about risk ratios
4 earlier.
5        So this slide shows the total number
6 and percentage of disciplinary incidents for all
7 students in TUSD during these time frames,
8 right?
9        MR. CUTLER:  Object to form,
10 foundation.
11        THE WITNESS:  I don't think that I
12    can agree to that because all it says is
13    incidents and percentage.  It's not
14    labeled that the percent is specifically
15    risk ratio.
16 BY MR. RICE:
17    Q.   But -- so if we go to slide 10,
18 then, Discipline Disparity - Three Year
19 Comparison.
20    A.   Okay, there we go.
21    Q.   And do you see it shows that for the
22 2014 to 2015 school year, 10.53 percent of white
23 students were involved in disciplinary
24 incidents?
25        MR. CUTLER:  Object to form,

Page 103

1    foundation.
2        THE WITNESS:  So again, because I'm
3    specific in how I look at numbers and
4    labels, this is difficult for me to
5    articulate because it just says percent.
6        And so I don't know what percent --
7    like you're saying percent of incidents,
8    but without knowing exactly what that
9    10.53 represents, I can't specifically say
10    that this shows a disparity in these
11    spaces.
12        This is not typical numeric
13    representation for risk ratios, is where
14    it says percent, so that part is not clear
15    to me what exactly these percentages
16    represent.
17        And I don't want to make an
18    assumption in this space about it, and
19    because I did not generate this data I'm
20    not sure what -- you're saying it's
21    percentage of incident, but I can't
22    confirm that.
23        MR. RICE:  Let's go to -- let's mark
24    as Exhibit 15 Tab 14.
25        ///

Page 104

1        (Whereupon, Tucson-Warmbrand-15
2        was marked for identification.)
3        MR. RICE:  And Exhibit 15 is a
4    document produced by TUSD with the Bates
5    00234343.
6 BY MR. RICE:
7    Q.   And, Ms. Warmbrand, this is a report
8 from May 23, 2023, correct?
9    A.   Yes.
10    Q.   And this is while you were director
11 of student relations?
12    A.   Yes.
13    Q.   And what's the purpose of this
14 report?
15    A.   Give me a moment to look through,
16 please.
17        (Witness reviewing document.)
18    A.   So this particular report is for our
19 EDI department, equity, diversity and
20 inclusiveness, requested by the previous
21 director, Dr. Kinasha Brown, and this is a
22 presentation given to the directors of African
23 American Student Services, Native American
24 Student Services, Hispanic -- Mexican American
25 Student Services rather, and APARSS, which is

Page 105

1 our refugee student population and Asian student
2 population, that talks about behavior
3 disciplinary trends and then highlights schools
4 that need support.
5    Q.   And then on slide 2, under Overall
6 Trends, the report states, "African American
7 students continue to have the highest risk ratio
8 for minor and major infractions combined."
9 Correct?
10    A.   Yes.
11    Q.   And then the document states that
12 African American students have a 1.46 ratio,
13 correct?
14    A.   Correct.
15    Q.   And that means African American
16 students were 40 -- on the aggregate level,
17 46 percent more likely to experience
18 disciplinary incidents than white students?
19    A.   It's not predictive.  It's literally
20 based upon what limits I put on the reporting
21 for the time frame that this articulates for the
22 incidents that occurred.
23        So this is literally what the
24 disproportionality is for this time frame, for
25 that month, for that year.  It's not predictive

27 (Pages 102 - 105)

Page 106

1 to say that this is consistent. No, it's not
2 predictive.
3      Q.   So what it's saying is that African
4 American students did on the aggregate level
5 actually receive 46 percent more discipline?
6      A.   For May of 2023.
7      Q.   Then the next slide refers to Tier 3
8 support schools. And what does that mean?
9      A.   That means that they had three
10 things that contribute to being a Tier 3 school.
11 One is disproportionality via risk ratio
12 reporting. The second is that they are
13 consistently in the top 10 for all violations
14 throughout the district. And the third category
15 would be that their 02 reports had corrections
16 that were not consistently corrected, and that
17 report is in a document you already have.
18      Q.   And what was the 02 report?
19      A.   It's in --
20      Q.   That was Exhibit 2 we looked at
21 earlier.
22      A.   It was one of the very first --
23 yeah, it was Exhibit 2. You see ID 1-02,
24 incomplete discipline records.
25      Q.   And so that third category, is that

Page 107

1 the ID 1-02 reports are not being completed --
2      A.   Right.
3      Q.   -- for these schools?
4      A.   Right. So they're a support school
5 then, so we can assist them in getting their
6 documentation done correctly.
7      Q.   And so -- just again, did you
8 prepare this document, or your department
9 prepared it?
10      A.   I did.
11      Q.   And so at this time, as of May 2023,
12 there was a disparity in the rate of discipline
13 that African American students were receiving
14 compared to white students?
15      A.   Yes.
16      MR. CUTLER:  Object to form.
17      THE WITNESS:  Yes.
18 BY MR. RICE:
19      Q.   And so if we look at the next few
20 slides, these slides show specific schools. If
21 we look at the first one here, for instance,
22 Gridley is on the screen right now --
23      A.   Yes.
24      Q.   -- it has green, yellow, and red,
25 correct?

Page 108

1      A.   Correct.
2      Q.   And this is what you were referring
3 to earlier about the risk ratio?
4      A.   Yes.
5      Q.   And could you explain what the
6 colors here would mean?
7      A.   So green basically states that there
8 isn't a disproportionate based upon both the
9 enrollment numbers at this site of African
10 American students or Native American students,
11 right? It looks at each ethnicity. That there
12 is or isn't a disproportionality.
13      So green would say that there are
14 not more incidents of multi-racial students, for
15 example, is in green, right? So that means that
16 those multi-racial students did not have more
17 incidents proportionally for the population that
18 exists at Gridley than the white and Anglo
19 students and the amount of population they had,
20 that Gridley had.
21      Q.   And so this document shows that for
22 African American students, the risk ratio was
23 yellow?
24      A.   Correct.
25      Q.   And it was 1.59, correct?

Page 109

1      A.   Correct.
2      Q.   And what would yellow mean here?
3      A.   So yellow would mean that you had a
4 higher percentage of African American students
5 engaged in disciplinary incidents during the
6 time period the report was pulled than you had
7 white or Anglo students in this time period.
8      I do want to note, though, and I
9 tell anyone who analyzes this data, that the
10 other part that's important to look at is the
11 enrollment numbers, because the smaller you have
12 in student enrollment for a particular
13 ethnicity, the fewer incidents you need to have
14 students engaged in to have a
15 disproportionality.
16      So it's not just looking at the risk
17 ratio number. You also need to look at the
18 distinct student enrollment and the number of
19 incidents.
20      And I say this because when you look
21 at other students of other ethnicity, they may
22 have higher level of student incidents, but they
23 also have a higher level of enrollment. So it's
24 just important to note when you analyze
25 disproportionality.

28 (Pages 106 - 109)

Page 110

1    Q.   And for the Spanish students in this
2  document, the risk ratio is 1.39, correct?
3    A.   Correct.
4    Q.   So even though it's green, they were
5  experiencing a higher level of discipline
6  compared to white students?
7        MR. CUTLER:  Object to form.
8        THE WITNESS:  No.  Because their
9    student enrollment is higher than white
10   and Anglo students, so it's divided by --
11   that's why I'm saying student enrollment
12   is a critical piece.
13       If the enrollment is higher than
14   white and Anglo students, they may have
15   higher than a 1.0, but it doesn't mean
16   that they have a distinctive risk ratio
17   because of the percentage of enrollment
18   compared to white or Anglo students.
19       That's only applicable to Hispanic
20   students, though.  Everyone else has lower
21   numbers than our Hispanic numbers versus
22   white.  So for Hispanic students
23   specifically, they can have risk ratios
24   higher than 1.0, but it won't mean that
25   there's disproportionality because they

Page 111

1    have a higher number of students enrolled.
2        That's not true of the other
3    ethnicities, however.
4  BY MR. RICE:
5    Q.   But the discipline percentage for
6  the population of Hispanic students is still
7  higher than that for white students, correct?
8    A.   So if you want to look at not
9  disproportionality but overall discipline, we
10 have more Hispanic students enrolled in the
11 district than any other ethnicity, and they have
12 more disciplinary incidents than any other
13 ethnicity.  But that doesn't necessarily mean
14 it's disproportionate.
15   Q.   Let's go to the next slide here.
16       This shows the same types of numbers
17 for Dietz, correct?
18   A.   Dietz.
19   Q.   Dietz.
20       And if we look at Dietz here, it
21 shows that African American students have a 6.4
22 risk ratio, correct?
23   A.   Yes.
24   Q.   And the risk ratio is red, which
25 means it was significantly above the threshold?

Page 112

1    A.   Yes.
2    Q.   And the risk ratio for multi-racial
3  students is also 5.71, so it was red,
4  significantly above the threshold as well?
5    A.   Yes.
6    Q.   The risk ratio for Hispanic students
7  is 2.16, it's yellow, meaning it's above the
8  threshold for disparity?
9    A.   Yes.
10   Q.   Then let's go back to Exhibit 9, and
11 that was the exhibit labeled District Discipline
12 Summary: December 22nd.  I think it's that one.
13   A.   Okay.
14   Q.   And this is the discipline summary
15 for 2022, correct?
16   A.   Yes.
17   Q.   At this time, December 2022, African
18 American students had a 1.77 discipline ratio,
19 correct?
20   A.   Correct.
21       MR. RICE:  Let's mark as Exhibit 16
22   Tab 28.
23       (Whereupon, Tucson-Warmbrand-16
24       was marked for identification.)
25   ///

Page 113

1  BY MR. RICE:
2    Q.   The document is undated on the
3  front, but if you flip to the back you see the
4  metadata file is EDI Presentation for Directors,
5  December 12, 2023?
6    A.   Yes.
7    Q.   Ms. Warmbrand, this is a similar
8  presentation of the EDI department that you
9  prepared in December 2023?
10   A.   Yeah.
11   Q.   And that's about seven months later
12 than Exhibit 15, the May 2023 presentation we
13 were just looking at, correct?
14   A.   Yes.
15   Q.   And according to the first page of
16 this document, Exhibit 16, at this time African
17 American students continued to have the highest
18 risk ratio for minor and major infractions
19 combined, correct?
20   A.   Yes.
21   Q.   And the presentation also states
22 that the discipline percentage of population for
23 African American students is 14.4 percent,
24 correct?
25   A.   Yes.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 Q. And so as of December 2023, there
2 was still racial disparity in the administration
3 discipline in the district, correct?
4 MR. CUTLER: Object to form.
5 THE WITNESS: For African American
6 students.
7 MR. CUTLER: Is there a Bates number
8 with this?
9 MR. RICE: No, it was produced with
10 the PFS as an attachment.
11 BY MR. RICE:
12 Q. And then if we go to page 8...
13 A. Of Exhibit 16?
14 Q. Of Exhibit 16. Thank you. It's
15 slide 15 in the top left.
16 Do you see this has information on
17 Sabino High School?
18 A. Yes.
19 Q. And this shows that in
20 December 2023, African American students at
21 Sabino High School had a 2.58 risk ratio,
22 correct?
23 A. Yes.
24 Q. And that was above the threshold and
25 showed a significant racial disparity, correct?

