**Exhibit 37**

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 145

1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

2

      *****************************
3                                     Case No.
       IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
4      ADDICTION/PERSONAL INJURY
       PRODUCTS LIABILITY LITIGATION
5                                     MDL No. 3047
       *****************************

6

       This Document Relates To:
7

       Tucson Unified School District
8      v. Meta Platforms Inc., et a
9      Case No. 4:24-cv-01382
10     *****************************
11

           CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
12

13

14        REMOTE  CONTINUED  VIDEOTAPED  DEPOSITION  OF
15                  HOLLY L. HAMMEL
16

17

18

                       June 24th, 2025
19                       12:30 p.m.
20

21

22

23

24     Reported By:
25     MAUREEN O. POLLARD, CA CSR #14449, RDR

CONFIDENTIAL

Page 146

1

2

3          Continued Videotaped Deposition of

4  HOLLY L. HAMMEL, held remotely, commencing at 12:30,

5  on the 24th of June, 2025, before Maureen O'Connor

6  Pollard, Registered Diplomate Reporter, Realtime

7  Systems Administrator, California CSR #14449.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 148

1 REMOTE APPEARANCES (Continued):

2

  ON BEHALF OF SNAP, INC.:

3

     MUNGER, TOLLES & OLSON

4    350 South Grand Avenue, 50th Floor

     Los Angeles, California 90071-3426

5    213-683-9516

     BY:  VICTORIA A. DEGTYAREVA, ESQ.

6      victoria.degtyareva@mto.com

     BY:  ROWLEY RICE, ESQ.

7      rowley.rice@mto.com

     BY:  JULIA KONSTANTNINOVSKY, ESQ.

8      julia.konstantninovsky@mto.com

9

10 ON BEHALF OF ALPHABET INC., GOOGLE LLC,

   and YOUTUBE, LLC:

11

     WILLIAMS & CONNOLLY LLP

12   630 Maine Avenue, S.W.

     Washington, DC 20024

13   202-434-5380

     BY:  CAMILA BAYLY, ESQ.

14

15 Also Present:

16 Videographer:  James Vonwiegen

17 Trial Tech:  Brian Fronzaglia

18

19

20

21

22

23

24

25

Page 147

1 REMOTE APPEARANCES:

2

  ON BEHALF OF THE PLAINTIFFS:

3

     WAGSTAFF & CARTMELL

4    4740 Grand Avenue, Suite 300

     Kansas City, Missouri 64112

5    816-701-1145

     BY:  AUSTIN BRANE, ESQ.

6      abrane@wcllp.com

7

8 ON BEHALF OF META PLATFORMS, INC. f/k/a FACEBOOK,

  INC.; FACEBOOK HOLDINGS, LLC; INSTAGRAM, LLC;

9 FACEBOOK PAYMENTS, INC.; FACEBOOK OPERATIONS, LLC;

  FACEBOOK TECHNOLOGIES, LLC; SICULUS, INC.; and MARK

10 ELLIOT ZUCKERBERG:

11   SHOOK, HARDY & BACON LLP

     2555 Grand Boulevard

12   Kansas City, Missouri 64108

     816-474-6550

13   BY:  DANA STRUEBY, ESQ.

       dstrueby@shb.com

14   BY:  COURTNEY C. BURRESS, ESQ.

       cburress@shb.com

15

16

  ON BEHALF OF DEFENDANTS TIKTOK, LTD.; TIKTOK, LLC;

17 TIKTOK INC.; BYTEDANCE LTD.; and BYTEDANCE INC.:

18   KING & SPALDING LLP

     50 California Street, Suite 3300

19   San Francisco, California 94111

     415-318-1205

20   BY:  ALESSANDRA M. GIVENS, ESQ.

       agivens@kslaw.com

21

22

23

24

25

Page 149

1          INDEX

2 EXAMINATION                    PAGE

3 HOLLY L. HAMMEL

4   BY MR. RICE                151

5   BY MS. STRUEBY                204

6   BY MR. BRANE                205

7

8

9          E X H I B I T S

10 NO.        DESCRIPTION            PAGE

11 Tucson-    May 13, 2025 Declaration of

   Hammel-17   Holly Hammel.................   154

12

   Tucson-    Plaintiff's Amended Answers

13 Hammel-18   to Defendants'

            Interrogatories to Tucson

14          Unified School District (Set

            3)...........................   159

15

16

17

18

19

20

21

22

23

24

25

2 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1         - - -
    DEPOSITION SUPPORT INDEX
2         - - -
3
    Direction to Witness Not to Answer
4  PAGE    LINE
    None.
5
6
7
8  Request for Production of Documents
    PAGE    LINE
9  None.
10
11
    Stipulations
12 PAGE    LINE
    None.
13
14
15 Questions Marked Highly Confidential
    PAGE    LINE
16 None.
17
18
19
20
21
22
23
24
25

Page 151

1           P R O C E E D I N G S
2
3           THE VIDEOGRAPHER:  We're now on the
4  record.  My name is James Vonwiegen.  I'm a
5  videographer for Golkow.
6           Today's date is June 24, 2025, and the
7  time is 12:30 p.m.
8           This is a continuation of Holly
9  Hammel's deposition in the matter of Social
10 Media, California MDL 3047.
11          The court reporter is Maureen Pollard,
12 and will now re-swear in the witness.
13               *   *   *
14 Whereupon,
15          HOLLY L. HAMMEL,
16 being first remotely duly sworn to testify to the
17 truth, the whole truth, and nothing but the truth,
18 was examined and testified further as follows:
19               EXAMINATION
20 BY MR. RICE:
21    Q.   Good afternoon, Ms. Hammel.
22    A.   Good afternoon.
23    Q.   Could you please restate your name for
24 the record?
25    A.   Sure.  Holly Hammel.

Page 152

1     Q.   And do you understand that you are
2  testifying under oath today?
3     A.   Yes.
4     Q.   Is there any reason you cannot give
5  truthful and accurate testimony today?
6     A.   No.
7     Q.   And you were deposed previously in this
8  litigation, correct?
9     A.   Correct.
10    Q.   And during your prior deposition you
11 gave truthful and accurate testimony, correct?
12    A.   Yes.
13    Q.   And you're currently employed as a
14 regional assistant superintendent at Tucson Unified
15 School District, correct?
16    A.   Correct.
17    Q.   And so you understand that if I say
18 "TUSD" or "the district," I'm referring to Tucson
19 Unified School District, correct?
20    A.   Yes, correct.
21    Q.   And you understand that if I say
22 "defendants' platforms," I'm referring to Facebook,
23 Instagram, TikTok, YouTube, and Snapchat?
24    A.   Yes.
25    Q.   And you understand that this deposition

Page 153

1  is occurring remotely right now via Zoom, correct?
2     A.   Correct.
3     Q.   Could you confirm before we go further
4  that the technology for you is working properly and
5  that you can see and hear me?
6     A.   Yes, I can see and hear you.
7     Q.   And could you confirm that you're alone
8  in the room where you're testifying?
9     A.   Yes, I'm completely alone.
10    Q.   And do you have any documents in front
11 of you?
12    A.   I have nothing in front of -- well, I
13 have -- I have no documents in front of me.
14    Q.   And you have nothing in front of you
15 other than your -- the computer device you're using
16 to -- for this deposition?
17    A.   And a pair of reading glasses.
18    Q.   Understood.
19         You understand that while we are on the
20 record during the deposition today you may not
21 communicate with anyone else, correct?
22    A.   Correct.
23    Q.   What did you do to prepare for the
24 deposition today, Ms. Hammel?
25    A.   I read over my declaration.  And I also

