**Exhibit 37**

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2

IN RE: SOCIAL MEDIA              )
3  ADOLESCENT ADDICTION/PERSONAL    )
   INJURY PRODUCTS LIABILITY        ) Case No.
4  LITIGATION                       ) 4:22-MD-03047-YGR
   _____ )
5  THIS DOCUMENT RELATES TO:        ) MDL No. 3047
   Tucson Unified School District   )
6  v. Meta Platforms Inc., et al., )
   Case No. 4:24-cv-01382           )
7

8                MONDAY, JUNE 30, 2025
9        CONFIDENTIAL - ATTORNEYS' EYES ONLY -
              PURSUANT TO PROTECTIVE ORDER
10
                        - - -
11

12            Remote videotaped deposition of
13   Julie Shivanonda, held at the location of the
14   witness in Tucson, Arizona, commencing at
15   9:00 a.m. Pacific Time, on the above date,
16   before Carrie A. Campbell, Registered
17   Diplomate Reporter, Certified Realtime
18   Reporter, Illinois, California & Texas
19   Certified Shorthand Reporter, Missouri,
20   Kansas, Louisiana & New Jersey Certified
21   Court Reporter.
22                        - - -
23
24
25

CONFIDENTIAL

Page 2

1    A P P E A R A N C E S :
2
3
    WAGSTAFF & CARTMELL LLP
4    BY:  AUSTIN BRANE
        abrane@wcllp.com
5    4740 Grand Avenue, Suite 300
     Kansas City, Missouri  64112
6    (816) 701-1100
     Counsel for Plaintiffs
7
8
    MUNGER TOLLES & OLSON LLP
9    BY:  ROWLEY RICE
        Rowley.Rice@mto.com
10       FAYE PAUL TELLER
        Faye.Teller@mto.com
11       JULIA KONSTANTNINOVSKY
        julia.konstantninovsky@mto.com
12   350 South Grand Avenue, 50th Floor
     Los Angeles, California  90071
13   (213) 683-9100
     Counsel for Snap, Inc.
14
15
    SHOOK HARDY & BACON LLP
16   BY:  COURTNEY C. BURRESS
        cburress@shb.com
17       DANA L. STRUEBY
        dstrueby@shb.com
18   2555 Grand Boulevard
     Kansas City, Missouri  64108
19   (816) 474-6550
     Counsel for Meta Platforms, Inc., f/k/a
20   Facebook, Inc.; Facebook Holdings, LLC;
     Facebook Operations, LLC; Facebook
21   Payments, Inc.; Facebook Technologies, LLC;
     Instagram, LLC; Siculus, Inc.; and
22   Mark Elliot Zuckerberg
23
24
25

Page 4

1              INDEX
2                    PAGE
3    APPEARANCES...................................  2
4    EXAMINATIONS
5      BY MR. RICE...............................   6
6
7              EXHIBITS
8    No.   Description              Page
9    1    Declaration of Julie Shivananda        9
10       (Exhibit attached to the deposition.)
11   CERTIFICATE...................................100
12   ACKNOWLEDGMENT OF DEPONENT...................102
13   ERRATA.......................................103
14   LAWYER'S NOTES...............................104
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    KING & SPALDING LLP
     BY:  MICHAEL SHAGRIN
2       mshagrin@kslaw.com
     1185 Avenue of the Americas, 34th Floor
3    New York, New York  10036
     (212) 556-2100
4    Counsel for TikTok, Ltd.; TikTok, LLC;
     TikTok, Inc.; ByteDance Ltd.; and
5    ByteDance Inc.
6
7    WILLIAMS & CONNOLLY LLP
     BY:  DANIEL WHITELEY
8       dwhiteley@wc.com
     680 Maine Avenue, SW
9    Washington, DC  20024
     (202) 434-5547
10   Counsel for Alphabet Inc., Google LLC,
     and YouTube, LLC
11
12
    ALSO PRESENT:
13
       MIKE FRONZAGLIA, trial technician,
14   Precision Trial Solutions
15
16   V I D E O G R A P H E R :
       JAMES VONWIEGEN,
17       Golkow Litigation Services
18          – – –
19
20
21
22
23
24
25

Page 5

1          VIDEOGRAPHER:  We are now on
2    the record.  My name is James
3    Vonwiegen.  I'm a videographer for
4    Golkow.
5          Today's date is June 30, 2025,
6    and the time is 9 a.m.
7          This remote video deposition is
8    being held in the matter of Social
9    Media California MDL 3047, Tucson
10   Unified School District versus Meta,
11   for the United States District Court,
12   Northern District of California.
13         The deponent is Julie
14   Shivanonda.
15         All parties to the deposition
16   are appearing remotely and have agreed
17   to the witness being sworn in
18   remotely.
19         Due to the nature of remote
20   reporting, please pause briefly before
21   speaking to ensure all parties are
22   heard completely.
23         Counsel will be noted on the
24   stenographic record.
25         The court reporter is Carrie

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1    Campbell, who will now swear in the
2    witness.
3
4         JULIE SHIVANONDA,
5    of lawful age, having been first duly sworn
6    to tell the truth, the whole truth and
7    nothing but the truth, deposes and says on
8    behalf of the Defendants, as follows:
9
10        DIRECT EXAMINATION
11   QUESTIONS BY MR. RICE:
12       Q.    Good morning, Ms. Shivanonda.
13       A.    Good morning.
14       Q.    Could you state your name for
15   the record?
16       A.    Julie Shivanonda.
17       Q.    And do you understand you're
18   testifying under oath today?
19       A.    I do.
20       Q.    Is there any reason you cannot
21   give truthful and accurate testimony in this
22   case?
23       A.    No.
24       Q.    And you were deposed previously
25   in this case.

Page 7

1         Correct?
2    A.    Correct.
3    Q.    And during your prior
4    deposition, you gave truthful and accurate
5    testimony.
6         Correct?
7    A.    Correct.
8    Q.    And you're employed at Tucson
9    Unified School District.
10        Correct?
11   A.    Correct.
12   Q.    And you understand that if I
13   say "TUSD" or "the district" then, I'm
14   referring to Tucson Unified School District.
15        Correct?
16        I didn't quite hear.
17        Was that correct?  Did you say
18   correct?
19   A.    Correct.
20   Q.    And you understand that if I
21   say "defendants' platforms," I'm referring to
22   Facebook, Instagram, TikTok, YouTube and
23   Snapchat?
24   A.    Yes.
25   Q.    And you understand this

Page 8

1    deposition is being conducted remotely via
2    Zoom.
3         Correct?
4    A.    Correct.
5    Q.    And before we go further, can
6    you just confirm the technology is working
7    properly and that you can see and hear me?
8    A.    Yes, I see and I hear you, yes.
9    Q.    And then can you confirm you're
10   alone in the room where you're testifying?
11   A.    Yes, I am alone.
12   Q.    Do you have any documents in
13   front of you today?
14   A.    I do not.
15   Q.    And do you understand that
16   during this deposition you may not
17   communicate with anyone else while we're on
18   the record today?
19        Correct?
20   A.    Correct.  Yes, I understand.
21   Q.    And what did you do to prepare
22   for the deposition today, Ms. Shivanonda?
23   A.    I met with legal counsel, and I
24   reviewed the written declaration that was
25   submitted on May 13th.

Page 9

1         (Shivanonda Exhibit 1 marked
2         for identification.)
3    QUESTIONS BY MR. RICE:
4    Q.    Let's mark as Exhibit 1 Tab 1.
5         And, Ms. Shivanonda, this is
6    the May 13 declaration you referred to.
7         Correct?
8    A.    The first page it looks as
9    though, but without seeing the bottom page
10   and the date, I am not 100 percent sure.
11        MR. RICE:  Mr. Fronzaglia,
12   could you just briefly scroll through
13   for the witness?
14        MR. BRANE:  And then, Julie,
15   you'll see in the chat, Mike dropped a
16   link that says "Here is a URL for the
17   marked exhibits."  If that's easier,
18   your preference, that'll take you to a
19   sharefile where you can pull it up on
20   your computer as well.
21        THE WITNESS:  Yes.  I click on
22   that link, and the link tells me there
23   are no files in here.
24        MR. BRANE:  Try refreshing.
25   That's what I got at first, too.

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1    MIKE FRONZAGLIA:  Yes, I just
2  introduced it, so it will take a few
3  seconds.  Thank you.
4    THE WITNESS:  Okay.  Okay.  I
5  have it up, yes.  Thank you.
6    MR. BRANE:  Sorry, Rowley.
7  QUESTIONS BY MR. RICE:
8    Q.    No, totally understand.
9        And this is the declaration,
10  Ms. Shivananda, you signed under penalty of
11  perjury on May 13, 2025.
12        Correct?
13    A.    Correct.
14    Q.    Did you write the first draft
15  of this declaration?
16    A.    So I worked with legal counsel,
17  and I was provided a template to help support
18  in the writing.  And then I went in and I
19  added my content, and then it was shared with
20  legal counsel.  So, yes, I worked on the
21  first draft.
22    Q.    But counsel wrote the initial
23  template for you?
24    A.    The initial template, yes.
25    Q.    When did you first see a draft

Page 11

1  of the declaration?
2    A.    I don't recall the date, but I
3  worked on the draft.  I had about two weeks
4  that I was working on the draft, so it was
5  probably about two weeks before.  I would say
6  probably early May when I received the
7  template.  I worked on it for about two weeks
8  and then sent it to legal counsel for their
9  review.
10        And then we made some edits as
11  needed and then officially signed it on
12  May 13th.
13    Q.    Did you review any documents
14  before signing the declaration or making
15  edits?
16    A.    Not for this declaration, no,
17  but I had recently gone through the
18  deposition process.  And so with that
19  preparation in mind, and based on all of my
20  experience over the past 21 years in
21  education, I leaned heavily on that to add my
22  content to the declaration.
23    Q.    So between your prior
24  deposition and signing this declaration, you
25  didn't review any documents?

