**Exhibit 43**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

2

IN RE: SOCIAL MEDIA                )
3   ADOLESCENT ADDICTION/PERSONAL    )
INJURY PRODUCTS LIABILITY          ) Case No.
4   LITIGATION                         ) 4:22-MD-03047-YGR
_____   )
5   THIS DOCUMENT RELATES TO:          ) MDL No. 3047
Tucson Unified School District     )
6   v. Meta Platforms Inc., et al., )
Case No. 4:24-cv-01382             )

7

8                  TUESDAY, JULY 1, 2025
9        CONFIDENTIAL - ATTORNEYS' EYES ONLY -
              PURSUANT TO PROTECTIVE ORDER
10                          - - -
11                Remote videotaped deposition of
12   Brian Lambert, held at the location of the
13   witness in Tucson, Arizona, commencing at
14   9:02 a.m. Pacific Time, on the above date,
15   before Carrie A. Campbell, Registered
16   Diplomate Reporter, Certified Realtime
17   Reporter, Illinois, California & Texas
18   Certified Shorthand Reporter, Missouri,
19   Kansas, Louisiana & New Jersey Certified
20   Court Reporter.
21                          - - -
22
23
24
25

CONFIDENTIAL

Page 2

1    A P P E A R A N C E S :
2
3    WAGSTAFF & CARTMELL LLP
     BY:  AUSTIN BRANE
4       abrane@wcllp.com
     4740 Grand Avenue, Suite 300
5    Kansas City, Missouri  64112
     (816) 701-1100
6    Counsel for Plaintiffs
7
8    MUNGER TOLLES & OLSON LLP
     BY:  ROWLEY RICE
9       Rowley.Rice@mto.com
     JULIA KONSTANTNINOVSKY
10      julia.konstantninovsky@mto.com
     350 South Grand Avenue, 50th Floor
11   Los Angeles, California  90071
     (213) 683-9100
12   Counsel for Snap, Inc.
13
14   SHOOK HARDY & BACON LLP
     BY:  COURTNEY C. BURRESS
15      cburress@shb.com
     DANA L. STRUEBY
16      dstrueby@shb.com
     2555 Grand Boulevard
17   Kansas City, Missouri 64108
     (816) 474-6550
18   Counsel for Meta Platforms, Inc., f/k/a
     Facebook, Inc.; Facebook Holdings, LLC;
19   Facebook Operations, LLC; Facebook
     Payments, Inc.; Facebook Technologies, LLC;
20   Instagram, LLC; Siculus, Inc.; and
     Mark Elliot Zuckerberg
21
22
23
24
25

Page 3

1    KING & SPALDING LLP
     BY:  MATTHEW ROWAN
2       mrowan@kslaw.com
     621 Capitol Mall, Suite 1500
3    Sacramento, California  95814
     (916) 321-4800
4    Counsel for TikTok, Ltd.; TikTok, LLC;
     TikTok, Inc.; ByteDance Ltd.; and
5    ByteDance Inc.
6
7    WILLIAMS & CONNOLLY LLP
     BY:  ARMANI J. MADISON
8       amadison@wc.com
     680 Maine Avenue, SW
9    Washington, DC  20024
     (202) 434-5547
10   Counsel for Alphabet Inc.; Google LLC,
     and YouTube, LLC
11
12
     ALSO PRESENT:
13
        JUSTIN BILY, exhibit technician
14
15
     V I D E O G R A P H E R :
16   JAMES ARNDT,
     Golkow Litigation Services
17
         - - -
18
19
20
21
22
23
24
25

Page 4

1                    INDEX
2                              PAGE
3    APPEARANCES................................. 2
4    EXAMINATIONS
5      BY MR. RICE............................   6
6
7              EXHIBITS
8    No.   Description                  Page
9    1    Declaration of Brian Lambert          8
10      (Exhibit attached to the deposition.)
11
12   CERTIFICATE...............................70
13   ACKNOWLEDGMENT OF DEPONENT.................72
14   ERRATA....................................73
15   LAWYER'S NOTES............................74
16
17
18
19
20
21
22
23
24
25

Page 5

1            VIDEOGRAPHER:  We are now on
2    the record.  My name is James Arndt.
3    I am a videographer for Golkow, a
4    Veritext division.
5            Today's date is July 1, 2025,
6    and the time is 9:02 a.m. Pacific
7    Time.
8            This remote video deposition is
9    being held in the matter of the Social
10   Media Adolescent Addiction and
11   Personal Injury Products Liability
12   Litigation, for the United States
13   District Court, Northern District of
14   California.
15           The deponent is Brian Lambert.
16           All parties to this deposition
17   are appearing remotely and have agreed
18   to the witness being sworn in
19   remotely.
20           Due to the nature of remote
21   reporting, please pause briefly before
22   speaking to ensure all parties are
23   heard completely.
24           Counsel will be noted on the
25   stenograph record.

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1    The court reporter is Carrie
2  Campbell, and she will now swear in
3  the witness.
4
5        BRIAN LAMBERT,
6  of lawful age, having been first duly sworn
7  to tell the truth, the whole truth and
8  nothing but the truth, deposes and says on
9  behalf of the Defendants, as follows:
10
11       DIRECT EXAMINATION
12  QUESTIONS BY MR. RICE:
13    Q.    Good morning, Mr. Lambert.
14    A.    Good morning.
15    Q.    Could you please state your
16  name for the record?
17    A.    Brian Lambert.
18    Q.    And do you understand,
19  Mr. Lambert, that you are testifying under
20  oath today?
21    A.    Yes.
22    Q.    Is there any reason you cannot
23  give truthful and accurate testimony today?
24    A.    No.
25    Q.    And you're employed at Tucson

Page 7

1  Unified School District as a regional
2  assistant superintendent.
3        Correct?
4    A.    That's correct.
5    Q.    So you understand that if I say
6  "TUSD" or "the district" in my questions, I'm
7  referring to Tucson Unified School District.
8        Correct?
9    A.    Correct.
10    Q.    And you understand that if I
11  say "defendants' platforms" in my questions,
12  I'm referring to Facebook, Instagram, TikTok,
13  YouTube and Snapchat?
14    A.    Yes.
15    Q.    And you understand this
16  deposition today is being conducted remotely
17  via Zoom.
18        Correct?
19    A.    Correct.
20    Q.    Can you confirm the technology
21  is working properly, that you can see and
22  hear me okay?
23    A.    Yes.
24    Q.    And can you confirm that you're
25  alone in the room where you're testifying

Page 8

1  today?
2    A.    Yes.
3    Q.    Do you have any documents in
4  front of you?
5    A.    No.
6    Q.    And do you understand that
7  while we're on the record today, you may not
8  communicate with anyone else during the
9  deposition?
10    A.    Yep.  Yes.
11        (Lambert Exhibit 1 marked for
12  identification.)
13  QUESTIONS BY MR. RICE:
14    Q.    Let's mark as Exhibit 1 Tab 1.
15        MR. BRANE:  So, Brian, you'll
16  see in the chat there's a link there
17  from Justin "marked exhibits folder."
18  If you pull that up, it'll bring up
19  sort of a file share web page, and
20  then exhibits will load there.  Just
21  give them a minute, but they'll show
22  up.
23        You might have to refresh after
24  a minute if it's easier.  They'll show
25  them on the screen, I'm sure, but if

