**Exhibit 27**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (TUCSON) (SD MSJ NO. 2)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3   IN RE: SOCIAL MEDIA      )   CASE NO. 4:22-MD-03047-YGR
     ADOLESCENT               )
 4   ADDICTION/PERSONAL       )   MDL No. 3047
     INJURY PRODUCTS          )
 5   LIABILITY LITIGATION     )
     _____   )
 6                            )
     THIS DOCUMENT RELATES    )
 7   TO:                      )
                              )
 8   Tucson Unified School    )
     District v. Meta         )
 9   Platforms Inc., et al.   )
                              )
10   Case No.: 4:24-cv-1382   )
     _____   )
11
12     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13            Monday, July 14, 2025
14
15        Video-Recorded Oral Deposition of ROBERT
     ROSS, held at the location of the witness, Tucson,
16   Arizona, commencing at 9:04 a.m. PDT on the above
     date, before Debra A. Dibble, Fellow of the Academy
17   of Professional Reporters, Certified Court Reporter,
     Registered Diplomate Reporter, Certified Realtime
18   Reporter.
19
20
21
22
                        __  __  __
23
                   GOLKOW - VERITEXT
24        877.370.3377 ph | 917.591.5672 fax
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

1 A P P E A R A N C E S :
2   WAGSTAFF & CARTMELL LLP
     BY:  AUSTIN BRANE, ESQUIRE
3       abrane@wcllp.com
     4740 Grand Avenue
4    Suite 300
     Kansas City, Missouri 64112
5    (816) 701-1100
     Counsel for Plaintiffs
6
7
     SHOOK HARDY & BACON L.L.P.
8    BY:  COURTNEY C. BURRESS, ESQUIRE
        cburress@shb.com
9       DANA L. STRUEBY, ESQUIRE
        dstrueby@shb.com
10   2555 Grand Boulevard
     Kansas City, Missouri 64108
11   (816) 474-6550
     Counsel for Defendants Meta Platforms,
12   Inc. f/k/a Facebook, Inc.; Instagram,
     LLC; Facebook Payments, Inc.; Facebook
13   Operations, LLC; and Siculus, Inc.
14
15   WILLIAMS & CONNOLLY LLP
     BY:  CAMILA BAYLY, ESQUIRE
16      cbayly@wc.com
     680 Maine Avenue SW
17   Washington, DC 20024
     (202) 434-5969
18   Counsel for Defendants Google LLC and
     YouTube LLC
19
20   MUNGER TOLLES & OLSON LLP
     BY:  STEPHANY REAVES, ESQUIRE
21      Stephany.Reaves@mto.com
     601 Massachusetts Avenue NW
22   Suite 500 E
     Washington, DC 20001
23   (202) 220-1126
     Counsel for Defendant Snap, Inc.
24
25

Page 3

1    MUNGER TOLLES & OLSON LLP
     BY:  VICTORIA A. DEGTYAREVA, ESQUIRE
2       Victoria.Degtyareva@mto.com
        JULIA KONSTANTINOVSKY, ESQUIRE
3       Julia.Konstantinovsky@mto.com
     350 South Grand Avenue
4    50th Floor
     Los Angeles, California 90071-3426
5    (213) 683-9505
     Counsel for Defendant Snap Inc.
6
7    KING & SPALDING LLP
     BY:  MICHAEL SHAGRIN, ESQUIRE
8       mshagrin@kslaw.com
     1185 Avenue of the Americas
9    34th Floor
     New York, New York 10036
10   (212) 827-4084
     Counsel for Defendant TikTok
11
12   VIDEOGRAPHER:
13     Zach Hone
14   DOCUMENT TECHNICIAN:
15     Tejash Patel
16
17
18
19
20
21
22
23
24
25

Page 4

1              INDEX
2
3   APPEARANCES              2
4   PROCEEDINGS              6
5
6   EXAMINATION OF ROBERT ROSS:
7       EXAMINATION BY MS. REAVES        7
8
9   CERTIFICATE             74
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          DEPOSITION EXHIBITS
2 NUMBER         DESCRIPTION       PAGE
3 TUSD-Ross-1  Plaintiff's Second    10
4    Amended Answers to
5    Defendants'
6    Interrogatories to
7    Tucson Unified School
8    District (Set 3)
9 TUSD-Ross-2  Plaintiff's Third     47
10   Amended Answers to
11   Defendants'
12   Interrogatories to
13   Tucson Unified School
14   District (Set 1)
15
16
17
18
19
20
21
22
23
24
25

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1             ------------
2        P R O C E E D I N G S
3        July 14, 2025, 9:04 a.m. PDT
4             ------------
5             THE VIDEOGRAPHER:  We are now
6   on the record.  My name is Zach Hone.
7   I'm a videographer for Golkow, a
8   Veritext division.  Today's date is
9   July 14, 2025, and the time is
10  9:04 a.m.
11            This remote video deposition is
12  being held in the matter of In Re:
13  Social Media Adolescent Addiction
14  Personal Injury Products Liability
15  Litigation.  This document relates to
16  Tucson Unified School District versus
17  Meta Platforms Inc., et al., for the
18  United States District Court, Northern
19  District of California.
20            The deponent is Robert Ross.
21            All parties to this deposition
22  are appearing remotely and have agreed
23  to the witness being sworn in
24  remotely.
25            Due to the nature of remote

Page 7

1   reporting, please pause briefly before
2   speaking to ensure all parties are
3   heard completely.
4             Counsel will be noted on the
5   stenographic record.  The court
6   reporter is Debbie Dibble, and will
7   now swear in the witness.
8             ------------
9             ROBERT ROSS,
10       having been duly sworn,
11       testified as follows:
12            ------------
13          EXAMINATION
14            ------------
15  BY MS. REAVES:
16       Q.   Good morning, Mr. Ross.  Can
17  you please state your name for the record.
18       A.   It's Robert Ross.
19       Q.   And if you have any problems
20  with the remote setup while we're connected
21  to this deposition, could you let us know?
22       A.   Absolutely.
23       Q.   And you understand that while
24  we're on the record, you must not communicate
25  or consult with anyone off the record?

Page 8

1        A.   I understand.
2        Q.   You also understand that during
3   this deposition, you shouldn't consult any
4   documents or records?
5        A.   Except for ones that you might
6   provide, yes.
7        Q.   Okay.  You understand that
8   you're testifying under oath?
9        A.   Yes.
10       Q.   Is there any reason you cannot
11  provide truthful and accurate testimony
12  today?
13       A.   No.
14       Q.   You understand that when I say
15  TUSD or Tucson Unified School District, I'm
16  referring to the district where you work?
17       A.   Yes.
18       Q.   And if I say defendants'
19  platforms, I'm referring to Facebook,
20  Instagram, TikTok, YouTube, and Snapchat.
21            Do you understand that?
22       A.   Yes.
23       Q.   Did you do anything to prepare
24  for this deposition today?
25       A.   I looked at a few documents and

Page 9

1   had a couple of conversations with outside
2   counsel about it.
3        Q.   Did you review any documents
4   separate from your conversations with outside
5   counsel?
6        A.   No.
7        Q.   Did you take any notes?
8        A.   No.
9        Q.   Did any documents refresh your
10  recollection on facts?
11       A.   On facts, no.
12       Q.   Do you have any documents or
13  notes with you today in front of you?
14       A.   No.
15       Q.   So you understand that today
16  you're here to testify about TUSD's response
17  to defendants' Interrogatory 5?
18       A.   Yes.  That's my understanding.
19       Q.   And you are general counsel for
20  TUSD?
21       A.   I am.
22       Q.   How long have you been employed
23  with the district?
24       A.   Two different tours of duty,
25  from 2005 to 2010, and then since 2017.

3 (Pages 6 - 9)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1  14 years total.
2      Q.    Have your roles at the district
3  all been as a lawyer?
4      A.    Yes, always as general counsel.
5      Q.    And do you have any background
6  in education other than as a lawyer?
7      A.    No.
8      Q.    Understanding that you are
9  TUSD's lawyer, I want to make clear that my
10  questions are about the factual information
11  related to TUSD's interrogatory response.
12      So you understand, I'm not
13  asking you to provide me with privileged
14  information.
15      A.    I understand.
16      Q.    I want to get started.  So if
17  we could pull up tab 1.  We'll mark for
18  identification tab 1 as Exhibit 1.
19      (Whereupon, TUSD-Ross-1,
20      Plaintiff's Second Amended Answers to
21      Defendants' Interrogatories to Tucson
22      Unified School District (Set 3), was
23      marked for identification.)
24  BY MS. REAVES:
25      Q.    Now, you recognize Exhibit 1?

