**Exhibit 656**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**Expert Report of Brian G. Osborne**
**May 16, 2025**

**CONFIDENTIAL**

# TABLE OF CONTENTS

**Page**

EXECUTIVE SUMMARY OF OPINIONS .......................................................................... 1

INTRODUCTION AND QUALIFICATIONS.................................................................... 2

METHODOLOGY ............................................................................................................... 5

INTRODUCTION ............................................................................................................... 6

BACKGROUND ................................................................................................................. 7

    Public education is a public right, and its effective functioning is essential to the
        health of our society and democracy ........................................................................... 7

    Public school systems make a significant and intentional investment in school
        district operations and educational leadership as a core component of
        district operations. .................................................................................................. 9

    Principals and superintendents are responsible for a defined set of operational,
        instructional, and compliance duties, as outlined in policy, law,
        contracts, job descriptions, and professional leadership standards. ................. 9

    Managing the mental health, disciplinary, and school climate issues stemming
        from social media now consumes a substantial portion of school leaders'
        time, creating a burden that interferes with their ability to carry out core
        responsibilities and disrupts school district operations.................................... 14

ANALYSIS AND OPINIONS ..........................................................................................17

    Opinion 1:  The emotionally destabilizing effects of social media, particularly
        students' compulsive use, fear of exposure, exclusion, or public shaming,
        are now shaping behavior and mental health in ways that fundamentally
        disrupt school operations, school climate and the educational experience
        and interfere with the public right to an education. ...........................................17

    Opinion 2: The cumulative impact of social media saturation and its associated
        emotional strain diminishes educator morale, increases staff burnout,
        and contributes to a pervasive sense of instability in school
        environments...................................................................................................... 21

    Opinion 3: The growing need to allocate additional funding for mental health
        and student support services is intensifying already difficult tradeoffs in
        resource allocation. ............................................................................................23

    Opinion 4: Promulgating and enforcing rules to limit social media and personal
        electronic devices in schools is operationally complex and often a source
        of conflict among school staff, students, and families....................................... 25

    Opinion 5. The cumulative effect of these demands is increased cost, diverted
        resources, heightened emotional strain, and reduced leadership capacity,
        negatively impacting school districts, schools, and public education..............29

RESERVATION OF RIGHTS .......................................................................................... 31

**CONFIDENTIAL**                                                                                              i

1.  I am Brian G. Osborne, Ed.D., and I have been retained as an expert in MDL No. 3047 Local Governments and School Districts v Social Media Companies RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION, Case number 4:22-MD-3047 U.S. District Court for the Northern District of California.

## Executive Summary of Opinions

2.  I have prepared this report based on more than 25 years of experience in public education, including service as a teacher, principal, superintendent, and consultant to school and district leaders across the country. My work centers on helping educational leaders improve school climate, strengthen instructional leadership, and manage complex operational demands. In recent years, I have seen firsthand and heard consistently from colleagues that social media has introduced a scale and intensity of disruption that fundamentally alters the conditions under which school leaders work and schools and districts operate.

3.  This report offers my expert opinion that social media platforms, as designed, operated, and promoted by Defendants and used by students, disrupt school operations, hinder educational leadership, require significant utilization and/or diversion of resources, and undermine the mission of public education. My conclusions are based on my leadership experience, ongoing work with schools and districts, review of case materials, and relevant research.

4.  In this report, I offer the following expert opinions which I hold to a reasonable degree of certainty:

    i.   The emotionally destabilizing effects of social media, particularly students' compulsive use, fear of exposure, exclusion, or public shaming, are now shaping behavior and mental health in ways that fundamentally disrupt school operations, school climate and the educational experience.

    ii.  The cumulative impact of social media saturation and its associated emotional strain diminishes educator morale, increases staff burnout,

and contributes to a pervasive sense of instability in school environments.

    iii.    There is a growing need to allocate human and financial resources to address mental health, educational, disciplinary, and student support issues stemming from social media.

    iv.    Promulgating and enforcing rules to limit social media and personal electronic devices in schools is operationally complex.

    v.    The cumulative effect of these demands is increased cost, diverted resources, heightened emotional strain, and reduced leadership capacity.

I hold all of the opinions expressed in this report to a reasonable degree of professional certainty, consistent with the standards and methodologies accepted in my field.

5.    These findings reflect patterns that are not isolated or anecdotal—they are widespread, predictable, and increasingly unavoidable. As an educational leader, I am deeply concerned about the long-term impact of these conditions on the capacity of school districts and schools within those districts to operate effectively and serve students, families, and communities effectively.

### Introduction and Qualifications

6.    I am an educational leader, professor of practice, and consultant with more than 25 years of experience in public education and 5 years in higher education, including service as a teacher, school co-founder, Chief of Staff for Teaching and Learning in the New York City Department of Education, and Superintendent of Schools in two diverse and complex districts, one in New York and one in New Jersey.

7.  I am a Professor of Practice in Educational Leadership at Lehigh University and Executive Director of the Lehigh University School Study Council[1]. I support superintendents, principals, and other district leaders through teaching classes, professional learning networks, informal thought partnership, and formal executive coaching.  My consulting work includes working directly in public schools, regularly supporting the leadership development of new principals and district leaders.

8.  My career has been primarily focused on educational leadership to improve teaching and learning to scale.  I have led large-scale instructional improvement initiatives, overseen the implementation of curricula, addressed equity and increased access to advanced coursework, and ensured effective governance through partnering with boards of education.

9.  I have consulted with school districts, education-focused nonprofits, and private sector organizations to improve educational outcomes and build leadership capacity.

10.  My professional background includes:

  •  Leading districts as Superintendent of Schools for the South Orange-Maplewood School District, NJ, from 2007 to 2014, and the New Rochelle City School District, NY, from 2014 to 2018. In both roles, I led efforts to expand access to rigorous instruction, support student mental health and well-being, and manage operational and instructional challenges in diverse school communities. In each district, I worked directly with an elected Board of Education to provide effective policy governance and strategic long-term fiscal oversight.

  •  Serving as Chief of Staff for Teaching and Learning at the New York City Department of Education, the largest public school system in the

---

[1] This report reflects only my view, and its contents are not endorsed by nor do they necessarily represent the views of Lehigh University, the College of Education, or the Lehigh University School Study Council.

country. There, I coordinated major systemwide initiatives related to
curriculum, assessment, professional development, and instructional
leadership.

- Co-founding a small public high school in the South Bronx, a small
  school (400 students, grades 9-12) that featured project-based
  learning, an interdisciplinary approach to content, block scheduling,
  site-based management, and service learning, and where I taught
  math, science, E.S.L., and advisory.

- Teaching a bilingual fifth-grade class at P.S. 28, a school on the
  Washington Heights and Harlem border in Manhattan.

11. My academic credentials include an Ed.D. in Administration, Planning, and Social
Policy from the Harvard Graduate School of Education, where I completed the
Urban Superintendents Program. I also hold an M.A. in Administration, Planning,
and Social Policy from Harvard University, an M.A.T. in Mathematics Education
from New York University, and an A.B. in Philosophy and Religion from Colgate
University.

