# Exhibit 7

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CHARLESTON) (SD MSJ NO. 3)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY ) MDL No.
PRODUCTS LIABILITY LITIGATION ) 4:22-md-3047-YGR
________________________________)
THIS DOCUMENT RELATES TO: )
)
CHARLESTON COUNTY SCHOOL )
DISTRICT V. META PLATFORMS INC.,)
ET AL. )
CASE NO.: 4:23-CV-04659 )
________________________________)

VIDEOTAPED DEPOSITION OF
ELLEN BEVILL NITZ
Friday, April 4, 2025
Mount Pleasant, South Carolina
9:06 a.m. Eastern

Reported by: Karen Kidwell, RMR, CRR
Job No.: 7276753

APPEARANCES:

For MDL Plaintiffs:

MOTLEY RICE LLC
BY JADE A. HAILESELASSIE, ESQ.
jhaileselassie@motleyrice.com
TAMMY CAULEY RIVERS, ESQ.
tcrivers@motleyrice.com
P. GRAHAM MAIDEN, ESQ. (via Zoom)
gmaiden@motleyrice.com
BRETT PANDER, ESQ. (via Zoom)
bpander@motleyrice.com
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
843.216.9670

For the Defendants Meta Platforms, Inc., f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg:

SHOOK, HARDY & BACON L.L.P.
BY: MATT DePAZ, ESQ.
mdepaz@shb.com
WILLIAM S. WALBERG, ESQ. (via Zoom)
wwalberg@shb.com
2555 Grand Boulevard
Kansas City, Missouri 64108
816.559.4086

For the Defendant Snap:

KIRKLAND & ELLIS, LLP
BY: ANDREW KARP, ESQ. (via Zoom)
andrew.karp@kirkland.com
601 Lexington Avenue
New York, New York 10022
212.341.7593

APPEARANCES CONTINUED:

For the Defendants Alphabet Inc., Google LLC, and YouTube LLC:

WILLIAMS & CONNOLLY LLP
BY: J. ANDREW KEYES, ESQ.
akeyes@wc.com
DANIEL WHITELEY, ESQ.
dwhiteley@wc.com
680 Maine Street SW
Washington, DC 20024
202.434.5584

For the Defendants TikTok, Ltd.; TikTok, LLC; TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:

KING & SPALDING LLP
BY: ISABEL KING, ESQ. (via Zoom)
iking@kslaw.com
110 North Wacker Drive, Suite 3800
Chicago, Illinois 60606
312.764.6921

Also Present:

Matt Walters, Videographer
Vince Rosica, Exhibit Technician
Lisa Mandara, Paralegal,
Motley Rice (via Zoom)

# I N D E X


WITNESS/EXAMINATION Page

ELLEN BEVILL NITZ

By Mr. Keyes 5

By Ms. Haileselassie 94


# E X H I B I T S


| Number | Description | Page |
|---|---|---|
| Nitz Exhibit 1 | Ellen Bevill Nitz, RN, BSN resume, Confidential, Bates MR_CCSD_7490008-010 | 37 |
| Nitz Exhibit 2 | CCSD EOY Survey Results for Mental Health chart, Confidential, Bates MR_CCSD_749011 | 60 |


REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

MOUNT PLEASANT, SOUTH CAROLINA
FRIDAY, APRIL 4, 2025
P R O C E E D I N G S
- - -
VIDEOGRAPHER: We are now on record. Today's date is April 4th, 2025, and the time is 9:06 a.m.

This is the video deposition in regards to Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, heard in the United States District Court, Northern District of California.

This deposition is taking place at Motley Rice, in Mount Pleasant, South Carolina. Our deponent today is Ellen Nitz.

Will our court reporter please swear in our witness.

ELLEN BEVILL NITZ,
being first duly sworn, testified as follows:

EXAMINATION

BY MR. KEYES:

Q. Good morning, Ms. Nitz. My name is Andrew Keyes. I'm an attorney with the law firm of Williams & Connolly, and we represent the Google and YouTube Defendants in this case.

Would you state your full name for the record.
A. Yes. Ellen Bevill Nitz.
Q. What is your home address?
A. 40 --
MS. HAILESELASSIE: My -- pardon me. Objection.
As far as home address, the Defense witnesses have not been placing theirs on the record, and I would object to this witness placing hers on the record for similar reasons.
If -- if you need her, of course, you can contact us. But -- I would object to her home address being on the record.
MR. KEYES: Okay. We've asked other witnesses this week, and they've provided their addresses without objection, but . . .
BY MR. KEYES:
Q. What's your work address?
A. My work address is at Mary Ford Elementary School Nursing Services. And it's 3180 Thomasina MacPherson Boulevard, and that's in Charleston.
Q. And are you an employee of Charleston County School District?
A. Yes, sir.

Q. Is your current position director of nursing?
A. Yes, sir.
Q. And you've been employed by Charleston County School District since March of 2007?
A. Correct.
Q. And you've been continuously employed throughout that time period by Charleston County School District?
A. Yes, sir.
Q. Are you aware that you are under oath today?
A. Yes, sir.
Q. And do you understand that you're giving testimony under oath as if you were in a courtroom before a judge or a jury?
A. Yes, sir.
Q. Is there any reason you cannot testify truthfully and accurately today?
A. No, sir.
Q. Did you do anything to prepare for today's deposition?
A. I reviewed some of my past surveys that have been done by my nurses, and we also met in preparation of this.

Q. Anything else?
A. No, sir.
Q. You say "we met in preparation"; who's the "we"?
A. So I met with Jade and Tammy. We met yesterday. And then prior to that, I met with a -- a larger group from -- from Motley Rice.
Q. Okay. Jade and Tammy are attorneys with the law firm of Motley Rice?
A. Correct.
Q. And you understand Motley Rice to be representing Charleston County School District in this case?
A. Yes, sir.
Q. When you met with Jade and Tammy, did any nonlawyers participate?
A. At the first meeting, one -- we had a paralegal that was there.
Q. Okay. But referring to your meeting yesterday with Jade and Tammy, did any nonlawyers --
A. It was just the three of us.
Q. Okay. And how long was yesterday's meeting?
A. Right over an hour.
Q. Did you review any documents during your

meeting with Jade and Tammy yesterday?
A. No.
Q. And then you said before yesterday, you met with a larger group from Motley Rice. When was that meeting?
A. A few weeks prior. I don't remember the date.
Q. Did any nonlawyers participate in that meeting?
A. That was the paralegal that was there.
Q. Okay. And who were the lawyers from Motley Rice who participated in that meeting?
A. I do not remember the names.
Q. Okay. Did anyone else participate in that meeting besides the lawyers and the paralegal from Motley Rice and you?
A. Not to the best of my knowledge.
Q. Did you review any documents during that earlier meeting?
A. No, sir.
Q. Did you review the transcript of any testimony given by any witness in this case?
A. No, sir.
Q. Did you speak with any nonlawyers to prepare for today's deposition?

A. No, sir.
Q. Okay. You said you did review surveys by your nurses?
A. Yes, sir.
Q. Did you review anything else, when it comes to documents, to prepare for today's deposition?
A. I did look through -- just on Google, looked at some of the things that I have seen within our district that our children have been exposed to, just trying to refresh my memory.
Q. Anything else?
A. No, sir.
Q. Okay. So when you refer to these surveys by the nurses, what are you talking about?
A. So the State will put out a nursing survey for the end of the year, and it captures a lot of the data points that have -- the nurses have seen in the clinics, anywhere from how many times -- how many diabetics we have within the District to how many asthma-related incidents we've seen, number of pregnancies. And we also will go ahead and capture information on anxiety as well and how many of our students have anxiety disorders. And they -- they break it down into the different groupings.

Q. And -- and where did you go to look at these nursing surveys?
A. So each year, from the State, we get the survey. I send it out to all 80 of my schools, and then I will able -- I'm able to compile this information. And I have the summary for that for the past five years, when I have -- since I have been the director.
Q. So you said you get a survey from the State. The State of South Carolina decides what questions are on the survey?
A. Correct.
Q. And have the questions on that survey changed over the five years?
A. They have added a few extra questions that they thought would be helpful data points to be able to secure more staffing for nursing.
Q. And then when you get the survey questions, you send them out to each school within Charleston County School District?
A. Yes, sir.
Q. And you have the -- the nurse, or the nurse liaison for that school, fill out the survey?
A. I have the lead nurse to fill that out.
Q. The lead nurse for each school?

A. Correct.
Q. And is there a nurse at each school?
A. Yes, sir.
Q. Is there more than one nurse at some schools?
A. Yes, sir.
Q. And so where there are more than one nurse at a particular school, you have the lead nurse fill out the survey?
A. That is what I ask. It could be that the lead nurse could be busy, and that she would have someone else pull that information, one of the other nurses pull it. But for the most part -- for the most part, it would be the lead nurse.
Q. And then how do they complete the survey? Do they do it electronically, on paper, something else?
A. So I send it out in a Google form.
Q. Okay. And so they then go into the Google document and fill it out?
A. Correct.
Q. Okay. And then how do they notify you when they've completed the survey for their school?
A. So I have five nurse liaisons that work under me, and they -- they -- we work by teams. They

pull their team's data. They put it on an Excel sheet. I take all the -- the summary, or the -- I take all of the surveys and then compile them into the District summary.

Q. Okay. And what is that document called that compiles all the survey feedback that you've received from the nurse or the lead nurse at each school?

A. We call it the end-of-the-year survey, nursing survey.

Q. And where is that end-of-the-year survey stored?

A. In my Google Drive.

Q. So do you have end-of-year survey for 2024?

A. We do -- we -- so we break it into school years. So we do have it for '23-'24. And of course at the end of this school year, in May, we will do one for '24-'25.

Q. Okay. So do you have the end-of-year survey for the preceding five school years?

A. I have it starting in '20. So I have '20-'21, '21-'22, '22-'23, '23-'24. And I -- so I only -- I'm sorry, I only have four right now. I will have my fifth one.

Q. Okay. And then once you have compiled the data that you receive from the lead nurse at each of the schools, what do you do with this end-of-year survey?

A. I submit it to our State nursing consultant for South Carolina.

Q. And who is the State nursing consultant?

A. Victoria Ladd, L-a-d-d.

Q. And is she an employee of South Carolina?

A. She is funded half through South Carolina Department of Ed and half from Department of Health.

Q. And what is your understanding of what Ms. Ladd does, then, with the end-of-year survey results that you submit, and that I assume she gets from every other school district in South Carolina?

A. Correct. They're simply -- they are data points to show what the school nurse does within the educational system. And it helps provide additional funding for staffing, and hopefully to -- to be able to get more staff.

Q. Are the results of the end-of-year surveys for Charleston County School District made publicly available?

A. No.

Q. Okay. Are the end-of-year surveys for all

of the districts, once reviewed and consolidated by Ms. Ladd, made publicly available?

A. I'm unsure.

MS. HAILESELASSIE: Object to form.

BY MR. KEYES:

Q. You don't know one way or the other?

A. I do not.

Q. Okay. Do -- have you received access to any composite that Ms. Ladd or someone in South Carolina State government has prepared that aggregates all the information from all the end-of-year surveys from all the school districts in the state?

A. I have not.

Q. Okay. And what is your understanding of how that -- the data reported by the different school districts in the end-of-year surveys affects funding for -- for nursing going forward?

A. Could you repeat that, please?

Q. Yeah. What is your understanding of how that data, that's reported in these different end-of-year surveys, affects funding for nursing going forward?

MS. HAILESELASSIE: Object to form.

BY MR. KEYES:
Q. You can answer.
A. So again, it shows the importance of having a school nurse on campus, what they're able to do, how to get the kids taken -- their -- their health care needs met, and back into the classrooms so that they can achieve academic success.
Q. Okay. And to be clear, in preparing for today's deposition, you reviewed the four end-of-year surveys that are in your Google documents that are specific to Charleston County School District, correct?
A. Correct.
Q. And you did not review any survey data for other school districts or for the state as a whole; is that correct?
A. Correct.
Q. And then when you reviewed these end-of-year surveys to prepare for today's deposition, did you discuss them with anyone?
MS. HAILESELASSIE: Object, to the extent it would call for you to reveal attorney-client privileged information. But you may answer, as -- as long as it doesn't divulge any such information.

THE WITNESS: We did discuss it at our meeting this week.

BY MR. KEYES:

Q. To prepare for the deposition?

A. Correct.

Q. With the lawyers?

A. Correct.

Q. Okay. Did you discuss it with anyone else?

A. No.

Q. Okay. And where are these end of -- surveys located? You said they're in Google Doc. How would you access them if you were at your laptop or desktop right now?

A. I would go into my Google Drive.

Q. Okay. And they're called end-of-year surveys?

A. EOY surveys, nursing surveys, yes.

Q. And when you did review these four end-of-year surveys, what did you learn?

A. I learned that we did see an increase of kids that exhibited anxiety; that it continues. It's a growing trend.

Q. Anything else that you learned from reviewing these end-of-year surveys?

A. No, sir.
Q. Do you have access to the end-of-year surveys that were conducted before the 2020-2021 school year?
A. No, sir.
Q. Okay. Did you have any involvement in any of those end-of-year school -- end-of-year surveys?
A. As a nurse liaison at the time, as a nurse manager, of course I had my team information; but that would just be from the Mount Pleasant schools itself. That's what I managed at that point. So I didn't have District numbers.
Q. Okay. And who then compiled all of the data from all of the schools in Charleston County School District for years prior to the 2020-2021 school year?
MS. HAILESELASSIE: Object to form.
THE WITNESS: So Melissa Prendergast was the director of nursing prior to me.
BY MR. KEYES:
Q. And for how long was she the director of nursing?
A. I started in 2007; Melissa was there. She was there prior to that. I don't know her exact time frame that she became the director.

Q. Do you know if there is an end-of-year survey somewhere -- in someone else's files, even if it's not in your files?

MS. HAILESELASSIE: Object to form.

BY MR. KEYES:

Q. For before the 2020-2021 school year?

MS. HAILESELASSIE: Same objection.

THE WITNESS: So I did search my files, and I could not find it.

BY MR. KEYES:

Q. Okay. Any other take-aways you had from looking at these four end-of-year surveys to prepare for today's deposition?

A. No, sir.

Q. Then you said you also looked through Google to see what children had been exposed to? Did I get that right?

A. Well --

MS. HAILESELASSIE: Object to form.

BY MR. KEYES:

Q. If I got it wrong, you tell me.

A. No. No. So what I did was I was Googling, looking at different challenges that I had heard that, you know, the nurses were seeing in clinics through the years.

Q. Okay. And so when you say you were Googling, what did you run as a search query?
A. Well, the first one I looked at was "fire and ice."
Q. Okay. What else?
A. And then the "choking."
Q. Okay. What else?
A. And -- I'm trying to think if I really looked at anything else. I don't remember if I looked at anything else at this point.
Q. Okay. You do remember running the "fire and ice" and the "choking" queries in Google?
A. Yes, sir.
Q. Any other queries you ran?
A. Again, if I did, I don't remember exactly what it was.
Q. Okay. And then based on those queries, what information did you then see and read?
A. It substantiated what I remembered.
Q. Okay. And how much time did you spend doing this Googling?
A. Ten minutes.
Q. And how much time did you spend reviewing the end-of-year surveys?
A. 15 minutes, possibly.

Q. Okay. Why did you run the query "fire and ice"?
A. It was a common concern that I had heard through my nurses at the time, when I was a nurse liaison even, that we had kids that were, you know, trying different challenges, and we always like to try to let school nurses know what's going on: "Hey, be on the lookout for this." And that was -- that was a big one.
Q. Okay. Any other reason you -- you ran the query "fire and ice"?
A. I wanted to make sure that I had the right information.
Q. And then what did you learn, based on that query?
A. That my recollection was correct.
Q. Okay. And -- and when was this a challenge?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I don't know the exact time frame. I do know that it was during my time as a liaison, as well as a director.
BY MR. KEYES:
Q. Okay. So for what period of time was this a -- a challenge that was a common concern?

A. Again, I don't know the time frame.
Q. What was the fire-and-ice challenge?
A. So children would go ahead and use salt on their arm, just readily available table salt, and then they would put ice on top of it. And it was a challenge to see how long you could leave it. And -- and then they would come away with burns, and then go to see my nurses.
Q. Did you treat any of the CCSD children who participated in the fire-and-ice challenge?
A. No, sir.
Q. You believe that other nurses within Charleston County School District did treat --
A. Yes, sir.
Q. -- students who -- who participated in that challenge?
A. Yes, sir.
Q. Do you have any records showing how many CCSD students participated in this fire-and-ice challenge?
A. I -- I do not have specific records that I can pull, no, sir.
Q. Does -- does the District have records that could be searched to determine the number of CCSD students who participated in the fire-and-ice

challenge?
MS. HAILESELASSIE: Object to form.
THE WITNESS: So --
BY MR. KEYES:
Q. You can answer.
MS. HAILESELASSIE: You may answer.
But I'll -- I'll note this witness is not here as a 30(b)(6), so she's, you know, not required to testify on behalf of the District.
But to the extent you -- you know, you may answer.
THE WITNESS: So any time a child comes into our clinics, we do have electronic -- electronic medical records that we keep documentation of each visit. And that is one thing that we were able to provide is, you know, any type of incident that could have been related to mental health issues.
BY MR. KEYES:
Q. You say "that is one thing we were able to provide." Who's the "we"?
A. Nursing services.
Q. And -- and provide to whom?
A. So I was able to -- to give to -- to Jade, for -- I requested from our EMR provider, Frontline

Health. They ran a report to, you know, show any type of mental health issues that may have occurred.

Q. Okay. And you went to the Frontline --

A. Frontline Health.

Q. Did you go to Frontline Health to ask for this report?

MS. HAILESELASSIE: I'll object, to the extent that any of -- of this is attorney-client privileged or work product.

BY MR. KEYES:

Q. Okay. Did you go to the -- did you run the report yourself, or did you ask the vendor to run the report?

A. I asked the vendor to run the report.

Q. And who at the vendor did you ask?

A. I asked Kim Healey.

Q. And how did you know to ask Kim Healey to run this report?

A. Anytime that we need larger data information, that is our common way of -- of -- you know, to be able to get -- to be able to obtain that.

Q. Did Ms. Healey run the report you requested?

A. She did. She had to -- she actually had to -- to have someone else within the, you know,

within Frontline, run that information.
Q. And then did she provide you the report that was run?
A. She did.
Q. And do you know what field or fields were searched within the electronic medical records to generate this report?
MS. HAILESELASSIE: Object to form.
THE WITNESS: So they were common fields, and we made sure that patient identifiers were -- were taken out.
BY MR. KEYES:
Q. And what were these common fields that were searched?
MS. HAILESELASSIE: Object to form.
THE WITNESS: So normally what we would do is prior to -- to items being redacted, the identifying factors, it would have been the date, the time, the school -- of course the patient's -- the student's name, date of birth. It would give the reason that they were in the clinic, whether it was a headache, GI, whatever it may be.
And then it would then go into what the -- any of their vital signs that they had, and then

what the comments were on that particular occasion, as well as did they return to class or sent home.

BY MR. KEYES:

Q. Those are the fields that were searched?

MS. HAILESELASSIE: Object to form.

