# Exhibit 9

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CHARLESTON) (SD MSJ NO. 3)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

------------------------------x

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDITION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | ) MDL No. 3047<br>) Case No. 4:22-md-03047-YGR |
| This Document Relates to:<br>Charleston County School District v. Meta, et al., Case No. 23-cv-04659 | ) |

VIDEOTAPED 30(B)(6) DEPOSITION OF CHARLESTON
COUNTY SCHOOL DISTRICT BY
KENNETH L. BUCKHEISTER
MT. PLEASANT, SOUTH CAROLINA
WEDNESDAY, APRIL 30, 2025
9:21 A.M. EASTERN STANDARD TIME

Job No.: 7348880
Pages: 1 - 104
Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Deposition of KENNETH L. BUCKHEISTER, held at the offices of:

MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464

Pursuant to notice, before Leslie Anne Todd, Certified Shorthand Reporter, who officiated in administering the oath to the witness.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

JADE HAILESELASSIE, ESQUIRE
GRAHAM MAIDEN, ESQUIRE
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
(843) 216-9000

ON BEHALF OF THE GOOGLE AND YOUTUBE DEFENDANTS:

DANIEL WHITELEY, ESQUIRE
ANDY KEYES, ESQUIRE
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue Southwest
Washington, DC 20024
(202) 434-5000

ON BEHALF OF THE META DEFENDANTS:

EBAN S. FLASTER, ESQUIRE (via Zoom)
BRYCE FAGAN, ESQUIRE (via Zoom)
SHOOK HARDY & BACON, LLP
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, Pennsylvania 19103
(215) 278-2555

APPEARANCES (Continued):

ON BEHALF OF TIKTOK DEFENDANTS:

DANIEL C. SALE, ESQUIRE (via Zoom)
KING & SPALDING, LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
(202) 737-0500

ALSO PRESENT:

KATHARINE COLLINS, ESQUIRE (via Zoom)
KYLE ROEDER, Videographer
VINCE ROSICA, Trial Technician
(via Zoom)

C O N T E N T S


| EXAMINATION OF KENNETH L. BUCKHEISTER | PAGE |
|---|---|
| By Mr. Whiteley | 8, 91 |
| By Ms. Haileselassie | 85 |


E X H I B I T S

(Attached to transcript)


| BUCKHEISTER DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| No. 1 | Defendants' Amended Notice of Oral and Videotaped Deposition of Kenneth Buckheister, Request for Production of Documents | 18 |
| No. 2 | Defendants' Amended Supplemental Notice of Oral and Videotaped 30(b)(6) Deposition of Plaintiff Charleston County School District | 19 |
| No. 3 | Policy JICJ Prohibition of Personal Electronic Devices During the School Day | 22 |
| No. 4 | CCSD Student Mobile Device Responsible Use Handbook and Agreement | 44 |

E X H I B I T S  C O N T I N U E D

(Attached to transcript)

| BUCKHEISTER DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| No. 5 | Screen capture from CCSD's Facebook account April 15, 2020 | 50 |
| No. 6 | Screen capture from CCSD's Facebook account September 27, 2019 | 73 |
| No. 7 | Screen capture from CCSD's Facebook account re Suicide Prevention Month September 11, 2023 | 79 |

P R O C E E D I N G S

-------------------

THE VIDEOGRAPHER: We are now on record.

My name is Kyle Roeder, and I'm the videographer for Golkow. Today's date is April 30, 2025, and the time is 9:21 a.m.

This video deposition is being held at Motley Rice, LLC, 28 Bridgeside Boulevard, Mt. Pleasant, South Carolina 29464, in the matter of Charleston County School District v. Meta Platforms, Incorporated, et al., for the United States District Court, Northern District of California.

The deponent is Kenneth Buckheister.

Counsel will be noted on the stenographic record.

The court reporter is Leslie Todd, and will now swear in the witness.

///

///

KENNETH L. BUCKHEISTER,
having first been duly sworn, was
examined and testified as follows:
EXAMINATION
BY MR. WHITELEY:
Q. Good morning.
A. Good morning.
Q. Could you please state your full name for the record?
A. Kenneth Lee Buckheister.
Q. And do you understand you are under oath today?
A. Yes.
Q. And you understand that oath requires you to tell the truth?
A. Yes.
Q. And do you understand that you've been designated to testify on behalf of the Charleston County School District on certain topics today?
A. Yes.
Q. If I call Charleston County School District, CCSD or the District, you understand what I'm referring to?
A. Yes.

Q. Are you prepared to answer questions about the topics for which you've been designated based on information available to the District?
A. Yes.
Q. All right. We're going to cover a few ground rules.
Because the court reporter is on Zoom today, it's very important that we give each other space to ask the question and then answer the question. So I'll make sure to let you finish your answer before asking the next question. I ask that you wait until I finish asking the question before you answer.
Understood?
A. Understood.
Q. And your counsel may make objections to my questions from time to time throughout the day. So I'll also ask that you pause for that.
Understood?
A. Understood.
Q. And if your counsel does object, you should still answer the question,

unless counsel tells you not to answer the question.
Understood?
A. Yes.
Q. We ask that you -- you know, if one of my questions is unclear or you weren't able to hear it, please ask me to repeat it and I will. Otherwise, we will assume that you've understood the question as posed.
Understood?
A. Understood.
Q. And if you ever need a break, we can take one at any point, just let us know. The only exception to that is if I've asked a question, we do need to get an answer on the record before we take the break.
Understood?
A. Understood.
Q. Is there any reason you cannot give truthful testimony today?
A. No.
Q. Where are you currently employed, Mr. Buckheister?
A. CCSD.
Q. And what is your role with

CCSD?

A. Executive associate of IT. I lead the IT team.

Q. And how long have you been in that role?

A. Almost a year. July 1st.

Q. What is -- what are your primary areas of responsibility as the executive associate of IT?

A. Making sure that we are providing network, devices, connectivity, software to teachers, principals, students, and staff; making sure our network is secure; making sure that my team's happy; making sure the superintendent and the cabinet are happy; and, most importantly, that kids are able to receive instruction without interruption; that teachers are able to do their job without interruption or hassle or hurdles; just to make sure all of the technology is running smoothly for everyone.

Q. And to prepare for this deposition today on behalf of the District, what did you do?

A. I met with attorneys from

Motley Rice. I read the complaint, a snoozer for somebody like me, but still interesting. I reviewed our policies and procedures. I reviewed other documents that are relevant to the case.

Q. Okay. What policies and procedures did you review?

A. The School District's student handbook; staff policies and procedures; PDP -- that's the progressive discipline plan; I reviewed the IT acceptable use policy. I believe that covers it.

Q. You said you also reviewed staff policies. Which staff policies did you review?

A. I'm not going to be able to recall the title of the -- it's a 2017-2018 staff handbook, something like that.

Q. And what is the general subject matter of that staff policy or staff handbook?

A. The general -- I'm sorry, the what?

Q. The general subject matter. Like, what's covered in that policy, if you

don't remember the name?
A. Everything that the District expects from staff in terms of behavior, responsibilities, duties, and so on.
Q. And separate from the policies and procedures, you said you reviewed documents relevant to the case. What documents did you review?
A. The -- as I mentioned, the complaint first and then some of the answering documents. Is that how they're referred to? I don't -- yeah.
Q. By answering documents, do you know if these were discovery responses on behalf of the District?
A. Thank you. Yes, I believe that's what they were. I mean, if I can characterize them, it was attorneys for the plaintiff pushing back on -- on certain topics and then -- yeah, just basically pushing back and then -- and then stating, you know, our -- our side of the -- of the facts.
Q. And you said earlier you met with attorneys from Motley Rice to prepare

for this deposition. When did you meet with them?
A. It's been three meetings. They've ranged over the last three weeks. Without looking at my calendar -- I'd be happy to look at my calendar if that would help if you want specific days, but basically three sessions, about an hour each.
Q. And were these meetings in person or virtual?
A. There were two that were virtual and a third was in person.
Q. And so the first meeting you think was about three weeks ago, give or take?
A. Yeah. I believe it -- I believe it was three weeks. It was before spring break if memory serves. So, yeah, that -- that makes sense.
Q. And was that first meeting to prepare for this deposition the first time you had ever met with any attorneys from Motley Rice?
A. Yes.
Q. Was anyone other than yourself

and the attorneys from Motley Rice present at any of these meetings?
A. No.
Q. Have you reviewed any transcripts of any witness who has been deposed thus far in this case?
A. No.
Q. To prepare for this deposition, did you talk to anybody from CCSD who has been deposed in this case?
A. My -- one of my direct reports, Tom Nawrocki, was deposed. I -- I speak with him every day, several times a day. Not on this topic. I spoke with Shavonna Coakley. I -- did you say folks who were deposed in this case?
Q. Yes.
A. I speak with my husband every morning; sometimes in the evening too. My boss, Daniel Prentice, has been deposed. I speak with him on a regular basis. I believe this -- that's most or all of everyone that I've had conversations with, not about this.
Q. And your husband is Mr. Briggman?

A. Yes.
Q. And did you discuss with Mr. Nawrocki his deposition that was taken in this case?
A. No. My understanding from him, and -- I didn't have any interest in speaking to him about the deposition, but every time he mentions it, he says, I can't say anything about the deposition. So he's very much a rulekeeper, as am I typically. But that was all he would ever say.
Q. And did you discuss with Ms. Coakley or Dr. Coakley --
A. It is Doctor.
Q. -- the substance of her deposition?
A. No.
Q. And Mr. Briggman has not yet been deposed in this case, correct?
A. That's correct.
Q. Did you discuss his potential deposition or your deposition with Mr. Briggman?
A. No.
Sorry.

MS. HAILESELASSIE: I'll object to the extent that -- that the marriage privilege applies.
BY MR. WHITELEY:
Q. Okay. Did you bring any documents with you to your deposition today?
A. No.
Q. Other than the CCSD employees you mentioned, did you talk to anybody else, employee of CCSD or not, about this deposition?
A. I -- I guess I do want to clarify with you. When you say "about this deposition," you're -- you're probably not asking about -- why don't I let you tell me what you're asking about instead of me trying to guess.
Q. Sure. Separate from discussing the fact that you would be deposed and busy today, have you discussed with anybody else?
A. It's -- it's just the former, yeah, that -- that I have been deposed, and I'll be out for some or most of the day.
Q. Separate from reviewing the documents we've talked about and talking to

these folks, talking to your attorneys, did you do anything else to prepare for your deposition on behalf of the District?
A. Can you list those activities again for me?
Q. Yes. We've talked about certain documents you reviewed and we talked about this list of individuals and we talked about your meetings with attorneys from Motley Rice, correct?
A. Yes.
Q. And separate from that bucket, is there anything else you did to prepare for your deposition today?
A. No.
Q. If you could pull up tab 25. This is the amended deposition notice -- there you go, Mr. Buckheister --
A. Oh, thanks. Oh, great. That's better.
Q. There should be copies for your counsel in there too.
MR. WHITELEY: And we'll mark this as Exhibit 1.
(Exhibit No. 1 was marked for

identification.)
BY MR. WHITELEY:
Q. Do you have a copy of Exhibit 1 in front of you, Mr. Buckheister?
A. I do.
Q. Have you seen this document before?
A. Yes.
Q. And when did you see it?
A. Well, it was provided to me last week, and I reviewed it this weekend, this past weekend.
Q. And -- sorry.
A. No, no. Sorry. I was done.
Q. And if you could go on the first page to line 17, do you see that you've been designated on behalf of the District for topics 6 through 8, 11, 13, and 14?
A. Yes.
Q. If you could turn -- I'm going to mark another document. This will be tab 6, and I will hand you a physical copy.
MR. WHITELEY: This will be Exhibit 2.
(Exhibit No. 2 was marked for

identification.)
BY MR. WHITELEY:
Q. Do you have Exhibit 2 in front of you?
A. I do.
Q. Have you seen this document before?
A. Yes.
Q. And did you also review this document this last weekend?
A. On Monday.
Q. Okay.
A. Monday, yes.
Q. So these contain the topics, the substance of the topics for which you have been designated. Can you turn to page 8?
A. Yep. I'm there.
Q. Towards the bottom of the page, do you see topic 6 and the beginning of topic 7?
A. Yes.
Q. And topic 7 continues onto the next page.
A. Mm-hmm.

Q. And topic 8 is also on that page.
A. Yes.
Q. Now, you're prepared to testify about topics 6 through 8 today?
A. Yes.
Q. And then also on page 9, do you see topic 11?
A. Yes.
Q. You're prepared to talk about topic 11 on behalf of the District today?
A. Yes.
Q. And the next page, page 10, let me know when you're there.
A. I'm there.
Q. Do you see topics 13 and 14?
A. Yes.
Q. And you're prepared to give testimony on behalf of the District on these topics today?
A. Yes.
Q. Thank you.
You can put those to the side.
A. All right.
Q. Have you taken any notes or

prepared any documents or summaries as a part of your prepar- -- preparation for this deposition?
A. No.
Q. Have you ever received any training or instruction from the District on how to handle public statements or interviews on behalf of the District?
A. I have not.
MR. WHITELEY: I'm going to mark another document. This is tab 7, which will be Exhibit 3.
(Exhibit No. 3 was marked for identification.)
BY MR. WHITELEY:
Q. Do you have Exhibit 3 in front of you?
A. I do.
Q. Okay. And this is titled "Policy JICJ Prohibition of Personal Electronic Devices During the School Day," issued November 2024, correct?
A. Yes.
Q. And you're familiar with this policy, correct?

A. Yes.
Q. Beginning -- this policy was issued in 2024, but starting in January of 2025, all CCSD students had to keep cell phones, headphones, smart watches, and other electronic devices turned off and stored away during the school day, correct?
MS. HAILESELASSIE: Objection to the extent that this questioning falls outside of the agreed discovery period.
MR. WHITELEY: You can answer.
THE WITNESS: So can you restate the question, please?
BY MR. WHITELEY:
Q. Yes.
Starting in January of 2025, all CCSD students had to keep cell phones, headphones, smart watches, and other electronic devices turned off and stored away during the school day, correct?
A. Yes.
Q. Has CCSD studied or prepared a report about the impact of this policy since it was implemented in January of 2025?

MS. HAILESELASSIE: Same objection.
You can answer.
THE WITNESS: The terms were studied or -- it's the first part --
BY MR. WHITELEY:
Q. Prepared -- prepared a report.
A. Okay. Have -- have we prepared a report about the impact of --
I'm going to ask you to state the question again, please.
Q. Yes. Has CCSD studied or prepared a report about the impact of this policy since it was implemented in January of 2025?
A. So does the sentence when it uses the term "studied," does it mean studied a report or has it studied --
Q. Studied or prepared a report.
A. Studied -- studied what, a report or studied the effects?
Q. The effects or prepared a report about the effects.
A. Thank you. Yes.
Q. And so has CCSD prepared a

report about the impact of this change in policy?
A. Not to my knowledge.
Q. So CCSD has studied the impact of this change in policy over the last few months?
A. Yes.
Q. How has CCSD done so?
A. Observation in the classroom; observations in the schools; grades; reports from mental health professionals; interactions with parents. There are others. Give me a minute.
Reports from our security team of incidents that have occurred. I believe that's it.
Q. Okay. Well, let's go through each of those. You mentioned observation in the classroom and observation in schools.
Who is doing this observation?
A. Principals; teachers; school counselor; psychologists; nurses; media -- our tech specialists; level leaders, often referred -- well, also referred to as associates, the folks who principals report

to; administrators who are responsible for discipline in the schools, culture in the schools, well-being of students; the superintendent.

Q. Anybody else? I know that was a long list.

A. It's a pretty long list, yeah. There's probably a few others, but it's -- in general, it's staff that is responsible for the care of children.

Q. And you said media. Did that mean --

A. I'm sorry. I -- I'll let you finish.

Q. Yeah.

-- did that mean CCSD's internal media or communications department, or did that mean like a local news station?

A. Did I say media? Oh, I -- I'm sorry. Yeah, I was -- what I -- what I said was kind of misleading. I started to say media specialists, which are folks -- what we used to call librarians when I was in school. But we refer to them as tech liaisons because of their relationship with IT, but they're

really media specialists.
Q. Okay. I think what the library carries has changed since when I was in school.
A. Yeah. Going back to my education, it's really, really different.
Q. So are these observations collected or regularly reported by these individuals? Is there a -- is there a form that people fill out every week about the impact of this policy?
A. There -- there is data collection in -- of all sorts related to activities in schools, especially when they go outside the bounds of how we expect students to behave.
Q. So my question is more specific to the impacts of this policy. Are there any specific data collection initiatives or forms or some other way of collecting information that the District has implemented specifically to look at the impact of the cell phone policy?
MS. HAILESELASSIE: Object to form. Are we on topic 13?

