1    [Submitting Counsel on Signature Page]

2

3

4

5

6

7

8

9

10

11

12                    **UNITED STATES DISTRICT COURT**

13            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15    IN RE: SOCIAL MEDIA ADOLESCENT          No. 4:22-md-03047-YGR
      ADDICTION/PERSONAL INJURY
16    PRODUCTS LIABILITY LITIGATION           MDL No. 3047

17    This Document Relates To:               **IRVINGTON PUBLIC SCHOOLS'**
                                              **OPPOSITION TO DEFENDANTS' MOTIONS**
18                                            **FOR SUMMARY JUDGMENT (SD MSJ No. 4)**

19    *Irvington Public Schools v. Meta Platforms,*   Judge: Hon. Yvonne Gonzalez Rogers
      *Inc., et al.*
20                                            Magistrate Judge: Hon. Peter H. Kang

21    Case No. 4:23-cv-01467-YGR            Date: January 26, 2026
                                            Time: 8:00 AM
22                                          Place: Courtroom 1, 4th Floor

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    RELEVANT FACTS ............................................................................................ 1

       A.     IPS Scholars' Widespread, Compulsive Use of Defendants' Platforms .................... 1

       B.     Defendants' Platform Designs Drive Compulsive Use by IPS Scholars, Substantially Disrupting Learning at IPS .................................................................. 3

       C.     Defendants' Platforms Increase Student Anxiety, Depression, and School Avoidance at IPS .............................................................................................. 4

       D.     Defendants' Platforms Are Particularly Harmful to IPS Scholars ........................... 5

       E.     Widespread, Compulsive Use of Defendants' Platforms Diverts IPS Resources. ............................................................................................................. 6

III.   ARGUMENT ....................................................................................................... 7

       A.     Each Defendant's Conduct Has Been a Substantial Factor Causing IPS' Harms. ........................................................................................................ 7

       B.     IPS Was Harmed by Each Defendant's Failure to Warn of Their Platform's Risks. ............................................................................................. 9

       C.     IPS' Damages Are Supported by Ample Record Evidence and Are Compensable Pursuant to New Jersey Law .......................................................... 10

              1.     IPS Is Entitled to Compensation for Diversion of Staff and Teacher Time .. 11

              2.     Defendants' Legal Challenges to IPS's "Lost Time" Damages Are Meritless. ......................................................................................... 11

              3.     IPS's 15-Year Strategic Plan Is a Cognizable Remedy. ............................... 12

IV.    CONCLUSION ................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alexander v. Cheaster,*
   164 A. 287 (N.J. 1933) ........................................................................................... 12

*American Sanitary Sales Co. v. Dep't of Treasury,*
   429 A.2d 403 (N.J. Super. Ct. App. Div. 1981) ........................................................... 11

*Conklin v. Hannoch Weisman,*
   678 A.2d 1060 (N.J. 1996) ....................................................................................... 9

*Dolby Labs. Licensing Corp. v. Adobe Inc.,*
   2019 WL 6327210 (N.D. Cal. Nov. 26, 2019) .......................................................... 12

*Financial Servs. Vehicle Tr. v. Panter,*
   204 A.3d 303 (N.J. Super. Ct. App. Div. 2019) ......................................................... 11

*Fosgate v. Corona,*
   330 A.2d 355 (N.J. 1974) ......................................................................................... 9

*Gilbert v. Stewart,*
   255 A.3d 1101 (N.J. 2021) ........................................................................................ 7

*In re 3M Combat Arms Earplug Prods. Liab. Litig.,*
   2023 WL 4358713 (N.D. Fla. May 1, 2023) ............................................................. 10

*In re Gen. Motors LLC Ignition Switch Litig.,*
   339 F. Supp. 3d 262 (S.D.N.Y. 2018) ..................................................................... 12

*James v. Bessemer Processing Co., Inc.,*
   714 A. 2d 898 (N.J. 1998) ....................................................................................... 10

*Lane v. Oil Delivery, Inc.,*
   524 A.2d 405 (N.J. Super. App. Div. 1987) .............................................................. 11

*Macrie v. SDS Biotech Corp.,*
   630 A.2d 805 (N.J. Super. Ct. App. Div. 1993) .......................................................... 9

*Mauro v. Raymark Indus., Inc.,*
   561 A.2d 257 (N.J. 1989) ......................................................................................... 12

*New Jersey Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.,*
   2021 WL 6144081 (D.N.J. Dec. 30, 2021) ................................................................ 9

*O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am.*,
   825 A.2d 524 (N.J. Super. Ct. App. Div. 2003) ................................................................. 9

*People Exp. Airlines, Inc. v. Consol. Rail Corp.*,
   495 A.2d 107 (1985) ......................................................................................................... 11

*Reed v. Bd. of Educ. of City of E. Orange*,
   2022 WL 288099 (N.J. Super. Ct. App. Div. Feb. 1, 2022) ............................................. 11

