**Exhibit 25**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA

2

                - - - - -

3

4    IN RE: SOCIAL MEDIA            CASE NO.

5    ADOLESCENT ADDICTION/PERSONAL    4:22-md-03047-YGR

6    INJURY PRODUCTS LIABILITY       MDL No. 3047

7    LITIGATION

8

9    THIS DOCUMENT RELATES TO:

10    Irvington Public Schools

11            vs.

12    Meta Platforms Inc., et al.

13    Member Case No.: 4:23-cv-01467-YGR

14                - - - - -

15            Tuesday, May 6, 2025

16      CONFIDENTIAL - ATTORNEYS' EYES ONLY

17            PURSUANT TO PROTECTIVE ORDER

18          Videotaped deposition of APRIL K. VAUSS,

19    held at the offices of the Irvington Board of

20    Education, One University Place, Irvington, New

21    Jersey, commencing at 9:41 a.m. Eastern, on the

22    above date, before Robin L. Clark, Professional

23    Reporter and Notary Public in and for the State of

24    New Jersey.

25

CONFIDENTIAL

```
                                            Page 2

 1    APPEARANCES:
 2
            CARELLA, BYRNE, CECCHI, BRODY
 3          & AGNELLO, P.C.
            BY:  MICHAEL A. INNES, ESQ.
 4          WILLIAM MANORY, ESQ. (Zoom)
            JAN BRODY, ESQ. (Zoom)
 5          5 Becker Farm Road
            Roseland, New Jersey 07068
 6          973-994-1700
            minnes@carellabyrne.com
 7          wmanory@carellabyrne.com
            jbrody@carellabyrne.com
 8                  For the Plaintiffs and the
            Witness
 9
10          SHOOK, HARDY & BACON, L.L.P.
            BY:  LAURIE A. HENRY, ESQ.
11          2555 Grand Boulevard
            Kansas City, Missouri 64108
12          816-474-6550
            lhenry@shb.com
13                  For the Defendants, Meta
            Platforms, Inc., f/k/a Facebook, Inc.;
14          Facebook Holdings, LLC;
            Facebook Operations, LLC; Facebook
15          Payments, Inc.; Facebook Technologies,
            LLC; Instagram, LLC; and Siculus, Inc.
16
17          KIRKLAND & ELLIS LLP
            BY:  ANDREW KARP, ESQ.
18          VANESSA DiFEO, ESQ.
            601 Lexington Avenue
19          New York, New York 10022
            212-341-7593
20          andrew.karp@kirkland.com
            vanessa.difeo@kirkland.com
21                  For the Defendant, Snap,
            Inc.
22
23
24
25
```

CONFIDENTIAL

```
                                             Page 3

 1   ALSO PRESENT:
 2
               DANIEL ORTEGA, VIDEOGRAPHER
 3
               T.J. PATEL, TRIAL TECH
 4
               RYAN SIFFRINGER, Carella Byrne
 5
 6   REMOTE APPEARANCES:
 7
               SHOOK, HARDY & BACON, L.L.P.
 8             BY:  AMANDA C. SAPAR, ESQ.
               Two Commerce Square
 9             2001 Market Street, Suite 3000
               Philadelphia, Pennsylvania 19103
10             215-278-2555
               asapar@shb.com
11                       For the Defendants, Meta,
               Platforms, Inc., f/k/a Facebook, Inc.;
12             Facebook Holdings, LLC;
               Facebook Operations, LLC; Facebook
13             Payments, Inc.; Facebook Technologies,
               LLC; Instagram, LLC; and Siculus, Inc.
14
15             KING & SPALDING LLP
               BY:  ISABEL KING, ESQ.
16             110 North Wacker Drive, Suite 3800
               Chicago, Illinois 60606
17             312-995-6333
               iking@kslaw.com
18                       For the Defendants,
               TikTok, Ltd.; TikTok, LLC;
19             TikTok, Inc.; ByteDance Ltd.; and
               ByteDance Inc.
20
21
22
23
24
25
```

CONFIDENTIAL

Page 4

1    ZOOM APPEARANCES, CONTINUED:

2

              WILLIAMS & CONNOLLY, LLP
3             BY:  KEY'TOYA BURRELL, ESQ.
              680 Maine Avenue SW
4             Washington, D.C.  20024
              202-434-5425
5             kburrell@wc.com
                        For the Defendants, Alphabet,
6             Inc., Google, LLC, and YouTube, LLC

7             SKADDEN, ARPS, SLATE, MEAGHER &
              FLOM, LLP
8             BY:  LAURA BERNESCU, ESQ.
              320 South Canal Street
9             Chicago, Illinois 60606
              312-407-0700
10            laura.bernescu@skadden.com
                        For the Defendant, Snap,
11            Inc.
12                     - - - - -
13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

1                    I N D E X
2    WITNESS                                    PAGE
3    APRIL K. VAUSS
        BY MR. KARP:                            10
4
5                    E X H I B I T S
6    NUMBER           DESCRIPTION               MARKED
7    Vauss
8    Exhibit 1        Curriculum Vitae          12
9    Exhibit 2        Article entitled "How to  63
                      Direct a Districtwide Tech
10                    Transformation on a Budget"
                      Bates BW__Irvington00182944
11                    to 00182946
12   Exhibit 3        Email dated 3/5/20 Bates  71
                      BW__Irvington 00005125
13
     Exhibit 4        Technology Plan 2013 to   73
14                    2016 Bates
                      BW__Irvington00005126 to
15                    00005146
16   Exhibit 5        Email dated 6/10/22 Bates 94
                      BW__Irvington00169330
17
     Exhibit 6        Technology Plan 2022-2027 96
18                    Bates BW__Irvington00169331
                      to 00169369
19
     Exhibit 7        IPS Student Code of Conduct 128
20                    Bates BW__Irvington00223664
                      to 00223744
21
     Exhibit 8        Video Clip                167
22
     Exhibit 9        Irvington Public Schools: 168
23                    Emergency Virtual or Remote
                      Instruction Programs for
24                    the 2023-2024 School Year
                      Bates BW__Irvington00068487
25                    to 00068515

Page 6

| 1 | Exhibit 10 | IPS Performance Report 2023-2024 | 175 |
| | Exhibit 11 | IPS Performance Report 2023-2024 for Enrollment data | 176 |
| | Exhibit 12 | IPS Performance Report 2023-2024 for Chronic Absenteeism | 186 |
| | Exhibit 13 | IPS Performance Report 2023-2024 for Academic Performance | 196 |
| | Exhibit 14 | NJSLA Science Assessment: Grade 5 Summary | 202 |
| | Exhibit 15 | NJSLA Science Assessment: Grade 8 Summary | 206 |
| | Exhibit 16 | NJSLA Science Assessment: Grade 11 Summary | 206 |
| | Exhibit 17 | Email dated 6/3/20 Bates BW__Irvington00188208 | 212 |
| | Exhibit 18 | Dr. Rivera's Covid 19 Crisis Response Program Bates BW__Irvington00188209 to 00188212 | 213 |
| | Exhibit 19 | Email String Bates BW__Irvington00161969 to 00161970 | 251 |
| | Exhibit 20 | Grant Final Attachment Bates BW__Irvington00161971 | 253 |
| | Exhibit 21 | NJ 101.5 News Article | 266 |
| | Exhibit 22 | Email dated 11/14/23 Bates BW__Irvington00489736 to 00489737 | 294 |
| | Exhibit 23 | Email dated 1/24/23 Bates BW__Irvington00063621 to 00063622 | 304 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 7

1

Exhibit 24     Email dated 8/3/23 Bates     313
                BW__Irvington00070026 to
                00070028

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 8

1          DEPOSITION SUPPORT INDEX

2

                    - - - - -

3

4   Direction to Witness Not to Answer

5   Page  Line

6   14     4

7   61     11

8   62     3, 21

9

    Request for Production of Documents

10

    Page  Line

11

    284    17

12

    Question Marked

13

    Page  Line

14

    NONE

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
                                        Page 9
 1              THE VIDEOGRAPHER:  We are now
 2         on the record.  My name is Daniel
 3         Ortega and I am the legal
 4         videographer for Golkow Litigation
 5         Services.  Today's date is May 6,
 6         2025, and the time is 9:41 a.m.
 7              This video deposition is
 8         being held at One University
 9         Place, Irvington, New Jersey, in
10         the matter of Social Media, CA
11         MDL 3047, Irvington Public
12         Schools versus Meta Platforms,
13         Inc., et al.
14              The deponent today is April
15         Vauss.  All counsel will be noted
16         on the stenographic record.  The
17         court reporter today is Robin
18         Clark and will now swear in the
19         witness.
20                   - - - - -
21              APRIL K. VAUSS, having been
22         duly sworn, was examined and
23         testified as follows:
24                   - - - - -
25
```

CONFIDENTIAL

Page 10

1    BY MR. KARP:

2          Q.      Good morning, Dr. Vauss.

3          A.      Good morning.

4          Q.      My name is Andrew Karp and I

5    represent Snap in this litigation.

6                  Can you please state your

7    full name for the record?

8          A.      My name is April K. Vauss.

9          Q.      You understand that you're

10   under oath today?

11         A.      Yes, uh-huh.

12         Q.      Is there any reason you

13   cannot provide truthful and accurate

14   testimony today?

15         A.      No.

16         Q.      If at any point you don't

17   understand a question that I've asked,

18   please let me know and I'll do my best to

19   clarify.  Okay?

20         A.      Sure.

21         Q.      Throughout today's

22   deposition, I may refer to Irvington Public

23   Schools as IPS.  You'll understand when I

24   use that acronym, I mean Irvington Public

25   Schools?

CONFIDENTIAL

Page 11

1          A.      Yes.

2          Q.      Okay.  What is your home

3    address?

4          A.      ████████  ███████  ████████

█  ██████████  ████  ███████  ██████.

6          Q.      And what is your work

7    address?

8          A.      One University Place,

9    Irvington, New Jersey 07111.

10          Q.      Okay.  Is this your first

11    time being deposed?

12          A.      It is.

13          Q.      Lucky you.  In advance of

14    your deposition, we asked for a copy of

15    your CV and just a few minutes before we

16    got started today, your counsel provided me

17    with a copy.  So let's take a few minutes

18    to walk through that.  We'll mark this as

19    Exhibit 1.  Do you have a copy in front of

20    you, Dr. Vauss?

21          A.      I do not.

22              MR. KARP:  Okay.  Michael, did

23          you print a copy of Dr. Vauss's CV?

24              THE WITNESS:  Thank you.

25              MR. INNES:  I was trying to

Page 12

1           text that person to get off.
2                   THE EXHIBIT TECH:  Do you have
3           a tab number?
4                   MR. KARP:  This was just
5           provided a few minutes ago in hard
6           copy, but we can get you an
7           electronic copy after the
8           deposition.
9                   - - - - -
10          (Curriculum Vitae marked
11          Vauss Exhibit 1 for
12          identification.)
13                  - - - - -
14  BY MR. KARP:
15          Q.    Dr. Vauss, do you recognize
16  this document?
17          A.    I do.
18          Q.    Okay.  What is this document?
19          A.    This is my résumé.
20          Q.    And did you put this
21  together?
22          A.    I did, or maybe my
23  secretaries.  I mean, this is the latest
24  one, but, yes, but the genesis of it was
25  me.

CONFIDENTIAL

Page 13

1          Q.      Okay.

2          A.      Yes, yes.

3          Q.      Okay.  Do you recall

4    approximately when this CV was put

5    together?

6          A.      I believe 2020.  I think this

7    was the résumé I submitted for my

8    application for superintendent.

9          Q.      Okay.  So, to your knowledge,

10   this résumé has not been updated since

11   roughly 2020?

12         A.      Yes.

13         Q.      Okay.  Sitting here today, do

14   you have any reason to doubt the accuracy

15   or the completeness of any information in

16   this CV?

17         A.      I see one error.  My

18   graduation date was December 1995.  In my

19   affidavit I corrected, because it had

20   June 1994 as well.  So in my affidavit, it

21   says December 1995.

22         Q.      Okay.  And you're referring

23   to your graduation from Earlham College?

24         A.      That is correct.

25         Q.      Okay.  You just referred to

CONFIDENTIAL

Page 14

1  an affidavit, can you explain to me exactly

2  what that document is that you're referring

3  to?

4            MR. INNES:  Objection.

5            Ms. Vauss, I'll direct you not to

6            answer that question because it

7            will divulge attorney-client

8            privilege.

9  BY MR. KARP:

10       Q.    Are you going to follow your

11  counsel's instruction not to answer?

12       A.    Yes.

13       Q.    Okay.  Great.  Let's walk

14  through your education.  You, as you just

15  told us, received your bachelor's degree in

16  sociology and anthropology from Earlham

17  College in 1995?

18       A.    Yes.

19       Q.    Okay.  You then went on to

20  get a master's of arts in secondary

21  education from Oakland City University in

22  Indiana?

23       A.    Yes.

24       Q.    After that, you received your

25  master of arts in educational

CONFIDENTIAL

Page 15

1  administration from Oakland City University

2  in May of 2009?

3          A.      That's correct.

4          Q.      And then, finally, you

5  received your educational doctorate in

6  administration from Oakland City University

7  in May of 2017?

8          A.      That is correct.

9          Q.      Okay.  You don't have any

10  training in child psychology?

11          A.      No.

12          Q.      No training in psychiatry?

13          A.      No.

14          Q.      You don't have any training

15  in addiction treatment?

16          A.      No.

17          Q.      Are you the author of any

18  articles or studies regarding education?

19          A.      Yes.

20          Q.      Okay.  Which ones?

21          A.      I wrote -- my dissertation

22  was based on how cooperative learning

23  enhances minors understanding of

24  mathematics.

25          Q.      And was that dissertation

CONFIDENTIAL

Page 16

1  written in connection with your -- the

2  doctorate you earned in May --

3          A.      Yes.

4          Q.      -- of 2017.

5          A.      Uh-huh.

6          Q.      Did you address any matters

7  relating to social media in that

8  dissertation?

9          A.      No.

10         Q.      Are you the author of any

11 articles or studies regarding adolescent

12 mental health or well-being?

13         A.      No.

14         Q.      Have you conducted any

15 research on adolescent mental health or

16 well-being?

17         A.      No.

18         Q.      And are you the author of any

19 articles or studies regarding social media?

20         A.      No.

21         Q.      Have you -- excuse me, have

22 you conducted any research on social media?

23                 MR. INNES:  Objection to form.

24            You can answer.

25                 THE WITNESS:  Oh, okay.  No.

CONFIDENTIAL

Page 17

1    BY MR. KARP:

2         Q.    Let's talk a little bit about

3    your job experience.  You are currently

4    employed by Irvington Public Schools,

5    correct?

6         A.    Yes.

7         Q.    And you -- what is your

8    current job title?

9         A.    Superintendent.

10         Q.    And you've been the

11    superintendent of Irvington Public Schools

12    since 2020?

13         A.    Yes.

14         Q.    You were interim

15    superintendent -- excuse me, you were

16    promoted to interim superintendent in April

17    of 2020?

18         A.    April 20th, uh-huh.

19         Q.    And then you became

20    superintendent, I guess, officially in June

21    of 2020; is that right?

22         A.    July 1st.

23         Q.    July of 2020, my apologies.

24         A.    Okay.

25         Q.    You've been with Irvington

CONFIDENTIAL

Page 18

1    Public Schools for quite sometime?

2            A.      Yes, uh-huh.

3            Q.      You started out as a math

4    specialist; is that right?

5            A.      Yes, uh-huh.

6            Q.      Can you tell me what that

7    entailed?

8            A.      I helped teachers perfect

9    their math instruction.

10           Q.      And you held that role as a

11   math specialist from September of 2004

12   through June of 2010?

13           A.      Yes, uh-huh.

14           Q.      And in that role, did you

15   work at a specific school or was that a

16   district-wide position?

17           A.      I actually worked at this

18   school, University Elementary School.

19           Q.      After that, you went on to

20   become a fourth grade teacher at University

21   Elementary School?

22           A.      For one year, yes.

23           Q.      And you were in that role

24   from September of 2010 through June of

25   2011, correct?

Page 19

1          A.      Yes.

2          Q.      Following that, you became

3    assistant principal of more than one school

4    within IPS between the years -- excuse me,

5    during the period November 2011 to December

6    of 2013, correct?

7          A.      Yes.

8                  MR. INNES:  Objection to form.

9                  THE WITNESS:  Sorry.

10   BY MR. KARP:

11         Q.      Your résumé indicates that

12   you were assistant principal at Florence

13   Avenue Elementary School and assistant

14   principal at University Middle School from

15   November of 2011 to December of 2013.

16                  Do you see that?

17         A.      (Nodding).

18         Q.      Were you in those roles at

19   the same time or did they happen one right

20   after the other?

21         A.      They were one after the

22   other.

23         Q.      Okay.  So which one came

24   first?

25         A.      Florence Avenue.

CONFIDENTIAL

Page 20

1          Q.      Okay.  So you were first an

2    assistant principal at Florence Avenue and

3    then you became assistant principal at

4    University Middle School?

5          A.      Yes, uh-huh.

6          Q.      Okay.  In January of 2014,

7    you became the principal of Florence Avenue

8    School?

9          A.      Yes.

10         Q.      And you held that position

11   through June of 2017; is that right?

12         A.      Yes.

13         Q.      Okay.  In July of 2017, you

14   became assistant superintendent of

15   curriculum and instruction for the

16   Irvington Board of Education?

17         A.      Yes.

18         Q.      And then, as we just

19   discussed, you became interim

20   superintendent in April of 2020?

21         A.      Uh-huh.

22         Q.      And superintendent in July of

23   2020?

24         A.      Yes.

25         Q.      And you still hold that

CONFIDENTIAL

Page 21

1    position today?

2            A.      Yes.

3            Q.      Okay.  Prior to working at

4    Irvington Public Schools, you taught

5    Japanese; is that correct?

6            A.      Yes, uh-huh.

7            Q.      And you taught Japanese in

8    Indianapolis, Indiana, from January of 1997

9    through June of 2002?

10           A.      That is correct.

11           Q.      And you went on to teach U.S.

12   history and world history in New Jersey,

13   but not at Irvington Public Schools, from

14   September of 2002 through June of 2004; is

15   that right?

16           A.      Yes, uh-huh.

17           Q.      Focusing for a minute on your

18   position as superintendent, is that a

19   position you were elected to?

20                   MR. INNES:  Objection.  You

21           can answer.

22                   THE WITNESS:  Oh, okay.  Okay.

23           When you say, "elected to," no, I'm

24           not an elected official, so.

25

Page 22

1    BY MR. KARP:

2         Q.      And to clarify, I was

3    wondering if there was an election in which

4    members of the community or maybe members

5    of the board would have voted to select or

6    not select you for the role of

7    superintendent?

8                    MR. INNES:  Objection to form.

9                    THE WITNESS:  So board members

10            are elected.  I was voted, like,

11            there was a -- there was an agenda

12            item that was presented to the

13            board and then they voted on that,

14            but I'm not an elected official.

15   BY MR. KARP:

16        Q.      I understand.

17        A.      Okay.

18        Q.      And thank you for clarifying.

19        A.      Okay.

20        Q.      I'm a little less familiar

21   with how all of that works, but I

22   appreciate the information.

23        A.      Okay.

24        Q.      You mentioned earlier that

25   you have never been deposed, correct?

CONFIDENTIAL

Page 23

1         A.      Yes.

2         Q.      Okay.  Have you ever provided

3    live testimony at trial?

4                 MR. INNES:  Objection.  You

5              can answer.  So maybe, we might

6              have skipped over this, but,

7              Dr. Vauss, when Mr. Karp asks you

8              questions, I will interpose or

9              insert an objection.  Unless I

10             instruct you not to answer or give

11             you some other kind of instruction,

12             you can just go ahead and answer.

13                THE WITNESS:  Okay.  Okay.

14             Got it.  Can you repeat your

15             question, please?

16   BY MR. KARP:

17        Q.      Of course.  Have you ever

18   provided live testimony at trial?

19                MR. INNES:  Objection to form.

20                THE WITNESS:  Yes.

21   BY MR. KARP:

22        Q.      How many times have you done

23   that?

24        A.      Perhaps two, I want to say

25   two in my career.

CONFIDENTIAL

Page 24

```
 1        Q.     Can you tell me about the
 2   first time that you provided testimony at
 3   trial?
 4        A.     Yes.  So I was a teacher in
 5   Indianapolis public schools, a Japanese
 6   teacher.  I was walking the halls and a
 7   student was not going to class.  I told the
 8   student to go to class and the student
 9   actually hit me and so as a result of that,
10   the district pressed charges and I had to
11   testify against the young man.
12        Q.     Okay.  I'm sorry that you
13   were hit by the student.  Do you recall how
14   that case resolved?
15        A.     Well, the understanding was
16   that -- is it okay?  Oh, it's okay.
17             MR. INNES:  Uh-huh.
18             THE WITNESS:  So the
19          understanding was that the young
20          man was going to plead guilty to
21          the charge, but he attempted not to
22          and they thought that I had left
23          the court and I was actually in the
24          gallery.  And so when he didn't
25          accept the plea, they asked if I
```

CONFIDENTIAL

Page 25

```
 1            was there and I had to get up on
 2            the stand and testify and he got
 3            found guilty and that was -- that
 4            was it.  You know, I think he got
 5            probation maybe or something like
 6            that.
 7   BY MR. KARP:
 8       Q.     And that would have been
 9   sometime between 1997 and 2002 --
10       A.     Yes.
11       Q.     -- when you were teaching in
12   Indianapolis?
13       A.     Yes.
14              MR. INNES:  Objection to form.
15   BY MR. KARP:
16       Q.     Can you tell me about the
17   second time that you provided testimony at
18   trial?
19       A.     That was more recent.  I had
20   a teacher who was non-renewed and she tried
21   to have it overturned.
22       Q.     Okay.  So a teacher whose
23   contract was not renewed was challenging
24   the decision not to bring her back to the
25   school?
```

CONFIDENTIAL

Page 26

1                    MR. INNES:  Objection to form.
2                    THE WITNESS:  Yes.
3    BY MR. KARP:
4         Q.      And roughly when did you
5    provide trial -- excuse me.  Strike that.
6                    Roughly when did you provide
7    that trial testimony?
8         A.      I want to say December,
9    November, December.
10        Q.      Of 2024?
11        A.      Yeah, there was two, yes,
12   December.
13        Q.      To your knowledge, did any of
14   the allegations or claims in that case
15   relate to adolescent mental health or
16   well-being?
17                    MR. INNES:  Objection to form.
18               Outside of the relevant time
19               period.  To the extent you can
20               answer that question without
21               revealing conversations you had
22               with your attorneys or the
23               district's attorneys, you can do
24               so.
25                    THE WITNESS:  Okay.  Can you

CONFIDENTIAL

1              repeat your question and then I
2              can --
3    BY MR. KARP:
4              Q.     Sure.
5              A.     -- see if I can answer.
6              Q.     To your knowledge, did any of
7    the allegations or claims in that case
8    relate to adolescent mental health or
9    well-being?
10             MR. INNES:  Objection to form.
11             Same objections.
12             THE WITNESS:  I would say no.
13             But I think it would be best not
14             to, you know, get into the
15             students -- or the case, it's still
16             pending.
17   BY MR. KARP:
18             Q.     To your knowledge, did any of
19   the claims or allegations in the case
20   relate to social media?
21             MR. INNES:  Objection to the
22             form.  Dr. Vauss, to the extent
23             it's an ongoing litigation, I would
24             instruct you not to answer the
25             question unless you feel

Page 28

```
 1              comfortable.
 2                    THE WITNESS:  I would say no,
 3              I don't feel comfortable because it
 4              is ongoing.
 5    BY MR. KARP:
 6         Q.    Let me ask a slightly
 7    different question.  Did any of the
 8    testimony that you provided relate to
 9    social media?
10                    MR. INNES:  Objection to form.
11              Dr. Vauss, to the extent you are
12              able to disclose that testimony,
13              you can do so.  And, Andrew, it
14              might be a good idea just to take a
15              break.  I don't know the
16              particulars of that litigation or
17              protective orders that may be in
18              place or not.  Do you want to take
19              a break and I can investigate that?
20                    MR. KARP:  Sure.  I have no
21              problem with that if you want to
22              take a minute.
23                    THE VIDEOGRAPHER:  The time
24              right now is 9:58 p.m.  We are off
25              the video record.
```

CONFIDENTIAL

Page 29

```
 1                    - - - - -
 2       (A recess was taken at this time.)
 3                    - - - - -
 4                THE VIDEOGRAPHER:   The time
 5           right now is 10:07 a.m.   We're back
 6           on the record.
 7   BY MR. KARP:
 8       Q.      Welcome back, Dr. Vauss.
 9       A.      Thank you.
10       Q.      Just before the break, we
11   were talking about some -- let's try that
12   again.
13                Welcome back.   Just before
14   the break, we were discussing some live
15   testimony that you provided at a trial.   Do
16   you recall?
17       A.      Yes.
18       Q.      And the question I had asked
19   was did any of the testimony you provided
20   relate to social media.   And we took a
21   break so that you could confer with your
22   counsel on confidentiality.   Are you able
23   to answer the question?
24                MR. INNES:   Yes.
25                THE WITNESS:   Okay.   I was
```

CONFIDENTIAL

Page 30

```
 1              waiting.  Not -- not my testimony,
 2              it didn't have anything to do with
 3              social media.
 4  BY MR. KARP:
 5       Q.     Okay.  Did your testimony in
 6  that case at that trial have anything to do
 7  with adolescent mental health or
 8  well-being?
 9                   MR. INNES:  Objection to form.
10                   THE WITNESS:  No.
11  BY MR. KARP:
12       Q.     Okay.  Dr. Vauss, what did
13  you do to prepare for today's deposition?
14                   MR. INNES:  Objection to form.
15              Dr. Vauss, you can answer that
16              question to the extent it
17              doesn't -- you don't reveal
18              communications, direct
19              communications that you and I had
20              or you had with members of our
21              team.
22                   THE WITNESS:  Uh-huh.  You
23              know, I had conversations, you
24              know, perhaps with my staff and
25              just recounted the many experiences
```

CONFIDENTIAL

Page 31

1          that I've had as an administrator
2          in Irvington Public School
3          District.
4    BY MR. KARP:
5          Q.    Do you recall approximately
6    how many of those conversations you had?
7              MR. INNES:  Objection to form,
8          but you can answer the question so
9          as long as it doesn't reveal
10         communications you've had with
11         counsel.
12             THE WITNESS:  I've had so many
13         conversations over the years, so I
14         couldn't even begin to tell you how
15         many conversations --
16   BY MR. KARP:
17         Q.    Sure.
18         A.    -- because --
19         Q.    I didn't mean to interrupt
20   you.
21         A.    Because it is such a big part
22   of everything that happens on a daily
23   basis.  So, in a day, I could be speaking
24   to my administrator several times about
25   something that has happened as it relates

Page 32

```
 1    to social media.  So I really couldn't give
 2    you an accurate number.
 3            Q.    I understand.  And just to
 4    clarify, my question is specifically about
 5    today's deposition and I'm wondering what,
 6    if anything, you did to prepare to testify
 7    today at this deposition.
 8                    MR. INNES:  Objection to form.
 9                Same instruction.  To the extent
10                you can answer that without
11                revealing conversations you may
12                have had or not had with counsel,
13                you may do so.
14                    THE WITNESS:  I would just say
15                I had several conversations with
16                administrators to see, you know, to
17                get some real anecdotals on, you
18                know, mental anecdotals about how
19                much this impacts their daily
20                performance.
21    BY MR. KARP:
22            Q.    When did you first learn that
23    you would be sitting for a deposition in
24    this case?
25                    MR. INNES:  Objection to form.
```

CONFIDENTIAL

```
                                        Page 33
 1                THE WITNESS:  I think this has
 2           been going on for a couple of
 3           years, so, eventually, I guess I
 4           would think that this might -- may
 5           happen, but the actual dates,
 6           probably in the last month or so.
 7    BY MR. KARP:
 8           Q.    So if I'm hearing you
 9    correctly, you expected that this day could
10    come --
11           A.    Yes.
12           Q.    -- that you could be asked to
13    testify, but it wasn't until roughly a
14    month ago that you were told that your
15    deposition was going to happen on a
16    specific date; is that fair?
17           A.    I think at some --
18                MR. INNES:  Objection to form.
19                THE WITNESS:  Somewhat,
20           because we were trying to, I guess,
21           match dates with you-all and our
22           people, so somewhere around that
23           time.
24    BY MR. KARP:
25           Q.    Since you learned that you
```

CONFIDENTIAL

Page 34

1   would be giving this deposition today, have

2   you had any meetings with counsel?

3                    MR. INNES:  Objection to form.

4            Doctor, you can answer that

5            question, but I would caution you

6            not to give particulars about any

7            conversations we may have had.

8                    THE WITNESS:  Yes.

9   BY MR. KARP:

10       Q.      Approximately how many times

11  have you met with counsel to prepare for

12  today's deposition?

13       A.      A handful maybe.  I don't

14  know.  I couldn't give an accurate amount.

15       Q.      It's okay to estimate.  Is a

16  handful three to five, is that what you're

17  thinking?

18       A.      I don't want to lock in, but

19  that sounds right.  Maybe more.

20       Q.      Do you recall when that first

21  meeting would have taken place?

22                    MR. INNES:  Objection to form.

23                    THE WITNESS:  I have no idea

24            what the first date that we've ever

25            met to prepare for deposition or

Page 35

```
 1              ever, like what do you --
 2    BY MR. KARP:
 3         Q.    I can clarify.  Sure.  Do you
 4    recall approximately when you first met
 5    with counsel to prepare for today's
 6    deposition?
 7                   MR. INNES:  Objection to form.
 8                   THE WITNESS:  Maybe sometime
 9              in April, but I'm not really sure.
10    BY MR. KARP:
11         Q.    Do you recall who was at that
12    first meeting with counsel?
13                   MR. INNES:  Objection to form.
14              Doctor, you can give the names of
15              counsel.
16                   THE WITNESS:  Okay.  So
17              Mr. Innes, David Gilfillan, Zach.
18              I don't know Zach's last name.
19                   MR. INNES:  I can represent,
20              Zach Bower, B-O-W-E-R.
21                   THE WITNESS:  I think that was
22              it.  I think that was it, yes.
23    BY MR. KARP:
24         Q.    Okay.  Was anyone else
25    present at this meeting?
```

Page 36

```
 1           A.      Not that I recall.  I mean,
 2    myself and my lawyers.
 3           Q.      Do you recall approximately
 4    how long this meeting lasted?
 5           A.      No idea.
 6           Q.      Could you estimate an hour or
 7    four hours --
 8                   MR. INNES:  Objection to form.
 9           Calls for speculation.  Compound.
10           You can answer.
11                   THE WITNESS:  Okay.  Two hours
12           maybe, two or three hours.  You're
13           referring to the preparation time
14           meeting?
15    BY MR. KARP:
16           Q.      At that first meeting.
17           A.      Okay.  So maybe about two
18    hours.  I'm estimating on the higher end.
19           Q.      You said that you met with
20    counsel a handful of times --
21           A.      Uh-huh.
22           Q.      -- in preparation for today's
23    deposition?
24           A.      That sounds about right, yes.
25           Q.      Did your other -- I'm sorry.
```

Page 37

1   Did your other meetings with counsel last
2   approximately the same amount of time?
3               MR. INNES:  Objection to form.
4               THE WITNESS:  Roughly maybe,
5          yes.  I wasn't timing them.
6   BY MR. KARP:
7          Q.    Other than the three lawyers
8   you've already identified, did anyone else
9   attend or participate in those other
10  meetings you had to prepare for today's
11  deposition?
12              MR. INNES:  Objection to form.
13              THE WITNESS:  Yes, there were
14         other participants at different
15         times.
16  BY MR. KARP:
17         Q.    Okay.
18         A.    Uh-huh.
19         Q.    Do you recall the names of
20  those individuals?
21              MR. INNES:  You can provide
22         the names.
23              THE WITNESS:  Principal
24         Bussacco, Michael Bussacco, was at
25         a meeting before.  Principal

CONFIDENTIAL

Page 38

