**Exhibit 26**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 323

1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
2                      -   -   -
3   IN RE: SOCIAL MEDIA  : Case No.
    ADOLESCENT           : 4:22-MD-03047-YGR
4   ADDICTION/PERSONAL   :
    INJURY PRODUCTS      :
5   LIABILITY LITIGATION,: MDL No. 3047
                         :
6   This Document Relates:
    To:                  :
7                        :
    Irvington Public     :
8   Schools v. Meta      :
    Platforms Inc.,      :
9   et al.               :
                         :
10  Case No.:            :
        -cv-01467-YGR    :                    4:23
11
12                  -   -   -
                 MAY 9, 2025
13                  VOLUME II
        CONFIDENTIAL ATTORNEYS EYES ONLY
14                  -   -   -
15
16            Oral deposition of APRIL
    VAUSS, Ph.D., taken pursuant to notice,
17  was held at Irvington Board of Education,
    1 University Place, Irvington, New Jersey
18  07111, commencing at 9:56 a.m., on the
    above date, before Amanda Dee
19  Maslynsky-Miller, a Court Reporter and
    Certified Realtime Reporter.
20
21
                    -   -   -
22
23
24

CONFIDENTIAL

```
                                              Page 324

 1   APPEARANCES:
 2
 3          CARELLA, BYRNE, CECCHI, BRODY &
            AGNELLO, P.C.
 4          BY: MICHAEL A. INNES, ESQUIRE
            5 Becker Farm Road
 5          Roseland, New Jersey 07068
            (973) 994-1700
 6          minnes@carellabyrne.com
            Representing the Plaintiffs
 7          and April Vauss, Ph.D.
 8
 9          KIRKLAND & ELLIS LLP
            BY: ANDREW KARP, ESQUIRE
10          BY: VANESSA DiFEO, ESQUIRE
            601 Lexington Avenue
11          New York, New York 10022
            (212) 341-7593
12          andrew.karp@kirkland.com
            vanessa.difeo@kirkland.com
13          Representing the Defendant,
            Snap, Inc.
14
15
16
            SHOOK, HARDY & BACON L.L.P.
17          BY: LAURIE A. HENRY, ESQUIRE
            2555 Grand Boulevard
18          Kansas City, Missouri 64108
            (816) 474-6550
19          lhenry@shb.com
            Representing the Defendants,
20          Meta Platforms, Inc. f/k/a
            Facebook, Inc., Instagram, LLC,
21          and Mark Elliot Zuckerberg
22
23
24
```

CONFIDENTIAL

Page 325

```
 1    APPEARANCES: (Continued)
 2    VIA ZOOM:
 3
 4            SHOOK, HARDY & BACON L.L.P.
              BY: AMANDA C. SAPER, ESQUIRE
 5            Two Commerce Square
              2001 Market Street
 6            Suite 3000
              Philadelphia, Pennsylvania 19103
 7            (215) 278-2555
              asaper@shb.com
 8            Representing the Defendants,
              Meta Platforms, Inc. f/k/a
 9            Facebook, Inc., Instagram, LLC,
              and Mark Elliot Zuckerberg
10
11
12            SKADDEN, ARPS, SLATE, MEAGHER &
              FLOM LLP
13            BY: DANIEL COBOURN, ESQUIRE
              320 South Canal Street
14            Chicago, Illinois 60606
              (312) 407-0700
15            daniel.cobourn@skadden.com
              Representing the Defendant,
16            Snap, Inc.
17
18            KING & SPALDING LLP
              BY: ISABEL KING, ESQUIRE
19            110 N Wacker Drive
              Suite 3800
20            Chicago, Illinois 60606
              (312) 995-6333
21            iking@kslaw.com
              Representing the Defendant,
22            TikTok Inc., ByteDance Inc.,
              ByteDance Ltd., TikTok Ltd., and
23            TikTok, LLC
24
```

CONFIDENTIAL

Page 326

1  APPEARANCES: (Continued)

2  VIA ZOOM:

3

        WILLIAMS & CONNOLLY LLP

4       BY: KEY'TOYA BURRELL, ESQUIRE

        680 Maine Avenue SW

5       Washington, DC 20024

        (202) 434-5000

6       kburrell@wc.com

        Representing the Defendant,

7       YouTube, LLC, Google LLC, and

        Alphabet Inc.

8

9

10

11

12  ALSO PRESENT:

   Danny Ortega

13  Olivia Sattan

   Kyle Dingus, Paralegal, Kirkland & Ellis

14  Ryan Siffringer

15

                     -   -   -

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

```
                                          Page 327

 1                      -   -   -
 2                   I N D E X
 3                      -   -   -
 4
    Testimony of:  APRIL VAUSS, Ph.D.
 5
 6      By Attorney Karp                    331, 498
        By Attorney Innes                   479
 7
 8
 9                      -   -   -
10                E X H I B I T S
11                      -   -   -
12
    NO.             DESCRIPTION                    PAGE
13
    Irvington-April Vauss-25
14               No Bates,
                 Irvington Township Addresses
15               'Misleading' Media Report on
                 Irvington High; Satisfactory
16               Rating From NJDOH           341
17  Irvington-April Vauss-26
                 3047M DL_002074_NJDOH_0000279-0417
18               5/11/23 Letter,
                 Pulliam to Vauss           364
19
    Irvington-April Vauss-27
20               No Bates
                 Photograph                 389
21
    Irvington-April Vauss-28
22               No Bates
                 2016-17 School Performance
23               Report, Irvington Township  391
24
```

CONFIDENTIAL

Page 328

```
 1                    -  -  -
 2               E X H I B I T S
 3                    -  -  -
 4
   NO.              DESCRIPTION                    PAGE
 5
   Irvington-April Vauss-29
 6               No Bates
                 Chronic Absenteeism, Supporting
 7               Student Attendance and Combatting
                 Chronic Absenteesim in Our
 8               Nation's Schools               412
 9 Irvington-April Vauss-30
                 No Bates
10               New Video: Jashyah Moore Seen
                 At Deli On Day She Disappeared
11               In East Orange, NJ             429
12 Irvington-April Vauss-31
                 No Bates
13               Press Release, Mother of
                 Missing Juvenile Charged
14               With Endangering               442
15 Irvington-April Vauss-32
                 No Bates
16               Complaint-Warrant              449
17 Irvington-April Vauss-33
                 No Bates
18               Photograph                     485
19 Irvington-April Vauss-34
                 No Bates
20               Third Amended Plaintiff Fact
                 Sheet-School Districts         468
21
22
23
24
```

CONFIDENTIAL

Page 329

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5    Direction to Witness Not to Answer

 6    Page  Line      Page  Line       Page  Line

 7    354    4        474  16          477     18

 8    356   12        476  13

 9    471   14        477  1

10

11    Request for Production of Documents

12    Page  Line      Page  Line       Page  Line

13    434   10

14

15

16    Stipulations

17    Page  Line      Page  Line       Page  Line

18    330    1

19

20

21    Question Marked

22    Page  Line      Page  Line       Page  Line

23    None

24
```

CONFIDENTIAL

Page 330

1                          -   -   -

2                    (It is hereby stipulated and

3           agreed by and among counsel that

4           sealing, filing and certification

5           are waived; and that all

6           objections, except as to the form

7           of the question, will be reserved

8           until the time of trial.)

9                          -   -   -

10                   VIDEO TECHNICIAN:  We are

11          now on the record.  My name is

12          Danny Ortega, and I'm the legal

13          videographer for Golkow Litigation

14          Services.  Today's date is May

15          9th, 2025, and the time is

16          9:56 a.m.

17                   This video deposition is

18          being held at 1 University Place,

19          Irvington, New Jersey, in the

20          matter of Social Media, CA

21          MDL3047, Irvington Public Schools

22          versus Meta Platforms, Inc.,

23          et al.  The deponent today is

24          April Vauss.

CONFIDENTIAL

Page 331

1              All counsel will be noted on
2          the stenographic record.  The
3          court reporter today is Amanda
4          Miller, and will now swear in the
5          witness.
6                    -   -   -
7              APRIL VAUSS, after having
8          been duly sworn, was examined and
9          testified as follows:
10                   -   -   -
11                  EXAMINATION
12                   -   -   -
13   BY ATTORNEY KARP:
14       Q.    Good morning, Dr. Vauss.
15       A.    Good morning.
16       Q.    Welcome back.
17       A.    Thank you.
18       Q.    This is the second day of
19   your deposition, correct?
20       A.    Yes.
21       Q.    Since adjourning your
22   deposition on Tuesday evening, have you
23   done anything additional to prepare for
24   this deposition?

CONFIDENTIAL

Page 332

1          A.    No.
2          Q.    Did you meet with counsel at
3    any point between the first day of your
4    deposition and today?
5               ATTORNEY INNES:  Objection
6          to form.
7               THE WITNESS:  Yes.
8    BY ATTORNEY KARP:
9          Q.    Okay.  And was your meeting
10   with counsel in preparation for the
11   deposition we're currently taking?
12         A.    No.
13         Q.    Dr. Vauss, what is a climate
14   and culture survey?
15         A.    A climate and culture survey
16   is to determine how the environment and
17   the people feel in a particular entity.
18         Q.    Are climate and culture
19   surveys a way that Irvington Public
20   Schools collects data for its students?
21         A.    A culture and climate survey
22   is one way that we do collect information
23   about how our students feel.
24         Q.    How often does -- in a given

CONFIDENTIAL

Page 333

1  year, how often does Irvington Public

2  Schools conduct climate and culture

3  surveys?

4          A.    There isn't a set number.

5  Buildings -- certain buildings may do it

6  twice a year, maybe at the beginning and

7  the end; maybe once a year; other times

8  maybe just to -- to get a pulse of the

9  building.

10          Q.    In your role as

11  superintendent, do you review the results

12  of these climate and culture surveys?

13          A.    Not all of them.

14          Q.    Which ones do you review?

15              ATTORNEY INNES:  Objection

16          to form.

17              THE WITNESS:  It could -- it

18          could be random.  As a practice, a

19          particular one for a building, I

20          wouldn't necessarily review.  But

21          if I were, maybe once a year.

22  BY ATTORNEY KARP:

23          Q.    Is there something in

24  particular that would prompt you to

CONFIDENTIAL

Page 334

1  review a climate and culture survey?

2              ATTORNEY INNES:  Objection

3        to form.

4              THE WITNESS:  Maybe as a

5        tool for a new administrator.

6  BY ATTORNEY KARP:

7        Q.    To your knowledge, is there

8  an individual at Irvington Public Schools

9  who would have the climate and culture

10  surveys that have been conducted by the

11  district?

12              ATTORNEY INNES:  Objection

13        to form.  Is there a time period

14        that we're talking about?

15              ATTORNEY KARP:  Sure.  I can

16        clarify that.

17  BY ATTORNEY KARP:

18        Q.    For the last ten years, is

19  there a particular individual within

20  Irvington Public Schools who would have a

21  compilation of the climate and culture

22  surveys conducted by the district?

23              ATTORNEY INNES:  Objection

24        to the form.

CONFIDENTIAL

Page 335

