**Exhibit 3**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

2

                   - - - - -

3

4    IN RE: SOCIAL MEDIA              CASE NO.

5    ADOLESCENT ADDICTION/PERSONAL    4:22-md-03047-YGR

6    INJURY PRODUCTS LIABILITY        MDL No. 3047

7    LITIGATION

8

9    THIS DOCUMENT RELATES TO:

10    Irvington Public Schools

11           vs.

12   Meta Platforms Inc., et al.

13   Member Case No.: 4:23-cv-01467-YGR

14                   - - - - -

15           Thursday, May 16, 2025

16      CONFIDENTIAL - ATTORNEYS' EYES ONLY

17            PURSUANT TO PROTECTIVE ORDER

18            30(b)(6) Videotaped deposition of DR.

19   APRIL VAUSS, held at the offices of the Irvington

20   Board of Education, One University Place, Irvington,

21   New Jersey, commencing at 9:11 a.m. Eastern, on the

22   above date, before Robin L. Clark, Professional

23   Reporter and Notary Public in and for the State of

24   New Jersey.

25

CONFIDENTIAL

Page 2

```
 1   APPEARANCES:
 2
             CARELLA, BYRNE, CECCHI, BRODY
 3           & AGNELLO, P.C.
             BY:  MICHAEL A. INNES, ESQ.
 4           DAVID G. GILFILLAN, ESQ. (Zoom)
             5 Becker Farm Road
 5           Roseland, New Jersey 07068
             973-994-1700
 6           minnes@carellabyrne.com
             dgilfillan@carellabyrne.com
 7                   For the Plaintiffs and the
             Witness
 8
 9           KIRKLAND & ELLIS LLP
             BY:  ANDREW KARP, ESQ.
10           VANESSA DiFEO, ESQ. (Zoom)
             601 Lexington Avenue
11           New York, New York 10022
             212-341-7593
12           andrew.karp@kirkland.com
             vanessa.difeo@kirkland.com
13                   For the Defendant, Snap,
             Inc.
14
15           KIRKLAND & ELLIS LLP
             BY:  FARAZ SHAHIDPOUR, ESQ.
16           333 West Wolf Point Plaza
             Chicago, Illinois 60654
17           312-862-1541
             faraz.shahidpour@kirkland.com
18                   For the Defendant,
             Snap, Inc.
19
20   ALSO PRESENT:
21
             DANIEL ORTEGA, VIDEOGRAPHER
22
             MICHAEL FRONZAGLIA, TRIAL TECH
23
24
25
```

CONFIDENTIAL

```
                                                   Page 3

 1    REMOTE APPEARANCES:
 2
               SHOOK, HARDY & BACON, L.L.P.
 3             BY:  TERRENCE J. SEXTON, ESQ.
               2555 Grand Boulevard
 4             Kansas City, Missouri 64108
               816-474-6550
 5             tsexton@shb.com
                         For the Defendants, Meta
 6             Platforms, Inc., f/k/a Facebook, Inc.;
               Facebook Holdings, LLC;
 7             Facebook Operations, LLC; Facebook
               Payments, Inc.; Facebook Technologies,
 8             LLC; Instagram, LLC; and Siculus, Inc.
 9
               SHOOK, HARDY & BACON, L.L.P.
10             BY:  KATELYN ROMEO, ESQ.
               Two Commerce Square
11             2001 Market Street, Suite 3000
               Philadelphia, Pennsylvania 19103
12             215-278-2555
               kromeo@shb.com
13                       For the Defendants, Meta
               Platforms, Inc., f/k/a Facebook, Inc.;
14             Facebook Holdings, LLC;
               Facebook Operations, LLC; Facebook
15             Payments, Inc.; Facebook Technologies,
               LLC; Instagram, LLC; and Siculus, Inc.
16
17             KING & SPALDING LLP
               BY:  ISABEL KING, ESQ.
18             110 North Wacker Drive, Suite 3800
               Chicago, Illinois 60606
19             312-995-6333
               iking@kslaw.com
20                       For the Defendants,
               TikTok, Ltd.; TikTok, LLC;
21             TikTok, Inc.; ByteDance Ltd.; and
               ByteDance Inc.
22
23
24
25
```

```
                                         Page  4

 1          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
            BY:   DANIEL COBOURN, ESQ.
 2          320 South Canal St.
            Chicago, Illinois 60606
 3          312-407-0700
            daniel.cobourn@skadden.com
 4                     For the Defendant, Snap, Inc.
 5
            WILLIAMS & CONNOLLY LLP
 6          BY:   ANNIE E. SHOWALTER, ESQ.
            680 Maine Avenue, S.W.
 7          Washington, D.C. 20024
            202-434-5841
 8          ashowalter@wc.com
                       For the Defendants, Alphabet,
 9          Inc., Google, LLC and YouTube, LLC
10
                       - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 5

```
 1                    I N D E X
 2   WITNESS                                   PAGE
 3   DR. APRIL VAUSS
       BY MR. KARP:                          10, 353
 4     BY MS. SHOWALTER:                      325
       BY MR. INNES:                          335
 5
 6                  E X H I B I T S
 7   NUMBER          DESCRIPTION            MARKED
 8   Vauss
 9   Exhibit 1      Defendants' Amended         12
                    Supplemental Notice of Oral
10                  and Videotaped Deposition
                    30(b)(6) Deposition of
11                  Plaintiff Irvington Public
                    Schools
12
     Exhibit 2      Binder of Documents         25
13
     Exhibit 3      Graduation Rates            31
14
     Exhibit 4      Notes from conversation     31
15                  with Dean Bryant
16   Exhibit 5      Comprehensive Annual        32
                    Financial Reports from 2016
17                  through 2023
18   Exhibit 6      Plaintiff's Third Amended   75
                    Answers to Defendants'
19                  Interrogatories to
                    Irvington Public Schools
20                  (Set 3)
21   Exhibit 7      Letter Bates               134
                    BW__Irvington00463683 to
22                  00463688
23   Exhibit 8      Email String Bates         157
                    BW__Irvington 00002168 to
24                  00002169
25   Exhibit 9      Letter Bates               159
                    BW__Irvington00002170
```

CONFIDENTIAL

Page 6

1

   Exhibit 10      PowerPoint Presentation      162
2                  Bates BW__Irvington
                   00487452
3

   Exhibit 11      Letter dated 12/16/21 on      176
4                  IPS Website
5  Exhibit 12      Tip Sheet on Social Media     187
                   Use and Mental Health Bates
6                  BW__Irvington00032486 to
                   00032487
7

   Exhibit 13      2024-2025 Student Code of     206
8                  Conduct Bates
                   BW__Irvington00629350 to
9                  00629430
10 Exhibit 14      Email dated 6/11/21 Bates     226
                   BW__Irvington00161074
11

   Exhibit 15      Policy 3283 on Electronic     227
12                 Communication Between
                   Teaching Staff Members and
13                 Students Bates
                   BW__Irvington00161075 to
14                 00161079
15 Exhibit 16      School Safety Data System     230
                   2023-24 Incidents Bates
16                 BW__Irvington00673652 to
                   00673661
17

   Exhibit 17      Student Safety Data System    238
18                 2017-18 Incidents Bates
                   BW__Irvington00673582 to
19                 00673596
20 Exhibit 18      2019 Crime in the United      254
                   States
21

   Exhibit 19      Uniform Crime Report Crime    256
22                 in the United States, 2019
23 Exhibit 20      2019 Crime in the United      259
                   States (New Jersey)
24

   Exhibit 21      NJ.com Article                265
25

CONFIDENTIAL

Page 7

1

Exhibit 22        Third Amended Plaintiff        268
2                 Fact Sheet - School
                  Districts
3
Exhibit 23        Plaintiff Fact Sheet -        270
4                 School Districts
                  (Supplemental)
5
Exhibit 24        RLS Media Article             285
6
Exhibit 25        2023-2024 BSCA Stronger       293
7                 Connections Grant 3047
                  MDL__002074__NJDOE__0002706
8                 to 0002769
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 8

1                DEPOSITION SUPPORT INDEX

2

                          - - - - -

3

4    Direction to Witness Not to Answer

5    Page   Line

6    36      13

7    39      19

8    Request for Production of Documents

9    Page   Line

10   NONE

11   Question Marked

12   Page   Line

13   NONE

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 9

```
 1              THE VIDEOGRAPHER:  We are now
 2         on the record.  My name is Daniel
 3         Ortega and I am the legal
 4         videographer for Golkow Litigation
 5         Services.  Today's date is May 16,
 6         2025, and the time is 9:11 a.m.
 7              This video deposition is
 8         being held at social -- sorry,
 9         One University Place, Irvington,
10         New Jersey, in the matter of
11         Social Media, CA MDL 3047,
12         Irvington Public Schools versus
13         Meta Platforms, Inc., et al.
14              The deponent today is April
15         Vauss.  All counsel will be noted
16         on the stenographic record.  The
17         court reporter today is Robin
18         Clark who will now swear in the
19         witness.
20                   - - - - -
21              DR. APRIL VAUSS, having been
22         duly sworn, was examined and
23         testified as follows:
24                   - - - - -
25
```

CONFIDENTIAL

Page 10

```
 1  BY MR. KARP:
 2          Q.      Good morning, Dr. Vauss.
 3          A.      Good morning.
 4          Q.      How are you?
 5          A.      I'm well.  How about
 6  yourself?
 7          Q.      I'm doing well.  It's good to
 8  see you again.  Can you please state your
 9  name for the record?
10          A.      Dr. April Vauss.
11          Q.      For completeness here on this
12  transcript, my name is Andrew Karp.  I
13  represent Snap in this lawsuit.  You
14  understand that you're under oath today?
15          A.      Yes.
16          Q.      Is there any reason you
17  cannot provide truthful and accurate
18  testimony today?
19          A.      Yes.
20          Q.      If at any time you don't
21  understand the question I'm asking, please
22  let me know so I that can clarify,
23  otherwise, I'll assume that you have
24  understood the question.  Is that okay?
25          A.      Yes.
```

CONFIDENTIAL

Page 11

1          Q.     We haven't had a problem with
2     this so far, but verbal answers are
3     preferred, just so that the court reporter
4     can get an accurate record of our
5     conversation.
6          A.     Yes.
7          Q.     Throughout today's
8     deposition, I may refer to Irvington Public
9     Schools as IPS.  If I use that acronym,
10    you'll understand I mean Irvington Public
11    Schools?
12         A.     Yes.
13         Q.     Are you familiar with who the
14    Defendants are in this litigation?
15         A.     Yes.
16         Q.     And who are they?
17         A.     SnapChat, YouTube, I think
18    Google platform, Facebook, Instagram.
19         Q.     Anyone else?
20         A.     I think I named them all.
21         Q.     Are you aware of whether
22    TikTok is a Defendant in this case?
23         A.     Oh, I'm sorry, yes and
24    TikTok.
25         Q.     Throughout today's deposition

CONFIDENTIAL

Page 12

1    I may refer to Defendants' platforms.  Do

2    you understand that when I use that phrase,

3    I'm referring to Facebook, Instagram,

4    TikTok, SnapChat, and YouTube?

5          A.    Yes.

6          Q.    I'm handing you tab 1B, which

7    we will mark as Exhibit 1.  This document

8    is Defendants' Amended Supplemental Notice

9    of Oral and Videotaped Deposition 30(b)(6)

10   Deposition of Plaintiff Irvington Public

11   Schools.

12              Do you see that?

13         A.    Yes.

14               - - - - -

15              (Defendants' Amended

16          Supplemental Notice of Oral and

17          Videotaped Deposition 30(b)(6)

18          Deposition of Plaintiff Irvington

19          Public Schools marked Vauss

20          Exhibit 1 for identification.)

21               - - - - -

22   BY MR. KARP:

23         Q.    Have you seen this document

24   before?

25         A.    Yes.

CONFIDENTIAL

Page 13

1          Q.      When did you first see this
2     document?
3          A.      I can't recall the first
4     time.
5          Q.      Do you recall an approximate
6     date of when you first saw this notice?
7          A.      I've seen it, but I don't
8     want to take a guess.
9          Q.      What is your understanding of
10    why you're here to testify today?
11         A.      I'm testifying on behalf of
12    Irvington Public Schools in regards to
13    social media's injury, addiction for our
14    scholars.
15         Q.      You understand that you are
16    speaking on behalf of the district for the
17    topics that are indicated on the first page
18    of this notice?
19         A.      Yes.
20         Q.      Okay.  And if you look at the
21    first page of the notice, about halfway
22    down, it indicates that you are designated
23    to testify on topic numbers 1 through 24,
24    26 through 31, 35, 36, 37, 39, 41, 43, 45,
25    and 47 through 70.

CONFIDENTIAL

1              Do you see that?

2        A.      Yes.

3        Q.      Is it your understanding that

4   you're here to testify on behalf of the

5   district with respect to those topics?

6        A.      Yes.

7        Q.      Okay.  Are you here to

8   testify for the district on any other

9   topics?

10       A.      No.

11       Q.      What did you do -- excuse me,

12  strike that.

13              Did you do anything to

14  prepare for today's deposition?

15       A.      Yes.

16       Q.      What did you do to prepare?

17              MR. INNES:  Dr. Vauss, I'll

18          just caution, there's going to be,

19          I'm assuming a long line of

20          questions about your preparation.

21          My only instruction to you would be

22          not to divulge the content of

23          conversations you've had with

24          counsel.

25              THE WITNESS:  Okay.

CONFIDENTIAL

Page 15

1                    MR. INNES:  Other than that,
2              please feel free to answer the
3              questions.
4                    THE WITNESS:  Okay.  I,
5              obviously, I read the document and
6              I spoke with staff members and I
7              also, depending on topics, I looked
8              up different work products and
9              things that would be applicable to
10             the questions that were noted in
11             the topics.
12   BY MR. KARP:
13        Q.    Did you meet with your
14   counsel to prepare for today's deposition?
15        A.    Yes.
16        Q.    When did you first meet with
17   counsel to prepare for today's deposition?
18        A.    I wouldn't be able to recall
19   a specific time.
20        Q.    Do you recall if it was
21   approximately a month ago or was it maybe
22   even further back than that?
23        A.    Can you ask your question
24   again?
25        Q.    Sure.  And it wasn't a good

Page 16

```
 1   question, so I'll reask it happily.
 2                   Can you approximate a date
 3   when you first met with counsel?
 4         A.     I probably could not.  I
 5   don't want to guess, so I would say I met
 6   with him.
 7         Q.     Approximately how many
 8   meetings did you have with counsel?
 9         A.     I would say I had multiple
10   meetings, the exact number, I wouldn't be
11   able to recall.
12         Q.     Just to get a sense of kind
13   of orders of magnitude, is it closer to 20
14   meetings or closer to five meetings?
15         A.     I shouldn't guess.  I would
16   just say multiple, multiple meetings.
17         Q.     Approximately how long did
18   those meetings last?
19         A.     Once again, I don't want to
20   guess, so I won't guess.
21         Q.     Do you remember if the
22   meetings lasted half an hour or four hours?
23         A.     Did they last 30 minutes or
24   four hours?  I wouldn't -- I couldn't say
25   either of those answers.
```

CONFIDENTIAL

Page 17

1          Q.       Sitting here today, you can't
2     give me an approximation or an average of
3     how long those meetings went?
4                     MR. INNES:  Asked and
5               answered.
6                     THE WITNESS:  Yeah, I wouldn't
7               want to guess, but it's safe to say
8               I met multiple times.
9     BY MR. KARP:
10         Q.       Was anyone else present at
11    the meetings that you had with counsel to
12    prepare for today's deposition?
13         A.       Were there other people
14    present when I met with counsel?  There
15    were times where there were -- I was with
16    counsel -- can you ask your question again?
17         Q.       In addition to counsel, were
18    any other individuals present at the
19    meetings you had with counsel to prepare
20    for today's deposition?
21         A.       There were some meetings.
22         Q.       Who were those individuals?
23         A.       At those meetings,
24    Ms. Pettiford, let me look at my notes.
25    Mr. Mangan, Mr. Bussacco, Mr. -- Dr. Zahir,

CONFIDENTIAL

Page 18

1    Mr. Amberg, Dr. Adegboyega, Alexis Penn,
2    Ms. Lopez, Dr. Ligons, Ms. Cedillo,
3    Ms. Brown, Ms. Vasquez, Ms. Johnson,
4    Ms. Freeman, Dean Bryant, Dr. Wilson.  I
5    think that's it.  Ms. Dove, Ms. Johnson.
6            Q.      Is this a different
7    Ms. Johnson?
8            A.      Yes, uh-huh.
9            Q.      What are the first names of
10   the two Ms. Johnsons that you mentioned?
11           A.      One Ms. Johnson is an HSSC
12   and, I'm sorry, I don't know her first
13   name.  But the teacher, there's a teacher
14   Ms. Johnson, and her first name is Betty.
15           Q.      Thank you.
16           A.      You're welcome.
17           Q.      Did you meet with these --
18   did you meet with each of these people
19   individually or did the meetings with
20   counsel involve a group of people?
21                   MR. INNES:  Objection to form.
22                   THE WITNESS:  There were,
23           there were times, groups.
24   BY MR. KARP:
25           Q.      Was it important for you to

CONFIDENTIAL

Page 19

1    talk to these individuals in preparing for

2    today's deposition?

3              A.      I would say yes.

4              Q.      Why did you find it important

5    to meet with these individuals to prepare

6    for today's deposition?

7              A.      Because some of the people

8    who I've listed here have been some of the

9    people who have approached me that I've had

10   conversations, because if they have had to

11   deal with disciplinary matters, if they've

12   seen me and they've approached me about

13   social media and its effects on their

14   scholars in class, and because of their

15   capacity, depending on if they are a school

16   counselor or HSSC or any of the --

17   depending on what their roles are for some

18   of these people.

19             Q.      You said that you looked at

20   work product to prepare for today's

21   deposition?

22             A.      Uh-huh.

23             Q.      What do you mean by "work

24   product"?

25             A.      Meaning, for example, like,

CONFIDENTIAL

Page 20

1    our financial reports.  I looked at data

2    from the schools as far as graduation --

3    graduation rates.  Just some -- a few of

4    the things, there's different things that

5    I've looked at.  The school handbooks, this

6    is -- these are just examples, it's not

7    necessarily exhaustive of all the things

8    I've looked at.

9              I would have to go through,

10   unless you want me to kind of go through,

11   I'll go through each of these so I can let

12   you know.  Just one second.  So, for

13   example, we were talking about a district

14   mandate about being diligent -- excuse me,

15   being vigilant in when you hold meetings so

16   that you can make sure that, during this

17   season students were involved in TikTok

18   challenges, and we wanted to make sure that

19   staff was monitoring students' behaviors in

20   various ways and so my assistant supe had

21   sent out an email to building

22   administration and supervisors and

23   directors.

24        Q.    And just so the record is

25   clear, this is a document you reviewed and

CONFIDENTIAL

Page 21

1    brought with you today to today's

2    deposition?

3         A.    Yes, yes.

4         Q.    All of the documents you're

5    going through are documents you brought

6    with you to today's deposition?

7         A.    Yes.

8         Q.    And that you reviewed in

9    advance of today's deposition --

10        A.    Yes.

11        Q.    -- to prepare?

12        A.    So this is a policy for the

13   use of technology.  I brought that.

14                   I brought images from some

15   of the TikTok challenges that were held at

16   some of the middle schools and the high

17   school.

18                   I brought just an example of

19   a PowerSchool entry.  For example,

20   vandalized bathroom within the west wing,

21   TikTok challenge was written and entered.

22                   Some of the board agendas

23   for some of the services that we get for,

24   like, example, CarePlus, you may have heard

25   that throughout testimony.  Some of the

CONFIDENTIAL

Page 22

1   partnerships for, you know, different

2   mental health consultant services.  And

3   that was just the board agenda to get those

4   things approved, originally versus now.

5          Q.      What I think may be a good

6   way to cover this is, can we mark this

7   binder as an exhibit to today's deposition

8   as the materials that Dr. Vauss brought

9   with her?

10                 MR. INNES:  Yeah, absolutely.

11              If Dr. Vauss is done answering your

12              question, but, yeah, we can

13              absolutely mark it.

14   BY MR. KARP:

15          Q.      Fair to say you reviewed the

16   materials in this binder and brought them

17   with you today?

18          A.      Yes, that's fair.

19          Q.      Okay.

20          A.      Do you want me to continue to

21   go through them?

22          Q.      I think we may go through

23   ourselves --

24          A.      Okay.

25          Q.      -- later in the deposition,

Page 23

1  but I figure we can mark this for now

2  and --

3          A.      Okay.

4          Q.      -- discuss it?

5          A.      Okay.  All right.  I just

6  spent a lot of time to get this together, I

7  wanted to go through it.  Okay.  All right.

8  Okay.

9          Q.      Thank you.

10          A.      All right.

11          Q.      So we will mark the binder of

12  materials that Dr. Vauss brought with her

13  to today's deposition as Exhibit 2.  And I

14  do not have an electronic copy of this,

15  but --

16                  MR. INNES:  Nor do I, so we'll

17          work on doing that.

18                  MR. KARP:  Is there a copy

19          that I can see and look at on a

20          break?

21                  MR. INNES:  Yeah, I mean, you

22          can look at the binder during a

23          break.

24                  MR. KARP:  You don't have to

25          pass it to me right now, but --

CONFIDENTIAL

Page 24

1           MR. INNES:  I'll actually have
2       you do it on the record.
3           MR. KARP:  Is there a copy
4       that is available for me to review?
5           MR. INNES:  There is this
6       copy, yeah.
7           MR. KARP:  That's the only
8       copy you brought with you today?
9           MR. INNES:  This is the only
10      copy, yeah.  There's also, we, I
11      mean, for the sake of completeness,
12      Dr. Vauss, is this, I think there's
13      a pile of documents next to you?
14          THE WITNESS:  Yes.  Yes.
15          MR. KARP:  And I can ask the
16      questions to make sure that all of
17      this gets accounted for in the
18      record.
19          So Exhibit 2 will be the
20      binder that Dr. Vauss brought
21      with her to today's deposition.
22          Dr. Vauss, is it accurate
23      that you brought other materials
24      with you to today's deposition?
25          THE WITNESS:  Yes.

CONFIDENTIAL

Page 25

```
 1                - - - - -
 2              (Binder of Documents  marked
 3          Vauss Exhibit 2 for
 4          identification.)
 5                - - - - -
 6   BY MR. KARP:
 7          Q.     And are those also materials
 8   that you reviewed in preparation for
 9   today's deposition?
10          A.     Yes.
11          Q.     If we -- if we take the
12   documents in the binder and all of the
13   other documents you brought with you today,
14   is that the full universe of documents that
15   you looked at to prepare for today's
16   deposition?
17              MR. INNES:  Objection to form.
18              THE WITNESS:  Yes.  I would
19          like to go through it just so that
20          I can make sure that when you
21          review it that you see, you know
22          why I put this in here.  I think
23          that's kind of important to this
24          process.
25
```

CONFIDENTIAL

Page 26

1    BY MR. KARP:

2          Q.      And, sorry, I think as I ask

3    questions, if there are materials that are

4    pertinent to you that -- and to the answers

5    you're providing --

6          A.      Yes, uh-huh.

7          Q.      -- you can absolutely direct

8    me to the tabs for the specific documents

9    in your binder as we go.

10         A.      Okay.

11         Q.      And I appreciate the offer to

12   do that.

13         A.      Okay.  Okay.

14         Q.      So what -- what other

15   materials did you bring with you to today's

16   deposition, meaning outside of the binder?

17         A.      Me and my binder.  No, I

18   just -- I just, I brought a copy of

19   graduation rates as well, because I believe

20   that was a question that came up.

21               And also one of the things

22   that in preparation, I spoke with our dean,

23   one of our deans at the -- at the high

24   school and I think I mentioned him on

25   the --

CONFIDENTIAL

Page 27

1          Q.      Did you say Dean Bryant
2    before?
3          A.      Dean Bryant.
4          Q.      That was the individual you
5    met with?
6          A.      Yes, Dean Bryant about, we
7    have a total of five deans at the high
8    school.  He is the most senior of the
9    deans, meaning he's been in the district, I
10   believe, since 2010 and just, you know, I
11   wanted to know how much of his time did he
12   spend with social media when he first came
13   versus now.
14                 And he said it probably
15   started around 2015, actually, I think
16   that's his start date, I correct myself, he
17   started around 2015 and he, at that time,
18   spent around 85 percent of his time on
19   dealing with social, things related to
20   social media as far as discipline.  And,
21   you know, when he said that and then I
22   asked him, I said, well, how much of your
23   time do you spend now?  And he said
24   60 percent of his time, but there are five
25   deans.  So the math person that I am, I was

CONFIDENTIAL

Page 28

1  like let me figure out, you know, how much

2  time is that and so I came up with that.

3  So I brought that as well.

4        Q.     So you took notes during your

5  conversation with Dean Bryant?

6        A.     Well, I listened to what he

7  said about the amount of time that he spent

8  and so I did take the note of him spending

9  85 percent of his time and I said, wow,

10  okay, so how much do you spend now?  And he

11  said around 60 percent.  And I said, you

12  spend 60 percent of your time and you have

13  five people now, five other -- or a total

14  of five, so four other people, and he said

15  that is correct.  And I said that seems

16  like still an awful lot amount of time, and

17  so I left it there, because, I just my math

18  brain was -- just started to go and so I

19  spoke with Dr. A and I said, and I gave him

20  the specs and we sat down and figured out,

21  like, what would that be, how much time

22  would that be, if someone spent 85 percent

23  for this one set of time versus, you know,

24  let's say if he spent between 2015 to 2020,

25  85 percent of his time when it was only

CONFIDENTIAL

Page 29

1  him.  And then for the last four years,

2  there has been five, and he still spends

3  60 percent.

4        Q.    Thank you.  And I appreciate

5  all of that information.  My question was

6  just simply if you had taken notes during

7  the conversation.

8              So fair to say you took

9  notes from your conversation, based on your

10 conversation with Dean Bryant, maybe some

11 of the other deans, and you brought those

12 notes with you to today's deposition?

13       A.    I didn't meet with any of the

14 other deans.

15       Q.    Oh, okay.  In addition to the

16 graduation rates, the notes that you were

17 just discussing and the contents of the

18 binder, did you bring anything else with

19 you to today's deposition?

20       A.    Oh, no, I'm sorry, no, I did

21 not.

22              MR. INNES:  Just so the record

23         is clear, I do think there is --

24         did you bring that or is that from

25         the reporter?

CONFIDENTIAL

Page 30

1             THE WITNESS:  Oh, no, this is
2        the court reporter.
3             MR. INNES:  That stack there.
4             THE WITNESS:  This right here?
5             MR. INNES:  Yeah.
6             THE WITNESS:  This is mine,
7        yes, this is mine.
8             MR. INNES:  So we should
9        probably --
10             THE WITNESS:  Yes.
11             MR. KARP:  So you brought
12        something else?
13             THE WITNESS:  I mentioned this
14        first.
15             MR. INNES:  We did, I'm sorry.
16             THE WITNESS:  Yeah, I did
17        mention this.
18   BY MR. KARP:
19        Q.    I'm sorry, I missed that.
20   What was that?
21        A.    This is the Comprehensive
22   Financial Annual Report.  I think I
23   mentioned this first before I went to my
24   binder.
25        Q.    Is there a year on that?

CONFIDENTIAL

Page 31

1        A.      I brought 2016 through 2023.

2        Q.      And did you review all of

3   those in preparation for today's

4   deposition?

5        A.      Yes, I would say I reviewed

6   them again, but this is something that I

7   have to look at every year even though I

8   don't create it, but as you know, we have

9   to do it, yes.

10       Q.      I understand.  We will mark

11   the graduation rates as Exhibit 3.

12                   - - - - -

13              (Graduation Rates marked

14         Vauss Exhibit 3 for

15         identification.)

16                   - - - - -

17              MR. INNES:  We will mark

18         Dr. Vauss's notes relating to her

19         conversations with dean --

20         conversation with Dean Bryant as

21         Exhibit 4.

22                   - - - - -

23              (Notes from conversation

24         with Dean Bryant marked Vauss

25         Exhibit 4 for identification.)

CONFIDENTIAL

Page 32

1              - - - - -

2              MR. KARP:  And we will mark

3         collectively the Comprehensive

4         Annual Financial Reports from 2016

5         through 2023 as Exhibit 5.  And I

6         will ask that counsel for the

7         district provide electronic copies

8         to the court reporter to the extent

9         that we do not have those, you

10         know, available to us right now at

11         this deposition.

12              - - - - -

13         (Comprehensive Annual

14         Financial Reports from 2016

15         through 2023 marked Vauss Exhibit

16         5 for identification.)

17              - - - - -

18   BY MR. KARP:

19         Q.    If we account for Exhibit 2

20   being the binder, the graduation rates,

21   Exhibit 3, the notes, Exhibit 4, and the

22   financial reports that you were just

23   discussing, Exhibit 5, is that the full

24   universe of documents that you reviewed in

25   preparation for today's deposition?

CONFIDENTIAL

Page 33

1          A.      Yes.

2          Q.      Okay.   Thank you.   Did you

3    take it upon yourself to pull these

4    documents and review them?

5          A.      Yes.

6          Q.      You had them in your

7    possession already, the documents that you

8    looked at to prepare for today's deposition

9    were already in your files?

10                  MR. INNES:   Okay.   I guess my

11              objection is vague, and I'll just

12              explain it.   When you refer to your

13              files, are we talking about

14              Dr. Vauss or are we talking about

15              the district?

16   BY MR. KARP:

17         Q.      That's fair.   Dr. Vauss, the

18   materials that you reviewed to prepare for

19   today's deposition, were they already in

20   your files, meaning Dr. Vauss's files?

21         A.      Yes, yes.

22         Q.      Did anyone assemble the

23   documents for you to review?

24         A.      Did anyone assemble them?

25   You mean put them in the binder for me?

CONFIDENTIAL

Page 34

1          Q.      Did anyone --

2          A.      I gathered the documents.

3          Q.      Did anyone organize the

4    documents for you for your review?

5          A.      No, I -- my secretaries put

6    the binder together, but I chose the

7    documents that were going in, if that's

8    what I believe you're asking me.

9          Q.      Thank you.

10          A.      You're welcome.

11          Q.      Other than the notes that

12    we've already talked about and marked as

13    Exhibit 4, did you take any notes in

14    preparation for today's deposition?

15          A.      No.

16          Q.      Dr. Vauss, was Irvington

17    Public School District approached by any

18    law firms that tried to make them aware of

19    litigation against social media companies?

20          A.      Can you explain what you mean

21    by, "approach"?

22          Q.      Was the district -- did the

23    district receive any emails from law firms

24    or other written communications from law

25    firms providing them information about

CONFIDENTIAL

Page 35

1   ongoing litigation that school districts

2   were having against social media companies?

3          A.    I believe counsel produced

4   something that was sent to an email, but as

5   I stated then, I am not aware of that law

6   firm or even -- I wasn't even aware of that

7   email.

8          Q.    And as a reminder today,

9   you're here testifying on behalf of the

10  district --

11         A.    Yes.

12         Q.    -- so my question is a little

13  bit different --

14         A.    Okay.

15         Q.    -- and not specific to what

16  Dr. Vauss --

17         A.    Okay.

18         Q.    -- personally --

19         A.    Okay.  I understand.

20         Q.    -- thought and knows.  Is the

21  district aware of emails or other written

22  communications it received informing them

23  of ongoing litigation that school districts

24  around the country were engaged in with

25  social media companies?

CONFIDENTIAL

Page 36

1           A.      To my knowledge, I don't
2    believe that the district is aware of
3    other, you know, law firms that are suing
4    social media platforms, not to my
5    knowledge.
6           Q.      Did Irvington Public Schools
7    discuss the decision to file this lawsuit
8    at any Board of Education meetings?
9           A.      No.
10           Q.      Does that include closed
11   sessions?
12           A.      I believe --
13                  MR. INNES:  Objection to form.
14           To the extent that counsel was
15           present at a closed session, I
16           direct you not to answer that
17           question.
18                  THE WITNESS:  Okay.  I can't
19           answer that.  I believe -- no.
20           Well, counsel was present, but also
21           those sessions are attorney-client
22           privileged.
23   BY MR. KARP:
24           Q.      Is a closed session -- strike
25   that.

Page 37

1               I asked before about Board
2    of Education meetings.
3          A.      Uh-huh.
4          Q.      A closed session meeting of
5    the Board of Education is still a meeting
6    of the Board of Education, correct?
7          A.      Yes.
8          Q.      It's just there's a
9    different -- the discussions that are had
10   during the closed session are not public;
11   is that correct?
12         A.      They're not public, but
13   they're also attorney-client privileged
14   until such time as it's deemed privilege is
15   no longer necessary and I'm not aware that
16   that is the case.
17         Q.      All closed session meetings
18   of the Board of Education are privileged?
19         A.      Yes.
20         Q.      Every closed session meeting.
21   Board of Education involves either seeking
22   or receiving legal advice?
23               MR. INNES:  Objection to form.
24         Calls for speculation.  To the
25         extent you understand the question,

CONFIDENTIAL

Page 38

1          you can answer.

2                    THE WITNESS:  Can you ask your

3          question again?

4    BY MR. KARP:

5          Q.      Sure.  My question was every

6    closed session meeting of the Board of

7    Education for Irvington Public Schools

8    involves either seeking or receiving legal

9    advice?

10                   MR. INNES:  Same objection.

11                   THE WITNESS:  Yeah, I would

12         say I can't answer that, because I

13         think that gets into an area where

14         it's not my expertise to make that

15         determination.

16   BY MR. KARP:

17         Q.      Are there lawyers present at

18   every closed session meeting of the Board

19   of Education for Irvington Public Schools?

20         A.      Yes.

21         Q.      And do those lawyers always

22   speak or contribute to the conversation?

23         A.      Yes.

24         Q.      When did Irvington Public

25   Schools first determine that social

CONFIDENTIAL

Page 39

1    media -- that Defendants' social media

2    platforms were harming the district?

3                    MR. INNES:  Objection to form.

4                    THE WITNESS:  I believe that

5              it is -- it's -- it was a continuum

6              of things.  When you say, when did

7              we make that determination and my

8              role is speaking for the entire

9              district, I think the timetable,

10             it's scattered.  It's different

11             points at which people probably

12             within the district, if it's the

13             entire entity, that people had that

14             feeling that it was harming the

15             scholars.

16    BY MR. KARP:

17         Q.     When did the district first

18    decide to file this lawsuit?

19                    MR. INNES:  Objection to form.

20             To the extent that that reveals

21             conversations with counsel, you

22             don't have to answer, but if you

23             can do so without referencing the

24             content of communications with

25             counsel, you can answer.

Page 40

1                THE WITNESS:  Well, any time
2          I'm given that, I'm going to say I
3          won't answer.
4    BY MR. KARP:
5          Q.    You're going to follow your
6    counsel's instruction?
7          A.    I'm going to follow my
8    counsel.
9          Q.    I'm simply asking for a date,
10   not the contents of any communications, to
11   be clear.
12               I'll ask again and feel free
13   to give the same instruction if you deem
14   that appropriate.  When did the district
15   first decide to file this lawsuit?
16               MR. INNES:  You can answer
17          that question, if you know.
18               THE WITNESS:  I'm not sure of
19          the exact date, of the exact date.
20   BY MR. KARP:
21         Q.    The district is not sure of
22   that exact date?
23         A.    The district is not sure of
24   the exact date.
25         Q.    What percentage of time do

CONFIDENTIAL

Page 41

1    IPS students spend on their cell phones?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  I would say

4            that -- well, let me get some

5            clarity on your question, if you

6            will.  When you say how much time

7            does our -- do IPS students spend

8            on their cell phones, do you mean

9            while in school or do you mean in

10           general?

11   BY MR. KARP:

12           Q.     I mean in general.

13           A.     I don't know.

14           Q.     And just to make sure we're

15   being clear here, when you say, "I don't

16   know," you mean the district does not know?

17           A.     Yes.  So I'll start answering

18   the district.  The district would not know

19   the entire amount of time that the scholars

20   are on their phone, but from the

21   conversations that I've had, that the

22   district has had with staff, I would say

23   that they spend anywhere from 12 to 20-some

24   hours on the phone, not, obviously, that's

25   not relegated only to the time that they're

CONFIDENTIAL

Page 42

1  in school, but for the 24-hour span, if

2  we're talking about a 24-hour span, then

3  the district would, from conversations with

4  staff, make the determination that they

5  spend the majority of their day on cell

6  phones.

7          Q.    The district's position is

8  that Irvington Public School students spend

9  between 12 and 20 hours on their cell

10 phones daily?

11         A.    I think that that would be a

12 safe number.

13         Q.    And what is the district

14 basing that on?

15         A.    The staff --

16              MR. INNES:  Asked and

17         answered.

18              THE WITNESS:  I'm sorry, the

19         information provided to the

20         district by the staff, by

21         administration, by teachers, by the

22         staff.

23 BY MR. KARP:

24         Q.    And what information is the

25 staff providing?

CONFIDENTIAL

Page 43

1          A.      They're saying that when they
2     speak to or when they're in class with
3     students, they are on their phones on
4     platforms nonstop.  They have to constantly
5     tell students to get off of their phones.
6     When they come in, they're on their phones.
7                     When, for example, the
8     attendance committee people meet with
9     scholars about their attendance, for
10    example, I remember Ms. Vasquez said that
11    she's asking them, why are you tardy, why
12    aren't you coming to school, they're, like,
13    I couldn't get up.  I didn't sleep.  Well,
14    what were you doing as to why you didn't
15    sleep, you know, or, you know, something
16    like that.  And it's because I was on my
17    phone.
18          Q.      Staff are reporting their
19    observations; is that right?
20          A.      Yes, thank you.
21          Q.      And have staff ever attempted
22    to quantify how much time students are
23    spending on their cell phones?
24                  MR. INNES:  Objection to form.
25                  THE WITNESS:  When you say,

CONFIDENTIAL

Page 44

1              have they -- have they tried to
2              quantify it, I don't -- I think if
3              maybe if they ask, but I think they
4              use verbiage, like they're on all
5              the time and I don't think that
6              really necessary quantifies it.
7    BY MR. KARP:
8          Q.     You said, "if asked," does
9    that mean that the district has not asked?
10         A.     I think when someone says
11   someone is on their phone all the time,
12   then the question lends itself to, well,
13   how often are they on and they're on their
14   phone all the time in class.
15         Q.     Do you have any data to
16   support the numbers 12 to 24 -- excuse me,
17   12 to 20 hours per day?
18         A.     No, no study, no data from a
19   study or anything.
20         Q.     No numbers, no statistics?
21         A.     No.
22         Q.     Just making sure we're on the
23   same page.
24         A.     Yes.  Yes.
25         Q.     And the answer is no, you

CONFIDENTIAL

Page 45

1    don't, the district doesn't have that?

2         A.    Uh-uh.

3         Q.    Does the district have the

4    ability to track how much time students

5    spend on their cell phones outside of

6    school?

7         A.    Do we have a means to track

8    that?  Not a means to track how long

9    they're on their cell phones, no.

10        Q.    Outside of school?

11        A.    Outside of school.

12        Q.    And the district doesn't do

13   that?

14        A.    No.

15        Q.    When does the IPS school day

16   start?

17        A.    It starts at 8:25 for

18   teaching staff at the middle school.

19   8:06 for the high school.

20        Q.    And is that also the same for

21   students?

22        A.    No, students start at 8:16 at

23   the high school and 8:30 at the middle

24   school.

25        Q.    And when do high school

CONFIDENTIAL

Page 46

1    students end their day, end their school

2    day?

3            A.      2:55, the students, 2:55.

4            Q.      So before 8:16 and after

5    2:55, does Irvington Public Schools have a

6    way of knowing how much time their students

7    are spending on their cell phones?

8            A.      No, other than the

9    conversations that they have with the

10   scholars, which just lends themselves to

11   asking them, you know, questions about, you

12   know, why, why aren't you -- why don't you

13   come -- if you don't come to school on

14   time, why aren't you here?  Why are you

15   always on your phone?  Why -- you know, are

16   you on your phones like this at, you know,

17   at home, but not a quantifiable number.

18           Q.      Rounding a little bit here,

19   Irvington Public School students at the

20   high school are roughly in school from

21   8:00 to 3:00?

22           A.      At the high school, yes, I

23   guess you can round it to that, yes,

24   uh-huh.

25           Q.      You're a math teacher, so

CONFIDENTIAL

Page 47

1    please keep me honest, but that's about a
2    seven-hour window?
3            A.      Uh-huh.
4            Q.      That means there are 17 other
5    hours in the day that Irvington Public
6    Schools does not track students' cell phone
7    usage; is that right?
8                    MR. INNES:  Objection to form.
9            Misstates prior testimony.
10                   THE WITNESS:  Can you ask your
11           question again?
12   BY MR. KARP:
13           Q.      For the other 17 hours in the
14   day when Irvington High School students are
15   not in school, the school, Irvington Public
16   Schools is not tracking how much time
17   they're spending on their cell phones; is
18   that right?
19           A.      Yes.
20           Q.      When Irvington Public School
21   students are at school, are they permitted
22   to have their cell phones out?
23           A.      Yes.
24           Q.      At what times?
25           A.      Oh, before class starts and

Page 48

1   during lunchtime.

2          Q.      After class as well or no?

3                  MR. INNES:  Objection to form.

4                  THE WITNESS:  When you say,

5             "after class," you mean in the

6             hallways or --

7   BY MR. KARP:

8          Q.      Once, once class, once the

9   school day is concluded.

10         A.      Oh, yes, after the school day

11  is concluded.

12         Q.      After school, thank you.

13         A.      If they're not involved in

14  any after-school activities.

15         Q.      Students at Irvington Public

16  Schools are not permitted to have their

17  cell phones out during class, correct?

18         A.      Yes.

19         Q.      They're supposed to be in

20  their bags or concealed in some way?

21         A.      Yes.

22                 MR. INNES:  Objection to form.

23                 THE WITNESS:  One thing I made

24            mention of before was the exception

25            if they use it for a calculator and

CONFIDENTIAL

Page 49

1          that was probably some years back.
2    BY MR. KARP:
3          Q.    Why are Irvington Public
4    Schools -- excuse me -- why do Irvington
5    Public Schools have the ability -- strike
6    that, bad question.
7                You said that Irvington
8    Public School students can use their cell
9    phones during their lunch periods?
10         A.    Yes.
11         Q.    Why?
12         A.    That's their break.
13         Q.    Could Irvington Public
14    Schools tell their students not to use
15    their cell phones during lunch?
16         A.    Could they, I imagine, yes,
17    uh-huh.
18         Q.    But that's not something that
19    the district has done, correct?
20         A.    No.
21         Q.    They haven't done that at all
22    in the last ten years?
23                MR. INNES:  Objection to form.
24                THE WITNESS:  No, we haven't.
25           We've -- we have not.

CONFIDENTIAL

Page 50

1   BY MR. KARP:

2          Q.      Does every student at

3   Irvington Public Schools have a cell phone?

4                    MR. INNES:  Objection to form.

5                    THE WITNESS:  I don't know.

6   BY MR. KARP:

7          Q.      Do you know -- you know, does

8   the district know what social media

9   accounts different students have?

10                   MR. INNES:  Objection to form.

11                   THE WITNESS:  So can you --

12           can you clarify when you say, do we

13           know what social media, like, well,

14           I'll just have you clarify.

15  BY MR. KARP:

16         Q.      Sure.  Why don't I back up a

17  little bit.  Does Irvington Public Schools

18  know one way or the other whether every

19  student at Irvington Public Schools has

20  social media?

21                   MR. INNES:  Objection to form.

22                   THE WITNESS:  No.

23  BY MR. KARP:

24         Q.      Does Irvington Public

25  Schools -- to the extent that students at

CONFIDENTIAL

Page 51

1    Irvington Public Schools do have social
2    media, does the district know specifically
3    which platforms those students use?
4          A.    So can you ask your question
5    again?
6          Q.    Sure.  Does the district --
7    does Irvington Public Schools know how many
8    of its students have Facebook accounts?
9          A.    No.
10          Q.    Does Irvington Public Schools
11    know how many of its students have
12    Instagram accounts?
13          A.    No.
14          Q.    Does Irvington Public Schools
15    know how many of its students have SnapChat
16    accounts?
17          A.    No.
18          Q.    Does Irvington Public Schools
19    know how many of its students have TikTok
20    accounts?
21          A.    No.
22          Q.    Does Irvington Public Schools
23    know how many of its students have YouTube
24    accounts?
25          A.    No.

CONFIDENTIAL

Page 52

