**Exhibit 4**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

2                  OAKLAND DIVISION

3                  - - - - -

4    IN RE: SOCIAL MEDIA           CASE NO.

5    ADOLESCENT ADDICTION/PERSONAL   4:22-md-03047-YGR

6    INJURY PRODUCTS LIABILITY      MDL No. 3047

7    LITIGATION

8

9    THIS DOCUMENT RELATES TO:

10    Irvington Public Schools

11            vs.

12   Meta Platforms Inc., et al.

13   Member Case No.: 4:23-cv-01467-YGR

14                  - - - - -

15            Thursday, May 1, 2025

16       CONFIDENTIAL - ATTORNEYS' EYES ONLY

17             PURSUANT TO PROTECTIVE ORDER

18            Videotaped deposition of MICHAEL BUSSACCO,

19   held at the offices of the Irvington Board of

20   Education, One University Place, Irvington, New

21   Jersey, commencing at 10:06 a.m. Eastern, on the

22   above date, before Robin L. Clark, Professional

23   Reporter and Notary Public in and for the State of

24   New Jersey.

25

CONFIDENTIAL

```
                                              Page 2

  1   APPEARANCES:
  2
              CARELLA, BYRNE, CECCHI, BRODY
  3           & AGNELLO, P.C.
              BY:  MICHAEL A. INNES, ESQ.
  4           ZACHARY S. BOWER, ESQ. (ZOOM)
              5 Becker Farm Road
  5           Roseland, New Jersey 07068
              973-994-1700
  6           minnes@carellabyrne.com
              zbower@carellabyrne.com
  7                     For the Plaintiffs and the
              Witness
  8
  9           SHOOK, HARDY & BACON, L.L.P.
              BY:  TERRENCE J. SEXTON, ESQ.
 10           2555 Grand Boulevard
              Kansas City, Missouri 64108
 11           816-474-6550
              tsexton@shb.com
 12                     For the Defendants, Meta
              Platforms, Inc., f/k/a Facebook, Inc.;
 13           Facebook Holdings, LLC;
              Facebook Operations, LLC; Facebook
 14           Payments, Inc.; Facebook Technologies,
              LLC; Instagram, LLC; and Siculus, Inc.
 15
 16           KIRKLAND & ELLIS LLP
              BY:  ANDREW KARP, ESQ.
 17           FARAZ SHAHIDPOUR, ESQ.
              601 Lexington Avenue
 18           New York, New York 10022
              212-341-7593
 19           andrew.karp@kirkland.com
              faraz.shahidpour@kirkland.com
 20                     For the Defendant, Snap,
              Inc.
 21
 22
 23
 24
 25
```

CONFIDENTIAL

Page 3

1    ALSO PRESENT:

2
              DANIEL ORTEGA, VIDEOGRAPHER
3
              JUSTIN BILY, TRIAL TECH
4
              RYAN SIFFRINGER, Carella Byrne
5

6    REMOTE APPEARANCES:

7
              SHOOK, HARDY & BACON, L.L.P.
8             BY:  AMANDA C. SAPAR, ESQ.
              Two Commerce Square
9             2001 Market Street, Suite 3000
              Philadelphia, Pennsylvania 19103
10            215-278-2555
              asapar@shb.com
11                        For the Defendants, Meta,
              Platforms, Inc., f/k/a Facebook, Inc.;
12            Facebook Holdings, LLC;
              Facebook Operations, LLC; Facebook
13            Payments, Inc.; Facebook Technologies,
              LLC; Instagram, LLC; and Siculus, Inc.
14
15            KING & SPALDING LLP
              BY:  ALISON WALTER, ESQ.
16            50 California Street
              Suite 3300
17            San Francisco, California 94111
              415-318-1200
18            awalter@kslaw.com
                          For the Defendants,
19            TikTok, Ltd.; TikTok, LLC;
              TikTok, Inc.; ByteDance Ltd.; and
20            ByteDance Inc.
21
22
23
24
25

```
                                            Page 4

1    ZOOM APPEARANCES, CONTINUED:
2              SKADDEN ARPS
               BY:  ANNELIESE V. THOMAS, ESQ.
3              320 S. Canal St.
               Chicago, Illinois 60606
4              312-407-0604
               anneliese.thomas@skadden.com
5                        For the Defendant, Snap, Inc.
6
               WILLIAMS & CONNOLLY, LLP
7              BY:  KEY'TOYA BURRELL, ESQ.
               680 Maine Avenue SW
8              Washington, D.C.  20024
               202-434-5425
9              kburrell@wc.com
                         For the Defendants, Alphabet,
10             Inc., Google, LLC, and YouTube, LLC
11                    - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 5

1                          I N D E X
2     WITNESS                                      PAGE
3     MICHAEL BUSSACCO
         BY MR. KARP:                          8, 332
4        BY MR. INNES:                       279, 382
         BY MR. SEXTON:                           365
5
6                          E X H I B I T S
7     NUMBER            DESCRIPTION               MARKED
8     Bussacco
9     Exhibit 1         Curriculum Vitae            12
10    Exhibit 2         Notice of Deposition        24
11    Exhibit 3         Annual School Planning      51
                        2023-2024 Bates
12                      BW__Irvington00334790 to
                        00334863
13
      Exhibit 4         School Performance Report  188
14
      Exhibit 5         Professional Assessment and 199
15                      Development Evaluation
                        Bates BW__Irvington00300320
16                      to 00300325
17    Exhibit 6         Email String Bates         208
                        BW__Irvington00093416 to
18                      00093444
19    Exhibit 7         Student Code of Conduct    217
                        Bates
20                      BW__Irvington00629349 to
                        00629430
21
      Exhibit 8         Email dated 8/31/22 Bates  232
22                      BW__Irvington00101544
23    Exhibit 9         Uniform Cell Phone Letter  233
                        dated 1/17/20 Bates
24                      BW__Irvington00101546
25

CONFIDENTIAL

Page 6

1

　Exhibit 10　　　Professional Assessment and　242
　　　　　　　　　Development Evaluation for
2
　　　　　　　　　School Administrators Bates
3　　　　　　　　　BW__Irvington00332758 to
　　　　　　　　　00332766

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 7

1           DEPOSITION SUPPORT INDEX

2

                    - - - - -

3

4    Direction to Witness Not to Answer

5    Page   Line

6    42      9

7    274     11

8    381     11

9    Request for Production of Documents

10   Page   Line

11   NONE

12   Question Marked

13   Page   Line

14   NONE

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
                                    Page 8

1            THE VIDEOGRAPHER:  We are now
2       on the record.  My name is Daniel
3       Ortega and I am the legal
4       videographer for Golkow Litigation
5       Services.  Today's date is May 1st,
6       2025, and the time is 10:06 a.m.
7            This video deposition is
8       being held at One University
9       Place, Irvington, New Jersey, in
10      the matter of Social Media, CA
11      MDL 3047, Irvington Public
12      Schools versus Meta Platforms,
13      Inc., et al.  The deponent today
14      is Michael Bussacco.
15           All counsel will be noted on
16      the stenographic record.  The
17      court reporter today is Robin
18      Clark and will now swear in the
19      witness.
20                - - - - -
21           MICHAEL BUSSACCO, having
22      been duly sworn, was examined and
23      testified as follows:
24                - - - - -
25
```

Page 9

1    BY MR. KARP:

2         Q.      Mr. Bussacco, good morning.

3         A.      Good morning, sir.

4         Q.      Can you please state your

5    full name for the record?

6         A.      Yeah.  My name is Michael

7    Edward Bussacco.

8         Q.      My name is Andrew Karp.  I

9    represent Snap in this litigation and I'll

10   be taking your deposition today.

11        A.      Okay.

12        Q.      You understand that you're

13   under oath?

14        A.      Yes, sir.

15        Q.      Is there any reason you

16   cannot provide truthful and accurate

17   testimony today?

18        A.      No.

19        Q.      Okay.  If at any point you

20   don't understand a question that I've

21   asked, please let me know so that I can

22   clarify.  Otherwise, I'm going to assume

23   that you understand the question; is that

24   fair?

25        A.      Understood.

CONFIDENTIAL

Page 10

1          Q.     Throughout today's
2    deposition, I may refer to Irvington Public
3    Schools as IPS, that's fine?
4          A.     Yeah.
5          Q.     You'll know if I say, "IPS,"
6    I mean Irvington Public Schools?
7          A.     Absolutely.
8          Q.     Great.
9               MR. INNES:  Counsel, let's
10         just let him get his answers out
11         before you start talking again.
12   BY MR. KARP:
13         Q.     Sure.  That's actually a good
14   reminder.  Let's try to have a clean record
15   here and not talk over each other,
16   likewise, I'll give your counsel an
17   opportunity to object to my questions,
18   which he won't do, of course, because my
19   questions will be flawless, right?
20               MR. INNES:  They always are.
21   BY MR. KARP:
22         Q.     Always are.  Okay.  So, Mr.
23   Bussacco, excuse me --
24         A.     That's fine.
25         Q.     -- what is your home address?

CONFIDENTIAL

Page 11

1    ███        ██        ███  ████  ████  ████
2    █  ███  ████

3         Q.    And what is your work

4    address?

5         A.    255 Myrtle Avenue, Irvington,

6    New Jersey.

7         Q.    Okay.  I'll represent to you

8    that in advance of this deposition, we

9    requested a copy of your CV, but thus far

10   have not received one.  Is that something

11   that you brought with you today?

12        A.    Yeah.

13        Q.    Is that a yes?

14        A.    Yes.  Yes, it is.  I'm

15   sorry --

16        Q.    No worries.

17        A.    -- first time doing this.

18        Q.    Of course.  So also a good

19   tip here, it's important to give verbal

20   answers so that we have a record of your

21   responses.

22        A.    Understood.  Thank you.

23        Q.    Thank you.  Counsel is

24   handing me a copy of your CV.

25        A.    Yeah, I have one here.

CONFIDENTIAL

Page 12

1              MR. INNES:  Even one better,

2         I'll hand you two copies.

3              THE WITNESS:  I have one in

4         front of me as well.

5    BY MR. KARP:

6         Q.    Excellent.  Thank you.  Okay.

7    Why don't we mark this copy of your CV as

8    Exhibit 1?

9                   - - - - -

10             (Curriculum Vitae marked

11        Bussacco Exhibit 1 for

12        identification.)

13                  - - - - -

14   BY MR. KARP:

15        Q.    Mr. Bussacco, is this a

16   current copy of your CV?

17             MR. INNES:  Objection.

18             THE WITNESS:  Yes, it is.

19   BY MR. KARP:

20        Q.    Is this -- sitting here

21   today, is there anything you would add or

22   change about this CV?

23        A.    No.

24        Q.    And you prepared this CV?

25        A.    Yes, I did.

CONFIDENTIAL

```
                                        Page 13

 1              MR. INNES:  Objection.
 2    BY MR. KARP:
 3         Q.     Let's start with your
 4    education.  According to your CV, you have
 5    a master's in administration from Rutgers;
 6    is that right?
 7         A.     That is correct.
 8         Q.     And in what year did you earn
 9    that master's degree?
10         A.     2012.
11         Q.     Okay.  You also have a
12    master's degree in elementary education
13    from Rutgers?
14         A.     Yes, I do.
15         Q.     And when did you earn that
16    degree?
17         A.     2008.
18         Q.     You have a bachelor's degree
19    in history from Rutgers --
20         A.     Yes.
21         Q.     -- is that right?  And when
22    did you earn that?
23         A.     2007.
24         Q.     It says here that you're a
25    candidate for a doctorate in organizational
```

CONFIDENTIAL

Page 14

1  leadership with an emphasis in K through 12

2  leadership from Grand Canyon University; is

3  that correct?

4          A.      That is correct.

5          Q.      When do you anticipate

6  completing that degree?

7          A.      December of this year.

8          Q.      You don't have any degrees

9  relating to psychology?

10          A.      I do not.

11          Q.      No degrees in counseling?

12          A.      I do not.

13          Q.      Psychiatry?

14          A.      I do not.

15          Q.      Behavioral therapy?

16          A.      I do not.

17          Q.      Are you the author of any

18  articles or studies relating to education?

19                  MR. INNES:  Objection.

20                  MR. KARP:  You may answer.

21                  THE WITNESS:  No.

22  BY MR. KARP:

23          Q.      Are you the author of any

24  articles or studies relating to adolescent

25  mental health or well-being?

CONFIDENTIAL

Page 15

1                    MR. INNES:  Objection to form.
2                    THE WITNESS:  No.
3    BY MR. KARP:
4         Q.     Have you conducted any
5    research on adolescent mental health or
6    well-being?
7                    MR. INNES:  Objection to form.
8                    THE WITNESS:  No.
9    BY MR. KARP:
10        Q.     Are you the author of any
11   articles or studies relating to social
12   media?
13                   MR. INNES:  Objection to form.
14                   THE WITNESS:  No.
15   BY MR. KARP:
16        Q.     Have you conducted any
17   research relating to social media?
18                   MR. INNES:  Objection to form.
19                   THE WITNESS:  No.
20   BY MR. KARP:
21        Q.     Have you read the legal
22   Complaint that IPS has filed in this case?
23        A.     Yes.
24        Q.     Are you aware that IPS is
25   alleging that social media has caused a

CONFIDENTIAL

Page 16

1    mental health crisis among its students?
2                   MR. INNES:  Objection to form.
3                   THE WITNESS:  Yes.
4    BY MR. KARP:
5         Q.     Has any professor at Rutgers
6    or Grand Canyon University told you that
7    student use of social media has caused a
8    mental health crisis?
9                   MR. INNES:  Objection to form.
10                   THE WITNESS:  No, not
11            directly.
12    BY MR. KARP:
13         Q.     Let's shift gears a little
14    bit to your job experience.
15         A.     Okay.
16         Q.     You're currently the
17    principal at University Middle School; is
18    that right?
19         A.     That is correct.
20         Q.     And you've been in that role
21    since December of 2021?
22         A.     Yes.
23         Q.     In that role, you are an
24    employee of Irvington Public Schools; is
25    that right?

CONFIDENTIAL

Page 17

1          A.      Correct.

2          Q.      And according to your CV,

3    University Middle School includes grades

4    six through eight; is that right?

5          A.      That is correct.

6          Q.      From July 2018 through

7    December 2021, you were the principal of

8    Community Charter School of Paterson in

9    Paterson, New Jersey; is that right?

10         A.      Yes, sir.

11         Q.      Community Charter School of

12   Paterson is not part of IPS, right?

13         A.      It is not.

14         Q.      And the students who attend

15   Community Charter School of Paterson are in

16   grades five through eight?

17         A.      Yes, at that school.

18         Q.      Before that, from August of

19   2014 through July of 2018, you were the

20   assistant principal of Union Avenue Middle

21   School; is that correct?

22         A.      That is correct.

23         Q.      Union Avenue Middle School is

24   part of Irvington Public Schools, correct?

25         A.      Yes, it is.

CONFIDENTIAL

Page 18

1          Q.      And I don't see this on your
2    CV, but can you tell me what grade levels
3    are in included at university -- excuse me,
4    Union Avenue Middle School?
5          A.      Absolutely.  Grades six to
6    eight.
7          Q.      From 2008 -- excuse me, from
8    September 2008 through August 2014, you
9    were a social studies teacher at Union
10   Avenue Middle School; is that right?
11         A.      That is correct.
12         Q.      What grades did you teach?
13         A.      I taught sixth, seventh, and
14   eighth two years each year.  Two years of
15   sixth, two years of seventh, and one year
16   of eighth, I apologize, my math is wrong.
17         Q.      Good thing you're a social
18   studies teacher.
19         A.      Exactly.
20         Q.      All right.  Before you were a
21   social studies teacher -- or strike that.
22               Did you have any jobs before
23   you were a social studies teacher at Union
24   Avenue Middle School?
25         A.      I did have a job -- could you

CONFIDENTIAL

Page 19

1    repeat the question, I'm sorry?

2           Q.      Sure.  Did you have any jobs

3    before you were a social studies teacher at

4    Union Avenue Middle School?

5           A.      No.

6                        MR. INNES:  Objection to form.

7                        THE WITNESS:  No, I did not

8                have a job prior to that date at

9                Union Avenue Middle School.

10   BY MR. KARP:

11          Q.      Okay.  And to clarify, I'm

12   not just asking about jobs within the

13   district, I'm asking about any employment

14   that you might have had.

15          A.      I misunderstood your

16   question.  Yes, I worked for, it has been a

17   long time ago, Woodbridge Child Diagnostics

18   in Avenel, New Jersey.

19          Q.      And what is Woodbridge

20   Child --

21          A.      Diagnostics.

22          Q.      -- Diagnostics?

23          A.      It is no longer in service,

24   but it was a youth house for children in

25   between homes.

CONFIDENTIAL

Page 20

1         Q.      And is Woodbridge or was
2    Woodbridge run by the state of New Jersey
3    or was it a private operation?
4         A.      To my understanding, it was
5    run by the state of New Jersey.
6         Q.      When you were employed with
7    Woodbridge, what populations did you work
8    with?
9                  MR. INNES:  Objection to form.
10                  THE WITNESS:  I worked with
11            children that -- from the age of
12            nine or ten all the way up to 17.
13    BY MR. KARP:
14         Q.      And can you tell me more
15    about your role with the Woodbridge Child
16    Diagnostics Center?
17         A.      Yeah, I was a youth worker
18    and my role was ensuring that student --
19    children, I'm sorry, I'm so used to saying
20    students.
21         Q.      That's okay.
22         A.      Children, I would take them
23    when assigned I would take them to doctor's
24    appointments.  I would take them to the
25    movies.  I would take them out for outings.

CONFIDENTIAL

Page 21

1   That was my role.  I would supervise them

2   on the floor and that was pretty much my

3   job.

4           Q.    Okay.  So to sum all this up,

5   you were employed by Irvington Public

6   Schools from 2008 through 2018?

7           A.    Uh-huh.

8           Q.    You left for approximately

9   three years to work in Paterson?

10          A.    Uh-huh.

11          Q.    And then returned to

12  Irvington Public Schools in 2021; is that

13  right?

14          A.    That is correct.

15          Q.    Okay.  Why did you leave IPS

16  in 2018?

17          A.    I left Irvington Public

18  Schools for a career advancement.

19          Q.    The district didn't ask you

20  to leave?

21          A.    They did not.

22          Q.    Okay.  And why did you come

23  back to Irvington Public Schools in 2021?

24          A.    I never wanted to leave.  I

25  did want to grow my career and I felt like

CONFIDENTIAL

Page 22

1  I wasn't growing at the time, so I took an

2  opportunity to better myself and when the

3  opportunity arose to come back to

4  Irvington, I took it.

5          Q.      Were you asked to leave the

6  Community Charter School of Paterson?

7          A.      No.

8          Q.      Fair to say that in your

9  professional career, you've never taught

10  elementary school or high school at IPS?

11          A.      No, I have never taught K to

12  five or nine to 12.

13          Q.      Have you ever worked as a

14  mental health counselor or school

15  psychologist for IPS?

16                  MR. INNES:  Objection to form.

17                  THE WITNESS:  I have not.

18  BY MR. KARP:

19          Q.      Have you ever worked as a

20  social worker for IPS?

21          A.      I have not.

22          Q.      Have you ever worked as a

23  guidance counselor for IPS?

24          A.      I have not.

25          Q.      Have you ever held a position

Page 23

1    in the IT department for IPS?

2          A.      I have not.

3          Q.      Have you ever worked in the

4    budget and finance department for IPS?

5          A.      No.

6          Q.      Mr. Bussacco, have you ever

7    been deposed?

8          A.      I have not.

9          Q.      This is your first time?

10         A.      First time.

11         Q.      Congratulations.

12         A.      Thank you.

13         Q.      Have you ever provided

14   testimony in a legal proceeding?

15                 MR. INNES:  Objection to form.

16                 THE WITNESS:  No, I have not.

17   BY MR. KARP:

18         Q.      And that would include

19   testifying live at a trial, for example.

20         A.      No.  I paused because I

21   served on a jury before, so I just had to

22   think.

23         Q.      Have you ever been charged

24   with a crime?

25         A.      No.

CONFIDENTIAL

Page 24

1        Q.      At IPS or elsewhere, have you
2    ever been the subject of disciplinary
3    action in your professional capacity?
4        A.      I have not.
5        Q.      At IPS or elsewhere, have you
6    ever been investigated for any alleged
7    misconduct in your professional capacity?
8        A.      I have not.
9        Q.      You can put your CV to the
10   side for now.
11              I'm going to hand you tab
12   one, which we will mark as Exhibit 2.
13                  - - - - -
14              (Notice of Deposition marked
15          Bussacco Exhibit 2 for
16          identification.)
17                  - - - - -
18              THE WITNESS:  Thank you, sir.
19              MR. INNES:  Just remind you to
20          take your time and review the whole
21          document.
22   BY MR. KARP:
23        Q.      If at any point you need to a
24   chance to review any of the documents that
25   we're going over, please let me know.

Page 25

1          A.      I would like to review this
2    one.
3          Q.      Sure.
4          A.      Please.
5          Q.      Uh-huh.  Are you okay to
6    proceed?
7          A.      I am.
8          Q.      Have you seen this document
9    before?
10         A.      I have not.
11         Q.      What is your understanding of
12   why you are here testifying today?
13         A.      To discuss my professional
14   view on how social media impacts the lives
15   of our students.
16         Q.      And did you do anything to
17   prepare for today's deposition?
18         A.      I talked about my résumé, I
19   went over my résumé with the lawyers.  And
20   kind of what you just discussed today, we
21   went through certain items they had
22   questions about.
23         Q.      So if I understand you
24   correctly, you met with counsel to prepare
25   for today's deposition; is that fair?

CONFIDENTIAL

Page 26

1          A.      That is fair.
2          Q.      And I don't want to know the
3    specifics of your conversations with
4    counsel, but you did just tell me that you
5    discussed your CV with counsel in
6    preparation for today; is that right?
7          A.      Yeah, we discussed a
8    couple --
9                  MR. INNES:  Objection.  One
10              second.  So to the extent that you
11              can answer counsel's question
12              without discussing the particulars
13              of our conversation --
14                  THE WITNESS:  Understood.
15                  MR. INNES:  -- you can do so.
16              But to the extent that responding
17              to the question would require you
18              to give specifics of our
19              conversation, I would caution you
20              not to answer the question.
21                  THE WITNESS:  All right.  I
22              won't answer the question.
23    BY MR. KARP:
24          Q.      Roughly how many times did
25    you meet with counsel in advance of today's

CONFIDENTIAL

Page 27

1   deposition?

2          A.      Two times.

3          Q.      Do you recall approximately

4   how long those meetings lasted?

5          A.      Today was about 30 minutes.

6   And the other one, 90 minutes to maybe a

7   little bit longer, not too much longer than

8   that.

9          Q.      So one of those meetings

10  occurred today?

11         A.      Uh-huh.

12         Q.      And the first meeting you had

13  with counsel, do you recall when that took

14  place?

15         A.      Monday or Tuesday of this

16  week.  I'm doing testing right now, so.

17         Q.      And when you say, "counsel,"

18  who specifically do you mean?

19         A.      This gentleman right here.

20         Q.      And for those who can't see

21  who you're gesturing to, what is that

22  gentleman's name?

23         A.      I'm going to say your first

24  name, so do you want -- there's so many

25  people I'm meeting, sorry.

CONFIDENTIAL

Page 28

```
1                 MR. INNES:  Counsel, I can
2            represent that he met with me,
3            Michael Innes.
4                 THE WITNESS:  I was going to
5            say Michael, because I know him as
6            Michael, sorry.  I'm Michael as
7            well, so.
8    BY MR. KARP:
9         Q.    Okay.  So you met with
10   Michael?
11        A.    Yes, I did.
12        Q.    Did you meet with any other
13   counsel?
14        A.     The gentleman to the left who
15   is present today.
16        Q.    Okay.
17        A.     And his name again, I just
18   met you this day, I'm so sorry.
19                 MR. SIFFRINGER:  Ryan
20            Siffringer.
21                 THE WITNESS:  Ryan.
22   BY MR. KARP:
23        Q.    Did you, at either of these
24   two meetings, did you meet with counsel who
25   are actually employed by Irvington Public
```

CONFIDENTIAL

Page 29

1   Schools?

2          A.      I did not, no.

3                  MR. INNES:  Objection to form.

4   BY MR. KARP:

5          Q.      I'll rephrase that question.

6   You understand that the two counsel you've

7   already identified work at an outside law

8   firm, yes?

9          A.      Yes.

10         Q.      Have you met with any of the

11  in-house counsel for Irvington Public

12  Schools?

13                 MR. INNES:  Objection to form.

14                 THE WITNESS:  I have not.

15  BY MR. KARP:

16         Q.      Was anyone else present at

17  your meetings with counsel?

18                 MR. INNES:  Objection to form.

19                 THE WITNESS:  No, not to my

20          recollection, no.

21  BY MR. KARP:

22         Q.      Other than speaking to

23  counsel to prepare for today's deposition,

24  did you speak with any of your colleagues

25  at University Middle School?

CONFIDENTIAL

1          A.      Regarding, I'm sorry?

2          Q.      In preparation for today's

3    deposition, did you speak to any of your

4    colleagues at University Middle School?

5          A.      To prepare for my deposition?

6          Q.      Yes.

7          A.      I did not.

8          Q.      Did you speak -- in

9    preparation for today's deposition, did you

10   speak with anyone else at IPS?

11         A.      No.  Other than they knew I

12   was here today to let them know I was

13   coming here.

14         Q.      Sure.

15         A.      Uh-huh.

16         Q.      Did you review any documents

17   to prepare for today's deposition?

18                 MR.  INNES:  Objection to form.

19          And, Mr. Bussacco, I'll just

20          caution you, again, that to the

21          extent you can respond, but to give

22          particulars of any information that

23          you respond, I caution you against

24          giving those particulars, but you

25          can answer.

CONFIDENTIAL

Page 31

1                    THE WITNESS:  My résumé that
2            we went over, but that's -- yeah.
3  BY MR. KARP:
4        Q.    Okay.  Did you review any
5  documents to refresh your recollection of
6  matters that you thought could come up at
7  today's deposition?
8                    MR. INNES:  Objection.
9                    THE WITNESS:  Based on
10            counsel, pass that, I won't answer
11            that -- I don't answer that
12            question you said, pass?  I don't
13            know how that works.
14                    MR. INNES:  So -- sure.  So
15            this is, yeah, this is a little
16            awkward and tricky, right?  Counsel
17            is asking you -- well, to the
18            extent to respond to counsel's
19            question, if you have to reveal
20            attorney-client communications or
21            conversations, I would ask you not
22            to do that.  But to the extent that
23            you can respond that you reviewed
24            documents in the case, if you did,
25            you can respond to that.

CONFIDENTIAL

1              THE WITNESS:  Understood.

2         Okay.  Thank you.  I reviewed the

3         résumé, as I previously said.  And

4         an email that was sent out

5         regarding, and I took a note on

6         this, on Rutgers Comprehensive

7         School of Mental Health and why did

8         I have an email about that.

9    BY MR. KARP:

10        Q.    Hold on --

11        A.    The Rutgers Comprehensive

12   School of Mental Health and what was that

13   regarding.

14        Q.    Were you just referring to

15   your CV?

16        A.    No, I told you, I had this

17   and I took notes and that's all I took.

18        Q.    Sure.

19        A.    Because it's an eight-letter

20   acronym, so I always forget which.

21        Q.    Okay.  So in preparation

22   for -- you took notes in preparation for

23   today's deposition?

24        A.    Yes, Rutgers Comprehensive

25   School of Mental Health and Hanson School

CONFIDENTIAL

Page 33

1    of Mental Health Services, what I wrote

2    today in my notes.

3            Q.      And those are acronyms

4    relating to institutions where you have

5    received education?

6            A.      They actually regarded --

7                    MR. INNES:  Objection to form.

8                    THE WITNESS:  They are

9            regarding a partnership I have for

10           my school at University Middle

11           School.  I have a partnership with

12           that company.

13   BY MR. KARP:

14           Q.      Okay.  We'll request the

15   production of those notes.

16           A.      Not a problem.

17                   MR. INNES:  Do you want us to

18           make a copy for them now?

19                   MR. KARP:  That would be

20           great.  We can go off the record

21           and do that, or we can do it at the

22           next break, either one is fine.

23                   MR. INNES:  Yeah, we can do it

24           at the next break.

25

CONFIDENTIAL

Page 34

1  BY MR. KARP:

2          Q.      Okay.  Other than reviewing

3  your CV and reviewing an email to help you

4  understand what those acronyms stand for,

5  did you look at any other documents to

6  refresh your memory or your recollection in

7  advance of today's deposition?

8                    MR. INNES:  Objection to form.

9            Mr. Bussacco, to the extent you can

10           answer that question generally

11           speaking, you can do so.  I would

12           caution you against giving

13           particulars about anything that we

14           communicated about.

15                  THE WITNESS:  Just emails.

16  BY MR. KARP:

17         Q.      Emails plural?

18         A.      Yeah, about two or three

19  emails.

20         Q.      Relating to those acronyms?

21         A.      Most --

22                    MR. INNES:  Objection.

23                    THE WITNESS:  Most of them

24           related to that, the two of them,

25           yeah.

Page 35

1    BY MR. KARP:

2         Q.     What did the other emails

3    relate to?

4         A.     When I was a teacher, an

5    email I sent out.

6         Q.     Okay.  Can you tell me more

7    about that email that you reviewed?

8              MR. INNES:  Objection to form.

9         Counsel, I can -- I will represent

10        to you that every document that

11        he's referring to has been produced

12        in the case.

13             MR. KARP:  I understand.

14             MR. INNES:  If that's what

15        you're trying to figure out, it has

16        been given.

17             MR. KARP:  I understand that.

18        I appreciate that representation.

19        I would like to know specifically

20        what he used to refresh his

21        recollection for today's

22        deposition.  And if you could

23        identify that specific email,

24        that's our request.

25             MR. INNES:  You're making a

Page 36

```
 1              request --
 2                   MR. KARP:  I'm making a
 3              request for you to identify the
 4              email that he --
 5                   MR. INNES:  Okay.  You can put
 6              that in writing and we can duke
 7              that out after hours.
 8                   MR. KARP:  Sure.
 9   BY MR. KARP:
10        Q.     Sitting here today, what is
11   your -- what is your recollection of the
12   email you reviewed from when you were a
13   teacher?
14        A.     Accessing Khan Academy, which
15   is a platform for students, an adapted
16   platform for students to gain mastery at
17   certain deficits they have in ELA and math.
18        Q.     Okay.  And what did you learn
19   or what did you -- strike that.
20                   Why was it important to you
21   to review that email?
22                   MR. INNES:  Objection to form.
23                   THE WITNESS:  I don't believe
24              it was important for me to review,
25              it was just a question of why I was
```

CONFIDENTIAL

Page 37

1          having kids use Khan Academy.
2     BY MR. KARP:
3          Q.     And what's the answer to that
4     question?
5               MR. INNES:  Objection.  I
6          would like to go off the record for
7          a moment.
8               MR. KARP:  Sure.
9               MR. INNES:  We're just going
10          to take a five-minute break.
11               MR. KARP:  Sure.  That's fine.
12               MR. INNES:  Great.  Thanks.
13               THE VIDEOGRAPHER:  The time
14          right now is 10:33 a.m. and we are
15          off the record.
16                    - - - - -
17     (Discussion was held off the record.)
18                    - - - - -
19               THE VIDEOGRAPHER:  The time
20          right now is 10:35 a.m.  We're back
21          on the record.
22     BY MR. KARP:
23          Q.     Mr. Bussacco, before your
24     counsel requested a break, we were talking
25     about an email you reviewed to refresh your

CONFIDENTIAL

Page 38

1    recollection in advance of today's

2    deposition.

3                    Do you remember that?

4            A.      Yes.

5            Q.      It was only a few minutes

6    ago.  And you told me that you wanted to

7    understand why you had chosen Khan Academy

8    for your students; is that correct?

9            A.      Uh-huh.

10           Q.      And what did you learn from

11   reviewing that email?

12           A.      It refreshed my memory of

13   what I taught a long time ago, but I didn't

14   learn much from it.  It was just a question

15   asked of me, what is this.

16           Q.      Other than that email, and

17   the emails you reviewed to understand the

18   meaning of certain acronyms, did you review

19   any other emails to refresh your memory in

20   advance of today's deposition?

21                    MR. INNES:  Objection to form.

22                    THE WITNESS:  No.

23   BY MR. KARP:

24           Q.      Other than speaking to

25   counsel and reviewing the documents that we

CONFIDENTIAL

Page 39

1    just discussed, have you done anything else

2    to prepare for today's deposition?

3              A.     No.

4              Q.     Mr. Bussacco, what's your

5    understanding of the allegations in this

6    lawsuit?

7              A.     Basic, the impact social

8    media has on student's mental health and

9    day to day.

10             Q.     Do you know who the

11   Defendants are in this lawsuit?

12             A.     That would be Meta, Snap,

13   TikTok, and there's a couple of other ones,

14   yeah.

15             Q.     A couple of other ones?

16             A.     A couple of other ones, yeah,

17   but those are the three that come to mind.

18             Q.     I'll represent to you that

19   YouTube is --

20             A.     YouTube, yes, I know that

21   one, I'm sorry, I apologize.

22             Q.     No need to apologize.  It's a

23   lot to remember.

24             A.     Yeah.

25             Q.     When did you become aware of

CONFIDENTIAL

Page 40

```
 1   this lawsuit?
 2          A.      Exact --
 3                  MR. INNES:  Objection to form.
 4                  THE WITNESS:  Exact date, I
 5           don't know.  I want to say a couple
 6           of months ago, maybe December,
 7           January estimate.
 8   BY MR. KARP:
 9          Q.      Okay.  So roughly December of
10   2024 or January of 2025?
11          A.      Yeah.
12          Q.      Were you -- I believe I know
13   the answer to this question, but were you
14   involved in the decision to file this
15   lawsuit?
16          A.      I was not.
17          Q.      You told me earlier that you
18   reviewed the Complaint in this lawsuit?
19          A.      I have --
20                  MR. INNES:  Objection to form.
21                  THE WITNESS:  -- yes, but not
22           in detail.
23   BY MR. KARP:
24          Q.      Okay.  That would be another
25   document that you reviewed in preparation
```

CONFIDENTIAL

Page 41

1   for today's deposition; is that fair?
2                   MR. INNES:  Objection to form.
3                   THE WITNESS:  That would be
4           correct.
5   BY MR. KARP:
6           Q.      Have you assisted with
7   drafting any documents that have been used
8   in this litigation such as the Irvington
9   Public Schools fact sheet?
10                  MR. INNES:  Objection to form.
11          If you can answer that question
12          without divulging attorney-client
13          privilege or conversations you've
14          had with attorneys, you can do so.
15          THE WITNESS:  I can't answer
16          that question.
17  BY MR. KARP:
18          Q.      Have you assisted in drafting
19  any discovery responses in this lawsuit?
20                  MR. INNES:  Same objection.
21          Same instruction.
22                  THE WITNESS:  I cannot.
23  BY MR. KARP:
24          Q.      And to clarify, you cannot
25  answer the question because you're

CONFIDENTIAL

Page 42

1   listening to your counsel's instruction or

2   because you don't understand the question?

3          A.      Listening to the advisement

4   of my counsel.

5          Q.      Has anyone at Irvington

6   Public Schools asked you to provide

7   information to be used in connection with

8   this lawsuit?

9                   MR. INNES:  Objection to form.

10           Instruct the witness not to answer

11           that question.

12  BY MR. KARP:

13         Q.      Are you going to follow your

14  counsel's advice?

15         A.      I will follow my counsel's.

16         Q.      In your various roles as a

17  teacher, assistant principal, and principal

18  with Irvington Public Schools, have you

19  ever received a performance review?

20                  MR. INNES:  Objection to form.

21                  THE WITNESS:  I have.

22  BY MR. KARP:

23         Q.      Can you give me an estimate

24  of how many performance reviews you've

25  received during your time at IPS?

Page 43

1          A.     I can.  Five years as a
2   teacher, to the best of my knowledge.  Four
3   years as assistant principal.  And I will
4   be getting my fourth one this year for
5   principal.  So eight, four, and four.
6          Q.     Based on that answer, am I
7   correct in understanding that these
8   performance reviews are given annually?
9          A.     That is correct.
10         Q.     Would those performance
11  reviews be memorialized or written down
12  somewhere?
13                 MR. INNES:  Objection to form.
14                 THE WITNESS:  To the best of
15           my understanding, they should be in
16           our files.
17  BY MR. KARP:
18         Q.     As part of the process of
19  being reviewed in your professional
20  capacity, did you complete any
21  self-evaluations?
22         A.     Yes, it is part of the rubric
23  for a principal.
24         Q.     And would those
25  self-evaluations have been in writing as

CONFIDENTIAL

Page 44

1    well?

2          A.      Yes.

3          Q.      Let's go back to Exhibit 2

4    for a second.

5          A.      That is this one, right?

6          Q.      Yes, it's the notice.  And if

7    you'll follow me to page 6.  You'll see in

8    this document that in connection with

9    taking your deposition today, the

10   Defendants in this case requested the

11   production of certain documents and those

12   documents are listed here on page 6.

13                Do you see that?

14         A.      Yes.

15         Q.      I want to draw your attention

16   to question number four -- or excuse me,

17   request number four.  Why don't you take a

18   second to look that over?

19         A.      Absolutely.  Okay.

20         Q.      You would agree with me that

21   we requested the production of

22   self-evaluations and performance reviews

23   relating to certain subject matter?

24                MR. INNES:  Objection to form.

25                THE WITNESS:  I see that here.

CONFIDENTIAL

Page 45

1    BY MR. KARP:

2         Q.      To the best of your

3    recollection, have any of your performance

4    reviews or self-evaluations related to

5    setting or enforcing policy regarding

6    students' use of electronic devices or

7    online media and communication services?

8         A.      Could you repeat that

9    question?

10                MR. INNES:  Objection.  Is

11            there a question there?

12   BY MR. KARP:

13        Q.      Yes, I did ask a question.

14   And I'll ask it again.

15        A.      Thank you.

16        Q.      To the best of your

17   recollection, did any of your performance

18   reviews or self-evaluations from IPS relate

19   to setting or enforcing policy regarding

20   students' use of electronic devices or

21   social media?

22                MR. INNES:  Objection to form.

23                THE WITNESS:  So if I

24            understand your question correctly,

25            you're asking has any of my

CONFIDENTIAL

Page 46

1          performance reviews focused
2          specifically on setting or
3          enforcing policy regarding
4          students' electronic devices or
5          online media; is that correct?
6   BY MR. KARP:
7          Q.     That's correct.
8          A.     Not specifically.
9          Q.     Meaning that those
10  performance reviews and self-evaluations
11  did not expressly reference setting or
12  enforcing policies for students' uses of
13  social media or electronic devices?
14              MR. INNES:  Objection.
15          Misstates prior testimony and
16          objection to form.
17              THE WITNESS:  Can you say that
18          one more time?  I'm just processing
19          to make sure.
20              MR. KARP:  Sure.
21              THE WITNESS:  Sorry about
22          that.
23  BY MR. KARP:
24          Q.     And maybe I'll ask a
25  different question.  Have any of your

CONFIDENTIAL

Page 47

1  performance reviews or self-evaluations
2  from IPS mentioned setting or enforcing
3  policy regarding students' use of
4  electronic devices or social media?
5              MR. INNES:  Objection to form.
6              THE WITNESS:  Performance
7        review would include enforcing
8        policy, but district policy, which
9        electronic devices are is embedded
10       into the policy.  So what is my
11       ability to enforce policy regarding
12       all the policies set by Irvington
13       Public Schools district and that
14       there is an electronic device
15       policy within the district, so it
16       would fall under that, but not
17       explicitly, if that makes sense.
18  BY MR. KARP:
19       Q.    Thank you.  It does make
20  sense.  Looking down at subpart B in the
21  notice, have any of your self-evaluations
22  or performance reviews related to setting
23  or enforcing policy regarding teachers' use
24  of electronic devices or social media?
25              MR. INNES:  Objection to form.

CONFIDENTIAL

Page 48

```
 1                    THE  WITNESS:   And  this  answer
 2            will  be  similar  to  the  last  one
 3            where  we  would  be  discussing  me
 4            enforcing  policy  and  we  do  have  a
 5            policy  on  teachers'  use  of
 6            electronic  devices  and  online  media
 7            and  communication  services.
 8  BY  MR.  KARP:
 9          Q.     Okay.   Would  that  be  the  same
10  answer  or  a  similar  answer  for  subpart  C,
11  which  relates  to  setting  or  enforcing
12  policy  regarding  monitoring  or  treating
13  mental,  social,  emotional,  or  behavioral
14  health  of  students?
15                    MR.  INNES:   Objection  to  form.
16                    THE  WITNESS:   Yes,  it  would
17            for  enforcing  policy  regarding
18            monitoring.
19  BY  MR.  KARP:
20          Q.     I  think  you  can  probably
21  guess  where  I'm  going  next  --
22          A.     D.
23          Q.     --  subpart  D.   Have  any  of
24  your  self-evaluations  or  performance
25  reviews  related  to  monitoring  or  treating
```

CONFIDENTIAL

Page 49

1  mental, social, emotional, or behavioral

2  health of students?

3              MR. INNES:  Objection to form.

4              THE WITNESS:  Monitoring.

5  BY MR. KARP:

6         Q.    Have any of your

7  self-evaluations or performance reviews

8  related to studying, measuring, or

9  reporting on mental, social, emotional, or

10  behavioral health of students?

11             MR. INNES:  Objection to form.

12             THE WITNESS:  So has my

13         performance review specifically --

14         I'm sorry, I forgot there's a mic

15         there -- focused on that question,

16         E, studying, measuring, reporting

17         on social, emotional, or behavioral

18         health of students, yes, for

19         reporting only.

20  BY MR. KARP:

21         Q.    And have any of your

22  self-evaluations or performance reviews

23  related to setting or enforcing policy

24  regarding student and staff discipline?

25         A.    I don't set --

CONFIDENTIAL

```
                                        Page 50

 1                    MR. INNES:  Objection to form.
 2                    THE WITNESS:  I don't set
 3             policy, I enforce policy.
 4      BY MR. KARP:
 5          Q.    Okay.  So some of the
 6      self-evaluations and performance reviews
 7      you've received relate to enforcing policy
 8      regarding student and staff discipline?
 9                    MR. INNES:  Objection to form.
10                    THE WITNESS:  Yes.
11                    MR. KARP:  That's a yes, okay.
12                    The witness has testified
13             that there are a number of
14             responsive performance reviews
15             and self-evaluations to this
16             request and we would renew our
17             request for those documents, I
18             don't believe they have been
19             produced.
20                    MR. INNES:  Sure.  You can
21             send us a letter about that and
22             we'll respond.
23                    MR. KARP:  Sure.
24                    MR. INNES:  I'm not sure your
25             record reflects that, but okay.
```

CONFIDENTIAL

Page 51

1                   MR. KARP:  I think it does.

2     BY MR. KARP:

3           Q.     You can put this exhibit to

4     the side.

5           A.     Absolutely.

6           Q.     Actually, I'm about to start

7     a pretty long line of questioning and we

8     have been going roughly an hour, just a bit

9     under, do you want to take a quick break?

10                  MR. INNES:  Do you need a

11            break?

12                  THE WITNESS:  I'm fine, if you

13            guys are fine.

14    BY MR. KARP:

15          Q.     You're fine to continue?

16          A.     I'm fine.

17          Q.     Sure.  Let's keep going.  I'm

18    going to hand you tab two, which is --

19    which we will mark as Exhibit 3.

20          A.     Thank you.

21                  - - - - -

22                  (Annual School Planning

23            2023-2024 Bates

24            BW__Irvington00334790 to 00334863

25            marked Bussacco Exhibit 3 for

CONFIDENTIAL

Page 52

```
 1          identification.)
 2                  - - - - -
 3    BY MR. KARP:
 4          Q.      The starting Bates number on
 5    this document is BW__Irvington00334790.
 6                  Mr. Bussacco, are you
 7    familiar with this document?
 8          A.      Yes, I am.
 9          Q.      I see you nodding your head
10    emphatically.
11          A.      I said yes.
12          Q.      What is this document?
13          A.      This is the annual school
14    plan.  It is part of a plan we submit to
15    the department of education every year.  It
16    breaks down areas, root causes of areas we
17    believe we need to improve upon, areas that
18    we're doing really well on, intervention
19    areas, and how we can continue to move the
20    school forward.
21          Q.      Okay.
22          A.      So it's a comprehensive plan.
23          Q.      You said the department of
24    education, you're referring to the New
25    Jersey Department of Education?
```

CONFIDENTIAL

Page 53

```
 1          A.      Yes, New Jersey.  There are
 2    many states, you're right.
 3          Q.      And did you create this
 4    annual school planning document?
 5          A.      The template is provided by
 6    the department of education, New Jersey's
 7    department of education.  We fill in on
 8    their template.
 9          Q.      Okay.  So you provided
10    information to help prepare this annual
11    school planning?
12          A.      That is accurate.
13          Q.      Okay.  Did you draft any
14    sections of this document?
15                  MR. INNES:  Objection to form.
16              Counsel, before we keep going, I
17              just want to note for the record,
18              is this part of a family or is this
19              a standalone document that was
20              produced?
21                  MR. KARP:  Offhand, I don't
22              know the answer to that question
23              but I can let you know at a break.
24                  MR. INNES:  Sure.  I mean, it
25              has been our consistent position
```

CONFIDENTIAL

Page 54

1          that full families should be used
2          as exhibits, so.
3               MR. KARP:  I'm fairly
4          confident that this document was
5          part of Mr. Bussacco's custodial
6          file, but we can sort that out on a
7          break.  And I note your objection.
8               THE WITNESS:  And what was
9          your question again?  I'm sorry.
10  BY MR. KARP:
11       Q.    Of course.  Did you draft any
12  sections of the annual school planning for
13  2023-2024?
14       A.    Yes.
15       Q.    Do you recall which sections
16  you contributed to?
17       A.    I'm going to refer you to
18  page 1.  Page 1 certifies that I worked on
19  all parts of this document.
20       Q.    Were you responsible for
21  ensuring the accuracy of this document?
22       A.    Yes, I was one of the people,
23  one of the team responsible for that, that
24  is correct.
25       Q.    Do you have any reason to

CONFIDENTIAL

Page 55

```
 1   doubt the accuracy of any data that is
 2   contained in this document?
 3                   MR. INNES:  Mr. Bussacco, I
 4           would instruct you to review the
 5           entire document before answering
 6           that question.  It's a 74-page
 7           document.  Take your time.
 8                   THE WITNESS:  I was going to
 9           say, this is not the current plan,
10           so I would have to refamiliarize --
11           I would have to look at the
12           document, to be honest with you, to
13           know that.
14   BY MR. KARP:
15       Q.    At the time that this
16   document was finalized and went out the
17   door to the New Jersey Department of
18   Education, did you feel confident in the
19   accuracy of the data that was contained in
20   this report?
21                   MR. INNES:  Objection to form.
22           Lack of foundation.  Compound.
23                   THE WITNESS:  So did I feel
24           confident in what was submitted to
25           the NJDOE, department of education
```

CONFIDENTIAL

Page 56

1              is your question?

2    BY MR. KARP:

3         Q.    That's the question.

4         A.    I would say I did, based on

5    page 73.

6         Q.    Certainly it's your intent to

7    provide truthful and accurate and complete

8    information to the New Jersey Department of

9    Education, yes?

10        A.    That is correct.

11        Q.    Okay.  You beat me to this

12   already, but let's take a look at page 1.

13   You were the first individual listed in

14   this table called "ASP Development Team

15   Members."

16              Do you see that?

17        A.    Uh-huh, yes, sir.

18        Q.    You're identified as the

19   principal and the table includes the word,

20   "yes" under comprehensive analysis and

21   needs, root cause analysis, and SMART Goal

22   development; is that right?

23        A.    That is right.

24              MR. INNES:  Objection to form.

25

Page 57

1    BY MR. KARP:

2         Q.      What's the significance of

3    the word, "yes" under -- in the columns for

4    comprehensive and analysis needs, root

5    cause analysis, and SMART Goal development?

6                    MR. INNES:  Objection to form.

7                    THE WITNESS:  The "yes"

8              signifies that I was part of the

9              development in that area, talking

10             about questions, debating what to

11             put down there, and then overall

12             making a determination as a team.

13   BY MR. KARP:

14        Q.      Are these ASP documents

15   submitted to the New Jersey Department of

16   Education by every IPS school?

17                   MR. INNES:  Objection to form.

18             You've shown him one ASP, now

19             you're referring to multiple ASP

20             documents.

21   BY MR. KARP:

22        Q.      Sure.  I can rephrase the

23   question, does every IPS school submit an

24   ASP -- excuse me, does every IPS school

25   submit an ASP to the New Jersey Department

CONFIDENTIAL

Page 58

1    of Education annually?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  To the best of

4           my knowledge, they submit them to

5           our superintendent.  So going back

6           prior to Dr. Vauss, my knowledge,

7           it went to Dr. Hackett, but we

8           submit them to the superintendent

9           and from their part, it gets

10          submitted and it depends on what

11          school.  I don't know if every

12          school submits it.  I've only

13          worked at two.

14   BY MR. KARP:

15          Q.    Okay.  And for the two

16   schools that you've worked at within IPS,

17   you have submitted an ASP to the New Jersey

18   Department of Education every year?

19                    MR. INNES:  Objection to form.

20          Which school are we talking about?

21                    THE WITNESS:  Union Avenue.

22          You're talking about Union Avenue

23          and University Middle School, the

24          two schools I worked at?

25

CONFIDENTIAL

Page 59

1   BY MR. KARP:

2        Q.    I'm referring to the two

3   schools you worked at.

4        A.    So the two schools I worked

5   at were Union Avenue Middle School --

6   University Middle School and Union Avenue

7   Middle School.  And, yes, we did submit at

8   my time there.  I can only speak to at

9   Union Ave. though from when I became

10  assistant principal in 2014.

11       Q.    Understood.  To your

12  knowledge, is it a requirement that every

13  school in the state of New Jersey submit an

14  ASP to the New Jersey Department of

15  Education?

16             MR. INNES:  Objection to form.

17         Calls for speculation.

18             THE WITNESS:  To my knowledge,

19         I don't know if every district is

20         required to submit this.

21  BY MR. KARP:

22       Q.    Do you know if the

23  requirement to submit an ASP to the New

24  Jersey Department of Education is limited

25  only to Title I schools?

CONFIDENTIAL

Page 60

```
 1              MR. INNES:  Objection to form.
 2         Lack of foundation.
 3              THE WITNESS:  I know that we
 4         are a Title I district and that's
 5         why we submit -- that's one of the
 6         reasons we submit it.
 7  BY MR. KARP:
 8       Q.    Okay.  So one of the reasons
 9  that schools in IPS submit these ASPs to
10  the New Jersey Department of Education is
11  that they are Title I schools?
12              MR. INNES:  Objection to form.
13         Misstates prior testimony.  Again,
14         you've shown him one ASP, you're
15         referring to multiple ASPs, but
16         it's your record.
17              MR. KARP:  We have been
18         discussing ASPs generally, I think
19         the question is fine.  You're
20         entitled to disagree.
21              THE WITNESS:  Can you say the
22         question again?  I apologize.
23  BY MR. KARP:
24       Q.    Of course.  You just told me
25  that IPS schools are Title I, correct?
```

CONFIDENTIAL

Page 61

1          A.      Correct, we are a Title I
2     district.
3          Q.      And is your Title I
4     designation one of the reasons that IPS
5     schools submit ASPs to the New Jersey
6     Department of Education?
7                      MR. INNES:  Objection to form.
8                      THE WITNESS:  To the best of
9              my understanding, yes.
10    BY MR. KARP:
11         Q.      Let's take a look at page 4.
12    There's a table on page 4 titled, "Prior
13    Year Interventions."
14                      Do you see that?
15         A.      Yes.
16         Q.      What is the significance of
17    this table?
18                      MR. INNES:  Object to the
19              form.
20                      THE WITNESS:  These were
21              interventions that we used for the
22              specific plan in 2022 to 2023 and
23              we would provide a basic measurable
24              outcome at that time about if we
25              would like to continue this

CONFIDENTIAL

Page 62

1              intervention or would we like to
2              cease the intervention.
3    BY MR. KARP:
4         Q.      Does this table list all of
5    the interventions that University Middle
6    School executed during the 2022-2023 school
7    year?
8         A.      It does not.
9         Q.      There would be additional
10   interventions that are not included here?
11        A.      Absolutely.
12        Q.      And why weren't those other
13   interventions included?
14        A.      Refreshing my memory, looking
15   at this document, I believe we were
16   focusing on one, two, three, four, five,
17   six areas -- no, five areas that we were
18   focused on bringing back.  We saw huge
19   successes in certain programs such as after
20   school and Saturday Academy, the PBS IST,
21   positive behavior support, so we wanted to
22   let the state know that we really liked
23   these interventions we put forward and we
24   would like to continue them.  And to the
25   best of my understanding, I don't know if

CONFIDENTIAL

Page 63

1  we had more space to put more information,

2  if we had other boxes, I can't recall.

3          Q.    I don't want to put words in

4  your mouth, so --

5          A.    That's fine.

6          Q.    -- please let me know if you

7  don't agree with this, but were these the

8  interventions that University Middle School

9  prioritized for the New Jersey Department

10  of Education?

11                MR. INNES:  Objection to form.

12                THE WITNESS:  These were a

13          handful of the priorities,

14          absolutely.

15  BY MR. KARP:

16          Q.    Would you consider these to

17  be key interventions that University Middle

18  School executed during the 2022-2023 school

19  year?

20                MR. INNES:  Objection to form.

21                THE WITNESS:  Say that one

22          more time, key what, I apologize.

23  BY MR. KARP:

24          Q.    That's okay.  Do you consider

25  these to be key interventions or important

CONFIDENTIAL

Page 64

1    interventions that University Middle School

2    executed during the 2022-2023 school year?

3                    MR. INNES:  Objection to form.

4                    THE WITNESS:  I believe these

5              were five of several, that yes,

6              that were key.

7    BY MR. KARP:

8         Q.      And this table also indicates

9    or reflects whether University Middle

10   School intended to continue with these

11   intervention programs, right?

12        A.      Yes, they are.

13                   MR. INNES:  Objection to form.

14                   THE WITNESS:  As indicated in

15             column 5.

16   BY MR. KARP:

17        Q.      Correct.

18                   MR. INNES:  Sorry, Mike, just

19             give me a second to --

20                   THE WITNESS:  Sorry.

21                   MR. INNES:  Fast going

22             conversation, but just give me a

23             second to get an objection in if I

24             need to.  Thank you.

25                   THE WITNESS:  No problem.

CONFIDENTIAL

Page 65

1    BY MR. KARP:

2         Q.     The far right column of this

3    table describes the measurable outcomes of

4    these interventions?

5                   MR. INNES:  Is that a

6         question?

7                   THE WITNESS:  That is correct,

8         if that's a question.

9    BY MR. KARP:

10        Q.     You'd agree with me that the

11   words, "social media" do not appear

12   anywhere in this table, correct?

13        A.     I do not see the words,

14   "social media," explicitly on this table.

15        Q.     Let's turn now to page 24.  I

16   promise we won't go through all 74 pages of

17   this.  The table on this page, which

18   continues for several pages, is titled,

19   "Climate and Culture."

20                   Do you see that?

21        A.     I do.

22        Q.     What kind of information is

23   contained in this table?

24        A.     The state requests that we

25   provide enrollment numbers, attendance

CONFIDENTIAL

Page 66

1  rates for students and staff, chronic

2  absenteeism, it's climate and culture

3  surveys, discipline.  They do ask for

4  college and career readiness, but it's

5  blank, because I am in middle school, so

6  it's not applicable.  And they -- I think,

7  that's the end of it, I think it ends on

8  page 33.

9          Q.      Okay.  If you look toward the

10 right-hand side of the page, you'll see a

11 column called, "your data"?

12         A.      What page am I on, sir?  I've

13 flipped through a lot.

14         Q.      That's okay.  Go back to

15 page 24?

16         A.      Thank you.

17         Q.      So on page 24, on the

18 right-hand side, you'll see a column

19 called, "your data."

20         A.      Uh-huh.

21         Q.      Do you see that?

22         A.      I do.

23         Q.      Does this column reflect the

24 enrollment data for University Middle

25 School for various school years?

```
                                    Page 67
 1                 MR. INNES:  Objection to form.
 2                 THE WITNESS:  It does, it
 3             includes from 2020 to 2023.
 4   BY MR. KARP:
 5         Q.     Okay.  So this column
 6   includes the enrollment data for University
 7   Middle School from 2020 through 2023,
 8   correct?
 9         A.     That is correct.
10         Q.     Do you have any reason to
11   doubt the accuracy of the enrollment data
12   contained in this column?
13                 MR. INNES:  Objection to form.
14                 THE WITNESS:  I don't doubt
15             it, but the numbers based on just
16             the transient nature of our
17             district, it could be off by a few
18             numbers but nothing major.
19   BY MR. KARP:
20         Q.     Okay.  Understood.  The
21   overall enrollment at University Middle
22   School for the 2022-2023 school year was
23   723 students.
24                 Do you see that?
25         A.     Yeah, approximately at that
```

CONFIDENTIAL

Page 68

1    time when this was created, because this is

2    not created at the end of year.  As you see

3    at the bottom, it was created in February.

4          Q.    Okay.  So, again, correct me

5    if I am not understanding you, but this

6    document is -- or strike that actually.

7                The numbers that are

8    included here may be off by a few students

9    here and there?

10         A.    Absolutely.

11         Q.    But for the most part, you

12   consider this data to be accurate?

13         A.    Fairly accurate, absolutely.

14         Q.    Okay.  So just to ask that

15   question one more time, the overall

16   enrollment at University Middle School in

17   2022 through 2023 was roughly 723 students?

18                MR. INNES:  Objection.  Asked

19           and answered.

20                THE WITNESS:  Correct, at the

21           draft of this document, at the date

22           of the draft of this document.

23   BY MR. KARP:

24         Q.    Sure.  And at the time that

25   this document was drafted 518 of those

CONFIDENTIAL

Page 69

1    students were African American?

2         A.    Correct.

3         Q.    Okay.  198 of those students

4    were Hispanic?

5         A.    Yup.

6         Q.    Three of those students were

7    Asian?

8         A.    Uh-huh.

9         Q.    Two were American Indian?

10        A.    Okay.

11        Q.    One was Pacific Islander?

12        A.    Yup.

13        Q.    And one was multiracial?

14        A.    Yup.  I was just looking at

15   the numbers and added them up.

16        Q.    Of course.  Do these numbers

17   generally reflect the makeup of the broader

18   Irvington community?

19             MR. INNES:  Objection to form.

20             THE WITNESS:  I would say in

21             more recent years, we have -- our

22             Hispanic population has increased,

23             but the other populations have

24             relatively stayed the same.

25

Page 70

1    BY MR. KARP:

2           Q.      Okay.  Ninety-one students

3    are listed as SWD for the 2022-2023 school

4    year; is that right?

5           A.      Ninety-one, yes.

6           Q.      And SWD stands for students

7    with disabilities?

8           A.      That is correct.

9           Q.      To your knowledge, does this

10   category refer only to physical

11   disabilities or would it also include other

12   forms of disability?

13                  MR. INNES:  Objection to form.

14                  THE WITNESS:  It's based on

15           their educational -- Individual

16           Education Plan, their IEP, so it's

17           based on academic need and

18           assistance.  So there's

19           self-contained, there are inclusion

20           students, and there's resource

21           students.

22   BY MR. KARP:

23          Q.      I'll represent to you that 91

24   out of 723 is approximately 12.5 percent.

25                  Do you have any reason to

Page 71

1    doubt my math?

2            A.      I trust you on that --

3                    MR. INNES:  Object to form.

4                    THE WITNESS:  I would trust

5            you on your math, because I don't

6            want to do it.

7    BY MR. KARP:

8            Q.      If we can reach that

9    agreement, I think we're going to be in

10   good shape today.

11                   So you would agree with me,

12   assuming that my math is correct, that

13   12.5 percent or approximately 12.5 percent

14   of students at University Middle School

15   during the 2022-23 school year were

16   students with disabilities?

17           A.      That would be accurate using

18   the numbers 91 and 723.

19                   MR. KARP:  Can I request a

20           brief break just to deal with a

21           tech issue on my computer?

22                   MR. INNES:  Sure.

23                   MR. KARP:  Thank you.

24                   THE VIDEOGRAPHER:  The time

25           right now is 11:09 a.m.  We are off

CONFIDENTIAL

Page 72

1          the record.

2                    - - - - -

3      (A recess was taken at this time.)

4                    - - - - -

5                    THE VIDEOGRAPHER:  The time

6          right now is 11:22 p.m. -- I'm

7          sorry, a.m., we are back on the

8          record.

9                    MR. KARP:  Thank goodness,

10         it's not p.m.

11                   THE WITNESS:  Yeah.

12                   MR. INNES:  We'll get there.

13  BY MR. KARP:

14         Q.     Mr. Bussacco, welcome back.

15         A.     Thank you.

16         Q.     We just took a brief break.

17  Before the break, we were talking about the

18  annual school planning for the 2023-2024

19  school year, right?

20         A.     That is correct.

21         Q.     And I'll pick up from our

22  questioning on page 24.  Are you on that

23  page?

24         A.     Yes, I am.

25         Q.     And according to this

CONFIDENTIAL

Page 73

```
 1   document, during the 2022-2023 school year,
 2   University Middle School had 172 students
 3   who were designated ELL?
 4           A.      Uh-huh.
 5           Q.      Do you see that?
 6           A.      Yes, I do.
 7           Q.      And does ELL stand for
 8   English language learner?
 9           A.      That is correct.
10           Q.      And English language learners
11   are students whose first language or
12   primary language is not English; is that
13   correct?
14           A.      That is correct.
15           Q.      I'll represent to you that
16   172 out of 723 is approximately 24 percent.
17   Any reason to doubt my math?
18           A.      I do not doubt you.
19           Q.      Okay.  So, again, assuming my
20   math is right, approximately 24 percent of
21   students at University Middle School during
22   the 2022-2023 school year were designated
23   ELL?
24           A.      Yeah.
25           Q.      Generally speaking, does
```

Page 74

1    University Middle School serve a large

2    immigrant community?

3                    MR. INNES:  Objection to form.

4                    THE WITNESS:  Yes, I would

5            equate about a quarter of them, a

6            quarter of students being an amount

7            as a large percentage.

8    BY MR. KARP:

9            Q.    And do you have an

10   understanding of where those immigrants

11   hail from?

12           A.    All over the place, all over.

13           Q.    Can you give me some

14   examples?

15           A.    I've had students come all

16   the way up from Chile.  I've had students

17   come from Central America.  I have had

18   students coming from Dominican Republic,

19   Haiti, all over.  Some of my students

20   take -- you know, travel to get here, so.

21           Q.    Of course.  We just spent

22   some time going over the data for

23   2022-2023.  Let's look at some prior years.

24           A.    Okay.

25           Q.    If you look down at the

CONFIDENTIAL

Page 75

1  table, you'll see the data for, the
2  enrollment data from the 2021-2022 school
3  year.
4          A.      Yup, yes.
5          Q.      Overall enrollment at
6  University Middle School for the 2021-2022
7  school year was 755 students; is that
8  right?
9          A.      Yes, that is, yes.
10          Q.      Of the 755 students, 152 from
11  ELL; is that right?
12          A.      Where do you see that?  I'm
13  sorry?  Oh, I see it right there, I
14  apologize.
15          Q.      On the next page.
16          A.      Yes, that's why, yeah.  I see
17  it.
18          Q.      To your knowledge, is the
19  enrollment data for the 2021 and 2022
20  school year that's contained in this table
21  complete and accurate?
22          A.      To the best of my knowledge,
23  it is.
24          Q.      And let's keep moving and
25  look at the data for the 2020-2021 school

CONFIDENTIAL

Page 76

1    year, which appears on page 25 and spills

2    onto page 26.

3                    Do you see that?

4            A.    I do.

5            Q.    Okay.  The overall enrollment

6    at University Middle School for the

7    2020-2021 school year was 778 students,

8    correct?

9            A.    Yes, based on this report.

10           Q.    Of these 778 -- excuse me, of

11   these 778 students, 118 were ELL, right?

12           A.    Based on what was shared with

13   me, correct.

14           Q.    Okay.  To your knowledge, is

15   the data contained in this table for the

16   2020-2021 enrollment at University Middle

17   School complete and accurate?

18           A.    Based on what was shared with

19   me, yes.

20           Q.    Based on the data we just

21   looked at, you'd agree with me that overall

22   enrollment at University Middle School has

23   decreased over the last several years?

24           A.    It has.

25           Q.    Overall enrollment at

Page 77

1  University Middle School was 778, then it

2  was 755, and then it was 723 in the three

3  years that we just discussed, correct?

4          A.    Yes, but it has increased

5  since.

6          Q.    It has increased in the

7  2023-2024 school year, is that what you

8  mean?

9          A.    And then, yeah -- and yup.

10         Q.    And so the decline was over

11  these few years that we just looked at, but

12  since then, the numbers have gone up?

13         A.    Yes, slightly, but nothing

14  major.

15         Q.    Okay.  To your knowledge, why

16  did enrollment at UMS decline over this

17  three-year period?

18         A.    I can speak only to 2021 to

19  2023, as I wasn't in the district at the

20  time, so I can't speak to anything prior to

21  2021 -- well, the gap, but at this school.

22  Why do I believe enrollment declined?  To

23  me, it's a slight declinement.  It's what I

24  would consider less than 2 percent, if my

25  math is correct, 778 to 755.  It's not a

CONFIDENTIAL

Page 78

1    major decrease.  It could be because of --

2    we have a very fluid district, which means

3    that I have registrations constantly,

4    almost every day I have a registration, and

5    then sometimes people leave.  They might

6    wind up going back to their home country.

7    They might wind up going to a different

8    state.  So, yes, it did decrease, but it's

9    nothing alarming.

10         Q.    Just to make sure we're on

11   the same page, the enrollment dropped from

12   778 in the 2020 to 2021 school year to 723

13   in the 2022-2023 school year?

14         A.    Oh, I was comparing to 755 to

15   723 when I was speaking.  But from 2021, I

16   can assume, once again, I wasn't in the

17   district for these years for 2020-2021, the

18   world was experiencing a pandemic at the

19   time.  It could be that -- there's a lot of

20   factors that could happen why the numbers

21   decreased.

22         Q.    You'd agree that the pandemic

23   was a very disruptive time for students at

24   IPS?

25                MR. INNES:  Objection to form.

CONFIDENTIAL

Page 79

1            THE WITNESS:  My opinion, I
2         think it was disruptive for
3         everyone.
4    BY MR. KARP:
5         Q.     Sure.  Despite the declining
6    numbers in enrollment at University Middle
7    School over these three years, the number
8    of ELL students increased; is that right?
9         A.     That is correct.
10         Q.     Okay.  And those numbers went
11    from 118 to 152 to 172 over this three-year
12    period?
13              MR. INNES:  Objection to form.
14              THE WITNESS:  Yes, based on
15         this data.
16    BY MR. KARP:
17         Q.     What is your understanding of
18    why the number of ELL students increased
19    during this three-year period?
20              MR. INNES:  Objection to form.
21         Calls for speculation.
22              MR. KARP:  I'm asking for his
23         understanding.
24              THE WITNESS:  My
25         understanding, a lot of our

CONFIDENTIAL

Page 80

```
1              students and families come here for
2              a better opportunity from their
3              home countries and some of them
4              have traveled, as I said, as far as
5              South America, Central America, all
6              the way to little old Irvington, so
7              a lot of immigrants wind up in this
8              area.
9    BY MR. KARP:
10           Q.     You'd agree with me as the
11   overall enrollment at University Middle
12   School declined and the number of ELL
13   students increased over this three-year
14   period, the percentage of ELL students at
15   University Middle School went up?
16           A.     Absolutely.
17           Q.     Let's turn to page 26.  You'd
18   agree with me that page 26 includes
19   attendance data for University Middle
20   School?
21           A.     It does include it.
22           Q.     In the column called, "your
23   data," the phrase, "overall student
24   attendance" appears a number of times.
25                  Do you see that?
```

Page 81

1          A.     Yes, I do.

2          Q.     What does overall student

3   attendance mean?

4          A.     An aggregated data of year to

5   date from September to June.  So this is

6   where our percentage of attendance is as of

7   June.  So you take each month and it gives

8   you a percentage and it gives you the

9   aggregated data of, for example, 22-23,

10  overall student attendance, 93.5 percent of

11  our students attended school on a regular

12  basis.

13         Q.     And what is your

14  understanding of -- or when you say that

15  they attended school on a regular basis,

16  what do you mean by regular basis?

17         A.     So it includes their

18  absences.  So, basically, when you factor

19  in all attendance and absences,

20  93.5 percent of our students attended

21  school for the year.  They didn't miss

22  days, basically is what I'm saying.  So

23  there's kids that may -- for example, let

24  me rephrase it this way.  So I'm a student

25  at University Middle School, I missed two

CONFIDENTIAL

Page 82

1  days of school, that would give me a

2  percentage, two divided by 180, that's my

3  percentage.  When you take all of the

4  students in there, it gives you everyone's

5  percentage and then it gives you a

6  percentage of how many students attended

7  for the year.

8         Q.     I see.  So overall student

9  attendance reflects the average attendance

10  rate --

11         A.     For the year.

12         Q.     -- for the year?  Okay.

13         A.     Uh-huh.  So it should say, to

14  be more clear, it should say year to date

15  rather than overall.

16         Q.     Understood.  And the overall

17  student attendance at University Middle

18  School for the 2022-2023 school year was

19  93.5 percent?

20         A.     That is accurate.

21         Q.     And that number for the

22  2021-2022 school year was 93.7 percent?

23         A.     Uh-huh.

24         Q.     And that number for the 2020

25  to 2021 school year was 89.65 percent

CONFIDENTIAL

Page 83

1  correct?

2       A.     That's what I see, yes.

3       Q.     Were more University Middle

4  School students absent due to remote

5  learning during the COVID-19 pandemic?

6             MR. INNES:  Objection to form.

7             THE WITNESS:  When I returned

8             to district, we were back in

9             school.  There was no remote

10            learning when I returned to

11            district.

12 BY MR. KARP:

13      Q.     Do you have an understanding

14 of why the number -- why the overall

15 student attendance rate was lower in 2020

16 to 2021 than in the two subsequent years

17 that are listed here?

18            MR. INNES:  Objection to form.

19            THE WITNESS:  I can assume or

20            speculate based on my knowledge as

21            a principal in another district

22            that it could be because of kids

23            not logging on remotely during the

24            2020-2021 year, but I can't speak

25            specifically for Irvington at that

CONFIDENTIAL

Page 84

1           time.
2    BY MR. KARP:
3           Q.      During the 2020 to 2021
4    school year -- strike that.  Sorry.
5                   Let's look at page 27.
6    Page 27 includes data regarding chronic
7    absenteeism at University Middle School.
8                   Do you see that?
9           A.      I do.
10          Q.      And according to this report,
11   UMS defines chronic absenteeism as, "the
12   percentage of students who are absent
13   10 percent or more of the days from the
14   start of school to the current date and
15   includes both excused and unexcused
16   absences."
17                  Did I read that correctly?
18          A.      The only change I would make
19   in that statement is that is not
20   Irvington's, that is the department of
21   education's, New Jersey's definition.
22          Q.      Okay.  That is the state of
23   New Jersey's definition of chronic
24   absenteeism?
25          A.      Yes, sir.

Page 85

1          Q.     At the time that this ASP

2    report was put together, the rate of

3    chronic absenteeism at University Middle

4    School for the 2023-2024 school year was

5    12.12 percent --

6                    MR. INNES:  Objection to form.

7                    MR. KARP:  -- is that right?

8                    THE WITNESS:  The overall year

9           to date quantity, yes, 12.2 in the

10          column pre-populated data we're

11          talking about?

12   BY MR. KARP:

13          Q.     Yes.

14          A.     Yes.

15          Q.     So at the time that this ASP

16   was put together, 12.12 percent of UMS

17   students had missed 10 percent or more of

18   school days during the 2023-2024 school

19   year; is that right?

20                    MR. INNES:  Objection to form.

21                    THE WITNESS:  To the best of

22          my understanding, yes.

23   BY MR. KARP:

24          Q.     In the column called, "your

25   data," there is a section for the 2022-2023

Page 86

1  school year.

2              Do you see that?

3      A.    I do.

4      Q.    There are no percentages

5  included for overall chronic absenteeism.

6              Do you see that?

7      A.    I do.

8      Q.    Do you know why that data is

9  missing?

10      A.    Oversight, but if you look to

11  the left, it would be that data.  That's

12  the current data, the pre-populated.  It

13  would be similar to that.  If you look at

14  other trends, they're fairly similar

15  numbers.

16      Q.    Okay.

17      A.    So I think it was just an

18  oversight that someone didn't copy that and

19  we missed it.

20      Q.    Got it.

21      A.    So I would say from looking

22  at all the other data, assuming based on

23  other data here, that if you look above

24  when we were just talking about attendance

25  rate, if you look in the column overall

CONFIDENTIAL

Page 87

1    year to date student attendance average,
2    93.5 and if you look to the your data, it
3    says 93.5.  So I would say the overall
4    chronic absenteeism was 12.12.  Subgroup
5    one is special ed.  Subgroup two is ELL.
6    And I don't --
7            Q.    So am I understanding you
8    correctly your -- you believe that the
9    pre-populated data that's listed at the top
10   of page 27 applies to the 2022 to 2023
11   academic year or would roughly be the same?
12           A.    To the best of my
13   understanding, it should be roughly the
14   same, because that is pre-populated based
15   on the data we provided to the state on a
16   monthly basis.
17           Q.    Okay, there are breakdowns
18   for that school year for grade six, grade
19   seven and grade eight.
20                 Do you see that?
21           A.    I do.
22           Q.    And for grade six, 21 percent
23   of University Middle School students were
24   chronically absent during this year, do you
25   agree?

CONFIDENTIAL

Page 88

1              MR. INNES:  Objection to form.

2              THE WITNESS:  Yes, but I do

3        not believe that is the overall

4        number.  I believe it's an earlier

5        date before the plan was submitted.

6        So basically there was a -- so how

7        chronic absenteeism works, we look

8        at it on a month-by-month basis.

9        Always in September, our numbers

10       are extremely high, because,

11       unfortunately, sometimes kids don't

12       start on time.  I don't want to

13       send my kid to school for the first

14       three days, it's half days, I'm

15       going to let them have extra time,

16       that impacts us.  But as we do

17       interventions and strategies to

18       lower the number, that number

19       decreases.  So looking at this,

20       mathematically just from a quick

21       glance, I'm not doing any

22       calculations, it does not seem

23       accurate, that number.  Because if

24       you had 21 percent, 22 percent, and

25       20 percent, you couldn't get

Page 89

1          12 percent.  So I think that's
2          inaccurate data that got submitted.
3          Just from me looking at it very
4          quickly.
5   BY MR. KARP:
6          Q.    The center column could
7   represent, I don't want to put words in
8   your mouth --
9          A.    No, fine.
10         Q.    -- so, please, you know, the
11  center column could represent the data that
12  exists as of the time that this report was
13  created in -- during the 2023-2024 school
14  year as it applies to the 2023-2024 school
15  year, correct?
16              MR. INNES:  Objection to form.
17         Calls for speculation.
18              THE WITNESS:  Could you repeat
19         that?  Just I want to make sure I
20         answer that correctly.
21  BY MR. KARP:
22         Q.    Sure.  The 12.12 percent
23  that's indicated here in this table may not
24  rise to the levels we see in the column to
25  the right, because the year hasn't been

CONFIDENTIAL

Page 90

1   completed yet, correct?

2          A.     It's a possibility.

3          Q.     If we look at the overall --

4   excuse me, if we look at the absenteeism

5   rates for the 2022 through 2023 school

6   year, we see between grades six and grades

7   eight, a rate of 20 to 22 percent of

8   chronic absenteeism.

9                 Do you see that?

10                MR. INNES:  Objection.

11             Misstates the document.

12                THE WITNESS:  Looking at the

13             document, the grade six, 21, grade

14             seven, 22, grade eight, 20 percent,

15             and your question is?

16   BY MR. KARP:

17          Q.     The range of chronic

18   absenteeism for the 2022 to 2023 school

19   year is between 20 and 22 percent, do you

20   agree?

21          A.     At one point, the percentage

22   was that, but I don't believe that's how we

23   ended the year.

24          Q.     This report was put together

25   in -- during the 2023-2024 school year,

CONFIDENTIAL

Page 91

1    correct?

2              A.      This report was put together

3    between the 2022-2023 school year for the

4    23-24 year.  This report is for next year's

5    plan, 23-24.  We're looking at stuff from

6    22-23 to build the 23-24 school year.

7              Q.      So the data that's reflected

8    for the 2022 to 2023 school year is not

9    complete at this point in time?

10             A.      Say that again.  So in this

11   column you're talking about, or in the

12   overall --

13             Q.      I'm looking in the your data

14   column specifically.

15             A.      Okay.

16             Q.      And I'm looking at the data

17   for the 2022 to 2023 school year.

18                     MR. INNES:  And which page are

19            we on?

20                     MR. KARP:  We're on page 27.

21                     THE WITNESS:  Twenty-seven.

22            Okay.  And your question was again,

23            I apologize?

24   BY MR. KARP:

25             Q.      My question is -- well, let

CONFIDENTIAL

Page 92

1   me take a step back and just ask a
2   different question.
3         A.      Okay.
4         Q.      When was this report put
5   together?
6         A.      This report, let me go back
7   to page 1 to make sure I'm saying it
8   correctly, this report for the 23-24 school
9   year was done -- I just want to make sure
10  I'm saying it right, I'm doing the 25-26
11  right now, so it would be before, so this
12  was done in February 2023 to June 2023.  We
13  work on it for that long, putting together
14  data, having meetings, all that fun stuff.
15        Q.      The date on this document, if
16  you look at the bottom, is February 4,
17  2024?
18        A.      I'm assuming, and I can only
19  assume, this was recovered in my files and
20  this is a PDF version of it, when I
21  downloaded it, to reference it for the
22  current year, because it's a fluid
23  document.  So that's not the date, that was
24  the date it was downloaded as a PDF, not
25  submitted.  I can help you, if you go to

Page 93

1   the last page, to the best of my

2   understanding, I submitted this report on

3   June 16, 2023 --

4          Q.     That's helpful.

5          A.     -- is when I submitted this

6   report.

7          Q.     Okay.  Excellent.  Thank you.

8          A.     You're welcome.

9          Q.     Let's look at the data for

10  2021 and 2022.

11         A.     What page are we going back

12  to, 27?

13         Q.     Sure, yes, page 27.

14         A.     Okay.

15         Q.     You'd agree with me that the

16  data for the 2021 through 2022 school year

17  was complete --

18         A.     I do.

19         Q.     -- at this point in time --

20         A.     Absolutely.

21         Q.     -- when the report was

22  created, yes?

23         A.     I agree with that statement.

24         Q.     Okay.  And the overall rate

25  of chronic absenteeism for that school year

CONFIDENTIAL

Page 94

1    was 21 percent?

2          A.      For the 2021-2022 school

3    year, yes.

4          Q.      Correct.

5          A.      Uh-huh.

6          Q.      And if you look at the

7    breakdowns for grade six, grade seven, and

8    grade eight, you'll see that the range of

9    chronic absenteeism was between 20 percent

10   and 22 percent.  Do you agree?

11         A.      I do.

12         Q.      We also have data for the

13   year before, which is the 2021 -- excuse

14   me, 2020 through 2021 school year.

15                 Do you see that --

16         A.      I do.

17         Q.      -- on page 28?  Overall

18   chronic absenteeism that year was

19   31 percent, right?

20         A.      That's what was reported to

21   me, correct.

22         Q.      And the range that we see for

23   the individual grades at the University

24   Middle School was between 30 and

25   32 percent, right?

CONFIDENTIAL

Page 95

1         A.      Correct.

2         Q.      Would you agree with me that

3   chronic absenteeism was an even bigger

4   challenge for University Middle School

5   during the pandemic?

6                    MR. INNES:  Objection to form.

7                    THE WITNESS:  I would agree it

8             was hard getting children to log on

9             based on my experience in another

10            district, but similar demographics,

11            middle school, yes.

12   BY MR. KARP:

13        Q.      During the 2020 to 2021

14   school year, nearly one-third of students

15   at University Middle School were

16   chronically absent, right?

17                    MR. INNES:  Objection to form.

18                    THE WITNESS:  Yeah,

19            approximately, based on, yup.

20   BY MR. KARP:

21        Q.      That means that nearly one in

22   three students were absent for 10 percent

23   or more of the school year, correct?

24        A.      That is accurate based on the

25   definition, yeah.

CONFIDENTIAL

Page 96

```
 1          Q.      Do you have any reason to
 2    dispute the chronic absenteeism data in
 3    this table?
 4          A.      I don't.  It was provided to
 5    me by the previous principal.
 6          Q.      And this would have been data
 7    that you approved, that you reviewed and
 8    approved before it was sent to the New
 9    Jersey Department of Education, correct?
10                    MR. INNES:  Objection to form.
11                    THE WITNESS:  For the most
12              part -- well, yes, we do review
13              things, but as you see, sometimes
14              things slip through the crack.  And
15              this is a fluid document and it can
16              be changed even after being
17              submitted.
18    BY MR. KARP:
19          Q.      Do you recall making any
20    changes to this document?
21                    MR. INNES:  Objection to form.
22                    THE WITNESS:  I don't recall,
23              but sometimes, I make changes based
24              on dollar amounts.  When you go
25              through the plan, you see that
```

CONFIDENTIAL

Page 97

1              maybe I budgeted, and this is just
2              me speculating, I budget $2,000 for
3              a plan and find out that it's
4              $4,000, I have to readjust and move
5              money around.
6    BY MR. KARP:
7         Q.    But for this specific plan --
8         A.    No, prior year data, I do not
9    change.
10        Q.    During your time as principal
11   of University Middle School, has it been a
12   priority to reduce chronic absenteeism?
13        A.    Yes, it's part of the Every
14   Student Succeeds Act.
15        Q.    Why is reducing chronic
16   absenteeism a priority for University
17   Middle School?
18        A.    The more time students are at
19   school, the more they learn.  That's just a
20   basic answer.  But chronic absenteeism, if
21   they're with us, we know they're learning.
22        Q.    Does chronic absenteeism lead
23   to worse educational outcomes for students?
24        A.    Based on my understanding, it
25   can, based on research, the more time

Page 98

1    you're out of the classroom, the less time

2    you're receiving academics.

3         Q.    You would agree with me that

4    chronic absenteeism could cause students to

5    fall behind their classmates?

6                   MR. INNES:  Objection to form.

7                   THE WITNESS:  It's possible.

8    BY MR. KARP:

9         Q.    As principal of University

10   Middle School, what have you personally

11   observed in the effects of chronic

12   absenteeism on students here?

13        A.    So if I'm understanding you

14   correctly, how has chronic absenteeism

15   affected University Middle School as a

16   whole?

17        Q.    I was asking about just the

18   student experience, but I would also like

19   to hear your answer as to how it has

20   affected the school more generally.

21        A.    Absolutely.  Chronic

22   absenteeism makes it very difficult -- I'll

23   start backwards.  I usually start with

24   students, but I'll end with students.  It

25   makes it very difficult for teachers to

CONFIDENTIAL

Page 99

1  teach, students aren't there and they're
2  behind, so they have to constantly reteach
3  lessons, have students stay after school,
4  all that good stuff, reach out to parents,
5  do their best to make them aware.
6              How it has impacted
7  students.  Students, I have students that
8  are chronically absent for many reasons, so
9  it has impacted their academics.  Sometimes
10 they have to go to summer school because
11 they have missed so many days and I
12 can't -- they can't be promoted based on
13 their current grades.
14              It has led to them wanting
15 to talk to school counselors and our HSSC,
16 which is our health and social service
17 coordinator, because we found out there's a
18 lot of underlying reasons why they're
19 chronically absent, and they talk about
20 that with them.  I can delve into that if
21 you would like me to some more about how
22 that impacts us.  So constantly.  I was
23 fortunate enough to get an additional
24 school counselor to deal with chronic
25 absenteeism, and a dean, because it was

Page 100

1  becoming so rampant and part of it was we

2  had students who missed school because they

3  didn't go to sleep, because they are on

4  video games, they're on social media

5  platforms, so many reasons why, but those

6  are my main two, that children are

7  constantly on their devices, mainly their

8  phones, and they don't make it to school.

9  And depending on how you look at it,

10  sometimes parents wake up their child, they

11  have to go to work, just like the rest of

12  us in this room, and they had everything

13  ready for their child, sometimes the child

14  just doesn't make it to school.  So then

15  we're putting systems in place.  The school

16  counselor is identifying what is causing

17  these issues, why they're absent.  We do

18  something called Check and Connect where we

19  meet with them, we do a check-in, kind of

20  restorative practices, how can we assist

21  you with your problems that you're

22  experiencing, and give them strategies.

23  And it leads to a whole bunch of things

24  that we have done such as getting another

25  school counselor, getting another dean,

CONFIDENTIAL

Page 101

1   doing restorative practices, talking about

2   the impact of social media, the impact of

3   not coming to school.  And I can go on and

4   on if you would like me to.

5          Q.     I'm good breaking here, if

6   you are.  So you said a lot, I have a

7   number of follow-up questions.

8          A.     Absolutely.

9          Q.     You mentioned that chronic

10  absenteeism leads to teachers working

11  harder; is that right?

12         A.     Yeah, harder than even --

13  they work hard now, now it's even harder,

14  because they have to make sure that child

15  is caught up, because our teachers don't

16  just dismiss children, even though they're

17  chronically absent, we've got to make sure

18  they're caught up.  They're giving up their

19  lunchtime.  They're giving up after-school

20  time.  They're constantly in communication

21  with parents and students, reaching out to

22  them on Global Classroom, opening up their

23  grade books after they're closed, and I

24  don't know if you know that's a nightmare

25  for teachers, so, yeah, it's a lot.

CONFIDENTIAL

Page 102

1        Q.      Chronic absenteeism leads to

2   these kinds of inefficiencies in the

3   classroom, do you agree?

4        A.      Yeah, when a child is not

5   there, it takes away from them learning,

6   yeah, absolutely.

7        Q.      Whether that student is

8   absent because she's home babysitting a

9   sibling or home playing video games, that

10  absence is having the same effect on --

11       A.      There are different types of

12  absences, since you brought it up.  We do

13  experience some children that have to stay

14  home and watch their younger siblings.

15  Those students are, I would guess, I would

16  say more self-sufficient in my experience

17  where they're able to go onto the Google

18  classroom and keep up with their

19  assignments compared to students that are

20  chronically absent because they didn't go

21  to sleep the night before.

22       Q.      Understood.  You mentioned

23  that when students are chronically absent,

24  it could lead them to fall behind and be

25  held back and not promoted to the next

CONFIDENTIAL

Page 103

1    grade; is that right?

2         A.      It's a possibility if they

3    are unable to keep up with all the missed

4    assignments and activities, because they

5    compound.  So if I miss five or six days in

6    a row, yes, I get time to make it up, but

7    am I still able to make it up based on all

8    of my other responsibilities and things

9    that I have going on in my life of the

10   child that I think is a bigger priority

11   than my education, because we are talking

12   about middle school students.

13        Q.      So you would agree that it's

14   not good for a student's self-esteem to be

15   held back a class year?

16        A.      A hundred percent, it's not

17   good for self-esteem, which is why we don't

18   promote it, retention.  We offer summer

19   school.  We offer Saturday Academy to

20   recover some missed work.  So I've had to

21   hire staff to work on Saturdays to help

22   these scholars catch up on their chronic

23   absenteeism.  We have been doing that for

24   two years, which has helped us a lot,

25   because, academically, we can't make up

Page 104

1   their absences, but, academically, they're

2   able to come to a location with certified

3   teachers and staff members to help them

4   with these missed assignments.

5          Q.     You also mentioned that in

6   some instances, parents just fail to wake

7   up their kids in the morning or make sure

8   that they've actually gone off to school;

9   is that right?

10         A.     No, I would rephrase that

11  saying that they did their best, they woke

12  them up, when they left, their child was

13  awake, but sometimes when they leave and

14  they have to go to work, because they might

15  have to be at work at 7:00, our children

16  don't come to school until 7:45 or 8:00,

17  sometimes they fall asleep and take

18  advantage of the situation, because, once

19  again, we're dealing with middle school

20  students who no matter where you are in the

21  country or the world, middle school

22  students will take advantage and their job

23  is to push the boundaries, push that line.

24  And so it's our job to show them where that

25  line is as educators and parents.

CONFIDENTIAL

1        Q.      Right.  You'd agree with me
2    that chronic absenteeism is disruptive of
3    school culture?
4                    MR. INNES:  Objection to form.
5                    THE WITNESS:  What would
6            you -- could you elaborate on what
7            you mean by that?
8    BY MR. KARP:
9        Q.      Sure.  It may be difficult to
10   establish a cohesive culture if people
11   aren't actually in school making social
12   connections?
13       A.      So if I understand you
14   correctly, if I'm a chronically absent
15   student, is it difficult for me to, not
16   assimilate, I don't like that word, but to
17   be part of the culture if I'm not there?
18       Q.      Correct.
19       A.      It could be, but even when
20   they're not physically there, a lot of my
21   students are still there.  They know what's
22   going on, because they're connected through
23   cell phones and social media platforms.  So
24   they are connected in some way, just not
25   physically.

CONFIDENTIAL

Page 106

1          Q.      Chronic absenteeism may
2    create certain inefficiencies to the extent
3    when you are setting aside money for the
4    school year, you're budgeting for a certain
5    number of students to be in the classroom;
6    is that right?
7                    MR. INNES:  Objection to form.
8                    THE WITNESS:  Your question is
9             I'm budgeting for students to be in
10            the classroom?
11   BY MR. KARP:
12            Q.      A certain number of students
13   to be in attendance.
14            A.      Our budget is based on
15   students enrollment, not attendance, but
16   enrollment.
17            Q.      And if you're basing your
18   budget on enrollment, you're expecting
19   everyone who is enrolled to be --
20            A.      To come to school.
21            Q.      -- in school, right?
22            A.      That's fair.
23            Q.      So when students don't show
24   up for school, don't attend class, that
25   creates inefficiencies in the budget, would

CONFIDENTIAL

Page 107

1    you agree?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  What do you mean

4              by inefficiencies when a student

5              doesn't come?  That one I'm lost

6              on.

7    BY MR. KARP:

8         Q.      Sure.  You might devote a

9    certain amount of resources to a class that

10   you're expecting to be -- to have 30

11   people, but only 15 attend.

12        A.      Okay.

13        Q.      And then you need to, I

14   think, allocate other resources in order to

15   address the other 15 that didn't show up.

16        A.      So you're saying, if I'm

17   understanding you, I would have to -- I

18   budgeted for, let's just say for argument's

19   sake, 30 Chromebooks for 30 students in the

20   classroom, most students don't come and I

21   have to relocate my money to figure out how

22   to figure out how to tackle chronic

23   absenteeism problems?

24        Q.      I'm talking about the money

25   that was spent in order to provide the

CONFIDENTIAL

Page 108

1  students you expected to be there with

2  technology, just to stick with your

3  example.

4          A.    It would still be there, even

5  if they didn't come, we would budget for

6  the number of kids enrolled, not

7  attendance.

8          Q.    Shifting gears a little bit,

9  as principal of University Middle School,

10 are you concerned that while they're

11 missing class, these chronically absent

12 students may be home alone and isolated?

13              MR. INNES:  Objection to form.

14              THE WITNESS:  I definitely

15          don't think they're isolated.  As I

16          mentioned earlier, children are

17          never isolated because of this, a

18          cell phone is what I'm pointing to,

19          and everything that it has.  So,

20          no, I'm not worried that they're

21          isolated.  I do worry sometimes

22          that in general, that is a student

23          home, is a student safe, because

24          that is part of my job as well.

25              And then we have systems in

CONFIDENTIAL

Page 109

1          place for that.  If a student
2          misses five days, I send out a
3          ride officer to make sure
4          everything is okay.  We reach
5          out, we have school counselors
6          call, we have deans call, so
7          there's a lot of assistance in
8          place to take that worry off.
9          And if we are -- let's just say
10          that I'm a person that doesn't
11          come -- I always come to school
12          and I miss three days in a row,
13          there's already phone calls and
14          everything going out, so we have
15          systems in place.  So I wouldn't
16          generally say I'm worried, it's
17          just, you always have a worry in
18          your head when all your kids
19          aren't there.  You always -- just
20          like your own child, you're
21          wondering, like, is everything
22          okay.
23  BY MR. KARP:
24          Q.    I believe you said one of
25  your concerns is that if they're not in

Page 110

1    school, they may be unsafe; is that right?

2                    MR. INNES:  Objection to form.

3            Misstates prior testimony.

4                    THE WITNESS:  I wouldn't say

5            that they're unsafe, because

6            they're home and I don't know if

7            they're unsafe, so I can't say that

8            they are.  My concern is are they

9            home, are they doing what they're

10           supposed to, because we're dealing

11           with middle schools kids once

12           again.  I don't know if you have a

13           middle school kid or ever had one,

14           they push the boundaries.  I have

15           been doing this for 15, 16 years

16           with middle school kids.  My job as

17           a middle school principal in part

18           is instilling in academics and

19           ensuring policy is educating middle

20           school students on how to make

21           right choices.  And part of our

22           choices and seldom times, middle

23           school kids take advantage of

24           everyone and they say they're going

25           to school, not all of them, a

CONFIDENTIAL

Page 111

1           handful, and they don't and they go
2           to the park and they hang out.
3           Anything that can happen, and
4           that's not an Irvington problem,
5           that's a middle school problem.
6    BY MR. KARP:
7         Q.      Are you concerned that
8    while -- as principal of University Middle
9    School, are you concerned that while
10   they're missing class, chronically absent
11   students may be drinking alcohol or taking
12   drugs?
13                  MR. INNES:  Objection to form.
14                  THE WITNESS:  That hasn't -- I
15           haven't thought about that when
16           they're absent, no.
17   BY MR. KARP:
18        Q.      Do you have concerns as the
19   principal of University Middle School that
20   students who are chronically absent may be
21   engaging in criminal behavioral?
22        A.      I do not.  And part of that
23   is because I was a chronically absent
24   student, so.
25        Q.      You mentioned some of the

```
                                    Page 112
 1   reasons that you believe students are
 2   chronically absent, has University Middle
 3   School ever studied or researched the
 4   underlying reasons for chronic absenteeism
 5   at the school?
 6                   MR. INNES:  Objection to form.
 7                   THE WITNESS:  So you say study
 8            and research, are you talking
 9            about, like, an official, like a
10            dissertation or a published article
11            or just conversations that would
12            pop up in a meeting?
13   BY MR. KARP:
14        Q.      More of the former, has
15   University Middle School collected any data
16   or specifically studied why students are
17   chronically absent at University Middle
18   School?
19                   MR. INNES:  Objection to form.
20                   THE WITNESS:  Definitely
21            haven't made an official study.
22            Have we collected data, anecdotal
23            records, I would say, of why, when
24            we do our Check and Connect, as I
25            talked about a little bit earlier.
```

CONFIDENTIAL

```
                                        Page 113
 1              Check and Connect is when I meet
 2              with a dean, school counselor,
 3              principal, teacher, someone I'm
 4              comfortable with meeting as a
 5              child, they divulge reasons why
 6              they're chronically absent, so
 7              anecdotal records.
 8   BY MR. KARP:
 9         Q.      But no statistics or figures,
10   nothing quantitative like that?
11                   MR. INNES:  Objection to form.
12                   THE WITNESS:  Have we done it
13              statistically, no.
14   BY MR. KARP:
15         Q.      Let's take a look at page 30
16   of Exhibit 3.
17         A.      Yes.
18         Q.      This table includes
19   disciplinary data for University Middle
20   School, right?
21         A.      Yes, it does.
22         Q.      If we look at the your data
23   column, we see that the total number of
24   suspensions for the 2021-2022 school year
25   was 246.
```

CONFIDENTIAL

Page 114

1                    Do you see that?
2         A.      I do see that.
3         Q.      Do you have any reason to
4    doubt the accuracy of that number?
5         A.      I do not.
6         Q.      We spoke earlier about how
7    the overall enrollment at University Middle
8    School during the 2021-2022 school year was
9    755 students.
10                   Do you recall that?
11        A.      I do recall that
12   conversation.
13        Q.      If you have 246 suspensions
14   and 755 students, that's roughly one
15   suspension for every three students, do you
16   agree?
17                   MR. INNES:  Objection to form.
18                   THE WITNESS:  You say that's
19            one suspension for every three
20            students?
21   BY MR. KARP:
22        Q.      Correct.
23        A.      I couldn't say that, because
24   sometimes students get suspended -- the
25   same student gets suspended multiple times.

Page 115

1          Q.     Sure.  And I'm not saying
2    that one in three students get suspended,
3    I'm saying there would be 200 -- there
4    would be one suspension for every three
5    students that you have enrolled at
6    University Middle School?
7                    MR. INNES:  Objection to form.
8                    THE WITNESS:  If you phrase it
9             that way, but the overall
10            suspension for the year average was
11            under 2 percent.
12   BY MR. KARP:
13         Q.     I'm not understanding what
14   you're saying about that data point, can
15   you explain?
16         A.     So you're saying one in three
17   would have been suspended.  That's what you
18   said, correct?  Like, how would you say you
19   said that then --
20         Q.     Sure.  I'm saying if you
21   compare the number of suspensions to the
22   enrollment number, the ratio is one to
23   three.
24         A.     So 246 to 755 is one to three
25   is what you're saying?

CONFIDENTIAL

Page 116

1          Q.      Roughly, yes.

2          A.      And then what is your

3     question about the one to three?

4          Q.      Just if that math is

5     accurate.

6                    MR. INNES:  Objection to form.

7                    THE WITNESS:  If you looked at

8              it from that standpoint, yes, it

9              would be one to three.

10    BY MR. KARP:

11         Q.      The rightmost column of this

12    table is titled, "Observations/Trends."

13                  Do you see that?

14         A.      Absolutely.

15         Q.      And the table states, "The

16    return to in-person learning presented some

17    challenges.  We experienced many behavioral

18    and social challenges.  Students had to

19    readjust to structure, routines, and

20    procedures of the school setting."

21                  Did I read that correctly?

22         A.      Yes, you did.

23         Q.      Is it true that the return to

24    in-person learning presented some

25    challenges for University Middle School?

Page 117

1          A.      Yes, one of the major

2    challenges was getting children to

3    understand that they cannot be connected to

4    their cell phone at all times, because as

5    we're all well aware, students across the

6    country were allowed to run rampant while

7    everyone else was working and everyone was

8    remote, so during that time, what I saw in

9    Paterson and what I saw when I returned to

10   Irvington, very similar, students forgot

11   this was not part of the classroom, the

12   cell phone and social media and the text

13   messaging and that caused the majority of

14   our uptick in referrals and our problems

15   with social and behavior.  Students didn't

16   know how to interact with each other.  They

17   became accustomed to talking about each

18   other on social media platforms and other

19   various tools and they did not know how to

20   have conversations in person anymore

21   leading to daily interruptions to

22   instruction, which continues today.  It's

23   gotten better based on interventions my

24   school has put in place and the district,

25   but it's still an issue today.  It's

CONFIDENTIAL

Page 118

1  actually still a big issue, but the worst
2  year for me and my staff was 21-22, because
3  it was the return to school after being
4  allowed on social media, computers, cell
5  phones.
6           Q.     And I appreciate that
7  response and I know you're doing your level
8  best to answer my questions.  I'll just ask
9  that you listen very carefully to my
10 question.  I simply asked whether, you
11 know, yes or no whether the return to
12 in-person learning presented some
13 challenges.
14           A.     Oh, yes.
15                 MR. INNES:  Asked and
16           answered.
17                  THE WITNESS:  Yes.
18 BY MR. KARP:
19           Q.     Certainly answered.  Move to
20 strike the nonresponsive portions of the
21 testimony.
22                 MR. INNES:  Object.  That's
23           not even a thing.
24 BY MR. KARP:
25           Q.     You would agree with me that

Page 119

1    this table does not actually refer to

2    social media or technology use explicitly,

3    correct?

4            A.      Does it refer explicitly to

5    the word, "social media" is your question?

6            Q.      Correct.

7            A.      No, but just behavioral and

8    social challenges.

9            Q.      Right.  Or to ask the

10   question slightly different, the words,

11   "social media" don't appear in this part of

12   the table, correct?

13           A.      Yeah, nor does any other

14   specific challenges.

15           Q.      Okay.  Well, the challenges

16   that you do identify are structure -- the

17   need to readjust to the structure,

18   routines, and procedures of the school

19   setting, right?

20           A.      Correct.

21           Q.      Is it your experience that

22   students became accustomed to a lack of

23   structure during -- while they were

24   learning remotely during the COVID-19

25   pandemic?

Page 120

1          A.      A lack of school structure,
2    yes.
3          Q.      Has it been your experience
4    as a teacher and administrator for IPS that
5    students benefit from having a routine?
6          A.      Yes.
7          Q.      Structure and routine create
8    stability for students, right?
9          A.      It's a fact.
10               THE STENOGRAPHER:   What was
11          that?
12               THE WITNESS:   Yes, a fact.
13    BY MR. KARP:
14          Q.      I don't see data in this
15    table for the 2022 to 2023 academic year.
16    Do you know why that is?
17          A.      It might have just been left
18    out on accident, an oversight.   But the
19    pre-populated data is to the left.   So
20    that's the information the state has about
21    University Middle School as of the end of
22    2023, the date specifically June 16, 2023.
23    And it's not broken down like the data in
24    your data, but the state looks at it
25    differently.

CONFIDENTIAL

Page 121

1               Student suspension

2     year-to-date average they reported based on

3     all the data supplied to them, 1.97 percent

4     of our students had suspensions.  And the

5     state average is, the state goal is not to

6     exceed 5 percent.

7          Q.     Let's turn to page 42.  This

8     section of the ASP is called, "Priority

9     Performance Needs and Root Cause Analysis."

10               Do you see that?

11          A.     I do.

12          Q.     What kind of information is

13    contained in this table?

14          A.     Based on how you create an

15    end of school plan, you are allowed to have

16    three areas, all three of them are preset

17    by the state, effective instruction,

18    effective instruction, climate and culture,

19    those are the three areas the state told us

20    we had to focus on.

21               So effective instruction,

22    the first row would be our ELA, second one

23    would be mathematics, as I referred to as

24    SMART Goal 2, and SMART Goal 3 is climate

25    and culture.

CONFIDENTIAL

Page 122

1         Q.      When you say the state told
2    you to focus on those areas, do you mean
3    they told University Middle School
4    specifically to focus on those areas or
5    they told every school who was completing
6    this ASP to focus on those areas?
7               A.      I can't --
8                     MR. INNES:  Objection.  Calls
9              for speculation.
10                    THE WITNESS:  I can't speak to
11             every school, but I know that we
12             are provided with these
13             instructions.
14   BY MR. KARP:
15             Q.      Okay.
16             A.      So that's why, so effective
17   instruction first row, SMART Goal 1 was
18   referred to in the rest of the document.
19   The second one is SMART Goal 2, and the
20   third one is referred to as SMART Goal 3.
21             Q.      And the word SMART here is an
22   acronym standing for Specific, Measurable,
23   Achievable, Relevant, and Time-Bound?
24             A.      Yes.
25             Q.      This area -- excuse me, this

CONFIDENTIAL

Page 123

1  column called "Area Focus for SMART Goals"

2  describes potential areas of improvement

3  for University Middle School; is that

4  right?

5          A.      Which column are you talking

6  about?

7          Q.      The area of focus for SMART

8  Goals.

9          A.      Yeah, so that's effective

10  instruction is referred to later in the

11  document to SMART Goal 1, SMART Goal 2,

12  SMART Goal 3.

13          Q.      And the column called,

14  "Priority Performance Need" explains why

15  University Middle School is pursuing these

16  goals, right?

17          A.      Yup, the most recent IXL --

18  yes, that would be accurate.  And that's

19  just one of many priority performance needs

20  and we don't -- we only list a limited

21  amount.

22          Q.      What kind of information is

23  contained in the column called, "Possible

24  Root Causes"?

25          A.      That is -- what kind of, say

CONFIDENTIAL

Page 124

1  that again, what kind of information?

2          Q.      What kind of information is

3  contained in that column?

4                  MR. INNES:  Objection.

5                  THE WITNESS:  That is what we

6              believe possible, we believe based

7              on what we've seen as educators,

8              educational leaders, deans, school

9              counselors, what we believe is our

10              root causes that contribute to our

11              need.  So kind of like a backwards

12              design.

13  BY MR. KARP:

14          Q.      The rightmost column of this

15  table is called, "Strategies to Address

16  Challenge."

17                  Do you see that?

18          A.      Yes.

19          Q.      The information on this

20  column is intended to answer the question,

21  "What does the root cause imply for next

22  steps in improvement planning?"

23                  Do you see that?

24          A.      I do.

25          Q.      So as we've discussed a

```
                                        Page 125
 1   little bit already, this table identifies
 2   three SMART Goals for UMS, right?
 3           A.      Yes.
 4           Q.      The first area of focus is
 5   effective instruction.
 6                   Do you see that?
 7           A.      Yes.
 8           Q.      And this first row relates to
 9   student performance in English and language
10   arts, right?
11           A.      That is correct.
12           Q.      Okay.  And according to
13   what's written in the priority performance
14   need column, 66 percent of sixth graders,
15   77 percent of seventh graders, and
16   74 percent of eighth graders at University
17   Middle School were two or more grade levels
18   behind in ELA, correct?
19           A.      Yup.
20           Q.      And ELA stands for English
21   language arts?
22           A.      That is correct.
23           Q.      Okay.  And if we look in the
24   possible root causes column, we see that a
25   comprehensive needs assessment and data
```

CONFIDENTIAL

Page 126

1  analysis allowed University Middle School

2  to conclude that language barriers and ELLs

3  were a possible root cause of this

4  underperformance, do you agree?

5              MR. INNES:  Objection.

6          Misstates the document.

7              THE WITNESS:  Yes, that is

8          what the root cause was suspected

9          to be.

10  BY MR. KARP:

11      Q.    Okay.  Technology is not

12  listed as a possible root cause of this

13  underperformance in ELA, correct?

14      A.    There's no technology listed

15  in that statement.

16      Q.    UMS does not identify cell

17  phones as a possible root cause for this

18  underperformance?

19              MR. INNES:  Objection to form.

20              THE WITNESS:  We do not on

21          this statement.

22  BY MR. KARP:

23      Q.    UMS does not -- does not

24  identify social media as the reason or a

25  possible root cause for why students

Page 127

1   underperformed in ELA, correct?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  Correct, based

4          on the design of the ASP.

5   BY MR. KARP:

6          Q.    And according to the column

7   header, these possible root causes are

8   based upon the CNA and data analysis.

9                    Do you see that?

10         A.    Yes.

11         Q.    And CNA means comprehensive

12  needs assessment?

13         A.    Correct.

14         Q.    So these are data driven?

15         A.    Based off of IXL, based on

16  the priority performance need.  So it's a

17  backwards design, so the root causes are

18  based on the IXL, nothing else.

19         Q.    What does IXL stand for?

20         A.    You're taking me back.  It's

21  a -- it's a -- I can't remember for the

22  life of me, I do apologize.

23         Q.    That's okay.

24         A.    Basically though it's just a

25  comprehensive tool where it starts you off

CONFIDENTIAL

Page 128

1  at your current level and assesses you.

2  It's adaptive, that's what -- so it's an

3  adaptive program.  So we take an assessment

4  on where you're at and then we use it to

5  help catch up the gaps while also teaching

6  the curriculum at the same time.

7          Q.     Let's look at the next item

8  in this table, which is also effective

9  instruction, and this SMART Goal relates to

10  UMS students' performance in mathematics,

11  correct?

12          A.     Yes.

13          Q.     And according to what's

14  written in the priority performance need

15  column, 44 percent of sixth graders,

16  49 percent of seventh graders, and

17  57 percent of eighth graders at University

18  Middle School were three or more grade

19  levels behind in mathematics, correct?

20          A.     That is correct.

21          Q.     So to put that in

22  perspective, 57 percent of eighth graders

23  at University Middle School were performing

24  at fifth grade level or lower?

25          A.     That statement is correct.

CONFIDENTIAL

Page 129

1          Q.     Okay.  In the Irvington
2    Public School system a fifth grader would
3    attend elementary school, right?
4          A.     Yes.
5          Q.     As a potential root cause,
6    UMS stated that, "57 percent of math
7    teachers at UMS demonstrated a need for
8    professional development on differentiation
9    structures and strategies for data-driven
10   center-based learning activities," right?
11         A.     That is what it says.
12         Q.     Technology is not called out
13   by University Middle School as a possible
14   root cause of this underperformance in
15   mathematics, correct?
16                   MR. INNES:  Objection to form.
17                   THE WITNESS:  In this
18            statement, it is not.
19   BY MR. KARP:
20         Q.     Cell phones are not
21   specifically identified by University
22   Middle School as being a possible root
23   cause of this underperformance in
24   mathematics, right?
25         A.     It is not for this plan.

```
                                    Page 130
 1         Q.      And social media likewise is
 2  not specifically identified as a possible
 3  root cause of this underperformance in
 4  mathematics, right?
 5                  MR. INNES:  Objection to form.
 6                  THE WITNESS:  It is not for
 7          this plan.
 8  BY MR. KARP:
 9         Q.      University Middle School
10  identified several strategies to address
11  these challenges, right?
12         A.      Correct.
13         Q.      Those are listed in the
14  rightmost column of this table?
15         A.      Yup.
16         Q.      Okay.  Those strategies were
17  differentiation, including small group
18  instruction and math labs; after school and
19  Saturday Academy; and hiring a math
20  interventionist?
21                  MR. INNES:  Objection to form.
22          Misstates the document.
23                  THE WITNESS:  Correct.
24  BY MR. KARP:
25         Q.      Similar strategies were
```

CONFIDENTIAL

Page 131

1   identified for student performance in

2   English language arts, do you agree?

3           A.      Correct.

4           Q.      For that SMART Goal,

5   differentiation, including small group

6   instruction and ELA labs; after school and

7   Saturday Academy; and hiring an ELA

8   interventionist were identified as

9   strategies, correct?

10          A.      For that priority performance

11  need, yes.

12          Q.      The third and final area of

13  focus for SMART Goals in this table is

14  climate and culture, attendance/behavior.

15              Do you see that on page 43?

16          A.      I do.

17          Q.      Under priority performance

18  need, the table states that, "scholars

19  still require continued support developing

20  the ability to regulate emotions and

21  social-emotional learning skills."

22              Did I read that right?

23          A.      You did.

24          Q.      The school's objective was

25  to, quote, "improve the development of

Page 132

1  school-wide social emotional learning

2  skills and to decrease the scholars'

3  chronic absenteeism rate."

4            Do you see that?

5      A.     Yes, because the SMART Goal

6  is attendance/behavior.

7      Q.     In your experience, has it

8  been a priority of University Middle School

9  to support students in developing their

10 ability to regulate emotions?

11     A.     Repeat that question one more

12 time, sir.

13     Q.     Sure.  In your experience,

14 has it been a priority for University

15 Middle School to support students in

16 developing their ability to regulate

17 emotions?

18     A.     Yes.

19     Q.     The third column identifies

20 possible root causes for this particular

21 SMART Goal, correct?

22     A.     Uh-huh.

23     Q.     The first one listed is

24 parents oversight?

25     A.     Correct.

CONFIDENTIAL

Page 133

1          Q.      And the ASP document states,
2     "Parents are not managing their scholar's
3     school attendance due to other priorities
4     such as financial (work overnight or leave
5     home before their scholar), family
6     challenges or other social distractions."
7          A.      Yes.
8          Q.      Did I read that correctly?
9          A.      You read that correctly.
10         Q.      Fair to say that University
11    Middle School parents have a lot going on?
12                 MR. INNES:  Objection to form.
13                 THE WITNESS:  I wouldn't say
14            directly that University Middle
15            School parents have a lot going on
16            in general.
17    BY MR. KARP:
18         Q.      Is it true that University
19    Middle School parents were not managing
20    their children's school attendance because
21    of work, family challenges, and social
22    distractions?
23         A.      Based on our Check and
24    Connects with students, some of them, a
25    percentage of them alluded to that, that

Page 134

1  they took advantage of situations, parents

2  leaving early, falling back to sleep after

3  staying up all night.

4          Q.      As a result, scholars at

5  University Middle School would miss school,

6  right?

7          A.      Yes.

8          Q.      And that's what University

9  Middle School identified as a root cause

10  for this particular SMART Goal, right?

11          A.      Yup.  And the part about

12  family challenges or other social

13  distractions in that same sentence.

14          Q.      Sure.  Yes.  The table also

15  states that parental access to, excuse me,

16  the table also refers to parental access to

17  PowerSchool and Dojo.

18              Do you see that?

19          A.      Yes, I do.

20          Q.      What does that mean?

21          A.      Their ability to have access

22  to class, Dojo, which is a platform where

23  we communicate through parents in multiple

24  languages.  If we write in our native

25  language, you can read it in your native

Page 135

1  language.  And PowerSchool is the platform
2  they use to view their child's grades.
3        Q.    And when University Middle
4  School listed, "Parental access to
5  PowerSchool and Dojo," as a possible root
6  cause, they meant that some parents don't
7  have access to those platforms?
8        A.    A small percentage of our
9  students -- I mean, parents did not have
10  access to both platforms.
11        Q.    Okay.  The next root cause
12  listed as academic self-esteem.
13              Do you see that?
14        A.    Absolutely.
15        Q.    It states, "Students who are
16  illiterate struggle in all of their core
17  subjects, experience frustration, low
18  self-esteem, and a lack of
19  self-regulation."
20              Did I read that correctly?
21        A.    Yeah.
22        Q.    In your experience, is that
23  also true for students who have some
24  ability to read but struggle with literacy?
25        A.    Academic self-esteem?

CONFIDENTIAL

Page 136

1          Q.     Yes.

2          A.     Yes, uh-huh.

3          Q.     You'd agree with me that it's

4    important for students to have confidence

5    in themselves in the classroom?

6          A.     A hundred percent.

7          Q.     In your experience, as a

8    teacher and administrator at Irvington

9    Public Schools, has it been important to

10   cultivate the academic self-esteem of your

11   students?

12         A.     Very important.

13         Q.     Higher academic self-esteem

14   leads to better outcomes for students?

15         A.     Yes.

16         Q.     And fewer behavioral issues,

17   right?

18         A.     There is a correlation, yes.

19         Q.     A third root cause that

20   University Middle School identified was

21   culture and climate and it states,

22   "Students experience a change in the

23   school-wide culture and climate (New

24   administration, dean, and staff members)."

25               Did I read that correctly?

Page 137

1           A.      That is correct.

2           Q.      Was UMS going through a

3    change of administration?

4           A.      APs, new dean, staff members,

5    a lot of new employees joined that year.

6           Q.      Okay.  So there was a lot of

7    turnover or change in the faculty and staff

8    at University Middle School?

9                   MR. INNES:  Objection to form.

10                  THE WITNESS:  There was a lot

11          of change in that year.

12   BY MR. KARP:

13          Q.      And University Middle School

14   felt that that was disruptive to the

15   school's culture and climate, right?

16          A.      Not disruptive, a possible

17   root cause for students becoming acclimated

18   to all the new updates based on the new

19   strategy of a new team coming in.

20          Q.      University Middle School

21   listed this as a possible root cause

22   because the change in school administration

23   had a negative impact on students, right?

24                  MR. INNES:  Objection to form.

25                  THE WITNESS:  I wouldn't

Page 138

```
 1              necessarily say negative, different
 2              and difference always leads to
 3              confusion.  So I would say having a
 4              new climate and culture when you're
 5              accustomed -- sorry, when you're
 6              accustomed to something different
 7              is always going to be difficult,
 8              especially for students.
 9    BY MR. KARP:
10         Q.    It might -- sorry, I didn't
11    mean to interrupt you.  It might have been
12    disorienting for students?
13         A.    Such as, what do you mean by
14    "disorienting"?
15         Q.    Students who were used to
16    seeing certain people in certain roles were
17    suddenly meeting new people and that might
18    have been confusing or disorienting to
19    them?
20         A.    I wouldn't go --
21              MR. INNES:  Objection to form.
22              THE WITNESS:  I wouldn't say
23          disoriented, because it should have
24          been more clearly articulated here.
25          I was able to fill the staff.  The
```

CONFIDENTIAL

Page 139

1          students were accustomed to having
2          substitutes and they were now able
3          to have certified teachers in front
4          of them.
5     BY MR. KARP:
6          Q.    Okay.  University Middle
7     School identified several strategies to
8     address these challenges and those are
9     listed in the rightmost column.
10              Do you see that?
11         A.    Yes.
12         Q.    The column very aptly is
13    called, "Strategies to Address Challenge"?
14         A.    Uh-huh.
15         Q.    And for chronic absenteeism,
16    the table states, The Principal, Climate
17    and Culture -- excuse me, Climate and
18    Culture Specialist, and Dean of Attendance,
19    will monitor and track chronic absenteeism
20    referrals and utilize the data to determine
21    an effective reward system, as well as
22    strategies and techniques to assist with
23    improving chronic absentee rate results."
24              Did I read that correctly?
25         A.    Yes.

CONFIDENTIAL

Page 140

1          Q.     Okay.  Were any of these
2     strategies actually implemented?
3          A.     Sorry, I'm looking through
4     everything.  Let's see.  Yes, if you go to
5     page 61, step number one was done.  Step
6     number two was done.  Strategy three was
7     done.  Strategy number four was done, five,
8     six, seven.  Let me just go through all of
9     them and check through.  Yup.  No.  There's
10    a lot, so.  So all of strategy one, to
11    answer your question.
12         Q.     And what page are you looking
13    at?
14         A.     I am looking at pages 60 all
15    the way to page 66.  And when I'm looking
16    in the column that says, "strategy one" and
17    I'm putting checks next to everything that
18    has been completed for strategy one to
19    answer your question.
20                So, yes, all of these
21    strategies, to answer your question, were
22    done as -- and then there's action steps
23    that breaks down everything we did to
24    address that strategy.
25         Q.     Okay.  And we'll get into

CONFIDENTIAL

Page 141

1    this part of the planning document in a

2    little bit, so we can go through some of

3    that detail, but I appreciate you're

4    pointing me to this.

5                    Some of the dates listed in

6    this table are from 2024.  For example, if

7    you look at the end dates that are listed

8    for some of the items on page 63, those are

9    from 2024.

10                   Do you see that?

11        A.      They should be.  That is

12   accurate.  The plan is for 2023-2024.

13        Q.      So this is not one of the

14   kind of post hoc or after-the-fact edits

15   you were talking about, this is you were

16   putting in dates as of June of 2023 when

17   you created the document?

18           A.      No, I can clarify for that --

19              MR. INNES:  Objection to form.

20           Misstates prior testimony.  Go

21           ahead.

22              THE WITNESS:  But I can

23           clarify.  These are dates we

24           proposed to the state when we were

25           building the plan in 2023, I

CONFIDENTIAL

Page 142

```
 1              believe I said February of 2023 all
 2              the way to June, these are the
 3              dates we proposed we were going to
 4              have all the stuff done for the
 5              next school year.  So these might
 6              not be the actual dates that we did
 7              it, but they are very close, if not
 8              to earlier than the dates we have
 9              on here, end dates.
10    BY MR. KARP:
11         Q.     Your testimony that these
12    steps and strategies were completed is
13    based on your own experience and not some
14    checkmark that appears in this document?
15         A.     Oh, no, this is me knowing as
16    the principal what we did that year,
17    correct.
18         Q.     I see.  Okay.
19         A.     And there is -- there is on
20    the part, it's not in this document, that
21    tells us what we completed and what we did
22    not complete.
23         Q.     Okay.  That's helpful.  I'm
24    going to try to get us to a stopping point
25    so we can break for lunch.
```

CONFIDENTIAL

Page 143

1          A.      Okay.

2          Q.      Thanks for sticking with me

3    for a bit.

4                  In your experience as

5    principal of University Middle School, did

6    any of these strategies that you employed

7    to reduce chronic absenteeism actually

8    drive down chronic absenteeism for the

9    school?

10         A.      Yes.

11                 MR. INNES:  Objection to form.

12   BY MR. KARP:

13         Q.      Did any of the strategies

14   that you employed to reduce chronic

15   absenteeism at University Middle School

16   relate to social media?

17                 MR. INNES:  Objection to form.

18                 THE WITNESS:  Yes.  Based on

19           your question of the wording of

20           relate, they do relate.  They don't

21           explicitly use it, but they do

22           relate based on conversations and

23           anecdotal records.

24   BY MR. KARP:

25         Q.      Okay.  Let's unpack that for

CONFIDENTIAL

Page 144

1  a second.  You'd agree with me that nowhere

2  in the action steps for SMART Goal 3, that

3  table we were just going over that runs

4  from page 60 through 66, do the words,

5  "social media" appear, correct?

6              MR. INNES:  Mr. Bussacco,

7        counsel has referenced a half dozen

8        pages, so if you need to, please

9        take your time to review those

10        pages before answering.

11              MR. KARP:  Sure.

12              THE WITNESS:  So your question

13        was, does anything on these

14        multiple pages use the word

15        explicitly, "social media"?

16  BY MR. KARP:

17        Q.    Do the words, "social media,"

18  appear anywhere in the list of action steps

19  and strategies for SMART Goal 3 that appear

20  in this planning document?

21        A.    That specific word does not

22  exist on this document.

23        Q.    It looks like you circled

24  certain items or certain --

25        A.    I did.

Page 145

1        Q.      -- rows of this table.  How
2    many did you circle?
3        A.      Well, I stopped when I
4    answered, I only looked at the first five
5    and I circled two out of five, when you
6    used the word, "relate."
7        Q.      Okay.
8        A.      So I was looking for things
9    that relate to social media.
10        Q.      Okay.  Why don't you tell me
11    about the first one you circled?
12        A.      Sure.  So if you look on
13    page 60 of 74, step number one strategy
14    one, "Create an attendance committee (AIC).
15    Members of the AIC will analyze student
16    data and identify interventions to be
17    implemented during the school year.  The
18    AIC will meet monthly to review logs that
19    track students' attendance, intervention,
20    and next steps."
21                So since you said the word,
22    "relate," I looked at how we analyzed
23    student data, as I talked about earlier,
24    anecdotal records, when scholars would tell
25    us about their issues.

CONFIDENTIAL

Page 146

```
 1              Many of the issues arise
 2   from problems from social media and then we
 3   identified interventions to support our
 4   students throughout the school year and the
 5   school day.
 6         Q.     University Middle School
 7   developed specific interventions for social
 8   media; is that what you're testifying to?
 9         A.     We developed strategies on
10   how to reduce -- not strategies, but
11   techniques on how to reduce the use of
12   social media.
13              We've talked to some of our
14   parents how to put some of the apps that
15   they're unaware of how to filter and, you
16   know, turn off of -- what is it, like a
17   warning type thing, like, you spent too
18   much time on here and it pauses.  The phone
19   has it, I don't know if the apps have it,
20   but I know the phones have that function.
21   I couldn't speak if the apps have it.  But
22   we did provide individual strategies based
23   on students telling us, I'm not coming to
24   school because I'm being picked on, and
25   most of the time our kids are being picked
```

CONFIDENTIAL

Page 147

1   on in the cloud, social media, and they

2   don't want to come to school, so we

3   identify strategies and then we did

4   restorative practices of the strategy where

5   we bring certain members to the team, we

6   talk about it, we talk about your social

7   media footprint.  And we spend a lot of our

8   time developing individual interventions.

9   A lot of them are based on not restorative

10  practices, but what's the word I'm looking

11  for, give me a second, basically

12  interventions on how to self-regulate, how

13  to use your cell phone, social media

14  platforms, all these different outcomes, so

15  you feel safer at school.

16              And we've seen it, and you

17  asked in the previous question, have we

18  seen the success, yes, based on spending a

19  lot more time individual with students who

20  have problems that they express to us when

21  we do these Check and Connects, yes.

22       Q.     You mentioned that students

23  have reported to you that they are being

24  picked on and that's a reason that they

25  don't want to come to school?

Page 148

1          A.      Yeah.

2          Q.      You agree with me that

3    students have been picked on since the

4    beginning of time, right?

5                    MR. INNES:  Objection to form.

6                    THE WITNESS:  I do, but it's a

7            different type of pick on.

8    BY MR. KARP:

9          Q.      Students get bullied in

10   person or picked on in person all the time,

11   right?

12                   MR. INNES:  Objection to form.

13                   THE WITNESS:  Yes, but there's

14           a but, yeah.

15   BY MR. KARP:

16         Q.      You also mentioned that some

17   of the intervention strategies involved

18   communicating with parents around things or

19   steps they might be able to take with their

20   children's cell phones; is that right?

21         A.      Yup.  Because a lot of them

22   were unaware, because they didn't realize

23   that they have these apps on phones, not

24   apps, they're not even apps, but I guess --

25         Q.      Parental controls?

Page 149

1         A.        Parental controls, but a lot
2    of the other ones don't have parental
3    controls we've noticed.
4         Q.        Do you agree that parents
5    have a role in deciding how their children
6    are able to use their phones?
7         A.        If educated, absolutely.
8         Q.        Sure.  And parents have the
9    ability to an extent to limit how much time
10   their children are spending on different
11   applications or using their cell phones
12   more generally?
13        A.        Say that one more time, I'm
14   sorry.
15        Q.        Sure.  Parents have a role in
16   deciding or actually, sorry, let me
17   just reread the question.
18        A.        I can -- I see it now.
19        Q.        I'll just reask the question
20   and apologies for any redundancies.
21   Parents have a role in deciding how their
22   children use their cell phones, yes?
23        A.        Yeah, everyone has a role.
24        Q.        Parents have a role in
25   deciding how much time their children spend

CONFIDENTIAL

Page 150

1    on specific apps or using their cell phones
2    more generally?
3                    MR. INNES:  Objection to form.
4                    THE WITNESS:  If they're made
5            aware of these, absolutely.
6    BY MR. KARP:
7         Q.    Sure.  One of the reasons you
8    communicated with parents about what they
9    can do with their children's cell phones is
10   that parents have the ability to set
11   parental controls and certain restrictions
12   on how their children use cell phones,
13   right?
14                   MR. INNES:  Objection to form.
15                   THE WITNESS:  I definitely had
16           conversations with parents and then
17           we unearthed that students know how
18           to bypass that.
19   BY MR. KARP:
20        Q.    You spent time working with
21   parents to figure out how they could set
22   these parental controls if they wanted to,
23   right?
24        A.    I wouldn't say I spent time
25   explaining them, like, how do you do it,

Page 151

1    but let them know that they have those

2    features.

3            Q.    The district itself or

4    University Middle School itself cannot go

5    on to a student's cell phone and set

6    parental controls; is that right?

7            A.    Absolutely not.

8                    MR. KARP:  This might be a

9            good time for a break.

10                    MR. INNES:  Okay.  Do you want

11            a break?

12                    THE WITNESS:  I'm fine.  Do

13            you guys want a break?

14                    THE STENOGRAPHER:  I need a

15            break.

16                    THE WITNESS:  She wants a

17            break.

18                    THE VIDEOGRAPHER:  The time

19            right now is 12:22 p.m.  We are off

20            the record.

21                        - - - - -

22        (A recess was taken at this time.)

23                        - - - - -

24                    THE VIDEOGRAPHER:  The time

25            right now is 1:36 p.m.  We are back

CONFIDENTIAL

Page 152

```
 1              on the record.
 2    BY MR. KARP:
 3         Q.     Mr. Bussacco, welcome back.
 4    Did you have a good lunch?
 5         A.     It was all right.  It was all
 6    right.
 7         Q.     It was all right?  Okay.
 8                MR. SEXTON:  It's a school
 9           lunch.
10    BY MR. KARP:
11         Q.     All right.  So before the
12    break, we were talking a bit about this
13    annual school planning document.
14         A.     Yes.
15         Q.     And I would like to turn back
16    to that.
17         A.     Okay.
18         Q.     If I could direct your
19    attention to page 43, just let me know if
20    you're there.
21         A.     I am there.
22         Q.     Okay.  We were just
23    discussing the strategies to address the
24    challenges for SMART Goal number 3 and the
25    first item listed here is chronic
```

CONFIDENTIAL

Page 153

1    absenteeism.

2                    Do you see that?

3          A.     Yes.

4          Q.     Okay.  Picking up from where

5    we left off, this strategy refers to a

6    climate and culture specialist.

7                    Do you see that?

8          A.     Yes.

9          Q.     What is a climate and culture

10   specialist?

11         A.     It's also known as a dean of

12   students here, similar role, different

13   name.  Dean of students oversees, I would

14   say, the well-being of students on top of

15   everyone else, but their job is to check

16   and connect with students, talk with them a

17   little bit more, it's more of just check

18   and connect.  It's just building up a

19   climate and culture, why do you want to be

20   at the school.

21         Q.     Okay.  At the time that this

22   particular report was put together, who

23   would have been the climate and culture

24   specialist for University Middle School?

25         A.     I believe it's Grizzly

CONFIDENTIAL

Page 154

1    Matias, but let me just double check, yes,
2    Grizzly Matias, page 1.
3          Q.      Okay.  And the climate and
4    culture specialist described here would be
5    specific to University Middle School as
6    opposed to a district-wide climate and
7    culture specialist?
8          A.      That is correct, she only
9    works for University Middle School.
10         Q.      Okay.
11         A.      And then -- oh, go ahead.
12         Q.      How long has University
13   Middle School had a climate and culture
14   specialist?
15         A.      I can speak since I have been
16   there three years, but I believe they had
17   one prior to me.
18         Q.      Okay.
19         A.      Ms. Matias came with me.
20         Q.      Okay.  And to the extent you
21   know, how far back in time do you believe
22   that University Middle School had a climate
23   and culture specialist?
24         A.      I believe from being in the
25   district, we put them at the middle schools

CONFIDENTIAL

Page 155

1   and the high school in 2012-2013 we put
2   them in the district, but I'm not
3   100 percent sure, but it was somewhere
4   around that time, I was still in the
5   classroom.
6           Q.    Do you know why that specific
7   role of climate and culture specialist was
8   created?
9           A.    I don't.  Why it was
10  originally created by Dr. Hackett, I do not
11  know.
12          Q.    This description also --
13  excuse me, this passage for chronic
14  absenteeism also refers to a dean of
15  attendance.
16              Do you see that?
17          A.    Yes, that's Mr. Byock, Mr.
18  Michael Byock.  His role is basically when
19  children are late, he contacts parents
20  after three times, has a conversation with
21  them, and that's pretty much the extent of
22  his job at my school.  His hours are a
23  little bit different than everyone else's.
24          Q.    When you say -- or just to
25  clarify rather --

CONFIDENTIAL

Page 156

1          A.      Sure.

2          Q.      -- does he have district-wide

3    responsibilities or --

4          A.      No, this gentleman does, but

5    when he's working for my school, it's from

6    8:00 to 10:30 or 8:00 to 11:00.  But his

7    role when he leaves me is not a dean of

8    attendance.

9          Q.      Okay.  Let's look at the next

10   strategy on this page, which is refers to

11   suspension rates.  Tiered interventions and

12   restorative practices?

13         A.      Yes.

14         Q.      Do you see that?

15                 The description here or the

16   passage here refers to improving suspension

17   rate results.

18         A.      Yup.

19         Q.      Do you see those words?

20         A.      Yes.

21         Q.      What does it mean to improve

22   suspension rate results?

23         A.      To reduce it, to reduce the

24   number of suspensions.

25         Q.      Okay.  If we turn the page,

CONFIDENTIAL

Page 157

1    the next strategy identified by University

2    Middle School is positive behavior support.

3            A.      Yup.

4            Q.      Do you see that?

5            A.      Yup.

6            Q.      And this passage reads,

7    "Positive Behavior Support, Social

8    Emotional Learning Instructional

9    Specialist:  The Climate and Culture

10   Specialist will create a data collection

11   tool to ensure early monitoring of the

12   effectiveness of Restorative Practices and

13   Behavior strategies implemented for our

14   at-risk scholars."

15           A.      Yup.

16           Q.      Did I read that correctly?

17           A.      You did.

18           Q.      Okay.  Was the data

19   collection tool described in this passage

20   actually created?

21           A.      Just give me one -- a few

22   minutes.  So based on the action steps of

23   that strategy being completed, all of them

24   but one, if you go to page 61 of 74, we did

25   not purchase an SEL program that year.

CONFIDENTIAL

Page 158

1    That's the only thing we did not do for

2    that goal.  We scrapped it.  I couldn't

3    tell you why, I can't remember, to be

4    honest with you.  But everything else on

5    strategy three was completed for that SMART

6    Goal.

7         Q.    So you're referring to step

8    number three, strategy number three, on

9    page 61?

10        A.    Say that one more time.

11        Q.    That's okay.  You're

12   referring to step number three, strategy

13   number three that appears on page 61?

14        A.    Yes, where it says, "Purchase

15   SEL program to support our district and

16   school mission and vision."

17        Q.    Okay.  And that is the data

18   collection tool that is mentioned --

19        A.    No, that is not a tool.  This

20   is just a strategy that aligns to that.

21   The tool was more than of an anecdotal note

22   where we did Check and Connect, if you look

23   over here, sources of evidence on page 60,

24   Check and Connect tracker is what we made.

25   So basically a connect and check -- excuse

CONFIDENTIAL

Page 159

1  me, tongue twister, a Check and Connect
2  tracker is the data log where we took
3  anecdotal records of students that we met
4  with, had students sign in that we met with
5  them to talk about what their issues and
6  concerns were regarding why they weren't
7  coming to school, among other issues.
8          Q.      Okay.  So you're referring to
9  step number three, strategy number one also
10  on page 61 where it says, "Identify trends
11  in attendance for MP1 using chronic
12  absenteeism analysis tool (Check and
13  Connect)?"
14          A.      Check and Connect, yes, sir.
15          Q.      So how long has University
16  Middle School been using Check and Connect?
17          A.      To the best of my knowledge,
18  I believe this was the first year we
19  actually made it official, so 23-4, 4-5,
20  five, so two years, we have been using
21  Check and Connect.
22          Q.      Have you ever used Check and
23  Connect personally --
24          A.      Yes.
25          Q.      -- in your professional --

CONFIDENTIAL

Page 160

1          A.     I remember that, yes.  In my
2   professional -- I used it as an assistant
3   principal at Union Ave.  Middle School,
4   because we -- I was one of the team members
5   there to reduce the chronic absenteeism of
6   that school and get that school out of
7   status.
8                I used it in my school as
9   principal of the Community Charter School
10  of Paterson, so I could hit the ground
11  running, be proactive rather than reactive.
12  I implemented that in day one as principal,
13  not day one, but, you know.
14          Q.     I understand.  So Check and
15  Connect was available when you were
16  employed at Union Avenue Middle School; is
17  that right?
18          A.     Yeah, it's not something I
19  created, it's just a concept that I used.
20          Q.     Okay.
21          A.     I wouldn't take credit for
22  creating it.
23          Q.     Sure.  You didn't claim the
24  name --
25          A.     No.

CONFIDENTIAL

Page 161

1          Q.      -- Check and Connect?
2          A.      No, I would be much -- I
3     would be rich.
4          Q.      Do you know why University
5     Middle School did not adopt or start using
6     Check and Connect until years after Union
7     Avenue Middle School?
8          A.      I can't say that they did or
9     didn't, if I misspoke, I don't know what
10    the principal before me used.  I know it's
11    a concept that has been discussed within
12    the district, so maybe she was using it,
13    but I can't speak to what she was or was
14    not using.  So if I misspoke, I apologize.
15         Q.      Okay.  So to make sure we're
16    on the same page --
17         A.      Yup.
18         Q.      -- your understanding is that
19    Check and Connect has been used at
20    University Middle School for at least the
21    last two years?
22         A.      Correct, I can only speak to
23    what I remember.
24         Q.      Okay.  Sitting here today,
25    you're not sure, you don't know whether

CONFIDENTIAL

Page 162

1    Check and Connect was also being used
2    before you became the principal?
3            A.      That is correct.
4            Q.      Okay.  The data that is
5    collected on using Check and Connect, where
6    would that be stored?
7                    MR. INNES:  Objection to form.
8                    THE WITNESS:  It's probably --
9            it's definitely a form, not
10           probably, definitely stored in a
11           Google sheet, it would be a Google
12           sheet that the dean and I have.
13   BY MR. KARP:
14           Q.      Okay.
15           A.      Uh-huh.
16           Q.      And do you know how far back
17   in time that data goes for Check and
18   Connect?
19                   MR. INNES:  Object to form.
20                   THE WITNESS:  Off the top of
21           my head, no, but based on this
22           report, I would say September 1,
23           2023.
24   BY MR. KARP:
25           Q.      The data that has been

CONFIDENTIAL

Page 163

1    collected using Check and Connect exists in
2    a Google sheet, is that what you said?
3              A.     Yeah.
4              Q.     Does it exist anywhere else
5    such as a database that you can pull
6    reports from, something like that?
7                    MR. INNES:  Objection to form.
8                    THE WITNESS:  No, you cannot
9              pull reports from it.  So it's not
10             like on a platform like PowerSchool
11             or Naviance, it's not a platform.
12                   THE STENOGRAPHER:  PowerSchool
13             and what?
14                   THE WITNESS:  Naviance.  I'll
15             speak up.  I'm sorry, the fan, I
16             forgot.
17   BY MR. KARP:
18             Q.     Let's turn back to page 44.
19             A.     Okay.
20             Q.     In the passage about positive
21   behavior support, University Middle School
22   refers to at-risk scholars.
23                   Do you see that at the very,
24   very end of that paragraph?
25             A.     Absolutely.

Page 164

```
 1        Q.     What is meant by at-risk
 2   scholars as that term is used here?
 3        A.     At-risk scholar means
 4   students that are chronically absent.
 5   Students that continue to get flagged for
 6   discipline referrals.  Students that had
 7   poor academic performance the year before.
 8   So there's a lot of categories where at
 9   risk would fall in, but it's academics,
10   attendance, and sometimes behavior.
11        Q.     Okay.  And those are the
12   metrics that -- or the areas UMS uses to
13   identify at-risk scholars?
14        A.     Yeah, there's also others,
15   teacher input, so referrals, I said that,
16   so referrals, yeah.  Those are pretty much
17   the metrics based on what we receive and
18   what we see.
19        Q.     And does University Middle
20   School treat at-risk scholars any
21   differently from other students who don't
22   have that designation?
23                MR. INNES:  Objection to form.
24                THE WITNESS:  I wouldn't say
25          they're treated differently other
```

CONFIDENTIAL

```
 1            than the fact that they do get that
 2            quick Check and Connect, but
 3            scholars who want it are still able
 4            to have it, because we have
 5            ample -- well, we have four school
 6            counselors and an HSSC admin, so
 7            there are options for all scholars,
 8            but I wouldn't say different.  They
 9            do get -- but technically, they do
10            get a little bit more time with
11            people, yes.
12  BY MR. KARP:
13       Q.    Does University Middle School
14  track the number of at-risk scholars that
15  it has in a given year?
16       A.    I would say based on the tier
17  interventions, yes, we track the number of
18  how many we believe fall into each
19  category.
20       Q.    Is there somewhere we could
21  look if we wanted to know how many at-risk
22  scholars there were at University Middle
23  School in -- during the 2022-2023 school
24  year, for example?
25       A.    Yes.  I believe with our
```

CONFIDENTIAL

Page 166

1    partnership with the Rutgers Comprehensive
2    School of Mental Health program that we
3    formed in 2022, we do have to report data
4    to Rutgers every year, no names, just data
5    that's reported.
6            Q.    And that data would include
7    the number of at-risk scholars at
8    University Middle School?
9            A.    Broken down by tier one, two,
10   and three, yup.
11           Q.    Okay.  And if you could
12   elaborate on that, what is meant by tier
13   one, tier two, and tier three?
14           A.    Okay.  Here we go, I'm
15   getting tested.  All right.  Now, so
16   there's three different types of tiers for
17   interventions.  Students -- I'm going to do
18   a very simplified version unless you want
19   me to go -- there's three different
20   versions.  Students that just need a little
21   bit of support to those that continually
22   display at-risk behavior in different
23   categories and we have to do more intensive
24   work with them.  It could be social
25   emotional, it could be lack of -- what's

CONFIDENTIAL

Page 167

1  the word now we changed it to, chronic

2  absenteeism, there's a new word for chronic

3  absenteeism, but it could be chronic

4  absenteeism, it could -- school avoidance,

5  that's what I'm looking for, school

6  avoidance, school avoidance.  It could be

7  academics.  It could be behavior.  It

8  could -- so many factors fall into what

9  makes a kid at risk.  Behavior comes up a

10  lot.  Are they consistently making poor

11  decisions?  Are those decisions the same?

12  Is it based on they don't know how to

13  communicate with one another where they're

14  using social media to talk to each other,

15  causing fights in the school.  I could go

16  on and on, where they would fall.

17          The majority of our

18  scholars, the goal is to have them fall

19  into the lower category rather than the

20  other one.

21      Q.     Thank you for that

22  explanation.

23          Does University Middle

24  School collect data on whether these

25  at-risk scholars use social media?

CONFIDENTIAL

Page 168

1                MR. INNES:  Objection to form.

2                THE WITNESS:  Do we collect

3           data if at-risk scholars use social

4           media?  Anecdotal records, such as

5           student statements sometimes refer

6           to social, they write that this has

7           happened because of this, X, Y, and

8           Z and social media winds up in

9           those documents, but anecdotal, not

10          where we write down 72 percent of

11          something.

12    BY MR. KARP:

13          Q.     Understood.  So there could

14    be anecdotes of social media use that were

15    provided by at-risk scholars, but

16    University Middle School has not compiled

17    any statistics --

18          A.     There you go.

19          Q.     -- about social media use; is

20    that fair?

21          A.     That is a fair -- yeah, we

22    haven't, statistics, no.

23          Q.     Okay.  And in a similar vein,

24    University Middle School has not studied or

25    analyzed how at-risk scholars are using

CONFIDENTIAL

Page 169

1    social media as compared to other students

2    at University Middle School?

3                    MR. INNES:  Objection to form.

4                    THE WITNESS:  Can you say it

5            one more time?  I'm sorry.

6    BY MR. KARP:

7            Q.    I'll do my best.

8            A.    Yeah, okay.

9            Q.    University Middle School has

10   not studied or analyzed how at-risk

11   scholars use social media, if at all, as

12   compared to other students who are not

13   considered at risk at University Middle

14   School?

15           A.    So we've definitely analyzed

16   the data, because you said the word,

17   "analyzed," correct?  So we've looked at,

18   you know, anecdotal records.  We analyze

19   those records, which got us the grant to

20   work with the Rutgers Comprehensive School

21   of Mental Health, because we were able to

22   provide them with a lot of information and

23   data of why our students need this support,

24   so we are in a partnership with them, it's

25   a study, a five-year program we're part of

CONFIDENTIAL

Page 170

1    Rutgers, and we are reporting all of the

2    ways our scholars are negatively impacted

3    throughout the day, which includes social

4    media, home life, the world around us,

5    politics, so we do report that based on

6    conversations.

7         Q.    Okay.  You mentioned a minute

8    ago or a few minutes ago that you don't

9    have statistics or figures on social media

10   use for at-risk scholars at University

11   Middle School.  Do I have that right?

12        A.    We don't have specific

13   statistics, like 65 percent, 70 percent,

14   but we do have -- we can point to, from

15   those notes that we have when we do the

16   Check and Connect, how much, so if we

17   wanted to, we could count them all up and

18   get you a number.

19        Q.    Sure.  And to kind of close

20   the loop there, those notes would be in the

21   Google spreadsheet that you referred to

22   earlier that contains the Check and Connect

23   data?

24        A.    Yup.

25        Q.    Okay.  Similarly, you do

CONFIDENTIAL

Page 171

1   not -- or strike that.

2                University Middle School

3   does not collect or have statistics for

4   social media usage of any of its students;

5   is that fair?

6                MR. INNES:  Objection to form.

7                THE WITNESS:  When you -- what

8          are you -- what do you mean by

9          statistics, what do you mean,

10          because it's a broad word, so what

11          statistics are you looking for --

12                MR. KARP:  Does  University --

13                THE WITNESS:  -- in your

14          question?

15   BY MR. KARP:

16        Q.     Understood.  Does University

17   Middle School know what percentage of its

18   students use social media?

19        A.     Do I know and the staff at

20   University Middle School know how many kids

21   based on us looking and knowing on a

22   day-to-day basis, because I can give you a

23   number based on that, they all have social

24   media, almost, I would say almost all have

25   social media.  But do we have it written

Page 172

1    down by a case-by-case basis that this
2    person, this person, that person has social
3    media, no.
4          Q.    I'm asking if you have a
5    number, do you know what percentage of
6    students use social media and I believe
7    your answer is no, you don't have a number?
8                MR. INNES:  Asked and
9                answered.  Misstates prior
10               testimony.
11               THE WITNESS:  So, in my
12               opinion, I have a number based on
13               what I deal with on a day-to-day
14               basis.  Eighty percent of my
15               discipline referral forms have
16               social media in them.
17   BY MR. KARP:
18         Q.    Okay.  You'd agree though
19   that just because social media is mentioned
20   in a disciplinary form, it doesn't mean, it
21   doesn't -- or strike that.
22                You would agree that
23   disciplinary forms do not tell you whether
24   students who haven't been disciplined are
25   using social media, right?

CONFIDENTIAL

Page 173

```
 1          A.      No, it would not tell me,
 2    that is correct.
 3          Q.      Does University Middle School
 4    have any statistics or data regarding how
 5    at-risk scholars use social media?
 6                    MR. INNES:  Objection to form.
 7                    THE WITNESS:  Do we have any
 8              data on how at-risk students use
 9              social media?  Data in the form of
10              student statements.
11    BY MR. KARP:
12          Q.      Does University Middle School
13    know or can it quantify how many hours the
14    average at-risk scholar spends on social
15    media?
16                    MR. INNES:  Objection to form.
17                    THE WITNESS:  Can we quantify
18              the hours, no.
19    BY MR. KARP:
20          Q.      Sitting here today, do you
21    know or do you know whether at-risk
22    scholars at University Middle School use
23    social media more than other students at
24    University Middle School who have not been
25    designated at risk?
```

CONFIDENTIAL

Page 174

1          MR. INNES:  Objection to form.
2          THE WITNESS:  Based on what is
3      provided to me in student
4      statements, I could say students
5      that do not get in trouble for
6      social media are on the social
7      media, because when I am able to
8      view the pages with parent
9      permission, I see a lot of my
10     scholars on these social media apps
11     that were involved in incidents,
12     liking the fights, screenshotting
13     the fight, sending it out, causing
14     more issues.  So I can collect it
15     that way and I know a lot of my
16     kids are using social media.
17          Also from all the pages they
18     created where they tag University
19     Middle School and if you click on
20     it, you can see the number of
21     students from, even specifically
22     from your angle, you guys can see
23     the number of people on that
24     page.  So we do get a lot of hits
25     of students or likes from

CONFIDENTIAL

Page 175

1          students in the building that
2          aren't tier one or aren't in
3          trouble.  And that's evident on
4          the posts that are shared with us
5          when we do our investigation.  So
6          that leads me to believe that
7          they are on social media, not
8          just tier one students.
9   BY MR. KARP:
10       Q.    Sure.  And I appreciate that
11  answer.  If you -- I'm going to ask the
12  question again just to make sure you
13  understood it.
14             Sitting here today, do you
15  know if at-risk scholars at University
16  Middle School use social media more, and
17  that could be the number of hours, for
18  example, than other students at University
19  Middle School who are not at risk?
20             MR. INNES:  Objection.  Asked
21          and answered.  If you don't like
22          the answer he gives, ask a better
23          question.  You also had an
24          agreement, a ground rule was if he
25          answers your question, he

CONFIDENTIAL

Page 176

```
 1              understands your question.  So you
 2              don't need to preface your next
 3              question with do you understand it.
 4                  MR. KARP:  I'm just having a
 5              conversation with the witness.  I
 6              don't think there's a need to
 7              escalate this.  I was seeking
 8              clarification, because it didn't
 9              appear to me that there was an
10              understanding based on the response
11              that was given and I, respectfully,
12              allowed him to complete his answer
13              and I asked my question again.  I
14              would appreciate an answer to the
15              question that I've reasked.
16                  MR. INNES:  The question
17              you've reasked?  Objection.  Asked
18              and answered.  You can answer.
19                  THE WITNESS:  Yes, I did
20              understand the question.  I do not
21              believe at-risk students at
22              University Middle School
23              necessarily use social media more
24              than other students.
25
```

CONFIDENTIAL

Page 177

1    BY MR. KARP:

2         Q.       Mr. Bussacco, you'd agree

3    with me that in addition to the many

4    challenges facing University Middle School

5    students we've already discussed, many

6    University Middle School students struggle

7    with poverty, would you agree with that?

8         A.       I wouldn't say necessarily

9    they struggle with poverty.  There's a

10   percentage of disadvantaged students, if

11   you go to page 18.  University Middle

12   School -- here we'll go up higher, page 17,

13   what year is this, that's academics.  Let

14   me see.  Is it on here?  I see it in the

15   academics, I want to see if it's anywhere

16   else.  Hold on one second, I apologize.

17                     I'm looking for the

18   attendance tab, I'm sorry.  So this

19   doesn't, on page 24, it doesn't break down

20   economically disadvantaged, but I wouldn't

21   say the majority of our kids fall under

22   economically disadvantaged.  There's a nice

23   percentage, but not a majority.  A

24   majority, in my definition, is 50 percent

25   or more.

Page 178

1          Q.     Sure.  And just to make sure
2     the record is clear, I asked if many, not
3     if the majority --
4          A.     Many, but what's your
5     definition of many?  Many is most.  Many
6     and most go synonymous to me, so I would
7     say I have a nice percentage of students
8     that are economically disadvantaged.
9          Q.     Okay.
10         A.     But I also have the opposite,
11    I have extremely wealthy students.
12         Q.     Would you agree that
13    University Middle School students are
14    challenged by violence and crime in the
15    Irvington community?
16                    MR. INNES:  Objection to form.
17             Vague, ambiguous.
18                    THE WITNESS:  While I don't
19             live in Irvington, I do live in
20             Newark, New Jersey, but I have been
21             part of the Irvington community for
22             a long time, and I can confidently
23             say based on the mayor, crime has
24             drastically dropped in Irvington
25             throughout the years since he has

CONFIDENTIAL

Page 179

```
1              been there.  So I know you could
2              look up his statistics, but I know
3              every year he does a state of the
4              union and that's one of his
5              highlights as how crime has dropped
6              since him becoming mayor many years
7              ago.
8    BY MR. KARP:
9         Q.     During your time as a teacher
10   and administrator for Irvington Public
11   Schools, have students in the district
12   experienced racial or social injustices
13   either firsthand or in the community?
14                  MR. INNES:  Objection.
15                  THE WITNESS:  Have students in
16              the district experienced racial or
17              social injustices?  Based on my
18              opinion, yes, most people have.
19   BY MR. KARP:
20        Q.     You'd agree with me that
21   issues of racial or social injustice are
22   very serious and could have a negative
23   impact on student mental health?
24                  MR. INNES:  Objection to form.
25                  THE WITNESS:  Yes.
```

CONFIDENTIAL

Page 180

1    BY MR. KARP:
2         Q.    During your time as a teacher
3    and administrator at Irvington Public
4    Schools, have you ever observed any on
5    campus rallies or protests regarding racial
6    or social injustice?
7                   MR. INNES:  Objection to form.
8                   THE WITNESS:  Rallies on
9            campus, no.
10   BY MR. KARP:
11        Q.    You'd agree with me that the
12   COVID-19 pandemic had a negative impact on
13   the mental health of Irvington Public
14   Schools students?
15        A.    Yes, and all students.
16        Q.    The COVID-19 pandemic caused
17   some Irvington Public Schools students to
18   feel afraid, yes?
19        A.    Yes, to all students.
20                  MR. INNES:  Objection.
21   BY MR. KARP:
22        Q.    And the COVID-19 pandemic
23   caused a loss of learning for Irvington
24   Public School students, right?
25                  MR. INNES:  Objection to form.

CONFIDENTIAL

Page 181

1              THE WITNESS:  Yes, across the
2         nation.
3  BY MR. KARP:
4         Q.    Let's turn to page 45 of
5  Exhibit 3.  We have been talking about
6  these SMART Goals for a while, I don't want
7  to spend too much more time on them, I'm
8  sure you don't want to either.  So I will
9  just ask you a few follow-up questions
10  here.
11              Previously, we discussed
12  action steps for SMART Goal number 3.  Do
13  you remember that?
14         A.    Yes, I do.
15         Q.    And now we're looking at the
16  action steps -- this actually starts on
17  page 46, my apologies.  We're looking at
18  the action steps and strategies for SMART
19  Goal number 1.
20         A.    Okay.
21         Q.    And according to this annual
22  school planning document, there are 19
23  action steps and at least one strategy
24  listed for each of them for SMART Goal
25  number 1.

CONFIDENTIAL

Page 182

1              Do you see that?

2       A.    Yes.

3       Q.    I'll give you a chance to

4    review the document, because my question

5    relates to a few pages here.

6       A.    Okay.

7       Q.    But does -- do the words,

8    "social media" appear anywhere in this

9    table?

10      A.    No, because IXL software

11   doesn't have a component to link to social

12   media.  And this goal is based on IXL

13   software.

14      Q.    These are strategies --

15   steps, action steps and strategies that

16   University Middle School came up with to

17   deal with or to address SMART Goal number

18   1, correct?

19      A.    Yes, using the IXL software.

20      Q.    IXL software would have been

21   used to identify the problems and the

22   performance metrics for students for

23   English language arts in this instance,

24   right?

25              MR. INNES:  Objection to form.

CONFIDENTIAL

```
                                        Page 183
 1                THE WITNESS:  Say that one
 2          more time.
 3  BY MR. KARP:
 4          Q.      IXL would have assisted you
 5  and your team with identifying the
 6  performance statistics in English language
 7  arts for University Middle School students,
 8  right?
 9          A.      Yup.
10                    MR. INNES:  Objection to form.
11                    THE WITNESS:  Through an
12          academic lens only.
13  BY MR. KARP:
14          Q.      IXL -- you did not use IXL to
15  come up with these action steps or
16  strategies -- or strike that.  Let me ask a
17  different question.
18                    IXL did not generate these
19  action steps and strategies, correct?
20          A.      No, they provided us with
21  data to develop the action steps.
22          Q.      And you and your team worked
23  together to come up with these action steps
24  and strategies, right?
25          A.      Yup.
```

Page 184

1          Q.      And social media is not
2   expressly mentioned in any of these action
3   steps or strategies, right?
4          A.      It would not be.
5          Q.      Let's look at SMART Goal
6   number 2.  The action steps for SMART Goal
7   number 2 start on page 53.
8                  Do you see that?
9          A.      Absolutely.
10          Q.      And as a reminder SMART Goal
11   number 2 relates to academic performance in
12   mathematics specifically, right?
13          A.      That is correct.
14          Q.      Okay.  Again, feel free to
15   review this table, but -- before answering
16   my question, but this planning document
17   lists 20 action steps and at least one
18   strategy for each --
19          A.      Yup.
20          Q.      -- as a means of achieving
21   SMART Goal number 2, correct?
22          A.      Correct.
23          Q.      And nowhere in the action
24   steps or strategies for SMART Goal number 2
25   does University Middle School expressly

CONFIDENTIAL

Page 185

1    reference social media, do you agree?

2            A.      Same as my first answer,

3    since this is i-Ready instead of IXL, it's

4    strictly based on --

5                    THE STENOGRAPHER:  Since this

6            is --

7                    THE WITNESS:  Since this is

8            i-Ready instead of IXL, this is

9            strictly based on classroom,

10            classroom only, so we're looking at

11            academics purely, not outside

12            components.

13    BY MR. KARP:

14            Q.      In fairness, you're

15    contending in this lawsuit that students

16    are using their cell phones and social

17    media in the classroom; isn't that right?

18            A.      Correct.

19                    MR. INNES:  Objection.

20            Argumentative.

21    BY MR. KARP:

22            Q.      Let's turn to page 59.  This

23    part of the report relates to SMART Goal

24    number 3.  Do you see that at the top of

25    the page?

CONFIDENTIAL

Page 186

1      A.      Yes.

2      Q.      And it reads, "SMART Goal 3:

3  By June 2024, students at UMS will

4  consistently demonstrate behaviors that

5  reflect our #valuesmatter school climate."

6              Did I read that correctly?

7      A.      Yes, sir.

8      Q.      What is the -- what is meant

9  by "#valuesmatter school climate"?

10      A.      It's our mantra, our values,

11  our voices matter, our attitude, our

12  language, unfaltering drive, our Eagle

13  pride, and our school matter.  So each one

14  of those letters is an acronym.  It should

15  be capitalized, but it's not.

16      Q.      Let's look at action step

17  number four, strategy number two, this

18  appears on page 61.

19      A.      Which one are we looking at

20  again?

21      Q.      Action step four, strategy

22  two, which reads, "Identify students with

23  behavioral needs for MP1."

24              Do you see that?

25      A.      Yes, I do.

CONFIDENTIAL

Page 187

1          Q.     What is meant by MP1?

2          A.     Marking period.

3          Q.     I'm sorry, say that again.

4          A.     Marking period.

5          Q.     Marking period one, got it.

6    Thank you.

7          A.     Yup.

8          Q.     How does University Middle

9    School identify students with behavioral

10   needs as that phrase is used here in the

11   document?

12         A.     So students that consistently

13   receive referral forms from teachers, dean

14   interactions, admin interactions, students

15   that just need a little bit more assistance

16   to be redirected.

17         Q.     Does University Middle School

18   have any statistics or numbers on how these

19   students with behavioral needs use social

20   media, if at all?

21         A.     Only if there are

22   interactions and discipline referral

23   form -- the discipline referral forms and

24   student statements.

25         Q.     I'm sure you'll be relieved

CONFIDENTIAL

Page 188

1    to know that we are going to put this

2    document to the side and move on.

3            A.    One down.

4            Q.    I'm now handing you tab

5    three, which we will mark as Exhibit 4.

6                    MR. INNES:  Andrew, is this

7            document a standalone or part of a

8            family?

9                    MR. KARP:  I believe this is a

10           publicly available document that we

11           accessed online.

12                   MR. INNES:  Okay.  I will

13           represent that number three, we did

14           some due diligence, is a member of

15           a family.

16                   MR. KARP:  Okay.

17                   MR. INNES:  Just for the

18           record.

19                       - - - - -

20           (School Performance Report

21           marked Bussacco Exhibit 4 for

22           identification.)

23                       - - - - -

24   BY MR. KARP:

25           Q.    Mr. Bussacco, I handed you a

CONFIDENTIAL

Page 189

1  document a moment ago.  Have you seen this
2  before?
3          A.      Yes, I have.
4          Q.      When did you see it?
5          A.      I want to say maybe a week
6  after it was published, I received it.
7  Sorry.  But we received it from the
8  assistant superintendent, Dr. Adegboyega.
9  And I said a week after, I meant a week
10  before it was published, the other way
11  around.
12          Q.      Got it.  What is this
13  document?
14          A.      This is how we, our district,
15  specifically, my school, did on the NJSLA,
16  which our kids are taking right now this
17  week.  So this was their performance on the
18  2024 NJSLA, so last year.
19          Q.      Okay.  Am I correct that IPS
20  submits school performance reports to the
21  New Jersey Department of Education?
22          A.      Yes, I'm sorry, I'm looking
23  at a document.  Yes, the answer is yes.
24          Q.      And if I at any point say
25  "New Jersey DOE," you understand I mean

Page 190

1    department of ed?

2            A.       Absolutely.

3            Q.       The New Jersey Department of

4    Education compiles annual school plans and

5    then creates reports for each of the

6    districts in New Jersey; is that your

7    understanding?

8                    MR. INNES:  Objection to form.

9                    THE WITNESS:  Repeat that.

10   BY MR. KARP:

11           Q.       My question was, does the New

12   Jersey Department of Education create

13   reports for each of the school districts

14   based on data or information that schools

15   supply to it?

16           A.       Yes, this information comes

17   from -- information from the school -- or

18   not from the school, from the district and

19   information from the state that they report

20   to us, like the bottom part, is how our

21   students compare to other students, that's

22   from the state.

23           Q.       Understood.  These school

24   performance reports -- or let me strike

25   that.

CONFIDENTIAL

Page 191

1           What we're looking at right
2   now is a school performance report,
3   correct?
4           A.      From last year, yup.
5           Q.      Yes.   This report and others
6   are available online, so they're publicly
7   available?
8           A.      Absolutely.
9           Q.      Okay.   Is it part of your job
10  to review these school performances reports
11  when they're released?
12          A.      Mainly the bottom portion,
13  how -- highlights reported by the district,
14  so how does the student growth compare to
15  other students and how do students perform
16  in assessment, that's my main priority.
17          Q.      Understood.   Let's look at
18  the top of this report.
19          A.      Yes.
20          Q.      What school year --
21          A.      This would be last year it
22  looks like, 23-24.
23          Q.      Okay.   So according to this
24  report that was put out by the New Jersey
25  Department of Education, University Middle

Page 192

1  School had 697 students in -- during the

2  2023 to 2024 school year?

3          A.      That's what the district

4  reported, yes.

5          Q.      You said earlier that the

6  numbers had gone up, the enrollment numbers

7  for University Middle School had gone up in

8  the last couple of years.  Does this

9  refresh your recollection that they

10  actually went down?

11          A.      So the issue with this report

12  is, if you remember what I said earlier in

13  the conversation, we have a transient -- a

14  transient, so when they ran the report,

15  that was the number at that time.

16  Yesterday, I had four registrations.  We

17  get registrations, consistently numbers go

18  up, people leave, so that is a best guess

19  number around that time.  I would say it

20  was closer to maybe 710, 715.  But that at

21  one point was an accurate number.

22          Q.      Okay.

23          A.      Probably, whatever day they

24  ran it.  And it also doesn't include

25  students -- it also includes sometimes

CONFIDENTIAL

Page 193

```
 1   students that transferred out gets wrapped
 2   up in our data from the NJDOE.
 3          Q.     Understood.  According to the
 4   NJ Department of Education 12.6 percent of
 5   students at University Middle School during
 6   the 2023-2024 academic year were students
 7   with disabilities, do you see that?
 8          A.     Yeah, I think we said
 9   something compatible earlier.
10          Q.     When we were discussing
11   other -- other school years, right?
12          A.     Yeah.
13          Q.     And the New Jersey Department
14   of Ed also reported that 26.7 percent of
15   students at University Middle School during
16   the 2023-2024 academic year were
17   multilingual learners, right?
18          A.     Yeah, were -- yeah, I think
19   the numbers are pretty accurate.
20          Q.     I was going to ask if there's
21   a difference between multilingual learners
22   and ELL, there isn't?
23          A.     There is no difference.
24          Q.     There's no difference.  Okay.
25   And here --
```

CONFIDENTIAL

Page 194

1          A.     I'm sorry, we now refer to
2    them as multi-language learners, that's
3    what we refer to them present day.
4          Q.     Got it.  Okay.  Thank you.
5          A.     You're welcome.
6          Q.     And the New Jersey Department
7    of Education reported that 74 percent of
8    students at University Middle School were
9    economically disadvantaged during the
10   2023-2024 school year.
11              Do you see that?
12         A.     I do.  Because I'm under the
13   impression somewhere in the 40 percent.
14         Q.     But according to the state --
15         A.     The state reported
16   74 percent --
17         Q.     -- that number is higher?
18              THE STENOGRAPHER:  Wait a
19          minute, the state what?
20              THE WITNESS:  The state
21          reported 74 percent.  Or we
22          reported it, I actually don't know
23          where this data came from, the top
24          part.  It either came from the
25          school or the state pulled it from

Page 195

1          a report.  That's out of my purview
2          how they get it.
3  BY MR. KARP:
4          Q.      I understand.  In any event,
5  the data --
6          A.      It's not --
7          Q.      -- that we're looking at has
8  been published by the department of
9  education in this school performance
10  report?
11          A.      Yup.  And it's accessible to
12  everybody, yup.  That is accurate.
13          Q.      Let's look at the middle of
14  the page and some of these metrics.
15          A.      Sure.
16          Q.      The first couple of charts
17  here or graphs show how students -- how
18  student growth at University Middle School
19  compares to other students, right?
20          A.      Correct.
21          Q.      And this -- these graphs show
22  that University Middle School was meeting
23  standards for English language arts as well
24  as -- excuse me, growth standards for
25  English language arts as well as for

CONFIDENTIAL

Page 196

1   mathematics?

2          A.     That's correct.

3          Q.     Okay.  Do you know for how

4   long or for how many years UMS students

5   have been meeting these growth standards?

6          A.     Based on my understanding,

7   prior to me getting there, not often.

8   Because they were in -- we're currently in

9   status with the state, which means that

10  they come and we do reports and we do the

11  end-of-school plan and we talk about it.

12  They have been in that for a while based on

13  five of the components of ESSER, every

14  student succeeds.

15         Q.     Let's look at the graphs just

16  below.  The question at the top is, "How

17  did students perform on assessments?"

18         A.     Yup.

19         Q.     20.8 percent of University

20  Middle School students were below the state

21  average in English and language arts; is

22  that right?

23         A.     No.  Say that again.

24         Q.     Sure.

25         A.     I think you said it

CONFIDENTIAL

Page 197

1  backwards, but --

2        Q.      I did say that backwards and

3  I apologize.  Thanks for catching that.  So

4  this -- if you look on the left of this

5  table, or this part of the document, it

6  states, "This section shows the percentage

7  of students who met or exceeded

8  expectations on statewide assessments,

9  (NJSLA and DLM)," right?

10        A.      Yes.

11        Q.      So to correct myself,

12  20.8 percent of UMS students met or

13  exceeded expectations in English language

14  arts, right?

15        A.      That is correct.

16        Q.      Okay.  That's only one in

17  five --

18        A.      One in five.

19        Q.      -- students approximately?

20        A.      That is correct.

21        Q.      And for mathematics, less

22  than 10 percent of University Middle School

23  students met or exceeded expectations; is

24  that right?

25        A.      That is correct.

CONFIDENTIAL

Page 198

1          Q.      You can put this document to
2    the side.
3                  Mr. Bussacco, we've spent a
4    lot of time talking about your time at
5    University Middle School, which is where
6    you are currently the principal.  I have a
7    few questions for you about your time at
8    Union Avenue Middle School.
9          A.      Okay.
10         Q.      Remind us what your role was
11    at Union Avenue Middle School.
12         A.      I was a teacher from 2008 to
13    July or August 2014.  Assistant principal
14    from 2014 to June 2018 or July, one of
15    those, yeah.
16         Q.      While you were assistant
17    principal of Union Avenue Middle School, do
18    you remember evaluating any of the
19    counselors who worked there?
20         A.      I know I did, but do I
21    remember them specifically, no.
22         Q.      I'm handing you tab four,
23    which we will mark as Exhibit 5.
24         A.      Ms. Ganthier.
25                 - - - - -

CONFIDENTIAL

Page 199

1          (Professional Assessment and

2          Development Evaluation Bates

3          BW__Irvington00300320 to 00300325

4          marked Bussacco Exhibit 5 for

5          identification.)

6                - - - - -

7    BY MR. KARP:

8          Q.    Do you need a minute to --

9          A.    Yeah, this is a long time

10   ago.

11         Q.    Let me know when you're

12   ready.

13         A.    No problem.  I've read the

14   narrative that I wrote, yeah.

15         Q.    Okay.  This document is dated

16   February 11, 2015.

17               Do you see that?

18         A.    Yeah.

19         Q.    And it's a professional

20   assessment and development evaluation for

21   guidance counselors and health and social

22   services coordinators.

23               Do you see that?

24         A.    Yes.

25         Q.    And am I right that health

```
                                        Page 200
 1   and social services coordinators is
 2   sometimes abbreviated as HSSC?
 3          A.     You are correct.
 4          Q.     Okay.  And the particular
 5   individual being evaluated in this instance
 6   was Marie --
 7          A.     Ganthier.
 8          Q.     -- Ganthier?
 9          A.     Uh-huh.
10          Q.     I never would have gotten
11   that on my own, so thank you.
12                 Do you remember -- well,
13   first of all, did you complete this
14   evaluation of Ms. Ganthier?
15          A.     It definitely looks like my
16   writing, so yes.
17          Q.     Let's --
18          A.     Do I remember?
19          Q.     Let's look at Section II,
20   which appears on the second page.
21          A.     Okay.  So the activity and/or
22   lesson observed?
23          Q.     Yes.
24          A.     Okay.
25          Q.     Throughout this evaluation,
```

Page 201

1    there are times stamps indicating when you
2    made certain observations; is that fair?
3         A.    Yes.
4         Q.    Okay.  So at 9:25, the
5    evaluation states, "HSSC explains to the
6    scholars that she is doing a revisit and is
7    going to continue to discuss peer pressure
8    with them."
9              Did I read that correctly?
10        A.    Yes, sir.
11        Q.    Okay.  Let's move onto the
12   next page which is Bates ending in 322.
13   And you can see at 9:38, Ms. Ganthier
14   starts to discuss social media with the
15   students.
16              Do you see that?
17        A.    Yes, sir.
18        Q.    Ms. Ganthier asks the
19   students to share what they believe social
20   media is and various students identify
21   Facebook, Twitter, SnapChat, Instagram, and
22   Kik.
23        A.    Uh-huh.
24        Q.    Is that right?
25        A.    That's correct.

CONFIDENTIAL

Page 202

1          Q.       Okay.  Are you familiar with

2    Twitter or X?

3          A.       I am familiar with X.

4          Q.       X used to be known as

5    Twitter, correct?

6          A.       Twitter, I do know that, yes.

7          Q.       Do you know if X or Twitter

8    is a Defendant in this lawsuit?

9          A.       I don't believe so.

10         Q.       Do you know why X or Twitter

11   is not a Defendant in this lawsuit?

12                  MR. INNES:  Objection to form.

13                  THE WITNESS:  I would not

14          know.

15   BY MR. KARP:

16         Q.       What about Kik, are you

17   familiar with Kik?

18         A.       I don't even know what Kik

19   is, but I wrote it.

20         Q.       Okay.  And to your knowledge,

21   Kik is not a Defendant in this lawsuit?

22         A.       No.

23         Q.       Okay.  Ms. Ganthier asked the

24   class to discuss the dangers of social

25   media and various students responded with

CONFIDENTIAL

Page 203

1    posting naked or nasty pictures, posting

2    slurs and curses, making fun of someone,

3    doing nasty stuff on SnapChat.

4              Do you see that?

5         A.    I do.

6         Q.    Okay.  You'd agree with me

7    that naked or nasty pictures, is that as

8    being used here refers to something that a

9    social media user chose to post on their

10   social media account?

11              MR. INNES:  Objection, form.

12              THE WITNESS:  I believe based

13         on the age group and I'm going way

14         back now, posting naked or nasty

15         pictures could simply be, if I'm

16         thinking of sixth graders, they

17         think men without their shirt on in

18         a bathing suit is a nasty picture.

19         But, yes, it's also safe to say

20         that pictures posted of nudity as

21         well.

22   BY MR. KARP:

23         Q.    Sure.  They're referring to

24   pictures or content that is being posted to

25   a social media account?

                                    Page 204

1        A.      Correct, yes.

2        Q.      Okay.  People can also share

3    naked or nasty pictures over text messages,

4    right?

5        A.      Uh-huh.

6                MR. INNES:  Objection to form.

7    BY MR. KARP:

8        Q.      They can share them over

9    using the AirDrop feature on their cell

10   phones; is that right?

11       A.      Yeah, not back then though.

12       Q.      Today, students --

13       A.      Yes.

14       Q.      -- could share naked or nasty

15   pictures using AirDrop?

16       A.      AirDrop, they could.

17       Q.      The document also refers to

18   posting slurs and curses, right?  You'd

19   agree that those are words or content that

20   is being posted to a social media account,

21   right?

22       A.      Words being posted, yup,

23   okay.

24       Q.      Someone could use these slurs

25   or curse words in person, right?

CONFIDENTIAL

Page 205

1          A.      Of course.

2          Q.      Right.  Someone could use

3    slurs or curse words over text messages?

4          A.      They could.

5          Q.      They could also use them over

6    other messaging platforms such as WhatsApp,

7    right?

8          A.      They could.

9          Q.      The document also refers to

10   making fun of someone.

11               Do you see that?

12         A.      I do.

13         Q.      Do you agree that that likely

14   refers to using hurtful words or images or

15   other content and posting that on a social

16   media account?

17               MR. INNES:  Objection.

18               THE WITNESS:  Do I believe

19         that means posting it, making fun

20         of someone, yes, based on the

21         original question she asked, yeah.

22   BY MR. KARP:

23         Q.      Right.  The question that she

24   asked was about the dangers of social

25   media, so when someone -- one of these

CONFIDENTIAL

Page 206

```
 1   students responded with making fun of
 2   someone, they could have been referring to
 3   the words or content that were being posted
 4   on social media, right?
 5          A.     Yeah, the words, content,
 6   yeah, okay.
 7          Q.     People make fun of each other
 8   in person as well, right?
 9          A.     They do, it's less these days
10   though.
11          Q.     People make fun of each other
12   over text message and other messaging
13   platforms?
14                 MR. INNES:  Objection.
15                 THE WITNESS:  People do.
16   BY MR. KARP:
17          Q.     Yeah.  The last item that's
18   listed here is doing nasty stuff.
19                 Do you see that?
20          A.     Yup.
21          Q.     You'd agree that this refers
22   to nasty, to use the student's words
23   content, that someone has posted to social
24   media, correct?
25          A.     Yes.
```

Page 207

1                    MR. INNES:  Objection.

2      BY MR. KARP:

3           Q.    Is it fair to say that when

4      asked about the dangers of social media,

5      these are the four dangers that these

6      students identified in response to

7      Ms. Ganthier?

8                    MR. INNES:  Objection.

9                    THE WITNESS:  Yes, in 2015.

10     BY MR. KARP:

11          Q.    Okay.  And these dangers

12     relate to what people are posting on their

13     social media accounts, right?

14                   MR. INNES:  Objection.

15                   THE WITNESS:  What do you mean

16          by that?  I'm confused now with the

17          question.

18     BY MR. KARP:

19          Q.    Understood.  These four

20     categories that we just ran through refer

21     to words and images and other content that

22     people are posting on their social media

23     accounts?

24          A.    You mean, like, posting the,

25     like, initial picture and the all the stuff

CONFIDENTIAL

Page 208

1    underneath it, like the comments and the

2    likes and all that stuff you're talking

3    about or you're just talking about the

4    picture picture?

5          Q.    I'm saying -- and I

6    appreciate the clarification -- I'm saying

7    these four categories refer to what is

8    being posted or shared or put on social

9    media by the user?

10         A.    Then yes.

11         Q.    Yes.  You can put this

12   document to the side.  I'm going to hand

13   you tab six -- I'm sorry, tab five, which

14   has been marked Exhibit 6.

15                      - - - - -

16               (Email String Bates

17               BW__Irvington00093416 to 00093444

18               marked Bussacco Exhibit 6 for

19               identification.)

20                      - - - - -

21   BY MR. KARP:

22         Q.    I'll admit this is a fairly

23   long document, I'm not asking you about

24   every page of it.  If at any point in time

25   you need a moment or opportunity to review

Page 209

1   something, please let me know.  Okay?

2          A.     All right.

3          Q.     Did you want to take some

4   time now?

5          A.     I do.

6          Q.     Yeah, take a minute.

7          A.     Thank you.  What is this?  I

8   remember this document now, okay.

9          Q.     Okay.  Mr. Bussacco, this is

10  an email that you sent to Eric James in May

11  of 2017; is that right?

12         A.     Yes.

13         Q.     The subject line of this

14  email is, "Forward:  Teacher evaluation"?

15         A.     Yes.

16         Q.     At this point in time in

17  2017, you were the assistant principal at

18  Union Avenue Middle School?

19         A.     Yup.

20         Q.     Okay.  And this is a teacher

21  evaluation Google Form that you filled out?

22         A.     Yes, with Ms. Bevin Subocz.

23         Q.     And who is that?

24         A.     She was the technology

25  director at the time.  She no longer works

CONFIDENTIAL

Page 210

1    in the district.

2            Q.      The teacher whom you were

3    evaluating was Hollie Mathias, Mathias?

4            A.      Yeah, Mathias.

5            Q.      Who is Ms. Mathias?

6            A.      She was a computer teacher in

7    the district.  She no longer works in the

8    district.

9            Q.      Okay.  If you turn to the

10   page with the Bates number ending in 422 in

11   the bottom right-hand corner, you'll see

12   that Ms. Mathias is described as being in

13   technology education.  Does that makes

14   sense?

15           A.      Yeah, computer, yup.

16           Q.      Yeah, exactly.  Okay.  To the

17   best of your recollection, was Ms. Mathias

18   an effective teacher?

19           A.      She received a three, it

20   looks like, as her overall score, right, am

21   I reading this correctly?  Give me a

22   second.  Yes, she received a 3.2, so she

23   was described as effective.

24           Q.      Let's look at the page with

25   the Bates number ending in 430.

CONFIDENTIAL

Page 211

1              A.      430?  Okay.
2              Q.      And here we see that Ms.
3      Mathias received a rating of distinguished
4      for the category establishing a culture of
5      learning?
6              A.      Uh-huh.
7              Q.      Is that right?
8              A.      "Teacher communicates passion
9      for the subject," that one, yes.
10             Q.      And to receive a rating of
11     distinguished, "The teacher communicates
12     passion for the subject.  The teacher
13     conveys the satisfaction that accompanies a
14     deep understanding of complex content," so
15     on and so forth, yes?
16             A.      Correct, yeah.
17             Q.      There is a comment here about
18     this particular rating.  Do you see that?
19             A.      Underneath it, yup, "the
20     teacher exhibits a passion."
21             Q.      Exactly.  And that comment
22     reads, "The teacher exhibits a passion for
23     teaching and learning and it is evident in
24     her dealings with the students.  Her room
25     is completely decorated using teacher

CONFIDENTIAL

Page 212

1  created posters and decorations.  One
2  example of Instagram work.  Student work in
3  up next to a poster that says Instagram for
4  each student."
5         A.     Yup.
6         Q.     "Every wall has some sort of
7  handmade poster or anchor charts to help
8  the students in class.  During the game,
9  the students were enjoying the lesson and
10  having fun with the review game."
11                Did I read that correctly?
12         A.     Yes, you did.
13         Q.     You observed that Ms. Mathias
14  established a culture for learning, right?
15         A.     Correct.
16         Q.     Do you recall writing this
17  comment specifically?
18         A.     I do.
19         Q.     One way that you observed Ms.
20  Mathias exhibit a passion for teaching and
21  learning was by putting student work up
22  next to a poster that says Instagram for
23  each student, right?
24         A.     Yeah, the Instagram work and
25  hashtags.

CONFIDENTIAL

Page 213

1          Q.     Okay.  Ms. Mathias was
2     engaging her students by showcasing work on
3     an Instagram poster; is that fair?
4                    MR. INNES:  Objection to form.
5                    THE WITNESS:  She was -- at
6                that time, the reason I remember,
7                Bevin Subocz was there and it was
8                important to mention she was there,
9                we were struggling with students'
10               inappropriate use of social media
11               and parts of the curriculum as the
12               director of technology, she tasked
13               staff with, in her department, of
14               changing the narrative of social
15               media platforms to post positive
16               images on the Instagram.  So
17               Instagram work, she writes in
18               quotes, is to put images that are
19               appropriate that we should
20               celebrate and these are the type of
21               images we should being using in
22               social media.
23     BY MR. KARP:
24          Q.     Okay.  So instead of running
25     away from social media, the point of this

CONFIDENTIAL

Page 214

1    lesson was to lean in and teach students

2    about using social media in a certain way?

3              A.    Yes, because --

4                    MR. INNES:  Objection.

5              Misstates prior testimony.

6                    THE WITNESS:  But it is part

7              of the state curriculum, of New

8              Jersey's curriculum to use

9              technology in an appropriate and

10             safe way.

11   BY MR. KARP:

12             Q.    Understood.  It was

13   intentional that Ms. Mathias was using

14   Instagram as part of her lesson, yes?

15             A.    At that point in time, that

16   was the major platform our students were

17   using in an inappropriate way.

18             Q.    So it's fair to say you

19   didn't leave this lesson and tell Ms.

20   Mathias to stop showcasing Instagram in the

21   classroom?

22             A.    Not the real -- showcasing

23   Instagram on how it could be used properly,

24   correct.  That was --

25             Q.    Sorry, I didn't mean to

Page 215

1    interrupt you.

2         A.    No, correct, if that's what

3    you're saying.  Because the whole message

4    was how to use social media platforms in an

5    effective way, because as I testified

6    earlier or stated earlier, we were having a

7    serious issue around this time around 2017

8    is when we were noticing a huge uptick in

9    social media problems in our school.

10        Q.    And I want to make sure that

11   I understood you correctly.

12        A.    Yes, sir.

13        Q.    Before, the issue you were

14   trying to address was the content that was

15   being posted on Instagram and trying to

16   encourage students to post positive content

17   instead of negative content; is that fair?

18        A.    Yup.

19             MR. INNES:  Objection.

20             THE WITNESS:  But also to,

21        instead of just the positive, not

22        just instead of, so let me rephrase

23        it.  I'm looking at the wall like

24        it was there yesterday, the

25        positive aspects of it, but also

Page 216

1          what comes underneath it, we should
2          be liking -- we should be liking
3          positive images.  We should not be
4          posting fights.  We should not be
5          talking about each other.  So it's
6          all how to refrain, how Instagram
7          should have been utilized rather
8          than what it became.
9    BY MR. KARP:
10         Q.    Understood.  You agree then
11   that at least at this point in time, Union
12   Avenue Middle School believed that social
13   media could be used safely and in a
14   positive way?
15                MR. INNES:  Objection.
16                THE WITNESS:  I would say we
17         believe that everything designed
18         has the ability to be used safely
19         if used correctly.
20   BY MR. KARP:
21         Q.    Okay.  We can put this
22   document to the side.  We have been going
23   for a little bit more than an hour, good to
24   take a five-minute break?
25                MR. INNES:  Sure.

CONFIDENTIAL

Page 217

1                    THE WITNESS:  I can use the

2              restroom, yes.

3                    THE VIDEOGRAPHER:  The time

4              right now is 2:48 p.m.  We are off

5              the record.

6                        - - - - -

7        (A recess was taken at this time.)

8                        - - - - -

9                    THE VIDEOGRAPHER:  The time

10             right now is 3:06 p.m.  We are back

11             on the record.

12   BY MR. KARP:

13        Q.    Mr. Bussacco, let's take a

14   look at the Irvington Public Schools

15   Student Code of Conduct.

16        A.     Okay.

17        Q.     This is tab eight and we will

18   mark this as Exhibit 7.

19                        - - - - -

20             (Student Code of Conduct

21             Bates  BW__Irvington00629349 to

22             00629430 marked Bussacco Exhibit

23             7 for identification.)

24                        - - - - -

25

CONFIDENTIAL

Page 218

1                    THE WITNESS:  Lengthy.
2     BY MR. KARP:
3          Q.     We will not be going through
4     every policy in this lengthy document and
5     I'll do my best to direct you to specific
6     portions of it.
7          A.     I appreciate that.
8          Q.     Of course.  Again, if at any
9     point, you need to review something, let me
10    know.
11                This is the Student Code of
12    Conduct for Irvington Public Schools for
13    the 2024-2025 academic year, do you agree?
14         A.     Yes.
15         Q.     Are you generally familiar
16    with this document?
17         A.     Familiar, yes.
18         Q.     Okay.  Did you help put it
19    together in any way?
20         A.     Not to my knowledge.
21         Q.     Okay.  Is it your
22    understanding that this code of conduct
23    applies to all schools in the district?
24         A.     Yeah, I look at it as the
25    district -- this is the federal, my policy

CONFIDENTIAL

Page 219

1    is the state, yeah.

2         Q.     Okay.  So University -- this

3    code of conduct that we've marked as

4    Exhibit 7 applies to University Middle

5    School?

6         A.     That, it does.

7         Q.     For the 2024-2025 calendar

8    year.

9         A.     Uh-huh.

10        Q.     Historically, is it your

11   understanding that the district-wide code

12   of conduct for students applies to

13   University Middle School?

14        A.     Does this district apply to

15   University, yes.

16        Q.     It would also apply to Union

17   Avenue Middle School; is that a fair?

18        A.     That is a fair assumption,

19   because it is a district policy, yeah.

20        Q.     Yes.  You said something a

21   moment ago I want to go back to.  Does

22   University Middle School have its own

23   student code of conduct?

24        A.     We have a handbook, not a

25   code of conduct, but a handbook that

Page 220

1    explicitly outlines areas pertaining to
2    University Middle School.
3           Q.    Okay.  And is it your
4    understanding that some of the policies in
5    the University Middle School handbook are
6    of a similar nature to the policies in the
7    district-wide student code of conduct?
8           A.    Yes.
9           Q.    Okay.  Let's look at page 28.
10   Are you there?
11          A.    Yeah, I'm reading it right
12   now.
13          Q.    Okay.  Again, you're welcome
14   to read this as much as you'd like, but
15   I'll let you know, I'm not going to get
16   into much detail about the document.
17          A.    Go ahead.
18          Q.    This section of the student
19   code of conduct sets out the district's
20   policies regarding the use of technology,
21   do you agree?
22          A.    Yes.
23          Q.    It says, "Use of Technology"
24   at the top?
25          A.    Uh-huh.  I see it.

CONFIDENTIAL

Page 221

1          Q.      Yeah.  And did you draft this
2     section of the district-wide policy?
3          A.      I did not.
4          Q.      Did you have any input in the
5     technology policy for the district?
6          A.      No.
7          Q.      Is it fair to say that
8     University Middle School abides by the
9     technology policies that we're looking at
10    now in the district-wide student code of
11    conduct?
12         A.      To the best of our ability.
13         Q.      To your knowledge, have these
14    technology policies changed at all since
15    you became principal of University Middle
16    School in 2022?
17         A.      I believe the --
18                 MR. INNES:  Objection to form.
19         Sorry.
20                 THE WITNESS:  -- from looking
21         at the document, I believe the
22         guidelines that changed, have been
23         updated, but the policy hasn't been
24         updated since 2012.
25

CONFIDENTIAL

Page 222

1  BY MR. KARP:

2       Q.     Okay.  And the guidelines are

3  the first section --

4       A.     Yes.

5       Q.     -- that we're looking at?

6       A.     Uh-huh.

7       Q.     Okay.  Sitting here today, do

8  you know what the differences or the

9  changes would be to the guidelines for the

10  use of technology in the district?

11       A.     Do I notice the differences

12  from looking at it?  I can't say I would

13  notice any updates.

14       Q.     And just to clarify my

15  question, I believe you said a minute ago

16  that your belief is that the guidelines for

17  the use of technology might have changed in

18  the last several years; is that right?

19       A.     Yeah, based on language in

20  here, social networking sites, but then

21  there's some old language in here like chat

22  rooms, so --

23       Q.     I see.

24       A.     So I was just looking at the

25  language that I saw.

CONFIDENTIAL

Page 223

1       Q.     Okay.  Which leads you to
2   believe that it might have changed over
3   time --
4       A.     There might have been some
5   updates since 2012.
6       Q.     Understood.  Thank you.  Does
7   the University Middle School handbook have
8   a separate set of technology policies that
9   apply to University Middle School
10  specifically?
11      A.     Explicit, I'm thinking, I'm
12  sorry, I wish I had it in front of me.  We
13  might list more current than -- that's all,
14  it might be more updated.
15      Q.     Sure.
16      A.     Not the policy, but what I
17  mean by updated, we might specifically talk
18  about specific social media platforms and
19  how do get help if you're -- you know,
20  stuff like that, that might be in there.
21      Q.     All right.  If I'm hearing
22  you correctly, the district has some
23  technology policies that are set out in the
24  district-wide student code of conduct,
25  separately University Middle School has a

CONFIDENTIAL

Page 224

1   handbook, and there may be certain policies
2   in there relating to the use of technology?
3           A.      Yeah, if I'm saying it
4   correctly, I'm trying to say, like, we
5   expand upon it, we go deeper into what this
6   means.
7           Q.      So it's --
8           A.      Same policy, it's just,
9   what's the word, macro instead of micro.
10          Q.      Okay.
11          A.      There you go.  Or the other
12  way.
13          Q.      In a way, is the
14  district-wide policy the floor and you are
15  building upon that?
16          A.      Yes, there you go, I like
17  that better.
18          Q.      I have my moments.
19          A.      You do.  I like that.
20          Q.      Let's look at page 32.
21          A.      Okay.
22          Q.      And this page says,
23  "Prohibited items" at the top.
24                  Do you see that?
25          A.      Uh-huh.

CONFIDENTIAL

Page 225

1          Q.     This is the district's policy
2    on prohibited items, yes?
3          A.     Yeah.
4          Q.     Okay.  Did you draft this
5    section of the district-wide policy?
6          A.     I did not.
7          Q.     Did you have any input in
8    this section?
9          A.     No.
10          Q.     Does University Middle School
11    abide by the prohibited items policy that
12    has been set by the district?
13          A.     We have removed some and
14    added some.
15          Q.     Can you explain that?
16          A.     Sure.  Bringing cigarettes
17    and other tobacco products, tobacco
18    products would be vapes.  We don't have
19    iPods anymore, so I'm looking at certain
20    words, MP3 players, so we, basically, we
21    talk more about vapes instead of tobacco
22    products.  We talk about cell phones and
23    headphones and stuff like that.  So that's
24    what I meant, I can give you an analogy
25    with the floor up, take this and make it

CONFIDENTIAL

Page 226

1    more relevant to my current population.

2          Q.    Okay.

3          A.    Because it looks like, and

4    I'm just looking at, this policy was last

5    updated on the page, 1/2012.

6          Q.    So if I'm hearing you

7    correctly, the University Middle School

8    handbook has certain policies relating to

9    prohibited items that build upon or add to

10   what's described here in the district-wide

11   policy?

12         A.    That is fair, yes.  Uh-huh.

13         Q.    Let's look at pages 51 to 52.

14   And these pages refer to the Irvington

15   Board of Education student personal

16   electronic reporting device policy?

17         A.    Uh-huh.

18         Q.    This is the district's policy

19   regarding student personal electronic

20   recording devices, correct?

21         A.    Yeah.

22         Q.    Did you draft this section?

23         A.    I did not.

24         Q.    Did you have any input in

25   this section?

CONFIDENTIAL

Page 227

1          A.      I did not.

2          Q.      Did you have any involvement

3     in putting it together?

4          A.      I did not.

5          Q.      Okay.  Does University Middle

6     School abide by this policy?

7          A.      Let me read it really

8     quickly.

9                    MR. INNES:  While Mr. Bussacco

10             is reviewing that, I would just say

11             that a lot of lines of questioning

12             today, including this one, seem to

13             have been way more efficient to

14             have been done by written response,

15             right?  It doesn't seem like it's

16             necessary to bring all these people

17             together just to ask if the

18             documents it says what it says and

19             if the school abides by what that

20             document says.

21                    THE WITNESS:  So I've read the

22             document and your question again

23             was, I'm sorry?

24     BY MR. KARP:

25          Q.      Does University Middle School

CONFIDENTIAL

Page 228

1  abide by the policy that's set out here?

2          A.      For the most part.

3          Q.      What doesn't it -- what

4  doesn't University Middle School abide by

5  that is described in the district-wide

6  policy?

7          A.      So this one says, if you go

8  to student's rights and responsibilities,

9  number three, we do require students keep

10  their cell phones out of sight.  We ask

11  them to power it off during the school day.

12  And -- but not always school-sponsored

13  activities.  Because if I'm reading this

14  correctly, it says it can't be used during

15  school-sponsored activities.

16          Q.      So University Middle School

17  students in some instances may be permitted

18  to use their personal electronic recording

19  devices during school-sponsored activities;

20  is that right?

21          A.      Yeah, not school-sponsored

22  activities during the school day, but

23  off-campus games.

24          Q.      Sure.

25          A.      Yeah.  Things I can't

CONFIDENTIAL

Page 229

1    regulate.

2          Q.      Understood.   Like --

3          A.      I just wanted to make that

4    clear.

5          Q.      -- if the soccer team were

6    traveling and had a night game or

7    something, they could --

8          A.      They would have their phone

9    on the bus.  They would probably have their

10   phone at the game --

11         Q.      Understood.

12         A.      -- because it can't be

13   regulated for the most part.  But that's

14   it, everything else looks similar.  And

15   then there's a second -- do you want me to

16   look at the second page too of it?

17         Q.      My questions were referring

18   to the entire policy, so I would include --

19         A.      I didn't see the second page,

20   I apologize.

21         Q.      Just let me know if your

22   answer is any different.

23         A.      So district staff rights and

24   responsibilities, number two, "District

25   staff may confiscate personal electronic

CONFIDENTIAL

Page 230

1  device when such devices are being used in
2  violation --"
3                    THE STENOGRAPHER:  District --
4                    THE WITNESS:  I'm sorry,
5             district staff rights and
6             responsibilities, number two,
7             "District staff may confiscate
8             personal electronic devices when
9             such devices are being used in
10            violation."  District staff does
11            not include teachers at University
12            Middle School, that would include
13            administration and deans that can
14            confiscate it.
15  BY MR. KARP:
16        Q.    Understood.  So teachers at
17  University Middle School are not permitted
18  or authorized to confiscate these personal
19  electronic recording devices?
20        A.    No, they would report it and
21  someone would come, not immediately, but
22  very quickly, to handle that situation
23  because we don't want an escalation
24  happening between the child [sic] and the
25  student over the phone.

CONFIDENTIAL

Page 231

1          Q.      Understood.  Does University
2     Middle School -- or strike that.
3                  Does the University Middle
4     School handbook include additional policies
5     regarding student personnel electronic
6     recording devices?
7          A.      I believe we go specific on
8     consequences.  I think there's consequences
9     like first time, second time, third time.
10    Off the top of my head, I couldn't tell
11    you.
12         Q.      Sure.  So it may get into
13    certain disciplinary action --
14         A.      Yup.
15         Q.      -- for violations of the
16    policies?
17         A.      Correct, yup.
18         Q.      Right.  And that's not here
19    in the district-wide policy?
20         A.      No.
21         Q.      Okay.  You can put this to
22    the side.
23         A.      Okay.
24         Q.      I'm handing you tab 6A1.
25         A.      Thank you.

CONFIDENTIAL

Page 232

1          Q.      Which we will mark as
2    Exhibit 8.
3                        - - - - -
4                    (Email dated 8/31/22 Bates
5               BW__Irvington00101544 marked
6               Bussacco Exhibit 8 for
7               identification.)
8                        - - - - -
9    BY MR. KARP:
10         Q.      This is an email from Gail
11   Rosen to you dated August 31, 2022.
12                    Do you see that?
13         A.      Yup.
14         Q.      And Ms. Rosen says, "Hello,
15   I've attached four documents to give to
16   parent and add to the parent information
17   sheet.  Please review for changes."
18                    Do you see that?
19         A.      Yes, I do.
20         Q.      Okay.  Who is Gail Rosen?
21         A.      She was my secretary.
22         Q.      One of the attachments to
23   this email is called, "uniform cell phone
24   letter."
25                    Do you see that?

CONFIDENTIAL

Page 233

1          A.      Yeah.

2          Q.      I'm going to hand you tab

3    6A2, which I'll represent to you is the

4    uniform cell phone letter that was attached

5    to that email.

6          A.      Okay.

7          Q.      And we'll mark this as

8    Exhibit 9.

9                     - - - - -

10               (Uniform Cell Phone Letter

11            dated 1/17/20 Bates

12            BW__Irvington00101546 marked

13            Bussacco Exhibit 9 for

14            identification.)

15                     - - - - -

16             MR. INNES:  You're going to

17            break up an email family into

18            separate exhibits?

19             MR. KARP:  I don't have

20            questions about the other

21            attachments and these are documents

22            that you produced.  You're

23            certainly welcome to look at them

24            or explore them with your

25            witness at another time.

CONFIDENTIAL

Page 234

1           MR. INNES:  No, I just think
2      for the record, make sure that this
3      document is the parent of this
4      document.  Do we know that?
5           MR. KARP:  We do, and I'm
6      happy to provide you with the
7      metadata, if you would like.
8           THE WITNESS:  So you're saying
9      this document is the attachment
10      that Ms. Rosen put -- called
11      uniform cell phone letter?
12           MR. KARP:  Correct.
13           THE WITNESS:  Okay.
14           MR. INNES:  So just for the
15      record, Exhibit 9 is the attachment
16      to Exhibit 8, one of four
17      attachments to Exhibit 8?
18           MR. KARP:  There are multiple
19      attachments to Exhibit 8 --
20           MR. INNES:  Yeah.
21           MR. KARP:  -- Exhibit 9 is one
22      of those attachments.
23           MR. INNES:  Is one of those.
24           MR. KARP:  Yes.
25           Some of the other

CONFIDENTIAL

Page 235

1           attachments are school spirit
2           shirt order forms, I didn't think
3           you wanted to spend time --
4                MR. INNES:  It's certainly up
5           to you how you want to spend time,
6           I've never seen it done where we
7           break up a large family of
8           documents into multiple exhibits.
9           It's as we get down the road years
10          from now, this is going to get --
11          this could be potentially
12          confusing, but it's your record.
13                MR. KARP:  I'm trying to make
14          as clear of a record as I can, I
15          know you disagree with --
16                MR. INNES:  On this point, I
17          do.
18  BY MR. KARP:
19          Q.    Okay.  So taking a look at
20  Exhibit 9, this letter is dated January 17,
21  2020.
22                Do you see that?
23          A.    I do.
24          Q.    That's before you were a
25  principal of University Middle School?

CONFIDENTIAL

Page 236

1        A.      Correct.

2        Q.      Was this a letter that was

3    sent around in 2020 that you then reviewed

4    for possible use at this point in time in

5    2022?

6        A.      So if I'm remembering

7    correctly, Gail Rosen was my secretary when

8    I was at University Middle School, I

9    believe she was there prior to me going

10   there, that's why she has access to this

11   letter.  She -- I had a -- I'm trying -- I

12   had a parent, based on here, I had a parent

13   open house meeting coming up right before

14   school started and I think she was giving

15   me ideas.  Maybe this, yeah, for over the

16   weekend, Thursday, Friday to prepare for

17   it, because I think it was a Saturday, I

18   think the event was, I don't remember

19   exactly, but I had an event, a carnival and

20   everything, meet the principal, all that

21   nice, cute stuff.  So I think she was

22   giving me ideas of what she previously had

23   in her files as the secretary, because she

24   wanted to be my -- what's the word I'm

25   looking for -- the principal secretary.  I

CONFIDENTIAL

Page 237

1   have three secretaries and she wanted to be
2   the principal secretary and she was vying
3   for that role at that time.
4                MR. INNES:  Before you ask
5            your next questions, let me state
6            on the record again, and the reason
7            why we ask for full families is I
8            think it just played out, right,
9            you want to ask questions about
10           this and the witness is jogging his
11           recollection by looking at the
12           attachment name, right, so I think
13           in all fairness, we should be using
14           the full family as the exhibit so
15           that the entire -- every document
16           in the family is contextualized.  I
17           think that, honestly, would get you
18           a better, more complete record from
19           my perspective.
20                MR. KARP:  I understand your
21           position and I just want to ask
22           questions about this specific
23           letter.
24                This letter is on letterhead
25           that lists you as or identifies

CONFIDENTIAL

Page 238

1          you as the principal, correct?
2               THE WITNESS:  Yes, going back
3          to my statement earlier, Ms. Rosen
4          took it upon herself to modify some
5          documents to get her -- to prepare
6          for the year, she was vying for a
7          position at that time, yeah.
8    BY MR. KARP:
9          Q.    Do you recall whether this
10   letter actually went out to parents while
11   you were principal in 2022?
12         A.    I do not believe I put this
13   letter out.
14         Q.    Okay.  Do you know one way or
15   another whether this letter was sent to
16   parents previously on January 17 of 2020?
17         A.    I can only assume, I wasn't
18   in the district.  I can assume since she
19   had access to it that Principal Tucker
20   wrote this letter and gave it out.
21         Q.    I understand that this
22   predates your time as principal.  Exhibit 9
23   states that cell phone policies are
24   integral -- or an integral part of our
25   school climate and culture.

CONFIDENTIAL

Page 239

1                   Do you see that?
2                   MR. SEXTON:  What part of the
3             exhibit are you referring to, what
4             exhibit number?
5                   THE WITNESS:  This one.
6                   MR. INNES:  No, he's right,
7             Exhibit 8 is the cover email to
8             Exhibit 9.
9                   MR. SEXTON:  Sorry, sorry.
10                  MR. INNES:  I think my
11            statement just played out on the
12            record.
13    BY MR. KARP:
14        Q.    Looking specifically at
15    Exhibit 9, which is the letter dated
16    January 17, 2020, it states that cell phone
17    policies are an integral part of University
18    Middle School's climate and culture?
19                  Do you see that?
20        A.    I do see that statement.
21        Q.    Okay.  And if you look down
22    to the sentence below it says, "The major
23    infractions and issues include," and then
24    there's a list of four infractions and
25    issues.

                                                      Page 240

1                      Do you see that?

2          A.     I do.

3          Q.     The first is lost or stolen

4    phones, right?

5                      MR. INNES:  Objection.

6                      MR. KARP:  You may answer.

7                      THE WITNESS:  Oh, yes, I do

8              see that.

9    BY MR. KARP:

10         Q.     Yes.  The second item listed

11   here is "Inappropriate pictures and

12   videotaping (nudity, fights and dancing)."

13                     Do you see that?

14         A.     Yes, I do.

15         Q.     Okay.  Is it your

16   understanding that nudity, fights and

17   dancing refer to content or images or

18   videos that would be shared using cell

19   phones?

20                     MR. INNES:  Objection.  Before

21              he answers, let me put this on the

22              record.  So I think you've already

23              established that this predates his

24              time in the district.  You

25              established that he hasn't drafted

CONFIDENTIAL

Page 241

1      this email.  And now you're asking

2      about what this email means or

3      letter means; is that correct?

4           MR. KARP:  If he doesn't

5      understand or if he doesn't know

6      the answer to the question, he's

7      more than welcome to say, I don't

8      know, this predates my time.  I'm

9      asking if he knows.  And he's

10     well --

11          MR. INNES:  Do you have a

12     good-faith basis to ask him if he

13     understands what's in the letter

14     that admittedly predates his time?

15          MR. KARP:  He received this

16     letter, very clearly, we can see

17     that with the email he received

18     from Gail Rosen.  And I'm asking

19     him if he has an understanding.  If

20     he doesn't, he can say so.

21          MR. INNES:  Okay.

22          MR. KARP:  Your objection is

23     noted.  Mr. Bussacco, do you want

24     me to repeat the question?

25          THE WITNESS:  What was your

CONFIDENTIAL

Page 242

1          question?  Yes, please.
2    BY MR. KARP:
3          Q.      My question is, is it your
4    understanding that inappropriate pictures
5    and vaping as it's used here is referring
6    to nudity, fights, and dancing that were
7    being shared on cell phones?
8          A.      I can't speculate.
9          Q.      Okay.  What about texting
10   during class, do you have an understanding
11   of what that's referring to?
12         A.      I know what texting is, but I
13   don't know what was happening at that
14   school at this time.
15         Q.      Okay.  Likewise, you don't
16   know what's referred -- what is meant here
17   by inappropriate social media use?
18         A.      Not specifically, no.
19         Q.      We can move on from this
20   document.  Let's take a look at tab ten
21   and, finally, the numbers line up, we will
22   mark this as Exhibit 10.
23                     - - - - -
24               (Professional Assessment and
25         Development Evaluation for School

Page 243

```
 1              Administrators Bates
 2              BW__Irvington00332758 to 00332766
 3              marked Bussacco Exhibit 10 for
 4              identification.)
 5                     - - - - -
 6    BY MR. KARP:
 7         Q.     Do you need a minute to
 8    review this?
 9         A.     No, I understand the
10    document.  I don't know the specifics at
11    the moment, but as I look through it.
12         Q.     Sure.  Okay.  This document
13    is dated May 19, 2023.  Do you see that as
14    the evaluation date?
15         A.     Yes.
16         Q.     Okay.  This is a professional
17    assessment and development evaluation for
18    school administrators?
19         A.     Uh-huh.
20         Q.     As part of your role as
21    principal of University Middle School, do
22    you conduct evaluations of other
23    administrators?
24         A.     Administrators that work for
25    me, yes.
```

Page 244

1        Q.      Yes.  And that's based on
2   your observations of those administrators?
3        A.      Yup.
4        Q.      The administrator who appears
5   to be reviewed or evaluated here is Ms.
6   Sharrock?
7        A.      Ms. Sharrock.
8        Q.      Sharrock, thank you.  Who is
9   Ms. Sharrock?
10       A.      She is -- was my assistant
11  principal for that year.  She is now the
12  assistant principal at the Rita Owens STEAM
13  High School.
14       Q.      And for the record, that's
15  not part of Irvington?
16       A.      No, it is part of Irvington.
17  The Rita Owens STEAM, yes, that's a
18  satellite of Irvington High School.
19       Q.      Understood, okay.  And is
20  this the form that you filled out as part
21  of evaluating Ms. Sharrock?
22       A.      So page 1, 2, and up to
23  number 14, that's her opinions.  This is
24  her reflection.  These are her answers.
25       Q.      Yes.

Page 245

1          A.      Where the domains, that's my
2  writing there.  And then on the last page,
3  pages 8 and 9 are her opinions.
4          Q.      Okay.  So this document
5  contains a mix of statements that
6  Ms. Sharrock has made and statements that
7  you've made?
8          A.      Correct.  So the first part,
9  if I'm making more sense, you see where it
10  says a pre-conference date on May 15?
11          Q.      Uh-huh.
12          A.      Pre-conference were her
13  responses to numbers one to 14.
14          Q.      Understood.
15          A.      I don't know when the
16  post-conference happened, I'm assuming it
17  happened after the 19th, makes sense, post,
18  and that's when she provided me, after she
19  saw my whole narrative I wrote, where she
20  provided her feedback, her opinions, her
21  post-observation on pages 8 and 9.
22          Q.      And the time frame at issue
23  for this evaluation or the time period for
24  which Ms. Sharrock was being evaluated is
25  indicated as July 1, 2022, through May 15,

CONFIDENTIAL

Page 246

1    2023; is that right?

2           A.     Yeah.

3           Q.     Let's go to the bottom of the

4    third page.

5           A.     Okay.

6           Q.     Do you see the section called

7    "Comments"?

8           A.     Yes.

9           Q.     The comment at the bottom of

10   this page reads, "Ms. Sharrock demonstrates

11   a commendable commitment to ensuring a

12   data-driven focus on student achievement.

13   Her efforts are evident in the school's

14   culture, where data is valued and utilized

15   to inform decision-making.  She

16   collaborates with teachers and staff,

17   encouraging them to analyze data, set

18   goals, and implement evidence-based

19   practices.  Ms. Sharrock provides timely

20   feedback and support to educators,

21   empowering them to use data effectively in

22   tailoring instruction and interventions to

23   meet student needs."

24                 Did I read that correctly?

25          A.     Yes, you did.

CONFIDENTIAL

Page 247

1          Q.     Is that -- did you write that
2    comment?
3          A.     I did.
4          Q.     Okay.  And do you believe all
5    of that to be true?
6          A.     I do.
7          Q.     Ms. Sharrock, as you
8    observed, makes evidence-based decisions?
9          A.     On academics, yeah.  This is
10   strictly regarding academics.
11         Q.     And Ms. Sharrock is a
12   commendable administrator in your view?
13         A.     In my view, yes.
14         Q.     Let's go back to the first
15   page.
16         A.     Okay.
17         Q.     We've discussed this a little
18   bit already, but the first page includes
19   information from the pre -- from the
20   pre-conference; is that right?
21         A.     That's correct.
22         Q.     Okay.  And you can even see
23   at the just under the table it says, "to be
24   completed by the administrator"?
25         A.     Yeah.

Page 248

1          Q.      "-- for the pre-observation
2    conference," right?
3          A.      Uh-huh.
4          Q.      So these are statements that
5    Ms. Sharrock made?
6          A.      Correct.
7          Q.      Yes.  I didn't mean to answer
8    for you.
9          A.      No, I appreciate it.
10         Q.      Question one asks, "What data
11   sources did you consider to develop your
12   student achievement goals?"
13                 Do you see that?
14         A.      I do.
15         Q.      And Ms. Sharrock wrote, "The
16   data sources I have used to develop my
17   student achievement goals are the
18   attendance data and the daily discipline
19   data."  And she lists OSS, ISS, HFP, and
20   BMR?
21         A.      Yes.
22         Q.      OSS is out-of-school
23   suspension?
24         A.      Yes, sir.
25         Q.      ISS is in-school suspension?

CONFIDENTIAL

Page 249

1         A.      Yup.

2         Q.      Okay.  This is where I --

3         A.      HFP is home for parent.

4         Q.      Okay.

5         A.      And BMR, behavior

6    modification.

7         Q.      And what do those two

8    acronyms --

9         A.      Home for parents basically

10   means I need -- I've exhausted many, you

11   know -- HFP, it means that as

12   administrators and deans, we've

13   exhausted -- and teachers, we've exhausted

14   many different outlets, what I mean by

15   exhausted is we've tried pulling the

16   student aside privately, talking to them,

17   contacting parents, so now we get to the

18   point where I need your parent to come into

19   school and meet with the administrator.  So

20   that's what HFP is, like, we don't want you

21   to suspend you, but we have got to figure

22   something out, because that's the path

23   you're going and we want to fix that.  So I

24   do more HFPs than I do the other two.

25                And BMR is synonymous with

Page 250

1    in-school suspension, I just don't like the
2    word, "ISS," but that's the word the state
3    uses, so behavior modification, because
4    in-school suspension, in my day what that
5    meant is I would sit there and I would just
6    be bored out of my mind and my punishment
7    BMR where I establish I'm going there is
8    where students reflect on their behavior,
9    they check in with the school counselor,
10   HSSC, or a dean, admin as well, but those
11   are the main ones, the school counselors,
12   HSSC, and the deans to reflect on their
13   behavior.  So they have to write, you know,
14   why do they believe they're here, what
15   could they have done differently, and then
16   they get to meet with someone and then we
17   make the determination next steps how to
18   get them out of that room as fast as
19   possible, because they are losing
20   instruction and the goal is to get them in
21   the classroom, but they do need, like, a
22   timeout.
23         Q.     Understood.  Thank you for
24   that explanation.  In response to question
25   two, Ms. Sharrock wrote, "The root cause of

CONFIDENTIAL

Page 251

1    my student achievement goals is poor
2    attendance, language barriers, economic
3    factors, and the structure of parental
4    involvement."
5                    Do you see that?
6            A.    I do.
7            Q.    Do you have any basis to
8    disagree with Ms. Sharrock's statement?
9            A.    "The root cause of my student
10   achievement goals is poor attendance,
11   language barriers, economic factors, and
12   the structure of parental --" those are
13   some of them, yup.
14           Q.    Are these still root causes
15   of more academic achievement at University
16   Middle School?
17                    MR. INNES:  Objection.
18                    THE WITNESS:  Poor attendance
19             or school avoidance is what we call
20             it today.  Language barriers, not
21             so much.  We've created many goals
22             and opportunities to support our
23             growing population, so no.
24                    Economic factors, possibly.
25                    And the structure of

Page 252

```
 1              parental involvement, that has

 2              changed drastically for the

 3              positive.  And it goes with the

 4              nature of middle school, once

 5              your child leaves, you know,

 6              elementary, parents get less

 7              involved all the way to high

 8              school.

 9    BY MR. KARP:

10         Q.     Ms. Sharrock goes on to say,

11    "We have a chronic absenteeism rate due to

12    many factors, such as students staying home

13    to babysit or parents unaware that their

14    child is home because they have to work."

15                 Did I read that correctly?

16         A.     You did read her statement

17    correctly.

18         Q.     Do you have any basis to

19    disagree with Ms. Sharrock's statement?

20         A.     I do.  I do.  That is not the

21    majority of our chronic absenteeism.  We do

22    experience students having to stay home, as

23    I mentioned way -- many hours ago, I was a

24    chronically absent student and

25    unfortunately it became, does mom go to
```

Page 253

1    work or do I stay home from school and
2    watch my brother.  So these are realities
3    in the world we live in, but I would not
4    say this is even remotely to the chronic
5    absenteeism problem that we experience
6    today.  So I disagree with that statement
7    and that is why I mentioned a little bit
8    earlier, these are her opinions.
9           Q.     Sure.  And Ms. Sharrock, as
10   you mentioned, continues to work for
11   Irvington Public Schools?
12          A.     Absolutely.
13          Q.     After this year, she was
14   promoted from assistant principal to did
15   you say principal?
16          A.     No, she's still assistant
17   principal --
18          Q.     Assistant principal at a --
19          A.     -- at a different high
20   school.
21          Q.     -- high school?  Okay.
22          A.     Uh-huh.
23          Q.     Got it.
24          A.     She left me after this year.
25          Q.     Ms. Sharrock continues to

CONFIDENTIAL

Page 254

1  say, "We have a large ELL population whose
2  parents often shy away from school
3  involvement.  We also have a developing
4  PTA, where we struggle with increasing
5  parent attendance and investment."
6          A.     At that time, that was a
7  factual statement.  Today, not so much.
8          Q.     Okay.  So with respect to the
9  2022 to 2023 school year, that was a true
10  statement -- in your view?
11          A.     We have a large -- we do have
12  a large ELL population, correct, we still
13  do.  Parents shy away from school
14  involvement, I would say more not shy away,
15  but more of those language barriers and not
16  understanding what we were doing in the
17  school, which I mentioned a little bit
18  earlier, we've put systems in place to
19  correct that and we were developing PTA
20  prior to me, the PTA wasn't really there,
21  and now we have a fully functioning PTA.
22          Q.     At the time though, there
23  was, you agree that the --
24          A.     Fairly accurate, yeah, the
25  PTA, that statement was correct, we were

CONFIDENTIAL

Page 255

1   developing a PTA where we struggled with
2   increasing parent attendance at those
3   events, yup.
4          Q.     And if I understood you
5   correctly, the language barrier made it
6   challenging to engage with the parents of
7   ELA students?
8          A.     Yes, I would say it wasn't
9   that they shied away from school
10  involvement, they were just not
11  knowledgeable, that's not a fair word, but
12  they were unfamiliar with how to engage
13  with school.
14         Q.     And would that have had a
15  negative effect on those ELL students whose
16  parents weren't participating?
17         A.     It could have if
18  interventions weren't put in place to
19  correct that.
20         Q.     Ms. Sharrock concluded her
21  response by saying, "All of these factors
22  lead to poor academic achievement," do you
23  agree?
24         A.     When you -- let me see, when
25  children don't come to school, I stated

CONFIDENTIAL

Page 256

1    earlier, chronic absenteeism, yup, I agree

2    with that one.  Students staying home.

3    Parents not being involved, you could argue

4    that it could or not, depending on the

5    student, but if they need to get into

6    contact with the school and they don't know

7    how to, so I can see where she was going

8    with that.

9              I don't see a correlation

10   between the PTA and academic achievement.

11   But -- let me retract that, no, I can't.  I

12   see a correlation, but not a direct

13   correlation between poor academic

14   achievement and having a PTA.  Having a PTA

15   is very effective, because you get more

16   parents' word of mouth to talk about the

17   positives, not always the negatives of the

18   school.  So, you know, when a school is

19   looked at as a better place, people want to

20   be there.  So having a stronger PTA that

21   supports them back to school changes the

22   narrative that people don't get to see

23   about our school.

24        Q.      I understand.  Do the words,

25   "social media" appear anywhere in

Page 257

1    Ms. Sharrock's response where she was asked
2    to identify the root causes of the student
3    achievement issues?
4           A.     She did not write that.
5           Q.     Why don't we turn to page 9.
6           A.     Okay.
7           Q.     And the prompt for -- excuse
8    me, prompt number five says, "Describe the
9    most critical need in your building."
10          A.     Uh-huh.
11          Q.     Do you see that?
12                 This is also a section of
13   the assessment that Ms. Sharrock filled
14   out?
15          A.     Yes.  This is Ms. Sharrock's
16   statement.
17          Q.     And in response to this
18   prompt, Ms. Sharrock wrote, "the most
19   critical need at University Middle School
20   is professionalism."
21          A.     Yup.
22          Q.     "There is a huge potential
23   gap at University Middle School.  There is
24   an immense amount of talent that is
25   available and in the staff pool.  However,

CONFIDENTIAL

Page 258

1    there is a culture of chronic complaining

2    and commiseration.  If the staff were able

3    to see their potential and invest in

4    solutions there would be less strife

5    between staff and students, which leads to

6    BMR assignments, HFP or suspensions.  These

7    disciplinary measures take away valuable

8    time from learning.  Further, there is a

9    casualness overlaying the behavior of a

10   significant amount of the support staff.

11   The school would benefit from more

12   professional exemplars for the students."

13                  Did I read that correctly?

14        A.    You read her statement

15   correctly.

16        Q.    Okay.  Your assistant

17   principal concluded and wrote here that the

18   most critical need at University Middle

19   School was professionalism among the staff?

20        A.    That is what she wrote.

21        Q.    She identified a culture of

22   chronic complaining and commiseration?

23        A.    She did, but I disagree with

24   the whole statement.

25        Q.    She also stated that there

CONFIDENTIAL

Page 259

1    was strife between staff and students and

2    that that resulted in BMR assignments, HFP,

3    or suspensions, right?

4            A.      She did claim that, yes.

5            Q.      Ms. Sharrock believed, as she

6    wrote here, that the school would benefit

7    from more professional exemplars from

8    students, right?

9            A.      Yes, she did write that

10   statement.

11           Q.      Nowhere in this response when

12   Ms. Sharrock was asked to describe the most

13   critical need in the building did she

14   identify anything relating to technology,

15   do you agree?

16           A.      Specifically, no, but in the

17   sentence of less strife between staff and

18   students, based on my recollection of my

19   conversation, that is part of her argument

20   is was there was a huge change in culture

21   that year where I became principal and

22   staff members joined the school and you had

23   teachers who wanted zero tolerance for

24   certain things and you had people who

25   understood how to work with students and I

CONFIDENTIAL

Page 260

1   was changing its culture.  And there's a
2   lot of movement that happened after this
3   year, including Ms. Sharrock, who did not
4   fit in the culture of this school, but the
5   strife is talking about how staff members,
6   there was a large percentage of staff
7   members at the time who believed in zero
8   tolerance, rather than educating students
9   on the misuse of technology, fooling around
10  in class, not being prepared, and I had to
11  shift an entire culture, which we've
12  successfully done this year.  We're moving
13  in the right direction, as evidenced in our
14  growth in our new state report that just
15  came out a couple of weeks ago, but that is
16  what she is referring to and she was
17  subsequently transferred that year.
18          Q.      But, to be clear, based on
19  the evaluation or the assessment that we're
20  reviewing, you gave her a very positive
21  assessment?
22          A.      Oh, absolutely, she was a
23  phenomenal administrator in the concepts of
24  doing her job.  Content based, probably one
25  of the strongest ELA people I've met in my

CONFIDENTIAL

Page 261

1    entire career.  She had an ELA background.

2    She knew how to -- she knew what good

3    instruction looked like.  She was a veteran

4    educator.  I relied on her for certain

5    areas, but she's not the person I relied on

6    for chronic -- not chronic -- for climate

7    and culture.  I had two other assistant

8    principals.  They were my main focus.  She

9    was more of an academic, but since I serve

10   as academic and climate and culture, I had

11   to, unfortunately, lose an AP and because I

12   could do similar things as her, I moved

13   her, but academic-wise, she's phenomenal.

14   She's probably one of the strongest in this

15   district today academic-wise.

16           Q.     And you commended her for

17   making data-driven decisions?

18           A.     Academic data decisions.  She

19   was mainly responsible for walk-throughs

20   and increasing test scores.  So my data,

21   specifically, if I can go back specifically

22   is academic, because if you look on page 1,

23   it's all about academics and that's what I

24   was talking about.

25           Q.     Do you have any reason to

CONFIDENTIAL

Page 262

1    believe that the statements Ms. Sharrock

2    made in this assessment were not data

3    driven?

4            A.      Yes, I believe some of these

5    were her opinions.  So data in her

6    anecdotal records and conversations with

7    certain people.  So data, in her mind, but

8    she doesn't, as you can see in her

9    reflections, she does not provide any

10   concrete data.  These are just all

11   opinions.

12                  But when I meet with her for

13   her regular weekly check-ins and stuff, we

14   discuss IXL data, i-Ready data at the time,

15   how many walk-throughs she's done, growth

16   areas for teaching and learning and that

17   was specifically her job.  So that's why I

18   commended her on her data, because she's

19   spot on with great instruction.

20           Q.      You agree that Ms. Sharrock

21   had no motive to lie or make up facts --

22           A.      I wouldn't say there's these

23   lies --

24           Q.      -- for this assessment?

25           A.      I wouldn't say these lies at

CONFIDENTIAL

Page 263

1   all.  These are her opinions.  Everybody is
2   entitled to her opinion.  She saw it things
3   her way.  She saw it as people just
4   complaining and she comes from a different
5   era of administration and I operate
6   differently and I welcome complaints,
7   concerns, because that's how you go you
8   grow and find your weak areas and she's
9   more of a perspective, I am assistant
10  principal, this is my role, do not question
11  me.
12          Q.     And in terms of the most
13  critical need that she identified at
14  University Middle School --
15          A.     Professionalism?
16          Q.     -- she does not mention the
17  word, "technology" anywhere in that
18  response?
19          A.     Not in written response, she
20  does not.
21          Q.     The words, "cell phone" do
22  not appear in this response?
23          A.     No, once again, not in a
24  written response, but this is, to be fair,
25  since you're bringing up a post-observation

CONFIDENTIAL

Page 264

1    reflection, there's a conversation piece

2    that comes with this and a whole year's

3    worth of conversations.  So that's why I

4    went back, I know specifically what she was

5    talking about with the strife.

6            Q.    Okay.  But she does not

7    specifically use the words, "social media"

8    in her response, right?

9            A.    No, I don't think she uses

10   that within anything in this.

11           Q.    You can put this document to

12   the side.

13                 Mr. Bussacco, do you use

14   social media in your personal life?

15           A.    I do.

16           Q.    What social media accounts do

17   you have?

18           A.    Do I have or do I use?

19   There's a difference, but I mainly use

20   Instagram and Facebook.  I've had a

21   Facebook since it was back in the day when

22   you had to be a college student to get a

23   Facebook account.  So I have that.

24                 I use Instagram, I don't use

25   it regularly, it's more of my son's

Page 265

1    Instagram page.  He wants me to post
2    pictures of him, so he can get his likes.
3    And he's only nine years old, and so he
4    wants his likes.  He's very vain, love him,
5    but vain.  But those are the two main
6    platforms I use.
7              I have TikTok on my phone,
8    have I engaged in it, yeah, it's just I
9    don't enjoy it.  It's not my thing.  But I
10   have those apps.  I have Twitter or X, I
11   have that.  I use that just, you know, to
12   follow certain -- I like music, so certain
13   artists and stuff like that, but that's
14   pretty much it.
15             I don't really engage in
16   social media, like, I don't post a lot
17   anymore, but I have it.
18        Q.    Okay.
19        A.    So if you see my social
20   media, it's mainly just pictures of my
21   family, outings, nothing, yeah.  It's
22   boring.
23        Q.    Do you have a Snap --
24             MR. INNES:  I'm going to
25        object to this, it's getting very

CONFIDENTIAL

Page 266

1              difficult for me to get these

2              objections --

3                      THE WITNESS:  Sorry.

4                      MR. INNES:  -- just to the

5              relevance of exploring Mr.

6              Bussacco's personal life here.  I'm

7              just wondering what the relevance

8              of is of these questions.

9      BY MR. KARP:

10          Q.    Understood.  I'll try to keep

11     this brief.

12                      Mr. Bussacco, do you have a

13     SnapChat account?

14                      MR. INNES:  Objection.

15              Relevance.

16                      THE WITNESS:  I don't believe

17              I do, I might.

18                      MR. KARP:  I'm happy to give

19              you a running objection, if that's

20              easier for you on this line of

21              questioning, but you're also

22              welcome to --

23                      MR. INNES:  Yeah, if you want

24              to stipulate that we'll --

25                      MR. KARP:  You can have a

                                        Page 267

1              running objection.
2                   MR. INNES:  Running objection.
3                   MR. KARP:  Gotcha.
4                   THE WITNESS:  So to answer
5              that question, if I do, I don't
6              remember it, I haven't used it in
7              years.  So I might have created
8              one, but I don't think I do.  I
9              haven't used it, let's say, at
10             least in the past five years, I can
11             confidently say that.
12     BY MR. KARP:
13          Q.    Do you have a YouTube
14     account?
15          A.    I do.
16          Q.    Do you recall roughly when
17     you created your Instagram account,
18     approximately?
19          A.    I think when it came out.  I
20     think it was 2018, 2019.  I was on a
21     vacation in Costa Rica.  That's all I
22     remember.
23          Q.    And how often would you say
24     you post on Instagram?
25          A.    Six to 12 times a year.

CONFIDENTIAL

Page 268

1        Q.      How often are you using
2   Instagram to look at posts that other
3   people have made?
4        A.      Daily.
5        Q.      You said daily?
6        A.      Daily, yeah, uh-huh.
7        Q.      Did you say you created your
8   Facebook account when you were in college?
9        A.      Yeah.
10       Q.      May I ask when exactly that
11   was?
12       A.      Probably 2003, 2004.
13       Q.      Do you post on Facebook?
14       A.      Rarely, six to 12 times a
15   year maybe.  I'm tagged in things, but I
16   don't post.
17       Q.      And has that roughly been the
18   same since 2003, 2004 or has that changed
19   over the last 20 years --
20       A.      It has drastically changed.
21   I used to use it a lot more.
22       Q.      And how often are you on
23   Facebook looking at the content that other
24   people have posted?
25       A.      Not as -- probably every

Page 269

1    other day or daily, but Instagram is the

2    one I go to the most.

3          Q.    Okay.  You said you also have

4    a TikTok account?

5          A.    I have a TikTok account, yes.

6    I was curious what the fad was.

7          Q.    And I believe you said it's

8    not something you use very often?

9          A.    No.  I get tagged a lot, but

10   I don't really even open that often.

11         Q.    Could you approximate how

12   many times a year you have used your TikTok

13   account?

14         A.    I don't think I've ever made

15   a post before.  I might look at it, I'm

16   going to guesstimate, twice a month, maybe

17   three times a month.  Ice cream time.

18         Q.    You said you have a Twitter?

19         A.    I do have X, yup.

20         Q.    Or X, right.  Do you post to

21   X?

22         A.    Not --

23              MR. INNES:  Objection.  I

24         guess a running objection is

25         covering this, now we're into

CONFIDENTIAL

Page 270

```
1          non-defendants, right?  Now I'm
2          trying to figure out what the
3          relevance is again.
4              MR. KARP:  I just want to
5          understand Mr. Bussacco's use of
6          social media.
7              MR. INNES:  How is that
8          relevant to our case?
9              MR. KARP:  I don't think I
10         need to make legal arguments about
11         relevance of my questions.  I
12         believe this could lead to
13         discoverable --
14             MR. INNES:  I think you have
15         to have a good-faith basis to ask
16         your question.
17             MR. KARP:  Sure.  I believe
18         that Mr. Bussacco's views on the
19         potential uses of social media are
20         relevant to the claims that you're
21         making.
22             MR. INNES:  For use, an
23         adult's use of social media in his
24         private capacity are relevant to
25         the features and the harms these
```

```
                                    Page 271
 1              features have caused to the
 2              students in the school district?
 3                   MR. KARP:  Are you instructing
 4              the witness not to answer my
 5              questions about --
 6                   MR. INNES:  No, you said we're
 7              having a conversation.  We're
 8              having a conversation about the
 9              relevance and your good-faith basis
10              to ask Mr. Bussacco about his use
11              of social media, including
12              platforms that aren't even part of
13              the case.
14                   MR. KARP:  Sure.  This is the
15              only one that he identified and
16              I'll be done with this in about 20
17              seconds, if you let me.
18                   MR. INNES:  Okay.
19  BY MR. KARP:
20       Q.    Do you know how often you use
21  X, how many times a year?
22       A.    Looking at it, probably
23  daily.  I don't think I've posted in many,
24  many years.
25       Q.    You said that you might have
```

CONFIDENTIAL

Page 272

1    a SnapChat account, but you don't know for
2    sure sitting here today --
3           A.     I'm positive I created it in
4    my younger days, but I don't use it.
5           Q.     Okay.  You said that you have
6    a YouTube account?
7           A.     I do.
8           Q.     For how long have you had a
9    YouTube account?
10          A.     I believe I created it during
11   COVID in 2020.
12          Q.     Okay.  And can you tell me
13   more about how you typically use YouTube?
14          A.     I guess, because I rarely use
15   it, ████ ████ ████ ██ ███ ████ ██
16   █ ████ ██ ███ ███ ████ ██ ███ ███ █ ███
17   Maybe someone told me about a music video,
18   but that's pretty much it.
19                  There was a time where I
20   used it to do, like, what's it called, my
21   God, give me a second, I'm sorry.  I used
22   it to -- what is it called, I'm sorry?
23   Post like my events during social media.
24   Like if I had a poetry slam, I would post
25   it with that specific link so they would go

CONFIDENTIAL

Page 273

1   to -- my parents would go to that event,

2   the ones that missed it.

3        Q.    Understood.

4        A.    And that was not in Irvington

5   Public Schools though, that was in

6   Paterson.

7        Q.

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 274

19          Q.      Just one more set of

20    questions, Mr. Bussacco.

21          A.      Yes, sir.

22          Q.      In connection with this

23    lawsuit, did you receive a litigation hold

24    notice or a document instructing you to

25    preserve or hold onto documents?

Page 275

```
1          A.      Did I receive something that

2    asked me to preserve or hold onto

3    documents?  I don't recall being asked to

4    preserve anything.  I don't recall that.

5          Q.      Okay.  You do not recall

6    receiving a document that would have set

7    out instructions for types of documents

8    that you should hold onto and should not

9    delete or destroy?

10         A.      I know I was asked about

11   certain documents I have, but I'm never

12   allowed to delete documents anyway, so no

13   one has asked me to not delete something.

14         Q.      When you say you're not

15   allowed to delete documents, what do you

16   mean?

17         A.      School documents, if I'm on

18   the web, Irvington documents and I'm doing

19   work for that, it belongs to the district,

20   so even if I delete it, it's not deleted.

21         Q.      Do you recall ever receiving

22   an instruction orally not to destroy any

23   documents that could relate to this

24   litigation?

25                  MR. INNES:  Objection,
```

Page 276

```
 1              privileged.  To the extent you can
 2              answer the question without
 3              divulging communications between me
 4              or any of the members of my team
 5              and law firm, you can do so.  If
 6              you can't, then you should not
 7              answer that question.
 8                   THE WITNESS:  Your question
 9              was, do you recall ever receiving
10              an instruction orally not to
11              destroy any documents?  That was
12              your question?
13      BY MR. KARP:
14           Q.    Sure.
15           A.    I was never asked to not
16      destroy any documents.
17           Q.    Do you know if University
18      Middle School has any systems in place that
19      automatically delete files after a certain
20      period of time, for example, emails may be
21      deleted after 90 days or something along
22      those lines?
23                   MR. INNES:  Objection.  Asked
24              and answered.
25                   THE WITNESS:  The way Google
```

CONFIDENTIAL

Page 277

```
 1              works, emails get deleted, all my
 2              emails go back to when I was in the
 3              district from 2008, they're all in
 4              nice, little folders, so they don't
 5              get deleted unless you delete an
 6              email.
 7                   And then what I answered
 8              earlier, they have a right to
 9              access my email, because it's --
10                   MR. INNES:  Right.
11                   THE WITNESS:  I'm an employee
12              of the district, yeah.
13  BY MR. KARP:
14       Q.    Last question here, set of
15  questions, earlier we were discussing
16  school performance reports --
17       A.    Yes.
18       Q.    -- for University Middle
19  School.  Do you prepare drafts of those
20  performance reports?
21       A.    What do you mean by that, I'm
22  sorry?  Like how we're doing on the
23  assessments?
24       Q.    In terms of the information
25  that you collect and provide to the New
```

CONFIDENTIAL

Page 278

1    Jersey Department of Education in the form

2    of something like an annual school

3    planning, do you retain -- do you create

4    and retain drafts of those planning

5    documents?

6            A.     Oh, drafts of the

7    end-of-school plan?

8            Q.     Yes.

9            A.     Yes, I personally do.

10           Q.     Okay.  And would those drafts

11   be in your files?

12           A.     Yes.

13           Q.     Do you know specifically

14   where in your files they would be?  Are

15   they saved in a particular system?

16           A.     They're in my Google Drive.

17   Most likely knowing me, they're organized

18   as either data team or backslash ASP for

19   annual school plan.

20                  MR. KARP:  Okay.  Thank you

21           for your time today.  There are a

22           couple of things I want to put on

23           the record, but I will, for now,

24           pass the witness if you have any

25           questions.

CONFIDENTIAL

Page 279

1            MR. INNES:  Yeah.  Can you
2        give me ten minutes to go off the
3        record for ten minutes to gather my
4        notes and --
5            MR. KARP:  Sure.
6            MR. INNES:  -- I think that
7        way I can streamline it, rather
8        than fumbling around.
9            THE VIDEOGRAPHER:  The time is
10        4:08 p.m.  We are off the record.
11                - - - - -
12    (A recess was taken at this time.)
13                - - - - -
14            THE VIDEOGRAPHER:  The time
15        right now is 4:31 p.m.  We're back
16        on the record.
17  BY MR. INNES:
18        Q.    Good afternoon, Mr. Bussacco.
19  For the record, my name is Michael Innes.
20  I represent the school district in this
21  case.  First of all, thank you very much
22  for being here.
23            At one point, during the
24  questioning today by Mr. Karp, you'll
25  recall that the topic of New Jersey state

CONFIDENTIAL

Page 280

1    testing came up.  Is that going on today?

2         A.    Yes, it is.

3         Q.    Okay.  And before you came

4    here today, could you walk me through your

5    morning?

6         A.    Yes.  I arrived approximately

7    about 8:00 in the morning like I usually

8    do.  My morning is usually making last

9    minute adjustments, if anyone calls out for

10   testing, moving proctors around.

11              Before I could get upstairs

12   to testing, around 8:27, 8:28, we got a

13   signal five.  A signal five indicates a

14   fight.  We got it on the radio there being

15   a fight.  I did not go to the fight.  I was

16   in the secure testing location, but

17   security brought them to my office where my

18   APs were.  My AP, Ms. Alexis Allen-Penn,

19   handled the situation and upon further

20   investigation we found out it wasn't a

21   fight, it was actually students using

22   TikTok to do the fight challenge.  I would

23   call it -- I don't know if it's really

24   called a challenge, but a quick search that

25   she said she made basically was just cause

CONFIDENTIAL

Page 281

1  a fight, cause pandemonium.

2         Q.      And so this morning before

3  this deposition, you were engaged in an

4  investigation or diffusing a situation

5  regarding a TikTok challenge that resulted

6  in a fight?

7         A.      I personally didn't, but my

8  AP who is part of testing, she was assigned

9  to that, and I had to reassign someone else

10 to take her part, she wound up handling the

11 matter.

12        Q.      Okay.  And were the students

13 involved in that challenge, were they

14 scheduled to take the test today?

15        A.      Yes.

16        Q.      In your experience as an

17 educator, is that -- is engaging in a fight

18 the best way to prepare to sit for the

19 NJSLA?

20               MR. KARP:  Object to form.

21               THE WITNESS:  No, I believe

22         it's the opposite.

23 BY MR. INNES:

24        Q.      Why would you say it's the

25 opposite?

CONFIDENTIAL

Page 282

1          A.      We want to get students
2    relaxed, at the same time, mentally pumped
3    up to do their best on the assessment and,
4    unfortunately, people had their phones out,
5    because it was around arrival time, kids
6    get in around 8:25, so that spread around
7    that there was a fight, and now everyone
8    was talking about it, there was comments on
9    it, so that disrupted the classrooms where
10   kids are testing, as well as the
11   sixth-grade area where they're not testing,
12   so it just spreads like wildfire.
13          Q.      And you also discussed with
14   Mr. Karp earlier today your school's
15   performance, your school's academic
16   performance.  Do you remember that?
17          A.      Regarding my academic
18   performance?
19          Q.      Yeah, your scholars' overall
20   academic performance.
21                  Do you recall that?
22          A.      Slightly, yeah.
23          Q.      In your experience in the
24   district and as an educator, is it your
25   belief that scholars' use of social media

CONFIDENTIAL

                                        Page 283

1    has had a negative impact on their

2    learning?

3             A.      In my --

4                     MR. KARP:  Object to form.

5                     THE WITNESS:  In my opinion,

6             do I believe social media has had a

7             negative impact on students'

8             learning is your question?

9    BY MR. INNES:

10            Q.      On scholars learning.

11            A.      Scholars, yes, 100 percent.

12            Q.      In your experience, is it

13   your opinion that they've had -- strike

14   that.

15                    In your experience in

16   Irvington, would you agree that scholars

17   use of social media has depressed their

18   scores on testing?

19                    MR. KARP:  Object to form.

20                    THE WITNESS:  I could make

21            that correlation, because they're

22            spending more time wondering who is

23            liking their posts, who is talking

24            about them, not focusing on

25            academics.  That I could also look

CONFIDENTIAL

Page 284

1              at how even homework is not done on
2              a regular basis.  Classwork is
3              suffering, because the kids are --
4              figured out ways to use social
5              media apps and other projects, you
6              know, using the phone to text like
7              this under the table without the
8              teacher even knowing now.  Kids
9              have become very adaptive of doing
10             things in plain sight.
11    BY MR. INNES:
12             Q.    So, and correct me if I'm
13    wrong, but I think is it your testimony
14    that students are not as engaged in their
15    homework because they're using social
16    media?
17                  MR. KARP:  Object to form.
18                  THE WITNESS:  I personally
19             believe they're not engaged in
20             their homework on top of all other
21             academics because of their
22             extensive use of wondering what's
23             going on in the world out there and
24             not on a global, but more on a
25             micro stance of Irvington, what's

CONFIDENTIAL

Page 285

1                happening in my school, with my
2                friends at the high school and it's
3                a lot going on, it's a constant.
4    BY MR. INNES:
5         Q.     And in your experience, in
6    conversations with scholars and faculty,
7    based on that, are the students focused --
8    are the scholars focused on likes?
9         A.     Are scholars focused on
10   likes?
11                MR. KARP:  Object to form.
12                THE WITNESS:  I would say,
13           yes, in the concept that they want
14           to use it to show, you know, that
15           they're popular, otherwise, they
16           wouldn't keep doing it.  And then
17           other kids do take that message and
18           share it out so they can get likes
19           and who was the first person who
20           can get the information out there.
21                So it's always been like a
22           competition, unfortunately, of
23           who can post these videos, who
24           can get likes, but it's more --
25           it's deeper than that.  It's the

CONFIDENTIAL

Page 286

1          comments, the comments that come
2          from it and then it's just deep.
3    BY MR. INNES:
4          Q.      So let's circle back to where
5    we started this conversation.  Is it your
6    belief that students engaged in the TikTok
7    challenge this morning for purposes of
8    getting likes?
9          A.      After discussing this with
10   Mrs. Allen-Penn, we initially were going to
11   have their parents pick them up because we
12   thought there was a fight and it's
13   disrupting the testing environment, so
14   we're a little bit stricter when it comes
15   to stuff like that, because there's a lot
16   of irregularities that could have taken
17   place, but as she's talking to the kids,
18   she realized this is how she found out that
19   they really weren't fighting.  She also
20   knew that two of the kids were really
21   close, so it was suspicious or, like,
22   what's going on.  So it was more kids doing
23   it so they could say, ooh, look, whose
24   fight was the best, so, yes, likes is where
25   I would go with that.

CONFIDENTIAL

Page 287

1          Q.      Okay.  So it actually wasn't
2    a fight, it was a --
3          A.      A pretend fight.
4          Q.      -- a pretend fight?
5          A.      Cause chaos, basically.
6          Q.      Okay.  And and they engaged
7    in that challenge --
8          A.      They set up their phone prior
9    to the event, it wasn't like other people
10   recorded it, because -- so let me retract,
11   other people did record it, but they set up
12   their phone prior to, so when we ran the
13   cameras back, you see them setting up their
14   phones and then engaging in it.
15         Q.      And the reason they wanted to
16   do that is the hope to increase their
17   popularity?
18         A.      To record it --
19              MR. KARP:  Object to form.
20              MR. SEXTON:  Calls for
21         speculation.
22              THE WITNESS:  I believe the --
23              MR. INNES:  Hang on a second,
24         which one of you guys is defending?
25              MR. KARP:  Sure.  We can agree

CONFIDENTIAL

Page 288

1              that an objection for one is an
2              objection for all?
3                      MR. INNES:  Yes.
4                      MR. KARP:  Object to the form.
5                      MR. INNES:  That's how we've
6              done it in the past.
7                      MR. KARP:  Sure.
8                      THE WITNESS:  I believe -- I
9              forgot the question, I'm sorry.
10  BY MR. INNES:
11        Q.    Yeah.  That's fine.  Let me
12  read it back to you.
13        A.    Oh, the reason they wanted to
14  do that is to hopefully increase their
15  popularity.  My assumption based on her
16  investigation, her being Mrs. Allen-Penn,
17  my assistant principal, that we know the
18  kids set up their cameras to record it and
19  to post it was to get likes and to share it
20  out.
21        Q.    Was this the first experience
22  that the district has had with posts to
23  TikTok?
24        A.    I won't speak for the
25  district --

CONFIDENTIAL

Page 289

1                    MR. KARP:  Object to form.

2                    THE WITNESS:  I won't speak to

3            the district, I can speak to

4            University Middle School.  This is

5            not the first time.

6    BY MR. INNES:

7         Q.      How many times in the past

8    have you at the middle school addressed

9    issues, disciplinary issues, related to the

10   use of social media?

11        A.      Every day I deal with

12   something that relates to social media.  If

13   it's not myself, my assistant principals,

14   my deans, my school counselors, and my

15   HSSC, I'm positive my teachers do as well,

16   but the majority of our discipline referral

17   forms that relate -- not relate -- that

18   correlate to OSS, ISS, BMR, HSP stem with

19   80 percent, if not more, an element of

20   social media that led us here.

21        Q.      Do you believe that number

22   would go down if the social media companies

23   removed the feature like a like?

24                    MR. KARP:  Object to form.

25            Speculation.  Lacks foundation.

CONFIDENTIAL

Page 290

```
 1                THE  WITNESS:   I believe if
 2           they removed features where you
 3           could only post pictures, less
 4           people would engage, because there
 5           wouldn't be comments, which cause
 6           fights.  For example, I could be
 7           talking -- you could post a picture
 8           of you and your middle school
 9           girlfriend at the time.  I, being
10           jealous of the situation, say
11           something nasty about you in that
12           post.  Your friend finds out about
13           it and now you're fighting over a
14           post and the likes and the comments
15           from this whole circle.  And that's
16           a constant battle.  So the answer
17           to your question, to go back to it,
18           I believe that if they didn't have
19           comments or features and it was
20           just a picture, we still have
21           incidents, but a lot less.
22      BY MR. INNES:
23           Q.     You spoke with Mr. Karp a lot
24      about the ASP in 23-24.
25           A.     Yes.
```

CONFIDENTIAL

Page 291

1          Q.      Do you remember that?

2          A.      I do remember that.

3          Q.      Okay.  And the topic of

4   absenteeism came up.  Do you recall that as

5   well?

6          A.      Yes.

7          Q.      Okay.  Is one factor that

8   contributes to school avoidance the use of

9   social media?

10         A.      That is one of the factors.

11         Q.      Okay.  And could you describe

12  why you believe that the use of social

13  media contributes to school avoidance?

14                  MR. KARP:  Object to form.

15                  THE WITNESS:  Two -- I could

16              give two.  I gave one in earlier

17              testimony how students are so

18              compelled to be on their phone at

19              nighttime, scroll through it, and

20              want to be in the know.  So they're

21              not getting enough sleep and

22              they're not coming to school.

23              That's a fairly common thing where

24              they will arrive late to school,

25              we're getting better with coming

CONFIDENTIAL

Page 292

1          late, but they tell you, oh, I was
2          on this all night, I was on this
3          all night.
4              Another way social media
5          impacts chronic absenteeism is
6          fear to come to school because
7          you think based on all the
8          comments and, I guess, the
9          private messaging features that
10         they have where people are
11         charting certain students and
12         saying you come to school, I'm
13         going to do this to you because
14         you did this, and then most of
15         the time that kid had nothing to
16         do with it, they just commented
17         on a post and someone got mad at
18         it and it's a whole trickle down
19         effect, so they don't want to
20         come.  The parents come in, the
21         parents come in irate, my child
22         is being bullied, they throw the
23         word, "bullying" around without
24         understanding the whole dynamics
25         of the word, and because they use

CONFIDENTIAL

Page 293

1    that word. now I have to get a
2    bullying specialist involved and
3    an investigation takes place and
4    we have to figure out how to get
5    their child to feel safe to come
6    to school.  We do a whole bunch
7    of restorative practices.  We
8    pull all the kids down.
9         The majority of the time,
10    I'm the last one of my leadership
11    team that would do that.  It
12    would mainly be, my first line of
13    defense would be my school
14    counselors, HSSC, deans,
15    assistant principals, and then
16    myself, but we are constantly all
17    day being pulled in directions
18    for examples like that, those.
19  BY MR. INNES:
20       Q.    And the examples you gave,
21  students have told you or your staff that
22  they are late to school or don't attend
23  school because they have been on social
24  media all night?
25                MR. KARP:  Object to form.

CONFIDENTIAL

Page 294

1           THE WITNESS:  I've had
2      conversations with some students.
3      Mr. Byock would have had more.
4      He's the attendance dean.  So the
5      late arrival, part of his
6      conversation is to figure out fact
7      finding, so he has a lot of those
8      conversations with kids.  He brings
9      them to the APs, the guidance
10     counselors, for further evaluation
11     and assistance.  Assistance is
12     better than evaluation, but he has
13     the majority of that, because it's,
14     like, a chain of command and it
15     just gets passed up.
16           So let's say it's just
17     social media, maybe we just pass
18     them to the grade-level school
19     counselor and they can talk about
20     better strategies.  If it's
21     deeper, like I don't want to come
22     to school because I feel like,
23     you know, I'm on social media,
24     because these kids are going to
25     do X, Y, and Z to me, it goes

CONFIDENTIAL

Page 295

1              automatically to a dean.  Now,
2              the dean looks at the things when
3              the child gives it to them or the
4              parent gives them the messages
5              and an investigation takes place
6              and then kids are constantly
7              being called out of instruction
8              to have these meetings.
9     BY MR. INNES:
10          Q.     And the time away from
11    instruction to investigate these incidents
12    that arise through social media, does that
13    negatively impact their mental health?
14          A.     It's just like them not being
15    at school, because now they're being pulled
16    out of instruction.  It's not that we can
17    wait, oh, and I'm not trying to relegate
18    saying PE is not important, but it's not
19    that I can say, oh, we'll wait to talk to
20    them until they have PE or a different
21    elective.  Most of these matters, we need
22    to be able to deal with it at the moment,
23    so you have ELA and math, which we saw from
24    the data presented to us, is an area we
25    need to grow in, we're still pulling them,

Page 296

1  because they can't focus on ELA and math,
2  but we are taking them out.  So it's just
3  like them not being at school.
4       Q.     So your investigation into
5  instances arising with social media has a
6  negative impact on your ability to meet the
7  state standards to pull your schools out of
8  status; is that correct?
9                 MR. KARP:  Object to form.
10          Lacks foundation.  Assumes facts.
11             THE WITNESS:  In my opinion,
12          based on the numerous daily
13          meetings I have, yes, I could make
14          that direct correlation, because
15          just like the state makes a
16          correlation, time out of school,
17          lower academics.  There's a whole
18          by fifth grade, this by this.  Yes,
19          they're technically in school, but
20          they're not in school, because
21          they're in the main office, they're
22          in the dean's office and these
23          investigations could be as quick as
24          I'm calling you down for five
25          minutes or you're down there for

Page 297

```
 1            maybe two to three hours as we're
 2            finding.  And then when we find
 3            out, because we're dealing with
 4            children, not Irvington children,
 5            we are dealing with Irvington
 6            children, but children by nature,
 7            especially middle school kids, are
 8            not always truthful in their
 9            initial statements and then as you
10            fact find and do more
11            investigation, I'm calling you back
12            down.  And now I have to pull you
13            out of another class, because I
14            found out you misled me and I have
15            to investigate this so we can get
16            to the bottom of it.  So a lot of
17            times, it's being pulled out of
18            instruction.
19   BY MR. INNES:
20         Q.    You referenced a chain of
21   command.
22         A.    Yup.
23         Q.    Where do you fall within the
24   chain of command?
25         A.    I'm the principal, so I'm the
```

CONFIDENTIAL

Page 298

1  top.  I get major infractions.  My main

2  focus is academics.  I'm mainly in the

3  classroom supporting teachers with how

4  to -- better teaching practices, you know,

5  purely academic.

6              When I'm called out, it's

7  because all the other ones are slammed with

8  something and I'm next up.  I get called

9  down -- I have specific parent meetings set

10 up, but I have a system in place where my

11 deans and my school counselors are the

12 first line when these matters come up, then

13 my assistant principals, and then myself.

14 So I'm, like, I'm not saying they're not

15 all major, because depending on how you

16 look at it, but I'm, like, major

17 infractions or I'm the last resort because

18 everyone else is tied up.  And it happens

19 more than you think where I can't be in the

20 classrooms because I'm downstairs dealing

21 with matters.

22       Q.    All right.  How many deans do

23 you currently have?

24       A.    I have two deans.

25       Q.    And how many school

Page 299

1   counselors do you currently have?

2          A.      Four.

3          Q.      How many assistant

4   principals?

5          A.      Two.

6          Q.      Has your -- have those

7   staffing numbers been the same over your

8   entire time period?

9          A.      No.

10         Q.      How have they changed?

11         A.      When I started, there was

12  three assistant principals and one dean,

13  three school counselors.  They reduced the

14  district, the district reduced one

15  assistant principal in my building, but I

16  was able to, in my school budget meeting

17  with the superintendent's office and her

18  cabinet, petition for the need for a fourth

19  school counselor and a dean so that my APs

20  and I can get into the classrooms more, so

21  that chain of command I just described, I

22  have more people on the ground dealing with

23  those matters so that I can actually do the

24  job I was hired for.  Yes, part of my job

25  is to talk to children, which I could

Page 300

1    daily, but my main focus is to talk to
2    children in the classroom, educate adults
3    on how to do best practices, model
4    instruction. I'm the lead educational
5    leader -- educational teacher leader in the
6    building. And based on all the discipline
7    referral forms and my accounts of my day to
8    day and she's been in the building, which
9    is right around the corner, she knew that
10   we needed that. It has been amazing, in my
11   opinion, having these extra staff, because
12   as I told you a little earlier, I'm still
13   tied up, but if I didn't have these extra
14   staff, I would be even more tied up as the
15   principal. But my deans, they spend about,
16   not taking their lunch duty that they do,
17   they spend most of their day with matters
18   of social media at one point or another.
19        Q.     Thank you. You'll recall
20   also discussing with Mr. Karp a
21   professional assessment of Ms. Ganthier?
22        A.     Ms. Ganthier, yeah.
23        Q.     Ganthier. Okay.
24        A.     I can go back to that
25   document you're referring to?

CONFIDENTIAL

Page 301

1          Q.      Sure.

2          A.      Where is it?  I got it.

3          Q.      And I'm just going to direct

4    your attention to the third -- second --

5    well, it's the page number ending in 322.

6          A.      Okay.

7          Q.      Okay.  So are you aware that

8    Facebook is a Defendant in this case?

9          A.      I am.

10         Q.      Okay.  Are you aware that

11   SnapChat is a Defendant in this case?

12         A.      I am.

13         Q.      Are you aware that Instagram

14   is a Defendant in this case?

15         A.      I am.

16         Q.      Okay.  It says at the middle

17   of the page, 9:40 a.m., and, again, this is

18   something you wrote, right?

19         A.      This is what I wrote based on

20   what the HSSC was doing at the time, yes.

21         Q.      Okay.  So HSSC, who is Ms.

22   Ganthier?

23         A.      Yes.

24         Q.      "Tells class that she is not

25   surprised with all of the examples of

CONFIDENTIAL

Page 302

1   social media that they know.  She then asks
2   the class to discuss with their elbow
3   partner the dangers of social media."
4                   Do you see that?
5           A.     Yes, I do.
6           Q.     Okay.  So Irvington Public
7   Schools is taking valuable instruction time
8   to teach their students about or scholars
9   about the dangers of social media; is that
10  correct?
11                  MR. KARP:  Object to form.
12                  THE WITNESS:  That is correct.
13  BY MR. INNES:
14          Q.     Okay.  And they're
15  teaching -- you're teaching the scholars
16  about the dangers of social media
17  presumably because they didn't know about
18  the dangers of social media; is that
19  correct?
20                  MR. KARP:  Object to form.
21              Assumes facts.  Lacks foundation.
22  BY MR. INNES:
23          Q.     I'll withdraw the question.
24  Let me ask it this way.  Why is
25  Ms. Ganthier taking valuable time to teach

CONFIDENTIAL

Page 303

1    students about the dangers of social media?

2                    MR. KARP:  Object to form.

3            Calls for speculation.

4                    THE WITNESS:  So my

5            understanding as assistant

6            principal is part of her role as

7            the HSSC, it's part of -- it's one

8            of her many components of her job

9            to go in the classroom and do a

10           presentation based on what the

11           principal at the time, which was

12           not me, deemed important concerns

13           in his school, one of them being

14           social media, which I'm aware of,

15           because I was the assistant

16           principal at that time.  And that

17           is what he tasked Ms. Ganthier and

18           he also had three school

19           counselors.  So, yes, to answer

20           your question, based on Mr. Pierre

21           who was the principal at the time,

22           he wanted his school counselors and

23           HSSCs to educate our scholars about

24           their use of social media and the

25           dangers that they're not aware of.

CONFIDENTIAL

Page 304

1              While they see, part of it was,
2              like, as they see they're doing it,
3              do they realize that this is
4              forever and that was the
5              conversation and we're still having
6              that conversation that that is your
7              footprint forever.  It's out there.
8              Just because you think you deleted
9              it, someone could have had a
10             picture of it, it's there forever
11             once you post it, and that was part
12             of the narrative we wanted them to
13             understand.  You guys think you're
14             being funny.  You guys think this
15             is harmless, but it's not.
16    BY MR. INNES:
17         Q.     And this is the New Jersey
18    Department of Education standards for
19    instruction direct the Irvington Public
20    Schools to teach about technology and the
21    worldwide web, so to speak?
22                  MR. KARP:  Object to form.
23                  THE WITNESS:  Yes, technology
24             is part of New Jersey curriculum.
25             So the use of -- the safe use -- I

```
                                    Page 305
```

1          know I'm butchering it, the safe
2          use of technology.
3   BY MR. INNES:
4          Q.     Is mandated by the state of
5   New Jersey?
6          A.     Uh-huh.
7          Q.     In your experience in
8   Irvington Public Schools, why would a
9   scholar post a nude image?
10                MR. KARP:  Object to form.
11         Calls for speculation.
12                THE WITNESS:  Based on my
13         experience of dealing with issues
14         of students posting inappropriate
15         photos, there's a lot of reasons
16         why.  I'll give you a couple based
17         on conversations.  I can't
18         specifically speak back to this
19         particular matter, because it was
20         2015, but of my understanding as
21         assistant principal and principal
22         and dealing with these matters for
23         so many years, they do it for
24         several reasons.  One, body images.
25         They put it out there to see if

CONFIDENTIAL

Page 306

1          they are really what they think
2          they are or maybe they're not.
3               So to elaborate, I had a
4          young lady who would post
5          pictures of herself, not
6          completely naked, but the
7          under -- her underbreast would be
8          showing and her abdominal, she
9          would do her makeup, and she just
10         didn't think she was a pretty
11         young lady.  And she would post
12         it and she would even comment,
13         like, look at this fat heifer and
14         stuff like that, talking about
15         herself in a negative way.  And
16         then she would get comments on
17         it, oh, you're beautiful.  Oh,
18         you're this, but then you would
19         also get the flip, like, yeah,
20         you are, you need to go to,
21         like -- so she did it for self --
22         based on the conversations I've
23         had with her and the school
24         counselor, more the school
25         counselor, because they could

CONFIDENTIAL

Page 307

1          assess this matter more than me,
2          so this is them explaining it to
3          me as I'm listening, she did it
4          because she was reaching out,
5          because she had body image
6          concerns.  So I've had that
7          experience.  So she's looking for
8          people to validate her through
9          comments and likes and all that
10         stuff.  And, unfortunately, she
11         also got the other end where she
12         didn't get validated and she
13         found out -- not found out, but
14         kids were being mean.
15              I've had people post naked
16         pictures as revenge of their
17         ex-boyfriend and girlfriends and,
18         unfortunately, once it's
19         officially, like, a naked picture
20         of a student, I don't have access
21         to that, because then it's a
22         whole chain-of-command thing.
23         The police get involved.  It's a
24         whole investigation.  The phone
25         gets taken.  They do what they

CONFIDENTIAL

Page 308

1    need to do.  They tell me yes or
2    no, it was there, because I'm
3    assuming it's there, because I
4    can't look at it.  The moment I
5    look at it, I get brought in.  So
6    when that happens, most of the
7    time, it's there and we find out
8    through investigation, they do it
9    to get back at someone or I used
10   to date you for two weeks ago and
11   you did this to me and this is me
12   putting up there and then they
13   get a whole bunch of laughs and
14   other stuff.  They're trying to
15   make their ex-boyfriend or friend
16   mortified by all the comments and
17   statements said about them.
18         And some people do it for
19   fun.  They think it's -- they
20   don't understand that it's
21   dangerous.  As I said a little
22   bit earlier, this sticks with you
23   forever.  Someone is going to
24   screenshot that and,
25   unfortunately, it could go to

Page 309

```
 1              some, you know, they can go to
 2              people who really shouldn't have
 3              access to that, so.
 4  BY MR. INNES:
 5        Q.     You were asked earlier if --
 6  strike that.
 7               You were asked earlier if
 8  students in your school share information
 9  about via text.
10               Do you recall that?
11        A.     I do.
12        Q.     You also were asked
13  information about whether they share
14  information by AirDrop?
15        A.     Uh-huh.
16        Q.     Based on your experience,
17  what's the most common way that students
18  share information?
19               MR. KARP:  Object to form.
20               THE WITNESS:  Based on the
21           investigations myself and my team
22           do, most of it would be private
23           messages or on a page where you can
24           list comments.  Most of them aren't
25           cell phones.  The reason that is in
```

CONFIDENTIAL

Page 310

1          this day and age is because text
2          message based on my experience can
3          be easily -- much more easily
4          monitored.  You can't hide your
5          text messages.  Most parents have
6          access to their child's phone or
7          they tell you they do.  And they
8          go, it's not my child, and then you
9          found out that their child has a
10         whole secret life going on because
11         they're making secret accounts.  So
12         you think you're monitoring your
13         child's Instagram or SnapChat, but
14         they have other accounts that
15         there's real accounts and that's
16         where a lot of stuff is happening,
17         you see comments and you see --
18         what's that feature where you tag,
19         you tag someone and did you see
20         this about Michael, did you see
21         this, and it's just a growing
22         problem.
23              I've had experience with
24         AirDrop, but it's not that common
25         and the reason why it's not that

Page 311

```
 1              common, because kids have figured
 2              out a lot of adults forget to put
 3              their things on AirDrop and they
 4              don't want us to know right away,
 5              so I've received maybe a handful
 6              of AirDrops in my career here,
 7              but most kids have realized we're
 8              not doing that, because we don't
 9              want the adults to find out.
10   BY MR. INNES:
11        Q.    Okay.  Do you recall Mr. Karp
12   asking you questions about a performance
13   evaluation that you did, you can either
14   refer to it or not, I don't think you're
15   going to need to.
16        A.    Okay.
17        Q.    But it involved -- well,
18   let's, actually, let's get it out, let's go
19   to Exhibit 6, and it's the Bates number
20   ending in 3430 is the page number.
21        A.    Okay.  It's there.
22        Q.    And this is where you
23   described an observation in the room where
24   the teacher had referenced Instagram in a
25   posting on -- or, I'm sorry, an exhibit on
```

CONFIDENTIAL

Page 312

1    the wall; is that correct?

2         A.    Yes.

3         Q.    Were they actually using the

4    Instagram app in that classroom?

5         A.    Not at all.

6         Q.    In fact, that lesson was

7    about teaching them how to use Instagram

8    correct; is that right?

9         A.    Yes, as I spoke earlier, and

10   it's even in this document where I put

11   Instagram in quotes to make it notable to

12   whoever read it in admin.  I never knew we

13   would be here today reading it in front of

14   a group of lawyers, that it wasn't really

15   Instagram, it was the logo, I think, it's

16   the camera at the time, it was whatever the

17   camera was, the Instagram logo, and it was

18   showcasing positive images being done in

19   the classroom to change the mindset that

20   this is what it was designed for and this

21   is where you guys need to start using it

22   and then she could reference it as this is

23   what you're supposed to do on your social

24   media platform.  You're supposed to talk

25   about family, your trips, and stuff like,

CONFIDENTIAL

Page 313

1    not to do what you guys have been doing,

2    because as I mentioned earlier, this was

3    the time where we noticed a huge uptick in

4    the use of social media, I believe, because

5    more kids had access to phones.  It just

6    started becoming the norm around 2016,

7    2017, that was the trend, we noticed that

8    kids had phones, but now more and more and

9    more kids were having phones.  And with

10   getting phones, they had access to all

11   these platforms that no one ever told them

12   how to use properly, except for the

13   teachers, and sometimes you don't want to

14   listen to just your teacher, so they used

15   it creatively, as any child would when you

16   put something in their hand, they're going

17   to use it how they want to use it.

18         Q.     And you said they were

19   getting phones and they had access to these

20   platforms.  By the platforms, are you

21   referring to the Defendants' platforms?

22         A.     I'm talking to --

23                MR. KARP:  Object to form.

24                THE WITNESS:  -- in the, I

25         think it was referenced, there was

CONFIDENTIAL

Page 314

1          a whole -- there was one point
2          today where we referenced all the
3          platforms, Ms. Ganthier's, so this
4          is two years after that, so those
5          were the platforms I'm talking
6          about, so.  There was about five or
7          six platforms in that and three of
8          them are the Defendants.
9   BY MR. INNES:
10         Q.    Okay.  And when you say, "no
11  one ever told them how to use them
12  properly," when you say "them," who are
13  you -- I'm sorry?
14         A.     I'm talking the person, when
15  I meant them, I'm talking about the
16  Defendants, Twitter, all of those
17  companies, social media platforms.
18         Q.     Okay.  So the Defendants
19  never taught the scholars how to
20  properly --
21         A.     They might have --
22              MR. KARP:  Object to form.
23              THE WITNESS:  If I'm
24         remembering my account creation,
25         maybe there was, you know, this is

CONFIDENTIAL

Page 315

1           what you're supposed to do, but,

2           obviously, you could bypass it if

3           it was an age restriction because

4           children have it and there was

5           never commercials or

6           advertisements, to my knowledge,

7           pushed to students on how to use

8           platforms properly.  If there was,

9           I don't think a lot of parents

10          would have even allowed their

11          children to download these, in my

12          opinion.

13   BY MR. INNES:

14          Q.    I mean, the reality is that

15   the scholars weren't going to get off

16   Instagram, so you were going to try to

17   teach them --

18          A.    Safe practices.

19               MR. KARP:  Object to form.

20          Please just let me get my

21          objection --

22               THE WITNESS:  Absolutely,

23          sorry.

24   BY MR. INNES:

25          Q.    And so through this class,

Page 316

1    the school district is, at least your

2    school, is attempting to deal with that

3    reality, right?

4                    MR. KARP:  Object to form.

5                    THE WITNESS:  Yes, this was at

6            Union Avenue Middle School.

7    BY MR. INNES:

8         Q.    Okay.  And you're taking time

9    out of the instructional day to teach your

10   scholars about the ways in which to use

11   Instagram?

12        A.    Yes, time was taken out of

13   instruction for HSSCs and school counselors

14   to go into classrooms, yes.

15        Q.    At this point in time, is it

16   your belief that when this class is

17   happening that the -- that Instagram had

18   adequately conveyed the potential harms of

19   its platform to the scholars?

20                    MR. KARP:  Object to the form.

21                    THE WITNESS:  I don't think it

22           was conveyed.

23                    MR. KARP:  Object only to the

24           extent there was no question

25           pending.

CONFIDENTIAL

Page 317

1    BY MR. INNES:

2        Q.    I think there was.  So as

3    part of your -- the New Jersey curriculum,

4    you teach about safe online --

5        A.    Safe use of technology.

6        Q.    Safe use of technology, thank

7    you.  So when building the curriculum for

8    the safe use of technology, did you ever

9    find documents from the Defendants in this

10   case describing how young people should use

11   their platforms to be safe online?

12              MR. KARP:  Object to form.

13              THE WITNESS:  I did not and

14         the young lady I mentioned earlier

15         who did the evaluation with me that

16         we're referencing was the

17         technology director for the

18         district at the time and she didn't

19         provide any documents to supplement

20         the curriculum from the Defendants.

21   BY MR. INNES:

22       Q.    Mr. Karp asked you some

23   questions about relating to social

24   injustice.

25       A.    Uh-huh.

Page 318

1          Q.      How, if at all, does social
2    media play a role in social injustice in
3    the Irvington school community?
4                    MR. KARP:  Object to form.
5                    THE WITNESS:  Say the question
6              one more time, I'm sorry.
7    BY MR. INNES:
8          Q.      Certainly.  So how, if at
9    all, does social media relate to social
10   injustice in Irvington?
11                   MR. KARP:  Object to form.
12             Assumes facts.  Lacks foundation.
13                   THE WITNESS:  I can give two
14             examples of social injustice, one
15             being a narrative on social media
16             of Irvington and, unfortunately, it
17             is usually the negative of when --
18             yes, I don't live here, I live
19             right next door, but this is where
20             I spent the majority of my career
21             and social media platforms paint
22             Irvington in a bad light, because
23             you have access to students posting
24             inappropriate things with the
25             hashtag Irvington or our school

CONFIDENTIAL

Page 319

```
 1            names on it and it just gives a bad
 2            look that this is a bad environment
 3            and, unfortunately, the stigma
 4            attached, because this is a
 5            predominantly black and Hispanic
 6            and migrant population, that it
 7            paints that negative picture.  This
 8            is what that population does when
 9            it's far from the truth, in my
10            opinion.  It just paints a really
11            bad picture of Irvington, which is
12            polar opposite, in my opinion.  And
13            then -- go ahead.
14   BY MR. INNES:
15        Q.    Go ahead.
16        A.    And then the second one, our
17   students, unfortunately, don't understand
18   the severity of posts they put when they
19   comment about skin color.  I've had
20   numerous parents come in that their child
21   is being bullied and this is a social
22   injustice because their child just happens
23   to be a darker shade of black than another
24   kid and they're making fun of him and
25   they're posting pictures and kids are
```

CONFIDENTIAL

1    talking about him.  So, in my eyes, that's

2    a form of social injustice that this child

3    has to suffer and it's not just one child,

4    it happens more than you think, because

5    kids think they're being funny.  Because,

6    oh, I'm just joking with my friend.  It's

7    not funny, and there's more education that

8    needs to happen about self-perpetrated

9    social injustice that our kids aren't

10   realizing that they're doing.  But these

11   platforms make it so much easier to do it

12   because I'm just being funny with my

13   friend, it wasn't a big deal.  And now

14   there's all these comments about this kid

15   and now we have to have the HSSC get

16   involved, because this child is sad that

17   there's nothing they can do about their

18   skin color and everyone is making fun of

19   them.  Their self-worth is diminished and

20   we have to show them positive images of

21   other people and how you should own who you

22   are.  And there's a lot of conversation and

23   these are -- become good conversations, but

24   they start off bad at all times.  So we can

25   always take something bad and turn it to

CONFIDENTIAL

Page 321

1    good, but it's more bad happening.  And
2    then we're just -- I wish we could be more
3    proactive.  I wish there was more
4    information put out there for the kids to
5    realize the dangers of things they put out
6    there rather than being reactive.  So we
7    react to things.  We find ways to help
8    these kids get through these barriers and
9    positivity and understanding where they
10   come from matters, what they look like
11   matters, their ethnicity, their background,
12   but we do do that on our own, but when it
13   comes up in this isolated -- isolated in
14   the context of being posted on social media
15   where they're constantly being targeted
16   just for, and that's just one example, a
17   different shade of skin color.
18           Q.     You're familiar with
19   Instagram, right?
20           A.     A hundred percent.
21           Q.     And you're familiar with the
22   button on Instagram posts, it looks like a
23   heart?
24           A.     Yeah.
25           Q.     Okay.  When you're talking

CONFIDENTIAL

Page 322

1    about this perpetuation of the negative
2    posting or seeking popularity, in your
3    experience in your investigations with
4    students, do you believe that that feature,
5    the heart, perpetuates the harms?
6                      MR. KARP:  Object to form.
7              Calls for speculation.  Lacks
8              foundation.  Assumes facts.
9                      THE WITNESS:  In my opinion,
10             based on my job and my daily
11             interaction with this, that heart a
12             hundred percent does and I'm going
13             to tell you why.  Because deeper
14             than the heart is you can click it
15             open and see who liked it.  And
16             then once you see who liked it and
17             now there's a whole list of people
18             that I'm going to have a problem
19             with because why did you like that
20             picture of my best friend getting
21             beat up yesterday.  So now there's
22             a whole list of people that these
23             students have that I don't like
24             anymore and I'm going to cause
25             problems.  So that like is not just

CONFIDENTIAL

Page 323

```
 1              a like, it's a list of every single
 2              person who liked it and then you
 3              find out that your best friend
 4              liked your other best friend
 5              getting beat up and then you have
 6              drama.  So those likes are
 7              extremely dangerous and that is one
 8              of the main reasons we have
 9              problems every day.  The other are
10              the comments.
11  BY MR. INNES:
12         Q.     The comments?
13         A.     The comments.
14         Q.     Can you explain --
15         A.     Yeah, because if they don't
16  have accounts where the comments aren't
17  there, because you can have that feature,
18  but if you don't know that, you don't know
19  that.  Some kids -- most people want that
20  feature, because we know they want that
21  instant gratification.  So they comment,
22  they tag, the tag-in in the comments causes
23  more issues because it's just like the
24  like, I don't have to do an investigation
25  because now it's on my phone.  I know that
```

CONFIDENTIAL

Page 324

1   you liked it -- I know that you know about

2   it, because I just tagged you in it, and

3   that causes more issues.  Oh, you knew

4   about this and you didn't tell me.

5                    So it's just constant and

6   then, unfortunately, middle school kids,

7   regardless, Irvington or not, it could be

8   California, Texas, it doesn't matter,

9   middle school kids are learning to process

10  and having all these extra devices that

11  they don't know how to use properly just

12  add to the growing problem that middle

13  school kids face every single day across

14  the country, probably the world, but I'll

15  focus on America, that they deal with every

16  single day.

17        Q.      Why do you think -- you say

18  that they don't know how to use them

19  properly, why do you think that is?

20                    MR. KARP:  Object to form.

21                    THE WITNESS:  I don't base --

22            I'm just -- a few conversations,

23            you create the account.  You see

24            what other people do.  You follow

25            along.  They're children.  They're

CONFIDENTIAL

Page 325

```
1         impressionable.  They see things.
2         They see celebrities making
3         accounts.  They see people they
4         like making accounts.  Oh, maybe
5         one day I could be a social media
6         influencer.  If I get these likes,
7         maybe, and I wouldn't say that's
8         the majority of my kids, but that's
9         a nice percentage where they feel
10        like, I could be this one day and,
11        and, yes, you could, but you've got
12        to figure out how to use it, but
13        they're also not told explicitly,
14        like, don't use it to attack other
15        people verbally, because it's
16        verbal and then it turns into
17        physical, unfortunately, and
18        bullying, harassment.  But they're
19        not educated, other than the
20        school, that has to take time to do
21        it and, yes, their parents might do
22        it, but when they see adults,
23        similar age to their parents, and
24        they see their pages, these adults
25        are doing it, so.
```

CONFIDENTIAL

                                        Page 326

1    BY MR. INNES:

2          Q.      It's interesting you say

3    that.  So the adults are doing it.  You

4    testified earlier that you have social

5    media accounts.

6          A.      Yeah.

7          Q.      Do you believe that you were

8    adequately warned about the harms that can

9    be caused by these apps?

10                  MR. KARP:  Object to form.

11                  THE WITNESS:  Was I initially

12              adequately warned?  No.  Did I

13              learn as I got older?  Yes.  I

14              could tell you I would be mortified

15              of some of my earlier posts as a

16              college student using Facebook.

17              Because I didn't understand that

18              my -- what I posted on there and

19              I'm in college, I'm a college

20              student, I haven't graduated yet,

21              but I'm a college student equating

22              to a middle school student right

23              now, I didn't understand the danger

24              of what I put out there on social

25              media when it first came, because

CONFIDENTIAL

Page 327

1           it was explicitly advertised at the
2           time to college students.  I did
3           not know what I put out there lasts
4           forever, because it was not taught
5           to me.
6    BY MR. INNES:
7           Q.    Who would have been in the
8    best position to teach that to you?
9                 MR. KARP:  Object to form.
10          Calls for speculation.
11                THE WITNESS:  I believe, me in
12          particular, since Facebook --
13          Facebook at the time, it's Meta
14          now, Facebook at the time heavily
15          pushed to colleges and universities
16          and put certain ones on a wait list
17          before they could get this Facebook
18          app.  They should have come to
19          campuses and advertised more about
20          your social media footprint.  That
21          never happened, to my recollection.
22          I got access to it and it became us
23          talking about, you know, talking to
24          each other, putting photos up that
25          I regret being up there.  I deleted

Page 328

1          them when I was, you know, when I
2          got a little older, but as I tell
3          the kids, it's probably out there.
4          If I ever ran for president or
5          governor, I'm pretty sure someone
6          is going to pull it up one day, and
7          that's what I tell the kids, you
8          never know when you're going to get
9          older, and social media imprint,
10         but I was 19, 20 years old, and I
11         had no idea how to use Facebook and
12         I was accepted into college.
13    BY MR. INNES:
14         Q.    You live in Irvington?
15         A.    I live in Newark.
16         Q.    Newark.  And Newark is --
17         A.    Next door.
18         Q.    How far away?
19         A.    I can get to my house in ten
20    minutes.
21         Q.    How would you describe Newark
22    as compared to Irvington, similar
23    communities?
24         A.    Similar community, but much
25    bigger, it's much bigger.

CONFIDENTIAL

Page 329

1              Q.      All right.  And the folks
2     that are the parents of your scholars --
3              A.      Uh-huh.
4              Q.      -- they're more or less close
5     to your age or generation; is that right?
6                        MR. KARP:  Object to form.
7                        THE WITNESS:  Sadly, they are,
8            yeah.  No, I'm thinking about it.
9            Yeah, when I started, no, now, yes.
10    BY MR. INNES:
11             Q.      Right.  And your testimony
12    was you didn't understand as a young adult
13    the potential harms of social media, right?
14                        MR. KARP:  Object to form.
15                        THE WITNESS:  No.
16    BY MR. INNES:
17             Q.      And because you didn't
18    understand the potential harms of social
19    media, you couldn't educate your children
20    about potential harms of social media?
21                        MR. KARP:  Object to form.
22                        THE WITNESS:  My correlation
23            was similar to that, but --
24    BY MR. INNES:
25             Q.      Well, let me strike that.

CONFIDENTIAL

Page 330

```
 1                You weren't given
 2   information by the Defendants on how to
 3   educate your children about the harms of
 4   social media?
 5         A.      No, I was not.
 6         Q.      Much like the parents of your
 7   scholars weren't educated by social media
 8   about the harms, correct?
 9                    MR. KARP:  Object to form.
10            Lacks foundation.  Assumes facts.
11                    THE WITNESS:  No, they were
12            not.
13   BY MR. INNES:
14         Q.      And one of the reasons why
15   you take time away from classroom
16   instruction to instruct your or to teach
17   your scholars about the potential harms of
18   social media is because they don't get that
19   instruction at home, correct?
20                    MR. KARP:  Object to form.
21                    THE WITNESS:  The majority of
22            them don't get it to the extent
23            that we provide it to them.
24                    MR. INNES:  Pass the witness.
25                    MR. SEXTON:  Can I take a
```

CONFIDENTIAL

Page 331

1          break before --
2                MR. KARP:  Yeah, we would like
3          to take a quick break.
4                MR. INNES:  Yeah, sure.
5                THE VIDEOGRAPHER:  The time
6          right now is 5:20 p.m.  We are off
7          the record.
8                     - - - - -
9      (A recess was taken at this time.)
10                     - - - - -
11                THE VIDEOGRAPHER:  The time
12          right now is 5:47 p.m.  We are back
13          on the record.
14                MR. INNES:  So just a quick
15          statement, so after about four and
16          a half hours of questioning,
17          Plaintiffs did about 43 minutes, 48
18          minutes of their own questioning.
19          We have been off the record for
20          over 25 minutes.  It seems a little
21          excessive for something this late
22          in the day and that much
23          questioning and that little amount
24          of cross-examination, but the
25          witness is yours.

Page 332

1  BY MR. KARP:

2      Q.      I appreciate that statement.

3  Briefly in response, as you know, there are

4  a number of Defendants in this case, and,

5  surely, we were utilizing that time in the

6  interest of efficiency and to streamline

7  some of the questioning that I'll be

8  proceeding with now.  We appreciate the

9  break.

10              Mr. Bussacco, you have been

11 here a while and I'm going to try to get

12 you out of here as quickly as I can and

13 I'll reiterate that we appreciate your time

14 today, so thank you.

15      A.      No problem.

16      Q.      You mentioned in response to

17 a number of the questions that your counsel

18 asked that you have negative opinions of

19 social media platforms; is that accurate?

20      A.      I have negative and positive,

21 absolutely.

22      Q.      Okay.  What are those

23 positive opinions?

24      A.      Positive opinions of social

25 media?

CONFIDENTIAL

Page 333

1          Q.      Yeah.

2          A.      You can use it to advertise

3     events, change the narrative of your school

4     by posting more positive stuff.  I can --

5     you can use it to showcase positive things

6     happening in the world, your life, so

7     there's ways that you can use social media

8     effectively, absolutely.

9          Q.      Earlier today, I asked you

10    some questions about a lesson that one of

11    your teachers was doing in which she

12    featured Instagram posters.  Do you

13    remember that?

14         A.      Ms. Mathias.

15         Q.      Ms. Mathias, yes.

16         A.      Uh-huh.

17         Q.      And your counsel asked you a

18    few follow-up questions about that lesson.

19         A.      I remember them.

20         Q.      The reason that Ms. Mathias

21    did that lesson is that she recognized that

22    there was a positive and productive way to

23    use social media, right?

24              MR. INNES:  Objection.

25         Misstates prior testimony.  Calls

CONFIDENTIAL

Page 334

1              for speculation.  Lack of
2              foundation.
3                   THE WITNESS:  So the question
4              is Ms. Mathias utilized the concept
5              of Instagram to make it positive,
6              am I saying it correctly what
7              you're saying?  I'm sorry.
8    BY MR. KARP:
9         Q.    I'll rephrase the question.
10   Sure.  You testified earlier that Ms.
11   Mathias and her team had made a decision to
12   intentionally teach kids about the positive
13   use of Instagram and to try to change the
14   narrative.
15                   Do you remember that
16   testimony?
17        A.    I do.
18        Q.    Okay.  And that is an
19   acknowledgment and recognition from the
20   school that there is a safe and positive
21   and productive way to use Instagram, right?
22                   MR. INNES:  Objection.
23                   THE WITNESS:  If taught.
24   BY MR. KARP:
25        Q.    Sure.

CONFIDENTIAL

```
                                        Page 335
 1                    MR. SEXTON:   I'm sorry, I
 2            didn't hear your answer.
 3                    THE WITNESS:   If taught.
 4    BY MR. KARP:
 5          Q.      You mentioned having negative
 6    and positive opinions of social media.   Do
 7    you remember that?
 8          A.      Yup.
 9          Q.      For how long have you held
10    these negative opinions of social media?
11                    MR. INNES:   Objection.
12                    THE WITNESS:   I wouldn't say I
13            hold negative opinions about it,
14            it's more of I get to live it on a
15            day-to-day basis working with
16            children.  So I would say once
17            we've -- I've realized -- well,
18            we're talking about me, once I
19            realized the harms of social media
20            and how quickly it can escalate, I
21            saw the negative impacts of it, but
22            I also acknowledge publicly
23            recording that there are positives
24            if done correctly and educated.
25
```

CONFIDENTIAL

Page 336

1   BY MR. KARP:

2           Q.      Have you shared these

3   concerns and these thoughts about social

4   media with parents of the students in your

5   school?

6           A.      A hundred percent.

7           Q.      And in what form would those

8   communications have taken?

9           A.      Going back to a previous

10  question you asked me from Ms. Gail Rosen,

11  I was preparing for an orientation and a

12  block party, so that was part of my

13  presentation.  There's a PowerPoint --

14  excuse me -- that I do every year for

15  parents come in, specifically incoming

16  sixth-grade parents, to talk about these

17  are social media platforms, this is what,

18  you know, we're asking you to help us out,

19  because it's supposed to be a community

20  partnership, so I do my best to educate the

21  few amount of parents that do come, so

22  that's part of that.

23                  And it's also embedded into

24  the eighth-grade curriculum for my scholars

25  based on the department of education.  But

CONFIDENTIAL

Page 337

1   me specifically, I send out -- I do a

2   presentation.  We do PTA events where we

3   talk about how we can assist our children,

4   how to better use platforms.  So we do that

5   as a school.

6          Q.    As part of the presentation

7   that you just described as part of that

8   sixth-grade orientation, you said that you

9   enlisted the -- one thing you presented on

10  was enlisting the assistance of parents in

11  helping their students understand how to

12  use social media?

13         A.    To create a partnership.

14         Q.    Okay.  You agree in that

15  respect that parents have a role in

16  monitoring how their children use cell

17  phones and use social media, correct?

18         A.    I do, and that's why I took

19  it upon myself to educate them because a

20  lot of our parents don't know these is what

21  we're finding out, because they also had

22  similar stories to me where they were using

23  social media as a younger person and didn't

24  know.

25         Q.    You also mentioned that

CONFIDENTIAL

Page 338

1  social media instruction is mandated by the
2  state for eighth graders, did I hear you
3  correctly?
4        A.    Not social media, but back to
5  the question from both of you, more of
6  proper use of technology.  Social media
7  falls under a second umbrella, but it's not
8  the curriculum, it's proper use of
9  technology in this day and age, 21st
10 century skills.
11       Q.    Understood.  So that
12 curriculum is not a choice that any school
13 and IPS is making, it is a must, a
14 requirement that is coming from the state
15 of New Jersey?
16       A.    Yes.  They provide a basic
17 kind of elevation we talked about where the
18 district provides the plan and the school
19 elevates it.  So the state provides the
20 floor plan and we elevate it.  Mr. Amberg
21 has done a fantastic job at putting more
22 relevant topics specifically on social
23 media and how to educate our staff to
24 educate our students.
25       Q.    In response to your counsel's

CONFIDENTIAL

Page 339

1    questions, you provided some testimony

2    about likes and comments on social media

3    platforms, do you recall?

4         A.     I recall.

5         Q.     Have you reached out to any

6    of those social media platforms to express

7    your concerns about the like and comment

8    features?

9         A.     I have reached out to my

10   direct supervisor at points, she's no

11   longer in the district, and she has told us

12   that she has reached out, I can't confirm

13   or deny she did it, but she told me, so I

14   took her at her word that she reached out

15   to try to get certain pages removed to

16   Instagram specifically, because some of our

17   students use Instagram to make fight pages

18   and they tag the school in it, which goes

19   back to an earlier statement I said about

20   the negative impact being put up on

21   Instagram, YouTube of Irvington and, in

22   particular, my school.

23        Q.     Sure.  And who was your

24   direct supervisor?

25        A.     At that time that what I'm

CONFIDENTIAL

Page 340

1   talking about, her name is Dr. -- not Anna,
2   I'm sorry, Dr. McCleod, M-C-C-L-E-O-D.  And
3   that was 2022-2023.  And the reason I
4   stopped, she said she's tried and they
5   won't pull it.
6            Q.    And what was Dr. McCleod's --
7   what is Dr. McCleod's first name?
8                  MR. INNES:  Objection.  Before
9            you answer that question, I'll just
10           make the record that we have
11           repeatedly requested information
12           specific to the pages that Mr.
13           Bussacco has just testified about
14           and those have not yet been
15           produced in the case.  We call for
16           their production immediately.
17                 MR. KARP:  I understand.
18                 THE WITNESS:  You said what is
19           her first name?
20                 MR. KARP:  Yes.
21                 THE WITNESS:  Latee,
22           L-A-T-E-E, and she's no longer with
23           the district.  She's with Essex
24           Regional.  She's the superintendent
25           of Essex Regional.  I don't

CONFIDENTIAL

Page 341

1              remember the title, to be exact,
2              but she's no longer with the
3              district.
4    BY MR. KARP:
5         Q.      Putting aside the
6    communication you had with Dr. McCleod,
7    have you directly had any interactions or
8    communications with any social media
9    platforms?
10        A.      Regarding my school, no.
11        Q.      Have you had interactions
12   with social media companies, other ones?
13                MR. INNES:  Objection.
14                THE WITNESS:  Have I had,
15            like, have I personally reached out
16            to --
17   BY MR. KARP:
18        Q.      Yes.
19        A.      I'm thinking, it has been a
20   while.  I don't believe I have personally,
21   no.
22        Q.      Okay.  And that would include
23   any of the Defendants in this case, Meta?
24        A.      I personally haven't reached
25   out to any of them.  I can't speak to Bevin

Page 342

1    Subocz and John Amberg though.

2         Q.    Okay.  Have you gone to the

3    websites for any of these social media

4    companies to see what materials they have

5    available, what guidance they might have

6    available to users of their platforms?

7         A.    I have personally, I think it

8    was when I went to Paterson, I know that

9    doesn't go to this case, I think around

10   2019, 2020, Instagram created a teen

11   account where it could be linked to the

12   parents and they -- which was a nice step

13   in the right direction and they provide,

14   you know, how to do that and that was it.

15   So it was more of, like, hey, this is how

16   you could do it and that was it.  But I

17   believe it was 2019, 2020 is when Instagram

18   created that, because I was in Paterson

19   when I learned that.

20        Q.    And is that the only instance

21   you can recall of when you would have

22   visited the website of a social media

23   company to see what guidance or materials

24   they had available for use?

25        A.    Yeah, I did not search more

CONFIDENTIAL

Page 343

1    than certain things.  And then I also had

2    tech people there as well, so they were the

3    ones who pointed me in that direction, but

4    no.

5         Q.    When you visited the site to

6    learn about teen accounts for Instagram --

7         A.    Instagram.

8         Q.    -- was that in your

9    professional capacity or was that --

10        A.    Professional.

11        Q.    Okay.  But, again, that was

12   while you were at Paterson, not with

13   Irvington?

14        A.    But it gave me knowledge that

15   I could use in my sixth-grade orientation,

16   hey, in case you're not aware of this, it's

17   not being marketed out there, but I found

18   this, so did you know you could do this

19   type of thing and most parents were, like,

20   I did not know.

21        Q.    Sure.  So this information

22   that you ultimately passed on was publicly

23   available and anyone, including parents,

24   could have gone onto those sites to see it

25   themselves?

Page 344

```
 1          A.     If you knew what to search
 2    for.
 3          Q.     Okay.  But it was -- it was
 4    on the websites for people to visit?
 5          A.     I can speak of Instagram,
 6    uh-huh.
 7          Q.     Okay.  You also said earlier
 8    that -- or testified earlier in response to
 9    your counsel's questions that parents
10    didn't have information about how to
11    educate their students on effective or safe
12    social media use.  Do you remember that?
13          A.     I do.
14          Q.     Is that something that you
15    have or that University Middle School has
16    to the extent you know ever studied or
17    tried to investigate?
18                     MR. INNES:  Objection.
19                     THE WITNESS:  Of why, have we
20             ever studied or investigated why
21             parents --
22    BY MR. KARP:
23          Q.     Whether or not parents have
24    information and know how to educate their
25    children on the use of social media.
```

Page 345

1          A.     So there was never a direct
2     study, but based on previous answers I
3     provided, conversations with parents would
4     be my data, my PTA meetings, my
5     orientation, most parents say they didn't
6     even know these things exist.
7          Q.     Have you ever surveyed
8     parents at University Middle School or any
9     school in the district about whether
10    they've ever visited the sites of any
11    social media companies to understand the
12    materials and resources that are available
13    to users?
14                    MR. INNES:  Objection.
15                    THE WITNESS:  I have not
16           surveyed for that particular thing.
17    BY MR. KARP:
18          Q.     Earlier you testified about
19    an incident that you attended to this
20    morning prior to today's deposition, do you
21    recall?
22          A.     Yes, but it was my assistant
23    principal that attended to it, I just was
24    there.
25          Q.     Okay.  I believe you

Page 346

1    described this incident as a fake fight?

2         A.      Yeah.

3         Q.      Okay.  You did not personally

4    attend or you were not physically present

5    for this fake fight, correct?

6         A.      No, because we believed --

7    security believed it was a real fight.  At

8    my school, we call a signal five if there's

9    a fight.  They went there, my assistant

10   principal and me were in the same room when

11   they were bringing this to us.  She took

12   it, because I was overseeing testing

13   getting everything ready and then upon her

14   investigation is what I discussed, how we

15   discovered it, where the kid said, hey,

16   that's my friend, we're just playing

17   around, and then we looked at the camera,

18   not their camera, but our cameras, and see

19   they set up the camera prior to.

20        Q.      You mentioned or you

21   testified about why the students engaged in

22   this behavior.  Do you remember?

23        A.      I do.

24        Q.      Did you, prior to giving that

25   testimony, did you interview the students

Page 347

1   who were involved?

2          A.      Ms. Allen-Penn did.

3          Q.      Okay.

4          A.      That's how I got that

5   information.

6          Q.      You did not personally

7   interview them though?

8          A.      No, I did not.

9          Q.      Let's talk a bit more

10  generally about TikTok challenges which you

11  referenced in your testimony.  What is your

12  understanding of how a TikTok or other

13  viral challenge works?

14         A.      My understanding is someone,

15  an influencer goes on and tells kids to do

16  certain -- well, people, I'll just say

17  people, tells people to do certain things

18  and they do it.  My limited understanding,

19  I do remember during COVID, there was the

20  TikTok challenges, break the sink and stuff

21  like that, but once again, I wasn't in

22  Irvington at the time when I experienced

23  that, but I don't equate TikTok challenges

24  today to that.  It's more people saying to

25  do stuff, it gets traction, and students

CONFIDENTIAL

Page 348

1   want to do it so they can also get

2   traction.  And that's what this fight, one

3   was after talking to my assistant

4   principal, she apparently -- not

5   apparently, she told me she did a quick

6   search and that's how she was able to

7   verify that they were, you know, there was

8   some lady that posted three days ago and

9   it's becoming -- it's getting more views

10  and more upticks, so more people are seeing

11  it.

12          Q.    Okay.  You understand that

13  students must first see the challenge on

14  TikTok or another site?

15          A.    Yeah.

16              MR. INNES:  Objection.

17  BY MR. KARP:

18          Q.    And then the student emulates

19  or the students emulate what they're seeing

20  in real life?

21              MR. INNES:  Objection.

22              THE WITNESS:  Yeah.

23  BY MR. KARP:

24          Q.    Do you have any evidence that

25  the students who were involved in this

Page 349

1    morning's incident were emulating content

2    that they saw on TikTok specifically?

3                    MR. INNES:  Objection.

4                    THE WITNESS:  Emulate

5              specifically what they saw, the

6              content was, to my understanding,

7              to cause chaos, simulate a fight,

8              so then, yes, because that's what

9              they did.  They knew that a signal

10             five would be called and people

11             would break it up and they laughed

12             about it and it was sent throughout

13             the school during testing.  Before

14             the start of testing.  I don't want

15             a testing irregularity.

16   BY MR. KARP:

17         Q.    And do you have evidence that

18   they were emulating something that they saw

19   on TikTok as opposed to some other site?

20         A.    They mentioned the word

21   specifically TikTok to my assistant

22   principal.

23         Q.    Okay.  And that is when your

24   assistant principal interviewed them?

25         A.    During her interviews when

CONFIDENTIAL

Page 350

1   that statement came out.
2          Q.      Okay.  But, again, you did
3   not --
4          A.      I did not.
5          Q.      Were any records, I know, I
6   understand that this incident happened only
7   this morning, but have any records been
8   obtained relating to these students' use of
9   social media?
10                   MR. INNES:  Objection.
11                   THE WITNESS:  Records such as
12              how?  You mean their student
13              statements that they wrote telling
14              us that they used social media and
15              that's where they got the idea
16              from?
17   BY MR. KARP:
18          Q.      If the students usage data or
19   anything along those lines has been
20   obtained is kind of what I'm asking.
21          A.      I can't obtain usage data,
22   but there's testimony, their written
23   statement says it.
24                   MR. INNES:  One second.  So I
25              guess I'm going to call for the

CONFIDENTIAL

Page 351

1       production of the usage data.  You
2       guys have it, right?
3           MR. KARP:  I'll clarify my
4       question, I was asking --
5           MR. INNES:  No, you don't have
6       to clarify.
7           MR. KARP:  -- about content
8       filters and the extent you're able
9       to --
10          MR. INNES:  You said usage
11      data.  You asked him if they had
12      collected usage data.  You guys
13      have usage data, right?  TikTok has
14      usage data.  You're asking him to
15      provide the usage data.
16          MR. KARP:  I'm asking -- I
17      will reask my question, if that was
18      not clear, and I apologize, I was
19      asking with the intent of getting
20      at any data that the district is
21      able to intercept through content
22      filters or other monitoring of
23      network activity and how these
24      students might have been on social
25      media, data that you have

CONFIDENTIAL

1          available, that's what I was
2          asking.
3               THE WITNESS:  The district
4          isn't able to log onto a student's
5          personal device.  They would have
6          had to be asking it through a
7          district computer, which is
8          blocked, so they wouldn't have.  So
9          we are unable to, I believe it's
10         illegal to access a student's phone
11         through a Wi-Fi server and Mr.
12         Amberg can talk to more of that,
13         but, no, I would never be able to.
14              MR. KARP:  Understood.
15              MR. INNES:  Before you ask
16         your next question, so what's good
17         for the goose is good for the
18         gander.  If you guys are going to
19         ask him to give usage data, I would
20         expect you would honor our request
21         that we made multiple times for
22         usage data regarding the folks in
23         our school district.  You thus far
24         have refused to provide that, so
25         it's a little disingenuous for you

CONFIDENTIAL

Page 353

1    to be asking for usage data.
2         MR. KARP:  I certainly don't
3    believe it's disingenuous.  I
4    clarified the intent of my
5    question, I was asking about data
6    that the district might have in its
7    possession regarding the use of its
8    networks.  That was my intent.
9    I've since clarified it.  I
10   understand your request.  It's on
11   the record.  We can talk about it
12   after the deposition.
13        MR. INNES:  I'll renew our
14   request --
15        MR. KARP:  Sure.
16        MR. INNES:  -- and we would
17   like you to produce the usage data
18   that we have been asking about for
19   over a half year now, I think.
20        MR. KARP:  Okay.  I've made
21   requests for documents as well that
22   you have not produced, so we can
23   deal with that --
24        MR. INNES:  We can talk about
25   that.

CONFIDENTIAL

Page 354

1                    MR. KARP:  Sure.

2                    MR. INNES:  No, let's keep

3            talking.  Let's put it on the

4            record, what don't you think you

5            have?

6                    MR. KARP:  I don't think that

7            this is an appropriate use of time.

8            We have a limited time --

9                    MR. INNES:  It's your time.

10                   MR. KARP:  It is my time and

11           I'm choosing not to use it for

12           this.  I'm choosing to wrap up my

13           questioning with the witness so

14           that he can get out of here.

15                   MR. INNES:  Are you agreeing

16           to produce the usage data?

17                   MR. KARP:  I'm not agreeing to

18           produce anything at this time.

19           Great.

20   BY MR. KARP:

21           Q.    You mentioned earlier as part

22   of your testimony that sometimes students

23   stay up late at night on their cell phones,

24   correct?

25           A.    That is correct.

CONFIDENTIAL

Page 355

1          Q.    You said sometimes they are
2    on social media?
3          A.    Yes.
4          Q.    And you said sometimes
5    they're playing video games?
6          A.    Yes.
7          Q.    Have you ever studied or
8    investigated specifically which apps or
9    social media platforms students are using
10   that is causing them to stay up late at
11   night?
12                MR. INNES:  Objection.
13                THE WITNESS:  I haven't
14           studied, but based on daily
15           investigations through myself,
16           deans, school counselors, HSSCs,
17           it's mainly TikTok, Instagram,
18           Facebook, and X.
19   BY MR. KARP:
20         Q.    And X?
21         A.    Uh-huh.
22         Q.    Okay.  Do you have any data
23   on how often those social media platforms
24   are being used by students as opposed to
25   other things that they are doing on their

CONFIDENTIAL

Page 356

1    cell phones such as playing video games?

2              MR. INNES:  Objection.  This

3              is exactly what we just talked

4              about.  You're asking him for the

5              data that we've asked for you to

6              produce and you haven't produced

7              it.

8              MR. KARP:  I'm not asking for

9              that.  I will rephrase the

10             question.

11             Do you have any -- does

12             University Middle School or do

13             you personally have any

14             information about how often

15             students are using social media

16             late at night versus playing

17             video games or doing other things

18             on their phone?

19             THE WITNESS:  So your question

20             is do I have any data?

21   BY MR. KARP:

22        Q.    Any data or any statistics.

23        A.    I have data in the form of

24   student statements and if we analyze it, we

25   can give you a percentage, but that's all

CONFIDENTIAL

1    we have.

2         Q.      Understood.  You don't know

3    the percentage of time that -- or the

4    percentage of these students that you are

5    talking about who are up late at night on

6    social media versus the percentage who are

7    using their cell phones for other things?

8         A.      I can't give you a

9    percentage, correct, but, once again, the

10   majority of my interactions are because of

11   social media at night.

12        Q.      And I don't want to belabor

13   the point, I'm going to move on, I just

14   want to ask to the extent you've had

15   these -- you had these anecdotal

16   experiences, are they memorialized

17   anywhere?  Are these conversations written

18   out in any forms that you and the district

19   maintain?

20        A.      Yes, student statements, not

21   all student statements, but student

22   statements are taken.  When they meet with

23   a school counselor, their names are written

24   down and they have conversations, so there

25   should be some type of logs talking about

CONFIDENTIAL

Page 358

1    this, but most of them would be from the

2    health and social service coordinator and

3    that's more like the student talking to a

4    therapist, but it's not protected in that

5    way.

6          Q.     Just a few more questions and

7    then I will -- I will pause and allow

8    others to jump in with their questions if

9    they have any.

10               We talked a bit about

11   University Middle School students' academic

12   performance on standardized tests.  Do you

13   recall --

14         A.     Yes, we did.

15         Q.     -- your counsel came back to

16   that topic when he was asking you

17   questions, do you remember?

18         A.     Yes.

19         Q.     Do you or does University

20   Middle School have any information about

21   how social media use at University Middle

22   School compares to social media use at

23   other schools in New Jersey?

24               MR. INNES:  Objection.

25               THE WITNESS:  No, because I

Page 359

```
 1          don't think it's collected from
 2          other schools within the
 3          district -- the state you said, I'm
 4          sorry.
 5  BY MR. KARP:
 6          Q.    You don't have data or
 7  statistics regarding how many students at
 8  University Middle School or any other
 9  school in Irvington Public Schools uses
10  social media as compared to other schools
11  in the state of New Jersey; is that right?
12                MR. INNES:  Objection.  I know
13          you don't want to belabor this, but
14          you are, so I'll keep responding
15          this way.  We have asked for usage
16          data up and down from each one of
17          your Defendants and you've refused
18          to provide it.  You're now
19          injecting it into your defense in
20          this case that you need the usage
21          data and implying that because we
22          haven't done studies, they have
23          usage data, the data that you have.
24          It's relevant.  It should be
25          produced.  It should be produced
```

CONFIDENTIAL

Page 360

```
 1              today.  It should have been
 2              produced six months ago.
 3                   MR. KARP:  I don't agree that
 4              that's what I'm asking --
 5                   MR. INNES:  These are your
 6              questions.  Every question is about
 7              what data do you have about usage,
 8              how does it compare, what social
 9              media data usage.  You are the
10              social media platforms.  You have
11              the data.  Produce it.
12   BY MR. KARP:
13        Q.    My question, if I may ask
14   another one, in light of your counsel's
15   objection, is whether you or University
16   Middle School have ever specifically tried
17   to quantify social media use at other
18   schools in the state of New Jersey?
19                   MR. INNES:  Objection.
20                   THE WITNESS:  Can you ask the
21              question again?
22   BY MR. KARP:
23        Q.    Have you or has University
24   Middle School ever attempted to quantify or
25   measure the amount of social media use at
```

CONFIDENTIAL

```
                                        Page 361
 1    other schools in the state of New Jersey?
 2            A.      I wouldn't be able to --
 3                    MR. INNES:  Objection.
 4                    THE WITNESS:  -- because other
 5              schools don't publicize their usage
 6              data.  It's not shared.  It's not
 7              public knowledge.  It's private.
 8              It's protected.
 9    BY MR. KARP:
10            Q.      A couple of more things here.
11    We talked a little bit about Ms. Ganthier's
12    lesson where she was asking students about
13    the dangers of social media, do you recall?
14            A.      I do recall.
15            Q.      You've testified about likes
16    and comments?
17            A.      Uh-huh.
18            Q.      Those two particular features
19    were not mentioned by any of the students
20    that Ms. Ganthier surveyed, right?
21            A.      Not in that statement, no.
22            Q.      Okay.  Do you believe that
23    social media has had a larger negative
24    impact on the mental health of students
25    than poverty?
```

Page 362

```
 1        A.      I can only speak to social
 2   media, because I deal with that every day
 3   and I do deal with poverty.  I believe that
 4   social media has had a negative impact.
 5   Also poverty has a negative impact.
 6        Q.      I'm asking if you think that
 7   the negative impact of social media is
 8   larger on the mental health of students
 9   than poverty.
10        A.      I'm going to say yes and I'm
11   going to tell you why I say yes.  I believe
12   it has a larger on mental health, social
13   media, because it's in the moment.  You
14   know it.  Growing up impoverished myself, I
15   didn't know I was poor.  A lot of our kids
16   don't know they're poor.  You don't know
17   you're poor unless someone tells you you're
18   poor or unless you're missing meals.  I
19   didn't know I was poor.  I had a parent
20   that cared about me.  I had two brothers
21   and we were taken care of, but we were poor
22   compared to other people.  I didn't grow up
23   in a town of social media.  I have students
24   that are poor, they don't realize they're
25   poor, because there are similar kids around
```

Page 363

1  them, so they're lucky for that part, but

2  social media is every single day and it

3  drains on my scholars every single day.

4           I spend countless hours

5  dealing with social media and my other

6  staff members spend even more time than I

7  do.  So, in my honest opinion, by doing

8  this for many, many years, I believe social

9  media has a huge impact and I believe that

10  studies should be being done by Defendants

11  to show this and things should be done

12  about it.  So, yes, growing up as someone

13  who was poor, so I can speak to that as

14  well, yes.

15           Q.     Do you believe that social

16  media has had a larger negative impact on

17  the mental health of students than racism?

18           A.     Could you not make a

19  correlation that racism exists on social

20  media as well, so they're similar?

21  Students experience racism on a daily basis

22  through social media when they post things,

23  other people get it and they say

24  inappropriate comments about them.  So not

25  only are they experiencing racism in the

CONFIDENTIAL

Page 364

1    micro, now it became a macro, because

2    social media has expounded it.  So I would

3    argue that social media makes it worse.

4    So, yes, to answer your question, yes.

5              Q.      Social media has had a larger

6    negative impact on student mental health

7    than racism has?

8              A.      Because it takes it from a

9    micro to a macro and they're exposed to

10   racism at a much more greater and prevalent

11   thing than we've ever experienced at their

12   age growing up.

13             Q.      Is that something that you or

14   University Middle School has ever studied?

15             A.      No.

16             Q.      Do you have any studies or

17   are you aware of any literature to back up

18   that statement or that testimony?

19             A.      Any statement about my

20   statement I just made, just from my

21   professional experience of over 15, 16

22   years, and talking to colleagues and other

23   people in similar situations.

24                     MR. KARP:  I have no further

25             questions on my end.  I want to

CONFIDENTIAL

Page 365

1              make sure that others -- other
2              codefendants don't have questions.
3                     MR. INNES:  Uh-huh.
4                     MR. SEXTON:  I have a few.  I
5              can ask them from here if you want
6              to hand me the microphone.
7                     MR. KARP:  Sure.
8                     MR. SEXTON:  Can you hear me
9              okay?
10                    THE WITNESS:  I can hear you,
11             sir, yup.
12                    MR. INNES:  And who do you
13             represent?
14                    MR. SEXTON:  I represent Meta.
15                    THE WITNESS:  Meta.
16   BY MR. SEXTON:
17         Q.    I'm sorry.  I won't be doing
18   this for very long.  Good afternoon, Mr.
19   Bussacco.  I know it has been a long day.
20   I just have a few questions for you.  My
21   name is Terry Sexton.  I represent Meta
22   Platforms.
23         A.    Yes, sir.
24         Q.    Were you aware before today
25   that Meta owns both the Instagram and

CONFIDENTIAL

Page 366

1    Facebook platforms?

2         A.    Yes, uh-huh.

3         Q.    Okay.  You've never

4    communicated by any means with anyone who

5    works at Meta, right?

6         A.    No, sir.

7                   MR. INNES:  Objection.

8           Outside the scope.

9    BY MR. SEXTON:

10        Q.    You've never communicated by

11   any means with anyone who works for

12   Facebook?

13                  MR. INNES:  Objection.  Beyond

14          the scope.

15                  THE WITNESS:  No, sir.

16   BY MR. SEXTON:

17        Q.    You've never communicated by

18   any means with anyone who works for

19   Instagram?

20                  MR. INNES:  Objection.  Beyond

21          the scope.

22                  THE WITNESS:  No, sir.

23   BY MR. SEXTON:

24        Q.    Okay.  You told us earlier

25   that you learned that Instagram makes

Page 367

1  special accounts available for teenagers

2  called teen accounts; is that right?

3          A.      To my understanding, it was

4  more where parents can monitor their

5  child's account and I believe it came

6  around 2019.

7          Q.      You learned about those

8  accounts while you were working at

9  Community Charter School of Paterson?

10         A.      That is correct.

11                 MR. INNES:  Objection.  Beyond

12             the scope.  Counsel, you had an

13             opportunity to ask questions.  Now

14             we are in the ping-pong of a

15             deposition.  You have to stay

16             within the scope of my examination.

17             You're not.

18                 MR. SEXTON:  I'm in the --

19                 MR. INNES:  You're nowhere

20             near it.

21                 MR. SEXTON:  I'm in the scope.

22                 MR. INNES:  You're nowhere

23             near.  You can say that, but you're

24             nowhere near it.

25                 MR. SEXTON:  I'm going to ask

CONFIDENTIAL

Page 368

1           questions.
2                   MR. INNES:  Move to strike all
3           of them.
4    BY MR. SEXTON:
5       Q.      Okay.  Did you tell parents
6    at the charter school about Instagram teen
7    accounts?
8                   MR. INNES:  Objection.
9           Misstates prior testimony.  Way
10          outside the scope.
11                  THE WITNESS:  I did, but I
12          want to make it clear that it was
13          not part of Irvington Public School
14          -- I was not part of Irvington
15          Public Schools at the time.
16   BY MR. SEXTON:
17      Q.      What did you tell parents at
18   Paterson about Instagram teen accounts?
19                  MR. INNES:  Objection.  Beyond
20          the scope.
21                  THE WITNESS:  To my knowledge,
22          I just made them aware that it
23          exists and that they should use it
24          because they can monitor a child's
25          account, nothing other than that,

CONFIDENTIAL

```
                                                Page 369

 1              and I think -- take it back, also

 2              this is how you could do it, try it

 3              out, see if you want to do it.

 4    BY MR. SEXTON:

 5         Q.     So you were encouraging

 6    parents at Paterson Charter Stool -- strike

 7    that.

 8                   You were encouraging parents

 9    at Community Charter School in Paterson to

10    explore and use or at least consider using

11    Instagram teen accounts; is that right?

12                   MR. INNES:  Objection.

13              Outside the scope.

14                   THE WITNESS:  Yes.

15    BY MR. SEXTON:

16         Q.     Have you also told parents at

17    your current school, University Middle

18    School, about Instagram teen accounts?

19                   MR. INNES:  Objection.

20              Outside the scope.

21                   THE WITNESS:  I previously

22              answered that from other counsel,

23              during orientation, I made them

24              aware of certain things.

25
```

CONFIDENTIAL

Page 370

1    BY MR. SEXTON:
2        Q.      Did you have PowerPoints or
3    slides or handouts to accompany these --
4        A.      Not handouts --
5        Q.      -- presentations?
6        A.      -- PowerPoints.
7        Q.      And is this part of a
8    presentation that you give every year here
9    at University Middle School?
10                   MR. INNES:  Mike, let me --
11             before you answer those questions,
12             let me get my objections in.  It's
13             really important, especially with
14             him going way beyond the scope.
15             You had an opportunity to ask all
16             these on direct through your other
17             counsel, you didn't do it.
18    BY MR. SEXTON:
19        Q.      Do you want to answer my
20    question now?
21        A.      Can you ask it again, please?
22        Q.      Sure.  Did you have handouts
23    or other materials that you distributed to
24    parents when you presented to them about
25    Instagram teen accounts?

CONFIDENTIAL

```
                                    Page 371

 1                MR. INNES:  Objection.
 2                THE WITNESS:  I don't believe
 3          there was handouts.
 4   BY MR. SEXTON:
 5        Q.    Okay.  And is this a
 6   presentation you give each year at the
 7   beginning of the school year to new parents
 8   at University Middle School?
 9                MR. INNES:  Objection.
10                THE WITNESS:  It's part of --
11          it's a small part of my
12          orientation.
13   BY MR. SEXTON:
14        Q.    Okay.  You said that you
15   learned about Instagram teen accounts when
16   you went to visit the Instagram website; is
17   that right?
18                MR. INNES:  Objection.
19   BY MR. SEXTON:
20        Q.    Or strike that.  I'll ask a
21   better question.
22                How did you learn about
23   Instagram teen accounts?
24                MR. INNES:  Objection.
25                THE WITNESS:  I was made aware
```

```
                                    Page 372

1            by an employee in the district.  I
2            can't remember who, an employee in
3            the district that I joined, I
4            looked into it, learned basics,
5            told parents.
6    BY MR. SEXTON:
7         Q.    You encouraged them to use
8    Instagram teen accounts?
9                 MR. INNES:  Objection.
10                THE WITNESS:  Yes, sir.
11   BY MR. SEXTON:
12        Q.    Okay.  You also spoke earlier
13   about a supervisor of yours named Dr. Latee
14   McCleod; is that right?
15        A.    That is correct.
16                MR. INNES:  Objection.
17   BY MR. SEXTON:
18        Q.    You said you think Dr. Latee
19   McCleod might have communicated directly
20   with a social media company?
21                MR. INNES:  Objection.
22                THE WITNESS:  What I said was
23          she told me she did --
24                MR. SEXTON:  Okay.
25                THE WITNESS:  -- and then she
```

Page 373

1            said that they would not pull the

2            fight page on Instagram.

3    BY MR. SEXTON:

4            Q.      Okay.

5            A.      She did not go into reasons

6    nor did she have to, because she's my

7    superior.

8            Q.      Okay.  When did Dr. McCleod

9    tell you that?

10           A.      God, I think it was the 2022

11    academic year, I couldn't tell you

12    specific --

13           Q.      Have you ever seen any of Dr.

14    McCleod's communications with Meta or

15    Instagram?

16           A.      I wouldn't be privy to that,

17    she's my supervisor.

18           Q.      So you've never seen those?

19           A.      No.

20           Q.      And you've never seen any

21    communications that would have come back

22    from Meta or Instagram to Dr. McCleod; is

23    that right?

24                    MR. INNES:  Objection.

25                    THE WITNESS:  No, sir.

                                              Page 374

1   BY MR. SEXTON:

2        Q.    Okay.  You also said earlier

3   you thought Instagram didn't instruct users

4   on how to use its platform appropriately;

5   is that right?

6        A.    Yes, when we were

7   specifically talking about the two

8   documents provided to me in 2015 and two

9   thousand and -- let me find the years, 2015

10  and I don't, the other year was before the

11  teen account, so what's the other one for

12  Ms. Mathias, anyone know the year?  I'll

13  find it.

14            MR. INNES:  While Mr. Bussacco

15            is searching for that, have you

16            guys produced any communications

17            from Irvington?

18            MR. SEXTON:  I don't know.

19            THE WITNESS:  Do you have that

20            one, Michael?

21            MR. INNES:  Will you agree to

22            search for those and produce those?

23            THE WITNESS:  I need the year.

24            MR. SEXTON:  Send me a letter

25            and I'll take a look at it.

Page 375

1                THE WITNESS:  Thank you, sir,
2         I appreciate it.
3                MR. INNES:  Zach, if you're on
4         the line, can you just send a
5         letter to -- what was your name
6         again?
7                MR. SEXTON:  My name is Terry
8         Sexton.
9                MR. INNES:  Mr. Sexton
10        requesting production.
11               THE WITNESS:  So the years I
12        was discussing came directly from
13        what we were talking about the 2015
14        article, the 100300320 and the one
15        from 2017.  At the moment, we did
16        not know those existed and I don't
17        believe it existed into 2019 based
18        on my knowledge, I learned years
19        later.
20   BY MR. SEXTON:
21        Q.    Have you ever visited the
22   Meta Family Center?
23               MR. INNES:  Objection.
24        Outside the scope.
25               THE WITNESS:  I don't recall.

CONFIDENTIAL

Page 376

1    BY MR. SEXTON:

2         Q.      You don't recall ever

3    visiting the Meta Family Center?

4                 MR. INNES:  Objection.  Asked

5            and answered.

6                 MR. SEXTON:  I'm sorry?

7                 THE WITNESS:  I don't recall

8            going to that website.

9    BY MR. SEXTON:

10        Q.      Are you familiar with what

11   parental controls other than teen accounts

12   that Meta makes available to Instagram and

13   Facebook users?

14        A.      I am not.

15        Q.      Are you familiar with any of

16   the safety features Meta makes available to

17   Instagram and Facebook users other than

18   teen accounts?

19        A.      No.

20        Q.      You can't name any?

21        A.      Safety features?

22        Q.      Yes, sir.

23        A.      I'm just trying to think of

24   my own, no, off the top of my head, I

25   cannot.

Page 377

1          Q.    Last topic, I think, you
2     talked about a feature of some social media
3     platforms including Facebook and Instagram
4     called likes, correct?
5          A.    Likes, yes.
6          Q.    All right.  And you offered
7     some personal opinions about likes and how
8     important those are to some Instagram
9     users, do you recall that?
10          A.    I do.
11          Q.    All right.  And you
12     specifically, you said you think likes are
13     a problematic feature of Instagram; is that
14     correct?
15          A.    I do believe they can be
16     problematic.
17          Q.    And likes are problematic, in
18     your opinion, because users can see who
19     likes or didn't like their comments --
20          A.    Yeah.
21          Q.    -- or their content; is that
22     right?
23          A.    Correct, that was my
24     statements.
25          Q.    So users receive a message

Page 378

1    from other users through those likes; is

2    that correct?

3           A.      No.  So what I believe

4    happens, and you would know better than me,

5    when you log on and you like, let's say

6    it's my picture, I put up something, I put

7    up a picture of a fight between me and Mike

8    over here, counsel likes it.  You have a

9    problem with it.  You look at the likes and

10   you see that he is one of the people that

11   liked it and then I was referencing how

12   that causes conflict in my school.

13          Q.      Okay.  All right.

14          A.      Because it lists the names of

15   everyone that likes it.

16          Q.      Okay.  And that list of who

17   likes their content and who doesn't, that

18   communicates something --

19          A.      It sure does.

20          Q.      -- to the user, right?

21          A.      It does.

22          Q.      And that's the problem with

23   likes?

24          A.      In my opinion, the problem

25   with likes in the middle school I work in

Page 379

1  is that it is a popularity problem.  Kids

2  use it to gain popularity and post

3  inappropriate things, as we talked about

4  the pictures earlier.  I also talked about

5  how likes are negative and the part that we

6  just discussed, how they can use it to, I

7  can't believe you liked that, you're

8  supposed to be my friend, causing

9  conflicts.  And I think I'll just stick

10  with those two.

11         Q.     Were you aware that Instagram

12  users can turn off likes?

13         A.     I am aware of that.

14         Q.     Okay.  Were you aware that

15  Instagram users can turn off comments?

16         A.     I am aware of that.

17         Q.     And were you aware that

18  parents can turn off likes and comments in

19  their children's accounts, if they choose

20  to do so?

21         A.     I'm also aware that scholars

22  can get around that.

23         Q.     But not with teen accounts,

24  right?

25         A.     They can if they make a

CONFIDENTIAL

Page 380

1   separate account that their parents don't

2   know about.

3            Q.      Okay.

4            A.      Because it's very easy to

5   make a separate account.

6            Q.      Okay.  How many Instagram

7   accounts do you have?

8            A.      I have two.

9            Q.      Okay.  ███ ██ ███ ███ ███

██ ███ █ ███ ███ ███ ████ ██ ███

██ ███ ███ ███ █ ███ ███ ███ ███

██ ███ ███ ███ ███ ███ ███ ██

██ ███ ███ ███ ███ ███ ██ ███ ██ ███

██ ██ ███ ████ █ ███ ███ ███ ███ ███

██ ███ ███ ███ ███ █

██ ███ ███ █ ███ ███ ██ ███

██ ███ ███ ███ ███ ███ ██

██ ███ ███

██ ███ ███ ███ ███ ███ ██

██ ███ ███ ███ ███ ████

██ ███ ███ ███ ███

██ ███ ███ ███ █ ███ ██ ███

██ ███ ███ ███ ███

██ ███ ███ ███ ███

25

CONFIDENTIAL

Page 381

16          MR. SEXTON:  Okay.  Those are

17      all the questions I have got for

18      now.  Thank you so much.

19          MR. INNES:  Do you guys have

20      more?

21          MR. KARP:  I'm not sure, I was

22      going to ask.  Does anyone on the

23      line who is attending virtually

24      have questions?

25          Hearing nothing, Michael,

CONFIDENTIAL

Page 382

1          anything else or are we good to
2          go?
3                    MR. INNES:  Give me three
4          minutes, and it's a hard three and
5          I'll tell you whether I've got
6          questions.
7                    MR. KARP:  You mean a
8          three-minute break?
9                    MR. INNES:  What's that?
10                    MR. KARP:  A three-minute
11          break.  We'll go off the record.
12                    THE VIDEOGRAPHER:  The time
13          right now is 6:29 p.m.  We are off
14          the record.
15                    - - - - -
16      (A recess was taken at this time.)
17                    - - - - -
18                    THE VIDEOGRAPHER:  The time
19          right now is 6:33 p.m.  We're back
20          on the record.
21   BY MR. INNES:
22       Q.    Mr. Bussacco, thanks for
23   coming back, I know it's very late in the
24   day, approaching 7:00 o'clock almost, a few
25   follow-up questions.

CONFIDENTIAL

Page 383

1          A.      Okay.

2          Q.      Are you aware that Defendants

3    in this case are some of the largest

4    companies in the world?

5          A.      Yes, I am.

6          Q.      Is it your understanding that

7    they're some of the most profitable

8    companies in the world?

9                  MR. KARP:  Object to form.

10              Lacks foundation.  Assumes facts.

11              Calls for speculation.

12                  THE WITNESS:  I'm aware.

13   BY MR. INNES:

14         Q.      Is it your understanding that

15   none of the Defendants sell an actual

16   physical product, correct?

17                  MR. KARP:  Object to form.

18              Lacks foundation.  Assumes facts.

19              Calls for speculation.

20                  THE WITNESS:  I am aware.

21   BY MR. INNES:

22         Q.      Is it your understanding that

23   the Defendants make their money leveraging

24   data they have collected?

25                  MR. KARP:  Object to form.

CONFIDENTIAL

Page 384

1         Assumes facts.  Lacks foundation.
2         Calls for speculation.
3              THE WITNESS:  I do.
4    BY MR. INNES:
5         Q.    You'll recall being asked by
6    counsel numerous times whether or not you
7    could do an analysis of your scholars' use
8    of data as compared to other things.  Do
9    you recall that?
10        A.    I do recall being asked
11   several times, I'm sorry.
12        Q.    If you had usage data from
13   the Defendants' platforms, could you have
14   done an analysis?
15             MR. KARP:  Object to form.
16        Hypothetical.
17             THE WITNESS:  Easily.
18             MR. INNES:  No further
19        questions, but I do have a
20        statement on the record, actually,
21        a request and we can go Defendant
22        by Defendant or you guys can take
23        this jointly, it doesn't really
24        matter to me.  But do you -- can
25        you make a representation of

CONFIDENTIAL

Page 385

1          whether or not you intend to

2          continue to ask witnesses, at least

3          of my direct clients, and more

4          broadly, all other clients, about

5          their children's accounts and their

6          personal accounts and if you do,

7          just let me know now?

8               MR. KARP:  I think we'd

9          appreciate the opportunity to

10         discuss that as a joint defense.

11              MR. INNES:  We have

12         depositions that are going forward

13         tomorrow.

14              MR. KARP:  I understand.

15              MR. INNES:  I need to know

16         whether or not I need a protective

17         order, because we're not answering

18         those questions.

19              MR. KARP:  I understand, and

20         my recommendation is if that issue

21         comes up again tomorrow, you can

22         instruct your witness not to answer

23         and we can handle it the same way

24         that we did today, but I will

25         represent to you that that is an

CONFIDENTIAL

Page 386

1          issue that we will discuss and will
2          endeavor to get back to you with a
3          response soon.
4               MR. INNES:  Okay.  TikTok, you
5          need to get back to me on whether
6          or not you're going to ask about my
7          teachers and principals students'
8          accounts, right, or are you Snap?
9               MR. KARP:  I represent Snap.
10              MR. INNES:  Okay.  So Snap
11         needs to get back to me.
12              You represent Meta,
13         Mr. Sexton?
14              MR. SEXTON:  Right.
15              MR. INNES:  What's your
16         position?
17              MR. SEXTON:  We'll talk about
18         it.
19              MR. INNES:  You'll talk about
20         it, okay.  Who else do we have on
21         the line, Defendants, sorry, for
22         YouTube?
23                    - - - - -
24         (Stenographer clarification.)
25                    - - - - -

CONFIDENTIAL

Page 387

1              MR. INNES:  Okay.  YouTube,
2       this is Michael Innes for
3       Plaintiffs, do you understand my
4       request?
5              MS. BURRELL:  Is your request
6       that we put on the record whether
7       or not we're going to be asking any
8       more witnesses about their social
9       media use?
10             MR. INNES:  And their
11      children's social media use and
12      their children's accounts.
13             MS. BURRELL:  YouTube's stance
14      is that we don't have to give away
15      our deposition questions, but to
16      the extent that you have an issue
17      with that line of questioning, you
18      have asked our employees about
19      their children accounts --
20             MR. INNES:  And have you
21      responded?  Has your client
22      responded to those depositions,
23      because we're not familiar with
24      those?
25             MS. BURRELL:  Yes.

Page 388

1           MR. INNES:  You have provided
2      information about your client's
3      children's accounts?
4           MS. BURRELL:  Yes, it is my
5      understanding those questions have
6      been asked and some of them have
7      been answered.  To the extent that
8      you don't want your witnesses to
9      answer, you are free to move to
10     strike.
11          MR. INNES:  I know what my
12     rights are, I might be filing for a
13     protective order in advance, so
14     just we don't have to go through
15     whole that rigmarole.
16          Okay.  Who else is up?  I
17     got TikTok, I got YouTube.  I got
18     Meta, you're conferring.  Snap?
19          MS. WALTER:  This is Alison on
20     behalf of TikTok.
21          MR. INNES:  Okay.  What's your
22     position, TikTok?
23          MS. WALTER:  We will discuss
24     it and get back to you.
25          MR. INNES:  Okay.  Who am I

CONFIDENTIAL

Page 389

```
 1              missing?  I have got YouTube,
 2              TikTok, Meta, Snap.  That's
 3              everybody.  All right.  Thanks,
 4              guys.  Talk it over.  Let us know.
 5                   MR. KARP:  See you soon.
 6                   MR. INNES:  See you tomorrow
 7              morning, right?
 8                   MR. KARP:  See you tomorrow.
 9                   MR. SEXTON:  Actually, you
10              won't see me.  You'll see a
11              prettier face tomorrow.
12                   MR. KARP:  Off the record.
13                   MR. INNES:  We're done.
14                   THE VIDEOGRAPHER:  You guys
15              need the time on the record before
16              we go off?
17                   MR. KARP:  Yes, please.
18                   MR. INNES:  Yeah.
19                   THE VIDEOGRAPHER:  So Mr. Karp
20              was on the record for five hours
21              and six minutes.  Mr. Innes was on
22              the record for 53 minutes.
23              Mr. Sexton was on the record for
24              11.  The time right now is
25              6:39 p.m.  We are off the record.
```

CONFIDENTIAL

Page 390

1                - - - - -

2              (Whereupon, the deposition

3        was concluded at 6:39 p.m.)

4                - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 391

1           C E R T I F I C A T I O N

2

3

4           I HEREBY CERTIFY that the proceedings and

5     evidence are contained fully and accurately in the

6     stenographic notes taken by me upon the foregoing

7     matter on May 1, 2025, and that this is a correct

8     transcript of same.

9

10

11

12

13

14     _____

15           Robin L. Clark
       Registered Professional Reporter

16

17

18

19

20

21           (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means unless under the direct control

24     and/or supervision of the certifying reporter.)

25