**Exhibit 5**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

2

                    - - - - -

3

4   IN RE: SOCIAL MEDIA              CASE NO.

5   ADOLESCENT ADDICTION/PERSONAL    4:22-md-03047-YGR

6   INJURY PRODUCTS LIABILITY        MDL No. 3047

7   LITIGATION

8

9   THIS DOCUMENT RELATES TO:

10   Irvington Public Schools

11          vs.

12   Meta Platforms Inc., et al.

13   Member Case No.: 4:23-cv-01467-YGR

14                  - - - - -

15          Tuesday, May 20, 2025

16      CONFIDENTIAL - ATTORNEYS' EYES ONLY

17            PURSUANT TO PROTECTIVE ORDER

18          Videotaped deposition of DR. KCYIED ZAHIR,

19   held at Union Avenue Middle School, 427 Union

20   Avenue, Irvington, New Jersey, commencing at 9:37

21   a.m. Eastern, on the above date, before Robin L.

22   Clark, Professional Reporter and Notary Public in

23   and for the State of New Jersey.

24

25

CONFIDENTIAL

```
                                              Page 2

 1    APPEARANCES:
 2
              SEEGER WEISS, LLP
 3            BY:  CARLOS F. RIVERA, ESQ.
              JENNIFER SCULLION, ESQ.
 4            55 Challenger Road, 6th Floor
              Ridgefield Park, New Jersey 07660
 5            973-639-9100
              crivera@seegerweiss.com
 6            jscullion@seegerweiss.com
 7
              KIRKLAND & ELLIS LLP
 8            BY:  ANDREW KARP, ESQ.
              VANESSA DiFEO, ESQ.
 9            601 Lexington Avenue,
              New York, New York 10022
10            212-341-7593
              andrew.karp@kirkland.com
11            vanessa.difeo@kirkland.com
                        For the Defendant, Snap,
12            Inc.
13
              SHOOK, HARDY & BACON, L.L.P.
14            BY:  LAURIE HENRY, ESQ.
              2555 Grand Boulevard
15            Kansas City, Missouri 64108
              816-474-6550
16            lhenry@shb.com
                        For the Defendants, Meta
17            Platforms, Inc., f/k/a Facebook, Inc.;
              Facebook Holdings, LLC;
18            Facebook Operations, LLC; Facebook
              Payments, Inc.; Facebook Technologies,
19            LLC; Instagram, LLC; and Siculus, Inc.
20
      ALSO PRESENT:
21
              DANIEL ORTEGA, VIDEOGRAPHER
22            OLIVIA SATTAN, EXHIBIT TECH
23            EMMA DeGROFF
24
25
```

CONFIDENTIAL

```
                                                    Page 3

 1   REMOTE APPEARANCES:
 2
 3              CARELLA, BYRNE, CECCHI, BRODY
                & AGNELLO, P.C.
 4              BY:  MICHAEL A. INNES, ESQ.
                DAVID G. GILFILLAN, ESQ.
 5              5 Becker Farm Road
                Roseland, New Jersey 07068
 6              973-994-1700
                minnes@carellabyrne.com
 7              dgilfillan@carellabyrne.com
                          For the Plaintiffs and the
 8              Witness
 9
10              KING & SPALDING LLP
                BY: PATRICK PRICE, ESQ.
11              500 West 2nd Street, Suite 1800
                Austin, Texas 78701
12              512-457-2000
                pprice@kslaw.com
13                        For the Defendants,
                TikTok, Ltd.; TikTok, LLC;
14              TikTok, Inc.; ByteDance Ltd.; and
                ByteDance Inc.
15
16
                WILLIAMS & CONNOLLY, LLP
17              BY:  JOSEPH F. SANDOVAL-BUSHAR, ESQ.
                680 Maine Avenue SW
18              Washington, D.C.  20024
                202-434-5013
19              jsandoval-bushar@wc.com
                          For the Defendants, Alphabet,
20              Inc., Google, LLC and YouTube, LLC
21
22
23
24
25
```

CONFIDENTIAL

Page 4

1    REMOTE APPEARANCES, continued:

2

            SHOOK, HARDY & BACON, L.L.P.
3            BY:  KATELYN ROMEO, ESQ.
            Two Commerce Square
4            2001 Market Street, Suite 3000
            Philadelphia, Pennsylvania 19103
5            215-278-2555
            kromeo@shb.com
6                    For the Defendants, Meta
            Platforms, Inc., f/k/a Facebook, Inc.;
7            Facebook Holdings, LLC;
            Facebook Operations, LLC; Facebook
8            Payments, Inc.; Facebook Technologies,
            LLC; Instagram, LLC; and Siculus, Inc.

9

10

            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11           BY:  ANNELIESE V. THOMAS, ESQ.
            320 S. Canal St.
12           Chicago, Illinois 60606
            312-407-0604
13           anneliese.thomas@skadden.com
                    For the Defendant, Snap, Inc.

14
                    - - - - -

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

1                    I N D E X
2    WITNESS                                    PAGE
3    DR. KCYIED ZAHIR
        BY MR. KARP:                         9, 378
4       BY MR. SANDOVAL-BUSHUR:                 337
        BY MR. RIVERA:                          342
5
6                    E X H I B I T S
7    NUMBER          DESCRIPTION              MARKED
8    Zahir
9    Exhibit 1       Curriculum Vitae             11
10   Exhibit 2       Dissertation Bates           30
                     BW__Irvington00084775 to
11                   84880
12   Exhibit 3       Union Avenue Middle School   85
                     Parent & Teacher Handbook
13                   2023-2024 Bates
                     BW__Irvington00507982 to
14                   508015
15   Exhibit 4       Email dated 10/2/23 Bates   137
                     BW__Irvington00083334
16
     Exhibit 5       Email String Bates          146
17                   BW__Irvington00083313
18   Exhibit 6       Email dated 9/22/23         158
                     BW__Irvington00079688
19
     Exhibit 7       Email String Bates          162
20                   BW__Irvington00086585 to
                     00086587
21
     Exhibit 8       Email String Bates          171
22                   BW__Irvington00079618 to
                     00079621
23
     Exhibit 9       2023-2024 School            187
24                   Performance Report
25   Exhibit 10      School Performance Report   189
                     Enrollment data

CONFIDENTIAL

Page 6

Exhibit 11    School Performance Report    211
              on Chronic Absenteeism

Exhibit 12    School Performance Report    227
              on Academic Achievement

Exhibit 13    School Performance Report    234
              relating to Accountability

Exhibit 14    Email String Bates          238
              BW__Irvington00083105 to
              00083106

Exhibit 15    Email String Bates          249
              BW__Irvington00083094 to
              00083095

Exhibit 16    Email String Bates          261
              BW__Irvington00081693 to
              00081696

Exhibit 17    Email dated 3/27/23 Bates   276
              BW_Irvington00351327

CONFIDENTIAL

Page 7

1              DEPOSITION SUPPORT INDEX

2

                            - - - - -

3

4    Direction to Witness Not to Answer

5    Page   Line

6    332    1

7    333    13

8    334    13

9    Request for Production of Documents

10   Page   Line

11   NONE

12   Question Marked

13   Page   Line

14   NONE

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 8

1            THE VIDEOGRAPHER:  We are now
2       on the record.  My name is Daniel
3       Ortega and I am the legal
4       videographer for Golkow Litigation
5       Services.  Today's date is May 20,
6       2025, and the time is 9:37 a.m.
7            This video deposition is
8       being held at 427 Union Avenue,
9       Irvington, New Jersey, in the
10       matter of Social Media, CA MDL
11       3047, Irvington Public Schools
12       versus Meta Platforms, Inc., et
13       al.
14            The deponent today is
15       Dr. Kcyied Zahir.  All counsel
16       will be noted on the stenographic
17       record.  The court reporter today
18       is Robin Clark and will now swear
19       in the witness.
20                  - - - - -
21            DR. KCYIED ZAHIR, having
22       been duly sworn, was examined and
23       testified as follows:
24                  - - - - -
25

CONFIDENTIAL

```
                                                    Page 9
 1   BY MR. KARP:
 2          Q.        Good morning, Dr. Zahir.
 3          A.        Good morning.
 4          Q.        My name is Andrew Karp and I
 5   represent Snap in this lawsuit.
 6                    Can you please state your
 7   full name for the record?
 8          A.        Kcyied Zahir.
 9          Q.        You understand that you're
10   under oath today?
11          A.        Yes.
12          Q.        Is there any reason you
13   can't provide truthful and accurate
14   testimony today?
15          A.        No.
16          Q.        Is this your first time
17   being deposed?
18          A.        Yes.
19          Q.        Congratulations.  If at any
20   point you don't understand the questions
21   I'm asking, please let me know and I'll do
22   my best to clarify.  Otherwise, I will
23   assume that you understood the question I'm
24   asking; is that okay?
25          A.        Yes.
```

Page 10

```
 1        Q.       Throughout today's
 2  deposition, I may refer to Irvington Public
 3  Schools as IPS.  If I use that acronym, do
 4  you understand that I'm referring to
 5  Irvington Public Schools?
 6        A.       Yes.
 7        Q.       I may also refer to Union
 8  Avenue Middle School as Union Avenue.  Do
 9  you understand that I'm referring to the
10  middle school?
11        A.       Yes.
12        Q.       ███ ████ ████ ██ ████ █████
    ██ ███████
    ██    ██   ████ █████ █████ ████
    ██ ████████ ██ ████ .
16        Q.       And what is your work
17  address?
18        A.       427 Union Avenue, Irvington,
19  New Jersey.
20        Q.       Prior to your deposition,
21  your counsel provided me with a copy of
22  your CV and I'll hand that to you right
23  now.  This is tab one, which we will mark
24  as Exhibit 1.
25                 - - - - -
```

CONFIDENTIAL

Page 11

1              (Curriculum Vitae marked

2          Zahir Exhibit 1 for

3          identification.)

4                  - - - - -

5    BY MR. KARP:

6          Q.      Dr. Zahir, do you recognize

7    this document?

8          A.      Yes.

9          Q.      What is this document?

10         A.      It appears to be my résumé.

11         Q.      Is this something that you

12   prepared?

13         A.      I believe so, yes.

14         Q.      Do you recall when you

15   prepared it?

16         A.      I'm not sure of the exact

17   date that this was prepared.

18         Q.      Sitting here today, does

19   this appear to be a current version of your

20   résumé?

21         A.      No.

22         Q.      What about it does not look

23   current?

24         A.      The current position has me

25   as principal of Mount Vernon Avenue.  And

CONFIDENTIAL

Page 12

```
 1   the doctoral degree has been confirmed.
 2        Q.      Okay.  So am I correct that
 3   you are currently the principal of Union
 4   Avenue Middle School?
 5        A.      Yes.
 6        Q.      And when did you become
 7   principal of Union Avenue Middle School?
 8        A.      July 1st, 2023.
 9        Q.      Were you the principal of
10   Mount Vernon Avenue Elementary School up
11   until that time?
12        A.      Yes.
13        Q.      You also mentioned that you
14   have since completed your doctorate?
15        A.      Yes.
16        Q.      Congratulations.
17        A.      Thank you.
18        Q.      When did you earn that
19   degree?
20        A.      December 2024 -- I'm sorry,
21   December 2023.
22        Q.      Okay.
23        A.      Yeah.
24        Q.      Okay.  Is the other
25   information contained in this résumé
```

CONFIDENTIAL

Page 13

1    accurate?

2         A.       It appears to be.

3         Q.       We're going to spend a

4    little time walking through this.

5         A.       Sure.

6         Q.       You said that your current

7    title is principal of Union Avenue Middle

8    School, correct?

9         A.       Yes.

10        Q.       Before that, you served as

11   the principal of Mount Vernon Avenue

12   Elementary School, correct?

13        A.       Yes.

14        Q.       And that was from 2022 up

15   until July of 2023, correct?

16        A.       Yes.

17        Q.       Okay.  Mount Vernon Avenue

18   Elementary School is a school within the

19   Irvington Public School District?

20        A.       Yes.

21        Q.       But during that, you worked

22   at Science Park High School as the

23   principal; is that correct?

24        A.       Yes.

25        Q.       That was a different school

CONFIDENTIAL

Page 14

1    district in Newark?

2            A.      Yes.

3            Q.      Before that, from 2015

4    through 2021, you were the school

5    disciplinarian at Cicely L. Tyson School of

6    Performing and Fine Arts in East Orange?

7            A.      Yes.

8            Q.      What did your job entail as

9    school disciplinarian?

10           A.      I don't understand the

11   question.

12           Q.      Can you tell me about your

13   responsibilities as school disciplinarian

14   for Cicely L. Tyson Community School for --

15   of Performing and Fine Arts?

16           A.      To maintain a positive

17   climate and culture in the building.

18           Q.      And you were -- your

19   responsibilities were specific to that

20   school as opposed to district-wide; is that

21   right?

22           A.      Yes.

23           Q.      From 2012 to 2015, you were

24   a math instructor at Weequahic High School?

25           A.      Yes.

CONFIDENTIAL

Page 15

1          Q.      Did I roughly pronounce that
2     correctly?
3          A.      If you're not from Newark,
4     you pronounced it correctly.
5          Q.      Okay.  How would you
6     pronounce it?
7          A.      Weequahic.
8          Q.      I'm sorry?
9          A.      Weequahic, that's fine.
10         Q.      Also within Newark Public
11    Schools, correct?
12         A.      Yes.
13         Q.      From 2007 through 2012, you
14    were an SOS instructor or the dean of
15    discipline at that same school?
16         A.      Yes.
17         Q.      Can you tell me about your
18    responsibilities in that role?
19         A.      So similar to Cicely Tyson,
20    to maintain a positive climate and culture
21    in the building.
22         Q.      From 2003 to 2007, you were
23    a math instructor at the same high school?
24         A.      Yes.
25         Q.      And before that, from 2004

CONFIDENTIAL

Page 16

1    through 2007 -- or strike that.

2                    Around the same time, from

3    2004 through 2007, you were a homework

4    hotline math instructor?

5           A.      I forgot about that, yes.

6           Q.      That was in addition to

7    serving as a math instructor at the time?

8           A.      Yes.

9           Q.      Can you explain how you held

10   those two roles at the same time?

11          A.      That was an after-school

12   position.

13          Q.      In that role as homework

14   hotline math instructor, were you working

15   with high school students?

16          A.      It was whoever called from

17   K -- from kindergarten to sometimes

18   college.  It was a televised position.

19          Q.      Before that, from 2000 to

20   2004, you were associate director of Upward

21   Bound/College Bound at Seton Hall

22   University?

23          A.      Yes.

24          Q.      Can you tell me about your

25   responsibilities in that role?

CONFIDENTIAL

Page 17

1          A.          I assisted the director in

2     running the pre-college program.

3          Q.          Were you working with high

4     school-aged students at the time?

5          A.          Yes.

6          Q.          During that same period of

7     time, you were a math professor at Seton

8     Hall University from 2001 to 2003?

9          A.          Yes.

10          Q.          Before that, you were a math

11     instructor in East Orange from 1999 through

12     2000?

13          A.          Yes.

14          Q.          And, finally, from 1998

15     through 1999, you were a math instructor at

16     Arts High School in Newark?

17          A.          Yes.

18          Q.          Any other job experience

19     that is not listed on your résumé that you

20     would like to add?

21          A.          No.

22          Q.          You also have significant

23     coaching experience, correct?

24          A.          I coached a bit.

25          Q.          Do you coach at all at Union

CONFIDENTIAL

Page 18

1   Avenue Middle School?

2          A.       No.

3          Q.       Have you coached at any

4   school in the Irvington Public School

5   District?

6          A.       No.

7          Q.       From 2004 through 2016, you

8   were head coach of track and field at a

9   high school in Newark Public Schools; is

10  that right?

11         A.       Yes.

12         Q.       Let's look to the front of

13  your résumé and talk a little bit about

14  your education.  You earned your bachelor's

15  degree in mathematics secondary education

16  from the University of Maryland Eastern

17  Shore in 1998; is that right?

18         A.       Yes.

19         Q.       In 2000 -- excuse me, in

20  2001, you earned your master's degree in

21  psychology from Seton Hall University?

22         A.       Yes.

23         Q.       And as part of that degree,

24  you focused on marriage and family therapy;

25  is that right?

CONFIDENTIAL

Page 19

1          MR. RIVERA:  Object to form.
2    BY MR. KARP:
3          Q.      You can answer the question.
4          A.      I didn't hear what he said.
5          MR. RIVERA:  I just objected
6          to the form.  You can answer the
7          question.
8          THE WITNESS:  Okay.
9    BY MR. KARP:
10         Q.      Do you need me to reask it?
11         A.      Yes.
12         Q.      And I'll ask a slightly
13    different question.  Your résumé says "MA
14    Marriage and Family Therapy."
15         Do you see that?
16         A.      Yes.
17         Q.      What does that mean?
18         A.      It says psychology first,
19    because at the conclusion of the degree,
20    the last practicum part, I chose to forego
21    the required 5,000 hours to complete the
22    master's in marriage and family therapy,
23    but all of my coursework was marriage and
24    family therapy.  I just didn't do the 5,000
25    hours.

Page 20

1          Q.          Is it fair to say that your
2    focus in earning that master's degree was
3    on marriage and family therapy?
4          A.          Yes.
5                    MR. RIVERA:  Object to form.
6          Asked and answered.
7    BY MR. KARP:
8          Q.          Did any of your education in
9    psychology involve child psychology?
10         A.          I don't understand the
11   question.
12         Q.          Did you take any courses on
13   child psychology?
14         A.          I'm not sure how to answer
15   that question.
16         Q.          Did any of the coursework
17   that you took at Seton Hall University as
18   part of this master's program cover issues
19   of child psychology?
20         A.          I'm sorry, but it's -- I'm
21   not sure how to answer that question.  I'm
22   trying to give you a straight answer.  I'm
23   not sure how to answer.
24         Q.          And I'll try asking it a
25   little bit differently.  Do you recall

CONFIDENTIAL

Page 21

```
 1   studying child psychology as part of this
 2   master's degree?
 3          A.      I'm not clear on how to
 4   answer that question.
 5          Q.      Let's try to talk this
 6   through.  What exactly is not clear about
 7   the question that I'm asking?
 8          A.      The child psychology part.
 9          Q.      As part of this master's
10   program, did you study the psychology of
11   children or adolescents in particular?
12                  MR. RIVERA:  Object to form.
13                  THE WITNESS:  I'm unclear.
14   BY MR. KARP:
15          Q.      Are you -- do you have a
16   medical degree in psychiatry?
17          A.      No.
18          Q.      As part of this master's
19   program, did you ever study addiction
20   treatment?
21          A.      Addiction treatment, no.
22          Q.      Did you study addiction?
23          A.      Yes.
24          Q.      Can you tell me about that?
25          A.      I don't understand.
```

CONFIDENTIAL

Page 22

```
 1          Q.        What do you recall -- sorry,
 2    strike that.
 3                    You just told me that you
 4    studied addiction as part of this master's
 5    program, correct?
 6          A.        Yes.
 7          Q.        And what courses or what
 8    lessons do you recall on addiction?
 9                    MR. RIVERA:  Object to form.
10                    THE WITNESS:  I recall
11            covering addiction.
12    BY MR. KARP:
13          Q.        Do you recall what you
14    learned?
15          A.        The conceptual part of
16    addiction, what is an addiction, I guess.
17          Q.        As part of this degree
18    program at Seton Hall, did you study the
19    impact of technology on psychology?
20                    MR. RIVERA:  Object to form.
21                    THE WITNESS:  I don't recall.
22    BY MR. KARP:
23          Q.        The next item on your résumé
24    is NJEXCEL from Thomas Edison University.
25    You received a principal/supervisory
```

CONFIDENTIAL

Page 23

1    certification; is that right?

2           A.      Yes.

3           Q.      Can you tell me more about

4    that certification?

5           A.      The certification?  It's a

6    certification to allow me to be a

7    principal.

8           Q.      Is that part of state

9    licensing in the state of New Jersey?

10          A.      It's one of the licenses you

11   can get, yes.

12          Q.      You cannot be a principal in

13   the state of New Jersey without this

14   certification; is that correct?

15                  MR. RIVERA:  Object to form.

16                  THE WITNESS:  I'm not sure.

17           I'm not sure if you can or you

18           can't.

19   BY MR. KARP:

20          Q.      What kind of training or

21   coursework was entailed in earning this

22   certification?

23                  MR. RIVERA:  Object to form.

24                  THE WITNESS:  I'm not sure how

25           to answer that question.  Can you

CONFIDENTIAL

Page 24

1              be more specific?
2    BY MR. KARP:
3         Q.      This certification program
4    or -- strike that.
5                 You completed this
6    certification program in five years, from
7    2011 through 2016?
8         A.      Yeah.
9         Q.      And during that time, did
10   you take classes?
11        A.      Yes.
12        Q.      What were those classes
13   about?
14        A.      Leadership.
15        Q.      Anything else?
16        A.      I can't recall.
17        Q.      Did the classes focus on a
18   particular grade level or type of school?
19                MR. RIVERA:  Object to form.
20                THE WITNESS:  No.
21   BY MR. KARP:
22        Q.      As part of that
23   certification program, did you take any
24   classes relating to social media?
25                MR. RIVERA:  Object to form.

CONFIDENTIAL

Page 25

1                    THE WITNESS:  I'm not sure how

2           to answer that question.

3  BY MR. KARP:

4           Q.      I can rephrase it a little

5  bit.  As part of the certification program,

6  did you take any classes relating to the

7  student use of social media?

8                    MR. RIVERA:  Objection to

9           form.

10                   THE WITNESS:  I'm not sure.

11  BY MR. KARP:

12          Q.      As part of the certification

13  program, did you take any classes relating

14  to student uses of technology?

15                   MR. RIVERA:  Objection to

16          form, vague.

17                   THE WITNESS:  As a focal

18          point?

19  BY MR. KARP:

20          Q.      Is it something you studied?

21                   MR. RIVERA:  Objection to

22          form.

23                   THE WITNESS:  I'm unclear --

24          I'm not sure how to answer if I

25          studied it.

CONFIDENTIAL

Page 26

1    BY MR. KARP:

2         Q.        Did any of your classes or

3    any of your coursework involve student use

4    of technology?

5                   MR. RIVERA:  Object to form.

6                   THE WITNESS:  Yes.

7    BY MR. KARP:

8         Q.        How so?

9         A.        Technology use is a

10   component of 21st century learning, so that

11   topic was covered.

12        Q.        And what did you learn?

13        A.        I'm not clear on the

14   question.

15        Q.        What do you recall -- do you

16   recall that topic being covered?

17        A.        Yes, technology in the

18   classroom was covered.

19        Q.        And what do you recall about

20   that lesson or that course?

21                   MR. RIVERA:  Objection to

22            form.

23                   THE WITNESS:  I recall it

24            being covered as a form of

25            instruction or a means to provide

Page 27

1          education.
2    BY MR. KARP:
3          Q.        Technology as a tool to
4    teach students?
5          A.        I don't --
6          Q.        Is that what you mean?
7          A.        What do you mean by
8    "technology is a tool to teach students"?
9          Q.        You mentioned or you
10   testified a minute ago that you recall it
11   being covered as a form of instruction and
12   I was trying to clarify if you meant that
13   you learned about technology as a way to
14   educate students.
15         A.        Twenty-first century
16   instruction, 21st century learning, that's
17   a -- that's just a direction, a desired
18   direction that schools want to go in.
19   Technology as a form of instruction, I'm
20   unclear on what you mean by that.
21         Q.        And those are the words that
22   you used a few minutes ago.  You said
23   technology as a form of instruction and I
24   was just trying to clarify what you meant
25   by that?

CONFIDENTIAL

Page 28

1              MR. RIVERA:  Object to form.
2         Mischaracterizes his testimony.
3  BY MR. KARP:
4         Q.      Earlier you used the words,
5  "technology as a form of instruction"?
6         A.      Can you give me the full
7  context of that response.
8         Q.      I asked, "And what do you
9  recall about that lesson or that course?"
10 Your counsel objected and then you stated,
11 "I recall it being covered as a form of
12 instruction or a means to provide
13 education."
14              And I just was wondering if
15 you could clarify.
16         A.      Okay.  So meaning if you're
17 providing instruction by use of a Smart
18 Board or you're providing instruction by
19 use of some digital educational resource,
20 but that's what I mean by that.
21         Q.      Thank you.  Did any of
22 your -- to the extent that this topic was
23 covered during your certification program,
24 do you recall studying cell phone use,
25 student cell phone use?

CONFIDENTIAL

Page 29

1                    MR. RIVERA:  Objection to

2          form.

3                    THE WITNESS:  No.

4    BY MR. KARP:

5          Q.        From 2019 -- strike that.

6                    You earned your doctorate in

7    educational leadership from Trident

8    University in December of 2023; is that

9    right?

10         A.        Yes.

11         Q.        Did any of your

12   coursework -- did any of the coursework you

13   completed to earn that degree relate to

14   student use of social media?

15                   MR. RIVERA:  Object to form.

16                   THE WITNESS:  Can you repeat

17         the question?

18   BY MR. KARP:

19         Q.        Sure.  Did any of the

20   coursework that you completed to earn your

21   doctorate degree involve student use of

22   social media?

23                   MR. RIVERA:  Same objection.

24                   THE WITNESS:  I don't recall,

25         no.

CONFIDENTIAL

Page 30

1   BY MR. KARP:

2          Q.         Did any of the coursework

3   you completed to earn your doctorate degree

4   involve student use of technology?

5          A.         No.   That my doctorate, that

6   wasn't the focal point.

7          Q.         What was the focal point of

8   your doctorate?

9          A.         Educational leadership.

10          Q.         Can you be more specific as

11   to whether -- or strike that.

12                     Was there a particular focus

13   within educational leadership?

14          A.         No.

15          Q.         I'm handing you tab four,

16   which we can mark as Exhibit 2.

17                     MR. RIVERA:  You can take a

18           moment to look over the document.

19                     - - - - -

20           (Dissertation Bates

21           BW__Irvington00084775 to 84880

22           marked Zahir Exhibit 2 for

23           identification.)

24                     - - - - -

25

CONFIDENTIAL

Page 31

```
 1  BY MR. KARP:
 2          Q.        The document I handed you is
 3  titled, "Teacher Efficacy While Using
 4  Culturally Responsive Pedagogy for African
 5  American Students in Urban Public
 6  Education."  And you are listed as the
 7  author of this.
 8                  Do you see that?
 9          A.        Yes.
10          Q.        Do you recognize this
11  document?
12          A.        Yes.
13          Q.        What is this document?
14          A.        It appears to be my
15  dissertation.
16          Q.        And is this the final
17  dissertation that you -- that you defended
18  or is this a proposal?
19          A.        I would have to read the
20  whole thing to --
21          Q.        On the cover page here, it
22  says, "Defended mm dd, year."  Does that
23  refresh your memory of whether this is a
24  proposal or the final dissertation?
25          A.        Again, I'm not sure.  Yeah,
```

CONFIDENTIAL

```
                                    Page 32
 1   I'm not sure if this is the final or not
 2   the final.
 3           Q.        Understood.  Can you tell me
 4   a bit about this dissertation?
 5                     MR. RIVERA:  Object to form.
 6                     THE WITNESS:  I don't
 7            understand the question.
 8   BY MR. KARP:
 9           Q.        The title of this
10   dissertation, as I mentioned a minute ago,
11   is, "Teacher Efficacy While Using
12   Culturally Responsible Pedagogy for African
13   American Students in Urban Public
14   Education."
15                     Do you see that?
16           A.        Yes.
17           Q.        What issues do you address
18   in your dissertation?
19           A.        Teacher pedagogy and the
20   importance of it for -- to be culturally
21   responsive when providing education to
22   kids.
23           Q.        Is there a particular
24   position or art -- excuse me, strike that.
25                     Is there a particular
```

Page 33

1    position that you take in this dissertation

2    or argument that you make in this

3    dissertation?

4                    MR. RIVERA:  Object to form.

5                    THE WITNESS:  No.

6    BY MR. KARP:

7         Q.      Can you describe for me the

8    main themes of your dissertation?

9         A.      Outside of the title?

10        Q.      Yes.

11        A.      It's the importance of

12   culturally responsive pedagogy in urban

13   education, that's the theme.

14        Q.      Let's turn to the page

15   ending in 4786 in the bottom right-hand

16   corner.  Just let me know when you get

17   there.

18        A.      I'm there.

19        Q.      And if we look about halfway

20   down the page, there's a title here, "Why

21   Culturally Responsive Teaching is needed in

22   Urban Public School Settings."

23                    Do you see that?

24        A.      Yes.

25        Q.      You wrote, "Our urban K

CONFIDENTIAL

Page 34

1    through 12 school population is becoming

2    increasingly diverse," and then you cite to

3    a study.

4                      Do you see that?

5          A.      Yes.

6          Q.      You go on to write, "There

7    is a significant discrepancy between the

8    students in urban schools and the staff in

9    the same environment that is largely White

10   and Middle class."  And then you cite to

11   another study.

12                     Do you see that?

13         A.      Yes.

14         Q.      Okay.  What did you mean

15   when you wrote that?

16         A.      Those are cited.  Those are

17   quotes from other publications.  Those are

18   not my words.

19         Q.      And I apologize, I didn't

20   see quotation marks.  I didn't realize that

21   you were quoting from studies?

22         A.      It's cited at the end.

23         Q.      You're citing to these

24   studies as your source for the -- for the

25   statement, correct?

Page 35

1          A.       Yes.

2                   MR. RIVERA:  Object to form.

3    BY MR. KARP:

4          Q.       Okay.  You wrote this in

5    your dissertation, correct?

6          A.       I believe so, yes.

7          Q.       So when you wrote that,

8    "There is a significant discrepancy between

9    the students in urban schools and the staff

10   in the same environment that is largely

11   White and Middle class," what did you mean

12   by that?

13         A.       I don't understand the

14   question.

15         Q.       What does that statement

16   mean to you?

17                  MR. RIVERA:  Object to form.

18                  THE WITNESS:  What do I think

19          about what Rubel wrote?

20   BY MR. KARP:

21         Q.       Yes.

22         A.       I'm thinking he meant the

23   difference in race and culture.

24         Q.       Is this a true statement?

25                  MR. RIVERA:  Object to form.

Page 36

1          THE WITNESS:  I don't
2       understand.
3  BY MR. KARP:
4       Q.       Do you believe that this is
5  true?
6       A.       Do I believe what Rubel
7  stated is Rubel's truth or do I believe --
8  I don't understand the question.
9       Q.       Do you believe it's true
10 that there is a significant discrepancy
11 between the students in urban schools and
12 the staff in the same environment that is
13 largely white and middle class?
14      A.       I'm not clear on how to
15 answer that question.
16      Q.       How can I help you?  How can
17 I clarify?
18      A.       You're asking me do I
19 believe that this statement is true.  I
20 think that's based on the selection from
21 which he was pulling.  If there was a
22 hypothetical where you had a school with
23 all black kids and the teachers were all
24 white, that would make the statement true.
25      Q.       Do you believe that there is

CONFIDENTIAL

Page 37

1    a significant discrepancy between the

2    students -- or strike that.

3                    Do you believe that this

4    statement applies to Union Avenue Middle

5    School?

6                    MR. RIVERA:  Object to form.

7                    THE WITNESS:  No.

8    BY MR. KARP:

9         Q.         So in your view, there is

10   not a significant discrepancy between are

11   the students at Union Avenue Middle School

12   and their staff?

13        A.         I'm not sure what area of

14   significance he is talking about.  My

15   example was if we're talking about race,

16   just population and cultural backgrounds in

17   this particular building, no.  But I don't

18   know what this author's significance was

19   specifically speaking to.

20        Q.         Let's turn to the page

21   ending in 4790.  This section is titled,

22   "Outside Influences and Academic

23   Disconnection."

24                    Do you see that?

25        A.         Yes.

CONFIDENTIAL

Page 38

```
 1          Q.        Partway down the page, there
 2    is a statement, "They frequently are in
 3    classrooms where teachers' perceptions of
 4    them come from a place of stereotypes and
 5    generalizations, especially from educators
 6    who do not come from the environments in
 7    which they are teaching."
 8                    Do you see that?
 9          A.        Yes.
10          Q.        Do you believe that that
11    statement applies in any way to Union
12    Avenue Middle School?
13                    MR. RIVERA:  Objection to
14          form.
15                    THE WITNESS:  I can't -- I
16          don't know how to answer that
17          question as it applies to Union
18          Avenue.  I would have to ask the
19          teachers their perception.
20    BY MR. KARP:
21          Q.        As principal of Union Avenue
22    Middle School, do you know one way or
23    another whether this is a true statement?
24                    MR. RIVERA:  Objection to
25          form.
```

CONFIDENTIAL

Page 39

1    BY MR. KARP:

2          Q.        Or strike that.

3                    As principal of Union Avenue

4    Middle School, do you know whether or not

5    this statement applies to the teachers in

6    this school?

7                    MR. RIVERA:  Objection to

8          form.  Asked and answered.

9                    MR. KARP:  You can answer the

10         question.

11                   THE WITNESS:  I thought I did.

12   BY MR. KARP:

13         Q.        I'm sorry, I don't see an

14   answer on the record.  I can ask the

15   question again.

16                   As principal of Union Avenue

17   Middle School, do you know whether teachers

18   in this school have the perceptions that

19   you describe here in your dissertation?

20         A.        I don't know how to answer

21   the question.  I would have to ask the

22   teachers their perception.

23         Q.        And you have not done that?

24                   MR. RIVERA:  Objection, form.

25                   THE WITNESS:  Have I asked the

CONFIDENTIAL

Page 40

1           teachers what are their perceptions

2           and stereotypes of their students?

3    BY MR. KARP:

4           Q.       Yeah.

5           A.       No.

6           Q.       If we look at the next

7    paragraph it starts, "This level of

8    misunderstanding can lead to academic

9    disconnection, or lack of connection with

10   learning, which can significantly hurt our

11   African American male students and lead to

12   withdrawal from challenging classes,

13   dropping out of school entirely, and

14   delinquency."

15                   Do you see that?

16          A.       Yes.

17          Q.       And that's what you wrote in

18   your dissertation, correct?

19          A.       That is a quote from

20   Hawkins-Jones and Reeves.

21          Q.       And you wrote that in your

22   dissertation, right?

23          A.       I added it to my

24   dissertation.

25          Q.       And do you believe that this

CONFIDENTIAL

Page 41

1   is a true statement?

2               MR. RIVERA:  Objection to

3          form.

4               THE WITNESS:  I don't -- I

5          don't know how to answer that

6          question, do I believe it's true or

7          not.

8   BY MR. KARP:

9          Q.      Do you believe that there

10  are levels of misunderstanding between

11  students and teachers that can lead to

12  academic disconnection here at Union Avenue

13  Middle School?

14              MR. RIVERA:  Objection to

15         form.

16              THE WITNESS:  I'm not sure how

17         you want me to answer the question.

18  BY MR. KARP:

19         Q.      Truthfully.

20         A.      I understand.  I'm not clear

21  on -- and you're asking me as it applies to

22  Union Avenue?

23         Q.      Yes.

24         A.      I mean, if this is a

25  possibility, I don't look it as the sole

CONFIDENTIAL

Page 42

1    reason for those outcomes that are listed,
2    that they listed.
3            Q.      Let's turn back a few pages
4    to the page ending in 4779.  At the very
5    bottom of the page, you wrote, Some would
6    argue that African American students
7    struggle from the effects of their
8    socioeconomic environment."
9                    Do you see that?
10           A.      Yes.
11           Q.      And then you go onto write,
12   "Poverty, racial bias (perceived and
13   observed), environmental disadvantages,
14   impoverished schools, and stress can lead
15   to behavioral, academic, and psychological
16   difficulties among African American
17   children," And then you cite to a number of
18   sources.
19                   Do you see that?
20           A.      Yes.
21           Q.      Do you believe that that's a
22   true statement?
23           A.      I believe that some will
24   argue that, yes.
25           Q.      When you say that some would

CONFIDENTIAL

Page 43

1    argue -- or strike that.

2                  My question is whether you

3    believe that this is a true statement?

4                  MR. RIVERA:  Object to form.

5                  THE WITNESS:  Do I believe

6         that some would argue that, yes.

7    BY MR. KARP:

8         Q.      Do you believe that poverty,

9    racial bias, perceived and observed,

10   environmental disadvantages, impoverished

11   schools, and stress can lead to behavioral,

12   academic, and psychological difficulties

13   among African American children?

14        A.      My belief is that those

15   things would affect all children.

16        Q.      Including children at Union

17   Avenue Middle School?

18        A.      All children.

19        Q.      Let's turn to the page

20   ending 4824.  You wrote that, "For this

21   study, the researcher will use social media

22   platforms such as Facebook, Instagram, and

23   LinkedIn to solicit participants."

24                  Do you see that?

25        A.      Yes.

CONFIDENTIAL

Page 44

1        Q.        "The researcher will use

2    social media groups specifically designed

3    for educators."

4                    Do you see that?

5        A.        Yes.

6        Q.        Is that something that you

7    did?

8        A.        Yes.

9        Q.        A couple of sentences down,

10    you wrote, "The use of social media as a

11    recruitment tool for research with humans

12    is increasing and likely to continue to

13    grow."

14                    Do you see that?

15        A.        Yes.

16        Q.        Let's turn back one page to

17    4823.  At the bottom of the page you wrote

18    this -- excuse me, strike that.

19                    At the bottom of this page,

20    you wrote, "This researcher has over 4,000

21    Facebook friends, is linked to more than 20

22    groups for educators, and has over 500

23    LinkedIn affiliates."

24                    Do you see that?

25        A.        Yes.

Page 45

```
 1          Q.       "This researcher," as it's
 2   used here, does that refer to you?
 3          A.       Yes.
 4          Q.       And was that true at the
 5   time that you wrote your dissertation?
 6          A.       I believe so.
 7          Q.       Do you stand behind what's
 8   written in your dissertation?
 9                   MR. RIVERA:  Object to form.
10                   THE WITNESS:  I don't
11              understand the question.
12   BY MR. KARP:
13          Q.       Is there anything in this
14   dissertation -- excuse me, strike that.
15                   Is there anything in your
16   dissertation that you believe not to be
17   true?
18                   MR. RIVERA:  Object to form.
19                   THE WITNESS:  I don't
20              understand -- I don't understand
21              the nature of the question based
22              upon the dissertation.
23   BY MR. KARP:
24          Q.       Is there any information in
25   this dissertation that you disagree with?
```

CONFIDENTIAL

Page 46

```
 1          A.        I think it's possible.
 2          Q.        You possibly disagree with
 3     the things you wrote in your dissertation?
 4          A.        It's a dissertation.  It's a
 5     collection of research.  There may be
 6     things that I possibly don't agree with.
 7     That doesn't mean it doesn't support the
 8     research.
 9          Q.        Is there any part of your
10     dissertation -- or strike that.
11               Do you believe any part of
12     this dissertation to be false?
13               MR. RIVERA:  Object to form.
14          You've also put a document in front
15          of him that's over a hundred pages
16          long and he hasn't had an
17          opportunity to look through it and
18          we don't know the exact date of
19          this draft either.
20               MR. KARP:  I appreciate the
21          objection.  You produced this
22          document and it's his dissertation
23          that I presume that he worked on
24          for a long time.
25               THE WITNESS:  I don't
```

CONFIDENTIAL

Page 47

1              understand the question that you're

2              asking me.

3    BY MR. KARP:

4         Q.       Sitting here today, is there

5    any part of your dissertation that you

6    would change?

7         A.       That I would change?

8         Q.       Yes.

9              MR. RIVERA:  Object to form.

10              THE WITNESS:  I would say no,

11              because I was -- it was

12              successfully defended and they call

13              me doctor now, I don't want to

14              change it.

15    BY MR. KARP:

16         Q.       Understood.  You can put

17    this to the side.

18         A.       Okay.

19         Q.       Aside from your

20    dissertation, are you the author of any

21    articles or studies relating to education?

22                 MR. RIVERA:  Objection to

23              form.

24                 THE WITNESS:  In my lifetime?

25

Page 48

1   BY MR. KARP:

2          Q.      Yes.

3          A.      I'm not sure.  I don't

4   recall.

5          Q.      You don't recall whether

6   you've written any articles relating to

7   education?

8          A.      I don't recall.  It has

9   been, like, 26 years.  I don't recall.

10         Q.      Have you conducted any

11  studies -- sorry, strike that.

12                 Other than your

13  dissertation, have you conducted any

14  studies regarding education?

15                 MR. RIVERA:  Object to form.

16                 THE WITNESS:  I'm not sure

17         how -- regarding education?

18  BY MR. KARP:

19         Q.      Yeah.

20         A.      What do you mean by,

21  "studies"?

22         Q.      A study could involve

23  identifying a population of people and

24  conducting a survey, for example.

25         A.      Yes.

CONFIDENTIAL

Page 49

```
 1                  MR. RIVERA:  Object to form.
 2    BY MR. KARP:
 3          Q.      You've -- okay.  Tell me
 4    about any studies that you have done
 5    relating to education.
 6                  MR. RIVERA:  Objection to
 7              form.
 8                  THE WITNESS:  It's such a
 9              vague question, can you be more
10              specific?
11    BY MR. KARP:
12          Q.      Can you give me some
13    examples and then I can maybe help you
14    narrow it down?
15                  MR. RIVERA:  Objection to
16              form.  He said it's a little vague.
17              You can reframe your question.
18    BY MR. KARP:
19          Q.      You told me that you've
20    conducted studies relating to education,
21    correct?
22          A.      I said yes to your question.
23          Q.      And what did you mean by
24    that?
25          A.      Based upon the -- your
```

CONFIDENTIAL

Page 50

```
1    explanation of your question, any surveys
2    or studies of population in education, my
3    answer is yes, this is -- there are times
4    throughout the year where we have to do
5    that just as principals.
6              Q.       Tell me more about that.
7              A.       About a principal gathering
8    data?
9              Q.       Is it your testimony that
10   you perform or conduct surveys in your role
11   as principal of Union Avenue Middle School?
12                  MR. RIVERA:  Objection to
13           form.
14                  THE WITNESS:  Yes.
15   BY MR. KARP:
16              Q.       What surveys?
17              A.       We do a climate and culture
18   survey in our building.
19              Q.       How often do you do these
20   climate and culture surveys?
21              A.       Once a year.
22              Q.       Do you write the questions
23   for those surveys?
24              A.       Do I personally write them?
25   I didn't for this one, no.
```

CONFIDENTIAL

Page 51

1          Q.          Have you done that in the
2     past?
3          A.          In this building?
4          Q.          I'm talking specifically
5     about Union Avenue Middle School.
6          A.          No.
7          Q.          So to make sure we're on the
8     same page, you've never written the
9     questions for a climate and culture survey
10    that has been given at Union Avenue Middle
11    School?
12         A.          No.
13         Q.          Have you written questions
14    for climate and culture surveys given at
15    other schools?
16         A.          I don't recall.
17         Q.          What topics are covered in
18    the climate and culture surveys that are
19    given at Union Avenue Middle School?
20         A.          There would possibly be
21    something about the opinions of the school
22    environment, things like that.
23         Q.          Are all students at Union
24    Avenue Middle School asked to complete
25    these climate and culture surveys?

CONFIDENTIAL

Page 52

1        A.        No.

2        Q.        Which students complete the

3    climate and culture surveys at Union Avenue

4    Middle School?

5        A.        I'm not sure if it was

6    presented to the students or if it was

7    presented to the staff.

8        Q.        So these surveys might have

9    been conducted of the staff and not the

10   students?

11       A.        This particular one I'm

12   talking about, I believe it's for the

13   staff.

14       Q.        And when you say -- the

15   climate and culture survey you have in

16   mind, is that for the 2024-2025 school

17   year?

18       A.        Yes.  No, I'm sorry, so I

19   would say yes if the data is collected for

20   2024-25.

21       Q.        When was the survey

22   completed or given out to participants?

23                 MR. RIVERA:  Object to form.

24                 THE WITNESS:  It was given out

25          two days ago.

CONFIDENTIAL

Page 53

1    BY MR. KARP:

2          Q.        Oh.  So the data is being

3    collected in this school year for

4    2024-2025?

5          A.        Yes.

6          Q.        And your testimony is you

7    don't know whether that survey was given to

8    staff or to students?

9                    MR. RIVERA:  Object to form.

10                   MR. KARP:  -- or potentially

11              both?

12                   MR. RIVERA:  Object to form.

13                   THE WITNESS:  That one was to

14              staff.  You're asking me specifics

15              when before it was a general.  So,

16              specifically, that particular one

17              was for staff.

18   BY MR. KARP:

19         Q.        And my questions earlier

20   about climate and culture surveys to

21   students.  I was asking about studies of

22   students.

23         A.        No.

24         Q.        Since you became principal

25   of Union Avenue Middle School in 2023, have

Page 54

1   there been any climate and culture surveys
2   of students?
3           A.      No.
4           Q.      While you were principal at
5   Mount Vernon Avenue Elementary School, were
6   there any climate and culture surveys of
7   those students?
8                   MR. RIVERA:  Objection to
9           form.
10                  THE WITNESS:  Not that I
11          recall.
12  BY MR. KARP:
13          Q.      Can you think of any other
14  time that you have studied or conducted a
15  study of students?
16                  MR. RIVERA:  Objection to
17          form.
18                  THE WITNESS:  I don't
19          understand the question.
20  BY MR. KARP:
21          Q.      Can you think of any other
22  time that you've conducted a survey of
23  students?
24          A.      I'm sure I have, but I can't
25  think of one off the top of my head.

CONFIDENTIAL

Page 55

1          Q.      Have you conducted any
2    research regarding social media?
3                      MR. RIVERA:  Objection to
4              form, vague.
5                      THE WITNESS:  Can you define
6              "research"?
7    BY MR. KARP:
8          Q.      Have you collected data or
9    statistics regarding student use of social
10   media?
11                     MR. RIVERA:  Objection to
12             form.
13                     THE WITNESS:  No.
14   BY MR. KARP:
15         Q.      Have you performed any
16   research or analysis of the potential
17   impact social media could have on students?
18                     MR. RIVERA:  Object to form.
19                     THE WITNESS:  Can you define
20             "analysis"?
21   BY MR. KARP:
22         Q.      Have you written any
23   articles -- or strike that.
24                     Let's move on and we'll come
25   back to this.  Have you read the legal

CONFIDENTIAL

Page 56

1    Complaint that Irvington Public Schools has

2    filed in this lawsuit?

3            A.        I can't say that I read it,

4    no.

5            Q.        You told me that this is

6    your first deposition, correct?

7            A.        Yes.

8            Q.        Have you ever provided

9    testimony at trial?

10           A.        For this?

11           Q.        No, in general.

12           A.        Yes.

13           Q.        When was that?

14           A.        There were multiple ones.  I

15   don't know the exact dates.

16           Q.        Can you approximate how many

17   times you provided testimony at trial?

18           A.        Oh, I would probably say

19   more than five, less than 15.  I'm not

20   sure.  Is there, I'm sorry, is there --

21   does it matter whether it was during a

22   trial or at sentencing?

23           Q.        It does not matter.

24           A.        Okay.

25           Q.        Thank you for clarifying.

Page 57

1   To the extent you can remember these cases,
2   I want to talk about a little bit about
3   what they were about.  Were any of these
4   cases that you testified in at trial, did
5   any of them involve student use of social
6   media?
7                    MR. RIVERA:  Object to form.
8                    THE WITNESS:  I'm not sure how
9            to answer that question.
10  BY MR. KARP:
11       Q.      Did any of the testimony you
12  provided at trial in these five to 15 cases
13  relate to a student's use of social media?
14                   MR. RIVERA:  Object to form.
15                   THE WITNESS:  Is there a
16           distinction between current student
17           and former student?
18  BY MR. KARP:
19       Q.      No.
20       A.      Yes.
21       Q.      Is there one particular case
22  or multiple cases where that's true?
23                   MR. RIVERA:  Object to form.
24                   THE WITNESS:  I believe
25           multiple.

CONFIDENTIAL

Page 58

1   BY MR. KARP:
2        Q.       Do you recall when you gave
3   testimony in those cases?
4        A.       I can't recall the date.
5        Q.       Are you able to approximate
6   or estimate when you would have provided
7   testimony in those cases?
8                  MR. RIVERA:  Object to form.
9                  THE WITNESS:  I believe
10           possibly within the last three
11           years.
12   BY MR. KARP:
13        Q.       Did any of those cases
14   involve IPS students?
15        A.       No.
16        Q.       To the extent that you've
17   provided testimony at trial, did any of
18   your testimony -- has any of your testimony
19   ever related to adolescent mental health?
20                  MR. RIVERA:  Objection to
21           form.
22                  THE WITNESS:  I don't
23           understand the question.
24   BY MR. KARP:
25        Q.       Have you ever provided

CONFIDENTIAL

Page 59

```
 1   testimony at trial about the mental health
 2   of a student?
 3          A.      A current student?
 4          Q.      Current or former.
 5          A.      Yes.
 6          Q.      And what were those cases
 7   about?
 8                  MR. RIVERA:  Objection to
 9          form.
10                  THE WITNESS:  I don't
11          understand the question.
12   BY MR. KARP:
13          Q.      How many cases do you recall
14   where you provided testimony regarding the
15   mental health of this student?
16                  MR. RIVERA:  I'm going to
17          object to form to this line of
18          questioning.  It's completely
19          outside the scope of this
20          deposition, and it's completely
21          irrelevant to the deposition and
22          the case at hand.
23                  MR. KARP:  Okay.  Noted.  You
24          can answer.
25                  THE WITNESS:  Can you repeat
```

Page 60

1                the question?
2    BY MR. KARP:
3          Q.         You testified that you had
4    provided testimony at trial regarding the
5    mental health of a student, correct?
6          A.         Former student.
7          Q.         Of a former student.
8          A.         Yes.  Yes.
9          Q.         Is that just one case?
10         A.         No, the mental health of the
11   individual was mentioned each time.
12         Q.         What do you mean, "each
13   time"?
14         A.         Each time that I spoke, I
15   spoke to the individual's mental health.
16         Q.         And just to take a step back
17   here, I'm trying to understand kind of what
18   testimony you have provided at trial and I
19   would like to walk through or understand
20   kind of each of these cases to the extent
21   that there are multiple cases.  So that's
22   just to give you the context of where I'm
23   headed here and maybe that will help us
24   along.
25         A.         I don't -- I'm trying to

CONFIDENTIAL

Page 61

1   understand the connectivity between my
2   history speaking on behalf or testifying
3   for individuals that were former students
4   with what we're doing here.  I'm confused.
5         Q.      You told me that you
6   provided testimony at trial about the
7   mental health of a former student, correct?
8         A.      Yes.
9         Q.      And is it your testimony
10  that you've provided that testimony on
11  multiple occasions?
12        A.      The same testimony?
13        Q.      Have you provided testimony
14  regarding the mental health of a former
15  student in multiple cases?
16        A.      It's always been a question
17  of me speaking on behalf of the
18  individual's mental health.
19        Q.      And roughly -- in roughly
20  how many cases have you provided testimony
21  regarding the mental health of a former
22  student?
23        A.      I can't recall the exact
24  number.  But I think it's pretty -- a
25  pretty standard question, can you speak to

Page 62

1    this individual's mental health.

2              MR. RIVERA:  Counsel, we have

3         been going for a bit over an hour,

4         it might be a good time for a break

5         and we can get back to this.

6              MR. KARP:  I'm in the middle

7         of a line of questioning, so as

8         soon as I'm done asking a

9         question --

10              MR. RIVERA:  There's no

11         current question pending.  You

12         asked a question, he answered it.

13         We're entitled to a break.

14              MR. KARP:  I'm getting --

15              MR. RIVERA:  We can get

16         back --

17              MR. KARP:  I'm getting to a

18         stopping point in a few minutes and

19         I can try to wrap this up, okay?

20              MR. RIVERA:  There's not a

21         current question pending.  You

22         asked a question, he answered.  You

23         can get back to this line of

24         questioning after a short break.

25              MR. KARP:  Let's go off the

CONFIDENTIAL

Page 63

1          record.

2                    THE VIDEOGRAPHER:  The time

3          right now is 10:46 a.m.  We are off

4          the record.

5                    - - - - -

6      (A recess was taken at this time.)

7                    - - - - -

8                    THE VIDEOGRAPHER:  The time

9          right now is 10:59 a.m. and we're

10          back on the record.

11   BY MR. KARP:

12          Q.      Welcome back, Dr. Zahir.

13          A.      Uh-huh.

14          Q.      Before the break, you told

15   me that you provided testimony at trial

16   roughly five to 15 times; is that right?

17                    MR. RIVERA:  Object to form.

18          You can answer.

19                    THE WITNESS:  Between that,

20          I'm not sure how many times I was

21          asked to come in and talk.

22   BY MR. KARP:

23          Q.      Did any of those cases where

24   you provided testimony at trial relate to

25   the potential impact of social media on the

CONFIDENTIAL

Page 64

```
 1  mental health of a student or former
 2  student?
 3                  MR. RIVERA:  Object to form.
 4          You can answer.
 5                  THE WITNESS:  No.
 6  BY MR. KARP:
 7      Q.      Did any of the testimony you
 8  provided at those cases relate to the
 9  potential impact of social media on the
10  mental health of a student or former
11  student?
12                  MR. RIVERA:  Object to form.
13                  THE WITNESS:  No.
14  BY MR. KARP:
15      Q.      Did any of those cases --
16  or strike that.
17                  When you have provided
18  testimony at trial, did any of that
19  testimony relate to the potential impact of
20  technology on the mental health of a
21  student or former student?
22      A.      Can you repeat the question?
23      Q.      Sure.  To the extent that
24  you've provided testimony at trial, has any
25  of that testimony related to the potential
```

CONFIDENTIAL

Page 65

1  impact of technology, such as a cell phone,
2  on the mental health of a student or former
3  student?
4              MR. RIVERA:  I'm just going to
5          object.  I want to clarify that the
6          testimony he provided wasn't at a
7          trial, it was during a subsequent
8          phase, a sentencing or sentence
9          reduction situation.
10 BY MR. KARP:
11     Q.      So let's back up.  I'll
12 withdraw my question.
13              Dr. Zahir, to the extent
14 that you've provided testimony, you
15 provided this testimony at sentencing?
16     A.      Yes.
17     Q.      Okay.  Not during an actual
18 trial in front of -- strike that.
19              Not during the earlier
20 phases of a trial as to whether that
21 particular individual was actually guilty
22 of a crime?
23     A.      No.
24     Q.      When you provided -- so just
25 to kind of reask my questions here, when

CONFIDENTIAL

Page 66

1    you provided testimony during the

2    sentencing phase, did any of that testimony

3    relate to the potential impact of social

4    media on the mental health of a student or

5    former student?

6          A.      No.

7          Q.      Did any of that testimony

8    relate to the potential impact of

9    technology, such as a cell phone, on the

10   mental health of a student or former

11   student?

12              MR. RIVERA:  Object to form.

13          You can answer.

14              THE WITNESS:  No.

15   BY MR. KARP:

16          Q.      Did you do anything to

17   prepare for today's deposition?

18          A.      I don't understand the

19   question.

20          Q.      In advance of today's

21   deposition, did you meet with your counsel?

22          A.      You mean the people here?

23          Q.      Yes.

24          A.      Oh.  Yes.

25              MS. HENRY:  And people from

CONFIDENTIAL

Page 67

```
 1              their firms.  It doesn't have to be
 2              just these two.
 3                   THE WITNESS:  Okay, yes.
 4  BY MR. KARP:
 5        Q.      And I'll ask a broader
 6  question to hopefully get us on the same
 7  page.  In advance of this deposition, did
 8  you meet with your lawyers?
 9        A.      You're talking about the
10  same people?
11        Q.      In advance of this
12  deposition, did you meet with any lawyers?
13        A.      I don't understand the
14  question.  I'm not trying to be difficult.
15        Q.      And I'm trying to think of
16  another way --
17        A.      Other than --
18        Q.      I'm trying to think of
19  another way to ask the question to clarify.
20                   MS. SCULLION:  I think the
21              witness was suggesting his point of
22              clarification, what's your points
23              of clarification?
24                   THE WITNESS:  Did I meet with
25              anyone other than --
```

CONFIDENTIAL

Page 68

```
 1              MS. HENRY:  Right.  Like, it
 2         could be these two or it could be
 3         other individuals from their firm
 4         or it could be another lawyer who
 5         is also representing the Plaintiffs
 6         in this litigation.  So Andrew is
 7         saying, he's not -- these two or
 8         other people representing
 9         Plaintiffs.
10              THE WITNESS:  Other than their
11         company or their firm?
12              MS. HENRY:  Their side.
13   BY MR. KARP:
14         Q.     I'm sorry, let's take a big
15   step back.
16         A.     Okay.
17         Q.     Sorry, reset.  Did you meet
18   with lawyers to prepare for today's
19   deposition?
20         A.     Yes.
21         Q.     Who?
22         A.     Them.
23         Q.     And who is them?
24         A.     I don't have the name of the
25   company committed to --
```

CONFIDENTIAL

Page 69

1        Q.        Who are the individuals?

2                  MS. HENRY:  Individuals he

3            asked --

4                  MR. KARP:  Yeah, who are --

5            and sorry, who are the individuals

6            you're referring to and what are

7            their names?

8                  THE WITNESS:  Oh, I feel bad,

9            I don't know.

10                  MS. SCULLION:  It's okay.  It

11            happens for every single witness

12            and every single deposition, so,

13            yes, he's referring to Carlos

14            Rivera and myself, Jennifer

15            Scullion.

16   BY MR. KARP:

17        Q.        Other than Carlos and

18   Jennifer, did you meet with any lawyers?

19        A.        Yes.

20        Q.        Do you remember their names?

21        A.        I have no idea.

22        Q.        Were they with the same law

23   firm?

24        A.        I believe so.

25        Q.        Roughly, how many lawyers --

CONFIDENTIAL

Page 70

1   roughly, how many additional lawyers were

2   there?

3          A.        Three.

4                    MR. RIVERA:  Object to form.

5             You can answer.

6   BY MR. KARP:

7          Q.        Did you meet with any

8   lawyers for the district itself?

9          A.        No.

10         Q.        Putting aside the lawyers,

11  did you meet with anyone else to prepare

12  for today's deposition?

13         A.        No.

14         Q.        Did you review any documents

15  to prepare for today's deposition?

16         A.        I don't understand --

17                   MR. RIVERA:  I'm going to

18             object to the extent that if you

19             can answer without disclosing

20             attorney-client privilege or

21             getting into attorney work product,

22             meaning documents shown to you by

23             your attorneys, you can respond.

24                   THE WITNESS:  Yes.

25

CONFIDENTIAL

Page 71

1  BY MR. KARP:

2        Q.       And were those documents

3  that you identified?

4        A.       I don't understand the

5  question.

6        Q.       You just told me that you

7  reviewed documents to prepare for today's

8  deposition, correct?

9        A.       I didn't say that, but you

10 said did I review any documents.

11       Q.       The question I asked was,

12 did you review any documents to prepare for

13 today's deposition, and then the answer you

14 gave was yes?

15       A.       Okay.  So maybe I just heard

16 review any documents.

17       Q.       So you did not look at any

18 documents to prepare for today's

19 deposition?

20       A.       Yes, I looked at documents.

21       Q.       What documents did you look

22 at?

23             MR. RIVERA:  I'm going to

24        object and I'm going to instruct

25        the witness to the extent there

Page 72

1          were documents outside of what was
2          shown to you by counsel, you can
3          answer to that.  The documents
4          shown to you by counsel are
5          protected by the attorney work
6          product and you don't have to
7          disclose any information.
8               MR. KARP:  Okay.  You may
9          answer to the extent that you can.
10              THE WITNESS:  I just got even
11         more confused.
12              MR. RIVERA:  Let's try to
13         clarify.  Are there documents
14         outside of anything that was shown
15         to you by your attorneys that you
16         reviewed individually or separately
17         and apart to prepare for today?
18    BY MR. KARP:
19         Q.     I will ask the question.  I
20    appreciate that, Carlos.
21              You reviewed documents to
22    prepare for today's deposition, correct?
23         A.     Yes.
24         Q.     Okay.  And were all of those
25    documents -- or strike that.

Page 73

1              Were any of those documents
2  provided to you by counsel?
3         A.      Yes.
4         Q.      Put those to the side.  Did
5  you review any other documents?
6         A.      Meaning on my own?
7         Q.      Yes.
8         A.      Like research and stuff?
9         Q.      Any documents you would have
10 looked at to prepare for today's
11 deposition.
12        A.      No.
13        Q.      So the documents you
14 reviewed were provided by counsel?
15        A.      Yes.
16        Q.      Did any of those documents
17 refresh your recollection of facts or
18 information for today's deposition?
19        A.      I don't understand the
20 question.
21        Q.      In reviewing these
22 documents, did any of them refresh your
23 memory of information you once knew and
24 maybe had forgotten?
25              MR. RIVERA:  Object to form.

CONFIDENTIAL

Page 74

```
 1            You can answer.
 2                 THE WITNESS:  I can't really
 3            recall.  I don't know if I forgot
 4            it, you know.
 5   BY MR. KARP:
 6        Q.       Regardless of whether you
 7   had forgotten or not, did any refresh --
 8   did any of these documents refresh your
 9   memory?
10                 MR. RIVERA:  Objection.  Asked
11            and answered.
12                 THE WITNESS:  I don't know how
13            to answer that question.
14   BY MR. KARP:
15        Q.       Did you take any notes while
16   preparing for today's deposition?
17        A.       No.
18        Q.       Did you bring anything with
19   you to today's deposition?
20        A.       A cup of coffee.
21        Q.       Dr. Zahir, have you ever
22   been charged with a crime?
23        A.       No.
24        Q.       At IPS or elsewhere, have
25   you ever been subject to disciplinary
```

CONFIDENTIAL

Page 75

```
 1   action in your professional capacity?
 2           A.      What do you mean?
 3           Q.      In the course of your job or
 4   any of your jobs, have you ever been
 5   subject to disciplinary action?
 6                   MR. RIVERA:  Objection to
 7           form.  You can answer.
 8                   THE WITNESS:  I'm not clear,
 9           subjected to or disciplined, are
10           you saying they're the same?
11   BY MR. KARP:
12           Q.      In your -- in any of your
13   jobs, have you been -- have you been
14   disciplined?
15                   MR. RIVERA:  Objection to
16           form.  You can answer.
17                   THE WITNESS:  I received a
18           write-up.  Yes, I received a
19           write-up.
20   BY MR. KARP:
21           Q.      When did you receive a
22   write-up?
23           A.      I want to say late winter,
24   early spring 2023.
25           Q.      And at that time, were you a
```

CONFIDENTIAL

Page 76

1    principal at Mount Vernon?

2            A.      Yes.

3            Q.      And what was the write-up

4    for?

5            A.      Do you really want to know?

6            Q.      I do.

7            A.      I went to a funeral that I

8    had permission to go to.

9            Q.      Thank you.  I'm sorry for

10   your loss.

11           A.      I thought it was bogus too,

12   so.

13           Q.      And I'm also sorry for your

14   loss.

15                   Have you ever been

16   investigated for any alleged misconduct in

17   any of your jobs?

18                   MR. RIVERA:  Objection to

19           form, vague.

20                   THE WITNESS:  Can you be clear

21           on investigated?

22   BY MR. KARP:

23           Q.      Has there ever been an

24   investigation of your conduct regarding

25   allegations that were made while you were

CONFIDENTIAL

Page 77

1    in any professional role?

2                    MR. RIVERA:  Objection to

3            form, foundation.

4                    THE WITNESS:  Like by the

5            police?

6    BY MR. KARP:

7        Q.        By -- and if you don't

8    understand the question, it's fine just to

9    tell me that you need me to clarify and I'm

10   happy to do that.  An investigation by

11   anyone, it could be law enforcement, it

12   could be other administrators within the

13   district.

14       A.        I'm not clear on how to

15   answer the question.  A situation was

16   investigated.  I can't say I was

17   investigated, but a situation was

18   investigated.

19                   Okay.  Tell me more about

20   that.

21                   MR. RIVERA:  Objection to

22           form.

23                   THE WITNESS:  ███ █████  ██ ████

██       ████ ████ ████ ████ █████ ████ ████

██       ████ ▪ ██ ██ ████ ▪ ████

CONFIDENTIAL



Page 78

Page 79

BY MR. KARP:

3

4     Q.      And this was -- sorry,
5  strike that.

6              When did this happen?

7     A.      Oh, I'm not sure of the
8  date.  I don't know exactly the date.

9     Q.      Were you employed by
10  Irvington Public Schools at the time?

11     A.      No.

12     Q.      Okay.  This predates your
13  time at Irvington Public Schools?

14     A.      Oh, yes.

15     Q.      Circling back to the
16  write-up you received for attending the
17  funeral, what were the consequences of that
18  write-up?

19     A.      It was just a write-up.

20     Q.      And for many of us who
21  aren't familiar with the significance of a
22  write-up, can you tell me whether there was
23  some pause in your employment or anything
24  like that?

25     A.      No, it was just a noted

Page 80

1   document, a document to note that there was

2   a meeting addressing the action.  No pause

3   in pay, no suspension or anything like

4   that.

5          Q.      What is your understanding

6   of the allegations that have been made in

7   this lawsuit?

8                  MR. RIVERA:  Objection.

9                  THE WITNESS:  I'm not sure I

10          understand the question.

11   BY MR. KARP:

12          Q.      What is your understanding

13   of this lawsuit?

14                  MR. RIVERA:  Objection to

15          form, vague.

16                  THE WITNESS:  There's a claim

17          that the use of social media has an

18          adverse effect on students and

19          their education.

20   BY MR. KARP:

21          Q.      And where did you get that

22   understanding of the lawsuit?

23          A.      I'm not sure how to answer

24   that question.

25          Q.      Did you read any documents

Page 81

1   that gave you that understanding of the

2   lawsuit?

3           A.      I don't recall reading

4   documents.  I don't recall.  I can't say

5   that -- I'm not sure.

6           Q.      Do you recall if you got

7   that understanding of the lawsuit from

8   speaking to other individuals?

9                   MR. RIVERA:  Objection to

10              form.  And to the extent it doesn't

11              involve conversations with your

12              attorneys, you can answer.

13                  THE WITNESS:  Yeah, it's like

14              a chicken egg thing now.  Like, I

15              don't know if we were told that

16              there -- that we would possibly be

17              part of something or we would be

18              questioned about the effects of

19              social media.  I'm not sure what

20              led to me formulating an

21              understanding of what the lawsuit

22              is.

23   BY MR. KARP:

24           Q.      When did you first become

25   aware of the lawsuit?

CONFIDENTIAL

Page 82

1          A.          I'm not sure of the date,

2     but I believe our superintendent mentioned

3     it in a principals' meeting, I think.

4          Q.          And that would be Dr. Vauss?

5          A.          Yes.

6          Q.          Do you recall approximately

7     when that meeting occurred?

8          A.          I have -- I couldn't begin

9     to pinpoint.

10         Q.          Not even the year?

11         A.          Well, it would have to be

12    this school year, but was it November,

13    December, January, I'm not sure.

14         Q.          So you recall a meeting with

15    Dr. Vauss where you learned about this

16    lawsuit that occurred during the 2024-2025

17    school year?

18                     MR. RIVERA:  Objection to

19               form.  You can answer.

20                     THE WITNESS:  I believe so.

21               You know, you're asking me on the

22               spot to go back and pinpoint, I

23               believe it may have been in a

24               meeting, at a principals' meeting.

25

CONFIDENTIAL

Page 83

1    BY MR. KARP:

2            Q.        And who attends principals'

3    meetings?

4            A.        Principals.

5            Q.        Principals from which

6    schools?

7            A.        All the schools.

8            Q.        So this is a periodic

9    meeting that Dr. Vauss has with the

10   principals of all schools within IPS?

11           A.        Yes.

12           Q.        How often do those meetings

13   occur?

14           A.        Once a month, minimum.

15           Q.        Are lawyers present for

16   those meetings?

17           A.        No.

18           Q.        Are agendas created for

19   those meetings?

20           A.        Yes.

21           Q.        And those are written down?

22           A.        Yes.

23           Q.        Do you receive those in

24   advance of each meeting?

25           A.        No.

CONFIDENTIAL

Page 84

1          Q.          Do you keep copies of those
2    agendas?
3          A.          I'm not sure.
4    Unintentionally, maybe.  It's -- yeah.
5          Q.          Do you take notes during
6    those meetings?
7          A.          Sometimes, depending on what
8    we're discussing.
9          Q.          And do you keep those notes?
10          A.          It depends.  I can't say for
11    sure.
12          Q.          Do you take those notes on a
13    computer or in a notebook?
14                    MR. RIVERA:  Objection to
15               form.
16                    THE WITNESS:  I'm bad with
17               that, it would be on whatever is in
18               front of me and then, you know.
19    BY MR. KARP:
20          Q.          And that could be a
21    notebook, that could be a laptop?
22                    MR. RIVERA:  Objection to
23               form.
24                    THE WITNESS:  I don't think
25               it's ever a laptop.  So it would

CONFIDENTIAL

Page 85

1              probably be the papers from the
2              agenda, like.  From the materials
3              from the meeting, I may just jot
4              something down and then --
5    BY MR. KARP:
6              Q.      Is someone at those meetings
7    responsible with keeping the minutes?
8              A.      Not to my knowledge.
9              Q.      There's no one there whose
10   responsibility it is to maintain or create
11   a record of what was discussed?
12                   MR. RIVERA:  Object to form.
13                   THE WITNESS:  Not to my
14             knowledge.
15   BY MR. KARP:
16             Q.      Were you involved in the
17   decision to file this lawsuit?
18             A.      No.
19             Q.      I'm handing you tab five,
20   which we will mark as Exhibit 3.
21                   - - - - -
22             (Union Avenue Middle School
23        Parent & Teacher Handbook
24        2023-2024 Bates
25        BW__Irrington00507982 to 508015

Page 86

```
 1              marked Zahir Exhibit 3 for
 2              identification.)
 3                   - - - - -
 4   BY MR. KARP:
 5        Q.         This is the Union Avenue
 6   Middle School Parent and Teacher Handbook
 7   for 2023-2024.
 8                   Do you see that?
 9        A.         Yes.
10        Q.         And your name is also
11   indicated on the front?
12        A.         Yes.
13        Q.         Do you recognize this
14   document?
15        A.         I believe so, yes.
16              MR. RIVERA:  You can take a
17        minute to look through the document
18        to familiarize yourself with it.
19   BY MR. KARP:
20        Q.         And I'll let you know, I'm
21   not going to ask you about every page of
22   this document, only a few.
23        A.         That's fine.
24        Q.         Did you draft any portions
25   of this document?
```

CONFIDENTIAL

Page 87

1          A.        No.

2          Q.        Did you approve the Union

3     Avenue Middle School parent and teacher

4     handbook before it was created?

5                    MR. RIVERA:   Object to form.

6     BY MR. KARP:

7          Q.        Strike that.

8                    Did you approve this

9     document?

10         A.        Yes.

11         Q.        Were you asked to review

12    this document before it was finalized?

13         A.        Yes.

14         Q.        And who asked you to do

15    that?

16         A.        I don't recall who asked me

17    to review it.  I know that the review

18    happens when the name of the principal

19    changes, if there's a difference in the

20    logo, not so much in the structure of the

21    pamphlet itself.

22         Q.        Let's turn to page 11.

23    Bates ending in 992.  The last section of

24    this page is titled, "Cell Phones and Other

25    Electronic Devices."

CONFIDENTIAL

Page 88

1                         Do you see that?

2         A.        Yes.

3         Q.        Does this set out Union

4    Avenue Middle School's policy with respect

5    to cell phone use in school?

6         A.        I don't know what you mean.

7         Q.        Is this Union Avenue Middle

8    School's policy on cell phones?

9         A.        This is the district's

10   policy.

11        Q.        And the district's policy

12   applies to Union Avenue Middle School,

13   correct?

14        A.        I'm not sure how to answer

15   that question.

16        Q.        The document we're looking

17   at right now is a handbook for Union Avenue

18   Middle School, correct?

19        A.        Yes.

20        Q.        And it incorporates the

21   district's policy on cell phones and

22   electronic devices?

23        A.        Yes.

24        Q.        Okay.  So you're saying that

25   this policy is not unique to Union Avenue

CONFIDENTIAL

Page 89

1   Middle School, it's the district policy?

2           A.      To my knowledge, yes.

3           Q.      Okay.  And -- but fair to

4   say, the policy that is indicated here is

5   the policy that applies to Union Avenue

6   Middle School, correct?

7                   MR. RIVERA:  Object to form.

8           You can answer.

9                   THE WITNESS:  Say that

10          question again, sir.

11  BY MR. KARP:

12          Q.      This is the policy -- this

13  policy called, "Cell Phones and Other

14  Electronic Devices," applies to Union

15  Avenue Middle School, correct?

16          A.      That, yes.

17          Q.      At least it did in the

18  2023-2024 school year that we're looking

19  at, right?

20          A.      Yes.

21          Q.      And according to this

22  policy, "Cell phones, recording devices,

23  and personal listening devices must be

24  turned off during the school day and must

25  not be visible."

CONFIDENTIAL

Page 90

1              Do you see that?

2      A.      Yes.

3      Q.      "If the device is visible or

4  activated in any fashion it will be taken

5  from the student, and a parent/guardian

6  will be asked to pick up the confiscated

7  item from the main office between 8:00 a.m.

8  to 8:30 a.m. and between 3:00 p.m. and

9  4:00 p.m."

10              Do you see that?

11      A.      Yes.

12      Q.      And that is the policy at

13  Union Avenue Middle School, correct?

14      A.      I'm not sure how to answer

15  that question.

16      Q.      Does Union Avenue Middle

17  School enforce what I just read?

18              MR. RIVERA:  Object to form.

19              THE WITNESS:  We adhere to the

20          policy.

21  BY MR. KARP:

22      Q.      Can Union Avenue Middle

23  School students use their cell phones or

24  have them visible before school starts?

25      A.      Meaning outside?

Page 91

1          Q.          During the school day -- or
2    strike that.
3                      While a student from Union
4    Avenue Middle School is present on campus,
5    can he or she have a cell phone out before
6    classes start?
7                      MR. RIVERA:  Object to form.
8                      THE WITNESS:  Can you be more
9          specific with your question?
10   BY MR. KARP:
11         Q.          If a student is on the
12   playground or otherwise outside of the
13   school, but still on school property and
14   classes have not yet started, can that
15   student have a cell phone out consistent
16   with this policy?
17         A.          Has the student entered the
18   building yet?
19         Q.          In this scenario, no.
20         A.          If they're not in the
21   building, yes.
22         Q.          Once the student has entered
23   the building, but before classes have
24   started, can that student have a cell phone
25   out?

CONFIDENTIAL

Page 92

```
 1          A.       No.
 2          Q.       Can a -- excuse me, can a
 3   Union Avenue student have a cell phone out
 4   in between class periods when walking from
 5   class to class?
 6                   MR. RIVERA:  Object to form.
 7                   THE WITNESS:  No, they're not
 8          supposed to have their phones out
 9          in passing.
10   BY MR. KARP:
11          Q.       I didn't mean to cut you
12   off, I'm sorry.
13          A.       They're not supposed to have
14   their phones out in passing, no.
15          Q.       Are Union Avenue Middle
16   School students permitted to have their
17   cell phones out during their lunch periods?
18          A.       In this building, yes.
19          Q.       Are Union Avenue students
20   permitted to have their cell phones out
21   after school while they're still in the
22   building?
23          A.       I don't understand the
24   question.
25                   MR. RIVERA:  Object to form.
```

CONFIDENTIAL

Page 93

1    BY MR. KARP:
2         Q.       Are Union Avenue Middle
3    School allowed to have their cell phones
4    out after classes have concluded for the
5    day while they're still in the building?
6                        MR. RIVERA:  Object to form.
7                        THE WITNESS:  I'm confused on
8               the scenario you're creating, at
9               the end of the day, class is over,
10              but they're still in the building.
11                   MS. HENRY:  Like between
12              dismissal and when they left the
13              property --
14                   MR. RIVERA:  Object to form.
15                   MS. SCULLION:  We really need
16              just one questioner.
17   BY MR. KARP:
18        Q.       What's the last period of
19   the school?
20        A.       Ninth period.
21        Q.       After ninth period, but
22   before the student has left the building,
23   can a student have a cell phone out?
24        A.       They're not given permission
25   to do that, no.

Page 94

1          Q.       If a student has his or her
2     cell phone out at that point in time, would
3     it be confiscated?
4          A.       No.
5          Q.       Why not?
6          A.       It depends on the nature of
7     them having it out.  If the kid has his
8     cell phone out and the kid is saying, okay,
9     Mommy, I'm coming right now, I wouldn't
10    confiscate the kid's phone because the
11    mother is saying I'm down the street, I'm
12    not at the normal parking spot.
13         Q.       So students can use their
14    cell phone after ninth period for certain
15    purposes?
16         A.       I think the way you're
17    asking me is if they have been given
18    permission to do so as opposed to is there
19    a level of understanding in the event that
20    they do so.  And I think those are
21    different.
22         Q.       The policy here indicates --
23    strike that.
24                  The policy written in the
25    handbook states that cell phones will be

CONFIDENTIAL

Page 95

1    confiscated if they're visible and I'm
2    trying to understand and I'm asking you if
3    a cell phone would be confiscated in this
4    situation?
5                MR. RIVERA:  Object to form.
6           Asked and answered.
7                THE WITNESS:  I think that if
8           you are speaking letter to the law,
9           it would be based on the intent of
10          who wrote that policy.  I don't
11          know the intent of the author of
12          that policy.  But I can tell you if
13          the speed limit says 55, do you get
14          a ticket at 56 always?  No, because
15          the police officer may say, where
16          are you going?  Do you know you
17          were going fast and you may say
18          yeah, I'm sorry, I was in a slight
19          rush and the police officer,
20          understanding the circumstance may
21          say okay, just keep it under 55.
22                So the letter of the law and
23          the intent versus the execution
24          of the law based on the scenario,
25          the way you're asking me, I can't

Page 96

```
 1           answer that question.
 2    BY MR. KARP:
 3           Q.       So there are instances when
 4    students can have their cell phones out at
 5    school and they will not be confiscated,
 6    correct?
 7                    MR. RIVERA:  Object to form.
 8                    THE WITNESS:  Are there
 9              instances where a cell phone may be
10              seen and it's not confiscated, yes,
11              but can they do it, meaning we're
12              granting them permission, they're
13              never granted permission to do
14              that.
15    BY MR. KARP:
16           Q.       Are students permitted to
17    have their cell phones out during
18    after-school activities like soccer
19    practice?
20                    MR. RIVERA:  Objection to
21              form.
22                    THE WITNESS:  Again, I don't
23              think the soccer coach says, okay,
24              guys, while we're practicing, you
25              have permission to take out your
```

CONFIDENTIAL

Page 97

1              phone.  So I don't know how to

2              answer that question based on how

3              you're asking me.

4    BY MR. KARP:

5         Q.      If a student has his or her

6    cell phone out during soccer practice,

7    would that student be disciplined?

8                   MR. RIVERA:  Objection to

9              form.

10                  THE WITNESS:  Depending on the

11             nature of the use of the phone.

12   BY MR. KARP:

13        Q.      So in some cases, they would

14   not be disciplined?

15        A.      Again, the scenario if the

16   kid's mother is saying what time is

17   practice over and the kid pulls out the

18   phone, I don't see grounds to discipline

19   the kid because the rigidness of the rule

20   says yes or no.

21        Q.      But in other instances, the

22   cell phone -- the student could be

23   disciplined?

24                  MR. RIVERA:  Objection to

25             form.

CONFIDENTIAL

Page 98

```
 1                    THE WITNESS:  Case-by-case
 2           scenario, yes.
 3   BY MR. KARP:
 4        Q.      Does Union Avenue Middle
 5   School provide buses for its students to
 6   get to school?
 7        A.      Only those that are
 8   identified as a particular population.
 9        Q.      Would those be students with
10   special needs?
11        A.      Yes.
12                    MR. RIVERA:  Objection to
13           form, foundation.
14   BY MR. KARP:
15        Q.      Any other populations of
16   students that fall into that category?
17        A.      No.  That a bus is issued
18   for, not to my knowledge, no.
19        Q.      Are those students permitted
20   to use -- or strike that.
21                    If a student from Union
22   Avenue Middle School has his or her phone
23   out on the bus going to or from school,
24   would that student be disciplined?
25                    MR. RIVERA:  Objection to
```

CONFIDENTIAL

Page 99

```
 1              form.  Calls for speculation.
 2                   THE WITNESS:  I can't say, it
 3              depends -- I can say that the
 4              discipline would speak to the
 5              nature of the usage when they are
 6              outside of the school.
 7   BY MR. KARP:
 8         Q.       I'll phrase that a little
 9   differently.  Does it violate Union Avenue
10   policy for a student to have a phone out
11   while taking a bus to and from school?
12                   MR. RIVERA:  Objection to
13              form.
14                   THE WITNESS:  I have to read
15              it again.  It would violate it
16              depending on what you constitute as
17              the start of the school day.  Does
18              the school day start the moment the
19              kid is picked up from their house
20              or does the school day start the
21              moment instruction or the moment
22              they enter the building and go to
23              class?  I don't know the author of
24              the policy.  I don't know what they
25              define as the school day.
```

CONFIDENTIAL

```
                                      Page 100

  1   BY MR. KARP:

  2        Q.      As principal of Union Avenue

  3   Middle School, do you enforce this policy?

  4              MR. RIVERA:  Objection to

  5         form.

  6              THE WITNESS:  Again, we adhere

  7         to the policy.

  8   BY MR. KARP:

  9        Q.      If a student ended up in

 10   your office because he or she had a cell

 11   phone out on a bus, what would you do?

 12              MR. RIVERA:  Objection to

 13         form.

 14              THE WITNESS:  Ask them what

 15         were they doing with the cell

 16         phone.

 17   BY MR. KARP:

 18        Q.      And in your view, was having

 19   the cell phone out a violation of the

 20   policy?

 21              MR. RIVERA:  Objection to

 22         form.

 23              THE WITNESS:  That would

 24         depend on my understanding of what

 25         the definition or the intent of
```

CONFIDENTIAL

```
                                    Page 101
 1            school day.  So this is -- this is
 2            left to the interpretation of
 3            someone who created this.
 4   BY MR. KARP:
 5            Q.      Have you ever had a student
 6   in your office at Union Avenue Middle
 7   School for a cell phone violation?
 8            A.      Yes.
 9                    MR. RIVERA:  Objection to
10            form.
11   BY MR. KARP:
12            Q.      And what time of day was
13   that student using his or her cell phone?
14                    MR. RIVERA:  Objection to
15            form.
16                    THE WITNESS:  I've had
17            students in my office numerous
18            times for improper use of cell
19            phone and sometimes it happened
20            during the day, sometimes it
21            happened after school, sometimes it
22            happened over the weekend.
23   BY MR. KARP:
24            Q.      As principal of Union Avenue
25   Middle School applying this policy, how do
```

CONFIDENTIAL

                                                    Page 102

1    you define the school day?

2              A.        I'm not at liberty to give

3    my definition to either expand or contract

4    this.  I can only work within the confines

5    of this based upon a case-by-case scenario.

6              Q.        So there isn't a blanket

7    prohibition on cell phones at Union Avenue;

8    is that right?

9                   MR. RIVERA:  Objection to

10              form.

11                   THE WITNESS:  I don't know

12              what you mean by that.

13   BY MR. KARP:

14              Q.        There are times when

15   students can have their cell phones on

16   campus and not get -- and not be

17   disciplined, correct?

18              A.        Again, you're asking about

19   do we give them permission versus if it

20   occurs, do we automatically punish them.

21   Those are two different things.

22              Q.        When students have their

23   cell phones out at a time when they're not

24   supposed to, according to this policy, do

25   those cell phones get confiscated?

CONFIDENTIAL

```
                                        Page 103

 1                    MR. RIVERA:  Objection to

 2             form.

 3                    THE WITNESS:  It depends on

 4             the nature of what occurs.  If a

 5             kid is in the classroom and a

 6             teacher is providing instruction

 7             and a kid is on his phone, the

 8             phone is confiscated.

 9                    If the kid walks into the

10             classroom and the kid may have --

11             may have had his phone looking at

12             it, not on, but looked at it and

13             a teacher says put your phone

14             away, if the kid puts his phone

15             away, then we're able to get to

16             the root of this, which is we

17             don't want cell phones out during

18             school.  But the black and white

19             questioning, I can't answer it

20             the way that you're asking it.

21             I'm sorry.

22    BY MR. KARP:

23          Q.       No need to apologize.  How

24    many -- how many cell phones are

25    confiscated from students at Union Avenue
```

CONFIDENTIAL

Page 104

1    Middle School on an average day?

2                    MR. RIVERA:  Objection to

3            form.

4                    THE WITNESS:  Well, there's no

5            way to accurately answer that

6            question.  Like, that's not a data

7            point that's collected that we have

8            to report.

9    BY MR. KARP:

10           Q.      How many cell phones were

11   confiscated from Union Avenue Middle School

12   last week?

13           A.      Again, that's not a data

14   point that I would give you an accurate

15   number.  By the end of the day, what's

16   tallied, we don't tally it and say add that

17   to yesterday's total.

18           Q.      So that's not information

19   that you track?

20           A.      No.

21                   MR. RIVERA:  Objection to

22           form.

23                   THE WITNESS:  We're not

24           instructed to track that

25           information.

Page 105

1   BY MR. KARP:

2         Q.        And as a result, you don't

3   track that information?

4         A.        We're not instructed to

5   track it.

6         Q.        So you don't track it?

7         A.        We're not instructed to

8   track it.

9                   MR. RIVERA:  Objection to

10             form.

11  BY MR. KARP:

12        Q.        What is your best

13  recollection of how many cell phones were

14  confiscated last week?

15        A.        I couldn't recall how many,

16  because it's not a -- it's not a pipeline

17  where every phone finds its way to me.  A

18  teacher could confiscate the cell phone,

19  call the parent, and say I have your

20  child's cell phone, can you come get it

21  after school, or I will hold it until the

22  end of the day and give it back.  We don't

23  track that data.

24        Q.        How many cell phones were

25  confiscated by Union Avenue Middle School

Page 106

```
 1   students yesterday?
 2                  MR. RIVERA:  Objection to
 3             form.
 4                  THE WITNESS:  By who?
 5   BY MR. KARP:
 6        Q.      By any Union Avenue Middle
 7   School staff?
 8        A.      I can't speak to all the
 9   staff.
10        Q.      Have you confiscated
11   any cell pones --
12        A.      Yesterday, I had four.
13        Q.      Yesterday --
14                  MS. SCULLION:  Hold on, we're
15             starting to speak over each other,
16             and it's going to be a problem for
17             the court reporter, so I'm just
18             going to ask that you let him
19             finish his questions --
20                  THE WITNESS:  Sure.
21                  MS. SCULLION:  -- and you can
22             let him finish his answers, and
23             we'll have this be a little bit
24             more easier for the court reporter.
25             Thank you.
```

CONFIDENTIAL

Page 107

1    BY MR. KARP:

2         Q.       Yesterday you confiscated

3    four cell phones?

4         A.       Four.

5         Q.       And they were all returned

6    to the students that day?

7                  MR. RIVERA:  Objection to

8              form.

9    BY MR. KARP:

10        Q.       -- or to their -- strike

11   that.

12                 They were returned to the

13   students or their parents that day?

14        A.       At the end of the day, yes.

15        Q.       But there's no record of

16   those confiscations?

17                 MR. RIVERA:  Objection to

18             form.

19                 THE WITNESS:  Again, this is

20             not a stat we record.

21   BY MR. KARP:

22        Q.       Do you record the reasons

23   for the confiscation?

24                 MR. RIVERA:  Objection to

25             form.

Page 108

```
 1                    THE WITNESS:  No.
 2   BY MR. KARP:
 3         Q.      These confiscations could
 4   have occurred whether the student was
 5   playing videos games or texting or on
 6   social media or something else, correct?
 7                    MR. RIVERA:  Objection to
 8           form.
 9                    THE WITNESS:  I can't speak to
10           everyone's confiscation or why.
11   BY MR. KARP:
12         Q.      If I wanted to know what
13   those students were doing on those cell
14   phones -- strike that.
15                    If I wanted to know what
16   those four students were doing on their
17   cell phones at the time that those cell
18   phones were confiscated, what would I do?
19                    MR. RIVERA:  Objection to
20           form.
21                    THE WITNESS:  I don't
22           understand the question.
23   BY MR. KARP:
24         Q.      Is there a way for me to
25   know or find out what those students were
```

```
                                              Page 109
 1    doing on their cell phones at the time that
 2    they were confiscated?
 3                    MR. RIVERA:  Objection to
 4           form.
 5                    THE WITNESS:  You would ask
 6           the person who confiscated it.
 7    BY MR. KARP:
 8         Q.      And you were the person who
 9    confiscated those phones, correct?
10         A.      Yes.
11         Q.      Do you know what those
12    students were doing on their cell phones at
13    the time?
14         A.      Yes.
15         Q.      What were they doing on
16    their cell phones?
17         A.      They were on social media.
18         Q.      What platforms were they on?
19         A.      I'm not -- Instagram and
20    TikTok.
21         Q.      And you saw them on
22    Instagram and TikTok?
23         A.      I asked.
24                    MR. RIVERA:  Objection to
25           form.
```

CONFIDENTIAL

Page 110

1  BY MR. KARP:

2       Q.      Before you confiscated

3  the phone -- well, strike that.

4               You asked the students what

5  they were doing on their cell phones when

6  they were confiscated?

7               MR. RIVERA:  Object to form.

8               THE WITNESS:  I believe one I

9          asked.  Two, as I walked over, I

10         saw.  And one was because the phone

11         was ringing during instructional

12         time.  I believe that was the case.

13  BY MR. KARP:

14      Q.      For that last one, they were

15  receiving a call?

16              MR. RIVERA:  Objection to

17         form.

18              THE WITNESS:  I'm not sure if

19         it was a call or an alarm, but it

20         was going off and the individual

21         refused to turn it off, so I asked

22         the individual to give me the phone

23         and I brought it downstairs to my

24         office.

25

CONFIDENTIAL

```
                                    Page 111

 1   BY MR. KARP:

 2          Q.        And for that one in

 3   particular, do you -- your understanding is

 4   that that caller alarm was related to

 5   social media?

 6                    MR. RIVERA:  Objection to

 7            form.

 8                    THE WITNESS:  No, that one was

 9            disrupting the learning

10            environment.

11   BY MR. KARP:

12          Q.        Once the phones were

13   confiscated, did you meet with the

14   students?

15          A.        I don't understand what you

16   mean.

17          Q.        Walk me through the process

18   of confiscating a phone from a student.

19          A.        Give me your phone.  Thank

20   you.

21          Q.        And then after that, is

22   there a meeting with the student?

23          A.        Depending on the nature of

24   the incident.  These particular incidents,

25   there was no need for a meeting, because it
```

CONFIDENTIAL

Page 112

1   was clear what was being done.

2           Q.      Do you know if for these

3   four students these were their first times

4   violating the policy?

5                   MR. RIVERA:  Objection to

6           form.

7                   THE WITNESS:  I can't answer

8           that.

9   BY MR. KARP:

10          Q.      Let's go back to the policy

11  for a minute.  About halfway through it

12  states, "Any student who violates this

13  policy a second time will have this

14  privilege revoked, and the device will not

15  be returned until the end of the school

16  year."

17                  Do you see that?

18          A.      I do.

19          Q.      Union Avenue School -- Union

20  Avenue Middle School doesn't track whether

21  students have violated this policy more

22  than once?

23                  MR. RIVERA:  Objection to

24          form.

25                  THE WITNESS:  Not in the

CONFIDENTIAL

Page 113

1          extent of sight, if I see the
2          phone.  The way this is written,
3          no.
4   BY MR. KARP:
5          Q.     How many times per year --
6   or strike that.
7                 For the 2023-2024 school
8   year, so the last school year, how many
9   cell phones were confiscated and not
10  returned until end of the school year?
11                MR. RIVERA:  Objection to
12         form.
13                THE WITNESS:  I can't answer
14         that.  That's not a stat that we
15         store.
16  BY MR. KARP:
17         Q.     Do you recall if any were
18  confiscated and held until the end of the
19  school year?
20         A.     No.
21         Q.     You don't recall it or they
22  weren't, there were none?
23                MR. RIVERA:  Objection to
24         form.
25                THE WITNESS:  Again, if the

CONFIDENTIAL

1           phone is confiscated, it doesn't
2           necessarily have to be confiscated
3           by myself.  I will also state that
4           I don't know the author of this and
5           their intent, so.
6   BY MR. KARP:
7           Q.      And you can only answer as
8   to what if you know.  So my question to you
9   is, were any cell phones confiscated during
10  the 2023-2024 school year that were not
11  returned until the end of the year?
12                  MR. RIVERA:  Objection to
13          form.
14                  THE WITNESS:  Again, I can't
15          answer that.  I did not confiscate
16          a phone and hold one for the whole
17          year.  I did not.
18  BY MR. KARP:
19          Q.      If others -- if other staff
20  at Union Avenue Middle School confiscated a
21  phone and held it until the end of the
22  school year, that would not be brought to
23  your attention?
24                  MR. RIVERA:  Objection to
25          form.

CONFIDENTIAL

Page 115

1                THE WITNESS:  It may not be.

2          It doesn't have to be.

3    BY MR. KARP:

4          Q.      This school year, meaning

5    the 2024-2025 school year, have any cell

6    phones been confiscated that will not be

7    returned until the end of the school year?

8          A.      I'm sorry, I'm -- because

9    we're going letter to the law, in here, it

10   says, "it will be taken from the student,

11   and parent or guardian will have to pick up

12   the phone if confiscated item from the main

13   office between 8:00 a.m. to 8:30 p.m."

14   [sic].  All right.  If that teacher returns

15   it to the main office, so I don't know.

16         Q.      And I'm focusing on the next

17   sentence which says, "Any student who

18   violates this policy a second time will

19   have this privilege revoked, and the device

20   will not be returned until the end of the

21   school year."

22                Do you see that?

23         A.      Yes.

24         Q.      And that is the policy of

25   the Union Avenue Middle School, correct?

Page 116

1          A.       That is the policy of the
2    district that we adhere to.
3          Q.       And my question to you is
4    whether any cell phones have been
5    confiscated during this school year,
6    2024-2025, that will be returned to
7    students at the end of the school year?
8          A.       Not by me.
9          Q.       Do you know if by anyone?
10         A.       Again, not that I know of,
11   no.  But that does not mean that it has or
12   hasn't happened.  There's a possibility
13   that a parent could say he was on his phone
14   again, okay, Ms. such and such, you hold
15   onto the phone and he'll get it at the end
16   of the year and that teacher may lock it in
17   their drawer.
18         Q.       And that is not information
19   that the district -- that the school
20   tracks?
21              MR. RIVERA:  Objection to
22        form.
23              THE WITNESS:  No.
24   BY MR. KARP:
25         Q.       In your experience as

CONFIDENTIAL

1    principal of Union Avenue Middle School,

2    does confiscating a student's cell phone

3    discourage him or her from using a cell

4    phone during school?

5                    MR. RIVERA:  Objection to

6            form.

7                    THE WITNESS:  Yes.

8    BY MR. KARP:

9            Q.      Let's turn to page 10 of

10   this document and the section titled,

11   "Guidance."  Did you write this section of

12   the handbook?

13           A.      No.

14                   MR. RIVERA:  Objection to

15           form.  Asked and answered.

16   BY MR. KARP:

17           Q.      According to the handbook,

18   "Guidance counselors help students in a

19   variety of ways.  Some of the services

20   provided by the guidance counselors are,"

21   and then there's a list.

22                   Do you see that?

23           A.      Yes.

24           Q.      The last bullet in this list

25   is "Conducting weekly guidance lessons on

CONFIDENTIAL

Page 118

1    conflict resolution skills, social media,

2    et al."

3                     Do you see that?

4         A.        Yes.

5         Q.        Do you have an understanding

6    of what's meant by conducting weekly

7    guidance lessons on social media?

8                     MR. RIVERA:  Object to form.

9                     THE WITNESS:  Do I understand

10            what the author of this meant?

11   BY MR. KARP:

12        Q.        Yes, that's the question.

13        A.        I can't speak to --

14                     MR. RIVERA:  Objection to

15            form.

16                     THE WITNESS:  I can't speak to

17            the meaning of the person who wrote

18            it.

19   BY MR. KARP:

20        Q.        Do you know what, if any,

21   weekly guidance lessons Union Avenue gives

22   on social media?

23        A.        Globally or are you -- I

24   don't understand the question.

25

CONFIDENTIAL

Page 119

```
 1          Q.       This policy refers to weekly
 2    guidance lessons regarding social media,
 3    correct?
 4                   MR. RIVERA:  Objection to
 5          form.
 6                   THE WITNESS:  Say that again.
 7    BY MR. KARP:
 8          Q.       This handbook specifically
 9    the section on guidance refers to
10    "Conducting weekly guidance lessons on
11    conflict resolution skills, social media,
12    et al."
13                   Do you see that?
14          A.       Uh-huh.
15          Q.       Is it your understanding
16    that those weekly guidance lessons occur?
17          A.       With who?
18          Q.       Are these weekly -- do
19    guidance counselors offer weekly lessons --
20    strike that.
21                   Do guidance counselors at
22    Union Avenue Middle School offer weekly
23    lessons on social media?
24                   MR. RIVERA:  Object to form.
25                   THE WITNESS:  I'm not
```

CONFIDENTIAL

Page 120

1            understanding with who.
2      BY MR. KARP:
3            Q.        Who was the intended
4      audience for this particular section of the
5      handbook?
6            A.        I don't know --
7                      MR. RIVERA:  Objection to
8            form.
9                      THE WITNESS:  I don't know the
10           nature of the author and what they
11           wrote or intended.
12     BY MR. KARP:
13           Q.        And if you read up, it says,
14     "Guidance counselors help students in a
15     variety of ways."
16                      Do you see that?
17           A.        Uh-huh.
18           Q.        Are these lessons given to
19     students?
20           A.        It says, "Some of the
21     services provided are."  Are they given to
22     the students, yes.
23           Q.        The first sentence of this
24     section is, "Union Avenue Middle School's
25     guidance counselors work with the students,

CONFIDENTIAL

Page 121

1   teachers, and parents under the direction

2   of the principal."

3                  Do you see that?

4        A.       Uh-huh.

5        Q.       And you are the principal,

6   correct?

7        A.       Uh-huh.

8        Q.       And do you work --

9                  MS. SCULLION:  I'm sorry, we

10          need to say yes and no.

11                 THE WITNESS:  Yes, I'm sorry,

12          yes.

13  BY MR. KARP:

14       Q.       And do you work with

15  guidance counselors on their weekly lessons

16  on conflict resolution skills and social

17  media?

18                 MR. RIVERA:  Objection to

19          form.

20                 THE WITNESS:  In what way?

21  BY MR. KARP:

22       Q.       In the way that's

23  contemplated by this handbook.

24                 MR. RIVERA:  Objection to

25          form.  Lack of foundation.

Page 122

1              THE WITNESS:  I'm not clear on
2         how it was contemplated by the
3         handbook.
4    BY MR. KARP:
5         Q.      Do you work with guidance
6    counselors regarding any of the weekly
7    lessons that they teach?
8              MR. RIVERA:  Objection to
9         form.
10             THE WITNESS:  I'm not sure how
11        to answer that question.
12   BY MR. KARP:
13        Q.      Tell me about the
14   responsibilities of guidance counselors at
15   Union Avenue Middle School.
16             MR. RIVERA:  Objection to
17        form.
18             THE WITNESS:  I'm not clear on
19        their full job description.
20   BY MR. KARP:
21        Q.      Do you ever see them?
22             MR. RIVERA:  Objection to
23        form.
24             THE WITNESS:  As it applies to
25        my building, yes, but they have a

CONFIDENTIAL

Page 123

```
 1              supervisor that provides them with
 2              most of their immediate
 3              supervision -- well, not immediate
 4              supervision, but most of their job.
 5    BY MR. KARP:
 6         Q.        Do you hire guidance
 7    counselors to work at Union Avenue Middle
 8    School?
 9         A.        No.
10         Q.        Who does?
11         A.        The supervisor of guidance,
12    they appoint them to the schools.
13         Q.        And you're not involved in
14    that decision at all?
15         A.        I may -- I may be asked how
16    do I feel about this candidate.  If there's
17    an interview, I may get a courtesy of being
18    on the interview if they're specifically
19    interviewing for me, but that has never
20    happened here.
21         Q.        What are the general
22    responsibilities of guidance counselors at
23    Union Avenue Middle School?
24                   MR. RIVERA:  Objection to
25              form.
```

CONFIDENTIAL

                                              Page 124

1                    THE WITNESS:  I can't speak to

2            their written responsibilities.

3    BY MR. KARP:

4         Q.       Can you speak to any of

5    their responsibilities?

6                    MR. RIVERA:  Objection to

7            form.

8                    THE WITNESS:  Yes.

9    BY MR. KARP:

10        Q.       How do guidance

11   counselors -- well, strike that.

12                   What responsibilities can

13   you speak to?

14        A.       Their impact on advising

15   when it comes to scheduling.  Their impact

16   on when we're having parent conferences or

17   we're doing I&RS meetings.  Their impact on

18   students who are not doing well

19   academically, the guidance that they

20   provide them.

21        Q.       What are I&RS meetings?

22        A.       Excuse me?

23        Q.       What are I&RS meetings?

24        A.       Intervention and referral

25   services.

CONFIDENTIAL

Page 125

1          Q.       The handbook refers to
2    conducting weekly guidance lessons on
3    conflict resolution skills, social media,
4    et al.
5                    Do you see that?
6          A.       Yes.
7          Q.       Are you aware of any weekly
8    guidance lessons offered by guidance
9    counselors at Union Avenue Middle School?
10                   MR. RIVERA:  Object to form.
11                   THE WITNESS:  You've asked me
12           that and my response is, to who?
13   BY MR. KARP:
14         Q.       To anyone.
15         A.       I am not --
16                   MR. RIVERA:  Object to form.
17                   THE WITNESS:  I am not aware
18           of a guidance counselor meeting
19           with a particular group of kids
20           every week.
21   BY MR. KARP:
22         Q.       And that wasn't my question.
23         A.       That's where I'm confused.
24         Q.       My question is, are you
25   aware of any weekly guidance lessons that

CONFIDENTIAL

Page 126

1  have been offered to anyone, whether it's

2  parents, teachers, or students?

3         A.      My confusion is when you

4  say, "weekly," as if what I'm hearing is if

5  it's recurring with the same people.

6         Q.      And with all due respect,

7  Dr. Zahir, the policy that we have in front

8  of us in the handbook for your school says

9  conducting weekly guidance lessons.

10                Do you see that?

11        A.      Yes.  I did not write the

12 policy.  I don't understand the intent of

13 the person who wrote it.  So I'm not clear

14 on the meaning behind weekly.

15        Q.      So my understanding of your

16 testimony is you're not aware of any weekly

17 guidance lessons that have been offered to

18 anyone?

19        A.      Yes --

20                MR. RIVERA:  Object to form.

21                THE WITNESS:  That is not what

22         I said, what I'm saying is I don't

23         understand you asking me about

24         weekly lessons.  That's why I asked

25         to who.

CONFIDENTIAL

```
 1   BY MR. KARP:
 2        Q.      Are you aware of any lessons
 3   taught by guidance counselors at Union
 4   Avenue Middle School?
 5        A.      Yes.
 6        Q.      Tell me about those lessons.
 7                MR. RIVERA:  Objection to
 8           form.
 9                THE WITNESS:  The guidance
10           counselors periodically go into the
11           classrooms, speak to the kids about
12           a multitude of things from
13           self-esteem to social media to,
14           like, when we have our
15           anti-bullying months or we have --
16           let me think, there's, like, a
17           kindness initiative we do.  Things
18           of that nature.
19   BY MR. KARP:
20        Q.      You said periodically?
21        A.      Yes.
22        Q.      How often?
23        A.      I can't speak to how often.
24        Q.      You said self-esteem, social
25   media, and bullying are some of the topics
```

CONFIDENTIAL

Page 128

1    they cover, and kindness?

2          A.        Yes.

3          Q.        College prep, is that

4    another topic that they may cover?

5                    MR. RIVERA:  Object to form.

6                    THE WITNESS:  That is an

7              assumption, but we're a middle

8              school.  So the depth of how deep

9              they go with that, I don't know.

10   BY MR. KARP:

11         Q.        To the extent that guidance

12   counselors are teaching lessons on social

13   media -- or let me rephrase that, strike

14   that.

15                   To the extent that guidance

16   counselors at Union Avenue Middle School

17   are teaching students about social media,

18   are there any handouts or presentations

19   that you're aware of?

20                   MR. RIVERA:  Objection to

21             form.

22                   THE WITNESS:  Not that I can

23             recall.  I'm not sure.

24   BY MR. KARP:

25         Q.        Do you know approximately

CONFIDENTIAL

Page 129

1  how many lessons guidance counselors at
2  Union Avenue Middle School give to students
3  on social media?
4               MR. RIVERA:  Objection to
5         form.
6               THE WITNESS:  I'm not -- I
7         don't understand the question.
8  BY MR. KARP:
9        Q.      Do guidance counselors teach
10  five lessons on social media or do they
11  teach one lesson on social media a year?
12              MR. RIVERA:  Objection to
13         form.
14              THE WITNESS:  I don't
15         understand -- I'm confused when
16         your -- the number is what's
17         confusing me.
18  BY MR. KARP:
19        Q.      I'm sorry, I didn't mean to
20  cut you off.
21        A.      No, go ahead.
22        Q.      You testified that guidance
23  counselors at Union Avenue Middle School
24  teach lessons to students regarding social
25  media, correct?

Page 130

1          A.       I mentioned other things

2    also, yes.

3          Q.       Among a number of topics,

4    correct?

5          A.       Uh-huh.

6          Q.       And my question to you is,

7    in a given school year, how many lessons do

8    guidance counselors give to students at

9    Union Avenue Middle School regarding social

10   media?

11                  MR. RIVERA:  Objection to

12          form.

13                  THE WITNESS:  The same

14          students?

15   BY MR. KARP:

16         Q.       Any students at Union Avenue

17   Middle School, how many lessons are they

18   teaching?

19                  MR. RIVERA:  Objection to

20          form.

21                  THE WITNESS:  I'm not sure of

22          how many.

23   BY MR. KARP:

24         Q.       During the 2023-2024 school

25   year, how many lessons did guidance

CONFIDENTIAL

Page 131

1    counselors at Union Avenue Middle School

2    teach regarding social media?

3                    MR. RIVERA:  Objection to

4            form.

5                    THE WITNESS:  I am not sure.

6    BY MR. KARP:

7        Q.    What is the last lesson that

8    you can recall that a guidance counselor at

9    Union Avenue Middle School gave to

10   students?

11       A.    I'm not sure --

12                   MR. RIVERA:  Objection to

13           form.

14                   THE WITNESS:  -- what the last

15           lesson was.

16   BY MR. KARP:

17       Q.    Okay.  And you don't recall

18   when that lesson was given?

19       A.    I'm not sure when that last

20   lesson was given.

21       Q.    And I think I left out a

22   part of my question, I apologize.

23                   What is the last lesson

24   regarding social media specifically that

25   you recall being given by guidance

Page 132

1    counselors at Union Avenue Middle School?
2           A.      Say that again, sir.
3           Q.      What is the last lesson
4    regarding social media that you can recall
5    being given by guidance counselors at Union
6    Avenue Middle School?
7           A.      I don't understand --
8                   MR. RIVERA:  Objection to
9           form.
10                  THE WITNESS:  I don't
11          understand the question.
12   BY MR. KARP:
13          Q.      You've testified that
14   guidance counselors at Union Avenue Middle
15   School have given or taught lessons to
16   students regarding social media, correct?
17          A.      Yes.
18          Q.      What is the last of those
19   lessons that you can recall?
20          A.      I don't understand the
21   question.
22          Q.      Do you recall any of those
23   lessons?
24          A.      I recall having a
25   conversation about those lessons.

CONFIDENTIAL

Page 133

1          Q.          With whom?

2          A.          With the guidance

3    counselors.

4          Q.          Do you remember which ones?

5          A.          I'm not sure if it was --

6    I'm not sure if it was Ms. Knight or

7    Ms. Vargas.

8          Q.          You said Ms. Vargas, it

9    could have been --

10          A.          I'm not sure if it was Ms.

11    Knight or Ms. Vargas.

12          Q.          The first name was Ms.

13    Knight?

14          A.          Knight.

15          Q.          Do you recall when you had

16    this conversation?

17          A.          I do not recall.

18          Q.          Was it 2025?

19          A.          I believe so.  It may have

20    been fall, like, fall, early winter 2024.

21          Q.          Your best recollection is

22    that it occurred this school year?

23          A.          Yes.  I can't give you

24    exactly when, but there was conversations

25    about pushing into the classrooms last

CONFIDENTIAL

Page 134

1    school year about the use of social media.
2    The date, I can't recall, but this is --
3    this is such a big issue in the school that
4    it's discussed a lot and from the guidance
5    counselors' perspective, there have been
6    conversations about pushing into the
7    classes to discuss the dangers of it,
8    proper use, and so on and so forth and
9    whatever.
10        Q.      And the last time you
11   discussed a lesson that guidance counselors
12   at Union Avenue Middle School would give to
13   students about social media was the fall or
14   winter of 2024?
15                MR. RIVERA:  Objection to
16            form.
17                THE WITNESS:  I said I can't
18            recall.
19   BY MR. KARP:
20        Q.      Do you know if there have
21   ever been weekly guidance lessons on social
22   media --
23                MR. RIVERA:  Objection to
24            form.
25                MR. KARP:  -- at Union Avenue

CONFIDENTIAL

Page 135

1          Middle School?
2                    THE WITNESS:  I can't speak to
3               it.  I don't understand what they
4               mean by weekly.
5     BY MR. KARP:
6          Q.      You don't think that means
7     happening every week?
8                    MR. RIVERA:  Objection to
9               form.
10                   THE WITNESS:  I understand
11              what weekly means, but to who?
12    BY MR. KARP:
13         Q.      Meaning who the audience is?
14         A.      Who are they having the
15    lessons with every week?
16         Q.      Are you aware of any weekly
17    guidance lessons that have been given to
18    any group of people by guidance counselors
19    at Union Avenue Middle School?
20         A.      I don't understand the
21    nature of the question.
22                   MR. KARP:  This might be --
23                   MR. RIVERA:  I think now is a
24              good time for a break, lunch is
25              ready.

CONFIDENTIAL

Page 136

1          MR. KARP:  Yeah, I think this

2      is a good time for lunch.

3          THE WITNESS:  No problem.

4          THE VIDEOGRAPHER:  The time

5      right now is 12:09 p.m.  We are off

6      the record.

7              - - - - -

8    (A recess was taken at this time.)

9              - - - - -

10          THE VIDEOGRAPHER:  The time

11      right now is 1:03 p.m.  We are back

12      on the record.

13  BY MR. KARP:

14      Q.     Dr. Zahir, welcome back.

15  How was lunch?

16      A.      It was cool.  Pepper and

17  turkey, I think.  Whoever picked that, by

18  the way, it was a good choice.

19      Q.      I agree, I had some good

20  chicken salad.  Well, I hope you feel

21  nourished and ready to go?

22      A.      Right.

23      Q.      I'm handing you tab six

24  which we will mark as Exhibit 4.

25              - - - - -

CONFIDENTIAL

Page 137

1              (Email dated 10/2/23 Bates

2          BW__Irvington00083334 marked

3          Zahir Exhibit 4 for

4          identification.)

5              - - - - -

6    BY MR. KARP:

7        Q.     This is an email dated

8    October 2, 2023.  The subject is

9    "Walk-through feedback 9/27/2023," and this

10   email is from Ray-Quell Cotton to Ryan

11   Carroll, and you are copied on this email.

12              Do you see that?

13       A.     Yes.

14       Q.     Okay.  Are you familiar with

15   this email?

16       A.     Okay.  Yes.

17       Q.     Was that a yes?

18       A.     Yes, it looks familiar.

19       Q.     Do you recall receiving this

20   email?

21       A.     I'm not going to say I

22   recall, but I -- it doesn't look foreign.

23       Q.     Who is Ray-Quell Cotton?

24       A.     She, I believe is the

25   supervisor of health and phys. ed.

CONFIDENTIAL

Page 138

1          Q.          And who is Mr. Carroll?

2          A.          He's a phys. ed teacher.

3          Q.          Both individuals work at

4    Union Avenue?

5          A.          No.

6          Q.          Where do these teachers

7    work?

8          A.          Mr. Carroll works here.

9          Q.          Here being Union Avenue?

10          A.          Yes.

11          Q.          Where does Ms. Cotton work?

12          A.          She works for the district.

13    She's a district supervisor.

14          Q.          And this part is -- excuse

15    me -- strike that.

16                    As part of her role as

17    district supervisor, does Ms. Cotton do

18    walk-throughs of phys. ed classes taught by

19    Union Avenue phys. ed teachers?

20                    MR. RIVERA:  Object to form.

21                    THE WITNESS:  Can you repeat

22          the question?

23    BY MR. KARP:

24          Q.          Sure.  Does -- in her role

25    as supervisor of health and physical

Page 139

```
 1   education for Irvington Public Schools,
 2   does Ms. Cotton observe phys. ed teachers
 3   at Union Avenue Middle School?
 4          A.      Yes.
 5          Q.        And here in this email,
 6   Ms. Cotton wrote to Mr. Carroll, "Good
 7   afternoon Mr. Carroll, Thank you for
 8   sharing your educational space with me.
 9   Listed below, please find your Grows and
10   Glows to use as you continue your growth as
11   an educator."
12                   Do you see that?
13          A.      Yes.
14          Q.        Are you familiar with grows
15   and glows?
16          A.      Yes.
17          Q.        What is meant by that term,
18   "grows and glows"?
19                   MR. RIVERA:  Object to form.
20                   THE WITNESS:  What does she
21          mean or what does the terminology
22          in education mean?
23   BY MR. KARP:
24          Q.        What does the terminology in
25   education mean?
```

CONFIDENTIAL

Page 140

1          A.          Your glows are areas that

2     you were cited doing well.  Your grows are

3     areas that need improvement, recommended

4     areas of improvement.

5          Q.          Is it your understanding

6     that that's how Ms. Cotton was using those

7     terms here in her email?

8                    MR. RIVERA:  Object to form.

9                    THE WITNESS:  I would assume

10            that.

11     BY MR. KARP:

12          Q.          Let's look at the grows

13     section for Mr. Carroll.  The third bullet

14     down states, "Students were observed using

15     cell phones.  Reinforce the district cell

16     phone policy to students.  Cell phones

17     should be off and out of sight.  Please

18     take the appropriate disciplinary action

19     against students who violate this policy."

20                    Do you see that?

21          A.          Uh-huh.

22          Q.          Do you have an understanding

23     of why Mr. Carroll received this feedback?

24                    MR. RIVERA:  Object to form.

25                    THE WITNESS:  I don't

                                        Page 141

1              understand the question.
2    BY MR. KARP:
3         Q.      Do you know why Ms. Cotton
4    gave Mr. Carroll that feedback?
5                 MR. RIVERA:  Objection to
6              form.  Calls for speculation.
7                 MR. KARP:  I'm asking if he
8              knows.
9                 THE WITNESS:  I don't, I can't
10             speak to why she did it, what her
11             motivation was, her thought.
12   BY MR. KARP:
13        Q.      Were you present for Ms.
14   Cotton's observation of Mr. Carroll's
15   class?
16        A.      I don't recall.  I don't
17   believe so, but I don't recall, no.
18        Q.      Ms. Cotton reported that
19   students in Mr. Carroll's class were using
20   their cell phones, correct?
21        A.      That's what it says.
22        Q.      And she was encouraging him
23   to enforce the cell phone policy?
24                MR. RIVERA:  Object to form.
25                THE WITNESS:  I can't speak

CONFIDENTIAL

Page 142

1              for what she thought or wanted.  I
2              can read what she said.
3    BY MR. KARP:
4         Q.      You told me a minute ago
5    that the grows section refers to
6    recommended areas of improvement; is that
7    right?
8         A.      That's the -- that is what
9    it's understood to mean.
10        Q.      And what Ms. Cotton told Mr.
11   Carroll is one way he could improve would
12   be to reinforce the district's cell phone
13   policy to students, right?
14                 MR. RIVERA:  Object to form.
15                 MR. KARP:  You can answer the
16         question.
17                 THE WITNESS:  I thought you
18         were just restating it.  I didn't
19         know if you were asking me a
20         question.
21   BY MR. KARP:
22        Q.      Sorry.  One of the
23   recommended areas of improvement that Ms.
24   Cotton shared with Mr. Carroll was that he
25   could reinforce the district's cell phone

CONFIDENTIAL

Page 143

1   policy to students, correct?

2           A.          What I read is that under

3   the category of grow, "Students were

4   observed using cell phones.  Reinforce the

5   district cell phone policy to students."  I

6   have to take it for what's there.  I can't

7   speak to what she wanted or what she felt.

8   I can't speak to that.

9           Q.          Ms. Cotton observed that

10  students had their cell phones out in

11  class, in Mr. Carroll's class, correct?

12          A.          Mr. Carroll observed, no.

13  Ms. Ray-Quell Cotton observed.

14          Q.          Sorry if I misspoke, Ms.

15  Cotton observed that students in Mr.

16  Carroll's class had their cell phones out,

17  correct?

18          A.          That's what it says.

19          Q.          And she encouraged Mr.

20  Carroll to reinforce the district cell

21  phone policy to students, correct?

22                      MR. RIVERA:  Object to form.

23                      THE WITNESS:  Again, her

24              encouraging him, I can't speak to

25              that.  I can speak to what's

CONFIDENTIAL

Page 144

1      written.
2  BY MR. KARP:
3        Q.      Do teachers at Union Avenue
4  Middle School enforce the district cell
5  phone policy?
6        A.      As I stated earlier, we
7  adhere to the district's cell phone policy
8  for the most part.
9        Q.      What do you mean, "for the
10  most part"?
11        A.      As principals, we have what
12  I can call procedural autonomy, and in
13  those cases, in those cases where we deem
14  necessary, we have the autonomy to invoke a
15  building-based procedure, not to ignore
16  district policy, but because of the climate
17  and culture of the state where we are here,
18  sometimes we have that latitude.  So when I
19  say adhere, meaning we're not re-- we're
20  not disregarding it but there are times
21  when our procedural autonomy comes into
22  play.
23        Q.      And I've asked questions
24  today about whether this policy has been
25  enforced.  Do you recall those questions?

CONFIDENTIAL

Page 145

```
 1          A.      Yes.
 2          Q.      And is there a difference in
 3   your mind between enforce and adhere?
 4          A.      Yes.
 5          Q.      And what is that difference?
 6          A.      When I hear the word,
 7   "enforce," I think of discipline or action
 8   or punishment.  When I hear, "adhere," I'm
 9   acknowledging that that's the policy and
10   that policy are bumpers or guidelines.  We
11   do not deviate outside, but within those
12   guidelines, there are times when you have
13   to make a decision based on a case-by-case
14   perspective.  So not adhering to the policy
15   would be ignoring it totally and saying we
16   do whatever we want, phones whenever,
17   however, no, so.
18          Q.      And here Ms. Cotton told Mr.
19   Carroll that students had their cell phones
20   out and that he should reinforce the
21   district's policy, which is to for students
22   to have their phones off and out of sight.
23                  MR. RIVERA:  Object to form.
24          Asked and answered.
25                  MR. KARP:  Is that right?
```

CONFIDENTIAL

Page 146

```
 1                    THE WITNESS:  That's what it
 2          says.
 3  BY MR. KARP:
 4          Q.      You can put this to the
 5  side.
 6                  As to the activities that
 7  Ms. Cotton observed in Mr. Carroll's class
 8  that we were just discussing, do you know
 9  how students were using their cell phones?
10                  MR. RIVERA:  Objection to
11          form.  Calls for speculation.
12                  THE WITNESS:  No.
13  BY MR. KARP:
14          Q.      I'm handing you tab seven
15  which we'll mark as Exhibit 5.
16                      - - - - -
17                  (Email String Bates
18          BW__Irvington00083313 marked
19          Zahir Exhibit 5 for
20          identification.)
21                      - - - - -
22  BY MR. KARP:
23          Q.      Let me know once you've had
24  a chance to take a look.
25          A.      Okay.
```

CONFIDENTIAL

1          Q.        This is an email chain from

2     October 3, 2023, the subject line is

3     regarding 10/2 walk-through feedback, and

4     the top email is from Lance Hilfman to Leon

5     Wallace.  You are copied on this email.

6                    Do you see that?

7          A.        Yes.

8          Q.        Who is Lance Hilfman?

9          A.        He is a teacher.

10         Q.        And is he a teacher at Union

11    Avenue Middle School?

12         A.        Yes.

13         Q.        What does he teach?

14         A.        Special education.

15         Q.        Who is Leon Wallace?

16         A.        He was a past vice principal

17    here.

18         Q.        Is he still employed at the

19    district?

20         A.        Yes.

21         Q.        Where does he work now?

22         A.        He's the principal of

23    Berkeley Elementary School.

24         Q.        If we look down to the

25    second email from the top it reads, "Hello,

Page 148

1    Mr. Hilfman, it was an honor to come into

2    your classroom to view your scholars and

3    instruction.  The following is feedback

4    from the walk-through."

5                    Do you see that?

6         A.        Yes.

7         Q.        In Mr. Wallace's job as vice

8    principal of Union Avenue Middle School,

9    did he observe classroom instruction for

10   various teachers?

11        A.        Yes.

12        Q.        And then he would evaluate

13   those teachers based on those observations?

14                  MR. RIVERA:  Object to form.

15                  THE WITNESS:  What do you mean

16        by "evaluate"?  I'm unclear.

17   BY MR. KARP:

18        Q.        Sure.  He would give those

19   teachers or instructors feedback based on

20   --

21        A.        Yes.

22        Q.        -- his observations?

23        A.        Yes.

24        Q.        And like the other email we

25   looked at, Mr. Wallace identifies certain

CONFIDENTIAL

Page 149

1    glows and certain grows for this particular

2    instructor.

3                    Do you see that?

4          A.       Yes.

5          Q.       And is your understanding

6    the same here that glows would reflect

7    something that the teacher did well and

8    grows would reflect potential areas for

9    improvement?

10         A.       That's the -- that's the

11   understanding of glows and grows, yes.

12         Q.       The first item under grows

13   that Mr. Wallace and the only item under

14   grows that Mr. Wallace reports is, "Do not

15   hesitate to address cell phone usage during

16   your lesson.  Moreover, moving forward

17   contact security or administration to

18   assist in said situation."

19                    Do you see that?

20         A.       I do.

21         Q.       Mr. Wallace was encouraging

22   Mr. Hilfman to address cell phone usage

23   during his lessons, right?

24                    MR. RIVERA:  Object to form.

25                    THE WITNESS:  I see what he

CONFIDENTIAL

Page 150

```
 1          wrote.  I don't quite understand
 2          the need to write that.
 3  BY MR. KARP:
 4       Q.     Were you present for this
 5  observation?
 6       A.     No.
 7       Q.     Okay.  Have you spoken to
 8  Mr. Hilfman or Mr. Wallace about his
 9  particular observation?
10       A.     Not that I recall.
11       Q.     Have you spoken to either of
12  the individuals about this piece of
13  feedback on not hesitating to address cell
14  phone usage?
15       A.     Not that I recall.  But I
16  just want to address that Mr. Wallace did
17  not provide a descriptor for why he
18  itemized that grow.  And if you look at
19  this, there were four students in that
20  class and this is an autistic room.  So I'm
21  not sure what due diligence was done by
22  Mr. Wallace to even determine if the kid
23  not having the phone went against his IEP.
24  So I don't -- I don't know the nature of or
25  the justification for that, because he's
```

CONFIDENTIAL

Page 151

1   not citing that something happened.  He's

2   just saying, do not hesitate to address.

3   And what I can add to you is that it is

4   customary that if you provide glows, you

5   sometimes have to provide a grow.  But when

6   the grows come without citing an incident,

7   I can't speak to the validity of a kid in

8   that classroom being on the cell phone and

9   the nature of why.  Because it's possible

10  that in that room, it could be for a

11  reading aid or learning aid.  Maybe the kid

12  is not comfortable looking at the board

13  itself.  There's a lot with this one here,

14  so.

15        Q.      Is that something that

16  Mr. Wallace would be familiar with as vice

17  principal of the school?

18                MR. RIVERA:  Object to form.

19                THE WITNESS:  I cannot speak

20        to what he would be familiar with

21        or not.

22  BY MR. KARP:

23        Q.      Mr. Wallace would not be

24  familiar with an appropriate or

25  inappropriate use of a cell phone in a

CONFIDENTIAL

Page 152

1   particular classroom?

2            MR. RIVERA:  Object to form.

3            MR. KARP:  You can answer.

4            THE WITNESS:  I cannot speak

5        to what he will or will not be

6        familiar with.

7   BY MR. KARP:

8        Q.      Did the vice principals --

9   how many vice principals are there at Union

10  Avenue Middle School?

11       A.      Currently?

12       Q.      In 2023, how many vice

13  principals were there at Union Avenue

14  Middle School?

15       A.      At some part during the

16  year, there were two, at other parts, there

17  were three.

18       Q.      At all times, are vice

19  principals of Union Avenue Middle School

20  expected to know what an appropriate or

21  inappropriate use of a cell phone is by a

22  student?

23            MR. RIVERA:  Object to form.

24            THE WITNESS:  I don't know how

25        to answer that question.

CONFIDENTIAL

Page 153

1    BY MR. KARP:
2            Q.      As vice principal of --
3    well, strike that.
4                    You are -- you were the
5    principal for -- at the time that this
6    email was written, correct?
7            A.      Yes.
8            Q.      Okay.  And Mr. Wallace
9    reported to you as vice principal, correct?
10                   MR. RIVERA:  Object to form.
11                   THE WITNESS:  Yes.
12   BY MR. KARP:
13           Q.      Okay.  Did you expect, in
14   your role as principal, did you expect
15   Mr. Wallace to know how to distinguish
16   between appropriate and inappropriate uses
17   of cell phones in class?
18           A.      At the time of this email, I
19   had not had any opportunity to formulate an
20   expectation, because this is two and a
21   half, three weeks into the school year, we
22   have not completed our normalization or our
23   calibration of school norms.  So for me to
24   expect something from someone I'm not used
25   to working with, that's not a fair

CONFIDENTIAL

Page 154

1   statement.

2        Q.        Sitting here today, May 20,

3   2025, as principal of Union Avenue Middle

4   School, do you expect your vice principals

5   to know the difference between appropriate

6   and inappropriate cell phone usage at Union

7   Avenue Middle School?

8        A.        At this point in time, yes.

9        Q.        And that is not an

10  expectation you had for your vice principal

11  on October 3, 2023?

12            MR. RIVERA:  Object to form.

13            THE WITNESS:  Again, I did not

14        not have that expectation or I

15        didn't expect him to or not.  For

16        me, I did not formulate what my

17        expectation of him was, because I

18        didn't really know him.

19  BY MR. KARP:

20        Q.        Do you have any reason to

21  think that Mr. Wallace was telling Mr.

22  Hilfman to -- not to hesitate to address

23  cell phone usage during his lesson while

24  students were using their cell phones

25  consistent with IEPs?

Page 155

1          MR. RIVERA:  I'll object to
2      the form.
3          MS. SCULLION:  Can you restate
4      that?
5          THE WITNESS:  Yeah, can you
6      restate the question?
7          MR. KARP:  Who is defending
8      this deposition?  Just one counsel.
9          MR. RIVERA:  I got my
10     objection on the record.
11         MS. SCULLION:  I wasn't
12     actually able to hear the question.
13     That's why I was asking.
14 BY MR. KARP:
15     Q.      Okay.  I can reask the
16 question.  Do you have any reason to
17 believe that Mr. Wallace was offering this
18 piece of feedback when a student was using
19 his or her cell phone appropriately?
20         MR. RIVERA:  Objection to
21     form.
22         THE WITNESS:  I don't have a
23     reason in this email to assume that
24     this was related to a cited
25     incident, because it's not stated.

Page 156

1    BY MR. KARP:

2         Q.        And what do you mean, "a

3    cited incident"?

4         A.        If you refer back to the

5    other one with Ms. Cotton, she clearly

6    stated students were observed, so these

7    have to be evidence based.  This statement

8    is not evidence based.  It comes -- for me,

9    it reads as advice, but it does not say

10   that it's based upon something that was

11   observed.  And my knowledge of that

12   classroom and based on the entire email,

13   there were four students in that room.  How

14   do we speak to the educational capabilities

15   of them if they could comprehend, if they

16   could read.  Some students in that room are

17   nonverbal and not literate.  So we don't

18   know who was there.

19        Q.        This email was forwarded to

20   you later in the day on October 3, 2023?

21        A.        Uh-huh.

22                  MR. RIVERA:  Objection to

23            form.

24   BY MR. KARP:

25        Q.        Do you recall responding to

Page 157

1    this email?

2         A.       Do I recall responding to

3    it, I don't.

4         Q.       Do you recall following up

5    and asking about this comment on whether or

6    not Mr. Hilfman was addressing cell phone

7    usage during his lesson?

8         A.       I do not recall responding

9    to it.  I see where he says, "Thank you for

10   the glows and suggestions," but I don't see

11   where Mr. Hilfman is saying, I'm glad you

12   caught that, or I didn't see that, or which

13   student were you talking about?  And as I

14   stated previously, it is common practice

15   that when you provide glows, you have to

16   provide a grow.

17        Q.       And you believe that

18   Mr. Wallace provided this grow simply

19   because he needed to provide a grow along

20   with some glows?

21        A.       That's not what I said.

22                 MR. RIVERA:  Objection to

23            form.

24                 THE WITNESS:  I didn't

25            say that -- I didn't say what I

Page 158

```
 1              believed.  I'm telling you that I
 2              can't attribute this to anything
 3              without any cited evidence of what
 4              occurred.  I don't -- I can't speak
 5              to why Mr. Wallace wrote this that
 6              way.
 7  BY MR. KARP:
 8         Q.     We can put this to the side.
 9  I'm handing you tab eight, which we will
10  mark as Exhibit 6.
11                   - - - - -
12              (Email dated 9/22/23
13              BW__Irvington00079688 marked
14              Zahir Exhibit 6 for
15              identification.)
16                   - - - - -
17  BY MR. KARP:
18         Q.     Let me know once you've had
19  a chance to take a look.
20         A.     I see it.
21         Q.     This is an email dated
22  September 22, 2023.  The subject line is
23  "Using the cell phone during class."  This
24  is from Rufina Garcia to you.
25                   Do you see that?
```

Page 159

1              MR. RIVERA:  I'm sorry, your
2          responses need to be verbal.
3              THE WITNESS:  Yes, yes.
4    BY MR. KARP:
5          Q.     Who is Rufina Garcia?
6          A.     She's a teacher here at
7    Union Avenue.
8          Q.     She's a Spanish teacher?
9          A.     Yes.
10         Q.     Her signature block says,
11   "UMS," does that refer to Union Avenue or
12   University Middle School?
13         A.     That's -- that would -- the
14   district would assume that that's
15   University Middle School, but under it, she
16   puts Union Avenue, so I don't know.
17         Q.     And Ms. Garcia wrote to you,
18   "The following students were using their
19   cell phones during class, talkative,
20   disrespectful, talking back and refusing to
21   change seats.  I will contact the parents
22   today by the end of the day."
23             Do you see that?
24         A.     I do.
25         Q.     Do you recall this incident?

Page 160

1        A.        I do not.

2        Q.        Do you know if these

3  students had their cell phones confiscated?

4        A.        I do not know which students

5  she's speaking of.

6        Q.        Okay.  Do you recall

7  following up with Ms. Garcia about -- to

8  identify these students?

9                  MR. RIVERA:  Object to form.

10                 THE WITNESS:  I don't recall.

11            My natural reaction is to follow

12            up.  I would walk down to the

13            classroom or I would speak to her

14            the next day, depending on, you

15            know, in this particular case, this

16            was sent at 2:59, the day is over

17            with, so there's no students who

18            you need to address at that moment.

19  BY MR. KARP:

20        Q.        Sitting here today, do you

21  recall how the students that Ms. Garcia has

22  emailed you about were using their cell

23  phones?

24                 MR. RIVERA:  Object to form.

25                 THE WITNESS:  I do not recall.

CONFIDENTIAL

Page 161

1            I can only go by what she has in
2            this email but again, she did not
3            list who the students were.
4   BY MR. KARP:
5        Q.      I asked you a couple of
6   minutes ago if you know whether these
7   students had their cell phones confiscated,
8   do you recall?
9        A.      I do not recall.
10       Q.      No, I'm sorry, do you recall
11  the question?
12       A.      Do I recall you asking the
13  question, yes.
14       Q.      You did not personally
15  confiscate these students' cell phones,
16  correct?
17       A.      I do not recall.
18       Q.      And, to your knowledge --
19  and you do not recall if Ms. Garcia
20  confiscated these cell phones?
21            MR. RIVERA:  Object to form.
22            THE WITNESS:  I do not recall
23            and, like, once again, based on the
24            time that this was sent, the school
25            day is over.  I don't recall if she

CONFIDENTIAL

Page 162

1            did or didn't.  I'm not sure.
2    BY MR. KARP:
3            Q.        Do you know if you responded
4    to this email?
5            A.        I don't recall.
6            Q.        Do you know if you told
7    Ms. Garcia that she should confiscate their
8    cell phones?
9                    MR. RIVERA:  Object to form.
10                   THE WITNESS:  I don't recall
11            if I told her to confiscate their
12            cell phones.  I don't recall if I
13            told her to do that.
14   BY MR. KARP:
15           Q.        Do you recall asking
16   Ms. Garcia for more information about how
17   the students were using their cell phones?
18           A.        I don't recall anything
19   about this particular matter.
20           Q.        You can put this to the
21   side.  I'm handing you tab nine which we'll
22   mark as Exhibit 7.
23                    - - - - -
24                   (Email String Bates
25            BW__Irrington00086585 to 00086587

CONFIDENTIAL

Page 163

1              marked Zahir Exhibit 7 for
2              identification.)
3                    - - - - -
4                    THE WITNESS:  Okay.
5     BY MR. KARP:
6          Q.       This is an email chain dated
7     May 10, 2023, the subject line is regarding
8     cell phone use during instructional hours.
9     The top email is from Teesha Davis to Mia
10    Appling and you were copied.
11                   Do you see that?
12         A.       Yes.
13         Q.       Who is Teesha Davis?
14         A.       Supervisor of ELA for the
15    elementary grades.
16         Q.       And ELA is English language
17    arts?
18         A.       Yes.
19         Q.       Who is Mia Appling?
20         A.       She was a first grade
21    teacher at Mount Vernon.
22         Q.       At the time of this email --
23    or strike that.
24                   At the time of these emails,
25    you were principal of Mount Vernon?

CONFIDENTIAL

Page 164

1          A.        Yes.

2          Q.        Is Ms. Appling still a first

3    grade teacher at Mount Vernon?

4          A.        I believe so.

5          Q.        Let's turn to the second

6    page of this email ending in 586.

7    Ms. Davis wrote to Ms. Appling, "Good

8    afternoon Ms. Appling, On Wednesday, at

9    approximately 11:05 a.m., I witnessed you

10   in the doorway of your classroom having a

11   conversation on your cell phone using an

12   earbud."

13                   Do you see that?

14         A.        Yes.

15         Q.        Is it appropriate for

16   teachers to be on their cell phones in

17   front of students?

18                   MR. RIVERA:  Object to form.

19                   THE WITNESS:  No, it is not.

20   BY MR. KARP:

21         Q.        Was Ms. Appling in violation

22   of school policy by taking a call in the

23   doorway of her classroom?

24                   MR. RIVERA:  Object to form.

25                   THE WITNESS:  I don't know how

Page 165

1           to answer that question.
2    BY MR. KARP:
3           Q.       Does Irvington Public
4    Schools have a policy stating that teachers
5    cannot be on their cell phones during the
6    school day?
7           A.       I believe there is a policy,
8    I'm not fully aware of all of the verbiage.
9           Q.       Ms. Davis wrote, "When I
10   walked past acknowledged me by stating that
11   you had received my email.  After you
12   acknowledged me, you continued your
13   conversation.  While you were on the phone
14   in the doorway, students were seated in the
15   classroom at their desks."
16               Do you see that?
17          A.       Yes.
18          Q.       Okay.  Was it appropriate
19   for Ms. Appling to be on her phone while
20   her students were seated at their desks?
21              MR. RIVERA:  Object to form.
22              THE WITNESS:  I don't
23          understand the question.
24   BY MR. KARP:
25          Q.       Was it consistent with

Page 166

1    district policy for Ms. Appling to take a
2    phone call in front of her students while
3    they were seated at their desks?
4                    MR. RIVERA:  Objection to
5            form.
6                    THE WITNESS:  I don't have the
7            district policy committed to
8            memory.  I don't have it committed
9            to memory to know exactly what it
10           states.
11   BY MR. KARP:
12           Q.      If you were to walk by a
13   teacher at Union Avenue Middle School on
14   his or her cell phone today while that
15   teacher's students were seated and ready to
16   go, would you engage with that teacher or
17   tell that teacher to hang up the call?
18                   MR. RIVERA:  Objection to
19           form.
20                   THE WITNESS:  My immediate
21           question would not be hang up the
22           phone.
23   BY MR. KARP:
24           Q.      What would your immediate
25   question be?

CONFIDENTIAL

Page 167

1        A.        I would want to know why are
2    they on the phone.
3        Q.        Ms. Davis wrote to Ms.
4    Appling, "Refrain from using your cell
5    phone during instructional hours when
6    students are present."
7        A.        Uh-huh.
8        Q.        "This behavior is not only
9    unprofessional, it violates district
10   policies."
11                 Do you see that?
12       A.        I do.
13       Q.        And is it your understanding
14   that this conduct violated district
15   policies?
16                 MR. RIVERA:  Object to form.
17                 THE WITNESS:  It is my
18            assumption that it violates the
19            district policy, but, again, I do
20            not know the verbiage of that
21            district policy.
22   BY MR. KARP:
23       Q.        Sitting here today, as
24   principal of Union Avenue Middle School,
25   what is your understanding of the policy on

CONFIDENTIAL

Page 168

1    teacher use of cell phones during the
2    school day?
3           A.         Policy removed, I think it's
4    inappropriate for a teacher to be
5    conducting a phone call during
6    instructional time.  What the policy says,
7    I can't speak to verbatim, but policy or no
8    policy, I think it's inappropriate for a
9    teacher to be conducting a phone
10   conversation during instructional time.
11                     However, as a parent, and a
12   former teacher, in the event that there was
13   an emergency phone call received, I may
14   need to respond, then hang up, find
15   coverage, and then pursue the matter.  So
16   for me, I can't speak to, you know, thumbs
17   up, thumbs down on right or wrong, because
18   it would have to be my first inclination is
19   why are you on the phone.
20          Q.         And my question was about
21   your understanding of the district's
22   policies.  So does the district have a
23   policy on whether teachers can use their
24   cell phones during the school day?
25                     MR. RIVERA:  Objection to

Page 169

1          form.  Asked and answered.
2                  THE WITNESS:  I believe I
3          answered the question when you
4          asked.  I believe there is a
5          policy, I do not know verbatim what
6          it is.
7    BY MR. KARP:
8         Q.      And is that policy in the
9    Union Avenue Middle School handbook?
10        A.      For the students?  I'm not
11   sure if it's in the handbook for the
12   students.
13        Q.      I'm asking about teachers.
14        A.      That the handbook -- which
15   handbook, the teacher handbook?
16        Q.      The teacher handbook that we
17   were just looking at.
18        A.      I don't -- I can't say
19   verbatim if it's in there and the wording
20   that's in there.
21        Q.      What do you know about the
22   policy, if not the exact wording?
23                  MR. RIVERA:  Objection to
24          form.
25                  THE WITNESS:  I believe that

CONFIDENTIAL

```
                                        Page 170

 1            you are not to be on your phone
 2            during instructional time.
 3      BY MR. KARP:
 4            Q.       Does being on -- strike
 5      that.
 6                     If a teacher is on her phone
 7      in front of students who are supposed to
 8      have their phones concealed, is that
 9      setting a good example for students?
10                     MR. RIVERA:  Objection to
11            form.
12                     THE WITNESS:  I can't speak to
13            examples and if the kids are
14            influenced by that or not.  In this
15            particular situation, these are
16            first graders.  I doubt that they
17            have phones.
18      BY MR. KARP:
19            Q.       You doubt that first
20      graders --
21            A.       Have phones.
22            Q.       -- have phones?
23                     Are you aware that some of
24      the allegations in this case involve
25      elementary school students and their use of
```

CONFIDENTIAL

```
                                        Page 171

 1   cell phones?

 2          A.      Uh-huh.

 3                  MR. RIVERA:  Objection to

 4          form.

 5                  THE WITNESS:  But, globally,

 6          if in my experience, there may have

 7          been a small minority of students

 8          in elementary with phones, but it

 9          wasn't all of the students.  And

10          we're talking about six-year-olds

11          in this particular case, so.

12   BY MR. KARP:

13          Q.      And this would not have --

14   this would not make an impression on

15   six-year-olds?

16                  MR. RIVERA:  Objection to

17          form.

18                  THE WITNESS:  I can't say

19          whether it will or it wouldn't.

20   BY MR. KARP:

21          Q.      You can you put this to the

22   side.  I'm handing you tab ten which we'll

23   mark as Exhibit 7 -- Exhibit 8, apologies.

24                          - - - - -

25                  (Email String Bates
```

CONFIDENTIAL

Page 172

```
 1           BW__Irvington00079618 to 00079621

 2           marked Zahir Exhibit 8 for

 3           identification.)

 4                    - - - - -

 5   BY MR. KARP:

 6         Q.      Are you ready?

 7         A.      Yes.

 8         Q.      This is an email chain from

 9   July through September of 2023.

10                 Do you see that?

11         A.      Yes.

12         Q.      And, excuse me, the subject

13   line of this email is regarding Yondr and

14   Union Avenue Middle School.

15                 Do you see that?

16         A.      Yes.

17         Q.      Let's turn to the second

18   page of this email chain ending in Bates

19   619.  And let's look down toward the bottom

20   of the page at an email from July 24th of

21   2023.

22                 Do you see that?

23         A.      Yes.

24         Q.      This email is addressed to

25   you, right?
```

CONFIDENTIAL

Page 173

1          A.       Yes.
2          Q.       And Ms. Panayotov or
3    Panayotov, says, "Thank you for reaching
4    out to Yondr."
5                    Do you see that?
6          A.       Yes.
7          Q.       Do you recall reaching out
8    to Yondr?
9          A.       Yes.
10         Q.       What is Yondr?
11         A.       Yondr is a company that
12   makes sealable pouches for cell phones.
13         Q.       At the time that you sent
14   this email and reached out -- or strike
15   that.
16                  At the time that you reached
17   out to Yondr, were you principal of Union
18   Avenue Middle School?
19         A.       Yes, I just began.
20         Q.       Why did you reach out
21   to Yondr?
22         A.       My intention was to
23   incorporate some strategies that I was
24   familiar with from other schools.
25         Q.       And what other schools are

CONFIDENTIAL

Page 174

1    you referring to?

2           A.      Cicely Tyson.

3           Q.      They used Yondr pouches?

4           A.      Yes.

5           Q.      And tell me what your

6    understanding is of how -- or strike that.

7                   When you were at Cicely

8    Tyson, you were the school disciplinarian;

9    is that right?

10          A.      Yes, yes.

11          Q.      And did you use Yondr

12   pouches in your day to day -- excuse me,

13   day-to-day and job?

14                  MR. RIVERA:  Objection to

15           form.

16                  THE WITNESS:  Yes.

17   BY MR. KARP:

18          Q.      How so?

19          A.      I don't understand the

20   question.

21          Q.      Students at the school were

22   using Yondr pouches?

23          A.      Yes.

24                  MR. RIVERA:  Object to form.

25

CONFIDENTIAL

Page 175

1   BY MR. KARP:

2        Q.      And that was as a means of

3   storing their cell phones during the school

4   day?

5        A.      No.

6        Q.      How were students at Cicely

7   Tyson using Yondr pouches?

8        A.      They were using Yondr

9   pouches to prevent students from using

10  their phones during class instruction.

11       Q.      And when did students at

12  Cicely Tyson place their phones into Yondr

13  pouches?

14       A.      Upon --

15              MR. RIVERA:  Objection to

16          form.

17              THE WITNESS:  Upon entry.

18  BY MR. KARP:

19       Q.      At the beginning of the

20  school day?  And when --

21              MR. RIVERA:  Verbal responses,

22          I'm sorry.

23              THE WITNESS:  Yes.

24  BY MR. KARP:

25       Q.      And when would students

CONFIDENTIAL

Page 176

1    regain access to their cell phones?

2            A.      At the end of the day.

3            Q.      And remind me when you were

4    the school disciplinarian at Cicely Tyson.

5            A.      October 2015 until

6    June 2021.

7            Q.      And in your experience at

8    Cicely Tyson, were Yondr pouches an

9    effective way to keep students off their

10   cell phones during the school day?

11                  MR. RIVERA:  Object to form.

12                  THE WITNESS:  I don't

13          understand the question.

14   BY MR. KARP:

15           Q.      Did Cicely Tyson's use of

16   Yondr pouches discourage students from

17   using their cell phones during the school

18   day?

19                  MR. RIVERA:  Object to form.

20                  THE WITNESS:  That was the

21          goal.

22   BY MR. KARP:

23           Q.      And when you reached out to

24   Yondr as the principal of Union Avenue

25   Middle School, were you contemplating using

Page 177

1    Yondr pouches at the Union Avenue Middle

2    School?

3            A.       In addition to other

4    options, yes.

5            Q.       Let's go to the first page

6    of this email chain which ends -- is Bates

7    ending in 618.  Here you're having an

8    exchange with Ruqayyah Rashad?

9            A.       Yes.

10           Q.       Who was Ruqayyah Rashad?

11           A.       I'm assuming an employee

12   from Yondr.

13           Q.       And do you know if it's

14   Ms. or Mr.  Rashad?

15           A.       I believe it is Ms. and the

16   name is Ruqayyah.

17           Q.       And on August 23, 2023, at

18   9:00 a.m., Ms. Rashad writes to you, "I

19   hope this email finds you well.  I just

20   want to do follow up and see if you were

21   still interested in learning more about

22   Yondr and how we can work to support in

23   creating a cell phone free experience."

24                    Do you see that?

25           A.       Yes.

CONFIDENTIAL

Page 178

1          Q.          You responded to that email

2    later in the day saying, "I am interested,

3    however I have to make sure I get approval

4    from my district before I commit to any

5    meeting or trainings.  I don't want to

6    spend any time and it be for naught."

7                    Do you see that?

8          A.          Yes.

9          Q.          So at least at this point in

10   time on August 23, 2023, you were

11   interested in learning more about Yondr

12   pouches?

13                    MR. RIVERA:  Object to form.

14                    THE WITNESS:  No.

15   BY MR. KARP:

16         Q.          You were not interested in

17   learning more?

18         A.          Learning more about Yondr

19   pouches, no.

20         Q.          You wrote to Ms. Rashad that

21   you were interested, what did you mean by

22   that?

23         A.          In possibly purchasing them.

24         Q.          So at this point in time,

25   August 23, 2023, you were interested in

CONFIDENTIAL

Page 179

```
 1   purchasing Yondr pouches for Union Avenue
 2   Middle School?
 3           A.      Yes, as a possibility, there
 4   were other options also.
 5           Q.      Ms. Rashad follows up with
 6   you roughly a month later, she says, "I
 7   hope this email finds you well.  I just
 8   wanted to follow up from our last
 9   communication."
10                   Do you see that?
11           A.      Yes.
12           Q.      And then Ms. Rashad asks if
13   you were ever able to follow up with your
14   district.
15                   Do you see that?
16           A.      Yes.
17           Q.      You wrote, "At this time my
18   district is not in favor of collecting
19   phones.  I will reach out if and when it
20   changes."
21                   Do you see that?
22           A.      Yes.
23           Q.      So in September of 2023, you
24   told Ms. Rashad that the district was not
25   interested in purchasing Yondr pouches,
```

Page 180

1    correct?
2              MR. RIVERA:  Objection to
3         form.
4              THE WITNESS:  Yes.
5    BY MR. KARP:
6         Q.      Why wasn't the district in
7    favor of collecting phones?
8              MR. RIVERA:  Object to form.
9              THE WITNESS:  It's not that
10        the district --
11              MR. KARP:  Go ahead.
12              THE WITNESS:  It's not the
13        district wasn't in favor, that was
14        my message to her as a salesperson.
15        My instructions from a member of
16        the cabinet was what investigation
17        have you done to determine that
18        cell phones will be -- are a major
19        issue at your school.  Before you
20        invoke taking them, have you done
21        any, any investigation to see if
22        this is something that we need to
23        spend money on.  So what I told her
24        was, they're not interested at this
25        time and then I had to now do what

Page 181

```
 1              we spoke about earlier, which is
 2              calibrating the building, finding
 3              out how big of an issue this is,
 4              and then what other ways can we
 5              effectively address the use of cell
 6              phones in the building.
 7   BY MR. KARP:
 8       Q.       So as of September 27, 2023,
 9   you had not investigated or determined
10   whether cell phone use at Union Avenue
11   Middle School was a sufficient or large
12   enough problem such that it will require
13   the purchase of Yondr pouches?
14                  MR. RIVERA:  Objection to
15              form.
16                  THE WITNESS:  I can't speak --
17              I can't answer the question that
18              way.  I'm not clear on how to
19              answer it the way you're asking me.
20   BY MR. KARP:
21       Q.       Can you explain to me again
22   what your cabinet -- what this cabinet
23   member -- or, actually, strike that.
24                  You referred to a
25   conversation that you had with a cabinet
```

Page 182

1  member about Yondr pouches, correct?

2      A.      Yes.

3      Q.      Who was that cabinet member?

4      A.      Mr. Evans.

5      Q.      And who is Mr. Evans?

6      A.      He's currently the assistant

7  superintendent.

8      Q.      Was he in that role at the

9  time that you had this conversation?

10      A.      No, he was the assistant to

11  the assistant superintendent.

12      Q.      And when -- and you

13  approached Mr. Evans about the possibility

14  of purchasing Yondr pouches?

15      A.      I approached Dr. Vauss

16  first.  She directed me to have the

17  conversation with Mr. Evans.  She was not

18  opposed, but she said talk to Mr. Evans,

19  see what he thinks about it.  And when

20  speaking with Mr. Evans, it was not, no, we

21  don't want to do it, it was, well, let's

22  look at what comes with a cultural change

23  at the school and how will the community

24  receive it.  What are some issues that may

25  come with engaging in taking cell phones

CONFIDENTIAL

Page 183

1    when this has never happened before.  So

2    that's when I was told to do some more

3    investigation.

4                   And if you really look at

5    the timeline, this first conversation

6    started in July.  There were no students in

7    the school until the second week of

8    September, so there's not enough time for

9    me to gauge whether this is something that

10   we need versus is there another way.

11        Q.        So at this point in time,

12   when you were -- September 27, 2023, when

13   you responded to Ms. Rashad, when you said

14   the district was not in favor of collecting

15   phones, what you meant was at that point in

16   time, you had not determined whether it was

17   necessary to collect phones using Yondr

18   pouches?

19                   MR. RIVERA:  Object to form.

20                   THE WITNESS:  Can you say that

21        again?

22   BY MR. KARP:

23        Q.        At this time that you sent

24   this email to Ms. Rashad on September 27,

25   2023, what you meant by my district is not

CONFIDENTIAL

Page 184

```
1    in favor of collecting phones, is that you

2    had not yet determined whether it was

3    necessary to purchase Yondr pouches to

4    collect cell phones?

5                    MR. RIVERA:  Objection to

6            form.

7                    THE WITNESS:  I'm not sure how

8            to answer the question.

9    BY MR. KARP:

10        Q.      I think we can probably move

11   on from that.  And then Ms. Rashad wrote

12   back, "Good morning, thank you for the

13   update.  Please feel free to reach out at

14   any time if you are in need of any

15   assistance in the future."

16                    Do you see that?

17        A.      Yes.

18        Q.      And have you ever gotten

19   back in touch with Ms. Rashad?

20        A.      I didn't need to.

21        Q.      Have you ever gotten back in

22   touch with anyone from Yondr?

23        A.      Had no need to.

24        Q.      You can put this to the

25   side.
```

CONFIDENTIAL

Page 185

```
 1                    Does Union Avenue Middle
 2   School use Yondr pouches?
 3          A.      No.
 4          Q.      To your knowledge, does any
 5   school at IPS use Yondr pouches?
 6          A.      No.
 7          Q.      Does Union Avenue Middle
 8   School use any locker or bag for students
 9   to store their cell phones?
10                    MR. RIVERA:  Objection to
11            form.
12                    THE WITNESS:  No.
13   BY MR. KARP:
14          Q.      Do you know if any school --
15   or strike that.
16                    To your knowledge, does any
17   school at IPS require their students to
18   store their cell phones in lockers or some
19   other sealable bag?
20          A.      I'm not sure --
21                    MR. RIVERA:  Objection to
22            form.
23                    THE WITNESS:  I'm not sure
24            with other schools.
25
```

CONFIDENTIAL

Page 186

1  BY MR. KARP:

2       Q.      At the end of the day, whose

3  decision -- or strike that.

4               Who has the authority -- who

5  at IPS has the authority to purchase Yondr

6  pouches for schools in the district?

7               MR. RIVERA:  Objection to

8          form.  Foundation.

9               THE WITNESS:  I don't

10         understand the question.

11  BY MR. KARP:

12      Q.      Did you need approval --

13  strike that.

14              As principal of Union Avenue

15  Middle School, did you need approval from

16  the superintendent before you could

17  purchase Yondr pouches?

18              MR. RIVERA:  Objection to

19         form.

20              THE WITNESS:  Yes, you need

21         approval for all purchases.

22  BY MR. KARP:

23      Q.      Approval from the

24  superintendent?

25              MR. RIVERA:  Objection to

CONFIDENTIAL

Page 187

1    form.

2              THE WITNESS:  Ultimately, yes.

3    BY MR. KARP:

4         Q.    I'm handing you tab 11 which

5    we will mark as Exhibit 9.

6                   - - - - -

7              (2023-2024 School

8         Performance Report marked Zahir

9         Exhibit 9 for identification.)

10                  - - - - -

11   BY MR. KARP:

12        Q.    Dr. Zahir, are you familiar

13   with this document?

14        A.    I'm familiar with the school

15   report, school performance report, yes.

16        Q.    This is a School Performance

17   Report from the New Jersey Department of

18   Education, correct?

19        A.    Yes.

20        Q.    And this corresponds to the

21   2023-2024 school year?

22        A.    I think as of today, I need

23   glasses.  Good job.  Just made me feel

24   older.

25        Q.    Not my intention, sorry.

Page 188

```
 1          A.      Sure.  2023-2024 reports.
 2          Q.      Thank you.
 3          A.      Oh, thank you, guys.
 4          Q.      Is this information publicly
 5   available?
 6          A.      Yes.
 7          Q.      If I went onto the website
 8   for the New Jersey Department of Education,
 9   I could pull performance reports for
10   various schools across the state, correct?
11          A.      I believe so --
12                  MR. RIVERA:  Objection to
13          form.
14                  THE WITNESS:  I believe so.
15   BY MR. KARP:
16          Q.      Do you have any reason to
17   doubt the accuracy or the correctness of
18   any data that is reported in the
19   performance reports of the New Jersey
20   Department of Education?
21                  MR. RIVERA:  Objection to
22          form.
23                  THE WITNESS:  I don't know how
24          to answer that question.
25
```

CONFIDENTIAL

Page 189

```
 1   BY MR. KARP:
 2          Q.        I'm handing you tab 11A.
 3                    MR. RIVERA:  Exhibit 10.
 4                    MR. KARP:  This will be
 5             Exhibit 10.
 6                    - - - - -
 7                    (School Performance Report
 8             Enrollment data marked Zahir
 9             Exhibit 10 for identification.)
10                    - - - - -
11   BY MR. KARP:
12          Q.        Do you recognize this
13   document?
14          A.        Yes.
15          Q.        This is -- this is
16   enrollment data from the New Jersey
17   Department of Education included in the
18   performance report for Union Avenue Middle
19   School for the 2023-2024 school year,
20   correct?
21          A.        Yes.
22          Q.        Let's turn to the third page
23   of this document, which looks like this.
24   And this table is called, "Enrollment
25   Trends by Student Group."
```

CONFIDENTIAL

Page 190

1              Do you see that?

2      A.      Yes.

3      Q.      Do you have any reason to

4   doubt the accuracy or correctness of the

5   data that's reported in this table?

6              MR. RIVERA:  Objection to

7         form.

8              THE WITNESS:  I don't know how

9         to answer that question.

10  BY MR. KARP:

11      Q.      Do you believe that the data

12  reported by the New Jersey Department of

13  Education as to enrollment trends by

14  student group for Union Avenue Middle

15  School is inaccurate?

16             MR. RIVERA:  Objection to

17        form.

18             THE WITNESS:  It's presented.

19        I would have to cross-reference it

20        with what we have here and what we

21        submitted.  You know, not that I'm

22        saying it's false or true, but I

23        can't speak to --

24  BY MR. KARP:

25      Q.      In your role as principal of

Page 191

```
 1    Union Avenue Middle School, do you submit
 2    data to -- do you submit enrollment data to
 3    the New Jersey Department of Education?
 4           A.      It's -- it's -- they receive
 5    it, as far as if it's from a report or not,
 6    I'm not clear on how to answer the
 7    question, but they do receive our
 8    enrollment data, it's daily.
 9           Q.      The school submits
10    enrollment data to the state?
11                   MR. RIVERA:   Objection to
12           form.
13                   THE WITNESS:   Yes.
14    BY MR. KARP:
15           Q.      In your role as principal of
16    Union Avenue Middle School, do you ever
17    look at or review the school performance
18    reports that are put out by the state of
19    New Jersey?
20                   MR. RIVERA:   Objection to
21           form.
22                   THE WITNESS:   Yes.
23    BY MR. KARP:
24           Q.      Have you seen this
25    particular document before?
```

CONFIDENTIAL

Page 192

```
 1          A.      Yes.
 2          Q.      And do you have any reason
 3   to doubt that the data that's contained
 4   here is correct?
 5          A.      I don't know how to answer
 6   that -- that question.
 7          Q.      Do you have any basis to say
 8   that the information contained in this
 9   table is incorrect?
10                  MR. RIVERA:  Objection to
11          form.
12                  THE WITNESS:  I don't know how
13          to answer that question.
14   BY MR. KARP:
15          Q.      Let's look at the data for
16   2023-2024.  This was your first year as
17   principal, correct?
18          A.      Yes.
19          Q.      Okay.  It indicates -- the
20   School Performance Report for this school
21   year indicates that 81.1 percent of
22   students at Union Avenue Middle School are
23   economically disadvantaged; is that right?
24          A.      What page are you on?
25                  MR. RIVERA:  Objection to
```

CONFIDENTIAL

```
                                      Page 193
 1              form.
 2   BY MR. KARP:
 3          Q.      We're on --
 4          A.      Page 1?
 5          Q.      This is the third page.  It
 6   says one of one on the bottom right-hand
 7   corner?
 8          A.      Okay.  What was your
 9   question again, I'm sorry?
10          Q.      The state of New Jersey
11   reported that for the 2023-2024 school
12   year, 81.1 percent of students at Union
13   Avenue Middle School were economically
14   disadvantaged.  Do you see that?
15          A.      Yes.
16          Q.      Is that correct?
17                  MR. RIVERA:  Objection to
18             form.
19                  THE WITNESS:  I see what they
20             put, I can assume so.
21   BY MR. KARP:
22          Q.      Do you have any reason to
23   doubt the accuracy of that number?
24                  MR. RIVERA:  Objection to
25             form.
```

Page 194

1                    THE WITNESS:  I don't know how
2         to answer the question.
3    BY MR. KARP:
4         Q.      Is this School Performance
5    Report based on information that Union
6    Avenue Middle School submitted to --
7         A.      It should be.
8         Q.      -- New Jersey?
9         A.      It should be, yes.
10                   MS. SCULLION:  Reminder, just
11        please wait for a question --
12                   THE WITNESS:  Okay.  Sorry.
13                   MS. SCULLION:  -- and answer.
14                   THE WITNESS:  Sorry.
15   BY MR. KARP:
16        Q.      Thank you.  Is this School
17   Performance Report based on information
18   that Union Avenue Middle School submitted
19   to the state?
20                   MR. RIVERA:  Objection to
21        form.
22                   THE WITNESS:  It should be.
23   BY MR. KARP:
24        Q.      Do you have any reason to
25   believe that that's not the case here for

CONFIDENTIAL

Page 195

1   the 2023-2024 school year?

2                    MR. RIVERA:  Objection to

3          form.

4                    THE WITNESS:  I don't know how

5          to answer that question.

6   BY MR. KARP:

7        Q.        According to the state,

8   81.1 percent of students at Union Avenue

9   Middle School were economically

10  disadvantaged.

11                   Do you see that?

12       A.        Yes, I do.

13       Q.        9.3 percent of students at

14  Union Avenue Middle School were identified

15  as students with disabilities?

16       A.        Yes.

17       Q.        27.4 of students were

18  identified as multilingual learners?

19       A.        That's what it says, yes.

20       Q.        0.3 percent of students were

21  identified as experiencing homelessness.

22                   Do you see that?

23       A.        Yes.

24       Q.        0.3 percent of students were

25  identified as being in foster care?

CONFIDENTIAL

Page 196

1          A.      That's what it says.
2          Q.      0.1 percent of students were
3    military connected students?
4          A.      Yes.
5          Q.      And 0.0 percent were
6    identified as migrant students, right?
7          A.      Yes.
8          Q.      That's what the state of New
9    Jersey reported here?
10         A.      Okay.
11                 MR. RIVERA:  Object to form.
12   BY MR. KARP:
13         Q.      Yes?
14         A.      That's what the state of New
15   Jersey reported, yes.
16         Q.      What are multilingual
17   learners?
18         A.      Students who primarily speak
19   non-English at home.
20         Q.      Is multilingual learners a
21   different term or a term of art than ELL?
22         A.      It's the same.
23         Q.      Same.  And does that mean
24   that their -- the primary language that
25   they speak at home is not English?

CONFIDENTIAL

Page 197

1              MR. RIVERA:  Objection to
2         form.
3              THE WITNESS:  Yes, that's my
4         understanding.
5    BY MR. KARP:
6         Q.      In your experience as an
7    educator, do economic disadvantages have a
8    negative impact on student mental health?
9              MR. RIVERA:  Objection to
10        form.
11             THE WITNESS:  In what way?
12   BY MR. KARP:
13        Q.      Might students who are
14   economically disadvantaged have lower
15   academic self-esteem?
16             MR. RIVERA:  Objection to
17        form, foundation.  Calls for
18        speculation.
19             THE WITNESS:  Can you ask that
20        question again?
21   BY MR. KARP:
22        Q.      Sure.  Might economic
23   disadvantages lead a student to have lower
24   academic self-esteem?
25             MR. RIVERA:  Objection to

CONFIDENTIAL

Page 198

1              form.
2                    THE WITNESS:   It's possible it
3              can contribute.
4     BY MR. KARP:
5          Q.       How so?
6                    MR. RIVERA:   Objection to
7              form.
8     BY MR. KARP:
9          Q.       In what way?
10         A.       In what way could --
11         Q.       In what way could it
12    contribute?
13         A.       To low economic status --
14    what was the --
15         Q.       My question was whether
16    economic disadvantage could lead a student
17    to have low self-esteem, low academic
18    self-esteem?
19                   MR. RIVERA:   Objection to
20             form.
21    BY MR. KARP:
22         Q.       And you said it could
23    contribute, correct?
24         A.       Yes, it's possible it could
25    contribute.

CONFIDENTIAL

Page 199

1          Q.       And in what ways could it
2     contribute?
3          A.       The kid is disadvantaged,
4     the kid wants something that parents can't
5     afford.  It could have a negative effect on
6     the kid wanting to go to school.  The kid
7     might not have the nicest clothes.
8          Q.       And that could be a reason
9     that the child in question avoids school?
10               MR. RIVERA:  Objection to
11          form.
12               THE WITNESS:  I don't know how
13          to answer that question without
14          making it sound exact and I don't
15          see this as an exact.
16     BY MR. KARP:
17          Q.       Are there any other ways you
18     can think of that economic disadvantage
19     might impact a student's self-esteem?
20               MR. RIVERA:  Objection to
21          form, vague.
22               THE WITNESS:  Yes.
23     BY MR. KARP:
24          Q.       And how so?
25          A.       That there are a multitude

Page 200

1  of ways.  I don't know if I can list them

2  all.  If you're economically disadvantaged,

3  you may feel like you are not -- you don't

4  have enough.

5          Q.      And how would that make a

6  student or a child feel?

7                  MR. RIVERA:  Objection to

8          form.  Calls for speculation.

9                  THE WITNESS:  It may make them

10         feel like they don't have enough.

11 BY MR. KARP:

12         Q.      Could that lead that child

13 or that student to feel depressed?

14                 MR. RIVERA:  Objection to

15         form.  Calls for speculation.

16         Calls for expert opinion.

17                 THE WITNESS:  I mean, I can't

18         diagnose a kid for depression, so.

19 BY MR. KARP:

20         Q.      In your experience as an

21 educator have you observed the potential

22 impact of economic disadvantage on the

23 mental health or well-being of your

24 students?

25                 MR. RIVERA:  Objection to

CONFIDENTIAL

Page 201

1             form, vague.
2                   THE WITNESS:  I would say I
3             may have observed the opposite.
4    BY MR. KARP:
5        Q.        Can you explain?
6        A.        Meaning how economically
7    disadvantaged kids and people are treated
8    may have a greater effect on them than what
9    they think of themselves at times.  It's
10   how poor people are treated.
11       Q.        Can you tell me more about
12   that?
13                 MR. RIVERA:  Objection to
14            form.
15                 THE WITNESS:  How much time
16            you got, right?  This is --
17   BY MR. KARP:
18       Q.        I'll ask a more specific
19   question.  Are you -- are you referring to
20   students who are bullied or taunted
21   because -- because they are economically
22   disadvantaged because they are poor or --
23       A.        I think that's very --
24                 MR. RIVERA:  Objection to
25            form.

CONFIDENTIAL

Page 202

```
 1              THE WITNESS:  Sorry.  Sorry.
 2          I think that that's micro.  You
 3          have systems that one might argue
 4          bully poor people.  So putting the
 5          onus on the individual at times and
 6          not all the outward influences on
 7          the individual, I don't know how
 8          to, you know, start there from a
 9          causality perspective.
10  BY MR. KARP:
11      Q.      And I'm certainly not trying
12  to put the onus on the individual.  I'm
13  trying to understand -- or you mentioned
14  that sometimes it's about how those
15  individuals are treated, right?  And I'm
16  just trying to understand that a little bit
17  better.  Is bullying an example of how
18  those individuals would be treated that
19  would affect their mental health?
20              MR. RIVERA:  Objection to
21          form.
22              THE WITNESS:  I think,
23          respectfully, I think you're asking
24          a small question and I'm speaking
25          of something that's bigger.  What
```

CONFIDENTIAL

Page 203

1    happens from a kid to a kid or an
2    adult to a kid is so small in
3    comparison to what happens from
4    societal systems to identify groups
5    of people.
6         My original statement was
7    that I think economically
8    disadvantaged people sometimes
9    get treated bad, which can have
10   an effect on how they feel.
11   More, like, I just -- I'm trying
12   to figure out a way to answer
13   your question, but I'm conflicted
14   in providing an answer that makes
15   it seem like a finger point where
16   I think that this, it's just -- I
17   mean, the magnitude I think is
18   much larger than peer to peer.
19  BY MR. KARP:
20      Q.      I understand.  Thank you.
21           MR. RIVERA:  Andrew, we have
22   been going for a little over an
23   hour, you think a good time for a
24   break or --
25           MR. KARP:  Yeah, we can take a

CONFIDENTIAL

Page 204

1         break here.

2                     THE VIDEOGRAPHER:  The time

3              right now is 2:18 p.m.  We are off

4              the record.

5                     - - - - -

6         (A recess was taken at this time.)

7                     - - - - -

8                     THE VIDEOGRAPHER:  The time

9              right now is 2:33 p.m.  We're back

10             on the record.

11   BY MR. KARP:

12        Q.        Welcome back, Dr. Zahir.  We

13   were just taking a look at Exhibit 10 and

14   I'll refer you back to that.  If you turn

15   the page, there's another table called,

16   "Enrollment by Racial and Ethnic Group."

17                  Do you see that?

18        A.        Yes.

19        Q.        There's data here for the

20   2023-2024 school year in the rightmost

21   column.

22                  Do you see that?

23        A.        Yes, yes, sir.

24        Q.        And this section of the

25   School Performance Report from the New

CONFIDENTIAL

Page 205

1    Jersey Department of Education breaks down

2    or provides enrollment data by racial and

3    ethnic group, correct?

4         A.       Yes.

5                  MR. RIVERA:  Object to form.

6    BY MR. KARP:

7         Q.       Looking at the data in the

8    rightmost column for the 2023-2024 school

9    year, is it your understanding that this

10   roughly describes the composition of

11   students at Union Avenue Middle School?

12        A.       Yes, I guess.

13        Q.       There's also data in this

14   table for the 2022-2023 school year and the

15   2021-2022 school year.

16                 Do you see that?

17        A.       Yes.

18        Q.       Any reason to doubt the

19   accuracy of the data for the preceding

20   years?

21                 MR. RIVERA:  Objection to

22            form.

23                 THE WITNESS:  I don't know how

24            to answer that question.

25

CONFIDENTIAL

Page 206

1    BY MR. KARP:

2          Q.        This is data provided by the

3    New Jersey Department of Education,

4    correct?

5          A.        Yes, it appears so, yes.

6          Q.        This is data that is

7    available to you as principal of Union

8    Avenue Middle School?

9          A.        Yes.

10          Q.        Let's turn the page to a

11    table called, "Enrollment by Home

12    Language."  I believe it's on the back page

13    of it.  And according to this table, it

14    shows the percentage of students by primary

15    home language.

16                    Do you see that at the top?

17    Do you see that?

18          A.        Yes.

19          Q.        And according to the New

20    Jersey Department of Education,

21    40.8 percent of students at Union Avenue

22    Middle School for the 2023-2024 school year

23    spoke English as their primary language at

24    home.

25                    Do you see that?

CONFIDENTIAL

Page 207

1          A.      Yes.
2          Q.      Is that your understanding
3    as principal of Union Avenue Middle School?
4                  MR. RIVERA:  Object to form.
5                  THE WITNESS:  I'm -- I
6              understand what the graph is
7              saying.  I can't speak to my
8              understanding of the graph.  I
9              understand what it's saying.
10   BY MR. KARP:
11         Q.      As principal of Union Avenue
12   Middle School, do you have -- do you
13   believe that more or less students than are
14   represented here in this chart speak
15   English as their primary language at home?
16                 MR. RIVERA:  Object to form.
17                 THE WITNESS:  I believe it's
18             possible that there's a
19             considerable amount more.
20   BY MR. KARP:
21         Q.      And why do you say that?
22         A.      Because there's a lot of
23   assumptions with this data.
24         Q.      The New Jersey Department of
25   Education bases its performance reports on

Page 208

1   information that's provided by Union Avenue

2   Middle School, correct?

3                   MR. RIVERA:  Object to form.

4                   THE WITNESS:  Yes, yes, but

5              it's based on enrollment

6              information.  So if there's a

7              student who was considered an MLL,

8              has the last name Quartey and their

9              parents are from Ghana, the

10             assumption is that that kid is a

11             multi-language learner and they

12             would have to test out of the

13             multi-lingual program.  But at

14             home, they speak English, but they

15             may be listed as such.

16  BY MR. KARP:

17       Q.      So the data provided by the

18  New Jersey Department of Education is not

19  correct?

20                  MR. RIVERA:  Objection to

21             form.

22                  THE WITNESS:  I can't say it

23             was correct or false, I'm saying

24             that I can -- I understand what's

25             presented, but if you're asking me

CONFIDENTIAL

Page 209

```
 1              is it possible for there to be
 2              more, this is indicative of
 3              enrollment data.  How kids enroll
 4              into a building and how they're
 5              classified based upon demographics
 6              written on a document, on a
 7              document.
 8                   There are times when it's
 9              better to assume that a kid
10              speaks another language at home,
11              because if you assume that they
12              don't, because you hear them
13              speak English, you may discount
14              services that they should be
15              given, so you may classify them
16              as such, and they can test out,
17              but to assume that they don't
18              need just because they spoke to
19              you in English, sometimes could
20              be a disservice.  So based upon
21              this, it's based on enrollment
22              data.
23  BY MR. KARP:
24         Q.      So Union Avenue Middle
25  School does not rely on information that it
```

CONFIDENTIAL

Page 210

1    receives in its school performance reports

2    from the New Jersey Department of

3    Education?

4                    MR. RIVERA:  Objection to

5             form.  Foundation.

6                    THE WITNESS:  I didn't say

7             that.

8    BY MR. KARP:

9         Q.        Does Union Avenue Middle

10   School rely on enrollment data that it

11   receives from the New Jersey Department of

12   Education?

13        A.        Rely on it how?

14        Q.        For purposes of running the

15   school.

16                   MR. RIVERA:  Objection to

17            form.

18                   THE WITNESS:  This particular

19            information is after the fact.

20            This is information that they

21            already received from the school,

22            so we would not need to rely on

23            this to run our building, because

24            they get this from us.

25

CONFIDENTIAL

Page 211

1    BY MR. KARP:

2           Q.        Okay.  So this information

3    in the table comes from Union Avenue Middle

4    School?

5           A.        Based on enrollment data.

6           Q.        Let's take a look at tab 11B

7    which we will mark as Exhibit 11.

8                      - - - - -

9                      (School Performance Report

10              on Chronic Absenteeism marked

11              Zahir Exhibit 11 for

12              identification.)

13                     - - - - -

14    BY MR. KARP:

15           Q.        This is a School Performance

16    Report from the New Jersey Department of

17    Education, specifically a section dealing

18    with chronic absenteeism.

19                     Do you see that?

20           A.        Yes.

21           Q.        Let's look at the first page

22    of this document, which is a table -- which

23    includes a table called, "Chronic

24    Absenteeism Trends."

25                     Do you see that?

CONFIDENTIAL

Page 212

1          A.       Yes.

2          Q.       This includes data for the

3    2021-2022, the 2022-2023, and 2023-2024

4    school years.

5                    Do you see that?

6          A.       Yes.

7          Q.       Let's focus on the 2023-2024

8    school year when you were principal of

9    Union Avenue Middle School.  That data is

10   in the rightmost column.

11                   Do you see that?

12         A.       Yes.

13         Q.       Okay.  Chronic absenteeism

14   for the 2023-2024 school year at Union

15   Avenue Middle School was 18.4 percent.

16                   Do you see that?

17         A.       Yes.

18         Q.       Okay.  Just below that, we

19   see the ESSA target or state average for

20   grades served.

21                   Do you see that?

22         A.       Yes.

23         Q.       In this instance, grades

24   served would reflect or refer to grades six

25   through eight, correct?

CONFIDENTIAL

Page 213

1                    MR. RIVERA:  Objection to

2          form.

3                    THE WITNESS:  Yes.

4    BY MR. KARP:

5          Q.        And the ESSA target or the

6    state average for grades six through eight

7    was 13.8 percent, correct?

8          A.        That's what it says.

9          Q.        So that's why the New Jersey

10   Department of Education reported that the

11   ESSA target was not met.

12                    Do you see that?

13                    MR. RIVERA:  Objection to

14          form.

15                    THE WITNESS:  I see what it

16          says, yes.

17   BY MR. KARP:

18          Q.        Chronic absenteeism at Union

19   Avenue Middle School was higher than the

20   state average for grades six through eight,

21   correct?

22                    MR. RIVERA:  Objection to

23          form.

24                    THE WITNESS:  Yes.

25

CONFIDENTIAL

Page 214

1    BY MR. KARP:

2         Q.        Let's take a look

3    historically at some of this data.  Chronic

4    absenteeism at Union Avenue Middle School

5    in 2021-2022 was reported by the New Jersey

6    Department of Education as 26.4 percent.

7                   Do you see that?

8         A.        Yes.

9         Q.        The ESSA target for that

10   year for grades six through eight was

11   16.4 percent?

12        A.        Yes.

13        Q.        That's a 10 percent

14   difference, yes?

15        A.        Yes.

16        Q.        The following year, chronic

17   absenteeism at Union Avenue Middle School

18   was 20.0 percent.

19                   Do you see that?

20        A.        Yes.

21        Q.        The ESSA target for grades

22   six through eight was 14.8 percent, right?

23        A.        Yes.

24        Q.        So chronic absenteeism at

25   Union Avenue Middle School went down from

CONFIDENTIAL

Page 215

1   the 2021-2022 school year to the 2022-2023
2   school year, correct?
3           A.      That's what it says in the
4   chart.
5           Q.      Not only that, but the gap
6   between Union Avenue Middle School and the
7   state target also shrunk.
8                   Do you see that?
9                   MR. RIVERA:  Objection to
10          form.
11                  THE WITNESS:  Yes.
12  BY MR. KARP:
13          Q.      The gap in --
14          A.      That's what it says on here.
15          Q.      New Jersey Department of
16  Education reported a gap of 10 percent for
17  the 2021-2022 school year, but a gap of
18  only 5.2 percent for the following school
19  year, correct?
20                  MR. RIVERA:  Objection to
21          form.
22                  THE WITNESS:  That's what it
23          says on here.
24  BY MR. KARP:
25          Q.      That number goes down again

CONFIDENTIAL

Page 216

1  for the subsequent year, which is

2  2023-2024.

3                    Do you see that?

4        A.      That's what it says on here.

5        Q.      The gap for the -- between

6  chronic absenteeism -- strike that.

7                    The difference between the

8  chronic absenteeism rate at Union Avenue

9  Middle School and the state target for

10 grades six through eight in the 2023-2024

11 school year was 4.6 percent, correct?

12                  MR. RIVERA:  Object to form.

13                  THE WITNESS:  That's what it

14         says.

15 BY MR. KARP:

16       Q.      So from 2021 through 2024,

17 not only does the rate of chronic

18 absenteeism go down at Union Avenue Middle

19 School, but the gap between the rates at

20 Union Avenue and the state average go down,

21 correct?

22                  MR. RIVERA:  Object to form.

23                  THE WITNESS:  That's what it

24         says here.

25

Page 217

1   BY MR. KARP:

2         Q.        In your experience as an

3   educator and administrator, does chronic

4   absenteeism lead to worse educational

5   outcomes for students?

6                   MR. RIVERA:  Objection to

7              form.

8                   THE WITNESS:  I don't

9              understand the question.

10  BY MR. KARP:

11        Q.        I'll ask it one more time

12  just to make sure that you heard it.

13                  Based on your experience as

14  a school principal and as a teacher, does

15  chronic absenteeism lead to worse academic

16  outcomes for students?

17                  MR. RIVERA:  Object to form.

18                  THE WITNESS:  No.

19  BY MR. KARP:

20        Q.        Students who are chronically

21  absent do not perform worse in school?

22                  MR. RIVERA:  Object to form.

23                  THE WITNESS:  Not necessarily.

24             It's a case-by-case situation.

25

Page 218

1    BY MR. KARP:

2         Q.      Being absent -- does being

3    absent from class have a negative impact on

4    a student's academic performance?

5         A.      It can.

6         Q.      And when a student is

7    repeatedly absent from school and misses

8    class instruction, does that have a

9    negative impact on that student's academic

10   performance?

11                MR. RIVERA:  Object to form.

12                THE WITNESS:  It depends on

13          the circumstances.

14   BY MR. KARP:

15        Q.      So there are some

16   circumstances when chronic absenteeism does

17   not result in worse academic outcomes for

18   students?

19        A.      Yes.

20        Q.      Does chronic absenteeism

21   lead students to fall behind their peers

22   who are attending class?

23                MR. RIVERA:  Object to form.

24                THE WITNESS:  It depends.

25

CONFIDENTIAL

Page 219

1    BY MR. KARP:

2          Q.      Students who are chronically

3    absent -- strike that.

4                  Does chronic absenteeism

5    lead to learning loss?

6                      MR. RIVERA:  Object to form.

7                      THE WITNESS:  What do you mean

8          by, "learning loss"?

9    BY MR. KARP:

10         Q.      Missing educational

11   experiences such as lessons.

12                     MR. RIVERA:  Object to form.

13                     THE WITNESS:  Not necessarily.

14   BY MR. KARP:

15         Q.      As principal of Union Avenue

16   Middle School, are you familiar with the

17   term, "learning loss"?

18         A.      Yes.

19         Q.      And what does that mean to

20   you?

21         A.      Learning loss is when the

22   absence causes you to lose what you have

23   already learned, not missing out on what's

24   being taught.

25         Q.      And does chronic absenteeism

Page 220

1    lead to learning loss?

2                    MR. RIVERA:  Objection to

3            form.

4                    THE WITNESS:  Not necessarily.

5    BY MR. KARP:

6        Q.        When doesn't it lead to

7    learning loss?

8        A.        When a kid has high

9    retention ability.

10       Q.        And in your experience as

11   principal of Union Avenue Middle School,

12   are the students who are chronically absent

13   students with high retention abilities?

14       A.        That would have to be

15   something that I, that you researched or

16   dive into.  It depends on the circumstance

17   or why they're chronically absent.

18       Q.        Does Union Avenue Middle

19   School discourage students from being

20   chronically absent?

21       A.        What do you mean by

22   "discourage"?

23                  MR. RIVERA:  Object to form.

24   BY MR. KARP:

25       Q.        Does Union Avenue Middle

CONFIDENTIAL

Page 221

1    School encourage students to attend school?

2            A.      Yes.

3            Q.      Okay.  Why?

4            A.      It's a state requirement.

5            Q.      Is it a goal of Union Avenue

6    Middle School to lower the rate of chronic

7    absenteeism at the school?

8            A.      Yes.

9            Q.      Why?

10           A.      I don't understand.

11           Q.      Why is that a goal of the

12   school?

13           A.      It's one of the ratings.

14   It's one of the areas that a school is

15   rated on.

16           Q.      Why?

17           A.      Because it's a requirement.

18                   MR. RIVERA:  Object to form.

19                   THE WITNESS:  It's a

20            requirement.

21   BY MR. KARP:

22           Q.      So the only reason Union

23   Avenue Middle School wants its students not

24   to be chronically absent is because it's

25   rated on that?

```
                                        Page 222

 1                    MR. RIVERA:  Objection to
 2           form.
 3                    THE WITNESS:  I didn't say
 4           that.
 5    BY MR. KARP:
 6           Q.      What did you say?
 7           A.      I said -- I answered your
 8    question and I said that it's a state
 9    requirement.  It's one of the areas that
10    schools are rated on.
11           Q.      Other than the fact that
12    schools are rated on chronic absenteeism,
13    are there other reasons that Union Avenue
14    Middle School wants to lower the rate of
15    chronic absenteeism among students?
16                    MR. RIVERA:  Objection to
17           form.
18                    THE WITNESS:  I'm not sure how
19           to answer that question.
20    BY MR. KARP:
21           Q.      What's your understanding of
22    why schools are evaluated or rated for
23    chronic absenteeism?
24           A.      Because students are
25    required to attend school from kindergarten
```

Page 223

1  to 12th grade.  And students need to be in

2  school and if your kids are not coming to

3  school, then that could be problematic for

4  your school and for the community.

5        Q.       And why would that be

6  problematic for the school and the

7  community?

8        A.       Because kids aren't in

9  school, supervision, education, a multitude

10  of reasons why kids go to school.

11        Q.       So when students are not in

12  school, teachers or administrators can't

13  supervise what they're doing?

14              MR. RIVERA:  Object to form.

15              THE WITNESS:  I don't

16        understand the question.

17  BY MR. KARP:

18        Q.       I asked, Why would it be

19  problematic for the school and the

20  community?"  And you said, "Kids aren't in

21  school, supervision, education, a multitude

22  of reasons why kids go to school."

23              Do you recall saying that?

24        A.       Yes.

25        Q.       What did you mean by

Page 224

1    supervision?

2            A.        If a parent goes to work and

3    their child is not in school when they are

4    expected to be, who is monitoring the

5    child?

6            Q.        Does the school know -- when

7    a student is not in school, does the school

8    know what he or she is doing with his or

9    her time?

10                    MR. RIVERA:  Objection to

11            form.

12                    THE WITNESS:  It depends on

13            the circumstance.

14    BY MR. KARP:

15            Q.        Does Union Avenue Middle

16    School monitor what its students do when

17    they are not at school?

18            A.        Monitor, no.

19            Q.        Does Union Avenue Middle

20    School track what its students do when they

21    are not at school?

22                    MR. RIVERA:  Objection to

23            form.

24                    THE WITNESS:  Track, no.

25

```
                                          Page 225
 1   BY MR. KARP:
 2           Q.       Does Union Avenue Middle
 3   School monitor how much time their students
 4   spend on cell phones when they are not at
 5   school?
 6                       MR. RIVERA:  Objection to
 7                form.
 8                       THE WITNESS:  Why would they?
 9                I don't understand the nature of
10                the question.
11   BY MR. KARP:
12           Q.       Is that a no, they don't
13   monitor?
14           A.       I don't understand how to
15   answer that question.
16           Q.       Okay.  Does Union Avenue
17   Middle School know how much time its
18   students spend on their cell phones when
19   they are not at school?
20                       MR. RIVERA:  Objection to
21                form.
22                       THE WITNESS:  I don't think
23                any school does.
24   BY MR. KARP:
25           Q.       To the extent Union Avenue
```

```
                                        Page 226
```

1    Middle School students are using their cell
2    phones outside of school, does Union Avenue
3    Middle School know how they're using their
4    cell phones?
5                    MR. RIVERA:  Objection to
6            form.
7                    THE WITNESS:  I don't
8            understand the question, sir.
9    BY MR. KARP:
10        Q.      Does Union Avenue Middle
11   School know how many text messages a
12   student sends in a given day when they're
13   not in school?
14        A.      That would be an invasion of
15   privacy.
16        Q.      Does Union Avenue Middle
17   School know how many hours a student spends
18   playing video games on his or her cell
19   phone when not at school?
20                    MR. RIVERA:  Objection to
21           form.
22                    THE WITNESS:  No.
23   BY MR. KARP:
24        Q.      Does Union Avenue Middle
25   School know how much time a student -- or

Page 227

1    strike that.

2                        Does Union Avenue Middle

3    School know how many hours a student spends

4    on social media when they're not at school?

5                        MR. RIVERA:  Objection to

6                form.

7                        THE WITNESS:  Unable to track

8                unless they're on a school-issued

9                Chromebook or they're logged in

10               using their school-issued Google

11               account.

12   BY MR. KARP:

13        Q.      And they would be permitted

14   to access social media platforms on those

15   devices?

16        A.      No.

17        Q.      I'm handing you 11C, which

18   we will mark as Exhibit 12.

19                        - - - - -

20                (School Performance Report

21               on Academic Achievement marked

22               Zahir Exhibit 12 for

23               identification.)

24                        - - - - -

25

CONFIDENTIAL

Page 228

1    BY MR. KARP:

2         Q.        This is a School Performance

3    Report from the New Jersey Department of

4    Education specifically focused on academic

5    achievement.

6                   MR. RIVERA:  Object to form.

7    BY MR. KARP:

8         Q.        Do you see that?

9         A.        Yes.

10        Q.        This is data that is part of

11   the school performance reports that are

12   issued by the state of New Jersey?

13        A.        Yes, I guess so.

14        Q.        Toward the back of this

15   document, the third to last page includes a

16   table called, "English Language Proficiency

17   Test - Participation and Performance."

18   Just let me know when you're there.

19        A.        Yes.

20        Q.        According to the New Jersey

21   Department of Education, "This table shows

22   by years in district, the number of

23   multilingual learner students taking the

24   ACCESS for ELLs Assessment for English

25   language proficiency and the number and

Page 229

1  percentage of students tested who received

2  an overall score of four and a half or

3  above.  Students must receive a score of

4  four and a half or higher to be considered

5  for proficient status."

6            Do you see that?

7       A.    Yes.

8       Q.    And if you look at the

9  middle called percentage -- excuse me,

10 strike that.

11           If you look at the middle

12 column that says, "Percent students with

13 overall score below 4.5," there are three

14 lines.

15           Do you see that?

16      A.    Yes.

17      Q.    If a student has a score

18 below 4.5, they are not proficient; is that

19 correct?

20           MR. RIVERA:  Object to form.

21           THE WITNESS:  No, they are not

22        proficient.

23 BY MR. KARP:

24      Q.    If you look at the leftmost

25 column, years in district, that reflects

CONFIDENTIAL

Page 230

1    how many years the student has been in the
2    district; is that right?
3            A.      Yes.
4            Q.      And the numbers for -- or
5    strike that.
6                    If we look at students who
7    have been in the district for zero to two
8    years, over 90 percent of those students
9    were not proficient.
10                   MR. RIVERA:  Object to form.
11                   MR. KARP:  Is that correct?
12                   THE WITNESS:  Yes.
13   BY MR. KARP:
14           Q.      That's the same for students
15   who have been in the district for three to
16   four years, correct?
17           A.      Yes.
18           Q.      And that's also the same for
19   students who have been in the district for
20   five or more years?
21           A.      Yes.
22           Q.      Do students -- strike that.
23                   Do language barriers affect
24   a student's ability to learn?
25                   MR. RIVERA:  Object to form.

Page 231

1            Vague.

2                THE WITNESS:  I don't

3            understand the question.

4    BY MR. KARP:

5        Q.        Do language barriers present

6    a challenge for Union Avenue Middle School

7    students to learn material in their

8    classes?

9                MR. RIVERA:  Object to form.

10                THE WITNESS:  I think it's --

11            it's possible.

12    BY MR. KARP:

13        Q.        Let's turn the page --

14                MR. RIVERA:  Sorry, do you

15            need a minute?

16                THE WITNESS:  I've just got to

17            give them the clear in the front.

18            That's all.

19    BY MR. KARP:

20        Q.        Do you need to take a break?

21        A.        Nope, I just sent a text.  I

22    apologize.

23        Q.        No, no worries.  Thank you.

24                Let's turn to the table

25    called, "English Language Arts Assessment

Page 232

1   Performance Trends."  It's one or two pages
2   later and I think it's also displayed on
3   the screen.
4           A.      Uh-huh.
5           Q.      According to the New Jersey
6   Department of Education, "This graph shows
7   the percentage of students who met or
8   exceeded expectations on each grade level
9   exam on the New Jersey Student Learning
10  Assessment (NJSLA) for English Language
11  Arts (ELA) for the past three years."
12                  Do you see that?
13          A.      Yes.
14          Q.      And there's data in this
15  paragraph for grades six, seven, and eight,
16  correct?
17          A.      Yes.
18          Q.      For the 2021-2022,
19  2022-2023, and 2023-2024 school years,
20  correct?
21          A.      Yes.
22          Q.      For all three of those
23  years, at no point, did any of the
24  students -- or strike that.
25                  In none of those years did

CONFIDENTIAL

Page 233

1  Union Avenue Middle School have more than
2  35 percent of students exhibit proficiency
3  on this exam; is that correct?
4              MR. RIVERA:  Object to form.
5              THE WITNESS:  Yes.
6  BY MR. KARP:
7       Q.      And this is information that
8  you would have available to you as
9  principal of Union Avenue Middle School?
10       A.      Yes.
11       Q.      Do you recall reviewing any
12  of this data in your role as principal?
13       A.      Yes.
14       Q.      Let's turn the page to the
15  graph titled, "NJSLA Science Assessment
16  Grade 8 Summary."  And let's look at the
17  final year listed here which is the
18  2023-2024 school year.
19              Do you see that?
20       A.      Yes.
21       Q.      According to the New Jersey
22  Department of Education, "This table shows
23  how students performed on the NJSLA Science
24  assessment."  Excuse me, "Students scoring
25  at Level 3 or 4 are considered proficient."

CONFIDENTIAL

Page 234

1                      Do you see that?

2          A.         Yes.

3          Q.         According to the state,

4   68 percent of students in grade 8 were at

5   Level 1, do you see that?

6          A.         Yes.

7          Q.         And 31 percent of students

8   in grade 8 were at Level 2, correct?

9          A.         Yes.

10         Q.         99 percent of students in

11  the eighth grade were not proficient on the

12  New Jersey Science assessment, correct?

13                    MR. RIVERA:  Object to form.

14                    THE WITNESS:  Yes, according

15             to this data.

16  BY MR. KARP:

17         Q.         You can put this document to

18  the side.  I'm handing you tab 11D.  We'll

19  mark this as Exhibit 13.

20                    - - - - -

21                    (School Performance Report

22             relating to Accountability marked

23             Zahir Exhibit 13 for

24             identification.)

25                    - - - - -

CONFIDENTIAL

Page 235

```
 1   BY MR. KARP:
 2        Q.       This section of the School
 3   Performance Report relates to
 4   accountability.
 5                 Do you see that?
 6        A.       Yes.
 7        Q.       What is your understanding
 8   of what this section of the New Jersey
 9   School Performance Report -- strike that.
10                 What is your understanding
11   of the data and information that is
12   included in the accountability section for
13   this report?
14                 MR. RIVERA:  Objection to
15            form, vague.
16                 THE WITNESS:  I'm reading it.
17   BY MR. KARP:
18        Q.       I'll withdraw the question.
19                 Let's look at the very last
20   page of this document which includes a
21   table called, "Accountability Indicator
22   Scores and Summative Ratings - 2023-24
23   School Year."
24                 Do you see that?
25        A.       Yes.
```

CONFIDENTIAL

Page 236

```
 1          Q.       On the left-hand side you'll
 2    see a column called, "ESSA accountability
 3    indicator."
 4                   Do you see that?
 5          A.       Yes.
 6          Q.       And there are a number of
 7    items listed here from ELA proficiency to
 8    math growth to chronic absenteeism.
 9                   Do you see that?
10          A.       Yes.
11          Q.       Is this what you mean -- is
12    that what you meant earlier when you said
13    that the school is evaluated based on
14    chronic absenteeism?
15                   MR. RIVERA:  Objection to
16          form.
17                   THE WITNESS:  To an extent,
18          yes.
19    BY MR. KARP:
20          Q.       If we look a couple of rows
21    down from chronic absenteeism, you'll see a
22    line summative rating percentile rank.
23                   Do you see that?
24          A.       Yes.
25          Q.       Do you have an understanding
```

CONFIDENTIAL

Page 237

1    of what's meant by, "summative rating

2    percentile rank"?

3              A.      The accumulation of all the

4    performance percentages, the summation of

5    that, and where it ranks in the state.

6              Q.      And the percentile rank

7    indicated for Union Avenue Middle School

8    for this school year was 23.9 percent.

9                     Do you see that?

10             A.      Yes.

11             Q.      What does that mean?

12                    MR. RIVERA:  Objection to

13           form.

14                    THE WITNESS:  I don't

15           understand.

16   BY MR. KARP:

17             Q.      What is your understanding

18   of what is meant by the 23.9 percentile?

19             A.      Meaning we fall -- we fall

20   at that level based on the accountability

21   score.

22             Q.      And what is -- what is an

23   accountability score?

24             A.      Well, I mean, it's -- it's

25   basically your rating as a school, to my

CONFIDENTIAL

Page 238

1    understanding, it's your rating as a school

2    where you are held accountable for these

3    particular categories and then how you

4    perform in those categories.

5            Q.        And in this particular year,

6    Union Avenue Middle School's percentile

7    rank for these metrics or indicators was

8    23.9?

9            A.        Yes.

10           Q.        You can put this document to

11   the side.  I'm handing you tab 13, which we

12   will mark as Exhibit 14.

13                         - - - - -

14                  (Email String Bates

15                  BW__Irvington00083105 to

16                  00083106 marked Zahir Exhibit 14

17                  for identification.)

18                         - - - - -

19                  MR. KARP:  Do we need to

20                  redact this?

21                  MR. RIVERA:  Yeah, we need to

22                  redact the student names from this

23                  document.

24                  MR. KARP:  Okay.  Do we need

25                  to go off the record --

CONFIDENTIAL

Page 239

1                    MR. RIVERA:  Yes.

2                    MR. KARP:  To do that

3           before -- sure.  Let's go off the

4           record.

5                    THE VIDEOGRAPHER:  The time

6           right now is 3:09 p.m.  We are off

7           the record.

8                    - - - - -

9      (A recess was taken at this time.)

10                   - - - - -

11                   THE VIDEOGRAPHER:  The time

12          right now is 3:16 p.m.  We are back

13          on the record.

14    BY MR. KARP:

15          Q.       Welcome back, Dr. Zahir.  We

16    took a brief break to redact one of the

17    documents that I handed you.  The redacted

18    version of this document will be marked as

19    Exhibit 14.

20          A.       Uh-huh.

21          Q.       This is an email from

22    October -- or strike that.

23                   This is an email chain from

24    October 13, 2023.  Do you see that?

25          A.       Yes.

Page 240

1          Q.          The subject line is
2    regarding parent concern.  Do you see that?
3          A.          Yes.
4          Q.          If we look down at the
5    bottom of the first page, there is an email
6    from a Amirah Cureton --
7          A.          Uh-huh, yes.
8          Q.          -- to you?
9          A.          Yes.
10         Q.          Who is Ms. Cureton?
11         A.          I'm not sure.  I know she
12   works for central office and she may be --
13   she may be someone's secretary.  Maybe one
14   of the -- maybe Dr. Adeboyega's secretary,
15   I'm not sure.
16         Q.          In her signature block it
17   indicates confidential administrative
18   secretary --
19         A.          Yes.
20         Q.          -- assistant
21   superintendent's office?  Does that refresh
22   your memory?
23         A.          Yes, yes.
24         Q.          And Ms. Cureton writes to
25   you about a mother who called and stated

CONFIDENTIAL

Page 241

1    that she was concerned about the behavior

2    of students at Union Avenue Middle School.

3    Do you see that?

4            A.      Yes.

5            Q.      "She said that her children

6    are constantly being picked on and as a

7    result, they are becoming depressed."

8            A.      Yes.

9            Q.      "She is considering

10   homeschooling."

11           A.      Yes.

12           Q.      Do you recall this incident?

13           A.      Yes, I do.

14           Q.      Okay.  Without naming any of

15   the students or identifying them, do you

16   recall in what way they were being

17   bullied -- or strike that.

18                   Without divulging their

19   names, do you recall in what way these

20   students were constantly being picked on?

21           A.      No.  After our findings,

22   they were not constantly being picked on.

23           Q.      Was an HIB form -- strike

24   that.

25                   Was an HIB claim form

CONFIDENTIAL

Page 242

1  created for this incident?

2                      MR. RIVERA:  Objection to

3              form.  Lacks foundation.

4                      THE WITNESS:  I don't

5              recall -- I don't recall because

6              this specific matter was ultimately

7              handled with a conversation with

8              the parent.

9  BY MR. KARP:

10         Q.      HIB claim forms record the

11  findings of anti-bullying specialists

12  within the district; is that right?

13                      MR. RIVERA:  Objection to

14              form.

15                      THE WITNESS:  Yeah -- no, I'm

16              sorry, I don't know how to answer

17              that question.

18  BY MR. KARP:

19         Q.      Sure.  What is an HIB claim

20  form?

21         A.      It is a form used for an

22  accusation of harassment, intimidation, or

23  bullying.

24         Q.      And that -- and harassment,

25  intimidation, or bullying is sometimes

CONFIDENTIAL

Page 243

1    referred to as HIB; is that right?

2           A.       Yes.

3           Q.       And that is a form of

4    contact that is defined by the state of New

5    Jersey, correct?

6                    MR. RIVERA:  Objection to

7            form.

8                    THE WITNESS:  Yes.

9    BY MR. KARP:

10          Q.       HIB sets the criteria for

11   what constitutes -- sorry, strike that.

12                   The state of New Jersey sets

13   the criteria for what does or does not

14   constitute HIB; is that fair?

15                   MR. RIVERA:  Object to form.

16                   THE WITNESS:  I am not certain

17           if it's federal or if it's just

18           state.  I'm not sure who determines

19           the ultimate law.  If it's state,

20           then, yes, it would come from New

21           Jersey Department of Education.

22   BY MR. KARP:

23          Q.       And when an incident of

24   potential harassment, intimidation -- I'll

25   pause my question.

CONFIDENTIAL

Page 244

1          MS. SCULLION:  I apologize for
2     interrupting your question,
3     Counsel.  We do have a question,
4     because according to our records,
5     this entire document was eventually
6     withheld for SPER.
7          MR. KARP:  Was this part of
8     the recent clawbacks, because --
9          MS. SCULLION:  I do not know
10    when, but the Bates number does
11    match up, my suggestion would be
12    that we take a break and try and
13    figure out what's going on with
14    this document.  I also had a
15    question, how much time are we on
16    the record today?
17         MR. KARP:  I think right now
18    we're probably at about four hours
19    and 20, but Danny would know
20    better.
21         THE VIDEOGRAPHER:  Four hours
22    and 16 minutes.
23         MS. SCULLION:  According to
24    our records, you came into this
25    deposition, Defendants came into

CONFIDENTIAL

Page 245

1          this deposition with only about

2          three hours and 54 total minutes

3          total remaining.  So our

4          understanding is that you are

5          probably over time at this point.

6          I'm happy to review that with you

7          as well, but we're definitely going

8          to need to review at the end of the

9          day where we are, because according

10         to our records, there's minimal

11         time.

12              MR. KARP:  We --

13              MS. HENRY:  We have a

14         different calculation.

15              MS. SCULLION:  Okay.

16              MR. KARP:  Yeah, and I wonder

17         if maybe one of the 30(b)(6)s is

18         being inadvertently counted.

19              MS. SCULLION:  Yeah, I'm

20         looking at that and it doesn't

21         appear that this count is a

22         30(b)(6).  Why don't we go off the

23         record and figure out this

24         document.

25              THE VIDEOGRAPHER:  The time

CONFIDENTIAL

Page 246

1          right now is 3:30 -- 3:22 p.m.,

2          we're off the record.

3              - - - - -

4      (A recess was taken at this time.)

5              - - - - -

6              THE VIDEOGRAPHER:  The time

7          right now is 3:34 p.m. and we're

8          back on the record.

9  BY MR. KARP:

10        Q.      Dr. Zahir, welcome back.  We

11  just took a brief break to address a

12  potential privilege issue regarding

13  Exhibit 14 and I believe where we landed,

14  Counsel, correct me if I'm wrong, is that

15  it's fine to proceed with Exhibit 14 with

16  the redactions that have been drawn; is

17  that correct?

18              MR. RIVERA:  Correct.

19  BY MR. KARP:

20        Q.      We also sorted out a timing

21  issue and understand that Defendants do

22  have time left at this deposition to

23  proceed and as such, we will proceed.

24              Dr. Zahir, just before the

25  break, we were talking about HIB, do you

CONFIDENTIAL

Page 247

1  recall?

2          A.      Yes.

3          Q.      And can you tell me what

4  kind of information would be contained in

5  an HIB claim form?

6          A.      In a claim form?

7          Q.      Correct.

8          A.      It would be a statement of

9  what an individual has claimed to have

10  happened to them, possibly the name of the

11  individuals all involved, location, time,

12  things of that nature.

13          Q.      And does someone at Union

14  Avenue Middle School investigate HIB claims

15  that are made by students?

16          A.      Yes, we have an HIB

17  specialist in the building.

18          Q.      And who is that -- who is

19  the current HIB specialist at Union Avenue

20  Middle School?

21          A.      Ms. Vargas.

22          Q.      Was Ms. Vargas the HIB

23  specialist at Union Avenue Middle School in

24  October of 2023?

25          A.      Yes.

CONFIDENTIAL

Page 248

1          Q.          And upon receiving an HIB
2    claim form, Ms. Vargas would have
3    investigated that claim?
4          A.          Yes.
5          Q.          And would the results of her
6    investigation be included or recorded in
7    that claim form?
8          A.          In the claim form?  I'm not
9    sure if it's recorded in the claim form,
10   but if it's founded, whether it's founded
11   or unfounded, there's a report that would
12   state founded or unfounded.
13         Q.          So there might be a separate
14   document that Ms. Vargas creates
15   determining one way or another whether the
16   incident qualifies as HIB?
17         A.          Yes.
18         Q.          Is there a name for that
19   form?
20         A.          I'm not sure if there's a
21   name for the HIB form, but at some point,
22   it's reported on the SSDS document as a --
23   when we do our discipline reports for the
24   month, any HIB, founded HIBs, will be
25   reported.  If it's unfounded, it's

CONFIDENTIAL

Page 249

1  unfounded.

2       Q.       Your recollection of this

3  particular incident is that the claims were

4  not founded?

5       A.       I'm learning that my memory

6  is a thing now, but this particular one, I

7  don't recall it going that far simply

8  because I remember this one, like, vividly

9  and the mother involved and the situation

10  and I recall that this, I believe, this

11  ended with a conversation.

12       Q.       You can put this document to

13  the side.  I'm handing you tab 14, which we

14  will mark as Exhibit 15.

15                  - - - - -

16              (Email String Bates

17              BW__Irvington00083094 to 00083095

18              marked Zahir Exhibit 15 for

19              identification.)

20                  - - - - -

21  BY MR. KARP:

22       Q.       Let me know once you've had

23  a chance to take a look.

24       A.       Okay.

25       Q.       This is an email chain dated

CONFIDENTIAL

Page 250

1    October 16th through 17th, 2023.

2                    Do you see that.

3          A.       Yes.

4          Q.       The subject line of this

5    email is regarding formal complaint and

6    then there's some personal information

7    that's been redacted.

8                    Do you see that?

9          A.       Yes.

10         Q.       The top email in this chain

11   is from Dr. Vauss.

12                  Do you see that?

13         A.       Yes.

14         Q.       And you are copied on this

15   email.

16                  Do you see that?

17         A.       Yes.

18         Q.       Do you recall receiving this

19   email?

20         A.       Yes.

21         Q.       Let's look down on the page

22   to the email dated October 16, 2023, that

23   was sent at 11:23 a.m.

24                  Do you see that email?

25         A.       Yes.

CONFIDENTIAL

1        Q.      The email reads, "This email

2   is solely for the purpose of documenting

3   that I reached out on Friday, October 13,

4   2023, to both Mr. Zahir, acting Principal

5   at Union Avenue School and Dr. Vauss,

6   acting Superintendent of Irvington Board of

7   Education in regards to school safety and

8   negative exposure."

9              Do you see that?

10       A.      Yes.

11       Q.      Do you recall that the

12  emails we just looked at and marked as

13  Exhibit 14 were on October 13?

14       A.      Yes.

15       Q.      Of the same year?

16       A.      Yes.

17       Q.      Do you have a recollection

18  that these emails that we're looking at in

19  Exhibit 15 relate to the same incident and

20  the same student?

21       A.      Yes.

22              MR. RIVERA:  Object to form.

23              THE WITNESS:  Sorry.

24  BY MR. KARP:

25       Q.      This parent continues to

Page 252

1    say, "I believe my children are being

2    effected negatively to the point my

3    daughter want to go elsewhere next year and

4    my son look depressed after school everyday

5    since he started."

6                    Do you see that?

7         A.        Yes.

8         Q.        "My main concerns are as

9    follows:  Profanity being used loosely by

10   students in hallways, recess and gym."

11                  Do you see that?

12        A.        Yes.

13        Q.        "Disrespect and threats from

14   students to staff members."

15                  Do you see that?

16        A.        Yes.

17        Q.        This parent told you about,

18   "intimidation and bullying by behavior

19   students to other students"?

20        A.        Yes.

21        Q.        She also reported,

22   "inappropriate conversations about sex."

23                  Do you see that?

24        A.        Yes.

25        Q.        And lastly, she refers to,

CONFIDENTIAL

Page 253

1    "Cleanliness and sanitation of the school
2    building.  My son have to close his eyes to
3    use the urinal."
4                    Do you see that?
5         A.      Yes.
6         Q.      That's what this parent told
7    you about in October of 2023?
8                    MR. RIVERA:  Object to form.
9             You can answer.
10                    THE WITNESS:  This parent
11             mentioned these things and then I
12             was instructed to talk to her.  So
13             this is her account of what we
14             spoke about.
15    BY MR. KARP:
16         Q.      You spoke to her after she
17    sent this email?
18         A.      I think this email is after
19    I spoke to her.
20         Q.      And are these concerns that
21    she raised with you when you had that
22    discussion?
23                    MR. RIVERA:  Object to form.
24                    THE WITNESS:  Are there
25             concerns?

Page 254

1  BY MR. KARP:

2          Q.       The concerns that this

3  parent listed in her email dated

4  October 16, 2023, are these concerns that

5  she shared with you in the discussion

6  you're recalling?

7          A.       I believe so, yes.

8          Q.       And what did you tell this

9  parent?

10         A.       I don't understand the

11  question.

12                  MR. RIVERA:  Objection to

13         form.

14  BY MR. KARP:

15         Q.       When this parent came to you

16  and said, "profanity being used loosely by

17  students in hallways, recess and gym," how

18  did you respond?

19                  MR. RIVERA:  Object to form.

20                  THE WITNESS:  Well, I asked

21             her the source of her information,

22             because she's citing things that

23             she couldn't have possibly

24             witnessed, to find out where she

25             got all of this information from.

Page 255

```
 1              And she said her son was telling
 2              her these things.
 3                  I'm sorry, I recall this
 4              vividly.  So when I met with her
 5              son and I met with her, a lot of
 6              this information was then now not
 7              the case.  And from this
 8              particular situation here, after
 9              my conversation with her, she
10              felt a lot better about some of
11              the more factual things that
12              occurred.  Not that it matters,
13              but her son, I believe her son
14              may be special needs, I'm not
15              certain.  I don't know if there
16              was a classification there or
17              not, but there were signs and
18              what went from this being the
19              worst place to be, it was no
20              longer the case after our
21              conversation.
22   BY MR. KARP:
23          Q.      Did this parent's -- did the
24   student in question continue to feel this
25   way?
```

Page 256

1          A.        No.

2          Q.        This parent reported that,

3    cleanliness and sanitation of the school

4    building was a concern and indicated that

5    her son had to close his eyes when he used

6    the urinal.

7                    Do you see that?

8          A.        Yes, I read it.

9          Q.        Have you heard from other

10   students that they have to close their eyes

11   when they're in the bathroom?

12                   MR. RIVERA:  Object to form.

13                   THE WITNESS:  I've never heard

14          that phrase.

15   BY MR. KARP:

16         Q.        Is cleanliness and

17   sanitation a problem for Union Avenue

18   Middle School?

19                   MR. RIVERA:  Object to form.

20                   THE WITNESS:  I don't know how

21          to answer that question.

22   BY MR. KARP:

23         Q.        Does Union Avenue Middle

24   School struggle -- or strike that.

25                   Does Union Avenue Middle

                                        Page 257

1   School receive complaints from parents and

2   students about the cleanliness and sanitary

3   conditions of the building?

4              MR. RIVERA:  Object to form.

5              THE WITNESS:  I've never

6          received a complaint from a parent,

7          to my knowledge, other than this

8          parent about the cleanliness of the

9          building.  I, however, I have at

10         times my own personal concerns,

11         where I speak to my custodian --

12         custodial team about a certain

13         standard of what a school should

14         be.

15  BY MR. KARP:

16         Q.     And what are those concerns?

17         A.     My concern is that a school

18  should be clean and we need to ensure that

19  this is a safe and clean place for people's

20  children.

21         Q.     And do you approach your

22  custodial staff -- or strike that.

23              When you have approached

24  your custodial staff with these concerns,

25  is it because you felt that certain parts

Page 258

1   of the school were not being properly
2   maintained?
3                    MR. RIVERA:  Object to form.
4                    THE WITNESS:  When I first
5              arrived here, I was not happy with
6              the condition of the building and
7              one of my goals was to clean the
8              building up, because I wasn't happy
9              with the building.  So that was
10             a -- that was a big thing for me.
11  BY MR. KARP:
12        Q.      What exactly did you want to
13  be cleaned up?
14        A.      The school.
15        Q.      What parts of the school?
16        A.      All of it.
17        Q.      Was it dirty?
18                    MR. RIVERA:  Object to form.
19             You can answer.
20                    THE WITNESS:  I think that's
21             subjective.
22  BY MR. KARP:
23        Q.      When you wanted the school
24  cleaned up, what were you observing?
25        A.      I just observed that I

CONFIDENTIAL

Page 259

1   didn't think the school was at my personal
2   standard for what I think it should be in
3   order to provide the type of education I
4   would like to provide.  There was no dirty
5   rating system that it failed.  There was
6   no, you know, test or nothing.  It's just
7   as a new principal walking into the
8   building, there are things that you
9   pinpoint and, for me, I was not happy with
10  what I saw based upon my standards.
11          Q.      And in what ways did the
12  school fall below your standards for
13  cleanliness?
14          A.      Well, I can't answer that
15  question in what ways it fell below,
16  because that would mean that it was
17  somewhere and then I watched it get worse.
18  I can't say that.  I can just say that if
19  you ask everyone here what's clean to them,
20  we all may have different -- what's okay,
21  we all may have different perspectives.  As
22  a building leader, I know that I need to be
23  comfortable with the environment, because
24  people's kids go here.
25          Q.      And when you became

CONFIDENTIAL

Page 260

1   principal of Union Avenue Middle School,

2   you were not okay with the conditions of

3   the school?

4           A.      When I first arrived, no, I

5   was not.

6           Q.      Do you believe that the

7   conditions of the school sent a message to

8   the students who were learning here?

9                   MR. RIVERA:  Object to form.

10                  THE WITNESS:  I can't speak to

11          what effect it had on the kids

12          actually.  That's an assumption

13          that someone could make.

14   BY MR. KARP:

15          Q.      Did you -- was one reason

16   for addressing these problems a concern

17   that the state of the building and the

18   conditions of the building sent the wrong

19   message to students who were learning here?

20                  MR. RIVERA:  Object to form.

21                  THE WITNESS:  No, it for me,

22          one of my core principles is that

23          this is home and in order for me to

24          lead in the way I know that I can,

25          I can't be the only one that views

Page 261

```
1                  this place as home.  So you take
2                  care of your home.  Well, you have
3                  to set the standard and you have to
4                  say this is home, this is where we
5                  are, we have to keep it clean.  So
6                  it's more about taking pride in
7                  where you spend your time and where
8                  you go to school.
9    BY MR. KARP:
10         Q.      I'm handing you tab 15,
11   which we will mark as Exhibit 16.
12                       - - - - -
13                  (Email String Bates
14                  BW__Irvington00081693 to 00081696
15                  marked Zahir Exhibit 16 for
16                  identification.)
17                       - - - - -
18                  MR. RIVERA:  So if we can just
19                  go off the record quickly?
20                  MR. KARP:  Can you explain why
21                  we need to?
22                  MR. RIVERA:  Well, we need to
23                  get some redactions on the student
24                  identifying information on this
25                  document as well.
```

CONFIDENTIAL

Page 262

1                    MR. KARP:  Understood.  We can
2              go off the record.
3                    THE VIDEOGRAPHER:  The time
4              right now is 3:52 p.m.  We are off
5              the record.
6                    - - - - -
7          (A recess was taken at this time.)
8                    - - - - -
9                    THE VIDEOGRAPHER:  The time
10              right now is 4:07 p.m.  We are back
11              on the record.
12     BY MR. KARP:
13          Q.      Welcome back, Dr. Zahir.  We
14     took a brief break to address some -- or to
15     apply some redactions to a document I
16     handed you.  The redacted version of this
17     document will be marked as Exhibit 16.  And
18     my understanding is that the redactions
19     were applied to respect the privacy and
20     identity of the individual student who is
21     named in this document.
22                    Dr. Zahir, have you had an
23     opportunity to look over the document?
24          A.      Yes.
25          Q.      This is an email dated

CONFIDENTIAL

Page 263

1    February 2, 2024, correct?

2          A.      Yes.

3          Q.      This is -- the email was

4    sent by Dr. April Vauss, correct?

5          A.      Yes.

6          Q.      And she is forwarding you an

7    email that she received that same day from

8    the parent of this student, correct?

9          A.      Yes.

10          Q.      Okay.  And the parent was

11    updating Dr. Vauss about some of her

12    concerns; is that fair?

13                MR. RIVERA:  Object to form.

14                THE WITNESS:  Yes.

15    BY MR. KARP:

16          Q.      Let's turn the page to Bates

17    ending in 1694.  This is the second page of

18    the document.  And let's look at the bottom

19    email on this page that's dated January 18,

20    2024.  Are you with me?

21          A.      Yes.

22          Q.      And we see here that the

23    parent of this student reported an

24    incident.

25                Do you see that?

```
                                        Page 264
 1         A.      Yes.
 2         Q.       In the second paragraph of
 3    this email, she says, yesterday, I -- or
 4    strike that.
 5              I just want to be mindful of
 6    the redactions here.  This parent wrote,
 7    "This email is to inform you that my son
 8    will be out of school for a few days
 9    because I need to let him see a crisis
10    counselor."
11              Do you see that?
12         A.      Yes.
13         Q.      She reported that her son
14    had been acting strange for the past month
15    or so and even when she asked him what was
16    wrong, he wouldn't tell her anything.
17              Do you see that?
18         A.      Yes.
19         Q.      She goes onto write that,
20    "Yesterday I threatened to take his phone
21    and game system if he didn't tell me.  He
22    stated during lunch on January 12, 2023 an
23    unknown child ran up to him and smacked him
24    extremely hard on the back of his head.  He
25    also stated since November a boy bigger
```

Page 265

1    then him keep poking him and shining a

2    light directly in his eye and purposely

3    sitting next to him in his math class.  He

4    said most of the time he play it off and

5    laugh so the teacher won't think anything."

6                    Do you see that?

7         A.        Yes.

8         Q.        And did you investigate this

9    report?

10        A.        Yes, I did.

11        Q.        And what did you learn when

12   you investigated it?

13        A.        That none of this happened.

14                  MR. RIVERA:  Object to form.

15                  THE WITNESS:  I'm sorry, that

16             this is the same individual from

17             the previous October situation and

18             after watching the camera for over

19             two weeks, we never could identify

20             where the incident occurred in the

21             cafeteria.  He never could identify

22             who the kid was.  It started it was

23             supposedly January 16th.  Then, no,

24             it wasn't the 16th, it was the

25             12th.  We did the whole week.  Then

Page 266

1            I don't remember which day.  Then I
2            went up to the math class and I
3            asked the math teacher about him
4            and some other kid and the only
5            thing we came up with is that there
6            was a student that sat in his seat,
7            although there were no assigned
8            seats, a student sat in his seat,
9            he got upset because the teacher
10           wouldn't make the kid get up.  The
11           kid said something to him, it
12           wasn't nice, the kid said something
13           to him.  I addressed the kid.  I
14           addressed him.  The kid humbly
15           apologized and said, I'm sorry, I
16           didn't mean nothing by it.  I
17           brought him downstairs.  He told
18           his mother that the boy apologized
19           and everything was fine.
20   BY MR. KARP:
21          Q.     Did this incident involve
22   bullying over social media?
23          A.     There was, to my
24   understanding, there was no social media
25   involved in this case.

CONFIDENTIAL

Page 267

 1          Q.      Let's look at the email from
 2     a couple of weeks later on February 2.
 3     This is the first page.  Let me know when
 4     you're there.
 5          A.      I'm there.
 6          Q.      Closer to the bottom of the
 7     page, this parent wrote, "It's imperative
 8     that the student is held accountable for
 9     his undue actions.  It is not ok for
10     someone to walk up while your head is
11     looking at a phone during recess and smack
12     you on the back of your head hard."
13               Do you see that?
14          A.      Yes.
15          Q.      And is that the student who
16     you addressed?
17          A.      No.  We could never find
18     that student.  Where it was stated that it
19     happened and the three or four different
20     days that he said it happened, we spent
21     days investigating this, and it was
22     unfounded and it just ended up being at the
23     end, the mother got upset with the son for
24     saying that when things happen, you need to
25     let us know right away, because one of the

CONFIDENTIAL

Page 268

1    issues was you didn't tell us when it

2    happened, you told your mother two weeks

3    later or a week and a half later.  Your

4    mother expressed this concern, I guess,

5    with the superintendent, then the

6    superintendent contacted us.  And then we

7    did what we did, still nothing, and then a

8    week and a half after that, it was she

9    wanted answers and I -- because I know the

10    mother.  I'm familiar with her.  And it was

11    another situation where the son made a

12    claim and the only thing that we got from

13    this was the young man in his math class

14    was also in his -- who was in English class

15    said to him, I didn't know it was assigned

16    seats, he kept telling me to get up and I

17    told him I'm not getting up, and I said

18    something mean to him or whatever, but

19    there was never no fight or anything

20    physical.

21           Q.        Thank you.  In the next

22    paragraph of this email, this parent wrote,

23    "Then on top of that he was getting

24    verbally bullied and taunted since

25    September of 2023, that I made a complaint

CONFIDENTIAL

Page 269

1    with Mr. Wallace about certain students,"
2    and that her son was afraid to speak up due
3    to retaliation.
4                    Do you see that?
5         A.        She's referring to the
6    previous situation you brought up that we
7    addressed and there was never a student.
8         Q.        Was this -- was this student
9    afraid to speak up because of retaliation,
10   for fear of retaliation?
11                   MR. RIVERA:  Object to form.
12                   THE WITNESS:  I can't speak to
13           what he felt, but for us, time and
14           location is what's important.  And
15           when you give us a time and you
16           give us a location, we just look at
17           what's on the camera and nothing.
18   BY MR. KARP:
19        Q.        The parent goes on to report
20   that her son is "being called autistic
21   constantly every day when he is not.  He is
22   starting to think he is autistic."
23                   Do you see that?
24        A.        Yes.
25        Q.        Did you investigate that

CONFIDENTIAL

Page 270

1    claim?

2            A.        That came from the kid in

3    the classroom.  I think he said something

4    along those lines, whatever, I can't

5    confirm exactly what the kid said, but that

6    was in the classroom.  And when I spoke

7    with the kid about his comment, his entire

8    disposition changed to a very -- his affect

9    was disappointed in himself where he said,

10   I'm so sorry, I didn't -- I didn't even

11   mean to hurt you like that.  And then he

12   said, I apologize.  The young man said,

13   it's okay, I accept your apology.  And he

14   went to shake the boy's hand, they did --

15   her son stuck his hand out and said, it's

16   okay, he shook his hand, and I said, so

17   we're not going to have a problem anymore?

18   And the guy said, Dr. Zahir, I apologize, I

19   won't do that ever again.  I walked him

20   downstairs to his mother, the boy had a

21   smile on this his face, and his mother

22   said, thank you, Dr. Zahir, for addressing

23   the situation.

24           Q.        In the next paragraph, this

25   parent wrote that, "This matter was not

Page 271

1    handled expeditiously as you stated, more
2    dilatory or without serious concern for it
3    to be laws against this type stuff,
4    students commit suicide over things like
5    this, I'm not going to wait until something
6    happen to my child."
7                    Do you see that?
8         A.        Yes.
9         Q.        As principal of Union Avenue
10   Middle School, have you received complaints
11   about how quickly incidents reported by
12   parents are addressed?
13                   MR. RIVERA:  Object to form.
14                   THE WITNESS:  Can you ask that
15        question again?
16   BY MR. KARP:
17        Q.        As principal of Union Avenue
18   Middle School, have you received complaints
19   from parents that their reports of bullying
20   and other issues affecting their children
21   are not quickly addressed?
22                   MR. RIVERA:  Object to form.
23                   THE WITNESS:  Only, and very
24        limited, when what the student goes
25        home and tells their parent is not

```
                                              Page 272

 1               what actually happened at the

 2               school.  But I have a track record

 3               here of addressing situations

 4               immediately.

 5    BY MR. KARP:

 6          Q.       Do you agree that bullying

 7    of this nature would have a negative effect

 8    on a student's mental health?

 9                   MR. RIVERA:  Object to form.

10                   THE WITNESS:  I don't

11               understand the nature of something

12               that didn't occur.

13    BY MR. KARP:

14          Q.       At least some of the things

15    that are indicated here by this parent did

16    occur, correct?

17          A.       One.

18                   MR. RIVERA:  Object to form.

19    BY MR. KARP:

20          Q.       One thing?

21          A.       One thing.  There was no

22    smacking of the head was founded.  No

23    bothering since September was

24    substantiated.  The only thing was the kid

25    said something to him.  She describes it as
```

CONFIDENTIAL

Page 273

1   calling him autistic.  I can't confirm that

2   that's what the kid said, but he said

3   something in retaliation to her son telling

4   him to get out of the chair repeatedly and

5   he said no.  So there was no, no -- nothing

6   founded in this situation that was bullying

7   or harassment or intimidation.

8         Q.      Let's turn the page back to

9   the email from January 18, 2024 at 9:48

10  that we were looking at a few minutes ago.

11  If you look at the very last line of this

12  email, this parent wrote, "I have some text

13  from him having a breakdown.  Attaching a

14  text message so we don't get lost."

15              Do you see that?

16        A.      Yes.

17        Q.      And then on the next page,

18  there's a text message.

19              Do you see that?

20        A.      Yes, I do.

21        Q.      And in this text message,

22  this parent's -- this student tells his

23  mom, "I don't want to stay at this

24  cockroach infested, asylum looking,

25  abandoned hospital looking school."

CONFIDENTIAL

Page 274

1              Do you see that?
2        A.       Yes, I do.
3        Q.       Is that the school that
4    you -- you told me earlier that when you
5    joined in -- when you joined Union Avenue
6    Middle School in 2023, it did not meet your
7    standards, correct?
8        A.       Yes, I said that.
9        Q.       Is this the state of the
10   school when you joined?
11       A.       No.
12              MR. RIVERA:  Object to form.
13   BY MR. KARP:
14       Q.       Did you do anything in
15   response to this to receiving this text
16   message to investigate whether the school
17   was cockroach infested?
18              MR. RIVERA:  Object to form.
19              THE WITNESS:  I need to be
20          clear.  That text message with the
21          photo of the cockroach thing, I'm
22          not sure if I received that, but
23          whether I did or I didn't, that's
24          her son and his creative
25          description of something, but it

Page 275

1              doesn't cite any bullying,
2              intimidation, harassment, or
3              whatever.
4    BY MR. KARP:
5         Q.      Are these the conditions in
6    which --
7         A.      No.
8         Q.      -- students -- let me start
9    the question --
10        A.      Sorry, sorry.
11        Q.      No problem.  Are these the
12   conditions in which Union Avenue Middle
13   School students go to school?
14              MR. RIVERA:  Object to form.
15              THE WITNESS:  No.
16   BY MR. KARP:
17        Q.      Are there cockroaches at
18   Union Avenue Middle School?
19              MR. RIVERA:  Object to form.
20              THE WITNESS:  Not that I've
21        seen.
22   BY MR. KARP:
23        Q.      Have students reported to
24   you or other staff members that they are
25   unhappy with the conditions of the school?

CONFIDENTIAL

Page 276

1                MR. RIVERA:  Object to form.

2                THE WITNESS:  No.

3    BY MR. KARP:

4        Q.      This is the only complaint

5    you've ever received about the conditions

6    of the school?

7                MR. RIVERA:  Object to form.

8                THE WITNESS:  People, students

9            may express a concern.  Teachers

10           would express a concern about if

11           the custodian cleaned their room,

12           but to the degree of an asylum

13           looking abandoned hospital, no.

14   BY MR. KARP:

15       Q.      Let's take a look -- you can

16   put this document to the side.  Let's take

17   a look at tab 17.  Sorry, misplaced this

18   folder.  I'm handing you tab 17.  We will

19   mark this Exhibit 17.

20                    - - - - -

21           (Email dated 3/27/23 Bates

22           BW_Irvington00351327 marked Zahir

23           Exhibit 17 for identification.)

24                    - - - - -

25

CONFIDENTIAL

Page 277

1   BY MR. KARP:

2          Q.       Have you seen this document

3   before?

4          A.       Yes.

5          Q.       Do you recall receiving this

6   email?

7          A.       Yes.

8          Q.       This email is dated

9   March 27, 2023, and the subject line is,

10  "Trip to Baltimore, Basketball Uniforms,

11  Student Council Feedback."

12                  Do you see that?

13         A.       Yes.

14         Q.       This is -- you received this

15  email from Ms. Sekou; is that right?

16         A.       Yes, Mr. Sekou.

17         Q.       Mr. Sekou, thank you.  Who

18  is Mr. Sekou?

19         A.       A math teacher at Mount

20  Vernon.

21         Q.       At this point in time, you

22  were principal of Mount Vernon?

23         A.       Yes.

24         Q.       The third item in

25  Mr. Sekou's email reads, "During the last

CONFIDENTIAL

Page 278

1    student council meeting, the following

2    things were expressed by students."

3                    Do you see that?

4        A.        Yes.

5        Q.        "In the girls and boys

6    bathroom students are writing inappropriate

7    words.  There is poop on the walls in the

8    first and second floor girls bathroom.

9    Overall, the bathrooms are unsanitary."

10                   Do you see that?

11       A.        Yes.

12       Q.        Did you investigate that?

13       A.        Yes.

14       Q.        What did you find?

15                   MR. RIVERA:  Object to form.

16                   THE WITNESS:  I don't recall

17           that we found poop on the walls.

18           That's not to say that in an

19           elementary school, some kid may

20           have done that.  I mean, these are,

21           from an outsider, this is, like,

22           disgusting.  From someone who works

23           in education at an elementary

24           level, I mean, this is not

25           something that is -- does not

CONFIDENTIAL

Page 279

```
 1              happen, regardless of your
 2              location, I don't care what part of
 3              the city, state you're in.  So
 4              these are concerns expressed by the
 5              student council at the school,
 6              according to him, which is another
 7              thing, you know, he's saying that
 8              the kids expressed this.  I can't
 9              confirm or deny that the students
10              actually expressed this.
11   BY MR. KARP:
12        Q.        Mr. Sekou reported this to
13   you in his email on March 27th, correct?
14        A.        Yes.
15        Q.        Is it common for elementary
16   schools to be -- elementary school
17   bathrooms to be kept in this kind of
18   condition?
19              MR. RIVERA:  Object to form.
20          You can answer.
21              THE WITNESS:  No.
22   BY MR. KARP:
23        Q.        You said, as an outsider, it
24   sounds disgusting, correct?
25        A.        As an outsider reading this,
```

CONFIDENTIAL

Page 280

1    it sounds disgusting.

2          Q.      It doesn't sound disgusting

3    as an insider is what you're saying?

4          A.      It sounds disgusting

5    regardless, but this is -- this would not

6    be the first time that a custodian would

7    have to be called to a bathroom because of

8    something that was done in the bathroom.

9          Q.      Students, according to

10   Mr. Sekou, students at the student council

11   meeting reported that the bathrooms were

12   unsanitary, correct?

13         A.      According to Mr. Sekou.

14         Q.      Do you have a reason to

15   doubt Mr. Sekou?

16         A.      Yes.

17         Q.      And why is that?

18         A.      Because there have been

19   numerous times when Mr. Sekou has said

20   things that were not true.

21         Q.      And on what occasions would

22   those be?

23         A.      I can't recall them all, but

24   you're asking me, do I have reason to

25   doubt, my answer is yes.  Now, am I saying

Page 281

1    that this is not a possibility, I am not

2    saying that, but do I have reason to doubt,

3    yes.

4           Q.       Your opinion of Mr. Sekou is

5    that he doesn't tell the truth?

6                    MR. RIVERA:  Object to form.

7                    THE WITNESS:  My opinion is

8           based on circumstances where he did

9           not tell the truth.

10   BY MR. KARP:

11          Q.       But sitting here today, you

12   can't remember those specific instances?

13          A.       No, not all of them, no.

14          Q.       He also reported, "Fights

15   are happening during recess.  Student

16   Council members stated that when they tell

17   their teachers, the issue is not

18   addressed."

19                    Do you see that?

20          A.       Yes, I do.

21          Q.       And then Mr. Sekou provides

22   some additional detail on the list he

23   provides, correct?

24          A.       Yes.

25          Q.       He asks, "What is causing

CONFIDENTIAL

Page 282

1   fights?"  First item is unwanted touching.

2                   Do you see that?

3        A.      Yes.

4        Q.      The second is roasting?

5        A.      Yes.

6        Q.      The third is taking other

7   people's things?

8        A.      Yes.

9        Q.      All of these are some form

10  of bullying; is that fair?

11                  MR. RIVERA:  Object to form.

12                  THE WITNESS:  No, not fair.

13  BY MR. KARP:

14       Q.      Okay.  Why not?

15       A.      Because touching, unwanted

16  touching is not bullying.

17       Q.      Understood.  The next item

18  is cyberbullying on Roblox, TikTok, and

19  Instagram.

20                  Do you see that?

21       A.      Yes.

22       Q.      And these are elementary

23  school students?

24       A.      That he's speaking of, yes.

25       Q.      You mentioned earlier that

CONFIDENTIAL

Page 283

1  you had no -- you didn't know if first
2  graders had cell phones, do you recall
3  that?
4          A.      I didn't say that -- I
5  didn't know if first graders had cell
6  phones.
7          Q.      When you were principal of
8  Mount Vernon -- of the Mount Vernon School,
9  did you know whether your students had cell
10 phones?
11         A.      I didn't know all of them,
12 but I knew that in comparison to a middle
13 school, that it's not a close amount.
14         Q.      Cyberbullying on Roblox,
15 TikTok, and Instagram is what Mr. Sekou
16 reported to you, correct?
17         A.      That's what's in the email.
18         Q.      Do you know what Roblox is?
19         A.      Yes, I do.
20         Q.      What is Roblox?
21         A.      Roblox is a game, it's a
22 community-based game where kids can play
23 against each other and they can purchase
24 items to support their characters.
25         Q.      Are you aware of whether

CONFIDENTIAL

Page 284

```
 1   Roblox is a defendant in this lawsuit?
 2          A.      I'm not sure.
 3                  MR. RIVERA:  Object to form.
 4                  THE WITNESS:  I'm not sure.
 5   BY MR. KARP:
 6          Q.      Has Roblox caused a
 7   disruption to instruction at -- or strike
 8   that.
 9                  Was Roblox causing a
10   disruption to instruction at Mount Vernon?
11          A.      Not to my knowledge.
12                  MR. RIVERA:  Objection to
13             form.
14   BY MR. KARP:
15          Q.      Does Roblox cause a
16   disruption to instruction in Union Avenue
17   Middle School?
18                  MR. RIVERA:  Object to form.
19                  THE WITNESS:  Cause a
20             disruption to my -- to the
21             instruction?  The kids aren't
22             playing Roblox during class time.
23             I'm not sure how to --
24   BY MR. KARP:
25          Q.      Are students at Union Avenue
```

CONFIDENTIAL

Page 285

1  Middle School using Roblox while they're at
2  school?
3          A.       In class, I'm not sure.
4          Q.       Any time that they're at
5  school.
6                   MR. RIVERA:  Object to form.
7              You can answer.
8                   THE WITNESS:  I can't confirm
9              whether they are or they're not.
10  BY MR. KARP:
11          Q.       You're not sure what
12  those -- what students are doing on their
13  cell phones?
14                   MR. RIVERA:  Object to form.
15                   THE WITNESS:  I can't say that
16              either.  I can't say that I'm not
17              sure, because there are instances
18              where I have confirmation of what
19              they're doing on their phones.
20  BY MR. KARP:
21          Q.       In some instances, you don't
22  know what they're doing on their phones?
23          A.       I don't understand the
24  question.
25          Q.       When you -- when you see

CONFIDENTIAL

Page 286

1  students on their phones at Union Avenue

2  Middle School, do you know what they're

3  doing on their phones?

4          MR. RIVERA:  Object to form.

5          THE WITNESS:  I don't know how

6      to answer that question.

7  BY MR. KARP:

8      Q.      You testified that sometimes

9  you have confirmation of what students are

10 doing on their cell phones, correct?

11     A.      Yes.

12     Q.      And sometimes you don't,

13 correct?

14     A.      I don't -- I don't know how

15 to answer the opposite of what you just --

16 like, I don't know how to answer that,

17 sometimes I don't.

18     Q.      When you confiscate a cell

19 phone from a student at Union Avenue Middle

20 School, do you always know what that

21 student was doing on his or her phone?

22          MR. RIVERA:  Object to form.

23          THE WITNESS:  Do I always know

24      what a student is doing on their

25      phone when I confiscate their

CONFIDENTIAL

Page 287

```
 1              phone?  These are case-by-case
 2              scenarios.  I don't know how to
 3              answer that question.
 4    BY MR. KARP:
 5         Q.     Let's go back to the
 6    document, Exhibit 17.  Mr. Sekou reported
 7    cyberbullying on TikTok.
 8                   Do you see that?
 9         A.     Yes.
10         Q.     Do you know what he was
11    referring to?
12         A.     No, I do not.
13         Q.     He also reported
14    cyberbullying on Instagram.
15                   Do you see that?
16         A.     Yes, I do.
17         Q.     Do you know what he was
18    referring to?
19                   MR. RIVERA:  Object to form.
20                   THE WITNESS:  In this
21            situation, no, I do not.
22    BY MR. KARP:
23         Q.     He also goes on to say,
24    students -- Mr. Sekou goes on to say,
25    "Students are creating their own Google
```

CONFIDENTIAL

Page 288

1    Meet links and arguing."

2                    Do you see that?

3         A.      Yes.

4         Q.      Do you have any personal

5    knowledge of those students?

6         A.      I can't speak to what he's

7    citing here, but am I familiar with Google

8    Meet links that turn into arguments, yes,

9    just like I'm familiar with cyberbullying

10   on Instagram and TikTok.

11        Q.      You said you're familiar

12   with Google Meet things -- excuse me, you

13   said that you're familiar with Google Meet

14   things that turn into arguments, correct?

15        A.      Yes.

16        Q.      Is that something you

17   observed at Mount Vernon?

18        A.      If my memory serves me

19   correct, yes.  Like, off the top of my

20   head, all of the details, I can't recall,

21   but yes, there was a Google Meet that was

22   created and kids were talking about each

23   other, yes.

24        Q.      A link to a Google meeting

25   would be circulated, students would join,

CONFIDENTIAL

Page 289

1   and then they would argue over video?

2                   MR. RIVERA:  Object to form.

3                   THE WITNESS:  Yes.  Over a

4           video?

5   BY MR. KARP:

6       Q.       They would argue at the

7   Google meeting?

8       A.       Well, it would -- so it

9   could be a Google Meet where it's visual

10  and they're arguing or it could be like a

11  Google Classroom and then they're saying

12  mean things to each other using words.

13      Q.       They're -- okay.  They're

14  saying mean things, hurtful things, to each

15  other in that Google Classroom -- over that

16  Google Classroom platform?

17                  MR. RIVERA:  Object to form.

18  BY MR. KARP:

19      Q.       Is that what you're saying?

20      A.       Not just Google, Instagram,

21  SnapChat, all of them.

22      Q.       I understand, and I'm just

23  trying to understand here to the extent

24  that you're talking -- that we're talking

25  about Google Meet and the links and what

Page 290

1  you're familiar with.  So let me ask my

2  question again.

3              At Mount Vernon, you

4  observed that some students were

5  circulating Google Meet links and arguing

6  over Google Meet either over video or by

7  sending mean messages to each other --

8              MR. RIVERA:  Objection to

9          form.

10             MR. KARP:  -- correct.

11             THE WITNESS:  I was informed

12         of a situation, a couple of

13         situations actually, not one, where

14         students were on a Google chat,

15         whether it was a meet where it's

16         visual or whether it was in a

17         Google Classroom that it created,

18         where they were saying things and

19         bullying people or posting images

20         or whatever and it was through

21         their Google account.

22  BY MR. KARP:

23      Q.      And these are

24  school-provided or district-provided gmail

25  accounts?

CONFIDENTIAL

Page 291

1          A.         I can't confirm if they were
2      all district Google accounts or if kids
3      created their own, so I can't speak to
4      that.
5          Q.         The district does provide
6      students with their own Google accounts,
7      correct?
8                    MR. RIVERA:  Object to form.
9                    THE WITNESS:  For the purposes
10            of education, yes.
11      BY MR. KARP:
12          Q.         Sitting here today, do you
13      know if students can -- can G chat or send
14      messages over Google chat using their
15      district-provided accounts?
16          A.         I'm not sure.  I can say
17      that anything that they do using their
18      Google log-in is flagged if it's negative
19      or inappropriate.  There's something put in
20      place by the school so that we don't foster
21      that type of negative behavior using the
22      means and methods that we provided for
23      them.
24          Q.         Is that the GoGuardian
25      software?

CONFIDENTIAL

                                                    Page 292

1                    MR. RIVERA:  Object to form.

2            Foundation.

3                    THE WITNESS:  I believe so.

4    BY MR. KARP:

5          Q.      You said that you had heard

6    about these incidents involving Google Meet

7    links?

8          A.      There was -- like, this is

9    three years ago, or two years ago, but

10   there was a situation that was reported to

11   me where I had to address issues like that,

12   yes.

13         Q.      Did you see any of the

14   actual messages that were being exchanged

15   by these students?

16         A.      In some cases, yes, I

17   believe some parents may have taken

18   screenshots of them.  Some kids may have

19   taken screenshots of them.

20         Q.      And is there a record of

21   those incidents?

22                   MR. RIVERA:  Object to form.

23                   THE WITNESS:  That would

24           depend on the nature of the

25           complaint.  If a student reported

Page 293

1             that they were being bullied and
2             they provided that evidence, then
3             that information could be part of
4             an HIB investigation.  And then if
5             it seemed to be appropriate, maybe
6             it was stored by the person who did
7             the HIB over at Mount Vernon.
8    BY MR. KARP:
9         Q.      These -- these incidents --
10   or strike that.
11              Mount Vernon would have
12   maintained records of these incidents?
13        A.      They should have.
14        Q.      And those records would
15   include screenshots of the messages if any
16   were taken?
17        A.      If they were --
18              MR. RIVERA:  Object to form.
19              THE WITNESS:  If they were
20         part of the investigation, yes.
21   BY MR. KARP:
22        Q.      To the extent students were
23   using Google Meet to argue over video, did
24   you ever see those videos?
25              MR. RIVERA:  Object to form.

CONFIDENTIAL

Page 294

1            THE WITNESS:  I don't recall
2        seeing an actual video where
3        someone took a screen recording of
4        a video from Mount Vernon, but I
5        recall dealing with situations
6        because of what occurred during the
7        group chat.
8    BY MR. KARP:
9        Q.        We have been talking
10   specifically about Mount Vernon.  Have
11   students at -- have students at Union
12   Avenue Middle School used Google Meet links
13   to argue and say mean things to each other?
14       A.        In middle school, you would
15   see more Instagram, SnapChat, TikTok,
16   because now they have cell phones, most of
17   them, the majority of them have cell
18   phones, so there wouldn't be a need to
19   resort to a Chromebook or a laptop, it
20   would be on a cell phone.
21       Q.        We'll circle back to that.
22   Let's return to Mount Vernon for a minute.
23   Are you aware of instances of bullying that
24   occurred at Mount Vernon over TikTok?
25                 MR. RIVERA:  Object to form.

CONFIDENTIAL

Page 295

1              You can answer.

2                    THE WITNESS:  Over TikTok?  So

3              it -- I don't understand the

4              question.

5    BY MR. KARP:

6         Q.        Let me -- actually, let me

7    zoom out and ask a different question.

8    Remind me of the dates when you were

9    principal at Mount Vernon.

10        A.        July 7, 2002, to June 30,

11   2003.

12        Q.        Did you mean 2022?

13        A.        2022, yes, sorry.

14        Q.        Through June 30, 2023?

15        A.        Yes, sorry about that.

16        Q.        No problem.  During that

17   time, do you recall any incidents that

18   occurred involving students in which you

19   believe social media had a negative impact

20   on student mental health?

21        A.        Yes.

22        Q.        Can you tell me about those?

23        A.        It's a lot of them.  One

24   example, there was a young lady who got

25   into a fight after school and the kids

CONFIDENTIAL

Page 296

1  recorded the fight.  And one of the

2  individuals who had a cell phone recorded

3  the fight and then may have shared it with

4  some of the other kids in the fourth and

5  fifth grade who had phones.  They took the

6  fight and posted it on Instagram.  And in

7  the -- I found out about it, because in the

8  classroom, there was an argument -- I'm

9  really trying to put this together, so I

10  apologize, but in the classroom, there was

11  an argument, and I don't want to conflate

12  the two.  This particular situation, I

13  believe in the classroom there was an

14  argument about it.  The kids were brought

15  to my office.  I spoke to them.  I was able

16  to recover the video that was posted on

17  Instagram and avoid there being an

18  additional fight.  But the original fight

19  was on Instagram and it was pretty bad.

20  The young lady was, she was -- she was

21  banged up pretty bad and they recorded it

22  and posted it.

23              I mean this is -- the thing

24  about elementary school is that although

25  most kids don't have phones, if something

                                        Page 297

1    is captured on a phone, then at recess or,

2    you know, when kids, you know, congregate,

3    they're showing it and they're exposing

4    what was recorded and what may have been

5    posted on the social media page.

6           Q.      First of all, I'm sorry that

7    happened to that student.  To make sure I'm

8    understanding, there was a fight that

9    occurred in person, that fight was

10   recorded, and then that fight was shared;

11   is that correct?

12                  MR. RIVERA:  Object to form.

13           You can answer.

14                  THE WITNESS:  Yes.

15   BY MR. KARP:

16           Q.      The video of that fight was

17   shared?

18           A.      Yes.

19           Q.      And you were able to recover

20   the video and watch the video?

21           A.      I was shown the video, yes.

22           Q.      And your recollection is

23   that that video was posted to Instagram?

24           A.      I saw it on Instagram.  I'm

25   not sure why the kid had an Instagram

CONFIDENTIAL

Page 298

1  account, but that's another story.

2          Q.     Did you say that this fight

3  took place at lunchtime?

4                  MR. RIVERA:  Object to form.

5                  THE WITNESS:  No, this fight

6              took place after school on the way

7              home.

8  BY MR. KARP:

9          Q.     Did you say that the video

10  was shared during lunchtime?

11                  MR. RIVERA:  Object to form.

12                  THE WITNESS:  Shared in a

13              sense that it was shown.  I mean,

14              it's shown.

15  BY MR. KARP:

16          Q.     Students are allowed to have

17  their cell phones out during lunch?

18          A.     No, at Mount Vernon, when I

19  was at Mount Vernon, cell phones were --

20  cell phone usage in school was not a major

21  issue while I was at Mount Vernon.  Under

22  my leadership, there were just certain

23  expectations and, like I said, you have

24  kids as young as three years old and kids

25  as old as ten.  The grade levels where you

CONFIDENTIAL

Page 299

1    saw more phones were fourth and fifth
2    graders, some, very few third graders.  A
3    second grader or a first grader with a cell
4    phone was rare.  So we didn't have that
5    issue, you know.  If it was seen, it was
6    addressed, you know, brought to my office,
7    parent pick them up after school, they
8    would get it.  It's a different environment
9    there.
10          Q.       So the policy at Mount
11   Vernon -- strike that.  Am I understanding
12   you correctly that students at Mount Vernon
13   were not permitted -- or strike that.
14                  Mount Vernon policy at the
15   time that you were principal was that
16   students should not have their phones out
17   during lunch?
18                  MR. RIVERA:  Object to form.
19                  THE WITNESS:  Mount Vernon
20          does not have a policy, the
21          district has a policy.
22   BY MR. KARP:
23          Q.       And does Mount Vernon adhere
24   to that policy?
25          A.       Yes, when I was there, we

CONFIDENTIAL

Page 300

1    adhered to the district policy.

2         Q.        And did the district policy

3    allow students to have their phones out

4    during lunch without having them

5    confiscated?

6         A.        The district policy does not

7    speak to that.

8         Q.        The district policy does not

9    speak to use of cell phones during the

10   lunch period?

11        A.        No, it does not.

12        Q.        So it's up to individual

13   schools to interpret the policy?

14                  MR. RIVERA:  Object to form.

15                  THE WITNESS:  I don't know how

16        to answer that question.

17   BY MR. KARP:

18        Q.        It's up to individual

19   schools to make decisions about whether to

20   allow their students to use their cell

21   phones during lunch without disciplining

22   them?

23                  MR. RIVERA:  Objection to

24        form.

25                  THE WITNESS:  Principals have

CONFIDENTIAL

Page 301

1          procedural autonomy at times and

2          when a principal believes that this

3          is something that the kids can do

4          safely, then there are

5          opportunities for you to do that,

6          but it's not a school policy.

7  BY MR. KARP:

8        Q.      While you were principal of

9  Mount Vernon, you did not require students

10  to conceal their cell phones during lunch,

11  correct?

12              MR. RIVERA:  Object to form.

13          You can answer.

14              THE WITNESS:  I don't recall

15          having to address what students

16          could or could not do with their

17          cell phones for grades P3 through

18          grades three.  For grades four and

19          five, cell phones were not

20          permitted.

21  BY MR. KARP:

22        Q.      Why not have a policy that

23  just applies to the school generally?

24              MR. RIVERA:  Objection.

25              THE WITNESS:  I don't

CONFIDENTIAL

Page 302

1          understand the question.
2   BY MR. KARP:
3          Q.      Why not require the
4   concealment of phones for all grade levels?
5                  MR. RIVERA:  Object to form.
6                  THE WITNESS:  That was the
7          district's policy.
8   BY MR. KARP:
9          Q.      And did you require -- the
10  fight that occurred involving the student,
11  what grade was she in?
12         A.      Fourth grade -- third,
13  actually, fourth grade, I believe, fourth
14  grade.
15         Q.      And these students were not
16  supposed to have their phones out during
17  lunch?
18                 MR. RIVERA:  Object to form.
19                 THE WITNESS:  No, they were
20         not.
21  BY MR. KARP:
22         Q.      Do you recall what this
23  fight was about?
24         A.      No.
25         Q.      Are you aware of any other

CONFIDENTIAL

Page 303

1   incidents that occurred at Mount Vernon

2   High School [sic] in which you believe

3   social media harmed students?

4          A.      Yes.

5          Q.      What else?

6          A.      It's just that social media,

7   it's ingrained in so much of what happens

8   at elementary, even more at middle, and

9   even more at high school.  Citing each

10  event is going to be -- I mean, you're

11  talking the moment something happens after

12  school, someone who happens to have a phone

13  records it.  And after they record it, they

14  either create a group chat on a social

15  media platform or they publicly post it or

16  they create a page solely dedicated to

17  fights at the school.  So, at some point,

18  social media will be part of it, because of

19  the nature of how they utilize social

20  media.

21         Q.      Students -- I didn't mean to

22  cut you off, I'm sorry.

23         A.      No, I'm just saying, so to

24  cite one or two or every, I don't think is

25  practical for this setting.

CONFIDENTIAL

Page 304

```
 1         Q.        Students record video or
 2    take pictures of things that they see,
 3    those videos and images are posted to
 4    social media, they get shared; is that
 5    right?
 6                   MR. RIVERA:  Object to form.
 7            You can answer.
 8                   THE WITNESS:  Yes.
 9    BY MR. KARP:
10         Q.        And that causes disruption?
11                   MR. RIVERA:  Object to form.
12                   THE WITNESS:  Yes.
13    BY MR. KARP:
14         Q.        And that affects the mental
15    health of those students?
16                   MR. RIVERA:  Object to form.
17                   THE WITNESS:  I believe -- I
18            believe so.  I believe so.
19    BY MR. KARP:
20         Q.        And is that -- we were just
21    talking about Mount Vernon, is that also
22    true for Union Avenue Middle School?
23         A.        Times 30.
24                   MR. KARP:  We have been going
25            for a little bit and I think I can
```

CONFIDENTIAL

Page 305

1              take a minute to figure out what

2              final questions I have, if we can

3              take a brief break.

4                   MR. RIVERA:  Sure.

5                   THE VIDEOGRAPHER:  The time

6              right now is 4:53 p.m.  We are off

7              the record.

8                   - - - - -

9         (A recess was taken at this time.)

10                  - - - - -

11                  THE VIDEOGRAPHER:  The time

12             right now is 5:03 p.m.  We're back

13             on the record.

14    BY MR. KARP:

15         Q.       Welcome back, Dr. Zahir.  In

16    your role as principal of Union Avenue

17    Middle School, do you evaluate the

18    performance of teachers?

19         A.       Yes.

20         Q.       How often do you evaluate

21    their performance?

22         A.       I don't know what you mean.

23         Q.       Do you hold annual reviews

24    of your teachers?

25         A.       Summative reviews, yes.

CONFIDENTIAL

Page 306

1          Q.          You said summative?

2          A.          Summative.

3          Q.          And what is a summative

4    review?

5          A.          It's a summation of their

6    formative reviews.

7          Q.          And how many reviews do

8    teachers at Union Avenue Middle School

9    receive in a given year?

10          A.          It depends on their tenure

11    status.

12          Q.          Can you provide me with a

13    range?

14          A.          Tenured, minimum two.

15    Nontenured, minimum three.

16          Q.          So teachers at Union Avenue

17    Middle School receive between two and -- or

18    at least two formative reviews during the

19    year and then they receive a summative

20    review at the end of the year?

21          A.          Yes.

22          Q.          What criteria do you use to

23    evaluate teachers during their formative

24    reviews?

25          A.          Danielson model.  We use the

CONFIDENTIAL

Page 307

1  Charlotte Danielson.

2          Q.       Are teachers evaluated -- or

3  strike that.

4                   Do teacher evaluations have

5  an impact on teacher compensation?

6          A.       There's a possibility.

7  There's no such things as merit pay, but

8  based on a teacher's performance there is a

9  possibility for withholding of increment.

10         Q.       Can you give me an example

11 of when that would occur?

12         A.       Let's say a teacher

13 demonstrates a dereliction of duty and is

14 absent 42 days, 50 days, after all of the

15 meetings and, you know, conversations you

16 have with a teacher, you can recommend that

17 the teacher be put on what's called a

18 corrective action plan and you can withhold

19 an increment, so that next year, they don't

20 get their incremental bump in pay.

21         Q.       So a teacher could be paid

22 less for not meeting certain standards or

23 expectations?

24                   MR. RIVERA:  Object to form.

25                   THE WITNESS:  Not paid less,

CONFIDENTIAL

Page 308

1            will not receive the next
2            increment.
3   BY MR. KARP:
4        Q.      A teacher's future pay could
5   be impacted by a failure to meet the
6   school's standards or expectations?
7        A.      Yes.
8                MR. RIVERA:  Object to form.
9   BY MR. KARP:
10       Q.      You said there's no merit
11  pay?
12       A.      I wish, no.
13       Q.      Teachers are not paid more
14  for doing an exceptional job?
15       A.      That's the business of
16  education.
17       Q.      Are teachers paid more or
18  less based on what they do with their
19  school days?
20               MR. RIVERA:  Object to form.
21               THE WITNESS:  I don't
22           understand the question.
23  BY MR. KARP:
24       Q.      Are teachers paid more or
25  less based on whether they spent -- or

                                        Page 309

1   strike that.

2                   Are students paid more or

3   less based on the academic performance of

4   their students?

5                   MS. SCULLION:  Teachers?

6                   MR. RIVERA:  Objection.  You

7          said students.

8   BY MR. KARP:

9        Q.         Thank you.  Sorry.  It has

10   been a long day.  Strike that.

11                   Are teachers paid more based

12   on the academic performance of their

13   students?

14        A.         I wish, no.

15        Q.         Are -- well, let's shift

16   gears a little bit.  As principal of Union

17   Avenue Middle School, do you receive a

18   salary?

19        A.         Yes.

20        Q.         Do you also receive

21   benefits?

22        A.         I'm offered benefits, yes.

23        Q.         Do those benefits include

24   health insurance?

25        A.         Yes.

CONFIDENTIAL

Page 310

1          Q.          What other benefits are
2     included?
3                      MR. RIVERA:  Objection to
4            form.
5                      THE WITNESS:  Medical, dental,
6            maybe vision.
7     BY MR. KARP:
8          Q.          Do you receive performance
9     evaluations as principal?
10          A.          I have, yes.
11          Q.          How many times have you
12     received evaluations as principal of Union
13     Avenue Middle School?
14          A.          None.
15                      THE STENOGRAPHER:  How many?
16                      THE WITNESS:  None.
17     BY MR. KARP:
18          Q.          Do you know how your salary
19     is determined?
20          A.          It's based upon experience
21     and what you negotiate before you're hired
22     and then after that, you're on a step.
23          Q.          And the step refers to
24     changes in your salary in subsequent years?
25                      MR. RIVERA:  Object to form.

CONFIDENTIAL

Page 311

1                  THE WITNESS:  I don't
2            understand the question.
3    BY MR. KARP:
4          Q.       What did you mean by,
5    "step"?
6          A.       So your step could be your
7    qualifications and years of service as a
8    combination.  So, let's say, if you have a
9    master's plus 30 additional credits, and
10   you have been an administrator for six
11   years, you would be a master's plus 30,
12   step six.  And then you could negotiate to
13   come in higher than you are qualified
14   depending on the extent of the need, but
15   once you come in, then there is no merit
16   pay or increment based upon performance.
17         Q.       So once that initial salary
18   is determined, there's no additional
19   negotiation that happens in later years?
20         A.       No.
21                  MR. RIVERA:  Object to form.
22   BY MR. KARP:
23         Q.       It's -- your pay is simply
24   determined by the combination of some of
25   the factors that you listed like your --

CONFIDENTIAL

Page 312

1   what degrees you have and what courses

2   you've taken or how many credits you have;

3   is that right?

4           MR. RIVERA:  Objection to

5           form.

6           THE WITNESS:  When you are

7           hired, you provide a résumé, proof

8           of employment, and so on and so

9           forth.  There are multiple factors

10          that go into it.  For example,

11          let's say, in this district, they

12          may have a different pay scale than

13          another district.  So in the

14          previous district, I may have two

15          years' administrative experience,

16          but my pay is more than five years

17          of administrative experience in

18          this district.  Coming into this

19          district, I can negotiate to not

20          have a lateral financial move.  I

21          can say, well, if you want me, you

22          have to make it financially worth

23          my while.  That means that I may be

24          put on step seven, step eight,

25          which would constitute me wanting

CONFIDENTIAL

Page 313

```
1              to leave my old job and come here.
2                   Now that I'm here and we
3              agree on that step, I may not
4              have the tangible qualifications,
5              but being recruited, coming from
6              somewhere that pays more, that's
7              how they compensate for your
8              recruitment.  But once you start,
9              you only move up whatever the
10             contract allows based upon
11             percentage increase.
12  BY MR. KARP:
13        Q.      Thank you for that
14  explanation.
15                   Does your salary in a given
16  year change based upon whether you
17  addressed two incidents of cheating in a
18  year or 30 incidents of cheating in a year?
19                   MR. RIVERA:  Objection to
20        form.
21                   THE WITNESS:  Of cheating.
22  BY MR. KARP:
23        Q.      Of students cheating.
24                   MR. RIVERA:  Objection to
25        form.
```

CONFIDENTIAL

Page 314

1                    THE WITNESS:  No.
2       BY MR. KARP:
3            Q.       Does your salary in a given
4       year change based on whether you have
5       addressed 20 fights at school or 50 fights
6       at school?
7                    MR. RIVERA:  Objection to
8            form.
9                    THE WITNESS:  I don't know how
10           to answer that question.  I can say
11           not doing your job can cause you to
12           be non-renewed.  So if in your job
13           you are to maintain a positive
14           climate and culture, and you don't
15           by way of not addressing fights,
16           not addressing cheating, not
17           addressing whatever, and it's
18           deemed that you are not a viable
19           candidate, then you can be removed.
20      BY MR. KARP:
21           Q.       Does any part of your
22      day-to-day activities -- or strike that.
23                    Does any of part of your
24      day-to-day responsibilities as principal of
25      Union Avenue Middle School affect the

CONFIDENTIAL

Page 315

```
 1   amount of health insurance coverage you
 2   receive?
 3                  MR. RIVERA:  Object to form.
 4            Well outside the scope.
 5                  THE WITNESS:  I don't
 6            understand the question.
 7   BY MR. KARP:
 8        Q.     How is your health insurance
 9   covered determined?
10                  MR. RIVERA:  Object to form.
11            Again, well outside the scope.
12                  THE WITNESS:  I don't know how
13            they calculate it, but if you're
14            employed, you have health
15            insurance.
16   BY MR. KARP:
17        Q.     The district offers you
18   health insurance --
19        A.     Yes --
20        Q.     -- every year?
21        A.     -- it comes with the job.
22        Q.     And does the health
23   insurance you're offered vary based on what
24   it is you do during the day as principal?
25                  MR. RIVERA:  Object to form.
```

CONFIDENTIAL

Page 316

```
 1              THE WITNESS:  No.
 2    BY MR. KARP:
 3         Q.      Do any of your benefits,
 4    such as medical, dental, or vision vary
 5    based on what you do during the day as
 6    principal of Union Avenue Middle School?
 7              MR. RIVERA:  Objection to
 8         form.
 9              THE WITNESS:  No.
10    BY MR. KARP:
11         Q.      Dr. Zahir, do you use social
12    media in your personal life?
13         A.      Yes.
14         Q.      What social media accounts
15    do you have?
16         A.      I have Facebook.  I have
17    Instagram, but I don't really use it.  I
18    got TikTok back after Trump got rid of it.
19    LinkedIn.  If there's something else out
20    there, I may have had it, but I don't -- I
21    don't use it.
22         Q.      Do you have a SnapChat
23    account?
24         A.      No.
25         Q.      Do you have a YouTube
```

Page 317

1    account?

2            A.        Yes.

3            Q.        When did you create your

4    Facebook account?

5            A.        Oh, gosh, 2009 maybe.

6            Q.        Do you still use Facebook

7    today?

8            A.        Yes, sorry.  Yes.

9            Q.        How often do you use

10   Facebook today?

11           A.        Every day.

12           Q.        Can you generally describe

13   how it is that you use Facebook today?

14                   MR. RIVERA:  Objection to

15             form.

16                   THE WITNESS:  It's like

17             digital seeing in, right.  See

18             what's going on, scroll a little

19             bit.

20   BY MR. KARP:

21           Q.        Sorry, are you finished?

22           A.        No, yeah.

23           Q.        You keep -- you keep up to

24   date on current events?

25                   MR. RIVERA:  Object to form.

CONFIDENTIAL

Page 318

```
 1              THE WITNESS:  At times, until
 2         I feel like it -- it becomes
 3         programming.
 4  BY MR. KARP:
 5         Q.      And do you use it to keep up
 6  with your Facebook friends and what's
 7  happening in their lives?
 8              MR. RIVERA:  Object to form.
 9              THE WITNESS:  Unconsciously,
10         like, not intentionally.  Like, I
11         don't go to Facebook and let me see
12         what John is doing with his family,
13         no.
14  BY MR. KARP:
15         Q.      Do you post to Facebook?
16         A.      Yeah.
17         Q.      How often do you post to
18  Facebook?
19         A.      It's not a set, it depends
20  on what I'm feeling.  If the Celtics are
21  playing, probably the whole game.
22         Q.      Are you from Boston?
23         A.      No.
24         Q.      Just a Celtics fan?
25         A.      Yeah.
```

Page 319

1         Q.      On average, how often do you

2    post to Facebook in a week?

3                 MR. RIVERA:  Object to form.

4                 THE WITNESS:  I couldn't

5              calculate it.  It could be three

6              times a day and then I wouldn't

7              post again for four days, five

8              days, it depends.

9    BY MR. KARP:

10        Q.      When did you create your

11   Instagram account?

12        A.      I don't recall.  And to this

13   day, I don't use it.  I think it's linked

14   to Facebook, so if you see something

15   current, it's because I posted on Facebook

16   and it went there.

17        Q.      Do you recall ever using it?

18        A.      Yeah.

19        Q.      During what period of time

20   did you -- do you recall using Instagram?

21        A.       It never took traction with

22   me, but I think I created it when I was

23   contemplating doing a motivational speaking

24   business and the whole plan was for me to,

25   like, post motivational words to athletes

CONFIDENTIAL

Page 320

1    and, you know, people.  That's why the
2    title is, "Motivated by KZ," but it just
3    never stuck.
4           Q.      And do you recall when that
5    was, approximately?
6           A.      It would have to be after
7    2015, I think.
8           Q.      Today, you don't post to
9    Instagram, correct?
10          A.      Directly, no, but Facebook
11   and Instagram are linked, so it sends it
12   there.
13          Q.      So sometimes when you post
14   to Facebook, it also posts to your
15   Instagram?
16                  MR. RIVERA:  Object to form.
17                  THE WITNESS:  I think the way
18          it's set up, it always does.  I'm
19          not sure.
20   BY MR. KARP:
21          Q.      Are you aware of whether
22   there are settings that allow you to -- not
23   to post on Instagram and to post to
24   Facebook only?
25          A.      Recently, I was shown that

Page 321

1    and I just figured leave it as is, you
2    know.
3         Q.       When did you create your
4    TikTok account?
5         A.       A month ago, two months ago,
6    if that.
7         Q.       Why did you create your
8    TikTok account one or two months ago?
9              MR. RIVERA:  Object to form.
10             THE WITNESS:  You really want
11          to know this?
12   BY MR. KARP:
13        Q.       I do.
14        A.       I would look on TikTok, you
15   know, and then Trump canceled it and I
16   accidentally deleted the app off my phone,
17   so it was gone.  So then it was a, hey,
18   Dad, look at this and I'm, like, I can't, I
19   don't have TikTok.  So then when I one day
20   tried to download it back, it was there, so
21   I just downloaded it back.  I never posted
22   anything, I don't think, no, never made a
23   TikTok.
24        Q.       So your son or daughter
25   would share videos with you on TikTok?

CONFIDENTIAL

```
                                    Page 322
 1                MR. RIVERA:  Objection.
 2                THE WITNESS:  My sons and my
 3         wife would do the, hey, look at
 4         this.
 5   BY MR. KARP:
 6         Q.       And when you say, "look at
 7   this," they would -- you're gesturing they
 8   would hold up their phones --
 9         A.       Yeah.
10         Q.       -- and show you a video?
11         A.       Yeah, I can't recall too
12   many times my kids -- I don't think my kids
13   ever texted me a link to something on
14   TikTok.
15         Q.       And you testified that
16   you've never -- you've never created a
17   TikTok.  Let me rephrase that.  You've
18   never posted a video to TikTok?
19         A.       I don't think I did.  I
20   don't -- I don't think I've ever -- if I
21   did, it was, like, once, like, hey, how do
22   you do this, but nothing, like, commentary
23   with editing and stuff, no.
24         Q.       In the last one or two
25   months, how many times have you used
```

```
                                            Page 323
 1   TikTok, approximately?
 2                 MR. RIVERA:  Object to form.
 3                 THE WITNESS:  Opening the app
 4           to do it, I don't think I have.
 5           Intentionally, maybe, like, I
 6           tapped it or something, but if
 7           you're on, like, Facebook, someone
 8           posts a TikTok and you see it that
 9           way and it will say watch here or
10           open up TikTok to view.  That
11           happens randomly whenever the
12           algorithm decides to pull up
13           somebody's TikTok account.
14   BY MR. KARP:
15        Q.     And in those instances, do
16   you follow the link to TikTok to watch it
17   there?
18        A.     No.
19        Q.     You watch it --
20        A.     Right where it's at and
21   then -- because it gets weird, like, you'll
22   watch something and then this algorithm
23   thinks that that's what you're into and you
24   get flooded with all those videos.
25        Q.     You said that you have a
```

Page 324

1  LinkedIn?

2       A.      Yeah.

3       Q.      When did you create your

4  LinkedIn?

5       A.      I do not recall, but I'm

6  going to cancel the membership soon.

7       Q.      Why is that?

8       A.      I don't use it.

9       Q.      You said you do not have a

10 SnapChat account?

11              MR. RIVERA:  Object to form.

12              THE WITNESS:  I don't think

13         so.  I think if I tried to start

14         one once, it just looks too weird,

15         it looks kiddie, right, the big

16         yellow thing I don't get, so it's

17         just not a -- you know, it's not a

18         thing.

19 BY MR. KARP:

20       Q.      You said you have a Tik --

21 strike that.

22              You said you have a YouTube

23 account?

24       A.      Yes.

25       Q.      When did you create your

CONFIDENTIAL

Page 325

1    YouTube account?

2         A.       Create the actual account or

3    download YouTube?

4         Q.       When did you first download

5    YouTube?

6         A.       I think when I first heard

7    about it.

8         Q.       Can you recall approximately

9    when that was?

10        A.       I don't know.  How old is

11   YouTube?  I don't know.

12        Q.       When you say, "download

13   YouTube," you mean download the YouTube app

14   to your phone?

15        A.       Yes.

16        Q.       Before that, did you watch

17   YouTube videos on your computer?

18        A.       However -- when I was first

19   introduced to YouTube, I thought it was a

20   great idea and I would watch stuff.

21        Q.       Putting aside having an

22   account -- or strike that.

23               Before you had a YouTube

24   account, did you watch videos on YouTube?

25        A.       Yes.

                                                      Page 326

1                    MR. RIVERA:   Objection to
2             form.
3    BY MR. KARP:
4         Q.      For how long have you been
5    watching videos on YouTube?
6         A.      I can't recall, because I
7    don't know how old YouTube is.
8         Q.      Can you give me an estimate
9    or approximation?
10        A.      It was in the early 2000s I
11   guess.  I don't know how old YouTube is.
12        Q.      Do you continue to watch
13   videos on YouTube today?
14        A.      Yes.
15        Q.      How often do you watch
16   videos on YouTube today?
17        A.      I can't say, maybe every
18   other day, if not every day.  It depends on
19   what I'm looking for or if some of the
20   pages that I follow post an update.
21        Q.      Have you ever posted videos
22   to your own YouTube account?
23        A.      Embarrassing enough, yes.
24        Q.      What makes that
25   embarrassing?

Page 327

```
 1          A.        I got threw out of a bar.
 2    It was Giants versus the Buccaneers, we
 3    lost, and the Giants fans tossed me out of
 4    the bar and I think that's, like, on
 5    YouTube.
 6          Q.        Have you posted any other
 7    videos to YouTube?
 8          A.        Yes, when I had a podcast,
 9    we would post shows up there.
10          Q.        What was the name of that
11    podcast?
12          A.        The Reality Unscripted Show.
13          Q.        When did you have that
14    podcast?
15          A.        2017.
16          Q.        Is when you started or that
17    was the only year you had?
18          A.        No, that was when I started.
19          Q.        And for how long did you
20    have that?
21          A.        I believe we stopped 2019
22    maybe, I think.  I'm not sure.
23          Q.        And recordings of that
24    podcast would be posted to your YouTube
25    account?
```

CONFIDENTIAL

Page 328

1          A.       I believe --
2                    MR. RIVERA:  Objection to
3              form.
4                    THE WITNESS:  I believe, I
5              believe so or maybe not, I'm not
6              sure.
7     BY MR. KARP:
8          Q.       And is there anything else
9     you recall posting to your YouTube account?
10                   MR. RIVERA:  Object to form.
11                   THE WITNESS:  It's hard to
12             say.  There's, like, a video of my
13             son scared of a fly.  And I was
14             telling him to pick up the fly and
15             he was crying and crying and crying
16             and crying and crying.  And then we
17             realized the fly was dead, it was
18             one of those man raising his son
19             videos where he just was -- his
20             grandmother told him to be scared
21             of bugs and I was kind of like over
22             it.  That might be there, I think.
23             I don't know, coaching videos and
24             stuff from track and field.  I
25             don't know.

CONFIDENTIAL

Page 329

1    BY MR. KARP:

2         Q.        Shifting gears a bit, Dr.

3    Zahir, are you the owner of a company

4    called, "Incredible Media Group"?

5         A.        One of, yes.

6         Q.        What is Incredible Media

7    Group?

8         A.        It was a production company,

9    one of our harebrain ideas.

10        Q.        When you say, "it was a

11   production company," do you mean that it's

12   no longer in business?

13        A.        No, it's in the internet

14   ether right now.  It's nothing.

15                  THE STENOGRAPHER:  It's what?

16                  THE WITNESS:  I said it's in

17          the internet ether.  It's, like,

18          it's just there.

19   BY MR. KARP:

20        Q.        What services did Incredible

21   Media Group provide?

22        A.        We produced music.

23        Q.        Did you use social media as

24   a means to promote the music you were

25   producing?

CONFIDENTIAL

Page 330

```
 1              MR. RIVERA:  Objection to
 2          form.
 3              THE WITNESS:  There was an
 4          attempt to advertise our company,
 5          but we weren't that successful with
 6          it.  You know, it didn't take off.
 7  BY MR. KARP:
 8      Q.      Do you recall what social
 9  media platform you would have used?
10              MR. RIVERA:  Objection to
11          form.
12              THE WITNESS:  If it was me, it
13          was Facebook.  I mean, there may
14          have been something on Instagram,
15          but that was it.
16  BY MR. KARP:
17      Q.      ███████ ████ ███████ ██ ████
██ ██████ ██ ████ █████ ████ ████
██ █████          ██    ████
██ ████          ██    ████ █████ ██████ ████ █████
██ ████          █████
██ ████          ██    ████
██ ████          ██    █████ █████ ████ █████ █████
██ ████          ██    ██████ ████ █████
██ ████          ██    ████ ████ █████ ████ █████
```

Golkow Technologies,
A Veritext Division

Page 331

3          MR. RIVERA:  I'm going to
4     object to this line of questioning.
5     I've allowed some latitude getting
6     his personal use of social media.
7     We're not going to allow this same
8     latitude on his children who are
9     not students of Irvington School
10    District, never attended Irvington
11    School District, and have nothing
12    to do with this litigation
13    whatsoever.
14         MR. KARP:  You're aware
15    that -- or this is not directed at
16    you, Dr. Zahir.  You have asked our
17    witnesses questions about their
18    children and we have permitted them
19    to answer to an extent and I'm only
20    going to probe the areas that our
21    witnesses have testified about in
22    response to your questions.
23         Are you still going to
24    instruct your witness not to
25    answer?

CONFIDENTIAL

Page 332

1            MR. RIVERA:  Yes.

2            MR. KARP:  I would at least

3        like to ask a number of questions

4        to make a record and make it clear

5        to me what it is you're instructing

6        him not to answer on and I won't

7        belabor the point and spend too

8        much doing this, but I want to get

9        some clarity on what it is you're

10       instructing not to answer.

11        MS. HENRY:  I will also note

12       that other witnesses for Irvington

13       have answered these very narrow

14       questions.

15  BY MR. KARP:

16       Q.

CONFIDENTIAL



Page 333

CONFIDENTIAL

Page 334

```
13            MR. RIVERA:  Objection to

14       form.  And it's outside the scope.

15       To the extent of getting into his

16       children's use of social media, you

17       don't have to answer these

18       questions.  I'm instructing you not

19       to answer these questions.

20            THE WITNESS:  Okay.

21            MR. KARP:  And just to make

22       sure I understand, what's the basis

23       of the instruction?

24            MR. RIVERA:  It's completely

25       outside the scope.  His children's
```

CONFIDENTIAL

Page 335

```
 1              use of social media, the ability to
 2              access social media has nothing to
 3              do with this litigation.  They're
 4              not students in Irvington School
 5              District.  They've never been
 6              students in Irvington School
 7              District.  And completely outside
 8              the scope of this litigation.
 9   BY MR. KARP:
10        Q.      Are you going to follow your
11   counsel's instructions not to answer?
12        A.      Yes.
13              MS. HENRY:  You do know you
14              asked our witnesses these
15              questions?
16              MR. KARP:  Yes, you're aware
17              of that?
18              MR. RIVERA:  That's -- I have
19              not asked those questions.
20              MS. HENRY:  Your side of the
21              group has asked our witnesses those
22              questions.
23              MR. RIVERA:  We can discuss
24              that --
25              MS. SCULLION:  He's not on the
```

Page 336

1          stand.
2                    MR. RIVERA:  -- at another
3               time.  The instruction stands.
4     BY MR. KARP:
5          Q.      What social media accounts
6     do your children have?
7                    MR. RIVERA:  Same instruction.
8     BY MR. KARP:
9          Q.      Are you going to follow your
10    counsel's advice?
11         A.      Yes.
12         Q.      Do you limit your children's
13    screen time on their cell phones?
14                   MR. RIVERA:  Objection to
15              form.  You can answer.
16                   THE WITNESS:  At this point in
17              time, I don't have to, but,
18              initially, we monitored and limited
19              screen time of anything,
20              television, cell phone, iPads, all
21              of it.
22    BY MR. KARP:
23         Q.      And did you -- have you ever
24    limited the time of day at which your
25    children can use their cell phones?

CONFIDENTIAL

Page 337

1              MR. RIVERA:  I'm going to
2         object to the remainder of this
3         line of questioning, completely
4         outside the scope reviewing his
5         children's use.  You don't have to
6         answer these questions.
7    BY MR. KARP:
8         Q.      Are you going to follow your
9    counsel's instruction?
10        A.      Yes.
11             MR. KARP:  With that, I
12        believe that I'm done with my
13        questioning, but I want to make
14        sure that no one else on Zoom or in
15        the room has questions that they
16        want to ask.
17   BY MR. SANDOVAL-BUSHUR:
18        Q.      This is Joe Sandoval-Bushur
19   for YouTube and Google.  I have just a
20   couple of questions.
21             Hello, Dr. Zahir.  Thank you
22   very much for your time today.  You said in
23   response to questions just a few minutes
24   ago that you believe that you posted videos
25   to YouTube relating to your coaching of

Page 338

```
 1   track and field; is that correct?
 2                 MR. RIVERA:  Objection to
 3            form.  You can answer.
 4                 THE WITNESS:  It may have been
 5            a posting at a track meet or track
 6            practice, maybe.
 7   BY MR. SANDOVAL-BUSHUR:
 8        Q.       And those videos would
 9   relate to your role as a coach of high
10   school track and field; is that correct?
11        A.       I'm not --
12                 MR. RIVERA:  Object to form.
13                 THE WITNESS:  I'm not sure of
14            the exact video.  I'm just speaking
15            what could possibly be there.
16   BY MR. SANDOVAL-BUSHUR:
17        Q.       Have you ever coached track
18   and field at any level other than at K-12
19   level?
20                 MR. RIVERA:  Object to form.
21                 THE WITNESS:  Yes.
22   BY MR. SANDOVAL-BUSHUR:
23        Q.       Did your -- the videos that
24   you're thinking you may have posted to
25   YouTube relate to your coaching of track at
```

CONFIDENTIAL

Page 339

1    a K to 12 level or at some different level?

2                    MR. RIVERA:  Objection to

3              form.

4                    THE WITNESS:  I'm not sure.

5              That is why I don't -- I would have

6              to see the video.  I'm certain that

7              I didn't post any track videos on

8              YouTube within the last seven,

9              eight -- I mean, after 2015, I

10             don't think I did.

11   BY MR. SANDOVAL-BUSHUR:

12         Q.       In addition to posting

13   videos on YouTube, do you also watch videos

14   on YouTube?

15                   MR. RIVERA:  Objection to

16             form.  Asked and answered.

17                   THE WITNESS:  Yes.

18   BY MR. SANDOVAL-BUSHUR:

19         Q.       What types of videos do you

20   watch on YouTube?

21                   MR. RIVERA:  Objection to

22             form, vague.

23                   THE WITNESS:  I don't know how

24             to answer that question.

25

```
                                        Page 340
 1   BY MR. SANDOVAL-BUSHUR:
 2         Q.       Do you watch educational
 3   videos on YouTube?
 4                  MR. RIVERA:  Objection to
 5           form.
 6                  THE WITNESS:  I don't know how
 7           to answer that question.  What do
 8           you mean?
 9   BY MR. SANDOVAL-BUSHUR:
10         Q.       Do you watch videos on
11   YouTube relating to the news or current
12   events?
13                  MR. RIVERA:  Objection to
14           form.
15                  THE WITNESS:  Sometimes, yes.
16   BY MR. SANDOVAL-BUSHUR:
17         Q.       Do you watch how-to videos
18   on YouTube, such as videos about how to
19   repair something or do some sort of task?
20                  MR. RIVERA:  Objection to
21           form.
22                  THE WITNESS:  Yes, but there
23           are also videos that I don't go
24           looking for that pop up that I may
25           watch also.
```

CONFIDENTIAL

Page 341

1   BY MR. SANDOVAL-BUSHUR:

2         Q.        What do you mean when you

3   say that?

4         A.        The way it's designed, if

5   I'm watching one video, if I scroll up, I

6   don't get to choose what that next video

7   that's coming after it.  So it may be

8   something that I didn't think about

9   watching, but it's there.

10        Q.        And do you ever enjoy

11  watching those videos that pop up in that

12  way?

13               MR. RIVERA:  Objection to

14        form.

15               THE WITNESS:  Sometimes I do

16        and then sometimes I can be

17        disturbed by some of it and I'll

18        quickly change it.  But if you

19        watch it, then even if I'm three

20        seconds, five seconds in, then that

21        might cause another video similar

22        to that to pop up also.

23               MR. SANDOVAL-BUSHUR:  I have

24        no further questions.  Thank you.

25               MR. KARP:  Anyone else on Zoom

Page 342

1          have questions?
2               THE WITNESS:  There are more
3          people out there?
4               MR. PRICE:  Nothing from
5          TikTok, thanks.
6               MR. KARP:  Do you have any
7          questions, Carlos?
8               MR. RIVERA:  I will have some
9          questions.  Let's take a short
10          break and we'll come back and get
11          this wrapped up.
12               MR. KARP:  Sounds good.
13               THE VIDEOGRAPHER:  The time
14          right now is 5:37 p.m. and we're
15          off the record.
16                    - - - - -
17     (A recess was taken at this time.)
18                    - - - - -
19               THE VIDEOGRAPHER:  The time
20          right now is 5:43 p.m.  We're back
21          on the record.
22  BY MR. RIVERA:
23       Q.     Good afternoon, Dr. Zahir.
24  My name is Carlos Rivera.  I'm with Seeger
25  Weiss and we represent the school district

CONFIDENTIAL

```
                                            Page 343
 1   in this litigation.  Thank you very much
 2   for taking your time to be with us here
 3   today.
 4           A.       No problem.
 5           Q.       We spent some time earlier
 6   this morning discussing your résumé and
 7   your background.  Do you remember that line
 8   of questioning from counsel?
 9           A.       Yes.
10           Q.       And you received your
11   doctorate; is that correct?
12           A.       Yes.
13           Q.       And what was that in?
14           A.       Educational leadership.
15           Q.       And prior to that you
16   received a bachelor's degree in psychology,
17   correct?
18           A.       A master's.
19           Q.       Master's in psychology?
20                    MR. KARP:  Object to form.
21                And do we have an understanding
22                that an objection for one is an
23                objection for all?
24                    MR. RIVERA:  Yes.
25                    MR. KARP:  Thanks.
```

CONFIDENTIAL

Page 344

1    BY MR. RIVERA:

2         Q.        As part of your coursework

3    pursuing your master's, did you do any

4    study on developmental psychology?

5                   MR. KARP:  Object to form.

6                   THE WITNESS:  Yes.

7    BY MR. RIVERA:

8         Q.        And what did that entail?

9         A.        We studied the developmental

10   process of human beings from the autonomous

11   phase up to adulthood and some of the

12   common challenges or look fors at each

13   stage level.

14        Q.        Have you used the knowledge

15   gained throughout -- through that

16   coursework in your role as an educator?

17                  MR. KARP:  Object to form.

18                  THE WITNESS:  Yes, it allows

19             me to sometimes formulate an

20             understanding of what an individual

21             may be dealing with.  I know that

22             I'm not a licensed psychologist or

23             practicing therapist, but some of

24             the information that we covered, it

25             sticks with you in this profession.

CONFIDENTIAL

Page 345

1   BY MR. RIVERA:

2         Q.      And how long have you been

3   an educator?

4         A.      Professionally?

5         Q.      Yes.

6         A.      Since 1998, '99.

7         Q.      That's over 25 years of

8   experience, correct?

9         A.      Yes.

10              MR. KARP:  Object to form.

11              THE WITNESS:  Yes.

12  BY MR. RIVERA:

13        Q.      And how long have you been

14  an administrator within Irvington School

15  District?

16        A.      This is my third year.

17        Q.      In those 25 years as an

18  educator, including the years as an

19  administrator, have you regularly observed

20  and interacted with students?

21              MR. KARP:  Object to form.

22              THE WITNESS:  Every day.

23  BY MR. RIVERA:

24        Q.      And in your role as an

25  administrator, have you continued to

Page 346

1   regularly observe, monitor, and interact
2   with your students?
3              MR. KARP:  Object to form.
4              THE WITNESS:  Yes, whether I'm
5          an administrator or not, in this
6          profession, your interactions are
7          things that come with the job.
8          It's -- it's ironically and I'm --
9          I guess this is like a revelation,
10          me saying this, but, ironically,
11          it's one of the reasons why I
12          didn't pursue therapy because of
13          this thing called transference of
14          emotion.  During my years in
15          graduate school and during the
16          practicum hours, prior to the
17          5,000, we would do therapy.  We
18          would -- like, I was located at the
19          Family Service Bureau in Newark and
20          the impact, sitting in front of
21          someone and having them talk to
22          you, there's this thing called
23          transference of emotion that you
24          would then take home and you didn't
25          have the proper way to get rid of

CONFIDENTIAL

Page 347

1          that or flush, it would affect it.
2          So the irony is I walked away from
3          therapy because I did not like how
4          that felt.
5               But when I came into
6          education, it -- the
7          interactions, it may have been
8          threefold, fivefold at times, you
9          know, and I learned to deal with
10         it, I learned to deal with it,
11         but it's definitely, you know,
12         the interactions are, they're a
13         huge part of the job.
14    BY MR. RIVERA:
15         Q.       In your role as an
16    administrator within Irvington School
17    District, have you observed the students'
18    use of social media?
19                    MR. KARP:  Object to form.
20                    THE WITNESS:  So observing
21         them use it would be -- it's hard
22         to see them doing it unless I walk
23         up on them when they're using their
24         phone and not supposed to or if
25         they're in the cafeteria and

CONFIDENTIAL

Page 348

```
 1              they're not supposed to be on
 2              social media, I've seen the results
 3              of them using it.  So I think
 4              that's a difference in what you're
 5              asking me.  In realtime, that's not
 6              a common thing to see, but the
 7              aftermath or the results of them
 8              using social media, yes.
 9  BY MR. RIVERA:
10       Q.      How do you describe that
11  aftermath?
12       A.      Well --
13              MR. KARP:  Object to form.
14              THE WITNESS:  Well, almost all
15              of our discipline issues are
16              affected by social media one way or
17              the other.
18              For example, it could be
19              something as simple as a kid is
20              in class, a kid doesn't pass a
21              test or a kid does something in
22              the class and the teacher says
23              something to the kid and the kids
24              laugh, right, or whatever the
25              case may be.
```

Page 349

1           There are times when someone
2       would then go on social media and
3       talk about this kid and then all
4       the kids are now invited into a
5       group chat and then they start
6       laughing at what happened in the
7       classroom.  And then the kid
8       hears about it, and there's a
9       fight.  And I'll get the report
10      that there's a fight because they
11      were laughing at me about
12      something that happened in
13      school.  I mean, that's a mild
14      case.
15           You know, there are
16      situations where a kid was dared
17      to walk into the brook behind the
18      school without his clothes.  They
19      said, I dare you to take your
20      clothes off and go into the
21      brook.  This is not during school
22      time.  And for $10, the kid took
23      the dare.  What he did not know
24      was when he took his clothes off,
25      they recorded him.  So now when

CONFIDENTIAL

Page 350

```
 1                he comes out of the brook to get
 2                his clothes, they take his
 3                clothes and run and they have a
 4                video of this kid running down
 5                Chancellor Avenue naked and they
 6                posted it.  So now this kid
 7                doesn't want to come to school.
 8                Their parents are disgusted,
 9                whatever, you know what I'm
10                saying, and now we get the
11                blowback of something that was
12                posted and then the comments that
13                flooded the post affect the
14                child.
15   BY MR. RIVERA:
16        Q.      As an administrator, do you
17   have an understanding of what motivates
18   your students to post to social media?
19                MR. KARP:  Object to form.
20                THE WITNESS:  I believe I do.
21                I may not know all the motivations,
22                but I know some of them.  It's at
23                times, it's -- it could be
24                considered a popularity thing.  You
25                know, there's a reward to be the
```

CONFIDENTIAL

Page 351

1          first to post, right?  It's like
2          eyewitness news, the first news van
3          that shows up to an event, there's
4          this thing where I posted it, come
5          on my page, bring traffic to my
6          page to see what happened.
7                Sometimes it's just to be
8          able to say that you were there,
9          you know, you are sharing an
10         experience, although it might be
11         someone's downfall, it makes you
12         popular.
13               You may want social media
14         notoriety.  You may want to
15         increase your friends.  You may
16         just want to do it because of the
17         likes, you know, it's -- there's
18         a drive there to be -- to get
19         approval or to be popular or to
20         be known.
21               Or sometimes to just really
22         hurt someone, because they don't
23         like the person and they want to
24         do something to hurt the kid.
25

CONFIDENTIAL

Page 352

1  BY MR. RIVERA:

2          Q.      When you say sometimes that

3  they just do it for the likes, what do you

4  mean by that?

5          A.      Well, on social media, they

6  have -- some social medias have, like, a

7  like button or a heart, you know, and you

8  click the heart that means you like it, or

9  I think on Facebook there's, like, a thumbs

10  up if you like it.

11          Q.      In your role as an

12  administrator within Irvington School

13  District, have you observed that your

14  students' use of social media has had a

15  negative impact on their life?

16                  MR. KARP:  Object to form.

17                  THE WITNESS:  It does, but

18              it's not in the way that someone

19              who is not in education might see

20              on the surface, right?  Because if

21              you say social media is causing

22              this kid not to do math, it's not

23              that point to point.  It's

24              something on social media is

25              causing this kid to not be able to

Page 353

```
 1          focus in school, because they may
 2          have been ridiculed.  They may be
 3          embarrassed.  They may not be able
 4          to sit in the classroom knowing
 5          that everyone is talking about
 6          them.
 7               I can give you an example,
 8          when I was in East Orange, there
 9          was an individual -- and this is
10          terrible, right, so I just want
11          to be mindful that there are some
12          things I'm probably not going to
13          mention, because I think it's
14          disgusting whether this camera is
15          on or not.  There some things
16          that are just disgusting.  This
17          one is disgusting, but I need to
18          give you an example.  There was a
19          kid who had a sexual encounter
20          with a young lady and for
21          whatever reason, he decided to,
22          in class, AirDrop the video of
23          her doing things to him.  And the
24          teacher described it as there
25          were just, like, alarms, boop,
```

Page 354

```
 1          boop, boop, boop, and then
 2          everyone is now watching this
 3          video.  And then someone who he
 4          AirDropped it to posted it.  I
 5          don't know how a young lady
 6          recovers from that, right?  Like,
 7          I don't know how she recovers
 8          from something like that.  And
 9          his rhyme or reason for wanting
10          to do it was to hurt her, but
11          then the rhyme or reason for the
12          person who decided to post it,
13          why are we sharing this outside
14          of the school, let alone sharing
15          it, period.  There's a place to
16          share it, and they share it, and
17          then people flood to it.  And
18          then once it's there, people can
19          take screen records and they can
20          do whatever they want.  They can
21          audit it -- they can edit it,
22          throw music behind it.  But these
23          are just -- it's just an example
24          of me seeing how that affected
25          that student and how does that
```

Page 355

```
 1              student become whole and return
 2              to school and focus on learning?
 3  BY MR. RIVERA:
 4         Q.        Have the effects of social
 5  media use by your students had a negative
 6  impact on the overall learning environment
 7  in your school?
 8                   MR. KARP:  Object to form.
 9                   THE WITNESS:  Once again, yes,
10              because it could turn your day
11              upside down.  See, when you ask
12              this question, the mistake is that
13              you look at it from a point to
14              point, right.  You can't say does
15              fire make things hot?  Yes, it
16              heats it up, right?  But when you
17              say something, how did the social
18              media affect the learning, the
19              potential to learn or how kids
20              learn in a school day, you may not
21              see the point to point, because the
22              kids aren't supposed to be on their
23              phones in school.  So if they're
24              not on their phones in school, how
25              is that stopping them?  It's
```

Page 356

```
1              because what happens outside the
2              school, what happens before school,
3              what happens after school can turn
4              the school into a water cooler, the
5              most negative water cooler you can
6              think of, because now everybody is
7              here and then it turns into a
8              fight.  It turns into a mob of kids
9              who want to run down the hall to
10             watch the fight.  How does a
11             teacher now stop that, get the kids
12             back into their seats, and get them
13             to now focus?
14                  Like, these are the type of
15             things that happen and it's
16             because of something that they
17             saw, read, posted, or commented,
18             not even during the school day.
19    BY MR. RIVERA:
20         Q.      Have those occurrences
21    impacted your or your other administrators
22    in your building's ability to do your --
23    your job as described in your job
24    description?
25                  MR. KARP:  Object to form.
```

Page 357

1          THE WITNESS:  On a daily

2          basis.

3  BY MR. RIVERA:

4          Q.      In what way?

5          A.      I can give you yesterday.

6  Something as simple as yesterday, I had to

7  do my third round observations and I needed

8  to get as many of them done as possible

9  before I'm out, and my schedule was to try

10  and knock out as many as possible, but

11  because of a situation involving social

12  media, I had to now do conflict resolution.

13          A young lady made a comment

14  about another young lady's hair.  The young

15  lady who heard the comment decided to be

16  messy and then go in the group chat and

17  post this comment about the girl's hair.

18  The kids who read it in the group chat said

19  in the group chat that they were going to

20  beat her up.  That same young lady went

21  back and told the girl, you need to be

22  careful, because I heard they want to fight

23  you.  So now that girl who made the

24  original comment about the girl is now

25  telling her friends that they're trying to

CONFIDENTIAL

Page 358

1    jump her after school.  So then it becomes

2    this plan to meet up in the locker room to

3    fight and I get wind of it, so now I have

4    to stop what I'm doing to address it to

5    avoid a fight and this is something that

6    happens on a daily basis.

7           Q.       You mentioned -- I'm sorry.

8    All right.  You mentioned they were being

9    messy in the group chat, on a post in the

10   group chat, is that a group chat on

11   Instagram?

12                   MR. KARP:  Object to form,

13           leading.

14                   THE WITNESS:  This particular

15           group chat was Instagram, this

16           particular one.  Being messy is

17           they intentionally stir up

18           problems.  They'll be a group chat

19           call, right, where they may do,

20           like, a video call, I'm not sure

21           which platform this is, but they'll

22           do a video call and while they're

23           talking about an individual,

24           someone will tag the girl that's

25           being talked about and then she

CONFIDENTIAL

Page 359

1              joins the call, not knowing what
2              she's walking into, and then it
3              becomes, well, she's here right
4              now, say it to her face and powder
5              keg.
6      BY MR. RIVERA:
7              Q.      Those chat features and
8      video features that you just described,
9      have they impacted your students'
10     interactions with their learning
11     environment?
12                  MR. KARP:  Object to form.
13                  THE WITNESS:  Yes, and once
14             again, it's because if the
15             intention is for kids to come to
16             school and be in an environment
17             where they are safe to learn and
18             you create a safe environment here,
19             but you now have to ward off the
20             results of what happened away from
21             here, you now have to alter what
22             your intention is here to keep them
23             safe here.  And it has a direct
24             effect on them.
25

Page 360

1    BY MR. RIVERA:

2         Q.       How many times have you as

3    the principal of Union Avenue Middle School

4    addressed disciplinary issues that relate

5    to social media?

6                   MR. KARP:  Object to form.

7                   THE WITNESS:  Too many to

8              count.  I would say, I mean not

9              to -- my running joke is social

10             media is the high fructose corn

11             syrup of all problems in school.

12             It's in everything.  At some point,

13             it either starts on social media,

14             happens before and then is

15             mentioned on social media, starts,

16             happens, and then it's posted on

17             social media.  But one way or

18             another, it finds its way onto a

19             platform where everyone who is not

20             there can now witness it.  And it

21             becomes a huge, huge problem.

22                  Last week, we had a young

23             man -- we had a kid who wanted to

24             fight another kid.  So I'll give

25             you an example of how it didn't

Page 361

1          start on social media.  We had a
2          kid who wanted to fight another
3          kid because of something he was
4          told was said about his dead
5          brother.  Whether the kid
6          actually said it or not is not
7          even the point.  He heard that
8          someone said something about his
9          dead brother.  He wanted to
10         confront the kid.  The long walk
11         home, he's constantly trying to
12         fight this kid.  The kid is being
13         shielded by a couple of other
14         young ladies who are older than
15         them.  These kids are sixth
16         graders, the girls are eighth
17         graders and they're saying, no,
18         we're not letting you fight.
19         They go all the way up Chancellor
20         Avenue with the kid trying to
21         fight the other kid.  They
22         prevent them from fighting, but
23         the kid who wanted to fight them
24         got on his phone and called some
25         of his friends, who he say are

Page 362

1          gang members, I can't say they
2          are or not.  So then the other
3          kid got on the phone and called
4          some of his friends.  Now, some
5          kids pull up on a bike and the
6          kid who was the aggressor now has
7          to contend with those three guys
8          on a bike.  They rob them.  And,
9          mind you, all this is happening
10         on the street.  The kid who gets
11         robbed goes on Instagram and he
12         posts a video of a gun and says
13         to the kid who called them, your
14         words and those girls won't save
15         you.  And then he comes to school
16         the next day.  So now, all the
17         kids saw the post on Instagram of
18         him saying that his words and
19         those girls won't save him and
20         the picture of -- and a little
21         video of a gun, now my building
22         is in an uproar because kids are
23         now calling their parents and
24         running down to the office saying
25         that this individual says he's

CONFIDENTIAL

Page 363

1              going to shoot up the school.
2              And we're testing.  We're in the
3              midst of NJSLA testing and I have
4              to worry about how I deal with
5              this and not blow the test
6              scores, because then that's going
7              to be on our school report card
8              next year.
9    BY MR. RIVERA:
10        Q.      Is that uproar you just
11   described conducive to a good testing
12   environment for your students?
13              MR. KARP:  Object to form.
14              THE WITNESS:  No.  No, it's
15        not.
16   BY MR. RIVERA:
17        Q.      Earlier you were asked some
18   questions relating to chronic absenteeism.
19   Do you remember --
20        A.      Yes.
21        Q.      -- that line of questioning?
22        A.      Yes.
23        Q.      In your experience, have you
24   observed social media to play any role in
25   the issue of chronic absenteeism?

Page 364

```
 1           MR. KARP:  Object to form.
 2           THE WITNESS:  So the issue,
 3      the issue with chronic absenteeism
 4      is chronic absenteeism is a term
 5      that's given to percentage of days
 6      absent based on days offered to
 7      attend.
 8           So answering that question
 9      about chronic absenteeism is
10      really -- it's not a question you
11      can answer that way, but does
12      social media have an effect on
13      kids being absent, yes.  The
14      difference is clear.  If a kid is
15      here in September, right, if a
16      kid misses more than one day in
17      September, that kid is
18      chronically absent.  But if in
19      October, that kid misses no days,
20      that kid is no longer chronically
21      absent.  You are afforded
22      10 percent of the school year
23      before you're considered
24      chronically absent.
25           So the struggle with that is
```

CONFIDENTIAL

Page 365

1      it's not about chronic
2      absenteeism, it's about
3      absenteeism or school avoidance.
4      And kids avoid school when they
5      feel that if they come here,
6      they're going to be ridiculed
7      because of something that someone
8      posted.
9            We had a situation last --
10     two weeks ago where a girl is
11     dating the ex-boyfriend of
12     another girl and she decided to
13     share her love and put his face
14     on her screensaver.  And kids saw
15     the face of this kid on her
16     screensaver.  Word got back to
17     the other girl that this girl is
18     walking around with her
19     ex-boyfriend's face on a
20     screensaver.  Her and her sister
21     jumped this girl on a corner.
22     Thank God the security guards got
23     there in time, they bring her
24     back in the building bleeding,
25     and what do I see by the end of

Page 366

1           the night, the video.
2                So now this girl doesn't
3           want to come to school.  What do
4           you say to your kid when, one,
5           you see a video of your child
6           being demolished, bleeding, and
7           then your kid doesn't want to go
8           to school.  Do you say, well, no,
9           you're going to school and face
10          the music.  You know what, take a
11          couple of days off.  Boop, that
12          kid is on the chronic absenteeism
13          list now.  That kid is now on the
14          school avoidance list, but it's
15          not because the kid is sick.
16          It's not because the kid doesn't
17          want to come to school.  It's not
18          because the kid doesn't value
19          education.  It's because the kid
20          can't just come to school and be
21          a student.  The kid now has to
22          face the ridicule of not being
23          strong enough to fight two girls
24          at once.
25

Page 367

1   BY MR. RIVERA:

2           Q.       And when you say you saw a

3   video, was that on social media?

4           A.       Yes.

5           Q.       Where?

6           A.       Instagram.

7           Q.       Dr. Zahir, I want to shift

8   gears a little bit to a document we were

9   looking at earlier today.  It was marked as

10  Exhibit 3 to the deposition, the parent

11  teacher and handbook.  Can you get that in

12  front of you?

13                   MR. KARP:  Let me get my copy.

14           Oh, sorry, I have a copy of it.

15           Thank you.

16  BY MR. RIVERA:

17          Q.       I just want to orient you to

18  page 10 of the document.  Do you recall

19  being asked some questions about this

20  section on the bottom half of the page

21  related to guidance?

22          A.       Yes.

23          Q.       What is your understanding

24  of how your guidance counselors address the

25  issues of social media with students?

CONFIDENTIAL

Page 368

1                MR. KARP:  Object to form.
2                THE WITNESS:  My guidance
3        counselors -- my guidance
4        counselors are charged with the
5        responsibility of providing
6        auxiliary support to students
7        outside of mainstream instruction
8        and a lot of times what affects the
9        students are bullying, lack of
10       school spirit, academic challenges,
11       things of that nature, and,
12       naturally, social media.
13               My guidance counselors
14       throughout the year, more often
15       than not, have to have
16       conversations with students about
17       how to avoid problems on social
18       media, how to -- how to
19       effectively use social media.
20       How to not use social media.  How
21       to not get pulled into problems.
22       Because my guidance counselors, a
23       lot of times, are resources for
24       me when there are problems in the
25       building that I can't get to it

CONFIDENTIAL

Page 369

1    or my building disciplinarian
2    can't get to it, I may send a kid
3    to guidance.  And the guidance
4    counselor sometimes may have a
5    roundtable with kids and talk
6    about what happened and their
7    actions and why they shouldn't
8    use social media this way, why
9    they shouldn't be on it for this
10   reason or that reason.
11        We provide lessons, and I
12   say the word, "lessons," simply
13   because if I provide instruction
14   and then I can assess your
15   understanding of the instruction,
16   that constitutes as a lesson,
17   whether it's formal or informal.
18        I just had a situation with
19   a guidance counselor and myself
20   where we had to educate these
21   girls on how to not -- or the
22   pitfalls of social media.  And
23   what not to post and what not to
24   respond to and if someone says
25   your name doesn't mean you have

CONFIDENTIAL

Page 370

1          to now put a comment or request

2          to say something.

3                  So, my guidance counselors,

4          I mean they do the yeoman's job

5          of guiding the students to help

6          them avoid or deal with or even

7          process.

8                  We've got a young lady right

9          now who is pregnant.  This is how

10         important my guidance counselors

11         are in this matter.  We've got a

12         young lady who is pregnant.  I

13         actually have two.  Some kid

14         decided to go on social media and

15         talk about this girl who is

16         pregnant.  She's 12 and you're

17         posting pregnant pictures or

18         making comments and all types of

19         ignorance.  And the young lady

20         needs someone to talk to.

21                 My guidance counselors meet

22         with this young lady, allow the

23         young lady to have lunch with

24         her, to avoid going into the

25         cafeteria, to avoid going into

Page 371

1              the classroom.  Sometimes, we
2              have kids in the side room over
3              there where we bring Chromebooks
4              out and say just do your work
5              down here.  We know you're
6              dealing with something, we don't
7              want you to go back into the
8              classroom right now.
9                   So it's, you know, this -- a
10             lot of this really troubles me,
11             because I think that sometimes
12             we're having a conversation about
13             something that to me is so
14             obvious.  It's so obviously a
15             problem that to sit here and
16             attempt to debate or discuss that
17             is not -- I think is
18             irresponsible.  I just think it's
19             irresponsible.
20   BY MR. RIVERA:
21        Q.      In your role as an
22   administrator, have you -- have you seen
23   that the ability to comment on posts has
24   exacerbated instances of bullying or
25   harassment in your school?

CONFIDENTIAL

Page 372

1          MR. KARP:  Object to form.
2          THE WITNESS:  Yes.
3          MR. KARP:  Sorry, object to
4      form, leading, and numerous other
5      grounds.
6          THE WITNESS:  Yes.  And I
7      learned a long time ago that when
8      there's a problem if you look at
9      the problem like a fire, you have
10     three options.  You can assess the
11     fire, let it burn out on its own.
12     You can throw water on it, put it
13     out right away, or you can put gas
14     on it and make it worse.  The
15     comment is the gasoline.  Even if
16     the comment is a positive one
17     saying, hey, everybody, I don't
18     think this is cool that you all are
19     bullying her.  Now the swarm goes
20     to that person.  And when it goes
21     to that person, depending on what
22     that person's profile picture looks
23     like or who they are, people go on,
24     they click on their profile.  They
25     screenshot their profile.  They put

CONFIDENTIAL

Page 373

```
 1            messages, nasty, little wicked
 2            comments about them and they flood
 3            the timeline or that thread with
 4            nasty comments about the person who
 5            was trying to do the right thing.
 6            And that just allows -- it allows
 7            this moment, this content to now
 8            live.
 9                 And then in some cases, you
10            have anniversaries, which is
11            wicked.  Imagine two years ago,
12            there was a post put up about
13            someone, on Facebook, it might
14            say hey, two years ago.  And
15            it's, like, why are you
16            regurgitating this.  Because it
17            was so much traffic at the time,
18            it was one of your hottest posts.
19            It was one of your most volatile
20            posts.  You had 450 comments or
21            450 likes.  I don't -- I don't
22            understand the nature of this
23            debate.
24   BY MR. RIVERA:
25            Q.     Has the ability for students
```

Page 374

```
 1   to tag other students in the comments made
 2   these situations of harassment worse?
 3                MR. KARP:  Object to form.
 4                THE WITNESS:  Yes, you can add
 5          your two cents with your thumbs.
 6          You don't even have to be there.
 7                There have been -- there
 8          have been -- I'm trying to find
 9          the social term, you know how
10          something happens and then
11          there's a new term that now
12          everyone says, right?  Like,
13          woke, right, now woke is a thing.
14          Or I remember back in the day, if
15          something was fat, that means it
16          was dope.  And if it means it was
17          dope, that means it was good,
18          right?
19                Sharkeisha is a thing,
20          because some girl named
21          Sharkeisha on social media beat
22          the brakes off some other girl.
23          And the girl, her friends say,
24          Sharkeisha know.  Do you know now
25          that when kids fight, the people
```

Page 375

```
 1              watch and go, Sharkeisha know.
 2              Where did they learn that from?
 3              Social media.
 4   BY MR. RIVERA:
 5         Q.      Have you observed your
 6   students' use of social media to have a
 7   negative impact on your students' mental
 8   health?
 9              MR. KARP:  Object to form.
10              THE WITNESS:  I'm funny about
11              the mental health term.  I want to
12              be clear that I will never assume
13              to be a mental health expert.  So
14              there are a million things that may
15              affect you, but I listen to what
16              you say.  When you tell me that
17              this is affecting your mental
18              health, I take you for your word.
19              So to answer the question is yes,
20              because the kids say it.
21                 Remember, this is a
22              generation of kids that don't
23              mind telling you that something
24              is affecting their mental health.
25              They have been trained to
```

CONFIDENTIAL

Page 376

1           express, I need a mental break,
2           like, kids will say that, I need
3           a recovery day.  I need a mental
4           health day.  We didn't have
5           mental health days growing up.
6           These kids will say, I need a
7           mental health day.
8                So when they come to me and
9           say I can't -- Dr. Zahir, I can't
10          focus or they're crying
11          because -- when a girl is scared
12          to come to school because she got
13          black girl hair, right?  She got
14          black girl hair.  I'm talking
15          thick, beautiful hair, and it
16          just don't style the way they
17          show on the videos.  Or it's not
18          long enough if she shakes her
19          head, it waves in the wind.  And
20          the kids comment about her hair
21          or the kid will take a picture of
22          her walking home after school and
23          then edit the picture and post
24          it.
25                This girl don't want to come

CONFIDENTIAL

Page 377

```
 1              to school.  And we have a no hats
 2              policy.  We have a no hood
 3              policy.  So what do you tell this
 4              girl when she's walking around,
 5              creeping around the corners with
 6              a scarf on or with a hood on and
 7              when you get to the root of it,
 8              it's because some kid took a
 9              picture of her and posted it and
10              was laughing and taunting her
11              hair.  And she's not even in the
12              group chat.  She doesn't even
13              know why they're doing that to
14              her.  So when that girl says, I
15              can't, I don't want to be here,
16              it affects the mental health.
17   BY MR. RIVERA:
18         Q.      I just want to go over my
19   notes.  I think I might have reached the
20   end of my questions, so just give me a
21   couple of minutes here.
22              THE VIDEOGRAPHER:  The time
23              right now is --
24              MR. KARP:  Oh, sorry, we're
25              still on the record, right?
```

Page 378

1              MR. RIVERA:  Yeah.

2              THE VIDEOGRAPHER:  Oh, I'm

3         sorry.

4              MR. RIVERA:  All right.  Dr.

5         Zahir, I don't have any additional

6         questions for you.  Thank you very

7         much for your time today.

8              MR. KARP:  We may have some

9         additional questions.  I'm going to

10         take a brief break.

11              THE VIDEOGRAPHER:  The time

12         right now is 6:18 p.m.  We are off

13         the record.

14              - - - - -

15     (A recess was taken at this time.)

16              - - - - -

17              THE VIDEOGRAPHER:  The time

18         right now is 6:28 p.m.  We're back

19         on the record.

20  BY MR. KARP:

21         Q.      Dr. Zahir, welcome back, I

22  just want to follow up on some of the

23  questions that were asked by your counsel.

24         A.      Sure.

25         Q.      You discussed with your

CONFIDENTIAL

Page 379

1    counsel the -- that there was an effect
2    that social media has had on the learning
3    environment at Irvington Public Schools?
4            A.      Yes.
5            Q.      What studies would you point
6    to or are you relying on for the fact that
7    social media has had an effect on the
8    learning environment at Irvington Public
9    Schools?
10                    MR. RIVERA:  Objection to
11            form.
12                    THE WITNESS:  What studies am
13            I referring to?
14                    MR. KARP:  Yes.
15                    THE WITNESS:  I'm living it.
16    BY MR. KARP:
17            Q.      Are you relying on any
18    studies or literature that links social
19    media to the learning environment?
20                    MR. RIVERA:  Objection to
21            form.
22                    THE WITNESS:  With all due
23            respect, who is the expert on
24            gorillas, the gorilla or the person
25            who studies gorillas?

Page 380

1    BY MR. KARP:

2          Q.        And with all due respect, I

3    am asking you questions and if you want to

4    get into this with your counsel, you may.

5                MS. SCULLION:  Wait, I'm

6                sorry, was the witness done his --

7                finished with his answer?

8                MR. KARP:  Please don't -- are

9                you defending this deposition?

10               MS. SCULLION:  I apologize.

11               MR. KARP:  Thank you.

12               MS. SCULLION:  Mr. Rivera can

13               handle it.

14               MR. RIVERA:  He was in the

15               middle of a response, if you allow

16               him to complete his response.

17               MR. KARP:  Sure.

18               THE WITNESS:  And I say that

19               respectfully, because my answer to

20               the question was, I'm living this.

21               Someone would have -- someone needs

22               to study us to see what we deal

23               with every day.  I don't need to

24               study what I live.  So, no, I don't

25               rely on a study to give meaning and

CONFIDENTIAL

```
 1              understanding and -- or meaning and
 2              understanding the effects of what I
 3              live and see.
 4    BY MR. KARP:
 5         Q.       Fair to say that you're not
 6    relying on any studies for your testimony
 7    that social media has had a negative impact
 8    on the learning environment at Irvington
 9    Public Schools?
10                   MR. RIVERA:  Object to form.
11                   THE WITNESS:  I don't
12              understand the question, sir.
13    BY MR. KARP:
14         Q.       Can you point me to any
15    studies or any literature that show a
16    negative effect of social media on the
17    learning environment at Irvington Public
18    Schools?
19                   MR. RIVERA:  Objection to
20              form.  Asked and answered.
21                   THE WITNESS:  This is a
22              natural phenomenon that needs to be
23              studied.
24    BY MR. KARP:
25         Q.       But you have not conducted
```

CONFIDENTIAL

Page 382

1   that study?

2                    MR. RIVERA:  Objection to

3            form.

4                    THE WITNESS:  I'm living it.

5   BY MR. KARP:

6        Q.        You said that this needs to

7   be studied?

8        A.        It needs to be studied, but

9   my -- my testimony, my life, what I'm

10  dealing with, I'm living it.  I need to

11  study -- to conduct a study on what I'm

12  experiencing?  I don't understand.

13       Q.        You can either point to

14  studies or not.  And is it your testimony

15  that you cannot point to studies linking

16  social media to a negative impact on the

17  learning environment at Irvington Public

18  Schools?

19                    MR. RIVERA:  Objection to

20           form.  Asked and answered a couple

21           of times already.  His answer is

22           his answer.

23                    MR. KARP:  You may answer.

24                    MS. HENRY:  He hasn't answered

25           the question.

CONFIDENTIAL

Page 383

1              MS. SCULLION:  I'm sorry, how
2         many people are taking the
3         deposition?
4              MS. HENRY:  I mean, you spoke
5         on two events.
6              MS. SCULLION:  I was told not
7         to.
8              MR. KARP:  You may answer.
9              MR. RIVERA:  You can repeat
10        your answer.
11             MR. KARP:  Are you coaching
12        the witness?
13             THE WITNESS:  I've answered
14        the question multiple times.  I
15        don't know how to provide another
16        answer than that.
17   BY MR. KARP:
18        Q.     Can you point me to any
19   studies to substantiate that social media
20   has had a negative effect on discipline at
21   Irvington Public Schools?
22             MR. RIVERA:  Objection to
23        form.
24             THE WITNESS:  I am the study.
25

CONFIDENTIAL

```
                                    Page 384
 1   BY MR. KARP:
 2         Q.      Can you point to any studies
 3   or data to substantiate that specific
 4   features on social media platforms have had
 5   a negative impact on the learning
 6   environment at Irvington Public Schools?
 7         A.      Yes.
 8                 MR. RIVERA:  Objection to
 9          form.
10   BY MR. KARP:
11         Q.      What studies can you point
12   to?
13         A.      Myself, my life.
14         Q.      Can you point to any studies
15   or data to support your contention that
16   social media -- that specific features on
17   social media have had a negative effect on
18   discipline at Irvington Public Schools?
19                 MR. RIVERA:  Objection to
20          form.
21                 THE WITNESS:  Yes.
22   BY MR. KARP:
23         Q.      What studies?
24         A.      My life.
25                 MR. RIVERA:  Objection to
```

CONFIDENTIAL

Page 385

1          form.
2                    THE WITNESS:  My experiences.
3    BY MR. KARP:
4          Q.        You testified earlier about
5    the relationship between social media and
6    how kids learn during the school day, do
7    you recall?
8          A.        Yes.
9          Q.        Okay.  Can you point me to
10   any studies or data to support your
11   contention that social media has had a
12   negative impact on how kids learn during
13   the school day?
14                   MR. RIVERA:  Objection to
15          form.
16                   THE WITNESS:  The same study
17          as before.
18   BY MR. KARP:
19         Q.        And that would be?
20         A.        My life, my experiences.
21         Q.        Can you point to any studies
22   or data to substantiate your contention
23   that specific social media features have
24   had a negative impact on how kids learn --
25   how IPS students learn during the school

CONFIDENTIAL

                                        Page 386

1   day?
2              MR. RIVERA:  Objection to
3          form.
4              THE WITNESS:  I don't
5          understand that question.
6   BY MR. KARP:
7       Q.       Can you point to any studies
8   or data to support your contention that
9   specific features of social media platforms
10  have had a negative impact on how kids
11  learn during the school day?
12             MR. RIVERA:  Objection to
13         form.
14             THE WITNESS:  You're phrasing
15         the question as to how they learn,
16         but not can they learn.  Social
17         media gets in the way of them
18         learning.  It doesn't -- I don't
19         understand the connection of how
20         they learn.
21  BY MR. KARP:
22      Q.       Do you have any -- can you
23  point me to any studies or data to support
24  what I understand to be your testimony that
25  specific features of social media platforms

Page 387

1    have a negative effect on how students can

2    learn?

3                    MR. RIVERA:  Objection to

4            form.

5                    THE WITNESS:  I don't

6            understand the logic of your --

7            respectfully, I don't understand

8            the logic of the question.  How a

9            kid learns, you have auditory

10           learners.  You have kinesthetic

11           learners.  These are different ways

12           that kids are predisposed to

13           learning.  That's not addressing

14           them having a fair and safe

15           opportunity to learn.  We're

16           talking about the opportunity to

17           learn, not the manner in which they

18           learn.

19    BY MR. KARP:

20           Q.     Dr. Zahir, in response to

21    questions from your counsel, you mentioned

22    a number of disciplinary incidents, do you

23    recall?

24           A.     Yes.

25           Q.     Okay.  Where would I go to

CONFIDENTIAL

Page 388

1  get the number of disciplinary actions that

2  have been taken with respect to Union

3  Avenue Middle School students that involve

4  social media?

5              MR. RIVERA:  Object to form.

6              THE WITNESS:  So, and I

7         mentioned this earlier, discipline

8         that involves social media is not

9         an identified category where we are

10        instructed to tally.

11  BY MR. KARP:

12      Q.      You could tally it if you

13  wanted to, correct?

14              MR. RIVERA:  Objection, form.

15              THE WITNESS:  If I wanted to

16        tally it, I could.

17  BY MR. KARP:

18      Q.      If you wanted Union Avenue

19  Middle School to track how many

20  disciplinary actions were taken relating to

21  social media, that's something you could

22  do, correct?

23              MR. RIVERA:  Objection to

24        form.

25              THE WITNESS:  If I was

CONFIDENTIAL

Page 389

1           comfortable with a -- bless you --
2           if I was comfortable with being
3           within 5 to 7 percent, I would just
4           go 90 percent of them are.  I
5           would -- I think that I would do a
6           waste -- I would waste a lot of
7           time tallying them, when based on
8           my experience, which is what I'm
9           saying, in almost all of them,
10          something involving social media,
11          somehow it involves social media.
12   BY MR. KARP:
13        Q.     But that's not something
14   that you track?
15               MR. RIVERA:  Objection to
16          form.
17               THE WITNESS:  I've already
18          answered that, sir.
19   BY MR. KARP:
20        Q.     If I wanted to look at the
21   data to show that 90 percent or more of
22   these incidents involve social media in
23   some way, where would I look?
24               MR. RIVERA:  Objection to
25          form.

Page 390

```
 1              THE  WITNESS:   I've already
 2          answered that, sir.
 3  BY MR. KARP:
 4         Q.       Are you done with your
 5  answer?
 6         A.        I'm -- I am clear that
 7  everyone at this table has a job to do.
 8  And I am not trying to complicate anyone's
 9  job.   It's just difficult for me to pretend
10  that I'm not answering your question.   I've
11  answered your question.   We are not
12  instructed to tally that.   If I chose to
13  tally that, I could, and in my professional
14  opinion, it would be a waste of time
15  tallying it unless someone wants that.   For
16  me, I know that as long as I don't mind
17  being 5 to 7 percent off on the exact
18  number, I could estimate with a great,
19  strong hypothesis that 90 percent of them
20  are going to involve social media one way
21  or the other.
22         Q.       You're aware that the school
23  district in this case has alleged that
24  social media has caused a mental health
25  crisis among students, correct?
```

CONFIDENTIAL

Page 391

1          A.          I am, sir.

2                      MR. RIVERA:  Objection to

3              form.

4    BY MR. KARP:

5          Q.          And where did you get that

6    understanding?

7          A.          Say it again.

8          Q.          Where did you get that

9    understanding of the allegations?

10                     MR. RIVERA:  Objection to form

11             to the extent it involves

12             conversations with your attorneys.

13                     MR. KARP:  You can answer the

14             question.

15                     THE WITNESS:  Where did I get

16             the understanding that the school

17             district has alleged, I don't

18             understand.  That's why we're here,

19             correct?

20   BY MR. KARP:

21         Q.          And you're telling me today

22   that over 90 percent of the disciplinary

23   actions that have been taken at Union

24   Avenue Middle School involve social media,

25   correct?

```
                                           Page 392
 1                MR. RIVERA:  Objection to
 2          form.
 3                THE WITNESS:  In one way or
 4          another, as I said, it's either
 5          going to start with something on
 6          social media, it's going to start
 7          without social media and then be
 8          shared on social media, or it's
 9          going to start, then something is
10          going to happen and then that is
11          going to be reported or commented
12          about on social media.  But one way
13          or another, most of all of our
14          discipline problems, major ones,
15          that affect kids wanting to come to
16          school and all these other things,
17          they find their way to social
18          media.
19   BY MR. KARP:
20          Q.     And where is that
21   documented?
22                MR. RIVERA:  Objection to
23          form.
24                THE WITNESS:  I answered that
25          already.
```

CONFIDENTIAL

Page 393

1    BY MR. KARP:

2          Q.        I don't recall that answer.

3    What's the answer to that question?

4          A.        It's in the -- I don't know

5    what that's called, but it's --

6          Q.        Is your answer that it's not

7    documented?

8                    MR. RIVERA:  Objection to

9              form.

10                   THE WITNESS:  I answered, we

11             are not required nor requested to

12             keep track of everything that

13             involves social media.

14                   In the event that a kid

15             records someone and does

16             something with it, and the

17             suspension says, improper use of

18             cell phone, it will say improper

19             use of cell phone, improper use

20             of internet or whatever, those

21             things are the overarching

22             category that that disciplinary

23             action would fall under.

24                   But there are things that

25             happen so often that may not

CONFIDENTIAL

Page 394

```
1              result in a suspension, but they
2              still -- they still are affected
3              or enticed or whatever by social
4              media.
5    BY MR. KARP:
6         Q.        So the school tracks
7    improper use of cell phones --
8              MR. RIVERA:  Objection to
9              form.
10             MR. KARP:   -- as a specific
11             type of disciplinary action?
12             MR. RIVERA:  Objection to
13             form.
14             THE WITNESS:  That is one --
15             MR. RIVERA:  Outside the
16             scope.
17             THE WITNESS:  -- of the
18             categories.  That is one of the
19             drop-down categories, improper use
20             of technology.
21   BY MR. KARP:
22        Q.        And that's where we would
23   look to find incidents relating to social
24   media?
25             MR. RIVERA:  Objection to
```

CONFIDENTIAL

Page 395

1              form.
2                    THE WITNESS:  You can, but
3              that's not where every incident
4              involving social media would be
5              stored, because, again, we are not
6              required nor requested to keep a
7              score of everything involving
8              social media.
9    BY MR. KARP:
10         Q.      Who decides what's in that
11   drop-down menu of different types of
12   disciplinary actions?
13         A.      That's software --
14                 MR. RIVERA:  Objection to
15             form.
16                 THE WITNESS:  That's software
17             based, to my knowledge.
18   BY MR. KARP:
19         Q.      What data or research can
20   you point to that social media contributes
21   to absenteeism or school avoidance?
22                 MR. RIVERA:  Objection to
23             form.
24                 THE WITNESS:  Respectfully, I
25             want to say asked and answered, but

Page 396

```
 1            I know that you asked it slightly
 2            different.  My experiences and the
 3            data that I have witnessed.
 4  BY MR. KARP:
 5       Q.      You would agree with me that
 6  kids have wanted to avoid school because of
 7  fearing ridicule or bullying even before
 8  social media existed?
 9            MR. RIVERA:  Objection to
10            form.
11            THE WITNESS:  Social media
12            makes it worse now.
13  BY MR. KARP:
14       Q.      My question is different.
15  My question is, have students always
16  avoided school for fear of being bullied or
17  ridiculed?
18            MR. RIVERA:  Objection to
19            form.
20            THE WITNESS:  I don't know if
21            kids have always feared to be
22            ridiculed.  I don't know what the
23            times were in the early 1900s --
24  BY MR. KARP:
25       Q.      Before -- I didn't mean to
```

CONFIDENTIAL

```
                                        Page 397
 1   cut you off, sir.
 2          A.      I'm saying I don't know.
 3          Q.      Before social media, did
 4   kids fear coming to school -- or strike
 5   that.
 6                  Before social media, did
 7   kids avoid coming to school because they
 8   were afraid of being bullied or ridiculed?
 9                  MR. RIVERA:  Objection to
10          form, vague, broad.
11                  THE WITNESS:  There's an
12          argument for that, but
13          unfortunately -- well, fortunately,
14          for them back then, they only had
15          to worry about kids at their
16          school.  They didn't have to worry
17          about seeing their face everywhere.
18   BY MR. KARP:
19          Q.      Is that a yes?
20          A.      That was my answer.
21          Q.      Yes?
22                  MR. RIVERA:  Objection to
23          form.  Asked and answered.
24   BY MR. KARP:
25          Q.      Is that a yes, that before
```

CONFIDENTIAL

```
                                    Page 398
 1   social media, kids avoided school for fear
 2   of being bullied or ridiculed?
 3                MR. RIVERA:  Objection to
 4         form.
 5                THE WITNESS:  That's a
 6         possibility.
 7                MR. RIVERA:  Asked and
 8         answered.
 9                THE WITNESS:  That's a
10         possibility.  You're asking me
11         definitively to speak on these
12         hypotheticals where it's possible.
13   BY MR. KARP:
14         Q.     When did you become a
15   teacher?
16         A.     1998 --
17         Q.     Okay.
18         A.     -- '99.
19         Q.     Was there social media in
20   1998?
21         A.     No.
22         Q.     At that point in time, did
23   students avoid coming to school because
24   they were afraid of being bullied or --
25         A.     I can't speak to that, I was
```

CONFIDENTIAL

Page 399

1    a math teacher.  I wasn't in the position
2    of a disciplinarian.
3            Q.      Math teachers don't know if
4    students avoid coming to school for fear of
5    being bullied or ridiculed?
6                    MR. RIVERA:  Objection to
7            form.
8                    THE WITNESS:  I don't think
9            you can make that blanket
10           statement, because a math teacher
11           is not charged to be a counselor, a
12           math teacher may not know.
13   BY MR. KARP:
14           Q.      So is it your testimony that
15   you don't know for any period of time
16   because you've never been a counselor?
17                   MR. RIVERA:  Objection to
18           form.
19                   THE WITNESS:  That's not my
20           testimony.
21   BY MR. KARP:
22           Q.      You've never been a
23   counselor, correct?
24                   MR. RIVERA:  Objection to
25           form.

CONFIDENTIAL

Page 400

```
 1                THE WITNESS:  School
 2          counselor, no.
 3   BY MR. KARP:
 4          Q.      Even before social media,
 5   kids have wanted to be popular, would you
 6   agree?
 7                MR. RIVERA:  Objection to
 8          form.  Outside the scope.
 9                THE STENOGRAPHER:  What was --
10          objection to form, what?
11                MR. RIVERA:  Outside the
12          scope.
13                MR. KARP:  What scope?
14                MR. RIVERA:  Of my line of
15          questioning, which is what you're
16          limited to now.
17                MR. KARP:  He testified about
18          kids wanting to be popular and
19          using social media, it's well
20          within the scope.
21                Do you need me to reask the
22          question?
23                THE WITNESS:  I don't
24          understand how to answer that
25          question.
```

Page 401

1   BY MR. KARP:

2          Q.        You testified earlier in

3   response to some questions from counsel

4   about students posting to social media

5   because they wanted to be popular, do you

6   recall?

7          A.        Yes.

8          Q.        Students wanted to be

9   popular even before social media, correct?

10                   MR. RIVERA:  Objection to

11             form.

12                   THE WITNESS:  I don't

13             understand the -- I don't

14             understand the logic behind the

15             question, like, we're talking about

16             students wanting to be popular,

17             people want to be popular.

18   BY MR. KARP:

19          Q.        That's always been the case

20   even before social media, correct?

21                   MR. RIVERA:  Objection to

22             form.

23                   THE WITNESS:  People wanting

24             to be popular and the means in

25             which they can be popular are two

Page 402

1          different things.  My context to

2          the answer is based upon the

3          vehicle that social media provides

4          for them to become popular, simply

5          by posting other people's pain.

6          I -- I mean, in the forties,

7          somebody wanted to be Judy Garland,

8          like that's -- I don't understand

9          the connectivity with the question.

10   BY MR. KARP:

11          Q.     It's a yes-or-no question,

12   before social media, did students want to

13   be popular?

14              MR. RIVERA:  Objection to

15          form.  Asked and answered.

16              THE WITNESS:  I don't know how

17          to answer that question.

18   BY MR. KARP:

19          Q.     But you are able to answer

20   the question that today students want to be

21   popular because they -- by using social

22   media?

23              MR. RIVERA:  Objection to

24          form.

25              THE WITNESS:  It's evidence,

Page 403

```
 1          it's their desires for attention is
 2          evidenced by what they post and
 3          their explanation for why they post
 4          it.
 5  BY MR. KARP:
 6          Q.       How long have you been
 7  working in education?
 8          A.       I just answered that, 19 --
 9  25, 26 years, I don't know.
10          Q.       And has social media been
11  around for that entire time?
12          A.       No.
13               MR. RIVERA:  Objection to
14          form.
15  BY MR. KARP:
16          Q.       Before social media existed,
17  did you ever observe students doing things
18  because they wanted to be popular?
19               MR. RIVERA:  Objection to
20          form.
21               THE WITNESS:  I can't answer
22          that question.  Before social
23          media, I was a math teacher.
24  BY MR. KARP:
25          Q.       Before social media, did
```

Page 404

1  students congregate around fights to watch
2  them take place?
3              MR. RIVERA:  Objection to
4        form.
5              THE WITNESS:  Yes.
6  BY MR. KARP:
7        Q.    Before social media -- or
8  strike that.
9              Kids got into fights even
10  before social media existed, correct?
11        A.    Yes.
12              MR. RIVERA:  Objection to
13        form.
14  BY MR. KARP:
15        Q.    Fights took place at school
16  even before social media, correct?
17        A.    Are you suggesting that
18  social media doesn't cause fights because
19  they've existed before that?
20        Q.    I'm not suggesting anything.
21  I'm asking a question about whether fights
22  occurred before social media?
23              MR. RIVERA:  Objection to
24        form.
25              THE WITNESS:  I don't

CONFIDENTIAL

Page 405

1              understand the --
2    BY MR. KARP:
3              Q.        Was there -- sorry, I didn't
4    mean to cut you off.
5              A.        And I'm really not trying to
6    be difficult.  I'm not understanding -- you
7    have an opportunity to ask me questions,
8    but you're asking me questions that I don't
9    understand the logical basis behind other
10   than this all happened before social media,
11   so what's the big deal.  And I think that
12   that's -- that's a very dangerous
13   perspective.
14             Q.        You responded to questions
15   from counsel saying that social media has
16   led to fights at Union Avenue Middle
17   School, correct?
18             A.        Yes.
19                  MR. RIVERA:  Objection to
20            form.
21   BY MR. KARP:
22             Q.        And my question is, did
23   fights take place at Union Avenue Middle
24   School even before social media?
25                  MR. RIVERA:  Objection to

CONFIDENTIAL

                                              Page 406

1           form.

2                   THE WITNESS:  I wasn't here at

3           Union Avenue Middle School.

4    BY MR. KARP:

5        Q.      In your experience as an

6    educator, did fights take place at school

7    even before social media?

8        A.      Yes.  I'm confused.

9        Q.      You testified earlier that

10   social media has exacerbated harassment and

11   bullying at Irvington Public Schools,

12   correct?

13                  MR. RIVERA:  Objection to

14           form.  You can answer.

15                  THE WITNESS:  I don't recall

16           if I said it exacerbated it at

17           Irvington Public Schools, as far as

18           social media has made bullying

19           worse in general.

20   BY MR. KARP:

21       Q.      And can you point me to any

22   research or data or studies to support

23   that?

24                  MR. RIVERA:  Objection to

25           form.

CONFIDENTIAL

```
                                        Page 407

 1                THE WITNESS:  Again, there is

 2           no greater research for me to

 3           formulate an opinion than what I

 4           live.

 5   BY MR. KARP:

 6           Q.       Is that a no?

 7                MR. RIVERA:  Objection to

 8           form.

 9                THE WITNESS:  That's my

10           answer, sir.

11   BY MR. KARP:

12           Q.       You mentioned a story

13   earlier -- or strike that.

14                You told us earlier about a

15   student who was bullied because of her

16   hair, do you recall?

17           A.       Yes.

18           Q.       Were students bullied about

19   their hair even before social media?

20                MR. RIVERA:  Objection to

21           form.

22                THE WITNESS:  Not on social

23           media.

24   BY MR. KARP:

25           Q.       But were students bullied?
```

CONFIDENTIAL

Page 408

```
 1          A.         My comment was about a girl
 2    being bullied on social media.
 3          Q.         And have students been
 4    bullied about their appearance even --
 5          A.         Not on social media.
 6          Q.         Please let me finish my
 7    question.
 8          A.         Sorry.
 9          Q.         Before social media, were
10    students bullied for their appearance?
11                     MR. RIVERA:  Objection to
12           form.
13                     THE WITNESS:  My example was
14           about on social media.  I don't
15           understand the nature of the
16           question outside of social media.
17    BY MR. KARP:
18          Q.         With all due respect, you
19    don't understand my question?
20          A.         I don't, I don't understand,
21    I don't understand the line of questioning
22    and maybe it's because of how my mind is
23    wired, I want to provide information that
24    can be useful, not to hinder, but I need to
25    understand, like, we're pushing ten hours
```

Page 409

1    and I'm trying to understand what are we

2    driving at?

3                    This is -- I made an example

4    about a girl being bullied about her hair

5    on social media, because there were people

6    who weren't there when they saw her hair,

7    but because of social media, everybody is

8    now in on a joke.  I don't think you can go

9    back in time and replicate that to justify

10   that social media did not make that

11   situation worse.  That situation would have

12   been worse regardless of social media,

13   because there's nothing that we've ever

14   seen like media and social media, it makes

15   the world smaller.

16                    So I don't know how we come

17   up with false comparisons and the purpose

18   behind the false comparison when how is

19   that fruitful?  I don't understand the

20   question.

21        Q.        With all due respect, Dr.

22   Zahir, you don't need to understand the

23   logic of my questions, I'm simply asking

24   questions and expecting answers.

25                    So my question to you is

CONFIDENTIAL

Page 410

1   before social media, were students bullied

2   because they were different?

3                       MR. RIVERA:  Objection to

4              form.

5                       THE WITNESS:  I don't know

6              how --

7                       MR. RIVERA:  Asked and

8              answered.

9                       THE WITNESS:  -- to answer a

10             question I don't understand.  I

11             don't understand the question.

12   BY MR. KARP:

13        Q.       You don't understand the

14   question, were students bullied for being

15   different before social media existed?

16                       MR. RIVERA:  Objection to

17             form.

18                       THE WITNESS:  I don't

19             understand the logic of the

20             question, so in order for me to

21             provide a logical answer, I don't

22             understand the logic of the

23             question.

24   BY MR. KARP:

25        Q.       Is it your testimony that

CONFIDENTIAL

Page 411

1    students were not bullied for being

2    different or for their physical appearance

3    before social media?

4                    MR. RIVERA:  Objection to

5            form.

6                    THE WITNESS:  That is not my

7            testimony.

8    BY MR. KARP:

9        Q.        Is it your testimony that

10   they were bullied for being different or

11   for their physical appearance before social

12   media?

13       A.        That is not my testimony.

14                  MR. RIVERA:  Objection to

15           form.

16   BY MR. KARP:

17       Q.        You had testified in

18   response to questions from counsel that you

19   studied developmental psychology; is that

20   right?

21       A.        We learned about

22   developmental psychology, yes.

23       Q.        Okay.  Have you ever

24   diagnosed someone with addiction?  Have you

25   ever diagnosed someone with addiction?

CONFIDENTIAL

Page 412

1          A.        I am not a professional.

2                    MR. RIVERA:  Objection to

3              form.

4                    THE WITNESS:  I'm not in a

5              position to formally diagnose

6              anyone.

7     BY MR. KARP:

8          Q.        Have you ever treated

9     someone for addiction?

10                   MR. RIVERA:  Objection to

11             form.

12                   THE WITNESS:  Professionally,

13             no.

14                   MR. KARP:  I believe those are

15             all my questions.  Do you have any?

16                   MR. RIVERA:  I'm good.  No

17             further questions.

18                   MS. SCULLION:  The deposition

19             is complete.

20                   MR. KARP:  Can I just make a

21             brief statement on the record?

22                   MS. SCULLION:  Well, the

23             deposition is complete, so I don't

24             know what we're making a statement

25             about.

CONFIDENTIAL

Page 413

1          MR. KARP:  Not any further

2     questioning, I just wanted to make

3     a record of our position that

4     Irvington is continuing to produce

5     documents in this litigation and

6     there are still some discovery

7     disputes, in particular, about the

8     status of the privilege log.  Our

9     position here is that this

10    deposition is open subject to the

11    additional production of materials

12    that may require needing to ask

13    additional questions.  We don't

14    know if that's going to be the

15    case, but we hope that it's not,

16    but to the extent there are

17    documents we have requested that

18    have not yet been produced, we --

19    our position is that this

20    deposition is still open.

21          MS. SCULLION:  And we disagree

22    with that position and we will be

23    happy to meet and confer about that

24    should the occasion arise.

25          MR. KARP:  Thank you.

Page 414

1          MR. RIVERA:  Could we get the

2     time on the record?

3          THE VIDEOGRAPHER:  So

4     Mr. Andrew Karp was on the record

5     for six hours 17 minutes.

6     Mr. Joseph Sandoval for four

7     minutes, and Mr. Carlos Rivera for

8     35 minutes.  The time right now is

9     6:57 p.m.  We are off the record.

10              - - - - -

11          (Whereupon, the deposition

12     was concluded at 6:57 p.m.)

13              - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 415

1              C E R T I F I C A T I O N

2

3

4          I HEREBY CERTIFY that the proceedings and

5      evidence are contained fully and accurately in the

6      stenographic notes taken by me upon the foregoing

7      matter on May 22, 2025, and that this is a correct

8      transcript of same.

9

10

11

12

13      *Robin L. Clark*

14      _____

15              Robin L. Clark
        Registered Professional Reporter

16

17

18

19

20

21          (The foregoing certification of this

22      transcript does not apply to any reproduction of the

23      same by any means unless under the direct control

24      and/or supervision of the certifying reporter.)

25

CONFIDENTIAL

Page 416

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8              After doing so, please sign the errata

9    sheet and date it.

10             You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13             It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 417

```
 1                    - - - - -
 2                 E  R  R  A  T  A
 3                    - - - - -
 4    PAGE      LINE      CHANGE
 5
      ____      ____      _____
 6
      ____      ____      _____
 7
      ____      ____      _____
 8
      ____      ____      _____
 9
      ____      ____      _____
10
      ____      ____      _____
11
      ____      ____      _____
12
      ____      ____      _____
13
      ____      ____      _____
14
      ____      ____      _____
15
      ____      ____      _____
16
      ____      ____      _____
17
      ____      ____      _____
18
      ____      ____      _____
19
      ____      ____      _____
20
      ____      ____      _____
21
      ____      ____      _____
22
      ____      ____      _____
23
      ____      ____      _____
24
25
```

CONFIDENTIAL

Page 418

1    ACKNOWLEDGMENT OF DEPONENT

2        I, DR. KCYIED ZAHIR, do hereby

3  certify that I have read the foregoing pages

4  and that the same is a correct

5  transcription of the answers given by me to

6  the questions therein propounded, except for

7  the corrections or changes in form or

8  substance, if any, noted in the attached

9  Errata Sheet.

10

11  DATE                    SIGNATURE

12

   Subscribed and sworn to before me this

13

         day of                    ,

14  2025.

15

16  My commission expires:

17

18

19

20  Notary Public

21

22

23

24

25