**Exhibit 6**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

2

                    - - - - -

3

4    IN RE: SOCIAL MEDIA            CASE NO.

5    ADOLESCENT ADDICTION/PERSONAL    4:22-md-03047-YGR

6    INJURY PRODUCTS LIABILITY        MDL No. 3047

7    LITIGATION

8    THIS DOCUMENT RELATES TO:

9    Irvington Public Schools

10          vs.

11   Meta Platforms Inc., et al.

12   Member Case No.: 4:23-cv-01467-YGR

13                  - - - - -

14          Wednesday, May 14, 2025

15      CONFIDENTIAL - ATTORNEYS' EYES ONLY

16            PURSUANT TO PROTECTIVE ORDER

17

18          Videotaped deposition of JOHN AMBERG, held

19   at the offices of the Irvington Board of Education,

20   One University Place, Irvington, New Jersey,

21   commencing at 9:25 a.m., Eastern, on the above date,

22   before Robin L. Clark, Professional Reporter and

23   Notary Public in and for the State of New Jersey.

24

25

```
                                                    Page 2

1    APPEARANCES:
2
             SEEGER WEISS, LLP
3            BY:  JENNIFER SCULLION, ESQ.
             CARLOS F. RIVERA, ESQ.
4            55 Challenger Road, 6th Floor
             Ridgefield Park, New Jersey 07660
5            973-639-9100
             jscullion@seegerweiss.com
6            crivera@seegerweiss.com
                        For the Plaintiffs and
7            Witness
8
             SHOOK, HARDY & BACON, L.L.P.
9            BY:  TERRENCE J. SEXTON, ESQ.
             2555 Grand Boulevard
10           Kansas City, Missouri 64108
             816-474-6550
11           tsexton@shb.com
                        Counsel for Defendants, Meta
12           Platforms, Inc., f/k/a Facebook, Inc.;
             Facebook Holdings, LLC;
13           Facebook Operations, LLC; Facebook
             Payments, Inc.; Facebook Technologies,
14           LLC; Instagram, LLC; and Siculus, Inc.
15
             KIRKLAND & ELLIS LLP
16           BY:  FARAZ SHAHIDPOUR, ESQ.
             333 West Wolf Point Plaza
17           Chicago, Illinois 60654
             312-862-1541
18           faraz.shahidpour@kirkland.com
                        For the Defendant,
19           Snap, Inc.
20
             KIRKLAND & ELLIS LLP
21           BY:  ANDREW KARP, ESQ.
             601 Lexington Avenue
22           New York, New York 10022
             212-341-7593
23           andrew.karp@kirkland.com
                        For the Defendant, Snap,
24           Inc.
25
```

CONFIDENTIAL

Page 3

1    ALSO PRESENT:

2
            DANIEL ORTEGA, VIDEOGRAPHER
3
            MICHAEL FRONZAGLIA, TRIAL TECH
4
            EMMA DeGROFF
5

    REMOTE APPEARANCES:
6

7            CARELLA, BYRNE, CECCHI, BRODY
             & AGNELLO, P.C.
8            BY:  MICHAEL A. INNES, ESQ.
             DAVID GILFILLAN, ESQ.
9            5 Becker Farm Road
             Roseland, New Jersey 07068
10           973-994-1700
             minnes@carellabyrne.com
11           dgilfillan@carellabyrne.com
                        For the Plaintiffs and the
12           Witness
13
             SHOOK, HARDY & BACON, L.L.P.
14           BY:  KATELYN ROMEO, ESQ.
             Two Commerce Square
15           2001 Market Street, Suite 3000
             Philadelphia, Pennsylvania 19103
16           215-278-2555
             kromeo@shb.com
17                      Counsel for Defendants, Meta,
             Platforms, Inc., f/k/a Facebook, Inc.;
18           Facebook Holdings, LLC;
             Facebook Operations, LLC; Facebook
19           Payments, Inc.; Facebook Technologies,
             LLC; Instagram, LLC; and Siculus, Inc.
20

21

22

23

24

25

```
                                              Page 4

 1   REMOTE APPEARANCES, CONTINUED:
 2
                 KING & SPALDING LLP
 3               BY:  ERIN LEE, ESQ.
                 1180 Peachtree Street, N.E., Suite 1600
 4               Atlanta, Georgia 30309
                 404-572-2788
 5               elee@kslaw.com
                         For the Defendants,
 6               TikTok, Ltd.; TikTok, LLC;
                 TikTok, Inc.; ByteDance Ltd.; and
 7               ByteDance Inc.
 8
                 SKADDEN ARPS
 9               BY:  ANNELIESE V. THOMAS, ESQ.
                 320 S. Canal St.
10               Chicago, Illinois 60606
                 312-407-0604
11               anneliese.thomas@skadden.com
                         For the Defendant, Snap, Inc.
12
13               WILLIAMS & CONNOLLY, LLP
                 BY:  ARMANI J. MADISON, ESQ.
14               680 Maine Avenue S.W.
                 Washington, D.C.  20024
15               202-434-5374
                 amadison@wc.com
16                       For the Defendants, Alphabet,
                 Inc., Google, LLC and YouTube, LLC
17
18                       - - - - -
19
20
21
22
23
24
25
```

Page 5

```
 1                    I N D E X
 2  WITNESS                                    PAGE
 3  JOHN L. AMBERG
      BY MR. SHAHIDPOUR:                        10
 4    BY MR. MADISON:                          278
 5
 6                  E X H I B I T S
 7  NUMBER         DESCRIPTION              MARKED
 8  Amberg
 9  Exhibit 1     Curriculum Vitae             13
10  Exhibit 2     Defendants' Notice of Oral   43
                  and Videotaped Deposition
11                of John Amberg; Request for
                  Production of Documents
12
    Exhibit 3     Email String Bates           56
13                BW__Irvington00238419
14  Exhibit 4     PowerPoint entitled          59
                  "Informed Decision Making
15                Through Data Analysis"
                  Bates BW__Irvington00238420
16
    Exhibit 5     Third Amended Plaintiff     112
17                Fact Sheet - School
                  Districts
18
    Exhibit 6     CARES Act Budget Bates      137
19                BW__Irvington00256844 to
                  256845
20
    Exhibit 7     Email dated 9/11/19 Baes    143
21                BW__Irvington00227923 to
                  00227924
22
    Exhibit 8     Student Use of Technology   147
23                Agreement and Release of
                  Liability Form Bates
24                BW__Irvington00227925 to
                  227927
25
    Exhibit 9     Chromebook Student User     147
```

CONFIDENTIAL

Page 6

1                    Agreement Bates
                     BW__Irvington00227933 to
2                    227934
3   Exhibit 10       Email String Bates              185
                     BW__Irvington00338969
4
    Exhibit 11       Letter to Parents Bates         187
5                    BW__Irvington00338970
6   Exhibit 12       Letter Bates                    193
                     BW__Irvington00463682 to
7                    463688
8   Exhibit 13       IPS Website Page                212
9   Exhibit 14       Email String Bates              233
                     BW__Irvington00481804
10
    Exhibit 15       IPS Technology Plan Bates       246
11                   BW__Irvington00169331 to
                     163369
12
    Exhibit 16       Professional Assessment and     256
13                   Development Evaluation
                     Bates BW__Irvington00225419
14                   to 225454
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 7

1              DEPOSITION SUPPORT INDEX

2

                        - - - - -

3

4   Direction to Witness Not to Answer

5   Page  Line

6   279    19

7   Request for Production of Documents

8   Page  Line

9   NONE

10  Question Marked

11  Page  Line

12  NONE

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 9

1           THE VIDEOGRAPHER:  We are now

2      on the record.  My name is Daniel

3      Ortega and I am the legal

4      videographer for Golkow Litigation

5      Services.  Today's date is May 14,

6      2025, and the time is 9:25 a.m.

7           This video deposition is

8      being held at One University

9      Place, Irvington, New Jersey, in

10      the matter of Social Media, CA

11      MDL 3047, Irvington Public

12      Schools versus Meta Platforms,

13      Inc., et al.  The deponent today

14      is John Amberg.

15           All counsel will be noted on

16      the stenographic record.  The

17      court reporter today is Robin

18      Clark and will now swear in the

19      witness.

20                - - - - -

21           JOHN L. AMBERG, having been

22      duly sworn, was examined and

23      testified as follows:

24                - - - - -

25           THE WITNESS:  My name is

CONFIDENTIAL

Page 10

```
 1            Amberg.
 2                 MS. SCULLION:  His name is
 3            Amberg, yeah.
 4                 THE VIDEOGRAPHER:  I'm sorry.
 5                 MS. SCULLION:  That's all
 6            right.
 7   BY MR. SHAHIDPOUR:
 8        Q.    Good morning, Mr. Amberg.
 9   Could you please state your full name for
10   the record?
11        A.    John Louis Amberg.
12        Q.    It's nice to you meet you.
13   My name is Faraz Shahidpour.  I represent
14   the Snap Defendant in this case.  Is this
15   your first time being deposed?
16        A.    In this case?
17        Q.    In any case.
18        A.    I believe I might have been
19   deposed many, many years ago in a real
20   estate situation.
21        Q.    Okay.  You understand that
22   you're under oath today?
23        A.    I do.
24        Q.    Is there any reason that you
25   cannot provide truthful and accurate
```

CONFIDENTIAL

Page 11

1   testimony today?

2           A.      No.

3           Q.      If at any point you don't

4   understand the question that I've asked,

5   please let me know and I can clarify.

6   Otherwise, I'm going to assume that you

7   understand the question that I ask.  Okay?

8           A.      Yes.

9           Q.      And another ground rule is

10  that unlike if we were having a

11  conversation in normal life, we can't talk

12  over each other at all in this deposition.

13  That is because there's a court reporter

14  who is listening and jotting down what we

15  say, so to make sure that we get a clean

16  record, I ask that you wait until I finish

17  my question before you give your answer

18  and, similarly, I'll wait until you finish

19  giving your answer before I ask my next

20  question.  Sound good?

21          A.      That's fine.

22          Q.      And because there's a court

23  reporter writing down what we say, it's

24  important to give verbal responses as

25  opposed to head nods or "uh-huhs" or

CONFIDENTIAL

Page 12

1   anything else that can't be recorded

2   stenographically.  Understood?

3           A.      Understood.

4           Q.      Throughout today's

5   deposition, I may refer to Irvington Public

6   Schools as IPS or the district.  Will you

7   understand what I mean by IPS or the

8   district?

9           A.      Correct.

10          Q.      What is your home address?

11          A.      ████  ████████  ████████

    ██  ████████████  ██████  ████████  ███████

13          Q.      And what is your work

14  address?

15          A.      Primarily, One University

16  Place, fourth floor.

17          Q.      And prior to your deposition,

18  your counsel provided me with a copy of

19  your CV as we requested.  Is that something

20  that you're aware of?

21          A.      Of my CV?

22          Q.      Of the fact that I was

23  provided with your CV.

24          A.      Yes.

25          Q.      I'm handing you what has been

CONFIDENTIAL

Page 13

1    marked or what will be marked as Exhibit 1.

2    Tab 1.

3                          - - - - -

4                     (Curriculum Vitae marked

5                 Amberg Exhibit 1 for

6                 identification.)

7                          - - - - -

8                     MS. SCULLION:  Counsel, did

9                 you want the reporter to mark the

10                exhibit?

11   BY MR. SHAHIDPOUR:

12        Q.     Yes, the reporter will be

13   marking it.

14                  Mr. Amberg, you've seen this

15   document before?

16                     MS. SCULLION:  I'm sorry,

17                could you give the witness a chance

18                to look at it?

19                     THE WITNESS:  Repeat the

20                question.

21   BY MR. SHAHIDPOUR:

22        Q.     Have you seen this document

23   before?

24        A.     I have.

25        Q.     What is it?

CONFIDENTIAL

Page 14

1          A.      It is a résumé.

2          Q.      Is it your résumé?

3          A.      It is my résumé.

4          Q.      Did you prepare it?

5          A.      I believe so.

6          Q.      Is there any reason you

7    believe you may not have prepared it?

8          A.      No, it's just a long time

9    ago.

10         Q.      Okay.  And do you remember

11   approximately when you may have prepared

12   it?

13         A.      I probably began preparing it

14   15 years ago and I made some additions all

15   the way up to about six months ago.

16         Q.      Is this a current and

17   accurate copy of your résumé?

18                 MS. SCULLION:  Objection to

19         form.

20                 THE WITNESS:  Could you

21         restate, like, kind of --

22   BY MR. SHAHIDPOUR:

23         Q.      Sorry, I didn't hear you

24   there.

25         A.      Explain what you mean by

CONFIDENTIAL

Page 15

1    "current"?

2         Q.      Is this résumé up to date?

3         A.      It's missing executive

4    director.

5         Q.      Is there anything else that's

6    missing?

7         A.      I've given some examples of

8    what I do, but not all of the examples of

9    what my job entails.

10         Q.      Okay.  Is there anything

11    else?

12         A.      No, I believe it's fairly

13    accurate.

14         Q.      Okay.  We'll get to the

15    changes that you mentioned a minute, but I

16    want to talk a little bit about your

17    education.

18         A.      Sure.

19         Q.      You have a master's degree,

20    correct?

21         A.      That is correct.

22         Q.      From Saint Peter's University

23    in Jersey City?

24         A.      Correct.

25              MS. SCULLION:  I'm required to

Page 16

```
 1              say, "Go Peacocks."
 2      BY MR. SHAHIDPOUR:
 3              Q.      Was your concentration in
 4      administration and supervision?
 5              A.      That is correct.
 6              Q.      And you earned that master's
 7      degree in 2006?
 8              A.      I believe so, yes.
 9                      MS. SCULLION:  I see 2008.
10                      THE WITNESS:   2008.
11      BY MR. SHAHIDPOUR:
12              Q.      Excuse me, it's 2008.  You
13      have a culinary associate of arts degree
14      from the CIA, which you earned in 1996; is
15      that right?
16              A.      That is correct.
17              Q.      You also have a bachelor's
18      degree from Saint Peter's University in
19      Jersey City, Go Peacocks?
20              A.      That is correct.
21              Q.      That is correct.  In
22      classics -- and excuse me, the bachelor's
23      degree that you have from Saint Peter's
24      University, that is in classics and
25      classical languages, literature and
```

CONFIDENTIAL

Page 17

1    linguistics?

2          A.     Yes.

3          Q.     Broadly known as classics as

4    it's listed on your CV?

5          A.     Yes.

6          Q.     And you earned that degree in

7    classics from Saint Peter's University in

8    1991; is that right?

9          A.     That is correct.

10          Q.     You don't have any education

11    or training in psychology?

12          A.     I do.

13          Q.     What is that education or

14    training in psychology that you have?

15          A.     I can teach it, because I

16    took courses at Saint Peter's that allows

17    me as a social studies teacher to teach

18    psychology.

19          Q.     Okay.  And to which grades --

20    grade levels are you permitted or certified

21    to teach psychology as a social studies

22    teacher?

23                MS. SCULLION:  Objection to

24          form.

25                THE WITNESS:  I believe that

CONFIDENTIAL

Page 18

1          would be high school, based on my
2          old -- based on the old certs.
3    BY MR. SHAHIDPOUR:
4          Q.     Excuse me, that last part, I
5    didn't catch that.
6          A.     Yeah, old certifications.
7    They changed certifications throughout the
8    years, so I'm K-8, which doesn't exist
9    anymore either.
10          Q.     Do you remain certified to
11    teach high schoolers psychology?
12          A.     Yes.
13          Q.     And that's grades 9 through
14    12?
15          A.     I believe so.
16          Q.     Are you certified to teach AP
17    psychology?
18          A.     I don't believe so.
19          Q.     Do you teach psychology to
20    high schoolers in your current role?
21          A.     I do not.
22          Q.     Have you ever taught
23    psychology to high schoolers?
24          A.     I don't believe so, no.
25          Q.     Have you ever taught

CONFIDENTIAL

Page 19

1   psychology to any grade level?

2           A.      I don't believe so.

3           Q.      Are you certified to teach

4   psychology to anyone -- to any grade level

5   other than high schoolers?

6           A.      I don't believe so.

7           Q.      And just to backtrack a

8   little bit, you received that certification

9   by virtue of having taken certain classes

10  in psychology as a student?

11          A.      I believe, and, again, the

12  state of New Jersey certification based on

13  social studies, I believe that's the case.

14          Q.      I see.  So your certification

15  to teach social studies in the state of New

16  Jersey encompasses teaching psychology as a

17  social studies subject to high schoolers?

18          A.      Correct.

19          Q.      Do you have any education or

20  training in child psychology specifically?

21          A.      Courses from my master's

22  degree.

23          Q.      And do those courses from

24  your master's degree in child psychology

25  qualify you to practice or to teach child

Page 20

1    psychology?

2                    MS. SCULLION:  Objection to

3               form.

4                    THE WITNESS:  I don't believe

5               so, sir.

6    BY MR. SHAHIDPOUR:

7         Q.    Do you have any education or

8    training in counseling?

9                    MS. SCULLION:  Objection to

10              form.

11                   THE WITNESS:  I do not.

12   BY MR. SHAHIDPOUR:

13        Q.    Do you have any education or

14   training in psychiatry?

15                   MS. SCULLION:  Objection to

16              form.

17                   THE WITNESS:  Let me check my

18              CV.  I don't believe so, sir.

19   BY MR. SHAHIDPOUR:

20        Q.    Do you have any education or

21   training in behavioral therapy?

22                   MS. SCULLION:  Objection to

23              form.

24                   THE WITNESS:  I don't believe

25              so.

CONFIDENTIAL

Page 21

1   BY MR. SHAHIDPOUR:

2         Q.      And you mentioned that you

3   took some classes in child psychology

4   during your master's degree.

5         A.      I believe it was one.

6         Q.      It was one.  Do you remember

7   what course that was?

8         A.      I do not.

9         Q.      Was it required to obtain

10  your degree?

11        A.      I believe it was.

12        Q.      Are you the author of any

13  articles relating to education?

14        A.      I don't believe I am.

15        Q.      Are you the author of any

16  studies relating to education?

17                    MS. SCULLION:  Objection to

18          form.

19                    THE WITNESS:  I don't believe

20          I am.

21  BY MR. SHAHIDPOUR:

22        Q.      Are you the author of any

23  articles or studies relating to adolescent

24  mental health or well-being?

25                    MS. SCULLION:  Objection to

CONFIDENTIAL

Page 22

1               form.
2                   THE WITNESS:  I don't believe
3               I am.
4    BY MR. SHAHIDPOUR:
5         Q.    Have you ever conducted any
6    research on adolescent mental health?
7                   MS. SCULLION:  Objection to
8               form.
9                   THE WITNESS:  I don't believe
10              I have.
11   BY MR. SHAHIDPOUR:
12        Q.    Are you the author of any
13   articles relating to social media?
14                  MS. SCULLION:  Objection to
15              form.
16                  THE WITNESS:  I don't think
17              so.
18   BY MR. SHAHIDPOUR:
19        Q.    Are you the author of any
20   studies relating to social media?
21                  MS. SCULLION:  Objection to
22              form.
23                  THE WITNESS:  What was the
24              question again?
25

CONFIDENTIAL

Page 23

```
 1   BY MR. SHAHIDPOUR:
 2        Q.    Are you the author of any
 3   studies relating to social media?
 4               MS. SCULLION:  Same objection.
 5               THE WITNESS:  I don't believe
 6          so.
 7   BY MR. SHAHIDPOUR:
 8        Q.    Have you ever conducted any
 9   research relating to social media?
10               MS. SCULLION:  Objection to
11          form.
12               THE WITNESS:  Could you
13          explain the question as far as
14          research goes?
15   BY MR. SHAHIDPOUR:
16        Q.    Sure.  Have you ever
17   attempted to study social media usage among
18   any population?
19        A.    No.
20        Q.    Have you ever attempted to
21   study the impact of social media on any
22   population?
23        A.    I don't believe so.
24        Q.    Have you ever attempted to
25   study a particular social media platform?
```

CONFIDENTIAL

Page 24

```
 1                MS. SCULLION:  Objection to
 2          form.
 3                THE WITNESS:  I don't believe
 4          so.
 5   BY MR. SHAHIDPOUR:
 6          Q.    Have you ever attempted to --
 7   strike that.
 8                Have you ever done any
 9   investigations into the features of a
10   social media platform?
11                MS. SCULLION:  Objection to
12          form.  Vague.
13                THE WITNESS:  Could you
14          rephrase that, please?
15   BY MR. SHAHIDPOUR:
16          Q.    Have you ever tried to
17   investigate any features of a social media
18   platform for the purpose of an academic
19   understanding of the social media platform?
20                MS. SCULLION:  Objection to
21          form.  Are you asking if he has
22          undertaken any academic
23          investigation?
24                MR. SHAHIDPOUR:  I have my
25          question on the record.
```

CONFIDENTIAL

Page 25

```
 1                 MS. SCULLION:  Okay.
 2            Objection to form.  Vague.
 3                 THE WITNESS:  I'm confused by
 4            that question.
 5  BY MR. SHAHIDPOUR:
 6        Q.     Have you ever attempted to
 7  investigate any features of a social media
 8  platform for the purpose of gaining an
 9  academic understanding of the social media
10  platform?
11                 MS. SCULLION:  Same objection.
12                 THE WITNESS:  I'm sorry, I'm
13            still confused.
14  BY MR. SHAHIDPOUR:
15        Q.     Have you ever investigated
16  the features of any social media platform
17  in an academic environment?
18                 MS. SCULLION:  Objection to
19            form.  Counsel, and just I would
20            like to be clear, are you asking
21            whether he's -- when you say, "in
22            an academic environment," he works
23            in an academic environment, are you
24            asking whether he's undertaken an
25            academic investigation or if he's
```

Page 26

1          just conducted an investigation in
2          any other sense within a school?
3          That's the confusion here.
4   BY MR. SHAHIDPOUR:
5          Q.     I understand.  Mr. Amberg,
6   have you ever undertaken an academic
7   investigation into any features of a social
8   media platform?
9          A.     I'm still not exactly sure,
10  but I don't think so.
11         Q.     Let's try and zoom out a
12  little bit.  Do you have any experience
13  with social media platforms beyond being a
14  personal user of social media platforms?
15                MS. SCULLION:  Objection to
16         form.  Assumes facts not in
17         evidence.
18                THE WITNESS:  Explain that.
19  BY MR. SHAHIDPOUR:
20         Q.     Do you personally use any
21  social media?
22         A.     Yes.
23         Q.     And outside of that use of
24  social media in your personal life, do you
25  have any experience with social media?

CONFIDENTIAL

Page 27

1                    MS. SCULLION:  Objection to

2           form.  Vague.

3                    THE WITNESS:  The back end,

4           maybe.

5    BY MR. SHAHIDPOUR:

6           Q.     And what do you mean by, "the

7    back end"?

8           A.     Whitelisting or blocking.

9           Q.     Whitelisting or blocking

10   social media platforms?

11          A.     Particularly, we have

12   everything blocked except for YouTube and

13   that is upon request by a supervisor, so

14   on, but that's it.

15          Q.     Okay.  Have you ever

16   undertaken to understand the technical

17   features of any social media platforms such

18   as the algorithms?

19                   MS. SCULLION:  Objection to

20          form.  Vague.

21   BY MR. SHAHIDPOUR:

22          Q.     Okay.

23          A.     I don't believe so.

24                   MS. SCULLION:  Wait, he's --

25          are you withdrawing the question?

CONFIDENTIAL

Page 28

1              MR. SHAHIDPOUR:  Sorry, I
2         thought he nodded his head.
3              MS. SCULLION:  Sorry, I
4         didn't -- if you're going to say
5         yes or no, you say it as you say
6         it.
7              THE WITNESS:  I don't believe
8         so.
9              MS. SCULLION:  Thank you.
10   BY MR. SHAHIDPOUR:
11        Q.     All right.  Mr. Amberg, you
12   are employed by the Irvington Board of
13   Education; is that right?
14        A.     That is correct.
15        Q.     And what is your current job
16   title?
17        A.     My current job title is
18   executive director.
19        Q.     And executive director of
20   what exactly?
21        A.     Of technology and media
22   services.
23        Q.     And is that a district-wide
24   position?
25        A.     That is.

CONFIDENTIAL

Page 29

1          Q.      You oversee technology and
2     media services for the entire district?
3          A.      That is correct.
4          Q.      Does anyone report to you?
5          A.      Yes.
6               MS. SCULLION:  May I request
7          that we take down the call-out,
8          that's actually not -- that's his
9          old position.  Thank you.
10              MR. SHAHIDPOUR:  Sorry, I
11         think there was a question.
12              MS. SCULLION:  Apologies.
13              MR. SHAHIDPOUR:  No, no, there
14         may not have been.  Oh, yeah, who
15         reports to you?
16              THE WITNESS:  We have
17         teachers.  We have technology
18         coaches.  We have technicians.
19    BY MR. SHAHIDPOUR:
20         Q.      What do teachers report to
21    you?  I can rephrase.  What information do
22    teachers report to you?
23              MS. SCULLION:  Objection,
24         vague.
25              THE WITNESS:  Academics,

CONFIDENTIAL

Page 30

1           school issues, dealing with

2           anything from supplies to

3           curriculum to class sizes to

4           schedules.  We work on academic

5           issues, teacher evaluations.

6    BY MR. SHAHIDPOUR:

7           Q.    Okay.  Do you supervise

8    teachers in your role as executive

9    director?

10          A.    I do.

11          Q.    In what capacity do you

12   supervise teachers in your role as

13   executive director?

14              MS. SCULLION:  Objection to

15          form.

16   BY MR. SHAHIDPOUR:

17          Q.    How do you supervise teachers

18   in your role as executive director?

19          A.    I conduct walk-throughs.  I

20   conduct just-in-time evals.  I conduct

21   district-wide walk-throughs.  I conduct

22   evaluations both announced and unannounced.

23          Q.    All right.  You said -- you

24   testified that tech coaches report to you?

25          A.    That is correct.

CONFIDENTIAL

Page 31

1          Q.      What sort of information do
2    tech coaches report to you?
3          A.       Training, Chromebook
4    management, inventory management, data,
5    data analysis, scheduling, testing,
6    specifically state testing.  I'm sure
7    there's other things that I don't remember
8    at this point.
9          Q.      All right.  No, that's
10   helpful.  And you said that these are tech
11   coaches; is that right?
12         A.      Correct.
13         Q.      Who are they coaching?
14         A.      The teachers.
15         Q.      The teachers.  Do they coach
16   students?
17         A.      No, a tech coach coaches
18   teachers.
19         Q.      And then you listed a third
20   category of people who report to you,
21   technicians.  What sort of information do
22   they report to you?
23         A.      Again, let me think,
24   infrastructure primarily.
25         Q.      And could you tell us a

CONFIDENTIAL

Page 32

1    little bit what you mean by infrastructure?

2         A.    Sure.  Access points, if

3    there's issues during testing with access

4    points, say, there's not enough bandwidth,

5    that sort of thing.  IDFs and MDFs, meaning

6    where the switches are stored, where

7    servers may be located.  Any networking

8    issues.

9         Q.    Do you report to anyone?

10        A.    I do.

11        Q.    To whom do you report?

12        A.    I report to the assistant to

13   the assistant superintendent, the assistant

14   superintendent, to the superintendent.

15        Q.    So that's a lot of

16   assistants.  I'm trying to -- the assistant

17   to the assistant superintendent --

18        A.    Yeah.

19        Q.    -- is the first name that you

20   listed?

21        A.    Yes.

22        Q.    Who is that?

23        A.    Sean Evans.

24        Q.    Sean Evans.  And then you

25   also said the assistant superintendent, who

CONFIDENTIAL

Page 33

1    is that?

2           A.       There are two, one is Matin

3    Adegboyega and the second is Reggie

4    Lamptey.

5           Q.       And then the superintendent,

6    is that Dr. Vauss?

7           A.       That is correct.

8           Q.       Is there anyone else to whom

9    you report?

10          A.       I don't believe so.

11          Q.       Do you interact with students

12   directly in your role as executive director

13   of technology and media services?

14                   MS. SCULLION:  Objection to

15           form.

16                   THE WITNESS:  In this role,

17           no.

18   BY MR. SHAHIDPOUR:

19          Q.       And when you say, "in this

20   role," do you mean that in previous roles,

21   you did interact directly with students?

22                   MS. SCULLION:  Objection to

23           form.

24                   THE WITNESS:  Yes.

25

Page 34

1   BY MR. SHAHIDPOUR:

2        Q.      And which roles, which role

3   or roles would that be?

4                MS. SCULLION:  Objection to

5           form.

6                THE WITNESS:  Well, I was a

7           teacher in the district, so -- I

8           was an administrator in the

9           district.

10  BY MR. SHAHIDPOUR:

11       Q.      All right.  So it's a little

12  bit hard to hear with the fan.

13       A.      Assistant principal, it's the

14  second bullet point on whatever this is

15  entitled.

16       Q.      It's exhibit 1?

17       A.      Exhibit 1, sorry.

18       Q.      That's okay.  So you

19  interacted directly with students as a

20  teacher and an assistant principal; is that

21  right?

22       A.      That is correct.

23       Q.      And you were previously

24  director of technology and media services

25  from 2018 until when?  Excuse me, I'll

Page 35

1    scratch that.

2              Did you previously serve as

3    director of technology and media services?

4         A.    I did.

5         Q.    And what years would that be?

6         A.    Up until last year.

7         Q.    And starting when?

8         A.    Maybe July of last year.

9         Q.    Sorry, I meant when did you

10   start -- looking at your résumé, when did

11   you start serving as director of technology

12   and media services at Irvington Board of

13   Education?

14        A.    I believe 2018.

15        Q.    2018.  So from 2018 to 2024,

16   you were the director of technology and

17   media services?

18        A.    I believe that's correct.

19        Q.    That was also a district-wide

20   role?

21        A.    Correct.

22        Q.    And in that role, you also

23   oversaw technology coaches, technicians,

24   and looking at your résumé, it says media

25   specialists and computer teachers as well?

CONFIDENTIAL

Page 36

1          A.      Uh-huh.
2                  MS. SCULLION:  You need to say
3          yes or no.  Sorry.
4                  THE WITNESS:  Yes.
5                  MS. SCULLION:  Thank you.
6      BY MR. SHAHIDPOUR:
7          Q.      And in that role, you were
8      also involved in the technology and media
9      curriculum at IPS?
10         A.      That is correct.
11         Q.      What schools employ a
12     technology and media curriculum at IPS?
13                 MS. SCULLION:  Objection to
14         form.
15                 THE WITNESS:  K through 5
16         employs media specialists.  Sixth
17         through eighth grade middle school
18         employs computer teachers.  And the
19         high schools employ technology
20         teachers.
21     BY MR. SHAHIDPOUR:
22         Q.      And how does a position of
23     director of technology and media services
24     differ from executive director?
25         A.      The difference is I'm now

CONFIDENTIAL

Page 37

1    actively involved in the evaluation process

2    where I'm actively working on the

3    evaluations on a district-wide level and

4    actively working on district-wide

5    inventory, where before I just set up the

6    backbone for it.

7            Q.      Was there an executive

8    director of technology and media services

9    while you were director?

10           A.      No, sir.

11           Q.      Moving on, there was -- from

12   2013 to 2018 you were assistant principal

13   of Irvington High School?

14                   MS. SCULLION:  Sorry, Counsel,

15           did you mean 2014 to 2018?

16                   MR. SHAHIDPOUR:  Sorry, I'm --

17                   MS. SCULLION:  2013, I heard

18           2013.

