**Exhibit 8A**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

2

              - - - - -

3

4     IN RE: SOCIAL MEDIA           CASE NO.

5     ADOLESCENT ADDICTION/PERSONAL   4:22-md-03047-YGR

6     INJURY PRODUCTS LIABILITY       MDL No. 3047

7     LITIGATION

8

9     THIS DOCUMENT RELATES TO:

10    Irvington Public Schools

11            vs.

12    Meta Platforms Inc., et al.

13    Member Case No.: 4:23-cv-01467-YGR

14              - - - - -

15            Tuesday, May 13, 2025

16       CONFIDENTIAL - ATTORNEYS' EYES ONLY

17            PURSUANT TO PROTECTIVE ORDER

18            30(b)(6) videotaped deposition of SHELLEY

19    PETTIFORD, held at the offices of the Irvington

20    Board of Education, One University Place, Irvington,

21    New Jersey, commencing at 9:30 a.m. Eastern, on the

22    above date, before Robin L. Clark, Professional

23    Reporter and Notary Public in and for the State of

24    New Jersey.

25

CONFIDENTIAL

Page 2

1    APPEARANCES:
2
             CARELLA, BYRNE, CECCHI, BRODY
3            & AGNELLO, P.C.
             BY:  MICHAEL A. INNES, ESQ.
4            WILLIAM MANORY, ESQ. (Zoom)
             5 Becker Farm Road
5            Roseland, New Jersey 07068
             973-994-1700
6            minnes@carellabyrne.com
             wmanory@carellabyrne.com
7                     For the Plaintiffs and the
             Witness
8
9            SHOOK, HARDY & BACON, L.L.P.
             BY:  LAURIE A. HENRY, ESQ.
10           2555 Grand Boulevard
             Kansas City, Missouri 64108
11           816-474-6550
             lhenry@shb.com
12                    For the Defendants, Meta
             Platforms, Inc., f/k/a Facebook, Inc.;
13           Facebook Holdings, LLC;
             Facebook Operations, LLC; Facebook
14           Payments, Inc.; Facebook Technologies,
             LLC; Instagram, LLC; and Siculus, Inc.
15
16           KIRKLAND & ELLIS LLP
             BY:  ANDREW KARP, ESQ.
17           FARAZ SHAHIDPOUR, ESQ.
             601 Lexington Avenue
18           New York, New York 10022
             212-341-7593
19           andrew.karp@kirkland.com
             faraz.shahidpour@kirkland.com
20                    For the Defendant, Snap,
             Inc.
21
22
23
24
25

Page 3

```
 1   ALSO PRESENT:
 2
              DANIEL ORTEGA, VIDEOGRAPHER
 3
              MICHAEL FRONZAGLIA, TRIAL TECH
 4
 5
     REMOTE APPEARANCES:
 6
              SHOOK, HARDY & BACON, L.L.P.
 7            BY:  KATELYN ROMEO, ESQ.
              Two Commerce Square
 8            2001 Market Street, Suite 3000
              Philadelphia, Pennsylvania 19103
 9            215-278-2555
              kromeo@shb.com
10                     For the Defendants, Meta,
              Platforms, Inc., f/k/a Facebook, Inc.;
11            Facebook Holdings, LLC;
              Facebook Operations, LLC; Facebook
12            Payments, Inc.; Facebook Technologies,
              LLC; Instagram, LLC; and Siculus, Inc.
13
14            KING & SPALDING LLP
              BY:  DANIEL C. SALE, ESQ.
15            1700 Pennsylvania Avenue, N.W., Suite 900
              Washington, D.C. 20006
16            202-737-0500
              dsale@kslaw.com
17                     For the Defendants,
              TikTok, Ltd.; TikTok, LLC;
18            TikTok, Inc.; ByteDance Ltd.; and
              ByteDance Inc.
19
20            WILLIAMS & CONNOLLY, LLP
              BY:  LYDIA A. WEIANT, ESQ.
21            680 Maine Avenue SW
              Washington, D.C.  20024
22            202-434-5351
              lweiant@wc.com
23                     For the Defendants, Alphabet,
              Inc., Google, LLC, and YouTube, LLC
24
25                     - - - - -
```

CONFIDENTIAL

```
                                        Page 4
 1                    I N D E X
 2   WITNESS                              PAGE
 3   SHELLEY E. PETTIFORD
       BY MR. KARP:                      7, 152
 4     BY MR. INNES:                    139, 160
 5
 6                  E X H I B I T S
 7   NUMBER          DESCRIPTION              MARKED
 8   Pettiford
 9   Exhibit 1       Defendants' Amended           10
                     Supplemental Notice of Oral
10                   and Videotaped Deposition
                     of Plaintiff Irvington
11                   Public Schools
12   Exhibit 2       Third Amended Plaintiff       23
                     Fact Sheet - School
13                   Districts
14   Exhibit 3       Plaintiff Fact Sheet -        42
                     School Districts
15                   Supplemental
16   Exhibit 4       Email dated 3/6/23 Bates      71
                     BW__Irvington00032766
17
     Exhibit 5       IPS HSSC Monthly Report       72
18                   dated 2/2023 Bates
                     BW__Irvington00032767 to
19                   32769
20   Exhibit 6       IPS HSSC Monthly Report       83
                     dated 2/2023 Bates
21                   BW__Irvington00008609 to
                     8612
22
     Exhibit 7       Email dated 6/3/20 Bates     109
23                   BW__Irvington00188208
24   Exhibit 8       COVID 19 Crisis Response     110
                     Program Bates
25                   BW__Irvington00188209 to
                     188212
```

CONFIDENTIAL

Page 5

1

  Exhibit 9      Protocol for Dr. Karla      117

2               Rivera/Nadirah Muhammad's

               Consultation Bates

3               BW__Irvington00124731 to

               124733

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 6

1              DEPOSITION SUPPORT INDEX

2

                        - - - - -

3

4    Direction to Witness Not to Answer

5    Page   Line

6    29     18

7    38     6

8    77     10

9    Request for Production of Documents

10   Page   Line

11   NONE

12   Question Marked

13   Page   Line

14   NONE

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 7

1          THE VIDEOGRAPHER:  We are now

2          on the record.  My name is Daniel

3          Ortega and I am the legal

4          videographer for Golkow Litigation

5          Services.  Today's date is May 13,

6          2025, and the time is 9:30 a.m.

7          This video deposition is being held

8          at One University Place, Irvington,

9          New Jersey, in the matter of Social

10         Media, CA MDL 3047, Irvington

11         Public Schools versus Meta

12         Platforms, Inc., et al.

13              The deponent today is

14         Shelley Pettiford.  All counsel

15         will be noted on the stenographic

16         record.  The court reporter today

17         is Robin Clark who will now swear

18         in the witness.

19              - - - - -

20         SHELLEY E. PETTIFORD, having

21         been duly sworn, was examined and

22         testified as follows:

23              - - - - -

24  BY MR. KARP:

25         Q.    Ms. Pettiford, good morning.

CONFIDENTIAL

```
                                      Page 8

 1           A.     Good morning.
 2           Q.     Can you please state your
 3    full name for the record?
 4           A.     My full name is Shelley Emily
 5    Pettiford.
 6           Q.     My name is Andrew Karp.  I
 7    represent Snap in this litigation and we'll
 8    be spending a little bit of time together
 9    today.
10           A.     Okay.
11           Q.     Is this your first time being
12    deposed?
13           A.     No.
14           Q.     Okay.  You understand that
15    you're under oath today?
16           A.     Yes.
17           Q.     Is there any reason you
18    cannot provide truthful and accurate
19    testimony today?
20           A.     No.
21           Q.     If at any point you don't
22    understand a question I've asked, please
23    let me know and I'll do my best to clarify
24    it.
25           A.     Okay.
```

Page 9

1          Q.      Otherwise, I'll assume you've
2    understood what I've asked.
3          A.      Okay.
4          Q.      Throughout today's
5    deposition, I may refer to Irvington Public
6    Schools as IPS.  Do you understand that if
7    I use IPS, I mean Irvington Public Schools?
8          A.      Yes.
9          Q.      I may also say the district,
10   in which case I'm referring to Irvington
11   Public Schools.
12         A.      Okay.
13         Q.      You understand that your
14   testimony today is on behalf of the
15   Irvington Public School District?
16         A.      Yes.
17         Q.      What is your work address?
18         A.      The location of my office?
19         Q.      Yes.
20         A.      It's at 1253 Clinton Avenue,
21   Irvington High School, Irvington, New
22   Jersey.
23         Q.      And what is your home
24   address?
25         A.      ██████ ██████ ████████ ███ █████

Page 10

1    ████████ ████████ ███ ███████ ████████ █████ ███████ .

2            Q.        In advance of your

3    deposition, we requested a copy of your CV,

4    but have not received that CV from your

5    counsel.  Did you bring a copy with you

6    today?

7            A.        What is a CV?

8            Q.        A résumé.

9            A.        No, I wasn't aware that I

10   needed to bring a résumé.

11           Q.        That's quite all right.  We

12   can sort that out separately.

13           A.        Uh-huh.

14           Q.        I'm handing you tab two,

15   which we will mark as Exhibit 1.

16                     - - - - -

17                   (Defendants' Amended

18                 Supplemental Notice of Oral and

19                 Videotaped Deposition of

20                 Plaintiff Irvington Public

21                 Schools marked Pettiford Exhibit

22                 1 for identification.)

23                     - - - - -

24                   MR. INNES:  This is a copy of

25                 the notice you served yesterday,

Page 11

1          right?

2                    MR. KARP:  Yes.

3                    THE WITNESS:  That's this one?

4                    MR. INNES:  Yes, same thing.

5    BY MR. KARP:

6          Q.    Ms. Pettiford, have you seen

7    this document before?

8          A.    Yes, I have.

9          Q.    What is your understanding of

10   this document?

11         A.    That it is various topics

12   that we may discuss today during our

13   deposition.

14         Q.    You understand that you have

15   been designated to speak or to provide

16   testimony on certain topics that are listed

17   in this notice.

18         A.    Yes.

19         Q.    Okay.  Let's look at some of

20   those topics.  If we turn to Schedule A,

21   which starts on page 6, you'll see a

22   definitions section.

23         A.    Yes.

24         Q.    And if you turn the page to

25   page 7 --

CONFIDENTIAL

Page 12

1          A.      Yup.

2          Q.      -- Section II is the

3    deposition topics.

4          A.      Yes.

5          Q.      Let's turn to page 13.  Do

6    you see the section called, "Student Mental

7    Health and Related Services"?

8          A.      I do.

9          Q.      Do you understand that you

10   have been designated to testify on topics

11   32 through 34?

12         A.      Thirty-two -- yes.

13         Q.      You've also been designated

14   to testify on topic 38?

15         A.      Yes.

16         Q.      You've also been designated

17   to testify on topic 40?

18         A.      Yes.

19         Q.      You've also been designated

20   to testify on topic 42?

21         A.      Yes.

22         Q.      You've been designated to

23   testify on topic 44?

24         A.      Yes.

25         Q.      And you've been designated to

CONFIDENTIAL

Page 13

1    testify on topic 46?

2         A.    Yes.

3         Q.    Have you been designated to

4    testify on any other topic --

5         A.    No.

6         Q.    -- at today's deposition?

7         A.    No, I haven't.

8         Q.    Did you do anything to

9    prepare for today's deposition?

10         A.    Yes.

11         Q.    What did you do to prepare?

12         A.    I met with counsel.  I met --

13    I had conversations with Superintendent

14    Dr. Vauss; Mr. Amberg, who is an executive

15    director of technology; Principal Mangan

16    who is a principal at the high school.

17    Principal Zahir, who is a principal of

18    Union Avenue Middle School; Principal

19    Bussacco, who is principal of University

20    Middle; Dean Freeman who is a dean at the

21    high school.  And also I met with school

22    counselors, Ms. Brown from the high school;

23    Ms. Cedillo from the high school;

24    Ms. Johnson, who is an HSSC at the high

25    school; Ms. Vasquez who is an HSSC at the

CONFIDENTIAL

Page 14

1   high school; Ms. Lopez who is an HSSC at
2   the University Middle; and Ms. Penn who is
3   an AP at the middle school, University
4   Middle, former school counselor.
5           Q.      What was that last name?
6           A.      Penn, P-E-N-N.
7           Q.      Approximately how many times
8   did you meet with counsel?
9                   MR. INNES:  Objection to form.
10  BY MR. KARP:
11          Q.      I'll reask.  Approximately
12  how many times did you meet with counsel to
13  prepare for today's deposition?
14          A.      Maybe ten plus.
15          Q.      Do you recall when you first
16  met with counsel to prepare for today's
17  deposition?
18          A.      No, I don't recall.
19          Q.      Could you give me a rough
20  estimate of when you first met with counsel
21  to prepare for today's deposition?
22          A.      I need clarity, I have a
23  clarifying question, is that okay?
24          Q.      For your counsel or a
25  clarifying question for me?

CONFIDENTIAL

Page 15

1          A.      I think it's for you.

2          Q.      Sure.

3          A.      When I first met Mr. Innes or

4    when we started preparing for today?

5          Q.      When was your first meeting

6    in preparation for today's deposition with

7    counsel?

8          A.      A few weeks, it's been a few

9    weeks.

10          Q.      Okay.

11          A.      Probably, probably two, three

12    weeks --

13          Q.      Two to three weeks --

14          A.      -- or more.

15          Q.      -- ago?

16          A.      Yeah, maybe a month.

17          Q.      And between then and now, you

18    have met with counsel approximately ten

19    times to prepare for today's deposition?

20          A.      Yes.

21          Q.      On average, how long did

22    those meetings last?

23          A.      Three, maybe five hours.

24          Q.      Was anyone else present at

25    those meetings?

CONFIDENTIAL

Page 16

```
 1          A.     Yes.
 2          Q.     Were those other individuals
 3   lawyers?
 4          A.     Some of the meetings, yes.
 5          Q.     Okay.  What other lawyer --
 6   when you say that you met with counsel,
 7   who -- who did you meet with?
 8          A.     In terms of the team,
 9   correct?
10          Q.     Can you name the lawyer?
11          A.     Zach was once or twice, Dave,
12   and Mike.
13          Q.     And by, "Mike," you mean
14   Michael Innes --
15          A.     I do.
16          Q.     -- who is representing you
17   today?
18          A.     Yup.
19          Q.     When you had conversations
20   with Dr. Vauss, Mr. Amberg, Mr. Mangan, Dr.
21   Zahir, and Mr. Bussacco, were those in the
22   presence of counsel?
23          A.     Yes.
24          Q.     Were your conversations with
25   Dean Freeman, Ms. Brown, Ms. Cedillo,
```

CONFIDENTIAL

Page 17

1   Ms. Johnson, Ms. Vasquez, Ms. Lopez, and
2   Ms. Penn also in the presence of counsel?
3          A.     Yes.
4          Q.     Are you relying on your
5   conversations with those nonlawyers for
6   your testimony today?
7          A.     The conversations are
8   helpful.
9          Q.     In what way?
10         A.     They're helpful in the fact
11  that I want to be able to give clear,
12  concise answers that accurately reflect the
13  district.
14         Q.     What did you discuss with
15  Dr. Vauss in preparation for today's
16  deposition?
17         A.     We went over some of the
18  topics in the Complaint to be sure that,
19  again, our answers were clear, concise, and
20  accurate for the district.
21         Q.     Did she provide any
22  information that you are relying on today?
23                MR. INNES:  Objection to form.
24                MR. KARP:  You may answer.
25                THE WITNESS:  I'm like what do

CONFIDENTIAL

Page 18

1           I do?  Rely on is a funny word,

2           right?  All the conversations are

3           helpful to make sure that I give

4           you accurate information.

5    BY MR. KARP:

6           Q.     You mentioned Dean Freeman,

7    what is Dean Freeman's role?

8           A.     She's a dean at the high

9    school, so climate and culture at the high

10   school.  And she's not -- she's no longer a

11   dean, I'm sorry, she's now an assistant --

12   an acting assistant principal.  She used to

13   be in the dean capacity, my apologies.

14          Q.     No problem.  When did she

15   change roles?

16          A.     I believe this is her first

17   year, so that would be September.

18          Q.     Did you review any documents

19   to prepare for today's deposition?

20          A.     Yes, I reviewed this

21   document.

22          Q.     Are you gesturing to the

23   notice?

24          A.     Yes, I apologize.

25          Q.     That's okay.  Other than the

CONFIDENTIAL

Page 19

1  deposition notice, did you review documents

2  to prepare for today's deposition?

3          A.      Some of my personal documents

4  just to support my answers, just to make

5  sure I was giving you clear and concise

6  answers, yes.

7          Q.      I understand.  Why was it

8  important to you to review those documents?

9          A.      Because I want to be honest

10  in my testimony.

11          Q.      Sitting here today, do you

12  recall what those documents are?

13          A.      For instance, I looked at --

14  I looked at my awareness dates to make sure

15  I remembered them all, because they are

16  associated with one of the topics.

17          Q.      What is an awareness date?

18          A.      So members of my team do

19  different awareness dates to support a safe

20  environment and it's relevant to one of

21  your questions -- one of your -- one of

22  your topics.

23          Q.      What is the significance of

24  an awareness date?

25          A.      The significance is to

CONFIDENTIAL

Page 20

1    promote a healthy school environment.  So

2    there are different activities that we are

3    responsible to have throughout the year and

4    I wanted to be sure I remembered those for

5    today.

6            Q.    And for those who just aren't

7    as familiar with the definition of an

8    awareness date, what does that date

9    represent?

