**Exhibit 9**

# IRVINGTON PUBLIC SCHOOLS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ NO.4)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-01467-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1        UNITED STATES DISTRICT COURT

         NORTHERN DISTRICT OF CALIFORNIA

2

                  - - - - -

3

4    IN RE: SOCIAL MEDIA           CASE NO.

5    ADOLESCENT ADDICTION/PERSONAL   4:22-md-03047-YGR

6    INJURY PRODUCTS LIABILITY      MDL No. 3047

7    LITIGATION

8

9    THIS DOCUMENT RELATES TO:

10   Irvington Public Schools

11           vs.

12   Meta Platforms Inc., et al.

13   Member Case No.: 4:23-cv-01467-YGR

14                  - - - - -

15           Thursday, May 15, 2025

16      CONFIDENTIAL - ATTORNEYS' EYES ONLY

17           PURSUANT TO PROTECTIVE ORDER

18           Videotaped deposition of SHELLEY

19   PETTIFORD, held at the offices of the Irvington

20   Board of Education, One University Place, Irvington,

21   New Jersey, commencing at 9:30 a.m. Eastern, on the

22   above date, before Robin L. Clark, Professional

23   Reporter and Notary Public in and for the State of

24   New Jersey.

25

```
                                                    Page 2

 1    APPEARANCES:

 2

              CARELLA, BYRNE, CECCHI, BRODY
 3            & AGNELLO, P.C.
              BY:  MICHAEL A. INNES, ESQ.
 4            ZACHARY BOWER, ESQ. (Zoom)
              WILLIAM MANORY, ESQ. (Zoom)
 5            DAVID G. GILFILLAN, ESQ. (Zoom)
              5 Becker Farm Road
 6            Roseland, New Jersey 07068
              973-994-1700
 7            minnes@carellabyrne.com
              zbower@carellabyrne.com
 8            wmanory@carellabyrne.com
              dgilfillan@carellabyrne.com
 9                    For the Plaintiffs and the
              Witness
10

11            SHOOK, HARDY & BACON, L.L.P.
              BY:  TERRENCE J. SEXTON, ESQ.
12            2555 Grand Boulevard
              Kansas City, Missouri 64108
13            816-474-6550
              tsexton@shb.com
14                    For the Defendants, Meta
              Platforms, Inc., f/k/a Facebook, Inc.;
15            Facebook Holdings, LLC;
              Facebook Operations, LLC; Facebook
16            Payments, Inc.; Facebook Technologies,
              LLC; Instagram, LLC; and Siculus, Inc.
17

18            KIRKLAND & ELLIS LLP
              BY:  ANDREW KARP, ESQ.
19            M. HOUSTON BROWN, ESQ.
              601 Lexington Avenue
20            New York, New York 10022
              212-341-7593
21            andrew.karp@kirkland.com
              houston.brown@kirkland.com
22                    For the Defendant, Snap,
              Inc.
23

24

25
```

CONFIDENTIAL

```
                                                      Page 3

 1   ALSO PRESENT:
 2
                 DANIEL ORTEGA, VIDEOGRAPHER
 3
                 MICHAEL FRONZAGLIA, TRIAL TECH
 4
 5
     REMOTE APPEARANCES:
 6
                 SHOOK, HARDY & BACON, L.L.P.
 7               BY:  KATELYN ROMEO, ESQ.
                 Two Commerce Square
 8               2001 Market Street, Suite 3000
                 Philadelphia, Pennsylvania 19103
 9               215-278-2555
                 kromeo@shb.com
10                         For the Defendants, Meta
                 Platforms, Inc., f/k/a Facebook, Inc.;
11               Facebook Holdings, LLC;
                 Facebook Operations, LLC; Facebook
12               Payments, Inc.; Facebook Technologies,
                 LLC; Instagram, LLC; and Siculus, Inc.
13
14               KING & SPALDING LLP
                 BY:  ALISON WALTER, ESQ.
15               50 California Street
                 Suite 3300
16               San Francisco, California 94111
                 415-318-1200
17               awalter@kslaw.com
                           For the Defendants,
18               TikTok, Ltd.; TikTok, LLC;
                 TikTok, Inc.; ByteDance Ltd.; and
19               ByteDance Inc.
20
21
22
23
24
25
```

CONFIDENTIAL

```
                                          Page 4

 1            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
              BY:  DANIEL COBOURN, ESQ.
 2            LAURA BERNESCU, ESQ.
              320 South Canal St.
 3            Chicago, Illinois 60606
              312-407-0700
 4            daniel.cobourn@skadden.com
              laura.bernescu@skadden.com
 5                    For the Defendant, Snap, Inc.
 6
              WILSON, SONSINI GOODRICH & ROSATI
 7            BY:  PRAATIKA PRASAD, ESQ.
              1301 Avenue of the Americas, 40th Floor
 8            New York, New York 10019-6022
              pprasad@wsgr.com
 9            212-999-5800
                      For the Defendants, Alphabet,
10            Inc., Google, LLC, and YouTube, LLC
11
                       - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 5

1                    I N D E X
2    WITNESS                                    PAGE
3    SHELLEY PETTIFORD
        BY MR. KARP:                          8, 230
4       BY MR. SEXTON:                     214, 233
        BY MS. PRASAD:                          222
5       BY MR. INNES:                           225
6

7               E X H I B I T S
8    NUMBER            DESCRIPTION           MARKED
9    Pettiford
10   Exhibit 1     Curriculum Vitae             11
11   Exhibit 2     LinkedIn Profile             22
12   Exhibit 3     Arrest Record                37
13   Exhibit 4     Defendants' Notice of Oral   42
                   and Videotaped Deposition
14                 of Shelley Pettiford;
                   Request for Production of
15                 Documents
16   Exhibit 5     Third Amended Plaintiff      55
                   Fact Sheet - School
17                 Districts
18   Exhibit 6     HSSC Monthly Statistics      60
                   Report Bates
19                 BW__Irvington00479393 to
                   00479396
20
     Exhibit 7     HSSC Monthly Report dated    64
21                 February 2023 Bates
                   BW__Irvington00032767 to
22                 00032769
23   Exhibit 8     Bid Submission Bates         87
                   BW__Irvington00034660 to
24                 00034696
25

Page 6

1
   Exhibit 9        Email Chain Bates          99
2                    BW__Irvington 00033434 to
                     00033435
3
   Exhibit 10       2021-2022 Budget PDF Format  104
4                    Bates BW__Irvington00479746
5  Exhibit 11       2021-2022 Budget Excel      106
                     Native Format Bates
6                    BW__Irvington00479746
7  Exhibit 12       Email String Bates          111
                     BW__Irvington00064729 to
8                    00064737
9  Exhibit 13       IPS Wish List Bates         130
                     BW__Irvington00463225 to
10                   00463259
11 Exhibit 14       Email dated 12/14/21 Bates  149
                     BW__Irvington00016422
12
   Exhibit 15       Email dated 12/16/21 Bates  153
13                   BW__Irvington00016441
14 Exhibit 16       Suicide Prevention          161
                     Information University
15                   Middle School 2020-2021
                     PowerPoint
16                   BW__Irvington00479130
17 Exhibit 17       Mental Health Support Grant  174
                     Bates BW__Irvington00479794
18                   to 00479796
19 Exhibit 18       Board Meeting Minutes dated  186
                     1/21/15 Bates
20                   BW__Irvington00555757 to
                     00555828
21
   Exhibit 19       2023-2024 Administrators'   188
22                   Retreat Agenda Bates
                     BW__Irvington00013208 to
23                   00013214
24
25

CONFIDENTIAL

Page 7

1        DEPOSITION SUPPORT INDEX

2

                  - - - - -

3

4  Direction to Witness Not to Answer

5  Page   Line

6  49        22

7  50        10

8  54        11

9  Request for Production of Documents

10  Page   Line

11  NONE

12  Question Marked

13  Page   Line

14  NONE

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 8

1              THE VIDEOGRAPHER:  We are now
2          on the record.  My name is Daniel
3          Ortega and I am the legal
4          videographer for Golkow Litigation
5          Services.  Today's date is May 15,
6          2025, and the time is 9:54 a.m.
7              This video deposition is
8          being held in the matter of
9          Social Media, CA MDL 3047,
10          Irvington Public Schools versus
11          Meta Platforms, Inc., et al.
12              The deponent today is
13          Shelley Pettiford.  All counsel
14          will be noted on the stenographic
15          record.  The court reporter today
16          is Robin Clark who will now swear
17          in the witness.
18                  - - - - -
19              SHELLEY PETTIFORD, having
20          been duly sworn, was examined and
21          testified as follows:
22                  - - - - -
23    BY MR. KARP:
24          Q.    Ms. Pettiford, good morning.
25          A.    Good morning.

CONFIDENTIAL

1          Q.      How are you?

2          A.      I've been better.  I'm good

3    though.

4          Q.      You hit some traffic, I

5    heard?

6          A.      Yes.

7          Q.      Can you please state your

8    full name for the record?

9          A.      Shelley Emily Pettiford.

10         Q.      It's good to see you again.

11   We spoke earlier this week, yes?

12         A.      Yes.

13         Q.      For the record, my name is

14   Andrew Karp and I represent Snap in this

15   lawsuit.

16                 You understand that you're

17   under oath today?

18         A.      Yes.

19         Q.      And is there any reason you

20   cannot provide truthful or accurate

21   testimony today?

22         A.      No.

23         Q.      As we discussed the other

24   day, if there's any point in time when you

25   don't understand my question, please let me

CONFIDENTIAL

Page 10

1  know so that I can clarify.  Does that

2  sound good?

3          A.     Yes.

4          Q.     From time to time today, I

5  will refer to Irvington Public Schools as

6  IPS and you understand that when I say,

7  "IPS" I mean --

8          A.     Yes.

9          Q.     -- Irvington Public Schools?

10         A.     Yes.

11         Q.     Thank you.  Earlier you

12 stated your full name for the record.

13         A.     Yes.

14         Q.     I was wondering if you go by

15 any other names?

16         A.     When I was married, Goodluck.

17         Q.     Shelley Goodluck?

18         A.     Yes.  Pettiford Goodluck,

19 Goodluck, it depends on the ID that you

20 look at.

21         Q.     In advance of today's

22 deposition, we requested a copy of your CV.

23 Did you bring one with you today?

24         A.     Yeah.

25         Q.     Thanks.  For the record,

Page 11

1    counsel has handed me a copy of Ms.

2    Pettiford's CV.  We'll mark this as

3    Exhibit 1.  We do not have a digital copy

4    of this.  It was just provided.

5                    - - - - -

6                (Curriculum Vitae marked

7             Pettiford Exhibit 1 for

8             identification.)

9                    - - - - -

10   BY MR. KARP:

11        Q.     Ms. Pettiford, did you create

12   this CV?

13        A.     Yes.

14        Q.     When did you create it?

15        A.     Create or update?

16        Q.     So you updated it at some

17   point?

18        A.     I updated it since I moved

19   into the director role, probably, I don't

20   think I did it right away, so sometime

21   between April and -- April 2024 and

22   December 2024.

23        Q.     So a version of this CV

24   existed at some point and between

25   April 2024 and December 2024, you updated

CONFIDENTIAL

Page 12

1    it?

2              A.      I added the first position,

3    yes.

4              Q.      Okay.  The other information

5    contained in the CV was already a part of

6    the CV?

7              A.      Yes.

8              Q.      A few months have passed

9    since December of 2024, is there anything

10   that you would add to your CV today to make

11   it more current or accurate?

12             A.      No.

13             Q.      What is your current job

14   title?

15             A.      Director of guidance, health

16   and social service coordinators, HIB, SEL,

17   and McKinney-Vento.

18             Q.      And you've held that position

19   since February of 2024?

20             A.      Yes.

21             Q.      Previously, you were the

22   director supervisor of guidance and health

23   and social services coordinators?

24             A.      Yes.

25             Q.      That was with Irvington

CONFIDENTIAL

Page 13

1    Public Schools?

2            A.      Yes.

3            Q.      And you held that position

4    from November 2020 through February of

5    2024?

6            A.      Yes.

7            Q.      Before you joined -- or

8    strike that.

9                    You were -- from

10   September 2004 through November of 2020,

11   you were a lead school counselor at Arts

12   High School in Newark, New Jersey?

13           A.      Yes.

14           Q.      And is that part of the

15   Irvington Public School District?

16           A.      No.

17           Q.      So you joined Irvington

18   Public Schools in November of 2020?

19           A.      Yes.

20           Q.      You were also an academic

21   counselor and resident director at NJIT in

22   Newark, New Jersey, from June 2017 through

23   August of 2023, correct?

24           A.      Yes.

25           Q.      So you held that role while

Page 14

1  you were employed in Newark and also while

2  you were employed by Irvington Public

3  Schools?

4          A.      Yes.

5          Q.      Can you tell me a little bit

6  more about that role?

7          A.      Sure.  It's a part-time role,

8  so NJIT, Center for Pre-College Programs

9  housed Upward Bound and Talent Search,

10  which are pre-college programs for high

11  school students.  So during the school

12  year, I would come in on the weekends and

13  do counseling classes for grades 9 through

14  12.  During the summer, I would do

15  counseling classes from 9 through 12 and

16  when I transitioned out of the classroom

17  for that program, I would stay in the dorms

18  with them in the summertime.

19          Q.      So, fair to say, most of the

20  time you spent in this role was on weekends

21  or over the summer?

22          A.      During the school year as

23  well, but it was Saturdays.

24          Q.      On weekends?

25          A.      Uh-huh, just Saturday.

CONFIDENTIAL

Page 15

1          Q.     Yes.   Thank you.   You were
2     also a lead teacher for the Newark Board of
3     Education for that same time period
4     June 2017 through August of 2023?
5          A.     Yes.
6          Q.     What did that role entail?
7          A.     So that was just an
8     after-school program that happened at Arts
9     High.   We would have different activities
10    for our 9th through 12 grade students.   It
11    was like a high, high level babysitting
12    program.
13         Q.     Did it involve teaching at
14    all?
15         A.     No, because we have vendors
16    that came in and did different workshops,
17    so it was more so making sure the kids were
18    safe, having little groups with them, but
19    not really teaching.
20         Q.     Would it be similar to an
21    after-school program?
22         A.     Yes.
23         Q.     It also -- your résumé also
24    indicates that from September of 2010
25    through June of 2014, you served as a

Page 16

1    school counselor at the Newark Evening High

2    School?

3            A.      Uh-huh.

4            Q.      What did that job entail?

5            A.      Same, same skill set used as

6    the regular school counselor, academic

7    advisement.  The only differences in this

8    role, it was an adult school.  So students

9    were coming back, different ages, different

10   walks of life for different reasons, coming

11   back to attain their high school diploma.

12   So we would offer counseling service to the

13   students or their transcripts, create an

14   academic plan, hold individual counseling

15   sessions with them.

16           Q.      Do you recall the average age

17   of a student who would have participated in

18   the Newark Evening High School program?

19           A.      It really could range.  It

20   could range from an 18-year-old who dropped

21   out and wanted to come back to a

22   grandmother who was 62 and decided to come

23   back.  So it was really an age range, a

24   wide range.

25           Q.      A minute ago, you told me

Page 17

1    that you started at Irvington Public

2    Schools in November of 2020?

3           A.     Yes.

4           Q.     At the time that you joined

5    Irvington Public Schools, did anyone tell

6    you that students in the district were

7    challenged by a mental health crisis caused

8    by social media?

9           A.     No.

10          Q.     Let's talk a little bit about

11   your education.

12          A.     Okay.

13          Q.     You list here director of

14   school counseling services Kean University,

15   Union, New Jersey?

16          A.     Yes.

17          Q.     Can you tell me more about

18   that?

19          A.     So because I received my

20   master's degree in counselor education, I

21   needed to get a certification to be a

22   director, so I went back to Kean and got

23   that certification.  So it's a director of

24   school counseling services, student support

25   services.

CONFIDENTIAL

Page 18

1        Q.        So this is a certification?

2        A.        Yes.

3        Q.        Okay.  And when did you

4    attain this certification?

5        A.        I'm going to be guessing,

6    maybe 2018.

7        Q.        You received your master's

8    degree in counselor education from Virginia

9    State University?

10        A.        Yes.

11        Q.        When did you receive that?

12        A.        Ninety-eight.

13        Q.        You also received a

14    bachelor's degree in psychology from

15    Virginia State University; is that right?

16        A.        Yes.

17        Q.        And when did you --

18        A.        Ninety-six.

19        Q.        I'm sorry?

20        A.        Ninety-six.

21        Q.        You received that in 1996?

22        A.        Uh-huh.

23        Q.        Thank you.  Did any of your

24    education and training specifically focus

25    on the potential impact of social media on

CONFIDENTIAL

Page 19

1    children --

2         A.      No.

3         Q.      -- or on adolescents?

4         A.      No.

5         Q.      Did any of your education and

6    training at Kean University or Virginia

7    State involve the potential impact of

8    technology on the mental health of

9    adolescents?

10        A.      Did it involve it?

11        Q.      Or I can ask a slightly

12   different question.

13        A.      Uh-huh.

14        Q.      While at Kean University or

15   Virginia State University, do you recall

16   taking any courses that addressed the

17   potential impact that technology could have

18   on adolescent mental health?

19        A.      Not a course in particular,

20   no.

21        Q.      Are you remembering a

22   particular lesson?

23        A.      I mean, we've had discussions

24   about it.

25        Q.      When you were at Kean

CONFIDENTIAL

Page 20

1    University?

2            A.      Kean University, yes.

3            Q.      In particular?

4            A.      Yes.

5            Q.      Not at Virginia State?

6            A.      Not that I can recall, no.

7            Q.      Tell me a little bit more

8    about what you recall from the discussions

9    you had at Kean University on this topic.

10           A.      I don't recall a lot, but we

11   had -- we did have a lesson or two on the

12   effects of general technology on mental

13   health, because this was a counseling --

14   counseling certification, we talked about

15   different things that affect mental health

16   and technology was definitely one of them.

17           Q.      Do you remember anything

18   about what those effects were?

19           A.      Not particularly.

20           Q.      And do you recall whether

21   social media was a part of that discussion?

22           A.      Not particularly, no.  I

23   don't recall.

24           Q.      Ms. Pettiford, you are a

25   licensed school counselor in the state of

CONFIDENTIAL

Page 21

1   New Jersey?

2          A.      Yes.

3          Q.      Do you hold any teaching

4   positions?

5          A.      No.  Currently?  I just want

6   to make sure I'm not lying under oath.

7          Q.      Thank you for being careful.

8          A.      Uh-huh.

9          Q.      Currently, do you have hold

10  any teaching positions?

11         A.      No.

12         Q.      Have you ever held any

13  teaching positions?

14         A.      I have taught in the past,

15  yes.

16         Q.      Where have you taught?

17         A.      I have taught at Essex County

18  College.

19         Q.      And for how long were you a

20  teacher or professor at Essex County

21  College?

22                 MR. INNES:  Objection to form.

23           You can answer.

24                 THE WITNESS:  Oh, okay.  So I

25           was adjunct, which means it was

CONFIDENTIAL

Page 22

```
 1            part-time and it was -- it was eons

 2            ago, so long ago that it wouldn't

 3            be on my résumé.  Do you want me

 4            guess?  Should I guess?

 5  BY MR. KARP:

 6        Q.    You should not guess.

 7        A.    I don't -- I cannot guess.

 8        Q.    Do you recall if it was

 9  within the last ten years?

10        A.    It was not.

11        Q.    Do you recall if it was

12  within the last 20 years?

13        A.    I'm not sure.

14        Q.    I'm handing you tab one,

15  which we'll mark as Exhibit 2.

16                  - - - - -

17            (LinkedIn Profile marked

18         Pettiford Exhibit 2 for

19         identification.)

20                  - - - - -

21  BY MR. KARP:

22        Q.    Ms. Pettiford, do you

23  recognize this document?

