*[Submitting Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047<br><br>Case No. 4:22-md-3047-YGR<br><br>**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)** |
| This Document Relates to:<br>*Board of Education of Harford County v. Meta Platforms, Inc., et al.*<br><br>Case No.: 4:23-cv-03065 | **Hearing:**<br>Date: January 26, 2026<br>Time: 8:00 A.M.<br>Place: Oakland, California<br>Judge: Hon. Yvonne Gonzalez Rogers |

1

**TABLE OF CONTENTS**

2

Page

3

I.    INTRODUCTION ...................................................................................................1

4

II.    ARGUMENT ........................................................................................................2

5

A.    Genuine Disputes of Material Fact Preclude Summary Judgment on
Causation.................................................................................................... 2

6

7

1.    Defendants misconstrue the evidentiary record and the role of

"third-party content" in Harford's claims. ....................................... 2

8

9

2.    Harford need only demonstrate that each Defendant's conduct was

a substantial factor in causing the alleged harm............................... 3

10

11

3.    Harford's testimonial and documentary evidence establish a

genuine dispute of material fact regarding causation....................... 4

12

a.    Evidence regarding causation and mental health ................ 4

13

b.    Evidence regarding causation and diverted instructional

time..................................................................................... 6

14

15

c.    Defendants' alternative theories of causation do not

disprove Plaintiffs' theory of causation .............................. 7

16

B.    A Reasonable Jury Could Hold Defendants Liable for Failing to Warn
Harford About the Dangerous Nature of Their Platforms. .......................... 9

17

1.    Maryland law follows the heeding presumption, which makes this

18

issue unsuitable for judgment as a matter of law. ............................ 9

19

2.    Defendants mischaracterize the facts that they claim show Harford

20

would not have heeded a warning.................................................. 10

21

C.    Harford Has Suffered Harm from Defendant's Conduct .......................... 11

22

III.    CONCLUSION ...................................................................................................14

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**Cases**

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
   2023 WL 4352081 (N.D. Fla. July 5, 2023) ......................................................... 9

*AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*,
   10 A.3d 745 (Md. 2010) ...................................................................................... 12

*Consumer Prot. Div. v. Morgan*,
   874 A.2d 919 (Md. 2005) ...................................................................................... 4

*CSX Transp., Inc. v. Miller*,
   159 Md. App. 123, 858 A.2d 1025 (2004) ............................................................. 7

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) .................................................................................. 3

*Eagle-Picher Indus., Inc. v. Balbos*,
   604 A.2d 445 (Md. 1992) ................................................................................. 9, 10

*Est. of Fisher v. City of Annapolis*,
   2024 WL 1299353 (D. Md. Mar. 27, 2024), *recons. granted in part on other
   grounds*, 2024 WL 3275643 (D. Md. July 2, 2024) ................................................ 4

*Innovative Sports Mgmt. Inc. v. Hunt*,
   2020 WL 3121192 (D. Ariz. Feb. 24, 2020) ........................................................... 3

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ................................................................................ 3

*Mayor & City Council of Baltimore v. Monsanto Co.*,
   2020 WL 1529014 (D. Md. Mar. 31, 2020) .......................................................... 12

*Mitchell v. Rite Aid of Md., Inc.*,
   290 A.3d 1125 (Md. App. Ct. 2023) ....................................................................... 4

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .................................................................................. 2

*Russo v. Duracell Inc.*,
   2024 WL 3256572 (D. Nev. June 28, 2024) ........................................................... 7

*Schultz v. Bank of Am., N.A.*,
   990 A.2d 1078 (Md. 2010) ................................................................................... 12

*State v. Exxon Mobil Corp.*,
   406 F. Supp. 3d 420 (D. Md. 2019) ........................................................................ 9

*Strong v. Prince George's Cnty.*,
   549 A.2d 1142 (Md. Ct. Spec. App. 1988) ......................................................................... 12

*U.S. Gypsum Co. v. Mayor & City Council of Balt.*,
   647 A.2d 405 (Md. 1994)........................................................................................................ 9

*Wolff v. Magal*,
   2022 WL 2282682 (Md. Ct. Spec. App. June 23, 2022) ...................................................... 12

**Statutes**

20 U.S.C. § 1232(g) ...................................................................................................................... 3

Maryland Telephone Consumer Protection Act............................................................... 12, 13

Md. Code Ann., Educ. § 4-131 ................................................................................................... 3

1

## I.    __INTRODUCTION__

Harford County Public Schools ("Harford," "HCPS," or the "District") is a medium-sized suburban school district in northeast Maryland. In 2023, total enrollment at HCPS—including Elementary, Middle, and High Schools—was 38,105 students. Ex. 1 at 23. Harford's mission statement is: "Each student will attain academic and personal success in a safe and caring environment that honors the diversity of our students and staff." Ex. 3. Harford works diligently to fulfill this mission each day. However, Defendants' conduct in operating addictive and harmful social media platforms has severely hindered the District's ability to do so, harming student well-being, disrupting learning, and straining school resources.[1]

Harford witnesses report that they have faced increasing pressure on their staffing and finances that are directly related to harms flowing from students' compulsive or problematic use of Defendants' platforms. According to the HCPS Executive Director of Student Services Buck Hennigan, who has more than 25 years of relevant experience, student mental health in particular has suffered:

> [W]hat I've seen over the years is that students have become so addicted to getting onto their social media on their phone that someone's desire to take that from them is equivalent to taking a drug from a drug addict, that they would rather do anything than give that up, including fighting and cursing and pushing and shoving or running.

