*[Submitting Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | No. 4:22-md-03047-YGR |
| | MDL No. 3047 |
| This Document Relates To: | |
| *Breathitt County Board of Education v. Meta Platforms, Inc., et al.* | **SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS** |
| *Tucson Unified School District v. Meta Platforms, Inc., et al.* | |
| *Charleston County School District v. Meta Platforms, Inc., et al.* | Judge: Hon. Yvonne Gonzalez Rogers Magistrate Judge: Hon. Peter H. Kang |
| *Irvington Public Schools v. Meta Platforms, Inc., et al.* | Date: January 26, 2026 Time: 8:00 AM Place: Courtroom 1, 4th Floor |
| *Dekalb County School District v. Meta Platforms, Inc., et al.* | |
| *Board of Education of Harford County v. Meta Platforms, Inc., et al.* | |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARD .......................................................................................... 3

III.   ARGUMENT ....................................................................................................... 3

       A.    Defendants' "Fit" Arguments Do Not Present a Proper Basis for Exclusion. ........... 3

       B.    Defendants' Reliability Arguments Premised on the "Disentanglement" of
             Causal Factors Go to Weight, Not Admissibility. ............................................ 4

             1.    The Districts' Experts Do Not Need to Apportion Liability Among
                   Defendants for Their Opinions to Be Admissible. ................................ 5

             2.    Defendants' Arguments Regarding Third-Party Conduct Do Not
                   Render the Districts' Experts' Opinions Inadmissible. ......................... 6

             3.    The Districts' Experts Offer Reliable and Helpful Opinions Which
                   Are Not Barred by Section 230. ......................................................... 8

       C.    There Is No Basis to Exclude Mr. Klein's Survey. ........................................... 9

             1.    Mr. Klein Has the Requisite Experience. ............................................ 9

             2.    The Klein Survey Was Properly Pre-Tested. ....................................... 9

             3.    The Klein Survey Asked About Defendants' Platforms. ...................... 10

             4.    The Klein Survey Avoided Non-Response Bias. ................................. 11

             5.    The Klein Survey Properly Engaged in Retrospective Reporting. ........ 13

             6.    The Klein Survey Avoided Recall Bias. ............................................. 16

       D.    There Is No Basis to Exclude Dr. Ward's Lost-Time Damages Opinions. ........... 17

             1.    Dr. Ward's Lost-Time Damages Are Legally Cognizable. .................... 18

             2.    Dr. Ward's Teacher-Related Damages Opinions Are Properly
                   Based on the Admissible Klein Survey. ............................................. 19

             3.    Defendants Wrongly Claim That Dr. Ward Failed to Disentangle
                   Actionable and Inactionable Conduct. .............................................. 19

       E.    There Is No Basis to Exclude Mr. Meyers's "Out-of-Pocket" Damages
             Opinions. ................................................................................................ 22

       F.    Dr. Hoover's Opinions on Causation, Harm, and Mitigation Are Reliable and
             Admissible. .............................................................................................. 24

             1.    Dr. Hoover Used a Reliable, Sound, and Well-Established
                   Methodology to Reach Her Specific Causation Opinions. .................... 25

i

2.    Dr. Hoover's Opinions Are Directly Tied to Defendants' Actionable Conduct ........................................................................................... 33

3.    Dr. Hoover's "Strategic Plans" Are Proper Remedies for the Districts' Claims .......................................................................................... 36

4.    Dr. Hoover's Opinions About the Staffing, Training Levels, and Timeframe for Her Strategic Plans Are Well-Supported. ........................... 36

G.    There Is No Basis To Exclude Dr. Leslie's Estimate of Strategic Plan Costs. ......... 40

H.    There Is No Basis to Exclude Dr. Osborne's Opinions. ............................................... 41

1.    Dr. Osborne's Experience and Sustained Interactions with School Leaders Qualifies Him as an Expert. ............................................... 41

2.    Dr. Osborne's Opinions Rest on a Reliable Methodology. ........................... 41

3.    Dr. Osborne's Opinions Assist the Jury. ....................................................... 43

4.    Dr. Osborne's Opinions Are Not a Conduit for Hearsay. ............................. 44

5.    Dr. Osborne Corrected His Citation Errors. .................................................. 45

IV.    CONCLUSION ...................................................................................................................... 47

ii

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Abu-Lughod v. Calis*,
    2015 WL 12731921 (C.D. Cal. July 1, 2015) ...............................................20, 24

5

*AgroFresh Inc. v. Essentiv LLC*,
    2019 WL 9514565 (D. Del. Oct. 7, 2019)........................................................8

6

7

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
    738 F.3d 960 (9th Cir. 2013) ...................................................................4, 25

8

*Alcantar v. Hobart Serv.*,
    2013 WL 156530 (C.D. Cal. Jan. 15, 2013) ................................................14, 17

9

10

*Alorica Inc. v. Tech Mahindra (Americas) Inc.*,
    2025 WL 2577788 (E.D. Tex. Sep. 5, 2025)................................................20, 24

11

12

*Angelo v. Thomson Int'l, Inc.*,
    2024 WL 3202513 (E.D. Cal. June 27, 2024) ...................................................45

13

*In re Apple Inc. Sec. Litig.*,
    2023 WL 4556765 (N.D. Cal. July 17, 2023) ....................................................3

14

15

*In re Apple iPhone Antitrust Litig.*,
    2024 WL 5701895 (N.D. Cal. Feb. 2, 2024) (Gonzalez Rogers, J.) ...........................18

16

*Asetek Danmark A/S v. CoolIT Sys. Inc*,
    2022 WL 21306657 (N.D. Cal. Oct. 4, 2022) ..................................................44

17

18

*In re: Autozone, Inc.*,
    2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ...............................................13, 15

19

20

*Bale v. Nastasi*,
    982 F. Supp. 2d 250 (S.D.N.Y. 2013) ............................................................6

21

*Barnes v. Century Alum. Co.*,
    2013 WL 1906283 (D.V.I. May 8, 2013)......................................................21, 24

22

23

*BillFloat Inc. v. Collins Cash Inc.*,
    105 F.4th 1269 (9th Cir. 2024).................................................................9, 17

24

25

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
    582 F.3d 1227 (11th Cir. 2009) ..................................................................7

26

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
    564 F. Supp. 2d 322 (D.N.J. 2008)...............................................................8

27

28

*Briscoe v. White*,
    2004 WL 5488228 (M.D. Fla. May 24, 2004) ...................................................................41

*C.N. v. Wolf*,
    2006 WL 5105270 (C.D. Cal. Nov. 13, 2006) ...............................................................41

*Carolina v. JPMorgan Chase Bank NA*,
    2021 WL 5396066 (D. Ariz. Nov. 17, 2021) ...............................................................45

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2017 WL 10434367 (N.D. Cal. Jan. 23, 2017)....................................................19, 40

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    2025 WL 3009526 (4th Cir. Oct. 28, 2025) .................................................................36

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ...................................................................37, 38, 42, 43

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015) ..........................................................................16

*Concord Music Grp. v. Anthropic PBC*,
    2025 WL 1482734 (N.D. Cal. May 23, 2025)...............................................................46

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................3, 44

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ........................................................................................3

*Duran v. U.S. Bank Nat'l Ass'n*,
    325 P.3d 916 (Cal. 2014) ............................................................................................16

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) .............................................................................. *passim*

*Engilis v. Monsanto Co.*
    151 F.4th (9th Cir. 2025) ............................................................................................31

*Fannie Mae v. LaRuffa*,
    702 F. App'x 505 (9th Cir. 2017)...............................................................................19

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
    618 F.3d 1025 (9th Cir. 2010).......................................................................................9

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*,
    2017 WL 8948975 (D. Del. May 30, 2017) ......................................................... *passim*

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021).......................................................................................33

iv

*Hatcher v. Cnty. of Alameda*,
  2011 WL 1225790 (N.D. Cal. Mar. 31, 2011) ...............................................22

*Hays v. Park City Sch. Dist.*,
  214 F. Supp. 3d 1162 (D. Utah 2016) .........................................................41

*Hollander v. Sandoz Pharms. Corp.*,
  289 F.3d 1193 (10th Cir. 2002) ...................................................................5

*Humetrix, Inc., v. Gemplus S.C.A.*,
  268 F.3d 910 (9th Cir. 2001) ......................................................................3

*Jimenez v. Allstate Ins. Co.*,
  2019 WL 13088814 (C.D. Cal. May 13, 2019) ......................................13, 15

*Johnson v. Nissan N. Am., Inc.*,
  2022 WL 2869528 (N.D. Cal. July 21, 2022), *aff'd*, 2024 WL 4784367 (9th Cir.
  Nov. 14, 2024) ...........................................................................................11

*In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
  2022 WL 1814440 (N.D. Cal. June 2, 2022) ..........................................43, 44

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020) .......................................................36

*Kawasaki v. Rorze Corp.*,
  2025 WL 1836331 (N.D. Cal. July 3, 2025) ...................................20, 21, 24

*Kim v. Benihana, Inc.*,
  2024 WL 3550390 (C.D. Cal. May 20, 2024) ............................................21

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*,
  2006 WL 6505346 (W.D. Tex. Aug. 11, 2006) .........................................13

*Kohls v. Ellison*,
  2025 WL 66514 (D. Minn. Jan. 10, 2025) ..................................................46

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .............................................................................28, 32

*Litton Sys., Inc. v. Honeywell, Inc.*,
  1996 WL 634213 (C.D. Cal. July 24, 1996) ................................................7

*Loc. 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*,
  189 F.3d 473 (9th Cir. 1999) .....................................................................24

*Marlo v. UPS, Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) ......16

v

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

*Medlock v. Taco Bell Corp.*,
  2015 WL 8479320 (E.D. Cal. Dec. 9, 2015) ...............................................11, 14, 17

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ...................................................................................17

*Metrejean v. REC Marine Logistics, L.L.C.*,
  2009 WL 3062622 (E.D. La. Sep. 21, 2009) ............................................................24

*Moreno v. Ross Island Sand & Gravel Co.*,
  2015 WL 5604443 (E.D. Cal. Sep. 23, 2015) ...........................................................22

*Morgan v. Cmty. Against Violence*,
  2023 WL 6976510 (D.N.M. Oct. 23, 2023) ...............................................................47

*Nucci v. Rite Aid Corp.*,
  2020 WL 3187335 (N.D. Cal. June 14, 2020) ......................................................13, 14

*Ohio Org. Collab. v. Husted*,
  2016 WL 8201848 (S.D. Ohio May 24, 2016) .......................................................20, 24

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) .....................................................................................4

*Perry v. Novartis Pharms. Corp.*,
  564 F. Supp. 2d 452 (E.D. Pa. 2008) .........................................................................33

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ...................................................................4, 6, 33, 40

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
  752 F.3d 807 (9th Cir. 2014) ...............................................................................33, 37

*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013) .......................................................................15

*Rider v. Sandoz Pharms. Corp.*,
  295 F.3d 1194 (11th Cir. 2002) ...................................................................................5

*Rogers v. Raymark Indus., Inc.*,
  922 F.2d 1426 (9th Cir. 1991) ..............................................................................41, 43

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
  950 F. Supp. 981 (C.D. Cal. 1996) ..........................................................................4, 5

*Scalfani v. Air Liquide Sys. Corp.*,
  14 F. Supp. 3d 1351 (C.D. Cal. 2014) .........................................................................5

*Social Media Cases*,
  2025 WL 2807828 (Cal. Super. Ct. Sep. 22, 2025).......................................... *passim*

vi

*Spintouch, Inc. v. Outform, Inc.*,
  2022 WL 17363902 (C.D. Cal. Sep. 28, 2022) ............................................................. 44

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  2008 WL 2323856 (N.D. Cal. May 22, 2008) ............................................................. 30

*In re Toyota Motor Corp. Unintended Accel. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  978 F. Supp. 2d 1053 (C.D. Cal. 2013) ............................................................... 20, 24

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
  2018 WL 5013580 (N.D. Cal. Oct. 16, 2018) ..................................................... 20, 24

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*,
  296 F. Supp. 3d 1142 (N.D. Cal. 2017) ..................................................................... 43

*United States v. Chen*,
  2021 WL 2662116 (N.D. Cal. June 29, 2021) ........................................................... 44

*United States v. H & R Block, Inc.*,
  831 F. Supp. 2d 27 (D.D.C. 2011) ............................................................................ 13

*United States v. Porter*,
  2016 WL 540808 (E.D. La. Feb. 10, 2016) ............................................................... 20

*United States v. Sandoval-Mendoza*,
  472 F.3d 645 (9th Cir. 2006) ................................................................................... 1, 3

*Univ. of Kan. v. Sinks*,
  2008 WL 755065 (D. Kan. Mar. 19, 2008) ............................................................... 13

*Vazquez v. Leprino Foods Co.*,
  2023 WL 1868973 (E.D. Cal. Feb. 9, 2023) ........................................................ 12, 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  500 F. Supp. 3d 940 (N.D. Cal. 2020) ........................................................................ 8

*Walker v. Ellensburg Sch. Dist.*,
  2018 WL 11468666 (E.D. Wash. Nov. 5, 2018) ....................................................... 41

*Wallace v. Countrywide Home Loans Inc.*,
  2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ....................................................... 13

*Wasica Fin. GmbH v. Schrader Int'l, Inc.*,
  432 F. Supp. 3d 448 (D. Del. 2020) .................................................................... 20, 24

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) .................................................................................... 6

*Wendt v. Host Int'l, Inc.*,
  125 F.3d 806 (9th Cir. 1997) ...................................................................................... 9

vii

*Wirtgen Am., Inc. v. Caterpillar, Inc.*,
   715 F. Supp. 3d 587 (D. Del. 2024) ............................................................................7

*Yellowstone Womens First Step House, Inc. v. City of Costa Mesa*,
   2018 WL 6167930 (C.D. Cal. Nov. 5, 2018) ...........................................................22

*Zucchella v. Olympusat, Inc.*,
   2023 WL 2628107 (C.D. Cal. Jan. 10, 2023).......................................................8, 19

**Other Authorities**

Fed. R. Evid. 703 ..............................................................................................................19

*Reference Manual on Scientific Evidence* (3d ed. 2011).............................................12, 13

I.     **INTRODUCTION**

"*Daubert* makes the district court a gatekeeper, not a fact finder. When credible, qualified experts disagree," the parties are "entitled to have the jury … decide" the facts at issue. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). In an effort to prematurely win the battle of the experts, Defendants ignore this basic proposition of law, moving for wholesale exclusion of ***all*** Plaintiffs' school district experts ("Districts' experts"). But there is no serious dispute that the Districts' experts are well-qualified and employed sound, reliable methodologies used in their fields. Defendants' arguments boil down to disputes over factual issues. Those are for the jury to decide.

**Mr. Jeffrey Meyers** is a forensic accountant with over two decades of experience calculating damages. He relies on sworn affidavits and interrogatories, as well as corroborating District documents, when calculating the Districts' past out-of-pocket damages.

**Mr. Robert Klein** is an MIT-educated survey expert with 50 years of experience in survey design. He collected quantitative data by designing a survey in which teachers reported the amount of instructional time diverted due to student use of Defendants' platforms. Mr. Klein appropriately tethered questions regarding historically diverted instructional time to particularly memorable events in teachers' lives, such as the current school year, the COVID lockdown, and the post-shutdown return to school.

**Dr. Bryce Ward** is a Harvard-educated economist. He calculates lost time (i.e., diversion) damages based on Klein's teacher survey, sworn affidavits from mental health professionals and administrators employed by the Districts, and deposition testimony.

