**Exhibit 18**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

- - -

IN RE: SOCIAL MEDIA     : Case No.
ADOLESCENT              : 4:22-MD-03047-YGR
ADDICTION/PERSONAL      : MDL No. 3047
INJURY PRODUCTS         :
LIABILITY LITIGATION,   :
                        :
This Document Relates to:
All Actions             :

- - -

SEPTEMBER 5, 2025

- - -

Videotaped deposition of
ROBERT KLEIN, taken pursuant to notice,
was held at the law offices of Kessler
Topaz Meltzer & Check, LLP, 280 King of
Prussia Road, Radnor, Pennsylvania 19087,
commencing at 9:29 a.m., on the above
date, before Amanda Dee Maslynsky-Miller,
a Court Reporter and Certified Realtime
Reporter.

- - -

GOLKOW, A VERITEXT COMPANY
877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 2

APPEARANCES:


      KESSLER TOPAZ MELTZER & CHECK, LLP
      BY: MELISSA L. YEATES, ESQUIRE
      BY: JORDAN E. JACOBSON, ESQUIRE
      280 King of Prussia Road
      Radnor, Pennsylvania 19087
      (610) 667-7706
      myeates@ktmc.com
      jjacobson@ktmc.com
      Representing the Plaintiff


      CARELLA, BYRNE, CECCHI, BRODY &
      AGNELLO, P.C.
      BY: ZACHARY S. BOWER, ESQUIRE
      2222 Ponce De Leon Boulevard
      Miami, Florida 33134
      (973) 994-1700
      zbower@carellabyrne.com
      Representing the Plaintiff,
      Irvington Public Schools


      COVINGTON & BURLING LLP
      BY: CHRISTIAN J. PISTILLI, ESQUIRE
      One CityCenter
      850 Tenth Street, NW
      Washington, DC 20001
      (202) 662-6000
      cpistilli@cov.com

      - and -

      BY: BREE PEILEN, ESQUIRE
      The New York Times Building
      620 Eighth Avenue
      New York, New York 10018
      (212) 841-1000
      bpeilen@cov.com
      Representing the Defendant,
      Meta Platforms, Instagram and
      Siculus

CONFIDENTIAL

Page 3

APPEARANCES: (Continued)

        WILLIAMS & CONNOLLY LLP
        BY: DANIEL WHITELEY, ESQUIRE
        680 Maine Avenue SW
        Washington, DC 20024
        (202) 434-5000
        dwhiteley@wc.com
        Representing the Defendants,
        YouTube, LLC, and Google LLC


        KIRKLAND & ELLIS LLP
        BY: FARAZ SHAHIDPOUR, ESQUIRE
        333 West Wolf Point Plaza
        Chicago, Illinois 60654
        (312) 862-2000
        faraz.shahidpour@kirkland.com
        Representing the Defendants,
        Snap Inc.


VIA ZOOM:


        KESSLER TOPAZ MELTZER & CHECK, LLP
        BY: ALEX PARK, ESQUIRE
        280 King of Prussia Road
        Radnor, Pennsylvania 19087
        (610) 667-7706
        apark@ktmc.com
        Representing the Plaintiff

CONFIDENTIAL

Page 4

APPEARANCES: (Continued)
VIA ZOOM:

          EILAND & BONNIN LAW FIRM
          BY: DAVID BONNIN, ESQUIRE
          2200 Market Street
          Suite 501
          Galveston, Texas 77550
          (409) 763-3260
          dbonnin@eilandlaw.com
          Representing the Plaintiffs


          O'HANLON, DEMERATH & CASTILLO
          BY: KAYLIE MORGAN, ESQUIRE
          117 West Craig Place
          San Antonio, Texas 78212
          (210) 310-3030
          kmorgan@808West.com
          Representing the Texas Plaintiffs


          KING & SPALDING LLP
          BY: LISA ANN HORVATH, ESQUIRE
          500 West 2nd Street
          Suite 1800
          Austin, Texas 78701
          (512) 457-2000
          lhorvath@kslaw.com
          Representing the Defendants,
          TikTok Inc., ByteDance Inc.,
          ByteDance Ltd., TikTok Ltd., and
          TikTok, LLC

CONFIDENTIAL

Page 5

APPEARANCES: (Continued)

VIA ZOOM:

        COVINGTON & BURLING LLP
        BY: SANTIAGO M. ZALAZAR, ESQUIRE
        One CityCenter
        850 Tenth Street, NW
        Washington, DC 20001
        (202) 662-6000
        szalazar@cov.com
        Representing the Defendant,
        Meta Platforms, Instagram and
        Siculus


ALSO PRESENT:

Brian McGee, Videographer

                    -   -   -

CONFIDENTIAL

Page 6

- - -

I N D E X

- - -

Testimony of:  ROBERT KLEIN

By Attorney Pistilli                    13, 314
By Attorney Shahidpour                  272
By Attorney Whiteley                    288, 319
By Attorney Horvath                     298
By Attorney Jacobson                    313

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION                        PAGE

Klein-1          No Bates
                 5/18/25 Social Media and
                 Teacher Time Survey
                 Methodology and Results,
                 Breathitt                          18

Klein-2          No Bates
                 LexisNexis Results, Steak-umm
                 Co, LLC v Steak 'Em
                 Up, Inc.                           26

Klein-3          No Bates
                 LexisNexis Result, Maker's
                 Mark Distillery, Inc. v
                 Diageo N. Am., Inc.                31

Klein-4          No Bates
                 LexisNexis Result, ComponentOne
                 LLC v ComponentArt Inc.            37

CONFIDENTIAL

Page 7

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Klein-5 | No Bates LexisNexis Result, Avocado Plus Inc. v Johanns | 42 |
| Klein-6 | No Bates Robert Klein LinkedIn Profile | 48 |
| Klein-7 | No Bates Applied Marketing Science Web Page | 55 |
| Klein-8 | No Bates Expert Witnesses: When Are They Necessary and Does Daubert/Kumho Make a Difference? | 58 |
| Klein-9 | No Bates 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Charleston | 78 |
| Klein-10 | No Bates 5/18/25 Social Media and Teacher Time Survey Methodology and Results, DeKalb | 78 |
| Klein-11 | No Bates 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Harford | 78 |

CONFIDENTIAL

Page 8

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Klein-12 | No Bates 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Irvington | 79 |
| Klein-13 | No Bates 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Tucson | 79 |
| Klein-14 | No Bates Teachers' Working Time From Time-Use Data: Consequences of the Invalidity of Survey Questions For Teachers, Researchers, and Policy | 165 |
| Klein-15 | No Bates Improving the Quality of Retrospective Reports: Calendar Interviewing Methodologies | 193 |
| Klein-16 | No Bates 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, Charleston | 194 |
| Klein-17 | No Bates Event History Calendar, Lavrakas | 199 |

CONFIDENTIAL

Page 9

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION                        PAGE

Klein-18       No Bates
               8/1/25 Rebuttal Expert Report
               Replying to the Reports of
               Dr. Michael J. Stern and
               Dr. Darius Lakdawalla,
               Breathitt                          216

Klein-19       No Bates
               8/1/25 Rebuttal Expert Report
               Replying to the Reports of
               Dr. Michael J. Stern and
               Dr. Darius Lakdawalla,
               DeKalb                             216

Klein-20       No Bates
               8/1/25 Rebuttal Expert Report
               Replying to the Reports of
               Dr. Michael J. Stern and
               Dr. Darius Lakdawalla,
               Harford                            216

Klein-21       No Bates
               8/1/25 Rebuttal Expert Report
               Replying to the Reports of
               Dr. Michael J. Stern and
               Dr. Darius Lakdawalla,
               Irvington                          217

Klein-22       No Bates
               8/1/25 Rebuttal Expert Report
               Replying to the Reports of
               Dr. Michael J. Stern and
               Dr. Darius Lakdawalla,
               Tucson                             217

Klein-23       No Bates
               Reference Manual on
               Scientific Evidence,

CONFIDENTIAL

Page 10

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION                          PAGE

Klein-24      Klein000001-0005

              Invoices                               271

CONFIDENTIAL

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line      Page Line       Page Line

None

Request for Production of Documents

Page Line      Page Line       Page Line

73      12

Stipulations

Page Line      Page Line       Page Line

12      1

Question Marked

Page Line      Page Line       Page Line

None

CONFIDENTIAL

Page 12

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:  We are now on the record.  My name is Brian McGee.  I'm the videographer for Golkow, a Veritext division. Today's date is September 5th, 2025, and the time is 9:29 a.m.

This video deposition is being held in Radnor, PA, in the matter of In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation for the United States District Court Northern District of California.

The deponent is Robert

CONFIDENTIAL

Page 13

Klein.  Counsel will be noted on the stenographic record.

The court reporter is Amanda Miller and will now swear in the witness.

- - -

ROBERT KLEIN, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY PISTILLI:

Q.    Good morning, Mr. Klein.  My name is Chris Pistilli, and I represent the Meta defendants in this lawsuit.

Will you please state your full name for the record?

A.    Robert Lawrence Klein.

Q.    And you were engaged by plaintiff school districts as an expert --

ATTORNEY HORVATH:  Sorry, I can't hear the witness.  Can

Page 14

everybody else hear him?  Maybe it's my issue.

BY ATTORNEY PISTILLI:

Q.    Mr. Klein, you were engaged by the plaintiff school districts in this litigation against Meta, TikTok, YouTube and Snap?

A.    Yes.

Q.    Are you represented by counsel at this deposition?

A.    Personally?  I don't believe so.

Q.    Let's go over some ground rules today.

Do you understand that you're under oath today just as if you were in a court in front of a judge?

A.    Yes.

ATTORNEY HORVATH:

Mr. Klein, can you say something?

THE WITNESS:  Yes.

Who is speaking?

ATTORNEY YEATES:  Who is this?

Page 15

- - -

(Whereupon, a discussion off the record occurred.)

- - -

BY ATTORNEY PISTILLI:

Q.    Mr. Klein, is there anything that would prevent you from giving complete and accurate testimony today?

A.    No.

Q.    You understand that the court reporter is writing down everything that you and I say, right?

A.    Yes.

Q.    And that's very difficult to do if we're talking over one another.  So let's both try our best to not do that.

Can you do that with me?

A.    Yes.

Q.    And if at any point you don't understand my question for any reason, could you please let me know, and I'll rephrase it for you?

A.    Okay.

Q.    And unless you do that and

Page 16

you go ahead and answer my question, I'm going to assume you understood my question.

Is that fair?

A.    Yes.

Q.    If at any point today you need a break, please just let me know and we can make that happen, okay?

A.    Yes.

Q.    Have you ever been deposed before?

A.    Yes, I have.

Q.    Approximately how many times?

A.    Between 90 and 100.

Q.    And were those depositions as expert witnesses?

A.    Yes.

Q.    And did those depositions typically involve marketing studies that you had performed?

A.    Surveys.  Yes.

Q.    What sort of surveys?

A.    Surveys related to Lanham

Page 17

Act litigation.  Issues of likelihood of confusion, secondary meaning, genericism, consumer behavior.

Q.    Anything else?

A.    Patent damages.

Let me see if I can -- false advertising.

That covers the vast majority of them.

Q.    And have you ever testified in court?

A.    Yes.

Q.    Approximately on how many occasions?

A.    Twenty to 25.  Some in the U.S. and -- some in Canada and the rest in the U.S.

Q.    Have you ever offered expert opinions in cases involving Meta?

A.    Yes.

Q.    On how many occasions?

A.    Once.

ATTORNEY PISTILLI:  Do we want to go off the record for a

Page 18

minute?

VIDEO TECHNICIAN:  The time is 9:34 a.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 9:35 a.m., and we are on the record.

- - -

(Whereupon, Exhibit Klein-1, No Bates, 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Breathitt, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    Mr. Klein, I've handed you a document that's been marked as Exhibit-1.

Is that a report that you submitted in the Breathitt case?

A.    Yes, it appears to be.

CONFIDENTIAL

Page 19

Q.   And am I right that you submitted a total of 12 reports in connection with these matters?

A.   That's correct.

Q.   One each for Breathitt, Charleston, DeKalb, Harford, Irvington and Tucson, opening reports?

A.   I believe that's correct, yes.

Q.   And then a rebuttal report in each of those same six cases?

A.   Yes.

Q.   Is there anything in your reports that you need to correct or amend?

A.   No.

Q.   So the reports are final, complete and accurate?

A.   Yes.

Q.   Did you draft these 12 reports yourself?

A.   Yes.

Q.   Did you have staff assisting you in preparing the reports?

Page 20

A.    Yes.

Q.    Who are -- what staff?

A.    Staff at Applied Marketing Science.

Q.    And approximately how many people at Applied Marketing Science assisted you in drafting the report?

A.    Well, when you say "drafting the report," and "in preparing the report," I mean, all the words are mine.

But the issues of the appendices and putting all that together, I was -- I was assisted by four individuals at Applied Marketing Science.

Q.    Okay.  And you're a principal of Applied Marketing Science?

A.    No.  I'm an employee.

Q.    You're an employee.

Do you receive a share in the profits of Applied Marketing Science?

A.    Applied Marketing Science has a profit sharing plan that all the employees participate in.

Q.    And what's your position at

CONFIDENTIAL

Page 21

Applied Marketing Science?

A.    I'm a chairman emeritus.  I started the company 35 years ago and turned over the day-to-day management about ten years ago.

Q.    Did the attorneys for the plaintiffs review drafts of your report?

A.    Yes.

Q.    Provide input?

A.    Certainly helped with proper identification of the parties and the, you know, formatting issues.

Q.    Anything else?

A.    Not beyond minor wording changes.

Q.    How many hours did you spend drafting your 12 reports?

A.    I'm not really sure how to answer that.  I know how much time I spent in total.

Q.    Sure.  How much time did you spend in total?

A.    Just over 100 hours between February and -- through July.

CONFIDENTIAL

Page 22

Q.    And do you know how much time other individuals at your firm spent working on the report during that same period?

A.    No, I don't.

Q.    And what is your hourly rate?

A.    I think it's $835 an hour.

Q.    So to date you've made approximately $83,500 on this matter?

A.    No.

Q.    Why is that?

A.    I don't get a -- that's -- that doesn't come to me directly.  I get paid a salary.

Applied Marketing Science got that much money for time that I spent on it.

Q.    What did you do to prepare for your deposition today?

A.    I read over my report, the various rebuttal reports that made reference to me, my reply report, and I met with counsel.

Q. Did you review any literature in preparing for your deposition today?

A. Not in preparation for the deposition, no.

Q. On how many occasions did you meet with counsel in preparation for your deposition?

A. Twice.

Q. And for how long did you meet with them?

A. Three or four hours on Wednesday and a couple of hours yesterday.

Q. Other than counsel, did you discuss the subject of your deposition with anyone?

A. Not the subject of the deposition, no.

Q. Did you discuss anything related to your deposition with others?

A. Yes. Several of the individuals at Applied Marketing Science were listening in to the discussions we

Page 24

had in preparation for the deposition.

Q.    What did you discuss with your colleagues at Applied Marketing?

A.    I really didn't discuss anything with the colleagues.  They were able to provide certain details about the billing, for example.

Q.    Approximately when were you first retained in this matter?

A.    It was in February of 2025.

Q.    All right.  If you could, please, take a look at Exhibit-1, take a look at Page A-2, A-2.

A.    A-2?  Oh, I thought you said 18.

Q.    Sorry.

Starting here on Page A-2, is this a complete list of your prior expert testimony in the past four years?

A.    It's the list of the cases in which I have provided testimony either in deposition or in court, yes.

Q.    And if you look at Page A-3, one of the matters referenced is Klein,

Page 25

et al., versus Meta Platforms, Inc.

Do you see that?

A.    Yes.

Q.    And that's the case you referred to previously?

A.    That's correct.

Q.    And you were also engaged by the plaintiffs' lawyers in that case, correct?

A.    That's correct.

Q.    And you submitted two expert reports in that case?

A.    I believe so, yes.

Q.    And you testified at two depositions?

A.    Yes.

Q.    You were testifying against Meta in those depositions, right?

A.    Yes.

Q.    But then before trial, the plaintiffs dropped your opinions, correct?

A.    I really don't know what's going on in that case.

CONFIDENTIAL

Page 26

Q.    You weren't asked to testify at trial?

ATTORNEY JACOBSON:

Objection.  Foundation.

THE WITNESS:  I didn't realize there had been a trial.

BY ATTORNEY PISTILLI:

Q.    To your knowledge, has your testimony ever been excluded?

A.    Not to my knowledge, no.

Q.    To your knowledge, has a judge ever discounted your testimony in a written opinion?

A.    Yes.

ATTORNEY PISTILLI:  Could we look at Tab 27?

- - -

(Whereupon, Exhibit Klein-2, No Bates, LexisNexis Results, Steak-umm Co, LLC v Steak 'Em Up, Inc., was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Page 27

Q.    Have you seen Exhibit-2 before, Mr. Klein?

ATTORNEY JACOBSON:  Are there hard copies for counsel?

THE WITNESS:  Yes.

BY ATTORNEY PISTILLI:

Q.    And does this relate to litigation matter entitled Steak-umm Co., LLC v Steak 'Em Up, Inc.?

A.    Yes.

Q.    And did you testify as an expert in that matter?

A.    Yes, I did.

Q.    And if you could look at Page 19.

Do you see the top of Page 19?

A.    Yes.

Q.    And in this -- well, strike that.

This is a written opinion by the court in the Steak-umm matter?

A.    That's what it appears to be, yes.

CONFIDENTIAL

Page 28

Q.    And do you see where the court wrote, Accordingly, numerous flaws in Mr. Klein's survey undermine the reliability of his numbers.
Dr. Rappeport estimates that no more than a 10 percent likelihood of confusion is a fair estimate for Mr. Klein's results.
Dr. Rappeport's estimate is based solely on his expertise.  I find and conclude there is no evidence of likelihood of confusion due to the multiple flaws in the Klein's survey and Dr. Rappeport's critique of the Klein survey.  Having no evidence demonstrating a reliable percentage of a likelihood of confusion, this court gives no weight to the survey results.

Do you see that?

A.    Yes.

Q.    And so in this opinion, the court concluded that there were numerous fundamental flaws in your survey, correct?

A.    The flaws that the judge is

Page 29

referring to has to do with the -- my client in that case's theory of the case.

They -- Steak-umm brought the action because they were -- believed that the name Steak 'Em Up would confuse people and lead them to believe that the Steak 'Em Up product was made with Steak-umms. And the judge in this case didn't believe that that constituted a likelihood of confusion.

And so what I was measuring wasn't what the judge thought the case was all about but was what my client thought the case was all about.

So my survey was directed at the issue raised by my client in this matter. And the judge decided that that really wasn't the relevant theory of the case.

Q. If you look at Page 18, it says, Because Mr. Klein failed to ask the connection affiliation question to all consumers, his survey fails to show source confusion.

Page 30

Do you see that?

A.    On which page?

Q.    The very bottom of Page 18.

A.    This is basically what I just described to you, that the results of a survey asking respondents whether a restaurant named Steak 'Em Up serves Steak-umm products is almost meaningless. Relevant survey questions concern source -- confusion of source, sponsorship and this wasn't that.

This was, though, what the plaintiff in the matter believed was -- was relevant, so.

Q.    As an expert, you just did what the plaintiffs told you in that case?

ATTORNEY JACOBSON:    Objection.

THE WITNESS:    No.    As an expert, I did what was alleged to be the -- the harm.    And so I designed the survey to address that issue.

CONFIDENTIAL

Page 31

BY ATTORNEY PISTILLI:

Q.    Well, the court criticized you for failing to ask an important question, correct?

A.    In the court's mind, yes.

But it wasn't the important question in the -- in terms of the theory of the case that the plaintiff's attorney had raised.

ATTORNEY PISTILLI:  Tab 28.

-  -  -

(Whereupon, Exhibit Klein-3, No Bates, LexisNexis Result, Maker's Mark Distillery, Inc. v Diageo N. Am., Inc., was marked for identification.)

-  -  -

THE WITNESS:  There are two here.  I have two copies.

This is one of my favorites. Go ahead.

BY ATTORNEY PISTILLI:

Q.    Do you recognize the document that's been marked as Exhibit-3?

Page 32

A.    Yes.

Q.    What is it?

A.    It's the -- well, it's a LexisNexis document that includes the opinion of the court, yes.

Q.    It includes the opinion of the court in a case called Maker's Mark Distillery, Inc. v Diageo North American, Inc.?

A.    Yes.

Q.    And that was a case in which you served as an expert witness?

A.    That's correct.

Q.    You conducted a market research survey in that case?

A.    Yes.

Q.    Let's turn to Page 25.

Do you see the first full paragraph on Page 25?

A.    Yes.

Q.    The court writes, quote, Cuervo offered the survey evidence of Robert Klein to show that confusion did not exist.  Klein concluded that only

CONFIDENTIAL

Page 33

2 percent of respondents were confused about the two brands.  In the court's view, the study and its conclusions were flawed in several significant ways.

Do you see that?

A.    Yes.

Q.    Do you agree that the court, in this case, reached the conclusion that your study was flawed in several significant ways?

A.    Well, that's what they wrote.  The -- his main problem with the -- with my survey was that it was conducted online.  And in his view, no one would ever buy alcoholic beverages online.  But that's clearly not the case.

Q.    Well, he, in fact -- the court goes on to give four separate reasons that, in its view, your survey was flawed, correct?

A.    Yes.

I don't want to go too far out on a limb, but this was home cooking. It was a case brought in Louisville,

Page 34

Kentucky, by an international firm against a local -- local firm.

I disagree with his -- his conclusions here.

Q. So your view is that the judge was acting in bad faith?

ATTORNEY JACOBSON: Objection. Mischaracterizes testimony.

THE WITNESS: I think the judge did not completely understand the survey I conducted and the basis on which I offered my opinion.

BY ATTORNEY PISTILLI:

Q. Just so we're clear, only one of the four reasons offered by the judge had to do with the fact that the survey was conducted online, correct?

A. The second item has to do with the way in which the products were identified, the -- which he believes suggests that they're not affiliated.

This was a $100 bottle of

tequila that Jose Cuervo put out. And they used a drippy wax seal on the top of the bottle. And Maker's Mark was claiming that that would confuse people and they would see that drippy wax seal and think that Maker's Mark was the source of the Jose Cuervo tequila.

You've got tremendous price differences between these products, you know, as well as the fact that the Jose Cuervo product is sold in a custom-made wooden box, and each year a different Mexican artist produces that commemorative box. Also, they had stopped using that drippy wax seal several years earlier.

And so what the judge actually did was award no damages and told them to stop doing something that they had already stopped doing.

Q. Well, one of the reasons that the court excluded your opinion was because it found that your control group was problematic and may have skewed the

results, correct?

A. That -- and that was related to the color of the wax seal that was used. Maker's Mark brought -- raised that issue long after I had done my survey.

Q. Well, that wasn't my question, sir.

My question was just, did the court find that your control group was problematic and may have skewed the results?

A. That's what it says. I don't agree, but.

Q. And then the court also noted that a number of other courts had criticized your surveys.

Do you see that?

A. This was an interesting case, because the case cited didn't involve me and took place years before I ever served as an expert witness.

The Indianapolis Colts case was Jacob Jacoby, not me, and was in, I

Page 37

think, 1985. As I said, it was long before I ever served as an expert witness.

Q. But you were an expert witness in Board of Regents v KST Electronics Limited, right?

A. That's correct. And in that case, the judge found that I was very persuasive in my arguments, if you want to look at that case, and found for my -- my client in that case.

Q. Well, the court here says that you asked leading questions, right?

A. Yes. I disagree.

But that -- that case, you're talking about the Board of Regents case. That was a case in which the -- again, that was the original case in which the judge had mistaken me for somebody else.

ATTORNEY PISTILLI: Let's take a look at Tab 29.

- - -

(Whereupon, Exhibit Klein-4,

CONFIDENTIAL

Page 38

No Bates, LexisNexis Result, ComponentOne LLC v ComponentArt Inc., was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I've handed you a document that's been marked as Exhibit-4.

Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It's a decision in the case of ComponentOne v ComponentArt.

Q.    And this was a case in federal district court?

A.    Yes.

Q.    And you testified as an expert in that case?

A.    Yes.

Q.    Let's take a look at Page 18.

You see there where it says, ComponentOne has offered the opinion of

Page 39

Robert Klein?

A.    Yeah.    Mine has some highlighting in it.

- - -

(Whereupon, a discussion off the record occurred.)

- - -

BY ATTORNEY PISTILLI:

Q.    This was another case where you did a marketing survey, correct?

A.    Correct.

Q.    If you look with me at Page 20, do you see there where it says, The court finds that Klein's survey suffers from fundamental methodological flaws that prevent it from creating a genuine issue of material fact as to actual confusion.  Although defendant's argument that many grounds exist in which the court could find Klein's survey fundamentally unsound is strong, the court will focus on Klein's choice of stimuli.

Do you see that?

CONFIDENTIAL

Page 40

A.    No.   But --

Q.    The bottom of Page -- on Page 20, the bottom of the first column.

A.    Okay.   Yes.

Q.    So in this decision, another federal court found that there were fundamental methodological flaws in your survey, correct?

A.    That's what they wrote, yes. I disagree, but.

Q.    But that's -- that's what the court concluded, right?

A.    Yes.   This is another situation like the Steak-umm's case where the confusion that was alleged was due to ComponentArt changing its name from -- and I forget what they were called before they were ComponentArt, but they changed their name to Component -- to ComponentArt, which meant that in listings of component -- these are software components.

In any listing of manufacturers or providers of these

Page 41

components, ComponentArt's name would now be listed above ComponentOne in a directory or list of exhibitors or anything like that.  And that's what upset the ComponentOne people.

And so that was the type of stimulus I used in conducting the survey, which -- so it was a survey that was directed specifically at what the allegations were in the complaint.

And the court found that there were other ways in which people would encounter the marks that weren't covered by my survey.

Q.    When you're doing a marketing survey, you need to replicate market conditions, right?

ATTORNEY JACOBSON: Objection.  Foundation.

THE WITNESS:  In general, the more you can replicate market conditions, the better.  But it is a survey, so there is that type of limitation.

BY ATTORNEY PISTILLI:

Q. And the court found that your survey failed to replicate market conditions, correct?

A. It replicated the market condition that my client was -- was concerned about.

But I recognize, and the court recognized, that there were other situations in which people would encounter the marks.

ATTORNEY PISTILLI: Tab 30.

- - -

(Whereupon, Exhibit Klein-5, No Bates, LexisNexis Result, Avocado Plus Inc. v Johanns, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q. I've handed you a document that's been marked as Exhibit-5.

Do you recognize Exhibit-5?

A. Yes. This was from a case that was, what, 20 years ago? Yes.

Q.    This is a federal court litigation in a matter called Avocados Plus Inc. versus Johanns?

A.    Yes.

Q.    And you testified as an expert in this case?

A.    Yes.

Q.    This was another marketing research survey?

A.    That's correct.

Q.    Take a look with me at Page 13, please.

Do you see where it says, In support of this contention, plaintiffs hired a marketing consultant and statistician to conduct a survey gauging the likelihood that consumers will, in fact, attribute the avocado promotions to them.

Do you see that?

A.    No.  I --

Q.    Sure.  Look under the section, Defendants will be given an opportunity --

Page 44

A.   Yes.

Q.   -- to conduct limited discovery.

A.   Okay.  Yes.

Q.   And does this reflect that you were hired to conduct a survey gauging the likelihood of consumers attributing avocado promotions to plaintiffs?

A.   That wasn't what I was actually hired -- hired to survey.  The original assignment had to do with the use of the check-off provision in the Agricultural Department in promotion of various agricultural products.

And I don't know if you're familiar with the check-off procedure, but essentially ads, like, you know, "beef, it's what for dinner" or "got milk" or stuff like that are actually ads put out by the Agricultural Department and funded by a tax or check-off of the manufacturers.

And each of the various

CONFIDENTIAL

Page 45

industry groups has sued the Agricultural Department over the use of this check-off, saying that it's compelled speech and they're being forced to finance speech that they don't necessarily agree with.

The beef industry, for example, would rather be able to promote its own Angus beef or grass-fed beef or something like that as opposed to just beef in general.

And each of the industry groups has sued the Agricultural Department and generally won until the -- until the beef case came along.

And in that beef case, the argument was -- or the argument that won was, this really isn't personal speech, this is government speech and the government can say anything it wants. And if you don't like what the government says, elect a different government.

And that argument actually won at the Supreme Court. And that took

Page 46

place about six months before this particular case came up.

And so the avocado growers had been in -- in litigation with the Agricultural Department. And so the survey that I did tried to measure who they would attribute the avocado ads to. And no one that saw the ads would attribute it to the U.S. government, they would attribute it to avocado growers and so on.

The judge in this case felt that there was a need for the avocado purchasers or potential purchasers of avocados to actually attribute it to the specific growers who had brought the suit.

And so at the last minute, we had to modify the survey that I was conducting to add a question about the specific Mexican growers who, of course, no one would recognize.

And that was the source of the argument about a leading question.

CONFIDENTIAL

Page 47

Q.    Just so I'm clear, you were tasked with conducting a survey to figure out whether consumers thought the advertisement was speech by the government or speech by the plaintiffs, correct?

A.    Yes.  Correct.

Q.    And what the court concluded was that in conducting that survey, the format you used was unnecessarily suggestive, correct?

A.    That's what they concluded, yes.

Q.    Let's talk a little bit about your background.

You have a Bachelor's degree in mechanical engineering?

A.    That's correct.

Q.    And a Master's degree in management?

A.    That's correct.

Q.    You don't have any other post-secondary degrees, do you?

A.    No.

CONFIDENTIAL

Page 48

Q.    You're not a sociologist?

A.    No.

Q.    Let's take a look at your LinkedIn profile.

ATTORNEY PISTILLI:  Tab 25.

- - -

(Whereupon, Exhibit Klein-6, No Bates, Robert Klein LinkedIn Profile, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    Do you recognize the document I've handed you that's been marked as Exhibit-6?

A.    I don't believe I've ever seen it before.  But I guess I know what it is.

Q.    Is it your LinkedIn profile?

A.    It appears to be.

Q.    And you've never seen your own LinkedIn profile before?

A.    If I have, it was a long time ago.

Page 49

Q.    But to the best of your understanding, is this your current LinkedIn profile?

ATTORNEY JACOBSON:

Objection.  Foundation.

THE WITNESS:  I don't know.

I mean, it could be.

BY ATTORNEY PISTILLI:

Q.    Have you been at Applied Marketing Science for approximately 36 years and six months?

A.    Yes.

Q.    And do you see that your LinkedIn profile says that you've been at Applied Marketing Science for 36 years and six months?

A.    Yes.

Q.    And do you see in the summary section it says you're an expert witness on issues relating to survey research related to trademarks, secondary meaning, customer confusion, class certification, antitrust, false advertising and sales forecasting,

Page 50

et cetera.

Do you see that?

A.    Yes.

Q.    This isn't a case about trademarks, secondary meaning, customer confusion, class certification, antitrust, false advertising or sales forecasting, is it?

A.    No, it's not.

Q.    Then do you see where it goes on to list your specialties?

A.    Yes.

Q.    And it, again, says your specialties are survey research related to trademarks, secondary meaning, customer confusion, class certification, antitrust, false advertising, and sales forecasting.

A.    Et cetera, yes.

Q.    Yes.  And so this case doesn't fall into any of the specifically enumerated categories of your specialties, correct?

A.    It's not one of these listed

Page 51

specialties, no.

Q.    And the survey you conducted in this case is not a market research study, correct?

A.    I think it falls into the general category of market research.  I mean, it's a survey of a population to understand what their experiences have been.

Q.    Market research surveys are focused on consumer decisions about, for instance, whether to buy a product, right?

ATTORNEY JACOBSON:

Objection.  Foundation.

THE WITNESS:  They can be that.

BY ATTORNEY PISTILLI:

Q.    What's your definition of a market research survey?

A.    It would be a survey of people to understand their beliefs, behaviors, motivations.

Q.    Relating to market goods?

Page 52

A.    I think market research generally refers to survey research that covers a wide range of topics.

I don't think that market research is -- has a fundamentally different definition than survey research.

Q.    But market research surveys focus on consumer preferences, attitudes, behaviors and needs regarding products, right?

ATTORNEY JACOBSON: Objection.

THE WITNESS:  It's certainly not limited to that.

BY ATTORNEY PISTILLI:

Q.    Have you ever offered expert testimony before in a case regarding anything other than a consumer product?

A.    Sure.

Q.    What are some examples?

A.    The -- consumer products? Pharmaceuticals and hip implants.

Let me just -- this is only

CONFIDENTIAL

Page 53

in the last four years, so.

Strip clubs, pesticides, travel websites.

Those are the ones that come to mind.

Q.    Everything you just mentioned, though, involved goods or services available for purchase, correct?

ATTORNEY JACOBSON: Objection.

THE WITNESS:  Not necessarily.  But in general, probably most of them were.

BY ATTORNEY PISTILLI:

Q.    Pharmaceuticals are products that people can buy, right?

A.    Right.  But it wasn't people that we were interviewing.  We were interviewing doctors.

Q.    Right.  Because doctors have to prescribe medicines in order for consumers to be able to purchase them, right?

A.    Yes.

Page 54

Q.    Same thing with hip implants?

A.    Well, it really had to do with the -- how doctors recognize one product compared to another, or one brand versus another.

Q.    Right.  So it had to do with the purchase -- the market purchase of products?

ATTORNEY JACOBSON:

Objection.

THE WITNESS:  Not -- not so much the market purchase of products, but physicians or doctor -- sorry, doctors' preferences for one manufacturer over another.

BY ATTORNEY PISTILLI:

Q.    So preferences between two different brands?

A.    Okay.

Q.    Similarly, travel websites sell services, right?

A.    The -- yes.

Page 55

Q.    And pesticides are consumer products that people can buy, consumers and others?

A.    And others, yes.

Q.    Commercial products?

A.    Right.

ATTORNEY PISTILLI:  Let's take a look at Tab 31.  We'll mark this as Exhibit-7.

-  -  -

(Whereupon, Exhibit Klein-7, No Bates, Applied Marketing Science Web Page, was marked for identification.)

-  -  -

BY ATTORNEY PISTILLI:

Q.    Do you recognize Exhibit-7?

A.    It appears to be a page from Applied Marketing Sciences' website.

Q.    And that's the firm that you're chair emeritus of, right?

A.    Employee of, yes.

Q.    Employee and chair emeritus?

A.    Yes.

CONFIDENTIAL

Page 56

Q.    And this lists various specialties of your firm, correct?

A.    Yes.

Q.    It lists eight specific specialties, right?

A.    Specific areas in which we provide litigation support services, yes.

Q.    And one of those is trademark infringement, right?

A.    Yes.

Q.    This isn't a trademark infringement case, right?

A.    That's correct.

Q.    One of them is deceptive advertising?

A.    Yes.

Q.    This isn't a deceptive advertising case, right?

A.    That's correct.

Q.    One of them is class actions?

A.    That's correct.

Q.    This isn't a class action, right?

CONFIDENTIAL

Page 57

A.    No, it's not a class action.

Q.    Next is claim substantiation, right?

A.    Yes.

Q.    This isn't a case involving claim substantiation, right?

A.    I don't believe so.

Q.    Next is patent infringement?

A.    Yes.

Q.    This isn't a patent case, right?

A.    This is not a patent case.

Q.    The next is content analysis?

A.    Yes.

Q.    This case doesn't involve content analysis, right?

A.    Correct.

Q.    The next is antitrust, right?

A.    Yes.

Q.    This isn't an antitrust case, right?

A.    That's correct.

Page 58

Q.    And the last is rebuttal surveys and reports.

You didn't do a rebuttal survey in this case, did you?

A.    No, I didn't.

ATTORNEY PISTILLI:  Let's take a look at Tab 32.

- - -

(Whereupon, Exhibit Klein-8, No Bates, Expert Witnesses: When Are They Necessary and Does Daubert/Kumho Make a Difference?, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I'm handing you a document that's been marked as Exhibit-8.

Let me know if you recognize Exhibit-8.

Do you recognize Exhibit-8?

A.    Yes.

Q.    What is it?

A.    It's an article that I co-authored with two attorneys that --

based on a presentation that we made at a conference for, I think, IP litigators.

Q. And do you stand by the opinions that you offered in this article?

A. I think this article was accurate at the time that I wrote it.

Q. Do you think it's become inaccurate in some way since you wrote it?

A. I haven't really looked at it since then.

Q. Look with me, if you would, at Page 14, Requirements of a good survey.

A. Yes.

Q. And you list a number of relevant factors that you believe are requirements of a good survey.

Do you see that?

A. Yes. They are taken from the reference Manual for Complex Litigation.

Q. Do you agree that those are,

Page 60

in fact, requirements of a good survey?

A.    I think these are dimensions on which a good survey, or any survey, should be evaluated.

Q.    And do you agree that one of the requirements of a good survey is that the questions asked were clear and not leading?

A.    That's an important piece, yes.

Q.    It's also important that the survey was conducted by qualified persons following proper interview procedures?

A.    Yes.  That's -- again, these are taken from the Manual for Complex --

Q.    Well, I'm just asking if you -- since you quoted them in your article, I'm just asking if you agree with them?

A.    Yeah.  I probably quoted them in the -- in my report.

Q.    You also agree it's important that the process -- survey process be conducted in a way to ensure

Page 61

objectivity?

A.    Yes.

Q.    And one of the things that you note specifically in order to ensure objectivity is having an understanding of whether the persons surveyed are aware of its purpose in litigation?

A.    The -- yes.  That has to do with making sure that the survey is double-blind.

Q.    Well, because it can lead to non-objective results if the survey participants are aware that they're responding to a litigation survey, correct?

A.    It's possible.  But it's not -- it's not been my -- my experience that that changes people's opinions.

Q.    One of the things you wrote here was that in order to ensure objectivity, you need to determine if the survey involved persons who are aware of its purpose in the litigation, right?

A.    I didn't really follow your

Page 62

question.

Q.    That's fine.  We can move on.

This was not a peer-reviewed article, correct?

A.    No, it wasn't.

Q.    If we can go back to Exhibit-1, Tab 1.  And if you could go to Page A-1 with me.

A.    Okay.

Q.    Sorry.  Page A-2, apologies.

Do you see there there's a list of publications?

A.    Yes.

Q.    Is that a complete list of your publications in the past ten years?

A.    Yes.

Q.    What was the subject matter of the quality function deployment article?

A.    Quality function deployment is a technique for product design that was imported from Japan by the auto industry in the early '80s and has now

been widely used in a variety of industries to make sure that the customer's wants and needs are linked to the features of a particular product.

And so quality function deployment, or QFD for short, is what we started Applied Marketing Science to be focused on.  And John Hauser, Abbie Griffin were -- Abbie was an employee. John Hauser was my MIT professor that I co-founded Applied Marketing Science with.  And he's written a number of articles about QFD and its application.

Q.    Was this publication that you co-authored in the Wiley International Encyclopedia of Marketing peer reviewed?

A.    I don't know.

Q.    Do you remember going through a peer-review process as part of your publication of the article?

A.    I know it was reviewed for inclusion in the -- in this encyclopedia. But I don't know if there was a formal

peer-review process. It was reviewed by peers, but.

Q. The third and final article listed is called, Voice of the Customer.

What was the subject matter of that publication?

A. So similar to QFD, the voice of the customer is an input to the QFD process. So it's understanding customer wants and needs and structuring them in a way that allows you to link them up with the product engineering features of a particular product.

Q. And this was published in the same encyclopedia?

A. Yes.

Q. So I take it your answer about whether or not it was peer reviewed would be the same?

A. Yes.

Q. Do you have any publications prior to 2010?

A. Yes.

Q. To your knowledge, were any

Page 65

of them peer reviewed?

A.    I don't believe so.

Q.    Let's turn -- sticking with Exhibit-1, let's look at Appendix E.

Could you just help me understand what these different categories are?

I think I know invitations sent is just how many people received an e-mail from your firm inviting them to participate in the survey, correct?

A.    Yes.

Q.    And then completed survey, does that mean everyone who filled it out all the way to the end?

A.    That's correct.

Q.    Can you explain to me what disqualified means?

A.    In -- if you look at the -- starting with D -- Page D-12, you can see the program -- the program -- the teacher survey with the programmer instructions. And so there are various places in which people can respond and it wouldn't be --

Page 66

they wouldn't continue.

For example, the screening question at the top, QS2, Are you a -- and it asks, Teacher, administrator, counselor, other.  And so if they don't choose teacher, then they -- they don't continue the survey and so they are terminated, in survey language.

And so, you know -- or if they are an elementary school teacher, pre-K to kindergarten, or something like that, then they're not going to continue.

Q.    Thanks.

And then can you help me understand what are all the different ways that one could get disqualified from the survey?

A.    The -- let me see if I can.

So if they answer QS2 with something other than being a teacher, they would be disqualified.  If they chose the wrong school district, they would be disqualified.  If they didn't choose middle or high school, they would

CONFIDENTIAL

Page 67

be disqualified.  If they were under 21, they were disqualified -- if they answered that they were under 21 they were disqualified.

And QS7 is a quality control check where we make sure they're really paying attention to the question.  And if they don't answer that correctly, they're disqualified or terminated.

QS8 has a list of instructions that they qualified for the survey, but we want to make sure that they do it in one session without being interrupted, that they keep the browser minimized -- maximized for the entire survey, that while taking the survey they don't consult with other websites or other electronic or written materials, that they answer the questions on their own without consulting any other person, and if they normally wear glasses when viewing electronic screens to wear them during the survey.

And if they answer that they

don't understand or don't agree with the instructions, then they are terminated.

Q. And then are -- you have separate listings for disqualified and terminated.

But are those always going to be the same?

A. Where -- where are you looking?

Q. Sorry. I'm back on E-1.

A. So disqualified is the sum of the terminates and the failed district validation.

Q. And what does failed district validation mean?

A. They chose a different district than the one that they were actually in.

Q. You're referring there to their answer to QS3?

ATTORNEY JACOBSON: Can you point us what page you're on, counsel?

ATTORNEY PISTILLI: D-13.

Page 69

THE WITNESS: I believe so, yes.

BY ATTORNEY PISTILLI:

Q. And now could you just help me understand what incomplete/break-offs are?

A. Incompletes or break-offs are when they get partway through the questionnaire and don't complete it.

Q. And let me ask you some questions about that.

When you're -- when you open up the questionnaire, can you click through without putting in an answer?

A. No.

Q. So you can never get past the very first page unless you answer the question on the first page?

A. I can't see the first page.

There it is.

So unless they click next, they can't get to the next page.

Q. And then on the next page they have to put in the CAPTCHA

Page 70

information or they can't go forward?

A.    That's correct.

Q.    And then I understand we're looking at this specific example that doesn't have any incomplete or break-offs.

But could you tell me generally how your survey treated incomplete/break-offs?

A.    They weren't included in the analysis data set.

Q.    So you essentially assumed that they were similarly situated as non-respondents?

A.    I'm not sure we made any assumptions about them.  We just didn't have a complete data set for them.

Q.    But they were treated, for purposes of your analysis, the same way that you treated someone who didn't respond at all, correct?

ATTORNEY JACOBSON:

Objection.  Foundation.

THE WITNESS:  Well, that

Page 71

would be the effect of not including them in the sample, analysis sample.

ATTORNEY PISTILLI:  Take a five-minute break?

ATTORNEY JACOBSON:  Sounds good.

VIDEO TECHNICIAN:  The time is 10:44 a.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 10:58 a.m., and we are on the record.

BY ATTORNEY PISTILLI:

Q.    If you could, please, turn back to Exhibit-1 again, which is your opening report in Breathitt and take a look with me at Page 5.

A.    Yes.

Q.    Do you see in Paragraph 20

Page 72

you write, Prior to sending survey invitations to each teacher on the list, the district was instructed to send a warming e-mail to the teachers on the list informing them of an upcoming survey and asking for their cooperation in promptly completing the survey.  The district was instructed to make sure not to reveal the purpose of the survey or to make any mention of social media.

          Do you see that?

     A.    Yes.

     Q.    Do you know whether warming e-mails were sent to the six districts?

     A.    It's my understanding they were, yes.

     Q.    Do you have copies of those warming e-mails?

     A.    No, I do not.

     Q.    Have you ever seen the text of the warming e-mails sent by any of the six districts?

     A.    I believe I have.

          Actually -- that's the

Page 73

invitation.  They were sent by the districts, and we provided them with some wording to use.  But they essentially composed the e-mail and sent it.

Q.   What wording did you provide for them to use?

A.   Something along the lines of what was shown here in Paragraph 20.

Q.   Do you know what words each or any of the districts actually used?

A.   As I sit here today, I don't think I can -- I know how to answer that.

ATTORNEY PISTILLI:  We call for the production of the warming e-mails.

BY ATTORNEY PISTILLI:

Q.   So you don't know, for instance, if they --

ATTORNEY JACOBSON:  And I'll just ask counsel to make that request in writing after this so that we can consider it.

BY ATTORNEY PISTILLI:

Q.   So you don't know whether

Page 74

they followed your instructions or not, correct?

ATTORNEY JACOBSON:

Objection. Foundation.

THE WITNESS: Certainly, I expect them to follow the instructions, yes.

BY ATTORNEY PISTILLI:

Q. But you didn't verify by looking at what they actually sent, correct?

ATTORNEY JACOBSON:

Objection.

THE WITNESS: One of my staff may have. But I did not.

BY ATTORNEY PISTILLI:

Q. Let's look at some of the results of your survey, starting with Breathitt.

You also see in Paragraph 20 it says, Plaintiff provided a list of all the middle and high school teachers currently employed full time in the district. This list contained a total of

Page 75

70 e-mails.

Do you see that?

A. Yes.

Q. So that means there were 70 full-time middle and high school teachers in Breathitt?

ATTORNEY JACOBSON:

Objection. Foundation.

THE WITNESS: That would be my understanding, yes.

BY ATTORNEY PISTILLI:

Q. And now let's take a look at Page 12 of your report.

Does Page 12 tell us, in the chart on the top, that only three Breathitt middle school teachers responded to the question regarding classroom distraction for a decade ago, i.e., 2014?

A. Three out of the 19 who responded for the current --

Q. Well, there are 70 teachers in the district total?

A. There were 70 names we

Page 76

received, yes.

Q.    Yes.

And of those 70 names, only seven individuals responded to the question regarding in-class distraction a decade ago, correct?

A.    There were seven teachers that were currently employed who were eligible to answer that question, yes.

Q.    Only seven answered it, right?

A.    There were only seven that were asked it, yes.

Q.    And you extrapolated from those seven answers to the entire Breathitt teacher population, correct?

A.    No, I don't think that's a correct -- correct statement.

Q.    Well, you -- you reported time spent addressing what you call social media distraction in class for the 2014 time period, correct?

A.    I reported the data that we collected, yes.

Page 77

Q.    Right.  And that data showed a number of minutes that you assert are -- were spent dealing with social media-related in-class distraction in 2014, correct?

A.    For these respondents, yes.

Q.    But just so we're clear, the figure you reported was based on only a total of seven responses, correct?

A.    There were only seven teachers who were employed in -- currently employed full time who were eligible to answer that -- that question, either because they started teaching after 2014, which would be the main reason that they wouldn't have been asked.

Q.    Right.  But just so the jury is clear, the figure you report for Breathitt for the 2014 time period is based on a sum total of seven answers?

ATTORNEY JACOBSON:

Objection.  Asked and answered.

THE WITNESS:  There were

CONFIDENTIAL

Page 78

seven teachers who were eligible to answer that question, yes.

ATTORNEY PISTILLI:  Let's go ahead and mark the next five reports all at once.

-   -   -

(Whereupon, Exhibit Klein-9, No Bates, Social Media and Teacher Time Survey Methodology and Results, Charleston, was marked for identification.)

-   -   -

(Whereupon, Exhibit Klein-10, No Bates, 5/18/25 Social Media and Teacher Time Survey Methodology and Results, DeKalb, was marked for identification.)

-   -   -

(Whereupon, Exhibit Klein-11, No Bates, 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Harford, was marked for identification.)

-   -   -

CONFIDENTIAL

Page 79

(Whereupon, Exhibit Klein-12, No Bates, 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Irvington, was marked for identification.)

- - -

(Whereupon, Exhibit Klein-13, No Bates, 5/18/25 Social Media and Teacher Time Survey Methodology and Results, Tucson, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    So we've handed you exhibits 9, 10, 11, 12 and 13.  We'll go through them one by one.

But I can represent to you that those are your -- copies of your opening report for the other five bellwether cases.

A.    Okay.

Q.    And we'll start with Exhibit-9, which is Tab 2.

Page 80

If you would look with me, please, again, at Paragraph 20, which is on Page 5 of Exhibit-9.

A.    Sorry, which page?

Q.    Page 5, Paragraph 20.

Have you found Paragraph 20?

A.    Paragraph 20, yes.

Q.    And does this indicate that you sent your survey for the Charleston School District to a total of 1,620 e-mail addresses?

A.    Yes.

I wish I had titled the -- these with the name of the school district.  But --

Q.    I can help -- we're going to flip, in a second, to Page 12, which is titled, if that helps you.

A.    Yeah.  Yes.

Q.    Okay.  And so looking now at Page 12, there were just 15 middle school teachers who responded to the a-decade-ago question?

A.    Right.  Out of the 102 that

Page 81

responded to the invitation.

Q. And there were just 18 high school teachers who responded to the a-decade-ago question?

A. Right. Out of the 131 who were qualified to complete the survey, yes.

Q. So that means that the figures you report supposedly relating to in-class social media distraction for 2014 were based on the responses of only 33 individuals, correct?

A. Right. Out of -- they were the ones who were qualified to provide an answer in that -- that time period.

Q. Let's flip back to Page 2, if you would.

A. Of Exhibit-9?

Q. Yes.

A. Okay.

Q. And your conclusion is that, From 2014 through the present, middle and high school teachers in Charleston had an increasing amount of scheduled classroom

Page 82

instruction time diverted to the use of social media platforms?

A. I'm sorry, I don't understand your question.

Q. Is your conclusion that from 2014 through the present, middle and high school teachers in Charleston had an increasing amount of scheduled classroom instruction time diverted due to the use of social media platforms?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS: The data shows that over that, you know, ten-year time period there was an increase in diverted time.

BY ATTORNEY PISTILLI:

Q. Well, let's look at some of the numbers.

You see that once in-person teaching resumed after the pandemic, high school teachers allegedly spent an average of 14.9 percent of time diverted to deal with social media issues?

A.    You're reading from Paragraph 2?

Q.    Yes.

A.    Okay.  And, I'm sorry, could you ask -- do that again?

Q.    You see that once in-person teaching resumed after the pandemic, high school teachers allegedly spent an average of 14.9 percent of time diverted to deal with social media use issues?

A.    That's not what's written here exactly.

It says, Once in-person teaching resumed, following the pause on in-person teaching due to the pandemic, the diverted time was 12 percent, 12.0 percent for middle school teachers and 14.9 percent for high school teachers.

Q.    Well, I'm just asking you, do you agree that once in-person teaching resumed post-pandemic, high school teachers allegedly spent an average of 14.9 percent of time diverted to deal with social media issues?

Page 84

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, it's not allegedly.  I mean, this is the data I collected.

BY ATTORNEY PISTILLI:

Q.    The data you collected shows that 14.9 percent of time was diverted to deal with social media issues after in-person teaching resumed after the pandemic?

A.    Yes.  Just after.

Q.    And it was 12.9 percent for middle school students -- middle school teachers?

A.    Yes.

Q.    And then in school year '23/'24, high school teachers spent 13.7 percent of their classroom time diverted due to social media use?

A.    That's what the survey indicates, yes.

Q.    And 9.2 percent for middle school teachers?

Page 85

A.    Yes.

Q.    So from post-pandemic to 2023/2024, the average amount of time diverted due to social media use fell for high school teachers, right?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  Compared to the just after in-person classes resumed.  But compared to the baseline of 2014, they're still significantly larger.

BY ATTORNEY PISTILLI:

Q.    But you'll agree that from 2023 -- from post-pandemic to 2023/2024, the time spent by high school teachers diverted to social media use fell, correct?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  That's what the survey measured, yes.

BY ATTORNEY PISTILLI:

Q.    Yes.

CONFIDENTIAL

Page 86

And it fell by 3.7 percent for middle school teachers, right?

A.    I'm sorry, where are you looking for that number?

Q.    Well, what -- what did you report for 2023/2024 for middle school teachers?

A.    8 -- 9.2 percent.

Q.    And what did you report for immediate post-pandemic?

A.    12.9 percent.

Q.    So it went from 12.9 percent to 9.2 percent, correct?

A.    Yes.

Q.    So it went down by 3.7 percent, correct?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  Yes, that's what we measured.

BY ATTORNEY PISTILLI:

Q.    And then for the current year, 2025, high school teachers spent 4.3 percent of their classroom

Page 87

instruction time on time devoted to social media use?

A.    That's what we measured, yes.

Q.    And you measured 7.1 percent for middle school teachers?

A.    Yes.

Q.    And so from 2023/'24 to 2025, the average amount of time diverted due to social media use fell 9.4 percent for high school teachers?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  9.4 percentage points, yes.

BY ATTORNEY PISTILLI:

Q.    And it also fell for middle school teachers, correct?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  That's what we measured.

BY ATTORNEY PISTILLI:

Q.    So from '23/'24 school year

Page 88

to the '25 current school year, teachers overall spent less classroom instruction time diverted due to social media, right?

ATTORNEY JACOBSON:
Objection. Form.

THE WITNESS: Again, that was what the survey showed.

BY ATTORNEY PISTILLI:

Q. Now, if you could bear with me, I want to go back for a minute to Exhibit-8 -- sorry. Exhibit-1.

If you could look at Page 12 with me -- no, not Page 12.

Sorry. Let's look at Page 2.

Do you see that post -- from post-pandemic to 2023, would you agree with me that the average amount of time diverted due to social media use for high school teachers fell by 1.2 percent?

ATTORNEY JACOBSON:
Objection. Form.

THE WITNESS: This is Exhibit-1?

Case 4:22-md-03047-YGR    Document 2407-20    Filed 11/07/25    Page 90 of 397

CONFIDENTIAL

Page 89

BY ATTORNEY PISTILLI:

Q.    Yes.

A.    And in total or --

Q.    For high school teachers.

A.    For high school teachers?

From -- and the time period, again, was from just after --

Q.    From post -- well, for post-pandemic for high school teachers, it was 5.9 percent, correct?

A.    Right.

Q.    And then in the 2023/2024 school year, it was 5.5 percent, right?

A.    Yes.

Q.    And so it fell from post-pandemic to 2023-2024, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  According to the data we collected, yes.

BY ATTORNEY PISTILLI:

Q.    And then, similarly, for middle school teachers, post-pandemic it was 7.8 percent?

Golkow Technologies,
A Veritext Division

877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 90

A.    Yes.

Q.    And then in the 2023/2024 school year, it was 6.3 percent?

A.    Yes.

Q.    Which, again, means it dropped from post-pandemic to 2023/2024, correct?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  Yes, that's what we measured.

BY ATTORNEY PISTILLI:

Q.    And then looking from 2023 to 20 -- 2023/'24 to the '25 school year, the average amount of time diverted due to social media use fell 9.4 percent for high school teachers, right?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  No.
Am I looking at the right --
I've got -- mine shows 5.5 percent going to 3.9 percent.

BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 91

Q.    So it's 3.9 percent for the 2025 school year, correct?

A.    '24/'25, yes.

Q.    And it was higher than that, 6.3 percent, in the prior school year, correct?

A.    I thought you were looking at high school teachers.

Q.    Sorry.  Let's start over, and we'll do high school first, okay?

A.    Okay.

Q.    So just doing high school.

5.9 percent was the post-pandemic number, correct?

A.    Correct.

Q.    And then in '23/'24, it went down from 5.9 percent to 5.5 percent, correct?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  That's what we measured, yes.

BY ATTORNEY PISTILLI:

Q.    And then you measured that

CONFIDENTIAL

Page 92

in '24/'25, it went down further to 3.9 percent?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  That's what I measured, yes.

BY ATTORNEY PISTILLI:

Q.    So you measured that from return to class after the pandemic to the current school year, it went down by -- from 5.9 percent to 3.9 percent, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes, that's what we measured.

BY ATTORNEY PISTILLI:

Q.    Yep.

And now we'll turn to middle school.

Middle school, post-pandemic was 7.8 percent, correct?

A.    That's correct.

Q.    And then when we get to the '23/'24 school year, it goes down to

Page 93

6.3 percent, correct?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  Yes, that's
what we measured.

BY ATTORNEY PISTILLI:

Q.    And then it goes down
further in the current school year to
5.2 percent?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  Again, that's
what we measured.

BY ATTORNEY PISTILLI:

Q.    Yep.

So what you measured is that
the amount of diverted time went down
from return to class after the pandemic
to the current school year, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes, that's
correct.

BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 94

Q.    All right.  Let's take a look at Exhibit-10.

Is Exhibit-10 your opening report for the DeKalb plaintiff?

A.    Yes.

Q.    And then let's look again, if we could, at Paragraph 2.

A.    Okay.

Q.    And in the 2023/'24 school year, you reported that high school teachers spent 14.9 percent of their classroom time diverted due to social media use?

A.    Yes.

Q.    And 10.2 percent for middle school teachers?

A.    That's correct.

Q.    And then in the current year, high school teachers, you reported, spent 11.7 percent of their classroom time diverted due to social media?

A.    Yes.

Q.    And 5.2 percent for middle school teachers?

Page 95

A.    That's correct.

Q.    And so from 2023/'24 school year to the '24/'25 school year, the average amount of time diverted due to social media use fell 3.2 percent for high school teachers?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  That's -- I believe that's correct, yes.
That's what we reported --
measured.

BY ATTORNEY PISTILLI:

Q.    And you reported that it fell, over that same time period, 5 percent for middle school teachers?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  Five
percentage points.

BY ATTORNEY PISTILLI:

Q.    Five percentage points, yes.
So from '23/'24 to '24/'25, teachers overall spent less classroom

instruction time diverted due to social media use according to your data, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes.

BY ATTORNEY PISTILLI:

Q.    If you could turn to Paragraph 20 with me.

A.    Of Exhibit-10?

Q.    Exhibit-10, yes.  Sticking with Exhibit-10.

And does this indicate that you sent a total of 2,977 surveys out to DeKalb teachers?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Which -- which paragraph?

BY ATTORNEY PISTILLI:

Q.    20.

A.    Yes.  The list we had was 2,977 e-mail addresses.

Q.    And then let's take a look at Page 12, starting with the middle

Page 97

school teachers column.

Of the 2,977 surveys you sent out, you only had 12 responses from middle school teachers for the a-decade-ago, i.e., 2014 question, correct?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  Well, again, only -- we had 70 total responding middle school teachers, and 12 of them were eligible to be asked the question about the 2014 time period.

BY ATTORNEY PISTILLI:

Q.    But you sent the survey to 2,977 people, correct?

A.    Who are currently employed full time in the school district, yes.

Q.    And of those, only 12 middle school teachers responded to that particular question?

A.    No.  Seventy middle school teachers responded to the survey, and 12

of them were eligible to be asked the 2014 question.

Q. Right. So only 12 responded, right?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS: There are 12 -- we have 12 responses for that time period.

BY ATTORNEY PISTILLI:

Q. And you have, from high school teachers, only 18 responses from that time period, right?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: We have 18 responses from that time period.

BY ATTORNEY PISTILLI:

Q. And you extrapolated from those just 30 responses when you provided your amount-of-time-diverted figure for the 2014 time period, correct?

ATTORNEY JACOBSON: Objection to form.

CONFIDENTIAL

Page 99

THE WITNESS:  The 2014 data is based on the number of teachers who responded.

BY ATTORNEY PISTILLI:

Q.    Which is just 30, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  In total between the two, yes.

BY ATTORNEY PISTILLI:

Q.    Let's turn now to Exhibit-11.

Does Exhibit-11 appear to be your opening report in the Harford case?

A.    Yes.

Q.    Let's take a look at Paragraph 2.

You reported that when in-person teaching resumed post-pandemic, high school teachers spent 18.6 percent of their classroom time on social media disruptions?

A.    Well, the -- you paraphrased what it says there.  The number is

Page 100

9.4 percent for middle school teachers and 18.6 percent for high school teachers.

Q. And then for the '23/'24 school year, high school teachers reported 16.5 percent of their classroom disruptions were due to social media use?

A. Yes.

Q. And for middle school teachers that same year, it was 8.9 percent?

A. That's correct.

Q. And so between when in-person teaching resumed post-pandemic and the '23/'24 school year, the amount of classroom disruption time reported by high school teachers fell 2.1 percentage points?

ATTORNEY JACOBSON:
Objection. Form.

THE WITNESS: Yes, that's what we measured.

BY ATTORNEY PISTILLI:

Q. You also measured that it

Page 101

fell for middle school teachers, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes, that's correct.

BY ATTORNEY PISTILLI:

Q.    And then for the current school year, '24/'25, high school teachers reported 10.6 percent of their classroom disruption time was spent dealing with social media issues?

A.    Yes.

Q.    And 5.7 percent for middle school teachers that school year?

A.    Yes, that's correct.

Q.    So from '23/'24 to '24/'25, the amount of time high school teachers reported spending dealing with social media issues fell 5.9 percentage points?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  For high school teachers.

BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 102

Q.    Yep.

A.    Yes.

Q.    And it fell 3.2 percentage points for middle school teachers over that same one-year period?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes.

BY ATTORNEY PISTILLI:

Q.    Let's take a look at Paragraph 20.

Does this indicate that you sent 1,378 e-mails to middle and high school teachers in Harford?

A.    That's correct.

Q.    Let's turn to Page 12.

From the 1,378 surveys that you sent out, you only have 12 valid responses to the question relating to a decade ago from middle school teachers, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Maybe I'm in

the wrong exhibit.  Which --
Exhibit-11?

BY ATTORNEY PISTILLI:

Q.    Yes.  Oh, 21, not 12.  My apologies.

A.    Yes.  I mean, that's how many were eligible to be asked the question out of the total respondents.

And we got the response rate that's not uncommon for unidentified surveys that are used without an incentive, Internet surveys.

Q.    And then for high school teachers, you only had 26 valid responses to the questions relating to a decade ago from the 1,378 surveys you sent out, right?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  I think the more appropriate is to look at the number that were teaching in the current year versus that because, you know, you can't ask questions

Page 104

about ten years ago for someone who just started teaching.

BY ATTORNEY PISTILLI:

Q. Right. But your -- the percentages you report for time spent on in-class distraction relating to social media for the 2014 time period were based entirely on the responses of the 47 individuals, correct?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS: Yes, we -- those were the only ones who were eligible to be asked the question.

BY ATTORNEY PISTILLI:

Q. Let's take a look at Exhibit-12.

Is Exhibit-12 the opening report you submitted in the Irvington case?

A. Yes.

Q. Let's take a look at Paragraph 2.

When in-person teaching

Page 105

resumed post-pandemic, high school teachers reported that 13.4 percent of their classroom disruptions were due to social media?

A. Yes. I mean, that's the number that's reported on Page 12 in the table.

Q. And it was 10 percent post-pandemic for middle school teachers?

A. Yes. Again, that's what -- what's presented in the table on Page 12.

Q. And then last school year, '23/'24, high school teachers reported 17.6 percent of their classroom disruptions were due to social media use?

A. Yes.

Q. And 4.9 percent for middle school teachers?

A. Yes.

Q. And so between when in-person teaching resumed post-pandemic and the '23/'24 school year, the amount of classroom disruption time reported by middle school teachers fell 5.1 percent?

CONFIDENTIAL

Page 106

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  5.1 percentage points, yes.

BY ATTORNEY PISTILLI:

Q.    And for the current year, 2025, high school teachers reported 9.9 percent of their classroom disruption time was spent dealing with social media issues?

A.    That's correct.

Q.    And it was 2.2 percent for middle school teachers?

A.    Yes.

Q.    So between '23/'24 and '24/'25, the amount of time high school teachers reported spending dealing with social media issues fell 7.7 percentage points?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes, that's the number reported.

BY ATTORNEY PISTILLI:

Page 107

Q.    And for middle school teachers from '23/'24 to '24/'25, it fell by 2.7 percentage points?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  That's what we measured, yes.

BY ATTORNEY PISTILLI:

Q.    Let's take a look at Paragraph 20.

Does Paragraph 20 indicate that you sent the survey to a total of 270 middle and high school teachers in Irvington?

A.    Yes.

Q.    And let's take a look at Page 12.

Does Page 12 indicate that of all the surveys you sent out, you only had nine responses to the question relating to social media in-class distraction during the 2014 time period from middle school teachers?

ATTORNEY JACOBSON:

Page 108

Objection.  Form.

THE WITNESS:  Yes.  Of the 41 who responded to the survey, yes.

BY ATTORNEY PISTILLI:

Q.    But you sent out a total of 270 surveys, right?

A.    That's correct.

Q.    And then from high school teachers, you had just 13 responses for the 2014 time period?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Of the 49 who are currently full-time teachers in high school -- the same high school, actually.

BY ATTORNEY PISTILLI:

Q.    And so that means that your percentages that you report relating to 2014 are based on the responses of just 22 individuals?

ATTORNEY JACOBSON:

Objection.  Form.

Page 109

THE WITNESS: Yeah, again, I wouldn't have said just 22. But that's the number who are eligible to be asked that question, given that they're currently full-time teachers in the high school or middle school.

BY ATTORNEY PISTILLI:

Q. All right. Let's take a look at Exhibit-13.

Is this the opening report that you submitted in the Tucson case?

A. Yes.

Q. Let's take a look at Paragraph 2.

In 2014 for Tucson, middle school teachers reported 2.6 percent of their classroom disruptions were due to social media?

A. Middle school teachers in 2014? Is that what you --

Q. Yes.

A. Yes. We measured 2.6 percent.

Page 110

Q.    And then at the beginning of 2020, middle school teachers reported the same amount of classroom disruptions due to social media, right, 2.6 percent?

A.    Yes.

Q.    So for middle school teachers, there wasn't any increase from 2014 to 2020?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  For these respondents, that's correct.

BY ATTORNEY PISTILLI:

Q.    And then when in-person teaching resumed post-pandemic, high school teachers reported 20.2 percent of their classroom disruptions were due to social media use?

A.    That's correct.

Q.    And 5.5 percent for middle school teachers?

A.    Yes.

Q.    Last school year, '23/'24, high school teachers reported 20 percent

of their classroom disruptions were due to social media use?

A.    Yes.

Q.    And 5.3 percent for middle school teachers?

A.    Yes.

Q.    So between when in-person teaching resumed post-pandemic and the '23/'24 school year, the amount of classroom disruption time reported by high school teachers fell, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  By .2 percentage points.

BY ATTORNEY PISTILLI:

Q.    And it also fell for middle school teachers, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  By the same .2 percentage points.

BY ATTORNEY PISTILLI:

Q.    And then for the current

Page 112

year, '24/'25, high school teachers reported 14.8 percent of their classroom disruption time was spent dealing with social media issues?

A.    Yes.

Q.    And 5.2 percent for middle school teachers?

A.    Yes.

Q.    So between the '23/'24 school year and the '24/'25 school year, the amount of time high school teachers reported spending dealing with social media issues fell 5.2 percentage points?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS:  That's correct.

BY ATTORNEY PISTILLI:

Q.    And it also fell for middle school teachers over that same period?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS:  Yes.

BY ATTORNEY PISTILLI:

Page 113

Q.    Let's take a look at Paragraph 20.

Does this indicate to you that for Tucson, you sent your survey to a total of 1,077 middle and high school teachers?

A.    Yes.

But, I mean, to be completely accurate, you know, what was sent to them was an invitation to complete the survey, not the survey itself.

Q.    Fair enough.

And let's look together at Page 12.

Does this indicate to you that of all the surveys that you sent out in Tucson, you only received four responses to the question relating to in-class distraction relating to social media for the 2014 time period?

ATTORNEY JACOBSON:

Objection.   Form.

THE WITNESS:   No, I think

you're mischaracterizing it.

We had 22 responses from middle school teachers. And of those 22, only four were eligible to be asked that question.

BY ATTORNEY PISTILLI:

Q. Right. So there were only four valid responses, correct?

ATTORNEY JACOBSON:

Objection. Form.

THE WITNESS: There were four responses for that time period. I certainly believe they were valid.

BY ATTORNEY PISTILLI:

Q. And you sent out a total of 1,077 surveys, correct?

ATTORNEY JACOBSON:

Objection. Form.

THE WITNESS: Yes. But you've got, you know, two different filters here.

One being response to the survey itself. And the second

being still employed in the same school at the same -- ten years earlier.

BY ATTORNEY PISTILLI:

Q. But now turning to high school teachers, you only had eight responses to the question relating to a decade ago, correct?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS: Well, we had eight responses out of the 32 who were -- there were eight people who were eligible to be asked the question out of the 32 that responded to the survey.

BY ATTORNEY PISTILLI:

Q. And so the percentages that you report for Tucson relating to the 2014 time period were extrapolations based on only 12 responses, correct?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: They weren't

Page 116

extrapolations.  They were --
these were the numbers we
collected and what we reported.

BY ATTORNEY PISTILLI:

Q.    You collected and reported them as figures for the Tucson School District for the 2014 school year, right?

A.    Right.  Because these were the only ones who were eligible to be -- to be counted there.

Q.    Right.  But that figure for the 2014 school year is based only on 12 responses?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  In total, there were 12 respondents who were eligible to be asked that question, yes.

BY ATTORNEY PISTILLI:

Q.    And then the figures you report for 2014 were based only on those 12 responses?

ATTORNEY JACOBSON:

Page 117

Objection.  Form.

THE WITNESS:  Yes, that's correct.

BY ATTORNEY PISTILLI:

Q.    Let's take a look for a minute at Page 10.

A.    For Tucson?

Q.    Yes.

And then the question you asked here, Question 5 -- first, other than -- just so we're on the same page, other than having the -- strike that.

This is -- you asked essentially the same question to each of the six school districts, right?

A.    Yes.

Q.    And, then, the question you asked had them fill in numbers of minutes, right?

A.    That is correct.

Q.    And then how did you go from those number of minutes to calculating the percentages that you report?

A.    We used the data that we

collected in Questions 1 -- well, really Question 2.  But, In terms of a typical day, how much of your time is scheduled instruction time?

Q.    So the percentages have the minutes diverted as the numerator and the total scheduled instruction time as the denominator, essentially?

A.    Yes, essentially.

Q.    Let's take a look at Paragraph 26.

Do you see you say there, Respondents who indicated they did not know how many hours and/or minutes they are at school in a typical day were skipped to the end and subsequently removed from the data prior to analysis.

Do you see that?

A.    Yes.

Q.    And does that accurately describe your methodology for all six of the cases?

A.    Yes.

Q.    And so if somebody said they

didn't know how many hours or minutes they worked, then you didn't ask them any questions about in-class distraction, correct?

A.    Yes, that's correct.

Q.    So no further data was collected from those individuals?

A.    That's correct.

Q.    And you essentially treated them as if they hadn't responded to the survey at all?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I guess that's the implication, yes.

BY ATTORNEY PISTILLI:

Q.    And so you assumed that they were representative despite the fact that they revealed they were different in the sense that they were unable to recall the amount of time they spent working, right?

ATTORNEY JACOBSON:

Objection.  Foundation.

THE WITNESS:  I'm not sure I

Page 120

agree with that.

BY ATTORNEY PISTILLI:

Q.    We know that they are different in some way from the people who you included in your data set, right?

ATTORNEY JACOBSON:  Objection.  Foundation.

THE WITNESS:  No, I don't think we know that they're different.  They answered the question in a way that made it impossible to continue the survey.

So that's all I know.  I mean, I have no reason to believe that we don't have a representative sample here.

BY ATTORNEY PISTILLI:

Q.    Well, there -- there were two categories of people who responded to your survey, right?

There were people who felt that they could estimate the amount of time they spent on in-class instruction and there were people who felt that they

couldn't, correct?

ATTORNEY JACOBSON:

Objection.  Compound.

THE WITNESS:  No, that -- I don't think that's a way to describe --

BY ATTORNEY PISTILLI:

Q.    How would you describe it?

A.    -- describe them.

There were people who responded to the survey and there were people who didn't.  And I have no reason to believe that we don't have a representative sample of people responding.

Q.    Well, we'll get to people who didn't respond.

But right now I'm asking you about people who indicated they didn't know how many hours and/or minutes they were at school in a typical day.

Because there were some people who said they didn't know how many hours or minutes they were at school in a

Page 122

typical day, right?

A.    Yes.   There are some people who did that.

Q.    And then there were other people who felt that they were capable of answering that question, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  They did answer the question.

BY ATTORNEY PISTILLI:

Q.    Right.  And that's a difference between those two groups, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  It's just their response to the questionnaire was different -- to the question was different.

I mean, I don't know that that means that they're different types of people.

BY ATTORNEY PISTILLI:

Page 123

Q.    Well, you just don't know, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I have no reason to believe that they are really different types of people. They just answered the question in a way that made it illogical to continue an interview with them.

BY ATTORNEY PISTILLI:

Q.    But you didn't do anything to test whether they were, in fact, different types of people, right?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  They had qualified for the survey.  And we got to the point where we asked how long -- how many hours they spend in a typical day.  And, you know, they felt they couldn't answer that question.

BY ATTORNEY PISTILLI:

Page 124

Q.    Right.  And that makes them different from the people who felt they could answer the question?

ATTORNEY JACOBSON:

Objection.  Form.  And asked and answered.

THE WITNESS:  Well, I mean, any difference between responses of any individual are going to -- you know, you could characterize it that way.

So I wouldn't say that they're different.  They just gave different answers.

BY ATTORNEY PISTILLI:

Q.    Different answers relating to their ability to recall past events?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, not past events.  Current events.

BY ATTORNEY PISTILLI:

Q.    Different in terms of their ability to confidently give estimates

Page 125

regarding time spent on tasks.

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS: No. I mean, the question is, you know, in a typical day for the current school year, how many hours and/or minutes are you at school?

And of the -- and we take the answer to that question and say, of the, say, five hours you're at school on a typical day for the current school year, how much of that time is scheduled instruction time, i.e., the total time that you're scheduled to be teaching a class.

And if they say they don't know, then we're not going to continue the survey.

BY ATTORNEY PISTILLI:

Q. But you -- I understand your view that you don't think this is likely.

But you would agree with me

that if those people were different from the people who were able to answer that question in a relevant way, that would mean that your sample is not representative?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Well, I mean, you know, hypothetically. You presented a situation that I don't know that I agree that they're any different from the people who did respond, they just answered the question differently.

BY ATTORNEY PISTILLI:

Q. Right. But if they were different, that would call into question the representativeness of your data?

ATTORNEY JACOBSON: Objection. Form. And asked and answered.

THE WITNESS: If they were different hypothetically, then under that hypothetical, they

Page 127

would be different.

I mean, I'm -- I mean, you've -- but I have no reason to believe that they're any different.

BY ATTORNEY PISTILLI:

Q.    You didn't perform any testing to determine whether they're different, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I had no reason to believe that they were different.

BY ATTORNEY PISTILLI:

Q.    So you just assumed they were the same?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We sent the invitation and reminders and got a response rate that was not atypical for an Internet survey with no incentive.

Page 128

BY ATTORNEY PISTILLI:

Q.    That wasn't my question, sir.

You effectively assumed that individuals who are unable to estimate the amount of time they spent on in-class instruction were similarly situated to the individuals who completed your survey?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  And I have no reason to believe they are any different.

ATTORNEY PISTILLI:  This is a natural stopping point.  I'm happy to take, like, a five-minute break.  I'm also happy if you guys want to do lunch.  I defer to you all.  And we can do a short lunch.

ATTORNEY JACOBSON:  I'm not positive if food has been delivered, so that would factor in a little bit.

Page 129

ATTORNEY PISTILLI:  Can we go off the record?

VIDEO TECHNICIAN:  The time is 11:59 a.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 12:13 p.m., and we are on the record.

BY ATTORNEY PISTILLI:

Q.    If you could continue with Exhibit-13 and look at Page 12.

We've been talking about the number of people responding to the a-decade-ago question.

And I think you said that what you're reporting there is the total number of people eligible to respond; is that correct?

A.    Yes, that's what I said.

Q.    And could you explain what

Page 130

you mean by "eligible"?

A.    That they were still teaching at the same school ten years earlier.

Q.    But does it include everyone who was still teaching at the school ten years earlier?

A.    It includes everyone who was qualified to start the -- and provide an answer for the current school year.

Q.    And in order to be qualified to offer estimates for the current school year, what criteria applied?

A.    They had to pass all the screening questions, the quality control check, and they needed to know how many -- how much time they spent at school in a typical day and how much of that was instruction time.  Essentially, Questions 1 and 2.

Q.    Take a look, if you would, with me, at Appendix E, Page E-1.

Now, you say there were 59 completed surveys.

Page 131

A.    Yes.

Q.    But then you only report 54 data points for that current school year; is that correct?

A.    That's correct.

Q.    And so, then, who are the other four?

A.    This was something that we actually looked into yesterday in understanding the differences between the reported numbers and -- the completed surveys and the number reported in, you know, Paragraph 40.

And I'm trying to recall the conclusions.  And I believe it had to do with the respondents who answered "don't know" to the Questions 1 and 2.  So they wouldn't be included in the tables on Page 12, but they were counted as completed surveys.

Q.    So you're saying for Tucson, four people dropped out of Table 12 because they were unable to recall the amount of time they had spent working and

Page 132

the amount of that time that was instructional?

A. That's my remembrance of looking at these yesterday.

Q. And then to maybe save us all some time and paper shuffling, if we were to look at all the other reports, if there was a difference between the number of people with reported responses for the current school year and that number of completed surveys shown in Appendix E, it would be for that same reason?

A. Yes.

Q. When -- when you asked people about the amount of time they spent providing instruction, you only asked for the current time period, correct?

A. Correct.

Q. So you didn't, for instance, require someone to remember the amount of time they spent on in-class instruction in 2014 prior to answering questions about diverted time in 2014, correct?

Page 133

A.    That's correct.  But we were -- you know, it was the same teacher in the same school.  So, you know, their instruction time would have been, you know, basically, the same.

Q.    So you essentially assumed that the amount of time teachers spend on in-class instruction was the same in 2014 as it was when you administered the survey?

ATTORNEY JACOBSON:

Objection.  Form.  Misstates testimony.

THE WITNESS:  I think we assumed that it was the same throughout this -- this time period.

BY ATTORNEY PISTILLI:

Q.    Right.  So you assumed that each teacher spent the same amount of time on in-class instruction for the entirety of their tenure at the school?

ATTORNEY JACOBSON:

Objection.  Form.

Page 134

THE WITNESS:  It might -- it might vary from, you know, one year to the next.

But, again, these were the same -- same teachers and the same -- in the same schools.

BY ATTORNEY PISTILLI:

Q.  Right.  But that doesn't mean that the amount of time they spend on instruction doesn't change over time, does it?

ATTORNEY JACOBSON:  Objection.  Form.

THE WITNESS:  It doesn't necessarily mean that.  But I think it's a fair assumption.

BY ATTORNEY PISTILLI:

Q.  Did you do anything to test that assumption?

A.  No, I did not do anything to test that assumption.

Q.  Did you look at any data from the district regarding time spent in school by teachers?

Page 135

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  It was my assumption that, actually, Dr. Ward would -- had that information.

BY ATTORNEY PISTILLI:

Q.    But it's not something you looked at?

A.    No, it was not something I looked at.

Q.    Let's turn to Page 10.

A.    Are we still on Exhibit-13?

Q.    Yes.

But, again, is -- Page 10, Exhibit-13, contains the text of Question 5, correct?

A.    Correct.

Q.    And that was the same question that you asked in all six of the districts?

A.    That's correct.

Q.    And you asked respondents to estimate how many minutes in a typical

Page 136

day were diverted away from teaching during scheduled instruction time due to student use of social media, right?

A.    Yeah.  Paraphrased, yes.

Q.    And you asked that of respondents even if they didn't select social media as one of the causes of disruption to their scheduled instruction time in the current school year, right?

A.    Yes.  If they didn't identify that as a disruption, it was coded as a zero.

Q.    Right.  But you, nonetheless, went and asked them the question as to other time periods, correct?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  That's correct.

BY ATTORNEY PISTILLI:

Q.    And such a follow-up question could have led the teachers to reconsider their initial answer, correct?

Page 137

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  Well, they reconsidered their initial estimate, they only increased the amount of time diverted.  So I think it's conservative the way we treated it.

BY ATTORNEY PISTILLI:

Q.    Well, could they go back and change their prior answer?

A.    No.

Q.    And, then, you didn't ask any other questions about -- follow-up questions about time diverted due to other issues, correct?

A.    That's correct.

But the respondents would have no way of knowing that they weren't going to be asked about it.

Q.    Well, they knew they weren't asked about it, right?

A.    Only when the survey ended.

Q.    But you didn't -- after

CONFIDENTIAL

Page 138

asking an initial question about unauthorized texting, you didn't follow up on that in your survey at all?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We didn't follow it up on the survey.  But the teachers didn't know that we weren't going to.

BY ATTORNEY PISTILLI:

Q.    You didn't ask questions about student tardiness?

A.    Again, the -- we weren't trying to do a comparative -- comparative measures.  And the teachers didn't know that was the only thing we were going to be following up on.

Q.    But you didn't follow up on classroom technology failure during class, right?

ATTORNEY JACOBSON:

Objection.  Asked and answered.

THE WITNESS:  That wasn't one of the -- as I said, we only

Page 139

followed up on the social media issues. And teachers would have no way of knowing that those were the only ones -- that was the only thing we were going to follow up on.

BY ATTORNEY PISTILLI:

Q. You didn't follow up on any of the items that you asked about in your threshold question regarding in-class diversion, correct?

ATTORNEY JACOBSON: Objection. Asked and answered.

THE WITNESS: The only thing we followed up on was the social media issues.

BY ATTORNEY PISTILLI:

Q. And so you're not able to say how much time teachers spent being diverted in class, total, correct?

A. That's correct.

Q. And so, for instance, you can't tell me whether time spent on social media-related diversions have

merely replaced other forms of diversion in earlier time periods, correct?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  We didn't ask about the other time periods.  So we don't have a comparative measure.

BY ATTORNEY PISTILLI:

Q.    Well, you asked about other time periods, correct?

A.    Other time periods, yes.

Q.    But you didn't ask about other forms of diversion during any of those time periods?

A.    That's correct.

Q.    And so it's possible that any increase in time spent diverted due to social media issues merely replaced other forms of in-class distraction during earlier time periods?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well,

Page 141

hypothetically, you know, maybe that's possible. But I -- you know we measured the diversion due to social media. If that were to have declined, it doesn't mean that others would have increased.

BY ATTORNEY PISTILLI:

Q. Well, the point is, you don't know if total time spent on in-class diversions went down, went up or stayed the same during your survey period?

A. Right. We asked about social media-related issues only.

Q. Let's go back to Page 9. And this is Question 3, correct?

A. Page 9?

Q. Page 8 of this one.

A. Yes.

Q. So on Page 8, Question 3, this is the question that you asked for each of the six districts, correct?

A. Yes.

Q.    And would you agree to me -- with me that there are two separate questions that you asked relating to social media?

A.    Yes.

Q.    And there's no other category of potential in-class distraction that is listed twice here, correct?

A.    I think that's correct.

Q.    And isn't it possible that a person looking at this survey might find it significant that you asked two social media-related questions whereas every other category is only asked once?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  Well, these items are presented in randomized order.  I mean, for our convenience, we put the social media ones right up at the top, in terms of just, you know, coding and so on.  But every teacher sees

it in a different order.

And so, you know, whether they see -- see them separated by seven other items or next to each other, you know, it doesn't, you know -- they're not necessarily going to say, oh, wow, this must be about social media.

But even if it is, this only takes them, then, to the next question which has to do with, okay, so how much time was diverted due to social media?

BY ATTORNEY PISTILLI:

Q.    Well, I understand that they don't necessarily appear in this order.

But you agree with me, don't you, that there are two social media-related questions here, correct?

A.    Yes.

Q.    And no other category of possible in-class distraction is listed twice, correct?

A.    That's correct.

Q. And do you agree with me that someone responding to this survey could find that significant?

A. No, I don't think I agree with that.

Q. So no one would have a reason to wonder whether this survey was, in fact, about social media where it alone, among all of the possible options, is listed twice?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: No. I think that, you know, even if they do notice that it's listed twice, they're immediately taken to the question that asks about time spent on social media and they could, then, think, okay, and next I'm going to be asked about this and next I'm going to be asked about something else.

BY ATTORNEY PISTILLI:

Q. But it's a cue that this is

a survey focused on social media, correct?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: No, I don't believe so.

I mean, yes, I -- you're certainly correct that they're mentioned twice. But it's certainly in different contexts.

One has to do with use and activities in classroom, others have activities outside the classroom. I mean, if we -- you know, someone could just as easily assume that what we're talking about is how in-classroom distractions in total manifest themselves in terms of diverted time or outside the classroom.

I mean, you've got all sorts of stuff here.

BY ATTORNEY PISTILLI:

Q. Right. But it's your expert

Page 146

opinion that you're not in any way tipping people off that this is a social media survey when you include it, and only it, twice?

That's your expert opinion for the jury?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Yes. I don't see that as -- as biassing in any way.

BY ATTORNEY PISTILLI:

Q. You're aware, aren't you, that each of these school districts have brought lawsuits involving social media, correct?

A. Yes.

Q. And you're aware that those lawsuits are public?

A. I was unaware of these lawsuits prior to being contacted for this case. So I'm not sure what to say about how public the knowledge is.

Q. Well, are you aware that

Page 147

each of these districts trumpeted the filing of the lawsuits and press?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I haven't seen any press coverage of these lawsuits.

BY ATTORNEY PISTILLI:

Q.    It's not something you looked at?

A.    Not something I was aware of.

Q.    And are you aware that school district personnel have been involved in discovery in these lawsuits?

A.    I've been informed of that, yes.

Q.    And did you even consider the possibility that the teachers to whom you sent this survey were, in fact, well aware of the fact that their employer had brought these social media lawsuits?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS: I don't have any knowledge of what the teachers are aware of in terms of the lawsuits.

BY ATTORNEY PISTILLI:

Q. That's not something you considered when you were crafting your survey, correct?

A. You're carefully, I think, crafting the survey to, you know, make sure that we had a -- didn't have any leading questions and didn't motivate a response by people who had a particular axe to grind or anything like that.

Q. But you didn't do anything to rule out the possibility that some of the people who received your survey knew about this lawsuit?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: I mean, it's possible that they may have known about the lawsuit. But whether they connected the survey to that

Page 149

or not, until we get to the -- you know, the key questions about time diverted, it certainly wouldn't disqualify them from the survey.

BY ATTORNEY PISTILLI:

Q.    Well, when we get to the key question about time diverted, isn't it possible that a teacher would connect the survey to the litigation?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I mean, hypothetically, I guess that's possible.

BY ATTORNEY PISTILLI:

Q.    And you didn't ask any questions, for instance, about teachers' awareness of the litigation?

A.    No.  The questions that we asked are identified here.

Q.    And would you agree that if a teacher connected this survey to the litigation, that could impact the way that they responded to the questions

Page 150

about time diverted?

A.   I have no reason to think that there was any influence based on knowledge of a -- of a lawsuit.

Q.   But you didn't do any testing to rule that possibility out?

A.   As I said, I had no reason to believe that there would be a problem.

Q.   But sitting here today, you don't know whether the individuals who filled out this survey were aware of the litigation or took the litigation into account when answering your questions, right?

ATTORNEY JACOBSON:
Objection.  Asked and answered.

THE WITNESS:  I think we got -- I think people answered the questions honestly and to the best of their ability.  The -- yeah.

BY ATTORNEY PISTILLI:

Q.   So it's your expert testimony that if a survey recipient understands that a survey is related to

Page 151

litigation and understands that they can help their school out by responding in a certain way there's no potential that they did so?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Well, I don't think there's necessarily a right or wrong answer to this question about, you know, time diverted.

BY ATTORNEY PISTILLI:

Q. You don't think that --

ATTORNEY JACOBSON: The witness was still speaking. So I would ask that you please let him finish his testimony before asking another question.

BY ATTORNEY PISTILLI:

Q. Were you still speaking?

A. I think so. But go ahead.

ATTORNEY JACOBSON: It's happened a few times now. So I would just be cognizant, as you asked at the beginning of the

Page 152

deposition that both of you make sure the other is done speaking.

BY ATTORNEY PISTILLI:

Q.    My question is not whether there's a right-or-wrong answer.

My question is, if someone knows about the lawsuit, isn't it possible that they will understand that saying they spent more time diverted to social media would be helpful to the lawsuit?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I really don't know what they would -- what they would think under that hypothetical situation.

BY ATTORNEY PISTILLI:

Q.    But it's not anything that you tried to test for?

A.    That's right.  There's no mention of the lawsuit in this survey.

Q.    You also didn't ask teachers any questions designed to test their

Page 153

ability to recall events going, in some cases, back more than a decade, correct?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  Well, we did pre-testing of the survey in which, you know, it was clear that teachers were able to appropriately provide answers for both the current year as well as looking back over sometimes as much as a decade.

The survey was carefully designed to provide kind of guardrails or use the current time diverted estimate as a way of them being able to say, is it more or less now than it was then and how much more or less, so that they essentially were able to give us the pattern of time diverted over -- over these time periods.

And as you point out, I mean, the numbers went down

Page 154

over -- in a number of cases, which would certainly indicate that, you know, they weren't biassing their responses to help the school district.

BY ATTORNEY PISTILLI:

Q.   Let's talk a little bit about the pre-testing.

Can you describe generally what you did to pre-test the survey?

A.   So we recruited teachers in a variety of both middle and high school, teaching a variety of grades and subjects.  And these were teachers who were not in any of the 12 original districts.

They were invited to participate in the -- in this interview process.  They were sent a link to the program survey.

And we spoke -- spoke to them by phone as they were taking the survey in what I term a ride-along kind of situation.  Where, as they answer each

question, they explained the thinking and the thought process about that -- about that question and how they arrived at their answer.

Q.    How many individual teachers were involved in the pre-testing?

A.    Twenty-three.

Q.    And, then, did your staff who were on the phone with those teachers have a script that they used?

A.    Well, we had the survey. And so at each point it was asking -- you know, asking them, you know, so where did that -- how did you reach that conclusion?  Why did you answer it that way?

Q.    Right.  But were they provided with a list of questions that they should ask to follow up on for each question?

A.    No.  Just the general, you know, how did you reach that conclusion, how did you reach -- you know, and it was trying to keep it conversational.

Page 156

Q.    And were they -- the pre-tests recorded?

A.    No.

Q.    Were there any memos prepared that memorialized the calls after they happened?

A.    Not beyond just having the schedule of calls.  I was briefed after the calls, and I listened to at least a half a dozen of them myself.

Q.    And what, if any, questions were asked to probe the ability of teachers to recall down to the minute time spent relating to social media diversion up to a decade ago?

ATTORNEY JACOBSON:
     Objection.  Form.
     THE WITNESS:  In each case, you know, as they answered the question, we would ask them to explain, you know, how did you reach that conclusion, how did you arrive at that?
     And what we heard was that,

you know, they were looking and thinking about, okay, so was, you know, a year ago more or less than it is now and how much more or less and then going back and back and back.

BY ATTORNEY PISTILLI:

Q.    Did you ask them whether they felt confident in their ability to recall the amount of time spent on in-class disruption down to the minute?

A.    They -- you know, my perception, in listening to the interviews, was that they were very comfortable making those -- those estimates.

Q.    But did you actually ask them the question?

A.    No, I don't believe we did.

Q.    Did you ask them any other questions that were designed to probe the accuracy of their recall over a significant number of years?

ATTORNEY JACOBSON:

Page 158

Objection.  Form.

THE WITNESS:  Well -- and to the extent that we were asking them to explain their thought process and how they reached a particular -- reached a particular answer, we felt that was -- that was the appropriate way to gauge their comfort in making those estimates.

BY ATTORNEY PISTILLI:

Q.    Did you make any changes to the survey as a result of the pre-test?

A.    The -- I don't recall any specific or significant changes.  There might have been some wording changes.

But, you know, I was very comfortable that we were able to get accurate and well-thought-out answers to the questions.

Q.    But you didn't do anything to try to objectively verify their ability to recall, down to the minute, events over a significant number of

Page 159

years, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, again, the process of kind of asking about the current time period and then time periods prior to that gives a -- kind of these -- what I was terming as guardrails around their answer.

And so the thought process was, is it more or is it less, how much more, how much less was what was -- was what I was hearing in the interviews.

BY ATTORNEY PISTILLI:

Q.   Well, my question was a little bit different.

It's about whether you did anything to objectively verify their ability to accurately recall, down to the minute, events over a significant period of years?

ATTORNEY JACOBSON:

Page 160

Objection.  Form.

THE WITNESS:  We didn't have any -- any questions to do that. And I have no reason to believe that they weren't accurate estimates.

BY ATTORNEY PISTILLI:

Q.    But it's not something you tested?

A.    Yeah, I'm not sure what sort of test you're thinking about.

Q.    But you agree with me you didn't test it?

ATTORNEY JACOBSON:

Objection.  Form.

Mischaracterizes testimony.

THE WITNESS:  Well, I mean, as I said, in the pre-test, you know, we heard people were very comfortable with making these estimates and responding to the questions as we -- as we drew them up.

BY ATTORNEY PISTILLI:

Page 161

Q.    Right.  But my question is about the pre-test and whether, during the course of the pre-test, you did anything to objectively verify their ability to perform these down-to-the-minute recollections over a significant period of time.

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, what we did was, they took the survey and as they answered the questions, they explained the thought process.

And I felt that was the appropriate way to conduct the pre-test.

BY ATTORNEY PISTILLI:

Q.    You would agree with me that that's not any form of objective verification?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  The -- it

Page 162

wasn't an attempt to verify their responses. We accepted their responses because they sounded, you know, appropriately well reasoned.

BY ATTORNEY PISTILLI:

Q. And turning back to the survey itself, you didn't ask teachers any follow-up questions to ascertain their ability to reliably recall, down to the minute, events over a significant time period, right?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS: You know, if they didn't recall or didn't remember, there was a clear option of checking "don't know."

And so to the extent that they did that, you know, we didn't include that as -- as their response there.

BY ATTORNEY PISTILLI:

Q. But my question is about

what, if anything, you did to verify the accuracy of reports of people who, for whatever reason, chose to answer the question?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Yeah, I'm not sure what you're suggesting should have been done.

The -- as I said, the description of the thought process sounded, to me and in my experience, as being, you know, appropriate for the question.

And they had plenty of opportunity to say they don't know or no minutes were diverted.

BY ATTORNEY PISTILLI:

Q. You didn't ask them any objectively verifiable facts to test their memory, right?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: We didn't --

it wasn't a -- there wasn't a
separate memory -- memory test.

BY ATTORNEY PISTILLI:

Q.    Would you agree with me that the longer time passes, the more challenging it is for a person to recall events accurately?

A.    I think it depends on what the event is and how you characterize it to them.

I think -- you know, for example, I think everyone can probably know where they were on 9/11, of a certain age, I guess.  But that doesn't mean I can ask them what they had for dinner that night.

Q.    Right.  And you couldn't ask them how many minutes they spent grocery shopping on 9/11?

A.    I could probably ask them if they went grocery shopping on 9/11.  I mean, it depends on what the question is and the context that you're asking it.

Q.    Right.  So even if with a

Page 165

salient anchor like 9/11, it wouldn't be reason to believe for people to remember down to the minute the tasks they spent time on that day?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: I think it depends on what the task is.

BY ATTORNEY PISTILLI:

Q. If you asked them how many minutes they spent on the phone that day?

A. I mean, that's an interesting -- you know -- but I could probably ask them how much time they spent watching television that day.

I mean, it's -- you know, it's one of those it depends.

ATTORNEY PISTILLI: Let's take a look at Tab 39.

- - -

(Whereupon, Exhibit Klein-14, No Bates, Teachers' Working Time From Time-Use Data: Consequences of the Invalidity of

Page 166

Survey Questions For Teachers, Researchers, and Policy, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    In the course of preparing your report or rebuttal report, did you look at this article?

A.    I don't believe so.

Q.    Are you aware that this was cited by Stern in his report?

A.    I believe I remember that.

Q.    And this is a research paper entitled, Teachers' Working Time From Time Use Data:  Consequences of the Invalidity of Survey Questions for Teachers, Researchers and Policy.

Do you see that?

A.    I see the title, yes.

Q.    And this was published in Teaching and Teacher Education in 2022?

A.    It looks like the copyright is 2021.  But I don't know.

Q.    I'm just looking at the --

Page 167

A.    It says -- the heading says -- yeah, I'm not sure why the copyright would be different, but.

Q.    And did you, in either of your reports, cite any literature addressing the ability of teachers to recall time spent on discrete tasks over significant periods of time?

A.    I think I did in looking at the -- one of -- one of his footnotes that talked about tying estimates to important dates, which is exactly what we did.

Q.    You're referring to the event calendar study?

A.    Yes.

Q.    Okay.  We'll get to that.

But nothing that you cited, including what you just referred to, was an academic article discussing the ability of teachers to recall time spent over significant periods, correct?

ATTORNEY JACOBSON:

Objection to form.

Page 168

THE WITNESS:  I'm sorry, I didn't understand the question.

BY ATTORNEY PISTILLI:

Q.    Sure.

This is an article specifically about the ability of teachers to recall time spent on tasks at work over significant periods of time, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I haven't really read this article, so --

BY ATTORNEY PISTILLI:

Q.    Did you read it after you got the Stern report?

A.    No.

Q.    Did you cite any articles specifically addressing the question of teacher recall over significant periods of time?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, I don't

Page 169

believe so.

Or we can look at my rebuttal report and see. But I don't recall that.

BY ATTORNEY PISTILLI:

Q. So if we look together at Page 2, Section 2.2.

And this academic article reports that, The difficulties that teachers face when estimating their working hours in questionnaires can result in systematic error related to the validity of the measuring instrument.

Do you disagree with the sociology professor who wrote this article?

ATTORNEY JACOBSON:

Objection. Form.

THE WITNESS: I would need to read the article in more detail to understand what they're asking teachers to estimate.

BY ATTORNEY PISTILLI:

Q. Take your time.

Page 170

A.    You really want me to read the whole article?

Q.    Well, I want you to answer my question whether or not you disagree with the academic literature indicating that teachers face difficulties when estimating their working hours in questionnaires that can lead to systematic error?

ATTORNEY JACOBSON:  And the witness has testified that he hadn't read this article before and would need to to understand the article in its entirety to answer that question.

THE WITNESS:  This seems to be addressing the issue of total working time as opposed to specific elements of --

BY ATTORNEY PISTILLI:

Q.    Well, in the first instance, would you agree with me that it's easier to estimate total work time than to estimate subcomponents?

CONFIDENTIAL

Page 171

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I don't necessarily agree with that.

BY ATTORNEY PISTILLI:

Q.    So you think it's easier to tell me each of the specific tasks you did in a workday than to tell me how long your workday was?

ATTORNEY JACOBSON:

Objection.  Mischaracterizes testimony.

THE WITNESS:  I think it depends on what the task is and how the question is asked.

ATTORNEY JACOBSON:  We're coming up on an hour pretty soon, and I've been told lunch has been delivered.

ATTORNEY PISTILLI:  Sure. We can stop now.  That's fine.

VIDEO TECHNICIAN:  The time is 1:06 p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 1:44 p.m., and we are on the record.

BY ATTORNEY PISTILLI:

Q.    So before the break, Mr. Klein, we were looking at Exhibit-14, which is the research paper titled, Teachers' Working Time From Time Use Data:  Consequences of the Invalidity of Survey Questions for Teachers, Researchers and Policy.

Do you recall that?

A.    Yes.

Q.    The lead author of that article is Petrus te Braak?

A.    Yes.

Q.    He's a sociology professor?

A.    I didn't look at his credentials, but --

Q.    And I believe you suggested

Page 173

before the break you thought that this article concerned estimates of total work time?

A.    I don't remember what I said.

Q.    Let me direct your attention to Page 8 and Section 4.3.

Do you see that's titled, Working Hours Per Subactivity?

A.    Yes.

Q.    You say, In Step 3, we examined differences in the average working time per subactivity.

Do you see that?

A.    Yes.

Q.    And then if you look back on Page 6, in Table 2, it lists the six subactivities that they asked teachers about?

A.    Yes.

Q.    And so do you understand now that part of what this article talks about is the ability of teachers to recall the amount of time spent on

Page 174

discrete tasks during the school day?

ATTORNEY JACOBSON:  And I would just note that earlier the witness had testified that he would need to read the entire document to --

ATTORNEY PISTILLI:  I gave him the opportunity to read for as long as he wanted.

ATTORNEY JACOBSON:  Correct. And that was still going on before the break.

BY ATTORNEY PISTILLI:

Q.    Do you need to --

A.    Well, I do know note that these subactivities mention social media or dealing with classroom interruptions.

Q.    This is an article about the ability of teachers to recall subactivities during the workday, correct?

A.    Yes.

But it also, as I recall when I -- when I looked at it, it was --

labeled the surveys as being the current standard for how you go about doing -- here, measuring the work times has become standard practice in teachers' questionnaires.

So I don't know whether diaries are more or less accurate. This says they give different results. But I don't know if they would give different results if the subactivity was dealing with interruptions due to social media.

Q. Do you see on Page 2 it says, The difficulties that teachers face when estimating their working hours in questionnaires can result in systemic error related to the validity of the measuring instrument.

Do you have any basis to dispute that statement?

ATTORNEY JACOBSON:
Objection. Form.

THE WITNESS: It says that it can result. It doesn't say does result. And it says that

the -- it is often assumed that the related error is random and would, therefore, have no effect on the results.

So I don't know whether -- I don't think this says anything about social media.

BY ATTORNEY PISTILLI:

Q. I'm not asking you about social media.

I'm asking you questions about the ability of teachers to accurately report the amount of time spent on events in the past.

A. And I think what I -- what I've said has been that in the pre-test interviews, it sounded like the teachers were, you know, perfectly able to estimate the amount of classroom disruption time they had to deal with due to social media issues.

Q. I'm asking -- let me ask you this: Do you have any literature you can cite that would support the proposition

that teachers are capable of recalling, down to the minute, time spent on issues relating to social media?

A. I can't quote a study that would match up with each one of those elements of your -- your question.

But the -- you know, as I note here, the, you know, teacher working time estimates are typically -- traditionally measured by interviews or questionnaires, okay.

I mean, so we did it the way it's typically done.

Q. And did you -- take a look with me at Page 13.

Do you see where it says, Recent research has raised concerns about the accuracy of teachers' working time through traditional questionnaires. Our study demonstrates that these concerns are indeed justified.

Do you have any basis to dispute that statement, sir?

A. Having not read this entire

Page 178

article or really seen it before, no, I can't -- I'm not qualified to dispute that.

Q. Well, again, I'd invite you to take as much time as you need to look at the article.

After you've done that, please let me know if you have any basis to dispute the conclusions of this academic literature.

A. Well, again, this academic literature doesn't have anything to do with social media.

But -- and, you know, I don't think I'm qualified to dispute the results in a -- in a field that I'm not an expert in.

Q. And that field we're talking about here is sociology?

A. I suppose.

Q. And what the sociologists are doing is measuring the amount of time that teachers spend on tasks, right?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS: Okay. So let me -- let me do some reading here.

Well, I think the, you know, the -- when you look at the activity list used for the time diary, there's nothing in here that deals with dealing with disruptions in classrooms due to anything, much less due to social media.

And I don't understand the claim of a diary being more accurate than -- than a questionnaire. A questionnaire is, as it notes, the typical and traditional way of measuring teacher time.

So, you know, I guess this is -- you know, falls into the interesting if true category.

BY ATTORNEY PISTILLI:

Q.    So my question was, do you agree with the conclusion of this

Page 180

academic research paper that, Recent research has raised concerns about the accuracy of teachers' working time through traditional questionnaires. Our study demonstrates that these concerns are, indeed, justified.

A.    I have no reason to agree or disagree with that.

Q.    And you can't cite me any literature that reaches a different conclusion, can you?

A.    No, I cannot.

Q.    And then do you see this academic researcher also concludes that questionnaires gauging teachers' working hours are prone to a number of measurement errors?

Do you see that?

A.    That's in, what, 2.2?

Q.    6.

A.    2.6?

Q.    No, 6.  Right after the second sentence of the conclusion.

Questionnaires gauging

teachers' working hours are prone to a number of measurement errors when stratifying by teachers' profiles or the various work-related activities.

Do you see that?

A. Yes, I see that.

Q. And do you have any basis to dispute that statement?

A. I don't have any basis to support that statement.

I do note that this is a study that was done in Belgium, which, you know, may be very different than the U.S.

Q. Are you aware of any literature that calls into question the validity of these authors' conclusion?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: I don't have any basis for either accepting or disputing these.

BY ATTORNEY PISTILLI:

Q. And are you aware of any

Page 182

literature supporting the proposition that there are differences between the ability of teachers in Belgium and the United States to recollect issues?

A.    No.  But, again, this has nothing to do with social media.

VIDEO TECHNICIAN:  Can we go off the record?

ATTORNEY PISTILLI:  Yes. Can we go off the record?

VIDEO TECHNICIAN:  The time is 2:02 p.m.  We are going off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 2:11 p.m., and we are on the record.

BY ATTORNEY PISTILLI:

Q.    Do you -- continuing with Exhibit-14, could you turn to Page 9, please?

Page 183

A.    Okay.

Q.    Do you see Section 5, Discussion, second paragraph, it says, Given the complexity of teachers' work, classic questionnaire methodologies are prone to a number of measurement errors when estimating teachers' working time.

Do you see that?

A.    Yes.

Q.    And you see it then cites a couple academic articles for that proposition?

A.    I see the citations, yes.

Q.    And so sitting here today, do you have any basis to dispute the conclusion that, given the complexity of teachers' work, classic questionnaire methodologies are prone to a number of measurement errors when estimating teachers' working time?

A.    I don't have any basis for disputing or supporting that.

Q.    Are you aware of any literature calling that conclusion into

Page 184

question?

A. No, I'm not aware of any literature calling that into question.

I don't -- I don't understand why the complexity of their work would make classic questionnaire methodologies more prone to measurement error than a diary would be, but.

Q. Well, look with me, if you would, at Page 2.

Do you see where it says, Collecting data on the working time of teachers on a regular basis is challenging, as the teaching profession consists of a number of complex tasks that take place in different contexts.

Do you see that?

A. No.

Q. The top of Page 2, first full paragraph.

A. Okay.

So this is looking at the total work time, not the specific number of minutes that are taken up by social

Page 185

media disruptions.

Q.    Well, my -- my question is whether you have any basis to dispute the statement that, Collecting data on the working time of teachers on a regular basis is challenging, as the teaching profession consists of a number of complex tasks that take place in different contexts?

A.    And the question is do I have any -- I'm sorry?

Q.    Do you have any basis to dispute that statement?

A.    I don't have any basis for, you know, supporting that statement either.

I mean, it seems to be drawing the conclusion that because it consists of a number of complex tasks that take place in different contexts, that collecting data is difficult.  I mean, maybe that is true.

But I don't see what that has to do with social media and

Page 186

disruptions in the classroom.

Q.    Well, but it has to do with the measurement of teacher work time, right?

A.    Total time, yes.

ATTORNEY JACOBSON:  Object to the form.

BY ATTORNEY PISTILLI:

Q.    Take a look with me, if you would, further on in the second column of Page 2.

Do you see the paragraph toward the middle that starts, Teachers' working time?

A.    Yes.

Q.    And then do you see it cites the Chenu article for the proposition that, Compared to other occupational sectors, it is particularly difficult for teachers to assess working time through such methods, by which it means traditional interviews or questionnaires?

A.    Yes, I see that.

Q.    And do you have any basis to

CONFIDENTIAL

Page 187

dispute that statement?

A.    I haven't seen the Chenu article, so I'm not sure.  I don't have a basis for saying anything one way or the other.  I don't have an opinion on it.

Q.    This is not something you looked at?

A.    That's correct.

Q.    Take a look with me, if you would, at Page 3.

Do you see the first full paragraph on Page 3 relating to recall bias?

A.    I'm sorry, which paragraph?

Q.    Page 3, first full paragraph.

A.    Where it starts, A second measurement error?

Q.    Yes.

And this paragraph relates to recall bias, right?

A.    Okay.  I see that, yes.

Q.    And are you familiar with the concept of recall bias?

CONFIDENTIAL

Page 188

A.    I'm not sure.

Q.    When you design surveys, do you attempt to ensure that the results aren't impacted by recall bias?

A.    I'm not sure how recall bias is being defined in this situation.

Q.    How do you define recall bias?

A.    I don't think I have a working definition of recall bias. I'm not sure what it means, what it's referring to here. It doesn't seem to define it.

Q.    Would you agree that in order for a survey to generate valid results, the respondent must have the correct information, manage to recall it at the time of the survey, and be able to provide it in the correct way?

ATTORNEY JACOBSON: Objection. Compound.

THE WITNESS: Well, that's the -- you know, you're paraphrasing the sentence in the

Page 189

paper.

You know, I think that in the pre-test we found that the teachers did have that information and were able to recall it at the time of the survey.

So if that's what recall bias is, then that -- I'm not concerned about it.

BY ATTORNEY PISTILLI:

Q. Do you see the statement, In the case of teachers, the question arises as to whether or not teachers correctly recalled their working hours over a given period of time that takes into account the irregularity of their daily cycles, the number of different aspects of their job and the open-ended nature of their work?

Do you see that?

A. Yes.

Q. Do you have any basis to dispute that statement?

A. It doesn't seem to be making

CONFIDENTIAL

Page 190

a statement. It says the question arises as to whether or not teachers correctly recall, not making a statement that the teachers don't recall or can't recall.

Q. Well, in fact, as we discussed previously, the conclusion of this article is that recent research raises concerns about the accuracy of teachers' working time estimates through survey questionnaires, right?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: In Belgium, yes. In total.

But not involving disruptions due to social media.

BY ATTORNEY PISTILLI:

Q. But this survey specifically looks at teachers' ability to recall the amount of time they devoted to an enumerated set of discrete tasks during a workday, correct?

A. Correct. It seems a pretty burdensome process compared to the

Page 191

simplicity of focusing in on repercussions of social media use in the classroom.

Q.    Do you see where it says, A third measure of error relates to the assumption that the respondent is sincere in their responses?

Do you see that?

A.    And this is?

Q.    Directly below the paragraph we've been looking at.

A.    I'm sorry.  What page are we on?

Q.    We're on Page 3.

A.    Yes, I see that.

Q.    And do you agree that error can be introduced into survey responses if the respondent is not sincere in their responses?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:

Hypothetically, if they're not sincere in their responses, then,

Page 192

you know, that could result in measurement error.

But I have no reason to believe that the respondents to our survey weren't sincere in their responses.

BY ATTORNEY PISTILLI:

Q. But you didn't do anything to test whether they were sincere in their responses, correct?

A. My experience as a market researcher is that when respondents undertake to take a survey, you know, they are sincere in their responses and are responding to the best of their ability.

Q. But in the market research work you do --

A. Survey research, in general. Not just market research.

Q. Well, the survey here directly related to a subject about which the respondent very well could have been aware that their school district had a

Page 193

direct financial interest, correct?

A.    Hypothetically, that's possible.

Q.    And, again, not something you tested?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  We didn't test for knowledge of the lawsuit.

BY ATTORNEY PISTILLI:

Q.    Let's take a look at another article.

ATTORNEY PEILEN:  Tab 37.

-  -  -

(Whereupon, Exhibit Klein-15, No Bates, Improving the Quality of Retrospective Reports: Calendar Interviewing Methodologies was marked for identification.)

-  -  -

BY ATTORNEY PISTILLI:

Q.    Exhibit-15.  Take a minute to look at Exhibit-15 and let me know if

this is something you're familiar with.

A.    Yeah, I recognize this as a -- as one of the articles that was cited by -- in the rebuttal to my report that described an event history calendar.

I didn't read the article, though.

Q.    So you cite it in your report, but you didn't read it?

A.    I said -- I think I said I -- that I noted that it was footnoted in one of the rebuttal reports.

But no, I did not read it.

- - -

(Whereupon, Exhibit Klein-16, No Bates, 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, Charleston, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    So we're going to mark as

Page 195

Exhibit-16 just one of your rebuttal reports.

If you could turn to Page 3.

A.    Yes.

Q.    Paragraph 8.

A.    Yes.

Q.    And do you see that Footnote 3 is a citation to Belli?

A.    Yes.

Q.    And then the title is, Improving Retrospective Reports and Surveys?

A.    Yes.

Q.    Now this citation is a little bit different, but is it your understanding that this was the article that you meant to refer to in your report?

A.    I believe so.

Q.    And you, in your report, don't you rely on this article to respond to some of Mr. Stern's critiques, right?

A.    Yes.

Q.    And in particular, you cite

Page 196

this on the topic of retrospective reporting and validity of results based on retrospective reporting?

A. Yes.

Q. And, in fact, this is the only thing that you cite in order to support the proposition that your survey is aligned with the concept of an event history calendar; is that right?

A. That's correct.

Q. What's an event history calendar?

A. Let me make sure I get the definition here right.

So event history calendar uses, as it says here on -- there's no page number.

It includes dates of noteworthy events for interviewers to use as temporal anchors. It's really describing the qualitative interviewing not quantitative interviewing as we did here.

But it points out that by

Page 197

using clearly identified dates, the interview produces more information, better information, and that the interviewee enjoys the task more, which is kind of irrelevant here, given it's an Internet interview.

But I think what it implies for our -- my survey is that by tying it to specific events, the shutdown prior to COVID or -- and the coming back to in-person instruction, allows the respondent to think about those dates and recognize what was going on at that time as it relates to classroom -- diversion of classroom time due to social media.

Q.    So just so it's clear, event history calendars are survey methodologies that involve a narrative or conversational style of respondent expression, right?

A.    It's a qualitative interviewing style, yes.

Q.    And you didn't do that, right?

CONFIDENTIAL

Page 198

A.    No, we used a quantitative style.

Q.    Just a couple of other questions about this article.

First, you found it appropriate to rely on this article, right?

A.    I point -- I used it to support the validity of the data that we collected, just as Dr. Stern did to criticize it.

Q.    But there's nothing in this article about social media, right?

A.    No, there's not.

Q.    But, still, somehow you're able to find some relevance to it, right?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  I think so, yes.

BY ATTORNEY PISTILLI:

Q.    Because that's -- that's what you do, right?  The articles aren't going to be about exactly the question

Page 199

you're asking and they still have some relevance to the debate, right?

A.    Some relevance, usually.

Q.    All right.  We'll come back to this article?

ATTORNEY PISTILLI:  But right now I'm going to give you Exhibit-17, which is --

-   -   -

(Whereupon, Exhibit Klein-17, No Bates, Event History Calendar, Lavrakas, was marked for identification.)

-   -   -

BY ATTORNEY PISTILLI:

Q.    Do you see that Exhibit-17 is an entry from the Encyclopedia of Survey Research Methods?

A.    Yes.

Q.    Is that a reference that you're familiar with?

A.    No.

Q.    Do you see that this is an encyclopedia entry defining an event

Page 200

history calendar?

A.    That's what it appears to be, yes.

Q.    So we can look at getting another copy of this.  But for now I can represent to you -- I'm not sure why it's not appearing -- that this entry was co-authored by Belli, whose article we were just discussing.

ATTORNEY JACOBSON:  I would object to any testimony being offered without a complete exhibit and without information that counsel is representing without it being shown in the exhibit.

BY ATTORNEY PISTILLI:

Q.    So looking at Page 2, do you see the definition of an event history calendar begins by saying, The event history calendar is a conversational interviewing approach, right?

A.    Yes.

Q.    So, again, that's not what you did, right?

Page 201

A.    That's correct.  We used a quantitative Internet survey.

Q.    And then do you see, looking further down, toward the middle of the page, one of the points it makes is that an event history calendar uses parallel retrieval cues?

Do you see that?

A.    Can you give me an approximate line?

Q.    Sure.  Look -- look starting where the Page 247 break is.

A.    Oh, okay.

Okay.  Yes, I see it.

Q.    And parallel retrieval, right, involves using different types of events to help the respondent situate specific events in a timeline, right?

A.    It's not a phrase I'm familiar with.

Q.    Are you familiar with the fact that it's a component of the event history calendar approach?

ATTORNEY JACOBSON:

Page 202

Objection to form.

THE WITNESS: Again, I'm -- it's -- I'm not familiar with the -- with the phrase. I mean, the concept seems straightforward.

BY ATTORNEY PISTILLI:

Q. But the concept here, as they -- they give an example as, you know, you might ask about periods of unemployment and periods of change in residence because those may help the respondent more accurately situate those events in time, right?

A. Right.

Q. But you didn't rely on any parallel retrieval cues in your survey, right?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Well, I didn't, for example, put a date -- I didn't say March of 2020 and the school shut down.

I guess that would be an

Page 203

example of a parallel or --

BY ATTORNEY PISTILLI:

Q.   Well, no.  You didn't, for instance, ask teachers about a timeline of their life events to help them situate responses relating to social media, right?

A.   Well, we asked them, you know, when you first started teaching.

And life events like, you know, losing your job due to COVID and so on, I think, would qualify as a life event.

Q.   It's your testimony that the teachers lost their job due to COVID?

A.   Some did.

Q.   Do you see where it says, It's the use of the respondents' own remembered events as cues to recall less easily retrieved information that is hypothesized to lead to benefits in data?

A.   I'm sorry, where would that be?

Q.   The very bottom of the page

Page 204

we're looking at.

A.   It's hypothesized to do that.  I see that.

Q.   And you didn't allow your respondents, through a flexible conversational interviewing style, to themselves generate the life events that were used as cues in your survey, right?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  No.  We used -- we used an Internet survey that tied their responses to events that they would be naturally familiar with.

BY ATTORNEY PISTILLI:

Q.   But you didn't allow them to -- strike that.

You didn't use the respondents' own remembered events as cues, correct?

A.   Except when we asked them, you know, to estimate the time diverted when they first began teaching.

CONFIDENTIAL

Page 205

So that was their own event. Their own life event.

Q.    They didn't select the life events that they would use as anchors, correct?

A.    That's correct.  This was a quantitative interview where we wanted to tabulate results.

Q.    Right.  But in a conversational -- in an event history calendar approach, the respondents select the life events that are used as the cues.

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  In this version of it, yes.

BY ATTORNEY PISTILLI:

Q.    Take a look with me, if you would, at the next page.

Do you see where it says, In addition to the length of the reference period, instrument designers need to determine the smallest units of time in

Page 206

which life events are to be allocated, whether years, months or, in some instances, thirds of a month.

Do you see that?

A.    No.

Q.    The third full sentence on Page 3.

A.    Third full sentence.

Oh, okay.  Thank you.

Okay.  I see that.

Q.    And so this indicates that the smallest acceptable unit of time would be, in some instances, thirds of a month, correct?

A.    For locating life events, not for estimating the amount of time diverted to teaching due to social media.

Q.    And the life events here -- you asked people to estimate social media diversion going back multiple years down to the minute, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, not down

Page 207

to the minute.  How many minutes --

BY ATTORNEY PISTILLI:

Q.    Right.

A.    -- were spent dealing with disruptions due to student use of social media.

And it is in the context of what that experience has been in the current school year, the most recent past school year, and so on as appropriate for how long they've been teaching.

Q.    Can you point me to any academic article or other support for the proposition that an event calendar history can appropriately be used to ask questions getting down as granular as the number of minutes devoted in a day to specific tasks?

A.    I hadn't seen the, you know, specific definition of event history calendar before seeing the rebuttal report.

And what I do believe and

recognize I've done is essentially used that concept in the design of the survey, not the, you know, prescribed step-by-step qualitative interviewing process that is -- was the basis for these event history calendars, but converted that to a quantitative survey that could be administered to over 2,000 teachers over the Internet.

Q. My question -- so there was -- my question, sir, was whether you can point me to any academic literature supporting use of calendar interviewing methodologies that ask the respondents to recall time spent down to the level of minutes on a given day?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: The -- no, I can't point you to a -- any specific academic reference.

But it feels like -- and I believe that this definition that you've provided supports what we

did.

BY ATTORNEY PISTILLI:

Q. Let's turn back to Exhibit-15, which, again, is the article that you cited in support of your methodology, right?

A. And which Dr. Stern supported -- cited in support of his criticism.

Q. And do you see in the introduction there where it says, Research on human memory suggests that the quality of data obtained through retrospective reporting is seriously compromised by the limitations on respondent memory?

Do you see that?

A. Yes.

Q. Do you have any basis to dispute that statement?

A. I think we actually dealt with that in our survey by tying it to specific memorable events.

I think if we -- if we'd

Page 210

picked a random date and asked about that, that would have been a challenge for a respondent.

But the -- you know, the -- by tying it to the events around COVID, I think we got good results, valid results that -- that are accurate and usable for Dr. Ward's purposes.

Q. Well, but this study we're looking at is about the use of event history calendar techniques, correct?

A. Yes.

Q. If you'd look with me, if you would, and I recognize this doesn't have pages, but the section toward the very beginning titled, The Potential of Event History Calendars?

A. Yes.

Q. And it says, Problems with the quality of retrospective reports obtained with Q-list interviews may be ameliorated with new methodologies that, A, optimize usage of autobiographical memory cues, and, B, allow for a more

Page 211

narrative or conversational style of respondent expression, correct?

A.    That's what it says, yes.

Q.    And you didn't do anything that involved a narrative or a conversational style of respondent expression, correct?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  No.  We basically translated that into the quantitative interviewing that we did.

BY ATTORNEY PISTILLI:

Q.    Well, but the conclusion we were just looking at suggests that there are serious recall issues when you do it via quantitative interviewing method, correct?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  No, I don't think that's what I said.

BY ATTORNEY PISTILLI:

Page 212

Q.    That's what this article says, right?

A.    I don't think this article says anything about quantitative interviewing.

Q.    The use of traditional Q-list approaches results in retrospective reporting errors that become considerably more pronounced with events that have occurred in the more distant past.

Do you see that right below the introduction?

A.    Yes.

Q.    You don't have any basis to dispute that statement, do you?

A.    No.  I think that that's why we designed the survey the way we did.

Q.    You did a Q-list survey?

A.    The -- we did a quantitative survey and tabulated the results.  I don't think that what we did would necessarily fall into the category of a Q-list, question list.

We asked questions, as I've done for 50 years or more, and got answers that we tabulated and that Dr. Ward appropriately used in his analysis.

Q. You asked a list of questions, right?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: It was a questionnaire, yes.

BY ATTORNEY PISTILLI:

Q. Now, let's look further back in this article and talk about the types of things that these event history calendars attempt to measure.

And take as much time as you'd like, but let me know if this article indicates or provides any examples of event history calendars being used to represent -- to -- strike that.

Let me know if this article provides any examples of event history calendars being used to measure time

Page 214

spent on a daily or even weekly basis.

Are you able to answer my question, sir?

A.    Could you repeat your question, please?

ATTORNEY JACOBSON:  And I'll just note for the record the witness was continuing to review the document, as he had been invited to do by counsel before answering the question.

BY ATTORNEY PISTILLI:

Q.    And to remind you, the question is, does this article provide any examples of event history calendars being used to measure time spent on a daily or weekly basis?

A.    It's doesn't appear to have any examples of that.

Q.    It measures things like whether, at a given point in time, you were employed and whether you were full time or part time, right?  That's the sort of thing that --

Page 215

A.    That's right.

Q.    -- that's being used here.

And can you point me to any other examples of event historical calendars being used in the academic literature to measure time spent on a daily basis?

A.    No.  As I said earlier, I hadn't come across the term "event history calendar" until I saw it in the rebuttal report and realized that we've been doing it that way ourselves without reference to this report -- this particular paper.

ATTORNEY PISTILLI:  Good time for a break?

ATTORNEY JACOBSON:  Yes.

VIDEO TECHNICIAN:  The time is 2:58 p.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

Page 216

(Whereupon, Exhibit Klein-18, No Bates, 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, Breathitt, was marked for identification.)

- - -

(Whereupon, Exhibit Klein-19, No Bates, 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, DeKalb, was marked for identification.)

- - -

(Whereupon, Exhibit Klein-20, No Bates, 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, Harford, was marked for identification.)

- - -

Page 217

(Whereupon, Exhibit Klein-21, No Bates, 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, Irvington, was marked for identification.)

- - -

(Whereupon, Exhibit Klein-22, No Bates, 8/1/25 Rebuttal Expert Report Replying to the Reports of Dr. Michael J. Stern and Dr. Darius Lakdawalla, Tucson, was marked for identification.)

- - -

VIDEO TECHNICIAN:  The time is 3:18 p.m.  We are on the record.

BY ATTORNEY PISTILLI:

Q.    All right.  Mr. Klein, we've handed you what have been marked as Exhibit-18, 19, 20, 21 and 22.

Do you have those in front

CONFIDENTIAL

Page 218

of you?

A.    Yes.

Q.    And just to make sure we have them in the record.

Is Exhibit-18 a copy of your rebuttal report in the Breathitt case?

A.    Yes.

Q.    And is Exhibit-19 a copy of your rebuttal report in the DeKalb case?

A.    Yes.

Q.    Is Exhibit-20 a copy of your rebuttal report in the Harford case?

A.    Yes.

Q.    Is Exhibit-21 a copy of your rebuttal report in the Irvington case?

A.    No.  Tucson.

Q.    Exhibit-21 is a copy of your rebuttal report in the Tucson case?

A.    Yes.

Q.    And is Exhibit-22 a copy of your rebuttal report in the DeKalb case?

A.    No.  It's also Tucson.

Q.    Sorry about that.  Give us 22 back, and we'll get you a replacement

Page 219

of DeKalb.

ATTORNEY PISTILLI:  What's the tab number?  What's DeKalb?

ATTORNEY WHITELEY:  19.

ATTORNEY PISTILLI:  Can you bring up Tab 19, please?  DeKalb is Tab 19?

ATTORNEY PEILEN:  Yes.

ATTORNEY PISTILLI:  Tab 19.

ATTORNEY PEILEN:  Sorry, it's Exhibit-19.  It's Tab 10.

BY ATTORNEY PISTILLI:

Q.    And could we just scroll through this, please?

A.    DeKalb?

Q.    And do you see that -- we'll mark this as Exhibit-22.

Is that a copy of your report in the DeKalb case on the screen?

A.    What's on the screen, yes. I thought I had one for DeKalb.

ATTORNEY WHITELEY:  Irvington and Tucson.  Thought that was --

Page 220

ATTORNEY PEILEN:  18 is Breathitt.  19 is DeKalb.  20 is Harford.  21, Irvington.  22, Tucson

ATTORNEY WHITELEY:  The one we marked as 20 is Tucson.

ATTORNEY PEILEN:  It should be 22.

ATTORNEY JACOBSON:  We have all the rebuttal reports in Mr. Klein's binder if you want to mark those rebuttal reports.

ATTORNEY PISTILLI:  Sure. Can we just mark the binder as a composite of all the rebuttal reports?  Does that work for you?

ATTORNEY JACOBSON:  Sure, yes.

ATTORNEY PISTILLI:  Let's just mark that as Exhibit-22. Appreciate the courtesy.

ATTORNEY JACOBSON:  We'll have to take out the openings, but --

CONFIDENTIAL

Page 221

ATTORNEY PISTILLI:  We can work on that.

BY ATTORNEY PISTILLI:

Q.    And just a couple other clean-up questions from earlier in the day.

We talked some about the drafting of your report.  But who actually designed the survey instrument?

A.    I did.

Q.    And did you work with staff on the design of the survey instrument?

A.    Yes.

Q.    What role did staff play in that?

A.    Designing a good survey is a collaborative process.  And the staff assisted in some of the wording issues, but, also, they were conducting the pre-test interviews and managing the logistics of that.

Q.    We also talked earlier today about some of your work relating to marketing studies.

CONFIDENTIAL

Page 222

A.    I stepped on my microphone.

I broke it.  Sorry.

Q.    Do you recall we also talked earlier today about some of your work on marketing studies?

A.    Yes.

Q.    And when you, for instance, do a survey regarding Maker's Mark, do you make any effort to not include employees of Maker's Mark manufacturer?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  Well, I mean, I've never done a survey for Maker's Mark, so --

BY ATTORNEY PISTILLI:

Q.    Just, it's a hypothetical.

A.    Yeah.  Hypothetical.

It depends on what the survey is.  You want to screen out anyone who would have an unusual amount of knowledge about a particular subject.

So I wouldn't ask, do you work for Maker's Mark?  But anyone in the

Page 223

alcoholic beverage industry would be --
would be screened out, because they would
have, let's say, more information about
the category than the average consumer.

Q.    And would you ever do a
consumer survey about a product and
survey just the employees of the product
manufacturer?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  I guess it
depends on what the survey is for.

BY ATTORNEY PISTILLI:

Q.    To see how much they like
the brand.

A.    That is a situation that
could be relevant for a survey in some,
you know, limited subpopulation, even
employees.

Q.    But if you were -- if you
were trying to understand just general
consumer sentiment, you wouldn't survey
just a group of people who were employed
by that manufacturer, right?

Page 224

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Again, it depends on -- on the situation in which you're trying to -- trying to measure. It might be very important to understand the attitude your employees have toward your particular product.

ATTORNEY PISTILLI: Let's move on to a new topic.

- - -

(Whereupon, Exhibit Klein-23, No Bates, Reference Manual on Scientific Evidence, Third Edition, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q. I'm handing you a document that's been marked as Exhibit-23.

What is Exhibit-23?

A. I'm sorry?

Q. What is Exhibit-23?

Page 225

A.    It's a chapter from the Reference Manual on Scientific Evidence called The Reference Guide on Survey Research by Shari Diamond.

Q.    And is this something that you rely on when you offer expert testimony?

A.    I find this to be a very helpful guide.

Q.    I mean, as we discussed before, a valid survey needs to include a sample that's representative of the target population, right?

A.    That's correct.

Well, I guess it depends on what the survey is orienting towards. But, generally, you would like to have a representative sample of whatever universe you've defined.

Q.    And look with me, if you would, at Page 382.

A.    Yes.

Q.    Do you see where it says, Nonetheless, when respondents are not

Page 226

selected randomly from the relevant population, the expert should be prepared to justify the method used to select respondents. Special precautions are required to reduce the likelihood of biased samples.

Do you see that?

A.    Yes.

Q.    And do you agree with that statement?

A.    In general.

Q.    What, if any, steps did you take to ensure that the individuals who completed your survey were, in fact, representative of the overall target population?

A.    Well, rather than taking a sample of the population, we invited every member of the identified universe to participate in the survey and sent them multiple reminders to do so.

And so I have no reason to believe that we don't have a representative sample.

Page 227

Q.    So you sent it to everyone, right?

A.    Yes.

Q.    But then only a relatively small subset of the people you sent it to responded, correct?

A.    As is typical with Internet surveys with no incentive.

Q.    But my question, sir, is what, if anything, did you do to ensure that the population that responded was representative of the larger group of people who were given the opportunity to respond?

A.    By sending the multiple reminders and trying not to -- not trying, but by not disclosing the nature of the survey or the reason why their opinion is being solicited.

Q.    Well, I understand that you didn't, at least in your communications, say what the purpose of the survey was and that you sent multiple reminders.

But explain to me how that

Page 228

ensures that there isn't a relevant difference between the people who chose to respond and the people who chose not to respond?

A.    As I said, I have no reason to believe that these people who did not respond are any different or had any particular reason for not responding.

But, you know, beyond the multiple reminders and inviting everyone rather than just a sample, that's what we did.

Q.    Take a look with me, if you would, at Page 383 of the Reference Guide on Survey Research.

A.    Yes.

Q.    Do you see where it says, Even when a sample is drawn randomly from a complete list of elements in the target population, responses or measures may be obtained on only part of the selected sample.

Do you see that?

A.    Yes.

Q.    And that's what happened here, right?  You only obtained responses from a portion of the sample?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We received -- we got a sample -- we got responses from a sample of the population, yes.

BY ATTORNEY PISTILLI:

Q.    And then it goes on to say, that, If this lack of response is distributed randomly, valid inferences about the population can be drawn with the assurance using the measures obtained from the available elements of the sample.

Do you see that?

A.    Yes.

Q.    But then it goes on to say, right, that the difficulty is that non-response often is not random.

Do you see that?

A.    Yes.

Page 230

Q.    And do you agree with that statement?

A.    As it says, it may not be random.  But that doesn't say it's always not random.

Q.    You see where it goes on to say, The key to evaluating the effect of non-response in a survey is to determine, as much as possible, the extent to which non-respondents differ from the respondents and the nature of the responses they would provide if they were present in the sample.

Do you see that?

A.    Yes.

Q.    And do you agree with that statement?

A.    In -- in general.

Q.    And what efforts, if any, did you take to determine whether non-respondents differ from respondents in the nature of the responses they would provide in this case?

A.    We had no information about

Page 231

the non-respondents. And so we did what we do in cases related to trademarks or confusion or false advertising, don't do anything to tip off what the nature of the survey is and take as broad a sample as you can.

We got response rates that were in line with what we expect from an Internet survey with no incentive.

Q. But just to be clear, you didn't undertake any efforts to determine whether non-respondents and respondents are similarly situated, correct?

ATTORNEY JACOBSON:

Objection. Form.

THE WITNESS: And I have no reason to think they're not.

BY ATTORNEY PISTILLI:

Q. But you have no basis to say that they are?

A. I have no basis to say they aren't.

Q. You also have no basis to say that they are?

Page 232

A.    I think we're agreeing with each other.

Q.    So you're --

A.    -- I have no --

Q.    -- agreeing with me --

A.    I have no basis for saying that they're any different than the people who did respond.  And, you know, the various rebuttal reports that I've seen don't suggest any reason why they would be different.

Q.    You have no basis to say that the people who did respond aren't different from the people who didn't, correct?

ATTORNEY JACOBSON: Objection.  Form.  And asked and answered.

THE WITNESS:  As I -- as I said before, the -- by inviting everyone to participate and sending multiple reminders, that meets kind of the standards that we've used in -- in all of our

Page 233

other surveys.

BY ATTORNEY PISTILLI:

Q.    What is your basis, if any, for the claim that the individuals who did not respond are similarly situated to the individuals who did?

A.    I have no basis for -- for believing that they are not -- that there is any difference.

Q.    Right.  And -- my apologies, were you done?

A.    Yes.

Q.    But it's equally true that you have no basis for saying that they're the same?

A.    We used the standards that we've used in hundreds of surveys that have been, you know, presented in court and accepted.

And in terms of taking a -- using a complete census of -- trying to get a complete census of the population and get the maximum number of respondents.

Page 234

Q.    But respectfully, sir, that wasn't my question.

My question is, do you have any basis for assuming that the non-responders and responders are similarly situated?

A.    As I've said, I have no basis for thinking that they aren't similarly situated.

Q.    And you have no basis for thinking that they are?

ATTORNEY JACOBSON: Objection.  Asked and answered. Repeatedly.

THE WITNESS:  I think I've said clearly that I don't have any reason or any information that would lead me to believe that they are not -- that we don't have a valid, representative sample.

BY ATTORNEY PISTILLI:

Q.    You also have no data or information that shows that they are a valid sample?

Page 235

ATTORNEY JACOBSON:

Objection.  Form.  And asked and answered.

THE WITNESS:  Well, we don't have data from the respondents who did not answer.  So I'm not sure what you would, you know, expect me to do in that situation.

Again, by not making the subject matter apparent in the invitation and getting the warming letter by the -- from the school board or the district office, wherever it came from, you know, we did everything we could to get the maximum response rate.  And we got a response rate that was in line with what we've seen in other surveys on the Internet with no incentive.

BY ATTORNEY PISTILLI:

Q.    Well, sir, but response rate and representativeness are related but distinct concepts, right?

Page 236

A.    Yes.

Q.    Yes.

And all else equal, the lower the response rate, the greater the concerns about representativeness, correct?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  It depends on the situation.  I mean, that's not -- I don't think that's universally true.

BY ATTORNEY PISTILLI:

Q.    Well, isn't it more likely that if two people out of 100 answer a survey, they're not going to be representative than if 98 out of 100 answer a survey?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  I think small samples can be just as accurate as large samples.

BY ATTORNEY PISTILLI:

Page 237

Q. Yeah. And they -- they can be. And, in fact, the reference guide we've been looking at acknowledges that they can, right?

A. Yes.

Q. But in order for them -- in order for small samples to be representative, the lack of response has to be distributed randomly, correct?

A. I think that's correct.

Q. And here you don't have any basis to know, one way or the other, whether the lack of response was distributed randomly?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Again, I don't have any reason to think that it isn't.

BY ATTORNEY PISTILLI:

Q. And you don't have any reason to think that it is?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: I like my description of it better.

BY ATTORNEY PISTILLI:

Q. Well, but, respectfully, I'm allowed to ask a question.

A. Yes.

Q. And it's your responsibility to answer it truthfully.

And so the question, again, is, do you have any evidence or data that would support the proposition that, in this case, the lack of response was distributed randomly?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: And as I've said, while I may not have any evidence that it's not random, I also don't have any reason to believe that it isn't.

BY ATTORNEY PISTILLI:

Q. You asked the survey participants some questions about their age, right?

Page 239

A.    Let me -- yes.

Q.    Question --

A.    QS6.

Q.    QS6 asks if they're under 21, between 21 and 34, between 35 and 54 and between 55 and over, right?

A.    Yes.

Q.    And each of the school districts has information about the age of its teaching staff, correct?

A.    I don't know.

Q.    Did you make any effort to determine whether the responses you got in your survey reporting the age of the respondents was representative of the teacher pool in the six districts?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  There was no data -- data available on the age distribution of teachers in the school district.

BY ATTORNEY PISTILLI:

Q.    Did you ask whether the

Page 240

school districts had demographic information available about its teachers?

A.    And I was told that they did not.  It would not be available.

Q.    You were told that the school districts don't know the age, gender, race, tenure of its teachers?

A.    You asked specifically about age -- or I asked specifically about age in the survey.  And I was told that that data was not available.

Q.    And is the reason you asked is that you would have liked to be able to determine whether the ages of your respondents were representative of the ages of the overall teacher population?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  You know, I think that could be one use of that.

I think another would be to, you know, set quotas or do other things.

But when we decided to send the invitation to everybody, then we didn't need that.

BY ATTORNEY PISTILLI:

Q.    When you say "set quotas," you mean ensure that, you know, each of the age bands is appropriately represented in the responses, right?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  That would be one possible use of that information.

BY ATTORNEY PISTILLI:

Q.    And did you ask about any other demographic data that you might have used to determine whether the respondent population was representative of the overall teacher population?

A.    No --

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  -- because I had all the information that I

CONFIDENTIAL

Page 242

needed to construct and conduct the survey.

BY ATTORNEY PISTILLI:

Q.    So you don't know, for example, whether the folks who responded to the survey were disproportionately old or young?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  The data was certainly collected and provided to Dr. Ward as part of his analysis.

BY ATTORNEY PISTILLI:

Q.    What data are you referring to?

A.    The data collected from the survey.

Q.    Well, my question was, you don't know whether the survey respondents were disproportionately old or young as compared to the overall teacher population?

Do you understand that

Page 243

question?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Yes, I think I understand the question.

BY ATTORNEY PISTILLI:

Q.    And is that a true statement?

A.    As I said, that information was not -- not available.

Q.    And you don't know whether the respondents disproportionately teach certain subjects?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We didn't ask what subjects they taught.

BY ATTORNEY PISTILLI:

Q.    And you -- so then you don't know whether a disproportionate number of responders teach specific subjects?

ATTORNEY JACOBSON:

Objection.  Form.  And asked and answered.

THE WITNESS:  The question wasn't asked in the survey, so I certainly wouldn't have any basis for answering.

BY ATTORNEY PISTILLI:

Q.    And it's certainly possible that students are more distracted in math class than social studies, right?

ATTORNEY JACOBSON:  Objection.  Form.

THE WITNESS:  I know I wasn't but -- no, I really don't know anything about the prevalence of distraction by subject matter.

BY ATTORNEY PISTILLI:

Q.    Just at a general level, it is possible, right, that the run of students in a given school district are more engaged in certain subjects than they are in others?

ATTORNEY JACOBSON:  Objection.  Form.

THE WITNESS:  You know, that's possible.  I mean, you

Page 245

certainly see differences across the school districts in terms of the disruptions due to social media, so.

BY ATTORNEY PISTILLI:

Q.    And if it were true that, hypothetically, kids were more distracted in math class than social studies and all the math teachers responded and none of the social studies teachers responded, your survey wouldn't be representative, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, I mean, under that hypothetical -- accepting your hypothetical, then if, hypothetically, we've got a biased sample, then we've got a biased sample.

BY ATTORNEY PISTILLI:

Q.    And then, for instance, you didn't ask for any information relating to teacher tenure from the districts,

Page 246

correct?

A.    Yes, that's -- that's correct, because the teacher tenure really wasn't relevant in the survey. Because we were looking at teachers who had been in the same school as opposed to teachers who had switched schools and so on.

Q.    Well, but, for instance, you don't have information about whether a disproportionate number of newer teachers responded to your survey, correct?

A.    I guess that's correct, yes.

Q.    And if, in general, newer teachers had greater difficulty with classroom management that could introduce bias into your survey, correct?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  Well, hypothetically, if -- and I don't know whether newer teachers would have more or less of a problem with disruptions due to social

Page 247

media.  It could work one way --
it could work either way.

BY ATTORNEY PISTILLI:

Q.    But, again, it's just not
something that you looked into at all?

A.    That's correct.  We had all
the information we needed for the survey.

Q.    If I could ask you to turn
all the way back to Exhibit-1.

And can we go to Page 8,
please?

A.    Exhibit-1.  Yes.  Okay.
And?

Q.    Page 8.

A.    Page 8.

Q.    I want to look with you at
Question 3.

A.    Okay.

Q.    And though we're looking at
Exhibit-1, which I believe is your
Breathitt report, Question 3 was the same
for each of the six surveys, correct?

A.    That's correct.

Q.    And then do you see in the

Page 248

first listed question, it says,

Unauthorized student use of social media,

e.g., Facebook, Instagram, Snapchat,

TikTok, YouTube, et cetera, during class.

Do you see that?

A.    Yes.

Q.    And then that same phrasing

is repeated in the other social media

question.

It says some, e.g.,

Facebook, Instagram, Snapchat, TikTok,

YouTube, et cetera.

Do you see that?

A.    Yes.

Q.    And so your survey defines

social media as including but not being

limited to Facebook, Instagram, Snapchat,

TikTok and YouTube; is that fair?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I think these

are the primary social media

platforms that middle and high

school students would routinely

Page 249

access.

BY ATTORNEY PISTILLI:

Q. "e.g." means for example, right?

A. Yes.

Q. And then at the end you also say, et cetera, which means there are more?

A. Yes.

Q. So Facebook, Instagram, Snapchat, TikTok and YouTube, according to the survey question that you administered, are examples of social media but not the only examples, correct?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: They may not be the only forms of social media, but those are the ones that the students are -- are accessing and making use of.

BY ATTORNEY PISTILLI:

Q. Did you ask them that?

A. We asked the -- you know,

Page 250

when we were doing the teacher interviews, they had no problem with -- with that kind of construction.

And the e.g. and et cetera were important there to make that parallel to all the other examples that we gave.

Because if we didn't, then it would really stand out as -- as being the focus of what the survey was all about.

Q.   So I understand that your testimony is that teachers understood the phraseology.  But that's really not my question.

It's just that on its face the clear meaning of the e.g. and the et cetera is that social media includes but is in no way limited to the five platforms you specifically reference, correct?

ATTORNEY JACOBSON:
        Objection.  Form.

THE WITNESS:  Well, I think

Page 251

that teachers recognize that these are the platforms that students make use of.  And so rather than trying to create a -- some other definition of social media, we simply listed the platforms that we know students use.

BY ATTORNEY PISTILLI:

Q.    If a teacher experienced disruption that they attributed to X, formerly known as Twitter, they should include that in their answer, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  The -- X probably isn't a platform that students make much use of.

BY ATTORNEY PISTILLI:

Q.    But if a student -- if a teacher experienced disruption that they attributed to X, the teacher should include it in their answer?

ATTORNEY JACOBSON:

Objection.  Form.  Asked and

CONFIDENTIAL

Page 252

answered.

THE WITNESS:  Well, if, hypothetically, the -- a teacher thinks that students are using X and that's -- causing diversion of time, then, hypothetically, they would be including that, that recognition.

But my understanding, based on the pre-test, is that Facebook, Instagram, Snapchat, TikTok and YouTube are the, you know, huge percentage of the social media usage.  And there may be some outside that, but the -- you know, it requires, you know -- well, never mind.

BY ATTORNEY PISTILLI:

Q.    Are you familiar with Discord?

A.    I have heard of it in the context of gaming, yes.

Q.    It's a social media platform, right?

Page 253

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I'm not sure.
I've never been on Discord.

BY ATTORNEY PISTILLI:

Q.    So you -- you don't know,
sitting here today, one way or the other,
whether Discord is a social media app?

ATTORNEY JACOBSON:

Objection.  Form.  And asked and
answered.

THE WITNESS:  As I say, I've
never been on Discord.

BY ATTORNEY PISTILLI:

Q.    Have you ever heard of
Omegle?

A.    O --

Q.    Omegle?

A.    No.

Q.    Have you ever heard of Yik
Yak?

A.    No.

Q.    There's a lot of social
media apps out there, though, right?

Page 254

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  I'm not sure.

BY ATTORNEY PISTILLI:

Q.    You don't know?

A.    Well, I know that these are the five main ones that are used by students.

Q.    But whether and to what extent there are other ones is outside your expertise?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  My expertise is in the creating of surveys. And I think that the listing of the -- these five platforms appropriately directs teachers to think about those platforms and student use of those platforms.

BY ATTORNEY PISTILLI:

Q.    Among others?

A.    I think that the way this is listed -- and, again, it wouldn't be the

first thing that -- or necessarily be the first thing that the teacher saw.  And so they're going to see a number of alternative, let's say, disrupting events or disrupting situations all that are followed by e.g. and et cetera.

And so when they run across the -- any of the first two that are listed here, it won't look any different than the ones that they saw in student tardiness or unauthorized messaging, that sort of thing.

Q.    So when a teacher looks at this and they see, Student tardiness to school or class, e.g., disrupting class when walking in late, bus is running late, et cetera, a teacher would understand that there could be other ways of student tardiness creating disruptions besides walking in late and buses running late, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  The -- could

Page 256

you repeat the question?  I'm sorry.

BY ATTORNEY PISTILLI:

Q.    Sure.

When a teacher looks at this survey and sees, Student tardiness to school or a class, e.g., disrupting class when walking in late, buses running late, et cetera, or early departures, they would understand that student tardiness might create disruptions other than by walking in late or buses running late, correct?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  I guess that's possible, yes.

BY ATTORNEY PISTILLI:

Q.    And then when they see, Classroom environment issues, e.g., uncomfortable seating, poor lighting, temperature issues, et cetera, they would understand that there could be classroom environment issues other than

uncomfortable seating, poor lighting and temperature issues, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I -- that's entirely possible.

BY ATTORNEY PISTILLI:

Q.    So did you make any effort in your survey to understand whether any particular features of Facebook, Instagram, Snapchat, TikTok or YouTube were causing classroom disruption?

A.    No.  It was the student use of those platforms.

Q.    So student use no matter which features they were using?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We really didn't inquire about any specific features.

BY ATTORNEY PISTILLI:

Q.    And so if the teacher attributed a disruption to Facebook,

Page 258

Instagram, Snapchat, TikTok or YouTube, you included it in your calculations irrespective of the particular feature that caused the disruption?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Again, we didn't ask about specific features. So there was no way we could attribute it to that.

BY ATTORNEY PISTILLI:

Q. And then, for instance, your social media disruption would include disruptions caused by the algorithmic promotion of addictive engagement?

ATTORNEY JACOBSON: Objection to form.

THE WITNESS: Whatever that means.

BY ATTORNEY PISTILLI:

Q. Are you aware of plaintiffs' allegations in this lawsuit?

A. Yes.

Q. And are you aware that one

Page 259

of the things they allege is that the defendants' platforms use algorithms to promote addictive engagement?

A.    Yes.

Q.    So when you ask teachers about social media-related disruption, it would include disruptions that they attribute to the algorithmic promotion of addictive engagement?

A.    Well, I don't know, hypothetically, if they attribute it to any one particular feature or if one particular feature is causing the disruption that needs to be dealt with, so.

Q.    But irrespective of what the feature is, if the teacher attributes it to social media, it's included in your analysis?

A.    If the teacher believes that social media is causing the disruption that diverts time from -- from teaching, then I would hope they would include it here.

CONFIDENTIAL

Page 260

Q.    And you're aware that defendants' platforms sometimes send notifications to users?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  Yeah, I think I've seen those.

BY ATTORNEY PISTILLI:

Q.    And if a student is distracted because they receive a notification during class, that's another thing that the teacher should include in their survey response, correct?

A.    If it causes a disruption that they need to deal with to -- because it diverts -- and if it diverts time from teaching, then I would hope they would include all of those.

Q.    Let's look back at Question 3 again.

And do you see where -- the second question -- and I recognize it's not always the second question someone receives, you ask about, Repercussions

Page 261

from student use of social media outside of the classroom, e.g., students anxious or inattentive due to prolonged social media use, students suffering from sleep deprivation due to late night social media use, dealing with student conflicts stemming from social media use.

Do you see that?

A.    Yes.

Q.    And when you say something like "dealing with student conflict stemming from social media use," you mean things like, you know, maybe someone is being bullied by another student and that's done, in part, through comments or posts on a social media platform, right?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  I mean, that's certainly one possibility.

BY ATTORNEY PISTILLI:

Q.    Or two students could be having, like, a war of words with one another in a -- in a comment section on a

Page 262

social media post, right?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:

Hypothetically, yes.

BY ATTORNEY PISTILLI:

Q.    Now let's talk about some of these other categories.

You refer to things like students being anxious or inattentive as repercussions from student use of social media?

A.    Those are examples.

Q.    So you're -- you're drawing to the teachers' mind a link between anxiety and inattention and social media use in the formation of the question, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I'm sorry, could you repeat that?

BY ATTORNEY PISTILLI:

Q.    The question suggests a link

Page 263

between social media use and anxiety and inattentiveness, correct?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: I think it provides examples that -- what social media could potentially manifest itself in student behavior.

BY ATTORNEY PISTILLI:

Q. But if you wanted to, right, instead of asking this question, you could have, for instance, asked, how much time do you spend dealing with anxiety or inattentiveness, correct?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Well, I think there are a lot of questions we, you know, could ask.

I mean, I think this gets at the issue we were trying to measure.

BY ATTORNEY PISTILLI:

Page 264

Q.    But rather than asking a question in a way that presupposes that social media causes anxiety or inattention, you could have more neutrally asked, for example, in the first instance, about anxiety or inattention, correct, and then followed up?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, I'm not sure how that would -- that would work and stay parallel with the other -- other issues.

BY ATTORNEY PISTILLI:

Q.    Well, you could have had -- instead of your second category there, you could have asked whether disruptions were caused by students who were anxious or inattentive; you could have asked whether disruptions were caused by students being sleep deprived; you could have asked whether students were being disruptive because of conflict, right?

Page 265

ATTORNEY JACOBSON:

Objection.  Form.  Compound.

THE WITNESS:  And then what?

BY ATTORNEY PISTILLI:

Q.    And then if, and only if, they said yes asked whether, in fact, the teachers attributed any of that to social media?

A.    Sounds like a pretty leading question.  I don't think I would do something like that.

Q.    Well, you don't think it's leading to put in the question itself a linkage between social media use and all of these harms?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, I don't think that's leading.

BY ATTORNEY PISTILLI:

Q.    You don't think it would be more neutral to ask about the harms without, in the question itself, tying the harms to social media?

Page 266

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, I think --
I think the way we asked it was
neutral and essentially surrounded
by, you know, a bunch of other
similar types of issues.

BY ATTORNEY PISTILLI:

Q.    Let me ask you this: What,
if anything, did you do to determine
whether teachers have the ability to
reliably gauge the cause of a student's
sleep deprivation?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Teachers get
to know their students.  And, you
know, it's -- and they talk to
their students.  They care about
their students.

And from the pre-test
interviews, it was clear that they
were able to, in some cases,
attribute these symptoms to social

Page 267

media and in other cases not.

BY ATTORNEY PISTILLI:

Q.    What, if anything other than the pre-testing, did you do to determine whether teachers are able to reliably determine the cause of a student's sleep deprivation?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  The -- if a teacher believes that the sleep deprivation is due to overuse of social media, then they'll select this alternative.

And, you know, if they don't, if they think it's because of an unstable home environment or, you know, the -- they'll -- they'll recognize that.

BY ATTORNEY PISTILLI:

Q.    But my question is, what, if anything, did you do to determine whether those teacher-reported beliefs are reliable?

Page 268

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I think that the pre-test interviews we did made it clear that the teachers could answer this question appropriately.

BY ATTORNEY PISTILLI:

Q.    Did you ask teachers in the pre-test interview whether they believed that they can reliably determine the reason that a given student is sleep deprived on a given day?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We did not ask that specific question.

BY ATTORNEY PISTILLI:

Q.    Did you ask them, in a pre-test interview, whether they believed that they could reliably determine the reason that a student was anxious or inattentive on a given day?

ATTORNEY JACOBSON:

Page 269

Objection to form.

THE WITNESS:  Again, it's a question of the teacher getting to know their student and understanding what's causing particular behaviors.

BY ATTORNEY PISTILLI:

Q.    Well, my question was different, though, sir.

It was, did you ask the teachers in the pre-test interview whether they believe that they could reliably determine the reason a student was anxious or inattentive on a given day?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We didn't ask that specific question, no.

BY ATTORNEY PISTILLI:

Q.    And did you ask them whether they believed that they could reliably determine the reason for conflict between students in a given instance?

Page 270

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  The -- I mean, it's the same kind of an answer.

As the teachers were going through these -- the list of items and they could say, oh, yeah, that happened or no, that doesn't happen.

So while we didn't ask the teachers specifically that question, it was clear from the pre-test that they were -- they understood -- understood their students.

BY ATTORNEY PISTILLI:

Q.   The pre-test for which you have no records?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Correct.

ATTORNEY PISTILLI:  Why don't we take a quick break?  I think I'm done.  I think my

colleagues may have a couple of minutes.

VIDEO TECHNICIAN: The time is 4:13 p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

(Whereupon, Exhibit Klein-24, Klein000001-0005, Invoices, was marked for identification.)

- - -

VIDEO TECHNICIAN: The time is 4:36 p.m., and we are on the record.

ATTORNEY PISTILLI: Mr. Klein, thank you for your time today. I have no further questions for you at this time, and I'm going to pass the witness to my co-counsel.

- - -

Page 272

EXAMINATION

- - -

BY ATTORNEY SHAHIDPOUR:

Q.    Good afternoon, Mr. Klein.

A.    Good afternoon.

Q.    My name is Faraz Shahidpour. I'm with Kirkland and Ellis, and I represent Snap, the maker of Snapchat.

I've handed you what's been marked as Exhibit-24.

Have you seen these documents before?

A.    Yes.

Q.    And does Exhibit-24 reflect all the payment and compensation you've received in connection with your work in this litigation?

A.    Not my compensation.  But this is the -- these are the invoices that Applied Marketing Science sent for my work on this case through July of this year.

So this is -- this isn't my compensation, this is what the firm has

Page 273

billed for my time.

Q.    Got it.

So does Exhibit-24 reflect all of the payment or compensation that AMS has received in connection with your work in this litigation through July 2025?

A.    With my work, yes.

Q.    Do you recall testifying earlier that your team conducted some pre-test interviews in connection with the surveys --

A.    Yes.

Q.    -- that -- excuse me -- that the surveys that you sent to teachers within the school districts?

A.    Yes.

Q.    And you listened to those pre-test interviews after?

A.    I listened to, I believe, six of the 23.

Q.    So you listened to six of the 23 pre-test interviews that your team conducted with teachers in anticipation

Page 274

of the survey; is that right?

A.    As a -- as a pre-test of the survey.

Q.    And then do you also recall testifying earlier that it's your understanding that TikTok, Facebook, Instagram, Snapchat and YouTube are the only platforms that students use?

A.    I think I said that they were the primary platforms that students use.  They may peripherally use others at various times, but these are the main ones that are used by students of this age group.

Q.    And is your basis that those five platforms are the primary platforms that students use your having listened to the six pre-test interviews?

ATTORNEY JACOBSON:
Objection.  Form.
Mischaracterizes testimony.
THE WITNESS:  I'm not sure I understand your question.
BY ATTORNEY SHAHIDPOUR:

Q.   So you -- is your only basis for asserting that TikTok, Facebook, Instagram, Snapchat and YouTube are the primary platforms that students use the six pre-test interviews that you listened to?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No.  It certainly came from looking at the original complaint, from speaking with counsel and kind of the -- sort of informal exploratory interviewing with friends -- friends and family that is common before any survey is undertaken in some field that we don't have extensive experience in.

BY ATTORNEY SHAHIDPOUR:

Q.   So when you say -- excuse me.

When you say "informal exploratory interviewing with friends and family," are you referring to your own

friends and family?

A.    Friends and family is sort of a catchall term for, does anyone in the company know high school teachers or middle school teachers and do you have kids in high school or middle school and -- so that we can talk about issues related to social media just informally to inform ourselves of the -- what the landscape is like.

Q.    And so who -- what are the names of the friends and family that you spoke with?

A.    I don't have those names.

Q.    Are they recorded anywhere?

A.    Probably not.

Q.    Were there any notes taken from these friends and family interviews?

A.    Not that I'm aware of.

Q.    Is there anyone who would be aware of whether notes exist from those interviews?

A.    The -- it would not be typical to save notes from those kinds of

Page 277

informal -- informal discussions.

These weren't, you know, hour-long kinds of interviews scheduled with -- where we didn't pay an incentive or anything like that.

Again, it was just kind of the informal, as I said, exploratory kind of stuff that we would undertake in -- in any situation before -- if we were working in a field that we didn't have extensive experience in already.

Q. Okay. Do you have a Snapchat account?

A. No.

Q. Have you ever used Snapchat?

A. Not to my knowledge.

Q. Do you have a Facebook account?

A. I do have a Facebook account.

Q. How long have you had a Facebook account?

A. I'd say probably eight years -- I'm trying to picture the -- I

CONFIDENTIAL

Page 278

know the picture that I'm using was taken in Patagonia, and I'm trying to think when I was there.

So it was probably from about ten years ago.

Q.   And how frequently do you use Facebook?

ATTORNEY JACOBSON:
Objection.   Form.

THE WITNESS:   Almost never.

BY ATTORNEY SHAHIDPOUR:

Q.   How frequently did you use Facebook when you first made your account?

ATTORNEY JACOBSON:
Objection.   Form.

THE WITNESS:   Very little. I mean, it was -- I thought it -- I thought it would be useful.   It wasn't.

BY ATTORNEY SHAHIDPOUR:

Q.   How many hours a day did you use Facebook when you first downloaded it?

Page 279

A.   Five minutes.  But not -- that wouldn't have been an everyday type of occurrence.

Again, it was -- it just -- it seemed like something that was appropriate to do, but I didn't find any use for it.

Q.   Do you have an Instagram account?

A.   I do.

Q.   Since when?

A.   That's a lot more recent. The last two or three years.

Q.   And how frequently do you use Instagram?

A.   Maybe once a month.

Q.   And what do you do on Instagram when you use it?

A.   Kind of keep track of my grandkids.  They tend to post more -- more frequently.

Q.   Do you have a TikTok account?

A.   I don't think so.

Page 280

Q.    Have you ever used TikTok?

A.    My granddaughter has shown me some TikTok videos.  But beyond that, no, I haven't used it.

Q.    She sent them to you or she has shown --

A.    No.  She showed me.  And she likes to produce them herself, dance moves and stuff.

Q.    And do you have a YouTube account?

A.    I access YouTube -- videos on YouTube.  I don't know whether I have an account -- whether that means I have an account or not.

Q.    And how long have you been accessing videos on YouTube?

A.    For quite a while.  I mean, probably at least ten years.

Q.    It's not possible to derive the amount of time diverted from instruction, if any, due to Snapchat in particular from any of your survey results in this litigation, right?

Page 281

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, the survey clearly identifies Snapchat as one of the social media platforms that teachers were responding to.

So to that extent, we have information about diverted time due to those five platforms that were named, but not specific to any one of those five platforms.

BY ATTORNEY SHAHIDPOUR:

Q.    Well, you have information about social media in particular and teachers responded using -- by -- teachers responded with the understanding in the question that social media encompassed more than just those five platforms, right?

ATTORNEY JACOBSON:

Objection.  Form.

Mischaracterizes testimony.

THE WITNESS:  I don't think

Page 282

that teachers necessarily thought about the social media platforms as being broader than those five.

But those five are clearly identified and make up the, I think, bulk of student use and the resulting disruption of classes that need to be dealt with.

BY ATTORNEY SHAHIDPOUR:

Q. So if, say, your survey results showed that 20 percent of high school teachers' time in a given district in a given year was diverted due to students' social media use, you wouldn't be able to derive the exact percent that would be attributable -- attributable to a particular one of defendants' platforms, right?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: We -- we measured the social media as a -- as a unit and did not break out individual platforms.

CONFIDENTIAL

Page 283

BY ATTORNEY SHAHIDPOUR:

Q.    Right.   I understand what you measured.   I'm trying to understand what can be derived from your measurement.

Is it possible to derive particular percentages of time diverted due to student use of any particular one of the platforms?

ATTORNEY JACOBSON:

Objection.  Form.  Asked and answered.

THE WITNESS:  Not to any one specific platform from my data.

My understanding and belief is that there's other data that can be used to allocate student usage across those platforms.  But that wasn't part of my assignment.

BY ATTORNEY SHAHIDPOUR:

Q.    And when you say "other data," does that other data to which you're referring include teacher survey data that you conducted?

A. No.

Q. Did you consider any internal Snap documents in formulating your opinions?

A. I don't think I was exposed to any internal Snap documents.

Q. You never conducted a survey containing any questions that sought to measure Snapchat usage in particular, have you?

ATTORNEY JACOBSON:

Objection. Form.

THE WITNESS: Not Snapchat usage in itself, no. Certainly, included, again, as one of the five services -- platforms.

BY ATTORNEY SHAHIDPOUR:

Q. What did you do, if anything, to learn about how the Snapchat app works in connection with providing your opinions in this case?

A. As I think I said before, I don't have a Snap account -- Snapchat account. I really don't know much about

Page 285

Snapchat.

Q.    You didn't undertake to learn about the app when you designed the survey?

ATTORNEY JACOBSON:
Objection to form.

THE WITNESS:  That's correct.  It wasn't necessary in determining the total average of time diverted from teaching by social media platforms.

BY ATTORNEY SHAHIDPOUR:

Q.    And you didn't undertake to learn about the Snapchat app in forming your opinions based on the results of the surveys?

A.    I think, as I said, I saw -- it wasn't part of my assignment.  It wasn't necessary.

Q.    What is your income as chairman emeritus at Applied Marketing Science?

ATTORNEY JACOBSON:
Objection.  Form.  And scope.

THE WITNESS: I don't think I'm going to answer that. I wouldn't want that information on the public record.

BY ATTORNEY SHAHIDPOUR:

Q. Do you earn any income outside of your salary at Applied Marketing Science?

A. Not from employment anywhere, no.

Q. From anywhere else?

A. Yeah. I mean, you know, Medicare, investments, that sort of stuff.

Q. Have you reached out to any public health authorities to share the opinions about social media that you're offering in this litigation?

A. No. My understanding is this is to be confidential. I wouldn't presume to publicize it myself.

Q. Prior to this litigation, did you have any familiarity with the specific school district plaintiffs for

Page 287

which you were retained to conduct surveys?

A.    No -- no relevant contact or information.  I grew up in Atlanta, so DeKalb is -- you know, I know about the DeKalb school system.

But not -- I certainly didn't have any contact with them.

Q.    You didn't go to -- you didn't go to a school within the DeKalb County system?

A.    No.

Q.    Do you believe that social media should be banned?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  I don't really have an opinion about that.

BY ATTORNEY SHAHIDPOUR:

Q.    Do you --

A.    Certainly not as an expert.

Q.    Sorry.  I didn't mean to cut you off.

Do you believe that Snapchat

Page 288

should be banned?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I really don't have an expert opinion on whether Snapchat should be banned.

ATTORNEY SHAHIDPOUR:  Okay. Thank you, Mr. Klein.  I have no further questions.  But I'll open it for my colleagues.

ATTORNEY WHITELEY:  Are we okay if I question over here?

Thank you.

- - -

EXAMINATION

- - -

BY ATTORNEY WHITELEY:

Q.    Good afternoon, Mr. Klein.

A.    Good afternoon.

Q.    My name is Daniel Whiteley. I represent the Google and YouTube defendants in this case.

And I have a few more questions for you, okay?

A.    Okay.

Q.    You're still good to keep answering questions?

A.    Sure.

Q.    All right.  During that last segment of questioning, you said, my understanding and belief is that there's other data that can be used to allocate student usage across those platforms.

What data are you referring to in that answer?

A.    I was instructed to focus on social media use for these five platforms specifically as an aggregate and told that I didn't have to worry about trying to allocate it by individual defendant.

So I guess I was making the assumption that someone else was going to be worrying about that.

Q.    Okay.  So no one told you specifically, you know, the school districts themselves have data that allocates the percentage of student usage across those platforms?

Page 290

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  That's right.
No one told me that.

BY ATTORNEY WHITELEY:

Q.    No one told you another
expert in this litigation has data that
can be used to allocate student usage
across those platforms?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, I wasn't
told that.  I mean, it seemed
logical.  But I may be getting
outside of my lane in assuming
that.

BY ATTORNEY WHITELEY:

Q.    Regardless, your scope of
work was to look at all of these
platforms together, right?

A.    That's correct.

Q.    And I believe earlier you
talked about AMS having profit sharing;
is that right?

A.   Yes.

Q.   And you receive a share of the profits from AMS on a yearly basis?

A.   As do all the employees.

Q.   Okay.  What is your share of AMS's yearly profits?

A.   I have no idea.

Q.   How is the percentage of profit sharing determined at AMS?

A.   There's a committee of principals that meets to decide what the profit sharing percentage will be and that -- and then I -- they tell me.

Q.   Safe to say you're not on that committee?

A.   I'm not on that committee. I used to be, but.

Q.   Okay.  When did you stop being on that committee?

A.   About eight -- eight years ago; eight to ten years ago.

Q.   And you said earlier you're not comfortable sharing your income.

If I represent to you that

Page 292

this transcript is confidential and will not be publicly available, would that change your willingness to answer that question?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  I'm sorry, I really don't feel comfortable with answering that question.

BY ATTORNEY WHITELEY:

Q.    Even if it's not in the public record?  If this transcript is not in the public record?

A.    Even in that situation.

Q.    Other than the pre-test of the survey and the informal interviews you described during my last colleagues' questionings, do you have any other basis for your assertion that the five defendant platforms are the platforms that are most used by students?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Well, I guess

Page 293

did you -- from discussions with counsel as well who, it's my understanding, have access to other data that I don't.

BY ATTORNEY WHITELEY:

Q.    Anything else that forms the basis for your assertion that the five defendant platforms are the ones that are most used by students?

ATTORNEY JACOBSON:

Objection.  Form.  And asked and answered.

THE WITNESS:  Not really, no.

BY ATTORNEY WHITELEY:

Q.    During your pre-test interviews, did teachers tell you what percentage of students in their school use Snapchat?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No.  We didn't ask about the usage of individual platforms.

Page 294

BY ATTORNEY WHITELEY:

Q.    Did they tell you what percentage of students in their school use any of the defendants' platforms?

ATTORNEY JACOBSON:

Objection to form.

THE WITNESS:  No.  Although, I would be surprised if it was much less than 100 percent.

BY ATTORNEY WHITELEY:

Q.    Why do you say that?

A.    Again, my grandchildren and their extensive use, as well as their parents.

Q.    Do you have any other basis for saying that you would be surprised that less than 100 percent of students use defendants' platforms?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  Again, sort of it's more of the common knowledge idea.

BY ATTORNEY WHITELEY:

Page 295

Q.    You were asked whether you reviewed any internal documents from Snap.

Have you reviewed any internal documents from any of the defendant companies in this case?

A.    Not to my knowledge, no.

Q.    Can you give me the names of any individuals that you interviewed as a part of the pre-test?

A.    No.

Q.    Can you tell me what school districts these individuals work in?

A.    Not as I sit here.  But they weren't any of the 12 bellwether districts.

Q.    Right.  And do you know the names of any of the districts, with the understanding that they're not among the 12 that you originally offered reports for?

A.    I don't have that information.  I don't think I've ever -- I don't think I've ever seen that

Page 296

information.

Q.    How long were the pre-test interviews?

A.    They generally ran, like, 30 minutes.

Q.    And why did you not record or take notes of these interviews?

A.    We didn't need to.

Q.    Why did you not need to?

A.    Because we were in there in the moment and listening to them.

Q.    But now, sitting here today, I don't have any document that I can look at to verify what was said in these interviews.  And so I can't verify what they said about how much students are using these platforms in their districts.

Do you agree?

ATTORNEY JACOBSON: Objection.  Form.

THE WITNESS:  Yes, I agree with that statement.

BY ATTORNEY WHITELEY:

Q.    And I believe you said you

Page 297

have kids and grandkids, right?

A.    Yes.

Q.    When your children were in high school and middle school, do you know if any of the five defendant platforms were operating?

A.    They weren't.

Q.    They were not?

A.    They were not.

Q.    Have you ever conducted a survey of teachers about their use of YouTube during instruction time?

A.    No.

Q.    Are you aware of any studies about teachers' use of YouTube during instruction time?

A.    No.

ATTORNEY WHITELEY:  Thank you, Mr. Klein.  I have no further questions at this time.

Do we want to go off the record?

ATTORNEY HORVATH:  I have questions.

CONFIDENTIAL

Page 298

ATTORNEY WHITELEY:  We're getting a bad echo.  Let's go off the record and try to figure that out.

VIDEO TECHNICIAN:  The time is 5:02 p.m.  We are going off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 5:03 p.m., and we are on the record.

- - -

EXAMINATION

- - -

BY ATTORNEY HORVATH:

Q.   Mr. Klein, my name is Lisa Horvath.  I am here on behalf of TikTok.

Are you ready to proceed?

A.   Yes, I am.

Q.   The good news is I have only a few follow-up questions.

Earlier in your deposition, you were asked questions about the different -- or the ability of the teachers to identify what their students were using and what was causing disruptions in the classroom.

Do you recall that testimony?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: Well, I think I testified about that they were able to determine that it was social media use, not necessarily the specific platform they were using.

BY ATTORNEY HORVATH:

Q.    Right.  And I think you said you were able to determine that because teachers know their students, correct?

A.    No.  I think that was in the context of teachers being able to attribute certain behaviors of students to social media use.

Q.    Okay.  And the reason that you determined teachers could determine certain behaviors of students were caused by social media was because you believe teachers know their students?

ATTORNEY JACOBSON:

Objection.  Form.

BY ATTORNEY HORVATH:

Q.    Is that correct?

A.    That's what teachers told us, yes.

Q.    Okay.  And how many students does -- did each teacher answering the survey have from year to year?

A.    That wasn't one of the questions we asked.

Q.    Okay.  So you don't know if the teacher had 30 students all day long or had 60 students in five different class periods, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  As -- as I said, we don't have any

CONFIDENTIAL

Page 301

information on the number of students that each teacher interacted with.

BY ATTORNEY HORVATH:

Q. So the answer to my question is, yes, you have no idea if teachers were with their students all day or part of a day, correct?

A. That's correct.

Q. And you don't know if the classroom size was 10 students, 20 students or 50 students, correct?

ATTORNEY JACOBSON:

Objection. Form. And asked and answered.

THE WITNESS: That's correct. We didn't ask any questions about that.

BY ATTORNEY HORVATH:

Q. And you would agree that in addition to there being different teacher demographics, there are also differences in student demographics, correct?

ATTORNEY JACOBSON:

Page 302

Objection. Form.

THE WITNESS: When you say "student demographics," what are you referring to?

BY ATTORNEY HORVATH:

Q. I'm referring to things like family income level, gender --

A. There's clearly --

Q. -- academic background, interests?

A. There's clearly differences by student -- in students in those -- on those dimensions.

Q. Okay. And we don't have any information from your survey regarding the demographics of the students for the teachers who answered the survey, correct?

ATTORNEY JACOBSON:

Objection. Form.

THE WITNESS: Not from my survey. But I'm -- it's my understanding that the demographics of the school

Page 303

districts are -- are public
knowledge.

BY ATTORNEY HORVATH:

Q.    Well, you can have different
demographics within a single school
district from school to school, can't
you?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  Of course.

BY ATTORNEY HORVATH:

Q.    And do we have -- or can you
tell from your survey if there were any
schools within a district who provided no
survey responses?

A.    Not from my survey, no.

Q.    Okay.  So it's possible that
there are schools within each district
that provided no responses to the survey,
true?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:
Hypothetically, that's possible,

Page 304

yes.

BY ATTORNEY HORVATH:

Q.    Okay.  You don't know one way or the other, correct?

ATTORNEY JACOBSON:

Objection.  Form.  And asked and answered.

THE WITNESS:  As I said, we didn't -- we don't have data on which school each individual respondent taught at.

BY ATTORNEY HORVATH:

Q.    And so it's possible that we have zero responses from some of the schools in the district, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  That's possible.

BY ATTORNEY HORVATH:

Q.    Did I hear you say that no surveys were sent to teachers unless they were currently employed by the district at the time of the survey?

Page 305

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  That's correct.

BY ATTORNEY HORVATH:

Q.    So there were no surveys sent to teachers who were employed in 2014 but were not employed, at the time of the survey, by the district, correct?

A.    Yes, that -- well, that's correct.  I think it would have been extraordinarily difficult to collect that kind of a sample.

Q.    Difficult or not, it wasn't done, fair?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  We only interviewed people who were full-time teachers currently.  The -- yeah, that's who we interviewed.

BY ATTORNEY HORVATH:

Q.    Okay.  And then when you

Page 306

were performing the analysis of the data, you looked at different response rates that were reflected in Appendix E for each of your school district reports, correct?

A.    I just want to make sure I understand what Appendix E was -- or remind myself.

That was the response statistics.  Yes.  And we reported those for each of the school districts.

Q.    Right.  And under those response statistics, you did not include a line that reflected the response rate of usable survey responses to the total number of surveys, right?

ATTORNEY JACOBSON:
Objection.

BY ATTORNEY HORVATH:

Q.    You provide that percentage?

ATTORNEY JACOBSON:
Objection.  Form.

THE WITNESS:  I'm not sure I understand what -- what I --

Page 307

BY ATTORNEY HORVATH:

Q.    Sure.  Let me see if I can do a better job.

The last line in Appendix E is a response rate.

Do you see that?

A.    Yes.

Q.    And the formula you noted for the response rate was to take Line E, which is the total responding as the numerator, and use Line A as the denominator, Line A being the number of invitations sent, right?

A.    Correct.

Q.    So you got to that percentage by dividing the total responding by the total number of surveys sent, correct?

A.    Correct.

Q.    You did not include the percentages for the actual completed surveys, Line B, divided -- or, actually, it would be -- yeah, Line B divided by the number of invitations sent, right?

Page 308

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  No, we didn't calculate that percentage.  It's fairly straightforward.

BY ATTORNEY HORVATH:

Q.   Okay.  But straightforward -- if you wanted to find out the usable response rate, that's what you would do; you would divide Line B by Line A in each of your Appendix Es, correct?

ATTORNEY JACOBSON:

Objection.  Form.

THE WITNESS:  If -- if that's what you wanted to do.  That's not what would typically be done, but.

BY ATTORNEY HORVATH:

Q.   And if you wanted to look at the percentage of teachers who could respond from a decade ago versus the number of total surveys sent, the way to do that math would be to take the number

Page 309

of teachers who answered from 2014 and divide that by the total number of surveys sent, correct?

A. That sounds reasonable.

Q. That would be just simple math, right?

A. Yes.

Q. And you did not include that percentage on your Appendix E, did you?

A. No. But as you pointed out, it's a fairly straightforward calculation.

Q. Is there a reason you did not provide that information on Appendix E?

A. Because it's not typically reported in survey research.

We didn't hide the data. I mean, as you point out, it's easy enough to calculate.

Q. We were talking earlier about event calendars.

Do you recall that testimony?

Page 310

A.    Yes.

Q.    Is the only purported anchoring event that is included in your survey the pandemic?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS:  Well, the -- there's an anchor that's created by their estimate of the current usage or current disruption rate. And so that becomes one anchor.

And the -- then the COVID pandemic is a second.

And we also asked them, when they first started teaching, what was the disruptions due to social media use.

BY ATTORNEY HORVATH:

Q.    For the teachers that answered with information from 2014, the pandemic was six years after the 2014 timeframe, correct?

A.    Yes.

Q.    And just to class the loop

Page 311

on the surveys that were not sent to all the teachers that were there in 2014, is the reason that was not done was just that it would be difficult?

ATTORNEY JACOBSON: Objection. Form.

THE WITNESS: The -- well, first of all, we wouldn't know how to reach -- reach them. The -- and, you know, they wouldn't be able to have the same kind of anchoring that teachers that are there now have in looking back.

So it did not seem that a survey that was directed at teachers who, you know, maybe retired ten years ago would yield any kind of data that would be useful.

BY ATTORNEY HORVATH:

Q. It's my understanding you're refusing to answer any questions regarding your current salary, correct?

A. That's correct.

Page 312

ATTORNEY JACOBSON:

Objection.  Form.

BY ATTORNEY HORVATH:

Q.    What percentage of revenue from Applied -- from Applied Marketing --

A.    Science.

Q.    -- Science, what percentage of revenue from Applied Marketing Science, Inc., is related to surveys done for litigation?

A.    So I don't -- I'm -- that's not something that's -- that's published for the -- internally.  My understanding is that it has generally been about 60 to 70 percent.

ATTORNEY HORVATH:  I'll pass the witness.

ATTORNEY JACOBSON:  All right.  If all defense counsel have gone, I have just a couple of questions for you, Mr. Klein.

-   -   -

EXAMINATION

-   -   -

CONFIDENTIAL

Page 313

BY ATTORNEY JACOBSON:

Q.    As you know, my name is Jordan Jacobson.  I represent plaintiffs in this matter.

You've offered expert opinions in litigation before this case, correct?

A.    That's correct.

Q.    And in approximately how many cases have you served as an expert witness?

A.    I've served as an expert witness in several hundred cases.  I've provided testimony in about 100 cases.

Q.    And do you know if there were Daubert motions submitted to exclude your testimony in those hundreds of cases where you've served as an expert?

A.    Yes.

Q.    And are you aware of any of those Daubert motions being granted and your testimony being excluded?

A.    No, none of them were granted.  And my testimony has never been

Page 314

excluded or limited in any way.

ATTORNEY JACOBSON:  No further questions from me.

ATTORNEY PISTILLI:  Just a couple quick follow-ups.

- - -

EXAMINATION

- - -

BY ATTORNEY PISTILLI:

Q.    You've never submitted a survey in litigation before examining a sociological question, correct?

A.    There is nothing that comes to mind, except that I'm remembering a case that had to do with employee behavior and the extent to which they were paid for the time spent putting on protective gear and stuff like that.

So, I mean, that sort of gets at the -- one of the issues you raised earlier.

But I'm not sure what qualifies as a sociological issue.  I mean, the -- we talked earlier about the

case against Meta that I was involved in. And I hadn't realized it had settled, or maybe it hasn't settled, but my survey in that case had to do with individuals' attitudes toward privacy. And I guess that would fall into the category of a sociological survey.

Q. I think we earlier discussed that all of your prior testimony related to goods or services made available to the consumer public or other businesses, correct?

ATTORNEY JACOBSON:
Objection. Form.

THE WITNESS: Well, it had to do with consumer behavior. And often there was a product or a service involved in that.

BY ATTORNEY PISTILLI:

Q. Right. So your -- your testifying experience relates to consumer behavior?

ATTORNEY JACOBSON:
Objection. Form. Misstates

testimony.

THE WITNESS: Well, surveys -- I'm sorry.

Surveys that describe consumer behavior or consumer wants and needs.

BY ATTORNEY PISTILLI:

Q. Just one other quick point to follow up on.

You testified a moment ago that you asked information in your survey about when teachers began teaching at their school?

A. I believe that's correct.

Q. And if you want, I can help and we can look at Exhibit-1 as an example.

ATTORNEY JACOBSON: Is -- this seems outside the scope of redirect.

ATTORNEY PISTILLI: I'm just trying to clarify. I mean, you can object.

ATTORNEY JACOBSON: You're

clarifying my four questions about whether testimony had been excluded before?

ATTORNEY PISTILLI:  After I finished examining, he said something that I don't think was accurate.  And I'm trying to follow up on that.

ATTORNEY JACOBSON:  During --

ATTORNEY PISTILLI:  If you're unwilling to let me question on that, you can make your objection, and we'll take it to the court if we need to.

ATTORNEY JACOBSON:  You had passed the witness.  And so we will object to questioning that's outside the scope of redirect.

BY ATTORNEY PISTILLI:

Q.    Am I right, sir, that in Screening Question 2, you did ask about when teachers -- oh, not Screening Question 2 --

A.     5.

Q.     -- Screening Question 5, you asked about when teachers started at their current school, right?

A.     Yes.

Q.     But, in fact, when you asked teachers about social media use in Survey Question 5, you didn't use that information as an anchor, correct?

A.     If it was prior to -- and I'm looking at Page D-19.

If it was prior to 2015, then -- or 2014, then we didn't ask about their current -- when they first started teaching.

ATTORNEY PISTILLI:  Thank you.  No further questions.

ATTORNEY WHITELEY:  I have one follow-up question based on plaintiffs' questioning.

- - -

EXAMINATION

- - -

BY ATTORNEY WHITELEY:

Q.    Okay.  Mr. Klein, this is Daniel Whiteley again.

In how many of those hundreds of cases that plaintiffs' counsel just asked you about did you conduct a survey asking employees of one of the parties to estimate the minutes they have spent on certain tasks over a period of years?

ATTORNEY JACOBSON:    Objection.  Form.

THE WITNESS:  I don't think I've ever done something in the -- that -- in the -- that would meet the characteristics that you just described.

ATTORNEY WHITELEY:  Thank you.

I'll give this back to you.

ATTORNEY PISTILLI:  Are we done?

ATTORNEY WHITELEY:  Lisa, did you have more questions?

ATTORNEY HORVATH:  Mr.

Page 320

Whiteley just asked mine.  So I think I'll pass.

VIDEO TECHNICIAN:  I'll now be stating the on-record times for each party.

Christian Pistilli, representing Meta, 5 hours 12 minutes.  Faraz Shahidpour, representing Snap, went 16 minutes.  Daniel Whiteley, representing YouTube, went nine minutes.  Lisa Horvath, representing TikTok, went 15 minutes.  Jordan Jacobson, representing plaintiff, went one minute.

The time is 5:26 p.m., and we are off the record.

- - -

(Whereupon, the deposition concluded at 5:26 p.m.)

- - -

CONFIDENTIAL

Page 321

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

*Amanda Miller*

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated:  September 7, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

CONFIDENTIAL

Page 322

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

CONFIDENTIAL

Page 323

- - - - - -

E  R  R  A  T  A

- - - - - -

PAGE    LINE    CHANGE

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

CONFIDENTIAL

Page 324

ACKNOWLEDGMENT OF DEPONENT


I,_____, do hereby certify that I have read the foregoing pages,  1 - 321, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.


_____
ROBERT KLEIN                     DATE


Subscribed and sworn to before me this
_____ day of _____, 20____.

My commission expires:_____


_____
Notary Public

CONFIDENTIAL

Page 325

LAWYER'S NOTES

PAGE   LINE

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

CONFIDENTIAL

**[& - 2]**                                                              Page 1

| & | | | |
|---|---|---|---|
| **&** | | | |

**&**  1:16 2:2,8,14 3:3,9,16 4:3,9 4:14 5:4

**0**

**03047**  1:3

**1**

**1**  6:14 11:17 18:13,21 24:12 62:8,8,9 65:4 68:10 71:20 88:11,24 118:1 130:20,22 131:17 247:9 247:12,20 316:16 324:3
**1,077**  113:5 114:17
**1,378**  102:13,17 103:16
**1,620**  80:10
**1.2**  88:20
**10**  7:17 28:6 78:14 79:16 94:2,3 96:9,10 96:11 105:8 117:6 135:12 135:15 219:11 301:11
**10.2**  94:15
**10.6**  101:9

**100**  16:15 21:23 34:24 236:15,17 294:9,17 313:14
**10018**  2:21
**102**  80:24
**10:44**  71:9
**10:58**  71:16
**11**  7:20 78:20 79:16 99:12,13 103:2
**11.7**  94:20
**117**  4:10
**11:59**  129:4
**12**  8:5 11:12,17 19:2,20 21:17 65:20 75:13,14 79:2,16 80:17 80:21 83:16 88:12,13 96:24 97:3,11,20,24 98:3,8,8 102:16,18 103:4 104:17 104:18 105:6 105:11 107:17 107:18 113:15 115:21 116:12 116:17,23 129:15 131:19 131:22 154:15 295:15,20 320:7

**12.0**  83:16
**12.9**  84:13 86:11,12
**12:13**  129:11
**13**  6:6 8:8 43:12 68:24 79:9,16 108:10 109:10 129:15 135:13,16 177:15
**13.4**  105:2
**13.7**  84:19
**131**  81:5
**14**  8:11 59:14 165:22 172:10 182:23
**14.8**  112:2
**14.9**  82:23 83:9 83:18,23 84:8 94:11
**15**  8:15 80:21 193:16,23,24 209:4 320:13
**16**  8:18 194:16 195:1 320:9
**16.5**  100:6
**165**  8:14
**17**  8:21 199:8 199:11,16
**17.6**  105:14
**18**  6:16 9:5 24:15 29:20 30:3 38:22 81:2 98:12,16

216:2 217:23 218:5 220:1
**18.6**  99:20 100:2
**1800**  4:16
**19**  9:9 27:15,17 75:20 216:10 217:23 218:8 219:4,6,7,9,11 220:2 318:11
**19087**  1:17 2:4 3:18
**193**  8:17
**194**  8:20
**1985**  37:1
**199**  8:22
**1:06**  171:23
**1:44**  172:6

**2**

**2**  6:17 24:13,13 24:14,17 26:18 27:1 33:1 62:11 79:24 81:16 83:2 88:15 94:7 99:17 104:23 109:15 111:14 111:21 118:2 130:20 131:17 169:7 173:17 175:12 184:10 184:19 186:11 200:17 317:22

CONFIDENTIAL

**[2 - 3]**                                                                                    Page 2

317:24
**2,000**   208:8
**2,977**   96:13,22
   97:2,17
**2.1**   100:17
**2.2**   106:12
   180:19
**2.2.**   169:7
**2.6**   109:17,24
   110:4 180:21
**2.7**   107:3
**20**   9:12 39:13
   40:3 42:24
   71:24 73:8
   74:20 80:2,5,6
   80:7 90:14
   96:8,20 102:11
   107:10,11
   110:24 113:2
   216:18 217:23
   218:11 220:2,6
   282:11 301:11
   324:11
**20.2**   110:16
**20001**   2:16 5:6
**20024**   3:4
**2010**   64:22
**2014**   75:19
   76:22 77:5,15
   77:20 81:11,22
   82:6 85:11
   97:5,13 98:2
   98:22 99:1
   104:7 107:22

108:11,21
109:16,21
110:8 113:21
115:20 116:7
116:12,22
132:23,24
133:8 305:8
309:1 310:20
310:21 311:2
318:13
**2015**   318:12
**202**   2:17 3:5
   5:6
**2020**   110:2,8
   202:22
**2021**   166:23
**2022**   166:21
**2023**   85:15
   87:8 88:17
   90:13,14 94:9
   95:2
**2023-2024**
   89:16
**2023/2024**   85:3
   85:15 86:6
   89:12 90:2,6
**2025**   1:9 12:15
   24:10 86:23
   87:9 91:2
   106:7 273:7
   321:11
**21**   9:16 67:1,3
   103:4 217:2,23
   218:14,17

220:3 239:5,5
**210**   4:11
**212**   2:21
**216**   9:8,11,15
**217**   9:18,22
**22**   9:19 108:22
   109:2 114:2,4
   217:10,23
   218:20,24
   219:17 220:3,8
   220:20
**2200**   4:4
**2222**   2:10
**23**   9:23 84:18
   87:24 91:16
   92:24 95:23
   100:4,15
   101:16 105:13
   105:22 106:15
   107:2 110:23
   111:9 112:9
   224:14,21,22
   224:24 273:21
   273:23
**24**   10:5 84:18
   87:8,24 90:14
   91:3,16 92:1
   92:24 94:9
   95:2,3,23,23
   100:4,15 101:8
   101:16,16
   105:13,22
   106:15,16
   107:2,2 110:23

111:9 112:1,9
112:10 271:11
272:10,14
273:3
**247**   201:12
**25**   17:15 32:17
   32:19 48:5
   88:1 90:14
   91:3 92:1 95:3
   95:23 101:8,16
   106:16 107:2
   112:1,10
**26**   6:19 103:14
   118:11
**27**   26:16
**270**   107:13
   108:7
**271**   10:6
**272**   6:6
**28**   31:10
**280**   1:16 2:4
   3:17
**288**   6:7
**29**   37:22
**298**   6:7
**2:02**   182:12
**2:11**   182:19
**2:58**   215:19
**2nd**   4:15

**3**

**3**   6:20 24:23
   31:12,24
   141:16,21

CONFIDENTIAL

**[3 - 8/1/25]**                                          Page 3

173:11 187:10
187:12,15
191:14 195:3,8
206:7 247:17
247:21 260:20
**3.2** 95:5 102:3
**3.7** 86:1,16
**3.9** 90:23 91:1
92:2,11
**30** 42:12 98:20
99:5 296:4
300:18 322:16
**3047** 1:4
**31** 6:21 55:8
**310-3030** 4:11
**312** 3:11
**313** 6:8
**314** 6:6
**31605** 321:10
**319** 6:7
**32** 58:7 115:12
115:15
**321** 324:3
**33** 81:12
**33134** 2:10
**333** 3:10
**34** 239:5
**35** 21:3 239:5
**36** 49:10,15
**37** 6:23 193:13
**382** 225:21
**383** 228:14
**39** 165:19

**3:18** 217:18

**4**

**4** 6:22 37:24
38:8
**4.3** 86:24
**4.3.** 173:7
**4.9** 105:17
**40** 131:13
**409** 4:6
**41** 108:3
**42** 7:6
**434-5000** 3:5
**457-2000** 4:17
**47** 104:8
**48** 7:8
**49** 108:14
**4:13** 271:4
**4:22** 1:3
**4:36** 271:16

**5**

**5** 1:9 7:5 42:14
42:21,22 71:22
80:3,5 95:16
117:10 135:17
183:2 318:1,2
318:8 320:7
**5.1** 105:24
106:3
**5.2** 93:9 94:23
112:6,13
**5.3** 111:4
**5.5** 89:13 90:22
91:17 110:20

**5.7** 101:13
**5.9** 89:10 91:13
91:17 92:11
101:19
**5/18/25** 6:15
7:15,18,21 8:6
8:9 18:14
78:14,20 79:2
79:9
**50** 213:2
301:12
**500** 4:15
**501** 4:5
**512** 4:17
**54** 131:2 239:5
**55** 7:10 239:6
**58** 7:13
**59** 130:23
**5:02** 298:6
**5:03** 298:13
**5:26** 320:17,21
**5th** 12:14

**6**

**6** 7:7 48:7,15
173:17 180:20
180:22
**6.3** 90:3 91:5
93:1
**60** 300:19
312:14
**60654** 3:10
**610** 2:5 3:18

**620** 2:20
**662-6000** 2:17
5:6
**667-7706** 2:5
3:18
**680** 3:4

**7**

**7** 7:9 55:9,11
55:17 321:11
**7.1** 87:5
**7.7** 106:18
**7.8** 89:24 92:21
**70** 75:1,4,22,24
76:3 97:10
312:15
**73** 11:12
**763-3260** 4:6
**77550** 4:5
**78** 7:16,19,22
**78212** 4:11
**78701** 4:16
**79** 8:7,10

**8**

**8** 7:11 58:9,17
58:19,20 86:8
88:11 141:19
141:21 173:7
195:5 247:10
247:14,15
**8.9** 100:11
**8/1/25** 8:18 9:6
9:9,13,16,20
194:16 216:2

CONFIDENTIAL

**[8/1/25 - addictive]** Page 4

216:10,18
217:2,10
**808west.com**
4:12
**80s** 62:24
**83,500** 22:10
**835** 22:8
**841-1000** 2:21
**850** 2:16 5:5
**862-2000** 3:11
**877.370.3377**
1:24

**9**

**9** 7:14 78:7
79:16,24 80:3
81:18 141:15
141:18 182:23
**9.2** 84:23 86:8
86:13
**9.4** 87:10,14
90:16 100:1
**9.9** 106:8
**9/11** 164:13,19
164:21 165:1
**90** 16:15
**917.591.5672**
1:24
**973** 2:11
**98** 236:17
**994-1700** 2:11
**9:29** 1:18 12:15
**9:34** 18:3

**9:35** 18:10

**a**

**a.m.** 1:18 12:15
18:3,10 71:9
71:16 129:4
**abbie** 63:8,9
**ability** 124:17
124:24 150:20
153:1 156:12
157:9 158:23
159:21 161:5
162:10 167:6
167:21 168:6
173:23 174:19
176:12 182:3
190:19 192:16
266:11 299:3
**able** 24:6 45:8
53:22 126:2
139:18 153:8
153:17,20
158:18 176:18
188:18 189:5
198:16 214:2
240:13 266:23
267:5 282:15
299:13,19,22
311:11
**above** 1:18
41:2
**academic**
167:20 169:8
170:5 178:10

178:11 180:1
180:14 183:11
207:14 208:12
208:21 215:5
302:9
**acceptable**
206:12
**accepted** 162:2
233:19
**accepting**
181:21 245:17
**access** 249:1
280:12 293:3
**accessing**
249:20 280:17
**account** 150:13
189:15 277:13
277:18,20,22
278:14 279:9
279:23 280:11
280:14,15
284:23,24
**accuracy**
157:22 163:2
177:18 180:3
190:8
**accurate** 15:8
19:18 59:7
113:9 158:19
160:5 175:7
179:14 210:7
236:22 317:7
322:20

**accurately**
118:20 159:21
164:7 176:13
202:12
**acknowledges**
237:3
**acknowledg...**
324:1
**act** 17:1
**acting** 34:6
**action** 29:4
56:23 57:1
**actions** 1:6
56:21
**activities**
145:12,13
181:4
**activity** 179:6
**actual** 39:18
307:21
**actually** 35:18
44:11,20 45:23
46:15 68:18
72:24 73:10
74:10 108:17
131:9 135:4
157:17 209:21
221:9 307:22
**add** 46:20
**addiction** 1:4
12:19
**addictive**
258:15 259:3,9

CONFIDENTIAL

**[addition - analysis]**                                        Page 5

| | | | |
|---|---|---|---|
| **addition** 205:22 301:21 | **ages** 240:14,16 | **agreeing** 232:1 232:5 | **alternative** 255:4 267:14 |
| **address** 30:23 | **aggregate** 289:14 | **agricultural** 44:14,15,21 | **amanda** 1:19 13:3 321:10 |
| **addresses** 80:11 96:22 | **agnello** 2:9 | 45:1,13 46:5 | **ameliorated** 210:22 |
| **addressing** 76:20 167:6 168:19 170:17 | **ago** 21:3,5 42:24 48:24 75:18 76:6 80:23 81:4 | **ahead** 16:1 31:21 78:4 151:20 | **amend** 19:15 |
| **administered** 133:9 208:8 249:13 | 97:5 102:20 103:15 104:1 115:8 129:18 | **al** 25:1 | **american** 32:8 |
| **administrator** 66:4 | 156:15 157:3 278:5 291:21 | **alcoholic** 33:15 223:1 | **amount** 81:24 82:8 85:3 87:9 88:18 90:15 |
| **adolescent** 1:3 12:19 | 291:21 308:22 311:17 316:10 | **alex** 3:17 | 93:17 95:4 98:21 100:15 |
| **ads** 44:18,20 46:7,8 | **agree** 33:7 36:14 45:6 | **algorithmic** 258:14 259:8 | 101:17 105:22 106:16 110:3 |
| **advertisement** 47:4 | 59:24 60:5,18 60:22 68:1 | **algorithms** 259:2 | 111:9 112:11 119:21 120:22 |
| **advertising** 17:7 49:24 | 83:20 85:14 88:17 120:1 | **aligned** 196:8 | 128:6 131:24 132:1,15,21 |
| 50:7,17 56:15 56:18 231:3 | 125:24 126:11 142:1 143:17 | **allegations** 41:10 258:22 | 133:7,20 134:9 137:6 157:10 |
| **affiliated** 34:23 | 144:1,4 149:21 160:12 161:19 | **allege** 259:1 | 173:24 176:13 176:19 178:22 |
| **affiliation** 29:22 | 164:4 170:22 171:4 179:24 | **alleged** 30:21 40:15 | 190:20 206:16 222:21 280:21 |
| **afternoon** 272:4,5 288:18 288:19 | 180:7 188:14 191:16 226:9 | **allegedly** 82:22 83:8,22 84:4 | **ams** 273:5 290:23 291:3,9 |
| **age** 164:14 238:24 239:9 239:14,20 | 230:1,16 296:18,21 301:20 | **allocate** 283:17 289:8,16 290:8 | **ams's** 291:6 |
| 240:6,9,9 241:7 274:14 | **agreed** 12:3 | **allocated** 206:1 | **analysis** 57:14 57:17 70:11,19 |
| | | **allocates** 289:23 | 71:3 118:17 |
| | | **allow** 204:4,17 210:24 | 213:5 242:13 |
| | | **allowed** 238:5 | 259:19 306:1 |
| | | **allows** 64:11 197:11 | |

CONFIDENTIAL

anchor  165:1 310:8,11 318:9

anchoring 310:3 311:12

anchors  196:20 205:4

angus  45:9

ann  4:15

answer  11:5 16:1 21:19 64:17 66:19 67:8,19,24 68:20 69:14,17 73:12 76:9 77:13 78:2 81:15 122:10 123:23 124:3 125:10 126:2 130:10 136:24 137:11 151:9 152:5 154:24 155:4,15 158:7 159:10 163:3 170:3,15 214:2 235:6 236:15 236:18 238:8 251:12,22 268:6 270:4 286:2 289:11 292:3 301:5 311:22

answered  67:3 76:10 77:23 120:10 123:8 124:6 126:13 126:21 131:16 138:22 139:13 150:16,18 156:19 161:12 232:18 234:13 235:3 243:24 252:1 253:11 283:12 293:12 301:15 302:17 304:7 309:1 310:20

answering 122:6 132:23 150:13 214:11 244:4 289:3 292:9 300:13

answers  76:15 77:21 124:14 124:16 153:9 158:19 213:3 324:4

anticipation 273:24

antitrust  49:23 50:7,17 57:19 57:22

antonio  4:11

anxiety  262:16 263:1,14 264:3 264:6

anxious  261:2 262:10 264:19 268:22 269:14

apark  3:19

apologies  62:11 103:5 233:10

app  253:8 284:20 285:3 285:14

apparent 235:10

appear  99:13 143:16 214:18

appearances 2:1 3:1 4:1 5:1

appearing 200:7

appears  18:24 27:23 48:20 55:18 200:2

appendices 20:12

appendix  65:4 130:22 132:11 306:3,7 307:4 308:11 309:9 309:15

application 63:13

applied  7:10 20:3,6,14,16,20 20:21 21:1 22:16 23:23 24:3 49:9,15 55:12,19 63:7 63:11 130:13 272:20 285:21

286:7 312:5,5 312:8

apply  321:18

appreciate 220:21

approach 200:21 201:23 205:11

approaches 212:7

appropriate 103:21 158:8 161:16 163:14 198:6 207:11 279:6 322:6

appropriately 153:9 162:4 207:16 213:4 241:7 254:18 268:7

approximate 201:10

approximately 16:13 17:13 20:5 22:10 24:8 49:10 313:9

apps  253:24

areas  56:6

argument 39:19 45:17,17 45:23 46:24

arguments 37:9

CONFIDENTIAL

**[arises - attorney]** Page 7

| | | | |
|---|---|---|---|
| **arises** 189:12 190:1 | 109:4 114:5 115:14 116:18 117:10,13,18 123:19 124:5 126:20 132:14 132:17 135:20 135:23 136:5 136:14 137:20 137:22 138:22 139:9,13 140:10 141:13 141:22 142:3 142:13,15 144:20,21 149:20 150:16 151:24 156:12 165:10 171:15 173:18 203:8 204:22 206:19 210:1 213:1,6 232:17 234:13 235:2 238:22 240:8,9,12 243:23 244:2 249:24 251:24 253:10 263:13 264:5,18,20,23 265:6 266:4 283:11 293:11 295:1 299:2 300:16 301:14 304:6 310:14 316:11 318:3,6 319:5 320:1 | **asking** 30:6 60:16,18 72:6 83:19 121:18 138:1 151:16 155:12,13 158:3 159:5 164:23 169:21 176:9,11,22 199:1 263:12 264:1 319:6 | 135:4 191:6 289:18 |
| **arrive** 156:23 | | | **assumptions** 70:16 |
| **arrived** 155:3 | | | **assurance** 229:15 |
| **article** 58:23 59:5,6 60:18 62:5,20 63:21 64:3 166:8 167:20 168:5 168:13 169:8 169:16,20 170:2,12,14 172:19 173:2 173:22 174:18 178:1,6 186:17 187:3 190:7 193:12 194:6 195:16,21 198:4,6,13 199:5 200:8 207:14 209:4 212:1,3 213:14 213:19,22 214:14 | | **asks** 66:4 144:17 239:4 | **atlanta** 287:4 |
| | | **aspects** 189:17 | **attached** 322:12 324:6 |
| | | **assert** 77:2 | **attempt** 162:1 188:3 213:16 |
| | | **asserting** 275:2 | **attention** 67:7 173:6 |
| | | **assertion** 292:19 293:7 | **attitude** 224:8 |
| | | **assess** 186:20 | **attitudes** 52:9 315:5 |
| | | **assignment** 44:12 283:19 285:18 | **attorney** 6:6,6 6:7,7,8 13:13 13:23 14:3,19 14:23 15:5 17:23 18:19 26:3,7,15,24 27:3,6 30:18 31:1,8,10,22 34:7,15 37:21 38:6 39:8 41:18 42:1,12 42:19 48:5,12 49:4,8 51:14 51:18 52:12,16 53:9,14 54:10 54:18 55:7,16 58:6,15 68:21 68:24 69:3 |
| **articles** 63:13 168:18 183:11 194:3 198:23 | | **assisted** 20:7 20:13 221:18 | |
| **artist** 35:13 | | **assisting** 19:23 | |
| **ascertain** 162:9 | | **assume** 16:2 145:16 | |
| **asked** 26:1 37:13 60:7 76:13 77:17,23 97:12 98:1 103:7 104:14 | | **assumed** 70:12 119:17 127:16 128:4 133:6,15 133:19 176:1 | |
| | | **assuming** 234:4 290:15 | |
| | | **assumption** 134:16,19,21 | |

CONFIDENTIAL

**[attorney - attorney]** Page 8

| | | | |
|---|---|---|---|
| 70:22 71:4,6 | 112:18,21,24 | 151:21 152:3 | 205:14,18 |
| 71:18 73:13,16 | 113:22 114:6,9 | 152:12,18 | 206:22 207:3 |
| 73:19,23 74:3 | 114:15,18 | 153:3 154:6 | 208:17 209:2 |
| 74:8,12,16 | 115:4,9,17,22 | 156:16 157:7 | 211:8,14,20,24 |
| 75:7,11 77:22 | 116:4,14,20,24 | 157:24 158:11 | 213:8,12 214:6 |
| 78:3 79:14 | 117:4 119:12 | 159:2,16,24 | 214:12 215:15 |
| 82:11,17 84:1 | 119:16,22 | 160:7,14,24 | 215:17 217:20 |
| 84:6 85:6,13 | 120:2,6,17 | 161:8,18,22 | 219:2,4,5,8,9 |
| 85:19,23 86:17 | 121:2,7 122:7 | 162:6,13,23 | 219:10,12,22 |
| 86:21 87:12,16 | 122:11,15,24 | 163:5,18,22 | 220:1,5,7,9,13 |
| 87:19,23 88:4 | 123:3,11,15,24 | 164:3 165:5,9 | 220:17,19,22 |
| 88:8,21 89:1 | 124:4,15,18,22 | 165:18 166:5 | 221:1,3 222:11 |
| 89:17,21 90:8 | 125:2,21 126:6 | 167:23 168:3 | 222:16 223:9 |
| 90:12,18,24 | 126:15,19 | 168:10,14,22 | 223:13 224:1 |
| 91:19,23 92:3 | 127:6,10,15,18 | 169:5,17,23 | 224:10,19 |
| 92:7,12,16 | 128:1,10,15,21 | 170:10,20 | 229:4,10 |
| 93:2,6,10,14,20 | 129:1,13 | 171:1,5,10,16 | 231:14,18 |
| 93:24 95:7,13 | 133:11,18,23 | 171:20 172:8 | 232:16 233:2 |
| 95:17,21 96:3 | 134:7,12,17 | 174:2,7,10,13 | 234:12,21 |
| 96:6,15,19 | 135:1,7 136:17 | 175:20 176:8 | 235:1,21 236:7 |
| 97:7,15 98:5 | 136:21 137:1,9 | 178:24 179:22 | 236:13,19,24 |
| 98:10,14,18,23 | 138:4,10,21 | 181:18,23 | 237:15,20,23 |
| 99:4,6,10 | 139:7,12,17 | 182:9,21 186:6 | 238:3,14,21 |
| 100:19,23 | 140:3,9,22 | 186:8 188:20 | 239:17,23 |
| 101:2,6,20,24 | 141:7 142:16 | 189:10 190:11 | 240:17 241:4,9 |
| 102:6,9,22 | 143:14 144:11 | 190:17 191:20 | 241:14,21 |
| 103:3,18 104:3 | 144:23 145:3 | 192:7 193:6,10 | 242:3,8,14 |
| 104:10,15 | 145:23 146:7 | 193:13,22 | 243:2,6,14,18 |
| 106:1,5,20,24 | 146:12 147:3,8 | 194:23 198:17 | 243:22 244:5,9 |
| 107:4,8,24 | 147:23 148:5 | 198:21 199:6 | 244:15,21 |
| 108:5,12,18,23 | 148:19 149:5 | 199:15 200:10 | 245:5,13,21 |
| 109:8 110:9,13 | 149:10,15 | 200:16 201:24 | 246:18 247:3 |
| 111:12,16,19 | 150:15,21 | 202:6,18 203:2 | 248:19 249:2 |
| 111:23 112:14 | 151:5,11,13,18 | 204:9,16 | 249:15,22 |

CONFIDENTIAL

**[attorney - bachelor's]**

250:22 251:8
251:13,18,23
252:18 253:1,5
253:9,14 254:1
254:4,12,21
255:22 256:3
256:14,18
257:3,7,17,22
258:5,11,16,20
260:4,8 261:17
261:21 262:2,6
262:19,23
263:3,10,16,24
264:9,15 265:1
265:4,16,20
266:1,8,14
267:2,8,20
268:1,8,14,18
268:24 269:7
269:16,20
270:1,16,19,22
271:18 272:3
274:19,24
275:7,19 278:8
278:11,15,21
281:1,13,21
282:9,19 283:1
283:10,20
284:11,17
285:5,12,23
286:5 287:15
287:19 288:2,7
288:11,17
290:1,5,10,17

292:5,10,22
293:5,10,15,20
294:1,5,10,19
294:24 296:19
296:23 297:18
297:23 298:1
298:18 299:9
299:17 300:6,8
300:21 301:4
301:13,19,24
302:5,19 303:3
303:8,11,21
304:2,5,12,16
304:20 305:1,5
305:16,23
306:17,19,21
307:1 308:1,6
308:13,19
310:5,18 311:5
311:20 312:1,3
312:16,18
313:1 314:2,4
314:9 315:13
315:19,23
316:7,18,21,24
317:4,9,11,16
317:20 318:16
318:18,24
319:10,17,20
319:22,24
322:16
**attorneys**   21:6
58:24

**attributable**
282:16,16
**attribute**   43:18
46:7,9,10,15
258:10 259:8
259:11 266:24
299:23
**attributed**
251:10,21
257:24 265:7
**attributes**
259:17
**attributing**
44:8
**atypical**   127:23
**austin**   4:16
**author**   172:18
**authored**   58:24
63:15 200:8
**authorities**
286:16
**authors**   181:17
**auto**   62:23
**autobiograph...**
210:23
**available**   53:8
229:16 239:20
240:2,4,11
243:10 292:2
315:10
**avenue**   2:20 3:4
**average**   82:23
83:9,22 85:3
87:9 88:18

90:15 95:4
173:12 223:4
285:9
**avocado**   7:6
42:16 43:18
44:8 46:3,7,10
46:13
**avocados**   43:2
46:15
**award**   35:18
**aware**   61:6,13
61:22 146:13
146:18,24
147:11,13,21
148:3 150:11
166:10 181:15
181:24 183:23
184:2 192:24
258:21,24
260:1 276:19
276:21 297:14
313:20
**awareness**
149:18
**axe**   148:14

**b**

**b**   6:11 7:2 8:2
9:2 10:2
210:24 307:22
307:23 308:10
**bachelor's**
47:16

CONFIDENTIAL

**back** 62:7
68:10 71:20
81:16 88:10
137:10 141:15
153:2,11 157:5
157:5,6 162:7
173:16 197:10
199:4 206:20
209:3 213:13
218:24 247:9
260:19 311:13
319:19
**background**
47:15 302:9
**bad** 34:6 298:2
**bands** 241:7
**banned** 287:14
288:1,6
**based** 28:8 59:1
77:8,21 81:11
99:2 104:7
108:21 115:21
116:12,22
150:3 196:2
252:9 285:15
318:19
**baseline** 85:11
**basically** 30:4
133:5 211:11
**basis** 34:13
175:18 177:22
178:8 181:7,9
181:21 183:15
183:21 184:13

185:3,6,12,14
186:24 187:4
189:22 208:5
209:19 212:15
214:1,17 215:7
231:19,21,23
232:6,12 233:3
233:7,14 234:4
234:8,10
237:12 244:3
274:15 275:1
291:3 292:18
293:7 294:15
**bates** 6:14,17
6:20,22 7:5,7,9
7:11,14,17,20
8:5,8,11,15,18
8:21 9:5,9,12
9:16,19,23
18:14 26:19
31:13 38:1
42:15 48:8
55:12 58:10
78:8,14,20
79:2,9 165:22
193:16 194:16
199:11 216:2
216:10,18
217:2,10
224:14
**bear** 88:9
**beef** 44:19 45:7
45:9,9,11,15,16

**began** 204:24
316:12
**beginning**
110:1 151:24
210:16
**begins** 200:19
**behalf** 298:20
**behavior** 17:3
263:9 314:16
315:16,22
316:5
**behaviors**
51:23 52:10
269:6 299:23
300:3
**belgium** 181:12
182:3 190:13
**belief** 283:15
289:7
**beliefs** 51:22
267:23
**believe** 14:11
19:8 25:13
29:6,9 48:16
57:7 59:18
65:2 69:1
72:23 95:10
114:13 120:14
121:13 123:6
127:4,13
128:13 131:15
145:6 150:8
157:19 160:4
165:2 166:9,12

169:1 172:24
192:4 195:19
207:24 208:23
226:23 228:6
234:18 238:20
247:20 269:12
273:20 287:13
287:24 290:22
296:24 300:4
316:14
**believed** 29:4
30:13 268:10
268:20 269:22
**believes** 34:22
259:20 267:11
**believing** 233:8
**belli** 195:8
200:8
**bellwether**
79:21 295:15
**benefits** 203:21
**best** 15:16 49:1
150:19 192:15
**better** 41:22
197:3 238:2
307:3
**beverage** 223:1
**beverages**
33:15
**beyond** 21:14
156:7 228:9
280:3
**bias** 187:13,21
187:24 188:4,5

CONFIDENTIAL

188:8,10 189:8
246:17
**biased** 226:6
245:19,20
**biassing** 146:10
154:4
**billed** 273:1
**billing** 24:7
**binder** 220:11
220:14
**bit** 47:14
128:24 154:7
159:18 195:15
**blind** 61:10
**board** 37:5,16
235:13
**bonnin** 4:3,4
**bottle** 34:24
35:3
**bottom** 30:3
40:2,3 203:24
**boulevard** 2:10
**bower** 2:9
**box** 35:12,14
**bpeilen** 2:22
**braak** 172:19
**brand** 54:5
223:15
**brands** 33:2
54:20
**break** 16:7 69:5
69:7 70:6,9
71:5 128:18
172:9 173:1

174:12 201:12
215:16 270:23
282:23
**breathitt** 6:16
9:8 18:16,23
19:5 71:21
74:19 75:6,16
76:16 77:20
216:6 218:6
220:2 247:21
**bree** 2:19
**brian** 5:14
12:12
**brief** 18:6
71:12 129:7
172:2 182:15
215:22 271:7
298:9
**briefed** 156:8
**bring** 219:6
**broad** 231:5
**broader** 282:3
**brody** 2:8
**broke** 222:2
**brought** 29:3
33:24 36:4
46:16 146:15
147:22
**browser** 67:14
**building** 2:20
**bulk** 282:6
**bullied** 261:14
**bunch** 266:6

**burdensome**
190:24
**burling** 2:14
5:4
**bus** 255:16
**buses** 255:20
256:8,12
**businesses**
315:11
**buy** 33:15
51:12 53:16
55:2
**byrne** 2:8
**bytedance** 4:18
4:19

**c**

**calculate** 308:4
309:20
**calculating**
117:22
**calculation**
309:12
**calculations**
258:2
**calendar** 8:16
8:22 167:15
193:18 194:5
196:9,12,15
199:12 200:1
200:19,20
201:6,23
205:11 207:15
207:22 208:13

210:11 215:10
**calendars**
197:17 208:6
210:17 213:16
213:20,24
214:15 215:5
309:22
**california** 1:1
12:23
**call** 73:13
76:20 126:17
**called** 32:7
40:17 43:2
64:4 225:3
**calling** 183:24
184:3
**calls** 156:5,8,9
181:16
**canada** 17:16
**capable** 122:5
177:1
**captcha** 69:24
**care** 266:19
**carefully** 148:9
153:13 322:4
**carella** 2:8
**carellabyrne....**
2:11
**case** 1:3 18:23
25:4,8,12,24
29:2,8,12,14,19
30:17 31:8
32:7,11,15
33:8,16,24

CONFIDENTIAL

**[case - citations]**                                                                 Page 12

36:20,20,23
37:8,10,11,15
37:17,17,18
38:13,15,19
39:9 40:14
42:23 43:6
45:15,16 46:2
46:12 50:4,20
51:3 52:18
56:12,18 57:5
57:10,12,16,23
58:4 99:14
104:20 109:12
146:22 156:18
189:12 218:6,9
218:12,15,18
218:21 219:19
230:23 238:12
272:21 284:21
288:22 295:6
313:6 314:15
315:1,4
**case's** 29:2
**cases** 17:19
19:11 24:20
79:21 118:22
153:2 154:1
231:2 266:23
267:1 313:10
313:13,14,17
319:4
**castillo** 4:9
**catchall** 276:3

**categories**
50:22 65:7
120:19 262:8
**category** 51:6
142:7,15
143:21 179:21
212:23 223:4
264:17 315:6
**cause** 266:12
267:6
**caused** 258:4
258:14 264:19
264:21 300:3
**causes** 136:7
260:14 264:3
**causing** 252:5
257:12 259:13
259:21 269:5
299:5
**cecchi** 2:8
**census** 233:21
233:22
**certain** 24:6
151:3 164:14
243:13 244:19
299:23 300:3
319:8
**certainly** 21:10
52:14 74:5
114:13 145:8
145:10 149:3
154:2 242:11
244:3,6 245:1
261:20 275:10

284:14 287:7
287:21
**certificate**
321:1
**certification**
12:4 49:23
50:6,16 321:17
**certified** 1:20
321:11
**certify** 321:4
324:3
**certifying**
321:21
**cetera** 50:1,19
248:4,12 249:7
250:4,18 255:6
255:17 256:9
256:22
**chair** 55:21,23
**chairman** 21:2
285:21
**challenge** 210:2
**challenging**
164:6 184:14
185:6
**change** 134:10
137:11 202:10
292:3 323:3
**changed** 40:18
**changes** 21:15
61:18 158:12
158:15,16
322:11 324:5

**changing** 40:16
**chapter** 225:1
**characteristics**
319:15
**characterize**
124:10 164:9
**charleston** 7:16
8:20 19:6
78:10 80:9
81:23 82:7
194:20
**chart** 75:15
**check** 1:16 2:2
3:16 44:13,17
44:22 45:3
67:6 130:16
**checking**
162:18
**chenu** 186:17
187:2
**chicago** 3:10
**children** 297:3
**choice** 39:22
**choose** 66:6,24
**chose** 66:22
68:16 163:3
228:2,3
**chris** 13:15
**christian** 2:15
320:6
**citation** 195:8
195:14
**citations**
183:13

CONFIDENTIAL

**[cite - company]** Page 13

cite 167:5 168:18 176:24 180:9 194:8 195:24 196:6
cited 36:20 166:11 167:18 194:4 209:5,8
cites 183:10 186:16
citycenter 2:15 5:5
claim 57:2,6 179:13 233:4
claiming 35:4
clarify 316:22
clarifying 317:1
class 49:22 50:6,16 56:20 56:23 57:1 76:5,21 77:4 81:10 92:9 93:18 104:6 107:21 113:20 119:3 120:23 125:17 128:6 132:22 133:8 133:21 138:20 139:10,20 140:20 141:10 142:7 143:22 157:11 244:8 245:8 248:4 255:15,15

256:7,7 260:11 300:20 310:24
classes 85:9 282:7
classic 183:5,17 184:6
classroom 75:18 81:24 82:8 84:19 86:24 88:2 94:12,20 95:24 99:21 100:6,16 101:10 105:3 105:14,23 106:8 109:18 110:3,17 111:1 111:10 112:2 138:19 145:12 145:14,17,20 174:17 176:19 186:1 191:3 197:14,15 246:16 256:20 256:23 257:12 261:2 299:6 301:11
classrooms 179:9
clean 221:5
clear 34:16 47:1 60:7 77:7 77:19 153:7 162:17 197:16 231:10 250:17

266:22 268:5 270:12
clearly 33:16 197:1 234:16 281:4 282:4 302:8,11
click 69:13,21
client 29:2,13 29:16 37:11 42:6
clubs 53:2
coded 136:12
coding 142:23
cognizant 151:23
collaborative 221:17
colleagues 24:3 24:5 271:1 288:10 292:17
collect 305:12
collected 76:24 84:5,7 89:20 116:3,5 118:1 119:7 198:10 242:11,17
collecting 184:12 185:4 185:21
color 36:3
colts 36:23
column 40:3 97:1 186:10

come 22:14 53:4 199:4 215:9
comes 314:13
comfort 158:9
comfortable 157:15 158:18 160:20 291:23 292:8
coming 171:17 197:10
commemorat... 35:14
commencing 1:18
comment 261:24
comments 261:15
commercial 55:5
commission 324:12
committee 291:10,15,16 291:19
common 275:15 294:22
communicati... 227:21
companies 295:6
company 1:23 21:3 276:4

CONFIDENTIAL

**[comparative - conservative]**                                    Page 14

**comparative**
  138:14,14
  140:7
**compared**  54:5
  85:8,10 186:18
  190:24 242:22
**compelled**  45:3
**compensation**
  272:15,18,24
  273:4
**complaint**
  41:10 275:11
**complete**  15:8
  19:18 24:18
  62:15 69:9
  70:17 81:6
  113:11 200:12
  228:19 233:21
  233:22
**completed**
  65:13 128:8
  130:24 131:11
  131:20 132:11
  226:14 307:21
**completely**
  34:11 113:9
**completing**
  72:7
**complex**  59:22
  60:15 184:15
  185:8,19
**complexity**
  183:4,16 184:5

**component**
  40:19,21
  201:22
**componentart**
  6:23 38:2,14
  40:16,18,20
**componentart's**
  41:1
**componentone**
  6:23 38:2,14
  38:24 41:2,5
**components**
  40:22 41:1
**composed**  73:4
**composite**
  220:15
**compound**
  121:3 188:21
  265:2
**compromised**
  209:15
**concept**  187:24
  196:8 202:5,7
  208:2
**concepts**
  235:24
**concern**  30:9
**concerned**  42:7
  173:2 189:9
**concerns**
  177:17,20
  180:2,5 190:8
  236:5

**conclude**  28:9
**concluded**
  28:21 32:24
  40:12 47:8,12
  320:21
**concludes**
  180:14
**conclusion**  33:8
  81:21 82:5
  155:15,22
  156:22 179:24
  180:11,23
  181:17 183:16
  183:24 185:18
  190:6 211:15
**conclusions**
  33:3 34:4
  131:15 178:9
**condition**  42:6
**conditions**
  41:17,22 42:4
**conduct**  43:16
  44:2,6 161:16
  242:1 287:1
  319:6
**conducted**
  32:14 33:14
  34:12,19 51:2
  60:12,24
  273:10,24
  283:24 284:7
  297:10
**conducting**
  41:7 46:20

  47:2,9 221:19
**conference**
  59:2
**confident**  157:9
**confidential**
  286:20 292:1
**confidently**
  124:24
**conflict**  261:11
  264:24 269:23
**conflicts**  261:6
**confuse**  29:5
  35:4
**confused**  33:1
**confusion**  17:2
  28:6,11,15
  29:10,24 30:10
  32:23 39:18
  40:15 49:22
  50:6,16 231:3
**connect**  149:8
**connected**
  148:24 149:22
**connection**
  19:3 29:22
  272:16 273:5
  273:11 284:20
**connolly**  3:3
**consequences**
  8:12 165:24
  166:15 172:13
**conservative**
  137:7

CONFIDENTIAL

**[consider - correct]**                                    Page 15

| | | | |
|---|---|---|---|
| **consider** 73:22 147:18 284:2 | **containing** 284:8 | **cooking** 33:23 | 92:22 93:1,19 93:23 94:17 |
| **considerably** 212:9 | **contains** 135:16 | **cooperation** 72:6 | 95:1,10 97:6 97:17 98:22 |
| **considered** 148:7 | **content** 57:13 57:17 | **copies** 27:4 31:19 72:17 79:19 | 100:12 101:5 101:15 102:15 |
| **consists** 184:15 185:7,19 | **contention** 43:14 | **copy** 200:5 218:5,8,11,14 218:17,20 219:18 | 104:9 106:11 108:8 110:12 110:19 112:17 |
| **constituted** 29:9 | **context** 164:23 207:8 252:22 299:22 | **copyright** 166:22 167:3 | 114:8,17 115:8 115:21 117:3 |
| **construct** 242:1 | **contexts** 145:10 184:16 185:9 185:20 | **correct** 19:4,8 19:14 25:6,9 | 117:20 119:4,5 119:8 121:1 |
| **construction** 250:3 | **continue** 66:1,7 66:12 120:12 123:10 125:20 129:14 | 25:10,22 28:23 31:4 32:13 33:20 34:19 | 122:6 127:9 129:22 131:4,5 132:18,19,24 |
| **consult** 67:17 | | 36:1 37:7 | 133:1 135:17 |
| **consultant** 43:15 | **continued** 3:1 4:1 5:1 | 39:10,11 40:8 42:4 43:10 | 135:18,22 136:16,20,24 |
| **consulting** 67:20 | **continuing** 182:22 214:8 | 47:6,7,11,18,21 50:23 51:4 | 137:16,17 139:11,20,21 |
| **consumer** 17:3 51:11 52:9,19 52:22 55:1 223:4,6,22 315:11,16,21 316:5,5 | **control** 35:23 36:10 67:5 130:15 321:20 | 53:8 56:2,13 56:19,22 57:18 57:24 61:15 62:5 65:11,16 70:2,21 74:2 | 140:2,11,16 141:17,23 142:9,10 143:19,23,24 145:2,8 146:16 148:8 153:2 |
| **consumers** 29:23 43:17 44:7 47:3 53:22 55:2 | **convenience** 142:21 | 74:11 76:6,16 76:18,18,22 77:5,9 81:12 | 159:1 167:22 168:9 174:10 174:21 187:8 |
| **contact** 287:3,8 | **conversational** 155:24 197:19 200:20 204:6 205:10 211:1,6 | 85:18 86:13,16 87:18 89:10 | 188:17,19 190:22,23 |
| **contacted** 146:21 | **converted** 208:7 | 90:7 91:2,6,14 91:15,18 92:21 | 192:10 193:1 196:10 201:1 |
| **contained** 74:24 | | | |

CONFIDENTIAL

**[correct - customer's]**                                    Page 16

204:21 205:5,6 206:14 210:11 211:2,7,19 225:14 227:6 231:13 232:15 236:6 237:9,10 239:10 246:1,3 246:12,13,17 247:6,22,23 249:14 250:21 255:21 256:13 257:2 260:13 262:18 263:2 263:15 264:7 270:21 285:8 290:21 299:20 300:9,20 301:8 301:9,12,17,23 302:18 304:4 304:15 305:4,9 305:11 306:5 307:14,18,19 308:12 309:3 310:22 311:23 311:24 313:7,8 314:12 315:12 316:14 318:9 324:4

**corrections** 322:5,7 324:5

**correctly** 67:8 189:13 190:2

**counsel** 12:3 13:1 14:10 22:24 23:7,15 27:4 68:23 73:20 200:14 214:10 271:23 275:12 293:2 312:19 319:5

**counselor** 66:5

**counted** 116:10 131:19

**county** 287:11

**couple** 23:13 183:11 198:3 221:4 271:1 312:20 314:5

**course** 46:21 161:3 166:6 303:10

**court** 1:1,20 12:22 13:3 14:17 15:11 17:11 24:22 27:22 28:2,16 28:21 31:2 32:5,7,21 33:7 33:18 35:22 36:10,15 37:12 38:16 39:14,20 39:22 40:6,12 41:11 42:2,9 43:1 45:24 47:8 233:18 317:15 322:20

**court's** 31:5 33:2

**courtesy** 220:21

**courts** 36:16

**cov.com** 2:17 2:22 5:7

**coverage** 147:6

**covered** 41:14

**covers** 17:8 52:3

**covid** 197:10 203:11,15 210:5 310:12

**covington** 2:14 5:4

**cpistilli** 2:17

**crafting** 148:7 148:10

**craig** 4:10

**create** 251:4 256:11

**created** 310:8

**creating** 39:16 254:15 255:19

**credentials** 172:23

**criteria** 130:13

**criticism** 209:9

**criticize** 198:11

**criticized** 31:2 36:17

**critique** 28:13

**critiques** 195:22

**cue** 144:24

**cuervo** 32:22 35:1,7,11

**cues** 201:7 202:16 203:19 204:8,21 205:13 210:24

**current** 49:2 75:21 86:22 88:1 92:10 93:8,19 94:18 101:7 103:23 106:6 111:24 124:21 125:6 125:13 130:10 130:12 131:3 132:10,17 136:9 153:10 153:15 159:6 175:1 207:10 310:9,10 311:23 318:4 318:14

**currently** 74:23 76:8 77:12 97:18 108:15 109:5 304:23 305:20

**custom** 35:11

**customer** 49:22 50:5,16 64:4,8 64:9

**customer's** 63:3

CONFIDENTIAL

**cut** 287:22
**cycles** 189:16

**d**

**d** 6:2 65:20,20
68:24 318:11
**daily** 189:16
214:1,17 215:7
**damages** 17:5
35:18
**dance** 280:8
**daniel** 3:3
288:20 319:2
320:10
**darius** 8:20 9:7
9:11,14,18,21
194:19 216:5
216:13,21
217:5,13
**data** 8:12 70:11
70:17 76:23
77:1 82:13
84:5,7 89:20
96:2 99:1
117:24 118:17
119:6 120:5
126:18 131:3
134:22 165:23
166:15 172:13
184:12 185:4
185:21 198:9
203:21 209:13
234:22 235:5
238:10 239:20

239:20 240:11
241:16 242:10
242:15,17
283:14,16,22
283:22,24
289:8,10,22
290:7 293:4
304:9 306:1
309:18 311:18
**date** 1:19 12:14
22:9 202:21
210:1 322:9
324:8
**dated** 321:11
**dates** 167:12
196:18 197:1
197:12
**daubert** 7:13
58:12 313:16
313:21
**david** 4:4
**day** 21:4,4
118:3,15
121:21 122:1
123:21 125:6
125:12 130:18
136:1 165:4,11
165:15 174:1
207:18 208:16
221:6 268:13
268:23 269:15
278:22 300:18
301:7,8 324:11

**days** 322:16
**dbonnin** 4:6
**dc** 2:16 3:4 5:6
**de** 2:10
**deal** 82:24
83:10,23 84:9
176:20 260:15
**dealing** 77:3
101:11,18
106:9,17 112:3
112:12 174:17
175:10 179:8
207:5 261:6,11
263:14
**deals** 179:8
**dealt** 209:21
259:14 282:8
**debate** 199:2
**decade** 75:18
76:6 80:23
81:4 97:5
102:20 103:15
115:8 129:18
153:2,12
156:15 308:22
**deceptive** 56:14
56:17
**decide** 291:11
**decided** 29:17
241:1
**decision** 38:13
40:5
**decisions** 51:11

**declined** 141:5
**dee** 1:19
**deemed** 322:19
**defendant** 2:22
5:7 289:16
292:20 293:8
295:6 297:5
**defendant's**
39:18
**defendants** 3:6
3:12 4:18
13:16 43:23
259:2 260:2
282:17 288:22
294:4,18
**defense** 312:19
**defer** 128:19
**define** 188:7,13
**defined** 188:6
225:19
**defines** 248:15
**defining** 199:24
**definition**
51:19 52:6
188:10 196:14
200:18 207:21
208:23 251:5
**degree** 47:16
47:19
**degrees** 47:23
**dekalb** 7:19
9:11 19:6
78:16 94:4
96:14 216:14

CONFIDENTIAL

218:9,21 219:1
219:3,6,15,19
219:21 220:2
287:5,6,10
**delivered**
128:23 171:19
**demerath** 4:9
**demographic**
240:1 241:16
**demographics**
301:22,23
302:3,16,24
303:5
**demonstrates**
177:20 180:5
**demonstrating**
28:14
**denominator**
118:8 307:12
**department**
44:14,21 45:2
45:14 46:5
**departures**
256:9
**depends** 164:8
164:22 165:8
165:17 171:14
222:19 223:12
224:4 225:15
236:9
**deployment**
62:19,21 63:6
**deponent** 12:24
324:1

**deposed** 16:10
**deposing**
322:16
**deposition** 1:13
11:2 12:16
14:10 22:20
23:3,5,8,16,19
23:21 24:1,22
152:1 299:1
320:20 321:6
322:3,13,17,19
**depositions**
16:16,19 25:15
25:18
**deprivation**
261:5 266:13
267:7,12
**deprived**
264:22 268:13
**derive** 280:20
282:15 283:6
**derived** 283:4
**describe**
118:21 121:6,8
121:9 154:9
316:4
**described** 30:5
194:5 292:17
319:16
**describing**
196:21
**description**
6:13 7:4 8:4
9:4 10:4

163:11 238:2
**design** 62:22
188:2 208:2
221:12
**designed** 30:23
152:24 153:14
157:21 212:18
221:9 285:3
**designers**
205:23
**designing**
221:16
**despite** 119:18
**detail** 169:20
**details** 24:6
**determine**
61:21 127:8
205:24 230:8
230:20 231:11
239:13 240:14
241:17 266:10
267:4,6,22
268:11,21
269:13,23
299:13,19
300:2
**determined**
291:9 300:2
**determining**
285:9
**devoted** 87:1
190:20 207:18
**diageo** 6:21
31:15 32:8

**diamond** 225:4
**diaries** 175:7
**diary** 179:7,13
184:8
**differ** 230:10
230:21
**difference** 7:13
58:12 122:13
124:8 132:8
228:2 233:9
**differences**
35:9 131:10
173:12 182:2
245:1 301:22
302:11
**different** 35:12
45:22 52:6
54:20 65:6
66:15 68:16
114:22 119:19
120:4,10
122:19,20,22
123:7,14 124:2
124:13,14,16
124:23 126:1
126:12,17,23
127:1,5,9,14
128:14 143:1
145:10 159:18
167:3 175:8,9
180:10 181:13
184:16 185:9
185:20 189:17
195:15 201:16

CONFIDENTIAL

228:7 232:7,11 232:14 255:9 269:9 299:3 300:19 301:21 303:4 306:2

**differently** 126:14

**difficult** 15:14 185:21 186:19 305:12,14 311:4

**difficulties** 169:9 170:6 175:13

**difficulty** 229:21 246:15

**dimensions** 60:2 302:13

**dinner** 44:19 164:16

**direct** 173:6 193:1 321:20

**directed** 29:15 41:9 311:15

**direction** 11:5

**directly** 22:14 191:10 192:22

**directory** 41:3

**directs** 254:18

**disagree** 34:3 37:14 40:10 169:14 170:4 180:8

**disclosing** 227:17

**discord** 252:20 253:4,8,13

**discounted** 26:12

**discovery** 44:3 147:15

**discrete** 167:7 174:1 190:21

**discuss** 23:16 23:20 24:2,4

**discussed** 190:6 225:10 315:8

**discussing** 167:20 200:9

**discussion** 15:2 39:5 183:3

**discussions** 23:24 277:1 293:1

**disproportion...** 243:20 246:11

**disproportion...** 242:6,21 243:12

**dispute** 175:19 177:23 178:2,9 178:15 181:8 183:15 185:3 185:13 187:1 189:23 209:20 212:16

**disputing** 181:22 183:22

**disqualified** 65:18 66:16,21 66:23 67:1,2,4 67:9 68:4,11

**disqualify** 149:4

**disrupting** 255:4,5,15 256:7

**disruption** 100:16 101:10 105:23 106:8 111:10 112:3 136:8,11 157:11 176:20 251:10,20 257:12,24 258:4,13 259:6 259:14,21 260:14 282:7 310:10

**disruptions** 99:22 100:7 105:3,15 109:18 110:3 110:17 111:1 179:9 185:1 186:1 190:16 207:6 245:3 246:24 255:19 256:11 258:14 259:7 264:18

264:21 299:6 310:16

**disruptive** 264:24

**distant** 212:11

**distillery** 6:21 31:14 32:8

**distinct** 235:24

**distracted** 244:7 245:7 260:10

**distraction** 75:18 76:5,21 77:4 81:10 104:6 107:22 113:20 119:3 140:20 142:8 143:22 244:14

**distractions** 145:18

**distributed** 229:13 237:9 237:14 238:13

**distribution** 239:21

**district** 1:1,1 12:22,22 38:16 66:22 68:12,15 68:17 72:3,8 74:24 75:23 80:10,15 97:19 116:7 134:23 147:14 154:5 192:24 235:13

CONFIDENTIAL

239:22 244:18
282:12 286:24
303:6,14,18
304:15,23
305:9 306:4
**districts** 13:21
14:5 72:14,22
73:2,10 117:15
135:21 141:23
146:14 147:1
154:16 239:9
239:16 240:1,6
245:2,24
273:16 289:22
295:13,16,18
296:17 303:1
306:11
**diversion**
139:11 140:1
140:14 141:3
156:15 197:14
206:20 252:5
**diversions**
139:24 141:10
**diverted** 82:1,9
82:16,23 83:9
83:16,23 84:8
84:20 85:4,17
87:9 88:3,19
90:15 93:17
94:12,21 95:4
96:1 98:21
118:6 132:24
136:1 137:6,15

139:20 140:18
143:13 145:19
149:3,7 150:1
151:10 152:9
153:16,21
163:17 204:23
206:17 280:21
281:9 282:13
283:7 285:10
**diverts** 259:22
260:16,16
**divide** 308:10
309:2
**divided** 307:22
307:23
**dividing** 307:16
**division** 12:13
**doctor** 54:15
**doctors** 53:19
53:20 54:4,15
**document** 1:6
18:21 31:24
32:4 38:7,10
42:20 48:14
58:16 174:6
214:9 224:20
296:13
**documents**
11:10 272:12
284:3,6 295:2
295:5
**doing** 35:19,20
41:15 91:12
175:2 178:22

215:12 250:1
322:8
**double** 61:10
**downloaded**
278:23
**dozen** 156:10
**dr** 8:19,20 9:7,7
9:10,11,14,14
9:17,18,21,21
28:5,8,12
135:5 194:18
194:19 198:10
209:7 210:8
213:4 216:4,5
216:12,13,20
216:21 217:4,5
217:12,13
242:12
**draft** 19:20
**drafting** 20:7,8
21:17 221:8
**drafts** 21:7
**drawing**
185:18 262:14
**drawn** 228:18
229:14
**drew** 160:22
**drippy** 35:2,5
35:15
**dropped** 25:21
90:6 131:22
**due** 28:11
40:15 82:9
83:15 84:20

85:4 87:10
88:3,19 90:15
94:12,21 95:4
96:1 100:7
105:3,15
109:18 110:3
110:17 111:1
136:2 137:15
140:18 141:3
143:13 175:11
176:20 179:9
179:10 190:16
197:15 203:11
203:15 206:17
207:6 245:3
246:24 261:3,5
267:12 280:22
281:10 282:13
283:8 310:16
**duly** 13:8 321:5
**dwhiteley** 3:5

e

**e** 2:3 6:2,11 7:2
8:2 9:2 10:2
65:4,10 68:10
72:4,14,18,21
73:4,15 75:1
80:11 96:22
102:13 130:22
130:22 132:11
306:3,7 307:4
307:9 309:9,15
323:1

CONFIDENTIAL

**e.g.** 248:3,10 249:3 250:4,17 255:6,15 256:7 256:20 261:2

**earlier** 35:16 115:3 130:4,7 140:2,21 174:3 215:8 221:5,22 222:4 273:10 274:5 290:22 291:22 299:1 309:21 314:21 314:24 315:8

**early** 62:24 256:9

**earn** 286:6

**easier** 170:22 171:6

**easily** 145:15 203:20

**easy** 309:19

**echo** 298:2

**edition** 224:16

**education** 166:21

**effect** 71:1 176:3 230:7

**effectively** 128:4

**effort** 222:9 239:12 257:8

**efforts** 230:19 231:11

**eight** 56:4 115:6,12,13 277:23 291:20 291:20,21

**eighth** 2:20

**eiland** 4:3

**eilandlaw.com** 4:6

**either** 24:21 77:14 167:4 181:21 185:16 247:2

**elect** 45:22

**electronic** 67:18,22

**electronics** 37:6

**elementary** 66:10

**elements** 170:19 177:6 228:19 229:16

**eligible** 76:9 77:13 78:1 97:12 98:1 103:7 104:14 109:3 114:4 115:14 116:9 116:18 129:21 130:1

**ellis** 3:9 272:7

**em** 6:18 26:20 27:9 29:5,7 30:7

**emeritus** 21:2 55:21,23 285:21

**employed** 74:23 76:8 77:11,12 97:18 115:1 214:22 223:23 304:23 305:7,8

**employee** 20:17 20:18 55:22,23 63:9 314:15

**employees** 20:23 222:10 223:7,19 224:8 291:4 319:6

**employer** 147:21

**employment** 286:9

**encompassed** 281:19

**encounter** 41:13 42:11

**encyclopedia** 63:16,23 64:15 199:17,24

**ended** 137:23 189:18

**engaged** 13:20 14:4 25:7 244:19

**engagement** 258:15 259:3,9

**engineering** 47:17 64:12

**enjoys** 197:4

**ensure** 60:24 61:4,20 188:3 226:13 227:10 241:6

**ensures** 228:1

**entire** 67:15 76:15 174:5 177:24

**entirely** 104:8 257:6

**entirety** 133:22 170:14

**entitled** 27:8 166:14

**entry** 199:17,24 200:7

**enumerated** 50:22 190:21

**environment** 256:20,24 267:17

**equal** 236:3

**equally** 233:13

**errata** 322:6,9 322:12,15 324:6

**error** 169:12 170:9 175:16 176:2 184:8 187:18 191:5 191:16 192:2

CONFIDENTIAL

**[errors - exhibit]** Page 22

**errors** 180:17 181:2 183:6,19 212:8
**es** 308:11
**esquire** 2:3,3,9 2:15,19 3:3,9 3:17 4:4,10,15 5:4
**essentially** 44:18 70:12 73:3 117:14 118:8,9 119:9 130:19 133:6 153:20 208:1 266:5
**estimate** 28:7,8 120:22 128:5 135:24 137:5 153:16 169:22 170:23,24 176:19 204:23 206:19 310:9 319:7
**estimates** 28:5 124:24 130:12 157:16 158:10 160:6,21 167:11 173:2 177:9 190:9
**estimating** 169:10 170:7 175:14 183:7 183:19 206:16

**et** 25:1 50:1,19 248:4,12 249:7 250:4,18 255:6 255:17 256:9 256:22
**evaluated** 60:4
**evaluating** 230:7
**event** 8:22 164:9 167:15 194:5 196:8,11 196:15 197:16 199:11,24 200:18,19 201:6,22 203:13 205:1,2 205:10 207:15 207:21 208:6 210:10,17 213:15,20,23 214:15 215:4,9 309:22 310:3
**events** 124:17 124:21,21 153:1 158:24 159:22 162:11 164:7 176:14 196:19 197:9 201:17,18 202:13 203:5 203:10,19 204:7,14,20 205:4,12 206:1 206:15,18

209:23 210:5 212:10 255:4
**everybody** 14:1 241:2
**everyday** 279:2
**evidence** 9:24 28:10,14 32:22 224:15 225:2 238:10,18
**exact** 282:15
**exactly** 83:12 167:12 198:24
**examination** 13:11 272:1 288:15 298:16 312:23 314:7 318:22
**examined** 13:8 173:12
**examining** 314:11 317:5
**example** 24:7 45:8 66:2 70:4 164:12 202:8 202:21 203:1 242:5 249:3 264:5 316:17
**examples** 52:21 213:20,23 214:15,19 215:4 249:13 249:14 250:6 262:13 263:6

**except** 12:6 204:22 314:14 324:5
**exclude** 313:16
**excluded** 26:9 35:22 313:22 314:1 317:3
**excuse** 273:14 275:20
**exhibit** 18:13 18:21 24:12 26:18 27:1 31:12,24 37:24 38:8 42:14,21 42:22 48:7,15 55:9,11,17 58:9,17,19,20 62:8 65:4 71:20 78:7,13 78:19 79:1,8 79:24 80:3 81:18 88:11,11 88:24 94:2,3 96:9,10,11 99:12,13 103:1 103:2 104:17 104:18 109:10 129:15 135:13 135:16 165:21 172:10 182:23 193:15,23,24 194:15 195:1 199:8,10,16 200:12,15

CONFIDENTIAL

**[exhibit - feature]** Page 23

209:4 216:1,9 216:17 217:1,9 217:23 218:5,8 218:11,14,17 218:20 219:11 219:17 220:20 224:13,21,22 224:24 247:9 247:12,20 271:10 272:10 272:14 273:3 316:16

**exhibitors** 41:3

**exhibits** 79:15

**exist** 32:24 39:19 276:21

**expect** 74:6 231:8 235:7

**experience** 61:17 163:13 192:11 207:9 275:18 277:11 315:21

**experienced** 251:9,20

**experiences** 51:8

**expert** 7:12 8:18 9:6,9,13 9:16,20 13:22 16:17 17:18 24:19 25:11 27:12 30:15,21 32:12 36:22

37:2,4 38:19 43:6 49:19 52:17 58:10 145:24 146:5 150:22 178:17 194:17 216:3 216:11,19 217:3,11 225:6 226:2 287:21 288:5 290:7 313:5,10,12,18

**expertise** 28:9 254:11,14

**expires** 324:12

**explain** 65:17 129:24 156:21 158:4 227:24

**explained** 155:1 161:13

**exploratory** 275:13,23 277:7

**exposed** 284:5

**expression** 197:20 211:2,7

**extensive** 275:18 277:11 294:13

**extent** 158:3 162:19 230:9 254:10 281:8 314:16

**extraordinarily** 305:12

**extrapolated** 76:14 98:19

**extrapolations** 115:20 116:1

**f**

**face** 169:10 170:6 175:13 250:16

**facebook** 248:3 248:11,17 249:10 252:10 257:10,24 274:6 275:2 277:17,19,22 278:7,13,23

**fact** 33:17 34:18 35:10 39:17 43:18 60:1 119:18 123:13 144:8 147:20,21 190:5 196:5 201:22 226:14 237:2 265:6 318:6

**factor** 128:23

**factors** 59:18

**facts** 163:20

**fail** 322:18

**failed** 29:21 42:3 68:12,14

**failing** 31:3

**fails** 29:23

**failure** 138:19

**fair** 16:4 28:7 113:13 134:16 248:18 305:15

**fairly** 308:5 309:11

**faith** 34:6

**fall** 50:21 212:23 315:6

**falls** 51:5 179:20

**false** 17:6 49:23 50:7,17 231:3

**familiar** 44:17 187:23 194:1 199:21 201:20 201:21 202:3 204:15 252:19

**familiarity** 286:23

**family** 275:15 275:24 276:1,2 276:12,18 302:7

**far** 33:22

**faraz** 3:9 272:6 320:8

**faraz.shahidp...** 3:11

**favorites** 31:20

**fax** 1:24

**feature** 258:3 259:12,13,17

CONFIDENTIAL

**[features - form]** Page 24

features 63:4 64:12 257:10 257:16,21 258:9

february 21:24 24:10

fed 45:9

federal 38:16 40:6 43:1

feel 292:8

feels 208:22

fell 85:4,17 86:1 87:10,17 88:20 89:15 90:16 95:5,15 100:17 101:1 101:19 102:3 105:24 106:18 107:2 111:11 111:17 112:13 112:19

felt 46:12 120:21,24 122:5 123:22 124:2 157:9 158:7 161:15

field 178:16,18 275:17 277:10

figure 47:2 77:8,19 98:21 116:11 298:3

figures 81:9 116:6,21

filing 12:4 147:2

fill 117:18

filled 65:14 150:11

filters 114:22

final 19:17 64:3

finance 45:5

financial 193:1

find 28:9 36:10 39:20 142:12 144:3 198:16 225:8 279:6 308:8

finds 39:14

fine 62:2 171:21

finish 151:16

finished 317:5

firm 4:3 22:2 34:1,2 55:20 56:2 65:10 272:24

first 24:9 32:18 40:3 69:17,18 69:19 91:10 117:10 170:21 184:19 187:11 187:15 198:5 203:9 204:24 248:1 255:1,2 255:8 264:6 278:13,23 310:15 311:8

318:14

five 71:5 78:4 79:20 95:19,22 125:11 128:17 250:19 254:7 254:17 274:16 279:1 281:10 281:12,19 282:3,4 284:16 289:13 292:19 293:7 297:5 300:19

flawed 33:4,9 33:20

flaws 28:2,11 28:22,24 39:16 40:7

flexible 204:5

flip 80:17 81:16

florida 2:10

focus 39:22 52:9 250:10 289:12

focused 51:11 63:8 145:1

focusing 191:1

folks 242:5

follow 61:24 74:6 136:22 137:14 138:2,7 138:18 139:5,8 155:19 162:9 298:24 314:5 316:9 317:8

318:19

followed 74:1 139:1,15 255:6 264:7

following 60:13 83:14 138:17

follows 13:9

food 128:22

footnote 195:7

footnoted 194:11

footnotes 167:10

forced 45:4

forecasting 49:24 50:8,18

foregoing 321:17 324:3

forget 40:17

form 12:6 82:12 84:2 85:7,20 86:18 87:13,20 88:5 88:22 89:18 90:9,19 91:20 92:4,13 93:3 93:11,21 95:8 95:18 96:4,16 97:8 98:6,15 98:24 99:7 100:20 101:3 101:21 102:7 102:23 103:19 104:11 106:2

CONFIDENTIAL

**[form - full]**                                                  Page 25

| | | | |
|---|---|---|---|
| 106:21 107:5 | 186:7 190:12 | 275:8 278:9,16 | **formulating** |
| 108:1,13,24 | 191:21 193:7 | 281:2,22 | 284:3 |
| 110:10 111:13 | 198:18 202:1 | 282:20 283:11 | **forward** 70:1 |
| 111:20 112:15 | 202:19 204:10 | 284:12 285:6 | **found** 35:23 |
| 112:22 113:23 | 205:15 206:23 | 285:24 287:16 | 37:8,10 40:6 |
| 114:10,19 | 208:18 211:9 | 288:3 290:2,11 | 41:11 42:2 |
| 115:10,23 | 211:21 213:9 | 292:6,23 | 80:6 189:3 |
| 116:15 117:1 | 222:12 223:10 | 293:11,21 | 198:5 |
| 119:13 122:8 | 224:2 229:5 | 294:6,20 | **foundation** |
| 122:16 123:4 | 231:15 232:17 | 296:20 299:10 | 26:4 41:19 |
| 123:16 124:5 | 235:2 236:8,20 | 300:7,22 | 49:5 51:15 |
| 124:19 125:3 | 237:16,24 | 301:14 302:1 | 70:23 74:4 |
| 126:7,20 | 238:15 239:18 | 302:20 303:9 | 75:8 119:23 |
| 127:11,19 | 240:18 241:10 | 303:22 304:6 | 120:7 |
| 128:11 133:12 | 241:22 242:9 | 304:17 305:2 | **founded** 63:11 |
| 133:24 134:13 | 243:3,15,23 | 305:17 306:22 | **four** 20:13 |
| 135:2 136:18 | 244:10,22 | 308:2,14 310:6 | 23:12 24:19 |
| 137:2 138:5 | 245:14 246:19 | 311:6 312:2 | 33:18 34:17 |
| 140:4,23 | 248:20 249:16 | 315:14,24 | 53:1 113:18 |
| 142:17 144:12 | 250:23 251:14 | 319:11 324:5 | 114:4,8,12 |
| 145:4 146:8 | 251:24 253:2 | **formal** 63:24 | 131:7,22 317:1 |
| 147:4,24 | 253:10 254:2 | **format** 47:10 | **frequently** |
| 148:20 149:11 | 254:13 255:23 | **formation** | 278:6,12 |
| 151:6 152:13 | 256:15 257:4 | 262:17 | 279:14,21 |
| 153:4 156:17 | 257:18 258:6 | **formatting** | **friends** 275:14 |
| 158:1 159:3 | 258:17 260:5 | 21:12 | 275:15,23 |
| 160:1,15 161:9 | 261:18 262:3 | **formerly** | 276:1,2,12,18 |
| 161:20,23 | 262:20 263:4 | 251:11 | **front** 14:17 |
| 162:14 163:6 | 263:17 264:10 | **forming** 285:14 | 217:24 |
| 163:23 165:6 | 265:2,17 266:2 | **forms** 140:1,14 | **full** 13:18 32:18 |
| 167:24 168:11 | 266:15 267:9 | 140:20 249:18 | 74:23 75:5 |
| 168:23 169:18 | 268:2,15 269:1 | 293:6 | 77:12 97:19 |
| 171:2 175:21 | 269:17 270:2 | **formula** 307:8 | 108:15 109:5 |
| 179:1 181:19 | 270:20 274:20 | | 184:20 187:11 |

CONFIDENTIAL

**[full - grocery]**                                        Page 26

187:15 206:6,8
214:22 305:20
**function** 62:19
62:21 63:5
**fundamental**
28:22 39:15
40:7
**fundamentally**
39:21 52:5
**funded** 44:22
**further** 92:1
93:8 119:6
186:10 201:4
213:13 271:20
288:9 297:19
314:3 318:17

**g**

**galveston** 4:5
**gaming** 252:22
**gauge** 158:8
266:12
**gauging** 43:16
44:7 180:15,24
**gear** 314:18
**gender** 240:7
302:7
**general** 41:20
45:11 51:6
53:12 155:21
192:19 223:21
226:11 230:18
244:16 246:14

**generally** 45:14
52:2 70:8
154:9 225:17
296:4 312:14
**generate**
188:15 204:7
**genericism**
17:2
**genuine** 39:17
**getting** 200:4
207:17 235:11
269:3 290:14
298:2
**give** 33:18
124:24 153:20
175:8,9 199:7
201:9 202:8
218:23 295:8
319:19
**given** 43:23
109:4 183:4,16
189:14 197:5
208:16 214:21
227:13 244:18
268:12,13,23
269:14,24
282:12,13
321:7 324:4
**gives** 28:16
159:8
**giving** 15:7
**glasses** 67:21
**go** 14:13 16:1
17:24 31:21

33:22 62:7,8
70:1 78:3
79:16 88:10
117:21 129:2
137:10 141:15
151:20 175:2
182:7,10
247:10 287:9
287:10 297:21
298:2
**goes** 33:18
50:11 92:24
93:7 229:11,20
230:6
**going** 16:2
25:24 63:19
66:12 68:6
80:16 90:23
124:9 125:19
137:20 138:9
138:16 139:5
143:7 144:20
144:21 153:1
157:5 174:11
182:12 194:24
197:13 198:24
199:7 206:20
236:16 255:3
270:5 271:22
286:2 289:18
298:6
**golkow** 1:23
12:13

**good** 13:14
59:14,19 60:1
60:3,6 71:7
210:6 215:15
221:16 272:4,5
288:18,19
289:2 298:23
**goods** 51:24
53:7 315:10
**google** 3:6
288:21
**government**
45:19,20,21,22
46:9 47:5
**grades** 154:13
**grandchildren**
294:12
**granddaughter**
280:2
**grandkids**
279:20 297:1
**granted** 313:21
313:24
**granular**
207:17
**grass** 45:9
**greater** 236:4
246:15
**grew** 287:4
**griffin** 63:9
**grind** 148:14
**grocery** 164:18
164:21

CONFIDENTIAL

**[ground - hours]** Page 27

| | | | |
|---|---|---|---|
| **ground** 14:13 | **happened** | **hide** 309:18 | 199:11 200:1 |
| **grounds** 39:19 | 151:22 156:6 | **high** 66:24 | 200:18,20 |
| **group** 35:23 | 229:1 270:8 | 74:22 75:5 | 201:6,23 |
| 36:10 223:23 | **happy** 128:17 | 81:2,23 82:6 | 205:10 207:16 |
| 227:12 274:14 | 128:18 | 82:21 83:7,18 | 207:21 208:6 |
| **groups** 45:1,13 | **hard** 27:4 | 83:21 84:18 | 210:11,17 |
| 122:13 | **harford** 7:22 | 85:5,16 86:23 | 213:15,20,23 |
| **growers** 46:3 | 9:15 19:6 | 87:11 88:19 | 214:15 215:10 |
| 46:10,16,21 | 78:22 99:14 | 89:4,5,9 90:17 | **home** 33:23 |
| **guardrails** | 102:14 216:22 | 91:8,10,12 | 267:17 |
| 153:15 159:9 | 218:12 220:3 | 94:10,19 95:6 | **honestly** |
| **guess** 48:17 | **harm** 30:22 | 98:11 99:20 | 150:19 |
| 119:14 149:13 | **harms** 265:15 | 100:2,5,17 | **hope** 259:23 |
| 164:14 179:19 | 265:22,24 | 101:8,17,22 | 260:17 |
| 202:24 223:11 | **hauser** 63:8,10 | 102:13 103:13 | **horvath** 4:15 |
| 225:15 246:13 | **heading** 167:1 | 105:1,13 106:7 | 6:7 13:23 |
| 256:16 289:17 | **health** 286:16 | 106:16 107:13 | 14:19 297:23 |
| 292:24 315:5 | **hear** 13:24 14:1 | 108:9,16,16 | 298:18,20 |
| **guide** 225:3,9 | 304:21 | 109:6 110:15 | 299:17 300:8 |
| 228:14 237:2 | **heard** 156:24 | 110:24 111:11 | 301:4,19 302:5 |
| **guys** 128:18 | 160:19 252:21 | 112:1,11 113:5 | 303:3,11 304:2 |
| **h** | 253:15,20 | 115:5 154:12 | 304:12,20 |
| | **hearing** 159:14 | 248:23 276:4,6 | 305:5,23 |
| **h** 6:11 7:2 8:2 | **held** 1:15 12:17 | 282:11 297:4 | 306:19 307:1 |
| 9:2 10:2 | **help** 65:5 66:14 | **higher** 91:4 | 308:6,19 |
| **half** 156:10 | 69:4 80:16 | **highlighting** | 310:18 311:20 |
| **handed** 18:20 | 151:2 154:4 | 39:3 | 312:3,16 |
| 38:7 42:20 | 201:17 202:11 | **hip** 52:23 54:1 | 319:24 320:12 |
| 48:14 79:15 | 203:5 316:15 | **hired** 43:15 | **hour** 22:8 |
| 217:22 272:9 | **helped** 21:10 | 44:6,11,11 | 171:17 277:3 |
| **handing** 58:16 | **helpful** 152:10 | **historical** 215:4 | **hourly** 22:6 |
| 224:20 | 225:9 | **history** 8:22 | **hours** 21:16,23 |
| **happen** 16:8 | **helps** 80:18 | 194:5 196:9,11 | 23:12,13 |
| 270:9 | | 196:15 197:17 | 118:14 119:1 |

CONFIDENTIAL

**[hours - indicates]** Page 28

121:20,24
123:20 125:7
125:11 169:11
170:7 173:9
175:14 180:16
181:1 189:14
278:22 320:7
**huge** 252:12
**human** 209:12
**hundred**
313:13
**hundreds**
233:17 313:17
319:4
**hypothesized**
203:21 204:2
**hypothetical**
126:24 152:17
222:17,18
245:16,17
**hypothetically**
126:9,23 141:1
149:13 191:23
193:2 245:7,18
246:21 252:3,6
259:11 262:5
303:24

**i**

**i.e.** 75:19 97:5
125:15
**idea** 291:7
294:23 301:6

**identification**
18:17 21:11
26:22 31:16
38:4 42:17
48:10 55:14
58:13 78:11,17
78:23 79:6,12
166:3 193:20
194:21 199:13
216:7,15,23
217:7,15
224:17 271:13
**identified**
34:22 149:20
197:1 226:19
282:5
**identifies** 281:4
**identify** 136:11
299:4
**illinois** 3:10
**illogical** 123:9
**immediate**
86:10
**immediately**
144:16
**impact** 149:23
**impacted** 188:4
**imperative**
322:14
**implants** 52:23
54:2
**implication**
119:15

**implies** 197:7
**important** 31:3
31:6 60:9,11
60:23 167:12
224:7 250:5
**imported** 62:23
**impossible**
120:12
**improving** 8:15
193:16 195:11
**inaccurate** 59:9
**inattention**
262:16 264:4,7
**inattentive**
261:3 262:10
264:20 268:23
269:14
**inattentiveness**
263:2,15
**incentive**
103:12 127:24
227:8 231:9
235:20 277:4
**include** 130:5
146:3 162:21
222:9 225:11
251:12,22
258:13 259:7
259:23 260:12
260:18 283:23
306:13 307:20
309:8
**included** 70:10
120:5 131:18

258:2 259:18
284:15 310:3
**includes** 32:4,6
130:8 196:18
250:18
**including** 71:2
167:19 248:16
252:7
**inclusion** 63:23
**income** 285:20
286:6 291:23
302:7
**incomplete**
69:5 70:5,9
**incompletes**
69:7
**increase** 82:15
110:7 140:18
**increased**
137:5 141:6
**increasing**
81:24 82:8
**index** 11:2
**indianapolis**
36:23
**indicate** 80:8
96:12 102:12
107:11,18
113:3,16 154:2
**indicated**
118:13 121:19
**indicates** 84:22
206:11 213:19

CONFIDENTIAL

**[indicating - interviewing]**                                    Page 29

**indicating**
  170:5
**individual**
  124:9 155:5
  282:24 289:16
  293:23 304:10
**individuals**
  20:14 22:2
  23:23 76:4
  81:12 104:9
  108:22 119:7
  128:5,8 150:10
  226:13 233:4,6
  295:9,13 315:4
**industries**  63:2
**industry**  45:1,7
  45:12 62:24
  223:1
**inferences**
  229:13
**influence**  150:3
**inform**  276:9
**informal**
  275:13,22
  277:1,1,7
  292:16
**informally**
  276:8
**information**
  70:1 135:6
  188:17 189:4
  197:2,3 200:13
  203:20 223:3
  230:24 234:17

234:23 239:9
240:2 241:13
241:24 243:9
245:23 246:10
247:7 281:9,14
286:3 287:4
295:23 296:1
301:1 302:15
309:14 310:20
316:11 318:9
**informed**
  147:16
**informing**  72:5
**infringement**
  56:9,12 57:8
**initial**  136:24
  137:4 138:1
**injury**  1:4
  12:20
**input**  21:9 64:8
**inquire**  257:20
**instagram**  2:23
  5:8 248:3,11
  248:17 249:10
  252:11 257:11
  258:1 274:7
  275:3 279:8,15
  279:18
**instance**  51:12
  73:18 132:20
  139:22 149:17
  170:21 203:4
  222:7 245:22
  246:9 258:12

263:13 264:6
269:24
**instances**  206:3
  206:13
**instructed**  72:3
  72:8 289:12
**instruction**
  82:1,9 87:1
  88:2 96:1
  118:4,7 120:23
  125:15 128:7
  130:19 132:16
  132:22 133:4,8
  133:21 134:10
  136:2,8 197:11
  280:22 297:12
  297:16
**instructional**
  132:2
**instructions**
  65:22 67:11
  68:2 74:1,7
  322:1
**instrument**
  169:13 175:17
  205:23 221:9
  221:12
**interacted**
  301:3
**interest**  193:1
**interesting**
  36:19 165:13
  179:21

**interests**
  302:10
**internal**  284:3
  284:6 295:2,5
**internally**
  312:13
**international**
  34:1 63:16
**internet**  103:12
  127:23 197:6
  201:2 204:12
  208:9 227:7
  231:9 235:19
**interrupted**
  67:14
**interruptions**
  174:17 175:11
**interview**  60:13
  123:10 154:18
  197:2,6 205:7
  268:10,20
  269:11
**interviewed**
  295:9 305:19
  305:22
**interviewee**
  197:4
**interviewers**
  196:19
**interviewing**
  8:16 53:18,19
  193:18 196:21
  196:22 197:22
  200:21 204:6

CONFIDENTIAL

208:4,13
211:12,18
212:5 275:14
275:23
**interviews**
157:14 159:15
176:17 177:10
186:22 210:21
221:20 250:2
266:22 268:4
273:11,19,23
274:18 275:5
276:18,22
277:3 292:16
293:17 296:3,7
296:15
**introduce**
246:16
**introduced**
191:17
**introduction**
209:11 212:13
**invalidity** 8:13
165:24 166:16
172:13
**investments**
286:13
**invitation** 73:1
81:1 113:10
127:21 235:11
241:2
**invitations** 65:8
72:2 307:13,24

**invite** 178:4
**invited** 154:17
214:10 226:18
**inviting** 65:10
228:10 232:20
**invoices** 10:6
271:12 272:19
**involve** 16:20
36:21 57:16
197:18
**involved** 53:7
61:22 147:15
155:6 211:5
315:1,18
**involves** 201:16
**involving** 17:19
57:5 146:15
190:15
**ip** 59:2
**irregularity**
189:16
**irrelevant**
197:5
**irrespective**
258:3 259:16
**irvington** 2:12
8:7 9:18 19:6
79:5 104:19
107:14 217:6
218:15 219:23
220:3
**issue** 14:2
29:16 30:24
36:5 39:17

170:17 263:22
314:23
**issues** 17:1
20:11 21:12
49:20 82:24
83:10,24 84:9
101:11,19
106:10,18
112:4,13
137:16 139:2
139:16 140:19
141:14 176:21
177:2 182:4
211:17 221:18
256:20,22,24
257:2 264:14
266:7 276:7
314:20
**item** 34:20
**items** 139:9
142:19 143:4
270:6

**j**

**j** 2:15 8:19 9:7
9:10,14,17,21
194:18 216:4
216:12,20
217:4,12
**jacob** 36:24
**jacobson** 2:3
6:8 26:3 27:3
30:18 34:7
41:18 49:4

51:14 52:12
53:9 54:10
68:21 70:22
71:6 73:19
74:3,12 75:7
77:22 82:11
84:1 85:6,19
86:17 87:12,19
88:4,21 89:17
90:8,18 91:19
92:3,12 93:2
93:10,20 95:7
95:17 96:3,15
97:7 98:5,14
98:23 99:6
100:19 101:2
101:20 102:6
102:22 103:18
104:10 106:1
106:20 107:4
107:24 108:12
108:23 110:9
111:12,19
112:14,21
113:22 114:9
114:18 115:9
115:22 116:14
116:24 119:12
119:22 120:6
121:2 122:7,15
123:3,15 124:4
124:18 125:2
126:6,19
127:10,18

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 128:10,21 | 222:11 223:9 | 293:10,20 | 46:12 |
| 133:11,23 | 224:1 229:4 | 294:5,19 | **july** 21:24 |
| 134:12 135:1 | 231:14 232:16 | 296:19 299:9 | 272:21 273:6 |
| 136:17 137:1 | 234:12 235:1 | 300:6,21 | **jury** 77:18 |
| 138:4,21 | 236:7,19 | 301:13,24 | 146:6 |
| 139:12 140:3 | 237:15,23 | 302:19 303:8 | **justified** 177:21 |
| 140:22 142:16 | 238:14 239:17 | 303:21 304:5 | 180:6 |
| 144:11 145:3 | 240:17 241:9 | 304:16 305:1 | **justify** 226:3 |
| 146:7 147:3,23 | 241:21 242:8 | 305:16 306:17 | **k** |
| 148:19 149:10 | 243:2,14,22 | 306:21 308:1 | |
| 150:15 151:5 | 244:9,21 | 308:13 310:5 | **k** 66:11 |
| 151:13,21 | 245:13 246:18 | 311:5 312:1,18 | **kaylie** 4:10 |
| 152:12 153:3 | 248:19 249:15 | 313:1,3 314:2 | **keep** 67:14 |
| 156:16 157:24 | 250:22 251:13 | 315:13,23 | 155:24 279:19 |
| 159:2,24 | 251:23 253:1,9 | 316:18,24 | 289:2 |
| 160:14 161:8 | 254:1,12 | 317:9,16 | **kentucky** 34:1 |
| 161:22 162:13 | 255:22 256:14 | 319:10 320:14 | **kessler** 1:15 2:2 |
| 163:5,22 165:5 | 257:3,17 258:5 | **jacoby** 36:24 | 3:16 |
| 167:23 168:10 | 258:16 260:4 | **japan** 62:23 | **key** 149:2,6 |
| 168:22 169:17 | 261:17 262:2 | **jjacobson** 2:6 | 230:7 |
| 170:10 171:1 | 262:19 263:3 | **job** 189:18 | **kids** 245:7 |
| 171:10,16 | 263:16 264:9 | 203:11,15 | 276:6 297:1 |
| 174:2,10 | 265:1,16 266:1 | 307:3 | **kind** 153:14 |
| 175:20 178:24 | 266:14 267:8 | **johanns** 7:6 | 154:23 159:5,8 |
| 181:18 186:6 | 268:1,14,24 | 42:16 43:3 | 197:5 232:23 |
| 188:20 190:11 | 269:16 270:1 | **john** 63:8,10 | 250:3 270:4 |
| 191:20 193:6 | 270:19 274:19 | **jordan** 2:3 | 275:12 277:6,7 |
| 198:17 200:10 | 275:7 278:8,15 | 313:3 320:14 | 279:19 305:13 |
| 201:24 202:18 | 281:1,21 | **jose** 35:1,7,10 | 311:11,18 |
| 204:9 205:14 | 282:19 283:10 | **judge** 14:17 | **kindergarten** |
| 206:22 208:17 | 284:11 285:5 | 26:12 28:24 | 66:11 |
| 211:8,20 213:8 | 285:23 287:15 | 29:8,12,17 | **kinds** 276:24 |
| 214:6 215:17 | 288:2 290:1,10 | 34:6,11,18 | 277:3 |
| 220:9,17,22 | 292:5,22 | 35:17 37:8,19 | |

CONFIDENTIAL

**king** 1:16 2:4 3:17 4:14
**kirkland** 3:9 272:7
**kirkland.com** 3:11
**klein** 1:14 6:4 6:14,17,20,22 7:5,7,8,9,11,14 7:17,20 8:5,8 8:11,15,18,21 9:5,9,12,16,19 9:23 10:5 13:1 13:7,14,19 14:4,20 15:6 18:13,20 24:24 26:18 27:2 28:13 29:21 31:12 32:23,24 37:24 39:1 42:14 48:7,8 55:11 58:9 78:7,14,20 79:2,9 165:22 172:10 193:16 194:16 199:11 216:2,10,18 217:2,10,21 224:14 271:11 271:19 272:4 288:8,18 297:19 298:19 312:21 319:1 324:8

**klein's** 28:3,7 28:12 39:14,20 39:22 220:11
**klein000001-...** 10:5 271:11
**kmorgan** 4:12
**knew** 137:21 148:17
**know** 15:21 16:7 21:12,19 22:1 25:23 35:10 44:16,18 48:17 49:6 58:18 63:18,22 63:24 65:8 66:9 72:13 73:9,12,17,24 82:14 103:24 113:9 114:21 118:14 119:1 120:3,9,13 121:20,23 122:21 123:1 123:22 124:10 125:5,19 126:9 126:11 130:16 131:13,17 133:2,3,5 134:2 138:8,15 141:1,3,9 142:23 143:2,5 143:6 144:14 145:15 148:10 149:2 150:10

151:10 152:15 153:7 154:3 155:13,13,22 155:23 156:19 156:21 157:1,3 157:12 158:17 160:19 162:4 162:15,18,20 163:13,16 164:11,13 165:13,16 166:23 174:15 175:6,9 176:5 176:18 177:7,8 178:8,14 179:4 179:19,20 181:13 185:15 188:23 189:2 192:1,13 193:24 202:9 203:9,11 204:23 207:20 208:3 210:4 213:18,22 223:18 228:9 232:8 233:18 235:7,14 237:12 239:11 240:6,19,23 241:6 242:4,20 243:11,20 244:11,13,23 246:22 249:24 251:7 252:12

252:15,16 253:6 254:5,6 259:10 261:13 263:20 266:6 266:17,18 267:15,18 269:4 276:4 277:2 278:1 280:13 284:24 286:12 287:5,5 289:21 295:17 297:5 299:20 300:5,17 301:10 304:3 311:8,10,16 313:2,15
**knowing** 137:19 139:3
**knowledge** 26:8,10,11 64:24 146:23 148:2 150:4 193:9 222:22 277:16 294:22 295:7 303:2
**known** 148:22 251:11
**knows** 152:7
**kslaw.com** 4:17
**kst** 37:5
**ktmc.com** 2:5,6 3:19
**kumho** 7:13 58:12

CONFIDENTIAL

**[l - lists]** Page 33

| **l** | | | |
|---|---|---|---|
| **l**  2:3 | **lawsuits**  146:15 | **lighting**  256:21 | **linked**  63:3 |
| **labeled**  175:1 | 146:19,21 | 257:1 | **linkedin**  7:8 |
| **lack**  229:12 | 147:2,7,15,22 | **liked**  240:13 | 48:4,8,19,22 |
| 237:8,13 | 148:4 | **likelihood**  17:1 | 49:3,14 |
| 238:12 | **lawyer's**  325:1 | 28:6,10,15 | **lisa**  4:15 298:19 |
| **lakdawalla** | **lawyers**  25:8 | 29:10 43:17 | 319:22 320:12 |
| 8:20 9:7,11,14 | **lead**  29:6 61:11 | 44:7 226:5 | **list**  24:18,20 |
| 9:18,21 194:19 | 170:8 172:18 | **likely**  125:23 | 41:3 50:11 |
| 216:5,13,21 | 203:21 234:18 | 236:14 | 59:17 62:13,15 |
| 217:5,13 | **leading**  37:13 | **likes**  280:8 | 67:10 72:2,5 |
| **landscape** | 46:24 60:8 | **limb**  33:23 | 74:21,24 96:21 |
| 276:10 | 148:12 265:9 | **limitation** | 155:18 179:6 |
| **lane**  290:15 | 265:13,19 | 41:24 | 210:21 212:7 |
| **language**  66:8 | **learn**  284:19 | **limitations** | 212:19,24,24 |
| **lanham**  16:24 | 285:3,14 | 209:15 | 213:6 228:19 |
| **large**  236:23 | **led**  136:23 | **limited**  37:6 | 270:6 |
| **larger**  85:12 | **length**  205:22 | 44:2 52:15 | **listed**  41:2 |
| 227:12 | **leon**  2:10 | 223:18 248:17 | 50:24 64:4 |
| **late**  255:16,17 | **letter**  235:12 | 250:19 314:1 | 142:8 143:22 |
| 255:20,21 | **level**  208:15 | **line**  11:6,6,6,11 | 144:10,15 |
| 256:8,8,12,12 | 244:16 302:7 | 11:11,11,16,16 | 248:1 251:6 |
| 261:5 | **lexisnexis**  6:18 | 11:16,21,21,21 | 254:24 255:9 |
| **lavrakas**  8:22 | 6:20,23 7:6 | 201:10 231:8 | **listened**  156:9 |
| 199:12 | 26:19 31:13 | 235:18 306:14 | 273:18,20,22 |
| **law**  1:15 4:3 | 32:4 38:1 | 307:4,9,11,12 | 274:17 275:5 |
| **lawrence**  13:19 | 42:15 | 307:22,23 | **listening**  23:24 |
| **lawsuit**  13:16 | **lhorvath**  4:17 | 308:10,11 | 157:13 296:11 |
| 148:18,23 | **liability**  1:5 | 323:3 325:2 | **listing**  40:23 |
| 150:4 152:7,11 | 12:20 | **lines**  73:7 | 254:16 |
| 152:22 193:9 | **life**  203:5,10,12 | **link**  64:11 | **listings**  40:21 |
| 258:22 | 204:7 205:2,3 | 154:19 262:15 | 68:4 |
| | 205:12 206:1 | 262:24 | **lists**  56:1,4 |
| | 206:15,18 | **linkage**  265:14 | 173:17 |

CONFIDENTIAL

**[literature - make]**

**literature** 23:2 167:5 170:5 176:23 178:10 178:12 180:10 181:16 182:1 183:24 184:3 208:12 215:6

**litigation** 1:5 12:21 14:6 17:1 27:8 43:2 46:4 56:7 59:23 61:7,14 61:23 149:9,18 149:23 150:12 150:12 151:1 272:17 273:6 280:24 286:18 286:22 290:7 312:10 313:6 314:11

**litigators** 59:2

**little** 47:14 128:24 154:7 159:18 195:15 278:17

**llc** 3:6,6 4:19 6:18,23 26:20 27:9 38:2

**llp** 1:16 2:2,14 3:3,9,16 4:14 5:4

**local** 34:2,2

**locating** 206:15

**logical** 290:14

**logistics** 221:21

**long** 23:10 36:5 37:1 48:23 123:20 171:8 174:9 207:12 277:3,21 280:16 296:2 300:18

**longer** 164:5

**look** 24:12,13 24:23 26:16 27:14 29:20 37:10,22 38:21 39:12 43:11,22 48:3 55:8 58:7 59:13 65:4,19 71:22 74:17 75:12 80:1 82:18 88:12,14 94:2,6 96:23 99:16 102:10 103:21 104:16 104:22 107:9 107:16 109:10 109:14 113:1 113:14 117:5 118:10 129:15 130:21 132:7 134:22 165:19 166:8 169:2,6 172:22 173:16 177:14 178:5 179:5 184:9

186:9 187:9 193:11,24 200:4 201:11 201:11 205:19 210:13 213:13 225:20 228:13 247:16 255:9 260:19 290:19 296:13 308:20 316:16

**looked** 59:11 131:9 135:9,11 147:10 174:24 187:7 247:5 306:2

**looking** 68:9 70:4 74:10 80:20 86:4 90:13,21 91:7 132:4 142:12 153:11 157:1 166:24 167:9 172:10 184:22 191:11 200:17 201:3 204:1 210:10 211:16 237:3 246:5 247:19 275:10 311:13 318:11

**looks** 166:22 190:19 255:13 256:5

**loop** 310:24

**losing** 203:11

**lost** 203:15

**lot** 253:23 263:19 279:12

**louisville** 33:24

**lower** 236:4

**lunch** 128:19 128:20 171:18

**m**

**m** 5:4

**made** 22:9,22 29:7 35:11 59:1 70:15 120:11 123:9 268:5 278:13 315:10 322:7

**mail** 65:10 72:4 73:4 80:11 96:22

**mails** 72:14,18 72:21 73:15 75:1 102:13

**main** 33:12 77:15 254:7 274:12

**maine** 3:4

**majority** 17:9

**make** 7:13 16:8 58:12 63:2 67:6,12 72:8 72:10 73:20 148:10 152:1 158:12 184:6

CONFIDENTIAL

**[make - meaning]** Page 35

196:13 218:3
222:9 239:12
250:5 251:3,17
257:8 282:5
306:6 317:13
322:4
**maker** 272:8
**maker's** 6:20
31:14 32:7
35:3,6 36:4
222:8,10,15,24
**makes** 124:1
201:5
**making** 61:9
157:15 158:9
160:20 189:24
190:3 235:9
249:21 289:17
**manage** 188:17
**management**
21:4 47:20
246:16
**managing**
221:20
**manifest**
145:18 263:8
**manual** 9:23
59:22 60:15
224:15 225:2
**manufacturer**
54:16 222:10
223:8,24
**manufacturers**
40:24 44:23

**march** 202:22
**mark** 6:21
31:14 32:7
35:3,6 36:4
55:8 78:4
194:24 219:17
220:12,14,20
222:8,10,15,24
**marked** 11:20
18:16,21 26:21
31:15,24 38:3
38:8 42:17,21
48:9,15 55:13
58:13,17 78:10
78:17,23 79:5
79:12 166:3
193:19 194:20
199:12 216:6
216:14,22
217:6,14,22
220:6 224:16
224:21 271:12
272:10
**market** 4:4
32:14 41:17,21
42:3,5 51:3,6
51:10,20,24
52:1,4,8 54:8
54:13 192:11
192:17,20
**marketing** 7:10
16:20 20:3,6
20:14,16,20,21
21:1 22:16

23:23 24:3
39:10 41:16
43:8,15 49:10
49:15 55:12,19
63:7,11,16
221:24 222:5
272:20 285:21
286:8 312:5,8
**marks** 41:13
42:11
**maslynsky** 1:19
321:10
**master's** 47:19
**match** 177:5
**material** 39:17
**materials** 67:18
**math** 244:7
245:8,9 308:24
309:6
**matter** 12:18
22:10 24:9
27:8,12,22
29:17 30:13
43:2 62:18
64:5 235:10
244:14 257:15
313:4
**matters** 19:3
24:24
**maximized**
67:15
**maximum**
233:23 235:16

**mcgee** 5:14
12:12
**md** 1:3
**mdl** 1:4
**mean** 20:10
49:7 51:7
65:14 68:15
84:4 103:6
105:5 113:8
120:14 122:21
124:7 125:4
126:4,8 127:2
127:2 130:1
134:9,15 141:5
142:20 145:7
145:14,21
148:21 149:12
153:24 160:17
164:15,22
165:12,16
177:12 185:17
185:22 202:4
222:13 225:10
236:10 241:6
244:24 245:15
261:12,19
263:21 270:3
278:18 280:18
286:12 287:22
290:13 309:19
314:19,24
316:22
**meaning** 17:2
49:22 50:5,15

CONFIDENTIAL

250:17
**meaningless**
  30:8
**means**   65:18
  75:4 81:8 90:5
  108:19 122:22
  186:21 188:11
  249:3,7 258:19
  280:14 321:19
**meant**   40:20
  195:17
**measure**   46:6
  140:8 191:5
  213:16,24
  214:16 215:6
  224:6 263:23
  284:9
**measured**
  85:22 86:20
  87:3,5,22
  90:11 91:22,24
  92:6,8,15 93:5
  93:13,16 95:12
  100:22,24
  107:7 109:23
  141:3 177:10
  282:22 283:3
**measurement**
  180:17 181:2
  183:6,19 184:7
  186:3 187:18
  192:2 283:5
**measures**
  138:15 214:20

228:20 229:15
**measuring**
  29:11 169:13
  175:3,17
  178:22 179:17
**mechanical**
  47:17
**media**   1:3 6:15
  7:15,18,21 8:6
  8:9 12:18
  18:14 72:10
  76:21 77:4
  78:8,15,21
  79:3,10 81:10
  82:2,10,24
  83:10,24 84:9
  84:20 85:4,17
  87:2,10 88:3
  88:19 90:16
  94:13,21 95:5
  96:2 99:21
  100:7 101:11
  101:19 104:7
  105:4,15 106:9
  106:18 107:21
  109:19 110:4
  110:18 111:2
  112:4,13
  113:21 136:3,7
  139:1,16,24
  140:19 141:4
  141:14 142:4
  142:14,22
  143:8,13,19

144:8,18 145:1
  146:3,15
  147:22 152:10
  156:14 174:16
  175:11 176:7
  176:10,21
  177:3 178:13
  179:11 182:6
  185:1,24
  190:16 191:2
  197:15 198:13
  203:6 206:17
  206:19 207:7
  245:4 247:1
  248:2,8,16,22
  249:14,18
  250:18 251:5
  252:13,23
  253:8,24
  258:13 259:6
  259:18,21
  261:1,4,6,7,12
  261:16 262:1
  262:12,16
  263:1,7 264:3
  265:8,14,24
  267:1,13 276:8
  281:5,15,18
  282:2,14,22
  285:11 286:17
  287:14 289:13
  299:14,24
  300:4 310:17
  318:7

**medicare**
  286:13
**medicines**
  53:21
**meet**   23:7,11
  319:14
**meets**   232:23
  291:11
**melissa**   2:3
**meltzer**   1:16
  2:2 3:16
**member**   226:19
**memorable**
  209:23
**memorialized**
  156:5
**memory**   163:21
  164:2,2 209:12
  209:16 210:24
**memos**   156:4
**mention**   72:10
  152:22 174:16
**mentioned**   53:7
  145:9
**merely**   140:1
  140:19
**messaging**
  255:11
**met**   22:24
**meta**   2:23 5:8
  13:16 14:6
  17:19 25:1,18
  315:1 320:7

CONFIDENTIAL

**method** 211:18 226:3

**methodologi...** 39:15 40:7

**methodologies** 8:17 183:5,18 184:7 193:19 197:18 208:14 210:22

**methodology** 6:16 7:16,19 7:22 8:7,10 18:15 78:9,16 78:22 79:4,11 118:21 209:6

**methods** 186:21 199:18

**mexican** 35:13 46:21

**miami** 2:10

**michael** 8:19 9:7,10,14,17,21 194:18 216:4 216:12,20 217:4,12

**microphone** 222:1

**middle** 66:24 74:22 75:5,16 80:21 81:22 82:6 83:17 84:14,14,23 86:2,6 87:6,17 89:23 92:18,20

94:15,23 95:16 96:24 97:4,11 97:20,23 100:1 100:9 101:1,13 102:4,13,20 105:9,17,24 106:13 107:1 107:13,23 109:7,16,20 110:2,6,20 111:4,17 112:6 112:19 113:5 114:3 154:12 186:13 201:4 248:23 276:5,6 297:4

**milk** 44:20

**miller** 1:19 13:4 321:10

**mind** 31:5 53:5 252:17 262:15 314:14

**mine** 20:10 39:2 90:22 320:1

**minimized** 67:15

**minor** 21:14

**minute** 18:1 46:18 71:5 88:10 117:6 128:17 156:13 157:11 158:23 159:22 161:6

162:11 165:3 177:2 193:23 206:21 207:1 320:16

**minutes** 77:2 117:19,22 118:6,14 119:1 121:20,24 125:8 135:24 163:17 164:18 165:11 184:24 207:2,18 208:16 271:2 279:1 296:5 319:7 320:8,10 320:12,14

**mischaracteri...** 34:8 160:16 171:11 274:21 281:23

**mischaracteri...** 114:1

**misstates** 133:12 315:24

**mistaken** 37:19

**mit** 63:10

**modify** 46:19

**moment** 296:11 316:10

**money** 22:17

**month** 206:3,14 279:16

**months** 46:1 49:11,16 206:2

**morgan** 4:10

**morning** 13:14

**motions** 313:16 313:21

**motivate** 148:12

**motivations** 51:23

**move** 62:2 224:11

**moves** 280:9

**multiple** 28:11 206:20 226:21 227:15,23 228:10 232:22

**myeates** 2:5

**n**

**n** 6:2,21 31:15

**name** 12:11 13:15,18 29:5 40:16,19 41:1 80:14 272:6 288:20 298:19 313:2

**named** 30:7 281:11

**names** 75:24 76:3 276:12,14 295:8,18

**narrative** 197:18 211:1,5

**natural** 128:16

CONFIDENTIAL

**[naturally - objection]**

**naturally** 204:15

**nature** 189:18 227:17 230:11 230:22 231:4

**necessarily** 45:6 53:12 134:15 143:6 143:16 151:8 171:4 212:23 255:1 282:1 299:14

**necessary** 7:12 58:11 285:8,19 322:4

**need** 16:7 19:14 41:16 46:13 61:21 169:19 170:13 174:5 174:14 178:5 205:23 241:3 260:15 282:8 296:8,9 317:15

**needed** 130:16 242:1 247:7

**needs** 52:10 63:3 64:10 225:11 259:14 316:6

**neutral** 265:22 266:5

**neutrally** 264:5

**never** 48:21 69:16 222:14

252:17 253:4 253:13 278:10 284:7 313:24 314:10

**new** 2:20,21,21 210:22 224:11

**newer** 246:11 246:14,22

**news** 298:23

**night** 164:16 261:5

**nine** 107:20 320:11

**non** 61:12 70:14 229:22 230:8,10,21 231:1,12 234:5

**normally** 67:21

**north** 32:8

**northern** 1:1 12:22

**notary** 324:14

**note** 61:4 174:3 174:15 177:8 181:11 214:7

**noted** 13:1 36:16 194:11 307:8 322:11 324:6

**notes** 179:16 276:17,21,24 296:7 325:1

**noteworthy** 196:19

**notice** 1:14 144:15

**notification** 260:11

**notifications** 260:3

**number** 36:16 59:17 63:12 77:2 86:4 91:14 99:2,24 103:22 105:6 106:23 109:3 117:22 129:17 129:21 131:12 132:8,10 154:1 157:23 158:24 180:16 181:2 183:6,18 184:15,23 185:7,19 189:17 196:17 207:18 219:3 233:23 243:20 246:11 255:3 301:1 306:16 307:12,17,24 308:23,24 309:2

**numbers** 28:4 82:19 116:2 117:18 131:11 153:24

**numerator** 118:6 307:11

**numerous** 28:2 28:21

**nw** 2:16 5:5

**o**

**o** 253:17

**o'hanlon** 4:9

**oath** 14:16

**object** 186:6 200:11 316:23 317:18

**objection** 26:4 30:19 34:8 41:19 49:5 51:15 52:13 53:10 54:11 70:23 74:4,13 75:8 77:23 82:12 84:2 85:7,20 86:18 87:13,20 88:5 88:22 89:18 90:9,19 91:20 92:4,13 93:3 93:11,21 95:8 95:18 96:4,16 97:8 98:6,15 98:24 99:7 100:20 101:3 101:21 102:7 102:23 103:19 104:11 106:2 106:21 107:5 108:1,13,24

CONFIDENTIAL

**[objection - okay]** Page 39

| | | | |
|---|---|---|---|
| 110:10 111:13 | 190:12 191:21 | 275:8 278:9,16 | **occasions** 17:14 |
| 111:20 112:15 | 193:7 198:18 | 281:2,22 | 17:21 23:6 |
| 112:22 113:23 | 202:1,19 | 282:20 283:11 | **occupational** |
| 114:10,19 | 204:10 205:15 | 284:12 285:6 | 186:18 |
| 115:10,23 | 206:23 208:18 | 285:24 287:16 | **occurred** 15:3 |
| 116:15 117:1 | 211:9,21 213:9 | 288:3 290:2,11 | 39:6 212:10 |
| 119:13,23 | 222:12 223:10 | 292:6,23 | **occurrence** |
| 120:7 121:3 | 224:2 229:5 | 293:11,21 | 279:3 |
| 122:8,16 123:4 | 231:15 232:17 | 294:6,20 | **offer** 130:12 |
| 123:16 124:5 | 234:13 235:2 | 296:20 299:10 | 225:6 |
| 124:19 125:3 | 236:8,20 | 300:7,22 | **offered** 17:18 |
| 126:7,20 | 237:16,24 | 301:14 302:1 | 32:22 34:13,17 |
| 127:11,19 | 238:15 239:18 | 302:20 303:9 | 38:24 52:17 |
| 128:11 133:12 | 240:18 241:10 | 303:22 304:6 | 59:4 200:12 |
| 133:24 134:13 | 241:22 242:9 | 304:17 305:2 | 295:20 313:5 |
| 135:2 136:18 | 243:3,15,23 | 305:17 306:18 | **offering** 286:18 |
| 137:2 138:5,22 | 244:10,22 | 306:22 308:2 | **office** 235:13 |
| 139:13 140:4 | 245:14 246:19 | 308:14 310:6 | **offices** 1:15 |
| 140:23 142:17 | 248:20 249:16 | 311:6 312:2 | **offs** 69:5,7 70:6 |
| 144:12 145:4 | 250:23 251:14 | 315:14,24 | 70:9 |
| 146:8 147:4,24 | 251:24 253:2 | 317:14 319:11 | **oh** 24:14 103:4 |
| 148:20 149:11 | 253:10 254:2 | **objections** 12:6 | 143:7 201:13 |
| 150:16 151:6 | 254:13 255:23 | **objective** 61:12 | 206:9 270:7 |
| 152:13 153:4 | 256:15 257:4 | 161:20 | 317:23 |
| 156:17 158:1 | 257:18 258:6 | **objectively** | **okay** 15:23 |
| 159:3 160:1,15 | 258:17 260:5 | 158:22 159:20 | 16:8 20:15 |
| 161:9,23 | 261:18 262:3 | 161:4 163:20 | 40:4 44:4 |
| 162:14 163:6 | 262:20 263:4 | **objectivity** 61:1 | 54:21 62:10 |
| 163:23 165:6 | 263:17 264:10 | 61:5,21 | 79:22 80:20 |
| 167:24 168:11 | 265:2,17 266:2 | **obtained** | 81:20 83:4 |
| 168:23 169:18 | 266:15 267:9 | 209:13 210:21 | 91:10,11 94:8 |
| 171:2,11 | 268:2,15 269:1 | 228:21 229:2 | 143:12 144:19 |
| 175:21 179:1 | 269:17 270:2 | 229:15 | 157:2 167:17 |
| 181:19 188:21 | 270:20 274:20 | | 177:11 179:2 |

CONFIDENTIAL

**[okay - page]**

183:1 184:21
187:22 201:13
201:14 206:9
206:10 247:12
247:18 277:12
288:7,12,24
289:1,20 291:5
291:18 300:1
300:12,17
302:14 303:17
304:3 305:24
308:7 319:1
**old**  242:6,21
**omegle**  253:16
253:18
**once**  17:22 78:5
82:20 83:6,13
83:20 142:15
279:16
**ones**  53:4 81:14
104:13 116:9
139:4 142:22
249:19 254:7
254:10 255:10
274:13 293:8
**online**  33:14,16
34:19
**open**  69:12
189:18 288:9
**opening**  19:7
71:21 79:20
94:3 99:14
104:18 109:11

**openings**
220:23
**operating**
297:6
**opinion**  26:13
27:21 28:20
32:5,6 34:14
35:22 38:24
146:1,5 187:5
227:19 287:18
288:5
**opinions**  17:19
25:21 59:4
61:18 284:4,21
285:15 286:17
313:6
**opportunity**
43:24 163:16
174:8 227:13
**opposed**  45:10
170:18 246:6
**optimize**
210:23
**option**  162:17
**options**  144:9
**order**  53:21
61:4,20 130:11
142:20 143:1
143:16 188:15
196:6 237:6,7
**orienting**
225:16
**original**  37:18
44:12 154:15

275:11 322:15
**originally**
295:20
**outside**  145:13
145:20 252:15
254:10 261:1
286:7 290:15
316:19 317:19
**overall**  88:2
95:24 226:15
240:16 241:19
242:22
**overuse**  267:12
**own**  45:9 48:22
67:20 203:18
204:20 205:1,2
275:24

**p**

**p.c.**  2:9
**p.m.**  129:11
171:23 172:6
182:12,19
215:19 217:18
271:4,16 298:6
298:13 320:17
320:21
**pa**  12:17
**page**  6:13 7:4
7:10 8:4 9:4
10:4 11:6,6,6
11:11,11,11,16
11:16,16,21,21
11:21 24:13,17

24:23 27:15,16
29:20 30:2,3
32:17,19 38:22
39:13 40:2,3
43:12 55:13,18
59:14 62:9,11
65:20 68:22
69:17,18,19,22
69:23 71:22
75:13,14 80:3
80:4,5,17,21
81:16 88:12,13
88:15 96:24
102:16 105:6
105:11 107:17
107:18 113:15
117:6,11
129:15 130:22
131:19 135:12
135:15 141:15
141:18,19,21
169:7 173:7,17
175:12 177:15
182:23 184:10
184:19 186:11
187:10,12,15
191:12,14
195:3 196:17
200:17 201:5
201:12 203:24
205:20 206:7
225:21 228:14
247:10,14,15
318:11 323:3

CONFIDENTIAL

**[page - percent]**                                                            Page 41

325:2

**pages** 210:15
324:3

**paid** 22:15
314:17

**pandemic**
82:21 83:7,15
83:21 84:11
85:2,15 86:10
88:17 89:9,16
89:23 90:6
91:14 92:9,20
93:18 99:19
100:14 105:1,9
105:21 110:15
111:8 310:4,13
310:21

**paper** 132:6
166:13 172:11
180:1 189:1
215:14

**paragraph**
32:19 71:24
73:8 74:20
80:2,5,6,7 83:2
94:7 96:8,18
99:17 102:11
104:23 107:10
107:11 109:15
113:2 118:11
131:13 183:3
184:20 186:12
187:12,14,16
187:20 191:10

195:5

**parallel** 201:6
201:15 202:16
203:1 250:6
264:13

**paraphrased**
99:23 136:4

**paraphrasing**
188:24

**parents** 294:14

**park** 3:17

**part** 63:20
173:22 214:23
228:21 242:12
261:15 283:19
285:18 295:10
301:7

**participants**
61:13 238:23

**participate**
20:23 65:11
154:18 226:20
232:21

**particular** 46:2
63:4 64:13
97:22 148:13
158:6,6 195:24
215:14 222:22
224:9 228:8
257:10 258:3
259:12,13
269:6 280:23
281:15 282:17
283:7,8 284:9

**particularly**
186:19

**parties** 21:11
319:7

**partway** 69:8

**party** 320:5

**pass** 130:14
271:22 312:16
320:2

**passed** 317:17

**passes** 164:5

**past** 24:19
62:16 69:16
124:17,20
176:14 207:10
212:11

**patagonia**
278:2

**patent** 17:5
57:8,10,12

**pattern** 153:21

**pause** 83:14

**pay** 277:4

**paying** 67:7

**payment**
272:15 273:4

**peer** 62:4 63:17
63:20 64:1,18
65:1

**peers** 64:2

**peilen** 2:19
193:13 219:8
219:10 220:1,7

**pennsylvania**
1:17 2:4 3:18

**people** 20:6
29:6 35:4 41:5
41:12 42:10
51:22 53:16,17
55:2 65:9,24
97:17 115:13
120:4,19,21,24
121:10,12,14
121:16,19,23
122:2,5,23
123:7,14 124:2
126:1,2,12
129:17,21
131:22 132:9
132:15 146:2
148:13,17
150:18 160:19
163:2 165:2
206:19 223:23
227:5,13 228:2
228:3,6 232:8
232:13,14
236:15 305:19

**people's** 61:18

**percent** 28:6
33:1 82:23
83:9,16,17,18
83:23 84:8,13
84:19,23 86:1
86:8,11,12,13
86:16,24 87:5
87:10 88:20

CONFIDENTIAL

**[percent - pistilli]**                                                          Page 42

89:10,13,24
90:3,16,22,23
91:1,5,13,17,17
92:2,11,11,21
93:1,9 94:11
94:15,20,23
95:5,16 99:20
100:1,2,6,11
101:9,13 105:2
105:8,14,17,24
106:8,12
109:17,24
110:4,16,20,24
111:4 112:2,6
282:11,15
294:9,17
312:15
**percentage**
  28:15 87:14
  95:20,22
  100:17 101:19
  102:3 106:3,18
  107:3 111:15
  111:22 112:13
  252:13 289:23
  291:8,12
  293:18 294:3
  306:20 307:16
  308:4,21 309:9
  312:4,7
**percentages**
  104:5 108:20
  115:18 117:23
  118:5 283:7

307:21
**perception**
  157:13
**perfectly**
  176:18
**perform** 127:7
  161:5
**performed**
  16:21
**performing**
  306:1
**period** 22:4
  76:22 77:20
  81:15 82:15
  89:6 95:15
  97:14 98:9,13
  98:17,22 102:5
  104:7 107:22
  108:11 112:20
  113:21 114:13
  115:20 132:17
  133:17 141:12
  159:6,22 161:7
  162:12 189:15
  205:23 319:9
**periods** 136:15
  140:2,6,11,12
  140:15,21
  153:22 159:7
  167:8,22 168:8
  168:20 202:9
  202:10 300:20
**peripherally**
  274:11

**person** 67:20
  82:20 83:6,13
  83:15,20 84:10
  85:9 99:19
  100:14 104:24
  105:21 110:14
  111:7 142:12
  164:6 197:11
**personal** 1:4
  12:19 45:18
**personally**
  14:11
**personnel**
  147:14
**persons** 60:12
  61:6,22
**persuasive** 37:9
**pesticides** 53:2
  55:1
**petrus** 172:19
**ph** 1:24
**pharmaceutic...**
  52:23 53:15
**phone** 154:22
  155:9 165:11
**phrase** 201:19
  202:4
**phraseology**
  250:14
**phrasing** 248:7
**physicians**
  54:14
**picked** 210:1

**picture** 277:24
  278:1
**piece** 60:9
**pistilli** 2:15 6:6
  13:13,15 14:3
  15:5 17:23
  18:19 26:7,15
  26:24 27:6
  31:1,10,22
  34:15 37:21
  38:6 39:8 42:1
  42:12,19 48:5
  48:12 49:8
  51:18 52:16
  53:14 54:18
  55:7,16 58:6
  58:15 68:24
  69:3 71:4,18
  73:13,16,23
  74:8,16 75:11
  78:3 79:14
  82:17 84:6
  85:13,23 86:21
  87:16,23 88:8
  89:1,21 90:12
  90:24 91:23
  92:7,16 93:6
  93:14,24 95:13
  95:21 96:6,19
  97:15 98:10,18
  99:4,10 100:23
  101:6,24 102:9
  103:3 104:3,15
  106:5,24 107:8

CONFIDENTIAL

**[pistilli - please]**                                                      Page 43

| | | | |
|---|---|---|---|
| 108:5,18 109:8 | 169:23 170:20 | 254:21 256:3 | 318:20 319:4 |
| 110:13 111:16 | 171:5,20 172:8 | 256:18 257:7 | **plan**  20:22 |
| 111:23 112:18 | 174:7,13 176:8 | 257:22 258:11 | **platform** |
| 112:24 114:6 | 179:22 181:23 | 258:20 260:8 | 251:16 252:24 |
| 114:15 115:4 | 182:9,21 186:8 | 261:21 262:6 | 261:16 283:14 |
| 115:17 116:4 | 189:10 190:17 | 262:23 263:10 | 299:15 |
| 116:20 117:4 | 192:7 193:10 | 263:24 264:15 | **platforms**  2:23 |
| 119:16 120:2 | 193:22 194:23 | 265:4,20 266:8 | 5:8 25:1 82:2 |
| 120:17 121:7 | 198:21 199:6 | 267:2,20 268:8 | 82:10 248:23 |
| 122:11,24 | 199:15 200:16 | 268:18 269:7 | 250:20 251:2,6 |
| 123:11,24 | 202:6 203:2 | 269:20 270:16 | 254:17,19,20 |
| 124:15,22 | 204:16 205:18 | 270:22 271:18 | 257:14 259:2 |
| 125:21 126:15 | 207:3 209:2 | 314:4,9 315:19 | 260:2 274:8,10 |
| 127:6,15 128:1 | 211:14,24 | 316:7,21 317:4 | 274:16,16 |
| 128:15 129:1 | 213:12 214:12 | 317:11,20 | 275:4 281:6,10 |
| 129:13 133:18 | 215:15 217:20 | 318:16 319:20 | 281:12,20 |
| 134:7,17 135:7 | 219:2,5,9,12 | 320:6 | 282:2,18,24 |
| 136:21 137:9 | 220:13,19 | **place**  4:10 | 283:9,18 |
| 138:10 139:7 | 221:1,3 222:16 | 36:21 46:1 | 284:16 285:11 |
| 139:17 140:9 | 223:13 224:10 | 184:16 185:8 | 289:9,13,24 |
| 141:7 143:14 | 224:19 229:10 | 185:20 | 290:9,20 |
| 144:23 145:23 | 231:18 233:2 | **places**  65:23 | 292:20,20 |
| 146:12 147:8 | 234:21 235:21 | **plaintiff**  2:6,12 | 293:8,24 294:4 |
| 148:5 149:5,15 | 236:13,24 | 3:19 13:21 | 294:18 296:17 |
| 150:21 151:11 | 237:20 238:3 | 14:5 30:13 | 297:6 |
| 151:18 152:3 | 238:21 239:23 | 74:21 94:4 | **play**  221:14 |
| 152:18 154:6 | 241:4,14 242:3 | 320:15 | **plaza**  3:10 |
| 157:7 158:11 | 242:14 243:6 | **plaintiff's**  31:8 | **please**  13:17 |
| 159:16 160:7 | 243:18 244:5 | **plaintiffs**  4:7 | 15:21 16:7 |
| 160:24 161:18 | 244:15 245:5 | 4:12 21:7 25:8 | 24:12 43:12 |
| 162:6,23 | 245:21 247:3 | 25:21 30:16 | 71:19 80:2 |
| 163:18 164:3 | 249:2,22 251:8 | 43:14 44:9 | 151:15 178:8 |
| 165:9,18 166:5 | 251:18 252:18 | 47:5 258:21 | 182:24 214:5 |
| 168:3,14 169:5 | 253:5,14 254:4 | 286:24 313:3 | 219:6,14 |

CONFIDENTIAL

**[please - prior]** Page 44

247:11 322:3,8
**plenty** 163:15
**plus** 7:6 42:16
  43:3
**point** 3:10
  15:19 16:6
  68:22 123:19
  128:16 141:8
  153:23 155:12
  198:8 207:13
  208:12,20
  214:21 215:3
  309:19 316:8
**pointed** 309:10
**points** 87:15
  95:20,22
  100:18 101:19
  102:4 106:4,19
  107:3 111:15
  111:22 112:13
  131:3 196:24
  201:5
**policy** 8:14
  166:2,17
  172:15
**ponce** 2:10
**pool** 239:16
**poor** 256:21
  257:1
**population**
  51:7 76:16
  225:13 226:2
  226:16,18
  227:11 228:20

229:9,14
233:22 240:16
241:18,19
242:23
**portion** 229:3
**position** 20:24
**positive** 128:22
**possibility**
  147:19 148:16
  150:6 261:20
**possible** 61:16
  140:17 141:2
  142:11 143:22
  144:9 148:22
  149:8,14 152:8
  193:3 230:9
  241:12 244:6
  244:17,24
  256:17 257:6
  280:20 283:6
  303:17,24
  304:13,19
**post** 47:23
  83:21 85:2,15
  86:10 88:16,17
  89:8,9,16,23
  90:6 91:14
  92:20 99:19
  100:14 105:1,9
  105:21 110:15
  111:8 262:1
  279:20
**posts** 261:16

**potential** 46:14
  142:7 151:3
  210:16
**potentially**
  263:7
**practice** 175:4
**pre** 66:11 153:6
  154:8,10 155:6
  156:2 158:13
  160:18 161:2,3
  161:17 176:16
  189:3 221:20
  252:10 266:21
  267:4 268:4,10
  268:20 269:11
  270:13,17
  273:11,19,23
  274:2,18 275:5
  292:15 293:16
  295:10 296:2
**precautions**
  226:4
**preferences**
  52:9 54:16,19
**preparation**
  23:4,7 24:1
**prepare** 22:19
**prepared** 156:5
  226:2
**preparing**
  19:24 20:9
  23:2 166:6
**prescribe** 53:21

**prescribed**
  208:3
**present** 5:13
  81:22 82:6
  230:13
**presentation**
  59:1
**presented**
  105:11 126:10
  142:19 233:18
**press** 147:2,6
**presume**
  286:21
**presupposes**
  264:2
**pretty** 171:17
  190:23 265:9
**prevalence**
  244:13
**prevent** 15:7
  39:16
**previously** 25:5
  190:6
**price** 35:8
**primary**
  248:22 274:10
  274:16 275:4
**principal** 20:16
**principals**
  291:11
**prior** 24:18
  64:22 72:1
  91:5 118:17
  132:23 137:11

CONFIDENTIAL

**[prior - published]**                                                      Page 45

146:21 159:7 197:9 286:22 315:9 318:10 318:12

**privacy** 315:5

**probably** 53:13 60:20 164:12 164:20 165:14 251:16 276:16 277:23 278:4 280:19

**probe** 156:12 157:21

**problem** 33:12 150:8 246:23 250:2

**problematic** 35:24 36:11

**problems** 210:19

**procedure** 44:17

**procedures** 60:13

**proceed** 298:21

**process** 60:23 60:24 63:20 64:1,9 154:19 155:2 158:5 159:5,11 161:14 163:11 190:24 208:5 221:17

**produce** 280:8

**produces** 35:13 197:2

**product** 29:7 35:11 51:12 52:19 54:5 62:22 63:4 64:12,13 223:6 223:7 224:9 315:17

**production** 11:10 73:14

**products** 1:4 12:20 30:8 34:21 35:9 44:15 52:10,22 53:15 54:9,14 55:2,5

**profession** 184:14 185:7

**professor** 63:10 169:15 172:21

**profile** 7:8 48:4 48:9,19,22 49:3,14

**profiles** 181:3

**profit** 20:22 290:23 291:9 291:12

**profits** 20:20 291:3,6

**program** 65:21 65:21 154:20

**programmer** 65:22

**prolonged** 261:3

**promote** 45:8 259:3

**promotion** 44:14 258:15 259:8

**promotions** 43:18 44:8

**promptly** 72:7

**prone** 180:16 181:1 183:6,18 184:7

**pronounced** 212:9

**proper** 21:10 60:13

**proposition** 176:24 182:1 183:12 186:17 196:7 207:15 238:11

**propounded** 324:5

**protective** 314:18

**provide** 21:9 24:6 56:7 73:5 81:14 130:9 153:9,14 188:19 214:14 230:12,23

306:20 309:14

**provided** 24:21 73:2 74:21 98:20 155:18 208:24 242:11 303:14,19 313:14

**providers** 40:24

**provides** 213:19,23 263:6

**providing** 132:16 284:20

**provision** 44:13

**prussia** 1:17 2:4 3:17

**public** 2:12 146:19,23 286:4,16 292:12,13 303:1 315:11 324:14

**publication** 63:14,21 64:6

**publications** 62:13,16 64:21

**publicize** 286:21

**publicly** 292:2

**published** 64:14 166:20 312:12

CONFIDENTIAL

**[purchase - questions]**                                  Page 46

| | | | |
|---|---|---|---|
| **purchase** 53:8 53:22 54:8,8 54:13 | **qualify** 203:12 **qualitative** 196:21 197:21 208:4 | 123:8,23 124:3 125:5,10 126:3 126:14,17 | 263:12 264:2 265:10,13,23 267:21 268:6 |
| **purchasers** 46:14,14 | **quality** 8:15 | 128:2 129:18 135:17,20 | 268:17 269:3,8 269:19 270:12 |
| **purported** 310:2 | 62:19,21 63:5 67:5 130:15 | 136:15,23 138:1 139:10 | 274:23 281:18 288:12 292:4,9 |
| **purpose** 61:7 61:23 72:9 227:22 | 193:17 209:13 210:20 | 141:16,21,22 143:11 144:17 | 301:5 314:12 317:13,22,24 318:2,8,19 |
| **purposes** 70:19 210:8 | **quantitative** 196:22 198:1 | 149:7 151:9,17 152:4,6 155:1 155:3,20 | **questioning** 289:6 317:18 |
| **pursuant** 1:14 | 201:2 205:7 208:7 211:12 | 156:20 157:18 159:17 161:1 | 318:20 |
| **put** 35:1 44:21 69:24 142:21 202:21 265:13 | 211:18 212:4 212:20 | 162:24 163:4 163:14 164:22 | **questionings** 292:18 |
| **putting** 20:12 69:14 314:17 | **question** 11:20 12:7 15:20 | 168:2,19 170:4 170:15 171:15 | **questionnaire** 69:9,13 122:19 179:15,15 |
| **q** | 16:1,3 29:22 31:4,7 36:8,9 | 177:6 179:23 181:16 184:1,3 | 183:5,17 184:6 213:11 |
| **qfd** 63:6,13 64:7,8 | 46:20,24 62:1 66:3 67:7 | 185:2,10 189:12 190:1 | **questionnaires** 169:11 170:8 |
| **qs2** 66:3,19 | 69:18 75:17 76:5,9 77:13 | 198:24 208:10 208:11 212:24 | 175:5,15 177:11,19 |
| **qs3** 68:20 | 78:2 80:23 81:4 82:4 97:5 | 214:3,5,11,14 227:9 234:2,3 | 180:4,15,24 186:22 190:10 |
| **qs6** 239:3,4 | 97:13,22 98:2 102:19 103:8 | 238:5,9 239:2 242:19 243:1,5 | **questions** 8:13 30:9 37:13 |
| **qs7** 67:5 | 104:14 107:20 109:4 113:19 | 244:1 247:17 247:21 248:1,9 | 60:7 67:19 69:11 103:15 |
| **qs8** 67:10 | 114:5 115:7,15 116:19 117:9 | 249:12 250:15 256:1 260:20 | 103:24 118:1 119:3 130:15 |
| **qualified** 60:12 67:11 81:6,14 123:18 130:9 130:11 178:2 178:15 | 117:10,14,17 118:2 120:11 122:6,10,20 | 260:22,23 262:17,24 | 130:20 131:17 132:23 137:14 |
| **qualifies** 314:23 | | | |

CONFIDENTIAL

137:15 138:11 142:3,14 143:19 148:12 149:2,17,19,24 150:13,19 152:24 155:18 156:11 157:21 158:20 160:3 160:22 161:12 162:9 166:1,16 172:14 176:11 198:4 207:17 213:1,7 221:5 238:23 263:19 271:21 284:8 288:9,24 289:3 297:20,24 298:24 299:2 300:16 301:18 311:22 312:21 314:3 317:1 318:17 319:23 324:4

**quick** 270:23 314:5 316:8

**quite** 280:18

**quotas** 240:23 241:5

**quote** 32:21 177:4

**quoted** 60:17 60:20

**r**

**r** 323:1,1

**race** 240:7

**radnor** 1:17 2:4 3:18 12:17

**raised** 29:16 31:9 36:4 177:17 180:2 314:21

**raises** 190:8

**ran** 296:4

**random** 176:2 210:1 229:22 230:4,5 238:18

**randomized** 142:19

**randomly** 226:1 228:18 229:13 237:9 237:14 238:13

**range** 52:3

**rappeport** 28:5

**rappeport's** 28:8,12

**rate** 22:7 103:9 127:22 235:16 235:17,22 236:4 306:14 307:5,9 308:9 310:10

**rates** 231:7 306:2

**rather** 45:8 226:17 228:11 251:3 264:1

**reach** 155:14 155:22,23 156:22 311:9,9

**reached** 33:8 158:5,6 286:15

**reaches** 180:10

**read** 22:21 168:13,15 169:20 170:1 170:12 174:5,8 177:24 194:6,9 194:13 322:3 324:3

**reading** 83:1 179:3

**ready** 298:21

**realize** 26:6

**realized** 215:11 315:2

**really** 21:18 24:4 25:23 29:18 45:18 54:3 59:11 61:24 67:6 118:1 123:7 152:14 168:13 170:1 178:1 196:20 244:12 246:4 250:9,14 257:19 284:24 287:17 288:4

292:8 293:13

**realtime** 1:20 321:11

**reason** 15:21 77:16 120:14 121:12 123:6 127:3,13 128:13 132:12 144:7 150:2,7 160:4 163:3 165:2 180:7 192:3 226:22 227:18 228:5,8 231:17 232:10 234:17 237:18 237:22 238:19 240:12 268:12 268:22 269:13 269:23 300:1 309:13 311:3 322:5

**reasonable** 309:4

**reasoned** 162:5

**reasons** 33:19 34:17 35:21

**rebuttal** 8:18 9:6,9,13,16,20 19:10 22:22 58:1,3 166:7 169:3 194:4,12 194:17 195:1 207:22 215:11 216:3,11,19

CONFIDENTIAL

**[rebuttal - related]**                                                  Page 48

217:3,11 218:6
218:9,12,15,18
218:21 220:10
220:12,15
232:9
**recall**  119:20
124:17 131:14
131:23 153:1
156:13 157:10
157:22 158:14
158:23 159:21
162:10,16
164:6 167:7,21
168:7,20 169:4
172:16 173:24
174:19,23
187:12,21,24
188:4,5,7,10,17
189:5,7 190:3
190:4,4,19
203:19 208:15
211:17 222:3
273:9 274:4
299:7 309:23
**recalled**  189:14
**recalling**  177:1
**receipt**  322:17
**receive**  20:19
260:10 291:2
**received**  65:9
76:1 113:18
148:17 229:6
272:16 273:5

**receives**  260:24
**recent**  177:17
180:1 190:7
207:10 279:12
**recess**  18:6
71:12 129:7
172:2 182:15
215:22 271:7
298:9
**recipient**
150:23
**recognition**
252:8
**recognize**
31:23 38:9
42:8,22 46:22
48:13 54:4
55:17 58:18,20
194:2 197:13
208:1 210:14
251:1 260:22
267:19
**recognized**
42:9
**recollect**  182:4
**recollections**
161:6
**reconsider**
136:24
**reconsidered**
137:4
**record**  12:11
13:2,18 15:3
17:24 18:4,11

39:6 71:10,17
129:2,5,12
171:24 172:7
182:8,10,13,20
214:7 215:20
217:19 218:4
271:5,17 286:4
292:12,13
296:6 297:22
298:3,7,14
320:4,18 321:6
**recorded**  156:2
276:15
**records**  270:18
**recruited**
154:11
**redirect**  316:20
317:19
**reduce**  226:5
**refer**  195:17
262:9
**reference**  9:23
22:23 59:22
199:20 205:22
208:21 215:13
224:14 225:2,3
228:14 237:2
250:20
**referenced**
24:24
**referred**  25:5
167:19
**referring**  29:1
68:19 167:14

188:12 242:15
275:24 283:23
289:10 302:4,6
**refers**  52:2
**reflect**  44:5
272:14 273:3
**reflected**  306:3
306:14
**refusing**  311:22
**regarding**
52:10,18 75:17
76:5 125:1
134:23 139:10
222:8 302:15
311:23
**regardless**
290:18
**regents**  37:5,16
**regular**  184:13
185:5
**relate**  27:7
**related**  16:24
23:21 36:2
49:21 50:14
77:4 139:24
141:14 142:14
143:19 150:24
169:12 175:16
176:2 181:4
192:22 231:2
235:23 259:6
276:8 312:9
315:9

CONFIDENTIAL

**[relates - reports]**                                              Page 49

**relates** 1:6
187:20 191:5
197:14 315:21
**relating** 49:20
51:24 81:9
102:19 103:15
104:6 107:21
108:20 113:19
113:20 115:7
115:19 124:16
142:3 156:14
177:3 187:12
203:6 221:23
245:23
**relatively** 227:4
**relevance**
198:16 199:2,3
**relevant** 29:18
30:9,14 59:18
126:3 223:17
226:1 228:1
246:4 287:3
**reliability** 28:4
**reliable** 28:14
267:24
**reliably** 162:10
266:12 267:5
268:11,21
269:13,22
**rely** 195:21
198:6 202:15
225:6
**remember**
63:19 132:21

162:17 165:2
166:12 173:4
**remembered**
203:19 204:20
**remembering**
314:14
**remembrance**
132:3
**remind** 214:13
306:8
**reminders**
127:21 226:21
227:16,23
228:10 232:22
**removed**
118:17
**repeat** 214:4
256:1 262:22
**repeated** 248:8
**repeatedly**
234:14
**repercussions**
191:2 260:24
262:11
**rephrase** 15:22
**replaced** 140:1
140:19
**replacement**
218:24
**replicate** 41:16
41:21 42:3
**replicated** 42:5
**reply** 22:23

**replying** 8:19
9:6,10,13,17,20
194:17 216:3
216:11,19
217:3,11
**report** 8:18 9:6
9:9,13,16,20
18:22 19:10
20:7,9,10 21:7
22:3,21,23
60:21 71:21
75:13 77:19
79:20 81:9
86:6,9 94:4
99:14 104:5,19
108:20 109:11
115:19 116:22
117:23 131:2
166:7,7,11
168:16 169:3
176:13 194:4,9
194:17 195:18
195:20 207:23
215:11,13
216:3,11,19
217:3,11 218:6
218:9,12,15,18
218:21 219:19
221:8 247:21
**reported** 76:19
76:23 77:8
94:10,19 95:11
95:14 99:18
100:6,16 101:9

101:18 105:2,6
105:13,23
106:7,17,23
109:17 110:2
110:16,24
111:10 112:2
112:12 116:3,5
131:11,12
132:9 267:23
306:10 309:17
**reporter** 1:20
1:21 13:3
15:11 321:11
321:21
**reporting**
129:20 196:2,3
209:14 212:8
239:14
**reports** 8:16,19
9:6,10,13,17,20
19:2,7,14,17,21
19:24 21:17
22:22 25:12
58:2 78:5
132:7 163:2
167:5 169:9
193:17 194:12
194:18 195:2
195:11 210:20
216:4,12,20
217:4,12
220:10,12,16
232:9 295:20
306:4

CONFIDENTIAL

**[represent - responses]** Page 50

| represent | requires | 97:21,24 98:4 | responders |
| --- | --- | --- | --- |
| 13:15 79:18 | 252:16 | 99:3 108:3 | 234:5,5 243:21 |
| 200:6 213:21 | research  32:15 | 115:16 119:10 | responding |
| 272:8 288:21 | 43:9 49:21 | 120:19 121:11 | 61:14 97:10 |
| 291:24 313:3 | 50:14 51:3,6 | 149:24 227:6 | 121:15 129:17 |
| representative | 51:10,20 52:1 | 227:11 242:5 | 144:2 151:2 |
| 119:18 120:16 | 52:2,5,7,8 | 245:9,10 | 160:21 192:15 |
| 121:14 126:5 | 166:13 172:11 | 246:12 281:16 | 228:8 281:7 |
| 225:12,18 | 177:17 180:1,2 | 281:17 | 307:10,17 |
| 226:15,24 | 190:7 192:17 | respondent | response  103:9 |
| 227:12 234:20 | 192:19,20 | 188:16 191:6 | 114:23 122:18 |
| 236:17 237:8 | 199:18 209:12 | 191:18 192:23 | 127:22 148:13 |
| 239:15 240:15 | 225:4 228:15 | 197:12,19 | 162:22 229:12 |
| 241:18 245:11 | 309:17 | 201:17 202:12 | 229:22 230:8 |
| representativ... | researcher | 209:16 210:3 | 231:7 235:16 |
| 126:18 235:23 | 180:14 192:12 | 211:2,6 241:18 | 235:17,22 |
| 236:5 | researchers | 304:11 | 236:4 237:8,13 |
| represented | 8:14 166:2,17 | respondents | 238:12 260:13 |
| 14:9 241:8 | 172:15 | 30:6 33:1 | 306:2,9,13,14 |
| representing | reserved  12:7 | 70:14 77:6 | 307:5,9 308:9 |
| 2:6,12,22 3:6 | residence | 103:8 110:12 | responses  77:9 |
| 3:12,19 4:7,12 | 202:11 | 116:17 118:13 | 81:11 97:3 |
| 4:18 5:7 | respectfully | 131:16 135:23 | 98:8,12,17,20 |
| 200:14 320:7,9 | 234:1 238:4 | 136:6 137:18 | 102:19 103:14 |
| 320:11,13,15 | respond  65:24 | 192:4,12 | 104:8 107:20 |
| reproduction | 70:21 121:17 | 203:18 204:5 | 108:10,21 |
| 321:19 | 126:13 129:21 | 204:20 205:11 | 113:19 114:2,8 |
| request  11:10 | 195:21 227:14 | 208:14 225:24 | 114:12 115:7 |
| 73:21 | 228:3,4,7 | 226:4 230:10 | 115:12,21 |
| require  132:21 | 232:8,13 233:5 | 230:11,21,21 | 116:13,23 |
| required  226:5 | 308:22 | 231:1,12,12 | 124:8 132:9 |
| requirements | responded | 233:24 235:5 | 154:4 162:2,3 |
| 59:14,19 60:1 | 75:17,21 76:4 | 239:15 240:15 | 191:7,17,19,24 |
| 60:6 | 80:22 81:1,3 | 242:20 243:12 | 192:6,10,14 |

CONFIDENTIAL

**[responses - right]** Page 51

| | | | |
|---|---|---|---|
| 203:6 204:13 | 84:10 85:10 | 40:12 41:17 | 162:12 163:21 |
| 228:20 229:2,8 | 99:19 100:14 | 51:13 52:11 | 164:17,24 |
| 230:12,22 | 105:1,21 | 53:16,17,20,23 | 178:23 180:22 |
| 239:13 241:8 | 110:15 111:8 | 54:7,23 55:6 | 186:4 187:21 |
| 303:15,19 | **retained**  24:9 | 55:21 56:5,9 | 190:10 195:22 |
| 304:14 306:15 | 287:1 | 56:12,18,24 | 196:9,14 |
| **responsibility** | **retired**  311:17 | 57:3,6,11,17,20 | 197:20,24 |
| 238:7 | **retrieval**  201:7 | 57:23 61:23 | 198:7,13,16,23 |
| **rest**  17:16 | 201:15 202:16 | 76:11 77:1,18 | 199:2,4,7 |
| **restaurant**  30:7 | **retrieved** | 80:24 81:5,13 | 200:21,24 |
| **result**  6:20,23 | 203:20 | 85:5 86:2 88:3 | 201:16,18 |
| 7:6 31:13 38:1 | **retrospective** | 89:11,13,16 | 202:13,14,17 |
| 42:15 158:13 | 8:16 193:17 | 90:17,21 92:11 | 203:7 204:8 |
| 169:12 175:15 | 195:11 196:1,3 | 94:1 96:2 98:3 | 205:9 206:21 |
| 175:23,24 | 209:14 210:20 | 98:4,13 99:5 | 207:4 209:6 |
| 192:1 | 212:8 | 101:1 102:21 | 212:2,12 213:7 |
| **resulting**  282:7 | **return**  92:9 | 103:17 104:4 | 214:23 215:1 |
| **results**  6:16,18 | 93:18 322:15 | 108:7 109:9 | 217:21 223:24 |
| 7:16,19,22 8:7 | **reveal**  72:9 | 110:4 111:11 | 225:13 227:2 |
| 8:10 18:16 | **revealed** | 111:18 114:7 | 229:2,21 |
| 26:19 28:7,17 | 119:19 | 116:7,8,11 | 233:10 235:24 |
| 30:5 36:1,12 | **revenue**  312:4 | 117:15,19 | 237:4 238:24 |
| 61:12 74:18 | 312:8 | 119:21 120:5 | 239:6 241:8 |
| 78:10,16,22 | **review**  21:7 | 120:20 121:18 | 244:8,17 |
| 79:4,11 175:8 | 23:1 63:20 | 122:1,12,14 | 245:12 249:4 |
| 175:10 176:4 | 64:1 214:8 | 123:2,14 124:1 | 251:12 252:24 |
| 178:16 188:3 | **reviewed**  62:4 | 126:16 133:19 | 253:24 261:16 |
| 188:16 196:2 | 63:17,22 64:1 | 134:8 136:3,9 | 262:1 263:11 |
| 205:8 210:6,6 | 64:18 65:1 | 136:13 137:22 | 264:24 274:1 |
| 212:7,21 | 295:2,4 | 138:20 141:13 | 280:24 281:20 |
| 280:24 282:11 | **ride**  154:23 | 142:22 145:24 | 282:18 283:2 |
| 285:15 | **right**  15:12 | 150:14 151:8 | 289:5 290:3,20 |
| **resumed**  82:21 | 19:1 24:11 | 152:5,21 | 290:24 295:17 |
| 83:7,14,21 | 25:18 37:6,13 | 155:17 161:1 | 297:1 299:18 |

CONFIDENTIAL

**[right - school]**                                        Page 52

| | | | |
|---|---|---|---|
| 306:12,16 | **sample** 71:2,3 | 176:6 177:16 | 97:1,4,11,19,21 |
| 307:13,24 | 120:16 121:14 | 183:3 184:11 | 97:23 98:12 |
| 309:6 312:19 | 126:4 225:12 | 190:1 191:4 | 99:20 100:1,2 |
| 315:20 317:21 | 225:18 226:18 | 196:16 203:17 | 100:5,5,9,15,17 |
| 318:4 | 226:24 228:11 | 205:21 209:11 | 101:1,8,8,14,14 |
| **road** 1:17 2:4 | 228:18,22 | 210:19 211:3 | 101:17,23 |
| 3:17 | 229:3,7,8,17 | 212:2,4 225:23 | 102:4,14,20 |
| **robert** 1:14 6:4 | 230:13 231:5 | 228:17 230:3 | 103:13 105:1,9 |
| 7:8 12:24 13:7 | 234:20,24 | 248:1,10 | 105:12,13,18 |
| 13:19 32:23 | 245:19,20 | **schedule** 156:8 | 105:22,24 |
| 39:1 48:8 | 305:13 | **scheduled** | 106:7,13,16 |
| 324:8 | **samples** 226:6 | 81:24 82:8 | 107:1,13,23 |
| **role** 221:14 | 236:22,23 | 118:3,7 125:14 | 108:9,16,17 |
| **routinely** | 237:7 | 125:16 136:2,8 | 109:6,7,17,20 |
| 248:24 | **san** 4:11 | 277:3 | 110:2,6,16,21 |
| **rule** 148:16 | **santiago** 5:4 | **school** 13:21 | 110:23,24 |
| 150:6 | **save** 132:5 | 14:5 66:10,22 | 111:5,9,11,18 |
| **rules** 14:14 | 276:24 | 66:24 74:22 | 112:1,7,10,10 |
| **run** 244:17 | **saw** 46:8 | 75:5,16 80:10 | 112:11,20 |
| 255:7 | 215:10 255:2 | 80:14,21 81:3 | 113:5 114:3 |
| **running** 255:16 | 255:10 285:17 | 81:23 82:7,22 | 115:2,6 116:6 |
| 255:20 256:8 | **saying** 45:3 | 83:8,17,18,21 | 116:7,12 |
| 256:12 | 131:21 152:9 | 84:14,14,17,18 | 117:15 118:15 |
| | 187:4 200:19 | 84:24 85:5,16 | 121:21,24 |
| **s** | 232:6 233:14 | 86:2,6,23 87:6 | 125:6,8,12,13 |
| **s** 2:9 6:11 7:2 | 294:16 | 87:11,18,24 | 130:3,6,10,12 |
| 8:2 9:2 10:2 | **says** 29:21 | 88:1,20 89:4,5 | 130:18 131:3 |
| **safe** 291:14 | 36:13 37:12 | 89:9,13,23 | 132:10 133:3 |
| **salary** 22:15 | 38:23 39:13 | 90:3,14,17 | 133:22 134:24 |
| 286:7 311:23 | 43:13 45:22 | 91:2,5,8,10,12 | 136:9 146:14 |
| **sales** 49:24 | 49:14,19 50:13 | 92:10,19,20,24 | 147:14 151:2 |
| 50:7,17 | 74:21 83:13 | 93:8,19 94:9 | 154:5,12 174:1 |
| **salient** 165:1 | 99:24 167:1,2 | 94:10,16,19,24 | 192:24 202:23 |
| | 175:8,13,22,24 | 95:2,3,6,16 | 207:10,11 |

CONFIDENTIAL

**[school - sending]** Page 53

235:12 239:8 239:22 240:1,6 244:18 245:2 246:6 248:24 255:15 256:7 273:16 276:4,5 276:6,6 282:12 286:24 287:6 287:10 289:21 293:18 294:3 295:12 297:4,4 302:24 303:5,6 303:6 304:10 306:4,11 316:13 318:4

**schools** 2:12 134:6 246:7 303:14,18 304:15

**science** 7:10 20:4,6,14,16,20 20:21 21:1 22:16 23:23 49:10,15 55:13 63:7,11 272:20 285:22 286:8 312:6,7,9

**sciences** 55:19

**scientific** 9:24 224:15 225:2

**scope** 285:24 290:18 316:19 317:19

**screen** 219:19 219:20 222:20

**screened** 223:2

**screening** 66:2 130:15 317:22 317:23 318:2

**screens** 67:22

**script** 155:10

**scroll** 219:13

**seal** 35:2,5,15 36:3

**sealing** 12:4

**seating** 256:21 257:1

**second** 34:20 80:17 114:24 180:23 183:3 186:10 187:17 260:22,23 264:17 310:13

**secondary** 17:2 47:23 49:21 50:5,15

**section** 43:23 49:19 169:7 173:7 183:2 210:15 261:24

**sectors** 186:19

**see** 17:6 25:2 27:16 28:1,18 30:1 32:18 33:5 35:5 36:18 38:23 39:13,24 43:13

43:20 49:13,18 50:2,10 59:20 62:12 65:20 66:18 69:19 71:24 72:11 74:20 75:2 82:20 83:6 88:16 118:12 118:18 143:3,3 146:10 166:18 166:19 169:3 173:8,14 175:12 177:16 180:13,18 181:5,6 183:2 183:8,10,13 184:11,17 185:23 186:12 186:16,23 187:11,22 189:11,20 191:4,8,15 195:7 199:16 199:23 200:18 201:3,8,14 203:17 204:3 205:21 206:4 206:10 209:10 209:17 212:12 219:16 223:14 225:23 226:7 228:17,23 229:18,23 230:6,14 245:1

247:24 248:5 248:13 255:3 255:14 256:19 260:21 261:8 307:2,6

**seeing** 207:22

**seem** 188:12 189:24 311:14

**seemed** 279:5 290:13

**seems** 170:16 185:17 190:23 202:5 316:19

**seen** 27:1 48:17 48:21 72:20 147:5 178:1 187:2 207:20 232:10 235:18 260:7 272:11 295:24

**sees** 142:24 256:6

**segment** 289:6

**select** 136:6 205:3,11 226:3 267:13

**selected** 226:1 228:21

**sell** 54:23

**send** 72:3 241:1 260:2

**sending** 72:1 227:15 232:22

CONFIDENTIAL

**[sense - situated]** Page 54

**sense** 119:20
**sent** 65:9 72:14
  72:21 73:1,4
  74:10 80:9
  96:13 97:3,16
  102:13,18
  103:16 107:12
  107:19 108:6
  113:4,10,17
  114:16 127:20
  147:20 154:19
  226:20 227:1,5
  227:23 272:20
  273:15 280:5
  304:22 305:7
  307:13,18,24
  308:23 309:3
  311:1
**sentence**
  180:23 188:24
  206:6,8
**sentiment**
  223:22
**separate** 33:18
  68:4 142:2
  164:2
**separated**
  143:3
**september** 1:9
  12:14 321:11
**serious** 211:17
**seriously**
  209:14

**served** 32:12
  36:22 37:2
  313:10,12,18
**serves** 30:7
**service** 315:18
**services** 53:8
  54:23 56:7
  284:16 315:10
**session** 67:13
**set** 70:11,17
  120:5 190:21
  240:23 241:5
**settled** 315:2,3
**seven** 76:4,7,10
  76:12,15 77:9
  77:10,21 78:1
  143:4
**seventy** 97:23
**several** 23:22
  33:4,9 35:16
  313:13
**shahidpour** 3:9
  6:6 272:3,6
  274:24 275:19
  278:11,21
  281:13 282:9
  283:1,20
  284:17 285:12
  286:5 287:19
  288:7 320:8
**share** 20:19
  286:16 291:2,5
**shari** 225:4

**sharing** 20:22
  290:23 291:9
  291:12,23
**sheet** 322:7,9
  322:12,15
  324:6
**shopping**
  164:19,21
**short** 63:6
  128:20
**show** 29:23
  32:23
**showed** 77:1
  88:7 280:7
  282:11
**shown** 73:8
  132:11 200:15
  280:2,6
**shows** 82:13
  84:7 90:22
  234:23
**shuffling** 132:6
**shut** 202:23
**shutdown**
  197:9
**siculus** 2:23 5:8
**sign** 322:8
**signature**
  321:10
**significant** 33:4
  33:10 142:13
  144:3 157:23
  158:15,24
  159:22 161:7

  162:11 167:8
  167:22 168:8
  168:20
**significantly**
  85:12
**signing** 322:10
**similar** 64:7
  266:7
**similarly** 54:22
  70:13 89:22
  128:7 231:13
  233:5 234:6,9
**simple** 309:5
**simplicity**
  191:1
**simply** 251:6
**sincere** 191:6
  191:18,24
  192:5,9,14
**single** 303:5
**sir** 36:8 128:3
  177:23 208:11
  214:3 227:9
  234:1 235:22
  269:9 317:21
**sit** 73:11
  295:14
**sitting** 150:9
  183:14 253:7
  296:12
**situate** 201:17
  202:12 203:5
**situated** 70:13
  128:7 231:13

CONFIDENTIAL

**[situated - sorry]**                                                    Page 55

| | | | |
|---|---|---|---|
| 233:5 234:6,9 | **snapchat** 248:3 | 139:1,15,24 | 281:18 282:2 |
| **situation** 40:14 | 248:11,17 | 140:19 141:4 | 282:14,22 |
| 126:10 152:17 | 249:11 252:11 | 141:14 142:4 | 285:11 286:17 |
| 154:24 188:6 | 257:11 258:1 | 142:13,21 | 287:13 289:13 |
| 223:16 224:4 | 272:8 274:7 | 143:8,13,18 | 299:14,24 |
| 235:8 236:10 | 275:3 277:13 | 144:8,18 145:1 | 300:4 310:16 |
| 277:9 292:14 | 277:15 280:22 | 146:2,15 | 318:7 |
| **situations** | 281:4 284:9,13 | 147:22 152:10 | **sociological** |
| 42:10 255:5 | 284:19,23 | 156:14 174:16 | 314:12,23 |
| **six** 19:11 46:1 | 285:1,14 | 175:11 176:7 | 315:7 |
| 49:11,16 72:14 | 287:24 288:6 | 176:10,21 | **sociologist** 48:1 |
| 72:22 117:15 | 293:19 | 177:3 178:13 | **sociologists** |
| 118:21 135:20 | **social** 1:3 6:15 | 179:10 182:6 | 178:21 |
| 141:23 173:17 | 7:15,18,21 8:6 | 184:24 185:24 | **sociology** |
| 239:16 247:22 | 8:9 12:18 | 190:16 191:2 | 169:15 172:21 |
| 273:21,22 | 18:14 72:10 | 197:15 198:13 | 178:19 |
| 274:18 275:5 | 76:21 77:3 | 203:6 206:17 | **software** 40:22 |
| 310:21 | 78:8,14,20 | 206:19 207:6 | **sold** 35:11 |
| **size** 301:11 | 79:2,9 81:10 | 244:8 245:3,8 | **solely** 28:8 |
| **skewed** 35:24 | 82:2,10,24 | 245:10 246:24 | **solicited** 227:19 |
| 36:11 | 83:10,24 84:9 | 248:2,8,16,22 | **somebody** |
| **skipped** 118:16 | 84:20 85:4,17 | 249:13,18 | 37:20 118:24 |
| **sleep** 261:4 | 87:2,10 88:3 | 250:18 251:5 | **soon** 171:17 |
| 264:22 266:13 | 88:19 90:16 | 252:13,23 | **sorry** 13:23 |
| 267:6,11 | 94:12,21 95:5 | 253:8,23 | 24:16 54:15 |
| 268:12 | 96:1 99:21 | 258:13 259:6 | 62:11 68:10 |
| **small** 227:5 | 100:7 101:11 | 259:18,21 | 80:4 82:3 83:4 |
| 236:21 237:7 | 101:18 104:6 | 261:1,3,5,7,12 | 86:3 88:11,14 |
| **smallest** 205:24 | 105:4,15 106:9 | 261:16 262:1 | 91:9 168:1 |
| 206:12 | 106:18 107:21 | 262:11,16 | 185:11 187:14 |
| **snap** 3:12 14:7 | 109:19 110:4 | 263:1,7 264:3 | 191:12 203:22 |
| 272:8 284:3,6 | 110:18 111:2 | 265:7,14,24 | 218:23 219:10 |
| 284:23 295:3 | 112:4,12 | 266:24 267:13 | 222:2 224:23 |
| 320:9 | 113:20 136:3,7 | 276:8 281:5,15 | 256:2 262:21 |

CONFIDENTIAL

287:22 292:7 316:3

**sort** 16:23 160:10 214:24 255:12 275:13 276:2 286:13 294:21 314:19

**sorts** 145:21

**sought** 284:8

**sounded** 162:3 163:12 176:17

**sounds** 71:6 265:9 309:4

**source** 29:24 30:10,10 35:7 46:23

**space** 322:6

**spalding** 4:14

**speaking** 14:22 151:14,19 152:2 275:11

**special** 226:4

**specialties** 50:11,14,23 51:1 56:2,5

**specific** 46:16 46:21 56:4,6 70:4 158:15 170:19 171:7 184:23 197:9 201:18 207:19 207:21 208:21 209:23 243:21 257:20 258:8

268:17 269:19 281:11 283:14 286:24 299:15

**specifically** 41:9 50:21 61:4 168:6,19 190:18 240:8,9 250:20 270:11 289:14,21

**speech** 45:4,5 45:18,19 47:4 47:5

**spend** 21:16,22 123:21 133:7 134:9 178:23 263:14

**spending** 101:18 106:17 112:12

**spent** 21:20 22:2,17 76:20 77:3 82:22 83:8,22 84:18 85:16 86:23 88:2 94:11,20 95:24 99:20 101:10 104:5 106:9 112:3 119:21 120:23 125:1 128:6 130:17 131:24 132:16,22 133:20 134:23 139:19,23

140:18 141:9 144:18 152:9 156:14 157:10 164:18 165:3 165:11,15 167:7,21 168:7 173:24 176:14 177:2 207:5 208:15 214:1 214:16 215:6 314:17 319:8

**spoke** 154:21 154:21 276:13

**sponsorship** 30:11

**staff** 19:23 20:2 20:3 74:15 155:8 221:11 221:14,17 239:10

**stand** 59:3 250:9

**standard** 175:2 175:4

**standards** 232:23 233:16

**start** 79:23 91:9 130:9

**started** 21:3 63:7 77:14 104:2 203:9 310:15 318:3 318:14

**starting** 24:17 65:20 74:18 96:24 201:11

**starts** 186:13 187:17

**state** 13:17 322:5

**statement** 76:18 175:19 177:23 181:8 181:10 185:4 185:13,15 187:1 189:11 189:23 190:1,3 209:20 212:16 226:10 230:2 230:17 243:8 296:22

**states** 1:1 12:21 182:4

**stating** 320:4

**statistician** 43:16

**statistics** 306:10,13

**stay** 264:13

**stayed** 141:11

**steak** 6:18,18 26:20,20 27:8 27:9,22 29:3,5 29:7,8 30:7,8 40:14

**stemming** 261:7,12

CONFIDENTIAL

**[stenographic - suggestive]**

**stenographic**
  13:2
**step**  173:11
  208:4,4
**stepped**  222:1
**steps**  226:12
**stern**  8:19 9:7
  9:10,14,17,21
  166:11 168:16
  194:19 198:10
  209:7 216:5,13
  216:21 217:5
  217:13
**stern's**  195:22
**sticking**  65:3
  96:10
**stimuli**  39:23
**stimulus**  41:7
**stipulated**  12:2
**stipulations**
  11:15
**stop**  35:19
  171:21 291:18
**stopped**  35:15
  35:20
**stopping**
  128:16
**straightforward**
  202:5 308:5,8
  309:11
**stratifying**
  181:3
**street**  2:16 4:4
  4:15 5:5

**strike**  27:19
  117:12 204:18
  213:21
**strip**  53:2
**strong**  39:21
**structuring**
  64:10
**student**  136:3
  138:12 207:6
  248:2 251:19
  254:20 255:10
  255:14,19
  256:6,10
  257:13,15
  260:9 261:1,6
  261:11,14
  262:11 263:8
  268:12,22
  269:4,13 282:6
  283:8,17 289:9
  289:23 290:8
  301:23 302:3
  302:12
**student's**
  266:12 267:6
**students**  84:14
  244:7,18
  248:24 249:20
  251:2,7,17
  252:4 254:8
  261:2,4,22
  262:10 264:19
  264:22,23
  266:17,19,20

  269:24 270:15
  274:8,10,13,17
  275:4 282:14
  292:21 293:9
  293:18 294:3
  294:17 296:16
  299:4,20,23
  300:3,5,12,18
  300:19 301:2,7
  301:11,12,12
  302:12,16
**studies**  16:20
  221:24 222:5
  244:8 245:8,10
  297:14
**study**  33:3,9
  51:4 167:15
  177:4,20 180:5
  181:12 210:9
**stuff**  44:20
  145:22 277:8
  280:9 286:14
  314:18
**style**  197:19,22
  198:2 204:6
  211:1,6
**subactivities**
  173:18 174:16
  174:20
**subactivity**
  173:9,13
  175:10
**subcompone...**
  170:24

**subject**  23:16
  23:18 62:18
  64:5 192:22
  222:22 235:10
  244:14 322:10
**subjects**  154:14
  243:13,17,21
  244:19
**submitted**
  18:23 19:2
  25:11 104:19
  109:12 313:16
  314:10
**subpopulation**
  223:18
**subscribed**
  324:10
**subsequently**
  118:16
**subset**  227:5
**substance**
  324:6
**substantiation**
  57:3,6
**sued**  45:1,13
**suffering**  261:4
**suffers**  39:15
**suggest**  232:10
**suggested**
  172:24
**suggesting**
  163:8
**suggestive**
  47:11

CONFIDENTIAL

**[suggests - survey]**                                        Page 58

| | | | |
|---|---|---|---|
| **suggests** 34:23 | 163:8 167:2 | 60:3,3,6,12,23 | 190:10,18 |
| 209:12 211:16 | 168:4 171:20 | 61:9,12,14,22 | 191:17 192:5 |
| 262:24 | 187:3 188:1,5 | 65:11,13,22 | 192:13,19,21 |
| **suit** 46:17 | 188:11 196:13 | 66:7,8,17 | 196:7 197:8,17 |
| **suite** 4:5,16 | 200:6 201:11 | 67:12,16,16,23 | 199:18 201:2 |
| **sum** 68:11 | 218:3 220:13 | 70:8 72:1,5,7,9 | 202:16 204:8 |
| 77:21 | 220:17 235:6 | 74:18 78:9,15 | 204:12 208:2,7 |
| **summary** 49:19 | 253:3 254:3 | 78:21 79:3,10 | 209:22 212:18 |
| **supervision** | 256:4 264:12 | 80:9 81:6 | 212:19,21 |
| 321:21 | 274:22 289:4 | 84:21 85:22 | 221:9,12,16 |
| **support** 11:2 | 306:6,23 307:2 | 88:7 97:16,24 | 222:8,14,20 |
| 43:14 56:7 | 314:22 | 107:12 108:3 | 223:6,7,12,17 |
| 176:24 181:10 | **surprised** | 113:4,11,11 | 223:22 225:3 |
| 196:7 198:9 | 294:8,16 | 114:24 115:16 | 225:11,16 |
| 207:14 209:5,8 | **surrounded** | 119:11 120:12 | 226:14,20 |
| 238:11 | 266:5 | 120:20 121:11 | 227:18,22 |
| **supported** | **survey** 6:15 | 123:18 125:20 | 228:15 230:8 |
| 209:8 | 7:15,18,21 8:6 | 127:23 128:9 | 231:5,9 236:16 |
| **supporting** | 8:9,13 18:15 | 133:10 137:23 | 236:18 238:22 |
| 182:1 183:22 | 28:3,12,13,16 | 138:3,7 141:11 | 239:14 240:10 |
| 185:15 208:13 | 28:22 29:15,23 | 142:12 144:2,7 | 242:2,6,18,20 |
| **supports** | 30:6,9,23 | 145:1 146:3 | 244:2 245:11 |
| 208:24 | 32:15,22 33:13 | 147:20 148:8 | 246:4,12,17 |
| **suppose** 178:20 | 33:19 34:12,19 | 148:10,17,24 | 247:7 248:15 |
| **supposedly** | 36:6 39:10,14 | 149:4,9,22 | 249:12 250:10 |
| 81:9 | 39:20 40:8 | 150:11,23,24 | 256:6 257:9 |
| **supreme** 45:24 | 41:7,8,14,16,23 | 152:22 153:6 | 260:13 274:1,3 |
| **sure** 21:18,21 | 42:3 43:9,16 | 153:13 154:10 | 275:16 280:23 |
| 43:22 52:20 | 44:6,11 46:6 | 154:20,23 | 281:4 282:10 |
| 61:9 63:2 67:6 | 46:19 47:2,9 | 155:11 158:13 | 283:23 284:7 |
| 67:12 70:15 | 49:20 50:14 | 161:11 162:8 | 285:4 292:16 |
| 72:8 119:24 | 51:2,7,20,21 | 166:1,16 | 297:11 300:14 |
| 146:22 148:11 | 52:2,6 58:4 | 172:14 188:15 | 302:15,17,22 |
| 152:2 160:10 | 59:15,19 60:1 | 188:18 189:6 | 303:13,15,16 |

CONFIDENTIAL

303:19 304:24
305:9 306:15
309:17 310:4
311:15 314:11
315:3,7 316:11
318:7 319:6
**surveyed** 61:6
**surveys** 16:22
16:23,24 36:17
51:10 52:8
58:2 96:13
97:2 102:17
103:11,12,16
107:19 108:7
113:17 114:17
130:24 131:12
131:20 132:11
175:1 188:2
195:12 227:8
233:1,17
235:19 247:22
254:15 273:12
273:15 285:16
287:2 304:22
305:6 306:16
307:17,22
308:23 309:3
311:1 312:9
316:3,4
**sw** 3:4
**swear** 13:4
**switched** 246:7
**sworn** 13:8
321:5 324:10

**symptoms**
266:24
**system** 287:6
287:11
**systematic**
169:12 170:9
**systemic**
175:15
**szalazar** 5:7

**t**

**t** 6:11 7:2 8:2
9:2 10:2 323:1
**tab** 26:16 31:10
37:22 42:12
48:5 55:8 58:7
62:8 79:24
165:19 193:13
219:3,6,7,9,11
**table** 105:7,11
131:22 173:17
**tables** 131:18
**tabulate** 205:8
**tabulated**
212:21 213:3
**take** 24:12,12
37:22 38:21
43:11 48:3
55:8 58:7
64:17 71:4,21
75:12 94:1
96:23 99:16
102:10 104:16
104:22 107:9

107:16 109:9
109:14 113:1
117:5 118:10
125:9 128:17
130:21 165:19
169:24 177:14
178:5 184:16
185:8,20 186:9
187:9 192:13
193:11,23
205:19 213:17
220:23 226:13
228:13 230:20
231:5 270:23
296:7 307:9
308:24 317:14
**taken** 1:14 18:7
59:21 60:15
71:13 129:8
144:16 172:3
182:16 184:24
215:23 271:8
276:17 278:1
298:10
**takes** 143:10
189:15
**talk** 47:14
154:7 213:14
262:7 266:18
276:7
**talked** 167:11
221:7,22 222:3
290:23 314:24

**talking** 15:15
37:16 129:16
145:16 178:18
309:21
**talks** 173:22
**tardiness**
138:12 255:11
255:14,19
256:6,10
**target** 225:13
226:15 228:19
**task** 165:8
171:14 197:4
**tasked** 47:2
**tasks** 125:1
165:3 167:7
168:7 171:7
174:1 178:23
184:15 185:8
185:19 190:21
207:19 319:8
**taught** 243:17
304:11
**tax** 44:22
**te** 172:19
**teach** 243:12,21
**teacher** 6:15
7:15,18,21 8:6
8:9 18:15
65:21 66:4,6
66:10,20 72:2
76:16 78:8,15
78:21 79:3,10
133:2,20

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 142:24 149:8 | 97:11,21,24 | 176:12,17 | 318:3,7 |
| 149:22 166:21 | 98:12 99:2,20 | 177:1,18 | **teachers'** 8:12 |
| 168:20 177:8 | 100:1,3,5,10,17 | 178:23 180:3 | 165:22 |
| 179:18 186:3 | 101:1,9,14,17 | 180:15 181:1,3 | **teaching** 77:14 |
| 239:16 240:16 | 101:23 102:4 | 182:3 183:4,7 | 82:21 83:7,14 |
| 241:19 242:22 | 102:14,20 | 183:17,20 | 83:15,20 84:10 |
| 245:24 246:3 | 103:14 105:2,9 | 184:13 185:5 | 99:19 100:14 |
| 250:1 251:9,20 | 105:13,18,24 | 186:13,20 | 103:22 104:2 |
| 251:21 252:3 | 106:7,13,17 | 189:4,12,13 | 104:24 105:21 |
| 255:2,13,17 | 107:2,13,23 | 190:2,4,9,19 | 110:15 111:8 |
| 256:5 257:23 | 108:10,15 | 203:4,15 208:9 | 125:17 130:3,6 |
| 259:17,20 | 109:6,17,20 | 239:21 240:2,7 | 136:1 154:13 |
| 260:12 267:11 | 110:2,7,16,21 | 245:9,10 246:5 | 166:21 184:14 |
| 267:23 269:3 | 110:24 111:5 | 246:7,11,15,22 | 185:6 203:9 |
| 283:23 300:13 | 111:11,18 | 250:13 251:1 | 204:24 206:17 |
| 300:18 301:2 | 112:1,7,11,20 | 254:18 259:5 | 207:12 239:10 |
| 301:21 | 113:6 114:3 | 262:15 265:7 | 259:22 260:17 |
| **teachers** 8:13 | 115:6 133:7 | 266:11,16 | 285:10 310:15 |
| 72:4 74:22 | 134:5,24 | 267:5 268:5,9 | 316:12 318:15 |
| 75:5,16,22 | 136:23 138:8 | 269:11 270:5 | **team** 273:10,23 |
| 76:7 77:11 | 138:15 139:2 | 270:11 273:15 | **technician** |
| 78:1 80:22 | 139:19 147:19 | 273:24 276:4,5 | 12:10 18:2,9 |
| 81:3,23 82:7 | 148:2 149:17 | 281:6,16,17 | 71:8,15 129:3 |
| 82:22 83:8,17 | 152:23 153:8 | 282:1,12 | 129:10 171:22 |
| 83:18,22 84:15 | 154:11,14 | 293:17 297:11 | 172:5 182:7,11 |
| 84:18,24 85:5 | 155:5,9 156:13 | 297:15 299:4 | 182:18 215:18 |
| 85:16 86:2,7 | 162:8 166:1,14 | 299:20,22 | 217:17 271:3 |
| 86:23 87:6,11 | 166:17 167:6 | 300:2,5,10 | 271:15 298:5 |
| 87:18 88:1,20 | 167:21 168:7 | 301:6 302:17 | 298:12 320:3 |
| 89:4,5,9,23 | 169:10,22 | 304:22 305:7 | **technique** |
| 90:17 91:8 | 170:6 172:12 | 305:20 308:21 | 62:22 |
| 94:11,16,19,24 | 172:14 173:18 | 309:1 310:19 | **techniques** |
| 95:6,16,24 | 173:23 174:19 | 311:2,12,16 | 210:11 |
| 96:14 97:1,4 | 175:4,13 | 316:12 317:23 | |

CONFIDENTIAL

**[technology - think]**

| | | | |
|---|---|---|---|
| **technology** 138:19 | 142:23 145:19 148:3 233:20 245:2 | **testimony** 6:4 15:8 24:19,21 26:9,12 34:9 52:18 133:13 150:23 151:16 160:16 171:12 200:11 203:14 225:7 250:13 274:21 281:23 299:8 309:24 313:14,17,22 313:24 315:9 316:1 317:2 321:7 | 214:24 255:1,2 255:12 260:12 |
| **television** 165:15 | **test** 123:13 134:18,21 152:20,24 154:10 158:13 160:11,13,18 161:2,3,17 163:20 164:2 176:16 189:3 192:9 193:8 221:20 252:10 266:21 268:4 268:10,20 269:11 270:13 270:17 273:11 273:19,23 274:2,18 275:5 292:15 293:16 295:10 296:2 | | **things** 61:3,19 213:15 214:20 240:24 259:1 261:13 262:9 302:6 |
| **tell** 70:7 75:14 139:23 171:7,8 291:13 293:17 294:2 295:12 303:13 | | | **think** 22:8 34:10 35:6 37:1 51:5 52:1 52:4 59:2,6,8 60:2 65:8 73:12 76:17 103:20 113:24 120:9 121:5 125:23 129:19 133:14 134:16 137:7 142:10 144:4,13,19 148:9 150:2,17 150:18 151:8 151:12,20 152:16 164:8 164:11,12 165:7 167:9 171:6,13 176:6 176:15 178:15 179:4 188:9 189:2 194:10 197:7,12 198:19 203:12 209:21,24 210:6 211:23 212:3,17,22 |
| **temperature** 256:22 257:2 | | | |
| **temporal** 196:20 | | **testing** 127:8 150:6 153:6 154:8 155:6 267:4 | |
| **ten** 21:5 62:16 82:14 104:1 115:2 130:3,6 278:5 280:19 291:21 311:17 | | **tests** 156:2 | |
| | | **texas** 4:5,11,12 4:16 | |
| **tend** 279:20 | | **tested** 160:9 193:5 | |
| **tenth** 2:16 5:5 | | | |
| **tenure** 133:22 240:7 245:24 246:3 | | **text** 72:20 135:16 | |
| | **testified** 13:9 17:10 25:14 38:18 43:5 170:11 174:4 299:12 316:10 | **texting** 138:2 | |
| **tequila** 35:1,7 | | **thank** 206:9 271:19 288:8 288:13 297:18 318:16 319:17 | |
| **term** 154:23 215:9 276:3 | | | |
| **terminated** 66:8 67:9 68:2 68:5 | **testify** 26:1 27:11 | **thanks** 66:13 | |
| | | **theory** 29:2,18 31:7 | |
| **terminates** 68:12 | **testifying** 25:17 273:9 274:5 315:21 | **thing** 54:1 138:16 139:5 139:14 196:6 | |
| **terming** 159:9 | | | |
| **terms** 31:7 118:2 124:23 | | | |

CONFIDENTIAL

**[think - time]**                                                Page 62

| | | | |
|---|---|---|---|
| 231:17 232:1 | 91:7 155:2 | 83:9,16,23 | 144:17 145:20 |
| 234:15 236:11 | 158:4,19 | 84:8,19 85:3 | 149:2,7 150:1 |
| 236:21 237:10 | 159:11 161:13 | 85:16 87:1,1,9 | 151:10 152:9 |
| 237:18,22 | 163:11 173:1 | 88:3,18 89:6 | 153:15,21,22 |
| 240:20,22 | 219:21,23 | 90:15 93:17 | 156:14 157:10 |
| 243:4 248:21 | 278:18,19 | 94:12,21 95:4 | 159:6,7 161:7 |
| 250:24 254:16 | 282:1 | 95:15 96:1 | 162:12 164:5 |
| 254:19,23 | **three**  23:12 | 97:13,19 98:9 | 165:4,14,23,23 |
| 260:6 263:5,18 | 75:15,20 155:7 | 98:13,17,21,22 | 166:14,15 |
| 263:21 265:10 | 279:13 | 99:21 100:16 | 167:7,8,21 |
| 265:12,19,21 | **threshold** | 101:10,17 | 168:7,8,21 |
| 266:3,4 267:16 | 139:10 | 104:5,7 105:23 | 169:24 170:18 |
| 268:3 270:24 | **tied**  204:13 | 106:9,16 | 170:23 171:22 |
| 270:24 274:9 | **tiktok**  4:18,19 | 107:22 108:11 | 172:5,12,12 |
| 278:2 279:24 | 4:19 14:6 | 108:15 109:5 | 173:3,13,24 |
| 281:24 282:6 | 248:4,11,18 | 111:10 112:3 | 176:13,20 |
| 284:5,22 | 249:11 252:11 | 112:11 113:21 | 177:2,9,18 |
| 285:17 286:1 | 257:11 258:1 | 114:12 115:20 | 178:5,22 179:6 |
| 295:23,24 | 274:6 275:2 | 118:3,4,7 | 179:18 180:3 |
| 299:11,18,21 | 279:22 280:1,3 | 119:21 120:23 | 182:11,18 |
| 305:11 315:8 | 298:20 320:13 | 125:1,14,15,16 | 183:7,20 |
| 317:6 319:12 | **time**  6:15 7:15 | 128:6 129:3,10 | 184:12,23 |
| 320:2 | 7:18,21 8:6,9 | 130:17,19 | 185:5 186:3,5 |
| **thinking**  155:1 | 8:12,12 12:8 | 131:24 132:1,6 | 186:14,20 |
| 157:2 160:11 | 12:15 18:2,9 | 132:15,17,22 | 188:18 189:6 |
| 234:8,11 | 18:15 21:19,21 | 132:24 133:4,7 | 189:15 190:9 |
| **thinks**  252:4 | 22:2,17 48:24 | 133:16,21 | 190:20 197:13 |
| **third**  64:3 | 59:7 71:8,15 | 134:9,10,23 | 197:15 202:13 |
| 191:5 206:6,8 | 74:23 75:5 | 136:2,9,15 | 204:23 205:24 |
| 224:16 | 76:20,22 77:12 | 137:6,15 | 206:12,16 |
| **thirds**  206:3,13 | 77:20 78:9,15 | 139:19,23 | 208:15 213:17 |
| **thirty**  322:16 | 78:21 79:3,10 | 140:2,6,11,12 | 213:24 214:16 |
| **thought**  24:14 | 81:15 82:1,9 | 140:15,18,21 | 214:21,23,23 |
| 29:12,14 47:3 | 82:15,16,23 | 141:9 143:12 | 215:6,16,18 |

CONFIDENTIAL

**[time - tucson]**                                         Page 63

| | | | |
|---|---|---|---|
| 217:17 252:6 | today's 12:14 | 184:23 186:5 | **tremendous** |
| 259:22 260:16 | **together** 20:12 | 190:14 285:9 | 35:8 |
| 263:14 271:3 | 113:14 169:6 | 306:15 307:10 | **trial** 12:8 25:20 |
| 271:15,19,21 | 290:20 | 307:16,17 | 26:2,6 |
| 273:1 280:21 | **told** 30:16 | 308:23 309:2 | **tried** 46:6 |
| 281:9 282:12 | 35:19 171:18 | **toward** 186:13 | 152:20 |
| 283:7 285:10 | 240:3,5,10 | 201:4 210:15 | **true** 179:21 |
| 297:12,16,20 | 289:14,20 | 224:9 315:5 | 185:22 233:13 |
| 298:5,12 | 290:4,6,13 | **towards** 225:16 | 236:12 243:7 |
| 304:24 305:8 | 300:10 | **track** 279:19 | 245:6 303:20 |
| 305:20 314:17 | **took** 36:21 | **trademark** | 321:6 |
| 320:17 | 45:24 150:12 | 56:9,11 | **trumpeted** |
| **timeframe** | 161:11 | **trademarks** | 147:1 |
| 310:22 | **top** 27:16 35:2 | 49:21 50:5,15 | **truthfully** |
| **timeline** 201:18 | 66:3 75:15 | 231:2 | 238:8 |
| 203:4 | 142:22 184:19 | **traditional** | **try** 15:16 |
| **times** 2:20 | **topaz** 1:16 2:2 | 177:19 179:17 | 158:22 298:3 |
| 16:14 151:22 | 3:16 | 180:4 186:22 | **trying** 131:14 |
| 175:3 274:12 | **topic** 196:1 | 212:6 | 138:14 155:24 |
| 320:4 | 224:11 | **traditionally** | 223:21 224:5,5 |
| **tip** 231:4 | **topics** 52:3 | 177:10 | 227:16,17 |
| **tipping** 146:2 | **total** 19:2 21:20 | **transcript** | 233:21 251:4 |
| **title** 166:19 | 21:22 74:24 | 292:1,12 | 263:22 277:24 |
| 195:10 | 75:23 77:9,21 | 321:18 322:17 | 278:2 283:3 |
| **titled** 80:13,18 | 80:10 89:3 | 322:19 | 289:15 316:22 |
| 172:11 173:8 | 96:13 97:10 | **transcription** | 317:7 |
| 210:16 | 99:8 103:8 | 324:4 | **tucson** 8:10 |
| **today** 14:14,16 | 107:12 108:6 | **translated** | 9:22 19:7 |
| 15:8 16:6 | 113:5 114:16 | 211:11 | 79:11 109:12 |
| 22:20 23:3 | 116:16 118:7 | **travel** 53:3 | 109:16 113:4 |
| 73:11 150:9 | 125:15 129:20 | 54:22 | 113:18 115:19 |
| 183:14 221:22 | 139:20 141:9 | **treated** 70:8,18 | 116:6 117:7 |
| 222:4 253:7 | 145:18 170:17 | 70:20 119:9 | 131:21 217:14 |
| 271:20 296:12 | 170:23 173:2 | 137:8 | 218:16,18,22 |

CONFIDENTIAL

**[tucson - usable]**                                    Page 64

219:23 220:4,6
**turn** 32:17 65:3
  71:19 92:18
  96:7 99:11
  102:16 135:12
  182:23 195:3
  209:3 247:8
**turned** 21:4
**turning** 115:5
  162:7
**twenty** 17:15
  155:7
**twice** 23:9
  142:8 143:23
  144:10,15
  145:9 146:4
**twitter** 251:11
**two** 25:11,14
  31:18,19 33:2
  54:19 58:24
  99:9 114:21
  120:19 122:13
  142:2,13
  143:18 236:15
  255:8 261:22
  279:13
**tying** 167:11
  197:8 209:22
  210:5 265:23
**type** 41:6,23
  279:2
**types** 122:23
  123:7,14
  201:16 213:14

266:7
**typical** 118:2
  118:15 121:21
  122:1 123:21
  125:6,12
  130:18 135:24
  179:16 227:7
  276:24
**typically** 16:20
  177:9,13
  308:17 309:16

**u**

**u.s.** 17:16,17
  46:9 181:14
**umm** 6:18
  26:20 27:8,22
  29:3 30:8
**umm's** 40:14
**umms** 29:8
**unable** 119:20
  128:5 131:23
**unauthorized**
  138:2 248:2
  255:11
**unaware**
  146:20
**uncomfortable**
  256:21 257:1
**uncommon**
  103:10
**under** 14:16
  43:22 67:1,3
  126:24 152:16

239:4 245:16
  306:12 321:20
**undermine**
  28:3
**understand**
  14:15 15:10,20
  34:12 51:8,22
  65:6 66:15
  68:1 69:5 70:3
  82:4 125:22
  143:15 152:8
  168:2 169:21
  170:13 173:21
  179:12 184:5
  223:21 224:7
  227:20 242:24
  243:5 250:12
  255:18 256:10
  256:23 257:9
  274:23 283:2,3
  306:7,24
**understanding**
  49:2 61:5 64:9
  72:15 75:10
  131:10 195:16
  252:9 269:5
  274:6 281:17
  283:15 286:19
  289:7 293:3
  295:19 302:23
  311:21 312:13
**understands**
  150:24 151:1

**understood**
  16:2 250:13
  270:14,14
**undertake**
  192:13 231:11
  277:8 285:2,13
**undertaken**
  275:16
**unemployment**
  202:10
**unidentified**
  103:10
**unit** 206:12
  282:23
**united** 1:1
  12:21 182:4
**units** 205:24
**universally**
  236:12
**universe**
  225:19 226:19
**unnecessarily**
  47:10
**unsound** 39:21
**unstable**
  267:17
**unusual** 222:21
**unwilling**
  317:12
**upcoming** 72:5
**ups** 314:5
**upset** 41:5
**usable** 210:7
  306:15 308:9

CONFIDENTIAL

**[usage - voice]**                                                Page 65

**usage**  210:23 252:14 283:18 284:9,14 289:9 289:23 290:8 293:23 310:10
**use**  8:12 44:13 45:2 73:3,6 82:1,9 83:10 84:20 85:4,17 87:2,10 88:19 90:16 94:13 95:5 96:2 100:7 105:15 110:18 111:2 136:3 145:11 153:15 165:23 166:15 172:12 191:2 196:19 203:18 204:19 205:4 207:6 208:13 210:10 212:6 240:20 241:12 248:2 249:21 251:3,7 251:17 254:20 257:13,15 259:2 261:1,4 261:6,7,12 262:11,17 263:1 265:14 274:8,11,11,17 275:4 278:7,12 278:23 279:7 279:15,18

282:6,14 283:8 289:13 293:19 294:4,13,18 297:11,15 299:14,24 307:11 310:17 318:7,8
**used**  35:2 36:4 41:7 47:10 63:1 73:10 103:11 117:24 155:10 179:6 198:1,8 201:1 204:8,12,12 205:12 207:16 208:1 213:4,21 213:24 214:16 215:2,5 226:3 232:24 233:16 233:17 241:17 254:7 274:13 277:15 280:1,4 283:17 289:8 290:8 291:17 292:21 293:9 322:20
**useful**  278:19 311:19
**users**  260:3
**uses**  196:16 201:6
**using**  35:15 197:1 201:16 229:15 233:21

252:4 257:16 278:1 281:16 296:17 299:5 299:16
**usually**  199:3

**v**

**v**  6:18,21,23 7:6 26:20 27:9 31:14 32:8 37:5 38:2,14 42:16
**valid**  102:18 103:14 114:8 114:14 188:15 210:6 225:11 229:13 234:20 234:24
**validation** 68:13,15
**validity**  169:13 175:16 181:17 196:2 198:9
**variety**  63:1 154:12,13
**various**  22:22 44:15,24 56:1 65:23 181:4 232:9 274:12
**vary**  134:2
**vast**  17:8
**verifiable** 163:20

**verification** 161:21
**verify**  74:9 158:22 159:20 161:4 162:1 163:1 296:14 296:15
**veritext**  1:23 12:13
**version**  205:17
**versus**  25:1 43:3 54:6 103:23 308:22
**video**  12:10,16 18:2,9 71:8,15 129:3,10 171:22 172:5 182:7,11,18 215:18 217:17 271:3,15 298:5 298:12 320:3
**videographer** 5:14 12:12
**videos**  280:3,12 280:17
**videotaped** 1:13
**view**  33:3,14,19 34:5 125:23
**viewing**  67:22
**voice**  64:4,7

CONFIDENTIAL

**[waived - witness]**                                    Page 66

| w | way 34:21 59:9 | wednesday | witness 11:5 |
|---|---|---|---|
| **waived** 12:5 | 60:24 64:11 | 23:13 | 13:5,24 14:21 |
| **walking** 255:16 | 65:15 70:19 | **weekly** 214:1 | 26:5 27:5 |
| 255:20 256:8 | 120:4,11 121:5 | 214:17 | 30:20 31:18 |
| 256:12 | 123:9 124:11 | **weight** 28:16 | 32:12 34:10 |
| **want** 17:24 | 126:3 137:7,19 | **went** 86:12,15 | 36:22 37:3,5 |
| 33:22 37:9 | 139:3 146:1,11 | 91:16 92:1,10 | 41:20 49:6,20 |
| 67:12 88:10 | 149:23 151:3 | 93:17 136:14 | 51:16 52:14 |
| 128:19 170:1,3 | 153:16 155:16 | 141:10,10 | 53:11 54:12 |
| 220:11 222:20 | 158:8 161:16 | 153:24 164:21 | 69:1 70:24 |
| 247:16 286:3 | 177:12 179:17 | 320:9,11,13,15 | 74:5,14 75:9 |
| 297:21 306:6 | 187:4 188:19 | **west** 3:10 4:10 | 77:24 82:13 |
| 316:15 | 212:18 215:12 | 4:15 | 84:3 85:8,21 |
| **wanted** 174:9 | 237:12 247:1,2 | **whiteley** 3:3 | 86:19 87:14,21 |
| 205:7 263:11 | 247:9 250:19 | 6:7 219:4,22 | 88:6,23 89:19 |
| 308:8,16,20 | 253:7 254:23 | 220:5 288:11 | 90:10,20 91:21 |
| **wants** 45:20 | 258:9 264:2 | 288:17,20 | 92:5,14 93:4 |
| 63:3 64:10 | 266:4 304:4 | 290:5,17 | 93:12,22 95:9 |
| 316:6 | 308:23 314:1 | 292:10 293:5 | 95:19 96:5,17 |
| **war** 261:23 | **ways** 33:4,10 | 293:15 294:1 | 97:9 98:7,16 |
| **ward** 135:5 | 41:12 66:16 | 294:10,24 | 99:1,8 100:21 |
| 213:4 242:12 | 255:18 | 296:23 297:18 | 101:4,22 102:8 |
| **ward's** 210:8 | **wc.com** 3:5 | 298:1 318:18 | 102:24 103:20 |
| **warming** 72:4 | **we've** 79:15 | 318:24 319:2 | 104:12 106:3 |
| 72:13,18,21 | 129:16 191:11 | 319:17,22 | 106:22 107:6 |
| 73:14 235:11 | 215:11 217:21 | 320:1,10 | 108:2,14 109:1 |
| **washington** | 232:24 233:17 | **wide** 52:3 | 110:11 111:14 |
| 2:16 3:4 5:6 | 235:18 237:3 | **widely** 63:1 | 111:21 112:16 |
| **watching** | 245:18,19 | **wiley** 63:15 | 112:23 113:24 |
| 165:15 | **wear** 67:21,22 | **williams** 3:3 | 114:11,20 |
| **wax** 35:2,5,15 | **web** 7:10 55:13 | **willingness** | 115:11,24 |
| 36:3 | **website** 55:19 | 292:3 | 116:16 117:2 |
|  | **websites** 53:3 | **wish** 80:13 | 119:14,24 |
|  | 54:22 67:17 |  | 120:8 121:4 |

CONFIDENTIAL

**[witness - writing]**                                           Page 67

| | | | |
|---|---|---|---|
| 122:9,17 123:5 | 213:10 214:8 | 288:4 290:3,12 | 220:16 221:2 |
| 123:17 124:7 | 222:13 223:11 | 292:7,24 | 221:11,23 |
| 124:20 125:4 | 224:3 229:6 | 293:13,22 | 222:4,24 247:1 |
| 126:8,22 | 231:16 232:19 | 294:7,21 | 247:2 264:13 |
| 127:12,20 | 234:15 235:4 | 296:21 299:11 | 272:16,21 |
| 128:12 133:14 | 236:9,21 | 300:23 301:16 | 273:6,8 290:19 |
| 134:1,14 135:3 | 237:17 238:1 | 302:2,21 | 295:13 |
| 136:19 137:3 | 238:16 239:19 | 303:10,23 | **workday**  171:8 |
| 138:6,23 | 240:19 241:11 | 304:8,18 305:3 | 171:9 174:20 |
| 139:14 140:5 | 241:23 242:10 | 305:18 306:23 | 190:22 |
| 140:24 142:18 | 243:4,16 244:1 | 308:3,15 310:7 | **worked**  119:2 |
| 144:13 145:5 | 244:11,23 | 311:7 312:17 | **working**  8:12 |
| 146:9 147:5 | 245:15 246:20 | 313:11,13 | 22:3 119:21 |
| 148:1,21 | 248:21 249:17 | 315:15 316:2 | 131:24 165:23 |
| 149:12 150:17 | 250:24 251:15 | 317:17 319:12 | 166:14 169:11 |
| 151:7,14 | 252:2 253:3,12 | 321:5,7 322:1 | 170:7,18 |
| 152:14 153:5 | 254:3,14 | **witnesses**  7:12 | 172:12 173:9 |
| 156:18 158:2 | 255:24 256:16 | 16:17 58:10 | 173:13 175:14 |
| 159:4 160:2,17 | 257:5,19 258:7 | **wolf**  3:10 | 177:8,18 180:3 |
| 161:10,24 | 258:18 260:6 | **won**  45:14,17 | 180:15 181:1 |
| 162:15 163:7 | 261:19 262:4 | 45:24 | 183:7,20 |
| 163:24 165:7 | 262:21 263:5 | **wonder**  144:7 | 184:12 185:5 |
| 168:1,12,24 | 263:18 264:11 | **wooden**  35:12 | 186:14,20 |
| 169:19 170:11 | 265:3,18 266:3 | **wording**  21:14 | 188:10 189:14 |
| 170:16 171:3 | 266:16 267:10 | 73:3,5 158:16 | 190:9 277:10 |
| 171:13 174:4 | 268:3,16 269:2 | 221:18 | **works**  284:20 |
| 175:22 179:2 | 269:18 270:3 | **words**  20:10 | **worry**  289:15 |
| 181:20 188:22 | 270:21 271:22 | 73:9 261:23 | **worrying** |
| 190:13 191:22 | 274:22 275:9 | **work**  168:8 | 289:19 |
| 193:8 198:19 | 278:10,17 | 170:23 173:2 | **wow**  143:7 |
| 202:2,20 | 281:3,24 | 175:3 181:4 | **write**  72:1 |
| 204:11 205:16 | 282:21 283:13 | 183:4,17 184:6 | **writes**  32:21 |
| 206:24 208:19 | 284:13 285:7 | 184:23 186:3 | **writing**  15:11 |
| 211:10,22 | 286:1 287:17 | 189:19 192:18 | 73:21 |

CONFIDENTIAL

**[written - zoom]**                                    Page 68

| | | |
|---|---|---|
| **written**  26:13 27:21 63:12 67:18 83:11 | 95:3,3 100:5 100:10,15 101:8,14 102:5 103:23 105:12 | **yep**  92:17 93:15 102:1 |
| **wrong**  66:22 103:1 151:9 152:5 | 105:22 106:6 110:23 111:9 112:1,10,10 | **yesterday** 23:14 131:9 132:4 |
| **wrote**  28:2 33:12 40:9 59:7,9 61:19 169:15 | 116:7,12 125:7 125:13 130:10 130:13 131:3 132:10 134:3 | **ygr**  1:3 **yield**  311:17 **yik**  253:20 **york**  2:20,21,21 **young**  242:7,21 |
| **x** | 136:9 153:10 157:3 207:10 207:11 272:22 282:13 300:14 300:14 | **youtube**  3:6 14:6 248:4,12 248:18 249:11 252:12 257:11 258:1 274:7 275:3 280:10 280:12,13,17 288:21 297:12 297:15 320:11 |
| **x**  6:2,11 7:2 8:2 9:2 10:2 251:10,15,21 252:4 | **yearly**  291:3,6 **years**  21:3,5 24:19 35:16 | |
| **y** | 36:21 42:24 49:11,15 53:1 | **z** |
| **yak**  253:21 **yeah**  39:2 60:20 80:19 109:1 136:4 150:20 160:10 163:7 167:2 194:2 222:18 237:1 260:6 270:7 286:12 305:21 307:23 | 62:16 104:1 115:2 130:3,7 157:23 159:1 159:23 206:2 206:20 213:2 277:24 278:5 279:13 280:19 291:20,21 310:21 311:17 | **zachary**  2:9 **zalazar**  5:4 **zbower**  2:11 **zero**  136:12 304:14 **zoom**  3:14 4:2 5:2 |
| **year**  35:12 82:14 84:17 86:23 87:24 88:1 89:13 90:3,14 91:2,5 92:10,24 93:8 93:19 94:10,19 | 319:9 **yeates**  2:3 14:23 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.