Page 115

1 A. It's red.
2 Q. It's red.
3 MR. RICE: And let's mark as
4 Exhibit 17 Tab 13.
5 (Whereupon, Tucson-Warmbrand-17
6 was marked for identification.)
7 MR. RICE: And Exhibit 17 is a
8 document produced by TUSD with the Bates
9 00046949.
10 BY MR. RICE:
11 Q. And, now, Ms. Warmbrand, this --
12 MR. CUTLER: Hang on a second.
13 MR. RICE: Sorry.
14 BY MR. RICE:
15 Q. And is this a document you would
16 have prepared, Ms. Warmbrand?
17 A. Yes.
18 Q. And what's the purpose of this
19 document?
20 A. This document is our presentation
21 for our district behavior management committee
22 that I chair.
23 Q. And who else is on the committee?
24 A. Leadership from TEA, our association
25 for teachers; leadership from our association of

Page 116

1 administrators; legal counsel; assistant
2 superintendent; one regional superintendent; and
3 a representative from each of our equity
4 directors.
5 Q. And if we go to slide 10 titled
6 Discipline Risk Ratio by Ethnicity, this one
7 states that African American students had a 1.9,
8 yellow, risk ratio, correct?
9 A. Yes.
10 Q. And Native American students had a
11 1.37 risk ratio, correct?
12 A. Yes.
13 Q. And multi-racial students had a 1.21
14 risk ratio, correct?
15 A. Correct.
16 Q. And so as of -- excuse me, I'm so
17 sorry.
18 As of January 2024 there was still
19 racial disparity with respect to African
20 American students in TUSD schools, correct?
21 MR. CUTLER: Objection.
22 THE WITNESS: In this time period,
23 yes.
24 BY MR. RICE:
25 Q. And now let's -- can we go back to

Page 117

1 tab -- Exhibit 10, which is Tab 31?
2 And we looked at this document
3 earlier. This shows discipline information for
4 the 2023 to 2024 school year?
5 A. Yes. Exhibit 10, yes.
6 Q. Yes.
7 And it states that the risk ratio
8 for African American students is 1.75, correct?
9 A. Yes.
10 Q. And the ratio for multi-racial
11 students is 1.59, correct?
12 A. Correct.
13 Q. And seeing this, we see that as of
14 March 2024, approximately a year ago, there was
15 racial disparity with respect to African
16 American students for this time frame, correct?
17 MR. CUTLER: Object to form.
18 THE WITNESS: Yes.
19 BY MR. RICE:
20 Q. And there was also racial disparity
21 with respect to multi-racial students for this
22 time period, correct?
23 MR. CUTLER: Object to form.
24 THE WITNESS: For the month of March
25 2024, yes, but not in Exhibit 17.

30 (Pages 114 - 117)

Page 118

1 BY MR. RICE:
2      Q.   Do racial disparities in discipline
3 still exist in TUSD today for African American
4 students?
5           MR. CUTLER:  Object to form.
6           THE WITNESS:  No, not on a
7 consistent basis.
8 BY MR. RICE:
9      Q.   But they do exist for particular
10 schools at certain time frames?
11     A.   At certain time frames for
12 particular schools, yes.
13          MR. RICE:  Let's mark as Exhibit 18
14 Tab 15.
15          (Whereupon, Tucson-Warmbrand-18
16          was marked for identification.)
17          MR. RICE:  And Exhibit 18 is a
18 document produced by TUSD with the Bates
19 00047051.
20 BY MR. RICE:
21     Q.   Ms. Warmbrand, do you recognize this
22 report?
23     A.   No.
24     Q.   Do you see that it contains the
25 conclusions of the EDI department after its

Page 119

1 review of complaints related to Sabino High
2 School?
3           MR. CUTLER:  Object to form,
4 foundation.
5           THE WITNESS:  I don't know.  I'd
6 have to read it.
7           MR. CUTLER:  Yeah, read the
8 document.
9           (Witness reviewing document.)
10          THE WITNESS:  Okay.
11 BY MR. RICE:
12     Q.   Do you recall the EDI department
13 investigating the culture and climate at Sabino
14 High School?
15          MR. CUTLER:  Object to form.
16          THE WITNESS:  No.  To clarify, this
17 is from 9/23/2021, so October of 2021.
18          MR. CUTLER:  September.
19          THE WITNESS:  I'm sorry.  Thank you.
20          So I was not employed with
21 Dr. Kinasha Brown at this time.  I do know
22 that something had occurred with Sabino,
23 and I know this houses with my program
24 coordinator who was in the department at
25 the time, but I was not the director of

Page 120

1      student relations so that's why I had to
2      read through this.  I was not directly
3      involved in this.
4 BY MR. RICE:
5      Q.   You were never made aware of the
6 conclusions of this report?
7      A.   I know that my program coordinator
8 when I took the position did brief me on what
9 had occurred at Sabino High School, but
10 Dr. Brown did not give me, like, additional
11 directives for Sabino High School based upon
12 this information or anything of that nature.
13     Q.   Do you have any reason to doubt the
14 EDI department's findings about the culture at
15 Sabino High School?
16          MR. CUTLER:  Object to form,
17 foundation.
18          THE WITNESS:  I can't really speak
19 to that because I didn't oversee this
20 program coordinator in this process.
21          MR. RICE:  Let's mark as Exhibit 19
22 Tab 16.
23          (Whereupon, Tucson-Warmbrand-19
24          was marked for identification.)
25          MR. RICE:  And Exhibit 19 is a

Page 121

1      document produced with the Bates 00047033.
2 BY MR. RICE:
3      Q.   And, Ms. Warmbrand, do you see that
4 Ms. Brown sent you this e-mail that says
5 Subject:  EDI Sabino?
6           MR. CUTLER:  Object to form,
7 foundation.
8           THE WITNESS:  Yeah, I see that that
9 was sent.
10 BY MR. RICE:
11     Q.   And then it has Attachments:  EDI -
12 Sabino (2) zip file?
13     A.   Yeah.
14          MR. RICE:  Let's mark as Exhibit 19
15 Tab -- sorry, what number -- 20, Tab 20 --
16 I'm sorry, Exhibit 20 Tab 16A.
17          (Whereupon, Tucson-Warmbrand-20
18          was marked for identification.)
19          MR. RICE:  And let's mark as
20 Exhibit 21 Tab 16B.
21          (Whereupon, Tucson-Warmbrand-21
22          was marked for identification.)
23          MR. RICE:  And Exhibit 22 Tab 16C.
24          (Whereupon, Tucson-Warmbrand-22
25          was marked for identification.)

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1    MR. CUTLER: You've got to slow down
2    here. Let me see what these are here,
3    please.
4    THE WITNESS: Okay.
5    MR. RICE: And then we'd like to
6    mark as Exhibit 23 Tab 16D.
7    (Whereupon, Tucson-Warmbrand-23
8    was marked for identification.)
9  BY MR. RICE:
10    Q.   And I'll represent to you,
11  Ms. Warmbrand, these are attachments to the
12  e-mail that Ms. Brown sent you.
13    A.   Mm-hmm, yes.
14    Q.   And so do you see that Ms. Brown
15  sent to you the focus group reports from Sabino
16  High School?
17    MR. CUTLER: Can you give us just a
18  second, like I asked, please?
19    MR. RICE: I'm sorry.
20    (Pause.)
21    MR. RICE: Are you ready, Counsel?
22    MR. CUTLER: Yeah.
23  BY MR. RICE:
24    Q.   Ms. Warmbrand, do you see that
25  Ms. Brown sent you these focus group reports

Page 123

1  from Sabino High School?
2    A.   Mm-hmm. Oh, yes.
3    Q.   And before we look at those, I want
4  to go back to the Exhibit 19, the focus group
5  report itself, on page 052.
6    MR. CUTLER: Exhibit 19 is the
7    e-mail?
8    MR. RICE: Exhibit 18, I'm sorry,
9    Exhibit 18, the focus group report.
10    THE WITNESS: Yes.
11  BY MR. RICE:
12    Q.   And do you see on Exhibit 5, too,
13  the report lists findings?
14    A.   Mm-hmm.
15    Q.   And do you see the first bullet
16  says, "Students and teachers have experienced a
17  culture and climate where racist remarks, jokes,
18  and gestures are the 'norm' among students.
19  Derogatory remarks, jokes, and gestures are
20  directed toward race, gender, and sexuality."
21    Do you see that?
22    A.   Yes.
23    Q.   And the second-to-last bullet
24  states, "Some students see classroom management
25  as an issue: describing behavior as

Page 124

1  disrespectful, disruptive (mask issue),
2  offensive, and no rules or expectations."
3    Do you see that?
4    A.   Yes.
5    Q.   And do you agree a culture where
6  racist remarks are the norm could harm student
7  mental health?
8    MR. CUTLER: Object to form,
9    foundation, incomplete hypothetical, calls
10    for speculation, and it's vague.
11    Go ahead.
12    THE WITNESS: Could you repeat the
13    question, or clarify whether you mean in
14    the context of this reporting or just in
15    general?
16  BY MR. RICE:
17    Q.   In general do you think that a
18  culture of using racist remarks generally would
19  harm student mental health?
20    A.   Yes.
21    Q.   And using racist slurs violates the
22  code of conduct, correct?
23    A.   Yes.
24    Q.   So now I want to look at Exhibit 20,
25  which is the first attachment, ending in Bates