3 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1  met with our counsel.
2      Q.   Did you meet with anyone other than
3  counsel?
4      A.   No.
5      Q.   You didn't review any documents other
6  than the declaration you signed in this case?
7      A.   Yes.
8          MR. RICE:  Can we mark as Exhibit 17
9      Tab 1?  And Exhibit 17 will be Ms. Hammel's
10     May 13th declaration.
11         (Whereupon, Exhibit Tucson-Hammel-17
12         was marked for identification.)
13 BY MR. RICE:
14     Q.   And, Ms. Hammel, this is the
15 declaration you were just referring to that you
16 signed in this case, correct?
17     A.   Yes.
18     Q.   And you signed this declaration under
19 penalty of perjury?
20     A.   Yes.
21     Q.   Did you write the first draft of this
22 declaration?
23         MR. BRANE:  Counsel, I've got the
24     exhibit link, but nothing is showing up
25     there yet.  I want to make sure Ms. Hammel

Page 155

1      is able to download it and pull it up.
2          Ms. Hammel, for starters -- okay.  It's
3      there now.  There's a link in the chat,
4      Ms. Hammel, that says "Marked Exhibits
5      Folder."
6          THE WITNESS:  I'm looking at a screen
7      share, which is fine.  But I wonder if it
8      can be made a little larger, or would you
9      like me to go to the link?
10         MR. BRANE:  Whichever works for you,
11     yeah, if it's easier to pull up and scroll
12     through or look at the screen.
13         THE WITNESS:  Oh, whatever just
14     happened.
15         MR. BRANE:  If you change your mind, in
16     the chat there's a marked exhibits folder
17     link, and that will just take you to a
18     share file and you can open it up on your
19     computer if you prefer.
20         THE WITNESS:  Okay.  Thank you.
21         MR. BRANE:  Yep.
22 BY MR. RICE:
23     Q.   So going back to the question I asked,
24 Ms. Hammel, did you write the first draft of this
25 declaration?

Page 156

1      A.   What do you mean by "first draft"?
2      Q.   Did you begin with a blank page, or did
3  someone else write the initial draft of the
4  declaration for you?
5      A.   Got it.
6          There was an initial draft.
7      Q.   And was that authored by counsel?
8      A.   I believe so.
9      Q.   And by "counsel," I'm referring to
10 Mr. Brane or attorneys at his law firm at Wagstaff
11 Cartmell.
12         Is that who authored the first draft of
13 the declaration?
14     A.   I'm assuming so since it came from
15 them.  But I don't know who authored it.
16     Q.   But you received the declaration from
17 them?
18     A.   Yes.
19     Q.   And when did you see the first draft of
20 this declaration?
21     A.   I'm guessing probably April.
22     Q.   Did you make any edits to the
23 declaration?
24     A.   Oh, lots.  Many.
25     Q.   So which portions of the declaration

Page 157

1  did you write?
2      A.   Would you like me to go through all of
3  it?
4      Q.   Yeah.  If you just identify the
5  paragraphs that you -- you don't need to read them,
6  but if you just want to identify the paragraphs you
7  wrote large portions of or all of.
8      A.   Or edited?
9      Q.   Yeah.
10     A.   So, for example, in the first line I
11 believe I put in my name.
12         In the second line I filled out my
13 education and the years.
14         In the third line I filled out my years
15 of experience.
16         I filled out paragraph 4.
17         I filled out -- I believe I made
18 changes to paragraph 5.
19         I made changes to paragraph 6 and added
20 things there.
21         I believe I made changes to 7.
22         I believe I made changes to 8.
23         I believe I made changes to 9.
24         I definitely added and changed 10.
25         I don't remember if I edited or changed

4 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1 number 11.
2        I added to and changed paragraph 12.
3        I don't remember if I changed 13 at
4 all.
5        I added to 14 and edited.
6        I edited 15 and added.
7        Oh, I -- definitely I enhanced 16 and
8 added.
9        I don't recall if I added to 17.
10       I believe I added -- I can't remember
11 if I added to 18 or not.
12    Q.   Did you review any documents before
13 signing the declaration?
14    A.   Yes, we were -- yes.
15    Q.   Which documents did you review?
16    A.   I don't know the name of it.  It was a
17 document from our attorney.
18    Q.   What type of document was it?  Was it
19 an e-mail, a Word document, an Excel spreadsheet?
20    A.   It was an e-mail.  And I don't know
21 what type of document it was.  I would -- it was
22 like a Word document.  It wasn't Excel.
23    Q.   What type of information was included
24 in the -- the document you reviewed?
25    A.   I don't remember it that well.

Page 159

1    Q.   Is there any part of the declaration
2 you can identify that you relied on that document
3 for in drafting the declaration?
4    A.   Yes.  There -- oh, there was a part --
5 at the end of the document there was an attachment
6 that had suggestions about time.  And I remember not
7 agreeing with those, and so I changed that, I
8 believe, in my document towards the end, the
9 paragraph that gave percentages.
10    Q.   And then other than that one document,
11 were there any other documents that you reviewed in
12 drafting the declaration?
13    A.   No.
14       MR. RICE:  Let's mark as Exhibit 18
15    Tab 3.
16       (Whereupon, Exhibit Tucson-Hammel-18
17       was marked for identification.)
18       MR. RICE:  And, Mr. Fronzaglia, if you
19    could just flip through this document for
20    Ms. Hammel.
21       And, Mr. Fronzaglia, if you can flip to
22    the very -- towards the back of the
23    document, there's a chart labeled
24    Exhibit 1.  And if you could, thank you,
25    zoom in on the second page, the next page

Page 160

1    of Exhibit 1.
2 BY MR. RICE:
3    Q.   Ms. Hammel, is this the document you
4 were just referring to with the percentages that you
5 disagreed with?
6    A.   No, but this does look familiar a bit.
7    Q.   The document that you reviewed for the
8 draft of your declaration with the percentages, that
9 was a document created by counsel?
10    A.   I don't know.  I believe so.  It came
11 from them.
12    Q.   It didn't appear to be a document
13 created by TUSD to you, correct?
14    A.   Correct.
15       MR. RICE:  Mr. Fronzaglia, can you go
16    back to Exhibit 17?
17    Q.   And then, Ms. Hammel, other than
18 counsel, did anyone else review this declaration
19 that you're aware of?
20    A.   I don't know.
21    Q.   You're not aware of anyone else
22 reviewing the declaration?
23    A.   No.
24    Q.   You didn't ask anyone else to review it
25 for you, for instance?

Page 161

1    A.   No.
2    Q.   And, then, did you do anything else to
3 confirm the accuracy of the information in this
4 declaration before you signed it?
5    A.   Confirm the accuracy?  I had a
6 conversation with a colleague.
7    Q.   Who was that colleague?
8    A.   Richard Sanchez.
9    Q.   And why did you speak to Mr. Sanchez?
10    A.   Because Richard Sanchez was a middle
11 school principal for us, and when I saw the ranges
12 of time that administrators were spending on social
13 media, I had my own hypothesis that it was probably
14 higher in middle schools, and I wanted to run that
15 by him and see what he thought.
16    Q.   And what was Mr. Sanchez's response?
17    A.   He seemed to agree.
18    Q.   And did Mr. Sanchez consult any
19 documents in responding to you, or did he rely
20 purely on his own recollection?
21    A.   No, it was just -- it was a casual
22 conversation.  There weren't any documents.
23    Q.   And you relied on your conversation
24 with Mr. Sanchez in creating your estimates of the
25 time spent by middle school site administrators?