Page 12

1    A.    Not specifically for this
2  declaration.  However, in my role as
3  director, it's -- the information that
4  informed this is something that we work on
5  and I use on a daily basis.
6    Q.    Other than counsel, did anyone
7  else review the declaration before you signed
8  it?
9    A.    Not on my end, no.
10    Q.    Did you discuss the declaration
11  with anyone other than counsel?
12    A.    No.
13    Q.    And did you do anything else to
14  confirm the accuracy of the information in
15  the declaration before you signed it?
16    A.    Again, leaning on my 21 years
17  of experience and my -- based on my
18  preparation that -- the deposition was just a
19  few weeks prior, I leaned on that as I was
20  writing, but I did not specifically look at
21  any specific documents or data in the moment
22  as writing this declaration.
23    Q.    So let's go to paragraph 18.
24  It starts near the bottom of page 5.
25        And, Ms. Shivananda, in

Page 13

1  paragraph 18, you refer to several
2  percentages that go from the 2016 to 2017
3  school year to present.
4        What do you understand those
5  percentages to refer to?
6    A.    The percentages of time based
7  on the specific roles that I've identified,
8  their specific time dealing with issues
9  related to social media within our schools.
10    Q.    So, for instance, when you say
11  that 75 percent of a behavioral specialist's
12  time was spent on issues related to social
13  media, what type of activities would that
14  include?
15    A.    So our behavioral specialist,
16  behavior interventionist, they are constantly
17  dealing with behaviors, various behaviors, on
18  school campuses, and the behaviors that they
19  may see would be in relation to maybe a
20  fight.  So a fight that may have either been
21  video-recorded and posted on a social media
22  platform, may have been discussed on a social
23  media platform, any bullying that may have
24  happened on a social media platform.  Then
25  the behavior that we see on our school

4 (Pages 10 - 13)

Page 14

1 campuses, that is the specific behavior that
2 they may be seeing.
3        So they do a lot of their time
4 of investigating and talking with students
5 and with others that may have been involved
6 or have seen that information, and then they
7 will do restorative practices.  They will
8 have conversations.  They will inform admin
9 whether or not discipline is required, work
10 with other roles within their school to
11 identify whether any other interventions need
12 to be put in place.
13        They may collaborate with MTSS
14 or with school counselors to identify if it's
15 an anxiety issue or depression or something
16 else that needs to be addressed on their
17 social and emotional and mental health
18 well-being, whether there needs to be a
19 referral to an outside agency.
20        So that would be a lot of the
21 direct time that they would spend within that
22 75 percent.
23    Q.   So in that 75 percent, would
24 that include all time that behavioral
25 specialists spend relating to fights?

Page 15

1    A.   Fights was just one example.
2 So it could be, again, bullying.  It could
3 be, again, if there's issues of body
4 dysmorphia, if there's issues of disordered
5 eating that comes from the content that the
6 youth or the students are either viewing or
7 engaging in on social media platforms.  A lot
8 of that -- then that behavior then comes.
9        The other component of it is
10 just the actual use of cell phones and use of
11 social media during school time.
12        A lot of times the behavior
13 specialist will also be the one called to a
14 classroom if a student refuses to put away a
15 device, a cell phone, a school laptop or
16 computer.
17        A lot of times they will get
18 into a power struggle with a teacher, which
19 then directly interferes with instruction,
20 and behavioral specialists and intervention
21 monitors are usually the ones that are called
22 to the classroom to help either deescalate
23 the situation or remove the student from the
24 classroom.
25        Then they have those ongoing

Page 16

1 conversations with the students about why
2 they're using their devices, why they are
3 refusing to put them away, and then they do
4 that investigative work in terms of what is
5 happening and what is causing those
6 behaviors.
7        And then they're often those
8 that are ongoing to provide those
9 interventions.  They might be doing check-ins
10 with students then, either on a daily or a
11 week basis.  They may be running small groups
12 based on if there was bullying or if there
13 was other behaviors that were happening.
14        So they do, yeah, a lot of that
15 work around a multitude of behaviors that are
16 often caused by social media content.
17    Q.   What social media platforms are
18 included in the paragraph 18 percentages?
19    A.   Any and all.  So over the
20 years, there have been numerous new social
21 media platforms that either have changed or
22 have been introduced.  Common ones that we
23 generally will see are Instagram, Snapchat,
24 TikTok, and a little bit of Facebook.
25    Q.   Would it include Reddit?

Page 17

1    A.   Reddit, potentially.  That is
2 not one that we hear on a regular basis more
3 so than some of the other social media
4 platforms.
5    Q.   Before this litigation, had you
6 ever attempted to estimate the percentage of
7 time that TUSD staff spent on issues relating
8 to social media?
9    A.   So a lot of our practice is
10 trying to identify the why behind behaviors.
11 And so over this last decade or so, we have
12 been seeing an increase of that why behind
13 the behavior is connected to social media.
14        Have we done any exhaustive
15 studies?  I would say not necessarily.
16 However, we -- on a very regular basis, we do
17 evaluate the concerns, the discipline
18 concerns.  We evaluate the trends of what
19 we're seeing, and then trying to be as
20 abreast of interventions and resources as
21 possible.
22        So one of our big components is
23 identifying interventions based on the reason
24 and the why.  So I would say that we have
25 been very cognizant of the cause of the

CONFIDENTIAL

Page 18

1  behaviors and have seen a significant
2  increase over the last decade or so as one of
3  the major causes of our discipline and
4  behaviors as being connected to social media.
5      Q.    So before litigation, you had
6  never tried to estimate the percentage of
7  time that staff spent on these issues.
8      Correct?
9      MR. BRANE:  Object to form.
10      THE WITNESS:  So I would say
11      not necessarily specifically calling
12      out social media, but we have
13      obviously identified the causes and
14      the reasons behind the discipline and
15      the behaviors that we are seeing and
16      have actively identified that social
17      media is a prevalent issue and
18      concern.
19  QUESTIONS BY MR. RICE:
20      Q.    Who first suggested the
21  percentages listed in paragraph 18?
22      A.    Can you repeat the question?
23      Q.    Okay.  Who first suggested the
24  percentages that are listed in paragraph 18?
25      A.    Those are my estimates of

Page 19

1  percentages based on my experience as the
2  director as well as working in school
3  systems.
4      Q.    And so those are based on your
5  personal experiences and impressions?
6      A.    Correct.
7      Q.    And you didn't consult any
8  documents in calculating those percentages.
9      Correct?
10      A.    For this specific declaration
11  it was, again, reviewing just in my -- I had
12  that information already, as I had been
13  ongoing reviewing for the case over the past
14  year, year and a half.  And with my
15  deposition being so close, I had reviewed,
16  you know, data and documents prior to that
17  for the case.
18          So then I didn't necessarily
19  directly review those documents again, just
20  because it had been a few weeks since the
21  deposition.  So then I used just, again,
22  my knowledge and my experience to estimate
23  these estimations.
24      Q.    What data and documents are you
25  referring to?

Page 20

1      A.    So previously, as I was
2  preparing for my depositions, we -- which
3  I've also noted in this declaration is that
4  we regularly survey our school counselors.
5  They provide information on their time of use
6  as school counselors on a semester basis, and
7  so that was taken into an account.
8          In preparation for my
9  deposition, I did have conversations with
10  school counselors as well as my school
11  counseling coordinators.
12          However, also leading into --
13  in my experience and my role as the director,
14  I regularly collaborate with our school
15  safety department as well as our discipline
16  department.  And we, ongoing, have
17  conversations around discipline trends and
18  identify what needs are needed within our
19  school, our climate and culture needs, and
20  then tailor interventions.
21          I do meet with our coordinator
22  of our multi-tiered systems of supports
23  coordinator on a monthly basis, and we review
24  the data within the MTSS platforms for
25  behaviors and SEL plans as needed.  So we

Page 21

1  identify that data.
2          They, ongoing, have
3  conversations with our MTSS facilitators
4  around discipline and the data.  So, again,
5  discipline data as well as anecdotal data,
6  just through conversations.
7          Regularly called out to schools
8  to evaluate climate and culture, meet with
9  climate and culture and admin teams to review
10  their discipline data and their trends on a
11  regular basis to identify whether we need
12  additional professional development for
13  teachers, whether we need other intervention
14  strategies, whether we need to increase our
15  positive behavior intervention supports on
16  campuses.
17          Just a myriad of just my work
18  is really spent focused on the data of what's
19  happening in our schools.
20      Q.    So with respect to the
21  counselor time reports, do you personally
22  review all of the time reports that are
23  submitted?
24      A.    I will review -- so my school
25  counseling coordinators, they collect those

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1  datas, or those surveys, and then they create
2  kind of an overall analysis.
3       And then we, at the department
4  level, we do review the overarching analysis
5  and the top trends of what's happening on
6  school campuses, yes.
7       Q.   Has anyone at TUSD ever
8  analyzed those time records for connections
9  to defendants' platforms?
10      MR. BRANE:  Object to form.
11      THE WITNESS:  So we
12      absolutely -- so the difficulty is, we
13      don't necessarily document and say,
14      this was a social media concern.
15      However, all of the work and the
16      behaviors that our school counselors
17      are handling, there are connections to
18      social media.
19      So we don't necessarily call
20      out and have a question about how
21      often are you dealing with social
22      media, because we know that as we
23      again identify the cause, the root
24      cause, of what's happening, we -- it's
25      pervasive and it's infiltrative

Page 23

1      throughout all of the work that they
2      do.
3       So when they have small groups
4      with bullying, we then also talk with
5      counselors and say, okay, where is the
6      bullying coming from.
7       And the majority of the time,
8      it's happening on social media
9      platforms, Instagram, TikTok, people
10      being left out, people having negative
11      comments about others.
12      So we do an overarching
13      analysis of that data, more of a
14      qualitative overarching analysis of
15      that data, just because it is so
16      pervasive.  And then there's also just
17      so much happening, we can deduct that
18      the majority of the time it is coming
19      from social media.
20  QUESTIONS BY MR. RICE:
21      Q.   But sitting here today, you can
22  identify a percentage that's linked to social
23  media of those time reports.
24      Correct?
25      A.   Correct.  So based on the --

Page 24

1  the incidences that are occurring, yes.
2       Q.   You also refer to conversations
3  with school counselors in connection with
4  your deposition preparation.
5       Correct?
6       A.   Correct.
7       Q.   And how many counselors did you
8  meet with?
9       A.   In preparation for the
10  deposition, I met with about 20 school
11  counselors.  However, in my role, I meet with
12  school counselors on a regular basis.  We
13  bring all school counselors together three
14  times a year, and then I'm also out at school
15  sites engaging with school counselors on a
16  regular basis.
17      Q.   Does that include specialist
18  counselors and the counseling interns?
19      A.   Yes.
20      Q.   Are there different meetings
21  for school counselors, specialist counselors
22  and counseling interims, or are they all part
23  of those three times a year meetings?
24      A.   They are all part of those
25  three times a year meetings, and then in