Page 9

1    it's easier for you to have a copy up
2    as well, they're available there.
3  QUESTIONS BY MR. RICE:
4    Q.    And, Mr. Lambert, this is a
5  declaration you signed in this case.
6        Correct?
7    A.    That is correct.
8    Q.    And you signed it under the
9  penalty of perjury.
10        Correct?
11    A.    I'm sorry?
12    Q.    You understand you signed the
13  declaration under penalty of perjury?
14    A.    That's correct.
15    Q.    And what did you do to prepare
16  for this deposition today, Mr. Lambert?
17    A.    I met with Austin, the
18  attorney, yesterday.
19    Q.    Anything else?
20    A.    No.
21    Q.    Going back to Exhibit 1, your
22  declaration, did you write the first draft of
23  this declaration?
24    A.    No.
25    Q.    To the best of your knowledge,

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1  who wrote the first draft of the declaration?
2      A.    I believe maybe attorneys that
3  work with Austin.  They gave us a template.
4      Q.    And then when did you first see
5  a draft of the declaration?
6      A.    This year.  Maybe April, May.
7  I don't remember exactly.
8      Q.    Did you make any edits to the
9  template that counsel provided you?
10     A.    Yes.
11     Q.    Did you review any documents
12 before signing the declaration?
13     A.    No.
14     Q.    Did you consult with anyone
15 else before signing the declaration other
16 than counsel?
17     A.    No.
18     Q.    Did you do anything else to
19 confirm the accuracy of the information in
20 the declaration before you signed it?
21     A.    No.
22     Q.    To your knowledge, did anyone
23 other than counsel review this declaration
24 before you signed it?
25     A.    I don't believe so.

Page 11

1      Q.    And you didn't show it to
2  anyone else other than counsel before you
3  signed it?
4      A.    No.
5      Q.    So let's go to page 5,
6  paragraph 17.
7      A.    Okay.
8      Q.    So in this paragraph, you refer
9  to site administrators at the elementary and
10 middle and high school levels.
11         Which positions are included in
12 the term "site administrators"?
13     A.    Principals and assistant
14 principals.
15     Q.    And is that consistent across
16 all three levels?
17     A.    Yes.
18     Q.    And you directly supervise
19 principals.
20         Correct?
21     A.    That is correct.
22     Q.    And then the assistant
23 principals report to the principals who
24 report to you.
25         Is that fair?

Page 12

1      A.    Yes.
2      Q.    So in paragraph 17, you refer
3  to several percentages from 2018 to the
4  present.
5          What do you understand those
6  positions -- excuse me.  What do you
7  understand the percentages you put in
8  paragraph 18 -- paragraph 17 to mean?
9      A.    The percent of time that the
10 administrators are dealing with issues
11 stemming from social media and working with
12 students about those issues.
13     Q.    So, for instance, when you say
14 that 15 to 20 percent of a high school site
15 administrator's time in 2018 was spent
16 dealing with issues stemming from social
17 media and working with students about those
18 issues, what types of activities would be
19 included in that time estimate?
20     A.    Dealing with investigations.
21 Dealing with students that report things.
22 Dealing maybe with referrals from teachers.
23 Dealing with issues parents bring in.
24         A lot of it's investigating.  I
25 would say a majority of that time is -- dealt

Page 13

1  with investigating things that -- concerns
2  that are brought forward.
3      Q.    And are those usually concerns
4  about a particular social media post or video
5  or photo?
6      A.    Well, it could be.  It could be
7  maybe an accusation that someone has made.  I
8  think it could be, like, a fight that
9  happens, and then they're dealing with the
10 spreading of the video via social media.
11     Q.    And when you refer to "social
12 media" in this declaration, what applications
13 are included in that term as you use it here?
14     A.    I believe the most common ones
15 that we deal with are probably Snapchat,
16 TikTok and Instagram.
17     Q.    Are there other platforms
18 besides Snapchat, TikTok and Instagram
19 included in the term "social media" here?
20     A.    I think, you know, I could say
21 Facebook.  Kids don't really use Facebook
22 very much.  I think that's maybe an older
23 term.  If we go back, say, six,
24 seven years, it might have been Facebook, but
25 now kids don't really use those much.

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1    Q.    What about Reddit?
2    A.    I'm not even familiar with
3  that, really.
4    Q.    Would this -- would the
5  percentages here include Discord?
6    A.    Discord?  What's Discord?
7    Q.    Are you familiar with the
8  platform Discord?
9    A.    Hold on.  The camera fell
10  again.
11       MR. RICE:  Should we go off the
12    record briefly?
13       THE WITNESS:  Yeah.  Sorry.
14       VIDEOGRAPHER:  We are going off
15    the record at 9:12 a.m.
16     (Off the record at 9:12 a.m.)
17       VIDEOGRAPHER:  Okay.  We are
18    back on the record at 9:12 a.m.
19       THE WITNESS:  All right.
20    Rowley, you were saying something
21    about dis -- discourse?  Discord?
22  QUESTIONS BY MR. RICE:
23    Q.    Are you familiar with the
24  platform Discord?
25    A.    No.  Never heard of it.

Page 15

1    Q.    Is it -- is it possible that
2  even if you're not aware of a particular
3  platform, the percentages listed in
4  paragraph 17 would include issues that stem
5  from other social media platforms besides the
6  ones you identified?
7       MR. BRANE:  Object to form.
8       THE WITNESS:  I would say that
9    I'd probably increase then the number
10    because I'm only going by what I've
11    collected in -- you know, from my
12    dealings with administrators.  So I've
13    never heard of them using any other
14    terms.
15  QUESTIONS BY MR. RICE:
16    Q.    And for the percentages
17  identified in paragraph 17, you didn't
18  estimate the percentage of time that site
19  administrators spend on any one platform
20  specifically.
21       Is that correct?
22    A.    That's correct.
23    Q.    And so if I -- and so sitting
24  here today, would you be able to estimate the
25  percent of time applicable to one particular

Page 16

1  platform?
2    A.    I don't think I would.  I --
3  that would take a lot of, like, research.
4    Q.    And before this litigation, had
5  you ever attempted to estimate the percentage
6  of time that TUSD staff spend on dealing with
7  social media-related issues?
8    A.    I think that we've had
9  discussions as administrators about how much
10  time we've spent with dealing with issues
11  from social media.  I don't think that's new.
12    Q.    Are any of those discussions
13  documented anywhere?
14    A.    No.  You know, they might be in
15  a -- monthly discipline reports.  I don't
16  know.  Sometimes schools, you know, will -- I
17  know that I've seen in the past, like,
18  documentation of girls gossiping, and in my
19  conversation with those administrators,
20  it's -- a lot of the gossiping is going back
21  and forth through social media.
22       So I don't think it says, per
23  se, exactly it's using social media, but they
24  might utilize -- they might talk about
25  recording, maybe, in a discipline report, of

Page 17

1  fights and things like that.  Posting.
2  Bullying.
3    Q.    And in drafting your
4  declaration, you did not review any monthly
5  discipline reports.
6       Correct?
7    A.    No.  These were based on my
8  experience in my position, in my 27 years as
9  an administrator -- or as an educator.
10    Q.    And in the monthly discipline
11  reports, those don't estimate the percentage
12  of time an administrator spent on a
13  particular incident --
14    A.    No.
15    Q.    -- or a particular category of
16  incidents.
17       Right?
18    A.    No.
19    Q.    Do you know of anyone at TUSD
20  who, before litigation, attempted to estimate
21  the percentage of time that TUSD staff spend
22  on dealing with issues stemming from social
23  media?
24    A.    I don't think anybody gathered
25  the -- like, that data.  I think we've had

5 (Pages 14 - 17)

Page 18

1 conversations for years and years and years.
2    Q.    But you're not aware of anyone
3 trying to document those conversations and
4 put a percentage?
5    A.    No.
6    Q.    Who first suggested the
7 percentages listed in paragraph 17?
8    A.    I believe that was me.  I tried
9 to come up with -- and I'll be honest, I
10 tried to do a very conservative percentage.
11 I actually think it would be rather higher,
12 but I tried to go conservative in these
13 percentages.
14    Q.    Did you consult any documents
15 relating to those percentages?
16    A.    No.
17    Q.    And you didn't ask -- you
18 didn't interview anyone in connection with
19 these percentages.
20         Correct?
21    A.    No.  I'm just going based on my
22 experience.
23    Q.    And you didn't conduct any
24 surveys of site administrators in coming up
25 with these percentages.