Page 11

1      A.    Yes, it looks familiar.  If you
2  could go to the last page, or the date, I
3  would definitely --
4      Q.    Sure.  So let's go -- let's go
5  back to the first page.  The date isn't on
6  the last page.
7      The first page, it says:
8  Plaintiff's Second Amended Answers to
9  Defendants' Interrogatories to Tucson Unified
10  School District (Set 3).
11      If we could turn to the second
12  page of this document, at the top it says:
13  Date of Service: May 16, 2025.
14      Do you see that?
15      A.    Yes.
16      Q.    And so this is the most recent
17  version of responses to Interrogatory 5 that
18  TUSD has provided to defendants, right?
19      A.    That's my understanding, yes.
20      Q.    Okay.  And if we go to page --
21  PDF page 3 of this document, it's page 2
22  written in the document.
23  I want to look at the
24  interrogatory question itself.
25      So Interrogatory No. 5, we

Page 12

1  asked:  For each category of damages for
2  which you are seeking damages in this
3  action -- and then there is more detail.  At
4  the end, the request was:  Please (a)
5  describe what the category includes, (b)
6  explain how you performed or arrived at your
7  computation, and (c) identify each cost or
8  other input that you used in your
9  computation.
10      Do you see that?
11      A.    Yes.
12      Q.    Okay.  And if we go to PDF
13  page 4, it's page 3 in the document, we see
14  TUSD's response.
15      Correct?
16      A.    Yes.
17      Q.    All right.  Now, turning to the
18  last paragraph in this document.
19      All right.  We're going to be
20  focused in this deposition on the content
21  that follows this.  So it says:  Plaintiff
22  listed the following general categories of
23  past compensatory damages in its Second
24  Supplemental Initial Disclosures.
25      Do you see that portion?

Page 13

1      A.    Yes.
2      Q.    And does this accurately
3  reflect the categories of past compensatory
4  damages that TUSD is seeking?
5      MR. BRANE:  Object to form.
6      A.    It does -- based on my
7  communications regarding the case, yes, it
8  does.
9  BY MS. REAVES:
10      Q.    Okay.  And you verified the
11  response -- TUSD's response to this entire
12  interrogatory, correct?
13      A.    Yes, I verified the responses
14  provided by staff.
15      Q.    So I want to make sure -- we
16  can take down the document just briefly, but
17  we're going to come back to it.  I want to
18  make sure we understand the basis for your
19  testimony today and for your verification of
20  TUSD's response.
21      Do you work directly with
22  students?
23      A.    I'm not a classroom teacher,
24  but I do have contact with students on
25  occasion, yes.

4 (Pages 10 - 13)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1    Q.    What contact do you have with
2  students?
3    A.    Well, I served as a hearing
4  officer for expulsions in the district.
5  There are two of us who do that.  So when
6  there are expulsions, I'm having direct
7  contact with students through that process,
8  but it's not a daily occurrence.
9    Q.    Did you rely on any personal
10  knowledge from your work as a hearing officer
11  in verifying these responses?
12    A.    No.
13    Q.    Okay.  Do you work directly
14  with teachers?
15    A.    Only if there's a legal issue
16  that's arisen regarding those teachers.
17  That's not very often.
18    Q.    And does your -- does any
19  aspect of your personal knowledge in working
20  directly with teachers, did you rely on that
21  in verifying these responses?
22    A.    No.
23    Q.    What about working directly
24  within schools?  Do you work directly within
25  TUSD schools?

Page 15

1    A.    Very rarely, and it's only if
2  there's an issue happening at the school, a
3  meeting or -- a discipline meeting or a
4  special education meeting.
5    Q.    Okay.  And so did your
6  verification of these responses rely on any
7  personal experience working within TUSD
8  schools?
9    A.    No.
10    Q.    Did you have a role in
11  preparing TUSD's response to Interrogatory 5?
12    A.    I didn't.
13    Q.    What was your role?
14    A.    My job was to facilitate
15  getting the right district staff members who
16  have more direct information or access to
17  data and analysis and making sure that they
18  were connected with outside counsel to
19  provide the information in -- accurately and
20  in the format that was appropriate for
21  responding to the interrogatories.
22    Q.    Okay.  And so which district
23  staff members did you identify who provided
24  information to respond to this interrogatory?
25    A.    So for this one, I know that --

Page 16

1  I made sure that the chief finance officer,
2  Ricky Hernandez, was involved.  Julie
3  Shivanonda, who does a lot work on behalf of
4  the district to -- for social-emotional
5  learning and responses to, you know,
6  social-emotional issues at school, Julie
7  Shivanonda was involved.  Anna Warmbrand, who
8  was, I believe, the director of student
9  relations.  So she was involved in many
10  disciplinary issues and the student code of
11  conduct; made sure that she was connected to
12  provide responses.
13         And Dr. Sabrina Salmon, who is
14  the director -- I think executive director of
15  exceptional education, which is our word for
16  special education.  Because she has
17  information about social workers and some
18  counseling information that seemed relevant
19  to responding to these interrogatories.
20         So -- oh, Joseph Hallums, who
21  is our director of school safety, to make
22  sure that he was at least consulted in
23  providing information needed from him for
24  this.  He works quite a bit with student
25  relations and Anna Warmbrand to disciplinary

Page 17

1  matters, so I made sure he was involved.
2         That's all I can think of right
3  now.
4    Q.    Okay.  And in terms of your
5  verification of the accuracy of these
6  responses, did you consult with anyone to be
7  able to verify these responses as accurate?
8         MR. BRANE:  Object to form.
9    A.    I reviewed the data provided,
10  but I didn't myself go in and determined
11  whether or not it was exactly what was --
12  where either Ricky Hernandez or Dr. Salmon
13  got from their records.  But I did take a
14  look at those.  Those are the people I rely
15  on when I need this kind of information for
16  my work, so I trust that their work was
17  accurate and -- I know they were the right
18  people to ask.
19  BY MS. REAVES:
20    Q.    And you referenced the data
21  that others provided and that you reviewed.
22  What data was provided for these responses?
23    A.    Well, I'm thinking about
24  positions, staff positions and salaries,
25  mostly.  And also data relating to purchases

5 (Pages 14 - 17)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1  of products that the district could use in
2  connection with combatting the effects of
3  potential media activities in schools.  So
4  that's the data I'm talking about.
5      Q.   Okay.  And that's the data you
6  reviewed in order to verify the accuracy of
7  these responses?
8      A.    That's the data that the --
9  yes, that the staff provided, and it seemed
10 responsive to me.  But again, I didn't -- I
11 didn't go into their -- into their records
12 and, you know, and do my own math, basically.
13 Those are the people that I would rely on to
14 get that information and forward it on to
15 outside counsel for a response.
16     Q.   So I just want to make sure
17 that your testimony is clear.  Is it your
18 testimony that the individuals you identified
19 provided records or data to outside counsel
20 for this, but you didn't personally review
21 the records or data in verifying the accuracy
22 of the responses?
23     A.    I reviewed their --
24          MR. BRANE:  Objection to the
25     form.

Page 19

1          THE WITNESS:  I'm sorry.
2          MR. BRANE:  Go ahead.
3      A.    I reviewed their product, not
4  the math that they did to come up with it.
5  BY MS. REAVES:
6      Q.   And when you say you reviewed
7  their product, what do you mean by that?
8      A.    There are charts that were
9  attached to the response.  And I looked at
10 those as basically the work of the group, and
11 made sure that it appeared to be responsive
12 to the interrogatories.
13          And again, these are the people
14 that I would rely on to provide that kind
15 information to me or to our governing board
16 or the superintendent.
17          So I was satisfied that their
18 work accurately represented what our records
19 are, because that's the practice in this
20 district.  These are the folks we go to.
21     Q.   Okay.  And so when you say that
22 you reviewed their charts that they provided
23 in response, are you referring to Exhibit 1
24 that's attached to the interrogatory response
25 itself?