12. A Professor of Practice differs from a research faculty member or professor. My
position does not include gathering data, conducting research, or publishing.
Instead, my work is interactive. In my interactions, I seek to identify, prepare, and
support educational leaders to have the knowledge, skills, and dispositions
necessary to effectively improve the culture, student outcomes, and opportunities
in public education. I typically teach about 40 graduate students a year in my
courses. In addition, I regularly interact with superintendents and leadership
teams from the 25 districts that participate in the Lehigh University School Study
Council. As a consultant, I provide executive coaching to 10-20 principals and
district leaders a year. I also serve as a design team member for the New Jersey
Network of Superintendents, which provides professional development
programming and conducts instructional rounds in schools for approximately 12
districts a year.

**CONFIDENTIAL**                                                          4

13. I regularly interact with school and district leaders in urban and suburban districts of varying size and demographics in Pennsylvania and New Jersey. As part of this work, I spend 40-50 days a year in public schools, observing school climate and classroom instruction. My long career in public education and field experience provides the foundation for my work, including my regular interactions with leaders and aspiring leaders, which keeps me current. The overall goal of my work is to support schools and their leaders in growing their leadership capacity, usually through conversation about the leadership challenges and opportunities they face in their professional settings.

14. A complete copy of my curriculum vitae is attached as Exhibit A.

## Methodology

15. In preparing this report, I relied on a combination of professional expertise, field-based knowledge, review of relevant materials, and current research in educational leadership, educational operations, and student well-being.

16. This report draws on my experience as a school and district leader, including service as a superintendent. As a consultant and coach to educational leaders, I regularly engage with superintendents, principals, and district teams in urban, suburban, and rural contexts across the country. These interactions provided a broad understanding of the systemic challenges schools face due to student social media use and the design of social media platforms.

17. I reviewed deposition transcripts from superintendents and senior district officials deposed in this litigation. These transcripts provided direct accounts of how social media impacts schools in different geographic and demographic contexts, and helped validate that the patterns I describe are not isolated but widespread. I analyzed the testimony to identify recurring themes, shared leadership burdens, and consistent descriptions of institutional strain.

18. I consulted various relevant sources, including peer-reviewed studies, national surveys, professional standards documents (such as PSEL), and public reporting

**CONFIDENTIAL**                                                                                      5

from research organizations like the Pew Research Center. These sources confirmed and contextualized my experiences in the field.

19.  I reviewed selected court filings, including orders and amicus briefs, to inform my understanding of the issues raised in this matter. I also reviewed media reports of real-world incidents cited in the litigation to ensure alignment with publicly documented examples.

20.  Throughout this process, I have aimed to offer a clear, experience-based account of what is happening in schools, grounded in evidence and professional judgment. My observations are informed by both local and national perspectives, and I offer them in the service of helping the court and jury understand how the design and saturation of social media platforms are interfering with the leadership and functioning of public schools.

21.  My time working on this expert report is being compensated at a rate of $300 per hour. My compensation is not contingent upon the opinions I render or the outcome of this litigation.

22.  Please see attached Exhibit B for a full list of the materials I considered in preparing this report.

## Introduction

23.  I come to this discussion as a lifelong advocate of public education. What we see now is that social media has become as ubiquitous and dominant as education itself. Indeed, perhaps the only force in young people's lives that has become as universal as education is social media. Unfortunately, social media functions not to help educate all children but instead to profit from exploiting students' attention, disrupting the operations and educational mission of school districts and their schools in the process. The juxtaposition could not be made any plainer.

24.  My formal and informal discussions with school and district leaders about their operations and leadership challenges frequently and consistently include situations involving severe and pervasive mental health, educational, and operational challenges stemming from students' compulsive use of social media. As a result, in

this report, I seek to describe the negative impact on school districts and schools, including negative impacts to school district operations and resources and educational leaders' ability to effectively perform their duties.

25. As background, I explain how the enterprise of public education is a common public good, enabling our nation's commitment to democracy. I then explain that school districts, schools and educational leaders play a critical role in the functioning of this vital public good. Next, I provide a brief review of the duties and responsibilities of educational leaders, particularly principals and superintendents. How to effectively fulfill these duties is the practice I seek to promote in the leaders I support and the aspiring leaders I teach. With an understanding of the mission and operations of school districts and schools, as well as the duties and responsibilities of educational leaders, I then opine that social media demands are negatively impacting school districts and schools, diminishing their ability to perform effectively.

26. This harm is significant to school districts and schools and interferes with their core mission and operations, leading to a weakened system of public education.

## Background

<u>Public education is a public right, and its effective functioning is essential to the health of our society and democracy.</u>

27. Public education stands as a cornerstone of democratic society, designed to serve the collective good by fostering critical thinking, civic responsibility, and equitable opportunity (Feinberg, 2012). As a common good, public education was established and perpetuated for the purpose of society as a whole, not as a private commodity. Schools and school districts are the primary mechanism to provide the hope of equal opportunity to all in our nation regardless of demographic or family circumstances.

28. Public education has long been recognized as a cornerstone of a just and equitable democratic society—a shared investment in the development of individuals and communities. As a common good, public education serves not only the individual student but also the broader public by cultivating civic responsibility, economic

mobility, and social cohesion (Labaree, 1997). This distinguishes it from private goods, which benefit individuals exclusively, and from market-driven institutions, which rely on competition and exclusion. Instead, public schools are designed to be inclusive, non-rivalrous, and mutually reinforcing—what philosopher Danielle Allen describes as a form of infrastructure for democracy itself (Allen, 2022).

29.  Public education is fundamentally different from private or for-profit enterprises: it exists to serve the public good rather than the narrower interests of boards or shareholders. Public education is tasked with equipping individuals to participate meaningfully in a democratic society, fostering civic responsibility, and promoting equity (Feinberg, 2012; Levinson, 2012). It provides a space where young people encounter diverse perspectives, practice critical thinking, and develop the skills needed to collaborate across differences.

30.  The framing of public education as a common good is more than philosophical. It is embedded in legal and constitutional commitments across the nation, where states are required to provide a "thorough and efficient" or "adequate" education for all children (Rebell, 2012). Courts have repeatedly affirmed that education plays a foundational role in preparing citizens to engage in democratic governance, exercise their rights, and contribute to the collective welfare. As such, educational access, quality, and equity are not just individual entitlements but public obligations, justified by the broader societal benefits they produce. Education is the "very foundation of good citizenship" and "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." (*Brown v. Board of Education*, 1954).

31.  Understanding education as a common good also reinforces the need for collective action in addressing emergent threats to learning environments, including the mental health harms posed by social media use. Public schools are charged with safeguarding the well-being of all students, especially the most vulnerable. As such, when platform design contributes to dysregulation, distraction, widespread

anxiety, trauma and/or other mental health concerns among youth, public education systems are forced to bear the burden and incur related costs.

32. In this light, educational leaders' growing concern about social media's impact is not alarmist; it reflects their duty to uphold a public good in the face of external threats. Their testimony and institutional responses should be understood not only as administrative reactions, but as acts of public stewardship. Protecting public education's accessibility, quality, and capacity to educate the nation's children is essential not just for students, but for the democratic society we all share.

Public school systems make a significant and intentional investment in school district operations and educational leadership as a core component of district operations.

33. School districts invest substantial public resources in educational leadership and administration as a core function of effective schooling.  Spending on leadership and administration accounts for approximately 10% of the overall school budget. This is a critical investment of public monies in the leadership capacity required to ensure safe, effective, and equitable learning environments (U.S. Department of Education, 2023). This includes the salaries and benefits of superintendents, principals, assistant principals, and central office personnel, as well as the infrastructure that supports school management, compliance, and instructional oversight.