Andy, these are records that were turned over, so I'll object to the memory test. I mean, unless you have a document that you can show this witness, I don't think she's required to list for you every field that you have been given.

MR. KEYES: I'm entitled to ask her questions and probe her knowledge.

BY MR. KEYES:

Q. And ma'am, if you don't know, you should feel free to say "I don't know."

A. Okay.

Q. Okay?

But you just listed for me the common fields that were the -- the subject of this search. What -- what search term or terms were used to identify electronic medical records that could be related to mental health issues?

MS. HAILESELASSIE: Object to form.

THE WITNESS: So to the best of my recollection, we -- we checked things that were mental health issues, such as anxiety, depression.

BY MR. KEYES:

Q. So you asked Kim Healey, or her colleague at the vendor, to run the term "anxiety" through the electronic medical records?

A. Yes. We went through a list that we normally look at, and -- and then we -- I chose the things that I thought would pull up those records.

Q. Okay. What are the other search terms that you asked Kim Healey or her colleague at the vendor to run besides anxiety or depression?

A. Obsessive compulsive disorder. We did oppositional defiance. We -- I think that we ended up with -- I think it was body image. And I'm trying to think if -- if there was any eating disorder.

There could have been more.

Q. Okay. And when this query was run, was it like a series of codes you could choose from, or were these search terms sort of run against all the text in the database?

A. So no, it would be -- it would be run on the -- the way that the nurse put it in. So we have

templates, and you -- you pick a general global template, such as "anxiety." And then from there, they're able to pick -- to do subgroups from there.

Q. Okay. So these are electronic medical records that are filled out by the nurse in the school when he or she sees a student who comes to seek care of some sort?

A. Correct. They're office visits.

Q. Okay. And then within Frontline, if a student comes in and has a complaint or a concern, the nurse then can pick a template within Frontline: "Oh, you're complaining" -- or "your issue is anxiety," and so there's like an "anxiety" thing you can check, and then you'll fill out more information related to anxiety? Is that how it works?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes, sir.

BY MR. KEYES:

Q. Okay. So when you listed anxiety, depression, obsessive-compulsive, oppositional defiance, body image, maybe eating disorder, are these all different templates that could be searched?

A. Those are just different subcategories. And then we really depend on a lot of the comments that the nurse puts in.

Q. Are you able to tell me what the templates are that the nurse would choose from, at the first level?

A. That-- that's what we just did. So it's the global template of anxiety.

Q. Okay. Is there a separate global template for depression?

A. It falls under anxiety.

Q. What about obsessive-compulsive?

A. It goes under -- those are all subgroups.

Q. Same thing for oppositional defiance?

A. Correct.

Q. Body image?

A. Correct.

Q. Eating disorders?

A. Correct.

Q. Okay. So am I understanding, then, that you asked Frontline to go search all of the "anxiety" templates that had been filled out for these other things by using these search terms?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes, sir.

BY MR. KEYES:

Q. Okay. Do you remember how many separate times CCSD students were treated for anxiety in any

particular year?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Not broken down into year, no, sir. Except for the -- the end-of-the-year survey.
BY MR. KEYES:
Q. Okay. Is the end-of-the-year survey supposed to reflect data that nurses at individual schools are pulling from Frontline themselves?
A. They should match up.
Q. Okay. So the work that was done by the vendor theoretically should match up the numbers in the end of your surveys?
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Is that right?
A. They should.
Q. Okay.
Okay. So were you able to find any records that reflect the number of CCSD students that participated in this fire-and-ice challenge?
A. I did not look.
Q. Okay. And where was this fire-and-ice challenge promoted, if you know?
A. The kids. It was word of mouth throughout

the -- the students.
Q. Word of mouth?
A. Uh-huh.
Q. Okay. Where did the challenge originate?
A. I -- you know, they were always -- it was always reported through social media.
Q. What social media?
A. I don't have specifics.
Q. Okay. Then you -- you said you also ran the term "choking" in Google.
A. Correct.
Q. Did you do that for the same reason, that -- that you remember that being a concern you had heard from your nurses?
A. Yes, sir.
Q. Okay. And what was the choking challenge, as you understand it?
A. The -- they would choke another student until they became unresponsive.
Q. Do you have any records showing the number of CCSD students who participated in the choking challenge?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I have one instance that I'm very familiar with.

BY MR. KEYES:
Q. Okay. Do you have any records showing the number of CCSD students who participated in the choking challenge?
A. I do not.
Q. Do you know whether Charleston County School District itself has any records that show the number of students who participated in the choking challenge?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I would think that they would.
BY MR. KEYES:
Q. Okay. Where would those records be?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I would think that in the -- the discipline in the 360 platform.
BY MR. KEYES:
Q. Because if -- if someone was known to have participated in a choking challenge, that would be an infraction?
A. Absolutely.
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Against the rules?

A. Uh-huh.
Q. Yes?
A. Yes.
Q. And then would lead to some disciplinary consequence?
A. Yes, sir.
Q. Do you have any idea how many CCSD students participated in the choking challenge?
A. I do not.
Q. Okay. You referenced this one instance that was familiar to you. What -- what is that instance?
A. It was an instance where a middle schooler was choked.
Q. To the point of being unconscious?
A. Yes, sir.
Q. Is the middle school student okay now?
A. He is.
Q. Was the middle school student choked by another middle school student?
A. Yes.
Q. And -- and was that middle school student who did the choking punished?
A. Yes, sir.
MS. HAILESELASSIE: Object to form.

BY MR. KEYES:
Q. What was the punishment?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I don't know exactly what the end punishment was.
BY MR. KEYES:
Q. How was this choking challenge spread, or publicized, if you know? Word of mouth?
A. It was --
MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes. Word of mouth, social media.
BY MR. KEYES:
Q. What social media? If you know.
A. I don't know.
Q. Okay. Anything else you can tell me about your experience with the fire-and-ice challenge or the choking challenge?
A. Well, for the choking challenge, I watched a child drop to the ground and defecate himself. He was totally unresponsive, per -- per video.
Q. Okay. You weren't there for the original choking --
A. No.
Q. -- but it was recorded?

A. It was recorded, and I reviewed it.
Q. And you saw the video?
A. Yes.
Q. Okay. And you found that stressful?
A. Yes, sir.
Q. Okay. Is there any other details you -- you are aware of, either from your personal experience or from your Googling that you can tell me about, regarding the fire-and-ice challenge or the choking challenge?
MS. HAILESELASSIE: Object to form.
THE WITNESS: No, sir.
BY MR. KEYES:
Q. Okay. Do you remember there being any other challenges in the Charleston County School District system besides fire-and-ice and choking?
A. I'm not sure if you would call them challenges. But we -- we did have word spread that -- you know, how to get high off of different over-the-counter medications, such as Coricidin, or even Benadryl, different things. And -- and we went through a period where huffing was another thing that we saw a lot, the nurses were concerned about.
Q. Anything else?
A. Not that I can recollect at this time.

Q. Okay. Did you take any notes while you were doing this Googling?
A. No, sir.
Q. Did you take any notes when you were reviewing the end-of-year surveys?
A. No. I mean, besides putting it on a summary sheet for myself, for year by year.
Q. Okay. You did prepare that summary sheet?
A. I did.
Q. Yeah. And where -- where is that summary sheet now? Do you still have it?
A. Yes, I do.
Q. Did you bring it to today's deposition?
A. I did.
Q. Okay. May I see it?
MS. HAILESELASSIE: Well, we'll talk about that on the break.
MR. KEYES: Okay.
BY MR. KEYES:
Q. Did you bring other documents with you to today's deposition?
A. Besides my résumé, no, sir.
Q. You mentioned your résumé. I'm showing you what has been marked as Nitz Exhibit 1.
(Nitz Exhibit 1 was marked for identification.)

BY MR. KEYES:
Q. If you would give a copy to your counsel.
This was produced with the Bates numbers MR_CCSD_749008 through 749010.
What is this exhibit?
A. This -- this is my résumé that when I applied for director of nursing I used.
Q. Okay. You prepared it?
A. I did.
Q. Is it accurate?
A. Unfortunately, when I was going through it last night, I looked at it, and I thought, "Oops, didn't update the entire thing." So --
Q. So it's accurate, but there may be stuff you wanted to add?
A. Well, it was actually in -- I still say "present" on some of my -- some of my past work, that would have been correct when I applied for being director, and that would be for Roper. I left Roper in 2019, when I became director, and -- yeah, so those -- those two, for being the -- the Women's Services educator as well as working in Women's Services. I ended that in 2019.
Q. When was the last time you edited this résumé?

A. In -- when I was asked for a CV for today.
Q. Okay. So did you edit this résumé in connection with submitting it today? Or you last edited it when you were applying for a position with Charleston County School District?
A. So just to be clear, I had this résumé in preparation for my -- when I was applying for director of nursing. And then I just went and updated it -- not completely, obviously -- for this particular -- for this need.
Q. When -- when did you do this updating?
A. I'm trying to think. Maybe a couple weeks ago. Three weeks ago, maybe.
Q. Okay. And are you able to identify the content in here that you added when you did this updating a couple weeks ago?
A. Besides putting that I'm the director of nursing now, I don't think that there was anything else that was added.
Q. Okay. When you asked Frontline to run a report to identify electronic medical records that could be related to mental health issues, did you ask them to use as a search term "social media"?
A. No, sir.
Q. Why not?

MS. HAILESELASSIE: Object to form.
THE WITNESS: The main -- my nurse would probably not document that.
BY MR. KEYES:
Q. Okay. And did you ask Frontline to run the names of any Defendant in this case?
A. No, sir.
Q. Why not?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Again, we would not have documented that.
BY MR. KEYES:
Q. Okay. Do the electronic medical records, as you understand them, include any field that would report whether a student was making a complaint in connection with social media?
A. Unless it was commented by the nurse, no.
Q. Because there is a "Comment" field where --
A. Yes.
Q. -- a nurse can insert observations?
A. Correct. And most visits will have a comment.
Q. Okay.
A. Or should have a comment.

Q. Okay. And -- and given that a nurse could have mentioned social media or a Defendant's name in the "Comment" section, why didn't you ask Frontline to run those as search terms when they were generating this report for you?

MS. HAILESELASSIE: Object to form.

BY MR. KEYES:

Q. You didn't think it was likely there would be a reference?

A. I didn't -- I -- I was looking at anxiety.

Q. Okay. It sounds like, from press reports, that this has been an extremely stressful two weeks for you and your colleagues in nursing and administration, given what happened at R.B. Stall High School. So you have my support.

Can you just explain what happened to that freshman at R.B. Stall High School last week, who had the asthma attack?

MS. HAILESELASSIE: So object to the preamble. Object, to the extent that this calls for this witness to divulge information that is protected by a FERPA or HIPAA, and is -- object, to the extent that this is a matter, you know, currently under investigation.

I would really object to this witness

answering any questions about this, because this is also outside of the discovery period and irrelevant to this case.

BY MR. KEYES:

Q. You can answer.

MS. HAILESELASSIE: I really would object to her answering this question, and I would instruct her not to answer.

BY MR. KEYES:

Q. Well, ma'am, I don't want any information that's covered by FERPA or HIPAA. But you participated in a press conference a few days ago about this incident, correct?

A. Yes.

Q. Okay. And so my -- my question stands, then.

Without disclosing anything that's subject to HIPAA, or anything that's subject to FERPA, or anything you can't disclose because of an ongoing investigation, can you just explain what happened with this student?

MS. HAILESELASSIE: And Ms. Nitz, I would advise that you can respond to this question, to the extent your response is something that would have been covered in a public press conference.

THE WITNESS: Yes. It --
MS. HAILESELASSIE: And I would --
THE WITNESS: It was in the media, in the press release.
BY MR. KEYES:
Q. Right. Okay. So I understand that it involved a freshman at R.B. Stall High School. Is that correct?
A. That was stated in the press release.
Q. And this is a student who had or complained of difficulty breathing, and potentially an asthma issue, and went to a clinic?
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Is that -- is that correct?
A. Again, you can refer to the press release.
Q. Well, I'm asking you for your perspective, because you participated in the news conference that -- right? Was on the news?
MS. HAILESELASSIE: Andy, this witness may not be able to recall at this moment every single item that was in the press release. And to the extent she has additional knowledge, may have concerns about whether your representation --

MR. KEYES: I don't want a speech. She can answer for herself, Jade. You're coaching.

MS. HAILESELASSIE: She can answer for herself, but I am telling you, there are concerns around this. This is outside the discovery period. This is -- this is irrelevant. And I -- I would ask that you really limit your questions here.

BY MR. KEYES:

Q. Ms. Nitz, as I understand it from press reports, a freshman at R.B. Stall High School went to the clinic complaining of difficulty breathing. Was administered Albuterol. According to the nurse, seemed to recover a few minutes later and was sent back to class. Within an hour or so later, the student had issues in the classroom, declined rapidly, became nonresponsive, was administered three doses of Narcan while the paramedics were called.

A code was declared within the school, so that students would remain in place, to clear the hallways, so that the paramedics could reach the student as quickly as possible. The student was then transported to a hospital and was declared dead later that afternoon.

Did I get that right?

MS. HAILESELASSIE: So I would object to that preamble.
And Ms. Nitz, I would -- I would say that you can testify to the extent that you are aware any of that is public information.
MR. KEYES: Okay.
BY MR. KEYES:
Q. Did I get that right?
A. Yes.
Q. Okay. Has that happened before in Charleston County School District?
MS. HAILESELASSIE: Object to form.
THE WITNESS: We have emergencies, but we have -- I am unfamiliar with any deaths.
BY MR. KEYES:
Q. Okay. And I'm not suggesting that this student died at school; he died at the hospital. Correct?
Is that correct?
A. He was --
MS. HAILESELASSIE: Object to form.
THE WITNESS: He was declared at the hospital, that is correct.
BY MR. KEYES:
Q. Okay. And you're not aware of any student

dying on school grounds --
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. -- during your tenure? Is that correct?
A. Correct.
Q. Okay. Have there been students who have overdosed on school grounds?
MS. HAILESELASSIE: Object to form. Vague, not limited in time.
THE WITNESS: We have had children that -- yes.
BY MR. KEYES:
Q. Okay. Has that happened in -- in a high school?
A. Yes.
Q. Has it happened in middle school, or a middle school?
A. Yes.
Q. Has it happened in an elementary school?
A. You would have to define -- we have had altered behavior, where we think that drug substances were used in elementary school.
Q. So how many times are you aware of where there's been an overdose at a CCSD high school?
MS. HAILESELASSIE: Object to form.

THE WITNESS: I don't have the numbers in front of me, but I -- I believe that it has been about five times that we have had to use Narcan.
BY MR. KEYES:
Q. Okay. And what is Narcan, for the members of the jury?
A. So Narcan is a medication to reverse an opioid.
Q. And is it your belief that the roughly five times involved an overdose of an opioid?
A. That --
MS. HAILESELASSIE: Object to form.
THE WITNESS: That is why we used it.
BY MR. KEYES:
Q. Okay. Did -- did the Narcan work in reversing the opioid overdose in those roughly five instances?
MS. HAILESELASSIE: Object to form.
THE WITNESS: The patients were then taken to the -- via EMS.
BY MR. KEYES:
Q. How many times have there been an overdose by a CCSD student in a middle school?
MS. HAILESELASSIE: Object to form.
THE WITNESS: It's either one or two.

BY MR. KEYES:
Q. Was Narcan administered to those -- that student, or those students?
A. To one student.
Q. Okay. What about the other?
A. I -- I don't recollect 100 percent if --
Q. Did Narcan -- I'm sorry to interrupt.
A. No. If they thought that it was drug-related, they would use Narcan, because . . .
Q. And did the Narcan reverse the overdose for that student in the middle school?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes. They were able to be transported via EMS.
BY MR. KEYES:
Q. Okay. And then how many instances have there been of overdoses or altered behavior in CCSD elementary schools?
A. We have had a few.
Q. Has -- has the use of opioids been a problem in CCSD schools?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I think nationwide we know that opioids have been an issue. And we're no different.

BY MR. KEYES:
Q. Okay. So the use of opioids has been an issue in Charleston County School District?
MS. HAILESELASSIE: Object to form.
THE WITNESS: It's been a concern.
BY MR. KEYES:
Q. Well, what is the difference between an issue and a concern? I asked you if it was an issue; you said it's been a concern. What's the difference?
MS. HAILESELASSIE: Object to form.
THE WITNESS: It's -- I mean, anytime that we know that there are health concerns out there, it -- we -- we want to make sure that we're addressing them. And therefore we have the Narcan available.
BY MR. KEYES:
Q. Has there been a particular time when you thought the issue of opioids and CCSD schools was a bigger concern?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I would say two to three years ago, it was -- probably three years ago, to my best recollection, it was -- it was one of the things that we were most concerned about, making sure that we could prevent -- you

know, that we could save a life, if there was an instance, you know, on our campus.
BY MR. KEYES:
Q. What were other things, besides opioids, that you were most concerned about three years ago?
A. Cardiac emergency response.
Q. What else?
A. I mean -- life saving -- so you're -- you're talking -- you know, making sure that you have epinephrine for severe allergies, that you have Narcan for opioid, that you have an AED for cardiac response.
We're limited what we can do in a school setting. But all of those we're able to address.
Q. Has fentanyl been an issue in CCSD schools?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Again, drug use across the nation has been, you know, an issue; and fentanyl was one of those things that we all wanted to make sure that we had the right tools to be able to save a life.
BY MR. KEYES:
Q. So you said drug use across the nation has been an issue. I'm asking specifically about CCSD.

Has fentanyl been an issue in CCSD schools?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Again, I would have to answer that any time a drug is used, a street drug, you have to worry that it could be laced with fentanyl.

BY MR. KEYES:

Q. Okay. So then are -- are the use of street drugs an issue within CCSD schools?

MS. HAILESELASSIE: Object to form.

THE WITNESS: We know that kids do street drugs.

BY MR. KEYES:

Q. Okay. Do you have any records that track the -- the incidence or prevalence of CCSD students using drugs?

A. We are -- school nurses actually assess for altered behavior. We look at their signs and symptoms, their vital signs. We look to see if their pupils are dilated or pinpoint. We look to see what their gait looks like, their neurological response.

We don't have any testing that we can do, per se, except to say that we think that the child has altered behavior, and then they're -- they go to administrators for further action.

Q. What -- I sort of recognize that the last two weeks would not be easy or stress-free for you. But prior to the last two weeks, would you characterize your job as director of nursing as being easy?
A. No, sir.
MS. HAILESELASSIE: Object to preamble --
BY MR. KEYES:
Q. Or stress-free?
MS. HAILESELASSIE: Object to the preamble. Object to form.
BY MR. KEYES:
Q. Stress-free?
A. No, sir.
Q. Why not?
A. Because I manage 50,000 children --
Q. Okay.
A. -- and about 6,000 staff members.
Q. Was it a particularly stressful or challenging job during COVID?
A. Yes, sir.
Q. Why?
A. We took a very active role in making sure that we kept our community as safe as we could.
Q. And can you just describe briefly what

your role was, as the director of nursing for Charleston County School District, in managing the response to the COVID-19 pandemic?

A. Yes. So I worked directly with the DHEC regional medical director, as well as MUSC, and the -- the pediatric director of infectious disease. And we worked together to contact trace; make sure that we were keeping, you know, sick people at home; providing the correct guidance at the time, which of course, everyone's aware, changed almost hourly it seemed like.