MR. WHITELEY: You can answer.
THE WITNESS: You know that this policy was put into effect in January of 2025. I haven't seen -- my expectation is that any data collection that's been going on or will go on becomes meaningful when you have a reasonable amount of time in which to judge the data, to understand the data, to compare it against previous years. So I don't know -- I haven't seen any -- I have not seen any reports or any data analysis of the impact yet.
BY MR. WHITELEY:
Q. And as the District representative, are you aware of any reports or data analysis or collection of observations about the impact of this policy?
A. Is that not the same question you just asked me?
Q. Well, you said I have not seen. So I'm making sure --
A. I see now. Thank you. And I jumped over you again. I'll try not to do

that.
Q. Yeah. So as the District representative, are you aware of any reports, data analysis, or collection of observations about the impact of this policy?
MS. HAILESELASSIE: Object to form. Asked and answered.
THE WITNESS: I'm not.
MS. HAILESELASSIE: Counsel, which topic are we on?
MR. WHITELEY: I think it's covered by 6, 13 -- maybe some others.
BY MR. WHITELEY:
Q. You also said -- you also mentioned grades. Has the -- earlier.
Has the District collected or prepared any data or analysis about the impact of this policy on student grades?
A. Well, we're constantly, constantly tracking performance. We test constantly. So, yes, we are collecting that data.
Q. But that's a part of -- if I understand your answer, that's a part of the normal data collection; it's not specific to

this policy?
MS. HAILESELASSIE: Object to form.
BY MR. WHITELEY:
Q. It existed before this policy was implemented, and nothing has changed to track anything specific about this policy?
A. Hmm, I will say that we have tracked grades for many, many years. I will also say that changes in policies and procedures around the care and feeding of students, security, their mental health, their emotional health does show itself in the regular reporting or regular gathering of -- of test data that we have been doing for years. So we've seen impacts, and we -- we would expect to see impacts of -- of a policy that is this broad and kind of far reaching.
Q. Well, let me ask it this way: The District has not changed that data gathering you just described to measure something specific about this policy, correct? It's continuing the data collection that it's done for years, as you said?

MS. HAILESELASSIE: I'm going to object to the form.
I'm sorry.
BY MR. WHITELEY:
Q. Right?
A. I believe you might be asking if we've modified any of our data gathering or reporting in order to judge whether this new policy has had -- is having an impact. And I have to assume that we have, but I don't know for sure.
Q. You're not aware of anything?
A. I'm not aware of anything.
Q. Is CCSD tracking if discipline incidents related to device use have decreased since this policy was implemented in January of 2025?
A. We are tracking it, yes.
Q. Are you aware of what that data shows?
A. I'm not.
Q. Is CCSD tracking if all discipline incidents have decreased since this policy was implemented?
A. I missed the first part of the

question. Can you restate?
Q. Is CCSD tracking if all discipline incidents have decreased since this policy was implemented?
A. I still didn't understand. Can you -- I'm sorry. Can you say it a little slower?
Q. Yeah. So is CCSD tracking if all types of discipline incidents in the schools have decreased since implementing this policy in January of 2025?
A. We're not tracking whether anything is increasing or decreasing. We're just tracking. The data will show what the data shows. I'm -- hope I'm answering your question.
We're not looking for an outcome necessarily. The data will tell the story if that makes sense.
Q. And sitting here today, do you know what story that data tells?
A. I don't.
Q. Were you involved in drafting this policy, Exhibit 3?
A. I was not.

Q. Who was involved in drafting this policy?
A. Cabinet-level folks, cabinet members, school -- some school based professionals, level leaders, associates, folks in academics, security, and legal counsel.
Q. And you've said the term level leaders a couple of times.
A. Yeah. I'm sorry.
Q. What does that mean?
A. Level leaders is another term for associates, and associates are the folks who principals report to. So you've met a couple maybe. Sherry Eppelsheimer is an associate. I hope -- yeah.
Q. So they are District-level employees, not a specific school?
A. Correct. They have the responsibility -- each of them has responsibility for several schools.
Q. Understood. And CCSD's board of trustees ultimately made the decision to approve and implement this policy, right?
A. All policy changes are -- go

before the board for their approval, yes, and this one did.

Q. And I if I refer to the board of trustees as "the board," you know what I'm referring to?

A. Yes.

Q. And did CCSD -- are you aware of CCSD employees who advocated for or against adopting the new policy in January of 2025? And when I say advocating, I mean advocating at a board meeting.

A. Am I aware of any who advocated for or against at a board meeting, any CCSD employees who advocated for or against? I watch each board meeting. I don't remember seeing anyone advocate for or against in front of the board. Well, I'm thinking of public testimony. You're talking about any CCSD employee, including the superintendent or cabinet members?

Q. Yes.

A. And do I remember seeing them advocate for or against in a board meeting, I do not remember.

Q. Have you talked with school

educators or administrators about the effects of this policy?

A. Yes.

Q. Who have you talked to?

A. Do you want names? It's principals and folks in the academic office, the head of HR, the superintendent, the CFO, the head of security, my team.

Q. And what did you learn from these conversations?

A. That students are more engaged with each other. That in the beginning, they were frantic and anxious about their devices going away, even for a few hours. That as time wore on and the policy had been in effect for a few weeks, students seemed happier, more engaged with each other as I said, less anxious. Did I say happier already?

Q. I believe you did.

A. I believe that covers it.

Q. Under the current policy, what are the punishments for students if they violate the policy?

A. So there's a progressive

discipline policy that lays out number of infractions and the specific infraction and how -- how each of those is handled.

Q. And under that progressive discipline plan, can CCSD -- or will CCSD, rather, confiscate the student's cell phone at any point?

A. Yes. I believe that's part of the -- part of the plan.

Q. And do you know under what circumstances CCSD would confiscate a student's phone for a violation of this policy?

A. Under what -- no, I -- I'm not -- no, I'm not perfectly clear on -- on the PDP.

Q. Students can use a cell phone for things other than accessing and -- social media platforms, right?

A. Yes.

Q. Students can text on their cell phone?

A. They can.

Q. If they have an iPhone, they can use AirDrop?

A. I assume, yes.
Q. A student could use a web browser on their phone to access websites?
A. Including social media, yes.
Q. And they could access non-social media websites?
A. Yes.
Q. They could access sports apps or websites?
A. Typically not. They're -- they're -- there are -- well, if they're going through -- if they're going through the cell system, you know, their own wireless plan, we don't have the ability to restrict. If they're on the guest network, as they often have to be because they're in cinderblock buildings that are the perfect Faraday rooms unintentionally, so they are -- they're limited in -- in what sites they can go to on that network.
Q. I understand that the District blocks on its network various types of websites and content. But if a student did have a cell signal on their cell phone, they can use it to access a sports website or a

sports app?
MS. HAILESELASSIE: Object to form. Calls for speculation.
THE WITNESS: I'm -- yeah, I assume all students can access everything that you and I can access on their cell plans, unless their parents have somehow restricted it, so yes.
BY MR. WHITELEY:
Q. And that would include other platforms like Discord, right?
A. I --
MS. HAILESELASSIE: Object to form.
THE WITNESS: I don't -- I don't know.
BY MR. WHITELEY:
Q. You don't know if it's possible for a student on a cellular network to access Discord?
A. I've never been to Discord. I don't know how it's accessed.
MS. HAILESELASSIE: Counsel, what topic are we on?

MR. WHITELEY: We're on topics 6 and 7.
BY MR. WHITELEY:
Q. And is the same true for Reddit, a student could access it on a cell- -- cellular network on their phone at school?
MS. HAILESELASSIE: Object to the scope. Object to form.
THE WITNESS: So yeah, yes, a student can get to Reddit on their -- on their wireless plan.
BY MR. WHITELEY:
Q. CCSD uses iBoss to filter content on its District-provided network, right?
A. Yes.
Q. It's done so since 2018?
A. Yes.
Q. CCSD has used Google Workspace for Education for a number of years, correct?
A. Correct.
Q. CCSD enabled Google Workspace for Education access to YouTube in 2019, correct?
A. I'm not sure of the year, but

we do have access to YouTube, students do.
Q. And you started at CCSD in 2020?
A. Yes. In a different department.
Q. When you started in CCSD in 2020, YouTube ac- -- was YouTube access enabled through Google Workspace for Education?
A. Yes.
Q. So you were not involved in that decision personally to enable that access?
A. Correct.
Q. Have you spoken with anybody at CCSD who was involved in that decision to enable access about that decision?
A. That would have been the IAC with input from academics, so I have to assume I've spoken to someone involved. Yes.
Q. But did you speak to any of those people about the specific change enabling access to YouTube through Google Workspace for Education?
A. I've not spoken -- I've not

spoken about the initial enablement of YouTube. I have spoken with my team, with leadership, including the CFO, the superintendent, and the deputy superintendent about additional restrictions on YouTube and Google Workspace.

Q. And you said IAC earlier. Is that the Internet Access Committee?

A. Thank you. I was not going to remember that acronym.

Q. But that's the correct --

A. Yes, yes.

Q. And YouTube access is still enabled today, correct?

A. Correct.

Q. The District -- you said you've spoken with individuals about additional restrictions on YouTube and Google Workspace.

Are you aware of the restriction levels available concerning YouTube in Google Workspace for Education?

A. I am.

Q. And for elementary schools in CCSD, the restriction level is super strict for YouTube access?

A. That's the discussion we're having now. The truth is that we're at moderate level for all students, and too much is getting through that moderate level promises it does not allow. Vulgarity, for example, in music lyrics are supposed to be excluded, and they apparently are not. I've had complaints from parents of second graders seeing the word -- or hearing the word, in lyrics, motherfucker, and reports that -- for example, in reports that kids are watching that at school. He caught his daughter watching it at home.

So we are exploring moving to, I believe it's called strict restriction mode for elementary students. I've presented our plan to the CFO and the deputy superintendent and they took it to cabinet, I believe -- their plan was to take it to cabinet yesterday.

Q. So this is an ongoing --

A. Yep.

Q. -- potential policy change that you are describing?

A. Ongoing, meaning it's in --

it's in the works, is that --
Q. Yeah. It has not been implemented yet.
A. That's correct.
Q. And for middle and high schools in the District, the restriction level is moderate, correct?
A. Yes.
Q. YouTube is an add-on service within Google Workspace for Education, correct?
A. That's my understanding.
Q. And Google requires that the District gets consent from parents to use YouTube as an add-on service, right?
A. That's also my understanding.
Q. How did CCSD obtain consent from parents or guardians for their students to use YouTube as an add-on?
A. This is a point of frustration for me and my team. If I had a representative from YouTube, Google here to ask the question, my question would -- to them would be, how would you facilitate reaching out to the parents of 55,000

students to individually get permission to use YouTube? It's an impossible -- they know it -- Google YouTube knows -- and this makes me very angry, and I will try to stay calm -- they know that that is an impossible request, so that -- I -- we have not gotten consent from the parents of our 55,000 children every year, no.

Q. CCSD does require students to -- and parents to sign a responsible device use handbook every year, correct?

A. That's correct. Parents and students, yes.

MR. WHITELEY: I'm going to mark tab 20 as Exhibit 4.

(Exhibit No. 4 was marked for identification.)

THE WITNESS: Are we done with Exhibit 3?

BY MR. WHITELEY:

Q. Yes. You can put that to the side. Thank you.

A. I'm not going to be offended if you slide the heck out of this thing towards me. Okay.

Q. I just don't want to knock over

your water.

A. I'll move the water. If you're a good aim, go for it. If not, don't.

Q. Let me know when you have Exhibit 4 in front of you.

A. I have it in front of me.

Q. And so this is the CCSD Student Mobile Device Responsible Use Handbook and Agreement, right?

A. Yes.

Q. The District -- I'll represent to you this was produced to us by the District. It's bearing Bates numbers 213474, and the date on this from the metadata indicates that it's the 2024 version of that document.

Does this look like it's the most recent one from the most recent school year?

A. Yes.

Q. And if you could turn to the last page. In the bottom right-hand corner, it'll have 482 as the last three digits.

This is the part where students and parents sign and agree to the terms of

this agreement?
A. Yes.
Q. But CCSD has not added a provision here providing consent for students to access YouTube, correct?
A. I didn't expect to come away from this deposition with a great idea. As you mentioned, this is last year's. And our first recognition, understanding that Google YouTube required consent of all parents for students to use Google YouTube was the spring of this year. So I'm going to propose that we add that consent to this form. That's a great idea. Thank you.
Q. So then I believe that makes the answer to my question no; it is not currently on the form?
A. Not currently on the form.
Q. And you mentioned earlier you received complaints from -- you received a complaint from a parent about a student who was watching YouTube at home and there was vulgar content in a song that the student watched.
A. It was on a District device, a

Chrome -- Chromebook -- not a Chrome, a Chromebook -- and the parent reported that his daughter said that she and her friends had been watching Sabrina Carpenter's -- or listening to it at least -- it was on YouTube; I don't know if it was a video or just a static, you know, album page -- at school, and he came upon her listening to it at home on her Google Chromebook as well.

Q. Have you received any other complaints from parents or guardians about their student having access to YouTube?

A. Yes. Other parents have contacted me directly to ask that we turn YouTube off for all students, or their student, failing that, which becomes difficult because teachers use it appropriately for instructional purposes. It's -- it's the rabbit hole that YouTube takes students down, discovering content that their parents are terrified to learn they have access to, that they object to.

Q. Okay. So the parent complaints you received are about their children having access to content -- certain content on

YouTube?
A. Yes.
MS. HAILESELASSIE: Object to form.
BY MR. WHITELEY:
Q. And you said that teachers use YouTube instructionally, right?
A. Yes.
Q. And the District still allows teachers to do that today, right?
A. Yes.
Q. Have you -- strike that.
CCSD has, at least at some point, had its own mobile app available to download, right?
A. Yes.
Q. Do you know if it's still available to download in the Apple app store?
A. I don't -- I don't know. I don't know that.
Q. What about the Google Play store, do you know if its app is still available to download?
A. I don't know. Sorry.
Q. Did the District stop updating

these apps or make a decision to, you know, remove them?

A. Communication is responsible for -- would be responsible for that. I don't know what they are doing with a mobile app today.

Q. And if you wanted to find that out, who would you go talk to in communications?

A. Michelle Mills or Vanessa Denney.

Q. The District has a YouTube account, correct?

A. When you say it has a YouTube account, do you mean --

Q. On which it posts content on YouTube.

A. Yes.

Q. The District has a Facebook account that it uses to post content?

A. Yes.

Q. It has an Instagram account?

A. Yes.

Q. It also has a Twitter or X account?

A. Yes.
Q. And other than those platforms, does the District have any other online accounts?
A. Those are the only ones I'm familiar with.
MR. WHITELEY: Vince, could you pull up the CCSD homepage and share it on the screen. I think this is link number 5. For the record, we are pulling up the website CCSDschools.com.
(Exhibit No. 5 was marked for identification.)
BY MR. WHITELEY:
Q. Can you see that on the screen in front of you, Mr. Buckheister?
A. Yes.
Q. This is CCSD's homepage, right?
A. Correct.
Q. And I'd like to direct your attention to that top left-hand corner. Do you see there's a black bar that goes across the top of the -- the page?
A. Yes.

Q. And it's present on every single web page on the CCSD website, right?

MS. HAILESELASSIE: Object to form.

THE WITNESS: I have no idea. I'm sorry.

BY MR. WHITELEY:

Q. Okay.

MR. WHITELEY: Vince, can you click on Divisions and follow that.