*Sharpe v. Bestop, Inc.*,
   713 A.2d 1079 (N.J. Super. Ct. App. Div. 1998) ............................................................. 10

*Townsend v. Pierre*,
   110 A.3d 52 (N.J. 2015) ..................................................................................................... 7

*Underwood v. Camden Cnty. Off. of Sheriff*,
   2024 WL 1366672 (D.N.J. 2024) ....................................................................................... 7

Other Authorities

N.D. Cal. Civil, L.R. 5- .......................................................................................................... 16

Prosser, Law of Torts, (4 ed. 1971) ......................................................................................... 9

## I.      INTRODUCTION[1]

As an urban school district serving the Township of Irvington in Essex County, New Jersey, Irvington Public Schools ("IPS") has long grappled with the challenges its scholars[2] face as a result of racial and income inequality and violence. Confronted with overwhelming evidence supporting IPS's negligence claim, Defendants try to argue that IPS's socioeconomic conditions excuse their misconduct. Motion for Summary Judgment (Irvington) [ECF 2294] ("Mot.") at 1, 3-4. That is not the law: Defendants must take their victims as they find them. And this case is about what is *new* to IPS—namely, Defendants' ubiquitous, highly-addictive platforms targeting students and schools. Defendants knew students like IPS scholars were especially vulnerable to the harms Defendants' platforms inflict, yet they failed to warn of the risks.

As shown below, when viewing the extensive fact and expert evidence in the light most favorable to IPS and drawing all inferences in its favor, a reasonable juror could find that (1) each Defendant's negligence, including each Defendant's failure to warn of the risks its platform poses, is a substantial cause of IPS's ongoing injuries, and (2) IPS has provided a sufficient basis to award it damages for its hard costs and diverted resources, as well as the means to redress its ongoing and future harms. Summary judgment should be denied.

## II.      RELEVANT FACTS

There is ample evidence showing Defendants' misconduct is harming IPS. IPS teachers, counselors, and administrators have observed first-hand that IPS scholars' compulsive use of Defendants' platforms harms scholars' wellbeing. The record further confirms Defendants' platforms undermine and interfere with IPS's instruction, and divert time and resources from IPS's core educational mission. Defendants' platforms substantially and negatively impact IPS <u>every day</u>.

### A.      IPS Scholars' Widespread, Compulsive Use of Defendants' Platforms.

National data shows high rates of social media use among children—particularly Black and Hispanic children, who comprise approximately 98% of IPS's scholars. Ex. 15; Ex. 22. Defendants

---

[1] IPS incorporates by reference Plaintiffs' Omnibus Opposition to Defendants' Motion for Summary Judgment.
[2] IPS refers to its students as scholars. *E.g.*, Ex. 3 at 13:9-14 & 43:7-17.

offer no evidence that IPS scholars' use of their platforms departs from this national pattern. Indeed, data from Defendants confirms widespread use by children in Irvington. *E.g.*, Ex 17; Ex. 18; Ex. 19. And IPS witnesses repeatedly identified Defendants' platforms as the ones used by IPS scholars and harming them and IPS. *E.g.*, Ex. 3 at 20:9-23 (disruptions due to TikTok use); *id.* at 271:13-272:15 (Instagram disruptions); Ex. 2B at 485:5-490:17 (impact of Snapchat use); Ex. 7 at 137:23-144:15 (disruptions due to Instagram use); *id.* at 158:19-162:20 (YouTube use caused disruption of standardized testing); Ex. 5 at 108:3-109:23; 282:17-24; 289:6-21; 294:9-20; 295:16-298:1; 350:16-352:10; 356:20-359:24 (middle school students disciplined for using TikTok and Instagram in class); Ex. 6 at118:15-120:5 & 121:23-123:25 (students evading filters to access YouTube).

The evidence shows use by IPS scholars is not only widespread, but growing. Shelley Pettiford, IPS's Director of Guidance and Health & Social Service Coordinators, testified "all our kids are exposed to using social media…." Ex. 9 at 142:8-12. Despite Defendants' claims that they bar users under 13 (Pls.' Omnibus Opp., § III.A.2), IPS has seen use as early as second grade and continuing through middle and high school. *See, e.g.*, Ex. 3 at 92:20-94:7 (second grader posting naked image of herself); 337:15-339:18 (7-8 yr. old student sending/posting naked images of herself); Ex. 6 at 122:16-123:18 (elementary students evading IPS's filters to access YouTube); Ex. 5 at 288:6-291:10 (elementary students using social media to bully one another); 302:25-304:23 (social media ingrained at elementary level and continues in middle and high school); Ex.7 at 158:19-167:8, 170:14-175:24 (compulsive use disrupting classes, testing, attendance, and safety). Use of Defendants' platforms by IPS scholars has increased year-after-year (Ex. 8A at 66:3-7), as IPS counselors noted at their monthly meetings. *Id.* at 85:12-87:25 ("social media usage is up" and "has increased over the years").