```
 1           Mangan, Dr. Zaire, John Amberg,
 2           Shelley Pettiford.  I'm trying to
 3           think.  Betty Johnson, Marcia Dove,
 4           Dr. Adegboyega.  That's it.
 5                MR. INNES:  Andrew, if I could
 6           take a quick break, we don't have
 7           to leave the room, but if we could
 8           just go off the record for one
 9           second.
10                MR. KARP:  Sure.  We can go
11           off the video record.
12                THE VIDEOGRAPHER:  The time
13           right now is 10:15 a.m.  We are off
14           the record.
15                     - - - - -
16      (A recess was taken at this time.)
17                     - - - - -
18                THE VIDEOGRAPHER:  The time
19           right now is 10:19 a.m.  We're back
20           on the record.
21   BY MR. KARP:
22        Q.    Dr. Vauss, you understand
23   that the deposition we are conducting today
24   is about what you know in your personal and
25   individual capacity?
```

CONFIDENTIAL

Page 39

1          A.      Yes, yes.

2          Q.      And just to revisit some of

3    the questions I asked before the break, can

4    you tell me approximately -- well, let me

5    kind of start over then.

6                  In preparation for today's

7    deposition where you're testifying as an

8    individual, did you meet with counsel to

9    prepare?

10          A.      I did.  I did.

11          Q.      Okay.  And do you recall

12   approximately how many -- how many meetings

13   you had with counsel to prepare for this

14   deposition?

15          A.      I would say two to three to

16   prepare for today.

17          Q.      And when was the first of

18   those meetings to occur?

19          A.      It was sometime in April.

20          Q.      Who attended those

21   meetings -- or excuse me, strike that.

22                  Who attended that first

23   meeting?

24          A.      Mr. Innes, Mr. Gilfillan, and

25   Zach Bower.

CONFIDENTIAL

Page 40

1          Q.      Did anyone else attend that
2    meeting?
3          A.      No.
4          Q.      Do you recall approximately
5    how long that meeting lasted?
6          A.      Maybe around two hours.
7          Q.      How about the second meeting
8    you had with counsel?
9          A.      Roughly around the same time.
10          Q.      And was it the same group as
11    the first meeting?
12          A.      Yes, uh-huh.
13          Q.      No one else was in
14    attendance?
15          A.      No.
16          Q.      And did a third meeting take
17    place?
18          A.      I don't think so, but maybe,
19    you know, maybe, like, by Zoom or phone, I
20    can't recall.
21          Q.      All of these meetings, to
22    your recollection, occurred within the past
23    month?
24          A.      Roughly, around, yeah, maybe
25    a month, three weeks.

CONFIDENTIAL

Page 41

1        Q.      Other than meeting with

2    counsel, did you discuss your deposition

3    with your colleagues at Irvington Public

4    Schools?

5             A.      No.

6             Q.      Did you review any documents

7    to prepare for today's deposition?

8                     MR. INNES:  Objection to form.

9                     THE WITNESS:  I would say no.

10             What I -- how I prepared for today

11             was just recounting my own

12             experiences and the experiences

13             that have been shared with me

14             probably in the last, you know,

15             experiences, my own experiences,

16             and the conversations maybe for the

17             last 13, 13 years or so.

18    BY MR. KARP:

19             Q.      But to make sure I'm

20    understanding, you did not look at any

21    specific documents or review any specific

22    materials to prepare for today's

23    deposition?

24             A.      Documents, papers, I mean, I

25    looked at the trial information.  I looked

CONFIDENTIAL

Page 42

1   at, you know, the filings.  I looked up
2   probably old things that I've had,
3   documents that I've had.  I mean, things
4   that I see in a regular -- in my capacity
5   on a regular basis.  But if -- I guess I
6   should ask you to clarify, did I go out and
7   do some research for this or something, no,
8   no.
9           Q.      You said that you reviewed
10  trial information, did I hear you
11  correctly?
12          A.      The document that -- of the
13  case, the filing.
14          Q.      Are you referring to the
15  legal Complaint that was filed in this
16  case?
17          A.      Yes, the Complaint.  Yes, the
18  Complaint.
19          Q.      I believe you said that you
20  looked at documents that you would
21  ordinarily look at in your job as
22  superintendent; is that correct?
23          A.      Yes.
24          Q.      Do you recall specifically
25  which documents you looked at to prepare

CONFIDENTIAL

Page 43

1   for today's deposition?

2             MR. INNES:  Objection.

3         Misstates prior testimony.  You can

4         answer.

5             THE WITNESS:  Okay.  So, for

6         example, principals reports, those

7         are things that are submitted to me

8         every month, so maybe I looked at

9         those.  I looked at, like, ASPs,

10        annual school performance

11        preparation.  Those are things that

12        I look at in my capacity and I have

13        to, you know, see what the goals

14        are for schools.

15  BY MR. KARP:

16        Q.    And did you look at these

17  principals reports and ASPs to refresh your

18  memory of certain information for today's

19  deposition?

20        A.    No.  Actually, no.  No.  I'm

21  intimately familiar with a lot of these

22  documents, so.

23        Q.    Why did you look at these

24  materials?

25             MR. INNES:  Objection to form.

CONFIDENTIAL

Page 44

```
 1                 THE WITNESS:  To see just to
 2            refresh what has been going over --
 3            going on for, you know, over a
 4            course of a period of time.
 5   BY MR. KARP:
 6          Q.    Is it fair to say you wanted
 7   to refresh your recollection of certain
 8   facts that were contained in these
 9   documents?
10                 MR. INNES:  Objection to form.
11            Misstates the prior testimony.  It
12            doesn't provide a time period.
13                 THE WITNESS:  I would say not
14            so much that, but just to compare
15            maybe school to school and what
16            they look at.  But just to be fair,
17            I also look at when people submit
18            things to compare how quickly they
19            turn things in versus another
20            school so that I can say whether or
21            not I need to adjust dates, due
22            dates, for example, and to see, you
23            know, the quality of one report
24            versus another to present exemplars
25            to certain administrators, things
```

CONFIDENTIAL

Page 45

1            like that.

2     BY MR. KARP:

3            Q.     What did you learn from

4     reviewing these materials in preparation

5     for today's deposition?

6            A.     What did I learn?  I wouldn't

7     say that I learned anything.

8            Q.     Okay.  This was knowledge you

9     already had that you wanted to refresh; is

10    that fair?

11                 MR. INNES:  Objection to form.

12                 THE WITNESS:  I would say

13           that's -- yes, I would say that's

14           fair.

15    BY MR. KARP:

16           Q.     Other than looking at some

17    materials and meeting with counsel, did you

18    do anything to -- anything else to prepare

19    for today's deposition?

20                 MR. INNES:  Objection to the

21           form.  Asked and answered.  You can

22           answer.

23                 THE WITNESS:  I would say no.

24    BY MR. KARP:

25           Q.     During your employment with

CONFIDENTIAL

Page 46

1    Irvington Public Schools, have you ever

2    received a performance review?

3          A.      An evaluation?

4          Q.      Yes.

5          A.      Yes, I have, yes.

6          Q.      Can you approximate for me

7    the number of evaluations you have received

8    while working for Irvington Public Schools?

9                  MR. INNES:  Objection.  Calls

10              for speculation.  You can answer.

11                  THE WITNESS:  There's a lot.

12              So 20 years, 21 years in the

13              district, maybe 48, 50, I don't

14              know, a lot, maybe a lot.

15    BY MR. KARP:

16          Q.      Would you have received

17    between two and three evaluations each year

18    for your tenure here at Irvington Public

19    Schools?

20          A.      For most, yes, most,

21    especially as a teacher.

22          Q.      As part of receiving those

23    evaluations, did you have to complete a

24    self-evaluation of your own performance?

25          A.      I would say there isn't a

CONFIDENTIAL

Page 47

1    space for a narrative of your performance,

2    but there is a space for you to demonstrate

3    the things that you've done within the

4    classroom if it's a teacher evaluation or

5    within your school if you're a principal.

6            Q.    To make sure I'm

7    understanding, so in connection with these

8    evaluations you would have received, you

9    would have made some form of a submission?

10           A.    Yes.

11           Q.    Okay.  Do you recall if any

12   of the evaluations you've received during

13   your time at Irvington Public Schools

14   related to adolescent mental health or

15   well-being?

16           A.    Well --

17                 MR. INNES:  Objection to form.

18                 THE WITNESS:  I'm sorry.  So

19           can I --

20                 MR. INNES:  Yes.

21                 THE WITNESS:  Okay.  Sorry.

22                 MR. INNES:  Yes, unless I tell

23           you not to answer, go ahead and

24           answer, yeah.

25                 THE WITNESS:  Okay.  So I

CONFIDENTIAL

Page 48

1          would ask the question so when you
2          say adolescent well-being, the
3          well-being of children, is that
4          what you're asking?
5    BY MR. KARP:
6          Q.      Yes, that would be included.
7          A.      So depending on the capacity,
8    making sure that students are in a safe
9    productive learning environment, yes, that
10   is our responsibility.  Making sure that
11   the pedagogy can be executed with fidelity,
12   that's a part of it.  Making sure that
13   there's an environment for quality
14   instruction, yes, that's a part of it.  So,
15   yes, every level of education, the
16   students' well-being is a part of it.
17         Q.      And you would have been
18   evaluated as to how successful you were in
19   meeting the wellness needs of your
20   students; is that fair?
21                 MR. INNES:  Objection to form.
22                 THE WITNESS:  I would say,
23          depending on what category you
24          place that in, then yes.  The
25          overall well-being, it's a

Page 49

1              community effort.  It is a, you
2              know, school community.  It is all
3              of -- we all have a role, whether
4              it's the classroom teacher, the
5              lunch aide, security, principal,
6              AP, so to that degree, yes.
7    BY MR. KARP:
8         Q.    Do you recall if any of your
9    evaluations or any of the submissions that
10   you made in connection with those
11   evaluations would have referred to social
12   media?
13                  MR. INNES:  Objection to form.
14                  THE WITNESS:  There would
15              probably be a time period where
16              social media was becoming such an
17              encroachment upon the lives of
18              teachers, on the lives of
19              administration, and I would say
20              there is also the scholars within
21              the classroom and so mindfulness to
22              that would be probably something
23              that could have been mentioned.
24   BY MR. KARP:
25         Q.    You said that there probably

CONFIDENTIAL

Page 50

1    would have been a time period when that was

2    true?

3              A.      Uh-huh.   Uh-huh.

4              Q.      Can you approximate for me

5    when that time period would be?

6              A.      I recall social media really

7    taking off around 2013, 2014.  In 2013, I

8    was an assistant principal and if you, you

9    know, assistant principal is -- a lot of

10   what assistant principals have to deal with

11   is discipline.  And I can recall around

12   that time that social media was a big part

13   of school as opposed to outside of school.

14   Where, you know, perhaps before, it was

15   something outside of school and not

16   something we would see encroaching upon our

17   lives in the school.

18             Q.      To make sure we're on the

19   same page, is it your belief that around

20   2013 or 2014, your evaluations and any

21   submissions you made in connection with

22   those evaluations would have related in

23   some way to social media?

24             A.      I wouldn't say it the way --

25   I thought you asked --

CONFIDENTIAL

Page 51

1          Q.      How would you say it?

2          A.      Okay.  So you said the

3    well-being of students, that would be a

4    part of evaluations forever.

5          Q.      Sure.

6          A.      Social media being mentioned,

7    social media or, you know, students being

8    on, let's say, sites or things that they

9    shouldn't have been, I wouldn't say that

10   that was in my evaluation, but you would

11   see that that would be a concern that maybe

12   teachers might bring up when they're being

13   evaluated and maybe, you know, they make

14   note of this is a part of what is

15   encroaching on their ability to teach.  It

16   may be something that you might see a

17   principal or an AP mention.

18                  In 2014, I was a principal

19   of an elementary school here in Irvington,

20   but elementary, and that wouldn't have been

21   an issue at the elementary school that I

22   was at.  So it would be far-fetched to see

23   something like that mentioned in my

24   evaluation.

25          Q.      I understand.  And thank you

CONFIDENTIAL

Page 52

1    for clarifying.

2                    Shifting gears a bit,

3    Dr. Vauss, have you ever been charged with

4    a crime?

5            A.      No.

6                        MR. INNES:  Objection to form.

7                        THE WITNESS:  Sorry.  No, no,

8            I have not.

9    BY MR. KARP:

10           Q.      At Irvington Public Schools

11   or elsewhere, have you ever been the

12   subject of disciplinary action in your

13   professional capacity?

14                       MR. INNES:  Objection to form.

15                       THE WITNESS:  No.

16   BY MR. KARP:

17           Q.      At Irvington Public Schools

18   or elsewhere, have you ever been

19   investigated for any alleged misconduct in

20   your professional capacity?

21                       MR. INNES:  Objection to form.

22                       THE WITNESS:  No.

23   BY MR. KARP:

24           Q.      Dr. Vauss, what is your

25   understanding of the allegations that have

Page 53

1    been made in this lawsuit?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  Can you -- can

4          you rephrase the question?

5    BY MR. KARP:

6          Q.    Sure.  You're aware that

7    Irvington Public Schools has filed a

8    lawsuit against various social media

9    companies, correct?

10         A.    Yes.

11         Q.    And that is one of the

12   reasons we're here for this deposition,

13   right?

14         A.    Yes, absolutely.

15         Q.    My question to you is what is

16   your understanding of the claims that

17   Irvington Public Schools is making against

18   social media companies?

19         A.    My understanding is, is that

20   social media has -- has a medium that is

21   encroaching upon our ability through its

22   addictive nature to educate our scholars

23   and to provide them an arena that is free

24   of distractions, continuous, unfettered,

25   unmonitored distractions from a quality

CONFIDENTIAL

1  education that they so desperately need.

2          Q.      And where did you get that

3  understanding of the claims that have been

4  made in this case?

5                  MR. INNES:  Objection to form.

6              Doctor, you can -- you should

7              answer that question, but I caution

8              you not to reveal conversations

9              you've had with counsel.

10                 THE WITNESS:  Okay.  So I kind

11             of come to those conclusions myself

12             that that's what social media does.

13             Were there conversations, you know,

14             with counsel, perhaps, but that

15             conclusion I came to myself.

16  BY MR. KARP:

17         Q.      And my question was simply

18  how you learned about what specific claims

19  were included in the lawsuit?

20         A.      Oh.

21         Q.      And I was, so just with that

22  in mind, where did you get that

23  understanding of what claims had been made

24  in the lawsuit?

25         A.      My counsel.

CONFIDENTIAL

Page 55

1          Q.     When did you first become
2    aware of this lawsuit?
3                    MR. INNES:  Objection to form.
4                    THE WITNESS:  It was in maybe
5          a couple of years ago, maybe less.
6    BY MR. KARP:
7          Q.     So it is presently May of
8    2025.
9          A.     Uh-huh.
10         Q.     You're thinking it could have
11    been the spring of 2023?
12                   MR. INNES:  Objection to form.
13                   THE WITNESS:  I think maybe
14         later.
15    BY MR. KARP:
16         Q.     Later?
17         A.     Yeah.  I think.
18         Q.     When you first became aware
19    of this lawsuit, do you know whether the
20    lawsuit had already been filed?
21                   MR. INNES:  Objection to form.
22                   THE WITNESS:  I'm not sure.
23    BY MR. KARP:
24         Q.     Okay.  Were you involved in
25    the decision to file this lawsuit?

CONFIDENTIAL

Page 56

1                    MR. INNES:  Objection to form.
2                    THE WITNESS:  Yes.
3    BY MR. KARP:
4         Q.    Is it fair to say then that
5    you became aware of this lawsuit before it
6    had been filed?
7                    MR. INNES:  Objection to form.
8                    THE WITNESS:  I don't know if
9              that would be fair, because I don't
10             know if it was filed before or what
11             time period it was filed
12             originally.
13   BY MR. KARP:
14        Q.    I understand.  You just
15   testified though that you were involved in
16   the decision to file it?
17        A.    For --
18                    MR. INNES:  Wait one second.
19                    THE WITNESS:  Okay.
20                    MR. INNES:  So you're talking
21             about the lawsuit, the MDL, or are
22             you talking about the Complaint
23             that was filed by Irvington,
24             there's --
25                    MR. KARP:  I can clarify,

CONFIDENTIAL

1            sure.

2                    THE  WITNESS:   Oh.

3    BY MR. KARP:

4        Q.      When did you first become

5    aware of the lawsuit that Irvington Public

6    Schools has filed against social media

7    companies?

8        A.      The same time period that I

9    was just saying, I guess a little less than

10   two years or maybe a year and a half or

11   somewhere.

12        Q.      And at that time, did you

13   understand one way or another whether other

14   school districts had filed similar

15   lawsuits?

16                    MR. INNES:  Objection to form.

17            To the extent you can answer that

18            without guessing and without

19            revealing conversations you've had

20            with counsel, you can do so.

21                    THE  WITNESS:  So I don't want

22            to guess.  I just know that, you

23            know, we joined a lawsuit.

24   BY MR. KARP:

25        Q.      So a litigation was ongoing

CONFIDENTIAL

Page 58

```
 1   and Irvington Public Schools joined that
 2   litigation; is that fair?
 3                    MR. INNES:  Objection to form.
 4                    THE WITNESS:  I think
 5            that's -- yes, uh-huh.
 6   BY MR. KARP:
 7        Q.      And you testified that you
 8   were involved in the decision for Irvington
 9   Public Schools specifically to file this
10   lawsuit against social media companies?
11                    MR. INNES:  Objection.  Asked
12            and answered for the third time.
13                    MR. KARP:  You can answer.
14                    THE WITNESS:  I would say yes,
15            yes.
16   BY MR. KARP:
17        Q.      Do you recall who else was
18   involved in the decision to file the
19   lawsuit?
20                    MR. INNES:  Objection to form.
21            Doctor, you can answer that
22            question so long as you have
23            knowledge of that and so long as
24            you don't reveal conversations
25            you've had with counsel.
```

CONFIDENTIAL

Page 59

1              THE WITNESS:  Okay.  So I'm
2         the chief school administrator, so
3         I can, you know, bring suggestions,
4         bring things to my board and they
5         agree or disagree, but it's not a
6         vote, so to speak.  It's just as
7         the superintendent as, you know,
8         here, you know, the merits and see
9         if it resonates with our experience
10        here in Irvington and that's how
11        the decision was made.
12   BY MR. KARP:
13        Q.    When you say that you brought
14   this issue or this matter to the board,
15   would that have been an agenda item for a
16   board meeting?
17        A.    No.
18        Q.    Okay.  What form would that
19   have taken?
20        A.    So we have closed sessions.
21   I don't know that those matters can be
22   really discussed too deeply, but it's not a
23   matter that has to be voted on.  It's just
24   information that we share to let the board
25   know what's going on in the district, so.

CONFIDENTIAL

Page 60

1          Q.     Closed sessions means that
2     the meetings are not open to the public?
3          A.     Yeah, and matters until such
4     time as attorney-client privilege is no
5     longer necessary, those things stay
6     confidential.
7          Q.     I see.  I believe you said
8     that the board did not vote on whether to
9     file this litigation?
10         A.     Yeah, it's not a thing that
11    they vote on.
12         Q.     Okay.  Did the board need to
13    approve the decision to file this lawsuit?
14                MR. INNES:  Objection to form.
15                THE WITNESS:  No.
16    BY MR. KARP:
17         Q.     Why did you bring it -- why
18    did you bring this lawsuit to the board's
19    attention?
20                MR. INNES:  Objection to form.
21                To the extent that that reveals
22                attorney-client privilege, you
23                don't need to disclose anything
24                about that.
25                THE WITNESS:  Okay.

CONFIDENTIAL

Page 61

1   BY MR. KARP:

2          Q.     Are you able to answer the

3   question or --

4          A.     I think not.

5          Q.     Okay.  Did you share the

6   decision -- well, strike that.

7                 When you brought the idea of

8   filing this lawsuit to the board's

9   attention, was it still an open question of

10  whether to file the lawsuit?

11                MR. INNES:  Objection to form.

12            Doctor, to the extent that that

13            would require you to reveal

14            conversations with counsel or from

15            closed session that was subject to

16            attorney-client privilege, you do

17            not need to answer that question.

18                THE WITNESS:  I should not

19            answer that question.

20  BY MR. KARP:

21          Q.     Okay.  And I'm not asking for

22  any specific details here, I'm just going

23  to keep this at a high level.  In

24  connection with making the decision for

25  Irvington Public Schools to file this

CONFIDENTIAL

Page 62

1  lawsuit, did you receive any documents or

2  materials from counsel?

3              MR. INNES:  Objection to form.

4         Andrew, that's a really crafty way,

5         because it's getting way too close

6         to the line of attorney-client

7         privilege, so I'll instruct the

8         witness not to answer that

9         question.

10             THE WITNESS:  I can't answer

11        that question.

12  BY MR. KARP:

13        Q.    I can -- I'm going to ask it

14  in a slightly different way.  In connection

15  with making the decision to file -- or

16  strike that.

17             In connection with Irvington

18  Public Schools' decision to file this

19  lawsuit, did you consider any documents or

20  materials?

21             MR. INNES:  Objection.  Same

22        instruction.

23  BY MR. KARP:

24        Q.    Are you going to --

25        A.    I can't answer that.

CONFIDENTIAL

Page 63

1          Q.     Okay.  We have been going

2     about on hour and I'm probably going to

3     change subjects now, do you want to take a

4     quick break?

5                    MR. INNES:  Are you good?

6                    THE WITNESS:  I'm good.  I'm

7               good.

8     BY MR. KARP:

9          Q.     Keep going, okay.  Let's go

10     for a little bit longer.

11                    I'm handing you tab four,

12     which we will mark as Exhibit 2.

13                         - - - - -

14                    (Article entitled "How to

15               Direct a Districtwide Tech

16               Transformation on a Budget" Bates

17               BW__Irvington00182944 to 00182946

18               marked Vauss Exhibit 2 for

19               identification.)

20                         - - - - -

21                    MR. INNES:  Take your time and

22               review the document.

23     BY MR. KARP:

24          Q.     If at any time you need --

25     excuse me, if at any point you need an

CONFIDENTIAL

Page 64

1  opportunity to review documents, please let

2  me know, Dr. Vauss.

3              For the record, this is

4  Bates starting with BW__Irvington00182944.

5  Take your time, but let me know when you're

6  ready.

7         A.    I am ready.

8         Q.    Dr. Vauss, have you seen this

9  document before?

10        A.    Yes.

11        Q.    What is this document?

12        A.    It is a technology document I

13  wrote for a periodical.

14        Q.    Okay.  And when you say a

15  periodical, can you be more specific?

16        A.    I forget the name of the

17  magazine, but it was in connection with

18  Bluum, B-L-U-U-M, Technology.

19        Q.    Okay.  And this article is

20  titled, "How to Direct a Districtwide Tech

21  Transformation on a Budget"?

22        A.    Uh-huh.

23        Q.    Let's look at the section

24  called, "Beginning a Technological

25  Evolution."

CONFIDENTIAL

Page 65

1          A.      Uh-huh.

2          Q.      The article states you began

3    a technological evolution at Irvington

4    Public Schools.

5                  What did you mean by that?

6          A.      At that time -- it's okay?

7                  MR. INNES:  Yeah.

8                  THE WITNESS:  Okay.  So at

9               that time, I was, it says

10              2013-2014, so that was the school

11              year, but I started in January of

12              2014 as an administrator at

13              Florence.  We started a coding

14              initiative.  I remember that was --

15              the student that I referenced was a

16              second grade student who was

17              interested in technology and coding

18              specifically.  And we started a

19              coding club.

20   BY MR. KARP:

21          Q.      The article states, "I

22   believed technology would be powerful for

23   our scholars and I wanted everyone to have

24   access to it."  Do you see that?  Those are

25   your words?

Page 66

1          A.      Uh-huh.

2          Q.      What did you mean by that?

3          A.      Meaning that technology was,

4    is a big part of learning of our society

5    and I wanted all of our students to have

6    access in a very responsible way.

7          Q.      And -- excuse me -- do you

8    still feel that way today?

9          A.      Yes, uh-huh.

10          Q.      Toward the bottom of the

11    first page, you wrote, "We also have

12    Chromebooks for every student and 3D

13    printers and interactive whiteboards in our

14    classrooms.  We even bought virtual reality

15    headsets."

16                  Do you see that?

17          A.      Yes, uh-huh.

18          Q.      Is that all of that true?

19          A.      That is true.

20          Q.      And then at the very --

21    excuse me -- at the very bottom of the

22    page, the article refers to the district's

23    AI community summit and AI academy.  Do you

24    see that?

25          A.      Yes, uh-huh.

CONFIDENTIAL

Page 67

1          Q.      What was the AI community

2     summit?

3          A.      It was an initiative we had

4     community members, whether they were people

5     who actually lived in Irvington several

6     years ago or lived in neighboring

7     communities who have careers in technology

8     and they wanted to bring it to Irvington

9     Public Schools, but I believe that -- I

10    believed -- I believed and I believe that

11    our community has to come along for this

12    technology revolution, if you want to call

13    it, and so we had a forum for our whole

14    entire community to come and learn about

15    AI.

16          Q.      Okay.  Fair to say that

17    Irvington Public Schools wants to keep the

18    community up to date and up to speed on the

19    newest developments in technology; is that

20    fair?

21                    MR. INNES:  Objection to form.

22                    THE WITNESS:  Yes.

23    BY MR. KARP:

24          Q.      The next page of this article

25    includes a section called, "Finding the

Page 68

1  Funding (and Partners) for a Tech

2  Makeover."

3          Do you see that?

4      A.    Yes, uh-huh.

5      Q.    You wrote that Irvington

6  Public Schools has been able to fund these

7  initiatives by leveraging state and federal

8  funds, specifically, ESSER funds and have

9  secured various grants?

10     A.    Uh-huh.

11     Q.    Is that true?

12     A.    That is true.  That's what I

13 wrote, uh-huh.

14     Q.    And ESSER stands for

15 Elementary and Secondary School Emergency

16 Relief?

17     A.    Yes, uh-huh.

18     Q.    A lot of acronyms today.

19     A.    Uh-huh.

20     Q.    And ESSER funds have been

21 provided to Irvington Public Schools to

22 help the district address the impact of

23 COVID-19 specifically, correct?

24     A.    Yes, uh-huh.

25     Q.    Do you know how much ESSER

CONFIDENTIAL

Page 69

1  funding has been put toward the initiatives

2  that you describe in this article?

3              MR. INNES:  Objection to form.

4              THE WITNESS:  I couldn't give

5        you a number.

6  BY MR. KARP:

7        Q.    Okay.

8        A.    No, I couldn't give you a

9  number.

10        Q.    I don't want you to

11  speculate, but are you able to approximate?

12              MR. INNES:  Objection to form.

13              THE WITNESS:  I would, I mean,

14        it would -- it would be me

15        guessing, but if I were to

16        specifically talk about ESSER

17        funds, I would say maybe around a

18        million.

19  BY MR. KARP:

20        Q.    You also refer to securing

21  various grants --

22        A.    Uh-huh.

23        Q.    -- to help fund these

24  initiatives.  Do you know which grants

25  would have been used to pay for these

CONFIDENTIAL

Page 70

1    initiatives?

2            A.      I couldn't speak to that.

3    That would be government programs or our

4    business administrator.

5            Q.      Who within the government

6    programs' office would have that

7    information?

8            A.      That would probably be

9    Mr. Lamptey.  He would definitely have that

10   information.

11           Q.      You also wrote, "We can and

12   will always hope for more funding."

13                   Do you see that?

14           A.      Yes, uh-huh.

15           Q.      Is that still a true

16   statement?

17           A.      That is, and I have to make

18   note that even this past year, we received

19   full funding from our state with our local

20   contributions and we are continuing to move

21   forward with, you know, making sure that we

22   provide a quality education for our

23   scholars.

24           Q.      Thank you.  You could put

25   this to the side for now.

CONFIDENTIAL

Page 71

1          A.      Okay.

2          Q.      I don't think you'll need

3    much time to read this.  I'm handing you

4    tab five, which we will mark as Exhibit 3.

5    For the record, this BW__Irvington00005125.

6          A.      Uh-huh.

7                      - - - - -

8               (Email dated 3/5/20 Bates

9           BW__Irvington 00005125 marked

10          Vauss Exhibit 3 for

11          identification.)

12                     - - - - -

13          MR. INNES:  Andrew, is there

14          an attachment to this?  I see one

15          referenced.

16   BY MR. KARP:

17          Q.      I am getting there.

18   Dr. Vauss, this is an email dated March 5,

19   2020.

20               Do you see that?

21          A.      Uh-huh.

22          Q.      You are the sender of this

23   email.  Do you see your name in the "to"

24   line?

25          A.      No, I see from, from Cynthia

CONFIDENTIAL

Page 72

1    Littlejohn to me.  I'm the recipient.
2           Q.     I apologize, I reversed it.
3           A.     Okay.
4           Q.     I need a little bit more
5    coffee this morning.
6                  You are the recipient of
7    this email, correct?
8           A.     Yes.
9           Q.     Okay.  And it came from
10   Cynthia Littlejohn, as you just said?
11          A.     Uh-huh.
12          Q.     Okay.  The email says, "Dear
13   Dr. Vauss, please see attached.  Thanks,
14   Cynthia," correct?
15          A.     Uh-huh.
16          Q.     I'm going to hand you tab 5A,
17   which is the attachment to this email.
18   We'll mark this as Exhibit 4.  For the
19   record, this is Bates starting
20   BW__Irvington00005126.
21                 Dr. Vauss, I will not ask
22   you about every single page of this
23   document, but if at any point you need some
24   time to review, let me know.
25                 MR. INNES:  Doctor, take the

CONFIDENTIAL

Page 73

1                 time to review the plan and just

2                 let us know when you're ready.

3                     - - - - -

4                 (Technology Plan 2013 to

5                 2016 Bates BW__Irvington00005126

6                 to 00005146 marked Vauss Exhibit

7                 4 for identification.)

8                     - - - - -

9    BY MR. KARP:

10         Q.      Dr. Vauss, are you ready to

11   proceed?

12         A.      Yes.

13         Q.      This is the technology plan

14   for Irvington Public Schools for 2013

15   through 2016, correct?

16         A.      Yes.

17         Q.      And this plan that we're

18   looking at was approved by the Irvington

19   Board of Education on March 20, 2013?

20                 MR. INNES:  Objection to form.

21                 THE WITNESS:  Yes, it looks

22           like it, that's correct.

23   BY MR. KARP:

24         Q.      Okay.  Let's take a look at

25   page 5.  At the very top of this page,

CONFIDENTIAL

Page 74

1    you'll see a section called, "Technology

2    Mission Statement."

3                    Do you see that?

4           A.     Uh-huh. Yes, I'm sorry, yes.

5           Q.     According to this technology

6    plan, "The Irvington Public School District

7    remains committed to implementing

8    technology as an integrated tool to provide

9    students with exceptional learning

10   experiences that prepare them for life and

11   careers in a world of exponential change

12   and instill the desire for lifelong

13   learning.  The commitment is based on the

14   philosophy that technology literacy is an

15   integral component of a balanced

16   educational experience."

17                    Did I read that correctly?

18          A.     Yes, you read it correctly,

19   yes.

20          Q.     And do you agree with that

21   statement?

22          A.     Yes, uh-huh.

23          Q.     Last sentence of this

24   paragraph -- was that the iPad?

25                    MR. INNES:  Yeah.

CONFIDENTIAL

Page 75

1              MR. KARP:  Maybe I should ask
2         a better question.
3              MR. INNES:  That's amazing.
4    BY MR. KARP:
5         Q.     Dr. Vauss, the last sentence
6    of this paragraph states, "The Irvington
7    Public School District's Technology
8    Curriculum is aligned to and infuses the
9    New Jersey Core Curriculum Content
10   Standards for Technology 8.1, 8.2, in
11   addition to the Common Core Standards to
12   ensure the literacy needed by all students
13   to succeed in a highly technological
14   world."
15              Do you see that?
16        A.     Yes, uh-huh.
17        Q.     Do you know what is meant
18   here by the New Jersey Core Curriculum
19   Content Standards for Technology 8.1, 8.2?
20        A.     So those are the standards
21   that are part of the curriculum, the
22   state-required curriculum, because
23   technology used to be a stand apart content
24   area, but at this time, it became something
25   that was infused throughout all of the

CONFIDENTIAL

Page 76

1   curricula.

2          Q.     So this is some form of

3   state-mandated curriculum regarding

4   technology; is that right?

5          A.     Yes, uh-huh.

6          Q.     Irvington Public Schools is

7   required to teach its students about

8   technology?

9          A.     To integrate it, not as a

10  standalone --

11         Q.     Okay.

12         A.     -- but as an integrated tool

13  that's used throughout the curriculum.

14         Q.     If I wanted to understand

15  what the state requires in terms of

16  technology education today, where would I

17  look?

18         A.     You could either look on our

19  website or we have the state standards --

20  well, we have actually our curriculum.  You

21  could actually go to New Jersey Department

22  of Education and look on the site and you

23  would find the standards.  It's not called

24  Common Core anymore, it's New Jersey

25  Student Learning Standards, but --

CONFIDENTIAL

Page 77

1          Q.      Let's take a look at page 7.
2    At the very top of the page, the technology
3    plan states, "Irvington also employs six
4    technology coaches, whose primary function
5    is to train our entire staff on the
6    infusion of technology in their classrooms.
7    The technology coaches currently train on
8    the use of Smartboards, Smart tables,
9    OnCourse lesson planning system, MyMath,
10   Microsoft Office, and Google Docs.  The
11   trainings take place during common planning
12   time when available, as well as teacher
13   prep periods.  Currently each technology
14   coach is responsible for two buildings."
15                 Did I read that correctly?
16         A.     Yes.
17         Q.     Does Irvington Public Schools
18   still have technology coaches today?
19         A.     Yes.
20         Q.     Has the number of technology
21   coaches remained the same or has that
22   changed?
23         A.      I think that's still the
24   number, somewhere around that number.  It
25   may have increased by one or two.

Page 78

1          Q.     Okay.

2          A.     I can't, you know, off the

3    top of my head, I can't tell you how many

4    tech coaches we have, but that sounds about

5    right.

6          Q.     So at the time that this was

7    written, there were six technology coaches?

8          A.     Uh-huh, that's correct.

9          Q.     And today your -- you believe

10   there could be anywhere between six and

11   eight?

12         A.     I believe.

13              MR. INNES:  Objection.

14              THE WITNESS:  I think that

15         might be correct.

16   BY MR. KARP:

17         Q.     And according to this

18   technology plan, the primary function of

19   these technology coaches is to train the

20   district's entire staff on the infusion of

21   technology into their classrooms, correct?

22         A.     Yes.

23         Q.     So these coaches are helping

24   IPS staff to keep up with changes to

25   technology and new ways they may feature in

CONFIDENTIAL

Page 79

1    the classroom?
2                MR. INNES:  Objection to form.
3                THE WITNESS:  I would say -- I
4           would say, yes, to a degree, yes.
5           I don't know that that is their
6           primary focus.  When you talk -- if
7           I were to, you know, pull from
8           there, making sure the Smartboards
9           work correctly, yes.  Making sure
10          that OnCourse is online, making
11          sure our Wi-Fi is up in the
12          building, making sure that maybe a
13          new teacher knows how to, you know,
14          knows about Google Suites, yes.
15          Ongoing training, there is a --
16          there are things you have access to
17          our website -- excuse me -- and on
18          there, there are, you know,
19          documents for them to look and
20          maybe self-train.  So yes, and yet
21          some of those things have changed,
22          because I believe this document was
23          2013 to 2016.
24   BY MR. KARP:
25          Q.    Sure.  Sure.  And everything

CONFIDENTIAL

Page 80

1   you said is consistent with the words on

2   the page here that their primary function

3   is to train Irvington Public School staff

4   on the infusion of technology into their

5   classrooms; is that fair?

6           A.      Their primary, I think their

7   primary responsibility would be to make

8   sure that the technology is up and running

9   and available for the teachers.  I would

10  say that's their primary duty.  So is it

11  still somewhat the same, yes.  But it's a

12  much more, you know, technology maintenance

13  type of role more so these days.  Because

14  this time period was the first, you know,

15  induction of technology not being a

16  standalone content area, but something that

17  was being -- well, mandated, but encouraged

18  to be infused in just your everyday role of

19  whatever your content area may be.

20          Q.      Understood.  Why was it

21  important for Irvington Public Schools to

22  have these technology coaches?

23          A.      From a --

24                  MR. INNES:  Objection to form.

25                  THE WITNESS:  From a practical

CONFIDENTIAL

Page 81

1          standpoint, to make sure that we
2          were in alignment with state
3          mandates.  Two, to bring, you know,
4          more of the world, more access to
5          our scholars via our teachers, so.
6   BY MR. KARP:
7          Q.      That makes sense.  Let's take
8   a look at page 12.  There's a table on
9   page 12 called, "Three-Year Technology
10  Implementation Activity Table."
11                Do you see that?
12         A.      Yes.
13         Q.      The table starts on page 12
14  and it runs for a few pages through
15  page 15.
16                Do you see that?
17         A.      Yes, uh-huh.
18         Q.      Let's take a look at the last
19  row of this table on page 15.  The last row
20  of this table reads, "Provide parent
21  training on basic computer use, internet
22  use, internet safety, social media, and
23  email," correct?
24         A.      Uh-huh.
25         Q.      So the goal that is set out

CONFIDENTIAL

Page 82

1    in this activity table is to educate

2    parents and provide them with training on

3    various internet features, social media,

4    and email, correct?

5                MR. INNES:  Objection to form.

6                THE WITNESS:  I would say from

7            my experience, making sure parents

8            knew how to turn a computer on,

9            that internet was available and how

10           to use it safely being making sure

11           that maybe you don't go to sites

12           that are not good sites for people

13           to go to.  And then letting them

14           know about social media, because at

15           that juncture, even though I guess

16           there were other things out in,

17           like, twenty -- I guess, 2010 or

18           whatever, I don't know, like

19           MySpace or things that were like

20           the beginning of social media, I

21           think it was still rather new at

22           that time and just introducing them

23           and letting them know that this was

24           something that was out there and

25           also most importantly that emails,

CONFIDENTIAL

Page 83

1              that that was a form of
2              communication that we could use to
3              communicate maybe with their
4              schools.
5     BY MR. KARP:
6          Q.     And why were emails the most
7     important?
8                   MR. INNES:  Objection to form.
9                   THE WITNESS:  Most important,
10             I would say because if they're
11             not -- if they don't come into the
12             school or if there's, let's say, if
13             I think of something at midnight
14             and I want to tell my child's
15             teacher or principal, I can email
16             them and they would have it the
17             next day.
18    BY MR. KARP:
19         Q.     Understood.  Irvington Public
20    Schools believed that there was a safe way
21    for parents and their children to use
22    social media, correct?
23                  MR. INNES:  Objection to form.
24             And, again, I don't -- I don't want
25             to confuse the two hats that she

CONFIDENTIAL

Page 84