```
 1              THE WITNESS:  So maybe I can
 2         ask you a question so I can
 3         understand what you --
 4  BY ATTORNEY KARP:
 5         Q.    Absolutely.
 6         A.    So is your question asking
 7  was someone charged to be the collector,
 8  like, the parliamentarian of all the
 9  information about cultures -- about
10  culture and climate for the district?
11         Q.    We can -- we can start
12  there.
13              Is there an individual
14  within Irvington Public Schools who is
15  charged with -- with conducting these
16  climate and culture surveys?
17              And my question relates to
18  the -- to the past ten years.
19         A.    No, there isn't one person.
20         Q.    Who at Irvington High School
21  would have been charged with conducting
22  climate and culture surveys in the last
23  ten years?
24         A.    The person at the high
```

CONFIDENTIAL

Page 336

1   school?

2          Q.     Uh-huh, yes.

3          A.     Maybe a principal.  But

4   there's been several different principals

5   in the last ten years at the high school.

6          Q.     So are school principals

7   some of the individuals who would be

8   conducting climate and culture surveys?

9                 ATTORNEY INNES:  Objection

10         to form.

11                THE WITNESS:  Occasionally.

12         There are probably other people

13         who could do that.  But they are

14         not mandated, unless I mandate

15         them.

16  BY ATTORNEY KARP:

17         Q.     I understand.

18         A.     Or superintendents before

19  me.

20         Q.     Are there particular roles

21  or positions within Irvington Public

22  Schools who would have the responsibility

23  for conducting climate and culture

24  surveys?

CONFIDENTIAL

Page 337

1                    ATTORNEY INNES:  Objection
2          to form.
3                    THE WITNESS:  No, no.
4    BY ATTORNEY KARP:
5          Q.    Are climate and culture
6    surveys submitted to the state at any
7    point in time?
8          A.    They -- they may have been,
9    yes.
10          Q.    Is that part of the school
11   planning submissions that are made to the
12   state?
13                    ATTORNEY INNES:  Objection
14          to form.  Lack of foundation.
15                    THE WITNESS:  There may be
16          verbiage that's placed in certain
17          mandated reports to the state that
18          mention that.
19                    But as a rule, that part is
20          not something that's mandated.
21   BY ATTORNEY KARP:
22          Q.    Can you think of a context
23   or an occasion when the district would
24   submit climate and culture surveys to the

CONFIDENTIAL

Page 338

1    New Jersey Board of Education?

2              ATTORNEY INNES:  Objection

3         to form.

4              THE WITNESS:  It may --

5         maybe as part of the ASP, our

6         annual school plans, as a reason

7         or a rationale to include it as

8         part of one's goals.

9    BY ATTORNEY KARP:

10        Q.    Are you aware of a central

11   location in the district's files where

12   climate and culture surveys would be

13   compiled?

14             ATTORNEY INNES:  Objection.

15        Asked and answered.

16             THE WITNESS:  So one place?

17        Maybe not one place.  Maybe

18        shared, maybe at, like, an

19        end-of-school report or maybe if

20        someone wants to show us a survey

21        they may have conducted as part of

22        an evaluation or, you know -- but

23        there's no mandated reporting of a

24        culture and climate survey, so to

CONFIDENTIAL

Page 339

1          speak.
2                If there is a survey that is
3          given out from my office, then
4          by -- by virtue of me giving it
5          out, it's mandated.  But it's not
6          something that I may do routinely,
7          you know.  We'll talk about the
8          last five years of my tenure, it
9          wouldn't have been something that
10         I've done routinely.
11    BY ATTORNEY KARP:
12         Q.    If you wanted to review the
13    climate and culture surveys that have
14    been conducted for the last ten years,
15    how would you go about locating those
16    surveys?
17               ATTORNEY INNES:  Objection
18         to form.
19               THE WITNESS:  So I might
20         ask -- this may sound antiquated,
21         but I might ask the present
22         principal, is it the same computer
23         with the same hard drive?  And ask
24         them to search -- you know, use

CONFIDENTIAL

Page 340

1          keywords to see if they can locate
2          a survey, if they don't have it in
3          a separate binder or something,
4          maybe, in their office that they
5          are sharing with the previous
6          principal.
7                I might go to -- to see how
8          many annual school plans we can
9          maybe get from the past.  Because
10         they haven't always been mandated,
11         probably, in the last -- maybe in
12         the last ten years that -- that
13         window it would fall within.
14               I would see maybe as a part
15         of their school leadership
16         council, if they conducted any, so
17         there's -- there's not a mandate.
18         So it would be very hard, because
19         that would be an internal
20         function, so.
21   BY ATTORNEY KARP:
22         Q.    I believe you said this
23   already, but just to confirm, there's no
24   central location, no shared folder that

CONFIDENTIAL

Page 341

1    you would -- that you would go to -- go

2    to where you would expect to find all of

3    these climate and culture surveys

4    compiled; is that right?

5         A.    No.

6         Q.    Dr. Vauss, on Tuesday we

7    spent some time discussing the June 2023

8    New Jersey 101.5 article called, Shocking

9    Fights, Riots, Rats, Crumbling School.

10             Do you recall that?

11        A.    Yes.

12        Q.    And for the record, just for

13   clarity, that article was previously

14   marked Exhibit-21.

15             When we were discussing

16   that -- that piece, you mentioned a

17   counter-article.

18             Do you recall that?

19        A.    Yes.

20             ATTORNEY KARP:   I'm going to

21        hand you Tab 35, which we will

22        mark as Exhibit-25.

23                  -   -   -

24             (Whereupon, Exhibit

CONFIDENTIAL

Page 342

1          Irvington-April Vauss-25, No

2          Bates, Irvington Township

3          Addresses 'Misleading' Media

4          Report on Irvington High;

5          Satisfactory Rating From NJDOH,

6          was marked for identification.)

7                       -   -   -

8    BY ATTORNEY KARP:

9          Q.    Dr. Vauss, this is an

10   article titled, Irvington Township

11   Addresses, quote, Misleading Media Report

12   on Irvington High, Satisfactory Rating

13   From NJDOH.

14              Do you see that?

15         A.    Yes.

16         Q.    And this is dated June 5th,

17   2023.

18              Is this the counter-article

19   that you had in mind when we were

20   discussing these issues the other day?

21         A.    Yes.

22              ATTORNEY INNES:  Objection

23         to form.

24              THE WITNESS:  Yes.

CONFIDENTIAL

Page 343

1    BY ATTORNEY KARP:

2         Q.    That was a yes?

3         A.    Yes.

4         Q.    Let's look at Pages 3 and 4

5    of this article.

6              In the middle of Page 3, it

7    states, In the spirit of transparency,

8    Irvington Township superintendent

9    Dr. April Vauss said she returned the

10   e-mail in under an hour with the

11   following information -- and then the

12   article purports to include an e-mail

13   that you sent.

14              Do you see that?

15        A.    Yes.

16        Q.    Do you recall writing this

17   e-mail to the author of the New Jersey

18   101.5 article?

19              ATTORNEY INNES:  Objection

20        to form.

21              THE WITNESS:  Yes.

22   BY ATTORNEY KARP:

23        Q.    To the best of your

24   recollection, is this an accurate

CONFIDENTIAL

Page 344

1    reproduction of the e-mail you wrote?

2                    ATTORNEY INNES:  Objection

3         to form.

4                    THE WITNESS:  Without having

5         it in front of me, I would -- I

6         would say I believe so.

7    BY ATTORNEY KARP:

8         Q.    Let's turn to Page 4 of the

9    article.

10                   And I'll focus you on the --

11   at the very top of the article -- at the

12   very top of the page, rather.  One of the

13   things you wrote in your e-mail was, As

14   of May 11th, we have satisfied all

15   concerns within the building.

16                   Do you see that?

17        A.    Yes.

18        Q.    And I read that correctly?

19        A.    You read that correctly.

20        Q.    What happened on May 11th?

21        A.    There was some concerns from

22   the IEA, Irvington Educational

23   Association, that were raised.

24                   Without having it right in

CONFIDENTIAL

Page 345

1   front of me, I'm not really familiar with

2   what those concerns were.  But those

3   concerns were one thing, and the article

4   and the images in that article were

5   something completely separate.  They

6   were -- they were conflated issues.

7               So the images here were one

8   thing.  The concerns of the building

9   from -- that were raised by the IEA were

10  something completely different.

11              ATTORNEY INNES:  And just so

12        the record reflects, when

13        Dr. Vauss said "reflected here,"

14        she was pointing to Exhibit- --

15              ATTORNEY KARP:  Exhibit-21,

16        I believe.

17              ATTORNEY INNES:  21.

18              ATTORNEY KARP:  And thank

19        you.  I was going to clarify that.

20  BY ATTORNEY KARP:

21        Q.    So you are distinguishing

22  between the content of the New Jersey

23  101.5 article and the photographs that

24  are included there and the issues that

CONFIDENTIAL

Page 346

1  are discussed there, on the one hand, and

2  the issues that were of interest to the

3  IEA?

4          A.    Yes.

5          Q.    You testified the other day

6  that you had no basis to dispute that the

7  photographs contained in the New Jersey

8  101.5 article were taken at Irvington

9  High School.

10          Do you remember that?

11          A.    I said that these were

12  images that were from years -- at least a

13  dozen years before of places in Irvington

14  public schools.

15          As to the veracity of them

16  being pictures of -- one, of the current

17  school, I said that is not correct and

18  they weren't the pictures of the school

19  during the time that this article was

20  made, okay.

21          And as far as all of these

22  images being Irvington High School, I did

23  not agree with that.

24          Q.    Okay.  And I want to make

CONFIDENTIAL

Page 347

1    sure I have your testimony right.

2              So your -- your testimony is

3    that these images were of a different

4    Irvington -- different buildings within

5    the Irvington Public Schools --

6         A.    At some time period.

7         Q.    At some point in time, but

8    not necessarily the point in time that

9    the author was -- was claiming in his

10   article?

11        A.    Yes.

12        Q.    Is that --

13             ATTORNEY INNES:  Objection

14        to form.  Misstates prior

15        testimony.

16             ATTORNEY KARP:  I believe

17        Dr. Vauss just told me she --

18             ATTORNEY INNES:  I just take

19        issue with the "not necessary."

20        She has more opinions than that in

21        her testimony.

22             ATTORNEY KARP:  Understood.

23   BY ATTORNEY KARP:

24        Q.    Focusing back on Exhibit-25

CONFIDENTIAL

Page 348

1    and the counter-article.

2              What you're pointing out

3    to -- what you've pointed out in your

4    e-mail is that there were issues at

5    Irvington High School, but by May 11th,

6    which is before the New Jersey 101.5

7    article came out, those issues had been

8    addressed or fixed, correct?

9        A.    So let me just -- for a

10   point of clarification.

11             I think what we need here is

12   we need to see the e-mail that was sent

13   to me.  Because, once again, I believe

14   that there were issues that were

15   conflated.

16             One, were there -- were

17   there concerns that the IEA raised?

18   That's one set of questioning.  Whether

19   this is the high school in its current

20   state or at the time of this article was

21   another set of questions.

22             So for me to speak to as of

23   May the 11th is to say that that has to

24   do with this article, and I am -- my

CONFIDENTIAL

Page 349

1    contention is that it does not.  So I
2    would need to see the complete
3    questioning from the reporter to be able
4    to accurately give an answer to your
5    question.
6           Q.    Understood.  What you're
7    telling the author of the New Jersey
8    101.5 article is that there were issues
9    and they were addressed by the time --
10   strike that.
11              What you wrote to the author
12   of the New Jersey 101.5 article is that
13   there were issues at Irvington High
14   School, but those issues had already been
15   addressed as of May 11th; is that right?
16              ATTORNEY INNES:  Objection
17        to form.
18              THE WITNESS:  What I would
19        like to -- to be able to
20        accurately answer your question, I
21        would like to see the e-mail that
22        was sent.
23              Because as you can see in
24        the e-mail that I sent, it's that

Page 350

1          I am not sure what photos or
2          videos you have or whether they
3          pertain to our high school, but
4          you are welcome to send them to me
5          at your earliest convenience.
6                And as I've noted before, I
7          never saw these photos before they
8          printed their article.  I would be
9          able to say, hey, concern by the
10         IEA is not these photos.  I would
11         have been able to say that.
12               But this -- I don't believe
13         that that was the -- the intention
14         was to clarify.  It was to create
15         an article, maybe.  I don't know.
16               But I just know that this is
17         one thing and this is another.
18               So to be more accurate and
19         to make sure that my testimony --
20         testimony is -- is truthful, I
21         would like to see the e-mail.
22    BY ATTORNEY KARP:
23          Q.    And I believe the e-mail
24    that you're requesting is on the prior --

CONFIDENTIAL

Page 351

1         A.    Other page?

2         Q.    -- page, starting on Page 2.

3         A.    Okay.

4         Q.    Let me know once you've had

5    a chance to look at that.

6         A.    So there -- there were

7    several e-mails that were sent.  This

8    isn't -- this isn't the only e-mail that

9    was sent.  This is one response.

10              This isn't the -- this isn't

11   the only e-mail as it relates to this.

12        Q.    As it was reported in this

13   counter-article that you mentioned the

14   other day, there was the e-mail coming

15   from Mr. Matthew that appears on Pages 2

16   and 3, and then your response right

17   after.

18              Your testimony is that there

19   are other e-mails in this chain?

20        A.    And there was a phone call

21   as well.

22              So this isn't the

23   embodiment.  This is a piece of it, all

24   right.  I -- I'm not discounting this.

CONFIDENTIAL

Page 352

1  But I'm saying, this isn't the totality

2  of it.

3            So for me to speak to

4  this -- and then we conflate the two

5  together as though the totality of it, I

6  don't believe is accurate.

7        Q.    And I'm not trying to

8  conflate anything.  I'm just trying to

9  sort it out.

10        A.    No, I understand.  But I

11  just want to be accurate, you know.

12            And if we're using this as

13  an instance -- you know, I thought I was

14  here to speak about how social media

15  is -- is hurting the children of

16  Irvington Public Schools.

17            But if we want to talk about

18  this, I think we have to talk about the

19  entirety of it; the phone calls from the

20  reporter, the e-mails, my response,

21  everything, to give an accurate picture

22  to everyone.

23        Q.    You -- fair to say that the

24  conditions of a building and the

CONFIDENTIAL

Page 353

1   conditions in which students attend

2   school have an affect on their

3   well-being, correct?

4          A.    Yes, yes.  I think that's

5   fair.

6          Q.    And on the first day of your

7   deposition, you told me that you believed

8   many of the photographs contained in the

9   New Jersey 101.5 article came from an SDA

10  letter.

11               Do you remember that

12  testimony?

13         A.    I said from a compilation of

14  pictures, it was something that was sent

15  to the SDA, I think, back in 2012 or --

16  so I don't -- you know, but before --

17  before my tenure as superintendent and

18  before, probably, even my tenure at

19  central office.

20         Q.    What is your basis for

21  believing that the photographs came from

22  the SDA process?

23         A.    I believe --

24               ATTORNEY INNES:  Objection

Page 354

1    to form.
2            Dr. Vauss, to the extent
3        you've had conversations with
4        counsel for the district or in
5        other capacities, you do not need
6        to reveal those conversations.
7            THE WITNESS:  Okay.
8            ATTORNEY INNES:  Or that you
9        even had those conversations.  I
10       just caution you that if you feel
11       comfortable answering that
12       question, you can.
13           THE WITNESS:  I do not.
14  BY ATTORNEY KARP:
15       Q.   I'm sorry, you --
16       A.   I do not.
17       Q.   -- do not feel comfortable
18  answering --
19       A.   Yes.
20       Q.   -- the question?
21           You're going to follow your
22  counsel's instruction on answering the
23  question?
24       A.   I'm going to take my

CONFIDENTIAL

Page 355

1    counsel's instruction.

2         Q.    Do you recall the last time

3    you saw or reviewed the SDA letter that

4    you referred to as potentially containing

5    the photos from the New Jersey 101.5

6    article?

7         A.    I do not.

8         Q.    Is that something that you

9    attempted to find between the first day

10   of your deposition and today?

11        A.    No.

12        Q.    Did you -- do you recall

13   reviewing that letter at the time that

14   the New Jersey 101.5 article was

15   released?

16        A.    No.

17        Q.    Turning back to your e-mail

18   as it's reproduced in the

19   counter-article.  And I'll direct your

20   attention to Page 4.

21        A.    Page 4.

22        Q.    You wrote, I would hope that

23   your source is not utilizing your

24   reporting as a way to attack the building

CONFIDENTIAL

Page 356

1    administration.
2              Do you see that?
3         A.    Yes.
4         Q.    What made you suspect that
5    this was an attack on the building
6    administration?
7              ATTORNEY INNES:  Objection
8         to the form.
9              To the extent that you've
10        had discussions with counsel or
11        that was an investigation that was
12        ongoing by the -- by the district
13        that involved counsel, I'll direct
14        you not to answer that question.
15             But if you feel comfortable
16        answering it, you may.
17             THE WITNESS:  I will have to
18        say no, I can't discuss that.
19   BY ATTORNEY KARP:
20        Q.    What did you know, at the
21   time that you wrote this e-mail, that
22   made you think it could be an attack on
23   building administration?
24             ATTORNEY INNES:  Objection

CONFIDENTIAL

Page 357

1          to the form.
2                    You can answer.
3                    THE WITNESS:  Information
4          that was shared with me.  Not
5          information that was shared with
6          building administration but
7          information shared with me.
8    BY ATTORNEY KARP:
9          Q.    And just to be respectful of
10   your counsel's instruction, I'm -- I am
11   not asking who gave you this information
12   and what -- or the details of any
13   conversations you had.
14                    My question is really just
15   about what you knew and what knowledge
16   you had when you wrote this e-mail.
17                    Does that make sense?
18         A.    May I speak with my counsel,
19   please?
20         Q.    You may.
21                    ATTORNEY KARP:  We can go
22         off the record.
23                    VIDEO TECHNICIAN:  The time
24         right now is 10:20 a.m.  We are

CONFIDENTIAL

Page 358

1          off the record.

2                    -  -  -

3               (Whereupon, a brief recess

4          was taken.)

5                    -  -  -

6               VIDEO TECHNICIAN:  The time

7          right now is 10:29 a.m.  We are

8          back on the record.

9               ATTORNEY INNES:  Thank you.

10         This is -- for the record, it's

11         Michael Innes, counsel for the

12         school district.

13              We went off the record

14         because Dr. Vauss had a question

15         regarding attorney-client

16         privilege that may bear on this

17         line of questioning.

18              We've resolved that, and so

19         we can continue.

20              ATTORNEY KARP:  Thank you.

21   BY ATTORNEY KARP:

22         Q.   Dr. Vauss, just before we

23   took our break, I was asking you some

24   questions about a statement you made in

Page 359

1    this e-mail about your suspicion that the

2    New Jersey 101.5 article was an attack on

3    the building administration.

4              Do you remember that?

5         A.    Yes.

6         Q.    And my question to you was

7    what you knew at the time that you wrote

8    this e-mail that made you think the

9    report could be an attack on the building

10   administration?

11        A.    This belief was in regards

12   to information shared with me by a member

13   of the union.

14        Q.    And what specifically was

15   shared with you by that member of the

16   union?

17        A.    That they didn't like the

18   administration.

19        Q.    At the time that you wrote

20   this e-mail to the author of the New

21   Jersey 101.5 article, did you know who

22   the source was of the photographs and

23   complaints that were included in that

24   article?

CONFIDENTIAL

Page 360

1          A.      No.

2          Q.      Sitting here today, do you

3    know who the source was?

4          A.      No.

5          Q.      You also told me that the

6    author of the New Jersey 101.5 article

7    wanted to slander a town with a

8    democratic mayor.

9                  Do you recall that?

10         A.      Yes.

11         Q.      And the democratic mayor

12   you're referring to is your husband?

13         A.      Yes.

14         Q.      What made you feel or

15   suspect that this was a political hit

16   piece?

17         A.      Well, throughout, it said --

18   well, it listed him as a democratic

19   mayor.  So that was -- that's what made

20   me feel as though it was something to do

21   with politics.

22                 Because my husband is not

23   the leader of the school district, I am,

24   so.

CONFIDENTIAL

Page 361

1        Q.     Let's turn to Page 5 of the
2    article.
3        A.     Of the article?
4        Q.     Of the article -- the
5    counter-article.
6        A.     Okay.
7        Q.     Exhibit-25, for clarity.
8        A.     Okay.
9        Q.     Toward the bottom of the
10   page, the article reports, Mayor Vauss
11   said the school, like just about every
12   building in New Jersey, has resource
13   officers and security patrolling the
14   school.  Quote, There have been no riots
15   in or around the school.
16             Do you see that?
17        A.     Yes.
18        Q.     Is that a true statement?
19        A.     That there have been no
20   riots in or around the school?  According
21   to my definition of a riot, yes, there
22   hasn't been riots in or around the
23   school.
24        Q.     And in this statement, he's

CONFIDENTIAL

Page 362

1   referring to Irvington High School?

2          A.     Yes, I believe so.

3          Q.     What is your definition of a

4   riot?

5          A.     I don't know that I can come

6   up with one that is a pure definition.

7                 But I think about, you know,

8   people, you know, protesting some

9   injustice and they feel as though there

10  is no remedy, so they are fighting the

11  powers that be to get what it is that

12  they are asking for.

13                So if -- that being, you

14  know, a clumsy definition, but that would

15  be what I would see as a riot.

16         Q.     Were those the types of

17  incidents and events that were being

18  reported on in the New Jersey 101.5

19  article?

20         A.     Let me look at -- let me

21  look at the article again.  But I -- I

22  know of no riots.  I thought they were

23  reporting on fights that they allege

24  happened.

CONFIDENTIAL

Page 363

1              So riots, I'm thinking of a
2   mob of people who are protesting against
3   some type of injustice or something that
4   they don't like.
5              So I don't know that that's
6   what they reported on.  If you could
7   bring it to my attention where in that
8   article it says that, I can see if that's
9   what they're describing.
10       Q.    And is this your
11  understanding of what your husband meant
12  when he said there have been no riots in
13  or around the school?
14              ATTORNEY INNES:  Objection
15         to form.
16              THE WITNESS:  I would
17         imagine what I describe is maybe
18         what he meant.
19              But to be honest, I didn't
20         discuss what he said with him, to
21         be quite honest.
22  BY ATTORNEY KARP:
23       Q.    He was responding to the New
24  Jersey 101.5 article, correct?

CONFIDENTIAL

Page 364

1          A.    I believe --

2                ATTORNEY INNES:   Objection

3          to form.

4                THE WITNESS:   I believe so,

5          yes.

6   BY ATTORNEY KARP:

7          Q.    And the incidents that were

8   reported in that article, correct?

9          A.    Yes.

10          Q.    You can put this exhibit to

11   the side.

12          A.    Okay.

13                ATTORNEY KARP:   I'm handing

14          you Tab 28.   We'll mark this

15          Exhibit-26.

16                    -   -   -

17                (Whereupon, Exhibit

18          Irvington-April Vauss-26,

19          3047MDL_002074_NJDOH_0000279-0417,

20          5/11/23 Letter, Pulliam to Vauss,

21          was marked for identification.)

22                    -   -   -

23                ATTORNEY KARP:   The starting

24          Bates number of this document is

CONFIDENTIAL

Page 365

```
 1          3047MDL_002074_NJDOH_0000279.  And
 2          the first couple of pages of this
 3          exhibit are a declaration from the
 4          custodian of records at the New
 5          Jersey Department of Health.
 6  BY ATTORNEY KARP:
 7          Q.    Dr. Vauss, I'll represent to
 8  you that these are documents that were
 9  produced to us by the New Jersey
10  Department of Health.  And that is
11  explained in the declaration from the
12  custodian of records.
13          Do you see that?
14          A.    Yes.
15          Q.    Let's turn to the page with
16  Bates ending in 296.
17          Are you there?
18          A.    Yes.  296.
19          Q.    This is a memorandum from
20  the New Jersey Department of Health,
21  correct?
22          A.    Yes.
23          Q.    And the subject line of
24  this -- of this memorandum is, Violations
```

CONFIDENTIAL

Page 366

1    of the PEOSH Act, and there's a reference

2    to Irvington High School, Irvington

3    Public School District.

4                    Do you see that?

5        A.    Yes.

6        Q.    PEOSH stands for Public

7    Employees Occupational Safety and Health

8    Act, correct?

9        A.    Yes.

10       Q.    Do you have any reason to

11   doubt the accuracy of the images and

12   information that are contained in the

13   records produced to us by the New Jersey

14   Department of Health?

15                ATTORNEY INNES:  Objection

16       to form.

17                THE WITNESS:  No.

18   BY ATTORNEY KARP:

19       Q.    Do you have any reason to

20   doubt that the images are what the New

21   Jersey Department of Health says that

22   they are?

23                ATTORNEY INNES:  Objection

24       to form.  Speculation -- calls for

CONFIDENTIAL

```
                                              Page 367

 1        speculation.

 2                THE WITNESS:  No.

 3                (Technical difficulties.)

 4                VIDEO TECHNICIAN:  The time

 5        right now is 10:39 a.m.  We are

 6        off the record.

 7                     -   -   -

 8                (Whereupon, a brief recess

 9        was taken.)

10                     -   -   -

11                VIDEO TECHNICIAN:  The time

12        right now is 10:48 a.m., and we

13        are back on the record.

14   BY ATTORNEY KARP:

15        Q.    Dr. Vauss, just before the

16   break, I was asking about the information

17   and the images that are contained in

18   these Department of Health records.