```
 1          Q.      You gave the number or the
 2   range 12 to 20 hours before to approximate
 3   how much time Irvington Public School
 4   students spend on their cell phones each
 5   day --
 6          A.      Uh-huh.
 7          Q.      -- is that right?
 8          A.      Yes.
 9          Q.      How much of that time is
10   spent on social media specifically?
11          A.      For the 12 to 20 hours?
12          Q.      For the 12 to 20 hours that
13   the district believes students are on their
14   phones.
15          A.      I couldn't give an exact
16   amount, but I would say the majority of
17   that time.
18          Q.      Okay.  What's your basis for
19   that?
20          A.      Because when -- the staff
21   members I've spoken to and they complain
22   about the students being on social media
23   nonstop, they use their cell phones most of
24   the time to access social media and it's
25   rarely, if ever, are they on the phone
```

CONFIDENTIAL

Page 53

```
 1    talking, or maybe they talk to their
 2    parents, but most of the time, what has
 3    been observed is that they have been on
 4    social media platforms and that is the
 5    main -- that's the bulk of that time is
 6    where it's being spent.
 7         Q.    Does Irvington Public Schools
 8    know how much time their students spend
 9    playing video games on their cell phones?
10         A.    I don't know.
11         Q.    Does Irvington Public Schools
12    know how much time students -- their
13    students spend texting on their cell
14    phones?
15         A.    I don't know.  I do know, I,
16    you know, I do know that they don't text
17    singularly in a way that, for example,
18    although I'm speaking for Irvington Public
19    Schools, they don't text the same way that
20    Dr. Vauss may text, which is the normal, I
21    guess, antiquated way, but they text
22    through some of the social media platforms,
23    that's their way of texting.  DMing, going
24    on and, you know, making comments and
25    having conversations through those
```

CONFIDENTIAL

Page 54

1    platforms is something that I did learn
2    that I wasn't aware of.
3           Q.     Do Irvington Public Schools
4    use other -- other applications such as
5    WhatsApp to communicate?
6                    MR. INNES:  Objection to form.
7                    THE WITNESS:  Does Irvington
8           Public Schools, yes, I mean, as our
9           organization or do some of our
10          staff members?
11   BY MR. KARP:
12          Q.     And I left out a word from my
13   question, I apologize.
14          A.     Okay.
15          Q.     Do Irvington Public School
16   students use WhatsApp to communicate?
17          A.     That, I don't know.
18          Q.     Do Irvington Public Schools
19   use Signal as a means of communication?
20          A.     I don't know what Signal is.
21          Q.     Is the district aware of any
22   other messaging platforms other than those
23   that they've sued in this case that
24   students use to communicate?
25          A.     No.

Page 55

1          Q.      You said earlier that the
2    district's belief is that Irvington Public
3    School students spend the majority of their
4    12 to 20 hours that they're spending on
5    cell phones on social media.  Did I hear
6    you correctly?
7          A.      Yes.
8          Q.      Okay.  And is that -- does
9    the district know one way or the other
10   whether that is limited to Defendants'
11   social media platforms?
12         A.      I would say no.
13         Q.      Do Irvington Public School
14   students have Twitter accounts --
15               MR. INNES:  Objection to form.
16               MR. KARP:  -- or X accounts?
17               THE WITNESS:  I don't know.  I
18        don't know.
19   BY MR. KARP:
20         Q.      The district does know that
21   they have Defendants' platforms?
22         A.      I know that the staff members
23   I've spoken to have mentioned the
24   Defendants' platforms.  To the extent that
25   that time period is used for other things,

CONFIDENTIAL

Page 56

1    other platforms rather, I'm not aware.

2         Q.    Are you familiar with Roblox?

3         A.    What is it called?

4         Q.    Is the district familiar with

5    Roblox?

6         A.    Is that R-O-B-L-O-X?

7         Q.    Yes.

8         A.    The district, Dr. Vauss, the

9    district, I can say I am, I don't know to

10   the extent how it fits within the district.

11   I can't say yes for the district.

12        Q.    Does the district know how

13   much time its students spend using Roblox?

14        A.    No, I have no idea.

15        Q.    Other than observations and

16   reports that have been given by staff, does

17   the district have any other information to

18   know what students are doing on their cell

19   phones?

20        A.    Other than what the staff has

21   shared with us that has been around them,

22   no, not anything other than that.

23        Q.    That is what the district is

24   relying on to say that students spend

25   between 12 to 20 hours on their cell phones

Page 57

1    each day and the majority of that time is

2    spent on social media?

3           A.     So, my staff, they are with

4    the scholars for that seven-hour block that

5    you outlined.  They speak to them.  They

6    speak to them sometimes when they -- the

7    scholars won't speak to their parents.

8    They have conversations with the scholars,

9    because like myself, their interest is for

10   the students to achieve.  So the students

11   have formed and built relationships with

12   these staff members and they are pretty

13   much an open book with them in regards to

14   this.  I don't believe that the scholars

15   would make that up about the amount of time

16   that they're spending, because it doesn't

17   necessarily show them in the best of light.

18   They're trying to find, you know, causes

19   and solutions to their absenteeism or their

20   tardiness.

21           Q.     Have scholars told you,

22   Dr. Vauss, that they are using their cell

23   phones 12 to 20 hours per day?

24           A.     No.

25           Q.     Have scholars told the

CONFIDENTIAL

Page 58

1   district that they use their cell phones 12

2   to 20 hours per day?

3                    MR. INNES:  Objection to form.

4                    THE WITNESS:  So inasmuch as

5              when you say, "the district," you

6              mean everything and everyone within

7              the district, as you stated

8              earlier, then I would say -- I

9              would say they didn't say I spent

10             12 to 20 hours on my cell phone a

11             day.  I think that that -- and

12             maybe I misunderstood your earlier

13             question, but you wanted me to come

14             up with an approximation and so

15             when you say I come to school and

16             basically even if I'm, you know,

17             I'm sneaking, I'm on my phone

18             for -- in every one of my classes

19             all day, even at lunchtime.  Then I

20             go to my sports and I find some way

21             or whatever club I'm in to be on my

22             phone.  Then I go home, and instead

23             of doing my homework, I don't do my

24             homework, because I'm on my phone

25             on a platform, messing around, you

CONFIDENTIAL

Page 59

1          know, making a TikTok video or, you

2          know, or continuing, putting some

3          information about a fight that may

4          have been posted.  And then I go,

5          continue to be online when it's

6          time for me to go to bed.  Maybe my

7          parents think I'm in my room and

8          I'm asleep, but I'm on my phone and

9          I fall asleep with the phone in my

10          hand.  And then I just kind of wake

11          up whenever I wake up and then I'm

12          tardy and then the cycle begins all

13          over again.

14              So that's where I got that

15          12 to 20 hours.  So no one said I

16          spend 12 to 20 hours on my cell

17          phone a day, to my knowledge,

18          none of the students said that.

19  BY MR. KARP:

20      Q.     And this is every student at

21  Irvington Public Schools?

22      A.     No.

23      Q.     And the district is making or

24  reaching conclusions about the number of

25  hours purely based on reports from scholars

CONFIDENTIAL

Page 60

1    of -- strike that.

2                    How often do these

3    conversations with scholars happen --

4                    MR. INNES:  Objection to form.

5                    THE WITNESS:  I would say --

6    BY MR. KARP:

7         Q.      -- that ones that you

8    described?

9         A.      I would say as often as a

10   child or children come in tardy.  As often

11   as, you know, there may be some problems

12   with absences that, you know, that they may

13   be having those conversations.  As often as

14   a teacher has to stop instruction and, you

15   know, stop teaching to try to get the

16   attention of the scholars back on what's

17   happening.  And I could go on and on.  As

18   often as, you know, someone is videotaping

19   something as opposed to being engaged with

20   what's going on in the school.

21        Q.      Putting aside whether that

22   video ends up on social media, videotaping

23   at school is prohibited by IPS policy,

24   correct.

25                    A.      Yes.  When you say,

CONFIDENTIAL

Page 61

1    "videotaping," making a video?

2            Q.      There's a policy --

3            A.      Yeah, we have --

4            Q.      -- in the Irvington Public

5    Schools handbook that prohibits students

6    from taking videos on their cell phones; is

7    that right?

8            A.      There isn't a policy that

9    says that, but we have a policy that talks

10   about video imagery of students.  So if I'm

11   taking a video image, even though I may be

12   a student, if I'm taking an image of a

13   child and I don't have a signed permission

14   slip from the parent that said it was okay,

15   then, yes, that scholar is in violation of

16   that policy as well.

17           Q.      Does Irvington Public Schools

18   know how many text messages Irvington

19   public school students -- excuse me, strike

20   that.

21                   Does the district know how

22   many text messages an Irvington Public

23   School student sends each day?

24                   MR. INNES:  Objection to form.

25           Outside the scope.

CONFIDENTIAL

Page 62

1                    THE WITNESS:  No.

2    BY MR. KARP:

3         Q.    Does IPS know how many of its

4    students play video games on their cell

5    phones?

6                    MR. INNES:  Objection.

7            Outside the scope.

8                    THE WITNESS:  No.

9    BY MR. KARP:

10        Q.    Does IPS know whether

11   students -- or strike that.  Does IPS know

12   how many of their students have parental

13   controls enabled on their cell phones?

14        A.    No.

15        Q.    Does IPS -- to the extent

16   that IPS students use social media, does

17   the district know how many of those

18   students have some parental controls or

19   restrictions set on their social media

20   accounts?

21                   MR. INNES:  Objection.

22           Outside the scope.  Can you just as

23           a parliamentary matter, what topic

24           are you we on now?

25                   MR. KARP:  This is use and

CONFIDENTIAL

Page 63

1           impact, one and eight.

2                MR. INNES:  Okay.

3                I just want to make sure my

4           scope objections are right.  I

5           don't want to step on your toes.

6                MR. KARP:  Topic one is about

7           their use of cell phones and

8           electronic devices.

9                MR. INNES:  I'll allow you a

10          little leeway, but it doesn't talk

11          about text messages, right, it just

12          talks about cell phones.

13               MR. KARP:  Which is a way -- I

14          hear you.  Thank you, Michael.

15               MR. INNES:  And eight, and

16          just if -- you guys know the notice

17          better than I do, I'm hearing

18          questions about video games.  I'm

19          not sure that fits into any of the

20          topics or notice.

21               MR. KARP:  Thank you.  Your

22          objections are noted.

23               Dr. Vauss, my question was

24          whether the district knows, to

25          the extent that their students

CONFIDENTIAL

Page 64

```
 1            use social media, how many of
 2            those students have parental
 3            controls or some restrictions on
 4            their social media accounts?
 5                 THE WITNESS:  No.
 6                 MR. INNES:  Objection.
 7            Outside the scope.
 8                 THE WITNESS:  No.
 9  BY MR. KARP:
10       Q.    Does Irvington Public Schools
11  know whether their students have disabled
12  any features on their social media
13  accounts?
14                 MR. INNES:  Objection to
15            scope.
16                 THE WITNESS:  No.
17  BY MR. KARP:
18       Q.    Is it the district aware that
19  it's possible to disable comments and likes
20  and other features on social media
21  platforms?
22                 MR. INNES:  Objection to
23            scope.
24                 THE WITNESS:  No.
25
```

Page 65

1    BY MR. KARP:

2          Q.      That's not something the

3    district is aware of?

4          A.      That -- if we talk -- can you

5    ask your question again?

6          Q.      It's okay, no problem.  Is

7    the district aware that on some social

8    media platforms you can -- a user can

9    disable comments and likes?

10                   MR. INNES:  Objection to

11           scope.

12                   THE WITNESS:  Yes.

13   BY MR. KARP:

14         Q.      And is the district aware one

15   way or another of how many of its students

16   have disabled those features?

17         A.      No.

18                   MR. INNES:  Objection to

19           scope.

20                   THE WITNESS:  No, sorry.

21   BY MR. KARP:

22         Q.      Has IPS ever attempted to

23   study the prevalence of social media use by

24   its students?

25                   MR. INNES:  Objection to form.

CONFIDENTIAL

Page 66

1                          THE WITNESS:  No.

2    BY MR. KARP:

3              Q.     It has not conducted a study

4    or anything along those lines?

5              A.     No.

6                    MR. INNES:  Objection to form.

7                    THE WITNESS:  Oh.

8                    MR. KARP:  You can answer.

9                    THE WITNESS:  No.

10   BY MR. KARP:

11             Q.     Thank you.  Does IPS have any

12   data on how many of its students use social

13   media platforms other than Defendants'

14   platforms?

15             A.     No.

16             Q.     Is the district aware of any

17   study or analysis done on the impacts of

18   social media on the mental health of IPS

19   students?

20             A.     No.

21             Q.     Is the district aware of any

22   study or analysis that has been performed

23   on the impacts of social media on the

24   academic outcomes of IPS students?

25             A.     No.

Page 67

1                    MR. INNES:  Objection to form.
2    BY MR. KARP:
3         Q.    Is the district aware of any
4    study or analysis that has been performed
5    on the impacts of social media on IPS
6    student graduation rates?
7         A.    No.
8         Q.    Is the district aware of any
9    study or analysis that has been performed
10   on the impact of social media on IPS
11   student suspension rates?
12                   MR. INNES:  Objection to form.
13            Outside the scope.
14                   THE WITNESS:  No.
15   BY MR. KARP:
16        Q.    Has the district studied or
17   analyzed trends over time in the usage of
18   social media?
19                   MR. INNES:  Objection to form.
20            Outside the scope.
21                   THE WITNESS:  No.
22   BY MR. KARP:
23        Q.    Dr. Vauss, you testified as
24   the district that IPS staff spend some part
25   of their time addressing issues relating to

CONFIDENTIAL

Page 68

1    the impact of social media on their
2    students; is that right?
3                    MR. INNES:  Objection to form.
4                    THE WITNESS:  Yes.
5                    MR. INNES:  Misstates prior
6              testimony.
7    BY MR. KARP:
8          Q.      I'll rephrase that.
9    Dr. Vauss, as the district, you testified
10   that IPS staff spend some portion of their
11   time addressing issues relating to social
12   media --
13                   MR. INNES:  Same objection.
14                   MR. KARP:  -- is that correct?
15                   THE WITNESS:  Yes, uh-huh,
16            yes.
17   BY MR. KARP:
18         Q.      Approximately how much of
19   that time involves addressing posts that
20   IPS students make on social media -- on
21   Defendants' social media platforms?
22                   MR. INNES:  Objection to form,
23            vague.
24                   THE WITNESS:  Can you -- can
25            you rephrase or explain?

CONFIDENTIAL

Page 69

1    BY MR. KARP:

2          Q.      Sure.   The district is aware

3    there are many ways to use social media

4    platforms, right?

5          A.      Yes.

6          Q.      One thing that an IPS student

7    could do on a social media account is to

8    post a comment, a photograph, a video,

9    something like that, right?

10         A.      Yes.

11         Q.      How much time does the

12   district spend addressing social media

13   related issues that specifically involve

14   posts that its students are making?

15                 MR. INNES:  Objection to form.

16                 THE WITNESS:  So the actual

17           post, it spills out into other

18           areas and I would say as a

19           district, probably spend, if we,

20           you mean as an entire entity, I

21           would average anywhere, like, to

22           85 percent of the time is being

23           spent with social media-related

24           issues.  As far as the posts

25           themselves, I couldn't speak to

CONFIDENTIAL

Page 70

```
1              just the posts.  I would have to
2              speak to the posts, the liking, the
3              sharing, and the result of that
4              usage.  If I can ask for a pause, I
5              need to adjust my contacts.
6                   MR. KARP:  Of course.
7                   THE WITNESS:  I'm sorry.  I'm
8              struggling here.
9                   MR. KARP:  Not a problem.
10                  THE WITNESS:  I'm just going
11             to put my glasses on.
12                  MR. KARP:  Absolutely.  No
13             problem.
14                  THE VIDEOGRAPHER:  The time
15             right now is 10:13 a.m.  We're off
16             the record.
17                        - - - - -
18      (A recess was taken at this time.)
19                        - - - - -
20                  THE VIDEOGRAPHER:  The time
21             right now is 10:24 p.m. -- I'm
22             sorry, a.m.  We're back on the
23             record.
24                  MR. KARP:  Thank goodness it's
25             not p.m.
```

Page 71

1              THE VIDEOGRAPHER:   Right.
2    BY MR. KARP:
3         Q.      Welcome back, Dr. Vauss.
4         A.      Thank you.
5         Q.      We took a brief break so you
6    could change into your glasses.
7         A.      Yes.
8         Q.      They look great.
9         A.      Oh, thank you.
10        Q.      On the break, you have a
11   chance -- did you meet with your counsel at
12   all?
13        A.      I saw my counsel, yes.
14        Q.      Okay.  And did you speak with
15   him?
16        A.      Yes, I did.
17        Q.      Before the break, we were
18   talking about percentages of time that
19   people at IPS are spending on different
20   activities, fair?
21        A.      Yes.
22        Q.      Okay.  I was asking about how
23   much time was spent addressing posts and
24   you were giving me an explanation of
25   what -- what you knew to be the case for

Page 72

1    IPS.

2             A.      Yes.

3             Q.      Okay.  And I believe you

4    mentioned, and please correct me if I'm

5    wrong, that often what IPS staff are

6    addressing is posts that end up getting

7    likes and comments and then that might turn

8    into a fight or some in-person incident; is

9    that fair?

10            A.      Yes.

11            Q.      Okay.  How much time does IPS

12   staff spend or what percentage of IPS time

13   is spent dealing with that type of issue

14   relating to social media?

15                    MR. INNES:  Objection to form.

16                    THE WITNESS:  So we made a

17               declaration and it has a breakdown

18               of the amount of time that's being

19               spent, I guess some of it speak to

20               maybe things being posted.

21               Obviously, the outcomes, so, for

22               example, I'm just looking at, for

23               example, 80 percent, I would say

24               about 80 percent of the assistant

25               principal's time is being spent

Page 73

```
 1              dealing with what I described.  I
 2              would say the same for principals.
 3              Our school resource officers, they
 4              spend 100 percent of their time
 5              dealing with their issues.
 6              Something like security would spend
 7              about 30 percent.  I can go do the
 8              whole --
 9  BY MR. KARP:
10       Q.     And I appreciate that.  What
11  document are you looking at right now that
12  you have in front of you?
13       A.     A declaration that we
14  provided of a breakdown of the amount of
15  time --
16       Q.     And if you look at the front
17  of that document?
18       A.     -- and resources, our
19  resources.
20       Q.     Didn't mean to cut you off.
21       A.     I'm sorry, our resources that
22  we attribute to spending on social
23  media-related issues.
24       Q.     And if you look at the front
25  of that document, are those interrogatory
```

CONFIDENTIAL

Page 74

1  responses?

2          A.      No, I don't --

3          Q.      It would be in the title --

4          A.      Oh, yes, it is.  It is.

5          Q.      Okay.  I want to make sure

6  I'm understanding -- and we'll eventually

7  mark a copy of this document.  But I just

8  want to make -- before I do, I want to make

9  sure I'm understanding your testimony.

10         A.      Yes.

11         Q.      So you were just referring

12  to, I believe, it's Exhibit A to those

13  interrogatory responses that has a

14  breakdown of people's salaries?

15         A.      Yes, yes.

16         Q.      And the percentage --

17         A.      -- yes, of time.

18         Q.      And my question to you was --

19  well, strike that.

20               For clarity, let's just mark

21  the document now and then I can ask you

22  some questions.

23               MR. INNES:  So I think this

24          document was part of the binder

25          that was already marked, but we can

CONFIDENTIAL

Page 75

1              separately mark this one, if that's
2              your preference.
3                    MR. KARP:  Tab 47.
4                    THE EXHIBIT TECH:   47, thank
5              you.
6    BY MR. KARP:
7         Q.    Thank you.  We'll mark tab 47
8    as Exhibit 6.  Just to make sure we have
9    the same documents in front of us,
10   Dr. Vauss, do you mind turning back to the
11   cover page?
12        A.    Sure.
13        Q.    It says, "Plaintiff's Third
14   Amended Answers to Defendants'
15   Interrogatories to Irvington Public Schools
16   (Set 3)"?
17        A.    Yes.
18                    - - - - -
19             (Plaintiff's Third Amended
20        Answers to Defendants'
21        Interrogatories to Irvington
22        Public Schools (Set 3) marked
23        Vauss Exhibit 6 for
24        identification.)
25                    - - - - -

CONFIDENTIAL

Page 76

1    BY MR. KARP:

2           Q.      Under -- just a little bit

3    down on the page for date of service, it

4    indicates May 14, 2025?

5           A.      Yes.

6           Q.      These were served just two

7    days ago?

8           A.      Yes.

9           Q.      And you were just referring

10   to some of the information that was

11   provided on Exhibit A; is that right?

12          A.      Yes.

13          Q.      Exhibit A to this document?

14          A.      Yes, yes.  This document,

15   yes.

16          Q.      What is your understanding of

17   Exhibit A to this document?

18          A.      So this is a breakdown of the

19   percentage of time allocated to social

20   media and a breakdown of the financial cost

21   of that percentage.

22          Q.      I want to make sure I'm

23   reading the information here correctly.

24   The dollar amounts that are listed for each

25   year, do those correspond to salaries?

CONFIDENTIAL

1          A.      The total cost for -- so it
2     could be salary.  It could be benefits.
3     It's the accumulation of costs.
4          Q.      Let's use a specific example
5     just to make sure we're on the same page.
6     Do you see there's a line toward the top of
7     the page for chemistry.  That's actually a
8     bad example, because there's not a lot of
9     information there.  Let's say math.
10         A.      Uh-huh.
11         Q.      Do you see the line for math?
12    And I think we might be able to zoom in on
13    the screen a little bit.  Thank you, a
14    little bit.
15                 THE EXHIBIT TECH:  Yeah,
16             that's about as big as I'm going to
17             get.
18    BY MR. KARP:
19         Q.      Do you see the line for math?
20         A.      I do.
21         Q.      The first column that we get
22    to is a column for 2016?
23         A.      Yes.
24         Q.      Okay.  Does that correspond
25    to the 2016 calendar year or the 2016

CONFIDENTIAL

Page 78

1  school year for IPS?

2         A.      That is -- let's see.  That

3  is the 2016 school year.

4         Q.      Okay.  So does that

5  correspond to the 2016-2017 school year or

6  the 2015-2016 school year?

7         A.      Well, the way we do is

8  2016-2017, we do it as a block, so that

9  would be -- that would be the school year.

10  That would be the entire school year.

11         Q.      So the 2016 school year --

12  2016 is the starting point of the school

13  year, meaning it's the 2016-2017 school

14  year, correct.

15         A.      Yes.

16         Q.      To give you another example,

17  if I were to say the 2020 -- excuse me, the

18  2020 school year, that would mean the

19  school year that took place from 2020 to

20  2021?

21         A.      Or it could be 19-20.

22         Q.      And that's what I'm trying to

23  understand here.  So for 2016, is that

24  referring, as it's written here in the

25  exhibit, does that refer to the 2015 to

CONFIDENTIAL

Page 79

1    2016 school year at IPS or the 2016 to 2017
2    school year at IPS?
3           A.    Can I take a moment --
4           Q.    Of course.
5           A.    -- and look at.  I would say
6    that's the 2015-2016 -- well, let me
7    explain.  I believe the amount of money
8    that we spent for teachers for the calendar
9    year of 2016 and then 2017.  Not the
10   breakdown of -- because that could have
11   been, the breakdown would have started at
12   2015, but we start 2016 through 2024.
13   Okay.
14          Q.    Okay.  So is the 2016 here
15   referring to the 2016 calendar year, is
16   that what you're saying?
17          A.    The calendar year.
18          Q.    Okay.  So this would capture
19   the end of the -- or, like, the second half
20   of the 2015-2016 school year and the
21   beginning of the following year from 2016
22   to 2017; is that right?
23                I'll withdraw the question
24   and maybe direct your attention to the very
25   top of the page where there's a line for --

Page 80

1  for your compensation.

2             Do you see that?

3        A.    Yes.

4        Q.    It says, "Dr. A. Vauss,

5  April 2020 forward"?

6        A.    Uh-huh.

7        Q.    And if you look there, for

8  2020, the number $43,674.72 is listed?

9        A.    Uh-huh.

10       Q.    Does that reflect that you

11  became -- excuse me, you became

12  superintendent of Irvington Public Schools

13  in July of 2020, right?

14       A.    Uh-huh.

15       Q.    So does this reflect part of

16  your salary, a partial year's salary for

17  you?

18       A.    Yes.

19       Q.    Does that refresh your

20  recollection that the 2020, as it's being

21  used in that column, refers to the calendar

22  year 2020?

23       A.    Yes, it is calendar.

24       Q.    Okay.  So each column here

25  from 2016 to 2024 corresponds to a calendar

CONFIDENTIAL

Page 81

1    year.  Is that the district's

2    understanding?

3             A.      Yes.

4             Q.      Just to stick with that part

5    of the spreadsheet, since we're already

6    there, just above that salary or that

7    compensation I read out is a number, it's

8    0.50.

9                     Do you see that?

10            A.      Yes.

11            Q.      Does that represent

12   50 percent?

13            A.      Oh, yes, for mine, yes.  I'm

14   looking at the wrong line, yes.

15            Q.      And to make sure I'm

16   understanding this document correctly, that

17   is the weight percentage that the district

18   is attributing to the time it has spent and

19   the resources it has spent addressing what

20   it believes was caused by social media?

21            A.      The time that the

22   superintendent spends.

23            Q.      Correct.  So thank you for

24   clarifying.  In this specific example for

25   you, that 0.50 reflects how much of your

CONFIDENTIAL

Page 82

1    time, Dr. Vauss, was spent addressing

2    issues that the district believes was

3    caused by social media?

4          A.      Yes.

5          Q.      Okay.  And is that how we

6    would interpret this spreadsheet more

7    generally, that if there is a weight

8    percentage above some amount of

9    compensation, that is how much time the

10   district is attributing to social

11   media-related issues?

12         A.      Yes.

13         Q.      Okay.  Thank you for walking

14   through that with me.

15         A.      No problem.

16         Q.      Earlier, I was asking you

17   about -- about this very issue of how much

18   time or what percentage of time IPS staff

19   spend addressing issues that it attributes

20   to social media, correct?

21         A.      Uh-huh, yes.

22         Q.      And you pointed me to the

23   assistant principal and principals and I

24   believe HSSCs --

25         A.      As an example, yes.

CONFIDENTIAL

Page 83

1          Q.      -- as examples, yes.  And I
2    believe you testified -- well, let's --
3          A.      I think I mentioned school
4    resource officers.
5          Q.      Thank you.
6          A.      Yeah.  I think I kind of
7    was -- I think we stopped, you kind of
8    stopped me and we didn't go through the
9    whole thing, but that's okay.
10         Q.      Okay.
11         A.      It's your floor.
12         Q.      Let's go to the line for
13   assistant principals.  I believe that was
14   the first example you gave me.
15         A.      Yes.
16         Q.      So this is about halfway down
17   the page.
18         A.      Uh-huh.
19         Q.      So, in this example, the
20   weight percentage appears below the
21   compensation as opposed to above; is that
22   correct?
23         A.      Ask that question again,
24   please.
25         Q.      Just looking at the chart,

CONFIDENTIAL

Page 84

1    the weight percentage appears below --

2            A.      Oh, appears below, oh, yes.

3            Q.      -- as opposed to above --

4            A.      Yes.

5            Q.      -- which is what we saw for

6    your --

7            A.      Yes, that's correct.

8            Q.      And you said -- you pointed

9    me to 80 percent for assistant principals?

10           A.      Yes.

11           Q.      In your example?

12           A.      Yes.

13           Q.      So were you looking at the

14   2023 and 2024 columns when you gave me

15   those numbers?

16           A.      I looked actually at the last

17   one, but it was also 2023, yes.

18           Q.      Okay.  I want to stick

19   with -- I don't want to put words in your

20   mouth.  You were looking specifically at

21   the 2024 calendar year?

22           A.      In that particular moment, I

23   was.

24           Q.      Yes.

25           A.      But I'm speaking to the

Page 85

1    amount of time that they've spent and how

2    it has increased --

3           Q.      Okay.

4           A.      -- so.

5           Q.      So in 2023 and 2024,

6    80 percent of the time, just to make sure

7    I'm understanding your testimony from

8    before --

9           A.      Yes.

10          Q.      -- 80 percent of the time --

11   strike that.

12                  Assistant principals at IPS

13   in 2023 and 2024 spent 80 percent of their

14   time addressing issues involving students

15   who posted things to social media, those

16   things might have been liked, might have

17   been commented on, and that resulted in

18   fights or other in-person incidents

19   occurring at IPS; is that correct?

20                  MR. INNES:  Objection to form.

21                  THE WITNESS:  And shared.

22   BY MR. KARP:

23          Q.      And shared?

24          A.      Yes.

25          Q.      And that's what the

CONFIDENTIAL

Page 86

1   80 percent here signifies?

2          A.    The amount of time that

3   they've had to deal with things related to

4   social media.

5          Q.    Okay.  And I'm asking a

6   slightly different question and that is --

7          A.    Okay.

8          Q.    -- for the type of -- earlier

9   you told me that some of the incidents that

10  IPS staff have addressed have involved

11  posts to social media that are liked,

12  commented on, shared, and then they spill

13  into in person incidents.

14               Do you recall that?

15         A.    Yes.

16         Q.    Okay.  And I'm asking about

17  that in particular, those types of

18  occurrences.

19         A.    Uh-huh.

20         Q.    Do you understand?

21         A.    Yes, uh-huh.

22         Q.    Is the 80 percent here how

23  much time is spent addressing those

24  incidents?

25         A.    Yes.

Page 87

1                    MR. INNES:  Objection to form.

2                    THE WITNESS:  Oh, sorry.  Yes.

3    BY MR. KARP:

4          Q.     Yes, they are?

5          A.     Uh-huh.

6          Q.     You mentioned principals as

7    well?

8          A.     Yes.

9          Q.     If we look up a couple of

10   rows, they're also at 80 percent --

11         A.     Yes.

12         Q.     -- principals, according to

13   this exhibit that was provided by the

14   district, 80 percent of principal -- IPS

15   principal time has been spent addressing

16   social media-related issues involving posts

17   that were either liked, commented on, or

18   shared that resulted in some in-person

19   incident at school?

20                    MR. INNES:  Objection to form.

21                    THE WITNESS:  So just to give

22            you a broad -- when we say

23            incidents that happen at school,

24            whether there's a situation in a

25            class that a staff member is

CONFIDENTIAL

Page 88

```
1              complaining about, whether it's,
2              for example, a head custodian
3              calling a principal to see the
4              damage that may have been done as a
5              result of social media.  And
6              probably most frequently, posts
7              that have been put up and as a
8              result, it spills over into the
9              school and because people have
10             liked and shared it and it takes on
11             a life of its own and what is, what
12             is interesting is because, you
13             know, when I became a principal
14             versus being a principal now is
15             dramatically different.  Because
16             many of us know that usually
17             disciplinary matters are dealt with
18             by assistant principals.  But
19             because of the inundation of social
20             media into the realities of
21             schools, it's everyone.  Everyone
22             has to deal with it.  It's not, you
23             know, usually people think, hey,
24             you know, I get to become a
25             principal, I don't have to deal
```

Page 89

```
 1              with discipline as much.  I might
 2              have to deal with the heavy hitters
 3              or I have to deal with just parents
 4              who maybe don't like a consequence,
 5              but now everyone is spending an
 6              exorbitant amount of time and it's
 7              changing the framework of what it
 8              is, as educators, that they thought
 9              they were going to deal with, so
10              yes, 80 percent.
11  BY MR. KARP:
12          Q.      Thank you.  Your -- if I'm
13  understanding your point, there are a lot
14  of ways that various people at IPS in
15  various roles may need to get involved to
16  address some of these issues; is that what
17  you're saying?
18          A.      Well, I'm speaking
19  specifically about principals because you
20  pointed out the principals and APs, so
21  that's why I mentioned them.
22          Q.      Thank you for clarifying.
23          A.      You're welcome.
24          Q.      We've gone through two
25  examples for assistant principals and
```

CONFIDENTIAL

Page 90

```
1   principals.  There are a lot of other

2   people listed here.