19   BY MR. SHAHIDPOUR:

20           Q.      Oh, from 2014 to 2018, you

21   were assistant principal of Irvington High

22   School?

23           A.      I believe so.

24           Q.      And it looks like from your

25   résumé, you were 12th and 11th grade

CONFIDENTIAL

Page 38

1   administrator; is that right?

2          A.      That's correct.

3          Q.      Was that for the entirety of

4   your term as assistant principal?

5          A.      That is correct.

6          Q.      What does 12th and 11th grade

7   administrator entail?

8          A.      A lot of data, data.

9          Q.      And what do you mean by that?

10          A.      So as an assistant principal

11   primarily of a graduating class, there's

12   data that has to be compiled based on their

13   cohort, based on their graduation

14   requirements, based on NJ SMART.

15          Q.      Okay.  And what did you do

16   with that data?

17          A.      Made sure students, A, were

18   able to graduate, that's the number one

19   focus.  Created reports so that they could

20   be sent to the state based on 12th grade

21   graduation rates and so on.

22          Q.      All right.  And then from

23   2012 to 2014, you were administrator on

24   call, assistant principal high school,

25   building principal elementary.  Could you

CONFIDENTIAL

Page 39

1   explain what your role was during that time
2   period?
3          A.     Primarily a teacher, but when
4   I'm called, I would go in and be an
5   administrator.
6          Q.     And what did you teach?
7          A.     Social studies.
8          Q.     And from 2004 to 2014, you
9   were also a teacher at Irvington High
10  School?
11         A.     That is correct.
12         Q.     And you taught personal
13  finance and history?
14         A.     Yeah, social studies in
15  general, yes.
16         Q.     And from 1999 to 2004, you
17  were a fifth grade teacher at Grove Street
18  School; is that right?
19         A.     That sounds about right.
20         Q.     Grove Street School is part
21  of IPS?
22         A.     That is correct.
23         Q.     So you have been employed by
24  IPS for over 26 years from 1999 to the
25  present; is that right?

CONFIDENTIAL

Page 40

1          A.     Sounds about right.
2          Q.     And before that, you worked
3    at Sojourn School in Newark, New Jersey?
4          A.     That is correct.
5          Q.     That's not part of IPS, is
6    it?
7          A.     No.
8          Q.     And you worked with fifth
9    through 12th graders at Sojourn School?
10         A.     From what I recall, yes.
11         Q.     Were you a teacher at Sojourn
12   School in Newark?
13         A.     I was.
14         Q.     And from 1996 to 1997, you
15   worked at Ogden Residential Juvenile
16   Justice facility in Newark; is that right?
17         A.     I believe so.
18         Q.     Did you work there in a
19   culinary capacity?
20              MS. SCULLION:  Objection to
21         form.
22              THE WITNESS:  I don't
23         remember, sir.
24   BY MR. SHAHIDPOUR:
25         Q.     Okay.  Before that, you

CONFIDENTIAL

Page 41

1  worked at Disney World; is that right, in

2  1995?

3          A.      That is correct.

4          Q.      And before that, you worked

5  at Academy of Saint Benedict's in Newark,

6  New Jersey, as a fifth grade teacher it

7  looks like?

8          A.      It sounds about right.

9          Q.      Have you ever -- is that a

10 complete list of your professional work

11 experience?

12         A.      Sounds pretty close.

13         Q.      Have you ever worked as a

14 mental health counselor?

15         A.      I don't believe so.

16         Q.      Have you ever worked as a

17 school psychologist?

18         A.      No, sir.

19         Q.      Have you ever worked as a

20 guidance counselor?

21         A.      No, sir.

22         Q.      Have you ever worked in the

23 budget and finance department?

24         A.      No, sir.

25         Q.      Okay.  And you told me

Page 42

1    earlier that this isn't your first
2    deposition.  You said you were previously
3    deposed in a real estate context?
4                 MS. SCULLION:  Objection.
5             Mischaracterizes the testimony.
6                 THE WITNESS:  I believe so.  I
7             don't even remember.  It was many
8             years ago.
9    BY MR. SHAHIDPOUR:
10          Q.    Do you remember any details
11   about that deposition?
12                MS. SCULLION:  Objection.
13            Mischaracterizes the testimony.
14            Assumes facts not in evidence.
15                THE WITNESS:  I don't believe
16            so.
17   BY MR. SHAHIDPOUR:
18          Q.    Okay.  Have you ever
19   testified in court?
20          A.    I did.
21          Q.    When did you testify in
22   court?
23          A.    Is a divorce testimony?
24          Q.    Is that the only time?
25          A.    Yeah, I believe so.

CONFIDENTIAL

Page 43

1          Q.      Okay.  Have you ever been

2    charged with a crime?

3          A.      No, sir.

4          Q.      Have you -- sorry, Mr.

5    Amberg, it gets a little bit personal, but

6    just bear with me, have you ever been

7    subject to any disciplinary action in your

8    professional capacity?

9          A.      No.

10         Q.      Have you ever been

11   investigated for any alleged misconduct in

12   your professional capacity?

13         A.      No.

14         Q.      I will hand you what will be

15   marked as Exhibit 2, this is tab three.

16                 MS. SCULLION:  Thank you.

17                      - - - - -

18                 (Defendants' Notice of Oral

19            and Videotaped Deposition of John

20            Amberg; Request for Production of

21            Documents marked Amberg Exhibit 2

22            for identification.)

23                      - - - - -

24   BY MR. SHAHIDPOUR:

25         Q.      Have you seen this before,

Page 44

1   Mr. Amberg?

2              MS. SCULLION:  Let the witness

3          look through the document.

4   BY MR. SHAHIDPOUR:

5       Q.      Consider that an invitation

6   to look through the document, Mr. Amberg.

7       A.      Yes, I've seen it.

8       Q.      When have you seen it?

9       A.      I don't remember exactly.  A

10  couple of weeks ago.

11      Q.      And what is your

12  understanding of why you're here to testify

13  today?

14             MS. SCULLION:  Objection to

15         form.

16             THE WITNESS:  To tell the

17         truth, the whole truth, and nothing

18         but the truth.

19  BY MR. SHAHIDPOUR:

20      Q.      Excellent.  That's all we can

21  ask for, Mr. Amberg.  Did you do anything

22  to prepare for today's deposition?

23      A.      Can you explain that again?

24      Q.      Did you review any documents

25  in anticipation of today's deposition?

CONFIDENTIAL

Page 45

1              MS. SCULLION:  You can answer
2         the question yes or no.
3              THE WITNESS:  Yes.
4    BY MR. SHAHIDPOUR:
5         Q.    What documents did you review
6    in anticipation of today's deposition?
7              MS. SCULLION:  So I'm going to
8         object and instruct the witness
9         that you can answer that question
10        with respect to any documents that
11        you may have looked at on your own,
12        but to the extent that they were
13        documents that were shown to you by
14        any lawyers in the course of
15        preparing for today's deposition,
16        you should not identify that,
17        because that is both privileged and
18        work product information.
19              MR. SEXTON:  This is Terry
20        Sexton from Meta.  I just want to
21        put on the record I want to dispute
22        that interpretation of the rules
23        regarding privilege.  We can take
24        it up later, but I think we're
25        entitled to know what the witness

CONFIDENTIAL

Page 46

```
 1              has reviewed.  We're not entitled
 2              to know what you showed him or what
 3              he showed you, but we are entitled
 4              to know what he's looked at, so I
 5              don't accept that exclusion.  I
 6              just wanted that noted for the
 7              record.
 8                   MS. SCULLION:  So noted.
 9                   THE WITNESS:  Nothing.
10    BY MR. SHAHIDPOUR:
11         Q.    And is that you have not
12    reviewed any documents --
13         A.    On my own, no.
14                   MS. SCULLION:  What's the
15              question?
16                   MR. SHAHIDPOUR:  I was going
17              to finish my question.  You haven't
18              reviewed any documents apart from
19              any that counsel may have given
20              you?
21                   MS. SCULLION:  You can answer.
22                   THE WITNESS:  That is correct.
23    BY MR. SHAHIDPOUR:
24         Q.    And did any of the documents
25    you reviewed refresh your recollection
```

Page 47

1    about events that occurred while you were

2    an employee of IPS?

3           A.     No, sir.

4           Q.     Did you speak with anyone in

5    preparation for today's deposition?

6                  MS. SCULLION:  Apart from

7           counsel, is that the question?

8                  MR. SHAHIDPOUR:  I'm asking.

9                  MS. SCULLION:  Okay.  So you

10          can answer that question -- first

11          answer the question yes or no,

12          apart from counsel.

13                 MR. SHAHIDPOUR:  No, my

14          question on the record is did you

15          speak with anyone in preparation

16          for today's deposition?

17                 THE WITNESS:  Yes.

18   BY MR. SHAHIDPOUR:

19          Q.     And who did you speak with?

20                 MS. SCULLION:  You can answer.

21                 THE WITNESS:  Counsel.  I told

22          my secretary I'm going in for a

23          deposition, not to book me.  The

24          team, that I'm going to be out for

25          all day today.

CONFIDENTIAL

Page 48

1    BY MR. SHAHIDPOUR:

2         Q.    Okay.  And when did you speak

3    with counsel?

4         A.    Yesterday and this morning.

5    And it might have been one other time, I

6    don't remember, but definitely yesterday

7    and today.

8         Q.    So two or three times you've

9    spoken with counsel in preparation for

10   today's deposition.  How long did those

11   meetings last with -- how long did the

12   meetings with counsel last in preparation

13   for this deposition?

14        A.    Altogether, a couple of

15   hours.

16        Q.    And when you say you were --

17   you met with counsel, who is that?

18        A.    It would be my lawyers.

19        Q.    And who are your lawyers?

20        A.    Jen, Carlos.

21                   - - - - -

22     (Discussion was held off the record.)

23                   - - - - -

24             MR. SHAHIDPOUR:  Great.

25             THE WITNESS:  So, I'm sorry, I

CONFIDENTIAL

Page 49

1          don't remember your name.

2               MS. DeGROFF:   Emma.

3               THE WITNESS:   Emma.

4    BY MR. SHAHIDPOUR:

5          Q.     Emma.  So Jen, Carlos, and

6    Emma, anyone else?

7          A.     No.

8          Q.     Do you have any documents

9    with you today at this deposition?

10         A.     The Wi-Fi password.

11         Q.     Great.  Noted.  I'll mark

12   that as an exhibit.

13         A.     So I did speak to you guys

14   giving you the Wi-Fi password in the past

15   couple of days.

16         Q.     That's right.  Is there

17   anyone else that you spoke with?

18         A.     No.

19         Q.     Great.  Well, I forgot to

20   mention, Mr. Amberg, but if there's at any

21   point where you want to take a break, let

22   us know and we'll see what we can do.  We

23   will try to accommodate you as much as we

24   can.

25                    Let's turn to page 6 of

Page 50

```
 1   Exhibit 2 in front of you.  And take a
 2   moment to just scan, if you haven't
 3   already, but looking specifically at
 4   question four, do other individuals at IPS
 5   review your performance?
 6           A.      Repeat the question.
 7           Q.      Sure.  Do other individuals
 8   at IPS review your performance as executive
 9   director of technology and media services?
10           A.      Yes.
11           Q.      And did they also -- did
12   individuals at IPS also review your
13   performance as director of technology and
14   media services?
15           A.      That is correct.
16           Q.      Who would have reviewed your
17   performance in both in either -- starting
18   with executive director?
19           A.      The assistant to the
20   assistant, the assistant, the other
21   assistant, and the superintendent.
22           Q.      And would that also be the
23   same list of individuals who review your
24   performance as director of technology and
25   media services?
```

CONFIDENTIAL

Page 51

1          A.     Correct.
2          Q.     And did they review your
3    performance periodically?
4          A.     Yes.
5          Q.     And is that on a quarterly
6    basis?
7          A.     Can you rephrase the question
8    just so I can --
9          Q.     Sure.  I'm happy to.  So you
10   testified that your performance is reviewed
11   periodically by that list of individuals.
12   What is the period -- what is the period?
13         A.     Formal or informal?
14         Q.     Let's go with formal.
15         A.     Twice a year.
16         Q.     Twice a year.  Each semester?
17         A.     Close, yes.
18         Q.     And do any of your formal
19   performance reviews relate to setting or
20   enforcing policy regarding students' use of
21   electronic devices or social media
22   services?
23              MS. SCULLION:  Objection to
24         form.
25              THE WITNESS:  I believe it's

Page 52

1              based on Marzano.

2    BY MR. SHAHIDPOUR:

3          Q.      I'm sorry, I didn't hear

4    that.

5          A.      I believe it's based on

6    Marzano.

7          Q.      What do you mean by, "based

8    on Marzano"?

9          A.      Teachers are based on one set

10   of criteria that the state of New Jersey

11   approves, Charlotte Danielson.  And the

12   administrators are based on Marzano, which

13   is another form that the state of New

14   Jersey approves for administrators.

15         Q.      So is that a list of criteria

16   on which you're reviewed?

17         A.      Yes, similar to that.

18         Q.      How would it differ?

19              MS. SCULLION:  Objection to

20          form.

21              THE WITNESS:  There's

22          components, there's criteria, there

23          are domains, that sort of thing.

24   BY MR. SHAHIDPOUR:

25         Q.      Okay.  So does the Marzano

CONFIDENTIAL

Page 53

```
 1   include setting or enforcing policy
 2   regarding students' use of electronic
 3   devices?
 4                 MS. SCULLION:  Objection to
 5          form.
 6                 THE WITNESS:  I don't believe
 7          it does.
 8   BY MR. SHAHIDPOUR:
 9        Q.    Okay.  Does it include
10   setting or enforcing policy regarding
11   teachers' use of electronic devices?
12                 MS. SCULLION:  Objection to
13          form.
14                 THE WITNESS:  I don't believe
15          Marzano does.
16   BY MR. SHAHIDPOUR:
17        Q.    Does Marzano include -- when
18   you're reviewed pursuant to Marzano, are
19   you reviewed in terms of your performance
20   of setting or enforcing policy regarding
21   monitoring or treating mental, social,
22   emotional, or behavioral health of
23   students?
24                 MS. SCULLION:  Objection to
25          form.
```

CONFIDENTIAL

Page 54

1            THE WITNESS:  I don't believe
2        it does.
3    BY MR. SHAHIDPOUR:
4        Q.    Does Marzano include review
5    of your performance in studying, measuring,
6    or reporting on mental, social, emotional,
7    or behavioral health of students?
8            MS. SCULLION:  Objection to
9        form.
10           THE WITNESS:  I don't believe
11       it does.
12   BY MR. SHAHIDPOUR:
13       Q.    Does Marzano include review
14   of your performance in setting policy
15   regarding student discipline?
16       A.    I don't believe it does.
17       Q.    Does Marzano include a review
18   of your performance in enforcing policy
19   regarding student discipline?
20       A.    I don't believe it does.
21       Q.    And does Marzano include
22   setting policy, review -- excuse me, strike
23   that.
24           Does Marzano include review
25   of your performance in setting policy

Page 55

1    regarding staff discipline?

2         A.     I believe professionalism

3    would be the terminology.

4         Q.     Okay.  Does any performance

5    review that you've received as an IPS

6    administrator relate to staff discipline?

7                 MS. SCULLION:  Objection to

8          form.

9                 THE WITNESS:  I don't recall.

10   BY MR. SHAHIDPOUR:

11        Q.     And then do you submit

12   self-evaluations as part of -- as a regular

13   part of your formal performance reviews at

14   IPS?

15        A.     We answer post-eval

16   questions.

17        Q.     Sorry.  You answer post-eval

18   questions, is that what you --

19        A.     Uh-huh.

20        Q.     And what are post-eval

21   questions?

22        A.     After the evaluation, there's

23   a set of questions that I don't recall, but

24   are asked of administrators, and there's

25   things that are asked for teachers, but the

CONFIDENTIAL

Page 56

1    Charlotte Danielson method for teachers.

2         Q.      And you are asked to sort of

3    self-evaluate your performance in these

4    post-evaluation questions?

5                    MS. SCULLION:  Objection to

6              form.

7                    THE WITNESS:  Yes.

8    BY MR. SHAHIDPOUR:

9         Q.      Mr. Amberg, I'm handing you

10   what has been marked or what will be marked

11   Exhibit 3.  You can put Exhibit 2 to the

12   side.

13                   MS. SCULLION:  Thank you.

14                   THE EXHIBIT TECH:  Tab?

15                   MR. SHAHIDPOUR:  That is tab

16             four.

17                   MS. SCULLION:  She's going to

18             put the sticker on there.

19                   THE WITNESS:  I can help you

20             with that.

21                   - - - - -

22             (Email String Bates

23             BW__Irvington00238419 marked

24             Amberg Exhibit 3 for

25             identification.)

CONFIDENTIAL

```
 1                    - - - - -
 2    BY MR. SHAHIDPOUR:
 3          Q.      Please take a moment and
 4    review the document and let me know when
 5    you have ever seen it before.
 6          A.      I am vaguely familiar with
 7    this, yes.
 8          Q.      This email is from 2013?
 9          A.      That is correct.
10          Q.      That's when you were
11    assistant principal at Irvington High
12    School; is that right?
13          A.      That is correct.
14          Q.      And you mentioned that you
15    worked a lot with data and data analysis
16    while you were assistant principal; is that
17    right?
18          A.      That is correct.
19          Q.      And what you've attached --
20    and this email is from you; is that right?
21          A.      As far as I see.
22          Q.      And you attached a
23    presentation entitled, "Informed Decision
24    Making Through Data Analysis
25    final.PowerPoint"?
```

Page 58

1              MS. SCULLION:  Objection to

2          form in terms of completeness.  I

3          don't see an attachment here.

4    BY MR. SHAHIDPOUR:

5        Q.     Looking under the "to" line

6    in this email, you sent the email to a

7    number of people; is that right?

8        A.     That is correct.

9        Q.     And then under that the

10   exhibit -- Exhibit 3 notes that there's an

11   attachment to the email that you sent; is

12   that right?

13       A.     It looks that way.

14       Q.     And the title of the

15   attachment looks -- or is, "Informed

16   Decision Making Through Data Analysis

17   Final.PowerPoint;" is that right?

18              MS. SCULLION:  Objection to

19          form.

20              THE WITNESS:  It looks like

21          it.

22   BY MR. SHAHIDPOUR:

23       Q.     I'll hand you what will be

24   marked as Exhibit 4.

25              MS. SCULLION:  Thank you.

CONFIDENTIAL

Page 59

```
 1              MR. SHAHIDPOUR:  This is 4A.
 2              MS. SCULLION:  Now I'm
 3       confused.  We just had what I
 4       thought was three, am I off by one?
 5       It's Exhibit 3?
 6              MR. SHAHIDPOUR:  Now I'm
 7       marking Exhibit 4, which is the
 8       attachment to Exhibit 3.
 9              MS. SCULLION:  Okay.  So he
10       said 4A, that's why I was
11       confused --
12              MR. SHAHIDPOUR:  Tab 4A --
13              MS. SCULLION:  -- oh, thank
14       you.
15              MR. SHAHIDPOUR:  -- for the
16       trial tech.
17              MS. SCULLION:  Got it.  Too
18       many numbers floating around.
19       Okay.
20              THE WITNESS:  So is this 4A?
21              MS. SCULLION:  No, this is
22       four for us.
23                   - - - - -
24              (PowerPoint entitled
25       "Informed Decision Making Through
```

Page 60

```
 1            Data Analysis" Bates
 2            BW__Irvington00238420 marked
 3            Amberg Exhibit 4 for
 4            identification.)
 5                 - - - - -
 6   BY MR. SHAHIDPOUR:
 7       Q.      And, for the record, this is
 8   a document that was produced in native
 9   format with Bates ending in 8420.  And we
10   have pulled that native format as the rest
11   of the document.
12            And, Mr. Amberg, I'll
13   represent to you that this is the
14   attachment to the email that I just showed
15   you as Exhibit 3.  Do you have any reason
16   to doubt that this is the attachment to the
17   email that you sent?
18            MS. SCULLION:  So take some
19            time to look through.  Counsel, do
20            you have, I mean, do you have the
21            metadata that shows the
22            parent-child relationship?
23            MR. SHAHIDPOUR:  You can look
24            at the Bates, the Bates for this
25            document follows immediately after
```

CONFIDENTIAL

Page 61

```
 1              the parent email.
 2                   MS. SCULLION:  I'm just -- I
 3              mean I'm just assuming that the
 4              metadata actually reflects that
 5              this is the child, the parent-child
 6              relationship; is that right?
 7                   MR. SHAHIDPOUR:  Yes.
 8                   MS. SCULLION:  Is there a
 9              reason not just produce, to just
10              use it as one exhibit, I'm just
11              trying to understand the logic
12              here?
13                   MR. SHAHIDPOUR:  Just to keep
14              different documents different as
15              different exhibits, but that's our
16              preference.
17                   MS. SCULLION:  Okay.  I mean,
18              I will state I think it's unfair to
19              ask the witness to confirm whether
20              this is the attachment.  We can go
21              ahead with it, but we really should
22              have the metadata here, if you're
23              going to ask him about a 2015 email
24              to confirm under oath whether this
25              in fact the attachment when the
```

CONFIDENTIAL

Page 62

```
 1              metadata would show whether it was.

 2                   MR. SEXTON:  This is the Terry

 3              Sexton from Meta, I just want note

 4              that the long speaking objection is

 5              inappropriate under the federal

 6              rules.

 7                   MS. SCULLION:  So noted.

 8    BY MR. SHAHIDPOUR:

 9         Q.     Let me know when you've had a

10    chance to review, Mr. Amberg.

11         A.     Okay.

12         Q.     Can you turn back to the

13    first page of the native file, please?

14         A.     Native meaning.

15         Q.     Meaning following the slip

16    sheet, so it would be the second page, the

17    start of the PowerPoint.

18         A.     Okay.

19         Q.     This is a PowerPoint

20    entitled, "Informed Decision Making Through

21    Data Analysis;" is that right?

22         A.     That's what it says.

23         Q.     And did you create this

24    PowerPoint?

25         A.     I did not.
```

CONFIDENTIAL

Page 63

1          Q.      You did not.  Do you see your
2     name listed under the title of the
3     PowerPoint?
4          A.      Along with Sean Evans and
5     D'Antonio, if you look, open this up, and
6     you go to this page, do you see the name
7     here?
8          Q.      Sure.
9          A.      And then if you keep going,
10    do you see the name here?
11         Q.      Sure.  So did you create a
12    portion of this PowerPoint?
13         A.      I believe, based on the date,
14    that this was part of our certification
15    process, so I believe this was part of a
16    class.
17         Q.      So my question is whether you
18    created this PowerPoint?
19         A.      I don't remember.  What I do
20    remember is being in class with them and
21    for a certification process and I think it
22    was a collaborative effort probably between
23    many people.
24         Q.      Sure.  Did you present this
25    presentation to anyone?

CONFIDENTIAL

Page 64

```
 1          A.      That, I definitely don't
 2    remember.
 3          Q.      So what was the purpose of
 4    this presentation?
 5          A.      I don't remember that either,
 6    but -- I don't remember.
 7          Q.      So a minute ago, you ran
 8    through various pages of the presentation;
 9    is that right?
10          A.      Rephrase.
11          Q.      I just want to check -- a
12    minute ago, you looked through the
13    presentation; is that right?
14          A.      That is correct.
15          Q.      Did looking through it jog
16    your memory as to what the purpose of the
17    presentation may have been?
18          A.      What I think what I told you
19    is I believe this was part of our
20    certification process and it was something
21    that we presented both to our certification
22    class and then I'm guessing to -- but this
23    is, I don't remember, I guess also
24    presented it to other administrators.
25                  MS. SCULLION:  Mr. Amberg, I'm
```

CONFIDENTIAL

Page 65

```
 1              just going to remind you.  You use
 2              the word "guess" a few times in
 3              your answer, so you should not be
 4              guessing today.  You should be
 5              testifying based on actual
 6              recollections and knowledge.
 7  BY MR. SHAHIDPOUR:
 8         Q.      Let's turn to the next page,
 9  Mr. Amberg.
10         A.      Sure.
11         Q.      In your role as assistant
12  principal at Irvington High School, did you
13  on occasion analyze certain types of data
14  relating to students?
15         A.      Yes.
16         Q.      Would the type of data that
17  you analyzed include failure rates?
18         A.      Absolutely.
19         Q.      Would it include failure
20  rates among certain subgroups of students?
21         A.      Me personally?
22         Q.      Yes.
23         A.      Twelfth grade.
24         Q.      Twelfth grade.  Did you ever
25  analyze any failure rates for students
```

Page 66

```
 1   other than 12th graders?
 2          A.      11RR --11Rs, 10RRs, and
 3   9RRRs.
 4          Q.      Could you explain what you
 5   mean by "RR"?
 6          A.      Sure.  There's something
 7   called a cohort.  When a student enters
 8   high school, they enter in a cohort.  If
 9   they fall behind, they're still part of
10   that cohort, but possibly in a different
11   grade.
12          Q.      And so you analyzed a
13   particular cohort?
14          A.      The 12th grade cohort.
15          Q.      And then when you were
16   saying, "RR," what did you mean by that?
17          A.      Retained retained.
18          Q.      Retained retained?
19          A.      Correct.
20          Q.      What does that mean?
21          A.      Held back.
22          Q.      Okay.
23          A.      So they're still part of the
24   cohort, they were just retained.
25          Q.      Got it.  Did you have
```

CONFIDENTIAL

Page 67

1    occasion to review attendance issues

2    amongst students at Irvington High School

3    in your role as assistant principal?

4          A.     Twelfth grade.

5          Q.     You never reviewed attendance

6    issues for students other than 12th

7    graders?

8          A.     Twelfth grade is the

9    graduating year.  It must be spot on.  My

10   students must graduate.  They have to go

11   onto college or a career.  So my focus, my

12   sole focus, is to make sure my students are

13   getting into that college, they're getting

14   educated, they're going on to the best

15   career they possibly can have.

16         Q.     Sure.  I understand that and

17   I understand it's extremely important.  My

18   question was -- well, when you say it was

19   your sole focus, does that mean that you

20   didn't analyze any data relating to

21   anything relating to students other than

22   12th graders?

23              MS. SCULLION:  Objection to

24         form and mischaracterizes the

25         testimony.

CONFIDENTIAL

Page 68

1    BY MR. SHAHIDPOUR:

2            Q.      I'm asking him.

3            A.      11RRs, 10RRs, and 9RRRs.

4            Q.      So in this presentation

5    that's the second slide after the first

6    slide with your name on it, it notes that,

7    "On average 9th graders have the highest

8    failure rate;" is that right?

9                    MS. SCULLION:  Are you asking

10               what it says?

11                   THE WITNESS:  I believe that's

12               what's written on the page.

13   BY MR. SHAHIDPOUR:

14           Q.      And on this slide, it says,

15   "On average 9th graders have the most

16   attendance issues;" is that right?

17                   MS. SCULLION:  I'm sorry,

18               objection to form.  Counsel, my

19               question is, are you -- you say is

20               that right, are you asking him is

21               that accurate or is it correct that

22               that's what it says?

23                   MR. SHAHIDPOUR:  Counsel, I'm

24               asking my questions and if he has a

25               clarifying question, he can ask it

Page 69

```
 1              and I ask that you keep your
 2              speaking objections to a minimum --
 3                   MS. SCULLION:  And I'm trying
 4              to suggest --
 5                   MR. SHAHIDPOUR:  You can
 6              object to form.
 7                   MS. SCULLION:  I'm trying to
 8              suggest a way to get just through
 9              this more quickly.  I found your
10              question vague on a very important
11              issue.  If you're asking about is
12              that an accurate statement
13              factually or are you asking whether
14              it's on the page?
15  BY MR. SHAHIDPOUR:
16        Q.    Mr. Amberg, is it true on
17  average that -- strike that.
18              Mr. Amberg, does it say on
19  this page that, "on average 9th graders
20  have the most attendance issues"?
21        A.    It does say that on this
22  page.
23        Q.    Do you have any reason to
24  dispute that that was true at the time of
25  this presentation?
```

CONFIDENTIAL

Page 70

1          A.      I don't know, primarily,
2    because I was in charge of 12th grade.
3          Q.      And then does it say on this
4    presentation that, "On average 9th graders
5    have the highest disciplinary referrals"?
6          A.      It is written on this page,
7    yes, sir.
8          Q.      And do you have any reason to
9    doubt that that was true in 2015?
10         A.      Once again, I'm not sure,
11   because my primary job was to make sure
12   12th graders went on to college, went on to
13   a career, and make the best of their lives.
14         Q.      And then so as part of your
15   job, did you have to obtain certain
16   certifications?
17         A.      Me personally?
18         Q.      Yes.
19         A.      Yes.
20         Q.      And you testified earlier
21   that you suspect that this document may
22   have been something that you participated
23   in creating in the course of obtaining a
24   certification?
25         A.      Correct.

CONFIDENTIAL

Page 71

1          Q.     And so these slides that
2     follow the title slide that has your name
3     on it, could they have been slides that you
4     created in the course of obtaining that
5     certification?
6                     MS. SCULLION:  Objection to
7              form.  Lacks foundation.
8                     THE WITNESS:  I don't
9              remember, but that's what I
10             suspect --
11    BY MR. SHAHIDPOUR:    --
12         Q.     Okay.
13         A.       -- based on the dates and the
14    people who participated in it.
15         Q.     And let's talk a little bit
16    more generally.  Was it your experience as
17    assistant principal that Irvington High
18    School used data analysis for making
19    decisions about class failures?
20         A.     Could you explain that?
21         Q.     In your experience as
22    assistant principal at Irvington High
23    School, was it the case that Irvington High
24    School's administration conducted data
25    analysis to make decisions regarding

CONFIDENTIAL

Page 72

1  students' class failures?

2              MS. SCULLION:  Objection to

3          form.  Vague.

4              THE WITNESS:  I can tell you

5          for 12th grade, I did a lot of data

6          analysis.  I can't speak to any

7          others, primarily because each

8          assistant principal had their grade

9          level.

10 BY MR. SHAHIDPOUR:

11      Q.      I understand that.  Did you

12 speak with other assistant principals about

13 their -- about the work they were doing for

14 their grade levels?

15      A.      I don't remember speaking

16 specifically about that, no, sir.  We spoke

17 all the time though.

18      Q.      You didn't speak about

19 methods of data analysis with other

20 assistant principals while you were an

21 assistant principal at Irvington High?

22              MS. SCULLION:  Objection to

23          form.

24              THE WITNESS:  I basically

25          conducted my data analysis with my

CONFIDENTIAL

Page 73

1              guidance counselors, with my

2              teachers to make sure that every

3              single student had the best pathway

4              to graduate.

5    BY MR. SHAHIDPOUR:

6         Q.    Did you present the findings

7    of your data analysis to people?

8         A.    To the state.

9         Q.    To the state.  That's to the

10   state of New Jersey, was it -- excuse me.

11   To who at the state did you present your

12   findings?

13        A.    Present meaning I hand in a

14   report form NJ SMART, there are all

15   different state reports that are sent in,

16   but --

17        Q.    Sorry, did I cut you off?

18        A.    Yes.

19        Q.    I'm sorry?

20        A.    I did not present as in

21   speaking to the state, no.

22        Q.    Got it.  Did you ever present

23   findings of your data analysis to

24   administrators at IPS?

25        A.    The 12th grade findings, of

Page 74

1    course, that's how we knew who is

2    graduating and not.

3             Q.      And then did IPS

4    administrators make decisions based on the

5    data analysis that you provided to them?