10           A.    Different topics.  So, for

11   instance, it's May, so an awareness date in

12   May would be a mental health, because it's

13   mental health month.  So each month may

14   have a different awareness date, school

15   violence prevention, suicide prevention.

16   So I just wanted to make sure I remembered

17   those so that we could speak about it

18   today.

19           Q.    So these are dates on which

20   awareness is being directed to a certain

21   topic or subject matter?

22           A.    Yes.

23           Q.    Other than looking at

24   awareness dates and the notice, did you

25   review -- do you recall the documents that

CONFIDENTIAL

Page 21

1   you reviewed to prepare for today?

2        A.     That's pretty much it,

3   uh-huh.

4        Q.     Did you bring any documents

5   with you to today's deposition?

6        A.     Yes.

7        Q.     What did you bring with you?

8        A.     I brought the -- what is this

9   called?

10                MR. INNES:  You can just read

11           it.

12                THE WITNESS:  Oh, Plaintiff's

13           amended answers, is that what I

14           should be reading?  Plaintiff's

15           Amended Answer to Defendant's

16           Interrogatory 3 to Irvington Public

17           Schools, I brought that.

18   BY MR. KARP:

19        Q.     So you brought a set of

20   interrogatory responses?

21        A.     Yes, uh-huh.

22        Q.     Did you bring anything else

23   with you?

24        A.     I think it's two of them.

25   There are actually two.  It's a set.  So I

CONFIDENTIAL

Page 22

1    have set one, set three, and I also have

2    the Complaint.

3           Q.     Did you bring anything else

4    with you today to today's deposition?

5           A.     I have some personal notes as

6    well.

7           Q.     Did you take notes on the

8    interrogatory responses or the Complaint?

9           A.     Yes.

10          Q.     You said you also brought

11   personal notes?

12          A.     Uh-huh.

13          Q.     Did you take notes or

14   annotate the copy of the notice that you

15   brought with you to today's deposition?

16          A.     Did I take notes on the

17   notice, yes.

18                 MR. KARP:  We'll request

19            copies of all of the annotated

20            documents --

21                 MR. INNES:  Sure.

22                 MR. KARP:  -- and if it's

23            possible to do that on a break

24            while we're still here, that would

25            be great.

CONFIDENTIAL

Page 23

```
 1   BY MR. KARP:
 2        Q.     Let's talk about the personal
 3   notes that you brought?
 4        A.     Okay.
 5        Q.     What is -- what information
 6   is contained in your personal notes?
 7        A.     Just, I guess some starter
 8   points so that I can accurately answer your
 9   questions on the different items that are
10   my responsibility.
11        Q.     Is this information you felt
12   was important that you wanted to have
13   available to you during the deposition?
14        A.     Absolutely.
15        Q.     I'm handing you tab 13, which
16   we'll mark as Exhibit 2.
17                    - - - - -
18              (Third Amended Plaintiff
19          Fact Sheet - School Districts
20          marked Pettiford Exhibit 2 for
21          identification.)
22                    - - - - -
23   BY MR. KARP:
24        Q.     This is the Third Amended
25   Plaintiff Fact Sheet - School Districts.
```

CONFIDENTIAL

Page 24

1             Have you seen this document

2    before, Ms. Pettiford?

3         A.    I have not.

4         Q.    Do you have an understanding

5    of what it is?

6                   MR. INNES:  Objection to form.

7                   THE WITNESS:  I do not.  This

8          is my first time seeing it.  I

9          would need to read through it.

10   BY MR. KARP:

11        Q.    If at any point I ask a

12   question and you need an opportunity to

13   review, let me know, but I will not be

14   asking you about every single page of this

15   document.

16        A.    Okay.

17        Q.    Can you turn to the very last

18   page, which is page 40?

19        A.    Okay.

20        Q.    Do you see that this is a

21   certification page?

22        A.    I do.

23        Q.    And this certification was

24   signed by April Vauss?

25        A.    I see that.

CONFIDENTIAL

Page 25

1        Q.      Who is April Vauss?

2        A.      The superintendent of

3    schools.

4        Q.      And she signed this

5    certification on April 28, 2025.

6                    Do you see that?

7        A.      Yes.

8        Q.      And as part of this

9    certification, she declared under penalty

10    of perjury that the information provided in

11    this Plaintiff Fact Sheet is complete,

12    true, and correct to the best of her

13    knowledge and information.

14                    Do you see that?

15        A.      Yes.

16        Q.      Let's turn to page 11.  Are

17    you there?

18        A.      I am.

19        Q.      Okay.  And page 11 includes

20    question number 16.  Do you see that?

21        A.      Yes.

22        Q.      Okay.  Question number 16

23    asks the district to, "Provide the total

24    number of healthcare workers (for example,

25    social workers, nurses, psychologists,

CONFIDENTIAL

Page 26

1    psychiatrists, counselors) employed by the

2    district whose primary responsibilities

3    include addressing student mental health

4    issues from 2017 to 2018 to present or to

5    the year for which data is most currently

6    available and their positions (specified as

7    FTE, if available), as well as the total

8    number of volunteers in these positions, if

9    any."

10                Do you see that?

11        A.      Yes.

12        Q.      And did I read that

13   correctly?

14        A.      You did.

15        Q.      Okay.  And below that prompt

16   is a table.  Do you see that?

17        A.      Yes.

18        Q.      And in the column for number

19   of employees, N/A is written for all of the

20   years listed?

21        A.      Yes.

22        Q.      Do you see that?

23        A.      Yes.

24        Q.      Okay.  So from 2017 -- excuse

25   me, from the 2017-2018 school year through

CONFIDENTIAL

Page 27

1    the 2023-2024 school year, the district

2    indicated N/A.

3                    Do you see that?

4         A.    Yes.

5         Q.    It's the same response for

6    the number of volunteers?

7         A.    Yes.

8         Q.    Do you see that?  For those

9    same school years?

10        A.    Yes.

11        Q.    Is it the district's position

12   that no IPS employees have primary

13   responsibility for addressing student

14   mental health issues?

15                    MR. INNES:  Objection to form.

16            Outside the scope.  You can answer.

17                    THE WITNESS:  Can you repeat

18            the question?

19   BY MR. KARP:

20        Q.    Is it the district's position

21   that IPS does not employ anyone whose

22   primary responsibility it is to provide

23   mental health services to students?

24                    MR. INNES:  Objection.

25            Outside the scope.

CONFIDENTIAL

Page 28

```
 1                THE WITNESS:  I'm confused by
 2         the question.
 3  BY MR. KARP:
 4         Q.     The table that we just looked
 5  at says "N/A --"
 6         A.     Yeah.
 7         Q.     -- for each of these years
 8  and doesn't provide a specific number.
 9                Do you see that?
10         A.     I do.
11         Q.     Okay.  Is it the district's
12  position that there are no employees of the
13  district whose primary responsibility it is
14  to provide mental health services to
15  students?
16                MR. INNES:  Objection.
17         Objection.  Outside the scope.  You
18         can answer.
19                THE WITNESS:  According to
20         this chart, it would appear so, as
21         such.
22  BY MR. KARP:
23         Q.     And as we looked, the
24  district certified this answer, correct?
25         A.     Yes.
```

CONFIDENTIAL

Page 29

```
 1        Q.      Do you have a different
 2   understanding?
 3        A.      Yes.
 4        Q.      Do you believe that the
 5   information contained in this table is not
 6   true or accurate?
 7                MR. INNES:  Objection to form.
 8           It's early on, but you've done it
 9           pretty early.  So when you say
10           "you," are you referring to IPS or
11           are you referring to Ms. Pettiford
12           in her professional capacity?
13   BY MR. KARP:
14        Q.      Sure.  Ms. Pettiford, in your
15   individual or personal capacity, do you
16   believe that the information contained in
17   this table is not true or inaccurate?
18                MR. INNES:  Objection.  You
19           don't have to answer that question.
20                MR. KARP:  You're instructing
21           her not to answer that?
22                MR. INNES:  I am.
23   BY MR. KARP:
24        Q.      Are you going to follow your
25   counsel's instruction?
```

CONFIDENTIAL

Page 30

1          A.       Absolutely.

2          Q.       As the district, is it your

3    position that the information contained in

4    this table is not true or accurate?

5          A.       I would go with the will of

6    the superintendent of schools and her

7    certification of this document.

8          Q.       What is the district's

9    understanding of healthcare workers

10   employed by the district whose primary

11   responsibilities include addressing student

12   mental health issues?

13                  MR. INNES:  Objection to form.

14           Can you direct me to what topic

15           we're under?  And, if you can, that

16           might obviate my need for scope

17           objections.  But as it stands, I

18           don't see a topic that's directly

19           related to this, but if you can

20           tell me what it is --

21                  MR. KARP:  Topics 32 through

22           34 relate to how many students have

23           sought services and understanding

24           who is providing those services is

25           certainly within the scope of those

CONFIDENTIAL

 1          topics.

 2                  MR. INNES:  Okay.  These

 3          questions have nothing to do with

 4          that though, Andrew.

 5                  MR. KARP:  Your scope

 6          objection is noted.  I believe that

 7          these are within the -- these

 8          questions are within the scope.

 9                  MR. INNES:  You're definitely

10          not getting out of here before

11          lunch.

12  BY MR. KARP:

13          Q.     Do you need me to reask my

14  question?

15          A.     Yes.

16          Q.     Is it the -- what is the

17  district's understanding of the phrase,

18  "healthcare workers employed by the

19  district whose primary responsibilities

20  include addressing student mental health

21  issues"?

22          A.     Since you have connected it

23  to questions 32 to 34, I'm going to assume

24  that healthcare workers are the vendors

25  that are listed, which would then make this

CONFIDENTIAL

Page 32

1   document extremely accurate.

2          Q.      The vendors who are listed,

3   meaning third parties?

4          A.      Meaning third parties, yes.

5   If those are considered healthcare workers,

6   then the answer would be N/A, because, yes.

7          Q.      The parenthetical here

8   includes social workers, nurses,

9   psychologists, psychiatrists, and

10  counselors.

11              Do you see that?

12         A.      I do.

13         Q.      Does IPS employ any of those

14  individuals?

15         A.      Is it mental health

16  counselors?  Mental health counselors, no.

17  Nurses, yes.  School psychologists, yes.

18  On the Child Study Team, meaning special ed

19  services.  School counselors, yes, and

20  health and service coordinators.

21         Q.      Is it the district's position

22  that those individuals do not have the

23  primary responsibility of providing mental

24  health services to students?

25         A.      I think primary is relative,

CONFIDENTIAL

Page 33

1    is that a percentage?  Is there a
2    percentage attached to primary
3    responsibility?
4          Q.    What is the district's
5    understanding of primary as it's being used
6    here?
7          A.    That would be a total guess.
8    Is this the district's document?
9          Q.    This is a document that the
10   district certified and provided in
11   litigation.
12                MR. INNES:  Objection.
13          Misrepresents the certification.
14                THE WITNESS:  I don't know is
15          my answer.
16   BY MR. KARP:
17          Q.    Is it the district's position
18   that school psychologists do not have among
19   their primary responsibilities, the
20   responsibility of providing mental health
21   services to students?
22          A.    I am not responsible for
23   school psychologists throughout the
24   district.  I wouldn't know that answer.
25          Q.    I'm asking you as the

CONFIDENTIAL

```
                                        Page 34
 1   district, not as Ms. Pettiford.
 2           A.      I'm responding as the
 3   district.  As a district employee, I
 4   supervise school counselors and health and
 5   social service coordinators.
 6           Q.      Is it the district's position
 7   that it is not one of the primary
 8   responsibilities of school social workers,
 9   HSSCs to provide mental health services to
10   students?
11                   MR. INNES:  Objection to
12           scope.
13                   THE WITNESS:  So HSSCs do not
14           provide mental health counseling to
15           students.
16   BY MR. KARP:
17           Q.      And my question was a little
18   different.  I wasn't asking about mental
19   health counseling, I was asking about
20   addressing student mental health issues.
21   Is it one of the primary responsibilities
22   of an IPS social worker to address student
23   mental health issues?
24                   MR. INNES:  Objection to form
25           to scope.  Do, Andrew, you
```

CONFIDENTIAL

Page 35

1          represented that we're talking
2          about -- that these questions are
3          within the scope of every notice
4          topic, right?  So --
5               MR. KARP:  I didn't say that.
6               MR. INNES:  You did.
7               MR. KARP:  I said topics 32 to
8          34.
9               MR. INNES:  Thirty-two to --
10         all right, we can limit it to that.
11         So 32 is the number of students.
12         33 is the identification and
13         conclusions of any analysis.  And
14         there's 34.
15              MR. KARP:  Uh-huh.
16              MR. INNES:  The identification
17         and conclusions of any analysis.  I
18         don't see in here any way, shape,
19         or form that the number of health
20         workers or the response to 16 is in
21         any way within the scope of any of
22         those topics.
23              MR. KARP:  So this is a topic
24         that Dr. Vauss will be prepared to
25         address on Friday?

CONFIDENTIAL

Page 36

1           MR. INNES:  Dr. Vauss will be
2       prepared to testify on the topics
3       she's noticed on.
4           MR. KARP:  The questions I'm
5       asking, will Dr. Vauss be prepared
6       to answer them on Friday, because
7       then I can --
8           MR. INNES:  What topics are
9       these relevant to there?  Do you
10      want -- okay, let's keep talking
11      about that.  Direct me to the topic
12      that you want me to prepare
13      Dr. Vauss on for this answer for
14      this question.
15          MR. KARP:  We have limited
16      time.  Your scope objection is
17      noted --
18          MR. INNES:  You've asked me on
19      the record if I'm going to prepare
20      my witness in a fashion that I'm
21      unaware of until just now.  So if
22      you want to go on the record and
23      talk about that, let's finish that
24      conversation.  What topic is Dr.
25      Vauss -- will these questions

Page 37

1         relate to from Dr. Vauss's notice?

2              MR. KARP:  We're going to move

3         on.  I'm going to ask my questions.

4         We have limited time.

5              MR. INNES:  So are we not

6         going to --

7              MR. KARP:  We are not going

8         to --

9              MR. INNES:  If these

10        questions, if you're conceding that

11        these questions are relevant to

12        topics that are noticed for another

13        day, that's a totally different --

14             MR. KARP:  I'm not.  I have

15        not made that concession.  Okay.

16        We are going to continue our

17        questioning here and your scope

18        objection is noted.  Okay.  That's

19        all you're permitted, form

20        objections, and I will let you do a

21        scope objection, you know, but

22        that's it.  We're done.

23   BY MR. KARP:

24        Q.    Ms. Pettiford, do you

25   remember the question that was pending?

CONFIDENTIAL

Page 38

```
 1          A.      I do not.
 2          Q.      Is it the district's position
 3    that HSSCs employed by IPS do not have
 4    among their primary responsibilities
 5    addressing student mental health issues?
 6                  MR. INNES:  Objection to
 7              scope.  You don't have to answer
 8              that question.
 9    BY MR. KARP:
10          Q.      Are you going to follow your
11    counsel's instruction not to answer?
12          A.      Yes.
13          Q.      You'd agree with me that
14    guidance counselors and HSSCs at IPS have
15    many responsibilities?
16          A.      Yes.
17          Q.      They provide many services to
18    students, correct?
19                  MR. INNES:  Objection to
20              scope.
21                  THE WITNESS:  Yes.
22    BY MR. KARP:
23          Q.      They're involved in student
24    discipline?
25                  MR. INNES:  Objection to
```

CONFIDENTIAL

Page 39

1              scope.

2                   THE WITNESS:  No.

3    BY MR. KARP:

4         Q.    They're not.  Are they

5    involved in investigating HIB issues?

6         A.    Yes.

7         Q.    Are they involved in student

8    safety issues?

9                   MR. INNES:  Objection to

10              scope.

11                   THE WITNESS:  Safety in what

12              way?

13    BY MR. KARP:

14         Q.    In addressing safety

15    incidents that come up involving students.

16                   MR. INNES:  Objection to

17              scope.

18                   THE WITNESS:  Can you give me

19              an example?

20    BY MR. KARP:

21         Q.    If someone's behavioral

22    problems posed a safety issue, they might

23    get involved in counseling those students

24    and the students implicated in the

25    incident?

CONFIDENTIAL

Page 40

```
 1              MR. INNES:  Objection to
 2          scope.
 3              THE WITNESS:  They may.
 4  BY MR. KARP:
 5      Q.      Counselors and HSSCs may be
 6  involved in college planning for students?
 7      A.      School counselors, yes.
 8      Q.      School counselors might be
 9  involved in course selection?
10      A.      Yes.
11      Q.      They might be involved --
12  counselors might be involved in
13  post-graduation planning?
14      A.      Yes.
15      Q.      Would counselors or HSSCs be
16  involved in helping students navigate
17  government programs such as financial aid
18  or --
19      A.      Yes.
20      Q.      -- assistance programs?
21              Would they be involved with
22  social/emotional learning curriculum?
23      A.      Yes.
24      Q.      Are counselors and social
25  workers involved in addressing substance
```

CONFIDENTIAL

Page 41

1    abuse issues for students?

2                    MR. INNES:  Objection.

3                    THE WITNESS:  Yes and no.

4    BY MR. KARP:

5        Q.    Can you explain your answer?

6        A.    When you say, "addressing,"

7    it's the addressing word that I'm having

8    difficulty with.

9        Q.    Sure.  If a student were to

10   have a substance abuse issue and need

11   assistance combating that --

12       A.    Uh-huh.

13       Q.    -- addiction or whatever it

14   was, would a social worker or counselor be

15   involved?

16       A.    They would be involved in

17   referring the student to the necessary

18   third party.