24        A.    Yes.  When I say, "yes," I

25  recognize the information on the document.
```

CONFIDENTIAL

Page 23

1        Q.      If you look at the top
2    left-hand corner of the document, it
3    indicates that this was taken from your
4    LinkedIn profile.
5            A.      Okay.  Uh-huh.
6        Q.      Do you recall -- or strike
7    that.
8                Did you create this
9    document?
10                MR. INNES:  Objection to form.
11                THE WITNESS:  I'm assuming I
12        did, if it's on my LinkedIn.
13    BY MR. KARP:
14        Q.      Do you have any reason to --
15    and, please, if you need to take a minute
16    to review it, but do you have any reason to
17    doubt the accuracy of any information
18    that's contained in this document?
19            A.      No.  Nope.
20        Q.      If we look at the second page
21    of this document, there's a reference to
22    Essex Community College.
23                Do you see that?
24            A.      Yes.
25        Q.      And there it indicates that

CONFIDENTIAL

Page 24

1  you were an adjunct professor from
2  January 2001 through May of 2008?
3          A.      Yup.
4          Q.      Does that refresh your memory
5  of when you taught at Essex County College?
6          A.      According to the document, it
7  refreshes my memory, yes.
8          Q.      It also indicates -- strike
9  that.
10                 Your LinkedIn profile also
11  indicates you were an associate director at
12  Essex County College from June of 1998
13  through September of 2004?
14          A.      Yup.
15          Q.      Is that also true?
16          A.      Yes, that was true, but
17  that's not here.  It was probably too long
18  ago.
19          Q.      Sorry, it's not where?
20          A.      Oh, I see it.  I didn't see
21  it, I didn't see it initially.  Yes, that's
22  true.  My first gig out of my grad school.
23          Q.      When you were an adjunct
24  professor at Essex County College, what
25  were you teaching?

CONFIDENTIAL

Page 25

1          A.      I need to go back.  I taught
2    GED classes and human sexuality and PSR.
3          Q.      Did any of your courses
4    involve the impact or the potential impact
5    that technology could have on student
6    mental health?
7                    MR. INNES:  Objection to form,
8            vague.  You can answer.
9                    THE WITNESS:  No.
10   BY MR. KARP:
11         Q.      Did any of your -- any of the
12   classes you taught relate to the potential
13   impact that social media could have on
14   adolescent mental health?
15                   MR. INNES:  Objection to form.
16                   THE WITNESS:  No, but we are
17           talking about 2001.  Okay.
18   BY MR. KARP:
19         Q.      Fair enough.
20         A.      Okay.
21         Q.      I just needed to ask the
22   question.
23         A.      Oh, okay.  Okay.
24         Q.      You can put this to the side.
25         A.      Okay.

CONFIDENTIAL

Page 26

1          Q.     Ms. Pettiford, are you an
2     author of any articles or studies relating
3     to education?
4          A.     No.
5          Q.     Are you the author or --
6     excuse me.  Are you the author of any
7     articles or studies relating to adolescent
8     mental health?
9          A.     No.
10          Q.     Have you conducted any
11     research on adolescent mental health or
12     well-being?
13          A.     No.
14          Q.     Are you the author of any
15     articles or studies relating to social
16     media?
17          A.     No.
18          Q.     Have you conducted any
19     research relating to social media?
20          A.     No.
21          Q.     When we spoke on Tuesday, you
22     mentioned that that was not your first time
23     giving a deposition, do you recall?
24          A.     Yes.
25                    MR. INNES:  Objection to form.

CONFIDENTIAL

1                    THE WITNESS:  Yes.
2     BY MR. KARP:
3          Q.     How many other times have you
4     been deposed?
5          A.     Just once.
6          Q.     Do you recall when that --
7     when that was?
8          A.     It was in 2024.  I don't
9     remember the month.  That's the only one I
10    remember.
11         Q.     So you provided deposition
12    testimony in a case in 2024?
13                    MR. INNES:  Objection to form.
14                    THE WITNESS:  Yes, yes.
15    BY MR. KARP:
16         Q.     To the best of your
17    recollection?
18         A.     Yes, yes, uh-huh.
19         Q.     Can you tell me what that
20    case was about?
21         A.     It was dealing with a teacher
22    who had -- who was bringing a case against
23    Irvington Public Schools, a teacher who was
24    terminated.
25         Q.     To your knowledge, did any of

Page 28

1    the claims in that case relate to student

2    use of technology or social media?

3          A.    Yes.

4          Q.    What was your involvement in

5    the case?

6                MR. INNES:  Objection to form.

7                THE WITNESS:  I had to

8          investigate the HIB claim that the

9          student filed.

10   BY MR. KARP:

11         Q.    Were you a party to the case,

12   meaning the person suing or the person or

13   entity being sued?

14               MR. INNES:  Objection to form.

15               THE WITNESS:  I don't

16         understand the question.

17   BY MR. KARP:

18         Q.    You were not the individual

19   who filed this lawsuit, correct?

20         A.    No.

21         Q.    Were you named as a defendant

22   in the lawsuit?

23               MR. INNES:  Objection to form.

24               THE WITNESS:  No, I don't

25         think I was -- Irvington Public

CONFIDENTIAL

Page 29

1          Schools was in -- it was the

2          teacher versus the Irvington Public

3          Schools.

4  BY MR. KARP:

5          Q.      And you provided testimony

6  about the investigation that you had

7  conducted about a particular HIB claim?

8          A.      Yes.

9          Q.      And that investigation

10 involved, to some degree, student use of

11 technology or social media?

12         A.      Yes.

13                 MR. INNES:  Objection to form.

14                 THE WITNESS:  Yes.

15                 MR. INNES:  You're going to

16         continue this line of questioning,

17         I'm assuming?

18                 MR. KARP:  Not for much

19         longer.

20                 MR. INNES:  Okay.  So I'll

21         just, like, make an instruction.

22         So, Ms. Pettiford, to the extent

23         that any of your responses to this

24         line of questioning would involve

25         discussing things you had,

CONFIDENTIAL

Page 30

1           discussed only with counsel and not
2           in a public forum --
3                 THE WITNESS:  Okay.
4                 MR. INNES:  -- I would
5           instruct you not to answer those.
6                 THE WITNESS:  Okay.
7                 MR. INNES:  But we'll let
8           Mr. Karp ask his questions, I'll
9           make my objections, if needed, and
10          you can proceed.
11                THE WITNESS:  So would I say I
12          can't answer that?  That would be
13          my response if it was with counsel?
14                MR. INNES:  Well, we can let
15          Mr. Karp --
16                THE WITNESS:  Okay.
17                MR. INNES:  -- ask and then --
18                THE WITNESS:  Uh-huh.
19                MR. INNES:  -- we'll go from
20          there.
21  BY MR. KARP:
22          Q.    We were just discussing the
23  deposition you gave in this case in 2024?
24          A.    Uh-huh.
25          Q.    Did you also provide live

Page 31

1    testimony at trial in that case?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. KARP:

5          Q.     So there was a trial in that

6    case, correct?

7                    MR. INNES:  Objection to form.

8                    THE WITNESS:  I was in a

9            courtroom, so that's a trial,

10           right?  Yes.  I'm just making sure.

11                   MR. INNES:  Yeah.

12                   THE WITNESS:  I don't want to

13           lie.

14   BY MR. KARP:

15         Q.     Yes.  Do you recall when you

16   gave that trial testimony?

17                   MR. INNES:  Objection to form.

18                   THE WITNESS:  It was 2024, it

19           was this school year, so it was in

20           2024.

21   BY MR. KARP:

22         Q.     But it happened in 2024, not

23   2025?

24         A.     No, so this school year is

25   September 2024 to June 2025.  That's how we

Page 32

1  look at a school year, so it was this
2  school year, but in 2024.
3        Q.    Thank you.  So it would have
4  been in the fall or --
5        A.    Yes.
6        Q.    -- early winter of 2024?
7        A.    Yes, uh-huh.
8        Q.    Do you recall how the case
9  resolved?
10                MR. INNES:  Objection to form.
11                THE WITNESS:  I have --
12                MR. INNES:  Vague.  You can
13          answer.
14                THE WITNESS:  I don't know.
15  BY MR. KARP:
16        Q.    Do you know if the case did
17  resolve?
18                MR. INNES:  Objection to form.
19                THE WITNESS:  I don't know.
20  BY MR. KARP:
21        Q.    Is that the only occasion you
22  can recall when you gave deposition
23  testimony?
24                MR. INNES:  Objection to form.
25                THE WITNESS:  That's all I can

CONFIDENTIAL

Page 33

1                    recall, yes.

2    BY MR. KARP:

3           Q.      And let me ask a slightly

4    different question, because your counsel is

5    right, that was confusing.

6                        Other than the depositions

7    you are giving in this case relating to

8    social media, the lawsuit that Irvington

9    Public Schools has brought, is this

10   instance from 2024 with the HIB

11   investigation the only other time you can

12   recall giving a deposition?

13                   MR. INNES:  Objection to form.

14                   THE WITNESS:  That's the only

15            time I can recall, yes.

16   BY MR. KARP:

17          Q.      You told me a minute ago that

18   you testified at this trial, correct?

19          A.      Yes.

20          Q.      Have you provided any other

21   trial testimony?

22                   MR. INNES:  Objection to form.

23                   THE WITNESS:  Not that I can

24            recall.

25

CONFIDENTIAL

Page 34

1   BY MR. KARP:

2        Q.    So the only time you've ever

3   testified at trial was in this case

4   involving the HIB claim that you were

5   investigating?

6                MR. INNES:  Objection to form.

7                THE WITNESS:  That I can

8          recall.

9   BY MR. KARP:

10       Q.    Did the testimony you

11  provided in that case address how social

12  media might have affected the mental health

13  of a particular student?

14               MR. INNES:  Objection to form.

15               THE WITNESS:  I'm going to

16         say, yes, uh-huh.

17  BY MR. KARP:

18       Q.    How so?

19       A.    The young lady that was

20  involved, it affected her -- not only her

21  mental health, but also her behavior.  She

22  didn't want to come to school because of

23  the comments that were associated with the

24  post.  So in that way, I think -- I'm

25  trying to remember, because it was this

CONFIDENTIAL

Page 35

1    year, but -- so there was -- there was

2    posts about a young lady, a lot of students

3    and outsiders were commenting on it,

4    because of that, there was a fight in the

5    building.  So she didn't want to come to

6    school and it also involved the teacher as

7    well, so it was a whole mess, but yes, the

8    answer is yes.

9         Q.    To make sure I understood you

10   correctly, this was an instance of

11   cyberbullying?

12              MR. INNES:  Objection to form.

13         Misstates prior testimony.

14              THE WITNESS:  Part of the case

15         was cyberbullying, yes.

16   BY MR. KARP:

17        Q.    I believe you testified that

18   an outsider had posted something on social

19   media?  You're nodding your head no?

20        A.    No, I said outsiders also

21   commented.

22        Q.    Sorry, I apologize, I

23   misheard you.  There was a post to social

24   media and others commented on that post,

25   correct?

CONFIDENTIAL

Page 36

1          A.      Yes.

2          Q.      And that led to, ultimately,

3    led to a fight and for the student not want

4    to come to school?

5          A.      Yes.

6          Q.      Do you remember anything

7    about the testimony you provided regarding

8    the involvement of social media in that

9    incident?

10                 MR. INNES:  Objection to form.

11                 THE WITNESS:  Besides what I

12            just told you, no.

13                 MR. KARP:  I'll just put on

14            the record that we requested prior

15            testimony of this sort in the

16            deposition notice, so we will

17            follow up after the deposition just

18            to sort out any document production

19            issues.

20    BY MR. KARP:

21          Q.      Ms. Pettiford, have you ever

22    been charged with a crime?

23          A.      Not to my knowledge.

24          Q.      ████ █████████████ ████ █████ █████

██  ███████ ████ ████ ████ ██ ████ ████ ████

CONFIDENTIAL



Page 37



Page 38

CONFIDENTIAL



Golkow Technologies,
A Veritext Division

CONFIDENTIAL



877-370-3377                                          www.veritext.com

CONFIDENTIAL

Page 41

[REDACTED]

7              Ms. Pettiford, have you ever

8    been subject to disciplinary action in your

9    professional capacity?

10         A.    No.

11         Q.    Have you ever been

12   investigated for any alleged misconduct in

13   your professional capacity?

14         A.    No.

15         Q.    Have you ever been a

16   plaintiff or a defendant in a civil

17   lawsuit?

18         A.    Not that I can recall.

19         Q.    Shifting gears, I'm going to

20   hand you tab four --

21              MR. INNES:  Thanks.

22              MR. KARP:  -- which we'll mark

23         as Exhibit 4.  This is Defendants'

24         Notice of Oral and Videotaped

25         Deposition of Shelley Pettiford;

Page 42

1          Request for Production of

2          Documents.

3               Do you see that?

4               THE WITNESS:  Yes.

5               - - - - -

6               (Defendants' Notice of Oral

7          and Videotaped Deposition of

8          Shelley Pettiford;  Request for

9          Production of Documents marked

10         Pettiford Exhibit 4 for

11         identification.)

12              - - - - -

13  BY MR. KARP:

14       Q.    Have you seen this document

15  before?

16       A.    No.  Not that I can recall.

17  Let me see, can I read it?

18       Q.    Of course.

19       A.    It will kind of --

20       Q.    Sure.  Take your time.

21       A.    This is in my -- I believe I

22  may have seen this.

23       Q.    I'll represent to you that

24  this is the notice for your deposition

25  today --

CONFIDENTIAL

Page 43

1          A.      Okay.  Okay.

2          Q.      -- that we're in the middle

3     of?

4          A.      Okay.

5          Q.      And you said you might have

6     seen it?

7          A.      Yeah, there's so many papers.

8          Q.      We can agree on that for

9     sure.

10          A.      Uh-huh.

11          Q.      Let's --

12               MR. INNES:  And I think we can

13          also agree that we do not want the

14          witness to be guessing.

15               THE WITNESS:  Oh, I apologize

16          for guessing.

17     BY MR. KARP:

18          Q.      Sure.  I was just repeating

19     her testimony.

20               Ms. Pettiford, what did you

21     do -- excuse me -- strike that.

22               Did you do anything to

23     prepare for today's deposition?

24          A.      I think everything I've done

25     prepares me, all the months we talked with

CONFIDENTIAL

Page 44

1    counsel has prepared me for today.

2        Q.    You met with counsel to

3    prepare for today's deposition?

4        A.    Not specifically today, just

5    period.

6        Q.    To -- you've met with counsel

7    to prepare for depositions in this lawsuit?

8        A.    Yes.

9        Q.    Generally.

10       A.    And you put it so eloquently,

11   yes.

12       Q.    Was there any preparation

13   that you undertook specifically for today's

14   deposition as opposed to the depositions

15   that you've given more generally?

16            MR. INNES:  Objection to form.

17        What I believe counsel is asking

18        is, have you done any preparation

19        for today as opposed in preparation

20        for the 30(b)(6) deposition that

21        you gave earlier this week.

22            THE WITNESS:  No.

23   BY MR. KARP:

24       Q.    As your counsel just stated

25   on the record, you appeared for a

Page 45

1   deposition on Tuesday as the corporate

2   representative for the district on certain

3   topics, correct?

4           A.      Yes.

5           Q.      And we discussed at that

6   deposition that you had done certain things

7   to prepare, do you recall?

8           A.      Yes.

9           Q.      Okay.  And as your counsel

10  astutely pointed out, what I was getting at

11  is apart from your preparation for

12  Tuesday's deposition, have you done

13  anything else to prepare for today?

14          A.      Besides speak with counsel,

15  no.

16          Q.      And when did you speak with

17  counsel for today's deposition?

18          A.      Today.

19          Q.      Was that this morning before

20  the deposition got underway?

21          A.      A few minutes, yes.

22          Q.      You spoke for a few minutes?

23          A.      Uh-huh.

24          Q.      Was anyone else present for

25  that conversation?

CONFIDENTIAL

Page 46

1          A.     No.

2          Q.     For today's deposition as

3    opposed to Tuesday's, did you review any

4    documents?

5          A.     No.

6          Q.     For today's deposition, as

7    opposed to Tuesday's, did you speak with

8    anyone?

9          A.     No.

10          Q.     Other than counsel?

11          A.     No.

12          Q.     Did you bring any documents

13    with you to today's deposition?

14          A.     No.

15                  MR. INNES:  Just a point of

16            clarification, the résumé I think

17            was --

18                  THE WITNESS:  Oh, I'm sorry.

19    BY MR. KARP:

20          Q.     Fair.  You brought your

21    résumé today?

22          A.     Yes.

23          Q.     I thought maybe you had

24    brought the résumé, Michael.

25                  So you brought your résumé

CONFIDENTIAL

Page 47

1  today.  Did you bring anything else with
2  you?
3          A.      No.
4          Q.      Did you create any notes in
5  your preparation for today's deposition?
6          A.      No.
7          Q.      When did you become aware of
8  this lawsuit?
9              MR. INNES:  Objection to form.
10              THE WITNESS:  You asked me
11          that on Tuesday and I was unsure
12          and I don't want to guess.  It has
13          been over a year, at least.
14  BY MR. KARP:
15          Q.      I don't want you to guess
16  either, but to pick up on something you
17  just said, you've known about it for at
18  least a year?
19          A.      This school year, yes.
20          Q.      Which would be the 2024-2025
21  school year?
22          A.      Yes.
23          Q.      Were you involved in the
24  decision to file this lawsuit?
25              MR. INNES:  Objection to form.

Page 48

1                    THE WITNESS:  No.
2    BY MR. KARP:
3         Q.    When you first learned of
4    this lawsuit, it had already been filed?
5                    MR. INNES:  Objection to form.
6                    THE WITNESS:  I don't know.  I
7         don't know the timeline.
8    BY MR. KARP:
9         Q.    Do you recall if when you
10   first learned of this lawsuit, the district
11   was still considering whether to file it?
12                   MR. INNES:  Objection to form.
13        Asked and answered.
14                   THE WITNESS:  I don't know the
15        timeline.
16   BY MR. KARP:
17        Q.    Have you reviewed the
18   Complaint in this litigation?
19        A.    Is that the big packet that I
20   had on Tuesday?
21                   MR. INNES:  I can't help you
22        with that.
23                   THE WITNESS:  I'm sorry.
24   BY MR. KARP:
25        Q.    It's okay.  Are you aware

Page 49

```
 1    that in order to file this lawsuit, the
 2    district served or filed what's called a
 3    legal Complaint?  Are you aware of that?
 4          A.    I don't know the particulars
 5    about Complaints.
 6                MR. INNES:  I can represent to
 7          you, and this ties in what we
 8          discussed before the deposition,
 9          that the Complaint was part of the
10          materials that Ms. Pettiford
11          brought to the 30(b)(6) deposition
12          and it was a -- it is a thick
13          document.
14                MR. KARP:  It is.  You had a
15          lot to say.
16                MR. INNES:  We had a lot to
17          say.  We had a lot to do.
18    BY MR. KARP:
19          Q.    Ms. Pettiford, have you
20    assisted in drafting any discovery
21    responses for this case?
22                MR. INNES:  Objection.  You
23          don't have to answer that question.
24                THE WITNESS:  Okay.
25
```

Page 50

1    BY MR. KARP:

2        Q.    Are you following your

3    counsel's instructions?

4        A.    Yes.

5        Q.    Have you provided information

6    or collected documents to be used in

7    putting together written discovery

8    responses that the district served in this

9    lawsuit?

10                MR. INNES:  Don't answer that

11            question.

12                MR. SEXTON:  Sorry, can I just

13            ask for the basis for the

14            privilege instruction?  Is it

15            attorney-client privilege, is that

16            what you're asserting?

17                MR. INNES:  I'm directing her

18            not to answer the question.

19                MR. SEXTON:  Well, I'm just

20            asking the basis for the assertion

21            --

22                MR. INNES:  It's

23            attorney-client privilege.

24                MR. SEXTON:  Thank you.

25                MR. INNES:  But he's the one

CONFIDENTIAL

Page 51

```
1        conducting the deposition today,
2        right?
3             MR. SEXTON:  No, I'm entitled
4        to ask questions.
5             MR. INNES:  You are entitled
6        to ask questions when he's done
7        with his questions.  You did this
8        last time and I let it go.  So when
9        he's done with his questions, you
10       can ask questions.
11            MR. SEXTON:  What precludes me
12       from asking you to state the basis
13       for your objection and instruction
14       not to answer it?
15            MR. INNES:  Because he's
16       asking the questions.  If he wants
17       to ask me that, he can.  When you
18       get a turn and you ask questions
19       and I object to your questions, you
20       can ask me then too.
21            MR. SEXTON:  And the rule was
22       what?  What's the rule that you're
23       citing as the basis for instructing
24       me not to make my objection or
25       request you to clarify your
```

Page 52

```
 1          objection?
 2              MR. INNES:  Because if we had
 3          everyone asking questions at the
 4          same time and an objection for one
 5          is an objection for all in these
 6          questions, right, we would have --
 7          it would be mass chaos.  If you had
 8          all your lawyers here, an army of
 9          lawyers on this side of the table,
10          asking questions and asking me for
11          the basis of my objections
12          throughout the day, we would be
13          here all day and this court
14          reporter would have a very
15          difficult time taking down those
16          responses.
17              MR. SEXTON:  Okay.
18              MR. INNES:  That's why at the
19          end of Mr. Karp's questions like,
20          I'm presuming he will do, like he
21          has done in the other eight or
22          other nine depositions we've done,
23          he'll say does anyone have
24          questions?  And that's your cue to
25          say, I've got questions.  You can
```

CONFIDENTIAL

Page 53

```
 1          ask them, I will object to them, or
 2          I won't and then we can have this
 3          kind of discussion.
 4               MR. SEXTON:  Okay.  If you
 5          want to state the basis for your
 6          instruction at the time you're
 7          making the instruction, that will
 8          eliminate the need for me to ask
 9          you to state it for the record so
10          we have a clear record for the
11          judge to rule on later.
12               MR. INNES:  Mr. Karp can ask
13          me those questions if he'd like.
14               MR. SEXTON:  Okay.
15               MR. KARP:  Mr. Innes, were you
16          instructing your witness not to
17          answer based on the attorney-client
18          privilege?
19               MR. INNES:  I am.
20               MR. KARP:  Okay.
21               MR. INNES:  I think -- Andrew,
22          I think there's ways to ask these
23          questions where they're not
24          objectionable, so if you would like
25          to do that, you may.
```

CONFIDENTIAL

Page 54

1                    MR. KARP:  Thank you.

2     BY MR. KARP:

3          Q.    Ms. Pettiford, do you recall

4     providing information or documents to be

5     used in responding to the Plaintiff Fact

6     Sheet in this case?

7          A.    Yes.

8          Q.    What information or documents

9     did you provide to be used in responding to

10    the Plaintiff Fact Sheet?

11                    MR. INNES:  Objection.  Do not

12              answer that question on the basis

13              of privilege and attorney-client

14              work product.

15                    MR. KARP:  Are you going to

16              follow your counsel's instruction?

17                    THE WITNESS:  Yes.

18    BY MR. KARP:

19          Q.    Have you reviewed the

20    Plaintiff Fact Sheet in this case?

21          A.    What's the fact sheet?  I

22    would need to see it.

23          Q.    This is tab 27.  We'll mark

24    this as Exhibit 5.

25                    -  -  -  -  -

CONFIDENTIAL

```
                                        Page 55

 1              (Third Amended Plaintiff

 2           Fact Sheet - School Districts

 3           marked Pettiford Exhibit 5 for

 4           identification.)

 5                    - - - - -

 6   BY MR. KARP:

 7         Q.     Ms. Pettiford, do you see on

 8   the document this says, "Third Amended

 9   Plaintiff Fact Sheet - School Districts"?

10         A.     Yes.

11         Q.     A little bit to the left, the

12   case caption says, "Irvington Public

13   Schools versus Meta Platforms,

14   Incorporated, et al."

15              Do you see that?

16         A.     Yes.

17         Q.     Okay.  Does this refresh your

18   memory of what a Plaintiff Fact Sheet is?

19         A.     Yes.  What a fact sheet is --

20         Q.     I believe --

21         A.     -- or this fact sheet?

22         Q.     I believe you said you didn't

23   know what a --

24         A.     Yeah, I didn't know --

25         Q.     -- Plaintiff Fact Sheet --
```

CONFIDENTIAL

Page 56

1          A.      -- yes.

2          Q.      -- so I just wanted to know

3    if this --

4          A.      Yes, as you shared this, yes.

5          Q.      Your testimony was that you

6    provided information and documents to

7    assist the district in responding to the

8    questions in this Plaintiff Fact Sheet, do

9    you recall?

10         A.      I do recall, but since you've

11   now provided me with the fact sheet,

12   because that wasn't my understanding of the

13   question, I would have to look at the

14   questions to see if I provided information

15   for each of these questions.

16         Q.      What was your understanding

17   of the question that I asked before?

18         A.      Did I provide any information

19   toward this case, period, but it looks like

20   these are specific questions that you were

21   asking me about, so I would need to review

22   the questions.

23         Q.      So your testimony is you

24   might have -- is that you provided

25   information and documents in connection

CONFIDENTIAL

Page 57

1    with this lawsuit, but you don't know for

2    what purposes that information or those

3    documents were used?

4          A.      What purposes or if they were

5    used for this particular fact sheet, yes.

6          Q.      I understand.

7          A.      Uh-huh.

8          Q.      Let's look at the last page,

9    which is page 40 on the back.

10         A.      Yup.

11         Q.      There's a certification here

12   that was signed by April Vauss.

13                 Do you see that?

14         A.      Yes.

15         Q.      She's the superintendent of

16   Irvington Public Schools?

17         A.      Yes.

18         Q.      She signed this certification

19   on April 28, 2025?

20         A.      Yes.

21         Q.      And as part of the

22   certification, as you can see here, she

23   declared under penalty of perjury that the

24   information provided by -- provided in this

25   Plaintiff Fact Sheet is complete, true, and

CONFIDENTIAL

Page 58

1    correct to the best of her knowledge and
2    information.
3              Do you see that?
4         A.    Yes, yup.
5         Q.    Did you speak with Ms. Vauss
6    in connection with certifying this
7    Plaintiff Fact Sheet?
8         A.    No, I did not.
9         Q.    You can put this to the side.
10             I'm shifting gears a bit, if
11    you want to take a break, it would be a
12    good time to do that or we can keep going,
13    whatever you prefer.
14        A.    We're here.
15        Q.    Let's keep going.  I'm
16    handing you tab five --
17             MR. INNES:  Thank you.
18             MR. KARP:  -- which we'll mark
19         as Exhibit 6.
20             MR. INNES:  Andrew, is this a
21         standalone document?
22             MR. KARP:  I actually don't
23         know the answer to that question
24         offhand.
25             MR. INNES:  So to the extent

Page 59

1          it is a standalone document, great.

2          If it's a child or a parent of a

3          larger family, we would object to

4          the exhibits, the questioning on

5          the exhibit, because it's not the

6          full and complete document.

7              MR. KARP:  I'll represent that

8          this is how the file itself was

9          produced to us in the litigation.

10         It may -- it may or may not have

11         had a family associated with it,

12         but this file has not been combined

13         with other files or, I guess,

14         altered in any way based on how it

15         was provided to us.

16             MR. INNES:  I understand.

17         Just so we're not talking past each

18         other, you haven't altered this

19         document, but our objection is that

20         documents that are family members,

21         the parent and children is the

22         complete document.  And as has been

23         our objections in prior proceedings

24         in the case, to the extent that the

25         witness will be presented with a

CONFIDENTIAL

Page 60

1          document, it should be the full and
2          complete document.
3                  MR. KARP:  Your objection is
4          noted.
5                      - - - - -
6                  (HSSC Monthly Statistics
7          Report Bates
8          BW__Irvington00479393 to 00479396
9          marked Pettiford Exhibit 6 for
10         identification.)
11                     - - - - -
12    BY MR. KARP:
13         Q.    Ms. Pettiford, this
14    document -- we've confirmed there's no
15    family for this document.
16                 MR. INNES:  Thank you.
17    BY MR. KARP:
18         Q.    Ms. Pettiford, the title of
19    this document is, "HSSC Monthly Statistics
20    Report."
21                 Do you see that?
22         A.    Yes.
23         Q.    Have you seen this document
24    before?
25         A.    I have.

CONFIDENTIAL

Page 61