Ex. 4 at 109:8-15. Addressing these issues diverts teacher and administrator time from Harford's core educational mission, which negatively affects instruction, the school environment and learning. As Superintendent Sean Bulson explains, "trying to take a phone from a student . . . cuts into instructional time. A teacher has to decide every minute they're in the building whether they're going to take a minute to address a student about cell phones or . . . spend that minute teaching." Ex. 5 at 84:3-10; *see also* Ex. 12 (expert survey regarding lost teacher time).

Harford's educators and administrators care deeply about their students and have performed admirably under difficult circumstances. Nevertheless, Defendants' platforms have profoundly disrupted school life by fueling an unprecedented rise in student mental health issues and consuming valuable instructional and administrative time. These harms make it harder for Harford

---

[1] Plaintiffs incorporate by reference their Omnibus Opposition to Defendants' Motion for Summary Judgment.

1    to fulfill its mission of ensuring each student's academic and personal success in a safe and caring

2    environment. Through this suit, Harford seeks compensation for the damage already done and

3    measures to abate these harms going forward.

4    **II.    ARGUMENT**

5        **A.    Genuine Disputes of Material Fact Preclude Summary Judgment on
           Causation.**

6        Defendants do not argue "that there is an absence of evidence to support" Harford's case,

7    as they must to obtain summary judgment. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th

8    Cir. 2010). Nor do they address if the evidence establishes causation under Maryland's "substantial

9    factor" test; it does. Instead, they disagree with what that evidence shows—or, in their parlance,

10   that the evidence is not "competent." They say all of Harford's harm was caused by non-actionable

11   third-party content, ignoring the mountain of evidence of compulsive or problematic use by

12   students that has caused serious disruption of the school environment, which has in turn resulted in

13   diverted instructional time and increased mental health and technology costs to address these harms.

14   Defendants' arguments do not come close to satisfying their "burden of proving the absence of a

15   genuine issue of material fact" and summary judgment should be denied on that basis alone. *Id.*

16       Harford easily meets its burden to show that "a jury could reasonably render a verdict in

17   [its] favor." *Id.* The record includes direct testimony linking student use of Defendants' platforms

18   to diverted instructional time and increased mental health costs. Defendants' alternative-cause

19   theories are unsupported by the record. The Court should reject Defendants' efforts to present

20   conjecture as fact and deny summary judgment on causation.

21       **1.    Defendants misconstrue the evidentiary record and the role of "third-
              party content" in Harford's claims.**

22

23       Defendants largely focus their causation argument on whether Harford has sufficiently

24   connected its harms to Defendants' design choices and "actionable" features, rather than third-party

25   content on their platforms. This argument fails, for two reasons.

26       *First,* Harford has considerable evidence beyond what Defendants classify as "third-party

27   content" to support its claims of direct harm caused by Defendants' platforms and their design

28   choices. This includes testimony from school district witnesses that directly tie the features of

Defendants' platforms to harm to Harford which they have observed first-hand, such as increasing amounts of classroom time diverted and emerging student mental health issues.

Defendants do not address that evidence. Instead, they point to other, nonexistent categories of evidence they say Harford should have relied on. For instance, they claim Harford should have adduced "evidence regarding the number of its students who used Defendants' platforms [or 'at-issue' features], let alone evidence broken down by students' ages." Mot. Summ. J. (Harford) at 17 (Sep. 30, 2025), ECF No. 2296 ("Mot."). Defendants ignore that it is unclear whether or how Harford could have even conducted this type of surveillance on its student population given student privacy laws. *See, e.g.*, 20 U.S.C. § 1232(g) (placing restrictions on disclosure of student records); Md. Code Ann., Educ. § 4-131 (placing restrictions on how student data may be used and collected). Regardless, Rule 56 is not concerned with whether the non-moving party should or could have adduced different categories of evidence; it asks only whether that party can point to evidence that actually exists to demonstrate a triable question of fact. *Innovative Sports Mgmt. Inc. v. Hunt*, 2020 WL 3121192, at *3 (D. Ariz. Feb. 24, 2020) ("When judging the evidence at the summary judgment stage, the district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party.").