**Dr. Sharon Hoover** is a preeminent expert on mental health in schools, who performed interviews of District employees and reviewed relevant literature and other expert reports. She opines that Defendants' platforms cause serious harms to schools that require them to expend and redirect their limited resources. Using her experience working with schools nationwide, and the same methodology she has been using outside of litigation for 25 years, she developed a comprehensive strategic plan for school mental health systems to address the disruption Defendants have caused in schools.

**Dr. Douglas Leslie** is a Yale-educated economist. He costed out Dr. Hoover's plans using a

1

straightforward methodology, incorporating salary and benefits costs for staffing and training.

**Dr. Brian Osborne** is a professor of practice at Lehigh University and former school superintendent. He offers opinions regarding the impacts of Defendants' platforms on school operations and climate, and the cumulative effect of the burdens caused by Defendants' platforms on schools.

Defendants' arguments seeking exclusion of these experts can be grouped into two basic categories. First, Defendants argue that the Districts' experts run afoul of Section 230 or the First Amendment by not "disentangling" the impact of student exposure to third-party content, potentially harmful third-party misconduct, or specific features related to publishing activities. This argument has already been rejected by Judge Kuhl and is addressed in detail in Plaintiffs' concurrently-filed Opposition to Defendants' Section 230 *Daubert* Motion. *See* 230 Daubert Opp.; *Social Media Cases*, 2025 WL 2807828, at *6-8, *27, *32-33, *37, *46-47, *50-51 (Cal. Super. Ct. Sep. 22, 2025).

Second, Defendants create standards for the Districts' experts which are unsupported by Rule 702 and impossible to satisfy—and then argue the Districts' experts should be excluded because they fail to meet those fictional standards. Treating public schools like multi-billion-dollar tech companies, Defendants argue that the Districts' experts were required to rely on detailed, multi-year historical data collected by the Districts to document harm caused by Defendants. This not only ignores the realities of public school systems but also conceals the Defendants' superior, undisclosed knowledge of social media's evolving harms, which they hid from users, parents, school districts, and the public. And it improperly casts aside the ample evidence that does exist and was considered by the Districts' experts. That includes sworn affidavits and deposition testimony of mental health professionals and administrators, who have first-hand knowledge about how social media came to become one the of the biggest challenges school districts face. It also includes survey results of the teachers who see the harmful disruptions caused by Defendants' platforms on a daily basis. A jury is entitled to hear and consider the weight of expert testimony relying on this evidence.

Third, Defendants take aim at the Districts' experts with contradictory, scattershot arguments—criticizing Dr. Hoover for using qualitative data and Mr. Klein for using quantitative data. At the same time, they demand proof of student mental health referrals specifically linked to

2

1    social media use only to argue that such proof would be irrelevant since schools supposedly cannot

2    be harmed if their students are.

3           Ultimately, what Defendants don't like are the conclusions of the Districts' experts and the

4    realities they will present to the jury—the Districts did the best they could to address a significant,

5    external source of disruption and harm caused by Defendants. They have suffered substantial

6    damages and urgently need continuing relief to remedy Defendants' negligence and abate the

7    nuisance Defendants created. This battle of the experts belongs to the jury. As the Ninth Circuit has

8    explained, "[a]uthority to determine the victor in … a 'battle of expert witnesses' is properly reposed

9    in the jury." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001). Defendants'

10   Motion should therefore be denied.

11   **II.     LEGAL STANDARD**

12          Rule 702 allows expert testimony by a qualified witness where the opinion offered is relevant

13   and reliable. *See In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *1 (N.D. Cal. July 17, 2023).

14   Expert testimony is relevant if it "assist[s] the trier of fact," meaning it must be related to the factual

15   disputes at issue. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Expert testimony

16   is reliable where "the knowledge underlying it has a reliable basis in the knowledge and experience

17   of the relevant discipline." *Sandoval-Mendoza*, 472 F.3d at 654 (cleaned up). In assessing reliability,

18   the focus of the Court's inquiry should be on the experts' methods, not their conclusions. *Elosu v.*

19   *Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("Ultimately, the test under *Daubert* is

20   not the correctness of the expert's conclusions but the soundness of [their] methodology.") (cleaned

21   up). All of the Districts' experts meet this standard.

22   **III.    ARGUMENT**

23          **A.      Defendants' "Fit" Arguments Do Not Present a Proper Basis for Exclusion.**

24          Defendants incorrectly assert that the Districts' experts' opinions are inadmissible because

25   they are not relevant (i.e., do not "fit" the case). This argument ignores the Court's instruction not to

26   raise "fit" in *Daubert* motions. July 18, 2025 CMC Tr. at 38:11-24. In any event, the experts' opinions

27   are relevant because they "logically advance[] a material aspect of the proposing party's case,"

28   *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995), and "ha[ve] a valid

3

connection to the pertinent inquiry," *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013). The experts explain how Defendants' platforms harmed the Districts, identify diverted resources, and describe future support needed to address ongoing harm. These opinions will assist the jury in evaluating each District's negligence and/or nuisance claims under relevant state law. *See Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010) ("What is relevant" depends on claims asserted and is "controlled by Nevada law."). Defendants' expert-specific "fit" allegations are addressed below.

### B. Defendants' Reliability Arguments Premised on the "Disentanglement" of Causal Factors Go to Weight, Not Admissibility.

Defendants argue that the Districts' experts fail to establish causation because they do not disentangle Defendants' platforms from (1) each other, (2) third-party conduct, and (3) content. Before addressing these "disentanglement" claims, three threshold points are critical.

*First*, Defendants target the wrong experts. Only Drs. Hoover and Osborne offer causation opinions. *See* Ex. 79 ¶¶ 5, 34, 45, 53, 58, 78; Ex. 108 ¶¶ 64, 74, 79, 82, 88-89, 103-05, 110; Pls.' Omni. Opp. § V.D.i. The remaining Districts' experts do not, nor must they. *See Primiano*, 598 F.3d at 565 ("Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible."). Experts who do not opine on causation cannot be faulted for not "disentangling" Defendants' roles from other alleged causal factors.

*Second*, Defendants disregard other evidence of causation each District will present. They overlook numerous experts who speak to causation, and ignore the ample non-expert evidence detailed in each District's individual summary judgment oppositions, filed concurrently with this brief.

*Third*, whether the Districts' experts have shown substantial factor causation is, at most, a factual question for the jury—not a basis for exclusion under Rule 702. *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013) ("Causation is an intensely factual question that should typically be resolved by a jury.").

Defendants' authorities offer no support for exclusion. Their lead case, *Sanderson v. Int'l Flavors & Fragrances, Inc.*, involved experts who relied on no research linking the defendants'

4

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

fragrance products to the alleged injuries; the court noted that "*no* published work show[ed] that fragrance products . . . cause any of the injuries which plaintiff claims to have." 950 F. Supp. 981, 994 (C.D. Cal. 1996). This is plainly not true here where Drs. Hoover and Osborne base their opinions on extensive scientific literature discussed in detail throughout their reports. Dr. Hoover reviewed 80 articles in reaching her conclusions and discussed how they support her opinions. *See* Ex. 79 ¶¶ 30-82, Ex. B. Dr. Osborne likewise analyzed literature supporting his opinions. Ex. 108 ¶¶ 18, 69-70, 110. Neither *Sanderson* nor any other case Defendants cite justifies exclusion.[1] As detailed below and in Plaintiffs' Opposition to the GC Omnibus Motion, Drs. Hoover and Osborne apply sound scientific methods that meet *Daubert*'s reliability standards. Defendants' Motion attacks their conclusions, not their methodology—a challenge reserved for the jury, not the Court.

### 1. The Districts' Experts Do Not Need to Apportion Liability Among Defendants for Their Opinions to Be Admissible.

Defendants argue that the Districts' experts should be excluded because they do not apportion liability among Defendants. Mot. at 3-5. Judge Kuhl rejected this same argument. *See Social Media Cases*, 2025 WL 2807828, at *12, (holding that, "[a]s to harms arising from all types of social media platforms, Defendants have failed to demonstrate that their social platforms are so different from each other that it would be scientifically unreliable to investigate their mental health effects as a group."). The court further explained that, "[t]he fact that Defendant[s] might argue that [an expert's] opinions, without more, fail to show that any particular social media platform caused a particular type of harm suffered by a certain [p]laintiff is not a proper basis for excluding the testimony of a general causation expert." *Id.* at *18. Judge Kuhl concluded that Defendants' contention "is really about the sufficiency

_____

[1] *See also Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1207-09 (10th Cir. 2002) (rejecting expert testimony that relied on studies involving chemical structures not found in Parlodel and research showing negative effects only in limited populations or animals); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (reaching the same result where experts based their opinions on studies involving unrelated chemicals, unreplicated animal research, and stroke types different from the plaintiff's claim). Those cases bear no resemblance to this one. The Districts' experts do not speculate about a drug's effect on human health; they rely on relevant, peer-reviewed studies directly examining how Defendants' platforms harm adolescents. Their analyses rest on accepted scientific methods and meet *Daubert*'s reliability and relevance standards in full. *See Scalfani v. Air Liquide Sys. Corp.*, 14 F. Supp. 3d 1351, 1356 (C.D. Cal. 2014) (granting summary judgment where, unlike here, *see* Pls.' Omni Opp. § III(A)(4), the expert failed to link the plaintiff's injury to defendants' specific products).

5

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

1    of the evidence to prove liability as to any one Defendant; it is not an argument that justifies exclusion

2    of an expert's testimony." *Id.* at *31.

3          Judge Kuhl was correct: apportioning liability among Defendants is not the role of experts—

4    it is for the jury. *See* Pls.' Omni. Opp. § III.C.1.b; *see also Bale v. Nastasi*, 982 F. Supp. 2d 250, 258-

5    59 (S.D.N.Y. 2013) ("[W]here each side in such a case tells a story that is at least plausible and would

6    allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion

7    liability, and not for the court.").[2]

8          ###        2.        Defendants' Arguments Regarding Third-Party Conduct Do Not Render the Districts' Experts' Opinions Inadmissible.

9          Defendants argue that all six of the Districts' experts should be excluded for failing to separate

10   harms caused by Defendants from those allegedly caused by "third-parties". This argument again

11   asks the Court to decide factual questions reserved for the jury. The Ninth Circuit has made clear that

12   experts need not "eliminate all other possible causes of a condition for the expert's testimony to be

13   reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017). "It is enough that

14   the proposed cause 'be a substantial causative factor.'" *Id.* Judge Kuhl rejected this same argument,

15   holding that "[d]etermining whether the substance or instrumentality upon which liability is premised

16   caused a particular plaintiff's harm is also the role of the jury." *Social Media Cases*, 2025 WL

17   2807828, at *7. "Juries are frequently called upon to decide the extent to which a plaintiff's . . . harm

18   is caused by the defendant's actionable conduct or, instead, by other influences." *Id.* Defendants'

19   attempt to recast factual disputes as admissibility issues fails—the jury, not the Court, must determine

20   causation and apportion responsibility.

21         In any event, Dr. Hoover explains how the harms to the Districts stem directly from

22   Defendants' platforms, ***independent of any third-party*** conduct. She describes the "pervasive

23   negative impact" of Defendants' platforms on the school environment, including addictive design

24   features that disrupt classroom dynamics and impair teaching effectiveness. *See* Ex. 79 ¶¶ 34, 53-57.

25   She details how students' compulsive platform use leads to sleep deprivation, anxiety, depression,

---

[2] Even if apportionment were an appropriate expert task, it is not a *requirement* for any given expert to address. Each expert need not cover every aspect of a case. *See Primiano*, 598 F.3d at 565.

6

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

1    self-harm, and negative body image, *id.* ¶¶ 63-76, which impairs learning, weakens social

2    development, and erodes the overall school environment, *id.* ¶¶ 35-52. These harms also divert scarce

3    resources, *id.* ¶¶ 77-82, and reduce teacher morale, *id.* ¶ 58. As she concludes, Defendants' platforms

4    have "reshaped the educational landscape in ways that extend well beyond individual student

5    behavior." *Id.* ¶ 83.

6        In forming her opinions about the harms Defendants' platforms caused the Districts, Dr.

7    Hoover relied on the findings of Plaintiffs' general causation experts, who concluded that Defendants'

8    harmful design features are themselves a substantial factor in harming young people, independent of

9    any third-party conduct. Ex. 1 ¶¶ 182-97; Ex. 2 ¶¶ 49-69; *see generally* Ex. 3; Ex. 4 ¶¶ 253-305; Ex.

10   5 ¶¶ 123-38.

11       As Judge Kuhl correctly found, these causation experts used reliable methodologies to

12   conclude "that social media *features* cause harm as a general matter." *See Social Media Cases*, 2025

13   WL 2807828, at *10, *15, *23, *27, *33, *37, *46, *51. The Districts' experts build on those findings

14   to show that Defendants' platforms caused harm to the Districts and to quantify its scope. Their

15   opinions rest on the same sound scientific foundation Judge Kuhl upheld and therefore satisfy Rule

16   702's admissibility standards.

17       Dr. Ward and Mr. Meyers also reasonably relied on affidavits from District employees

18   describing how Defendants' platforms caused costs and diverted time. And Mr. Klein's survey

19   appropriately measured instruction time diverted due to Defendants' platforms. Any question about

20   what portion of the damages calculated by Dr. Ward or Mr. Meyers is attributable to Defendants'

21   platforms—rather than third-party conduct—is for the jury to decide. *Id*. at *7.

22       Finally, the cases Defendants cite are irrelevant. Their reliance on antitrust and patent

23   infringement cases only underscores the weakness of their argument. *See, e.g.*, *Litton Sys., Inc. v.

24   Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996) ("Disaggregation is required

25   because the antitrust laws are only intended to compensate plaintiffs for losses fairly caused by a

26   defendant's unlawful anticompetitive behavior."); *Wirtgen Am., Inc. v. Caterpillar, Inc*., 715 F. Supp.

27   3d 587, 591 (D. Del. 2024) (apportionment of damages limited to infringing features "unique to patent

28   law"). Likewise, *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp*., 582 F.3d 1227, 1232

(11th Cir. 2009) excluded an expert who counted payments the plaintiff admitted were lawful in his damages calculation. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) involved a flawed overpayment theory not at issue here; and *Zucchella v. Olympusat, Inc.*, 2023 WL 2628107, at *11 (C.D. Cal. Jan. 10, 2023) turned on plaintiff seeking damages for an unpled conspiracy claim. Moreover, *AgroFresh Inc. v. Essentiv LLC*, 2019 WL 9514565, at *1 (D. Del. Oct. 7, 2019) and *Bowers v. Nat'l Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322, 350 (D.N.J. 2008) concerned trade secrets and discovery sanction issues far afield from this case. These authorities offer no basis to exclude the Districts' well-supported expert testimony under Rule 702.

### 3. The Districts' Experts Offer Reliable and Helpful Opinions Which Are Not Barred by Section 230.

Defendants' recycled arguments regarding Section 230 and the First Amendment fare no better here. *See* Pls.' Omni. Opp. §V.B; *see also* 230 Daubert Opp. Rather, they distort the record. The Districts' experts show Defendants' conduct disrupted school operations, harmed the school environment, and forced the Districts to divert employee time and resources to address harms caused by Defendants' platforms, including their non-publishing features. *See* Ex. 79 ¶¶ 11, 30; Ex. 6 ¶ 41; Ex. 33 ¶ 1; Ex. 63 ¶ 1; Ex. 108 ¶ 3. Relying on other experts' content-neutral analyses, the Districts' experts further explain how students' compulsive and problematic social media use caused distraction and disruption that negatively impacted the school environment. *See, e.g.*, Ex. 79 ¶¶ 4, 56, 71. These opinions create a genuine dispute over whether Defendants' "non-publishing features" were a substantial factor contributing to the Districts' injuries.