Page 125

1  034.
2    And you see this is a report from a
3  focus group at Sabino High School --
4    MR. CUTLER: Object to form,
5    foundation.
6  BY MR. RICE:
7    Q.   -- correct?
8    A.   It would -- yes. It says Focus
9  Group Number 1.
10    Q.   And on page 35 you see there's a
11  section titled, Is there anything else someone
12  would like to share about their experience at
13  Sabino?
14    Correct?
15    A.   No, I don't see the pages numbered.
16    MR. CUTLER: Right here.
17    THE WITNESS: Oh, okay. Thank you.
18    Could you repeat that, please?
19  BY MR. RICE:
20    Q.   Sure.
21    Do you see that there's a section
22  titled Number 4 - Is there anything else someone
23  would like to share about their experience at
24  Sabino?
25    A.   Yes.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    Q.   And do you see the first bullet
2  reports, "Racists comments, toward Mexicans and
3  Asians - there is a lot of racial tension
4  students see but don't talk about - admin may
5  not know what to do with it"?
6    A.   Yes.
7    Q.   And you agree that racist comments
8  towards students could harm their mental health?
9        MR. CUTLER:  Object to form,
10  foundation, incomplete hypothetical,
11  vague.
12       THE WITNESS:  I mean, it could in
13  the context of disciplinary incidents,
14  though you have to go incident by incident
15  and student by student to figure out
16  what's really happening in all incidents,
17  right?
18       So it could, but I wouldn't say that
19  every time in the context of these focus
20  groups I could say that this happened for
21  every one because I wasn't there to hear
22  their student experiences.  I'm just
23  reading it on this piece of paper right
24  here.
25       ///

Page 127

1  BY MR. RICE:
2    Q.   Do you see that the third line down
3  states, "A science teacher was replaced by a
4  Japanese teacher and a lot of students would
5  make fun of her for being Japanese - I don't
6  know how people can verbally assault someone
7  like that."
8        Do you see that?
9    A.   I do.
10    Q.   Do you agree that making fun of a
11  teacher's race would disrupt the learning
12  environment?
13       MR. CUTLER:  Object to form,
14  foundation, incomplete hypothetical.
15       THE WITNESS:  I think that if you
16  were to talk broadly about students making
17  racial slurs to teachers, that that can
18  affect the culture and climate at a
19  school, and it can affect the teacher in
20  their teaching environment.
21       I do hesitate when provided with one
22  human being's account of a situation
23  without investigation and context to make
24  a general impact statement just due to the
25  nature of my position.  I definitely

Page 128

1  intake a lot of information, and you have
2  to be able to look through all of those
3  information pieces to make an outcome
4  determination or decision --
5  BY MR. RICE:
6    Q.   But in general --
7    A.   -- about what's right or wrong, not
8  specific to this document.
9    Q.   But in general you agree that racial
10  slurs disrupt the learning environment?
11       MR. CUTLER:  Object to form,
12  foundation.
13       THE WITNESS:  They can.
14  BY MR. RICE:
15    Q.   Are there times when racial slurs
16  don't disrupt the learning environment?
17    A.   If they are not heard by others.
18       But when students are talking
19  peer-to-peer in a space and they're using what
20  we would consider derogatory slurs amongst each
21  other, that does not necessarily always mean, if
22  other folks around them aren't engaged in that
23  space, that they find that offensive.  I'll be
24  very honest, we've worked in that space a bit
25  this year.

Page 129

1    Q.   The next line says, "A lot of sexist
2  comments."
3    A.   Yeah.
4    Q.   Correct?
5    A.   Yeah.
6    Q.   And do you think sexist comments can
7  harm student mental health?
8        MR. CUTLER:  Object to form,
9  incomplete hypothetical, vague.
10       THE WITNESS:  Depends on the context
11  of use.  Sexist comments are violations in
12  the code of conduct, that I can say
13  confidently.
14  BY MR. RICE:
15    Q.   And if we go to page 36, you see
16  this is -- under Focus Group Number 1 - 5th
17  period?
18    A.   Yes.
19    Q.   And then it says, What is your
20  experience at Sabino?
21    A.   Mm-hmm.  Yes.
22    Q.   And then if we turn to the next
23  page, the bottom of the next page, 37, do you
24  see that a student reported, "A lot of teachers
25  don't seem to care - one teacher I" have

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1  known -- "one teacher I know of have done
2  nothing or care about what teachers say."
3          Do you see that?
4      A.   Mm-hmm.
5      Q.   And then the next line a student
6  reported, "Not even just profanity and curse
7  words or a joke in bad taste - but slurs -
8  nothing is done about them."
9          Correct?
10     A.   That's what this says.
11     Q.   And then two lines down someone
12  reported, "Some of our teachers don't actively
13  stop students from using slurs - I hear them in
14  AP classes too."
15         Correct?
16     A.   That's what that says, yes.
17     Q.   And you agree that it's a problem if
18  teachers don't do anything about students using
19  racial slurs, correct?
20         MR. CUTLER:  Object to form,
21     incomplete hypothetical, vague.
22         THE WITNESS:  Well, any violation of
23     the code of conduct, it's expected that
24     adults that are in charge of that learning
25     environment do issue consequences in that

Page 131

1      space.
2  BY MR. RICE:
3      Q.   So you agree if teachers fail to
4  issue consequences for students using racial
5  slurs that would be a problem?
6      A.   That would be something that their
7  administration would have to work with them,
8  yes.  We do have the expectation that teachers
9  are upholding our code of conduct.
10     Q.   And that would include disciplining
11  students for using racial slurs, correct?
12         MR. CUTLER:  Object to form.
13         THE WITNESS:  Racial slurs is part
14     of our code of conduct, so yes.
15  BY MR. RICE:
16     Q.   And then the next line down says,
17  Number 2 - Sabino is a place for all, what ideas
18  do you have to ensure all students feel valued
19  and included?
20         Do you see that?
21     A.   Yes.
22     Q.   And then the first bullet on the
23  next page a student reported, "Dress code - I
24  think it is weird that all-male monitors that -
25  over sexualize - how they talk about our bodies

Page 132

1  and how they ask us to change and I don't feel
2  comfortable with any of the monitors and how it
3  is only males who talk to us and it's only girls
4  they talk to about dress code."
5          Do you see that?
6      A.   Yes.
7      Q.   And you agree it's a problem if male
8  staff members treat females students in a
9  sexualized manner, correct?
10     A.   Yes.
11     Q.   And in the next bullet a student
12  responds, "Sabino is not a good place to be
13  right now - people say I am sorry when I say I
14  attend here."
15         Correct?
16     A.   Yes.
17     Q.   Let's go to --
18         MR. CUTLER:  Can we take a break?
19         MR. RICE:  I'm almost done with
20     this, and then we can maybe take a lunch
21     break, if that's okay.
22         MR. CUTLER:  Almost done with what?
23         MR. RICE:  Going through these
24     exhibits.
25         MR. CUTLER:  But you've got five

Page 133

1      more exhibits.
2          MR. RICE:  I think it will be about
3      five or ten more minutes.
4          MR. CUTLER:  Okay.
5  BY MR. RICE:
6      Q.   Let's go to Exhibit 21, Tab 16B.
7          And, Ms. Warmbrand, do you see the
8  second page of this document, page 041?
9      A.   No.  You have to repeat which
10  exhibit you're on, please.
11     Q.   Exhibit 21.
12         MR. CUTLER:  This one here.
13         THE WITNESS:  Okay.
14  BY MR. RICE:
15     Q.   And the second page of this
16  document, do you see that in response a student
17  stated, "Counselor don't provide help"?
18     A.   No, I don't see it.
19     Q.   The bottom of page 41.
20     A.   Yes, I do see that.
21     Q.   And another student reported, "Fear
22  of her teachers"?
23     A.   Yes, I do see that.
24     Q.   Now let's go to Exhibit 23, ending
25  in Bates 045.

34 (Pages 130 - 133)

Page 134

1    And do you see that here the
2 Question Number 1 was, What is your experience
3 at Sabino?
4    A.   Yes.
5    Q.   And the fourth response down was,
6 "Students using language slurs like the 'N, F, R
7 words.'"
8        Correct?
9    A.   Yes.
10    Q.   And then a couple of lines down a
11 student reported, "Lots of racist slurs are
12 being said, they say that they are joking but it
13 is not funny.  They should think about other
14 people."
15        Correct?
16    A.   Yes.
17    Q.   Then on the next page, 46, a student
18 also reported, "Teachers not controlling
19 students in the classroom, saying racist stuff
20 in class.  Teachers need to be educated on
21 racism, culture."
22        Do you agree that teachers should be
23 educated on racism and culture?
24        MR. CUTLER:  Object to form,
25    foundation, incomplete hypothetical,

Page 135

1    vague.
2        THE WITNESS:  I mean, if they need
3    to be, then their principal should get
4    them training on whatever they need.
5 BY MR. RICE:
6    Q.   And you agree that teachers
7 shouldn't be saying racist things in class?
8    A.   Teachers should not be saying racist
9 things in class.
10        MR. RICE:  We can go off the record.
11        THE VIDEOGRAPHER:  We're going off
12    record.  The time is 12:27.
13        (Whereupon, a luncheon recess was
14        taken.)
15
16
17
18
19
20
21
22
23
24
25

Page 136

1        AFTERNOON SESSION
2
3        THE VIDEOGRAPHER:  We're going back
4    on record.  The time is 1:31.
5 BY MR. RICE:
6    Q.   Welcome back, Ms. Warmbrand.
7    A.   Thank you.
8    Q.   You mentioned that your duties
9 involve revising TUSD's code of conduct?
10    A.   Yes.
11    Q.   What's the process at TUSD for
12 revising the code of conduct?
13    A.   We intook 10 -- 9,000 like 647
14 stakeholder voices when we began the process two
15 years ago to change within the code of conduct
16 violations, levels, everything.
17        I have a committee, as I referred to
18 previously, that involves association leadership
19 for both administrators and teachers, voices of
20 equity, each of the equity departments, put
21 someone forward to represent them, one lawyer,
22 one assistant superintendent, one regional,
23 myself, and my compliance liaison as the
24 note-taker, and in that space we look at what
25 stakeholders have asked us to review for

Page 137

1 violations in the code of conduct, and then we
2 take stakeholder input and we work through
3 majority vote as to what revisions are then made
4 in the code of conduct.
5    Q.   Where are the -- what would this
6 committee be called?
7    A.   It's a district behavior management
8 committee.
9    Q.   And where are notes from those
10 meetings stored?
11    A.   They're stored in my folder for
12 district through Microsoft.
13    Q.   And then you say you gathered
14 approximately 9,647 stakeholder voices.  What
15 was the process for gathering that input?
16    A.   Much of it was surveys were
17 conducted districtwide for parents.  We had, I
18 believe, ten community forums, both Zoom and in
19 person, throughout every region.  My team went
20 to every comprehensive high school and met with
21 focus groups of students, and then I went and
22 met with every department in the district,
23 operations, curriculum, you name it.
24    Q.   And these forums were in the spring
25 of 2023?