5 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1    A.   Oh, no.  No.
2        Q.   How did that conversation factor into
3  your declaration?
4        A.   Well, again, I -- I spoke to Richard
5  just to test my own hypothesis.  I really think that
6  middle school was higher because of the unique needs
7  of middle school students, and from my own
8  experience in working with the middle schools that I
9  oversee.
10       Q.   Other than the percentage of time
11 related to middle school site administrators, did
12 you and Mr. Sanchez discuss any other subjects?
13       A.   No.
14       Q.   Did you discuss this declaration with
15 anyone other than Mr. Sanchez and counsel?
16       A.   I don't believe so.
17       Q.   And did you discuss this declaration
18 with Brian Lambert?
19       A.   I don't believe so.
20       Q.   And other than the steps we discussed,
21 did you do anything else to confirm the accuracy of
22 the information in this declaration before signing
23 it?
24       A.   No, I didn't confirm the accuracy.
25 I -- this declaration is based on my own

Page 163

1  experiences.
2        Q.   So you didn't take any steps to
3  independently confirm the statements you made in
4  this declaration?
5        A.   No.
6            MR. BRANE:  Object to form.
7            THE WITNESS:  Sorry.
8  BY MR. RICE:
9        Q.   So let's go to page 3, paragraph 15.
10           In paragraph 13 -- excuse me,
11 paragraph 15, you refer to site administrators.
12           Which positions are included in the
13 term "site administrators" as you use that term in
14 your declaration?
15       A.   That term there refers solely to the
16 elementary school principal.
17       Q.   And for middle school site
18 administrators, does that refer solely to middle
19 school principals?
20       A.   No.  That -- in my mind, that was
21 middle school principals and assistant principals.
22       Q.   And then for high school site
23 administrators, what does that term encompass?
24       A.   That encompasses the principal and the
25 assistant principal team.

Page 164

1        Q.   Are there assistant principals in
2  elementary schools in Tucson?
3        A.   Not in my region.
4        Q.   But there are in other regions in TUSD?
5        A.   Yes.
6        Q.   In paragraph 15 you refer to several
7  percentages from 2018 to the present for site
8  administrators, correct?
9        A.   Yes.
10       Q.   What do you understand those
11 percentages to refer to?
12       A.   I put those percentages as time that
13 was spent on ramifications of social media that
14 principals and assistant principals have to deal
15 with as a result of a social media type incident or
16 issue.
17       Q.   So, for instance, when you say that
18 20 percent of a high school site administrator's
19 time in 2018 was spent on the ramifications of
20 social media, what types of activities does that
21 include?
22       A.   Oh, that would include anything from a
23 TikTok challenge, to a student texting another
24 student to fight, to a parent bringing in a string
25 of texts going, Look, so and so is threatening my

Page 165

1  child.  Anything that the school had to deal with
2  that really took them away from what their jobs are.
3            That also includes all of the follow-up
4  that goes along with discipline, the investigation,
5  if there needs to be a needs assessment.
6            It's pretty comprehensive when those
7  issues arise.
8        Q.   Does that same answer apply to the
9  types of activities spent by middle school and
10 elementary school administrators?
11       A.   No.  I would -- yes and no.  I would
12 make a distinction.
13           I think those same type of activities
14 definitely apply to middle school, especially TikTok
15 challenges, fights, you know, threats that are sent
16 over a platform.
17           For elementary, I think that's very
18 different, at least just because of the less number
19 of kids having cellphones at the elementary level.
20 But it's the same ramification, when the parent
21 comes in to show what's been posted about their
22 child it still requires an investigation and a
23 response.  But the sheer volume, I believe, is less
24 at elementary.
25       Q.   When you say these percentages include

6 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1 time spent relating to the ramifications of social
2 media, what does the term "social media" include as
3 you used it in this declaration?
4      A.   It includes, honestly, everyone you
5 represent.
6      Q.   Does it include Reddit?
7      A.   I'm sorry.  Can -- will you repeat it?
8      Q.   Does it include Reddit?
9      A.   Oh, you said Reddit?
10      Q.   Yes.
11      A.   I thought you said a threat.  I'm
12 sorry.
13           Does it include Reddit?  No, I don't
14 believe so.
15      Q.   So which platforms would it include?
16           MR. BRANE:  Objection to form.
17           THE WITNESS:  I'm sorry?
18           MR. BRANE:  You can go ahead.  I was
19       just objecting.
20           THE WITNESS:  Oh, okay.  TikTok,
21       YouTube, Google, Snapchat, Instagram.
22 BY MR. RICE:
23      Q.   Other than those platforms, do the
24 estimates provided in paragraph 15 include issues
25 related to ramifications of any other platform

Page 167

1 usage?
2      A.   I don't know.  If -- for example, we
3 had a rash of school threats that were posted.
4 Although I can see that post in my mind, I can't
5 tell you what platform that was on.
6           I will tell you that those TikTokers
7 kept us very busy with their TikTok challenges in
8 the schools, especially for middle school.
9      Q.   Before this litigation had you ever
10 attempted to estimate the percentage of time that
11 TUSD site administrators spent on issues relating to
12 the ramifications of social media?
13      A.   No, I never estimated it.  But I was
14 frustrated of the time that it took.  When it
15 happened, it was just so pervasive.
16           But, no, I never categorized it.  That
17 would be difficult.
18      Q.   Do you know of anyone else at TUSD who
19 did that?
20      A.   No, not that I'm aware of.  I don't
21 know.
22      Q.   For the percentages listed in
23 paragraph 15, is it correct that counsel suggested
24 certain percentages and then you revised the
25 percentages listed in your declaration?

Page 168

1           MR. BRANE:  Object to form.
2           You can answer.
3 BY MR. RICE:
4      Q.   You can answer, Ms. Hammel.
5           MR. BRANE:  You can answer it.  Other
6       than if it would reveal the contents of a
7       conversation or a communication you had
8       with counsel, Ms. Hammel, you can answer.
9           THE WITNESS:  I'm sorry, can you just
10       repeat that?  I'm sorry.
11 BY MR. RICE:
12      Q.   Sure.
13           For the percentages that are listed in
14 paragraph 15, is it correct that counsel suggested
15 certain percentages, and then you revised the
16 percentages that are listed in your declaration?
17           MR. BRANE:  Object to form.
18           You can answer yes or no, Ms. Hammel.
19           THE WITNESS:  Yes.
20 BY MR. RICE:
21      Q.   And you didn't consult any documents,
22 other than a document provided by counsel, when you
23 estimate these percentages, correct?
24      A.   Correct.
25      Q.   And you didn't consult with anyone else

Page 169

1 other than Mr. Sanchez, correct?
2           MR. BRANE:  Object to form.
3 BY MR. RICE:
4      Q.   You can answer, Ms. Hammel.
5      A.   Okay.  I'm sorry.  I'm not --
6      Q.   Go ahead.
7      A.   -- really sure what you guys --
8      Q.   It's okay.  It's not a natural
9 conversation.
10           MR. BRANE:  It's harder on Zoom.
11           THE WITNESS:  Okay.  I would like to
12       clarify.
13           My conversation with Mr. Sanchez was
14       about my own hypothesis that middle school
15       should be higher and why.  The percentages
16       here are completely my own based on my own
17       experience.
18 BY MR. RICE:
19      Q.   Thank you for that clarification.
20           So you didn't consult with anyone else,
21 then, other than counsel, in determining these
22 percentages, correct?
23      A.   To be honest, I didn't consult with
24 counsel.  I saw their document, and I made my own
25 decision.

7 (Pages 166 - 169)

CONFIDENTIAL

Page 170
1    Q.   And you didn't consult with anyone else
2 at TUSD in determining the percentages here?
3    A.   No, I did not.
4    Q.   Did you conduct any interviews of TUSD
5 staff related to those percentages?
6        MR. BRANE:  Object to form.  Asked and
7    answered.
8        You can answer, Ms. Hammel, unless I
9    tell you otherwise.
10       THE WITNESS:  All right.  I will moving
11   forward.  I'm sorry.  I apologize.
12       MR. BRANE:  No, that's okay.
13       THE WITNESS:  Mr. Rice, I'm sorry,
14   would you repeat that one more time?
15 BY MR. RICE:
16   Q.   You didn't interview any TUSD staff
17 about the percentages listed in paragraph 15, right?
18   A.   Interview staff?  No.  I went with my
19 own experience of talking with principals.
20   Q.   And you didn't conduct any surveys
21 relating to the percentages listed in paragraph 15,
22 correct?
23   A.   Correct.
24   Q.   Did you create any documents in making
25 the estimates in paragraph 15?