Page 25

1  addition to that, we also, for specialist
2  counselors, new counselors and counseling
3  interns, we will have separate meetings as
4  they are focused on either being a new
5  counselor or learning or focusing on
6  special -- special projects.
7       We also -- then also meet with
8  counselors based on their level.  So we will
9  meet with elementary counselors, middle
10  school counselors, high school counselors and
11  then the specialist counselors to regularly
12  address their work and their role.
13      And then we also have what are
14  called professional learning communities with
15  school counselors where it may be mixed
16  across their levels and their specialties to
17  then discuss the professional growth as well
18  as supports with needing to create their
19  counseling model at their school.
20      Q.   Do you review time records in
21  these meetings?
22      A.   Occasionally, yes.
23      I can't say that we review them
24  at every single meeting, but they are -- they
25  are reviewed.  The trend data is reviewed.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1         And then also, again, tailoring
2   programming by school, we will use that
3   programming to then identify if we need to
4   identify additional community resources, if
5   we need to collaborate with community
6   agencies based on the need, whether or not
7   the needs to hire for school counselors,
8   review our suicide ideation protocol data as
9   well, identify what other maybe suicide
10  prevention activities and work needs to be
11  done in our schools.
12        So we do analyze that
13  frequently and identify what additional
14  supports are needed.
15     Q.    You meet with the counselors at
16  the elementary and middle school and high
17  school level, how often are those meetings?
18     A.    It depends on the level.  The
19  specialist counselors, they meet once a
20  quarter.  Elementary counselors, they meet
21  once a month.  Middle and high school, they
22  also meet once a month.
23     Q.    And then how often do you
24  meet with the -- when you meet with a
25  specialist counselor, do you meet with every

Page 27

1   special counselor?
2      A.    Yes.  So when we speak of
3   specialist counselors, we -- they are
4   directly focused on college and career
5   readiness, and so they meet specifically with
6   that specialization, and they meet once a
7   month, yes.
8      Q.    Okay.  And how many specialist
9   counselors are there?
10     A.    15.
11     Q.    And their role is focused on
12  college and career readiness, you said?
13     A.    Yes, correct.
14     Q.    And then what about counseling
15  interns?  What's their role?
16     A.    So counseling intern, they are
17  within their last year of their master's
18  program, so they are able to be hired as a
19  school counselor.  They are then assigned a
20  supervisor and a mentor, and they are
21  basically doing their internship while also
22  being a school counselor.
23     Q.    And for any of the types of
24  counselors, have you ever used any
25  time-keeping software to track the time they

Page 28

1   spend on issues relating to defendants'
2   platforms?
3      A.    Outside of they are -- they
4   track their time anecdotally.  If it's a
5   specific student issue, they will track that
6   in our student information system to document
7   that.
8         And then they -- their overall
9   time spent in the different components of
10  their role is what they then indicate on
11  their time of use on a semester basis.
12     Q.    So you've never used
13  time-keeping software that focused on
14  defendants' platforms?
15        Correct?
16     A.    Correct.
17     Q.    And other than in connection
18  with your deposition preparation, have you
19  ever interviewed any counselors about the
20  amount of time they spent on issues relating
21  to defendants' platforms?
22     A.    So again, back to kind of the
23  role of my job is meeting with counselors and
24  identifying whether -- what are the issues,
25  what are the difficulties.

Page 29

1         So we will just organically
2   have those conversations.  So we --
3   counselors are part of the discipline review
4   teams at their school sites where they review
5   specific discipline at their site.  They
6   review trend data.  They review then how many
7   students that they're seeing with anxiety,
8   how many students that they're seeing with
9   eating disorders, how many -- and then
10  they're also part of the multi-tiered system
11  of support process where they're regularly
12  meeting as a team to identify, here's an
13  identified behavior.  We then need to
14  identify what is happening, what is causing
15  that behavior, and then what are the
16  interventions.
17        So I am a part of a lot of
18  those conversations.  I will regularly go to
19  different schools and look at that data.  And
20  so, again, through those conversations, it's
21  more anecdotal.  We have those conversations
22  and then can backwards map it around, okay,
23  so, again, what is the purpose, what is the
24  why behind the behavior, and identify that
25  the majority of the time it is, again,

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1  pervasive through social media.
2         Our students are not -- that is
3  their life.  So we just know that they are
4  constantly on their devices or constantly
5  engaging in social media.  That is how they
6  communicate.  That is how they get their
7  information.
8         They don't just talk to each
9  other anymore.  They talk through social
10  media.  They don't just text.  They text
11  through social media.  They share Memes.
12  They share videos.  They share content
13  through social media platforms.
14         So every time we have a
15  conversation with a student or with a youth,
16  it is related to, I saw this on social media.
17  So-and-so sent me a private message on
18  Instagram saying that I was fat and that I
19  was ugly.  Or I saw on one of the fight pages
20  on the -- so we're on fight page -- that
21  there was a video posted.
22         So then they're coming together
23  and they're, like, oh, did you see this
24  fight.  Oh, I'm going to kick this butt --
25  this guy's butt after school.  Right?  It's

Page 31

1  constantly having those conversations.
2         So it's not necessarily a
3  direct impact analysis.  However, it's
4  organic conversations, and they are just
5  inundated of what it is that they're working
6  with.  So it's constantly connected to social
7  media.
8         So having those conversations
9  on a regular basis, we have been able to
10  deduce that the majority of their time is
11  spent on dealing with behaviors based on
12  social media content.
13    Q.    But you don't have any
14  documentation of how many of those
15  conversations referenced defendants'
16  platforms.
17         Correct?
18    A.    There may or may be.  So we
19  will generally have agendas within these
20  conversations.  So when we come through and
21  say, okay, this student needs this
22  intervention, we'll put an intervention plan
23  within our MTSS platform, and then it may or
24  may not also then talk about what happened on
25  the platform.

Page 32

1         We -- because of the
2  pervasiveness, because of the way that school
3  systems work, we don't necessarily have the
4  time to sit and have a -- a spreadsheet that
5  can then talk about, okay, this was because
6  of social media.  We just know it through
7  organic conversations.
8    Q.    Do you believe that all
9  counselors, specialist counselors and
10  counseling interns spend their time in the
11  same way?
12    A.    With some minor differences.
13  Everybody kind of does their work a little
14  bit differently.  However, our model in the
15  district is to follow the American School
16  Counselor Association model.  So they do have
17  some specific parameters around how they are
18  supposed to be spending their time.
19         We also do know that, again,
20  there's going to be differences at levels.
21  So a high school counselor is probably going
22  to be dealing with different behaviors and
23  needs than an elementary school counselor.
24  They're going to be seeing different needs
25  with a kindergartener versus a senior of high

Page 33

1  school.
2         For the most part, they are in
3  the same buckets of tasks that they are
4  tasked with.  The variances of the severity
5  may or may not.
6         I will say what we have also
7  seen over the past several years is even in
8  our elementary schools, we are seeing
9  constant use of social media and pervasive
10  use of social media even at elementary
11  school.
12    Q.    You estimate the percentage of
13  time spent by specialist counselors,
14  counselors and counseling interns on social
15  media-related issues as 50 percent.
16         Correct?
17    A.    That is the estimate, correct.
18    Q.    Could it be 49 percent?
19    A.    Again, it's my estimate.  So
20  based on the work of being in schools and
21  doing the work that I do, they -- I would
22  also say I may have also estimated low, to be
23  honest.  So it could even potentially be
24  higher.
25         That was a rough estimate given

9 (Pages 30 - 33)

Page 34

1 the amount of information I also just shared
2 around the differences between elementary and
3 high school. So a rough estimate is about
4 50 percent.
5     Q.    So it's possible it could be
6 49 percent then?
7     A.    Again, it's a --
8     Q.    Or 51 percent?
9     A.    -- it's a rough estimate,
10 right? So out of 130 counselors that we have
11 in the school district, there could be some
12 variances. But, again, that is just the
13 estimate based on my experience.
14     Q.    Could it be 40 percent?
15     A.    Again, based on the experiences
16 and all of the data, I highly doubt that it
17 would go any lower.
18         My -- like I said, I think I
19 already gave a bit of a low estimate. So
20 my thought would be if you're going to kind
21 of ask about different percentages, it might
22 even be higher than 50 percent, to be honest.
23     Q.    It's possible it could be 40 or
24 45 percent, for instance?
25         MR. BRANE: Object to form.

Page 35

1         THE WITNESS: On a day-to-day
2     basis, if we want to look at one day
3     versus another day, again, there's
4     variances.
5         So overall, 50 percent of their
6     time over the school year, could it be
7     potentially less one day and then
8     significantly more the next day?
9     Absolutely.
10 QUESTIONS BY MR. RICE:
11     Q.    It could be 45 percent over the
12 whole school year?
13         MR. BRANE: Object to form.
14         THE WITNESS: Again, I don't
15     have a spreadsheet that -- so the
16     issue is, is that it is pervasive in
17     all that they do, so actually trying
18     to then parse out.
19         So if you -- I mean, I could
20     say -- I could argue to say it could
21     also be about a hundred percent,
22     right, just because of how often
23     social media comes in with what it is
24     that they're doing.
25

Page 36

1 QUESTIONS BY MR. RICE:
2     Q.    So you think the percentage
3 could be between 45 and a hundred percent.
4     Is that right?
5         MR. BRANE: Object to form.
6         THE WITNESS: 45 percent is
7     what you stated. So, again, my
8     estimate is 50 percent.
9 QUESTIONS BY MR. RICE:
10     Q.    Why did you estimate 50 percent
11 and not 49 percent?
12         MR. BRANE: Object to form.
13         THE WITNESS: Because I would
14     say at least half of their time, so
15     half is 50 percent. At least half of
16     their time is spent on that. I don't
17     believe that less than half of their
18     time is spent on that.
19 QUESTIONS BY MR. RICE:
20     Q.    So it's sort of an
21 approximation?
22     A.    It's the estimated -- the
23 estimated approximation, yes.
24         The reality is, they are
25 spending the majority of their time dealing

Page 37

1 with pervasive issues connected to youth
2 social media use.
3     Q.    In paragraph 18, you also refer
4 to MTSS coordinators and facilitators.
5     Correct?
6         Did you answer? I didn't hear
7 it on the audio --
8     A.    Correct. Yes, correct.
9     Q.    And in paragraph 17, you refer
10 to meetings with MTSS teams.
11     Correct?
12     A.    Yes. Correct.
13     Q.    Which positions on the MTSS
14 teams do you meet with?
15     A.    So it depends on the time and
16 the situation. So MTSS, I meet regularly
17 with program manager and the MTSS
18 coordinator. We meet on a monthly basis to
19 review all district MTSS data.
20         And then MTSS teams are
21 required at every school campus. I have not
22 met with every MTSS team on a school campus.
23 We've got 90 schools, and so trying to get
24 out to every school every year is difficult.
25         However, I will meet with MTSS