Page 19

1         Correct?
2    A.    I mean, no formal surveys.  I'm
3 talking with administrators almost every day,
4 and we're having conversations about these
5 kind of things, so I think that's where I'm
6 getting my information from.
7    Q.    But you don't record anywhere
8 how many of those conversations --
9    A.    No.
10    Q.    -- you have per day.
11         Right?
12    A.    No.
13    Q.    And in making these
14 percentages, did you create any documents,
15 any calculations, spreadsheets, anything like
16 that?
17    A.    No.
18    Q.    So other than what we've
19 discussed, did you use any other method to
20 determine the percentages in paragraph 17?
21    A.    No.
22    Q.    So in paragraph 17, some of the
23 percentages are single numbers and some are
24 ranges.
25         Why is that?

Page 20

1    A.    I think a lot of times -- and I
2 think I went with, like, elementary was super
3 low at the very beginning.  Kids didn't
4 really have phones.  And I think that there's
5 a fluctuation in weeks.  Maybe you're -- one
6 week you might be at, like, 10 percent.
7 Maybe you're at 13 percent at a middle
8 school, followed by a week of 15 percent.
9         You know, I tried to go with
10 just some ballpark areas there.
11    Q.    So, for instance, in 2018, you
12 estimate that 3 percent of an elementary
13 school site administrator's time was spent on
14 social media-related issues.
15         Why did you estimate it's
16 3 percent but not 1 to 5 percent?
17    A.    3 -- well, I kind of went
18 between a 1 and a 5 percent, knowing that it
19 was -- it was part of their day, but not
20 an ex -- a lot of their day dealing with
21 mostly just fifth graders often are the first
22 kids that get phones.  So I tried to give
23 a -- you know, just a ballpark number there.
24         I think I could easily say 5 to
25 10 percent, but I was trying to just go

Page 21

1 conservative with the numbers.
2    Q.    Could it be 1 percent?
3    A.    No.  No way.
4    Q.    I --
5    A.    1 percent would be -- I'm
6 sorry?
7    Q.    Go ahead.
8    A.    1 percent would be, like, no
9 time in a week, and they're spending time
10 every week dealing with this.
11    Q.    So if another regional
12 assistant superintendent estimated that the
13 percent of an elementary school site
14 administrator's time in 2018 was 1 percent --
15    A.    Maybe in their region.
16    Q.    -- that would be inaccurate?
17    A.    Maybe in their region.  That's
18 not mine.
19    Q.    So these numbers are limited to
20 your region?
21    A.    To my expertise, yeah.  And I'm
22 not --
23    Q.    We're just focused on the
24 region -- I'm sorry.
25    A.    Yeah.  My expertise is going to

CONFIDENTIAL

Page 22

1  be from my region.
2        Now, does that mean I don't
3  have conversations with principals from other
4  regions?  No.  But the ones I know very well
5  are going to be from my region.
6        Q.    And in another region, the
7  percentage could be different?
8        A.    Yeah, maybe.
9        Q.    In paragraph 17, you also
10  estimate different estimates for different
11  time periods, from 2018, 2020 and 2025.
12        How did you determine the
13  percentages changed over those time periods?
14        A.    I saw an increase -- this is
15  from my experience -- with 2020 with the
16  isolation of students.  And then we've only
17  seen the use of social media increase into
18  our elementary schools every year.
19        Like -- but I think that with
20  2020 and COVID and the isolation, that's
21  really what kind of expedited numbers.  Or
22  increased them.
23        Q.    So how did you estimate, for
24  instance, that in 2018 the percent of time
25  was 10 to 15 percent for middle school site

Page 23

1  administrators and then for 2020 it was
2  30 percent?
3        A.    Like I said, just from my
4  experience, that we've seen such a huge
5  increase as a result of isolation for
6  students with the use of social media.  That
7  was their way of communicating with one
8  another.
9        Q.    So there's no -- there's no
10  numerical reference point for that change.
11        Right?
12        MR. BRANE:  Object to form.
13        THE WITNESS:  You're saying do
14  I -- maybe restate that in a different
15  way.  I don't understand what you're
16  asking.
17  QUESTIONS BY MR. RICE:
18        Q.    Sure.
19        So in like -- but if we -- if
20  we went to 2018, sitting here today, you
21  don't know how many social media-related
22  incidents a middle school site administrator
23  dealt with in 2018.
24        Correct?
25        A.    Not the hard numbers, no.  But

Page 24

1  I'm having conversations with them the whole
2  time during 2018, 2019, 2020, all the way to
3  now.
4        Q.    How many conversations did you
5  have in 2018?
6        MR. BRANE:  Object to form.
7        THE WITNESS:  I would say
8  daily, daily conversations with my
9  administrators.  Doesn't mean every
10  administrator every day, but we're
11  going to have conversations.  And I
12  would say minimum once a week, maybe
13  once every other week I'm having a
14  conversation.  And might be every day
15  with some of them when they're dealing
16  with bigger issues.
17  QUESTIONS BY MR. RICE:
18        Q.    And you're going -- you're
19  going off your recollection of what happened
20  in 2018.
21        Correct?
22        A.    Uh-huh.
23        Q.    So for 2018, you estimate a
24  percentage of a high school site
25  administrator's time was 15 to 20 percent.

Page 25

1        How did you determine that it
2  was 15 to 20 percent and not 10 percent or 10
3  to 20 percent?
4        A.    I -- well, like I said, I think
5  the number's actually higher.  I think it
6  would be easily higher than 20 percent.  I
7  think I was just being generous and saying 15
8  to 20 percent.  It could easily be a 25 to
9  30 percent, but I was just trying to give a
10  very generous, conservative response there.
11        Q.    Could it be 14 percent?
12        A.    No, I think it's going to --
13  like I said, if I had to go with a number, it
14  would go higher.
15        Q.    How can you be certain that
16  it's 14 percent -- or it is 15 percent and
17  not 14 percent for 2018?
18        MR. BRANE:  Object to form.
19        THE WITNESS:  Like I said, I
20  think I would go higher and not lower.
21  QUESTIONS BY MR. RICE:
22        Q.    So how can you know, though,
23  it's not 14 and a half percent compared to
24  15 percent?
25        MR. BRANE:  Object to form.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1       THE WITNESS:  Because I think
2   I've -- from my experience, 15 percent
3   would be the lowest I would go.
4   QUESTIONS BY MR. RICE:
5       Q.   So what is the number then for
6   the percentage of time high school site
7   administrators spent in 2018?
8       MR. BRANE:  Object to form.
9   The document speaks for itself.
10      He can read it to you, if you
11  want.
12      THE WITNESS:  15 to 20 percent,
13  and it may be higher.
14  QUESTIONS BY MR. RICE:
15      Q.   Okay.  So it could be a
16  different number than the number you put in
17  your declaration.
18      Correct?
19      A.   It could be 15 to 25, 15 to 30,
20  yeah.
21      Q.   Okay.  So it could be light.
22  Okay.
23      And is that true for all of the
24  numbers in the declaration?
25      A.   I think they could go higher,