Page 20

1      A.    Would you mind popping that up
2  there?
3      Q.   Yes.
4          So let's take a look back at
5  Exhibit 1, Deposition Exhibit 1.  And we can
6  turn to page 8.
7          MS. REAVES:  Can we go off the
8  record just briefly?
9          THE VIDEOGRAPHER:  We're going
10 off the record.  The time is 9:19.
11         (Recess taken, 9:19 a.m. to
12 9:20 a.m. PDT)
13         THE VIDEOGRAPHER:  Back on
14 record.  The time is 9:20.
15 BY MS. REAVES:
16     Q.   And so for the record, this is
17 Exhibit 1, and this is page 8 of Exhibit 1.
18         Maybe we could make it a little
19 bit bigger so you can see.
20         So this is the first chart in
21 the tables or charts that are attached at the
22 back of Plaintiff's Response to Defendants'
23 Interrogatory 5.
24         Is this one of the charts that
25 you're referring to that you reviewed?

Page 21

1      A.    Yes.
2      Q.   Okay.
3          MS. REAVES:  And can we turn to
4  the next page and let him scroll
5  through all of the charts.
6          [Document review.]
7  BY MS. REAVES:
8      Q.   Did you review this table as
9  well?
10     A.    Yes.
11     Q.   Okay.  Can you go to the next
12 page, please?
13         [Document review.]
14 BY MS. REAVES:
15     Q.   Is this one of the tables that
16 you're referring to?
17     A.    Yes, that looks like a
18 continuation of the previous page.
19         Yes.
20     Q.   All right.  And the next page,
21 please.
22         [Document review.]
23 BY MS. REAVES:
24     Q.   Do you recognize this table?
25     A.    Yes.  It looks like the same

6 (Pages 18 - 21)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1  thing.
2      Q.    Okay.  So these tables are
3  attached to the interrogatory responses as
4  Exhibit 1; is that correct?
5      A.    Yes.  Yes, it is.
6      Q.    And your testimony is that you
7  reviewed these tables for accuracy when you
8  were verifying the responses, but you did not
9  personally verify the underlying information
10 that went into these tables.
11     A.    Well, to be -- yes, I did
12 not -- I did not go in and check the math
13 with whatever source information that the
14 staff came up with for this kind of group
15 response.  But I did review it for
16 responsiveness, and again, relying on the
17 expertise of the team of people that I named
18 earlier to provide this information to our
19 counsel to respond.
20        So, yes, I did not go in and
21 basically check the math or the underlying
22 database that -- they came up with it, but I
23 did check it for responsiveness and also who
24 did the group response and whether this
25 response was responsive to the interrogatory

Page 23

1  question.
2      Q.    Okay.  Let's look at the
3  different categories specifically, and I'm
4  going to ask you a few follow-up questions.
5        So I want to start with
6  Category 2 of damages.  Can we go to PDF
7  page 5 in this document, please.
8        And then the second-to-last
9  paragraph:  For Category 2 damages, plaintiff
10 identified past expenditures it alleges were
11 necessitated by defendants' conduct,
12 including for -- and then it lists a number
13 of programs.
14        And then it says:  See
15 Exhibit 1.
16        Do you see that portion?
17     A.    Yes.
18     Q.    Now, I want to go to PDF
19 page 11, which is the page of Exhibit 1 that
20 references Category 2 damages.
21        Now, how did TUSD select
22 Character Strong curriculum as something that
23 was necessitated by defendants' platforms?
24     A.    In terms of why Character
25 Strong, that would probably be a question for

Page 24

1  Julie Shivanonda, who was -- you know, who
2  would select those sorts of products to
3  combat any social-emotional issues that are
4  coming up at the school.  That was her
5  responsibility to do.
6        So why they chose that
7  particular one, I wasn't involved in that
8  decision so I couldn't tell you.
9      Q.    And so was Julie Shivanonda the
10 person who chose Character Strong SEL
11 curriculum, to include it?
12     A.    Either she or some member of
13 her team was likely involved.  We also have a
14 curriculum department that may have worked
15 with her.  I mean, nobody at the school
16 district does things all by themselves.
17 There's always a team, especially with a
18 purchase of that size.
19     Q.    And how did you verify that it
20 was accurate to include Character Strong
21 curriculum?
22     A.    Well, I, again, relying on the
23 expertise of the team that I named earlier,
24 to -- you know, they had the discussions
25 that -- you know, I've been involved with

Page 25

1  those folks and our outside counsel, what is
2  related to this issue.  I would rely on the
3  expertise of someone like Julie Shivanonda to
4  determine whether or not that was combatting
5  the issue that's the subject of this case.
6      Q.    Okay.  In determining the
7  weight percentage assigned to this -- do you
8  see the weight percentage assigned?
9      A.    Yes.
10     Q.    Who determined the weight?
11     A.    Those -- I was involved in
12 several discussions with folks about this in
13 how to respond to this.  The weights were
14 kind of a group effort from those experts to
15 determine how much of this work is
16 specifically to this -- to the subject of
17 this lawsuit and how much is it maybe just
18 the general operation of districts without
19 the defendants' actions.  So that would be
20 something that those experts would be able to
21 tell you.
22     Q.    Okay.  So for Character Strong
23 specifically, when you say those experts,
24 besides Julie Shivanonda, who are you
25 referring to who determined the weight should

7 (Pages 22 - 25)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

1  be 40%?
2          MR. BRANE:  Objection to --
3      A.    This is --
4          THE WITNESS:  I'm sorry.
5          MR. BRANE:  Go ahead.
6      A.    Again, as I said before, this
7  is -- this whole response is, you know, a
8  response on behalf of the whole district, not
9  one person.  So there was a team involved in
10  this.  So from the district side, you've got,
11  I would say, Julie Shivanonda, who would be
12  one to lead that, but she wouldn't be doing
13  it by herself.  She also would be working
14  with perhaps social workers from Sabrina
15  Salmon's department as well as perhaps Anna
16  Warmbrand from student relations.
17          So again, this is kind of a
18  group result, not just one person.  So that
19  would be the team that I would go to to say,
20  if you're going to decide how much of this
21  attributable to a particular factor, you guys
22  go work on that and bring it back, and that's
23  what happened here.
24  BY MS. REAVES:
25      Q.    Okay.  And when the team came

Page 27

1  up with how much to attribute to defendants'
2  platforms, how did you verify that that
3  percentage was accurate?
4      A.    I relied on their work to tell
5  me that that's what they came up with, and
6  that's what I would do for any of the work
7  that I would ask them to do.  So I wouldn't
8  see this as any different.  So I relied on
9  their going through their records and their
10  expertise.
11      Q.    Do you know what records they
12  reviewed in coming up with this percentage?
13      A.    I don't.
14      Q.    Do you know anything about the
15  process of reviewing records that they went
16  through?
17      A.    I was involved in some meetings
18  with their discussions about, for example,
19  Anna Warmbrand looking at discipline data and
20  how much of violations might include a factor
21  of social media interaction.  And I know that
22  that was something that was looked at.
23          Other than that, I couldn't
24  tell you whether they -- whether there was
25  something else that they were reviewing.