34. The expectation is that these leaders will be able to focus their time on driving student achievement, supporting teachers, building school culture, and ensuring legal and operational accountability. When that leadership capacity is diverted by chronic crisis response, emotional fallout, or administrative triage related to social media, school districts are not receiving the full return on their investment, and students are not receiving the full benefit of that leadership.

Principals and superintendents are responsible for a defined set of operational, instructional, and compliance duties, as outlined in policy, law, contracts, job descriptions, and professional leadership standards.

**CONFIDENTIAL**                                                                 9

35.  In every public school system, there are essential responsibilities that principals and superintendents must carry out to meet their professional obligations, fulfill their contractual roles, and comply with legal and policy expectations. When school leaders are unable to fulfill these functions due to persistent external disruptions, such as those introduced by social media, they are prevented from doing their jobs as required to support school operations.

36.  These duties are not only embedded in local job descriptions and state mandates; they are also reflected in nationally recognized frameworks such as the Interstate School Leaders Licensure Consortium (ISLLC) Standards and the more recent Professional Standards for Educational Leaders (PSEL). While these standards include aspirational elements, they also serve as practical guides for what educational leaders are expected to do—from managing systems and ensuring instructional quality to fostering safe learning environments and engaging with families and communities. In this report, these responsibilities are presented not as idealized visions of leadership, but as the core, functional components of the job that educational leaders are held accountable for each day.

37.  **Principals** are responsible for ensuring a safe and orderly school environment. This includes conducting safety drills, managing physical security, enforcing discipline policies, and responding to student behavioral incidents. Principals must maintain visibility in hallways and classrooms, build systems to de-escalate conflict, and ensure staff are trained in safety protocols.

38.  Principals are responsible for supervising and evaluating staff in accordance with district protocols and state law. Principals are required to conduct formal and informal teacher observations, provide feedback, complete evaluations within mandated timelines, review lesson plans and support professional growth plans. This time-intensive work demands classroom walkthroughs, post-observation conferences, documentation, and data-based coaching.

39.  Principals are responsible for implementing curriculum and instructional standards. This involves aligning instructional practices with district and state

**CONFIDENTIAL**                                                    10

standards, leading grade-level or content area meetings, monitoring lesson planning, and supporting teachers in using high-quality materials. Principals are expected to lead instructional improvement efforts and ensure curriculum fidelity. This also often involves participating in district-wide curriculum review and selection efforts.

40.   Principals are responsible for monitoring student performance data and leading school improvement planning. Principals must analyze achievement data, disaggregate results by student subgroup, identify areas of need, and engage staff in continuous improvement. This requires time for data review, collaborative planning, goal-setting, and progress monitoring.

41.   Principals are responsible for managing discipline and enforcing school policies. This includes investigating behavioral incidents, assigning consequences, maintaining student records, involving families, and working with counselors or law enforcement when necessary. Effective management requires real-time responsiveness and consistent follow-through.

42.   Principals are responsible for communicating regularly with families and the community. Principals are responsible for keeping families informed through newsletters, calls, and meetings, responding to parent concerns, and engaging stakeholders in school events and decision-making processes. This builds trust and supports student success.

43.   Principals are responsible for overseeing building-level operations such as scheduling, safety drills, and student support services. Daily duties include creating master schedules, coordinating substitute coverage, leading staff meetings, monitoring attendance systems, managing special education compliance, and facilitating access to mental health and academic supports.

44.   In most places, a **school district superintendent** is the chief executive officer of a public school district hired by the elected board of education. They are responsible for overseeing the district's schools, implementing the policies set by the school board, managing the district's budget and operations, supervising

**CONFIDENTIAL**                                                                                              11

principals and administrative staff, and ensuring that educational programs meet state and federal standards. Superintendents serve as the primary instructional and operational leader of the district and are accountable for student achievement, staff performance, and community engagement across all schools in the system.

45. Superintendents are responsible for overseeing district operations, including instructional programs, facilities, budgeting, and personnel. Superintendents must make hiring and placement decisions, manage budget development, oversee maintenance and transportation, and ensure curriculum and assessment systems function at scale. This work requires coordination across departments and constant systems oversight.

46. Superintendents are responsible for implementing board policy and serving as chief advisor to the Board of Education. Superintendents are tasked with interpreting and enacting board policy, preparing reports and recommendations, and maintaining transparency and accountability in board relations. This requires careful communication, governance expertise, and political navigation. Superintendents are also responsible for working in partnership with the Board of Education to promulgate policy in response to changes in law or regulation, or in response to new or changing circumstances locally.

47. Superintendents are responsible for ensuring compliance with local, state, and federal laws and mandates. This includes oversight of special education, civil rights, Title programs, assessments, attendance, and safety regulations. Superintendents must stay informed about legal requirements and ensure that all departments adhere to applicable statutes.

48. Superintendents are responsible for managing crises and safeguarding student and staff well-being. Superintendents lead district responses to emergencies, weather events, threats, tragedies, or public health concerns. This requires leadership under pressure, communication with law enforcement and media, and coordination with schools and agencies.

49. Superintendents are responsible for supporting school leaders through supervision, professional development, and system-wide coherence. They are expected to mentor and evaluate principals, build leadership pipelines, offer training, and align building-level practice with district strategy. This involves frequent site visits, coaching conversations, and alignment of professional learning. It also requires clinical supervision, application of accountability and consequences for staff when warranted, completing accurate formal evaluations, and ensuring that the overall system of professional development, support, and evaluation for all employees in the district complies with policy, regulation, and the terms of collective bargaining agreements.

50. Superintendents are responsible for engaging with the public, media, and elected officials on behalf of the district. Superintendents represent the district in public forums, respond to press inquiries, advocate for policy positions, and communicate with legislators. These roles demand time, preparation, and careful messaging to sustain public trust.

51. Superintendents are responsible for maintaining a functional chain of command and clear lines of accountability. Superintendents must ensure that staff roles are clearly defined, decisions are made transparently, and communication flows efficiently across the organization. This requires structured meetings, documentation, and ongoing monitoring of implementation.

52. These responsibilities are each quite challenging themselves. Together, they form a demanding and complex set of duties that educational leaders are tasked with fulfilling on a daily basis. Fulfilling these duties effectively requires resources, and one of the most precious resources is leadership time. When leaders are able to focus leadership time on the core tenets of their job responsibilities, they are able to provide educational settings where teachers and students experience the safety, support, and structure needed to focus on the learning and teaching needed for public education to fulfill its role in our society.

53. A number of studies affirm what I have seen in my own work: when educational leaders have the time and capacity to focus on their essential duties, student

outcomes improve. Among others, Nettles and Herrington (2007) support the claim that leadership activity matters through their analysis of leadership's direct effect on student learning. They affirm that when principals are able to focus on implementing safe learning environments, coherent instruction, and assessment-informed practices, there are measurable academic gains, even if modest. Their research shows that these small but meaningful gains, particularly for underserved subgroups, depend on leaders being free to prioritize school improvement rather than react to crises.

Managing the mental health, disciplinary, and school climate issues stemming from social media now consumes a substantial portion of school leaders' time, creating a burden that interferes with their ability to carry out core responsibilities and disrupts school district operations.