And then not only did we -- we did about 35,000 cases during that time period. And then we also were able to provide vaccines to our staff members. And then as the students became available, we were able to go ahead and vaccinate the -- the children that we had consent to do.

Q. Was there resistance to vaccines?

MS. HAILESELASSIE: Object to form.

THE WITNESS: There's -- there's always going to be resistance to vaccines. It was never mandatory.

BY MR. KEYES:

Q. Okay. It was -- I'm sorry. There was resistance to -- at least in some quarters -- to the

COVID-19 vaccine?
A. Correct.
Q. Has there been resistance within the CCSD community to other vaccines?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes, sir.
BY MR. KEYES:
Q. What is that resistance?
A. We have some people that don't believe in vaccines, that they believe that they could do more harm than good. And all that we do is we state that they have to follow State law. So if they wish to not have their child vaccinated, then they have to have the proper exemption, which, for South Carolina, is either a religious exemption, a medical exemption, or if you're new to the district, you could have a 30-day exemption.
Q. In your experience, did COVID-19 exacerbate student anxiety?
A. Yes.
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. What is your basis for saying "yes"?
A. Because one of the things that we -- that we did see were people -- there was a stigma attached

to anyone having mental health issues. Nobody wants to say that they have mental health issues -- until the pandemic. During the pandemic, there was so much talk via media that, you know, the stress that everyone was under, and it became acceptable.

And so we started learning more about our children that did have more anxiety, more depression, that had, you know, that -- that parents were willing to share information.

Q. I don't want to put words in your mouth, so tell me if you disagree. But -- but based on what you said, do you -- do you agree that as terrible as COVID-19 was, one positive thing that came out of it was that the stigma surrounding mental health issues was reduced; and therefore, people could talk about mental health issues more freely?

MS. HAILESELASSIE: Object to form.

BY MR. KEYES:

Q. Do you agree with that?

A. I do.

Q. And did that apply just to adults, or did it apply to students as well?

A. I believe it applied to everyone.

Q. And so is it -- is it your experience, based on talking to students, based on talking to

your other nurses, that over the course of the COVID-19 pandemic, students talked more and more about whatever mental health issues they had?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes.

BY MR. KEYES:

Q. And I asked you about anxiety and whether COVID-19 made anxiety worse, and you said "yes." Right?

A. Yes.

Q. Does the same go for other mental health issues, that COVID-19 made other mental health issues worse?

MS. HAILESELASSIE: Object to form.

THE WITNESS: I think the isolation that a lot of people felt during COVID-19 made things worse.

BY MR. KEYES:

Q. Okay. And so when you gave me a list of the search terms that you asked Frontline vendor to run against electronic medical records to find potential issues relating to mental health, you have mentioned anxiety, but you also mentioned depression. Is it your experience that COVID-19 made depression worse for students?

MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes.
BY MR. KEYES:
Q. Is it your -- your experience that COVID-19 made OCD worse --
MS. HAILESELASSIE: Object --
BY MR. KEYES:
Q. -- for people who had it?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes.
BY MR. KEYES:
Q. Is it your experience that COVID-19 made oppositional defiance worse for people who had it?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes.
BY MR. KEYES:
Q. Is it your experience that COVID-19 made body image issues worse --
A. Yes.
Q. -- for students?
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Is it your experience that COVID-19 made eating disorders worse?
MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes.
BY MR. KEYES:
Q. Is it also your experience that COVID-19 may have triggered these problems for people who previously did not have them?
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Or had not diagnosed them?
MS. HAILESELASSIE: Same objection.
THE WITNESS: I -- I don't know -- I mean, there were many that were already out there. Some were exposed to us, we knew about, parents had reported, students had shared with us. Certainly we heard more after COVID-19.
But I -- I can't say that COVID-19 caused all of it. I think that it was just people were more willing to share information.
MR. KEYES: Okay.
MS. HAILESELASSIE: Andy, we've been going about an hour. Can we take a break?
MR. KEYES: Yeah. Let me just finish this line of questioning, then we can take a break.
BY MR. KEYES:
Q. So your testimony is that you can't say COVID-19 caused all of it?

A. Uh-huh.
Q. Yes?
A. Correct.
Q. But COVID-19 did make anxiety, depression, OCD, oppositional defiance, body image issues, and eating disorders worse for people who had it? Yes?
MS. HAILESELASSIE: Objection to form.
BY MR. KEYES:
Q. Is that correct?
A. That's my belief.
Q. Okay. And -- and it's also your experience that COVID-19 may have triggered those issues for some people who previously did not have it, or know they had it, before COVID-19?
MS. HAILESELASSIE: Object to form, and --
BY MR. KEYES:
Q. Is that fair?
MS. HAILESELASSIE: -- mischaracterizes prior testimony.
THE WITNESS: I think it's fair.
MR. KEYES: Okay. We can take a break.
VIDEOGRAPHER: Going off the record. The time is 10:07 a.m.
(A recess transpired from 10:07 a.m. until 11:03 a.m.)

VIDEOGRAPHER: Going back on the record. The time is 11:03 a.m.

BY MR. KEYES:

Q. Ms. Nitz, during the break, CCSD's counsel provided a document that I've marked as --

MS. HAILESELASSIE: And I'm sorry, Andy. If we're back on the record, there is a point of clarification that Ms. Nitz would like to make on the record before we proceed.

MR. KEYES: Okay.

THE WITNESS: So according to the Frontline information that we had pulled, I had forgotten that we had -- investigatively, we had pulled one group of a set of information that looked just at like anxiety issues; and then later, we did pull all of the office visits for the time period that they were looking at.

BY MR. KEYES:

Q. Okay. And is it your understanding that the second pull, then, included all of the data that's in Frontline?

A. Correct.

Q. And is it your understanding that that's the data that was produced to the Defendants in the case?

A. Yes, sir.
Q. Okay.
A. And I apologize. I had forgotten that piece.
Q. Ma'am, you're just obligated to give your best recollection, so you don't need to apologize.
Did you want to clarify anything else?
A. Not that I'm aware of at this time.
Q. Okay. During the break, CCSD's counsel provided us a document that we've marked as Nitz Exhibit 2.
(Nitz Exhibit 2 was marked for identification.)
BY MR. KEYES:
Q. Give a copy to your counsel.
This was produced with the Bates number MR_CCSD_749011. Have you seen this document before?
A. Yes, sir.
Q. What is it?
A. So this is in regards to the end-of-the-year survey that we discussed earlier. And I actually -- I created this document. I pulled the information that the State asked for under mental health disorder data, and then I looked at the survey results that I had for each of the corresponding years and included that.

Q. Okay. This is a chart you prepared?
A. Correct.
Q. Based on your review of the four end-of-year surveys you described earlier?
A. Yes.
Q. 2020-21, 2021-2022, 2022-2023, and 2023-2024 school years?
A. Correct.
Q. Okay. And you reviewed the data in those four end-of-year surveys, and then tallied them up and put them in this chart?
A. Correct.
Q. Okay. Did you prepare other summaries of other data in the end-of-year surveys separate from this Nitz Exhibit 2?
A. For this particular reason? Or --
Q. For any reason.
A. So in the summary, of course, it would go over many more different topics, if you looked at the entire summary. For this, I only pulled the section that was under mental health disorder. And I did -- I did leave out -- the other thing that was in there, I think, was autism, because autism did not fit under mental health and -- and what I would have categorized as mental health. It was the State that

did that.

Q. When you went back and you pulled these four end-of-year surveys, did you prepare any other summary of the data in those surveys other than what's in Exhibit 2?

A. No, sir.

Q. What is the Stop the Bleed program?

A. So Stop the Bleed is -- is our emergent response to any type of -- any type of injury that they could have any -- you know, any type of bleeding. So it's our response that we train people how to use a tourniquet. And again, it's to save lives.

Q. For how long has CCSD had the Stop the Bleed program?

A. I started implementing it as a liaison, so I -- I mean, I am -- I can't say for sure the year, but I would think that it would have been probably 2017, maybe, '16-'17.

Q. And does the Stop the Bleed program have a curriculum or a set of training materials?

A. Yes, it does.

Q. Did you create that curriculum or set of training materials?

A. No, sir.

Q. Did CCSD create that curriculum or set of training materials?
A. No, sir.
Q. Where did CCSD get that curriculum or set of training materials?
A. We actually collaborated with MUSC, and they received it. There's actually an organization called stopthebleed.org, and we adopted their protocol. And MUSC actually made a video for us, as well, to help train.
Q. And for the members of the jury, "MUSC" is Medical University of South Carolina?
A. Correct.
Q. Did CCSD pay any money to either develop or acquire the rights to the Stop the Bleed curriculum and training materials?
MS. HAILESELASSIE: Object to form.
THE WITNESS: So not for the program itself. Initially, the Department of Health, which was called DHEC at the time, did a roll-out where they provided a certain number of Stop the Bleed kits. I think we -- our first roll-out was about 1,100 kits for our entire district. And -- and then, since then we have added kits, to make sure that we have Stop the

Bleed kit in every classroom.
BY MR. KEYES:
Q. And what -- what is in a Stop the Bleed kit?
A. In a Stop the Bleed kit, you've got a tourniquet; you've got a pair of gloves; you have hemostatic gauze, so if somebody's bleeding out, you're able to pack with that; you have wound dressing, so that if you need to place that to help Stop the Bleed, you're able to do that.
There's also a -- the -- I'm trying to think what it's called now. The dressing -- not the dressing. It is a -- it's a wrap; it's an aluminum wrap, so if somebody goes into shock. I can't think of the word that I'm looking for right now.
And then a Sharpie, to be able to label.
Q. Was it your decision to start using the Stop the Bleed program in CCSD schools?
A. It was decided on the State level, and like I said, they went ahead and provided 1,100 of the first kits to us, and then we built upon that.
Q. Did the State mandate that each school district use the Stop the Bleed program?
MS. HAILESELASSIE: Object to form.

BY MR. KEYES:
Q. Or was it voluntary?
A. It was prior to me being the director. It was, I think, highly recommended.
Q. Okay. And do you know what prompted the State to highly recommend that each school district in the state use the Stop the Bleed program?
A. Active -- active shooters.
Q. And so the Stop the Bleed program is a set of kits, plus training, to address any significant bleed for any reason? Yes?
A. Correct.
Q. But your understanding is it was prompted by the -- the possibility or the risk that there would be an active shooter in one of the South Carolina schools?
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Is that right?
A. I believe that that's -- that was DHEC's intent.
Q. Okay. And then part of the program are the kits; part of the program is training. Yes?
A. Correct.
Q. And who gets the training in the Stop the

Bleed program?
A. So in the training, all of my nurses are trained, and they, in their schools, will then train staff members. And we request -- we -- their -- the protocol is to have at least 90 percent of your staff trained in Stop the Bleed.
Q. Are students trained in connection with Stop the Bleed program?
A. At some schools, they are.
Q. Which schools have Stop the Bleed program training for students?
A. Where our nurses feel that they may need it in their own personal life. So a lot of times it's our Title 1 schools.
And then there are some schools that have health care programs that, you know, that kids may be taught; or in a smaller school, where the nurse gets to be more involved on a daily basis, she may go in and do that as well.
Q. Do you have records that show which schools have trained students on the Stop the Bleed program?
A. That's maintained at each school level.
Q. Okay. So where would you go if you wanted to get an accurate list of the CCSD schools where

students were trained on the Stop the Bleed program to address bleeding from a traumatic wound, such as in an active-shooter situation?

A. So I would go to the school nurse herself.

Q. Okay. So how many students in CCSD schools have received training in the Stop the Bleed program, to your knowledge? Roughly.

A. I do not have a number.

Q. Dozens? Hundreds? Thousands?

A. I would easily say hundreds.

Q. Okay. High hundreds?

A. Again, I -- I really can't say, but I -- I would say hundreds.

Q. Did you track CCSD students' use of social media during the COVID-19 pandemic?

A. Personally, I did not track that.

Q. Did anyone else in CCSD nursing track CCSD students' use of social media during the COVID-19 pandemic?

MS. HAILESELASSIE: Object to form.

THE WITNESS: I can't really speak for individual nurses on that.

BY MR. KEYES:

Q. Are you aware of anyone in the Charleston County School District who tracked students' use of

social media during the COVID-19 pandemic?
A. Could you repeat that, please?
Q. Yeah. Are you aware of anyone in the Charleston County School District who tracked students' use of social media during the COVID-19 pandemic?
A. I would think that that would be our IT department.
Q. Okay. Are you guessing?
A. I -- I mean, I can't tell you 100 percent sure that they did, but I mean, that would be an educated guess.
Q. Okay. It's an educated guess, but you don't know. Is that fair?
MS. HAILESELASSIE: Asked and answered. Objection.
BY MR. KEYES:
Q. Is that fair?
A. Correct. That's fair.
Q. Okay. Are you aware of anyone besides CCSD's IT department tracking students' use of social media during the COVID-19 pandemic?
A. I -- again, I would think that our guidance counselors would be -- and our psychologists would be knowledgeable of that information.

Q. Do you think they would be tracking students' social media usage?

MS. HAILESELASSIE: Objection. Asked and answered.

THE WITNESS: I'm not sure.

BY MR. KEYES:

Q. Do you know whether CCSD's network allows students to access YouTube?

A. It does.

Q. The system does allow it?

A. I know that I can get on YouTube if I need to -- to watch something. I don't know if a student can definitely get on YouTube.

Q. Okay. I want to make sure I understand.

So you, as a staff member for CCSD, can access YouTube on the CCSD network, correct?

MS. HAILESELASSIE: Objection. Asked and answered.

THE WITNESS: Correct.

BY MR. KEYES:

Q. Do you know whether students can access YouTube on the CCSD network?

MS. HAILESELASSIE: Objection. Asked and answered.

THE WITNESS: I do not.

BY MR. KEYES:
Q. Can you, as a staff member, access social media sites on the CCSD network?
A. Not that I'm aware of.
Q. Do you know whether students can access social media sites on the CCSD network?
A. Not that I am aware of.
Q. Have you ever requested that CCSD block access to YouTube on the District's network?
A. No.
Q. Have you ever requested that CCSD block access to YouTube on District-issued devices?
A. No, I personally have not.
Q. Are you aware of anyone who has requested that CCSD block student access to YouTube, either on the District's network or on District-issued devices?
MS. HAILESELASSIE: Object to the form.
THE WITNESS: To -- I believe that, yes, that that has been discussed in group settings.
BY MR. KEYES:
Q. Okay. And where have you heard that discussed?
A. Through operations meetings.
Q. As a result of those discussions, did CCSD then block student access to YouTube, either on the

District's network or on District-issued devices?
MS. HAILESELASSIE: Object to the form.
THE WITNESS: That is my understanding.
BY MR. KEYES:
Q. So your understanding is that a step was taken to block student access to YouTube?
A. I believe so.
Q. When?
A. I don't know that answer.
Q. Okay. So is it your current belief that student access to YouTube is blocked either on the District's network or on District-issued devices?
MS. HAILESELASSIE: Object to the form.
THE WITNESS: That is my belief.
BY MR. KEYES:
Q. How big of a surprise would it be to you, then, if in fact student access to YouTube is not blocked, either on the District's network or on District-issued devices?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I -- I mean, I guess for teaching purposes, if they had something that they were using, that wouldn't be a huge shock. But I -- I was unaware of it.

BY MR. KEYES:
Q. Okay. Have you ever made any request to any Defendant in this case to modify any feature or function of any platform?
A. No.
Q. Have you ever made any request to any Defendant in this case to discontinue any feature or function of any platform?
A. No.
Q. Do you know who the Defendants in this case are?
A. I -- I believe that I do.
Q. What is your understanding of who the Defendants are in this case?
A. I would -- I believe that it is Meta and TikTok and Google.
Q. Any others?
A. It seems like there is -- seems like there's one more. I don't know right offhand.
Q. Okay. Do you know whether Snapchat is a Defendant?
A. I believe that it is. I'm not 100 percent.
Q. Okay. So if Meta, TikTok, Google, and Snapchat are the Defendants, have you made any

request to any of them to either modify or discontinue any feature or function of their platforms?

MS. HAILESELASSIE: Object to the form. Asked and answered.

THE WITNESS: No, sir. That's not really in -- I mean, we take care of physical aspects of the kids.

BY MR. KEYES:

Q. Have you ever spoken with a representative of any of the Defendants about a feature or function of one of their platforms?

A. No.

Q. Have you ever advocated for a change in CCSD's policy regarding students having access to or being able to use personal electronic devices on school grounds or during school activities?

MS. HAILESELASSIE: Object to the form.

THE WITNESS: I have never advocated, myself.

BY MR. KEYES:

Q. With anyone, correct?

A. At -- at school --

MS. HAILESELASSIE: Object to the form. You can answer.

THE WITNESS: -- no.
BY MR. KEYES:
Q. Is that correct?
A. I'm -- I want to make sure I understand the -- the question completely.
Q. Sure. Sure.
Is it accurate to say that you have never advocated for a change in CCSD's policy regarding students having access to or being able to use personal electronic devices on school grounds or during school activities? Is that accurate?
MS. HAILESELASSIE: Same objection.
THE WITNESS: I am -- I know that in the past, I've been part of group discussions. And of course we always worry when our kids come to us, and they're -- they're tired, they're sleepy, because they've been scrolling all night. They -- you know, they feel like they can't be in the classroom; that they need to be in the clinic, resting a lot.
Those are some concerns that I have shared. But I can't tell you dates and times.
BY MR. KEYES:
Q. Well, I'm not asking for dates and times. Have you ever gone to anyone in the CCSD

administration and asked for a change in CCSD's policy regarding whether students can have access to or can use their personal electronic devices on school grounds or during school activities?

A. No.

MS. HAILESELASSIE: Object to the form, and asked and answered.

BY MR. KEYES:

Q. Have you been involved at all in the drafting or adopting of any policy regarding whether students can have access to or can use personal electronic devices on school grounds or during school activities?

A. I was consulted on the diabetic use, for medical use.

Q. Any other involvement?

A. No.

Q. Have you ever been a teacher, in CCSD or elsewhere?

A. I have been a sub and a nurse at my children's school at Christ Our King.

Q. When was that?

A. That would have been -- well, I'd have to look at my résumé to make sure I gave you the right one, but -- it would be two thousand -- 2003 to 2007.

Q. And what are the age ranges of the students at that school?
A. It was anywhere from prekindergarten through 8th grade.
Q. Have you ever worked as a school counselor, in CCSD or elsewhere?
A. No.
Q. Have you ever worked as a mental health counselor, in CCSD or elsewhere?
A. No.
Q. Have you ever served as a mental health professional, in CCSD or elsewhere?
A. I have worked on the crisis team with the mental health counselors there.
Q. Okay. Where?
A. Any time that we've had a crisis within any of the school buildings -- if a teacher has passed, if a student has passed -- you know, any time that there's a tragedy, then we will go in as a team, to make sure that we get help for the -- for the people that need it.
Q. And when you serve on that crisis team, are you serving as a mental health professional?
A. No, I'm normally one that helps to just make sure that -- that we see the kids that are --

need to be seen.
Q. Have you ever worked in CCSD's IT department?
A. No.
Q. Have you ever worked in the budgeting or finance department or function of CCSD?
A. I work with them, not in them.
Q. Okay. Have you ever studied the frequency of students' use of social media?
A. No.
Q. Do you have any data on that?
A. No.
Q. Have you ever studied how much time students spend on social media?
A. Besides what the media reports, no.
Q. And do you have any data on that?
A. No.
Q. Have you ever studied CCSD students' mental health condition or problems?
A. No.
Q. And other than tallying up the numbers in Nitz Exhibit 2 in front of you --
A. Uh-huh.
Q. -- have you collected any data on CCSD students' mental health condition or problems?