BY MR. WHITELEY:

Q. And now we're on the Divisions subpage. Do you see the black bar is still there?

A. Yeah. It appears to be -- yeah, a bar that would appear on nearly every page.

Q. And so there's four icons there in the top left, right?

A. Yes.

Q. And the first one, that's the Facebook icon, right?

A. Yes.

Q. And if you click on it -- if you click on it, that's what will take you to

CCSD's Facebook page, right?
A. Yes.
Q. And then if we could go back to the CCSD website. If you click on the X icon, that will take you to X.com, formerly known as Twitter?
A. Okay. Yes.
Q. You may have to warned in these days.
A. Uh-huh.
Q. But that will take you to the, based on the URL --
MR. WHITELEY: If you could go back, Vince, and hover over the "X."
BY MR. WHITELEY:
Q. It's a little small, but in the bottom left-hand corner --
A. Oh, yeah.
Q. -- the URL will take you to the CCSD Twitter or X page.
A. Yes, it looks like it.
Q. And the other two, that's the YouTube icon and the Instagram icon, right?
A. Correct.
Q. And if you'll click on those,

it will take you to CCSD's pages on YouTube and Instagram?
A. Yes.
Q. So no matter where someone is on the CCSD website, if that black bar is there at the top, they're just one click away from these platforms, right?
MS. HAILESELASSIE: Object to form.
THE WITNESS: Yes.
BY MR. WHITELEY:
Q. And you said you read the complaint, right?
A. I missed that.
Q. You read the complaint --
A. Yes.
Q. -- that CCSD filed --
A. Yes.
Q. -- in this case?
A. Yes.
Q. And you're aware that the District is alleging that Defendants' platforms, including Facebook, Instagram, and YouTube, are addictive for children, right?
A. Can you ask the question again,

please?

Q. Yes. You're aware that the District is alleging in that complaint you read that Defendants' platforms, including Facebook, Instagram, and YouTube, are addictive for children?

A. Yes.

Q. So why does the District link to those platforms on its homepage?

MS. HAILESELASSIE: I'm going to object to the form.

THE WITNESS: Is there a correlation there or is there a relationship there? I don't understand what -- what are you asking? We have -- I mean, we have -- we use these social media platforms, the District does, to communicate with students and teachers and the public. So that is a reasonable, healthy use of a social media platform.

That's not what we're alleging in the complaint, as I understand it, is that all social media platforms and everything they do is bad.

What we're saying is that students are addicted to these platforms because of how they're constructed, how they're built by experts who are very good at making sure that the little dopamine push that they get when -- when -- when they get the likes or whatever it is are going to keep kids coming back for more. It has nothing to do with CCSD's use of social media's platform. It has everything to do with how these platforms are built. They are intended to addict children, to draw them in, to keep them using it, and it's devastating.

BY MR. WHITELEY:

Q. So if the District thinks that these platforms are very good at giving little dopamine pushes to students, why does it link to those platforms on its homepage?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Oh, I don't know how to answer this in a way that will

make sense.
We use these platforms to communicate appropriately with the public, with students, with teachers and other staff, parents. That is an appropriate use of a social media platform. It's a thing that they do well and that we take advantage of.
Does that mean that -- just because we have a major issue or complaint with how -- with some of how they do business, does that mean we should -- what's the word I'm looking for? -- not use these platforms? Does it mean that we should -- we should -- Oh, God, what's the word? I just don't understand the relationship.
Anyway...
BY MR. WHITELEY:
Q. So the District agrees there is some appropriate use of Defendant's platforms, right?
A. Absolutely.
Q. Are any of CCSD's content filtering softwares or mechanisms like iBoss

paid for by the State of South Carolina?
A. Yes.
Q. Which ones are paid for by the State of South Carolina?
A. I would have to get back to you on that. I don't have the entire list or --
Q. Okay.
MS. HAILESELASSIE: Which topic are we on?
MR. WHITELEY: I'm on topics 6 and 7.
BY MR. WHITELEY:
Q. Do you know how much money the District receives from the State of South Carolina for these content filtering softwares or other mechanisms?
MS. HAILESELASSIE: Object to form. Object to scope.
THE WITNESS: I have -- I mean, it's part of my budget. I can get that data. I don't have it at my fingertips.
MR. WHITELEY: Okay. So to the extent it's not been produced, we'll request that, but we can talk with the

attorneys about that on the break.
BY MR. WHITELEY:
Q. So who runs these social media accounts for the District, the Facebook, Instagram, YouTube, and Twitter pages?
A. Communications.
Q. And does the same person within the office of communications run these accounts or do multiple people?
A. That, I'm not sure of. I assume they're shared responsibility. Typically, it's going to be someone who's responsible for actual manipulation of the site, of the pages. Someone else is going to be responsible for editing/approval, that kind of thing.
Q. When you say manipulation of a site, do you mean like editing the banner photo and the description and that sort of thing?
A. Yeah. Managing the content.
Q. You mentioned a couple of other employees in communications earlier: Michelle Mills and Vanessa Denney. Do you know if they run these accounts or approve

content on these accounts?
A. My assumption is that one -- one of them -- I -- so communications has changed in the last few months. Some responsibilities were split. Vanessa Denney was originally responsible for kind of everything about communications, and Michelle Mills took over some responsibility. So it's not clear to me exactly who is responsible for what in some cases. In your specific question, it's not clear to me which of them is responsible for that.
I typically reach out to Michelle Mills when I have a question.
Q. When you have a question about what?
A. I'm not going to get into too many specifics. It's --
Q. Just the general topics of what you would reach out to her about is fine.
A. I am -- let's see -- how can I say this without divulging proprietary information?
Michelle, I have a topic. We need to communicate with parents and staff on

this topic. Here's my proposed language. Let me know of any edits. Can we go with this on Friday?

Q. Understood.

And did you speak to Ms. Mills or Ms. Denney to prepare for your deposition today?

A. I did not.

Q. Did you speak to anybody from communications to prepare for your deposition today?

A. I did not.

Q. Did you review any of CCSD's online accounts or any posts on those accounts to prepare for your deposition today?

A. I did not.

Q. And who in communications decides -- you know, in response to a question like the one you posed in your hypothetical of, you know, which method of communication to use?

A. Can you ask that again, please?

Q. So, yeah. If you -- in your hypothetical earlier, you said, I need to

reach a certain audience, staff, parents, someone else, and I'd like to get this out on Friday. So then somebody in communications will decide the best way to communicate that message to a particular audience, right?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes.

BY MR. WHITELEY:

Q. So my question is, who makes that decision in communications?

A. In the specific case I mentioned, that would be Michelle. There are going to be situations where her boss and my boss -- we both report to the CFO -- might be engaged as a representative of the cabinet. There are going to be situations where one or the other of those two go to the superintendent with the question, if I haven't already run it by her.

Q. Does CCSD monitor any metrics to understand engagement that it's receiving on its YouTube, Facebook, or Instagram accounts?

MS. HAILESELASSIE: Object to

form. Scope.

THE WITNESS: I know that the super- -- this is not answering your question. Maybe I'm saying too much. The superintendent's Facebook page is very active.

I don't know -- I don't know what metrics they track for any of our social media accounts.

BY MR. WHITELEY:

Q. Would that be -- if you wanted to figure that out, who would you ask at the District?

A. Michelle Mills.

Q. Does CCSD hire or contract with any third-party companies to post content on or otherwise use its Facebook, Instagram, or YouTube accounts?

A. Did you say to track or to post?

Q. Sorry. Does CCSD hire or contract with any third-party companies to post content on its -- those three accounts?

A. I'm not aware of any, but I can't be sure.

Q. And who would you go to ask?
A. Michelle Mills. Daniel Prentice can also answer that question. I wouldn't bother him with it, but he would know.
Q. That's because he's CFO, so he would know about the contracts?
A. Well, and because Michelle reports to him; communication reports up to him.
Q. Understood.
MR. WHITELEY: We've been going a little over an hour. Is now a good time for a break?
MS. HAILESELASSIE: Let's do that. Thank you.
THE VIDEOGRAPHER: Off record at 10:29 a.m.
(Recess.)
THE VIDEOGRAPHER: On record at 10:57 a.m.
BY MR. WHITELEY:
Q. Mr. Buckheister, I wanted to ask you another question about the January 2025 policy regarding cell phone use --

MS. HAILESELASSIE: Wait. Before --

MR. WHITELEY: Can we go off the record?

THE VIDEOGRAPHER: Off record at 10:57 a.m.

(Technical difficulties.)

THE VIDEOGRAPHER: On record at 11:02 a.m.

BY MR. WHITELEY:

Q. Mr. Buckheister, I wanted to ask you another question about the January 2025 cell phone policy we were discussing earlier.

The State of South Carolina mandated that schools adop- -- in the state adopt a policy like this, right?

A. Yes.

Q. And if a school did not adopt this policy, the state would withhold certain funding; is that correct?

A. That's what the law -- that's -- as I understand the law, yes.

Q. And earlier we talked about a couple of employees in the communications

department. Do you know if they report to Andrew or Andy Pruitt?

A. Andrew reports to Michelle Mills, as I understand it.

Q. And then I believe you said Michelle reports to Daniel Prentice?

A. Yes.

Q. And do all employees in the communications department report up to Michelle?

A. Their responsibilities in communications kind of bifurcate as I alluded to earlier. So Vanessa has direct reports and Michelle has direct reports.

Q. Okay. So all communications employees will report to one of those two individuals?

A. Yes.

Q. That includes Mr. Pruitt?

A. That includes them reporting up to Mr. Pruitt --

Q. No. Mr. Pruitt is included --

A. I'm sorry. I'm --

Q. That Mr. Pruitt includes -- is included in the group that reports up to one

of those two individuals?
A. Yes.
Q. And does Steven Wyatt report up to either Michelle or Vanessa?
A. Yes.
Q. We talked earlier about teachers' use of YouTube in the classroom and teachers can use YouTube to show instructional videos to students within the District, right?
A. Yes.
Q. Are you familiar with something called an Edpuzzle?
A. I have not seen that.
Q. And teachers can assign homework or other assignments to students that involves the use of YouTube, right?
A. I believe that would be unusual.
Q. But it does occur?
A. I have to assume that, yeah, that it does occur. And teachers often use YouTube in a classroom, right?
MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes. Teachers use YouTube in the classroom for instructional purposes.

BY MR. WHITELEY:

Q. And they do so often?

MS. HAILESELASSIE: Object to form.

THE WITNESS: I -- I can't characterize how often -- I don't know what "often" means. What does often mean? What do you mean by often?

BY MR. WHITELEY:

Q. Is it a part of -- a frequent part of teacher lesson plans?

MS. HAILESELASSIE: Object to form.

THE WITNESS: I -- no. I don't think it's frequent. If frequent means numbers -- numbers are better for me -- percentages to try and understand what you're asking, but --

BY MR. WHITELEY:

Q. Does the District have any data showing how often YouTube is used in the classroom?

A. It's not something we collect.
Q. Do you know what a Yondr pouch is?
A. I do.
Q. And the District has purchased Yondr pouches for some of its schools, correct?
A. Yes.
Q. But not all of its schools?
A. Correct.
Q. And why did the District decide to purchase Yondr pouches for some of its schools?
A. We liked the pilot technology. We liked -- and this isn't really -- Yondr pouches aren't really technology, but they affect technology. We like to pilot other programs. So we allowed a small group of schools to volunteer who were excited about using Yondr pouches to begin using them.
Q. And do you know why certain schools within the District were excited to use Yondr pouches?
MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes. They wanted to get mobile devices, phones out of the hands of students during the school day. So they were excited that there was a way to securely lock them away and ensure that students couldn't get to them during the school day.

BY MR. WHITELEY:

Q. Do you know how much the District has paid on average for a Yondr pouch?

A. About $25 per pouch.

Q. Earlier we were talking about the District's use of different platforms. The District uses platforms like Facebook, Instagram, Twitter, and YouTube to posts content about logistics-type information, like school closings, right?

A. Correct.

Q. It also will post about school-sponsored extracurriculars or sports?

A. Yes.

Q. The District could convey -- the District conveys information about -- to these platforms for emergencies affecting

schools within the District?
A. What do you mean by "emergencies"?
Q. Well, if there was a fire at a school building or nearby a school building and that caused an evacuation, the District might post about that on its -- these platforms that we're discussing, right?
A. Yes. They might -- we might.
Q. And CCSD will post content on these platforms about fundraising for the District, right?
A. Yes. There are a number of events that we'll post, we use the platforms to post, alert folks to, yes.
Q. CCSD has posted information about mental health issues and programs in the District, right?
A. Yes.
Q. Okay. If you could --
MR. WHITELEY: Vince, if you could pull up tab 44.
(Exhibit No. 6 was marked for identification.)
BY MR. WHITELEY:

Q. And I will represent to you this is a capture -- a screen capture of a post from CCSD's Facebook account that we captured. So can you see that on the screen in front of you?

A. Yes.

Q. Do you need it zoomed in or anything?

A. I think I'm good. Thank you.

Q. Okay. And this is dated April 15, 2020, and this is discussing the then ongoing closure of schools in response to COVID, correct?

A. Let's see.

(Peruses document.)

MS. HAILESELASSIE: Has this been produced in this litigation?

MR. WHITELEY: No. It's publicly available.

THE WITNESS: Did you say during or as a result of?

BY MR. WHITELEY:

Q. Yes. I said this -- this post was made when CCSD schools were still closed as a result of the COVID pandemic in April of

2020, right?

A. That's correct.

Q. And the District used its Facebook page to help ensure that social, emotional wellness, and additional homework supports are available for families, right?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Yeah. This was a really difficult time for everyone, but particularly students, and so yes.

BY MR. WHITELEY:

Q. Right. And as you said, it was a difficult time. And in the next paragraph, the District wrote on its Facebook page, "It is possible during this time that students may begin to become more withdrawn, have increased behavior issues, anxiety and fear, depression, as well as challenges completing homework assignments," right?

A. Yes. That is -- yes, that is on screen and was posted.

Q. And so the District established a family support line to provide support to students and families during this difficult

time?

MS. HAILESELASSIE: Object to form.

THE WITNESS: Yes.

BY MR. WHITELEY:

Q. And that was a good thing, right, to provide the support during this difficult time?

A. Absolutely, yes.

MR. WHITELEY: Now, if we could pull up tab 45, Vince.

(Exhibit No. 6 was marked for identification.)

BY MR. WHITELEY:

Q. This is another post the District made on its Facebook page that we captured.

And do you see that on your screen, Mr. Buckheister?

A. Yes.

Q. And the District wrote, "Charleston County School District (CCSD) will receive almost $1 million a year for five years to expand mental health support for children through a Project Prevent grant

from the U.S. Department of Education," right?

A. Yes.

Q. This post doesn't -- it talks about the need in the District for additional social, emotional, and mental health supports, right?

A. It does.

Q. It does not mention student social media use as a cause of those additional need -- additional social, emotional, mental health supports.

MS. HAILESELASSIE: Object to form. And also object to the questioning about particular areas in these posts that have nothing to do with the topics that Mr. Buckheister is here to testify to today regarding the policies and practices for -- for using these platforms, not the content of particular posts made to the platforms.

MR. WHITELEY: Yeah. This is --

MS. HAILESELASSIE: You may

answer.

MR. WHITELEY: Well, for the record, I disagree with your objection. This is a practice of the District to use its social media accounts to promote awareness and information about these topics. So I'm going to continue asking about it.

MS. HAILESELASSIE: Correct. You can ask him about the practices, but regarding, you know, specific content and, you know, content that is -- is not part of the practice of using these pages. The specific content that has to do with grants or programs, this witness is not prepared to testify to all of -- all of that granular detail about every piece of content that has been posted to the --

MR. WHITELEY: Okay. Well, we disagree about the scope of the topic. We can talk about that later off the record. But I'll continue asking about this document.

BY MR. WHITELEY:

Q. So going back to my question, I'll reask it.

This -- this particular post that the District made does not say that student social media use is a cause of the additional need for these services, right?

MS. HAILESELASSIE: Object to form.

THE WITNESS: That would be an amazingly badly written communication if we somehow sprinkled in here the -- the problem of social media usage by children into this message about something completely unrelated to the topic.

BY MR. WHITELEY:

Q. Well, the District does call out a specific type of trauma that students experience, right? It talks about gun violence in the last paragraph, right?

MS. HAILESELASSIE: Object to form.

THE WITNESS: It does call out gun violence. That doesn't have -- I don't understand what that has to do

with social media use by children, but --

BY MR. WHITELEY:

Q. I'm asking you, the District in this post called out gun violence as something that can traumatize children, right?

MS. HAILESELASSIE: Object to form. Scope.

THE WITNESS: It does, yes, call that out. It -- again, it has nothing to do with the use -- I just don't understand the -- the link that you're trying to make.

BY MR. WHITELEY:

Q. Well, it's a yes or no question. The District does call out gun violence as a -- something that can traumatize children in this post, correct?

MS. HAILESELASSIE: Object to form. Asked and answered repeatedly.