As IPS Superintendent Vauss testified:

> [I] hope that [other communities] don't use [social media] as much as our scholars do on an ongoing, nonstop basis throughout the school day. ….

Ex. 2A at 191:24-192:1; *see also* Ex. 2B at 483:20-485:4, 508:2-19; Ex. 3 at 43:7-17.

**B.     Defendants' Platform Designs Drive Compulsive Use by IPS Scholars, Substantially Disrupting Learning at IPS.**

Real-world observations by IPS staff confirm what Plaintiffs' experts and Defendants' internal documents show: the design, operation, and marketing of Defendants' platforms drives compulsive use by school-aged kids, including IPS scholars. IPS staff testified that the social rewards and interactions embedded in Defendants' platforms—including the pursuit of popularity, notoriety, attention, and "likes"—drives IPS scholars' non-stop use of social media. *E.g.*, Ex. 3 at 196:14-20 ("…popularity, notoriety…resulted in bullying [and] threats"); Ex. 4 at 285:12-24 ("…competition of who can post these videos, who can get likes"); *id.* at 288:13-15; Ex. 5 at 350:16-352:10 & 402:19–403:4 ("……their desires for attention is evidenced by what they post"); Ex. 7 at 159:3-25 (learning disrupted by scholars' "urges" to "peek, pry, comment, post" on social media due to "dopamine effect of wanting to be part of social media").

Defendants' platforms are the leading source of distraction and distress among IPS scholars and disruption and harm to the school environment and operations. E.g., Ex. 3 at 75:7-101:25 & Ex. 29; Ex. 10 ¶¶ 9-10; Ex. 3 at 114:7-18 (IPS is bombarded with the impacts of social media; everyday something happens of "grand magnitude" related to social media). As IPS Health and Social Services Coordinator ("HSSC") Sandra Lopez testified, "not a day [] goes by" without administrators, counselors, or the HSSC team having to respond to an incident linked to Defendants' platforms. Ex. 10 ¶ 8. Indeed, teachers frequently stop lessons because scholars are distracted by Defendants' platforms. *Id.* The "constant battle" against compulsive use of social media is "one of the biggest challenges" IPS faces, with issues stemming from Defendants' platforms eating up 70% of her time, and up to 85% of guidance staff time. *Id.* ¶¶ 8, 19-23.

IPS principals likewise confirmed social media diverts their time and attention on a daily basis. Principal Mangan testified that social media matters occupy most of his working hours, preventing him from completing core administrative duties. Ex. 7 at 170:14-175:24. Principal Bussacco likewise confirmed assistant principals, deans, counselors, HSSCs, and teachers daily address "something that relates to social media." Ex. 4 at 289:11-20. And Principal Zahir testified

that addressing social media-related incidents prevents him from fulfilling his day-to-day obligations and negatively impacts students' learning. Ex. 5 at 356:20-359:24.

Disruptions caused by social media carry over into disciplinary matters. At Union Avenue Middle School, disciplinary issues related to social media are "[t]oo many to count . . . social media is the high fructose corn syrup of all problems in school. It's in everything." Ex. 5, 360:2-363:8. Principal Zahir testified that, in his time at an IPS elementary school, students were impacted by fights being recorded and posted to social media sites, leading to arguments in the classroom. Ex. 5 at 295:16-298:1. Principal Mangan recounted a recent example where a scholar disrupted standardized testing because he was compulsively checking for YouTube notifications. Ex. 7 at 158:19-162:20. Principal Bussacco highlighted that "80 percent, if not more" of his middle school's discipline referral forms concern incidents in which there was "an element of social media that led us here." Ex. 4 at 289:11-20. And Superintendent Vauss testified that "fight pages" on Instagram— where students seek attention and notoriety by arranging physical fights to video and post to social media—are a particular scourge. Ex. 2B at 496:1-497:16; Ex. 2A at 242:17-243:23.

**C.    Defendants' Platforms Increase Student Anxiety, Depression, and School Avoidance at IPS.**

The record also shows Defendants' platforms harm IPS scholars' mental health and wellbeing. Dr. Hoover explains how social media "increase[s] [IPS] student anxiety and stress and negatively impacts their social interactions and skills…[and] exacerbate[s] violence, bullying, and emotional distress, with conflicts reaching wider audiences and lasting much longer than they would have in the past[.]" Ex. 12 ¶ 45. IPS witnesses echo these findings based on their daily experience. For example, Ms. Lopez attests that the "growing problem of addictive, compulsive, and problematic social media use" has been accompanied by a sharp rise in anxiety and depression among IPS scholars. Ex. 10 ¶¶ 7-8. Ms. Lopez emphasized these effects "are unique to social media," noting that repercussions from social media (*e.g.*, tagged images, comments, and fake accounts) damage scholars' self-esteem. *Id.* ¶¶ 10-11. Dr. Vauss similarly testified how ubiquitous beauty filters harm IPS scholars:

> [W]hen they are on a social media platform that has an image of what beauty is and there's filters that are placed on there . . . they can alter what the ideal of beauty is and what wealth is . . . and they look at themselves, it makes them feel not good

-4-

enough and not valued. And in a lot of those things they don't see themselves, you know, showing up as important. And I think that it contributes a lot to the self-esteem, a certain sense of anxiety because, you know, I -- I don't look like that. I'm not like that.