```
 1              might wear, if you're asking about
 2              Irvington Public Schools versus
 3              Dr. Vauss.
 4   BY MR. KARP:
 5         Q.     I can rephrase the question.
 6   Dr. Vauss, you received a copy of this
 7   technology plan, correct?
 8         A.     Yes.
 9         Q.     Is it your understanding from
10   reading this technology plan that the
11   district was making an effort to train
12   parents on the safe use of social media?
13                  MR. INNES:  Objection to form.
14                  THE WITNESS:  I would say
15              perhaps, but from my own
16              experience, I don't think that the
17              crafters of this actually really
18              knew much about social media at the
19              time.  I mean, I have been in this
20              district for now going on 21 years
21              and knowing what I know, I don't --
22              I think it was a word that was out
23              there and I don't think that the --
24              excuse me -- that the people who
25              were in charge of making the
```

CONFIDENTIAL

Page 85

1          decisions knew much about social

2          media, let alone was trying to make

3          a safe way to use it as opposed to

4          saying this is something that's out

5          there and we want people to know

6          that we know that it's out there.

7               I'm just being completely

8          honest from -- just from my

9          knowledge of who would have

10         crafted this and what their

11         knowledge is of technology and/or

12         social media.

13    BY MR. KARP:

14         Q.    Okay.  And to clarify, I

15    should have asked this at the beginning,

16    did you draft this technology plan?

17         A.    No.

18         Q.    And you did not -- you did

19    not put together this table that we're

20    reviewing right now, correct?

21         A.    No.

22         Q.    Okay.  If you could turn back

23    to page 8 for a moment.

24         A.    Uh-huh.

25         Q.    Section VI of this technology

CONFIDENTIAL

Page 86

1    plan refers to three-year goals.

2                    Do you see that?

3          A.    Yes, uh-huh.

4          Q.    And the plan reads, "List

5    clear goals for 2013 to 2016 that address

6    district needs.  There must be strong

7    connections between the proposed physical

8    infrastructure and goals.  Include goals

9    for using telecommunications and technology

10   that support 21st century learning

11   communities."

12                    Do you see that?

13         A.    Yes.

14                    MR. INNES:  Objection.

15             Misstates the document.

16   BY MR. KARP:

17         Q.    And to address your counsel's

18   objection, I omitted the information in

19   parentheses when I read that statement,

20   correct?

21         A.    Yes.

22         Q.    What is your understanding of

23   what is meant here by, "include goals for

24   using telecommunications and technology

25   that support 21st century learning

CONFIDENTIAL

Page 87

1    communities"?

2          A.    So "include goals for using

3    telecommunications and technology to

4    support 21st century learning communities."

5    I'm not sure exactly what they meant, but,

6    I mean, if you want telecommunications,

7    that wasn't a big part of necessarily what

8    I was doing at that time.  And technology,

9    the use of technology that supports our

10   overall goals and for our learning

11   communities, you know, we had to include

12   the use of technology and how it will

13   enhance our communities, our learning, you

14   know, demographics in our particular

15   schools, I would imagine.  But I would

16   think that this would be geared towards,

17   and we talk about the goals because I

18   was -- when this was crafted, I would have

19   been an assistant principal and so I would,

20   my goals would matter, but they wouldn't be

21   referring to me.

22          Q.    Sure.

23          A.    Okay.

24          Q.    The first goal listed here is

25   to improve student academic achievement

CONFIDENTIAL

Page 88

1    through the use of technology?

2          A.     Uh-huh.

3          Q.     Do you see that?

4          A.     Yes, uh-huh.

5          Q.     And then the document goes on

6    to list a number of strategies, do you see?

7          A.     Yes, uh-huh.

8          Q.     Okay.  If you look down at

9    item number two, which is on the following

10   page, you'll see the strategy, "building a

11   culture of continuous learning for staff."

12              Do you see that?

13         A.     Yes, I see it on your screen,

14   but I don't see it here, so.

15         Q.     It's right there in the

16   middle of the page on page 9.

17         A.     Page 9.  Okay.  Yes, I see

18   it.

19         Q.     Okay.  And if you look down

20   toward the bottom of that list, part G

21   says, "Investigating emerging possibilities

22   for electronic learning resources such as

23   ebooks, social media, and tablets for

24   teachers and students."

25              Do you see that?

CONFIDENTIAL

Page 89

1          A.      Yes, uh-huh.

2          Q.      As part of this technology

3    plan, the district was investigating ways

4    that it could use ebooks, social media, and

5    tablets with teachers and students,

6    correct?

7          A.      Uh-huh, yes.

8          Q.      You can put that to the side.

9    Can we take a brief break?

10               THE WITNESS:  I'm good.  I

11          mean, if you're good, I'm good.

12               MS. HENRY:  I could use a

13          break.

14               MR. KARP:  Yes, maybe five or

15          ten minutes, is that good?

16               MR. INNES:  Yeah.

17               THE VIDEOGRAPHER:  The time is

18          11:17 a.m.  We're off the record.

19                    - - - - -

20       (A recess was taken at this time.)

21                    - - - - -

22               THE VIDEOGRAPHER:  The time

23          right now is 11:31 a.m.  We're back

24          on the record.

25

CONFIDENTIAL

Page 90

1  BY MR. KARP:

2          Q.      Welcome back, Dr. Vauss.  We

3  just took a brief break.  Did you meet with

4  your counsel during the break?

5          A.      Yes.

6          Q.      And your counsel informed me

7  just before getting back on the record that

8  there was some testimony about the

9  technology plan we were just reviewing that

10  you wanted to amend; is that correct?

11          A.      I don't know if I would say,

12  "amend," but add to my testimony, which is

13  when this plan was developed, I wasn't a

14  part of the development of this plan.  And

15  at the time that this plan would have been

16  developed, I was an assistant principal at

17  University Middle School.  And I don't

18  believe that the authors of this

19  necessarily would have known the reality of

20  University Middle School, which would have

21  been social media was causing great harm to

22  what we were trying to do administratively,

23  instructionally.  We were constantly trying

24  to keep children from platforms even at

25  that time period.

CONFIDENTIAL

Page 91

1              So we would say 2012, 2013,
2   you know, I don't believe that this plan
3   was conscious of the realities of some of
4   what was going on at our schools at that
5   time.  I think that actually there was a
6   jargon and there was a vernacular in the
7   educational world that would make you
8   appear as though you were sophisticated in
9   the areas of what was going on
10  technologically speaking, and I think
11  that's why maybe some of the authors of
12  this put in those things, because, you
13  know, when I say 2013, 2012, I know as an
14  administrator, we were trying to keep
15  students off of these platforms that they
16  would use on their phones to tap into or
17  getting on from their computers, we didn't
18  have a lot of Chromebooks at that time
19  period, but we did have computers and they
20  would try to access some of these sites at
21  that time period.
22              So I don't think that this,
23  you know, I can't speak for them, but I
24  don't believe that this is -- was rooted in
25  awareness of what was going on in some of

Page 92

1  the schools.

2       Q.    Dr. Vauss, who wrote this

3  technology plan for 2013 through 2016?

4       A.    I think it would have been

5  the tech coach at the time in conjunction

6  with, you know, it was a committee, but I

7  would say the director of technology at the

8  time was Evan Abramson.  And there were,

9  you know, it was a committee, it was a

10 committee of people, so, you know.

11      Q.    Are you looking at a

12 particular page of this document?

13      A.    Oh, yes, I'm looking at

14 page 3, it says, "stakeholders," but

15 stakeholders doesn't mean crafters or

16 authors.

17      Q.    And your testimony that the

18 individuals who were responsible for

19 putting together this technology plan did

20 not know the realities of social media,

21 that's your testimony?

22              MR. INNES:  Objection to the

23         form.  Misstates the prior

24         testimony.

25              THE WITNESS:  I would say the

CONFIDENTIAL

Page 93

1              impact that social media was having

2              in the classrooms and on the school

3              culture in a negative way, I don't

4              think that they were necessarily

5              intimately aware of.  But I would

6              say that -- I want to say maybe

7              they had some information, but

8              intimately aware of it, perhaps

9              not.

10  BY MR. KARP:

11        Q.    Do you know with any

12  certainty what knowledge the drafters of

13  this document actually had?

14        A.    I think that some of them

15  would -- would agree that something like

16  social media needs to be something that

17  people are aware of, but to the degree of

18  how it can negatively impact instruction

19  and the mental health and the social

20  awareness of scholars, I don't think

21  that -- I don't believe from looking at the

22  people who were listed here, I wouldn't

23  say.

24        Q.    Okay.  But nevertheless, the

25  Irvington Board of Education approved this

CONFIDENTIAL

Page 94

1    technology plan, correct?

2         A.    Yes, uh-huh.

3         Q.    We can put this to the side.

4    I'm handing you tab six.

5              MR. INNES:  And, Andrew, I

6         think I'm onto your idiosyncrasy,

7         but the next exhibit will probably

8         be an attachment.

9              MR. KARP:  And what exhibit

10        number are we up to?

11             MR. INNES:  It's five.

12             MR. KARP:  So we'll mark this

13        as Exhibit 5.

14             Dr. Vauss, this is a

15        June 10, 2022, email.

16             Do you see that?

17             THE WITNESS:  Yes.

18                - - - - -

19             (Email dated 6/10/22 Bates

20        BW__Irvington00169330 marked

21        Vauss Exhibit 5 for

22        identification.)

23                - - - - -

24    BY MR. KARP:

25         Q.    The email is from John

CONFIDENTIAL

Page 95

1  Amberg?

2          A.      Yes.

3          Q.      And you are one of the

4  recipients, correct?

5          A.      Yes.

6          Q.      Who is John Amberg?

7          A.      He is our technology

8  director -- executive director.

9          Q.      He was the technology

10 director at the time that he sent this

11 email --

12         A.      Yes.

13         Q.      -- in June of 2022?

14         A.      Uh-huh.

15         Q.      And Mr. Amberg says, "Good

16 day, I am proud to present the five-year

17 tech plan for your approval."

18                 Do you see that?

19         A.      Yes.

20         Q.      And then presumably based on

21 the name of the attachment, he attaches

22 that plan, correct?

23         A.      Yes.

24         Q.      I'm handing you tab 6A.

25 We'll mark this as Exhibit 6.

CONFIDENTIAL

Page 96

1          A.      Okay.  Thank you.

2                  - - - - -

3                  (Technology Plan 2022-2027

4          Bates BW__Irvington00169331 to

5          00169369 marked Vauss Exhibit 6

6          for identification.)

7                  - - - - -

8    BY MR. KARP:

9          Q.      For the record, this is Bates

10   number starting BW__Irvington00169331.  And

11   based on the cover of this document, this

12   is the technology plan for Irvington Public

13   Schools for 2022 through 2027.

14         A.      That is correct.

15         Q.      So this is the technology

16   plan that is currently operative or in

17   place for Irvington Public Schools?

18         A.      Yes.

19         Q.      Okay.  Let's turn to page 11

20   of this document.

21                 MR. INNES:  Have you had a

22         chance to review it?

23                 THE WITNESS:  Say that --

24                 MR. INNES:  Have you had a

25         chance to review the entire

CONFIDENTIAL

Page 97

1          document?

2                    THE WITNESS:  No, I have not.

3    BY MR. KARP:

4          Q.     For now, I just have a few

5    questions about the information on this

6    page.  If you need more context and to look

7    at the surrounding pages, let me know,

8    Dr. Vauss.  On page 11, there is a table

9    called, "Key District Software and

10   Systems."

11                    Do you see that?

12         A.     Yes.

13         Q.     The first item listed is

14   PowerSchool Student Information System?

15         A.     Yes.

16         Q.     Are you familiar with

17   PowerSchool Student Information System?

18         A.     I am.

19         Q.     What is that?

20         A.     It is where we house

21   information about our scholars and their

22   families.

23         Q.     What type of information

24   is --

25         A.     So --

Page 98

1          Q.      -- maintained there?

2          A.      So what we would house there

3    would be their address, their parent,

4    guardians, grades, discipline records, or

5    if they have some type of disciplinary

6    disposition.  A myriad of information about

7    them.  That there were special -- if

8    they're a recipient of special services,

9    things like that.

10          Q.      Did you say that disciplinary

11   reports and disciplinary data would be --

12          A.      There's some, yes.

13          Q.      Okay.  When you say, "some,"

14   what would be included?

15          A.      If a child was suspended, I

16   believe that information would be in there.

17   And it has been so long since I've looked

18   at -- I've logged into PowerSchool.  If a

19   child has an allergy.  It's just a lot of

20   information about the children, but it's

21   limited in its scope, because at the same

22   time, you want to keep certain things maybe

23   confidential, like, there wouldn't be a

24   Social Security number, we don't put things

25   like that in there.

CONFIDENTIAL

Page 99

1          Q.      Sure.  You mentioned that a
2    record of suspension could be included in
3    PowerSchool?
4          A.      I believe so.  I believe so.
5    I'm not a hundred percent.  I know that
6    there's some discipline notes that
7    sometimes are held in there.  Suspensions
8    exactly, I think so, but that would be a
9    guess.
10          Q.      If a disciplinary incident
11    did not rise to the level of suspension,
12    would you expect it to be included in
13    PowerSchool?
14          A.      I can't say with certainty.
15    If it was, you were called to the
16    principal's office to speak to them about
17    you're talking too much in class or maybe
18    you said something cross with your teacher,
19    no, that wouldn't be in PowerSchool.
20          Q.      To your knowledge, would this
21    disciplinary data include a narrative or a
22    description of the --
23          A.      No.
24          Q.      -- incident?
25          A.      No, it wouldn't.

CONFIDENTIAL

Page 100

1         Q.      What form would this
2    information take?
3                 MR. INNES:  Objection to form.
4                 THE WITNESS:  I think it's a
5            drop-down menu, I want to say.
6    BY MR. KARP:
7         Q.      And then the type of
8    disciplinary incident could be selected
9    from that drop-down menu?
10        A.      I believe that's how it
11   operates.
12        Q.      Okay.  To your knowledge, is
13   there any option in that drop-down menu for
14   social media use?
15                MR. INNES:  Objection to form.
16                THE WITNESS:  I'm not sure, to
17           be honest.
18   BY MR. KARP:
19        Q.      Is there any option in that
20   drop-down menu for the use of technology or
21   a violation of the school or district's
22   policy on technology?
23                MR. INNES:  Objection to form.
24                THE WITNESS:  I don't think
25           with that specificity.  I don't

Page 101

1           want to be incorrect, so I would
2           say I don't know.
3   BY MR. KARP:
4           Q.      The third item in this list
5   is district and student email by Google for
6   Education.
7                   Do you see that?
8           A.      Yes, uh-huh.
9           Q.      Are you familiar with that
10  program?
11          A.      I am not.
12          Q.      Do you know if students at
13  Irvington Public Schools are provided with
14  Google email accounts?
15                  MR. INNES:  Objection to form.
16          Asked and answered.
17                  THE WITNESS:  Yes, they have
18          email accounts.
19  BY MR. KARP:
20          Q.      So through Google for
21  Education, students at IPS have their own
22  Google email accounts; is that correct?
23          A.      Yes.
24          Q.      Okay.  Are students at IPS
25  permitted to access their Google email

CONFIDENTIAL

Page 102

```
 1   accounts while on the district's Wi-Fi
 2   network?
 3          A.      Yes.
 4                  MR. INNES:  Objection to form.
 5                  THE WITNESS:  Yes.
 6   BY MR. KARP:
 7          Q.      Are IPS students able to
 8   access their district-provided Google email
 9   accounts on their district-issued
10   electronic devices?
11          A.      Yes.
12          Q.      For example, on a Chromebook
13   that has been provided by the district,
14   correct?
15          A.      Yes.
16          Q.      Can IPS students use a chat
17   or messaging feature on their
18   district-provided Google email accounts?
19                  MR. INNES:  Objection.
20                  THE WITNESS:  I don't believe
21              that they can use -- I know there's
22              one that exists, but I'm not sure
23              if students have access to that.
24   BY MR. KARP:
25          Q.      Do you know who would know
```

Page 103

1    the answer to that question?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  I believe Mr.

4            Amberg would.

5    BY MR. KARP:

6        Q.    Would Mr. Amberg also know

7    more about the settings and restrictions

8    that are applied to those Google email

9    accounts?

10                   MR. INNES:  Objection to form.

11                   THE WITNESS:  Yes.

12   BY MR. KARP:

13       Q.    Sitting here today, do you

14   know anything about what restrictions, if

15   any, the district places on these

16   district-provided Google email accounts?

17       A.    We have -- we do have

18   restrictions through a system we use called

19   GoGuardian and it does some type of

20   blocking from certain sites for our

21   scholars.

22       Q.    The next item in this list is

23   Google Classroom by Google for Education.

24   Do you see that?

25       A.    Uh-huh.

CONFIDENTIAL

Page 104

```
 1          Q.      Are you familiar with this
 2   program?
 3                   MR. INNES:  Objection to the
 4          form.
 5                   THE WITNESS:  Yes.  Yes, I am.
 6   BY MR. KARP:
 7          Q.      And what is your
 8   understanding of Google Classroom by Google
 9   for Education?
10          A.      So Google Classroom is a
11   platform that we use to present curriculum.
12   We used Google Classroom during the
13   pandemic to deliver instruction to our
14   scholars.
15          Q.      Is Google Classroom an
16   interface that students have access to or
17   is it more of a teaching tool for the
18   individuals providing instruction?
19                   MR. INNES:  Objection to form.
20                   THE WITNESS:  So yes.  Yes to
21          both, yes.  But it's funny the
22          GoGuardian platform, the reason why
23          we had GoGuardian, we had a student
24          who actually would -- didn't want
25          to return to school, because she
```

Page 105

```
 1              noticed that people were putting
 2              things on a social media platform
 3              about her and people were liking
 4              it.  It actually became a case that
 5              was -- made national news and we
 6              had to have that, because it -- we
 7              were trying to block what her
 8              experience was, because she ended
 9              up going over into Brooklyn, we had
10              to finally -- we had to get
11              involved with the FBI and they came
12              in and they interviewed us, because
13              the genesis of it was social media
14              and her feeling bullied through the
15              content that was put up, which, you
16              know, is what it is, but, more
17              importantly, she later recounted
18              the amount of likes and tags, but
19              no one was trying to help her,
20              meaning us adults, we were, but
21              none of the classmates were trying
22              to help her get home or try to help
23              us get her home.  So that's why we
24              ended up getting GoGuardian, to
25              kind of try to block the sites that
```

CONFIDENTIAL

Page 106

1           the children were accessing that
2           to, you know, she felt harassed, I
3           can't, you know, litigate whether
4           she was or not, but I think when
5           she saw how many people thought
6           what was happening to her was
7           funny, it caused her to go into a
8           crisis.  And I can't diagnose it,
9           but her mental health was not good
10          at that point.  I would like to
11          know where she is right now,
12          because she's no longer in our
13          district and how she's doing.  But
14          that, that spiraled us into
15          overdrive to try to come up with
16          something to help our students, so.
17               Sorry, that was just a side
18          note, because when you made
19          mention of that, I was thinking
20          of GoGuardian and, you know, at
21          the inception of this technology
22          plan, it's not listed here
23          because it came as a result of
24          that time period.
25

CONFIDENTIAL

Page 107

1    BY MR. KARP:

2         Q.    And I appreciate your sharing

3    that information and that story with me.    I

4    believe, you know this, but your counsel

5    will have an opportunity to ask you

6    questions about some of these experiences.

7              Going back to something you

8    said, the individual who was bullied in

9    this instance felt bullied by the content

10   of what was posted; is that what you said?

11        A.    No, I think the content that

12   they put up, if I recall, it wasn't as

13   though it was in and of itself not true or

14   something where she would say this is not

15   true.  Where she focused in on is was how

16   many people that she could see who liked it

17   who were supposed to be her friends.  The

18   people who liked her looking not in her

19   best light and they were liking and then

20   they were sharing it with other people and,

21   you know, it caused her -- it caused her to

22   spiral.  And when we then saw, like, the

23   different sites and all of that, we were,

24   like, I was, I asked Mr. Amberg, I was,

25   like, is there anything that we can do to

CONFIDENTIAL

Page 108

1    try to stop this.  I mean, we have some

2    really, you know, bright students who want

3    to get on these platforms, so we can't

4    entirely stop it, but we were trying our

5    best at that time.  And she was just -- she

6    just happened to be the genesis of that

7    particular site.

8         Q.     And I just want to make sure

9    I'm on the same page.

10        A.     Uh-huh.

11        Q.     I hear what you're saying

12   about the likes, but before anything was

13   even liked, something was posted that was

14   hurtful to this individual, correct?

15        A.     I don't know that one

16   happened before the other.  I think she

17   learned of a posting at the same time of

18   seeing who liked what was posted.  So did

19   the content hurt her, yes.  But, you know,

20   I believe what really hurt was that how

21   many people liked it as well, you know.

22   And I think in that instance too, not just

23   liking it, but also sharing it.  So it

24   wasn't confined to just being a post, but

25   it was being shared over and over and over

CONFIDENTIAL

1  again.  And it was hurtful to her.

2         Q.      And when someone likes a post

3  on social media, they are expressing that

4  they like what has been posted, correct?

5         A.      I mean, I guess, to a degree

6  that we can assume that that's what the

7  like means, yes.

8         Q.      They are expressing

9  themselves by clicking that button to say

10  that they like the post?

11                MR. INNES:  Objection to form.

12                THE WITNESS:  Yeah, I guess, I

13                guess, but I also think it's a way

14                of trying to hurt someone at the

15                same time.  You know, or that they

16                are acknowledging, yeah, I see

17                this, you know, and then, you know,

18                because you see a lot of things

19                that say like and share and I'm

20                going to spread this, whatever this

21                may be, I'm going to spread it and

22                cause happiness or sadness.  In

23                this instance, it caused a lot of

24                sadness, a lot of, you know, I

25                think the young lady dealt with a

                                              Page 110

1            little bit of suicidal ideations,
2            because she -- the liking and the
3            sharing said I don't really care
4            about you.
5    BY MR. KARP:
6            Q.    And when an individual shares
7    a post on social media, it's similar to
8    telling all their friends, correct?
9                    MR. INNES:  Objection to form.
10                   THE WITNESS:  Can you restate
11           that?
12   BY MR. KARP:
13           Q.    Sure.  Sharing a post is very
14   similar to turning to your friends and
15   telling them about that incident or about
16   that content or about whatever it was that
17   was posted?
18           A.    No, I wouldn't say that.  If
19   I say to -- if I turned to my counsel and
20   say, you know, something, at best, everyone
21   in this room can hear it as opposed to
22   something being on social media and it can
23   go -- it can go viral and it can go all
24   over the state.  It can go all over the
25   country.  And it has, really, it has, even

Page 111

1   if little, little bitty Irvington, things
2   have gone from city to city and been very,
3   not just hurtful, it's caused damage.  It's
4   caused death.  And I don't think that's
5   just as simple as turning and saying, you
6   know what, I beat that person up or, you
7   know, I'm going to beat that person up.
8   That's how it was when I was growing up.
9   But that's not what's going on now.
10          Q.     Do you recall approximately
11   when this incident took place?
12          A.     It had to be maybe, like,
13   20 -- sometime in 2023 maybe.
14          Q.     And at which Irvington school
15   was this young lady a student?
16          A.     She was a student at UMS.
17          Q.     Do you recall which social
18   media platform was involved in this
19   incident?
20          A.     This is a guess, it was -- it
21   was probably either Instagram or Facebook,
22   but I'm not a hundred percent sure.  It
23   could have even been -- I want to say it
24   was one of those two, I'm pretty sure.
25          Q.     Would there be reports or

CONFIDENTIAL

Page 112

1    other documents in the district's files

2    regarding this incident?

3           A.     There wouldn't be, because if

4    I would have, you know, be -- we were the

5    last school of record for her, but she had

6    transitioned to a different school

7    district, but she had not registered

8    officially in the other school district,

9    so.

10          Q.     Can you explain that one more

11   time?

12          A.     So when this happened, when

13   we learned of this, she was supposed to --

14   she had transferred out.  There's a process

15   how we transfer, so we transfer students if

16   we have a name of the school that they are

17   supposed to report to, we're talking about

18   out-of-district transfers, and until they

19   actually register in that school, they're

20   still a part of our school district.  So

21   the student was technically still a part of

22   our school district.  And when the things

23   that occurred to her happened, it was

24   interactions with, unfortunately, with

25   students who belonged to us here in

```
                                      Page 113
 1   Irvington.
 2          Q.      Did records of that incident
 3   exist at one point in time?
 4                 MR. INNES:  Objection to form.
 5                 THE WITNESS:  There weren't
 6            records, because we didn't have her
 7            records, you know, so to speak
 8            still, because we had sent things
 9            over to where she was supposed to
10            register and she hadn't registered.
11   BY MR. KARP:
12          Q.      Does Irvington keep records
13   for students who transfer to other school
14   districts?
15                 MR. INNES:  Objection to form.
16                 THE WITNESS:  Generally, no,
17            we transfer them over to where they
18            say that they're going.  We keep
19            records of former students who stay
20            and graduate, because that would,
21            you know, especially during --
22            well, we would love to, you know,
23            technology-wise have everything
24            online and then it can live on
25            forever, but that is not the case
```

CONFIDENTIAL

Page 114

```
 1              with all of our students,
 2              especially when, you know, you talk
 3              about students from '90s, 2000s,
 4              early 2000s, something like that.
 5              But former -- I mean, but
 6              transferring students, we transfer
 7              their information.
 8    BY MR. KARP:
 9         Q.    I understand.  Shifting focus
10    back to the plan itself, the document
11    that --
12         A.    Yes.
13         Q.    -- we have been discussing,
14    let's look at page 13.  According to this
15    section of the technology plan in 2022,
16    Irvington Public Schools had 12,258
17    Chromebooks for student use on a daily
18    basis; is that correct?
19         A.    Yes.
20         Q.    Were laptops provided to
21    students on a one-to-one basis?
22         A.    The Chromebooks, yes, uh-huh.
23         Q.    Meaning that there was one
24    Chromebook for every student?
25         A.    Yes.
```

CONFIDENTIAL

Page 115

1          Q.      To your knowledge, could

2    Irvington Public Schools students take

3    those Chromebooks home with them?

4          A.      Yes.

5          Q.      And was that true for all

6    ages or only certain grade levels?

7          A.      There was a time where we

8    allowed everyone to, because of the

9    necessity, especially when, you know, 2020,

10   but when the inception of this plan, we

11   had, I believe we pivoted from all of the

12   students taking them home and I think we

13   focused in on the upper grades, but I

14   believe Mr. Amberg can speak with certainty

15   on that.  But, I think, I want to say

16   grades six through 12 had the option of a

17   Chromebook at school and one at home.

18         Q.      And this document indicates

19   that during the 2022 to 2023 school year,

20   the district explored a two-to-one

21   initiative at the elementary schools?

22         A.      Uh-huh.

23         Q.      And that would have meant

24   that elementary school students in the

25   district would have had one --

```
                                        Page 116
 1          A.      Chromebook --
 2          Q.      -- Chromebook at home and one
 3   Chromebook at school?
 4          A.      Uh-huh.
 5          Q.      Did that ultimately come to
 6   be?
 7          A.      Yes, yes.
 8          Q.      Let's look at page 23.
 9   There's a table on this page, the three
10   columns read, "Educators'
11   Proficiency/Identified Need, Ongoing
12   sustained high quality professional
13   development planned and Support."
14                  Do you see that?
15          A.      Yes, uh-huh.
16          Q.      The last item in this chart
17   or table says, "Integrating Social Media
18   District Wide."
19                  Do you see that?
20          A.      Yes, uh-huh.
21          Q.      This is listed as educators
22   proficiency/identified need?
23          A.      Uh-huh.
24          Q.      And this was for the 2022 to
25   2027 technology plan for the district,
```

CONFIDENTIAL

Page 117

1  correct?

2        A.      Uh-huh.

3        Q.      And to accomplish this goal,

4  IPS planned for technology coaches to

5  provide all interested teachers with

6  training in district policies and the safe

7  use of social media.

8              Do you see that?

9        A.      Yes, uh-huh, yes.

10       Q.      So at this time -- strike

11 that.

12             So at this time, the

13 district was -- had identified a need to

14 integrate social media across the district,

15 correct?

16       A.      Yes, uh-huh.

17       Q.      And in order to do that, was

18 utilizing technology coaches to assist

19 teachers in understanding the safe use of

20 social media, correct?

21       A.      Yes.

22       Q.      Has IPS met this goal of

23 integrating social media district-wide?

24       A.      We do use social media, so

25 when you say, "met the goal," do we use

CONFIDENTIAL

Page 118

1   social media, do we make sure that our

2   teachers understand the safe uses of it,

3   and the ones that are in keeping with our

4   ECOS, yes, I would say yes, but it's very

5   monitored.

6               You have to have -- in order

7   for you, well, there are two uses.  We have

8   technology being used to advertise if we

9   have a game or if we have a fundraiser,

10  right, and that is, we know when you're

11  using it and what you're using it for.

12              And then we have within the

13  classroom, you have to lesson plan and you

14  have to give the rationale as to why you

15  may want to use something.  The only social

16  media site that I am aware of that would be

17  used by a teacher would be a clip of

18  something maybe on YouTube.  It would be a

19  clip of something, but it has to be vetted.

20  It has to be approved.  And it's not

21  something that you can just use randomly.

22  So you have to submit your lesson plans.

23  The supervisor or building administrator

24  who is responsible for you using that site

25  would have to really understand that

CONFIDENTIAL

Page 119

1    there's a connection and that there's no

2    other modality that you can use to execute

3    that particular lesson plan.  So it is used

4    very sparingly and rarely and if it's used,

5    it can't be something that is more than

6    somewhat of a snippet.  It can't be used

7    as, like, the lesson for that day or

8    something.

9         Q.       Nevertheless, the district's

10   goal was to integrate social media,

11   correct?

12                 MR. INNES:  Objection to form.

13           Asked and answered.

14                 THE WITNESS:  I think what we

15           said here was the safe use of

16           social media.  So our goal was not

17           to use social media as much as to

18           realize that it is a part of our

19           reality and we already know the

20           damages that it has done, so we

21           want to make sure that we, even

22           with our staff, we want to make

23           sure that within the school day, if

24           they're going to use it, that it's

25           used responsibly.

CONFIDENTIAL

Page 120

1  BY MR. KARP:

2       Q.      So there is a safe and

3  responsible way to use social media and the

4  district wanted to train and educate

5  teachers on how to do that?

6       A.      Yes.

7       Q.      To your knowledge, can

8  Irvington Public Schools students access

9  social media on the district's Wi-Fi

10 network?

11      A.      I -- well, let me answer that

12 in two parts.  With our GoGuardian, they

13 should not, but do we have students who are

14 able to bypass our safety measures, yes.

15      Q.      Does GoGuardian block access

16 to social media platforms?

17      A.      That is its purpose.

18      Q.      Does GoGuardian block access

19 to Facebook?

20      A.      I want to say yes, because

21 it's a social media site.  Has students

22 been able to bypass it?  Yes.  Have they

23 been able to bypass our safety measures?

24 Yes.  Those students who are intent on

25 getting on, yes, so.

Page 121