19                Do you remember?

20        A.    Yes.

21        Q.    And my question to you was,

22   do you have any basis to dispute that the

23   images and information that are contained

24   here in the New Jersey Department of
```

Page 368

1    Health records are what they purport to
2    be?
3                    ATTORNEY INNES:  Objection
4            to the form.
5                    THE WITNESS:  I don't have
6            any reason to confirm that they
7            are or to deny them.  So that's --
8            that's my position.
9    BY ATTORNEY KARP:
10           Q.    The date on this memorandum
11   is February 23rd, 2023.
12                   Do you see that?
13           A.    Yes.
14           Q.    Let's turn the page to the
15   page ending in 297.
16                   Do you see that you are
17   identified as the employer
18   representative?
19           A.    Yes.  Absolutely.  I'm the
20   superintendent.
21           Q.    What is the significance of
22   being the employer representative?
23           A.    So I will be notified or
24   sent information about various things

CONFIDENTIAL

Page 369

1   about the district.

2             So in this instance, this

3   came from -- I guess -- was it the

4   education Department of Health, or their

5   section.  Sorry.  Correction.

6             New Jersey Department of

7   Labor and Workforce Development,

8   Department of Health.  Yes, Department of

9   Health.  So I would have received the

10  complaint.

11       Q.    In your role as

12  superintendent of Irvington Public

13  Schools, are you generally involved in

14  inspections that the Department of Health

15  would do of school premises?

16       A.    No, not normally.

17       Q.    Would you be involved in

18  investigating complaints that were made

19  about the -- the conditions of buildings

20  within the Irvington Public Schools?

21       A.    I usually would have a

22  designee, because that wouldn't

23  necessarily be my -- my area of

24  expertise, to do the -- to do an

CONFIDENTIAL

                                    Page 370

1    investigation.

2           Q.    And who would that designee

3    be?

4           A.    Roger Monel.

5           Q.    As superintendent of

6    Irvington Public Schools, would you have

7    a role in addressing any health and

8    safety violations that were identified by

9    the New Jersey Department of Health?

10          A.    Yes.

11          Q.    And what would that role be?

12          A.    I would ensure that -- one,

13   that the people in charge of a particular

14   department, which would be the buildings

15   and grounds or the associate business

16   administrator, would address these

17   concerns and that they would let me know

18   that those concerns were addressed and be

19   able to give me the information to share

20   with the state, if -- if the inquiry was

21   directed towards me.

22          Q.    Let's go to the page ending

23   in 298, which is the following page.

24                This is a notice of order to

Page 371

1   comply from the New Jersey Department of

2   Labor and Workforce Development, correct?

3           A.    Yes.

4           Q.    And this letter was issued

5   to you on February 27th, 2023, following

6   an inspection on January 24th, 2023 --

7   excuse me, yes, 2023.

8                 Let me -- let me re-ask that

9   a bit cleaner.

10                This letter was issued to

11  you on February 27th, 2023, following an

12  inspection on January 24th, 2023; is that

13  right?

14          A.    Yes.

15          Q.    And according to this

16  letter, the inspection site was Irvington

17  High School?

18          A.    Yes.

19          Q.    So this notice relates to an

20  inspection that was done at Irvington

21  High School?

22          A.    Yes.

23          Q.    Let's turn to the page

24  ending in 303.  I want to focus you on

CONFIDENTIAL

Page 372

1  Citation 2, Item 1.

2              Are you there?

3       A.    Yes.

4       Q.    The New Jersey Department of

5  Labor and Workforce Development reported

6  that, Irvington High School was not

7  thoroughly cleaned, particularly the air

8  circulation vents in the boy's locker

9  room and wrestling room.  Debris was

10  observed on classroom materials and

11  floors from damaged walls and ceilings.

12  Deteriorating pipe wrap debris was

13  observed on floors in classrooms and

14  hallways.

15              Did I read that correctly?

16       A.    You read that correctly,

17  yes.

18       Q.    And the citation is

19  described as facility wide.

20              Do you see that?

21       A.    Yes.

22       Q.    Do you understand that to

23  mean across the Irvington High School

24  building?

CONFIDENTIAL

Page 373

1          A.    I -- yes.

2          Q.    I apologize in advance for

3    some page turning.  But let's look at the

4    page ending in 318, 3-1-8.

5                Are you there?

6          A.    Yes, I am.

7          Q.    Section E of this worksheet

8    is called, Measurements.

9                Do you see that?

10         A.    Yes.

11         Q.    And according to the New

12   Jersey Department of Health, employees

13   were exposed to possible respiratory

14   illness due to poor sanitation and indoor

15   air quality.

16               Do you see that?

17         A.    Yes, I see that.

18         Q.    Just below that, in a

19   section called Employer Knowledge, the

20   state reported that, The dirty vents and

21   damaged building material debris are in

22   plain view of all employees and

23   administrators.

24               Did I read that correctly?

CONFIDENTIAL

Page 374

1          A.     Yes.

2          Q.     Let's go back to 304, the

3   page ending in 304.

4                 Are you there?

5          A.     Yes.

6          Q.     And this page refers to

7   Citation 2, Item 3.

8                 Do you see that?

9          A.     Yes.

10         Q.     And the state reported that,

11  The pest management program was not

12  effective, as ongoing rodent

13  activity/sightings had been logged into

14  the pest management log book eleven

15  different times and locations throughout

16  the school in December, with no verified

17  corrective actions.  Holes were observed

18  in the walls throughout the facility in

19  the hallways, stairwells, classrooms and

20  wrestling room, permitting rodent

21  movement throughout the school.

22                Did I read that correctly?

23         A.     Yes.

24         Q.     Are those spaces where

CONFIDENTIAL

Page 375

1    students would spend time?

2          A.    I -- I --

3                ATTORNEY INNES:  Objection.

4          Calls for speculation.

5                THE WITNESS:  I can't say.

6          Especially from the pictures that

7          you have here and this, I can't

8          say.

9                This wouldn't be something

10         that I could verify or deny.  But

11         I couldn't verify it.

12   BY ATTORNEY KARP:

13         Q.    I will clarify my question.

14               Are hallways, stairwells,

15   classrooms and the wrestling room spaces

16   where Irvington students would spend

17   time?

18         A.    Yes.

19         Q.    Like the other citation we

20   looked at before, this was reported

21   facility wide at Irvington High School.

22               Do you see that?

23         A.    Yes.

24         Q.    Let's turn to the page

CONFIDENTIAL

Page 376

1    ending in 325.  Section E of the

2    worksheet details is called,

3    Measurements.

4                Do you see that?

5        A.    Yes.

6        Q.    And in the middle of that

7    paragraph, the state reported that, The

8    employees were exposed to possible

9    illness due to poor sanitation from

10   ongoing rodent activity, which had been

11   logged into the pest management log book

12   eleven different times.

13               Do you see that?

14       A.    Yes.

15       Q.    Let's turn to the pages

16   ending 327 and 328.

17               And I apologize for the

18   orientation of the photos.  They appear

19   to be upside down.  This is how we got

20   the records.  So you may need to rotate

21   the -- the document.

22       A.    I did.  Yes.

23       Q.    These are photographs of the

24   Tri-County Termite and Pest Control

CONFIDENTIAL

Page 377

1  problem log.

2              Do you see that?

3        A.    Yes.

4              ATTORNEY INNES:  Objection.

5              THE WITNESS:  Yes.

6  BY ATTORNEY KARP:

7        Q.    Is it correct that teachers

8  and other staff would write into this log

9  to make reports about pest control

10 issues?

11       A.    I'm not sure.  It looks -

12 from this, it looks like there may have

13 been, but.

14       Q.    I have flipped my book to be

15 right side up.  And at that point, I want

16 to focus your attention to the bottom

17 left-hand corner.

18              I recognize this is a little

19 difficult to read, but we'll do our best

20 here.

21              The pest control problem log

22 entry that we're looking at here states,

23 Mice are running all over the classroom.

24              Do you see that?

CONFIDENTIAL

Page 378

1          A.     You said the bottom right?

2          Q.     Bottom left-hand corner.

3          A.     Oh, left-hand corner.

4                 Yes.  I'm reading that, yes.

5                 Oh, wait.  This is better up

6    here.  Sorry.

7          Q.     Yeah.  It's definitely

8    clearer on the screen.

9          A.     Yes.

10         Q.     Okay.  So this entry in the

11   problem log says, Mice are running all

12   over the classroom.

13                Do you see that?

14         A.     Yes.

15         Q.     And about a line or two down

16   it says, Droppings are all over my desk.

17                Do you see that?

18         A.     Yes.

19         Q.     And this is an entry from

20   December of '22, correct?

21         A.     Uh-huh.

22         Q.     Let's look at the bottom

23   right-hand corner of the page.

24                This entry is dated December

CONFIDENTIAL

Page 379

1    7th, 2022.  And the location is Room 6.

2                    Do you see that?

3          A.    Yes.

4          Q.    Do you know what Room 6 is?

5          A.    I'm not exactly sure.  But

6    my guess would probably be, like, the

7    basement, maybe, because of the number.

8    But I'm not entirely sure.

9          Q.    The entry here in the

10   problem log is -- reads, Cockroaches

11   merrily marched from the walls to the

12   door in front of us.

13                   Do you see that?

14         A.    I'm assuming that -- I'm

15   assuming maybe your eyes are better than

16   mine.  Maybe you can zoom in so we can

17   see it better.  But I'll trust your eyes

18   on that.

19         Q.    I'll read it one more time

20   in case it helps.

21         A.    No I'm -- I'm reading it,

22   yes.

23         Q.    And it says, Cockroaches

24   merrily marched from the wall to the door

CONFIDENTIAL

Page 380

1  in front of us.

2          A.    Yes.

3          Q.    And just under that, the log

4  reads, Mice droppings daily.

5                Do you see that?

6          A.    Yes.

7          Q.    There's a section there for

8  action taken.

9                Do you see that?

10         A.    Yes.

11         Q.    And nothing is written

12  there, right?

13         A.    Yes.

14         Q.    Let's turn the page to 328.

15                This is another complaint

16  from December of 2022, correct?

17         A.    Yes.

18         Q.    And the location of this

19  complaint is Room 102.

20                Do you see that?

21         A.    Yes.

22         Q.    The log says, Mouse

23  droppings all over my room, every day.

24  Mice running around when students

CONFIDENTIAL

Page 381

1   present.   Cockroaches, exclamation point.

2             Do you see that?

3        A.    Uh-huh.

4        Q.    Mouse droppings all over my

5   room, the word "all" is in all caps,

6   right?

7        A.    Yes.

8        Q.    And for the section action

9   taken, it says, Please -- in all caps and

10  underlined -- take action, with two

11  exclamation points.

12            Do you see that?

13       A.    Yes.

14       Q.    This is what appeared in the

15  pest control problem log that the

16  Irvington High School maintained,

17  correct?

18            ATTORNEY INNES:   Objection

19       to form.

20            THE WITNESS:   Yes.

21  BY ATTORNEY KARP:

22       Q.    On the next few pages, from

23  329 to 331, those would be the ending

24  Bates numbers, there are various pictures

Page 382

1    that the inspector took of the walls and

2    floors at Irvington High School.

3              Do you see those

4    photographs?

5         A.    Yes.

6         Q.    Do you have any reason to

7    doubt that the inspector took these

8    photographs during his or her visit in

9    January of 2023?

10              ATTORNEY INNES:  Objection

11         to form.

12              THE WITNESS:  I can't

13         confirm or deny.  But I -- I

14         would -- if I were to venture a

15         guess, if it was said by the

16         inspector, then perhaps it is.

17    BY ATTORNEY KARP:

18         Q.    Almost done with this

19    document, Dr. Vauss.

20              If we turn back to Page 305.

21    This page refers to Citation 2, Item 4.

22              Do you see that?

23         A.    I'm sorry, you said 305?

24         Q.    Yes.  Bates ending in 305.

CONFIDENTIAL

Page 383

1          A.    Yes.  Just one second.

2          Q.    Take your time.

3          A.    Yes.

4          Q.    This page refers to Citation

5    2, Item 4.

6                Here the state reported,

7    Multiple areas of water intrusion and

8    water-damaged building materials were

9    observed throughout the building, which

10   had not been remediated, cleaned or

11   repaired.

12               Do you see that?

13         A.    Yes.

14         Q.    And there are a number of

15   locations listed for where this was

16   observed.

17               Do you see that?

18         A.    Yes.

19         Q.    Including ceiling tiles in

20   Room 6, hallways, Room 2, Room 3, the

21   wrestling room, and some closet areas.

22               Do you see that?

23         A.    Yes.

24         Q.    According to this letter,

CONFIDENTIAL

Page 384

1   abatement was required to occur by

2   April 24th, 2023.

3              Do you see that?

4        A.    Yes.

5        Q.    At least for this particular

6   citation that we're focused on right now,

7   right?

8        A.    Yes.

9        Q.    And if the district did not

10  abate these issues by April 24th, 2023,

11  it would be fined $1,000 per day; is that

12  right?

13       A.    Yes.

14       Q.    To your knowledge, was

15  abatement achieved for this citation?

16       A.    To the best of my knowledge,

17  it was.

18       Q.    You can put this document to

19  the side.

20             Dr. Vauss, on the first day

21  of your deposition, we talked about a

22  photograph that appeared in the New

23  Jersey 101.5 article with a sign that

24  said, Do not drink the water.

CONFIDENTIAL

1          Do you recall our discussion
2   about that photograph?
3          A.    Yes.
4          Q.    And our discussion about
5   that sign?
6          A.    Yes.
7          Q.    Okay.  And I asked you if
8   you were aware of whether those signs
9   were still hanging in Irvington Public
10  School buildings today.
11              Do you recall that?
12         A.    Yes.
13         Q.    Do you recall what your
14  testimony was in response to that
15  question?
16         A.    I believe I said I didn't
17  see them, or something to that effect.
18              But you could read me back
19  my answer.
20         Q.    I could.
21              ATTORNEY INNES:  Creative
22         way to avoid my asked and
23         answered.  But okay.
24              ATTORNEY KARP:  I'm a

CONFIDENTIAL

Page 386

1       creative lawyer, Michael.
2  BY ATTORNEY KARP:
3       Q.    Dr. Vauss, sitting here
4  today, are you aware of whether there are
5  signs in the bathrooms of University
6  Elementary School and the Irvington Board
7  of Education that instruct or caution
8  people not to drink the water from the
9  tap?
10      A.    I would say whatever I said
11  the other day is probably the same
12  answer, because I -- I don't know.
13           I haven't -- I wouldn't go
14  into the children's bathrooms.  So if
15  someone produced something that showed
16  something, you know, you can show it to
17  me.  And then I would say, yes, that's
18  our bathroom, maybe.
19           But I -- I couldn't tell
20  you.
21      Q.    You testified that you were
22  not aware of these signs.
23           And you mentioned that there
24  were filtered water stations; is that

CONFIDENTIAL

Page 387

1    right?

2            A.     Yes.   Yes.

3            Q.     Tell me more about these

4    filtered water stations.

5            A.     To the best of my knowledge,

6    every building has a gray type of machine

7    where people can put their -- their cup

8    or bottle and get water.  And --

9            Q.     And if -- sorry.  I didn't

10   mean to interrupt you.

11           A.     Go ahead.

12           Q.     Is that because they cannot

13   drink from the sink?

14           A.     From -- from the bathroom

15   sinks?

16           Q.     Or from any sink in the

17   building.

18           A.     Well, I think we -- we

19   changed over from traditional, like,

20   water fountains from when we were

21   children, or when I was a child, and they

22   moved to something that was more modern.

23                  That's -- that's the best of

24   my -- but I -- I would have to have

CONFIDENTIAL

Page 388

1  someone else probably testify about when

2  and the whys of switching from one thing

3  to the next.

4        Q.    You said a minute ago that

5  you are not aware of these signs in the

6  bathrooms because you haven't been into

7  the student bathrooms?

8        A.    I wouldn't, as a -- as a

9  practice.  Have I ever been into the

10  student bathroom?  Yes, but it would

11  probably be somewhere within the hours

12  that students aren't there.

13            There wouldn't be a reason

14  for me to go into the bathrooms.

15        Q.    Would it be important for

16  you to know, as superintendent of

17  Irvington Public Schools, whether

18  students could drink water from -- from

19  the sink in the bathroom or even use it

20  to brush their teeth?

21            ATTORNEY INNES:  Objection

22        to form.

23            THE WITNESS:  I think it

24        would be important.  But I think

CONFIDENTIAL

Page 389

1           it's important, also, to say that
2           all the reasons why someone
3           believes someone shouldn't drink
4           from the sink may come from their
5           own thought process, which is to
6           drink water from a sink in the
7           bathroom is dirty because of what
8           happens in a bathroom.
9                So there could be a reason
10          or rationale -- I'm not saying
11          that that is.  But that might be a
12          reason or rationale why someone
13          thinks that they shouldn't drink
14          from a bathroom sink.
15               So I'm not sure.  Those
16          are -- that would be someone from
17          that department who could speak
18          better about that.
19               ATTORNEY KARP:  I'm handing
20          you Tab 36.  And we will mark this
21          as Exhibit-27.
22                      -   -   -
23               (Whereupon, Exhibit
24          Irvington-April Vauss-27, No

CONFIDENTIAL

Page 390

1           Bates, Photograph, was marked for

2           identification.)

3                         -   -   -

4               ATTORNEY INNES:   Is this a

5           document that was produced in the

6           case?   I didn't see a Bates, is

7           why I asked.

8    BY ATTORNEY KARP:

9           Q.    Dr. Vauss, I'll represent to

10   you that on Tuesday when we were here for

11   your deposition, when I went into the

12   men's bathroom just across the hall from

13   where we're sitting today, I took this

14   photograph.

15               And I am showing it to you

16   now and marking it as Exhibit-27.

17          A.    Okay.

18          Q.    Have you seen signs like

19   this posted anywhere else in the

20   building?

21          A.    I would say I haven't.   It

22   doesn't mean that they don't exist.

23               Obviously, if you went into

24   the bathroom and it had it, then it's --

CONFIDENTIAL

Page 391

1    then it's there.

2            Q.    And the sign says, Caution,

3    with two exclamation points.  And it's in

4    a yellow background.  And then it says,

5    Do not drink the water.

6                 Do you see that?

7            A.    Yes.

8            Q.    Any reason to doubt that

9    this appears in the men's bathroom across

10   the hall?

11           A.    No, no reason to doubt that.

12           Q.    And we are sitting in the

13   same building as University Elementary

14   School, correct?

15           A.    Yes.

16           Q.    You can put this to the

17   side.

18                 ATTORNEY KARP:  I'm handing

19           you Tab 34, which we will mark as

20           Exhibit-28.

21                      -   -   -

22                 (Whereupon, Exhibit

23           Irvington-April Vauss-28, No

24           Bates, 2016-17 School Performance

CONFIDENTIAL

                                        Page 392

1          Report, Irvington Township, was

2          marked for identification.)

3                    -   -   -

4    BY ATTORNEY KARP:

5          Q.    And this is a school

6    performance report from the 2016-2017

7    school year.

8               Do you see that?

9          A.    Yes.

10         Q.    And this would have been

11   issued by the New Jersey Department of

12   Education?

13         A.    Yes.

14              ATTORNEY INNES:  Before you

15         go on, this is also a document

16         that was not produced, this is

17         something that you procured?

18              ATTORNEY KARP:  Sure.  For

19         clarity on the record, this -- New

20         Jersey school performance reports

21         are publicly available.

22   BY ATTORNEY KARP:

23         Q.    Correct, Dr. Vauss?

24         A.    Yes.

CONFIDENTIAL

Page 393

1          Q.    I can go onto the website

2    for the New Jersey Department of

3    Education, and I can download --

4          A.    Yes.

5          Q.    -- the reports they have

6    available?

7          A.    Yes.

8          Q.    This is the report that's

9    available from -- for the school year

10   2016-2017 for Irvington Public Schools.

11   And I'll represent to you that we

12   downloaded it from the website.

13             Fair?

14         A.    Yes.

15         Q.    Okay.  Let's take a look at

16   Page 42.  And there are page numbers

17   here, they may be slightly obscured by

18   the staple.

19             Do you need me to start

20   over?

21         A.    I'm sorry.

22         Q.    No problem at all.

23         A.    You said Page 42?

24         Q.    Page 42.  And the page

CONFIDENTIAL

Page 394

1  number might be obscured by the staple, I

2  apologize, if you're looking for it.

3              Dr. Vauss, Page 42 includes

4  some information and data regarding

5  chronic absenteeism.

6              Do you see that?

7      A.    Yes.

8      Q.    And according to the table

9  on the left, the district-wide rate of

10  chronic absenteeism for the 2016-2017

11  school year in Irvington Public Schools

12  was 15.7 percent.

13              Do you see that?

14      A.    Yes.

15      Q.    The target rate, which

16  reflects the state average, was 10.3.

17              Do you see that?

18      A.    Yes.

19      Q.    Any reason to dispute the

20  correctness or the completeness of the

21  data in this table?

22      A.    No.

23      Q.    Chronic absenteeism was a

24  problem for Irvington Public Schools,

CONFIDENTIAL

Page 395

1    even going back to 2016-2017, right?

2            A.    Yes.

3            Q.    You testified on Tuesday

4    that social media was one of the causes

5    of chronic absenteeism.

6                 Do you remember that?

7            A.    Yes.

8            Q.    What is your basis for that

9    statement?

10           A.    My experience, conversations

11   that I've had with my administrators, the

12   amount of times that they have told us

13   about students who tell us that they've

14   been on their phones, looking at social

15   media and liking and sharing, from the

16   moment they wake up until the time that

17   they fall asleep.

18                 And that a lot of times the

19   chronic absenteeism rate you see is

20   mingled with tardy rate -- the tardiness

21   rate.  And when students don't get a full

22   night's rest because they're on their

23   phones and their parents may think that

24   they're asleep, and they're on the social

CONFIDENTIAL

Page 396

1    media platforms, then they don't get up

2    on time and they -- they don't come to

3    school, you know.

4              And that's -- is it the only

5    cause?  Maybe not.  But is it a cause?

6    And if we removed that from being a

7    cause, then we would probably be much

8    better off.

9         Q.    You just said, is it the

10   only cause?  Maybe not.  Right?

11        A.    Uh-huh.

12        Q.    What are other causes of

13   chronic absenteeism?

14        A.    Maybe -- let me think about

15   it.

16              Maybe they don't like --

17   maybe certain students don't like school.

18   Maybe they don't feel confident about

19   school, and so they avoid it.

20              There are probably other

21   factors.  But what I've experienced, and

22   I can only speak in this -- this -- you

23   know, my experience, is that when we look

24   at certain sectors of our students, they

CONFIDENTIAL

Page 397

1    are inundated with social media as a part

2    of their life.  And if they are on a

3    platform from sunup to sundown, then that

4    is a big contributing factor.

5                    And I would say that some --

6    some of the effects of it are not direct.

7    Some are the conflicts and the issues

8    that our scholars have with other

9    scholars, but it generated from something

10   that was placed on a social media

11   platform and people were liking it and

12   sharing it and it comes into the school

13   and it starts a whole avalanche of

14   issues.

15        Q.    You said that students were

16   on social media from sunup to sundown,

17   right?

18        A.    Metaphorically.

19        Q.    Are you tracking or able to

20   track how much time students are spending

21   on social media outside of school?

22        A.    No.

23              ATTORNEY INNES:  Objection

24        to form.

Page 398

1             THE WITNESS:  Sorry.

2             No.  But, you know, I know

3         that you all can.  And if you

4         even -- with some of those fight

5         sites that we asked you all to

6         take down, if you could take those

7         down, and others like them, and

8         kind of prohibit our scholars from

9         being able to do that, it would

10        definitely make our lives a lot

11        easier.  And we could really hone

12        in on -- on some of the things

13        that are causing our numbers to

14        be -- well, I don't think our

15        numbers would be even as high as

16        they were in 2016.

17   BY ATTORNEY KARP:

18        Q.    And I just want to

19   understand the basis for your statement

20   that the students are on their phones

21   from sunup to sundown.

22             So your answer to my

23   question about do you track how much time

24   students are spending on social media

CONFIDENTIAL

Page 399

1    outside of school was no?
2          A.    Not on a platform.
3                But from the conversations
4    that some of our -- my staff have with
5    the scholars, what the administration
6    observes, the things that are shared with
7    them, I would say that they would -- they
8    would say, I pick up my phone when I get
9    up first thing in the morning and I kind
10   of just fall asleep, right.  And they
11   fall asleep with, you know, having been
12   on a site and they just kind of zonk out.
13               So that's what I mean.  But
14   I don't mean that we literally have a
15   tool to track the time that they are on
16   it or not.
17         Q.    Sitting here today, you
18   don't know whether students are on their
19   cell phones for two hours, four hours or
20   six hours, or some other amount of time,
21   when they're not in school, correct?
22               ATTORNEY INNES:  Objection
23         to form.
24               THE WITNESS:  No, I wouldn't

CONFIDENTIAL

Page 400

1          know with 100 percent accuracy.

2     BY ATTORNEY KARP:

3          Q.    Do you know how much -- do

4     you know with any accuracy?

5               ATTORNEY INNES:  Objection

6          to form.

7               THE WITNESS:  I would just

8          say experience, the conversations,

9          the things that they share.

10              Normally, children -- I

11         mean, I don't think that they

12         would make up that, I'm on my

13         phone all the time.  I mean, that

14         doesn't make them look -- give

15         them -- you know, make them look

16         positive or shows them in the best

17         light.

18     BY ATTORNEY KARP:

19          Q.    Students also play video

20     games on their cell phones, correct?

21          A.    I believe so.

22          Q.    Do you know how much time

23     they're spending playing video games on

24     their phones outside of school?

CONFIDENTIAL

Page 401

1          A.     I have no idea.

2          Q.     Do you know how much time

3    any Irvington Public School student is

4    spending on a particular social media

5    platform outside of school?

6          A.     No.

7          Q.     Do you know anything about

8    how -- strike that.

9                 Sitting here today, do you

10   know anything about how students are

11   using social media outside of the

12   classroom, outside of school?

13         A.     Yes.

14         Q.     And what do you know, sorry?

15         A.     They are -- they are

16   creating fight pages on Instagram.  They

17   are posting and sharing and liking fights

18   and other things that are negative.

19                Maybe they're using it in a

20   positive light as well.  Maybe they're on

21   there and -- but I think that the -- the

22   thing that, you know, that troubles me is

23   that it's -- it's the constant use -- if

24   we even don't look at outside of school,

CONFIDENTIAL

Page 402

1  but from the moment that they walk in the

2  building until the time they leave, from

3  what my staff tells me -- and I don't

4  have a reason to believe that they would

5  make it up -- is that it's a constant.

6  And it's not in a way that is enhancing

7  them.

8              That I am aware of.

9        Q.    You said that they may be

10  posting on social media when they're

11  outside of school?

12          A.    Yes.  Yes, they are.

13          Q.    You said they may be using

14  it for good or positive purposes?

15          A.    There's -- there are

16  positive -- there are positive, I think.

17  But -- there's positive and there's

18  negative.

19              It's like if I do something

20  that is stopping me from doing my job,

21  right, it's not necessarily that it's a

22  bad thing, it's just the time in which

23  I'm doing it is distracting me from what

24  my main purpose may be.

CONFIDENTIAL

Page 403

1                And for our scholars, they
2      need direction and they need to be able
3      to stay on task while they're in school.
4                I mean, you showed me data
5      that is less than stellar.  And for our
6      students to be on social media platforms
7      liking and sharing, even good -- if you
8      want to say good content, and doing that,
9      that is not helping our students improve
10     in their academics.
11               Q.    So you believe that students
12     are using social media -- that some
13     students are using social media for good
14     or positive ways outside of school?
15               A.    I think that's a logical
16     conclusion to come to.  Just like the
17     other is a logical conclusion.
18               Q.    You said that a lot of your
19     belief that students are using social
20     media a lot outside of school is coming
21     from conversations you've had with
22     administrators and staff, correct?
23               A.    Yes.
24               Q.    Who are those individuals?

Page 404

1          A.    Well, my principals.  They

2    say, you know -- this may be, like, you

3    know, just if they're reporting a

4    situation, and they're like, Doc, they're

5    on these phones all the time and they

6    are -- the moment something happens,

7    they're breaking out their phones to tape

8    and then to share on these platforms,

9    what -- instead of, maybe, them stopping

10   a fight or stopping a disagreement,

11   they're taking it out to be able to post

12   and become Instagram famous, or whatever

13   famous, whatever the vernacular is.

14          Q.    Is anyone at Irvington

15   Public Schools Instagram famous?

16          A.    You mean like a student or

17   adults or --

18          Q.    You just -- I don't mean to

19   cut you off.  Sorry.

20          A.    No, I'm sorry.  Go -- you

21   can ask your question again, please.

22          Q.    Well, you just -- you just

23   mentioned that students are trying to get

24   Instagram famous.

CONFIDENTIAL

Page 405

1              And I'm wondering if any of
2    them are Instagram famous?
3         A.    Famous with me, in my
4    circle, probably not, no.  I wouldn't --
5    I wouldn't know anyone who is Instagram
6    famous.  No, I wouldn't know.
7         Q.    You said that principals
8    were a source of information for the fact
9    that students were using social media,
10   correct?
11        A.    Uh-huh.  Yes.
12        Q.    Who else are you -- have you
13   discussed this with?
14        A.    Well, their staff speak to
15   them as well, and then they relay that to
16   me.  So, you know -- or if someone sees
17   me -- if I'm at a -- you know, a wellness
18   fair and maybe something may have
19   happened in their school and they may,
20   you know, bring it up -- I mean, I can't
21   cite actual, I had a conversation with
22   this person about social media on this
23   date or that date necessarily.
24              But it -- these are, you

CONFIDENTIAL

Page 406

1    know, things that they talk about.
2         Q.    So principals are talking to
3    their staff, and that information kind of
4    funnels up to you; is that how it occurs?
5         A.    At times, yes.
6         Q.    Where are these
7    conversations or discussions
8    memorialized?  Where are they written
9    down?
10             ATTORNEY INNES:  Objection
11        to form.  Lack of foundation.
12             THE WITNESS:  Should I
13        answer?
14             ATTORNEY INNES:  Yes.
15             THE WITNESS:  Oh, sorry.
16             They wouldn't necessarily be
17        written down.
18    BY ATTORNEY KARP:
19         Q.    These would be oral
20    conversations, maybe seeing someone in
21    the hallway or talking to them on the
22    phone?
23         A.    Yes.
24         Q.    Okay.  Would they be in any

Page 407

1    kind of reports that you receive from

2    your -- from your principals or staff?

3                    ATTORNEY INNES:  Objection

4          to the form.  Asked and answered.

5                    THE WITNESS:  They could --

6          if there's an incident report or

7          if there is something that

8          happened, it could possibly be in

9          there.

10   BY ATTORNEY KARP:

11         Q.    So some type of disciplinary

12   incident report could refer to social

13   media; is that what you're saying?

14         A.    I don't know that they would

15   necessarily say it.  They might say --

16   let's -- I'm just giving out an example.

17                    They might say, Andrew got

18   into a fight with Mike and -- and the

19   scholars around them decided to tape or

20   place it on a platform.  Or they might

21   say, they didn't try to stop, they

22   just -- they just filmed the fight.

23                    They may not necessarily

24   mention social media in the write-up.

CONFIDENTIAL

Page 408

1          Q.    Other than these incident
2    reports, is there any other written form
3    that you can think of where your
4    discussions with administrators would be?
5          A.    Not that I can recall.
6          Q.    Do any -- have any of the
7    reports you've gotten from your
8    administrators or staff said to you,
9    every student at Irvington Public Schools
10   is on social media every minute of every
11   day?
12         A.    No.
13         Q.    You said earlier that social
14   media was a big contributing factor to
15   chronic absenteeism.
16               Do you remember that?
17         A.    Yes.
18               ATTORNEY INNES:  Objection
19         to form.  Misstates the prior
20         testimony.
21               You can answer.
22               THE WITNESS:  Yes.
23   BY ATTORNEY KARP:
24         Q.    What is your source for

Page 409

1  saying it is -- that it is a big

2  contributing factor?

3          A.    As I said before,

4  conversations that I have with my

5  administrators.

6          Q.    Have you read any studies to

7  confirm that -- to confirm your belief

8  that social media is a big contributing

9  factor to chronic absenteeism?

10         A.    No.

11         Q.    Have you conducted any of

12 your own research on the issue to confirm

13 your belief that social media is a big

14 contributing factor to chronic

15 absenteeism?

16         A.    No.

17              ATTORNEY INNES:    Objection

18      to form.  Vague.

19 BY ATTORNEY KARP:

20         Q.    Have you looked at any

21 information that has -- has been made

22 available about chronic absenteeism by

23 the U.S. Department of Education?

24         A.    Not by the U.S. Department

CONFIDENTIAL

Page 410

1   of Education.  We have periodicals, and

2   they may talk about different things

3   that -- as it relates to school avoidance

4   or chronic absenteeism.

5                  But nothing that actually

6   just sticks out in my head that I can

7   make reference to.

8           Q.     Okay.  I think you're

9   answering my next question.

10                 But are there specific

11  periodicals you rely on for your belief

12  that social media is a big contributing

13  factor to chronic absenteeism?

14          A.     So I guess that's a no.

15  But -- but have I read different

16  periodicals and articles?  Yes, in the

17  past.

18                 You know, but -- it wasn't

19  necessarily about social media, but it

20  was about the issue of school avoidance.

21          Q.     And what -- what was

22  discussed in those articles?

23          A.     I can't recall right now.  I

24  mean, I'm just speaking over time.

CONFIDENTIAL

Page 411

1           I thought you meant just in
2    general, in life, yes, I have.
3           Q.    So your recollection of
4    those articles that relate to the issue
5    of chronic absenteeism or school
6    avoidance is that they don't refer to
7    social media but they discuss those
8    issues more generally?
9           A.    They're not -- it's not
10   limited to social media.  But it could
11   have mentioned social media as a
12   contributing factor.
13          Q.    It could have mentioned or
14   you remember that they specifically did
15   mention social media?
16          A.    I can't say I specifically
17   remember all the issues that were listed.
18               ATTORNEY KARP:  Can we pull
19        up Tab 37?
20               And I apologize, I don't
21        have a printed copy of this.  So
22        if at any point you want to take
23        control of the document or you
24        need the trial tech to scroll down

Page 412

1     or anywhere else on the page,

2     please let me know.

3           We'll mark this as

4     Exhibit-29.

5              -   -   -

6           (Whereupon, Exhibit

7     Irvington-April Vauss-29, No

8     Bates, Chronic Absenteeism,

9     Supporting Student Attendance and

10    Combatting Chronic Absenteesim in

11    Our Nation's Schools, was marked

12    for identification.)

13             -   -   -

14         ATTORNEY INNES:  Doctor, if

15    you're not familiar with this

16    document, you have full ability to

17    read the entire document, if you'd

18    like.

19         He doesn't have a copy of

20    it.  But if you'd like to read

21    this document, we can, I guess,

22    scroll through on the page or we

23    can go off the record and print

24    copies for everyone.

CONFIDENTIAL

Page 413

1          It's up to you.
2          ATTORNEY KARP:  I'm fine
3     either way, as long as you're
4     comfortable with --
5          THE WITNESS:  I would want
6     to read it and process it, yes.
7          ATTORNEY KARP:  Sure.
8     Before we do that, let me just
9     introduce it and explain what it
10    is.
11 BY ATTORNEY KARP:
12     Q.    Dr. Vauss, this is a page on
13 the website for the U.S. Department of
14 Education.
15          Do you see that?
16     A.    Yes.
17     Q.    And this page is called,
18 Chronic Absenteeism.
19          And we are visiting this
20 page on May 9th, 2025.  That's today,
21 correct?
22     A.    Yes.
23     Q.    If you want to scroll
24 through or if you want to take a break

Page 414

1    for us to print, let us know which one

2    you prefer.

3            ATTORNEY INNES:  Want to

4        scroll through?

5            THE WITNESS:  I mean, I can.

6        It doesn't -- doesn't --

7            Okay.  I'm ready for the

8        next page.

9            Okay.  Okay.  Okay.

10           ATTORNEY INNES:  The version

11       on my screen is cut off on a few

12       of these.  The middle of the

13       Page 9 -- 5 of 9, percentage on

14       the right is cut off.

15           ATTORNEY KARP:  Is that in

16       the file itself?

17           ATTORNEY INNES:  So, I mean,

18       I'll just make a statement about

19       the exhibit in general.  And I

20       don't have the protocol in front

21       of me, but if it doesn't have it

22       in the next one we do, we'll have

23       it.

24           To the extent we're going to

CONFIDENTIAL

Page 415

1          show witnesses documents,

2          especially multi-page documents,

3          documents that haven't been

4          produced in the case, going

5          forward we would ask that you

6          provide printed copies to all

7          counsel.

8                  ATTORNEY KARP:   I

9          understand.

10                 ATTORNEY INNES:   And for the

11         witness.

12                 THE WITNESS:  You can

13         change.  Okay.

14                 ATTORNEY INNES:  Are these

15         links live, to the extent we

16         want --

17                 ATTORNEY KARP:  They are.

18         And we are sending the link to the

19         trial tech in case that resolves

20         the completeness issue.

21                 ATTORNEY INNES:  The

22         actual -- are these hyperlinks in

23         the text or are those --

24                 ATTORNEY KARP:  Like, what

CONFIDENTIAL

Page 416

1          would happen if we clicked the

2          PDF?

3                    ATTORNEY INNES:  For

4          instance, if Dr. Vauss wants to

5          look at the underlying articles.

6                    ATTORNEY KARP:  She could.

7          So this is the live web page with

8          the data.

9                    ATTORNEY INNES:  In the

10         avoidance -- I'm not instructing

11         the witness to do anything.  I'm

12         just relaying it is a possibility.

13                   To the extent there's

14         anything on this, we're now on the

15         worldwide web as an exhibit, to

16         the extent you need to click

17         through any of these links, you're

18         free to do so.

19                   ATTORNEY KARP:  For clarity,

20         the exhibit is this specific web

21         page, not the entire Internet.

22         That would be challenging to mark,

23         for sure, and get into the record.

24                   ATTORNEY INNES:  There's a

CONFIDENTIAL

Page 417

1        way to do this.

2    BY ATTORNEY KARP:

3        Q.    Dr. Vauss, have you had a

4    chance to at least read through this

5    particular page --

6        A.    Yes.

7        Q.    -- on chronic absenteeism?

8        A.    Yes.

9        Q.    And is this your first time

10   seeing this web page?

11       A.    Yes.

12       Q.    Let's look at the top of the

13   page.

14             There's a sentence just

15   above the geography heading that says,

16   Though chronic absence derives from

17   multiple, often interconnected factors,

18   research points to student disengagement,

19   lack of access to student and family

20   supports, and student and family health

21   challenges as significant drivers.

22             Do you see that?

23       A.    Yes.

24       Q.    The department is calling on

CONFIDENTIAL

Page 418

1    states and districts to address these

2    factors and send a clear message that

3    students need to be in school.

4                    Do you see that?

5         A.     Uh-huh.

6         Q.     Social media is not listed

7    by the Department of Education as one of

8    these -- one of these -- one of these

9    factors that leads to chronic

10   absenteeism, correct?

11        A.     That is correct.

12        Q.     And if we scroll down in the

13   page to who is impacted, the Department

14   of Education states that, Disparities in

15   chronic absenteeism by key demographic

16   characteristics are evident, though

17   unacceptable levels of chronic

18   absenteeism exist for all students.

19                    Do you see that?

20        A.     Yes.

21        Q.     And then below we have data

22   about how different -- students of

23   different races and ethnicities and other

24   characteristics differ in terms of their

Page 419

1    chronic absenteeism, correct?

2         A.    Yes.

3         Q.    Okay.  And the first bar

4    graph here says, While prevalent across

5    the country, students of different races

6    and ethnicities experience chronic

7    absenteeism at different rates.

8              Do you see that?

9         A.    Yes.

10        Q.    Do you have any reason to

11   believe that certain -- students of

12   certain races or ethnicities use social

13   media more than others?

14             ATTORNEY INNES:  Objection

15        to the form.

16             THE WITNESS:  I guess my --

17        I don't.  I just -- when we --

18        when I read studies like this,

19        I'm -- you know, I'm always left

20        with the question, who did you

21        speak to to generate this

22        information?

23             I'm not saying that -- that,

24        in and of itself, that this data

CONFIDENTIAL

Page 420

1      is wrong.  But at the same time,

2      being someone who has worked with

3      data in the past, I just know, you

4      know -- let's say if I prepare for

5      a dissertation, I'm collecting

6      data.  Yes, I'm looking at data

7      that may contradict what my

8      assertion may be, but I'm also

9      looking at things that support it.

10          I'm not sure that all the

11     people who are listed here in the

12     different demographics were

13     represented in coming up with the

14     causations of chronic absenteeism,

15     especially as it relates to the

16     given year.  That's my concern.

17          But, you know, I wasn't a

18     part of this study.  And I'm not

19     trying to debunk it.

20          But I'm just -- I always

21     have questions.  I'm a person that

22     will ask questions.

23          ATTORNEY INNES:  Andrew,

24     before you ask your next question,

CONFIDENTIAL

Page 421

1          is it possible to drop the
2          hyperlink into the chat so folks
3          online can have it?
4                ATTORNEY KARP:  I don't have
5          access to the Zoom myself right
6          now.  I'm not logged in.  If
7          someone can drop that in, that
8          would be appreciated.
9                ATTORNEY INNES:  Thank you.
10  BY ATTORNEY KARP:
11          Q.    Dr. Vauss, just to make sure
12  I got the answer to my question.
13                You don't have a reason to
14  believe that students of different races
15  or ethnicities use social media more than
16  others, correct?
17          A.    I don't.
18          Q.    The next bar graph says,
19  Students with disabilities are 36 percent
20  more likely to experience chronic
21  absenteeism than students without
22  disabilities.
23                Do you see that?
24          A.    Yes.

CONFIDENTIAL

Page 422

1          Q.    What percentage of students

2    at Irvington Public Schools, this school

3    year -- or strike that.

4                What percentage -- do you

5    know what percentage of students at

6    Irvington Public Schools were designated

7    as students with disabilities in the

8    2023-2024 school year?

9          A.    Students -- let me just

10   clarify.

11               So students who are

12   identified by our special services

13   department?

14         Q.    Let me ask the question

15   again, because I might have asked a bad

16   one or an awkward one.

17               Do you know what percentage

18   of Irvington Public School students were

19   designated as students with disabilities

20   in the 2023-2024 school year?

21         A.    I couldn't give you a

22   percentage for -- with that particular

23   question.  No, I can't.

24         Q.    Do you know historically, in

CONFIDENTIAL

Page 423

1    the last ten years, what that number

2    would be?

3                    ATTORNEY INNES:   Objection

4            to form.

5                    THE WITNESS:   It would --

6            calls for me to guess.  I'm not

7            sure if their -- I'm going to --

8            I'm going to venture a guess in

9            that I believe that the children

10           being identified as children with

11           disabilities are students who

12           avail themselves of our special

13           services department.  And that

14           percentage is around 17 percent, I

15           believe.

16   BY ATTORNEY KARP:

17           Q.    That information would be

18   contained in the New Jersey school

19   performance reports, correct?

20           A.    Yes, yes.

21           Q.    Okay.  The Department of

22   Education also says, English learners are

23   20 percent more likely to experience

24   chronic absenteeism compared to

CONFIDENTIAL

Page 424

1  non-English learners.

2              Do you see that?

3        A.    Yes.

4        Q.    And we've discussed that the

5  percentage of English language learners,

6  or ELL students, sometimes referred to as

7  multilingual learners, has increased in

8  Irvington over the past several years,

9  correct?

10       A.    Yes.

11       Q.    Do you have any basis or

12  reason to doubt the analysis that has

13  been put forward by the Department of

14  Education on this particular web page?

15       A.    As it relates --

16             ATTORNEY INNES:  Objection

17       to form.

18             THE WITNESS:  Sorry.

19             As it relates to Irvington

20       Public Schools or just as it

21       relates to their study?

22  BY ATTORNEY KARP:

23       Q.    As it relates to their

24  analysis.

CONFIDENTIAL

Page 425

1          A.     No.  No, I don't.

2          Q.     Do you believe that their

3    analysis does not apply to Irvington

4    Public Schools?

5          A.     I think that there are

6    elements, I'm sure, that do.  But they

7    didn't study specifically Irvington

8    Public Schools.

9               So I don't know that I could

10   say that this is apples and apples.  Nor

11   would I necessarily say apples and

12   oranges.  But I wouldn't say that this is

13   entirely true of Irvington Public

14   School's problem with school avoidance.

15         Q.     The data that they collected

16   is at a national level, correct?

17              ATTORNEY INNES:  Objection

18         to form.

19              THE WITNESS:  I'm sorry?

20   BY ATTORNEY KARP:

21         Q.     The data that they collected

22   was at a national level?

23         A.     It was at a national level.

24         Q.     I didn't mean to interrupt

CONFIDENTIAL

Page 426

1   you.   Sorry.

2          A.     Sorry.   Yes.   Yes.

3          Q.     There's a map on this web

4   page with all 50 states and data for

5   each?

6          A.     I saw, yes.

7          Q.     We can take down this

8   exhibit.   I'm about to shift to another

9   topic, Dr. Vauss, do you need a break?

10  Are you okay?

11         A.     I'm fine.

12         Q.     Dr. Vauss, when we met on

13  Tuesday, you referred to an incident

14  involving an Irvington Public Schools

15  student who went missing and was found in

16  Brooklyn sometime after she went missing.

17                Do you remember that?

18         A.     I remember saying a student

19  went missing.   I don't recall saying that

20  a student was found in Brooklyn.

21                Did I say -- did I say this

22  child was found in Brooklyn?

23         Q.     You testified that she was

24  located.

CONFIDENTIAL

Page 427

1          A.    I know she was -- that could
2    have been.  Then that's -- if I said
3    that, then that's what it was.
4          Q.    You mentioned that that
5    incident made national news?
6          A.    Yes.
7          Q.    Okay.  Do you recall what
8    that student's name was?
9          A.    I do --
10              ATTORNEY INNES:  Objection
11          to form.  You do not need to
12          answer that -- well, sorry.
13              I'll caution you not to
14          disclose the student's name, if
15          you know it.
16              ATTORNEY KARP:  Are you
17          instructing her not to give the
18          name of the student if she knows
19          it?
20              ATTORNEY INNES:  Yes.
21              ATTORNEY HENRY:  On what
22          basis?
23              ATTORNEY KARP:  Is that a
24          privilege objection?

CONFIDENTIAL