3           A.      Uh-huh.

4           Q.      The way I've explained what

5   these weight percentages represent, is that

6   consistent across this -- across Exhibit A?

7                   MR. INNES:  Objection to form.

8                   THE WITNESS:  Consistent

9             meaning the same --

10  BY MR. KARP:

11          Q.      Meaning the same -- well,

12  I'll ask a different question?

13          A.      Yeah.

14          Q.      I'll ask a different

15  question, because I think I've confused you

16  a bit.

17          A.      I'm not confused.  It just

18  that I know that words matter and so, you

19  know, to say consistent means the same over

20  and over and over again and, you know,

21  that's not -- they don't always look the

22  same.

23          Q.      Throughout Exhibit A, the

24  district has given a weight percentage.

25          A.      Yes.
```

Page 91

1          Q.       And is it the district's
2    position that those weight percentages
3    reflect the amount of time that various
4    people in various roles at IPS have spent
5    addressing issues that have arisen as a
6    result of posting on social media likes,
7    comments, shares, and the in-person
8    incidents or effects that result?
9          A.       I would say that this
10   represents the effects of social media and
11   its effect taking away from the resources
12   and the primary roles of these various
13   employees.  They wouldn't all necessarily
14   fit into that category, but it would be
15   inclusive of that category as well.
16         Q.       Who would not fall into that
17   category that I just described?
18         A.       I wouldn't say that anyone
19   would not, but I would say that there are
20   other things that perhaps could be and I
21   wouldn't -- it wouldn't be a completely
22   accurate testimony for me to say only what
23   you're describing, Mr. Karp.
24         Q.       It's -- you used the word,
25   "inclusive," it's inclusive of what I was

CONFIDENTIAL

Page 92

1    describing?

2          A.      Yes.

3          Q.      Okay.   To the extent it's

4    included, is it the majority of the time,

5    what I described, is that the majority of

6    the time that these individuals are

7    spending addressing issues they believe are

8    related to social media?

9                  MR. INNES:   Object to form.

10                 THE WITNESS:   If I understand

11             you correctly, the percentages that

12             are here that they are dealing with

13             issues as it relates to social

14             media.

15   BY MR. KARP:

16         Q.      And, again, and I don't mean

17   to -- I just want to make sure I'm being

18   clear.

19         A.      Okay.

20         Q.      I'm asking specifically about

21   instances where something is posted to

22   social media, people like, comment, and

23   share, and/or share that post and that

24   results in a fight or some other incident

25   on -- at IPS?

CONFIDENTIAL

Page 93

1          A.      Okay.  So --
2                  MR. INNES:  Objection to form.
3          Misstates prior testimony.
4          Compound.  Vague.  And potentially
5          outside the scope.
6                  MR. KARP:  You can answer.
7                  THE WITNESS:  So let me give
8          you an example.  So we have -- we
9          had a second grade student who
10         posted a picture of herself on a
11         social media platform of her --
12         showing herself, her nude parts,
13         right?  It didn't result into a
14         fight, but it did result into an
15         investigation, right?  And the
16         concerning thing is that, yes, it
17         was shared.  I don't -- I don't
18         believe that the students liked it,
19         but they did share it.
20                 So we did have to then call
21         law enforcement who had to do a
22         report.  We had to make sure that
23         our staff understood that you
24         can't look at that, you know, all
25         of the things that go into a

CONFIDENTIAL

Page 94

1          child abuse type of case.  And

2          the young lady posted it on a

3          platform and shared it with

4          classmates and I didn't even

5          believe that she was old enough

6          to have one, but she was able to

7          form one of some kind.

8     BY MR. KARP:

9          Q.     Thank you, and that -- for

10    that example.  So some portion of the time

11    that IPS staff have spent addressing issues

12    they believe are -- that the district

13    believes relate to social media involves

14    addressing inappropriate pictures or videos

15    that are posted to social media?

16                MR. INNES:  Objection to form.

17                THE WITNESS:  Yes.

18    BY MR. KARP:

19          Q.     Yes.  Am I understanding your

20    point that there was no incident that --

21    in-person incident that resulted from that

22    second grader's post and that was a

23    distinction that you were making?

24          A.     Yes, that's what I was -- you

25    know, it didn't result into a fight so to

CONFIDENTIAL

Page 95

1    speak, it was dealt with in person at

2    school.

3            Q.     Let's look at the top part of

4    this chart, specifically the section

5    called, "Teachers."

6            A.     Uh-huh, yes.

7            Q.     It appears that elementary

8    school teachers are broken out separately;

9    is that right?

10           A.     Yes.

11           Q.     And the weight percentage for

12   2016 through 2024 for elementary school

13   teachers is 5 percent?

14           A.     Yes.

15           Q.     The -- below elementary is a

16   long list of other subject matter and

17   departments from art to math to phys. ed to

18   vocal music.

19                  Do you see that?

20           A.     Yes.

21           Q.     Okay.  Do these represent

22   teachers at the middle schools and high

23   schools?

24           A.     Yes.

25           Q.     What is the district's

CONFIDENTIAL

Page 96

1    basis -- strike that.

2                    The weight percentage

3    assigned for -- or that's indicated here,

4    rather, for middle school and high school

5    teacher ranges from 10 to 20 percent.

6                    Do you see that?

7            A.      Yes.

8            Q.      What's the district's basis

9    for the difference in weight percentage as

10   between elementary school teachers on the

11   one hand --

12           A.      Uh-huh.

13           Q.      -- at 5 percent and --

14           A.      Uh-huh, I'm sorry, yes.

15           Q.      -- and middle school and high

16   school teachers on the other hand at

17   between 10 and 20 percent?

18           A.      So when we look at K through

19   5, and the amount of time that is being

20   allocated for issues that pertain to social

21   media at the elementary level, it is about

22   5 percent and it's been steady.

23                   When we go from grades 6

24   through 12 and we look at the amount of

25   time that they have to deal with issues as

CONFIDENTIAL

Page 97

1    you described and, you know, inclusive of

2    the issues that you describe, it went from

3    on average 2016 all the way up to -- from

4    10 percent up to 20 percent.

5         Q.    Pre-K is listed under the

6    section for 10 to 20 percent.

7                   Do you see that about

8    halfway down?

9         A.    Yes.

10        Q.    I'm sorry, was that a yes?

11        A.    Yes.  Yes, sorry.

12        Q.    Do IPS -- do pre-K students

13   at IPS have social media accounts?

14        A.    Not to my knowledge.

15        Q.    Do pre-K students at IPS use

16   social media more than elementary school

17   students?

18        A.    No.

19        Q.    What's the district's basis

20   for including pre-K teachers with middle

21   school and high school teachers?

22        A.    Can I speak with my counsel,

23   please?  May I speak to my counsel?  Is

24   that okay?

25        Q.    If you don't know the

CONFIDENTIAL

Page 98

1   answer to the question -- yes, you may

2   speak with your counsel.  If you don't know

3   the answer, just so there isn't a question

4   pending on the break.  You can say you

5   don't know.

6                    THE WITNESS:  I don't know.

7                    MR. KARP:  Okay.  We can take

8            a break.

9                    THE VIDEOGRAPHER:  The time

10           right now is 10:57 a.m.  We are off

11           the record.

12                    - - - - -

13      (A recess was taken at this time.)

14                    - - - - -

15                    THE VIDEOGRAPHER:  The time

16           right now is 11:02 a.m.  We're back

17           on the record.

18                    MR. INNES:  Just real quick, I

19           just want to make a statement.  So

20           we did go off the record to discuss

21           the exhibit, which I don't know the

22           number --

23                    MR. KARP:  Six.

24                    MR. INNES:  Six.  We were

25           outside the room for less than --

Page 99

1          less than three minutes.

2                    MR. KARP:   Okay.

3                    THE WITNESS:   Okay.

4     BY MR. KARP:

5          Q.     Thank you.  Dr. Vauss, just

6     before the break, you asked if you could

7     speak --

8          A.     Yes.

9          Q.     -- with counsel and if you

10    could take a break?

11         A.     Yes.

12         Q.     Have you had a chance to do

13    that?

14         A.     Yes.

15         Q.     Is there something you wanted

16    to -- did you -- before the break I was

17    asking you about the pre-K entry on this

18    table?

19         A.     Yes.

20         Q.     Is there something you wanted

21    to tell me about that?

22         A.     Yes.  I'm embarrassed as a

23    teacher, specifically a math teacher that I

24    didn't see that.  The pre-K should have

25    gone under the same category as the

CONFIDENTIAL

Page 100

1   elementary.  If you note, there is a 5

2   percent below the master teacher, master

3   teacher, relief teacher, pre-K teacher

4   should go towards the top and the

5   attributable percentage would be 5 percent

6   for those as well.

7                THE VIDEOGRAPHER:  I'm sorry,

8          Mr. Karp, I'm having a technical

9          issue.  Could we go off?

10               MR. KARP:  Of course.

11               THE VIDEOGRAPHER:  The time

12         right now is 11:04 a.m.  We're off

13         the record.

14                      - - - - -

15      (Discussion was held off the record.)

16                      - - - - -

17               THE VIDEOGRAPHER:  The time

18         right now is 11:05 a.m.  We're back

19         on the record.

20  BY MR. KARP:

21        Q.     We took a brief break just to

22  address a technical issue, but we seem to

23  be back up and running again.

24               Just to make sure I heard

25  you correctly, Dr. Vauss, you were saying

Page 101

1    that the pre-K relief teacher and master
2    teacher should be moved to the section for
3    5 percent?
4          A.      Yes.
5          Q.      Along with elementary school
6    teachers?
7          A.      Yes.
8          Q.      Thank you.
9          A.      You're welcome.
10              MR. INNES:  And, obviously,
11         Andrew, we'll serve an amended
12         response.
13              MR. KARP:  Sure, we could sort
14         that out later.  Thank you.
15   BY MR. KARP:
16         Q.      Dr. Vauss, what is the
17   district relying on for the weight
18   percentages it has assigned for middle
19   school and high school teachers?
20         A.      This is based upon the amount
21   of time they've expressed, the
22   conversations that has been had, it's a
23   mixture of items that they come up with the
24   conclusion that it's this percentage of
25   time.

CONFIDENTIAL

Page 102

1          Q.      Has the district surveyed all
2    of the teachers whose compensation is
3    reflected in this exhibit?
4                    MR. INNES:  Objection to form.
5                    THE WITNESS:  Have we ever
6           surveyed them?
7    BY MR. KARP:
8          Q.      About this issue?
9          A.      Oh, about this issue, okay.
10   I don't believe we surveyed them about
11   this, so to speak.  We have given them a
12   survey.
13         Q.      Let's use social studies as
14   an example.
15         A.      Uh-huh.
16         Q.      This line refers to all
17   middle school and high school social
18   studies teachers?
19         A.      Yes.
20         Q.      In order to understand how
21   much time middle school and high school
22   social studies teachers at IPS spend
23   addressing issues they attribute to -- the
24   district attributes to social media --
25         A.      Yes.

CONFIDENTIAL

Page 103

```
1          Q.     -- did the district interview
2    each social studies teacher at IPS?
3                   MR. INNES:  Objection to form.
4                   THE WITNESS:  No, we didn't
5              interview every social studies
6              teacher.  I did interview one
7              social studies teacher and the
8              principal of the school and she is
9              someone who I consider a leader
10             amongst the teachers and she spoke
11             to the amount of time that from the
12             time the students come in there,
13             she's telling them to get off their
14             cell phones.  I asked her what do
15             you mean by being on the phone, so
16             to speak.  She said social media
17             platforms.  They're always trying
18             to post something so that they can,
19             I don't know, get attention.  We
20             didn't go into, really into the
21             causalities of it, but just the
22             nonstop, and from her vantage
23             point, she is not the only one that
24             has to deal with this.
25                  Speaking with my principals,
```

Page 104

```
 1            that is a constant, if we were
 2            would talk about a constant or
 3            something that happens
 4            consistently is telling students
 5            to get off of their cell phones
 6            and the platforms when they find
 7            out, when they look at, get off
 8            of that, get off of that site,
 9            get off of that.
10   BY MR. KARP:
11        Q.     Which principal -- which
12   middle school principal were you referring
13   to?
14        A.     I was speaking of
15   Mr. Bussacco.
16        Q.     Which school is he with?
17        A.     Oh, I'm sorry, University
18   Middle School.
19        Q.     Which social studies teacher
20   did you interview?
21        A.     Ms. Dove, Marsha Dove.
22        Q.     How many social studies
23   teachers are there -- approximately how
24   many social studies does IPS employee at
25   the middle school and high schools?
```

CONFIDENTIAL

Page 105

1                    MR. INNES:  Objection to form.
2          Outside the scope.
3                    THE WITNESS:  I'm not sure.
4    BY MR. KARP:
5          Q.    Can you give me a ballpark?
6                    MR. INNES:  Same objection.
7                    THE WITNESS:  I don't want to
8          guess.  So I shouldn't guess.
9    BY MR. KARP:
10         Q.    Do you know if it's more than
11   20?
12                   MR. INNES:  Same objection.
13                   THE WITNESS:  At the middle
14         school?
15   BY MR. KARP:
16         Q.    At the middle schools and
17   high schools at IPS.
18         A.    I don't want to guess.
19         Q.    The district lists, the line
20   here for social studies teachers relates to
21   or corresponds to the compensation paid to
22   all social studies teachers at IPS middle
23   schools and high schools, correct?
24         A.    Yes.
25         Q.    And my question is how many

Page 106

1  of those teachers exist?

2                    MR. INNES:  Objection.  Asked

3              and answered.

4                    THE WITNESS:  Yes, that's the

5              same answer.  I'm sorry, I don't

6              know the exact number right here.

7  BY MR. KARP:

8        Q.    I won't belabor the point, is

9  it more than ten social studies teachers?

10                   MR. INNES:  Objection to form.

11             Asked and answered.

12                   MR. KARP:  You can answer.

13                   THE WITNESS:  Yeah, I answered

14             that, I don't want to venture a

15             guess, but yes.

16  BY MR. KARP:

17        Q.    Did you interview any Spanish

18  teachers in connection with -- or let's

19  talk about Spanish teachers.  There's no

20  compensation listed for Spanish teachers

21  until 2024.

22                   Do you see that?

23        A.    Yes.

24        Q.    Is that because the district

25  didn't have Spanish teachers until 2024?

Page 107

1          A.      No, that's not correct.  We
2     had, we had Spanish teachers.
3          Q.      Okay.  But they weren't
4     spending any of their time addressing
5     issues relating to social media?
6          A.      They didn't -- it's not noted
7     here, so.
8          Q.      Why would Spanish teachers be
9     exempt from these issues that other
10    teachers at Irvington Public Schools
11    believe they're facing related to social
12    media?
13         A.      I couldn't venture a guess.
14         Q.      How did the district
15    determine that -- strike that.
16              What did the district do to
17    identify the weight percentage that should
18    be applied to Spanish teachers?
19         A.      Perhaps the complaints from
20    the classroom, I believe, maybe.  I
21    shouldn't be venturing a guess, but that's,
22    that's what -- or the conversation with
23    that particular teacher or teachers.
24         Q.      As the district, do you know
25    what was done to come up with the weight

Page 108

1    percentage applied to Spanish teachers?

2          A.      I don't know.

3          Q.      Let's talk about --

4          A.      As to the singular one, yes,

5    uh-huh.

6          Q.      It's a single Spanish

7    teacher?

8          A.      No, the singular --

9          Q.      Entry for 2024?

10         A.      Sale, yes, uh-huh.

11         Q.      Let's talk about world

12   language.  Did the district interview any

13   world language teachers to understand what

14   percentage of their time they attribute to

15   issues involving social media?

16         A.      We spoke -- we spoke to the

17   staff, yes.

18         Q.      You spoke to world language

19   teachers specifically?

20         A.      The administrators would have

21   spoken to them and based upon referrals,

22   based upon conversations, based upon

23   complaints, information, that's where they

24   would have come up with that figure.

25         Q.      Was every world language

CONFIDENTIAL

Page 109

1  teacher at IPS interviewed to come up with
2  the weight percentages that are reflected
3  in this table?
4      A.    I couldn't say that.  I
5  couldn't say yes or no to that.
6      Q.    Is it IPS's position that
7  every teacher has had the exact same
8  experience with social media in their
9  classrooms?
10     A.    I would not say that every
11 teacher has the same experience as anyone.
12     Q.    What percentage of the
13 district's time is spent addressing issues
14 related to fight pages on social media?
15            MR. INNES:  Objection to form.
16        I'm confused, you are asking about
17        the district?
18            MR. KARP:  I'm asking the
19        district their position on what
20        percentage of their time is spent
21        addressing fight pages on social
22        media.
23            THE WITNESS:  I don't think I
24        could quantify it.  It would be --
25        it's a large amount of time.  I

CONFIDENTIAL

Page 110

1          think it's safe to categorize
2          dealing with social media issues,
3          but dealing specifically with the
4          fights, it would be a large amount
5          of time.
6    BY MR. KARP:
7          Q.    By, "large amount of time,"
8    do you mean the majority of time or do you
9    mean something else?
10                  MR. INNES:  Objection to form.
11                  THE WITNESS:  Can you ask that
12          question one more time?
13   BY MR. KARP:
14         Q.    Sure.  I just want to
15   understand what you mean by, "large amount
16   of time --"
17         A.    Okay.
18         Q.    -- or get a better
19   understanding of that.
20         A.    Okay.
21         Q.    Do you mean it's the majority
22   of time that the district spends addressing
23   social media-related issues?
24         A.    If you -- if you pose the
25   question like that, I would say yes.

CONFIDENTIAL

Page 111

1          Q.      What percentage of time does
2    the district spend addressing inappropriate
3    photos or videos that are posted to social
4    media?
5                    MR. INNES:  Objection to form.
6                You're asking about at every level
7                and to come up with a blended
8                average for everything that's in
9                this chart?
10                    MR. KARP:  If you would like
11                to break it down by elementary
12                school, middle school, high school,
13                you're welcome to do that, but my
14                question stands.
15                    THE WITNESS:  Okay.  Can you
16                ask your question again?
17    BY MR. KARP:
18          Q.      Sure.  What percentage of
19    time does the district spend addressing
20    issues that it attributes to inappropriate
21    videos or images being posted to social
22    media?
23                    MR. INNES:  Same objection.
24                    THE WITNESS:  I would say a
25                fair amount is dealt with with

Page 112

1          posting.  A fair amount is being
2          spent with the sharing and the
3          liking.  The posting does not
4          necessarily become evident until it
5          is liked or shared.
6    BY MR. KARP:
7          Q.     If you include likes and
8    shares in my question, so the posting of
9    inappropriate content that may be liked or
10   shared or commented on, what percentage of
11   the district's time is spent addressing
12   issues it attributes to that type of social
13   media activity?
14                 MR. INNES:  Objection to form.
15                 THE WITNESS:  So I wouldn't
16          say that the district could answer
17          and break down that specific
18          category.  I think that it would be
19          responsible for the district to say
20          that it relates to social media and
21          the use of the platform in general
22          terms.  I don't think I can give a
23          responsible percentage out of the
24          percentage that we've already
25          given.

Page 113

1    BY MR. KARP:
2         Q.    Dr. Vauss, earlier we were
3    talking about the district's knowledge of
4    cell phone and social media use among IPS
5    students, do you recall?
6         A.    Yes.
7         Q.    You testified that you
8    approximated that IPS students spend
9    between 12 and 20 hours daily on their cell
10   phones, do you recall?
11        A.    Yes, I do.
12        Q.    You also testified that that
13   was based on reports and conversations that
14   the district has had with IPS staff,
15   correct?
16        A.    When you say, "reports," can
17   you please verify what you mean?
18        Q.    Conversations and
19   discussions --
20        A.    Oh, okay.
21        Q.    -- that they can have with
22   IPS students?
23        A.    Yes, that is correct.
24        Q.    Once the district realized or
25   believed that students were on their cell

CONFIDENTIAL

Page 114

1  phones for that amount of time, did they --
2  did the district have a town hall or group
3  meeting to discuss that as an issue?
4                    MR. INNES:  Objection to form.
5                    THE WITNESS:  No.
6  BY MR. KARP:
7        Q.    Did the district launch a
8  task force or has the district ever
9  launched a task force to address social
10 media usage among IPS students?
11       A.    No.  I think it's fair to say
12 that we are so bombarded with social media
13 and the effects of it that we're trying to
14 stay above water in trying to address these
15 things realtime.  It's, you know, I think
16 it's safe to say there isn't a day that
17 goes by that there's not something that
18 happens of a grand magnitude.
19                    You know, there's, you know,
20 been assemblies, I know Mr. Bussacco spoke
21 to me about his sixth grade assembly that
22 he had at the opening of the year where he
23 spoke to sixth graders and maybe some
24 parents were present, about the effects of
25 it and how it has affected the school day

Page 115

1    and how it, you know, it's not something
2    that's positive and yet, you know, the
3    students still continue to use it.
4         Q.     But the district hasn't had
5    a -- launched a task force to address this?
6         A.     Not -- no.
7         Q.     Sorry.  Let's switch gears a
8    little bit.  Dr. Vauss, last time we
9    spoke -- or strike that.
10              Dr. Vauss, you were
11   previously deposed in your individual
12   capacity as Dr. Vauss where you provided
13   testimony about what you knew personally,
14   do you recall?
15        A.     Yes.
16        Q.     At that deposition, we talked
17   a fair amount about an article that had
18   been written by New Jersey 101.5, do you
19   recall?
20        A.     Yes.
21        Q.     You were designated as the
22   corporate representative on topic 66, which
23   involves the New Jersey 101.5 article.  Are
24   you aware of that?
25        A.     Yes.

Page 116

1          Q.      Sitting here today as
2    Dr. Vauss personally, and individually, do
3    you stand by the testimony that you gave
4    last week?
5          A.      So I'm switching back do
6    Dr. Vauss?
7          Q.      Yes, just for this question.
8          A.      Just for this question.
9                  MR. INNES:  Objection to form.
10                  THE WITNESS:  Okay.  So can
11          you ask your question again,
12          please?
13   BY MR. KARP:
14          Q.      Sure.  Last week, you
15   provided testimony under oath regarding the
16   New Jersey 101.5 article.
17          A.      Yes, uh-huh.
18          Q.      And my question to you today
19   is simply do you stand by that testimony?
20                  MR. INNES:  Objection.
21          Outside the scope.  You can answer.
22                  THE WITNESS:  Okay.  Yes.
23   BY MR. KARP:
24          Q.      As the district now --
25          A.      Yes.

CONFIDENTIAL

Page 117

1          Q.      -- do you, have you done

2    anything else to prepare on this topic or

3    learn anything else about the 101.5

4    article?

5          A.      No, no.

6          Q.      Does the district disagree

7    with any of the testimony that was provided

8    by you in your individual capacity last

9    week?

10         A.      That's kind of confusing.

11   I'm a little confused.  So you wanted me to

12   answer as Dr. Vauss and now you want me to

13   answer does the district disagree with my

14   testimony?  What part of the district are

15   you referring to, if I may ask?

16         Q.      You are here on behalf -- and

17   it does get confusing because you're

18   wearing more than one hat?

19         A.      Yes, uh-huh.

20         Q.      You are appearing here as the

21   district --

22         A.      Yes.

23         Q.      -- as if the district were a

24   singular person, you know --

25         A.      Yes, yes.

Page 118

1          Q.      -- on certain topics.

2          A.      Yes.

3          Q.      And one of those topics is

4    topic 66 regarding the New Jersey 101.5

5    article.

6          A.      Uh-huh.

7          Q.      And my question to you is

8    simply whether the district has any basis

9    to disagree with the testimony that you,

10   Dr. Vauss, provided last week under oath?

11               MR. INNES:  Objection to form.

12          Counsel, to the extent that there's

13          particular testimony you would like

14          to direct the witness to that she

15          can read and consider, we would be

16          happy to do that.

17               MR. KARP:  You can answer.

18               THE WITNESS:  Okay.  So I'm so

19          sorry.  That was a lot of dialogue.

20          Can you repeat the question again?

21   BY MR. KARP:

22          Q.      Sure.  I'll ask it a little

23   bit differently.  Dr. Vauss, last week you

24   testified under oath about the New Jersey

25   101.5 article, do you recall?

CONFIDENTIAL

Page 119

1          A.       Yes.

2          Q.       Does the district have -- and

3    that testimony was based on your personal

4    knowledge, correct?

5          A.       Yes.

6          Q.       Does the district have any

7    additional knowledge relating to the New

8    Jersey 101.5 article?

9          A.       As to whether it is a correct

10   article?  That was the original part, was

11   it -- does everyone agree with -- does IPS

12   agree with my summation of the 101.5

13   article?

14         Q.       With the testimony that you

15   provided in response to my questions on the

16   101.5 article.

17               MR. INNES:  Objection to form.

18               THE WITNESS:  I would have to

19        say yes.

20   BY MR. KARP:

21         Q.       In preparation for topic 66,

22   to testify on topic 66 today, did you

23   review any documents or speak to any

24   individuals to prepare?

25         A.       Let me read that.

Page 120

1          Q.      Sure.

2          A.      So one thing that I know was,

3    a question was about signs that you saw

4    about don't drink the water.  I did look to

5    see when those signs originally came up

6    and -- and they came up in around 2005,

7    between 2005, I think, and 2007.

8                    And the signs were placed

9    around the district in areas like bathrooms

10   and sinks and our cosmetology department

11   to -- to make sure that people wouldn't

12   drink out of a wash basin as opposed to

13   drinking from a water fountain or one of

14   the filtered machines that we have.

15         Q.      And is that because it would

16   be unsafe to drink from those sources?

17         A.      No, because those sources

18   aren't meant for that purpose.  They're

19   meant to wash dishes, like, the one in the

20   back, in the back kitchen, they are to wash

21   someone's hair and to wash our hands after

22   you use the bathroom, that's in a bathroom,

23   where there are particles that are emitted

24   throughout the air in the bathrooms.  So we

25   don't want scholars or adults to drink

CONFIDENTIAL

Page 121

1    water out of a sink.

2          Q.     Have you personally been to

3    other bathrooms outside of IPS that have

4    had signs instructing people using the

5    bathroom not to drink the water?

6                    MR. INNES:  Objection.

7              Outside the scope.  Are you asking

8              if she has been to a bathroom

9              anywhere in the world?

10   BY MR. KARP:

11         Q.     I'm asking, outside of IPS,

12   have you seen signs in bathrooms telling

13   you not to drink the water?

14                   MR. INNES:  Objection to form.

15                   THE WITNESS:  I think you

16             asked, are there other places where

17             there were signs, I couldn't say.

18             There could have been.  There may

19             not have been.  I can't answer

20             that.  All I can speak to in right

21             now would be for Irvington.

22   BY MR. KARP:

23         Q.     And the reason that these

24   signs exist and that students are cautioned

25   not to drink the water is that the water

CONFIDENTIAL

```
                                      Page 122
 1   would not be safe to drink, correct?
 2          A.      No.
 3                  MR. INNES:  Objection to form.
 4                  THE WITNESS:  No.
 5   BY MR. KARP:
 6          Q.      You said it was not the
 7   purpose for the -- the intended purpose of
 8   that water was not for drinking, was that
 9   your testimony?
10          A.      That's what I said.
11          Q.      Because it would not be safe?
12          A.      No, no, because the basin,
13   there are all kinds of different types of
14   purposes for that and it's not drinking.
15   They're encouraged to drink from the water
16   fountains, which would have the same lines
17   and all of the things that go throughout
18   the building.  But, you know, the logic
19   behind that, I can't speak to, because I
20   wasn't the superintendent at the time the
21   signs were placed around.
22          Q.      You're here as the district,
23   correct?
24          A.      Yes.
25          Q.      And the district's testimony
```

CONFIDENTIAL

Page 123

1    is that these signs went up in 2005?

2            A.      Between 2005 and 2007.

3            Q.      So at least some of these

4    signs have been up for 20 years?

5            A.      I would say, yeah, if they

6    were exactly put up in 2005.

7            Q.      And when did you join

8    Irvington Public Schools?

9            A.      2004.

10           Q.      Other than reviewing

11   information regarding these signs, did you

12   do anything else to prepare for topic 66?

13           A.      No.  Because topic -- just

14   for my own understanding, can I read it out

15   loud?

16           Q.      You may.

17           A.      "The School District's

18   knowledge of complaints by Students or

19   Staff during the Relevant Time Period that

20   Schools are unsafe, including, but not

21   limited to, complaints regarding Irvington

22   High School during the 22-23 year, as

23   published on New Jersey 101 point" -- well,

24   1015, it says there, "dot com, and any

25   investigations by third-party entities in

CONFIDENTIAL

Page 124

1    response to such complaints, including, but
2    not limited to, the New Jersey Department
3    of Health or the Irvington Police
4    Department and the District's and our
5    Schools' response."
6                        So did I do anything after
7    last week's testimony, no, I did not do
8    anything else.
9            Q.      Also referenced in this topic
10   is investigations conducted by third
11   parties, including the New Jersey
12   Department of Health.
13                      Do you see that?
14           A.      Yes.
15           Q.      We -- last week when you were
16   deposed in your individual capacity, you --
17   we discussed at length some records from
18   the New Jersey Department of Health, do you
19   recall?
20           A.      Yes.
21           Q.      Okay.  Does the district have
22   any basis to disagree with the testimony
23   that you provided last week in your
24   individual capacity regarding the New
25   Jersey 101.5 article or the New Jersey

CONFIDENTIAL

Page 125

1    Department of Health records that we
2    discussed?
3                    MR. INNES:  Objection to the
4             form.  Objection to, it's vague,
5             it's ambiguous.  To the extent you
6             want to provide the witness with
7             the testimony and ask her questions
8             about that, you can do so.
9                    Dr. Vauss, you can answer
10            the question.
11                   THE WITNESS:  Does the
12            district agree with my testimony
13            from last week?
14    BY MR. KARP:
15        Q.     Correct.
16        A.     Yes.
17        Q.     Thank you.  And the
18    district -- other than the signs that you
19    just told me about and -- or strike that.
20                   Other than what we just
21    discussed with respect to the water signs,
22    the district doesn't have any knowledge
23    that is additional to the knowledge that
24    you had when you testified about the New
25    Jersey 101.5 article and New Jersey

CONFIDENTIAL

                                              Page 126

1    Department of Health records?

2                   MR. INNES:  Objection to form.

3                   MR. KARP:  You can answer.

4                   THE WITNESS:  Okay.  So does

5            the district, other than what I

6            testified last week, does that

7            testimony apply to the district as

8            well?

9    BY MR. KARP:

10           Q.     Yes.

11           A.     Yes.

12           Q.     Thank you.  Dr. Vauss, you're

13   the designated corporate representative on

14   topic nine, which is, "All preventative

15   and/or educational measures that the School

16   District has considered, proposed or

17   implemented to address the Alleged Harm,

18   including, but not limited to, the money

19   allocated and/or proposed to be allocated

20   to such preventative or educational

21   measures, including, but not limited to,

22   the use of cell phone pouches and

23   GoGuardian software."

24                   Do you see that?

25           A.     Yes.

CONFIDENTIAL

Page 127

1          Q.      What is GoGuardian?

2          A.      It is software that the

3    district uses to try to block usage on

4    sites that are not permissible.

5          Q.      When did the district

6    implement GoGuardian?

7          A.      We purchased GoGuardian in

8    December of 2020.

9          Q.      It was, did you say purchased

10   in December of 2020?

11         A.      I believe 2020.

12         Q.      And went into effect, the

13   district started using it in December of

14   2020 as well?

15         A.      I can't say exactly.  I know

16   that's when it was purchased.  But let me,

17   if you will, let me just check.  I'm not

18   sure of the date of implementation, but the

19   board approval of the document -- I mean of

20   the software was 2020.  December 2020.

21         Q.      And the district continues to

22   use GoGuardian today?

23         A.      Yes.

24         Q.      Does the district use any

25   other content filters or firewalls to -- on

CONFIDENTIAL

Page 128

1    the IPS network or on school-issued

2    devices?

3            A.      We have, I think that's our

4    primary one.  There are -- there is a

5    school type of filter before we had

6    GoGuardian that just tries to block usage

7    of sites that are not permissible.

8            Q.      Okay.  And what is the school

9    type of filter that you're referring to?

10           A.      I'm not sure what it's called

11   or if it's a particular site, but when you

12   have the school platform, Wi-Fi platform,

13   it just won't allow you to go on to certain

14   sites that are not -- there's a filter of

15   sites that may be, like, permissible and

16   certain sites are not, and so it blocked

17   it.  And that wasn't sufficient, that is

18   why we decided to go with GoGuardian.

19           Q.      Does the district use Palo

20   Alto?

21           A.      I'm not sure.

22           Q.      Is the district familiar with

23   Palo Alto?

24           A.      Dr. Vauss is not familiar

25   with Palo Alto.  Are there members of

CONFIDENTIAL

Page 129

```
 1   Irvington Public Schools who may be,
 2   probably, yes.
 3          Q.      Did you speak with them to
 4   prepare for this topic?
 5          A.      Not about Palo Alto.
 6          Q.      Other than GoGuardian, are
 7   you aware of any other content filters --
 8   or strike that.
 9                  Putting aside GoGuardian,
10   are you aware of any content filters or
11   firewalls that Irvington Public Schools has
12   used on its networks or on district-issued
13   devices?
14          A.      No, I am not.
15          Q.      Do you know one way or
16   another if the district has ever used
17   iboss?
18          A.      Can you --
19          Q.      I-B-O-S-S.
20          A.      Iboss, I am not familiar.
21          Q.      What did you do to prepare
22   for this topic?
23          A.      I spoke with Mr. Amberg about
24   the GoGuardian software.
25          Q.      What -- are social media
```

CONFIDENTIAL

Page 130

1  sites blocked by GoGuardian?

2         A.      I'm sorry.

3         Q.      Are social media sites

4  blocked by GoGuardian?

5         A.      They're supposed to be.

6         Q.      Does GoGuardian block

7  Facebook?

8         A.      It's supposed to.

9         Q.      And I'm not talking about

10 whether students can figure out ways around

11 GoGuardian.  I'm asking about the settings

12 and the way that IPS intends to use

13 GoGuardian, do you understand?

14        A.      Yes.

15        Q.      So is GoGuardian set to block

16 Facebook?

17        A.      I don't know that it's set

18 specifically to block Facebook, but the way

19 I believe that it operates is that things

20 that are offensive or not in keeping with

21 what sites we believe students should go

22 on, it blocks it.  So there may be times,

23 because the way filters work, sometimes

24 they can, it can be bypassed.  It's not a

25 perfect device to block any platform.

CONFIDENTIAL

```
                                    Page 131
 1          Q.      GoGuardian blocks categories
 2   of sites?
 3          A.      I'm not sure that that's the
 4   only way, but I believe that there may be
 5   categories, things that trigger, words that
 6   may trigger blockages.
 7          Q.      GoGuardian is set to -- to
 8   block content that the district chooses to
 9   block; is that right?
10          A.      I think it's safe to say it
11   attempts to block things that it would be
12   considered offensive or obscene or, you
13   know, like pornography, for example, it
14   would attempt to block that.  But if
15   certain words or things are used, it could
16   bypass the system.
17          Q.      GoGuardian makes the
18   determination of what gets blocked, not
19   IPS?
20                  MR. INNES:  Objection to form.
21                  THE WITNESS:  No, I believe
22          it's done by our tech department or
23          our tech director with his
24          oversight, let me say, every single
25          thing.
```

CONFIDENTIAL

                                        Page 132

1   BY MR. KARP:

2           Q.      So IPS has input into what

3   sites or what content is blocked by

4   GoGuardian?

5           A.      Yes.

6           Q.      And has the district used

7   GoGuardian to block Facebook?

8                   MR. INNES:  Objection to form.

9                   THE WITNESS:  I believe that

10          it has attempted to block it, yes.

11  BY MR. KARP:

12          Q.      For the entirety of the time

13  that the district has used GoGuardian?

14                  MR. INNES:  Objection to form.

15                  THE WITNESS:  Let me -- let me

16          clarify.  So there are -- I don't

17          think that -- I think that it goes

18          piece by piece and certain times

19          Facebook can be used.  Those are

20          some of the Facebook sites that

21          have been approved.  Certain

22          Instagram sites have been approved.

23          Something that would perhaps not be

24          approved at all would be like a

25          TikTok, that wouldn't be.

CONFIDENTIAL

Page 133

1                    YouTube, there would be
2              instances where YouTube would --
3              there would be a snippet of a
4              video or something that a teacher
5              may want to use and they get
6              permission to be able to use it.
7    BY MR. KARP:
8         Q.     So I appreciate that answer
9    and I think I'm more focused on the default
10   settings.  If I'm hearing you correctly,
11   there are instances when teachers or staff
12   can get permission for there to be limited
13   access for, like, a specific assignment or
14   video on one of these platforms; is that
15   what you're saying?
16        A.     Yes.
17        Q.     As a default, does IPS block
18   Facebook using GoGuardian?
19                   MR. INNES:  Objection to form.
20                   THE WITNESS:  Yes, it would be
21              an attempt to do that, yes.
22   BY MR. KARP:
23        Q.     As a default, does IPS block
24   Instagram using GoGuardian?
25                   MR. INNES:  Objection to form.

CONFIDENTIAL