6                    MS. SCULLION:  Objection to

7             form.  Lacks foundation.  Calls for

8             speculation.

9                    THE WITNESS:  Can you just

10            rephrase that, please?

11   BY MR. SHAHIDPOUR:

12            Q.      Are you aware of -- for what

13   purpose did you provide data analysis to

14   IPS administrators?

15            A.      How many graduation gowns we

16   should purchase, transcripts we should be

17   getting ready to send out, how many

18   students -- what would the graduation

19   percentage rate be, how many students

20   dropped out, how many students transferred,

21   how many students transferred into, like,

22   to another school in New Jersey compared to

23   outside New Jersey compared to, let's say,

24   internationally.

25            Q.      All right.  So those are the

CONFIDENTIAL

Page 75

```
 1   types of data of the data analysis that you
 2   provided.  I was asking for what purpose
 3   you provided those various categories of
 4   data to the Irvington Public Schools
 5   administrators.
 6                  MS. SCULLION:  Asked and
 7           answered.
 8                  THE WITNESS:  Graduation caps
 9           and gowns, transcript, how many
10           transcripts should be purchased,
11           you know, made.  Who would be
12           graduating, who wouldn't.
13   BY MR. SHAHIDPOUR:
14       Q.     Did Irvington Public Schools
15   administrators ever make decisions relating
16   to new programs or initiatives based on the
17   data analysis that you provided about 12th
18   graders?
19                  MS. SCULLION:  Objection to
20           form, lacks foundation, and calls
21           for speculation.
22                  THE WITNESS:  This is 12th
23           grade, correct?
24   BY MR. SHAHIDPOUR:
25       Q.     Yes.
```

1         A.      So if we were performing new
2    programs for the next year, are you talking
3    about in their college?
4         Q.      So to illustrate -- well,
5    let's walk it back.  Irvington Public
6    Schools may have made new decisions for
7    incoming 12th graders for the following
8    year based on data analysis that you
9    provided about Irvington High School
10   students -- excuse me, 12th graders from
11   the prior year; is that right?
12               MS. SCULLION:  Objection to
13          form.  Lacks foundation.  Calls for
14          speculation.
15               THE WITNESS:  New programs,
16          no, not necessarily.  They're on a
17          pathway already, especially if
18          they're in pathways, so it's how to
19          keep them on the pathway so that
20          they can graduate, go on and be
21          able to have a successful career.
22          That's the main point.  So making
23          sure they graduate, making sure
24          that they obtain the classes they
25          need to obtain so that they can,

CONFIDENTIAL

Page 77

1            based on the criteria, set about by
2            the state of New Jersey.
3    BY MR. SHAHIDPOUR:
4        Q.    All right.  Thank you, Mr.
5    Amberg.  Could you turn the page to --
6                MS. SCULLION:  Counsel, can I
7            suggest if you're going to move on
8            to something else, it has been just
9            a little over an hour, maybe take a
10           little break?
11               MR. SHAHIDPOUR:  Yeah, that
12           sounds good.
13               MS. SCULLION:  Great.  Okay.
14               THE VIDEOGRAPHER:  The time
15           right now is 10:37 a.m.  We are off
16           the record.
17                    - - - - -
18       (A recess was taken at this time.)
19                    - - - - -
20               THE VIDEOGRAPHER:  The time
21           right now is 10:53 a.m.  We are
22           back on the record.
23    BY MR. SHAHIDPOUR:
24        Q.    Hello again, Mr. Amberg.  Do
25    you have Exhibit 4 still in front of you?

CONFIDENTIAL

Page 78

1          A.      I do.

2          Q.      Could you turn to the page

3     that says, "Student Attendance YTD"?  It's

4     labeled five on the bottom right of that

5     exhibit.

6          A.      Uh-huh.

7          Q.      Was Irvington High School

8     meeting targets for student attendance

9     during the 2014 to 2015 school year?

10              MS. SCULLION:  Objection to

11          form.

12              THE WITNESS:  I don't recall.

13          And, again, my main focus were the

14          12th graders, but in all honesty, I

15          don't remember what -- if we were

16          meeting criteria or not.  But we

17          were always trying to strive for

18          higher.  Because our goal is to

19          graduate every single student no

20          matter what, because we want our

21          students to have the best quality

22          life they possibly could.

23     BY MR. SHAHIDPOUR:

24          Q.      Understood.  Looking at the

25     chart here on Exhibit 4 under student

CONFIDENTIAL

Page 79

```
 1    attendance, does it reflect that all
 2    students year to date were at 90 percent
 3    attendance?
 4             A.      That's what it seems to
 5    indicate.  I don't remember though exactly.
 6             Q.      And just as a refresher,
 7    since we took a break, this is a document
 8    that has your name on it under the title;
 9    is that right?
10             A.      I believe it's my name plus
11    others.
12             Q.      Right.  The first page of the
13    document has your name under, "Informed
14    Decision Making Through Data Analysis"?
15             A.      That's correct.
16             Q.      And then does anyone else's
17    name appear in the interim before we get to
18    this chart called, "Student Attendance Year
19    to Date"?
20             A.      I don't believe so, but I
21    don't remember who put this together and
22    the order it was put together, so I don't
23    know.
24             Q.      Would someone else have put
25    together a document and then put your name
```

CONFIDENTIAL

Page 80

1   on it?

2              MS. SCULLION:  Objection to

3         form, foundation.

4              THE WITNESS:  Well, again, if

5         this was from what I'm speculating,

6         what I believe, it's from the

7         classes that we had to take in

8         order for us to receive our

9         standard our certification.  Then

10        it could have been any one of that

11        team, whether both here in our core

12        team or even with the others that

13        were in those classes together for

14        their standard certification.

15   BY MR. SHAHIDPOUR:

16        Q.    Understood.  Other names

17   appear other elsewhere in the document as

18   you pointed out earlier, right?

19        A.    Uh-huh.

20             MS. SCULLION:  I'm sorry, you

21        need to say, "yes" or "no."

22             THE WITNESS:  Yes.

23             MS. SCULLION:  Thank you.

24   BY MR. SHAHIDPOUR:

25        Q.    And different sections of

Page 81

1    this document follow different title pages

2    that have other individuals' names on them,

3    right?

4                    MS. SCULLION:  Objection to

5            form.

6                    THE WITNESS:  With the exact

7            same title though, correct?

8    BY MR. SHAHIDPOUR:

9            Q.    That's right, yeah.

10           A.    Uh-huh.

11           Q.    There isn't a title page at

12   the very beginning that says everyone's

13   name, right?

14           A.    That is correct.

15           Q.    Okay.  Let's go back to that

16   "Student Attendance Year to Date" page.  Do

17   you have any reason to doubt the accuracy

18   of the data reflected in this table?

19           A.    I see what's written here, so

20   and it's 2015, I don't remember the exact

21   data even from my own particular cohorts,

22   but I see what is written here.

23           Q.    Right.  And it's something

24   that -- scratch that.

25                    What you see written here is

Page 82

1  a presentation that you and your colleagues
2  put together, right?
3              MS. SCULLION:  Objection to
4          form.  Vague.
5              THE WITNESS:  Colleagues
6          meaning teachers -- I'm sorry,
7          administrators in the class, there
8          might have been about 20 of us in
9          that class, along with if you're
10         compiling these things and working
11         on it in the class, and then also
12         my colleagues working in the school
13         subset of that.  So that's all the
14         possibilities.
15 BY MR. SHAHIDPOUR:
16      Q.     And you have reason -- do you
17 have reason to believe that anyone other
18 than the three individuals whose names are
19 listed in this presentation contributed to
20 this document?
21      A.     Oh, 100 percent.
22      Q.     Who would that be?
23      A.     I don't remember now, but
24 everybody that was in our cohort, we were
25 all contributing to each other, it was kind

CONFIDENTIAL

Page 83

1    of like we're sitting around this table now

2    and discussing, and add this point, that

3    point, we had our mentor who also

4    contributed, I don't remember her name

5    either, sorry, but that's how certification

6    processes work.

7            Q.    So you all --

8                  MR. SEXTON:  I'm sorry to

9            interrupt, I got a note that we

10           don't have the video turned on.

11                 MS. SCULLION:  Okay.  Go off

12           the record for one second.

13                 THE VIDEOGRAPHER:  It's on

14           now.

15                 MR. SEXTON:  Okay.  Thank you.

16                 MS. SCULLION:  Thanks.

17   BY MR. SHAHIDPOUR:

18           Q.    So you all -- let's go back a

19   little bit.  You circulated this

20   presentation as we noted earlier; is that

21   right?

22           A.    I believe that was the email.

23           Q.    And you circulated to a

24   number of other administrators?

25           A.    All the administrators, which

CONFIDENTIAL

Page 84

1    is part of the -- what I believe is the

2    certification process.

3        Q.    All right.  Let's move on to

4    the next slide titled, "Absenteeism."  Are

5    you with me?

6        A.    I am.

7        Q.    Do you have any reason to

8    doubt the data in this table?  This is the

9    one that immediately follows student

10   attendance.

11           MS. SCULLION:  So I think we

12           should make absolutely sure we're

13           absolutely on the same page.  Do

14           you see what's on the screen?

15           THE WITNESS:  I'm seeing it.

16           MS. SCULLION:  That's the page

17           you want?

18           MR. SHAHIDPOUR:  Yes.

19           MS. SCULLION:  And that's the

20           page you have.  Great.

21           THE WITNESS:  The only one I

22           can speak to that I have any sort

23           of familiarity with would be the

24           12th grade and that looks -- should

25           be about right.

CONFIDENTIAL

Page 85

1    BY MR. SHAHIDPOUR:

2         Q.    Okay.  Do you have any reason

3    to doubt the other data in this table?

4              MS. SCULLION:  Objection.

5              Lacks foundation.  And asked and

6              answered.

7              THE WITNESS:  Sir, maybe

8              you're not familiar with what

9              administrators do, but they're --

10             we are there to make sure our

11             students and for me, the 12th grade

12             have the best possible foundation

13             for their future.  So with that

14             being said, we really, and

15             especially 12th grade, it's the

16             most critical year, because this is

17             the year they graduate, hopefully,

18             graduate.  And with that being

19             said, we do anything and everything

20             to support them and that means

21             everything from a prom, right, to

22             senior day, all those things that's

23             on our plate.  Making sure that all

24             their testing has taken place.

25             That's part of the data, right,

Page 86

1          because you can't graduate if you
2          didn't pass the state-mandated
3          test.  So me, and my small little
4          team of guidance counselors and
5          12th grade teachers, work very hard
6          to make sure our students have that
7          very best chance to move on.
8    BY MR. SHAHIDPOUR:
9          Q.     And part of that process of
10   making sure that your students have the
11   best chance of moving on is compiling
12   complete and accurate data about them; is
13   that right?
14         A.     That is correct.
15         Q.     And did you experience --
16   scratch that.
17                Did you understand other
18   administrators to have a similar goal,
19   other administrators at IPS to have a
20   similar goal of ensuring that the students
21   for whom they were responsible also had the
22   best potential path forward?
23         A.     I'm not going to speak for
24   them.  I can only speak for myself in
25   saying that for me, that was 100 percent my

CONFIDENTIAL

Page 87

1    goal.  I came here to work because I care

2    about students.  I care about their

3    achievement.  And I've stayed here for, as

4    you noted on record, 26 years, because my

5    commitment is to the education of my

6    students.  I take that personally.  It's

7    something that's very important to me that

8    these students become critical thinkers,

9    that they have every chance they can to

10   have a better life.  I want them to have a

11   better life than me, just like my own, it's

12   a fact.

13           Q.      And in those 26 years, you

14   didn't gain any knowledge as to whether

15   other administrators had similar goals?

16                   MS. SCULLION:  Objection.

17           Mischaracterizes testimony.

18                   THE WITNESS:  I think that for

19           me, it is a personal.  It's

20           personal for me to work this hard

21           for this long, so I can speak for

22           myself, I can speak to my work

23           ethic, I can speak to the work

24           ethic of my team, and we work very

25           hard.

Page 88

```
 1              In general, I think every
 2          person who enters education
 3          enters it for the reason of
 4          educating and caring.  It's not
 5          for the money.  It's not for the
 6          fame.  It's not for power.  But
 7          it's to help the next generation
 8          move on.
 9  BY MR. SHAHIDPOUR:
10       Q.    All right.  Let's move on to
11  the next slide titled, "Discipline."
12              Do you have any reason to
13  doubt the data in this table?
14       A.    Again, I can speak for myself
15  and the 12th grade, as a 12th grade
16  administrator working very hard to make
17  sure my students move forward with life.  I
18  can say that I am not 100 percent sure,
19  because it was 2015, I don't have a
20  recollection of that, but that could be
21  correct, the 38.
22       Q.    All right.  Let's go on to
23  the next slide titled, "Intervention
24  Strategies."
25       A.    Sure.
```

Page 89

1          Q.    What do you understand an
2    intervention strategy to be?
3                    MS. SCULLION:  Objection to
4            form.  Vague.  And may I ask,
5            Counsel, are you asking him what
6            this meant here or in general?
7                    MR. SHAHIDPOUR:  No, what he
8            understands --
9                    MS. SCULLION:  Okay.
10                   MR. SHAHIDPOUR:  -- an
11           intervention strategy in general to
12           be?
13                   MS. SCULLION:  Thank you.
14                   THE WITNESS:  In general, to
15           help students who are having
16           trouble in a particular area to
17           overcome those troubles.
18   BY MR. SHAHIDPOUR:
19          Q.    And in general, how do you
20   understand IPS identified intervention
21   strategies --
22                   MS. SCULLION:  Objection to
23           form.
24                   MR. SHAHIDPOUR:  -- to employ?
25                   MS. SCULLION:  Objection to

CONFIDENTIAL

Page 90

```
 1          form.
 2               THE WITNESS:  Gosh, I couldn't
 3          begin to answer that.  I can tell
 4          you for 12th grade, I can say that
 5          we, myself, would speak with
 6          students constantly.  We would have
 7          small group meetings.  We would
 8          have large group meetings.  We
 9          would hold different events to
10          stimulate students, tell them yes,
11          you're going to make it, you're
12          going to graduate.  We worked with
13          teachers and we worked with
14          students who needed an extra
15          helping hand along the way.
16     BY MS. SCULLION:
17          Q.    So let's turn to this
18     particular document where it says,
19     "Intervention Strategies."
20          A.    Uh-huh.
21          Q.    Have you ever -- are you
22     familiar with any of the intervention
23     strategies -- strike that.
24               Are you familiar with any of
25     the items listed under intervention
```

CONFIDENTIAL

Page 91

1   strategies on this slide?

2          A.      These were part of our class

3   and these were suggestions made for all

4   administrators in our classes that this

5   could be something, no matter what school

6   you went to in the country, that has some

7   foundations.  So this would be something

8   along the lines of any other intervention

9   strategy that happens along the way, like

10  back in the day, you had Comer and so on.

11  It's different strategies, tools in a

12  toolbox that educators learn about so that

13  they have the tool if they want to

14  implement it with fidelity in their

15  particular district.

16         Q.      So I take it that you're

17  familiar with all three of these

18  intervention strategies listed on this

19  slide?

20         A.      We talked about different

21  kinds of intervention strategies, including

22  these, but many others also.

23         Q.      Did you talk about potential

24  intervention strategies based on data

25  analysis that you or others in the class

Page 92

1    performed?

2                    MS. SCULLION:  Objection to

3            form.

4                    THE WITNESS:  I believe one of

5            the Newark assistant principals

6            were discussing, I think it was

7            early monitoring of at-risk

8            students that they had employed or

9            were going to employ in their

10           district.  I believe there was some

11           at Rahway state -- Rahway School

12           District that talked about others.

13                   So it's, again,

14           conversations among people going

15           for their standard certification

16           and what are the tools in various

17           people's toolboxes.

18   BY MR. SHAHIDPOUR:

19           Q.     And was this presentation

20   specifically about informed decision-making

21   based on data analysis?

22           A.     I think this was, this is

23   what we've learned so far in our classes,

24   because if you look at --

25                   Q.     So for the record, are you

CONFIDENTIAL

Page 93

1    looking at --

2            A.        -- Exhibit 3.

3            Q.      Okay.

4            A.        And you analyze the two, this

5    was presented to all the assistant

6    principals and the assistant superintendent

7    as basically and, this is again, what I'm

8    guessing, it's presented to them as this is

9    what we've learned so far in our assistant

10   principal certification class.

11                  MS. SCULLION:  And, Mr.

12               Amberg, I'm just going to remind

13               you again, please do not guess.  If

14               you're actually guessing, please do

15               not.  Really, you should be

16               testifying from your actual

17               knowledge and recollection.

18                  MR. SHAHIDPOUR:  Counsel, I'll

19               remind again that the speaking

20               objections are inappropriate.

21                  MS. SCULLION:  You can't

22               seriously contest that you don't

23               want this witness guessing, you

24               want him guessing on the record?

25                  MR. SHAHIDPOUR:  I think the

CONFIDENTIAL

Page 94

1    record will speak for itself.
2           MS. SCULLION:  And he
3    literally said he was guessing, so
4    I'm just reminding him not to do
5    that.
6           MR. SHAHIDPOUR:  Right, right.
7    That's part of his testimony,
8    right, is that he is speculating?
9           MS. SCULLION:  Yes, and that
10   is not what he's here to do today.
11          MR. SHAHIDPOUR:  Right.
12   BY MR. SHAHIDPOUR:
13       Q.    Mr. Amberg, what was the
14   title of this presentation that's
15   Exhibit 4?
16       A.    "Informed Decision Making
17   Through Data Analysis."
18       Q.    Were you aware of -- in your
19   time at IPS, have you been made aware of
20   IPS identifying certain subgroups that
21   require extra assistance?
22          MS. SCULLION:  Objection to
23   form.
24          THE WITNESS:  As a 12th grade
25   administrator, I truly try to make

CONFIDENTIAL

Page 95

```
 1              sure every student had the best
 2              opportunity.  So I didn't look at
 3              one group, as you said, I looked at
 4              the whole -- at every single
 5              student and thought what could I do
 6              to make sure that these students
 7              have the best opportunity to
 8              graduate.  So that was what I did
 9              and that's what I can speak on.
10   BY MR. SHAHIDPOUR:
11        Q.      So you're not aware of IPS
12   identifying certain subgroups of students
13   that require additional assistance to meet
14   their full potential?
15              MS. SCULLION:  Objection to
16              form.  Asked and answered.
17              THE WITNESS:  I can say that
18              for my 12th grade students, every
19              student was important, no matter
20              what subgroup you're referring to,
21              heck, it can't matter to me.  What
22              mattered to me was them graduating,
23              them being able to become great
24              citizens of the United States.
25              MR. SEXTON:  Object to the
```

Page 96

1            response as nonresponsive.  Move to

2            strike.

3                  MS. SCULLION:  We contest the

4            motion.

5     BY MR. SHAHIDPOUR:

6         Q.    So you never identified any

7     particular subgroups that required

8     additional intervention during your time as

9     an IPS employee?

10                 MS. SCULLION:  And the entire

11            period, the entire 26 years?

12                 MR. SHAHIDPOUR:  Yes.

13                 MS. SCULLION:  Thank you very

14            much.

15                 THE WITNESS:  Okay.  So as

16            director of technology, we

17            identified students that did not

18            have the financial wherewithal to

19            purchase technology, specifically

20            Chromebooks, on their own, so we

21            made sure that we applied for

22            through the government programs,

23            which is a department, to make sure

24            that students had the technology

25            needed, especially during COVID,

CONFIDENTIAL

Page 97

1              but understand this, the analysis
2              primarily came through the food
3              services department.
4    BY MR. SHAHIDPOUR:
5         Q.    Thank you, Mr. Amberg.  So
6    you are not aware of any instances where
7    you identified 9th graders as a subgroup
8    that might need additional intervention?
9         A.    Oh, no, sir.
10        Q.    No.  You don't recall any
11   instances of identifying students who were
12   chronically absent as those who might need
13   additional intervention; is that right?
14             MS. SCULLION:  Objection to
15        form.
16             THE WITNESS:  Ninth grade?
17   BY MR. SHAHIDPOUR:
18        Q.    No, you don't recall any
19   instances of students who were chronically
20   absent as students who might need
21   additional intervention; is that right?
22             MS. SCULLION:  Objection to
23        form.
24             THE WITNESS:  For my 12th
25        graders, if students were absent,

CONFIDENTIAL

Page 98

1              we would reach out to the parents.

2              We would reach out to guidance.  We

3              would reach out to guardians to

4              make sure that they came to school,

5              because they were required to meet

6              a certain absenteeism rate in order

7              to graduate.

8    BY MR. SHAHIDPOUR:

9         Q.     So you answered, "for my 12th

10   graders," were you just responding in terms

11   of only during your time as assistant

12   principal to my previous question?

13        A.     Yes, sir.

14        Q.     So I'll ask again, during

15   your entire time as an IPS employee, do you

16   recall any instances of identifying

17   students who were chronically absent who

18   might need additional intervention?

19        A.     As a director of technology,

20   if students were chronically absent, we

21   needed to figure out ways to retrieve their

22   Chromebooks, especially at the end of the

23   year, so that was important, but we would

24   receive that data, again, from the

25   registrar's office and so on and then we

CONFIDENTIAL

Page 99

1  could speak with the tech coaches and so on

2  and with the registrar and with the

3  principal to try and retrieve Chromebooks

4  from the students, because they were

5  property of Irvington Public Schools.  And

6  they would need to be given to other

7  students in upcoming years in order to

8  further their education.

9         Q.     In your role as director of

10  technology and media services, have you

11  found it important to make informed

12  decisions based on data?

13             MS. SCULLION:  Objection to

14         form.  Vague.

15             THE WITNESS:  Any data, just

16         rephrase it maybe.

17  BY MR. SHAHIDPOUR:

18         Q.     Have you used -- well, have

19  you found it important to make decisions

20  based on an analysis of the data that is

21  available to you?

22             MS. SCULLION:  Objection to

23         form.  Vague.

24             THE WITNESS:  I believe in

25         general, data is very important and

CONFIDENTIAL

Page 100

1          we use it to -- in our purchasing

2          of Chromebooks, in our purchasing

3          of interactive boards.  We know

4          that when a Smart Board is in our

5          inventory system, that that right

6          there is either end of life or

7          really close to end of life.  So,

8          obviously, we know that we need to

9          be thinking about purchasing a new

10         interactive board in order to keep

11         that classroom functioning, the

12         teacher and the students being able

13         to do both their jobs, teaching and

14         learning.

15              Same thing with Chromebooks.

16         We understand that Chromebooks

17         have an end of life and we need

18         to really stay on top of that

19         data to know how many Chromebooks

20         are entering end of life, how

21         many Chromebooks are still in

22         good shape.  We look at our data

23         when it comes to Chromebook

24         repairs and so on.

25              We look at desktops within

Page 101

```
1              the schools to make sure that we
2              are up to date and if new
3              teachers are hired or any other
4              staff member, that we're able to
5              purchase a desktop for them.
6              Make sure that it's on the
7              correct OS.  Make sure we image
8              it properly for them.
9                   We also collect data on
10             laptops and iPads and so on.  So
11             if a student has a particular
12             IEP, we're told by that
13             department that they need a
14             particular resource, and then we
15             keep track and make sure that
16             that student gets that with the
17             appropriate case and we then keep
18             track of who has it and when it
19             was given out, when it was
20             returned.
21   BY MR. SHAHIDPOUR:
22        Q.    In your experience as an IPS
23   administrator, have you encouraged your
24   colleagues in the district to make informed
25   decisions based on data?
```

Page 102

1            MS. SCULLION:  Objection to

2        form.  Vague.

3            THE WITNESS:  I think it is

4        everyone's responsibility from the

5        janitor all the way up to do the

6        very best they can to make this the

7        best school possible, including the

8        food service workers.  Data there,

9        let's talk about whether students

10        enjoy broccoli compared to carrots.

11        Let's look at the data on what do

12        they eat and what don't they eat.

13        What's thrown away and what's kept.

14        Because food is an important part

15        of the education process, as Maslow

16        states, correct, if you don't have

17        that food in your stomach, you're

18        not going to be able to learn.  So

19        I think that I would absolutely

20        encourage the food service

21        department to look at that sort of

22        data and to make informed decisions

23        on it, 100 percent.

24   BY MR. SHAHIDPOUR:

25        Q.    So you have encouraged the

CONFIDENTIAL

Page 103

1    food services department to look at that

2    sort of data and make decisions on it?

3              A.    I --

4                    MS. SCULLION:  Objection,

5              sorry, objection to form, and asked

6              and answered.

7                    THE WITNESS:  I believe that

8              was one of our 12th grade asks as

9              coming from the student body, as

10             you can probably well imagine.

11   BY MR. SHAHIDPOUR:

12             Q.    That's one of the asks of the

13   12th graders or of you?

14             A.    Of the 12th graders through

15   me, because I'm just a conduit of the

16   student body.  I'm there to make sure the

17   student body achieves what they need to

18   achieve and if they feel that food helps

19   them in accomplishing their task,

20   absolutely.

21             Q.    In your experience, did 12th

22   graders at Irvington Public Schools

23   struggle with food insecurity?

24             A.    I think that everywhere in

25   the country, we struggle with food

Page 104

1  insecurity.  If we just look at, you know,
2  across the board what we eat compared to
3  what we're asked, you know, by health
4  experts, you know, Mediterranean diet
5  compared to what we eat with
6  ultra-processed foods and so on.  Let's
7  think about that for a second, what do we
8  eat here in the United States?  The access
9  to food, right, throughout the country, not
10 just here, but even in our local areas.  Do
11 we have fresh organic food?  Do we have it
12 cooked properly?  Do we have the ability to
13 pool local resources, local foods, right,
14 within our school district compared to
15 having it shipped from all over the
16 country, where you're not having the best
17 nutritional value.  Who is cooking the
18 food?
19            MR. SEXTON:  I object to the
20            witness's answer as totally
21            nonresponsive.  This is
22            filibustering and it's wasting our
23            time.  I move to strike his
24            response.  I just want to note that
25            for the record.  We're on time

CONFIDENTIAL

Page 105

```
1         limits here.  Counsel is aware that
2         we're on time limits here.  The
3         witness is deliberately
4         filibustering.
5              MS. SCULLION:  So we
6         absolutely disagree with that
7         characterization and it's improper
8         to make those accusations on the
9         record.  And we do contest the
10        motion.  Counsel asked about food
11        insecurity and --
12             MR. SHAHIDPOUR:  Well, that's
13        going to be a
14        mischaracterization --
15             MS. SCULLION:  And the witness
16        was giving his best answer.  I,
17        frankly, don't understand why we're
18        talking about food insecurity, but
19        here we are, that was the question
20        and the answer was given.
21             MR. SEXTON:  The question was
22        not about nationwide food
23        insecurity and processed foods.
24             MS. SCULLION:  If you don't
25        want to waste time, let's stop this
```

CONFIDENTIAL

                                    Page 106

1              and I would suggest going onto

2              questions that are relevant to the

3              case.

4                    MR. SHAHIDPOUR:  Thanks for

5              your input, Counsel.

6                    MS. SCULLION:  Yes.

7    BY MR. SHAHIDPOUR:

8         Q.     Speaking of questions

9    irrelevant to the case, are you aware of

10   any instances where Irvington High School

11   identified social media users as a subgroup

12   of IPS students requiring additional

13   interventions?

14                   MS. SCULLION:  Objection to

15             form.  Vague.

16                   THE WITNESS:  Are you talking

17             about as a director of technology,

18             in general?  In general, no.  And

19             as director of technology, no.

20   BY MR. SHAHIDPOUR:

21        Q.     To be clear, I was asking

22   you, Mr. Amberg, just if you're aware, I

23   wasn't asking in a particular role, is your

24   answer the same?

25                   MS. SCULLION:  Objection to

CONFIDENTIAL

Page 107

```
 1              form, vague, and lacks foundation.
 2                   THE WITNESS:  What I can say
 3              is this, as an assistant principal,
 4              what I've seen repeatedly when
 5              there are fights is everyone
 6              pulling out their cell phones
 7              jockeying for the best position to
 8              video record them.  And then later
 9              on, those fights end up all over
10              social media, which then leads to
11              more fights, days, sometimes even
12              weeks later.  Sometimes leading to
13              worse.  So I don't know if that
14              helps answer the question, but that
15              is the case.
16                   MR. SEXTON:  Object and move
17              to strike as nonresponsive.
18                   MS. SCULLION:  I contest the
19              motion.
20      BY MR. SHAHIDPOUR:
21          Q.    And when you mentioned fights
22      earlier, that students jockeying to -- you
23      mentioned students would jockey to get the
24      best position to film the fight?
25          A.    Uh-huh.
```

CONFIDENTIAL

Page 108

1          Q.      Is that so that they could
2     post the fight on social media?
3          A.      That's what would happen.
4          Q.      And then students would view
5     the fight on social media?
6          A.      That's what I understand.
7          Q.      And as a result of that
8     viewing of the fight on social media,
9     students would end up in more fights?  I'm
10    just trying to understand your testimony.
11         A.      Based on likes, based on
12    comments that other people made about the
13    fights, about what happened during the
14    fight, when we would pull them in and speak
15    to them, what's this about.  This person
16    said this about me.  This person said that.
17    It was an issue.
18         Q.      Okay.  Are you aware of any
19    instances where IPS considered whether more
20    prevalent social media use might be the
21    reason why the data showed that a
22    particular subgroup was struggling?
23              MS. SCULLION:  Objection to
24         form.  Vague as to time period.
25         And lacks foundation.

CONFIDENTIAL

1           THE WITNESS:  I apologize,
2        rephrase that just so I can
3        understand.
4  BY MR. SHAHIDPOUR:
5        Q.     Sure.  In your time as an IPS
6  employee, are you aware of any instances
7  where IPS considered whether a particular
8  subgroup of students may have not been
9  performing to their potential based on --
10 as a result of their social media use?
11       A.     We would hear -- I would
12 hear, I'm speaking for myself, I would hear
13 from teachers that students are distracted,
14 that students are interested in what they
15 saw, whether even if it is outside of
16 school that morning, that night, that
17 evening, what happened with blah, blah,
18 blah, and then that became more important
19 than the actual learning opportunity.  And
20 was that spoken of by teachers to me, that
21 was spoken.
22       Q.     Did any teachers speak to you
23 about -- excuse me -- did any teachers
24 speak to you about collecting any data on
25 students' social media use based on the

CONFIDENTIAL

Page 110

1    instances that you identified to my

2    previous -- in response to my previous

3    question?

4         A.    Data, no.  They were talking

5    specifically about specific events that

6    day, that week, what have you.  And then it

7    had ripple effects.

8         Q.    And did -- were you -- did

9    you speak with any other IPS employees

10   about any particular interventions based on

11   these instances that you mentioned in

12   response to my question?

13        A.    Well, we, as administrators,

14   tried to take cell phones from the

15   students, especially if they had them out,

16   because, again, our job here is to educate

17   and give the best possible education

18   possible and if they're more interested in

19   their phone than education, if they're more

20   addicted, if they're more excited about

21   their phone and what's going on or for that

22   matter, what happened in the social media

23   world the night before, the day before,

24   that morning, it becomes a distraction, a

25   huge distraction.