19                    MR. INNES:  Andrew, I'm sorry,

20           could we go off the record for

21           three minutes?  This is just

22           something in another matter that

23           just came up for me.

24                    MR. KARP:  That's fine.  We

25           can go off the record.

CONFIDENTIAL

Page 42

```
 1            THE VIDEOGRAPHER:  The time
 2         right now is 10:02 a.m.  We are off
 3         the record.
 4                  - - - - -
 5     (A recess was taken at this time.)
 6                  - - - - -
 7            THE VIDEOGRAPHER:  The time
 8         right now is 10:17 a.m.  We're back
 9         on the record.
10  BY MR. KARP:
11         Q.    Welcome back, Ms. Pettiford.
12         A.    Thank you.
13         Q.    I'm handing you tab 14, which
14  we'll mark as Exhibit 3.  This is Plaintiff
15  Fact Sheet - School Districts Supplemental.
16              Do you see that?
17         A.    Yes, I follow you, yes.
18         Q.    Have you seen this document
19  before?
20         A.    No.
21                  - - - - -
22            (Plaintiff Fact Sheet -
23         School Districts Supplemental
24         marked Pettiford Exhibit 3 for
25         identification.)
```

CONFIDENTIAL

Page 43

```
 1                    - - - - -
 2   BY MR. KARP:
 3         Q.     Let's turn to the very last
 4   page of this document.  Do you see a
 5   certification page?
 6         A.     Yes.
 7         Q.     This is also signed by
 8   Dr. Vauss?
 9         A.     Yes.
10         Q.     And this is dated May 31,
11   2024?
12         A.     Yes.
13         Q.     She makes the same
14   declaration under penalty of percentage
15   that the information provided in this
16   Plaintiff Fact Sheet is complete, true, and
17   correct to the best of her knowledge and
18   information?
19         A.     Yes.
20         Q.     Let's take a look at page 6.
21         A.     Page 6, there are no page
22   numbers, what number are you looking at?
23         Q.     That is odd.  Let's go to
24   question number nine.  Are you there?
25         A.     I am.
```

CONFIDENTIAL

Page 44

1          Q.     Okay.  Question nine asks the
2    district to provide the number of students
3    at IPS who were referred for mental health
4    services if such referrals are tracked.
5                    Do you see that?
6          A.     I do.
7          Q.     And then it gives a break
8    down of the number of students had who were
9    referred for mental health services for
10   each year between the school year 2017-2018
11   and the school year 2023-2024.
12                    Do you see that?
13         A.     Yes.
14         Q.     Any reason to doubt that the
15   numbers that are reflected in this table
16   are accurate and that this information is
17   complete?
18         A.     No reason.
19         Q.     Does IPS refer students to
20   third-party providers for mental health
21   services?
22         A.     Yes.
23         Q.     Under what circumstances?
24         A.     It could be a number of
25   things.  It could be suicide ideation, body

CONFIDENTIAL

Page 45

1  dysmorphia, anxiety, depression, et cetera.

2       Q.     Do the issues need to rise to

3  a certain threshold level of seriousness in

4  order for a referral to occur?

5       A.     On an individual basis.  It

6  can be seriousness.  It could be number of

7  occurrences.  So it kind of depends.  It's

8  on a case-by-case basis, I would say.

9       Q.     Who is responsible for

10 determining whether or not a student is

11 referred out for mental health services?

12      A.     Typically, it's the health

13 and social service coordinator.  Not

14 that it's only the mental health -- the

15 HSSC, but, typically, it is the health and

16 social service coordinator.

17      Q.     If not the HSSC, who else

18 could be in charge of determining whether

19 or not to refer a student for mental health

20 services?

21      A.     It could be a school

22 counselor.  It could be a principal.  It

23 could be a nurse.

24      Q.     Let's talk about HSSCs for a

25 second.  And just for clarity, what does

Page 46

1    HSSC stand for?

2          A.     Health and social service

3    coordinator.

4          Q.     Are HSSCs specific to

5    schools, individual schools within the

6    Irvington Public School District or do they

7    have district-wide responsibilities?

8          A.     They have school

9    responsibilities, they are assigned to

10   schools.

11         Q.     So an HSSC would be assigned

12   to a specific middle school, for example --

13         A.     Uh-huh.

14         Q.     -- as opposed to serving as

15   the HSSC for the entire district?

16         A.     Yes.

17         Q.     And one responsibility of an

18   HSSC would be to make this determination of

19   whether or not to refer students to a third

20   party for mental health services?

21         A.     Yes.

22         Q.     Okay.  When students are

23   referred for mental health services, does

24   the district create a record of that

25   referral?

CONFIDENTIAL

Page 47

1          A.      If students are sent out to a
2    crisis for, like, a crisis evaluation, yes,
3    there is a letter that accompanies the
4    student.
5          Q.      And when you say, "a letter
6    that accompanies the student," do you mean
7    that it becomes part of that student's
8    file?
9          A.      Yes.
10         Q.      And are individual schools
11   responsible for maintaining those referral
12   letters?
13         A.      Yes.
14         Q.      What information is contained
15   in a referral letter?
16         A.      For this particular example?
17         Q.      Yes.
18         A.      Name of student, date, of
19   course, maybe a small write-up of what
20   happened leading to the referral.  And then
21   it would be information on where the parent
22   can take the student for support, for help.
23         Q.      So a list of third parties
24   who may be able to provide the service?
25         A.      Yes, yup.

CONFIDENTIAL

Page 48

```
 1        Q.       Is the information contained
 2   on these referral forms compiled in any --
 3   or aggregated in a single place?
 4        A.       No.
 5                  MR. INNES:  Objection to form.
 6                  THE WITNESS:  Oh, I apologize,
 7          no.
 8   BY MR. KARP:
 9        Q.       Once a student is referred
10   out for services, does the district get
11   notified or updated on whether the student
12   has actually went out to obtain those
13   services?
14                  MR. INNES:  Objection to form.
15                  THE WITNESS:  No.
16   BY MR. KARP:
17        Q.       So a student who is referred
18   out for anxiety and told that there are a
19   number of providers who can help him or her
20   who doesn't actually follow through on the
21   referral, that's not something the district
22   would learn of?
23        A.       So if a student is sent out
24   for crisis in one of those situations, they
25   have to come back with clearance, so maybe
```

CONFIDENTIAL

Page 49

1    that answer is yes.

2         Q.    What do you mean by, "come

3    back with clearance"?

4         A.    If I'm a student who is

5    having, let's just say suicide ideation, I

6    speak with my HSSC, she determines I should

7    be sent to crisis for an evaluation.  In

8    order to return to school, I need a

9    clearance letter.

10        Q.    Understood.  Once a student

11   is referred out for mental health services

12   and starts treatment with one of these

13   third-party providers, does the district

14   get updates on how that treatment is going?

15        A.    No.

16        Q.    Does the district receive any

17   records as to the course of treatment that

18   that student is undergoing?

19        A.    No, because that information

20   is confidential.

21        Q.    The third-party providers

22   would maintain records relating to the

23   mental health services they are providing

24   to that student?

25                  MR. INNES:  Objection to form.

Page 50

 1           Outside the scope.  You can answer.
 2                    THE WITNESS:  Yes.
 3    BY MR. KARP:
 4           Q.     Does the district have the
 5    ability to request copies of the records
 6    that are maintained by these third-party
 7    providers in providing mental health
 8    services to IPS students?
 9           A.     No, because that information
10    is confidential.
11           Q.     Historically, has the
12    district ever requested records pertaining
13    to mental health services that were
14    provided by a third party to IPS students?
15                    MR. INNES:  Objection.  Asked
16             and answered.
17                    MR. KARP:  You can answer.
18                    THE WITNESS:  Not to my
19             knowledge, no.
20    BY MR. KARP:
21           Q.     Looking at this table, in the
22    2017-2018 school year, there were 19
23    referrals; is that right?
24           A.     According to the document,
25    yes.

CONFIDENTIAL

Page 51

1          Q.      Is the district aware of
2    whether any of the 19 referrals related to
3    social media?
4          A.      I am not sure.
5          Q.      For any of the referrals that
6    are listed in this table, does the district
7    know whether they related to social media?
8          A.      I'm not sure.  I would need
9    more information.
10         Q.      Topic 32 in this notice is,
11   "The number of students who sought and/or
12   received treatment or consultation for
13   mental, social, emotional, or behavioral
14   health concerns each year during the
15   Relevant Time Period."
16         A.      Yes.
17         Q.      And then lists a number of
18   the third-party providers?
19         A.      Uh-huh.
20         Q.      Topic 33 relates to, "The
21   identification and conclusions of any
22   analysis of Students' mental, emotional,
23   social, or behavioral health."
24                 Do you see that?
25         A.      Yes.

CONFIDENTIAL

Page 52

1    Q.    And 34 refers to, "The
2    identification and conclusions of any
3    analysis of any change over time (including
4    the alleged causes of such change) in
5    students' mental, emotional, social, or
6    behavioral health."
7              Do you see that?
8    A.    Yes.
9    Q.    Sitting here today, the
10   district isn't prepared to answer --
11   A.    Excuse me, I'm sorry.
12   Q.    Sitting here today, the
13   district isn't prepared to answer whether
14   any of the referrals that are listed in the
15   response to question nine relate to social
16   media?
17   A.    Can you repeat your question,
18   I'm sorry?
19   Q.    Sitting here today, the
20   district is not prepared to answer whether
21   any of the referrals that are listed in the
22   response to question nine relate to social
23   media?
24   A.    We would have to pull every
25   student record to get that information.

CONFIDENTIAL

Page 53

1          Q.      And when you say, "every

2     student record," do you mean the referral

3     letters or something else?

4          A.      I mean, we would need to look

5     at every record of every student in the

6     district to get that information.

7          Q.      If I want to know

8     specifically for the individuals who have

9     been referred out for services --

10         A.      Yes.

11         Q.      -- who are accounted for in

12    this table, whether their referrals related

13    to social media, where would I look?

14         A.      The student records.

15         Q.      So I would need to pull the

16    student records for these individuals in

17    order to know whether their referrals

18    related to social media?

19         A.      That would be my assumption

20    of where the information would be.

21         Q.      Does the district maintain or

22    hold onto the clearance letters it receives

23    once a student has received support for the

24    crisis and has returned to school?

25         A.      That information should be in

CONFIDENTIAL

Page 54

1    the student file.

2         Q.    And would those clearance

3    letters include details regarding whether

4    social media was in any way involved in the

5    mental health challenges that that student

6    was experiencing?

7                   MR. INNES:  Objection to form.

8              Objection to scope.

9                   Ms. Pettiford, I would just

10             caution you not to -- to the

11             extent that you know in your

12             personal capacity any details

13             about the individual students, I

14             would instruct you not to divulge

15             that information, but if you can

16             otherwise answer the question,

17             you may do so.

18                   THE WITNESS:  Okay.  Can you

19             repeat your question?

20    BY MR. KARP:

21         Q.    Sure.  To the extent that a

22    student has received support for suicidal

23    ideation and has returned to school with a

24    clearance letter, would that letter include

25    information regarding whether social media

CONFIDENTIAL

Page 55

1  was a part of the student's challenges?

2          A.      It would probably not include

3  a detailed description.

4          Q.      Students -- if a student is

5  referred to a third party for anxiety or

6  depression that is not at the level of

7  suicidal ideation, does that student need a

8  clearance letter to return to school?

9          A.      Yes.

10          Q.      Okay.  So under what

11  circumstances is a clearance letter

12  required for a student to return to school?

13          A.      Any time there is an

14  indication of a student having depressive

15  thoughts, being anxious, and then the

16  escalated levels like suicide ideation, but

17  it doesn't have to be suicide ideation.  I

18  know that's, like, the extreme end, but

19  there is a beginning -- a beginner level as

20  well.  So it could be a range of reasons.

21          Q.      Are --

22          A.      It's not really cut and dry,

23  I apologize.

24          Q.      I didn't mean to interrupt,

25  to cut you off.  Are all students who are

CONFIDENTIAL

Page 56

1    referred out for mental health services

2    required to have a clearance letter to

3    return to school?

4            A.    It depends on the individual

5    student's situation.

6            Q.    So there may be situations

7    when a student is referred out for

8    services -- for mental health services, but

9    a clearance letter is not required?

10           A.    Yes.

11           Q.    What -- can you give me an

12   example of when that would be the case?

13           A.    I mean, I don't want to use

14   the word, "depressed," because that would

15   be a crisis situation -- that may be a

16   crisis situation.  It's really hard to give

17   you an example, because I would need an

18   individual -- it fluctuates from the

19   individual student, but if there was a

20   student who, I don't know, was having a bad

21   day in school for some reason, the HSSC may

22   say, okay, I need you to maybe go home and

23   kind of reset.  So that's not, like, a

24   crisis situation and you wouldn't need to

25   see -- you wouldn't need to go to the

CONFIDENTIAL

Page 57

1    hospital for a clearance letter.  But if it

2    was a little bit more extreme, depending on

3    the conversation that you had with the

4    HSSC, then that determination would be

5    made.

6                Q.      Who pays for the mental

7    health services that are provided to IPS

8    students by these third-party providers?

9                       MR. INNES:  Objection.

10              Outside the scope.  Andrew, what

11              topic are you on for that one?

12                      MR. KARP:  I'm trying to

13              understand topic nine -- the

14              question number nine on the PFS.

15              Your scope objection is noted.

16                      THE WITNESS:  I don't know who

17              pays.

18   BY MR. KARP:

19                Q.      Does IPS attribute any of the

20   referrals that are listed in the response

21   to question number nine of this PFS to

22   social media?

23                      MR. INNES:  Objection to form.

24              Asked and answered.

25                      THE WITNESS:  I don't know.

Page 58

1          All I see is a number.
2               MR. INNES:  Andrew, I'll just
3          state for the record that that
4          question in particular and several
5          of your questions are not within
6          the scope that was negotiated or
7          even the text of the questions.  To
8          the extent that you want answers on
9          that or you want a witness prepared
10          on some of these topics, we could
11          have had that discussion before, in
12          fact, we did have that discussion
13          before through colleagues --
14    BY MR. KARP:
15          Q.    Let's turn back to Exhibit 2,
16    which is the Third Amended Plaintiff Fact
17    Sheet.  Let's go to page 5.  Page 5
18    includes enrollment data.
19               Do you see that?
20          A.    I do.
21          Q.    And just looking at the
22    2023-2024 school year, the district-wide
23    enrollment was 7,808 students.  Do you see
24    that?
25          A.    I do.

CONFIDENTIAL

Page 59

1              MR. INNES:  Objection to

2         scope.

3                  THE WITNESS:  I do.

4    BY MR. KARP:

5         Q.     And if we look at Exhibit 3

6    for the 2023-2024 school year, we see that

7    30 students were referred for mental health

8    services.

9                  Do you see that?

10              MR. INNES:  Objection, scope.

11         Asked and answered.

12                  THE WITNESS:  I see it.

13   BY MR. KARP:

14        Q.     Only 30 of 7,808 students for

15   the 2023-2024 school year were referred out

16   for services, mental health services; is

17   that correct?

18        A.     That's what's on the

19   document.

20        Q.     And these documents were

21   certified by Dr. Vauss, correct?

22        A.     Yes.

23              MR. INNES:  Objection.  Asked

24         and answered.

25

CONFIDENTIAL

Page 60

1    BY MR. KARP:

2         Q.    Has the district studied any

3    trends in the referrals it has been making

4    for students to -- for IPS students to

5    receive mental health services from

6    third-party providers?

7         A.    That's not how the district

8    retains its records, no.

9         Q.    What do you mean by that?

10        A.    I have not, I, meaning the

11   district, has not collected that data.

12              Can you tell me what number

13   we're on?

14        Q.    What topic we're on?

15        A.    Yes, what topic are we on?

16        Q.    Do you have the notice in

17   front of you?

18        A.    I do.

19        Q.    I'll pull it up.  Topic 34

20   is, "The identification and conclusions of

21   any analysis of any change over time in

22   students' mental, emotional, social, or

23   behavioral health."

24        A.    Okay.  Yup.

25        Q.    And I was asking if the --

CONFIDENTIAL

Page 61

1  now that you understand the topic we're
2  looking at, I was asking if the district
3  has ever conducted an analysis of any
4  trends or changes in the referrals for --
5  it has made for IPS students to receive
6  mental health services?
7           A.      No, we have not.
8           Q.      Does the district have an
9  understanding of why these students were
10  referred for mental health services?
11          A.      Are you referring to students
12  listed in number nine?
13          Q.      As to the students who were
14  identified in the response to question
15  number nine, does the district have an
16  understanding of why these students were
17  referred for mental health services?
18          A.      I do not, because I don't
19  know who these students are.
20          Q.      Is it the district's position
21  that all of these individuals who are
22  listed here have social media-related
23  issues?
24          A.      The district can't say that,
25  I don't -- I don't have any information.

Page 62

```
1    I'm looking at numbers.  I'm not looking
2    at -- looking at individual cases.
3                    MR. INNES:  Andrew, to the
4            extent that -- I don't know --
5                    MR. KARP:  I'm moving on,
6            Michael.
7                    MR. INNES:  Well, just maybe
8            we can have it, because I think
9            you're going to keep doing this.
10           Maybe I can have a running scope
11           objection.  The topics that you've
12           read, right, the topics that you've
13           noticed don't mention social media,
14           right?  Your questions are all
15           focusing on social media.  So
16           that's a basis for at least one of
17           my scope objections.
18   BY MR. KARP:
19           Q.    Ms. Pettiford, fair to say
20   that the COVID-19 pandemic had a
21   significant impact on the mental health of
22   Irvington Public School students?
23           A.    Yes.
24           Q.    And as a result of COVID-19,
25   the district started providing additional
```

CONFIDENTIAL

Page 63

1    mental health services to students?