```
 1          Q.      Can you explain what it is?
 2          A.       It is the monthly report for
 3    health and social service coordinators.
 4          Q.      Okay.  And health and social
 5    service coordinator stands -- are sometimes
 6    referred to as HSSCs?
 7          A.      Yup, you've got it.
 8          Q.      When you testified on
 9    Tuesday, we looked at a copy of these HSSCs
10    monthly reports, do you recall?
11          A.      Yes.
12          Q.      This particular one is
13    called, "HSSC Monthly Statistics Report."
14          A.      Uh-huh.
15          Q.      Is this any different from
16    the reports that we looked at on Tuesday
17    that did not use the word "statistics" in
18    the title?
19                  MR. INNES:  Objection, and to
20            be clear, when you say when you
21            looked at it on Tuesday, you're
22            referring to Ms. Pettiford in her
23            role as a designee for the
24            district?
25                  MR. KARP:  That is correct.
```

CONFIDENTIAL

Page 62

1              THE WITNESS:  So I would need

2          to see the other report, but from

3          my recollection, this was the

4          initial report and then I changed

5          it to what we saw on Tuesday.

6  BY MR. KARP:

7          Q.      So your recollection is that

8  at one point in time, the district used

9  HSSC monthly statistics reports and you

10  updated the forms, that's what we looked at

11  when you testified on Tuesday in your role

12  as a corporate representative?

13          A.      Yes.

14          Q.      Why did you change the

15  monthly statistics reports?

16          A.      So if that is the case, if I

17  have the opportunity to compare them, it's

18  because we needed additional information,

19  just more concise information about what

20  they do on a monthly basis.

21          Q.      I'm handing you tab seven --

22          A.      Okay.

23          Q.      -- which we will mark as

24  Exhibit 7.

25              MR. INNES:  Andrew, not to

CONFIDENTIAL

Page 63

 1          jump on your --
 2               MR. KARP:  I do not know if
 3          this is part of a family, if that's
 4          your question.
 5               MR. INNES:  That was my second
 6          question.  My first question --
 7               MR. KARP:  I'll allow you one
 8          question, Michael.
 9               MR. INNES:  It sounds like
10          this document may be -- I think
11          you're going with this was -- is
12          this the exhibit to the 30(b)(6)?
13               MR. KARP:  I believe that this
14          was the exhibit to the 30(b)(6) and
15          I --
16               MR. INNES:  We don't know.
17               MR. KARP:  I understood that
18          Ms. Pettiford was -- maybe wanted
19          to compare --
20               THE WITNESS:  Yes.
21               MR. KARP:  -- the two to the
22          extent I asked about changes.
23               MR. INNES:  Okay.  Because
24          your co-counsel is concerned about
25          having a clear record, I just, it

CONFIDENTIAL

Page 64

```
 1          might be better to actually
 2          introduce the exhibit that was used
 3          at the 30(b)(6) rather than a new
 4          document.
 5              MR. KARP:  I understand.  I'll
 6          ask my questions --
 7              MR. INNES:  Okay.
 8              MR. KARP:  -- and we can go
 9          from there.
10                  - - - - -
11              (HSSC Monthly Report dated
12          February 2023 Bates
13          BW__Irvington00032767 to 00032769
14          marked Pettiford Exhibit 7 for
15          identification.)
16                  - - - - -
17  BY MR. KARP:
18          Q.    Ms. Pettiford, I handed you
19  tab seven, which we have marked as
20  Exhibit 7.  This is an HSSC monthly report
21  from February of 2023.
22              Do you see that?
23          A.    Yes.
24          Q.    And this, the HSSC indicated
25  here is Maria-Elena Vasquez?
```

Page 65

1          A.      Uh-huh.
2          Q.      And this monthly report
3    doesn't include the word "statistics" in
4    the title, which is consistent with what
5    you told me a few minutes ago, correct?
6          A.      Yes.
7          Q.      Okay.  Having these two
8    documents in front of you, Exhibit 6 and
9    Exhibit 7 --
10         A.      Yup.
11         Q.      -- does it refresh your
12   memory of what changes you made to this
13   monthly report that HSSCs completed?
14         A.      They're very -- they're
15   pretty much identical.  There may have been
16   a -- it may have been that I took the word,
17   "statistics," statistics out and I made
18   this document electronic.  It was no longer
19   paper.
20         Q.      So there was a point in time
21   when the HSSC reports were completed in
22   hard copy?
23         A.      Yes.
24         Q.      For purposes of storing and
25   maintaining these reports, were they

CONFIDENTIAL

Page 66

1    scanned to the district network?

2            A.      I'm not --

3                    MR. INNES:  Objection to form.

4                    THE WITNESS:  Today is about

5            Ms. Pettiford, right, not the

6            district?

7                    MR. INNES:  Correct.

8                    THE WITNESS:  Okay.

9                    MR. KARP:  This is what you

10           know.

11                   THE WITNESS:  Right.  To my

12           knowledge -- well, I have limited

13           knowledge of what happened before I

14           got to the district in terms of

15           scanning a report.

16   BY MR. KARP:

17           Q.      When you started at the

18   district in November of 2020, do you recall

19   whether HSSC monthly reports were being

20   completed in hard copy?

21           A.      I don't recall.  We were

22   virtual.

23           Q.      At any point in time, do you

24   recall whether hard copy monthly reports

25   were scanned to create an electronic or

Page 67

1    digitized form of the reports?

2          A.     Yes.

3                 MR. INNES:  Objection to form.

4                 THE WITNESS:  Yes.

5    BY MR. KARP:

6          Q.     When was that?

7          A.     To my knowledge, 2022 to

8    current.

9          Q.     Thank you.  In your role as

10   district supervisor of guidance and health

11   and social service coordinators, did you

12   review HSSC monthly reports?

13         A.     Yes.

14         Q.     Tell me about that process.

15         A.     Each month, all health and

16   social service coordinators would complete

17   a report.  They would send them to my

18   attention and we would talk about them and

19   review them within our team meetings.

20         Q.     And those team meetings

21   occurred on a biweekly basis?

22         A.     For the most part, biweekly.

23   At times, it fluctuated, maybe once a

24   month, but maximum of two times a month.

25         Q.     And would those meetings

Page 68

1  include all HSSCs who had submitted reports

2  or did you meet with HSSCs on an individual

3  basis?

4           MR. INNES:  Objection to form.

5           THE WITNESS:  Both.  So at

6        times, I would meet with the whole

7        team and if I had any specific

8        concerns, then we would meet

9        individual.

10 BY MR. KARP:

11      Q.    Let's take a look at

12 Exhibit 6, which is the statistics form.

13      A.    Yup.

14      Q.    Do you recall approximately

15 when you made changes to the monthly

16 report?

17      A.    I do not.

18      Q.    Do you recall if it was --

19 strike that.

20           You started at IPS during

21 the pandemic, correct?

22      A.    Uh-huh.

23      Q.    So it necessarily would have

24 happened either during or after the

25 pandemic, correct?

CONFIDENTIAL

Page 69

1           A.      Yes.

2           Q.      Do you recall if students

3    were back at school in person at the time

4    that you updated the monthly reports?

5                       MR. INNES:  Objection to form.

6                       THE WITNESS:  I don't recall

7           exactly.

8    BY MR. KARP:

9           Q.      Looking at the second page of

10   Exhibit 6, there is a section of this form

11   relating specifically to homelessness.

12                   Do you see that?

13          A.      Yes.

14          Q.      Under that, there is a

15   section relating to alcohol and drugs?

16          A.      Yes.

17          Q.      Below that, we have suicide

18   and homicide.

19                   Do you see that?

20          A.      Uh-huh.

21          Q.      Under that, professional

22   development?

23          A.      Uh-huh.

24          Q.      Social media is not a

25   category that is listed on this HSSC --

CONFIDENTIAL

Page 70

1    HSSC monthly report, correct?

2         A.      Correct.

3         Q.      Okay.  When you updated the

4    monthly report, did you add social media as

5    a category?

6         A.      I did not.  Because it can

7    fit into other categories.  It's subsets of

8    other categories.

9         Q.      Do you receive HSSC monthly

10   reports today?

11        A.      Yes.

12        Q.      In your role as director?

13        A.      Yes.

14        Q.      Today, does the form include

15   a section on social media?

16                MR. INNES:  Objection to form.

17                THE WITNESS:  No, because it's

18          a subset of other topics in the

19          form.

20   BY MR. KARP:

21        Q.      You specifically track

22   incidents or encounters or sessions

23   relating to homelessness, right?

24        A.      The number of homeless

25   students, yes.

Page 71

1          Q.     The number of homeless

2    students who avail themselves of service

3    and meet with the HSSCs?

4          A.     Yes.

5          Q.     And you track specifically

6    for alcohol and drugs, suicide, homicide,

7    and professional development, correct?

8                    MR. INNES:  Objection to form.

9                    THE WITNESS:  Yes.

10   BY MR. KARP:

11         Q.     If you wanted to know more

12   specifically which of the incidents or

13   sessions or encounters involved social

14   media, this report could have been updated

15   to include that as a category, correct?

16                    MR. INNES:  Objection to form.

17              Calls for speculation.  Asked and

18              answered.

19                    THE WITNESS:  I'm not sure.

20              Repeat your question to me.

21   BY MR. KARP:

22         Q.     Is anything preventing an

23   HSSC from asking a student whether an issue

24   that they are experiencing relates to

25   social media?

CONFIDENTIAL

Page 72

1          A.      No.

2          Q.      It would be possible for an

3   HSSC to ascertain whether an incident or an

4   issue that they are made aware of relates

5   to social media in some way, correct?

6                     MR. INNES:  Objection to form.

7                     THE WITNESS:  Yes.

8   BY MR. KARP:

9          Q.      If HSSCs were asked, they

10  could seek out that information and report

11  it in a monthly report like the one we're

12  looking at, right?

13                    MR. INNES:  Objection to form.

14                    THE WITNESS:  If they were

15           asked.

16  BY MR. KARP:

17         Q.      If as part of the process of

18  meeting with students HSSCs inquired about

19  other social media was somehow involved,

20  that information could be tracked in a

21  monthly report like this, correct?

22         A.      That's a tricky question,

23  because like I said, social media falls

24  under other categories.  So, yes, I could

25  add a category that said social media

CONFIDENTIAL

Page 73

1    involvement, but social media could be a

2    part of suicide ideation, right?  It could

3    be a part of referrals to the Bridge and

4    these are all categories that are on the

5    monthly report.  So that's kind of a tricky

6    question, because it sounds like you're

7    asking me if it should be a separate

8    category that says, social media

9    involvement, right?  That's what it sounds

10   like you're asking me.

11           Q.      That is what I'm asking.

12           A.      Yes, that could be on the

13   form.  But the way we handle instances

14   using social media falls under other

15   categories.

16           Q.      Looking at these forms alone,

17   there's no way to know which of these

18   sessions or incidents or encounters relate

19   to social media?

20                   MR. INNES:  Objection to form.

21                   THE WITNESS:  No, but that's

22              why we just don't rely on the

23              forms.  That's why we have team

24              meetings.  We have conversations

25              with one another so we can have

CONFIDENTIAL

Page 74

1                those discussions.
2    BY MR. KARP:
3         Q.       And you mentioned these
4    periodic meetings, sometimes biweekly,
5    sometimes once a month, right?
6         A.       Yes.
7         Q.       And to the extent -- or
8    strike that.
9                Are the discussions that are
10   had during those meetings written down
11   anywhere?
12                   MR. INNES:   Objection to form.
13                   THE WITNESS:   No, for the most
14          part, no.
15   BY MR. KARP:
16        Q.       No one is taking meeting
17   minutes, for example?
18        A.       I do take minutes.
19        Q.       You have minutes from those
20   meetings?
21        A.       I would have to locate them,
22   but I do take meeting minutes, yes.
23   Specifically the meetings you're talking
24   about, I'm not sure, but I do take meeting
25   notes.

Golkow Technologies,
A Veritext Division

Page 75

1          Q.      I understand.  As a general

2     practice, you take notes during meetings?

3          A.      Yup.

4          Q.      Do you recall whether you

5     take notes or take down the minutes for any

6     of the discussions you have regarding these

7     HSSC reports?

8          A.      I don't recall.

9          Q.      Okay.  If you did, is there a

10    particular location on the network or on

11    your computer where you would save those

12    notes or minutes?

13         A.      No.

14         Q.      Meaning -- when you say,

15    "no," do you mean there's no central

16    location for them?

17         A.      There's no centralized

18    location.  I take down information

19    generally that needs follow-up or a topic

20    that I need to revisit with a particular

21    HSSC, but there's no centralized location.

22         Q.      Are those, the notes that you

23    take, are they taken electronically or by

24    hand in a notebook?

25                 MR. INNES:  Objection to form.

CONFIDENTIAL

1              THE WITNESS:   Typically by

2         hand.

3    BY MR. KARP:

4         Q.     Ms. Pettiford, and this is

5    probably an odd time to ask this question,

6    am I pronouncing your name correctly,

7    Pettiford or Pettiford?

8         A.     No, you're doing perfect.

9         Q.     Okay.  I just want to make

10   sure?

11        A.     I would have corrected you.

12        Q.     Thanks.

13        A.     No, you're fine.

14        Q.     It's like when you know

15   people for several years and --

16        A.     Now you want to ask the

17   question.

18        Q.     Yeah, yeah.

19        A.     No, it's fine.  Thank you for

20   asking.

21        Q.     Of course.  In your

22   experience at IPS, has the district strived

23   to provide IPS students with the mental

24   health services that they need?

25        A.     Yeah, as much as we could --

CONFIDENTIAL

Page 77

1   can, yes.

2          Q.      And since you joined IPS in

3   2020, has IPS added to its mental health

4   programming?

5                  MR. INNES:  Objection to form.

6                  THE WITNESS:  Yes.

7   BY MR. KARP:

8          Q.      Since you joined the district

9   in 2020, has IPS increased its mental

10  health staffing?

11         A.      Yes.

12         Q.      Since you joined the district

13  in 2020, has IPS added to the mental health

14  resources that it offers to students?

15         A.      Yes.

16         Q.      Are you proud of the fact

17  that IPS now offers more resources and

18  programming and staff to support the mental

19  health of IPS students?

20         A.      Proud?

21         Q.      Are you proud of that?

22         A.      Yeah, uh-huh, absolutely.

23         Q.      Sorry, I didn't mean to

24  interrupt you.

25         A.      No, I'm proud.

Page 78

1         Q.    You have been a school
2    counselor since 2004; is that right?
3         A.    Yes.
4         Q.    You started as a school
5    counselor in Newark and joined this
6    district, IPS, in 2020, right?
7         A.    Yes.
8         Q.    Okay.  In your 21 years as a
9    school counselor, have you ever observed a
10   stigma around discussing mental health
11   issues?
12             MR. INNES:  Objection to form.
13             THE WITNESS:  Yes.
14   BY MR. KARP:
15        Q.    And can you tell me about
16   that?
17        A.    Just, generally, in a black
18   and brown community, mental health is
19   looked at as a stigma, right?  Seeking,
20   seeking help for problems is something
21   that, culturally, we just don't do.  So
22   it's important for school districts to put
23   resources in place so that students, the
24   parents, community are more accepting of
25   the help and resources available.

CONFIDENTIAL

Page 79

1          Q.      In your experience as a

2    counselor over the last 20 years or so,

3    have you noticed any trends or changes in

4    the stigma around mental health?

5          A.      People are -- yes, students

6    are more open to seeking help, right?  They

7    are more heavily relied on their

8    relationships that they build with school

9    counselors, particularly, and health and

10   social service coordinators, which make

11   them a more comfortable to come and seek

12   the help they need.  So there's definitely

13   been a positive turnaround.

14         Q.      And you're talking about

15   students today --

16         A.      Yes --

17         Q.      -- are more open and

18   comfortable discussing their mental --

19         A.      For the most part, yeah, yes.

20         Q.      -- health issues?  And

21   seeking help for challenges they may be

22   facing?

23         A.      Uh-huh.

24         Q.      We've spent a lot of time

25   talking about these HSSCs at IPS.  Can you

CONFIDENTIAL

Page 80

1    generally describe for me the job of an

2    HSSC?

3         A.    So, in Irvington, they're

4    termed, "health and social service

5    coordinators," but, typically, these

6    ladies, this is a team of ladies, are

7    certified in school social work.  So in

8    other districts, they may be termed school

9    social workers.  Day to day, they help with

10   classroom lessons.  They offer individual

11   and group counseling.  They support our

12   homeless population.  They support our

13   students who are having crisis.  They

14   support families as well, because, you

15   know, sometimes parents come in and need

16   guidance.  They -- they put together our

17   wellness fair for the district.  So there's

18   an array of things that they can do.  Their

19   official job description may say one thing,

20   but whatever they can do to help the school

21   community and make sure our students are

22   safe and mentally sane, they will do.

23        Q.    And I believe you told me

24   when you testified as a representative of

25   the district that HSSCs are assigned to

CONFIDENTIAL

Page 81

1    specific schools?

2           A.      Yes.

3           Q.      Does each school have its own

4    HSSC -- or strike that.

5                   Does each IPS school have

6    its own HSSC?

7                   MR. INNES:  Objection to form.

8                   THE WITNESS:  No.  Well, they

9              share schools, so I don't know.

10             Each school has an HSSC.  Each

11             school doesn't have a full-time

12             HSSC.

13   BY MR. KARP:

14          Q.      Okay.  Does that vary between

15   elementary schools, middle schools, and the

16   high school?

17                  MR. INNES:  Objection to form.

18                  THE WITNESS:  Yes.  So the

19             elementary schools share.

20   BY MR. KARP:

21          Q.      I see.  How many elementary

22   schools are there within the district?

23          A.      I believe -- do you want me

24   to count?

25          Q.      I do.

Page 82

1          A.      Okay.   You've got to give me
2     these questions ahead of time.
3          Q.      Okay.
4          A.      They involve math.
5               MR. KARP:   I'm sure your
6          counsel would love that.
7               MR. INNES:   I think they have
8          a list of questions ahead of time,
9          but I'll let her answer it.
10              THE WITNESS:   I feel like I'm
11         missing one.   I have eight.   I feel
12         like I'm missing one, but ...
13    BY MR. KARP:
14         Q.      In the Plaintiff Fact Sheet
15    that we looked at a few minutes ago, the
16    number -- the count is nine, eight or nine;
17    is that fair, eight or nine elementary
18    schools?
19         A.      I want to be accurate.   I
20    need to know who I'm missing.   Can I look
21    at my cell phone?   Okay.   Yeah, I don't
22    want to tell you the wrong thing.
23              So you want to know
24    elementary schools, right?
25         Q.      I do.

Page 83

1          A.      There's nine.   I was missing
2    Thurgood.   Uh-huh.
3          Q.      How many HSSCs are assigned
4    to those nine elementary schools?
5          A.      So --
6                  MR. INNES:   Objection to form.
7            And, Andrew, I'll just tell you,
8            the form objection is that the
9            witness has testified that some are
10           split between different schools.
11                 MR. KARP:   I understand.
12           Thank you.
13                  THE WITNESS:   Five and a half.
14   BY MR. KARP:
15         Q.      Does that mean that one of
16   the HSSCs is part-time?
17         A.      No, so three have HSSCs that
18   are only at that school.   And then one,
19   two, three, four, five have -- they share.
20         Q.      That's a total of eight
21   schools, just to be clear?
22         A.      Say that again.
23         Q.      Well --
24         A.      So I didn't count Augusta,
25   because Augusta is a preschool.

CONFIDENTIAL

Page 84

1          Q.     Understood.
2          A.     They have a -- they do have a
3    preschool social worker who reports to me,
4    but her title is not HSSC.
5          Q.     I see.
6          A.     Uh-huh.
7          Q.     And all I'm trying to
8    understand is for the elementary schools,
9    how many HSSCs have responsibility and is
10   the answer five and a half?
11         A.     So one HSSC, which is the
12   half, she shares between elementary and the
13   STEAM Academy, which is one of our -- is
14   our satellite high school, which is why I
15   said five and a half.  So are you -- are
16   you asking me the number of people?
17         Q.     Yes.
18         A.     You want a people number?
19         Q.     The number of people.
20         A.     So that would be one, two,
21   three, four, five, six people.
22         Q.     So there are six HSSCs who
23   serve the elementary schools?
24         A.     In some capacity, yes.
25         Q.     Thank you and apologies if

CONFIDENTIAL

Page 85

```
 1   there was any confusion.
 2          A.     No, that's okay.
 3          Q.     How many HSSCs serve the
 4   middle schools at IPS?
 5          A.     One at each school, so two.
 6          Q.     And how many HSSCs serve the
 7   high schools at IPS, if you include STEAM?
 8          A.     So there's two at the main
 9   campus, two at the high school, and then
10   that one who shares Rosa and Chancellor,
11   uh-huh, that's it.
12          Q.     Are HSSCs paid on a salary?
13          A.     Yes.
14          Q.     Are they paid any more or
15   less depending on how many students they're
16   serving?
17          A.     I'm not HR, but not to my
18   knowledge.
19          Q.     Do you know if HSSCs are paid
20   any more or less based on whether the
21   students they see come to them with certain
22   issues?
23          A.     No.
24                 MR. INNES:  Objection to form.
25                 THE WITNESS:  No, they aren't.
```

Page 86

1          MR. KARP:  We have been going

2       for a little bit, can we take a

3       break?

4          THE WITNESS:  Thank you.

5          THE VIDEOGRAPHER:  The time

6       right now is 11:26 a.m. and we are

7       off the record.

8             - - - - -

9    (A recess was taken at this time.)

10            - - - - -

11          THE VIDEOGRAPHER:  The time

12       right now is 11:46 a.m.  We're back

13       on the record.

14 BY MR. KARP:

15       Q.    Ms. Pettiford, welcome back.

16       A.    Thank you.

17       Q.    Since joining IPS in 2020,

18 have you considered any bid proposals from

19 third parties to provide mental health

20 services to IPS students?

21          MR. INNES:  Objection to form.

22          THE WITNESS:  Yes.

23 BY MR. KARP:

24       Q.    Is that a part of your --

25 part of your role as director or

CONFIDENTIAL

Page 87

1    supervisor?

2         A.     Yes.

3         Q.     I'm handing you tab eight.

4              MR. INNES:  Feel free to read

5          the document.

6    BY MR. KARP:

7         Q.     It's a long document.  Take

8    the time that you need.  I will not be

9    asking about every page of this.

10        A.     Okay.

11               - - - - -

12             (Bid Submission Bates

13          BW__Irvington00034660 to 00034696

14          marked Pettiford Exhibit 8 for

15          identification.)

16               - - - - -

17   BY MR. KARP:

18        Q.     And if I didn't already say

19   so, I apologize, we'll mark this as

20   Exhibit 8.

21             Ms. Pettiford, do you

22   recognize this document?

23        A.     This is the first time I'm

24   seeing this document.  This full document.

25   Okay.

Page 88

1          Q.      I'll represent to you that we
2    received a copy of this document from your
3    files.  Is it possible that it was in your
4    files and that you're just not recalling
5    it?
6          A.      It is possible, yes.
7          Q.      The title of this document is
8    "Bid Submission," consultive services,
9    excuse me -- "Consultative Services -
10   Mental Health Provider."
11                 Do you see that?
12         A.      Yes.
13         Q.      And this was submitted by
14   CarePlus New Jersey, Incorporated?
15         A.      Yes.
16         Q.      On -- and the date on this
17   document is Tuesday, May 25, 2021?
18         A.      Yes.
19         Q.      At this point in time, you
20   would have been supervisor, correct?
21         A.      Yes.
22         Q.      What is CarePlus New Jersey?
23         A.      Just what it says.  It's a
24   mental health provider who come into
25   various schools to assist with the mental

CONFIDENTIAL

Page 89

1   health needs of students, special education
2   students.
3           Q.      And CarePlus New Jersey
4   provides mental health services to IPS
5   students?
6           A.      IPS special education
7   students, yes.
8           Q.      Okay.  So special education
9   students in the IPS district?
10          A.      Yes.
11          Q.      Let's take a look at page 7.
12          A.      Okay.  I think the pages stop
13  at page --
14                  MR. INNES:  My pages stop at
15          five.
16                  THE WITNESS:  I'm sorry, five,
17          six, seven.
18  BY MR. KARP:
19          Q.      Let's look at the page ending
20  in Bates 4666.  It says, "General
21  Specifications" at the top.
22          A.      Oh, 4666, okay.  Yup.
23          Q.      Do you see at the top there's
24  a section called, "Scope of Services"?
25          A.      Yes.

CONFIDENTIAL

Page 90

1          Q.      Okay.  And the bid proposal

2    reads, "The goal of this proposal is to

3    provide full-time services to Irvington

4    students that will empower them for

5    academic success.  Students who receive

6    support from school-based mental health

7    clinicians learn positive coping skills and

8    exhibit fewer disruptive behaviors.

9    Expanded student mental health programs

10   have produced positive outcomes on

11   attendance, truancy, and discipline

12   referrals."

13                Do you see that?

14        A.      Yes.

15        Q.      Did I read that correctly?

16        A.      Yes.

17        Q.      Do you agree with what's

18   written in this bid proposal?

19        A.      Uh-huh.

20        Q.      You mentioned earlier that

21   CarePlus supported the special education

22   students of Irvington Public Schools

23   specifically, correct?

24        A.      Uh-huh, yes.

25        Q.      And are you aware of whether

Page 91

1  they provided services to students at
2  Irvington Public Schools who are not
3  special education?
4          A.      I am not aware.
5          Q.      To your knowledge, does
6  CarePlus provide mental health services
7  that relate to a particular issue or could
8  a student with any mental health need seek
9  support from CarePlus?
10                  MR. INNES:  Objection to form.
11                  THE WITNESS:  I have limited
12            knowledge, because I don't work
13            directly with CarePlus, but from
14            what I understand, it's any issue.
15  BY MR. KARP:
16          Q.      Let's turn to page 3 of this
17  document, which is the Bates ending in
18  4663.  But this page actually does say
19  page 3 on it.
20          A.      Okay.
21          Q.      Page 3 indicates how much
22  CarePlus New Jersey would charge for the
23  services that it's proposing to provide in
24  this bid?
25          A.      Yup.

CONFIDENTIAL

Page 92

1          Q.     Do you agree with that?

2          A.       That that's what they show,

3    up.

4          Q.      And for the first section

5    here, which is titled, "Counseling Support

6    and Intervention Services - K through 5

7    program Tier 3 Students," they've indicated

8    that those services would cost $93,000.

9               Do you see that?

10         A.     Yes.

11         Q.     Okay.  Do you have any

12   understanding of what is meant by Tier 3

13   students?

14         A.     I do not.

15         Q.     In the next section, "High

16   School Mental Health Support Services

17   Program for Special Education Students," do

18   you see that?

19         A.     Yes.

20         Q.     CarePlus indicates that those

21   services would cost $200,000?

22         A.     Yes.

23               MR. INNES:  Objection.

24   BY MR. KARP:

25         Q.     And under the 200,000, they

Page 93