*Second,* Defendants' motion assumes that third-party content is inadmissible at trial. As explained in Plaintiffs' Omnibus Summary Judgment Opposition § III.B.2.a, that is the incorrect legal standard. To interpret section 230 and the First Amendment as broadly as Defendants do would effectively absolve liability for any activity by any website or social media company. *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (Section 230 "does not declare a general immunity from liability deriving from third-party content"); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021) ("publishing content is 'a but-for cause of just about everything'" a social media company does). Moreover, all of Defendants' features and their platforms as a whole remain "actionable" under Plaintiffs' failure to warn claims. *See* Mot. at 44-45.

**2.** <u>**Harford need only demonstrate that each Defendant's conduct was a substantial factor in causing the alleged harm.**</u>

Defendants also argue that no triable question on causation exists because Harford (in their

telling) cannot precisely quantify each Defendant's role in harming the District. As Plaintiffs explain in their Omnibus brief, multiple tortfeasors cannot escape liability simply because all of their actions harmed the plaintiff. *See* Pls. Omni Opp. § III.C.2.b; *Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 953 (Md. 2005) (it would be "impossible" to require plaintiffs to "prov[e] each concurrent tortfeasor's share of liability," and "[t]his 'absurd result' is solved by shifting the burden of apportioning liability to the defendants through joint and several liability" (citation omitted)). That proposition is clearly true as a matter of black-letter law, as well as the law of Maryland. *See, e.g.*, *Mitchell v. Rite Aid of Md., Inc.*, 290 A.3d 1125, 1157 (Md. App. Ct. 2023) (if the defendant's conduct was "one of multiple causes," the plaintiff must show that "it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries"); *Est. of Fisher v. City of Annapolis*, 2024 WL 1299353, at *7 (D. Md. Mar. 27, 2024) ("[A] single injury can, of course, have multiple proximate causes, all of which can support liability for that injury."), *recons. granted in part on other grounds*, 2024 WL 3275643 (D. Md. July 2, 2024). Here, a jury could find that each Defendant's conduct was a substantial factor in causing Harford's injuries.

### 3.  Harford's testimonial and documentary evidence establish a genuine dispute of material fact regarding causation.

Harford's evidence draws a clear line from Defendants' platforms to rising student mental health issues and the diversion of school time and resources. Experienced HCPS educators have witnessed these effects firsthand. At a minimum, this evidence raises a triable issue of fact on causation, requiring denial of summary judgment.

### a.  Evidence regarding causation and mental health

Buck Hennigan leads Harford's mental health services team and has served as the HCPS Assistant Superintendent of Student Support Services since 2017—the entire relevant period in this litigation. Cumulatively, Hennigan has worked in education for more than 25 years as a teacher, pupil personnel worker, and assistant principal. He has been on the front-line of student mental health issues and has witnessed first-hand the degradation in student mental health due to use of Defendants' platforms among the students that Harford serves. By his account, "we have not seen this drastic change in the mental health of our children . . . over the last hundred years that we have

1   seen in this very short window since social media came on the rise." Ex. 4 at 155:10-23. He has

2   observed this change in both boys and girls. Hennigan has observed that young girls have felt more

3   pressure regarding their appearance, and "depression, anxiety, the suicides skyrocketed." *Id*. at

4   155:20-23. He has also observed that boys are increasingly insular and disinterested, noting that

5   "the amount of boys getting their driver's license, getting jobs, going outside and playing and

6   having . . . slightly risky behavior and result in slight injuries, dating, all those things have

7   dramatically dropped in the last several years when social media came on the rise." *Id*. at 156:8-16.

8       Hennigan's eyewitness testimony is consistent with what Dr. Hoover reports in her general

9   and case-specific expert reports. District leaders reported to Dr. Hoover in her qualitative interviews

10  on the "erosion of [the] social-emotional development" of its students. Ex. 7 at 10 ¶ 51. Harford's

11  leaders observed: "We have seen a decline in our students' ability to appropriately socialize with

12  each other because so many of their interactions are with a phone." *Id*. Dr. Hoover appropriately

13  explains that this testimony is consistent with harm caused by increased social media use. *See, e.g.*,

14  Ex. 8 at 11 ¶ 48 ("A significant reduction in activities such as dating and spending time with friends

15  points to a displacement effect in which time spent on social media replaces opportunities for real-

16  world social interaction. This decline in face-to-face connections is linked to heightened feelings

17  of loneliness and social isolation among adolescents.").

18      Defendants also ignore documentary evidence that shows platform use causes mental health

19  harms. Harford identified "screen time" as an issue affecting students in its Wellness Needs

20  Assessment conducted in 2022, which reported that:

21          Over forty percent of student respondents indicate spending between *two hours and
            six hours* looking at a screen outside the school day. Nearly one-quarter of students
22          report spending *more than six hours* outside the school day looking at screens (23%).
            Only 14 percent of students look at screens for less *than two hours* outside the school
23          day.