Defendants concede that harm arising from their failure to warn about *all* features and the overall design of Defendants' platforms, is actionable. Mot. at 8 n.3. It is therefore proper for the Districts' experts to present evidence showing that schools expended significant time and resources to address problems caused by Defendants' platforms as a whole. Defendants may cross-examine those experts at trial and argue that any harm resulted solely from non-actionable conduct. *See Social Media Cases*, 2025 WL 2807828, at *40 ("If Defendants believe that [these experts' opinions are] insufficient evidence to demonstrate that a particular platform caused a particular type of harm, then

8

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

1    they will be free to so demonstrate at trial."). As Judge Kuhl held, juries are fully capable of

2    distinguishing actionable from nonactionable conduct and do so routinely. *Id.* at *6. The jury should

3    therefore evaluate the entire record, including the Districts' experts' testimony.

   **C.    There Is No Basis to Exclude Mr. Klein's Survey.**

4

5        Robert Klein holds Bachelors and Masters degrees from the Massachusetts Institute of

6    Technology ("MIT") and has over 50 years of experience designing and administering more than

7    1,000 market research surveys. He applied that expertise to design a "relevant" survey conducted

8    "according to accepted principles." *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1275 (9th Cir.

9    2024). The Ninth Circuit requires nothing more. *Id.* Defendants' criticisms raise issues for cross-

10   examination—not exclusion. The Ninth Circuit has long held that objections to "methodology, survey

11   design, reliability, the experience and reputation of the expert, [and] critique of conclusions" affect

12   the weight of the evidence, not its admissibility." *Id.*; *see also Fortune Dynamic, Inc. v. Victoria's*

13   *Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010); *Wendt v. Host Int'l, Inc.*, 125

14   F.3d 806, 814 (9th Cir. 1997).

15       Mr. Klein's survey satisfies Rule 702 and *Daubert*. Defendants misstate the law and seek to

16   exclude credible evidence that the jury is entitled to weigh. Their motion reflects disagreement with

17   his conclusions, not any flaw in his methods—an argument the Ninth Circuit has repeatedly rejected.

18   Excluding Mr. Klein's testimony would contravene settled Ninth Circuit precedent.

   **1.    Mr. Klein Has the Requisite Experience.**

19

20       Defendants' claim that Mr. Klein has never conducted a comparable survey is wrong. Mr.

21   Klein explained that his survey here is akin to the many market research studies he has conducted

22   because it obtains information from individuals on a specified topic, which is commonplace in market

23   research. *See* Ex. 12 ¶ 7; Ex. 13 ¶ 7; Ex. 14 ¶ 7; Ex. 15 ¶ 7; Ex. 16 ¶ 7; Ex. 17 ¶ 7; Ex. 18 at 51:2-

24   52:7. Mr. Klein's methodology rests on well-established principles that the Ninth Circuit has

25   repeatedly upheld as reliable. *See BillFloat Inc.*, 105 F.4th at 1275. Defendants' arguments are at best

26   fodder for cross examination and do not warrant exclusion. *Fortune Dynamic, Inc.*, 618 F.3d at 1036.

   **2.    The Klein Survey Was Properly Pre-Tested.**

27

28       Mr. Klein followed well-established survey principles in drafting questions and designing a

9

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

format to measure instructional time diverted by students' use of Defendants' platforms. He began with a proper pre-test in which teachers completed the survey while talking to Mr. Klein or his staff, who then reported the results to him. This process allowed Mr. Klein to confirm that teachers understood the questions and that the survey sought information about Defendants' platforms. Ex. 18 at 153:5-12, 154:7-155:4, 156:18-157:6, 158:2-10. The pre-test also verified that teachers could accurately recall the time diverted during each survey period. *Id*. This pre-testing process aligns with accepted professional standards and confirms that Mr. Klein's survey design meets *Daubert*'s reliability requirement and Rule 702's standard for admissibility.

### 3. The Klein Survey Asked About Defendants' Platforms.

The Klein Survey studied the time teachers in the Districts spent addressing classroom diversions stemming from student use of Defendants' platforms. To capture this data, the survey asked teachers how much instructional time was diverted from teaching due to "student use of social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.)." Ex. 8 ¶ 30. This clear, platform-specific language ensured respondents understood the survey referred to Defendants' platforms and yielded data directly tied to the Districts' claims.

Defendants overstate the significance of the survey's use of "e.g." and "etc.", speculating—without citing any supporting expert testimony—that these terms captured platforms beyond those at issue. Their argument is baseless. Mr. Klein explained that he included "e.g." and "etc." to avoid revealing the survey's purpose and to maintain consistency with questions about other potential classroom distractions, such as "Unauthorized student use of texting during class (e.g., texting using iMessage, WhatsApp, etc.)." *Id*. This phrasing follows standard survey design principles and prevents bias. *See* Ex. 18 at 250:4-11. In any event, Mr. Klein's pre-testing confirmed that teachers provided information about Defendants' platforms in response to these questions. Ex. 18 at 250:24-251:7, 252:9-17. That conclusion is entirely reasonable, as Defendants' platforms are the ones most commonly used by students.[3] Ex. 5 ¶¶ 284-87, 290, 329-30. The survey—explicitly listing only

---

[3] Defendants' claim that the survey failed to account for damages during periods when certain platforms were unavailable in the United States (Mot. at 10) is a non-sequitur. If a platform was not available during a given period, no instructional time could have been disrupted because of it—and none would have been reported.

10

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

Defendants' platforms—along with Mr. Klein's pre-testing procedures and deposition testimony, confirms that it measured instruction time disruptions caused by students' use of Defendants' platforms.

Defendants' mischaracterize Mr. Klein's testimony to suggest his survey captured time diverted by non-Defendant platforms. *See* Mot. at 10. In fact, he was responding to a hypothetical about Twitter/X, and he confined his answer to that hypothetical scenario. Read in context, his testimony confirms the survey measured only diversions caused by Defendants' platforms.

At most, Defendants' critique raises issues for cross-examination as "linguistic challenges," not grounds for exclusion. *See Johnson v. Nissan N. Am., Inc*., 2022 WL 2869528, at *8 (N.D. Cal. July 21, 2022), *aff'd*, 2024 WL 4784367 (9th Cir. Nov. 14, 2024); *see also Medlock v. Taco Bell Corp*., 2015 WL 8479320, at *4-5 (E.D. Cal. Dec. 9, 2015) (rejecting claims that words such as "ALWAYS" and "EVER" rendered a survey unreliable and holding that wording criticisms go to weight, not admissibility); *GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, 2017 WL 8948975, at *8-9 (D. Del. May 30, 2017) (denying *Daubert* motion because disputes over how a term is used, "should go to the jury.").

### 4. The Klein Survey Avoided Non-Response Bias.

Because the Klein Survey measured instructional time diverted in the Districts, it properly drew respondents from the relevant population—all current full-time middle and high school teachers. Defendants speculate, without evidence, that the survey suffers from non-response bias. They are wrong.

*First*, Mr. Klein took deliberate steps to prevent non-response bias. *See* Ex. 18 at 230:19-231:6, 232:12-233:24; *see also* Ex. 12 ¶ 11; Ex. 13 ¶ 11; Ex. 14 ¶ 11; Ex. 15 ¶ 11; Ex. 16 ¶ 11; Ex. 17 ¶ 11. The invitations sent to teachers regarding the survey made no mention of social media and instead, told teachers the survey sought "to understand the experiences and challenges faced by school personnel." *Id*. He further instructed the Districts to send neutral "warming emails," inviting teachers to participate without mentioning social media or the survey's purpose. Exs. 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30. As Mr. Klein explained, because the solicitations made "no . . . reference to social media[,]" teachers' views on the topic could not have influenced participation. Ex. 12 ¶ 11; Ex.

11

13 ¶ 11; Ex. 14 ¶ 11; Ex. 15 ¶ 11; Ex. 16 ¶ 11; Ex. 17 ¶ 11. As These safeguards align with professional survey standards and confirm that the survey avoided nonresponse bias.

Defendants' reliance on selective quotations from the *Reference Manual on Scientific Evidence* (3d ed. 2011) ("Manual") also fails. The Manual makes clear that the relevant question is whether nonresponse "is associated with systematic differences in response that cannot be adequately modeled or assessed." Manual at 385. Mr. Klein's design methodology eliminates that concern. Because invitations never mentioned social media, "there is no reason to believe that those who did not respond to the survey were in any way systematically different than those who did, as the solicitation of responses did not inform potential respondents that the survey related to social media." Ex. 12 ¶ 34; Ex. 13 ¶ 34; Ex. 15 ¶ 34.

**Second**, the warming emails assured teachers that responses would only be used "in the aggregate" and that survey response would not be part of teachers' performance evaluations. Exs. 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30. These assurances removed any concern that teachers' responses could be traced to them, further minimizing non-response bias and ensuring neutrality—consistent with accepted best practices.

**Third**, Defendants offer no factual basis to suggest that respondents differed meaningfully from nonrespondents. Their speculation about teachers' tenure, subject, or age lacks evidence or methodological support. Courts routinely reject such conjecture. *See Vazquez v. Leprino Foods Co.*, 2023 WL 1868973, at *7-9 (E.D. Cal. Feb. 9, 2023) (rejecting defendants' assertion that sample set of respondents was not probative of experience of all workers).

**Fourth**, Defendants' claim that the survey should have included former teachers misunderstands its purpose. The survey required respondents to report current instructional time diverted as a baseline for comparison; only current teachers could provide accurate, contemporaneous data. That was a foundational part of the survey design because the survey sought retrospective reporting. Excluding former teachers was therefore methodologically sound and consistent with accepted survey principles.

**Fifth**, the response rates fall well within accepted industry and judicial norms. Mr. Klein noted they were typical "for surveys sent to customer email lists when no cash or other incentive is offered."

12

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

Ex. 12 ¶ 34; Ex. 13 ¶ 34; Ex. 15 ¶ 34; Ex. 17 ¶ 33. Courts routinely find such rates sufficient for reliability and admissibility. *See United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 34 (D.D.C. 2011) (accepting 1-2% response rate and noting surveys with similar response rates guide business decisions); *GlaxoSmithKline LLC*, 2017 WL 8948975, at *11 (accepting survey with 2.3% response rate over claims of non-response bias); *Univ. of Kan. v. Sinks*, 2008 WL 755065, at *4-5 (D. Kan. Mar. 19, 2008) (survey with 2.16% response rate admissible; alleged flaws go to weight); *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, 2006 WL 6505346, at *2, *5-6 (W.D. Tex. Aug. 11, 2006) (citing the Reference Manual on Scientific Evidence and finding a survey with 135 respondents methodologically sound).

Defendants' reliance on *In re: Autozone, Inc.*, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) is misplaced. That decision applied an outdated version of the Manual. The current Manual rejects its premise, noting that "surveys may achieve reasonable estimates even with relatively low response rates." Manual at 385; *see also Vazquez*, 2023 WL 1868973, at *8 (quoting same and declining to follow *Autozone*); *Nucci v. Rite Aid Corp.*, 2020 WL 3187335, at *8 (N.D. Cal. June 14, 2020) (rejecting motion to strike survey with 49 valid responses and finding that arguments concerning sample size and response bias went to weight, not admissibility).

Defendants' other wage-and-hour cases are equally irrelevant. Those decisions involve employees with direct financial stakes in the litigation taking the survey, which creates unique self-interest concerns absent here. *See Jimenez v. Allstate Ins. Co.*, 2019 WL 13088814, at *23 (C.D. Cal. May 13, 2019); *Wallace v. Countrywide Home Loans Inc.*, 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012). District teachers had no personal or financial stake in taking the survey, and Defendants identify no comparable bias present here.

In short, Defendants' nonresponse bias argument is pure speculation. Courts consistently hold that such challenges go to weight, not admissibility. *Nucci*, 2020 WL 3187335, at *8; *Medlock*, 2015 WL 8479320, at *6 ("Defendants' arguments concerning nonresponse bias do not amount to a fatal flaw as to render the survey inadmissible."); *GlaxoSmithKline LLC*, 2017 WL 8948975, at *11-12.

### 5. The Klein Survey Properly Engaged in Retrospective Reporting.

Mr. Klein's survey asked teachers to report the amount of classroom time diverted due to

13

students' use of Defendants' platforms. Because it would be unreasonable to expect teachers to keep detailed logs of every classroom disruption, retrospective questions were necessary. Courts recognize the validity of retrospective reporting when contemporaneous records are unavailable. *See, e.g.*, *Alcantar v. Hobart Serv.*, 2013 WL 156530, at \*2 (C.D. Cal. Jan. 15, 2013) (rejecting exclusion where "it would be unreasonable to expect employees to maintain records of every time they were provided a meal break" and finding survey evidence provides a relevant approximation of damages").

Teachers reported diverted instruction time for the current school year, the prior school year, and then at previous distinct points in time. Mr. Klein designed the survey questions such that they were tethered to significant events in teachers' lives such as when they began teaching, the COVID-19 lockdown, and the return to in-person instruction—allowing them to reconstruct experiences accurately and minimize recall error. Ex. 12 ¶ 8; Ex. 13 ¶ 8; Ex. 14 ¶ 8;Ex. 15 ¶ 8; Ex. 16 ¶ 8; Ex. 17 ¶ 8.

Further, when asking teachers to report on prior years, the survey required them to compare those periods to their current experience, creating a clear cognitive anchor that enhanced recall accuracy and reliability. Ex. 6 ¶ 36; Ex. 7 ¶ 36; Ex. 8 ¶ 36; Ex. 9 ¶ 36; Ex. 10 ¶ 36; Ex. 11 ¶ 36. Klein asked about 2014 as a baseline (those results were not used by Dr. Ward to calculate damages). The survey showed that teachers across all six Districts reported meaningful increases in mean minutes of classroom time diverted in the current school year compared with 2014, ranging from roughly 5-18 minutes in 2014 to 11-50 minutes in the present year. Ex. 6 ¶ 41; Ex. 7 ¶ 41; Ex. 8 ¶ 41; Ex. 9 ¶ 41; Ex. 10 ¶ 41; Ex. 11 ¶ 41.

Retrospective surveys like this one are standard and widely used outside of litigation to guide business decisions. As Mr. Klein explained, "[r]etrospective reporting has been a standard market research tool for decades" and is routinely used to assess prior purchasing behavior and changes over time and by companies to "make critical marketing decisions." Ex. 12 ¶ 7; (citing Paul E. Green and Donald S. Tull, Research for Marketing Decisions 121 (Prentice-Hall, Inc. 1966); Ex. 13 ¶ 7; Ex. 14 ¶ 7; Ex. 15 ¶ 7; Ex. 16 ¶ 7; Ex. 17 ¶ 7. Economists, including Nobel laureate Claudia Goldin, have also relied on retrospective data in a survey spanning respondents' life histories. *See* Ex. 31 at 1-2. Defendants' own survey expert, Mr. Stern, has likewise relied on surveys using retrospective

14

1    reporting. *See* Ex. 32 at 6. That blatant contradiction is fatal to Defendants' claim of an "academic

2    consensus" that retrospective reporting is unreliable. Mot. at 13.

3        The study they cite—a working paper titled Belli, R. F. (2005) Improving the Quality of

4    Retrospective Reports—does not criticize the method but recommends anchoring questions to

5    significant life events to improve accuracy, as Klein did. (Mot. Ex. 73). Mr. Klein considered this

6    paper and noted that "the format of the questions in the Klein Survey are closely aligned with the

7    concept of an 'event history calendar'" approach Belli endorses. Ex. 12 ¶ 8; Ex. 13 ¶ 8; Ex. 14 ¶ 8;

8    Ex. 15 ¶ 8; Ex. 16 ¶ 8; Ex. 17 ¶ 8 (Mr. Klein explained, like an event history calendar, his survey

9    "ties the [survey] response to significant past events."). *Id*.