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    A.   Yes, and the beginning of the fall
2 as well.
3    Q.   Other than the surveys in connection
4 with the code of conduct, does your department
5 conduct any other surveys?
6         MR. CUTLER:  Object to form.
7         THE WITNESS:  No, not that come from
8    our department.
9 BY MR. RICE:
10   Q.   Does your department conduct any
11 other focus groups -- or forums?  Sorry, I
12 said --
13        MR. CUTLER:  Object to form.
14        THE WITNESS:  Forums.
15 BY MR. RICE:
16   Q.   Other than the forums you conduct in
17 connection with the code of conduct, does your
18 department conduct any other student or staff
19 forums?
20   A.   No.
21   Q.   How often does TUSD revise the code
22 of conduct?
23   A.   Every year.
24   Q.   And what are the reasons that you
25 might revise the code of conduct?

Page 139

1    A.   It's all based on stakeholder input
2 in terms of what's important from their vantage
3 point in the district.
4    Q.   Do you track the cost associated
5 with revising the code of conduct?
6    A.   Like the cost in my budget as a
7 department?
8    Q.   Yes, the cost in your budget.
9    A.   Yes.
10   Q.   And that's the cost associated with
11 revising the code of conduct as a whole?
12   A.   Yes.
13   Q.   And do you track the amount of time
14 that your department spends on revising the code
15 of conduct specifically?
16   A.   I track the amount of time that is
17 off of contract time, but not during your
18 regular workday.
19   Q.   By "off of contract time," do you
20 mean overtime?
21   A.   Yes, I mean overtime.
22        MR. RICE:  Let's mark as Exhibit 24
23   Tab 37.
24        (Whereupon, Tucson-Warmbrand-24
25        was marked for identification.)

Page 140

1 BY MR. RICE:
2    Q.   And Exhibit 24 is a document titled
3 Performance Impact Analysis: Proposed Revisions
4 to the Code of Conduct 2023-2024?
5    A.   Mm-hmm.
6    Q.   Ms. Warmbrand, did you draft this
7 document?
8    A.   Yes.
9    Q.   And what was the purpose?
10   A.   We have to perform performance
11 impact analysis for anything that we bring to
12 the school board for a vote.  So that's protocol
13 districtwide, it's not unique to my department.
14   Q.   In this case, the purpose is to
15 conduct a performance impact analysis for these
16 changes to the code of conduct, correct?
17   A.   Yes.
18   Q.   And then on page 3, under
19 Objectives, you list the objectives for the
20 proposed revisions, correct?
21   A.   Yeah.
22   Q.   And the first objective is,
23 "Decrease the variability in issuing
24 exclusionary consequences for all students with
25 an emphasis on decreasing variability in

Page 141

1 exclusionary practice for African American and
2 Mexican American students by creating a
3 progressive discipline model for all grade
4 bands," correct?
5    A.   Yes.
6    Q.   And the second objective is, "Create
7 consistent consequences for the violation of
8 fights, illicit drugs, tobacco, and alcohol,"
9 correct?
10   A.   Yes.
11   Q.   And then under "Why," you provide
12 the reason for the change, correct?
13   A.   Yes.
14   Q.   And the reason for that change was
15 that, "Upon returning from the pandemic
16 incidents involving aggression and drug use have
17 consistently impacted school sites throughout
18 TUSD," correct?
19   A.   Yes.
20   Q.   Then if we look at the next section
21 at the bottom of page 3 going on to page 4, USP
22 Program Background, in this section you
23 summarize the history of the unitary status plan
24 and the code of conduct of TUSD, correct?
25   A.   Yes.

36 (Pages 138 - 141)

CONFIDENTIAL

1    Q.   The unitary status plan is the
2 desegregation order we were discussing earlier
3 today, correct?
4    A.   Correct.
5    Q.   And according to this doc -- the
6 second paragraph, under the desegregation order
7 TUSD created a new code of conduct for the
8 2018-2019 school year, correct?
9    A.   Yes.
10    Q.   And that was a change from TUSD's
11 prior model which was titled Guidelines for
12 Student Rights and Responsibilities, correct?
13    A.   Yes.
14    Q.   And TUSD made that revision as part
15 of the desegregation order?
16    A.   Yes.
17    Q.   And then according to this document,
18 in 2019 to 2020 TUSD again revised the code of
19 conduct, correct?
20    A.   Yes.
21    Q.   And that revision was before you
22 started, correct?
23    A.   Yes.
24    Q.   And you weren't employed at TUSD at
25 that time at all, correct?

1    A.   No.
2    Q.   And so you weren't involved in that
3 revision?
4    A.   No.
5    Q.   You don't have personal knowledge of
6 that revision?
7    A.   I do not.
8    Q.   Are you familiar with the revisions
9 TUSD made to the code of conduct at that time?
10    A.   I have, like, paper copies of the
11 old document, but not in-depth, no.
12    Q.   Did any of the changes that -- well,
13 let me -- here the next, you see here it states,
14 "The new Code developed for school year
15 2019-2020 included several changes designed
16 specifically to reduce exclusionary discipline
17 for all students, but particularly for African
18 American students who experienced the greatest
19 levels of disproportionality," correct?
20    A.   Yes.
21    Q.   Is that your understanding of the
22 changes, that they were designed to reduce
23 exclusionary discipline for all students but
24 particularly African American students?
25         MR. CUTLER:  Object to form.  Asked

1 and answered, lacks foundation.
2         THE WITNESS:  I can't speak to that
3    specifically without having the full code
4    and then looking back at it.
5 BY MR. RICE:
6    Q.   To your knowledge, did any changes
7 in the 2019 to 2020 code of conduct relate to
8 social media?
9         MR. CUTLER:  Object to form.  Asked
10    and answered.
11         THE WITNESS:  Again, without having
12    it in front of me, I can't speak to that,
13    and I wasn't here employed in the space at
14    the time.
15 BY MR. RICE:
16    Q.   Then according to the performance
17 impact analysis, from 2019 to 2023 the code was
18 not updated, correct?
19    A.   Correct.
20    Q.   And then the code was updated in
21 connection with the 2023 to 2024 school year?
22    A.   Yes.
23    Q.   And you were --
24    A.   Yes.
25    Q.   -- involved in drafting that and

1 leading the committee?
2    A.   Yes.
3    Q.   And for that revision you conducted
4 forums with students, community members, and
5 parents?
6    A.   Mm-hmm, yes.
7    Q.   And then you took the feedback from
8 those forums and incorporated it into the
9 redesign of the code of conduct, correct?
10    A.   Correct.
11    Q.   And does TUSD always conduct
12 community or student forums when making changes
13 to the code of conduct?
14         MR. CUTLER:  Object to form.
15         THE WITNESS:  Yes, we always have
16    community input opportunities.
17 BY MR. RICE:
18    Q.   Are there -- other than the forums
19 in 2023 that we discussed earlier, are there
20 other forums that you're aware of that TUSD has
21 conducted in connection with the code of
22 conduct?
23    A.   We do have annually a first read
24 with the board that is open to the public for
25 them to share, yes.  So we do conduct in an

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 annual space in that way, and we also have an
2 open e-mail in which folks can e-mail directly
3 to code of conduct.
4        Q.   And do you review those e-mails?
5        A.   Yes, we do.
6        Q.   And then are there other community
7 input opportunities?
8        A.   Yes.  So because our equity
9 departments are represented, what we ask those
10 people that are on the committee to do is each
11 time a potential revision comes, is that they go
12 back to the folks that they serve and they go
13 through that process with the community they
14 serve in terms of does this revision surface
15 with you, what are your thoughts, what needs to
16 be done.
17        So like African American student
18 services, for example, will meet with their
19 department and their community stakeholders,
20 Mexican American, Native American, and then
21 they'll invite me into their spaces to talk
22 about the code of conduct and to take input from
23 their individual communities.
24        So the first year we had
25 districtwide, you know, 70, 80 people, sometimes

Page 147

1 120 depending, in the space, and now we're
2 giving it to the stakeholders that are
3 represented on the committee.  So TEA in their
4 meetings will go over all of the revisions and
5 bring back feedback.  ELI will go back to their
6 meeting stakeholders and bring back feedback.
7 Central district leadership does the same in
8 their spaces.
9        And so, yes, and then I tour, so to
10 speak, those spaces.  Like I'll go to the TEA
11 meetings.  I'm meet with ELI representatives so
12 that we are getting very targeted responses.
13 And in particular with our director of African
14 American Student Services, I work very, very
15 closely in the space and am actually very
16 excited about our lack of disproportionality
17 this spring.  So that's been good for us.
18        She actually shared that publicly at
19 a school board meeting that's documented in a
20 slide that I helped her make because I work with
21 that department.  She's one of the directors I
22 actually work closest with.
23        Q.   And that's because a major goal of
24 your revisions is to reduce the
25 disproportionality?