Page 171
1    A.   No.
2    Q.   Other than what we discussed, did you
3 use any other method to determine the percentages in
4 paragraph 15?
5    A.   Oh, well, the method I used we haven't
6 even talked about.
7        The method I used was that in my
8 experience -- I've been doing this for a very long
9 time, and I talk to my principals consistently.
10 When there's major issues that come up, I'm always
11 aware.
12       So this is truly based on my experience
13 with dealing with the fallout and the repercussions
14 of when there's incidents at my schools.
15   Q.   And when you say your "experience,"
16 you're referring to your memory over the time you've
17 been at TUSD, correct?
18   A.   No.  I am referring to my role as a
19 regional assistant superintendent and my
20 interactions with principals.  So in that way, yes,
21 I would agree that that's my memory.
22       But what it's based on is my experience
23 of doing this for many years now and seeing the
24 change over time, how the conversations have
25 shifted, how there's more involvement.  So that --

Page 172
1 that's what I use to do my percentages.
2    Q.   So how did you determine the change in
3 percentages between 2018, 2020, and 2025?
4    A.   Oh, great question.
5        From my experience -- one sec here.
6        From my experience and my -- I believe
7 my numbers support this, for the most part, I saw
8 stability in '18 through '20.
9        And you've got to remember when we say
10 2020, for educators we're not talking about
11 January 2020.  Our school year starts in August.  So
12 I'm going from August 2020 forward, right.
13       Then the pandemic hits.  So my
14 percentages show that it was really exacerbated over
15 the pandemic.  The kids learned how to use those
16 cellphones in a more insightful way.  And so then
17 when they returned to campus, that's where we really
18 saw the increase.  And it took a lot of work to try
19 and reset that.
20       So my answers reflect that things were
21 mostly stable, right, from '18 to '20 I believe the
22 percentages are the same.  And then what I'm saying
23 is from my experience, I saw an increase post 2020.
24   Q.   So how did you -- for instance, in
25 2018, you estimated that the percentage of time was,

Page 173
1 for elementary school site administrators, 1
2 percent, right?
3    A.   Yes.  That's what I put.
4    Q.   And then in 2020 you estimated it
5 changed to 2 percent.
6        How did you estimate that change?
7    A.   Just that there were higher principals
8 reporting that parents were coming in with concerns
9 that they were finding on the cellphone or that
10 their children had brought to them.
11       Again, still much smaller for
12 elementary.  But there is definitely, in my opinion,
13 more instances that had to be dealt with and
14 principals saying, I haven't dealt with this before
15 and now I am, for example.
16   Q.   How many reports were there in 2018?
17   A.   I don't know.
18   Q.   How many reports were there in 2020?
19   A.   I don't have the exact number.
20   Q.   And then, you know, for the year 2018,
21 you estimated that 10 percent of the time for middle
22 school site administrators was spent on the
23 ramifications of social media.
24       How did you estimate it was 10 percent
25 and not 8 percent or 12 percent?

8 (Pages 170 - 173)

CONFIDENTIAL

Page 174
1    A.   I looked at it more.  What I wanted to
2 reflect was that it was larger at the high schools,
3 smaller at the middle, and even less so at the
4 elementary.  So I used a scale that would show that.
5 That was my thought process in this.
6        So, for example, 20 percent of an
7 eight-hour day, two hours, right; 10 percent of
8 that, an hour.  I thought that was accurate.
9    Q.   But sitting here today, are you able to
10 say that it -- with certainty that it was 10 percent
11 and not 8 or 9 percent for middle school site
12 administrators in 2018?
13       MR. BRANE:  Object to form.
14       THE WITNESS:  No.  That's why as we
15    drill down, I'm more comfortable with the
16    ranges that were given.  And, again, those
17    are estimates, the solid numbers.
18 BY MR. RICE:
19    Q.   What range are you referring to?
20    A.   The one cited for 2025.
21    Q.   But for 2018 and 2020 you didn't
22 provide any ranges, correct?
23    A.   Correct.
24    Q.   And for those you picked a specific
25 number, correct?

Page 175
1    A.   Mm-hmm.  Again, one that would show a
2 scope.
3    Q.   But you didn't review any -- any
4 documents or numbers of reports when estimating
5 those percentages, correct?
6    A.   Correct.
7       MR. BRANE:  Object to form.  Asked and
8    answered.
9       THE WITNESS:  That's correct.  I relied
10    on my experience and conversations with
11    principals.
12 BY MR. RICE:
13    Q.   And how did you determine -- let's
14 focus on 2020 now.
15       How did you determine the percentage
16 for high school site administrators in 2020 was
17 20 percent and not 15 percent or 25 percent?
18       MR. BRANE:  Object to form.
19       THE WITNESS:  Again, I thought that was
20    a fair, accurate portrayal of the time that
21    was spent.
22 BY MR. RICE:
23    Q.   Based on what?
24       MR. BRANE:  Object to form.  Asked and
25    answered.

Page 176
1       THE WITNESS:  Based on the
2    conversations with them with discipline
3    issues that were coming out of social
4    media.
5 BY MR. RICE:
6    Q.   Is it possible that, in your mind, the
7 number could be 18 or 19 percent instead of
8 20 percent?
9    A.   That is possible.
10       Again, I also -- in my mind, if I'm
11 looking at a high school, my largest high school has
12 one principal and three assistant principals, so two
13 hours a day becomes four, to me, is a substantial
14 number.
15       And, again, with an elementary site
16 where there's only one principal and less, maybe,
17 volume with that, it still takes their time, but not
18 to the degree.
19    Q.   How many conversations with high school
20 site administrators did you have in 2020?
21       MR. BRANE:  Object to form.
22       THE WITNESS:  I don't know.  I talk to
23    them continually.
24 BY MR. RICE:
25    Q.   So that number is not tracked, correct?

Page 177
1    A.   Correct.
2    Q.   How many conversations about social
3 media did you have with high school site
4 administrators in 2020?
5       MR. BRANE:  Object to form.
6       THE WITNESS:  I don't know.
7 BY MR. RICE:
8    Q.   And that's not tracked, correct?
9    A.   Correct.
10    Q.   How many incidents relating to social
11 media did site administrators bring to your
12 attention in 2020?
13    A.   I don't know.
14    Q.   And that's not tracked anywhere,
15 correct?
16    A.   Correct.
17    Q.   And did you review any time logs for
18 site administrators relating to the time spent on
19 social media?
20       MR. BRANE:  Object to form.
21       THE WITNESS:  We don't have time logs
22    in schools.
23 BY MR. RICE:
24    Q.   And that's true for all of the site
25 administrators, correct?

9 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1    A.    Correct.
2    Q.    And did you interview any site
3  administrators about the amount of time they spent
4  on issues related to defendants' platforms?
5        MR. BRANE:  Object to form.  Asked and
6    answered.
7        THE WITNESS:  No.  I did not formally
8    interview anyone.  Again, it's an ongoing
9    conversation, call.
10  BY MR. RICE:
11    Q.    Other than conversations, did you do
12  anything else to determine the percentage of time
13  spent by high school site administrators?
14        MR. BRANE:  Object to form.
15        THE WITNESS:  No.  I -- that was truly
16    my own best estimate based on conversations
17    over the years and seeing an increase
18    moving forward from 2020 to '25.
19  BY MR. RICE:
20    Q.    But you weren't able to review any
21  numbers of conversations with site administrators
22  over that time period, correct?
23        MR. BRANE:  Object to form.
24        THE WITNESS:  There are no numbers to
25    review in that situation.