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1  teams at school sites, especially those that
2  have higher-level instances of discipline and
3  of climate and culture, and it's based on the
4  need.
5      Q.    You don't directly supervise
6  the MTSS teams.
7          Right?
8      A.    I do not directly supervise
9  MTSS facilitators, no.
10          Our school counselors and our
11  community health workers are part of that
12  MTSS team, and I do supervise those roles.
13      Q.    And you don't supervise MTSS
14  facilitators either.
15          Correct?
16      A.    I do not.  Correct.
17      Q.    And for the counselors, don't
18  they report to the principal at the school
19  site?
20      A.    School counselors are evaluated
21  by the school principal, and then as my role
22  as director of the department, then we
23  monitor the school counseling program.  And
24  then we make decisions and recommendations
25  with district leadership around the use of

Page 39

1  the school counselor role and position.
2          So it is a collaborative
3  process between our department and the
4  principal at the school site.
5      Q.    And so the MTSS meetings at
6  school sites, how often do you have those
7  meetings?
8      A.    It is a minimum once per month,
9  but it's also dependent upon the need.
10      Q.    Do you meet with one school,
11  once per month?
12      A.    Every school is required to
13  meet with their MTSS team at a minimum of
14  once per month.
15      Q.    And but you don't attend all of
16  those, all of those meetings, because there's
17  90 schools.
18          Correct?
19      A.    Correct.
20      Q.    And how often do you attend one
21  of those meetings?
22      A.    I would attend an MTSS team
23  meeting, I would say, across the district
24  probably at least once per month.  And then
25  again, I meet with the coordinator of the

Page 40

1  MTSS department once per month.
2      Q.    And when you attend an MTSS
3  team meeting, how many staff members
4  typically attend?  How many MTSS staffers
5  typically attend?
6      A.    So every school has an MTSS
7  facilitator, so they have one MTSS that
8  coordinates that.
9          And then within those teams,
10  it's again dependent upon school sites, but
11  the majority of the schools will have their
12  MTSS facilitator, their school counselor and
13  administrator, at least one teacher, often
14  either a school psychologist or an
15  exceptional education teacher, a restorative
16  practice facilitator, a community health
17  worker.  Behavior monitor interventionists
18  are often present.
19      Q.    So when you attend an MTSS
20  meeting at school, there would typically be
21  one MTSS facilitator present at that
22  particular meeting.
23          Do I have that right?
24      A.    Correct.
25      Q.    And then have you met with

Page 41

1  every MTSS facilitator in the district?
2          MR. BRANE:  Object to form.
3          THE WITNESS:  Well, actually,
4      not individually, but I actually
5      provide ongoing professional
6      development and consultation with all
7      of the MTSS facilitators.  So the MTSS
8      facilitators, they meet as a whole
9      once per month, and I will meet with
10      them either in small groups or again
11      provide training and ongoing
12      consultation and resources and
13      supports at least three to four times
14      per year.
15  QUESTIONS BY MR. RICE:
16      Q.    In your meetings with the MTSS
17  teams, do you review their time reports for
18  them?  The facilitators?
19      A.    We have.  And what I usually
20  review that with is usually with the
21  leadership team, so the coordinator of MTSS
22  and the program manager over MTSS.
23          We -- again, we meet on a
24  monthly basis, and we review number of plans,
25  percentages of plans, time that MTSS

11 (Pages 38 - 41)

Page 42

1 facilitators are spending on specific tasks
2 as well as connections to discipline and
3 behavior issues connected to social media.
4 So we review that as a district leadership
5 team on a monthly basis.
6     I can also say from my
7 experience, I was an MTSS facilitator for two
8 years and -- starting in 2016. Then I was
9 the MTSS coordinator for two years prior to
10 becoming a principal and then eventually this
11 role as well.
12     So I do have extensive
13 experience in that role of the time
14 commitments of the role and the needs and the
15 issues that are often addressed within that
16 role.
17     Q.    And from 2016 to 2018, you were
18 a -- you were an MTSS facilitator at Peter
19 Howell Elementary School.
20     Is that right?
21     A.    That is correct.
22     Q.    Were you a facilitator at any
23 other schools?
24     A.    Prior to Peter Howell, there
25 was -- 2016 was the first year that the MTSS

Page 43

1 facilitator position was created.
2     Prior to that, I was at Gridley
3 Middle School as a learning support
4 coordinator that was basically the MTSS
5 position as well. It was just reorganized in
6 a different way.
7     So I was at -- for the school
8 year 2015, again, at Gridley Middle School as
9 a learning support coordinator doing the
10 MTSS, the PBIS, the discipline support, the
11 behavioral support at Gridley Middle School.
12     Q.    But the only school you've
13 actually been an MTSS facilitator is at Peter
14 Howell Elementary School.
15     Correct?
16     A.    In name, correct, but I
17 facilitated the MTSS process at Gridley in
18 the 2015 school year.
19     Q.    For the 2016 to 2018 school
20 years when you were an MTSS facilitator, did
21 you conduct any research to inform your
22 opinions for those years?
23     MR. BRANE: Object to form.
24     THE WITNESS: So based on my
25 experience, I guess my anecdotal

Page 44

1 research was living that and what was
2 happening within the schools.
3     So I met with teachers on a
4 very regular basis. I held MTSS
5 meetings weekly. I met with every
6 teaching team on a weekly basis. I
7 did work closely with other MTSS
8 facilitators as well.
9     And so did I write a
10 peer-review research paper? No.
11 However, through -- and I would do my
12 own research. I can't speak to
13 exactly what research I was doing in
14 2016 to 2018; however, I did do
15 ongoing research and analysis.
16     I also went through training in
17 2018 when I was the MTSS coordinator.
18 We went through what's called the
19 Masonic Model to evaluate our
20 processes for MTSS. And so that was
21 research-based around how to identify
22 the causes of behaviors and how to
23 provide interventions and support.
24     During that time, I also worked
25 with our county superintendent's

Page 45

1 office, and so we did -- as a
2 collaborative process, we did kind of
3 our own kind of research within Pima
4 County, and we looked at other similar
5 roles in the MTSS platform across
6 school districts within Pima County to
7 identify what behaviors we were
8 constantly seeing, what were the
9 reasons.
10     And again, during that time,
11 not a peer-reviewed research paper,
12 but we constantly had conversations
13 around what was happening in the Pima
14 County community and at schools across
15 Pima County, and again identifying the
16 pervasiveness of the increase of use
17 of social media across our schools and
18 how that was affecting students, how
19 it was affecting their mental health,
20 how it was affecting our instructional
21 practices.
22     So anecdotally would do some of
23 my own research, absolutely.
24 QUESTIONS BY MR. RICE:
25     Q.    So did you see social media as

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1  a problem in 2016?
2      A.   I will say for one example,
3  when I was at -- in 2015 at Gridley, what I
4  often heard was I had middle school girls in
5  my office because of the bullying happening
6  on Instagram.  And they would single girls
7  out.  They would leave girls out.
8          We were constantly having
9  conversations around that to the point where
10  there was a set of parents that got in a
11  fistfight in front of the school because of
12  the comments that their daughter had made to
13  another daughter on their social media
14  platforms.
15      Q.   And so did you see it --
16  apologies.  I didn't mean to cut you off.
17          But so did you see social media
18  as a pervasive problem then as far back as
19  2015?
20      A.   I would say we were beginning
21  to see pervasiveness of social media way back
22  then, yes, absolutely.
23      Q.   In your time at Peter Howell
24  from 2016 to 2018, you referred to meeting
25  with the teaching team and meeting with

Page 47

1  administrators at Peter Howell.
2          Those were all -- those regular
3  weekly meetings were at all Peter Howell.
4          Correct?
5      A.   Correct.
6      Q.   You didn't meet with teaching
7  staff at other elementary schools while you
8  were an MTSS facilitator at Peter Howell.
9          Correct?
10      A.   Correct.
11          I did meet with other MTSS
12  facilitators, and we would discuss their
13  conversations and their data with their
14  teaching teams.  And then when I was the MTSS
15  coordinator from 2018 to 2020, I did attend
16  the MTSS meetings across the district and did
17  meet with teaching teams as well.
18      Q.   And then at the time you were
19  an MTSS facilitator and then an MTSS
20  coordinator, you didn't oversee counselors in
21  those roles.
22          Correct?
23      A.   Correct.  However, I did
24  regularly collaborate with the coordinators
25  of that department at that time.

Page 48

1          And then counselors were
2  regular members of MTSS meetings at the
3  majority of our schools throughout that time.
4      Q.   When you were an MTSS
5  coordinator from 2018 to 2020, how many
6  schools did you work with in that role?
7      A.   I directly supervised 38 MTSS
8  facilitators, and they were each assigned, so
9  that would be 38 schools.  However, I also
10  provided consultation support to the rest of
11  our schools as well.
12          So I oversaw the MTSS process
13  for the entirety of the district, so that
14  would be all 88 schools.  And then again, I
15  supervised and directly evaluated the 38 that
16  we had at that time.
17      Q.   And were those all the same
18  level, or were they different levels,
19  schools, the 38?
20      A.   All levels.  Grades K
21  through 12.
22      Q.   And as an MTSS facilitator and
23  then coordinator, you didn't oversee any
24  behavioral specialists in that role.
25          Right?

Page 49

1      A.   I did not evaluate or oversee
2  the specialists, no.  Again, collaborated
3  with those departments.
4      Q.   And you didn't oversee at that
5  time behavior intervention monitors either.
6          Correct?
7      A.   Correct, no, I did not oversee
8  or evaluate behavior intervention monitors at
9  that time.
10      Q.   Have you ever directly
11  supervised behavioral specialists in your
12  time at TUSD?
13      A.   No, I have not directly
14  supervised behavioral monitors or
15  interventions in my time.
16          Again, I collaborate with those
17  departments, and they were regularly involved
18  in the MTSS process.
19      Q.   Have you ever directly
20  supervised behavior intervention monitors in
21  your time at TUSD?
22      A.   No, I have not directly
23  supervised or evaluated behavior intervention
24  monitors.
25      Q.   And have you ever, in your time

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1  at TUSD, directly supervised restorative
2  practice facilitators?
3      A.   I did not directly oversee or
4  supervise restorative practice facilitators.
5          When I was an MTSS facilitator,
6  our coordinator did supervise both MTSS and
7  restorative practice facilitators, so we were
8  very collaborative, as well as all of our
9  professional development and trainings were
10 conducted together.
11         When I moved into the role of
12 coordinator in 2018 is when MTSS and
13 restorative practice facilitators and PBIS
14 were split.  So then at that point in time,
15 that coordinator, Veronica Duran, and I, we
16 were the two coordinators overseeing that
17 effort, and so we were highly collaborative
18 in identifying the needs and the data and how
19 we utilized restorative practice facilitators
20 to support the MTSS process.
21     Q.   And as director of social,
22 emotional learning, you don't currently
23 supervise restorative practice facilitators
24 today.
25         Correct?