Page 27

1   but I think I was going as low as I think it
2   could go.  But it definitely could go higher.
3       Q.   And what I hear you say is they
4   could be 10, 15 or 20 percent higher, the
5   numbers you estimated in the declaration?
6       A.   They possibly could.
7       Q.   And so sitting here today,
8   you're not able to say whether it's, for
9   2018, for instance, 15 percent compared to
10  30 percent?  It could be either number?
11      MR. BRANE:  Object to form.
12      THE WITNESS:  I think I'm going
13  to be comfortable saying it's 15 to
14  20 percent.
15  QUESTIONS BY MR. RICE:
16      Q.   But you're not certain of that?
17      A.   What I'm going to say is 15 to
18  20 percent.  That's what I feel from my
19  expertise.
20      Q.   So focusing then on 2025.  In
21  2025, you estimated the percentage of time
22  spent by high school site administrators was
23  25 to 35 percent.
24      Correct?
25      A.   Yes.

Page 28

1       Q.   Why'd you pick that range?
2       A.   Because that's what I've --
3   from my experience dealing with
4   administrators, that's how much time of their
5   day they're spending with that.
6       Q.   Could it be 20 percent?
7       A.   No.  I don't believe -- not in
8   my opinion, no.
9       Q.   In 2025 -- we're in July 2025.
10      Correct?
11      A.   That's correct.
12      Q.   So according to your
13  declaration, the percentages changed
14  beginning in 2025.
15      Is that right?
16      A.   It's only been increasing since
17  2020, correct.
18      Q.   So for 2024, what was the
19  percentage of time that high school site
20  administrators spent on issues related to
21  social media?
22      MR. BRANE:  Object to form.
23      THE WITNESS:  I would say 25 to
24  35 percent.
25

Page 29

1   QUESTIONS BY MR. RICE:
2       Q.   What about 2023?
3       A.   I'd probably say 25 to
4   35 percent.
5       Q.   So other than this declaration,
6   you never tried to estimate the percentage of
7   time high school site administrators spend on
8   issues relating to defendants' platforms.
9       Correct?
10      A.   I think there's lots of
11  conversations that happen, and that's where
12  we're having -- you know, that's where I gain
13  most of my information, is conversations,
14  looking at discipline reports, things like
15  that, uh-huh.
16      Q.   But you've never tracked their
17  time using time-keeping software, for
18  instance?
19      A.   No.
20      Q.   And high school site
21  administrators don't keep time records.
22      Correct?
23      A.   That's correct.  None of the
24  administrators would.
25      Q.   Do you believe that all high

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1  school site administrators in your region
2  spend their day-to-day in the same way?
3      A.   I wouldn't say exactly the same
4  way. I think there's areas of focus.
5          You know, looking at Cholla, we
6  have someone that oversees athletics and
7  facilities, someone who does curriculum,
8  somebody who does students' resources, but
9  they're all doing discipline, and so they're
10  all interacting with social media every day.
11     Q.   Looking to middle school site
12  administrators, other than this declaration,
13  you've never tried to estimate the percentage
14  of time middle school site administrators
15  spend on issues relating to defendants'
16  platforms.
17         Correct?
18     A.   I would say just like I've
19  said, it's usually from conversations.
20  That's where I'm getting most of my
21  information. It's not going to be something
22  I've collected the data, you know, on a -- on
23  a platform.
24     Q.   Right.
25         And there's no -- those

Page 31

1  conversations, again, just like for high
2  school site administrators and elementary
3  school site administrators, aren't documented
4  anywhere.
5          Correct?
6      A.   You might see some of those in
7  the discipline reports, but, no, the formal
8  conversations, no.
9      Q.   And middle school
10  administrators also don't keep time records.
11         Correct?
12     A.   Correct.
13     Q.   And you've never tried to track
14  their time using any kind of time-keeping
15  software.
16         Correct?
17     A.   Correct.
18     Q.   For middle school site
19  administrators, other than relying on your
20  recollection of conversations, did you do
21  anything else to determine the percentages
22  listed in paragraph 17?
23     A.   No. I'm going off of my
24  expertise and my prior knowledge.
25     Q.   Do you believe that all middle

Page 32

1  school site administrators spend their day to
2  day in the exact same way?
3      A.   Like I said, no. They might be
4  doing different things, but I think they're
5  all dealing with discipline every day. So
6  they're -- just like high school, they're
7  going to be interacting with social media.
8      Q.   But the level of -- what I
9  understand you saying, though, is the percent
10  of time they spend on social media in a given
11  day may vary between school and time period.
12         Correct?
13     A.   It could. Uh-huh.
14     Q.   And going to elementary school
15  site administrators, I just want to confirm
16  that I understand your testimony properly.
17         They don't keep time records
18  either, correct?
19     A.   Correct.
20     Q.   And you haven't used any
21  time-keeping software to estimate the time
22  they spend on social media either.
23         Correct?
24     A.   Correct.
25     Q.   And you didn't interview any

Page 33

1  elementary school site administrators in
2  connection with this declaration.
3          Correct?
4      A.   I'm just going based, like I
5  said, on my expertise and my prior knowledge.
6      Q.   And other than your
7  recollection of those conversations, you
8  didn't do anything else to determine the
9  percentages --
10     A.   Correct.
11     Q.   -- listed in paragraph 17?
12         For elementary site
13  administrators, do you believe that their day
14  to day can vary between schools?
15     A.   It could.
16     Q.   Now, you estimate that for all
17  of the positions, from 2018 to 2020, the
18  percentage of time spent on social
19  media-related issues increased.
20         Correct?
21     A.   That's correct.
22     Q.   Are you aware that another
23  regional superintendent estimated the
24  percentage of time actually remained stable
25  between 2018 and 2020?

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1    A.    I wouldn't know that.
2    Q.    Do you think that estimate is
3  incorrect?
4    A.    That's their opinion and
5  their -- you know, how they see things.
6    Q.    So their time estimate could be
7  correct?
8    A.    For them.
9          I'm going based on my expertise
10  and my region.
11    Q.    So in 2020, you estimated that
12  elementary school site administrators spent
13  10 percent of their time on social
14  media-related issues.
15          Are you --
16    A.    Yes --
17    Q.    -- aware that -- are you aware
18  that another regional superintendent
19  estimated the number was 2 percent during
20  that same time frame?
21    A.    I'm not aware.  We didn't
22  discuss this.
23    Q.    Do you believe a 2 percent
24  estimate would be inaccurate?
25    A.    For my schools.  Like I've

Page 35

1  said, this is based on my schools and my
2  experience.
3    Q.    And so it's possible that some
4  regions of TUSD, a 2 percent estimate would
5  be accurate?
6    A.    If that's what they put, I
7  don't want to -- I'm going based on -- I can
8  only speak for myself.
9    Q.    And so you estimated that in
10  2020, middle school site administrators spent
11  30 percent of their time dealing with issues
12  stemming from social media.
13          Correct?
14    A.    Yep.
15    Q.    Are you aware that another
16  regional assistant superintendent estimated
17  that that number was 10 percent?
18    A.    Like I said, we didn't --
19  we've -- I've shared, we didn't discuss this
20  prior to, so, no.
21    Q.    So 10 percent could be
22  accurate?
23    A.    Maybe.  Like I said, this is
24  based on my information from my region and my
25  collection.