Page 28

1      Q.    Okay.
2      A.    That's always a big one, is
3  student discipline reference.
4      Q.    And were student discipline
5  records reviewed to determine specifically
6  the Character Strong curriculum, the
7  percentage attributed to the Character Strong
8  curriculum?
9      A.    I don't know if they
10  specifically were.
11      Q.    What information do you have
12  about each of the individual items that were
13  listed here?  Were you part of a discussion
14  for each individual item, or were all of
15  these items left to the -- what you called
16  experts, to decide and bring back numbers to
17  you?
18      A.    So in terms of responding to
19  this interrogatory or just general operation
20  of the district of these products?
21      Q.    In terms of responding to this
22  interrogatory.
23      A.    I was listening to some of the
24  discussion when these -- the district staff
25  would bring these up.  So that's the extent

Page 29

1  of my involvement with this interrogatory
2  response.
3          I do know of some of these
4  products from other -- other work that I do
5  for the district.  But in terms of this
6  response, you know, the staff were the ones
7  that raised these as being relevant, and
8  mostly that would be Julia Shivanonda, Anna
9  Warmbrand and some with Joseph Hallums.
10      Q.    Okay.  So --
11      A.    That's my memory of those
12  discussions.
13      Q.    So sticking with the Character
14  Strong social-emotional learning curriculum,
15  there are four different years represented
16  here.  How did TUSD determine that the weight
17  should be 40% for the entire curriculum as
18  opposed to determining weights for individual
19  years?
20          MR. BRANE:  Objection to the
21      form.
22      A.    As I testified before, I
23  would -- that would be something I would
24  ask -- if you wanted specifically on how they
25  came up with 40 versus 50 or 25, I would ask

8 (Pages 26 - 29)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1  those folks.  Again, I relied on their much
2  superior knowledge to me on this.
3  BY MS. REAVES:
4      Q.    Prior version of this
5  interrogatory response, which you verified,
6  had no percentage attached for Character
7  Strong curriculum.
8          How did TUSD determine that it
9  should go from no percentage to 40%?
10     MR. BRANE:  Object to form.
11     And, you know, Mr. Ross, I would
12     counsel you to not reveal the contents
13     of conversations with -- you know,
14     between you and your staff that would
15     be privileged -- which you're familiar
16     with -- or with us.  I guess stick to
17     the -- more the process.
18     A.    Well, so the -- again, the
19  weights were the subject of, you know, kind
20  of the process that you go through in
21  discovery, right?  Questions come up.  You
22  know, things need to be narrowed down or
23  defined better.
24          And the team came up with their
25  best work to assign a weight to it.  So, you

Page 31

1  know, again, this is kind of the iterative
2  process that happens with discovery because
3  issues come up, more definition is needed,
4  and this was one of those kinds of subjects,
5  that it seemed right to come up with
6  something more definitive than just an
7  unweighted.
8  BY MS. REAVES:
9      Q.    So in verifying March 2025
10 earlier response, and then again, verifying
11 this May response, did you have -- did you
12 receive any additional information about
13 whether -- about what percentage to assign to
14 Character Strong curriculum?
15     A.    Well, the team came up with
16 better thinking on that, to create a more
17 useful product than the unweighted.  So that
18 was a -- again, the expertise of the industry
19 team to provide that.
20          And again, as part of the whole
21 discovery process, these questions come up.
22 You know, there is an obligation to make it
23 as accurate as possible, and that's what was
24 happening in that process between March and
25 May.

Page 32

1      Q.    Okay.  Also asking you about
2  the specific costs that are included for the
3  Character Strong SEL curriculum.  The costs
4  that are listed in TUSD's 20 -- March
5  response are different from TUSD's May
6  response.
7          Do you know what information
8  changed between the two responses?
9      A.    I would -- that would be a
10 question for the chief finance officer, Ricky
11 Hernandez, to tell you why there would be
12 something between one year here and one year
13 there.
14          Again, that's who I rely on for
15 anything with a dollar sign in front of it,
16 would be Mr. Hernandez to explain.  But
17 again, I rely on his years and years of
18 experience with school finance and purchasing
19 to refine numbers of anything that's changed
20 from one year to another.
21     Q.    Okay.  So in verifying the
22 costs associated with Character Strong
23 curriculum, you didn't personally review any
24 records?
25     A.    I did not look at purchase

Page 33

1  orders, no.  I would rely on the finance
2  office to do that.  They provide that to us,
3  including any numbers that are updated from
4  one response to another.
5      Q.    And in verifying the response
6  for Character Strong, social-emotional
7  learning curriculum, did anyone provide you
8  information about why they changed the costs
9  between the March and the May responses?
10     A.    No.
11     Q.    Let's talk about Talkspace.
12          Do you know what Talkspace is?
13     A.    I have some familiarity with
14 it, yes.  I remember reviewing a contract for
15 it, in addition to including it in the
16 response.
17     Q.    Who determined that Talkspace
18 was a product that was necessitated by
19 defendants' platforms?
20     A.    That would be, again, a team
21 discussion with, I'm sure centrally --
22 centering on Julia Shivanonda.  And perhaps
23 even Kinasha Brown, if we're going back a
24 couple of years.  She would have been
25 involved in that as well.  But Julie

9 (Pages 30 - 33)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

1  Shivanonda and perhaps Dr. -- I mean Anna
2  Warmbrand.
3          But those are the folks that
4  would be involved in telling us whether
5  Talkspace had a relevant connection with this
6  litigation.
7      Q.   Okay.  And in determining the
8  percentage to attribute to defendants'
9  platforms, do you know what records, if any,
10  TUSD reviewed?
11      A.   No.  I relied on the team to
12  provide the final product, including how they
13  would assess the percentage weight to apply
14  to it.
15      Q.   Do you know whether the team
16  looked at the percentage of students who used
17  Talkspace for an issue related to defendants'
18  platforms?
19      A.   I don't know that they did, but
20  that would not surprise me if they did.
21      Q.   To be clear, you don't know
22  whether or not they relied on the actual data
23  of how Talkspace was used in the district in
24  determining the percentage?
25          MR. BRANE:  Objection to form.

Page 35

1      A.   No.
2  BY MS. REAVES:
3      Q.   And again, the prior version of
4  TUSD's response on Talkspace was different
5  from the May response that's in front of you.
6          Do you have any information
7  about what information changed between March
8  and May for TUSD's response?
9      A.   Just what I've said before, is
10  that through the discovery process, more
11  refinement can happen and a more accurate
12  picture can emerge, so that's what happened
13  here, just a different character structure.
14      Q.   For the Awareity database, who
15  provided -- who determined that Awareity is
16  something that was necessitated by
17  defendants' platforms?
18      A.   Again, that was a team of folks
19  that I mentioned before, and I would
20  specifically say that Anna Warmbrand, Julie
21  Shivanonda and Joseph Hallums would have been
22  involved in identifying Awareity as being
23  relevant.
24      Q.   You are aware that Awareity --
25  you're aware that TUSD has a database that

Page 36

1  stores all of the Awareity reports that TUSD
2  has received, correct?
3      A.   Yes.
4      Q.   Do you -- did you review that
5  database or data from that database to
6  determine the percentage of Awareity reports
7  that relate to defendants' platforms?
8      A.   I personally did not.
9      Q.   Okay.  Do you know whether or
10  not the team that attributed 40% to
11  defendants' platforms reviewed the reports or
12  the data in TUSD's Awareity database?
13      A.   Again, in coming up with the
14  information that was provided in the
15  interrogatory, I don't know if they -- if
16  they did, but it would not surprise me if
17  they did, to come up with some number that
18  they can get behind.  I would rely on them to
19  do that in any context.
20      Q.   So in verifying this response,
21  you didn't ask whether or not they looked at
22  the data on the types of reports in the
23  Awareity database?
24      A.   I didn't specifically ask them
25  that.  I know that these are the right people

Page 37

1  to get this information.
2      Q.   Okay.  And they didn't
3  specifically tell you that they looked at the
4  data underlying the Awareity database in
5  determining the percentage to apply in this
6  interrogatory?
7          MR. BRANE:  I'll object to that
8      one and instruct the witness not to
9      answer.  That's a specific "what did
10      your client tell you" question.
11  BY MS. REAVES:
12      Q.   Do you have any information
13  that allows you to affirmatively say that the
14  data within the Awareity database was used in
15  creating the response to this interrogatory?
16      A.   Could you repeat that?
17      Q.   Sure.
18          Do you have any affirmative
19  information that the data and reports in the
20  Awareity database were reviewed to determine
21  the percentage to apply in response to this
22  interrogatory?
23      A.   I don't.  Again, I rely on the
24  folks who actually deal with this day-to-day
25  to come up with their view of the percentage