54. Today's schools, school districts and their leaders operate in a climate of constant diversion from their core responsibilities due to social media. Social media saturation has created an unrelenting set of disruptions that redirect leadership time and energy away from their core duties and toward managing emotional, reputational, operational and safety fallout. Of all the duties required of educational leaders, the overriding responsibility is keeping children safe. This imperative includes emotional and psychological safety as well as physical safety. Responding to the threats to mental health and discipline posed by social media use has preoccupied educational leaders. This preoccupation is consuming their time, attention, and energy to such a degree that tangible harm is being done to public education.

55. The most common leadership challenge to current and aspiring leaders I have observed is the struggle to find time to fulfill their essential job responsibilities due to the pervasive and growing problems associated with social media use by students. Social media has exacerbated distraction, anxiety, depression, bullying, and violence, to the point of causing ongoing, pervasive and at times severe damage to educational leaders' ability to focus essential resources such as leadership time, staff, and public monies on the essential work of educating

**CONFIDENTIAL**                                                                                      14

students. Every hour spent responding to crises or distractions created, or amplified, by social media is an hour not spent on improving the quality of instruction. The negative impact of social media on the ability of school administrators to carry out their duties is borne out by the testimony of such individuals from school district plaintiffs in this litigation.

56. One example from the deposition of Trayce Brown, the Chief of Student Support and Federal Programs for Hillsborough County Public Schools, illustrates how staffs' and teachers' time is spent responding to social media issues. "[S]taff are having to respond to behaviors because of social media, when we talk about that fear of missing out, that fear of being disconnected, teachers are having to spend time confiscating, storing personal electronic devices which are used to access those platforms." (Dep. Tr. of Tracye Brown, Apr. 23, 2025).

57. Another example from the deposition of Gary Brady, the Hillsborough County Public Schools Superintendent for High School Region 1, demonstrates the extent to which educational leaders are forced to spend their time addressing issues caused by social media use. Brady shared that when he speaks with the high school principals he oversees, they say that social media problems are "all we're dealing with," that "everything comes back to [social media]," and that is all they do all day. (Dep. Tr. Of Gary Brady, May 2, 2025).

58. Further, Denise Revels, the Director of Wrap Around and Student Support Services for the DeKalb County School District, testified that she observed teachers having to redirect students to get off their phones during class, and social workers have received concerns from teachers surrounding disruptions in class due to children being distracted in class by social media. (Dep. Tr. of Denise Revels, Apr. 18, 2025). Teachers in the plaintiff school districts reported concerns about students being fully engaged in social media platforms and not paying attention in class (Dep. Tr. of John Larsen, April 29, 2025) and reported concerns about the amount of time they spent disciplining students for disrupting class and/or not paying attention because they were utilizing social media during instructional time. (Dep. Tr. of Deborah Moore-Sanders, Apr. 9, 2025).

**CONFIDENTIAL**                                                                                      15

59.  Revels also testified that school districts offer programs to help students with academic, behavioral, or attendance concerns, including those that may be attributable to social media. (Dep. Tr. of Denise Revels, Apr. 18, 2025).  The DeKalb County School District's financial resources are also being diverted to purchase personal electronic device pouches in response to the negative impact of social media and personal electronic device usage on children during school hours. (Dep. Tr. of Kishia Towns. Ph.D., March 17, 2025). School districts were also forced to establish policies around the use of social media as overusage of social media may trigger feelings of isolation or inadequacy in students. (Dep. Tr. of Deborah Moore-Sanders, Apr. 9, 2025).

60.  Other school districts have also testified about their existing personnel being forced to divert attention to social media harms; needing to hire new and additional personnel to address social harms; developing educational materials for their administration, staff, students, and their families; and remediating physical damage to their property. (Dep. Tr. of John Larsen, Apr. 29, 2025). Specifically, according to testimony of McKinley Withers, Jordan County School District's Director of Health and Wellness, the school district's 2019-2020 "Strategic Plan" laid out three priorities that relate to or seek to address issues presented by students' use of social media: (1)"[i]ncrease student resilience and wellness through intentional instruction of social and emotional learning;" (2) "[i]ncrease student and family access to quality mental health services both in school and in the community;" and (3) "[i]ncrease District and community mental health & wellness literacy." (Dep. Tr. of McKinley Withers, April 9, 2025).

61.  Furthermore, school districts have also communicated with parents to try to address vandalism and theft on school property related to the platforms' promotion of viral social media challenges and to set up online resources to address negative effects of social media on children. A current example of the growing burden social media platforms place on school operations is the "Chromebook Challenge," a dangerous trend promoted on TikTok that encourages students to insert metal objects into the USB ports of school-issued laptops,

creating sparks, smoke, or even fires (CNET, 2025; Tom's Hardware, 2025). This viral challenge has prompted emergency responses and school evacuations across the country, including in New Jersey, Florida, Massachusetts, California, and Texas (ClickOrlando, 2025; Marblehead Current, 2025; Yahoo News, 2025a). In some instances, students have been criminally charged, as districts struggle to contain behaviors that originate online but create offline disruption and physical risk in schools (Yahoo News, 2025b). The Chromebook Challenge is not an isolated incident, but rather a stark illustration of an emerging pattern: schools are being forced to respond to increasingly hazardous behaviors promoted on social media that interrupt instruction, compromise student safety, and divert administrative and emergency resources. As these incidents become more frequent, the cumulative toll on school systems is becoming unsustainable.

62. School districts also face increasing student disciplinary incidents that are attributable to social media (Dep. Tr. of Kishia Towns, Ph.D., March 17, 2025), and educational leaders are pursuing ways to decrease suspensions and handle such disciplinary concerns. (Dep. Tr. of Denise Revels, April 18, 2025).

63. The rising demands associated with student social media use—declines in mental health, attention, behavior, and engagement—are placing significant strain on school leaders. As they redirect time, staff, and focus to manage the fallout, their capacity for core responsibilities diminishes. This shift imposes institutional costs schools must absorb without corresponding authority or support. Leadership attention is increasingly consumed by crisis response, especially as student mental health needs grow (Watson et al., 2022). In short, the student use of social media has reshaped the leadership landscape, making it harder to meet the urgent and expanding demands of public education.

## Analysis and Opinions

Opinion 1:  The emotionally destabilizing effects of social media, particularly students' compulsive use, fear of exposure, exclusion, or public shaming, are now shaping behavior and mental health in ways that fundamentally disrupt school operations, school climate and the educational experience and interfere with the public right to an

education.

64.  In my professional opinion, based on my review of the relevant literature and experience working with school districts and school district officials, student social media use significantly undermines the ability of schools, school districts, and educational leaders to fulfill their core responsibilities in multiple ways.

65.  First, the mental health toll on young people caused by social media use has resulted in student emotional needs that, in many schools, overwhelm the capacity of school-based mental health providers who often serve as the primary providers of youth mental health services. Because school mental health providers are unable to accommodate the increased mental health needs of students, school leaders are forced to step away from core responsibilities to address student needs when mental health demands exceed available resources.

66.  Second, student social media use has led to attention span deficiencies that hinder learning objectives and negatively impact teacher morale. (Siebers, 2021). This leads to strains in professional collaboration across educators, especially between teachers and principals. Teachers increasingly express frustration over students' reduced attention spans and their compulsive need to check social media, which strains collaboration and morale.

67.  Third, routine discipline issues have escalated in both frequency and intensity due to the anonymity and amplification embedded in social media platforms, requiring more administrative time and intervention.