A. The only thing -- I work with Boeing Wellness. That's another partner that we collaborate with. And -- and they have a lot of the mental health programs that are available to schools. And all of our schools -- well, not "all" -- the majority of our schools participate in wellness programs; and therefore, that's where we become a little bit more involved, making sure that if we have a high-risk school that has a lot of mental health needs, we try to make sure that we bring services to them.

Q. And for how long has CCSD participated in the Boeing Wellness program?

A. That started -- I believe that it started back about -- around 2010. That's -- that's not an exact date, by any means.

Q. And do you participate in the Boeing Wellness program?

A. So I participate in the Charleston Medical Society meetings, and that is where we also meet and collaborate with -- with Boeing.

Q. Do you have any data on how many students have participated in the Boeing Wellness program?

A. So we -- we actually -- that is all housed through Dr. Jan Key, who is the president of the Charleston Medical Society chapter for school

wellness, and -- and she keeps all that information.
Q. Okay. So do you have any data on how many students have participated in the Boeing Wellness program?
A. I do not.
Q. Do you have any other data on CCSD students' mental health condition or problems?
A. No, sir.
Q. Have you studied CCSD's expenditures in connection with students' use of social media?
A. No, sir.
Q. Have you studied CCSD's expenditures in connection with students' mental health condition or problems?
A. The only thing that we have looked at is the number of homebound students that we have, based on -- normally, we'll see that -- that kids that have a lot of anxiety, that they would like to be on medical homebound.
And -- and I don't have numbers. I don't have the data. But I do have one nurse that participates -- one of my nurse managers that participates in that homebound committee for anyone that appeals the decision.
Q. Okay. And then you would be familiar with

what CCSD spends in connection with that program?
MS. HAILESELASSIE: Objection. Form.
THE WITNESS: I do not have that number.
BY MR. KEYES:
Q. Okay. You don't have that number with you now?
A. I would -- I do not know that number.
Q. Okay. And you don't have it in your records?
A. No, sir.
Q. Okay. So do you -- so have you studied CCSD's expenditures in connection with students' mental health or conditions?
MS. HAILESELASSIE: Objection to form. Asked and answered.
THE WITNESS: No, sir.
BY MR. KEYES:
Q. Do you have any data that shows how much CCSD has spent either in connection with students' use of social media or students' mental health or conditions?
MS. HAILESELASSIE: Object to the form.
THE WITNESS: I do not.
BY MR. KEYES:
Q. Have you treated anyone in CCSD for mental

health?
A. Yes, I have.
Q. Who have you treated for mental health?
A. I've seen students.
Q. Okay. How many CCSD students have you treated for mental health, during your time?
A. During my time, I -- I don't have a number, really. I mean, I would -- as a manager, I fill in to clinics as needed for staffing purposes.
Q. Okay. Do you have any records that show the number of students you have treated for mental health?
A. Not -- I mean, they would be compiled within the -- the other records, but --
Q. You're talking about --
A. I don't have any particular records, no.
Q. When you say they would be compiled with the other records --
A. They would be in our electronic medical records.
Q. In Frontline?
A. Correct.
Q. Okay. Have you ever treated any CCSD student for social media addiction?
A. No.

MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. Have you ever provided a referral for a CCSD student in connection with social media addiction?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I have not.
BY MR. KEYES:
Q. Has any CCSD student come to you and said, "I'm addicted to social media"?
A. Not that I'm aware of.
Q. If someone came to you with a concern about social media addiction, do you -- do you have the background, the training, the expertise to diagnose someone as having social media addiction?
MS. HAILESELASSIE: Object to form.
THE WITNESS: I would collaborate with the people that do have the expertise -- that would be my psychologists within the school, our mental health counselors -- and I would make sure that we collaborate.
BY MR. KEYES:
Q. You wouldn't do it on your own?
A. I would build rapport with the student, to get them to trust me, and let them know that I'm here

to help them to find the resources that they need.

Q. But you would not diagnose someone, yourself, as having social media addiction; is that correct?

A. No, sir.

Q. Is that correct?

A. That is correct.

Q. Okay. And is that because you don't have the background, the training, or the expertise to do so?

A. Nurses assess. We do not diagnose.

Q. Do you use YouTube?

A. I do.

Q. Do you have a YouTube account?

A. For YouTube TV, I do.

Q. Okay. For how long have you had a YouTube TV account?

MS. HAILESELASSIE: Object to the form. Relevancy.

THE WITNESS: I would say three years, maybe.

BY MR. KEYES:

Q. Separate from watching YouTube TV, do you periodically look at YouTube for videos?

MS. HAILESELASSIE: Same objection.

THE WITNESS: Yes, if I need to learn how to fix my toilet or my washing machine.

BY MR. KEYES:

Q. I've done the same.

A. Yes, I do.

Q. Okay. And for how many years have you periodically been using YouTube in that -- for that reason?

MS. HAILESELASSIE: Same objection.

THE WITNESS: I don't even know how many years. I mean, since -- whenever I have a need, I will Google and see if I can find out how to do something.

But as entertainment, I don't just go through and view YouTube.

BY MR. KEYES:

Q. Okay. And you said you'll Google it. I want to be precise: Are you Googling how-to videos on YouTube?

MS. HAILESELASSIE: Same objection.

THE WITNESS: Yes.

BY MR. KEYES:

Q. Okay. Are there any other kind of situations where you use YouTube separate from YouTube TV and separate from how-to-fix-it videos?

MS. HAILESELASSIE: Same objection.
THE WITNESS: I think occasionally one of my kids might send me something. It's on different platforms a lot of time. And normally I will view, if they've sent me something.
BY MR. KEYES:
Q. When you refer to "my kids," are you referring to your children? Or students --
A. My biological children. I have five, so there's a lot -- lot going on.
Q. Congratulations.
So what is the age range of your five children?
A. So they are 24 to 34.
Q. Okay. And they use YouTube?
A. They do.
MS. HAILESELASSIE: Same objection.
BY MR. KEYES:
Q. And so if I understood your prior answer, if they send you a YouTube video, you'll watch it?
A. Correct.
Q. Okay. Any other situation where you use YouTube? You got YouTube TV; you got how-to-fix-it videos; and YouTube videos that your kids may send you. Any other scenario?

MS. HAILESELASSIE: Objection to form. Relevancy.

THE WITNESS: Occasionally there will be something workwise that -- you know, that I will refer to, whether it's -- I'm trying to think what -- what it would have been, whether it was some type of training or -- or something that I was, again, trying to learn more about.

BY MR. KEYES:

Q. Have you ever created any content to be posted on CCSD's YouTube channel?

A. I don't know how it was posted. We have -- we have created videos for nurse trainings and on chronic illnesses, but I don't know the platform that it's posted on, to be honest.

Q. Have you ever posted any content on CCSD's YouTube channel?

A. No. Not that I'm aware of.

Q. Did your kids, when they were younger, have YouTube accounts?

MS. HAILESELASSIE: Objection to form. Relevancy.

THE WITNESS: I believe so.

BY MR. KEYES:

Q. Did they have -- did any of your kids have

a YouTube account when they were in high school?
MS. HAILESELASSIE: Same objection.
THE WITNESS: I would think so.
BY MR. KEYES:
Q. And did any of your kids have a YouTube account when they were in middle school?
MS. HAILESELASSIE: Same objection.
THE WITNESS: Possibly.
BY MR. KEYES:
Q. Did you help set up a YouTube account for any of your kids when they were in high school or middle school?
MS. HAILESELASSIE: Same objection.
THE WITNESS: Possibly.
BY MR. KEYES:
Q. You don't have a recollection?
A. I do not have a recollection.
Q. Okay. Did you impose any limits on any of your kids' cell phones to restrict their access to YouTube on their device?
MS. HAILESELASSIE: Same objection.
THE WITNESS: When they were younger, if -- like for any type of screen time, I did. As they became older, in high school age, I did -- did not.

BY MR. KEYES:
Q. Okay. And where does middle school fall in that range, between younger and high school?
A. Like 6th to 8th grade.
Q. Right. But -- so I understand middle school is 6th to 8th grade; but you said when they were younger, you imposed some restrictions on what they could access on their phones.
A. Correct.
Q. When they were in high school, you did not.
A. Uh-huh.
Q. What was your practice when your kids were in 6th, 7th, or 8th grade?
MS. HAILESELASSIE: Objection to form.
BY MR. KEYES:
Q. Did you impose limits?
A. I had parental controls.
Q. Okay. And you had those parental controls enabled?
A. The majority of the time, yes.
Q. And those are parental controls that you enabled on the device itself?
MS. HAILESELASSIE: Object to the form.
THE WITNESS: To the best of my

recollection.
BY MR. KEYES:
Q. And when you enabled those controls on their devices, did you block their access to YouTube?
MS. HAILESELASSIE: Objection to form.
THE WITNESS: I believe that it was based on time, more than content.
BY MR. KEYES:
Q. Okay. So you might impose limits on how much time they could spend on their device per day?
A. Correct.
MS. HAILESELASSIE: Objection to form.
BY MR. KEYES:
Q. Did you impose limits on what hours during the day they could access their device?
MS. HAILESELASSIE: Objection to form. Relevancy.
THE WITNESS: I don't think I was smart enough at that time, no.
BY MR. KEYES:
Q. Okay. You remember just imposing a limit on how much time they could spend on their device?
MS. HAILESELASSIE: Same objection.
THE WITNESS: Correct.

BY MR. KEYES:
Q. Did you, for any of your kids when they were in middle school, separate from the time limit, impose any content limits on what they could access --
MS. HAILESELASSIE: Same objection.
BY MR. KEYES:
Q. -- such that they couldn't access YouTube, or they couldn't access social media, or something else?
A. I defined it as appropriate, and I expected my children to -- to follow that. Now --
Q. Why? Why did you expect your kids to follow it?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Out of respect.
BY MR. KEYES:
Q. For you?
A. Correct.
Q. As the parent?
A. Correct.
Q. Do you have social media accounts?
MS. HAILESELASSIE: Object to form. Relevancy.
THE WITNESS: I have a Facebook account

that -- that I used to follow my child when she would travel abroad. And -- but I -- I mean, occasionally I will look at something that somebody has post, but I don't -- I don't have any followers or anything. I don't do any of that, no.

BY MR. KEYES:

Q. Do you have an Instagram account?

MS. HAILESELASSIE: Object to form. Relevancy.

THE WITNESS: I believe I have one, just because the kids sent me stuff, and I did it just to be able to view that. But I don't look at it.

BY MR. KEYES:

Q. Do you have a TikTok account?

MS. HAILESELASSIE: Object to form. Relevancy.

THE WITNESS: To the best of my knowledge, I don't.

BY MR. KEYES:

Q. Do you have a Snapchat account?

MS. HAILESELASSIE: Object to the form. Relevancy.

THE WITNESS: Again, I don't believe I do.

BY MR. KEYES:

Q. Okay. So I want to make sure I understand.

As best you know, you do not have a TikTok account.

A. Uh-huh.

MS. HAILESELASSIE: Objection to form.

BY MR. KEYES:

Q. Is that correct?

A. Correct.

Q. You do not have a Snapchat account?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Correct.

BY MR. KEYES:

Q. You think you do have a Facebook account and an Instagram account, correct?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Correct.

BY MR. KEYES:

Q. You're not a regular poster, but you do watch whatever you get from your kids through Facebook or Instagram; is that correct?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Correct.

BY MR. KEYES:
Q. Okay. Anything else you can tell me about your use of social media?
MS. HAILESELASSIE: Object to form.
BY MR. KEYES:
Q. What -- what social media accounts you have?
A. No, the only thing --
Q. When you post?
A. I mean, that I can't --
MS. HAILESELASSIE: Object to form.
THE WITNESS: -- say is that like my grandson does watch YouTube Kids on my personal phone when he's at my house. He's . . .
BY MR. KEYES:
Q. Okay. So do you have a YouTube Kids account on your phone?
MS. HAILESELASSIE: Object to form.
THE WITNESS: On my personal phone.
BY MR. KEYES:
Q. And that's the account that you will use to access content that your grandchild can watch when he has your phone?
A. Correct.
MS. HAILESELASSIE: Object to form.

Relevancy.
BY MR. KEYES:
Q. Do you have other grandkids?
A. No. He's my -- well, I have a step-grandchild, yes. Or will have, the end of the month.
Q. Will have?
A. Yes.
Q. Congratulations.
A. Thank you.
MR. KEYES: Can we take a ten-minute break?
VIDEOGRAPHER: Going off the record. The time is 11:44 a.m.
(A recess transpired from 11:44 a.m. until 12:02 p.m.)
VIDEOGRAPHER: Going back on the record. The time is 12:02 p.m.
MR. KEYES: Ms. Nitz, I have no further questions. Thank you for your time today.
THE WITNESS: Thank you.

EXAMINATION

BY MS. HAILESELASSIE:
Q. Ms. Nitz, my name is Jade Haileselassie. I represent the Plaintiffs in this action, but in

this particular instance, I do represent the Charleston County School District. Do you understand that?

A. Yes.

Q. And we've met before, as you testified; have we not?

A. Yes.

Q. I just have a few follow-up questions.

You testified that COVID had an impact on the levels of anxiety being experienced by students at CCSD. Do you recall that?

A. Yes.

Q. And do you recall that you testified COVID had an impact on the anxiety levels of students -- I'm sorry, on the levels of depression being experienced by CCSD students. Do you recall that?

A. Yes.

Q. And do you recall that you testified that COVID also had an impact on the levels of body dysmorphia and eating disorders being experienced by students. Do you recall that?

A. Yes.

Q. Are there any other reasons, besides COVID, that had an impact on the anxiety, depression, body dysmorphia, and eating disorders that were being

experienced by students?
MR. KEYES: Objection to form. Foundation.
THE WITNESS: Our students felt very isolated at that time. They were used to the social aspect of being, you know, in the school setting, and many of them felt like they didn't have anybody to talk to at that point.
BY MS. HAILESELASSIE:
Q. Okay. And thinking of factors that would have also had an impact on anxiety, depression, body dysmorphia, and eating disorders in students at CCSD, do you believe that social media use is one of those factors?
MR. KEYES: Objection. Form.
THE WITNESS: I do.
BY MS. HAILESELASSIE:
Q. Ms. Nitz, if you -- do you still have Exhibit 2 in front of you?
A. Yes, I do.
Q. And that is the Bates ending 749011.
As you testified earlier, this document is a summary of the year-end survey results of mental health from the school year beginning 2020 and ending 2023-2024. Is that accurate?

A. Correct.
Q. Okay. And if we look at the first column, 2020 to 2021, does this contain the totals for each of the mental health disorders in Column 1 for this period?
A. It does.
Q. And could one of the reasons -- well, first of all, do you see the -- the totals for the 2020 to 2021 school year are lower than the totals for any of the other years represented on this chart?
A. I do.
Q. And could one of the reasons for this be that COVID happened during this time period, and schools were shut down, and you did not have access to students?
MR. KEYES: Objection to form. Speculation.
THE WITNESS: Yes.
BY MS. HAILESELASSIE:
Q. Looking at the next column, 2021 to 2022, do you see that there's a significant increase across the -- all mental health disorders for that time period?
A. I do.
Q. And looking at this chart, do you see that

some of these numbers have in fact doubled during this period?

A. I do.

Q. Do you know of any other reason beside COVID that you might attribute this increase?

MR. KEYES: Objection to form.

THE WITNESS: We did have a number of new families moving into Charleston County, due to us being able to provide face-to-face instruction five days a week.

BY MS. HAILESELASSIE:

Q. Okay. When -- when you say it was due to being able to provide face-to-face instruction, what is your -- what do you mean by that?

A. So our children were in school, and they were able to go Monday through Friday, where many schools, they were on rotating factors, whether they went twice a week or they did everything online.

There were a lot of different things done throughout the state, throughout the nation. But we were one of the largest school districts in the nation to be able to stay -- stay open, once the governor allowed it, and were able to provide that -- you know, the instruction, the in-school, you know, participation, face to face.

Q. Do you know approximately how many additional families moved into the Charleston County School District at that time who would have had students to be absorbed by CCSD?

A. I believe it was about a thousand families.

Q. And do you know approximately how many students CCSD absorbed as a result of those thousand families moving into the area?

A. In my best recollection, it was about 1,500 students.

Q. During the COVID lockdown time period, is it your understanding that the use of social media increased by students of CCSD?

MR. KEYES: Objection to form. Foundation. Asked and answered.

THE WITNESS: That is my understanding.

BY MS. HAILESELASSIE:

Q. Do you believe that the excessive use of social media by CCSD students has a negative impact on the mental health of CCSD students?

MR. KEYES: Objection to form. Foundation.

THE WITNESS: I do.

BY MS. HAILESELASSIE:
Q. Why do you believe that excessive use of social media by CCSD students has a negative impact on their mental health?
A. Excessive use is -- you know, they -- their -- many of them don't sleep well. They -- you know, they will try to live up to the standards that they see other people that are posting. They -- you know, they -- they just feel more isolated, and they can't live up to the standards that they need to, and that they're not as well liked, you know, at the school, in society. They're not as important.
Q. Do you believe that excessive use of social media by CCSD students has a negative impact on the physical health of those students?
A. Yes. I do.
Q. Okay. And why do you believe that excessive use of social media by CCSD students has a negative impact on their health?
A. So these are students that we'll see in the clinic quite frequently, that complain of headaches, needing to rest, take rest periods because they didn't sleep well the night before. Many of them, you know, will -- will state that, you know, that they were on their phone, and nurses try to

educate the kids at that point how important a good night's sleep is.

Q. Have you experienced an increase in CCSD students' self-harming within the past decade?

A. Unfortunately, yes.

Q. And do you have any -- any sense of what that increase in student self-harm is attributable to?

MR. KEYES: Objection. Form. Foundation.

THE WITNESS: What we see is -- especially with our -- our kids, normally females that cut, that it's a means of being able to control situations. It's -- it's putting the control back into their hands.

BY MS. HAILESELASSIE:

Q. And do you have any -- any idea why -- why it has increased the way it has over the past ten years?

A. It would be my belief that -- again, that it is passed through social media and, you know, by word of mouth, that, you know, this -- this helps if you do this; that it will help you gain control of your life.

Q. Thank you, Ms. Nitz. I have no further questions for you. I do thank you for your time. I

realize you're here on a school day, so thank you very much for taking the time to testify today.

A. Certainly.

MR. KEYES: I have no questions, Ms. Nitz. Thank you for your time.

Does anyone on the Zoom have questions?

MR. KARP: Nothing for Snap.

VIDEOGRAPHER: Before we go off the record, the total time for the Defendants is 1 hour and 42 minutes, and for the Plaintiffs, 9 minutes.

That ends this deposition. The time is 12:12 p.m.