BY MR. WHITELEY:

Q. Is that a yes?

A. It's a yes.

Q. Thank you.

You agree that social media can be -- strike that.
You'd agree that -- you know who the Defendants are in this case, right?
A. Yes.
Q. So -- and the Defendants -- the Defendant platforms at issue in this case are Facebook, Instagram, TikTok, Snapchat, and YouTube, to your understanding?
A. That's my understanding.
Q. And you'd agree that students, as a part of marginalized communities, can use these platforms to connect with other members of the marginalized communities?
MS. HAILESELASSIE: Object to form. And scope.
THE WITNESS: All students of any community can use these platforms to connect to other members of their community and other members of other communities and -- yeah, I mean, yeah. That's kind of one of their purposes, I think.
BY MR. WHITELEY:
Q. And we agree that that could be

beneficial?

MS. HAILESELASSIE: Object to form. And scope.

THE WITNESS: I believe that making connections with people is beneficial. I think that making com- -- interactions that don't involve technology are better. As far as a social media platform can facilitate further face-to-face or actual like -- yeah, face-to-face interaction with others in your community or outside of your community is a -- is a good thing.

MR. WHITELEY: And Vince, if you could pull up tab 46. And this is, for the record, another Facebook post made by Charleston County School District. This one's dated September 11, 2023.

(Exhibit No. 7 was marked for identification.)

BY MR. WHITELEY:

Q. Do you see this on your screen, Mr. Buckheister?

A. Yes.
Q. And here the District is posting about Suicide Prevention Month which is the month of September.
A. Yes.
Q. And the District writes, "September is Suicide Prevention Month -- a time to raise awareness and discuss this highly stigmatized topic. In addition to shifting public perception, we use this month to spread hope and vital information to people affected by suicide."
Did I read that correctly?
A. I believe so, yes.
Q. So the District thinks it's important to use social media to raise awareness about difficult topics like suicide, right?
A. The District feels it's important to raise awareness with whatever platform it has. That includes social media, that includes traditional media, that includes face-to-face meetings with the public. There, yeah, are many different ways that we try to get our message out.

Q. Does the District have or know of any report or study or analysis that it prepared or commissioned about student use of cell phones, smartphones, laptops, tablets, or other electronic devices?
A. That it commissioned?
Q. Prepared or commissioned.
A. That it prepared or commissioned.
Not to my knowledge.
Q. Okay. And just to make this a little easier on the both of us, if I say "cell phones and other devices," do you understand that that will refer to cell phones, smartphones, laptops, tablets, or other electronic devices?
A. I do.
Q. Thank you.
Does the District have or know of any report, study, or analysis that it has relied on about cell phones or other electronic devices -- about student use of cell phones or other electronic devices?
A. Can you narrow the topic down? About student use of cell phones or other

mobile devices is -- that is just really broad. I -- I'm not sure I can speak for the District.

Q. Well, has the District relied on any study, let's say, from 2017 to present, that analyzed CCSD students' use of cell phones or similar electronic devices?

A. Not to my knowledge.

Q. Does the District -- strike that.

Stepping back a little bit to outside of CCSD, does the District have in its possession or know of any report, study, or analysis from 2017 to present about elementary, middle, or high school students' use of cell phones or other electronic devices?

A. Yes. There's lots, lots of data out there, a lot of articles, studies, analyses that the District has, you know, at its -- at its fingertips.

Q. When you say "at its fingertips," what do you mean by that?

A. Available to it.

Q. And do you know any specific

studies that you're referring to here?
A. No. I don't -- I don't have a specific list for you.
Q. Okay. Who -- if you wanted to, you know, find some of those studies, who would you talk to in the District to find, you know, what the studies are and where they might be located?
A. So 7,500 employees currently, but going back to 2017, making an assumption about the number of folks who have retired, you know, you might be talking about -- in -- in that time period, you might be talking about 20,000 people.
Q. Sorry. My question was not about the number of employees. My question was if you wanted to -- tomorrow when you're at work if you wanted to find out, you know, if the District has collected these studies anywhere or, you know, somebody knows what database to use to access some of these studies, who would you go talk to? Do you know?
A. I didn't -- I didn't say that we had collected them or put them in a

database. What I said was that they were available to the District, and you and I both have to assume that they had been consumed by many, many, many people in the District. Who would I go and talk to? I could go and talk to anybody in leadership, any teacher, any principal and ask them what they've come across, what they've consumed.

Q. And does the District have or know of any report, study, or analysis it has relied on from 2017 to present regarding elementary, middle, or high school student use of cell phones or other electronic devices?

A. I can't point to a specific study or analysis. There's so much -- there's so much out there. There's -- a lot of research has gone into this, as you well know.

What we -- what I can point to is we see -- we see the result, we see the behaviors that are pointed to and the research, and are proven over and over by the research.

Q. And so you can't point me to a

specific piece of research that you're referring to?

A. No.

Q. Does the District have or know of any report, study, or analysis that it has relied on from 2017 to present regarding CCSD's students' use of TikTok, Snapchat, YouTube, Facebook, or Instagram?

A. I can't point you to a specific report.

MR. WHITELEY: Off the record.

THE VIDEOGRAPHER: Off record at 11:27 a.m.

(Recess.)

THE VIDEOGRAPHER: On record at 11:41 a.m.

MR. WHITELEY: Mr. Buckheister, thank you for your time. I have no further questions at this point pending questions from your counsel.

EXAMINATION

BY MS. HAILESELASSIE:

Q. All right. Good afternoon, Mr. Buckheister.

A. Good afternoon.

Q. As you know, I represent the Charleston County School District. I just have a few questions for you in follow-up.
Do you recall at the start of your testimony, you made some comments regarding the complaint that was filed in this matter?
A. Yes.
Q. Were those complaints made in your official capacity as a corporate designee for CCSD?
A. Yes. Except for one. I made a little bit of a flip comment about its length. I found -- I actually found it very interesting, the complaint, and there was some -- there were some parts of it that were more legalese than I'm used to, outside of my area of expertise, and -- but the facts I found very interesting.
Q. All right. Thank you.
You were also asked earlier about whether the issue that parents were concerned about regarding YouTube was related to content.
Do you recall that?

A. I do.
Q. What specifically was the concern being expressed by parents regarding content?
A. That they didn't feel that the content was appropriate for the age of their student, that -- that-- that's it. They just didn't feel the content was appropriate.
Q. And you also mentioned the rabbit hole as related to YouTube.
Do you recall those comments?
A. Yes.
MR. WHITELEY: Objection to form.
BY MS. HAILESELASSIE:
Q. Can you please explain for the jury what you meant by that?
A. The parent was concerned that the topic the student had been researching was -- the resulting videos that were -- that were beginning to be served up were only tangentially related to the topic at hand, and that they were being taken to darker and darker kind of views of -- that kind of tangential relationship to the topic.

Q. Have you ever spoken with any CCSD administrators or employees regarding this concern about the YouTube rabbit hole?
A. Yes. Yes.
Q. And -- and how -- how have those discussions played out?
A. That -- what -- what children are seeing is -- as I said earlier -- darker versions of -- it starts out as darker versions of the content and goes into increasingly darker -- darker places, and that children at that age are -- they're just -- they don't have the emotional, social stability to really handle and judge that -- that information as, you know, something they shouldn't be concerned about or worried about or dealing with or thinking about. Whereas, you or I might just shut it down, they're just -- they're drawn in and continue, you know, to go further down.
Q. Does CCSD have experience with children at CCSD experiencing this phenomenon that you're describing as the YouTube rabbit hole?
A. Yes.

MR. WHITELEY: Objection to form.

THE WITNESS: Yes.

BY MS. HAILESELASSIE:

Q. And how would the rabbit hole manifest on the YouTube available to students on their school-issued devices?

MR. WHITELEY: Objection to form. And scope.

THE WITNESS: Our understanding is that there is no difference between what a child can be served up on a CCSD device versus what is served up on their personal device if they have one, except for the restrictions that can be placed, the three levels of restriction that can be placed on YouTube by the District or presumably by parents as well.

But that the -- the algorithm still drives them into what a mental health professional would consider inappropriate, what a parent would consider inappropriate, what the algorithm or the -- the filtering

software doesn't consider inappropriate, and so continue -- continues to serve it up.

BY MS. HAILESELASSIE:

Q. And who are the -- what are the categories of administrators or employees who have discussed the YouTube algorithm at CCSD?

A. At schools: Teachers, school psychologists, our tech liaisons, and it -- you know, even up to the chief academic office, a lot of discussions around what we can do.

Q. And has CCSD determined that there is anything that they can do regarding the YouTube rabbit hole?

A. We've had --

MR. WHITELEY: Objection to form. Objection to scope.

THE WITNESS: We've had those discussions in IT. We don't know of a way -- we can't find a way to prevent the algorithm from serving those topics up from -- from taking the child down the rabbit hole. If there is a way, we have not been able to

find it, and we've done everything we can, and we're pretty good at this. So no, we haven't -- we haven't discovered that.

MS. HAILESELASSIE: Okay. Thank you very much for your testimony today as a corporate designee.

MR. WHITELEY: I've got some questions.

FURTHER EXAMINATION

BY MR. WHITELEY:

Q. So -- hold on.

Mr. Buckheister, I've got a few follow-up questions for you based on your counsel's questioning.

Has the District ever talked to anybody at YouTube about YouTube's algorithms?

A. We've -- we've discussed it with our YouTube representatives.

Q. And who is the YouTube representative?

A. I don't have the name with me.

Q. And what did you -- what did the District discuss with this

representative?

A. We'd like to understand if there's a way that we can not take students to a darker place down the rabbit hole when they're engaged with the platform.

Q. And do you recall when this conversation happened?

A. Before I was head of IT. My understanding is that it occurred, so it would have been pre-July 24.

Q. Okay. And the District still enables students to access YouTube, correct, after that conversation happened?

A. We do allow students to use YouTube. We do allow teachers to use YouTube after that conversation occurred. Our conversation wasn't about whether or not students should be using YouTube at all, but to see if we could trick the algorithm into not making it what it eventually becomes.

Q. All right. And after that conversation, the District still allows students to access YouTube, correct?

A. Yes.

MS. HAILESELASSIE: Objection.

Asked and answered.
BY MR. WHITELEY:
Q. And you mentioned conversations with administrators about this topic, right, and that includes principals?
A. Principals, yes.
Q. Okay. What principals at -- well, let me ask it this way first.
When you were talking about those conversations during your counsel's questioning, were these conversations that you had with these individuals, or these were conversations that someone else in the District has had?
A. Which questions?
Q. The questions about conversations with principals on this topic of the YouTube algorithm. Do you remember those questions from your counsel?
A. And which -- yes, I do.
Q. And so my question is: Did you have these conversations with principals and other individuals, or were other folks having these conversations with principals?
A. Both.

Q. Okay. Who did you talk to?
A. Andy Brandt, Steve Larson, Ryan Cumback. Those are the principals.
Q. Okay. You also mentioned psychologists. What psychologists did you talk to?
A. I didn't myself speak to any school psychologists.
Q. Do you know which school psychologists somebody else in the District talked to about this topic?
A. I don't have -- no specific names.
Q. And what about teachers, did you talk to any teachers about this?
A. I didn't speak -- I didn't say that I'd spoken to teachers, did I?
Q. Well, did you speak to teachers --
A. No.
Q. -- about this?
Do you know if anybody else at the District spoke to teachers about this?
A. Do I know of specific conversations between District staff and

teachers on this topic?
Q. Yes.
A. I don't know of specific conversations, dates, times.
Q. Do you know the names of any teachers that the District discussed this topic with?
A. I don't know -- no. I don't have a list of specific teachers for you.
Q. And what, if any, changes did the District make regarding YouTube access in response to this concern?
A. Taking devices away from kids during the day.
Q. Students still have their school-issued Chromebooks during the day, correct?
A. Yes. Those are monitored.
Q. So this concern you're talking about only applies to non-school-issued devices; is that right?
A. Can -- can you ask the question again? Can you rephrase?
Q. Yeah. So students could access YouTube either on a personal device, which

could be done through a cellular network or the District network, right?

A. Off campus with a personal device on a cellular network; they can also access YouTube with their Google Chrome devices --

Q. Correct.

A. -- their Chromebooks.

Q. Sorry. I didn't mean to cut you off. That was my next question.

Students could also access YouTube on their District-issued Chromebook devices?

A. Yes.

Q. So this concern that we're discussing about the YouTube algorithm, was that expressed in regard to YouTube access on Chrome devices or student access to YouTube on a personal device?

A. So the District -- we in IT can have an impact on Chromebooks. When I say an impact, we can con- -- we have control on Chromebooks that we don't have on personal devices. I hate to state the obvious, but there it is. That doesn't mean as part of

the conversation that we express a concern that's related to CCSD-issued devices as well as personal devices.

Q. So did the District, in response to these concerns, make any changes regarding YouTube access on its network or Chrome devices issued by the District?

MS. HAILESELASSIE: Object to the form. Asked and answered. Twice.

THE WITNESS: Yes.

BY MR. WHITELEY:

Q. What are those changes?

A. We -- we restrict as much as we can. As I told -- as I said earlier, we are looking at additional restrictions for younger grades. We are constantly looking for ways to limit what -- what can be seen, but we're fighting -- I mean, we're really fighting a monster. It's -- it's -- it's beyond our resources, our time, our bandwidth, our knowledge and expertise, even though, like I said, we're pretty darn good at this.

Q. So have any changes been implemented already by the District in

response to these concerns?
A. We can limit specific videos, and we've done that, when they are discovered and reported to us. That, again -- it doesn't -- it -- I don't -- and I don't have a metaphor for you other than to say, you know, the beast keeps fighting back.
Q. And so did the District limit any specific videos in response to these concerns?
A. We've limited specific videos, yes.
Q. Do you know how many?
A. I don't have that number at my fingertips.
Q. Do you know if it's ballpark less than 20 or more than 20?
A. Definitely more.
Q. Less than or more than 75 videos; do you know?
A. Definitely more.
Q. Is there a list somewhere in the District's possession of the videos that have specifically been blocked?
A. We have a system that we use to

block them, so I presume a list could be generated.

MR. WHITELEY: We'll ask for the production of that, but we can talk about that off the record.

Those are all the questions I've got. Thank you, Mr. Buckheister.

THE WITNESS: Sure.

MS. HAILESELASSIE: I have no further questions.

THE VIDEOGRAPHER: Are we going off record or --

MR. WHITELEY: Off the record. Any questions from Defendants on Zoom for the 30(b)(6) portion?

MR. FLASTER: Nothing for Meta.

MR. WHITELEY: Okay. Off the record.

THE VIDEOGRAPHER: All right. This concludes today's deposition. The time on the monitor is 11:57 a.m.

Total time on record for Williams & Connolly, I have -- it's 1 hour and 39 minutes. Total time on record for counsel for Plaintiff was

six minutes.

Off record, 11:57 a.m.

(Whereupon, the deposition of KENNETH L. BUCKHEISTER was concluded at 11:57 a.m.)

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date: April 30, 2025.