Ex. 2B at 491:2-22. Principal Zahir confirmed his middle school students told him social media negatively impacts their mental health: "[W]hen you tell me that this is affecting your mental health, I take you for your word. So to answer the question is yes, because the kids say it." Ex. 5 at 375:5-20.Educators across IPS also testified that excessive social media use fuels sleep deprivation and anxiety. Ex. 5 at 360:2-367:6, 375:5-377:16; Ex. 7 at 165:11-167:8; Ex 4 at 357:9-11. Ms. Lopez confirmed that sleep deprivation and anxiety are now leading causes of both tardiness and school avoidance within IPS. Ex. 10 ¶¶ 8-9, 19-20; *see also* Ex. 7 at 165:11-167:8.

Defendants claim "Irvington has no evidence that any student has ever been referred for mental health services due to social media or Defendants' platforms" and that "the number of Irvington students referred for mental health services has never exceeded 0.5%." Mot. at 5. But Defendants do not explain what they mean by "referred for mental health services." If Defendants mean out-of-district referrals (which represents a small percentage of students because it deals with the most extreme cases), IPS's records show such placements increased almost 100% over the relevant time period (Ex. 1, SPFS), mirroring increased social media use by IPS scholars. Ex. 4 at 85:19-23, 87:7-25. The dramatic increase in such placements supports IPS's claims. If Defendants are instead referring to in-school mental health visits to IPS counselors, IPS counselors' monthly meeting records confirm they were making social media referrals. *See* Ex. 8A at 53:12-14, 78:23-79:6. In order to attribute any specific scholar's referral to social media, individualized assessment of records would be required. Such individualized analysis is not necessary under the law (Pls. Omnibus Opp. § 3.B.1), and the parties specifically agreed the Districts were not required to produce individual student records. ECF 1209 (Stipulated Third Modified Protective Order) at 14.2.

### D.    Defendants' Platforms Are Particularly Harmful to IPS Scholars.

Defendants' platforms have a particularly pernicious impact on IPS scholars in light of Irvington's socioeconomic conditions. *E.g.*, Ex. 8A at 153:3-154:21 (observing connections between poverty and social media use). As Dr. Hoover opines, use of Defendants' platforms adds constant

emotional pressure to already vulnerable students. Ex. 13 ¶ 3. IPS educators like Principal Bussacco

explain that this is, in part, because social media is "immediate, unrelenting, and public":

> I believe [social media] has a larger [impact] on mental health [than poverty] — because it's in the moment … I spend countless hours dealing with social media and my other staff members spend even more time than I do. So, in my honest opinion, by doing this for many, many years, I believe social media has a huge impact and I believe that studies should be done by the defendants to show this, and things should be done about it.
>
> ***
>
> Students experience racism on a daily basis through social media … So not only are they experiencing racism in the micro, now it becomes a macro, because social media has expounded it. So I would argue that social media makes it worse. …

Ex. 4 at 362:6-363:14, 363:15-364:4; *see also* Ex. 2A at 243:4–23.

### E.    Widespread, Compulsive Use of Defendants' Platforms Diverts IPS Resources.

The harm caused by Defendants' platforms and failures to warn reach every part of IPS. The

widespread use of social media has forced teachers, counselors, and administrators to manage the

consequences—reducing time for instruction, counseling, and other educational matters. As student

focus, behavior, and mental health has declined due to use of Defendants' platforms, IPS has had to

redirect staff and funding away from education to address these harms. For example, Superintendent

Vauss testified "…social media was causing great harm to what we were trying to do administratively,

instructionally." Ex. 2A at 90:21-25. She also testified (as a Rule 30(b)(6) witness) that teachers were

"saying that when they speak to or when they're in class with students, they are on their phones on

platforms nonstop. They have to constantly tell students to get off of their phones." Ex. 3 at 43:1-5.

HSSC Lopez described how every hour spent responding to the effects of Defendants' platforms is

an hour lost from counseling students on other matters. Ex. 10 ¶¶ 21, 24.

Dr. Hoover's analysis confirms Defendants' platforms harm IPS. She found "IPS educators

reports describe how educator time and district capacity are diverted to address social media-related

disruptions. From investigating social media conflicts to mitigating schoolwide viral challenges, IPS

educators described a redirection of resources away from instruction and wellness promotion." Ex.