```
 1         Q.      And just to make sure that
 2    you're -- I appreciate your answer, I just
 3    want to make sure you're focused on my
 4    question --
 5         A.      I am.
 6         Q.      -- of what GoGuardian
 7    specifically is set --
 8         A.      Yes.
 9         Q.      -- to do --
10         A.      Uh-huh.
11         Q.      -- and the setting for
12    GoGuardian is to block Facebook; is that
13    accurate?
14               MR. INNES:  Objection to form.
15               THE WITNESS:  It is meant to
16           block sites our scholars shouldn't
17           go on.  That's what the intent is.
18           I don't believe that -- I can't
19           speak for the GoGuardian company,
20           but for our purposes, the reason
21           why we got it was to discourage our
22           scholars from getting on sites that
23           they shouldn't get on.  Was it
24           specific to Facebook?  I don't
25           believe that when we bought it we
```

CONFIDENTIAL

                                              Page 122

 1              said we don't want them to get on
 2              this site versus that site.  We
 3              don't want them to get on any sites
 4              during the school day that they
 5              shouldn't get on.  That's the
 6              point.  That was the purpose.
 7   BY MR. KARP:
 8        Q.     And I'm going to ask it a
 9   little bit differently just to make sure
10   we're on the same page.
11        A.     Okay.
12        Q.     I don't want to make this
13   seem redundant?
14        A.     Uh-huh.
15        Q.     Putting aside students are
16   able to bypass GoGuardian, does the
17   district use GoGuardian to block access to
18   Facebook?
19                 MR. INNES:  Objection.  Asked
20          and answered.
21                 THE WITNESS:  I believe so,
22          yes.  I believe so.
23   BY MR. KARP:
24        Q.     And do you know for how long
25   that has been the case?

Page 123

1          A.      That, I don't know.  It's --
2     I don't want to guess, but we -- we saw
3     issues as they were arising and that was
4     one of the solutions.
5          Q.      Putting aside whether
6     students are able to bypass GoGuardian,
7     does the district use GoGuardian to block
8     student access to Instagram?
9          A.      I believe so.
10          Q.      Putting aside whether
11     students are able to bypass GoGuardian,
12     does the district use GoGuardian to block
13     student access to SnapChat?
14          A.      I believe so.
15          Q.      And would these be the same
16     answers for TikTok?
17          A.      Yes, that would be the same
18     answer.
19          Q.      And what about YouTube?
20               MR. INNES:  Objection.  Asked
21          and answered.
22               THE WITNESS:  I believe so.
23     BY MR. KARP:
24          Q.      Okay.  So it's your
25     understanding that, putting aside whether

CONFIDENTIAL

Page 124

1    or not students are bypassing GoGuardian,

2    the district uses GoGuardian to block their

3    access to YouTube?

4                MR. INNES:  Objection.  Asked

5           and answered.

6                THE WITNESS:  I believe so.

7           There may be other things that we

8           use to try to prohibit getting on

9           unauthorized sites, during --

10          especially during instructional

11          time, but I know that's one of

12          those tools.

13   BY MR. KARP:

14       Q.    And would Mr. Amberg be

15   someone who is knowledgeable about

16   GoGuardian and whether students can access

17   different social media platforms in light

18   of GoGuardian?

19                MR. INNES:  Objection.

20          Compound.

21                THE WITNESS:  Yes.

22   BY MR. KARP:

23       Q.    Sitting here today, do you

24   know what percentage of students at

25   Irvington Public Schools have Facebook

Page 125

1    accounts?

2          A.     No.

3          Q.     Do you know what percentage

4    of students at IPS have Instagram accounts?

5          A.     No.

6          Q.     Do you know what percentage

7    of students at IPS have SnapChat accounts?

8          A.     No.

9          Q.     Do you know what percentage

10   of students at IPS have TikTok accounts?

11         A.     No.

12         Q.     And do you know what

13   percentage of students at IPS have YouTube

14   accounts?

15         A.     No, I don't.

16                MR. INNES:  I'll just make a

17            brief statement for the record,

18            I've said in prior depositions,

19            we've sent letters, we've sent

20            document requests, we've sent

21            interrogatories, I believe, asking

22            for that exact data, that I believe

23            your clients would all have and you

24            have refused to produce it.  I

25            renew my request for you to produce

CONFIDENTIAL

Page 126

1           that data immediately.
2                 MR. KARP:  Thank you, and I'm
3           simply asking if she knows and --
4                 MR. INNES:  I understand what
5           you're asking and I think you're
6           asking because you think it's
7           relevant, right, and you've told us
8           it's not relevant, I believe.
9                 MR. KARP:  You set out your
10          position on the record.
11                MR. INNES:  I'm just
12          responding to how you responded to
13          my position.
14     BY MR. KARP:
15          Q.    Do you know what percentage
16     of time Irvington Public School students
17     spends on their cell phones using social
18     media versus texting or playing video
19     games?
20          A.    No, but I would say that it
21     is significantly greater and while I don't
22     know how many, for example, how many of our
23     scholars have Instagram accounts, I know
24     that they have the ability to create
25     Instagram accounts at will and that they do

CONFIDENTIAL

Page 127

1  and they create sites where they can post

2  fights or any other content so that people

3  can see it, so they can like it, and most

4  importantly, especially as it pertains to

5  fights, so they can share it and that they

6  become Instagram famous.  That is -- that

7  happens on a daily basis almost, if I were

8  to venture a guess.  I don't know if they

9  go back to their other sites, I don't know

10  if it's just they create new ones, but they

11  create them constantly to be able to post,

12  like, and share and become Instagram --

13  they call it Instagram famous, the kids

14  say, so, yeah.

15          Q.    But your answer to my

16  question was no, you don't know what

17  percentage they spend on -- the amount of

18  time --

19          A.    One versus the other.

20          Q.    -- on social media versus

21  texting, doing video games, or something

22  else on their phones?

23          A.    No, I believe some -- with

24  the exception of the games, I think they do

25  those things almost simultaneously.  And I

Page 128

 1  think that a lot of our scholars,
 2  especially our secondary scholars, from the
 3  time that they wake up in the morning, it
 4  doesn't stop when they walk through the
 5  door and through the evening, they're on
 6  social media platforms.
 7        Q.      Let's take a look at another
 8  document.  This is tab 8A, it's a little
 9  bit long, so I am providing you with a full
10  copy and also an excerpt just to help you
11  focus on the pages we'll be discussing.
12  We'll mark the full copy as the exhibit.
13                  MR. INNES:  Seven?
14                  MR. KARP:  Yes, Exhibit 7.
15                   - - - - -
16                  (IPS Student Code of Conduct
17             Bates BW__Irvington00223664 to
18             00223744 marked Vauss Exhibit 7
19             for identification.)
20                   - - - - -
21  BY MR. KARP:
22        Q.      Dr. Vauss, this is the
23  Student Code of Conduct for Irvington
24  Public Schools for the 2023-2024 school
25  year.

CONFIDENTIAL

Page 129

1                  Do you see that?

2          A.     Uh-huh.

3          Q.     Are you familiar with this

4    document?

5          A.     Yes.

6          Q.     Did you help put it together?

7          A.     I looked over it, but my

8    technology person, Mr. Amberg, would have

9    put this together and although -- I'm

10   looking at just this --

11         Q.     I'm sorry, I'm talking --

12         A.     Sorry, sorry, the whole

13   document --

14         Q.     -- about the full Student

15   Code of Conduct?

16         A.     I thought you were talking

17   about just -- okay, yes.

18         Q.     So just to reask my question,

19   did you help put together this Student Code

20   of Conduct?

21         A.     Yes.

22         Q.     What was your involvement in

23   putting this together?

24         A.     So various stakeholders

25   contributed and then I just, I read through

Page 130

1    it and asked questions or did some, maybe
2    some editing maybe.
3           Q.    Did you draft any sections of
4    the Student Code of Conduct?
5           A.    So the district goals would
6    have been mine exclusively.
7           Q.    On page 4?
8           A.    Page 4, yes.
9           Q.    Into page 5?
10          A.    Yes, uh-huh.
11          Q.    Any other sections do you
12   recall writing?
13          A.    Give me -- can I look through
14   it?
15          Q.    Sure.
16          A.    Okay.  Delayed opening,
17   page 7.  School hours.  I would have input
18   on page 12, the goals of the Student Code
19   of Conduct.  Rights and responsibilities,
20   so kind of are things that have, you know,
21   things that we believe in, but I wouldn't
22   say that I crafted that, I would have just
23   continued some of it, uh-huh.
24          Q.    Sure.  And I don't want to
25   cut you off, Dr. Vauss.  I'm only going to

Page 131

1  ask about a couple of sections here.

2        A.    Okay.

3        Q.    Is it --

4              MR. INNES:  So are you going

5        to withdraw the question and ask --

6              MR. KARP:  Sure, I will

7        withdraw the question.

8              Dr. Vauss, you have drafted

9        and contributed to some sections

10       of the Student Code of Conduct,

11       correct?

12             THE WITNESS:  Yes.

13  BY MR. KARP:

14       Q.    I'm focused primarily on the

15  technology section which appears on

16  page 27, if you can turn there with me.

17       A.    Yes.

18       Q.    Did you contribute to the use

19  of technology section that appears on

20  page 27?

21       A.    I would have approved its

22  inclusion, but I would not have drafted

23  this.

24       Q.    Okay.  Do you recall

25  reviewing this section of the Student Code

CONFIDENTIAL

Page 132

1  of Conduct before it was finalized?

2          A.      Specifically this section,

3  no, but, yes, I would say I looked over the

4  code of conduct.

5          Q.      And this part of the Student

6  Code of Conduct applies to the use of cell

7  phones on IPS premises; is that fair?

8          A.      Which, the overall policy?  I

9  think it's -- it's saying our computer

10 network, whether it's the cell phone or if

11 it's a Chromebook or any of that, we don't

12 necessarily want our scholars to be

13 accessing those.

14         Q.      Sure.  I'll focus you at the

15 top of the page on "Guidelines for the use

16 of technology."

17                 Do you see that?

18         A.      Uh-huh.

19         Q.      And if you look partway down

20 that paragraph, there's a statement that

21 reads, "These guidelines cover the use of

22 computers, scanners, digital cameras, video

23 projectors, video cameras, cell phones,

24 Nextel devices, PDA devices, and wireless

25 email devices and define the acceptable use

CONFIDENTIAL

Page 133

1    of such technology by students."

2                    Do you see that?

3         A.     Yes.

4         Q.     So these guidelines refer to

5    cell phones and how they can or cannot be

6    used on IPS grounds; is that fair?

7         A.     Yes, I think so.

8         Q.     Okay.  Can IPS students bring

9    cell phones to school?

10        A.     Yes.

11        Q.     Are they permitted to have

12   their cell phones out during the school

13   day?

14        A.     Yes.

15        Q.     Under what circumstances?

16        A.     So I've had the occasion to

17   visit -- I'm a mathematics -- I mean,

18   amongst other things, but I love

19   mathematics, so I'll visit a math class and

20   not so much now, but maybe there has been a

21   time where they use their cell phones as a

22   calculator, you know.  And even the

23   calculators on phones have really, you

24   know, advanced and so I've gone into

25   classrooms and seen cell phones being used

Page 134

1    as calculators.

2         Q.    Okay.  So cell phones can be

3    used in class as part of instruction; is

4    that right?

5              MR. INNES:  Objection to form.

6              THE WITNESS:  Yeah.  Yeah --

7         yes, I guess I can answer.

8    BY MR. KARP:

9         Q.    Can students use their cell

10   phones for other purposes during the school

11   day?

12        A.    You mean permissive -- is it

13   permitted?

14        Q.    Yes, is it permitted?

15        A.    Yes, yes.

16        Q.    What other purposes can

17   they -- or strike that.

18              When else can students use

19   their cell phones during the school day?

20        A.    Like lunchtime, uh-huh.

21        Q.    Before school starts can, if

22   a student is walking around the hallways,

23   can he be on his cell phone?

24        A.    They shouldn't --

25              MR. INNES:  Objection.

CONFIDENTIAL

Page 135

1          THE WITNESS:  Sorry.

2          MR. INNES:  No, that's okay.

3          THE WITNESS:  No, they

4     shouldn't, they shouldn't.  A lot

5     of things that we hear are students

6     who will try to say I need to call

7     my parents, right, and we encourage

8     them to go to the main office, even

9     if the use of their cell phone has

10     to be done in front of an

11     administrator to call their

12     parents, if they don't -- a lot of

13     students don't know their parents'

14     phone numbers, they have it in the

15     cell phone.  So in order -- if it's

16     an emergency situation, and it has

17     to be considered that by the

18     administrator that they have to

19     call, they have to call in front of

20     an adult.  Because we discourage

21     them using the cell phone during

22     any time that's considered their

23     instructional time.  And when they

24     walk into the building, if you're

25     talking about the high school or

CONFIDENTIAL

```
                                          Page 136
 1              middle school, it's instruction
 2              more than likely has started.
 3   BY MR. KARP:
 4         Q.      Are students required to
 5   store their cell phones in a locker or
 6   other location during the school day?
 7                   MR. INNES:  Objection to form.
 8                   THE WITNESS:  They're not --
 9              not in a locked lock or bag or
10              anything, but they are asked to put
11              it away unless like the example I
12              gave of a scholar using it as a
13              calculator and that's after it has
14              been approved by the teacher.
15   BY MR. KARP:
16         Q.      And your understanding is
17   that students are permitted to use their
18   cell phones during their lunch periods?
19         A.      Yes.
20         Q.      If you look down in the
21   policy, there is a section that starts,
22   "students shall not."
23         A.      Yes.
24         Q.      And then there is a bulleted
25   list.
```

CONFIDENTIAL

Page 137

1              Do you see that?

2        A.      Yes.

3        Q.      The second item indicated

4   here is, "Students shall not access social

5   networking sites or chat lines or enter

6   chat rooms that are not under a class

7   activity under the supervision of a teacher

8   or other school personnel."

9              Do you see that?

10       A.      Yes.

11       Q.      And is that your

12  understanding of the district's policy?

13       A.      That that bullet is part of

14  our -- yes, uh-huh.

15       Q.      Would Facebook be included in

16  one of these social networking sites that

17  is not to be visited pursuant to this part

18  of the technology policy -- excuse me,

19  pursuant to this part of the Student Code

20  of Conduct?

21       A.      Yes, I would say -- I would

22  say so unless it was under the supervision

23  of, as according to the bullet, unless it

24  was under the supervision of a teacher or a

25  school personnel.

CONFIDENTIAL

Page 138

1          Q.      Is Instagram included in this

2     section as well?

3          A.      I mean, because it doesn't

4     specify a particular social network site, I

5     would say yes.  However, I have -- my

6     experience, I have never seen those sites

7     used as the instructional tool.  What I

8     have seen are sites being put up where,

9     whether your choice is A, B, C, or D, like

10    a random selector type of device being used

11    in that way, but not -- and not that I have

12    been in every single classroom every single

13    day, I've probably been in every single

14    classroom, but I've never seen those sites

15    used for educational purposes.

16         Q.      And I understand that.  The

17    question I'm asking is simply whether this

18    policy is including Instagram when it says,

19    "social networking sites"?

20         A.      Yes, I believe so.

21         Q.      And to go back to the first

22    platform I asked, Facebook would also be

23    included?

24         A.      Yes.

25         Q.      How about SnapChat?

CONFIDENTIAL

Page 139

1          A.        I believe so, yes.

2          Q.        And would you say the same

3    for TikTok?

4          A.        Yes.

5          Q.        And how about YouTube?

6          A.        Yes.

7          Q.        I believe you were telling us

8    a little bit about this already, but do

9    Irvington Public School teachers

10   incorporate social media into their lesson

11   plans?

12                    MR. INNES:  Objection to form.

13                    THE WITNESS:  Yes.  I can only

14              speak to YouTube as far as, like,

15              clips and I would say other social

16              networking sites, not so much

17              teachers, but sites that are

18              connected with Irvington High

19              School.  Blue Knights, I think

20              there may be a site where they post

21              about activities, whether it's the

22              JROTC is having a meet or if

23              there's a track meet or if there's

24              a football game or something of

25              that nature.

                                          Page 140

1   BY MR. KARP:
2        Q.      The student code -- you look
3   down at the last bullet here, the Student
4   Code of Conduct also says that, "Students
5   shall not use email or text messaging or
6   web postings on social networking sites to
7   promote the annoyance, harassment,
8   intimidation, bullying, or attack of
9   others."
10                 Do you see that?
11       A.      Yes.
12       Q.      This policy acknowledges that
13  annoyance, harassment, intimidation,
14  bullying, and attacking others could
15  potentially occur on social media
16  platforms?
17       A.      Yes.
18       Q.      It also acknowledges that
19  they could potentially occur over email?
20       A.      Yes.
21       Q.      And that they could
22  potentially occur over text?
23       A.      Yes.
24       Q.      Let's look at page 31 of the
25  Student Code of Conduct.  This section is

Page 141

1   called, "Prohibited Items."

2                 Do you see that?

3        A.    Yes, uh-huh.

4        Q.    Did you draft this section of

5   the Student Code of Conduct?

6        A.    I did not.

7        Q.    Did you review it before it

8   was finalized?

9        A.    Yes.

10       Q.    Cell phones are identified as

11  a prohibited item, correct?

12       A.    Yes.

13       Q.    And the policy states that

14  cell phones and -- or strike that.

15                 The policy states, "Such

16  items have no place in the academic

17  environment."

18                 Do you see that?

19       A.    No, where, which paragraph

20  are we looking at?

21       Q.    Sure.  I'll just read from

22  the beginning.

23       A.    Okay.

24       Q.    "Bringing cigarettes, any

25  other tobacco products, lighters, radios,

CONFIDENTIAL

Page 142

1  tape recorders, iPod, electronic music

2  devices, game systems, MP3 players,

3  cellular phones, walkie-talkies, cameras,

4  skateboards, scooters, musical instruments

5  (other than used by band members), laser

6  pointers, and any other dangerous illegal

7  or disturbing articles to school is

8  strictly prohibited.  Such items have no

9  place in the academic environment."

10            Do you see that?

11       A.    Uh-huh.

12       Q.    So according to Irvington

13  Public Schools, cell phones have no place

14  in the academic environment, correct?

15       A.    Yes, that's what it says, but

16  it also says, "We understand that cell

17  phones are prevalent in today's society."

18  So while we really were strong wording and

19  did not want and we do not want, if

20  possible, students to bring cell phones,

21  they are going to bring them.  And so, you

22  know, because of that, that's why we say

23  what we say after that.

24       Q.    I mean, you're referring to

25  the passage at the very end which reads,

Page 143

1    "We understand that cell phones are

2    prevalent in today's society; if students

3    bring cell phones to school, they should be

4    concealed and turned off."

5          A.      Uh-huh.

6          Q.      Do you see that?

7          A.      Uh-huh.

8          Q.      And is that the district

9    policy?

10         A.      We don't, no, we don't have

11   that in our policy, but as far as what we

12   think is the ideal situation, that's what

13   we presented here.

14         Q.      "If any staff member sees or

15   hears a cell phone the phone will

16   immediately be taken away and given to an

17   administrator.  Parent may be required to

18   pick it up."

19                 Do you see that?

20         A.      Yes, uh-huh.

21         Q.      During your time at Irvington

22   Public Schools, has the district ever

23   banned cell phones from school property

24   entirely?

25                 MR. INNES:  Objection to form.

CONFIDENTIAL

Page 144

```
 1                   THE  WITNESS:   No.
 2    BY MR.  KARP:
 3          Q.      Why not?
 4          A.        Because  cell  phones  have
 5    been -- have  become  integrated  into  what
 6    our  parents  use  to  stay  in  touch  and
 7    contact  with  their  scholars.   It  is  what
 8    our  staff  use  to  stay  in  contact  with  their
 9    children.   It  is  a  part  of  every  community
10    that  probably  is  in  New  Jersey  and  to,  you
11    know,  I  know  people  have  their  own  policies
12    and  we  have  things  that  are,  you  know,  as  I
13    state  that  may,  you  know,  become  state
14    policies,  but  cell  phones  are  a  tool  that
15    is  a  safety  tool  as  well  and  so  while  --
16    and  I  would  say  primarily  when  we  talk
17    about  not  having  those  things,  we  speak,
18    even  though  we  didn't  specify,  we  speak
19    more  to  the  younger  ones,  even  though  they
20    still  have  them,  but  it  is  not  --  it  would
21    not  be  a  popular  thing  to  ban  all  cell
22    phones.   Especially  if  a  child  were  to  be
23    walking  down  the  street,  something
24    happened,  and  they  needed  to  call  911.
25    That  has  become  such  a  part  of  our  culture
```

CONFIDENTIAL

Page 145

1  right now that it's kind of impossible to

2  ban it entirely.

3          Q.      As superintendent of

4  Irvington Public Schools, could you ban

5  cell phones outright if you wanted to?

6                  MR. INNES:  Objection to form.

7                  THE WITNESS:  I could not ban

8          it necessarily as an ongoing thing,

9          that would be something that I

10         would want the Board of Education

11         to perhaps vote on.

12 BY MR. KARP:

13         Q.      You could propose that idea

14 to the board if you wanted to?

15         A.      Yes.

16                 MR. KARP:  Okay.  I believe we

17         have reached our lunch break.  It's

18         about 12:30.  So let's go off the

19         record.

20                 THE VIDEOGRAPHER:  The time

21         right now is 12:33 p.m.  We are off

22         the record.

23                 - - - - -

24     (A recess was taken at this time.)

25                 - - - - -

```
                                         Page 146
 1              THE VIDEOGRAPHER:  The time
 2           right now is 1:23 p.m.  We are back
 3           on the record.
 4  BY MR. KARP:
 5        Q.     Dr. Vauss, welcome back from
 6  lunch.
 7        A.     Thank you.
 8        Q.     Does Irvington Public Schools
 9  have any social media accounts?
10        A.     Yes.
11        Q.     Which ones?
12        A.     We have, through the high
13  school, I know that we have, I think, it's
14  called Irvington Blue Knights.  We might
15  have others, but I know of that one
16  specifically.
17        Q.     Let's start at the
18  district-wide level, does the district
19  itself as opposed to individual schools
20  have any social media accounts?
21        A.     No.
22        Q.     You mentioned the Irvington
23  High School Blue Knights?
24        A.     I believe that's what it's
25  called.
```

CONFIDENTIAL

Page 147

1          Q.      And that is the name of the
2    high school's social media account?
3          A.      I think it's, yeah, Irvington
4    Blue Knights.
5          Q.      Okay.  And do you know on
6    what platform that social media presence
7    operates?
8          A.      I believe Instagram.
9          Q.      And just to ask a better
10   question than that, your belief is that the
11   Irvington High School Blue Knights have an
12   Instagram account?
13         A.      Yes.
14         Q.      Any other social media
15   accounts like Facebook?
16         A.      I'm not entirely sure.
17         Q.      Do you know if Irvington High
18   School has a SnapChat account?
19         A.      I'm not sure.  I'm not aware
20   if they are.
21         Q.      Do you know if they have --
22   if Irvington High School has a TikTok
23   account?
24         A.      I don't believe so, but I'm
25   not sure.  I mean, you know, I don't know.

Page 148

1          Q.      Do you know if Irvington High
2     School has its own YouTube account?
3          A.      That, I'm not sure of as
4     well.  I'm not sure if you have to have an
5     account to be able to access the videos, so
6     if you do, then that would be a yes.  But
7     if you can just use it at random, I would
8     say that, you know, but I know you have to
9     get authorization to use the YouTube in
10    class or instruction.
11         Q.      Understood.  So you don't
12    know for sure whether they do or do not --
13    whether Irvington High School does or does
14    not have a YouTube account?
15         A.      I'm not sure.
16         Q.      Okay.  With respect to the
17    Irvington High School Instagram account,
18    are you the account holder for that?
19         A.      No.
20         Q.      Do you know who is?
21         A.      I want to -- I'm venturing a
22    guess, because I know of two different
23    instances where it existed, one was a
24    former administrator and she was, I guess,
25    in charge of making sure information got

CONFIDENTIAL

Page 149

1    out about happenings at the high school.
2    And I know that, I want to say someone from
3    JROTC, but the exact individual, I'm not
4    sure.
5         Q.      What was the acronym you just
6    used, JR --
7         A.      Yes, JROTC program.
8         Q.      Oh, JROTC.  Thank you.  Sorry
9    about that.
10              Do you have any involvement
11   in managing the Irvington High School
12   Instagram account?
13        A.      No.
14        Q.      Do you have review content
15   before it is posted to the Irvington High
16   School Instagram account?
17        A.      No.
18        Q.      Have you ever created content
19   that was later posted on the Irvington High
20   School Instagram account?
21        A.      No.  Unless if it was
22   something of, maybe I was in it, because if
23   I attended, like, a health fair and they
24   posted it on there or something, but not me
25   creating content and put it on that site,

CONFIDENTIAL

Page 150

1   no.

2          Q.     Sure.  And I'll ask a

3   clarifying question.  Have you ever created

4   content for the purpose of having it posted

5   on the Irvington High School Instagram

6   account?

7          A.     No.

8          Q.     Other than the Irvington High

9   School Instagram account, are you aware of

10  other school-level accounts, school-level

11  social media accounts for Irvington Public

12  Schools?

13         A.     I'm not aware.

14         Q.     So no elementary schools or

15  middle schools with social media accounts?

16              MR. INNES:  Objection.  Asked

17         and answered.

18              THE WITNESS:  I'm not aware, I

19         mean, I'm not.

20  BY MR. KARP:

21         Q.     Can Irvington Public School

22  student groups have social media accounts?

23         A.     They -- after, like, an

24  after-school club or something like that,

25  maybe, yes.

CONFIDENTIAL

Page 151

```
 1        Q.      For example, a soccer team or
 2   a chamber orchestra?
 3                   MR. INNES:  Objection to form.
 4                   THE WITNESS:  It would be
 5             something that would be managed by
 6             their sponsor or their teacher or
 7             their coach, then yes, they could.
 8   BY MR. KARP:
 9        Q.      Okay.  So Irvington Public
10   Schools allows student groups to form or to
11   create social media accounts within certain
12   parameters?
13                   MR. INNES:  Objection to form.
14                   THE WITNESS:  Yes.
15   BY MR. KARP:
16        Q.      Okay.  Are you aware of any
17   social media accounts that Irvington Public
18   Schools groups have?
19                   MR. INNES:  Objection to form.
20                   MR. KARP:  Do we need to go
21             off the record?
22                   MS. HENRY:  No.
23                   THE WITNESS:  I am not -- I
24             couldn't give you a list of ones,
25             the ones that I mentioned earlier
```

CONFIDENTIAL

                                        Page 152

1            that posts about information about
2            the happenings at the school.  I
3            can speak to that that one, you
4            know, that I've seen that.  Would
5            there be ones that might maybe
6            highlight some of our athletic
7            programs, I think maybe there are,
8            but I couldn't with a
9            hundred percent, you know, you
10           know, certify that they have.
11   BY MR. KARP:
12           Q.    Understood.  You said that
13   there is a -- that there is an account that
14   is used to -- to share information about
15   upcoming events, is that like --
16           A.    Like, Irvington High School,
17   Irvington Blue Knights account.
18           Q.    Aside from that account, are
19   you aware of any extracurricular student
20   groups or clubs within the district that
21   have social media accounts?
22           A.    I am not aware.  They could,
23   but I'm not sure.
24           Q.    And that would include
25   Facebook, Instagram, SnapChat, TikTok, and

CONFIDENTIAL

Page 153

1   YouTube?

2           A.      That they post on those

3   platforms, those clubs, yes, I guess that

4   would be, yes, that would be where they

5   would post, if they exist, if those sites

6   exist.

7           Q.      Let me just clarify the

8   question to make sure we're on the same

9   page.  You're not aware of any student

10  group in Irvington Public Schools that has

11  its own Facebook account?

12          A.      I am not aware.

13          Q.      You are not aware of any

14  student group in Irvington Public Schools

15  has its own Instagram account?

16          A.      I'm not aware other than the

17  one that I mentioned.

18          Q.      Okay.  And the Blue Knights

19  is a -- is the mascot of Irvington High

20  School?

21          A.      Yes, it is.

22          Q.      Okay.  And that account is

23  dedicated to promoting sporting or the

24  athletics program --

25          A.      It's a myriad --

Page 154

1        Q.      -- at Irvington High School?
2        A.      -- of good things that are
3    going on at the high school.
4        Q.      Okay.
5        A.      So it could be JROTC.  It
6    could be athletics.  It could be that they,
7    you know, students winning scholarships.
8    It could be a myriad of things.
9        Q.      Okay.  Are you aware of
10   student groups at Irvington Public Schools
11   that have a SnapChat account?
12       A.      I am not.
13       Q.      Are you aware of any student
14   group at Irvington Public Schools that has
15   a TikTok account?
16       A.      I am not aware.
17       Q.      And are you aware of any
18   student group at Irvington Public Schools
19   that has a YouTube account?
20       A.      I am not aware.
21       Q.      Going back to the Blue
22   Knights Instagram account, do you know when
23   that was first created?
24       A.      The first time I heard of it
25   was probably back in maybe 2019 maybe, 2018

CONFIDENTIAL

Page 155

1   maybe.

2          Q.      Do you recall if you were

3   superintendent at the time that you first

4   heard about the Blue Knights Instagram

5   account?

6          A.      No, I was not.

7          Q.      Okay.  You were in your role

8   as a principal?

9          A.      No.

10                 MR. INNES:  Objection to form.

11                 THE WITNESS:  Oh, sorry, no.

12  BY MR. KARP:

13         Q.      Do you recall what role you

14  were in at the time that you heard about

15  the Instagram account?

16         A.      Yes.

17         Q.      And what was that?

18         A.      Assistant super -- assistant

19  superintendent for curriculum and

20  instruction --

21         Q.      I skipped a period of time in

22  your résumé, so you recall being assistant

23  superintendent at the time that you learned

24  that that account existed?

25         A.      Yes.

Page 156

1          Q.       Did you have any role in
2    approving the creation of that account?
3          A.       No.
4          Q.       Do you know who did?
5          A.       That would -- approval, who
6    was aware, intimately probably aware or to
7    a degree aware, would probably be Dr. Neely
8    Hackett who was the superintendent, that
9    may have been something to her, maybe Mr.
10   Amberg, because he was the technology
11   director and he would -- there would be a
12   part that he would have to possibly play in
13   that to make sure that it was in compliance
14   with our use of, you know, technology.
15         Q.       Do you know anything about --
16   well, strike that.
17                  Do you know if there was an
18   approval process for the creation of that
19   Instagram account for Irvington High
20   School?
21         A.       I think there may have been a
22   verbal okay by the superintendent, but
23   there wasn't approval, a board resolution
24   or, you know, but I wouldn't know how it
25   exactly transpired --

CONFIDENTIAL

Page 157

1          Q.     Sure?

2          A.     -- because that would have

3   been between the superintendent and the

4   administration at the high school at the

5   time.

6          Q.     And when you say you believe

7   it might have been a verbal okay --

8          A.     Uh-huh.

9          Q.     -- what is the basis for that

10  belief?

11         A.     Because I would just imagine

12  that -- I mean, it could have been in

13  writing, so I guess I shouldn't make that

14  assumption, but it could have been maybe a

15  request and then a conversation and then a

16  rationale through a conversation as to how

17  this would be helpful.

18                There could be some email or

19  something somewhere where there was

20  approval that was gained.  I don't want to

21  say that it wasn't.  But I would think that

22  as long as, you know, it was explained that

23  you can't do this on here, you can't do

24  that, you can't let students, you know, be

25  the one who have -- who has access to it.

Page 158

1    I would think it could be a verbal

2    approval, but I don't know.

3            Q.      Sitting here today, do you

4    know who approves the content that is

5    posted on the Irvington High School Blue

6    Knights Instagram account?

7            A.      Well, the owner of it would

8    be the one who would be able to control

9    that content.

10           Q.      And you do not presently know

11   who the owner is --

12           A.      I do not.

13           Q.      -- is that what you testified

14   to?

15           A.      Yes.

16           Q.      Can you tell me generally in

17   what ways Irvington Public Schools uses

18   social media?

19                   MR. INNES:  Objection to form.

20                   THE WITNESS:  So as I was

21              explaining with a site like

22              YouTube, it is used to further

23              engage the students maybe in a

24              country that they've never been in,

25              so they may use YouTube to show a

CONFIDENTIAL

Page 159

1    snippet of what it looks like in

2    this country, let's say in Italy,

3    for example, or Japan, but it's

4    something that would have to be

5    tied to curriculum.

6          So if we were doing a

7    lesson, say, a world history

8    lesson on the Shogun or the Edo

9    period of Japan, that would be

10   something that would be very,

11   pardon a pun, foreign to the

12   students.  So showing them a

13   snippet of a time period would be

14   something that would make it real

15   to the students and that would be

16   acceptable.

17          But to show, just show a

18   video and just watch endlessly

19   and it doesn't really connect to

20   the content that's trying to be

21   taught would be pointless and it

22   would start to turn into

23   something else.  You know, it

24   would be amusement, if you will.

25

CONFIDENTIAL