```
                                         Page 428
 1              ATTORNEY INNES:  I mean,
 2       we've had this discussion multiple
 3       times.  We're not talking about
 4       individual students.  You can get
 5       there a different way.
 6              ATTORNEY KARP:  She
 7       testified that --
 8              ATTORNEY INNES:  You can get
 9       there a different way.
10              ATTORNEY KARP:  Sorry.
11       Dr. Vauss testified that this
12       incident made national news.
13  BY ATTORNEY KARP:
14       Q.    Do you recall that?
15       A.    Uh-huh.
16              ATTORNEY KARP:  Certainly
17       the individual's name would have
18       been in the national news media.
19              ATTORNEY INNES:  Are you
20       asking me or are you asking the
21       witness?
22              ATTORNEY KARP:  I'm
23       establishing the basis for asking
24       why it's not an issue.
```

Page 429

1          I would certainly --

2          ATTORNEY INNES:  That's why

3     I said you can do it -- there's

4     foundation issues, right.  I've

5     let you go a long way on lack of

6     foundation, for the past two days,

7     right.

8          So you can ask it the way

9     you want to ask it.  And I'll

10    object the way I object.

11         ATTORNEY KARP:  Okay.  But

12    you didn't object, you instructed

13    her not to answer.

14         So I just wanted to --

15         ATTORNEY INNES:  Based on

16    your question, yes, she should not

17    answer that question.

18         ATTORNEY KARP:  Can I have

19    Tab 30, please?  I'll mark this as

20    Exhibit-30.

21                  -  -  -

22         (Whereupon, Exhibit

23    Irvington-April Vauss-30, No

24    Bates, New Video: Jashyah Moore

Page 430