```
 1                    THE WITNESS:  I believe, yes.
 2    BY MR. KARP:
 3          Q.     As a default, does IPS block
 4    TikTok using GoGuardian?
 5                    MR. INNES:  Objection to form.
 6                    THE WITNESS:  I believe so,
 7          yes.
 8    BY MR. KARP:
 9          Q.     As a default, does IPS use --
10    block SnapChat using GoGuardian?
11                    MR. INNES:  Objection to form.
12                    THE WITNESS:  I believe, I
13          believe so, yes.
14    BY MR. KARP:
15          Q.     And as a default, does IPS
16    block YouTube using GoGuardian?
17                    MR. INNES:  Objection to form.
18                    THE WITNESS:  I believe so,
19          yes.
20    BY MR. KARP:
21          Q.     I'm handing you tab 13 which
22    we'll mark as Exhibit 7.
23                    - - - - -
24                    (Letter Bates
25          BW__Irvington00463683 to 00463688
```

CONFIDENTIAL

Page 135

1          marked Vauss Exhibit 7 for

2          identification.)

3                    - - - - -

4    BY MR. KARP:

5          Q.      This is a letter from John

6    Amberg.

7               Do you see that?

8          A.      Yes.

9          Q.      Who is Mr. Amberg?

10         A.      He's our executive director

11   for technology.

12         Q.      Have you seen this letter

13   before?

14         A.      I'm sure I have, yes.

15         Q.      Mr. Amberg wrote, the

16   technology -- on the first page.

17         A.      Yes, uh-huh.

18         Q.      Mr. Amberg wrote, "The

19   technology department is constantly working

20   to improve the safety and security of our

21   district infrastructure."

22              Do you see that?

23         A.      Yes.

24         Q.      Is that accurate?

25         A.      Is it accurate that he's

CONFIDENTIAL

Page 136

1  working to improve the safety, yes.

2          Q.      Yes.

3          A.      And the security of our

4  district, yes.

5          Q.      I'll ask a different

6  question.  Is that true?

7          A.      That is true.

8          Q.      The next paragraph reads,

9  "The district purchased GoGuardian as a way

10  to allow teachers more flexibility in the

11  web filtration.  GoGuardian (scenes)

12  provides teachers the ability to control

13  what websites their students can visit and

14  for how long they can stay on."

15                  Do you see that?

16          A.      Yes.  Uh-huh.

17          Q.      "This year, we have noticed

18  an uptick in cybersecurity threats and that

19  teachers are not maximizing the usage of

20  GoGuardian Scenes."

21                  Do you see that?

22          A.      Yes.

23          Q.      "This is an issue, since this

24  is the best way to prevent a multitude of

25  issues with student engagement and

CONFIDENTIAL

Page 137

1   cybersecurity."

2                   Do you see that?

3        A.     Yes.

4        Q.     Okay.  One benefit when using

5   GoGuardian is to address cybersecurity

6   issues, correct?

7        A.     Uh-huh, yes.

8        Q.     Mr. Amberg wrote that

9   GoGuardian is the best way to address

10  issues of student engagement and

11  cybersecurity, correct?

12       A.     Yes.

13       Q.     Do you know what Mr. Amberg

14  meant when he said that teachers were not

15  maximizing the usage of GoGuardian Scenes?

16       A.     That they weren't using it as

17  often as they could.

18       Q.     Is it true that the

19  technology department is -- well, strike

20  that.

21                 The next paragraph reads,

22  "Unfortunately, the technology department

23  is in a constant cat and mouse battle with

24  hackers, proxy servers, fake school sites,

25  and VPNs."

CONFIDENTIAL

Page 138

1              Do you see that?

2        A.     Yes.

3        Q.     Is that true?

4        A.     To the best of my knowledge,

5   yes, at this time.

6        Q.     Is it still true today?

7        A.     That we're constantly in a

8   cat and mouse battle with hackers, if he

9   says so, then yes.

10       Q.     And GoGuardian is a way that

11  the district tries to keep -- or strike

12  that.

13              The district uses GoGuardian

14  to protect the district from hackers and

15  other cybersecurity threats, right?

16              MR. INNES:  Objection to form.

17              THE WITNESS:  To the degree it

18       can, yes, uh-huh.

19  BY MR. KARP:

20       Q.     The letter goes on to say --

21  strike that.  Just give me one second.

22              Let's turn to page with

23  Bates ending in 684 in the bottom right

24  corner.

25       A.     684, yes.

Page 139

1          Q.      And there Mr. Amberg wrote,
2     "To make matters worse, some of our
3     students are dabbling in the dark web,
4     copying and pasting scripts, using sites
5     and portals to access the unrestricted
6     net."
7                    Do you see that?
8          A.      Yes.
9          Q.      Okay.  Is that true?
10         A.      That was true at this time,
11    I'm sure, yes.
12         Q.      Okay.  He goes on to say
13    that, "Many of these sites have co-opted
14    Google Drive and Sites to mimic the Google
15    Classroom environment while offering access
16    to hacking tools, illegal movies and VPN
17    servers."
18                    Do you see that?
19         A.      Yes.
20         Q.      Students at IPS were
21    downloading movies illegally?
22                    MR. INNES:  Objection.
23          Assumes facts not in evidence.
24                    MR. KARP:  You can answer.
25                    THE WITNESS:  Oh.  Yes, that's

Page 140

1              what he's saying.
2     BY MR. KARP:
3          Q.      Okay.  And that's something
4     the district believes to be true?
5          A.      Yes, if he is stating it at
6     this time, yes, uh-huh.
7          Q.      He goes on to write, "Last
8     year students copied and pasted JavaScripts
9     to complete i-Ready and other apps.  This
10    year complete movies were downloaded in the
11    district triggering a copyright
12    infringement inquiry."
13                 Do you see that?
14         A.      Yes.
15                 MR. INNES:  Objection,
16            misstates the document.
17    BY MR. KARP:
18         Q.      Did I read that correctly?
19                 MR. INNES:  You did not.
20    BY MR. KARP:
21         Q.      Okay.  Sorry.  I'll try it
22    again.  "Last year, students copied and
23    pasted JavaScripts to complete i-Ready and
24    other apps.  This year complete movies were
25    downloaded in the district triggering a

CONFIDENTIAL

Page 141

1    copyright infringement query."

2                   Do you see that?

3          A.     Yes, I see that.

4          Q.     And I read it correctly that

5    time?

6          A.     Yes, you did.

7          Q.     Thank you.  The district had

8    to divert resources to address that

9    copyright infringement query?

10         A.     Yes.

11         Q.     Mr. Amberg wrote about

12   students dabbling in the dark web.

13                  Do you see that?

14         A.     Yes, uh-huh, which are we

15   referring back to the sentence before or

16   where are you?

17         Q.     We're at the very top of the

18   paragraph.

19         A.     Yes, yes, okay.  Never mind.

20         Q.     He wrote, "to make matters

21   worse some of our students are dabbling in

22   the dark web"?

23         A.     Uh-huh.

24         Q.     Are Defendants' social media

25   platforms part of the dark web?

CONFIDENTIAL

                                        Page 142

1              MR. INNES:  Objection to form.
2          Outside the scope.  You can answer
3          in your personal capacity, if you
4          know.
5              THE WITNESS:  I don't believe
6          the dark web is those social media
7          platforms that we've been
8          discussing.
9    BY MR. KARP:
10        Q.    Let's turn the page to 685.
11   Mr. Amberg wrote, "There are things we can
12   do as a district.  First, please be aware
13   that Classroom Management is the best first
14   line of defense.  Teachers must monitor
15   their students."
16              Do you see that?
17        A.    Yes.
18        Q.    Toward the bottom of the
19   paragraph, Mr. Amberg wrote, "As for our
20   students we are watching them playing
21   games, enjoying full length movies and
22   visiting problematic sites, including
23   Russian gaming sites."
24              Do you see that?
25        A.    Uh-huh, yes.

Page 143

1        Q.    Is that true?

2        A.    That's true that that's what
3    that sentence says.  I'm not sure when he
4    says, "we are watching them playing games,"
5    is he -- is that what you're talking about,
6    we are watching them play games, enjoying
7    full length movies, and visiting
8    problematic sites, including Russian gaming
9    sites.  Can you rephrase your question?

10       Q.    Sure.  Mr. Amberg reported in
11   this letter that students were playing
12   games, enjoying full length movies and
13   visiting problematic sites, including
14   Russian gaming sites.

15                Do you see that?

16       A.    Yes.

17       Q.    Is it true that IPS students
18   were playing games at school?

19       A.    It is true that I believe
20   that he is correct that that has been done,
21   but I wouldn't say that -- that that speaks
22   for all of our teachers are just watching
23   students play games and full length movies,
24   completing a full-length movie and all of
25   that and not intervening.

CONFIDENTIAL

Page 144

1          Q.      My question was simply if IPS
2     students are engaging in these activities.
3     So just to clarify --
4          A.      Yes, yes.
5          Q.      So are IPS students playing
6     games at school?
7                     MR. INNES:  Objection.
8               Outside the scope.
9                     THE WITNESS:  I would say,
10              according to Mr. Amberg, there are
11              students who are playing games,
12              yes.
13    BY MR. KARP:
14         Q.      Does the district have a
15    reason to doubt that Mr. Amberg is telling
16    the truth in this letter?
17                    MR. INNES:  Objection.
18              Outside the scope.
19                    THE WITNESS:  No.
20    BY MR. KARP:
21         Q.      Is it true that IPS students
22    were enjoying full-length movies and
23    visiting problematic sites?
24                    MR. INNES:  Objection.
25              Outside the scope.

CONFIDENTIAL

Page 145

1              THE WITNESS:  According to Mr.

2         Amberg, yes.

3    BY MR. KARP:

4         Q.    They were visiting Russian

5    gaming sites, correct?

6              MR. INNES:  Objection.

7         Outside the scope.

8              THE WITNESS:  According to Mr.

9         Amberg, yes.

10   BY MR. KARP:

11        Q.    GoGuardian would be one

12   mechanism for addressing these issues and

13   keeping students from using their

14   technology in this way, correct?

15        A.    Yes, that is one thing that

16   could help address that.

17        Q.    Okay.

18        A.    But that is not to say --

19   there may be instances where people aren't

20   using it but that doesn't mean that the

21   other staff aren't using it to do just

22   that, but it's limited, I would -- never

23   mind.

24        Q.    Have Irvington Public School

25   students used their cell phones at school

CONFIDENTIAL

Page 146

1   to access websites that they're not
2   supposed to access?
3           A.     Say that again, I'm sorry.
4           Q.     Sure.  Have IPS students used
5   their cell phones while at school or
6   attempted to use them to access sites
7   they're not supposed to be on?
8                   MR. INNES:  Objection to form.
9               Objection to scope.  What time
10              period are we talking about?
11                  MR. KARP:  In general during
12              the relevant time period.
13                  THE WITNESS:  Yes.  And just
14              the last question that you asked,
15              when I looked at the next page, and
16              when it was saying that the
17              teachers were, you know, could
18              have, I guess, stopped them from
19              watching movies.  Mr. Amberg notes
20              that while some of these can be
21              locked, some can't, because they're
22              housed on Google Drive, which is a
23              platform that we use for our
24              educational execution and if we
25              block certain things, in trying to

Page 147

```
 1            block that, it will stop the full
 2            use of what we're trying to use
 3            Google Drive for.  So I just wanted
 4            to clarify that.
 5    BY MR. KARP:
 6         Q.     Thank you for clarifying.
 7                Do IPS students -- have IPS
 8    students during the relevant time period
 9    attempted to access pornography on their
10    cell phones while at school?
11                MR. INNES:  Objection to form.
12            Outside the scope.
13                THE WITNESS:  I don't know as
14            the district and as myself, I don't
15            know.  I don't know.
16    BY MR. KARP:
17         Q.     Does the district know?
18                MR. INNES:  Objection.  Asked
19            and answered.
20                MR. KARP:  She said as
21            herself.
22                THE WITNESS:  I thought I said
23            as the district and myself, but I
24            could be wrong.
25
```

Page 148

1   BY MR. KARP:

2        Q.      I misheard you then.  As the

3   district and yourself, you don't know?

4        A.      I would say that I know as

5   the district in my capacity of speaking for

6   the district, I know of -- I think it would

7   be safe to say, yes, but I couldn't give

8   you on a specific time, date, at this

9   particular moment, but I would say chances

10  are likely, yes.

11       Q.      GoGuardian is an effective

12  tool that the district uses to keep IPS

13  students from accessing sites and doing

14  certain activity, engaging in certain

15  activity online while at school, correct?

16              MR. INNES:  Objection to form.

17              THE WITNESS:  Yes, to the

18          degree it can.

19  BY MR. KARP:

20       Q.      Does the district pay more

21  for GoGuardian based on how many issues are

22  flagged or how many times GoGuardian blocks

23  a student from engaging in a certain

24  activity?

25              MR. INNES:  Objection to form.

CONFIDENTIAL

Page 149

1                THE WITNESS:  I'm not sure if
2            increases in cost relate to the
3            amount of times that it has to be
4            used.  I know other systems that we
5            use for other reasons, when they
6            look at our amount of usage, they
7            do increase pricing.
8    BY MR. KARP:
9         Q.    The district doesn't know how
10   much it spent -- or strike that.
11              The district doesn't know
12   whether the amount of money it spends on
13   GoGuardian varies based on how much
14   activity the GoGuardian software blocks?
15              MR. INNES:  Objection to form.
16            Outside the scope.
17              MR. KARP:  You can answer.
18              THE WITNESS:  I'm not sure, as
19            the district, I'm not specifically
20            sure about that.  We would have to
21            be -- well, never mind, yes.
22   BY MR. KARP:
23         Q.    Are you familiar with the
24   Child's Internet Protection Act commonly
25   known as CIPA?

Page 150

1          A.      Yes.
2          Q.      To receive government
3   funding, a district must comply with CIPA?
4          A.      Yes.
5          Q.      Who at IPS has ultimate
6   responsibility for ensuring that IPS is
7   compliant with CIPA?
8          A.      The superintendent.
9          Q.      And that would be you,
10  Dr. Vauss?
11         A.      Yes, yes.
12         Q.      And to comply with CIPA, a
13  district must meet certain certification
14  requirements; is that right?
15         A.      Yes.
16         Q.      CIPA has three certification
17  requirements; is that correct?
18         A.      I'm not sure of the exact
19  number.
20         Q.      To comply with CIPA, a
21  district must have an internet safety
22  policy that includes technology protection
23  measures, correct?
24         A.      Uh-huh.
25         Q.      The protection measures --

Page 151

1    sorry, was that a yes?

2            A.      Yes, I'm sorry, yes.

3            Q.      The protection measures

4    require the district to block or filter

5    internet access to pictures that are

6    obscene, child pornography, or are harmful

7    to minors, correct?

8            A.      So that would be, like, our

9    firewall.  That was what I was referring to

10   earlier when I said that in conjunction

11   with GoGuardian.

12           Q.      Okay.

13           A.      Yes.

14           Q.      The second certification that

15   IPS needs to make in order to be CIPA

16   compliant is that it monitors the online

17   activity of minors, correct?

18           A.      Yes.

19           Q.      And the third certification

20   that IPS provides in order to be CIPA

21   compliant is that it provides education to

22   minors about appropriate online behavior,

23   correct?

24           A.      Yes, uh-huh.

25           Q.      Appropriate online behavior

CONFIDENTIAL

Page 152

1    includes interacting with others on social

2    media --

3          A.     Yes.

4          Q.     -- as well as cyberbullying

5    awareness and response?

6          A.     Yes.

7          Q.     IPS as an internet safety

8    policy, correct?

9          A.     Yes.

10         Q.     And this policy has been in

11   effect since 2014?

12         A.     I believe so, yes.

13         Q.     IPS has a program to block or

14   filter internet access as well as to

15   monitor the online activities of minors,

16   correct?

17         A.     Yes.

18         Q.     That program is GoGuardian?

19         A.     Yes.

20         Q.     You said earlier that

21   GoGuardian was first purchased in December

22   of 2020?

23         A.     I believe that was the date.

24         Q.     The Irvington Board of

25   Education approved the purchase of

CONFIDENTIAL

Page 153

1  GoGuardian?

2              MR. INNES:  Objection to form.

3          Asked and answered.

4              THE WITNESS:  Yes.

5  BY MR. KARP:

6      Q.     And the Board of Education

7  has approved the purchase and use of

8  GoGuardian every year since?

9      A.     Yes.

10     Q.     Okay.  GoGuardian is one of

11 the ways in which IPS complies with CIPA,

12 correct?

13     A.     Yes.

14              MR. KARP:  It's noon, are we

15          hungry?  Is this a good time for a

16          lunch break?

17              MR. INNES:  It's up to you,

18          Doctor.

19              THE WITNESS:  I mean I'm okay.

20              MR. KARP:  We can go for a

21          little bit longer, that's fine.

22              THE WITNESS:  What do you

23          think?

24              MR. INNES:  If you're hungry,

25          we should take a break.  If you're

CONFIDENTIAL

Page 154

1          not hungry, we can keep going.
2                  THE WITNESS:  Okay.  I don't
3          eat before 12:00, so.
4                  MR. KARP:  Okay.  We can keep
5          going.  I'll check in again in
6          about a half an hour.
7                  THE WITNESS:  Okay.  Well, I
8          don't eat anything, so I would like
9          to stop if that's okay.  I'm
10         sorry --
11                 MR. KARP:  I'm sorry.
12                 THE WITNESS:  I'm sorry.  I'm
13         sorry, I wasn't clear.  I just
14         drink coffee before and water, so.
15                 MR. KARP:  Now I understand.
16         Let's go off the record.
17                 THE VIDEOGRAPHER:  The time
18         right now is 12:04 p.m. and we're
19         off the record.
20                     - - - - -
21     (A recess was taken at this time.)
22                     - - - - -
23                 THE VIDEOGRAPHER:  The time
24         right now is 12:37 p.m.  We're back
25         on the record.

CONFIDENTIAL

Page 155

1    BY MR. KARP:

2         Q.      Dr. Vauss, welcome back from

3    lunch.

4         A.      Thank you.

5         Q.      What is Generations Family

6    Guidance?

7         A.      That is one of the services

8    that we use for our scholars here.

9         Q.      That's programming for the

10   students specifically?

11        A.      Yes.

12        Q.      Is that programming also

13   offered to IPS staff or is it just for IPS

14   students?

15        A.      I believe it's just for

16   students.

17        Q.      How long has IPS been

18   offering Generations Family Guidance?

19        A.      Let me look at my notes.

20             MR. INNES:  Objection to form.

21             THE WITNESS:  I'm not sure

22        exactly when it started.  I'm not

23        sure.

24   BY MR. KARP:

25        Q.      Do you have an approximate

Page 156

```
 1   date of when the district first started
 2   offering Generation Family -- Generations
 3   Family Guidance services?
 4          A.      I am not sure.
 5          Q.      Is --
 6          A.      Before my tenure.
 7          Q.      Are the services offered
 8   district-wide?
 9          A.      I believe it's the -- I mean,
10   district-wide, yes, as is necessary, yes.
11          Q.      Meaning -- or to clarify my
12   question, are Generations Family Guidance
13   services offered at all schools within
14   Irvington Public Schools?
15          A.      I don't believe so.  But when
16   I say it services our students and their
17   families, not our staff.
18          Q.      Thank you.
19          A.      Just to clarify.
20          Q.      Thank you for clarifying.  Do
21   you know of specific schools within IPS
22   where Generations Family Guidance services
23   are offered?
24          A.      Irvington High School.
25          Q.      You said Irvington High
```

Page 157

1  School?

2          A.      Yes.

3          Q.      Any of the middle schools?

4          A.      I don't want to guess, but I

5  know Irvington High School.

6          Q.      I'm handing you tab 18.

7          A.      Thank you.

8          Q.      We will mark this as

9  Exhibit 8.

10              MR. INNES:  I take it

11          Exhibit 9 will be the attachment?

12  BY MR. KARP:

13          Q.      That's where we're headed.

14  This is an email chain, the top email in

15  this chain is dated January 4, 2024.

16              Do you see that?

17          A.      Yes, yes.

18              - - - - -

19              (Email String Bates

20              BW__Irvington 00002168 to

21              00002169 marked Vauss Exhibit 8

22              for identification.)

23              - - - - -

24  BY MR. KARP:

25          Q.      The subject is, "Forward:

Page 158

1   Your scan, scan to my email," correct?

2          A.      Yes, uh-huh, that's correct.

3          Q.      Yes.  This is an email that

4   Tanora Ligons sent to Shelley Pettiford?

5          A.      Yes.

6          Q.      Who is Tanora Ligons?

7          A.      Actually, we know her as Dr.

8   Ligons.  She is an HSSC at Union Avenue

9   Middle School.

10         Q.      And who is Shelley Pettiford?

11         A.      She is our director of school

12  counselors, HSSCs, McKinney-Vento, and I

13  think there might be something else in her

14  title.

15         Q.      She's responsible for a lot

16  of programs within the district?

17         A.      Your voice kind of went down,

18  sorry.

19         Q.      She's responsible for many

20  programs in the district?

21         A.      Yes, yes.

22         Q.      Dr. Ligons wrote, "Good

23  morning, Ms. Pettiford, I hope this email

24  finds you well.  Attached is the letter

25  that you requested for GFG.  Thank you."

CONFIDENTIAL

Page 159

```
1                    Do you see that?
2        A.      Yes.
3        Q.      Okay.  And then she attaches
4   a document here?
5        A.      Yes, that's an attachment.
6        Q.      I'm handing you tab 18A.  And
7   that will be Exhibit 9.
8                    - - - - -
9                (Letter Bates
10               BW__Irvington00002170 marked
11               Vauss Exhibit 9 for
12               identification.)
13                   - - - - -
14  BY MR. KARP:
15       Q.      I'll represent to you that
16  this is the attachment to the email we were
17  just reviewing.  This is a letter signed by
18  Dr. Ligons.
19                   Do you see that?
20       A.      Yes.
21       Q.      And it says, "To whom it may
22  concern:  The Generations Family Guidance
23  team has been a great asset to Union Avenue
24  Middle School."
25                   Do you see that?
```

CONFIDENTIAL

Page 160

1          A.      Yes, uh-huh.

2          Q.      Does that refresh your

3    recollection that Generations Family

4    Guidance --

5          A.      Yes.

6          Q.      -- was used at Union, was

7    offered at --

8          A.      Yes.

9          Q.      -- Union Avenue Middle

10   School?

11         A.      Yes.

12         Q.      Thank you.

13         A.      I was most familiar with the

14   high school, but, yes, this is what this

15   shows, yes.

16         Q.      Thank you.  Does this refresh

17   your recollection of whether these services

18   were offered at any other schools at IPS in

19   addition to Irvington High School and Union

20   Avenue Middle School?

21         A.      Yes.

22         Q.      What other schools?

23         A.      University Middle School as

24   well.

25         Q.      Going back to the letter, Dr.

CONFIDENTIAL

Page 161

1   Ligons wrote, "The team provides group and

2   individual counseling to our scholars to

3   promote behavioral and academic success.

4   Some of the group and individual topics

5   include building self-esteem, goal setting,

6   developing healthy coping skills, emotion

7   regulation, and conflict resolution."

8                   Do you see that?

9           A.      Yes.

10          Q.      Did I read that correctly?

11          A.      Yes.

12          Q.      Generations Family Guidance

13  offered a range of services, correct?

14          A.      Yes.

15          Q.      Dr. Ligons goes onto write,

16  "In addition, they engage scholars through

17  classroom presentations that focus on

18  topics such as suicide -- excuse me --

19  suicide prevention, dangers of vaping, and

20  HIB."

21                  Do you see that?

22          A.      Yes.

23          Q.      Generations Family Guidance

24  provided services relating to vaping; is

25  that right?

Page 162

1        A.      Yes.

2        Q.      They provided services

3    relating to suicide prevention?

4        A.      Yes.

5        Q.      And they provided services

6    relating to HIB?

7        A.      Yes.

8        Q.      Dr. Ligons doesn't use the

9    words, "social media," anywhere in this

10   letter, correct?

11       A.      Yes.

12       Q.      Let's turn to tab 19.  We'll

13   mark this as Exhibit 10.

14                    - - - - -

15               (PowerPoint Presentation

16            Bates BW__Irvington00487452

17            marked Vauss Exhibit 10 for

18            identification.)

19                    - - - - -

20   BY MR. KARP:

21       Q.      Dr. Vauss, the first page of

22   this document I handed you says, "File

23   produced in native format," that simply

24   means that in this lawsuit this file was

25   produced to us as a PowerPoint

CONFIDENTIAL

Page 163

1  presentation.

2          A.      Okay.

3          Q.      I printed it to PDF so that

4  you would have it available to review

5  today.

6          A.      Okay.  Thank you.

7          Q.      The first slide of this

8  presentation is, "Social Media Safety

9  Presented by Guidance and HSSC Department."

10                 Do you see that?

11         A.      Yes, I do.

12         Q.      Are you familiar with this

13  presentation?

14         A.      Vaguely.

15         Q.      Do you know who received

16  this -- or strike that.

17                 Do you know to whom the

18  presentation was given?

19         A.      I believe it was given to

20  staff.  I'm not sure exactly which staff.

21  I know it was presented by guidance and the

22  HSSC department, because that's what it

23  says.

24         Q.      Is this a document that you

25  reviewed in your preparation for today's

Page 164

1   deposition?

2           A.      No, actually, no.

3           Q.      But your belief, sitting here

4   today, is that this presentation was given

5   to IPS staff?

6           A.      I believe so.

7           Q.      Do you know if this

8   presentation was given to students?

9           A.      I don't know.

10          Q.      Do you know who presented

11  this presentation?

12          A.      I do not.  I want to believe

13  looking at the content that it was given to

14  scholars as well.

15          Q.      Let's look at the second

16  slide here that says, "Pros of Social Media

17  Usage" at the top?

18          A.      Uh-huh.

19          Q.      Are you familiar with this

20  slide?

21          A.      I think you just -- you just

22  asked me that, I believe.  You asked if I

23  was familiar with this document and all of

24  that, so, I mean, I'm reading it with you.

25          Q.      Thank you.  And this

Page 165

1    presentation that was given by guidance and

2    HSSC department at IPS identifies a number

3    of pros of social media usage.

4                    Do you see those?

5         A.     I do.

6         Q.     Okay.  The first one listed

7    is, "Stay connected with friends and

8    family"?

9         A.     Yes.

10        Q.     And does the district agree

11   that's a pro of social media usage?

12        A.     Yes.

13        Q.     Social media can be an

14   educational tool.

15                    Do you see that?

16        A.     Yes.

17        Q.     That's what the guidance and

18   HSSC presented in this presentation?

19        A.     Yes, they did.

20        Q.     Social media can enhance

21   creativity.

22                    Do you see that?

23        A.     Yes.

24        Q.     Does the district agree with

25   that?

CONFIDENTIAL

Page 166

1          A.      Yes.

2          Q.      It's a -- social media can be

3     a means to share ideas, music, and art.

4                  Do you see that?

5          A.      Yes.

6          Q.      And then there's a prompt at

7     the end of this slide that says, "What

8     positive ways do you use social media?"

9                  Do you see that?

10         A.      Yes.

11         Q.      The presenters were

12    encouraging IPS staff who were listening to

13    this presentation to think of other ways

14    that social media could be used positively,

15    correct?

16         A.      I believe so, yes.

17         Q.      Do you know what other -- do

18    you know if the individuals who heard this

19    presentation came up with any --

20         A.      I don't know.  I wasn't

21    there.  I wasn't present.

22         Q.      I'm asking as the district if

23    you're aware.

24         A.      No, I don't know any other

25    things that they came up with --

Page 167

1          Q.      Thank you.

2          A.      -- as the district.

3          Q.      Irvington Public Schools

4    believes that there are positive ways to

5    use social media, correct?

6          A.      Yes.

7          Q.      Let's turn the page to slide

8    three.  Slide three runs through the cons

9    of social media usage according to the

10   guidance and HSSC department at IPS,

11   correct?

12         A.      Yes.

13         Q.      The first item here is

14   cyberbullying?

15         A.      Yes.

16         Q.      The second item is,

17   "Inappropriate post (pictures, threats, and

18   videos)?"

19         A.      Yes.

20         Q.      The third item here is

21   revealing personal information?

22         A.      Yes.

23         Q.      The fourth is easy target for

24   online predators?

25         A.      Yes.

CONFIDENTIAL

Page 168

1          Q.     The fifth is excessive usage?

2          A.     Yes.

3          Q.     And the last one is destroys

4    social skills?

5          A.     Yes.

6          Q.     Is it the district's position

7    that all of these cons apply to IPS

8    students?

9          A.     Yes.

10          Q.     Let's go through these in

11    order just to make sure we're on the same

12    page here.

13          A.     Okay.

14          Q.     Cyberbullying is the first

15    item listed?

16          A.     Yes.

17          Q.     And that refers to

18    individuals posting and liking and sharing

19    content on -- on social media that other

20    individuals might find offensive or hateful

21    or negative; is that right?

22               MR. INNES:  Objection.

23          Misstates the document.  Assumes

24          facts not in evidence.

25               THE WITNESS:  I'm sorry, so I

CONFIDENTIAL

```
                                            Page 169

 1            believe -- can you repeat your

 2            question?

 3  BY MR. KARP:

 4       Q.    I'll ask a slightly different

 5  question.  Cyberbullying involves someone

 6  posting something negative about someone

 7  else on social media, correct?

 8                MR. INNES:  Objection to form.

 9                THE WITNESS:  Yes.

10  BY MR. KARP:

11       Q.    Okay.  And that post might

12  hurt someone's feelings?

13                MR. INNES:  Objection to form.

14                THE WITNESS:  Yes.

15  BY MR. KARP:

16       Q.    And then other individuals

17  may comment on the post and that may also

18  lead to someone's feelings being hurt,

19  correct?

20                MR. INNES:  Objection to form.

21                THE WITNESS:  Yes.

22  BY MR. KARP:

23       Q.    The next item here is

24  inappropriate posts, pictures, threats and

25  videos.
```

CONFIDENTIAL

Page 170

1                    Do you see that?
2          A.    Yes.
3          Q.    This refers to pictures and
4    threats and videos that are posted on to
5    social media platforms, correct?
6          A.    Yes.
7          Q.    The next item here is
8    revealing personal information?
9          A.    Yes.
10         Q.    This could refer to an
11   individual posting a piece of private
12   information on social media that now the
13   public can view, correct?
14                    MR. INNES:  Objection to form.
15                    THE WITNESS:  Yes.
16   BY MR. KARP:
17         Q.    The next item is easy target
18   for online predators.
19                    Do you see that?
20         A.    Yes.
21         Q.    Does IPS have any data
22   regarding whether this was a particular
23   issue for IPS students?
24         A.    No.  When you say, "easy
25   target for online predators," so I would

CONFIDENTIAL

Page 171

1  say no.

2         Q.      The next item here is

3  excessive usage, which refers -- sorry, the

4  next item here is excessive usage, correct?

5         A.      Yes.

6         Q.      Referring to the amount of

7  time that an individual is spending on

8  social media, right?

9                 MR. INNES:  Objection to form.

10           Misstates the document.

11                THE WITNESS:  Yes.

12  BY MR. KARP:

13         Q.      And the last item here is

14  destroys social skills.

15                Do you see that?

16         A.      Yes.

17         Q.      Referring to what impact the

18  use of social media can have on an

19  individual's social skills?

20                MR. INNES:  Objection to form.

21           Misstates the document.

22                THE WITNESS:  Yes.

23  BY MR. KARP:

24         Q.      Let's turn the page to the

25  next slide.

CONFIDENTIAL

Page 172

```
 1              This slide is titled,
 2    "Challenges Spread Through Social Media."
 3              Do you see that?
 4         A.    Yes.
 5         Q.    And then a number of
 6    challenges are listed?
 7         A.    Yes.
 8         Q.    The questions at the bottom
 9    are, "Which of these is positive and why?"
10    And "Which of these is negative and why?"
11              Do you see that?
12         A.    Yes.
13         Q.    Sitting here today, do you
14    know which of these are positive or
15    negative?
16         A.    I believe GoFundMe pages,
17    these are not limited to IPS, but GoFundMe
18    page challenges are at times positive ones,
19    because they raise money.
20              Flash mob challenges are
21    just, just that, flash mob, that they don't
22    hurt anyone.
23              Some of the others, I
24    imagine they -- shut up and dance and the
25    challenge, not necessarily a bad thing.
```

CONFIDENTIAL

Page 173

1              The only thing that I would
2    say would be negative are the ones that
3    disrupt the instructional day or hurt
4    people or are disruptive in nature and
5    damaging.
6              Q.    You mentioned GoFundMe
7    challenge was one way to raise money?
8              A.    Yes, because I'm familiar
9    with GoGuardian pages, so.
10             Q.    Are you familiar at all with
11   the ice bucket challenge?
12             A.    Yes.
13             Q.    What is that?
14             A.    They have ice water thrown on
15   them and see if they can withstand it.
16             Q.    Was that also a fundraiser?
17             A.    Oh, these weren't things that
18   were promoted by the district.  So, I mean,
19   I guess that -- I don't understand -- maybe
20   you can ask that question again.
21             Q.    My question was simply was
22   the ice bucket challenge a fundraiser?
23                   MR. INNES:  Objection, so --
24                   MR. KARP:  I didn't ask at IPS
25             specifically, I'm just asking, does

CONFIDENTIAL

```
                                        Page 174

 1            the district know if the ice bucket

 2            challenge was a fundraiser?

 3                   THE WITNESS:   I believe in

 4            some places, it was.

 5   BY MR. KARP:

 6        Q.      The district here is -- or

 7   strike that.

 8                 The guidance and HSSC

 9   department for IPS highlighted a number of

10   challenges to IPS staff who were listening

11   to this presentation, correct?

12        A.      Yes.

13        Q.      The district acknowledges

14   that there are positive challenges that can

15   occur on social media, correct?

16        A.      Yes.

17        Q.      Let's turn the page.  This

18   slide is called, "Conclusion."

19                 Do you see that?

20        A.      Yes.

21        Q.      Okay.  The first conclusion

22   listed is, "Report any inappropriate social

23   media communication to parents, school,

24   school staff, or trusted adults."