CONFIDENTIAL

Page 111

1          Q.     Is it also a distraction when
2    students are listening to music on their
3    phones during school hours?
4          A.     I can tell you that some
5    teachers in the classroom played Mozart, we
6    played Brahms, we played jazz, we play
7    different things to help students learn.  I
8    don't have any data on any of that, to be
9    honest, so I can't respond to that, but I
10   am responding as an employee who worked
11   where did some teachers play music in the
12   classroom, they did.
13         Q.     Okay.  And how about students
14   listening to music on their personal
15   devices, has that been reported to you as a
16   potential distraction?
17         A.     Again, if they have their
18   personal devices out, my role as 12th grade
19   administrator was to take it.
20         Q.     And does that also include if
21   they were texting while their cell phones
22   were out?
23              MS. SCULLION:  Objection to
24         form.  Vague.
25              THE WITNESS:  If they had

CONFIDENTIAL

Page 112

1          their phone out, it was my job to

2          take it.  Not an easy job, because

3          they were addicted to it.

4   BY MR. SHAHIDPOUR:

5          Q.     They were addicted to their

6   cell phones?

7          A.     Uh-huh.

8          Q.     Are you trained in addiction?

9          A.     I am not.

10         Q.     Do you have any certification

11  to diagnose addiction?

12         A.     I am -- I do not.

13         Q.     Do you have any certification

14  or training on how to treat addiction?

15         A.     I do not.

16         Q.     Okay.  Mr. Amberg, I am

17  handing you tab five, which we will mark as

18  exhibit -- are we on five, Exhibit 5,

19  please?

20         A.     Get my glasses on for you.

21                     - - - - -

22              (Third Amended Plaintiff

23         Fact Sheet - School Districts

24         marked Amberg Exhibit 5 for

25         identification.)

CONFIDENTIAL

Page 113

```
 1                   - - - - -
 2   BY MR. SHAHIDPOUR:
 3          Q.     Mr. Amberg, have you seen
 4   this document before?
 5                   MS. SCULLION:  And I would
 6            suggest the witness takes the time
 7            to look through the document.
 8                   THE WITNESS:  Yeah, let me
 9            check this out, please.
10   BY MR. SHAHIDPOUR:
11          Q.     And just let me know when
12   you're ready.
13          A.     You should have chunked it,
14   it would have been quicker.
15          Q.     Well, I'm only going to ask
16   you about certain questions.  I'm not going
17   to ask you about the whole document.  So if
18   you want to turn to the last page, that's
19   where I'll ask you my first question,
20   that's page 40.  Do you see that this
21   document was certified by Dr. Vauss?
22          A.     I do see her signature.
23          Q.     And that's specifically the
24   answers to the document that are certified,
25   not the whole document?
```

CONFIDENTIAL

Page 114

```
 1              MS. SCULLION:  Sorry.
 2         Objection to form, foundation, and
 3         calls for a legal conclusion.
 4              THE WITNESS:  What does that
 5         mean by the way?
 6  BY MR. SHAHIDPOUR:
 7       Q.    Well, okay, so you testified
 8  that, yes, you saw that Dr. Vauss certified
 9  the document.  What did you understand me
10  to be asking when you said, "yes"?
11              MS. SCULLION:  Objection.
12         That's -- that is not a fair
13         question to ask him what he
14         understood you to be asking.  Ask a
15         question.
16              MR. SHAHIDPOUR:  I asked a
17         question.
18              MS. SCULLION:  Okay.  He gave
19         you the answer to the original
20         question.  Do you have another
21         question?
22              MR. SHAHIDPOUR:  No, that's
23         it.
24              MS. SCULLION:  Okay.
25              MR. SHAHIDPOUR:  Well, I do
```

CONFIDENTIAL

Page 115

1          have more questions.

2                    MS. SCULLION:  Yes, good.

3     BY MR. SHAHIDPOUR:

4          Q.     Do you see that Dr. Vauss

5     signed this document on April 28, 2025?

6          A.     To be legally technical, I

7     see that it's not her signature, but her --

8     but, like, a signed, you know, like a stamp

9     or whatever, digital signature.

10         Q.     Okay.

11         A.     Yeah, I see that.

12         Q.     Turn to page 14 in the

13    document.  Let me know when you're there.

14         A.     Okay.  I do.

15         Q.     Do you see that IPS was asked

16    to identify the persons most knowledgeable

17    about student use of social media on school

18    property and the impact of such use on IPS

19    from the 2017 to 2018 school year to the

20    present?

21         A.     Uh-huh.

22                    MS. SCULLION:  I'm sorry, you

23          need to say, "yes" or "no".

24                    THE WITNESS:  Yes.

25                    MS. SCULLION:  I'm going to

Page 116

1            keep reminding you.
2                    THE WITNESS:  Yes, I
3            apologize.
4                    MS. SCULLION:  That's all
5            right.
6    BY MR. SHAHIDPOUR:
7        Q.    And do you see your name
8    listed as one of those persons?
9        A.    I do.
10       Q.    Are you able to quantify the
11   amount of time that IPS students spend on
12   personal electronic devices while on IPS
13   property?
14                   MS. SCULLION:  I'm sorry,
15           objection to form, vague, including
16           as to time period, which students,
17           vague.
18                   THE WITNESS:  You're asking me
19           as an AP -- I'm sorry, as assistant
20           principal of 12th grade?
21   BY MR. SHAHIDPOUR:
22       Q.    Yeah, I'll ask it again.
23   During the entire course of your time as an
24   IPS employee, are you able to quantify the
25   amount of time that IPS students spend for

CONFIDENTIAL

Page 117

1    any given amount of time or over -- scratch
2    that.
3                During the entire course of
4    your time as an IPS employee, are you able
5    to quantify the amount of time that
6    students have used social media on IPS
7    property over any period of time?
8                MS. SCULLION:  Objection.
9           Very overbroad and vague.
10               THE WITNESS:  Sir, I would be
11          speculating.  I see outcomes, but I
12          don't see them, because 17-18, what
13          they're asking there, I was an
14          assistant principal, not director
15          of technology.  But as a director
16          of technology, again, I see
17          outcomes more than anything else.
18          Like, with the TikTok that
19          happened, challenge that just
20          happened, right, where they're
21          trying to blow up Chromebooks.  I
22          saw the outcome of that, right?  I
23          saw the Chromebooks that were --
24          that were destroyed.  I saw the
25          paperwork for the suspensions and

CONFIDENTIAL

Page 118

```
 1            so on.  But was I there to
 2            actually, anything else, no.  So I
 3            do see outcomes.
 4  BY MR. SHAHIDPOUR:
 5        Q.      So in terms of you being
 6  listed in response to this question as a
 7  person most knowledgeable, would you say
 8  that you're only knowledgeable about the
 9  impact of such use on your district from
10  the 2017-2018 school year to the present?
11            MS. SCULLION:  I'm sorry, can
12            you repeat the question or read it
13            back, either way?
14  BY MR. SHAHIDPOUR:
15        Q.      In terms of you being listed
16  in response to the question that we're
17  looking at on page 14 of Exhibit 5, your
18  understanding, is it your understanding
19  that you are listed as a person most
20  knowledgeable only as to the impact of such
21  use on your district from the 2017 --
22            MS. SCULLION:  So, hold on.
23            MR. SHAHIDPOUR:  -- 2018
24            school year to the present?
25            MS. SCULLION:  Thank you.  So
```

CONFIDENTIAL

Page 119

1          objection to form and lacks
2          foundation.  You have not shown
3          that he is the one that decided who
4          was being listed here and for what
5          purpose.  That's my basis for in
6          terms of lack of foundation.
7          That's what you're asking him.
8               THE WITNESS:  So, sir, my
9          little bit of confusion is because
10         they have me as director there,
11         which I wasn't at the time.  I can
12         answer you two different ways.  One
13         as assistant principal where I was
14         there for the fights.  I was there
15         for, hey, everybody better get
16         outside, because social media
17         stated -- police officers, RITE
18         officers, or SROs, which is a
19         school resource officer would say,
20         hey, something is posted on social
21         media, we need all the
22         administrators outside, because --
23         at dismissal.  So I can speak on
24         that aspect or if you're talking
25         about -- and I'm not trying to --

CONFIDENTIAL

```
                                        Page 120
 1              I'm just trying to make sure I get
 2              this right, we're talking about
 3              director, I'm here, right, I'm not
 4              in the classroom, so I see the
 5              outcomes as a director, right?  I
 6              see the broken Chromebook.  I see
 7              students going through backdoor
 8              websites to access, like, YouTube,
 9              even though we have it completely
10              blocked.  Proxies, you know, we see
11              the outcome on that end.  But if
12              you're talking about administrator,
13              12th grade administrator, I can
14              speak on that maybe a little
15              differently.
16    BY MR. SHAHIDPOUR:
17         Q.     From 2017 to 2018 school year
18    to the present, do you have any knowledge
19    about student -- student use of social
20    media on school property?
21         A.     I can tell you that the
22    outcomes, I can tell you that students post
23    because the SROs would say, hey, come
24    outside at dismissal or watch out at
25    lunchtime, or be careful, whatever they
```

CONFIDENTIAL

Page 121

1    would say, there's an issue that's brewing

2    up.  And then we, as assistant principals

3    and the SROs and the deans, would then have

4    to do that.  So, yes, that was occurring

5    during school and I'm guessing -- I'm not

6    guessing, so.

7              Q.    As director and then

8    subsequently executive director of

9    technology and social media services at

10   IPS, are you able to quantify the amount of

11   time that IPS students spend on particular

12   apps on their personal electronic devices

13   while on IPS property?

14                   MS. SCULLION:  And objection,

15             I think you inadvertently asked him

16             about a title of social media

17             services, you meant media services

18             I believe.

19                   MR. SHAHIDPOUR:  Excuse me.

20                   MS. SCULLION:  Could you maybe

21             restate the question?

22   BY MR. SHAHIDPOUR:

23             Q.    Yes.  As director and then

24   subsequently the executive director of

25   technology and media services at IPS, are

Page 122

1    you able to quantify the amount of time

2    that IPS students spend on particular apps

3    on their personal electronic devices while

4    on IPS property?

5                    MS. SCULLION:  So objection to

6              form, vague, overbroad.

7                    THE WITNESS:  So an executive

8              director or director, for that

9              matter, we implemented GoGuardian

10             and GoGuardian is a web filter that

11             we implemented that has really

12             helped to shut down, along with our

13             other web filter, the firewall,

14             through Palo Alto to shut down most

15             social media taking place on their

16             Chromebooks.  And I said most.  The

17             reason why I say most is because

18             our students, like all other

19             students, tend to be ingenious and

20             they tend to when they -- you know

21             I'm not clinically certified, but

22             when they have a real need to get

23             on certain sites, they're going to

24             find their way.

25                    And just a few, I guess

CONFIDENTIAL

Page 123

1          about a week ago, through our
2          best efforts, through
3          GoGuardian's best efforts,
4          through Palo Alto's best efforts,
5          a young elementary school student
6          found a way through another
7          website that had a back door to
8          YouTube and was just watching
9          YouTube.  But we try to really
10         lock down as best as we can and
11         it's difficult and it's trying,
12         it is almost like playing
13         whack-a-mole, because as websites
14         pop up, as proxies pop up, we're
15         trying to identify them, because
16         students are going to many
17         different sites, many different
18         applications.  Can I identify
19         every single one?  No.  But we do
20         see proxies, that's what
21         GoGuardian has identified, and
22         then it's our job to try and
23         figure out which proxy and what
24         was it, what are they getting
25         into, that sort of thing.

                                    Page 124

 1              MR. SEXTON:  Objection,
 2         nonresponsive.  Move to strike.
 3              MS. SCULLION:  We contest the
 4         motion.
 5    BY MR. SHAHIDPOUR:
 6         Q.    So, Mr. Amberg, I asked about
 7    personal electronic devices of students and
 8    their use.  Does GoGuardian apply to
 9    student's personal electronic devices?
10         A.    I apologize, I thought you
11    meant --
12         Q.    Your counsel --
13              MS. SCULLION:  That's okay.
14         I'm just trying to make sure we're
15         not talking over each other.  So
16         let him finish his question and you
17         can give your answer.  I'm sorry,
18         could you repeat your question?
19    BY MR. SHAHIDPOUR:
20         Q.    Does GoGuardian apply to
21    students' personal electronic devices?
22         A.    I was under the impression
23    you meant their personal Chromebook that
24    they -- because a student is assigned a
25    Chromebook, but I apologize, so, no, it

CONFIDENTIAL

Page 125

1    does not.

2            Q.      Does Palo Alto apply to

3    students' personal electronic devices?

4            A.      No, sir.

5            Q.      So my previous question about

6    whether -- scratch that.

7                    Is IPS able to track any

8    information relating to students' use of --

9    scratch that.

10                   Through any digital

11   infrastructure, is IPS able to track any

12   information about what students do on their

13   personal electronic devices?

14           A.      No, sir.

15                   MS. SCULLION:  Objection --

16           wait, objection to form,

17           foundation.  Please go ahead.

18                   THE WITNESS:  No, sir.

19   BY MR. SHAHIDPOUR:

20           Q.      To your knowledge, is that

21   something that anyone in the district can

22   do?

23                   MS. SCULLION:  Objection to

24           form.

25                   THE WITNESS:  Possibly the

Page 126

1           SROs.

2    BY MR. SHAHIDPOUR:

3           Q.     And what's your basis for

4    saying that?

5           A.     Just experience with working

6    as a 12th grade administrator, they would

7    come to us and say, hey, such and such,

8    such and such, such and such posted this,

9    you better be careful.  There may be a, you

10   know, something brewing in the cafeteria.

11   There may be something brewing outside

12   after school.  So, no, we don't, and,

13   again, I'm speaking as a 12th grade

14   administrator, we would learn from the

15   SROs, which is the school resource

16   officers, that this was posted on social

17   media, better be careful, maybe have a

18   staggered dismissal.  Maybe cancel

19   after-school activities.  Maybe be careful

20   at a basketball game, baseball game, soccer

21   game, whatever it happens to be.  They

22   would pull more resources, meaning more

23   officers would come to the school.

24   Hopefully, that answered your question.

25          Q.     Yes.  Yeah.  Yeah.  Are the

CONFIDENTIAL

Page 127

1  school resource officers -- from 2017 to
2  2018, are you aware of whether school
3  resource officers have been able to
4  quantify the amount of time that a student
5  spends on any particular application on
6  their personal electronic device?
7            A.     I don't --
8                   MS. SCULLION:  Objection to
9            form, vague.
10                  THE WITNESS:  I'm sorry, I
11           didn't mean to interrupt.
12                  MS. SCULLION:  That's okay.
13           That's all right.
14                  THE WITNESS:  I'm sorry, I
15           don't -- I don't have that answer.
16  BY MR. SHAHIDPOUR:
17        Q.     Let's move on to some other
18  questions related to what you just
19  testified.  You testified that IPS provides
20  students with Chromebooks; is that right?
21           A.     That is correct, sir.
22           Q.     What year did IPS start
23  providing students with Chromebooks?
24           A.     I don't have an exact answer
25  for that, what I can tell you it started at

CONFIDENTIAL

Page 128

1    UMS with one classroom and one Chromebook
2    cart and I'm going to say that was maybe
3    2012, but I'm not exactly sure.
4            Q.      Sure.
5            A.      But it was, like, one
6    classroom cart just as something to test
7    out.
8            Q.      Sort of like a pilot program?
9            A.      Yeah, exactly.
10            Q.      When did IPS start expanding
11    that program?
12            A.      COVID was a huge -- gradually
13    throughout the years, it has been going up,
14    based on state testing.  See, a lot of
15    times it's, you know, is the cart pushing
16    the horse or whatever the phrase is, it's
17    we have to meet our obligations with state
18    testing and when state testing went from
19    pen and paper to digital, it was really
20    kind of forcing us to have it.  And then
21    they ask, well, we're going to test X
22    amount of grades, so then we have to make
23    sure we know how many Chromebooks we need
24    for that specific thing.
25                    Secondly, a lot of our

CONFIDENTIAL

Page 129

1    curriculum, right, started transitioning,
2    again, from paper and pencil to digital.
3    So here again, we're, like, okay, and we
4    start moving towards that.  But the
5    largest, sir, was during COVID.  That's
6    when we really saw, it just became
7    overwhelming, because, again, our job, our
8    role as educators is to make sure that we
9    are able to educate our students the best
10   we can.  And the technology department, our
11   department, really understood that, and we
12   worked day and night, on weekends, to get
13   Chromebook carts wired and ready, at our
14   homes.  We had them delivered to our homes
15   and we literally wired carts at our homes.
16   I had it all in my driveway and we wired
17   carts to get them ready for kids.
18              We put -- we updated
19   operating systems, you know, whatever was
20   necessary to get our students and then they
21   made sure that we were able to pass them
22   out and we had lines outside during COVID
23   and we would pass them to the parents.
24          Q.     Thank you, Mr. Amberg, I
25   appreciate the narrative.  Just moving

Page 130

1    forward, when I ask a question like when,
2    that starts with when, I'm asking about
3    like a time period --
4           A.    Okay, I'm sorry.
5           Q.    -- not exactly why or how,
6    and I appreciate that, but we'll -- I try
7    to get to those questions too --
8           A.    Sure.
9           Q.    -- but I really just want to
10   establish years and time frames first.  So
11   what year did IPS start providing -- well,
12   scratch that.
13                Has IPS provided -- does IPS
14   provide every IPS student with a
15   Chromebook?
16          A.    That is what we strive to do,
17   correct, sir.
18          Q.    And what year did IPS start
19   its program of providing every student with
20   a Chromebook?
21          A.    Probably right around COVID
22   is really when, when we had maximum and
23   even went at one point to two-to-one.
24          Q.    And that's in 2020?
25          A.    Ish, but I'm going to say

Page 131

1    starting 2019-ish, you know, we have been

2    gradually building it up from, say, 2012

3    with our first Chromebook cart, as I

4    stated, based on testing and everything

5    else, we gradually started building up.  I

6    don't have the exact numbers in front of

7    me, but I can tell you, we started then,

8    and as it continued, we -- we bought more

9    and more and more to make sure our students

10   had them.

11         Q.     Does IPS provide its students

12   with Chromebooks for use at home?

13         A.     During COVID, we definitely

14   did, obviously.  After that, there was an

15   ECF grant that was given which allowed

16   students to have a Chromebook at home, so

17   that after they returned from COVID, to

18   have a Chromebook at home in order to

19   facilitate everything from homework to

20   projects, to, you know, studying for tests,

21   those sort of things.

22         Q.     Does IPS provide its students

23   with any tablets?

24         A.     If it's in -- and I think I

25   referred to this in the past, but if it is

CONFIDENTIAL

Page 132

1  part of a particular IEP, we are required,

2  not just by state law, but I believe it's

3  federal, to provide whatever is necessary

4  for the student and what I've seen,

5  primarily what the Child Study Team

6  decisions, they tend to be iPads.

7          Q.      Okay.

8          A.      Not so much like a Windows

9  tablet.  It tends to be an iPad, but I

10 figured that was okay for you.

11         Q.      Sorry, I didn't mean to cut

12 you off.  A little bit of a pause.  An IEP,

13 to be clear, is Individualized Education

14 Plan?

15         A.      Correct, sir.

16         Q.      Okay.  Does IPS provide

17 tablets, whether it's iPads or Microsoft

18 devices, to any students other than those

19 who are on IEPs?

20         A.      Possibly in the preschool

21 program, because Chromebooks and preschool

22 probably doesn't work out so well, but

23 that -- I haven't seen that in a

24 substantial amount of time, but I wouldn't

25 be surprised if there were some for the

CONFIDENTIAL

Page 133

1  preschool.
2          Q.      Okay.  And then, again, don't
3  want you guessing or speculating, do you
4  have any reason to -- what is your reason
5  for believing that it may have been
6  provided at the preschool, it being
7  tablets?
8          A.      I remember it was talked
9  about, but as far as it coming across my
10 desk for purchasing and so on, I haven't
11 seen that in a long time.
12         Q.      Okay.  Does IPS provide
13 students with Wi-Fi hotspots?
14         A.      Great question.  During
15 COVID, for a short amount of time for
16 students who needed it, we did.  After
17 COVID, no, except, there's an exception,
18 the exception is if there is a mandated
19 state test that they have to do and they're
20 out for a medical reason or something like
21 that, the teacher, the home instructor will
22 go and retrieve, I believe we have two or
23 three in the district, will go and take
24 that, have them do their standardized
25 tests, and then return it to the district.

CONFIDENTIAL

Page 134

1          Q.      So you mentioned GoGuardian
2   and another firewall earlier, Palo Alto?
3          A.      Web filter and a firewall.
4          Q.      I'm sorry, what was that?
5          A.      Web filter.
6          Q.      Web filter?
7          A.      GoGuardian is a web filter.
8   Palo Alto is both a firewall and a web
9   filter.
10         Q.      Perfect.  I appreciate that
11  clarification.  Do those tools apply when a
12  student is using their -- when a student
13  was using their Wi-Fi hotspot during COVID?
14         A.      That -- those, no, but we
15  purchased CIPA-compliant hotspots, so that
16  was like T-Mobile is CIPA compliant, a
17  trusted partner, you know, I don't know
18  anything more than that.
19         Q.      And so what is your
20  understanding of what the difference
21  between a CIPA-compliant hotspot is from a
22  regular hotspot?
23                  MS. SCULLION:  I'm just going
24          to object to the extent it calls
25          for any legal conclusion, but you

CONFIDENTIAL

Page 135

1              can testify to your understanding.
2                    THE WITNESS:  A CIPA compliant
3              would mean that there's some sort
4              of filtering there that don't allow
5              them to look at pornography, you
6              know, that sort of thing.  That's
7              covered under the Child Internet
8              Protection Act.
9    BY MR. SHAHIDPOUR:
10         Q.    Do you know whether these
11   COVID era CIPA compliant Wi-Fi hotspots
12   that IPS provided blocked any social media
13   websites?
14         A.    No, because we didn't get any
15   access to the web filtering.
16         Q.    Are there any other
17   electronic devices that IPS provides to
18   students for use either at home or at
19   school?
20                    MS. SCULLION:  Objection,
21              vague.
22                    THE WITNESS:  I'm thinking.
23              Hold on.  I don't think so.  I'm
24              wondering maybe with a sports team
25              if they do some sort of video game

CONFIDENTIAL

Page 136

1           analysis, but that's, you know, no,
2           for students, it's what I told you.
3                MR. SHAHIDPOUR:  Okay.  We've
4           reached about noon.  Would you like
5           to take a break?
6                MS. SCULLION:  I was going to
7           suggest it may be a good time for a
8           break only because it looks like
9           lunch is arriving imminently.
10               THE WITNESS:  Oh, then yes.
11          If not, keep going.  I enjoy
12          this --
13               MS. SCULLION:  It would be an
14          opportune time.
15               THE WITNESS:  -- thank you,
16          guys, I appreciate this.
17               MR. SHAHIDPOUR:  Thank you.
18          We can go off the record.
19               THE VIDEOGRAPHER:  The time
20          right now is 11:59 a.m.  We are off
21          the record.
22                    - - - - -
23      (A recess was taken at this time.)
24                    - - - - -
25               THE VIDEOGRAPHER:  The time

CONFIDENTIAL

```
                                     Page 137

 1            right now is 1:03 p.m.  We are back

 2            on the record.

 3   BY MR. SHAHIDPOUR:

 4         Q.     Welcome back, Mr. Amberg.

 5   Good afternoon.

 6         A.     Thank you.

 7         Q.     I've handed what I will mark

 8   as Exhibit 6, have you seen this document

 9   before?

10         A.     I didn't see this -- you

11   didn't tell me the back.  I'm sorry, I

12   have.

13                    - - - - -

14            (CARES Act Budget Bates

15            BW__Irvington00256844 to 256845

16            marked Amberg Exhibit 6 for

17            identification.)

18                    - - - - -

19   BY MR. SHAHIDPOUR:

20         Q.     And what is this document?

21         A.     It was a projection of how to

22   spend CARE Act budget.

23         Q.     And what is CARE Act or CARES

24   Act?

25         A.     CARES Act, sorry, was a grant
```

CONFIDENTIAL

Page 138

1    that came from the government to help with

2    students' needs, especially if there was

3    insecurities as far as financial and so on.

4          Q.    Okay.  Do you remember

5    when -- well, excuse me -- scratch that.

6                Did IPS receive funds

7    through the CARES Act?

8          A.    I believe they did.  That

9    would better be answered by our financial

10   department, Mr. Lamptey, who is the

11   business administrator, but I did spend

12   money on hotspots and Chromebooks.

13         Q.    Okay.  And those are the --

14   some of the items that are listed in this

15   CARES Act budget here that's Exhibit 6?

16         A.    It looks about right.

17         Q.    Okay.  Did -- is this an

18   accurate representation of the budget that

19   the media services and technology

20   department created for CARES Act funds at

21   IPS?

22               MS. SCULLION:  Objection to

23         form.  Vague.

24               THE WITNESS:  So to understand

25         how we work here, we're given a

CONFIDENTIAL

Page 139

```
 1              budget, correct, by the business
 2              administrator, right?  And then we
 3              work based on needs throughout the
 4              schools.  So I ask my tech coaches,
 5              and then I come up with a number of
 6              what we would need in order to be
 7              able to, especially around the time
 8              of COVID, what we would need for
 9              students and so on.
10   BY MR. SHAHIDPOUR:
11         Q.      Okay.  Got it.  Did you come
12   up with this budget that we're looking at
13   here?
14         A.      Well, Mr. Lamptey had his
15   part, because he's the money person and
16   then a collaborative effort between the
17   technology coaches, the principals, and
18   myself.
19         Q.      Is this -- can you put a date
20   or an approximate date on when this CARES
21   Act budget was made?
22         A.      I, truthfully, I don't
23   remember, I'm sorry.
24         Q.      Do you remember what school
25   year?
```

CONFIDENTIAL

Page 140

1          A.      I'm going to say maybe around

2   2020, but in all honesty, I don't remember.

3          Q.      Did IPS anticipate receiving

4   CARES Act funds due to COVID?

5                  MS. SCULLION:  Objection to

6               form.  Vague.

7                  THE WITNESS:  I don't know

8               what they anticipated.  What I can

9               tell you specifically for me is I

10              needed to make sure every student

11              who needed a Chromebook had a

12              Chromebook.  Who anticipated what,

13              as far as money is concerned,

14              that's out of my jurisdiction, but

15              my job was to make sure that I

16              spoke with every single person to

17              make sure that we had enough to

18              service our students.

19  BY MR. SHAHIDPOUR:

20          Q.      So was it through spending

21  pursuant to the CARES Act that the media

22  services and technology department was

23  first able to procure Chromebooks for every

24  IPS student?

25                  MS. SCULLION:  Sorry, let me

CONFIDENTIAL

Page 141

1             take a look at this again.

2             Objection to form.

3    BY MR. SHAHIDPOUR:

4          Q.    I'll withdraw and I'll kind

5    of break it down a little bit.

6                You testified earlier that

7    IPS at some point started to strive to

8    provide Chromebooks to every IPS student?

9          A.    That's correct.

10         Q.    Would it have been through

11   this CARES Act budget or spending

12   through -- scratch that.

13               Would it have been spending

14   through this CARES Act budget that IPS

15   would have first tried to provide

16   Chromebooks to every IPS student?

17               MS. SCULLION:  Objection to

18          form.

19               THE WITNESS:  So what I can

20          say is this.  We had before what

21          was called a building base budget

22          and that basically means that the

23          building principal was in charge of

24          their building and that gave them a

25          budget, which I wasn't aware of, to

CONFIDENTIAL

Page 142

1          purchase all different things, both
2          technology and otherwise.  They
3          would come to us and we would help
4          them make a decision on the type of
5          device that was -- or model or
6          make, that sort of thing.
7                Later on, this big amount of
8          money came around, I'm thinking,
9          right around COVID time and
10          that's when in order to make sure
11          we were able to have devices for
12          all of our students that we
13          purchased as a department instead
14          of at a building level.  But
15          before that, it was building
16          based, so I can't tell you why or
17          how the principal purchase, if
18          that makes sense.
19   BY MR. SHAHIDPOUR:
20          Q.     No, it does and I just want
21   to clarify, you pointed, when you said this
22   big amount of money, you said this big
23   amount of money came around, were you
24   pointing at exhibit --
25          A.     I was.

                                        Page 143

1          Q.      -- at the Exhibit 6 here?

2                  MS. SCULLION:  Just a reminder

3          let him finish his questions before

4          you begin your answers.  Thank you.

5   BY MR. SHAHIDPOUR:

6          Q.      Sorry.  Did you answer?

7          A.      I believe, yes, this is a

8   large amount of money, I believe we made

9   the purchase.

10         Q.      Got it.  I just wanted to

11  clarify the gesture for the record.  Thank

12  you.  I'm handing you tab seven, which

13  we'll mark as Exhibit 7.

14                  - - - - -

15                  (Email dated 9/11/19 Baes

16          BW__Irvington00227923 to 00227924

17          marked Amberg Exhibit 7 for

18          identification.)

19                  - - - - -

20  BY MR. SHAHIDPOUR:

21         Q.      Mr. Amberg, are you familiar

22  with the Chromebook Student User Agreement?

23         A.      Let me just read this.

24                  MS. SCULLION:  Before you give

25          your answer I'm just going to

CONFIDENTIAL

Page 144

```
 1              object on the grounds that the
 2              document as provided is incomplete.
 3              It lacks the attachments and I
 4              don't believe you should be asking
 5              the witness about the document
 6              without it being a complete form,
 7              so we're objecting on that basis.
 8                      MR. SHAHIDPOUR:  Noted.
 9                      THE WITNESS:  I'm familiar.
10  BY MR. SHAHIDPOUR:
11        Q.      And you're familiar with
12  Chromebook user -- Student User Agreement?
13        A.      That is correct.
14        Q.      Are you familiar with the
15  Student Use of Technology Agreement?
16                      MS. SCULLION:  Same
17              objections.
18                      THE WITNESS:  I'm more
19              familiar with the Chromebook
20              Student User Agreement.
21  BY MR. SHAHIDPOUR:
22        Q.      Okay.  But you're familiar
23  that IPS --
24        A.      Yes.
25        Q.      -- has both of these
```

Page 145

1    agreements --

2         A.      Yes.

3         Q.      -- in general?

4              MS. SCULLION:  So just a

5         reminder again, let him finish and

6         then you can give your answer.

7              THE WITNESS:  Yes.

8              MS. SCULLION:  Okay.  Thanks.

9              MR. SHAHIDPOUR:  I'll repeat

10        the question.

11             MS. SCULLION:  Thank you.

12   BY MR. SHAHIDPOUR:

13        Q.      So, Mr. Amberg, you're

14   familiar that IPS has these agreements?

15        A.      Correct.

16        Q.      Do you see in this email that

17   we're looking at, Exhibit 7, you were cc'd

18   on an email transmitting copies of both of

19   these agreements?

20             MS. SCULLION:  Objection to

21        form and objection that you're

22        asking about a facially incomplete

23        document because you have not

24        provided the attachments.

25             THE WITNESS:  I do see this

Page 146

1                   email.  It was sent from a tech

2                   coach to the building principal and

3                   I was copied.

4      BY MR. SHAHIDPOUR:

5           Q.       And I will note for the

6      record that this email was produced by the

7      district and I will hand to you tabs 7A and

8      7B, which I will mark Exhibits 8 and 9

9      respectively.  What I'm handing you now is

10     Exhibit 8.  And what I'm handing you now is

11     Exhibit 9.

12                   MS. SCULLION:  Counsel, could

13                   I have a representation for the

14                   record that the metadata indicates

15                   that these are in fact the children

16                   to Exhibit 7?

17                   MR. SHAHIDPOUR:  Yes, I was

18                   just about to represent that before

19                   asking my questions.