2            A.      Yes.

3            Q.      As a result of COVID-19, IPS

4    students felt isolated; is that fair?

5            A.      It's not just COVID-19, I

6    mean, do we only want to talk about

7    COVID-19, because I can go --

8            Q.      My questions are specifically

9    about COVID-19.

10           A.      I could assume that to be

11   true.

12           Q.      Students who were sent home

13   and could no longer see their friends at

14   school might have felt isolated; is that

15   fair?

16           A.      That's possible, yes.

17           Q.      IPS students who might have

18   felt scared during the pandemic of getting

19   sick or of loved ones getting sick; is that

20   fair?

21           A.      Yes.

22           Q.      IPS students missed out on

23   key milestones during the pandemic like

24   prom and graduation?

25                   MR. INNES:  Objection to form.

CONFIDENTIAL

Page 64

1          Lack of foundation.

2                THE WITNESS:  Maybe prom, but

3          not graduation.

4  BY MR. KARP:

5          Q.     Was graduation able to take

6  place in person as it normally would occur?

7          A.     I believe it did in 2021, I

8  believe it did.

9          Q.     Were IPS students able to

10  attend to homecoming in person?

11          A.     What year are you referring

12  to?

13          Q.     This would be the 2020-2021

14  school year.

15          A.     I'm not -- I don't deal

16  specifically with homecoming, so I can't

17  answer that question.

18          Q.     Does the district try to

19  create an environment where students are

20  comfortable talking about their mental

21  health issues?

22          A.     Yes.

23          Q.     And does the district

24  endeavor to create an environment where

25  students feel comfortable seeking help and

CONFIDENTIAL

Page 65

1    support for their mental health issues?

2          A.    Yes.

3          Q.    Does the district know how

4    many students, IPS students, were referred

5    for mental health services during the

6    2024-2025 school year?

7          A.    2024, I would have to look at

8    my -- I would have to research that.  I'm

9    not sure.

10         Q.    According to the response to

11   question nine, the number of students who

12   were referred for mental health services in

13   2022-2023 was 40 and the number of students

14   who received -- who were referred for

15   mental health services in 2023-2024 was 30.

16               Do you see that?

17         A.    I do.

18         Q.    Does the district have an

19   understanding of the -- of the decrease or

20   the decline in that number?

21         A.    There could be a number of

22   reasons.  It could be programming that's

23   done in the building that we talked about

24   earlier that comes with those awareness

25   dates.  We've really ramped up our program

CONFIDENTIAL

Page 66

1  into our -- to the student population, so I
2  would attribute it to that.
3          Q.    Is it the district's
4  understanding or is it the district's
5  position that students are using social
6  media more and more year after year?
7          A.    Yes.
8          Q.    Let's look at the notice.
9          A.    Can you repeat that?
10         Q.    Go back to the notice,
11 Exhibit No. 1.
12         A.    Oh, is that this?
13              MR. INNES:  Yes.
14              THE WITNESS:  Okay.
15 BY MR. KARP:
16         Q.    As we went over a minute ago,
17 topic 32 is, "The number of students who
18 sought and/or received treatment or
19 consultation for mental, emotional, social,
20 or behavioral health concerns each year
21 during the Relevant Time Period."
22              Do you see that?
23         A.    Yes.
24         Q.    What is that number for the
25 2017-2018 school year?

Page 67

```
 1                 MR. INNES:  Objection to form.
 2                 THE WITNESS:  Are you
 3            referring back to the chart you
 4            just showed me, number nine?
 5   BY MR. KARP:
 6        Q.     If you believe that the chart
 7   represents that information, then sure.
 8        A.     I don't have an exact number.
 9   The district doesn't have an exact number.
10        Q.     Okay.  Does it --
11        A.     I would have to pull every
12   student's record to verify the number of
13   students that fit this criteria.
14        Q.     Okay.  So this topic is
15   asking for the number of students who
16   sought or received these services.
17                 Do you see that?
18        A.     Yes.
19        Q.     Okay.  And sitting here
20   today, you cannot give an exact number, you
21   would need to pull the records of every IPS
22   student.  Was that your testimony?
23        A.     Yes.
24        Q.     Can you give me an
25   approximate number?
```

CONFIDENTIAL

Page 68

1          A.      No, I will not.

2          Q.      Does IPS know this number for

3    any year between the 2017-2018 school year

4    through the present?

5          A.      Are you, again, referring

6    back to number nine, the number for number

7    nine?

8          Q.      I'm referring to the number

9    that's described in topic 32.

10          A.      Since there aren't any

11    central locations to where this information

12    is collected, it would be difficult for me

13    to give you an exact number, unless I look

14    through the files of every student in every

15    school.

16          Q.      And as of now, the district

17    has not done that?

18          A.      The district has not done

19    that.

20          Q.      Topic 34 has, we went over a

21    few minutes ago refers to, "The

22    identification and conclusions of any

23    analysis of any change over time in

24    Students' mental, emotional, social, or

25    behavioral health."

CONFIDENTIAL

Page 69

1              Do you see that?

2         A.      I do.

3         Q.      Has IPS identified any trends

4    in student's mental, emotional, social, or

5    behavioral health from 2017 through the

6    present?

7                   MR. INNES:  Objection to form.

8              Outside the scope.

9                   THE WITNESS:  Not to my

10             knowledge.  I don't have the data

11             but I have examples.  We have a --

12             go ahead, I'll address your next

13             question.

14   BY MR. KARP:

15        Q.      Thank you.  Your testimony

16   though, just to make sure I'm

17   understanding, is that the district has not

18   identified any trends?

19        A.      Yes, that's my testimony.

20        Q.      And I believe you testified

21   earlier that the district has not performed

22   an analysis to understand what trends there

23   could be?

24        A.      We have not performed an

25   analysis, but I have examples, if you would

CONFIDENTIAL

Page 70

1    like to hear them.

2          Q.       And your counsel will have an

3    opportunity to ask you questions when I'm

4    done.

5          A.       Okay.

6          Q.       What are HSSC monthly

7    reports?

8                   MR. INNES:  Objection to form.

9                   THE WITNESS:  It's a

10           reflection of monthly tasks that

11           HSSCs have completed.

12   BY MR. KARP:

13         Q.       Did you say monthly tasks?

14         A.       Yeah.

15         Q.       What types of tasks?

16         A.       Students that may have seen,

17   workshops that they may have held.  I

18   believe parent conferences may be on it.  I

19   would need to see the document to tell you

20   exactly.

21         Q.       I'm handing you tab 15 which

22   we'll mark as Exhibit 4.  This is an email

23   from Maria-Elena Vasquez to you.

24                  Do you see that?

25         A.       Yes.

CONFIDENTIAL

1                    - - - - -

2                    (Email dated 3/6/23 Bates

3               BW__Irvington00032766 marked

4               Pettiford Exhibit 4 for

5               identification.)

6                    - - - - -

7    BY MR. KARP:

8           Q.      And this email is dated

9    March 6, 2023?

10          A.      Yeah.

11          Q.      The email reads, "Good

12   morning, please see attached monthly report

13   and communication log."  And then there's a

14   link and it says, "Thank You."

15                   Do you see that?

16          A.      Yes.

17          Q.      The attachment to this email

18   is Vasquez HSSC monthly report

19   February 2023.

20                   Do you see that?

21          A.      Yes.

22          Q.      I'm going to hand you the

23   attachment to that email.  This is tab 15A.

24   We'll mark this as Exhibit 5.

25                    - - - - -

Page 72

```
 1              (IPS HSSC Monthly Report
 2          dated 2/2023 Bates
 3          BW__Irvington00032767 to 32769
 4          marked Pettiford Exhibit 5 for
 5          identification.)
 6              - - - - -
 7  BY MR. KARP:
 8      Q.     This is an -- excuse me, an
 9  HSSC monthly report dated February 2023 and
10  the HSSC indicated is Maria-Elena Vasquez.
11              Do you see that?
12      A.     Yes.
13      Q.     Does this report reflect the
14  work that Ms. Vasquez performed herself or
15  would this include information or activity
16  that her team also conducted or performed?
17      A.     Both.
18      Q.     So just to make sure I'm
19  understanding, this report would include
20  some of the work that Ms. Vasquez did and
21  also some of the work that her team would
22  have done?
23      A.     Ms. Vasquez doesn't have a
24  team, but when I look at professional
25  development, that would include other
```

CONFIDENTIAL

Page 73

1   people outside of her.

2          Q.      And where is professional

3   development?

4          A.      It is on one, two -- the

5   third page.  Referrals would also be just

6   that, referrals from people outside of her

7   to her.

8          Q.      Okay.  So these are other

9   individuals reporting to Ms. Vasquez?

10          A.      Reporting information about

11   students, yes.  Not reporting as if they

12   are part of her team.

13          Q.      I see.  They are providing

14   her with information --

15          A.      Yes.

16          Q.      -- that she can include in

17   this report?

18          A.      Yes.

19          Q.      Who would those individuals

20   be who are reporting information to

21   Ms. Vasquez?

22          A.      This particular month, it

23   looks like an athletic director, an

24   assistant principal, it looks like a dean

25   of students, a secretary, and a coach.

CONFIDENTIAL

Page 74

1          Q.      Is the district relying on

2    these monthly reports to understand whether

3    students are seeking help for issues

4    allegedly related to social media?

5                    MR. INNES:  Objection to form.

6             You referred to these monthly

7             reports, I think we only have one

8             monthly report.

9    BY MR. KARP:

10          Q.      I'll withdraw the question.

11   Ms. Pettiford, I'm showing you one HSSC

12   report, correct?

13          A.      Yes.

14          Q.      Other HSSC reports exist,

15   correct?

16          A.      Yes.

17          Q.      They are created on a monthly

18   basis?

19          A.      Yes.

20          Q.      Who creates them?

21          A.      Individual HSSCs.

22          Q.      Okay.  How many HSSCs did the

23   district employ in 2023?

24          A.      I would need to --

25                    MR. INNES:  Objection.

Page 75

1              Outside the scope.

2                   THE WITNESS:  I would need to

3              count.

4    BY MR. KARP:

5         Q.     You may count, if you would

6    like.

7         A.     Okay.  What year did you ask

8    me?

9         Q.     2023.

10                  MR. INNES:  And just so my

11             objection is clear, it's outside

12             the scope.  To the extent, Ms.

13             Pettiford, you know that in your

14             personal capacity, please answer

15             that.

16                  THE WITNESS:  Can you repeat

17             that?

18                  MR. INNES:  Sure.  If you

19             know, if you can answer in your

20             capacity as Ms. Pettiford in the

21             district as opposed to the

22             district.

23                  THE WITNESS:  Okay.  I'm

24             missing someone.  I don't know the

25             employment dates offhand, so I

CONFIDENTIAL

Page 76

```
 1              can't -- I actually can't be
 2              specific about this, because I know
 3              we have new HSSCs.  Currently, we
 4              have nine.
 5   BY MR. KARP:
 6         Q.     And has the district employed
 7   approximately nine HSSCs over the past
 8   decade?
 9                  MR. INNES:  Objection.
10              Outside the scope.  You can answer.
11                  THE WITNESS:  No.  Answer?
12                  MR. INNES:  Yes.
13                  THE WITNESS:  No.
14   BY MR. KARP:
15         Q.     How has that number changed
16   over time?
17         A.     It has increased.
18         Q.     And do you know the
19   approximate number of HSSCs who were
20   employed for the 2017-2018 school year?
21                  MR. INNES:  Outside the scope.
22                  MR. KARP:  And an approximate
23              number is fine.
24                  THE WITNESS:  2017, four.
25              Approximately four.
```

CONFIDENTIAL

Page 77

1    BY MR. KARP:

2          Q.      And it is part of the -- as

3    part of their job responsibilities, HSSCs

4    create these monthly reports?

5          A.      Yes.

6          Q.      And is the district relying

7    on these HSSC reports for its claims that

8    social media has had a negative impact on

9    student mental health?

10               MR. INNES:  Objection to

11            scope.  You don't have to answer

12            that question.

13    BY MR. KARP:

14          Q.      Are you going to follow your

15    counsel's instruction not to answer?

16          A.      Yes.

17               MR. INNES:  Andrew, I think

18            there's a way you can ask that

19            question that's not objectionable.

20    BY MR. KARP:

21          Q.      Does the district expect that

22    HSSC reports, monthly reports, include

23    information relating or reflecting mental

24    health issues that were allegedly caused by

25    social media?

Page 78

1              MR. INNES:  Objection to

2         scope.

3              THE WITNESS:  To be clear, are

4         you asking if that information

5         would be in the report?

6    BY MR. KARP:

7         Q.    Yes.

8         A.    The report is not that

9    specific.  HSSCs are aware of that

10   information, but they put -- it's numbers.

11        Q.    So these reports would not

12   include or specifically refer to social

13   media as a potential cause of student

14   mental health issues; is that your

15   testimony?

16        A.    The number would not be on

17   the report.

18        Q.    Is it the district's position

19   that the numbers reflected here include

20   students whose mental health issues were

21   allegedly caused by social media?

22        A.    It is very possible.

23        Q.    How would the district know

24   whether the -- any of the cases or

25   individual incidents that are described in

CONFIDENTIAL

Page 79

1    these HSSC reports relate to social media?

2        A.    We have biweekly meetings.  I

3    have biweekly meetings with my team, so

4    those are the discussions that we have

5    during our meetings.  That is included in

6    the discussions we have in our meetings.

7        Q.    Okay.  And do -- when these

8    biweekly meetings occur, is -- are minutes

9    taken down or is there any written record

10   of those meetings?

11       A.    There typically are agendas,

12   yes.

13       Q.    Have any of those agendas

14   listed social media as a -- as a topic or

15   as an agenda item for those biweekly

16   meetings?

17           MR. INNES:  Objection to form.

18           I'm just not clear what period of

19           time.  I've lost the thread on

20           that.

21           THE WITNESS:  What was the

22           last part?

23   BY MR. KARP:

24       Q.    I can be clearer as to time.

25   For how long have you been having these

CONFIDENTIAL

Page 80

```
 1   biweekly meetings or has the district been
 2   having these biweekly meetings.
 3           A.     That is, to my understanding,
 4   it's always been a requirement of the
 5   district.
 6           Q.     Going back to when?
 7           A.     I can speak to going back to
 8   2020.  So I would say 2020.
 9           Q.     Is it that you don't know
10   whether they occurred before 2020 or --
11           A.     I know that they occurred, I
12   don't know the time frame.  I don't know if
13   it was once a month or twice a month, but
14   they've always occurred.
15           Q.     There were periodic meetings?
16           A.     It is a requirement of the
17   district to have team meetings, yes.
18           Q.     And before 2020, it might
19   have been less frequent, is that your
20   understanding?
21           A.     I do not know.
22           Q.     You do not know?
23           A.     I don't want to guess.
24           Q.     As of 2020, your
25   understanding is that these meetings
```

Page 81

1    occurred biweekly?

2         A.    Yes.

3         Q.    And for the period of time

4    that these meetings were occurring

5    biweekly, starting in or about 2020, did

6    any of the agendas list social media as a

7    topic or agenda item?

8         A.    Yes.

9         Q.    Okay.  Which ones?

10        A.    I would have to go back in

11   the record.

12        Q.    Can you approximate how many?

13        A.    I'd prefer not to.  I don't

14   want to tell a lie.

15        Q.    And I don't want you to lie

16   either.  So if you don't know, then it's

17   fine to say that you don't know.

18        A.    I don't know.

19        Q.    You don't know, and just to

20   make sure we're on the same page, you don't

21   know the approximate number of times an

22   agenda for one of these biweekly meetings

23   listed social media as an agenda?

24        A.    I do not know.  I did not

25   prepare for that question.

CONFIDENTIAL

Page 82

1          Q.      I understand.  Thank you.
2    Does the district compile HSSC monthly
3    reports in a central location?
4          A.      Yes.
5          Q.      Where is that?
6          A.      On --
7                     MR. INNES:  Again, objection,
8              time period.
9                     THE WITNESS:  On my
10              secretary's computer.
11   BY MR. KARP:
12         Q.      Who is your secretary?
13         A.      Betty DuPont.
14         Q.      And how far back do -- how
15   far back in time would those HSSC monthly
16   reports go?
17         A.      The ones that Ms. DuPont will
18   have, I believe to 2022.
19         Q.      Do you know or does the
20   district have a central repository of HSSC
21   reports from before 2022?
22         A.      Not to my knowledge.
23         Q.      Who would have HSSC reports
24   from 2022 and earlier?
25         A.      I would assume the person

CONFIDENTIAL

Page 83

1    who -- who supervised the department before

2    me or the people who supervised the

3    department.

4         Q.    I'm handing you tab 19B.  We

5    will mark this as Exhibit 6.  This is an

6    HSSC report dated February 2023 from

7    Shanell Toomer.

8              Do you see that?

9         A.    Yes.

10              - - - - -

11              (IPS HSSC Monthly Report

12         dated 2/2023 Bates

13         BW__Irvington00008609 to 8612

14         marked Pettiford Exhibit 6 for

15         identification.)

16              - - - - -

17    BY MR. KARP:

18         Q.    Who is Ms. Toomer?

19         A.    She's a health and social

20    service coordinator.

21         Q.    And what school is she had?

22         A.    She is at Thurgood Marshall.

23         Q.    As indicated at the top of

24    the document, correct?