```
 1   include or state plus $4,000 for school --
 2          A.      Wide.
 3          Q.      -- wide events, parentheses,
 4   optional.
 5                  MR. INNES:  Objection to form.
 6          Lack of foundation.  I don't think
 7          you've established whose
 8          handwriting this is.
 9   BY MR. KARP:
10          Q.      I understand.  Ms. Pettiford,
11   do you see on the page that under the
12   $200,000, there is a statement, "Plus
13   $4,000 for school-wide events (optional)?"
14                  THE WITNESS:  Yes, I see the
15          statement.
16   BY MR. KARP:
17          Q.      Okay.  Does the proposal from
18   CarePlus indicate in any way that the
19   services they are providing cost more or
20   less based on how many hours they spend
21   serving IPS students?
22                  MR. INNES:  Objection.  Lack
23          of foundation.
24                  THE WITNESS:  I have -- I
25          would have to read the whole
```

CONFIDENTIAL

Page 94

1              document really in its entirety to
2              answer that question.
3     BY MR. KARP:
4         Q.     On the pages that we're
5     looking at --
6         A.     Uh-huh.
7         Q.     -- the bid proposal indicates
8     that these services cost 93,000 plus
9     $200,000 and an optional 4,000.
10                 Do you see that?
11        A.     Yes.
12        Q.     Do these pages indicate --
13    does this page indicate anywhere that the
14    cost to IPS for these services would vary
15    based on how many hours a CarePlus provider
16    was spending or how many students they were
17    serving?
18                 MR. INNES:  Objection to form.
19              You're asking about this page and
20              not the entire document?
21                 MR. KARP:  I'm asking about
22              this page.
23                 THE WITNESS:  No.
24    BY MR. KARP:
25        Q.     If we look at the next page

Page 95

1    and the page after, so these would be

2    pages 4 and 5, there are additional

3    services listed at a cost of zero dollars

4    and there are notes including that the

5    services would be included.

6                    Do you see that?

7         A.    I do.

8         Q.    On page 5, toward the bottom

9    of the page, there's a section called,

10   "Contract Duration."

11                    Do you see that?

12        A.    Yes.

13        Q.    It reads, "This contract

14   shall be effective July 2021 through

15   June 2022, with option to renew for an

16   additional year."

17                    Do you see that?

18        A.    Yes.

19        Q.    And the contract is signed.

20                    Do you see that?

21                    MR. INNES:  Objection to form.

22                    THE WITNESS:  Yes.

23   BY MR. KARP:

24        Q.    Do you have any reason or any

25   basis to dispute that this contract

Page 96

1   represents the services that CarePlus

2   agreed to provide to IPS from July 2021

3   through June 2022?

4           MR. INNES:  Objection to form.

5       Misstates the document.  It clearly

6       is a bid submission.  You haven't

7       established any foundation that

8       this is the actual contract.

9           MR. KARP:  Please limit it to

10      a form objection.

11          MR. INNES:  You want the

12      record to be clear.

13          MR. KARP:  You're entitled to

14      a form objection.  You may answer.

15          THE WITNESS:  Can you repeat

16      your question?

17  BY MR. KARP:

18      Q.    Sure.  Do you have any basis

19  or any reason to dispute that this bid

20  proposal reflects the services that

21  CarePlus New Jersey agreed to provide to

22  IPS for July 2021 through June 2022?

23          MR. INNES:  Objection to form.

24      Misstates the document.

25          THE WITNESS:  I don't -- I

Page 97

1           don't know if the services were
2           provided.
3    BY MR. KARP:
4         Q.    Does IPS continue -- excuse
5    me, strike that.
6              Does IPS receive services
7    from CarePlus today?
8         A.    I believe so, I would be
9    guessing and I don't want to guess.
10        Q.    Let's take a look at pages 12
11   and 13.
12        A.    What's the number at the
13   bottom?
14        Q.    These are Bates ending in 671
15   and 672.  If I could direct your attention
16   to the bottom of this page ending in 671,
17   there's a section called, "Data to Support
18   Success and Intervention to Support
19   Services."
20              Do you see that?
21        A.    Yes.
22        Q.    The bid states, "CarePlus New
23   Jersey has been providing school-based
24   services in a wide range of school
25   districts throughout Northern New Jersey

Page 98

1   since 2005.  Our success included -- excuse
2   me -- our successes include improved
3   emotional and academic functioning for K
4   through 12th grade students through
5   programming at Irvington High School, (2013
6   through 2021).  Blue Knights Academy, 2019
7   through 2020, and Irvington elementary and
8   middle schools 2015 through 2021."
9              Do you see that?
10       A.    Yes.
11       Q.    And I read that correctly?
12       A.    Yup.
13       Q.    Do you have any -- is it your
14  understanding that CarePlus has been
15  providing services to IPS students for the
16  years that are indicated in this document?
17             MR. INNES:  Objection to form.
18             THE WITNESS:  Yes.
19  BY MR. KARP:
20       Q.    At the very least, that means
21  that CarePlus was providing services to
22  Irvington High School as far back as 2013?
23             MR. INNES:  Objection to form.
24             THE WITNESS:  According to
25         this document, yes.

CONFIDENTIAL

Page 99

1   BY MR. KARP:
2           Q.      And do you have any reason or
3   basis to think that that's not the case?
4           A.      No.
5           Q.      At the time of this proposal,
6   in May of 2021, CarePlus had already been
7   providing services to IPS students,
8   correct?
9                   MR. INNES:  Objection to form.
10                  THE WITNESS:  According to the
11          document, yes.
12  BY MR. KARP:
13          Q.      We can put this to the side.
14          A.      Okay.
15          Q.      I'm handing you tab nine
16  which we will mark as Exhibit 9.
17                          - - - - -
18                  (Email Chain Bates
19          BW__Irvington 00033434 to
20          00033435 marked Pettiford Exhibit
21          9 for identification.)
22                          - - - - -
23  BY MR. KARP:
24          Q.      The top email in this chain
25  is dated June 22 of 2022.

CONFIDENTIAL

Page 100

```
 1                     Do you see that?
 2          A.      Yes.
 3          Q.      The subject line is,
 4   "Forward:  Irvington Public Schools Plus
 5   Smarter Self."
 6                     Do you see that?
 7          A.      Yes.
 8          Q.      You were listed as a
 9   recipient of this email, correct?
10          A.      Yes.
11          Q.      Do you recall this email?
12          A.      Yes, now that you've given me
13   the document.
14          Q.      Okay.  Who is Joe DiVincenzo?
15          A.      Besides the county executive,
16   he's the chief executive officer of d/b/a
17   Eagle Rock Management Group.  I just read
18   it off the form.
19          Q.      Mr. DiVincenzo is the county
20   executive?
21          A.      Yes, I believe so, yup.
22          Q.      Do you know if he held that
23   role in June of 2022 when he sent this
24   email?
25          A.      I have no idea.
```

CONFIDENTIAL

Page 101

1          Q.      Do you recall receiving this
2    email from Mr. DiVincenzo?
3          A.      Now that you've given it to
4    me, yes, uh-huh.
5          Q.      The subject line of this
6    email includes the words, "Smarter Self"?
7          A.      Uh-huh.
8          Q.      Do you know what that refers
9    to?
10         A.      Yes.
11         Q.      What does that refer to?
12         A.      It is the app that Mr.
13   DiVincenzo was asking us to take a look at.
14         Q.      Okay.  The third paragraph of
15   Mr. DiVincenzo's email states, "Data
16   analytics have shown mental health claims
17   have significantly increased due to the
18   pandemic, global instability, and increase
19   in domestic terrorism."
20                  Do you see that?
21         A.      Yes.
22         Q.      Do you agree with that?
23         A.      I haven't studied data
24   analytics, so I don't know.
25         Q.      Do you agree that mental

Page 102

1    health claims have significantly increased
2    due to the pandemic, global instability,
3    and an increase in domestic terrorism?
4                    MR. INNES:  Objection to form.
5                    THE WITNESS:  I'm not sure.  I
6            don't have any basis to agree with
7            that statement.
8    BY MR. KARP:
9        Q.    Okay.  Do you have any basis
10   to disagree with that statement?
11       A.    Only because I haven't
12   studied mental health claims, so that would
13   be my basis to disagree.
14       Q.    You said you don't -- you
15   said earlier that you hadn't seen the data
16   analytics; is that right?
17       A.    Right.
18       Q.    Is that something you would
19   need to see in order to know whether this
20   was true?
21       A.    Right, because his statement
22   was based on the data analytics that he
23   must have seen concerning mental health
24   claims.
25       Q.    Can you tell me more about

Page 103

1    the application that is referenced in this
2    email?
3             A.     From what I remember, Smarter
4    Self was an app where students, it was
5    available to students and families 24 hours
6    a day, and if there was an issue that came
7    up before, during -- well, after school
8    hours, you could text the app and you would
9    be connected with the mental health service
10   provider.
11            Q.     So it was a way for -- a way
12   that students could access mental health at
13   any time of day or night, correct?
14            A.     Yes.
15            Q.     I'm handing you tab 11.
16               THE STENOGRAPHER:  I have to
17            go.  My machine just -- I don't
18            know what it did.
19               MR. KARP:  Okay.  We can go
20            off the record.
21               THE VIDEOGRAPHER:  The time
22            right now is 12:07 p.m.  We are off
23            the record.
24                  - - - - -
25        (A recess was taken at this time.)

CONFIDENTIAL

Page 104

```
 1                    - - - - -
 2              THE  VIDEOGRAPHER:   The  time
 3         right  now  is  12:20  p.m.   We're  back
 4         on  the  record.
 5   BY  MR.  KARP:
 6         Q.    Welcome  back,  Ms.  Pettiford.
 7         A.    Thank  you.
 8         Q.    We  just  took  a  brief  break.
 9   Mr.  Innes  was  looking  into  a  potential
10   privilege  issue.   Counsel,  may  I  ask  what
11   you  determined  on  the  break?
12              MR.  INNES:   You  can  ask  your
13         questions.
14              MR.  KARP:   Okay.   Thank  you.
15   BY  MR.  KARP:
16         Q.    I  handed  you  tab  ten  and  we
17   will  mark  that  as  Exhibit  10.   You'll  see
18   on  the  cover  sheet  of  this  document  that
19   the  file  was  produced  in  native  format.   Do
20   you  see  that?
21         A.    Yes.
22                    - - - - -
23              (2021-2022  Budget  PDF  Format
24         Bates  BW__Irvington00479746
25         marked  Pettiford  Exhibit  10  for
```

CONFIDENTIAL

Page 105

```
 1              identification.)
 2                    - - - - -
 3      BY MR. KARP:
 4          Q.     That's -- I'll represent to
 5      you that simply means this was an Excel
 6      spreadsheet and it was produced in the
 7      lawsuit as an Excel spreadsheet in that
 8      format.
 9          A.     Okay.
10          Q.     What I provided you with and
11      marked as Exhibit 10 is a printout of that
12      spreadsheet in PDF form --
13          A.     Okay.
14          Q.     -- for completeness, and to
15      the extent that you may want to look at the
16      native file, we have that available, we can
17      display that on the screen.
18          A.     Uh-huh.
19          Q.     We can mark that as
20      Exhibit 11, the native file.
21                  THE EXHIBIT TECH:  Eleven is
22              right here.
23                  MR. KARP:  It is Exhibit 11
24              will be the --
25                  THE EXHIBIT TECH:  Sorry, tab
```

CONFIDENTIAL

Page 106

1          11.  Gotcha.
2              MR. INNES:  Now I'm confused
3          so Exhibit 10 is the PDF.  Exhibit
4          11 --
5              MR. KARP:  Is the printout
6          that we're looking at here in hard
7          copy.
8              MR. INNES:  Yeah.
9              MR. KARP:  And to the extent
10         that the witness is viewing the
11         native file on the screen, I want
12         to make sure that that's
13         represented in the record.
14             MR. INNES:  Okay.
15             MR. KARP:  And we'll mark that
16         file as Exhibit 11.
17             MR. INNES:  Okay.
18             MR. KARP:  Sorry, it's a
19         little complicated with these
20         native files.
21                 - - - - -
22             (2021-2022 Budget Excel
23         Native Format Bates
24         BW__Irvington00479746 marked
25         Pettiford Exhibit 11 for

CONFIDENTIAL

Page 107

1                identification.)

2                          - - - - -

3    BY MR. KARP:

4          Q.      Ms. Pettiford, do you

5    recognize this document?

6          A.      Yes.

7          Q.      Can you tell me what it is?

8          A.      It was my budget back in

9    2021-2022.

10         Q.      Okay.  So budget for the

11   2021-2022?

12         A.      School year, yes.

13         Q.      And when you say, "your

14   budget," do you mean for a particular

15   department?

16         A.      I'm sorry, I was answering as

17   Ms. Pettiford.  It was for the department

18   of guidance, health and social service.

19         Q.      Did you create this budget?

20         A.      No.

21         Q.      Do you know who did?

22         A.      Yes, Celeste Banks, she is

23   the director of, I don't know her whole

24   title, but grants.

25         Q.      Did you -- did you -- strike

Page 108

1    that.

2                    Ms. Banks put this together;

3    is that right?

4         A.    Yes.

5         Q.    Did you assist her in putting

6    it together?

7         A.    We had conversations about

8    what the needs of the department were, yes.

9         Q.    Did you provide Ms. Banks

10   with information so she could create this

11   budget?

12        A.    About the needs of the

13   department, yes.

14        Q.    Let's look at the first page

15   of this budget.  There's some blue

16   highlighting and a little bit of yellow at

17   the top.

18                    Do you see that?

19        A.    Yes.

20                    MR. INNES:  Andrew, before you

21             -- is that represented -- have you

22             added that or is it in the native

23             as well?

24                    MR. KARP:  My understanding is

25             it's also in the native.  Do you

CONFIDENTIAL

Page 109

```
 1              also see that on the screen which
 2              is showing --
 3                    THE WITNESS:  Yup.
 4    BY MR. KARP:
 5         Q.      -- Exhibit 11?
 6         A.      Yup.
 7         Q.      The second line from the
 8    bottom is 360 Smarter Self.
 9                   Do you see that?
10         A.      Yes.
11         Q.      Is that the app we were just
12    discussing?
13         A.      Yes.
14         Q.      And the budget for 360
15    Smarter Self was $114,885?
16         A.      That sounds right, yup.
17         Q.      Do you know if that is money
18    that your department actually spent on the
19    app?
20         A.      I believe so, yes.
21         Q.      So this is in addition to
22    being what was budgeted, it is the actual
23    spend on the -- on the 360 Smarter Self
24    app --
25                    MR. INNES:  Objection to form.
```

CONFIDENTIAL

Page 110

1                    MR. KARP:  -- for this school
2          year?
3                    THE WITNESS:  Yes.
4    BY MR. KARP:
5          Q.    Does Irvington Public Schools
6    use 360 Smarter Self today?
7          A.    No.
8          Q.    Irvington Public Schools used
9    360 Smarter Self during the 2021-2022
10   school year?
11         A.    Yes.
12         Q.    Any other years after?
13         A.    No.
14         Q.    Was the program or the
15   application a success?
16                   MR. INNES:  Objection to form.
17                   THE WITNESS:  That's kind
18         of -- that's hard to say.  The use
19         of the program was very limited.
20   BY MR. KARP:
21         Q.    Did you have any personal
22   involvement with the app?
23         A.    Not after the initial
24   conversations from the email that you sent
25   me.  The conversation then went to the

CONFIDENTIAL

Page 111

1    principal of the high school.

2            Q.      Okay.  Was this -- was 360

3    Smarter Self an application available to

4    Irvington High School students

5    specifically?

6            A.      Yes.

7            Q.      Was the application available

8    to any other IPS students at other schools

9    in the district during the 2021-2022 school

10   year?

11           A.      Not to my knowledge.

12           Q.      I'm handing you tab 12 which

13   we will mark as Exhibit 12.

14                      - - - - -

15                   (Email String Bates

16                BW__Irvington00064729 to 00064737

17                marked Pettiford Exhibit 12 for

18                identification.)

19                      - - - - -

20   BY MR. KARP:

21           Q.      Let me know once you've had a

22   chance to take a look.

23           A.      Okay.

24           Q.      Let's turn to the third page

25   in this email chain, which is Bates ending

CONFIDENTIAL

Page 112

1   in 4731.

2          A.      Uh-huh.

3          Q.      This is an email from Deborah

4   Basica to Celeste Banks on December 2,

5   2022.

6                  Do you see that?

7          A.      Yes.

8          Q.      You are listed as -- as a CC

9   on this email?

10         A.      Email.

11         Q.      Do you recall receiving this

12  email?

13         A.      Now that you've given it to

14  me, yes.

15         Q.      Who is Deborah Basica?

16         A.      According to the email, she's

17  their HR manager.

18         Q.      Deborah wrote, "Celeste,

19  There are 28 students who have filled out

20  the student request form as I type this

21  email, the balance due is not dependent on

22  the number of students enrolled.  The

23  contingency Irvington requested and 360

24  extended the courtesy of accepting, was for

25  full payment when Smarter Self program went

Page 113

1    live.  Irvington's Smarter Self program was

2    live on the 16th."

3                    Do you see that?

4         A.    Yes.

5         Q.    So consistent with what you

6    told me, 360 Smarter Self was available to

7    some students in Irvington Public Schools

8    during the 2022 school year, correct?

9         A.    Yes.

10        Q.    Let's look at the first page

11   of this exhibit.  This is Bates ending in

12   4729.  There's an email that's dated

13   December 9, 2022, and it's from Peter

14   Basica to Dr. April Vauss.

15                   Do you see that?

16        A.    Yes.

17        Q.    This is roughly a week after

18   the email that Mrs., that Deborah Basica

19   sent to Celeste Banks, right?

20        A.    Yes.

21        Q.    And Peter Basica wrote, "Joel

22   has three children.  I have three college

23   age daughters.  The shocking numbers above

24   are why 360 exists.  Unfortunately, there

25   is a disconnect between our organization

CONFIDENTIAL

Page 114

1  and it is hurting students."
2              Do you see that?
3      A.    Yes.
4      Q.    Were you aware that Mr.
5  Basica had reached out to Dr. Vauss to tell
6  her that?
7      A.    No, I was not aware.
8      Q.    Do you believe there was a
9  disconnect between IPS and the 360 Smarter
10 Care organization that was hurting
11 students?
12             MR. INNES:  Objection to form.
13             THE WITNESS:  I can't answer
14         that, because I wasn't involved in
15         the discussion.  I don't know what
16         the basis of that statement is for
17         him.
18 BY MR. KARP:
19     Q.    If you look down a little bit
20 lower on this page, there's an email from
21 Mr. Lamptey to Deborah Basica on the same
22 day, December 9.
23     A.    Okay.
24     Q.    Mr. Lamptey wrote, "There
25 appears to be some questions about the

Page 115

1   adequacy of the implementation and what you

2   can do to help us increase participation.

3   28 out of a possible 1,750 is a far cry

4   from implemented.  The partnership only

5   works if we get students enrolled."

6                   Do you see that?

7           A.     Yes.

8           Q.     Were you aware of any

9   enrollment issues of Irvington Public

10  School students with 360 Smarter Self?

11                  MR. INNES:  Objection to form.

12                  THE WITNESS:  I was, yes, yes.

13  BY MR. KARP:

14          Q.     You were aware.  And what did

15  you know at that time?

16          A.     Pretty much what the email is

17  saying that there was a small amount of

18  students that participated with Smarter

19  Self.

20          Q.     And as a result of the low

21  participation, the district discontinued

22  the program?

23          A.     That, I don't know.

24          Q.     Okay.  Do you know why the

25  district did not continue using 360 Smarter

Page 116

1    Self?

2         A.    I do not.

3         Q.    Let's turn back to the

4    guidance budget that we were just looking

5    at.

6         A.    Okay.

7         Q.    Which is Exhibit 10.

8         A.    Uh-huh.

9         Q.    In hard copy and Exhibit 11

10   on your screen?

11        A.    Uh-huh.

12        Q.    If we go back to the first

13   page, there is a line in this budget for

14   wellness room.

15             Do you see that?

16        A.    Yes.

17        Q.    What does that refer to?

18        A.    From what I remember, this is

19   2021, we were discussing having

20   wellness/meditation spaces at each school

21   and that would have been the money allotted

22   to do that.

23        Q.    Did IPS follow up on that and

24   create wellness rooms?

25        A.    Not through my department,

CONFIDENTIAL

Page 117