24  Ex. 9 at 22. For example, in 2023 the HCPS Office of Strategic Initiatives collected strategic

25  focus group data from HCPS stakeholders regarding student cell phone use that provides evidence

26  of the mental health harms and disruptive effects of social media on Harford students, teachers,

27  and administrators. Harford identified the need for this study by April 2023 and the District

28  collected the focus group data in early June 2023, essentially contemporaneously with when it

filed suit. Ex. 10 at 3-4; Ex. 11 (email dated April 27, 2023 discussing proposed study).

     **b.**  **Evidence regarding causation and diverted instructional time**

  Harford does not rely solely on staff testimony and documents to establish diverted instructional time. It also submits expert testimony from Mr. Robert Klein, who surveyed Harford teachers on the amount of time "diverted from available classroom instruction time" as a result of use of Defendants' platforms. Ex. 12 at 5 ¶ 19. Defendants are wholly dismissive of Mr. Klein's survey, but for the reasons stated in Plaintiffs' Opposition to Defendants' Motion to Exclude, Defendants attacks on the survey fail. *See* SD Daubert Opp. § III.C.

  Defendants also ignore testimony from Harford fact witnesses about the causal link between social media and instructional disruption. Dr. Sean Bulson has 30 years of experience in public education and has served as Superintendent of HCPS since 2018. He has also served as a high-level administrator, principal, assistant principal, and teacher. Ex. 13. Drawing on his own experience as a principal prior to becoming a superintendent, Dr. Bulson testified that social media platforms are "constantly present in our classrooms and . . . a challenge that the teachers every day struggle with how to address." Ex. 5 at 94:5-19. While he could not recall "explicit conversations" with principals or assistant principals about the amount of time that teachers spend dealing with social media, he reports that "when we talk about discipline challenges, it always comes up. When we talk about students' ability to focus in classroom, it always comes up." *Id.* Every minute a teacher spends getting a child off of social media is a minute that "cuts into instructional time." *Id.* at 84:3-15. Dr. Bulson's testimony is corroborated by statements by Harford leadership, including Executive Director of Student Services Hennigan, who recalled a teacher telling him that "it was a struggle to keep the attention of the students in part because of wanting to access their phones during the day and in part because of their rewiring of their brain due to social media outside of the school day." Ex. 15 at 123:21-124:1. This is consistent with Mr. Klein's survey data collected from Harford teachers, which concluded "that from 2014 through the present, middle school and high school teachers in [Harford] have had an increasing amount of their scheduled classroom instruction time diverted due to the use of Defendants' social media platforms by their students." Ex. 12 at 2 ¶ 1.

  In addition, according to Harford's *Student Cell Phones Strategic Focus Group Report*,

students, teachers, and administrators in the District identified the "influence of social media" as a "disadvantage" of student cell phone use. Ex. 10 at 6-8. Harford teachers and administrators interviewed for this report also consistently identified instructional diversion as an issue, with teachers identifying "Class disruption," "Defiance," and "Increased cognitive load" and administrators identifying "Addiction," "Disengagement," "Distracti[on]," "Inability to focus," and "Increase in social anxiety" as "drawbacks" of student cell phone use. *Id.* at 7-8.

Defendants are likely to argue that "cell phone" use or "screen time" does not equate with social media use. This would be contrary to the scientific evidence, including studies authored by Plaintiffs' experts that show that when students use their cellphones, it is primarily to use social media. For instance, Dr. Christakis independently studied adolescent daily smartphone use during school hours and Instagram, TikTok, and Facebook were among the most used platforms. Ex. 16 at 278-79 ¶¶ 471-72. Dr. Twenge's research also confirms that the amount of time that students spend on social media has increased substantially: "Adolescents in 2013 spent less than 1.5 hours a day on social media; by 2023, they spent 4.8 hours a day." Ex. 17 at 11 ¶ 34 (citations omitted).

### c.   Defendants' alternative theories of causation do not disprove Plaintiffs' theory of causation

Defendants point to a laundry list of societal factors they insist are the true cause of Harford's mental health crisis. But even if Harford experienced harm from these other factors that says nothing about whether Defendants' social media platforms were *a substantial factor* in causing the harm alleged in this case. And Harford's witnesses do not agree that these other issues negate the harms of social media. As Buck Hennigan testified, while gun violence, poverty, and homelessness have existed for many years, they "didn't prevent people from socializing; from getting their license; from wanting to, you know, go out and play; all those things." Ex. 4 at 156:8-19. At best, these alternative causes establish a genuine dispute of material fact as to Defendants' affirmative defenses. *Russo v. Duracell Inc.*, 2024 WL 3256572, at *4 (D. Nev. June 28, 2024) ("While Defendants allege that Plaintiff has not negated this potential alternate cause . . . , Plaintiff was not required to do so at [the summary judgment] stage." (citation omitted)); *cf. CSX Transp., Inc. v. Miller*, 159 Md. App. 123, 207, 858 A.2d 1025, 1073 (2004) (affirming where "[t]he

*alternative causes* suggested by a defendant *affect the weight* that the jury should give the expert's testimony *and not the admissibility of that testimony*").