10       Defendants' cited authorities miss the mark. In the wage and hour case *Jimenez*, the court

11   excluded a survey not just based on the respondents' recall, but also on the fact that "approximately

12   86%" of respondents were aware of the lawsuit and over 50% of respondents understood they could

13   benefit from the lawsuit. This demonstrated that self-interest biased the survey. 2019 WL 13088814,

14   at *23. *In re Autozone, Inc.*, 2016 WL 4208200, at *19, questioned recall of minute distinctions in

15   shift length—not broad, aggregate experiences like diverted classroom time. *Reinsdorf v. Skechers

16   U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013), involved a survey riddled with flaws: the expert

17   failed to define his population, omitted "I don't know" options, and provided no controls—none of

18   which apply here.

19       Mr. Klein's survey avoided every flaw identified in those cases. His design followed accepted

20   principles, used appropriate controls, and targeted a well-defined population, fully satisfying

21   *Daubert*'s reliability requirement and Rule 702's admissibility standard. Defendants' reliance on

22   outdated or irrelevant authorities underscores the weakness of their position and reflects advocacy,

23   not science.[4]

24   ───────────────

25   [4] Other cases Defendants cite are even further afield, as they involve surveys designed or administered
     by individuals other than the testifying expert. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919,
26   951 (C.D. Cal. 2015) (excluding expert who was "not sufficiently familiar with the methodology

27

28

15

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

### 6.     The Klein Survey Avoided Recall Bias.

Beyond employing methodologically sound retrospective reporting techniques, the Klein Survey incorporates additional accepted design principles to minimize recall bias. The survey expressly instructed respondents not to guess and included a "Don't know" option for any question they could not confidently answer. Providing such an option is a well-established method for ensuring respondents do not supply inaccurate or speculative answers and is widely recognized as a safeguard for data reliability. Ex. 12 ¶ 8 (citing Manual at 390); Ex. 13 ¶ 8; Ex. 14 ¶ 8; Ex. 15 ¶ 8; Ex. 16 ¶ 8; Ex. 17 ¶ 8.

*GlaxoSmithKline* is instructive here. 2017 WL 8948975, at *11. There, the court distinguished between potential recall bias in surveys asking about specific historical events (such as treatment of a particular patient) and surveys asking respondents to report aggregate experiences over time. The latter, the court explained, are far less susceptible to recall bias. *See id.* The court further found that recall bias was mitigated where the survey instructed respondents not to guess and offered a "don't know" option—both standard safeguards for ensuring accuracy. *See id.* at *8, *11. The Klein Survey adopted the same proven safeguards. It asked teachers to report aggregate instruction time diverted, instructed respondents not to guess, and allowed "don't know" responses. These measures mirror those upheld in *GlaxoSmithKline* and effectively minimize any risk of recall bias. *See id.* at *11 (finding "the Court is not convinced that concerns of recall bias amount to a fundamental flaw that renders the … survey inadmissible").

In sum, Mr. Klein's survey methodology fully accords with accepted principles of survey design. *See BillFloat Inc.*, 105 F.4th at 1275; *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014) (noting than an expert's testimony is admissible where it has "a reliable basis in the knowledge and experience of the relevant discipline"). The survey targeted the appropriate

used…to opine that it was 'conducted according to accepted principles'"); *Marlo v. UPS, Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) (excluding expert where "Plaintiff's counsel wrote the survey questions" and expert lacked understanding of how to ensure representativeness); *Duran v. U.S. Bank Nat'l Ass'n*, 325 P.3d 916, 938 (Cal. 2014) (survey design devised by the court, not a qualified expert). None of those flaws exist here. Mr. Klein personally designed, pre-tested, and administered the survey, applying accepted principles at every stage.

16

population, tethered questions to significant periods in teachers' lives, asked questions about time diverted in the aggregate, and employed multiple safeguards to ensure reliability. It maintained respondent neutrality by concealing the survey's purpose, instructed teachers not to guess, and provided them with a "don't know" option. *E.g.*, Ex. 6. ¶¶ 20, 23, 25. The survey design and features effectively prevented non-response and recall bias. Courts consistently hold that alleged issues of recall or response bias are matters for cross-examination, not exclusion. *See Medlock*, 2015 WL 8479320, at *5 ("any issues of recall bias … go to the weight to be ascribed to the survey"); *Alcantar*, 2013 WL 156530, at *2-5; *GlaxoSmithKline LLC*, 2017 WL 8948975, at *8-9.

### D. There Is No Basis to Exclude Dr. Ward's Lost-Time Damages Opinions.

Dr. Ward is a Harvard-educated economist with nearly two decades of experience in econometric analysis and applied microeconomics—including urban and regional economics, labor economics, health economics, and public finance. *E.g.*, Ex. 33 at App. A. He has taught courses in microeconomic theory, econometrics, labor economics, public finance, environmental and natural resource economics, and social economics at Harvard University, Lewis and Clark College, the University of Oregon, Portland State University, and the University of Montana. *Id.* Throughout his career, he has presented, published, and provided litigation support on calculating economic damages from lost wages, analyzing wage and benefit growth, calculating hourly billing rates for government employees, and analyzing the effectiveness of various educational strategies, such as programs designed to promote college attendance for elementary schools, positive behavior support programs, public-private school partnerships, and eliminating achievement gaps. *Id.*

Dr. Ward's assignment here was straightforward: calculate the economic value of the lost time each District incurred as a result of teachers, counselors, and administrators diverting time from their core duties to address student use of Defendants' platforms. Ex. 38 ¶¶ 5-6. As Dr. Ward explains:

> The plaintiffs' approach to damages is based on the fundamental economic concept of opportunity cost. When a person allocates a scarce resource—such as money, time, or effort—to a particular use, they forgo the opportunity to use that resource for another potentially beneficial purpose. In economic terms, opportunity cost refers to the value of the forgone alternative.

*E.g.*, Ex. 33 ¶ 7.

To quantify those damages, Dr. Ward applied a simple, well-accepted formula: **Diversion damages**

17

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

**= time diverted × cost of that time (e.g., wages** or **hourly compensation).** See, e.g., id. ¶ 12.

For the first component—time diverted—Dr. Ward reasonably relied on Mr. Klein's survey (for teachers) and witness declarations and depositions (for counselors and administrators). *Id.* ¶¶ 35-41.[5] His assignment did not include independently determining the time diverted. For the second component—the cost of time—Dr. Ward identified the relevant employee populations and their total compensation, including benefits, for the relevant periods. *Id.* ¶¶ 14-21. Using these inputs, he calculated diversion damages for each District. Pls.' Omni. Opp. § V.C.ii.

Defendants' attacks on Dr. Ward misstate Rule 702. Experts are entitled to rely on data prepared by others, so long as it is the type of information reasonably relied upon by experts in the field. *See In re Apple iPhone Antitrust Litig.*, 2024 WL 5701895, at *11-13 (N.D. Cal. Feb. 2, 2024) (Gonzalez Rogers, J.) ("Objections to an expert's inputs may be raised on cross-examination."). Dr. Ward's methodology reflects standard economic practice and rests on reliable data and well-established principles. Defendants' disagreement with his inputs is not a methodological critique—it is a dispute over conclusions. *Daubert* does not permit exclusion on that basis. Their argument improperly conflates *admissibility* with *persuasiveness* and invites the Court to weigh the evidence—a task reserved for the jury.

1. **Dr. Ward's Lost-Time Damages Are Legally Cognizable.**

Defendants urge the Court to exclude Dr. Ward's damages opinions, arguing that "these lost-time damages are not recoverable under the substantive law that governs these cases." Mot. at 23. Yet they offer no supporting argument, analysis, or authority—only a passing reference to their summary judgment briefing. *Id*. This cursory assertion fails on its face. As explained in Plaintiffs' oppositions to those motions, diversion damages are recoverable under the governing law. *See*. Pls.' Omni. Opp. § V.C.ii.

---

[5] Defendants wrongly criticize Dr. Ward for purportedly not having identified any "opportunities—financial or otherwise—that any Plaintiff forewent because of the alleged time spent addressing social media." Mot. at 19. Dr. Ward explains that his approach is well-grounded in the literature, which recognizes that when "measuring the cost of education interventions, when a program, policy, or other initiative diverts staff time from its alternative use, it is appropriate to value the opportunity cost of this diverted time using the wages and fringe benefits paid to the relevant staff." *E.g.*, Ex. 39 ¶ 8.

18

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

### 2. Dr. Ward's Teacher-Related Damages Opinions Are Properly Based on the Admissible Klein Survey.

Dr. Ward properly relied on the Klein Survey results for the first part of his equation calculating the amount of time diverted for teachers. It is well-established that "experts may rely on other reports that would otherwise be hearsay to explain the basis of their expert opinion." *Fannie Mae v. LaRuffa*, 702 F. App'x 505, 507 (9th Cir. 2017) (citing *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir. 1984)). Defendants' cites do not suggest otherwise. In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) and *Zucchella*, 2023 WL 2628107, at *17, the courts excluded the underlying expert reports themselves—findings not applicable here because Mr. Klein's survey is admissible and reliable. *See* Section III.B; *Fannie Mae*, 702 F. App'x at 507.

### 3. Defendants Wrongly Claim That Dr. Ward Failed to Disentangle Actionable and Inactionable Conduct.

Defendants argue that Dr. Ward should be excluded because he "makes no attempt to apply a methodology for calculating damages attributable to *Defendants' actionable conduct.*" Mot. at 20. As discussed above (*see* Section III(A)(3)), Defendants' assertions regarding "disentanglement" misstate the record and the governing legal standard. More fundamentally, they mischaracterize what Rule 702 requires. *Daubert* does not demand that an expert parse liability among multiple defendants or isolate only "actionable" portions of the data; it requires that the expert apply a reliable methodology to relevant facts—which Dr. Ward indisputably did.[6]

It is well-established that experts may rely on otherwise inadmissible evidence in forming their opinions. *See* Fed. R. Evid. 703; *Fannie Mae*, 702 F. App'x at 507. Courts routinely uphold experts' reliance on discussions and information obtained from employees of the parties. *See Kawasaki v. Rorze Corp.*, 2025 WL 1836331, at *4 (N.D. Cal. July 3, 2025) (declining to exclude lost-profits expert and finding that reliance on employee discussions and depositions is not improper even when extensive). Any concern that an expert accepted employee statements "at face value" goes

---

[6] Defendants recycled "disentanglement" arguments are wrong on all points. *See* Pls.' Omni. Opp. § V.B. In fact, they underscore that these challenges are to the underlying facts that the Districts intend to present at trial—not challenges to the reliability of the Districts' experts under Rule 702.

1    to weight, not admissibility, and is properly addressed through cross examination—not exclusion. *Id.*

2            Dr. Ward's reliance on affidavits and deposition testimony to determine the "amount of time

3    diverted" was entirely reasonable. Each affiant or deponent was a counselor or administrator with

4    direct first-hand knowledge of the impact of Defendants' platforms on the District, and each affidavit

5    was made under penalty of perjury. *See, e.g.*, Irvington: Exs. 46, 47; Breathitt: Exs. 48, 49, 50, 51,

6    52; Tucson: Exs. 53, 54, 55, 56; Charleston: Exs. 57, 58; Harford: Ex. 61 at 52-60; Ex. 62 at 132-

7    143.[7] This type of reliance on sworn, first-hand factual accounts is consistent with accepted principles

8    of economic analysis and squarely within what *Daubert* and Rule 702 permit as a reliable basis for

9    expert opinion.

10           "Courts routinely hold that experts may reasonably rely on sworn witness testimony in

11   formulating their opinions." *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 2018 WL

12   5013580, at *4 (N.D. Cal. Oct. 16, 2018) ("UET fails to demonstrate why it is unreasonable for an

13   expert to rely on statements made in a sworn, signed declaration absent evidence rebutting the

14   underlying statements."); *Abu-Lughod v. Calis*, 2015 WL 12731921, at *4 (C.D. Cal. July 1, 2015)

15   (same); *In re Toyota Motor Corp. Unintended Accel. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978

16   F. Supp. 2d 1053, 1073 (C.D. Cal. 2013) (expert can rely on the testimony of plaintiff); *United States

17   v. Porter*, 2016 WL 540808, at *2 (E.D. La. Feb. 10, 2016) (collecting cases); *see also Alorica Inc.

18   v. Tech Mahindra (Americas) Inc.*, 2025 WL 2577788, at *3 (E.D. Tex. Sep. 5, 2025) (permitting

19   expert to rely on declaration regarding time spent on tasks); *Wasica Fin. GmbH v. Schrader Int'l,

20   Inc.*, 432 F. Supp. 3d 448, 460 (D. Del. 2020) (permitting expert to rely on declarations from third-

21   parties); *Ohio Org. Collab. v. Husted*, 2016 WL 8201848, at *3 (S.D. Ohio May 24, 2016) (permitting

22   expert to rely on declarations of election officials); *Barnes v. Century Alum. Co.*, 2013 WL 1906283,

23   at *3 (D.V.I. May 8, 2013) (permitting expert to rely on affidavits). This body of authority confirms

24   that Dr. Ward's reliance on sworn statements from District employees with direct knowledge of the

25   harms caused by Defendants' platforms is not just permissible—it is textbook expert practice.

26

27   ───────────────

28   [7] Dr. Ward did not provide a damages calculation for time loss for counselors or administrators for
     DeKalb; he provided a damages calculation for time loss by teachers using Mr. Klein's survey results.

Further confirming the reasonableness of Dr. Ward's reliance on these affidavits, the witnesses did not merely provide numerical estimates—they offered detailed reliable context about their backgrounds, their day-to-day roles in their respective Districts, and the basis for their time calculations. *Id*. To the extent Defendants contend that any affiant considered third-party content (Mot. at 21-22), other social media platforms (Mot. at 22), or purportedly non-actionable conduct (Mot. at 22-23), those are issues of factual causation reserved for the jury—not grounds for exclusion. *See Kawasaki*, 2025 WL 1836331, at *4 ("While [the moving party] may be concerned that [the expert] took [an employee's] word 'at face value,' that is a basis for . . . cross examination, not a basis for striking [the expert's testimony] altogether."). As Judge Kuhl held in rejecting *Sargon* motions, "determining whether the substance or instrumentality upon which liability is premised caused a particular plaintiff's harm is the role of the jury." *Social Media Cases*, 2025 WL 2807828, at *7.

As Dr. Ward explained, his reliance was reasonable because the employees who provided affidavits or deposition testimony "were people in positions where they would be able to directly or [sic] access the knowledge and information to provide an estimate under oath in this case." Ex. 45 at 291:15-292:25; *see also id*. at 209:6-11, 283:17-23. Defendants cite no authority suggesting that an expert may not rely on sworn testimony from individuals with direct, firsthand knowledge. Instead, they simply quarrel with the underlying testimony.[8] However, the proper mechanism to challenge that evidence is through cross-examination, not by excluding expert testimony under Rule 702.