Page 148

1        A.   Yes.
2        Q.   For these meetings you have with
3 departments, are there recordings or notes taken
4 of the feedback?
5        MR. CUTLER:  Object to form.
6        THE WITNESS:  If those are notes
7        taken in those spaces, it would be by
8        their director and their program
9        coordinator, and then their representative
10        will come back to the district behavior
11        management committee, and those -- and
12        where you'll see the articulation of those
13        notes will be -- if you're looking for it,
14        it will be in e-mails from myself or my
15        compliance liaison in summaries, or it
16        will just articulate itself in the next
17        month's meeting where we go over what had
18        been spoken about before to make sure
19        everyone is okay with it.
20 BY MR. RICE:
21        Q.   So we've discussed people commenting
22 via e-mail to the code of conduct e-mail at
23 board meetings, community forums, and feedback
24 at department meetings.  Are there other
25 mechanisms for input on the code of conduct that

Page 149

1 we haven't discussed?
2        A.   There are mechanisms for input on
3 discipline overall, and that would be in our
4 parent, staff, and student surveys that are not
5 administered through my department but
6 districtwide for all kids and all parents, and
7 there's sections about everything related to
8 schools, and there's a section about behavior
9 and discipline in there.
10        Q.   And who would be -- is anyone
11 responsible for providing feedback in those
12 surveys that relates to the code of conduct to
13 your department?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  Yes.  The director of
16        evaluation, Dr. Freitas.  She oversees all
17        of our surveys for the district.
18 BY MR. RICE:
19        Q.   At the forums you conduct, do you
20 have specific questions you ask the community,
21 or are there -- is it more of an open
22 opportunity for feedback?
23        A.   So we come at it typically in an
24 educational space, and we have developed
25 presentations for parents, for students, and for

38 (Pages 146 - 149)

CONFIDENTIAL

1 staff and departments, and so we'll use our
2 department presentation deck.
3          And usually once you give folks some
4 education on the code of conduct and you go
5 through policy, then the questions will surface
6 within what that document shares with them.
7          And so at that time, then there's
8 always time for questions and discussion, and
9 then we take that feedback.  Usually the
10 directors will have the summaries.  Sometimes my
11 compliance liaison will take notes in that
12 space.  It just depends who is there.
13          MR. RICE:  Let's mark as Exhibit 25
14 Tab 40.
15          (Whereupon, Tucson-Warmbrand-25
16          was marked for identification.)
17 BY MR. RICE:
18     Q.   And Exhibit 25 is a presentation on
19 the code of conduct revision process from
20 May 2023.
21     A.   Oh, yes.
22     Q.   And, Ms. Warmbrand, is this a
23 presentation you gave to the governing board?
24     A.   Yes.
25     Q.   And this was in connection with a

1 May 2023 board meeting, correct?
2     A.   Yes.
3     Q.   And slide 3 lists the number of
4 stakeholders you consulted?
5          MR. RICE:  One more slide actually,
6      sorry.
7     Q.   And so this is a summary of the
8 number of stakeholders you consulted?
9     A.   Yes.
10     Q.   And as you mentioned before, it was
11 almost 10,000 total stakeholders, including
12 1,800 students, 4,400 staff, 3,300 or so
13 parents?
14     A.   Yes.
15     Q.   And if we go to the next slide, it
16 lists the schools where you conducted forums,
17 correct?
18     A.   Yes.
19     Q.   And the next slide lists the
20 department forums you were discussing?
21     A.   Yes.
22     Q.   And then the next slide lists the
23 community forums --
24     A.   Yes.
25     Q.   -- you conducted?

1          And then after receiving this
2 feedback from the community, you and the
3 committee drafted revisions to the code of
4 conduct, correct?
5     A.   Yes.
6     Q.   And then you presented to the
7 governing board regarding the proposed revisions
8 to the code of conduct?
9     A.   Yes.
10     Q.   And one of those meetings you
11 presented, that was on May 26, 2023?
12     A.   Yes.
13          MR. RICE:  Could we play Tab 39 --
14 or mark Tab 39 as Exhibit 25?
15          MR. CUTLER:  26.
16          MR. RICE:  26, sorry.
17          (Whereupon, Tucson-Warmbrand-26
18          was marked for identification.)
19          MR. RICE:  And Exhibit 26 is a video
20 clip from the March 26, 2023 board
21 meeting.
22          (Video clip played.)
23 BY MR. RICE:
24     Q.   And, Ms. Warmbrand, that was you
25 speaking in that video clip, correct?

1     A.   Oh, yes.
2     Q.   And in this clip you stated that
3 there were not enough voices who said cellphones
4 were the most important piece in part, and so
5 you didn't change the code of conduct, correct?
6     A.   Yes.
7          MR. RICE:  Let's mark as Exhibit 27
8 Tab 22.
9          (Whereupon, Tucson-Warmbrand-27
10          was marked for identification.)
11 BY MR. RICE:
12     Q.   And Exhibit 27 is a presentation of
13 the code of conduct revision process from the
14 spring of 2023.
15          And, Ms. Warmbrand, is this another
16 presentation that you prepared in connection
17 with the code of conduct revision process?
18          (Witness reviewing document.)
19     A.   Yes, but this is not to the board.
20     Q.   Who was the presentation to?
21     A.   It looks like it would be to SLT,
22 the superintendent's leadership team, if I'm
23 reading this correctly.  It's a lot.  I use the
24 same base deck for both SLT and for the board.
25     Q.   And regardless of whether it was the

Golkow Technologies,
A Veritext Division

Page 154

1  SLT or the board, the point would be to
2  summarize changes to the code of conduct,
3  correct?
4      A.   Yes.
5      Q.   And so then slide 11, I'm looking at
6  the one that's titled Community Forum Feedback:
7  Parents, this lists the feedback you received
8  from parents at community forums, correct?
9      A.   Yes.
10     Q.   And the slide does not list any
11  feedback you received from parents about social
12  media, correct?
13     A.   No.
14     Q.   And then if we go to the next slide,
15  this lists Community Forum Feedback: Students,
16  correct?
17     A.   Yes.
18     Q.   And this slide doesn't list any
19  feedback about social media you received from
20  students, correct?
21     A.   No.
22     Q.   And then if we go to the next slide,
23  this lists feedback from staff, correct?
24     A.   Yes.
25     Q.   And this slide doesn't list any

Page 155

1  feedback about social media from staff, correct?
2      A.   No.
3      Q.   Did TUSD revise the code of conduct
4  for the 2024 to 2025 school year?
5      A.   Not yet, but we're in the process.
6      Q.   And then -- let me make sure I
7  understand.
8          So we were just looking at the
9  community feedback in connection with the --
10  that was given in the spring of 2023, correct?
11     A.   Mm-hmm.
12     Q.   And then TUSD revised the code of
13  conduct for -- the 2024-2025 school year is
14  ongoing right now.
15     A.   We --
16     Q.   So did TUSD revise in connection --
17     A.   Yes, we do have a revised code of
18  conduct for this year.
19     Q.   For this year?
20     A.   We are in the process of revising
21  the code of conduct currently.  I'm always in
22  the process of revising the code of conduct.
23  It's ongoing and annual.
24     Q.   I understand.  It gets confusing
25  because the school year -- or at least gets

Page 156

1  confusing to me.
2      A.   Right.  It's not a January to
3  January.
4      Q.   So the 2024-2025 revision, which
5  would have been the last revision --
6      A.   Yes.
7      Q.   -- of the code of conduct, you're
8  familiar with those revisions?
9      A.   Yes.
10     Q.   And that was the version of the code
11  of conduct we were just looking at earlier --
12     A.   Yes.
13     Q.   -- that was marked as Exhibit 3, I
14  think?
15     A.   Yes.
16     Q.   Did any revisions in the code of
17  conduct for the 2024 to 2025 school year relate
18  to social media?
19     A.   The revisions themselves didn't, but
20  what we did add is the option for site
21  administrators to present an alternative plan,
22  and this was per discussions with ELI, our
23  administrator association, to provide an
24  alternative plan for regional approval to limit
25  cellphone use on campus.

Page 157

1          And it was primarily from our high
2  school folks, because as I stated previously,
3  our middle schools actually have rules about
4  when cellphones can be out.
5          And to give some context, when we
6  get feedback from our stakeholders, what the
7  board wants us to most focus on is what are
8  suspendable or the escalations of suspensions.
9  None of the stakeholders in this space felt that
10  there should be exclusion for just cellphone
11  use, but rather what the violation is of what
12  can occur and what's recorded in that space, not
13  the physicality of having it.
14         Not to say we wouldn't have a
15  violation in the code of conduct, that it is a
16  violation, but rather we look at out-of-school
17  suspension in minimizing that impact and those
18  numbers in that space.  And so that's important
19  to note when you look at a document of
20  stakeholder feedback.
21         And then, you know, secondly, part
22  of why you don't see a majority of stakeholders
23  speaking in that space is because our elementary
24  and middle schools have strict cellphone
25  policies that they run through their site

Page 158

1 councils already.
2        And so really the folks that you're
3 looking to to guide you in whether this is an
4 appropriate revision is going to be your high
5 school campuses, and there are some of our high
6 school campuses that did articulate cellphone
7 policies in this space that are stricter or
8 different than what is dictated in the code of
9 conduct.
10        Part of that level 2 violation does
11 state that the principal can make their own
12 rules for code of conduct use.  That's one of
13 those first bullet points there in the
14 violation.  And so it's no surprise that you're
15 going to see in these feedback, in these forums
16 and from all of our stakeholders, that this
17 isn't going to surface as something that we need
18 to do a revision because we already have
19 language within the code that allows the
20 principal to make additional rules in that space
21 so long as it clears the regional superintendent
22 and is articulated to parents and students at
23 the beginning of the school year.
24        And so if that's accomplished, and
25 every site is different, right, so they'll have

Page 159

1 different things that they're going to require
2 and different resources to limit cellphone use,
3 then that's what they'll do in the space.  And
4 some high schools choose not to and then some
5 do.
6        And so that's part of why you don't
7 see it, is we already have in code very specific
8 ownership for site administration, and so it's
9 already taken care of.  It doesn't need
10 according to stakeholder feedback its own set of
11 revisions because it's addressed -- I don't want
12 to say freedom of choice, but basically it's up
13 to the principal and their leadership team and
14 the regional to determine any other protocols.
15    Q.    But for the 2024-2025 school year,
16 there were no changes in the code of conduct
17 related to social media?
18        MR. CUTLER:  Object to form.  Asked
19    and answered.
20        Go ahead.
21        THE WITNESS:  Not to the specific
22    document, but there are site
23    administrators that choose to utilize the
24    part of the code of conduct that they can
25    enforce cellphone policy.