Page 179

1  BY MR. RICE:
2    Q.    And then for middle school site
3  administrators, did you do anything else to
4  determine the percentage of time they spend on
5  issues relating to ramifications of social media?
6        MR. BRANE:  Object to form.
7        THE WITNESS:  No.  As I -- as I've
8    said, all of my numbers are based on my
9    experiences working with principals.
10  BY MR. RICE:
11    Q.    And then for elementary school site
12  administrators, did do you anything else to
13  determine the percentage of time they spend on
14  issues relating to the ramifications of social
15  media?
16        MR. BRANE:  Object to form.
17        THE WITNESS:  No.  Same answer, based
18    on conversations and experiences.  But I
19    did recognize that it seemed to be
20    increasing for elementary, which is why my
21    numbers were adjusted there.
22  BY MR. RICE:
23    Q.    And then for paragraph 15, you didn't
24  estimate the percentage of time that TUSD site
25  administrators spend on issues relating to use of

Page 180

1  specific social media platforms, correct?
2    A.    That's correct.
3    Q.    Let's --
4        MR. RICE:  Mr. Fronzaglia, can you pull
5    back up Exhibit 18?
6    Q.    Now, Ms. Hammel, do you recall looking
7  at this document in your prior deposition?
8        MR. RICE:  Mr. Fronzaglia, if we can
9    turn to the chart that's in Exhibit 1, but
10    do it slowly so Ms. Hammel can look at it
11    as we go through.
12    A.    Mr. Rice, would you repeat your
13  question?  Was it, is this the document I saw in my
14  deposition?
15    Q.    It is.
16        I was asking, do you recall looking at
17  this document in your deposition?
18    A.    Honestly, I don't recall.
19    Q.    And do you recall testifying that you
20  reviewed this document before your deposition?
21    A.    Yes.
22    Q.    Okay.  And at your prior deposition you
23  testified that you did not know how the weight
24  percentages in the weight column were calculated,
25  correct?

Page 181

1        MR. BRANE:  Counsel, we're not going to
2    go back through this exhibit.  I would
3    object to those questions and stop it.  We
4    are not going back.  I mean, you literally
5    asked, do you recall in your past
6    deposition.  This deposition is limited to
7    the declaration and that's it.
8        MR. RICE:  I think this
9    interrogatory -- response to interrogatory
10    number 5 clearly bears on the credibility
11    of Ms. Hammel's affidavit, Counsel.
12        MR. BRANE:  It's not referenced in the
13    declaration, so we're not going back
14    through it.
15        MR. RICE:  Both the declaration and the
16    interrogatory responses reference the
17    percentages assigned to certain site
18    administrators for certain school years.
19        MR. BRANE:  Okay.
20        MR. RICE:  And so I think it bears
21    on -- her answers in her prior deposition
22    with respect to this exhibit bear on the
23    credibility of her affidavit.
24        MR. BRANE:  I disagree.
25        Do you have a few questions, or are you

10 (Pages 178 - 181)

CONFIDENTIAL

Page 182
1    planning on really going back through this,
2    repeating what you did before?
3        MR. RICE:  We can take it down and go
4    back to the -- we can take it back and go
5    back to paragraph 15.
6        Thank you, Mr. Fronzaglia.
7    Q.    So, Ms. Hammel, in your declaration
8 here you estimate that 10 percent of a middle school
9 site administrator's time is spent on issues
10 relating to ramifications of social media, correct?
11    A.    Correct.
12    Q.    If someone estimated that the time
13 spent in 2018 was 12.5 percent for middle school
14 principals, would that be inaccurate?
15    A.    If someone else said it was 12 percent?
16    Q.    Yeah.
17    A.    I don't know.  I -- this is my
18 declaration based on my experience and what I
19 thought was accurate.  I don't --
20    Q.    If someone --
21    A.    -- know what someone else would do.
22    Q.    Do you believe 12.5 percent is
23 accurate?
24        MR. BRANE:  Object to form.
25        THE WITNESS:  I believe what I put in

Page 183
1    my declaration.
2 BY MR. RICE:
3    Q.    Which was 10 percent, not 12.5 percent,
4 correct?
5    A.    Correct.
6    Q.    And similarly -- sorry.  Go ahead.
7    A.    I just wanted to say it was 2018.
8    Q.    So, similarly, if in 2020 someone
9 estimated that the time spent by elementary school
10 principals on social media-related issues was
11 3.5 percent, do you think that would be accurate?
12    A.    I don't know what someone else would be
13 basing that on or their experience.  It may be
14 accurate for them.
15        For me, these were my numbers.
16    Q.    And you selected 2 percent, not
17 3.5 percent, correct?
18    A.    Correct.
19    Q.    In your experience, would 3.5 percent
20 be inaccurate?
21        MR. BRANE:  Object to form.  It's the
22    same question you just asked.
23        THE WITNESS:  I truly am not
24    comfortable speaking to anyone else's
25    experience.

Page 184
1        We are a huge district, 80-some
2    schools.  I have 17 of those.  So this is
3    based on my experience with my 17 schools.
4 BY MR. RICE:
5    Q.    So in paragraph 18 of the declaration
6 you state that you believe your experience is
7 representative of what other regional
8 superintendents see in your region, correct?
9    A.    Correct.
10    Q.    And in 2018, elementary school site
11 administrators, according to your declaration, spent
12 1 percent of their time on the ramifications from
13 issues related to social media, correct?
14    A.    I believe that's what it said.
15    Q.    Are you aware that another regional
16 super -- assistant superintendent estimated that the
17 number was 3 percent during that same timeframe?
18    A.    I'm not aware of that, no.
19    Q.    Do you believe that 3 percent estimate
20 is inaccurate?
21        MR. BRANE:  Object to form.
22        THE WITNESS:  It may be for them.
23        In going back to the 18 that you just
24    showed me, it talks about experiences.  So
25    when the regionals are talking, saying,

Page 185
1    Hey, are you getting hit with a wave of
2    social media threats right now, that's the
3    calibrated experience that I refer to
4    in 18.
5        I'm not talking about numbers.  I'm
6    talking about a collective experience with
7    how are we going to manage and address
8    these situations that are being created.
9 BY MR. RICE:
10    Q.    So your estimates are limited to your
11 17 schools then, correct?
12    A.    Absolutely.  Yes.
13    Q.    And they can't be generalized, then, to
14 all TUSD, correct?
15    A.    I don't know that.  I can only speak
16 for mine.
17        We -- every regional has a -- I don't
18 know how to explain this.  For example, there's a
19 regional who has more K-8 schools, a ton of them.  I
20 have one, right.  So different ages bring different
21 issues.
22        So I -- in my declaration here for 15,
23 I'm just talking about me, my own experience in my
24 region with my principals.
25        When I say it's representative, what I

11 (Pages 182 - 185)

CONFIDENTIAL

Page 186
1 mean is we are all dealing with the same type of
2 issues. I'm not referring to numbers.
3    Q.   Let's turn to the first page of your
4 declaration, then, and look at paragraph 6.
5    A.   Okay.
6    Q.   Now --
7       MR. RICE:  Mr. Fronzaglia, can you zoom
8  in? Thank you.
9    Q.   In this paragraph you refer to the
10 issues students face, correct?
11    A.   Give me one moment.
12       Could you repeat that?
13    Q.   Sure.
14    A.   Did you say student --
15    Q.   In the second sentence of paragraph 6,
16 you refer to issues that students in TUSD in your
17 region are dealing with, correct?
18    A.   What's -- what sentence are you
19 referring to?
20    Q.   The second sentence of the declaration,
21 Ms. Hammel.
22    A.   "Accordingly, a substantial amount"?
23 I'm sorry. I'm sorry. Thank you for whoever is
24 highlighting.
25       Okay. Would you repeat that one more