Page 51

1      A.   That is correct, I do not
2  supervise restorative practice facilitators.
3      Q.   And then in drafting this
4  declaration, did you conduct any research to
5  inform your opinions for the 2018 to 2020
6  school year?
7          MR. BRANE:  Object to form.
8          THE WITNESS:  Can you repeat
9      the question?
10 QUESTIONS BY MR. RICE:
11     Q.   I'll rephrase it.
12         In drafting this declaration,
13 did you review any documentation from the
14 2018 to 2020 school year to inform your
15 opinions?
16     A.   For this specific declaration I
17 did not.  However, I used my experience and
18 my knowledge in drafting this declaration.
19 And again, I had already done a lot of that
20 review for my deposition which had occurred
21 just a few weeks prior to this declaration.
22     Q.   When you say you rely on your
23 experience and knowledge, you're referring to
24 your personal recollection of your
25 experiences in the 2018 to 2020 school year.

Page 52

1          Is that correct?
2      A.   My personal experience and
3  knowledge from the 2016 and until 2025
4  experience.
5          So I, within my current role,
6  am very well-versed and collaborative with
7  these departments, and so all of my
8  experience over the past decade that I've
9  worked for Tucson Unified School District has
10 been in this area.  So used my collective
11 knowledge and experience based on all of my
12 roles.
13         Also, my experience as a parent
14 of 20 years.  I do have a 20-year-old and a
15 16-year-old, and so also very well-versed in
16 how social media also impacts my children.
17 And through conversations with them of what's
18 happening within their own communities as
19 well also gives me, I think, a unique purview
20 of also what is directly impacting our youth
21 today.
22     Q.   Do your children attend school
23 at TUSD?
24     A.   They do not.
25     Q.   Do your children have social

Page 53

1  media platforms?  Social media accounts?
2      A.   They do.
3      Q.   Which of the platforms do they
4  have accounts on?
5      A.   I believe TikTok, Instagram and
6  Facebook.
7          My oldest, I think, might also
8  have Snapchat.
9      Q.   Have you ever used parental
10 controls to limit the time they spend on
11 social media platforms?
12     A.   We have parental controls on
13 their cell phones.  My oldest no longer lives
14 with us, so we do not continuously have
15 parental controls on his.
16         However, there are parental
17 controls on the cell phone for my daughter,
18 who lives with us.  And those are parental
19 control apps within the cell phone.  Those
20 are not parental controls on the social media
21 platforms themselves, as we found it more
22 effective with the parental control apps.
23     Q.   Let's look again at
24 paragraph 18.
25         And I understand your testimony

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  to be that these percentages go back to the
2  2016 to 2020 school year to the present,
3  2025.
4          Correct?
5      A.   Yes.  So this was focused on
6  the litigation time period, so, yes, 2016,
7  2017, to present.
8      Q.   And so is it your testimony
9  that all the percentages listed in
10  paragraph 18 have stayed the same since 2016?
11     A.   So, again, this is an estimate
12  over time.  So when thinking about the
13  majority of this time over the past decade,
14  estimated in those specific time periods and
15  overall is an estimate of overarching time,
16  yes.
17     Q.   So, for instance, with MTSS
18  coordinators and facilitators, you estimate
19  that they spent 40 percent of their time on
20  social media-related issues going back to
21  2016.
22         Correct?
23     A.   Yes.  That was my estimate,
24  correct.
25     Q.   Do you think that the way those

Page 55

1  positions spend their time on a day-to-day
2  basis has consistently been the same from
3  2016 to 2025?
4      A.   So in the role of MTSS
5  facilitators, they are facilitating the
6  process and collecting the data, and so they
7  are not -- their time is not used as much as
8  others to provide the ongoing interventions,
9  which is why their percentage does seem to be
10  different.
11         But in collecting that data,
12  they -- since 2016, the role of the MTSS
13  facilitator really hasn't changed in the way
14  that they collect that data and how they hold
15  those meetings.
16         And so could it have changed
17  over the last decade?  I'm not sure, but I
18  would -- again, the estimation is now as well
19  as collective.
20     Q.   When you say it could have
21  changed over the last decade, I'm not sure.
22  Are you referring to the percentage of time
23  spent on social media-related issues?
24     A.   I'm saying the role of the MTSS
25  facilitator could have been shaped and

Page 56

1  changed over the past decade and how much
2  their involvement may have been with
3  interventions.
4          However, their role
5  predominantly is to collect the data and lead
6  the facilitation process to ensure then the
7  interventions are occurring, but they
8  generally are not providing those
9  interventions.
10         I don't believe that I'm saying
11  that the percentages could have changed.  I
12  am just saying that my overall estimation
13  during this entire time period is around
14  40 percent.
15     Q.   And it could have been
16  different for some years compared to others.
17         Right?
18         MR. BRANE:  Object to form.
19         THE WITNESS:  Again, back to
20  the other percentages, it could have
21  ebb and flowed.  Again, one year may
22  be more than another, and so there may
23  be one year where they're spending
24  90 percent of their time and then
25  another year maybe spending less than

Page 57

1  that.
2          So an overarching percentage of
3  around 40 percent, I did make that
4  determination with all of the
5  information.
6  QUESTIONS BY MR. RICE:
7      Q.   And then for the behavioral
8  specialists and behavior intervention
9  monitors, do you believe that the way they
10  spend their time on a day-to-day basis in
11  general, not related to social media
12  specifically, has stayed the same from 2016
13  to 2025?
14     A.   So their role is to intervene
15  and deal with behavior.  And so behavior has
16  been a pervasive issue across all of our
17  schools and all of our students since, you
18  know, the test of time, basically.
19         However, what I do know is
20  based on the trends, we have seen significant
21  increases in those behaviors being tied
22  directly to social media.
23         So their time, their baseline
24  predominantly time, is dealt on behavior.
25  The changes may be -- may be from the

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  different causes of that behavior. And like
2  I said, we've seen a significant increase of
3  those causes being directly tied to social
4  media over the last decade.
5      Q.    And then you were not employed
6  at TUSD for that entire time period from 2016
7  to 2025.
8          Correct?
9      A.    Correct. I did leave the
10 district in June of 2020. I was the
11 principal of a K-12 private school here in
12 the Tucson area, and then I returned to TUSD
13 in September of 2021.
14     Q.    And did you conduct any
15 research to inform your opinion about the
16 percentages for the 2020 to 2021 school year?
17     A.    Based on my experience working
18 in education and working -- continuing to be
19 in education within that school year, also
20 having ongoing conversations with colleagues,
21 I did a lot of collaboration in terms of
22 supports needed. So TUSD provided some
23 supports -- because of my -- the nature of my
24 school being a private school, TUSD provided
25 ancillary resources, so I was still in

Page 59

1  connection with colleagues during that time.
2          But again, my experience as a
3  principal, knowing what my current students
4  were currently engaged in, again, that
5  experience would have informed all of my
6  information here.
7      Q.    Which colleagues did you speak
8  with in 2020 to 2021 regarding the use of
9  social media by TUSD students?
10     A.    I couldn't say for certain. I
11 would say that ongoing, again, for the
12 ancillary resources, special ed resources
13 were provided to the students at my school.
14 So connections and collaboration with
15 exceptional ed staff there, as well as being
16 still pretty connected to colleagues within
17 MTSS and other administrators.
18         So I also leaned heavily on
19 other administrator/principal colleagues as I
20 was embarking on my first year as a
21 principal, so I met regularly with several
22 TUSD principals to support me in my role.
23 And so our conversations just overarchingly
24 talk about what are the needs and what are we
25 seeing.

Page 60

1          I will say that was also the
2  year of COVID, and so the concerns that we
3  were seeing with students and staff being
4  remote and using technology and devices,
5  having conversations around the difficulty of
6  keeping students engaged in a virtual setting
7  and combating the use of social media during
8  that time period, we would have conversations
9  around that, yeah.
10     Q.    Those conversations weren't
11 documented anywhere.
12         Correct?
13     A.    Correct.
14     Q.    And sitting here today, you're
15 not able to say how many conversations you
16 had about social media issues in 2020 or who
17 they were with.
18         Correct?
19     A.    Correct. Yeah, they were
20 ongoing conversations.
21         Living in the world of
22 education, it's -- education doesn't
23 necessarily change from year to year. We
24 have the same ongoing issues in what our
25 students are going through and what the needs

Page 61

1  are, so I leveraged, again, my experience.
2      Q.    As principal at a private
3  school, what was the cell phone policy you
4  instituted?
5      A.    Because it was a private school
6  and we were able to have more exact control,
7  students -- the cell phone policy was that if
8  students did bring a cell phone on campus,
9  was to stay in their backpack. And if it did
10 come out and if they were using it, then it
11 would be taken by school staff. And then we
12 would contact parents, and parents would have
13 to collect that device.
14     Q.    Do you think that policy
15 alleviated some of the harms resulting from
16 the use of cell phones on school property?
17     A.    So with -- even if students
18 aren't actively using their cell phone on
19 school property, we are still continuously
20 seeing the ramifications of the cell phone
21 and the social media usage.
22         If students -- I had many
23 students at the private school that parents
24 struggled to monitor devices, and they were
25 up all hours of the night. And so it was

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1  either a struggle of either getting them up
2  and going to school.  It was a struggle of us
3  trying to keep them awake and engaged.
4         What we would also see is then,
5  oh, I saw this on social media this last
6  night.  I'm going to talk to you about it
7  today.  I'm going to meet you at school, and
8  we're going to have a fight about it.
9         So it's -- even if the cell
10 phones are not actively being used on campus,
11 the ramifications and the issues that we
12 still see coming onto campus are still just
13 as pervasive of whether or not they actually
14 have the cell phone in their hand.
15        MR. RICE:  Let's take a short
16 break.
17        VIDEOGRAPHER:  The time is
18 10:10.  We're off the record.
19  (Off the record at 10:10 a.m.)
20        VIDEOGRAPHER:  The time is
21 10:31.  We're back on the record.
22 QUESTIONS BY MR. RICE:
23    Q.   Welcome back, Ms. Shivananda.
24        How often do you meet with
25 behavioral specialists?