Page 36

1    Q.    But 10 percent could be
2  accurate for other schools in TUSD?
3          MR. BRANE:  Object to form.
4          THE WITNESS:  I don't -- I
5  can't speak to that.
6  QUESTIONS BY MR. RICE:
7    Q.    For 2020, you also estimated
8  that high school site administrators spent 25
9  to 30 percent of their time on issues
10  stemming from social media.
11          Correct?
12    A.    That's what I wrote, yes.
13    Q.    Are you aware that another
14  regional assistant superintendent estimated
15  the number was 20 percent during that same
16  time frame?
17    A.    Like I said, we didn't discuss
18  this.
19    Q.    So 20 percent could be accurate
20  for some schools in TUSD?
21          MR. BRANE:  Object to form.
22          THE WITNESS:  I cannot speak to
23  that.  I can only speak to what I
24  know.
25

Page 37

1  QUESTIONS BY MR. RICE:
2    Q.    And you don't think it's at all
3  possible that 20 percent could be accurate
4  for schools in your region?
5    A.    That's correct.  I'm going
6  based on what I know from my region and my
7  schools and my experience.
8    Q.    For 2025, you estimate that
9  elementary school site administrators spend
10  10 to 15 percent of their time on issues
11  stemming from social media.
12          Correct?
13    A.    That's correct.
14    Q.    Are you aware that another
15  regional superintendent estimated the same
16  number as 2 to 5 percent in 2025?
17    A.    We've already gone through
18  this.  I didn't discuss this with them.
19    Q.    And so that could be accurate?
20          MR. BRANE:  Object to form.
21          THE WITNESS:  All I can speak
22  is what I have shared.
23  QUESTIONS BY MR. RICE:
24    Q.    And you can't speak to other
25  schools in other --

CONFIDENTIAL

Page 38

1    A.    No, I can't speak on someone
2  else's expertise.  I can share from my
3  experiences and my schools.
4    Q.    Let's go to the first page of
5  the declaration and look at paragraph 6.
6        So in paragraph 6, you refer to
7  the issues students face in the schools in
8  your region.
9        Correct?
10    A.    That's correct.
11    Q.    And so in your role as
12  assistant regional superintendent, you don't
13  work with students directly.
14        Correct?
15    A.    That's correct.  Usually I'm
16  working with the principal or assistant
17  principals, uh-huh.
18    Q.    So what is your basis for your
19  opinion that social media permeates or
20  exacerbates the issues that students face?
21    A.    That's from my conversations
22  with administrators, teachers, parents.
23    Q.    Did you track anywhere how many
24  students in your region have dealt with
25  issues relating to social media?

Page 39

1    A.    No.
2    Q.    Have you analyzed how many
3  students have dealt with issues related to
4  defendants' platforms specifically?
5    A.    No.
6    Q.    So you refer in paragraph 6 to
7  the challenges TUSD faces as a district.
8        What efforts have you made to
9  address social media use at the schools you
10  supervise?
11    A.    We've worked to restrict the
12  use of any cell phone activity during the
13  day.  However, they still get to use them at
14  night.  Before school.
15        So we've tried to limit when we
16  can, and then we also work with parents to
17  educate parents as well.
18    Q.    And when you say "restrict use
19  of cell phone activity during the day,"
20  you're referring to the TUSD cell phone
21  policy.
22        Correct?
23    A.    Uh-huh.  Yes.
24    Q.    Then in paragraph 7, you refer
25  to addictive and compulsive use.

Page 40

1        And you're not a medical
2  doctor, correct?
3    A.    That's correct.
4    Q.    And you're not a psychologist?
5    A.    I just have a lot of experience
6  in education, 27, 28 years.
7    Q.    But you're not a psychologist,
8  correct, Mr. Lambert?
9    A.    That's correct.
10    Q.    And you don't have any
11  specialized training in identifying
12  addiction.
13        Correct?
14    A.    That's correct.
15        MR. BRANE:  Object to form.
16  QUESTIONS BY MR. RICE:
17    Q.    And you don't have any
18  specialized training in mental health either.
19        Correct?
20    A.    I mean, we work with mental
21  health all the time, but, no.
22    Q.    And so then in paragraph 8, you
23  refer to parent and student reports.
24        Correct?
25    A.    That's correct.

Page 41

1    Q.    It's in paragraph -- yeah,
2  paragraph 8.
3    A.    Yeah.
4    Q.    Did you consult any parent or
5  student reports in drafting this declaration?
6    A.    No.
7    Q.    You refer to sleep deprivation.
8        Does TUSD track parent or
9  student reports of sleep deprivation?
10    A.    No.  That's just -- you know,
11  we just get that information from parents and
12  students.
13    Q.    And to your knowledge, has TUSD
14  ever tracked whether any parent or student
15  reports of sleep deprivation relate to
16  defendants' platforms?
17    A.    No.
18    Q.    In paragraph 7, you also refer
19  to difficulties in separating students from
20  their phones.
21        Correct?
22    A.    That's correct.
23    Q.    Do you have any data on the
24  number of times teachers have been unable to
25  separate students from their phones?

11 (Pages 38 - 41)

Page 42

1    A.    I think it's not going to be
2 concrete data. It's going to be, like, just
3 words from administrators and teachers.
4    Q.    So sitting here today, you
5 wouldn't be able to identify the number of
6 times in 2024 a teacher was unable to
7 separate a student from their phone.
8    Correct?
9    A.    Correct.
10    Q.    And then turning back to
11 paragraph 8. In paragraph 8, you refer to
12 students' anxiety and depression.
13    Correct?
14    A.    That's correct.
15    Q.    You have no training or
16 experience in diagnosing anxiety.
17    Correct?
18    A.    I mean, I think we have
19 training and experience in anxiety and
20 depression, being educators.
21    Q.    But you don't have any
22 experience in making medical diagnoses.
23    Correct?
24    A.    No.
25    Q.    And you don't have any training

Page 43

1 or experience in making medical diagnoses of
2 depression.
3    Correct?
4    A.    That's correct.
5    Q.    And you have no training or
6 experience in making a medical diagnosis of
7 suicidal ideation.
8    Correct?
9    A.    Right. I don't have the
10 medical training, no, but I have education
11 and experience.
12    Q.    And that's education and
13 experience not in a medical setting.
14    Correct?
15    A.    That's correct.
16    Q.    And do you track the number of
17 students diagnosed with anxiety?
18    A.    I do not, no.
19    Q.    Do you track the number of
20 students diagnosed with depression?
21    A.    No.
22    Q.    So sitting here today, you
23 wouldn't be able to tell me how many students
24 in the Silverbell region, the region you
25 supervise, have a diagnosis of anxiety or

Page 44

1 depression compared to a couple years ago.
2    Correct?
3    A.    I couldn't give you the
4 concrete numbers, no.
5    Q.    And you didn't review any data
6 on students' mental health diagnoses before
7 signing this declaration.
8    Correct?
9    A.    That's correct.
10    Q.    Do you track the cause of
11 students' anxiety?
12    A.    I think we track it in a way
13 that we have conversations, and we are always
14 trying to figure out things and
15 problem-solve.
16    Q.    But it's not documented
17 anywhere.
18    Correct?
19    A.    That's correct.
20    Q.    Do you track the cause of
21 students' depression?
22    A.    I think that we don't track it
23 in a formal way. Again, we have
24 conversations. We work with parents. We
25 have parent meetings. We try to work, like,

Page 45

1 for the whole child.
2    Q.    But you're not tracking
3 anywhere in the aggregate the causes of
4 students' depression or anxiety at TUSD.
5    Correct?
6    A.    I don't think we track it in a
7 formal way, but a lot times it's through
8 those conversations with families, with
9 students, with the counselors.
10    Q.    Okay. So how many students in
11 2024 had, in your opinion, depression caused
12 by social media?
13    A.    I don't think I could give you
14 an exact number. I think --
15    Q.    And that's not documented
16 anywhere.
17    Right?
18    A.    Right.
19    Q.    And understanding you're not an
20 expert, do you agree that anxiety can be
21 caused by factors unrelated to social media?
22    MR. BRANE: Object to form.
23    THE WITNESS: Okay. So I'm not
24 an expert -- as a medical expert? Is
25 that what you're saying?