10 (Pages 34 - 37)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

1  impact.
2      Q.    For school threat assessment
3  counseling?
4      A.    Consulting?
5      Q.    Consulting, yes.  School threat
6  assessment consulting was not included in the
7  March interrogatory responses and is here in
8  the May interrogatory responses.
9          Do you have any information as
10 to why TUSD included school threat assessment
11 counseling in its response that you verified?
12     A.    Consulting again, not
13 counseling.
14     Q.    Consulting.
15     A.    Yes.  Joseph Hallums and Anna
16 Warmbrand, and I believe Julie Shivanonda
17 were all working on -- during that time
18 frame, on school threat assessment analysis
19 and making it better for the district.
20         So that was during that time
21 frame that they were improving the process
22 for school threat assessments.
23     Q.    Okay.  And how did that group
24 determine that 40% of costs for school threat
25 assessment consulting should be attributed to

Page 39

1  defendants' platforms?
2      A.    Their experience with school
3  threat actions, specifically Joseph Hallums
4  and Anna Warmbrand and Julia Shivanonda, came
5  up with their assessment based on their
6  experience with it.
7      Q.    Do you know affirmatively
8  whether TUSD analyzed the data that it has on
9  school threats in determining that 40% of
10 school threat assessment consulting should be
11 attributed to defendants' platforms?
12     A.    Do I know affirmatively?  No,
13 but that is what they do, so -- when they
14 provide this in other contexts.  So I would
15 not expect them to make their process any
16 different than when they're reporting to the
17 governing board.  So they do review data to
18 come up with their numbers.
19     Q.    And specifically --
20     A.    I don't know specifically which
21 data they reviewed.
22     Q.    And when you say that they
23 reviewed data, do these individuals review
24 data to determine specifically the number of
25 school threats that are associated with

Page 40

1  defendants' platforms?
2          MR. BRANE:  Object to form.
3      A.    Can you repeat that?
4  BY MS. REAVES:
5      Q.    Sure.
6          When you say that these
7  individuals reviewed data, do they review
8  data to determine specifically the number of
9  school threats that are associated with
10 defendants' platforms?
11         MR. BRANE:  Object to form.
12     A.    I don't know if they
13 specifically did.  I would rely on them to
14 report to -- for this interrogatory and for
15 any other context, for example -- the school
16 board, to look at school threat data in
17 whatever the question is being asked in this
18 case; what's the connection with the
19 defendants' activities, then I would expect
20 them to look at their data with respect to
21 the defendants' activities and come up with
22 their best information to present in this
23 interrogatory, or if it's another context, to
24 the governing board as well.
25         So I wouldn't expect their

Page 41

1  process to be any different, and I'm
2  confident, based on my work with them over
3  the years, that that's what they did.
4  BY MS. REAVES:
5      Q.    But you don't know what
6  percentage of school threats involved
7  defendants' platforms?
8      A.    I don't.
9      Q.    And you don't know whether
10 these individuals looked specifically at what
11 percentage of school threats involved
12 defendants' platforms?
13     A.    I don't specifically know.  I
14 wasn't with them when they did it, but this
15 is what we -- what they came up with, so I
16 trust them.  They were the right people to do
17 it.  I trust that they looked at the right
18 data to come up with this.
19     Q.    Let's look at the Yondr pouches
20 rental.  Your understanding is that Yondr
21 pouches were used at Tucson High Magnet
22 School for one year; is that right?
23     A.    Yes.
24     Q.    And did you consult with Tucson
25 Magnet High administrators in attributing the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1  cost of Yondr to defendants?
2      A.   I guess there's another name
3  that I could put out of this one as part of
4  the team, and that would be Robert Thompson,
5  who is assistant principal at Tucson High.
6          But this particular item, the
7  team would be the folks at Tucson High and
8  the finance department and Ricky Hernandez to
9  come up with the number for the Yondr
10 pouches.
11     Q.   When you say the folks at
12 Tucson High, who are you referring to?
13     A.   I'm sorry, Robert Thompson, the
14 assistant principal.
15     Q.   And in particular, coming up
16 with 100% of the costs attributed to
17 defendants' platforms, who determined that it
18 was 100% of the cost?
19     A.   Robert Thompson and Ricky
20 Hernandez came up with 100%.  And I can tell
21 you when that was purchased that -- the
22 defendants' activities was the reason why the
23 school purchased that.
24     Q.   Did TUSD analyze any data to
25 determine the percentage of time TUSD

Page 43

1  students spend on defendants' platforms as
2  opposed to other applications on cell phones?
3          MR. BRANE:  Object to the form.
4      A.   I don't know.
5  BY MS. REAVES:
6      Q.   Does TUSD have any data about
7  the amount of time TUSD students spend on
8  defendants' platforms as opposed to other
9  applications on their phones?
10     A.   I don't believe so.  I think
11 that -- I think the defendants would have
12 that information better than the district.
13     Q.   So --
14     A.   I do remember this purchase and
15 why it was done, and it wasn't because kids
16 were calling their parents at home.
17     Q.   For cell phone lockers, who
18 decided to attribute cell phone lockers to
19 defendants' platforms?
20     A.   I'm sure finance was number
21 one, Ricky Hernandez, but there also was -- I
22 know communication with a principal at one
23 school in particular, Sabino High School,
24 that did cell phone lockers, and that's Kevin
25 Amidan.  And that's what that purchase was

Page 44

1  for, just the same as the Yondr pouches
2  rental.  The same process there.  So just the
3  school and finance.
4      Q.   Okay.  And so overall question
5  for all of the Category 2 damages that we see
6  here.  You did not personally review any data
7  reports for any of these programs, correct?
8      A.   Correct.
9          MR. BRANE:  Object to form.
10 BY MS. REAVES:
11     Q.   Okay.  And the individuals
12 you're relying on for this information, you
13 don't know what specific information they
14 reviewed in order to come up with these
15 percentages, correct?
16     A.   Correct.
17     Q.   And in particular, you don't
18 know whether these percentages correlate with
19 a specific percentage of defendants'
20 platforms that's represented in TUSD's
21 records, correct?
22     A.   Well, this is what they -- what
23 they, in their expertise, came up with, so I
24 was relying on their work to identify that
25 for us.

Page 45

1      Q.   But you were not aware whether
2  their percentages were an estimation as
3  opposed to an analysis of numerical data.
4          MR. BRANE:  Object to the form.
5      A.   That -- and I'm going to
6  divide -- kind of divide out everything
7  except for the last two, right?
8          So the last two, I know why
9  those were purchased.  I remember when they
10 were purchased specifically.
11         But for the other categories,
12 Character -- well, the other items, Character
13 Strong, Talkspace, Awareity, and school
14 threat assessment consulting, the folks that
15 we got involved, Julia Shivanonda, Joseph
16 Hallums, Ricky Hernandez, Anna Warmbrand,
17 they don't provide information like this in
18 any other context without reviewing data.
19 They don't just make a wild guess.
20         They are -- they all analyze
21 these things based on the information they
22 have available to them, not just making
23 something up.
24         So my experiences with them and
25 why I identified them to work on this is

12 (Pages 42 - 45)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1    because they don't just make random guesses.
2    They used their expertise and data that they
3    have.
4    BY MS. REAVES:
5        Q.    But my question is whether you
6    know whether they specifically looked at the
7    percentage of incidents related to defendants
8    in coming up with these percentages.
9        A.    I don't know what specific data
10    that they pulled to come up with it.
11        Q.    Okay.  Let's turn back to
12    Category 3.  So if we can go to page 5 in the
13    PDF here.
14            So:  For Category 3 damages,
15    plaintiff investigated incidents of property
16    damage plaintiff has reason to believe were
17    caused by defendants' conduct.
18            And then if we scroll to the
19    next -- the beginning of the next page it
20    says:  See Plaintiff's Third Amended Answers
21    to Defendants' Interrogatories (Set 1).
22            Do you see that?
23        A.    Yes.
24        Q.    Now, are you familiar with
25    Plaintiff's Third Amended Responses to

Page 47

1    Defendants' Interrogatories (Set 1)?
2        A.    I know I've seen them.  If you
3    want to pull it up.
4        Q.    Okay.  If we could pull up --
5    this is tab 13 in the binder.
6            (Whereupon, TUSD-Ross-2,
7        Plaintiff's Third Amended Answers to
8        Defendants' Interrogatories to Tucson
9        Unified School District (Set 1), was
10        marked for identification.)
11        MS. REAVES:  We'll mark this as
12        Exhibit 2.
13    BY MS. REAVES:
14        Q.    All right.  And if we scroll
15    down to the bottom page, the last few pages.
16        MR. BRANE:  And, of course,
17        Mr. Ross, if you want to see other
18        pages, just ask.
19    BY MS. REAVES:
20        Q.    Do you recognize these
21    responses?
22        A.    It looks familiar.  This isn't
23    one that I verified.  But I've seen a lot in
24    the pleadings.  So...
25            It does look familiar.