68.  Finally, the features social media companies chose to build into their platforms facilitate and amplify bullying. Bullying preceded both schools and social media. However, social media gives bullies easy access not only to their victims but to targeted audiences within the victim's school before which to mock and harass the victim. Furthermore, unlike in-person bullying (which is necessarily transient) social media creates a permanent digital record of every episode of cruelty. Finally, likes, comments, and notifications gamify cruelty by giving bystanders low-cost, anonymous ways to pile on, literally quantifying a victim's exclusion. Social media's

**CONFIDENTIAL**                                                                                      18

amplification of cruelty has enabled cyberbullying to reach unprecedented levels. Given the potential consequences, including suicide, serious injury, and depression, school districts and the schools within those districts and their educational leaders are morally and legally obligated to intervene at the slightest hint of cyberbullying.

69. The literature aligns with findings from the U.S. Surgeon General, who warned that "social media use by children and adolescents poses a risk of harm to their mental health" (Office of the U.S. Surgeon General, 2023), and from the CDC's Youth Risk Behavior Survey, which shows rising rates of persistent sadness, suicidal thoughts, and cyberbullying among teens (Centers for Disease Control and Prevention [CDC], 2023).

70. Recent qualitative research brings the voices of students into the conversation, offering deeper insight into how social media affects youth well-being and behavior in ways that directly impact school leadership. Popat and Tarrant (2022), in a synthesis of 24 qualitative studies, found that while adolescents often recognize the harms of compulsive social media use, they also describe an inability to disengage—likening the experience to "an online drug" (p. 326). Key themes from their review include a compulsive pursuit of validation through likes and comments, which contributes to anxiety, low self-esteem, and sleep disruption; constant comparison to idealized images, leading to body dissatisfaction and emotional distress; and the pressure to stay connected, which results in FOMO, reduced offline engagement, and impaired learning readiness. Students also reported disrupted sleep cycles and compulsive checking behaviors—conditions that erode emotional regulation, diminish school readiness, and increase the need for counseling, classroom intervention, and crisis management by school leaders. As Popat and Tarrant note, "The pressure to stay connected could reduce offline social engagement. Many felt social media diminished quality time with family and friends, resulting in emotional detachment" (p. 328).

71. One example from the deposition of Justin Funderburk, the Director of Technology for Spartanburg School District 6, illustrates the extent to which social media

notifications intrude on classroom learning. In recounting a conversation with a middle school math teacher, Funderburk shared that the teacher had tallied 120 social media notifications on student devices during a single 90-minute class period. While not part of any formal data-gathering process, this informal exercise made visible what many educators report anecdotally: students are subjected to near-constant digital stimulation, much of it shaped by social media platforms designed for engagement, interruption, and emotional reaction. These interruptions affect not only student attention and emotional regulation, but also the teacher's ability to manage instruction and the administrator's responsibility to maintain an environment conducive to learning. As Funderburk put it, the experience "opened [his] eyes" to the need for more proactive strategies—a recognition many school leaders are now arriving at in response to similar classroom realities (Dep. Tr. of Justin Funderburk, Apr. 15, 2025).

72. These accounts provide qualitative grounding for the behavioral and emotional instability documented by Angwaomaodoko (2024) and further validate the operational challenges schools, school districts and educational leaders face. Students' social media use undermines core cognitive, emotional, and relational capacities. Social media fragments attention spans and fosters habitual multitasking, undermining deep focus and leaving students conditioned to expect constant novelty and instant gratification (Twenge, 2017). At the same time, constant connectivity breeds impulsivity, emotional volatility, and social conflict. Cyberbullying, social comparison, and exposure to harmful content are linked to rising rates of anxiety and depression among youth (Watson et al., 2022), increasing the frequency and urgency of crises that school leaders must address. These conditions also erode the sense of belonging essential to healthy school communities. As students become increasingly disconnected from real-world relationships and reliant on superficial online validation (Popat & Tarrant, 2023), school leaders find their efforts to foster inclusive and connected environments consistently undermined.

73.  Family engagement is crucial for student success, yet many families are themselves struggling to manage their children's digital lives (Twenge, 2017). Leaders face new challenges in partnering with parents who may be overwhelmed, unaware, or unequipped to counteract the addictive pull of devices. Leaders' efforts to limit the use of personal electronic devices often face pushback from parents who have become accustomed to being able to track their children's location or have instant communication.

74.  In my ongoing conversations with fellow administrators, this pattern is a constant theme. Schools, school districts, and their leaders (including school districts who are plaintiffs in this case) are increasingly asked to manage the fallout of social media without any control over the platforms themselves. This response work consumes the time, energy, and focus we would otherwise dedicate to instructional leadership, staff development, and culture-building. And because these incidents are so unpredictable and fast-moving, leaders are often stuck in a reactive posture trying to mitigate harm after the fact rather than lead proactively.

75.  These effects are not abstract. They manifest in schools every day through reduced student focus, escalating peer conflict, emotional dysregulation, and rising demand for mental health services. These outcomes are not the result of leadership failure; rather, they reflect a tech-fueled crisis in adolescent development, one that school leaders must manage without control over its origin or design.

Opinion 2: The cumulative impact of social media saturation and its associated emotional strain diminishes educator morale, increases staff burnout, and contributes to a pervasive sense of instability in school environments.

76.  We are living in a moment of near-total social media saturation in the lives of young people. For many of today's students, social media is not an occasional activity; it is the constant backdrop to nearly every waking moment, whether in class, walking through the hallways, or at home. It shapes their attention, self-image, social interactions, and emotional states (Diaz et al., 2025). The Pew Research Center found that 95% of teens have access to a smartphone, and nearly

half report being online "almost constantly" (Anderson & Jiang, 2018). What makes this saturation so disruptive is not just the time spent online, but the emotional volatility, social comparison, and performative pressure embedded in these platforms. Students are not merely scrolling, they are being ranked, evaluated, excluded, and exposed in real time.

77.   In today's adolescent culture, digital interactions are saturated with social media norms and risks. The distinction between public and private life has eroded, not because students choose to broadcast everything, but because social media platforms create a constant risk of involuntary exposure. This culture of ambient surveillance and hyperconnectivity creates emotional strain even when students are not actively using a specific app.

78.   Students frequently arrive at school already upset by something that happened online the night before, something their teachers or principals may not even be aware of, but that can derail the entire day. Social media platforms amplify visibility, incentivize performance, and reward novelty, creating a state of chronic self-monitoring and emotional reactivity. The pressure to stay connected, look good, and remain socially relevant generates stress, comparison, and dysregulation, even when apps are not in use (Nesi, Telzer, & Prinstein, 2020; boyd, 2014).

79.   This psychological strain is changing how students carry themselves at school. Many are more guarded, reactive, and less socially confident. They fear being recorded, mocked, or turned into a meme. Teachers and staff are spending more time managing the fallout of online behavior and less time building relationships or supporting instruction. Counselors are stretched thin. Meanwhile, administrators are expected to solve problems they did not create using tools that were never designed for this work.

80.   In her deposition, Dr. Shavonna Coakley, Associate Superintendent for Charleston County School District, offers an account of how social media saturation is affecting school leadership and student well-being. She notes that social media

plays a part in almost all incidents regarding discipline, behavioral issues, or emotional dysregulation, highlighting the near-constant presence of these platforms in student conflict and crisis. Dr. Coakley describes students arriving at school already emotionally distressed by online activity from the night before, creating disruptions that school leaders must respond to without warning or preparation. Principals and counselors, she explains, are frequently "pulled away from everything else" to manage the fallout, diverting attention from instruction, culture-building, and essential school operations. Her testimony is consistent with what I am hearing from the school and school district leaders that I interact with, and it reinforces the reality that school and district leaders are confronting systemic burdens tied not only to student behavior, but to the design and pervasiveness of the platforms themselves (Dep. Tr. of Dr. Shavonna Coakley, April 30, 2025).