(Time Noted: 12:12 p.m.)

CERTIFICATE OF REPORTER

I, Karen K. Kidwell, Registered Merit Reporter and Notary Public for the State of South Carolina at Large, do hereby certify:

That the foregoing deposition was taken remotely before me on the date and at the time stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand this 7th day of April, 2025.

Karen K. Kidwell

________________________________

Karen K. Kidwell,
Registered Merit Reporter
Notary Public
State of South Carolina at Large
My Commission expires:
June 17, 2034

ERRATA for ASSIGNMENT #7276753 (Fact)

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.

___ The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure, any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page No._____Line No._____Change to_________________

___________________________________________________

Reason for change__________________________________

Page No._____Line No._____Change to_________________

___________________________________________________

Reason for change__________________________________

Page No._____Line No._____Change to_________________

___________________________________________________

Reason for change__________________________________

Page No._____Line No._____Change to_________________

___________________________________________________

Reason for change__________________________________

Page No._____Line No._____Change to_________________

___________________________________________________

Reason for change__________________________________

Page No._____Line No._____Change to_________________
___________________________________________________
Reason for change___________________________________
Page No._____Line No._____Change to_________________
__________________________________________________
Reason for change___________________________________
Page No._____Line No._____Change to_________________
___________________________________________________
Reason for change___________________________________
Page No._____Line No._____Change to_________________
___________________________________________________
Reason for change___________________________________
Page No._____Line No._____Change to_________________
___________________________________________________
Reason for change___________________________________
Page No._____Line No._____Change to_________________
___________________________________________________
Reason for change___________________________________

______________________________

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this____day of
____________, 20__.

_________________________________

NOTARY PUBLIC

My Commission Expires:___________

**&**

**&** 2:14,21 3:3 3:11 5:24

**0**

**04659** 1:8

**1**

**1** 4:13 36:24,25 66:14 97:4 102:10 103:7
**1,100** 63:23 64:20
**1,500** 99:11
**100** 47:6 68:10 72:23
**10022** 2:23
**10:07** 58:23,24
**110** 3:12
**11:03** 58:25 59:2
**11:44** 94:14,15
**12:02** 94:16,18
**12:12** 102:13 102:14
**15** 20:25
**16** 62:19
**17** 62:19 103:25
**19** 52:3 53:1,18 54:13 55:2,8 55:12,16,24 56:5,12,17,23 57:3,14,15,25 58:4,12,14 67:15,18 68:1 68:5,22

**2**

**2** 4:15 60:11,12 61:15 62:5 77:22 96:19
**20** 13:22,23 105:22
**20024** 3:6
**2003** 75:25
**2007** 7:5 18:23 75:25
**2010** 78:14
**2017** 62:19
**2019** 37:20,23
**202.434.5584** 3:7
**2020** 96:24 97:3,9
**2020-2021** 18:3 18:15 19:6
**2020-21** 61:6
**2021** 97:3,9,20
**2021-2022** 61:6
**2022** 97:20
**2022-2023** 61:6
**2023-2024** 61:7 96:25
**2024** 13:15
**2025** 1:15 5:2,6 103:20
**2034** 103:25
**21** 13:23,23
**212.341.7593** 2:23
**21954** 103:21
**22** 13:23,23
**23** 13:17,23,23
**24** 13:17,19,23 85:14
**25** 13:19
**2555** 2:16
**28** 2:7
**29464** 2:8

**3**

**30** 23:8 53:17 104:6
**3047** 1:4
**312.764.6921** 3:13
**3180** 6:21
**34** 85:14
**35,000** 52:13
**360** 32:17
**37** 4:13
**3800** 3:12

**4**

**4** 1:15 5:2
**40** 6:5
**42** 102:10
**4:22** 1:4
**4:23** 1:8
**4th** 5:6

**5**

**5** 4:4
**50,000** 51:16

**6**

**6** 23:8
**6,000** 51:18
**60** 4:15
**601** 2:22
**60606** 3:13
**64108** 2:17
**680** 3:6
**6th** 88:4,6,14

**7**

**7** 104:6
**7276753** 1:23 104:1
**7490008-010** 4:14
**749008** 37:4
**749010** 37:4
**749011** 4:17 60:16 96:21
**7th** 88:14 103:20

**8**

**80** 11:4
**816.559.4086** 2:17
**843.216.9670** 2:8
**8th** 76:4 88:4,6 88:14

**9**

**9** 102:11
**90** 66:5
**94** 4:5
**9:06** 1:17 5:7

**a**

**a.m.** 1:17 5:7 58:23,24,25 59:2 94:14,15
**ability** 103:16
**able** 11:5,5,16 14:19 16:4 23:16,20,24 24:21,21 28:3 29:1 30:19 38:14 42:21 47:13 49:14,22 52:14,16 64:8 64:10,16 73:16 74:9 91:13 98:9,13,16,22 98:23 101:12
**abroad** 91:2
**absolutely** 32:22
**absorbed** 99:4 99:8
**academic** 16:7
**acceptable** 54:5
**access** 15:8 17:13 18:2 69:8,16,21 70:2,5,9,12,15 70:25 71:6,11 71:17 73:15 74:9 75:2,11 87:19 88:8 89:4,15 90:5,8 90:9 93:22 97:14
**account** 83:14 83:17 87:1,6 87:10 90:25 91:8,16,22 92:5,11,15,16 93:17,21
**accounts** 86:20 90:22 93:6
**accurate** 37:10 37:14 66:25 74:7,11 96:25 103:13
**accurately** 7:19
**achieve** 16:7
**acquire** 63:15
**action** 50:25 94:25
**active** 51:23 65:8,8,15 67:3
**activities** 73:17 74:11 75:4,13
**actually** 24:24 37:16 50:17 60:21 63:6,7,9 78:23
**add** 37:15
**added** 11:15 38:15,19 63:25
**addicted** 82:10
**addiction** 1:3 5:9 81:24 82:5 82:13,15 83:3
**additional** 14:18 42:23 99:2 104:9
**address** 6:4,8 6:14,19,20 49:14 65:10 67:2
**addresses** 6:17
**addressing** 48:14
**administered** 43:13,17 47:2
**administration** 40:14 75:1
**administrators** 50:25
**adolescent** 1:3 5:9
**adopted** 63:8
**adopting** 75:10
**adults** 54:21
**advise** 41:23
**advocated** 73:14,19 74:8
**aed** 49:11
**affects** 15:17,22
**afternoon** 43:24
**age** 76:1 85:12 87:24
**aggregates** 15:11
**ago** 38:13,13,16 41:12 48:22,23 49:5
**agree** 54:12,19
**ahead** 10:22 22:3 52:16 64:20
**akeyes** 3:4
**al** 1:8
**albuterol** 43:13
**allergies** 49:10
**allow** 69:10
**allowed** 98:23
**allows** 69:7
**alphabet** 3:2
**altered** 45:21 47:17 50:18,24
**aluminum** 64:13
**andrew** 2:21 3:4 5:22
**andrew.karp** 2:22
**andy** 26:7 42:20 57:19 59:6
**answer** 16:2,23 23:5,6,11 41:5 41:8 43:2,3 50:4 71:9

73:25 85:19
**answered** 68:15 69:4,18 69:24 73:5 75:7 80:15 99:16
**answering** 41:1 41:7
**anxiety** 10:23 10:24 17:22 27:3,7,14 28:2 28:13,13,15,19 29:5,8,18,25 40:10 53:19 54:7 55:7,8,23 58:4 59:15 79:18 95:10,14 95:24 96:11
**anybody** 96:8
**anytime** 24:19 48:11
**apologize** 60:3 60:6
**appeals** 79:24
**appearances** 2:1 3:1
**applied** 37:7,18 54:23
**apply** 54:21,22
**applying** 38:4,7
**appropriate** 90:11
**approximately** 99:1,7
**april** 1:15 5:2,6 103:20
**area** 99:9
**arm** 22:4
**asked** 6:15 24:14,16 27:6 27:13 29:18 38:1,20 48:8 55:7,20 60:22 68:15 69:3,17 69:23 73:5 75:1,7 80:15 99:16
**asking** 42:17 49:25 74:24
**aspect** 96:6
**aspects** 73:7
**assess** 50:17 83:11
**assignment** 104:1
**assist** 104:9
**assume** 14:14
**asthma** 10:21 40:18 42:12
**attach** 104:10
**attached** 53:25
**attack** 40:18
**attorney** 5:23 16:22 24:8
**attorneys** 8:8
**attributable** 101:7
**attribute** 98:5
**autism** 61:23 61:23
**available** 14:23 15:2 22:4 48:15 52:15 78:4
**avenue** 2:22
**aware** 7:11 35:7 44:4,25 45:23 52:10 60:8 67:24 68:3,20 70:4,7 70:14 82:11 86:18
**aways** 19:11

**b**

**b** 4:11 23:8
**back** 16:6 43:15 59:1,7 62:2 78:14 94:17 101:14
**background** 82:14 83:9
**bacon** 2:14
**based** 20:17 21:14 54:11,25 54:25 61:3 79:16 89:6
**basis** 53:23 66:18
**bates** 4:14,17 37:3 60:15
96:21
**beginning** 96:24
**behalf** 23:9
**behavior** 45:21 47:17 50:18,24
**belief** 46:9 58:10 71:10,14 101:19
**believe** 22:12 46:2 53:9,10 54:23 65:20 70:18 71:7 72:12,15,22 78:13 86:23 89:6 91:11,25 96:13 99:5,19 100:2,13,17
**benadryl** 35:21
**best** 9:17 27:1 48:23 60:6 88:25 91:19 92:4 99:10 103:16
**bevill** 1:14 4:3 4:13 5:18 6:3
**big** 21:9 71:16
**bigger** 48:19
**biological** 85:9
**birth** 25:20
**bit** 78:7
**bleed** 62:7,8,15 62:20 63:15,22 64:1,3,5,10,18

64:23 65:7,9 65:11 66:1,6,8 66:10,21 67:1 67:6
**bleeding** 62:11 64:7 67:2
**block** 70:8,11 70:15,25 71:6 89:4
**blocked** 71:11 71:18
**body** 27:17 28:21 29:13 56:18 58:5 95:19,25 96:11
**boeing** 78:1,12 78:16,20,22 79:3
**boulevard** 2:7 2:16 6:22
**bpander** 2:7
**break** 10:25 13:16 36:17 57:20,22 58:21 59:4 60:9 94:12
**breathing** 42:11 43:12
**brett** 2:6
**bridgeside** 2:7
**briefly** 51:25
**bring** 36:13,20 78:10
**broken** 30:3
**bsn** 4:13
**budgeting** 77:5
**build** 82:24
**buildings** 76:17
**built** 64:21
**burns** 22:7
**busy** 12:11
**bytedance** 3:9 3:9

**c**

**c** 5:3
**california** 1:1 5:12
**call** 13:9 16:22 35:17
**called** 13:5 17:16 43:18 63:8,20 64:12
**calls** 40:20
**campus** 16:4 49:2
**capture** 10:22
**captures** 10:17
**cardiac** 49:6,11
**care** 16:6 28:7 66:16 73:7
**carolina** 1:16 2:8 5:1,14 11:10 14:6,9 14:10,15 15:10 53:14 63:12 65:16 103:3,24
**case** 1:8 5:25 8:13 9:22 39:6 41:3 59:25 72:3,7,11,14
**cases** 52:13
**categorized** 61:25
**cauley** 2:4
**cause** 103:18
**caused** 57:15 57:25
**ccsd** 4:14,16,17 22:9,19,25 29:25 30:20 31:21 32:3 33:7 37:4 45:24 46:23 47:17,21 48:18 49:15,25 50:1 50:9,15 53:3 60:16 62:14 63:1,4,14 64:18 66:25 67:5,14,17,17 69:15,16,22 70:3,6,8,11,15 70:24 74:25 75:18 76:6,9 76:12 77:6,18 77:24 78:11 79:6 80:1,19 80:25 81:5,23 82:4,9 95:11 95:16 96:12 99:4,8,14,20,21 100:3,14,18 101:3
**ccsd's** 59:4 60:9 68:21 69:7 73:15 74:8 75:1 77:2 79:9 79:12 80:12 86:11,16
**cell** 87:19
**certain** 63:21
**certainly** 57:14 102:3
**certificate** 103:1
**certify** 103:4,17 104:2
**challenge** 21:18 21:25 22:2,6 22:10,16,20 23:1 30:21,24 31:4,16,22 32:4,9,20 33:8 34:7,17,18,19 35:9,10
**challenges** 19:23 21:6 35:15,18
**challenging** 51:20
**change** 73:14 74:8 75:1 104:11,13,14 104:16,17,19

104:20,22,23 104:25 105:1,3 105:4,6,7,9,10 105:12,13,15 105:16,18
**changed** 11:14 52:10
**changes** 104:4 104:5,7
**channel** 86:11 86:17
**chapter** 78:25
**characterize** 51:4
**charleston** 1:7 6:22,23 7:4,8 8:12 11:20 14:22 16:11 18:14 22:13 32:6 35:15 38:5 44:11 48:3 52:2 67:24 68:4 78:18,25 95:2 98:8 99:2
**chart** 4:16 61:1 61:11 97:10,25
**check** 28:14
**checked** 27:2
**chicago** 3:13
**child** 23:12 34:20 50:23 53:13 91:1
**children** 10:10 19:16 22:3,9 45:10 51:16 52:17 54:7 85:8,9,13 90:12 98:15
**children's** 75:21
**choke** 31:18
**choked** 33:14 33:19
**choking** 20:6 20:12 31:10,16 31:21 32:4,8 32:20 33:8,23 34:7,18,19,23 35:10,16
**choose** 27:21 29:2
**chose** 27:10
**christ** 75:21
**chronic** 86:14
**city** 2:17
**civil** 104:7
**clarification** 59:8
**clarify** 60:7
**class** 26:2 43:15
**classroom** 43:16 64:1 74:19
**classrooms** 16:6
**clear** 16:8 38:6 43:20
**client** 16:22 24:8
**clinic** 25:22 42:12 43:12 74:20 100:21
**clinics** 10:19 19:25 23:13 81:9
**coaching** 43:2
**code** 43:19
**codes** 27:21
**collaborate** 78:2,20 82:17 82:21
**collaborated** 63:6
**colleague** 27:6 27:13
**colleagues** 40:13
**collected** 77:24
**column** 97:2,4 97:20
**come** 22:7 74:15 82:9
**comes** 10:6 23:12 28:6,10
**comment** 39:18 39:23,25 40:3
**commented** 39:17
**comments** 26:1 28:24
**commission** 103:24 105:25
**committee** 79:23
**common** 21:3 21:25 24:20 25:9,13 26:20
**community** 51:24 53:4
**compile** 11:5 13:3
**compiled** 14:1 18:13 81:13,17
**compiles** 13:6
**complain** 100:21
**complained** 42:11
**complaining** 28:12 43:12
**complaint** 28:10 39:15
**complete** 12:15 103:13
**completed** 12:23
**completely** 38:9 74:5
**composite** 15:9
**compulsive** 27:15 28:20 29:9

**concern** 21:3 21:25 28:10 31:13 48:5,8,9 48:19 82:12
**concerned** 35:23 48:24 49:5
**concerns** 42:24 43:5 48:12 74:21
**condition** 77:19 77:25 79:7,13
**conditions** 80:13,21
**conducted** 18:3
**conference** 41:12,25 42:18
**confidential** 4:14,17
**congratulations** 85:11 94:9
**connection** 38:3 39:16 66:7 79:10,13 80:1,12,19 82:4
**connolly** 3:3 5:24
**consent** 52:17
**consequence** 33:5
**consolidated** 15:1
**consultant** 14:6 14:7
**consulted** 75:14
**contact** 6:13 52:7
**contain** 97:3
**content** 38:15 86:10,16 89:7 90:4 93:22
**continued** 3:1
**continues** 17:22
**continuously** 7:7
**control** 101:12 101:13,22
**controls** 88:18 88:19,22 89:3
**copy** 37:2 60:14
**coricidin** 35:20
**correct** 7:6 8:10 11:12 12:1,21 14:16 16:12,13,16,17 17:5,7 21:16 28:8 29:12,14 29:16 31:11 37:18 39:22 41:13 42:8,15 44:18,19,23 45:4,5 52:9 53:2 58:3,9 59:22 61:2,8 61:12 63:13 65:12,24 68:19 69:16,19 73:22 74:3 81:22 83:4,6,7 85:21 88:9 89:11,24 90:19,21 92:9 92:10,13,16,18 92:22,24 93:24 97:1
**corrections** 104:9
**corresponding** 60:24
**counsel** 37:2 59:4 60:9,14 103:18
**counselor** 76:6 76:9
**counselors** 68:24 76:14 82:20
**counter** 35:20
**county** 1:7 6:24 7:5,8 8:12 11:20 14:22 16:11 18:14 22:13 32:6 35:15 38:5 44:11 48:3 52:2 67:25 68:4 95:2 98:8 99:2
**couple** 38:12,16
**course** 6:12 13:17 18:9 25:19 52:10 55:1 61:18 74:15
**court** 1:1 5:11 5:16
**courtroom** 7:15
**covered** 41:11 41:25
**covid** 51:20 52:3 53:1,18 54:13 55:2,8 55:12,16,24 56:5,12,17,23 57:3,14,15,25 58:4,12,14 67:15,18 68:1 68:5,22 95:9 95:13,19,24 97:13 98:5 99:12
**create** 62:23 63:1
**created** 60:21 86:10,13
**crisis** 76:13,16 76:22
**crr** 1:22
**current** 7:1 71:10
**currently** 40:24

**curriculum** 62:21,23 63:1 63:4,16
**cut** 101:11
**cv** 1:8 38:1

**d**

**d** 4:1 5:3 14:8,8
**daily** 66:18
**daniel** 3:5
**data** 10:18 11:16 13:1 14:2,16 15:16 15:21 16:14 18:14 24:19 30:8 59:20,24 60:23 61:9,14 62:4 77:11,16 77:24 78:21 79:2,6,21 80:18
**database** 27:23
**date** 5:6 9:7 25:19,20 78:15 103:6
**dates** 74:22,24
**day** 53:17 89:10,15 102:1 103:20 105:21
**days** 41:12 98:10
**dc** 3:6
**dead** 43:23
**deaths** 44:14
**decade** 101:4
**decided** 64:19
**decides** 11:10
**decision** 64:17 79:24
**declared** 43:19 43:23 44:22
**declined** 43:16
**defecate** 34:20
**defendant** 2:20 39:6 72:3,7,21
**defendant's** 40:2
**defendants** 2:11 3:2,9 5:25 59:24 72:10,14 72:25 73:11 102:9
**defense** 6:8
**defiance** 27:16 28:21 29:11 56:13 58:5
**define** 45:20
**defined** 90:11
**definitely** 69:13
**department** 14:11,11 63:19 68:8,21 77:3,6
**depaz** 2:14
**depend** 28:24
**deponent** 5:15 103:7,10,14
**deponent's** 105:19
**deposition** 1:13 5:8,13 7:22 9:25 10:7 16:9 16:20 17:4 19:13 36:13,21 102:12 103:5 103:13 104:8
**depression** 27:4,14 28:20 29:7 54:7 55:23,24 58:4 95:15,24 96:11
**describe** 51:25
**described** 61:4
**description** 4:12
**desire** 104:7
**desktop** 17:14
**details** 35:6
**determine** 22:24
**develop** 63:14
**device** 87:20 88:23 89:10,15 89:22
**devices** 70:12 70:16 71:1,12 71:19 73:16 74:10 75:3,12 89:4
**dhec** 52:4 63:20
**dhec's** 65:20
**diabetic** 75:14
**diabetics** 10:20
**diagnose** 82:15 83:2,11
**diagnosed** 57:8
**died** 44:17,17
**difference** 48:7 48:9
**different** 10:25 15:16,21 19:23 21:6 28:22,23 35:19,21 47:25 61:19 85:4 98:19
**difficulty** 42:11 43:12
**dilated** 50:20
**directly** 52:4
**director** 7:1 11:8 18:19,21 18:25 21:22 37:7,19,20 38:8,17 51:4 52:1,5,6 65:3
**disagree** 54:11
**disciplinary** 33:4
**discipline** 32:17
**disclose** 41:19
**disclosing** 41:17