________________________

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition. It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -

E R R A T A

\- - - - - -

PAGE LINE CHANGE

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

____ ____ ________________________________________

REASON: ________________________________________

ACKNOWLEDGMENT OF DEPONENT

I,___________________________, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

__________________________________________________

KENNETH L. BUCKHEISTER DATE

Subscribed and sworn to
before me this
______day of_______________,20___.
My commission expires:_______________
_____________________________________
Notary Public

**&**

**&** 3:13,21 4:5 99:23

**0**

**03047** 1:6
**04659** 1:9

**1**

**1** 1:24 5:11 18:24,25 19:3 73:23 99:23
**10** 21:13
**104** 1:24
**10:29** 63:18
**10:57** 63:21 64:6
**11** 6:13 19:18 21:8,11 79:20
**11:02** 64:9
**11:27** 85:13
**11:41** 85:16
**11:57** 99:21 100:2,5
**13** 19:18 21:16 27:25 29:12
**14** 19:18 21:16
**14542** 101:16
**15** 6:6 71:11
**17** 19:16
**1700** 4:6
**18** 5:14
**19** 5:19
**19103** 3:24
**1st** 11:6

**2**

**2** 5:15 19:24,25 20:3
**20** 44:15 98:17 98:17 104:16
**20,000** 83:14
**20006** 4:8
**2001** 3:23
**20024** 3:15
**2017** 82:5,14 83:10 84:11 85:6
**2017-2018** 12:17
**2018** 39:17
**2019** 6:9 39:23
**202** 3:16 4:9
**2020** 6:6 40:3,7 71:11 72:1
**2023** 6:13 79:20
**2024** 22:22 23:3 45:15
**2025** 1:18 7:7 23:4,17,25 24:15 28:4 31:17 32:11 34:10 63:25 64:13 101:15
**213474** 45:13
**215** 3:25
**216-9000** 3:8
**22** 5:22
**23** 1:9
**24** 92:10
**25** 18:16 69:12
**27** 6:9
**278-2555** 3:25
**28** 2:5 3:6 7:10
**29464** 2:6 3:7 7:12

**3**

**3** 5:20 22:12,13 22:16 32:24 44:18
**30** 1:14,18 5:17 7:7 99:15 101:15 102:12
**3000** 3:23
**3047** 1:4
**39** 99:24

**4**

**4** 5:23 44:15,16 45:5
**434-5000** 3:16
**44** 5:25 70:22
**45** 73:11
**46** 79:16
**482** 45:23
**4:22** 1:5

**5**

**5** 6:4 50:10,13
**50** 6:6
**5129** 1:25 101:19
**55,000** 43:25 44:7

**6**

**6** 1:14 5:17 6:7 19:18,22 20:20 21:5 29:12 39:2 57:10 70:23 73:12 99:15
**680** 3:14

**7**

**7** 6:10 20:21,23 22:11 39:2 57:11 79:21
**7,500** 83:9
**73** 6:9
**7348880** 1:23
**737-0500** 4:9
**75** 98:19
**79** 6:13

**8**

**8** 5:3 19:18 20:17 21:1,5
**843** 3:8
**85** 5:4

**9**

**9** 21:7
**900** 4:7
**91** 5:3
**9:21** 1:19 7:8

**a**

**a.m.** 1:19 7:8 63:18,21 64:6 64:9 85:13,16 99:21 100:2,5
**ability** 37:14
**able** 10:7 11:16 11:18 12:16 90:25
**absolutely** 56:23 73:9
**ac** 40:7
**academic** 35:6 90:10
**academics** 33:6 40:19
**acceptable** 12:11
**access** 37:3,5,8 37:25 38:5,6 38:20 39:5,23 40:1,7,13,17,23 41:8,13,25 46:5 47:12,22 47:25 83:21 92:12,23 95:11 95:24 96:5,11 96:17,18 97:6
**accessed** 38:23
**accessing** 36:18
**account** 6:5,8 6:11 49:13,15 49:20,22,25 71:3
**accounts** 50:4 58:4,9,25 59:1 60:14,15 61:24 62:9,18,23 75:6
**accurate** 102:15
**acknowledg...** 104:1
**acronym** 41:10
**active** 62:6
**activities** 18:4 27:14
**actual** 58:13 79:10
**actually** 86:14
**add** 43:9,15,19 46:13
**added** 46:3
**addict** 55:14
**addicted** 55:2
**addictive** 53:24 54:6
**addition** 1:5 80:9
**additional** 41:5 41:17 72:5 74:5,11,11 76:6 97:15
**administering** 2:16
**administrators** 26:1 35:1 88:2 90:6 93:4
**adolescent** 1:5
**adop** 64:16
**adopt** 64:17,19
**adopting** 34:9
**advantage** 56:8
**advocate** 34:16 34:23
**advocated** 34:8 34:12,14
**advocating** 34:10,11
**affect** 68:17
**affected** 80:12
**affecting** 69:25
**afternoon** 85:23,25
**age** 87:6 88:12
**ago** 14:14
**agree** 45:25 78:1,3,11,25
**agreed** 23:10
**agreement** 5:25 45:9 46:1
**agrees** 56:20
**aim** 45:3
**airdrop** 36:25
**al** 1:9 7:14
**album** 47:7
**alert** 70:15
**algorithm** 89:20,25 90:7 90:22 92:19 93:18 96:16
**algorithms** 91:18
**alleging** 53:22 54:3,22
**allow** 42:5 92:14,15
**allowed** 68:18
**allows** 48:9 92:22
**alluded** 65:12
**amazingly** 76:10
**amended** 5:11 5:15 18:17
**amount** 28:8
**analyses** 82:20
**analysis** 28:13 28:18 29:4,17 81:2,20 82:14 84:10,16 85:5
**analyzed** 82:6
**andrew** 65:2,3
**andy** 3:12 65:2 94:2
**angry** 44:4
**anne** 2:14
**answer** 9:1,11 9:12,15,25

10:1,15 23:12 24:3 28:1 29:24 46:16 55:25 63:3 75:1
**answered** 29:7 77:21 93:1 97:9
**answering** 13:11,13 32:15 62:3
**answers** 104:5
**anxiety** 72:18
**anxious** 35:13 35:18
**anybody** 15:9 17:9,20 26:5 40:15 60:9 84:6 91:17 94:22
**anyway** 56:18
**app** 38:1 48:14 48:18,22 49:6
**apparently** 42:7
**appear** 51:16
**appearances** 4:1
**appears** 51:15
**apple** 48:18
**applies** 17:3 95:20
**apply** 101:22
**appropriate** 56:6,21 87:6,8 102:4
**appropriately** 47:18 56:3
**approval** 34:1 58:15
**approve** 33:24 58:25
**apps** 37:8 49:1
**april** 1:18 6:6 7:7 71:11,25 101:15
**area** 86:18
**areas** 11:8 74:15
**articles** 82:19
**asked** 10:15 28:21 29:7 77:21 86:21 93:1 97:9
**asking** 9:12,14 17:15,16 31:6 54:16 67:21 75:8,23 77:4
**assign** 66:15
**assignments** 66:16 72:20
**associate** 11:2,9 33:16
**associates** 25:25 33:5,13 33:13
**assume** 10:8 31:10 37:1 38:5 40:20 58:11 66:21 84:3
**assumption** 59:2 83:10
**attached** 5:9 6:2 102:10 104:7
**attention** 50:22
**attorney** 102:12
**attorneys** 11:25 13:18,25 14:22 15:1 18:1,9 58:1
**audience** 61:1,5
**available** 9:4 41:20 48:14,18 48:23 71:19 72:6 82:24 84:2 89:6
**avenue** 3:14 4:6
**average** 69:10
**aware** 28:17 29:3 31:12,13 31:19 34:7,12 41:19 53:21 54:2 62:24
**awareness** 75:6 80:8,17,20

**b**

**b** 1:14 5:8,17 6:1 99:15
**back** 13:19,21 27:5 52:3,14 55:9 57:5 76:1 82:11 83:10 98:7
**bacon** 3:21
**bad** 54:25
**badly** 76:10
**ballpark** 98:16
**bandwidth** 97:21
**banner** 58:18
**bar** 50:23 51:13,16 53:5
**based** 9:3 33:4 52:12 91:14
**basically** 13:20 14:7
**basis** 15:21
**bates** 45:13
**bearing** 45:13
**beast** 98:7
**beginning** 20:20 23:2 35:12 87:21
**behalf** 3:2,10 3:18 4:3 8:18 11:23 13:15 18:3 19:17 21:11,19 22:8

**behave** 27:16
**behavior** 13:3 72:18
**behaviors** 84:22
**believe** 12:12 13:16 14:16,17 15:21 25:15 31:6 35:20,21 36:8 42:15,18 46:15 65:5 66:18 79:4 80:14
**beneficial** 79:1 79:6
**best** 61:4
**better** 18:20 67:19 79:8
**beyond** 97:20
**bifurcate** 65:12
**bit** 82:11 86:13
**black** 50:23 51:13 53:5
**block** 99:1
**blocked** 98:24
**blocks** 37:22
**board** 33:22 34:1,3,4,11,13 34:15,17,23
**boss** 15:20 61:14,15
**bother** 63:4
**bottom** 20:19 45:22 52:17
**boulevard** 2:5 3:6 7:11
**bounds** 27:15
**brandt** 94:2
**break** 10:12,16 14:18 58:1 63:14
**bridgeside** 2:5 3:6 7:11
**briggman** 15:25 16:18,23
**bring** 17:5
**broad** 30:18 82:2
**browser** 37:3
**bryce** 3:20
**bucket** 18:12
**buckheister** 1:16 2:1 5:2,10 5:13 6:3 7:18 8:1,10 10:23 18:18 19:4 50:17 63:23 64:11 73:19 74:17 79:25 85:17,24 91:13 99:7 100:4 104:11
**budget** 57:20
**building** 70:5,5
**buildings** 37:17
**built** 55:4,13
**business** 56:12
**busy** 17:19

**c**

**c** 3:1 4:4 5:1 6:1 7:1
**cabinet** 11:15 33:3,3 34:20 42:18,19 61:16
**calendar** 14:5,6
**california** 1:2 7:16
**call** 8:22 26:23 76:17,23 77:11 77:17
**called** 42:15 66:13 77:5
**calls** 38:3
**calm** 44:4
**campus** 96:3
**capacity** 86:10
**capture** 6:4,7 6:10 71:2,2
**captured** 71:4 73:17
**care** 26:10 30:11
**carefully** 102:3
**carolina** 1:17 2:6 3:7 7:12 57:1,4,15 64:15
**carpenter's** 47:4
**carries** 27:3
**case** 1:5,9 12:5 13:7 15:6,10 15:16 16:4,19 53:19 61:12 78:4,7
**cases** 59:10
**categories** 90:6
**caught** 42:12
**cause** 74:10 76:5
**caused** 70:6
**ccsd** 5:23 8:23 10:24 11:1 15:9 17:8,10 23:4,18,23 24:12,25 25:4 25:8 31:14,22 32:2,8 34:7,8 34:13,19 36:5 36:5,11 39:13 39:19,22 40:2 40:6,16 41:24 43:17 44:9 45:7 46:3 48:13 50:8 51:2 52:4,20 53:5,17 61:21 62:15,21 70:10 70:16 71:24 73:22 82:6,12 86:11 88:2,21 88:22 89:13 90:7,13 97:2

**ccsd's** 6:4,7,10 26:16 33:22 50:19 52:1 53:1 55:11 56:24 60:13 71:3 85:7
**ccsdschools.c...** 50:12
**cell** 23:4,18 27:23 36:6,17 36:21 37:13,24 37:24 38:7 39:5 63:25 64:13 81:4,13 81:14,21,23,25 82:7,16 84:13
**cellular** 38:20 39:6 96:1,4
**certain** 8:20 13:19 18:7 47:25 61:1 64:20 68:21
**certificate** 101:1,13,19
**certification** 101:21
**certified** 2:15 101:1,2
**certify** 101:3 104:3
**certifying** 101:25
**cfo** 35:7 41:3 42:17 61:15 63:6
**challenges** 72:19
**change** 25:1,5 40:22 42:23 103:4
**changed** 27:3 30:6,21 59:4
**changes** 30:10 33:25 95:10 97:5,12,24 102:9 104:6
**characterize** 13:18 67:9
**charleston** 1:8 1:14 5:18 7:13 8:19,22 73:22 79:18 86:2
**chief** 90:10
**child** 89:12 90:24
**children** 26:10 44:7 47:24 53:24 54:6 55:14 73:25 76:13 77:1,6 77:19 88:7,12 88:22
**chrome** 47:1,1 96:5,18 97:7
**chromebook** 47:1,2,9 96:12
**chromebooks** 95:16 96:8,21 96:23
**cinderblock** 37:17
**circumstances** 36:11
**clarify** 17:13
**classroom** 25:9 25:19 66:7,23 67:2,25
**clear** 36:15 59:9,11
**click** 51:10,24 51:25 52:4,25 53:6
**closed** 71:24
**closings** 69:18
**closure** 71:12
**coakley** 15:14 16:13,13
**collect** 68:1
**collected** 27:8 29:16 83:19,25
**collecting** 27:20 29:21
**collection** 27:13,19 28:6 28:18 29:4,25 30:24
**collins** 4:12
**com** 79:6
**come** 46:6 84:7
**coming** 55:9
**comment** 86:13
**comments** 86:5 87:11
**commerce** 3:22
**commission** 104:17
**commissioned** 81:3,6,7,9
**committee** 41:8
**communicate** 54:18 56:3 59:25 61:4
**communication** 49:3 60:22 63:9 76:10
**communicati...** 26:17 49:9 58:6,8,23 59:3 59:7 60:10,18 61:3,11 64:25 65:9,12,15
**communities** 78:12,14,21
**community** 78:18,20 79:12 79:13
**companies** 62:16,22
**compare** 28:10
**complaint** 12:1 13:10 46:21 53:13,15 54:3 54:23 56:11 86:6,15

**complaints** 42:8 46:20 47:11,23 86:9
**completely** 76:14
**completing** 72:19
**con** 96:22
**concern** 87:3 88:3 95:12,19 96:15 97:2
**concerned** 86:23 87:18 88:16
**concerning** 41:20
**concerns** 97:5 98:1,10
**concluded** 100:4
**concludes** 99:20
**confiscate** 36:6 36:11
**connect** 78:13 78:19
**connections** 79:5
**connectivity** 11:11
**connolly** 3:13 99:23
**consent** 43:14 43:17 44:6 46:4,10,13
**consider** 89:22 89:24 90:1
**constantly** 29:19,20,21 97:16
**constructed** 55:4
**consumed** 84:3 84:8
**contacted** 47:14
**contain** 20:14
**content** 37:23 39:14 46:23 47:20,25,25 49:16,20 56:24 57:15 58:21 59:1 62:16,23 69:17 70:10 74:20 75:12,12 75:15,19 86:24 87:4,6,8 88:10
**continue** 75:8 75:23 88:20 90:2
**continued** 4:1
**continues** 20:23 90:3
**continuing** 30:24
**contract** 62:15 62:22
**contracts** 63:7
**control** 96:22 101:24
**conversation** 92:7,13,16,17 92:22 97:1
**conversations** 15:23 35:10 93:3,10,11,13 93:17,22,24 94:25 95:4
**convey** 69:23
**conveys** 69:24
**copies** 18:21
**copy** 19:3,22 101:11
**corner** 45:22 50:22 52:17
**corporate** 86:10 91:7
**correct** 16:19 16:20 18:10 22:22,25 23:7 23:21 30:24 33:19 39:20,21 39:24 40:14 41:11,14,15 43:4,7,11 44:11,12 46:5 49:13 50:20 52:24 64:21 68:7,10 69:19 71:13 72:2 75:9 77:19 92:12,23 95:17 96:7 101:11 104:4
**corrections** 102:3,5 104:6
**correctly** 80:13
**correlation** 54:13
**counsel** 7:19 9:18,24 10:1 18:22 29:9 33:7 38:24 85:20 93:19 99:25
**counsel's** 91:15 93:10
**counselor** 25:22
**county** 1:8,15 5:18 7:13 8:19 8:22 73:22 79:18 86:2
**couple** 33:9,15 58:22 64:25
**court** 1:1 7:15 7:21 9:8 102:16
**cover** 9:7
**covered** 12:25 29:12
**covers** 12:12 35:21
**covid** 71:13,25

**csr** 1:25 101:18
**culture** 26:2
**cumback** 94:3
**current** 35:22
**currently** 10:22 46:17,18 83:9
**cut** 96:9
**cv** 1:9

**d**

**d** 6:1 7:1
**d.c.** 4:8
**daniel** 3:11 4:4 15:20 63:2 65:6
**darker** 87:23 87:24 88:8,9 88:11,11 92:4
**darn** 97:22
**data** 27:12,19 28:5,9,10,13,18 29:4,17,22,25 30:15,21,24 31:7,19 32:14 32:15,18,21 57:21 67:23 82:19
**database** 83:21 84:1
**date** 7:7 45:14 101:15 102:7 104:11
**dated** 71:10 79:19
**dates** 95:4
**daughter** 42:12 47:3
**day** 5:22 9:20 15:13,13 17:23 22:21 23:7,21 69:4,7 95:14 95:16 104:16
**days** 14:7 52:9 102:13
**dc** 3:15
**dealing** 88:17
**decide** 61:4 68:11
**decides** 60:19
**decision** 33:23 40:12,16,17 49:1 61:11
**decreased** 31:16,23 32:3 32:10
**decreasing** 32:13
**deemed** 102:15
**defendant** 78:7
**defendant's** 56:21
**defendants** 3:10,18 4:3 5:11,15 53:22 54:4 78:4,6 99:14
**definitely** 98:18 98:21
**denney** 49:11 58:24 59:5 60:6
**department** 26:17 40:5 65:1,9 74:1
**deponent** 7:17 104:1
**deposed** 15:6 15:10,12,15,20 16:19 17:19,22
**deposing** 102:12
**deposition** 1:14 2:1 5:10,12,17 6:3 7:9 11:23 14:1,21 15:8 16:3,7,9,16,22 16:22 17:6,11 17:14 18:3,14 18:17 22:3 46:7 60:6,10 60:15 99:20 100:3 102:2,10 102:13,14
**depression** 72:19
**deputy** 41:4 42:17
**described** 30:22
**describing** 42:24 88:23
**description** 58:19
**designated** 8:18 9:3 19:17 20:16
**designee** 86:11 91:7
**detail** 75:18
**determined** 90:13
**devastating** 55:16
**device** 5:23 31:15 44:11 45:8 46:25 89:13,14 95:25 96:4,19
**devices** 5:21 11:11 22:21 23:6,20 35:13 69:2 81:5,13 81:16,22,23 82:1,7,17 84:14 89:7 95:13,21 96:6 96:13,18,24 97:2,3,7
**difference** 89:11
**different** 27:6 40:4 69:14 80:24
**difficult** 47:17 72:10,14,25