13 ¶ 9. She also confirms "[e]xisting staffing and programming at Irvington Public Schools are

insufficient to address the complex impacts of social media on students' mental health, learning, and

1    the school environment." Ex. 12 ¶¶ 7, 30, 35. As Dr. Hoover notes, mental health referrals are limited

2    by provider shortages, insurance barriers, and family hesitance—not lack of need. Ex. 13 ¶ 16.

3        The evidence is compelling: the harms Defendants create and failed to warn about are draining

4    IPS's already strained resources, and diverting those resources from students who need them most.

5    **III.    ARGUMENT[3]**

6        The Court should deny Defendants' motion. The evidence shows each Defendant breached

7    its duties of care to IPS and its students and families. Pls. Omnibus Opp. § III.A.2. Viewed in the

8    light most favorable to IPS, the extensive record is more than enough for a jury to find that each

9    Defendant's negligence is a substantial cause of IPS's ongoing injuries, and that each Defendant owes

10   IPS redress for its ongoing and future harms.

11       **A.    Each Defendant's Conduct Has Been a Substantial Factor Causing IPS' Harms.**

12       As explained in Plaintiffs' Omnibus Opposition, Defendants argue for a causation standard

13   far higher than New Jersey law requires and misstate both the law on Section 230 and the record to

14   avoid liability. Pls.' Omnibus Opp., § III.B. Under New Jersey law, each Defendant is liable if its

15   conduct was a "substantial factor" in causing IPS's injuries. *See Gilbert v. Stewart*, 255 A.3d 1101,

16   1114 (N.J. 2021). Causation is a fact-bound question that is not to be "removed from the factfinder"

17   other than in "the highly extraordinary case in which reasonable minds could not differ" as to

18   whether causation was more likely than not. *Townsend v. Pierre*, 110 A.3d 52, 66 (N.J. 2015). And

19   IPS is not required to prove causation through any specific type of data or studies. *E.g.*, *Underwood

20   v. Camden Cnty. Off. of Sheriff*, 2024 WL 1366672, at *3 (D.N.J. 2024) (summary judgment can be

21   denied based on "circumstantial" evidence of causation).

22       The law also does not require IPS's harms to be fully independent of content. Pls.' Omnibus

23   Opp. § III.B.2.b. And Defendants ignore that compulsive use stems from their platforms' designs,

24   which intentionally exploit students' desire for popularity and peer approval—precisely what IPS

25   educators report. *Id.*, § III.A.2.

26

27

28   _____
     [3] IPS has dismissed without prejudice its claims against Mark Zuckerberg. ECF 40.

As detailed above, and confirmed by Dr. Sharon Hoover and IPS witnesses, Defendants' conduct has been a substantial factor in causing IPS's injuries. Dr. Hoover opines that IPS educators describe persistent, compulsive social media use, addictive posting, peer comparison, and sleep loss—harms fundamentally different from past distractions. Ex. 13 ¶ 7.  Dr. Hoover explains that such use fosters anxiety, peer conflict, and attention loss across student populations. *Id.* ¶ 100. IPS educators confirm based on their daily observations that these behaviors have transformed the occasional disruptions of the past into a daily struggle for order and stability. Section 1, *supra*.[4]

Defendants' claim that IPS's planning documents "do not identify social media as a root cause of student issues or priority for intervention." Mot. at 4. This ignores witness testimony and elides the fact that the forms are standardized. Ex. 4 at 53:3-3. As Principal Bussacco testified, social media is indeed incorporated in many of the specific items and issues discussed in the planning documents. *See, e.g.*, Ex. 4 at 143:13-23. And as Dr. Hoover has explained, the absence of formal documentation is not evidence of an absence of harm:

> The impacts of student social media use are visible in disruptions of classrooms and school functioning, peer aggression, staff burnout, and diverted instructional time and resources. These harms are independently consequential and not meaningfully captured in aggregate metrics such as test scores or discipline dashboards.

Ex. 13 ¶ 2; *see also id.* ¶ 74 (Defendants' argument "ignores the reality that discipline codes often lack categories specific to social media-related behaviors").

In sum, IPS has more than sufficient fact and expert evidence to create a triable issue of fact for the jury on the question of whether each Defendant's platform has been a substantial factor in causing harms to IPS, including classroom disruption; disciplinary issues; rising anxiety, depression, and physical exhaustion in scholars; and the need to divert and expand IPS's resources to address the significant, ongoing harms Defendants are inflicting on IPS.