```
                                        Page 160
 1   BY MR. KARP:
 2        Q.     Does the district use social
 3   media for any other purposes?
 4              MR. INNES:  Objection to form.
 5              THE WITNESS:  So to promote
 6         events that are happening
 7         throughout the district.  And
 8         actually, as we speak, I think
 9         early childhood, for example, comes
10         to mind.  So they may have a social
11         media site, now that I'm thinking
12         about it, they may have a social
13         media site and they let parents
14         know when they can come and
15         register their child for pre-K or
16         if they have some kind of health
17         and wellness fair.  That would
18         probably be the extent of that.
19         Individual schools, I'm pretty
20         positive they don't, other than the
21         high school.
22   BY MR. KARP:
23        Q.     Do you know --
24        A.     I'm not a hundred percent
25   sure.
```

CONFIDENTIAL

Page 161

1          Q.     Do you know who owns the --
2     who the account holder is for the early
3     childhood account that you just referred
4     to?
5          A.     I'm not sure if it's one of
6     our technology people or if it's the
7     director of early childhood.  I'm not sure.
8          Q.     Who is the director of early
9     childhood?
10          A.     Her name is Tawana Moreland.
11          Q.     Fair to say Irvington Public
12     Schools uses social media to share
13     information with the Irvington community?
14                    MR. INNES:  Objection to form.
15                    THE WITNESS:  Yes.
16     BY MR. KARP:
17          Q.     Let's pull up tab 27, which
18     is a very short video that I suspect you
19     will recognize.
20          A.     Uh-huh.
21                    - - - - -
22          (Whereupon, a video clip was played.)
23                    - - - - -
24                    MR. KARP:  I think we've lost
25          audio.

CONFIDENTIAL

Page 162

1           THE EXHIBIT TECH:  The audio
2      is still going, which is the
3      background noise.  I'm not sure why
4      we don't hear her speaking.  This
5      is the video file I received
6      though.  I can pause it, sorry.
7           MR. KARP:  Do you mind
8      pausing?
9           THE EXHIBIT TECH:  I know
10     there was a link I received in an
11     email.  I can go to that YouTube
12     link and play it from there.
13          MR. KARP:  Yes, or -- that
14     works.
15               - - - - -
16     (Whereupon, a video clip was played.)
17               - - - - -
18          THE EXHIBIT TECH:  It's the
19     actual video itself, because you
20     can hear the background music
21     playing, so.
22          MR. KARP:  It's odd, because
23     I've watched the video on that link
24     and it plays just fine, so I'm not
25     sure what the -- what's causing

CONFIDENTIAL

Page 163

1          it --
2                  THE EXHIBIT TECH:  Do you want
3          to go off the record and
4          double-check?
5                  MR. KARP:  Can you just
6          double-check that?
7                  MR. INNES:  I mean.  I don't
8          think we need to go off the record
9          for this.  If you guys want to fix
10         it in the back, we can go
11         forward --
12                 MR. KARP:  I think we're going
13         to go off the record.  It's a tech
14         issue, it will take a minute.
15                 MR. INNES:  I'm objecting to
16         going off the record, but if you
17         need it, go for it.
18                 MR. KARP:  Yeah, we do.  Let's
19         go off the record.
20                 THE VIDEOGRAPHER:  The time
21         right now is 1:41 p.m.  We are off
22         the record.
23                 - - - - -
24     (A recess was taken at this time.)
25                 - - - - -

```
                                       Page 164

 1              THE VIDEOGRAPHER:  The time
 2          right now is 1:46 p.m.  We are back
 3          on the record.
 4   BY MR. KARP:
 5          Q.    Dr. Vauss, thank you for
 6   bearing with us on some technical issues.
 7   We are going to view tab 27 right now.
 8                    - - - - -
 9              (Whereupon, a video clip was played.)
10                    - - - - -
11   BY MR. KARP:
12          Q.    Dr. Vauss, do you recognize
13   that video?
14          A.    I do.
15          Q.    Do you recognize the
16   person --
17          A.    I do.
18          Q.    -- in that video?  I'll
19   represent on the Irvington website that
20   video is called, "2020-2021 School
21   Reopening."
22          A.    Yes.
23          Q.    Does that sound familiar?
24          A.    Uh-huh.
25          Q.    Do you recall making this
```

CONFIDENTIAL

Page 165

1    video?

2          A.     Yes.

3          Q.     And this was in the wake of

4    the -- or strike that.

5                 This was during a time when

6    Irvington Public Schools was transitioning

7    to in-person instruction?

8          A.     No.

9          Q.     No, it was not?

10         A.     No.

11         Q.     At what point in time did you

12   make this video?

13         A.     I made it in September of

14   2020.  We still were physically, we were

15   closed, the physical building.

16         Q.     Okay.  And what was the

17   purpose of creating this video?

18         A.     It was to inform parents,

19   one, that while we thank them and continue

20   to partner with them as we go through -- as

21   we went through those unprecedented times,

22   but to inform them that the physical

23   building was not going to be open, that we

24   were going to continue to learn virtually.

25         Q.     And one way that you were

CONFIDENTIAL

Page 166

1    able to share information with parents and

2    students and other members of the community

3    was to encourage them to stay abreast of

4    updates using social media, correct?

5            A.     Uh-huh.  Uh-huh.  Yes, I said

6    that, uh-huh.

7            Q.     And you recall encouraging

8    them to continuously view social media,

9    correct?

10           A.     Yeah.

11                  MR. INNES:  Objection to form.

12                  THE WITNESS:  Oh, sorry.  Yes.

13             So I know that people go on social

14             media and while we -- I think we

15             used, the videographer used YouTube

16             to post a video and to use it to

17             put on our website, I know people

18             use social media.  I wasn't

19             encouraging our scholars to use

20             social media during the school day

21             or when they're virtually learning,

22             but I was encouraging them to look,

23             because people put things on their

24             social media sites and information

25             about schools are closed, schools

CONFIDENTIAL

                                        Page 167

1              are open, but I would say, and I
2              did mention social media, that is
3              true, because I know that that is a
4              tool that people use.  But all of
5              our information, our main
6              information was found on our
7              website, so.
8    BY MR. KARP:
9         Q.    I understand.
10        A.    Okay.
11        Q.    Thank you.
12        A.    You're welcome.  Let's take a
13   look at tab ten.  For the record, we're
14   going to mark that video as Exhibit 8.
15              THE EXHIBIT TECH:  Eight.
16                 - - - - -
17              (Video Clip marked Vauss
18         Exhibit 8 for identification.)
19                 - - - - -
20   BY MR. KARP:
21        Q.    Tab ten will be Exhibit 9 for
22   the record, this is Bates starting
23   BW__Irvington00068487.
24              Dr. Vauss, this is the
25   "Irvington Public Schools:  Emergency

Page 168

1    Virtual or Remote Instruction Programs for

2    the 2023-2024 School Year."

3                    Do you see that?

4            A.    Yes.

5                    - - - - -

6                    (Irvington Public Schools:

7            Emergency Virtual or Remote

8            Instruction Programs for the

9            2023-2024 School Year Bates

10           BW__Irvington00068487 to 00068515

11           marked Vauss Exhibit 9 for

12           identification.)

13                    - - - - -

14   BY MR. KARP:

15           Q.    Your name is at the bottom of

16   the cover page --

17           A.    Uh-huh.

18           Q.    -- and you're identified as

19   the superintendent of schools?

20           A.    Yes.

21           Q.    Okay.  Have you seen this

22   document before?

23           A.    Yes.

24           Q.    What is this document?

25           A.    It is our state-mandated

CONFIDENTIAL

Page 169

1    emergency virtual remote instruction

2    program for the 2023-24 school year.

3            Q.    Okay.  Let's turn to page 15.

4    There's a section on page 15 titled,

5    "Virtual/Remote Professional Development."

6                    Do you see that?

7            A.    Yes, uh-huh.

8            Q.    To the best of your

9    recollection, what information is contained

10   in this section of the policy?

11                    MR. INNES:  Objection to form.

12                    THE WITNESS:  So can I look --

13   BY MR. KARP:

14           Q.    You can review, sure.

15           A.    -- closer.  So at just quick

16   glance for the first couple of pages, it

17   talks about our professional development

18   that we offer, it's going to be offered

19   virtually, remote professional development.

20   And the first talks about the restorative

21   support, professional learning offerings

22   for trauma, equity, diversity and implicit

23   bias, social emotional learning, inclusion,

24   and the appropriate use of digital and

25   online learning tools and systems.

CONFIDENTIAL

Page 170

1          Q.      Do you see on page 17,
2     there's a section called, "Parental
3     Services"?
4          A.      Uh-huh.
5          Q.      If I'm going to read from the
6     second bullet.
7          A.      Okay.
8          Q.      "Numerous and varied means
9     will be used to inform parents of District
10    information and assistance that are
11    available.  We will continue to keep
12    parents and the community informed by
13    utilizing social media platforms such as
14    YouTube, Twitter, and Facebook.  Teachers
15    should readily use Google Classroom to
16    include parents and use the options
17    available through Class Dojo and OnCourse
18    teacher web pages for communicating
19    directly with families."
20                 Do you see that?
21         A.      Yes, uh-huh.
22         Q.      At this point in time, did
23    Irvington Public Schools have a Facebook
24    account?
25         A.      I'm not aware that Irvington

Page 171

1    Public Schools has one.  I knew of Twitter.
2    I did know of YouTube, but even seeing that
3    we made the video through YouTube, as I was
4    saying earlier, if you have to have an
5    account to use it, then yes, then we do.  I
6    wasn't aware.  I do -- I've seen the
7    Twitter back in the day and Facebook, I'm
8    not sure.
9         Q.      When you say you saw the
10   Twitter back in the day, what do you mean
11   by that?
12        A.      Meaning that --
13            MR. INNES:  Objection to form.
14            THE WITNESS:  Oh, sorry.  So I
15        know that the Twitter account that
16        it was information placed on
17        Twitter of just for, I think, it
18        was like some athletic account, but
19        I wasn't superintendent at the time
20        when I saw that.  I think it was --
21        that may have been managed by our
22        superintendent or her designee, but
23        I know she was aware of it.
24   BY MR. KARP:
25        Q.      Does Irvington Public Schools

CONFIDENTIAL

Page 172

1    presently have a Twitter account?
2                    MR. INNES:  Objection to form.
3                    THE WITNESS:  I don't know
4             that there's an active one, I
5             couldn't say.  I mean, I imagine
6             unless they closed it, then it
7             would still be in existence, but
8             actively using it, I don't believe
9             so, not sanctioned, not by myself,
10            it wouldn't be sanctioned.
11   BY MR. KARP:
12           Q.    Okay.  Did you review this
13   policy before it was approved?
14           A.    I looked over it, yes.  Am I
15   intimately familiar with every nuance,
16   maybe I was at one point, but I would say,
17   no, because to be honest, I give certain
18   duties to my designees.  So did I look over
19   it, yes.  With iron, you know, razor focus
20   on certain things, no, not this particular
21   one.
22           Q.    Ultimately, you did approve
23   this?
24           A.    Yes.  Yes, that is correct.
25           Q.    You refer to delegating to

Page 173

1  your designees?

2          A.      Yes.

3          Q.      For this section on parental

4  services, do you know who that individual

5  would have been?

6          A.      It probably would be, it was

7  something to do with technology and

8  servicing our parents in that way would

9  probably be Mr. Amberg, I would say, or it

10  may be Dr. Adeboyega, because they, he puts

11  it together, I look over it, I add, take

12  away, delete, things like that.

13          Q.      Understood.  Okay.  You can

14  put this to the side.  We're going to shift

15  gears a little bit, Dr. Vauss.  Am I

16  correct that every year Irvington Public

17  Schools prepares annual school reports that

18  it submits to the New Jersey Department of

19  Education?

20                  MR. INNES:  Objection to form.

21                  THE WITNESS:  Yes.

22  BY MR. KARP:

23          Q.      If I use -- if I say, "New

24  Jersey DOE," do you understand that I'm

25  referring to the department of education?

CONFIDENTIAL

Page 174

1          A.     Yes.

2          Q.     Okay.  The New Jersey

3    Department of Education compiles the school

4    planning documents that are assembled by

5    Irvington Public Schools and then issues

6    both the school- and district-level

7    performance reports; is that right?

8                    MR. INNES:  Objection to form.

9                    THE WITNESS:  Yes.

10   BY MR. KARP:

11         Q.     Okay.

12         A.     But as a point of

13   clarification, performance reports aren't

14   based on your annual school plan, so to

15   speak, not for every school location.

16         Q.     Sure.  Can you help me

17   understand that a little bit better?

18         A.     So there may be certain

19   benchmarks that if your school that may be

20   in status, they may need to meet those, but

21   schools in general have goals that they

22   want to meet, but they're not outlined by a

23   state as far as performance.

24         Q.     Okay.  The New Jersey

25   Department of Education on an annual basis

CONFIDENTIAL

Page 175

1    will issue district and school-level

2    performance reports for Irvington Public

3    Schools; is that correct?

4         A.    Yes, that is correct.

5         Q.    I'm handing you tab 11, which

6    we will mark as Exhibit 10.

7                   Do you recognize this

8    document?

9         A.    Yes.

10                   - - - - -

11                   (IPS Performance Report

12              2023-2024 marked Vauss Exhibit 10

13              for identification.)

14                   - - - - -

15   BY MR. KARP:

16        Q.    Have you seen it before?

17        A.    Yes.

18        Q.    What is this document?

19        A.    It is our performance report

20   from the state of New Jersey.

21        Q.    And this relates to the

22   2023-2024 school year?

23        A.    That is correct.

24        Q.    Am I correct that this

25   performance report is available online?

CONFIDENTIAL

Page 176

1          A.      Yes.

2          Q.      Okay.  If I went to the

3   website for the New Jersey Department of

4   Education, I could pull this report and

5   similar reports for other years, correct?

6                  MR. INNES:  Objection to form.

7                  THE WITNESS:  Yes.  Sorry.

8                  MR. INNES:  It's tough.

9   BY MR. KARP:

10         Q.      I'm going to hand you tab 12,

11  which we'll mark as Exhibit 11.  And I'll

12  represent to you, Dr. Vauss, that this is a

13  section of the performance report focused

14  on enrollment data.

15                 Do you see that?

16         A.      Yes.

17                     - - - - -

18                 (IPS Performance Report

19                 2023-2024 for Enrollment data

20                 marked Vauss Exhibit 11 for

21                 identification.)

22                     - - - - -

23  BY MR. KARP:

24         Q.      Let's take a look at

25  enrollment by student group and that table

Page 177

1  begins at the bottom of the first page and
2  continues onto the second page?
3          A.     Uh-huh.
4          Q.     And according to this report,
5  this table shows the percentage of students
6  by student group for the past three school
7  years.
8                Do you see that?
9          A.     Yes.
10         Q.     If you look at page 2,
11  there's a line in this table for
12  economically disadvantaged students.
13                Do you see that?
14         A.     Yes.
15         Q.     And it's hard to see here
16  with the page break, but this table is
17  intended to reflect the last three school
18  years, correct?
19         A.     Yes.
20         Q.     And is it your understanding
21  then that the rightmost column here would
22  be 2023-2024?
23         A.     Yes.
24         Q.     And then immediately to the
25  left would be the 2022-2023 school year?

Page 178

1          A.      Yes.
2          Q.      And then continuing on one
3     more to the left, that column would include
4     data for the 2021 to 2022 school year,
5     correct?
6          A.      Yes.
7          Q.      And what we see in this table
8     is an increase in the percentage of
9     economically disadvantaged students at
10    Irvington Public Schools between 2021 and
11    2024, do you agree?
12         A.      No.  I would say what you see
13    is between the years -- the inception year
14    on this data to the last year, you see more
15    students and more scholars, more families
16    filling out the lunch forms.
17         Q.      I see.
18         A.      Not an increase of
19    economically disadvantaged students, but
20    more students who have participated in
21    filling out an application.
22         Q.      Is it your understanding then
23    that in 2021-2022, the percentage would be
24    approximately the same as the data for
25    2022-2023 and 2023-2024?

Page 179

1          A.      That would be my guess.

2          Q.      In 2020 -- excuse me, strike

3   that.

4                  During the 2023-2024 school

5   year, the percentage of economically

6   disadvantaged students that the New Jersey

7   Department of Education reported for

8   Irvington Public Schools was 64 percent.

9                  Do you see that?

10         A.      Yes, I see it.

11         Q.      And is it your understanding

12  that that number is relatively stable for

13  the prior two years as well?

14         A.      Yes.

15         Q.      Okay.  Let's look also at the

16  line for multilingual learners, which is

17  two rows down.

18                  Do you see that?

19         A.      Yes, uh-huh.

20         Q.      And am I correct that

21  multilingual learners is another way to

22  refer to ELL students or English language

23  learners?

24         A.      Yes.

25         Q.      And those two are fairly

Page 180

1    synonymous, those two terms?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  I would say that

4            there are more students who are

5            identified in the 23-24 school year

6            that speak more than one language.

7            But they don't -- they don't

8            necessarily fall into the category

9            that you earlier described.

10   BY MR. KARP:

11        Q.    Okay.  My understanding of

12   English language learners is that those are

13   individuals whose primary language or first

14   language is not English; is that your

15   understanding?

16        A.    Sometimes, yes.

17        Q.    Okay.

18        A.    Sometimes.  Sometimes, those

19   students speak another language other than

20   English.  They may be learning it

21   simultaneously.  It may be their second

22   language, but they may not be English

23   language learners, because they may already

24   know English as well as other languages.

25        Q.    I see, okay.  And here, the

Page 181

1   New Jersey Department of Education reports

2   that during the 2021-2022 school year,

3   there were 26.9 percent -- or excuse me

4   26.9 percent of IPS students were

5   multilingual learners; is that correct?

6         A.    That's how it is identified.

7         Q.    And that number goes up in

8   the following year to 31.1 percent?

9         A.    Yes, uh-huh.

10        Q.    And for the 2023-2024 school

11  year, that number jumps to 38.6 percent; is

12  that correct?

13        A.    Yes.

14        Q.    Okay.  Would you agree with

15  me that the number of multilingual learners

16  at IPS has increased since the 2021-2022

17  school year?

18              MR. INNES:  Objection to form.

19              THE WITNESS:  Yes.

20  BY MR. KARP:

21        Q.    Is it fair to say that

22  language barriers can have a negative

23  impact on a student's academic performance?

24        A.    Can you explain your

25  question?

                                           Page 182

1          Q.     If a student isn't able to
2     access the information that's being taught
3     because of a language barrier, that would
4     have a negative effect on that student's
5     academic performance?
6                      MR. INNES:  Objection to form.
7                      THE WITNESS:  I would say yes,
8             uh-huh.
9     BY MR. KARP:
10         Q.     Okay.  Do you agree that
11    language barriers can sometimes make a
12    student feel isolated or alone?
13         A.     Yes.
14         Q.     Language barriers and also
15    culture barriers can lead a student to feel
16    different?
17         A.     Yes, if that is -- if that
18    happens, yes, then that would -- that might
19    make them feel isolated.
20         Q.     Yeah.  And is it fair to say
21    that language barriers could lead a student
22    to feel like he or she doesn't belong?
23                      MR. INNES:  Objection to form.
24                      THE WITNESS:  I would say no,
25            only from my own personal

Page 183

1    experience in having lived in
2    another country, I didn't feel like
3    I didn't belong and I was pretty
4    young, I just felt like I needed --
5    sometimes I probably missed out on
6    something that was being said or a
7    joke, but I wouldn't say I didn't
8    feel -- especially if you use
9    Irvington Public Schools, there are
10   so many students who have the
11   reality of knowing another language
12   and they're multiple, multiple
13   cultures in our community.
14   Honestly speaking, and having been
15   the principal of probably the most
16   diverse school in the district,
17   that's not -- that wasn't the sense
18   that I've gotten in Irvington
19   Public Schools, just to be honest.
20   BY MR. KARP:
21        Q.    Understood.  Let's look down
22   at the next table, which is, "Enrollment by
23   Racial and Ethnic Group."
24             Do you see that?
25        A.    Yes.

CONFIDENTIAL

Page 184

1          Q.      For the 2023-2024 school
2    year, the New Jersey Department of
3    Education reported that 0.3 percent of
4    students at IPS were white; is that
5    correct?
6          A.      I believe so, yes, uh-huh.
7          Q.      They also reported that
8    31.8 percent of IPS students during this
9    school year were Hispanic?
10         A.      Yes.
11         Q.      And just below that, you'll
12   see that the department of education
13   reported that 67.1 percent of students at
14   IPS during this school year were black or
15   African American, correct?
16         A.      Yes.
17         Q.      And if we look across the
18   columns here, is it fair to say that those
19   numbers remain relatively stable for the
20   three years that are reported here?
21         A.      Yes.
22         Q.      There's also a table called,
23   "Enrollment by Home Language" on the next
24   page and there's a bar graph there.
25         A.      Uh-huh.

Page 185

1          Q.     And this table shows the
2     percentage of students by primary home
3     language.
4                Do you see that?
5          A.     Yes.
6          Q.     Okay.  43.1 percent of
7     students are reported as having English as
8     their primary home language during the
9     2023-2024 school year, correct?
10         A.     Yes.
11         Q.     That means that approximately
12    57 percent of students reported having a
13    language other than English as their
14    primary home language during this school
15    year, correct?
16         A.     Yes.  And just, although it's
17    not registered on here, you may want to
18    just really do a deep dive into the data,
19    because then you would understand that
20    while their home language is these other
21    languages, how many are proficient, how
22    many received the syllabi literacy.  Our
23    numbers probably are comparable to any
24    place in the state if it doesn't exceed,
25    because while they do speak other

Page 186

1    languages, we pride ours in the advancement
2    of our students learning English.  So I
3    don't know this tells the whole story, but
4    it tells the story the state wants to tell.
5          Q.     Understood, and I just wanted
6    to understand what was being reported and
7    whether you understood it to be true.
8          A.     Yes.
9          Q.     And you do understand this
10   data as it's reported by the department of
11   education to be accurate?
12         A.     Yes, uh-huh.
13         Q.     I'm going to hand you tab 13.
14   We'll mark this as Exhibit 12.  And I'll
15   represent that this is another section of
16   the performance report for Irvington Public
17   Schools during the 2023-2024 academic year
18   focused on chronic absenteeism.
19              Do you see that?
20         A.     Yes.
21              - - - - -
22              (IPS Performance Report
23         2023-2024 for Chronic Absenteeism
24         marked Vauss Exhibit 12 for
25         identification.)

Page 187

```
 1                      - - - - -
 2   BY MR. KARP:
 3          Q.      The first table in this
 4   document is called, "Chronic Absenteeism
 5   Trends."
 6                   Do you see that?
 7          A.      Yes, uh-huh.
 8          Q.      And the first line in this
 9   table is for chronic absenteeism rate.
10                   Do you see that?
11          A.      Yes.
12          Q.      Okay.  And according to the
13   data reported here by the New Jersey
14   Department of Education in the 2021-2022
15   school year, the chronic absenteeism rate
16   was 31.1 percent?
17          A.      Yes.
18          Q.      The ESSA target for that year
19   was 18.1 percent, correct?
20          A.      Yes, uh-huh.
21          Q.      And does the ESSA target
22   reflect the statewide average for chronic
23   absenteeism?
24          A.      Yes, that's what it says,
25   state average for grades served.
```

CONFIDENTIAL

Page 188

1          Q.      So in this particular year of
2    2021-2022, the chronic absenteeism rate at
3    Irvington Public Schools was approximately
4    12 or 13 percent higher than the state
5    average --
6          A.      Uh-huh.
7          Q.      -- is that right?
8          A.      Yes.
9          Q.      Let's look at the next year,
10   which is the 2022-2023 school year.
11         A.      Uh-huh.
12         Q.      The chronic absenteeism rate
13   at Irvington Public Schools was
14   21.9 percent?
15         A.      Yes.
16         Q.      The ESSA target reflecting
17   the statewide average was 16.6 percent,
18   correct?
19         A.      Yes.
20         Q.      So, once again, Irvington
21   Public Schools had a higher chronic
22   absenteeism rate than the rest of the
23   state?
24         A.      Yes.  And if we did a deep
25   dive into the data, you would see that the

CONFIDENTIAL

Page 189

1   disproportionate number of chronic
2   absenteeism or as we call it now, school
3   avoidance rates, would be at the secondary
4   levels.  And that's where we've seen the
5   students who have been nonstop, I would
6   say, addicted to their social media.  To
7   just put these numbers and say Irvington
8   Public Schools is not -- it's not a true
9   story.  I mean, obviously, the state just
10  gathers the data and they put it together,
11  but if you were to break it down and look
12  at individual-type schools, a school like
13  Florence Avenue would have a significantly
14  lower rate than the state average.  But if
15  you add in our secondary schools, then you
16  see the percentage increases significantly.
17         Q.     And sitting here today,
18  Dr. Vauss, do you have an understanding of
19  how students at other secondary schools
20  around the state do or do not use social
21  media?
22                MR. INNES:  Objection to form.
23                THE WITNESS:  I don't, I
24         don't.
25

```
                                      Page 190
 1   BY MR. KARP:
 2         Q.     Do you know if -- how many
 3   schools in the state have banned cell
 4   phones altogether?
 5                   MR. INNES:  Objection to form.
 6                   THE WITNESS:  I don't.  All I
 7             know, all I can speak to is my
 8             community where I live where I have
 9             been for the last 21 years, because
10             we try our best to do the things
11             that we know will, you know, work
12             for our community, but we also have
13             to hone in on the things that kind
14             of take away from the progress and
15             the things that we're trying to do.
16             You know, something that is an
17             interference into what we're trying
18             to do.
19                 And if you look at the data,
20             you know, especially these years,
21             these are probably some -- these
22             are terrible numbers, but we have
23             a good idea of why our numbers
24             are that way and when you
25             extrapolate elementary schools,
```

CONFIDENTIAL

Page 191

1              they look like one thing and when
2              you look at the secondary
3              schools, it looks like something
4              entirely different.
5    BY MR. KARP:
6         Q.    Understood.  Sitting here
7    today, do you have an understanding of
8    whether Irvington Public Schools students
9    use social media more than students at any
10   other school in the state?
11                 MR. INNES:  Objection to form.
12                 THE WITNESS:  No, I don't.
13   BY MR. KARP:
14        Q.    For the 2023-2024 school
15   year, the chronic absenteeism rate
16   indicated is 21.5 percent.
17                 Do you see that?
18        A.    I do.
19        Q.    And the statewide average for
20   that year was 14.9 percent?
21        A.    I see that.  I mean, back to
22   your question about how we compare to other
23   communities and their usage, I'm not aware,
24   but I hope that they don't use it as much
25   as our scholars do on an ongoing, nonstop

CONFIDENTIAL

Page 192

1  basis throughout the school day.  When they

2  go home, when they get up in the morning, I

3  hope they don't, but I know that, you know,

4  students have some similarities, but I know

5  what our students tend to do here in

6  Irvington Public Schools and, you know,

7  that's really the only thing I can speak

8  to.

9        Q.    I understand.  If we look

10 above this table, we see a definition for

11 chronic absenteeism.

12              Do you see that?

13       A.    Which page?

14       Q.    On page 1.

15       A.    Oh, on page 1, okay.

16       Q.    Just above the table.  The

17 report says, "Chronic absenteeism is

18 defined as being absent for 10 percent or

19 more of the days enrolled during the school

20 year."

21              Do you see that?

22       A.    Uh-huh.

23       Q.    And today you used the term,

24 "school avoidance"?

25       A.    Yes, that's a new term

CONFIDENTIAL

Page 193

1    throughout the state, school avoidance.

2         Q.    Okay.

3         A.    Because what has been

4    noticed, a trend that I know was, you know,

5    discussed in a superintendent's meeting or

6    what have you, is that school avoidance is

7    happening through other municipalities,

8    other places, you know, and the term now,

9    as opposed to chronic absenteeism, it says

10   students are avoiding school, and so school

11   avoidance rates.

12        Q.    Understand.  I understand.

13   During your time as superintendent for

14   Irvington Public Schools, has it been a

15   priority to reduce chronic absenteeism or

16   school avoidance?

17        A.    I would say for my whole

18   entire career that we would -- we never

19   want to have chronic absenteeism.  So if

20   students, at a teacher level, we see a

21   student not coming to school, we call their

22   parents.  We miss Johnny, we miss April,

23   you know, what's going on.  As an

24   administrator, central office, at all

25   levels, yes, we always, you want to fight

CONFIDENTIAL

Page 194

1    against that.

2         Q.      And why is it important for

3    students to be in school?

4         A.      So that they can get a

5    quality education so that they can be

6    educated.

7         Q.      The school can provide a

8    support network for the student as well?

9         A.      A what?

10        Q.      Support network.

11        A.      Yes, yeah.

12        Q.      There are resources available

13   to students when they are physically

14   present at school that may not be available

15   to them if they are avoiding class or

16   outside of school?

17              MR. INNES:  Objection to form.

18              THE WITNESS:  We try to -- we

19          try to provide support for the

20          whole children, so part of the

21          whole is in school and outside of

22          school.  So there are supports in

23          and out of school.

24   BY MR. KARP:

25        Q.      That makes sense.  In your

Page 195

1    experience, does chronic absenteeism lead
2    students to fall behind, academically,
3    their peers who are attending class?
4           A.     Yes, it can.
5           Q.     And can chronic absenteeism
6    also lead to behavioral challenges with
7    students?
8                  MR. INNES:  Objection to form.
9                  THE WITNESS:  Can you clarify
10          what -- what you mean?
11   BY MR. KARP:
12          Q.     Perhaps a student who isn't
13   in class or in school regularly is
14   having -- having a problem or struggling to
15   integrate and feel a part of the community.
16                 MR. INNES:  Objection to form.
17                 THE WITNESS:  I'm not sure,
18          but if you're talking about if a
19          student is in class and they don't
20          understand what may be going on for
21          a plethora of reasons, it can cause
22          them to become frustrated, it
23          could, but I wouldn't necessarily
24          say it's this one thing versus
25          another.

```
                                              Page 196

1   BY MR. KARP:

2         Q.      Understood.   And I'm just

3   trying to understand the effects of chronic

4   absenteeism.

5         A.      Yes.

6         Q.      I think you've explained some

7   of them.

8         A.      Yes.

9         Q.      So I appreciate that.   Let's

10  take a look at the -- at another document.

11  This is tab 14.   And we'll mark this as

12  Exhibit 13.

13              Dr. Vauss, this is a section

14  of the Irvington Public Schools performance

15  reports that focuses on academic

16  performance.

17              Do you see that?

18        A.      Yes.

19              - - - - -

20              (IPS Performance Report

21          2023-2024 for Academic

22          Performance marked Vauss Exhibit

23          13 for identification.)