```
 1        Seen At Deli On Day She
 2        Disappeared In East Orange, NJ,
 3        was marked for identification.)
 4                -  -  -
 5   BY ATTORNEY KARP:
 6        Q.    This is an article from
 7   CBSNews.com.
 8              Do you see that, Dr. Vauss?
 9        A.    Yes.
10        Q.    And the name of the article
11   is, New Video:  Jashyah Moore seen at
12   deli on day she disappeared in East
13   Orange, New Jersey.
14              Do you see that?
15        A.    Yes.
16        Q.    Does -- is this the student
17   you had in mind when you testified that
18   an Irvington Public School student had
19   gone missing and was found in Brooklyn
20   sometime thereafter?
21        A.    I believe this is her.  I
22   didn't remember her name.
23        Q.    Have you read this article
24   before?
```

CONFIDENTIAL

Page 431

1        A.    I have not read this article

2   before.

3        Q.    CBS News is national media?

4        A.    Yes.

5        Q.    This took place in November

6   of 2021.

7              Do you see that?

8        A.    Uh-huh.

9        Q.    This article was published

10  on November 11th, 2021.

11       A.    Uh-huh.

12       Q.    And just to confirm, you

13  said you belive this is the student you

14  had in mind?

15       A.    I believe -- yes.  I didn't

16  see this article.  I did see that there

17  was a student missing from East Orange on

18  television.  And -- yes.

19       Q.    And you believe her to be a

20  student of Irvington Public Schools?

21       A.    She was a student.

22       Q.    At the time?

23       A.    At the time.

24              She had not -- she had not

CONFIDENTIAL

Page 432

1    fully transferred into East Orange.

2    That's how I became involved in the

3    situation.  Because the last school of

4    record for her was Irvington Public

5    Schools.

6              As I said the other day, the

7    process is for us to be given a name of a

8    school in East -- or wherever they're

9    being transferred to, in this case, it

10   was East Orange, she was given -- her

11   parents produced an East Orange address

12   of a school where she was going to be

13   transferred.

14             She wasn't fully

15   transferred.  So the last school of

16   record for her was Irvington Public

17   Schools.

18        Q.    I recall your testimony on

19   that.  Thank you.

20             Briefly, let's -- let's turn

21   to Page 4 of this article.  In the middle

22   of the page, they report, Stevens also

23   said investigators are launching a social

24   media campaign to ask the public for help

CONFIDENTIAL

Page 433

1   in the case.

2                   Do you see that?

3         A.      Yes.

4         Q.      Investigators were using

5   social media to help --

6         A.      Yes.

7         Q.      -- solve this case?

8         A.      Yes.  Absolutely.

9         Q.      When we first spoke about

10  this incident, you attributed Ms. Moore's

11  disappearance to social media.

12                  Do you recall that?

13        A.      Yes.  As it relates to her

14  being bullied and things being shared

15  online, even to her, her life, and shared

16  with other students.

17        Q.      Did you see any of those

18  posts?

19        A.      I did not.  I did not.

20        Q.      Did you see any of the

21  comments?

22        A.      I did not.

23        Q.      Did you see any -- do you

24  know, sitting here today, how many likes

CONFIDENTIAL

Page 434

1    or reactions the posts got?

2           A.    No, I don't.

3           Q.    Okay.  Do you know how many

4    times the posts were shared?

5           A.    No, I don't.

6                 ATTORNEY INNES:  Objection

7           to form.  I'll renew our request

8           for data related to use of

9           defendants' platforms, all

10          defendants' platforms, in the

11          district.

12                ATTORNEY KARP:  Thank you.

13   BY ATTORNEY KARP:

14          Q.    What was the content that

15   she was -- that you testified she was

16   being bullied about?

17                ATTORNEY INNES:  Objection

18          to form.

19                THE WITNESS:  I didn't speak

20          to her directly.  But what was

21          shared with me, as I was brought

22          over to discuss the case --

23          because at that point, she had not

24          been found.

CONFIDENTIAL

Page 435

1            You know, I have an idea
2        of -- of -- now, of what happened
3        with the young lady.  But what was
4        shared with me that day wasn't --
5        wasn't her actual post or anything
6        of that nature.
7    BY ATTORNEY KARP:
8        Q.    What was shared with you
9    that day?
10            ATTORNEY INNES:  Objection
11        to form.  To the extent that you
12        can answer that question without
13        revealing information that may or
14        may not -- that may have been
15        privileged, you may do so.
16            THE WITNESS:  Well, let me
17        just say, I don't know that I can
18        share too much more than what I've
19        shared.
20            Because it was -- the FBI
21        was -- was who I spoke with that
22        day.  And I know that they had
23        access to her usage.  So that's
24        all I can say.

CONFIDENTIAL

Page 436

1   BY ATTORNEY KARP:

2          Q.    So --

3          A.    I mean, I don't know if

4   that's --

5          Q.    So your -- the information

6   you got came from the FBI?

7          A.    And what -- and what they

8   viewed and -- yes.  I can say part of it

9   was from them.  I can say that.

10                 THE WITNESS:  Can I speak to

11         my counsel?

12                 ATTORNEY INNES:  You want to

13         go off the record?

14                 THE WITNESS:  I would.

15                 ATTORNEY KARP:  Is this

16         about -- just for privilege and to

17         see if this is confidential or

18         not?

19                 ATTORNEY INNES:  I don't

20         know what it's about.  But my

21         witness is asking to go off the

22         record and talk to me so --

23                 VIDEO TECHNICIAN:  The time

24         right now is 11:57 a.m.  We are

CONFIDENTIAL

Page 437

1          off the record.

2                         -   -   -

3              (Whereupon, a brief recess

4          was taken.)

5                         -   -   -

6              VIDEO TECHNICIAN:  The time

7          right now is 12:07 p.m.  We are

8          back on the record.

9     BY ATTORNEY KARP:

10         Q.    Dr. Vauss, we took a quick

11    break so that you could confer with your

12    counsel.

13         A.    Yes.

14         Q.    Did you have an opportunity

15    to do that?

16         A.    I did.

17         Q.    My question to you was

18    related to conversations you told us you

19    had with the FBI in connection with their

20    investigation of this incident.

21         A.    Yes.

22         Q.    What do you recall the FBI

23    shared with you as it related to their

24    investigation of this incident?

CONFIDENTIAL

Page 438

1          A.    So one of the things that I

2    wanted to clarify, there was the former

3    principal in the room as well.  So

4    that's -- that's what I wanted to -- to

5    contribute.

6              What they shared, they

7    shared that she had social media activity

8    and interactions with other scholars,

9    friends.  They did not mention,

10   necessarily, a particular platform,

11   and -- but just that things were -- were

12   shared in this instance.

13         Q.    On the first day of your

14   deposition, you mentioned Instagram as

15   potentially being related to this -- this

16   incident.

17              Do you recall that?

18         A.    Yes.

19         Q.    Is it now your testimony

20   that you do not know specifically which

21   social media platform you believe was --

22   was in play?

23              ATTORNEY INNES:  Objection

24         to form.  Misstates testimony.

CONFIDENTIAL

Page 439

1              THE WITNESS:  I would say
2         that they didn't share a
3         particular platform but that I
4         would -- to clarify, one that
5         would allow her to -- her
6         information to be shared among
7         classmates is perhaps the one that
8         they mentioned.
9              But they didn't mention --
10        they said social media platform
11        activity and what was -- the
12        activity that was -- was done.
13             But if I said Instagram, I'm
14        correcting myself.
15   BY ATTORNEY KARP:
16        Q.    Thank you.
17        A.    You're welcome.
18        Q.    You said that things were
19   shared, and I'm wondering if you can give
20   me a little more detail or specificity
21   about what was shared with you?
22        A.    That there was social media
23   activity amongst -- with the young lady.
24   The time period, they didn't give me a

CONFIDENTIAL

Page 440

1   specific time -- time period, but that

2   they were monitoring her movement to --

3   on social media platforms to try to find

4   her location.  And these were the things

5   that happened.

6           Q.    So -- I didn't mean to

7   interrupt you.

8           A.    Go ahead.

9           Q.    So the FBI was using social

10  media to try to find her location?

11          A.    I believe that's -- if I --

12  that's how -- what I understood them to

13  mean.

14          Q.    And social -- the fact that

15  she was even posting on social media or

16  engaged on social media told the FBI that

17  she was, thank goodness, still alive,

18  right?

19          A.    I think to that degree.  I'm

20  not sure -- I'm not sure exactly how they

21  used it.  But I think they looked at some

22  of her history.  I'm not entirely sure.

23              But it -- I think it did

24  help in trying to locate her.  Whether it

CONFIDENTIAL

Page 441

1  was hers or someone connected with her

2  or -- I'm not 100 percent sure.  I just

3  know that they observed that kind of

4  activity.

5          I don't think that their

6  purposes was to -- to deal with that so

7  much as to try to locate her.  I think

8  that was the whole -- their whole

9  purpose.

10      Q.    You previously testified

11  that this individual was being bullied on

12  social media?

13      A.    I believe that she felt

14  bullied because things were being shared

15  that weren't positive, yes.

16      Q.    And that is part of what the

17  FBI shared with you in that conversation?

18      A.    They shared -- they shared

19  that there was activity.  And then -- I

20  guess I should say that was my

21  conclusion.

22      Q.    Okay.  So they didn't

23  specifically --

24      A.    Say she was bullied.  Yes.

CONFIDENTIAL

Page 442

1          Q.    Okay.  Your conclusion was

2    that she felt bullied by what people were

3    posting about her?  That was -- that's

4    your conclusion?

5          A.    She felt uncomfortable about

6    whatever was -- I never saw it, but that

7    was my conclusion.

8               It could have been a wrong

9    conclusion.  But I believe that to be the

10   conclusion -- that was my conclusion at

11   the time.

12               ATTORNEY KARP:  I'm handing

13        you Tab 31A, which we will mark as

14        Exhibit-31.

15                    -   -   -

16               (Whereupon, Exhibit

17        Irvington-April Vauss-31, No

18        Bates, Press Release, Mother of

19        Missing Juvenile Charged With

20        Endangering, was marked for

21        identification.)

22                    -   -   -

23   BY ATTORNEY KARP:

24          Q.    Let me know once you've had

CONFIDENTIAL

                                                    Page 443

1    a chance to look it over.

2              ATTORNEY KARP:   For the

3         record, this is a news release

4         from the office of the county

5         prosecutor, dated November 12th,

6         2021.

7              THE WITNESS:   Uh-huh.

8    BY ATTORNEY KARP:

9         Q.    Dr. Vauss, do you see that

10   this is a news release from the office of

11   the county prosecutor?

12        A.    Yes.

13        Q.    And this is dated November

14   12th, 2021, which is the day after the

15   CBS News article we just looked at,

16   correct?

17        A.    Yes, yes.

18        Q.    And the title of this

19   announcement is -- or of this release is,

20   Mother of Missing Juvenile Charged With

21   Endangering.

22              Do you see that?

23        A.    Yes.

24        Q.    Were you aware that this

CONFIDENTIAL

Page 444

1    individual's mother had been charged with

2    endangerment?

3             A.    Yes.  Yes.

4             Q.    But your belief is that she

5    went missing because of social media?

6             A.    I believe it was a

7    contributing factor why she avoided --

8    when she was dealing with this, as

9    opposed to her coming to school, which we

10   have -- unfortunately, when we have

11   students who are abused or neglected by

12   their parents, they normally come to us

13   as a safe haven.  And she did not.

14              She avoided school, as well

15   as, obviously, her mother.  And when --

16   you know, when you think about, like,

17   well, normally students come to school

18   and they tell us a lot of what's going

19   on.  And then to hear about that activity

20   that was going on, I mean, I couldn't say

21   with 100 percent that that was it.

22              Obviously, part of it -- a

23   great deal of her running away had to do

24   with this.  But also, I believe, that she

CONFIDENTIAL

Page 445

1   didn't come to school because, maybe, of

2   what she felt like the students were

3   doing to her.

4           We have -- unfortunately, we

5   have students who are abused, and they do

6   come to school and they share it with us.

7   But I notice that if they feel as though

8   they're going to be mistreated or

9   something -- and in our instance, by

10  other -- by their classmates or picked

11  on, they may not want to.

12       Q.    This announcement -- or,

13  excuse me, this news release says that

14  the endangering charges include

15  allegations of physical abuse and also

16  neglect.

17           A.    Yes, yes.

18       Q.    The office of the county

19  prosecutor -- excuse me, the office of

20  the county prosecutor doesn't say

21  anything about social media --

22           A.    No, they --

23       Q.    -- correct?

24           A.    No, they don't.

CONFIDENTIAL

Page 446

1          Q.    You told me a minute ago
2    that you had not seen any of the posts on
3    this young lady's social media account,
4    correct?
5          A.    Yeah, that's correct.  Yes.
6          Q.    And you had assumed that she
7    was being bullied, right?
8          A.    From what they were sharing,
9    yes.
10          Q.    From what the FBI was
11    sharing?
12          A.    That they said that they saw
13    of the activity that was going on on
14    social media.
15                But you're correct, I didn't
16    see it.
17          Q.    You said it was your
18    conclusion that --
19          A.    That was my conclusion.
20          Q.    -- that she had been bullied
21    on social media?
22          A.    Yes.  That was my -- that
23    was my conclusion.
24          Q.    And you never spoke to

CONFIDENTIAL

Page 447

1  this --
2        A.    No.
3        Q.    -- individual?
4        A.    No.  You mean --
5        Q.    To Ms. Moore.
6        A.    Oh, to Ms. Moore?  No, I've
7  never spoken to her.  I thought you meant
8  the student.
9        Q.    Do you recall speaking --
10             ATTORNEY HENRY:  I think
11        that is what he meant.
12             THE WITNESS:  I'm sorry.
13             ATTORNEY KARP:  I didn't
14        hear what you said.
15             ATTORNEY HENRY:  She said
16        Ms. Moore.
17             THE WITNESS:  I thought you
18        were -- yeah, they're both
19        Ms. Moore, sorry.
20             ATTORNEY HENRY:  Right.
21        Just make clear which one she's
22        saying she never spoke to.
23  BY ATTORNEY KARP:
24        Q.    For clarity, I apologize,

CONFIDENTIAL

Page 448

1    you've never spoken with Ms. Moore?

2            A.    Mrs. -- the adult --

3                  ATTORNEY HENRY:   Which Ms.

4            Moore?

5                  ATTORNEY KARP:   Now I see

6            where the confusion is.   Thanks,

7            everyone.   We really do need that

8            lunch break.

9    BY ATTORNEY KARP:

10           Q.    You've never spoken to

11   Jashyah Moore, who went missing?

12           A.    No, not to my knowledge.

13           Q.    Have you spoken to any of

14   Jashyah Moore's friends about this

15   incident?

16           A.    No.

17                  Remember, just as a point of

18   clarification, when this story happened,

19   when Jashyah -- Jashyah ran away, it was

20   our understanding that she wasn't a

21   student of Irvington Public Schools

22   anymore.

23                  It wasn't until this

24   happened that we found out that she had

CONFIDENTIAL

Page 449

1    never been registered fully into East

2    Orange public schools.

3                    That's how I was -- I was

4    made -- you know, I got involved with the

5    case.

6                    ATTORNEY KARP:  I'm handing

7          you Tab 32.  We'll mark this as

8          Exhibit-32.

9                         -   -   -

10                   (Whereupon, Exhibit

11         Irvington-April Vauss-32, no

12         Bates, Complaint-Warrant, was

13         marked for identification.)

14                        -   -   -

15                   ATTORNEY INNES:  Again, just

16         because I don't see a Bates number

17         on this, this is not a document

18         that's been produced in this case;

19         is that correct?

20                   ATTORNEY KARP:  That's

21         correct.  It's a publicly

22         available document.

23                   ATTORNEY INNES:  Is your

24         position that publicly available

CONFIDENTIAL

```
                                    Page 450

 1         documents do not need to be

 2         produced in this case?

 3              ATTORNEY KARP:  No, it's not

 4         my position.  But they can be used

 5         with a witness at a deposition.

 6  BY ATTORNEY KARP:

 7         Q.   This is a criminal complaint

 8  in the case of Jashyah Moore.

 9              And I'm sorry, did you say

10  it's Jashyah Moore?  I don't mean to

11  mispronounce her name.

12         A.   Oh, I don't -- I'll be

13  honest, I don't know how to pronounce it

14  myself.  I believe it is Jashyah.

15         Q.   Just briefly, Dr. Vauss,

16  let's turn to Page 8.

17         A.   There are two Page 8s.  I

18  guess they're the same thing, yes.

19         Q.   That's odd.  They appear to

20  be the same.

21              ATTORNEY INNES:  I think

22         these are different documents.

23         Maybe not.

24  BY ATTORNEY KARP:
```

CONFIDENTIAL

Page 451

1          Q.    Let's look at the first
2    Page 8 so that we're literally all on the
3    same page.
4          A.    Yes.
5          Q.    Dr. Vauss, there is a lot of
6    disturbing content here.  I'm not going
7    to get into the detail on the record.
8                Have you had a chance to
9    look at it?
10         A.    Just -- what you just -- as
11   you handed it to me.  I've never seen
12   this before today.
13         Q.    I understand.  Did you want
14   to take a minute to read Page 8?
15         A.    Yes.
16         Q.    This is incredibly sad and
17   terrible.
18         A.    Yes.
19         Q.    We can all -- we can both
20   agree to that?
21               Is that a yes?
22         A.    Oh, I'm sorry.  Yes.  Yes.
23         Q.    Jashyah Moore alleges here
24   that she was the victim of physical abuse

CONFIDENTIAL

Page 452

1    at home, right?

2            A.    Yes.

3            Q.    She had been grabbed -- on

4    the day she went missing, she had been

5    grabbed by the neck and scratched and

6    assaulted in other ways, correct?

7            A.    Yeah.

8            Q.    And according to this

9    affidavit, she stated that she left and

10   knew she could not go back home because

11   Mom would beat her up and leave her all

12   bruised up.

13                Do you see that?

14           A.    Yes.

15           Q.    We can put this to the side.

16                ATTORNEY KARP:  I'm at a

17           good stopping point if we want to

18           take a lunch break.

19                ATTORNEY INNES:  Sure.

20                THE WITNESS:  That's fine.

21                VIDEO TECHNICIAN:  The time

22           right now is 12:22 p.m.  We are

23           off the record.

24                        -  -  -

CONFIDENTIAL

Page 453

1              (Whereupon, a luncheon
2         recess was taken.)
3                   -   -   -
4              VIDEO TECHNICIAN:   The time
5         right now is 1:13 p.m.   We are
6         back on the record.
7    BY ATTORNEY KARP:
8         Q.     Dr. Vauss, welcome back from
9    lunch.
10        A.     Thank you.
11        Q.     Before the break, we were
12   talking a bit about the signs that I've
13   noticed in the school where we're taking
14   this deposition that say, Caution, do not
15   drink the water.
16             Do you recall our --
17        A.     Yes.
18        Q.     -- exchanges about that?
19             During the lunch break, we
20   noticed that that sign was in the break
21   room where lunch was being served.
22             Were you aware that there
23   was a sign -- that there's a sign in that
24   room that says, Caution, do not drink the

CONFIDENTIAL

Page 454

1   water?

2          A.    I was not.

3                ATTORNEY INNES:  Objection.

4                THE WITNESS:  Sorry.

5                I was not, no.

6   BY ATTORNEY KARP:

7          Q.    That is a break room used by

8   members of the staff here at University

9   Elementary School?

10         A.    Yes.

11         Q.    Do you spend time in that

12  room?

13         A.    No.

14         Q.    You never go into that room

15  for refreshments or to have your lunch or

16  anything like that?

17                ATTORNEY INNES:  Asked and

18         answered.

19                THE WITNESS:  No.

20                ATTORNEY KARP:  Can I have

21         Tab 38, please.

22                We will mark this as the

23         next exhibit, which I believe is

24         Exhibit-33.

CONFIDENTIAL

Page 455