25                 Do you see that?
```

CONFIDENTIAL

Page 175

```
 1          A.      Uh-huh.
 2          Q.      It's encouraging, this slide
 3   is encouraging individuals to report
 4   inappropriate communications that they have
 5   observed on social media, correct?
 6          A.      Yes, uh-huh.
 7          Q.      Do not friend strangers is
 8   the second conclusion?
 9          A.      Yes.
10          Q.      The third is use privacy
11   settings?
12          A.      Yes.
13          Q.      And the last conclusion here
14   is, "Follow the WWGS (What Would Grandma
15   Say) rule."
16                   Do you see that?
17          A.      Yes.
18          Q.      And does the district have an
19   understanding of what's meant by the "what
20   would grandma say" rule?
21          A.      What would your -- yes, they
22   do, yes.
23          Q.      And what's that
24   understanding?
25          A.      What your grandma say if she
```

Page 176

1    saw your post or your activity.

2         Q.      So what would grandma say

3    about the photo or video that you're

4    posting to social media?

5         A.      Yes.

6         Q.      Do you agree that these are

7    all ways in which users of social media can

8    have more positive experiences on social

9    media?

10        A.      Yes.

11        Q.      Let's turn to another

12   exhibit.  This is tab 50.

13              THE EXHIBIT TECH:  Five zero?

14   BY MR. KARP:

15        Q.      Five zero, yes.  We will mark

16   this as Exhibit 11.  I'll represent to you

17   that this letter was obtained from the

18   Irvington website, Irvington Public Schools

19   website?

20        A.      Yes.

21              - - - - -

22              (Letter dated 12/16/21 on

23         IPS Website marked Vauss Exhibit

24         11 for identification.)

25              - - - - -

CONFIDENTIAL

Page 177

1   BY MR. KARP:

2           Q.      Let me know once you've had a

3   chance to look at it.  I apologize for the

4   small type, but it's also on the screen if

5   that helps you in larger font.

6           A.      No, that's fine.  That's

7   fine.  Yes, uh-huh.

8           Q.      Thank you.  This is a letter

9   dated December 16, 2021?

10          A.      Uh-huh, yes.

11          Q.      And this is -- the letter is

12  signed by you, Dr. April Vauss?

13          A.      Yes.

14          Q.      As superintendent of schools?

15          A.      Yes.

16          Q.      And this letter is addressed

17  to the Irvington Public Schools Community?

18          A.      Yes.

19          Q.      Who would that be?

20          A.      That would be staff, parents,

21  community members.

22          Q.      You wrote in this letter,

23  There has been an increase in challenges on

24  social media which promote violence against

25  public institutions such as schools."

Page 178

1                    Do you see that?

2          A.     Yes.

3          Q.     Okay.  What challenges were

4    you referring to in this letter?

5          A.     There was a challenge to hit

6    a staff member.

7          Q.     You go onto write in this

8    letter, "We take any potential threat

9    against our district with the utmost

10   seriousness, but there is no indication

11   that there is any specific threat to

12   Irvington Public Schools."

13                    Do you see that?

14         A.     Yes, uh-huh.

15         Q.     When you wrote this letter,

16   no Irvington Public Schools staff had been

17   hit in connection with this challenge?

18         A.     Yes, no.

19         Q.     Did that ever happen in

20   connection with this challenge that you're

21   referring to?

22         A.     No, no.  We receive guidance

23   from our -- our county-wide superintendent

24   about, about, you know, making sure that we

25   take all the necessary precautions to

Page 179

1    address, especially that particular one.

2            Q.        A little bit further down in

3    the letter you wrote, "We ask that you

4    provide guidance to your children on the

5    appropriate use of social media, encourage

6    them to seek a trusted adult to speak with

7    about any suspicious activity they see."

8            A.        Uh-huh.

9            Q.        Do you see that?

10           A.        Yes, uh-huh.

11           Q.        Do you agree that parents

12   should be providing their children with

13   guidance on the appropriate use of social

14   media?

15                     MR. INNES:  Objection to form.

16                     THE WITNESS:  Yes.

17   BY MR. KARP:

18           Q.        Other than the letter that

19   we're looking at, has the district sent out

20   letters to the Irvington Public School

21   community about other challenges on social

22   media?

23           A.        We've sent out phone blasts

24   alerting parents that these challenges are

25   occurring and that we encourage them to

CONFIDENTIAL

Page 180

1  talk to them and make sure that they don't

2  participate and that, you know, there will

3  be consequences if you, you know,

4  participate in those challenges.

5      Q.    What is a phone blast?

6      A.    It's a communication with

7  parents that either I record it with my own

8  voice or there is a faux voice that I use

9  to send out messaging to parents.  It will

10  go to their home phones, most of the time

11  their cell phones.

12      Q.    Are the scripts for those

13  phone blasts written down anywhere?

14      A.    Sometimes they are.  They're

15  written so that they can be answered or if

16  it's one that I recorded with my own voice,

17  I would have written it down, but after, I

18  would have disposed of it.

19      Q.    When is the last time the

20  district did one of these phone blasts

21  regarding a social media challenge?

22      A.    It would be around the time

23  where we were made aware of some of these

24  TikTok challenges.  Around, I want to

25  say -- I don't know the exact date.  I

CONFIDENTIAL

Page 181

1    can't say the exact date.  I do know that
2    there was a season where there was a
3    challenge every month, like, vandalize the
4    bathrooms, slap your teacher.  And during
5    that time, I sent out a phone blast asking
6    parents and telling scholars, you know, as
7    a conjoined message that they shouldn't
8    participate in these and that there would
9    be consequences.
10        Q.    Do you recall the school year
11   that that phone blast would have gone out?
12        A.    I believe it was the 21-22
13   school year.
14        Q.    And that is the last time the
15   district did one of these phone blasts?
16        A.    Regarding a challenge.
17        Q.    Regarding a social media
18   challenge?
19        A.    Yes, uh-huh.
20        Q.    Did you say that in some
21   instances the scripts for these phone
22   blasts would have been thrown out after you
23   recorded?
24        A.    Yeah, it would have been me
25   writing down, you know, Good Evening,

CONFIDENTIAL

Page 182

1   Irvington Community, this is Dr. April
2   Vauss, superintendent of schools, and then,
3   you know, to make sure that I hit the
4   points that I want, I would have written
5   some bullet points and then I would have
6   discarded it.
7           Q.      The scripts are not saved and
8   compiled in a central location; is that
9   correct?
10          A.      Uh-uh, uh-uh.
11          Q.      Do you know as Dr. Vauss
12  whether any of these scripts are in your
13  files?
14          A.      It's on school messenger, so
15  it would -- you could go to school
16  messenger, I believe it archives messages
17  that were sent before.  So it wouldn't be
18  something I would have a paper file of.
19          Q.      School messenger archives
20  messages that have been delivered to the
21  Irvington Public School community?
22          A.      Yes.
23          Q.      Are those messages that have
24  been delivered to the Irvington Public
25  School community orally?

CONFIDENTIAL

Page 183

1           A.      What do you mean?

2           Q.      Are these --

3           A.      All verb --

4           Q.      -- recordings --

5           A.      -- like, from a human,

6    sometimes they are a scripted message that

7    we want to go out, you know, for example,

8    today is an inclement weather day, we have

9    a delayed opening, so insomuch as that is

10   scripted.

11          Q.      Let's look at the bottom of

12   this letter.  Do you see just a little bit

13   below your signature --

14          A.      Yes.

15          Q.      -- there is a statement, "We

16   are all in this together, each one reach

17   one."

18          A.      Uh-huh.

19          Q.      And then to the right of that

20   there are number of icons, right?

21          A.      Yes.

22          Q.      The first one is Facebook?

23          A.      Yes.

24          Q.      The next one is X?

25          A.      Yes.

CONFIDENTIAL

Page 184

```
 1        Q.     And the third one is an
 2   envelope.
 3                  Do you see that?
 4        A.     Yes.  Now, I think all of
 5   those icons, not to say that they wouldn't
 6   have been there in 2021, but I don't
 7   believe that Twitter was known as X at the
 8   time.  I think it's because of when you --
 9   when you printed this.
10        Q.     Do you know one way or
11   another if the Facebook icon listed here
12   refers to a Facebook account held by the
13   Irvington Public School District?
14        A.     I'm not sure.
15        Q.     Do you know one way or
16   another -- or strike that.
17                  Do you know what would
18   happen if an individual visiting this web
19   page for Irvington Public Schools clicked
20   one of these icons at the bottom of the
21   screen?
22                  MR. INNES:  Objection to form.
23                  THE WITNESS:  Do I know if --
24          I'm sorry, say that again.
25
```

Page 185

1  BY MR. KARP:

2         Q.      Sure.   If an individual

3  reading this letter on the Irvington Public

4  Schools website --

5         A.      Yes.

6         Q.      -- were to click one of these

7  icons, do you know what would happen?

8         A.      I know if they hit the email,

9  it would email, I believe, our tech person

10  and so I don't want to guess what would

11  happen if they hit the Facebook link or X.

12         Q.      Do you know one way or

13  another whether clicking the Facebook icon

14  would allow a reader to share this letter

15  with others using the Facebook platform?

16                 MR. INNES:  Objection to form.

17                 THE WITNESS:  I don't know,

18         but I believe that's why that would

19         be there.

20  BY MR. KARP:

21         Q.      So that someone who visited

22  this page should share it with others using

23  Facebook?

24         A.      Yes.

25         Q.      And similarly with X, someone

Page 186

1    clicking that would be able to share this
2    letter over the X platform?
3           A.    Yes, as of this date that
4    this was printed.
5           Q.    Let's talk a little bit about
6    another subject.  Have HSSCs at IPS taught
7    lessons to IPS students regarding social
8    media?
9                 MR. INNES:  Objection to form.
10                THE WITNESS:  I don't believe
11          that they've taught lessons.  I
12          believe our school counselors have,
13          are the ones who go into classrooms
14          and teach lessons.  If they have
15          taught, it would be in small
16          groups, it wouldn't be in the
17          classroom setting format.
18   BY MR. KARP:
19          Q.    So it would be school
20   counselors as opposed to the HSSCs, which
21   as a shorthand I will refer to as social
22   workers?
23          A.    Uh-huh.
24          Q.    -- who would give these,
25   teach these lessons on social media to IPS

CONFIDENTIAL

Page 187

1   students?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  I would say that

4          social media may come into the

5          dealings of the social workers and

6          the groups that they conduct.  I

7          don't believe that they present

8          lessons exclusively just on social

9          media.  Unless a situation arose

10          that found it necessary.

11   BY MR. KARP:

12          Q.    I'm handing you tab 20A.

13          A.    Thank you.

14          Q.    We'll mark this as

15   Exhibit 12.

16                    - - - - -

17                    (Tip Sheet on Social Media

18          Use and Mental Health Bates

19          BW__Irvington00032486 to 00032487

20          marked Vauss Exhibit 12 for

21          identification.)

22                    - - - - -

23                    THE VIDEOGRAPHER:  Sorry,

24          counsel, could we go off the

25          record?  I'm having another tech

CONFIDENTIAL

Page 188

1          issue.

2                  MR. KARP:  Sure.  Go off the

3          record.

4                  THE VIDEOGRAPHER:  The time

5          right now is 1:16 p.m.  We are off

6          the record.

7                  - - - - -

8      (Discussion was held off the record.)

9                  - - - - -

10                 THE VIDEOGRAPHER:  The time

11         right now is 1:17 p.m.  We're back

12         on the record.

13  BY MR. KARP:

14        Q.     Counsel, just -- not

15  counsel -- Dr. Vauss, reset here,

16  Dr. Vauss, we took a brief break to address

17  a tech issue, but now we're back.

18        A.     Yes, yes.

19        Q.     Just before we took that

20  break, I handed you that document that we

21  are marking as Exhibit 12, the document

22  says, "Tip Sheet on Social Media Use and

23  Mental Health."

24                 Do you see that?

25        A.     Yes.

Page 189

1          Q.     Are you familiar with this
2    document?
3          A.     No, I am not.
4          Q.     Is this a document you
5    reviewed to prepare for today's deposition?
6          A.     No, it is not.
7          Q.     The statement states, "This
8    resource discusses the benefits of social
9    media and provides tips on how to use
10   social media in to support your mental
11   health."
12                Do you see that?
13         A.     Yes.
14         Q.     There's a Bates number at the
15   bottom of this document?
16         A.     Yes.
17         Q.     It's BW__Irvington00032486?
18         A.     Yes.
19         Q.     Do you understand what the
20   significance is of having a Bates number at
21   the bottom of a document?
22         A.     Yes.
23                MR. INNES:  Objection.
24   BY MR. KARP:
25         Q.     What's your understanding?

CONFIDENTIAL

Page 190

```
 1          A.      It's an Irvington product.

 2          Q.      This is --

 3          A.      Irvington schools.

 4          Q.      I didn't mean to cut you off.

 5     It's a document that Irvington Public

 6     Schools produced --

 7          A.      Yes.

 8          Q.      -- in the litigation?

 9          A.      Yes.

10          Q.      This resource that Irvington

11     had refers to tips on how to use social

12     media to promote mental health.

13                  Do you see that?

14          A.      Yes.

15                  MR. INNES:   Objection to form.

16                  THE WITNESS:   I'm sorry.

17     BY MR. KARP:

18          Q.      The first section here is

19     called, "Benefits of Social Media."

20                  Do you see that?

21          A.      Yes.

22          Q.      "There are many positives to

23     using social media, including social

24     support, connecting with others in a

25     meaningful way, and seeking out
```

Page 191

1   information."

2               Do you see that?

3       A.      Yes.

4       Q.      Are those ways that Irvington

5   Public School students use social media?

6               MR. INNES:  Objection to form.

7           Calls for speculation.

8               MR. KARP:  You can answer.

9               THE WITNESS:  Oh, yes.  Yes.

10  BY MR. KARP:

11      Q.      Yes, it is?

12      A.      Yes, uh-huh.

13      Q.      Or yes they are rather?

14  Thanks.

15      A.      Yes.

16      Q.      The tip sheet goes on to say,

17  "Here are some benefits to using social

18  media:  By reaching out to like-minded

19  people on social media, you can grow your

20  social support network of peers and find

21  help with making personal decisions and

22  forming opinions."

23               Do you see that?

24      A.      Yes.

25      Q.      This is something -- this is

CONFIDENTIAL

Page 192

```
 1   information that was shared with Irvington
 2   Public School students --
 3           A.    Yes.
 4           Q.    -- about how they could use
 5   social media to their benefit --
 6                 MR. INNES:  Objection.
 7   BY MR. KARP:
 8           Q.    -- correct?
 9           A.    Yes.
10           Q.    Another benefit that's listed
11   here is, "Connecting with others on social
12   media can help decrease feelings of
13   isolation."
14                 Do you see that?
15           A.    Yes.
16           Q.    Was that an important issue
17   for Irvington Public School students during
18   the pandemic when they were learning
19   virtually from home?
20           A.    Was which part, isolation or
21   was -- which part?
22           Q.    One of the benefits that's
23   listed here is that connecting with others
24   on social media can help decrease feelings
25   of isolation.
```

CONFIDENTIAL

Page 193

1                    Do you see that?

2          A.       Yes, uh-huh.

3          Q.       Did Irvington Public School

4    students feel isolated during the COVID-19

5    pandemic when they were home learning

6    virtually?

7                    MR. INNES:  Objection to form.

8          Outside the scope.

9                    THE WITNESS:  I would say yes.

10   BY MR. KARP:

11         Q.       And one way that feelings of

12   isolation could be counteracted, according

13   to this tip sheet, is to use social media

14   as a means of connecting with others,

15   correct?

16                   MR. INNES:  Objection to form.

17         Outside the scope.

18                   THE WITNESS:  Yes.

19   BY MR. KARP:

20         Q.       The tip sheet also says that,

21   "Using social media can help you explore

22   your interests and personal identity.  It

23   can give you opportunities to try out new

24   hobbies, develop skills and, explore your

25   passions such as artistic, academic, or

CONFIDENTIAL

Page 194

1    advocacy interests."

2              Do you see that?

3         A.    Yes.

4         Q.    Does the district agree with

5    that?

6         A.    Yes.

7         Q.    That's what was presented to

8    students?

9         A.    Yes.

10        Q.    "Social media can help you

11   stay connected with friends who live far

12   away and connect you to new people who

13   share similar interests, while also

14   allowing you to learn from those who have

15   different perspectives."

16             Do you see that?

17        A.    Yes.

18        Q.    That's what was presented to

19   students?

20        A.    Yes.

21             MR. INNES:  Objection to form.

22   BY MR. KARP:

23        Q.    "Being active on social media

24   can help with developing your personal and

25   professional skills, such as participating

Page 195

1    in advocacy and leadership efforts, finding

2    internships and job opportunities, and

3    applying to school."

4                    Do you see that?

5            A.      Yes, I think it's safe to say

6    that I believe these are ways that you

7    could use social media in a positive way,

8    yes.

9            Q.      And this handout goes on to

10   provide tips on healthy social media use.

11                   Do you see that?

12           A.      Yes.

13           Q.      And the handout states,

14   "While there are many positives to social

15   media use, there can also be harmful

16   experiences, such as online bullying,

17   harassment, and feeling inadequate when

18   comparing yourself to the online life of

19   those you follow."

20                   Do you see that?

21           A.      Yes.

22           Q.      So the handout acknowledges

23   that there are some negatives to social

24   media as well, correct?

25           A.      Yes.

CONFIDENTIAL

Page 196

1          Q.     And then provides tips on how
2     to address those negative aspects.
3                    Do you see that?
4          A.     Yes, I think, as I recall, I
5     recall this document, and the reality is
6     that the way social media is set up, that
7     students are going to be on there.  Our
8     students, we want to promote the ways that
9     it could be positive, however, our issues
10    aren't with the positive uses of social
11    media, our problems are with our students
12    not being as mature to be able to really
13    hone in on all of these positive ways, but
14    the ones that lend themselves to
15    popularity, notoriety, and as an end
16    result, it has resulted in the bullying,
17    the threats, the, you know, using it to
18    show people that, you know, I beat someone
19    up in a fight and then the rippling effects
20    of that have been catastrophic, you know.
21                    Even when I'm reading this
22    and one of the things it says, the study,
23    July 11, 2019, from this organization, that
24    was the same year that a young man by the
25    name of Marquise Jenkins was murdered on

CONFIDENTIAL

Page 197

1    Clinton Avenue in Irvington.  And he,

2    obviously, the night before, he was using

3    Facebook in a negative way to show others

4    what he had been doing to another group of

5    students in Newark and it was shared, it

6    was liked, and it was terrible because

7    those people --

8              Q.    Do you want to take a break?

9              A.    No, I'm okay.  Those people

10   knew he was going to be in school.  They

11   knew he was going to be in school and they

12   knew the way he went home and not only did

13   they murder him in the street, they did it

14   in front of our other children.  And it

15   just went on and on and on and they talked

16   about it on social media and I had never

17   experienced anything like that.

18              I sat in this room with the

19   superintendent at the time and we heard

20   about the shooting and we were trying to

21   wait to see to hear if he was going to make

22   it.  I don't think he made it from that

23   street.  I think he died there, but they

24   took him to the hospital and they declared

25   him dead.

CONFIDENTIAL

Page 198

```
 1                    And it was because, you
 2      know, he got on there the night before
 3      bragging out trying to hurt other people.
 4      And I think that if he had known that by
 5      doing that that he would lose his life the
 6      next day, he wouldn't have done it and they
 7      depend on us to try to give them guidance.
 8      I don't know what his parents' guidance was
 9      in his life.  I don't know.  I don't know.
10      But it's hard.  It's hard, because he -- if
11      he was alive today, he would be 24 years
12      old.  He would be 24 years old if he was
13      alive today.  And, you know, you know, I
14      just wish that he had known, I wish he had
15      known, I wish we would have known better at
16      that time.  I wish his parents had been
17      someone who would have known that, you
18      know, him putting this on social media
19      would have resulted in the ending of his
20      life.  I wish, but that's, that's not the
21      reality.
22           Q.     Thank you for sharing that
23      and that is an absolutely terrible and
24      tragic incident and I'm very sorry that you
25      experienced that and that the district
```

CONFIDENTIAL

Page 199

1    experienced that.  I'm very, very sorry.

2                    MR. INNES:  I don't know if

3              you asked another question, but I

4              was going to ask if you want to

5              take a break.

6                    MR. KARP:  Yeah, let's take a

7              break.

8                    THE WITNESS:  Yeah.

9                    MR. KARP:  Thank you,

10             Dr. Vauss.

11                   THE WITNESS:  The time right

12             now is 1:28 p.m.  We are off the

13             record.

14                         - - - - -

15       (A recess was taken at this time.)

16                         - - - - -

17                   THE VIDEOGRAPHER:  The time

18             right now is 1:39 p.m.  We're back

19             on the record.

20   BY MR. KARP:

21         Q.     Dr. Vauss, welcome back.

22   Thank you again for sharing that really

23   terrible story and I just want to reiterate

24   that it is incredibly sad for that

25   individual and for his family and for the

CONFIDENTIAL

Page 200

1   entire community and I'm very sorry that

2   that happened.

3           A.      I just wish we had known more

4   about the dangers and what would happen, I

5   wish we had of and maybe he would be alive.

6           Q.      I have a few questions about

7   what happened.

8           A.      Uh-huh.

9           Q.      If at any time you need to

10  take another break, just let me know, as I

11  mentioned to you before.

12                  You mentioned that this

13  individual had posted to Facebook the night

14  before this incident occurred?

15          A.      The group that he was with,

16  uh-huh.  I don't know -- I don't know that

17  he -- he may have himself personally

18  posted, but he was on a post and he was

19  bragging and talking about what had

20  happened.

21          Q.      I see.

22          A.      Yes.

23          Q.      You mentioned Facebook --

24          A.      Yes.

25          Q.      -- as the platform where that

CONFIDENTIAL

Page 201

1   post was made?

2           A.      Yes.

3           Q.      Did you view the post that

4   you referred to before?

5           A.      No, I didn't --

6                   MR. INNES:  Objection,

7               objection to form.  I'm just going

8               to say that I would like to keep

9               it, keep this tight.

10                  MR. KARP:  I will.

11                  MR. INNES:  All right.

12                  MR. KARP:  Thank you.  I was

13              simply asking if you had seen the

14              post.

15                  THE WITNESS:  No, I had not.

16              I have not.

17  BY MR. KARP:

18          Q.      And, very simply, my question

19  is what is your understanding -- or strike

20  that.

21                  Do you know specifically

22  that it was Facebook as opposed to another

23  platform where this video had been posted?

24                  MR. INNES:  Objection to form.

25              Asked and answered.  The witness

CONFIDENTIAL

```
                                      Page 202

 1            has testified at length about this.

 2            If Facebook has any reason to

 3            believe that it wasn't posted to

 4            their page, they're free to say so.

 5                 MR. KARP:  I'm simply asking a

 6            question and we can move on to

 7            another related issue.  But my

 8            question stands, if that was the

 9            specific platform at issue for this

10            incident.

11                 MR. INNES:  Same objection.

12                 MR. KARP:  You can answer.

13                 THE WITNESS:  Yes.

14    BY MR. KARP:

15         Q.    Does the district have an

16    understanding of whether this individual's

17    death was somehow related to gang violence?

18                 MR. INNES:  Objection to form.

19                 THE WITNESS:  I'm not sure.

20    BY MR. KARP:

21         Q.    Does the district know if

22    this -- strike that.

23                 Was this incident

24    investigated?

25                 MR. INNES:  Objection to form.
```

Page 203

1             Investigated by whom?

2                   THE WITNESS:  Yes.

3    BY MR. KARP:

4         Q.     I can rephrase and be more

5    specific.

6         A.     Please.

7         Q.     Did law enforcement

8    investigate this, this killing?

9         A.     Yes.

10        Q.     Do you know what was learned

11   from that investigation?

12                   MR. INNES:  Objection to form.

13                   THE WITNESS:  That there had

14            been a video placed on Facebook as

15            it relates to this incident.

16   BY MR. KARP:

17        Q.     Do you know if the person or

18   group of people who killed this young man

19   were ever caught?

20        A.     That, I don't know.

21        Q.     Do you know if anyone was

22   ever convicted for this crime?

23                   MR. INNES:  Objection to form.

24                   THE WITNESS:  I'm not sure.

25

CONFIDENTIAL

Page 204

BY MR. KARP:

1

2          Q.      We can -- we can move on

3     and --

4                    MR. INNES:  No, they're your

5               questions.  You can ask these

6               questions, I mean, the idea that a

7               murder might not be investigated is

8               beyond me, but go ahead.

9     BY MR. KARP:

10         Q.      Well, I'm trying to

11    understand what the district knows and my

12    understanding of your testimony is the

13    district is not aware of whether or not

14    someone was ultimately convicted for this

15    crime; is that right?

16         A.      That's correct.

17         Q.      Okay.  You testified that the

18    incident took place in front of one of the

19    schools at IPS?

20         A.      It didn't happen in front of

21    the school.

22         Q.      Okay.

23         A.      It happened as the young man

24    was on his way home from school.  It

25    happened on Clinton Avenue and the school

Page 205

1  is on Clinton Avenue, but it didn't happen

2  in front of the school.

3         Q.     You might have said that it

4  happened in front of IPS students?

5         A.     Yes.

6         Q.     And I apologize, that's what

7  I was misremembering.

8                Was this a traumatic

9  incident for the Irvington Public School

10  community?

11         A.     Yes.

12         Q.     It has caused trauma that

13  still lingers today, correct?

14         A.     Yes.  I don't know if the

15  population of students who were there

16  before are not there anymore, but those of

17  us who are aware of the incident, yes.

18         Q.     And for the time -- and for

19  the students at that time, correct?

20         A.     Yes.

21         Q.     Thank you, Dr. Vauss.  I

22  appreciate it.

23                We're going to shift gears a

24  bit and move on to the district's policies

25  on technology.

CONFIDENTIAL

Page 206

1          A.      Okay.

2          Q.      I'm handing you tab three.

3    We will mark this as Exhibit 13.  This is

4    the Irvington public school Student Code of

5    Conduct for the 2024-2025 school year.

6          A.      Yes.

7          Q.      Do you see that?

8          A.      Yes, yes.

9                     - - - - -

10              (2024-2025 Student Code of

11         Conduct Bates

12         BW__Irvington00629350 to 00629430

13         marked Vauss Exhibit 13 for

14         identification.)

15                     - - - - -

16    BY MR. KARP:

17         Q.      Have you seen this document

18    before?

19         A.      Yes.

20         Q.      What is this document?

21         A.      It's our code of conduct for

22    our scholars in the district.

23         Q.      And it sets out policies that

24    apply district-wide?

25         A.      Yes.

Page 207

1          Q.     And this particular version
2    of the Student Code of Conduct was approved
3    by the board on August 21, 2024?
4          A.     Yes.
5          Q.     Let's turn to the page ending
6    in 376.
7                  MR. INNES:  So just -- just
8             for the record, is this one of your
9             excerpt type exhibits or is it --
10                 MR. KARP:  It is, as I'm
11            realizing by the gaps in the Bates
12            numbers.
13                 MR. INNES:  Okay.
14    BY MR. KARP:
15          Q.     We have a complete version of
16    the Student Code of Conduct for you to
17    review if there's anything else in here
18    that you would like to see.  What you're
19    looking at is an excerpt of it with certain
20    pages that we'll be focusing on.
21          A.     Okay.
22          Q.     If at any point in time you
23    want this, just let me know, it's just one
24    of the tabs?
25                 MR. INNES:  But you're marking

CONFIDENTIAL

Page 208

```
 1            that as an exhibit or you're
 2            marking this as an exhibit?
 3                 MR. KARP:  For clarity of the
 4            record, we'll mark the full
 5            Irvington Public Schools Student
 6            Code of Conduct for 2024-2025 as
 7            Exhibit 13.
 8                 MR. INNES:  Okay.  Then I
 9            think it's more proper if we give
10            the witness the full exhibit.
11                 MR. KARP:  Sure.  It's tab
12            three on your system.
13                 MR. INNES:  It sounds like
14            they're going to ask you questions
15            about a particular piece of this,
16            but if you need to review the
17            document, please do so.
18                 THE WITNESS:  Okay.
19   BY MR. KARP:
20        Q.    So I wanted to draw your
21   attention to page 28, which is the Bates
22   ending in 376.
23        A.    Okay.  Okay.
24        Q.    At the top of this page, the
25   document reads, "Use of Technology."
```

CONFIDENTIAL

Page 209

1          Do you see that?

2        A.     Yes.

3        Q.     And just below that,

4    "Guidelines for the Use of Technology"?

5        A.     Yes.

6        Q.     Is this the district's policy

7    with respect to technology use at IPS?

8        A.     Yes.

9        Q.     Other than this policy that

10   is set out here in the Student Code of

11   Conduct, does the district have other

12   policies regarding the use of technology at

13   IPS?

14       A.     Other than this, this

15   category, this paragraph, we have these in

16   our -- we have a full embodiment of

17   policies in our -- on our website.

18       Q.     And is that just -- are you

19   saying that the policies listed here and

20   described here are also available on the

21   Irvington Public Schools website?

22       A.     Yes.

23       Q.     Is that what you're saying?

24       A.     Uh-huh.  Yes, I'm sorry, yes.

25       Q.     Thank you.  At the bottom of

Page 210

1    the first paragraph on this page, the
2    Student Code of Conduct says, "the
3    following conduct is prohibited while using
4    the school system network, accessing the
5    school system network from home, or while
6    involved in situations --"
7          A.     Wait, just pause you, I'm
8    sorry.
9          Q.     Of course.
10         A.     Where are you reading from
11   again?
12         Q.     Bottom of the first
13   paragraph.
14         A.     Oh, you know what, I'll just
15   look on the screen, okay, for right now.
16   Okay.  I'm ready, sorry.
17         Q.     "The following conduct is
18   prohibited while using the school system
19   network, accessing the school system
20   network from home, or while involved in
21   situations which this code has
22   jurisdiction -- in situations which this
23   code has jurisdiction."
24                Do you see that?
25         A.     Yes.

CONFIDENTIAL

Page 211

1          Q.      And then it goes on to say
2    that "students shall not," and there's a
3    list that follows.
4                  Do you see that?
5          A.      Yes.
6          Q.      The second bullet is,
7    "Students shall not access social
8    networking sites or chat lines or enter
9    chat rooms that are not part of a class
10   activity under the supervision of a teacher
11   or other school personnel."
12                 Do you see that?
13         A.      Yes.
14         Q.      And I read that correctly?
15         A.      Yes.
16         Q.      The last item in this list is
17   students shall not use email or text --
18   excuse me, let me start that over.  Strike
19   that.
20                 The last item in this list
21   is, "students shall not use email or text
22   messaging or web postings on social
23   networking sites to promote the annoyance,
24   harassment, intimidation, bullying or
25   attack of others."

CONFIDENTIAL

Page 212

1           Do you see that?

2      A.      Yes.

3      Q.      These are policies that

4  Irvington Public Schools has for all of its

5  students, correct?

6      A.      Yes.

7      Q.      Have these policies changed

8  in any meaningful way in the last ten

9  years?

10     A.      How would you define

11 meaningful?

12     Q.      Have there been any

13 significant changes to these policies in

14 the last ten years?

15     A.      No.

16     Q.      How does IPS enforce these

17 policies?

18     A.      Well, there are various ways

19 that these are enforced, one, if activity

20 has been monitored, whether in realtime or

21 through observation by our tech coaches, if

22 they see activity on GoGuardian, or any of

23 the -- if we notice firewall violations, or

24 if we notice -- or there are complaints

25 from students, teachers, staff regarding

CONFIDENTIAL

Page 213

1    the use of these, these unallowable uses by

2    our students, then there are levels of

3    consequences.

4            Q.      Let's turn the page to

5    prohibited items.  And I apologize, turn

6    the page in the excerpt, this is page 32 of

7    the Student Code of Conduct Bates ending in

8    380.

9            A.      Yes, uh-huh.

10           Q.      Is this the district's policy

11   on prohibited items?

12           A.      Yes.

13           Q.      If you look at the bolded

14   text after the asterisk?

15           A.      Uh-huh, yes.

16           Q.      The policy states, "We

17   understand that cell phones are prevalent

18   in today's society; if students bring cell

19   phones to school they should be concealed

20   and turned off.  If any staff member sees

21   or hears a cell phone the phone will

22   immediately be taken away and given to an

23   administrator.  Parent may be required to

24   pick it up."

25                   Do you see that?

CONFIDENTIAL

Page 214

1           A.      Yes.

2           Q.      Is that the district's

3    policy?

4           A.      Yes.

5           Q.      Approximately how many

6    phones, in the 24-25 school year,

7    approximately how many phones have been

8    confiscated from students who are in

9    violation of this policy?

10                  MR. INNES:  Objection to form.

11           Outside the scope.

12                  THE WITNESS:  I don't have a

13           number.

14    BY MR. KARP:

15           Q.      Do you have that number for

16    any school year in the last ten years?

17                  MR. INNES:  Objection to form.

18           Outside the scope.

19                  THE WITNESS:  No, I don't.

20    BY MR. KARP:

21           Q.      We talked earlier about when

22    students are and are not permitted to have

23    their phones out at school.

24           A.      Uh-huh.

25           Q.      I believe you mentioned

Page 215

1  before school as one example when they can
2  have their phones out?
3          A.      Before school, yes.
4          Q.      So if they're standing
5  outside the building or in the building
6  before classes start for the day, they can
7  have their phones out?
8          A.      Yes.
9          Q.      You also mentioned lunch
10 periods.
11         A.      I did.
12         Q.      Students can use their phones
13 during their lunch periods?
14         A.      Yes.
15         Q.      And then after school, even
16 if a student is still in the building or on
17 IPS property, they can use their cell
18 phones?
19         A.      Yes, I think I said we
20 dissuade them to use it if they're in an
21 organized activity after school.
22         Q.      When you say, "dissuade them
23 from using it," do you mean that it's not
24 permitted or they're discouraged from using
25 it?

CONFIDENTIAL

Page 216

1         A.      No, it would have the same

2    type of consequences if we see them, if

3    they're supposed to be in, we have a group

4    called Pretty Pearls of Promise.  If

5    they're on their phones, we would ask them,

6    one, to put it away, and then if they,

7    probably in that particular scenario, if

8    they continued to use it and not pay

9    attention to the activity then we probably

10   would ask them to leave the activity.  The

11   consequences of suspension and all of those

12   wouldn't apply to a club.

13        Q.      Did you say would not apply?

14        A.      Would not apply to a club,

15   because they would be asked to be dismissed

16   from.

17        Q.      So is a student and an IPS

18   student at soccer practice, for example,

19   you know, for the high school soccer team,

20   would not be permitted to have his phone

21   out during practice?

22        A.      Yes.

23        Q.      And if he were found to have

24   his phone out during practice, he would be

25   told to put it away?

CONFIDENTIAL

Page 217

1          A.      Yes.

2          Q.      And if he did not comply, he

3    would be asked to leave the activity or

4    leave the practice?

5          A.      Yes.

6                  MR. INNES:  Objection to form.

7          Calls for speculation.

8    BY MR. KARP:

9          Q.      But there wouldn't be the

10   same consequences around suspension that

11   would apply during the school day is your

12   testimony?

13         A.      Yes.

14         Q.      During the school day, are

15   students permitted to use their cellular

16   devices in between class periods?

17         A.      No.

18         Q.      So if they're in the hall

19   moving from one class to another, they

20   would not be permitted to have their cell

21   phone out?

22         A.      They wouldn't be permitted.

23   They would be asked to put it away, if it

24   was seen -- if they were in violation of

25   the policy, they would be told you're in

CONFIDENTIAL

Page 218

1    violation of the policy and they would be

2    expected to get into compliance with the

3    policy.

4         Q.    Is the -- is that the general

5    practice of IPS to first ask students to

6    stop using their phones and put them away

7    before attempting to confiscate them?

8              MR. INNES:  Objection to form.

9              THE WITNESS:  I would say,

10         yes.

11    BY MR. KARP:

12         Q.    Do students in Irvington

13    Public Schools take buses to get to school?

14              MR. INNES:  Objection to form.

15    BY MR. KARP:

16         Q.    Let me ask a different

17    question.  Does Irvington Public Schools

18    provide school buses to get students to

19    school?

20              MR. INNES:  Objection to form.

21         Outside the scope.

22              THE WITNESS:  To some of our

23         students.

24    BY MR. KARP:

25         Q.    And the only distinction I'm

CONFIDENTIAL

Page 219

1    making is between a New Jersey Transit bus

2    or a public bus versus a district bus.  Do

3    you understand?

4            A.      Yes, uh-huh.

5            Q.      And you said that some

6    students at IPS take district buses --

7            A.      Yes.

8            Q.      -- to get to school?

9            A.      Yes.

10           Q.      Are cell phones allowed --

11   can IPS students use their cell phones

12   while they're on the bus going to school?

13           A.      I would say I'm not sure that

14   that is something that we've considered,

15   because the students normally who take the

16   bus are students with learning

17   difficulties, usually severe ones.  I don't

18   know that that is an issue, but I would

19   imagine riding the bus is similar to

20   walking to school, so while on the bus,

21   they would be permitted to.

22           Q.      Are students -- are IPS

23   students with learning difficulties the

24   only -- is that the only group of students

25   at IPS who would take a district bus to get

Page 220

```
 1   to school?
 2            A.       No, we have another group of
 3   students who belong to our STEAM Academy
 4   and they're picked up at one spot in front
 5   of Irvington High School and taken to the
 6   academy.
 7            Q.       Do you know if those students
 8   are permitted to use their cell phones on
 9   the bus?
10            A.       Yes.
11            Q.       They are?
12            A.       It's similar to walking to
13   school.
14            Q.       When asked about cell phone
15   usage originally, you said, "I would say
16   I'm not sure that is something we've
17   considered because the students normally
18   who take the bus are students with learning
19   difficulties, usually severe ones," is
20   that --
21            A.       I think I said that, yes, I
22   just said that, right?
23            Q.       Yes, I'm just confirming you
24   said that.
25            A.       Okay.  I didn't know if you
```

Page 221

1  were talking about sometime before or right
2  now.  Yes.
3       Q.    Right now, just a few minutes
4  ago.
5       A.    Yes.
6       Q.    And my question is, is it the
7  district's understanding that those
8  students do not use cell phones?
9       A.    No, it's not my
10  understanding.  If I were to explain my
11  thinking, it was -- are they really in
12  possession of phones, the students that
13  have to take buses?  And then I thought
14  about the varying degrees of learning
15  difficulties that the students have who
16  ride a bus and then that's why I said, gave
17  the answer I gave.
18       Q.    That it wasn't an issue you
19  would consider?
20       A.    Yes.
21       Q.    That the district would
22  consider?
23       A.    Yes.
24       Q.    Let's look at page 51 of the
25  Student Code of Conduct, which appears on

CONFIDENTIAL

Page 222

1    Bates ending in 399.  At the top, the

2    document states, "Irvington Board of

3    Education Student Personal Electronic

4    Recording Device Policy."

5           A.    Yes.

6           Q.    Do you see that?

7           A.    Yes.

8           Q.    Is this the district's policy

9    on student personal electronic recording

10   devices?

11          A.    I'm just reading through the

12   whole document, if you don't mind.

13          Q.    Sure.

14          A.    Yes.

15          Q.    Section II here refers to

16   unauthorized use.

17                Do you see that?

18          A.    Yes.

19          Q.    "Unauthorized use of personal

20   electronic recording twice may include but

21   not limited to the following."

22                Do you see that?

23          A.    Yes.

24          Q.    And the first item listing

25   is, "Possessing, recording, sending video

Page 223

1    or audio information having sexual,
2    violent, bullying, or threatening content
3    on school grounds, school events, or school
4    buses will be prohibited and may result in
5    disciplinary action, up to and including
6    suspension and expulsion."
7             Do you see that?
8         A.    Yes.
9         Q.    Remember earlier I asked a
10   question about whether the act of taking
11   videos, regardless of whether they were
12   posted to social media, could be in
13   violation of the Student Code of Conduct?
14        A.    Yes.
15        Q.    Does this refresh your memory
16   that recording videos regardless of where
17   they're posted or where they end up could
18   violate the Student Code of Conduct for
19   IPS?
20        A.    Yes, but we have a network
21   and imaging policy that every scholar takes
22   home.  So, in short, yes, it does encompass
23   what you just asked, but that's a policy
24   that applies just to everyone.  So that
25   would be in keeping with having it here.

CONFIDENTIAL

Page 224

1          Q.     I understand.  Thank you.

2          A.     Yes.

3          Q.     Let's look at page 66, which

4    is Bates ending in 414.  Is this the

5    district's policy on levels of disciplinary

6    consequences?

7          A.     Let me just read through the

8    document --

9          Q.     Yeah, sure.

10         A.     -- real quick.

11              MR. INNES:  What topic are we

12         on?

13              THE WITNESS:  Okay.  Can I

14         have your question again, I'm

15         sorry?

16              MR. INNES:  Before we proceed,

17         I would like to know what topic

18         Mr. Karp is asking questions about.

19              THE WITNESS:  Okay.  Sorry.

20              MR. KARP:  This is topic six,

21         district-wide policies, procedures,

22         and factors regarding Defendants'

23         platforms and then it goes on to

24         include some other categories.

25         Also topics 11, 13, and 14.

CONFIDENTIAL

```
                                       Page 225

 1                  Dr. Vauss, my question was

 2             simply if this is the district's

 3             policy on the levels of

 4             disciplinary consequences?

 5                  THE WITNESS:  Yes.

 6  BY MR. KARP:

 7        Q.     And it refers to four levels

 8  of disciplinary consequences?

 9        A.     Yes.

10        Q.     Level 1 being the least

11  serious and level 1 being the most serious;

12  is that fair?

13        A.     Yes.

14        Q.     Level 1 is an administrative

15  conference?

16        A.     Yes.

17        Q.     Level 2 includes

18  conferencing, detention, in-school

19  suspension, a letter home, or other

20  disciplinary remedies?