20                   MS. SCULLION:  And for

21                   transparency, we're going to

22                   continue to object, because there's

23                   an additional, at least one

24                   additional, it looks like,

25                   attachment to Exhibit 7 that has

CONFIDENTIAL

Page 147

```
 1            not yet been provided to us.
 2                 MR. SHAHIDPOUR:  Okay.  Noted.
 3                 MS. SCULLION:  I'm sorry, is
 4            there a question pending?
 5                 MR. SHAHIDPOUR:  No, I was
 6            letting him review the document.
 7                 MS. SCULLION:  Okay.  Thank
 8            you.  Okay.  Great.
 9                 - - - - -
10            (Student Use of Technology
11            Agreement and Release of
12            Liability Form Bates
13            BW__Irvington00227925 to 227927
14            and Chromebook Student User
15            Agreement Bates
16            BW__Irvington00227933 to 227934
17            marked Amberg Exhibits 8 and 9
18            for identification.)
19                 - - - - -
20  BY MR. SHAHIDPOUR:
21       Q.    Again, Mr. Amberg, I'm only
22  going to ask questions about portions of
23  these documents.  If at any point during my
24  questions, you feel a need to review other
25  parts of the document, just let me know.
```

CONFIDENTIAL

Page 148

1        A.      Thank you.

2        Q.      But looking at Exhibit 8, is

3   this the Student Use of Technology

4   Agreement and Release of Liability Form of

5   Irvington Public Schools?

6              MS. SCULLION:  Objection to

7         form.  Vague.

8              THE WITNESS:  It appears to

9         be.

10  BY MR. SHAHIDPOUR:

11       Q.      And did you participate in

12  drafting -- well, scratch that.

13              Is this specifically the IPS

14  district-wide Student Use of Technology

15  Agreement and Release of Liability Form

16  from 2018?

17       A.      I believe this is an earlier

18  copy, especially with the use of PDAs in

19  there and emergency radios and so on, I

20  believe this may have been before my time,

21  because we don't have PDAs and so on.

22       Q.      Okay.  So given my

23  representation that this is an attachment

24  to the email that's Exhibit 7 that was

25  circulated in 2019, do you have any reason

CONFIDENTIAL

Page 149

1    to doubt that even if this policy was

2    drafted earlier, it was still in place in

3    the 2018-2019 period?

4                    MS. SCULLION:  Objection to

5              form.  Lacks foundation.  Yeah.  It

6              calls for speculation.

7                    THE WITNESS:  I would suspect,

8              but I don't know for sure.

9    BY MR. SHAHIDPOUR:

10         Q.    Okay.  Did you participate in

11   drafting this policy?

12                    MS. SCULLION:  Are you asking

13             specifically about Exhibit 8?

14                    MR. SHAHIDPOUR:  Exhibit 8.

15                    MS. SCULLION:  Thank you.

16                    THE WITNESS:  I did not.  This

17             is most likely before my time.

18   BY MR. SHAHIDPOUR:

19         Q.    Have you ever participated in

20   drafting one of IPS's Student Use of

21   Technology Agreement and Release of

22   Liability Forms?

23         A.    I participated in Chromebook

24   Student User Agreement, rules and

25   operating, this form, absolutely.

CONFIDENTIAL

Page 150

1        Q.    Okay.  But despite not
2    participating in drafting the Student Use
3    and Technology Agreement and Release of
4    Liability Form, you testified earlier that
5    you are generally familiar with it?
6            A.    Generally.
7                MS. SCULLION:  Objection,
8            mischaracterizes testimony.  Go
9            ahead.
10                THE WITNESS:  Generally.
11    BY MR. SHAHIDPOUR:
12            Q.    Generally.  Let's turn to the
13    bottom of the first page and this is --
14                MS. SCULLION:  Which exhibit?
15                MR. SHAHIDPOUR:  Yeah, I was
16            just about to say --
17                MS. SCULLION:  That's fine.
18                MR. SHAHIDPOUR:  -- of
19            Exhibit 8 --
20                MS. SCULLION:  Thank you.
21                MR. SHAHIDPOUR:  -- ending in
22            Bates number 925.  Do you see that
23            there are certain student
24            obligations and responsibilities
25            with respect to use of technology?

CONFIDENTIAL

Page 151

```
 1                  THE WITNESS:  Uh-huh.
 2    BY MR. SHAHIDPOUR:
 3           Q.     And this is use of district
 4    technology specifically, right?
 5           A.     Uh-huh.
 6                  MS. SCULLION:  You're going to
 7              need to say, "yes" or "no".
 8                  THE WITNESS:  Yes.
 9    BY MR. SHAHIDPOUR:
10           Q.     And just running through
11    these, "Students are prohibited from using
12    district technology for improper purposes,
13    including, but not limited to use of
14    district technology to access, post,
15    display, or otherwise use material that is
16    discriminatory, libelous, defamatory,
17    obscene, sexually explicit, or disruptive;"
18    is that right?
19           A.     Correct.
20           Q.     "Students are also prohibited
21    from using district technology to bully,
22    harass, intimidate, or threaten other
23    students, staff, or other individuals;" is
24    that right?
25           A.     That's what it says here,
```

CONFIDENTIAL

Page 152

1    yes.

2          Q.       And then cyberbullying in

3    parentheses?

4          A.       Yes.

5          Q.       Students are also prohibited

6    from using district technology to,

7    "disclose, use, or disseminate personal

8    identification information (such as name,

9    address, telephone number, Social Security

10   number, or other personal information) of

11   another student, staff member, or other

12   person with intent to threaten, intimidate,

13   harass, or ridicule that person."

14                 Do you see that?

15         A.       I do see that.

16         Q.       And then students are also

17   prohibited from, "Infringing on copyright

18   license, trademark, patent, or other

19   intellectual patent property rights;" is

20   that right?

21         A.       Uh-huh, I do see that.

22         Q.       Students are prohibited from,

23   "Intentionally disrupting or harming

24   district technology or other district

25   operations."

Page 153

1              Do you see that?

2        A.      I do see that.

3        Q.      Students are prohibited from

4    "installing unauthorized software."

5              Do you see that?

6        A.      I do.

7        Q.      Students are prohibited from

8    "Hacking into the system to manipulate the

9    data of the district or other users."

10             Do you see that?

11       A.      I do.

12       Q.      And then as there's a final

13   one that says students are prohibited from,

14   "Engaging in or promoting any practice that

15   is unethical or violates any law or Board

16   policy, administrative regulation, or

17   district practice.

18             Do you see that?

19       A.      I do.

20       Q.      So turning back on the first

21   page, the first three prohibitions and

22   then -- that we ran through and then the

23   fourth prohibition that we discussed, all

24   have to do specifically with the

25   information that a student views or shares

CONFIDENTIAL

Page 154

1    online?

2                    MS. SCULLION:  Objection to

3              form.

4                    THE WITNESS:  Are you asking

5              me?

6    BY MR. SHAHIDPOUR:

7         Q.    Yes.

8         A.    Could you repeat the

9    question?

10        Q.    Do the first four

11   prohibitions specifically have to do with

12   information that a student views or shares

13   online?

14                   MS. SCULLION:  Objection to

15             form.  And mischaracterizes the

16             document.

17                   MR. SHAHIDPOUR:  It was a

18             question of -- about the document.

19                   MS. SCULLION:  Which I think

20             had some built-in assumptions.

21                   THE WITNESS:  So one through

22             three looks like what students are

23             not allowed to post on online.  And

24             the fourth, I'm not even sure what

25             that exactly means, number four,

CONFIDENTIAL

```
                                      Page 155
 1            sorry.
 2   BY MR. SHAHIDPOUR:
 3            Q.      Okay.  You don't have to be
 4   sorry.  Prohibitions five, six, and seven,
 5   do they have to do with unauthorized
 6   disrupting, hacking, or manipulating
 7   district technology or the data on
 8   district -- data housed by district
 9   technology?
10                   MS. SCULLION:  Objection to
11            form and lacks foundation.
12                   THE WITNESS:  It appears to.
13   BY MR. SHAHIDPOUR:
14            Q.      And then prohibition eight is
15   a catchall about unethical conduct on
16   district technology.  Is that your
17   understanding of prohibition number eight?
18                   MS. SCULLION:  Objection to
19            form.  Lacks foundation.
20                   THE WITNESS:  I don't
21            understand catchall.
22   BY MR. SHAHIDPOUR:
23            Q.      Okay.
24                   MS. SCULLION:  Do you
25            understand the question?
```

CONFIDENTIAL

Page 156

```
 1                  THE WITNESS:  Just can you
 2             rephrase it and what do you mean by
 3             "catchall"?
 4  BY MR. SHAHIDPOUR:
 5        Q.     That's fine.  We can move on.
 6                  Moving toward the rest of
 7  the second page of Exhibit 8, do you see
 8  where it says in the middle of the page,
 9  the paragraph starting with "since the
10  use"?
11        A.     Uh-huh, yes, I do.
12        Q.     Is it your understanding
13  whether -- or is it your understanding that
14  IPS students have no expectation of privacy
15  in any use of district technology?
16                  MS. SCULLION:  Counsel, just
17             to be clear, are you asking him
18             about the document or are you just
19             asking him?
20                  MR. SHAHIDPOUR:  I'm asking
21             him.
22                  MS. SCULLION:  Okay.  Could
23             you restate the question, please?
24                  MR. SHAHIDPOUR:  Sure.
25                  MS. SCULLION:  Repeat it,
```

CONFIDENTIAL

1           rather.
2    BY MR. SHAHIDPOUR:
3           Q.    Is it your understanding that
4    IPS students have no expectation of privacy
5    in any use of district technology?
6                    MS. SCULLION:  Objection to
7              form, vague, and to the extent it
8              calls for any legal conclusion, you
9              can answer, if you can.
10                   THE WITNESS:  I don't know
11             what every single student believes,
12             but are students told, especially
13             when GoGuardian first came out, but
14             afterwards, my tech coaches still
15             say to their teachers that they're
16             training new teachers that make the
17             students aware that we are able to
18             see everything, that we can and
19             it's not everything, but everything
20             that we can.
21    BY MR. SHAHIDPOUR:
22           Q.    Is it your understanding that
23    according to the Student Use of Technology
24    Agreement and Release of Liability Form
25    that is in place today that IPS has the

CONFIDENTIAL

Page 158

1    right to monitor and record all IPS's
2    students use of district technology?
3              MS. SCULLION:  Objection to
4              form, vague, lacks foundation.
5              Calls for speculation.  And to the
6              extent it calls for a legal
7              conclusion.
8              THE WITNESS:  Again, what I
9              can say is GoGuardian when it's
10             implemented and every single year,
11             we explain to students and staff
12             that GoGuardian is a monitoring
13             tool to make sure that students are
14             on task, engaged in learning in
15             that particular class.
16    BY MR. SHAHIDPOUR:
17         Q.    Are there any other tools
18    besides GoGuardian that IPS uses to monitor
19    students' use of district technology?
20         A.    The interactive boards are on
21    Palo Alto web filter, but that's mainly
22    used by teachers in front of the classroom,
23    but sometimes there are learning
24    opportunities where students go up in front
25    of the board and manipulate math problems

CONFIDENTIAL

Page 159

1    or whatever, find a state, find a city,

2    find a country, that sort of thing.

3            Q.    Okay.  And does IPS, as far

4    as you're aware, does IPS maintain a record

5    of what it monitors IPS students to be --

6    strike that.

7                    You said IPS monitors

8    students' use of district technology using

9    GoGuardian?

10           A.    That is correct.

11           Q.    Does IPS keep a record of

12   that monitoring?

13                   MS. SCULLION:  Objection to

14           form.  Vague.

15                   THE WITNESS:  So because we

16           pay GoGuardian, the company, they

17           keep a certain amount for a certain

18           amount of time, I'm not exactly

19           sure how long or how much, but this

20           is kept through the provider.

21   BY MR. SHAHIDPOUR:

22           Q.    Are you able to pull reports

23   from GoGuardian about student activity on

24   district technology?

25                   MS. SCULLION:  Objection to

Page 160

```
 1              form.  Vague.
 2                   THE WITNESS:  I believe for a
 3              certain amount of time, yes.  When
 4              that -- when that ends, I'm not
 5              sure.  Sometimes we have to then --
 6              would have to go to GoGuardian
 7              themselves and ask.
 8    BY MR. SHAHIDPOUR:
 9         Q.     Have you ever -- oh, sorry,
10    so when you say that you would do it
11    without having -- when you would pull a
12    report without going through GoGuardian,
13    what does that entail?
14         A.     Well, my technology coaches
15    monitor twice a day GoGuardian.  Once in
16    the morning and once in the afternoon.  And
17    they primarily looked at -- look at flagged
18    activities, which isn't necessarily a
19    report, but -- I guess it's a report, I
20    don't know how technical you want to get,
21    and they look at the flagged activities and
22    another section to see if students are not
23    online, if they're attempting to go to
24    various sites, what sites are they going
25    to.  See there's a possibility of proxies
```

CONFIDENTIAL

Page 161

1    and those sort of things.
2         Q.    So when technology coaches
3    are looking at these twice a day reports
4    you said, do they record what they find
5    anywhere from these monitoring sessions?
6                   MS. SCULLION:  Objection to
7              form.
8                   THE WITNESS:  Normally what
9              happens is if something seems off,
10             they will go to the administration
11             of that building and they will make
12             them aware of what the potential
13             issue possibly could be and then
14             the building administrator would
15             then conduct some sort of
16             investigation.
17                  If it is at the middle
18             school and the high school, it
19             may be a dean doing the job, not
20             necessarily the administrator.
21    BY MR. SHAHIDPOUR:
22         Q.    Yeah, but is it -- are these
23    activities that you're describing logged
24    anywhere?
25                   MS. SCULLION:  Objection to

```
                                        Page 162
  1              form.
  2                    THE WITNESS:  Logged, that,
  3              I'm not sure.  I think every tech
  4              coach has a different relationship
  5              with the building administration
  6              and depending on what the building
  7              administration wants, because,
  8              again, it's kind of like the
  9              building runs the building, we --
 10              we notify them.  They then take
 11              appropriate action.
 12     BY MR. SHAHIDPOUR:
 13          Q.      Thank you.  You have
 14     Exhibit 9 in front of you still; is that
 15     right?  That's this Chromebook Student User
 16     Agreement Rules and Appropriate Usage.
 17          A.      I'm looking over it now.  I
 18     see it.
 19          Q.      Did you approve this policy?
 20                    MS. SCULLION:  Objection to
 21              form.  I just would note that it's
 22              labeled at the bottom as a draft
 23              policy.
 24                    THE WITNESS:  I don't think
 25              anything is truly approved by me.
```

CONFIDENTIAL

Page 163

1              It's a collaborative effort.  If
2              you're looking for approval,
3              everything goes to either the
4              assistant superintendent or the
5              superintendent for ultimate
6              approval and it would also go to
7              the building principal.
8    BY MR. SHAHIDPOUR:
9              Q.     And at some point, it goes to
10   you, perhaps before it goes to the
11   superintendent; is that right?
12             A.     It would come to me first, we
13   would kind of talk about it with the
14   technology coaches, find out what the needs
15   are in all different areas, and then we
16   also would speak with the register clerks,
17   the main office secretaries, because all of
18   them, when it comes to this sort of user
19   agreement have to participate in the
20   drafting of it, because there's a very good
21   chance our technology coach is not present
22   to hand out a Chromebook.  If you look,
23   according to your Exhibit 7, Mr. Felder who
24   created this, he was at three different
25   schools.  So he was at Berkeley Terrace, he

CONFIDENTIAL

Page 164

1    was at Grove Street, and he was at Madison.

2                    MS. SCULLION:  Uh-huh, thank

3           you.

4                    THE WITNESS:  So with that

5           being said, a lot of times, the

6           agreement has to also work for the

7           person distributing it, and a lot

8           of times that would either be the

9           register clerk, and the reason why

10          for the register clerk is because

11          they are there for new enrollments.

12          So if a student comes in brand new

13          and they're given a Chromebook,

14          they would be the ones doing that.

15   BY MR. SHAHIDPOUR:

16          Q.    So I asked whether at some

17   point this document goes to you for

18   approval before it goes on to someone else.

19   I'm not sure if you caught whether that's

20   what I was asking you, but that's what I

21   asked.

22          A.    It was --

23                    MS. SCULLION:  Hang on.  I

24          need to be clear, which document

25          are you asking about, nine?

CONFIDENTIAL

Page 165

1           MR. SHAHIDPOUR:  Yes.

2           MS. SCULLION:  Okay.

3           MR. SHAHIDPOUR:  Well, I asked

4       whether the -- let's look at what I

5       asked.

6           MS. SCULLION:  Or just ask a

7       new question to be clear as to what

8       you're talking about.

9   BY MR. SHAHIDPOUR:

10      Q.      Yeah.  So at some point

11  before going onto the superintendent, an

12  iteration of the Chromebook Student User

13  Agreement goes to you for approval; is that

14  right?

15      A.      No, we collaborate and draft

16  it and then it's and sent to people above

17  me to approve.  So if you're asking if I

18  collaborated in this, yes, I did.

19  Approved, no, I believe that's why, like,

20  it's drafts and things, it's then handed up

21  above us for the ultimate approval.

22      Q.      And the Chromebook Student

23  User Agreement lays out certain rules and

24  behavioral expectations with respect to

25  student use of Chromebooks?

CONFIDENTIAL

Page 166

1             MS. SCULLION:  Objection.  To

2        the extent you're asking about

3        Exhibit No. 9, which again is

4        labeled as a draft, I don't know

5        that we have the final in front of

6        us.

7             MR. SHAHIDPOUR:  I'm asking

8        about the Chromebook student user

9        agreement generally.

10            MS. SCULLION:  So not

11        necessarily specific to Exhibit 9.

12        Okay.  Thank you.

13            THE WITNESS:  So ask the

14        question again, I apologize.

15 BY MR. SHAHIDPOUR:

16        Q.    Does IPS's Chromebook Student

17 User Agreement lay out certain rules and

18 behavioral expectations with respect to

19 student use of Chromebooks?

20        A.    I believe so.

21        Q.    And those include some of the

22 items we see here on Exhibit 9 starting in

23 this numbered list on the first page; is

24 that right?

25            MS. SCULLION:  Objection to

Page 167

1          form.  Lacks foundation.  Calls for
2          speculation.
3              THE WITNESS:  Could you repeat
4          the question one more time?
5    BY MR. SHAHIDPOUR:
6          Q.     Sure.  I can just ask, are
7    students allowed to destroy, deface, or
8    alter Chromebook identifying labels?
9          A.     No, sir.
10         Q.     Are students allowed to
11   engage in online activities while using the
12   Chromebook that are in violation of
13   Irvington Acceptable Use Policy?
14         A.     No, sir.
15         Q.     Are students allowed to send
16   messages via school technology with the
17   intent to intimidate, frighten, threaten,
18   harass, ridicule, or bully another person?
19         A.     No, sir.
20         Q.     Are students allowed to use a
21   Chromebook -- or strike that.
22              Are students allowed to
23   change, alter, bypass, or attempt to bypass
24   any Chromebook security measures?
25         A.     No, sir.

Page 168

1          Q.      Is it a violation of IPS
2    Network/Internet Acceptable Use Policy to
3    share one's password with anyone else?
4          A.      At the time, absolutely not,
5    you were not allowed to share.
6          Q.      Okay.  Did students -- were
7    students prohibited from keeping their
8    Chromebook even if a school administrator
9    requested them to provide it?
10          A.      One more time.
11          Q.      Were students required to
12   submit their Chromebooks to school
13   administration upon request?
14          A.      Yes.
15          Q.      Okay.  So we looked at
16   number -- or we talked about a prohibition
17   about bypassing internet or filtered
18   internet sites.  Strike that.
19               We talked about Chromebook
20   security measures including filtered
21   internet sites; is that right?
22               MS. SCULLION:  Objection to
23         form.  Mischaracterizes testimony.
24               THE WITNESS:  We talked about
25         filtering of websites we have.

CONFIDENTIAL

                                        Page 169

1    BY MR. SHAHIDPOUR:

2          Q.      Yeah.  And it's against IPS

3    policy for students to try to bypass those

4    filters?

5          A.      That is correct.

6          Q.      And you testified about

7    GoGuardian being one of those filters; is

8    that right?

9          A.      That is correct.

10         Q.      And you also testified about

11   Palo Alto, is that considered a filtering

12   service?

13         A.      One part of it is.

14         Q.      How does Palo Alto filter

15   online websites?

16              MS. SCULLION:  Objection to

17         form.  Vague.

18              THE WITNESS:  It's -- we use

19         that primarily for our desktops,

20         for our interactive boards, and

21         primarily for our iPads if there's,

22         you know, use there.  And then

23         Chromebooks are -- primarily use

24         GoGuardian.

25

CONFIDENTIAL

Page 170

1    BY MR. SHAHIDPOUR:

2        Q.    I see.  So is it the case

3    that GoGuardian and Palo Alto are both

4    filtering devices that apply to different

5    types of student -- or district technology

6    that students use?

7        A.    Primarily, yes.

8        Q.    Okay.  Are there any other

9    web filters that IPS employs today?

10       A.    Not that I know of.

11       Q.    Would you be the one person

12   most knowledgeable about what web filters

13   IPS employs?

14            MS. SCULLION:  Objection to

15        form, vague, lacks foundation.

16            THE WITNESS:  Our network

17        administrator would probably be

18        more up to date, but in general,

19        those are the two.  I don't know of

20        any other web filters.

21   BY MR. SHAHIDPOUR:

22       Q.    And when did IPS start using

23   GoGuardian?

24       A.    2021 into 2022, I'm

25   suspecting.

CONFIDENTIAL

Page 171

1          Q.     What did IPS use before
2     GoGuardian, if anything?
3          A.     Oh, yes, iboss.
4          Q.     Iboss?
5          A.     Yes.
6          Q.     What did -- when did IPS
7     start using Palo Alto?
8          A.     Approximately five years ago.
9          Q.     That would be 2020?
10         A.     Uh-huh.
11         Q.     What, if anything, did IPS
12     use before Palo Alto?
13         A.     Iboss.
14         Q.     So iboss applied to the types
15     of devices that both GoGuardian and Palo
16     Alto applied to; is that right?
17         A.     Yes.
18              MS. SCULLION:  Just a
19          reminder, let him finish his
20          question before you start.
21              THE WITNESS:  Yes.
22              MS. SCULLION:  Thank you.
23     BY MR. SHAHIDPOUR:
24         Q.     And when did the district
25     start using iboss?

Page 172

```
 1          A.      Well before my time.
 2          Q.      Well before your time.  So
 3   well before, not -- well before your time
 4   at IPS?
 5          A.      No, well before my time as
 6   district -- as director of technology.
 7          Q.      Through these web filters,
 8   what sorts of web -- well, starting with
 9   GoGuardian, what types of web content --
10   well, strike that.
11               Does GoGuardian filter out
12   certain web content from students' access
13   on district technology?
14          A.      Yes.
15          Q.      What sorts of content does it
16   filter?
17          A.      We try to filter anything
18   noneducational.
19          Q.      And does that apply -- does
20   GoGuardian apply only on Chromebooks?
21          A.      Primarily.
22          Q.      So when you say, "primarily,"
23   does that mean there are other devices on
24   which GoGuardian is installed?
25          A.      I don't believe so.  I
```

CONFIDENTIAL

Page 173

1  believe it's primarily Chromebooks.

2        Q.      And so if a student is --

3  well, IPS has an internet network; is that

4  right?

5        A.      It has an internet, yes, and

6  it has WAN.

7        Q.      It has -- what was the last

8  one?

9                MS. SCULLION:  W-A-N, WAN.

10 BY MR. SHAHIDPOUR:

11       Q.      Okay.  Are there any filters

12 that apply to devices that are connected to

13 IPS networks other than student -- other

14 than district technology that students use?

15               MS. SCULLION:  Objection to

16          form.

17               THE WITNESS:  Could you better

18          explain that question?

19 BY MR. SHAHIDPOUR:

20       Q.      Sure.  So when we walked in

21 today, you handed us, graciously handed us

22 the Wi-Fi password; is that right?

23       A.      Yes, absolutely.

24       Q.      And so that's is the password

25 for IPS's network?

CONFIDENTIAL

Page 174

1          A.      Uh-huh.

2          Q.      I can connect --

3                  MR. SEXTON:  Yes or no?

4                  THE WITNESS:  Yes.

5                  MR. SEXTON:  Thank you.

6    BY MR. SHAHIDPOUR:

7          Q.      Thank you.  And I can connect

8    to IPS's network on my personal device; is

9    that right, if I have the password?

10         A.      That is correct.

11         Q.      Are there any web filters or

12   other content filters that would block a

13   user's access when they are connected via

14   their personal device through IPS's

15   network?

16                 MS. SCULLION:  So I just want

17           to clarify, are you asking about --

18           my impression is there is more than

19           one network, there's a guest

20           network and then another network,

21           are you asking about one in

22           particular?

23                 MR. SHAHIDPOUR:  About IPS's

24           networks in general.

25                 MS. SCULLION:  Okay.

CONFIDENTIAL

Page 175

1              THE WITNESS:  So we have one
2         pipe, we have separate VLANs.
3              THE STENOGRAPHER:  Separate
4         what?
5              THE WITNESS:  VLAN, V-L-A-N.
6         Now, the guest network was created
7         primarily for guests and those
8         would be people coming from the
9         outside to present.  They would be
10        vendors.  They would be
11        subcontractors who may need to
12        access the internet for some
13        reason.  HVAC companies now have
14        ports within schools, correct.  So
15        the guest network is filtered, but
16        less filtered because of access for
17        vendors, for lawyers, for anyone
18        that happens to come in that needs
19        to be able to do some sort of work
20        outside of the restricted
21        environment that we try and keep
22        our students as safe as possible.
23   BY MR. SHAHIDPOUR:
24        Q.    And there are IPS networks
25   other than the guest network that you

Page 176

1    mentioned?

2            A.        Separate VLANs, one network,

3    one pipe and then your VLANs.  So you would

4    have the Chromebooks are on one, we have

5    that on one, and then we -- and it's just

6    for network segmentation and then we have

7    the interactive boards on another

8    primarily.  And that's -- Irvington guest,

9    Irvington -- there's about three.

10           Q.        So just, generally speaking,

11   do -- does IPS employ content filters other

12   than GoGuardian or Palo Alto on any of its

13   networks?

14           A.        Other than those two,

15   those -- that's it.

16           Q.        Okay.  GoGuardian blocks --

17   are you familiar with Defendants'

18   platforms?

19                    MS. SCULLION:  Objection to

20           form.  Vague.

21                    THE WITNESS:  No.

22   BY MR. SHAHIDPOUR:

23           Q.        Are you familiar that there

24   are Defendants in this case in which you

25   are testifying today?

CONFIDENTIAL

Page 177

1          A.     I think we're talking about
2     social media, so Instagram, I'm guessing.
3               MS. SCULLION:  Please don't
4          guess.  If you don't know, you
5          don't know.
6               THE WITNESS:  Instagram, I
7          think that's Facebook, Google, and
8          I don't remember who else.
9     BY MR. SHAHIDPOUR:
10         Q.     Okay.  That's totally fine.
11    Can you access Instagram on a device on
12    which GoGuardian is active?
13         A.     No.
14              MS. SCULLION:  In IPS?
15              MR. SHAHIDPOUR:  In IPS.
16              MS. SCULLION:  Thank you.
17    BY MR. SHAHIDPOUR:
18         Q.     Is your answer no?
19         A.     The answer is no.
20         Q.     Can a user access Facebook on
21    a device on which GoGuardian is active in
22    IPS?
23         A.     All right.  So let me
24    rephrase both of those answers, the one
25    answer, and one I'm about to say.

Page 178

1  GoGuardian attempts to block all.  The

2  issue is that when backdoor sites occur,

3  and we don't know about it, when proxies

4  happen, and we don't know about it, and

5  GoGuardian doesn't -- can't and doesn't

6  catch.  Do they access, they could, but if

7  we're just talking about routine trying to

8  go to Instagram, trying to go to any other

9  site that we have blocked, GoGuardian is

10 decent.

11         Q.    Okay.  Putting aside any

12 efforts to bypass GoGuardian, does

13 GoGuardian block the official Instagram

14 domain?

15                MS. SCULLION:  Objection to

16         form.

17                THE WITNESS:  Yes.

18 BY MR. SHAHIDPOUR:

19         Q.    Does GoGuardian block the

20 official Facebook domain?

21                MS. SCULLION:  Same objection.

22                THE WITNESS:  Yes.

23 BY MR. SHAHIDPOUR:

24         Q.    Does GoGuardian at IPS block

25 the official SnapChat domain?

```
                                    Page 179
 1              MS. SCULLION:  Same objection.
 2              THE  WITNESS:  Yes.
 3    BY MR. SHAHIDPOUR:
 4         Q.     Does GoGuardian at IPS block
 5    the official TikTok domain?
 6              MS. SCULLION:  Same objection.
 7              THE  WITNESS:  Yes.
 8    BY MR. SHAHIDPOUR:
 9         Q.     Does GoGuardian at IPS block
10    the official YouTube domain?
11              MS. SCULLION:  Same objection.
12              THE  WITNESS:  That's a little
13         bit more difficult to answer.
14         Again, we have blocked everything
15         we can and, again, with YouTube,
16         same thing, there is a process
17         where it has to be whitelisted, but
18         in the past, and I believe still
19         now, some other applications have
20         used content from YouTube as part
21         of their curriculum or whatever
22         that was, and with that being said,
23         we were kind of shocked when they
24         became -- the teacher can't access
25         this particular thing and we go,
```

CONFIDENTIAL

```
                                          Page 180
 1              why.  And what we realized was that
 2              it was YouTube.  So then that had
 3              to be whitelisted and it's those
 4              sort of things that, you know,
 5              that's why I can't give you a
 6              definitive, if you understand.
 7    BY MR. SHAHIDPOUR:
 8         Q.    No, I understand.  Thank you
 9    for explaining.
10         A.    I'm trying.
11         Q.    Okay.  Did IPS start blocking
12    these official domains from the moment that
13    it implemented GoGuardian?
14              MS. SCULLION:  Objection to
15              form.
16              THE WITNESS:  So as a
17              district, again, as I've said
18              earlier, our main concern is the
19              safety of our students and their
20              ultimate attainment of education.
21              So what we do is we try and partner
22              with the best possible companies
23              and we follow mostly all the time,
24              mostly all the time what they
25              recommend for their standard
```

CONFIDENTIAL

Page 181

1          defaults and so on.  So that
2          whatever GoGuardian told us to do,
3          that's what we did at the moment
4          that they told us to do it.
5          Because the value is in the
6          product, so we're going to follow
7          what the product details.
8    BY MR. SHAHIDPOUR:
9          Q.    So did they make a
10   recommendation to you, they being -- well,
11   did GoGuardian make a recommendation to you
12   about what websites to block from the
13   moment that you first implemented
14   GoGuardian?
15          MS. SCULLION:  Objection to
16          form.
17          THE WITNESS:  Again, I believe
18          there's a collaborative effort.  We
19          knew some that students were on
20          that we needed to block such as
21          some social media sites, gaming
22          sites, and then there were others
23          that GoGuardian suggested and we
24          listened to their suggestions.
25

Page 182

1    BY MR. SHAHIDPOUR:

2        Q.    So you mentioned there are

3    some other types of sites that GoGuardian

4    blocks, including gaming sites.  What is a

5    gaming site?

6        A.    A site that has games.

7        Q.    Like video games?

8        A.    Video games.

9        Q.    Okay.  Does GoGuardian also

10   block access to pornography?