25         A.    Yes.

Page 84

1          Q.     And on the first page, if you
2     look down toward the bottom, there's a list
3     of group topics.
4                    Do you see that?
5          A.     Yes.
6          Q.     And social media usage is one
7     of those topics?
8          A.     Yes.
9          Q.     A date is listed for social
10    media usage, it's February 13, 2023?
11         A.     Yes.
12         Q.     Do you know what this group
13    session involved?
14                    MR. INNES:  Objection.
15             Outside the scope.
16                    THE WITNESS:  I don't -- I
17             don't know.
18    BY MR. KARP:
19         Q.     Okay.  That's -- did you
20    speak to Ms. Toomer in preparation for
21    today's deposition?
22         A.     No.
23         Q.     If an HSSC were to conduct a
24    group session on social media, would it be
25    reflected like this in an HSSC monthly

CONFIDENTIAL

Page 85

1  report?

2                    MR. INNES:  Outside the scope.

3                    THE WITNESS:  Yes, that's

4            fine.

5  BY MR. KARP:

6        Q.    Has the district performed

7  any analyses on the information that is

8  contained in HSSC monthly reports?

9        A.    An analysis, no.  We have

10 discussions about what's contained in the

11 report.

12       Q.    To the extent that the

13 individuals meeting to discuss these HSSC

14 monthly reports have discussed social media

15 and its potential effect on student mental

16 health, what has been discussed?

17                   MR. INNES:  Objection to

18           scope.

19                   THE WITNESS:  There are a

20           number of things that have been

21           discussed, how social media usage

22           is up.  It has increased over the

23           years.  How the comments on social

24           media, the likes, the shares have

25           affected -- negatively impacted our

Page 86

1      student population.

2           Social media has been at the

3      core of fights and aggressive

4      behavior of our students.  It's

5      also been the reason why we have

6      been really diligent and

7      persistent with workshops for our

8      students in order to increase the

9      climate and culture of our

10     building to eliminate those acts

11     of aggression.

12  BY MR. KARP:

13       Q.    So as a group meeting to

14  discuss these HSSC monthly reports, you

15  have discussed likes and shares?

16       A.    Uh-huh.

17       Q.    And the effect that those

18  have on student --

19       A.    Yeah.

20       Q.    -- mental health?

21       A.    Yup.

22       Q.    Meaning when someone sees a

23  post and likes it or has some reaction to

24  it and then they indicate that on whatever

25  platform they're using?

CONFIDENTIAL

Page 87

1          A.     Yes.

2          Q.     And sharing meaning they

3    take, a user would take content that has

4    been posted and share it or make it

5    available to other people?

6          A.     Yes.

7          Q.     You said social media usage

8    is up?

9          A.     Yes.

10         Q.     And what is the district's

11   basis for that understanding?

12         A.     There's no analysis that has

13   been done, however, the conversations with

14   the team, it's clear that social media

15   usage is up.

16         Q.     And what makes it clear that

17   social media usage is up?

18         A.     We discuss instances that

19   involve social media.  Our children

20   constantly having their phone in their hand

21   being on social media.  So I know you want

22   the analysis that I can't give you, but I

23   can give you information from meetings,

24   discussions, real life examples.  That's

25   what I have to give.

CONFIDENTIAL

Page 88

1      Q.      You said students --

2      A.      The district has to give.

3      Q.      You said that students have

4    their phones in their hands --

5      A.      Yes.

6      Q.      -- using social media?

7      A.      They would prefer to be on

8    their phone than be in class.

9      Q.      Okay.  And how does the

10   district know that students are -- strike

11   that.

12              Does the district have any

13   data regarding how often students are on

14   their phones using social media versus some

15   other activity like video games or watching

16   a TV show on some streaming service?

17     A.      The district does not.

18     Q.      You said social media is at

19   the core of fights?

20     A.      Yes.

21     Q.      Okay.  What do you mean by

22   that?

23     A.      A lot of times, when you have

24   conversations with students who have been

25   in an altercation, it usually comes back to

CONFIDENTIAL

Page 89

1   something that they've seen on social

2   media.  Someone posted something about

3   them.  Someone commented on the post and

4   now there's some aggressive behavior toward

5   the person who originally posted or maybe

6   the person who wrote the comment, so a lot

7   of times that is the basis for why there's

8   student conflict.

9           Q.    Someone has posted something

10  that is offensive or hateful and that

11  upsets another student; is that your

12  testimony?

13          A.    The posts can upset another

14  student.  The comments of viewers can upset

15  another student.  The fact that the post

16  may have been shared with other students

17  upsets the student.  So all of that.

18          Q.    You mentioned climate and

19  culture?

20          A.    Uh-huh.

21          Q.    Does the district have a way

22  of evaluating climate and culture?

23                MR. INNES:  Objection.

24          Outside the scope.

25                THE WITNESS:  Did you say --

CONFIDENTIAL

Page 90

1          did you use the word, "evaluating"?
2                    MR. KARP:  Uh-huh.
3                    THE WITNESS:  Not evaluating,
4          but we understand that it is
5          important to have a positive
6          climate and culture throughout the
7          building, which is why we employ
8          deans of climate and culture.
9     BY MR. KARP:
10         Q.     And you said Dean Freeman was
11    in that role before she became assistant
12    principal or acting principal?
13         A.     She was, so there is someone
14    else there now.
15         Q.     Let's shift gears a little
16    bit.
17                Does IPS train school
18    counselors and HSSCs on HIB issues?
19         A.     Yes.
20         Q.     What kind of training is
21    offered to IPS staff on HIB issues?
22         A.     So the training happens with
23    our anti-bullying specialists.  So specific
24    school counselors are identified as
25    anti-bullying specialists.  They receive

CONFIDENTIAL

Page 91

1    compliance training, state compliance

2    training, it's actually mandatory, as well

3    as reporting, training on reporting

4    instances of HIB.  That's what's required

5    from the state.

6            Q.      HIB would include

7    cyberbullying?

8            A.      Yes, harassment,

9    intimidation, and bullying.  That is part

10   of it, yes.

11           Q.      That bullying could also

12   happen in person?

13           A.      Yes.

14           Q.      Yes?

15           A.      Uh-huh.

16           Q.      It could also happen on other

17   social media such as text?

18           A.      Yes.

19           Q.      Someone could post -- someone

20   could bully someone else by posting to a

21   website?

22           A.      Yes.

23           Q.      Bullying existed way before

24   social media, you would agree?

25           A.      I would -- I would agree, but

CONFIDENTIAL

Page 92

1   social media has not helped.  It has

2   intensified it.

3        Q.    Why is it important for the

4   district to train staff on HIB-related

5   issues?

6        A.    It's important because we

7   have to learn how to keep our students

8   safe, right?  And then when instances do

9   come up, we need to know how to properly

10   investigate them so that we could put

11   procedures in place to keep our students

12   safe.

13        Q.    Is HIB training for staff,

14   for IPS staff, mandated by the state of New

15   Jersey?

16        A.    Yes.

17        Q.    So all schools, all districts

18   within the state of New Jersey must train

19   their staff in HIB?

20        A.    Yes.

21        Q.    Fair to say, regardless of

22   whether students were using social media,

23   IPS staff would need to be trained in HIB,

24   correct?

25        A.    Yes.

CONFIDENTIAL

Page 93

1          Q.      When a potential bullying

2    incident arises, who at IPS investigates

3    and determines whether that incident

4    qualifies as bullying within New Jersey

5    state law?

6          A.      The anti-bullying specialist.

7          Q.      And do those anti-bullying

8    specialists have district-wide

9    responsibilities or are they assigned to

10   particular schools?

11         A.      Assigned to particular

12   schools.

13         Q.      Okay.  How many anti-bullying

14   specialists -- well, strike that.

15                 Can you give me an

16   approximate number of the anti-bullying

17   specialists who are employed by IPS this

18   school year, so 2024 or 2025?

19                 MR. INNES:  Objection to form.

20            Outside the scope.  I'm kind of

21            giving you a leeway here, because I

22            want you -- I understand that your

23            questions do have some overlap, but

24            most of these questions in the last

25            five to six minutes focus on

CONFIDENTIAL

Page 94

```
1              bullying, right, which is your
2              topic 37, which we've discussed was
3              noticed for, originally noticed for
4              today, but is now noticed for
5              Friday.  If you want to continue
6              these questions, I'm sure Ms.
7              Pettiford -- I can discuss that
8              with Ms. Pettiford, if she's
9              comfortable answering these
10             questions and then we can take 37
11             off the table for Friday.
12                  MR. KARP:  My understanding is
13             that it would fall -- that these
14             bullying programs would fall into
15             topic 38, district-wide or
16             school-wide programs and/or
17             initiatives proposed or taken by
18             the school district during --
19                  MR. INNES:  Okay.  Fair.  I
20             was just trying to shorten my
21             Friday.
22     BY MR. KARP:
23         Q.    The question I asked, which
24     I'll reask now, is, and I can ask about a
25     different school year.  Does the district
```

Page 95

1    have an approximate number or know the

2    approximate number of anti-bullying

3    specialists who were employed for the

4    2023-2024 school year?

5            A.      So there's an anti-bullying

6    specialist in each elementary school.

7    There's one in both middle schools.  And

8    then in the high school, there's a number

9    of anti-bullying specialists.  Currently,

10   there's one for every grade level, because

11   of the large number of enrollment.

12                  In 2023, they may have been

13   doubling up.  They may have done, like,

14   nine and ten and 11 and 12, so there may

15   have been two.

16           Q.      Understood.

17           A.      Yeah.

18           Q.      Have the employment numbers

19   for anti-bullying specialists changed

20   significantly between the 2017-2018 school

21   year and the present?

22           A.      It has.

23           Q.      And what trend has there

24   been?

25           A.      The large -- the increase in

Page 96

1    the number of complaints, particularly in
2    the high school, so now there is an
3    anti-bullying specialist for each grade
4    level.
5           Q.    I'm handing you tab 20.
6           A.    Okay.  I may need a break in
7    a minute or two.
8                 MR. INNES:  Do you want to
9           take a break?
10               THE WITNESS:  I don't want
11          to --
12               MR. KARP:  We can take a
13          break.
14               THE WITNESS:  We can.
15               MR. KARP:  We can take a
16          break.
17               THE VIDEOGRAPHER:  The time
18          right now is 11:17 a.m.  We are off
19          the record.
20                      - - - - -
21      (A recess was taken at this time.)
22                      - - - - -
23               THE VIDEOGRAPHER:  The time
24          right now is 11:30 a.m.  We are
25          back on the record.

Page 97

1    BY MR. KARP:

2         Q.      Welcome back, doctor -- Ms.

3    Pettiford.

4         A.      Thank you.

5         Q.      I handed you tab 20 before

6    the break, but we actually don't even need

7    to look at it.  You can put that to the

8    side.

9               THE EXHIBIT TECH:  Are we

10         unmarking?

11              MR. KARP:  I never marked it.

12              THE WITNESS:  I don't need it.

13         Okay.

14              MR. INNES:  You don't need it.

15              MR. KARP:  I didn't say you

16         could keep.  We'll take that back.

17              MR. INNES:  I think I have a

18         copy.

19    BY MR. KARP:

20         Q.      Fair to say that the state of

21    New Jersey has a criteria that it uses to

22    define HIB?

23         A.      Yes.

24         Q.      And there can be student

25    conflict that doesn't qualify as HIB,

Page 98

1    correct?

2            A.      Yes.

3            Q.      If it doesn't meet one of

4    those criteria?

5            A.      Yes.

6            Q.      Criteria, excuse me.  For

7    bullying that occurs that does not qualify

8    as HIB --

9            A.      Yes.

10           Q.      -- does the district track

11   that information anywhere?

12           A.      The information is on the HIB

13   claim, because there's a written claim that

14   includes, like, all the supporting

15   documents, so the result of the

16   investigation is also notated on a claim.

17           Q.      Who completes these HIB claim

18   forms?

19           A.      The individual anti-bullying

20   specialist.

21           Q.      When an anti-bullying

22   specialist becomes aware of an incident, he

23   or she would fill out one of those claims?

24           A.      No, I apologize, I thought

25   you meant who housed them.  The victim is

CONFIDENTIAL

Page 99

1  the person who gives the information,

2  initial information.

3       Q.    And provides that to the

4  anti-bullying specialist?

5       A.    Yes.

6       Q.    And then the anti-bullying

7  specialist holds onto and maintains a

8  record of the claim?

9       A.    It becomes a part of the

10 package, yes.

11      Q.    But not every claim turns out

12 to be HIB?

13      A.    Every claim is not

14 substantiated, no.

15      Q.    Where -- or strike that.

16            Does IPS compile the HIB

17 claim forms in a central location?

18            MR. INNES:  Objection.

19        Outside the scope.

20            THE WITNESS:  Yes.

21 BY MR. KARP:

22      Q.    Where does it keep these HIB

23 claim forms?

24            MR. INNES:  Objection to

25        scope.

CONFIDENTIAL

```
                                        Page 100

 1                 THE WITNESS:  A folder, a
 2           Google Drive folder.
 3   BY MR. KARP:
 4        Q.     Do you know what that folder
 5   is called?
 6        A.     It's probably HIB claims and
 7   then the year.
 8        Q.     So the number of HIB claims
 9   would be larger than the number of --
10        A.     Substantiated cases, yes.
11        Q.     Thank you for finishing my
12   question.
13        A.     I probably shouldn't have
14   done that, but ...
15        Q.     No, we're trying to get out
16   of here --
17                 MR. INNES:  Trying to
18           get here.
19                 MR. KARP:  -- more quickly, so
20           that's helpful.  Thank you.
21                 THE WITNESS:  So the answer
22           is, yes, because everything is not
23           substantiated.
24   BY MR. KARP:
25        Q.     Thank you.  Does IPS offer
```

Page 101

1   programs to assist the victims of bullying?

2        A.     Yes.

3        Q.     What types of programs?

4        A.      It depends on the individual

5   case, of course, but individual counseling.

6   It could be group counseling.  Services are

7   also offered to the offender as well,

8   because you want to eliminate the behavior.

9   It could be outside referrals, depending on

10  the severity.  So each case is -- has to be

11  evaluated individually.

12       Q.     Okay.  So the victims and

13  also the perpetrators of bullying are

14  offered various services?

15       A.     Yes.

16       Q.     Some are offered by IPS

17  staff?

18       A.     Yes.

19       Q.     And some are offered by third

20  parties?

21       A.     Yes.

22       Q.     Are documents -- strike that.

23              For individual or group

24  counseling sessions, who leads those?

25       A.      It depends on the individual

Page 102

1   student; however, a victim or offender may
2   be -- may have to see their school
3   counselor once a month.  They might have to
4   see the HSSC twice a week.  It just depends
5   on, again, the severity and the particular
6   incident.
7           Q.      And are records maintained
8   for those individual or group counseling
9   sessions?
10          A.      It should be -- it should be
11  documented in our communication logs.
12          Q.      To your knowledge or to the
13  district's knowledge, how -- strike that.
14                  For how long would those
15  records have been kept in the communication
16  logs?
17          A.      How long -- can you restate
18  your question?  I'm not clear.
19          Q.      At what point in time did the
20  district start maintaining records of the
21  individual and group counseling sessions in
22  the communication logs?
23          A.      For clarity, are you asking
24  when communication logs started within the
25  district?

CONFIDENTIAL

Page 103

1          Q.      We can start there.  When did
2     the communication logs start within the
3     district?
4          A.      To my knowledge, they have
5     always been in the district.  There's
6     always been a form of documenting
7     interaction with students.  The name just
8     changes.  So it can go from a sign-in sheet
9     to now a communication log.  So they've
10    always -- they should have always existed
11    in some capacity.
12         Q.      Do communication logs include
13    records and information separate and apart
14    from these individual or group counseling
15    sessions to address bullying?
16         A.      I don't understand your
17    question.
18         Q.      Am I understanding your
19    testimony correctly that the records
20    created for individual counseling and group
21    counseling sessions would be saved in the
22    district's communication logs?
23                    MR. INNES:  Objection to form.
24                    THE WITNESS:  If a school
25             counselor or HSSC had an individual

CONFIDENTIAL

Page 104

```
 1              counseling session or held a group
 2              session, it should be identified on
 3              a communication log and probably
 4              their monthly report.
 5    BY MR. KARP:
 6         Q.    And my question is are
 7    other -- is other activity tracked in a
 8    communication logs?
 9         A.    Yes.
10         Q.    Okay.  What other activity is
11    tracked?
12         A.    It could be a parent
13    conference, academic counseling, student
14    conflict, a number of things.
15         Q.    You said that one way that
16    victims and perpetrators of bullying may
17    receive support is through a third-party
18    referral?
19         A.    Yes.
20         Q.    Is there documentation of
21    such referrals?
22         A.    That should be on the
23    findings -- the findings question on the
24    HIB form or next steps.  I don't know the
25    exact terminology of the session.  It might
```

Page 105

1    simply be summary.

2         Q.    And when you say, "the HIB

3    form," you're referring to the HIB claim?

4         A.    Yes.

5         Q.    When a student is referred

6    out for to receive services relating to a

7    bullying incident --

8         A.    Okay.

9         Q.    -- does that student need a

10   clearance letter upon returning to school?

11        A.    Probably not.

12        Q.    Does the district receive any

13   updates from the third parties who are

14   providing support to IPS students for

15   bullying?

16        A.    Reports on what in

17   particular?

18        Q.    If a student is receiving

19   services from one of these third parties,

20   let's say they have a few meetings, does

21   the district receive a report or an update

22   about how those meetings are going?

23        A.    No, because that information

24   is confidential.

25        Q.    Could the district ask for

Page 106

1    that information if it wanted to?