```
 1    but there are some rooms that were created
 2    in individual schools.
 3             Q.    Do you recall which schools?
 4             A.    Not offhand, no.
 5             Q.    Do you know if they were
 6    elementary schools, middle schools, or high
 7    schools?
 8                      MR. INNES:  Objection to form.
 9                      THE WITNESS:  Primarily, I
10             think, elementary.  Madison has
11             one, for sure, but I'm not sure
12             where the other schools are.
13    BY MR. KARP:
14             Q.    Can you approximate the
15    number of wellness rooms that were created
16    at IPS?
17                      MR. INNES:  Objection to form.
18                      THE WITNESS:  No.
19    BY MR. KARP:
20             Q.    Can you tell me if it's less
21    than ten?
22                      MR. INNES:  Objection to form.
23             Asked and answered.
24                      THE WITNESS:  I don't want
25             to -- I don't want to guess.
```

CONFIDENTIAL

Page 118

1    BY MR. KARP:
2          Q.      And I don't want you to guess
3    either.  I'm just trying to understand an
4    order of magnitude, if it's 50 or if it's
5    five, if you know.
6          A.      I would say it's 13 -- I
7    would say no more than 13, because that's
8    the number of schools we have.  No less
9    than one, no more than 13.
10         Q.      What is the purpose of a
11   wellness room?
12         A.      Spaces for students who may
13   be in crisis to kind of just calm down.
14   Spaces for students who just need a minute
15   to regroup.  So it's like a meditation
16   room, sensory space, and it may have
17   different objects in there for sensory
18   purposes for different type of learners, so
19   that's primarily what it is.
20         Q.      Excuse me.  At the time that
21   you -- at the time that Ms. Banks put
22   together the budget for the 2021-2022
23   school year for the guidance department,
24   did IPS already have wellness rooms?
25         A.      I'm not aware.  I can't

CONFIDENTIAL

Page 119

1    answer that question.  I don't know.

2          Q.     Do you know if IPS needed to

3    build new space for these wellness rooms or

4    if they converted an existing space for the

5    wellness rooms?

6                    MR. INNES:  Objection to form.

7                    THE WITNESS:  I'm not sure.

8    BY MR. KARP:

9          Q.     Do you know whether students

10   had -- strike that.

11                   Do you know if students

12   needed to make an appointment or

13   reservation in order to access any of the

14   wellness rooms at IMS?

15                   MR. INNES:  Objection to form.

16                   THE WITNESS:  I doubt it.

17   BY MR. KARP:

18         Q.     It would have been a space

19   that students could go to freely if they --

20   if they needed to meditate or if they were

21   in crisis?

22                   MR. INNES:  Objection to form.

23                   THE WITNESS:  With adult

24           supervision, yes.

25

CONFIDENTIAL

Page 120

1    BY MR. KARP:

2        Q.    Were IPS staff in the

3    wellness rooms to supervise any students

4    who were spending time there?

5                MR. INNES:  Objection to form.

6                THE WITNESS:  I would think

7            they were for safety purposes, but

8            I'm not in individual schools.

9    BY MR. KARP:

10        Q.    I believe you said that the

11    guidance department was not the department

12    to fund the creation of wellness rooms at

13    IPS.  Did I hear you correctly?

14        A.    Not the department to fund

15    any previous wellness rooms and then -- so,

16    yes, that's correct.

17        Q.    Which department oversees the

18    wellness rooms at IPS?

19        A.    I don't know if it's a

20    department or individual schools.  The

21    budget of individual schools.

22        Q.    You mentioned that Madison

23    has a wellness room, correct?

24        A.    I don't know if they still

25    have it, but they have had one in the past.

CONFIDENTIAL

Page 121

1          Q.     And your understanding is

2     that Madison as a school would have

3     operated its own wellness room as opposed

4     to having a person with district-wide

5     responsibility managing or operating the

6     wellness room?

7                    MR. INNES:  Objection to form.

8                    THE WITNESS:  Operating it on

9               a day-to-day basis meaning knowing

10              who is coming in and out?

11    BY MR. KARP:

12         Q.     Correct.

13         A.     That would be a school

14    responsibility.

15         Q.     Do you know, and I'm not

16    necessarily asking for a name here, but do

17    you know what role would have had

18    responsibility for oversight of wellness

19    rooms?

20                    MR. INNES:  Objection to form.

21                    THE WITNESS:  What role

22              meaning the title of the person?

23    BY MR. KARP:

24         Q.     Correct.

25         A.     Principal.  Possibly the --

Page 122

1    possibly the nurse.

2         Q.    Do you know if students who
3    were accessing wellness rooms at IPS were
4    permitted to use their cell phones in the
5    space?

6         A.    I don't know.

7         Q.    Do you know if they were
8    permitted to use any personal electronic
9    device in the space?

10        A.    I don't know.

11        Q.    Do you know if the wellness
12   rooms have Wi-Fi access?

13        A.    I don't know.

14        Q.    Can we pull up Exhibit 11 on
15   the screen, which is the native version of
16   this budget?  Thank you.

17                MR. INNES:  Is that big enough
18           for you?

19                THE WITNESS:  Yup.

20   BY MR. KARP:

21        Q.    And I'm going to make you
22   squint a little bit toward the bottom of
23   the screen, there are a few tabs.

24                Do you see them listed?

25        A.    Yes.

CONFIDENTIAL

Page 123

1          Q.      The first is ARP ESSER?

2          A.      Yes.

3          Q.      The second is amended ARP

4    ESSER, the third is mental health, and the

5    fourth is amendment one, mental health?

6          A.      Yup.

7          Q.      Does this budget relate

8    specifically to COVID-19 funding.

9                  MR. INNES:  Objection to form.

10                  THE WITNESS:  ESSER funds are

11          as a result of COVID funding, yes.

12   BY MR. KARP:

13          Q.      And ARP is the American

14   Rescue Plan, correct?

15                  MR. INNES:  Objection to form.

16                  THE WITNESS:  I believe so.

17   BY MR. KARP:

18          Q.      A lot of acronyms.

19          A.      Uh-huh.

20          Q.      Let's look at the third tab,

21   which is mental health.

22          A.      Uh-huh.

23          Q.      And if you want to look at

24   your hard copy on page, for Exhibit 10,

25   this is the third page.

Page 124

1          A.      Uh-huh.

2          Q.      The second line -- strike

3    that.  The first line in this budget is PD.

4                  Do you see that?

5          A.      Yes.

6          Q.      Do you know what that stands

7    for?

8          A.      Professional development.

9          Q.      Just below that is substance

10   abuse coordinator?

11         A.      Yes.

12         Q.      And can we expand the column?

13   Thank you.  Below that is a line for

14   benefits TPAF.

15                 Do you see that?

16         A.      Yes.

17         Q.      Do you know what TPAF stands

18   for?

19         A.      No.

20         Q.      Under that is supplies?

21         A.      Uh-huh.

22         Q.      And under that is Rethink Ed.

23                 Do you see that?

24         A.      Yes, uh-huh.

25         Q.      Focusing on the second line,

Page 125

1   substance abuse coordinator?

2          A.     Yes.

3          Q.     Did IPS hire a substance

4   abuse coordinator for the 2021-2022 school

5   year?

6          A.     We did not.  We instead hired

7   a climate and culture specialist.

8          Q.     Okay.  So the culture and

9   climate specialist listed to the right of

10  substance abuse coordinator is the

11  individual who actually was hired?

12         A.     Yes.

13         Q.     And the budget for that was

14  $102,000?

15         A.     Yes.

16         Q.     Do you have an understanding

17  of why the district hired a culture and

18  climate specialist as opposed to a

19  substance abuse coordinator?

20         A.     I do not.

21         Q.     The amount at the top of this

22  spreadsheet is $445,613.

23                Do you see that?

24         A.     Yes, yup.

25         Q.     Do you have an understanding

                                          Page 126

1    of what that number is?
2                    MR. INNES:  Objection to form.
3                    THE WITNESS:  It looks like
4            it's a total of the amounts that
5            are on the spreadsheet.
6    BY MR. KARP:
7         Q.    That was the total budget for
8    the items listed on this page?
9         A.    Yup.
10        Q.    Do you know where that money
11   came from?
12        A.    I do not.
13        Q.    Let's look at the next
14   page -- or the next tab, excuse me,
15   amendment one, mental health.  The first
16   line of this budget refers to a wellness
17   coordinator.
18                Do you see that?
19        A.    Yes.
20        Q.    Did IPS hire a wellness
21   coordinator?
22        A.    They did.
23        Q.    You said they did?
24        A.    Yes, I'm sorry.
25        Q.    And who was that individual?

CONFIDENTIAL

Page 127

1           A.      I don't remember her name.

2           Q.      Is she still employed at IPS?

3           A.      I'm not sure.  That's a HR

4    question.

5           Q.      Does IPS still have a

6    wellness coordinator today?

7           A.      I believe so.

8           Q.      Can you explain to me what

9    a -- or strike that.

10                  Can you describe the role of

11   a wellness coordinator at IPS?

12          A.      I cannot.  That's a HR

13   question.

14          Q.      Was the wellness coordinator

15   part of the guidance department?

16          A.      No.  It was a district

17   person.

18          Q.      This individual had -- had or

19   has district-wide responsibility?

20          A.      I believe so.

21          Q.      Do you have an understanding

22   of why this individual would be listed in

23   the guidance department budget if he or she

24   was not part of the guidance department?

25          A.      No, that's just -- that's

CONFIDENTIAL

Page 128

1    another -- that's not my -- that's not my

2    area.

3         Q.    Also for clarity of the

4    record and to make sure we don't have any

5    misunderstandings, the file name that

6    appears at the top of the screen is not the

7    file name that was -- that's associated

8    with the file as it was produced by the

9    district.  That is a title that we assigned

10   it.

11              If we can turn back to the

12   mental health tab, which is tab three -- or

13   excuse me, the third tab on the screen.

14              Ms. Pettiford, we were just

15   talking about culture and climate

16   specialists.

17        A.    Yes.

18        Q.    Can you tell me what that

19   role entails?

20        A.    I can't tell you what that

21   role entails, that's an HR question.

22        Q.    Is the culture and climate

23   specialist at IPS a part of the guidance

24   department?

25        A.    No.

CONFIDENTIAL

Page 129

1          Q.     Do you know what department

2     that individual would be a part of?

3          A.     I would be guessing.

4               MR. KARP:  I'm about to change

5          documents and it's 12:45, I think

6          it would be a good time to break

7          for lunch.

8               THE WITNESS:  Okay.

9               MR. INNES:  Sure.

10               THE VIDEOGRAPHER:  The time

11          right now is 12:47 p.m.  We are off

12          the record.

13                    - - - - -

14      (A recess was taken at this time.)

15                    - - - - -

16               THE VIDEOGRAPHER:  The time

17          right now is 1:24 p.m.  We are back

18          on the record.

19     BY MR. KARP:

20          Q.     Ms. Pettiford, I am handing

21     you tab 14.

22          A.     Andrew didn't say welcome

23     back.  You didn't say welcome back.

24          Q.     I should have said welcome

25     back.

CONFIDENTIAL

Page 130

```
 1          A.      Thank you.
 2          Q.      I hope you had a good lunch.
 3   We will mark this as Exhibit 13.
 4                     - - - - -
 5                  (IPS Wish List Bates
 6              BW__Irvington00463225 to 00463259
 7              marked Pettiford Exhibit 13 for
 8              identification.)
 9                     - - - - -
10   BY MR. KARP:
11          Q.      Ms. Pettiford, do you
12   recognize this document?
13          A.      I do not.
14          Q.      Do you want to take a minute
15   to review?
16          A.      Yeah.  Okay.
17          Q.      Now that you've had a minute
18   to review, do you recall ever seeing this
19   document?
20          A.      I have never seen this
21   document, but I know what the document is.
22          Q.      Okay.  Can you tell me what
23   the document is?
24          A.      It appears to be a wish list.
25   This was, like, the cover page or the
```

Page 131

1   original email is not attached.  Yeah, it's
2   a wish list.
3          Q.     And a wish -- what was this a
4   wish list for?
5          A.     Things that would be helpful
6   to different supervisors and directors to
7   have in their department.
8          Q.     Do you know where the funding
9   came from for the items on this wish list?
10         A.     I do not.
11         Q.     The very first page at the
12  top, it says, "Directions."
13                Do you see that?
14         A.     Yes.
15         Q.     And the directions are,
16  "Please fill out the following chart below
17  for your department.  Please see
18  Mr. Monel's chart as an example."
19                Do you see that?
20         A.     Yes, yes.
21         Q.     Do you recall ever supplying
22  information to be included in this wish
23  list?
24         A.     Yes.
25         Q.     Why don't we turn to page --

Page 132

1    the Bates number ending in 3254.

2         A.    Uh-huh.

3         Q.    There's a table that starts

4    on this page and your name is indicated.

5               Do you see that?

6         A.    Yes.

7         Q.    And the department is

8    guidance and HSSC?

9         A.    Yes.

10        Q.    Was this your wish list?

11        A.    Yes.

12        Q.    Are these items or

13   initiatives that you identified for this

14   wish list?

15        A.    Yes.

16        Q.    Do you -- did you write the

17   descriptions in column called, "Rationale"?

18        A.    I believe so, yes.

19        Q.    Okay.  I just want to take a

20   few minutes to understand what's included

21   in this wish list --

22        A.    Yes.

23        Q.    -- and discuss it with you.

24               The first item here is

25   McKinney-Vento coordinator.

CONFIDENTIAL

Page 133

1                    Do you see that?

2          A.      Yes.

3          Q.      And McKinney-Vento addresses

4    homelessness in IPS?

5          A.      Yes.

6          Q.      Can you -- sorry, I didn't

7    mean to cut you off?

8          A.      No, yes.

9          Q.      Can you tell me a little bit

10   more about that program?

11         A.      So McKinney-Vento is a

12   state -- or, actually, it's a federal

13   initiative to assist homeless families with

14   resources and any needs they may have.  So

15   the goal is, of course, to transition them

16   to permanent housing, but that is the goal,

17   that is essentially what McKinney-Vento is.

18         Q.      And in your experience at IPS

19   since 2020, has homelessness been an issue

20   for IPS students?

21         A.      Yes.

22         Q.      What you wrote here in the

23   rationale was, "As a result of COVID-19,

24   the number of homeless students/families

25   have increased."

CONFIDENTIAL

Page 134

1                    Do you see that?

2          A.      Yes.

3          Q.      Can you explain how that

4    occurred?

5                    MR. INNES:  Objection to form.

6    BY MR. KARP:

7          Q.      I can -- I'll withdraw the

8    question and rephrase.

9                    Can you explain what the

10   relationship was between COVID-19 and

11   homelessness at IPS?

12         A.      So this was written a few

13   years -- I think it's 2021-2022, oh, it

14   doesn't tell us, that first form is

15   missing.  However, COVID did have an effect

16   on homelessness, primarily because of loss

17   of employment.

18         Q.      Were the families in IPS more

19   susceptible to loss of employment during

20   COVID-19?

21                   MR. INNES:  Objection to form.

22                   THE WITNESS:  Can you ask that

23          question again?

24   BY MR. KARP:

25         Q.      You mentioned that COVID-19

CONFIDENTIAL

Page 135

1    might have led to a loss of employment and

2    that could have led to increased

3    homelessness, do you recall?

4         A.    Yes.

5         Q.    And my question is simply

6    whether there were certain characteristics

7    of the Irvington community that would make

8    them more susceptible to loss of employment

9    during the pandemic as opposed to other

10   communities in New Jersey?

11        A.    I mean, I would have to look

12   at a study to answer that accurately, but

13   if we want to just talk about the

14   population of Irvington, being minority,

15   it's a lot of jobs that the people in our

16   community had during COVID were jobs that

17   were not in operation, so that led to

18   unemployment.  Probably at an increased

19   rate, because of the level of employment,

20   the people within Irvington have.

21        Q.    Thank you, and I think you

22   got what I was thinking of and that was the

23   types of jobs that individuals in the

24   Irvington community might have and whether

25   they were more susceptible to losing those

CONFIDENTIAL

1  jobs or having a pause in their employment

2  during the pandemic.

3          A.      Uh-huh.

4                  MR. INNES:   Objection to form.

5  BY MR. KARP:

6          Q.      A couple of rows down --

7  well, I don't want to skip over, the second

8  row is, "Mental health PD training for all

9  school counselors and HSSCs."

10                  Do you see that?

11          A.      Yes.

12          Q.      PD is professional

13  development?

14          A.      Yes.

15          Q.      You did not indicate a

16  specific dollar amount for that item, but

17  listed it as TBD?

18          A.      Yes.

19          Q.      Under that we have substance

20  abuse coordinator.

21                  Do you see that?

22          A.      Yes.

23          Q.      We discussed that just before

24  the lunch break?

25          A.      Yes.

CONFIDENTIAL

Page 137

1          Q.      Ultimately, the district
2    hired a culture and climate specialist
3    instead of a substance abuse coordinator;
4    is that correct?
5          A.      Yes, that's my understanding,
6    I don't work for HR, okay.
7          Q.      The next row is wellness
8    center and meditation room.
9                  Do you see that?
10         A.      Yes.
11         Q.      We spoke about that at
12   length, do you recall?
13         A.      Yes.
14         Q.      What you wrote as the
15   description for that item is that, "The
16   global impact of COVID-19 has left the most
17   vulnerable population at-risk for
18   increasing mental health issues.  Creating
19   a safe, calm, inviting space for
20   students/teachers/staff, to come to relax
21   and destress would decrease the number of
22   interruptions to the school day."
23                  Do you see that?
24         A.      Yes, uh-huh.
25         Q.      And, to your knowledge,

Page 138

```
 1   wellness centers and meditation rooms were
 2   created at IPS, correct?
 3           A.      A few of them were, yes.
 4           Q.      You testified just before the
 5   lunch break that these wellness centers and
 6   meditation rooms would not have been
 7   operated or managed by the guidance
 8   department, right?
 9           A.      So I need you to understand
10   that the wellness rooms that I testified to
11   are in individual schools, so it's at the
12   autonomy of the principal to say who
13   manages or who looks after different rooms.
14   That's not information that would come to
15   me, because it's individual school based.
16           Q.      You did not personally have
17   responsibility for managing any of the
18   wellness centers or meditation rooms in the
19   district?
20           A.      Right, so the wellness
21   centers that you see on this chart and the
22   wellness amount that you saw on my budget
23   are rooms that I wanted to create
24   throughout the district.  That didn't
25   happen, because they were created at a
```

Page 139

```
 1   couple of schools through the principal's
 2   budget.
 3           Q.     So these rooms that you were
 4   proposing were not created; is that
 5   correct?
 6           A.     Ms. Pettiford did not create
 7   rooms.
 8           Q.     Principals at individual
 9   schools might have paid to create wellness
10   rooms for their students?
11           A.     Yes, they may have -- I'm
12   sorry.
13                  MR. INNES:  Objection to form.
14                  THE WITNESS:  Yes, they may
15          have done that.
16   BY MR. KARP:
17           Q.     Okay.  And I'll ask a
18   slightly different question.  They did do
19   that, correct?
20           A.     I testified earlier that I
21   knew of one at Madison, uh-huh.
22           Q.     To the extent that there are
23   wellness rooms in the district at Madison
24   or elsewhere --
25           A.     Okay.
```

Page 140

```
 1          Q.     -- your department would not
 2    have paid for them?
 3                    MR. INNES:  Objection to form.
 4                    THE WITNESS:  I don't
 5             believe -- I don't have any
 6             knowledge of my department paying.
 7             I say that because with budgets,
 8             money can be transferred and used
 9             for different purposes.  So Ms.
10             Pettiford doesn't have any
11             knowledge of that.
12    BY MR. KARP:
13          Q.     The description that you here
14    for the wellness rooms and the meditation
15    room, do you still believe that that's true
16    today?
17          A.     I do.
18          Q.     The next line in this wish
19    list is Rethink Ed SEL curriculum.
20                    Do you see that?
21          A.     Uh-huh.
22          Q.     Can you tell me more about
23    that?
24          A.     Just what it says, it's
25    evidence based.  It's technology driven;
```

CONFIDENTIAL

Page 141

1  it's online.  It is a platform that can be

2  used by school counselors and health and

3  social service coordinators to create

4  different lessons for students.  So, for

5  instance if you see a need for a social

6  media etiquette lesson, you can go into

7  Rethink Ed, you can look up the topic, it

8  will give you takeaways that the children

9  can have.  It will go through the entire

10  lesson.  So it's just a helpful way to pull

11  lessons for different topics as opposed to

12  having look for them in other places.

13        Q.    The description says,

14  "technology-driven solutions"?

15        A.    Uh-huh.

16        Q.    Do you know what's meant by

17  that phrase in particular?

18        A.    Meaning it's an electronic

19  platform.

20        Q.    A platform that students

21  could access on their Chromebooks?

22        A.    Students can access it and

23  the adults in the building, yes.

24        Q.    You mentioned a social media

25  etiquette --

CONFIDENTIAL

Page 142

1          A.      Yes.

2          Q.      -- lesson?

3          A.      Yes.

4          Q.      Is that something that you

5     would support?

6          A.      Absolutely.

7          Q.      Why?

8          A.      Because all our kids are

9     exposed to using social media, so to know

10    the right way to use it is important and it

11    will eliminate these mental health concerns

12    that we're talking about.

13         Q.      Do you believe that there's a

14    safe and responsible way to use social

15    media?

16                 MR. INNES:  Objection to form.

17                 THE WITNESS:  That's a tricky

18             question, because there is a safe

19             and responsible way for kids who

20             are of age to use it.  The problem

21             is there's no way to eliminate

22             students who are not of age.  So

23             when I say, "a safe way," I mean,

24             and an appropriate way, I mean,

25             outside of school, you shouldn't

CONFIDENTIAL

Page 143

1           use it while you're in school, but,
2           yes, there is a better way.  I
3           don't know about safe.  I'm stuck
4           on the safe word.
5   BY MR. KARP:
6           Q.    When you say, "of age," can
7   you explain what you mean?
8           A.    Eighteen and older, adults.
9           Q.    Who would, for this social
10  media etiquette lesson, who would
11  participate?
12          A.    You mean from Rethink Ed?
13          Q.    If Rethink -- strike that.
14              If IPS were to offer this
15  social media etiquette lesson using this
16  platform, who would the target audience be?
17          A.    So IPS wouldn't offer it.
18  Individual schools would decide.  So, for
19  instance, an HSSC at Madison may say maybe
20  they had some student conflict around
21  social media, so they decide maybe I need
22  to do an etiquette lesson.  They would then
23  go into Rethink and pull that lesson.  So
24  it's individual, because you see that
25  there's a need for a certain lesson.

Page 144

1        Q.    So an HSSC at the middle
2    school could decide to deliver this lesson
3    to middle school students?
4        A.    Whoever has access to Rethink
5    Ed, yes.
6        Q.    Do you know if that's ever
7    happened?
8                MR. INNES:  Objection to form.
9                THE WITNESS:  If what ever
10            happened?
11   BY MR. KARP:
12        Q.    Do you know if HSSCs around
13   the district who have responsibilities at
14   different schools have presented on or
15   taught lessons on the use of social media?
16                MR. INNES:  Objection to form.
17                THE WITNESS:  Yes, they have.
18            You have that information.
19   BY MR. KARP:
20        Q.    I have that information?
21        A.    Uh-huh.
22        Q.    What is your understanding of
23   the lessons and presentations that HSSCs
24   had given to their students to an
25   appropriate way to use social media?

CONFIDENTIAL

1        A.      So because on the school
2    level, I don't have the presentations, but
3    it goes back to what I just said, right, as
4    the HSSC in the building or school
5    counselor in the building, you see a need,
6    you meet a need, right?  So if they -- if,
7    not even if, when they had lessons on
8    etiquette with social media, there was some
9    sort of need that they saw, so that's why
10   they would have the lesson.  What that
11   lesson looks like, I can't tell you right
12   now.  I would have to research it.
13       Q.      In your role as supervisor or
14   your role as director, did you review the
15   presentations or lessons that HSSCs
16   provided to their students?
17       A.      I reviewed some of them.
18       Q.      And what's the purpose --
19       A.      And when I say, "review," we
20   do it as a group.  It's not an approval or
21   disapproval.
22       Q.      Okay.  So you were not
23   approving the content of what was being
24   presented before it was presented; is that
25   fair?

CONFIDENTIAL

                                        Page 146

1          A.      That's fair to say, they are
2     the professionals in their building,
3     uh-huh.
4          Q.      So in the course of your jobs
5     as -- or strike that.
6                  During your time at IPS, you
7     would have seen some of the presentations
8     and lessons that HSSCs gave to their
9     students, but not all of them?
10         A.      Yeah, some of them.  Uh-huh.
11         Q.      Do you recall any that
12    specifically related to social media
13    etiquette?
14         A.      I don't recall the lessons,
15    no.
16         Q.      Do you remember any that
17    related to positive ways that students
18    could use social media?
19         A.      I don't recall at this time.
20    I would have to research it.
21         Q.      Have you yourself, Ms.
22    Pettiford, ever given a presentation on the
23    appropriate uses of social media?
24         A.      No.
25         Q.      Have you ever given a

CONFIDENTIAL

Page 147

1    presentation or taught a lesson at IPS
2    regarding social media use more generally?
3                    MR. INNES:  Objection to form.
4                    THE WITNESS:  No, no.
5    BY MR. KARP:
6           Q.     And that would be a
7    presentation to students.
8           A.     I don't give presentations to
9    students.
10          Q.     Then we have our answer.
11          A.     Uh-huh.  Unless I'm called
12   upon to give a presentation.
13          Q.     Has that ever happened?
14          A.     Academic presentations, yeah.
15          Q.     Can you tell me more about
16   those?
17          A.     Graduation requirements, how
18   to make the best out of different years in
19   high school, those type of things.
20          Q.     The next item on the wish
21   list is a poster maker, laminator, and
22   shredder.
23                  Do you see that?
24          A.     Yes.
25          Q.     And if we turn the page, the

Page 148

1   final item on your list is eight additional

2   HSSCs so that one is assigned to each

3   school.

4           A.      Yes.

5           Q.      Do you see that?

6           A.      I do.

7           Q.      Why was this an item on your

8   wish list?

9           A.      Because the need for an HSSC

10  at each school to address the mental health

11  concerns of students, whatever the basis

12  may be, is critical to the development of

13  our students.  Because when -- when one is

14  not in a school, just to give you some

15  perspective, when I met with you on Tuesday

16  and I stepped out, actually, I stopped

17  twice, it's because I needed an HSSC at a

18  different school because there wasn't one

19  there and there was a crisis.  It doesn't

20  mean it was related to social media, but if

21  we had an HSSC in every building, there

22  could be constant contact, lessons for

23  students, different, different awareness

24  dates, SEL programming that could happen on

25  a daily basis as opposed to every other day

CONFIDENTIAL

Page 149

1  like it's happening now --

2      Q.      And that would be --

3      A.      -- and then every other

4  Friday.

5      Q.      Having additional HSSCs would

6  better support students and their mental

7  health needs?

8      A.      Absolutely.

9      Q.      Regardless of what was

10 causing it?

11     A.      Regardless of what the root

12 cause is.  That's why we need HSSCs.

13     Q.      You can put this to the side.

14     A.      Thank you.

15     Q.      I'm handing you tab 15, which

16 we will mark as Exhibit 14.  Let me know

17 once you've had a chance to read it.

18     A.      I have.

19              - - - - -

20          (Email dated 12/14/21 Bates

21       BW__Irvington00016422 marked

22       Pettiford Exhibit 14 for

23       identification.)

24              - - - - -

25

CONFIDENTIAL

Page 150

1   BY MR. KARP:

2        Q.      This is an email dated

3   December 14, 2021.

4                Do you see that?

5        A.      Yes.

6        Q.      And the subject line of this

7   email is regarding reason for more HSSCs?

8        A.      Yes.

9        Q.      This is an email that you

10  wrote to -- or excuse me, you -- the top

11  email is an email from you to Ms. Vasquez

12  saying thank you?

13       A.      Yes.

14       Q.      Below that we see an email

15  from Ms. Vasquez to you in which she

16  describes some of the reasons for

17  justifying the need for an additional HSSC.

18               Do you see that?

19       A.      Yes, yup.

20       Q.      She provides two reasons, the

21  first is crisis situations and the second

22  is general availability.

23               Do you see that?

24       A.      Yes.

25       Q.      And then she has an asterisk

CONFIDENTIAL

Page 151

1  toward the bottom with some additional

2  comments.

3                    Do you see that?

4          A.      Yes.

5          Q.      Ms. Vasquez wrote to you

6  that, "oftentimes there are multiple

7  situations going on at the same time and I

8  either have to keep students waiting for an

9  extended amount of time while I handle the

10  first incident, or I have to rush them out

11  of my office because there are others

12  waiting for me."

13                    Do you see that?

14         A.      Yes.

15         Q.      Is that consistent with what

16  you testified to a few minutes ago?

17         A.      Yes.

18         Q.      She also noted that,

19  "students coming to look for me and either

20  I'm not in my office, in a meeting, running

21  a group counseling session, et cetera."

22                    Do you see that?

23         A.      Yup.

24         Q.      The comment that Ms. Vasquez

25  made at the end of her email was, "Overall,

Page 152

1    I feel that many times we are doing the

2    students a disservice because we either

3    cannot give them our full attention or

4    allow them the amount of time they really

5    need, especially when you have to

6    prioritize which situations require more of

7    your immediate need."

8                    Do you see that?

9         A.    Yes.

10        Q.    Ms. Vasquez was sharing with

11   you that additional HSSCs would be helpful

12   because, at present, she doesn't have

13   enough time or availability to address all

14   of the issues in her school?

15        A.    Yes.

16        Q.    Do you recall what prompted

17   Ms. Vasquez -- or strike that.

18                    Do you have an understanding

19   of why Ms. Vasquez sent you this email?

20        A.    I don't, I don't remember.

21   It appears as though I sent her an email

22   asking her.  What's the date?

23        Q.    Let's take a look at tab 16,

24   which we'll mark as Exhibit 15.

25                    - - - - -