Similarly, after the isolated shooting on Harford's campus that Defendants highlight occurred, Harford received 33 threats in under a month, primarily on social media. According to Harford County Sheriff Jeffrey Gahler: "When you see the shooting incidents around the country and then, unfortunately, the shooting incident we had, you can expect a reaction and more things to be shared on social media and more concerns." Ex. 6 at 1. As even Defendants' expert Dr. Jack R. Smith acknowledges, these types of threats have increased in the digital world.[2] That said, while violence is a sad reality in schools, Defendants have not been able to identify any evidence that suggests that Harford is a particularly violent school district.

Defendants also identify COVID and chronic absenteeism as alternative causes, but they neglect evidence that their platforms spurred increased use of social media, and the accompanying negative mental health effects, during the COVID pandemic. For instance, Dr. Hoover observed that "[d]uring the pandemic, students' reliance on social media increased dramatically, exposing them to addictive design features that worsened sleep, anxiety, and social isolation. These dynamics amplified the documented harms associated with social media." Ex. 14 at 38 ¶ 143.[3] And while Defendants claim that chronic absenteeism was an issue at HCPS, as it was at nearly all public schools, their own expert disagrees that Harford was uniquely affected: "According to data from the Maryland State Department of Education, Harford County's 2023 chronic absenteeism rate was 23.4% placing it among the lowest rates in Maryland." Ex. 21 at 39 ¶ 148.

Other alternative causes invoked by Defendants also have little relevance to Harford. While Harford certainly has students who experience poverty, it is not a high-poverty district. As NCES data supports and defense expert Dr. Smith acknowledges, Harford is above both the state and national average on every metric measuring school poverty such as median household income, SNAP eligibility, and parent education level. Ex. 20 at 87-91 (discussing NCES data, Ex. 2).

---

[2] Ex. 20 at 77:22-78:9 (Q: "[I]n your experience as superintendent, have you ever received 33 school shooting threats within one month? A: Not to my recollection; although, it's hard to say.").
[3] *See also* Ex. 17 at 21 ¶ 55 (Twenge opining that "pandemic and lockdowns cannot be the cause of the increases in depression, self-harm, and suicide occurring between 2008 and 2019" and noting research shows rises in depression during pandemic "were small compared to the large increases before COVID that coincide with the rise of social media and smartphones").

Defendants also claim that Harford has budgetary issues, but Harford consistently exceeds Maryland and national averages on graduation rate and SAT scores. This is despite Harford having some of the lowest per pupil expenditures among Maryland public school systems with regard to overall budget, administration, mid-level administration, and instructional salaries. Ex. 22 at slide 9 (Table 3). Harford is tasked with doing the most good with the most efficiency. It appears to succeed in this regard, despite Defendants' claims otherwise.

In light of this evidence, Harford has shown a genuine dispute of material fact on causation.

### B.     A Reasonable Jury Could Hold Defendants Liable for Failing to Warn Harford About the Dangerous Nature of Their Platforms.

Defendants' claim that Harford would not have heeded warnings about their dangerous and addictive products is without merit. At minimum, under Maryland's heeding presumption, Harford has carried its burden of establishing a triable question of fact about whether they would have heeded such a hypothetical warning. Defendants' fact-bound disagreements are arguments they must make to the jury, not this Court on summary judgment.

### 1.     Maryland law follows the heeding presumption, which makes this issue unsuitable for judgment as a matter of law.

Maryland law recognizes the heeding presumption: an evidentiary presumption in failure to warn cases that "plaintiffs would have heeded a legally adequate warning had one been given." *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 464 (D. Md. 2019) (quoting *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 647 A.2d 405, 413 (Md. 1994)). "The presumption alone is sufficient to establish a triable issue of fact on the issue of causation." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2023 WL 4352081, at *3 (N.D. Fla. July 5, 2023) (Maryland law). In spite of the heeding presumption, Defendants argue that "[t]here is no evidence that, in the face of such a warning, Harford itself would have further restricted access to Defendants' platforms by students." Mot. at 44. This argument ignores that "direct evidence that [Harford] would have heeded adequate warnings [is] not an essential element of [its] case." *Eagle-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 469 (Md. 1992). Even if this were a proper legal argument, it is directed at the wrong audience. "[D]efendants ask [the Court] to ***hypothesize that warnings were given***, and then ask [the Court] to contemplate the effects of the hypothetical warnings. *Id*. at 468. This is a

1   question for the jury, based on its knowledge of the "natural instinct" and "disposition" of persons

2   to guard themselves against danger. *Id*. at 469. "[T]he possibility of heedlessness on [Harford's]

3   part[] is not, as a matter of law, a superseding cause." *Id*. at 470.