Moreover, Dr. Ward is not serving as a mere conduit for inadmissible hearsay. While he relied on affidavits and deposition testimony to calculate the "amount of time diverted", the Districts will introduce the same underlying evidence at trial through witness testimony. Courts routinely reject

---

[8] The sole case Defendants cite, *Kim v. Benihana, Inc.*, 2024 WL 3550390, at *6 (C.D. Cal. May 20, 2024), is inapposite. In *Kim*, the plaintiffs' damages expert constructed a "damages model" based on irrelevant and internally inconsistent survey percentages—calculating what consumers "on average" believed about the crab content of a sushi roll. The court excluded the expert's opinion because (1) he relied on "three irrelevant percentages" as a "critical input" to his model, and (2) the survey itself focused on a different sushi roll than the one at issue. *Id*. at *6-7. By contrast, Dr. Ward relied on data directly tied to Defendants' conduct—affidavits and deposition testimony from District employees with firsthand knowledge of how Defendants' platforms diverted time and resources. Unlike the speculative arithmetic in *Kim*, Dr. Ward's analysis rests on relevant, case-specific evidence and established economic principles. Far from undermining his testimony, *Kim* underscores why Dr. Ward's grounded, fact-based approach easily satisfies *Daubert* and Rule 702's reliability standard.

21

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

hearsay objections in this context, recognizing that such challenges are premature at summary judgment. As the Eastern District explained, "[h]earsay objections are often premature at summary judgment when asserted by a moving party" because "a party opposing a motion for summary judgment seeks a trial, not a verdict, and it stands to reason that if evidence may be converted to admissible form for trial, it should not be excluded." *Moreno v. Ross Island Sand & Gravel Co.*, 2015 WL 5604443, at *5 (E.D. Cal. Sep. 23, 2015) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)); *Hatcher v. Cnty. of Alameda*, 2011 WL 1225790, at *3 (N.D. Cal. Mar. 31, 2011). Indeed, Defendants concede as much, acknowledging that "[a]n expert can rely on these sorts of 'foundational' facts provided by the parties only if the parties' employees testify to the facts with firsthand knowledge at trial." Mot. at 24 n.14. That is precisely what the Districts intend to do.

Fundamentally, Defendants do not challenge Dr. Ward's methodology—they challenge his inputs, claiming that "he cannot vouch for the relevance or accuracy of the inputs he used." Mot. at 20. But Rule 702 does not require an expert to have firsthand knowledge of every data point underlying an analysis. *See Yellowstone Womens First Step House, Inc. v. City of Costa Mesa*, 2018 WL 6167930, at *8 (C.D. Cal. Nov. 5, 2018) ("The fact that an expert does not vouch for the underlying data does not preclude him from expressing an opinion based of the assumption of accuracy," and "whether he verified the data is a proper subject for cross examination."). If the law required experts to personally verify each input, nearly all economic testimony would be inadmissible. Defendants' argument reflects a fundamental misunderstanding of how expert economic analysis operates and confuses evidentiary sufficiency with methodological reliability.

### E.    There Is No Basis to Exclude Mr. Meyers's "Out-of-Pocket" Damages Opinions.

Mr. Meyers is a seasoned forensic accounting and damages expert with decades of experience calculating lost profits, compensatory damages, and other damage calculations for both plaintiffs and defendants. He has served as a financial expert in the *Deepwater Horizon* MDL (No. 2179) where he calculated business losses deriving from the largest oil spill in U.S. history. *See* Ex. 63 ¶¶ 3-7. Mr. Meyers holds a Master Analyst in Financial Forensics certification from The National Association of Certified Valuators and Analysts, which recognizes expertise and integrity in financial litigation

22

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

1    support. *Id*. at ¶ 4.

2        Applying the same methodologies he regularly uses in his professional work, Mr. Meyers

3    collaborated with each of the Districts to identify specific vendors ("Select Vendors") and

4    expenditures related to Social Emotional Learning (SEL) programs, mental health support, property

5    damage, and technology—costs that Districts attribute to Defendants' conduct. *Id*. at ¶ 14; Ex. 64 ¶

6    14; Ex. 65 ¶ 14; Ex. 66 ¶ 14; Ex. 67 ¶ 14; Ex. 68. ¶ 14. After identifying the Select Vendors, Mr.

7    Meyers collected information necessary to reconcile the total costs incurred during the period for

8    which the Districts are seeking out-of-pocket damages, such as financial statements, contracts,

9    invoices, vendor receipts, purchase orders, and work order numbers. Ex. 63 ¶¶ 15-16, 19; Ex. 64 ¶¶

10    15-16, 19; Ex. 65 ¶¶ 15-16, 19; Ex. 66 ¶¶ 15-16, 19; Ex. 67 ¶¶ 15-16, 19; Ex. 68 ¶¶ 15-16, 19. For

11    certain Select Vendors, District employees provided sworn allocation percentages representing the

12    portion attributable to Defendants' misconduct and Mr. Meyers multiplied those percentages by the

13    vendor costs to calculate the Districts' out-of-pocket damages. Ex. 63 ¶¶ 21-23; Ex. 64 ¶¶ 21-23; Ex.

14    65 ¶¶ 21-23; Ex. 66 ¶¶ 21-23; Ex. 67 ¶¶ 21-23; Ex. 68 ¶¶ 21-23.

15        Defendants' criticisms of Mr. Meyers' opinions mirror those they direct at Dr. Ward and fail

16    for the same reasons. They do not challenge Mr. Meyers' methodology or calculations, they challenge

17    his inputs, arguing that he failed to "disentangle" actionable conduct from non-actionable conduct.

18    Mot. at 25. But "[j]uries are frequently called upon to decide the extent to which a plaintiff's … harm

19    is caused by the defendant's actionable conduct or, instead, by other influences." *Social Media Cases*,

20    2025 WL 2807828, at *7. These factual disputes are for the jury—not grounds for exclusion.

21        As with Dr. Ward, Mr. Meyers reasonably relied on affidavits and interrogatory responses

22    from District employees with firsthand knowledge of the relevant expenditures. Each affidavit was

23    signed under the penalty of perjury. *See, e.g*., Breathitt: Exs. 48, 51; Charleston: Exs. 58, 59; DeKalb:

24    Ex. 60. Mr. Meyers' reliance on interrogatory responses submitted by Charleston, DeKalb, Tucson,

25    Irvington, and Harford was also appropriate.[9] *Loc. 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*,

26    189 F.3d 473 (9th Cir. 1999) ("[T]here is authority for accountants relying on lay witnesses in forming

27    ─────────────

28    [9] Ex. 66 ¶¶ 21-23; Ex. 67 ¶¶ 21-23; Ex. 68 ¶¶ 21-23; Exs. 76, 77, 78, 114, 115, 116.

23

their opinions and relaying them at trial."); *see also Metrejean v. REC Marine Logistics, L.L.C.*, 2009 WL 3062622, at *3 (E.D. La. Sep. 21, 2009) (finding that "deposition testimony, answers to interrogatories, and initial disclosures, as well as the report of [another expert], are sufficiently reliable bases" for an expert's opinion); *Alorica Inc.*, 2025 WL 2577788, at *3; *Wasica Fin. GmbH*, 432 F. Supp. 3d at 460; *United Energy Trading, LLC*, 2018 WL 5013580, at *4; *Abu-Lughod*, 2015 WL 12731921, at *4; *Ohio Org. Collab.*, 2016 WL 8201848, at *3; *Barnes*, 2013 WL 1906283, at *3; *In re Toyota Motor Corp. Unintended Acceleration*, 978 F. Supp. 2d at 1073.

Mr. Meyers is not a mere conduit for inadmissible hearsay. The Districts will introduce the underlying documents and testimony at trial through the appropriate witnesses. *See* Ex. 75 at 118:5-121:3. Defendants themselves concede that such reliance is proper where, as here, the foundational witnesses will testify at trial. Mot. at 24 n.14. To the extent Defendants wish to argue that any witness considered third-party content or non-actionable conduct (Mot. at 26-27), those arguments go to weight, not admissibility. *See Kawasaki*, 2025 WL 1836331, at *4; *Social Media Cases*, 2025 WL 2807828, at *7. Defendants' motion does not raise a *Daubert* issue—it simply repackages factual disputes as admissibility challenges. Rule 702 does not authorize that substitution, and this Court should reject it and allow the jury to weigh Mr. Meyers's sound analysis.

### F.    Dr. Hoover's Opinions on Causation, Harm, and Mitigation Are Reliable and Admissible.

Dr. Sharon Hoover is a licensed clinical psychologist and a Professor Emeritus of Child and Adolescent Psychiatry at the University of Maryland School of Medicine where she has been on the faculty for over 20 years. *See* Ex. 79 ¶ 12. From 2010 until May 2025, Dr. Hoover also co-directed the National Center for School Mental Health, where she advised schools nationwide, including on issues related to the adverse impacts of social media,[10] and developed strategic plans to strengthen student mental health systems. Ex. 79 ¶¶ 15-16. Over the course of her decades long, distinguished career, Dr. Hoover has provided consultation to federal, state, and local agencies on school mental health policy and implementation; testified before national and state legislative bodies, including the

---

[10] Notably, Dr. Hoover testified that in her usual practice consulting with school districts over the last decade, the negative impacts of social media on school districts was a common discussion point. Ex. 93 at 205:16-206:22.

24

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

U.S. Senate; and served as an advisor to the U.S. Department of Education, the U.S. Department of Health and Human Services, and the World Health Organization. *See id.* ¶ 21. In short, Dr. Hoover is uniquely qualified to assess the psychological and educational harms caused by Defendants' platforms and to design strategic frameworks for mitigating those harms within schools.

Unable to credibly challenge Dr. Hoover's qualifications, Defendants resort to disputing her conclusions, mischaracterizing her methodology, and cherry-picking snippets from her report and deposition to distort the record. None of these tactics provide a basis for exclusion. The full record shows that Dr. Hoover employed a rigorous, multidisciplinary approach grounded in decades of experience in child and adolescent psychology, school-based mental health systems, and program evaluation. Her analysis adheres to the standards and methodologies accepted in her field. *See Alaska Rent-A-Car, Inc*, 738 F.3d at 969 (expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline"). Defendants' disagreement with Dr. Hoover's conclusions does not render them speculative—it underscores their evidentiary strength. Those criticisms belong in cross-examination, not in a *Daubert* motion.

As detailed below, Dr. Hoover's opinions on causation and harm are the product of precisely the type of careful, evidence-based analysis that *Daubert* and Rule 702 are designed to admit. Her methodology connects well-established scientific research to real-world data from the Districts, offering a clear and reliable explanation of how Defendants' platforms have harmed school environments and what measures are required to address those harms.

        **1.**      **Dr. Hoover Used a Reliable, Sound, and Well-Established Methodology to Reach Her Specific Causation Opinions.**

        **a)**      **Dr. Hoover's Methodology and Conclusions Are Sound.**

Dr. Hoover drew on her more than twenty-five years of experience as a clinician, researcher, and consultant in child and adolescent mental health in schools to design evidence-based strategic plans tailored to the harms caused by Defendants' platforms. Ex. 79 ¶ 1-11. Her methodology integrates her extensive professional background, with past research on comprehensive school mental health systems, a review of documents and scientific literature, and direct engagement with state and local education leaders—including administrators, teachers, and school mental health professionals.

25

School District/Local Gov't Entity Pls.' Opp'n to Defs.' Mot. to Exclude Testimony of School District Experts
4:22-MD-03047-YGR

*Id.* Dr. Hoover conducted an independent literature review, addressing the core issues in this case and incorporated findings from Plaintiffs' other general causation experts and the studies they cited. *Id.* She also had each District complete the School Health Assessment and Performance Evaluation ("SHAPE") profile, a tool she developed at the National Center for School Mental Health and regularly employs in her work. The SHAPE profile provides critical data on staffing, mental health services, supports, and data systems. *See* Ex. 94 at 559:22-560:12. Dr. Hoover reviewed Plaintiff Fact Sheets to understand each District's size, resources, and the impact of Defendants' platforms. *See* Ex. 80 ¶ 27; Ex. 81 ¶ 27; Ex. 82 ¶ 27; Ex. 83 ¶ 27; Ex. 84 ¶ 27; Ex. 85 ¶ 27.

Finally, Dr. Hoover conducted interviews with key informants employed by the Districts who provided detailed information about the harms Defendants' platforms caused to each District and the resources needed to address those harms. These key informants were individuals identified as the most knowledgeable about the issues Dr. Hoover was investigating. As Dr. Hoover explained: "Key informant interviews are a standard, valid source of ground-level insight" which she has "used consistently in every district for which [she has] been asked to develop a strategic plan for comprehensive school mental health improvement." *E.g.*, Ex. 87 ¶ 19; Ex. 88 ¶ 15; Ex. 89 ¶ 17; Ex. 90 ¶ 16; Ex. 91 ¶ 15; Ex. 92 ¶ 23. These sources are routinely relied upon in her field and provide a sound factual foundation for her conclusions.

Using this rigorous methodology, Dr. Hoover offered both general causation and District specific causation opinions. In her general causation report, Dr. Hoover concluded that Defendants' platforms have caused significant, widespread harms to schools, including "diminished academic focus and disrupted classroom dynamics," "declines in face-to-face social skills and increases in mental health concerns," classroom disruptions, and the diversion of "limited staffing and funding to address the mental health and behavioral consequences of digital overuse." Ex. 79 ¶ 83. Dr. Hoover further concluded that addressing these harms requires a long-term, structured response—namely, a fifteen-year strategic plan using a Multi-Tiered Systems of Support ("MTSS") framework. This evidence-based framework provides escalating tiers of prevention and intervention services. *Id.* ¶ 94. Tier 1 programs focus on prevention and schoolwide education—such as digital literacy initiatives and mental health awareness training for all students, staff, and families. *Id.* ¶¶ 95-96. Tier 2 programs

26

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

address moderate harms through small-group counseling, peer support, and interventions that reduce compulsive use of Defendants' platforms and foster in-person relationships. *Id.* ¶¶ 97-98. Tier 3 interventions target students facing severe social, emotional, or academic disruption from Defendants' platforms. *Id.* ¶ 99.

Dr. Hoover explained the MTSS framework is necessary to repair and sustain healthy school environments, stating: "[t]he damaging effects of student social media use on school districts, schools, the school environment, student well-being, and learning can be addressed . . . through comprehensive school mental health systems." *Id.* ¶ 6. *See also id.* ¶ 84 ("The harms of social media to students and the school environment warrant a strategic plan and comprehensive approach to prevent and mitigate the negative impact."). She further testified that a K-12 approach is essential "because the harms are not exclusive to those students who may have used the platforms. They pervade the school. They pervade peer relationships. They pervade learning across the board." Ex. 94 at 623:10-624:4. Her fifteen-year implementation timeline, far from being *ipse dixit*, is grounded in "implementation science, public health precedent, and the real-world logistics of initiating and sustaining complex, systemic change in educational settings." Ex. 79 ¶ 106. Dr. Hoover cited research from the National Implementation Research Network and other established authorities supporting this timeframe. *Id.* ¶ 113.

In arriving at her case-specific opinions, Dr. Hoover again applied this methodology—drawing on her experience, literature review, Plaintiffs' other expert reports, District data, SHAPE profiles, and interviews—to conclude that Defendants' platforms have directly negatively impacted each District. She also detailed the staffing, professional development, and training necessary for each District to implement her MTSS plan effectively. *E.g.*, Ex. 80 ¶¶ 107-144.