Page 160

1 BY MR. RICE:
2    Q.    And you stated that elementary
3 schools and middle schools have policies
4 regarding cellphone use, correct?
5    A.    Yeah, they stick primarily with what
6 is in the code of conduct which says cellphones
7 cannot be out during instructional time, and
8 they'll enforce those in that space, and they'll
9 have their own rules as the principal for when
10 they should and shouldn't be used.
11    Q.    But high school, there's no
12 districtwide policy concerning the use of
13 cellphones in high schools?
14    A.    There is.  It's the same policy,
15 except some principals don't choose to add any
16 additional steps to it, whereas some schools
17 have much stricter policies, locking cellphones
18 up, for example, and they purchase their own
19 locked cellphone cases and protocols.
20        So high schools differentiate more
21 than our elementary and middle.  Our middle
22 schools could do that as well if they wanted,
23 but they primarily do not have cellphones out
24 during the school day.
25    Q.    And so the administrators have

Page 161

1 choice over the policy that they have on their
2 campuses?
3    A.    They have to utilize the cellphone
4 policy as it's stated in the code of conduct,
5 but they can add to it if they'd like to.  And
6 typically that addition isn't more flexibility,
7 it's, rather, less flexibility in how students
8 can maneuver.
9    Q.    And then TUSD's currently
10 considering revisions to the code of conduct for
11 the 2025 to 2026 school year?
12    A.    Yes.
13    Q.    Have those changes been presented to
14 the board yet?
15    A.    No.
16    Q.    Are you considering any changes to
17 the code of conduct relating to social media?
18    A.    No, we are not looking at revisions
19 that specifically talk about social media.  It
20 would have to be its own violation, and
21 currently as practices work and how in general
22 communication as I spoke to earlier in the day
23 operates, social media platforms can exist
24 within any of our violations or none at all,
25 just depending on the particular incident,

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 depending on the investigation.
2         And so what that would require to
3 have social media as its own violation is really
4 putting in policy the whys of how things
5 happen, and typically that's not how this
6 particular code of conduct has operated,
7 although, you know, some districts may utilize
8 it differently.
9         That doesn't mean, though, when you
10 pull violations like in a particular spreadsheet
11 that the driving violation for exclusion is
12 typically what will be pulled and surfaced, but
13 that doesn't mean that there aren't secondary
14 violations that a site administrator will
15 attach.
16         So if there was potentially social
17 media, cellphones, or improper use of
18 technology, that may be a secondary violation.
19 Not every student is suspended, and they just
20 have one thing on their record. Oftentimes
21 you'll see more than one violation.
22         So having not created that
23 particular spreadsheet, that is something that
24 did come to mind, is that not every single one
25 of those that are labeled under Aggression means

Page 163

1 that the only violation they had was aggression.
2         I have trained my site
3 administrators that every violation a student
4 violates you should put down, but we suspend off
5 your highest offense.
6         Q.   So you're not currently considering
7 any revisions to the code of conduct
8 specifically directed at social media, correct?
9         MR. CUTLER: Object to form. Asked
10 and answered.
11         THE WITNESS: No.
12 BY MR. RICE:
13         Q.   On the disciplinary data from
14 Synergy, does the spreadsheet we were looking at
15 earlier, the Exhibit 4, does that count -- would
16 an incident potentially be counted as a
17 violation in more than one category?
18         A.   Yes.
19         Q.   So that spreadsheet could be double
20 or triple-counted if it was -- if one incident
21 fell into multiple categories like aggression
22 and also threat, for instance?
23         A.   Correct.
24         Q.   And to determine how many unique
25 incidents were there, what would you need to do?

Page 164

1         A.   The site administrator has to do an
2 investigation and collect their data, their
3 student statements. They need to talk to the
4 alleged offender, they need to talk to the
5 alleged victim, they need to talk to any
6 witnesses.
7         If the kids can handwrite
8 statements, that's great. If not, if they're
9 too young, then a site administrator will do
10 that for them.
11         If there is anything on student's
12 cellphone that would implicate anything having
13 to do with the investigation, they can ask for
14 the student to show it to them. We cannot take
15 their cellphone and open it up and look. A
16 parent or guardian can do so or a child can
17 offer it up freely, but we are limited in that
18 ability. That's their personal property.
19         And so law enforcement certainly
20 can, our school safety can engage in that space.
21 So if that's a part of it, then we're able to do
22 that. If there's grounds to search, we'll
23 search students. And if there's video camera or
24 video footage, then we can utilize that as well.
25         So anything that engages in the

Page 165

1 space for whatever the incident is is usable for
2 the investigation.
3         Q.   So if we look at the Synergy data,
4 the aggregate data number of violations --
5         A.   Yeah.
6         Q.   -- if we were trying to understand
7 how many unique incidents there were, for
8 instance, how many might call into the
9 categories of both aggression and threats, what
10 would we need to do to answer that question?
11         A.   You would have to take two violation
12 reports and generate them. So I can sort any
13 violation in the district by a lot of different
14 factors and produce a report.
15         And so you'd have to take, for
16 example, like you said, threats and intimidation
17 and run a violation report, and then you would
18 take, you know, bullying or harassment --
19 bullying, let's say, and you would run that
20 violation report, and that would get you your
21 total numbers. Or you can run full violations
22 and just sort it in Excel.
23         There's a lot of different ways to
24 break up the numbers. It just depends what
25 you're looking for specifically.

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1    Q.    But looking at Exhibits 4, 5, and 6,
2  the spreadsheets we looked at earlier -- we can
3  refer to them again if it would be helpful --
4  looking at those spreadsheets, we wouldn't be
5  able to answer that question; we'd need to run
6  additional reports from Synergy?
7        MR. CUTLER:  Object to form.
8        THE WITNESS:  That particular Excel
9      spreadsheet, because I didn't generate it,
10     I'm not sure exactly what the parameters
11     were set in that.  I mean, I saw it was
12     suspension by all of these, but it didn't
13     break it down into any specificity, so
14     that, like, there wasn't like a bar that
15     said these are also violations related to
16     the same incident number, you know,
17     because that's how you would be able to
18     state that.
19  BY MR. RICE:
20    Q.    Do you personally use social media?
21    A.    I do.
22    Q.    Which platforms?
23    A.    I use Facebook because I'm older.
24  Sorry to say, that's what my children tell me.
25        So I use Facebook.  Sometimes I use

Page 167

1  Snapchat.  YouTube occasionally.  That's all.
2    Q.    You don't have an Instagram account?
3    A.    I might have opened one many years
4  ago because my kids wanted me to, but I don't
5  use it often.  But I may have one.  Like, I
6  can't remember the last time I used Instagram.
7    Q.    Do you have a TikTok account?
8    A.    No.
9    Q.    What do you typically use YouTube
10  for?
11    A.    Band, marching band --
12    Q.    And how often --
13    A.    -- videos.
14    Q.    Go ahead.  Sorry.
15    A.    Marching band videos.
16    Q.    Just to watch marching band videos?
17    A.    Very much.
18    Q.    And how often do you use YouTube for
19  that?
20    A.    Oh, frequently now because we're
21  moving into DCI summer competition season.
22  That's Drum Corps International.
23    Q.    And what do you use Snapchat for?
24    A.    Snapchat because at one point in
25  time my children had Snapchat and my husband had

Page 168

1  Snapchat, and they wanted to be on Snap, to do
2  Snaps.
3    Q.    And so you used it to send Snaps
4  with your family?
5    A.    Yeah, yeah.  And I do know that,
6  like, all the contact -- contact -- like all my
7  contacts are added and stuff, but I just don't.
8  I see they're there, though.
9    Q.    And then what do you use Facebook
10  for?
11    A.    Oh, everything.  That's the
12  platform -- I'm the Facebook generation in terms
13  of that was our big thing that happened, and so
14  we -- you know, all of my friends, you know,
15  family, we're all on Facebook, we're Facebook
16  people.
17    Q.    And then you mentioned you have
18  children.  How many children do you have?
19    A.    I have three teenage sons.
20    Q.    How old are they?
21    A.    16, 13, and 13.  I have twins.
22    Q.    Do they have cellphones?
23    A.    Yes, they do.
24    Q.    All three of them have cellphones?
25    A.    Yes.

Page 169

1    Q.    Do they have smartphones?
2    A.    Yes.
3    Q.    When did they first get smartphones?
4    A.    My oldest got it during the
5  pandemic.  And the twins got it the year after,
6  so 2021 probably.
7    Q.    So your oldest son received a
8  smartphone when he was around 11?
9    A.    Mm-hmm.  He was in sixth grade.
10    Q.    Sixth grade.
11        And then your two younger sons
12  were --
13    A.    Fifth grade.
14    Q.    -- fifth grade.
15    A.    When they got it a couple years
16  later.
17    Q.    Have you ever input any screen time
18  limits on their phones?
19    A.    Oh, I 100 percent do.  We pay a
20  little extra every month so that we can limit
21  their screen time, and then we can also monitor
22  what social media apps they're on and we can see
23  what they're doing.  Yeah, absolutely.
24    Q.    So do you restrict the total amount
25  of time per day they can use their cellphones?