Page 187
1 time? I'm with you now.
2    Q.   Sure.
3       So you see that sentence in front of
4 you?
5    A.   Yes. Now I do. Sorry.
6    Q.   In your role as assistant
7 superintendent, you don't work with students
8 directly, correct?
9    A.   On occasion I do, actually. But for
10 the most part, no.
11    Q.   Do you track the issues that students
12 in your region face?
13       MR. BRANE:  Object to form.
14       THE WITNESS:  No.
15 BY MR. RICE:
16    Q.   This sentence refers to "substantial
17 issues that students in my region's schools are
18 dealing with."
19       What are those substantial issues?
20    A.   The substantial issues are -- there's
21 many. It's the fighting. It's the bullying over
22 social media. It's the arranging of fights or
23 ganging up on a person. It's drugs and arranging
24 for that. It's threats. It's school threats, not
25 only just from one student to another, but what

Page 188
1 they're going to do to the school. It's threats
2 that really feed on parents' fears, you know, Don't
3 come to school Friday, at 1:00 p.m. I'm going to --
4 so, to me, it's the umbrella of that, including the
5 challenges that the kids embrace and then try to
6 carry out at school.
7    Q.   In preparing your declaration did you
8 analyze how many students in your region have dealt
9 with issues relating to social media?
10    A.   No.
11    Q.   Did you analyze how many students in
12 TUSD have dealt with issues relating to social
13 media?
14    A.   No.
15    Q.   Did you analyze how many students have
16 dealt with issues relating to defendants' platforms?
17    A.   No.
18    Q.   In this same paragraph you refer to the
19 challenges TUSD faces in the district in the first
20 sentence.
21    A.   Yes.
22    Q.   What efforts have you made to address
23 social media use at the schools you supervise?
24    A.   We've tried to curtail it with
25 enforcement of cellphone policies. We also do

Page 189
1 substantial work with social-emotional learning
2 curriculum to help address the students' needs. And
3 we have counselors and social workers.
4       Oh, we also have sent out parent links
5 in the past, I believe, reminding parents to please,
6 you know, talk with their children, that these types
7 of challenges can lead to consequences.
8    Q.   And the cellphone policies you refer to
9 in your answer, those relate to cellphones in
10 general, not social media specifically, correct?
11    A.   The cell -- well, the cellphone policy
12 does refer to the cellphone itself. But we've added
13 policy that if you're transmitting something over a
14 platform, you can be held responsible for that, I
15 believe.
16    Q.   But the policy limits the use -- the
17 students' use of cellphones in schools for any
18 purpose, correct?
19    A.   Yes. At the school level, yes.
20    Q.   In the next paragraph, paragraph 7, you
21 refer to students' use of social media.
22    A.   Yes.
23    Q.   What platforms or applications are you
24 referring to in this paragraph?
25    A.   The same ones cited before.

12 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1    Q.    Which ones are those?
2    A.    If I get it wrong, can I ask it to be
3 read back?
4        I go with TikTok, Instagram, YouTube,
5 Google, and Snapchat.
6    Q.    In this paragraph you also mention
7 separating students from their phones, correct?
8    A.    Correct.
9    Q.    Do you have any data on the number of
10 times teachers at TUSD have been unable to separate
11 students from their phones?
12    A.    I don't have data. I have experience
13 that we went so far to install cellphone lockers at
14 a high school to get the physicality of the phone
15 away from the student.
16    Q.    But you've never tracked the number of
17 times teachers at TUSD have had to separate students
18 from their cellphones, correct?
19    A.    No, I have not.
20        MR. BRANE: Object to form.
21        THE WITNESS: I have not tracked that.
22 BY MR. RICE:
23    Q.    And the high school with cellphone
24 lockers you referred to, that's Sabino High School,
25 correct?

Page 191

1    A.    Correct.
2    Q.    And that's one school, correct?
3    A.    Correct.
4    Q.    That's the only school at which you
5 installed cellphone lockers, correct?
6    A.    In my region, that's the only school
7 that has cellphone lockers.
8    Q.    Are you aware of any other school in
9 TUSD that has cellphone lockers?
10    A.    I'm not aware of lockers. I think
11 there's preventative measures that are in other
12 schools.
13    Q.    In paragraph 8 you refer to the effects
14 of social media in the classroom.
15        Do you track instances of classroom
16 disruption at the schools in your region?
17    A.    No. I don't track that.
18    Q.    So, then, you haven't tried to analyze
19 how many instances of classroom disruption in school
20 in your region have been caused by social media,
21 correct?
22        MR. BRANE: Object to form.
23        THE WITNESS: Correct.
24 BY MR. RICE:
25    Q.    And do you know of anyone at TUSD who

Page 192

1 has done that?
2    A.    Well, it's a little tricky.
3        So if there's truly a disruption or
4 incident, that will all end up in Synergy eventually
5 if it's a discipline with a consequence.
6    Q.    But you've never analyzed TUSD's
7 Synergy database for connections between instances
8 of classroom disruption and social media use, right?
9    A.    I have not looked at it for that.
10    Q.    And sitting here today, you're not
11 aware of anyone at TUSD who has done that analysis,
12 correct?
13    A.    I'm not aware of what others have done.
14    Q.    And you haven't analyzed how many
15 instances -- instances of classroom disruption at
16 schools in your region have been caused by
17 defendants' platforms, correct?
18    A.    That's correct.
19        MR. BRANE: Object to form.
20 BY MR. RICE:
21    Q.    And you don't know of anyone at TUSD
22 who has conducted that analysis, correct?
23    A.    I don't know about others.
24    Q.    In this same paragraph, paragraph 8,
25 you reference students' use of fake social media

Page 193

1 accounts.
2        What do you mean by "fake social media
3 accounts"?
4    A.    I mean when they use a name that's not
5 their own, and so we can't -- and the investigation,
6 then, is limited. We are not able to tie a post,
7 let's say, that's really inflammatory or just
8 downright mean to a student, or even a threat, we
9 can't tie it back to the student who actually did
10 it.
11    Q.    And do you have any data on the number
12 of students who use fake social media accounts?
13    A.    I don't have data on that.
14    Q.    And so you've never analyzed how many
15 of the fake social media accounts you reference are
16 tied to defendants' platforms, correct?
17    A.    That's correct.
18        Again, my experience is I know the
19 frustration when we hit the wall and we can't move
20 further into action because of that.
21    Q.    Let's move to paragraph 9.
22        In paragraph 9, Ms. Hammel, you refer
23 to bullying and harassment.
24    A.    Yes.
25    Q.    Are you aware of any data tracking how

13 (Pages 190 - 193)

CONFIDENTIAL

Page 194
1 many incidents of bullying at the schools in your
2 region involve defendants' platforms?
3      A.   If you mean tracking as in an informal
4 system, no.  If you mean tracking -- again, if it's
5 an incident that raises to a level of a consequence,
6 all of that ends up in our Synergy discipline
7 system.
8      Q.   But there's no category in Synergy for
9 incidents that are linked to social media, correct?
10      A.   I don't believe so.
11      Q.   And you haven't conducted any analysis
12 of incidents of bullying in Synergy to identify the
13 number that are linked to defendants' platforms,
14 correct?
15      A.   That's correct, no.
16      Q.   And you didn't review any Synergy
17 narratives in preparing this declaration, correct?
18      A.   Correct.
19      Q.   And are you aware of any data tracking
20 how many incidents of harassment at the schools in
21 your region involve defendants' platforms?
22      A.   Again, only -- only through our Synergy
23 system.  Because there is a violation in our code of
24 conduct for harassment, so that would end up in
25 Synergy under that code.