Page 63

1     A.   So it depends.  In my previous
2  roles, I met with behavioral specialists on
3  the campus at MTSS meetings.  In my current
4  role, I meet more so with the district
5  leadership, and we review trends.
6         So I may meet with the
7  behavioral specialists to do some ongoing
8  training or collaboration or calibration,
9  probably maybe about once a year.
10    Q.   In your meetings with the
11 district leadership, do you have time records
12 for behavioral specialists?
13    A.   So we ongoing have
14 conversations.  So MTSS facilitators, as they
15 create SEL or behavioral plans as needed for
16 students, they will identify a behavior,
17 intervention monitor or specialist as a
18 potential intervention person to provide
19 interventions.
20        As we review the behavior
21 management team meeting, that's where we
22 review the ongoing trends of discipline
23 behavior as well as climate and culture.  We
24 talk about how behavior intervention monitors
25 are used, what that looks like, what the need

Page 64

1  is.
2         And then when I go out -- for
3  example, I've been working with Booth Fickett
4  K-8 for the past three years to support their
5  climate and culture efforts, and so I would
6  meet with the administrator or the
7  administration team on that campus.  We met
8  probably about quarterly.  We developed
9  ongoing training, professional development.
10 We talked about the needs of how they're
11 using their behavior intervention monitors,
12 how they're using their specialists, how we
13 could better use their specialists.
14        So I would say anecdotally, you
15 know, I meet with different stakeholders
16 across the district to really get, you know,
17 a robust idea of what the needs are and how
18 they are using their time.
19    Q.   But and that's -- but that's
20 it.  That's all anecdotal.  You don't review
21 any documented time records for behavioral
22 specialists.
23        Correct?
24        MR. BRANE:  Object to form.
25        THE WITNESS:  Outside of those

Page 65

1     behavior management team meetings and
2     looking at specific MTSS plan data,
3     no.
4  QUESTIONS BY MR. RICE:
5     Q.   And how often do you meet with
6  behavior intervention monitors?
7     A.   Similar to behavior
8  intervention specialists.
9     Q.   And is the answer the same with
10 respect to time records for them?
11    A.   Yes.
12    Q.   And how often do you meet with
13 restorative practice facilitators?
14    A.   Similar.  So, again, working
15 with -- and actually, over this past year
16 have been working with that department a
17 little bit more closely, as we have been
18 really revamping and looking at our positive
19 behavior intervention systems in terms of
20 climate and culture to address the mental
21 health issues that we're seeing across our
22 campuses.  And so we actually meet regularly.
23 We also meet regularly with them.
24        I also oversee the community
25 health workers who also provide mental health

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  supports as well as substance abuse
2  prevention and intervention.  And so we have
3  been collaborating a lot more this year to
4  identify what their role looks like and how
5  they are providing ongoing supports for
6  students.
7        Again, looking at intervention
8  plans and discipline data campus-wide, we've
9  also been looking at a lot of trends data
10  across the district around where their time
11  is being spent and what is needed.  And
12  again, it definitely goes back to the
13  behaviors, right, so the fights, the
14  bullying, the behaviors that we're seeing on
15  our campuses.
16        The students that are either
17  coming to counselors with anxiety issues or
18  depression also have stemmed from other
19  difficulties with other students, which
20  then -- would then be referred to a
21  restorative practice facilitator.
22        Our restorative practice
23  facilitators, there's about ten across the
24  district, and those that are assigned to
25  sites, they do work collaboratively with our

Page 67

1  school counselor.  And so then through the
2  evaluation and analysis of the school
3  counselor time, we can then also see and
4  delineate how often school counselors are
5  referring students to restorative practice
6  facilitators.
7     Q.    But you don't regularly meet
8  with restorative practice facilitators
9  individually.
10        Correct?
11     A.    It depends on the situation.  I
12  have met with individual restorative practice
13  facilitators based on the school campus if I
14  am supporting and consulting on climate and
15  culture.
16        We actually -- as a district,
17  we just trained all of our restorative
18  practice facilitators and MTSS facilitators
19  in the CSTAG model, the Comprehensive School
20  Threat Assessment Guidelines model, which is
21  very mental health and intervention-based
22  based on any sort of threat, whether that be
23  physical threat, social/emotional threat,
24  suicide ideation.
25        So we actually just conducted

Page 68

1  that training and then had some really great
2  conversations within that training.  That was
3  in -- that was at the end of May, actually.
4  We just had those conversations around what
5  are they seeing on our school campuses with
6  regards to the needs and the discipline
7  behaviors and the interventions that are
8  needed.
9        So I was actually able to meet
10  with them on a -- on a smaller basis in --
11  during that time, and regularly throughout
12  the year, collaborating with that department,
13  coming in on a consultative basis, providing
14  ongoing training for that team and that
15  staff.
16        So it just depends.  So the
17  work is very kind of organic, and it meets
18  the needs of each individual school campus
19  based on our discipline data.
20     Q.    And you estimate the amount of
21  time spent by restorative practice
22  facilitators on social media-related issues
23  is 50 percent.
24        Correct?
25     A.    That was the overarching

Page 69

1  estimate over time, correct.
2     Q.    What was the percentage in
3  2024?
4     A.    Again, estimated overarching
5  time, their overall position, I would say
6  50 percent is also potentially low, right?  I
7  kind of went low on that personnel.
8        Again, social media, it's
9  pervasive throughout.  I can guarantee you
10  that pretty much every incident that they
11  deal with has some connection and tie to
12  social media.
13        Can I tell you the percentage
14  in 2024?  Not without, you know, looking at
15  specific discipline data.  But again, with
16  the way that we collect our discipline data,
17  the highest level of discipline is what gets
18  reported, and then we backwards map and
19  identify what was the cause of that
20  discipline.
21        And so social media is not
22  necessarily always the core of the discipline
23  that's put into the system because that's not
24  just the way that we record things.
25        And so, again, I was kind of

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 70

1 estimating somewhat low. I would imagine
2 it's probably even higher than 50 percent.
3         Can I tell you year by year
4 what that percentage would be? Again,
5 overarching, over the time that they spend, I
6 estimated 50 percent overall of what they
7 potentially would spend.
8     Q.   For any position listed in
9 paragraph 18, can you tell me what percentage
10 of the time spent with that position on
11 social media-related concerns was in 2024?
12         MR. BRANE: Object to form.
13 Asked and answered.
14         THE WITNESS: Do I respond?
15 QUESTIONS BY MR. RICE:
16     Q.   Yeah, you can go ahead and
17 answer, Ms. Shivanonda.
18     A.   Okay. I mean, more
19 specifically, again, this is an overarching
20 estimate.
21         Do I know on a day-to-day basis
22 if someone spent a hundred percent of their
23 time? No, I don't know that. But
24 overarching, the estimate is anywhere from 50
25 to a hundred percent of their time. It could

Page 71

1 be some variances from day to day, from year
2 to year.
3         I would say that, again, ever
4 since probably 2020, we've been seeing an
5 increase in the number of instances that are
6 being connected to social media platforms.
7         So, again, my overarching
8 estimation is at least 50 percent.
9     Q.   But for restorative practice
10 facilitators, could you identify what percent
11 of their time they spent on social
12 media-related concerns in 2016?
13         MR. BRANE: Object to form.
14 Asked and answered.
15         You can answer again, Julie.
16         THE WITNESS: So in 2016, the
17 restorative practice facilitators and
18 MTSS facilitators, we were in the same
19 department, and so we collaborated
20 very regularly.
21         Again, the restorative practice
22 facilitator position, there are only
23 ten in the district, and they are
24 assigned based on disciplinary need.
25         And so if you actually wanted to go

Page 72

1 back through and identify why they
2 were assigned to different schools,
3 you will see a direct correlation to
4 high levels of discipline.
5         And again, when we look at our
6 discipline data, we do see that the
7 causation for the majority of our
8 discipline instances has a strand or a
9 connection to social media.
10         So I would actually argue that
11 the ten restorative practice
12 facilitators could actually be
13 spending upwards of a hundred percent
14 of their time dealing with social
15 media because they are assigned to the
16 schools that have the highest level of
17 need, the highest level of discipline,
18 and the highest level of interventions
19 needed for students based on that.
20 QUESTIONS BY MR. RICE:
21     Q.   Just sitting here today, you
22 don't know whether it's 50 percent or a
23 100 percent of their time?
24     A.   I would there's an estimate of
25 a range, anywhere from 50 to a hundred

Page 73

1 percent. And it depends on the site where
2 they're assigned to. It depends on the
3 discipline. Yes.
4     Q.   And for any individual
5 restorative practice facilitator, you didn't
6 go analyze the discipline for a particular
7 site.
8         Correct?
9         MR. BRANE: Object to form.
10         THE WITNESS: So I would argue
11 that I do do that, because within the
12 monthly leadership meetings that we
13 have, we do look at all of the schools
14 and all of the trends.
15         And again, we -- the decision
16 of where to place that restorative
17 practice facilitator is directly
18 collab -- corroborated by the
19 discipline. And so they are looked at
20 on a regular basis on where the needs
21 are.
22 QUESTIONS BY MR. RICE:
23     Q.   But sitting here today, you
24 couldn't tell me what percentage of a
25 restorative practice facilitator's time at a

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1  particular school is spent on social
2  media-related concerns.
3        Correct?
4      A.    To be honest with you, I would
5  probably say probably 100 percent.  But the
6  reality of it, based on my experience, I do
7  not know explicitly.
8        But what I can tell you is from
9  my experience, we are dealing with social
10  media-related instances on a very robust,
11  comprehensive basis.  It's ongoing.  It's
12  daily.  So I gave a conservative estimate of
13  50 percent.
14      Q.    But it could be 75 percent or
15  it could be 45 percent?
16      A.    I would argue that 50 percent,
17  again, was conservative.  I don't think that
18  it would be below 50 percent.
19        And again, it's an ongoing,
20  cumulative estimation with the need
21  increasing year over year.
22      Q.    But you can't identify the
23  percentage for a specific year, right, for
24  any of these positions.
25        Correct?