CONFIDENTIAL

Page 46

1  QUESTIONS BY MR. RICE:
2      Q.    In your opinion, do you agree
3  that anxiety can be caused by factors
4  unrelated to social media?
5          MR. BRANE:  Object to form.
6          THE WITNESS:  That could be
7  true.
8  QUESTIONS BY MR. RICE:
9      Q.    And you agree that depression
10  can be caused by factors unrelated to social
11  media.
12         Correct?
13     A.    That could be true.
14     Q.    And some of those factors might
15  include things like the death of a loved one,
16  a parents' divorce, a romantic breakup or a
17  genetic predisposition?
18         MR. BRANE:  Object to form.
19         THE WITNESS:  I believe that
20  could be true.
21  QUESTIONS BY MR. RICE:
22     Q.    And for all the students in
23  your region who have been diagnosed with
24  anxiety and depression, are you aware of all
25  of the things that may be going on in their

Page 47

1  family or their personal lives that could
2  have contributed to the diagnosis?
3      A.    I won't know everything, but I
4  know what has been shared with me.
5      Q.    In this same paragraph,
6  paragraph 8 of Exhibit 1, you also mention
7  heightened stress, diminished self-esteem and
8  strained peer relationships.
9          Correct?
10     A.    Yes.
11     Q.    Have you ever analyzed how many
12  students in your district have experienced
13  those issues?
14     A.    We have lots of conversations
15  about these kind of things.  And we're always
16  trying to, as educators, problem solve and,
17  you know, support students the best that we
18  can.
19     Q.    But other than informal
20  conversations, you don't have any analysis of
21  the number of students in your district
22  experiencing those issues.
23         Correct?
24     A.    No.
25     Q.    And sitting here today, you

Page 48

1  can't say how many students experienced
2  heightened stress, diminished self-esteem and
3  strained peer relationships in 2018.
4          Correct?
5      A.    I couldn't give you an exact
6  number, no.
7      Q.    And you couldn't say the number
8  that experienced it in 2019 or 2020.
9          Correct?
10     A.    That's correct.
11     Q.    Can we turn to paragraph 9,
12  please?
13         In paragraph 9, you refer to
14  the effects of social media in the classroom.
15         Correct?
16     A.    Yes.
17     Q.    Have you ever tried to analyze
18  how many instances of classroom disruption at
19  schools in your region have been caused by
20  social media?
21     A.    I think it's a lot of
22  conversations with administrators, teachers.
23     Q.    But there's no documented
24  analysis.
25         Correct?

Page 49

1      A.    That's correct.
2      Q.    And you don't know of anyone at
3  TUSD who has conducted that analysis.
4          Correct?
5      A.    Not that I know of.
6      Q.    And sitting here today and then
7  drafting this declaration, you wouldn't be
8  able to identify the number of instances of
9  classroom disruption at schools in your
10  region for a particular year.
11         Correct?
12     A.    I think that you could maybe
13  find that in Synergy for classroom
14  disruptions and things like that.  I don't
15  know if it's going to say because of social
16  media.
17     Q.    And you didn't conduct that
18  analysis, even --
19     A.    No.
20     Q.    -- if it's possible to do, in
21  drafting the declaration.
22         Correct?
23     A.    That's correct.
24     Q.    Have you ever tried to analyze
25  which instances of classroom disruption have

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1 been caused by defendants' platforms
2 specifically?
3     A.    I think a lot of that's through
4 conversations.
5     Q.    But you've never documented
6 that anywhere.
7         Correct?
8     A.    That's correct.
9     Q.    And there are instances of
10 classroom disruption that are caused by
11 wanting to separate a student from technology
12 that don't involve social media.
13        Correct?
14     A.    Could you rephrase that?
15     Q.    You can disregard it.
16        You mention in the same
17 paragraph fake social media accounts.
18        Correct?
19     A.    Yes.
20     Q.    What do you mean by "fake
21 social media accounts"?
22     A.    Students create social media
23 accounts that are not theirs, or they use a
24 fake name, or they make one of another
25 student.  So it's not them.

Page 51

1     Q.    Have you ever analyzed how many
2 students in TUSD use fake social media
3 accounts?
4     A.    No.  Again, it's going to be
5 from conversations and...
6     Q.    But you've never answered a
7 number.
8        Right?
9     A.    No.
10     Q.    And you don't know of anyone at
11 TUSD who has conducted that analysis.
12        Correct?
13     A.    No.
14     Q.    In paragraph 10, you talk about
15 negative mental health impacts from social
16 media.
17        Correct?
18     A.    Yes, I see that.
19     Q.    And we went over a few of these
20 already.  We didn't cover all of them.
21        You don't have any training in
22 diagnosing the conditions listed in
23 paragraph 10, correct?
24     A.    I don't have any medical
25 training, no, but I would say I have training

Page 52

1 with -- as an educator.
2     Q.    And you don't have any training
3 in determining causation from a medical or
4 psychological perspective for the conditions
5 listed in paragraph 10.
6        Correct?
7        MR. BRANE:  Object to form.
8        THE WITNESS:  I don't have any
9     medical training, correct.
10 QUESTIONS BY MR. RICE:
11     Q.    In this paragraph you mention
12 suicidal ideations.
13        Correct?
14     A.    Yes.
15     Q.    Do you agree that suicidal
16 ideation and self-harm could be caused by
17 issues unrelated to social media?
18        MR. BRANE:  Object to form.
19        THE WITNESS:  It could.
20 QUESTIONS BY MR. RICE:
21     Q.    And you also mention sleep
22 disturbances.
23        Do you agree sleep disturbances
24 can be caused by issues unrelated to social
25 media?

Page 53

1        MR. BRANE:  Form.
2        THE WITNESS:  It could.
3 QUESTIONS BY MR. RICE:
4     Q.    And you refer to body
5 dissatisfaction/eating disorders.
6        Correct?
7     A.    That's correct.
8     Q.    Those can also be caused by
9 issues unrelated to social media.
10        Correct?
11        MR. BRANE:  Object to form.
12        THE WITNESS:  That's correct.
13 QUESTIONS BY MR. RICE:
14     Q.    In this same paragraph you
15 mention texting.
16        Correct?
17     A.    Yes.
18     Q.    Do you monitor whether students
19 experience any mental health effects from
20 texting?
21     A.    No.  These are based on my
22 experience.
23     Q.    And do you have any data
24 regarding which applications students are
25 using on their phones at any given time?