Page 48

1        Q.    And you don't recall verifying
2    these responses?
3        A.    I don't.
4        Q.    Do you understand that your --
5    TUSD's response in -- TUSD's response to
6    Interrogatory 5 incorporates this response by
7    reference?
8        A.    Yes.
9        Q.    Okay.  Now, in verifying -- we
10    can take this down.
11            In identifying those as
12    incidents that TUSD has a reason to believe
13    are related to defendants' or caused by
14    defendants' conduct, how did you verify that
15    was accurate?
16        A.    Well, that information would
17    come from purchasing, Ricky Hernandez, as to
18    outlays of money for damages caused that were
19    related to the defendants' activities.
20            It seemed awfully low to me,
21    but if that's what they could -- what they
22    could -- what finance could identify, that's
23    what they could identify.  Just eyeballing it
24    seemed low to me, based on just my views from
25    the general counsel's office.

Page 49

1        Q.    Okay.  And in verifying these
2    responses, how did TUSD determine that these
3    were specifically incidents caused by
4    defendants' platforms as opposed to caused by
5    something else?
6        A.    Again, relying on finance,
7    Ricky Hernandez, and Anna Warmbrand, who is
8    student relations, with the student
9    discipline reports, or at least her knowledge
10    of student discipline, that's how -- my
11    understanding is that the team came up with
12    that number.
13            Again, it seems low to me, but
14    if that's what they could verify from their
15    view, then I rely on them for that.
16        Q.    So your understanding is that
17    the team verified this list by looking at
18    student disciplinary records?
19        MR. BRANE:  Object to form.
20        A.    I would say that they -- it
21    was -- you couldn't just have student
22    discipline records, but also purchase records
23    to replace or repair whatever was connected
24    with the activities of students that were
25    again informed or had a connection with the

13 (Pages 46 - 49)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

1 defendants' activities.
2 BY MS. REAVES:
3      Q.    And aside from -- setting aside
4 the purchase orders for damages, I want to
5 focus on the student records.
6          What student records did this
7 group review in identifying the items they
8 listed in this response?
9          MR. BRANE:  Object to form,
10 asked and answered, calls for
11 speculation.
12     A.    I would -- I don't know
13 specifically, but based on past practice with
14 Ms. Warmbrand and Mr. Hernandez, I would
15 expect them to have looked at violations that
16 would result in damage that would be
17 connected with defendants' activities.
18 BY MS. REAVES:
19     Q.    So your expectation is that
20 they looked at individual student records to
21 determine whether or not the specific
22 incidents were related to defendants'
23 platforms?
24         MR. BRANE:  Object to form.
25     A.    I would say first they would

Page 51

1 look at data, kind of a conglomeration or
2 cumulative data, not individual student
3 records, but it's possible they did go in and
4 look at individual student records as well.
5          My -- the practice with them in
6 this case and in others is to first look at
7 consolidated data, not individual student
8 records, but I wouldn't rule out that they
9 looked at individual student records as well.
10 BY MS. REAVES:
11     Q.    Now, for the incidents that are
12 listed in response to Interrogatory 3 that's
13 incorporated by reference into
14 Interrogatory 5, those instances of property
15 damage are always instances where a person
16 caused damage, correct?
17     A.    Well, they wouldn't -- yeah, it
18 wouldn't be an act of God, right?
19     Q.    Okay.  And so for some of those
20 incidents, there were specific students who
21 were disciplined as a result of the damage;
22 is that right?
23         MR. BRANE:  Object to form.
24     A.    There may have been discipline
25 or they may have done something outside of

Page 52

1 formal discipline and had reimbursements made
2 by parents or themselves.  It could be a
3 combination of those.
4 BY MS. REAVES:
5      Q.    And when the district
6 identified these incidents, and attributes
7 them to defendants' platforms, did it take
8 into account the incidents that have been
9 reimbursed by particular families?
10         MR. BRANE:  Object to form.
11     A.    Again, I would ask -- that
12 would be a question for Ricky Hernandez in
13 finance and Anna Warmbrand in student
14 relations, to say whether or not they took
15 those into consideration.  But that would be
16 the practice I'm familiar with them to come
17 up with information such as this.
18 BY MS. REAVES:
19     Q.    And in verifying these
20 responses, you don't know whether or not they
21 took into account reimbursements that TUSD
22 has already received from families?
23     A.    I don't know specifically
24 whether they did.
25     Q.    Can we go back to page 5 on

Page 53

1 Exhibit 1.
2          And let's look -- let's go back
3 to Category 1 of damages.
4          So Category 1, the second
5 paragraph says:  Plaintiff identified costs
6 associated with certain staff, including
7 teachers, assistant principals, principals,
8 and staff providing mental health and related
9 student support services.
10         I want to ask you about that in
11 Exhibit 11.  And so let's -- I'm sorry,
12 Exhibit 1.  So can we turn to page 8, please.
13         So in Exhibit 1, this is -- the
14 first table is the student support positions
15 referred to in category one; is that correct?
16     A.    Yes.
17     Q.    Who identified this list of
18 individuals?
19     A.    Again, this is a team/group
20 effort, but the critical people there would
21 be, obviously, Ricky Hernandez in finance in
22 terms of positions and salaries, but also
23 Julie Shivanonda and Dr. Sabrina Salmon.
24         And now that I'm looking at
25 this, probably Dr. Joseph Gaw, who is the

14 (Pages 50 - 53)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1  director of health services, was also part of
2  the team that came up with this.
3         But Julie Shivanonda and Ricky
4  Hernandez, I would say, would probably be the
5  top of the list to identify these positions.
6      Q.   And if we look at the
7  second-to-last column, it says Weight.  Who
8  identified those weights?
9      A.   As in the past with the others,
10  that would be in discussion with Julie
11  Shivanonda, Ricky Hernandez --
12      Q.   Okay.
13      A.   Oh, there's more.
14         Dr. Sabrina Salmon, Dr. Joseph
15  Gaw, and I think I mentioned Julie
16  Shivanonda.  But they would all have been
17  involved in identifying percentage of effort
18  associated with each of these defendants'
19  activities.
20      Q.   Okay.  I want to break these
21  into categories and then ask you questions
22  about each of the categories, okay?
23         For counselor positions, did
24  TUSD or did this team review any records for
25  how counselors spend their time in

Page 55

1  determining the percentage to apply to
2  counselors?
3         MR. BRANE:  Object to form.
4      A.   I don't know specifically what
5  data they looked at, but it would surprise me
6  if they did not look at records.
7  BY MS. REAVES:
8      Q.   So in verifying the percentage
9  for counselors, you don't know what records
10  were reviewed, if any?
11      A.   I relied on the expertise of
12  the folks I listed to come up with this.
13      Q.   Okay.  And for any of the other
14  positions, did -- do you know what records
15  were reviewed in order to come up with the
16  percentage for any of these positions?
17      A.   I don't know specifically which
18  records that the team members reviewed.
19      Q.   Did TUSD conduct any surveys of
20  the people who hold these positions in order
21  to determine the percentage to apply to these
22  positions?
23         MR. BRANE:  Object to form.
24      A.   I don't know.
25

Page 56

1  BY MS. REAVES:
2      Q.   Did TUSD interview any people
3  who hold these positions in order to
4  determine the percentage to apply for these
5  positions?
6         MR. BRANE:  Other than the
7      people he's named?
8         Object to form.  Sorry.
9      A.   I don't know if the team that I
10  identified gave you specific staff members
11  out in the field; no, I don't know.
12  BY MS. REAVES:
13      Q.   Do you know what specific data
14  that TUSD relied on for any of these
15  positions in determining the percentage?
16      A.   No.
17      Q.   Do you know for a fact whether
18  TUSD relied on any data as opposed to
19  estimations or impressions in determining any
20  of these -- the percentage for any of these
21  positions?
22         MR. BRANE:  They are estimates.
23  Our response makes that pretty clear.
24         Earlier you asked if they were
25  estimates that were accurate to the