81.  Educational leaders I work with often share their frustration about being asked to "do something" about these issues—even when the sources are anonymous or originate off campus. Union leaders advocate for staff protection, and school leaders are left conducting exhausting investigations, often with little recourse. These incidents may not make headlines, but they erode leadership capacity over time.

82.  From a leadership standpoint, this is not hypothetical or anecdotal. It is a systemic condition. Social media saturation has become a defining challenge of contemporary public education—one that reshapes school climate, weakens staff morale, and consumes the energy that leaders would otherwise devote to teaching and learning.

Opinion 3: The growing need to allocate additional funding for mental health and student support services is intensifying already difficult tradeoffs in resource allocation.

83.  At the district level, one of the most important responsibilities of superintendents and other educational district leaders, usually in tandem with an elected board of education, is to determine resource allocation. By leading the process of developing

an annual budget to garner community support and making the funding decisions that make up the substance of the annual budget, educational leaders at the district level set the conditions for school-level leaders to exhibit the leadership strategies and behaviors that enable them to fulfill their duties and job responsibilities.

84. Public school districts in the United States operate within tightly regulated and often insufficient fiscal frameworks. Unlike private enterprises, districts cannot simply raise prices or increase revenue to meet rising costs. State-imposed tax caps, per-pupil funding formulas, and voter approval processes for budgets and bonds typically limit their ability to generate income. At the same time, school systems face structural cost drivers that rise annually, such as health insurance premiums, transportation costs, utilities, pension obligations, and contractual salary increases for staff. This creates a systemic mismatch between revenue growth and expenditure needs that districts must navigate every year (Learning Policy Institute, 2019).

85. The result is that district leaders, superintendents, boards of education, and finance officers are often forced into zero-sum trade-offs: investing in one area almost always means cutting or delaying investments in another. For example, a district might have to choose between maintaining small class sizes or adding a social worker; upgrading cybersecurity or replacing HVAC systems; expanding mental health services or preserving extracurricular programming. These decisions are rarely philosophical; they are fiscal necessities within the boundaries of what the community, the state, or law allows (National Conference of State Legislatures, 2020).

86. Moreover, the very act of choosing to invest in mental health supports, such as hiring social workers, counselors, or digital wellness educators, requires either increased funding or painful sacrifice elsewhere. For district-level leaders, the need to allocate resources in areas of social services and mental health services has grown. This leads to budget pressure and forced trade-offs that often lead to decreases in investment in academics and extracurriculars.

**CONFIDENTIAL**

87. For property tax-capped states, or underfunded urban and rural districts, there is no realistic way to fully meet the range of student needs emerging from social media-driven challenges without systemic funding reform or external accountability placed on the source of the harm (Chingos & Blagg, 2017; Center on Budget and Policy Priorities, 2022).

88. In the educational environment, the choice schools are left with is to "choose who loses" because that is what trade-off budgeting in public education often requires. The question is not whether we care about student well-being, but whether we have the means to meet all the needs in front of us. When social media harms push more students into crisis, schools respond because they must. But the larger question here requires recognition that educators cannot be expected to solve a problem created and monetized by others, especially while operating under severe and structural fiscal constraints.

89. In this context, it is neither fair nor accurate to argue that school systems should have "done more" to mitigate the effects of social media without acknowledging the fiscal constraints under which they operate. When social media platforms create harms that manifest in student dysregulation, distraction, or crisis-level mental health concerns, schools and school districts often divert resources from core instructional or safety functions to respond. This redistribution may delay academic interventions, defer capital improvements, or stretch staff to unsustainable levels. In short, schools are forced to carry the externalized costs of platform design decisions they did not make and cannot control.

Opinion 4: Promulgating and enforcing rules to limit social media and personal electronic devices in schools is operationally complex and often a source of conflict among school staff, students, and families.

90. Suggesting that educational leaders are at fault for not anticipating the harms associated with the student use of social media sooner, and not putting more protective measures in place earlier, belies the history of how we got here, dismisses the educational promise that personal computing once had, and glosses

over the failure of the social media companies to be forthcoming about the dangers that their internal research evidenced.

91. Over the past several decades, as computing in the classroom became more affordable and realistic, educational leaders saw tremendous promise in the use of these tools. The promise only increased when devices such as iPads, Chromebooks, and low-cost laptops became more affordable and the technology improved.

92. Educational leaders seized on deployment initiatives, working to bridge the 'digital divide' and seeing the possibilities of students being able to confer with others outside the four walls of the classroom. Personal electronic devices only made the potential upside more promising. Sadly, the potential of personal electronic devices as powerful learning tools is largely lost in the current context. Personal electronic devices offer access to calculators, language apps, news sources, virtual labs, and collaborative platforms that could enrich instruction and support differentiated learning. However, the pervasive design, promotion, distribution, and targeting of kids by social media apps to maximize compulsive engagement has made it nearly impossible to isolate "good screen time" from the compulsive behaviors that undermine learning. Rather than being empowered to integrate devices into pedagogy, educational leaders are often forced into an oppositional stance, treating personal devices solely as threats rather than tools.

93. Now that the inevitabilities and dangers of social media use are becoming evident in the literature and in the lived reality of schools, districts and their leaders are forced to take on yet another significant operational issue that diminishes their ability to lead proactively in ways that will improve student learning: the work of managing efforts to limit digital device usage such as personal electronic device bans.

94. Although banning student personal electronic device use in schools is increasingly seen as a simple policy solution to issues of distraction, cyberbullying, and social media use in school, the empirical evidence suggests that such bans may offer limited benefits and may divert leadership attention from deeper, systemic

**CONFIDENTIAL**                                                                                              26

priorities. While studies indicate modest positive effects of personal electronic device bans on academic performance and social climate, these gains may not be consistent or robust. For example, a recent meta-analysis found that smartphone bans may improve social well-being and reduce bullying somewhat, but their impact on academic performance is small and inconsistent (Böttger & Zierer, 2024).

95.   More critically, studies highlight that enforcement of such bans is fraught with challenges. Teachers report that managing bans consumes time, damages relationships with students, and may fail to curb covert use (Grigic Magnusson et al., 2023). As a result, school staff often tolerate limited phone use as long as it does not overtly disrupt class. This discretionary enforcement contributes to policy inconsistency and undermines credibility (Smale et al., 2021). Moreover, the public and political energy devoted to these debates may detract from more meaningful efforts to address digital dependency, build student media literacy, and create engaging, tech-informed learning environments. In effect, phone bans risk becoming a symbolic or partial fix, and the need for constant enforcement draws educational leaders away from fulfilling their core responsibilities.

96.   Moreover, blanket bans may lead to an increase in daily confrontations with students attempting to hide or sneak phone usage, turning hallway supervision into a series of disciplinary exchanges rather than positive relationship-building opportunities. Despite the well-documented risks to adolescent sleep health and attention, social media platforms have failed to incorporate even basic safeguards that would allow users to schedule app downtime during critical periods, such as overnight and during school hours. Research has consistently shown that adolescents delay sleep and experience reduced sleep quality due to social media use at bedtime, often driven by fear of missing out, social obligations, and the normative pressure to remain constantly available (MacKenzie et al., 2022; Scott et al., 2019). These same social and psychological pressures apply during the school day, when students are often distracted by the expectation of ongoing social media engagement. Adolescents themselves describe the experience as compulsive and

difficult to control, with some likening it to addiction. Yet major platforms have not proactively disabled access for users during sensitive periods in the day, including instructional time and sleep time, or when users are located at middle and high schools.