**discontinue** 72:7 73:2
**discovery** 41:2 43:6
**discuss** 16:20 17:1,8
**discussed** 60:20 70:19,22
**discussions** 70:24 74:14
**disease** 52:6
**disorder** 27:15 27:18 28:21 60:23 61:21
**disorders** 10:24 29:15 56:24 58:6 95:20,25 96:12 97:4,22
**district** 1:1,1,7 5:11,12 6:24 7:5,9 8:12 10:10,20 11:20 13:4 14:15,22 16:11 18:12,15 22:13,23 23:9 32:7 35:16 38:5 44:11 48:3 52:2 53:16 63:24 64:23 65:6 67:25 68:4 70:12,16 71:1 71:12,19 95:2 99:3
**district's** 70:9 70:16 71:1,12 71:18
**districts** 15:1 15:12,17 16:15 98:21
**divulge** 16:24 40:21
**doc** 17:12
**document** 1:6 4:25 12:20 13:5 26:9 39:3 59:5 60:10,16 60:21 96:22
**documentation** 23:15
**documented** 39:11
**documents** 8:25 9:18 10:6 16:10 36:20
**doing** 20:21 36:2
**doses** 43:18
**doubled** 98:1
**dozens** 67:9
**dr** 78:24
**drafting** 75:10
**dressing** 64:9 64:12,13
**drive** 3:12 13:13 17:15
**drop** 34:20
**drug** 45:21 47:9 49:18,24 50:4,5
**drugs** 50:9,12 50:16
**due** 98:8,12
**duly** 5:19 103:8
**dwhiteley** 3:5
**dying** 45:1
**dysmorphia** 95:20,25 96:12

**e**

**e** 4:1,11 5:3,3 104:6
**earlier** 9:19 60:20 61:4 96:22
**easily** 67:10
**eastern** 1:17
**easy** 51:2,5
**eating** 27:18 28:21 29:15 56:24 58:6 95:20,25 96:12
**ed** 14:11
**edit** 38:2
**edited** 37:24 38:4
**educate** 101:1
**educated** 68:12 68:13
**educational** 14:18
**educator** 37:22
**either** 35:7 46:25 53:15 63:14 70:15,25 71:11,18 73:1 80:19
**electronic** 23:13,14 25:6 26:23 27:8 28:4 38:21 39:13 55:21 73:16 74:10 75:3,12 81:19
**electronically** 12:16
**elementary** 6:20 45:19,22 47:18
**ellen** 1:14 4:3 4:13 5:15,18 6:3
**elliot** 2:13
**ellis** 2:21
**else's** 19:2
**emergencies** 44:13
**emergency** 49:6
**emergent** 62:8
**employed** 7:4,7
**employee** 6:23 14:9
**emr** 23:25

**ems** 46:20 47:14
**enabled** 88:20 88:23 89:3
**ended** 27:16 37:23
**ends** 102:12
**entered** 104:8
**entertainment** 84:14
**entire** 37:13 61:20 63:23
**entitled** 26:13
**eoy** 4:16 17:18
**epinephrine** 49:10
**errata** 104:1
**especially** 101:10
**esq** 2:3,4,5,6,14 2:15,21 3:4,5 3:11
**et** 1:8
**events** 103:19
**everyone's** 52:10
**exacerbate** 53:19
**exact** 4:24 18:24 21:20 78:15
**exactly** 20:15 34:4
**examination** 4:2 5:20 94:22 103:11,15
**excel** 13:1
**except** 30:4 50:23
**excessive** 99:19 100:2,5,13,18
**exemption** 53:14,15,15,17
**exhibit** 3:18 4:13,15 36:24 36:25 37:5 60:11,12 61:15 62:5 77:22 96:19
**exhibited** 17:22
**exhibits** 4:21
**expect** 90:13
**expected** 90:12
**expenditures** 79:9,12 80:12
**experience** 34:17 35:8 53:18 54:24 55:24 56:4,12 56:17,23 57:3 58:12
**experienced** 95:10,16,20 96:1 101:3
**expertise** 82:14 82:18 83:9
**expires** 103:24 105:25
**explain** 40:16 41:20
**exposed** 10:10 19:16 57:12
**extent** 16:21 23:10 24:8 40:20,23 41:24 42:23 44:4
**extra** 11:15
**extremely** 40:12

**f**

**f** 2:11
**face** 98:9,9,13 98:13,25,25
**facebook** 2:11 2:11,11,12,12 90:25 92:15,22
**fact** 71:17 98:1 104:1
**factors** 25:18 96:10,14 98:17
**fair** 58:17,20 68:14,18,19
**fall** 88:2
**falls** 29:8
**familiar** 31:25 33:11 79:25
**families** 98:8 99:2,6,9
**far** 6:8
**feature** 72:3,7 73:2,11
**federal** 104:6
**feedback** 13:6
**feel** 26:17 66:12 74:18 100:9
**felt** 55:16 96:4 96:7
**females** 101:11
**fentanyl** 49:15 49:20 50:1,6
**ferpa** 40:22 41:11,18
**field** 25:5 26:11 39:14,18
**fields** 25:5,9,13 26:5,21
**fifth** 13:25
**files** 19:2,3,8
**fill** 11:23,24 12:8,20 28:14 81:9
**filled** 28:5 29:19
**finance** 77:6
**find** 19:9 30:19 55:21 83:1 84:12
**finish** 57:21
**fire** 20:3,11 21:1,11 22:2 22:10,19,25 30:21,23 34:17

35:9,16
**firm** 5:23 8:9
**first** 5:19 8:17 20:3 29:2 63:22 64:21 97:2,8
**fit** 61:23
**five** 11:7,14 12:24 13:21 46:3,10,16 85:9,12 98:10
**fix** 84:2,25 85:23
**follow** 53:12 90:12,14 91:1 95:8
**followers** 91:5
**following** 104:5
**follows** 5:19
**ford** 6:20
**foregoing** 103:5,12
**forgotten** 59:13 60:3
**form** 12:18 15:4,24 18:17 19:4,19 21:19 23:2 25:8,15 26:6,25 28:16 29:21 30:2,14 31:23 32:10,15 32:23 33:25 34:3,10 35:11 39:1,9 40:6 42:13 44:12,21 45:2,8,25 46:12,18,24 47:12,22 48:4 48:10,20 49:17 50:2,10 51:11 52:19 53:5,21 54:17 55:4,14 56:1,9,14,21,25 57:6 58:7,15 63:17 64:24 65:17 67:20 70:17 71:2,13 71:20 73:4,18 73:24 75:6 80:2,14,22 82:1,6,16 83:18 86:1,21 88:15,24 89:5 89:12,16 90:15 90:23 91:9,17 91:23 92:7,12 92:17,23 93:4 93:11,18,25 96:2,15 97:16 98:6 99:15,22 101:9 104:7,9
**forward** 15:18 15:23
**found** 35:4
**foundation** 96:3 99:16,23 101:9
**four** 13:24 16:9 17:19 19:12 61:3,10 62:3
**frame** 18:25 21:21 22:1
**free** 26:17 51:2 51:9,13
**freely** 54:16
**frequency** 77:8
**frequently** 100:21
**freshman** 40:17 42:7 43:11
**friday** 1:15 5:2 98:16
**front** 46:2 77:22 96:19
**frontline** 23:25 24:3,4,5 25:1 28:9,11 29:18 30:9 38:20 39:5 40:3 55:20 59:12,21 81:21
**full** 6:1
**function** 72:4,8 73:2,11 77:6
**funded** 14:10
**funding** 14:19 15:17,22
**furnish** 104:10
**further** 50:25 94:19 101:24 103:17

**g**

**g** 5:3
**gain** 101:22
**gait** 50:21
**gauze** 64:7
**general** 28:1
**generate** 25:7
**generating** 40:5
**gi** 25:22
**give** 23:24 25:21 37:2 60:5,14
**given** 9:22 26:12 40:1,14 104:8
**giving** 7:14
**global** 28:1 29:5,6
**gloves** 64:6
**gmaiden** 2:6
**go** 10:22 11:1 12:19 17:15 22:3,7 24:5,11 25:24 29:18 50:24 52:16 55:11 61:18 66:18,24 67:4 76:19 84:14 98:16 102:8
**goes** 29:10 64:14

**going** 15:18,23 21:7 37:11 52:21 57:19 58:22 59:1 85:10 94:13,17
**good** 5:22 53:11 101:1
**google** 3:2 5:24 10:8 12:18,19 13:13 16:10 17:12,15 19:16 20:12 31:10 72:16,24 84:12 84:17
**googling** 19:23 20:2,21 35:8 36:2 84:18
**government** 15:10
**governor** 98:23
**grade** 76:4 88:4 88:6,14
**graham** 2:5
**grand** 2:16
**grandchild** 93:22 94:5
**grandkids** 94:3
**grandson** 93:13
**ground** 34:20
**grounds** 45:1,7 73:17 74:10 75:4,12
**group** 8:7 9:4 59:14 70:19 74:14
**groupings** 10:25
**growing** 17:23
**guess** 68:12,13 71:21
**guessing** 68:9
**guidance** 52:9 68:24

**h**

**h** 4:11
**haileselassie** 2:3 4:5 6:6 15:4,24 16:21 18:17 19:4,7 19:19 21:19 23:2,6 24:7 25:8,15 26:6 26:25 28:16 29:21 30:2,14 31:23 32:10,15 32:23 33:25 34:3,10 35:11 36:16 39:1,9 40:6,19 41:6 41:22 42:2,13 42:20 43:3 44:1,12,21 45:2,8,25 46:12,18,24 47:12,22 48:4 48:10,20 49:17 50:2,10 51:7 51:10 52:19 53:5,21 54:17 55:4,14 56:1,6 56:9,14,21,25 57:6,9,19 58:7 58:15,18 59:6 63:17 64:24 65:17 67:20 68:15 69:3,17 69:23 70:17 71:2,13,20 73:4,18,24 74:12 75:6 80:2,14,22 82:1,6,16 83:18,25 84:9 84:20 85:1,17 86:1,21 87:2,7 87:13,21 88:15 88:24 89:5,12 89:16,23 90:6 90:15,23 91:9 91:17,23 92:7 92:12,17,23 93:4,11,18,25 94:23,24 96:9 96:17 97:19 98:11 99:18 100:1 101:15
**half** 14:10,11
**hallways** 43:21
**hand** 103:20
**hands** 101:14
**happened** 40:14,16 41:20 44:10 45:13,16 45:19 97:13
**hardy** 2:14
**harm** 53:11 101:7
**harming** 101:4
**headache** 25:22
**headaches** 100:22
**healey** 24:16,17 24:22 27:6,13
**health** 4:16 14:11 16:6 23:18 24:1,2,4 24:5 26:24 27:3 38:22 48:12 54:1,2 54:14,16 55:3 55:11,12,22 60:23 61:21,24 61:25 63:19 66:16 76:8,11 76:14,23 77:19 77:25 78:4,9 79:7,13 80:13 80:20 81:1,3,6 81:12 82:20 96:24 97:4,22 99:21 100:4,15 100:19
**heard** 5:10 19:24 21:3

31:14 57:14 70:21
**help** 63:10 64:9 76:20 83:1 87:10 101:22
**helpful** 11:16
**helps** 14:18 76:24 101:21
**hemostatic** 64:7
**hey** 21:7
**high** 35:19 40:15,17 42:7 43:11 45:13,24 67:11 78:8 87:1,11,24 88:3,10
**highly** 65:4,6
**hipaa** 40:22 41:11,18
**holdings** 2:11
**home** 6:4,8,13 26:3 52:8
**homebound** 79:16,19,23
**honest** 86:15
**hopefully** 14:19
**hospital** 43:23 44:17,23
**hour** 8:24 43:15 57:20 102:10
**hourly** 52:10
**hours** 89:14
**house** 93:14
**housed** 78:23
**huffing** 35:22
**huge** 71:23
**huh** 31:3 33:1 58:1 77:23 88:12 92:6
**hundreds** 67:9 67:10,11,13

**i**

**ice** 20:4,12 21:2 21:11 22:2,5 22:10,19,25 30:21,23 34:17 35:9,16
**idea** 33:7 101:16
**identification** 36:25 60:12
**identifiers** 25:10
**identify** 26:23 38:14,21
**identifying** 25:18
**iking** 3:12
**illinois** 3:13
**illnesses** 86:14
**image** 27:17 28:21 29:13 56:18 58:5
**impact** 95:9,14 95:19,24 96:11 99:20 100:3,14 100:19
**implementing** 62:16
**importance** 16:3
**important** 100:12 101:1
**impose** 87:18 88:17 89:9,14 90:4
**imposed** 88:7
**imposing** 89:21
**incidence** 50:15
**incident** 23:17 41:13
**incidents** 10:21
**include** 39:14
**included** 59:20 60:25
**increase** 17:21 97:21 98:5 101:3,7
**increased** 99:14 101:17
**indicate** 4:24
**individual** 30:8 67:22
**infectious** 52:6
**information** 10:23 11:6 12:12 15:11 16:23,25 18:9 20:18 21:13 24:20 25:1 28:14 40:21 41:10 44:5 54:9 57:17 59:12,14 60:22 68:25 79:1
**infraction** 32:21
**initially** 63:19
**injury** 1:3 5:10 62:9
**insert** 39:21
**instagram** 2:12 91:8 92:16,22
**instance** 31:24 33:10,12,13 49:2 95:1
**instances** 46:17 47:16
**instruct** 41:8
**instruction** 98:10,13,24
**intent** 65:21
**interested** 103:19
**interrupt** 47:7
**investigation** 40:24 41:20
**investigatively** 59:13
**involved** 42:7 46:10 66:18

75:9 78:8
**involvement** 18:6 75:16
**irrelevant** 41:3 43:7
**isabel** 3:11
**isolated** 96:5 100:9
**isolation** 55:15
**issue** 28:12 42:12 47:24 48:3,8,8,18 49:15,19,25 50:1,9
**issued** 70:12,16 71:1,12,19
**issues** 23:18 24:2 26:24 27:3 38:22 43:16 54:1,2 54:14,16 55:3 55:12,12,22 56:18 58:5,13 59:15
**item** 42:22
**items** 25:17

**j**

**j** 3:4
**jade** 2:3 8:5,8 8:15,20 9:1 23:24 43:2 94:24
**jan** 78:24
**jhaileselassie** 2:4
**job** 1:23 51:4 51:20
**judge** 7:16
**june** 103:25
**jury** 7:16 46:6 63:11

**k**

**k** 2:11 103:2,22
**kansas** 2:17
**karen** 1:22 103:2,22
**karp** 2:21 102:7
**keep** 23:14
**keeping** 52:8
**keeps** 79:1
**kept** 51:24
**key** 78:24
**keyes** 3:4 4:4 5:21,23 6:15 6:18 15:5 16:1 17:3 18:20 19:5,10,20 21:23 23:4,19 24:10 25:12 26:4,13,15 27:5 28:18 29:23 30:6,15 32:1,13,18,24 34:1,6,13 35:13 36:18,19 37:1 39:4,12 40:7 41:4,9 42:5,14 43:1,9 44:6,7,15,24 45:3,12 46:4 46:14,21 47:1 47:15 48:1,6 48:16 49:3,23 50:7,13 51:8 51:12 52:23 53:7,22 54:18 55:6,18 56:3,7 56:11,16,22 57:2,7,18,21,23 58:8,16,21 59:3,10,18 60:13 64:2 65:1,18 67:23 68:17 69:6,20 70:1,20 71:4 71:15 72:1 73:9,21 74:2 74:23 75:8 80:4,17,24 82:2,8,22 83:22 84:3,16 84:22 85:6,18 86:9,24 87:4,9 87:15 88:1,16 89:2,8,13,20 90:1,7,17 91:7 91:15,21 92:1 92:8,14,19 93:1,5,15,20 94:2,11,19 96:2,15 97:16 98:6 99:15,22 101:9 102:4
**kids** 16:5 17:22 21:5 30:25 50:11 66:16 73:8 74:15 76:25 79:17 85:3,7,24 86:19,25 87:5 87:11,19 88:13 90:2,13 91:12 92:21 93:13,16 101:1,11
**kidwell** 1:22 103:2,22
**kim** 24:16,17 27:6,13
**kind** 84:23
**king** 3:11,11 75:21
**kirkland** 2:21
**kirkland.com** 2:22
**kit** 64:1,4,5
**kits** 63:22,23 63:25 64:21 65:10,23
**knew** 57:12
**know** 15:6 18:24 19:1,24 21:5,7,20,21

22:1 23:8,10 23:16 24:1,17 24:21,25 25:5 26:16,17 30:24 31:5 32:6 34:4 34:8,14,15 35:19 40:23 47:23 48:12 49:1,2,9,19 50:11 52:8 54:4,8 57:10 58:14 62:10 65:5 66:16 68:14 69:7,11 69:12,21 70:5 71:9 72:10,19 72:20 74:13,18 76:18 80:7 82:25 84:10 86:4,12,14 92:4 96:6 98:4 98:24,24 99:1 99:7 100:5,7,9 100:11,24,24 101:20,21
**knowledge** 9:17 26:14 42:23 67:7 91:19
**knowledgeable** 68:25
**known** 32:19
**kslaw.com** 3:12

**l**

**l** 14:8
**l.l.p.** 2:14
**label** 64:16
**laced** 50:5
**ladd** 14:8,13 15:2,9
**laptop** 17:13
**large** 103:4,24
**larger** 8:7 9:4 24:19
**largest** 98:21
**law** 5:23 8:9 53:12
**lawyers** 9:11 9:15 17:6
**lead** 11:24,25 12:8,11,14 13:7 14:2 33:4
**learn** 17:20 21:14 84:1 86:8
**learned** 17:21 17:24
**learning** 54:6
**leave** 22:6 61:22
**left** 37:19
**level** 29:3 64:19 66:23
**levels** 95:10,14 95:15,19
**lexington** 2:22
**liability** 1:4 5:10
**liaison** 11:23 18:8 21:5,22 62:16
**liaisons** 12:24
**life** 49:1,8,22 66:13 101:23
**liked** 100:11
**likely** 40:8
**limit** 43:8 89:21 90:3
**limited** 45:9 49:13
**limits** 87:18 88:17 89:9,14 90:4
**line** 57:22 104:11,14,17 104:20,23 105:1,4,7,10,13 105:16
**lisa** 3:19
**list** 26:11 27:9 55:19 66:25
**listed** 26:20 28:19
**litigation** 1:4 5:10
**little** 78:7
**live** 100:7,10
**lives** 62:13
**llc** 2:3,11,12,12 2:12 3:2,2,9
**llp** 2:21 3:3,11
**located** 17:12
**lockdown** 99:12
**long** 8:22 16:24 18:21 22:6 62:14 78:11 83:16
**look** 10:8 11:1 27:10 30:22 50:18,19,20 75:24 83:24 91:3,13 97:2
**looked** 10:9 19:15 20:3,9 20:10 37:12 59:15 60:23 61:19 79:15
**looking** 19:12 19:23 40:10 59:17 64:15 97:20,25
**lookout** 21:8
**looks** 50:21
**lot** 10:17 28:24 35:23 55:16 66:13 74:20 78:3,9 79:18 85:4,10,10 98:19
**lower** 97:9