73:8 80:17
**difficulties** 64:7
**digits** 45:23
**direct** 15:11 50:21 65:13,14 101:24
**directly** 47:14
**disagree** 75:3 75:21
**discipline** 12:10 26:2 31:14,23 32:3 32:9 36:1,5
**discord** 38:12 38:21,22
**discovered** 91:4 98:3
**discovering** 47:20
**discovery** 13:14 23:10
**discuss** 16:2,12 16:21 80:8 91:25
**discussed** 17:20 90:7 91:19 95:6
**discussing** 17:18 64:13 70:8 71:11 96:16
**discussion** 42:1
**discussions** 88:6 90:11,20
**dismantling** 101:12
**district** 1:1,2,9 1:15 5:19 7:13 7:15,16 8:19 8:23,23 9:4 11:23 13:2,15 18:3 19:17 21:11,19 22:6 22:8 27:21 28:16 29:2,16 30:21 33:17 37:21 39:14 41:16 43:6,14 45:11,13 46:25 48:9,25 49:12 49:19 50:3 53:22 54:3,8 54:18 55:18 56:20 57:14 58:4 62:13 66:10 67:23 68:5,11,22 69:10,15,23,24 70:1,6,12,18 72:3,15,23 73:16,21,22 74:5 75:5 76:4 76:17 77:4,17 79:19 80:2,6 80:15,19 81:1 81:19 82:3,4,9 82:12,20 83:6 83:19 84:2,4,9 85:4 86:2 89:18 91:16,25 92:11,22 93:14 94:10,23,25 95:6,11 96:2 96:12,20 97:4 97:7,25 98:8
**district's** 12:8 69:14 98:23
**divisions** 51:10 51:12
**divulging** 59:22
**doctor** 16:14
**document** 1:7 19:6,21 20:6 20:10 22:11 45:16 71:15 75:24
**documents** 5:14 12:4 13:7 13:8,11,13 17:6,25 18:7 22:1
**doing** 25:20 30:15 49:5 102:6
**dopamine** 55:6 55:20
**download** 48:15,18,23
**dr** 16:13
**drafting** 32:23 33:1
**draw** 55:14
**drawn** 88:19
**drives** 89:21
**duly** 8:2 101:6
**duties** 13:4

**e**

**e** 3:1,1 5:1,8 6:1 6:1 7:1,1 103:2
**earlier** 13:24 29:15 41:7 46:19 58:23 60:25 64:14,24 65:13 66:6 69:13 86:21 88:8 97:14
**easier** 81:12
**eastern** 1:19
**eban** 3:19
**editing** 58:15 58:18
**edits** 60:2
**edpuzzle** 66:13
**education** 27:6 39:20,23 40:9 40:24 41:21 43:10 74:1
**educators** 35:1
**effect** 28:3 35:16
**effects** 24:21,22 24:23 35:1
**either** 66:4 95:25

**electronic** 5:21 22:21 23:6,20 81:5,16,22,23 82:7,16 84:13
**elementary** 41:23 42:16 82:15 84:12
**emergencies** 69:25 70:3
**emotional** 30:13 72:5 74:6,12 88:13
**employed** 10:23
**employee** 17:10 34:19
**employees** 17:8 33:18 34:8,14 58:23 64:25 65:8,16 83:9 83:16 88:2 90:6
**enable** 40:12,17
**enabled** 39:22 40:8 41:14
**enablement** 41:1
**enables** 92:12
**enabling** 40:23
**engaged** 35:11 35:17 61:16 92:5
**engagement** 61:22
**ensure** 69:6 72:4
**entire** 57:6
**eppelsheimer** 33:15
**errata** 102:5,6 102:9,11 104:8
**especially** 27:14
**esquire** 3:3,4 3:11,12,19,20 4:4,12
**established** 72:23
**et** 1:9 7:14
**evacuation** 70:6
**evening** 15:19
**events** 70:14
**eventually** 92:20
**exactly** 59:9
**examination** 5:2 8:4 85:21 91:10 101:8
**examined** 8:3
**example** 42:6 42:11
**except** 86:12 89:15 104:6
**exception** 10:14
**excited** 68:19 68:22 69:4
**excluded** 42:7
**executive** 11:2 11:9
**exhibit** 18:24 18:25 19:3,24 19:25 20:3 22:12,13,16 32:24 44:15,16 44:18 45:5 50:13 70:23 73:12 79:21
**exhibits** 5:10 6:3
**existed** 30:5
**expand** 73:24
**expect** 27:15 30:17 46:6
**expectation** 28:5
**expects** 13:3
**experience** 76:19 88:21
**experiencing** 88:22
**expertise** 86:18 97:21
**experts** 55:5
**expires** 104:17
**explain** 87:16
**exploring** 42:14
**express** 97:1
**expressed** 87:3 96:17
**extent** 17:2 23:9 57:24
**extracurricul...** 69:21

**f**

**face** 79:10,10 79:11,11 80:23 80:23
**facebook** 6:5,8 6:11 49:19 51:22 52:1 53:23 54:5 58:4 61:23 62:5,17 69:15 71:3 72:4,15 73:16 78:8 79:17 85:8
**facilitate** 43:24 79:9
**fact** 17:19
**facts** 13:23 86:18
**fagan** 3:20
**fail** 102:14
**failing** 47:16
**falls** 23:10
**familiar** 22:24 50:6 66:12
**families** 72:6 72:25
**family** 72:24
**far** 15:6 30:18 79:8

**faraday** 37:18
**fear** 72:18
**feeding** 30:11
**feel** 87:5,8
**feels** 80:19
**fighting** 97:18 97:19 98:7
**figure** 62:12
**filed** 53:17 86:6
**fill** 27:10
**filter** 39:13
**filtering** 56:25 57:15 89:25
**find** 49:7 83:5,6 83:18 90:21 91:1
**fine** 59:20
**fingertips** 57:22 82:21,23 98:15
**finish** 9:12,14 26:14
**fire** 70:4
**first** 8:2 13:10 14:13,20,21 19:16 24:5 31:25 46:9 51:21 93:8
**five** 73:24
**flaster** 3:19 99:16
**flip** 86:13
**folks** 15:15 18:1 25:25 26:22 33:3,6 33:13 35:6 70:15 83:11 93:23
**follow** 51:10 86:3 91:14
**follows** 8:3
**foregoing** 101:4,21 104:3
**form** 27:9,25 29:7 30:3 31:2 38:3,15 39:8 46:13,17,18 48:4 51:4 53:9 54:11 55:23 57:18 61:7 62:1 66:25 67:7,16 68:25 72:8 73:3 74:14 76:8,22 77:9,21 78:16 79:3 87:14 89:2,9 90:18 97:9 104:7
**former** 17:21
**formerly** 52:5
**forms** 27:19
**forth** 101:5
**found** 86:14,14 86:19
**four** 51:18
**frantic** 35:13
**frequent** 67:13 67:18,18
**friday** 60:3 61:3
**friends** 47:3
**front** 19:4 20:3 22:16 34:17 45:5,6 50:17 71:5
**frustration** 43:20
**full** 8:9
**funding** 64:21
**fundraising** 70:11
**further** 79:10 85:19 88:20 91:10 99:10

**g**

**g** 7:1
**gathering** 30:14,22 31:7
**general** 12:19 12:22,24 26:9 59:19
**generated** 99:2
**getting** 42:4
**give** 9:10 10:20 14:14 21:18 25:13
**given** 104:5
**giving** 55:19
**go** 18:18 19:15 25:17 27:15 28:7 33:25 37:20 45:3 49:8 52:3,13 60:2 61:18 63:1 64:3 83:22 84:5,5 88:20
**god** 56:16
**goes** 50:23 88:10
**going** 9:6 12:16 19:20 22:10 24:10 27:5 28:6 31:1 35:14 37:12,12 41:9 44:14,22 46:12 54:10 55:9 58:12,14 59:17 61:14,17 63:12 75:8 76:1 83:10 99:11
**golkow** 7:6
**good** 8:6,7 45:3 55:5,19 63:13 71:9 73:6 79:13 85:23,25 91:2 97:22
**google** 3:10 39:19,22 40:8 40:23 41:6,18 41:21 43:10,13 43:22 44:3 46:9,11 47:9 48:21 96:5

**gotten** 44:6
**graders** 42:8
**grades** 25:10 29:15,18 30:9 97:16
**graham** 3:4
**grant** 73:25
**grants** 75:15
**granular** 75:18
**great** 18:19 46:7,14
**ground** 9:7
**group** 65:25 68:18
**guardians** 43:18 47:11
**guess** 17:12,17
**guest** 37:15
**gun** 76:19,24 77:5,17

**h**

**h** 5:8 6:1
**haileselassie** 3:3 5:4 17:1 23:8 24:1 27:24 29:6,9 30:2 31:1 38:2 38:14,24 39:7 48:3 51:3 53:8 54:10 55:22 57:8,17 61:6 61:25 63:15 64:1 66:24 67:6,15 68:24 71:16 72:7 73:2 74:13,25 75:9 76:7,21 77:8,20 78:15 79:2 85:22 87:15 89:4 90:4 91:5 92:25 97:8 99:9
**hand** 19:22 45:22 50:22 52:17 87:22
**handbook** 5:24 12:9,18,21 44:11 45:8
**handle** 22:7 88:14
**handled** 36:3
**hands** 69:3
**happened** 92:7 92:13
**happier** 35:17 35:18
**happy** 11:14,15 14:6
**hardy** 3:21
**hassle** 11:19
**hate** 96:24
**head** 35:7,8 92:8
**headphones** 23:5,19
**health** 25:11 30:12,13 70:17 73:24 74:6,12 89:22
**healthy** 54:20
**hear** 10:7
**hearing** 42:9
**heck** 44:23
**held** 2:1 7:10
**help** 14:7 72:4
**high** 43:5 82:15 84:12
**highly** 80:9
**hire** 62:15,21
**hmm** 20:25 30:8
**hold** 91:12
**hole** 47:19 87:10 88:3,24 89:5 90:15,24 92:4
**home** 42:13 46:22 47:9
**homepage** 50:8 50:19 54:9 55:21
**homework** 66:16 72:5,20
**hope** 32:15 33:16 80:11
**hour** 14:8 63:13 99:24
**hours** 35:14
**hover** 52:14
**hr** 35:7
**huh** 52:10
**hurdles** 11:19
**husband** 15:18 15:24
**hypothetical** 60:21,25

**i**

**iac** 40:18 41:7
**iboss** 39:13 56:25
**icon** 51:22 52:5 52:23,23
**icons** 51:18
**idea** 46:7,14 51:5
**identification** 19:1 20:1 22:14 44:17 50:14 70:24 73:13 79:22
**impact** 23:24 24:9,13 25:1,4 27:11,22 28:14 28:19 29:5,18 31:9 96:21,22
**impacts** 27:18 30:16,17
**imperative** 102:11
**implement** 33:24

**implemented** 23:25 24:14 27:21 30:6 31:16,24 32:4 43:3 97:25
**implementing** 32:10
**important** 9:9 80:16,20
**importantly** 11:16
**impossible** 44:2 44:5
**inappropriate** 89:23,24 90:2
**incidents** 25:15 31:15,23 32:3 32:9
**include** 38:11
**included** 65:22 65:25
**includes** 65:19 65:20,24 80:21 80:22,23 93:5
**including** 34:19 37:4 41:3 53:23 54:4
**incorporated** 7:14
**increased** 72:18
**increasing** 32:13
**increasingly** 88:11
**indicates** 45:15
**individually** 44:1
**individuals** 18:8 27:9 41:17 65:17 66:1 93:12,23
**information** 9:3 27:20 59:23 69:17,24 70:16 75:7 80:11 88:15
**infraction** 36:2
**infractions** 36:2
**initial** 41:1
**initiatives** 27:19
**injury** 1:5
**input** 40:19
**instagram** 49:22 52:23 53:2,23 54:5 58:5 61:23 62:17 69:16 78:8 85:8
**instruction** 11:17 22:6
**instructional** 47:18 66:9 67:3
**instructionally** 48:7
**instructions** 102:1
**intended** 55:14
**interaction** 79:11
**interactions** 25:12 79:7
**interest** 16:6
**interesting** 12:2 86:15,19
**internal** 26:17
**internet** 41:8
**interruption** 11:17,19
**interviews** 22:7
**involve** 79:7
**involved** 32:23 33:1 40:11,16 40:20
**involves** 66:17
**iphone** 36:24
**issue** 56:10 78:7 86:22
**issued** 22:22 23:3 89:7 95:16,20 96:12 97:2,7
**issues** 70:17 72:18
**it'll** 45:23

**j**

**jade** 3:3
**january** 23:3 23:17,25 24:14 28:4 31:17 32:11 34:9 63:24 64:12
**jicj** 5:20 22:20
**job** 1:23 11:18
**judge** 28:9 31:8 88:14
**july** 11:6 92:10
**jumped** 28:25
**jury** 87:17

**k**

**katharine** 4:12
**keep** 23:4,18 55:9,15
**keeps** 98:7
**kenneth** 1:16 2:1 5:2,13 7:17 8:1,10 100:4 104:11
**keyes** 3:12
**kids** 11:16 42:11 55:9 95:13
**kind** 26:21 30:18 58:16 59:6 65:12 78:22 87:24,24
**king** 4:5

**knock** 44:25
**know** 10:5,14 13:14,22 21:14 26:5 28:2,11 31:11 32:21 34:4 36:10 37:13 38:17,19 38:23 44:2,5 45:4 47:6,7 48:17,19,20,22 48:24 49:1,5 55:24 57:13 58:25 60:2,19 60:21 62:2,7,7 63:5,7 65:1 67:9 68:2,21 69:9 75:11,12 78:3 81:1,19 82:13,20,25 83:5,7,12,18,20 83:23 84:10,19 85:4 86:1 88:15,20 90:10 90:20 94:9,22 94:24 95:3,5,8 98:7,13,16,20
**knowledge** 25:3 81:10 82:8 97:21
**known** 52:6
**knows** 44:3 83:20
**kyle** 4:13 7:5

**l**

**l** 1:16 2:1 5:2 8:1 100:4 104:11
**language** 60:1
**laptops** 81:4,15
**larson** 94:2
**law** 64:22,23
**lays** 36:1
**lead** 11:3
**leaders** 25:23 33:5,9,12
**leadership** 41:3 84:6
**learn** 35:9 47:21
**lee** 8:10
**left** 50:22 51:19 52:17
**legal** 33:6
**legalese** 86:17
**length** 86:14
**leslie** 1:25 2:14 7:21 101:18
**lesson** 67:14
**level** 25:23 33:3 33:5,8,12,17 41:24 42:3,4 43:6
**levels** 41:20 89:16
**liability** 1:5
**liaisons** 26:24 90:9
**librarians** 26:23
**library** 27:2
**liked** 68:14,15
**likes** 55:8
**limit** 97:17 98:2 98:8
**limited** 37:19 98:11
**line** 19:16 72:24 103:4
**link** 50:9 54:8 55:21 77:13
**list** 18:4,8 26:6 26:7 57:6 83:3 95:9 98:22 99:1
**listening** 47:5,8
**litigation** 1:6 71:17
**little** 32:6 52:16 55:6,20 63:13 81:12 82:11 86:13
**llc** 2:4 3:5 7:10
**llp** 3:13,21 4:5
**local** 26:18
**located** 83:8
**lock** 69:5
**logistics** 69:17
**long** 11:4 26:6 26:7
**look** 14:6 27:22 45:17
**looking** 14:5 32:17 56:13 97:15,16
**looks** 52:21
**lot** 82:19 84:17 90:11
**lots** 82:18,18
**lyrics** 42:6,10

**m**

**made** 33:23 71:24 73:16 74:21 76:4 79:18 86:5,9 86:12 101:7 102:5
**maiden** 3:4
**maine** 3:14
**major** 56:10
**make** 9:11,18 11:20 49:1 56:1 77:14 81:11 95:11 97:5 102:3
**makes** 14:19 32:19 44:3 46:15 61:10
**making** 11:10 11:13,14,14 28:23 55:5 79:5,6 83:10 92:20