---

[4] When asked to identify "studies or data to substantiate that specific features on social media platforms have had a negative impact on the learning environment," Principal Zahir responded: "I'm living it"; "myself, my life"; "my experiences"; "There is no greater research for me to formulate an opinion than what I live." Ex. 5 at 378:21-387:18; 407:1-4. Indeed, this is one of the primary sources of Irvington's evidence—IPS educators' firsthand experience of how Defendants' platforms are impacting the scholars and classrooms they observe daily at IPS. This is admissible evidence, and any dispute about its weight is exclusively for a jury to resolve.

1    Defendants argue IPS must quantify each scholar's usage or apportion harm among the

2    Defendants. Mot. at 4-5, 18-21. That is not the law. It is not IPS's burden to prove a Defendant's

3    conduct was the sole cause of its injuries, nor is that what IPS alleges. Where there are concurrent

4    causes of an injury, plaintiff need only show the defendant's conduct was a "substantial factor" in

5    bringing it about *Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1073 (N.J. 1996); *see also* Pls.'

6    Omnibus Opp., § III.B. Nor is IPS required to apportion the extent to which each Defendant caused

7    IPS' injuries where, as here, its unified injuries result from the simultaneous tortious conduct of each

8    Defendant. *O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am.,* 825 A.2d 524,

9    531-32 (N.J. Super. Ct. App. Div. 2003).  To the extent Defendants point to socioeconomic or other

10   conditions impacting IPS, it is their burden to prove apportionment. *See Fosgate v. Corona,* 330 A.2d

11   355, 358 (N.J. 1974) (citing Prosser, Law of Torts, (4 ed. 1971), Section 52 at 319).

12   **B.    IPS Was Harmed by Each Defendant's Failure to Warn of Their Platform's
13          Risks.**

14   Defendants had a duty to warn IPS, its students, and their families of the foreseeable risks

15   associated with their platforms. Pls.' Omnibus Opp. § III.A.1. Defendants' assertions that they owed

16   no duty to warn IPS as a "non-user" (Mot. at 32) ignores the law. "New Jersey courts have not limited

17   the duty to warn to those with whom a defendant has a direct relationship." *New Jersey Dep't of Env't*

18   *Prot. v. E.I. du Pont de Nemours & Co.*, 2021 WL 6144081, at *7 (D.N.J. Dec. 30, 2021) (3M owed

19   duty to warn New Jersey of risks associated with PFAS); *Macrie v. SDS Biotech Corp.*, 630 A.2d

20   805, 809 (N.J. Super. Ct. App. Div. 1993) (fungicide manufacturer had duty to warn downstream

21   employees of processor that purchased vegetables grown by farmer that purchased fungicide).

22   Defendants knew or should have known that school-aged children, including those within

23   IPS, were using their platforms extensively and were vulnerable to resulting harms, such as anxiety,

24   depression, cyberbullying, and loss of focus. *See* Ex. 12 ¶¶ 7, 30; Ex. 10 ¶¶ 7-9. Yet Defendants

25   provided no warnings to IPS, its scholars, or their families. Pls.' Omnibus Opp. § III.A.1. Scholars

26   "had access to all these platforms," but "there were never commercials or advertisements… pushed

27   to students on how to use platforms properly." Ex. 4 at 311:17-314:17, 317:6-20. Parents received

28   nothing from Defendants to educate children about harms from use of their platforms (and many

-9-

1   "didn't even know these things exist."). *Id.* at 330:1-12; 344:23-345:6. As Principal Bussacco

2   summarized: "Most parents have access to their child's phone or they tell you they do. And they go,

3   'It's not my child,' and then you find out that their child has a whole secret life… making secret

4   accounts. So you think you're monitoring your child's Instagram or Snapchat, but they have other

5   accounts… and that's where a lot of stuff is happening—and it's just a growing problem." Ex. 4 at

6   310:5-2.

7        Had Defendants warned of the risks their platforms pose, the law presumes IPS and its

8   scholars and families would have heeded those warnings. *Sharpe v. Bestop, Inc.*, 713 A.2d 1079,

9   1084 (N.J. Super. Ct. App. Div. 1998), *aff'd* 730 A.2d 285 (1999). Contrary to Defendants' argument

10  (Mot. at 33), New Jersey does not restrict this presumption to platform "users." The

11  presumption applies to "all failure to warn ... cases." *In re 3M Combat Arms Earplug Prods. Liab.*

12  *Litig.*, 2023 WL 4358713, at *2 (N.D. Fla. May 1, 2023); *James v. Bessemer Processing Co., Inc.*,

13  714 A. 2d 898, 908 (N.J. 1998) (when widow sued manufacturer over her husband's death from

14  exposure to toxins at work, it was presumed employer would have heeded warning to protect

15  employees).