24              - - - - -

25
```

CONFIDENTIAL

Page 197

1    BY MR. KARP:

2        Q.     And this also relates to the

3    2023-2024 school year.

4               Do you see that?

5        A.     Yes.

6        Q.     I'm going to ask you to turn

7    to page 22.  The table toward the top of

8    the page is called, "English Language

9    Proficiency Test, Participation and

10   Performance."

11              Do you see that?

12       A.     Uh-huh.

13       Q.     "This table shows, by years

14   and district, the number of multilingual

15   students taking the ACCESS for ELLs

16   Assessment for English language proficiency

17   and the number and percentage of students

18   who received an overall school of 4.5 or

19   above.  Students must receive a score of

20   4.5 or higher to be considered for

21   proficient status."

22              Do you see that?

23       A.     Yes.

24       Q.     Okay.  What is the ACCESS for

25   ELLs Assessment for English language

CONFIDENTIAL

Page 198

1  proficiency?

2          A.      It is a test that we give to

3  our students who are multilingual learners

4  to assess their growth in the English

5  language.

6          Q.      Is this a state-mandated test

7  or is this a test that Irvington Public

8  Schools offers on its own?

9          A.      It is a standardized test.

10          Q.      Okay.  I apologize, for some

11  odd reason, the document didn't print with

12  column headings.  We can stay on the

13  record.  We're just going to sort that out

14  real quick.

15                  MR. INNES:  It's hard to read

16              the lines across the table, so are

17              you going to project this up on

18              the --

19                  MR. KARP:  On the screen.

20                  MR. INNES:  Can we make sure

21              that Dr. Vauss is able to scroll

22              through the document?

23                  MR. KARP:  Sure.

24                  MR. INNES:  Because at this

25              point, what we have in front of us

Page 199

1              isn't actually an exhibit, right,
2              you'll retract this one?
3                   MR. KARP:  I think that's
4              fair, yes.
5                   Are we good to go, TJ?
6              Thank you.
7    BY MR. KARP:
8         Q.      Dr. Vauss, apologies for the
9    technical issue.  If at any point you need
10   to see surrounding data, please let me
11   know.  But just to reorient us, we're
12   looking at a table called, "English
13   Language Proficiency Test - Participation
14   and Performance."  And, "This table shows,
15   by years in district, the number of
16   multilingual learner students taking the
17   ACCESS for ELLs Assessment for English
18   language proficiency and the number and
19   percentage of students who tested -- excuse
20   me -- students tested who received an
21   overall school of 4.5 or above.  Students
22   must receive a score of 4.5 or higher to be
23   considered for proficiency status."
24                   Do you see that?
25         A.      Yes.

Page 200

1          Q.      And if we look at the middle
2    column called, "percentage students with
3    overall score below 4.5," we see that for
4    students who have been in the district for
5    between zero and two years, that number is
6    greater than 90 percent.
7                    Do you see that?
8          A.      Yes.
9          Q.      So more than -- for students
10   who have been at Irvington Public Schools
11   between zero and two years, more than
12   90 percent of them did not achieve
13   proficient status, correct?
14         A.      Yes.
15         Q.      And that number is the same
16   for students who have been at the district
17   between three and four years, correct?
18         A.      According to this, yes.
19         Q.      And for students who have
20   been with the district for five or more
21   years, correct?
22         A.      Uh-huh, yes.
23         Q.      So for all three of these
24   categories, more than 90 percent of the
25   students who took this exam did not

CONFIDENTIAL

Page 201

1   demonstrate proficiency in English language

2   arts, correct?

3           A.      Yes.

4           Q.      Okay.  We can put this to the

5   side.

6           A.      And I would, I would just add

7   to my answer that, you know, we have a lot

8   of work to do and it is very difficult to

9   do that work when we have students who are

10  on social media nonstop, and they're not on

11  a site that is helping them learn the

12  English language, but to distract them from

13  learning and becoming proficient in the

14  English language.  It is very

15  disheartening, you know, when I see what

16  we're up against and the impediments to

17  that.

18          Q.      I understand.  I'm going to

19  hand you tab 14A.  We will mark this as

20  Exhibit 14.

21                  MR. INNES:  Just want a

22          clarification for the record, what

23          is Exhibit 13?

24                  MR. KARP:  That's fair --

25          that's a fair question.  Exhibit 13

Page 202

1              is the excerpt of the school

2              performance report that we just

3              looked at for multilingual learners

4              and their performance on the ACCESS

5              exam.

6                   MR. INNES:  Understood.  And

7              you guys will just provide that, a

8              clip of that to the reporter?

9                   MR. KARP:  We will.

10                  MR. INNES:  Great.  Thank you.

11   BY MR. KARP:

12        Q.    Dr. Vauss, Exhibit 14 says,

13   "NJSLA Science Assessment:  Grade 5

14   Summary" at the top.

15        A.    Yes.

16                  - - - - -

17              (NJSLA Science Assessment:

18              Grade 5 Summary marked Vauss

19              Exhibit 14 for identification.)

20                  - - - - -

21   BY MR. KARP:

22        Q.    Do you know what this data

23   refers to?

24        A.    It is the scores, a summary

25   of the scores for the NJSLA science

CONFIDENTIAL

Page 203

1   assessment.

2          Q.      And is that a standardized

3   test in science that fifth grade students

4   at IPS need to take?

5          A.      Yes, uh-huh.

6          Q.      If we look at these numbers

7   starting in 2021-2022, and if we use the

8   color scheme on the left to help us, we see

9   that 67 percent of students during this

10  school year achieved level one?

11         A.      Yes.

12         Q.      And 26 percent of students

13  during the 2021-2022 school year achieved

14  level two?

15         A.      (Nodding).

16         Q.      And according to the

17  explanation at the top, "This table shows

18  how students performed on the NJSLA Science

19  assessment.  Students scoring at Level 3 or

20  4 are considered proficient."

21                 Did I read that correctly?

22         A.      Yes.

23         Q.      So students who have achieved

24  a level two or a level one have not

25  achieved proficiency; is that correct?

CONFIDENTIAL

                                                    Page 204

1          A.     Yes.

2          Q.     So for the 2021-2022 school

3    year, approximately 93 percent of fifth

4    graders who took this science assessment

5    did not achieve proficiency; is that

6    correct?

7          A.     Yes.

8          Q.     And the numbers appear to be

9    the same for the following year, which is

10   2022-2023.

11               Do you see that?

12         A.     Yes.

13         Q.     So during that year,

14   approximately 93 percent of students in the

15   fifth grade who took this exam did not

16   achieve proficiency, correct?

17         A.     Yes.

18         Q.     And the number goes up just

19   barely in the following year, which is

20   2023-2024, where 94 percent of fifth

21   graders who took this assessment did not

22   achieve proficiency, correct?

23         A.     Yes.

24         Q.     Do you know if these numbers

25   are roughly the same for other grade levels

CONFIDENTIAL

Page 205

1  who also took the science assessment?

2          A.     The science, yes.

3          Q.     Okay.  So these numbers are

4  roughly the same for, is it eighth graders

5  who also take this exam?

6          A.     I believe so.

7          Q.     And for 11th graders as well?

8          A.     That, I'm not 100 percent

9  sure.  If you have it, it would be good to

10 see it.

11         Q.     Sure.

12         A.     If you have it.

13         Q.     I thought you would never

14 ask, Dr. Vauss.  I'm handing you tab 14B.

15                Before we get to the 11th

16 grade data, we'll just take a quick look at

17 the eighth grade data.  And if I failed to

18 mention this, we'll mark this as

19 Exhibit 15.

20                So for eighth graders in

21 2021-2022, approximately 100 percent of

22 students did not achieve proficiency on

23 this science assessment; is that right?

24         A.     Yes.

25                     - - - - -

CONFIDENTIAL

Page 206

1              (NJSLA Science Assessment:

2         Grade 8 Summary marked Vauss

3         Exhibit 15 for identification.)

4              - - - - -

5    BY MR. KARP:

6         Q.    Okay.  And in the following

7    year, it is roughly 97 percent?

8         A.    Yes.

9         Q.    And in the next year, which

10   is 2023-2024, roughly 99 percent of eighth

11   graders did not achieve proficiency,

12   correct?

13        A.    Yes, uh-huh.

14        Q.    I'm going to hand you tab

15   14C, which is the data you asked for

16   regarding 11th grade performance.  We'll

17   mark this as Exhibit 16.

18              - - - - -

19              (NJSLA Science Assessment:

20        Grade 11 Summary marked Vauss

21        Exhibit 16 for identification.)

22              - - - - -

23   BY MR. KARP:

24        Q.    According to this data,

25   during the 2021-2022 school year,

Page 207

1   approximately 95 percent of 11th graders

2   did not achieve proficiency on this science

3   assessment, correct?

4           A.      Yes.

5           Q.      And during the 2022-2023

6   school year, approximately 96 percent of

7   students did not achieve proficiency?

8           A.      Yes.

9           Q.      And finally during the

10  2023-2024 school year, approximately

11  94 percent of students did not achieve

12  proficiency.

13                  Do you see that?

14          A.      Yes, uh-huh.

15          Q.      Sometimes the numbers don't

16  perfectly add up to 100.

17          A.      Uh-huh.

18          Q.      Okay.  You can put this to

19  the side.

20                  MR. INNES:  Do you need a

21          break or are you good?

22                  THE WITNESS:  No, I'm fine.

23                  MR. KARP:  I'm about to start

24          a new line of questioning, if you

25          wanted to take a break, otherwise,

CONFIDENTIAL

Page 208

1          we can proceed.
2                  MS. HENRY:  Actually, let's
3          take a break, like, five minutes.
4                  MR. KARP:  Sure.  Let's go off
5          the record.
6                  THE VIDEOGRAPHER:  The time
7          right now is 2:41 p.m.  We are off
8          the record.
9                  - - - - -
10     (A recess was taken at this time.)
11                  - - - - -
12                  THE VIDEOGRAPHER:  The time
13          right now is 3:00 p.m.  We are back
14          on the record.
15  BY MR. KARP:
16          Q.    Dr. Vauss, welcome back.
17          A.    Thank you.
18          Q.    Let's talk a little bit about
19  the COVID-19 pandemic.  You were
20  superintendent during the COVID-19 pandemic
21  or at least a portion of it, correct?
22          A.    Yes.
23          Q.    What was that experience like
24  for you?
25          A.    It was, I actually started

CONFIDENTIAL

Page 209

1    April the 20th, 2020, that was my first
2    interim superintendent.  It was -- it was
3    filled with challenges, making sure that
4    students had access to technology while at
5    the same time, as time evolved, making sure
6    that that technology was being used
7    appropriately.  It was, it was a tough
8    time, because as was happening all over the
9    country, there were people dying and that
10   was tough.
11           Q.      You would agree that the
12   pandemic caused stress for millions of
13   people, correct?
14                   MR. INNES:  Objection to form.
15                   THE WITNESS:  I would imagine
16           so, yes.
17   BY MR. KARP:
18           Q.      And IPS students would be
19   among the people who were negatively
20   impacted by the COVID-19 pandemic, correct?
21           A.      Yes, I would say.  I think
22   especially them being isolated and having
23   their outlet be social media and using it
24   nonstop, growing an attachment and dare I
25   say an addiction to its use nonstop and,

CONFIDENTIAL

Page 210

1   you know, almost like there was a format
2   that was geared towards students who we
3   know are at home and not in school or
4   somewhere else where we can at least try to
5   stop them from getting distracted.
6          Q.     You mentioned earlier that
7   during the COVID-19 pandemic, people were
8   dying, correct?
9          A.     That is -- that is true.
10         Q.     It was a scary time for IPS
11  students?
12         A.     I think it was a scary time
13  for the world.
14         Q.     Of course.
15         A.     I think it was across the
16  world, yeah, it was.
17         Q.     IPS might have been afraid of
18  getting COVID-19 themselves, right?
19         A.     I think everyone was afraid
20  of getting COVID.  I think everyone was
21  afraid.
22         Q.     Sure.  Including IPS
23  students?
24         A.     Yeah, including them.
25         Q.     IPS students might have been

CONFIDENTIAL

Page 211

1  afraid that loved ones would get COVID and
2  potentially get sick or even die, correct?
3        A.    To be correct, everyone in
4  the world was afraid, I think, and so that
5  would include Irvington Public School
6  students, but, you know, I can't quantify
7  their fear more than any other place or
8  even, you know, so.
9        Q.    I understand.  You mentioned
10 that Irvington Public School students felt
11 isolated during the pandemic?
12       A.    I think everyone that could
13 not go to school, so you have March 16th
14 and schools closed across the United States
15 of America.  And students couldn't interact
16 with their teachers, you know, or their
17 friends.  So, did our school students, were
18 our students exempt from that, that
19 feeling, no, they weren't.
20       Q.    I understand.  I'm going to
21 hand you tab 15 and we will mark this as
22 Exhibit 17.
23       A.    Thank you.
24       Q.    For the record, this is Bates
25 number starting BW__Irvington00188208.

Page 212

```
 1          A.      Uh-huh.

 2                    -  -  -  -  -

 3                  (Email dated 6/3/20 Bates

 4           BW__Irvington00188208 marked

 5           Vauss Exhibit 17 for

 6           identification.)

 7                    -  -  -  -  -

 8   BY MR. KARP:

 9          Q.      Dr. Vauss, this is a June 3,

10   2020, email.

11                  Do you see that?

12          A.      Yes.

13          Q.      It's from Karla Rivera to

14   you?

15          A.      Uh-huh.

16          Q.      Ms. Rivera wrote, "Good

17   morning.  I've written a very general

18   description of the potential program.  Many

19   specifics we would need to figure out

20   together such as specific roles, schools,

21   et cetera.  Let me know your thoughts."

22                  Do you see that?

23          A.      Yes.

24          Q.      Do you recognize this email?

25          A.      I see my email address and I
```

CONFIDENTIAL

                                                    Page 213

1    do know Dr. Rivera, so yes.

2          Q.      And there's an attachment to

3    this email called "COVID doc."

4                  Do you see that?

5          A.      Uh-huh, yes.

6          Q.      I'll hand you tab 15A, which

7    we'll mark as Exhibit 18.

8          A.      Thank you.

9          Q.      For the record, this Bates

10   starting with BW__Irvington00188209.  And

11   I'll represent to you, Dr. Vauss, that this

12   is the attachment to Dr. Rivera's email.

13         A.      Yes.

14                      - - - - -

15               (Dr. Rivera's Covid 19

16          Crisis Response Program Bates

17          BW__Irvington00188209 to 00188212

18          marked Vauss Exhibit 18 for

19          identification.)

20                      - - - - -

21   BY MR. KARP:

22         Q.      Do you recognize this

23   document?

24         A.      Yes.

25         Q.      Do you need a moment to

CONFIDENTIAL

Page 214

1  review it?

2          A.      Yeah, I do need to review it.

3  Okay.

4          Q.      Who is Dr. Rivera?

5          A.      She was a school psychologist

6  for our district.

7          Q.      And at this point in time

8  when she emailed you and that would have

9  been June 3, 2020, was she an employee of

10 the district?

11         A.      I'm not sure if she had

12 joined our staff at that time, but if she

13 had not, she eventually did.

14         Q.      Okay.  So you believe you

15 might have hired her soon after this email

16 was sent?

17         A.      Yes.

18         Q.      And the document we're

19 looking at now, Exhibit 18, is called,

20 "Covid 19 Crisis Response Program."

21                 Do you see that?

22         A.      Yes.

23         Q.      Okay.  Was Dr. Rivera hired

24 to address the mental health of Irvington

25 students that might have been affected by

CONFIDENTIAL

Page 215

1    the COVID-19 pandemic?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  So can you ask

4           that again?  I'm sorry, I started

5           to read some more of the document.

6    BY MR. KARP:

7         Q.    Not a problem and I'll take

8    the opportunity to rephrase.

9         A.    Okay.

10        Q.    Did you hire Dr. Rivera to

11   support Irvington's students with the

12   negative effects of the COVID-19 pandemic?

13                   MR. INNES:  Objection to form.

14                   THE WITNESS:  I would say

15          potential negative effects, because

16          as I look at the date, I don't know

17          that all of the things that would

18          negatively affect the mental health

19          of our scholars was fully realized

20          at that juncture, but initially, it

21          was more of the possibility.

22   BY MR. KARP:

23        Q.    To phrase my question a

24   little bit differently, was Dr. Rivera

25   hired to support students in dealing with

Page 216

1  the effects, whatever they turned out to

2  be, of the COVID-19 pandemic?

3          A.      Amongst other things, yes.

4          Q.      What do you mean, "amongst

5  other things"?

6          A.      Meaning the fullness of a

7  school psychologist and especially if we

8  speak specifically to Dr. Rivera, I don't

9  think that in June, June 3rd, that while

10  there was some negative -- there was a lot

11  of negative use of social media, that un --

12  I guess not sanctioned, but not monitored

13  time period the scholars were online,

14  obviously, because we needed to educate

15  them virtually, but their access to be able

16  to get on social media unchecked was not

17  known on June 30 -- I mean, June 3rd of

18  this date but as time evolved and she was

19  with us, she could and she probably has

20  spoken to the impact that isolation coupled

21  with unfettered, unguarded, unmonitored

22  social media access, what that did to our

23  students and what they were able to see

24  happening in other places versus what they

25  could actually partake in or their own

CONFIDENTIAL

Page 217

1    realities was significant.

2         Q.      To your knowledge, when in

3    2020 did Irvington Public Schools shift to

4    a remote learning environment?

5         A.      May, May -- around May 4th or

6    somewhere in May.  Because we -- we were

7    paper and pencil before I became the

8    interim superintendent.

9         Q.      Okay.  So in March and April

10   of 2020, Irvington Public Schools was still

11   proceeding in person?

12        A.      No, no.  We, we had to come

13   up with a system, the day that we left, we

14   sent, much like other districts, we didn't

15   know how long this was going to last, so we

16   sent things home and then we, some of us,

17   essential workers, still came to sites and

18   disseminated social -- through social

19   distancing creating packets, providing

20   pencils and things to families that may not

21   have those things at home.

22        Q.      I understand.  So student --

23   at what point in time did Irvington Public

24   Schools send students home?

25        A.      March 16th.

CONFIDENTIAL

Page 218

1          Q.        March 16th of 2020?

2          A.        Yes, uh-huh.

3          Q.        And this proposal from

4    Dr. Rivera was sent to you on June 3, 2020?

5          A.        Uh-huh.

6          Q.        And is it your testimony that

7    Dr. Rivera did not realize that social

8    media -- that students would be using

9    social media while they weren't in school

10   for the three months that they had been

11   home at that point?

12         A.        I'm not saying that, because

13   I wouldn't be able to speak to that, but

14   I'm just saying that in June, when we're

15   talking about June 3rd and what, how this

16   would evolve, I don't think that any of us

17   could have imagined it, so I'm taking a

18   liberty and saying that she didn't.  But

19   what may have been her thought process on

20   that, I couldn't speak to.

21         Q.        Okay.  Does Dr. Rivera

22   mention social media anywhere in her

23   proposal?

24         A.        Let me look through it again.

25   No.

CONFIDENTIAL

Page 219

1          Q.      You mentioned a few minutes
2    ago that Dr. Rivera has probably spoken to
3    the impact of isolation from COVID and
4    unfettered access to social media.
5                   Do you recall saying that?
6          A.      Yes.
7          Q.      When she might she have
8    spoken to that issue?
9          A.      I said I couldn't speak to
10   that, that's what I said when you asked me,
11   you said what did she say about that and I
12   said I couldn't speak for her, but I would
13   imagine, so I was taking -- and I said I
14   was taking the liberty in speaking for her
15   while I can't speak for her, especially
16   with that specific question.
17         Q.      So you don't know, sitting
18   here today, you don't know one way or
19   another whether Dr. Rivera has addressed,
20   to use your words, unfettered access to
21   social media while students were isolated
22   at home?
23         A.      I mean, I'm sure she probably
24   has, because we've all, especially in that
25   realm of learning, and she's a school

CONFIDENTIAL

Page 220

1    psychologist and she may have dealt with

2    students who were victimized by students

3    placing content for people to like and

4    follow and share and tag.  And I'm sure a

5    great deal of her time was encumbered with

6    the after-effects of students having access

7    without any, you know, from a certain

8    window of time that they normally would be

9    in school and have a certain type of, at

10   least someone to say stop, don't do that,

11   get off that site, don't do that, don't do

12   this, there at home, you know, it's a

13   little different environment.

14          Q.     In fairness, you're

15   speculating and you don't know whether she

16   actually has dealt with these issues,

17   correct?

18          A.     That she's dealt with mental

19   health use as it relates to the use of

20   social media, I'm pretty sure that I could

21   probably say that every single one of our

22   school psychologists or HSSCs or school

23   counselors at the secondary level and she

24   was district-wide, so she had a variety of

25   students she dealt with, I would say no, I

Page 221

1  don't think I would be incorrect in saying

2  that.

3        Q.      What is your basis for

4  saying -- strike that.

5               You said that -- you

6  testified that Dr. Rivera has probably

7  spoken to the impact of unfettered access

8  to social media during the pandemic when

9  students were home and isolated, correct?

10       A.      Uh-huh.  Uh-huh.

11       Q.      What is your basis for saying

12  that?

13       A.      From my own experience and if

14  I experience it as the superintendent and

15  seeing the things that our scholars have

16  gone through and some of the after-effects

17  of students who have been, for example,

18  pulled out of class to be a part of

19  investigations that they may not have been

20  part of, where they then have to go see our

21  school's psychologist or go see our HSSC

22  and talk about, you know, how having seen

23  their friends put -- frenemies put things

24  online about them and people liking it and

25  sharing it, how that made them feel.  Her

CONFIDENTIAL

Page 222

1   being, you know, a doctor, a psychologist,

2   and knowing that, you know, she was -- she

3   was probably definitely, definitely aware

4   of this, definitely.

5           Q.      She was probably or

6   definitely?

7           A.      No, I said she probably was

8   definitely aware of this.  So I'm not a

9   betting woman and so I wouldn't bet

10  anything on that, but just from my

11  experience and the experiences that I'm

12  aware of that some of our staff may have

13  had, you know, with social media as an

14  ongoing inundation of their daily time,

15  especially during this time period, but as

16  a result of this time period and what

17  happens in schools, I would say yes.

18          Q.      Can you point to a concrete

19  or specific instance in which Dr. Rivera

20  addressed social media or students'

21  unfettered access to social media, to use

22  your words, during the COVID-19 pandemic?

23          A.      I would say I could speak to

24  the things that she had to deal with as a

25  result of our scholars being what I would

CONFIDENTIAL

Page 223

```
 1   call addicted to social media, follows and
 2   likes, and putting things that are negative
 3   to garner attention, I would say that she
 4   perhaps was overwhelmed with some of those
 5   things.  And the reason why I say she was
 6   overwhelmed, because she -- there were so
 7   many things that were happening as it
 8   relates to social media that she is no
 9   longer here as a psychologist.  She is, you
10   know, there was a lot -- it's very -- it
11   was very taxing to spend your day trying to
12   referee things that have happened outside
13   of school time, during school time, when
14   there's supposed to be instruction.  And
15   there are investigations going on as it
16   relates to a TikTok video that may have
17   been made or a fight that was placed up on
18   social media and people are sharing it all
19   over the school district.  And then you
20   have to, you know, determine who may have
21   been a victim in a fight or who may be
22   being harassed because they liked something
23   that they probably didn't really mean to
24   like or they shared it, it became -- it
25   probably became overwhelming.
```

CONFIDENTIAL

Page 224

1          Q.      Dr. Vauss, did you --
2   Dr. Rivera ever report this to you that she
3   had -- that she had specifically dealt with
4   students' access to social media during the
5   COVID-19 pandemic?  Was that something she
6   reported to you?
7          A.      She would not have reported
8   it to me directly, because I wasn't her
9   immediate report.  But the existence of
10  her, you know, as a floating school
11  psychologist, would have made that be a
12  part of it --
13         Q.      Are you --
14         A.      -- for sure.
15         Q.      I didn't mean to cut you off.
16  Are you aware of any articles that
17  Dr. Rivera published on this particular
18  issue?
19         A.      I am not.
20         Q.      Any videos that she might
21  have made to address the effects -- or
22  excuse me, strike that.
23              Are you aware of any videos
24  that Dr. Rivera might have created
25  regarding student access to social media

CONFIDENTIAL

Page 225

1   during the COVID-19 pandemic?

2         A.      I am not.

3         Q.      Okay.

4         A.      But that does not, I want to

5   be clear, that does not, you know, negate

6   what I know that our school psychologists,

7   our social workers, our HSSCs had to deal

8   with during that time period, but even

9   right now and it really doesn't -- I'm

10  sorry.

11        Q.      I'm just asking about

12  Dr. Rivera specifically.

13        A.      Oh, okay.

14        Q.      Do you understand?

15        A.      Okay.  But you asked -- I

16  know you asked me about her specifically,

17  but I would have to speak about the

18  entirety, because she doesn't report to me

19  and it's more about learning about what is

20  inundating our school psychologists, our

21  school counselors, and our social workers'

22  days.  You know, yes, we have students who

23  have problems, that's probably happened

24  from the beginning of time and we can't

25  ignore those if we really want, you know,

CONFIDENTIAL

Page 226

1   to educate the whole child.  But when I see

2   a trend of, it seems like the same kind of

3   vernacular of being inundated with social

4   media issues or social media-related issues

5   that are impeding the educational process,

6   or in the case of school psychologists or

7   social workers or school counselors, all

8   the peripheral things they're supposed to

9   be doing, they're not able to do on a daily

10  basis.

11          Q.      And if I can just focus back

12  on the document, Exhibit 18, let's look at

13  what Dr. Rivera actually was concerned

14  about.  If we look at the first paragraph

15  of this proposal, Dr. Rivera writes, "We

16  are facing unprecedented times as our

17  country faces a global pandemic that will

18  likely have immeasurable consequences in

19  the form of death, illness, financial loss,

20  and psychological trauma."

21                  Do you see that?

22          A.      Yes.

23                  MR. INNES:  Objection.

24          Argumentative.  Misstates the

25          document.

CONFIDENTIAL

Page 227

1   BY MR. KARP:

2         Q.      "While the entire nation is

3   contending with the disease it is clear

4   that urban communities of color have been

5   disproportionately and severely impacted."

6                   Do you see that?

7         A.      Yes.

8         Q.      And do you agree with that?

9         A.      It has been impacted.  I

10  don't know if I can -- I can speak to a

11  disproportionately, anecdotally maybe I can

12  say, yes.

13        Q.      Let's go through this --

14        A.      Especially when you say

15  contending with the disease, see, that's --

16  that's kind of like outside of my -- my

17  scope.

18        Q.      I understand.  Dr. Rivera

19  wrote, "It is clear that urban communities

20  of color have been disproportionately and

21  severely impacted."

22                   Do you agree with that

23  statement?

24        A.      I would say any impact is

25  severe, so, yes.  Disproportionately, I

Page 228

1   wouldn't have the data to say

2   disproportionately, because I don't know

3   other communities and how certain things

4   impact them.  I mean, I don't have that

5   experience, so I wouldn't know.  I can only

6   really speak to Irvington in this context.

7           Q.     Dr. Rivera is an expert in

8   her field, you'd agree?

9           A.     An expert.

10          Q.     In her field.

11          A.     I don't know about an -- she

12  is -- she is -- she defended her

13  dissertation.  She is a doctor.  She is

14  learned.  I don't know if she is the go-to

15  person in her field.  I wouldn't say she's

16  not, but I wouldn't know that she is.

17          Q.     You hired her after she

18  submitted this proposal, correct?

19          A.     I did.  I did.

20          Q.     Okay.

21          A.     And I'll be honest, when she

22  was.

23          Q.     Dr. Vauss --

24                 MS. HENRY:  There's no

25          question pending.

CONFIDENTIAL

Page 229

```
1              MR. KARP:  Yeah, sorry,
2         there's no question pending.
3              MR. INNES:  Well, no, hang on
4         a second, you said.
5              MR. KARP:  There is actually
6         no question pending.
7              MR. INNES:  There is a
8         question, because you haven't asked
9         another question.  The question you
10        just asked is still pending and
11        she's finishing her answer.  You
12        can let her finish her answer.
13        Dr. Vauss, please continue.
14             THE WITNESS:  So.
15             MS. HENRY:  "You hired her
16        after she submitted this proposal?"
17             MR. INNES:  No, no, Counsel.
18             MS. HENRY:  "I did," period.
19             MR. INNES:  Okay.  And she's
20        continuing to answer the question.
21        Do you want to read this or do you
22        want know the answer --
23             MS. HENRY:  It's a yes-or-no
24        question.  You know what she's
25        doing, Michael.
```

```
                                        Page 230
 1                 MR. INNES:  Excuse me?
 2                 MS. HENRY:  You know what
 3            she's doing.
 4                 MR. INNES:  I know what you're
 5            doing, you're trying to cut off my
 6            witness.
 7                 MR. KARP:  Let's take a
 8            look --
 9                 MR. INNES:  No, she's going to
10            continue her answer.
11                 THE WITNESS:  So what I wanted
12            to say was that we had no idea, I
13            had no idea on June 3rd what this
14            would evolve into.
15   BY MR. KARP:
16        Q.    If we look at the third
17   paragraph of this document, it states,
18   "These factors mean that while the country
19   is experiencing a collective trauma, the
20   psychological wounds may be even deeper and
21   longer lasting among low income, urban
22   communities."
23                 Do you see that?
24        A.    I see that.
25        Q.    Do you agree with that?
```

CONFIDENTIAL

Page 231

1          A.      I wouldn't -- I think she's
2     speaking in a broad term, so I guess I
3     could say I guess yes, but I have no basis
4     of knowing the veracity of that particular
5     assertion.
6          Q.      Further down on the page,
7     Dr. Rivera says, "According to the American
8     Psychological Association, stress has
9     increased dramatically among Americans
10    since the epidemic's outset.  Depression,
11    and anxiety are on the rise, as well as
12    social ills such as substance use and
13    domestic violence.  Children and
14    adolescents will be particularly affected,"
15    correct?
16          A.      That's what she wrote, yes.
17          Q.      That's what Dr. Rivera wrote
18    in this proposal --
19          A.      Yes.
20          Q.      -- a few months before she
21    was hired by the district?
22          A.      Yeah, I said yes.
23               MR. INNES:  If you want a yes
24          or no, you have got to take a yes
25          or no, all right?

Page 232

```
 1              MR. KARP:  And I did take
 2         it --
 3              MS. HENRY:  We want a yes or
 4         no.
 5              MR. INNES:  You got it that
 6         time, right?  So you can move on.
 7              MR. KARP:  All right, I was.
 8         "The impact of quarantining in
 9         their homes will be significant.
10         For many students, besides academic
11         learning, school provides social
12         connectedness in the form of
13         relationships with staff and peers,
14         structure, consistency, and
15         supervision both during and after
16         school hours.  The support schools
17         provide goes well beyond
18         educational instruction, with many
19         students, for example, dependent
20         upon school meals as a primary
21         source of nutrition."
22              Do you see that?
23              THE WITNESS:  I see that.
24    BY MR. KARP:
25         Q.    And is that something you
```

CONFIDENTIAL

```
                                      Page 233
1   agree with?
2               MR. INNES:  Objection.  What's
3          the time period?  Is she agreeing
4          with when it was written or
5          agreeing with it today?
6   BY MR. KARP:
7        Q.     Is that something you agree
8   with sitting here today?
9        A.     I would answer and say yes,
10  there was a vacuum in need and I think, I
11  believe social media jumped right in,
12  because they knew about the need for our
13  scholars to have social connectiveness in
14  the forms of relationship, so they allowed
15  it to be filled with features and likes and
16  tags and it made the students feel like
17  they were connected.
18               Unfortunately, it didn't
19  matter what it was, the content that they
20  were liking and sharing and tagging other
21  students in.  And it created a culture
22  of -- that was thin once we returned to our
23  buildings and it didn't stop.  It was a new
24  reality.  And that was nonstop use of
25  social media.
```

CONFIDENTIAL

Page 234

1          Q.      And none of that appears in
2   Dr. Rivera's report, correct?
3          A.      It doesn't, especially that
4   we know that this is June 3, 2020.  We were
5   less -- it was less than a month of online
6   instruction.
7          Q.      Dr. Rivera writes, "For some,
8   school is a safe haven from difficult
9   living situations.  Schools not physically
10  in session can no longer effectively
11  monitor and support these children, and
12  therefore it may be far more difficult to
13  protect them from harm, leaving some
14  vulnerable to abuse and neglect."
15              Do you see that?
16         A.      I see that.
17         Q.      Was that true for Irvington
18  students?
19              MR. INNES:  Objection.  True
20          now or true then?
21  BY MR. KARP:
22         Q.      I said was that true for
23  Irvington students?
24         A.      Let me read it again, okay?
25         Q.      Sure.

Page 235

1          A.      That is true, it was very
2    difficult to protect them from harms,
3    multiple harms, social media harm, harm
4    from maybe another source, but definitely
5    it was difficult to protect them from harm,
6    especially when -- if they're targeted for
7    harm.
8          Q.      And here Dr. Rivera is saying
9    that some would be left vulnerable to abuse
10   and neglect, correct?
11         A.      Yes, oh, yes.
12         Q.      Next Dr. Rivera says, "In
13   fact, it is difficult to know how some
14   students are faring at all through distance
15   learning.  According to the New York Times,
16   while chronic absenteeism is always an
17   issue under best of circumstances, now more
18   students than ever are missing class.  In
19   many districts, since the closing of
20   schools, some students have gone
21   unaccounted for, never or only sporadically
22   participating in distance learning."
23   Correct, or did I read that correctly?
24         A.      I think you read that
25   correctly.  I think the New York Times was

Page 236

1    not reporting on Irvington Public Schools.
2    That when she cites that, I think they were
3    speaking of the United States of America.
4              Q.      Irvington did not have a
5    larger issue with chronic absenteeism
6    during the pandemic?
7              A.      I'm not saying that.  What
8    I'm saying is, is that when you spoke to
9    that specific piece, that there -- it's
10   citing chronic absenteeism as it relates to
11   the United States or the entire country.  I
12   don't think that they cited Irvington
13   Public Schools is what I'm saying.
14             Q.      Meaning Irvington was not
15   mentioned in this New York Times is your
16   point?
17             A.      Yes, yes.
18             Q.      Let's turn the page.  A few
19   paragraphs down, Dr. Rivera wrote, "School
20   staff are also vulnerable to all the
21   stressors brought on by the pandemic, and
22   many are parents themselves.  Staff members
23   may have experienced illness or the loss of
24   loved ones.  They will not be invulnerable
25   to the myriad of negative social and

Page 237

1   psychological factors affecting all

2   Americans.  Returning to the school setting

3   will pose a transition for staff as well as

4   students."

5               Did I read that correctly?

6        A.    Yes.

7        Q.    How did IPS staff struggle --

8   or strike that.

9               How, if at all, did the

10  struggles of IPS staff during the pandemic

11  bleed into the classroom?

12              MR. INNES:  Objection.  Lack

13       of foundation.

14              MR. KARP:  You can answer.

15              THE WITNESS:  Oh, okay.  So

16       can you rephrase the question?

17  BY MR. KARP:

18       Q.    How about if I ask it a

19  little bit differently?

20       A.    Okay.

21       Q.    Did the struggles -- or did

22  Irvington staff face mental and emotional

23  struggles during the COVID-19 pandemic?

24              MR. INNES:  Objection.

25              THE WITNESS:  Can I answer?

CONFIDENTIAL

Page 238

```
 1                MR. INNES:  Yes.
 2                THE WITNESS:  Okay.  Yes, I
 3           would say yes.
 4  BY MR. KARP:
 5       Q.     And did those struggles
 6  manifest themselves in any way when
 7  Irvington transitioned back to in-school
 8  learning?
 9                MR. INNES:  Objection.
10                THE WITNESS:  Well, yes, and I
11           would say that what happened was is
12           that the realities of students
13           being at home manifested in the
14           classroom, because that's when you
15           saw students nonstop are trying to
16           be online all the time whether
17           it's, you know, it has been said
18           cell phones, but they also would
19           get online through their computers
20           that they have in the classroom.
21           And it was a stressor for teachers
22           to constantly try to get the
23           attention to engage the students
24           with the content that they're
25           charged to teach.  And it was, it
```

CONFIDENTIAL

Page 239

1          was, that would be a stressor.  I
2          would think that's one of the
3          stressors, amongst other things,
4          but it definitely was and it
5          continues to be a stressor to
6          compete with something that has
7          features versus let's, you know, go
8          over Romeo and Juliet.
9     BY MR. KARP:
10          Q.     I appreciate that answer.
11     I'll move to strike as nonresponsive.  My
12     question was simply about the struggles
13     that staff themselves were experiencing
14     during the pandemic and how, if at all,
15     those struggles might have manifested
16     themselves back in the classroom once you
17     were back to in-person instruction.
18               MR. INNES:  Okay.  Objection.
19          A brief statement, the doctor
20          answered your question.  If you
21          don't like the answers to her
22          questions, you can ask a different
23          question.  But you're not going to
24          strike her answers that are
25          truthful and that she understands,

CONFIDENTIAL

Page 240

```
 1              because she answered, right?  That

 2              is the instruction you gave her, if

 3              she answers the question, she

 4              understood the question.

 5                   MR. KARP:  Your position is

 6              noted and you may answer my

 7              question.

 8                   THE WITNESS:  Okay.  So --

 9              okay.  I'll answer it.  So are

10              there stressors that teachers had

11              when they came back, just so I

12              understand what your question is.

13  BY MR. KARP:

14        Q.    That they had during the

15  pandemic while they were out of the

16  classroom that might have materialized or

17  become more of an issue when she returned

18  to in person.