```
 1                    -   -   -
 2              (Whereupon, Exhibit
 3         Irvington-April Vauss-33, No
 4         Bates, Photograph, was marked for
 5         identification.)
 6                    -   -   -
 7  BY ATTORNEY KARP:
 8         Q.    Dr. Vauss, I'll represent
 9  that this is a photo that we took of the
10  sign in the break room for this building.
11              ATTORNEY INNES:   Counsel,
12         I'm going to object to the
13         introduction of any of these as
14         exhibits.
15              I let you go a little bit by
16         taking -- walking around campus
17         and taking pictures.  You didn't
18         ask to walk around or disclose
19         that you were going to be taking
20         pictures of our facilities, right.
21              I think there's a better way
22         to do this, a proper way to do
23         this.  And the way you've done it
24         is improper.
```

CONFIDENTIAL

Page 456

1          ATTORNEY KARP:  Your
2      objection is noted.
3  BY ATTORNEY KARP:
4      Q.    Dr. Vauss, do you see the
5  sign that's on the screen?
6      A.    Yes.
7      Q.    Do you have any reason to
8  doubt that this is a photo that was taken
9  in the break room?
10     A.    No.
11         ATTORNEY KARP:  We can take
12     this down.
13  BY ATTORNEY KARP:
14     Q.    Dr. Vauss, do you have any
15  social media accounts that you use in
16  your personal life?
17     A.    Yes.
18     Q.    What accounts do you have?
19     A.    I have Facebook, Instagram,
20  YouTube and TikTok.  I have -- and I have
21  an X account, Twitter, formerly known as
22  Twitter.
23     Q.    And you do not have --
24  sorry.

CONFIDENTIAL

Page 457

1         A.    Trying to remember in my
2    head.
3         Q.    You do not have a Snapchat
4    account?
5         A.    I do not.
6         Q.    When did you create your
7    Facebook account?
8         A.    I believe 2009.
9         Q.    And you still use it today?
10        A.    Yes.
11        Q.    Approximately how many times
12   a week do you use Facebook?
13        A.    Probably more than I can
14   count.
15        Q.    Do you post to Facebook?
16        A.    I do.
17              ATTORNEY INNES:  Objection.
18              THE WITNESS:  I do, yes.
19   BY ATTORNEY KARP:
20        Q.    Can you generally describe
21   the ways in which you use Facebook?
22        A.    I use Facebook to wish
23   people happy birthday, good job, like
24   things that I think are positive or are

CONFIDENTIAL

Page 458

1    something, you know, that I see that's

2    interesting.

3          Q.    Do you use Facebook any less

4    now than you did in 2009 when you created

5    the account?

6                ATTORNEY INNES:  Objection

7          to form.

8                THE WITNESS:  I'm not sure.

9    BY ATTORNEY KARP:

10         Q.    Do you think that you use it

11   more today than you used it in 2009?

12         A.    I don't think I could give

13   you a correct answer.  So I can't say.  I

14   would say I can't say.  That would be my

15   answer.

16         Q.    And I'm not trying to put

17   words in your mouth.

18                Do you think that it's

19   about -- that your use has been about the

20   same over the years?

21                ATTORNEY INNES:  Objection.

22         Asked and answered.

23                THE WITNESS:  I think that's

24         possible.  But I'm not sure, to be

CONFIDENTIAL

Page 459

1          honest.

2    BY ATTORNEY KARP:

3          Q.    When did you create your

4    Instagram account?

5          A.    That, I'm not sure.  I know

6    it was after Facebook.

7          Q.    So we know it was after

8    2009?

9          A.    Yes.

10          Q.    Using the pandemic as a

11    reference point, do you remember if it

12    was before or after the pandemic?

13          A.    I'm not sure.  I believe so,

14    though.  I'm pretty sure.

15          Q.    Which one, before or after?

16          A.    Before.  That it was before

17    2020, March 2020.

18          Q.    How often do you -- today,

19    how often do you use Instagram?

20          A.    I couldn't give you a

21    number.  I may look at an image every

22    day.  I'm not sure.

23          Q.    Can you generally describe

24    how you use Instagram today?

CONFIDENTIAL

Page 460

1          A.    I would use Instagram maybe

2     to post -- maybe post -- I think it's

3     kind of linked with Facebook, so I

4     wouldn't necessarily post to Instagram.

5               I might like or share

6     something, a content.  That's about it.

7          Q.    Do you use Instagram more,

8     less, or about the same as you did when

9     you created your account?

10               ATTORNEY INNES:  Objection

11          to form.

12               THE WITNESS:  Can you give

13          me the choices again?

14     BY ATTORNEY KARP:

15          Q.    Sure.  It's a

16     multiple-choice question.

17               Today, do you use Instagram

18     more, less, or about the same as you did

19     when you created the account?

20               ATTORNEY INNES:  Same

21          objection.

22               THE WITNESS:  I would say

23          probably more.  I mean, I -- than

24          when I first created it?  So maybe

Page 461

1          the same.  Because I can't give

2          you a date as to when I started

3          it, so I don't -- I don't know.

4     BY ATTORNEY KARP:

5          Q.    So you use Instagram --

6     today you use Instagram more or the same

7     as you did -- sorry, let me -- let me

8     rephrase that.  Strike that.

9               Today you use Instagram more

10    often or the same amount as you did when

11    you created the account?

12         A.    You want me to guess?  I

13    just --

14         Q.    I do not want you to guess.

15         A.    Oh, okay.  So I cannot say

16    if it's more or less.

17         Q.    You said that you had a

18    YouTube account?

19         A.    A what?

20         Q.    You said that you have a

21    YouTube account?

22         A.    Yes, I do.  I do.

23         Q.    When did you create that?

24         A.    I'm not sure of the exact

CONFIDENTIAL

Page 462

1  date.

2          Q.    Can you approximate?

3          A.    Maybe within the last -- I

4  want to say the last five years, within

5  the last five years.

6          Q.    Prior to creating a YouTube

7  account, did you use YouTube in any way?

8          A.    Yes.

9          Q.    For how long or for how many

10 years have you been using YouTube?

11         A.    That, I couldn't give you.

12 I couldn't venture a guess.

13         Q.    How do you use YouTube

14 today?

15         A.    I watch a lot of content.  I

16 use it to -- to read different articles,

17 text.  I -- personally, that's -- that's

18 how I use it.

19         Q.    Do you post anything to your

20 YouTube account?

21         A.    I don't post to my own

22 YouTube account, no.

23         Q.    Approximately how often are

24 you using YouTube?

CONFIDENTIAL

Page 463

1          A.     Probably daily.
2          Q.     And that is to watch
3     content, read articles, and read text?
4          A.     Generally.  I mean, you
5     could probably see that I'm -- may have
6     done something else, I'm not sure.
7                 But those are the things
8     that I know that I do on a daily basis.
9          Q.     You said you have a TikTok
10    account?
11         A.     Yes.
12         Q.     When did you create that?
13         A.     That is probably within the
14    last year or two.
15         Q.     So you believe you created
16    your TikTok account in 2023 or 2024?
17         A.     I think that would be
18    accurate.
19         Q.     Why did you create a TikTok
20    account?
21         A.     Honestly speaking, so that I
22    could view TikToks that were sent to me.
23    And I believe there was a thing where you
24    had to have a TikTok account to be able

CONFIDENTIAL

Page 464

1  to see TikToks being sent to you.

2        Q.  ████  ████████  ████████  ████

████  ██████████  ████████  ████████  ████████  ████

████  ██████████  ████████  ████  ████  ██████████  ████

████  ████  ████  ████████

6        Q.    Have you ever posted to

7  TikTok?

8        A.    No.

9        Q.    Today how often do you use

10  TikTok?

11        A.    Sporadically.

12        Q.    Could you approximate

13  roughly -- or strike that.

14            Can you approximate how many

15  times per week you use TikTok?

16        A.    I couldn't approximate.

17  Maybe two or three times.  That's --

18  looking at a video that's sent to me, if

19  that's the usage part, yes, that would be

20  a good estimation.

21        Q.    Have you participated in any

22  TikTok challenges?

23        A.    No.

24        Q.    I neglected to ask some of

CONFIDENTIAL

Page 465

1    these questions earlier.

2                    Why did you create your

3    Facebook account?

4          A.    Just I had heard about this

5    social media page, people I knew, family

6    had -- had joined it.  And I decided to.

7          Q.    Why did you create your

8    Instagram account?

9          A.    For similar reasons.

10         Q.    Why did you create your

11   YouTube account?

12         A.    Probably similar reasons.

13         Q.    Okay.  You said that you

14   also have X, formerly known as Twitter?

15         A.    Yes.

16         Q.    When did you create that

17   account?

18         A.    That, I'm not sure.  It's

19   been a while.

20         Q.    Without getting into much

21   detail, how often do you use X today?

22         A.    Very rarely.

23         Q.    Dr. Vauss --

24         A.    May -- may I ask a question?

Page 466

1   Just for clarification.

2           Q.     Sure.

3           A.     When you say "use," you mean

4   if we get a hit at -- you know, a

5   headline and it came from X, would that

6   be considered, in your mind, as using it,

7   if I go to the site to look at it?

8           Q.     Thank you for clarifying.

9                  If you were to receive a

10  notification -- a news notification on X

11  and then you opened that, I would

12  consider that use.

13          A.     Okay.  All right.

14          Q.     So I'll ask the question

15  again in case it changes your answer.

16          A.     Okay.

17          Q.     Approximately how often do

18  you use X?

19          A.     Probably, maybe, twice --

20  probably twice a week at best.

21          Q.     Thank you --

22          A.     You're welcome.

23          Q.     -- for clarifying.

24                 ██  ██  ███  ████

CONFIDENTIAL

Page 467



24          ATTORNEY KARP:  At this

Page 468

1          point, I have no further

2          questions -- I will retract that.

3          Just one thing that I skipped

4          over.  I apologize, Dr. Vauss, I

5          thought you were off the hook.

6                ATTORNEY INNES:  It's not

7          fun staying on the hook.

8                THE WITNESS:  No, it's not.

9                ATTORNEY KARP:  Dr. Vauss,

10         I'm going to hand you Tab 23,

11         which we will mark as Exhibit-34.

12                   -   -   -

13              (Whereupon, Exhibit

14         Irvington-April Vauss-34, No

15         Bates, Third Amended Plaintiff

16         Fact Sheet-School Districts, was

17         marked for identification.)

18                   -   -   -

19    BY ATTORNEY KARP:

20         Q.   Dr. Vauss, do you recognize

21    this document?

22              (Reporter clarification.)

23              THE WITNESS:  I do.

24    BY ATTORNEY KARP:

CONFIDENTIAL

Page 469

1          Q.    This is the third amended
2     plaintiff fact sheet.
3               Do you see that?
4          A.    Yes.
5               ATTORNEY KARP:  And just to
6          make sure is Exhibit-34 the next
7          number or 33?
8               TRIAL TECHNICIAN:  34.
9               ATTORNEY KARP:  So we marked
10         it correctly.  Thank you.
11    BY ATTORNEY KARP:
12         Q.    Dr. Vauss, what is your
13    understanding of this document?
14         A.    It is the third amended
15    plaintiff fact sheet.
16         Q.    Do you understand that this
17    is a document that was created for -- in
18    connection with this litigation?
19               ATTORNEY INNES:  Objection
20         to form.
21               THE WITNESS:  Yes.
22    BY ATTORNEY KARP:
23         Q.    Let's look at the very last
24    page, which is Page 40.  This is a

CONFIDENTIAL

Page 470

1    certification page.

2                    Do you see that?

3         A.    Uh-huh.

4         Q.    You are -- is that your

5    signature here?

6         A.    Yes.

7         Q.    You certified the

8    information that's contained in these --

9    in this plaintiff fact sheet, correct?

10        A.    Yes.

11        Q.    And you signed this

12   plaintiff fact sheet on April 28th -- or

13   strike that.

14                   You signed the certification

15   for this plaintiff fact sheet on April

16   28th, 2025.

17                   Do you see that?

18        A.    Yes.

19        Q.    And as part of certifying

20   the information contained here, you

21   represented that the information was

22   complete, true and correct to the best of

23   your knowledge?

24        A.    Yes.

CONFIDENTIAL

Page 471

1          Q.    Do you stand by that today?

2          A.    Yes.

3          Q.    Okay.  What did you do to

4    confirm that the information contained in

5    this fact sheet was complete, true and

6    correct?

7                ATTORNEY INNES:  Objection.

8                You don't have to answer

9          that question if it would reveal

10         privileged conversations or

11         directions that -- that counsel

12         gave you during the preparation of

13         this document.

14               So to the extent you can do

15         neither, I would instruct you not

16         to answer the question.

17   BY ATTORNEY KARP:

18         Q.    Are you able to answer the

19   question?

20         A.    No.

21         Q.    So you will follow your

22   counsel's instruction not to answer?

23         A.    Yes.

24         Q.    I'm not interested in who

CONFIDENTIAL

Page 472

1   told you to do what.
2               I'm simply asking a more
3   basic question, which is, Dr. Vauss, to
4   certify the information contained in this
5   plaintiff fact sheet, did you review any
6   documents?
7               ATTORNEY INNES:  Objection.
8               To the extent you can answer
9         that question generally speaking,
10        without disclosing conversations
11        you've had with me or my team, you
12        may do so.
13              THE WITNESS:  Can you ask me
14        again?  And I'll make that
15        determination based on counsel's
16        advice.
17   BY ATTORNEY KARP:
18        Q.    Absolutely.
19              I'm not interested in who
20   told you what.  I'm simply asking the
21   more basic question, which is, Dr. Vauss,
22   to certify the information contained in
23   this plaintiff fact sheet, did you review
24   any documents?

CONFIDENTIAL

Page 473

1          A.     I'm going to stick to my
2    counsel's advice and not answer.
3          Q.     Similar question.
4               To certify the information
5    contained in this plaintiff fact sheet,
6    did you speak to any -- did you speak to
7    anyone?
8               ATTORNEY INNES:  You can
9          answer the question.
10              THE WITNESS:  Parts of this,
11         yes.  I would say, yes, to get the
12         information that was necessary to
13         complete it.
14   BY ATTORNEY KARP:
15         Q.     Did you speak to counsel?
16              ATTORNEY INNES:  Objection.
17              You don't have to answer
18         that question.
19              THE WITNESS:  Okay.
20              ATTORNEY KARP:  I'm not
21         asking about what she discussed, I
22         just wanted to know if she spoke
23         to you.
24              ATTORNEY INNES:  The --

Page 474

1           whether or not -- okay.  It's a
2           yes-or-no question.  You can
3           answer the question.
4                   THE WITNESS:  Did I speak to
5           my counsel?  Yes.
6    BY ATTORNEY KARP:
7           Q.    To certify the information
8    in this plaintiff fact sheet, did you
9    speak to any individuals who are not
10   lawyers?
11                  ATTORNEY INNES:  You can
12          answer that question.
13                  THE WITNESS:  Yes.
14   BY ATTORNEY KARP:
15          Q.    Can you give me the names of
16   those individuals?
17                  ATTORNEY INNES:  Objection.
18                  I'll direct you not to
19          answer that question.
20   BY ATTORNEY KARP:
21          Q.    Are you going to follow your
22   counsel's direction?
23          A.    Yes.  I'm sorry.  I'm going
24   to follow my counsel's direction.

CONFIDENTIAL

Page 475

1          Q.     I'm always going to ask that

2     follow-up.

3          A.     That's okay.  I'm learning.

4     I'm learning.

5          Q.     Dr. Vauss, let's look at the

6     response to Question Number 42.

7                 Are you there?

8          A.     Yes.

9          Q.     This is on Page 31.

10                The question is, Does your

11    district use or provide any materials to

12    students, parents, teachers or staff

13    regarding the potential risks or adverse

14    effects of using electronic devices, the

15    Internet and/or social media?

16                Do you see that?

17         A.     Yes.

18         Q.     And I read that correctly?

19         A.     Yes.

20         Q.     And the answer provided here

21    is yes?

22         A.     Yes.

23         Q.     And then underneath the

24    question and answer there's a statement,

Page 476

1    The below is not intended as an

2    exhaustive list and plaintiff reserves

3    all rights to amend this response.

4              Do you see that?

5         A.    Yes.

6         Q.    And then below that there is

7    a list of Bates numbers which are

8    associated or correspond to documents the

9    district has produced in this case.

10        A.    Yes.

11        Q.    Did you review the documents

12   that are listed here in response to

13   Question Number 42?

14             ATTORNEY INNES:   Objection.

15             You don't have to answer

16        that question.

17   BY ATTORNEY KARP:

18        Q.    Are you going to follow your

19   counsel's advice?

20        A.    I'm going to follow my

21   counsel's advice.

22        Q.    Did you do anything to

23   confirm whether the documents that are

24   listed here are actually responsive to

Page 477

1   the question?

2           ATTORNEY INNES:  Objection.

3           You don't have to answer

4       that question.

5           Counsel, she's already

6       testified that she certified this

7       document, okay.  So what are we --

8       what are we trying to do here?

9           ATTORNEY KARP:  I'm trying

10      to understand what she did to

11      confirm the completeness and

12      correctness of the -- of the

13      responses that were given.

14          ATTORNEY INNES:  And her

15      signature and attestation to the

16      same is not enough for you?

17          ATTORNEY KARP:  I'd like to

18      probe that a bit.

19          ATTORNEY INNES:  I'm going

20      to instruct her not to answer

21      pretty much all these questions.

22          ATTORNEY KARP:  I

23      understand.  I'm almost done,

24      anyway.

CONFIDENTIAL

Page 478

1                THE WITNESS:  I would -- I
2        will follow my counsel's advice.
3  BY ATTORNEY KARP:
4        Q.    I understand.  Thank you.
5        A.    Okay.
6        Q.    I think actually I can wrap
7  up here.
8              ATTORNEY KARP:  I do not
9        have any further questions, but
10       open it to my colleagues here and
11       also on Zoom in case they have any
12       additional questions.
13             Hearing nothing, I pass the
14       witness.
15             ATTORNEY INNES:  Can we just
16       go off the record real quick and
17       I'll switch sides?
18             VIDEO TECHNICIAN:  The time
19       right now is 1:37 p.m.  We are off
20       the record.
21                  -  -  -
22             (Whereupon, a brief recess
23       was taken.)
24                  -  -  -

CONFIDENTIAL

Page 479

1          VIDEO TECHNICIAN:  The time
2     right now is 1:40 p.m., and we're
3     back on the record.
4          ATTORNEY KARP:  Michael, can
5     we agree that an objection for one
6     is an objection for all?
7          ATTORNEY INNES:  Yes,
8     please.
9               -   -   -
10              EXAMINATION
11              -   -   -
12 BY ATTORNEY INNES:
13     Q.    Good afternoon, Dr. Vauss.
14 We've been here, this is day two.  And
15 this is my first opportunity that I get
16 to ask you questions.
17          As you know, I represent the
18 school district in this litigation.  And
19 I just have a few brief questions, all
20 centered around the discussions you had
21 with Mr. Karp regarding chronic
22 absenteeism.
23          And I want to give you the
24 opportunity to provide a full picture of

CONFIDENTIAL

Page 480

1  chronic absenteeism, which I -- is now

2  known as school avoidance; is that

3  correct?

4          A.     Yes, yes.

5          Q.     So for a period of time, if

6  a student was absent for -- from school

7  for more than 10 percent of the school

8  year, they would be deemed chronically

9  absent; is that correct?

10          A.     Yes.

11          Q.     And now that same

12  statistics, if they're out for 10 percent

13  or more of the school year, it's deemed

14  to be school avoidance; is that correct?

15          A.     Yes.

16          Q.     During your conversations

17  with -- or the questions from Mr. Karp,

18  you said that the district would be much

19  better off without social media, in the

20  context of absenteeism.

21                 What did you mean by that

22  exactly?

23          A.     What I meant by that is

24  that, having spoken to various staff

CONFIDENTIAL

Page 481

1   members, knowing that they're responsible

2   for a classroom or a school building,

3   they've noticed over time that the usage

4   of social media's platforms, the

5   features, the -- the shares have impeded

6   and encroached upon the learning

7   environment and the learning space.

8                And that space being the

9   physical space in the building, but the

10  space that we hope that is used at home

11  or other locations to further our

12  children's learning.

13               We've noticed that -- that

14  instead of education in the classroom,

15  they would much prefer to be on those

16  platforms.  And it is causing students,

17  then, to want to not come to school at

18  times because of what is happening on

19  social media platforms.

20       Q.    Would you say that the --

21  what you've articulated as what's

22  happening on social media, is that a --

23  that is a cause of absenteeism?

24       A.    Yes.

CONFIDENTIAL

Page 482

1          Q.     Would you agree with the
2     statement that it is a significant cause?
3                    ATTORNEY KARP:   Object to
4          form.
5                    THE WITNESS:   Yes.
6     BY ATTORNEY INNES:
7          Q.     If you had to put it in your
8     own words, could you describe -- could
9     you give a quantification of how much of
10    a cause, if any, it is on absenteeism?
11                   ATTORNEY KARP:   Object to
12         form.
13                   THE WITNESS:   I would say
14         that it is a significant -- a
15         cause.  Could I say that it's 50
16         percent or 60 percent?  I would
17         say that in -- I would say in that
18         it is something that is something
19         the staff has to deal with from
20         the time the students walk in the
21         building until they leave, it has
22         to be a high number or percentage.
23              So I would say somewhere in
24         the neighborhood of a 50 percent

Page 483

1          cause of why students are not

2          coming to school.

3    BY ATTORNEY INNES:

4          Q.    You also mentioned in

5    your -- in your conversation with Mr.

6    Karp in this chronic absenteeism/school

7    avoidance line of questioning the word

8    "tardiness"?

9          A.    Yes.

10          Q.    What is tardiness?

11          A.    Tardiness is when students

12    come to school later than the designated

13    time period.

14          Q.    And what would be an example

15    of a cause of a student coming to school

16    late?

17          A.    Well, an acceptable one

18    would be a doctor's appointment, which

19    doesn't generally happen.

20              An unacceptable one is that

21    they were up all night on social media

22    and they just kind of fell asleep.  And

23    then when their alarm went off or they

24    were told to get up to come, they needed

CONFIDENTIAL

Page 484

1  extra time to sleep.

2            And so instead of arriving,

3  let's say, at 8:06 or 8:26 or 8:25, or

4  whatever time, they're coming to school

5  significantly late.  They're missing the

6  first block or they're missing half of

7  the first block of their -- their school

8  day.

9       Q.    Thank you.

10           And how -- what's the basis

11  for your knowledge of that testimony?

12      A.    Just the conversations I've

13  had with my staff and what they are up

14  against, you know.

15           And when asked, you know,

16  why are students not coming to school on

17  time -- they may say, students aren't

18  coming to school on time.  I might ask,

19  well, why aren't they coming?  And they

20  say, they're on -- they're on the social

21  media all the time.  They are on their

22  phones, logging into these sites, and

23  they're on from the time they walk into

24  the building until they leave.  Then when

CONFIDENTIAL

Page 485

1    they are supposed to be doing homework,

2    they're on -- they're on social media.

3                    And they just -- they're

4    just consumed with -- with that.

5          Q.    You just testified that when

6    they're supposed to be doing -- doing

7    their homework they're on social media.

8                    Is that an example of the

9    encroachment you were describing before?

10         A.    Yes.

11                   ATTORNEY KARP:  Object to

12         form.

13                   THE WITNESS:  Yes.  That's

14         exactly what I'm speaking of.

15   BY ATTORNEY INNES:

16         Q.    Also during your

17   conversation with Mr. Karp about school

18   avoidance, you mentioned that one of the

19   reasons might be that the student simply

20   doesn't like school.

21                   Is that -- do you remember

22   that?

23         A.    Yes.

24         Q.    Can you give me an example

CONFIDENTIAL

Page 486

1   of why a student might not like school?

2          A.    A lot of the reasons why I

3   believe that they don't like school is

4   because of, you know, the things that

5   they see on social media.

6                I remember we had a debate

7   about Doechii versus Beyonce.  And it

8   turned into light complexion versus brown

9   complexion, who should have won a Grammy,

10  who should have won this award.  And it

11  started to turn students against

12  students.

13               And it made a lot of them

14  unhappy and sad because what it turned

15  into was people liking and commenting on,

16  you know, who is better than the other

17  person or the other.  When, you know, up

18  to that point, this person may have been

19  my best friend and they happened to be a

20  different complexion than me.  And then

21  that -- having that platform to be able

22  to say all these mean and hateful things.

23               It's just an example of the

24  students not wanting to come to school.

Page 487

1    They're like, I don't want to -- I don't

2    want to come, I don't want to hear that,

3    I don't want to be exposed to that.

4                And because there's not an

5    end into the cycle, it lives on.  So you

6    try to resolve it, but it's still there.

7            Q.    Doctor, I know who Beyonce

8    is.

9                But could -- could you tell

10   the jury who Beyonce and Doechii are?

11           A.    Beyonce is probably one of

12   the most famous R&B, country music, I

13   guess, now, singers probably for the last

14   20 years.

15               And I believe Doechii --

16   well, she is -- she is a singer, an

17   artist who obviously won a Grammy.  And

18   she won it over Beyonce.

19           Q.    And you had mentioned --

20   just now you used the word "complexion."

21               How does complexion fit into

22   this story you're telling us about

23   Doechii and Beyonce and the social media

24   aspect that played out in school?

CONFIDENTIAL

Page 488

1          ATTORNEY KARP:  Object to
2      form.
3          THE WITNESS:  Well, there's
4      always been issues of colorism,
5      right.  That's not to discount
6      that.
7          But what happens in this
8      instance is that there's an
9      argument of who should have won.
10     And then the basis for who was
11     better is based upon whose
12     complexion is better.
13          And in this case, some
14     students took the viewpoint that
15     being light complexion was better
16     than being dark complexion.  And
17     others said, you know, you're
18     prejudiced if you have that
19     viewpoint.
20          And it just turned into
21     this -- this horrific argument on
22     the platform and them -- I
23     think -- and hatefully so, people
24     liking derogatory things that were

Page 489

1          said about the -- Doechii because
2          of her complexion and, likewise,
3          people saying derogatory things
4          about Beyonce because of hers.
5                And these are children who
6          are debating this.  And there is
7          no one who is -- you know, I'm not
8          saying certain colors about -- you
9          know, conversations about
10         complexion and race and colorism
11         should be had, but they should be
12         in an arena of responsible adults.
13               And that is not an arena
14         that is being monitored or being
15         refereed.  And there is no
16         stoppage to what is being allowed
17         to be said.
18               And that's where -- well,
19         one of my concerns, where they
20         lie.
21  BY ATTORNEY INNES:
22         Q.    And you just mentioned that
23  there might be or there were -- strike
24  that.

CONFIDENTIAL

Page 490

1          You just mentioned that
2   there were comments made on posts?
3          A.    Uh-huh.
4               ATTORNEY KARP:   Object to
5          form.
6   BY ATTORNEY INNES:
7          Q.    Do you recall what platform
8   those comments were posted on?
9          A.    I'm not entirely sure.  But
10  I believe it was -- I believe it was
11  Instagram.
12         Q.    And then you also --
13         A.    No.  Correct -- correction.
14               I believe it was Snapchat.
15  I believe it was Snapchat.
16         Q.    Snapchat.
17         A.    Uh-huh.
18         Q.    One of the other phrases you
19  used was -- when talking about chronic
20  absenteeism and school avoidance was --
21  was scholars don't feel confident.
22               What is an example of why --
23  in your experience, why a student or a
24  scholar might not feel confident and

CONFIDENTIAL

Page 491

1    not -- therefore, not come to school?

2          A.    Well, I think when they are

3    on a social media platform that has an

4    image of what beauty is and there's

5    filters that are placed on there, that

6    I've learned about, that they can alter

7    what the ideal of beauty is and what

8    wealth is, and this and that, and they

9    look at themselves, it makes them feel

10   not good enough and not valued.

11          And in a lot of those things

12   they don't see themselves, you know,

13   showing up as important.  And I think

14   that it contributes a lot to the

15   self-esteem, a certain sense of anxiety

16   because, you know, I -- I don't look like

17   that.  I'm not like that.

18          And they are -- so, you

19   know, I don't want to be around.  I don't

20   want to be -- I don't want to be picked

21   on.  I don't want to be bullied, you

22   know.

23          Q.    How, if at all, do -- strike

24   that.

Page 492

1           So is your testimony that
2  the self-esteem and anxiety issues are
3  exclusively caused by the content or
4  images projected?
5                ATTORNEY KARP:  Object to
6        form.
7                THE WITNESS:  No.
8  BY ATTORNEY INNES:
9        Q.    And what other -- well,
10  explain -- explain that.
11        A.    I would say when certain
12  troubling things are shared or if a
13  scholar happens to see something is liked
14  and, let's say, for example -- and this
15  is just -- I'm just giving an example.
16                If someone likes something
17  that's supposed to be your friend and
18  it's something that's derogatory towards
19  you, or it could be perceived to be
20  derogatory, if it's a fight, and the
21  person who is your friend likes it or
22  even shares it, that would be detrimental
23  to their self-esteem.
24                That would be -- that would

CONFIDENTIAL

Page 493

1  cause anxiety.  That would cause
2  depression.  Because they would feel --
3  that would be an isolation tool at that
4  point and make them feel like I'm in it
5  alone.  I mean, or I have a new enemy.  I
6  mean, there's a plethora of ways that
7  they filter this through.
8              And it -- while it may not
9  always look this way, it can cause a
10 certain amount of anxiety.  It can cause
11 depression.  And so -- and definitely
12 cause some types of suicidal ideation.
13        Q.    And do you base that on your
14 own personal knowledge?
15              ATTORNEY KARP:  Object to
16        form.
17              THE WITNESS:  No.
18 BY ATTORNEY INNES:
19        Q.    What do you base that on?
20        A.    On things shared with me.
21        Q.    Shared with you by who?
22        A.    By my staff members.
23        Q.    And do some of the staff
24 members include trained counselors?

CONFIDENTIAL