21        A.     Home for parent, meaning you

22  have to come back to school with a parent,

23  but yes.

24        Q.     Thank you for clarifying.

25  Level 3 is an out-of-school suspension?
```

                                        Page 226

1          A.      Yes.

2          Q.      And level 4 is a mandatory

3    ten-day suspension and an assessment for

4    whether there needs to be programmatic

5    modifications or an expulsion of the

6    student?

7          A.      Yes.

8          Q.      What level of disciplinary

9    consequences applies to a student who has

10   his or her phone out during the school day?

11         A.      I think it would be a level

12   1.

13         Q.      Okay.  I'm going to hand you

14   tab four, which we will mark as Exhibit 14.

15         A.      Yes.

16                 - - - - -

17              (Email dated 6/11/21 Bates

18              BW__Irvington00161074 marked

19              Vauss Exhibit 14 for

20              identification.)

21                 - - - - -

22   BY MR. KARP:

23         Q.      Do you see this document?

24         A.      Yes, I do.

25         Q.      This email was sent from

Page 227

1    Farrah Irving to you, Dr. April Vauss, on

2    February 2021.

3                    Do you see that?

4         A.    Yes.

5         Q.    The subject is sexual abuse

6    policy/training?

7         A.    Yes.

8         Q.    And Ms. Irving attaches a

9    document called, "Communication Policy."

10                   Do you see that?

11        A.    Yes.

12        Q.    I'm handing you tab 4A.

13        A.    Thank you.

14        Q.    We'll mark this as

15   Exhibit 15.

16                   - - - - -

17              (Policy 3283 on Electronic

18         Communication Between Teaching

19         Staff Members and Students Bates

20         BW__Irvington00161075 to 00161079

21         marked Vauss Exhibit 15 for

22         identification.)

23                   - - - - -

24   BY MR. KARP:

25        Q.    I'll represent to you that

Page 228

1    this is the attachment to the email that we
2    were just reviewing.
3              A.      Yes.
4              Q.      You can also tell because
5    it's the next Bates number sequentially.
6    Have you seen this document before?
7              A.      Yes.
8              Q.      It says, "Policy," at the top
9    and Irvington Board of Education?
10             A.      Yes.
11             Q.      And also at the top, this
12   document says, "3283 - Electronic
13   Communications Between Teaching Staff
14   Members and Students."
15                     Do you see that?
16             A.      Yes.
17             Q.      Is this the district's policy
18   on communications between staff and
19   students?
20             A.      Yes.
21             Q.      And the policy states, "The
22   Board of Education recognizes electronic
23   communications and the use of social media
24   outlets create new options for extending
25   and enhancing the educational program of

Page 229

1   the school district."

2               Do you see that?

3       A.    Yes.

4       Q.    "Electronic communications

5   and the use of social media can help

6   students and teaching staff members

7   communicate regarding:  Questions during

8   nonschool hours regarding homework or other

9   assignments; scheduling issues for

10  school-related cocurricular and

11  interscholastic activities; schoolwork to

12  be completed during a student's extended

13  absence; distance learning opportunities;

14  and other professional communications that

15  can enhance teaching and learning

16  opportunities between teaching staff

17  members and students."

18              Do you see that?

19      A.    Yes.

20      Q.    "However, the Board of

21  Education recognizes teaching staff members

22  can be vulnerable in electronic

23  communications with students."

24              Do you see that?

25      A.    Yes.

CONFIDENTIAL

Page 230

1          Q.      This is a policy intended
2     to -- to help staff be careful about the
3     ways that they interact with students
4     electronically?
5          A.      Yes.
6          Q.      Do you agree with the
7     statements in this -- as the district, do
8     you agree with the statements written in
9     this first paragraph?
10         A.      Yes.
11         Q.      Is this still the policy of
12    Irvington Public Schools?
13         A.      Yes.
14         Q.      We can put this to the side.
15    I'm handing you tab five, which we'll mark
16    as Exhibit 16.
17                      - - - - -
18              (School Safety Data System
19              2023-24 Incidents Bates
20              BW__Irvington00673652 to 00673661
21              marked Vauss Exhibit 16 for
22              identification.)
23                      - - - - -
24    BY MR. KARP:
25         Q.      In the top left, this

CONFIDENTIAL

Page 231

1    document says, "New Jersey Department of

2    Education" and the document is titled

3    "Student Safety Data System."

4            A.     Yes.

5            Q.     Do you see that?

6            A.     Yes.

7            Q.     Are you familiar with this

8    document?

9            A.     I am.

10           Q.     What is this document?

11           A.     This is our student safety

12   data system we have to share with the New

13   Jersey Department of Education based on

14   incidents of violence and vandalism.

15           Q.     And this particular document

16   or report refers to incidents from

17   2023-2024?

18           A.     Yes.

19           Q.     Is this a document that the

20   district prepares or is this prepared by

21   the department of education?

22           A.     You mean, did we come up with

23   a format or -- no, this is something that

24   is given to us and we have to fill it out

25   online.

Page 232

1          Q.      So the department of
2   education asks the district to supply it
3   with information?
4          A.      Yes.
5          Q.      Do you have any reason to --
6   as the district, do you have any reason to
7   dispute the accuracy of the information
8   that's contained in this document?
9          A.      No.
10          Q.      Let's look at Bates ending in
11   652, which is the very first page.  You'll
12   see on this page.  There are three
13   sections, report period one, report period
14   two, and 2023-2024 school year?
15          A.      Yes.
16          Q.      Do you see that?
17          A.      Yes.
18          Q.      What's meant by report period
19   one and report period two?
20          A.      So it would be the first
21   quadrant of reporting deadline, I'm not
22   sure of the exact deadline, and then there
23   would be a second one, and then for the
24   total school year.
25          Q.      Thank you.

CONFIDENTIAL

Page 233

1          A.      You're welcome.

2          Q.      Let's focus on the third

3   section called 2023-2024 school year.

4          A.      Yeah.

5          Q.      And the top row listed there

6   is Irvington High School.

7                  Do you see that?

8          A.      Yes.

9          Q.      Below Irvington High School

10  is other IPS schools in the district?

11         A.      Yes.

12         Q.      Including middle schools and

13  high schools, correct?

14         A.      Yes.

15         Q.      If we look at the first

16  column called, "Incident Total"?

17         A.      Yes.

18         Q.      The total number of

19  incidents, student safety incidents listed

20  here is 269.

21                 Do you see that?

22         A.      Yes, I do.

23         Q.      And if we look just to the

24  right, we see that the number of

25  incidents -- the number of those incidents

Page 234

1   involving violence was 75?

2        A.    Yes.

3        Q.    The number of those incidents

4   involving vandalism was 18?

5        A.    Yes.

6        Q.    The number of incidents

7   involving substances -- substances was 157?

8        A.    Yes.

9        Q.    And the number of incidents

10  involving weapons was 21.

11              Do you see that?

12       A.    Yes.

13       Q.    There is a column here for

14  other incidents leading to removal.

15              Do you see that?

16       A.    Yes.

17       Q.    Do you know what other

18  incidents would fall into this category?

19       A.    Other infractions, school

20  infractions, other incidents.

21       Q.    Do you know what is meant by

22  "removal," as that word is used here?

23       A.    Suspension, suspension.  I

24  mean as a general term, suspension,

25  expulsion.

CONFIDENTIAL

Page 235

1          Q.      And would that be in-school

2    suspension, out-of-school suspension, or

3    you're not making a distinction between

4    those two?

5          A.      I'm not making a distinction.

6          Q.      You mentioned earlier that if

7    a student's phone were confiscated, that

8    would be a level 1 disciplinary

9    consequence, correct?

10         A.      Yes.

11         Q.      And that would be an

12   administrative conference?

13         A.      Yes.

14         Q.      A student would not be

15   removed or suspended because the student

16   had his or her phone out, correct?

17         A.      That's correct.

18         Q.      Okay.  So if we add up the

19   total incidents and the other incidents

20   leading to removal, the total -- strike

21   that.

22                 Looking specifically at the

23   incident total and the other incidents

24   leading to removal, the sum of those is 767

25   incidents for the 2023-2024 school year; is

Page 236

1  that right?

2                  MR. INNES:  Objection to form.

3                  THE WITNESS:  Yes.

4  BY MR. KARP:

5       Q.     All of those incidents would

6  have led to removal?

7       A.     I'm sorry, say that again.

8       Q.     All of those incidents would

9  have led to removal?

10      A.     For a suspension, yes, or

11 expulsion.  Although, you know, we didn't

12 have any expulsions that school year.

13      Q.     Let's turn the page to Bates

14 ending in 653.  This page provides a little

15 bit more detail about the incidents that

16 took place at Irvington High School in

17 particular.

18                Do you see that?

19      A.     Yes.

20      Q.     It shows a little bit more

21 detail and a breakdown of the types of

22 incidents that were at issue, correct?

23      A.     Yes, uh-huh.

24      Q.     What is covered by the

25 vandalism incident listed here?

CONFIDENTIAL

```
                                        Page 237

 1               MR. INNES:  Objection to form.

 2               THE WITNESS:  Are you

 3           referring to the page you had me

 4           turn to?

 5   BY MR. KARP:

 6       Q.     Yes, the page ending in 653.

 7       A.     Okay.  And your question is

 8   what does vandalism refer to?  Can you ask

 9   your question again?

10       Q.     Sure.  You know what, I'm

11   just going to ask a different question

12   altogether.

13       A.     Okay.

14       Q.     Under vandalism, there is an

15   incident type called damage to property.

16           Do you see that?

17       A.     Yes.

18       Q.     And if you look over to the

19   right, the total number of incidents for

20   damage to property as a result of vandalism

21   is two for reporting period one, and zero

22   for reporting period two.

23           Do you see that?

24       A.     Yes, I do.

25       Q.     And the number of yearly
```

CONFIDENTIAL

Page 238

1    incidents is two, correct?

2            A.      Yes.

3            Q.      Okay.  So in -- for the

4    2023-2024 school year, the New Jersey

5    Department of Education reported that there

6    were only two instances or incidents of

7    vandalism involving damage to property --

8            A.      Yes.

9            Q.      -- at the high school?  Does

10   the district have any understanding of

11   whether those particular incidents involved

12   social media?

13           A.      We don't.

14           Q.      Let's take a look at another

15   document which is tab seven.

16           A.      Thank you.

17           Q.      We'll mark this as

18   Exhibit 17.

19                        - - - - -

20                   (Student Safety Data System

21                2017-18 Incidents Bates

22                BW__Irvington00673582 to 00673596

23                marked Vauss Exhibit 17 for

24                identification.)

25                        - - - - -

Page 239

1    BY MR. KARP:

2          Q.      This is another report from

3    the student safety data system and the

4    report says department of education for the

5    state of New Jersey in the top left.

6                  Do you see that?

7          A.      Yes.

8          Q.      Is this the same type of

9    student safety data report that we just

10   looked at, but in this instance, it's for

11   the 2017-2018 school year?

12         A.      Yes.

13         Q.      Let's focus on the bottom of

14   the page with the data -- bottom of the

15   first page with the data for -- strike

16   that.  Sorry.

17                 Let's look at the bottom of

18   the page, specifically the section for the

19   2017-2018 school year.

20                 Do you see that?

21         A.      Yes.

22         Q.      Okay.  The incident total for

23   all schools at IPS is 109.

24                 Do you see that?

25         A.      Yes.

CONFIDENTIAL

Page 240

1          Q.     And if we move to the right,
2    other incidents leading to removal?
3          A.     Yes.
4          Q.     That number is 1,285.
5                 Do you see that?
6          A.     I do, yes.
7          Q.     If we add those together, we
8    get 1,394 student safety incidents for the
9    2017-2018 school year in Irvington Public
10   Schools?
11         A.     Yes.
12         Q.     And all of these incidents
13   would have led to either a suspension or an
14   expulsion?
15         A.     Yes.
16         Q.     The number of violent
17   incidents in this school year was 77.
18                Do you see that?
19         A.     Yes.
20         Q.     Do you recall what that
21   number was for the 2023-2024 school year?
22         A.     Seventy-five.
23         Q.     Let's turn the page in
24   Exhibit 17, which is the 2017-2018 data.
25   My apologies, I'm going in the wrong

CONFIDENTIAL

Page 241

1    direction, my fault.

2                     Let's stay on the first page

3    of Exhibit 17.  There are 11 incidents of

4    vandalism listed.

5            A.      Yes.

6            Q.      Okay.  Eleven instances

7    involving substance abuse, or excuse me,

8    involving substances?

9            A.      Yes.

10           Q.      Ten instances involve --

11   incidents involving weapons?

12           A.      Yes.

13           Q.      The number for substances in

14   2017-2018 is 11 and the number of

15   substances -- substance-related incidents

16   for the 2023-2024 school year is 157.

17                    Do you see that?

18           A.      I do.

19           Q.      Does the district have an

20   understanding of that jump from 11 to 157?

21           A.      Is your question do we see

22   the jump?

23           Q.      Do you have an understanding

24   of why that jump occurred?

25                    MR. INNES:  Objection to form.

CONFIDENTIAL

Page 242

1           Outside the scope.
2                THE WITNESS:  There are a
3           myriad of reasons why it would have
4           jumped.  That would be conjecture
5           on my part to say why the substance
6           level, I might say because -- well,
7           I won't.
8    BY MR. KARP:
9           Q.    You said it would be
10   conjecture?
11          A.    Yes, it would be.
12                MR. KARP:  Can we take a brief
13          break?  We have been going for a
14          bit.
15                THE VIDEOGRAPHER:  The time
16          right now is 2:29 p.m.  We're off
17          the record.
18                - - - - -
19      (A recess was taken at this time.)
20                - - - - -
21                THE VIDEOGRAPHER:  The time
22          right now is 2:52 p.m.  We're back
23          on the record.
24   BY MR. KARP:
25          Q.    Dr. Vauss, welcome back.

CONFIDENTIAL

Page 243

1          A.       Thank you.

2          Q.       Is it the district's position

3    that social media -- or strike that.  The

4    district's position in this case is that

5    social media has had a negative impact on

6    the mental health of IPS students, correct?

7          A.       Yes.

8          Q.       Is it also IPS's position

9    that nothing other than social media has

10   had a negative impact on IPS student mental

11   health?

12         A.       No, I wouldn't say that.

13         Q.       The district would agree that

14   there are many contributing factors to an

15   IPS student's mental health, correct?

16         A.       Yes.

17         Q.       Does financial insecurity

18   have a negative effect on IPS student

19   mental health?

20              MR. INNES:  Objection to form.

21              THE WITNESS:  I would say,

22         meaning that if they're poor, if

23         that has a negative effect on our

24         scholars?

25

CONFIDENTIAL

Page 244

1    BY MR. KARP:

2        Q.      Correct.

3        A.      I would say inasmuch as that

4    they know that they are poor, then yes.

5        Q.      And I think I was using

6    financial insecurity a little bit more

7    broadly --

8        A.      Okay.

9        Q.      -- to mean that there are

10   varying levels of economic disadvantage and

11   the insecurity that a student might feel

12   about his or her finances or family's

13   finances could impact that student's mental

14   health.

15                   MR. INNES:  Objection to form.

16                   THE WITNESS:  I'd say that --

17            I mean, I can only answer that same

18            way, inasmuch as they know that

19            they are financially insecure, then

20            that might have an impact on their

21            mental well-being.

22                   THE VIDEOGRAPHER:  I'm sorry,

23            your microphone is upside down.

24            Thank you.

25                   THE WITNESS:  Thank you.

CONFIDENTIAL

Page 245

BY MR. KARP:

Q.      And is that something you've
observed among IPS students?

A.      That they feel insecure
because of their financial situations?

Q.      Strike that, only because I'm
asking you as the district.  Is the
district aware of whether that has been a
problem for IPS students?

A.      I would say, yes, varying
degrees, yes.

Q.      Has food insecurity been a
problem for IPS students?

MR. INNES:  Objection to form.

THE WITNESS:  When you state
it that way, as though it is a
problem with all of our students,
with IPS students, I would say no.
Are there certain students who have
food insecurity, yes.

BY MR. KARP:

Q.      And I didn't mean to imply
that it was applicable to every student in
IPS.  Do some students struggle with food
insecurity?

Page 246

1          A.      Yes.

2          Q.      And to be more specific, do

3    some IPS students struggle with food

4    insecurity?

5          A.      Yes.

6          Q.      And does that have a negative

7    impact on their mental health?

8          A.      I would say yes.

9          Q.      Do IPS students feel pressure

10   to graduate from high school?

11                 MR. INNES:  Objection to form.

12                 THE WITNESS:  Yes.

13   BY MR. KARP:

14         Q.      Pressure to go to college?

15                 MR. INNES:  Objection to form.

16                 THE WITNESS:  I would say yes.

17   BY MR. KARP:

18         Q.      Pressure to get a job after

19   graduation?

20                 MR. INNES:  Objection to form.

21                 THE WITNESS:  Pressure after

22            graduation from college, after

23            graduation from high school, there

24            may be some in different

25            categories.

Page 247

1    BY MR. KARP:

2        Q.        Pressure -- IPS students

3    experience these pressures to graduate, to

4    go to college, and to find jobs, right?

5                    MR. INNES:  Objection to form.

6            Outside the scope.

7                    THE WITNESS:  I would say yes,

8            students do, yes.

9    BY MR. KARP:

10        Q.        Those pressures have an

11    impact on their mental health?

12                    MR. INNES:  Same objection.

13                    THE WITNESS:  Yes.

14    BY MR. KARP:

15        Q.        Do some IPS students feel

16    pressure to provide financial support to

17    their families?

18                    MR. INNES:  Objection.

19            Outside the scope.

20                    THE WITNESS:  Yes.

21    BY MR. KARP:

22        Q.        And that may have a negative

23    impact on a student's mental health,

24    correct?

25            A.    Yes.

CONFIDENTIAL

Page 248

```
 1        Q.      Do IPS students suffer
 2   from -- or strike that.
 3                Do some IPS students
 4   struggle with low academic self-esteem?
 5                MR. INNES:  Objection to form.
 6                THE WITNESS:  Yes.
 7   BY MR. KARP:
 8        Q.      They don't feel confident in
 9   their abilities to perform in the
10   classroom?
11        A.      Yes.
12        Q.      And that has a negative
13   impact on a student's mental health,
14   correct?
15        A.      Yes.
16        Q.      Does violence in the
17   Irvington community have a negative impact
18   on the mental health of IPS students?
19        A.      Can you please clarify what
20   you mean, violence in the Irvington
21   community?
22        Q.      To the extent there are
23   violent incidents that occur in Irvington,
24   not necessarily on school grounds, it could
25   be anywhere in Irvington, does that have a
```

CONFIDENTIAL

Page 249

1  negative effect on student mental health?

2              MR. INNES:  Objection to form.

3         Asked and answered.  You may answer

4         again.

5              THE WITNESS:  Okay.  I would

6         say all students who are exposed to

7         violence.  All of the things, food

8         insecurity, financial insecurity,

9         violence, those all would have a

10        negative impact on mental health.

11 BY MR. KARP:

12      Q.    And thank you.  For violence,

13 whether that individual is the victim of

14 the violent incident or knows the victim,

15 knows of the victim, in any of those

16 scenarios, it could have a negative effect

17 on that person's mental health, right?

18      A.    Yes, I would --

19             MR. INNES:  Objection to form.

20             THE WITNESS:  Sorry, I would

21        say it would have a negative impact

22        no matter of known, unknown, in

23        this community, or any other

24        community, it would, you know,

25        violence, documented or

                                                        Page 250

1              undocumented, yes.

2    BY MR. KARP:

3         Q.      Does bullying have a -- or

4    strike that.

5                   Do IPS students struggle

6    with bullying?

7                   MR. INNES:  Objection to form.

8                   THE WITNESS:  There are

9         instances -- incidents of it, yes.

10   BY MR. KARP:

11        Q.      Bullying has a negative

12   effect on student mental health, correct?

13        A.      Yes.

14        Q.      And that would apply to IPS

15   students?

16        A.      Yes, that is correct.

17        Q.      Many of the issues that we

18   just discussed from financial insecurity to

19   bullying to pressure to get a -- to go to

20   college after graduating from high school

21   existed well before social media, correct?

22        A.      Yes.

23        Q.      Today, students are dealing

24   with some unique issues that some prior

25   generations have not needed to deal with,

Page 251

1    do you agree with that?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. KARP:

5          Q.     Students today have been

6    challenged by the COVID-19 pandemic, right?

7          A.     Yes.

8          Q.     And the district agrees that

9    that had a negative impact on student

10   mental health, correct?

11         A.     Yes.

12         Q.     Students for a period of time

13   were at home learning virtually and not

14   able to interact with their friends and

15   peers in person, right?

16         A.     Yes.

17         Q.     And might have felt isolated

18   during that time?

19         A.     Yes.

20         Q.     Might have felt scared about

21   getting COVID or having a loved one get

22   COVID-19?

23         A.     Yes.

24         Q.     Students today -- are IPS

25   students affected by -- or strike that.

CONFIDENTIAL

Page 252

```
1                  Do social justice issues
2     have an impact on the mental health of IPS
3     students?
4                  MR. INNES:  Objection to form.
5                  THE WITNESS:  Yes.
6     BY MR. KARP:
7          Q.     And is that something that
8     the district has observed in the last ten
9     years?
10         A.     I would say, yes.
11         Q.     I'm going to hand -- Danny,
12    is the video on?
13                 I want to turn back to the
14    discussion we were having of violence in
15    the Irvington community, to be a bit more
16    specific.  Does the district know how
17    violent crime rates in Irvington compare to
18    violent crime rates elsewhere in the state
19    of New Jersey?
20                 MR. INNES:  Objection to form.
21                 THE WITNESS:  Does IPS know
22            how incidents of violence happen --
23            can you, I'm sorry, I'm just trying
24            to --
25
```

CONFIDENTIAL

Page 253

1    BY MR. KARP:

2        Q.    Sure.  Does IPS know or have

3    an understanding of how the rates of

4    violent crime in Irvington compare to the

5    rates of violent crime elsewhere in New

6    Jersey?

7        A.    I would --

8              MR. INNES:  Objection to form.

9          The rest of New Jersey as a whole

10         or a specific community?  It's a

11         confusing question.

12    BY MR. KARP:

13        Q.    And my question stands.

14        A.    I would say no.

15        Q.    Has Irvington ever -- has the

16    district ever reviewed crime rate data

17    relating to Irvington in particular?

18        A.    No.

19        Q.    Has violent crime been an

20    issue for the Irvington community in the

21    relevant time period?

22              MR. INNES:  Objection to form.

23         Outside the scope.

24              THE WITNESS:  I would say

25         violent crimes has been an issue

CONFIDENTIAL

Page 254

1              across New Jersey, the United
2              States, and in our world.
3    BY MR. KARP:
4         Q.     And is Irvington included in
5    that?
6         A.     It's in that world, yes.
7    Yes.
8         Q.     I'm going to hand you tab 25.
9         A.     Thank you.
10        Q.     We'll mark this as the next
11   exhibit, which is Exhibit 18.
12                  - - - - -
13              (2019 Crime in the United
14              States marked Vauss Exhibit 18
15              for identification.)
16                  - - - - -
17                THE WITNESS:  Okay.
18   BY MR. KARP:
19        Q.     This is crime data FBI from
20   2019 taken from the FBI's website.
21                Do you see that?
22        A.     I do.
23        Q.     Has the district seen this
24   before?
25        A.     Not to my knowledge.

CONFIDENTIAL

Page 255

1           Q.      Let's focus on page 1,
2      specifically, the information relating to
3      New Jersey.
4                   Do you see that toward the
5      bottom of the page?
6           A.      I do.
7           Q.      Some information for New
8      Jersey is -- or strike that.
9                   The table reflects crime
10     data for New Jersey for 2018 and 2019.
11                  Do you see that?
12          A.      Yes.
13          Q.      If you look at the very top
14     of the table, there's a column for violent
15     crime.
16                  Do you see that?
17          A.      I do.
18          Q.      And on the right side of that
19     column, it says, "rate per 100,000."
20          A.      Yes.
21          Q.      Do you see that?
22          A.      I do.
23          Q.      Do you have an understanding
24     of what's meant by rate per 100,000?
25          A.      Yes.

Page 256

1    Q.    This is the rate per 100,000

2    people, correct?

3    A.    That is correct.

4    Q.    Okay.  So if we go back down

5    to New Jersey, and the data for New Jersey,

6    violent crime in New Jersey for 2019, that

7    rate was 206.9 per 100,000 people.

8              Do you see that?

9    A.    I do.

10    Q.    So according to the FBI, in

11    2019, there were 206.9 instances of violent

12    crime for every 100,000 people in the state

13    of New Jersey, correct?

14    A.    Yes.

15    Q.    Does IPS have any basis to

16    dispute the FBI data?

17    A.    No.

18    Q.    I'm handing you tab 26.

19              A good way to use up my

20    time, Michael.

21              MR. INNES:  I wish I was that

22         creative.

23              - - - - -

24              (Uniform Crime Report Crime

25         in the United States, 2019 marked

```
                                       Page 257

 1              Vauss Exhibit 19 for

 2              identification.)

 3                    - - - - -

 4    BY MR. KARP:

 5         Q.      We'll mark this as

 6    Exhibit 19.  This is also from the FBI.

 7    And it includes a definition of violent

 8    crime.

 9                   Do you see that?

10         A.      I do.

11         Q.      It reads, "In the FBI's

12    Uniform Crime Reporting Program, violent

13    crime is composed of four offenses:  Murder

14    and nonnegligent manslaughter, rape,

15    robbery, and aggravated assault."

16                   Do you see that?

17         A.      I do.

18         Q.      And those are the types of

19    incidents that are reported on in

20    Exhibit 18, correct?

21         A.      Yes.  I find it interesting,

22    "The data presented in Crime," it says, "in

23    Crime in the United States reflect a

24    Hierarchy Rule, which requires that only

25    the most serious offense in a
```

Page 258

1   multiple-offense criminal incident be
2   counted."
3                   So being a data person, that
4   means that there was something that was
5   left off.
6         Q.     So for any of the numbers
7   listed here, they could be higher --
8         A.     Yes, I know.
9         Q.     There may be -- no, I'm just
10   trying to understand what you're saying, so
11   there may be more incidents?
12         A.     I guess my emphasis is that
13   these numbers aren't exact.
14         Q.     Okay.  They might be
15   approximate numbers?
16         A.     Okay.
17         Q.     I'm asking if that's what
18   you're saying --
19         A.     That would be my
20   understanding from that statement, but
21   yeah.
22         Q.     Thank you.  Let's turn
23   back -- I'm going to hand you tab 27, which
24   we will mark as Exhibit 20.
25                   - - - - -

CONFIDENTIAL

Page 259

1                  (2019 Crime in the United
2              States (New Jersey) marked Vauss
3              Exhibit 20 for identification.)
4                     - - - - -
5    BY MR. KARP:
6          Q.      This is additional data from
7    the FBI for 2019 broken down by cities
8    within New Jersey.
9          A.      Uh-huh.
10         Q.      Do you see that?
11         A.      I do.
12         Q.      Okay.  Let's turn to the data
13   for Irvington.
14         A.      Uh-huh.
15         Q.      Which appears on the third
16   page?
17         A.      Yes.
18         Q.      Toward the bottom.
19         A.      Uh-huh, yes.
20         Q.      According to this table, the
21   population of Irvington at this point in
22   time was 54,034?
23         A.      Yes.
24         Q.      And for that population of
25   people, the FBI reported 280 incidents of

CONFIDENTIAL

```
                                        Page 260
 1  violent crime.
 2                 Do you see that?
 3        A.      I do.
 4        Q.      So in Irvington, there were
 5  280 incidents of violent crime for
 6  54,000 -- approximately 54,000 people as
 7  compared to the state of New Jersey?
 8        A.      Yes.
 9        Q.      Where there were 206.9
10  incidents of violent crime for
11  approximately 100,000 people?
12        A.      Yes.
13        Q.      Okay.  Meaning that the rate
14  of violent crime in Irvington, according to
15  the FBI, was more than two times as much as
16  the rate in the rest of the state?
17        A.      That is correct.
18        Q.      Is it the district's position
19  that those rates of violent crime would
20  have a negative impact on the mental health
21  of their students?
22                 MR. INNES:  Objection to form.
23                 THE WITNESS:  I would say,
24           yes, in addition to other things,
25           yes.
```

CONFIDENTIAL

Page 261

1    BY MR. KARP:
2         Q.      And we discussed a number of
3    factors --
4         A.      Yes.
5         Q.      -- that could contribute to a
6    student's mental health?
7         A.      Yes, we did.
8         Q.      And thank you for clarifying.
9         A.      And I would say to the degree
10   that it touches those individuals, you
11   know, I've lived in Irvington since 2017
12   and I have not been the victim of a crime.
13   So, you know, there's -- I feel bad for
14   those who it did affect, but I wouldn't say
15   that everyone is -- in Irvington is touched
16   by violence.
17        Q.      You mentioned earlier that
18   regardless of whether you're the victim of
19   violent crime, know someone who is the
20   victim of --
21        A.      Yes.
22        Q.      -- a violent crime, know of
23   someone or just --
24        A.      Yes.
25        Q.      -- hear about --

CONFIDENTIAL

Page 262

1          A.      Yes.

2          Q.      -- a violent crime that would

3    have a negative impact on mental health,

4    right?

5                  MR. INNES:  Objection to form.

6                  THE WITNESS:  Yes, I did say

7          that.

8    BY MR. KARP:

9          Q.      Does IPS give gang awareness

10   training?

11         A.      We do provide training for

12   our administrative staff, so, yes, that

13   would be a yes.

14         Q.      How often does that take

15   place?

16         A.      Yearly.

17         Q.      So some amount of gang

18   awareness training is given to IPS staff

19   every year?

20         A.      Yes.

21         Q.      Is gang awareness training

22   given to students in IPS?

23         A.      Not to my knowledge.

24         Q.      Okay.  Why is gang awareness

25   training given to IPS staff?

CONFIDENTIAL

Page 263

1          A.     I think because it's
2     important for our administrators, that's
3     who gets it, to understand what gangs are.
4     That is gangs from its pure definition
5     aren't always groups of people coming
6     together for violence, but it's a set
7     number of people who organize and form a
8     grouping of common interest.  And some are
9     negative and some are positive, and we want
10    to make sure that students aren't, you
11    know, marginalized or polarized as being a
12    part of a negative violent gang if and when
13    they are not.  They may -- there may be
14    stereotypes about what a gang member looks
15    like and what a violent person looks like
16    and we want to ensure that those
17    stereotypes are not applied to our
18    scholars.
19          Q.     Are IPS staff educated in
20    gang awareness or trained in gang awareness
21    because gang violence is an issue facing
22    Irvington Public Schools?
23          A.     I believe --
24               MR. INNES:  Objection to form.
25               THE WITNESS:  I believe some

CONFIDENTIAL

Page 264