11       A.    Absolutely.

12       Q.    And does GoGuardian block

13   specific -- let me rephrase.  Does

14   GoGuardian block categories or websites by

15   category or are there specific domains

16   listed that are blocked?

17            MS. SCULLION:  Objection to

18        form.

19            THE WITNESS:  Both.

20   BY MR. SHAHIDPOUR:

21       Q.    Both.  So when GoGuardian

22   blocks a category of sites, what might a

23   category of sites look like?

24       A.    Gaming.

25       Q.    You mentioned that students

CONFIDENTIAL

                                            Page 183

1    sometimes try to bypass GoGuardian filters

2    through other websites?

3            A.      That is correct.

4            Q.      And what kinds of websites

5    are those that -- that serve as proxies for

6    assessing otherwise blocked sites?

7                   MS. SCULLION:  Objection to

8           form.

9                   THE WITNESS:  Well, proxy

10          sites are kind of created every

11          kind of 30 seconds it seems like

12          and students will naturally look to

13          find the best ways of doing it.  So

14          they will hop on YouTube sometimes

15          and they, you know, Google just how

16          to get around GoGuardian or, you

17          know, how to bypass school web

18          filters.  And you'll find a video

19          that may or may not work, but,

20          again, it's our job to kind of stay

21          on top of it and keep our students

22          safe, because it's absolutely the

23          most critical thing.  There's other

24          sites that, you know, again, will

25          have those sort of best ways to get

CONFIDENTIAL

1           around your school website and, you

2           know, all different forms, it could

3           be Reddit, it could be, you know,

4           you name it.

5  BY MR. SHAHIDPOUR:

6        Q.    So do these websites that

7  facilitate students bypassing web filters

8  such as GoGuardian, do they post -- do they

9  pose cybersecurity risks for schools like

10  IPS?

11              MS. SCULLION:  Objection to

12           form and lacks foundation.

13              THE WITNESS:  Oh, they could.

14  BY MR. SHAHIDPOUR:

15        Q.    Would you say that

16  cybersecurity is one of the top priorities

17  for your position?

18        A.    It is definitely becoming a

19  very important one.  That's why we've

20  teamed up with the Department of Homeland

21  Security, CISA, to work on that, because,

22  again, we want to have the best possible

23  people on board working with us.

24        Q.    Has IPS suffered from any

25  cybersecurity breaches in the last five

CONFIDENTIAL

Page 185

1   years?

2                    MS. SCULLION:   Objection to

3              form.   Vague.

4                    THE WITNESS:   Us personally,

5              no.   Did PowerSchool get breached?

6              Yes.   But PowerSchool is hosted,

7              it's not within the domain of

8              Irvington Public Schools.

9   BY MR. SHAHIDPOUR:

10         Q.      And so when you say

11  PowerSchool got breached, did IPS student

12  or staff data become exposed through the

13  PowerSchool breach that you referenced?

14         A.      Student data, yes.

15         Q.      Okay.   I'm going to hand you

16  tab nine which I think we're on Exhibit 10.

17                      - - - - -

18                    (Email String Bates

19              BW__Irvington00338969 marked

20              Amberg Exhibit 10 for

21              identification.)

22                      - - - - -

23  BY MR. SHAHIDPOUR:

24         Q.      Let me know when you've had a

25  chance to scan the document.

CONFIDENTIAL

Page 186

1              A.      Do you have the other part of
2       it?
3              Q.      Sure.  I can hand you tab 9A,
4       which we'll mark as Exhibit 11, and I will
5       represent that this is the attachment to
6       Exhibit 10.
7              A.      I can't see.
8                      MS. SCULLION:  It's a bit
9              light.
10                     THE WITNESS:  Could you --
11                     MS. SCULLION:  He can.
12                     THE WITNESS:  -- magnify
13             Exhibit 11 for me?  I'm getting
14             old.
15                     MS. SCULLION:  Well, we're
16             probably the same age, the print is
17             quite light on this.
18                     THE WITNESS:  Not this one,
19             it's 11.
20                     MR. SHAHIDPOUR:  Yeah, we can
21             start with 11, well, especially if
22             the witness --
23                     MS. SCULLION:  Thank you.
24                     MR. SHAHIDPOUR:  -- wants to
25             look at it more closely.

CONFIDENTIAL

```
 1              MS. SCULLION:  Are you able to
 2         look at that?
 3              THE WITNESS:  Okay.
 4              - - - - -
 5              (Letter to Parents Bates
 6         BW__Irvington00338970 marked
 7         Amberg Exhibit 11 for
 8         identification.)
 9              - - - - -
10  BY MR. SHAHIDPOUR:
11       Q.    In 2022, you told parents --
12  well, let's start with the letter.  Is this
13  a letter that you sent or sought to have
14  sent to parents or guardians of IPS
15  students in 2022?
16              MS. SCULLION:  Objection to
17         form.
18              THE WITNESS:  That is -- that
19         is correct.
20  BY MR. SHAHIDPOUR:
21       Q.    That is correct.  In 2022, in
22  this letter, looking at Exhibit 11, you
23  told parents that, "The safety and security
24  of our students and staff is an utmost
25  priority for the district.  We are
```

CONFIDENTIAL

Page 188

1    constantly evolving as threats to our
2    cybersecurity and well-being of our
3    district become apparent.  Earlier this
4    year, the FBI warned that hackers from
5    around the world are targeting K through 12
6    schools.  In response, the Irvington Board
7    of Education updated the district firewall
8    and purchased two web filters.  We have
9    tightened security by removing browser
10   extensions, only allowing whitelisted sites
11   to be accessed.  In addition, we are
12   monitoring activity at both a macro and a
13   micro level."
14             Do you see that?
15        A.    I do.
16        Q.    What are the two web filters
17   that are referenced here?
18        A.    Palo Alto and GoGuardian.
19        Q.    And when it says,
20   "whitelisted," when you say, "only allowing
21   whitelisted sites to be accessed," what do
22   you mean by that?
23        A.    What I mean is that a site
24   must be approved by a building
25   administrator, a content supervisor,

CONFIDENTIAL

Page 189

1    someone like that.  A teacher can't even
2    say, hey, I want this opened up.  I say,
3    okay, please go to your building
4    administrator, please go to your content
5    supervisor, and ask them to ask me and then
6    we discuss it and then we open it up if
7    appropriate.
8            Q.      And what is the district
9    firewall that's referenced in this, just
10   before the two web filters in --
11           A.      Palo Alto.
12           Q.      Palo Alto.  So Palo Alto is
13   both the district firewall referenced here
14   and one of the web filters referenced here?
15           A.      That's correct.
16           Q.      Okay.  You write in the next
17   paragraph that there were several attempts
18   to infiltrate and exploit IPS applications
19   in the previous year; is that right?
20           A.      That is correct.
21           Q.      The IPS technology team
22   identified and mitigated those threats?
23           A.      Uh-huh.
24           Q.      And, finally, at the end, you
25   encourage IPS guardians and parents to

```
                                        Page 190
 1   speak with their children about online
 2   threats to -- online threats and internet
 3   safety; is that right?
 4          A.     That appears to be correct.
 5          Q.     And you directed them to
 6   iamcybersafe.org/s/parent tips; is that
 7   right?
 8          A.     I see that.
 9          Q.     Some basic cybersecurity tips
10   one might find on a site like that are
11   don't click on pop-ups; is that right?
12          A.     Uh-huh.
13                 MS. SCULLION:  Objection to
14             form.  Lacks foundation.
15   BY MR. SHAHIDPOUR:
16          Q.     Using parental controls?
17                 MS. SCULLION:  Same
18             objections.
19                 THE WITNESS:  Correct, for
20             some.
21   BY MR. SHAHIDPOUR:
22          Q.     Not accepting friend requests
23   from strangers?
24                 MS. SCULLION:  Same
25             objections.
```

CONFIDENTIAL

Page 191

1                    THE WITNESS:  That would be
2              one.
3    BY MR. SHAHIDPOUR:
4          Q.    Not to meet in person with
5    anyone you meet online if you're underaged?
6                    MS. SCULLION:  Same
7              objections.
8                    THE WITNESS:  That is correct.
9    BY MR. SHAHIDPOUR:
10         Q.    Did you have students sign
11   and return a slip to avoid suspension of
12   children's internet and Chromebook
13   privileges in conjunction with this letter?
14                   MS. SCULLION:  Objection to
15             form.  You say, "a slip," you mean
16             the letter?
17                   MR. SHAHIDPOUR:  Yes.
18                   THE WITNESS:  So, again, sir,
19             I work in collaboration with the
20             buildings, so, again, it is the
21             building principals that
22             disseminate, it's the building
23             principals that operate, so have I
24             seen any of that, no, I have not,
25             because that's really the

Page 192

1            building's responsibility.
2    BY MR. SHAHIDPOUR:
3            Q.      But this is the letter that
4    you wrote, right?
5            A.      That is correct.
6            Q.      And in the letter you wrote
7    you asked parents to please sign and return
8    the form before January 15, 2023; is that
9    right?
10           A.      That is correct.
11           Q.      Okay.  Did any -- do any
12    students -- did any students have their
13    internet and Chromebook privileges
14    suspended for failing to return signed
15    versions of the form referenced here as far
16    as you know?
17           A.      That I'm not sure of,
18    because, again, the building principals are
19    the ones that disseminate, put them in
20    their backpacks for elementary school, that
21    sort of thing, and then they would also be
22    the ones collecting, so I'm really not
23    sure.
24           Q.      Okay.  I'll hand you tab ten,
25    which we'll mark as Exhibit 12.  So

Page 193

1   included on this first page is just
2   metadata, what the document that was
3   actually produced to us from IPS starts on
4   the second page.  So --
5          A.     I'm aware of this.
6          Q.     Sorry, what was that?
7          A.     I'm aware.
8                      - - - - -
9                  (Letter Bates
10             BW__Irvington00463682 to 463688
11             marked Amberg Exhibit 12 for
12             identification.)
13                     - - - - -
14   BY MR. SHAHIDPOUR:
15          Q.     Turning back to the first
16   page of the letter, do you see your
17   letterhead at the top there?
18          A.     I do.
19          Q.     Did you write this letter?
20          A.     I did.
21          Q.     To whom did you -- well, did
22   you send this letter to anyone?
23          A.     I believe that this was
24   emailed to the staff of Irvington Public
25   Schools.

CONFIDENTIAL

Page 194

1          Q.      Was it emailed to anyone else
2    as far as you remember?
3          A.      I believe it was the staff of
4    Irvington Public Schools.
5          Q.      And then looking at the top
6    of this first page of the letter, is it
7    true -- well, did you write that the
8    technology department is constantly working
9    to improve the safety and security of IPS
10   infrastructure?
11         A.      Sir, all of us are here to
12   make sure our students are as safe as
13   possible.  We work with some of the best
14   companies to provide the best safety and
15   security for our students.
16         Q.      I'm sure that you do and I'm
17   sure you work very hard at it.  Throughout
18   the letter, you actually explain the ways
19   in which you do that, right?
20         A.      Yes, sir.
21         Q.      You start by talking about
22   GoGuardian.
23                 Do you see that?
24         A.      I do.
25         Q.      You say that this year you

CONFIDENTIAL

Page 195

1  had noticed an uptick in cybersecurity

2  threats and teachers are not utilizing the

3  use of GoGuardian Scenes; is that correct?

4      A.    That is correct.

5      Q.    And GoGuardian is a measure

6  the IPS employs to mitigate cybersecurity

7  threats?  I'm sorry, that's not on the

8  page, that was a question.

9      A.    I'm sorry, say it one more

10  time.

11      Q.    Is GoGuardian a measure that

12  IPS employs to mitigate cybersecurity

13  threats?

14      A.    Cybersecurity threats, I

15  think we try and do that in many, many

16  different ways.  I think to say that's it,

17  no, it's just a tool in a toolbox.  It's

18  also used as an engagement strategy,

19  meaning if kids aren't on social media,

20  they're able to focus on history.  If

21  they're, you know, if they're not looking

22  up something else, they're able to focus on

23  algebra.  So I think it's a tool, but

24  there's many different tools that we really

25  do try.  Something very simple as sending

CONFIDENTIAL

Page 196

```
 1   out newsletters to staff members saying,

 2   hey, watch out for, you know, phishing and

 3   giving examples of phishing emails.

 4        Q.    Sure.  I didn't mean to

 5   suggest that it was the only way that IPS

 6   does that, I just asked if it was a measure

 7   that IPS employs --

 8        A.    One of the tools --

 9        Q.    -- to mitigate cybersecurity

10   threats?

11        A.    One of the tools, but

12   GoGuardian has a lot more value than just

13   that.

14        Q.    But it's an important tool in

15   the toolbox to mitigate cybersecurity

16   threats; is that true?

17             MS. SCULLION:  Objection to

18        form.

19             THE WITNESS:  I think that

20        having end users paying, really,

21        attention to their emails and not

22        clicking on links is, according to

23        what I just learned from CISA, is

24        probably even more important.

25
```

CONFIDENTIAL

Page 197

1  BY MR. SHAHIDPOUR:

2        Q.      What is CISA?

3        A.      It's our Department of

4  Homeland Security, their cyber intelligence

5  wing that works with school districts to

6  help fortify schools and public companies,

7  public organizations, local governments,

8  libraries, if I'm missing something, I

9  apologize, but they work with all different

10  local, state, federal companies to really

11  help struggling, you know, districts and so

12  on that, you know, are overburdened by so

13  many different things that we're, you know,

14  competing to take care of, like testing,

15  you know, and everything else that goes on.

16  So it's a wonderful -- it's a wonderful

17  agency that we're working with.

18        Q.      So does CISA, do you know if

19  CISA recommends districts install web

20  filters?

21        A.      Well, in order, you know,

22  truthfully, to be CIPA compliant, you have

23  to have a web filter.  So that's beyond,

24  you know, Child Internet Protection Act, we

25  have to protect our students as safety 101.

CONFIDENTIAL

Page 198

1          Q.      And GoGuardian would be one
2     of those web filters that would be required
3     by CIPA?
4          A.      That they're one of, yes --
5          Q.      And --
6          A.      -- that and Palo Alto.
7          Q.      Sorry, I didn't mean to
8     interrupt.  CIPA is the Child Internet --
9          A.      Protection Act.
10         Q.      Privacy and Protection Act?
11         A.      Yes.
12         Q.      And that's a federal statute?
13         A.      Uh-huh.  Yes.
14         Q.      Yes.
15         A.      I remembered, sir.
16         Q.      Going on to the page that
17    ends in 684 of this letter, and looking at
18    the paragraph that -- well, are you with
19    me?
20         A.      I am now.
21         Q.      And then looking at the
22    paragraph that says, "To make matters
23    worse," do you see that paragraph?
24         A.      Uh-huh.
25         Q.      In this paragraph, you

Page 199

1   explain that students were using the dark

2   web, copying and pasting scripts, and using

3   sites and portals to access the

4   unrestricted net; is that right?

5            A.      Uh-huh, yes, sir.

6            Q.      Thank you.  And later on in

7   the paragraph you note that students were

8   copying and pasting JavaScripts to complete

9   i-Ready and other applications?

10           A.      That is correct.

11           Q.      So does that mean students

12  were faking progress on academic

13  assignments by using fake -- by using

14  JavaScripts?

15           A.      I-Ready stated that they had

16  a hole that they didn't alert and the

17  students found a way going on social media

18  sites and said, hey, you can complete

19  your -- all of your science work, you know,

20  it's not science, but your reading in, you

21  know, two hours and they were able to hop

22  on and we noticed it, teachers noticed it,

23  because students were getting done way too

24  quick.  And then we started, you know,

25  looking around, asking questions, we ended

CONFIDENTIAL

Page 200

```
 1   up calling i-Ready and try to mitigate it.
 2        Q.     So did i-Ready tell you that
 3   students were accessing this information
 4   via social media?
 5        A.     It was students telling us.
 6        Q.     Students told you that they
 7   accessed social media to find ways to fake
 8   completion on i-Ready?
 9        A.     That is correct.
10        Q.     Which sites did students tell
11   you they used to accomplish that?
12        A.     I can't remember in all
13   honesty all, but I believe you had Discord.
14   You had -- I believe one was YouTube, and I
15   don't remember the rest, I apologize.
16        Q.     You said Discord was one of
17   them?
18        A.     Yeah, I believe so.
19        Q.     Would Reddit have been a
20   possible website that students used?
21             MS. SCULLION:  Objection to
22        form.  Lacks foundation.  Calls for
23        speculation.
24             THE WITNESS:  I don't
25        remember, sir, I'm sorry.
```

CONFIDENTIAL

Page 201

1   BY MR. SHAHIDPOUR:
2        Q.     That's fine.  And so this is
3   a -- that's students watching or viewing
4   content that taught them how to fake
5   completion of academic assignments was a
6   problem for IPS?
7        A.     I think it would be a problem
8   for any school district.
9        Q.     But it was for IPS?
10       A.     But it was for that time for
11  IPS, absolutely.
12       Q.     Okay.  And then next
13  sentence, you note that IPS students
14  downloaded complete movies?
15       A.     Uh-huh.
16       Q.     Triggering a copyright
17  infringement inquiry?
18       A.     That's correct.
19       Q.     And is that using the
20  district's network that students were able
21  to accomplish that?
22       A.     That is correct.
23       Q.     Is that on school-issued
24  devices that students were able to download
25  complete movies?

CONFIDENTIAL

Page 202

1          A.        That is correct.  They hid it

2     in a Google slide and, unfortunately, when,

3     when you allow Google, you know, to be wide

4     open, which whether it's slide, whether

5     it's Excel -- sheets, whether it's docs,

6     and, again, I don't have a problem with

7     Google Classroom, any of that.  What I have

8     a problem with is the idea of when it's

9     embedded, we're not looking at a Google doc

10    in that respect, right, and they were able

11    to open it up through that.

12          Q.        And so you testified that

13    students are kind of ingenious about

14    finding ways to accomplish things that the

15    district doesn't want them to do on

16    district technology?

17          A.        I believe all kids, if they

18    have the motivation to do whatever it is,

19    good or bad, I think that they're going to

20    try.  My hope is that they're going to be

21    motivated to learn, motivated to follow the

22    right path, motivated to really go and have

23    a bright future.

24          Q.        Students doing -- engaging in

25    that behavior of violating the district's

CONFIDENTIAL

Page 203

1  use of technology policy potentially
2  exposes IPS to cybersecurity threats?
3              MS. SCULLION:  Objection to
4         form.  Vague.
5              THE WITNESS:  I would suspect.
6  BY MR. SHAHIDPOUR:
7      Q.    So onto the next page ending
8  in 685.
9      A.    Bad photocopying.
10     Q.    Looking at the paragraph down
11 there, in the middle of the page, you note
12 that, "There are things we can do as a
13 district."
14              Do you see that?
15     A.    Yes.
16     Q.    That's things that the
17 district can do to combat cybersecurity
18 threats; is that right?
19     A.    That's -- yes, that's part --
20 that's part of what we can do, yes.
21     Q.    You note that, "Classroom
22 Management is the best first line of
23 defense."
24     A.    That is what I said.
25     Q.    "Teachers must monitor their

CONFIDENTIAL

Page 204

1    students."

2          A.      That is correct.

3          Q.      What do you mean by,

4    "classroom management"?

5          A.      So teachers have to juggle

6    many, many hats.  They're working with

7    students of all different abilities in

8    their classroom.  And part of classroom

9    management is making sure students stay on

10   task.  Sometimes it's easy, sometimes it's

11   hard.  Speaking personally as a teacher of

12   20 years, depending on the classroom

13   makeup, depending on the day, it can be

14   incredibly difficult.

15               Adding on social/emotional

16   issues that a lot of times stem from social

17   media makes it even more difficult.  And

18   when students are more distracted by other

19   things, classroom management almost becomes

20   impossible.  So our goal is for every

21   student to be safe and learning, but it

22   does become difficult because of these

23   things.

24         Q.      And here you note that

25   classroom management is the best first line

CONFIDENTIAL

Page 205

1    of defense and is that the best first line

2    of defense against cybersecurity threats

3    that are discussed elsewhere in this

4    letter?

5            A.      Well, again, it depends on

6    who this is directed to, correct, so one

7    great line of defense for cybersecurity

8    would be to have ClearPass by HP, which

9    locks down every single port in a room so

10   that a person couldn't take a Raspberry Pi,

11   stick it in and cause a DDoS attack or

12   something like that, right?  So if you can

13   lock down every port that would be great,

14   that's important.

15                   Using, you know, a phishing

16   app is a great line of defense for

17   secretaries and for teachers and everybody

18   else who access their computers and go on

19   email and, boom, they're hit with

20   something.  So it really depends on -- so

21   if you're talking specifically a teacher in

22   a classroom, there's many different things,

23   but classroom management being -- being

24   engaged and working with the students,

25   absolutely, until it becomes a point where

CONFIDENTIAL

Page 206

1  it becomes overwhelming and many times,
2  that's the issue.
3          Q.      So when you're talking to
4  teachers, you have to remind them that
5  classroom management is a priority when it
6  comes to mitigating cybersecurity threats;
7  is that right?
8          A.      I would hope that every
9  single teacher's main focus is education.
10 That's the key.  So, hopefully, they're not
11 having to mitigate cybersecurity threats.
12 Isn't that kind of a shame to think that
13 teachers have to do that?  I mean, that
14 should be somebody else's job.  Like,
15 teachers are there to teach math and
16 science, probably not to make sure that a
17 Russian hacker is coming in to hack their
18 classroom.  But, unfortunately, if students
19 are trying to figure out how to get around,
20 how to get around, how to get around the
21 web filters and so on, this becomes an
22 issue and to ask a teacher, classroom
23 management is, hey, Billy, please get back
24 and focus on this.  Do you need help?  How
25 about doing a think, pair, share with Kagan

CONFIDENTIAL

Page 207

1    strategies?  That's classroom management.
2    Getting students so excited about learning,
3    that's the key.  The fact that now that
4    they have to wear, like, a white hat hacker
5    and go around to make sure that we're not
6    being infiltrated, I mean, that should be
7    someone else's job.
8          Q.     Having to deal with these
9    constant threats that you talk about in
10   this letter, this cat and mouse game that
11   detracts from the educational mission --
12         A.     I was speaking specifically
13   about me and our department --
14               MS. SCULLION:  Just please let
15          him finish --
16               THE WITNESS:  Yes.
17               MS. SCULLION:  -- his question
18          and then you can give your answer.
19          Thank you.
20               MR. SHAHIDPOUR:  I was
21          finished.  I can repeat it.
22               MS. SCULLION:  That would be
23          great.  Thank you.
24   BY MR. SHAHIDPOUR:
25         Q.     Yeah.  Having to deal with

CONFIDENTIAL

Page 208

1   these constant threats and the cat and
2   mouse game that you reference in this
3   letter with hackers and other bad actors
4   exposing IPS to cybersecurity threats, it
5   detracts from the educational mission of
6   the school?
7                  MS. SCULLION:  Objection to
8          form.  Mischaracterizes testimony.
9                  THE WITNESS:  So technology
10         coaches, right, we -- and
11         technicians for that matter, but
12         technology coaches are in the
13         buildings supposedly working with
14         the teachers teaching them, hey,
15         this is what Google just put out,
16         the latest form of Google Classroom
17         or, hey, we, you know, we have a
18         new program we're bringing in,
19         PowerSchool just created a new
20         update.  Those are the things that
21         should be worked on every day,
22         that's why technology coaches are
23         teachers, their certifications,
24         they're teachers.  They're here to
25         help teachers teach better.  But

CONFIDENTIAL

Page 209

```
 1              having to play this cat and mouse
 2              game of, hey, what is a kid doing
 3              now, what are the students, where
 4              are they, are they -- it's pulling
 5              away from the ability of teachers
 6              to teach and isn't that what we're
 7              here for?
 8   BY MR. SHAHIDPOUR:
 9         Q.    Thank you for your fulsome
10   answer.  Later in this paragraph, you write
11   that you've monitored students playing
12   games?
13         A.    Uh-huh.
14         Q.    Is that a yes?
15         A.    That is correct, we have.
16         Q.    And did you watch or did you
17   observe them enjoying full-length movies
18   and visiting problematic sites, including
19   Russian gaming sites?
20         A.    Can you rephrase that,
21   because I think you're saying that we're
22   sitting there physically watching, no,
23   we're not physically watching.  It's
24   through a GoGuardian or through other, a
25   teacher catching it and calling us in, but,
```

CONFIDENTIAL

Page 210

1    no, we're not, you know, watching students
2    in the classroom.
3              Q.       No, that's fair.  And if you
4    want me to rephrase, I'll rephrase, but I
5    think that you captured the gist of my
6    question, which is, your department
7    monitors students and alerted
8    administrators as to issues such as
9    students playing games, enjoying
10   full-length movies, and visiting
11   problematic sites including Russian gaming
12   sites; is that right?
13             A.       And that is correct and so
14   unfortunate, because our team has so many
15   other responsibilities, fixing Chromebooks.
16   Chromebooks break.  I love Chromebooks, if
17   Google is here, okay, I do, but, you know,
18   and I appreciate, I'll put this on the
19   record, I appreciate that they changed the
20   end of life and expanded that, wonderful.
21   But it's our job to teach.  It's our job to
22   make sure the students are learning and
23   when we're working on cybersecurity
24   threats, when we're working on, you know,
25   social media issues, it takes away from,

CONFIDENTIAL

Page 211

1    hey, we need to get this Chromebook fixed,

2    mailed out to the place that it is being

3    fixed, relog it back in, bring it back to

4    the cart, working with teachers.  I mean,

5    there's working on data, all the things

6    that we've talked about earlier, that's our

7    goal.  Let's get our kids educated the best

8    we can.

9              MR. SEXTON:  Object to

10          everything after "that is correct"

11          as nonresponsive and move to

12          strike.

13              THE STENOGRAPHER:  Object to

14          everything after what?

15              MR. SEXTON:  "That is

16          correct."

17              MS. SCULLION:  And we contest

18          the motion.

19              MR. SHAHIDPOUR:  We can take a

20          break here if the witness --

21              MS. SCULLION:  Yes, let's take

22          a break.

23              MR. SHAHIDPOUR:  -- and

24          counsel would like.

25              MS. SCULLION:  Yup.

CONFIDENTIAL

Page 212

1                    THE VIDEOGRAPHER:  The time
2             right now is 2:20 p.m.  We're off
3             the record.
4                    - - - - -
5       (A recess was taken at this time.)
6                    - - - - -
7                    THE VIDEOGRAPHER:  The time
8             right now is 2:43 p.m.  We're back
9             on the record.
10  BY MR. SHAHIDPOUR:
11        Q.      Welcome back, Mr. Amberg.
12        A.      Thank you.
13        Q.      I've handed you tab 11, which
14  we'll mark as Exhibit 13.  I'll represent
15  that this was not produced in discovery in
16  this case, but it is a -- extracted from a
17  web page on IPS's website.  Have you seen
18  this letter before?  I know it's a bit
19  small.
20        A.      Can you do me a favor, sir,
21  could you just --
22                    MS. SCULLION:  Enlarge it.
23                    THE WITNESS:  I see.
24                    - - - - -
25                    (IPS Website Page marked

Page 213

1                Amberg Exhibit 13 for

2                identification.)

3                      - - - - -

4    BY MR. SHAHIDPOUR:

5         Q.     So have you seen this letter

6    before?

7         A.     It's, I believe, on the

8    website.

9         Q.     Have you seen it on IPS's

10   website?

11        A.     In all honesty, I don't think

12   I've seen it, but it looks like it's IPS's

13   website, so I'm going to go yes.

14        Q.     Okay.  Dr. Vauss wrote this

15   letter?

16             MS. SCULLION:  Objection to

17             form.  Lacks foundation.  Calls for

18             speculation.

19             THE WITNESS:  That, I'm not

20             sure, because what I do know is

21             that GoGuardian also sends out,

22             especially when you purchase --

23             well, let me take that back.  Most

24             applications when you purchase an

25             application will have, you know,

Page 214

1              exciting news to parents and, you
2              know, those sort of things,
3              publicizing various, so I'm not
4              sure, it looks a little bit like
5              that, but it could have come from
6              Dr. Vauss too.
7    BY MR. SHAHIDPOUR:
8         Q.    But even if she didn't
9    necessarily write it, it's signed by
10   Dr. Vauss at the bottom; is that right?
11        A.    It looks to be, yes.
12        Q.    And it notes that if parents
13   need further clarification, they should
14   contact the technology department.
15             Do you see that toward the
16   very bottom before Dr. Vauss signs?
17        A.    I do.
18        Q.    Okay.  And so going back up a
19   little bit to the section titled, "When and
20   how does GoGuardian operate?"  Do you see
21   that the letter notes that, "The
22   GoGuardian's web-based services operate on
23   our school's managed Google Suite for
24   Education Chrome accounts, i.e., when a
25   student is logged into Chrome or a

Page 215

1   Chromebook with his or her school email

2   address."

3                    Do you see that?

4        A.      I do.

5        Q.      Is that an accurate

6   description of how GoGuardian operates

7   on -- at IPS?

8        A.      Well, it's any Chromebook, I

9   believe all of our Chromebooks have an

10  extension, a GoGuardian extension that's on

11  it, and what I believe they're referring to

12  is as long as they're not in guest, because

13  remember, I believe at that time -- does it

14  say 2021?

15                    MS. SCULLION:  Well, Counsel,

16           it does raise a question about, you

17           know, what is the date of this?

18                    THE WITNESS:  Yeah, this does

19           say 2021.  So in the 2021 school

20           year, and you're now dealing with

21           COVID and so on, there was a -- it

22           was open to guest mode, especially

23           so that whether it was students,

24           parents were able to access bank

25           accounts or whatever it was at that

CONFIDENTIAL

Page 216

1              particular time, but I think that's
2              what it's referring to.
3    BY MR. SHAHIDPOUR:
4         Q.    So just to make sure I
5    understand, when a student is -- at the
6    time of this letter --
7         A.    Correct.
8         Q.    -- when a student -- or
9    strike that.
10              At the time of this letter,
11    when an IPS-issued Chromebook was being
12    used, it could be used either in the
13    student's account or a guest account to log
14    into the Chromebook?
15         A.    It had the ability to go
16    through either guest or student through
17    Clever.
18         Q.    Through what was the last?
19         A.    Clever.
20         Q.    Clever.  What is Clever?
21         A.    Our single sign-on.
22         Q.    Single sign-on.  And so
23    GoGuardian only applied, is it true that
24    GoGuardian only applied when somebody was
25    logged into an IPS-issued Chromebook on the

CONFIDENTIAL

Page 217

1    student account through Clever?

2         A.    So again, just like today

3    with the guest network, guest network is

4    still web filtered and blocked, but it has

5    a little bit more, just like for you

6    vendors, anyone that comes in, to be able

7    to go to what they're dealing with.  So I

8    think on guest, we allowed some banking

9    information for parents.  I think we

10   allowed medical information, like being

11   able to go to medical, like, I'm trying to

12   think now, health, Blue Cross Blue Shield

13   and Aetna and things like that, that is not

14   allowed for students, but during COVID, it

15   was -- oh, telehealth, we also allowed, so

16   that students and parents that need to see

17   a doctor and so on, but couldn't get there

18   because of COVID, that they could be able

19   to access that.

20        Q.    So there are two different

21   tiers of web filtering that apply,

22   depending on which type of account you're

23   logged into?

24        A.    So guest, as I explained

25   earlier, guest mode is still web filtered,

CONFIDENTIAL

Page 218

1  right, but it has a little bit more

2  tolerance to get to certain things, not --

3  not pornography, not any of that stuff, but

4  at that time, if a parent needed to access

5  a bank account, telehealth, Aetna, those

6  things, we allowed some of those things to

7  be open so that it could be used.