2                    MR. INNES:  Objection.  Asked

3            and answered.

4                    THE WITNESS:  There would have

5            to be a release form by the parent

6            or guardian.

7    BY MR. KARP:

8            Q.    Those records are kept by the

9    third-party providers?

10           A.    Yes.  In terms of session and

11   progress, yes.

12           Q.    Does the district have any

13   specific policies for how it addresses

14   bullying incidents?

15           A.    Yes, our policy follows the

16   state -- the state law.  There's not a lot

17   of fluctuation when it comes to HIB.

18           Q.    And is that policy set out in

19   the Student Code of Conduct?

20           A.    Yes.

21           Q.    Anywhere else?

22           A.    The video, the training

23   videos on our district website who are for

24   everyone.  And individual schools may post

25   it in different areas or discuss it and go

Page 107

1  over it with their student population.

2         Q.     Do the HIB training videos

3  refer to social media at all?

4         A.     Cyberbullying is included.

5         Q.     Is social media or is any

6  specific social media platform identified?

7         A.     It may be identified in

8  our -- when we do scenarios.

9         Q.     Sitting here today, does the

10  district know one way or another whether

11  specific social media platforms are

12  identified in their HIB training videos?

13         A.     I would have to look at my

14  video again.

15         Q.     You mentioned that

16  cyberbullying would be inclusive or could

17  be inclusive of social media?

18         A.     Yes.

19         Q.     Sitting here today, do you

20  know if any of the HIB training videos

21  explicitly refer to social media?

22         A.     A particular platform?

23         Q.     Just social media in general.

24  Do the word -- I can strike that.

25                Do the words, "social

CONFIDENTIAL

Page 108

1   media," come up in any of these HIB

2   training videos?

3           A.      Yes.

4           Q.      For the HIB training videos,

5   approximately how much time in those videos

6   is spent discussing social media?

7                   MR. INNES:  Objection to form.

8                   THE WITNESS:  That's a

9               difficult question.  I don't know,

10              there's three or four slides, three

11              or four minutes.  I would have to

12              look at the presentation.

13  BY MR. KARP:

14          Q.      How long are the videos in

15  general in total?

16          A.      I believe my video was -- the

17  district video was maybe ten minutes.  I

18  would have to look.  I don't want to lie.

19  I'm under oath.

20          Q.      Thank you.  The HIB training

21  videos are ten minutes?

22          A.      Possibly, yes.

23          Q.      Let's shift gears a bit to

24  talk about the COVID-19 pandemic and some

25  of the initiatives that the district

CONFIDENTIAL

Page 109

1    enlisted during that time.

2                    Fair to say that the

3    COVID-19 pandemic was a very challenging

4    time for all schools around the country?

5         A.    Fair.

6         Q.    IPS is not an exception to

7    that?

8         A.    No.

9         Q.    Did IPS hire an individual

10   named Karla -- Dr. Karla Rivera to help

11   address -- to help provide services to

12   students relating to the COVID-19 pandemic?

13        A.    I don't know if that's why

14   she was hired, but she was hired as a

15   psychologist.  I believe she's a

16   psychologist.  Yup, school psychologist.

17        Q.    I'm handing you tab 16, which

18   we will mark as Exhibit 7.  This is an

19   email dated June 3, 2020, from Karla Rivera

20   to Dr. April Vauss, the superintendent of

21   IPS.

22                    Do you see that?

23        A.    Yes.

24                    - - - - -

25                    (Email dated 6/3/20 Bates

Page 110

```
 1            BW__Irvington00188208 marked
 2            Pettiford Exhibit 7 for
 3            identification.)
 4                 - - - - -
 5   BY MR. KARP:
 6        Q.    There's an attachment here,
 7   it says, "COVID doc."
 8                Do you see that?
 9        A.    Yes.
10        Q.    I'm handing you tab 16A, it's
11   Exhibit 8.  The title of this document is,
12   "COVID 19 Crisis Response Program."
13                Do you see that?
14        A.    Yes.
15                 - - - - -
16            (COVID 19 Crisis Response
17            Program Bates
18            BW__Irvington00188209 to 188212
19            marked Pettiford Exhibit 8 for
20            identification.)
21                 - - - - -
22   BY MR. KARP:
23        Q.    And under the title is Karla
24   Adams Rivera, and then it indicates her
25   doctorate degree.
```

Page 111

1                    Do you see that?

2          A.        Yes.

3          Q.        Dr. Rivera proposed a crisis

4    response program to Dr. Vauss.

5                    Do you see that?

6          A.        I see the title.  I haven't

7    read this document.  If you're going to ask

8    me questions about it, I would prefer to

9    read it.

10         Q.        Okay.  And I'll represent to

11   you that I'm only going to focus on the

12   first page, but, you know, take your

13   time --

14         A.        So I'll at least read.

15                    MR. INNES:  Read however much

16             you need to read to be familiar

17             with it.

18                    THE WITNESS:  Okay.

19                    MR. INNES:  If it's the first

20             page or the full document, that's

21             entirely up to you.

22                    THE WITNESS:  Okay.

23   BY MR. KARP:

24         Q.        And, Ms. Pettiford, I will

25   represent to you that I'm specifically

CONFIDENTIAL

Page 112

1   focused on the program rationale for my

2   questions --

3           A.      Okay.

4           Q.      -- which, I believe, ends

5   toward the bottom of the second page.

6           A.      Okay.  I'm comfortable.

7           Q.      Let's focus on the first

8   paragraph, Dr. Rivera wrote, "We are facing

9   unprecedented times as our country faces a

10  global pandemic that will likely have

11  immeasurable consequences in the form of

12  death, illness, financial loss, and

13  psychological trauma."

14                  Do you see that?

15          A.      Yes.

16          Q.      Does the district agree with

17  that statement?

18          A.      Yes.

19          Q.      Dr. Rivera goes on to say,

20  "While the entire nation is contending with

21  the disease, it is clear that urban

22  communities of color have been

23  disproportionately and severely impacted."

24                  Do you see that?

25          A.      No.

Page 113

1          Q.      That is the second -- or the
2     last line in the first paragraph.
3          A.      Oh, yes, yeah.
4          Q.      Okay.  Does the district
5     agree with that statement?
6          A.      Yes.
7          Q.      Does that statement apply to
8     IPS?
9          A.      Yes.
10          Q.      Dr. Rivera goes on to say
11     that, "Longstanding systemic inequalities
12     have led to a lack of access to healthcare,
13     and vulnerability to underlying health
14     conditions that increase severity of
15     COVID-19.  In addition, a dearth of
16     resources and lack of jobs creates an
17     inability to stock up on food and supplies.
18     Living in more densely populated
19     communities, and a higher likelihood of
20     front line jobs have resulted in greater
21     exposure, illness and deaths among Black
22     and Latino communities."
23                    Do you see that?
24          A.      Yeah.
25          Q.      Dr. Rivera wrote this to --

```
                                        Page 114
 1    wrote this proposal and provided it to
 2    Dr. Vauss?
 3            A.      Okay.
 4            Q.      And you saw that in the email
 5    that this was attached to, right?
 6            A.      Yes, I'm assuming this is the
 7    attachment, yes.
 8            Q.      Does the district agree that
 9    these are particular vulnerabilities and
10    characteristics of the Irvington community
11    that made it more vulnerable to the effects
12    of COVID-19?
13            A.      Yes.
14            Q.      In the next paragraph,
15    Dr. Rivera goes on to say that, "These
16    factors means that while the country is
17    experiencing a collective trauma, the
18    psychological wounds may be even deeper and
19    longer lasting among low income, urban
20    communities."
21                    Do you see that?
22            A.      Uh-huh.
23            Q.      Does the district believe
24    that that applies to Irvington Public
25    Schools?
```

Page 115

1          A.      Yes.

2          Q.      And, "As educational

3    institutions reopen, they must do so well

4    prepared for the psychological burden

5    students, families and staff may bring with

6    them."

7              Do you see that?

8          A.      Yes.

9          Q.      And does the district agree

10   with that?

11         A.      Yes.

12         Q.      After Dr. Rivera submitted

13   this proposal, she was hired by the

14   district, right?

15         A.      I wouldn't know that

16   information.  I don't know the timeline in

17   which she was hired.

18         Q.      You said earlier that she was

19   ultimately hired by the district, you just

20   don't know the timing?

21         A.      Right.

22         Q.      And what was Dr. Rivera's

23   role in providing services to students

24   during the COVID-19 pandemic?

25         A.      I didn't work personally with

CONFIDENTIAL

Page 116

1    Dr. Rivera.

2         Q.    Topic 46 of this notice

3    refers to initiatives proposed or taken by

4    the district during the relevant time

5    period to address any impacts on students

6    from the COVID-19 pandemic.

7              Do you see that?

8         A.    Yes.

9         Q.    You're aware that Dr. Rivera

10   was hired to provide mental health support

11   services that -- and address mental health

12   issues relating to the COVID-19 pandemic?

13             MR. INNES:  Objection.

14        Misstates prior testimony.

15             MR. KARP:  You can answer.

16             THE WITNESS:  I was -- I'm

17        aware that she was hired as a

18        school psychologist.  Her specific

19        role and responsibilities, I don't

20        know.

21   BY MR. KARP:

22        Q.    That's not something you

23   looked into to prepare for today's

24   deposition?

25        A.    No.

Page 117

1          Q.       I'm handing you tab 17 --

2          A.       Yup.

3          Q.       -- which we will mark as

4     Exhibit 9.  This is a "Protocol for Dr.

5     Karla Rivera/Nadirah Muhammad's

6     Consultation."

7                   Do you see that?

8          A.       Yes, I see the title.

9                       - - - - -

10                  (Protocol for Dr. Karla

11            Rivera/Nadirah Muhammad's

12            Consultation Bates

13            BW__Irvington00124731 to 124733

14            marked Pettiford Exhibit 9 for

15            identification.)

16                      - - - - -

17                  MR. INNES:  Okay.  One second.

18            I need to object to the entry of

19            this exhibit.  I mean, as I'm

20            sitting here now, this appears to

21            be a consultation for a particular

22            individual, that name -- while I'm

23            fine with the production of this

24            document, that name should have

25            been redacted as subject to a

CONFIDENTIAL

Page 118

```
 1          personal -- protected educational
 2          information.
 3                  MR. KARP:  Are you -- do you
 4          mean Nadirah Muhammad is a student?
 5                  MR. INNES:  That's what I'm --
 6          if we can go off the record.
 7                  MR. KARP:  She's a CarePlus
 8          counselor.
 9                  MR. INNES:  Okay.  Got it.
10          All right.  Okay.  Sorry.
11  BY MR. KARP:
12          Q.    No problem.  So this document
13  states, "Dr. Karla Rivera, Irvington's
14  Floating School Psychologist, and Nadirah
15  Mohammed, CarePlus counselor, have been
16  hired to provide trauma-informed school
17  strategies in response to COVID-19 to all
18  Irvington schools."
19                  Do you see that?
20          A.    Yes.
21          Q.    Does that refresh your memory
22  as to the reason that Dr. Rivera was hired?
23          A.    No.
24          Q.    Oh.
25          A.    I mean, it tells me, but I
```

CONFIDENTIAL

Page 119

1  was not involved in her hiring --

2          Q.      I understand.

3          A.      -- for the district.

4          Q.      It says here, as part of this

5  protocol that Dr. Rivera and Nadirah

6  Muhammad were hired to provide

7  trauma-informed school strategies in

8  response to COVID-19.

9                  Do you see that?

10         A.      Yes.

11         Q.      Any reason to doubt that?

12         A.      No.

13         Q.      "This includes offering

14 information on the physical and emotional

15 well-being of staff, assisting in creating

16 trauma-informed learning environments, and

17 identifying, assessing, and addressing

18 traumatic stress in the school setting."

19                 Do you see that?

20         A.      Yes.

21         Q.      Does the district have any

22 reason to doubt that these individuals were

23 hired for these purposes?

24         A.      No.

25         Q.      Let's look at the bottom of

CONFIDENTIAL

Page 120

1  this page to where it says, "School

2  personnel who would like to refer a student

3  to Dr. Rivera must first."

4          A.      Uh-huh.

5          Q.      And then it provides a list

6  of steps that need to be taken.

7                  Do you see that?

8          A.      Yes.

9          Q.      And the third item here on

10  this list is that, "The issue with the

11  student is identified as COVID-19 related."

12                  Do you see that?

13          A.      Yes.

14          Q.      So in order for a student to

15  be receiving services from Dr. Rivera or

16  from Nadirah Muhammad at CarePlus, the

17  issue identified by the student would need

18  to be COVID-19 related; is that right?

19          A.      According to that statement,

20  yes.

21          Q.      Does the district have any

22  reason to doubt that this is true?

23          A.      No.

24          Q.      Do you know anything -- what

25  does the district know about Dr. Rivera's

CONFIDENTIAL

Page 121

1    background?

2            A.      I don't know anything

3    about -- I, meaning the district, doesn't

4    know anything about Dr. Rivera's

5    background.

6            Q.      Does the district know

7    whether Dr. Rivera has any special

8    expertise in the area of social media?

9                    MR. INNES:  Objection to form.

10                   THE WITNESS:  I cannot -- I'm

11              a little confused at the line of

12              questioning.

13   BY MR. KARP:

14           Q.      Sure.  I can rephrase.

15           A.      It sounds -- the questions

16   sound like a human resources question, I'm

17   not involved in, as I sit in the district

18   seat, in human resources.  So I don't know

19   why people were hired, what the scope of

20   their job entails.  I don't know that

21   information.

22           Q.      And --

23           A.      And from the -- from the

24   letterhead, Dr. Rivera was -- worked with

25   special services.  That's a whole 'nother

CONFIDENTIAL

Page 122

1  department.

2        Q.      Let's talk about that.  So

3  what is the special services department?

4        A.      So special services

5  department deal with our special education

6  population.

7        Q.      Is it the district's position

8  that Dr. Rivera was only serving the

9  special education population at Irvington

10 Public Schools?

11       A.      When you talk about CarePlus,

12 the answer would be yes.

13       Q.      So Nadirah Muhammad at

14 CarePlus only provided services to special

15 education students at IPS?

16       A.      CarePlus deals with our

17 special education population.  I don't know

18 who Nadirah Muhammad is specifically.

19       Q.      Okay.  So CarePlus as a

20 provider in general --

21       A.      Yes.

22       Q.      -- in the way that it has

23 been engaged by Irvington Public Schools --

24       A.      Yes.

25       Q.      -- works specifically with

CONFIDENTIAL

Page 123

1   the special needs population?

2          A.      Yes.

3          Q.      As to Dr. Rivera, is it the

4   district's position that she provided

5   COVID-19 related services to all students

6   or just the special education students?

7          A.      From the document you gave

8   me, my assumption would be special

9   services.

10         Q.      Putting aside just the

11  document that I provided to you, and in

12  your preparation for topic 46, does the

13  district know whether Dr. Rivera provided

14  COVID-19 related services to students who

15  are not qualified or designated special

16  needs or special education?

17         A.      I'm unaware.  I can't

18  accurately answer that question.

19         Q.      Okay.  As part of this

20  document on the second page, there's a

21  request for consultation form?

22         A.      Yes.

23         Q.      And this particular form is

24  blank.

25                 Do you see that?

Page 124

1         A.      Yes.

2         Q.      Do you know where -- do you

3   know if the district maintained -- or

4   strike that.

5               Do you know if the district

6   has maintained these consultation forms in

7   a central location?

8         A.      I'm not aware.

9         Q.      Are you aware of whether the

10  district has maintained these consultation

11  forms anywhere?

12        A.      I'm unaware.

13              MR. INNES:  I'm sorry, do you

14         want to go off the record?  Do you

15         have a question?

16              THE WITNESS:  No, I'm just

17         trying to rationalize it in my

18         head.

19  BY MR. KARP:

20        Q.      So is it the district's

21  testimony that it doesn't know whether any

22  of these consultation forms to the extent

23  that they were completed are still within

24  the district's files?

25              MR. INNES:  Objection to form.

Page 125

1           Asked and answered.

2                THE WITNESS:  Asked and

3           answered.

4   BY MR. KARP:

5           Q.     Does the district have, for

6   any of the years that these services were

7   being offered, does the district have in

8   its possession any of the completed

9   consultation forms?

10               MR. INNES:  Objection.

11          Outside the scope.

12               THE WITNESS:  In my position

13          with the district, with guidance

14          and health and social services, I

15          am not familiar with this form.

16  BY MR. KARP:

17          Q.     What programs or initiatives

18  has Irvington Public Schools implemented to

19  respond to the needs of students who are

20  economically disadvantaged?

21          A.     We partner with Essex

22  Regional Educational Corporation.  We

23  provide students with different items that

24  they need for day-to-day living, clothing,

25  hygiene items.  We take them on college

CONFIDENTIAL

Page 126

1  tours.  We are we have a big college fair
2  for them in particular.  We also do
3  parenting workshops.  We do resource
4  fair -- we don't do a resource fair, we
5  give out a list of resources to parents and
6  families to help them in their situation.
7          Q.    Let's talk about some of
8  these initiatives.
9          A.    What number are you on?  It
10 just helps my brain work, I'm sorry.
11         Q.    I understand.
12               MR. INNES:  I think it's 44.
13               THE WITNESS:  Okay.  Yeah.
14 BY MR. KARP:
15         Q.    Forty-four, you guys are
16 faster.  I've got a pile of documents over
17 here.  Let's talk about the partnership
18 with Essex Regional Education corporation.
19         A.    Uh-huh.
20         Q.    How long has the district
21 been partnering with Essex?
22         A.    To my understanding, they
23 always partnered with Essex Regional --
24         Q.    When you say --
25         A.    -- in terms of the relevant

CONFIDENTIAL

Page 127

1   time period.