```
                                         Page 153

  1                  (Email dated 12/16/21 Bates
  2             BW__Irvington00016441 marked
  3             Pettiford Exhibit 15 for
  4             identification.)
  5                  - - - - -
  6  BY MR. KARP:
  7         Q.    This email is dated
  8  December 16, 2021.  And it's from Shanell
  9  Toomer to you.
 10              Do you see that?
 11         A.    Yes.
 12         Q.    Ms. Toomer is also providing
 13  you with two reasons that she believed that
 14  her school needed a full-time HSSC?
 15         A.    Yes.
 16         Q.    Did you ask Ms. Toomer and
 17  Ms. Vasquez to provide you with two reasons
 18  for adding HSSCs to each school?
 19         A.    It appears as if I did.
 20         Q.    And Ms. Toomer indicated in
 21  her first reason that, "HSSCs serve to
 22  assess students' overall functioning,
 23  provide therapeutic and crisis management
 24  services, advocate for children, connect
 25  families with community resources, and
```

CONFIDENTIAL

Page 154

1    facilitate workshops for the school

2    community on topics like stress management

3    and mental health."

4                    Do you see that?

5         A.    Yes.

6         Q.    Are you able to quantify how

7    much of an HSSC's time is spent on any of

8    those items?

9                    MR. INNES:  Objection to form.

10                   THE WITNESS:  It's difficult

11             to do, because day to day, it

12             changes so often, but in terms of

13             just facilitation and stress

14             management, mental health, I would

15             say 80 percent or higher.

16   BY MR. KARP:

17        Q.    And what is your basis for

18   that number?

19        A.    Because this is the -- this

20   is the overall responsibility of HSSCs.  So

21   this is their primary -- one of their

22   primary responsibilities, it's probably

23   going to be a higher percentage.

24        Q.    What is the other 20 -- using

25   your estimation, what is the other

CONFIDENTIAL

Page 155

1   20 percent of their role?

2           A.      Dealing with day-to-day

3   challenges that may come up, classroom

4   lessons, going into the classroom,

5   connecting with students.  Acknowledging

6   those days we talked about on Tuesday,

7   school safety and those awareness dates

8   that we discussed.  So that would be the

9   other 20.  Team meetings, record keeping,

10  all of that would be left.

11          Q.      So your estimation is that

12  roughly 80 percent of an HSSC's time would

13  be spent assessing students' overall

14  functioning, providing therapeutic and

15  crisis management services, advocating for

16  children, connecting families with

17  community resources, and facilitating

18  workshops for the school community on

19  topics like stress management and mental

20  health, and the other 20 percent would be

21  spent on the activities that you just

22  listed out?

23          A.      Activities, individual

24  counseling, group counseling, addressing

25  absenteeism, it could be a number of

CONFIDENTIAL

Page 156

1  things.  Day to day, it changes.  Remember,

2  I know you like to put things in a pie, but

3  it's hard to do that in education.

4       Q.     And I'm trying to do the best

5  that I can just to understand how people

6  are spending their time and I appreciate

7  your insights.

8            If I wanted to focus on one

9  of these items, like connecting families

10  with community resources, how would you go

11  about quantifying how much of an HSSC's

12  time was spent specifically on that?

13       A.     I wouldn't be able to

14  specifically on that.  It would vary.  It

15  could vary school to school.  It could vary

16  time of year.  I can't quantify that.  It's

17  really hard to quantify.

18       Q.     Is it -- are you able to --

19  to the extent that these different

20  activities involve different issues, such

21  as homelessness and violence and social

22  media perhaps, drug abuse, are you able to

23  tell me how much time an HSSC would spend

24  on a particular issue that's affecting

25  students?

CONFIDENTIAL

Page 157

1          A.       I am not.

2          Q.       The second item on

3    Ms. Toomer's list is, "Students are in need

4    of more social emotional learning skills to

5    help them to learn to properly socialize

6    with other people, cope with their feelings

7    about the pandemic and other mental health

8    issues.  If each school is allowed a

9    full-time HSSC, the students can receive

10   the services that will support this growing

11   need."

12         A.       Uh-huh.

13         Q.       Do you see that?

14         A.       I do.

15         Q.       Did IPS students need to

16   learn to properly socialize with other

17   students?

18         A.       I think all students need to

19   learn how to properly socialize.

20         Q.       Do you agree with

21   Ms. Toomer's observations that IPS students

22   needed to learn to properly socialize with

23   other students, cope with their feelings

24   about the pandemic and other mental health

25   issues?

Page 158

1          A.      Yes.

2          Q.      Do you have an understanding

3   of what Ms. Toomer meant by their feelings

4   about the pandemic?

5          A.      I would have to speak to

6   Ms. Toomer, but if I was -- you don't like

7   the guess word, but I would need to speak

8   to Ms. Toomer about her statements

9   specifically.

10          Q.      And I'm simply asking if you

11   have an understanding or it's fine to say

12   that you don't or that you need to speak to

13   her.

14          A.      Yeah, I would need to speak

15   with her to find out what she meant

16   specifically.

17          Q.      Do you know if you ever

18   responded to this email from Ms. Toomer?

19          A.      I don't recall.

20          Q.      Looking at tab 14 and the

21   email that Ms. Vasquez sent to you, you

22   responded, thank you.

23          A.      Okay.

24          Q.      Do you remember any further

25   discussion with Ms. Vasquez about this?

CONFIDENTIAL

Page 159

1          A.     We've discussed reasons for

2    more HSSCs in our department meetings, so I

3    don't know if that was before -- it was

4    probably before and after.

5          Q.     To the extent that you

6    discussed the need for more HSSCs with

7    Ms. Toomer, did any of those discussions

8    involve social media?

9          A.     I would have to -- I would

10   need to speak to her.  I would need to

11   speak to her.  We're talking about 2021.

12         Q.     I'll ask the question a

13   little bit differently.  Do you recall

14   whether any of your discussions with

15   Ms. Toomer about the addition of HSSCs to

16   Irvington Public Schools involved the use

17   of social media -- involved student use of

18   social media?

19         A.     I don't recall.

20         Q.     Do you recall whether any of

21   the conversations you had with Ms. Vasquez

22   about the addition or potential addition of

23   HSSCs to the district involved student use

24   of social media?

25         A.     So we talked about this

CONFIDENTIAL

Page 160

```
 1   earlier, remember when we looked at that
 2   report and you asked me why social media
 3   wasn't a tab, and I said social media can
 4   fit any of these categories.  I'm sure
 5   we've had those discussions.  I can't tell
 6   you if it was January 2021 or January 2023,
 7   but social media has been discussed.
 8        Q.    And my question was simply in
 9   the context of discussing the potential
10   addition --
11        A.    I don't remember.
12        Q.    -- of new HSSCs, do you --
13        A.    I don't remember specifically
14   in the context of what you're asking me.
15        Q.    And not a criticism, I just
16   want to make sure I get my complete
17   question out.
18        A.    I apologize for cutting you
19   off.
20        Q.    In the context of discussing
21   the potential addition of HSSCs to
22   Irvington Public Schools, do you recall
23   specifically discussing the use of social
24   media with Ms. Vasquez?
25        A.    I do not recall specifically
```

CONFIDENTIAL

Page 161

1   from 2021.

2          Q.     Do you recall ever discussing

3   the use of social media with Ms. Vasquez as

4   a reason for adding HSSCs to the district?

5          A.     Specific conversations, I do

6   not recall.

7          Q.     Thank you.  You can put these

8   to the side?

9          A.     Thank you.

10         Q.     I'm handing you tab 20, which

11  we will mark as Exhibit 16.

12                    -  -  -  -  -

13                 (Suicide Prevention

14            Information University Middle

15            School 2020-2021 PowerPoint

16            BW__Irvington00479130 marked

17            Pettiford Exhibit 16 for

18            identification.)

19                    -  -  -  -  -

20  BY MR. KARP:

21         Q.     The cover sheet of this

22  exhibit says, "File produced in native

23  format," which as we discussed earlier

24  means that the document was produced in its

25  original form, in this case, it's a

CONFIDENTIAL

Page 162

1    PowerPoint, but I printed this as a PDF for

2    you.

3          A.      Thank you.

4          Q.      I'll do my best to help to

5    point you to the pages even though they

6    don't have page numbers.

7          A.      Uh-huh.

8          Q.      Let me know once you've had a

9    chance to review.

10         A.      You can start.

11         Q.      Okay.

12         A.      Uh-huh.

13         Q.      The title slide of this

14   presentation is, "Suicide Prevention

15   Information University Middle School

16   2020-2021."

17                 Do you see that?

18         A.      Yes.

19         Q.      Are you familiar with this

20   presentation?

21         A.      I am not.

22         Q.      I'll represent to you that we

23   obtained a copy from your files.

24         A.      Okay.

25         Q.      Do you have any reason to

Page 163

1    doubt that this presentation was in your
2    files?
3            A.      Not if you got it from there,
4    nope.
5            Q.      You said that you're not
6    familiar with this presentation.  Do you
7    know what it is?
8            A.      It's a -- according to the
9    title of the document, it is a suicide
10   prevention -- well, suicide prevention
11   information.
12           Q.      Do you know if this
13   presentation was given to students at
14   University Middle School?
15           A.      I do not know.
16           Q.      For the 2020-2021 school
17   year, do you know who the HSSC was for
18   University Middle School?
19           A.      Yes.
20           Q.      Who was that?
21           A.      Ms. Lopez.
22           Q.      And what is Ms. Lopez's first
23   name?
24           A.      Sandra.  Sandra, Sandra.
25           Q.      If I wanted to know whether

Page 164

1    this presentation was given to students at
2    University Middle School, would Sandra
3    Lopez be a good person to ask?
4              A.      Yup.
5              Q.      Does New Jersey state law
6    require that students be educated on
7    suicide prevention?
8              A.      Yes.
9              Q.      I think we can agree that is
10   a very good thing.  Do you know for how
11   long that New Jersey has required that
12   curriculum?
13             A.      As long as I can remember
14   being an educator.
15             Q.      Does that go back to when you
16   were working in the Newark school system in
17   2004?
18             A.      Yes.
19             Q.      If you look at the second
20   slide, consistent with what you just said,
21   "State law requires that all students in
22   middle and high schools receive some type
23   of suicide prevention."
24             A.      Yes.
25             Q.      What form does that usually

Page 165

1    take at IPS?

2           A.      Similar to this, probably a

3    class lesson that includes a PowerPoint

4    presentation.  We usually have students

5    also sign a pledge, it's called suicide

6    pledge or -- and they also have one for

7    bullying.

8           Q.      Let's turn a couple of slides

9    forward to a slide that says, "Our Goal,"

10   at the top?

11          A.      Okay.

12          Q.      And the goal listed here to,

13   "Help students recognize the warning signs

14   and risk factors for their friends and

15   themselves and remind them of the things

16   that serve as a protective factor."

17                  Do you see that?

18          A.      Uh-huh.

19          Q.      Do you have an understanding

20   of what that means?

21          A.      Yes.

22          Q.      And what is your

23   understanding?

24          A.      So it tells us on the next

25   page.  "Risk factors are personal or

CONFIDENTIAL

Page 166

1    environmental characteristics that are

2    associated with suicide.  People affected

3    by one or more risk factors have a greater

4    probability of suicidal behavior."

5                  So the goal is to help them

6    recognize what those factors are.

7         Q.     The presentation goes on to

8    list a number of risk factors.  Do you see

9    that?

10        A.     Yes.

11        Q.     Among them are risky

12   behaviors, social alienation and isolation,

13   history of depression or anxiety, and there

14   are many others listed.

15                 Do you see that?

16        A.     Yes.

17        Q.     Is use of social media listed

18   anywhere as a risk factor for -- in this

19   presentation?

20        A.     So like the report we talked

21   about, it's not listed, but it can be a

22   contributing factor to, like, many of them.

23        Q.     Is it a risk factor for

24   students to be heavy users of social media?

25        A.     I don't understand your

CONFIDENTIAL

Page 167

1   question.  What do you mean?

2       Q.    This slide lists risk factors

3   for -- that are relevant to identifying

4   students who may have characteristics that

5   are associated with suicide?

6       A.    Yes.

7       Q.    And my question was if a

8   certain amount of usage of social media is

9   considered a risk factor.

10              MR. INNES:  Objection to form.

11              THE WITNESS:  I haven't done

12          research on that type of answer.

13  BY MR. KARP:

14      Q.    Are there any risk factors

15  listed on these two slides, and by that I

16  mean, the one that starts with risk factors

17  and the immediately subsequent slide --

18      A.    Uh-huh.

19      Q.    -- that do not apply to IPS

20  students?

21              MR. INNES:  Objection to form.

22              THE WITNESS:  I'm not sure

23          about that.  I would have to -- I

24          would have to go to each school and

25          figure that out, but when I look,

Page 168

1              first glance, they should all
2              apply, yes.
3    BY MR. KARP:
4         Q.     These are risk factors for --
5         A.     For everyone.
6         Q.     -- for everyone?
7         A.     Uh-huh.
8         Q.     IPS and elsewhere?
9         A.     Yes, when you pose the
10   question that way, yes.
11        Q.     Do the risk factors listed
12   here on these two slides have a connection
13   to the mental health of IPS students?
14        A.     Yes.
15        Q.     Loss in family, bullying
16   history, substance abuse, and dependence,
17   to give some examples --
18        A.     Uh-huh.
19        Q.     -- have a negative impact on
20   a student's mental health?
21        A.     Agreed.
22        Q.     If we turn a few slides later
23   and I do apologize that the presentation
24   doesn't have page numbers, I'm looking for
25   this slide.

CONFIDENTIAL

Page 169

1          A.        Yeah, okay.

2          Q.        This slide reads, "Social

3    media is one of the most prevalent places

4    for a student to identify he or she is

5    considering suicide.  We strongly encourage

6    students to report those comments if they

7    fear for their friend's life."

8                    Do you see that?

9          A.        Yes.

10         Q.        There are also two icons

11   listed on the right side of this slide, the

12   top one is Facebook.

13                   Do you see that?

14         A.        Uh-huh.

15         Q.        And the bottom one appears to

16   be Twitter, but perhaps it is inverted.  Do

17   you recognize that icon?

18         A.        No.

19         Q.        The top one is Facebook

20   though?

21         A.        Yes.

22         Q.        And what this slide is saying

23   is that students should be on the lookout

24   for posts and comments on social media

25   indicating that their friends may be

CONFIDENTIAL

Page 170

1   considering suicide; is that right?
2          A.     That's a good way to
3   interpret the slide.  That's one
4   interpretation.
5          Q.     What is your interpretation
6   of this slide?
7          A.     That it's possible that
8   students may identify themselves as being
9   suicidal on social media.  I don't
10  interpret it as you should be on a -- I
11  feel like the way you're changing it is,
12  which is your job, to put a good spin on
13  them using social media, so be on the
14  lookout, because it's the safe place to say
15  it, so I feel like you're twisting it a
16  little bit, but you have your job and I
17  have mine.
18         Q.     Can we turn back to the
19  slides that say, "Our Goal"?
20         A.     Our goal.  Yes.
21         Q.     This slide says, our goal is
22  "to help students recognize the warning
23  signs and risk factors for their friends."
24         A.     Yes.
25         Q.     Do you see that?

CONFIDENTIAL

Page 171

1          A.        Yes.

2          Q.        And the presentation goes on

3    to identify a number of those risk factors,

4    correct?

5          A.        Yes.

6          Q.        What you just told me is that

7    students may go on to social media and

8    identify themselves in some way as having

9    suicidal thoughts.  Do I have that correct?

10         A.        Yeah, I told you that based

11   on what was written here, yes.  Uh-huh.

12         Q.        You'd agree with me that the

13   district would want to encourage students

14   to report any instance in which one of

15   their friends had posted on social media

16   about being suicidal?

17         A.        Absolutely.

18         Q.        And that is what the district

19   is encouraging University Middle School to

20   do on this slide?

21                   MR. INNES:  Objection to form.

22                   THE WITNESS:  It's the form

23            that I'm not agreeing with.  The

24            district would be encouraging

25            students to inform of any, on

CONFIDENTIAL

Page 172

```
 1              any -- in any way they have found
 2              out that a student wants to commit
 3              suicide, yes, we would like to know
 4              that information from our students.
 5    BY MR. KARP:
 6         Q.      Absolutely.  And I'm not, to
 7    use your words, trying to put a spin on
 8    this, the words on the slide are, we
 9    strongly encourage students to report those
10    comments if they fear for their friend's
11    life?
12         A.      Agreed.
13         Q.      Whether they see a student
14    crying out for help on social media or
15    elsewhere, the district would like --
16         A.      To know that information.
17         Q.      And to encourage students to
18    report that?
19         A.      Absolutely.
20         Q.      And, here, we see an example
21    of where social media provides a lens or a
22    window into how some students are feeling
23    which could be suicidal?
24                 MR. INNES:  Objection to form,
25              compound, assumes facts not in
```

CONFIDENTIAL

Page 173

1          evidence.

2                    MR. KARP:  You can answer.

3                    THE WITNESS:  In this example,

4          yes, uh-huh.

5    BY MR. KARP:

6          Q.    We can put this to the side.

7                    Michael, I think I can

8    probably truncate a bit of my exam if we

9    take a couple of minutes off the record.

10                   MR. INNES:  Sure.

11                   THE VIDEOGRAPHER:  The time

12         right now is 2:13 p.m.  We're off

13         the record.

14                    - - - - -

15      (A recess was taken at this time.)

16                    - - - - -

17                   THE VIDEOGRAPHER:  The time

18         right now is 2:33 p.m.  We're back

19         on the record.

20    BY MR. KARP:

21          Q.    Welcome back, Ms. Pettiford.

22          A.    Thank you.

23          Q.    I'm going to hand you tab 24,

24    which we will mark as Exhibit 17.

25                    - - - - -

```
                                        Page 174

1              (Mental Health Support Grant

2              Bates BW__Irvington00479794 to

3              00479796 marked Pettiford Exhibit

4              17 for identification.)

5                      - - - - -

6    BY MR. KARP:

7         Q.    Let me know when you had a

8    chance to review.

9         A.    Yes, I'm good.

10        Q.    The title of this document

11   is, "Mental Health Support Grants."

12              Do you see that?

13        A.    Yes.

14        Q.    And your name is included at

15   the top in parentheses?

16        A.    Uh-huh.

17        Q.    Do you recognize this

18   document?

19        A.    I believe so.

20        Q.    What is this document?

21        A.    From reading it, it appears

22   that it is an explanation of why a mental

23   health support grant would be useful to the

24   district.