4          **2.    Defendants mischaracterize the facts that they claim show Harford
                   would not have heeded a warning.**

5          Defendants criticize Harford for not adopting its restrictive cell phone policy earlier,

6   suggesting that this shows it was at fault for failing to mitigate its damages. Essentially, this

7   argument is a preview of what it surely intends to argue as contributory negligence at the trial stage.

8   In any event, this does not show that Harford would not have heeded a warning. Instead, it shows

9   a diligent administration trying to meet the moment, one that surely would have acted differently if

10  appropriately warned regarding Defendants' dangerous platforms.

11         In the first instance, Defendants' account of Harford's policymaking is false. Since 2018-

12  2019, the Parent-Student Handbook has noted that: "Students are subject to suspension for

13  forwarding social media content resulting in danger or disruption, even if they did not create the

14  original content, including but not limited to: bullying, harassment, threats, threats of school

15  violence, and hate messages." Ex. 23 at -55981. Harford also did community outreach to parents to

16  help educate them on social media, including by producing a video where an assistant principal

17  discussed both the benefits and "more seedy things" on social media. Ex. 20 at 142-143. The

18  Harford County Board of Education later codified this policy in 2022 by amending its bullying

19  policy to include "Cyberbullying," which means "bullying which takes place via digital devices

20  including, but not limited to, cell phones, computers, tablets, by means including, but not limited

21  to, . . . social media . . . and which allow viewing, participation in, or sharing content." Ex. 24 at -

22  33163-64. A jury could reasonably conclude that these were reactions by a school system that, like

23  the rest of society, did not fully grasp that the platforms were designed to be addictive.

24         As new information came to light showing that the platforms that were a substantial cause

25  of the harm—that Defendants were the primary bad actors, not students or third-parties, Harford

26  changed its approach by, as Defendants note, instituting a "restrictive" cell phone use policy. As

27  described above, Harford initiated a focus group to study the issue in spring 2023 and published a

28

PLS.' OPP'N. TO DEFS.' MOT. FOR SUMM. JUDG.
(HARFORD) (SD MSJ NO. 6)
CASE NO. 4:22-MD-3047

report with their findings in August 2023. *See* Ex. 10. This restrictive policy was consistent with Harford's diligence in advancing policies based on what its leaders know about potential threats. The Board of Education of Harford County then duly considered the evidence collected in the focus group and amended its Personal Communications Device Policy on March 18, 2024—less than a year after convening its focus group. *See* Ex. 25. If Harford was aware of the dangerous and addictive design of Defendants' platforms earlier, it could have acted more quickly to restrict cell phone use. But school boards cannot act on knowledge they do not possess.

To be clear, even if the device policy has reduced some of the harms or time diverted by social media as Defendants argue, this policy has costs and requires that district resources be spent on enforcement and only time will tell how well it will work in the long term, particularly given that students continue to use social media outside of school. Harford's Director of Pupil Personnel Services Buzz Williams testified that while restrictive cell phone policies may be "good in theory," in practice students are so invested in social media use that enforcing such a policy would "feel like holding back a tsunami wave with your hand standing on the shore." Ex. 26 at 39:20-25.

Defendants also argue that Harford's institutional use of certain social media platforms, such as "Facebook, Twitter, Instagram, [and] YouTube" (Mot. at 5), means it would not have followed warnings. Defendants do not distinguish between Harford's legitimate need to communicate with parents (facilitated in large part by Defendants, *see* Omnibus Opp. to MSJ), and students' compulsive use of social media. As Harford's Communications Director Jillian Lader testified, "I encourage parents and guardians [to follow us on social media]. I don't encourage students." Ex. 19 at 39:24-25. This is because "with appropriate parent and guardian use of social media, we can provide information in a fast and easily accessible way so that a parent doesn't have to be connected to email or searching out a website." *Id*. at 42:13-17.  Harford has also purchased a new program that will allow it to communicate important updates to parents and the community without constant monitoring of social media platforms. *Id*. at 61:19-63:13.

C. <u>Harford Has Suffered Harm from Defendant's Conduct</u>

Defendants claim that Harford has not produced any evidence that can show compensatory or abatement damages, largely disregarding the testimony of Harford's damages experts. Expert-

1   specific arguments are largely addressed in Plaintiffs' Opposition to the Motions to Exclude the SD

2   Experts § III.C-H. But Harford has also in fact produced evidence sufficient to create a genuine

3   dispute of material fact with regard to each of the categories of damages it claims. *See* Ex. 7 & 12.

4   The Maryland cases that Defendants cite are distinguishable. *Mayor & City Council of*

5   *Baltimore v. Monsanto Co.* involved a claim of public nuisance, but that was not a decision on a

6   summary judgment motion, rather the court held it was "premature" to rule on damages at the

7   motion to dismiss stage "as there has been no discovery or development of a record in this case."