When developing the plan for each District, Dr. Hoover considered existing staffing and services within the District, the number of schools in the District, and the number of students in the District. She also considered staffing ratios established by national organizations, such as the National Association of School Psychologist, American School Counselor Association, and the School Social Worker Association, which "offer a reasonable, professionally endorsed baseline for estimating how much staffing is needed when a new substantial source of harm, like social media platform use, begins

27

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

placing additional strain on existing systems." Ex. 86 ¶ 51. Dr. Hoover explained that she used these ratios "to estimate the level of additional staffing that would be necessary to respond to the mental health and learning impacts of social media," *id*. ¶ 52, and that "this is a common and accepted approach in workforce planning: using established standards to model how new challenges impact overall service demand." *Id*. Dr. Hoover's reliance on nationally recognized staffing ratios reflects accepted workforce planning principles and further demonstrates the reliability of her approach. *Id*. ¶¶ 51-52. Dr. Hoover extrapolated from these ratios and used her substantial experience in the field to determine the staffing and training needed to effectively implement her strategic plan for each District.

This multi-layered approach—rooted in both quantitative benchmarks and qualitative expertise—exemplifies reliable methodology under *Daubert* and Rule 702. Dr. Hoover's opinions rest on her extensive experience, professional standards, empirical research, and direct evidence from the Districts—not speculation. Her conclusions also satisfy *Daubert's* "fit" requirement, as they directly address how Defendants' conduct caused concrete harms to the Districts and what measures are necessary to mitigate those harms.

> **b)** **Defendants' Attacks on Dr. Hoover's Methodology Fail.**

Defendants' attempt to reduce Dr. Hoover's rigorous, evidence-based methodology to mere parroting of statements from the Districts fails. That portrayal is both inaccurate and misleading. Dr. Hoover did not rely on litigation-driven narratives—she applied the same methodology, grounded in the accepted principles of public health and implementation science, that she has used for decades when consulting with school districts nationwide to design and develop strategic mental health plans. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Each of her sources was relevant, reliable, and consistent with best practices in her field.

Defendants' mischaracterization of Dr. Hoover's key informant interviews as the "spoon-feeding of lawyer-orchestrated facts" (Mot. at 34) demonstrates a fundamental misunderstanding of implementation science and public health research. As Dr. Hoover explained, key informant interviews are a standard, scientifically valid method for assessing District needs—particularly where formal data systems lag behind practice-based insights:

> Key informant interviews are a standard, valid source of ground-level insight. These interviews are a widely accepted and scientifically valid method for assessing district needs, particularly in contexts where formal data systems lag behind practice-based observations. This approach is used consistently in every district for which I have been asked to develop a strategic plan for comprehensive school mental health improvement. In my standard practice across dozens of school districts nationwide, I speak directly with district and school leaders, educators, and student support professionals to understand local strengths and identify service and infrastructure gaps in order to inform and support quality improvement.

*E.g.*, Ex. 89 ¶ 17 (citing Susan G. Forman, et al., *Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators*, 1 Sch. Mental Health, 26-36, (2009)). Dr. Hoover further explained that, "[i]n implementation science, such practice-based evidence is a necessary complement to traditional data sources." *Id.* (citing Kimberly Hoagwood, et al., *Unpacking the Black Box of Implementation: The Next Generation for Policy, Research and Practice*, 40 Admin. and Policy in Mental Health and Mental Health Servs. Rsch., 451-455 (2013)). Accordingly, these key informant interviews were not only appropriate but essential to Dr. Hoover's process for developing strategic plans for each District. Her reliance on these interviews aligns with standard, accepted practice in her field. *See Elosu*, 26 F.4th at 1028 (expert properly relied on testimony of interested party when doing so was consistent with industry practice).

Defendants also complain that Dr. Hoover did not identify her key informants by name. But maintaining respondent anonymity is standard in her discipline and part of Dr. Hoover's practice: "Consistent with the standard practices in my field, I do not attribute specific quotations to named individuals [in my reports.] This is intentional and standard practice in school consultation and qualitative research. Anonymity helps ensure candor and protects respondents from [fear of] potential repercussions, especially when they are discussing district challenges." Ex. 87 ¶ 20; Ex. 88 ¶ 17; Ex. 89 ¶ 18; Ex. 90 ¶ 18; Ex. 91 ¶ 18; Ex. 92 ¶ 24. Dr. Hoover further explained that "I consistently use this approach as my standard practice when working with school districts across the country, and it reflects longstanding norms for psychological consultation in school systems, including practices used in federally-funded needs assessments." *E.g.*, Ex. 89 ¶ 18. Defendants' demand that Dr. Hoover violate confidentiality norms in school-based research only underscores their misunderstanding of her discipline. Far from undermining her credibility, her adherence to these ethical and professional

standards reinforces the reliability of her opinions under *Daubert* and Rule 702. In any event, as Defendants concede, ***they were provided with a list of the individuals who served Dr. Hoover's key informants***. They therefore had every opportunity—and in many cases exercised it—to depose these witnesses, to test credibility, or to explore the statements made to Dr. Hoover. Having had full discovery access, Defendants' complaints about anonymity ring hollow.[11]

Defendants also cite *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856, at *3 (N.D. Cal. May 22, 2008) to challenge Dr. Hoover's use of key informants. That case is wholly inapposite. In *Therasense*, the expert's opinion relied on three experiments conducted by unidentified company employees—experiments the expert "did not participate in, observe, or supervise." *Id*. Defendants there had no knowledge of who conducted the experiments or of the factual foundation underlying the expert's opinions until after fact discovery had closed. *Id*. None of that is true here. Dr. Hoover relied on key informant interviews as one discrete component of a broader, well-established methodology consistent with her standard practice; she fully disclosed the facts relevant to her opinions; and the identities of her key informants were disclosed to Defendants during discovery and several were deposed by Defendants. The comparison to *Therasense* is misplaced.

Dr. Hoover's consideration of deposition testimony from the Districts' employees was also proper despite Defendants' suggestion otherwise. Again, deposition testimony was just one component of the broader set of data sources that Dr. Hoover properly reviewed; it informed her understanding of the Districts' experiences but did not drive her conclusions. Likewise, Defendants' attempt to fault Dr. Hoover for referencing the Plaintiff Fact Sheets misrepresents the documents' role. The Fact Sheets merely provided contextual information—such as the number of schools, students, and available resources within each District—not the foundation of Dr. Hoover's causation opinions. Her conclusions were grounded in the totality of the evidence, consistent with standard

---

[11] Defendants also misleadingly cite deposition testimony from a single key informant to suggest that counsel asserted privilege over communications with Dr. Hoover. This is false. The transcript makes clear that defense counsel merely asked whether the witness had met with Dr. Hoover during deposition preparation and counsel objected to discussing the contents of deposition preparation—standard privileged material. The witness then confirmed she did not meet with Dr. Hoover during deposition preparation. Ex. 95 at 19:10-21:25. Defendants' effort to twist a routine privilege objection into an accusation of concealment is unworthy of serious consideration.

30

1  practices in her field, not in any single document or data source.[12]

2  Nor was it improper for Dr. Hoover to consider the SHAPE profile provided by each District.

3  The SHAPE profile is a nationally disseminated tool developed by Dr. Hoover and regularly used in

4  her field. Ex. 79 ¶ 19. It enabled Dr. Hoover to evaluate each Districts' existing mental health

5  infrastructure, staffing services, and supports as she designed strategic plans for the Districts.

6  Defendants' complaint that the SHAPE profile does not include data on the number of students with

7  a mental illness diagnosis, or the impact of such a diagnosis is immaterial: Dr. Hoover's causation

8  opinions did not hinge on any single dataset; they were based on the cumulative weight of multiple

9  converging sources—precisely the kind of holistic, evidence-based assessment that is standard

10  practice in her field. Defendants' argument to the contrary reflects a fundamental misapprehension

11  of both Dr. Hoover's discipline and the standards of scientific rigor it demands.

12  Defendants further fault Dr. Hoover for collecting qualitative data from key informants rather

13  than relying on quantitative data that, quite simply, does not exist. This criticism is not only misplaced

14  but internally inconsistent: Defendants simultaneously argue that Mr. Klein's retrospective

15  quantitative data is unreliable while faulting Dr. Hoover for not producing similar data herself. In

16  reality, the types of information Defendants demand—such as precise measurements of how much

17  time each student spends on social media, the number of students diagnosed with "social media

18  addiction," or exact counts of the number of students impacted by social media-induced distraction

19  or bullying—are neither tracked nor reasonably collectible. The Districts are resource-constrained

20  public school systems whose mission is to educate students, not to conduct large-scale

21  epidemiological studies using data collections for which they have neither the technology nor

22

23  _____

24  [12] Defendants' reliance on *Engilis v. Monsanto Co.* 151 F.4th at 1040, 1051 (9th Cir. 2025) is entirely
misplaced. In *Engilis*, the expert's opinion rested solely on a single statement from a plaintiff fact

25  sheet and failed to consider any other relevant data that could have corroborated or contradicted that
information. *Id.* The court excluded the opinion because it lacked any independent analytical

26  foundation. Here, by contrast, Dr. Hoover used the Plaintiff Fact Sheets as just one of many inputs—
alongside extensive interviews, document reviews, scientific literature, and district-level data—

27  within a comprehensive, multidisciplinary methodology. Her analysis was not derivative of the fact
sheets; it was informed by them in context, consistent with accepted professional standards.

28  Defendants' attempt to equate this rigorous, multi-source methodology with the one-dimensional
approach in *Engilis* strains credibility.

31

1    resources. As Dr. Hoover explained, "existing [data] systems often do not track the types of internal

2    service referrals, behavioral disruptions, or emotional dysregulation commonly tied to social media

3    use." *E.g.*, Ex. 89 ¶ 14. Her use of qualitative data was not a methodological flaw—it was the only

4    scientifically appropriate approach given the real-world context in which these schools operate.

5         Because detailed quantitative data is often incomplete—or entirely unavailable—when

6    addressing public health crises, Dr. Hoover followed the same multidisciplinary approach she

7    employs in her professional consulting work with school districts nationwide. As she explained, her

8    "standard practice when consulting with school districts includes reviewing available school and

9    district-level data, while recognizing that such data often misrepresents or only scratches the surface

10   of, what is actually happening with respect to student mental health, service delivery gaps, school

11   climate disruption, and school functioning and fails to capture the scope of emerging harms, including

12   those caused by social media platform use." *E.g.*, *id.* (citing Kimberly Hoagwood, et al., *Unpacking

13   the Black Box of Implementation: The Next Generation for Policy, Research and Practice*, 40 Admin.

14   and Policy in Mental Health and Mental Health Servs. Rsch., 451-455 (2013)). Consistent with that

15   standard practice, Dr. Hoover reviewed the Districts' quantitative data including discipline records,

16   mental health service delivery data, and school staffing ratios—but properly supplemented those

17   materials with additional qualitative information to fill known data gaps. *E.g.*, *id.* ¶ 13. This holistic

18   approach is standard in implementation science and public health research and aligns squarely with

19   the principles the Supreme Court recognized in *Kumho Tire Co.*, 526 U.S. at 152, confirming that

20   reliable expert methodologies must reflect the realities of the professional field, not an artificial

21   standard of laboratory precision. Defendants' criticism ignores the settled principle that reliability

22   turns on whether an expert's method fits her discipline—not whether it conforms to Defendants'

23   litigation-driven notion of what "data" should look like. Courts do not demand data that reality makes

24   impossible to obtain; they demand expertise applied responsibly, which is exactly what Dr. Hoover

25

26

27

28

1    delivered.[13]

2        In sum, Dr. Hoover employed the same well-established, evidence-based methods that define

3    her decades of professional work. Her opinions are grounded in the accepted practices of her

4    discipline, informed by years of consulting with school districts nationwide, and supported by her

5    extensive experience developing and implementing strategic plans to address precisely the types of

6    harms the Districts face. *See Hardeman v. Monsanto Co.*, 997 F.3d 941, 962 (9th Cir. 2021) ("[A]

7    testifying expert can rely on his own extensive clinical experience under *Daubert*."); *see also Elosu*,

8    26 F.4th at 1024 ("An expert's specialized knowledge and experience can serve as the requisite 'facts

9    or data' on which they render an opinion."); *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d

10   807, 816 (9th Cir. 2014). Her testimony is admissible. *See Primiano*, 598 F.3d at 565 (explaining that

11   an expert's testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge

12   and experience of the relevant discipline").

13                    **2.    Dr. Hoover's Opinions Are Directly Tied to Defendants' Actionable
                              Conduct.**

14       Defendants' recycled arguments from their *Daubert* and summary judgment briefs claiming

15   that Dr. Hoover's opinions are not tied to Defendants' actionable conduct fail.

16       *First*, Defendants mischaracterize Dr. Hoover's opinions as being based **solely** on key

17   informant interviews and distort the record by cherry-picking statements out of context. As explained

18   above, while key informant interviews are a standard, validated tool in implementation science and

19   public health, they represent just one component of Dr. Hoover's methodology.[14] Her specific

20   causation opinions rest on a variety of data sources, including the SHAPE profiles, Plaintiff Fact

21   Sheets, District documents, peer-reviewed research, and the reports of other experts.

22

23   ───────────────────

24   [13] Defendants' citation to *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 467-28 (E.D. Pa.
     2008) is unavailing. Dr. Hoover has not offered speculative opinions based on the unavailability of

25   existing data like the expert in *Perry*. Rather, she has followed the standard practice in her field of
     reviewing and considering existing data sources and supplementing those sources with other available

26   relevant and reliable sources of information.

     [14] *See, e.g.*, Ex. 87 ¶ 19; Ex. 88 ¶ 15; Ex. 89 ¶ 17; Ex. 90 ¶ 15; Ex. 91 ¶ 15; Ex. 92 ¶ 23; ("Key

27   informant interviews are a standard, valid source of ground-level insight") (citing Susan G. Forman,
     et al., *Evidence-based interventions in schools: Developers' views of implementation barriers and*

28   *facilitators*, 1 Sch. Mental Health, 26-36, (2009)).

                                                    33

Defendants also cherry-pick quotations from key informant interviews to suggest that employees described harms caused by third party content or non-actionable features. That argument misrepresents the record. The statements describe harms caused by Defendants' platforms as a whole—including the design and functionality of their non-publishing features. *See, e.g.*, Ex. 80 ¶ 48 ("Social media has exhausted our students. It is 24/7."); Ex. 81 ¶ 49 (students "express distress over not being able to check their accounts."); Ex. 83 ¶ 54 ("A teacher can't compete with scrolling."); Ex. 84 ¶ 50 ("The lights, shine and technology attraction of social media surpasses the ability of schools to get students' attention, all the way from preK-12."); Ex. 85 ¶ 53 ("[K]ey informants report[] an 'increase in anxiety and depression' and 'increased suicidal ideation because of being on social media and lack of face-to-face interactions.'").

Defendants also ignore that Dr. Hoover's case-specific reports incorporate her general causation opinions which are rooted in an extensive scientific literature review and consistent with the findings of other Plaintiffs' expert reports. As Dr. Hoover testified, this body of evidence demonstrates that Defendants' platforms (and specific features of those platforms) are the driving force behind the harms to the Districts. Ex. 93 at 153:12-154:1 ("I … rel[ied] on other expert reports who really did do a deeper dive into some of the design features of the different platforms.").

*Second*, Defendants' claim that Dr. Hoover's strategic plans addresses social media generally rather than Defendants' platforms is equally baseless. Dr. Hoover made clear in both her reports and testimony that her opinions concern Defendants' platforms—the very ones overwhelmingly used by students and responsible for the harms at issue. *See, e.g.*, Ex. 79 ¶ 30 (explaining that, "[a]ccording to a recent Pew Research Center report, over a third of teens say they are using the top five online platforms (YouTube, TikTok, Instagram, Snapchat and Facebook) 'almost constantly'"); Ex. 93 at 203:7-24 ("When I speak about social media, [in my reports] it's talking about the platforms that young people are using, and those happen to be the defendants' platforms."). Again, Dr. Hoover also considered the opinions of other experts who opined that it is Defendants' platforms, including their non-publishing features, that have caused the relevant mental health harms to students, thereby disrupting school district operations and harming the school environment. *See, e.g.*, Ex. 79 ¶ 4; *E.g.* Ex. 1 ¶¶ 182-97.