43 (Pages 166 - 169)

CONFIDENTIAL

1    A.   Yes.
2    Q.   And when did you first implement
3  those restrictions, when they got the phones, or
4  was it sometime after that?
5    A.   It was probably a year and a half
6  after that.
7    Q.   And then do you place any
8  restrictions on the times of day they can use
9  their phones?
10   A.   No for the twins because their
11 school has a cellphone policy in which they
12 cannot have their cellphones out.  Our oldest
13 son, their high school also does not allow them
14 out during instructional time.  So it hasn't
15 impacted that part because we do have strict
16 rules in that place in this district.  They're
17 kids in TUSD, so both of their sites have
18 specific cellphone policies.
19        But the restrictions are at home
20 because of the addictive nature of having
21 cellphones and having smartphones and the amount
22 of time that they were engaging in social media,
23 and that's the real fact of the matter.  They
24 were losing a lot of sleep, and we did see an
25 impact on their focus in school and their

1  ability to do homework in an appropriate time
2  frame.  And so we had to set those limits
3  because otherwise my teenagers would be on their
4  phones on their social media platforms all the
5  time.
6          And we can see which kid prescribes
7  to which platform most often, and we get that
8  report every night before I go to bed so I can
9  make any strategic choices, both my husband and
10 I, the next day.
11   Q.   And so you set limits on the amount
12 of time they can use their phones in the
13 evening?
14   A.   100 percent, yeah.
15   Q.   Do you limit the amount of time they
16 can spend on particular applications?
17   A.   Yeah.  One of my sons is -- I mean,
18 he will literally spend hours and hours on
19 TikTok if we let him, and he will not do the
20 dishes, and he will not do his homework, and he
21 will sit there on TikTok, and we can see the
22 time.
23        You know, these other social media
24 platforms, like he'll be on Insta, you know,
25 maybe 23 minutes.  You know, he'll look at

1  Reddit, he'll da-ta-da-ta-da, you know, in these
2  spaces, and then it will be like TikTok is like
3  an hour and 46 minutes.  And I'm, like, Dude,
4  why have you -- like, this is what we've been
5  doing while the rest of the household has been
6  functioning around you.
7          So, you know, as opposed to my
8  oldest son where it will be all music, right.
9  Like he's in music forums, and all of his social
10 media is all DCI related and his drum corp and
11 all this other -- you know, the chats, the
12 groups, the things of that nature, it's all
13 based on his passion and his love.
14        But with the twins, that is not
15 necessarily the case.  His twin brother will be
16 on Instagram.  I mean, we've gone two hours at a
17 time and it is definitely detrimental to their
18 evening time and their family time, and creates
19 tension in the household for sure.
20        I'm not the only parent.  You know,
21 it's all anecdotal from a parental perspective.
22 But parents who are like me who are tracking
23 these spaces, we all have limits on the devices.
24 We're all tracking what's happening.
25        A lot of my friends are in

1  healthcare or education, friends that are
2  doctors, some that are law enforcement, and so,
3  you know, we can see really clearly the impact
4  of cellphone use and social media.
5          And then also you want your child to
6  be able to get ahold of you if something happens
7  at school, and that's really -- you know, when
8  you ask, like, why parents don't want to limit
9  cellphones, well, what our parent groups say is,
10 If there's a lockdown or a shooter in school, I
11 want to be able to have direct contact with my
12 child, don't you dare take that cellphone away
13 from them.
14        And so you won't see that come into
15 revision, because as a parent I absolutely
16 understand when there have been lockdowns on my
17 son's campus, like, being able to text him, Are
18 you okay, where are you right now?  Even though
19 I know what the incident is because I work with
20 Joe Hallums, right, like I have that inside
21 knowledge, even still, knowing that he's safe is
22 really important.
23        And so, you know, that's another
24 context at stakeholder feedback.  It's not --
25 you don't want to take on parents who say, How

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 dare you limit access to my child. So this is
2 where the cultural dilemma of our country sits.
3 We want access to our children and we don't want
4 them to have access to everyone else in the
5 world.
6          And, you know, obviously I could
7 take all their social media away, but then
8 that's also how they communicate with their
9 friends. It's just, at least for my own
10 children, there's an addictive nature to it.
11          And just anecdotally from the other
12 parents, I mean, we talk about it all the time.
13 One of their friends just got his phone taken
14 away for three weeks because he couldn't stay
15 off of social media and his grades slipped. I'm
16 sure if you talked to parents they would have
17 many, many a story in that vein. I know I have.
18    Q.    And so each of your three sons uses
19 different apps on his phone?
20    A.    Yeah.
21    Q.    And do you restrict the types of
22 applications they can download?
23    A.    Because we're able to literally go
24 in and monitor their forums they're in, there
25 was a period of time where we were definitely

Page 175

1 thinking about restricting Reddit.
2          But they are in these political
3 forums. My sons are National Geography and
4 history bee champions. They compete in
5 Washington, the twins, and so they'll go toe to
6 toe with people that are older than them, right.
7 Typically you wouldn't want your kids in a space
8 in that way, but we can actually see their
9 communications and see in that space.
10          And there will be times where I'll
11 be like, No, I want you out of that forum, like
12 we're not doing that anymore, or, You're just
13 not going to see these applications any longer.
14          But because we do pay every month to
15 be able to see all of that in this very nice,
16 you know, screen time app, I feel more
17 comfortable in that space. And, you know --
18 but, yeah, that was the only one, only because
19 they have pretty sophisticated opinions and
20 Politico geopolitics knowledge that it's not
21 really -- they're not going to find any
22 challenge in sitting in spaces with other 12 and
23 13 year olds.
24          That's my mom flex for you all
25 today.

Page 176

1    Q.    So you don't restrict the types of
2 applications they can download right now?
3    A.    No. Oh, that's not true. We did --
4 for the one twin, my husband -- he's even
5 stricter than I am -- he actually did restrict
6 TikTok for a month. Yeah, he did. That was
7 about five-and-a-half months ago.
8    Q.    Are there any other applications
9 you've restricted them from downloading?
10    A.    No. TikTok is the one that he's
11 most engrossed in, so that was better.
12    Q.    And your son now uses TikTok again?
13    A.    He does. He understands that if we
14 see excessive use, you know, more than about 36,
15 37 minutes, then we're going to have a
16 conversation. And if that behavior continues
17 and starts to impact his sleep, his chores, his
18 grades again, then we'll just be taking that off
19 the table for him.
20    Q.    And your other two sons, do they use
21 TikTok right now?
22    A.    My oldest son was opposed to it for
23 a very, very long time, but now he does engage
24 in TikTok challenges, I will say, that are not
25 related to destroying things at his school, but

Page 177

1 like ice bucket challenges for charity and
2 things of that nature.
3    Q.    And the other twin son also uses
4 TikTok?
5    A.    Less so. Like if you see his
6 TikTok, it might be six minutes in the day, if
7 anything, and that will be his twin trying to
8 get him to log in to see something. But he's
9 fundamentally opposed. They have their opinions
10 about its origin and the use of it.
11    Q.    Do they currently use Snapchat?
12    A.    Snapchat apparently is out now. I'm
13 still on it, but they've left me behind. And so
14 now it's a lot of Insta. Instagram, Instagram,
15 Instagram.
16    Q.    Is that true for all three of your
17 sons, that they no longer use Snapchat?
18    A.    Yes.
19          And they have their own Insta
20 Stories that they communicate with themselves.
21 Like, they have their own world, the three of
22 them, so, yeah.
23    Q.    Do you know approximately when they
24 stopped using Snapchat? Let me ask another way.
25          Do they still have Snapchat

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1 accounts --
2    A.   Yes, they do.  Yes.
3    Q.   -- they don't use it regularly, as
4 often?
5    A.   Yeah, they didn't stop per se.
6    Q.   And you mentioned they all -- all
7 three of your sons use Instagram currently?
8    A.   Yeah.
9    Q.   And do all three of your sons use
10 YouTube currently?
11    A.   The twins don't access it so much.
12 I mean, they'll watch some YouTube videos about
13 geopolitics sometimes, but it's not as deep as
14 my oldest with marching bands.
15    Q.   Have you ever restricted the types
16 of content any of your children could view on
17 YouTube?
18    A.   Yeah, my husband put filters on.  I
19 can't remember what those were, but those aren't
20 the same in place anymore as they get older, and
21 not for my oldest son.  He's handling his
22 business pretty well.
23        So they know if you can handle your
24 business and maintain, you know, a healthy
25 balance of social media and real life, then you

Page 179

1 don't have to be restricted.  But if you can't,
2 then you for sure will.
3    Q.   And have any of your children ever
4 used YouTube for educational purposes or as part
5 of assigned homework?
6    A.   Yes, absolutely.  In their social
7 studies classes, I know in middle school they
8 utilized that.
9    Q.   Have you ever complained to anyone
10 at their school about using YouTube videos for
11 homework?
12    A.   Yeah, I have actually.  I think that
13 there's been a couple of instances in which the
14 content that the teachers were assigning out of
15 YouTube had not been vetted appropriately for
16 cultural sensitivities, and they -- I know they
17 didn't align with district mission and vision in
18 that space.
19        And so I did report to the principal
20 that teachers were using them in that regard,
21 yes.
22    Q.   And then have you put time
23 restrictions on the amount of time they could
24 use Snapchat or Instagram?
25    A.   Yes, on Insta, not on Snapchat,

Page 180

1 because they don't really use it so much
2 anymore.
3    Q.   And what's the name of the tool you
4 mentioned that you use to limit your children's
5 applications?
6    A.   It's literally called Screen Time.
7    Q.   And have you ever contacted any of
8 the defendants to ask them to modify any
9 features on their platforms?
10    A.   As a site administrator, yeah, I
11 have.  I did.  I refer to two instances that I
12 contacted, and in these cases it was Snapchat
13 both times, one with the young lady who law
14 enforcement believed someone was trying to sex
15 traffic her.  And then the second one was a case
16 where there was distribution of a young lady's
17 private parts amongst a group of male students
18 at my school.
19    Q.   And both of those were in connection
20 with reports of specific misconduct on Snapchat,
21 correct?
22    A.   Yes.
23    Q.   You never contacted someone at
24 Snapchat to ask them to change any feature on
25 their platform?