Page 195
1      Q.   But Synergy doesn't track whether an
2 incident of harassment is linked to defendants'
3 platforms, correct?
4      A.   No, I don't believe it's linked like
5 that.
6      Q.   And you didn't review Synergy to
7 identify incidents of harassment linked to
8 defendants' platforms, correct?
9      A.   That's correct, no.
10      Q.   In paragraph 9 you also mention the
11 disseminating of bullying and harassment.
12      A.   Correct.
13      Q.   Is the concern that individuals use
14 social media platforms to share certain content
15 widely?
16      A.   Yes, that's my concern.
17      Q.   In paragraph 10, then, let's go to that
18 paragraph, you refer to anonymous school fight
19 pages, correct?
20      A.   Correct.
21      Q.   And these are social media accounts
22 that post photos or videos of school fights,
23 correct?
24      A.   Correct.
25      Q.   And your concern with these types of

Page 196
1 accounts is the photos or the videos that are posted
2 to these pages?
3      A.   No.  That's only one part of my
4 concern.
5      Q.   So part of your concern, though, is the
6 photos and videos that are posted to these pages,
7 correct?
8      A.   That's -- that's the action.
9          My real concern is for the kids that
10 are involved.  That's my concern.  And that we're
11 promoting and we're showing this and it then spreads
12 on to other people.  It almost gives a signal that
13 it's okay to behave that way at school and
14 participate in things like this.
15          So my concern is centered around the
16 student as a result of these pages.
17      Q.   You're worried the student might see
18 the content and then emulate it?
19      A.   No.  That's not what I said.  That's
20 part of what I said.
21          There are horrible pages out there
22 where young women are completely targeted and
23 bullied and harassed.  So my concern goes back for
24 the student and what that creates in that person.
25          If you want to take your example with

Page 197
1 the fight, my concern is for the poor kid who is
2 getting walloped, and now that's shared with
3 everybody, and that's not supposed to affect him
4 with other kids seeing it?  Kids whipping out their,
5 you know, cellphones to record it as it's happening
6 versus getting help.
7          It -- truly, to me, it's not as simple
8 as there's a fight page.  It is the ramifications of
9 effect on that student.  That -- that's what my
10 concern is.
11      Q.   Are you worried that the photos and
12 videos on these fight pages can be harmful to
13 students?
14      A.   Absolutely.
15      Q.   In this same paragraph you mention a
16 page where someone posted content identifying a
17 student as a school shooter, correct?
18      A.   Correct.
19      Q.   And then in the same paragraph you
20 write that student killed himself and his mother,
21 correct?
22      A.   Correct.
23      Q.   Is it your testimony that the student
24 killed himself and his mother as a result of social
25 media?

14 (Pages 194 - 197)

CONFIDENTIAL

Page 198
1    A.   No, that's not my testimony at all.
2    Q.   In the same paragraph you refer to
3 anonymous school pages on social media that target
4 specific students, correct?
5    A.   Correct.
6    Q.   Are the students on those pages
7 targeted by photos or videos?
8    A.   I'm trying to remember.
9        I believe there are photos.  I believe
10 there are videos.  I believe some are just, you
11 know, Comment on this person, followed by a string
12 of abhorrent things about them.  Some are a
13 confessional site.  It's a little bit of everything.
14    Q.   And then you mention trying to remove
15 pages like these.
16        Are you involved in trying to remove
17 these types of pages?
18    A.   No.
19    Q.   So you don't have personal knowledge of
20 what steps, if any, school site administrators have
21 taken to remove these types of pages?
22    A.   Well, I do actually.  That's why I put
23 that.
24        When speaking with one of my
25 principals, the one that lost her student to this

Page 199
1 murder and suicide, she talked passionately about
2 reaching out numerous times to have these pages
3 taken down and was told that they can't be taken
4 down.  And I believe we checked with our legal
5 counsel, who also confirmed that it can't be taken
6 down.
7        So that -- again, from my experience
8 that's why I put that there.
9    Q.   Do you know who the principal in this
10 incident contacted?
11    A.   I'm sorry.  Could you repeat that?
12    Q.   Do you know which platform the
13 principal in this incident contacted?
14    A.   Oh, thank you.  Now I understand.
15        I believe it was Instagram.
16    Q.   Do you know who at Instagram she
17 contacted?
18    A.   I don't.
19    Q.   Do you know how she contacted them?
20    A.   I don't know.
21    Q.   Other than --
22    A.   I know that she kept flagging it.  I
23 can't remember if she said specifically there was a
24 place to, like, submit a comment or to ask or --
25 this was several years ago.

Page 200
1        But I do know that she tried, and she
2 felt that she had made a good effort and couldn't
3 get it down.
4    Q.   But you're not familiar with the
5 specific steps she took?
6    A.   Other than what I just said.
7    Q.   Other than that one incident, have you
8 had other conversations with school site
9 administrators about attempts to remove anonymous
10 school pages?
11    A.   I believe there was a conversation in
12 one of my other high schools.
13    Q.   So other than those two incidents, you
14 can't recall any others in which you were involved?
15    A.   There was one other.
16        There was an e-mail from our
17 communications director that was -- she was
18 flabbergasted at what she saw.  She's like, This
19 needs to be taken down immediately.  And I responded
20 to her, and I just said, It's my understanding we
21 can't get them taken down.
22        That was the only other conversation.
23    Q.   Do you know whether the site
24 administrators at the schools in your region have
25 systems in place to contact platforms to remove

Page 201
1 social media pages?
2    A.   Not that I'm aware of.
3    Q.   Are you aware of the content-reporting
4 capabilities on Facebook?
5    A.   I'm not.
6    Q.   Have you ever investigated the
7 effectiveness of Facebook's contact -- content
8 reporting capabilities?
9    A.   I have not.
10    Q.   Are you aware of Instagram's content
11 reporting capabilities?
12    A.   I believe you can flag a post on
13 Instagram.
14    Q.   Have you ever investigated the efficacy
15 of Instagram's content reporting capabilities?
16    A.   I have not.
17    Q.   Are you aware of Snapchat's content
18 reporting capabilities?
19    A.   I am not.
20        But please understand, I don't even
21 have half of these things.
22    Q.   So, then, you haven't investigated the
23 efficacy of Snapchat's content reporting
24 capabilities?
25    A.   No.

15 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1    Q.   Are you aware of YouTube's content
2 reporting capabilities?
3    A.   No.
4    Q.   And have you ever investigated the
5 efficacy of YouTube's content reporting
6 capabilities?
7    A.   No.
8    Q.   Are you aware of TikTok's content
9 reporting capabilities?
10    A.   No.
11    Q.   Have you ever investigated the efficacy
12 of TikTok's content reporting capabilities?
13    A.   No.
14    Q.   In paragraph 17 you refer to TUSD's
15 inability to hire additional staff because of
16 funding constraints, correct?
17    A.   Yes.
18    Q.   Do TUSD's funding constraints include
19 decreasing student enrollment?
20        MR. BRANE:  Object to form.
21        THE WITNESS:  I don't know.
22 BY MR. RICE:
23    Q.   But do you -- as a regional assistant
24 superintendent, do you know that if TUSD was
25 experiencing decreased student enrollment, that

Page 203

1 would reduce the funding available to it?
2    A.   To be honest with you, school finance
3 is very complex.  So I know that our student
4 enrollment, like, drives our M&O funding.
5        But we have so many other sources of
6 funding that I -- I am not the expert or familiar
7 enough to really talk -- speak into what decreases
8 what.
9    Q.   Do you know whether school vouchers are
10 a funding constraint for TUSD?
11    A.   I don't know.
12    Q.   Do you know whether the termination of
13 federal ESSER funding is a funding constraint for
14 TUSD?
15    A.   I would say that that was, yes, a
16 funding constraint.
17    Q.   Do you know whether changes to TUSD's
18 desegregation budget are a funding constraint?
19    A.   I believe that they are.
20        MR. RICE:  We can go off the record.
21        THE VIDEOGRAPHER:  The time is 1:41.
22    We're off the record.
23        (Whereupon, a recess was taken.)
24        THE VIDEOGRAPHER:  The time is 1:56.
25    We're back on the record.