Page 75

1        MR. BRANE:  Object to form.
2        THE WITNESS:  If we needed to
3    get down into the data -- the issue,
4    though, is that we as a school
5    district, as an education, we don't
6    have the time, the capacity or the
7    resources to get as fine and granular
8    as what you're looking for.
9        The reality is, is I was
10    heading into a school just a couple of
11    weeks ago to do training with the
12    teachers and the staff, and walking in
13    the front door, there were ten staff
14    running out the front door to address
15    a fight that was occurring right in
16    front, with 25 students outside
17    whipping their cell phones out and
18    recording the entire fight.  And that
19    happens, all day, every day, on school
20    campuses.
21        Do we have the time to sit down
22    and say, oh, here's the percentage of
23    social media, that's just not the
24    reality.  We know that it's pervasive
25    through all of the work that we're

Page 76

1    doing, through the conversations that
2    we're doing, through the discipline
3    data that we have.  We know that there
4    is a high level of percentage that the
5    discipline and the issues that we are
6    seeing are caused through social
7    media.
8        Are we able to sit down and
9    look at specific data?  Yes and no.
10    We can probably parse that out.  But
11    the reality is, is that's not the way
12    that the school district works.  We
13    are not able to get that granular on a
14    regular basis.
15        We just know that it is
16    ongoing, it's pervasive, and it takes
17    up the majority of all of our staff
18    and stakeholders' time.
19  QUESTIONS BY MR. RICE:
20      Q.    And you didn't sit down and
21  view that specific data in drafting this
22  declaration.
23        Correct?
24        MR. BRANE:  Object to form.
25        THE WITNESS:  Not as I was

Page 77

1    drafting the declaration, no.
2  QUESTIONS BY MR. RICE:
3      Q.    You estimate that the
4  percentage of time spent by your position as
5  SEL director is 100 percent.
6        Correct?
7      A.    That is correct.
8      Q.    And the social/emotional
9  learning department supports every student at
10  TUSD.
11        Correct?
12      A.    Correct.
13      Q.    And that would include TUSD
14  students who don't use social media.
15        Correct?
16      A.    Correct.
17      Q.    And it -- does the SEL
18  department work with students in kindergarten
19  or first grade?
20      A.    Yes.
21      Q.    Does the department work with
22  issues -- does the SEL department work with
23  students who are concerned about issues that
24  are not related to social media?
25      A.    We are concerned with all

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1   issues that relate to the social, emotional
2   and mental health and well-being of all of
3   our students and all of our staff.  And
4   within our community, we know that social
5   media is pervasive, and the majority of the
6   issues that we do deal with have some sort of
7   tie or connection, whether it be familial use
8   of social media or direct use of social media
9   or being around other classmates and their
10  use of social media.
11          But I would argue to say that,
12  yes, 100 percent of our work will -- you
13  could find some causation of the work that we
14  do in terms of social media use.
15      Q.    Your department works with
16  students who have serious physical
17  disabilities.
18          Correct?
19      A.    Physical disabilities?
20          So we focus on social,
21  emotional, mental health and well-being.  So
22  if they have a physical disability that
23  impacts their social and mental, absolutely.
24  Physical well-being may be more so on our
25  nursing staff side of the house.

Page 79

1          But again, we also collaborate
2   and look at the whole child.
3       Q.    But you support the
4   social/emotional well-being of the students
5   who have physical disabilities.
6           Correct?
7       A.    Correct.
8       Q.    And you support the
9   social/emotional well-being of students who
10  are struggling with an issue in their home,
11  like a death in a family or their parents'
12  divorce.
13          Correct?
14      A.    Yes, absolutely.
15      Q.    And you support the
16  social/emotional well-being of students who
17  are struggling with poverty.
18          Correct?
19      A.    Correct.
20      Q.    And if a student is homeless,
21  you support their social/emotional well-being
22  then.
23          Correct?
24      A.    Correct.
25      Q.    And if a student has substance

Page 80

1   abuse issues, you still support their
2   social/emotional learning.
3           Correct?
4       A.    Correct.
5       Q.    Of the students you support,
6   have you ever analyzed how many of the
7   students are dealing with issues related to
8   social media?
9           MR. BRANE:  Object to form.
10          THE WITNESS:  Again, a direct
11  granular analysis, not -- some big
12  scope, not necessarily.
13          However, again, as I've
14  mentioned, there's connections with
15  social media in all of those forms and
16  facets.  So whether a student is
17  struggling with anxiety due to things
18  happening at home, then what they're
19  also encountering at school with their
20  peers who are engaging with social
21  media, that also has that connection
22  there.
23          The families that are dealing
24  with homelessness, we've also
25  identified connections with social

Page 81

1   media there as well.
2           Families that are potentially
3   subjected to fraud through the use of
4   social media, we've had students come
5   and say, you know, my parents were
6   scammed out of so much money on social
7   media, and so now we weren't able to
8   pay rent this month, right?
9           So it's very pervasive, and it
10  intertwines into all that we do.
11          Are we able to say that all
12  40,000 students that their -- have
13  been impacted with social media at
14  some point, I would imagine because
15  it's so pervasive in our community,
16  the answer would be yes.
17          Do we have any specific,
18  granular studies to identify that?
19  No.
20  QUESTIONS BY MR. RICE:
21      Q.    When you say that there are
22  families dealing with homelessness and you've
23  identified connections with social media
24  there, is that documented anywhere?
25      A.    So we utilize other resources.

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  We have our family community resource centers
2  where -- and then McKinney-Vento.  So there's
3  documentation around the act of the
4  homelessness.  In conversations with
5  students, it may or may not be documented.
6         If it was risen to the level of
7  needing additional outside resources and
8  supports, it may or may not have been
9  documented within the student information
10  system.
11        But again, we don't stop the
12  work that we're doing when we're working with
13  students to then document in any sort of
14  system.
15    Q.    And for every student you meet
16  with, you don't always ask them whether
17  there's a connection to social media with an
18  issue they're facing.
19        Right?
20        MR. BRANE:  Object to form.
21        THE WITNESS:  We don't have a
22  script that we ask every student.
23  It's definitely more organic.  And
24  when they come and they ask for
25  support from a school counselor and

Page 83

1  then we can deduct whatever that cause
2  may be.  And generally through that
3  investigation or through that
4  conversation, we are able to then
5  determine, identify, that there is
6  some connection to a social media
7  platform.
8  QUESTIONS BY MR. RICE:
9    Q.    But that's not a question you
10  ask every student.
11        Correct?
12        MR. BRANE:  Object to form.
13        THE WITNESS:  No.  When they
14  walk in our office, we don't say, how
15  have you been impacted by social media
16  today.  It's just not the way that the
17  world works.
18        So they come in, they say that
19  there's an issue, they're being
20  bullied, so-and-so is being mean to
21  them.
22        Okay, so tell me about the
23  instance.
24        Well, last night on Instagram,
25  someone posted a picture of me, and

Page 84

1  they -- and it was really, you know,
2  negative, and now everybody's talking
3  about me.
4        Okay.  Well, we didn't have to
5  ask the question, were you impacted by
6  social media.  It just comes out
7  through the instance.
8        Just like if you were to go see
9  a therapist.  Your therapist's first
10  question is not going to say, are you
11  here because of social media.
12        So that's just not the way that
13  we work.
14  QUESTIONS BY MR. RICE:
15    Q.    Do you track students' medical
16  diagnoses, Ms. Shivananda?
17    A.    I'm sorry, could you repeat the
18  question?
19        MR. BRANE:  Yeah.
20  QUESTIONS BY MR. RICE:
21    Q.    Do you track students'
22  diagnoses?
23        MR. BRANE:  Object to form.
24        THE WITNESS:  So there is -- we
25  are HIPAA and FERPA-compliant, and so

Page 85

1  depending upon what has been released
2  to the school district, we do take
3  information very confidentially.
4        If it is connected with any of
5  the resources and supports that we are
6  providing, we may or may not use that
7  information within the interventions
8  that we provide.
9        We are not clinicians or
10  diagnosticians, so we do not
11  clinically treat or diagnose students
12  with mental health diagnoses.
13  However, if we are aware of it, then
14  we will utilize that as a data point
15  in identifying the resources and the
16  supports that we provide.
17  QUESTIONS BY MR. RICE:
18    Q.    You mentioned bullying.
19        Are you aware of any data
20  tracking how many incidents of bullying at
21  TUSD involved defendants' platforms?
22    A.    So bullying can be difficult to
23  track.  So if it rises to the level of
24  discipline, then it is tracked in the
25  discipline system.  And then that would be

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1 part of the information within the discipline
2 of how the bullying is occurring.
3           Not all instances of bullying
4 are tracked as discipline. However, if a
5 student goes to a school counselor or another
6 resource or a stakeholder on a school campus
7 and talks about how they're being bullying --
8 how they're being bullied and if has any sort
9 of connection to social media, we do have
10 that conversation.
11           Is it always documented? No,
12 unless it rises to the level.
13           So if there's one instance
14 where a student may come and say, hey,
15 so-and-so, you know, posted something about
16 me on Instagram, other people are liking it
17 and commenting on it, it makes me feel really
18 uncomfortable, I feel like it's a bullying
19 situation, they may or may -- then there's
20 going to be an investigation, right? They
21 may have a restorative conference with the
22 student.
23           Is it all going to be
24 documented the first time? Yes or no,
25 possibly. If it happens a subsequent time,

Page 87

1 then potentially they'll get documented. But
2 not absolutely everything is documented.
3     Q.    Let's go to paragraph 12 in the
4 declaration.
5           Mr. Fronzaglia, I'm not seeing
6 it -- oh, there it goes. Thank you.
7 Paragraph 12.
8           So, Ms. Shivananda,
9 paragraph 12 was bullying and harassment.
10    A.    Yes.
11    Q.    Are you aware of any data
12 tracking how many instances of harassment at
13 TUSD involved defendants' platforms?
14    A.    Again, if it rises to the level
15 of disciplinary action needed, then that
16 would be tracked.
17           We also know just through
18 conversations with school counselors as we
19 talk about what are they regularly seeing.
20           Then also within our MTSS
21 platforms -- so our teachers will -- they
22 will write any observations that they have if
23 a student talked to a teacher about that.
24 They have a platform within the MTSS platform
25 to be able to document that.