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1    A.    No, just from conversations
2  with students, administrators, parents.
3    Q.    Do you have any data regarding
4  how much time students spend texting?
5    A.    I don't.  Just that -- the
6  information that I gathered, my expertise.
7    Q.    And that information you're
8  gathering is anecdotal information and
9  conversations.
10    Correct?
11    A.    That's correct.
12    Q.    And do you have any data
13  regarding how much time students spend
14  playing video games on their phones?
15    A.    I do not.
16    Q.    Do you have any data regarding
17  how much time students spend watching Netflix
18  on their phones?
19    A.    I do not.  I don't really hear
20  that much, but I'm not saying it doesn't
21  happen.
22    Q.    In paragraph 11, turning to
23  that paragraph, you refer to bullying and
24  harassment.
25    Correct?

Page 55

1    A.    That's correct.
2    Q.    Are you aware of any data
3  tracking how many incidents of bullying at
4  TUSD involved defendants' platforms?
5    A.    I don't think we have exact --
6  we can look at, in Synergy, the bullying and
7  harassment, but I don't think -- I don't know
8  if they're going to get into all of them.
9    Some of them might say where it
10  was on social media.
11    Q.    But there's no category in
12  Synergy that allows you to identify --
13    A.    That's correct.
14    Q.    -- the number of incidents.
15    Correct?
16    A.    That's correct.
17    Q.    And so to identify instances of
18  bullying or harassment related to social
19  media, you'd need to review the individual
20  narrative in Synergy --
21    A.    Correct.
22    Q.    -- for that.
23    Correct?
24    A.    Correct.
25    Q.    And you did not review any

Page 56

1  narratives for Synergy in preparing this
2  declaration.
3    Correct?
4    A.    Correct.  Just my expertise.
5    Q.    In this paragraph you also
6  mention disseminating information.
7    Correct?
8    A.    Yeah.
9    Q.    Is the concern there that
10  students will use social media platforms to
11  share those videos?
12    A.    Could you rephrase that?
13    Q.    Sure.
14    You write that your concern --
15  that bullying and harassment are disseminated
16  further, and for longer periods of time they
17  would be absent a social media platform.
18    What do you mean by that
19  phrase?
20    A.    I mean that we can share it out
21  wider and for longer periods than if we
22  didn't have these social media platforms.
23    Q.    And what's the "it" in the
24  answer you just gave?
25    A.    Like what are they sharing?

Page 57

1    Q.    Yeah.
2    A.    Could be kids getting bullied,
3  kids getting harassed, making fun of kids,
4  making videos and adding pictures and, like,
5  creating things about -- you know, messing
6  with kids.  And they get to share them out,
7  and they can go all around, all over, not
8  just within our one school.  It can go all
9  over social media.
10    Q.    In paragraph -- let's turn to
11  paragraph 12 then.
12    In paragraph 12, you refer to
13  anonymous school fight pages.
14    Correct?
15    A.    Correct.
16    Q.    And as I understand it, those
17  are social media accounts that post photos or
18  videos of school fights.
19    Is that correct?
20    A.    That's correct.
21    Q.    And what's your concern with
22  anonymous school fight pages?
23    A.    Well, we're glorifying fights.
24  So then students get to just hype up the
25  fight.  They get to share them.  They get to

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  get the likes.  They get to essentially cause
2  more bullying and harassment to kids.
3      Q.    And the glorification is
4  because people comment on and share the
5  photos or videos of the fights?
6      A.    That's correct.
7      Q.    And in this same paragraph, you
8  also refer to anonymous pages that target
9  specific students.
10         Correct?
11     A.    Uh-huh.
12     Q.    And are those students, are
13  they targeted with photos or videos then that
14  are posted to those pages?
15     A.    That's -- often, yes.
16     Q.    You also mention in the same
17  paragraph trying to remove these types of
18  pages.
19         Correct?
20     A.    Yes.
21     Q.    Are you personally involved in
22  efforts to remove these types of pages?
23     A.    I work with administrators who
24  work with the social media platforms to try
25  to get them taken down.

Page 59

1      Q.    Have you ever personally been
2  involved in trying to remove the type of page
3  described in paragraph 12?
4      A.    I think I was as a principal.
5  I think we tried to take some down back in
6  the day.  It was like Facebook.
7      Q.    And when would that have been?
8      A.    Maybe 2016, 2017.
9      Q.    Since becoming a regional
10  assistant superintendent, do you have
11  personal knowledge of the steps school site
12  administrators might have taken to remove
13  every fight page posted to a school in your
14  region?
15         MR. BRANE:  Object to form.
16         THE WITNESS:  I think we have
17     conversations about them.  I know
18     they're constantly working, as well as
19     we're trying to find them.
20         I mean, a lot of times you have
21     to be invited in.  So it's getting
22     to know they're out there and to
23     finding out about them.
24  QUESTIONS BY MR. RICE:
25     Q.    Do the schools in your region

Page 60

1  have any systems in place to contact
2  platforms to remove pages like the ones
3  described in paragraph 12?
4      A.    I believe they've attempted to.
5      Q.    Are you personally familiar
6  with Facebook's content reporting
7  capabilities?
8      A.    Yeah.  I believe you can put in
9  there that it's violent and things like that,
10  yeah.
11     Q.    Have you ever investigated the
12  efficacy of those content reporting
13  capabilities?
14     A.    No.
15         MR. BRANE:  Object to form.
16  QUESTIONS BY MR. RICE:
17     Q.    Are you aware of Instagram's
18  content reporting capabilities?
19     A.    Not as familiar, no.
20     Q.    And have you ever investigated
21  the efficacy of Instagram's content reporting
22  capabilities?
23     A.    No.
24     Q.    Are you aware of Snapchat's
25  content reporting capabilities?

Page 61

1      A.    No.
2      Q.    Have you ever investigated the
3  efficacy --
4      A.    No.
5      Q.    -- of Snapchat's content
6  reporting capabilities?
7      A.    No.
8      Q.    Are you aware of YouTube's
9  content reporting capabilities?
10     A.    No.
11     Q.    Have you ever investigated the
12  efficacy of YouTube's content reporting
13  capabilities?
14     A.    No.
15     Q.    Are you aware of TikTok's
16  content reporting capabilities?
17     A.    No.
18     Q.    Have you ever investigated the
19  efficacy of TikTok's content reporting
20  capabilities?
21     A.    No.
22         MR. RICE:  Why don't we go off
23     the record and take a short break.
24         VIDEOGRAPHER:  We are going off
25     the record at 10:06 a.m.

16 (Pages 58 - 61)

Page 62

```
1        (Off the record at 10:06 a.m.)
2        VIDEOGRAPHER:  We are back on
3   the record at 10:25 a.m.
4   QUESTIONS BY MR. RICE:
5     Q.    Welcome back, Mr. Lambert.
6        Could we turn to paragraph 19
7   of Exhibit 1?
8        In paragraph 19, you refer to
9   hire -- excuse me.  In paragraph 19, you
10  refer to TUSD's inability to hire additional
11  staff because of funding constraints.
12       Correct?
13    A.    That's correct.
14    Q.    TUSD's funding constraints
15  include decreasing student enrollment.
16       Correct?
17    A.    That's correct.
18    Q.    TUSD also has the funding
19  constraints resulting from school vouchers.
20       Correct?
21    A.    Yes.
22    Q.    TUSD's funding constraints also
23  include the termination of federal ESSER
24  funding related to the COVID-19 pandemic.
25       Correct?
```