Page 57

1  numbers, so let's be clear that the
2  response says they're estimates.
3         And I'll object to the form.
4      A.   Again, I would rely on the
5  expertise of the team that I identified to
6  come up with their professional judgments
7  with regard to these weights.
8  BY MS. REAVES:
9      Q.   So in relying on the team, you
10  don't know whether or not the team actually
11  analyzed data in their records, correct?
12         MR. BRANE:  Objection to the
13  form.
14      A.   Correct.
15  BY MS. REAVES:
16      Q.   And this table covers school
17  years 2016 to 2017 all the way through 2023
18  to 2024.
19         Do you see that?
20      A.   Yes.
21      Q.   And there's one percentage
22  that's applied for the entire time spanned.
23         Do you see that?
24      A.   Yes.
25      Q.   Do you know whether TUSD made

15 (Pages 54 - 57)

Golkow Technologies,
A Veritext Division
877-370-3377                                      www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1  any effort to determine percentage for
2  individual school years?
3      A.   I don't.
4      Q.   Now, this table also covers
5  positions that operate in elementary schools,
6  middle schools, and high schools; is that
7  right?
8      A.   Yes.
9      Q.   Do you know whether, in coming
10  up with these percentages, TUSD considered
11  what percentage applies for different school
12  levels?
13      A.   I don't.
14          I can come up with a
15  commonsense answer, but I don't.
16      Q.   Now, for a couple of these
17  positions, the TUSD's March response has a
18  different percentage from TUSD's May
19  response.  Do you have any information as to
20  why the percentages changed?
21      A.   Well, in the course of the
22  discovery process, as more information and
23  questions came up from the litigation, the
24  team would have continuing -- continually
25  worked on refining and providing more

Page 59

1  detailed and accurate information.  So it's
2  through the whole discovery process that they
3  came up with this information.
4      Q.   So when you verified the March
5  response versus when you verified the May
6  response, were you provided the additional
7  information that the district learned that
8  justified changing the percentages between
9  the two responses?
10      A.   What I was provided with was
11  the work of the team to adjust the
12  percentages.  The product, not the work
13  papers that led to it, but just the final
14  product.  This was their best work in March,
15  and through the -- again, the discovery
16  process and continuing discussions with that
17  team and providing more detailed information,
18  they made these refinements.
19      Q.   Can we turn to the next page?
20  There's a -- let's look at the table on the
21  next page.
22          Now, this table shows that the
23  school-based positions referenced in TUSD's
24  response; is that right?
25      A.   Yes.

Page 60

1      Q.   Okay.  In determining that --
2  the weight percentages for each of these
3  positions for each of these years, did TUSD
4  conduct any survey of district teachers,
5  assistant principals, or principals to
6  determine these percentages?
7          MR. BRANE:  Object to form.
8      A.   I don't know if the team did a
9  survey -- this team did a survey.  My folks
10  that I work with did a survey of school-based
11  staff to produce this.
12  BY MS. REAVES:
13      Q.   Okay.  So tell me how your team
14  determined the weight percentage to apply to
15  each of these positions.
16      A.   I don't know specifically what
17  they looked at for that, but again, these are
18  the -- Julie Shivononda, Ricky Hernandez, and
19  perhaps some of the assistant superintendents
20  would have been involved in coming up with
21  their best work in finding this weight
22  information.
23          So we're talking about people
24  who supervise schools as well as the ones who
25  are in charge of the finances as well as the

Page 61

1  ones who are in charge of the
2  social-emotional learning piece.  So -- in
3  the district level.  And that's how -- those
4  are the folks that I would rely on to get
5  this information, as with the board and the
6  superintendent.  Nothing different here from
7  any prior answers.
8      Q.   Earlier, a few minutes ago, you
9  testified that folks that you worked with did
10  a survey of where they stand to produce this.
11          What were you referring to
12  there?
13      A.   I don't recall saying that TUSD
14  did a survey.  You did.
15      Q.   Okay.  So to be clear, there
16  was no survey of TUSD teachers to determine
17  the weight to apply in response to this
18  interrogatory?
19          MR. BRANE:  Object to form.
20      A.   I don't recall our team doing a
21  survey, no.
22  BY MS. REAVES:
23      Q.   Okay.  And there was no survey
24  of assistant principals or principals in
25  order to determine the weights to apply in

16 (Pages 58 - 61)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

1  this interrogatory response?
2      A.    I don't know if our central
3  office team did a survey of principals or
4  assistant principals.
5      Q.    Did TUSD review any records to
6  determine the percentage to apply to these
7  specific positions?
8          MR. BRANE:  Object to form.
9      A.    Again, I don't know whether --
10 what our team used to come up with their, you
11 know, professional estimate of this, but I
12 would rely on them to come up with it based
13 on their knowledge and experience and
14 whatever data they may have available to
15 them.
16 BY MS. REAVES:
17     Q.    And do you know what data, if
18 any, your team reviewed in determining these
19 percentages?
20     A.    I don't.
21     Q.    Do you have any information
22 about the process that your team used to
23 determine these percentages?
24         MR. BRANE:  Object to form,
25     asked and answered.

Page 63

1      A.    I don't know exactly what
2  process they used.  I was not in their office
3  with them as they did it.  I know that they
4  provided this information through -- through
5  their work and through me and to our outside
6  counsel, but I don't know specifically what
7  records they were looking at to come up with
8  it.
9  BY MS. REAVES:
10     Q.    Do you know if teachers,
11 assistant principals or principals within
12 TUSD keep any records or data of how they
13 spend their time?
14         MR. BRANE:  Object to form.
15     A.    Oh, various positions have time
16 record information.
17 BY MS. REAVES:
18     Q.    Which positions have time
19 record information?
20     A.    Well, I couldn't tell you all
21 of them, but, you know, there are, for
22 example, exceptional education aides, nurses,
23 health aides, they would have some records of
24 time spent.  I don't know if those were
25 consulted with these percentages.

Page 64

1      Q.    Are you aware of any efforts to
2  quantify the amount of time that TUSD staff
3  have spent on issues related to social media
4  prior to this litigation?
5      A.    Just so I'm clear, so you're
6  asking before there was any -- before this
7  litigation occurred, did the district keep
8  time records?
9      Q.    Before this litigation
10 occurred, did the district attempt to
11 estimate or analyze the amount of time spent
12 on issues related to social media?
13         MR. BRANE:  Object to form.
14     A.    I don't -- I don't believe I've
15 ever seen any information prior to this
16 litigation that was specifically trying to
17 identify that.
18 BY MS. REAVES:
19     Q.    In verifying the accuracy of
20 these responses --
21         You could take down the
22 demonstrative for now.
23 BY MS. REAVES:
24     Q.    In verifying the accuracy of
25 these responses, what did you do to

Page 65

1  distinguish between potential impact of
2  screen time generally versus the alleged
3  impact of social media?
4      A.    Well, I, again, rely on the
5  people that I mentioned, the district team,
6  Julie Shivanonda and Anna Warmbrand and the
7  assistant superintendents, to give their best
8  information to make those estimates.
9          So I didn't personally review
10 any documents that would identify social
11 media screen time versus instructional screen
12 time versus any other screen time.
13     Q.    And do you know whether your
14 team looked at any information to
15 specifically distinguish between potential
16 impact of screen time generally versus
17 alleged impact of defendants' platforms?
18     A.    I don't know if they did.  I
19 know it's been a discussion with the board
20 for several years about screen time and the
21 impact of screen time.
22     Q.    Okay.  Similar question for
23 distinguishing between potential impact of
24 cell phones generally versus alleged impact
25 of social media.