97. Personal electronic device bans can provide some relief by reducing distractions and encouraging more focused, in-person interaction during school hours. However, they do not address the underlying social media use. The effects of social media use before and after school find their way into the school day, through reduced attention spans affecting the quality of classroom instruction and learning; the fallout from social comparison, lack of sleep, peer group exclusion, and bullying episodes facilitated by the apps; and the negative mental health consequences for youth caused by social media. Plus, implementation comes with its own set of enforcement challenges that divert leaders from their essential duties.

98. While bans might help create a more controlled environment, they need to be part of a broader strategy that includes education about responsible tech use, support for mental health, and engagement with parents and the community, a strategy that requires schools and school district resources to design and implement. Most fundamentally, the best way to address this problem would be to prevent and mitigate the problem at its source, by changing the design and operations of these platforms to reduce students' digital dependency. This comprehensive approach is crucial for addressing the root causes and ensuring long-term positive outcomes for schools and students.

99. In some districts, schools have adopted commercial solutions like Yondr bags, which require students to lock their phones in a magnetic pouch throughout the school day. While these systems can be expected to reduce overall in-school phone use, they introduce logistical burdens: the pouches can be time-consuming to distribute and collect, students sometimes damage them in an attempt to pry them open to access their phone, and the cost can be a substantial challenge, especially in underfunded schools. Enforcement inconsistencies across classrooms or grade levels can also lead to frustration among students and staff.

**CONFIDENTIAL**                                                                                    28

100.  In addition to schoolwide device policies and enforcement efforts, educational leaders must also contend with the ongoing technical challenge of blocking access to social media platforms on school networks and devices, because the dangers of social media find their way into all student device use, even school-issued laptops and tablets. This has become a persistent and frustrating cycle. Schools implement filters and restrictions, only to have students quickly find workarounds, using VPNs, proxy servers, mobile data, or alternate sites and apps that mimic or mask access. IT teams are often locked in a reactive loop, spending time identifying new circumvention tactics and updating blocklists rather than focusing on instructional support or infrastructure improvement. For administrators, the issue is not just technical; it becomes a disciplinary and cultural concern, as students repeatedly test boundaries, and staff are pulled into enforcement and redirection. The sheer volume of time spent on trying to limit access to social media, and the limited success of those efforts, underscores the scale and persistence of the problem.

Opinion 5. The cumulative effect of these demands is increased cost, diverted resources, heightened emotional strain, and reduced leadership capacity, negatively impacting school districts, schools, and public education.

101.  Although social media platforms initially positioned themselves as public goods enabling free expression, access to information, and global dialogue, their underlying business models depend on maximizing user engagement for profit (Twenge, 2017).

102.  The consequences of their designs, particularly for children and teens, are profound. Public education, as a public right, is under threat. Educational leaders, who play a critical role in ensuring public education fulfills its vital promise to our society as a whole, are increasingly undermined in their efforts by student use of social media. Leadership behaviors that could otherwise foster vibrant, equitable school cultures are disrupted, with devastating consequences not only for education but for society as a whole.

**CONFIDENTIAL**                                                                                      29

103. The contrast is stark: public education seeks to build informed citizens for the collective good; social media platforms seek to monetize attention (Twenge, 2017). This fundamental divergence in purpose has created new and serious challenges for educational leaders, as the very students they are trying to prepare for democratic participation are being systematically distracted, emotionally dysregulated, and, in many cases, addicted to digital environments engineered for profit.

104. The current school context has been radically altered by social media platforms' unregulated and psychologically manipulative nature. Designed to capture and hold user attention through feeds, infinite scrolling, and real-time notifications, these platforms have created conditions of compulsive use, particularly among adolescents.

105. Perhaps the most overlooked consequence of social media harm is the diversion of leadership capacity and attention away from the central work of educational leaders: cultivating school climate, strengthening instructional quality, and supporting students.

106. Thus, while platforms have become normalized in youth culture, their structural design contributes to serious educational and emotional harm, and schools disproportionately bear the burden of response. This burden must be understood not as a byproduct of school failure but as a predictable consequence of platform design decisions that prioritize engagement over well-being.

107. While schools, parents, and policymakers all have roles to play in addressing the fallout, social media companies should also shoulder responsibility for their role in creating these challenges, and should reform their practices.

108. Social media's disruption of effective educational leadership has profound implications not just for individual students but for the health of public education and, by extension, society itself.

**CONFIDENTIAL**                                                                                          30

109. Historically, public education has been a unifying institution, where young people learn to navigate differences and collaborate for the common good (Feinberg, 2012). The decline of meaningful interpersonal engagement undermines this socializing function.

110. Based on my professional experience and expertise and based on a growing consensus in the literature, it is clear that student use of social media is making it more difficult for school and district leaders to meet their core responsibilities. Platforms designed to maximize engagement are shaping student behaviors in ways that disrupt focus, safety, and well-being, forcing leaders to divert time and resources from instruction, equity, and culture to crisis management and damage control. In effect, public schools are being asked to absorb the social and operational consequences of technologies they did not create and cannot control. This shift represents a real and growing strain on educational leadership, one that ultimately compromises the ability of schools to serve their public mission.

## Reservation of Rights

111. My testimony is based upon the information presently available to me. I reserve the right to amend or modify my testimony should circumstances warrant.

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Signed: _Brian Osborne_____ Date:  May 16, 2025_____

Brian G. Osborne, Ed.D.

**CONFIDENTIAL**

References

Allen, D. (2022). *Justice by means of democracy*. University of Chicago Press.

Anderson, M., & Jiang, J. (2018, May 31). *Teens, social media & technology 2018*. Pew Research Center. https://pewrsr.ch/3hT9s48

Angwaomaodoko, E. A. (2024). The impact of social media on youth education and well-being. Path of Science, 10(4), 1010–1017. https://doi.org/10.22178/pos.103-8

Böttger, T., & Zierer, K. (2024). *To ban or not to ban? A rapid review on the impact of smartphone bans in schools on social well-being and academic performance. Education Sciences, 14*(8), 906. https://doi.org/10.3390/educsci14080906

boyd, d. (2014). *It's complicated: The social lives of networked teens*. Yale University Press.

Brown v. Board of Education, 347 U.S. 483, 493 (1954).