**m**

**ma'am** 26:16 41:10 60:5
**machine** 84:2
**macpherson** 6:22
**made** 14:22 15:2 25:10 55:8,12,16,24 56:5,12,17,23 63:9 72:2,6,25 103:10,15
**maiden** 2:5
**main** 39:2
**maine** 3:6
**maintained** 66:23
**majority** 78:5 88:21
**make** 21:12 48:13 49:21 52:7 58:4 59:8 63:25 69:14 74:4 75:24 76:20,25 78:10 82:20 92:2 104:7
**making** 39:15 48:25 49:9 51:23 78:8 104:8,9
**manage** 51:16
**managed** 18:11
**manager** 18:9 81:8
**managers** 79:22
**managing** 52:2
**mandara** 3:19
**mandate** 64:22
**mandatory** 52:22
**manner** 4:22
**march** 7:5
**mark** 2:13
**marked** 36:24 36:25 59:5 60:10,12
**mary** 6:20
**match** 30:10,12
**materials** 62:21 62:24 63:2,5 63:16
**matt** 2:14 3:17
**matter** 40:23
**md** 1:4
**mdepaz** 2:15
**mdl** 1:3 2:2
**mean** 26:9 36:6 48:11 49:8 57:10 62:17 68:10,11 71:21 73:7 81:8,13 84:11 91:2 93:10 98:14
**means** 78:15 101:12
**media** 1:3 5:9 31:6,7 34:12 34:14 38:23 39:16 40:2 42:3 54:4 67:15,18 68:1 68:5,22 69:2 70:3,6 77:9,14 77:15 79:10 80:20 81:24 82:4,10,13,15 83:3 90:9,22 93:3,6 96:13 99:13,20 100:3 100:14,18 101:20
**medical** 23:14 25:6 26:23 27:8 28:4 38:21 39:13 52:5 53:15 55:21 63:12 75:15 78:18,25 79:19 81:19
**medication** 46:7
**medications** 35:20
**meet** 78:19
**meeting** 8:17 8:19,23 9:1,5,9 9:12,15,19 17:2
**meetings** 70:23 78:19
**melissa** 18:18 18:23
**member** 69:15 70:2
**members** 46:5 51:18 52:15 63:11 66:4
**memory** 10:11 26:8
**mental** 4:16 23:18 24:2 26:24 27:3 38:22 54:1,2 54:14,16 55:3 55:11,12,22 60:22 61:21,24 61:25 76:8,11 76:14,23 77:19 77:25 78:3,9 79:7,13 80:13 80:20,25 81:3 81:6,11 82:20 96:23 97:4,22 99:21 100:4
**mentioned** 36:23 40:2 55:23,23
**merit** 103:2,23
**met** 7:24 8:3,5 8:5,6,15 9:4 16:6 95:5

**meta** 1:7 2:11 72:15,24
**middle** 33:13 33:17,19,20,22 45:16,17 46:23 47:11 87:6,12 88:2,5 90:3
**minute** 94:11
**minutes** 20:22 20:25 43:14 102:10,11
**mischaracteri...** 58:18
**missouri** 2:17
**modify** 72:3 73:1
**moment** 42:21
**monday** 98:16
**money** 63:14
**month** 94:6
**morning** 5:22
**motley** 2:3 3:19 5:13 8:7,9,11 9:4,12,16
**motleyrice.com** 2:4,5,6,7
**mount** 1:16 2:8 5:1,14 18:10
**mouth** 30:25 31:2 34:8,11 54:10 101:21
**moved** 99:2
**moving** 98:8 99:9
**musc** 52:5 63:6 63:9,11

**n**

**n** 4:1 5:3
**name** 5:22 6:1 25:20 40:2 94:24
**names** 9:13 39:6
**narcan** 43:18 46:3,5,7,15 47:2,7,9,10 48:15 49:11
**nation** 49:19,24 98:20,22
**nationwide** 47:23
**necessarily** 4:24
**necessary** 104:10
**need** 6:12 24:19 38:10 60:6 64:9 66:12 69:11 74:19 76:21 77:1 83:1 84:1,11 100:10
**needed** 81:9
**needing** 100:22
**needs** 16:6 78:9
**negative** 99:20 100:3,14,19
**neither** 103:17
**network** 69:7 69:16,22 70:3 70:6,9,16 71:1 71:12,18
**neurological** 50:21
**never** 52:22 73:19 74:7
**new** 2:23,23 53:16 98:7
**news** 42:18,19
**night** 37:12 74:18 100:23
**night's** 101:2
**nitz** 1:14 4:3,13 4:13,15 5:15 5:18,22 6:3 36:24,25 41:22 43:10 44:3 59:4,8 60:10 60:12 61:15 77:22 94:19,24 96:18 101:24 102:4
**nonlawyers** 8:16,20 9:8,24
**nonresponsive** 43:17
**normally** 25:16 27:10 76:24 79:17 85:4 101:11
**north** 3:12
**northern** 1:1 5:11
**notary** 103:3 103:23 105:24
**note** 4:21 23:7
**noted** 102:14 104:4,5
**notes** 36:1,4
**notify** 12:22
**number** 4:12 10:21 22:24 30:20 31:20 32:3,8 60:15 63:21 67:8 79:16 80:3,5,7 81:8,11 98:7
**numbers** 18:12 30:12 37:3 46:1 77:21 79:20 98:1
**nurse** 11:22,23 11:24,25 12:2 12:4,7,8,11,14 12:24 13:7,7 14:2,17 16:4 18:8,8 21:4 27:25 28:5,11 28:25 29:2 39:2,17,21 40:1 43:13 66:17 67:4 75:20 79:21,22 86:13

**nurses** 7:24 10:3,15,18 12:13 19:24 21:4,7 22:8,12 30:8 31:14 35:23 50:17 55:1 66:2,12 67:22 83:11 100:25
**nursing** 6:21 7:2 10:16 11:2 11:17 13:10 14:5,7 15:18 15:22 17:18 18:19,22 23:22 37:7 38:8,18 40:13 51:4 52:1 67:17

**o**

**o** 5:3
**oath** 7:11,15
**object** 6:10,13 15:4,24 16:21 18:17 19:4,19 21:19 23:2 24:7 25:8,15 26:6,8,25 28:16 29:21 30:2,14 31:23 32:10,15,23 33:25 34:3,10 35:11 39:1,9 40:6,19,20,22 40:25 41:6 42:13 44:1,12 44:21 45:2,8 45:25 46:12,18 46:24 47:12,22 48:4,10,20 49:17 50:2,10 51:7,10,11 52:19 53:5,21 54:17 55:4,14 56:1,6,9,14,21 56:25 57:6 58:15 63:17 64:24 65:17 67:20 70:17 71:2,13,20 73:4,18,24 75:6 80:22 82:1,6,16 83:18 88:24 90:15,23 91:9 91:17,23 92:12 92:17,23 93:4 93:11,18,25
**objection** 6:7 6:17 19:7 57:9 58:7 68:16 69:3,17,23 74:12 80:2,14 83:25 84:9,20 85:1,17 86:1 86:21 87:2,7 87:13,21 88:15 89:5,12,16,23 90:6 92:7 96:2 96:15 97:16 98:6 99:15,22 101:9
**objections** 103:10,15
**obligated** 60:5
**observations** 39:21
**obsessive** 27:15 28:20 29:9
**obtain** 24:21
**obviously** 38:9
**occasion** 26:2
**occasionally** 85:2 86:3 91:3
**occurred** 24:2
**ocd** 56:5 58:5
**offhand** 72:19
**office** 28:8 59:16
**oh** 28:12
**okay** 6:15 8:8 8:19,22 9:11 9:14 10:2,14 12:19,22 13:5 13:20 14:1,25 15:8,15 16:8 17:8,11,16 18:6,13 19:11 20:1,5,7,11,17 20:20 21:1,10 21:17,24 24:3 24:11 26:18,19 27:12,20 28:4 28:9,19 29:6 29:17,24 30:7 30:11,18,19,23 31:4,9,16 32:2 32:14 33:10,17 34:16,22 35:4 35:6,14 36:1,8 36:15,18 37:8 38:2,14,20 39:5,13,24 40:1,11 41:15 42:6 44:6,10 44:16,25 45:6 45:13 46:5,15 47:5,16 48:2 50:8,14 51:17 52:24 55:19 57:18 58:11,21 59:10,19 60:2 60:9 61:1,9,13 65:5,22 66:24 67:5,11 68:9 68:13,20 69:14 70:21 71:10 72:2,20,24 76:15 77:8 79:2,25 80:5,8 80:11 81:5,10 81:23 83:8,16 84:6,17,23 85:15,22 87:18 88:2,19 89:9 89:21 92:2

93:2,16 96:10 97:2 98:12 100:17
**older** 87:24
**once** 14:1 15:1 98:22
**ongoing** 41:19
**online** 98:18
**oops** 37:12
**open** 98:22
**operations** 2:12 70:23
**opioid** 46:8,10 46:16 49:11
**opioids** 47:20 47:24 48:2,18 49:4
**oppositional** 27:16 28:20 29:11 56:13 58:5
**organization** 63:7
**original** 34:22
**originate** 31:4
**outside** 41:2 43:5
**overdose** 45:24 46:10,16,22 47:10
**overdosed** 45:7
**overdoses** 47:17
**own** 66:13 82:23

**p**

**p** 2:5 5:3
**p.m.** 94:16,18 102:13,14
**pack** 64:8
**page** 4:2,12 103:7 104:11 104:14,17,20 104:23 105:1,4 105:7,10,13,16
**pages** 104:9
**pair** 64:6
**pandemic** 52:3 54:3,3 55:2 67:15,19 68:1 68:6,22
**pander** 2:6
**paper** 12:16
**paralegal** 3:19 8:18 9:10,15
**paramedics** 43:18,21
**pardon** 6:6
**parent** 90:20
**parental** 88:18 88:19,22
**parents** 54:8 57:12
**part** 12:13,14 65:22,23 74:14
**participate** 8:16 9:8,14 78:6,16,18
**participated** 9:12 22:10,15 22:19,25 30:21 31:21 32:3,8 32:20 33:8 41:12 42:18 78:11,22 79:3
**participates** 79:22,23
**participation** 98:25
**particular** 12:8 26:1 30:1 38:10 48:17 61:16 81:16 95:1
**particularly** 51:19
**partner** 78:2
**party** 103:18
**passed** 76:18 76:18 101:20
**past** 7:23 11:7 37:17 74:14 101:4,17
**patient** 25:10
**patient's** 25:20
**patients** 46:19
**pay** 63:14
**payments** 2:12
**pediatric** 52:6
**pending** 103:18
**people** 52:8 53:9,25 54:15 55:16 56:8,13 57:4,16 58:6 58:13 62:11 76:21 82:18 100:8
**percent** 47:6 66:5 68:10 72:23
**period** 7:8 21:24 35:22 41:2 43:6 52:13 59:17 97:5,13,23 98:2 99:12
**periodically** 83:24 84:7
**periods** 100:22
**personal** 1:3 5:9 35:7 66:13 73:16 74:10 75:3,11 93:13 93:19
**personally** 67:16 70:13
**perspective** 42:17
**phone** 93:14,17 93:19,23 100:25

**phones** 87:19 88:8
**physical** 73:7 100:15
**pick** 28:1,3,11
**piece** 60:4
**pinpoint** 50:20
**place** 5:13 43:20 64:9
**placing** 6:9,11
**plaintiffs** 2:2 94:25 102:10
**platform** 32:17 72:4,8 86:15
**platforms** 1:7 2:11 73:3,12 85:4
**pleasant** 1:16 2:8 5:1,14 18:10
**please** 5:16 15:19 68:2 104:9,10
**plus** 65:10
**point** 18:11 20:10 33:15 59:7 96:8 101:1
**points** 10:18 11:16 14:17
**policy** 73:15 74:8 75:2,10
**position** 7:1 38:4
**positive** 54:13
**possibility** 65:14
**possible** 43:22
**possibly** 20:25 87:8,14
**post** 91:4 93:9
**posted** 86:11 86:12,15,16
**poster** 92:20
**posting** 100:8
**potential** 55:22
**potentially** 42:11
**practice** 88:13
**preamble** 40:20 44:2 51:7,11
**preceding** 13:21
**precise** 84:18
**pregnancies** 10:22
**prekindergart...** 76:3
**prendergast** 18:18
**preparation** 7:25 8:3 38:7
**prepare** 7:21 9:25 10:6 16:19 17:4 19:12 36:8 61:13 62:3
**prepared** 15:10 37:8 61:1
**preparing** 16:8
**present** 3:16 37:17
**president** 78:24
**press** 40:11 41:12,25 42:4 42:9,16,22 43:10
**prevalence** 50:15
**prevent** 48:25
**previously** 57:5 58:13
**prior** 8:6 9:6 18:15,19,24 25:17 51:3 58:19 65:3 85:19
**privileged** 16:23 24:9
**probably** 39:3 48:22 62:18
**probe** 26:14
**problem** 47:21
**problems** 57:4 77:19,25 79:7 79:14
**procedure** 104:7
**proceed** 59:9
**produced** 37:3 59:24 60:15
**product** 24:9
**products** 1:4 5:10
**professional** 76:12,23
**program** 62:7 62:15,20 63:18 64:18,23 65:7 65:9,22,23 66:1,8,10,22 67:1,7 78:12 78:17,22 79:4 80:1
**programs** 66:16 78:4,6
**promoted** 30:24
**prompted** 65:5 65:13
**proper** 53:14
**protected** 40:22
**protocol** 63:9 66:5
**provide** 14:18 23:16,21,23 25:2 52:14 98:9,13,23
**provided** 6:16 59:5 60:10 63:21 64:20 82:3
**provider** 23:25

**providing** 52:9
**psychologists** 68:24 82:19
**public** 41:25 44:5 103:3,23 105:24
**publicized** 34:8
**publicly** 14:22 15:2
**pull** 12:12,13 13:1 22:22 27:11 59:16,20
**pulled** 59:12,14 60:21 61:20 62:2
**pulling** 30:9
**punished** 33:23
**punishment** 34:2,5
**pupils** 50:20
**purposes** 71:22 81:9
**pursuant** 104:6
**put** 10:16 13:1 22:5 27:25 54:10 61:11
**puts** 28:25
**putting** 36:6 38:17 101:13

**q**

**quarters** 52:25
**queries** 20:12 20:14,17
**query** 20:2 21:1 21:11,15 27:20
**question** 41:7 41:15,23 74:5
**questioning** 57:22
**questions** 11:11 11:13,15,19 26:14 41:1 43:8 94:20 95:8 101:25 102:4,6
**quickly** 43:22
**quite** 100:21
**quotations** 4:21
**quote** 4:24

**r**

**r** 5:3
**r.b.** 40:14,17 42:7 43:11
**ran** 20:14 21:10 24:1 31:9
**range** 85:12 88:3
**ranges** 76:1
**rapidly** 43:17
**rapport** 82:24
**reach** 43:21
**read** 4:23 20:18 104:2
**readily** 22:4
**realize** 102:1
**really** 20:8 28:24 40:25 41:6 43:8 67:12,21 73:6 81:8
**reason** 7:18 21:10 25:21 31:12 61:16,17 65:11 84:8 98:4 104:13,16 104:19,22,25 105:3,6,9,12,15 105:18
**reasons** 6:11 95:23 97:7,12 104:8
**recall** 42:21 95:11,13,16,18 95:21
**receive** 14:2
**received** 13:7 15:8 63:7 67:6
**recess** 58:24 94:15
**recognize** 51:1
**recollect** 35:25 47:6
**recollection** 21:16 27:2 48:23 60:6 87:16,17 89:1 99:10
**recommend** 65:6
**recommended** 65:4
**record** 4:23 5:5 6:2,10,11,14 58:22 59:1,7,9 94:13,17 102:9 103:14
**recorded** 34:25 35:1 103:11
**records** 22:18 22:21,23 23:14 25:6 26:7,23 27:8,11 28:5 30:20 31:20 32:2,7,14 38:21 39:13 50:14 55:21 66:20 80:9 81:10,14,16,18 81:20
**recover** 43:14
**redacted** 25:17
**reduced** 54:15
**refer** 10:14 42:16 85:7 86:5
**reference** 40:9
**referenced** 33:10
**referral** 82:3
**referring** 8:19 85:8

**reflect** 30:8,20
**reflected** 4:22
**refresh** 10:11
**regarding** 35:9 73:15 74:8 75:2,10
**regards** 5:8 60:19
**regional** 52:5
**registered** 103:2,23
**regular** 92:20
**related** 10:21 23:18 26:24 28:15 38:22 47:9 103:17
**relates** 1:6
**relating** 55:22
**release** 42:4,9 42:16,22
**relevancy** 83:19 86:2,22 89:17 90:24 91:10,18,24 94:1
**religious** 53:15
**remain** 43:20
**remember** 9:6 9:13 20:9,11 20:15 29:24 31:13 35:14 89:21
**remembered** 20:19
**remotely** 103:6
**repeat** 15:19 68:2
**report** 24:1,6 24:12,13,14,18 24:22 25:2,7 38:21 39:15 40:5
**reported** 1:22 15:16,21 31:6 57:13
**reporter** 5:16 103:1,2,23
**reporter's** 4:21
**reports** 40:11 43:11 77:15
**represent** 5:24 94:25 95:1
**representation** 42:25
**representative** 73:10
**represented** 97:10
**representing** 8:12
**request** 66:4 72:2,6 73:1
**requested** 23:25 24:23 70:8,11,14
**required** 23:9 26:10
**resistance** 52:18,21,25 53:3,8
**resources** 83:1
**respect** 90:16
**respond** 41:23
**response** 41:24 49:6,12 50:21 52:3 62:9,11
**rest** 100:22,22
**resting** 74:20
**restrict** 87:19
**restrictions** 88:7
**result** 70:24 99:8
**results** 4:16 14:14,21 60:24 96:23
**resume** 4:14
**return** 26:2
**reveal** 16:22
**reverse** 46:7 47:10
**reversing** 46:16
**review** 8:25 9:18,21 10:2,5 16:14 17:19 61:3
**reviewed** 7:23 15:1 16:9,18 35:1 61:9
**reviewing** 17:25 20:23 36:5
**rice** 2:3 3:19 5:14 8:7,9,11 9:4,12,16
**right** 8:24 13:24 17:14 19:17 21:12 30:16 42:6,19 43:25 44:8 49:21 55:9 64:15 65:19 72:19 75:24 88:5
**rights** 63:15
**risk** 65:14 78:8
**rivers** 2:4
**rmr** 1:22
**rn** 4:13
**role** 51:23 52:1
**roll** 63:21,23
**roper** 37:19,19
**rosica** 3:18
**rotating** 98:17
**roughly** 46:9 46:16 67:7
**rule** 104:6
**rules** 32:25 104:6
**run** 20:2 21:1 24:11,12,14,18 24:22 25:1,3 27:7,14,20,22 27:24 38:20 39:5 40:4