**managing** 58:21
**mandated** 64:16
**manifest** 89:6
**manipulation** 58:13,17
**marginalized** 78:12,14
**mark** 18:23 19:21 22:11 44:15
**marked** 18:25 19:25 22:13 44:16 50:13 70:23 73:12 79:21
**market** 3:23
**marriage** 17:3
**matter** 7:12 12:20,24 53:4 86:7
**md** 1:5
**mdl** 1:4
**mean** 13:17 24:17 26:12,16 26:18 33:11 34:10 49:15 54:16 56:9,12 56:15 57:19 58:18 67:11,11 70:2 78:21 82:23 96:9,25 97:18
**meaning** 42:25
**meaningful** 28:7
**means** 67:10,19 101:23
**meant** 87:17
**measure** 30:22
**mechanisms** 56:25 57:16
**media** 1:4 25:22 26:11,17 26:19,22 27:1 36:19 37:4,6 54:17,21,24 56:6 58:3 62:9 74:10 75:5 76:5,12 77:1 78:1 79:9 80:16,21,22
**media's** 55:11
**meet** 14:1
**meeting** 14:13 14:20 34:11,13 34:15,23
**meetings** 14:3,9 15:2 18:9 80:23
**members** 33:4 34:20 78:14,19 78:20
**memory** 14:18
**mental** 25:11 30:12 70:17 73:24 74:6,12 89:21
**mention** 74:9
**mentioned** 13:9 17:9 25:18 29:15 46:8,19 58:22 61:13 87:9 93:3 94:4
**mentions** 16:8
**message** 61:5 76:13 80:25
**met** 11:25 13:24 14:22 33:14
**meta** 1:9 3:18 7:14 99:16
**metadata** 45:14
**metaphor** 98:6
**method** 60:21
**metrics** 61:21 62:8
**michelle** 49:10 58:24 59:7,14 59:24 61:13 62:14 63:2,8 65:3,6,10,14 66:4
**middle** 43:5 82:15 84:12
**million** 73:23
**mills** 49:10 58:24 59:8,14 60:5 62:14 63:2 65:4
**minute** 25:13
**minutes** 99:24 100:1
**misleading** 26:21
**missed** 31:25 53:14
**mm** 20:25
**mobile** 5:23 45:8 48:14 49:5 69:2 82:1
**mode** 42:15
**moderate** 42:3 42:4 43:7
**modified** 31:7
**monday** 20:11 20:13
**money** 57:13
**monitor** 61:21 99:21
**monitored** 95:18
**monster** 97:19
**month** 6:12 80:3,4,7,10
**months** 25:6 59:4
**morning** 8:6,7 15:19
**motherfucker** 42:10
**motley** 2:4 3:5 7:10 12:1 13:25 14:23

15:1 18:10
**move** 45:2
**moving** 42:14
**mt** 1:17 2:6 3:7 7:11
**multiple** 58:9
**music** 42:6

**n**

**n** 3:1 5:1,1 6:1 6:1 7:1
**name** 7:5 8:9 13:1 91:23 101:15
**names** 35:5 94:13 95:5
**narrow** 81:24
**nawrocki** 15:12 16:3
**nearby** 70:5
**nearly** 51:16
**necessarily** 32:18
**necessary** 102:3
**need** 10:12,15 59:25 60:25 71:7 74:5,11 76:6
**network** 11:11 11:13 37:15,20 37:22 38:20 39:6,14 96:1,2 96:4 97:6
**never** 38:22
**new** 31:9 34:9
**news** 26:18
**non** 37:6 95:20
**normal** 29:25
**northern** 1:2 7:16
**notary** 104:19
**noted** 7:19 102:9 104:7
**notes** 21:25 101:11
**notice** 2:14 5:11,16 18:17
**november** 22:22
**number** 36:1 39:20 50:10 70:13 83:11,16 98:14
**numbers** 45:13 67:19,19
**nurses** 25:22
**nw** 4:6

**o**

**o** 5:1 6:1 7:1
**oath** 2:16 8:12 8:14
**object** 9:25 17:1 27:24 29:6 30:2 31:2 38:2,14 39:7,8 47:22 48:3 51:3 53:8 54:11 55:22 57:17,18 61:6 61:25 66:24 67:6,15 68:24 72:7 73:2 74:13,14 76:7 76:21 77:8,20 78:15 79:2 97:8
**objection** 23:8 24:2 75:4 87:13 89:1,8 90:17,18 92:25
**objections** 9:19 101:7
**observation** 25:9,18,19,20
**observations** 25:10 27:7 28:19 29:4
**obtain** 43:17
**obvious** 96:24
**occur** 66:20,22
**occurred** 25:15 92:9,16
**offended** 44:22
**office** 35:6 58:8 90:11
**offices** 2:2
**official** 86:10
**officiated** 2:15
**oh** 18:19,19 26:19 52:18 55:24 56:16
**okay** 12:6 17:5 20:12 22:19 24:8 25:17 27:2 44:24 47:23 51:8 52:7 57:7,23 65:15 70:20 71:10 75:20 81:11 83:4 91:5 92:11 93:7 94:1,4 99:17
**one's** 79:19
**ones** 50:5 57:3
**ongoing** 42:21 42:25 71:12
**online** 50:3 60:14
**oral** 5:12,16
**order** 31:8
**original** 101:12 102:11
**originally** 59:6
**outcome** 32:18
**outside** 23:10 27:15 79:12 82:12 86:17
**own** 37:13 48:14

**p**

**p** 3:1,1 7:1

**page** 5:2,10 6:3 19:16 20:17,19 20:24 21:2,7 21:13,13 45:22 47:7 50:24 51:2,17 52:1 52:20 62:5 72:4,15 73:16 103:4
**pages** 1:24 53:1 58:5,14 75:14 104:4
**paid** 57:1,3 69:10
**pandemic** 71:25
**paragraph** 72:14 76:20
**parent** 46:21 47:2,23 87:18 89:23
**parents** 25:12 38:8 42:8 43:14,18,25 44:7,10,12 45:25 46:10 47:11,13,21 56:5 59:25 61:1 86:22 87:3 89:19
**part** 22:1 24:5 29:23,24 31:25 36:8,9 45:24 57:20 67:13,14 75:13 78:12 96:25
**particular** 61:5 74:15,21 76:3
**particularly** 72:11
**parts** 86:16
**party** 62:16,22
**past** 19:12
**pause** 9:21
**pdp** 12:10 36:16
**pending** 85:20
**pennsylvania** 3:24 4:6
**people** 27:10 40:22 58:9 79:5 80:12 83:14 84:4
**percentages** 67:20
**perception** 80:10
**perfect** 37:17
**perfectly** 36:15
**performance** 29:20
**period** 23:11 83:13
**permission** 44:1
**person** 14:10 14:12 58:7
**personal** 1:5 5:21 22:20 89:14 95:25 96:3,19,23 97:3
**personally** 40:12
**peruses** 71:15
**phenomenon** 88:22
**philadelphia** 3:24
**phone** 27:23 36:6,12,17,22 37:3,24 39:6 63:25 64:13
**phones** 23:5,18 69:2 81:4,13 81:15,21,23,25 82:7,16 84:13
**photo** 58:19
**physical** 19:22
**piece** 75:18 85:1
**pilot** 68:14,17
**place** 92:4 101:5
**placed** 89:16,17
**places** 88:11
**plaintiff** 5:18 13:19 99:25
**plaintiffs** 3:2
**plan** 12:11 36:5 36:9 37:14 39:11 42:17,19
**plans** 38:7 67:14
**platform** 54:21 55:11 56:7 79:9 80:21 92:5
**platforms** 7:14 36:19 38:12 50:2 53:7,23 54:4,9,17,24 55:3,13,19,21 56:2,14,22 69:14,15,25 70:8,11,14 74:20,22 78:7 78:13,18
**play** 48:21
**played** 88:6
**pleasant** 1:17 2:6 3:7 7:11
**please** 8:8 10:7 23:14 24:11 54:1 60:23 87:16 102:2,6
**point** 10:13 36:7 43:20 48:14 84:15,20 84:25 85:9,19
**pointed** 84:22
**policies** 12:3,6 12:9,14,14 13:5 30:10 74:19

**policy** 5:20 12:12,20,25 22:20,25 23:2 23:24 24:14 25:2,5 27:11 27:18,23 28:3 28:19 29:5,18 30:1,5,7,18,23 31:9,16,24 32:4,11,24 33:2,24,25 34:9 35:2,15 35:22,24 36:1 36:13 42:23 63:25 64:13,17 64:20
**portion** 99:15
**posed** 10:9 60:20
**possession** 82:13 98:23
**possible** 38:19 72:16
**post** 49:20 62:16,20,23 69:20 70:7,10 70:14,15 71:3 71:23 73:15 74:4 76:3 77:5 77:19 79:18
**posted** 70:16 72:22 75:19
**posting** 80:3
**posts** 49:16 60:14 69:16 74:16,21
**potential** 16:21 42:23
**pouch** 68:2 69:11,12
**pouches** 68:6 68:12,16,20,23
**practice** 75:4 75:13
**practices** 74:19 75:10
**pre** 92:10
**prentice** 15:20 63:3 65:6
**prepar** 22:2
**preparation** 22:2
**prepare** 11:22 13:25 14:21 15:8 18:2,13 60:6,10,15
**prepared** 9:1 21:4,10,18 22:1 23:23 24:7,7,8,13,19 24:22,25 29:17 75:16 81:3,7,8
**present** 4:11 15:1 51:1 82:6 82:14 84:11 85:6
**presented** 42:16
**presumably** 89:18
**presume** 99:1
**pretty** 26:7 91:2 97:22
**prevent** 73:25 90:21
**prevention** 6:12 80:3,7
**previous** 28:11
**primary** 11:8
**principal** 84:7
**principals** 11:12 25:21,25 33:14 35:6 93:5,6,7,17,22 93:24 94:3
**privilege** 17:3
**probably** 17:14 26:8
**problem** 76:12
**procedures** 12:3,7,9 13:6 30:11
**proceeding** 101:4
**produced** 45:12 57:24 71:17
**production** 5:14 99:4
**products** 1:5
**professional** 89:22
**professionals** 25:11 33:5
**programs** 68:18 70:17 75:16
**progressive** 12:10 35:25 36:4
**prohibition** 5:20 22:20
**project** 73:25
**promises** 42:5
**promote** 75:6
**propose** 46:12
**proposed** 60:1
**propounded** 104:6
**proprietary** 59:22
**proven** 84:23
**provide** 72:24 73:7
**provided** 19:10 39:14
**providing** 11:11 46:4
**provision** 46:4
**pruitt** 65:2,19 65:21,22,24
**psychologists** 25:22 90:9

94:5,5,8,10
**public** 22:7 34:18 54:19 56:4 80:10,24 104:19
**publicly** 71:19
**pull** 18:16 50:8 70:22 73:11 79:16
**pulling** 50:11
**punishments** 35:23
**purchase** 68:12
**purchased** 68:5
**purposes** 47:18 67:3 78:22
**pursuant** 2:14
**push** 55:6
**pushes** 55:20
**pushing** 13:19 13:21
**put** 21:23 28:3 44:20 83:25

**q**

**question** 9:10 9:11,13,14,25 10:2,9,15 23:14 24:11 27:17 28:20 32:1,16 43:23 43:23 46:16 53:25 59:11,14 59:15 60:20 61:10,19 62:4 63:3,24 64:12 76:1 77:17 83:15,16 93:21 95:22 96:10
**questioning** 23:9 74:15 91:15 93:11
**questions** 9:2 9:19 10:6 85:19,20 86:3 91:9,14 93:15 93:16,19 99:6 99:10,14 104:5

**r**

**r** 3:1 7:1 103:2 103:2
**rabbit** 47:19 87:10 88:3,23 89:5 90:15,24 92:4
**raise** 80:8,16 80:20
**ranged** 14:4
**rather** 36:6
**reach** 59:13,20 61:1
**reaching** 30:19 43:25
**read** 12:1 53:12 53:15 54:4 80:13 102:2 104:3
**really** 27:1,6,6 68:15,16 72:10 82:1 88:14 97:18
**reask** 76:2
**reason** 10:19 102:4 103:6,8 103:10,12,14 103:16,18,20 103:22,24
**reasonable** 28:8 54:20
**recall** 12:17 86:4,25 87:11 92:6
**receipt** 102:13
**receive** 11:17 73:23
**received** 22:5 46:20,20 47:10 47:24
**receives** 57:14
**receiving** 61:22
**recent** 45:18,18
**recess** 63:19 85:14
**recognition** 46:9
**record** 7:4,20 8:9 10:16 50:10 63:17,20 64:4,5,8 75:3 75:23 79:17 85:11,12,15 99:5,12,13,18 99:22,25 100:2
**recorded** 101:8
**reddit** 39:5,10
**refer** 26:24 34:3 81:14
**referred** 13:12 25:24,24
**referring** 8:24 34:5 83:1 85:2
**regard** 96:17
**regarding** 63:25 74:18 75:11 84:11 85:6 86:6,23 87:3 88:2 90:14 95:11 97:6
**regular** 15:21 30:14,14
**regularly** 27:8
**related** 27:13 31:15 86:23 87:10,22 97:2
**relates** 1:7
**relationship** 26:25 54:14 56:17 87:25
**relevant** 12:4 13:7
**relied** 81:21 82:4 84:11 85:6

**remember** 13:1 34:15,22,24 41:10 93:18
**remove** 49:2
**repeat** 10:7
**repeatedly** 77:21
**rephrase** 95:23
**report** 23:24 24:7,9,13,18,19 24:21,23 25:1 25:25 33:14 61:15 65:1,9 65:16 66:3 81:2,20 82:13 84:10 85:5,10
**reported** 1:25 27:8 47:2 98:4
**reporter** 2:15 7:21 9:8 101:1 101:2,25
**reporter's** 101:13
**reporting** 30:14 31:8 65:20
**reports** 15:11 25:10,14 28:13 28:17 29:3 42:10,11 63:9 63:9 65:3,6,13 65:14,25
**represent** 45:11 71:1 86:1
**representative** 28:17 29:3 43:22 61:16 91:22 92:1
**representatives** 91:20
**reproduction** 101:23
**request** 5:13 44:5 57:25
**require** 44:9
**required** 46:10
**requires** 8:15 43:13
**research** 84:18 84:23,24 85:1
**researching** 87:19
**resources** 97:20
**response** 60:19 71:12 95:12 97:5 98:1,9
**responses** 13:14
**responsibilities** 13:4 59:5 65:11
**responsibility** 11:8 33:20,21 58:11 59:8
**responsible** 5:24 26:1,9 44:10 45:8 49:3,4 58:13 58:15 59:6,9 59:12
**restate** 23:14 32:1
**restrict** 37:14 97:13
**restricted** 38:8
**restriction** 41:20,24 42:15 43:6 89:17
**restrictions** 41:5,18 89:15 97:15
**result** 71:21,25 84:21
**resulting** 87:20
**retired** 83:11
**return** 102:11
**review** 12:7,15 13:8 20:9 60:13
**reviewed** 12:3 12:4,11,13 13:6 15:4 18:7 19:11
**reviewing** 17:24
**rice** 2:4 3:5 7:10 12:1 13:25 14:23 15:1 18:10
**right** 9:6 21:24 31:5 33:24 36:19 38:12 39:15 43:15 45:9,22 48:7 48:10,15 50:19 51:2,19,22 52:1,23 53:7 53:13,24 56:22 61:5 64:17 66:10,17,23 69:18 70:8,12 70:18 72:1,6 72:13,20 73:7 74:2,7 76:6,19 76:20 77:7 78:4 80:18 85:23 86:20 92:21 93:4 95:21 96:2 99:19
**roeder** 4:13 7:5
**role** 10:25 11:5
**rooms** 37:18
**rosica** 4:14
**rpr** 1:25 101:18
**rulekeeper** 16:10
**rules** 9:7
**run** 58:8,25 61:20
**running** 11:21
**runs** 58:3