16       Even absent a heeding presumption, IPS would have heeded an adequate warning. If

17  Defendants had provided adequate warnings of the negative effects of their platforms, IPS would

18  have taken specific steps to ensure IPS, its scholars, and its scholars' parents and guardians were

19  informed of those negative effects. Ex. 28 ¶¶ 4-8. As Dr. Noar opines, such warnings would have

20  avoided or lessened the harmful impacts of social media. Ex. 26 at ¶¶ 6.f & 274.[5]

21       **C.    IPS' Damages Are Supported by Ample Record Evidence and Are**
              **Compensable Pursuant to New Jersey Law.**

22

23       Defendants' challenges to IPS' damages (Mot. at 21-31) misstate the law and the record.

24  Under New Jersey law, "[i]t is … sufficient that the plaintiff prove damages with such certainty as

25

26  _____

    [5] Given IPS's statutory duty to educate students about online safety, IPS likely would have been
27  required to incorporate any actual warnings from Defendants into its curriculum. *See* Ex. 27 ("New
    Jersey Student Learning Standards" requiring instruction on responsible online behavior). Principal
28  Bussacco testified IPS actively searched for, but "did not find any documents from the Defendants
    describing how young people should use their platforms to be safe online." Ex. 4 at 317:6-20.

the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." *Lane v. Oil Delivery, Inc.,* 524 A.2d 405, 409 (N.J. Super. App. Div. 1987). Where, as here, there is evidence of the "fact of damage," "mere uncertainty as to the amount will not preclude the right of recovery." *Reed v. Bd. of Educ. of City of E. Orange,* 2022 WL 288099, at *4 (N.J. Super. Ct. App. Div. Feb. 1, 2022). "[A]bsolute precision in fixing damages" is not required. *American Sanitary Sales Co. v. Dep't of Treasury*, 429 A.2d 403, 406 (N.J. Super. Ct. App. Div. 1981). Indeed, New Jersey courts recognize "[i]t would be a travesty to deny a plaintiff essential justice because the absence of means for precision precludes perfect justice." *Id.*; *Financial Servs. Vehicle Tr. v. Panter*, 204 A.3d 303, 307 (N.J. Super. Ct. App. Div. 2019) ("it would be unjust to deprive a plaintiff of a remedy merely because of 'the absence of [the] means for precision.'").

### 1. IPS Is Entitled to Compensation for Diversion of Staff and Teacher Time

Dr. Hoover's investigation corroborates what IPS explained concerning diversion of IPS time and resources: "From investigating social media conflicts to mitigating schoolwide viral challenges, IPS educators described a redirection of resources away from instruction and wellness promotion" "to address social media-related disruptions." Ex. 13 ¶ 9.

IPS's losses are measurable. As discussed above, IPS has suffered reductions in instructional time, diversion of administrative hours, and increased expenditures for counseling and behavioral-support staff—all as a result of Defendants' platforms and failure to warn. *See supra* § 1; Ex. 12 ¶¶ 7, 30, 45, 51, 53; Ex. 11 ¶¶ 8, 17-24; Ex. 10 ¶¶ 18-24. This is more than enough for a "fair and reasonable estimate" of past damages.

### 2. Defendants' Legal Challenges to IPS's "Lost Time" Damages Are Meritless.

Contrary to Defendants' argument in a footnote (Mot. at 23, n.12), New Jersey does not narrowly restrict the types of economic losses that may be recovered in tort. Courts have long recognized that an injured entity may recover for financial and operational harms that are reasonably foreseeable. *See, e.g., People Exp. Airlines, Inc. v. Consol. Rail Corp.,* 495 A.2d 107, 108-09 (1985) (allowing economic losses in business-interruption case arising from train accident where damages included "certain fixed operating expenses allocable to the evacuation time period"). Plaintiffs have

1    put forth ample evidence that the harm to schools like IPS was not only foreseeable but known to

2    Defendants, who even targeted student users. Pls.' Omnibus Opp. § III.A.2.a.3, b.3, c.3, d.3.

3        The cases Defendants cite confirm IPS may recover for lost work time, as opposed to

4    personal time. *In re Gen. Motors LLC Ignition Switch Litig.,* 339 F. Supp. 3d 262, 309 (S.D.N.Y.

5    2018). Lost work time is measured by wages or earnings—precisely the method IPS uses here. *Id.*

6    (recognizing recovery for "lost income or earnings"); *see also Alexander v. Cheaster,* 164 A. 287,

7    288 (N.J. 1933) (evidence of wages is admissible as the "measure" of the value of lost time).

8        Finally, Defendants' argument—limited to a footnote—that IPS allegedly relies on "hearsay"

9    to support its "lost time" calculations ignores that Superintendent Vauss estimated time diverted to

10   address social media based on her observation that her own time is increasingly spent dealing with

11   social media's impact on IPS scholars, and on her "experience and interactions" with IPS staff, as

12   well as reports from Principals and Assistant Principals. Ex. 11 ¶¶ 17-23. And, of course, experts

13   such as Drs. Hoover, Klein, and Meyers may rely on hearsay. *E.g.*, *Dolby Labs. Licensing Corp. v.*

14   *Adobe Inc.*, 2019 WL 6327210, at *1 (N.D. Cal. Nov. 26, 2019).