19        A.    I guess that that's possible,

20  but I would say that there are things that

21  are triggers.  So when you're really trying

22  to focus, maybe you lost a loved one, I

23  don't know, but one of the things that I am

24  very proud of is that we didn't lose any

25  staff members or students during the
```

CONFIDENTIAL

Page 241

1    pandemic.  We didn't lose -- they may have
2    lost family members, that's not to negate
3    that, but we didn't lose any staff members
4    due to COVID during my tenure here.  And we
5    put in different safety measures to try to
6    help our staff, we always have, but one of
7    the constants was trying to teach, trying
8    to reacclimate students to school life and
9    I would say those were the greater
10   stressors for my staff members, because
11   when you're trying to compete with a social
12   media platform versus, you know -- you
13   know, trying to get them on task, that
14   was -- that was probably, if anything, that
15   was probably one of their greatest
16   stressors in the classroom when they
17   transitioned back in.
18          Q.    Further down in the document
19   Dr. Rivera writes, "In recent weeks, not
20   only are communities dealing with the
21   trauma of a global pandemic, but the
22   additional anxiety and uncertainty of major
23   disruption, political and civil unrest due
24   to racial hatred and violence.  The impact
25   of this is especially felt in black

CONFIDENTIAL

Page 242

1   communities.  Emotions and tensions are
2   running high and children are likely being
3   exposed to experiences, images in the
4   media, and conversations all around them
5   that may be frightening and confusing."
6                   Do you see that?
7         A.      I see that.
8         Q.      Do you have any understanding
9   of what Dr. Rivera was referring to in that
10  paragraph?
11                  MR. INNES:  Objection to form.
12                  THE WITNESS:  I think she's
13              talking about the -- if this is
14              2020, everything that was going on,
15              but I think one of the things to
16              underscore is images in the media
17              and while, when I look at that, I
18              think of images in the social media
19              and having content that is
20              protected, but people liking things
21              that are traumatic, things that
22              show people being marginalized and
23              polarized, and it living on in
24              infamy and people liking it and
25              sharing it and it goes over and

Page 243

```
 1              you're reliving it over and over
 2              again on certain social media
 3              platforms, that is, that is the
 4              most traumatic thing.  Because
 5              major disruption, political and
 6              civil unrest, unfortunately, in my
 7              lifetime, has been a norm.  That
 8              has been a norm, unfortunately.
 9              Being an African American, you
10              know, that has been for the last 52
11              years, been my reality.  What I've
12              noticed, especially as it pertains
13              to what students have to deal with,
14              they have to relive these things
15              that should and could go away.  And
16              when you think someone is your
17              friend or you think someone likes
18              you and then you find out that they
19              like something, some content that
20              is objectionable or racist or
21              harmful, and then they share it,
22              that is where I would argue is, the
23              most harm is done.
24   BY MR. KARP:
25          Q.    When I asked you if you had
```

CONFIDENTIAL

Page 244

1    an understanding of what Dr. Rivera was

2    referring to in this paragraph, you

3    testified, "if this is 2020, everything

4    that was going on."

5            A.      Uh-huh.

6            Q.      What did you mean by that

7    specifically?

8            A.      I believe, I don't know the

9    exact date, but I know that George Floyd, I

10   believe, was killed during that time.  But

11   I also know that there were other people

12   who I can name, which you probably wouldn't

13   know, that were killed during a certain

14   time but it wasn't placed on social media,

15   the imagery of a person's death and being

16   liked or shared and people making comments

17   and making features and, you know, mocking

18   it was not a reality that I can say that I

19   experienced as a child.  But the children

20   that she's speaking of, that is their

21   reality.  And it, if you want to,

22   obviously, I think we can all agree racism

23   is horrible, but to promote it in a sense

24   and share it constantly and continuously,

25   the fruits of that, is devastating and it's

Page 245

1  hard to get past.

2       Q.     You mentioned certain

3  individuals you didn't think I would

4  recognize or whose names I wouldn't

5  recognize.

6       A.     So you would like me to

7  mention them?  Because I would say when I,

8  you know, I'm from Indiana, there were

9  people who were murdered or killed or

10  something like that, but their names, it

11  was before social media existed.  So you

12  wouldn't know about them, so.

13       Q.     I just wanted to know what

14  you were referring to, that's all.

15       A.     Oh, okay.

16       Q.     Yeah.

17       A.     Okay.

18       Q.     And do you believe that that

19  is what Dr. Rivera was referring to in her

20  paragraph -- in this passage that she wrote

21  in her proposal?

22       A.     I believe that for sure, but

23  I think she's speaking to when she says the

24  "uncertainty of major disruption, political

25  and civil unrest due to the racial hatred

CONFIDENTIAL

Page 246

1    and violence."  The impact, and when you

2    get down, images in the media, I think that

3    the empathy and the sympathy even to things

4    that happen have been numbed by people

5    placing things on a platform, sharing it as

6    though the people in those images aren't

7    real.  So it's a game changer.  It's a game

8    changer for sure.  And I think she would --

9    that's when she says the images in the

10   media, I think that she's not -- she's not

11   talking about an image on CBS or NBC alone,

12   I think she's talking about all media.

13           Q.     I'm sorry, you refer to the

14   George Floyd shooting?

15           A.     Not shooting, he wasn't --

16           Q.     Or I apologize, his murder.

17           A.     His murder, yeah.

18           Q.     That was being covered on

19   national news, correct?

20           A.     Uh-huh.

21           Q.     And everyone was talking

22   about it, right, it was a horrible

23   incident, correct?

24           A.     Yes.

25           Q.     There were riots and protests

CONFIDENTIAL

Page 247

1  around the George Floyd killing, correct?
2          A.     Yes.
3          Q.     And that would have been
4  stressful, it was stressful for everyone,
5  including Irvington Public School students,
6  correct?
7          A.     I think, yes, but remember,
8  they're on social media.  I don't think
9  they watch the news like I may watch the
10  news or whatever news outlet that is your
11  soup du jour.  I think they see these
12  images on social media.  And one of the
13  instinctual things that are part of our
14  children's reality in IPS is to share, is
15  to like and that is -- makes a thing live
16  on.  And it also makes it so that you're
17  starting to see it over and over until you
18  become numb to certain things.  And that's
19  really heartbreaking.
20          Q.     Let's look at the next page,
21  which is, includes a section, "Potential
22  Strategies for Staff."  And this is page
23  ending 8211.
24                  Do you see that?
25                  And Dr. Rivera wrote, "For

CONFIDENTIAL

Page 248

1  staff, these may include school-wide
2  programs and activities aimed at enhancing
3  school climate, trauma related staff
4  trainings, support groups, classroom
5  interventions, individual consultation, and
6  the provision of resources staff may have
7  access for guidance and support."
8              Do you see that?
9      A.    Yes.
10     Q.    Okay.  Dr. Rivera did not
11  mention social media in her potential
12  strategies for staff, correct?
13     A.    Yes.
14     Q.    Next she refers to potential
15  strategies for families.
16             Do you see that?
17     A.    Yes.
18     Q.    "The needs of parents and
19  caretakers will be assessed.  Access to
20  resources for parents regarding such
21  concerns as how to talk to their children
22  about their experiences, navigating grief
23  and loss, stress management, distress
24  tolerance, and where to find needed
25  services within the community will be

Page 249

1   provided."

2                   Do you see that?

3         A.     Yes, I see that.

4         Q.     She also refers to parent

5   workshops and support groups.

6                   Do you see that?

7         A.     Yes.

8         Q.     Dr. Rivera doesn't mention

9   the words, "social media," in her potential

10  strategies for families, correct?

11        A.     No, she doesn't.

12        Q.     She also writes about

13  potential strategies for students.  "The

14  quick identification of individual students

15  for services will also be essential.

16  Quickly assessing students known to staff

17  to have suffered a loss or other

18  significant trauma or identified as

19  displaying a need will be necessary to

20  immediately provide them with needed

21  support."

22                   Do you see that?  Did I read

23  that correctly?

24        A.     That is correct.  And I would

25  just say that similar to what she put up at

Page 250

```
 1   the top for staff, as what she notes in the
 2   student section, are classroom
 3   interventions.  And I think because of the
 4   new norm that was set forth, although not
 5   fully realized at this time, it would be
 6   inclusive of what -- of social media, of
 7   media influences, being the teachers
 8   teaching and the students learning, okay,
 9   sorry.
10          Q.     That's okay.  Have you spoken
11   to Dr. Rivera about the meaning of
12   classroom interventions as she used that
13   phrase in this proposal?
14          A.     I have not.
15          Q.     She doesn't use the words,"
16   social media," in any of these potential
17   strategies for students, correct?
18          A.     That is correct.  However,
19   knowing my own experience and knowing what
20   was going on, I would say that classroom
21   interventions would definitely talk about
22   things that were interrupting the
23   instructional process, which the reality
24   was is that social media has and was and is
25   been one of those.
```

CONFIDENTIAL

Page 251

1          Q.       Dr. Rivera doesn't mention
2     Facebook anywhere in this proposal,
3     correct?
4          A.       No, she does not.
5          Q.       She doesn't refer to TikTok?
6          A.       No, she does not.
7          Q.       She doesn't refer to
8     Instagram?
9          A.       She does not.
10         Q.       She doesn't refer to
11    SnapChat?
12         A.       She does not.
13         Q.       And she does not refer to
14    YouTube, correct?
15         A.       She does not.
16         Q.       After she submitted this
17    proposal about the results of the COVID-19
18    pandemic, the district hired her, right?
19         A.       Yes.
20         Q.       Let's move onto tab 16.  What
21    exhibit number are we up to?
22                   THE EXHIBIT TECH:  Nineteen.
23                   - - - - -
24                   (Email String Bates
25              BW__Irvington00161969 to 00161970

CONFIDENTIAL

Page 252

1              marked Vauss Exhibit 19 for
2              identification.)
3                     - - - - -
4    BY MR. KARP:
5         Q.    Thank you.  We'll mark this
6    as Exhibit 19, and this is Bates starting
7    BW__Irvington00161969.
8                   Dr. Vauss, this is an email
9    dated January 29, 2021.
10                  Do you see that?
11        A.    Yes.
12        Q.    It's from Patricia Dowd to
13   you?
14        A.    Yes.
15        Q.    Who is Patricia Dowd?
16        A.    She is our former director of
17   special services.
18        Q.    And she wrote, "Thank you,
19   Dr. Vauss.  I have attached the final
20   verbiage written for the grant, I will
21   attach -- excuse me, I will attached a
22   coded list of students by school and this
23   signed letter with your approval."
24                  Do you see that?
25        A.    Yes.

CONFIDENTIAL

Page 253

1          Q.     Okay.  And then the

2     attachments that's listed here is called,

3     "Grant Final."

4               Do you see that?

5          A.     I do.

6          Q.     Okay.  I'm handing you tab

7     16A.  For the record, this is

8     BW__Irvington00161971.  And this will be

9     Exhibit 20.

10                    - - - - -

11               (Grant Final Attachment

12          Bates BW__Irvington00161971

13          marked Vauss Exhibit 20 for

14          identification.)

15                    - - - - -

16     BY MR. KARP:

17          Q.     Do you recognize this

18     document, Dr. Vauss?

19          A.     I do.

20          Q.     What is this document?

21          A.     It is -- I believe it's an

22     application for a grant.

23          Q.     Do you recall which grant?

24          A.     Actually, I do not.

25          Q.     Partway through, partway down

CONFIDENTIAL

Page 254

1    the page, there is a section listing out a
2    number of schools in Irvington Public --
3          A.      Uh-huh.
4          Q.      Excuse me, strike that.
5                  Partway through -- partway
6    down the page, there is a section listing
7    out schools in the Irvington Public School
8    District.
9                  Do you see that?
10         A.      Yes.
11         Q.      And for each of the schools
12   listed, there's also some data regarding
13   the percentage of economically
14   disadvantaged students and the percentage
15   of chronic absenteeism.
16                 Do you see that?
17         A.      Uh-huh, yes.
18         Q.      Do you have any reason to
19   doubt the accuracy of the data that's
20   contained here?
21         A.      No, I believe this is from
22   2021, yes.  This is, seems to be accurate.
23   I mean, I would think.  Yes, I would think
24   it would be accurate.
25         Q.      I just wanted to make sure

CONFIDENTIAL

Page 255

1    you finished your answer, I'm sorry.

2         A.     Uh-huh.

3         Q.     For Irvington High School,

4    for example, 67 percent of students are

5    identified as economically disadvantaged

6    and 50 percent are chronically absent?

7         A.     At that time, yes.

8         Q.     Meaning that 50 percent of

9    Irvington Public School students at this

10   point in time had missed ten or more

11   classes in the enrollment period, correct?

12                   MR. INNES:  Objection.

13           Misstates prior testimony.

14                   THE WITNESS:  So this would be

15           based upon them logging in for

16           virtual instruction and staying on.

17           So, yes, there was a problem with

18           getting the students to stay on the

19           site for instruction versus going

20           on somewhere else.

21   BY MR. KARP:

22        Q.     Okay.  Let's look at the

23   second page of this document, which ends in

24   1972.

25        A.     That's my birthday.

Page 256

1          Q.      And halfway down the page,

2    this grant application states, "Irvington,

3    an identified high-risk COVID area has had

4    a disruption in our academic program since

5    March 17, 2020 causing us to remain fully

6    virtual while simultaneously dealing with a

7    myriad of issues such as limited access to

8    technology, homes without internet access,

9    and families not technology savvy or with

10   limited language skills."

11                 Do you see that?

12          A.      Yes, uh-huh.

13          Q.      What is meant by, "Irvington

14   is identified as a high-risk COVID area"?

15          A.      Meaning we had a lot of COVID

16   cases.

17          Q.      I see.  And that would have

18   been particularly stressful for Irvington

19   Public School students, correct?

20                 MR. INNES:  Objection to form.

21                 MR. KARP:  You can answer.

22                 THE WITNESS:  Oh, okay.  I

23          would imagine it would be very

24          stressful.  I don't know that, once

25          again, I don't think I can quantify

Page 257

```
 1              to say that the stress regarding
 2              COVID was more here, a lot, what
 3              number is that, I don't know.  So
 4              it was stressful.
 5    BY MR. KARP:
 6         Q.     And among the myriad of
 7    issues that are identified here are limited
 8    access to technology, homes without
 9    internet, and families that aren't tech
10    savvy, or have limited language skills,
11    correct?
12                   MR. INNES:  Objection.
13              Argumentative.
14    BY MR. KARP:
15         Q.     Do you see those listed?
16         A.     Yes, I see that, yes, uh-huh.
17         Q.     Social media is not
18    identified as one of the myriad issues,
19    right?
20         A.     No, not on this, no.
21         Q.     And then later the grant
22    application says, "In addition, due to the
23    unique combination of the public health
24    crisis, social isolation, and the effects
25    of economic recession, we have experienced
```

CONFIDENTIAL

Page 258

1   more mental health problems among our
2   students at every grade level in this
3   virtual environment."
4                   Do you see that?
5           A.      I see that, yes.
6           Q.      Irvington identified a public
7   health crisis, social isolation, and the
8   effects of an economic recession as being
9   responsible for more mental health problems
10  at every grade level in the district.
11                  Do you see that?
12                  MR. INNES:  Objection.
13                  THE WITNESS:  Okay.
14  BY MR. KARP:
15          Q.      Let's turn the page to 1973.
16  About halfway down, "Current research by
17  the American Academy of Child and
18  Adolescent Psychology has demonstrated that
19  COVID-19 has affected learners' mental
20  health and increased their depression and
21  anxiety rates.  Our parents and teachers
22  have documented changes in their children's
23  emotions and behaviors during the pandemic
24  such as irritability, nervousness,
25  loneliness, uneasiness, and even

CONFIDENTIAL

Page 259

1  depression, further impacting their
2  academic success."
3              Do you see that?
4      A.    I do.
5      Q.    Social media is not listed
6  there, correct?
7      A.    That is correct.
8      Q.    Okay.
9      A.    However, I would say that
10  when we talk about social isolation,
11  irritability, nervousness, depression,
12  those were -- I would say one of the causes
13  was our students, the social isolation
14  calls them to turn to something that was
15  geared towards them, which is social media
16  and to fill voids, they used social media
17  in a way that was not conducive to them
18  being able to learn and, thus, I would just
19  say that it's -- this report does not
20  examine all of the root causes.  So I would
21  say that those same people who, given the
22  knowledge that we have, even if you look at
23  the date 2021, if you were to say September
24  of 2021, they might have a different
25  response.

CONFIDENTIAL

Page 260

1          Q.     Did you write this grant
2    application?

3          A.     I wrote it in -- I offered
4    information, but this, the anecdotals, the
5    gathering of data, was from my team or
6    designee.  I had to sign off, but it
7    wasn't -- all the data was not collected by
8    me, no.

9          Q.     And Patricia Dowd was on your
10   team?

11         A.     Yeah, she was the director of
12   special services.

13         Q.     I see.  So fair to say that
14   you and your team put this grant
15   application together?

16         A.     I was --

17                MR. INNES:  Objection to form.

18                THE WITNESS:  I was informed,
19         yes.

20   BY MR. KARP:

21         Q.     Okay.  You could have written
22   that social media was having a negative
23   impact on student mental health, correct?

24         A.     I imagine I could have.

25         Q.     And you didn't?

CONFIDENTIAL

Page 261

1          A.          The impact that it was having

2    at that particular moment was probably not

3    fully known at that time.  Was it an issue,

4    had it been an issue, yes.  But when, all

5    of a sudden we have a unique situation, we

6    have students who are no longer in our

7    classes or in our schools and they're

8    online and sometimes parents may say, you

9    know, you're online and think you're on the

10   sites that you're supposed to be on.  We

11   think that you're listening to us as we

12   look at you on the screen and you're

13   actually on social media.  That, I probably

14   wouldn't have spoken to at that point, but

15   knowing what I've known and the experience

16   that I've had since, yes, I would -- I

17   could have if I had known at that

18   particular moment.

19          Q.          Okay.  So you did not, you

20   and your team did not identify social media

21   expressly as being responsible for any of

22   these COVID-related issues, correct?

23                    MR. INNES:  Objection to form.

24                    THE WITNESS:  Not in this

25            grant application, no.

```
                                    Page 262
 1   BY MR. KARP:
 2        Q.      And the grant application
 3   that we're looking at right now was
 4   circulated in January of 2021?
 5        A.      I believe so, yes.  Yes,
 6   uh-huh.
 7        Q.      You mentioned earlier that
 8   students were sent home in connection with
 9   the pandemic in March of 2020; is that
10   right?
11        A.      Yes.
12        Q.      So as of January 2021, your
13   testimony is that you did not know or
14   realize the potential impact that social
15   media was having on students?
16              MR. INNES:  Objection.
17          Misstates prior testimony.
18              THE WITNESS:  The fullness of
19          the harms at that particular
20          juncture, no, I did not know.
21   BY MR. KARP:
22        Q.      Okay.  And, at that point,
23   they had been in a remote learning
24   environment for three or so months during
25   the 2020-2021 school year?
```

CONFIDENTIAL

Page 263

1          A.      Yes.

2          Q.      And a few months the prior
3     year, correct?

4          A.      A month the prior year.  For
5     the month of May, May 4th to the end of the
6     school year.

7          Q.      They had been home and
8     learning remotely for multiple months at
9     that point in a January of 2021?

10         A.      Remotely, yes, virtually, no.

11         Q.      Let's stay on page 1973.  All
12    the way down at the bottom, "Regardless of
13    the school or the grade level, our students
14    have faced notable challenges and barriers
15    including, but not limited to:  Changes in
16    their daily routines, lack of
17    predictability, increased fears about their
18    safety and the safety of loved ones,
19    extended periods of isolation, and, in some
20    cases, loss of a loved one, limited access
21    to food and safe shelter, and ongoing fear
22    regarding safety.  Therefore, our students'
23    frustrations are demonstrated through
24    externalizing behaviors such as refusal to
25    attend and participate in school, defiance

CONFIDENTIAL

Page 264

1    or verbal and physical outbursts, an

2    increase in anxiety and depression."

3                Did I read that correctly?

4         A.    Yes.

5         Q.    Again, you did not mention

6    social media in this part of the

7    application, correct?

8               A.    Uh-huh.

9                    MR. INNES:  Objection to form.

10                   THE STENOGRAPHER:  I didn't

11           get an answer, but "uh-huh."

12                   THE WITNESS:  Oh, sorry, yes.

13          Sorry.

14   BY MR. KARP:

15        Q.    "Our parents have also

16   reported they are also seeing internalizing

17   behaviors such as withdrawal, changes in

18   sleeping and eating patterns, and increased

19   physical complaints (headaches, stomach

20   aches).  Teachers have reported these

21   challenges as well as changes in their

22   students' abilities to focus and remain on

23   task in our Google classrooms at all

24   schools and grade levels."

25                   Do you see that?

Page 265

1          A.      That's in keeping with what
2     I've been saying that, you know, during
3     that time period, the soup du jour became
4     social media platforms and what was being
5     offered was a structure again after having
6     not had structure.  And particularly
7     keeping them on a platform to learn as
8     opposed to something that is probably more
9     exciting.  So, yes, this is correct and
10    it's accurate.
11         Q.      Let's turn back to 1973.  My
12    apologies, just one moment, Dr. Vauss.  We
13    can put this to the side.
14               I'm about to start another
15    topic, do we want a break or are we good to
16    continue?
17               MR. INNES:  Do you need a
18          break?
19               THE WITNESS:  It's up to you.
20               MR. INNES:  How much more do
21          you have to go do you think?
22               MR. KARP:  Another couple of
23          hours probably.
24               MR. INNES:  Okay.  Yeah, let's
25          take a break and use the bathroom.

CONFIDENTIAL

Page 266

```
 1              THE VIDEOGRAPHER:  The time
 2         right now is 4:06 p.m.  We are off
 3         the record.
 4              - - - - -
 5      (A recess was taken at this time.)
 6              - - - - -
 7              THE VIDEOGRAPHER:  The time
 8         right now is 4:29 p.m.  We're back
 9         on the record.
10  BY MR. KARP:
11      Q.    Dr. Vauss, I am handing you
12  tab 17, which we will mark as Exhibit 21.
13  I'll represent that this was printed from
14  the internet and has quite a lot of
15  advertisements at the end.  For
16  completeness just so you have the full
17  document, I have a complete copy for you,
18  but I also have an excerpt?
19      A.    Uh-huh.
20              MR. INNES:  Thanks.
21              - - - - -
22              (NJ 101.5 News Article
23         marked Vauss Exhibit 21 for
24         identification.)
25              - - - - -
```

CONFIDENTIAL

Page 267

1  BY MR. KARP:

2          Q.     Dr. Vauss, this is a news

3  article pulled from the website of New

4  Jersey 101.5.

5                 Do you see that?

6          A.     Uh-huh.

7          Q.     The headline of this article

8  is, "Shocking:  Fights, riots, rats,

9  plague, crumbling New Jersey school led by

10  red-carpet superintendent."

11                 Do you see that?

12          A.     Uh-huh, yes.

13          Q.     The article was published on

14  June 5, 2023.

15                 Do you see that?

16          A.     Yes, uh-huh.

17          Q.     And on the front page it

18  says, "Scenes from Irvington Public Schools

19  and Superintendent April Vauss."

20                 Do you see that?

21          A.     Yes.

22          Q.     Is that an image or a photo

23  of you on the cover of this news report?

24          A.     That is.

25          Q.     Did you know that they were

Page 268

1    going to print that photo of you in this

2    report?

3           A.     I did not.

4           Q.     How did it make you feel when

5    you saw this report?

6           A.     Well, this -- this news

7    outlet and this outlet is a political

8    operative.  This is a Republican -- the

9    owner of this is a Republican candidate for

10   governor who is very much aware that this

11   is mainly a Democratic town.  If you

12   deep -- dive deeper than this, you will

13   notice that there is another outlet that

14   wrote an article that disclaimed this.

15   When you look at the images in this of

16   schools in disrepair, this -- these images

17   were actually taken from an SDA report that

18   was used years, like, at this juncture,

19   ten, 12 years before they published this,

20   that were not of the high school and they

21   were used to get SDA to fix and repair

22   buildings throughout Irvington that were in

23   disrepair.

24                And they did not listen.

25   They did not check, because they had an

CONFIDENTIAL

Page 269

1    agenda.  They wanted to slander a town that

2    had a Democratic mayor.  And as we know

3    with this, the owner of this outlet running

4    for governor, how he feels about people who

5    are Democratic and who have the values of a

6    Democrat.

7                    And the cynicism of this was

8    only recognized when a different outlet, a

9    different news outlet, said, wait, we've

10   gone in and we see -- we see none of this

11   that was reported, right?  And then after

12   that report, one of the managers then

13   contacted me, which I don't see here where

14   he contacted me and then wanted to see some

15   real life imagery of the high school and

16   then wanted to speak to me.  Before, they

17   just wanted to say that they contacted me.

18                    And at the time, I asked

19   them, will you let me see the pictures?

20   The first time I saw the pictures that they

21   used was in the news article.  It was

22   cynical, because the people who listen to

23   101.5 want to believe this about a

24   predominantly black community.  So it fed

25   into their narrative and I thought it was

CONFIDENTIAL

Page 270

1    quite shameful.  Because then it took an

2    opportunity to take a picture that came

3    from me being at a ball to put it on like

4    this is how I dress to come to work and

5    this is how I present coming to work.  Is

6    it okay to go to a ball?  I think so.  I

7    don't come to work that way.  I don't

8    present that way.  And to slander me, to

9    say red-carpet superintendent, is as if I

10   don't know what's going on in my schools.

11   I go to my schools.  I see things in my

12   schools.  I'm not in an ivory tower.  I'm

13   not away. I live in this community.  I

14   know -- I know what I'm talking about what

15   goes on here, so I'm not the average

16   superintendent.

17             So this, you know, is funny,

18   this is, it's cynical, because you take

19   images that come from an SDA book that was

20   created in 2013 or 2014 from all throughout

21   the district that when it was put together,

22   I wasn't -- I was -- maybe I was a

23   principal at the time, I think I may have

24   been an AP, and they just put it out.  And,

25   you know, when you find out you're not

CONFIDENTIAL

Page 271

1  correct, you know, it's public shame,

2  private apologies.

3          Q.      Thank you for that response.

4  I want to walk through this article just to

5  understand what exactly was reported by New

6  Jersey 101.5.

7          A.      Uh-huh.

8          Q.      If we look at the cover page

9  here, New Jersey 101.5 reported, "A teacher

10 is blowing a whistle on horrific conditions

11 at Irvington High School."

12              Do you see that?

13         A.      Uh-huh.

14         Q.      "While the school building

15 falls apart, the student body has grown

16 increasingly violent.  The politically

17 connected superintendent denies any major

18 problem."

19              Do you see that?

20         A.      I should make note that my

21 superintendent and other district --

22         Q.      I'm sorry --

23         A.      -- and other state officials

24 walked through and concurred with what I

25 stated, but okay.

CONFIDENTIAL

```
                                              Page 272
 1         Q.      I understand, I just wanted
 2    to see --
 3         A.      Okay.
 4         Q.      -- if what was --
 5         A.      Because I don't want to
 6    continue the same thing that happened then
 7    to be what's happening right now either, so
 8    I want to be able to infuse things that are
 9    factual.
10              MS. HENRY:  You've got a
11         lawyer.  He'll take care of you.
12              THE WITNESS:  Okay.  Thank
13         you.  Thank you.
14              MR. INNES:  Look, it's not
15         something to be glib about, right?
16         So maybe we could maintain a sense
17         of decorum.
18              MR. KARP:  I think we have
19         been very respectful and I'm trying
20         to walk through the article with
21         Dr. Vauss.
22              THE WITNESS:  Yeah.
23    BY MR. KARP:
24         Q.      Dr. Vauss, on page 2, there
25    is an image of a desk with trash underneath
```

CONFIDENTIAL

Page 273

1    it.

2              Do you see that?

3         A.    Uh-huh.

4         Q.    And New Jersey 101.5 reported

5    that their investigation revealed,

6    "unsanitary, dangerous and violent

7    conditions more likely to get a business or

8    residence condemned than can be described

9    as an environment conducive to learning."

10             Do you see that?

11        A.    Uh-huh.

12        Q.    This photograph is captioned

13   as a "Photograph of Irvington High School

14   classroom taken by a whistleblower faculty

15   member."

16             Do you see that?

17        A.    I see that.

18        Q.    And do you have any reason or

19   any basis to dispute that this is a photo

20   of Irvington High School?

21        A.    I believe it's a photo of

22   Irvington High School, and it looks as

23   though a custodian started to sweep up the

24   trash that may have been left by maybe it

25   was the scholars or whomever, and they

CONFIDENTIAL

Page 274

```
 1   started to sweep it and then someone took a
 2   picture of it.  But to intimate that that
 3   is what the students see when they walk
 4   into a classroom and they sit amongst trash
 5   is not true.
 6           Q.    So, to your knowledge, this
 7   is a photograph of Irvington High School,
 8   correct?
 9           A.    Yes.
10           Q.    And have you spoken to any
11   janitorial staff who told you that they
12   pushed these items into the -- pushed these
13   items together before the photograph was
14   taken?
15           A.    No, but I also didn't speak
16   to any staff member who told me that they
17   walk into a class and they see trash like
18   this in the middle of the learning
19   environment, so.
20           Q.    The next bullet point says,
21   "The hallways are littered with food waste
22   and vermin, both dead and alive.  Outside,
23   garbage bags overflow from dumpsters."
24               Do you see that?  Sorry, was
25   that a yes?
```

CONFIDENTIAL

Page 275