```
 1              ATTORNEY KARP:  Object to
 2       form.
 3              THE WITNESS:  Yes.
 4  BY ATTORNEY INNES:
 5       Q.     Did those trained counselors
 6  share those similar -- share those
 7  stories with you?
 8       A.     Yes.
 9       Q.     Does the district employ
10  psychologists?
11       A.     Yes.
12       Q.     Did psychologists share that
13  information with you?
14       A.     Yes.
15       Q.     Are there any other mental
16  health professionals that the school
17  district employs?
18       A.     Yes.
19       Q.     Sure.  And what are their
20  titles?
21       A.     HSSCs.  Please forgive me,
22  because right now I can't think of the
23  acronym.  It's an acronym.  But they are
24  social workers.
```

CONFIDENTIAL

Page 495

1            And we also have school
2    counselors.
3        Q.    Have school counselors
4    shared similar stories with you?
5        A.    Yes.
6        Q.    Thank you.
7            Doctor, you'll recall that
8    defendants propounded -- or a fancy way
9    of saying sent us interrogatories.
10            Do you recall that?
11        A.    Yes.
12            ATTORNEY KARP:    Object to
13        form.
14    BY ATTORNEY INNES:
15        Q.    And do you recall signing a
16    verification for those interrogatories?
17        A.    Yes.
18        Q.    And do you recall in that
19    interrogatory a list of what we
20    colloquially refer to as fight pages?
21        A.    Yes.
22        Q.    And can you describe for the
23    jury what a fight page is, in your -- in
24    your words?

CONFIDENTIAL

Page 496

1          A.     So a fight page is a video
2     that was created during a physical
3     altercation between scholars.  And
4     they -- usually, another student will go
5     live and then post it, either video live
6     or they'll post it after it occurred, and
7     try to -- you know, with the objective of
8     getting likes and shares and followers --
9     ultimately, maybe, followers out of that.
10          Q.     Do you know if the fight
11     pages that we listed in that -- I'm
12     sorry, that the school district listed in
13     that interrogatory response are still
14     available on defendants' platforms?
15          A.     Yes.  And I would love to
16     ask that they be taken down.  Because
17     they are still active.
18          Q.     And why would you love for
19     them to be taken down?
20          A.     Because if we have an
21     incident and we -- "we" being my school
22     staff -- they deal with the issue, they
23     get the parties to come to some type of
24     peaceful resolution, when that video is

CONFIDENTIAL

Page 497

1  shared, and invariably it gets shared

2  again, the same feelings, the same anger,

3  the same issues arise over and over

4  again.

5           And that's -- that has

6  happened.

7      Q.    How often has that happened?

8      A.    Quite often.  Quite --

9  almost -- almost -- you know, if a fight

10 happens and it's placed on a platform,

11 how many times does that come up again?

12 Two, three, four, five times, that same

13 incident.

14     Q.    And does the district devote

15 resources to resolving those conflicts?

16     A.    Yes.

17     Q.    Thank you for that.

18           Have you ever -- strike

19 that.

20           Do you think the social

21 media companies, the defendants in this

22 case, should be on the hook for the

23 damages that they've caused to the

24 district?

CONFIDENTIAL

Page 498

1              ATTORNEY KARP:  Object to

2         form.

3              THE WITNESS:  Yes.

4              ATTORNEY INNES:  Thank you.

5         I'll pass the witness back to you.

6              ATTORNEY KARP:  I think I

7         just need, like, one minute, if we

8         can go off the record and take a

9         quick break.

10             ATTORNEY INNES:  Sure.

11             VIDEO TECHNICIAN:  The time

12        right now is 1:59 p.m.  We are off

13        the record.

14                  -   -   -

15             (Whereupon, a brief recess

16        was taken.)

17                  -   -   -

18             VIDEO TECHNICIAN:  The time

19        right now is 2:10 p.m.  We are

20        back on the record.

21                  -   -   -

22             EXAMINATION

23                  -   -   -

24   BY ATTORNEY KARP:

CONFIDENTIAL

1          Q.    Dr. Vauss, just a few
2    follow-up questions to the questions you
3    were just discussing with your counsel.
4          A.    Yes.
5          Q.    You testified a few minutes
6    ago that social media was impeding on the
7    learning space?
8          A.    Yes.
9          Q.    And you said that your
10   source for that information was your --
11   your staff.
12                Do I have that right?
13         A.    Yes.
14         Q.    Who specifically told you
15   that?
16         A.    So principals that I've
17   spoken to, teachers that I've spoken to
18   have noted how it is -- it's just
19   something that our scholars are on from
20   the time they walk into the building
21   until the time that they leave out.
22                And that it is -- there's a
23   great deal of time within the teaching
24   blocks to get them to stay off the

CONFIDENTIAL

Page 500

1   platforms.

2          Q.    What are the names of these

3   principals?

4          A.    I can say Principal Mangan.

5   Principal Bussacco.  Principal Zahir.

6          Q.    These are -- I'm sorry.  I

7   didn't mean to cut you off.

8          A.    Yes.

9          Q.    These are principals of the

10  middle schools and the high school --

11         A.    Yes.

12         Q.    -- within the district?

13         A.    Yes.

14         Q.    When did you speak to them

15  about these issues?

16         A.    I've spoken to them over

17  long periods of time.  Usually, you know,

18  if something happens, if an incident

19  happens, they might make mention of it.

20  And then we go into, well, why didn't

21  anyone stop a situation?  Why did they go

22  to their phones?  You know, and then

23  they'll offer, you know, their thoughts

24  on that.

CONFIDENTIAL

Page 501

1          Q.    So these conversations come
2     up when there are incidents?
3          A.    I wouldn't say that I would
4     isolate it to that.  But they have come
5     up during those incidents.
6          Q.    Are these conversations
7     written down anywhere?
8          A.    No.
9          Q.    These are oral
10    conversations?
11         A.    Yes.
12         Q.    You said you've spoken to
13    teachers?
14         A.    Yes.
15         Q.    Which teachers?
16         A.    I couldn't, like, come up
17    with a list of teachers off the top of my
18    head.  But just people that I engage with
19    when I walk around in the buildings, you
20    know.  It could be any number of
21    teachers.
22         Q.    And I'm not necessarily
23    asking for an exhaustive list.
24               But can you give me any

CONFIDENTIAL

Page 502

1  names?

2          A.    Like, Ms. Dove from -- from

3  University Middle School.  She's a

4  teacher that, you know, I know who has

5  complained about social media and

6  students not staying off of it when she's

7  trying to teach.

8                (Reporter clarification.)

9  BY ATTORNEY KARP:

10         Q.    Anyone else?

11         A.    I mean, there are others.

12  But, I mean, that's -- that's the first

13  name that comes to mind.

14         Q.    But are there any --

15  Ms. Dove is the first name that comes to

16  mind.

17                Are there any other names

18  that come to mind, sitting here today?

19         A.    None that just come to mind.

20         Q.    Ms. Dove complained to you

21  about social media use in her classroom?

22         A.    Uh-huh.

23         Q.    Tell me more about that.

24  What did she -- what did she tell you?

CONFIDENTIAL

Page 503

1          A.    I remember on -- going to

2    visit the school and walking in her

3    class, having a conversation with her

4    about upcoming retirement.

5               And she said, you know, I

6    won't miss having to tell students to get

7    off of their phones.  She just kind of --

8    and then we went on to her saying they

9    are on the phones all the time.

10              But then it went onto, well,

11   you know, thank you for all that you've

12   done for Irvington Public Schools.

13              It didn't go into an

14   exhaustive conversation at that point.

15        Q.    Ms. Dove was upset about

16   students using their phones in class when

17   she wanted them to focus on the lesson

18   she was teaching?

19          A.    Particularly them being on a

20   platform, not just -- not just -- because

21   she went over, told them to get off their

22   phones, she looked at what they're --

23   maybe she looked at what they were doing

24   for her to be able to say that.  I don't

CONFIDENTIAL

Page 504

1   know.

2            But she did say to stay off

3   their phones, and I took that to mean

4   social media, yes.

5        Q.    Did she specifically tell

6   you social media or did she just say she

7   was upset that -- or that she wanted kids

8   to get off their phones?

9        A.    She probably said

10  specifically their phones.  But I took it

11  to mean not just that they had a phone in

12  their hands but what they were doing with

13  the phones.

14       Q.    Okay.  In response to some

15  of the questions you received from your

16  counsel, you testified that social media

17  was a significant cause of absenteeism.

18            Do you recall that?

19       A.    Yes.

20       Q.    And you quantified the

21  percentage causation at 50 percent.

22            Do you recall that?

23       A.    Yes.

24       Q.    What's your basis for

CONFIDENTIAL

Page 505

1   quantifying social media as a 50 percent

2   cause of all chronic absenteeism?

3          A.     I would quantify -- I mean,

4   I would qualify that by the conversations

5   I've had with my administration in

6   regards to chronic absenteeism.

7          Q.     Are those the same

8   individuals that you listed before?

9              And I apologize if any of

10  these individuals are doctors, but Mr.

11  Mangan, Mr. Bussacco and Ms. Zahir?

12         A.     Dr. Zahir.

13         Q.     Dr. Zahir.

14             Are those the administrators

15  that you're talking about?

16         A.     Yes.

17         Q.     And they told you

18  50 percent?

19         A.     No.

20         Q.     Where is the 50 percent

21  number coming from?

22         A.     Looking at the amount of

23  time that the students are on the phones

24  and the things that are happening as a

CONFIDENTIAL

Page 506

1  result of their use of these different

2  platforms, I -- I came up with that

3  figure.

4        Q.    Your conversations with

5  administrators, is that your only

6  source -- the only source you're relying

7  on --

8        A.    And staff.  And staff.

9        Q.    I apologize.  Let me re-ask

10  the question.

11            Your conversations with

12  administrators and your staff are the

13  only source for the 50 percent number

14  you've given?

15        A.    And my staff, yes.  Yes.

16        Q.    Is the 50 percent, is it --

17  is it published anywhere that social

18  media is a 50 percent cause of all

19  chronic absenteeism?

20        A.    No.

21        Q.    Have you seen that in any

22  article?

23        A.    No, I have not.

24        Q.    Have you read that anywhere?

Page 507

1          A.     I have not.

2          Q.     Have you studied other

3    potential causes of chronic absenteeism

4    and tried to quantify them?

5          A.     No.

6          Q.     What makes up the other 50

7    percent?

8          A.     I would say students being

9    ill prepared.  Meaning maybe they are,

10   they don't have anything to -- maybe they

11   don't have clothes to -- clean clothes or

12   they didn't do their homework or they're

13   being held out to go to something family

14   related or -- there's so many variables

15   within the other 50 percent.

16         Q.     You talked about tardiness.

17                Do you recall?

18         A.     Yes.

19         Q.     And you gave two examples of

20   tardiness; one being a doctor's

21   appointment, another being students

22   staying up late on their phones and, I

23   guess, sleeping in or not getting enough

24   sleep, is --

CONFIDENTIAL

Page 508

1          A.    Yes.
2          Q.    How often is it happening
3    that students are on their phones late at
4    night and that is causing them to be
5    tardy for class?
6          A.    You said how often is that
7    happening?  I think it's happening quite
8    often.
9               When I've spoken to school
10   counselors and they've talked about them
11   having attendance groups or something of
12   the like and they ask the students
13   simply, why didn't you come to school or
14   why were you -- particularly, why were
15   you late?  And they say, I was -- I was
16   on -- fill in the blank of a platform --
17   I was on there all night long and then I
18   just fell asleep and then I just couldn't
19   get up in the morning.
20         Q.    So your belief is based on
21   conversations you've had with counselors?
22         A.    And staff.  Just staff, yes.
23   That would include them.
24         Q.    Who are these counselors?

CONFIDENTIAL

Page 509

1          A.     Some are high school
2    counselors.  Some are middle school
3    counselors.
4          Q.     Can you name them?
5          A.     I can give you Ms. -- maybe
6    Ms. Lopez.  She's a school social worker.
7               There's school counselors.
8    They're, like, Ms. Johnson, Ms. Brown,
9    Ms. Vasquez is a school -- high school
10   social worker.  Ms. Sadio.
11              I've been in the district
12   for, like, 21 years.  So I know a lot of
13   people.  And a lot of times they'll tell
14   me things just so that, you know, I have
15   a pulse on things -- on certain things.
16         Q.     You have specifically
17   discussed --
18              ATTORNEY KARP:  Do we need
19         to go off the record for --
20              THE WITNESS:  I have to make
21         sure things are locked.
22              ATTORNEY KARP:  We can go
23         off the record.
24              VIDEO TECHNICIAN:  The time

CONFIDENTIAL

Page 510

```
1          right now is 2:20 p.m.  We are off
2          the record.
3                    -   -   -
4          (Whereupon, a brief recess
5          was taken.)
6                    -   -   -
7          VIDEO TECHNICIAN:  The time
8          right now is 2:25 p.m.  We are
9          back on the record.
10 BY ATTORNEY KARP:
11         Q.    Dr. Vauss, just before the
12 break, we were talking about some
13 conversations you had had -- or that you
14 told me you had had with various
15 counselors in the district.
16              Do you recall?
17         A.    Uh-huh.
18         Q.    And it was specifically
19 about the issue of tardiness.  You
20 identified Ms. Lopez, Ms. Johnson,
21 Ms. Vasquez and Ms. Sadio.
22              Have you specifically spoken
23 to those individuals about social media
24 causing tardiness for IPS students?
```

Page 511

1          A.    I would talk about their
2     information that they gathered as far as
3     their attendance committees and the
4     causations for student tardiness and
5     absenteeism.
6          Q.    And your testimony is that
7     in your conversations with these four
8     individuals, they told you that social
9     media was a reason that students were
10    tardy?
11               ATTORNEY INNES:  Objection.
12               THE WITNESS:  Yes.
13    BY ATTORNEY KARP:
14         Q.    They told you that students
15    were up late at night on social media?
16         A.    Yes.
17         Q.    They didn't say that
18    students were on their phones; they said
19    social media specifically?
20         A.    They may have said on their
21    phones, whatever, doing those -- like, on
22    those -- on those platforms.
23         Q.    Did Ms. Lopez, Ms. Johnson,
24    Ms. Vasquez or Ms. Sadio identify any

CONFIDENTIAL

Page 512

1  specific platforms to you in their -- in

2  those conversations that you just told me

3  about?

4              ATTORNEY INNES:  Objection.

5              THE WITNESS:  They would

6        have -- yes, they would have said

7        those.  Maybe after questioning,

8        like, what are -- what are they

9        doing on the phones?  They're on

10       these -- on the platforms,

11       they're -- they're, you know, on

12       there.

13             And I might ask, well,

14       what -- what platforms and what

15       were they doing?

16  BY ATTORNEY KARP:

17       Q.    Do you specifically -- do

18  you specifically remember asking them

19  which platforms?

20       A.    I don't.  I -- I can't say.

21       Q.    Just to clarify something I

22  think I heard you say.

23             Did you say that these four

24  individuals, Ms. Lopez, Ms. Johnson,

CONFIDENTIAL

Page 513

1   Ms. Vasquez and Ms. Sadio would have

2   mentioned social media -- or, sorry,

3   would have mentioned specific social

4   media platforms or that they did mention

5   certain social media platforms?

6                  ATTORNEY INNES:  Objection.

7                  THE WITNESS:  Can you ask me

8        that again?

9   BY ATTORNEY KARP:

10        Q.    Did you testify -- strike

11   that.

12                You testified that you've

13   had conversations with Ms. Lopez,

14   Ms. Johnson, Ms. Vasquez and Ms. Sadio

15   about the causes of tardiness for IPS

16   students, correct?

17        A.    Yes.

18        Q.    And that in those

19   conversations, they have told you that

20   students stayed up late on -- on their

21   phones, maybe on social media; is that

22   right?

23        A.    Yes.

24                  ATTORNEY INNES:  Objection.

Page 514