```
 1          students do face the threat of gang
 2          violence.
 3   BY MR. KARP:
 4          Q.    And, again, my question in
 5   meant to imply that every student at
 6   Irvington Public Schools has --
 7          A.    That's why I wanted to make
 8   sure I clarified that.
 9          Q.    And I picked up on that, so
10   thank you.
11          A.    You're welcome.
12          Q.    Do IPS staff receive training
13   in gang awareness because some IPS students
14   are affected by gang violence?
15               MR. INNES:  Objection to form.
16               THE WITNESS:  Yes.
17   BY MR. KARP:
18          Q.    I'm going to hand you tab 32.
19   And I will just say very plainly for the
20   record that I am asking extremely limited
21   questions about this document.  And if at
22   any point we need to take a break, please
23   let me know.
24               MR. INNES:  Okay.  We're going
25          back to something.
```

CONFIDENTIAL

                                        Page 265

1              MR. KARP:  For the record,
2         this is Exhibit 21.
3                   - - - - -
4              (NJ.com Article marked Vauss
5         Exhibit 21 for identification.)
6                   - - - - -
7    BY MR. KARP:
8         Q.    Dr. Vauss, just a few
9    questions on this document and if you need
10   to take a break at any point, please let me
11   know.
12              This article is titled,
13   "Gang member who gunned down rival near New
14   Jersey high school pleads guilty," and it
15   was published April 15, 2024.
16              Do you see that?
17        A.    Yes.
18        Q.    Did you have a chance to
19   review this article when I handed it to
20   you?
21        A.    I did.
22        Q.    Does this article refer to
23   the incident that you were sharing with me
24   earlier?
25        A.    Yes.

Page 266

1          Q.     Does this refresh your memory
2   of whether gangs were involved in the
3   incident that you have shared with me?
4          A.     Yes.  Yes.  Yes.
5          Q.     And according to this
6   article, a gang member very tragically shot
7   the young man you were telling me about?
8          A.     Yes.
9          Q.     Who is described here as a
10  rival --
11         A.     Yes.
12         Q.     -- in the report?
13         A.     Yes.
14         Q.     I also asked you earlier that
15  you were aware one way or another if
16  someone had been convicted of the crime.
17  Does this refresh your memory?
18         A.     It does, it brings to my
19  memory the school resource officer, because
20  when you asked about the particular
21  platform that the -- that initiated -- I
22  mean, it could have been back and forth
23  before, but there was the incident that
24  happened the night before this incident and
25  that there was activity on Facebook where

CONFIDENTIAL

Page 267

1  they were sharing, they were liking what
2  the victim noted here, what he was doing
3  with the group of gang members that he was
4  involved with.  And I think it was because
5  they continued to brag and this particular
6  young man who shot Marquise was still
7  bragging and posting that they were
8  tracking them, their activity, and I think
9  that helped to get them, yes.
10         Q.     This individual pleaded
11  guilty to the crime?
12         A.     Yes, he did.
13         Q.     And it says here that he
14  pleaded, he "pleaded guilty in Newark
15  federal court to Racketeer Influenced and
16  Corrupt Organizations conspiracy,"
17  according to the U.S. Attorney's office,
18  right?
19         A.     Yes.
20         Q.     We can put this to the side.
21  Thank you.
22         A.     You're welcome.
23              MR. INNES:  Do you need a
24         break or can you push through?
25              THE WITNESS:  I'll push

CONFIDENTIAL

Page 268

1              through.
2    BY MR. KARP:
3          Q.    Are you sure?
4          A.    Yeah, I'm fine, yes.
5          Q.    I'm handing you tab two.
6    This is the Third Amended Plaintiff Fact
7    Sheet - School Districts for Irvington
8    Public Schools.
9                Do you see that?
10         A.    Yes.
11               - - - - -
12               (Third Amended Plaintiff
13         Fact Sheet - School Districts
14         marked Vauss Exhibit 22 for
15         identification.)
16               - - - - -
17   BY MR. KARP:
18         Q.    If we look at the last page
19   of this document at the back --
20         A.    Yes.
21         Q.    -- there's a certification.
22   You are the signatory?
23         A.    Yes.
24         Q.    And you signed this on
25   April 28, 2025?

Page 269

1          A.      Yes.

2          Q.      And you stated that you

3    declared under penalty of perjury that the

4    information provided in this Plaintiff Fact

5    Sheet is complete, true, and correct to the

6    best of your knowledge and information?

7          A.      Yes.

8          Q.      Thank you.

9          A.      You're welcome.

10          Q.      Let's turn to page 38.

11          A.      I'm sorry, can you repeat the

12   page.

13          Q.      Sorry, page 38.

14          A.      Thirty-eight.  Thank you.

15          Q.      Question 51 asks, "Do you

16   possess any existing report, survey,

17   analysis, study or other document that

18   provides an overview of or describes

19   traumatic events, that is, school shooting,

20   violence at school by a nonstudent or

21   non-staff members, and students or threats

22   of violence?"

23               Do you see that?

24          A.      Yes.

25          Q.      The answer is no to that

CONFIDENTIAL

Page 270

1    question?
2            A.     Yes.
3            Q.     Sitting here today, that
4    answer has not changed?
5            A.     No, it has not.
6            Q.     You can put this to the side
7    for now.  I'm handing you tab 30 --
8            A.     Thank you.
9            Q.     -- which we will mark as tab
10   23 -- Exhibit 23, excuse me.
11                     - - - - -
12                  (Plaintiff Fact Sheet -
13           School Districts (Supplemental)
14           marked Vauss Exhibit 23 for
15           identification.)
16                     - - - - -
17   BY MR. KARP:
18           Q.     This is "Plaintiff Fact Sheet
19   - School Districts (Supplemental)" for
20   Irvington Public Schools.
21                  Do you see that?
22           A.     Yes.
23           Q.     If we turn to the last page
24   of this document, there's a certification.
25                  Do you see that?

CONFIDENTIAL

Page 271

1          A.      Yes.

2          Q.      You are also the signatory

3    there?

4          A.      Yes.

5          Q.      And you signed this on

6    May 31, 2024?

7          A.      Yes.

8          Q.      Let's turn to questions nine

9    and ten.  Or rather the page that shows

10   questions nine and ten, but we're just

11   going to focus on question ten.

12         A.      Yes.

13         Q.      Question ten asks the

14   district to "Identify the number of and

15   location of any school shooting, whether

16   you attribute any such incident to social

17   media use, and if so, which social media

18   platform."

19              Do you see that?

20         A.      Yes.

21         Q.      And then the district wrote,

22   "During the 2018-2019 school year, a high

23   school student was fatally gunned down just

24   after class let out only blocks from

25   Irvington High School.  The School District

Page 272

1    attributes the shooting to social media

2    use, specifically Instagram."

3                    Do you see that?

4         A.    Yes.

5         Q.    This is why I was asking

6    earlier about the particular platform, you

7    had told me Facebook --

8         A.    Yes.

9         Q.    -- and I just wanted to

10   clarify --

11        A.    Yes, yes.

12        Q.    -- because here, there's a

13   reference to Instagram.

14                    Do you see that?

15        A.    Yes.

16        Q.    To be sure, is this the same

17   incident that we were talking about?

18        A.    This is the same incident.

19        Q.    Okay.  So is it the

20   district's understanding that the posts

21   that you had described were on Instagram

22   rather than Facebook?

23        A.    No, it's my understanding

24   that it's Facebook.  When I -- I spoke to

25   the school resource officer, as I was

Page 273

1  saying, and he said it was Facebook.

2          Q.      Okay.   So Instagram here

3  should be -- in the Plaintiff Fact Sheet

4  should say Facebook?

5          A.      That is correct.

6          Q.      And your understanding of

7  Facebook as the platform at issue was based

8  on discussions with the school resource

9  officer; is that what you told me?

10         A.      Yes.

11         Q.      Do you recall that

12  individual's name?

13         A.      Andrew Merisca.

14         Q.      Thank you.

15         A.      You're welcome.

16         Q.      Let's go to question 11.

17  Question 11 asks the district to "Identify

18  the number of and location of any other

19  violence perpetrated by an outsider (i.e.,

20  nonstudent and non-staff member) which

21  requires the cessation of school activities

22  for the entire district or an entire school

23  campus, whether you attribute any such

24  incident to social media use, and if so,

25  which social media platform."

                                    Page 274

1                    Do you see that?

2        A.      Yes.

3        Q.      The first incident listed is

4    the one that we've already discussed,

5    correct?

6        A.      Uh-huh, yes.

7        Q.      Let's focus on the next

8    paragraph.

9        A.      Yes.

10       Q.      Here, the district states

11   that, "During the 2023-2024 school year,

12   Irvington High School encountered three

13   significant security incidents involving

14   outsiders that required it to halt normal

15   school activities campus-wide.  The first

16   incident occurred on school grounds and

17   prompted a shelter in place to ensure the

18   safety of all students and staff.  Feuds

19   between students on Instagram led to a

20   melee that was this first incident.  This

21   melee was captured on Instagram Live and

22   shared throughout Instagram."

23                    Do you see that?

24       A.      Yes.

25       Q.      Okay.  Before we talk about

Page 275

1    the other two incidents that are described

2    later, let's just pause and talk about

3    that.  Who were these -- who are the

4    individuals -- or strike that.

5                      What is a shelter in place?

6           A.      A shelter in place is a

7    safety protocol when there may be some type

8    of unknown danger or situation occurring in

9    the building.

10          Q.      Thank you, Dr. Vauss.

11          A.      You're welcome.

12          Q.      In this particular incident,

13   students were fighting that led to a melee

14   and the melee was filmed and shared on

15   Instagram, is that --

16          A.      Yes.

17          Q.      -- what occurred?

18          A.      Yes.

19          Q.      "The other two incidents

20   originated in the community and were linked

21   to interactions on Instagram. These --"

22          A.      Yes.

23          Q.      I'm sorry --

24          A.      I'm sorry --

25          Q.      -- social media --"

Page 276

1        A.      -- finish the question.

2        Q.      I'll start over.  "The other

3   two incidents originated in the community

4   and were linked to interactions on

5   Instagram.  These social media exchanges

6   among students led to substantial safety

7   concerns, prompting the school to conduct a

8   comprehensive safety drill."

9                Do you see that?

10       A.      Yes.

11       Q.      Can you tell me more about

12  those incidents?

13       A.      Okay.  Which ones, all three

14  or --

15       Q.      The ones that you list as the

16  other two incidents.

17       A.      Okay.  All right.  So the

18  other two incidents, one involved a student

19  who I believe he shot himself, not

20  purposely, but accidentally, in the

21  backyard of a home and there were students

22  who were present when this -- when this

23  accident occurred.  It wasn't -- it was an

24  accident, but it occurred.  And as a result

25  of that, this is really silly, but

Page 277

1    students, you know, they posted about the
2    incident happening and then people were
3    putting comments like rest in peace, they
4    were sharing it.  And certain members of
5    the school community would say, you're not
6    really friends with this person.  Why are
7    you trying to -- and there's their
8    vernacular, you're trying to -- I'll just
9    say you're trying to pretend, you're trying
10   to pretend you had this relationship with
11   them that you didn't.
12              There was a girl who said I
13   was his girlfriend, you weren't.  Why are
14   you posting?  So it, just, it grew and it
15   grew and it grew.  As people commented on
16   the posting and they, you know, some of our
17   students didn't appreciate that, for
18   whatever reason, it grew into situations
19   that spilled over into the high school and
20   then we had to deal with it.
21              The second incident involves
22   one of our scholars was involved in a car
23   accident.  He was killed.  Same type of
24   situation.  You don't really know him.
25   You're trying to pretend like you know him.

Page 278

1    You're posting things and saying rest in
2    peace or you're acting like you had a
3    relationship with him and you didn't, and
4    it sounds really trivial, because the main
5    point is that a child died, but children
6    act like children.  And those are the two
7    incidents that are noted there.
8          Q.    Thank you.  So the first
9    incident involved a student who
10   inadvertently shot himself that was posted,
11   maybe not the shooting, but the fact that
12   it had happened was posted to social media
13   and there were some, a number -- that was
14   shared and commenting ensued?
15         A.    Yes, they gave their thoughts
16   on it and it became, it took a life of its
17   own.
18         Q.    As a result of that, was
19   there any violence or fighting at IPS, like
20   physical fighting?
21         A.    As a result of this incident?
22         Q.    Yes.
23         A.    Yes.
24         Q.    And in the other example that
25   you provided, there was a very tragic car

CONFIDENTIAL

Page 279

1  accident?

2          A.      Yes.

3          Q.      And students were posting

4  about the car accident and commenting about

5  the extent to which people actually knew

6  the individual who was in that car

7  accident; is that right?

8          A.      Yes.

9          Q.      Did that lead to violence or

10  physical fighting at IPS?

11          A.      Yes.

12          Q.      Okay.  For all three of these

13  incidents that are listed here --

14          A.      Yes.

15          Q.      -- in this paragraph, what is

16  the district's basis for saying that

17  Instagram in particular was the platform

18  that was being utilized or that was linked

19  to these incidents?

20          A.      Because the staff members

21  that are at Irvington High School, some of

22  them actually viewed these items online.

23  Students told them about it being online.

24  So it's a myriad of reasons why they know

25  that it was placed on the platform.

CONFIDENTIAL

Page 280

1        Q.    And these incidents occurred
2   at Irvington High School, correct?
3        A.    That's correct.
4        Q.    If I wanted to learn more
5   about these incidents, who would be a good
6   person to talk to?
7        A.    I would say --
8             MR. INNES:  Objection to form.
9             THE WITNESS:  Sorry.  I would
10        say speak to Principal Mangan for
11        sure, his AP staff, particularly
12        Ms. Freeman, like, she deals with a
13        lot of those issues.  And the
14        deans, I think the deans would be
15        privy to that as well.
16   BY MR. KARP:
17        Q.    Thank you.
18        A.    You're welcome.
19        Q.    Let's talk briefly about the
20   next item here, the next question here
21   which is number 12.
22             Do you see that?
23        A.    Yes.
24        Q.    In response to number 12, the
25   district wrote, "During the 2023-2024

CONFIDENTIAL

Page 281

1   school year, Irvington High School

2   experienced one serious threat of violence

3   that necessitated the cessation of all

4   school activities across the entire campus.

5   This incident, which was known to our

6   student body and involved a threat of a

7   school shooting, required the cessation of

8   all school activities for the entire school

9   campus.  Irvington attributes the incident

10  to social media, specifically Instagram."

11              Do you see that?

12      A.    Yes.

13      Q.    Okay.  Can you tell me more

14  about this incident?

15      A.    There was an incident saying

16  that there was something that was going to

17  happen at Irvington High School.

18      Q.    Meaning a post?

19      A.    A post, yes.

20      Q.    Someone posted something is

21  going to happen --

22      A.    Yes.

23      Q.    -- at Irvington High School?

24      A.    Yes.

25      Q.    And that was interpreted as

CONFIDENTIAL

Page 282

1  a threat --

2          A.      A threat, yes.

3          Q.      And that led to --

4          A.      And it was circulated

5  throughout.

6          Q.      And that led for the

7  cessation of all school activities across

8  the campus?

9          A.      Yes.  I believe, I want to

10  believe that it was during after-school

11  hours that we became aware of it, because

12  it wasn't -- we didn't miss the entire

13  school day.

14          Q.      The district attributed that

15  incident to Instagram?

16          A.      Yeah, the ability for that to

17  circulate, we believe there was some cause

18  on behalf, if it -- just one person had put

19  something up, it wouldn't have been passed

20  throughout the district.  If it hadn't been

21  passed throughout the district, no one

22  would have known about it and there

23  wouldn't be the need to stop school

24  activities.

25          Q.      Was it a real threat?

CONFIDENTIAL

Page 283

1                   MR. INNES:  Objection to form.
2    BY MR. KARP:
3          Q.     I can rephrase that.  The
4    school investigated the post, correct?
5          A.     Yes, we had school resource
6    officers in our area, security, you know,
7    out looking around trying to be vigilant
8    too.
9          Q.     Was it -- what I meant by my
10   question was, was it determined through the
11   investigation that the individual who
12   posted that sincerely or seriously intended
13   to do something at school that would harm
14   other students?
15         A.     I think --
16                 MR. INNES:  Objection to form.
17                 THE WITNESS:  Oh, sorry.  I
18             think that their intent was to
19             disrupt the school day and they
20             were successful in being able to
21             disrupt the school day.  So to that
22             degree, yes, they were successful
23             and it was, it was the threat that
24             they intended, which was to school
25             instruction, they were successful.

CONFIDENTIAL

Page 284

1    BY MR. KARP:

2         Q.       And I think -- thank you.

3    What I intended by my question was -- well,

4    actually, strike that.  I appreciate your

5    answer.

6                  Let's take a look at the

7    next tab, which is tab 33.

8         A.       If I can request that after

9    we do this one I can go to the bathroom.

10                 MR. KARP:  Yeah, we can take a

11         bathroom break?

12                 THE WITNESS:  Is that okay?

13                 MR. INNES:  Take it right now,

14         yes.

15                 THE WITNESS:  Thank you.

16                 THE VIDEOGRAPHER:  The time

17         right now is 3:38 p.m.  We are off

18         the record.

19                       - - - - -

20       (A recess was taken at this time.)

21                       - - - - -

22                 THE VIDEOGRAPHER:  The time

23         right now is 3:46 p.m.  We're back

24         on the record.

25

Page 285

1  BY MR. KARP:

2          Q.      Welcome back --

3          A.      Thank you.

4          Q.      -- Dr. Vauss.

5          A.      Thank you.

6          Q.      I am handing you tab 33.  We

7  will mark this as Exhibit 24.

8                  - - - - -

9                  (RLS Media Article marked

10            Vauss Exhibit 24 for

11            identification.)

12                  - - - - -

13 BY MR. KARP:

14          Q.      The title of this document

15 is, "Fourth Bomb Threat in a Month Called

16 at Irvington Township Middle School."

17                  Why don't you take a minute

18 just to look?  Have you had a chance to

19 take a look?

20          A.      Yes, uh-huh.

21          Q.      Thanks.

22          A.      You're welcome.

23          Q.      This article was published on

24 December 2, 2022.

25                  Do you see that?

CONFIDENTIAL

Page 286

1        A.      Yes.
2        Q.      As I stated a minute ago, the
3  title of this article is, "Fourth Bomb
4  Threat in a Month Called in at Irvington
5  Township Middle School."
6                Do you see that?
7        A.      Yes.
8        Q.      Do you recall this incident?
9        A.      Yes.
10       Q.      You were superintendent at
11 the time?
12       A.      Yes.
13       Q.      The article reads that, "The
14 Essex County Bomb Squad was called to the
15 scene to investigate a threat at a middle
16 school in Irvington Township Thursday
17 afternoon."
18       A.      Yes.
19       Q.      Do you see that?
20       A.      Yes.
21       Q.      "In the fourth bomb threat
22 called in at the Union Avenue Middle School
23 since November 3rd, Irvington Township
24 Police were notified of a threat phoned
25 into the building shortly before 1:50 p.m."

Page 287

1          A.      Yes.

2          Q.      So someone called Union

3    Avenue Middle School and made this bomb

4    threat?

5          A.      Yes, but it was also my

6    understanding that the person put it on one

7    of the platforms and was able to circulate

8    it around to the children who then told

9    their parents that, you know, about the

10   situation as well.

11         Q.      I'm not understanding, can

12   you --

13         A.      So the person, I believe,

14   placed the threat verbally, called it in,

15   but also placed it on social media, the

16   threat.  They made a threat of some kind.

17   This is my understanding from speaking to

18   the principal, the principal would have

19   called me, and the students got word of it,

20   because they saw the posting.

21         Q.      The threat was called in

22   to --

23         A.      To the school.

24         Q.      -- the school, correct?

25         A.      To the school, yes.

CONFIDENTIAL

Page 288

```
 1          Q.      You're saying in addition --
 2          A.      In addition, that was my
 3   understanding afterwards, yes.
 4          Q.      And when you say, "your
 5   understanding," you mean Dr. Vauss's
 6   understanding?
 7          A.      No, the district being
 8   that -- well, Dr. Vauss, having received a
 9   call from the principal at the time that
10   that was happening.
11          Q.      And I was clarifying, because
12   you said there was a conversation with
13   Principal Mangan, is that what you referred
14   to?
15          A.      Well, that was for Irvington
16   High School, this is for Union Avenue.
17          Q.      Oh, apologies.  But when you
18   said you had that conversation with the
19   principal of Union Avenue Middle School,
20   that was you, Dr. Vauss --
21          A.      Yes.
22          Q.      -- who had that conversation?
23          A.      Yes, that was me.  That was
24   me.
25          Q.      Are bomb threats common at
```

CONFIDENTIAL

Page 289

1    IPS?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  I would say

4          they're not common, they've

5          happened before.

6    BY MR. KARP:

7          Q.    This was -- this article was

8    written December 2nd of 2022 and this was

9    the fourth bomb threat to occur --

10         A.    Yes.

11         Q.    -- to be called in --

12         A.    For Union Avenue.

13         Q.    -- at Union Avenue --

14         A.    At Union Avenue.

15         Q.    -- specifically?

16         A.    Specifically Union Avenue.

17         Q.    So this one school, this was

18    the fourth bomb threat --

19         A.    Yes.

20         Q.    -- in a month --

21         A.    Unfortunately, yes.

22         Q.    -- to be called in?

23         A.    Yes.

24         Q.    Do students feel

25    comfortable -- do IPS students feel

CONFIDENTIAL

Page 290

1    comfortable coming to school if there are
2    constant bomb threats?
3                    MR. INNES:  Objection to form.
4            Misstates the prior testimony.
5            Lack of foundation.  Assumes facts
6            not in evidence.
7                    MR. KARP:  You can answer the
8            question.
9                    THE WITNESS:  Do they feel
10           comfortable coming to school if
11           there are bomb threats?  No.
12   BY MR. KARP:
13       Q.    A student might choose to
14   stay home if -- an IPS student might choose
15   to stay home if there were four bomb
16   threats made to his or her school in a
17   month?
18                   MR. INNES:  Objection.
19           Objection to the -- I'm sorry,
20           objection to form.
21                   THE WITNESS:  No, they
22           wouldn't want to come to school.
23   BY MR. KARP:
24       Q.    Let's look at Exhibit 23,
25   which was the supplemental PFS or Plaintiff

CONFIDENTIAL

Page 291

1    Fact Sheet.

2           A.      Was it the last one?  Yes.

3           Q.      The last exhibit we were

4    reviewing.

5           A.      Yes.

6           Q.      And let's go back to question

7    number 12.  Question 12 says, "Describe the

8    frequency of threats of violence to any of

9    your schools (for example, threat of school

10   shooting or bomb scare) which required a

11   cessation of school activities for the

12   entire district or an entire school campus

13   and were known to students, whether you

14   attribute any such incident to social media

15   use, and if so, which social media

16   platforms."

17              Do you see that?

18          A.      Yes.

19          Q.      The bomb threat we just

20   discussed is not listed in the response

21   that the district provided to question 12.

22          A.      Yes.

23          Q.      Why is that?

24          A.      To be honest, I'm not sure

25   why it's not listed.

CONFIDENTIAL

Page 292

1          Q.     We discussed that this was
2     the fourth bomb threat to be called in a
3     month, specifically at Union Avenue Middle
4     School?
5          A.     Uh-huh.
6          Q.     Were there other bomb threats
7     made that year at IPS schools?
8          A.     No, not to my knowledge --
9          Q.     Only --
10          A.     -- or IPS.
11          Q.     But sitting here today, you
12     do not know why the four different bomb
13     threats at Union Avenue Middle School are
14     not listed?
15          A.     No.
16               MR. INNES:  Objection to form.
17     BY MR. KARP:
18          Q.     Are there other incidents
19     that you're aware of or that the district
20     is aware of that should have been -- or
21     strike that.
22               Are you aware of other
23     incidents responsive to question number 12
24     that are not presently included in the
25     response?

CONFIDENTIAL

Page 293

1                    MR. INNES:  Objection to form.

2                    THE WITNESS:  No.

3    BY MR. KARP:

4          Q.    We're going to shift gears a

5    bit.  You can put this to the side.

6          A.    Thank you.

7          Q.    I'm handing you tab 24.

8                    MR. INNES:  Take your time.

9                    MR. KARP:  We will mark this

10              Exhibit 25.

11                    Dr. Vauss, if you look at

12              the first page, the bottom

13              right-hand corner, you'll see

14              there's a long Bates number and

15              the letters NJDOE appear.

16                    THE WITNESS:  Yes.

17                       - - - - -

18                    (2023-2024 BSCA Stronger

19              Connections Grant 3047

20              MDL__002074__NJDOE__0002706 to

21              0002769 marked Vauss Exhibit 25

22              for identification.)

23                       - - - - -

24    BY MR. KARP:

25          Q.    I'll represent to you that

Page 294

1    these records were produced by the New

2    Jersey Department of Education.

3        A.    Yes.

4        Q.    We are going to look at maybe

5    only a page of this long document --

6        A.    Okay.

7        Q.    -- but just for the record,

8    if you look at the front, this document is

9    the 2023-2024 BSCA Stronger Connections

10   Grant application?

11       A.    Yes.

12       Q.    Do you see that?

13       A.    Yes.

14       Q.    The applicant is 13 2330

15   Irvington Township Essex County.

16             Do you see that?

17       A.    Yes, I see that.

18       Q.    Is it your understanding that

19   this is a grant application that Irvington

20   Public Schools submitted?

21       A.    Yes.

22       Q.    To the New Jersey Department

23   of Education?

24       A.    Yes.  Yes.

25       Q.    Let's take a look at page,

CONFIDENTIAL

Page 295

1    the page with the Bates number ending 719.

2    On this page -- sorry about that.

3          A.    Not your fault.  Definitely

4    not your fault.

5          Q.    As if I were the cause of

6    this --

7                MR. INNES:  Motorcycles.

8    BY MR. KARP:

9          Q.    Dr. Vauss, on this page, the

10   application states that, "Irvington Public

11   Schools is seeking grant funding from the

12   Bipartisan Safer Communities Act (BSCA)

13   Stronger Connections Grant to implement a

14   comprehensive Restorative Practices Program

15   district-wide."

16                Do you see that?

17         A.    I do.

18         Q.    What are restorative

19   practices?

20         A.    Restorative practices are

21   practices that help us find ways to deal

22   with issues that we normally would suspend

23   for and find ways of restoring the child to

24   the learning environment to try to come up

25   with more inclusive, reflective ways to

CONFIDENTIAL

Page 296

1  restore the child to the place we want them

2  to be, which is with their friends, the

3  other scholars, their teachers, the staff,

4  you know, different people who have an

5  effect on their educational journeys.

6         Q.     That was very helpful, thank

7  you.

8         A.     You're welcome.

9         Q.     Let's turn to the page ending

10  in 722, and let me know when you're there.

11         A.     I am.

12         Q.     The first line of this

13  response states that, "If awarded grant

14  funding, the district proposes to implement

15  a comprehensive restorative practices

16  program district-wide for grade K through

17  12."

18                Do you see that?

19         A.     Yes.

20         Q.     And that is the restorative

21  practices -- that's a program that would

22  support the restorative practices you were

23  just telling me about, right?

24         A.     Yes.

25         Q.     If we look a little bit

Page 297

1    further down in this paragraph to the
2    middle.
3            A.    Do you mind if I just read
4    all the way down?
5            Q.    I do not mind at all.
6            A.    Okay.  Thank you.  Okay.  You
7    said the middle of the page, right, yes.
8            Q.    Yes.  There is a statement
9    here starts with the word, "data"?
10           A.    Yes.
11           Q.    According to this
12   application, "Data reveals that as a result
13   of COVID-19, the district has seen a spike
14   in student conduct referrals which
15   indicates a need for strengthening coping
16   skills to navigate peer conflicts in a more
17   acceptable manner."
18                 Do you see that?
19           A.    Yes.
20           Q.    And I read that correctly?
21           A.    Yes.
22           Q.    That is what the district
23   submitted to the New Jersey Department of
24   Education?
25           A.    Yes.

Page 298

1          Q.      And they -- the district goes
2     on to say, "This can be especially seen in
3     the special education population of
4     students where the increase of referrals
5     has put a significant strain on the mental
6     health service providers.  The current
7     ratio of school psychologists and school
8     counselors to students is a thousand to
9     one, which is double what it should be for
10    psychologists, and 75 percent more than
11    what it should be for school counselors and
12    social workers."
13               Do you see that?
14          A.      Yes.
15          Q.      And that is what the district
16    told the New Jersey Department of Education
17    in this application, right?
18          A.      Yes.
19          Q.      Earlier when we were talking
20    about whether students could use their cell
21    phones on school buses, like district buses
22    to get to school, you mentioned students
23    with educational difficulties?
24          A.      Yes.
25          Q.      Is that the same population

CONFIDENTIAL

Page 299

1    that's referred to here as special

2    education students?

3              A.     Yes.

4              Q.     And you testified earlier

5    that the district was not really aware of

6    how you considered whether those students

7    have cell phones?

8              A.     Whether the special ed

9    students have cell phones?

10             Q.     Who take the bus.

11             A.     Just like any other student,

12   yes, we don't know which of them have it

13   and which of them don't.  So, yes.

14             Q.     The application goes on to

15   say that, "The district's overall student

16   population is made up of 85 percent

17   black/Hispanic Latino, and low-income

18   students.  The district has 2,356 ELL

19   students."

20                   Do you see that?

21             A.     Yes.

22             Q.     Is that your general

23   understanding of the makeup of the IPS

24   student body at this point in time?

25             A.     Yes.

CONFIDENTIAL

Page 300

1          Q.      "Most suspensions across the
2     district affect the black male population
3     of students.  It is anticipated that
4     implementing a restorative practices
5     program will benefit all students, but
6     particularly black/male middle school and
7     high school students since they have the
8     largest number of suspensions."
9                    Do you see that?
10          A.      Yes.
11          Q.      "The district chose to use
12     restorative practices as its primary
13     intervention to be implemented because it
14     is currently being utilized in some
15     capacity at the district with positive
16     results."
17          A.      Yes.
18          Q.      So restorative practices were
19     already being used by the district and the
20     district sought to bulk up that program and
21     offer more of those services?
22          A.      Yes.
23                    MR. INNES:  Objection to form.
24                    THE WITNESS:  Sorry.
25

CONFIDENTIAL

Page 301

1   BY MR. KARP:

2        Q.     Does Irvington Public Schools

3   have any data on whether certain subgroups

4   of individuals, certain subgroups of

5   students use social media more than others?

6                    MR. INNES:  Objection to form.

7            Outside the scope.

8                    THE WITNESS:  No.

9   BY MR. KARP:

10       Q.     To refer directly to the

11  application that we were just discussing,

12  does Irvington Public Schools have any data

13  about whether black male students at IPS

14  use social media more than other students

15  at IPS?

16                   MR. INNES:  Objection to form.

17           Outside the scope.

18                   THE WITNESS:  No.

19  BY MR. KARP:

20       Q.     You can put this document to

21  the side.

22       A.     Okay.

23       Q.     Coming full circle,

24  Dr. Vauss, we're going to go back to

25  Exhibit 6, which is the Plaintiff's Third

CONFIDENTIAL

Page 302

1    Amended Answers to Defendants'
2    Interrogatories where we were discussing
3    this, this chart --
4            A.      Yes, excuse me, I'm sorry.
5            Q.      -- this table.  Do you still
6    have a copy?
7            A.      I do.
8            Q.      We talked a bit about Exhibit
9    A, let's look at Exhibit B.
10           A.      You said Exhibit B, okay,
11   yes.
12           Q.      And Exhibit B is the costs --
13   or strike that.
14                   The title of the table on
15   Exhibit B is, "Costs Associated with the
16   Harms Alleged in the Complaint for
17   Expenditures on External Programs and
18   Services."
19                   Do you see that?
20           A.      Yes.
21           Q.      The leftmost column of this
22   table is called, "Vendor"?
23           A.      Yes.
24           Q.      And then below that are a
25   number of vendors who have offered services

CONFIDENTIAL

Page 303

1  or provided services to the district, yeah?

2          A.     Yes.

3          Q.     The next column over is

4  approximate total spend.

5                  Do you see that?

6          A.     Yes.

7          Q.     And then there's a percent

8  allocation to harms?

9          A.     Yes.

10         Q.     What is your understanding --

11  what is the district's understanding of

12  percent allocation to harms?

13         A.     I would say the percent

14  allocation to harms as it relates to these

15  vendors, this is a conservative number of

16  the percentage of their time that they

17  service Irvington Public Schools that they

18  allocate to social media.

19         Q.     When we were looking at

20  the -- at Exhibit A --

21         A.     Yes.

22         Q.     -- which included the

23  compensation for different staff at IPS.

24         A.     Yes.

25         Q.     There were different weight

CONFIDENTIAL

Page 304

1  percentages or percent allocations --

2         A.     Uh-huh.

3         Q.     -- assigned to each year

4  between 2016 and 2024.

5                Do you see that?

6         A.     That is correct.

7         Q.     Do you remember that?

8         A.     Oh, do you want me to go back

9  to it?

10        Q.     I'm just asking --

11        A.     Oh, yes, I do remember.  Yes,

12  I do.  I do.

13        Q.     Here there is a single

14  percentage assigned for each one of these

15  vendors.

16                Do you see that?

17        A.     Yes.

18        Q.     Is it Irvington's --

19  Irvington Public Schools' position that the

20  percent allocation to harms has been

21  constant for the relevant time period for

22  all of these vendors?

23        A.     I would say insomuch as that

24  I wanted to make sure I gave a conservative

25  figure, I would say yes.

CONFIDENTIAL

Page 305

1          Q.     The percent allocation has

2     not gone up over the years during the

3     relevant time period for these vendors?

4          A.     I would say it's been steady,

5     yes.

6          Q.     Okay.  But it has gone up

7     for -- the district believes that it has

8     gone up for its own employees over the

9     years, correct?

10          A.     I think that's correct.

11     These are conservative figures that are

12     listed there.

13                    THE VIDEOGRAPHER:  I'm sorry,

14              Counsel, I really need to go off

15              the record again.

16                    MR. KARP:  Oh, sure.  No

17              problem.

18                    THE VIDEOGRAPHER:  The time

19              right now is 4:12 p.m. and we're

20              off the record.

21                       - - - - -

22        (Discussion was held off the record.)

23                       - - - - -

24                    THE VIDEOGRAPHER:  The time

25              right now is 4:16 p.m.  We're back

CONFIDENTIAL

Page 306

1          on the record.

2     BY MR. KARP:

3          Q.     Dr. Vauss, before we took our

4     break, we were discussing Exhibit B, do you

5     recall?

6          A.     Yes.  Yes.

7          Q.     From just a few minutes ago?

8          A.     Yes.

9          Q.     And we were specifically

10    discussing the percent allocations that are

11    listed here on Exhibit B.

12         A.     Yes, uh-huh.

13         Q.     Let's talk about some

14    examples.

15         A.     Uh-huh.

16         Q.     CarePlus New Jersey is listed

17    here as one of the vendors?

18         A.     Yes.

19         Q.     And the percentage allocation

20    to harms is 20 percent?

21         A.     Yes.

22         Q.     And what's the basis for --

23    for that number?

24         A.     So based upon discussions

25    that they've had with Ms. Pettiford or

Page 307

1    other counselors, teachers, because they
2    service, they service general ed students,
3    but they also service special ed
4    students --
5                    THE STENOGRAPHER:  They
6            service what?
7                    THE WITNESS:  I'm sorry, they
8            service general education students,
9            I'm sorry, I abbreviated education.
10           They service as general education
11           students as well as special needs.
12           And from those conversations,
13           that's where the percentage came
14           in.
15    BY MR. KARP:
16        Q.    Ms. Pettiford reached out to
17    CarePlus to ask them questions about how
18    much time they spent offering mental health
19    services relating to social media?
20        A.    I don't think she reached out
21    and asked, I think it was from a
22    conversations that she's had.  So would she
23    be calling them, which she be getting
24    information with the counselors and would
25    they be expressing that to counselors or

Page 308

1    HSSCs, yes, they would.

2                    Education, special education

3    department, Dr. Wilson, they would have

4    spoken to Dr. Wilson about what they find

5    themselves spending time doing.  They

6    may -- I mean, yes.

7            Q.    Sorry.

8            A.    You're welcome.

9            Q.    I didn't realize you were

10    done, thank you.  Did IPS review any

11    CarePlus records regarding the services

12    that were offered to IPS students to

13    determine what percentage of those services

14    related to social media?

15            A.    No, they would not have.

16            Q.    Does IPS have access to

17    CarePlus records for the services they're

18    providing to referrals?

19                    MR. INNES:  Objection to form.

20                    THE WITNESS:  I believe

21              CarePlus lets us know how many

22              students that they service, but

23              certain information may be

24              confidential.  So I wouldn't be

25              able to say, I serviced April for

CONFIDENTIAL

Page 309

1            this, this, and this, but I would
2            say, I serviced April and I could
3            speak to things in a more broad
4            sense.
5    BY MR. KARP:
6            Q.    Sitting here today, does the
7    district know if CarePlus charges more
8    money based on the number of referrals it
9    gets from IPS?
10                   MR. INNES:  Objection to form.
11                   THE WITNESS:  I would say that
12            as their work increases and there's
13            more students who are referred,
14            then, yes, they would.
15   BY MR. KARP:
16           Q.    When you say that you would
17   say, is it something --
18           A.    Yes.
19           Q.    -- that you know?
20           A.    Yes, that as they let us know
21   that they are working more, they would
22   increase costs.
23           Q.    So the district's testimony
24   is that CarePlus charges a fee or some
25   amount of money per student that it serves?

CONFIDENTIAL

Page 310

1          A.      No, I wouldn't say that.

2          Q.      What's -- what am I missing,

3    because I --

4          A.      Okay.

5          Q.      -- am clearly not following?

6          A.      Okay.  So if I'm saying that

7    my time is increased, I might say that I'm

8    servicing more students.  I might say that

9    I'm doing more as it relates to students,

10   but saying we -- there are -- let me see,

11   how do I say this?  I wouldn't say that

12   they would say just because they've

13   increased their services to students, but

14   that would be part of the reason why they

15   would increase prices.

16         Q.      Does the district know if

17   CarePlus charges a flat rate or a flat fee

18   for the services it offers in a given

19   school year?

20                 MR. INNES:  Objection to form.

21                 THE WITNESS:  Yes, they charge

22           us a price, a set price for the

23           year.

24   BY MR. KARP:

25         Q.      So in that year, regardless

CONFIDENTIAL

Page 311

1    of whether CarePlus sees 20 students who

2    have been referred or two students who have

3    been referred, the district is paying the

4    same amount of money?

5            A.    Yes.

6                    MR. INNES:  Objection to form.

7            Lacks sound evidence.

8    BY MR. KARP:

9            Q.    Let's look at GoGuardian as

10   another example listed here.

11           A.    Yes.

12           Q.    We discussed earlier

13   GoGuardian is one of the -- one of the

14   safeguards that the district employs

15   regarding internet usage at IPS, correct?

16           A.    Yes.

17           Q.    Okay.  And we discussed the

18   many different types of sites that

19   GoGuardian was designed to block, correct?

20           A.    Yes.

21           Q.    We also discussed that

22   GoGuardian is part of -- is one way in

23   which the district complies with CIPA,

24   correct?

25           A.    Yes.

CONFIDENTIAL

Page 312

1          Q.      And that is in order to
2     get -- strike that.
3                  And that by being CIPA
4     compliant, the district is able to get
5     certain government funding?
6                  MR. INNES:  Objection to form.
7                  THE WITNESS:  Yes.
8     BY MR. KARP:
9          Q.      Without social media, would
10    the district still be using GoGuardian?
11         A.      I'm sorry, say that again.
12         Q.      If IPS students did not use
13    social media, would the district still be
14    using GoGuardian?
15         A.      Yes.
16         Q.      Is that the same for Palo
17    Alto as well?
18         A.      Yes.
19         Q.      The content filter and
20    firewall?
21         A.      Yes.
22         Q.      Let's talk about Generations
23    Family Guidance, LLC.  We discussed that
24    program earlier?
25         A.      Yes.

CONFIDENTIAL

Page 313

1          Q.     What's the basis, what's the
2     district's basis for contending that
3     20 percent of the time that -- or strike
4     that.
5                    What's the district's basis
6     for saying that 20 percent of what it pays
7     for Generations Family Guidance should be
8     allocated to social media harms?
9          A.     Because while its primary
10    role was not intended to deal with issues
11    that arise as it relates to sharing and
12    liking and posts on social media, it finds
13    that it is in fact these issues are coming
14    up.
15         Q.     How does the district know
16    that?
17         A.     From the conversations that
18    the staff have had with the staff of
19    Generations.
20         Q.     IPS has reached out to the
21    staff of Generations Family Guidance to ask
22    how much of their time is spent on social
23    media-related issues?
24                    MR. INNES:  Objection to form,
25           misstates prior testimony.

CONFIDENTIAL

Page 314

1           MR. KARP:  I'm asking a
2           question, have they done that?
3                THE WITNESS:  No, they didn't
4           reach out and ask them that
5           specific question.
6  BY MR. KARP:
7        Q.     The district's testimony is
8  that based on --
9        A.     Through the normal course
10  of -- I'm sorry.  Sorry.  Sorry, sorry,
11  sorry.  I'm being a teacher, sorry, I'll be
12  quiet.
13       Q.     No problem.  The district's
14  testimony is that 20 percent is an
15  approximation based on conversations that
16  people who have worked with Generations
17  Family Guidance have had with the staff for
18  Generations Family Guidance?
19                MR. INNES:  Objection to form.
20                THE WITNESS:  I think much
21           like when they sit and they have
22           conversations about things that
23           they're noticing, whether it is a
24           natural conversation or one where
25           they do some type of debriefing or

CONFIDENTIAL

Page 315

1            talking about the relevancy of
2            their organization for our needs,
3            that that came up in conversations
4            or in meetings or discussions.
5    BY MR. KARP:
6        Q.    Is it the district's
7    testimony that staff from Generations
8    Family Guidance has told the district we
9    spend 20 percent of our time addressing
10   social media-related issues?
11               MR. INNES:  Objection to form.
12           Misstates prior testimony.
13               THE WITNESS:  I would say that
14           they didn't say we spend 20 percent
15           or when we estimate from all of the
16           different things that they deal
17           with that 20 percent of the time
18           was dealt with that, has dealt with
19           that.
20   BY MR. KARP:
21       Q.    And, specifically, what about
22   that information tells the district that
23   20 percent is the right number?
24               MR. INNES:  Objection to form.
25               THE WITNESS:  So if someone

Page 316

1            from Generations Family Guidance is

2            talking about what they're doing

3            with the students, and as they go

4            through, and they notice that that

5            percentage is a constant, that it's

6            a constant mentioning of, we had to

7            deal with how social media is

8            making the children feel about

9            themselves, body images, dynamics

10           within families, and that they're

11           noticing things that juxtapose to

12           their realities that they're

13           noticing on social media, that's

14           where the 20 percent would have

15           come from.

16  BY MR. KARP:

17       Q.      When did those conversations

18  occur?

19              MR. INNES:  Objection to form.

20              THE WITNESS:  I believe these

21           were conversations that were --

22           they're fluid.  They probably go on

23           all the time as far as how -- what

24           they're doing and the different

25           things that are affecting what they

CONFIDENTIAL

Page 317

1          do within their capacity.
2    BY MR. KARP:
3          Q.     For any of the weight
4    percentages or percent allocations that are
5    indicated in Exhibit A for IPS staff or
6    Exhibit B for the vendors who provide
7    services to IPS, did IPS reach out to any
8    of those individuals to ask them what
9    percentage of their time is spent
10   addressing issues that they believe relate
11   to social media?
12              MR. INNES:  Objection to form.
13          You're asking the question about
14          the two different exhibits, same
15          question?
16              MR. KARP:  I am.
17              MR. INNES:  Okay.  Compound,
18          vague, ambiguous.
19              MR. KARP:  You may answer.
20              THE WITNESS:  Okay.  So I
21          would not say that they called each
22          of these entities and said how much
23          of your day is spent based upon
24          social media.
25

Page 318

1  BY MR. KARP:

2          Q.      For any of these vendors

3  listed on Exhibit B, did -- did they ever

4  tell the district this is the percent of

5  time that we spend addressing issues that

6  we attribute to social media?

7                  MR. INNES:  Objection, asked

8          and answered several times.

9                  MR. KARP:  You may answer.

10                 THE WITNESS:  I believe that

11         there's -- this is an

12         approximation.  This is not them

13         calling them and they told them I

14         spent whatever percentage is listed

15         here.

16  BY MR. KARP:

17         Q.      This is the district making a

18  determination based on -- or strike that.

19                 Let's focus on Exhibit A for

20  a minute.  There are various percentile

21  allocations and weight percentages

22  indicated here on this page?

23         A.      Yes.

24         Q.      Earlier we talked about the

25  fact that students at IPS can use their

CONFIDENTIAL

Page 319

1   cell phones at lunch?

2          A.     Yes.

3          Q.     Would these percent

4   allocations be lower if students were not

5   permitted to use their cell phones during

6   their lunch periods?

7          A.     No.

8                 MR. INNES:  Objection to form.

9                 THE WITNESS:  No, I don't

10          believe so.

11  BY MR. KARP:

12         Q.     Why not?

13         A.     Because we're talking about

14  the -- the effects of the students'

15  behaviors outside of where it is

16  permissible.  So that's why it wouldn't be

17  inclusive of lunch period necessarily.  I

18  mean, I don't know of -- I don't know of --

19  I guess maybe I should just ask you what

20  exactly do you mean?

21         Q.     Is it the district's

22  understanding that IPS students use social

23  media during their lunch periods?

24         A.     Yes.

25         Q.     Okay.  And if students were

CONFIDENTIAL

Page 320