8        Q.      So the web filter that has a

9  little bit more tolerance for the guest

10  account, is that also GoGuardian?

11        A.      Everything is covered by

12  GoGuardian.  It's just what was allowed at

13  that time.

14        Q.      They had different

15  whitelists?

16        A.      So, it's -- yeah, perfect.

17        Q.      Was Netflix whitelisted for

18  the guest accounts?

19        A.      I don't think any streaming

20  service was whitelisted for anything.  Now,

21  to be clear, if there's ever a student

22  party, you know, a thing where they're

23  doing something after school, we may be

24  asked to whitelist something for an hour or

25  two, whatever, and then it goes right back

Page 219

1   on, but that's it.

2        Q.    Okay.  And then looking down

3   at the next section of the letter under

4   "What are my parental/guardian and child

5   responsibilities?"  Do you see that what

6   I'm referring to there?

7                Do you see the section?

8        A.    Yeah, I'm reading it right

9   off what he's giving me.

10       Q.    Okay.

11       A.    Yes.

12       Q.    And this letter to parents or

13  guardians, IPS informed them that they are

14  responsible for supervising their student's

15  internet access and usage when a student is

16  off campus?

17       A.    Uh-huh.

18       Q.    Did GoGuardian on a student

19  account still apply even if -- on a student

20  Chromebook still apply even if a student

21  was off campus?

22       A.    Yes, it still does.

23       Q.    It still does today?

24       A.    Uh-huh.

25       Q.    And students use their

CONFIDENTIAL

Page 220

1    Chromebooks off campus today?

2            A.      It depends on the school.  K

3    through 7, everything is classroom based

4    now.  We're giving back ECFs, so they will

5    be totally only in school.  High school

6    and, I believe, eighth grade are able to

7    bring their Chromebooks back and forth,

8    because they're doing projects, this or

9    that.

10           Q.      Is it true from your

11   perspective that parents are ultimately

12   responsible for monitoring students' use of

13   technology at home?

14                  MS. SCULLION:  Objection to

15              form and mischaracterizes the

16              document.  This is not his

17              document.

18                  MR. SHAHIDPOUR:  I was asking

19              about his perspective.

20                  MS. SCULLION:  Well, okay.

21                  THE WITNESS:  Looking at

22              specifically what was written, what

23              I believe they were talking about

24              was Google Classroom.

25                  MS. SCULLION:  If I understand

CONFIDENTIAL

Page 221

 1          counsel, he was not asking you

 2          about the document anymore; is that

 3          correct?

 4               MR. SHAHIDPOUR:  That's

 5          correct.

 6               MS. SCULLION:  Okay.  He's not

 7          asking about the document.  Do you

 8          want to repeat the question,

 9          please?

10               MR. SHAHIDPOUR:  And this is

11          precisely why the speaking

12          objections can distract from the --

13               MS. SCULLION:  No, the --

14               MR. SHAHIDPOUR:  -- question.

15          Is it true --

16               MS. SCULLION:  No, the witness

17          was confused as to whether you were

18          in fact, because it's still in

19          front of him on the screen and

20          highlighted, he thought you were

21          asking about the actual sentence in

22          this document.

23               MR. SEXTON:  He didn't say he

24          was confused.  He didn't say he was

25          confused.  He spontaneously offered

CONFIDENTIAL

Page 222

```
 1              the coaching.  He no longer --
 2                   MS. SCULLION:  No, he was --
 3              he was about to answer the question
 4              trying to explain who -- what this
 5              person, whoever wrote it meant.
 6              And that's not the question.
 7                   MR. SEXTON:  He had
 8              already said he --
 9                   MS. SCULLION:  No, but
10              please --
11                   MR. SHAHIDPOUR:  We can move
12              on --
13                   MS. SCULLION:  -- repeat the
14              question.
15    BY MR. SHAHIDPOUR:
16         Q.    We can move on.  Mr. Amberg,
17    I had asked, is it true from your
18    perspective that parents are ultimately
19    responsible for monitoring students' use of
20    technology at home?
21                   THE WITNESS:  In general, like
22              everything that we've talked about,
23              I believe it's a collaborative
24              effort.  I believe that there's
25              many parties that have
```

CONFIDENTIAL

Page 223

1          responsibility.  I believe parents

2          have a portion of that.  I

3          absolutely agree.  I think that

4          students themselves have a portion.

5          And then I also believe that

6          companies that are offering have a

7          responsibility too.

8              So I think it's -- I think

9          if we become, you know, if we

10         understand that it's not just one

11         party, but every single party is

12         contributing, and I think that

13         for parents, especially in areas

14         where parents are working

15         multiple jobs, I think in areas

16         where parents are single parents,

17         areas where parents may not have

18         English as their first language,

19         it becomes even more of a

20         responsibility of companies to

21         help with this.

22    BY MR. SHAHIDPOUR:

23         Q.     Okay.  You testified earlier

24    a little bit about the Child's Internet

25    Protection Act.

                                    Page 224

1              Do you recall that?

2        A.     I do.

3        Q.     Commonly known as CIPA?

4        A.     I do.

5        Q.     To receive a government, to

6   receive government funding, a district has

7   to comply with CIPA?

8              MS. SCULLION:  Objection to

9        the extent it is calls calling for

10       a legal conclusion.  You can

11       testify as to your understanding.

12             THE WITNESS:  I don't know

13       anything about the funding, sir,

14       I'm sorry.

15  BY MR. SHAHIDPOUR:

16       Q.     Do you have any involvement

17  at IPS with ensuring CIPA compliance?

18       A.     What my responsibility is is

19  to make sure that we have the components,

20  components such as web filter, components

21  such as a curriculum that talks about that,

22  and we have both.

23       Q.     And when you say,

24  "components," do you mean components of

25  what it takes for Irvington to be -- for

CONFIDENTIAL

Page 225

1    Irvington Public Schools to be CIPA

2    compliant?

3            A.      I would agree with that.

4            Q.      And so the first component

5    you mentioned was web filter?

6            A.      Web filter, firewall.

7            Q.      So web filters and firewalls

8    are necessary for Irvington Public Schools

9    to be CIPA compliant?

10            A.      Uh-huh.

11            Q.      The next component that you

12    mentioned was a curriculum that talks about

13    that, a curriculum that talks about what?

14            A.      Talks about everything from

15    the trials and tribulations of the internet

16    and how to be responsible citizen using the

17    internet.  It talks about social media and

18    to be aware of the good and the bad of

19    social media.  And that's primarily through

20    learning.com.

21            Q.      Through, sorry, what was the

22    last --

23            A.      Learning.com.

24            Q.      Learning.com.  What is

25    learning.com?

CONFIDENTIAL

Page 226

1          A.      That is our curriculum that
2     is used by the media specialists, K through
3     5 primarily, but also used sometimes in
4     middle school, but primarily K through 5,
5     where every single student in our
6     elementary schools learns about safety on
7     the internet, keeping them safe, keeping
8     them protected, and to understand their
9     responsibilities and roles as a good
10    internet user.
11         Q.      How long has learning.com
12    been a part of IPS's curriculum?
13         A.      Before my time.
14         Q.      Before your time as director
15    of technology and media services?
16         A.      Correct.
17         Q.      You don't know if it was at
18    some point -- when at some point between
19    when you started at Irvington Public
20    Schools and before you became director?
21         A.      I apologize, I don't know.
22         Q.      You don't need to apologize.
23    That's totally fine.
24                 Do you know how long -- for
25    how long IPS has had internet web filters

CONFIDENTIAL

Page 227

1  for the purposes of CIPA compliance?

2          A.      Well before my time as

3  director of technology.

4          Q.      When you joined as director

5  of technology, did you find anything out

6  that may have -- did you find out any

7  information that might shed light on that

8  answer?

9                  I'll rephrase the question.

10  Upon becoming director of technology and

11  media services, did you learn anything

12  about the state of IPS's technology and

13  media services department before you

14  joined?

15          A.      Sure, a little bit.

16          Q.      But just one thing that you

17  didn't learn was when these web filters

18  came into play?

19          A.      The date the web filters came

20  into play, no, I knew we had one.  I knew

21  the name.  But as far as going back 15, 20,

22  30 whatever years, no, I don't know.

23          Q.      And the one that, the one --

24  the web filter that IPS had at the time you

25  joined was iboss?

CONFIDENTIAL

1          A.      That is correct.

2          Q.      Were there any web filters in

3    place at the time at IPS?

4          A.      No.

5          Q.      And why did -- and IPS

6    eventually transitioned away from iboss; is

7    that right?

8          A.      Uh-huh.

9          Q.      Why did IPS --

10         A.      Yes.

11         Q.      Thank you.  Why did IPS

12    transition away from iboss?

13                  MS. SCULLION:  Objection to

14          form.  Lacks foundation.

15                  THE WITNESS:  So we're

16          constantly, and I'm speaking about

17          me personally, trying to make sure

18          that our students are as safe as

19          possible.  I researched, worked

20          with various companies, talked with

21          consultants.  I'm constantly

22          pulling in trying to learn.  I'm a

23          teacher at heart.  I love learning

24          and I want to do the best job

25          possible, my whole team does.  So

Page 229

1              we looked into and we're constantly
2              evaluating and reevaluating
3              everything.  You know, do we have
4              the best single sign-on?  Do we
5              have the best, you know, student
6              information system?  Do we have the
7              best, you know, so that is our
8              natural process and what we found
9              was that Palo Alto was extremely
10             highly rated.  It's an industry
11             leader, industry standard, and I
12             felt it was, with everything going
13             on, just as life gets more
14             complicated, I want to have the
15             best, so that's what we did.
16     BY MR. SHAHIDPOUR:
17          Q.     So you ultimately figured
18     that Palo Alto and GoGuardian were better
19     than iboss for your students?
20          A.     Take away GoGuardian for a
21     second and talking about Palo Alto, I
22     believe that they were the industry leader
23     and I felt comfortable going with the
24     industry leader.
25          Q.     And you -- IPS also

CONFIDENTIAL

Page 230

1  transitioned from iboss to GoGuardian under

2  your -- during your time of director of

3  technology and media services; is that

4  right?

5           A.      That is correct.

6           Q.      Did IPS transition to

7  GoGuardian from iboss for the same reason

8  as you mentioned for -- as it did for

9  transitioning from iboss to Palo Alto?

10          A.      So GoGuardian wears many

11 hats, right?  As I probably stated earlier,

12 it does many different things.  One, it

13 gives the teacher ultimately if -- if they

14 are doing it correctly, the ultimate

15 control on their web filter.  It can become

16 granular and we can see what's going on and

17 that was particularly important during

18 COVID when kids are home and were not being

19 monitored necessarily, especially if

20 parents have four or five kids and of all

21 different ages, you know, a teacher can

22 only see, you know, pre-GoGuardian, their

23 faces and then that's it.  What are they

24 really doing?  Are they really paying

25 attention?  So during COVID, it became

CONFIDENTIAL

Page 231

1   important.  That was one reason.

2                    Another reason is that it

3   really was, we were able to promote

4   engagement, okay, of students, because if

5   they're locked and focused in on a

6   particular thing and they can't scramble to

7   any other tab and they can't scramble to

8   any other site, more likely, they're going

9   to be forced to be engaged.  So, as I said,

10  it wears many hats.

11          Q.       And did you testify that

12  GoGuardian is -- GoGuardian and Palo Alto

13  are some of the components of IPS's CIPA

14  compliance?

15          A.       That is correct.

16          Q.       Because they help safeguard

17  student privacy?

18          A.       They do.

19          Q.       And then another component of

20  CIPA compliance is educating students about

21  appropriate online behaviors, correct?

22          A.       That is correct.

23          Q.       So to comply with CIPA, as

24  far as you're aware, IPS had to educate its

25  students about appropriate online

CONFIDENTIAL

```
                                    Page 232
 1   behaviors?
 2            MS. SCULLION:  Again, just
 3            objection to the extent it calls
 4            for a legal conclusion.  You can
 5            answer as to your understanding.
 6            THE WITNESS:  So my
 7            understanding is, for me,
 8            regardless of CIPA, I want my
 9            students to be as educated as
10            possible.  I don't want them being
11            vulnerable to online predators.  I
12            don't want them being -- going and
13            exploring sites that could hurt
14            them.  I don't -- so, to me, it is
15            really important that the students
16            are educated and are aware of all
17            the issues, because it goes back to
18            safety, right?  It goes back to
19            safety.  And to me, learning.com
20            does a very good job at presenting
21            the material.
22   BY MR. SHAHIDPOUR:
23       Q.    All right.  I'll try to move
24   onto tab 14, please.  I've handed you tab
25   14 which we will mark as Exhibit 15, 14,
```

```
                                              Page 233
 1   14.
 2                      - - - - -
 3                   (Email String Bates
 4              BW__Irvington00481804 marked
 5              Amberg Exhibit 14 for
 6              identification.)
 7                      - - - - -
 8   BY MR. SHAHIDPOUR:
 9         Q.    Mr. Amberg, do you see this
10   email was sent in March of 2023?
11                  MS. SCULLION:  Objection.
12              Mischaracterizes the document.
13                   THE WITNESS:  I do see the
14              email.
15   BY MR. SHAHIDPOUR:
16         Q.    And the email notes that --
17   the email that was sent to you is from Paul
18   Migaj, am I saying that correctly?
19         A.    Migaj.
20         Q.    Migaj.  And did Mr. Migaj --
21   well, who is Mr. Migaj?
22         A.    He's a technology coach in an
23   elementary school.
24         Q.    And Mr. Migaj told you --
25   well, is it Chancellor Elementary School
```

CONFIDENTIAL

Page 234

1    that Mr. Migaj was at at the time?

2         A.    Let me check.  Yes.

3         Q.    And Mr. Migaj, did he make

4    you aware that students at Chancellor

5    Elementary School had exploited a website

6    to listen to explicit songs in class?

7         A.    Yes.

8         Q.    And that website was

9    scratch.mit.edu?

10        A.    That is correct.

11        Q.    And that website Mr. Migaj

12   notes allows users to create pages with

13   audio content such as explicit songs?

14        A.    That is correct.

15        Q.    It could search for a user or

16   they could "navigate to scratch and then

17   search for a user such as Dd Osma [sic]"?

18        A.    That is what's written, yes.

19        Q.    "From there, they can listen

20   to explicit songs hosted on the user's page

21   on their headphones;" is that right?

22        A.    Yes, that is what's stated.

23             MS. SCULLION:  Let's make one

24        clarification, it's dd osma.

25

CONFIDENTIAL

Page 235

1    BY MR. SHAHIDPOUR:

2         Q.      Do you know what Mr. Migaj

3    was referring to by "dd osma"?

4         A.      Do I know the song, no, I do

5    not, but I am very familiar with this

6    email.

7         Q.      How are you very familiar

8    with this email?

9         A.      Because this brings up a

10   philosophical debate within the department

11   because of the fact that this is an

12   elementary school.  This is a -- this is an

13   MIT level program that's used in our -- in

14   our high school AP coding classes.

15              But here's the kicker, if

16   you go onto social media, you'll find exact

17   ways to go to songs, hey, do you know, does

18   your school have Scratch open?  Well, if

19   they do, you can listen to music, you can

20   listen to this, and you can exploit this

21   and you can exploit that.  So now it

22   becomes a problem for us.  What do we do

23   when we have students at the high school

24   who want to learn how to code, but have

25   this desire to be, you know, going to an

```
                                    Page 236
 1   MIT or a Harvard, wherever to learn coding,
 2   and trying to keep our students protected
 3   even in an elementary school.  And this is
 4   a basic problem that we're facing all the
 5   time.
 6                MR. SEXTON:  Objection,
 7           nonresponsive and move to strike.
 8                MS. SCULLION:  Contest the
 9           motion.
10   BY MR. SHAHIDPOUR:
11        Q.    And you mentioned that they
12   go to social media and learn how to exploit
13   websites like scratch.mit.edu?
14        A.     Exploit, I don't know if it's
15   exploit, but they learn how to get basic --
16   they will copy and paste basic coding and
17   then be able to do what they want to do.
18        Q.     Is that the social media
19   platform, the company, telling them to go
20   do that, to go copy and paste that code
21   that you testified about?
22                MS. SCULLION:  Objection to
23           form.  Lacks foundation.
24                THE WITNESS:  I don't think
25           Mark Zuckerberg or anyone else is
```

CONFIDENTIAL

                                        Page 237

1            necessarily saying that, but I do
2            believe it's their responsibility
3            for the content on there.
4    BY MR. SHAHIDPOUR:
5            Q.      And then in response to this,
6    you note that this will have to be a
7    classroom management issue.  Preventing
8    students from listening to explicit songs
9    during class would be considered a
10   classroom management issue, correct?
11           A.      Well, this was what prompted
12   the discussion that I talked about.  This
13   was, listen, tell the teacher to pay more
14   attention and then Mr. Migaj, along with
15   the other tech coaches and teachers and so
16   said, Mr. Amberg, we're swamped already.
17   You've got to find a way to basically shut
18   down Scratch.  But now we're back to this
19   philosophical, ethical issue.  We want to
20   teach our students how to code, how do we
21   do that and also try and keep our students
22   safe?
23                  It's wonderful to think,
24   let's put everything on the teachers and
25   that's a very easy solution for big

CONFIDENTIAL

Page 238

1  companies to say, but the reality is, it is

2  a very, very difficult job to do that and

3  try and do our primary job, which is

4  educate the student.

5        Q.      And when Mr. Migaj sent you

6  this email, did you understand that to be

7  students accessing the website on their

8  Chromebooks during class?

9        A.      Well, since Scratch is used

10  on the Chromebook at the high schools,

11  right, that would be primarily where I'm

12  going to go, especially thinking at the

13  elementary school, because that's what they

14  have access to.

15        Q.      And students can connect

16  their headphones to their Chromebooks

17  during school?

18        A.      So to understand how

19  education today is compared to years ago,

20  there is interactive lessons, right?  It

21  could be i-Ready.  It could be Read 180.

22  It could be IXL.  And they have an audio

23  component and they have visual components

24  and in order not to distract from other

25  students that may be on -- a little bit

CONFIDENTIAL

Page 239

1   ahead or a little bit behind, they may be
2   using headphones 100 percent.
3                   Now, the second part is if a
4   student has an IEP, right, Individual
5   Education Plan, where they need that
6   headphone in their ears in order not to be
7   distracted, that's another reason why
8   people use headphones.  Testing,
9   headphones.  So I'm not surprised, sir.
10       Q.    Mr. Amberg, I really
11  appreciate the explanation.  I just want to
12  make sure that you're listening for the
13  question that I ask, because I am more than
14  happy to ask why students have headphones,
15  but what I had asked was can students
16  connect their headphones to Chromebooks?
17                   MS. SCULLION:  And he answered
18                   the question, and to imply
19                   otherwise is not appropriate.  I
20                   mean, you asked him, you know,
21                   you're also asking, it sounded to
22                   me, are they permitted to and he
23                   was explaining the multiple ways
24                   and circumstances in which they
25                   would be permitted to use

CONFIDENTIAL

Page 240

1          headphones during class.

2                    MR. SHAHIDPOUR:  Thank you,

3          Counsel, and he --

4                    MS. SCULLION:  He answered the

5          question.  Go on --

6                    THE WITNESS:  No, honestly,

7          that's what I thought you meant.

8    BY MR. SHAHIDPOUR:

9          Q.    No, no, please don't assume

10   or guess what you think I mean.  If you

11   don't understand the question, please ask

12   me to clarify.

13         A.    I thought I understood the

14   question.

15         Q.    You've done it a few times.

16         A.    No, but I thought I

17   understood that.

18                   MS. SCULLION:  Why don't we

19         move on?

20                   THE WITNESS:  Wake up.

21   BY MR. SHAHIDPOUR:

22         Q.    Are -- let's see, did IPS

23   previously have a Cisco ASA firewall?

24         A.    That, I don't know.

25         Q.    You don't know.  Do you know

CONFIDENTIAL

Page 241

1  what the Cisco ASA firewall is?

2         A.     I do not.

3         Q.     Is IPS's Wi-Fi network

4  accessible to students on their personal

5  devices?

6         A.     They are not.

7         Q.     IPS allows personal devices

8  to be kept at school by IPS students?

9         A.     Rephrase.

10        Q.     So IPS's policy prevents

11 students from using their cell phones

12 during class, correct?

13        A.     Uh-huh, yes.

14        Q.     IPS policy doesn't prevent

15 them from having it, from -- IPS policy

16 doesn't prevent IPS students from keeping

17 their cell phones in their bags during

18 class; is that correct?

19        A.     They're allowed to keep their

20 cell phones in their bags.  They're just

21 not allowed to be seen.

22        Q.     Their cell phones can't be

23 seen at all?

24        A.     Except, I believe, at lunch,

25 maybe at lunch they can.

CONFIDENTIAL

1    Q.    Do IPS students have recess?

2    A.    Well, it depends on the grade

3    level.

4    Q.    Do some IPS students have

5    recess?

6    A.    Elementary school, if recess

7    means going outside and so on, elementary

8    schools do that, but high school and middle

9    schools, no, not so much.

10    Q.    Are the IPS students who do

11    have recess allowed to use their personal

12    cell phone devices during recess?

13    A.    The elementary schools, I

14    don't -- I don't know.

15    Q.    Do some IPS students have

16    study halls?

17    A.    Not traditional study halls,

18    no.  Not what we used to think of as study

19    halls.  Now, it's more of a learning

20    environment where they can choose the

21    subject that they need to focus on and work

22    on that, but that is an actual -- it's not

23    like study hall back in the day, it's

24    actual learning.

25    Q.    Understood.  Do IPS students

CONFIDENTIAL

Page 243

1  have any other sort of open periods during

2  the school day?

3                    MS. SCULLION:  Objection to

4            form.

5                    THE WITNESS:  No, sir, they

6            have gym, but gym is an actually

7            instructed class, nothing else.

8  BY MR. SHAHIDPOUR:

9        Q.     Aside from any of the tools

10 that we've talked about, the digital

11 infrastructure, are there any other ways

12 that come to mind for you when -- as to how

13 IPS restricts internet access or usage on

14 personal devices on IPS property?

15                   MS. SCULLION:  Objection to

16           form.  Vague.  May I ask a

17           clarifying, are you talking about

18           for students?

19                   MR. SHAHIDPOUR:  I was just

20           asking about personal devices on

21           IPS property.

22                   MS. SCULLION:  In general,

23           okay.

24                   THE WITNESS:  For anyone?

25

CONFIDENTIAL

Page 244

1    BY MR. SHAHIDPOUR:

2            Q.      For anyone.

3            A.      Well, adults can have their

4    devices.  Guests coming in have their

5    devices.  It's more regulating students.

6    It's, again, everything goes back to one

7    thing, learning and safety.  Keeping the

8    kids safe, making sure they're learning.

9    So that's why, why we, you know, why we're

10   doing it.  So adults especially, you know,

11   vendors, whoever is coming in, no.

12           Q.      And are there any ways that

13   we haven't yet talked about that IPS

14   filters content that IPS students can

15   access on their personal devices?

16           A.      IPS students should not be

17   accessing anything on their personal

18   devices.

19           Q.      During school?

20           A.      During school.

21           Q.      Okay.  I am handing you

22   exhibit tab 12A.

23                   MS. SCULLION:  So sorry.

24                   MR. SHAHIDPOUR:  Yup.

25                   MS. SCULLION:  Thank you.

CONFIDENTIAL

Page 245

1            Give us one second, I just
2       need to change an appointment.
3            MR. SHAHIDPOUR:  Sorry, what
4       was that?
5            MS. SCULLION:  I'm going to
6       just need to change an appointment,
7       give me one second, sorry.
8            MR. SHAHIDPOUR:  We can go --
9            MS. SCULLION:  It will take me
10      two seconds.
11           THE WITNESS:  Where should I
12      place this, right here?  Good.
13           MS. SCULLION:  Thank you.
14           MR. SHAHIDPOUR:  Did you get a
15      copy?
16           MS. SCULLION:  I did, I just
17      failed to note the number.
18           THE WITNESS:  I put down 15, I
19      believe.  Fifteen.
20           MS. SCULLION:  Thank you.
21  BY MR. SHAHIDPOUR:
22       Q.    So we will mark this as
23  Exhibit 15.  This is IPS's 2022 to 2027
24  technology plan; is that right, Mr. Amberg?
25           MS. SCULLION:  I ask the

Page 246

1              witness to make sure you look

2              through the document first.

3                     THE WITNESS:  It does appear

4              to be.

5                        - - - - -

6                     (IPS Technology Plan Bates

7              BW__Irvington00169331 to 169369

8              marked Amberg Exhibit 15 for

9              identification.)

10                       - - - - -

11    BY MR. SHAHIDPOUR:

12         Q.     And then turning to page 25,

13    do you see the page numbers on the bottom

14    right?

15         A.     Twenty-five?

16         Q.     Yes, that would be the Bates

17    ending in 356.

18         A.     Oh, gosh, yeah, it's so

19    light, I apologize, give me one second,

20    okay.

21         Q.     And talking about, we

22    discussed this, this plan, is it -- this

23    technology plan from 2022 to 2027 for IPS,

24    is it required for CIPA compliance?

25                     MS. SCULLION:  Objection to

CONFIDENTIAL

Page 247

1           the extent it calls for a legal
2           conclusion.  You can answer to the
3           extent that you know.
4                THE WITNESS:  I'm not sure,
5           but it's something that we created.
6   BY MR. SHAHIDPOUR:
7           Q.    Sorry, did you say, "that we
8   created"?
9           A.    Correct.
10          Q.    Did you have input in the
11  technology plan?
12          A.    I did, it's collaborative
13  like with everything else that we do here.
14          Q.    Can you give me, is it -- or
15  how many people had input into this
16  technology plan?
17          A.    Multiple.  Again, calling in
18  outside vendors that we worked with in the
19  past, consultants, obviously, my
20  technicians, my tech coaches, and then,
21  obviously, above us, assistant to the
22  assistant, assistant superintendent,
23  assistant superintendent, and
24  superintendent.
25          Q.    And who is the audience for

CONFIDENTIAL

Page 248

```
 1   this technology plan?
 2                MS. SCULLION:  Objection to
 3           form.  Vague.
 4                MR. SHAHIDPOUR:  Other than us
 5           right now.
 6                THE WITNESS:  Besides --
 7                MS. SCULLION:  Same
 8           objections.
 9                THE WITNESS:  Well, part it is
10           for us, it's almost like if you
11           think about a lesson plan in
12           school.  That's not for the
13           students so much, it's for the
14           teacher to kind of pace.  And
15           lesson plans are flexible and
16           sometimes you follow it completely,
17           sometimes you deviate, depending on
18           how well the external factors are
19           working at the time.
20   BY MR. SHAHIDPOUR:
21        Q.    Sure.  And so one goal of
22   this document was to lay out sort of a
23   lesson plan in terms of technology and its
24   incorporation at IPS for --
25        A.    That's correct.
```

CONFIDENTIAL

Page 249

1        Q.     Sorry, I was just going to
2    add for the time period 2020 to 2027?
3              MS. SCULLION:  Objection to
4         form.
5              MR. SHAHIDPOUR:  Is that
6         correct?
7              MS. SCULLION:  Objection to
8         form.
9              THE WITNESS:  That is correct,
10        sir.
11   BY MR. SHAHIDPOUR:
12        Q.     Okay.  So turning, looking at
13   this page that we've turned to under,
14   "Building a culture of continuous learning
15   for staff," subpoint G notes,
16   "Investigating emerging possibilities for
17   electronic learning resources such as
18   ebooks, social media, and tablets for
19   teachers and students."
20              Do you see that?
21        A.     I do.
22        Q.     Did the team that put this
23   technology plan together consider it --
24   consider social media as an emerging
25   possibility for electronic learning for

Page 250

1    2022 to 2027?

2          A.      What -- what we were talking

3    about here in general is how do we get our

4    teachers to use GoGuardian more efficiently

5    so that they can have more of the power

6    that we talked about earlier in opening up

7    say, like, a YouTube and that right there

8    is something that we believe would benefit

9    the education environment.

10                I think it also discusses

11   the fact that there are more and more

12   applications that we're seeing coming out

13   curriculum-wise that act in a way of social

14   media like in that forum, such as like a

15   ClassDojo, right?  And Howbit, which is a

16   class incentive/classroom management

17   application, but it has all the kind of,

18   like, the components, but it's set

19   specifically to the world of education to

20   the classroom experience for the teachers,

21   for the parents.

22                So how do we build and

23   educate our teachers to be able to use

24   something like GoGuardian fully, using

25   Scenes, using the power that they

CONFIDENTIAL

Page 251

1    themselves then can take on instead of

2    relying for us as a technology department

3    from keeping everything locked, because

4    right now, everything is locked and like we

5    talked about, they have to go to their

6    supervisor and then they have to go to the

7    next building administrator, then they're

8    going to us.

9         Q.    So this -- this subpoint that

10   we're talking about, it falls under

11   building a culture of continuous learning

12   for staff and that in turn falls under goal

13   one, "Improve student academic achievement

14   through the use of technology."

15                Do you see that?

16        A.    I do.

17        Q.    IPS has -- has IPS ever

18   considered investigating emerging

19   possibilities such as social media as a

20   means of improving student academic

21   achievement?

22                MS. SCULLION:  Objection to

23          form.

24                THE WITNESS:  So, again, I can

25          say YouTube, when used properly, is

Page 252

```
 1          a fantastic tool for teaching
 2          students about things, like, saying
 3          history, remember, I was a history
 4          teacher.  If you're capping off a
 5          discussion about the Civil War and
 6          you want to go to see a Ken Burns
 7          documentary and catch a snippet,
 8          right, and then you add on that ed
 9          puzzle which allows questioning, so
10          you're adding a 10-second clip and
11          then a question, 10-second clip and
12          then a question, that's a fantastic
13          tool, but it has to be used
14          properly and students need to be
15          safe and it needs to be focused on
16          specifically education.
17   BY MR. SHAHIDPOUR:
18          Q.    So when you say, "used
19   properly," in connection with social media,
20   do you mean choosing the right types of
21   content to show students on social media?
22          A.    It means if you have a
23   lesson, make sure that you have the
24   appropriate YouTube video to help bolster,
25   you're not just putting it on to just to
```

Page 253

1  say, hey, I'm going to walk away from my

2  class for two minutes and, you know, have a

3  breather.  It's about trying to educate the

4  student the best way.  And sometimes having

5  a video clip of something really does add

6  flavor and context.  There's no question

7  about that.  The question is are we able to

8  do that without safeguards, and the answer

9  is no.  Unfortunately, there's a lot of

10  stuff that is unsafe and that's -- that's

11  an issue.

12          Q.    Do you run any social media

13  accounts for IPS?

14          A.    I do not.

15                MS. SCULLION:  Objection --

16          sorry, objection to form,

17          foundation.  Assumes facts not in

18          evidence.

19  BY MR. SHAHIDPOUR:

20          Q.    Does IPS have any social

21  media accounts?

22          A.    So recruiting and retention

23  has one or two, because, as you can

24  understand, teaching is not easy.