2          Q.     So in terms of the relevant

3   time period, they've had this partnership?

4          A.     Not the whole time, you know

5   what, I don't want to guess.  So

6   representing the district where I sit,

7   since 2020, we have partnered.

8          Q.     Okay.  So at least since

9   2020?

10         A.     Yes.

11         Q.     Okay.  Who at IPS is involved

12  in this partnership with Essex?

13         A.     Ms. Pettiford.

14         Q.     And that's you?

15         A.     Yes.

16         Q.     Do other individuals at IPS

17  work with Essex to provide these important

18  services to IPS students?

19         A.     So the partnership begins

20  with myself and Essex Regional and then I

21  disseminate it to the liaisons throughout

22  the district.

23         Q.     How much of your time, Ms.

24  Pettiford, is spent working with Essex

25  Regional and partnering with them to

CONFIDENTIAL

Page 128

1  provide services to Irvington students?

2          A.      Are you looking for days,

3  hours?

4          Q.      A percentage.

5          A.      A percentage.  You like

6  percentages.  Maybe 20 percent.  You're

7  talking about Ms. Pettiford now, right?

8  Okay.

9          Q.      To the extent that liaisons

10  are also assisting with distributing and

11  making these services available --

12          A.      Yes.

13          Q.      -- can the district

14  approximate how much of their time is spent

15  on this particular work with Essex?

16          A.      Work with Essex Regional or

17  work with the families?

18          Q.      Implementing the services and

19  distributing resources through -- through

20  the partnership with Essex.

21          A.      It varies throughout the

22  year, because it depends on the needs of

23  the individual families, but if I had to

24  guess, I would say 15 to 18 percent.

25          Q.      Okay.  What programs or

CONFIDENTIAL

Page 129

1    initiatives does IPS implement to support
2    students who are dealing with drug or
3    alcohol use?
4              A.      We partner with the Imani
5    Center, so students who are having
6    drug-related issues or need drug testing,
7    they're referred to the Imani Center for
8    testing, for workshops that support the
9    problem that they're having.
10                    We partner with the Covenant
11   House.  That's a dual role, because they
12   help with drug -- they help with drug
13   support as well as homeless needs of our
14   students.  What number is that?
15             Q.      This is 40.
16             A.      We used to partner with
17   Concentra, it is during the relevant time
18   period, but not current.  Concentra offered
19   drug testing as well as drug awareness
20   presentations and workshops for our needs.
21   And Imani Center is the Bridge Center, so
22   they're the same, the same -- the Bridge
23   program is the umbrella that houses the
24   Imani Center, if that makes sense.
25             Q.      For how long has the district

CONFIDENTIAL

Page 130

1  partnered with the Bridge program?

2          A.      I believe throughout the

3  relevant time period.  I don't know for

4  certain.  But they have partnered with the

5  Imani Center at least for 2020.

6          Q.      What about the partnership

7  with Concentra, when did that start?

8          A.      I would be guessing.  They no

9  longer partner with Concentra in terms of

10  testing, but they still do offer, like,

11  workshops.  It would be totally a guess

12  that I don't feel I'm comfortable giving.

13          Q.      Do you know when the

14  partnership ended?

15          A.      Twenty -- it's another guess.

16  Maybe 2021.

17          Q.      And how about Covenant House?

18          A.      Covenant House isn't listed.

19          Q.      It's not listed here, but it

20  was one of the --

21          A.      One of the --

22          Q.      -- partnerships that you

23  mentioned.

24          A.      Oh, yes, yes.  What do you

25  want to know about the Covenant House?  I'm

CONFIDENTIAL

Page 131

1    sorry.

2          Q.     That's okay.  When did the

3    partnership start?

4          A.     At a minimum from 2021.

5          Q.     Who liaises and coordinates

6    with these partners to provide services

7    relating to drug and alcohol use?

8          A.     Between myself and the HSSCs.

9          Q.     Approximately how much time

10   do you and the HSSCs spend working with

11   these partners to provide services to IPS

12   students?

13         A.     We have not done an analysis,

14   but if I look at their monthly reports, I

15   may be able to tell you that they do a lot

16   of work with -- in terms of our homeless

17   students are you referring to?  Was that

18   your question?

19         Q.     Are you including --

20         A.     Repeat your question to make

21   sure I answer it correctly.

22         Q.     Sure.  Approximately what

23   percentage of time do you, Ms. Pettiford,

24   and the HSSCs spend working with these

25   partners to provide students with services

CONFIDENTIAL

Page 132

1  relating to drug and alcohol use?
2          A.     Oh, okay, that's different.
3  They would spend more time than I do in
4  terms of implementation of the programs.  I
5  would spend the time making the connection,
6  even though they do as well, I don't
7  implement it with students, they do.  So I
8  would say 25 percent.
9          Q.     Twenty-five percent of your
10 time and 25 percent of the HSSCs' time?
11         A.     Uh-huh, these are strictly
12 guesses, because I have not done an
13 analysis.
14         Q.     What programs or initiatives
15 has IPS implemented to respond to the needs
16 of students who engage in violence?
17         A.     The same programs that we've
18 discussed also support violence.  The Imani
19 Center does.  The Covenant House would.
20 There may be some programs that we may
21 find, like, online programs, but the
22 same -- the same programs have a lot of
23 support in place that we can utilize for
24 students.
25         Q.     The 25 percent approximate

Page 133

1   that you just -- or estimation that you

2   just gave me would include services

3   relating to students who have engaged in

4   violence?

5           A.      Yes, they can.  They

6   absolutely can.

7           Q.      It's not a separate number, a

8   separate additional amount of time?

9           A.      No.

10          Q.      What programs or initiatives

11  does the district offer to support its

12  homeless students?

13          A.      That's the partnership we

14  discussed with Essex Regional.  They put

15  together programs throughout the year that

16  will support our students in terms of

17  getting them -- their vital needs met,

18  whether it's winter coats, hygiene, hygiene

19  items.  Like I said earlier, we take them

20  to a really big college day where they have

21  different vendors there with information

22  for them.  So that partnership is with

23  Essex Regional.

24          Q.      A minute ago, you mentioned

25  that there were certain liaisons who might

CONFIDENTIAL

Page 134

1   be involved in supporting the work that's

2   done by Essex?

3          A.     Yes.

4          Q.     What roles do those

5   individuals have within IPS?

6          A.     They're HSSCs.

7          Q.     Okay.  The 20 percent

8   approximation that you gave me earlier

9   about the work you do with Essex, did that

10  also apply to the HSSCs?

11         A.     Yes.

12         Q.     Has Irvington ever hired

13  consultants specifically to address drug

14  abuse among IPS students?

15         A.     We have hired agencies to

16  come in and do workshops on vaping, yes.

17         Q.     Do you recall the names of

18  those agencies?

19         A.     Yes, New Life Mental Health

20  Counseling Services.

21         Q.     Any others?

22         A.     Not that I could recall at

23  this time.

24         Q.     Has Irvington Public Schools

25  ever hired consultants to specifically

Page 135

1    address alcohol abuse among IPS students?

2          A.      No, not to my knowledge.

3          Q.      Has Irvington ever hired any

4    consultants specifically to address issues

5    relating to poverty among IPS students?

6          A.      Hired, no, not to my

7    knowledge.

8          Q.      Has Irvington Public Schools

9    ever hired a consultant to specifically

10   address issues relating to homelessness

11   among IPS students?

12         A.      No.

13         Q.      Has IPS ever hired any

14   consultants specifically to address family

15   conflict and domestic issues among IPS

16   students?

17         A.      Hired outside agencies, no.

18         Q.      That's something that staff

19   would address, IPS staff would address?

20         A.      Yes.

21         Q.      HSSCs would be among them?

22         A.      Yup.

23         Q.      What percentage of time would

24   you approximate HSSCs spend addressing

25   issues of family conflict and domestic

CONFIDENTIAL

Page 136

1    violence for IPS students?

2          A.    Strictly a guess, I'll say --

3    I'm going to stick with 15 to 20.

4          Q.    Has IPS ever hired a

5    consultant specifically to address what it

6    believes to be -- well, strike that.

7                Has IPS ever hired a

8    consultant with -- to address issues of

9    social media usage among IPS students?

10         A.    Not that I'm aware of.

11         Q.    Earlier, we were talking

12   about the HIB training and how HIB claims

13   are made.

14                Do you recall that?

15         A.    Yes.

16         Q.    Approximately how much time

17   do HSSCs spend addressing HIB issues?

18         A.    In terms of HIB claims?

19         Q.    Yes.

20         A.    Those are done by

21   anti-bullying specialists.  That's not an

22   HSSC's role.  Not that they don't have

23   involvement, but in terms of claim,

24   investigation, that's not their role.

25         Q.    Is HIB 100 percent of the

CONFIDENTIAL

Page 137

1    role for anti-bullying specialists?

2              A.      Yes.

3              Q.      Do HSSCs have any involvement

4    with addressing HIB issues?

5              A.      Yes, it depends on the

6    individual circumstance.

7              Q.      Can the district approximate

8    how much time HSSCs spend addressing

9    HIB-related issues?

10             A.      It would be kind of hard to

11   do, because it's individual.  So I can't

12   give you -- I don't think it's smart for me

13   to give you a number when it's not their

14   sole responsibility.

15             Q.      So you're saying it's not

16   their sole responsibility?

17             A.      No.

18             Q.      It's part of their

19   responsibilities.  It --

20             A.      It's all part of your

21   responsibility, right, but if a claim is --

22   if a claim is made and they have

23   involvement, they will be involved, student

24   A.  Student B, they may not be needed, so

25   it's really hard for me to give you a

CONFIDENTIAL

Page 138

1  number.

2          MR. KARP:  Understood.  I

3      think I am done with my exam.  I

4      want to open it up to others on the

5      Zoom in case they have questions

6      for the witness before I pass the

7      witness.

8          THE WITNESS:  I didn't know

9      there was a Zoom.

10         MS. WEAINT:  No further

11     questions from the Google/YouTube

12     Defendants.

13         MR. SALE:  Nothing further

14     from TikTok either.  Thank you.

15         MR. KARP:  Michael?

16         MR. INNES:  Yeah, let's take a

17     quick break to organize my

18     thoughts.  I don't think I'm going

19     to have anything.

20         THE VIDEOGRAPHER:  The time

21     right now is 12:19 p.m.  We're off

22     the record.

23             - - - - -

24     (A recess was taken at this time.)

25             - - - - -

CONFIDENTIAL

Page 139

```
 1              THE  VIDEOGRAPHER:   The  time
 2         right  now  is  12:33  p.m.   We're  back
 3         on  the  record.
 4  BY  MR.  INNES:
 5       Q.      Good  afternoon,  Ms.
 6  Pettiford.   For  the  record,  my  name  is
 7  Michael  Innes.   We  know  each  other.
 8       A.      Yeah.
 9       Q.      I  represent  the  district.
10  Counsel  for  Snap  and  other  Defendants  had
11  an  opportunity  to  ask  you  questions  this
12  morning  regarding  various  topics  that  you
13  were  the  designee  for.   It's  now  my  turn  to
14  ask  you  a  few  questions  about  that.
15              Before  I  do  so,  I  just  want
16  to  make  is  a  statement  on  the  record  that
17  there  was  questioning  regarding  the  number
18  of  psychologists  or  social  workers,  et
19  cetera,  with  respect  to  the  Plaintiff's
20  Fact  Sheet.   The  answers  that  the  district
21  provided  to  that,  and  this  is  question
22  number  16  to  the  fact  sheet,  were  N/A.
23              Counsel,  it's  my
24  recollection  that  when  this  was  served,  we
25  received  no  response  back  from  Defendants
```

CONFIDENTIAL

```
                                        Page 140
  1    asking for clarification on this.  It's our
  2    position that it is not a well-phrased
  3    question and that's why you have an N/A.
  4                    Clearly, the district has,
  5    today has testified that it does employ
  6    some, if not all, of the folks that you
  7    listed as examples.  To the extent you
  8    would like to meet and confer off the
  9    record about what was actually asked for in
 10    16, we would be happy to consider that and
 11    then file an amended fact sheet.
 12                    MR. KARP:  May I make a
 13            response --
 14                    MR. INNES:  Absolutely.
 15                    MR. KARP:  A statement in
 16            response.  This is Mr. Karp.  I was
 17            not aware of any discovery
 18            correspondence regarding that
 19            particular question in the fact
 20            sheet.  I'm happy to meet and
 21            confer with you outside of this
 22            deposition to the extent that it
 23            may be appropriate for the fact
 24            sheet to be amended and we can sort
 25            that out off the record.
```

CONFIDENTIAL

Page 141

```
 1              MR. INNES:  Certainly.  Thank
 2         you.  Just to be clear, I don't
 3         know if there was any
 4         correspondence on this, other than
 5         us serving the fact sheet, I don't
 6         know if there was return
 7         correspondence on this particular
 8         topic.  And I don't want to imply
 9         that there was, I just don't know.
10         I don't recall receiving any.
11              Okay.  So, Ms. Pettiford,
12         let's pick up where counsel for
13         Snap left off.  It was toward the
14         end of his questioning, you'll
15         recall that there were questions
16         about percentage of time that
17         certain employees spent
18         addressing certain issues.
19              Do you remember that?
20              THE WITNESS:  Yes.
21    BY MR. INNES:
22         Q.    Okay.  So I just want to
23    ask -- a little feedback here -- is poverty
24    in any way related to social media?
25              MR. KARP:  Object to form.
```

Page 142

1              And an objection for one is an
2              objection for all, Counsel?
3                   MR. INNES:  Thank you, I
4              forgot about that.
5                   Let me strike that, sorry,
6              Ms. Pettiford.
7                   THE WITNESS:  What's
8              happening?
9    BY MR. KARP:
10        Q.    So Mr. Karp was just saying
11   that there's folks that are on the Zoom and
12   if I ask a question, lawyers like to object
13   to all questions, right, so Mr. Karp is
14   going to object on their behalf so we don't
15   get a cacophony --
16        A.    Oh, okay.
17        Q.    -- of defense objections.
18        A.    I didn't know that until
19   right before the break.
20        Q.    So let me rephrase -- let me
21   rephrase my question.  How, if at all, does
22   social media -- strike that.
23              Is it the district's
24   position that social media and poverty are
25   related?

Page 143

1                     MR. KARP:  Object to form.
2                     THE WITNESS:  Yes.
3    BY MR. INNES:
4         Q.     Is it the district's position
5    that the harms caused by social media and
6    the harms caused by alcohol are related?
7         A.     Yes.
8                     MR. KARP:  Object to form.
9    BY MR. INNES:
10        Q.     Is it the district's position
11   that the harms related to social media and
12   bullying are related?
13        A.     Yes.
14        Q.     Is it the district's position
15   that harms related to social media as well
16   as confirmed HIB events can be related?
17                    MR. KARP:  Object to form.
18                    THE WITNESS:  Yes.
19   BY MR. INNES:
20        Q.     Is it the district's position
21   that social media and reported HIBs that
22   are not confirmed can also be related to
23   social media?
24                    MR. KARP:  Object to form.
25                    THE WITNESS:  Yes.

Page 144

1    BY MR. INNES:

2         Q.    Would you agree with the

3    statement that -- that the district does

4    not consider its students to be a pie

5    chart, for example?

6                   MR. KARP:  Object to form.

7                   THE WITNESS:  No, I do agree.

8    BY MR. INNES:

9         Q.    And you were asked -- and

10   moreover, does the district agree that, for

11   instance, a counselor's time spent on

12   issues, could the district break that out

13   into a pie chart?

14                  MR. KARP:  Object to form.

15                  THE WITNESS:  It's difficult

16          to do, no.

17   BY MR. INNES:

18        Q.    And why is that difficult to

19   do?

20        A.    Well, for number one, your

21   time to task varies from day to day, right?

22   To be able to give a definitive percentage

23   on a specific topic is just not feasible,

24   because one day, I may be inundated with a

25   student conflict.  Another day, I may be

CONFIDENTIAL

Page 145

1    able to do some academic advising.  So it's
2    really difficult, which is what I stated
3    when Andrew, what's your last name?
4                    MR. KARP:  Karp.
5                    THE WITNESS:  Mr. Karp was
6            asking the question.  It's hard to
7            give a percentage that would equal
8            100, it's just not logical.
9    BY MR. INNES:
10        Q.    Okay.  And remind me, Ms.
11    Pettiford, who do you oversee in the
12    district?
13                    MR. KARP:  You're asking her
14            in her personal capacity?
15                    MR. INNES:  Yes.
16                    THE WITNESS:  School
17            counselors and health and social
18            service coordinators.
19    BY MR. INNES:
20        Q.    Okay.  I want to focus on
21    health and social service coordinators.
22    Health and social service -- and this is --
23    I'm asking you on behalf of the district.
24        A.    Okay.
25        Q.    Health and social service

CONFIDENTIAL

Page 146

1   coordinators, part of their job is to

2   address student mental health; is that

3   correct?

4           A.      Yes.

5           Q.      And when a particular HSSC is

6   addressing a particular student --

7           A.      Uh-huh.

8           Q.      -- that could be mental

9   health related to poverty, correct?

10          A.      Yes.

11          Q.      And it could be mental health

12  related to social media, correct?

13          A.      Yes.

14          Q.      And sometimes, it's related

15  to both; is that correct?

16          A.      Yup.

17          Q.      So a student's -- a

18  particular student's issue is not easily

19  divided between the different particular

20  harms; is that right?