25        Q.    Do you know -- strike that.
```

CONFIDENTIAL

Page 175

1                As we just established, the
2    title of this document is, "Mental Health
3    Support Grant"?
4            A.      Uh-huh.
5            Q.      Do you know which grant this
6    is referring to?
7            A.      I'm assuming it's the mental
8    health support grant.
9            Q.      Do you know what the source
10   of funding was for the mental health
11   support grant?
12                   MR. INNES:  Objection.
13             Assumes facts not in evidence.
14                   MR. KARP:  You can answer.
15                   THE WITNESS:  I don't know.  I
16             would have to ask Ms. Banks the
17             source of funding, because it
18             doesn't identify it in the document
19             unless I missed it.
20   BY MR. KARP:
21           Q.      If you look at the second
22   paragraph down, there's a statement,
23   "Please complete the following sections to
24   describe the planned use of the NJTSS
25   Mental Health Support Staffing grant

CONFIDENTIAL

Page 176

1  funds."

2                    Do you see that?

3          A.      Yes.

4          Q.      Do you know what that refers

5   to?

6          A.      Describe, please complete --

7   it appears as though it's asking me to

8   complete these sections to determine how

9   grant funds would be used.

10         Q.      Do you know whether this

11  grant funding had anything to do with the

12  COVID-19 pandemic?

13                   MR. INNES:  Objection to form.

14                   THE WITNESS:  I would need to

15          know the date of this grant in

16          order to answer that question.

17  BY MR. KARP:

18         Q.      Did you write any parts of

19  this document?

20         A.      I believe I did.

21         Q.      Prompt number one in this

22  document says, "Describe how the plan for

23  the use of funds is connected to the

24  submitted need assessment based on school

25  data and engagement with stakeholders."

CONFIDENTIAL

Page 177

1              Do you see that?

2        A.      Yes.

3        Q.      And then a response is

4   written just below.

5              Do you see that?

6        A.      Yes.

7        Q.      It states, "Throughout the

8   country, there is a growing need for mental

9   health services due to the COVID-19

10  pandemic and the 'new normal' that we are

11  faced with.  The disruptions have

12  ultimately affected our economic and health

13  status, social relations, and education.

14  As a result, there has been a significant

15  increase in crisis referrals, absenteeism

16  in our schools, conflict and the

17  classification of students.  The funding

18  will give the Irvington Public School

19  District the ability to provide

20  multi-tiered systems of support for our

21  academic community."

22              Do you see that?

23       A.      Yup.

24       Q.      Did I read that correctly?

25       A.      Yes.

CONFIDENTIAL

1        Q.      Did you write that?

2        A.      No, I did not.

3        Q.      Do you know who did?

4        A.      Probably Ms. Banks, she

5   writes the grants for the district. Celeste

6   Banks.

7        Q.      Do you know -- do you know

8   that it was Ms. Banks or do you suspect

9   that it was Ms. Banks?

10       A.      I suspect.  I don't write

11  grants for the district.

12       Q.      Have you ever provided

13  information to be used in applications that

14  the district has made for grant funding?

15       A.      Yes.

16       Q.      Have you ever written

17  sections of those grant applications?

18       A.      No.

19              MR. INNES:  Objection to form.

20  BY MR. KARP:

21       Q.      The statement we just read in

22  response to prompt number one --

23       A.      Yes.

24       Q.      -- do you agree with it?

25       A.      Yes.

Page 179

```
 1          Q.      Can you tell me more about
 2   the ways in which the COVID-19 pandemic
 3   affected IPS students?
 4          A.      The same way it affected
 5   everyone, disruptions in education, social
 6   isolation, having to be out of touch with
 7   one another, economic hardships, family,
 8   social relationships, learning loss, mental
 9   health challenges, being isolated,
10   depressed, anxious.  That's it in a
11   nutshell.
12          Q.      Are you aware as Ms.
13   Pettiford, not the district --
14          A.      Uh-huh.
15          Q.      -- of whether IPS students
16   used social media while they were
17   quarantining at home or not able to attend
18   in-person instruction during the pandemic?
19          A.      Yes.
20          Q.      What information are you
21   aware of as to how students were using
22   social media while they were not attending
23   school in person during the pandemic?
24                    MR. INNES:  Objection to form.
25                    THE WITNESS:  I'm not -- the
```

CONFIDENTIAL

Page 180

1          question isn't clear to me.

2     BY MR. KARP:

3          Q.     Sure, I'll clarify.  Can you

4     tell me what you know about how students

5     used social media while they were learning

6     remotely during the pandemic?

7          A.     I can't tell you specifically

8     how.  I do know that they were, because

9     there have been instances where there were

10    conflicts that resulted from social media,

11    but I can't tell you about their day-to-day

12    usage.  I would be strictly guessing.

13         Q.     Do you know if the district

14    has a way of monitoring how students are

15    using their cell phones outside of school?

16         A.     I don't -- I don't know if

17    the district does or not.  It's not my

18    area.

19         Q.     It's not something that you

20    do?

21         A.     No.

22         Q.     Did IPS students feel -- or

23    experience feelings of isolation during the

24    pandemic?

25                    MR. INNES:  Objection to form.

CONFIDENTIAL

Page 181

1                    THE WITNESS:  It is the form
2              of the question that I'm confused
3              about.  My assumption would be yes,
4              all of America felt social
5              isolation.
6    BY MR. KARP:
7         Q.      Did you meet with students to
8    provide them with mental health support
9    during the pandemic?
10        A.      I don't meet with students.
11        Q.      That would be your HSSCs?
12        A.      Or school counselors, yes.
13        Q.      You did not have any direct
14   interactions with students during the
15   pandemic during which you would have
16   provided mental health services?
17        A.      No.  I only meet with
18   students when I'm called in to meet about a
19   particular case.
20        Q.      Do you have any understanding
21   of whether students during -- strike that.
22              Do you have any
23   understanding of whether students who
24   were -- strike that.
25                   You joined Irvington Public

                                   Page 182

1    Schools in November of 2020, correct?

2            A.      Yes.

3            Q.      At that point in time, was

4    there in-person instruction?

5            A.      No.

6            Q.      Students were at home and

7    learning virtually?

8            A.      Yes.

9            Q.      Do you know for how long they

10   were at home and learning virtually?

11                   MR. INNES:  Objection to form.

12                   THE WITNESS:  I can't tell you

13            before I came here, no.

14   BY MR. KARP:

15           Q.      While students were at home

16   and learning virtually during the pandemic,

17   did they experience feelings of isolation?

18                   MR. INNES:  Objection to form.

19                   THE WITNESS:  I would assume

20            that they did, yes.

21   BY MR. KARP:

22           Q.      Do you know one way or

23   another if students used social media as a

24   way to stay in touch with each other while

25   they were at home and unable to interact in

CONFIDENTIAL

Page 183

1  person?

2              MR. INNES:  Objection to form.

3              THE WITNESS:  These would be

4        strictly guesses, because I'm not

5        in the homes of students, so I

6        would assume they did.

7  BY MR. KARP:

8        Q.     And I don't want you to

9  guess.  I don't want you to speculate.

10       A.     Uh-huh.

11       Q.     And I think your counsel

12  shares that view.  So your testimony is

13  that you don't have any information as to

14  how students were using social media while

15  they were learning virtually during the

16  pandemic; is that right?

17       A.     Yes.

18       Q.     Okay.  You can put this to

19  the side.

20       A.     Okay.  Thank you.

21       Q.     Ms. Pettiford, is violence an

22  issue for Irvington Public Schools?

23              MR. INNES:  Objection to form.

24              THE WITNESS:  Violence in what

25        way?

Page 184

1    BY MR. KARP:

2          Q.     Violence that takes place on

3    campus, on the IPS campus.

4                    MR. INNES:  Objection to form.

5                    THE WITNESS:  When you say, is

6              it an issue, what does that -- what

7              do you mean, can you clarify?

8    BY MR. KARP:

9          Q.     I'm happy to clarify.  Is

10   violence among students an issue for

11   Irvington Public Schools on Irvington

12   Public School property?

13         A.     Violence in terms of what

14   kind of violence, because violence is a

15   broad term?

16         Q.     Sure.  What I mean by

17   violence is anything from students

18   assaulting each other to other forms of

19   violent conflict.

20         A.     So, yes, Irvington Public

21   School students have fights, they do have

22   fights.

23         Q.     Is gang-related violence an

24   issue for Irvington Public Schools?

25                    MR. INNES:  Objection to form.

CONFIDENTIAL

Page 185

```
 1              THE WITNESS:  Not to my
 2         knowledge.
 3  BY MR. KARP:
 4         Q.     Is gang-related violence an
 5  issue for the Irvington community more
 6  generally?
 7                  MR. INNES:  Objection to form.
 8                  THE WITNESS:  I would have to
 9         speak to people in the township of
10         Irvington to get that information.
11  BY MR. KARP:
12         Q.     Have you ever spoken to your
13  counselors or HSSCs about issues of gang
14  violence affecting students?
15                  MR. INNES:  Objection to form.
16                  THE WITNESS:  Not that I can
17         recall.
18  BY MR. KARP:
19         Q.     I'm handing you tab 25.  One
20  second.  I'm handing you tab 25, which we
21  will mark as Exhibit 18.  These are board
22  meeting minutes.
23         A.     Okay.
24         Q.     The document is a bit long,
25  so I printed a full copy for you in case
```

                                    Page 186

1   you wanted to review it and we will mark
2   the full copy as the exhibit, but I'm also
3   handing you an excerpt with the --
4           A.      With information.
5           Q.      -- singular page that we'll
6   be discussing.
7           A.      Okay.
8                      - - - - -
9                   (Board Meeting Minutes dated
10              1/21/15 Bates
11              BW__Irvington00555757 to 00555828
12              marked Pettiford Exhibit 18 for
13              identification.)
14                     - - - - -
15  BY MR. KARP:
16          Q.      Ms. Pettiford, as I
17  represented a couple of minutes ago, these
18  are board meeting minutes from January of
19  2015.
20                  Do you see that?
21          A.      Yes.
22          Q.      If we look at page 67 of
23  these board minutes, there's a section that
24  says, school resource officers will," and
25  the eighth item lists is, "Provide annual

CONFIDENTIAL

Page 187

1    gang awareness trainings to administrators,

2    staff and students."

3         A.    Yes.

4         Q.    Are you familiar at all with

5    gang awareness training at Irvington Public

6    Schools?

7         A.    Yes.

8         Q.    Can you tell me more about

9    that?

10        A.    Usually -- usually a

11   detective comes in from the Irvington

12   community and he presents a PowerPoint and

13   just gives us a description of gangs that

14   have been identified in the community, ways

15   to spot gangs and their signature, and

16   their colors, things of that sort, but we

17   are trained every year, well, we're given

18   the information every year.

19        Q.    So these detectives help

20   Irvington Public School students identify

21   or spot gangs and their signatures and

22   colors in the Irvington community?

23              MR. INNES:  Objection.

24         Misstates prior testimony.

25              THE WITNESS:  So I'm not --

CONFIDENTIAL

Page 188

1            I'm not familiar with the training
2            that they give to students.  I'm
3            familiar with the training they
4            give to administrators.
5     BY MR. KARP:
6            Q.    Okay.  Have you participated
7     or attended any of those trainings?
8            A.    The administrators, yes.
9            Q.    And at those trainings, have
10    the detectives presented on how to identify
11    or spot symbols relating to particular
12    gangs in the Irvington community?
13           A.    Yes.
14           Q.    Let's take a look at tab 26,
15    which we'll mark as Exhibit 19.
16                     - - - - -
17               (2023-2024 Administrators'
18            Retreat Agenda Bates
19            BW__Irvington00013208 to 00013214
20            marked Pettiford Exhibit 19 for
21            identification.)
22                     - - - - -
23    BY MR. KARP:
24           Q.    Let me know once you've had a
25    chance to review it.

CONFIDENTIAL

Page 189

1          A.      I've reviewed it.

2          Q.      This is document is the

3    2023-2024 Administrators' Retreat Agenda

4    for Irvington Public Schools.

5                  Do you see that on the

6    cover?

7          A.      Uh-huh, yes.

8          Q.      This took place from

9    August 21, 2023, to August 24, 2023.

10                 Do you see that?

11         A.      Yes.

12         Q.      Are you familiar with this

13   retreat?

14         A.      I am, yes.

15         Q.      Did you attend this retreat?

16         A.      Yes.

17         Q.      And you presented at this

18   retreat?

19         A.      Yes.

20         Q.      What is this retreat?

21         A.      It's a time for

22   administrators to kind of come together

23   before the school year ends, go over

24   Irvington policies, procedures.  We usually

25   have one self-care mindfulness day.  We go

CONFIDENTIAL

Page 190

1  over evaluation tools.  We go over

2  procedures for purchase orders, just to try

3  to, you know, we come together at the

4  beginning of the year so we could have a

5  good year, right, let's just review

6  everything, let's start off on the right

7  page, and hit the ground running.

8       Q.    This takes place at the end

9  of the summer right before the school year

10 starts?

11      A.    It usually takes place the

12 last full week in August.

13      Q.    Let's look at page 5 of this

14 agenda.

15      A.    Yes.

16      Q.    At the very top of this page,

17 just before the list of presentations for

18 day three --

19      A.    Uh-huh.

20      Q.    -- there's a session listed

21 called, "Gang Awareness Training."

22            Do you see that?

23      A.    Yes.

24      Q.    And this is Sergeant Jenkins

25 from the Irvington Police Department, he's

CONFIDENTIAL

Page 191

1    listed as presenter?

2            A.      Yes.

3            Q.      Is this the time of

4    presentation you were just describing to

5    me --

6            A.      Yes.

7            Q.      -- a few minutes ago?  So

8    this would have been an instance where

9    administrators at Irvington Public Schools

10   were educated about how to recognize gangs

11   in Irvington?

12           A.      Yes.

13           Q.      And are you aware of whether

14   a similar training or type of training

15   would have been given to students?

16           A.      I'm not aware of the training

17   at all, but I saw the paper, the board

18   minutes that you gave me says it, but I'm

19   not aware.

20           Q.      That's not something that you

21   would have participated in in your role --

22           A.      Right.

23           Q.      -- as supervisor or director,

24   correct?

25           A.      Yes, right.

Page 192

```
 1         Q.     Do you recall whether social
 2  media was discussed at all at this retreat?
 3         A.     Yes.  In terms of the gang
 4  presentation?  Because it doesn't --
 5         Q.     Sorry, my question was more
 6  general.
 7         A.     Oh okay, because it is in the
 8  gang presentation.
 9         Q.     Okay.  What do you recall
10  about that?
11         A.     That's a huge form of
12  communication.  They use social media a lot
13  to -- different posts, different comments
14  on social media.  So remember when you
15  asked about suicide ideation and being able
16  to use it in a positive way, because we're
17  made aware that the student may be
18  suicidal, this would be an ideal example of
19  how it was used in a negative way, that
20  gangs communicate a lot on social media
21  through messaging -- oh, go ahead, I'm
22  sorry.
23         Q.     No, I didn't mean to cut you
24  off.
25         A.     No, no, I'm good.
```

CONFIDENTIAL

Page 193

1          Q.      So this training addresses
2    ways in which gangs might post or comment
3    on social media and how administrators can
4    recognize that type of activity?
5          A.      Recognize it just for
6    informational purposes, that's what his --
7    his presentation is pretty much
8    informational purposes.  But, yes, he tells
9    us how we could recognize different signs,
10   symbols, language, and colors.
11         Q.      Okay.  That are posted on a
12   social media platform?
13         A.      Yes.
14         Q.      Do you recall if any specific
15   social media platforms were listed or
16   identified in this gang presentation?
17         A.      I don't remember specifically
18   which ones.
19         Q.      Was social -- do you recall
20   if social media was discussed at any other
21   time during this retreat?
22         A.      Not that I recall.  Besides
23   during -- sorry, besides my HIB
24   presentation, because we talk about
25   cyberbullying.  We talked about that

Page 194

1  yesterday too, so.

2          Q.      In your experience, has gang

3  violence or the presence of gangs in

4  Irvington had an impact on the mental

5  health of Irvington Public School students?

6          A.      I would say yes.

7          Q.      How so?

8          A.      We've had instances where

9  students have been killed, which would

10  ultimately affect the mental health of

11  anyone that's involved, particularly a

12  young man, before I came to Irvington, but

13  it goes to show you how it would work on

14  social media, because I wasn't in social

15  media, but my students in Newark Public

16  Schools found out about the incident where

17  a young man was killed right down the

18  street from the high school on his way

19  home.  So in those ways, it's not -- it's

20  not used in a positive way.

21          Q.      For this specific incident

22  that you --

23          A.      Yes.

24          Q.      -- just recounted, do you

25  recall when that occurred?

Page 195

1          A.     So if I came in -- I would be
2    guessing, but I think it's 2016, but I know
3    you don't want me to guess, so before 2020.
4          Q.     Before 2020, because you
5    recall that you were in the Newark School
6    System?
7          A.     Yes, yes.
8          Q.     And your recollection is that
9    many students in your district --
10         A.     Yup.
11         Q.     -- heard about this terrible
12   incident --
13         A.     Uh-huh.
14         Q.     -- because people were
15   posting about it on social media?
16         A.     Yes.
17         Q.     And do you recall what
18   platforms your students viewed these posts
19   on?
20         A.     I don't remember.
21         Q.     And your recollection is that
22   the young man who was killed was an IPS
23   student at the time?
24         A.     Yes.
25         Q.     Do you know if he was a

Page 196

1  member of a gang?

2         A.    I don't know him -- I don't

3  know him personally, but that's the

4  information that was put out there.  I

5  don't know him personally, so I can't say

6  if he was or not.  It wouldn't be fair to

7  say.

8         Q.    Do you recall hearing or

9  reading about the fact that he was a member

10  of a gang?

11         A.    I don't know if he was a

12  member of a gang, his family.  I don't know

13  the specifics of the story and I don't want

14  to go on record speaking about something I

15  do not know.

16         Q.    And in that vein, if you

17  don't know the answers, please feel free to

18  say, "I don't know."

19         A.    Uh-huh.

20         Q.    Is it your understanding that

21  this young man was killed as a result of

22  gang-related violence?

23         A.    I don't know.

24         Q.    Do you recall anything about

25  the particular gangs involved?

CONFIDENTIAL

Page 197

1          A.      I don't know.
2          Q.      You gave that -- you
3   mentioned this example of gang violence
4   when I asked you if gang violence had a
5   negative impact on the mental health of IPS
6   students, correct?
7          A.      I believe so, yes.  You ask a
8   lot of questions.  It all flows together.
9          Q.      It's because I like talking
10  to you.  In what ways does gang violence
11  have a negative impact on the mental health
12  of Irvington Public Schools?
13         A.      Just in that instance in
14  itself, the fact that it's broad daylight,
15  you're walking home from school in broad
16  daylight on a busy street right after
17  school and plenty of people around and
18  someone is shot dead in the middle of the
19  street.  That absolutely has to have an
20  effect on someone's mental health.
21         Q.      That would be --
22         A.      Their safety, not feeling
23  safe, you know, it's broad daylight.
24         Q.      Is gang violence a reason
25  that Irvington Public School students may

CONFIDENTIAL

Page 198

```
1    not come to school?
2            A.      I don't have -- I would need
3    to speak to the proper people to know that,
4    individual schools.
5            Q.      And that would be the
6    counselors and HSSCs?
7            A.      That would be administration,
8    principals.
9            Q.      You mentioned that gang
10   violence could make IPS students feel
11   unsafe or scared; is that right?
12           A.      That's safe to say.
13           Q.      And that wouldn't be limited
14   to people directly involved in those gang
15   related activities, correct?
16           A.      Can you rephrase?
17           Q.      For an Irvington Public
18   School student or strike that.
19                   It would be scary or -- it
20   would be scary for an Irvington Public
21   School student simply to know that another
22   student at the school had been the victim
23   of gang-related violence?
24                   MR. INNES:  Objection to form.
25                   THE WITNESS:  That would be
```

CONFIDENTIAL

Page 199

1          scary.  Whether it was gang related

2          or not, it would be scary.

3    BY MR. KARP:

4          Q.    Yes.

5          A.    Uh-huh.

6          Q.    Sitting here today, do you

7    know anything about how rates of gang

8    violence in Irvington compare to rates of

9    gang violence in other parts of New Jersey?

10         A.    I do not.

11         Q.    We've talked a bit about HIB

12    and bullying --

13         A.    Yes.

14         Q.    -- a bit today and also when

15    you appeared as the corporate

16    representative for the district, correct?

17         A.    Yes.

18         Q.    In your role as supervisor

19    and director since November of 2020 -- or

20    strike that.

21              Since joining IPS in

22    November of 2020, how have you gotten

23    visibility into issues of bullying in the

24    district?

25         A.    What do you mean, gotten

CONFIDENTIAL

Page 200

1  visibility?

2          Q.      Sure.  To the extent that you

3  are addressing issues of bullying in

4  Irvington Public Schools, how do you hear

5  about bullying incidents?

6          A.      From the anti-bullying

7  specialists.

8          Q.      They report information to

9  you?

10         A.      So they complete the

11 investigation and then they -- they're

12 responsible to turn them in, yes.

13         Q.      And those are the HIB claim

14 forms --

15         A.      Yes.

16         Q.      -- that we discussed on

17 Tuesday when you appeared as a corporate

18 representative?

19         A.      Yes.

20         Q.      Shifting gears a bit, Ms.

21 Pettiford, do you use social media in your

22 personal life?

23         A.      I do.

24         Q.      Okay.  Do you have any social

25 media accounts?

CONFIDENTIAL

Page 201

1          A.     Yes.

2          Q.     Which social media accounts

3    do you have?

4          A.     I have Face -- I'm older, so

5    I have Facebook.  And I have Instagram.

6    And I think, I think that's -- I may have

7    accounts on others, but I don't use

8    anything else.  I may have accounts.  Now,

9    I don't want you pulling out any paperwork

10   from your box, so I may have accounts, but

11   I don't use anything else.  Right.  I use

12   Snap for my pictures.  I've never sent a

13   message.

14         Q.     So you have a SnapChat

15   account?

16         A.     I think I have, yes, I have

17   an account.  I have an account, yes.

18         Q.     Do you have a TikTok account?

19         A.     I think I signed up, but I

20   don't use TikTok, whatever it's called,

21   TikTok, X, Y, Z.

22         Q.     Do you have a Twitter

23   account --

24         A.     No.

25         Q.     -- that is now X?

CONFIDENTIAL

Page 202

1          A.      Oh, see, I don't even know
2    which is which, no.
3          Q.      Do you have a YouTube
4    account?
5          A.      Yes.
6          Q.      Just to take these in order,
7    you said you have a Facebook account?
8          A.      Yes.
9          Q.      Do you recall when you
10   created that account?
11         A.      No.  It's been a while, a
12   long time.
13         Q.      Can you approximate?
14         A.      This is spam calls.  Two
15   thousand -- I don't even think I had it in
16   college.  I'm just going to say 2008.  I
17   don't know.
18         Q.      And I don't want you to
19   guess --
20         A.      Okay.  Because I don't know.
21         Q.      Have you had it for at least
22   ten years?
23         A.      Yes.
24         Q.      How often do you use Facebook
25   today?

CONFIDENTIAL

Page 203

1          A.      I look at it at least once a
2    week, especially during my walking
3    challenge.
4          Q.      Is that how many steps?
5          A.      Yes, so I have to --
6          Q.      Are you competing with
7    others?
8          A.      -- post, yes.
9          Q.      So you post about how many
10   steps you've taken?
11         A.      Yes.
12         Q.      How are you doing in the
13   challenge?
14         A.      Not good, because I have been
15   sitting here all day.  Not good.  For two
16   days I haven't, Tuesday and Thursday, I
17   didn't make the cut.
18         Q.      Do you post about anything
19   else on Facebook?
20         A.      Birthdays or --
21         Q.      Is that generally how you use
22   Facebook when you do?
23         A.      Yes.
24         Q.      When did you create your
25   Instagram account?

CONFIDENTIAL

Page 204

1          A.      I don't know the date.

2          Q.      Have you had it for at least

3    ten years?

4          A.      Probably.

5          Q.      How often do you use

6    Instagram?

7          A.      A couple of times a week.

8          Q.      And can you generally

9    describe how it is that you use Instagram?

10         A.      The same thing, you know,

11   they are all connected, so you post on

12   Instagram, it goes to Facebook, so maybe a

13   birthday post, maybe a trip.  I would have

14   to look, but innocent stuff.  That's one

15   paper you could pull out of your box and

16   there wouldn't be anything that we needed

17   to talk about.

18         Q.      You mentioned using SnapChat

19   for pictures.

20         A.      Oh, yes.

21         Q.      Okay.  Tell me more about

22   that.

23         A.      They give you a nice glow.

24         Q.      How often do you -- or let's

25   start at the beginning.  When did you

CONFIDENTIAL

Page 205

1   create your SnapChat account?

2           A.      That's more recent, maybe,

3   maybe within the last ten years, maybe,

4   seven, five.

5           Q.      How often do you use

6   SnapChat?

7           A.      Not very often.

8           Q.      Once a month?

9           A.      Oh, I'm sorry, maybe once a

10  week.

11          Q.      I believe you said earlier

12  that you don't -- you don't actually post?

13          A.      Yeah, I don't even know how

14  to do that.

15          Q.      But you --

16          A.      I'm sorry.  I'm sorry.

17          Q.      But you take photos using the

18  filter features --

19          A.      Yeah --

20          Q.      -- on Snap?

21          A.      -- not like filters to make

22  me not look like myself.

23          Q.      But to add glow?

24          A.      Yes.

25          Q.      You said that you -- when I

CONFIDENTIAL

Page 206

1    asked if you had a TikTok account, you said

2    maybe?

3            A.      Yeah, I think I have -- I

4    think I created an account, but I don't use

5    the app.

6            Q.      Do you remember why you

7    created the account?

8            A.      Probably because it was a

9    new -- new app around and I just created

10   it.

11           Q.      And you also said that you

12   have a YouTube account, correct?

13           A.      Yes.

14           Q.      When did you create a YouTube

15   account?

16           A.      Maybe within the last five

17   years.

18           Q.      Why did you create that

19   account?

20           A.      I like to look at videos

21   about lifestyle, beauty, fashion, sometimes

22   gossip.

23           Q.      Before you created an

24   account, did you watch videos on YouTube?

25           A.      Before I created an account,

CONFIDENTIAL

Page 207

1  did I -- I may have watched videos before I

2  created it.

3         Q.      And the distinction I'm

4  making is that with an account, you are

5  logging in and that is a place where you

6  could post content --

7         A.      Right.

8         Q.      -- post videos --

9         A.      Right.

10         Q.      -- but there are also ways to

11  watch videos on YouTube that don't involve

12  having an account.  Do you understand that

13  distinction I'm making?

14         A.      I do.  I do.

15         Q.      Before you made your account,

16  you watched some videos on YouTube?

17         A.      Yes.  Oh, and cooking shows

18  too.

19         Q.      Roughly, how often -- today,

20  roughly, how often do you watch videos on

21  YouTube?

22         A.      Not often, maybe, maybe twice

23  a month.

24         Q.      Just to circle back on some

25  of the other applications.  Why did you

CONFIDENTIAL

Page 208

1    create your Facebook account?

2           A.      To connect with my college

3    friends.

4           Q.      Why did you create your

5    Instagram account?

6           A.      I don't -- probably the same

7    reason.

8           Q.      And why did you create your

9    SnapChat account?

10          A.      I told you, for the picture.

11          Q.      ███  ████████████  ███ ███ ███

█    ██████████

█           ██     █ █

█           ██     ████ ████ ██████ ████████ ██████

█           ██     ████ ████ ██████ ████████ ███ ██

█    ████

█                  ████ ███ █ ██ ██████

█                  ████ ██████ █ ██ ██████████ █

█           ██████████ █████ ██ █ ████████ █████

█           █████ ███ ████ ██████ ████████ █

█           █████ █████

█                  ████ ██ ██ ████ ██████

█                  ████ █████ ████ █████████

25

CONFIDENTIAL



Page 209



CONFIDENTIAL

Page 211



24    a friend.

25            Q.    If he did have a phone, would

CONFIDENTIAL

Page 212

4              MR. KARP:  I do not have any

5         further questions.  I do want to

6         mark a couple of things on the

7         record, which we discussed.

8         Actually, let me do that now before

9         I -- before I ask my colleagues if

10        they have any questions.

11             MR. INNES:  I had a separate

12        idea on that.  I mean, I don't

13        know, can we reopen the 30(b)(6) so

14        it's in that transcript and then --

15             MR. KARP:  Meaning reopen it

16        right now?

17             MR. INNES:  After --

18             MR. KARP:  Or, like, after we

19        conclude --

20             MR. INNES:  Yeah, after this,

21        I don't think we even need the

22        witness to do that.

23             MR. KARP:  I'm fine.

24             THE STENOGRAPHER:  What was

25        that, Michael?  You need what?  You

CONFIDENTIAL

Page 213

1         just slipped right by me.
2              MR. INNES:  Sorry.  We don't
3         need the witness for that endeavor.
4              THE VIDEOGRAPHER:  We're going
5         off the record?
6              MR. KARP:  No, not yet.
7         Although, I think we probably do
8         need her just to confirm what they
9         are.
10              MR. INNES:  Okay.
11              MR. KARP:  But we can make
12         that quick.
13              MR. INNES:  Okay.
14              MR. KARP:  I do not have any
15         further questions.  Do any
16         Codefendants either here in person
17         or attending on Zoom have
18         questions?
19              MR. SEXTON:  I have just a
20         few.  May I borrow your microphone?
21              MR. KARP:  Do you want to
22         switch seats?
23              MR. SEXTON:  I don't think
24         I'll take very long.  You can put
25         up with me.

Page 214