8   2020 WL 1529014, at *8 (D. Md. Mar. 31, 2020). The other two cases are both factually and legally

9   dissimilar. *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1085 (Md. 2010) (whether expert was

10  required to show breach of duty in bank fraud case); *Strong v. Prince George's Cnty.*, 549 A.2d

11  1142, 1145 (Md. Ct. Spec. App. 1988) (whether expert was required to prove causation of illness

12  after car accident). In the sole case Defendants cite that analyzed damages in the context of

13  summary judgment motion, the Court made clear that the only reason it ruled against plaintiff was

14  because "she presented ***no evidence*** establishing that [the decedent's] emotional distress resulted

15  in an injury capable of objective determination." *Wolff v. Magal*, 2022 WL 2282682, at *8 (Md.

16  Ct. Spec. App. June 23, 2022) (emphasis added). There, "[t]he only evidence presented by

17  [plaintiff] that provided any insight into [decedent's] emotional distress came from the affidavit

18  and answers to interrogatories attached to her response to Appellees' motion for summary

19  judgment." *Id.* at *8. Harford has provided much more than affidavits and interrogatory responses;

20  it has provided testimony, documents, and expert reports that support its claimed compensatory and

21  nuisance damages. Defendants' arguments to the contrary fail.

22  ***First,*** Defendants claim that Harford has "no evidence of actual losses." Mot. at 26.

23  Defendants essentially argue that because teachers are paid the same salaries regardless of how

24  much time Defendants have taken away from their instruction time, Harford "did not fail to earn

25  that amount as a result of Defendants' platforms" so there are no "actual damages." Defendants cite

26  a single case, *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, which, in fact, says the complete

27  opposite of what Defendants contend. 10 A.3d 745, 752 (Md. 2010). That case considered damages

28  under the Maryland Telephone Consumer Protection Act, holding that "actual damages could

involve, for example, the costs of the paper and ink used in processing the unsolicited faxes . . . and *the lost employee productivity* associated with the receipt, review, and disposal of the unwanted faxes, none of which is a fixed or liquidated sum." *Id*. (emphasis added). Whether these damages are characterized as a loss of employee time or productivity, there is substantial evidence to support.

Defendants characterize damages related to time diversion as essentially loss of business profits, but this fundamentally misconstrues Harford's mission as a public school system, which is not to turn a profit. Rather, Harford's mission is to help its students "attain academic and personal success in a safe and caring environment." Ex. 3. This mission becomes difficult when teachers, rather than focusing on academics and personal growth, are enforcing school polices on social media use. As explained by Superintendent Sean Bulson, "trying to take a phone from a student who is noncomplying [with a school policy] cuts into instructional time. A teacher has to decide every minute they're in the building whether they're going to take a minute to address a student about cell phones or whether they're going to spend that minute teaching." Ex. 5 at 84:3-10.

Dr. Bulson's testimony is bolstered by the survey of Harford teachers performed by Mr. Robert L. Klein showing "that from 2014 through the present, middle school and high school teachers in Plaintiff's school district have had an increasing amount of their scheduled classroom instruction time diverted." Ex. 12 at 2 ¶ 1. Mr. Klein's results show a clear increase in diverted time over the last decade, before and after both the pandemic and the return to in-person learning, before tapering off somewhat in the last school year. *Id*. at 2 ¶ 2, at 11-12 ¶ 41. Dr. Ward then calculated the value of the lost time reported. These are "actual damages" to the District and compensable as an "injury or loss" or an "advantage or benefit that it failed to receive." Ex. 31 at 1 ¶ 1.

***Second,*** Defendants argue that Harford would have spent the same amount of money on mental health salaries regardless of harms it suffered from their platforms. Mot. at 29-30. Even a cursory review of the evidence shows this is false. Harford witnesses trace these additional costs in substantial part to social media use. According to Buck Hennigan, HCPS students "are experiencing mental health crises at a level that we've never seen before." Ex. 4 at 152:9-15. As a result, the need for school-based mental health services "has grown exponentially over the last eight years due to [a] myriad of issues, most notably being social media impact on our children." *Id*. at 43:6-20.

1    Consequently, "[t]he district's mental health budget grew significantly, from $4.19 million in FY18

2    to $7.01 million in FY24, [with] nearly 15 new positions and increased salaries." Ex. 7 at 6 ¶ 29.

3    This near doubling of Harford's mental health budget has occurred even as enrollment has increased

4    only modestly, from 37,826 students in 2017 to 38,105 students in 2023. Ex. 1 at 23.