1    Defendants misstate Dr. Hoover's testimony to claim that her strategic plans are not focused

2    on harms from Defendants' platforms merely because certain services under those plans would be

3    available to all students. When her testimony is read in full, it is clear that Dr. Hoover designed her

4    plans to prevent and mitigate the pervasive, schoolwide harms caused by Defendants' platforms—

5    harms that affect every student, whether or not they personally use Defendants' platforms. Drawing

6    on her deep expertise in public health and school mental health, Dr. Hoover explained that a

7    comprehensive, universal plan is essential to restore school climate and functioning:

8         [S]tudents who may not have used the platforms could still benefit from
          services that are offered to address the harms, because the harms are not
9         exclusive to those students who may have used the platforms. They pervade
          the school. They pervade peer relationships. They pervade learning across
10        the board. And there's a prevention mechanism as well. So[,] for all of those
          reasons, it would be essential to put services in place for those students who
11        may not have yet used a platform directly themselves.

12   Ex. 94 at 623:10-624:4; *id*. at 627:2-628:7 ("[I]nherent in the plan is that students who may not have

13   been exposed to or may not be saying that they're addicted to social media could engage in the

14   services. But, again, there's a variety of services that are offered here, including things like restorative

15   practices after conflict that may erupt in relation to social media, which often involves many students,

16   whether they're on social media, not on social media, saying they're addicted to social media or

17   not."). Dr. Hoover further testified that this approach is grounded in the accepted public health

18   framework underpinning her field:

19        So[,] what I laid out included … a multi-tiered system of support, which is
          based on a public health framework which includes prevention. And so
20        especially for our younger kids, let's say our kindergarten, first grade
          students, who may not yet -- although they certainly may have, but may not
21        yet -- have had direct exposure or be personally using a defendants' platform,
          they would still be a part of receiving support from those professionals
22        because they would be, for example, receiving the skills for how to navigate
          the impacts on the schools and also potential mental health impacts for
23        exposure. Given how many young people, even at the elementary age, do
          start using, you want to start prevention early.

24   *Id*. at 616:14-617:10.

25        Defendants similarly wrench out of context Dr. Hoover's testimony about plans remaining

26   relevant even if Defendants' platforms ceased to exist. She did not say her plans were unrelated to

27   Defendants' platforms; she explained that because the plans address existing harms caused by those

28   platforms, continued intervention would still be necessary even if the platforms were suddenly

35

removed. As she testified: "[M]y plan is based on . . . this moment in time and the harms that we're

seeing. And the plan is based on the platforms being in existence and the harms that exist . . . once

harm has occurred, it's often the case that you need that continued mental health treatment . . . That

mental health treatment wouldn't end the moment, you know, YouTube went offline, for example."

*Id*. at 701:2-702:6. *See also* Ex. 92 ¶ 187 ("While the specific features and business practices of

Defendants' social media platforms are central to the current crisis, their impact on adolescent

development and school functioning is likely to persist well beyond the current year, regardless of

the precise form those platforms take.")

In short, Defendants' argument collapses under the weight of the record. Dr. Hoover's

opinions are unequivocally tied to Defendants' platforms and the harms they have caused. Her

strategic plans—grounded in accepted public-health principles—directly target the mental-health,

behavioral, and educational harms traceable to Defendants' conduct.

### 3. Dr. Hoover's "Strategic Plans" Are Proper Remedies for the Districts' Claims.

For the reasons stated in Plaintiffs' Opposition to Defendants' Motions for Summary

Judgment, Dr. Hoover's plans constitute appropriate remedies here. "[A] public nuisance case [can]

include a requirement that the defendants expend the money necessary to abate the nuisance." *In re

JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig*., 497 F. Supp. 3d 552, 653 (N.D. Cal.

2020); *see id.* (requiring defendants to "contribute to [an] abatement fund, which would be used to

support various measures to address the youth vaping epidemic" would constitute appropriate relief

pursuant to an abatement claim); *City of Huntington v. AmerisourceBergen Drug Corp*., 2025 WL

3009526, at *20 (4th Cir. Oct. 28, 2025) ("[T]he remedy of abatement … permit[s] a monetary award

to fund … abatement efforts.").

### 4. Dr. Hoover's Opinions About the Staffing, Training Levels, and Timeframe for Her Strategic Plans Are Well-Supported.

Defendants feign surprise at the scope and duration of Dr. Hoover's plans. But the scale of

her recommendations mirrors the magnitude and persistence of the harms Defendants' conduct has

caused: "Social media has introduced a persistent and preventable driver of mental health and

behavioral disruptions, which manifest daily in school environments. These challenges have

36

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

increased demand for school-based support, often overwhelming staff even in well-resourced districts." Ex. 86 ¶ 52.

Dr. Hoover's opinions on staffing, training and the 15-year implementation period rest on a robust foundation: (1) well-recognized principles of implementation science and public health precedent; (2) her substantial experience designing and implementing evidence-based school mental-health initiatives; and (3) her careful analysis of each District's unique characteristics, resources, and needs. *See* Ex. 79 ¶ 7 (describing the 15-year duration as both "reasonable and necessary" and "[g]rounded in public health precedent"). This robust foundation renders Dr. Hoover's testimony reliable. *See Pyramid Techs.*, 752 F.3d at 816 (finding an expert's opinion is reliable if it is "within the knowledge and experience of" the relevant discipline.) Defendants' criticisms—which are notably unsupported by any rebuttal expert testimony—attack Dr. Hoover's conclusions, not her methodology, and therefore go to weight, not admissibility. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014) ("[A]dmissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

***Staffing and Training Recommendations***: Dr. Hoover proposed appropriate staffing levels necessary to implement her strategic plans. As she explained: "Best practices in addressing complex challenges, like the impacts of social media emphasize the need for systemic, integrated approaches that are fully staffed and resourced. According to implementation science, effective, sustainable interventions in education systems require dedicated leadership, trained specialists, ongoing professional development, and protected time and resources." *E.g.*, Ex. 82 ¶ 77.

To ensure that her plans adhered to these best practices, Dr. Hoover relied on "nationally recognized staffing ratios, such as those recommended by [National Association of School Psychologist], [American School Counsel Association], and [School Social Work Association], [which] reflect years of research and field experience regarding caseloads, workload balance, prevention effectiveness, and student access to timely, meaningful mental health and counseling services in schools." Ex. 86 ¶ 51. Defendants' argument that these ratios are "irrelevant" misconstrues their use. Dr. Hoover did not invoke them to suggest that all districts must meet those benchmarks for general support. Rather, she used the ratios—consistent with accepted workforce-planning

37

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

1    methodology—to *estimate the level of additional staffing required* to specifically address the harms

2    created by Defendants' platforms. As she explained: "This is a common and accepted approach in

3    workforce planning: using established standards to model how new challenges impact overall service

4    demand. Just as public health systems use hospital bed capacity metrics to prepare for emerging

5    epidemics, or emergency services use response time benchmarks to scale for population growth, I use

6    staffing ratios to model the scope of additional investment needed to address a new, clearly

7    identifiable stressor." *Id.* ¶ 52.

8        Defendants' additional complaint that not every position in the plan has an existing staffing

9    ratio ignores that Dr. Hoover extrapolated from comparable roles with established ratios and

10   supplemented that data with her qualitative assessment of each District's existing resources, size, and

11   service needs as well as the impact of Defendants' platforms. *See, e.g.*, Ex. 87 ¶ 43; Ex. 88 ¶ 40; Ex.

12   89 ¶ 27; (asserting "[m]y staffing recommendations are both responsive to [the Districts'] unique

13   needs (e.g., enrollment size, existing service array, community partnerships), and rooted in

14   established professional guidance, as provided by leading organizations in school mental health and

15   student services."); *see also* Ex. 90 ¶ 30 (similar); Ex. 91 ¶ 28 (similar); Ex. 92 ¶ 32 (similar).

16       Dr. Hoover also based her professional-development recommendations "on best practice

17   estimates from successful professional development initiatives in areas such as trauma-informed care,

18   suicide prevention, and school climate reform." Ex. 86 ¶ 124 (citing Linda Darling-Hammond, et al.

19   *Effective Teacher Professional Development*, Learning Policy Institute (2017)). As Dr. Hoover

20   opines, "[t]hese are not arbitrary numbers, but rather conservative projections that reflect the level of

21   learning and planning required to meaningfully change practices and improve outcomes in complex

22   systems like schools. The numbers are meant to identify the minimal level of investment needed to

23   support sustained culture and systems change." *Id*.

24       Defendants claim that Dr. Hoover's plan is "unprecedented" rings hollow. The harms, caused

25   by Defendants' platforms are themselves unprecedented. That Dr. Hoover tailored a plan to

26   specifically address those unique harms does not make her methodology novel—it demonstrates her

27   adherence to accepted professional principles in adapting to new crises. Defendants' disagreements

28   over staffing volume or training hours are not grounds for exclusion. *See City of Pomona*, 750 F.3d

38

at 1044 (the reliability test "is not the correctness of the expert's conclusions but the soundness of his methodology"); *see also Elosu*, 26 F.4th at 1023-24 (trial court erred in excluding expert's testimony where court's "concerns speak to corroboration, not foundation, and are properly addressed through impeachment before a jury at trial—not exclusion by a district judge at the admissibility stage").

**15-year duration**: Dr. Hoover's conclusion that her strategic plans require a 15-year implementation timeline is likewise well supported. Her analysis is grounded in implementation science, public health precedent, and her extensive practical experience. *See, e.g.*, Ex. 79 ¶¶ 83, 107-119 (discussing research including findings from National Implementation Research Network). As she explained: "Leading frameworks in educational and health systems change consistently show that sustainable, high-fidelity implementation of comprehensive programs, especially across large and variable systems like school districts, requires 10-15 years, inclusive of exploration, installation, initial implementation, and full operation phases." Ex. 86 ¶ 74 (citing Dean L. Fixsen, et al., *Implementation research: A Synthesis of the Literature*, Univ. of S. Fla. (2005); Joseph A. Durlak, et al., *Implementation Matters: A Review of Research on the Influence of Implementation on Program Outcomes and the Factors Affecting Implementation*, 41 Am. J. Community Psychology 327-350 (2008)).

Defendants' criticisms of this timeline fail for multiple reasons. First, Dr. Hoover has clearly articulated public-health analogues, asserting, "The 15-year strategic plan I propose mirrors the timeline and investment required in past efforts to address ***similarly large-scale societal harms***, such as tobacco use and childhood obesity. These initiatives, too, required persistent effort, cross-sector coordination, and sustained funding." *Id.* ¶ 137. Dr. Hoover's articulation of youth tobacco reeducation as an analogous public health initiative makes sense. *Id.* ¶ 163. As Dr. Hoover testified, there are "overlapping components" between youth tobacco cessation and addressing the negative impact of social media use on students; both relate to "health education" and require "integration of behavior change [and] supports through students' developmental years." Ex. 93 at 313:3-7, 320:5-9. Second, Dr. Hoover has amply explained the necessity of a full K-12 approach. Preventive interventions must begin early:

39

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

1
2
3
4

> Given the documented early onset of social media use, it is imperative that any comprehensive school district initiative addressing the mental health and behavioral impacts of social media be designed to encompass the full K-12 continuum. Universal preventive strategies such as digital literacy education, life skills programs, mental health literacy curricula, and anti-cyberbullying initiatives must be integrated starting in kindergarten and be developmentally scaffolded through each grade level.

5
6
7
8

Ex. 79 ¶ 122. Because a K-12 approach is necessary for Dr. Hoover's strategic plan, following a full K-12 cohort further supports a 15-year timeline; *see also* Ex. 94 at 616:20-617:6. Because her strategic plans are designed to follow and protect a full K-12 cohort, the 15-year duration is not arbitrary but functionally necessary.[15]

9
10
11
12

Finally, Defendants' suggestion that Dr. Hoover was required to model precisely how many students will use the services is a red herring. Her plans are responsive to systemic harms, not individual utilization metrics. The precise number of participating students has no bearing on the reliability of her methodology or the soundness of her conclusions. *See Primiano*, 598 F.3d at 565.

### G.    There Is No Basis to Exclude Dr. Leslie's Estimate of Strategic Plan Costs.

13
14
15
16
17
18
19

Dr. Leslie is a Yale-educated Professor at Pennsylvania State University, specializing in Health Economics and Health Services Research. *E.g.*, Ex. 96 ¶ 4. Dr. Leslie has appointments in the Department of Public Health Sciences and the Department of Psychiatry & Behavioral Health at the Penn State College of Medicine and has been at Penn State for over 15 years. *Id.* Before joining Penn State, Dr. Leslie held faculty appointments at the Medical University of South Carolina and Yale University. *Id.*

20
21
22
23
24

Dr. Leslie costs out Dr. Hoover's plan. Mot. at 40. Defendants contend that Dr. Leslie's opinion should be excluded only if Dr. Hoover's opinion is excluded. *Id.* (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2). However, as detailed above, Defendants' criticisms of Dr. Hoover's opinion do not warrant exclusion, and this case is unlike *In re Cathode Ray Tube*. As Defendants offer no other grounds for excluding Dr. Leslie's opinions, they are

25
26
27
28

---

[15] Defendants also imply that Dr. Hoover has not explained why providing for "sustainable system change," as her 15-year timeline does, is necessary to address harms caused by Defendants' platforms. However, Dr. Hoover has articulated that this sustainable system change is necessary, in part, because the strategic plans require a shift in school climate and culture, which Dr. Hoover opines have been negatively impacted by Defendants' platforms. *See id.* ¶ 112.

40

1   admissible.

2       **H.    There Is No Basis to Exclude Dr. Osborne's Opinions.**

3           **1.    Dr. Osborne's Experience and Sustained Interactions with School
                    Leaders Qualifies Him as an Expert.**

4           Dr. Osborne is a Harvard-educated educator with over three decades of distinguished service

5   in public education including twenty-seven years as superintendent of two school districts. He

6   currently serves as a Professor of Practice in Educational Leadership at Lehigh University, where he

7   directs the Lehigh School Study Council—a consortium of over twenty-five school districts—and

8   has instructed approximately forty school leaders each year since 2018. Ex. 111. In addition to his

9   academic work, Dr. Osborne consults annually with fifteen to twenty education leaders on

10  educational leadership development. Ex. 110 at 28:17-29:1. Over the last six years alone, he has spent

11  approximately 40-50 days each year in schools, working directly with more than 350 educators. *Id.*

12  at 47:11-48:5; Ex. 109 ¶ 18.

13          Dr. Osborne's testimony rests not on *ipse dixit dixit*, but on deep, practice-based expertise.

14  The Ninth Circuit has long recognized that "[practical experience in a particular field" is a common

15  basis for reliable expertise. *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429-30 (9th Cir. 1991)

16  (citing Fed. R. Evid. 703). Courts routinely admit testimony from former superintendents on issues

17  regarding district practices, administrative structures, and the operation of public schools. *See, e.g.*,

18  *C.N. v. Wolf*, 2006 WL 5105270, at *1 (C.D. Cal. Nov. 13, 2006) (finding a former superintendent

19  "ha[d] adequate qualifications to express expert opinions in the area of school district practices and

20  procedures"); *accord Walker v. Ellensburg Sch. Dist.*, 2018 WL 11468666, at *1 (E.D. Wash. Nov.