Page 181

1    A.   Had I gotten ahold of anyone, I
2 would have requested that they allow screenshots
3 and that pictures allow to be saved somewhere,
4 even if it wasn't accessible to school
5 administrators, but at least, you know, children
6 don't own their cellphones.  Like they'll say,
7 Miss, this is my cellphone.  And I'll say, No,
8 this is your parents' cellphone they let you use
9 during the day, right?
10        So I understand the limits a school
11 district has, I've been in this long enough.
12        But some adult who cares about a
13 child should be able to go into their account
14 and be able to see everything that's being
15 shared, they're their legal guardian, and then
16 if they choose to share that with law
17 enforcement, they can.
18        And so, you know, nothing worse than
19 sitting next to a dad who is literally in tears,
20 like, I can't believe everyone can see my
21 daughter's pictures, do you have them?  No,
22 they've disappeared.  But other kids have seen
23 them, but now they're gone.  I want to see
24 everything that these young men are seeing.
25        And we're on the phone and nobody

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 answers. But if they had, you know, not only
2 would I have appealed, but he would have
3 appealed. He was very upset, and the sheriff's
4 deputy had to come and sit with him in that
5 space.
6         Yes, we definitely had a list of
7 asks and recommendations, but again, we were not
8 able to get ahold of anyone.
9         And the second time when we called,
10 we were able to get ahold of people and my
11 associate shared his concerns that I just shared
12 with you all here, and all they were able to do
13 was provide the verification that law
14 enforcement had the correct user name for an
15 account, and that was all. And that was all.
16         And so at least in the instance of
17 the young lady being sex trafficked, my recourse
18 was to just simply stay with her for as long as
19 it took for her legal guardian to come and get
20 her, and assign staff day after day after day so
21 that the adult man could not come and pick her
22 up outside of campus.
23    Q.    And then other than Snapchat, have
24 you ever contacted TikTok, Instagram, or YouTube
25 to ask them to make any changes to their

Page 183

1 platforms?
2    A.    No, I have not.
3         MR. RICE: We can go off the record.
4         THE VIDEOGRAPHER: We are going off
5    record. The time is 2:28.
6         (Whereupon, a recess was taken.)
7         THE VIDEOGRAPHER: We're going back
8    on record. The time is 2:45.
9 BY MR. RICE:
10    Q.    Welcome back, Ms. Warmbrand.
11         Before the break we discussed two
12 incidents you referenced involving Snapchat.
13         Do you remember that?
14    A.    Yes.
15    Q.    So in the first instance you
16 discussed, you referred that there was a
17 distribution of child sexual abuse material for
18 a young woman at school, is that correct?
19    A.    It was content of her naked body
20 that her boyfriend had. That's separate from
21 the sex trafficking instance.
22    Q.    Correct.
23    A.    Yes.
24    Q.    So on the -- on the one we're
25 referring to the distribution of the nude

Page 184

1 content, do you recall the approximate dates and
2 school involved with that incident?
3    A.    It was at least two years ago,
4 probably in the beginning of my time back in
5 TUSD, '22, '23.
6    Q.    And for this other incident you
7 discussed that was relating to sex trafficking,
8 how did you learn about the incident of sex
9 trafficking?
10    A.    So that was when I was a site
11 administrator. I was a school principal then.
12    Q.    Oh, so that was --
13    A.    That was before -- that was when I
14 worked in Sunnyside.
15    Q.    Okay. So the incident relating to
16 trafficking was not -- was before your
17 involvement in TUSD?
18    A.    Correct.
19    Q.    Okay. And then on the -- and that
20 was in connection with the school in Sunnyside,
21 you were a principal --
22    A.    Yes.
23    Q.    -- back then?
24    A.    In fact, the incident involving the
25 young lady in the sexting, although I have

Page 185

1 managed those here in TUSD from this position,
2 but the one where we did make the phone call was
3 also when I was a school administrator, a school
4 principal --
5    Q.    And that was --
6    A.    -- in Sunnyside.
7    Q.    -- before you were at TUSD?
8    A.    Mm-hmm.
9    Q.    And in the incident you referred to
10 relating to sexting, so that was in the
11 beginning of your tenure as student relations
12 director at TUSD?
13    A.    No, that was my last year as a site
14 administrator in Sunnyside. I had to count back
15 four years. I thought it was three. It was
16 four.
17    Q.    Okay. So the incident involving
18 sexting was also at Sunnyside?
19    A.    Yes, Sunnyvale Intermediate.
20    Q.    Okay. And so both of the incidents
21 we were discussing were --
22    A.    In Sunnyside.
23    Q.    -- in Sunnyside, before you were
24 employed at TUSD?
25    A.    Correct.

47 (Pages 182 - 185)

Page 186

1    Q.   Okay.  Then when -- switching
2  topics, when students physically damage TUSD
3  property, does the district seek reimbursement
4  from parents?
5         MR. CUTLER:  Object to form.
6         THE WITNESS:  What you get -- and
7     I'll answer from a parent perspective, as
8     my son has lost his charger more than
9     once, one of the twins, you will get a
10    fine on your parent account for the amount
11    of what it is.
12  BY MR. RICE:
13    Q.   And when you say lose his charger,
14  you're referring to his TUSD-issued device?
15    A.   Correct, mm-hmm.  Yeah.  So anytime
16  a device is damaged or lost, parents are charged
17  $45, even though the damage could be more
18  extensive.  And $45 is definitely not going to
19  replace the computer, but we are fined each time
20  that happens.
21    Q.   And what about for damage to other
22  physical property at school?
23    A.   It depends on the amount.  We have
24  amounts that's stated in the code of conduct,
25  but I always direct site administrators, if

Page 187

1  they're concerned about reimbursement, to work
2  with Nicole Lowery in risk management.  She
3  manages all of that when it comes to school
4  property in assessing damage and working with
5  families.
6     Q.   So if a student vandalizes school
7  property, TUSD may seek reimbursement via the
8  parents' account?
9         MR. CUTLER:  Object to form.
10        THE WITNESS:  Yes, they may.
11  BY MR. RICE:
12    Q.   Okay.
13    A.   We do have that right to do so, yes.
14    Q.   And do you know how often TUSD does
15  so?
16        MR. CUTLER:  Object to form.
17        THE WITNESS:  No, that's not through
18    my department.
19  BY MR. RICE:
20    Q.   Would Ms. Lowery be the person who
21  would know that, or someone else?
22        MR. CUTLER:  Object to form.
23        THE WITNESS:  She would be the
24    person I'd refer parents to.  I don't know
25    exactly in that space.

Page 188

1  BY MR. RICE:
2     Q.   And for your -- the accounts that
3  parents have with TUSD, do you know what
4  percentage of the amounts that TUSD levies on
5  parents are ultimately recovered?
6     A.   I do not have that information, no.
7     Q.   And do you know whether any amounts
8  that TUSD recovers from parents for property
9  damage caused by students are included in TUSD's
10  damages model in this case?
11        MR. CUTLER:  Object to form.
12        THE WITNESS:  I don't know.  I don't
13    know.
14        MR. RICE:  Well, thank you for your
15    time today, Ms. Warmbrand.  Subject to any
16    communications --
17        MR. CUTLER:  Well, I was telling
18    her, You're not done.
19        THE WITNESS:  Oh, okay.  I was
20    like --
21        MR. CUTLER:  There might be some
22    others.
23        MR. RICE:  So I have no further
24    questions for you at this time, subject to
25    any follow-up questions from your counsel.

Page 189

1         I don't know if any of my colleagues
2  on the Zoom have questions.
3         THE VIDEOGRAPHER:  Counsel on Zoom,
4  any questions?
5         MR. MCMAHAN:  No.  McMahan.
6         MR. CUTLER:  No questions from me.
7         MS. PRASAD:  Nothing from YouTube or
8  Google as well.  Thank you.
9         THE VIDEOGRAPHER:  This concludes
10  today's deposition.  The time is 2:52.
11        Total time on the record used for
12  counsel for Snap is three hours and
13  46 minutes.
14        We're going off the record.
15        (Whereupon, the deposition was
16    concluded.)
17
18
19
20
21
22
23
24
25

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1     CERTIFICATE OF COURT REPORTER
2
3          I, MAUREEN O'CONNOR POLLARD,
4 Registered Diplomate Reporter, CSR No. 14449 for
5 the State of California, the officer before whom
6 the foregoing deposition was taken, do hereby
7 certify that the foregoing transcript is a true
8 and correct record of the testimony given; that
9 said testimony was taken by me stenographically
10 and thereafter reduced to typewriting under my
11 direction; and that I am neither counsel for,
12 related to, nor employed by any of the parties
13 to this case and have no interest, financial or
14 otherwise, in its outcome.
15          Dated this 13th day of May, 2025.
16
17 _____
18     MAUREEN O'CONNOR POLLARD
19     CSR No. 14449
20
21
22
23
24
25

Page 191

1     INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4 carefully and make any necessary corrections.
5 You should state the reason in the appropriate
6 space on the errata sheet for any corrections
7 that are made.
8          After doing so, please sign the
9 errata sheet and date it.  It will be attached
10 to your deposition.
11          It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you.  If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

Page 192

1          - - - - - -
          E R R A T A
2          - - - - - -
3 PAGE  LINE  CHANGE
4 ____  ____  _____
5     REASON: _____
6 ____  ____  _____
7     REASON: _____
8 ____  ____  _____
9     REASON: _____
10 ____  ____  _____
11     REASON: _____
12 ____  ____  _____
13     REASON: _____
14 ____  ____  _____
15     REASON: _____
16 ____  ____  _____
17     REASON: _____
18 ____  ____  _____
19     REASON: _____
20 ____  ____  _____
21     REASON: _____
22 ____  ____  _____
23
24
25

Page 193

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I, _____, do
    Hereby certify that I have read the foregoing
5 pages, and that the same is a correct
    transcription of the answers given by me to the
6 questions therein propounded, except for the
    corrections or changes in form or substance, if
7 any, noted in the attached Errata Sheet.
8
9 _____
    WITNESS NAME          DATE
10
11
12
13
14
15
16 Subscribed and sworn
    To before me this
17 _____ day of _____, 20_____.
18 My commission expires: _____
19
    _____
20 Notary Public
21
22
23
24
25

Golkow Technologies,
A Veritext Division
877-370-3377                                              www.veritext.com

CONFIDENTIAL

Page 194

1          LAWYER'S NOTES
2  PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25