Page 204

1        MR. RICE:  Welcome back, Ms. Hammel.
2    Thank you for your time today.  Subject to
3    any questions from your counsel, I don't
4    have any questions at this time.
5        MR. BRANE:  Dana, you go first, yes.
6            EXAMINATION
7 BY MS. STRUEBY:
8    Q.   Hi, Ms. Hammel.  As I stated when we
9 were off the record, I represent Meta, and I have
10 just a couple of quick questions.
11        Today you were talking about
12 paragraph 10 of your declaration about the student
13 who unfortunately killed himself and his mother.
14        Do you remember that?
15    A.   I do.
16    Q.   And I think you also referenced that
17 that was relating to an Instagram page.
18        Do you remember saying that?
19    A.   I do remember saying that.  And I do
20 believe it was an Instagram page.
21    Q.   Do you remember the approximate date
22 that that incident happened?
23    A.   I don't.  It's in the Tucson
24 newspapers.
25    Q.   Do you have any way to estimate a

Page 205

1 timeframe or time of year, a year?  Any more
2 detailed information about the timing of that?
3    A.   I will give you my best guess.  It's
4 truly a guess.
5        It was several years ago.  I would
6 guess '22, possibly '23.  I believe it was in the
7 fall, but I'm not certain.
8    Q.   And just to make sure we have a clear
9 record, do you remember the name of the principal
10 you referenced that you think reported the page?
11    A.   I do.
12    Q.   What was that name?
13    A.   Her name is Tamara Ray.
14        MS. STRUEBY:  I have no further
15    questions.  Thank you.
16        MR. BRANE:  Anybody else from
17    defendants?  Okay.
18        Thank you, Ms. Hammel.  I have a couple
19    of quick questions.
20            EXAMINATION
21 BY MR. BRANE:
22    Q.   We've met before, correct?
23    A.   Yes.
24    Q.   At a few points today Mr. Rice asked
25 you questions about which social media platforms you

16 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1 were including when you refer to social media in
2 your declaration.
3          Do you recall those questions?
4     A.   I do.
5     Q.   And you named several that I don't need
6 to repeat.  But you mentioned Google a couple of
7 times.
8          Do you recall that?
9     A.   I do.
10     Q.   Why did you include Google in those
11 responses as to what you included in social media?
12     A.   Oh, just because they're a parent
13 company.
14     Q.   A parent company of what?
15     A.   Face -- YouTube.
16     Q.   Okay.  And then in paragraph --
17          MR. BRANE:  Actually, Counsel -- or,
18     Brian, do you mind pulling up Exhibit 17
19     and going to paragraph 15, please?
20     Q.   Ms. Hammel, you testified to this
21 earlier, so forgive me if this is clear to everyone
22 else.
23          But at a few times in paragraph 15 you
24 referenced a year, 2018, 2020, 2025.
25          Do you see that?

Page 207

1     A.   Yes.
2     Q.   What point in those years are you
3 referring to?
4          Does that make sense?
5          So for 2018, are you referring to the
6 start of the 2018-19 school year or something else?
7          MR. RICE:  Objection.  Leading.
8          THE WITNESS:  Sorry.
9 BY MR. BRANE:
10     Q.   You can answer.
11     A.   I made this clear earlier.
12          In education we always go school years.
13 So to me that's, like, an August 2018 through '19
14 year.  By 2020, again, August.
15          I picked that because we were on
16 lockdown during that time.  So start of August 2020
17 going into '21.
18     Q.   And you've not started the 2025-'26
19 school year, correct?
20     A.   Hang on.  I always mess these up.
21          We are just finishing '24-'25.  We're
22 going into '25-'26.
23     Q.   So in paragraph 15 when you use the
24 phrase "now in 2025," what timeframe are you
25 referring to there?

Page 208

1     A.   August forward.
2     Q.   August of 2025, which I don't believe
3 we've reached yet?
4     A.   Oh, I'm sorry.  No, no, no.  I'm so
5 sorry.
6          Spring semester 2025.
7     Q.   Okay.
8          MR. BRANE:  I have nothing further,
9     Ms. Hammel.  Thanks for your time.
10          Anybody else?  Okay.
11          MR. RICE:  Give me -- I think we may.
12     Give me just a moment.
13          No further questions from me.
14          THE VIDEOGRAPHER:  All right.  Total
15     time for Snap was one hour, 11 minutes;
16     Meta, 2 minutes; plaintiffs, 3 minutes.
17          The time is 2:02.  We're off the
18     record.
19          (Whereupon, the deposition was
20          concluded.)
21
22
23
24
25

Page 209

1          CERTIFICATE
2
          I, MAUREEN O'CONNOR POLLARD, Registered
3 Diplomate Reporter, Realtime Systems Administrator,
  and Certified Shorthand Reporter, do hereby certify
4 that prior to the commencement of the examination,
  HOLLY L. HAMMEL, was remotely duly identified and
5 sworn by me to testify to the truth, the whole
  truth, and nothing but the truth.
6
          I DO FURTHER CERTIFY that the foregoing
7 is a verbatim transcript of the testimony as taken
  stenographically by and before me at the time,
8 place, and on the date hereinbefore set forth, to
  the best of my ability.
9
          I DO FURTHER CERTIFY that I am neither a
10 relative nor employee nor attorney nor counsel of
  any of the parties to this action, and that I am
11 neither a relative nor employee of such attorney or
  counsel, and that I am not financially interested in
12 the action.
13

          Maureen O. Pollard
14 _____
15     MAUREEN O'CONNOR POLLARD
       NCRA Registered Diplomate Reporter
16     Realtime Systems Administrator
       Certified Shorthand Reporter
17     Notary Public
18     Dated:  June 24, 2025
19
20
21
22
23
24
25

17 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are
7  made.
8         After doing so, please sign the errata
9  sheet and date it.  It will be attached to your
10 deposition.
11        It is imperative that you return the
12 original errata sheet to the deposing attorney
13 within thirty (30) days of receipt of the deposition
14 transcript by you.  If you fail to do so, the
15 deposition transcript may be deemed to be accurate
16 and may be used in court.
17
18
19
20
21
22
23
24
25

Page 212

1
2         ACKNOWLEDGMENT OF DEPONENT
3
4    I, _____, do
   Hereby certify that I have read the foregoing pages,
5  and that the same is a correct transcription of the
   answers given by me to the questions therein
6  propounded, except for the corrections or changes in
   form or substance, if any, noted in the attached
7  Errata Sheet.
8
9  _____
   WITNESS NAME            DATE
10
11
12
13
14
15
16 Subscribed and sworn
   To before me this
17 _____ day of _____, 20____.
18 My commission expires: _____
19
   _____
20 Notary Public
21
22
23
24
25

Page 211

1         - - - - - -
        E R R A T A
2         - - - - - -
3  PAGE  LINE  CHANGE
4  ____ ____ _____
5    REASON: _____
6  ___ ____ _____
7    REASON: _____
8  ____ ____ _____
9    REASON: _____
10 ____ ____ _____
11   REASON: _____
12 ____ ____ _____
13   REASON: _____
14 ____ ____ _____
15   REASON: _____
16 ____ ____ _____
17   REASON: _____
18 ____ ____ _____
19   REASON: _____
20 ____ ____ _____
21   REASON: _____
22 ____ ____ _____
23
24
25

Page 213

1         LAWYER'S NOTES
2  PAGE  LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25

18 (Pages 210 - 213)