Page 88

1           So can I say with certainty
2 that every single harassment case has been
3 documented? No. However, a lot are in
4 various forms and through a lot of
5 conversations through the different
6 stakeholders that are involved in it.
7     Q.    The MTSS platform doesn't
8 categorize incidents by whether they relate
9 to social media.
10           Correct?
11    A.    Correct. There are specific
12 categories, whether it be bullying, whether
13 it be disruption, right?
14           And so then within the verbiage
15 that may be denoted under that category, then
16 it would be delineated whether or not it was
17 social media or not.
18    Q.    And so to identify the total
19 number of instances of harassment or bullying
20 related to social media, you would need to
21 review that verbiage.
22           Correct?
23    A.    You would need to review that
24 verbiage. And to be honest, as we look at --
25 it's honestly very difficult to pinpoint the

Page 89

1 number because of how large and pervasive it
2 is.
3           So prior to the use of social
4 media for bullying, it was, you know,
5 hearsay. It was one person said something
6 about another person.
7           But then on bullying and
8 harassment, the reach just is such a further
9 reach where multiple students, even across
10 multiple schools and across different school
11 districts and across the county, students are
12 now seeing people post pictures of them or
13 negative comments of them or leaving them out
14 or whatever it may be. It's just so
15 pervasive, and now it's difficult to identify
16 the number of people that have been impacted
17 by that bullying or harassment.
18           So if one picture is posted and
19 then you've got 57 comments agreeing with it,
20 the school, we don't have the capacity to
21 investigate and talk with all 57 students and
22 identify where the level of the bullying is.
23           And so, again, like in my
24 paragraph here, absent social media platform,
25 it was much easier to contain those instances

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1  of harassment and bullying, whereas now
2  social media just exacerbates it at such a
3  large scale that we don't have the capacity
4  to necessarily have explicit numbers of
5  impact.
6      Q.    Well, you said "exacerbate," so
7  you're referring to the ability to post and
8  share videos and comments online?
9      A.    Post videos, comments, likes,
10  shares, then sharing in private messages,
11  yes. Just puts it on a very, very public
12  platform.
13      Q.    Then if we go to paragraph 11,
14  Mr. Fronzaglia.
15          And in this paragraph you refer
16  to the negative mental health impacts of
17  social media.
18      A.    Yes.
19      Q.    You refer to suicidal ideations
20  or self-harms.
21          Do you track how many students
22  suffer from suicidal ideation or self-harm?
23      A.    Those that are reported, yes.
24          So we have a process in the
25  district. We have a suicide ideation

Page 91

1  protocol. And so if a student -- if either a
2  student goes to a staff member or another
3  student will share concerns with a staff
4  member, then we use that suicide ideation
5  protocol and identify whether or not it's
6  suicide ideation, self-harm or homicidal
7  ideation as well.
8      Q.    Do you track the causes of
9  suicidal ideation or self-harm?
10      A.    If it's able to be determined,
11  yes. That's part of the process of
12  identifying what is -- what is occurring, so
13  that way we can ensure that we are adequately
14  providing the right resources and
15  interventions in place.
16      Q.    And suicidal ideation,
17  self-harm can be caused by issues unrelated
18  to social media.
19          Would you agree?
20      MR. BRANE: Object to form.
21      THE WITNESS: Suicide ideation,
22  self-harm can be caused by a myriad
23  of -- of instances.
24          What we're also seeing is that
25  there's an increased amount of

Page 92

1  anxiety, suicidal ideation, self-harm,
2  threats of violence, increased
3  aggression. We're seeing a direct
4  increase, the more that we see an
5  increase of social media usage.
6  QUESTIONS BY MR. RICE:
7      Q.    You also mentioned sleep
8  disturbances in this paragraph.
9          Do you track the cause of
10  students' sleep disturbances?
11      A.    We -- if we are made aware.
12          So if a parent does report that
13  they're unable to get their students off
14  their devices or off social media late at
15  night, and then there's why they're able
16  to -- one of the issues that we are finding
17  is chronic tardiness and chronic absenteeism,
18  and then we do attempt to collect that
19  information of why students are not there.
20  So collecting whether or not they were up
21  late, whether or not they have an appointment
22  due to depression, anxiety.
23          And then what we're also seeing
24  from our teachers on a regular basis, if it
25  becomes increasingly difficult for teachers

Page 93

1  to get students engaged. We have students
2  wearing hoodies. They're hiding in their
3  hoodies. They're falling asleep in class.
4  They're having difficulty engaging.
5          And oftentimes when the teacher
6  asks, like, hey, why are you so tired, it's
7  like, well, I was up, you know, till 2 a.m.
8  talking to my friends on Instagram, talking
9  to my friends on Snapchat.
10          And so we just -- we don't
11  necessarily document that explicitly outside
12  of documenting for attendance and
13  absenteeism.
14          Teachers may also document that
15  in the MTSS observations as well.
16      Q.    In paragraph -- let's go to
17  paragraph 6. And in paragraph --
18  paragraph 8. Excuse me.
19          So in paragraph 8, you refer to
20  parents' and students' reports.
21          Correct?
22      A.    Correct.
23      Q.    Where would those reports be
24  documented?
25      A.    If they were documented, it

24 (Pages 90 - 93)

Page 94

1 would be documented in our student
2 information system.
3      Q.   In this paragraph, you mention
4 separating students from their phones.
5          Do you have any data on the
6 number of times teachers have been unable to
7 separate students from their phones?
8      A.   So the data probably -- there's
9 probably -- it's probably skewed data.  So I
10 know that teachers deal with this all day,
11 every day, on a regular basis.  Some teachers
12 are better at handling it than others.
13         So if they needed
14 administrative support, then that would be
15 documented in disruption.  Teachers also
16 document within the MTSS platform under
17 potential disruption or defiance, and so that
18 could be documented.  And again, if it's also
19 then documented enough to the level of a
20 disciplinary infraction, it would be
21 documented there as well.
22         So students constantly will
23 have their phones out.  A teacher will ask
24 the student to put it away.  They become
25 belligerent in often cases.  They refuse to

Page 95

1 put it away.
2          And then, again, depending upon
3 the teacher's ability to either deescalate
4 the situation, they could either then, you
5 know, talk through the -- with the student if
6 they have a good relationship, or potentially
7 call for a behavior intervention monitor or a
8 behavior specialist or admin to come down and
9 deal with the student and potentially remove
10 the student from the room, if need be.
11     Q.   But sitting here today, you
12 don't have a num -- you can't identify a
13 number of times that occurred.
14         Correct?
15         MR. BRANE:  Object to form.
16         THE WITNESS:  The number would
17 be infinite.  I mean, it happens so
18 often that, again, we don't have the
19 staffing, the capacity or the time to
20 sit down and document every single
21 time.
22         The more significant times
23 would be documented within either MTSS
24 or disciplinary records.
25

Page 96

1 QUESTIONS BY MR. RICE:
2      Q.   In this paragraph you also
3 mention screen exposure.
4          Correct?
5      A.   Yes.
6      Q.   Screen exposure would include
7 time playing video games.
8          Right?
9      A.   It would.
10     Q.   And it would include time a
11 student's using a computer or a tablet for an
12 educational purpose?
13     A.   Yes.
14     Q.   It would include time a student
15 is watching Netflix?
16     A.   Yes.
17         I can tell you, just as an
18 educator and as a parent of a teenager, the
19 majority of the time on screens are on their
20 phones, on social media.  So --
21     Q.   But TUSD doesn't look -- go
22 ahead.
23     A.   The days of -- I mean,
24 there's definitely video games, but I can
25 tell you -- I can't even tell you the last

Page 97

1 time my daughter turned on Netflix.
2      Q.   But TUSD doesn't track the
3 amount of time students spend on particular
4 applications.
5          Correct?
6      A.   No, but I imagine the social
7 media platforms have the ability to track
8 that.
9      Q.   But you don't have that data.
10         Correct?
11     A.   We do not have that data.  We
12 don't have access to personal devices.
13         MR. RICE:  All right.  Well,
14 thank you, Ms. Shivanonda, for your
15 time.
16         Subject to any questions from
17 other defendants or questions from
18 your counsel, I have no further
19 questions at this time.
20         MR. BRANE:  Anybody else?
21         MR. WHITELEY:  No questions
22 from YouTube.
23         MR. BRANE:  Is that good,
24 Rowley, to call it?
25         MR. RICE:  Let's give it --

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1    MR. BRANE:  No questions from
2  me, but if you need to check with
3  others, you tell me.
4    MR. RICE:  Yeah, I guess just
5  give another minute just in case
6  they --
7    MS. BURRESS:  Nothing from
8  Meta.  Thanks.
9    MR. RICE:  All right.  I'm
10  assuming nothing from TikTok then
11  either.
12    MR. SHAGRIN:  Nothing from
13  TikTok.
14    MR. RICE:  All right.  Well,
15  thank you.
16    Austin, you said you have no
17  questions?
18    MR. BRANE:  No questions from
19  me.  Yep, thank you.  Thank the
20  witness for the time.
21    MR. RICE:  Thank you,
22  Ms. Shivananda.
23    MR. BRANE:  Thanks, everybody.
24    VIDEOGRAPHER:  The time on the
25  record is 1 hour, 45 minutes.

Page 99

1    The time is 11:08.  We're off
2  the record.
3    (Deposition concluded at 11:08 a.m.)
4    – – – – – – –

Page 100

1    CERTIFICATE
2    I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
4  of the examination, Julie Shivananda, was
   duly sworn by me to testify to the truth, the
5  whole truth and nothing but the truth.
6    I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
7  testimony as taken stenographically by and
   before me at the time, place and on the date
8  hereinbefore set forth, to the best of my
   ability.
9
     I DO FURTHER CERTIFY that I am
10  neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
11  action, and that I am neither a relative nor
   employee of such attorney or counsel, and
12  that I am not financially interested in the
   action.
13
14
15    _Carrie A. Campbell_
16  CARRIE A. CAMPBELL,
   NCRA Registered Diplomate Reporter
17  Certified Realtime Reporter
   California Certified Shorthand
18  Reporter #13921
   Missouri Certified Court Reporter #859
19  Illinois Certified Shorthand Reporter
   #084-004229
20  Texas Certified Shorthand Reporter #9328
   Kansas Certified Court Reporter #1715
21  New Jersey Certified Court Reporter
   #30XI00242600
22  Louisiana Certified Court Reporter
   #2021012
23  Notary Public
   Dated:  July 2, 2025
24
25

Page 101

INSTRUCTIONS TO WITNESS

1
2
3    Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8    After doing so, please sign the
9  errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13    It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1        ACKNOWLEDGMENT OF DEPONENT
2
3
4        I,_____, do
hereby certify that I have read the foregoing
5    pages and that the same is a correct
transcription of the answers given by me to
6    the questions therein propounded, except for
the corrections or changes in form or
7    substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12    _____

Julie Shivanonda              DATE
13
14
15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18
19    Notary Public
20
21
22
23
24
25

Page 104

1    – – – – – – –
    LAWYER'S NOTES
2    – – – – – – –
3    PAGE   LINE
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25

Page 103

1    – – – – – – –
    ERRATA
2    – – – – – – –
3    PAGE   LINE  CHANGE
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25

27 (Pages 102 - 104)