Page 63

```
1     A.    That's correct.
2     Q.    Funding constraints could also
3   include changes to TUSD's desegregation
4   budget.
5        Correct?
6        MR. BRANE:  Object to form.
7        THE WITNESS:  That could be
8   correct.
9   QUESTIONS BY MR. RICE:
10    Q.    Now, let's go back to
11  paragraph 17.
12       And, Mr. Lambert, earlier in
13  the depo we looked at these percentages, for
14  instance, 30 percent for middles.
15       You recall we looked at the
16  percentage for middle school site
17  administrator is 30 percent.
18       Correct?
19    A.    In 2020?
20    Q.    In 2020, correct.
21    A.    That's correct.
22    Q.    And as I mentioned earlier,
23  another regional superintendent actually
24  estimated the percentage of time spent by
25  middle school site administrators in 2020 was
```

Page 64

```
1   10 percent.
2        Do you have any reason to
3   believe that in 2020 middle school site
4   administrators in your region had three times
5   as many social media-related incidents as in
6   other TUSD regions?
7        MR. BRANE:  Object to form.
8        THE WITNESS:  I can only speak
9   to my expertise and my knowledge.
10  This is based on reviewing
11  discipline -- monthly discipline
12  report meetings that we have every
13  month, working with Anna in student
14  relations.  This is about having
15  conversations, ongoing conversations,
16  with administrators.
17       I'm in schools.  I'm on the
18  phone.  This is all based on my
19  experience and my expertise with my
20  administrators.
21  QUESTIONS BY MR. RICE:
22    Q.    But so you're not able to speak
23  to how many incidents schools in your region
24  have experienced compared to schools in other
25  regions.
```

Page 65

```
1        Correct?
2        MR. BRANE:  Object to form.
3        THE WITNESS:  I couldn't speak
4   to -- you know, you're speaking of
5   another person's percentage.  I can't
6   speak to that.
7        I can only speak to mine.
8   QUESTIONS BY MR. RICE:
9     Q.    And you can't speak to the
10  number of social media-related incidents that
11  administrators in another region had to deal
12  with.
13       Correct?
14    A.    I mean, unless they had a
15  conversation with me and we were discussing
16  social media and we were discussing an
17  incident on their campus.  But I can't speak
18  about someone else's declaration.
19    Q.    And you can't speak to the
20  number -- separate from the percentages, you
21  can't speak to the number of particular
22  incidents in another region.
23       Correct?
24    A.    I'm going to know my region and
25  my experience.  You know, I have 28 years of
```

17 (Pages 62 - 65)

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

Page 66

1 experience in education.  I've been an
2 assistant principal, principal, teacher,
3 regional assistant superintendent.  I'm
4 giving my information based on my expertise.
5    Q.    And you're only a regional
6 assistant superintendent at one region.
7        Correct?
8    A.    I have -- I oversee one region,
9 yes.
10    Q.    And that's the only region
11 you've ever supervised.
12        Correct?
13    A.    That's correct.
14    Q.    And for a school that was not
15 in your region, sitting here today, would you
16 be able to say whether in 2020 a middle
17 school site administrator spent 10 percent of
18 their time on social media-related issues or
19 30 percent of their time on social
20 media-related issues?
21    A.    I'm only going to be able to
22 speak to my experience.  So I don't want to
23 speak to another person's experience.
24    Q.    I --
25    A.    I would say in general that

Page 67

1 this is based on my experience.
2        Do I have conversations with
3 other administrators?  Yes.  Are they outside
4 of my regions?  Yes.
5        So this is based on years of
6 experience looking at data for -- from
7 monthly discipline reports.
8        Do I look at other regions'
9 monthly discipline reports?  No.  But do I
10 have conversations with them, other
11 principals?  Yes.
12    Q.    Do you have any knowledge of
13 differences between the TUSD regions that
14 might impact differences in social media
15 usage?
16    A.    I couldn't speak to that.
17    Q.    Do you have any reason to
18 believe that students in one region might use
19 social media more or less than students in
20 another region?
21    A.    Again, I couldn't speak to
22 that.
23    Q.    Do you have any reason to
24 believe that students in your region might
25 use social media more than students in, for

Page 68

1 instance, the Arroyo Chico region?
2        MR. BRANE:  Object to form.
3 It's the same question.  Asked and
4 answered.
5        You can answer again,
6 Mr. Lambert.
7        THE WITNESS:  I couldn't speak
8 to that.
9        I can speak to my expertise and
10 my experience.  And like I said,
11 I've -- this is not just Silverbell.
12 This is conversations with other
13 regions as well.  Principals.
14        MR. RICE:  Well, thank you for
15 your time, Mr. Lambert.  Subject to
16 any further questions from your
17 counsel, I don't have any other
18 questions at this time.
19        THE WITNESS:  All right.
20        MR. BRANE:  Is that sufficient
21 waiting for other defendants?
22        MR. RICE:  I think so, if no
23 one else has chimed in by now.
24        MR. BRANE:  Okay.  Yeah.
25 Nothing from me.

Page 69

1        Just thank the witness for his
2 time.
3        MR. RICE:  Thank you.
4 Mr. Lambert.  Have a good day.
5        THE WITNESS:  Thank you.
6        MR. BRANE:  Thanks, everybody.
7        VIDEOGRAPHER:  We are going to
8 off the record at 10:34 a.m.
9        The total time spent on the
10 record by defendants is 1 hour, 12
11 minutes.
12        The total time spent by
13 plaintiffs is zero minutes.
14        Off the record at 10:34 a.m.
15 (Deposition concluded at 10:34 a.m.)
16 – – – – – – –

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1              CERTIFICATE
2       I, CARRIE A. CAMPBELL, Registered
        Diplomate Reporter, Certified Realtime
3  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
4  of the examination, Brian Lambert, was duly
   sworn by me to testify to the truth, the
5  whole truth and nothing but the truth.
        I DO FURTHER CERTIFY that the
6  foregoing is a verbatim transcript of the
7  testimony as taken stenographically by and
   before me at the time, place and on the date
8  hereinbefore set forth, to the best of my
   ability.
9
        I DO FURTHER CERTIFY that I am
10 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
11 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
12 that I am not financially interested in the
   action.
13
14
15     _Carrie A. Campbell_
16 CARRIE A. CAMPBELL,
   NCRA Registered Diplomate Reporter
17 Certified Realtime Reporter
   California Certified Shorthand
18 Reporter #13921
   Missouri Certified Court Reporter #859
19 Illinois Certified Shorthand Reporter
   #084-004229
20 Texas Certified Shorthand Reporter #9328
   Kansas Certified Court Reporter #1715
21 New Jersey Certified Court Reporter
   #30XI00242600
22 Louisiana Certified Court Reporter
   #2021012
23 Notary Public
   Dated:  July 3, 2025
24
25

Page 71

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.  You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13      It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you.  If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25

Page 72

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12  _____
   Brian Lambert          DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 Notary Public
20
21
22
23
24
25

Page 73

1      – – – – – –
          ERRATA
2      – – – – – –
3  PAGE  LINE  CHANGE
4  _____  ____  _____
5  _____  ____  _____
6  _____  ____  _____
7  _____  ____  _____
8  _____  ____  _____
9  _____  ____  _____
10 _____  ____  _____
11 _____  ____  _____
12 _____  ____  _____
13 _____  ____  _____
14 _____  ____  _____
15 _____  ____  _____
16 _____  ____  _____
17 _____  ____  _____
18 _____  ____  _____
19 _____  ____  _____
20 _____  ____  _____
21 _____  ____  _____
22 _____  ____  _____
23 _____  ____  _____
24 _____  ____  _____
25

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1      – – – – – – –
       LAWYER'S NOTES
2      – – – – – – –
3    PAGE  LINE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25

877-370-3377                 Golkow Technologies,                www.veritext.com
                              A Veritext Division

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.