17 (Pages 62 - 65)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1          Do you know what, if anything,
2    your team did to distinguish between cell
3    phones and social media?
4          A.    Cell phone use aside from
5    social media use on the cell phone?
6          Q.    Yes.
7          A.    I don't know if they attempted
8    to do that. I don't know that they would
9    have the information.
10         Q.    In determining the responses to
11   this interrogatory, and particularly the
12   percentages, do you know what your team did
13   to identify the platforms of the defendants
14   in this case as opposed to other social media
15   platforms?
16         A.    I don't know specifically what
17   they did to assign those -- what information
18   they looked at to assign those percentages.
19   Again, these are the people that myself, the
20   superintendent and our board rely on to come
21   up with that sort of information so that
22   decisions can be made. So I would rely on
23   them for the answer to that.
24         Q.    Do you know specifically
25   whether your team attempted to separate out

Page 67

1    defendants' individual platforms from social
2    media generally?
3          MR. BRANE:  Object to form,
4    asked and answered.
5          A.    Well, that was the task, so
6    yes.
7          If they came up with those
8    percentages, then I would rely on them to
9    identify that with the actions of the
10   defendants.
11   BY MS. REAVES:
12         Q.    Do you know whether the team
13   that came up with TUSD's interrogatory
14   responses made an effort to distinguish
15   between the impact of content posted on
16   defendants' platforms as opposed to the
17   design of defendants' platforms?
18         MR. BRANE:  Object to form.
19         A.    I don't know.
20   BY MS. REAVES:
21         Q.    Do you know whether the team
22   that looked at -- or the team that determined
23   TUSD's interrogatory responses made an effort
24   to distinguish between the impact of a
25   message that's shared on defendants'

Page 68

1    platforms as opposed to the design of
2    defendants' platforms?
3          A.    Can you repeat that? I want to
4    make sure I'm getting it right.
5          Q.    Sure.
6          The team that determined TUSD's
7    interrogatory responses, did they distinguish
8    between the impact of a message that's shared
9    on one of defendants' platforms versus impact
10   of the design of defendants' platforms?
11         A.    I'm not sure how -- I don't
12   know if they did. I don't know if they did.
13   And I don't know what the -- how the impact
14   would be any different. I mean, it's -- it's
15   all on the platform and there's an impact.
16         Q.    In determining TUSD's responses
17   to these interrogatories, did your team
18   include the conduct of third parties that
19   occurs in person but then is recorded and
20   posted online?
21         MR. BRANE:  Object to form.
22         A.    Could you either repeat that or
23   rephrase it? I want to make sure I
24   understand.
25

Page 69

1    BY MS. REAVES:
2          Q.    Sure. I'll provide an example.
3          A.    Great, that would be great.
4          Q.    So if a fight occurs in person
5    at a TUSD school, and then that fight is
6    recorded on a cell phone and then posted
7    online after the fact, did your team include
8    that in its determination of percentages that
9    it attributes to defendants' platforms?
10         MR. BRANE:  Object to form.
11         A.    So if I can rephrase that. So
12   if there is a -- if there is a posting on one
13   of the defendants' platforms of some action
14   that isn't specifically on the platform, did
15   the team discount or count those? Is that
16   the question --
17         Q.    Correct.
18         A.    I don't know if they
19   categorized those differently.
20         Q.    In determining the percentage
21   to attribute to defendants' platform for
22   mental health resources or social/emotional
23   learning, did the team distinguish between
24   multiple causes of mental illness and alleged
25   impacts of defendants' platforms?

18 (Pages 66 - 69)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1        MR. BRANE:  Object to form.
2        A.    Well, unless it was 100%, logic
3    would say they did.  So if it's less than
4    100%, then that would -- that's what their
5    work was, to identify the platforms' impact
6    as opposed to other factors.  But that would
7    be my expectation for this team.
8    BY MS. REAVES:
9        Q.    So you would expect that the
10    team should identify if there are other
11    factors besides defendants' platforms that
12    lead TUSD to provide students with support
13    services?
14        A.    Well, they came up with a --
15    I'm sorry.
16        MR. BRANE:  Go ahead, Rob.
17        Object to form.
18        A.    Well, in coming up with a -- if
19    the weight wasn't 100, then that's -- that is
20    what they did.  Otherwise, everyone would
21    have been 100%.
22    BY MS. REAVES:
23        Q.    And if the weight was 100, what
24    did the team do to identify other factors
25    that impact social-emotional health or mental

Page 71

1    health?
2        A.    Well, if there were no other
3    factors than the defendants' platforms that
4    they could identify, then they put 100.
5        MS. REAVES:  Could we just take
6    a brief break?  And then I think
7    we're --
8        THE VIDEOGRAPHER:  Off record.
9    The time is 10:19.
10        (Recess taken, 10:19 a.m. to
11    10:28 a.m. PDT)
12        THE VIDEOGRAPHER:  Back on the
13    record.  The time is 10:28.
14    BY MS. REAVES:
15        Q.    Mr. Ross, are there any other
16    individuals that you haven't already
17    identified who provided information for
18    TUSD's interrogatory responses?
19        A.    She works a lot with Julie
20    Shivanonda, but Rebecca Carrier in counseling
21    and social work was one who has been part of
22    the team too.  So Rebecca Carrier.
23        At the beginning of the
24    litigation, there was Dr. Joseph Gaw's
25    predecessor, and I -- she wasn't involved

Page 72

1    when we did these, so I don't know what
2    information she would have had, then.
3        So no, I think Rebecca Carrier
4    is the one that immediately comes to mind
5    that was also a part of providing these
6    responses with the team.
7        Q.    Okay.  And aside from what
8    we've discussed, is there any other data that
9    you specifically know the team reviewed in
10    providing these responses?
11        A.    Not that I can think of right
12    here.
13        Q.    And besides what we've already
14    discussed, are there any other records that
15    you specifically know the team reviewed in
16    providing these responses?
17        A.    No.
18        Q.    Is there anything else I
19    haven't asked you about that you did to
20    ensure that these responses were accurate?
21        A.    No.
22        MS. REAVES:  Okay.  No further
23    questions.
24        THE VIDEOGRAPHER:  We are off
25    the record.  The time is 10:30.

Page 73

1        (Time noted: 10:30 a.m. PDT)
2        --o0o--

19 (Pages 70 - 73)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 74

```
 1        C E R T I F I C A T E
 2
 3        I, DEBRA A. DIBBLE, RDR, CRR, CRC,
 4  Notary Public, do hereby certify:
 5        That ROBERT ROSS, the witness
 6  whose deposition is hereinbefore set forth,
 7  was duly sworn by me and that such deposition
 8  is a true record of the testimony given by
 9  such witness;
10        That pursuant to FRCP Rule 30,
11  signature of the witness was not requested by
12  the witness or other party before the
13  conclusion of the deposition;
14        I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage, and that I am in no
17  way interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have
19  hereunto set my hand on this 16th day of
20  July, 2025.
21
22  _____
    Debra A. Dibble
23  Fellow of the Academy of Professional
    Reporters
24  Registered Diplomate Reporter
    Certified Realtime Reporter
25  Notary Public 11/17/2027
```

Page 76

```
 1  ERRATA SHEET FOR THE TRANSCRIPT OF:
 2  CASE NAME: In Re: Social Media
 3  DEP DATE:  July 14, 2025
 4  DEPONENT:  ROBERT ROSS
 5  Pg. Ln.  Change/Reason
 6  ___ ___ _____ _____ _____
 7  ___ ___ _____ _____ _____
 8  ___ ___ _____ _____ _____
 9  ___ ___ _____ _____ _____
10  ___ ___ _____ _____ _____
11  ___ ___ _____ _____ _____
12  ___ ___ _____ _____ _____
13  ___ ___ _____ _____ _____
14  ___ ___ _____ _____ _____
15  ___ ___ _____ _____ _____
16  ___ ___ _____ _____ _____
17  ___ ___ _____ _____ _____
18  ___ ___ _____ _____ _____
19  ___ ___ _____ _____ _____
20  ___ ___ _____ _____ _____
21  ___ ___ _____ _____ _____
22  ___ ___ _____ _____ _____
23
24        _____
25            ROBERT ROSS
```

Page 75

```
 1        I HEREBY CERTIFY that I have read
 2  this transcript of my deposition, and that
 3  this transcript accurately states the
 4  testimony given by me, with the changes or
 5  corrections, if any, as noted.
 6
 7
 8
 9
10
11  _____
12  ROBERT ROSS
13
14
15
16
17
18
19
20
21
22
23
24
25
```