Brown, Tracye. (2025, April 24). Deposition of Tracye Brown, 30(b)(6) representative for Hillsborough County [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

Center on Budget and Policy Priorities. (2022). *Most states have cut school funding, and some continue cutting*. https://www.cbpp.org/research/state-budget-and-tax/most-states-have-cut-school-funding-and-some-continue-cutting

Centers for Disease Control and Prevention [CDC]. (2023). *Youth Risk Behavior Survey Data Summary & Trends Report: 2011–2021*. U.S. Department of Health and Human Services. https://www.cdc.gov/healthyyouth/data/yrbs/pdf/YRBS_Data-Summary-Trends_Report2023_508.pdf

Chingos, M. M., & Blagg, K. (2017). *Do poor kids get their fair share of school funding?* Urban Institute. https://www.urban.org/research/publication/do-poor-kids-get-their-fair-share-school-funding

ClickOrlando. (2025, May 9). *School districts warn parents about TikTok challenge encouraging students to damage Chromebooks*. https://www.clickorlando.com/news/local/2025/05/09/school-districts-warn-parents-about-tiktok-challenge-encouraging-students-to-damage-chromebooks/

CNET. (2025, May 10). *Dangerous TikTok Chromebook challenge: Avoid sparking a fire in your laptop*. https://www.cnet.com/tech/dangerous-tiktok-chromebook-challenge-avoid-sparking-a-fire-in-your-laptop/

Coakley, S. (2025, April 30). *Deposition of Dr. Shavonna Coakley* [Deposition transcript]. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, MDL No. 3047 (N.D. Cal.). Charleston County School District.

Council of Chief State School Officers. (2008). *Educational leadership policy standards: ISLLC 2008*. https://www.ccsso.org/sites/default/files/2017-11/ISLLC_2008.pdf

Cyberbullying Research Center. (2021). Amicus curiae brief in support of petitioners, Supreme Court of the United States, No. 20-255. https://www.supremecourt.gov/DocketPDF/20/20-255/169120/20210224135419750_20-255tsacCyberbullyingResearchCenter.pdf

Diaz, A. D., Peeples, D. A., & Weigle, P. E. (2025). Depression and social media use in children and adolescents. In *Pediatric Clinics of North America*, 72(2), 175–184. https://doi.org/10.1016/j.pcl.2024.11.004

Feinberg, W. (2012). *What is a public education and why we need it: A philosophical inquiry into self-development, citizenship, and democratic community*. Lexington Books.

Funderburk, J. C. (2025, April 15). *Deposition of Justin Funderburk, 30(b)(6) representative for Spartanburg School District 6* [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

Grigic Magnusson, A., Ott, T., Hård af Segerstad, Y., & Sofkova Hashemi, S. (2023). Complexities of managing a mobile phone ban in the digitalized schools' classroom. *Computers in the Schools, 40*(3), 303–323. https://doi.org/10.1080/07380569.2023.2211062

Labaree, D. F. (1997). *How to succeed in school without really learning: The credentials race in American education*. Yale University Press.

Larsen, John. (2025, April 29). *Deposition of John Larsen, 30(b)(1) representative for Jordan County* [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

Larsen, John. (2025, April 29). *Deposition of John Larsen, 30(b)(6) representative for Jordan County* [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

Learning Policy Institute. (2019). *Understanding school finance: How money matters for student success*. https://learningpolicyinstitute.org/product/understanding-school-finance-brief

**CONFIDENTIAL**

Levinson, M. (2012). *No citizen left behind*. Harvard University Press.

MacKenzie, M. D., Scott, H., Reid, K., & Gardani, M. (2022). Adolescent perspectives of bedtime social media use: A qualitative systematic review and thematic synthesis. Sleep Medicine Reviews, 63, 101626. https://doi.org/10.1016/j.smrv.2022.101626

Marblehead Current. (2025, May 8). *TikTok challenge leads to MHS evacuation Wednesday*. https://marbleheadcurrent.org/2025/05/08/tik-tok-challenge-leads-to-mhs-evacuation-wednesday/

Moore-Sanders, Deborah. (2025, April 9). Deposition of Deborah Moore-Sanders, 30(b)(1) representative for Dekalb County [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

National Conference of State Legislatures. (2020). *K-12 education finance overview*. https://www.ncsl.org/education/k-12-education-finance

National Policy Board for Educational Administration. (2015). *Professional standards for educational leaders 2015* https://www.npbea.org/wp-content/uploads/2017/06/Professional-Standards-for-Educational-Leaders_2015.pdf.

Nesi, J., Prinstein, M. J., & Telzer, E. H. (2018). Adolescents' social media use and mental health: A developmental neuroscience perspective. *Current Directions in Psychological Science, 27*(5), 363–369. https://doi.org/10.1177/0963721418778560

Nettles, S. M., & Herrington, C. (2007). Revisiting the importance of the direct effects of school leadership on student achievement: The implications for school improvement policy. Peabody Journal of Education, 82(4), 724–736. https://doi.org/10.1080/01619560701603239

Office of the U.S. Surgeon General. (2023). *Social media and youth mental health: The U.S. Surgeon General's advisory*. U.S. Department of Health and Human Services. https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

Popat, A., & Tarrant, C. (2022). Exploring adolescents' perspectives on social media and mental health and well-being – A qualitative literature review. Clinical Child Psychology and Psychiatry, 28(1), 323–337. https://doi.org/10.1177/13591045221092884

Popat, S., & Tarrant, A. (2023). *Social media, mental health, and young people: Emerging research and implications*. Youth Studies Journal.

Rebell, M. A. (2012). *Courts and kids: Pursuing educational equity through the state courts*. University of Chicago Press.

Revels, Denise. (2025, April 18). *Deposition of Denise Revels, 30(b)(6) representative for Dekalb County* [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

ScienceDaily (Mar. 22, 2016), https://www.sciencedaily.com/releases/2016/03/160322100401 ("Spending more time on social media may increase the risk of exposure to cyber-bullying or other similar negative interactions, which can cause feelings of depression."). 71.

Scott, H., Biello, S. M., & Woods, H. C. (2019). Identifying drivers for bedtime social media use despite sleep costs: The adolescent perspective. Sleep Health, 5(6), 539–545. https://doi.org/10.1016/j.sleh.2019.07.006

Siebers, T., Beyens, I., Pouwels, J., & Valkenburg, P. (2021). Social media and distraction: an experience sampling study among adolescents. Media Psychology, 25(3), 343-366.

Towns, Kishia. (2025, March 17). *Deposition of Kishia Towns, 30(b)(6) representative for Dekalb County* [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

Tom's Hardware. (2025, May 9). *A new TikTok challenge has kids attempting to short-circuit school-issued Chromebooks.* https://www.tomshardware.com/laptops/chromebooks/a-new-tiktok-challenge-has-kids-attempting-to-short-circuit-school-issued-chromebooks

Twenge, J. M. (2017). *iGen: Why today's super-connected kids are growing up less rebellious, more tolerant, less happy--and completely unprepared for adulthood.* Atria Books.

U.S. Department of Education, National Center for Education Statistics. (2023). *Revenues and expenditures for public elementary and secondary education: FY 2021 (NCES 2023-301).* https://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2023301

Watson, D., Topping, K., & Drew, S. (2022). The impact of social media use on adolescent mental health: Systematic review. *Journal of Adolescence*, 94, 123–138. https://doi.org/10.1016/j.adolescence.2022.01.003

Withers, McKinley. (2025, April 9). *Deposition of McKinley Withers, 30(b)(6) representative for Jordan County* [Deposition transcript]. United States District Court, Northern District of California. In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, No. 4:22-md-03047-YGR.

Yahoo News. (2025a, May 10). *Chromebook challenge: Schools warn of current TikTok trend causing laptop fires*. https://www.yahoo.com/news/chromebook-challenge-schools-warn-current-184203111.html

Yahoo News. (2025b, May 11). *This TikTok trend has kids setting school laptops on fire—now one teen is facing arson charges*. https://www.yahoo.com/lifestyle/tiktok-trend-kids-setting-school-165834563.html

**CONFIDENTIAL**