55:21
**running** 20:11
**résumé** 36:22 36:23 37:6,25 38:2,6 75:24

**s**

**s** 2:15 4:11 5:3
**safe** 51:24
**salt** 22:3,4
**save** 49:1,22 62:12
**saving** 49:8
**saw** 35:2,23
**saying** 53:23
**scenario** 85:25
**school** 1:7 6:21 6:24 7:5,9 8:12 11:19,20,23,25 12:2,8,23 13:8 13:16,18,21 14:15,17,22 15:12,16 16:4 16:11,15 18:4 18:7,15,16 19:6 21:7 22:13 25:19 28:6 32:7 33:17,19,20,22 35:15 38:5 40:15,17 42:7 43:11,19 44:11 44:17 45:1,7 45:14,16,17,19 45:22,24 46:23 47:11 48:3 49:13 50:17 52:2 61:7 64:22 65:6 66:17,23 67:4 67:25 68:4 73:17,17,23 74:10,11 75:4 75:4,12,12,21 76:2,5,17 78:9 78:25 82:19 87:1,6,11,12,24 88:2,3,6,10 90:3 95:2 96:6 96:24 97:9 98:15,21,24 99:3 100:12 102:1
**schooler** 33:13
**schools** 11:4 12:5 14:3 18:10,14 30:9 47:18,21 48:18 49:16 50:1,9 64:18 65:16 66:3,9,10,14,15 66:21,25 67:6 78:4,5,6 97:14 98:17
**screen** 87:23
**scrolling** 74:17
**se** 50:23
**search** 19:8 20:2 26:21,22 27:12,22 29:18 29:20 38:23 40:4 55:20
**searched** 22:24 25:6,14 26:5 28:22
**second** 59:20
**section** 40:3 61:20
**secure** 11:17
**see** 17:21 19:16 20:18 22:6,8 36:15 50:19,20 53:25 76:25 79:17 84:12 97:8,21,25 100:8,20 101:10
**seeing** 19:24
**seek** 28:7
**seemed** 43:14 52:11
**seems** 72:18,18
**seen** 10:9,18,21 60:16 77:1 81:4
**sees** 28:6
**self** 101:4,7
**send** 11:4,19 12:18 85:3,20 85:24
**sense** 101:6
**sent** 26:3 43:14 85:5 91:12
**separate** 29:6 29:24 61:14 83:23 84:24,25 90:3
**series** 27:21
**serve** 76:22
**served** 76:11
**services** 6:21 23:22 37:22,23 78:10
**serving** 76:23
**set** 59:14 62:21 62:23 63:1,4 65:9 87:10
**setting** 49:14 96:7
**settings** 70:19
**severe** 49:10
**share** 54:9 57:17
**shared** 57:13 74:22
**sharpie** 64:16
**shb.com** 2:15 2:16
**sheet** 13:2 36:7 36:8,11
**shock** 64:14 71:23
**shook** 2:14

**shooter** 65:15 67:3
**shooters** 65:8
**show** 14:17 24:1 26:10 32:7 66:20 81:10
**showing** 22:18 31:20 32:2 36:23
**shows** 16:3 80:18
**shut** 97:14
**sick** 52:8
**siculus** 2:12
**signature** 103:21 105:19
**significant** 65:10 97:21
**signs** 25:25 50:18,19
**similar** 6:11
**simply** 14:16
**single** 42:22
**sir** 6:25 7:3,10 7:13,17,20 8:2 8:14 9:20,23 10:1,4,13 11:21 12:3,6 18:1,5 19:14 20:13 22:11,14 22:17,22 28:17 29:22 30:4 31:15 33:6,16 33:24 35:5,12 36:3,22 38:24 39:7 51:6,14 51:21 53:6 60:1,17 62:6 62:25 63:3 73:6 79:8,11 80:10,16 83:5
**sites** 70:3,6
**situation** 67:3 85:22
**situations** 84:24 101:13
**sleep** 100:6,23 101:2
**sleepy** 74:17
**smaller** 66:17
**smart** 89:18
**snap** 2:20 102:7
**snapchat** 72:20 72:25 91:22 92:11
**social** 1:3 5:9 31:6,7 34:11 34:14 38:23 39:16 40:2 67:14,18 68:1 68:5,21 69:2 70:2,6 77:9,14 79:10 80:20 81:24 82:4,10 82:13,15 83:3 90:9,22 93:3,6 96:6,13 99:13 99:20 100:3,14 100:18 101:20
**society** 78:19 78:25 100:12
**somebody** 64:14 91:4
**somebody's** 64:7
**sorry** 13:24 47:7 52:24 59:6 95:15
**sort** 27:22 28:7 51:1
**sounds** 40:11
**south** 1:16 2:8 5:1,14 11:10 14:6,9,10,15 15:9 53:14 63:12 65:15 103:3,24
**spalding** 3:11
**speak** 9:24 67:21
**specific** 16:11 22:21
**specifically** 49:25
**specifics** 31:8
**speculation** 97:17
**speech** 43:1
**spend** 20:20,23 77:14 89:10,22
**spends** 80:1
**spent** 80:19
**spoken** 73:10
**spread** 34:7 35:18
**staff** 14:20 51:18 52:14 66:4,5 69:15 70:2
**staffing** 11:17 14:19 81:9
**stall** 40:14,17 42:7 43:11
**standards** 100:7,10
**stands** 41:15
**start** 64:17
**started** 18:23 54:6 62:16 78:13,13
**starting** 13:22
**state** 6:1 10:16 11:3,10,10 14:5,7 15:10 15:13 16:15 53:11,12 60:22 61:25 64:19,22 65:6,7 98:20 100:24 103:3 103:24
**stated** 42:9 103:6
**statement** 104:8

**states** 1:1 5:11
**stay** 98:22,22
**stenographic...** 103:11
**step** 71:5 94:5
**stigma** 53:25 54:14
**stop** 62:7,8,14 62:20 63:15,22 63:25 64:3,5 64:10,18,23 65:7,9,25 66:6 66:8,10,21 67:1,6
**stopthebleed....** 63:8
**stored** 13:12
**street** 3:6 50:4 50:9,11
**stress** 51:2,9,13 54:4
**stressful** 35:4 40:12 51:19
**student** 28:6,10 31:18 33:17,19 33:20,22 39:15 41:21 42:10 43:16,22,22 44:17,25 46:23 47:3,4,11 53:19 69:12 70:15,25 71:6 71:11,17 76:18 81:24 82:4,9 82:24 101:7
**student's** 25:20
**students** 10:24 22:15,19,25 29:25 30:20 31:1,21 32:3,8 33:8 43:20 45:6 47:3 50:15 52:15 54:22,25 55:2 55:25 56:20 57:13 66:7,11 66:21 67:1,5 67:14,18,25 68:5,21 69:2,8 69:21 70:5 73:15 74:9 75:2,11 76:2 77:9,14,18,25 78:21 79:3,7 79:10,13,16 80:12,19,20 81:4,5,11 85:8 95:10,14,16,21 96:1,4,12 97:15 99:4,8 99:11,14,20,21 100:3,14,15,18 100:20 101:4
**studied** 77:8,13 77:18 79:9,12 80:11
**stuff** 37:14 91:12
**sub** 75:20
**subcategories** 28:23
**subgroups** 28:3 29:10
**subject** 26:21 41:17,18
**submit** 14:5,14
**submitting** 38:3
**subscribed** 105:21
**substance** 104:7
**substances** 45:21
**substantiated** 20:19
**success** 16:7
**suggesting** 44:16
**suite** 3:12
**summaries** 61:13
**summary** 11:6 13:2,4 36:7,8 36:10 61:18,20 62:4 96:23
**support** 40:15
**supposed** 30:8
**sure** 21:12 25:10 35:17 48:13,25 49:9 49:21 51:23 52:7 62:17 63:25 68:11 69:5,14 74:4,6 74:6 75:24 76:20,25 78:8 78:10 82:21 92:2
**surprise** 71:16
**surrounding** 54:14
**survey** 4:16 10:16 11:4,9 11:11,13,18,23 12:9,15,23 13:6,9,10,11,14 13:21 14:4,13 16:14 19:2 30:5,7 60:20 60:23 96:23
**surveys** 7:23 10:2,14 11:2 13:3 14:21,25 15:12,17,22 16:10,19 17:12 17:17,18,18,20 17:25 18:3,7 19:12 20:24 30:13 36:5 61:4,10,14 62:3,4
**sw** 3:6
**swear** 5:16
**sworn** 5:19 103:8 105:21

**symptoms** 50:19
**system** 14:18 35:16 69:10

**t**

**t** 4:11
**table** 22:4
**take** 13:2,3 19:11 36:1,4 57:20,22 58:21 73:7 94:11 100:22
**taken** 16:5 25:11 46:19 71:6 103:5
**talk** 36:16 54:4 54:15 96:8
**talked** 55:2
**talking** 10:15 49:9 54:25,25 81:15
**tallied** 61:10
**tallying** 77:21
**tammy** 2:4 8:5 8:8,15,20 9:1
**taught** 66:17
**tcrivers** 2:5
**teacher** 75:18 76:17
**teaching** 71:22
**team** 18:9 76:13,19,22
**team's** 13:1
**teams** 12:25
**technician** 3:18
**technologies** 2:12
**tell** 19:21 29:1 34:16 35:8 54:11 68:10 74:22 93:2
**telling** 43:4
**template** 28:2 28:11 29:5,6
**templates** 28:1 28:22 29:1,19
**ten** 20:22 94:11 101:18
**tenure** 45:4
**term** 26:22 27:7 31:10 38:23
**terms** 26:22 27:12,22 29:20 40:4 55:20
**terrible** 54:12
**test** 26:8
**testified** 5:19 95:5,9,13,18 96:22
**testify** 7:18 23:9 44:4 102:2 103:8
**testimony** 7:15 9:22 57:24 58:19 103:9,14 104:2,8
**testing** 50:22
**text** 27:22
**thank** 94:10,20 94:21 101:24 101:25 102:1,5
**theirs** 6:9
**theoretically** 30:12
**thereof** 103:19
**thing** 23:16,20 28:13 29:11 35:22 37:13 54:13 61:22 78:1 79:15 93:8
**things** 10:9 27:2,11 29:20 35:21 48:24 49:4,20 53:24 55:16 98:19
**think** 20:8 26:10 27:16,17 27:18 32:11,16 38:12,18 40:8 45:21 47:23 50:23 55:15 57:16 58:20 61:23 62:18 63:22 64:12,14 65:4 68:7,23 69:1 85:2 86:5 87:3 89:18 92:15
**thinking** 96:10
**thomasina** 6:21
**thought** 11:16 27:11 37:12 47:8 48:18
**thousand** 75:25 99:5,8
**thousands** 67:9
**three** 8:21 38:13 43:17 48:22,22 49:5 83:20
**tiktok** 3:9,9,9 72:16,24 91:16 92:4
**time** 5:6 7:8 18:8,24 20:20 20:23 21:4,20 21:21,24 22:1 23:12 25:19 35:25 37:24 45:9 48:17 50:4 52:9,13 58:23 59:2,17 60:8 63:20 76:16,18 77:13 81:6,7 85:4 87:23 88:21 89:7,10,19,22 90:3 94:14,18 94:20 96:5 97:13,22 99:3 99:12 101:25 102:2,5,9,12,14

103:6,10,15
**times** 10:19 29:25 45:23 46:3,10,22 66:13 74:22,24
**tired** 74:16
**title** 66:14
**today** 5:15 7:12 7:19 38:1,3 94:20 102:2
**today's** 5:6 7:21 9:25 10:6 16:9,19 19:13 36:13,21
**together** 52:7
**toilet** 84:2
**took** 51:23
**tools** 49:21
**top** 22:5
**topics** 61:19
**total** 102:9
**totally** 34:21
**totals** 97:3,8,9
**tourniquet** 62:12 64:6
**trace** 52:7
**track** 50:14 67:14,16,17
**tracked** 67:25 68:4
**tracking** 68:21 69:1
**tragedy** 76:19
**train** 62:11 63:10 66:3
**trained** 66:3,6 66:7,21 67:1
**training** 62:21 62:24 63:2,5 63:16 65:10,23 65:25 66:2,11 67:6 82:14 83:9 86:7
**trainings** 86:13
**transcribed** 103:12
**transcript** 9:21 103:7 104:2
**transpired** 58:24 94:15
**transported** 43:23 47:14
**traumatic** 67:2
**travel** 91:2
**treat** 22:9,13
**treated** 29:25 80:25 81:3,6 81:11,23
**trend** 17:23
**triggered** 57:4 58:12
**true** 103:13
**trust** 82:25
**truth** 103:8,8,9
**truthfully** 7:19
**try** 21:7 78:9 100:7,25
**trying** 10:11 20:8 21:6 27:17 38:12 64:11 86:5,8
**turned** 26:7
**tv** 83:15,17,23 84:25 85:23
**twice** 98:18
**two** 37:21 40:12 46:25 48:21 51:2,3 75:25
**type** 23:17 24:2 62:9,9,10 86:7 87:23
**typed** 103:13

**u**

**uh** 31:3 33:1 58:1 77:23 88:12 92:6
**unaware** 71:24
**unconscious** 33:15
**under** 7:11,15 12:25 29:8,10 40:24 54:5 60:22 61:21,23
**undersigned** 104:2
**understand** 7:14 8:11 31:17 39:14 42:6 43:10 69:14 74:4 88:5 92:3 95:2
**understanding** 14:12 15:15,20 29:17 59:19,23 65:13 71:3,5 72:13 99:13,17
**understood** 85:19
**unfamiliar** 44:14
**unfortunately** 37:11 101:5
**united** 1:1 5:11
**university** 63:12
**unresponsive** 31:19 34:21
**unsure** 15:3
**update** 37:13
**updated** 38:9
**updating** 38:11 38:16
**usage** 69:2
**use** 22:3 38:23 46:3 47:9,20 48:2 49:18,24 50:8 62:12 64:23 65:7 67:14,18,25 68:5,21 73:16 74:9 75:3,11 75:14,15 77:9 79:10 80:20

83:12 84:24 85:15,22 93:3 93:21 96:13 99:13,19 100:2 100:5,13,18 104:9
**used** 26:22 37:7 45:22 46:13 50:4 91:1 96:5
**using** 29:20 50:16 64:17 71:23 84:7

**v**

**v** 1:7
**vaccinate** 52:16
**vaccinated** 53:13
**vaccine** 53:1
**vaccines** 52:14 52:18,21 53:4 53:10
**vague** 45:9
**vendor** 24:12 24:14,15 27:7 27:14 30:12 55:20
**victoria** 14:8
**video** 5:8 34:21 35:2 63:9 85:20
**videographer** 3:17 5:5 58:22 59:1 94:13,17
102:8
**videos** 83:24 84:18,25 85:24 85:24 86:13
**videotaped** 1:13
**view** 84:15 85:5 91:13
**vince** 3:18
**visit** 23:15
**visits** 28:8 39:22 59:16
**vital** 25:25 50:19
**voluntary** 65:2

**w**

**wacker** 3:12
**walberg** 2:15
**walters** 3:17
**want** 41:10 43:1 48:13 54:10 60:7 69:14 74:4 84:18 92:2
**wanted** 21:12 37:15 49:21 66:24
**wants** 54:1
**washing** 84:2
**washington** 3:6
**watch** 69:12 85:20 92:21 93:13,22
**watched** 34:19
**watching** 83:23
**way** 15:6 24:20 27:25 101:17
**wc.com** 3:4,5
**we've** 6:15 10:21 57:19 60:10 76:16 95:5
**week** 6:16 17:2 40:17 98:10,18
**weeks** 9:6 38:12,13,16 40:12 51:2,3
**wellness** 78:2,6 78:12,17,22 79:1,3
**went** 24:3 27:9 35:21 38:8 42:12 43:11 62:2 64:20 98:18
**whiteley** 3:5
**william** 2:15
**williams** 3:3 5:23
**willing** 54:8 57:17
**wish** 53:12
**witness** 4:2 5:17 6:10 9:22 17:1 18:18 19:8 21:20 23:3,7,12 25:9
25:16 26:10 27:1 28:17 29:22 30:3 31:24 32:11,16 34:4,11 35:12 39:2,10 40:21 40:25 42:1,3 42:20 44:13,22 45:10 46:1,13 46:19,25 47:13 47:23 48:5,11 48:21 49:18 50:3,11 52:20 53:6 55:5,15 56:2,10,15 57:1,10 58:20 59:11 63:18 67:21 69:5,19 69:25 70:18 71:3,14,21 73:6,19 74:1 74:13 80:3,16 80:23 82:7,17 83:20 84:1,10 84:21 85:2 86:3,23 87:3,8 87:14,22 88:25 89:6,18,24 90:16,25 91:11 91:19,25 92:13 92:18,24 93:12 93:19 94:21 96:4,16 97:18 98:7 99:17,24

101:10 103:20
**witnesses** 6:9 6:16
**women's** 37:21 37:22
**word** 30:25 31:2 34:8,11 35:18 64:15 101:21
**words** 54:10
**work** 6:19,20 12:24,25 24:9 30:11 37:17 46:15 77:7 78:1
**worked** 52:4,7 76:5,8,13 77:2 77:5
**working** 37:22
**works** 28:15
**workwise** 86:4
**worry** 50:5 74:15
**worse** 55:8,13 55:17,25 56:5 56:13,18,24 58:6
**wound** 64:8 67:2
**wrap** 64:13,14
**wrong** 19:21
**wwalberg** 2:16

**x**

**x** 4:1,11

**y**

**yeah** 15:20 36:10 37:20 57:21 68:3
**year** 10:17 11:3 13:9,11,14,18 13:20 14:3,13 14:21,25 15:12 15:17,22 16:9 16:19 17:16,20 17:25 18:2,4,7 18:7,16 19:1,6 19:12 20:24 30:1,3,4,7 36:5 36:7,7 60:20 61:4,10,14 62:3,17 96:23 96:24 97:9
**years** 11:7,14 13:17,21 18:15 19:25 48:22,22 49:5 60:25 61:7 83:20 84:6,11 97:10 101:18
**yesterday** 8:6 8:20 9:1,3
**yesterday's** 8:22
**ygr** 1:4
**york** 2:23,23
**younger** 86:19 87:22 88:3,7
**youtube** 3:2 5:24 69:8,11 69:13,16,22 70:9,12,15,25 71:6,11,17 83:12,14,15,16 83:23,24 84:7 84:15,19,24,25 85:15,20,23,23 85:24 86:11,17 86:20 87:1,5 87:10,20 89:4 90:8 93:13,16

**z**

**zoom** 2:5,6,15 2:21 3:11,19 102:6
**zuckerberg** 2:13