**ryan** 94:2

**s**

**s** 3:1,19 5:1,8 6:1 7:1
**sabrina** 47:4
**sale** 4:4
**saying** 55:1 62:4
**says** 16:8
**school** 1:8,15 5:19,22 7:13 8:19,23 12:8 22:21 23:7,21 25:21 26:23 27:4 33:4,4,18 34:25 39:6 42:12 45:18 47:8 64:19 69:4,7,18,20 70:5,5 73:22 79:18 82:15 84:12 86:2 89:7 90:8 94:8 94:9 95:16,20
**schools** 25:10 25:19 26:2,3 27:14 32:10 33:21 41:23 43:5 64:16 68:6,9,13,19,22 70:1 71:12,24 90:8
**scope** 39:8 57:18 62:1 75:21 77:9 78:16 79:3 89:9 90:18
**screen** 6:4,7,10 50:9,16 71:2,4 72:22 73:19 79:24
**second** 42:8
**secure** 11:13
**securely** 69:5
**security** 25:14 30:12 33:6 35:8
**see** 19:9,16 20:20 21:8,16 28:24 30:17 50:16,23 51:13 59:21 71:4,14 73:18 79:24 84:21,21,21 92:19
**seeing** 34:16,22 42:9 88:8
**seemed** 35:16
**seen** 19:6 20:6 28:4,12,12,22 30:16 66:14 97:17
**sense** 14:19 32:19 56:1
**sentence** 24:16
**separate** 13:5 17:18,24 18:12
**september** 6:9 6:13 79:20 80:4,7
**serve** 90:3
**served** 87:21 89:12,13
**serves** 14:18
**service** 43:9,15
**services** 76:6
**serving** 90:22
**sessions** 14:8
**set** 101:5
**several** 15:13 33:21
**share** 50:8
**shared** 58:11
**shavonna** 15:14
**sheet** 102:5,7,9 102:12 104:8
**sherry** 33:15
**shifting** 80:10
**shook** 3:21
**shorthand** 2:15 101:1,2,11
**show** 30:13 32:14 66:8
**showing** 67:24
**shows** 31:20 32:15
**shut** 88:18
**side** 13:22 21:23 44:21
**sign** 44:10 45:25 102:6
**signal** 37:24
**signature** 101:16
**signing** 102:8
**similar** 82:7
**single** 51:2
**site** 58:14,18
**sites** 37:19
**sitting** 32:20
**situations** 61:14,17
**six** 100:1
**slide** 44:23
**slower** 32:7
**small** 52:16 68:18
**smart** 23:5,19
**smartphones** 81:4,15
**smoothly** 11:21
**snapchat** 78:8 85:7
**snoozer** 12:1
**social** 1:4 36:18 37:4,6 54:17 54:21,24 55:11 56:6 58:3 62:9 72:4 74:6,10 74:11 75:5 76:5,12 77:1

78:1 79:9 80:16,21 88:13
**software** 11:12 90:1
**softwares** 56:25 57:16
**somebody** 12:2 61:3 83:20 94:10
**song** 46:23
**sorry** 12:22 16:25 19:13,14 26:13,20 31:3 32:6 33:10 48:24 51:6 62:21 65:23 83:15 96:9
**sort** 58:19
**sorts** 27:13
**south** 1:17 2:6 3:7 7:12 57:1,4 57:14 64:15
**southwest** 3:14
**space** 9:10 102:4
**spalding** 4:5
**speak** 15:12,18 15:21 40:21 60:5,9 82:2 94:7,16,18
**speaking** 16:6
**specialists** 25:23 26:22 27:1
**specific** 14:7 27:17,19 29:25 30:7,23 33:18 36:2 40:22 59:10 61:12 75:11,14 76:18 82:25 83:3 84:15 85:1,9 94:12,24 95:3 95:9 98:2,9,11
**specifically** 27:22 87:2 98:24
**specifics** 59:18
**speculation** 38:3
**split** 59:5
**spoke** 15:14 94:23
**spoken** 40:15 40:20,25 41:1 41:2,17 88:1 94:17
**sponsored** 69:21
**sports** 37:8,25 38:1 69:21
**spread** 80:11
**spring** 14:18 46:11
**sprinkled** 76:11
**square** 3:22
**stability** 88:14
**staff** 11:13 12:9 12:14,14,18,20 12:20 13:3 26:9 56:5 59:25 61:1 94:25
**standard** 1:19
**start** 86:4
**started** 26:21 40:2,6
**starting** 23:3 23:17
**starts** 88:9
**state** 8:8 24:10 57:1,4,14 64:15,16,20 96:24 102:4
**statements** 22:7
**states** 1:1 7:15
**static** 47:7
**stating** 13:21
**station** 26:18
**stay** 44:4
**stenographic** 7:20
**stenographic...** 101:9
**stepping** 82:11
**steve** 94:2
**steven** 66:3
**stigmatized** 80:9
**stop** 48:25
**store** 48:18,22
**stored** 23:6,20
**story** 32:19,21
**street** 3:23
**strict** 41:24 42:15
**strike** 48:12 78:2 82:9
**student** 5:23 12:8 29:18 37:2,23 38:20 39:5,10 45:7 46:21,23 47:12 47:16 74:9 76:5 81:3,22 81:25 84:12 87:7,19 96:18
**student's** 36:6 36:12
**students** 11:12 23:4,18 26:3 27:16 30:12 35:11,16,23 36:17,21 38:5 40:1 42:3,16 43:18 44:1,9 44:13 45:24 46:4,11 47:15 47:20 54:19 55:2,20 56:4 66:9,16 69:3,6 72:11,16,25 76:18 78:11,17

82:6,15 85:7 89:6 92:3,12 92:14,18,23 95:15,24 96:11
**studied** 23:23 24:5,12,17,17 24:18,19,20,20 24:21 25:4
**studies** 82:19 83:1,5,7,19,22
**study** 81:2,20 82:5,13 84:10 84:16 85:5
**subject** 12:19 12:24 102:8
**subpage** 51:13
**subscribed** 101:14 104:14
**substance** 16:15 20:15 104:7
**suicide** 6:12 80:3,7,12,18
**suite** 3:23 4:7
**summaries** 22:1
**super** 41:24 62:3
**superintendent** 11:15 26:4 34:19 35:7 41:4,4 42:17 61:19
**superintende...** 62:5
**supervision** 101:25
**supplemental** 5:15
**support** 72:24 72:24 73:7,24
**supports** 72:6 74:7,12
**supposed** 42:6
**sure** 9:11 11:10 11:13,14,14,20 17:18 28:23 31:11 39:25 55:6 58:10 62:25 82:2 99:8
**swear** 7:22
**sworn** 8:2 101:6 104:14
**system** 37:13 98:25

**t**

**t** 5:1,1,8 6:1,1 103:2
**tab** 18:16 19:22 22:11 44:15 70:22 73:11 79:16
**tablets** 81:4,15
**take** 10:13,16 14:15 42:19 51:25 52:5,11 52:19 53:1 56:8 92:3
**taken** 16:3 21:25 87:23 101:4
**takes** 47:20
**talk** 15:9 17:9 21:10 49:8 57:25 75:22 83:6,22 84:5,5 94:1,6,15 99:4
**talked** 17:25 18:6,7,8 34:25 35:4 64:24 66:6 91:16 94:11
**talking** 17:25 18:1 34:18 69:13 83:12,13 93:9 95:19
**talks** 74:4 76:19
**tangential** 87:25
**tangentially** 87:22
**teacher** 67:14 84:6
**teachers** 11:12 11:18 25:21 47:17 48:6,10 54:19 56:4 66:7,8,15,22 67:1 90:8 92:15 94:14,15 94:17,19,23 95:1,6,9
**team** 11:3 25:14 35:8 41:2 43:21
**team's** 11:14
**tech** 25:23 26:24 90:9
**technical** 64:7
**technician** 4:14
**technology** 11:20 68:14,16 68:17 79:8
**tell** 8:15 17:15 32:18
**tells** 10:1 32:21
**term** 24:17 33:8,12
**terms** 13:3 24:4 45:25
**terrified** 47:21
**test** 29:20 30:15
**testified** 8:3
**testify** 8:18 21:4 74:18 75:17
**testimony** 10:20 21:19 34:18 86:5 91:6 101:7

**text** 36:21
**thank** 13:16 21:22 24:24 28:24 41:9 44:21 46:14 63:16 71:9 77:25 81:18 85:18 86:20 91:6 99:7
**thanks** 18:19
**thereof** 101:11 101:14
**thing** 44:23 56:7 58:16,20 73:6 79:14
**things** 36:18
**think** 14:14 27:2 29:11 50:9 67:18 71:9 78:23 79:6
**thinking** 34:17 88:17
**thinks** 55:18 80:15
**third** 14:12 62:16,22
**thirty** 102:12
**three** 14:3,4,8 14:14,17 45:23 62:23 89:16
**tiktok** 4:3 78:8 85:7
**time** 1:19 7:7 9:19,19 14:21 16:7 28:8 35:15 63:14 72:10,14,16 73:1,8 80:8 83:13 85:18 97:20 99:21,22 99:24 101:5,6 101:8
**times** 15:13 33:9 95:4
**title** 12:17
**titled** 22:19
**today** 8:12,20 9:9 10:20 11:23 17:6,20 18:14 21:5,11 21:20 32:20 41:14 48:10 49:6 60:7,11 60:16 74:18 91:7
**today's** 7:6 99:20
**todd** 1:25 2:15 7:22 101:18
**told** 97:14
**tom** 15:12
**tomorrow** 83:17
**took** 42:18 59:8
**top** 50:22,24 51:19 53:6
**topic** 15:14 20:20,21,23 21:1,8,11 27:25 29:10 38:25 57:8 59:24 60:1 75:21 76:15 80:9 81:24 87:19,22,25 93:4,17 94:11 95:1,7
**topics** 8:20 9:2 13:20 19:18 20:14,15 21:5 21:16,20 39:1 57:10 59:19 74:17 75:7 80:17 90:23
**total** 99:22,24
**towards** 20:19 44:23
**track** 30:7 62:8 62:19
**tracked** 30:9
**tracking** 29:20 31:14,18,22 32:2,8,12,14
**traditional** 80:22
**training** 22:6
**transcribed** 101:10
**transcript** 5:9 6:2 101:10,12 101:22 102:13 102:15
**transcription** 104:4
**transcripts** 15:5
**trauma** 76:18
**traumatize** 77:6,19
**trial** 4:14
**trick** 92:19
**true** 39:4 101:10
**trustees** 33:23 34:4
**truth** 8:15 42:2
**truthful** 10:20
**try** 28:25 44:4 67:20 80:25
**trying** 17:16 77:14
**turn** 19:20 20:16 45:21 47:14
**turned** 23:6,20
**twice** 97:9
**twitter** 49:24 52:6,20 58:5 69:16
**two** 3:22 14:11 52:22 61:18 65:16 66:1
**type** 69:17 76:18

**types** 32:9 37:22
**typically** 16:10 37:10 58:12 59:13

**u**

**u** 6:1
**u.s.** 74:1
**uh** 52:10
**ultimately** 33:23
**unclear** 10:6
**under** 8:12 35:22 36:4,10 36:14 101:24
**undersigned** 101:2
**understand** 8:11,14,17,24 28:9 29:24 32:5 37:21 54:15,23 56:17 61:22 64:23 65:4 67:21 76:25 77:13 81:14 92:2
**understanding** 16:5 43:12,16 46:9 78:9,10 89:10 92:9
**understood** 9:16,17,22,23 10:3,9,10,11,17 10:18 33:22 60:4 63:11
**unintentionally** 37:18
**united** 1:1 7:15
**unrelated** 76:14
**unusual** 66:19
**updating** 48:25
**url** 52:12,19
**usage** 76:12
**use** 5:24 12:11 31:15 36:17,25 37:2,25 43:14 43:19 44:2,11 45:8 46:11 47:17 48:6 54:17,20 55:11 56:2,6,14,21 60:22 62:17 63:25 66:7,8 66:17,22 67:2 68:23 69:14 70:14 74:10 75:5 76:5 77:1 77:12 78:13,18 80:10,16 81:3 81:22,25 82:6 82:16 83:21 84:13 85:7 92:14,15 98:25
**used** 26:23 39:19 67:24 72:3 86:17 102:16
**uses** 24:17 39:13 49:20 69:15
**using** 55:15 68:20,20 74:20 75:14 92:18

**v**

**v** 1:9 7:13
**vanessa** 49:10 58:24 59:5 65:13 66:4
**various** 37:22
**version** 45:15
**versions** 88:9 88:10
**versus** 89:13
**video** 7:9 47:6
**videographer** 4:13 7:3,6 63:17,20 64:5 64:8 85:12,15 99:11,19
**videos** 66:9 87:20 98:2,9 98:11,20,23
**videotaped** 1:14 5:12,16
**views** 87:24
**vince** 4:14 50:7 51:9 52:14 70:21 73:11 79:15
**violate** 35:24
**violation** 36:12
**violence** 76:20 76:24 77:5,18
**virtual** 14:10 14:12
**vital** 80:11
**void** 101:13
**volunteer** 68:19
**vulgar** 46:23
**vulgarity** 42:5

**w**

**wait** 9:13 64:1
**want** 14:7 17:12 35:5 44:25
**wanted** 49:7 62:11 63:23 64:11 69:1 83:4,17,18
**warned** 52:8
**washington** 3:15 4:8
**watch** 34:15
**watched** 46:24
**watches** 23:5 23:19
**watching** 42:11 42:13 46:22 47:4
**water** 45:1,2

**way** 27:20 30:20 55:25 61:4 69:5 90:21,21,25 92:3 93:8
**ways** 80:24 97:17
**we've** 17:25 18:6 30:16 31:7 63:12 90:16,19 91:1 91:19,19 98:3 98:11
**web** 37:2 51:2
**website** 37:25 50:11 51:2 52:4 53:5
**websites** 37:3,6 37:9,23
**wednesday** 1:18
**week** 19:11 27:10
**weekend** 19:11 19:12 20:10
**weeks** 14:4,14 14:17 35:16
**wellness** 72:5
**whiteley** 3:11 5:3 8:5 17:4 18:23 19:2,23 20:2 22:10,15 23:12,15 24:6 28:1,15 29:11 29:13 30:4 31:4 38:10,18 39:1,3,12 44:14,19 48:5 50:7,15 51:7,9 51:11 52:13,15 53:11 55:17 56:19 57:10,12 57:23 58:2 61:9 62:10 63:12,22 64:3 64:10 67:4,12 67:22 69:8 70:21,25 71:18 71:22 72:12 73:5,10,14 74:23 75:2,20 75:25 76:16 77:3,15,22 78:24 79:15,23 85:11,17 87:13 89:1,8 90:17 91:8,11 93:2 97:11 99:3,13 99:17
**williams** 3:13 99:23
**wireless** 37:13 39:11
**withdrawn** 72:17
**withhold** 64:20
**witness** 2:16 7:23 15:5 23:13 24:4 28:2 29:8 38:4 38:16 39:9 44:18 51:5 53:10 54:12 55:24 57:19 61:8 62:2 67:1 67:8,17 69:1 71:20 72:9 73:4 75:16 76:9,23 77:10 78:17 79:4 89:3,10 90:19 97:10 99:8 101:6,7,14 102:1
**word** 42:9,9 56:13,16
**wore** 35:15
**work** 83:18
**works** 43:1
**workspace** 39:19,22 40:8 40:24 41:6,18 41:21 43:10
**worried** 88:16
**writes** 80:6
**written** 76:10
**wrote** 72:15 73:21
**wyatt** 66:3

**x**

**x** 1:4 5:8 6:1 49:24 52:4,14 52:20
**x.com** 52:5

**y**

**yeah** 13:12,20 14:16,18 17:22 26:7,15,20 27:5 29:2 32:8 33:10,16 38:4 39:9 43:2 51:15,16 52:18 58:21 60:24 66:21 72:9 74:23 78:21,21 79:11 80:24 95:24
**year** 11:6 39:25 44:8,11 45:19 46:12 73:23
**year's** 46:8
**years** 28:11 30:9,16,25 39:20 73:24
**yep** 20:18 42:22
**yesterday** 42:20
**ygr** 1:6
**yondr** 68:2,6 68:12,15,20,23 69:10

**younger** 97:16
**youtube** 3:10 39:23 40:1,7,7 40:23 41:2,5 41:13,18,21,25 43:9,15,19,22 44:2,3 46:5,10 46:11,22 47:6 47:12,15,19 48:1,7 49:12 49:14,17 52:23 53:1,24 54:5 58:5 61:23 62:18 66:7,8 66:17,23 67:2 67:24 69:16 78:9 85:8 86:23 87:10 88:3,23 89:6 89:18 90:7,15 91:17,20,21 92:12,15,15,18 92:23 93:18 95:11,25 96:5 96:12,16,17,18 97:6
**youtube's** 91:17

**z**

**zoom** 3:19,20 4:4,12,15 9:9 99:14
**zoomed** 71:7