15        **3.    IPS's 15-Year Strategic Plan Is a Cognizable Remedy.**

16        IPS's 15-year strategic plan constitutes a cognizable and recoverable remedy under New

17   Jersey law. The plan outlines long-term investments in student mental health, behavioral support, and

18   academic recovery to redress the harms caused by Defendants' negligence. IPS administrators and

19   experts testified that ongoing mental-health and behavioral interventions are needed to address the

20   continuing impacts of Defendants' platforms. Ex. 12 ¶¶ 7, 30; Ex. 10 ¶¶ 19-24. The plan is a roadmap

21   for redressing the ongoing harms Defendants are causing.

22        Defendants wrongly argue that IPS can only recover for future expenditures that it will "have

23   to make," and that the recommendations in Dr. Hoover's plan are insufficient as a matter of law to

24   allow a jury to award any of the costs to implement that plan. Mot. at 30. But New Jersey (like other

25   jurisdictions) allows recovery in tort for future damages so long as there is evidence from which a

26   jury can find that "future injury" is "reasonably probable." *Mauro v. Raymark Indus., Inc.*, 561 A.2d

27   257, 264-65 (N.J. 1989) (agreeing with "cases throughout the country" that "are almost uniform in

28   their conclusion that in order to recover damages, plaintiff must prove that the prospective disease is

1    at least reasonably probable to occur."); Pls.' Omnibus Opp. § III.D.

2    **IV.    CONCLUSION**

3         For the reasons set forth above, and in Plaintiffs' Omnibus brief, the Court should deny

4    summary judgment and allow IPS's case to proceed to trial.

5
     Dated: November 7, 2025                    **SEEGER WEISS, LLP**
6
                                                */s/ Jennifer Scullion*
7                                                Christopher Seeger
                                                 Jennifer Scullion
8                                                Carlos Rivera
                                                 Hillary Fidler
9                                                **SEEGER WEISS LLP**
                                                 55 Challenger Road, Suite 600
10                                               Ridgefield Park, NJ 07660
                                                 Telephone: 973-639-9100
11                                               JScullion@seegerweiss.com

12
                                                 /s/James E. Cecchi
13                                               James E. Cecchi
                                                 Michael A. Innes
14                                               David G. Gilfillan
                                                 **CARELLA, BYRNE, CECCHI,**
15                                               **BRODY & AGNELLO, P.C.**
                                                 5 Becker Farm Road
16                                               Roseland, New Jersey 07068
                                                 Telephone: 973.994.1700
17                                               JCecchi@carellabyrne.com

18
                                                 Zachary S. Bower
19                                               **CARELLA, BYRNE, CECCHI,**
                                                 **BRODY & AGNELLO, P.C.**
20                                               2222 Ponce De Leon Blvd.
                                                 Miami, Florida 33134
21
                                                 *Co-Counsel for Irvington Public Schools*
22
                                                 Lexi J. Hazam
23                                               **LIEFF CABRASER HEIMANN &**
                                                 **BERNSTEIN, LLP**
24                                               275 Battery Street, 29th Floor
                                                 San Francisco, CA 94111-3339
25                                               Telephone: 415-956-1000
                                                 lhazam@lchb.com
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Previn Warren
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

*Co-Lead Counsel*

Michael M. Weinkowitz
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

MELISSA YEATES
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 King of Prussia Road
Radnor, PA 19807
Telephone: 610-667-7706
mveates@ktmc.com

*Co-chairs School District Committee*
*Plaintiffs' Steering Committee Leadership*

**ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

Dated: November 7, 2025                    **SEEGER WEISS, LLP**


                                           /s/ *Jennifer Scullion*
                                           Jennifer Scullion

                                           **SEEGER WEISS LLP**
                                           55 Challenger Road, Suite 600
                                           Ridgefield Park, NJ 07660
                                           Telephone: 973-639-9100
                                           JScullion@seegerweiss.com

1

## <u>CERTIFICATE OF SERVICE</u>

2        The undersigned hereby certifies that a copy of the foregoing was served via electronic mail

3   on November 7, 2025, to Counsel for Defendants:

4        MetaNoticeofService@cov.com

5        SnapNoticeofService@mto.com

6        TikTokNoticeofService@faegredrinker.com

7        SERVICE-YOUTUBE-INRESOCIALMEDIAM@LIST.WSGR.COM

8        mdl3047coleadfirms@listserv.motleyrice.com

9        pscservicemdl3047@motleyrice.com

10

11                            */s/ Jennifer Scullion*
                             Jennifer Scullion
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-                          PLS.' OPP'N. TO DEFS.' MOT. FOR SUMM. JUDG.
                              (IRVINGTON) (SD MSJ NO. 4)
                              CASE NO. 4:22-MD-3047