```
 1          A.      I didn't see where you
 2   were -- is it still on the same page.
 3          Q.      Yes, just under the
 4   photograph.
 5          A.      Yes, yes.
 6          Q.      I'll read it again, "The
 7   hallways are littered with food waste and
 8   vermin, both dead and alive.  Outside,
 9   garbage bags overflow from dumpsters."
10               Did I read that correctly?
11          A.      Yes.
12          Q.      "Classrooms suffer from
13   flooding and extensive water damage, with
14   at least one ceiling appearing to be
15   buckling."
16               Do you see that?
17          A.      Yes.
18          Q.      That's what New Jersey 101.5
19   reported, correct?
20          A.      Okay.  Yes.  Do you want to
21   know about the media outlet that did a
22   story that countered this that showed that
23   what the images, that they were purposeful
24   and intentional in trying to slam a
25   Democratic town and that they walked
```

Page 276

1    through the building unscheduled with the

2    administration and didn't see something

3    that they made appear as if it happened

4    every day?

5         Q.    Your counsel will have an

6    opportunity to ask you questions.  I have a

7    limited amount of time.

8         A.    I understand.  I was just

9    wanting to know if you wanted to see the

10   counter-story, so I get that.

11        Q.    And I expect that your

12   counsel will discuss that with you.

13        A.    Okay.

14        Q.    Continuing on in the article,

15   New Jersey 101.5 reported that, "In one

16   restroom, a toilet is completely detached

17   from the wall.  In another restroom a sign

18   warns students not to drink tap water."

19              Do you see that?

20        A.    You're on page --

21        Q.    The top of page 3.

22        A.    Okay.  Sorry.  Yes.

23        Q.    Are there signs warning

24   students not to drink tap water?

25        A.    No, there aren't any signs

CONFIDENTIAL

Page 277

1    warning students to not drink tap water.

2    During this period of time, there may have

3    been, but because we were changing out

4    certain -- checking for lead, checking as

5    our normal basis, so has there ever been a

6    sign, yes, because that's a normal find,

7    our normal process when we do that.  But

8    now we have filtered machines where

9    students can have access and fill up their

10   water bottles and do all of those things.

11        Q.      Today, it would be acceptable

12   for students to drink water from the tap if

13   they went into the bathroom or found a sink

14   somewhere else in the school?

15        A.      During the time that this

16   article was made, the water would have been

17   acceptable for the scholars to drink.

18        Q.      The next bullet point reads,

19   "Mold covers walls and ceiling tiles along

20   with exposed asbestos, oozing chemicals,

21   peeling paint and crumbling masonry and

22   plaster, photos show."

23              Did I read that correctly?

24        A.      You read that correctly.

25        Q.      "When students and staff are

CONFIDENTIAL

Page 278

1   not dodging falling debris, they're ducking
2   for cover from an increasing number of
3   brawls and riots that break out in
4   classrooms and hallways and spill into the
5   neighborhood, which police officers
6   stationed at the school struggle to
7   contain, a teacher said."
8              Do you see that?
9         A.    I see that.
10        Q.    And then the article goes on
11   to say that nearly -- "The nearly
12   100-year-old building, meanwhile, lacks
13   proper security and members of street gangs
14   are able to walk into the building, a
15   teacher said."
16        A.    Wow.
17        Q.    Do you see that?
18        A.    I see that.  And wow.
19   It's -- it, obviously, someone fed what
20   101.5 wanted to hear, but I reiterate that
21   I am a physical superintendent and this
22   does not match the narrative that I would
23   give of Irvington High School, nor anyone
24   else who has on an ongoing basis gone to
25   the school, or separate media outlets that

CONFIDENTIAL

Page 279

1  are not -- that don't have a political

2  vent, so.

3            Q.      If we turn the page, the

4  article reports, "Our day at Irvington High

5  School is basically about trying to make

6  sure nobody gets hurt, a whistleblowing

7  teacher told New Jersey 101.5".

8                    Do you see that?

9            A.      Yes, uh-huh.

10           Q.      "This is something that is

11 constantly being covered up.  The children

12 are suffering."

13                   Do you see that?

14           A.      Uh-huh.

15           Q.      If we move on lower in the

16 article, it states, "It is quite disturbing

17 that I am now responding to an anonymous

18 complaint when there are processes and

19 procedures in place to deal with such

20 matters, i.e. reporting to principal,

21 reporting to union representatives, et

22 cetera."

23                   And that's something that

24 you said; is that right?

25           A.      Yes.

CONFIDENTIAL

Page 280

1         Q.      Okay.  Do you recall making
2    that statement?
3         A.      Vaguely.
4         Q.      Okay.
5         A.      Yes.
6         Q.      You go on to say, "It is
7    concerning to me out of the 70-plus
8    teachers, this is an anonymous complaint
9    that should affect the entire school and
10   not just one teacher."
11                Do you see that?
12        A.      Yes.
13        Q.      Do you recall making that
14   statement?
15        A.      Yes.
16        Q.      Okay.  New Jersey 101.5 goes
17   on to report, "While the conditions of the
18   school, which serves as a largely low
19   income and underserved community, raise
20   questions about management and oversight of
21   a budget that includes $138.4 million in
22   state aid, the increasing violence might be
23   another indication of behavior issues that
24   have become widespread among students after
25   the pandemic lockdowns in New Jersey."

CONFIDENTIAL

Page 281

1              Do you see that?

2         A.     I see that statement.

3         Q.     And next, the article --

4         A.     But I have to -- I have to

5    raise a point.

6         Q.     Sorry.

7         A.     When you say, they raised

8    questions about the management and

9    oversight of a budget, and then they give a

10   number of -- financially, we would be a

11   district that has several years of zero

12   audit findings.  So if the implication is

13   that funds are being mismanaged, then that

14   would not be in keeping with reality.

15        Q.     The article goes on to

16   include a number of photographs that I

17   would like to walk through with you right

18   now.

19        A.     Uh-huh.

20        Q.     The report states, "A

21   whistleblowing teacher says Irvington High

22   School is falling apart.  In these images

23   taken from the past year, the extent of the

24   deterioration is evident contributing to an

25   environment that is also beset by growing

Page 282

1    violence among the student body."

2                  Do you see that?

3         A.    I see that.

4         Q.    On page 5, this photo is

5    described as a disturbing school image.  Do

6    you see that?

7         A.    I do.

8         Q.    Do you have any reason to or

9    any basis to dispute that the photograph

10   that is featured on page 5 was taken of an

11   Irvington public school?

12        A.    I don't have a reason to

13   believe this isn't an image of an Irvington

14   public school classroom, but my question

15   would be under -- during what year and what

16   time frame are you saying that this image

17   existed.  I would -- I would -- I would not

18   agree that during the time that this

19   article was made that that was.

20        Q.    And I just, I'm looking at

21   your testimony, I want to make sure that

22   I'm understanding, you don't have a basis

23   to disagree or dispute that this was

24   taken -- this photograph was taken of a

25   school in the district, your question is

Page 283

1    merely about the time period --
2            A.      Yeah.
3            Q.      -- is that right?
4            A.      I believe this came from an
5    SDA report that was made around 2014 or
6    somewhere a little earlier than that.  And
7    it was in an effort to get support from the
8    state to make repairs to certain areas of
9    the school district that were in disrepair.
10           Q.      And for anyone who doesn't
11   know or isn't familiar with that acronym,
12   what does SDA stand for?
13           A.      School Development Authority.
14           Q.      Okay.  And what is your basis
15   for believing that this photo and others
16   that you've referenced were part of an SDA
17   report?
18           A.      Because I saw an SDA report
19   that had some of these images within it, so
20   I -- and then, also, when I went to the
21   high school to walk through with my
22   superintendent so that he could see the
23   condition of the school, he didn't see
24   these images, neither did the person who
25   came from another county as to, I guess,

CONFIDENTIAL

Page 284

1   verify that what my county superintendent

2   would vouch for would be what he would

3   vouch for.  And after that, they said we

4   don't see these things.  So, I mean

5   that's -- and so upon, you know, looking at

6   previous photos from an SDA report that was

7   produced, it was like, oh, this is where

8   these images came from.  Because I didn't

9   see these images and I've never seen these

10  types of images at the high school.  So we

11  dug deep and said, oh, that's where these

12  images came from.

13          Q.      Do you have a copy of that

14  SDA report?

15          A.      I don't, but I can possibly

16  produce it.

17          Q.      Yes.  We will request the

18  production of that SDA report.

19          A.      Okay.

20          Q.      We can email about that

21  separately, Michael.

22                  Let's turn the page to

23  page 6.  Do you have any basis to dispute

24  that the photos that were taken and

25  included on page 6 of this article are of a

Page 285

1    school within the Irvington Public Schools

2    District?

3          A.    No.

4          Q.    If we turn the page to

5    page 7, do you have any basis to dispute

6    that the photos that were -- that are

7    included here were taken of a school within

8    the Irvington Public Schools District?

9          A.    No.

10         Q.    On page 8, do you have any

11   reason to dispute that the images are

12   contained here were taken of a school

13   within the Irvington Public Schools

14   District?

15         A.    No.

16         Q.    On page 9, do you have any

17   reason to dispute that the images that are

18   included here were taken of a school in the

19   Irvington Public Schools District?

20         A.    No.

21         Q.    On page 10, do you have any

22   reason to dispute that the images that are

23   included here were taken of a school within

24   the Irvington Public Schools District?

25         A.    I would say no.

CONFIDENTIAL

Page 286

1          Q.     In an effort to expedite this
2    a bit, as to pages 11 through 19, do you
3    have any reason to dispute that any of the
4    images that are contained on those pages
5    were taken of schools in the Irvington
6    Public Schools District?
7          A.     No.
8          Q.     Let's take a look
9    specifically at page 16 of the article.
10   Dr. Vauss, you testified that currently it
11   is safe and there's no issue drinking water
12   from the tap at the school that we're
13   currently at, which is University
14   Elementary School, correct?
15         A.     I don't believe we have taps.
16   I believe we have filter machines where
17   children can put a bottle and get water.
18         Q.     I understand.  I'm referring
19   to -- and maybe my question wasn't clear --
20   earlier, is it -- today, is it safe for
21   children to drink water from the bathroom
22   sink?
23         A.     I think theoretically, but I
24   don't think most of the -- most anyone
25   drinks water from a bathroom tap, but it's

Page 287

1    just because maybe psychologically,
2    because, you know, they don't normally do
3    that, but.
4            Q.      On page 16, the top image
5    includes a sign that says, "Caution, do not
6    drink the water."
7            A.      Uh-huh.
8            Q.      Do you see that?
9            A.      Uh-huh.
10           Q.      Are you aware that those
11   signs are currently displayed in bathrooms
12   at this elementary school where we're
13   taking this deposition?
14           A.      I'm not aware, but I would
15   imagine much like what I just said, that
16   they would say don't drink the water in the
17   bathroom.  I mean, I think that we -- we
18   have filtered water in the hallways and I
19   don't know why they would dissuade them, I
20   couldn't say.  I really couldn't answer
21   that, to be honest.
22           Q.      So you weren't aware that
23   these signs were displayed is what --
24           A.      I may have seen them, I may
25   have, but I can't say, yes, I saw it on --

CONFIDENTIAL

Page 288

1    in this bathroom, you know, in this place

2    or that place, because if this is a student

3    bathroom, I wouldn't have an occasion to go

4    into a student bathroom.

5         Q.    And you do not have an

6    understanding of what is meant by this do

7    not drink the water sign that appears in a

8    number of the bathrooms in this school?

9              MR. INNES:  Objection.  Lack

10         of foundation.

11              MR. KARP:  You can answer.

12              THE WITNESS:  So, no, I'm not

13         aware, but I'm thinking that these

14         same signs aren't near the places

15         where our students drink water.  So

16         it would be in the bathroom and the

17         rationale and the why, I couldn't

18         begin to explain.

19    BY MR. KARP:

20         Q.    Have you ever received

21    complaints about the safety of the drinking

22    water at any Irvington public school?

23         A.    I've had people ask that we

24    check the water to make sure that the water

25    is drinkable.  I think more, I think as a

CONFIDENTIAL

Page 289

1    result of the lead issue that may have

2    taken place in Newark Public Schools, that

3    they believe our water sources are the same

4    and they are not.

5           Q.    I understand.  Let's look

6    briefly at page 19.  Toward the bottom of

7    the page, New Jersey 101.5 reported that

8    this whistleblowing teacher said,

9    "Everything is dilapidated, it's falling

10   apart.  There are cockroaches everywhere,

11   there's rodents, there's mold coming from

12   the walls.  After a big rainstorm, floods,

13   water coming from the ceiling."

14              Do you see that?

15          A.    I see that.

16          Q.    That's what was reported in

17   this article, correct?

18          A.    Yeah, that was reported in

19   this article.  Allegedly reported.  I don't

20   know who the teacher is.  I don't know.  So

21   it was allegedly said by a teacher, yes.

22          Q.    Let's take a look at page 21.

23   This section is called, "Chaos in the

24   streets; gangsters walking to the school,"

25   correct?

CONFIDENTIAL

Page 290

1        A.      Yes.

2        Q.      And the article states, "For

3    several months, Irvington High School tried

4    a staggered dismissal schedule as part of a

5    plan to stop students from fighting.  But

6    the teacher who spoke to New Jersey 101.5

7    said that plan was abandoned because

8    warring factions of students would simply

9    wait for each other outside the building.

10   The brawls often end up on TikTok and

11   SnapChat."

12              Do you see that?

13       A.      Yes.

14       Q.      "The teacher said another

15   problem is many of the doors leading into

16   the school do not have alarms and are not

17   locked and can be easily opened."

18              Do you see that?

19       A.      I see that.  And I'll tell

20   you, there were so many teachers who were

21   offended by what was said here,

22   specifically about our students as if there

23   were gangs of students who were, you know,

24   circling around in the school or waiting

25   outside.  And, once again, it was a teacher

CONFIDENTIAL

Page 291

1    who said that this was an issue.  And
2    never, you know, I mean, I have no way to
3    say that it wasn't a teacher that said it,
4    but I also don't have anything that was
5    produced or anything that really proves
6    that a teacher said this.
7            Q.    And what the article reported
8    in this section is for some of these brawls
9    and fights, students would take video of
10   them and post that content to TikTok or
11   SnapChat, correct?
12           A.    Yes.
13               MR. INNES:  Do you have?
14               THE WITNESS:  But --
15               MR. INNES:  No, go ahead.
16               THE WITNESS:  I was going to
17           say, it's funny it's the TikTok and
18           SnapChat, but they don't mention
19           Instagram, which is -- was
20           notorious for having fights placed
21           on there or any type of thing that
22           would get likes or shares.  I mean,
23           you know, maybe they are aware of
24           the usage of, you know, TikTok to
25           post the fights.  I've heard of the

CONFIDENTIAL

Page 292

1          SnapChat, but, you know, yeah, so.
2    BY MR. KARP:
3          Q.    If we look at the very last
4    page of this -- or actually strike that.
5                Just to make sure I can
6    close the loop on that, what you were just
7    referring to is that for some of these
8    brawls and fights, video would have been
9    taken and the content would have been
10   posted on Instagram is the other platform
11   that you're adding to the list?
12         A.    And I would think that if
13   they had any awareness of it, it was
14   because it was shared, it wasn't that it
15   was just placed up on there, that it was
16   shared and it spread.  And that's maybe
17   how, if it was on TikTok and SnapChat,
18   whatever this person is referring to, then
19   it would have been something that was
20   shared.  And that's how he or she became
21   aware of it.
22         Q.    On the last page of this
23   article, there's a section called,
24   "Teachers do not feel safe."
25                Do you see that?

Page 293

1        A.      Uh-huh.

2        Q.      "The whistleblower said that

3   during the winter there was no heat in the

4   school and temperatures in the classrooms

5   were in the 30s."

6                Do you see that?

7        A.      Yes.

8        Q.      "Teachers do not feel safe,

9   the teacher added.  It's a very uneasy

10  feeling and you don't know what's going to

11  happen next."

12               Do you see that?

13       A.      Uh-huh.

14       Q.      Next the teacher stated that

15  you had reassured faculty that you would be

16  available to discuss any concerns and had

17  promised to check in with the staff

18  throughout the year.

19       A.      Uh-huh.

20       Q.      "But we're going on about six

21  months and we haven't seen her," meaning

22  you, Dr. Vauss; is that correct?

23       A.      Which is amazing.  But it

24  fits a narrative, because I have an on -- a

25  standing monthly meeting with the union

CONFIDENTIAL

Page 294

1   representation for the district and for

2   this person to say that I haven't been seen

3   in six months is incredulous.  But it would

4   be something that would, you know, I

5   would -- and this is my conjecture, it

6   would get the attention of someone who

7   wanted to paint a narrative, someone at

8   101.5.

9           Q.      That's what was reported by

10  New Jersey 101.5, correct?

11          A.      That's what was reported by

12  the Republican 101.5 site that makes note

13  of, I guess, in here the Democratic mayor

14  in the article as well, which I don't

15  understand what relevance that has to

16  school, but ...

17          Q.      You can put this article to

18  the side.  Dr. Vauss, I'm going to hand you

19  tab 19, which we will mark as Exhibit 22.

20  And this is Bates starting

21  BW__Irvington00489736.

22          A.      Uh-huh.

23                        - - - - -

24                  (Email dated 11/14/23 Bates

25              BW__Irvington00489736 to 00489737

Page 295

1              marked Vauss Exhibit 22 for
2              identification.)
3                    - - - - -
4    BY MR. KARP:
5         Q.     Do you see that?  And this is
6    a November 14, 2023, email.  Do you see
7    that?
8         A.     Uh-huh.
9         Q.     The subject line is, "Grief
10   Email with Resources."
11                  Do you see that?
12        A.     Yes.
13        Q.     And this email was sent by
14   Tawana Moreland to you?
15        A.     Yes.
16        Q.     Have you seen this email
17   before?
18        A.     I'm sure I have.
19        Q.     Have you had a chance to look
20   it over?
21        A.     I'm sure at this, around this
22   time period, yes, I did, I'm sure.
23        Q.     I just meant today --
24        A.     Oh.
25        Q.     -- have you had a chance to

Page 296

1    look it over?

2          A.      Okay.   Let me look at it

3    right now.   Yes.

4          Q.      Who is Tawana Moreland?

5          A.      She is the director for early

6    childhood.

7          Q.      That's consistent with your

8    signature block at the bottom of this

9    email, correct?

10          A.      Yes.

11          Q.      And Ms. Moreland is emailing

12    you regarding grief resources.

13                  Do you see that?

14          A.      Yes.

15          Q.      Do you recall why

16    Ms. Moreland reached out in this email?

17          A.      Yes.

18          Q.      Why did she reach out?

19          A.      Ms. Benbow had suffered a

20    loss.

21          Q.      And do you recall what that

22    loss was?

23          A.      Yes.

24          Q.      Can you tell me more about

25    that?

Page 297

1          A.      Ms. Benbow's daughter was
2    murdered.
3                    THE STENOGRAPHER:  What --
4                    THE WITNESS:  Ms. Benbow's
5            daughter was murdered.
6    BY MR. KARP:
7          Q.      And that would have been a
8    very serious and tragic event for the
9    Irvington community, correct?
10         A.      Yes.  Her daughter was one of
11   my students.  I had her as a teacher.
12         Q.      I'm very sorry about that.
13   Is it fair to say that a traumatic and
14   tragic event like a murder would have a
15   negative effect on students at Irvington
16   Public Schools?
17                   MR. INNES:  Objection.
18                   THE WITNESS:  I believe a
19           murder would have a negative effect
20           on any community and, yes,
21           including Irvington Public Schools.
22   BY MR. KARP:
23         Q.      And if you need a minute
24   to --
25         A.      I'm okay.  I'm all right.

CONFIDENTIAL

Page 298

1          Q.      And Ms. Moreland was reaching

2    out about grief resources that could be

3    provided to students at Irvington Public

4    Schools, correct?

5          A.      Yes.

6          Q.      To help them process and

7    grieve this very terrible incident,

8    correct?

9          A.      She wanted it to -- she

10   wanted to offer it to Ms. Benbow.

11         Q.      And Ms. Benbow, to make sure

12   I'm understanding, was the mother of the

13   child who was murdered?

14         A.      Yes.

15         Q.      Okay.  Did Irvington Public

16   Schools offer support services and grief

17   counseling to its students when this event

18   took place?

19         A.      At this time, Ms. Benbow's

20   daughter had already graduated, was grown,

21   so most of our students would not have

22   known her.

23         Q.      Okay.  So Ms. Benbow's

24   daughter at the time of this murder was a

25   former IPS student?

CONFIDENTIAL

Page 299

1          A.      Yes.

2          Q.      Was there any -- was there

3    any concern that some students at Irvington

4    Public Schools knew her?

5          A.      Well, her siblings.

6          Q.      Her siblings were current

7    students of Irvington Public Schools?

8          A.      Yes.

9          Q.      I understand.  Without

10   dwelling on this anymore, fair to say that

11   this was a very difficult and tragic event

12   for the Irvington Public Schools community?

13         A.      Yes.  When I say she was my

14   student, I mean she was my student.  She

15   was in my fourth grade class that I taught.

16   So it was -- it was very tragic and harmful

17   and hurtful, yes, it was.

18                      - - - - -

19         (Stenographer clarification.)

20                      - - - - -

21   BY MR. KARP:

22         Q.      We can put this to the side.

23   Do you need a break?

24         A.      No, I'm good.

25         Q.      Talking more generally about

Page 300

1    this -- strike that.

2                    Talking more generally about

3    tragic events of this nature, what grief

4    counseling or mental health support

5    services does Irvington Public Schools have

6    in place for students?

7          A.      So we have, we have various

8    mental health, you know, venues for

9    students.  But if we're speaking

10   specifically for grief counseling, we have

11   a system in place that if we lose a staff

12   member or a scholar or anyone, any member

13   of our Irvington school community, we

14   dispatch our HSSCs and social workers to

15   that location and we, in a very intentional

16   way, if we have to break the news to the

17   students that this has happened or if they

18   already know, we just provide support in a

19   way of our school counselors, our HSSCs,

20   and to, you know, help them process this.

21         Q.      Following the death of Ms.

22   Benbow's daughter, do you recall if any

23   students took advantage of those grief

24   counseling and support services and

25   resources that the district had available?

CONFIDENTIAL

Page 301

1           A.      Not to my knowledge.  She
2    wasn't a student at the time this happened.
3    And she had not -- she was in her twenties,
4    so most of the students didn't know her
5    other than her siblings.
6           Q.      I understand.  To your
7    knowledge -- strike that.
8                   To the extent that anyone at
9    IPS did know her, are you aware of whether
10   they sought any of these grief counseling
11   or support services?
12          A.      Not to my knowledge.
13          Q.      One of the counseling
14   services that was mentioned in the email
15   that Ms. Moreland sent you is called
16   PerformCare.  Are you familiar with
17   PerformCare?
18          A.      I am.
19          Q.      What is PerformCare?
20          A.      Well, PerformCare provides a
21   myriad of counseling, assistance to our
22   scholars, and particularly to our families,
23   whether it's counseling that has to do with
24   behavior or grief or any type of loss, they
25   provide services sometimes and usually,

CONFIDENTIAL

Page 302

1    from my recollection, usually they provide

2    those services in the home.  They'll make

3    themselves available to counsel the family

4    or the individual in the home.

5              Q.      Okay.  And in this instance,

6    PerformCare, Ms. Moreland hired --

7    highlighted for you, excuse me, that

8    PerformCare could offer bereavement

9    counseling for young children, right?

10             A.      Uh-huh, yes.

11             Q.      Is that something that the

12   district ultimately offered through

13   PerformCare?

14             A.      We do for -- if we know of a

15   student that may have suffered some type of

16   tragedy, if we're aware, then we offer it

17   to a family if they have limited resources

18   or if they have other resources, we just

19   offer it.

20             Q.      Sure.  We're going to shift

21   gears and talk about something else now.

22   Are you sure you don't need a break?

23             A.      I'm fine.

24             Q.      I'm handing you tab 22, which

25   we will mark as Exhibit 23.  Dr. Vauss,

Page 303

1   have you seen this document before?

2          A.     I have.

3          Q.     Can you tell me what this

4   document is?

5          A.     I believe this complaint is

6   as it relates to a student who happened to

7   be special needs who urinated on another

8   student.

9                      MR. INNES:  So, Counsel,

10             before you ask another question I'm

11             going to make another statement on

12             the record and maybe you just

13             haven't been part of the discovery

14             issues in this case, but we have

15             taken the position that we're not

16             producing documents that address

17             individual students or individual

18             student harm.  So I guess I'll let

19             you ask questions about this, but I

20             think at the moment, I'm going to

21             object to the entire line of

22             questioning.

23                      MR. KARP:  I wasn't aware of

24             that, I'll represent that on the

25             record.  How about this, let's put

CONFIDENTIAL

Page 304

1          this document to the side for now
2          and I'll continue with some other
3          questions and we'll take a quick
4          break a little bit later so that I
5          can sort out whether I want to
6          revisit.
7               MR. INNES:  Okay.  We can
8          also -- I mean, if we're going to
9          go to another day, which I think
10          we've agreed to, we can talk about
11          it and revisit it then if you want.
12  BY MR. KARP:
13       Q.    Sure.  Dr. Vauss, I am
14  handing you tab 25.  We're going to scrap
15  the other Exhibit 23 designation that I
16  gave for the document earlier, as I'm not
17  sure whether we'll proceed with that.  This
18  document, tab 25, will be marked as
19  Exhibit 23.  And for the record, this is
20  Bates starting BW__Irvington 00063621.
21               Dr. Vauss, this is a
22  January 24, 2023, email.  Do you see that?
23       A.    I see this.
24               - - - - -
25               (Email dated 1/24/23 Bates

Page 305

```
 1              BW__Irvington00063621 to 00063622
 2              marked Vauss Exhibit 23 for
 3              identification.)
 4                   - - - - -
 5    BY MR. KARP:
 6         Q.    The subject line is,
 7    "Important - New Jersey school districts
 8    Social Media Lawsuit."
 9                 Do you see that?
10         A.    Uh-huh.
11         Q.    This is from William Shinoff
12    at frantzlawgroup.com?
13         A.    Yeah, I see that.
14         Q.    Okay.  Who is Mr. Shinoff?
15         A.    It says he's a lawyer, but I
16    don't know, I don't know him.  I have never
17    spoken to him ever.
18         Q.    You've never spoken with Mr.
19    Shinoff?
20         A.    No.
21         Q.    Do you recall receiving this
22    email?
23         A.    I don't recall receiving
24    this.
25         Q.    The email states, "Dear
```

CONFIDENTIAL

Page 306

1    superintendent, Over the past three years,

2    the attorneys at Frantz Law Group and I

3    have been working tirelessly representing

4    nearly 1,000 school districts across the

5    country against JUUL Labs and Altria to

6    hold them accountable for the youth vaping

7    epidemic that is impacting our nation.  As

8    a result of these efforts, in December of

9    2022 a proposed settlement was reached with

10   JUUL Labs and its founders, directors, and

11   board members.  JUUL agrees to pay 1.2

12   billion in youth vaping settlement,

13   Bloomberg News, Reuters," and that appears

14   to be a link.

15                 Do you see that?

16        A.     Yeah, I see that.

17        Q.     Okay.  Did Irvington Public

18   Schools participate in any litigation

19   against JUUL Labs?

20        A.     Not to my knowledge, not

21   during my tenure.  I know of no lawsuit

22   with JUUL.

23        Q.     What about any litigation --

24   or strike that.  Let me rephrase.

25                 Has Irvington Public Schools

Page 307

1  participated in any litigation against

2  Altria?

3          A.      Not to my knowledge.

4          Q.      Do you know anything about

5  the claims that were made by litigants

6  against JUUL Labs and Altria as they're

7  described by Mr. Shinoff in this email?

8                  MR. INNES:  Objection.

9                  THE WITNESS:  I have no idea.

10 BY MR. KARP:

11         Q.      Prior to seeing this email in

12 today's deposition, were you aware of any

13 litigation that school districts had

14 brought against JUUL Labs or Altria?

15         A.      I was not aware of any.

16         Q.      This is the first you're

17 hearing of that type of -- that litigation?

18         A.      Yeah.  I mean, yes, I'm not

19 aware of them being sued or anything like

20 that, no.

21         Q.      Let's continue reading, Mr.

22 Shinoff wrote, "While we continue our

23 litigation against Altria for the vaping

24 epidemic, there is another matter that

25 needs to be addressed by school districts

CONFIDENTIAL

Page 308

1  across the country, and this is the mental

2  health crisis that has been caused by

3  social media companies."

4              Do you see that?

5      A.     I do.

6      Q.     Mr. Shinoff goes on to say,

7  "Frantz Law Group is in the process of

8  beginning litigation on behalf of school

9  districts against Facebook, TikTok, Snap,

10 and YouTube."

11             Do you see that?

12     A.     Yes, I see it.

13     Q.     Is it your understanding that

14 those are the Defendants in the case that

15 Irvington has brought against social media

16 companies?

17     A.     Yes, I think those are the

18 the companies that you list that you

19 represent.

20     Q.     "This lawsuit alleges that

21 these companies have caused a mental health

22 crisis among children and teenagers that is

23 marked by higher proportions of anxiety,

24 depression, and thoughts of self-harm, all

25 of which severely affect their ability to

Page 309

```
 1   succeed in school."
 2                  Do you see that?
 3           A.    Uh-huh.
 4           Q.    This is an email that Mr.
 5   Shinoff sent to you as the superintendent,
 6   correct?
 7           A.    Uh-huh, yes.
 8           Q.    Are you aware of whether
 9   other superintendents received this email?
10           A.    I'm not --
11                 MR. INNES:  Objection.
12                 THE WITNESS:  Oh, sorry.  I'm
13          not aware.
14   BY MR. KARP:
15           Q.    Let's go down a little bit in
16   this email to the third to last paragraph.
17   "This lawsuit will be similar to the JUUL
18   lawsuit as we will be seeking to coordinate
19   various lawsuits into one multi-district
20   litigation overseen by one judge.  All that
21   will be required from your district to
22   participate is to fill out at a later date
23   a court-ordered discovery questionnaire."
24                  Do you see that?
25           A.    Uh-huh.
```

CONFIDENTIAL

Page 310

1          Q.      According to Mr. Shinoff, all

2     that a school district needed to do to

3     participate in this litigation was to fill

4     out a questionnaire?

5          A.      Uh-huh.

6          Q.      Do you see that?

7          A.      I see that.

8          Q.      "In addition, there is no

9     cost to your school district to join this

10    matter as we are handling this case on a

11    contingency fee basis.  As such there is no

12    financial harm for your District to be

13    involved because if there is no recovery,

14    then your District will pay no fees and

15    will not have to reimburse any litigation

16    cost we advance on your behalf."

17               Do you see that?

18          A.      Uh-huh, yes.

19          Q.      According to Mr. Shinoff, a

20    school district could join this lawsuit at

21    no cost, correct?

22          A.      Yes.

23          Q.      And then the last statement

24    that Mr. Shinoff makes in this email is

25    that, "If you are interested in learning

CONFIDENTIAL

1    more or if you would like a copy of this

2    contingency fee agreement to join this

3    matter, please contact me at

4    wshinoff@frantzlaw.com --

5    frantzlawgroup.com or at 619-964-0073."

6                    Do you see that?

7         A.      I see that.

8         Q.      Did you respond to

9    Dr. Shinoff -- to Mr. Shinoff when you

10   received this email?

11                  MR. INNES:  Objection.  She

12           already testified she didn't even

13           remember receiving it.

14                  MR. KARP:  She can tell me

15           that right now if she wants.

16                  MR. INNES:  Okay.  So before

17           you do that, you've spent, what,

18           five, ten minutes questioning a

19           witness about a document she says

20           she never saw, reading it to her to

21           see if you read it correctly.  This

22           isn't a deposition that you think

23           you need more than you need seven

24           hours.  It's your record.  Go for

25           it.

CONFIDENTIAL

Page 312

1                    MR. KARP:  Dr. Vauss, you may

2              answer the question.

3                    THE WITNESS:  Can you repeat

4              the question?

5    BY MR. KARP:

6          Q.    Sure.  Do you recall

7    reaching -- strike that.

8                    Did you reach out to Mr.

9    Shinoff in response to this email?

10         A.    No, I did not.

11         Q.    Okay.  That was the only

12   question I had.  Let's move on.

13                   MR. INNES:  I know you've got

14             questions your co-counsel wanted to

15             ask, but, quite honestly, some of

16             them are just an absolute waste of

17             time.

18   BY MR. KARP:

19         Q.    I'm handing you tab 26, which

20   we will mark as Exhibit 24.

21                   This is an August 3, 2023,

22   email from Mr. Shinoff to you.

23                   Do you see that?

24         A.    I see it.

25                   - - - - -

```
                                        Page 313
 1              (Email dated 8/3/23 Bates
 2              BW__Irvington00070026 to 00070028
 3              marked Vauss Exhibit 24 for
 4              identification.)
 5                       - - - - -
 6  BY MR. KARP:
 7          Q.      Okay.  Do you recall
 8  receiving this email?
 9          A.      I do not.
10          Q.      The subject is, "New Jersey
11  School District Social Media Lawsuit
12  Update."
13                  Do you see that?
14          A.      Oh, I see it, yes.
15          Q.      And this email is addressed
16  specifically to you, it says, Dear
17  Dr. Vauss.
18                  Do you see that?
19          A.      I see that.
20          Q.      Or excuse me, Dear
21  Superintendent Vauss.
22          A.      Yes, yes.  So I probably get
23  all kinds of companies and maybe not always
24  someone trying to have a -- mention a
25  lawsuit against a social media or someone
```

Page 314

```
 1   else, but I often get solicited and it may
 2   go from the very general to it will go to
 3   finding out what my name is to make it more
 4   personal, I guess, but I've never spoken to
 5   this man.
 6        Q.    Just to make sure I heard you
 7   correctly, you've never spoken to Mr.
 8   Shinoff?
 9        A.    No, I haven't.
10        Q.    Fair to say --
11        A.    And I don't recall this, this
12   email, but I mean, if you say it was sent
13   to me, that's my email address, but,
14   unfortunately, if it's not filtered to be
15   important or someone that I've interacted
16   with, it's probably in my emails, but it's
17   not something that I've engaged with.
18        Q.    This is an -- this email was
19   sent in August of 2023.
20              Do you see that?
21        A.    I see that.
22        Q.    The last email we looked at
23   was sent, I believe, in January of 2023.
24        A.    Uh-huh.
25        Q.    Do you happen to know when
```

CONFIDENTIAL

Page 315

1    Irvington Public Schools filed this lawsuit
2    against social media companies?
3            A.      I'm not -- I'm not aware of
4    the exact date, I'm not, I mean, that's not
5    in my mind, the exact date.  I know it may
6    have been in 2023.  I'm not sure of the
7    exact date.
8            Q.      Are you able to approximate
9    when?
10                   MR. INNES:  Objection.  You
11               asked her this, like, six hours ago
12               and she didn't know the answer.
13               You could have between now and then
14               gotten a copy of the Complaint and
15               put it in front of her as an
16               exhibit and we wouldn't have to
17               guess.
18                   MR. KARP:  I can ask my
19               questions as I would like to ask my
20               questions.  Your objection is
21               noted.  Please limit them to form
22               objections going forward.
23                   Dr. Vauss, I was simply
24               wondering if you could
25               approximate when Irvington Public

CONFIDENTIAL

Page 316

1           Schools filed this lawsuit

2           against social media.

3               MR. INNES:  Objection.  Asked

4           and answered.

5               THE WITNESS:  I couldn't

6           approximate.

7    BY MR. KARP:

8        Q.     And your testimony is you

9    don't recall having received this email,

10   correct?

11              MR. INNES:  Objection.  Asked

12          and answered.

13              THE WITNESS:  Yes, that's what

14          I said.  I don't recall.

15   BY MR. KARP:

16       Q.     Do you have any -- strike

17   that.

18              I may have a few more

19   things, but I think I'm at a good breaking

20   point.  Can we -- let's go off the record

21   just for a few minutes to see if there's

22   anything more I need to cover.

23              MR. INNES:  Sure.

24              THE VIDEOGRAPHER:  The time

25          right now is 5:31 p.m.  We are off

Page 317

1          the record.

2                    - - - - -

3      (A recess was taken at this time.)

4                    - - - - -

5                THE VIDEOGRAPHER:  The time

6          right now is 5:49 p.m.  We are back

7          on the record.

8  BY MR. KARP:

9          Q.    Dr. Vauss, welcome back.  We

10  are approaching the end of today.  After

11  discussing with your counsel, we've agreed

12  to leave the deposition open and to find a

13  second day to complete your deposition.  So

14  the good news is that you are done for the

15  day.  The bad news is you're going to see

16  me again at some time in the near future.

17          A.    That's okay.

18          Q.    But for now, I believe we are

19  done for the day.

20                MR. INNES:  Sounds good.

21                THE VIDEOGRAPHER:  Mr. Karp

22          has been on the record today for

23          five hours and 51 minutes.  The

24          time right now is 5:49 p.m.  We are

25          off the record.

CONFIDENTIAL

Page 318

1                - - - - -

2              (Whereupon, the deposition

3         was concluded at 5:49 p.m.)

4                - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 319

1           C E R T I F I C A T I O N

2

3

4           I HEREBY CERTIFY that the proceedings and

5    evidence are contained fully and accurately in the

6    stenographic notes taken by me upon the foregoing

7    matter on May 6, 2025, and that this is a correct

8    transcript of same.

9

10

11

12

13

14   _____

15           Robin L. Clark
     Registered Professional Reporter

16

17

18

19

20

21           (The foregoing certification of this

22   transcript does not apply to any reproduction of the

23   same by any means unless under the direct control

24   and/or supervision of the certifying reporter.)

25

CONFIDENTIAL

Page 320

1                INSTRUCTIONS TO WITNESS

2

3            Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8            After doing so, please sign the errata

9    sheet and date it.

10           You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13           It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 321

```
 1                    -  -  -  -  -
 2                  E  R  R  A  T  A
 3                    -  -  -  -  -
 4      PAGE      LINE      CHANGE
 5
        ____      ____      _____
 6
        ____      ____      _____
 7
        ____      ____      _____
 8
        ____      ____      _____
 9
        ____      ____      _____
10
        ____      ____      _____
11
        ____      ____      _____
12
        ____      ____      _____
13
        ____      ____      _____
14
        ____      ____      _____
15
        ____      ____      _____
16
        ____      ____      _____
17
        ____      ____      _____
18
        ____      ____      _____
19
        ____      ____      _____
20
        ____      ____      _____
21
        ____      ____      _____
22
        ____      ____      _____
23
        ____      ____      _____
24
25
```

CONFIDENTIAL

Page 322

1        ACKNOWLEDGMENT OF DEPONENT

2        I, APRIL K. VAUSS, do hereby

3   certify that I have read the foregoing pages

4   and that the same is a correct

5   transcription of the answers given by me to

6   the questions therein propounded, except for

7   the corrections or changes in form or

8   substance, if any, noted in the attached

9   Errata Sheet.

10

11  DATE                    SIGNATURE

12  Subscribed and sworn to before me this

13        day of                    ,

14  2025.

15

16  My commission expires:

17

18

19

20  Notary Public

21

22

23

24

25