```
 1          I'll just -- when you list those
 2          teachers, I believe the
 3          testimony -- the prior testimony,
 4          if I had realtime I would say, I
 5          think there was a Ms. Brown in
 6          there as well.
 7  BY ATTORNEY KARP:
 8          Q.    Did you say Ms. Brown?
 9          A.    Yes.
10                ATTORNEY KARP:  Thank you.
11  BY ATTORNEY KARP:
12          Q.    Let's add Ms. Brown to the
13  mix.
14                You've had conversations
15  with Ms. Brown, Ms. Lopez, Ms. Johnson,
16  Ms. Vasquez and Ms. Sadio about the
17  causes for tardiness for IPS students,
18  correct?
19          A.    Yes.
20          Q.    In any of those
21  conversations, did they tell you that
22  social media was the reason that students
23  were coming into school late?
24          A.    Yes.
```

CONFIDENTIAL

Page 515

1          Q.    And did -- in your
2   conversations with these five
3   individuals, did they specific -- did
4   they mention specific social media
5   platforms?
6          A.    Maybe not initially.  But I
7   think that the specific ones came up,
8   yes.
9          Q.    Does IPS have a way of
10  knowing what students are doing on their
11  phones late at night?
12         A.    No.
13         Q.    These conversations that
14  you've had with Ms. Brown, Ms. Lopez,
15  Ms. Johnson, Ms. Vasquez and Ms. Sadio,
16  are they written down anywhere?
17         A.    These -- no.
18         Q.    You referred to attendance
19  committees --
20         A.    Yes.
21         Q.    -- in your testimony?
22         A.    Yes.
23         Q.    What are attendance
24  committees?

Page 516

1          A.     They are committees that are
2     formed to try to improve the school
3     avoidance rates.
4          Q.     Do they collect attendance
5     data?
6          A.     I believe so.
7               But their function is to
8     collaborate and try to come up with
9     things that encourage students to want to
10    come to school.
11         Q.     Would attendance committees
12    have data in their possession relating to
13    how students are using their cell phones
14    outside of the school?
15         A.     No.
16         Q.     Dr. Vauss, how often do you
17    interact with students directly?
18              ATTORNEY INNES:   Objection
19         to form.
20              THE WITNESS:   Not as often
21         as I would like.  So the students
22         that are in this building, I -- on
23         a daily basis.
24              Other students, interact

CONFIDENTIAL

Page 517

1          with them?  That's not really what
2          I do.  So I couldn't give a
3          number.  But not often.
4                I did -- for example, I did
5          yesterday, I visited JROTC class,
6          I visited an RTC program, and I
7          had an opportunity to engage with
8          the students, but not in a -- not
9          in a teacher-pupil way.
10   BY ATTORNEY KARP:
11          Q.    You referred to "this
12   building."
13                And that is University
14   Elementary School?
15          A.    Yes.
16          Q.    Approximately how many
17   times, in a given school year, do you
18   visit Irvington High School?
19          A.    Oh, wow.
20                ATTORNEY INNES:  So
21          objection.  I think you have to
22          give some time period.
23                Dr. Vauss has been in the
24          district for a very long time.

CONFIDENTIAL

Page 518

```
 1              ATTORNEY KARP:  I
 2        understand.  And that's fair.
 3   BY ATTORNEY KARP:
 4        Q.    You became superintendent of
 5   IPS in July of 2020, correct?
 6        A.    Yes.
 7        Q.    You were interim as of April
 8   2020, and then you took on the role more
 9   officially in July, correct?
10        A.    Yes.
11        Q.    So in the 2020-2021 school
12   year, we were remote.
13        A.    Yeah.  I was going to say,
14   we were remote.
15        Q.    Bad year to pick.
16              Let's talk about 2023-2024
17   school year.
18              Can you approximate how many
19   times you visited Irvington High School
20   during that year?
21              ATTORNEY INNES:  Objection.
22        Outside the scope.
23              THE WITNESS:  I would say
24        anywhere from five to ten times.
```

CONFIDENTIAL

Page 519

1  BY ATTORNEY KARP:

2          Q.    Can you approximate how many

3  times you visited University Middle

4  School during the 2023-2024 school year?

5                  ATTORNEY INNES:   Objection.

6          Scope.

7                  THE WITNESS:  So can I ask a

8          question for clarification?

9  BY ATTORNEY KARP:

10         Q.    You may.

11         A.    So when you say "visited,"

12  do you mean just inside the building or

13  outside?

14                 Because we're right next

15  door.  And I found an occasion just to --

16  to walk over there and just to watch and

17  observe the scholars and things like

18  that.  So --

19         Q.    I will ask my -- let's go

20  back to Irvington High School, to make

21  sure we're on the same page and we have

22  the same understanding.

23         A.    Okay.

24         Q.    During the 2023-2024 school

CONFIDENTIAL

Page 520

1  year, how many times were you physically
2  present at Irvington High School at a
3  time when students were also present?
4          A.    It would be that same
5  number; five -- anywhere from five to ten
6  times.
7          Q.    During the 2023-2024 --
8          A.    I'm sorry.  So sports,
9  activities, all of that, then I couldn't
10  give you a number.  Because there's so
11  many sports and activities and things
12  that I attend.
13              I'm thinking of, you know,
14  maybe doing a walk-through or something,
15  if -- it's the five to ten as opposed to
16  just going to the school.
17              I go to the sports.  I
18  attend, you know, sports activities and
19  things like that.
20          Q.    So five to ten times during
21  the school day is your approximation --
22  your estimate?
23          A.    Yes.
24          Q.    With the possibility of

CONFIDENTIAL

Page 521

```
 1   going to -- being at Irvington High
 2   School more times for sporting events?
 3            A.    Sporting events, programs,
 4   ceremonies before and after school.  Yes.
 5            Q.    During the 2023-2024 school
 6   year, can you approximate for me how many
 7   times you were present at University
 8   Middle School at a time when students
 9   were also present?
10                  ATTORNEY INNES:  Objection.
11            Outside the scope.
12                  The scope objection is
13            because my cross -- or my direct
14            is limited really to absenteeism.
15            So I'll give you a little bit of
16            leeway to connect this to
17            absenteeism.  But if we're not
18            going to do that, then I think
19            we're done.
20                  ATTORNEY KARP:  I understand
21            your scope objections.  I think
22            this goes to some of the issues
23            that you raised in your exam.
24                  So your scope -- scope
```

CONFIDENTIAL

Page 522

1          objection is noted.

2                  ATTORNEY INNES:  Which one

3          is this?

4                  ATTORNEY KARP:  I don't need

5          to explain my -- the line of

6          questioning.

7                  You made a scope objection.

8          That's what you're entitled to do.

9                  ATTORNEY INNES:  But you

10         don't -- you can't -- this is not

11         related to absenteeism is what

12         you're saying?

13                 ATTORNEY KARP:  It is

14         related to absenteeism.

15                 ATTORNEY INNES:  Okay.

16                 ATTORNEY KARP:  Yeah.  I'm

17         fine saying that.  It's related to

18         absenteeism and issues of

19         tardiness that came up during your

20         exam.

21                 ATTORNEY INNES:  Okay.

22    BY ATTORNEY KARP:

23         Q.    Do you need me to re-ask the

24    question, Dr. Vauss?

CONFIDENTIAL

Page 523

1          A.     Please.

2          Q.     Sure.

3               During the 2023-2024 school

4    year, approximately how many times did

5    you visit University Middle School at a

6    time when students were also present?

7          A.     Maybe around the same amount

8    of times I visited the high school.

9          Q.     So that would be five to ten

10   times, and then some additional allowance

11   for athletic events and other activities

12   outside of school hours?

13         A.     Yes.

14         Q.     Okay.  Is it the same answer

15   for Union Avenue Middle School?

16         A.     Yes.

17         Q.     Would you say it's about the

18   same for the elementary schools within

19   IPS?

20              ATTORNEY INNES:  Objection

21         to scope.

22              THE WITNESS:  I would say

23         maybe a little less in some -- in

24         some instances; and in some

Page 524

1          instances a little more.
2    BY ATTORNEY KARP:
3          Q.    Let's talk about why
4    students aren't coming to school.
5               You talked about that with
6    your counsel, right?
7          A.    Yes.
8          Q.    Okay.  Have students ever
9    wanted to go to school?
10               ATTORNEY INNES:  Objection.
11               THE WITNESS:  Are you asking
12          me?  Yes.  I did.  I liked school.
13               I would say that there's --
14          well, let me -- let me have you
15          ask your question again.  I'm
16          sorry.
17    BY ATTORNEY KARP:
18          Q.    Sure.
19               Have students ever wanted to
20    go to school?
21          A.    Yes and no.  I would say,
22    no, there are times, I guess, that
23    students didn't want to go to school.
24    And, yes, there are times when students

CONFIDENTIAL

Page 525

1  did want to go to school.

2          Q.     IPS students would rather be

3  playing soccer or hanging out with their

4  friends than doing a math quiz, right?

5                  ATTORNEY INNES:  Objection

6          to the form.

7                  THE WITNESS:  Perhaps.

8  BY ATTORNEY KARP:

9          Q.     IPS students would rather be

10  watching TV or playing video games

11  than -- than learning biology?

12          A.     Perhaps.

13          Q.     You spoke with your counsel

14  about an incident involving Beyonce and

15  Doechii.

16                  Do you recall?

17          A.     Yes.

18          Q.     And some debate and

19  discussion that was happening around the

20  Grammy award that Doechii won.

21                  Do you recall?

22          A.     Yes.

23          Q.     And you said that complexion

24  was a big part of that discussion.

CONFIDENTIAL

Page 526

1           Do you recall?

2      A.    Yes.

3      Q.    We can both agree that

4  racism is a terrible thing, correct?

5      A.    But -- yes.  But it's

6  colorism, which is -- can be different.

7      Q.    Understood.  Also a terrible

8  thing.  Both are terrible things.

9      A.    Yes.  Absolutely.

10     Q.    And I didn't mean to

11 misspeak there.

12           Colorism, terrible thing?

13     A.    Yes.

14     Q.    And what these students were

15 posting about Beyonce and about Doechii

16 in the context of this Grammy award issue

17 was hurtful, correct?

18     A.    Yes.

19     Q.    Did you say that certain

20 comments -- did you testify that certain

21 comments regarding that debate were

22 posted to Snapchat?

23     A.    I believe that was the

24 platform that it was placed on.

CONFIDENTIAL

Page 527

1          Q.     And did you see those posts?

2          A.     I did not.

3          Q.     What is the basis for your

4    belief that those -- those comments or

5    that -- that content, maybe even images,

6    were posted to Snapchat specifically?

7          A.     Speaking to Principal

8    Bussacco and the -- also, I believe, that

9    Assistant Principal Penn was the

10   administrator who helped with the

11   investigation, as well as a social

12   worker, for purposes of HSSC, Ms. Lopez.

13   I think they handled the situation.

14         Q.     And one or more of those

15   individuals identified Snapchat

16   specifically?

17         A.     I heard that word being

18   mentioned.

19              But, I mean, I could be

20   incorrect.  I just know it was placed

21   upon a platform, and they said they

22   choose that because it can go away.  So

23   unless someone screenshots it and shows

24   an administrator, you know, this is what

Page 528

1    such and so said and this is what they

2    did, then it kind of goes away.

3            Q.    You testified that some

4    students don't want to come to school

5    because they don't feel good about

6    themselves or they don't feel confident,

7    right?

8            A.    Yes.

9            Q.    There are lots of causes,

10   unfortunately, for students to have low

11   self-esteem, right?

12           A.    Yes.

13           Q.    It could be low -- it could

14   be academic low -- it could be academic

15   self-esteem, correct?

16           A.    Yes.

17           Q.    They may not believe in

18   their ability to do well in school?

19           A.    Yes.

20           Q.    You talked about students

21   not feeling pretty or beautiful, right?

22           A.    Yes.

23           Q.    Historically, students have

24   compared themselves to celebrities?

Page 529

1          A.    Yes.

2          Q.    They have -- they've read
3    magazines and compared themselves to
4    models?

5          A.    Yes.  But their access to it
6    on an -- like, on an instant reel that
7    just goes on and on and people being able
8    to like or share this image versus that
9    image or something that makes them feel
10   less than, it's totally different than
11   someone like me who grew up and, you
12   know, maybe saw images that didn't look
13   like me being on magazines.

14              It's a totally different
15   world.  Because I might see that at a
16   grocery store and then I go home and I
17   get -- my self-esteem can be built up,
18   and there's not a device to stand
19   juxtaposed to that to say no, no, your
20   parents are wrong, right.  I mean, so
21   that's kind of what I meant.

22         Q.    Students can tell each other
23   that they look beautiful on social media
24   as well, right?

CONFIDENTIAL

Page 530

1          A.      They can.
2          Q.      You said that some of your
3   testimony is based on conversations that
4   you've had with trained counselors.
5                  Do you recall that?
6          A.      Yes.
7          Q.      And I apologize --
8          A.      School -- school counselors.
9   Yes.
10         Q.      School counselors.
11                 And I apologize if there's
12  some overlap with some of the questioning
13  I've already asked.  Tell me if there is,
14  or maybe your counsel will.
15                 But who are the trained
16  counselors you recall having discussions
17  with about social media?
18                 ATTORNEY INNES:  Asked and
19         answered.
20                 You may answer.
21                 THE WITNESS:  Okay.  So the
22         list of names that I shared with
23         you, with the exception of the one
24         I identified -- the person I

CONFIDENTIAL

Page 531

1          identified as a teacher, they are
2          either school counselors or
3          they're HSSCs.
4    BY ATTORNEY KARP:
5          Q.    And which is the individual
6    who was a teacher?
7          A.    Ms. Dove.
8          Q.    Ms. Dove.  Thank you.
9                You told your counsel that
10   you had spoken to school psychologists.
11               Who are those school
12   psychologists?
13         A.    We have various ones.  I --
14   I can't think of their names right off
15   the top of my head.
16               But we have -- like, they're
17   on child study teams.  We have them
18   throughout the district.  But to name our
19   whole school psychologists, I couldn't
20   off the top of my head.
21         Q.    And I'm not asking for you
22   to name the entire roster of school
23   psychologists for IPS.
24               I'm asking, which school

CONFIDENTIAL

Page 532

1   psychologist did you talk to about the

2   impact of social media on IPS students?

3          A.    Well, one person that's come

4   up with -- is Dr. Rivera.  And I know she

5   wrote a statement and she wrote an

6   article, you know, talking about what --

7   you know, the effects of COVID.

8                But I'm sure that if I had a

9   conversation with her today, and the

10  conversations that -- that were held

11  after COVID was in full effect, she would

12  talk about the imprint that social media

13  has had.

14         Q.    You have not had that

15  conversation with Dr. Rivera?

16         A.    No.

17         Q.    You're saying you --

18         A.    If I --

19         Q.    -- think if you --

20         A.    -- had a conversation with

21  her today.

22         Q.    Okay.  So you suspect that

23  if you had that conversation today,

24  that's what she would tell you?

CONFIDENTIAL

Page 533

1          A.     Yes.

2          Q.     But you haven't actually had

3    that conversation, is your testimony?

4          A.     Yes.  No.  That's right.

5          Q.     So Dr. Rivera never told you

6    those things; you just believe she could

7    today?

8          A.     Yes.

9          Q.     Okay.  You mentioned some

10   HSSCs.

11               Are those the -- is that

12   Ms. Lopez and the other --

13         A.     Yes.  Social -- social

14   workers, yes.

15         Q.     Okay.  Any other HSSCs that

16   come to mind who -- with whom you've

17   spoken --

18         A.     Ms. --

19         Q.     -- about social media?

20         A.     Ms. Vasquez is one for the

21   high school.

22         Q.     And just for completeness,

23   it was Ms. Lopez, Ms. Vasquez, Ms. Sadio

24   and Ms. Johnson?

CONFIDENTIAL

Page 534

1      A.    Yeah.  Though Sadio and

2  Johnson are school counselors.

3      Q.    I don't mean to confuse

4  them.  I apologize.

5      A.    That's okay.

6      Q.    You talked about fight pages

7  with your counsel.

8            Do you recall?

9      A.    Yes.

10      Q.    On what platform were those

11  fight pages posted?

12      A.    Instagram.

13      Q.    And for my own clarity, a

14  fight page is when someone takes a video

15  of a -- of a fight and posts it to a

16  platform; is that your understanding?

17      A.    Yes, that's my

18  understanding.  And it's managed and it's

19  ongoing -- it's like -- there's the

20  initial putting up of a fight and then

21  there is a page where fights are

22  collected.  They are shared, you know,

23  through -- to different people, you know,

24  not the least of which are other

CONFIDENTIAL

Page 535

1   students.

2         Q.    People are taking photos and

3   videos of fights, they are posting them

4   and then there's an ability for them to

5   be shared, is what you're saying?

6         A.    Yes.

7               And I guess features are

8   altered and all kinds of stuff.  And

9   liked.  And -- and commented on.

10              And there's no -- there's

11  nothing that -- like, that they just

12  present it and then you just see it and

13  that's just that.

14              It's the -- the harm that's

15  being caused has been when they can share

16  it and that you can comment and you can

17  like it.  And that's -- that's been the

18  issue.

19        Q.    So they post these fights on

20  a platform, correct?

21        A.    Uh-huh.

22        Q.    And then people have the

23  ability to post comments, you're saying?

24        A.    And -- and share it.

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 536

1          Q.    I'm just asking --
2          A.    Oh, I'm sorry.
3          Q.    -- just specifically, they
4    have the ability to post comments, yes?
5          A.    They have.  Unless they, I
6    guess -- I don't know if there's some way
7    that they can turn the comments off.  But
8    they have posted comments, yes.
9          Q.    And they have the ability to
10   like or react or kind of express
11   themselves in response to the video
12   that's on there, correct?
13         A.    Yes.
14         Q.    And then they can share it
15   so that other people can see it?
16         A.    Yes.
17         Q.    Okay.
18              ATTORNEY KARP:  I do not
19         have any further questions on my
20         end.
21              Anyone on the line have
22         questions?
23              In that case, I believe we
24         are done.

CONFIDENTIAL

Page 537

1           I'm sorry.  Unless, Michael,
2      you have questions.
3           ATTORNEY INNES:  I have no
4      further questions for Dr. Vauss.
5      Thank you.
6           Thank you, have Vauss.
7           ATTORNEY KARP:  Thank you
8      for your time.  I really
9      appreciate it.
10          THE WITNESS:  Thank you.
11     It's been a pleasure to meet you
12     all.
13               -  -  -
14          (Whereupon, a discussion off
15     the record occurred.)
16               -  -  -
17          VIDEO TECHNICIAN:  So
18     Mr. Karp, you've been on the
19     record for two hours and 55
20     minutes.  And Mr. Innes has been
21     on the record for 19 minutes.
22          The time right now is
23     2:49 p.m.  We are off the record.
24               -  -  -

CONFIDENTIAL

Page 538

1          (Whereupon, the deposition

2     concluded at 2:49 p.m.)

3               -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 539

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the

6   witness was duly sworn by me and that the

7   deposition is a true record of the

8   testimony given by the witness.

9

10

11          Amanda Maslynsky-Miller

12          Certified Realtime Reporter
            Dated:  May 12, 2025

13

14

15

16

17

18          (The foregoing certification

19   of this transcript does not apply to any

20   reproduction of the same by any means,

21   unless under the direct control and/or

22   supervision of the certifying reporter.)

23

24

CONFIDENTIAL

Page 540

1          INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

CONFIDENTIAL

Page 541

1            - - - - - -

             E R R A T A

2            - - - - - -

3    PAGE    LINE    CHANGE

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____

CONFIDENTIAL

Page 542

1          ACKNOWLEDGMENT OF DEPONENT

2

           I,_____, do

3    hereby certify that I have read the
     foregoing pages, 1 - 215, and that the

4    same is a correct transcription of the
     answers given by me to the questions

5    therein propounded, except for the
     corrections or changes in form or

6    substance, if any, noted in the attached
     Errata Sheet.

7

8    _____
     APRIL VAUSS, Ph.D.                    DATE

9

10

     Subscribed and sworn

11   to before me this
     _____ day of _____, 20_____.

12

     My commission expires:_____

13

14   _____
     Notary Public

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 543

1                     LAWYER'S NOTES

2    PAGE    LINE

3    ____    ____    _____

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____