```
 1   not on their phones using social media, as
 2   the district believes, during their lunch
 3   periods, would the percent allocation
 4   numbers on this Exhibit A be lower?
 5             MR. INNES:  Objection.  Calls
 6        for speculation.
 7             THE WITNESS:  I wouldn't say
 8        that they would lower, no.
 9   BY MR. KARP:
10        Q.    Even if that meant that
11   students were -- IPS students were using
12   social media less.
13        A.    Yes, during lunch, during the
14   lunch -- you're talking about the lunchtime
15   where it's permitted to, yes.  Yes, I
16   wouldn't -- yes, I'm saying my answer is
17   no, the percentage wouldn't change.
18        Q.    If students, just to make
19   sure that we're on the same page.
20        A.    Uh-huh.
21        Q.    If students were not
22   permitted to use their cell phones during
23   their lunch periods, would they be able to
24   use social media during their lunch
25   periods?
```

CONFIDENTIAL

Page 321

1                  MR. INNES:  Objection.

2           Assumes facts not in evidence.

3           Calls for speculation.  You can

4           answer.

5                  THE WITNESS:  Okay.  So can

6           you ask me again?

7    BY MR. KARP:

8        Q.     If the school's policy -- or

9    rather strike that.

10                If the district's policy was

11   that IPS students were not permitted to

12   take out their phones at lunch and use them

13   during lunch, would IPS students be able to

14   access social media during their lunch

15   periods?

16                  MR. INNES:  Objection.

17           Assumes facts not in evidence.

18           Calls for speculation.  Compound.

19                  MR. KARP:  You can answer.

20                  THE WITNESS:  You want me to

21           answer?  So, okay, can you ask

22           that -- it seems a little different

23           than the first one, you're asking

24           would the percentages be less if

25           students weren't allowed to be on

CONFIDENTIAL

Page 322

1              social media during their lunch
2              periods?
3    BY MR. KARP:
4              Q.      Yes.
5              A.      No, I don't believe so.
6              Q.      Why not?
7              A.      Because when we talk about
8    the amount of time that we're allocating to
9    on this, on Exhibit A, it's not considering
10   lunchtime.  It's not considering lunchtime
11   usage as encumbering the teachers' time.
12                   So when we say, for example,
13   looking at the percentages, 35 percent of
14   the -- no, that's not a good example.  I'm
15   trying to pull up a teacher.  So if we
16   picked any of the teachers, and we say that
17   20 percent of their time is being used,
18   we're talking about in class while they are
19   supposed to be doing schoolwork, they are
20   being or the teachers are supposed to be
21   teaching, they are prohibited from doing
22   that because students in the class are on
23   the platforms.  We're not talking about, we
24   would not include lunchtime data.
25             Q.      The district's position is

Page 323

```
 1   that student use of social media during
 2   their lunch periods does not affect the
 3   percent allocations that are included on
 4   Exhibits A and B?
 5                   MR. INNES:  Objection to form.
 6                   THE WITNESS:  We're saying
 7              that this percentage is things
 8              happening in the class that are
 9              deviating them away from their
10              primary role.  Could there have
11              been something that happened in
12              lunch, it could be.  It could have
13              been the night before.  It could
14              have been two days before.  But
15              we're just saying what exactly
16              happens in the classroom.
17   BY MR. KARP:
18        Q.    Is the district's position
19   that social media use during lunch breaks
20   and outside of school, when class is not in
21   session, does not affect the percent
22   allocations that are listed in Exhibits A
23   and B?
24                   MR. INNES:  Objection to form.
25                   THE WITNESS:  Yes, we're
```

CONFIDENTIAL

Page 324

1              saying that.
2                   MR. KARP:  I think we're at a
3              good breaking point just to confirm
4              that we're about to close out.
5                   MR. INNES:  Okay.  So you want
6              to speak with your co-counsel,
7              figure out if they're going to ask
8              questions, and then come back?
9                   MR. KARP:  Correct.
10                  MR. INNES:  Cool.
11                  THE VIDEOGRAPHER:  Want to go
12             off the record?
13                  MR. KARP:  Off the record,
14             please.
15                  THE WITNESS:  The time right
16             now is 4:35 p.m.  We are off the
17             record.
18                       - - - - -
19        (A recess was taken at this time.)
20                       - - - - -
21                  THE VIDEOGRAPHER:  The time
22             right now is 5:25 p.m.  We're back
23             on the record.
24   BY MR. KARP:
25         Q.    Welcome back, Dr. Vauss.

CONFIDENTIAL

Page 325

1          A.      Thank you.

2          Q.      Does IPS -- does the number

3    of teachers that IPS hires depend on the

4    number -- the amount of social media its

5    students are using?

6                    MR. INNES:  Objection to form.

7                    THE WITNESS:  Can you ask that

8          again?

9    BY MR. KARP:

10         Q.      Yeah.  Does the number of

11   teachers that IPS hires depend on the

12   amount of social media its students are

13   using?

14         A.      No.

15                    MR. INNES:  Objection to form.

16   BY MR. KARP:

17         Q.      Does IPS pay its teachers

18   more money based on how much social media

19   students are using?

20                    MR. INNES:  Objection to form.

21                    THE WITNESS:  No.

22                    MR. KARP:  I believe that's

23         all the questions that I have and I

24         turn it over to my Codefendants.

25

CONFIDENTIAL

                                                    Page 326

1   BY MS. SHOWALTER:

2          Q.     Thank you.  This is an Annie

3   Showalter from Williams and Connelly.  I

4   represent the YouTube Defendants.  How are

5   you, Dr. Vauss?

6          A.     I'm well.  Thank you.

7          Q.     Can you hear me okay?

8          A.     I can.

9          Q.     Great.  I think I just have a

10  couple of questions for you.

11                Doctor, are you aware that

12  Irvington has a YouTube account?

13         A.     Yes.

14         Q.     Do you know who is in charge

15  of managing Irvington's YouTube channel?

16         A.     I don't know specifically.

17         Q.     If I wanted to figure that

18  out, who would be the best person to ask?

19         A.     John Amberg, our executive

20  director for technology.

21         Q.     Would you defer to Mr.

22  Amberg, who was deposed earlier this week,

23  as to questions about the management of

24  Irvington's YouTube channel?

25                THE STENOGRAPHER:  Wait a

```
 1              minute, as to questions about?
 2              There was something going on.
 3              There were questions about?
 4                   MS. SHOWALTER:  The management
 5              of Irvington's YouTube channel.
 6                   MR. INNES:  Counsel, that's
 7              an -- this is counsel for the
 8              district, that's an entirely
 9              inappropriate question.  The
10              witness is here.  She's designated
11              for the topic.  She's prepared to
12              testify on those topics.  I was --
13              I did not have a conversation with
14              you about this, but this sounds a
15              lot like what counsel for Snap --
16                   MS. SHOWALTER:  You have to
17              make a record, Counsel, I
18              understand.
19  BY MS. SHOWALTER:
20         Q.     Dr. Vauss, did you speak
21  to --
22                   MR. INNES:  I'm not done.  I'm
23              not done.
24                   MS. SHOWALTER:  Okay.  Please
25              continue.
```

                                          Page 328

1              MR. INNES:  This sounds
2          exactly like the proposal that you
3          all made to us and that we turned
4          down.
5    BY MS. SHOWALTER:
6          Q.    I'm going to ask a different
7    question, counsel, may I move on?
8              Dr. Vauss, did you speak to
9    Mr. Amberg in preparing to testify today?
10         A.    Yes.
11         Q.    Did you speak to him about
12   Irvington's YouTube channel?
13         A.    I did not.
14         Q.    Are you aware that
15   Irvington's YouTube channel includes access
16   to features like likes?
17             MR. INNES:  Objection to form.
18             THE STENOGRAPHER:  Like what?
19             MR. KARP:  Likes.
20             THE WITNESS:  I would say I
21         did not know that, no.
22   BY MS. SHOWALTER:
23         Q.    Do you know whether Irvington
24   has ever sought to disable features,
25   including likes, on its own YouTube

                                            Page 329

1   channel?

2               MR. INNES:  Objection to form.

3               THE WITNESS:  No, I don't.

4   BY MS. SHOWALTER:

5       Q.      If Irvington thought its

6   YouTube posts could harm students, would it

7   refrain from posting content on its YouTube

8   channel?

9               MR. INNES:  Objection to form.

10              THE WITNESS:  Would Irvington

11          discontinue posting if they thought

12          their posts would harm students?

13              MS. SHOWALTER:  Correct.

14              THE WITNESS:  Yes.

15  BY MS. SHOWALTER:

16      Q.      Are you aware that Irvington

17  posted to its YouTube channel as recently

18  as three weeks ago?

19              MR. INNES:  Objection.

20          Outside the scope.  You can answer.

21              THE WITNESS:  No.

22  BY MS. SHOWALTER:

23      Q.      Are you familiar with Google

24  Workspace for Education, Dr. Vauss?

25      A.      Yes.

CONFIDENTIAL

Page 330

1       Q.      Does Irvington use Google
2    Workspace for Education?
3       A.      Yes.
4       Q.      Does it use a free or a paid
5    version?
6       A.      I'm not sure if ours is paid
7    or free.
8       Q.      Did you speak to Mr. Amberg
9    about Irvington's use of Google Workspace
10   for Education in preparation for your
11   deposition on topic seven today?
12       A.      No, I did not.
13              THE EXHIBIT TECH:  She appears
14          frozen.  She just dropped.
15              MR. KARP:  Can we go off the
16          record because she dropped off --
17              THE VIDEOGRAPHER:  The time
18          right now is 5:30 p.m.  We are off
19          the record.
20                   - - - - -
21       (Discussion was held off the record.)
22                   - - - - -
23              THE VIDEOGRAPHER:  The time
24          right now is 5:35 p.m.  We are back
25          on the record.

Page 331

1    BY MS. SHOWALTER:

2        Q.    Dr. Vauss, am I correct that

3    you are not aware of whether Irvington

4    schools have paid or free access to Google

5    Workspace for Education?

6        A.    I believe --

7            MR. INNES:  Objection to form.

8            THE WITNESS:  Oh, sorry.  I

9        believe we have a paid platform.  I

10        know I said -- I'm amending my

11        answer when you were last on, I

12        know we pay for the Google

13        Workspace.  We use that as one of

14        our platforms to kind of help

15        things stay safe.  And I know that

16        we use a compilation of the Google

17        Suites.

18    BY MS. SHOWALTER:

19        Q.    Do you know whether Irvington

20    has chosen to enable YouTube access through

21    its Google Workspace for Education account

22    or not?

23            MR. INNES:  Objection to form.

24            THE WITNESS:  Yes, we have

25        enabled it.  We do use it as an

CONFIDENTIAL

Page 332

1          educational tool.
2    BY MS. SHOWALTER:
3          Q.    So does that access extend to
4    students?
5                MR. INNES:  Objection to form.
6                THE WITNESS:  No, it has to --
7          so when I say, we give access, it
8          is something where you have to be
9          allowed by our tech directors or
10         the tech coaches, you have to get
11         approval.  If you put it within
12         your lesson plans that you're going
13         to use a specific YouTube site, it
14         has to be vetted by the
15         administrator in charge of checking
16         your specific lesson plan and
17         ensure that it really has some
18         relevance to what it is that you're
19         trying to teach and then you're
20         able to use it.
21    BY MS. SHOWALTER:
22         Q.    Understood.  So am I correct
23    that teachers can seek to have YouTube
24    videos whitelisted for use in lesson plans?
25                MR. INNES:  Objection to form.

Page 333

1              THE WITNESS:  Yes.  If

2         whitelisted you mean making it okay

3         to use for their specific lesson

4         content, then that --

5              MS. SHOWALTER:  Yes.

6              THE WITNESS:  Then that would

7         be a yes.

8    BY MS. SHOWALTER:

9         Q.    That's correct.  And has that

10   been the practice at Irvington at least

11   since 2015?

12              MR. INNES:  Objection to form.

13              THE WITNESS:  I wouldn't be

14         able to speak that that was our

15         practice in 2015, because I don't

16         think that there was enough

17         information known about YouTube.  I

18         think as time evolved and seeing it

19         being used in lots of ways that are

20         not educational that it has a cause

21         for that adjustment.

22   BY MS. SHOWALTER:

23         Q.    Meaning that before the

24   whitelisting practice went into effect,

25   there may or may not have been broader

CONFIDENTIAL

Page 334

1    access to YouTube, you're not sure?

2         A.    Yes.

3              MR. INNES:  Objection to form.

4              THE WITNESS:  I'm sorry.  Yes.

5              MS. SHOWALTER:  I pass the

6         witness.

7              MR. KARP:  Anyone else on Zoom

8         have questions?

9              MR. SEXTON:  How much time is

10        left?

11             THE VIDEOGRAPHER:  Six

12        minutes -- I'm sorry, we have been

13        on the record for five hours and 54

14        minutes.

15             MR. SEXTON:  Hi, Dr. Vauss,

16        this is Terry Sexton for Meta.  I'm

17        not going to ask you any questions

18        at this time.

19             THE WITNESS:  Thank you,

20        Terry.

21             MR. KARP:  We pass -- anyone

22        else on Zoom?  We pass the witness.

23             MR. INNES:  Okay.  Let me flip

24        over that side.

25             THE VIDEOGRAPHER:  Do you want

CONFIDENTIAL

Page 335

1          to go off the record, counsel?

2                MR. KARP:  Make sure we have

3          an accurate time count.

4                MR. INNES:  Yeah.

5                THE VIDEOGRAPHER:  The time

6          right now is 5:39 p.m.  We are off

7          the record.

8                - - - - -

9     (Discussion was held off the record.)

10                - - - - -

11                THE VIDEOGRAPHER:  The time

12          right now is 5:42 p.m.  We are back

13          on the record.

14  BY MR. INNES:

15          Q.    Good evening, Dr. Vauss.  We

16  know each other, but for the record, my

17  name is Michael Innes.  I represent the

18  district in this matter.  Thank you for

19  being here.

20          A.    You're welcome.

21          Q.    It has been a long day and I

22  just want to ask you, now it's my turn to

23  ask you questions to follow up on the

24  questions that counsel for Defendants

25  asked.

Page 336

1          A.      Yes.

2          Q.      Earlier today, you testified

3    that students or scholars spend between 12

4    and 20 hours on their cell phones a day.

5    Do you remember that?

6          A.      Yes.

7          Q.      And then you also walked us

8    through how you came to that calculation --

9    that calculation.

10               Do you recall that?

11         A.      Yes.

12         Q.      And I wanted to drill down on

13   that a little bit more.

14         A.      Okay.

15         Q.      Were you describing the

16   average student when saying 12 to 20?

17         A.      No.

18               MR. KARP:  Object to form.

19          And an objection for one is an

20          objection for all?

21               MR. INNES:  Absolutely.

22               THE WITNESS:  Sorry.

23   BY MR. INNES:

24         Q.      I can ask you the question

25   again.  So, Dr. Vauss, when you testified

Page 337

1  earlier that students or scholars spend

2  between 12 and 20 hours on their cell

3  phones, were you referring to the average

4  student?

5          A.      No, that was the extreme

6  situations, extreme cases.

7          Q.      Okay.  So could you provide

8  an estimate of how many hours a day the

9  average student at Irvington Public Schools

10  spends on their cell phone?

11                  MR. KARP:  Object to form.

12                  THE WITNESS:  I would say

13          seven to eight hours.

14  BY MR. INNES:

15          Q.      Thank you.  Dr. Vauss, you

16  testified earlier today about a fairly

17  disturbing story of a student posting a

18  nude image on social media.

19                  Do you remember that?

20          A.      Yes.

21          Q.      Dr. Vauss, I think you also

22  testified that student was in this

23  building; is that right?

24          A.      Yes.

25                  MR. KARP:  Object to form.

                                        Page 338

1              What building are we in?
2                    MR. INNES:  I'm sorry?
3                    MR. KARP:  What building are
4          we in?
5    BY MR. INNES:
6          Q.    I'm going to get there.  And,
7    Dr. Vauss, can you tell the building what
8    building we are in right now?
9          A.    University Elementary School
10   as well as the Irvington Board of Ed.
11         Q.    Okay.  So you when you
12   testified that the student was in this
13   building, were you referring to go her
14   being a student in the elementary school?
15         A.    Yes.
16         Q.    And do you recall about the
17   age of that student or scholar, I should
18   say, at the time of that incident?
19         A.    Between seven and eight.
20         Q.    And do you recall testifying
21   that that scholar posted via her own
22   account?
23         A.    Yes.
24                   MR. KARP:  Object to form.
25         Sorry.

                                                    Page 339

1    BY MR. INNES:

2         Q.     Dr. Vauss, is it fair to say

3    that a scholar between the ages of seven

4    and eight had a social media account in

5    which they posted a nude photo?

6         A.     Yes.

7         Q.     Dr. Vauss, is it the

8    district's position that a seven- or

9    eight-year-old should be able to have an

10   account on social media?

11                   MR. KARP:  Object to form.

12                   THE WITNESS:  I would say no,

13              we don't believe that they should

14              and we wish that there were more

15              safety precautions taken by social

16              media platforms to ensure that

17              scholars would not be able to set

18              up these accounts.

19   BY MR. INNES:

20        Q.     Thank you, Doctor.  Doctor,

21   you'll also recall questions from Mr. Karp

22   regarding drinking water in the district.

23        A.     Yes.

24        Q.     And I believe it was your

25   testimony that signs had been placed above

CONFIDENTIAL

Page 340

1   wash basins since as early as 2005; is that
2   correct?
3           A.      Yes.
4           Q.      And, Dr. Vauss, in
5   preparation for your 30(b)(6) testimony on
6   behalf of the district, did you have
7   opportunity to ask anyone about whether or
8   not "do not drink water" signs were posted
9   above drinking fountains?
10          A.      Yes, I did.
11                  MR. KARP:  Object to form.
12                  THE WITNESS:  Oh, sorry, yes.
13  BY MR. INNES:
14       Q.      And what -- and who are those
15  folks?
16       A.      I spoke to our associate
17  business administrator, Roger Monel, and
18  our supervisor of custodians, Zorana
19  Figueroa.
20       Q.      Okay.  What did Mr. Monel
21  tell you when you inquired about the
22  placement of drinking water signs above
23  fountains?
24          A.      It was, his recollection was
25  to dissuade anyone from using the water

Page 341

1    basins or the wash basins for drinking and
2    to in turn by proxy encourage them to use
3    the water fountains.
4         Q.    So Irvington Public Schools
5    has water fountains available for students
6    to use?
7         A.    Yes, that's correct.
8         Q.    At any point in time, has a
9    sign been posted above any of those water
10   fountains saying do not drink the water?
11        A.    No.
12        Q.    To your knowledge, is the
13   water that flows into the wash basins the
14   same as the water that comes out of the --
15   pardon me, I'll start again, a little
16   ambient noise.
17             To your knowledge, is the
18   water that flows from the taps in the wash
19   basin the same as the water that flows into
20   the drinking fountains?
21        A.    Yes.
22        Q.    Based on your conversations
23   in preparation for this deposition, did you
24   learn that the water was unsafe?
25             MR. KARP:  Object to form.

```
                                          Page 342
 1                  THE WITNESS:   No.
 2    BY MR. INNES:
 3         Q.     Did you learn that the water
 4    was in fact safe for drinking?
 5         A.     Yes.
 6         Q.     And has that been true for
 7    the entire relevant time period?
 8         A.     Yes.
 9         Q.     Thank you.  Dr. Vauss, you'll
10    recall that counsel for Snap also asked you
11    about cyberbullying, do you recall?
12         A.     Yes.
13         Q.     And his questions were
14    limited to content involving cyberbullying;
15    is that right?
16                  MR. KARP:  Object to form.
17                  THE WITNESS:   Yes.
18    BY MR. INNES:
19         Q.     Okay.  Dr. Vauss, is it the
20    district's position that cyberbullying can
21    occur via like features on social media?
22         A.     Yes, they -- yes.
23         Q.     Is it the district's position
24    that cyberbullying has occurred via the
25    share function on social media platforms?
```

Page 343

1        A.        Yes.

2        Q.        Is it the district's

3    experience that cyberbullying has occurred

4    through the ability of individuals to post

5    anonymously on social media?

6                    MR. KARP:  Object to form.

7                    THE WITNESS:  Yes.

8    BY MR. INNES:

9        Q.        You also in a related line of

10   questioning remember there is an acronym of

11   WWGS?

12       A.        Yes.

13       Q.        Can you tell the jury what

14   WWGS is?

15       A.        What would grandma say.

16       Q.        And is it the -- what would

17   grandma say about cyberbullying?

18                    MR. KARP:  Object to form.

19                    THE WITNESS:  So grandma would

20            say that you should not post bad

21            things, but you should also not

22            share bad things.  You shouldn't

23            post fights.  But you shouldn't

24            share them.  You shouldn't like

25            them.  You shouldn't try to enhance

CONFIDENTIAL

Page 344

```
 1              photos that are bad photos by using
 2              features.  All of those things
 3              would be within what grandma would
 4              say not to do with social media.
 5    BY MR. INNES:
 6         Q.    And there actually isn't a
 7    grandma, right?
 8         A.    No.
 9               MR. KARP:  Object to form.
10    BY MR. INNES:
11         Q.    Can you explain what the
12    acronym, what would grandma says mean?
13         A.    So, basically what -- you
14    know, most people look up to their
15    grandparents and they care about what their
16    grandma says, so they would say what would
17    you say if your grandma was here.  So it's
18    the metaphor for doing the right thing when
19    no one is watching.
20         Q.    Thank you, Dr. Vauss.
21         A.    You're welcome.
22         Q.    You'll also recall Mr. Karp
23    asking you about a code of conduct.
24               Do you remember that?
25         A.    Yes.
```

CONFIDENTIAL

Page 345

```
 1        Q.      Okay.  And this is -- my
 2   question isn't about the actual code of
 3   conduct.  My question is more to is there a
 4   difference in Irvington Public Schools --
 5   strike that.
 6                Irvington Public Schools has
 7   a code of conduct; is that right?
 8        A.      Yes.
 9        Q.      And Irvington Public Schools
10   also has policies; is that correct?
11        A.      Yes.
12        Q.      Are policies and the code of
13   conduct the same thing?
14        A.      No.
15        Q.      Can you explain that to the
16   jury, please?
17        A.      So there are the ideal ways
18   in which we would want scholars to behave
19   and we set forth a structure to keep things
20   within that, but also in a broader sense,
21   in our policies and our practices is that
22   we want our administration specifically,
23   but teachers as well, to use common sense
24   when applying some of these, these ethos.
25        Q.      Thank you, Doctor.  Along
```

Page 346

1    those same lines, does each school have a

2    separate handbook?

3                    MR. KARP:  Object to form.

4                    THE WITNESS:  Yes.

5    BY MR. INNES:

6          Q.    And, Dr. Vauss, can you

7    describe to the jury in general terms what

8    a school handbook might be?

9          A.    So a handbook is things that

10   are specific, for example, an elementary

11   student handbook would be different than

12   one that would be for the high school.  So

13   if, by chance, as it relates to what we

14   have been talking about, an elementary

15   student is seen with a cell phone in their

16   hand, they wouldn't be suspended.  They

17   would be -- maybe they might ask for it,

18   maybe they might say put it away, and then

19   that would be the end of the incident.

20         Q.    Dr. Vauss --

21         A.    I was going to say and then

22   when you talk about the high school, so

23   many students do have cell phones that if

24   every time we had a parent-teacher

25   conference, we had a suspension, as it

Page 347

1    relates to having a cell phone, then we

2    would be spending all of our time meeting

3    with parents about just physically the

4    phone itself.  And we would not get

5    anything accomplished.

6           Q.    And, Dr. Vauss, that reminds

7    me of some testimony you gave about

8    incident reports.

9                 Do you remember that?

10          A.    Yes.

11                MR. KARP:  Object to form.

12   BY MR. INNES:

13          Q.    And do you remember testimony

14   that you provided regarding policies about

15   cell phone use?

16          A.    Uh-huh.

17                MR. KARP:  Object to form.

18                THE WITNESS:  Yes.

19   BY MR. INNES:

20          Q.    Dr. Vauss --

21                MR. KARP:  Are you saying

22           today or at some other point in

23           time?

24   BY MR. INNES:

25          Q.    I'm saying today, yeah.  This

Page 348

1    is all -- I'm asking this witness in her

2    capacity as the corporate designee.

3                    And so let me start again,

4    Dr. Vauss.  In your role today at this

5    deposition, you provided testimony about

6    incident reports; is that correct?

7         A.     Yes.

8         Q.     And you also provided

9    testimony about policies related to those

10   incident reports, do you recall?

11        A.     Yes, yes.

12        Q.     And specifically policies

13   related to cell phone use?

14        A.     Yes.

15        Q.     Dr. Vauss, if the district

16   were to -- well, strike that.

17                    If teachers and

18   administrators were to file incident

19   reports for every time a student had a cell

20   phone outside of their backpack or in the

21   open, what would the result be?

22                    MR. KARP:  Object to form.

23                    THE WITNESS:  We would be

24         spending a lot of time collecting

25         cell phones and having parent

CONFIDENTIAL

```
                                            Page 349
 1              conferences and pulling children
 2              out of class for instruction and we
 3              would be negatively impacted
 4              academically, to say the least,
 5              because we're spending our time
 6              meeting and conferencing about
 7              students having cell phones.
 8   BY MR. INNES:
 9         Q.    So those students may have to
10   be pulled out of class and lose valuable
11   instructional time?
12         A.    Yes.
13         Q.    Dr. Vauss, one of the last
14   questions that Mr. Karp asked you at the
15   end of today was, "Is the district's
16   position that social media use during lunch
17   breaks and outside of school in classes not
18   in session does not affect the percent
19   allocations that are listed in exhibits A
20   and B?"
21              Do you recall that question?
22         A.    I do.
23         Q.    And you answered, "Yes, we're
24   saying that."
25              Do you recall that answer?
```

CONFIDENTIAL

Page 350

1        A.      I do.

2        Q.      Okay.  Doctor, is there

3    anything you would like to add?

4        A.      I believe I misunderstood his

5    question.  So if our students wasn't -- if

6    they weren't on social media before the

7    school day started, during the school day,

8    at lunch, after school, we wouldn't be

9    having the issues that we're having with

10    our scholars, not all of the issues.  And

11    particularly some of the things that we've

12    mentioned here today, cyberbullying,

13    inappropriate pictures being up, people

14    sharing those things, people enhancing

15    photos and sharing throughout their cliques

16    and their circles, so, yes, I misunderstood

17    what he meant.  The numbers would be lower

18    if we weren't using social media before,

19    after, during the school day, or at lunch.

20        Q.      So just so I have this right,

21    your testimony -- the district's testimony

22    is that if scholars were not using social

23    media in the ways that you've articulated,

24    that the percentage applied in the Exhibit

25    A would go down?

```
                                    Page 351

 1          A.      Yes.
 2                  MR. KARP:  Object to form.
 3                  THE WITNESS:  Sorry, yes.
 4     BY MR. INNES:
 5          Q.      Okay.  And, Dr. Vauss, the
 6     estimates that you have placed in Exhibit
 7     A, would you describe those as -- well, how
 8     would you describe them?  Are they
 9     conservative?
10          A.      I would say --
11                  MR. KARP:  Object to form.
12                  THE WITNESS:  I would say yes.
13     BY MR. INNES:
14          Q.      Thank you, let me just take a
15     look.
16                  Dr. Vauss, are you -- strike
17     that.
18                  Dr. Vauss, you'll recall
19     that Mr. Karp asked you questions about
20     social media policies, do you recall?
21          A.      Yes.
22          Q.      Okay.  And those policies
23     address the use of social media at the
24     school; is that correct?
25          A.      Yes.
```

CONFIDENTIAL

Page 352

1          Q.      And, Dr. Vauss, are you
2    familiar with a platform called ClassDojo?
3          A.      Yes, I am.
4          Q.      Is the district aware of a
5    platform called ClassDojo?
6          A.      Yes.
7          Q.      And does the district
8    consider ClassDojo to be social media?
9          A.      Yes.
10                 MR. INNES:  Thank you.  No
11            further questions at this time.
12            Andrew, I can pass Ms. Vauss back
13            to Defendants.
14                 MR. KARP:  Could I just use
15            the bathroom real quick?
16                 MR. INNES:  Yeah, sure.
17                 THE VIDEOGRAPHER:  The time
18            right now is 5:57 p.m.  We are off
19            the record.
20                     - - - - -
21        (A recess was taken at this time.)
22                     - - - - -
23                 THE VIDEOGRAPHER:  The time
24            right now is 6:02 p.m.  We're back
25            on the record.

CONFIDENTIAL

Page 353

1    BY MR. KARP:

2            Q.      Dr. Vauss, welcome back.

3            A.      Thank you.

4            Q.      I'm just going to follow up

5    on a few of the questions that your counsel

6    asked.

7            A.      Yes.

8            Q.      You testified a minute ago

9    that the district's understanding is that

10   the average Irvington Public School student

11   spends between seven and eight hours on a

12   cell phone daily?

13           A.      Yes.

14           Q.      What's the basis for that?

15           A.      I believe if we -- from what

16   the teachers and what I think is reasonable

17   for what they would have -- would be able

18   to observe, that is the window of time.  I

19   think the 12 to 20 time is extreme

20   situations.  Do they exist, yes, but on

21   average, I believe a lot of our students

22   have social media and they are not stopping

23   social media when they come to school.  And

24   when they're on their lunch breaks, they're

25   on social media and during class time.  And

Page 354

1    on average, although you asked for and 8:00

2    to 3:00 window, the exact time that they're

3    usually in instruction is, like, 6.5 amount

4    of time, so I would say around seven to

5    eight hours.

6           Q.      Thank you.  Has the district

7    done any -- has the district ever done any

8    research on how much time IPS students

9    spend on their cell phones daily?

10                  MR.  INNES:  Objection.  Asked

11          and answered.

12                  THE WITNESS:  No.

13   BY MR. KARP:

14          Q.      Has the district done any

15   study to substantiate the number seven to

16   eight hours of cell phone use for the --

17   for an average Irvington Public School

18   student daily?

19          A.      No.

20          Q.      Is the district aware of any

21   literature that indicates that the average

22   student in the United States spends between

23   seven and eight hours on their cell phones

24   daily?

25          A.      No.

Page 355

1          Q.      Is the district aware of any
2    literature that says Irvington Public
3    School students are on their cell phones or
4    using their cell phones for seven to eight
5    hours daily?
6          A.      No.
7          Q.      Has any Irvington Public
8    School student told the district, I use my
9    cell phone between seven and eight hours a
10   day?
11         A.      No, but there have been some
12   that say that they're on social media
13   platforms a great amount of time.  When
14   they were asked why they were chronically
15   absent, why are you absent all the time,
16   why are you tardy, because I'm on my phone.
17   And when asked, well, what are you doing on
18   your phone, I am on, you know, this, they
19   name specific sites.
20         Q.      And numbers are not provided,
21   quantifications, the number of hours are
22   not provided --
23         A.      No.
24                 MR. INNES:  Objection to form.
25                 THE WITNESS:  No, they don't.

CONFIDENTIAL

Page 356

1   BY MR. KARP:
2          Q.      You testified earlier about
3   parental controls, do you recall?
4          A.      Under -- can you refresh me?
5          Q.      You testified earlier about
6   safety features on social media platforms,
7   do you recall?
8          A.      Yeah, I believe I was asked a
9   question about safety features.
10         Q.      Is the district aware that
11  Irvington Public Schools -- excuse me,
12  strike that.
13                 Is the district aware that
14  parental controls can be -- can be set on
15  cell phones that Irvington Public School
16  students have?
17                 MR. INNES:  Objection to
18             scope.
19                 THE WITNESS:  When you say,
20             "cell phones that Irvington Public
21             Schools have," their own cell
22             phone?
23  BY MR. KARP:
24         Q.      Strike that.  Or let me ask a
25  different question.

CONFIDENTIAL

Page 357

1          A.      Yes.

2          Q.      Does the district decide

3   whether to put parental restrictions on an

4   IPS students cell phone?

5                  MR. INNES:  Objection to form.

6          Outside the scope of the exam.

7                  THE WITNESS:  No.

8   BY MR. KARP:

9          Q.      Parents of students and

10  caretakers of students in Irvington Public

11  Schools would decide whether there are --

12  whether parental controls are utilized,

13  correct?

14                 MR. INNES:  Objection,

15          objection to form.  Outside the

16          scope of the examination.

17                 MR. KARP:  You can answer.

18                 THE WITNESS:  Am I aware if

19          parents place these safety

20          features, no.

21  BY MR. KARP:

22         Q.      The district is not aware of

23  whether that happens one way or another?

24         A.      No.

25         Q.      Is the district aware that

Page 358

1    there are teen accounts for some social
2    media platforms?
3                    MR. INNES:  Objection to form.
4           Outside the scope of the exam.
5                    THE WITNESS:  Yes.
6    BY MR. KARP:
7           Q.     Whose decision, is it
8    Irvington Public Schools' decision whether
9    one of its students has a social media
10   account in the first place?
11                  MR. INNES:  Objection to form.
12          Outside the scope.
13                  THE WITNESS:  No.
14   BY MR. KARP:
15          Q.     Earlier you testified that
16   the second grader who participated in
17   that -- in that incident had a social media
18   account, correct?
19          A.     Yes.
20          Q.     Was it Irvington Public
21   Schools' decision to allow that student to
22   have a social media account?
23          A.     No.
24          Q.     That would have been her --
25   that would have been someone else, correct?

CONFIDENTIAL

Page 359

1              MR. INNES:  It assumes facts
2         not in evidence.
3              THE WITNESS:  As far as I
4         know, she was savvy enough to
5         create it herself.
6    BY MR. KARP:
7         Q.    You amended your answer --
8    or strike that.
9              I asked you about the
10   information and the percent allocations on
11   Exhibit A, do you recall?
12        A.    I do.
13        Q.    You amended your -- one of
14   your answers after we came back from a
15   break?
16        A.    I did.
17        Q.    Did you meet with counsel on
18   that break?
19        A.    I did meet with counsel on
20   that break.
21        Q.    Okay.  And is it the
22   district's position that IPS students' use
23   of social media during lunch periods does
24   not affect the percent allocations on
25   Exhibit A?

CONFIDENTIAL

```
                                    Page 360

  1              MR. INNES:  Objection to form.
  2              THE WITNESS:  It is our belief
  3         that it does affect the items in
  4         Exhibit A.
  5    BY MR. KARP:
  6         Q.    And if cell phones were --
  7              MR. INNES:  Nope, we're done.
  8         That's six minutes.
  9              MR. KARP:  Okay.
 10              MR. INNES:  Thank you very
 11         much.
 12              THE VIDEOGRAPHER:  The time
 13         right now is 6:08 p.m.  We're off
 14         the record.
 15                   - - - - -
 16       (Discussion was held off the record.)
 17                   - - - - -
 18              THE VIDEOGRAPHER:  The time
 19         right now is 6:10 p.m.  We are back
 20         on the record.  Mr. Andrew Karp was
 21         on the record for five hours and 52
 22         minutes.  Annie Showalter was on
 23         the record for eight minutes.
 24         Michael Innes was on the record for
 25         16 minutes.
```

CONFIDENTIAL

Page 361

1              And on the 30(b)(6)

2        deposition of Shelley Pettiford,

3        I want to make a correction,

4        Mr. Andrew Karp was on the record

5        for two hours and 25 minutes.

6        The time right now is 6:10 p.m.

7        We are off the record.

8                  - - - - -

9              (Whereupon, the deposition

10       was concluded at 6:10 p.m.)

11                 - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 362

1              C E R T I F I C A T I O N

2

3

4         I HEREBY CERTIFY that the proceedings and

5    evidence are contained fully and accurately in the

6    stenographic notes taken by me upon the foregoing

7    matter on May 16, 2025, and that this is a correct

8    transcript of same.

9

10

11

12

13    *Robin L. Clark*

14    _____

15         Robin L. Clark
     Registered Professional Reporter

16

17

18

19

20

21         (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means unless under the direct control

24    and/or supervision of the certifying reporter.)

25

Page 363

1           INSTRUCTIONS TO WITNESS

2

3           Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8           After doing so, please sign the errata

9    sheet and date it.

10          You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13          It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 364

```
1                    -  -  -  -
2                E  R  R  A  T  A
3                    -  -  -  -
4    PAGE      LINE      CHANGE
5

6    ____      ____      _____

7    ____      ____      _____

8    ____      ____      _____

9    ____      ____      _____

10   ____      ____      _____

11   ____      ____      _____

12   ____      ____      _____

13   ____      ____      _____

14   ____      ____      _____

15   ____      ____      _____

16   ____      ____      _____

17   ____      ____      _____

18   ____      ____      _____

19   ____      ____      _____

20   ____      ____      _____

21   ____      ____      _____

22   ____      ____      _____

23   ____      ____      _____

24   ____      ____      _____
25
```

CONFIDENTIAL

Page 365

1          ACKNOWLEDGMENT OF DEPONENT
2          I, DR. APRIL VAUSS, do hereby
3    certify that I have read the foregoing pages
4    and that the same is a correct
5    transcription of the answers given by me to
6    the questions therein propounded, except for
7    the corrections or changes in form or
8    substance, if any, noted in the attached
9    Errata Sheet.
10
11   DATE                    SIGNATURE
12   Subscribed and sworn to before me this
13        day of                    ,
14   2025.
15
16   My commission expires:
17
18
19
20   Notary Public
21
22
23
24
25