25  Recruiting teachers and retaining teachers

CONFIDENTIAL

Page 254

```
 1   is almost a full-time job, especially with
 2   everything that's going on.  So with that
 3   being said, I think recruiting and
 4   retention has been having, like, blitzes to
 5   try and get teachers to come in to become
 6   part of Irvington Public Schools system, so
 7   I believe that.  And I also believe and
 8   it's not part of the school system, but the
 9   football team, or maybe it's the booster
10   club, I don't know, has, like, a Blue
11   Knights thing, but I don't run that and we
12   don't run the retention and recruitment
13   stuff either.
14          Q.     And you mentioned Blue
15   Knights, is that the Irvington High School
16   mascot?
17          A.     Come on, you're here in
18   Irvington.  You have to know that, yes.
19          Q.     I'm checking.  So are you
20   involved in either the recruiting and
21   retention or athletic social media
22   accounts?
23          A.     No, sir.
24                 MS. SCULLION:  Objection to
25          form.
```

CONFIDENTIAL

Page 255

1   BY MR. SHAHIDPOUR:

2         Q.      Are you involved in any other

3   IPS social media activity?

4                   MS. SCULLION:  Objection to

5             form.

6                   THE WITNESS:  No, sir.

7   BY MR. SHAHIDPOUR:

8         Q.      Have you ever been portrayed

9   in content that IPS has posted to social

10  media?

11                  MS. SCULLION:  Objection to

12            form and foundation.

13                  THE STENOGRAPHER:  Objection

14            to form and what?

15                  MS. SCULLION:  And foundation.

16                  THE WITNESS:  I believe there

17            was a YouTube video not produced by

18            us, but by produced by a company

19            talking about highlighting the

20            technology at IPS at Irvington

21            Public Schools, excuse me, and they

22            interviewed me about Chromebooks,

23            about, I believe, it was Ozobots,

24            Legos, and 3D printers and so on

25            and how we use them within the

CONFIDENTIAL

Page 256

1          district.
2    BY MR. SHAHIDPOUR:
3          Q.     Okay.  Does anyone who
4    reports to you in the technology and media
5    services department operate any social
6    media accounts on behalf of IPS?
7          A.     Not that I know of.
8          Q.     Who is Carl Walton?
9          A.     Carl Walton, he retires next
10   month, but he is supervisor.
11         Q.     And I'll mark tab 17 as
12   Exhibit 16.
13                    - - - - -
14              (Professional Assessment and
15           Development Evaluation Bates
16           BW__Irvington00225419 to 225454
17           marked Amberg Exhibit 16 for
18           identification.)
19                    - - - - -
20              THE WITNESS:  Thank you.
21              MS. SCULLION:  Uh-huh.
22   BY MR. SHAHIDPOUR:
23         Q.     We talked earlier about
24   performance evaluations.  Do you conduct --
25   do you evaluate the performance of other

CONFIDENTIAL

Page 257

1    IPS staff in the course of your duties at

2    IPS?

3            A.      Yes, sir, that's one of my

4    main jobs is to evaluate media specialists,

5    to evaluate my technology team, to evaluate

6    anybody that needs to be evaluated.

7            Q.      And we talked about this a

8    little bit earlier, but is that part of

9    being executive director at IPS or is that

10   part of being director in general?

11           A.      Any time you're an

12   administrator, that's where -- and that's

13   why you must have a teaching cert and an

14   administrative cert, you then become an

15   evaluator and it could be anyone in the

16   district that's an administrator, sorry.

17           Q.      And looking at this first

18   page, under question one, it asks or it

19   says, "To be completed by the administrator

20   for the Pre-Observation Conference."  It

21   says, "completed by the administrator," is

22   that referring to the person being

23   evaluated or the person evaluating?

24           A.      So because this is an

25   evaluation for supervisors, this would be

CONFIDENTIAL

Page 258

1    considered the supervisor would have to
2    fill this out.
3            Q.      So, on this document, who
4    filled out the response to Section 1?
5            A.      Carl, Carl.
6            Q.      Carl Walton?
7            A.      Yes.
8            Q.      Carl Walton notes that he
9    considered sources of data to develop
10   student achievement goals?
11           A.      Through NJ SMART.
12           Q.      NJ SMART.  And then on the
13   next page, he mentions PowerSchool
14   reporting?
15           A.      Correct.
16           Q.      And this is sort of what we
17   talked about earlier in terms of IPS using
18   data to develop student achievement goals;
19   is that right?
20                   MS. SCULLION:  Objection to
21           form.
22                   THE WITNESS:  Well, NJ SMART
23           is the information that we send to
24           the state regarding the students.
25           It could have anything from the

CONFIDENTIAL

Page 259

```
 1            student's family's income letter to
 2            their race, to their gender, all
 3            that information and we just grab
 4            the information and we put -- place
 5            it in the report and send it to the
 6            state.
 7  BY MR. SHAHIDPOUR:
 8        Q.    Okay.  And moving on to
 9  the -- you're familiar with the Bates
10  numbers that I have been referencing so
11  far?
12        A.    Is that these --
13        Q.    The numbers on the bottom
14  right.
15        A.    Yeah.
16        Q.    To the page that ends in 441.
17  It's quite a ways through the document.
18        A.    Okay.
19        Q.    And at this point in the
20  document, you are evaluating Mr. Walton?
21        A.    That is correct.
22        Q.    And at the very bottom, we
23  see corporation -- domain for cooperation
24  and collaboration.
25                Do you see that?
```

CONFIDENTIAL

Page 260

1          A.      Domain III, Domain IV, yes.

2          Q.      And you generally tried to

3    provide helpful feedback in these

4    evaluations?

5          A.      I try.

6          Q.      Well, feedback for

7    Mr. Walton?

8          A.      That's -- that's the hope.

9          Q.      And also evaluate him for

10   other purposes such as -- well, strike

11   that.

12               You also evaluated him for

13   purposes of the district's perspective as

14   to his performance?

15                    MS. SCULLION:  Objection to

16           form.

17                    THE WITNESS:  Typically, I'm

18           evaluating him to help him be the

19           best supervisor possible in order

20           to provide students, teachers, and

21           other administrators the help that

22           they need to be successful.

23   BY MR. SHAHIDPOUR:

24         Q.      Yup.  And for this particular

25   domain, you evaluated him on ensuring that

CONFIDENTIAL

Page 261

1    teachers have opportunities to observe and
2    discuss effective teaching; is that right?
3          A.     Uh-huh.
4          Q.     On his performance on --
5    moving onto the next page, ensuring that
6    teachers have formal roles in the
7    decision-making process regarding district
8    initiatives?
9          A.     Where are you, I apologize?
10          Q.     The next page on to 442,
11    still in this section.
12          A.     Okay.
13          Q.     You also evaluated him for
14    ensuring that teachers have formal roles in
15    the decision-making process regarding
16    district initiatives?
17          A.     Again, if you remember, it's
18    a collaborative, I keep on going back to we
19    all try and work together, because
20    everybody has different expertise and
21    bringing in as many stakeholders as
22    possible is absolutely pertinent to the
23    educational experience of the student.
24          Q.     Okay.  And you can move down
25    to number five, Mr. Walton was evaluated

CONFIDENTIAL

Page 262

1  and provided feedback on how --

2          A.      Domain V?

3          Q.      No, sorry, subpart five under

4  Domain IV.

5          A.      Okay.  I apologize.

6          Q.      No need to apologize, on 442.

7          A.      Okay.

8          Q.      "The administrator ensures

9  that students, parents, and community have

10 formal ways to provide input regarding the

11 optimal functioning of the district."

12                  Do you see that?

13         A.      I do.

14         Q.      This is sort of going to the

15 collaborative nature of how the district

16 operates that you have been testifying

17 about?

18         A.      Correct.

19         Q.      And one way to be

20 collaborative is to solicit input from

21 various stakeholders?

22         A.      That is.

23         Q.      Looking at the top -- well,

24 and under these subparts you rated

25 Mr. Walton as highly effective at Domain

CONFIDENTIAL

Page 263

1    IV?

2            A.        That is correct.

3            Q.        And you wrote that,

4    "Mr. Walton recognizes the importance of

5    creating channels for students, parents,

6    and the community to provide input and stay

7    informed about the optimal functioning of

8    the district.  To ensure effective

9    communication and engagement, he places a

10   strong emphasis on maintaining and

11   optimizing various communication platforms,

12   including the district website, school

13   messenger system, social media channels,

14   and the phone system."

15                    Do you see that?

16           A.      I do.

17           Q.        And then going down to the

18   fourth paragraph, you wrote, "Recognizing

19   the impact of social media in today's

20   digital age, Mr. Walton leverages social

21   media platforms to engage with the

22   community and provide updates on district

23   activities.  He ensures that social media

24   accounts are regularly monitored, actively

25   responds to inquiries or concerns, and

CONFIDENTIAL

                                    Page 264

1    promotes positive interactions among

2    stakeholders."

3                    Do you see that?

4            A.     I do.

5            Q.     Which social media accounts

6    was Mr. Walton regularly monitoring?

7            A.     ClassDojo.

8            Q.     ClassDojo is a social media

9    account?

10           A.     That's, for school districts,

11   absolutely.  That's the one of the best

12   ways for teachers, administrators to

13   communicate with parents.  So that's

14   something that he was one of the ones that

15   actually brought about, because it's

16   monitored, it's safe, and it's

17   collaborative.  And it's, like, a walled

18   environment, kind of like I explained with

19   our students, elementary and middle school

20   students cannot have an email, right?

21   They're not allowed to have an email.  It's

22   blocked.  It's -- the only people are the

23   high school.  So this is a safe way of

24   making announcements of saying, hey, we're

25   doing this, this is great, come out and see

CONFIDENTIAL

Page 265

1    it.  So, absolutely, it's a wonderful
2    experience.
3            Q.      So which other social media
4    platforms did Mr. Walton leverage to engage
5    with the community?
6            A.      Well, now, it's through
7    PowerSchool, but before it was on its own
8    and that's our phone blast system.
9            Q.      Okay.
10           A.      It used to be on its own, now
11    it's PowerSchool.
12           Q.      So back to the first
13    paragraph, where it says at the very end,
14    "including the district website, school
15    messenger system, social media channels,
16    and the phone system," are those all
17    separate items?
18           A.      I'm sorry, what do you mean
19    by "separate items"?
20           Q.      Where it says social media
21    systems in this list, you understand that
22    to be referring to go -- what is that?
23                   MS. SCULLION:  ClassDojo.
24                   MR. SHAHIDPOUR:  ClassDojo and
25            PowerSchool?

Page 266

1              THE WITNESS:  Well, now, it
2         was phone blast, kind of like
3         school messenger is an example of
4         one.  He also was in charge of the
5         idea of integrating from PRIs to
6         SIP with the phones.  So that's why
7         I brought that in.  So, as you
8         know, companies, you know, Verizon
9         has been getting away from copper,
10        right, POTS lines.
11   BY MR. SHAHIDPOUR:
12        Q.    I didn't know that.
13        A.    So they have been getting
14   away from POTS lines, or plain old
15   telephony, and they have been going towards
16   SIP.  And they're, like, listen, copper
17   breaks way too much.  So with that, he was
18   one of the main people that worked on
19   transferring the whole district phone
20   system that, you know, leverages the use of
21   calling parents and being able to contact,
22   from PRI to SIP.  That has been super and
23   cost savings.
24              MR. SHAHIDPOUR:  Understood.
25         Do you want to take a quick break?

CONFIDENTIAL

                                              Page 267

1              We're close to the end here.
2                    MS. SCULLION:  Yeah, why don't
3              we take a break?
4                    THE VIDEOGRAPHER:  The time
5              right now is 3:46 p.m.  We're off
6              the record.
7                      - - - - -
8         (A recess was taken at this time.)
9                      - - - - -
10                   THE VIDEOGRAPHER:  The time
11             right now is 4:00 p.m.  We're back
12             on the record.
13   BY MR. SHAHIDPOUR:
14        Q.     Well, again, Mr. Amberg, just
15   a few more questions.  Do you use social
16   media in your personal life?
17        A.     If you ask my kids, no.  Me,
18   not really, I use -- I used to have
19   Facebook many years ago when I -- I don't
20   have it now.
21                   I think I opened a Twitter
22   account, but I don't think I ever tweeted
23   and I'm not sure how to tweet or is it Xing
24   now.
25                   And SnapChat, I had that,

CONFIDENTIAL

Page 268

```
1    but I haven't used that in years too.

2                   Instagram, I have and I

3    follow chefs, because they're my passion.

4         Q.      Culinary Instagram accounts.

5    How long have you had Facebook?

6         A.      I have no idea.  Because I

7    haven't used it in a couple of -- three or

8    four years and -- or five years now.  And

9    maybe -- I had it primarily for Roth and

10   Amberg, so maybe 2009, I had it.

11        Q.      Okay.  How long have you had

12   Instagram?

13        A.      A year or two, not very long.

14        Q.      How long have you had Twitter

15   or X?

16        A.      I don't know, because I don't

17   think I ever used it.

18        Q.      All right.  Do you have a

19   TikTok account?

20        A.      No, I don't have a TikTok

21   account.

22        Q.      Do you have a YouTube

23   account?

24        A.      I use YouTube, but an

25   account, what does that mean, I'm sorry?
```

CONFIDENTIAL

Page 269

 1              MS. SCULLION:  He actually
 2          can't answer questions.  So the
 3          answer -- if you don't know, you
 4          don't know.
 5              THE WITNESS:  I don't know.
 6  BY MR. SHAHIDPOUR:
 7      Q.    Do you have a log-in or
 8  sign-in for YouTube that you use?
 9              MS. SCULLION:  Objection to
10          form.
11              THE WITNESS:  I don't -- I
12          don't think so.
13  BY MR. SHAHIDPOUR:
14      Q.    Okay.  Do you have a
15  LinkedIn?
16      A.    I do.
17      Q.    How long have you been using
18  LinkedIn?
19      A.    To the best of my
20  recollection, maybe seven, eight years.
21      Q.    And, I'm sorry, going back to
22  YouTube, how long have you been using
23  YouTube?
24      A.    I have no idea.  But for a
25  while.  I find education videos excellent.

CONFIDENTIAL

Page 270

1           Q.      And then how long have you

2    had SnapChat?

3           A.      I have no idea.  I don't Snap

4    very much and haven't for years.

5           Q.      Any other social media

6    accounts?

7           A.      Are there others?  I don't

8    think so.

9           Q.      Do you have a Reddit account?

10          A.      No.

11          Q.      Have you ever used Reddit?

12          A.      I think I've Googled

13   something and, like, Reddit showed up.

14          Q.      How many hours a week do you

15   spend on social media?

16                  MS. SCULLION:  So I'm going to

17             start objecting.  I mean, this

18             lawsuit is not about Mr. Amberg's

19             personal use of social media, so

20             I'll allow you some leeway, but

21             we're not going to allow very much

22             of this.

23                  THE WITNESS:  I have no idea,

24             but sometimes I listen -- well,

25             it's primarily YouTube, but I

CONFIDENTIAL

1          couldn't quantify how long or how
2          much, but ...
3    BY MR. SHAHIDPOUR:
4          Q.     And you said you follow chefs
5    on Instagram and you have for the past one
6    or two years; is that right?
7          A.     Yeah.
8          Q.     And about how much time do
9    you spend on Instagram?
10               MS. SCULLION:  Objection to
11          form.
12               THE WITNESS:  Not very long.
13   BY MR. SHAHIDPOUR:
14         Q.     Do you plan to get rid of
15   your social media?
16               MS. SCULLION:  Objection.  So
17          what is the relevance of these
18          questions to this lawsuit?
19               MR. SHAHIDPOUR:  Counsel, you
20          can have your form objection.  You
21          can have your privilege objections.
22          We're not going to litigate
23          relevance --
24               MS. SCULLION:  I mean --
25               MR. SHAHIDPOUR:  -- at a

CONFIDENTIAL

Page 272

1      deposition.
2            MS. SCULLION:  Well, I mean,
3      at some point you're really getting
4      into, I mean, this is his personal
5      life.  It's an invasion of his
6      privacy.  You all have raised
7      questions about privacy and I think
8      we are now in the territory where
9      we're going beyond what is even
10     potentially relevant.
11           MR. SEXTON:  You all have
12     asked every one of our company
13     witnesses about their social use
14     and their children's social media
15     use.  So the objection has no --
16           MR. SHAHIDPOUR:  And I'll say
17     that to the extent your client and
18     the witness have made statements
19     about social media, their usage of
20     social media bears on their
21     understanding of its features and
22     how it can be used.
23           MS. SCULLION:  Well, our
24     client is IPS.  Mr. Amberg has made
25     comments with respect to social

CONFIDENTIAL

Page 273

1          media in the relevant sense in

2          terms of its use within schools.

3          And -- but he's not -- he's not

4          here to talk about his personal use

5          or nonuse of social media as an

6          adult outside of the school

7          environment in his personal life.

8          So these are not appropriate

9          questions.

10              MR. SHAHIDPOUR:  That's my

11          articulation of the relevance.  We

12          don't have to get into it further

13          on the record.  And we don't have

14          any more questions on it

15          regardless.

16              Mr. Amberg, do you have

17          family members who use social

18          media?

19              MS. SCULLION:  Objection.

20          That's off limits.  It has

21          absolutely no relevance whatsoever

22          and we're not going to allow him to

23          answer those questions.

24              MR. SHAHIDPOUR:  Are you going

25          to follow your counsel's

CONFIDENTIAL

Page 274

1           instruction?

2                   THE WITNESS:  I listen to my

3           counsel all the time.

4                   MS. SCULLION:  I'm going to

5           take a quick break.  Mr. Amberg, if

6           you would just remain here.  But

7           please do not talk to anybody.  I'm

8           just going to take a break and chat

9           with someone.

10                  THE VIDEOGRAPHER:  The time

11          right now is 4:07 p.m. and we're

12          off the record.

13                      - - - - -

14     (A recess was taken at this time.)

15                      - - - - -

16                  THE VIDEOGRAPHER:  The time

17          right now is 4:10 p.m.  We're back

18          on the record.

19    BY MR. SHAHIDPOUR:

20          Q.     Mr. Amberg, before we took a

21     break, I asked whether you were going to

22     follow your counsel's instruction not to

23     answer my question.  You said you listen to

24     your counsel all the time.  Are you

25     following her instruction not to answer

CONFIDENTIAL

Page 275

1  right now?

2          A.      I'm listening to my counsel.

3          Q.      Okay.  Earlier you mentioned

4  certain viral -- I don't want to put words

5  in your mouth, but a viral challenge

6  involving Chromebooks.

7                  Do you recall that?

8          A.      I do.

9          Q.      Can you tell me a little bit

10  about this challenge that you're aware of?

11                 MS. SCULLION:  Objection to

12          form.

13                 THE WITNESS:  I was alerted a

14          couple of days ago of Chromebooks

15          at a middle school smoking and

16          possibly destroyed, damaged.  I

17          went immediately to the middle

18          school and spoke with the tech

19          coach, spoke with the dean of

20          discipline, and spoke with the

21          principal and they had spoken with

22          the children involved and the

23          children stated that they were

24          doing a TikTok challenge where they

25          take a metal object and stick it

CONFIDENTIAL

Page 276

1              into the power source of the
2              Chromebook to spark, catch on fire,
3              smoke, for which they were fairly
4              successful.
5    BY MR. SHAHIDPOUR:
6         Q.      And was this a middle
7    school -- or which middle school is this
8    at?
9         A.      University Middle School.
10        Q.      And that's an IPS school?
11        A.      That is correct.
12        Q.      And when you use the word,
13   "challenges," what do you understand a
14   challenge to be?
15        A.      Well, I guess the challenge
16   would be having students telling other
17   students I challenge you to do this, this,
18   or this.  And then they show them what they
19   do and then other students, other people,
20   it doesn't have to be students do that
21   particular thing.
22        Q.      And then they post it online
23   and it goes viral?
24        A.      They post it online.
25        Q.      And you said it's students

CONFIDENTIAL

1  challenging other students to complete the
2  challenge?
3         A.    Kids, I'm using students,
4  because this in the work environment, but I
5  would suspect young adults.  I don't think
6  we would do that.
7         Q.    Okay.  Do you know whether
8  students receive any monetary rewards for
9  completing a challenge?
10         A.    I have no idea about that.
11         Q.    Have you seen the viral
12  challenge on any platforms that you
13  referenced in your earlier testimony?
14         A.    Afterwards, I went online and
15  went to the news, Googled it and found it
16  all over the place happening all over the
17  country and then I sent out an email
18  warning everyone.
19         Q.    Did you see the particular
20  videos -- well, did you find out whether
21  the students involved in this challenge
22  incident involving UMS Chromebooks posted a
23  video online?
24         A.    That, I am not aware of.
25         Q.    Okay.  You never saw any

CONFIDENTIAL

Page 278

1  video that they posted?

2      A.    Of them posting it, I have

3  not seen a video.

4      Q.    You only heard from other

5  administrators that they had said something

6  about it being related to a social media

7  challenge; is that right?

8      A.    The students told the

9  administrator that they saw and they

10 participated in a TikTok challenge.

11          MR. SHAHIDPOUR:  Okay.  We're

12          going to see if any of our

13          Codefendants have any questions for

14          Mr. Amberg.  Anyone on Zoom?

15          THE WITNESS:  Well, I didn't

16          even know, hi, Zoom.

17 BY MR. MADISON:

18     Q.    Yes, this is Armani Madison

19 from Williams and Connelly appearing on

20 behalf of Defendant YouTube.  I have a few

21 questions.

22          MR. SHAHIDPOUR:  Hold on.  Can

23          you hear Mr. Madison?

24          THE WITNESS:  I think so.

25          MR. SHAHIDPOUR:  He can hear

CONFIDENTIAL

Page 279

1              you.

2    BY MR. MADISON:

3         Q.      Okay.  Terrific.  Good

4    afternoon, Mr. Amberg.

5         A.      Good afternoon.

6         Q.      I have a few questions to

7    ask.  So we spoke a bit about the school

8    district's social media.  Are you familiar

9    with Irvington's social media presence?

10                    MS. SCULLION:  Objection.

11             Asked and answered.

12    BY MR. MADISON:

13        Q.      Sorry, if you could give me

14    an answer.

15        A.      I can hear you.  I'm not very

16    familiar with anything due to social media.

17    Like I said, I am aware that the retention

18    and recruitment has social media and I

19    believe that Irvington Blue Knights has

20    social media, which is just the football, I

21    believe the booster.  I'm not aware of

22    anything else.

23        Q.      So do you know if IPS has a

24    YouTube channel?

25        A.      That, I'm not aware of.

                                        Page 280

1          Q.      Okay.  Let's see, one second.
2    Do you know if Irvington has a Facebook
3    account as a school district?
4                  MS. SCULLION:  Counsel, when
5            you say, "Irvington," do you mean
6            IPS?
7                  MR. MADISON:  Yes, sorry, IPS.
8                  MS. SCULLION:  Thank you.  No,
9            go ahead.
10                  THE WITNESS:  That's -- I'm
11            not really sure of what, I don't
12            think so, whatever recruitment and
13            retention has, but that's something
14            that's not in my purview.
15   BY MR. MADISON:
16          Q.      Okay.  Do you know if IPS has
17   a TikTok account?
18          A.      I've never heard of an
19   Irvington TikTok account, Irvington Public
20   Schools TikTok account.
21          Q.      Okay.  Does IPS have an
22   Instagram account?
23          A.      I haven't heard of that, but
24   maybe recruitment and retention, like I
25   said.

CONFIDENTIAL

1          Q.     Do you know if IPS has a

2   SnapChat account?

3          A.     I've never heard of them

4   having a SnapChat account.

5          Q.     Okay.  Do you know who would

6   be, who would know whether the school

7   district has those accounts?

8          A.     Well, I would probably ask

9   retention and recruitment.

10          Q.     Okay.  I want to talk a bit

11   about IPS's sort of practices with respect

12   to student YouTube use.

13               What is Irvington's current

14   practice regarding student access to

15   YouTube on school-issued devices?

16               MS. SCULLION:  Objection,

17          asked and answered.  This was

18          discussed at length.

19   BY MR. MADISON:

20          Q.     Yes, I'm asking just to

21   confirm, are students allowed to use

22   YouTube on school-issued devices?

23               MS. SCULLION:  Objection,

24          asked and answered.

25               MR. MADISON:  You may answer

Page 282

1          the question.

2               THE WITNESS:  As I've stated

3          before, everything is blocked on

4          all social media.  What we do allow

5          is after they go, and meaning they,

6          the teachers, go to their content

7          supervisor, or their building

8          administrator, sometimes both, they

9          are allowed to have something

10         whitelisted to show.  Now,

11         sometimes, as stated before, other

12         applications have used YouTube that

13         we are ourselves were not even

14         aware of and also, sometimes -- and

15         when I'm talking about

16         applications, I'm talking about

17         school curriculum applications,

18         right, and then sometimes there's

19         just websites that are back doors

20         to YouTube, as I referenced earlier

21         in the conversation about the

22         second or third grader.

23    BY MR. MADISON:

24         Q.    Are you familiar with

25    something called Google Workspace for

Page 283

1  Education?

2          A.      I am.

3          Q.      It's a suite of tools

4  that schools can use in proving --

5                  THE STENOGRAPHER:  Wait a

6          minute, I didn't hear that.  Is the

7          what?

8                  THE WITNESS:  Suite of tools.

9  BY MR. MADISON:

10         Q.      Let me speak up.  It's a

11  suite of tools that schools can use when

12  providing educational services to students,

13  is that your understanding?

14         A.      That is correct.

15         Q.      There is a version of Google

16  Workspace available for free; is that

17  correct?

18         A.      There is.

19         Q.      Okay.  Did IPS ever use the

20  freely available version of Google

21  Workspace?

22         A.      I do believe so, sir.

23         Q.      When did IPS start using the

24  free version of Google Workspace?

25         A.      Well before my time as

CONFIDENTIAL

Page 284

1   director.

2          Q.      Would you be able to give me

3   a ballpark?

4          A.      No, sir.

5          Q.      And has IPS been using the

6   free version of Google Workspace

7   continuously since you started in your

8   current role?

9          A.      That is correct.

10         Q.      Okay.  Has IPS ever purchased

11  Google Workspace, to your knowledge?

12  Sorry, let me ask -- sorry, there might be

13  an issue with my sound here.  I'll ask it

14  again.  Did IPS ever purchase Google

15  Workspace?

16         A.      No, sir.

17         Q.      Okay.  Did IPS ever use

18  Player for Education as an embedded player

19  for YouTube videos, to your knowledge?

20         A.      I'm not familiar with that,

21  sir.

22         Q.      Okay.  Let's see, has IPS had

23  any -- strike that.

24                 During what years from 2015

25  to the present has IPS blocked access to

CONFIDENTIAL

Page 285

1   YouTube on its network or on IPS-provided

2   devices?

3                    MS. SCULLION:  Objection to

4            form.

5                    THE WITNESS:  So I can only

6            speak to my knowledge, sir.

7   BY MR. MADISON:

8         Q.     Okay.

9         A.     And I can say through the

10  years I have been in this position, it has

11  been blocked.

12        Q.     Does IPS's general network

13  filter -- prevent students from downloading

14  apps on their personal devices?

15                   MS. SCULLION:  Objection to

16           form.

17                   THE WITNESS:  Personal

18           devices?

19                   MR. MADISON:  Yes.

20                   THE WITNESS:  We don't allow

21           personal devices, sir.

22  BY MR. MADISON:

23        Q.     Yeah, so understanding that,

24  if the student were still connect to the

25  IPS network with their personal device,

CONFIDENTIAL

Page 286

1   would they be able to download an app to
2   that device using the network?
3                   MS. SCULLION:  Objection to
4           form.  Vague.
5                   THE WITNESS:  Number one, we
6           really keep students off.  We, even
7           the guest network, we change that
8           password once a week as, I believe,
9           the lawyers are aware.  We go in
10          and we've now changed so that even
11          passwords for students' accounts
12          are not even known by students and
13          we try to do multifactor and so on.
14                  So, in general, what I can
15          say is that students shouldn't be
16          able to get on.  If they do, I'm
17          not sure, sir.
18  BY MR. MADISON:
19          Q.    Okay.  And my last question
20  here, are students able to download apps on
21  school-issued devices?
22                  MS. SCULLION:  Objection to
23          form.  Vague.
24                  THE WITNESS:  Chromebooks
25          can't download things.  You can --

CONFIDENTIAL

Page 287

1    extensions, but we have all that

2    blocked also, sir.

3         MR. MADISON:  Those are all my

4    questions.  Thank you so much, Mr.

5    Amberg.

6         THE WITNESS:  Thank you.

7         MR. SHAHIDPOUR:  Anyone else

8    on Zoom with any questions for Mr.

9    Amberg?

10         MR. KARP:  Before we go off

11    the record, is it -- Counsel, is it

12    your position that Mr. Amberg is

13    not permitted to answer any

14    questions regarding his family

15    members' use of social media?

16         MS. SCULLION:  It's our

17    position that questions with

18    respect to Mr. Amberg's family's

19    personal use of social media is not

20    relevant.  Among other things, his

21    children are not students in the

22    Irvington Public Schools.  So that

23    is our position.

24         MR. KARP:  We -- after you

25    instructed him -- Mr. Amberg not to

CONFIDENTIAL

Page 288

1    answer, we took a brief break and I

2    just wanted to make sure that your

3    instruction to the witness stood.

4         MS. SCULLION:  Yes.  Thank

5    you.

6         MR. KARP:  Thank you.

7         MS. SCULLION:  Are we done?

8         MR. SHAHIDPOUR:  We're done.

9         MS. SCULLION:  And we have no

10   questions for the witness, so the

11   deposition is complete.

12        MR. SHAHIDPOUR:  Thank you

13   very much, Mr. Amberg.

14        THE WITNESS:  Thank you, it

15   has been a pleasure, guys.

16        MS. SCULLION:  Let's let him

17   go off the record.

18        THE VIDEOGRAPHER:  Before we

19   go off the record, Mr. Faraz

20   Shahidpour has been on the record

21   for five hours.  Armani Madison for

22   nine minutes.  The time right now

23   is 4:26 p.m.  We are off the

24   record.

25             - - - - -

CONFIDENTIAL

Page 289

1              (Whereupon, the deposition

2         was concluded at 4:26 p.m.)

3                   - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 290

1          C E R T I F I C A T I O N

2

3

4          I HEREBY CERTIFY that the proceedings and

5    evidence are contained fully and accurately in the

6    stenographic notes taken by me upon the foregoing

7    matter on May 15, 2025, and that this is a correct

8    transcript of same.

9

10

11

12

13

14    _____

15          Robin L. Clark
      Registered Professional Reporter

16

17

18

19

20

21          (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means unless under the direct control

24    and/or supervision of the certifying reporter.)

25

CONFIDENTIAL

Page 291

1              INSTRUCTIONS TO WITNESS

2

3           Please read your deposition over carefully

4     and make any necessary corrections.

5     You should state the reason in the appropriate

6     space on the errata sheet for any corrections

7     that are made.

8           After doing so, please sign the errata

9     sheet and date it.

10          You are signing same subject to the

11    changes you have noted on the errata sheet,

12    which will be attached to your deposition.

13          It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25

Page 292

```
1                     -  -  -  -  -
2                   E  R  R  A  T  A
3                     -  -  -  -  -
4     PAGE      LINE      CHANGE
5
6     ____      ____      _____

7     ____      ____      _____

8     ____      ____      _____

9     ____      ____      _____

10    ____      ____      _____

11    ____      ____      _____

12    ____      ____      _____

13    ____      ____      _____

14    ____      ____      _____

15    ____      ____      _____

16    ____      ____      _____

17    ____      ____      _____

18    ____      ____      _____

19    ____      ____      _____

20    ____      ____      _____

21    ____      ____      _____

22    ____      ____      _____

23    ____      ____      _____

24    ____      ____      _____
25
```