21          A.      No, it's not usually divided

22  or able to just say it's one particular

23  situation.

24          Q.      Would you say -- is it the

25  district's position that social media has

                                        Page 147

1    exacerbated these underlying -- these
2    underlying conditions that harm mental
3    health?
4                    MR. KARP:  Object to form.
5                    THE WITNESS:  I agree.  I
6            would agree.  The district would
7            agree.  We all agree.
8    BY MR. INNES:
9            Q.    Is it the district's
10   position -- would the district agree with
11   the position that social media is a
12   substantial factor in the mental health
13   harms for the scholars in the district?
14                   MR. KARP:  Object to form.
15                   THE WITNESS:  I would agree in
16           many ways it is.  I don't know if
17           you want me to give you examples.
18   BY MR. INNES:
19           Q.    Sure, certainly, how many
20   examples?
21           A.    I mean, I have a few.  So I
22   believe that let's start with the
23   challenges that lie on social media.  The
24   challenges in itself are -- will affect the
25   mental health of students and sometimes the

CONFIDENTIAL

Page 148

 1  safety of students.

 2            We talked about COVID a lot

 3  and what the impact of COVID was.  What we

 4  didn't discuss was, during COVID, students

 5  were doing -- they were allowed to do

 6  things on, say, Google, for instance, to

 7  create their own links, have their own chat

 8  rooms, create disturbances throughout the

 9  day, because if you think about children,

10  they would much rather be on a social media

11  platform talking with their friends as

12  opposed to being on a Zoom for algebra 2,

13  right?

14            So we like to say COVID is a

15  reason and no doubt that it contributed to

16  the mental health of students, but we

17  cannot ignore the impact that social media

18  has had, the exposure of racism, the

19  exposure of colorism, fight pages that are

20  created, comments that are constantly

21  driving students to want to check their

22  phone to see what the latest trend or

23  information is.

24            I think I mentioned fight

25  pages.  Being able to post derogatory

Page 149

1  information, comment on derogatory

2  information and it disappears within a day,

3  right, all contribute to HIB claims, the

4  mental health of students, students not

5  wanting to come to school to avoid that

6  type of behavior.  So we can't -- we can't

7  eliminate or ignore the impact that social

8  media has had on those things.

9         Q.     You mentioned just now HIB

10  and Mr. Karp also asked you questions about

11  HIB investigations.

12         A.     Uh-huh.

13         Q.     When an HIB investigation is

14  undertaken, there's interviews of the

15  victim; is that right?

16         A.     Victim, yes.

17         Q.     And there's interviews of the

18  perpetrator --

19         A.     The offender.

20         Q.     The offender, so there's

21  interviews of both the victim and the

22  offender.  Are there other interviews of

23  witnesses to the event?

24         A.     Yes.  So the victim is

25  interviewed.  The victim is -- does a

CONFIDENTIAL

Page 150

1    written statement.  The offender does the
2    same.  And then both are given an
3    opportunity to bring witnesses to support
4    whatever their story may be.  That's part
5    of the investigation in ten days.
6            Q.     And have -- has the district
7    investigated HIB incidents in the past that
8    involve social media?
9            A.     Yes.
10           Q.     And when students are
11    interviewed as part of that investigation,
12    is that during the school day?
13           A.     Yes, it's during the school
14    day, yes.
15           Q.     Are they on occasion removed
16    from class to participate in that
17    investigation?
18           A.     They have to come out of
19    class.  Everyone involved, victim,
20    offender, witnesses.  Time is spent writing
21    statements, printing information from
22    social media, if it relates, reviewing the
23    documents, yes, students are definitely
24    pulled out of class.
25           Q.     And those investigations into

CONFIDENTIAL

Page 151

1    HIB incidents involving social media, would

2    the district agree that that could have a

3    potential negative effect on all students

4    involved in the investigation?

5                MR. KARP:  Object to form.

6                THE WITNESS:  Yes, because it

7          results in learning loss.  So not

8          being in class when you're supposed

9          to be learning will ultimately

10         affect you.  And if it's a severe

11         case where you may be put out of

12         school or suspended for a few days

13         because of the investigation, which

14         is also an option, it affects

15         learning loss.

16   BY MR. INNES:

17        Q.    Okay.  And just so the jury

18   is familiar, when you say, "learning loss,"

19   what exactly do you mean by that?

20        A.     That being out of class.  So

21   you learn -- you lose time, because New

22   Jersey goes by seat time, most departments

23   do, so there's a number of hours you should

24   be in your seat, right, to be proficient in

25   that particular area.  When you are out of

Page 152

1   that seat, out of that seat for interviews,

2   out of that seat for in-school suspension,

3   out of that seat for out-of-school

4   suspension, you are losing valuable

5   academic time.  So we consider that

6   learning loss.

7               MR. INNES:  Thank you.  No

8          further questions.  Andrew?

9               MR. KARP:  Could we take a

10         quick break?  I think I'll need to

11         consult with Codefendants.

12              MR. INNES:  Sure.

13              THE VIDEOGRAPHER:  The time

14         right now is 12:45 p.m.  We are off

15         the record.

16                   - - - - -

17     (A recess was taken at this time.)

18                   - - - - -

19              THE VIDEOGRAPHER:  The time

20         right now is 12:52 p.m.  We are

21         back on the record.

22   BY MR. KARP:

23       Q.     Ms. Pettiford, welcome back.

24   I'm just going to follow up on a few of the

25   questions that your counsel discussed with

CONFIDENTIAL

Page 153

1   you a few minutes ago.

2           A.      Uh-huh.

3           Q.      Do you recall providing some

4   testimony regarding the relationship

5   between social media on the one hand and

6   poverty, HIB, alcohol use, drug use, and

7   bullying more generally?

8           A.      Yes.

9           Q.      Okay.  You said that social

10  media was related to poverty, HIB,

11  bullying, alcohol use, and drug use?

12          A.      Yes.

13          Q.      Okay.  What analysis has the

14  district conducted to support that there is

15  a relationship between social media and

16  poverty, HIB, bullying, alcohol use, and

17  drug use?

18          A.      As I stated previously, the

19  district has not done an analysis.  That's

20  not how we collect the data.  However,

21  through meetings with my team, district

22  meetings, district meetings with various

23  people within the district, it's clear that

24  there's a correlation between those things.

25          Q.      So the district is relying on

CONFIDENTIAL

Page 154

1  oral discussions and conversations that
2  people at the district have had?
3          A.      We're relying on
4  conversations from people who are doing the
5  work, yes.
6          Q.      Stories and anecdotes that
7  these individuals have raised at meetings?
8          A.      It sounds like you're making
9  light by using the word, "stories."
10  Because, okay, I don't want you to make it
11  light because it's a serious situation,
12  right?  So this is conversations based on
13  the work that the people who do the work
14  were having those conversations.  That's
15  how we get to a goal, right, we sit, we
16  discuss, we come up with a plan and we
17  implement it.
18          Q.      And the district, as you just
19  said, considers these to be serious issues
20  and serious problems?
21          A.      Yes.
22          Q.      But the district has not
23  taken the next step of performing any type
24  of analysis to understand the relationship
25  or anything like that?

Page 155

1          A.      We have not --
2                  MR. INNES:  Objection to form.
3              Argumentative.
4                  THE WITNESS:  We have not
5              performed an analysis.
6    BY MR. KARP:
7          Q.      Can the district point to any
8    studies supporting the contention that
9    there is a relationship between social
10   media on the one hand and poverty, HIB,
11   bullying, drug use, and alcohol use?
12                 MR. INNES:  Objection to form.
13                 THE WITNESS:  So I cannot
14             point to a study.  That was not one
15             of my areas of topics that I was to
16             discuss.  If I had known that, I
17             would have pulled up a few studies.
18   BY MR. KARP:
19         Q.      So the district is aware of
20   studies that support that?
21         A.      There are -- there are
22   studies.  I just don't have them, because
23   that's not one of the topics that I was
24   prepared for.
25                 Q.      Sitting here today, what can

CONFIDENTIAL

Page 156

1  you recall about these studies, if

2  anything?

3          A.      I'm not -- I don't want to

4  speculate.

5          Q.      Do you recall that your

6  counsel asked you a number of questions

7  about HIB investigations?

8          A.      Yes.

9          Q.      You said that students were

10  pulled out of class to participate in these

11  investigations?

12          A.      As needed, yes.

13          Q.      And could these HIB

14  investigations be conducted after school?

15          A.      No.

16          Q.      Why not?

17          A.      Contractually, school

18  counselors have a contract, they're

19  contracted from 8:00 to 3:00.

20          Q.      So they have to happen

21  between the hours of 8:00 to 3:00?

22          A.      Yes.

23          Q.      Could they happen during

24  lunch periods?

25          A.      They probably do, if students

CONFIDENTIAL

Page 157

1    are available.  Remember, it depends on the

2    availability of students.

3            Q.    And if a student is

4    questioned or participates in one of these

5    interviews during a lunch period, they're

6    not missing class instruction, correct?

7            A.    It depends on how long the

8    interview goes.

9            Q.    You said earlier that social

10   media is related to poverty, and HIB,

11   bullying, alcohol use, and drug use, yes?

12           A.    Yes.

13           Q.    You said that it's not easy

14   to divide up the time that someone spends

15   on issues relating to social media versus

16   some of these other issues, correct?

17           A.    Yes.

18           Q.    Okay.  Sitting here today,

19   does the district have a way to calculate

20   how much time an individual spends

21   addressing issues that they believe relate

22   to social media?

23               MR. INNES:  Objection to form.

24               THE WITNESS:  The district

25          does not have a way to calculate

Page 158

1        that information, because it varies
2        from day to day, month to month,
3        year to year.
4             MR. KARP:  I do not have any
5        further questions.  Does -- I do
6        have a brief statement I want to
7        make before we go off the record,
8        but I'm done with my questions, if
9        anyone on Zoom has anything.
10            MS. WEAINT:  No further
11       questions from Google/YouTube.
12            MR. KARP:  Are you done with
13       your questions?
14            MR. INNES:  No.
15            MR. KARP:  You're not.  Should
16       I wait to make my statement
17       until --
18            MR. INNES:  It's entirely up
19       to you.
20            MR. KARP:  Okay.  I'll just
21       say our position is that we would
22       like to keep this record open to
23       the extent any additional documents
24       are produced after this deposition.
25       I know that there are some

CONFIDENTIAL

Page 159

1     discovery disputes that the parties
2     are working through.  So to the
3     extent that anything is produced
4     after the fact that would be
5     relevant, we would certainly want
6     to reserve our rights to continue
7     asking questions.
8           We don't know if that's
9     going to be necessary at this
10    time and we certainly hope it's
11    not, but we are going to reserve
12    our rights to the extent
13    additional documents are
14    produced.  And that's the only
15    statement I wanted to make.
16          MR. INNES:  Okay.  Yeah, so
17    just in response to that, the
18    parties and the court agreed that
19    we would have ten hours to conduct
20    the 30(b)(6) depositions.  If
21    there's time left open at the end
22    of that and you want to continue to
23    bring back designees on prior
24    topics, we can have that
25    conversation at that point, I hope

CONFIDENTIAL

```
                                              Page 160

 1              that's not necessary.  But I think
 2              that's enough of a response.
 3    BY MR. INNES:
 4         Q.    Ms. Pettiford, I'm actually
 5    not going to switch sides on this, because
 6    we've just got -- it's very, very easy
 7    questions.
 8         A.    Okay.
 9         Q.    So Mr. Karp just questioned
10    you about oral conversations that you had
11    with your staff?
12         A.    Uh-huh.
13         Q.    And your staff is a staff of
14    folks who have advanced degrees, correct?
15              MR. KARP:  Object to form.
16              THE WITNESS:  Yes.
17              MR. KARP:  Are you asking her
18         in her individual capacity or as
19         the district?
20    BY MR. INNES:
21         Q.    Sure.  I can rephrase it as
22    the district.  Do you recall Mr. Karp asked
23    the district questions about what -- that
24    it didn't have an analysis related to the
25    time spent with by various folks addressing
```

CONFIDENTIAL

Page 161

1   mental health services issues.

2               Do you recall that?

3               MR. KARP:  Object to form.

4               THE WITNESS:  Yes.

5   BY MR. INNES:

6        Q.     And do you recall your

7   testimony that the district bases its

8   conclusions on conversations that are had

9   amongst those folks in those roles?

10       A.     Yes.

11       Q.     And folks in those roles that

12  are meeting and having conversations about

13  the mental health of the student population

14  specifically as it relates to social media

15  and their use of social media, those

16  individuals have doctoral degrees?

17              MR. KARP:  Object to form.

18              THE WITNESS:  Some of them do.

19  BY MR. INNES:

20       Q.     And some of them have

21  certificate degrees?

22              MR. KARP:  Object to form.

23              THE WITNESS:  They all have

24          certificates.

25

CONFIDENTIAL

Page 162

1    BY MR. INNES:

2         Q.      And what do they have

3    certificates in?

4         A.      It just depends on their

5    role.  It could be, some of them are

6    licensed practical counselors.  Some of

7    them are master's of social work.  Some of

8    them are certified as school counselors.

9    PhD in leadership, PhD in education, PhD in

10   mental health.  I'll have to get the rest

11   from human resources.

12        Q.      Thank you.  That's fine.

13   Before we took our last -- our last break

14   or after we took our last break --

15        A.      Okay.

16        Q.      -- there was a comment that

17   was made that I think you wanted to

18   address.

19        A.      Oh, the comment by Mr. Karp

20   when he said, way too many examples,

21   Shelley.

22        Q.      Is that the one you wanted to

23   address?  Go ahead.

24                MR. KARP:  I object to form.

25         It was about missing a flight.  It

CONFIDENTIAL

Page 163

1         was a joke.

2              THE WITNESS:  I didn't know

3         the context of the comment.  It was

4         a little offensive, because I felt

5         like you were implying that the

6         examples may have not been relevant

7         and I take it offense to that,

8         because, to me, this is a serious

9         topic that affects our students and

10        I feel like -- I know this is

11        your -- you guys job to defend

12        these platforms, but they

13        absolutely have a negative effect

14        on our students' mental health.  So

15        when you said that, I was, like, I

16        didn't know you were referring to

17        your colleague, but I was

18        absolutely offended by -- by the

19        comment.

20              MR. KARP:  Michael, may I make

21        a statement in response?

22              MR. INNES:  Absolutely.

23              MR. KARP:  And, Ms. Pettiford,

24        certainly, I take these issues very

25        seriously.  I did not know that you

CONFIDENTIAL

Page 164

1           had misinterpreted or that you

2           would interpret it that way and I

3           thought that you had heard the

4           earlier conversation about my

5           colleague trying to make a flight

6           and I was simply joking as we were

7           joking amongst ourselves about how

8           much time was left in the

9           deposition --

10              THE WITNESS:  Okay.

11              MR. KARP:  -- and being able

12          to to get to the airport in time.

13              THE WITNESS:  Understood.

14              MR. KARP:  So that was all

15          that I intended and I certainly did

16          not mean to offend you.  I

17          apologize.

18              THE WITNESS:  Understood.

19          Thank you.

20              MR. INNES:  Okay.  No further

21          questions.

22              MR. KARP:  Nothing further.

23              MR. INNES:  Time on the

24          record.

25              THE WITNESS:  So Mr. Karp has

CONFIDENTIAL

Page 165

1          been on the record for two hours

2          and five minutes.  Mr. Innes has

3          been on the record for 12 minutes.

4                The time right now is

5          1:03 p.m.  We are off the record.

6                    - - - - -

7                (Whereupon, the deposition

8          was concluded at 1:03 p.m.)

9                    - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 166

1          C E R T I F I C A T I O N

2

3

4          I HEREBY CERTIFY that the proceedings and

5     evidence are contained fully and accurately in the

6     stenographic notes taken by me upon the foregoing

7     matter on May 13, 2025, and that this is a correct

8     transcript of same.

9

10

11

12

13

14     _____

15          Robin L. Clark
       Registered Professional Reporter

16

17

18

19

20

21          (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means unless under the direct control

24     and/or supervision of the certifying reporter.)

25

CONFIDENTIAL

Page 167

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8              After doing so, please sign the errata

9    sheet and date it.

10              You are signing same subject to the

11    changes you have noted on the errata sheet,

12    which will be attached to your deposition.

13              It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 168

```
1                   -  -  -  -  -
2                 E  R  R  A  T  A
3                   -  -  -  -  -
4      PAGE        LINE         CHANGE
5
       ____        ____         _____
6
       ____        ____         _____
7
       ____        ____         _____
8
       ____        ____         _____
9
       ____        ____         _____
10
       ____        ____         _____
11
       ____        ____         _____
12
       ____        ____         _____
13
       ____        ____         _____
14
       ____        ____         _____
15
       ____        ____         _____
16
       ____        ____         _____
17
       ____        ____         _____
18
       ____        ____         _____
19
       ____        ____         _____
20
       ____        ____         _____
21
       ____        ____         _____
22
       ____        ____         _____
23
       ____        ____         _____
24
25
```

CONFIDENTIAL

Page 169

1       ACKNOWLEDGMENT OF DEPONENT

2          I, SHELLEY PETTIFORD, do hereby

3   certify that I have read the foregoing pages

4   and that the same is a correct

5   transcription of the answers given by me to

6   the questions therein propounded, except for

7   the corrections or changes in form or

8   substance, if any, noted in the attached

9   Errata Sheet.

10

11  DATE                    SIGNATURE

12  Subscribed and sworn to before me this

13          day of                    ,

14  2025.

15

16  My commission expires:

17

18

19

20  Notary Public

21

22

23

24

25