```
 1              MR. INNES:  You've got about
 2         12 minutes, because we have a hard
 3         stop at 3:30.
 4  BY MR. SEXTON:
 5         Q.     Hello, Ms. Pettiford.
 6         A.     Hi.
 7         Q.     My name is Terry Sexton and I
 8  represent Meta Platforms.  Are you aware
 9  that Meta is the parent company or the
10  owner of Facebook and Instagram?
11         A.     You just made me aware.
12         Q.     Okay.  You just learned that
13  for the first time?
14         A.     I just learned it was
15  Instagram as well, yes.
16         Q.     Okay.  If I refer to Meta or
17  Instagram or Facebook, you'll understand
18  who I'm talking about?
19         A.     Yup.
20         Q.     Okay.  Have you ever
21  communicated by any means with anyone who
22  works for Meta?
23              MR. INNES:  Objection to form.
24              THE WITNESS:  Communicated,
25         not that I'm aware of, but I don't
```

CONFIDENTIAL

Page 215

1              know everyone's work history

2              either.

3    BY MR. SEXTON:

4         Q.     I'm only asking what you're

5    aware of, to your knowledge --

6         A.     Oh, yeah, no, not to my

7    knowledge.

8         Q.     Have you ever communicated by

9    any means with someone who works for

10   Facebook?

11              MR. INNES:  Objection to form.

12              THE WITNESS:  Not to my

13              knowledge.

14   BY MR. SEXTON:

15        Q.     Have you ever communicated by

16   any means with someone who you believe to

17   be working for Instagram?

18              MR. INNES:  Objection to form.

19              THE WITNESS:  Not to my

20              knowledge.

21   BY MR. SEXTON:

22        Q.     Have you ever -- strike that.

23              You told us a few minutes

24   ago that you have had both Facebook and

25   Instagram accounts for a number of years

CONFIDENTIAL

Page 216

```
 1   now; is that right?
 2        A.    Yes.
 3        Q.    Have you ever complained
 4   about a post or a user that you encountered
 5   on either Facebook or Instagram?
 6              MR. INNES:  Objection to form.
 7              THE WITNESS:  Yes.
 8   BY MR. SEXTON:
 9        Q.    Can you tell me about that,
10   please?
11        A.    I don't remember the
12   particular post, but I have reported -- I
13   have reported accounts on Instagram.  They
14   allow you to do that.
15        Q.    And what kind of accounts do
16   you remember reporting?
17        A.    I don't remember.  I don't
18   remember.
19        Q.    Do you have any recollection
20   of the kind of content that these accounts
21   that you reported were posting?
22              MR. INNES:  Objection to form.
23              THE WITNESS:  I believe it --
24              MR. INNES:  Asked and
25          answered.
```

CONFIDENTIAL

```
                                          Page 217

 1               THE WITNESS:  Oh, I'm sorry,
 2          yeah, I don't want to guess.  I'm
 3          not going to guess.
 4   BY MR. SEXTON:
 5        Q.    All I want to know is what
 6   you remember.  Do you remember anything
 7   about these accounts you reported or why
 8   you reported them?
 9               MR. INNES:  Objection to form.
10               THE WITNESS:  The only thing I
11          do remember is a cousin of mine had
12          someone create a false account of
13          them and we as a family was
14          reporting it.  The other instances,
15          I don't remember.
16   BY MR. SEXTON:
17        Q.    Okay.  And you said a cousin
18   had someone create a false account for
19   them.  First, how old was the cousin?
20        A.     An adult cousin of mine,
21   there was a -- there was a duplicate
22   account created of a family member.  They
23   didn't have them do it.  They didn't ask
24   them to do it.  It was a stranger.
25        Q.     Someone pretended to be your
```

Page 218

1    cousin?

2                    MR. INNES:  Objection to form.

3                    THE WITNESS:  Right.

4    BY MR. SEXTON:

5         Q.    And you reached out directly

6    to Instagram about that?

7         A.    By reaching out to Instagram,

8    it's an icon that you can say report this,

9    report this profile or report this ad.

10        Q.    Did you ever receive any

11   communication back from Instagram?

12        A.    No.

13        Q.    Did Instagram, to your

14   knowledge, take any action on your report?

15        A.    Not to my knowledge.

16        Q.    Do you know whether that

17   account that was created was ultimately

18   taken down?

19        A.    No, I don't know.

20        Q.    No knowledge one way or the

21   other what happened?

22        A.    No.

23        Q.    Okay.

24                    MR. INNES:  So, Counsel, it's

25            late in the day, we have a hard

Page 219

```
1              stop at 3:30.  Your questions have
2              zero -- and I understand that this
3              objection is preserved.  But I
4              don't understand any of the
5              relevance of this to the case.
6    BY MR. SEXTON:
7         Q.      Okay.  You told us earlier
8    you did not allow your son to use social
9    media when he was a child; is that right?
10        A.      Yes.
11        Q.      Why is that?
12        A.      Because he was a child and it
13   should be -- it should be earmarked for
14   adults.  I don't know what kind of content
15   he may have seen as a minor.
16        Q.      You say your son today is 28?
17        A.      He is.
18        Q.      So this would have been more
19   than ten years ago that you were
20   prohibiting your son from using social
21   media; is that right?
22        A.      Yes.
23        Q.      And why did you believe at
24   the time that your son was a child that
25   social media was inappropriate for him?
```

                                            Page 220

1        A.      I just said, because some of

2    the content is inappropriate.

3        Q.      Are you familiar with any of

4    the parental controls that Meta makes

5    available to Instagram and Facebook users?

6                MR. INNES:  Objection.

7                THE WITNESS:  No.

8    BY MR. SEXTON:

9        Q.      Are you familiar with any of

10   the safety features that Meta makes

11   available to users?

12               MR. INNES:  Objection.

13               THE WITNESS:  No.

14   BY MR. SEXTON:

15       Q.      Finally, you told us earlier

16   about some gang awareness training that

17   participants in the 2023-2024

18   administrators retreat received; is that

19   right?

20       A.      Yes, yes.

21       Q.      Is that gang training

22   something that you all receive each year?

23       A.      Yes.

24       Q.      Why?

25       A.      Because it's relevant, it's

CONFIDENTIAL

Page 221

1    important.  You want to stay up to date

2    with latest trends.

3         Q.    The latest trends in what?

4         A.    What is -- what is the

5    presentation about?  What did you just say?

6    It's gang -- what is it, a gang training,

7    gang awareness.  Things change, you should

8    be up to date.

9         Q.    So you believe it's important

10   for you as a school administrator in the

11   Irvington Public Schools to be updated each

12   year on gang violence; is that right?

13                MR. INNES:  Objection.  Asked

14         and answered.

15                THE WITNESS:  Yes.

16   BY MR. SEXTON:

17        Q.    Okay.  I don't have anything

18   further at this time.  Thank you so much.

19                Oh, I'm sorry, I asked you

20   earlier if you had ever communicated with

21   anyone who worked for Facebook or Instagram

22   or Meta.  I want to ask about the other

23   platforms just to take care of that.

24        A.    Yes.

25        Q.    Have you ever communicated by

Page 222

1    any means with anyone who works for Snap?

2         A.       No.

3         Q.       Have you ever communicated

4    with any means by anyone who works for

5    TikTok?

6                   MR. INNES:  Objection.

7                   THE WITNESS:  No.

8    BY MR. SEXTON:

9         Q.       Have you ever communicated by

10   any means with anyone who works for

11   YouTube?

12                  MR. INNES:  Objection.

13                  THE WITNESS:  No.

14   BY MR. SEXTON:

15        Q.       Have you ever communicated by

16   any means with anyone who works for Google?

17                  MR. INNES:  Objection.

18                  THE WITNESS:  No.

19                  MR. SEXTON:  That's all I've

20           got, thank you so much.

21                  MR. KARP:  Does anyone on the

22           line have additional questions for

23           Ms. Pettiford?

24   BY MS. PRASAD:

25        Q.       Yes.  I just have one

CONFIDENTIAL

Page 223

1  question on behalf of Google and YouTube.
2  This is Praatika Prasad.
3                    Does the school district
4  have a YouTube channel?
5                    MR. INNES:  Objection to form.
6                    THE WITNESS:  Not that I'm
7             aware of.  That's -- not that I
8             know of.
9  BY MS. PRASAD:
10        Q.    Okay.  Thank you.  And do you
11  know if your school district has a Facebook
12  account, a channel?
13                    MR. INNES:  Objection to form.
14                    THE WITNESS:  Not that I'm
15             aware of.  That's not my lane.
16  BY MS. PRASAD:
17        Q.    Do you know if your school
18  district has a TikTok account?
19                    MR. INNES:  Objection to form.
20                    THE WITNESS:  Not that I'm
21             aware of.
22  BY MS. PRASAD:
23        Q.    Do you know if your school
24  district has an Instagram account?
25                    MR. INNES:  Objection to form.

CONFIDENTIAL

Page 224

1                    THE WITNESS:  I don't know the
2            answer to those questions.
3    BY MS. PRASAD:
4            Q.    Okay.  This is the last one.
5    Do you know if your school has a SnapChat
6    account?
7            A.    I don't know the answer to
8    that question.
9                    MS. PRASAD:  Okay.  That's all
10           for me.  Thank you.
11                   MR. KARP:  Anyone else on Zoom
12           have questions?  Hearing nothing,
13           do you have questions for Ms.
14           Pettiford?
15                   MR. INNES:  I think I will,
16           but give me two minutes.  I'll step
17           outside and we'll come right back
18           in.
19                   MR. KARP:  Sure.
20                   THE VIDEOGRAPHER:  The time
21           right now is 3:25 p.m.  We're off
22           the record.
23                   - - - - -
24       (A recess was taken at this time.)
25                   - - - - -

CONFIDENTIAL

Page 225

```
 1              THE VIDEOGRAPHER:  The time
 2          right now is 3:31 p.m.  We're back
 3          on the record.
 4  BY MR. INNES:
 5      Q.     Good afternoon, Ms.
 6  Pettiford.  You know me, I'm Michael Innes.
 7      A.     I do.
 8      Q.     I represent the school
 9  district in this case.
10              MR. INNES:  Andrew, we have an
11          agreement that an objection for one
12          is an objection for all?
13              MR. KARP:  Thank you.
14  BY MR. INNES:
15      Q.     Thank you.  So I'm just going
16  to ask you a few follow-up questions from
17  your discussion with counsel for Snap and
18  counsel for Meta.
19      A.     Okay.
20      Q.     You'll recall that a little
21  earlier in the day Mr. Karp asked you a
22  question that to the extent that these
23  different activities involved different
24  issues such as homelessness and violence
25  and social media perhaps, drug use, are you
```

CONFIDENTIAL

```
                                    Page 226
 1   able to tell me how much an HSSC would
 2   spend on a particular issue that's
 3   affecting students.  And you answered, "I
 4   am not."
 5           A.     Oh, okay.
 6           Q.     What did you mean by that
 7   response, "I am not"?
 8           A.     It's really hard to quantify
 9   it, and I think I explained that in the
10   next answer.  It's hard to quantify a
11   percentage, especially when you lump all of
12   those categories together.  So if you
13   separate them out and I'm able to have a
14   discussion with my team, I'm able to -- I
15   would be able to accurately give you a
16   percentage.
17           Q.     So when you say, "your team,"
18   are you referring to having conversations
19   with individual HSSCs?
20           A.     Not only HSSCs, individual
21   HSSCs, individual school counselors, that's
22   the complete team.  But when you asked me,
23   I don't want to say a generic question to
24   be rude, but when you lump three topics
25   together and say, well, how much time,
```

Page 227

1    it's -- I can't give you an accurate

2    percentage, but if I went to each HSSC and

3    I said, listen, these are the -- these are

4    the areas, how much resources do you give

5    to the parent, how much time do you spend

6    on resources with parents, with violence,

7    with class lessons, with social media, with

8    stress management, then I could come back

9    and say I'll give you an average amount of

10   time.

11           Q.      Okay.   Thank you for that.

12           A.      Yup.

13           Q.      You'll recall that counsel

14   for Meta Platforms just asked you some

15   questions about parental controls.

16           A.      Okay.   Yes.

17           Q.      Okay.   Are you aware that

18   Mark Zuckerberg, the CEO of Meta, testified

19   before Congress in or about February of

20   2024?

21                   MR. SEXTON:   Object to form.

22                   MR. KARP:   Object to form.

23                   THE WITNESS:   Yes.

24                   MR. INNES:   So we had an

25            agreement, right --

CONFIDENTIAL

```
 1              MR. SEXTON:  You're asking
 2         about my client.  I didn't hear him
 3         object.  There's no need to get out
 4         of sorts about it.  We're fine.
 5         Keep going.  You told me your
 6         client had a hard stop, so let's
 7         keep going.
 8  BY MR. INNES:
 9         Q.    Okay.  Do you need me to
10  repeat my question?
11         A.    Please.
12         Q.    So are you aware that Mark
13  Zuckerberg, who is the CEO of Meta
14  Platforms, testified before Congress in or
15  around February of 2024?
16              MR. KARP:  Object to form.
17              THE WITNESS:  Yes.
18  BY MR. INNES:
19         Q.    And are you aware, during
20  that testimony Mr. Zuckerberg issued an
21  apology to parents?
22              MR. KARP:  Object to form.
23              THE WITNESS:  I am aware.
24  BY MR. INNES:
25         Q.    Okay.  And you'll recall that
```

```
                                    Page 229
 1   counsel for Meta suggested that there are
 2   parental controls in place that would
 3   protect children?
 4              MR. KARP:  Object to form.
 5              THE WITNESS:  Yes.  Sorry,
 6         yes, he asked if I was aware of
 7         those parental controls.
 8   BY MR. INNES:
 9         Q.    Okay.  If there was -- if
10   those parental controls are in place, why
11   do you believe Mr. Zuckerberg needed to
12   apologize?
13              MR. KARP:  Object to form.
14         Calls for speculation.
15              THE WITNESS:  In my opinion,
16         he wouldn't have had to apologize
17         if those parental controls were
18         effective.
19              MR. INNES:  Thank you, Ms.
20         Pettiford.  I have no more
21         questions for you.  I don't know if
22         Ms. Pettiford can indulge you guys
23         for another couple minutes, but
24         we're six minutes over now.
25              THE WITNESS:  It's okay.
```

CONFIDENTIAL

                                          Page 230

1              MR. KARP:  I have a minute of
2         questions.
3              THE WITNESS:  Uh-huh.
4    BY MR. KARP:
5         Q.    Ms. Pettiford, your counsel
6    just asked you about what it would take or
7    what would be involved in quantifying how
8    much time an HSSC spent addressing
9    different issues, do you recall?
10        A.    Uh-huh.
11        Q.    And you said or testified
12   that, just now, that you would be able to
13   do that if you had individual conversations
14   with the HSSCs?
15        A.    Right.
16        Q.    Have you done that?
17        A.    I have had individual
18   conversations.  Throughout my employment
19   here?
20        Q.    I can rephrase the question.
21        A.    Oh.
22        Q.    Have you had that type of
23   conversation with any of your HSSCs about
24   how much time they spend on social media as
25   opposed to homelessness or drug abuse or

CONFIDENTIAL

Page 231

1   any other issue?

2        A.      I have not currently.

3        Q.      Okay.  Why not?

4        A.      Because the question never

5   came up.  So in our team meetings, we do

6   have discussions about the different areas

7   that they do work in, meaning group

8   sessions, absenteeism, mental health,

9   social media, all of those things, but

10  we've never quantified it.  I never had a

11  need to quantify it until this came up.

12       Q.      You are confident that you're

13  HSSCs would be able to provide you with the

14  information necessary to do that

15  quantification?

16                  MR. INNES:  Objection to form.

17                  THE WITNESS:  I'm confident

18            that they could tell me about the

19            time spent on a day-to-day basis,

20            but, unfortunately, it wouldn't be

21            a one-size-fits-all response.

22  BY MR. KARP:

23       Q.      You mentioned earlier that it

24  varies, that the responsibilities and

25  activity of HSSCs varies a lot day to day,

Page 232

1    correct?

2          A.      And school counselors, yes --

3          Q.      And school counselors?

4          A.      -- and myself.

5          Q.      I didn't mean to leave them

6    out.

7          A.      No, no, that's fine.

8          Q.      HSSCs, counselors, yourself,

9    your day-to-day activities vary a lot,

10   correct?

11         A.      They do.

12         Q.      What information would you

13   need to hear -- or strike that.

14                 What information would HSSCs

15   and counselors use to tell you how much

16   time they are spending addressing any one

17   particular issue?

18                    MR. INNES:  Objection to form.

19                    THE WITNESS:  They could use

20            their communication log.  They

21            could use any anecdotal notes that

22            they may have to be able to tell me

23            on a day-to-day basis what they

24            have done.

25

CONFIDENTIAL

Page 233

1   BY MR. KARP:

2        Q.     Would they be estimating or

3   giving you an exact percentage?

4              MR. INNES:  Objection to form.

5        Calls for speculation.

6              MR. KARP:  You can answer.

7              THE WITNESS:  I'm assuming it

8        would be an estimate.

9   BY MR. KARP:

10       Q.     And just to clarify, you have

11  not had those conversations to date?

12       A.     I have not.  In terms of

13  percentage, correct?

14       Q.     In terms of quantifying how

15  much time they have spent.

16       A.     Yes, right.

17             MR. KARP:  I have no further

18       questions.

19  BY MR. SEXTON:

20       Q.     I just have two or three.

21  Ms. Pettiford, did you watch Mark

22  Zuckerberg's testimony?

23       A.     Did I watch it?

24       Q.     Yes.

25       A.     No, I did not watch his full

CONFIDENTIAL

Page 234

1    testimony.

2          Q.        Have you read it someplace?

3          A.        Yes, online.

4          Q.        Where did you read it online?

5          A.        I believe it was Google.

6          Q.        Did you read the entire

7    transcript or just a press report of it?

8          A.        I did not read the entire

9    transcript.

10         Q.        What did Mark Zuckerberg

11   apologize for?

12         A.        For -- he apologized to

13   parents for any wrongdoing -- and I'm not

14   quoting Mark Zuckerberg -- for any

15   wrongdoing or harm that has come to the

16   children that were affected with the lack

17   of parental, what's the word, parental

18   restrictions?

19         Q.        Controls?

20         A.        Controls, thank you.

21         Q.        You told us earlier you're

22   not familiar with Meta's parental controls,

23   right?

24         A.        I have never read Meta

25   parental controls.

CONFIDENTIAL

```
                                        Page 235

 1            MR. SEXTON:  That's all I've
 2       got.  Thank you.
 3            MR. KARP:  Do you have any?
 4            MR. INNES:  No, not after
 5       that.
 6            MR. KARP:  Anyone on the line
 7       have anything further?
 8            Did you want to close and
 9       reopen, how do you want to
10       handle?
11            MR. INNES:  Yeah, I mean, I
12       think it's cleaner just to keep the
13       transcript the transcript.
14            MR. KARP:  Sure, as long as
15       Ms. Pettiford can stay for a couple
16       of minutes.
17            THE WITNESS:  I'm fine.  Yup.
18            MR. KARP:  With that, I
19       believe we're done for the day.
20            MR. INNES:  The time on the
21       record.
22            THE VIDEOGRAPHER:  So Mr. Karp
23       had been on the record for three
24       hours and 45 minutes.  Mr. Sexton
25       has been on for seven minutes.
```

CONFIDENTIAL

Page 236

1           Ms. Prasad for one minute.  And

2      Mr. Innes four minutes.  The time

3      right now is 3:40 p.m.  We are off

4      the record.

5                 - - - - -

6              (Whereupon, the deposition

7      was concluded at 3:40 p.m.)

8                 - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 237

1                    C E R T I F I C A T I O N

2

3

4             I HEREBY CERTIFY that the proceedings and

5     evidence are contained fully and accurately in the

6     stenographic notes taken by me upon the foregoing

7     matter on May 15, 2025, and that this is a correct

8     transcript of same.

9

10

11

12

13     *Robin L. Clark*

14     _____

15              Robin L. Clark
       Registered Professional Reporter

16

17

18

19

20

21             (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means unless under the direct control

24     and/or supervision of the certifying reporter.)

25

CONFIDENTIAL

Page 238

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8              After doing so, please sign the errata

9    sheet and date it.

10             You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13             It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 239

```
1                    -  -  -  -  -
2                  E  R  R  A  T  A
3                    -  -  -  -  -
4    PAGE      LINE       CHANGE
5
6    ____      ____       _____

7    ____      ____       _____

8    ____      ____       _____

9    ____      ____       _____

10   ____      ____       _____

11   ____      ____       _____

12   ____      ____       _____

13   ____      ____       _____

14   ____      ____       _____

15   ____      ____       _____

16   ____      ____       _____

17   ____      ____       _____

18   ____      ____       _____

19   ____      ____       _____

20   ____      ____       _____

21   ____      ____       _____

22   ____      ____       _____

23   ____      ____       _____

24   ____      ____       _____
25
```

CONFIDENTIAL

Page 240

1          ACKNOWLEDGMENT OF DEPONENT

2          I, SHELLEY PETTIFORD, do hereby

3    certify that I have read the foregoing pages

4    and that the same is a correct

5    transcription of the answers given by me to

6    the questions therein propounded, except for

7    the corrections or changes in form or

8    substance, if any, noted in the attached

9    Errata Sheet.

10

11   DATE                    SIGNATURE

12

     Subscribed and sworn to before me this

13

             day of                    ,

14

     2025.

15

16   My commission expires:

17

18

19

20   Notary Public

21

22

23

24

25