5        **Third,** Harford has had to divert administrative resources to address the harms of social

6    media. According to Supervisor of Safety and Security Donoven Brooks: "There's almost nothing

7    that we deal with now when it comes to interpersonal conflict between students that doesn't have a

8    nexus to social media." Ex. 18 at 128:5-8. He estimates that "anywhere from 40 to 45 percent of

9    [his staff's] time is dealing with students and situations where we're finding out conflicts either

10    originated on using social media, or if they started in school, continue via the use of social media

11    in these conflicts." *Id*. at 127:23-128:4. This evidence further supports the need for abatement.

12        Mr. Meyers, a forensic accountant, has calculated costs from certain vendors "related to

13    Technology, Social Emotional Learning (SEL) Curriculum, and Mental Health incurred as a result

14    of the alleged improper actions of the Defendants." Ex. 27 at 4 ¶ 14. Contrary to Defendants claim,

15    the 20% weight applied to technology costs incurred as a result of Defendants' conduct is supported

16    by testimony from Harford's Director of Information Technology Drew Moore. Ex. 28 at 14-18

17    (describing specific technology tools claimed as expenses). In fact, Plaintiffs voluntarily reopened

18    Mr. Moore's deposition to address Defendants' concerns regarding Mr. Moore's estimation of 20

19    percent, and he confirmed how he derived that percentage. Ex. 29 at 16:18-17:5.

20        Mr. Moore's testimony creates a genuine issue of material fact regarding actual costs

21    incurred. He has testified that he has had to shut down proxies used by students to avoid the school

22    firewall and get on social media too many times to estimate. He describes his department's work

23    as "like a Whac-A-Mole. . . . [Proxies] pop up; we block them. Students find other ones; they might

24    use them. We find it; we block it." Ex. 30 at 44:4-22. Defendants' complaints about how Mr. Moore

25    arrived at his weight percentage do not disprove his testimony about the department he runs. The

26    jury may decide whether to believe his percentage, but it cannot be decided as a matter of law.

27    **III.**   **CONCLUSION**

28        For the reasons stated herein, Defendants' Motion should be denied.

1    Respectfully submitted,

2    DATED: November 7, 2025                    By:  /s/ Lexi J. Hazam

3                                                    LEXI J. HAZAM
                                                     **LIEFF CABRASER HEIMANN &**
4                                                    **BERNSTEIN, LLP**
                                                     275 Battery Street, 29th Floor
5                                                    San Francisco, CA 94111-3339
                                                     Telephone: 415-956-1000
6                                                    lhazam@lchb.com

7
                                                     *Counsel for Plaintiffs and Co-Lead Counsel*
8

9                                                    PREVIN WARREN
                                                     **MOTLEY RICE LLC**
10                                                   401 9th Street NW Suite 630
                                                     Washington DC 20004
11                                                   Telephone: 202-386-9610
                                                     pwarren@motleyrice.com
12

13                                                   *Co-Lead Counsel*

14                                                   MICHAEL M. WEINKOWITZ
                                                     **LEVIN SEDRAN & BERMAN, LLP**
15                                                   510 Walnut Street
                                                     Suite 500
16                                                   Philadelphia, PA 19106
                                                     Telephone: 215-592-1500
17                                                   mweinkowitz@lfsbalw.com

18
                                                     *Co-chair School District Committee*
19                                                   *Plaintiffs' Steering Committee Leadership*

20                                                   MELISSA YEATES
21                                                   **KESSLER TOPAZ MELTZER**
                                                     **& CHECK LLP**
22                                                   280 King of Prussia Road
                                                     Radnor, PA 19087
23                                                   Telephone: 610-667-7706
                                                     myeates@ktmc.com
24
                                                     *Co-chair School District Committee*
25                                                   *Plaintiffs' Steering Committee Leadership*

26

27

28

1

## <u>ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27</u>

2

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

DATED: November 7, 2025                                     By: /s/ Lexi J. Hazam

4

5                                                                                  LEXI J. HAZAM
                                                                                    **LIEFF CABRASER HEIMANN &**
6                                                                                  **BERNSTEIN, LLP**
                                                                                    275 Battery Street, 29th Floor
7                                                                                  San Francisco, CA 94111-3339
                                                                                    Telephone: 415-956-1000
8                                                                                  lhazam@lchb.com

9                                                                                  *Co-Lead Counsel*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

The undersigned hereby certifies that a copy of the foregoing was served via electronic mail on

3

November 7, 2025, to Counsel for Defendants:

4

MetaNoticeofService@cov.com

5

6

SnapNoticeofService@mto.com

7

TikTokNoticeofService@faegredrinker.com

8

SERVICE-YOUTUBE-INRESOCIALMEDIAM@LIST.WSGR.COM

9

mdl3047coleadfirms@listserv.motleyrice.com

10

pscservicemdl3047@motleyrice.com

11

12

13

14

*/s/ Lexi J. Hazam*

15

Lexi J. Hazam

16

17

18

19

20

21

22

23

24

25

26

27

28