21  5, 2018); *Hays v. Park City Sch. Dist.*, 214 F. Supp. 3d 1162, 1190 (D. Utah 2016); *Briscoe v. White*,

22  2004 WL 5488228, at *2-3 (M.D. Fla. May 24, 2004). Indeed, Defendants' own expert disclosures

23  confirm that such professional experience is a recognized and reliable basis for educational

24  expertise—each of Defendants' four superintendent experts likewise rely on experience as the

25  foundation of their opinions. Having embraced that standard themselves, Defendants cannot credibly

26  challenge it here.

27          **2.    Dr. Osborne's Opinions Rest on a Reliable Methodology.**

28          Dr. Osborne's methodology draws from both his own first-hand experience and his review of

41

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

the record in this case. His opinions are grounded in decades of direct engagement with school leaders confronting the harms Defendants' platforms pose—an experience that spans his work as a school district superintendent, "Professor of Practice," and "consultant and coach to educational leaders." Ex. 108 ¶¶ 6, 16.

In forming his opinions, Dr. Osborne also reviewed the evidentiary record, including depositions of the Districts' witnesses. Ex. 108 ¶ 17. He found that these witnesses' testimony was "consistent with what I am seeing in schools and hearing from the leaders that I regularly interact with." Ex. 109 ¶ 30. In addition, Dr. Osborne considered "various relevant sources, including peer-reviewed studies, national surveys, professional standards documents . . . and public reporting from research organizations." Ex. 108 ¶ 18. That body of literature revealed "a consistent institutional pattern," namely that, "as students' use of social media has become more immersive, compulsive, and socially consequential, school leaders are increasingly called upon to manage disruptions that originate or escalate online, as well as the challenges of decreased teacher morale and student attention." Ex. 109 ¶ 26; *see also id.* at Appendix C. The scholarly consensus in the literature aligns squarely with Dr. Osborne's his first-hand observations and the testimony of the school leaders in these Districts.

The Ninth Circuit makes clear that "[t]he test [for reliability of expert opinion] 'is not the correctness of the expert's conclusions but the soundness of his methodology," and once an expert meets Rule 702, "the fact finder decides how much weight to give that testimony." *City of Pomona*, 750 F.3d at 1044. Dr. Osborne's approach readily satisfies that standard. He testified that his "approach reflects a widely accepted and practiced methodology in the field of educational leadership and executive coaching." Ex. 109 ¶ 16. He also cited foundational sources in educational leadership to confirm that his methodology—listening to and analyzing the experiences of school leaders to identify institutional challenges and develop practical interventions—is "an established, acceptable methodology." Ex. 110 at 198:17-199:15; Ex. 109.

Courts have recognized that fact gathering through interviews and qualitative data collection can form a reliable methodological basis when consistent with professional norms. *See Elosu*, 26 F.4th at 1028 (holding expert properly relied on interested-party testimony consistent with accepted

42

SCHOOL DISTRICT/LOCAL GOV'T ENTITY PLS.' OPP'N TO DEFS.' MOT. TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-MD-03047-YGR

practice in his field). Dr. Osborne's methodology, which integrates structured qualitative inquiry, professional experience, and peer-reviewed research, is both well-documented and widely accepted in educational leadership. *See City of Pomona*, 750 F.3d at 1044 (methodology is reliable if "published in peer-reviewed literature" and "generally accepted in the field").

Accordingly, Dr. Osborne's opinions rest on a sound, reliable methodology consistent with the professional standards and empirical practices of his discipline. Defendants' criticisms mischaracterize that methodology and, at most, go to weight—not admissibility.

### 3.    Dr. Osborne's Opinions Assist the Jury.

The breadth—rather than the specificity—of Dr. Osborne's opinions is a strength, not a shortcoming. Drawing on decades of nationally grounded experience, Dr. Osborne identifies institutional patterns that transcend geographic boundaries. His insights align with, and are corroborated by, the testimony of District witnesses rather than being based solely on them. Disputes about whether the effects of social media manifest uniformly across schools, or whether the Districts' experiences might somehow differ, go to weight, not admissibility. *In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *4 (N.D. Cal. June 2, 2022).

Nor does the fact that Dr. Osborne is not a "case-specific expert" preclude him from testifying about his experience working with school leaders generally. The Ninth Circuit has made clear that an "expert [is not] required to be personally familiar with the facts or data of the particular case about which he is testifying; an expert opinion may be based on any type of evidence commonly used by experts in the field." *Rogers*, 922 F.2d at 1429-30 (citing Fed. R. Evid. 703). Courts routinely apply this principle. In *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*, for example, the court denied a motion to exclude an expert who made "no effort to examine the facts in this case specifically," finding that the expert could properly offer "opinions on what [industry] executives consider with respect to [the pertinent issues in the case]" because that subject fell "reasonably within [the expert's] experience in the industry." 296 F. Supp. 3d 1142, 1181 (N.D. Cal. 2017). Dr. Osborne's testimony fits comfortably within that framework. His sustained engagement with school districts enables him to speak to widespread, systemic trends in educational leadership and student welfare. His experiential opinions are consistent with and "evident in the testimony on

43

record" from the Districts, as well as in the professional literature. Ex. 110 at 130:17-131:14. As he explained, further document review was unnecessary to his assignment, and nothing in Rule 702 requires more. *Id*. at 130:4-9.

Defendants' criticisms, therefore, miss the mark. They may test Dr. Osborne's conclusions through cross-examination, but their objections go to weight, not admissibility. There is "enough logical connection" between the Districts' leaders and those Dr. Osborne has interacted with throughout his long career, such that "defendants' complaints go primarily to the weight of [his] opinions and not their exclusion." *In re JUUL Labs, Inc.*, 2022 WL 1814440, at *4.

Ultimately, Dr. Osborne's findings are not anecdotal—they reflect widespread, predictable, and well-documented patterns in educational systems nationwide. His testimony will help the jury understand how Defendants' platforms have reshaped the educational environment at a systemic level, providing precisely the type of expert perspective *Daubert* envisions as assisting the trier of fact.

### 4.      Dr. Osborne's Opinions Are Not a Conduit for Hearsay.

Under Rule 703, experts may base their opinions on any materials of a type reasonably relied on by experts in the field, even if those documents are not themselves admissible. *See United States v. Chen*, 2021 WL 2662116, at *3 (N.D. Cal. June 29, 2021) (citing Fed. R. Evid. 801(c)); *Daubert*, 509 U.S. at 592. Defendants cite *Asetek Danmark A/S v. CoolIT Sys. Inc*, 2022 WL 21306657, at *20 (N.D. Cal. Oct. 4, 2022), but in that case, the court excluded expert testimony because it was a transparent attempt to have an expert give an opinion about a hearsay document in order to put the document itself before the factfinder and offer it for the truth of the matter asserted. *Id*. The expert was not permitted to give his "opinion" on this document, because it was a rather obvious "attempt to adopt the hearsay document itself as expert opinion." *Id*. By contrast, the alleged "hearsay" in this case—Dr. Osborne's knowledge based on his interactions with hundreds of school officials across the country—is his experience and research itself. The two situations could not be more different.

Defendants characterize Dr. Osborne's testimony as hearsay without identifying any specific statements. "[W]ithout further specificity, the Court cannot determine whether these statements are hearsay." *Spintouch, Inc. v. Outform, Inc.*, 2022 WL 17363902, at *8 (C.D. Cal. Sep. 28, 2022).

"[H]earsay arguments are notoriously fact-specific, in that a single statement might, or might not, be hearsay for several different reasons depending on what the statement is offered to prove." *Carolina v. JPMorgan Chase Bank NA*, 2021 WL 5396066, at *8 (D. Ariz. Nov. 17, 2021). It is not this "Court's duty to sift through the record to locate [the alleged hearsay statements] and find the statements that Defendant[s] contest[]." *Angelo v. Thomson Int'l, Inc.*, 2024 WL 3202513, at *18 (E.D. Cal. June 27, 2024). Defendants' contentions are not grounds for exclusion of Dr. Osborne. Instead, they are evidentiary objections better addressed at trial.

### 5.     Dr. Osborne Corrected His Citation Errors.

Defendants claim that Dr. Osborne "admitted reliance on non-existent sources hallucinated by artificial intelligence." Mot. at 41. That assertion is false. None of Dr. Osborne's cited sources are "non-existent," they were merely cited incorrectly. Defendants know this. The Districts' counsel entered each of the underlying articles into the record during Dr. Osborne's deposition and submitted a fully corrected report within a week of his deposition. *See* Ex. 110 at 392:10-23. Further, the Districts agreed to hold the deposition open for any follow-up questioning, but Defendants never took them up on that offer.

Dr. Osbourne reviewed and relied on each of the cited works. The problem arose because he used Gemini, an AI tool developed by Google, to automatically format his citations into APA style. Gemini incorrectly formatted six references—five of which appeared in a single footnote that also contained seven other correctly cited supporting sources. *See* Ex. 109 ¶ 31 n.9. Two of the six errors involved nothing more than broken hyperlinks:

| Incorrect Citation | Corrected Citation |
|---|---|
| ScienceDaily (Mar. 22, 2016), https://www.sciencedaily.com/releases/2016/03/160322100401 ("Spending more time on social media may increase the risk of exposure to cyber-bullying or other similar negative interactions, which can cause feelings of depression."). 71. | University of Pittsburgh Schools of the Health Sciences. (2016, March 22). Social media use associated with depression among US young adults. ScienceDaily https://www.sciencedaily.com/releases/2016/03/160322100401.htm |
| Learning Policy Institute. (2019). *Understanding school finance: How money matters for student success*. https://learningpolicyinstitute.org/product/understanding-school-finance-brief | Baker, B. D. (2017, December 13). *How Money Matters for Schools*. Learning Policy Institute. https://learningpolicyinstitute.org/product/how-money-matters-report |

*See* Ex. 112 (link missing ".htm") & Ex. 113 (incomplete link). The remaining four are citation

mistakes to academic research articles:

| Incorrect Citation | Corrected Citation |
| --- | --- |
| Montag, C., Sindermann, C., Becker, B., & Panksepp, J. (2021). An affective neuroscience framework for the molecular study of Internet and smartphone use disorder. Neuroscience & Biobehavioral Reviews, 120, 571–582. https://doi.org/10.1016/j.neubiorev.2020.10.027 | Montag, C., Sindermann, C., Becker, B., & Panksepp, J. (2016). An Affective Neuroscience Framework for the Molecular Study of Internet Addiction. *Frontiers in Psychology*, 7. https://doi.org/10.3389/fpsyg.2016.01906 |
| Nesi, J., Prinstein, M. J., & Telzer, E. H. (2018). Adolescents' social media use and mental health: A developmental neuroscience perspective. Current Directions in Psychological Science, 27(5), 363–369. https://doi.org/10.1177/0963721418778560 | Nesi, J., Telzer, E. H., & Prinstein, M. J. (2020). Adolescent Development in the Digital Media Context. *Psychological Inquiry*, *31*(3), 229–234. https://doi.org/10.1080/1047840X.2020.1820219 |
| Watson, D., Topping, K., & Drew, S. (2022). The impact of social media use on adolescent mental health: Systematic review. Journal of Adolescence, 94, 123–138. https://doi.org/10.1016/j.adolescence.2022.01.003 | Watson, J. C., Prosek, E. A., & Giordano, A. L. (2021). Distress Among Adolescents: An Exploration of Mattering, Social Media Addiction, and School Connectedness. *Journal of Psychoeducational Assessment*, *40*(1), 95-107. https://doi.org/10.1177/07342829211050536 |
| Popat, S., & Tarrant, A. (2023). Social media, mental health, and young people: Emerging research and implications. Youth Studies Journal. | Popat, A., & Tarrant, C. (2022). Exploring adolescents' perspectives on social media and mental health and well-being – A qualitative literature review. *Clinical Child Psychology and Psychiatry*, *28*(1), 323–337. https://doi.org/10.1177/13591045221092884 |

The Court should rightly be vigilant about the growing use of AI tools by experts and the legal

profession. But, Dr. Osborne's minor citation errors—identified, disclosed, and corrected on the

record—bear no resemblance to the kind of misconduct that have scandalized the profession. This is

not a case where an expert submitted declarations "to two non-existent academic articles," *Kohls v.*

*Ellison*, 2025 WL 66514, at *3 (D. Minn. Jan. 10, 2025), or "to an article that did not exist and whose

purported authors had never worked together," *Concord Music Grp. v. Anthropic PBC*, 2025 WL

1482734, at *3 (N.D. Cal. May 23, 2025). Nor is this a situation involving "non-existent judicial

opinions with fake quotes and citations." *Morgan v. Cmty. Against Violence*, 2023 WL 6976510, at

*8 (D.N.M. Oct. 23, 2023).

Every article, Dr. Osborne cited exists, was read, and is part of the record. When the formatting errors came to light, he immediately acknowledged and corrected them. Defendants, who had the opportunity to reopen his deposition, declined to do so. There is thus no prejudice, no fabrication, and no basis for exclusion. Dr. Osborne's citation errors were clerical, not substantive. His opinions are well-supported, reliable, and firmly grounded in the literature he actually reviewed. Rule 702 evaluates expertise and methodology—not typographical precision. Dr. Osborne's forthright disclosure and prompt correction exemplify the transparency Rule 702 is meant to encourage, not penalize.

## IV.     CONCLUSION

Taken together, the record demonstrates that each of the Districts' experts—Klein, Ward, Meyers, Hoover, Leslie, and Osborne—employed sound methodologies grounded in their respective disciplines, relied on appropriate data and experience, and offered opinions that will assist the trier of fact. Defendants' criticisms go to weight, not admissibility, and provide no basis for exclusion under *Daubert* or Rule 702. For the foregoing reasons, Plaintiffs respectfully request the Motion be denied in its entirety.

1    Dated: November 7, 2025                    Respectfully submitted,

2
                                                /s/ Melissa L. Yeates
3                                               MELISSA L. YEATES
                                                **KESSLER TOPAZ**
4                                               **MELTZER CHECK, LLP**
                                                280 King of Prussia Road
5                                               Radnor, PA 19087
                                                Telephone: 610-667-7706
6                                               myeates@ktmc.com

7                                               *Plaintiffs' Steering Committee Leadership*
                                                *Co-Chair of Local Government Entity*
8                                               *Subcommittee*

9

10                                              LEXI J. HAZAM
                                                **LIEFF CABRASER HEIMANN**
11                                              **& BERNSTEIN, LLP**
                                                275 BATTERY STREET, 29TH FLOOR
12                                              SAN FRANCISCO, CA 94111-3339
                                                Telephone: 415-956-1000
13                                              lhazam@lchb.com

14                                              PREVIN WARREN
                                                **MOTLEY RICE, LLC**
15                                              401 9th St, Suite 630
                                                Washington, DC 20004
16                                              Phone: (202) 386-9610
                                                Email: pwarren@motleyrice.com

17                                              *Co-Lead Counsel for Plaintiffs*

18

19                                              MICHAEL M. WEINKOWITZ
                                                **LEVIN SEDRAN & BERMAN, LLP**
20                                              510 Walnut Street, Suite 500
                                                Philadelphia, PA 19106
21                                              Telephone: 215-592-1500
                                                MWeinkowitz@lfsbalw.com

22                                              *Plaintiffs' Steering Committee Leadership*
                                                *Co-Chair of Local Government Entity*
23                                              *Subcommittee*

24

25

26

27

28

48

## <u>ATTESTATION</u>

I, Melissa L. Yeates, attest that the evidence cited herein fairly and accurately disputes the facts as asserted.

Dated: November 7, 2025

By: */s/ Melissa L. Yeates*
Melissa L. Yeates