# Exhibit 45

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - -

IN RE: SOCIAL MEDIA                CASE NO.

ADOLESCENT ADDICTION/PERSONAL     4:22-md-03047-YGR

INJURY PRODUCTS LIABILITY         MDL No. 3047

LITIGATION

THIS DOCUMENT RELATES TO

ALL ACTIONS

- - - - -

Friday, August 15, 2025

CONFIDENTIAL - ATTORNEYS' EYES ONLY

PURSUANT TO PROTECTIVE ORDER

Videotaped deposition of BRYCE WARD, PhD, held at the offices of Kessler Topaz Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, Pennsylvania, commencing at 9:06 a.m. Eastern, on the above date, before Robin L. Clark, Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

CONFIDENTIAL

Page 2

APPEARANCES:

KESSLER TOPAZ MELTZER & CHECK, LLP
BY:   TYLER GRADEN, ESQ.
JORDAN JACOBSON, ESQ.
MELISSA YEATES, ESQ. (ZOOM)
JUSTIN SWOFFORD, ESQ. (ZOOM)
280 King of Prussia Road
Radnor, Pennsylvania 19087
610-667-7706
tgraden@ktmc.com
jjacobson@ktmc.com
myeates@ktmc.com
jswofford@ktmc.com
            For the Plaintiffs

WILLIAMS & CONNOLLY, LLP
BY:   JOSEPH S. SANDOVAL-BUSHUR, ESQ.
and KEY'TOYA BURRELL, ESQ.
680 Maine Avenue SW
Washington, D.C.  20024
202-434-5013
jsandoval-bushur@wc.com
kburrell@wc.com
            For the Defendants, Alphabet,
Inc., Google, LLC and YouTube, LLC


SHOOK, HARDY & BACON, L.L.P.
BY:   BRIAN M. LANDS, ESQ.
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, Pennsylvania 19103
215-278-2555
blands@shb.com
            For the Defendants, Meta
Platforms, Inc., f/k/a Facebook, Inc.;
Facebook Holdings, LLC;
Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies,
LLC; Instagram, LLC; and Siculus, Inc.

CONFIDENTIAL

Page 3

APPEARANCES, CONTINUED:

        MUNGER, TOLLES & OLSON LLP
        BY  STEPHANY REAVES, ESQ.
        601 Massachusetts Avenue NW
        Suite 500E
        Washington, D.C. 20001
        202-220-1126
        stephany.reaves@mto.com
            For the Defendant, Snap, Inc.

ALSO PRESENT:

        WILLIAM CHAN, VIDEOGRAPHER

        VINCE ROSICA, EXHIBIT TECH

REMOTE APPEARANCES:

        CARELLA, BYRNE, CECCHI, BRODY
        & AGNELLO, P.C.
        BY:  MICHAEL A. INNES, ESQ.
        ZACHARY S. BOWER, ESQ.
        5 Becker Farm Road
        Roseland, New Jersey 07068
        973-994-1700
        minnes@carellabyrne.com
        zbower@carellabyrne.com
            For the Irvington Plaintiffs

        MOTLEY RICE, LLC
        BY:  ESTHER E. BEREZOFSKY, ESQ.
        210 Lake Drive East, Suite 101
        Cherry Hill, New Jersey 08002
        856-667-0500
        eberezofsky@motleyrice.com
            For the Plaintiffs

CONFIDENTIAL

Page 4

REMOTE APPEARANCES, CONTINUED:

            EILAND & BONNIN, P.C.
            BY:  DAVID BONNIN, ESQ.
            CRAIG EILAND, ESQ.
            2200 Market Street, Suite 501
            Galveston, Texas 77550
            409-763-3260
            dbonnin@eilandlaw.com
            ceiland@eilandlaw.com
                      For the Texas ISD Plaintiffs

            KING & SPALDING LLP
            BY:  PHILIP GREEN, ESQ.
            1180 Peachtree Street, NE
            Suite 1600
            Atlanta, Georgia 30309
            404-572-2728
            pgreen@kslaw.com
                      For the Defendants,
            TikTok, Ltd.; TikTok, LLC;
            TikTok, Inc.; ByteDance Ltd.; and
            ByteDance Inc.
                      - - - - -

CONFIDENTIAL

                         I N D E X
    WITNESS                                              PAGE
    BRYCE WARD
      BY MR. SANDOVAL-BUSHUR:                             10

                         E X H I B I T S
    NUMBER           DESCRIPTION                        MARKED
    Ward
    Exhibit 1A       Amended Expert Report for            11
                     Breathitt case

    Exhibit 1B       Amended Expert Report for            11
                     Charleston case
    Exhibit 1C       Amended Expert Report for            12
                     DeKalb case

    Exhibit 1D       Amended Expert Report for            13
                     Harford case
    Exhibit 1E       Amended Expert Report for            13
                     Irvington case

    Exhibit 1F       Amended Expert Report for            14
                     Tucson case
    Exhibit 2A       Reply Report for Breathitt           14
                     case

    Exhibit 2B       Reply Report for Charleston          15
                     case
    Exhibit 2C       Reply Report for DeKalb              15
                     case

    Exhibit 2D       Reply Report for Harford             15
                     case
    Exhibit 2E       Reply Report for Irvington           16
                     case

    Exhibit 2F       Reply Report for Tucson              16
                     case

CONFIDENTIAL

Page 6

Exhibit 3A    Breathitt Original Expert      20
              Report

Exhibit 3B    Charleston Original Expert     21
              Report

Exhibit 3C    DeKalb Original Expert         21
              Report

Exhibit 3D    Harford Original Expert        22
              Report

Exhibit 3E    Irvington Original Expert      22
              Report

Exhibit 4     Email dated 4/11/25            30

Exhibit 5A    Appendix B Materials           37
              Considered Breathitt
              Documents

Exhibit 5B    Appendix B Materials           38
              Considered Charleston
              Documents

Exhibit 5C    Appendix B Materials           39
              Considered DeKalb Documents

Exhibit 5D    Appendix B Materials           39
              Considered Harford
              Documents

Exhibit 5E    Appendix B Materials           40
              Considered Irvington
              Documents

Exhibit 5F    Appendix B Materials           40
              Considered Tucson Documents

Exhibit 6     Invoices Bates Ward000001      60
              to Ward 000005

Exhibit 7     Robert L. Klein Breathitt     124
              Expert Report dated 5/18/25

Exhibit 8     Nominet Article               335

Exhibit 9     NEA Article                   346

CONFIDENTIAL

Page 7

Exhibit 10

Exhibit 11      Affidavit of Lisa Kathryn      387
                Allison

Exhibit 12      Affidavit of Anita Huggins      388

CONFIDENTIAL

Page 8

DEPOSITION SUPPORT INDEX

- - - -

Direction to Witness Not to Answer

Page  Line

NONE

Request for Production of Documents

Page  Line

NONE

Question Marked

Page  Line

NONE

CONFIDENTIAL

Page 9

THE VIDEOGRAPHER: We are now on the record. My name is William Chan. I am a videographer for Golkow, a Veritext division. Today's date is Friday, August 15, 2025. The time is 9:06 a.m. Eastern. This video deposition is being held at the offices of Kessler Topaz Meltzer and Check, 280 King of Prussia Road, Radnor, Pennsylvania, in re: Social Media Adolescent Addiction, Personal Injury Products Liability Litigation for the United States District Court, Northern District of California. The deponent is Bryce Ward, PhD.

All counsel will be noted on the stenographic record. The court reporter is Robin Clark who will now swear in the witness.

- - - - -

BRYCE WARD, PhD, having been duly sworn, was examined and testified as follows:

Page 10

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      Good morning, Dr. Ward.

A.      Good morning.

Q.      My name is Joseph Sandoval-Bushur.  I represent YouTube and Google in this case and I'll be asking questions today on behalf of the Defendants.  You have been deposed a number of times before, correct?

A.      That is correct.

Q.      So I expect that you know the drill and the rules for the day, but just as a reminder, please wait until I finish asking a question to begin answering your question and if you need a break at any time, please just let me know.

Do you understand?

A.      I agree, yes, I understand, sorry.

Q.      Okay.  I am going to hand you a binder and this binder contains documents marked Exhibits 1A through 1F.  Exhibit 1A is a copy of your amended expert report for the Breathitt case, right?

Page 11

A.      Yes.

                    - - - - -

                (Amended Expert Report for
        Breathitt case marked Ward
        Exhibit 1A for identification.)
                    - - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      And this is your operative
report in the Breathitt case, correct?

A.      That is correct.

Q.      Exhibit 2B is the amended
expert report -- your amended expert report
for the Charleston case?

            MR. GRADEN:  I'm sorry, is it
        1B?

            MR. SANDOVAL-BUSHUR:  1B, yes.
                    - - - - -

                (Amended Expert Report for
        Charleston case marked Ward
        Exhibit 1B for identification.)
                    - - - - -
                         --

BY MR. SANDOVAL-BUSHUR:

Q.      Sorry, I will ask that again,
thank you.  Exhibit 1B is your expert
report for the Charleston case, correct?

CONFIDENTIAL

Page 12

A.    It is, although, actually, I'm noticing, when we submitted these, we forgot to attach the Exhibit B, which is the list of materials considered.  It's the same as the original report, so I brought copies of those here with me today.

Q.    Okay.

A.    Do I hand them to you?  Do I keep them here?

Q.    Okay.  Yeah, I will take those and we'll deal with them in a second once we get through.

A.    Okay.  Yeah, yes, so B is Charleston, that is correct.

Q.    Okay.  Exhibit 1C is your amended report for the DeKalb case, correct?

A.    Yup.

- - - - -

(Amended Expert Report for DeKalb case marked Ward Exhibit 1C for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And that is the operative

Page 13

report for the DeKalb case, correct?

A.    Yes.

Q.    Exhibit 1D is your amended expert report for the Harford case, correct?

A.    Yup.

- - - - -

(Amended Expert Report for Harford case marked Ward Exhibit 1D for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And that is your operative report for the Harford case?

A.    Yup.

Q.    Exhibit 1E is your amended report for the Irvington case, right?

A.    Yup.

- - - - -

(Amended Expert Report for Irvington case marked Ward Exhibit 1E for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And that's your operative

Page 14

report for the Irvington case, correct?

A.    That is correct.

Q.    And Exhibit 1F is your expert report for the Tucson case, correct?

A.    That is correct.

- - - - -

(Amended Expert Report for Tucson case marked Ward Exhibit 1F for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And that is the operative report for the Tucson case?

A.    That is the operative report.

Q.    All right.  And I'm going to go ahead and give you a binder marked "tab 2" binder and that contains exhibits that have been marked Exhibits 2A through 2F. Exhibit 2A is your reply report for the Breathitt case, correct?

A.    Correct.

- - - - -

(Reply Report for Breathitt case marked Ward Exhibit 2A for identification.)

CONFIDENTIAL

Page 15

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 2B is your reply report for the Charleston case, correct?

A.    Correct.

- - - - -

(Reply Report for Charleston case marked Ward Exhibit 2B for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 2C is your reply report for the DeKalb case, correct?

A.    Correct.

- - - - -

(Reply Report for DeKalb case marked Ward Exhibit 2C for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 2D is your reply report for the Harford case?

A.    Correct.

- - - - -

(Reply Report for Harford

CONFIDENTIAL

Page 16

case marked Ward Exhibit 2D for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And Exhibit 2E is your reply report for the Irvington case?

A.    Correct.

- - - - -

(Reply Report for Irvington case marked Ward Exhibit 2E for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 2F is your reply report for the Tucson case, correct?

A.    Correct.

- - - - -

(Reply Report for Tucson case marked Ward Exhibit 2F for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And so Exhibits 1A through 1F and Exhibits 2A through 2F are the complete set of reports that are your operative

Page 17

reports in this case, correct?

A.    That is correct.

Q.    And if I refer to the bellwether cases, will you understand that I am referring to the Breathitt, Charleston, DeKalb, Irvington, and Tucson cases?

A.    Correct.

Q.    Your expert report Exhibits 1A through 1F and 2A through 2F contain a complete statement of all the opinions that you may express in the bellwether cases and the basis and reasons for them, correct?

A.    Correct.

Q.    Is there anything in your expert reports, Exhibits 1A through to 1F and 2A to 2F that you believe should be corrected?

A.    I did notice a typo in the Breathitt case report, 1A.

Q.    Can you please identify the paragraph in which --

A.    Yes, I'll do that.

Q.    -- the typo in the Breathitt

CONFIDENTIAL

Page 18

report, Exhibit 1A, is located?

A.    So paragraph 17, I think that's where it's referring to, so footnotes, the footnote 3, wherever that is, yes, okay, I relied on data provided to me by Breathitt, so all those XLSX files that are footnotes three, four, five, six, those, should all be listed under footnote three.  And then the variable names for -- that are cited for footnotes four, five, and six, should be listed for those, so it's like job desk and stuff like that.

Q.    So footnotes four, five, and six contain the correct citations?

A.    They're the citations that should have been under three, right, so three -- because they're separate year files and I somehow got them into the different things as opposed to the right line and then that supplanted the variable names that were supposed to be listed in four, five, and six.

Q.    Sorry, just to make sure I understand, so what citations should appear in footnote four?

CONFIDENTIAL

Page 19

A.    That should say, like, job desk, it's like a variable name.

Q.    Okay.  Uh-huh.  Okay.  And what should the footnote say for footnote five?

A.    I think it's site.

Q.    How do you spell that?

A.    S-I-T-E.

Q.    Okay.  And what should the footnote be for footnote six?

A.    Off the top of my head, I think it's salary or gross salary or something along those lines, you know, some demarcation of wages.

Q.    You issued amended reports for four districts, Breathitt, Charleston, DeKalb, and Harford on Friday, August 8, correct?

A.    That is correct.

Q.    What prompted you to issue the amended reports for Breathitt, Charleston, DeKalb and Harford?

A.    As I was reviewing for my deposition, as I was going back through all of my calculations, I noticed some

CONFIDENTIAL

Page 20

calculation errors.

Q.    Did anything about your methodology for estimating damages change between your original report and your amended report --

A.    No change in methodology.

Q.    Did you change any of the inputs you used between your original report and your amended report for any district?

A.    No.

Q.    Okay.  I am going to give you a binder titled, "tab three" and this contains Exhibits 3A through 3E. Exhibit 3E is a copy of your original expert report in the Breathitt case, correct?

A.    3E?

Q.    Sorry, I misstated. Exhibit 3A is a copy of your original report in the Breathitt case, correct?

A.    Correct.

- - - - -

(Breathitt Original Expert Report marked Ward Exhibit 3A for

Page 21

identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 3B is a copy of your original report in the Charleston case, correct?

A.    Correct.

- - - - -

(Charleston Original Expert Report marked Ward Exhibit 3B for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 3C is a copy of your original report in the DeKalb case, correct?

A.    Correct.

- - - - -

(DeKalb Original Expert Report marked Ward Exhibit 3C for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 3D is a copy of your original report in the Harford case?

CONFIDENTIAL

Page 22

A.      Correct.

- - - - -

(Harford Original Expert Report marked Ward Exhibit 3D for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      And Exhibit 3E is a copy of your original case in the -- your original report in the Irvington case, correct?

A.      Correct.

- - - - -

(Irvington Original Expert Report marked Ward Exhibit 3E for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      None of the reports in Exhibits 3A through 3E are currently your operative reports for any of these districts, correct?

A.      That is correct.

Q.      For Breathitt, in your amended report, Exhibit 1A, you are now estimating damages that are approximately

Page 23

30 to 40 percent higher than you estimated in your original Breathitt report, correct?

A.    I don't know the exact calculation off the top of my head, but it's higher.

Q.    Why are you now estimating damages for Breathitt that are higher than what you estimated in your original report?

A.    So the change has to do with this 2014 to 20 -- or I guess 2015 to 2020 period, where in the original calculation, I had intended to sum two numbers and I had averaged them.  And that's what's driving the increase for the most part.  There's also a slight change in the benefits multiplier, I applied an incorrect benefits multiplier to that particular portion to the calculation.  It's different than the one I applied above in Table 5, the earlier part -- the 2021 to 2024 part of the calculation.

Q.    Why did you change the benefits multiplier that you used in the Breathitt case --

A.    I didn't change -- sorry.

Page 24

Q.    Sorry -- between your original report your amended report?

A.    I was inconsistent between two tables in the report, right?  So I didn't change -- I just changed it so that the one in Table 6, the second part of the table or the second table that has summary damages matched the one in Table 5., because that was the one that I intended to use.

Q.    So in your original Breathitt report, you used an incorrect benefit multiplier for some of your damages estimates?

A.    For part of the calculation, correct.

Q.    And are you now using the correct benefit multiplier for all of your calculations in Breathitt?

A.    Yes.

Q.    When did you discover that you had made an error in your Breathitt damages calculations?

A.    Last Wednesday.

Q.    Did you yourself discover

that you had made an error in your Breathitt damages calculations or did someone else bring it to your attention?

A. No, I found it.

Q. For DeKalb, you are now estimating damages that are approximately 20 to 40 percent higher than you estimated in your original report; is that correct?

A. I don't remember, I don't know the math off the top of my head, but I'll trust that you did the math.

Q. You are aware that for DeKalb, you are now estimating damages that are higher than you estimated in your original report, correct?

A. I believe that's correct.

Q. Why are you now estimating damages for DeKalb that are higher than what you estimated in your original report?

A. So I had intended to -- you know, I missed some cells in a spreadsheet, so instead of summing 2018 for middle schoolers and 2018 for high schoolers, I had somehow done 2018 and 2015 and then carried that down. So some of the years

were, you know, lower years and so, essentially, they're older years, and so for part of the calculation, and so when you correct it, you get whatever the correct answer is.

Q.    When did you discover that you had made an error in your DeKalb damages calculations?

A.    Last Thursday.

Q.    And what prompted that discovery?

A.    I was reviewing all of my stuff as part of the deposition, preparing for deposition.

Q.    For Harford, you are now estimating damages that are approximately 34 percent higher than you estimated in your original report, correct?

A.    Correct.

Q.    Why?

A.    So I was -- when I was doing the high school and middle school teacher calculations, I applied the share of time loss for middle school to both middle and high school instead of doing the

Page 27

appropriate share for high school applied to the value for high school, so I just multiplied the wrong cells together.

Q. Were there any other corrections that you made to your Harford report?

A. I think that's it.

Q. Did you make any corrections in your amended Harford report to damages relating to middle school teachers for the school 2025?

A. Oh, yeah, there was one, I had applied the total value for 2025 instead of 2024 for the last year.

Q. When did you discover that you had made an error in your Harford damages calculations?

A. That was Thursday.

Q. And what prompted that discovery?

A. Part of my reviewing my files in preparation for deposition.

Q. For Charleston, you are now estimating damages that are approximately 13 percent lower than you estimated in your

Page 28

original report, correct?

A.    Correct.

Q.    Why?

A.    So they had sent me a file which had the different years for data and the tabs were labeled 2017-18, '19, '20, '21, '22, '23, '24 and in my world when you see a year and it's a fiscal year, the year assigned is for the later year, so 2016-17 to 23-24.  But it turns out that they actually had labeled 2017 for 2017-2018 and so when I input the data, I assigned them the wrong year.  So that just shifted everything off by a year and made it so that I included effectively an extra year that I didn't have data for.  Because 24-25 is outside of my damages calculation.  So it's effectively the removal of that year of data is what drives the decrease in the calculation.

Q.    How did you discover that you had made that error?

A.    As I was reviewing everything in preparation for my deposition.

Q.    How did you come to realize

CONFIDENTIAL

Page 29

that you had misinterpreted that Excel
spreadsheet?

A.      Oh, as I was literally going
through all of the raw files again and
within the raw file, it says that it's FY,
whatever it is.  I had just written code.
I had opened the file and just written code
to import it and, you know, hadn't paid
close attention to what was actually in the
files, because I'm just importing it and
then running it through my program.

Q.      Were there any other changes
in your damages estimates for Charleston
between your original report and your
amended report?

A.      Everything just stems from
the shifting of the years.

Q.      Did you make any change in
how you determined whether certain district
employees were teachers and included them
in your calculations?

A.      No.

Q.      Did you apply any discount to
the base pay values that you used for your
calculations?

Page 30

A.    No, my understanding for Charleston is that the data I was provided are the base pay data.

Q.    And when did you discover that you had made an error in your Charleston damages calculations?

A.    That was last Wednesday.

Q.    All right.  Let's mark tab four as Exhibit 4.

- - - - -

(Email dated 4/11/25 marked Ward Exhibit 4 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And, Mr. Ward, do you see that this is an email exchange between Plaintiff's counsel, Tyler Graden, and myself relating to your expert reports in this case?

A.    Yes.

Q.    Have you briefly seen the response that Mr. Graden provided regarding the reasons for the changes to your expert reports --

CONFIDENTIAL

Page 31

A.     Yes.

Q.     -- on August 11?

A.     Sorry, yes.

Q.     Did you provide that information to Mr. Graden?

A.     I did.

Q.     And the list of changes in Mr. Graden's email, as we've just gone over, is accurate, but it's not quite complete; is that right?

A.     I did forget the one middle school year issue in Harford.

Q.     Okay.  And you also -- okay, I got it.

You also issued an amended report for Irvington, correct?

A.     That is correct.

Q.     And you issued that amended report on May 31st, correct?

A.     I believe that's the date.

Q.     Your amended report for Irvington increased the damages that you estimated for Irvington, correct?

A.     I don't recall, but I'll trust you on that.

Page 32

Q.      Why did your amended report for Irvington increase the damages that you estimated for Irvington?

A.      The issue for Irvington was one of the affidavits when I was entering the data, the percentage should have applied for 2025 and it got entered as 2015.  So then when I was doing the calculations for interpolating and figuring out what percentage to apply in each year, that was just wrong, so you had to correct it and whatever it corrected came out of it, I don't remember -- I actually don't remember whether it went up or down.

Q.      So your testimony is that the only thing that changed in Irvington was a single time estimate from an employee affidavit that the year associated with that estimate changed from 2015 to 2025?

A.      Yeah, I think it was principals and vice principals, I think. It may have been all of the ones for that person, I can't remember, but it was, yeah, it was 2015 to 2025 was the issue.

Q.      What prompted your discovery

CONFIDENTIAL

Page 33

that you had made that error in the Irvington report?

A.    I think the attorneys for Irvington were reviewing it and noticed that the table in 2015 didn't -- or the table of percentages didn't make sense because it had a number for 2015 in it that they hadn't provided and so they were, like, this seems like an error and so I went in and I was, like, yes, you are correct, that's an error.

Q.    Did you have a quality control process that you followed before you issued your opening reports to ensure that you had accurately calculated your damages estimates?

A.    I did for most of it.  There was some stuff that was -- I was doing, you know, kind of outside of my normal process, which was to do it in Stata code that, obviously, didn't get through the full quality control checks.

Q.    So what is your normal quality control process before reaching conclusions?

CONFIDENTIAL

Page 34

A.      Well, you know, you do your work.  You go back through your work.  You make sure that when you're looking at results, they all make sense.  That there's nothing that's, you know, nonintuitive or looks out of place.  You know, you recheck your code or your calculations.

Q.      What was different in your work in this case regarding your quality control process as compared to your normal process?

MR. GRADEN:  Objection.  You can answer.

THE WITNESS:  Well, you know, the spreadsheet errors, I didn't do it in my normal Stata code process where I make --

- - - - -

(Stenographer clarification.)

- - - - -

THE WITNESS:  It's called Stata, S-T-A-T-A, right, where I'm writing in, I want to multiply this by this or add this by this, right, which kind of forces you to be a

Page 35

little bit more diligent about what you're doing.  I thought these were relatively simple calculations and I could just do them in a simpler, quicker manner in Excel.  And, you know, I just -- there's typos in there, that's pretty much what it is.

The Charleston thing, that was just, you know, that's just me thinking of data that I'm going to be provided or going to be what I assume them to be.  And you know, the original one, that's also just a typo that those data were checked and somehow didn't get caught.

BY MR. SANDOVAL-BUSHUR:

Q.    Why did you not follow your normal process of using Stata code in your work in this case?

MR. GRADEN:  Objection.

THE WITNESS:  It didn't seem -- I thought it would be quicker and easier to do it in

CONFIDENTIAL

Page 36

Excel, because it was a relatively straightforward calculation.

BY MR. SANDOVAL-BUSHUR:

Q.    Was using Excel instead of Stata a choice that you made?

A.    Yeah.

Q.    Were you asked to work in Excel?

A.    No, no, it was literally just me being, like, oh, I just need to make these adjustments, these are all kind of, these are these protection things, like, it will be a little bit easier for me to do that just doing it in Excel and, you know, just got some -- got some cells wrong.

Q.    Who entered the cells wrong?

A.    Me.

Q.    Do you feel certain that there are no other errors in your damages calculations that you have not yet discovered?

A.    I have been through everything.  I feel pretty good that everything is now correct.

Q.    A few minutes ago, you handed

me a set of folders that each have the name of the school district on the tab and then contain a document that is titled, "Appendix B Materials Considered," correct?

A.    That is correct.

Q.    And it's your testimony that the list of materials considered on this Appendix B for each of the districts is identical to the list of materials considered in your opening reports in each of the cases; is that correct?

A.    That is correct.

Q.    Okay.  Just so that we have a clean record, let's go ahead and mark all of these.  I am going to mark your Appendix B materials considered for Breathitt as Exhibit 5A.  I guess I'll hand that back to you.

A.    You can hand it back, yeah.

- - - - -

(Appendix B Materials Considered Breathitt Documents marked Ward Exhibit 5A for identification.)

- - - - -

CONFIDENTIAL

Page 38

MR. SANDOVAL-BUSHUR:  Counsel, can we get another copy of each of these just so that both the witness can have one and I can have one?

MR. GRADEN:  I believe there are multiple copies of each.

MR. SANDOVAL-BUSHUR:  I only see one copy in each folder.

THE WITNESS:  Yeah, there's only one there.

MR. GRADEN:  Okay.  We can -- do you want to take a beat and get those copies now or we can do that at the next break --

MR. SANDOVAL-BUSHUR:  We can do it at the next break.

MR. GRADEN:  -- whatever you prefer.  That's fine.

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 5B is your Appendix B materials considered for the Charleston case, correct?

A.    Correct.

- - - - -

(Appendix B Materials

CONFIDENTIAL

Page 39

Considered Charleston Documents marked Ward Exhibit 5B for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 5C is your Appendix B materials considered for the DeKalb case, correct?

A.    Correct.

- - - - -

(Appendix B Materials Considered DeKalb Documents marked Ward Exhibit 5C for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Exhibit 5D is your Appendix B materials considered for the Harford case, correct?

A.    Correct.

- - - - -

(Appendix B Materials Considered Harford Documents marked Ward Exhibit 5D for identification.)

CONFIDENTIAL

Page 40

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      Exhibit 5E is your Appendix B materials considered for the Irvington case, correct?

A.      Correct.

- - - - -

(Appendix B Materials Considered Irvington Documents marked Ward Exhibit 5E for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      And Exhibit 5F is your Appendix B materials considered for the Tucson case, correct?

A.      Correct.

- - - - -

(Appendix B Materials Considered Tucson Documents marked Ward Exhibit 5F for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      And, again, just so that we

CONFIDENTIAL

Page 41

have a clean record, the list of materials considered in Exhibits 5A through 5F are identical to the list of materials considered in your opening reports for each of the six bellwether districts, correct?

A.    Correct.

Q.    Do your expert reports, Exhibits 1A through 1F and Exhibits 2A through 2F, including the list of materials in Exhibits 5A through 5F, identify all of the materials that you considered in forming your opinions?

A.    Yes.

Q.    And there are no other materials that are considered in forming your opinions that are not contained in 1A through 1F, 2A through 2F, and 5A through 5F, correct?

A.    Correct.

Q.    In forming your opinions in this case, you did not consider any internal documents of any Defendants, like, internal emails or presentations, correct?

A.    That is correct.

Q.    In forming your opinions in

Page 42

this case, you did not consider any deposition or other testimony of any current or former employee of any Defendant, correct?

A.    That is correct.

Q.    Were there any materials that would have been helpful to you in forming your opinions in this case that you did not have access to?

A.    The information I had was sufficient to support my opinions.

Q.    Were there any documents that you ever asked for in order to help form your opinions in this case that you were not able to obtain?

A.    I had asked for, you know, data from DeKalb, I never got the individual level data that I got for other districts from that group.  I don't recall anything else where I didn't get anything that was -- that I requested.

Q.    So for all of the bellwether districts except for DeKalb, you received salary data that identified at the individual employee level the salary that

Page 43

was paid to that employee; is that correct?

A.    Yeah, for each of the other five, I have data that speaks to salaries for -- you know, Harford slightly is different, it only includes middle and high school teachers and counselors and psychologists.  But for all five of them, I have at least some data that is at the employee level and includes their salary.

Q.    For DeKalb, you did not have any data that identified the salary of individual employees, correct?

A.    That's correct.

Q.    Do you know why DeKalb did not provide you with data that identified the salary of the individual employees who were included in your damages calculations?

A.    I do not.

Q.    In forming your opinions in this case, you considered some documents that were produced by the school district Plaintiffs, correct?

A.    Yes.

Q.    For the documents that were produced by the school districts, did

Page 44

Plaintiffs' attorneys identify and provide those to you?

MR. GRADEN: Objection. Compound.

THE WITNESS: Some of them.

BY MR. SANDOVAL-BUSHUR:

Q. There were documents that were produced by the school districts in this case that you considered in forming your opinions that Plaintiffs' attorneys did not identify and provide to you?

A. Oh, I'm sorry, I misunderstood, no, yeah, everything they provided -- I'm sorry --

Q. Let me just maybe ask the question again.

A. Yeah, let me -- I thought you were saying that they just decided what to give me as opposed to, hey, do you have something like this, right, that's where I'm confused.

Q. Okay.

A. The genesis of the request.

Q. Did you request any information from the school districts?

Page 45

A.    Yes.

Q.    Was there a list of information that you requested from each school district?

A.    No, I would just call attorneys and say, hey, do you have, say, a contract or information on salaries.

Q.    So there was no step in your process of formulating your opinions in which you identified a list of the documents or information that you needed or wanted from each district in order for you to form your opinions; is that correct?

MR. GRADEN:  Objection.

THE WITNESS:  Oh, I mean, I did not write them a list and send them a list.  I said, hey, I would like data on individuals that identifies their position, their sites, and their base salary. Before we got that, I was, like, do we have information on FTEs or average salaries or benefits, you know, so it was essentially me saying what kind of data can I get

CONFIDENTIAL

Page 46

to do my calculation.

BY MR. SANDOVAL-BUSHUR:

Q.    There were some documents that you relied on in reaching your opinions that you did not specifically request from Plaintiffs' attorneys but Plaintiffs' attorneys provided to you; is that right?

A.    I mean, yeah, they sent me lots of stuff.

Q.    Aside from the documents that were produced by the Plaintiffs, were there any other documents that were provided to you by Plaintiffs' attorneys?

A.    I'm sorry, what?

Q.    So publicly available documents, academic articles --

A.    Oh.

Q.    -- were there any documents in that category that were provided to you by Plaintiffs' attorneys?

A.    Not that I recall.

Q.    You went out and found all of those documents on your own?

A.    I found those, yes.

Page 47

Q.    Did you communicate in any way whether by speaking in person, by telephone, corresponding by email or otherwise with any employees or people otherwise affiliated with any of the bellwether districts in forming your opinions?

MR. GRADEN:   Objection, compound.

THE WITNESS:   I had a brief conversation with, I believe it was the CFO in Charleston.   Everything else was mediated through attorneys.

BY MR. SANDOVAL-BUSHUR:

Q.    So you spoke directly with the Charleston CFO, correct?

A.    That is correct.

Q.    What is the name of that individual?

A.    Oh, I don't even know.   I just referred to him as the CFO.

Q.    So, sitting here today, you cannot tell me the name of the Charleston CFO whom you spoke with?

Page 48

A.    No, I cannot.

Q.    Why did you speak with the Charleston CFO?

A.    I had asked for information on the benefits and he was going to be on a call and so they were, like, hey, join this call and you can get the benefits description from him.

Q.    What information did the Charleston CFO provide to you?

A.    Just described the benefits multiplier over time.

Q.    Did you rely on that information in forming your opinion?

A.    I did.

Q.    Did you take any notes or otherwise record, memorialize your conversation with the Charleston CFO?

MR. GRADEN:  Objection. Compound.

THE WITNESS:  I just typed it right into the calculations.

BY MR. SANDOVAL-BUSHUR:

Q.    So can you explain to me, you were on the call, the Charleston CFO --

CONFIDENTIAL

Page 49

A.    Oh, yeah, so I know I'm getting the benefits multiplier.  There's a part of my code where I just have a little program that has this is the benefits multiplier for this year.  And so he said something to the effect of if it started here and it ended it here and it increased by 1 percentage point between there, and so I just typed in the base year, I typed in the end year, and then I typed in the numbers that would go between them.

Q.    Did you ask for any documentation to support what the Charleston CFO told you was the benefits multiplier for Charleston?

A.    No, I trusted he knows that.

Q.    Did you speak -- let me ask it a little differently.

Did you communicate in any way with any other employees other than the Charleston CFO of any school districts in forming your opinions in this case?

A.    Not directly, no.

Q.    What do you mean when you say, "not directly"?

Page 50

A.      If I had questions, I would ask attorneys and the attorneys would go and get the information and then they would bring it back to me.

Q.      Who did you receive information from from any of the school districts via an attorney in the way you just described?

A.      Who were they talking to?  I don't remember who they talked to.  I don't recall off the top of my head.

Q.      So to the extent you received information via the Plaintiffs' attorneys from any employees of any of the school districts, you do not know the identities of those district employees, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Oh, they might have told me, I don't remember as I'm sitting here.

BY MR. SANDOVAL-BUSHUR:

Q.      Okay.  So sitting here today, for the district employees for whom you received information via Plaintiffs' attorneys, you cannot provide the names of

Page 51

any of those employees, correct?

MR. GRADEN:  Objection, foundation and vague.

THE WITNESS:  Not off the top of my head, no.

BY MR. SANDOVAL-BUSHUR:

Q.    Well, this is my chance to ask you who those people might be, but it sounds like you, sitting here today, cannot tell me any of those names, correct?

A.    Nope.

Q.    When you say, "no," you mean that is correct?

A.    I'm sorry, yes, no, I cannot.

MR. GRADEN:  Objection. Vague.

BY MR. SANDOVAL-BUSHUR:

Q.    Did you receive any assistance from anyone other than Plaintiffs' attorneys and the Charleston CFO in preparing your reports?

A.    What do you mean by "assistance"?

Q.    Did you have anyone who assisted you in performing research

relating to the formation of your opinions in this case?

A.    No.

Q.    Did you have anyone who assisted you in performing the calculations --

A.    No.

Q.    -- that you did in the course of your work in this case?

A.    No.

Q.    Did you have anyone who assisted you in any data entry in connection with this case?

A.    Yes.

Q.    Who was that?

A.    Margaret Ward.

Q.    Who is Margaret Ward?

A.    She's my wife.

Q.    And how specifically did Margaret Ward assist you in connection with this case?

A.    I've had her first check the data entry in -- for the affidavits and then I got a few more affidavits and so I had her just enter those.  She also helped

me format tables.

Q.    Did anyone other than Margaret Ward provide you with assistance in connection with this case?

A.    No.

Q.    Did your wife, Margaret Ward, perform any calculations or data analysis in this case?

A.    No.

Q.    Did you use ChatGPT in your work in this case?

A.    Probably not, but maybe at some point, I asked it a question.

Q.    Do you believe that ChatGPT is a reliable source of information?

A.    I use it like a search engine.  So I think it's a -- to the extent it provides me a link, I'm happy to follow the link and see where it goes.

Q.    Do you believe it is appropriate to use ChatGPT for academic research?

A.    I mean, it's -- I think it's a pretty good search engine.  I think it's very useful for surfacing information.

CONFIDENTIAL

Page 54

Q.    Are you able to tell me whether or not you used ChatGPT in your work in this case?

A.    I don't recall if I did any searches using ChatGPT or not.  I'm still kind of figuring out, you know, whether I'm using it or not and this period of time was when I was literally really just starting to use ChatGPT.  So maybe I did, maybe I didn't, I don't recall.  I certainly didn't use it to actually, like, summarize information.  For me, it's just like, please, find me articles that -- about X.

Q.    So you may have used ChatGPT in this case to help you find articles that supported your opinions; is that right?

MR. GRADEN:  Objection.

THE WITNESS:  No, that might inform my opinions, that might help, you know, I'm not sure what it would have been in this case, but, you know, to the extent that I do searches on the internet now, it is a tool that I sometimes use.

Page 55

BY MR. SANDOVAL-BUSHUR:

Q.    If you used ChatGPT to help you find articles that might inform your opinions in this case, was that the only search engine that you used to identify those articles?

A.    No.

MR. GRADEN:  Objection to form.  Foundation.

THE WITNESS:  No, as I said, like, I'm also using Google, and yeah, I guess Google would be the main one that I use.

BY MR. SANDOVAL-BUSHUR:

Q.    When were you retained by Plaintiffs to work on this case?

A.    Last summer or last fall, somewhere in there.

Q.    Who retained you?

A.    This firm.

Q.    And that is the Kessler Topaz firm?

A.    Yes, Kessler Topaz Meltzer and whatever the last name is.

Q.    Was there a particular

CONFIDENTIAL

Page 56

attorney at Kessler Topaz who retained you?

A.    No, I mean, I feel it has been the same basic group the whole time, so I couldn't tell you if there was one specifically or not.

Q.    What is Rubin Anders Scientific?

A.    They help match attorneys and people who do expert witness testimony.

Q.    And do you have a relationship with Rubin Anders Scientific?

A.    I mean, you know, I have been in their little profile of experts for some time.

Q.    Do you have any relationship with any other expert firms other Rubin Anders?

A.    I feel like, yeah.

Q.    What other expert firms?

A.    I couldn't tell you.

Q.    For your work in this case, were you initially contacted by Plaintiffs through Rubin Anders?

A.    Yeah, Rubin Anders reached out to me.

Page 57

Q.    What did you understand your assignment was when you were retained?

A.    I was going to do something related to damages in a case involving school districts and social media.

Q.    Did your understanding of your assignment change at any point during the course of your work in this matter?

A.    No, I mean, at the beginning I didn't really understand what it was, so yeah, it changed to what do you want me to do to this is what we want you to do.

Q.    And then so once you received a more detailed assignment for your work in this case, what did you understand your assignment in this case to be?

A.    It's exactly what's in my reports.  I was going to estimate the value of time for staff and teachers.

Q.    And so estimating the value of time for staff and teachers, calculating damages in that way was something that was assigned to you by Plaintiffs' attorneys; is that right?

A.    Yeah, so it was we will

provide you with estimates that describe time loss, but we need somebody to go and assemble the data to figure out what the value of that time is and to apply that to the time loss and so that was my assignment and that's what's in my reports.

Q.      You were paid $665 an hour for all of your work relating to this case, correct?

A.      That is correct.

Q.      Do you perform any work that is compensated at a different rate in connection with this case?

A.      Do I?

Q.      Yeah.

A.      Yeah, I mean, I have rates from all sorts of periods of time and various different types of clients.

Q.      Sorry, I will reask that question.

Was all of your time in this case billed --

A.      Oh, this case?

Q.      Yes -- at $665 an hour?

A.      Yeah, $665 an hour.

Q.    Did anyone else other than yourself bill for work relating to your reports at that $665 an hour rate?

A.    No.

Q.    Did your wife also bill for her work performed in connection with this case?

A.    Yes.

Q.    And what rate did she bill at?

A.    I can't remember.

Q.    Did your wife bill at $250 an hour?

A.    If that's what's on the invoices, that probably is what it is.

Q.    Okay.  In calendar year 2025, what percentage of your total income has come from compensation for your work on this case?

MR. GRADEN:  Objection.

THE WITNESS:  Forty percent, 40, maybe half.  I don't -- I do not have a running total of how much I've billed this year. But it seems like, I mean, there was

Page 60

another big chunk at the beginning of the year, so that seems about right.

BY MR. SANDOVAL-BUSHUR:

Q.    So your best estimate is somewhere between 40 and 50 percent of your total income for calendar year 2025 has come from compensation for work on this case, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I think so.

MR. SANDOVAL-BUSHUR:  We're going to mark tab five as Exhibit 6.

- - - - -

(Invoices Bates Ward000001 to Ward 000005 marked Ward Exhibit 6 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Dr. Ward, Exhibit 6 is a set of invoices relating to your work in this case, correct?

A.    Yes.

Q.    Is this a complete set of

Page 61

invoices for your work relating to this case?

A.    I mean, it doesn't have stuff for this month, but as of the end of July, yes.

Q.    So Exhibit 6 is a complete set of the invoices for your work in this case through the end of July 2025, correct?

A.    That is correct.

Q.    And all of the time in Exhibit 5 is -- that is billed at the $665 an hour rate is time that you personally worked, correct?

MR. GRADEN:  Objection.

THE WITNESS:  That is correct.

MR. GRADEN:  Just for clarity, which exhibit?

BY MR. SANDOVAL-BUSHUR:

Q.    Oh, thank you for saying that.  I'll reask the question.

All of the time in Exhibit 6 that is billed at $665 an hour is time that you personally worked, correct?

A.    That is correct.

Q.    All of the time in Exhibit 6

CONFIDENTIAL

Page 62

that is billed at the rate of $250 an hour is time that your wife spent on this case; is that correct?

A.    That is correct.

Q.    You billed a total of 335,000, a little more than $335,000 for your work on this case; is that right?

A.    I haven't summed it up, but I will trust that you have.

Q.    Assuming that that's right that you've billed a little over $335,000 through July for your work on this case, does that change at all your estimate of what percentage of your total compensation for calendar year 2025 relates to your work on this case?

A.    No.

Q.    We do not have an invoice for the month of August 2025.  How much time have you billed working on this case in the month of August?

A.    I have no idea.

Q.    Can you offer any sort of estimate?

A.    So the reply reports were

Page 63

submitted before August, right?  So that's -- that was July 31st, so there's none of that time, so it's just depo prep time.

Q.    You also submitted amended reports.

A.    Yeah, that rose out of the depo prep, so, you know, there wasn't a ton of time into that.  I mean, it will be less than, probably less than 40 hours, maybe right around 40 hours.

Q.    I would like to ask you about your time billed in the period of May 10th through May 19th.

A.    Okay.

Q.    And May 10th to May 19th is the ten days leading up to your submission of your expert report, correct?

A.    That is correct.

Q.    You billed a lot of time in that period of May 10th to May 19th, correct?

A.    It was a very miserable period, yes.

Q.    It looks like you billed at

CONFIDENTIAL

Page 64

least 20 hours eight of those ten days and billed 17 hours the remaining two days; is that right?

A.     That is correct.

Q.     Is that accurate that you actually worked that many hours in the ten days leading up to your submission of your reports?

A.     It is.

Q.     How much sleep did you get in those ten days?

A.     Those four hours, I would sleep four hours a day and I would work the rest of the day.

Q.     So your testimony is 100 percent of the time that you spent other than sleeping was spent working on your reports in this case?

A.     Yup.

Q.     Did you eat any meals during the ten days leading up to to your submission of reports in this case?

A.     I mean, while I would work, I would eat some food, but, typically, I was eating about once a day.

Q.    So in the ten days leading up to your submission of your reports in this case, you were eating only about one meal a day?

A.    Only one meal, I might have, you know, grabbed a banana or something as I paced around and thought about stuff, but, you know, it was -- I literally just did work.

Q.    Did getting such a small amount of sleep in those ten days leading up to your submission of your report negatively impact your work at all?

A.    I mean, it may have contributed to those errors we talked about earlier, but other than that, no, I mean, it's just getting the calculations done.

Q.    Were you working on any other matters or projects other than this case in the month of May 2025?

A.    During the entire month, I think there was, like, maybe a few hours here and there where I had to take a phone call or do something, but no, pretty much this was what I was doing.

Page 66

Q.    In those ten days leading up to your submission of your report, May 10th through May 19, 2025, were you working on any other matters or projects other than this?

A.    Not that I recall.

Q.    Was there a reason why you had to cram so much work into the ten days leading up to your submission of your reports in this case?

MR. GRADEN:  Objection.

THE WITNESS:  I had to write reports and I'm downstream of pretty much everybody else.  All right.  So I have to wait for everybody to provide me the information and so, yeah, you know, it was a real sprint at the end.

BY MR. SANDOVAL-BUSHUR:

Q.    Was there any change in the methodology for calculating damages that occurred in the month of May 2025?

A.    I mean, the methodology is pretty straightforward, right?  Multiply time loss by value of time, right?  So, no,

Page 67

that didn't change at all.

Q.    Throughout the entire month of May 2025, did you know that you were going to be calculating teacher time loss based on the results of a survey conducted by Robert Klein?

A.    I did.

Q.    During the entire month of May 2025, did you know that you were going to be calculating non-teacher time loss based on employee affidavits or declarations?

A.    I did.

Q.    And, similarly, throughout the entire month of April 2025, did you know that you were going to be calculating teacher time loss based on the results of a survey conducted by Robert Klein?

A.    No.

Q.    When did you learn that you would be calculating teacher time loss based on the results of a survey conducted by Robert Klein?

A.    I don't remember exactly when they told me that Mr. Klein was who was

Page 68

doing the survey, but it would have been sometime in April.

Q.    And throughout the entire month of April 2025, did you know that you were going to be calculating non-teacher time loss based on the results or information contained in employee affidavits or declarations?

A.    I don't remember exactly what I knew on the employee affidavits, but when I was restarted in early April, I was reminded of that, if I didn't know it already.  If I had forgotten between September and April, like, I don't remember if we talked about this in September specifically or not, but it was pointed out when I was kind of restarted in April that we are also getting time loss estimates from affidavits.

Q.    Do you know why you did not receive the affidavits that you were using for purposes of your damages calculations until just a few days before your report was submitted?

MR. GRADEN:  Objection.

CONFIDENTIAL

Page 69

THE WITNESS:  I do not.

BY MR. SANDOVAL-BUSHUR:

Q.    What did you do to prepare for your deposition?

A.    I reviewed all of my reports and the footnotes in them and the programs and spreadsheets that did the calculations. I met with the attorneys.

Q.    How many meetings did you have with attorneys to prepare for your deposition today?

A.    I met with them on Wednesday and Thursday.

Q.    Who did you meet with?

A.    Tyler, Mr. Graden, Ms. Jacobson.  Who else was in the room? Justin Swofford, Melissa Yeates, but only yesterday, and there were a couple of attorneys from the Irvington district, Michael, and I can't remember the other guy's name.

Q.    So you met with approximately six attorneys to prepare for your deposition today?

A.    At various points, yeah.

Page 70

Q.    How much time total did you spend meeting with attorneys to prepare for your deposition today?

A.    Twelve hours maybe. Although, not all of that time was actually meeting about the deposition, some of that was, like, eating lunch or whatever, but I was here for about six hours each day.

Q.    You are a cofounder of a firm called ABMJ Consulting, correct?

A.    That is correct.

Q.    What is ABMJ Consulting?

A.    That's the firm that I work at. We do economic analysis, policy analysis, and management consulting.

Q.    Is the other cofounder of ABMJ Consulting your wife?

A.    That is correct.

Q.    Are there any other cofounders of ABMJ?

A.    No.

Q.    Do you own 100 percent of ABMJ Consulting?

A.    My wife and I do.

Q.    Are you an employee of ABMJ

Page 71

Consulting?

A.     Yes.

Q.     Is your wife an employee of ABMJ Consulting?

A.     Only occasionally.

Q.     Does ABMJ Consulting have any employees other than you and occasionally your wife?

A.     Nope.

Q.     Since July 2021, have you been employed by any entity other than ABMJ Consulting?

A.     I don't think so.

Q.     You were previously employed by the University of Montana, correct?

A.     That is correct.

Q.     But you have not been employed by the University of Montana since July 2021, correct?

A.     No -- correct, yes.  No, I have not been employed by the University of Montana.

Q.     Before July 2021, were you a part-time employee at the University of Montana?

CONFIDENTIAL

Page 72

A.    Between, I think, July of 2018 and July of 2021, yes, I was a part-time employee.

Q.    From July 2018 to July 2021, you were a research associate at the Rural Institute for Inclusive Communities at the University of Montana, correct?

A.    That is correct.

Q.    Why did that position end?

A.    Oh, I just -- post-COVID, I didn't want to keep doing it, so I said I've got other things to do with my time.

Q.    Were you ever a tenure track professor at the University of Montana?

A.    No, I was a research professor.

Q.    Have you ever been a tenure track professor at any university?

A.    No.

Q.    Since July 2021, have you received any compensation other than from the work you do for ABMJ Consulting?

A.    Oh, I have no idea.

Q.    You have no idea if you have received any compensation over the past

Page 73

four years from any entity other than from your work at ABMJ Consulting?

A.    I don't recall any, but, you know, sometimes I get paid through other things for whatever it is.  I don't remember.  I don't think so, but I'm not going so say for sure, because I definitely don't remember how I got paid for anything that I do, for everything that I've ever done in the past three years or four years.

Q.    Are there any sources of income other than your work through ABMJ Consulting that you think you might have received over the past four years?

A.    Listen, here's the issue. Sometimes when people have me give speeches or whatever it is, they will just issue me a check and they won't actually issue it to the firm and so I'm, like, okay, whatever, that's a 1099 kind of thing.  I don't recall doing that in the past few years, but I know that has come up at some point in the past where somebody gave me a check for something that wasn't specifically ABMJ, so I had to do a separate thing in

CONFIDENTIAL

Page 74

taxes.  I don't recall that happening, but I know that I vaguely remember that happening at some point in the past. Typically, I just run it through the firm, if I can.

Q.    Other than paying you in connection with giving a speech, are there any other sources of income that you think you might have received over the past four years?

A.    I mean, there's things like interest and dividends and things like that, but I'm assuming you're not asking about that.

Q.    Right.

A.    Not that I recall.

Q.    Since July 2021, how much of the work that you do at ABMJ Consulting has been work relating to litigation or other legal disputes?

A.    It's typically about 50/50. Other legal disputes, you mean?

Q.    Right.

A.    Sorry, litigation, it's about 50 percent.

Page 75

Q.    And for that 50 percent, is that all work in which you are hired to serve as an expert witness or consultant?

A.    Yes.

Q.    What type of work do you do in the 50 percent of your work for ABMJ Consulting that is not work relating to litigation?

A.    Typically, it's, like, policy work.  You know, I mean, I've done a lot of stuff on Medicaid expansion or kind of in Montana, if there's a policy question about labor markets or, you know, we want to do, you know, so there's just a mix of, you know, I'm known around the state and people will call me up and ask me to help them analyze something, write a report on something, give a presentation on something.  So it's, yeah, but it's a mix of that type of work.

Q.    Who are your clients for work relating to policy questions?

A.    I mean, it's a big mix, but it's a lot of Montana Healthcare Foundation, the Missoula Economic

Page 76

Partnership.  Sometimes they're just private individuals who are wanting to have a report done for something they're trying to understand or lobby for.  It's mostly just, yeah, local foundations, local economic development entities or other random people.

Q.    In how many cases have you been hired to serve as an expert witness?

A.    I have no idea.

Q.    Can you offer any estimate of the number of cases in which you have been hired to serve as an expert witness?

A.    Hundreds.

Q.    And when you say, "hundreds," do you mean more than 200?

A.    I have no idea.  I have been engaged in this work for some level for nearly 20 years.  I kind of assume that it's kind of averaged out at maybe eight cases a year, so -- but it could be more, it could be less, I don't actually know.

Q.    In how many cases in which you have been hired as an expert witness have you testified?

CONFIDENTIAL

Page 77

A.    Define testified.

Q.    Let's start with testified at trial.

A.    I don't know off the top of my head.  I can remember maybe five or six.

Q.    What percentage of your work as an expert witness is on behalf of Plaintiffs?

A.    It's about 50/50.

Q.    You have never been employed in a K-12 educational setting; is that correct?

A.    That is correct.

Q.    And you have never been employed by a K-12 school district, correct?

A.    That is correct.

Q.    And you have never worked at all in a K-12 school district setting, correct?

A.    That is correct.

Q.    Prior to your work in this case, have you ever calculated damages incurred by a school district?

A.    I don't recall.

Q.      Sitting here today, you cannot think of any prior case in which you have calculated damages incurred by a school district; is that right?

A.      I don't remember, no.

Q.      Prior to your work in this case, you have never calculated opportunity costs for a school district; is that correct?

A.      I've calculated it in things related to education, I don't think I have ever been hired by a school district to do it.

Q.      In what setting related to education have you previously calculated opportunity costs?

A.      So I've done evaluations of different programs in educational settings and when you do evaluations, typically, something that goes along with that evaluation at least in terms of when you're presenting it to clients is here's the impact, but here's what it costs.  And so the cost estimate that I would have discussed with people would have been

Page 79

equivalent to what I'm doing here.

Q.    When you have previously calculated opportunity costs in relation with projects relating to education, did you label what you calculated opportunity costs?

A.    I don't know if I would have done that.  That's a more technical jargony term.  We would have just called it costs.

Q.    And in any of those prior times that you calculated opportunity costs in an education-related setting, did you rely on time estimates provided by school employees?

A.    Yes.  Or either the person doing the intervention who would have then drawn it from school employees, or -- I think that was always the -- yeah, I was doing it, I'm working with the person running the intervention, so they're telling it to me, but they're taking it from school employees.

Q.    In any of these other prior times that you calculated opportunity costs in an education-related setting, are there

CONFIDENTIAL

Page 80

any publicly available reports or materials relating to those?

A.    I don't remember if it's in the reports or not.  You know, I mean, I know we talk about it and it would have been in presentations, but I don't know if it made it into any of the final reports that would have been public, but I certainly recall doing it.

Q.    And did any of these prior instances in which you calculated opportunity costs in an education-related setting relate to a K-12 educational setting?

A.    Yes, they were all K-12 settings, at least the ones that I remember.

Q.    Were they all in the state of Montana?

A.    No, the one was in Oregon and one was -- I was evaluating a program that's done nationally.  So, you know, I had data to draw from from, you know, this program that had been implemented in dozens, if not hundreds of school

Page 81

districts, and so we were just trying to have some way of talking about, here you've got -- these are the effects of this intervention, so but what does it take, so you have this, you know, if you're going to implement our little program, what are the resources involved, that kind of stuff.

Q.    Prior to this case, have you previously calculated litigation damages using an opportunity cost methodology?

A.    I mean, almost all damages I calculate are ultimately some form of opportunity costs.

Q.    What is social media?

A.    What is social media?  I don't have any formal definition of social media.  When I think of social media, I'm going to think of Instagram and Facebook and SnapChat, TikTok.

Q.    What are -- are there any other platforms that you consider to be social media?

A.    YouTube.  Those are the big ones to me.

Q.    Do you consider Twitter or X

Page 82

to be social media?

A.    Oh, Twitter and X, yeah, that's social media.

Q.    Do you consider Reddit to be social media?

A.    I don't, but I don't, you know, I don't really use Reddit.

Q.    Do you think other people might consider Reddit to be social media?

A.    I have no --

MR. GRADEN:  Objection.

THE WITNESS:  I have no idea.

BY MR. SANDOVAL-BUSHUR:

Q.    What would make Twitter social media but Reddit not social media?

A.    I don't -- when people say social media companies, I think they include Twitter in it, but I have no -- I have no opinions about what the definition of social media is.  And I have no basis to demarcate it.  I have no -- yeah, I don't have any opinions about what is or is not social media or what the lines around what is or is not social media are.

Q.    Do you think everyone has the

CONFIDENTIAL

Page 83

same understanding of what is and is not social media?

MR. GRADEN:  Objection.

THE WITNESS:  I have no idea what other people think.

BY MR. SANDOVAL-BUSHUR:

Q.     Do you consider Pinterest to be social media?

A.     I have no idea whether Pinterest is social media or not.

Q.     Do you consider Tumblr to be social media?

A.     I have no idea whether Tumblr is social media or not.

Q.     Do you consider Twitch to be social media?

A.     I have no idea whether Twitch is social media.

Q.     Do you consider Discord to be social media?

A.     I have no idea whether Discord is social media.

Q.     Do you consider Roblox to be social media?

A.     I have no idea whether Roblox

CONFIDENTIAL

Page 84

is social media.

Q.    Do you consider WhatsApp to be social media?

A.    I have no idea whether WhatsApp is social media.

Q.    Do you consider Netflix to be social media?

A.    I don't know whether Netflix is social media.

Q.    Are there any other platforms you can think of that you consider to be social media?

A.    No, I don't -- again, I don't have any definition of social media that I'm operating from.

Q.    You are not offering any opinions in this case about the conduct of any Defendant, correct?

A.    That is correct.

Q.    You are not offering an opinion in this case on causation, correct?

A.    That is correct.

Q.    You are not offering the opinion that Defendants' conduct caused harms, correct?

Page 85

A.    That is correct.

Q.    And you are not offering the opinion that Defendant -- any Defendant caused any student to film or share videos of fights, correct?

MR. GRADEN:  Objection.

THE WITNESS:  That is correct.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering the opinion that any Defendant caused any student to bully another student, correct?

A.    That is correct.

Q.    You are not offering the opinion that Defendants' conduct caused damages, correct?

A.    That is correct.

Q.    You rely on others to make the determination that social media caused a loss of time, but you yourself did not make the determination of causation, correct?

A.    That is correct.

Q.    You are not offering the opinion that Defendants' conduct caused any bellwether district to experience worse

Page 86

educational outcomes, correct?

A.    That is correct.

Q.    You are not offering the opinion that any Defendants' conduct caused any mental illness, correct?

A.    That is correct.

Are you at a pausing point? I would like to take a break.  It's getting hot in here and I need to just stretch my legs.

MR. SANDOVAL-BUSHUR:  Sure. Let's go off the record.

THE VIDEOGRAPHER:  Going off video record 10:24 a.m.

- - - - -

(A recess was taken at this time.)

- - - - -

THE VIDEOGRAPHER:  Back on video record, 10:42 a.m.

BY MR. SANDOVAL-BUSHUR:

Q.    Dr. Ward, the damages that you calculate in this case are what you characterize as the amount of money that each school district lost while teachers, counselors, and/or administrators diverted

time to address issues caused by social media in the school environment, correct?

A.    Is that a quote from somewhere?

Q.    If you want to take a look at Exhibit 2F, page 1, paragraph 2.

A.    Okay.  I see that.

Q.    So you agree that the damages that you calculate in this case are what you characterize as the amount of money that each school district lost while teachers, counselors, and/or administrators diverted time to address issues caused by social media in the school environment, correct?

A.    Correct.

Q.    You are not offering an opinion on the amount of money any school district lost while teachers, counselors, and/or administrators diverted time to address issues caused by YouTube, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  YouTube specifically?

Page 88

BY MR. SANDOVAL-BUSHUR:

Q.    Correct.

A.    No, I'm not doing anything for a specific company like YouTube.

Q.    And you are not offering an opinion on the amount of damages that YouTube caused any school district to incur, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Not as a specific company, no.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering an opinion on the amount of money any school district lost while teachers, counselors, and/or administrators diverted time to address issues caused by SnapChat, TikTok, Instagram, or Facebook, correct?

MR. GRADEN:  Objection to form.

THE WITNESS:  I am not doing any calculations for any specific companies.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering an

Page 89

opinion on the amount of damages that SnapChat, TikTok, Instagram, or Facebook caused any school district to incur, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Correct.  Not as an individual -- not as individual companies.

BY MR. SANDOVAL-BUSHUR:

Q.     If someone wanted to know how much in damages a school district incurred because of student use of YouTube specifically, the damages estimates that you have offered in this case would not answer that question, correct?

A.     Not unless somebody broke the time loss estimates into specifics for each company.

Q.     You have not --

A.     I have not.

Q.     -- broke the time loss estimates into specifics for each company, correct?

A.     That is correct.

Q.     Are you aware of anyone who

Page 90

has broken the time loss estimates into specifics for each company?

A.    I am not.

Q.    If someone wanted to know how much in damages a school district incurred because of student use of SnapChat or TikTok or Instagram or Facebook, the damages estimates that you have offered in this case would not answer that question, correct?

MR. GRADEN:  Object to form.

THE WITNESS:  They don't provide estimates for each company, no.

BY MR. SANDOVAL-BUSHUR:

Q.    The inputs for your damages estimates can be put into two categories, first, the amount of money that school districts spend on salaries and benefits for certain employee positions, and, two, the amount of time that employees in those positions spent addressing issues relating to student use of social media; is that correct?

A.    Yes.

Page 91

Q.    I want to start by asking about the information that you rely on in your damages calculations for the amount of time that employees spent addressing issues relating to student use of social media.

For your calculation of damages relating to teachers, you rely on the results of a teacher time survey that was conducted by Robert Klein, correct?

A.    That is correct.

Q.    The results of Klein's teacher time survey are an essential and necessary input to your estimate of damages relating to teacher salaries and benefits, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  That is correct.

BY MR. SANDOVAL-BUSHUR:

Q.    You did not play any role in designing the Klein teacher time survey, correct?

A.    That is correct.

Q.    You did not decide what questions would be asked in the Klein teacher time survey, correct?

Page 92

A.    That is correct.

Q.    You did not offer any input on what questions would be asked in the Klein teacher time survey, correct?

A.    That is correct.

Q.    You relied on Mr. Klein to design the teacher time survey appropriately, correct?

A.    That is correct.

Q.    You did not play any role in conducting the Klein teacher time survey, correct?

A.    That is correct.

Q.    You relied on Mr. Klein to conduct the teacher time survey appropriately, correct?

A.    That is correct.

Q.    You are not able to say whether the people who responded to the Klein teacher time survey provided accurate responses, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I have no opinion about the -- what -- just restate your question, I can't

Page 93

remember exactly.

BY MR. SANDOVAL-BUSHUR:

Q.    Sure.  You were not personally able to say whether the people who responded to the Klein teacher time survey provided accurate responses, correct?

A.    I am not.

Q.    You are not personally able to say whether the survey results that Mr. Klein reports accurately reflect the answers that teachers actually gave, correct?

A.    I'm sorry, say that again.

Q.    You are not personally able to say whether Mr. Klein accurately reported the answers that teachers gave to the teacher time survey, correct?

MR. GRADEN:  Objection.

THE WITNESS:  No, I have the raw data from the survey.

BY MR. SANDOVAL-BUSHUR:

Q.    Where did you get the raw data from the Klein teacher time survey from?

Page 94

A.      It was provided to me by Mr. Klein.

Q.      And you relied on Mr. Klein to provide you accurate raw data from the survey, correct?

A.      That is correct.

Q.      Did you recalculate the results of the Klein teacher time survey using the raw data that Mr. Klein provided you?

A.      I replicated his means, yeah.

Q.      Did you do anything else to -- let me ask the question again.

Other than looking at the raw data that Mr. Klein provided you to recalculate the mean, did you do anything else with that raw data?

A.      I also calculated the confidence interval around the mean.  But other than that, no, that's all I did.

Q.      For purposes of your damages estimates, you assume that the results of the Klein teacher time survey are reliable and accurate, correct?

MR. GRADEN:  Objection.

Page 95

THE WITNESS:  That is correct.

MR. SANDOVAL-BUSHUR:  And, Counsel, what is the basis for your objection?

MR. GRADEN:  Foundation.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering the opinion that the results of the Klein teacher time survey are in fact reliable and accurate, correct?

A.    That is correct.

Q.    So if, for example, the Klein survey reported that high school teachers in one district in a particular year spent an average of 30 minutes per day addressing issues related to student use of social media, you are not offering the opinion that teachers in fact spent an average of 30 minutes per day addressing issues related to student use of social media, correct?

A.    Correct, I'm relying on Mr. Klein's estimates in his survey.

Q.    When you offer an estimate of damages relating to teacher salaries and

Page 96

benefits, your opinion is that your damages estimate is reliable if you assume that the results of the Klein survey are reliable and accurate, correct?

A.     That is correct.

Q.     If the Klein survey overstates the amount of time that teachers spend addressing issues related to student use of social media, then your damages estimate would overstate the amount of damages, correct?

A.     That's how multiplication works, yeah.

Q.     If the court or jury concludes that the Klein teacher time survey included time spent on activities for which a school district cannot seek damages in this case, then your damages estimate relating to teacher salaries and benefits would not be accurate, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Not without adjustment to whatever the jury found.

Page 97

BY MR. SANDOVAL-BUSHUR:

Q.    But that is -- the statement I just made is correct?

A.    Yes.

Q.    Okay.

A.    I'm saying that if they found a different number, you can use the numbers in my report to calculate for whatever, you know, the jury ultimately found, assuming they have found a number.

Q.    If the court or jury were to conclude that the Klein survey is not reliable and accurate, then you would agree that they could not rely on your damages estimates relating to teacher salaries and benefits, correct?

MR. GRADEN:  Objection form.

THE WITNESS:  They could not rely on the numbers as is.  They could rely on the -- they could make adjustments to those numbers based on whatever they found, if they found a different number.

BY MR. SANDOVAL-BUSHUR:

Q.    Did you ever communicate with

Mr. Klein about the survey?

A.    We had some phone calls, yes.

Q.    Did you communicate with Mr. Klein about the survey before the survey was given?

A.    No, I did not.

Q.    Are you relying in any way in offering your opinions on any of your communications with Mr. Klein?

A.    Sorry, say that again.

Q.    Are you, in offering your opinions in this case, relying in any way on your communications with Mr. Klein?

A.    No, everything ultimately is in his report that I'm relying on.

Q.    For your calculation of damages relating to non-teacher positions such as counselors and school administrators, you rely for most districts on time estimates and affidavits of district employees, correct?

A.    That is correct.

Q.    And just a wording clarification, in some of your reports, you refer to affidavits and in some reports,

CONFIDENTIAL

Page 99

you refer to declarations.  Can we agree that if I refer to either affidavits or declarations, we'll both understand that that encompasses both affidavits and declarations?

A.    Absolutely.  In my mind, they're all affidavits, but if something was labeled a declaration, in my brain, it's an affidavit.  So we're on the same page there.

Q.    Great.  For your calculation of damages relating to non-teacher positions for Breathitt, Charleston, Irvington, and Tucson, you rely on time estimates and affidavits of district employees, correct?

A.    Can you list the districts again?

Q.    Breathitt, Charleston, Irvington, and Tucson.

A.    Yes, that's correct.

Q.    You consider the time estimates from the affidavits of district employees to be an essential and necessary input to your estimate of damages relating

CONFIDENTIAL

Page 100

to non-teacher salaries and benefits, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Correct.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not able to say whether the time estimates provided in the employee affidavits are accurate, correct?

A.    That's correct.

Q.    You did not take any steps to validate the accuracy of the time estimates provided in the employee affidavits, correct?

A.    I trusted that the employees reported their information correctly.

Q.    And you did not take any steps to validate the accuracy of the time estimates provided in the employee affidavits, correct?

A.    Other than reading what they said, correct.  And their depositions of those who have been deposed.

Q.    When you initially issued your damages estimates for the bellwether districts, you had not reviewed any of the

CONFIDENTIAL

Page 101

deposition testimony of any of the witnesses who provided affidavits, correct?

A.    I don't think I had.

Q.    If you had reviewed the deposition testimony of any of the employees who provided affidavits at the time that you issued your initial reports, you would have included a citation to that deposition testimony in your report, correct?

A.    That's correct.

Q.    You relied on the employees who provided affidavits to accurately estimate time, correct?

A.    That's correct.

Q.    For purposes of your damages estimates, you assume that the time estimates in employee affidavits are reliable and accurate, correct?

A.    That's correct.

Q.    So if, for example, an employee affidavit estimated that employees in a particular position spent 25 percent of their time addressing issues related to student use of social media, you are not

offering the opinion that employees in that position in fact spent 25 percent of their time addressing issues related to student use of social media, correct?

A.      That's correct.

Q.      That is the same for all estimates for all positions, correct?

A.      That's correct.

Q.      When you offer an estimate of damages relating to non-teacher salaries and benefits, your opinion is that your damages estimate is reliable if you assume that the employee affidavits are reliable and accurate, correct?

MR. GRADEN:   Objection.

THE WITNESS:   That's correct.

BY MR. SANDOVAL-BUSHUR:

Q.      If employee affidavits overstate the amount of time that employees in a particular position spend addressing issues related to student use of social media, then your damages estimate would overstate the amount of damages, correct?

A.      That's correct.

Q.      If the court or jury

Page 103

concludes that the employee affidavits included time spent on activities for which a school district cannot seek damages in this case, then your damages estimate relating to the non-teacher salaries and benefits would not be accurate, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Not without adjustments for whatever the court found.

BY MR. SANDOVAL-BUSHUR:

Q.    If the court or jury were to conclude that the employee affidavits are not reliable and accurate, then you would agree that they could not rely on your damages estimates relating to non-teacher salaries and benefits, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Not without making adjustments.

BY MR. SANDOVAL-BUSHUR:

Q.    For the Harford School District for your calculation of damages relating to non-teacher positions, you rely on time estimates provided in an

Page 104

interrogatory response and depositions of three district employees, correct?

A.    That is correct.

Q.    The time estimates from the interrogatory response and the three district employee depositions are an essential and necessary input to your estimate of damages relating to non-teacher salaries and benefits for Harford, right?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  That is correct.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not able to say whether the time estimates provided in the interrogatory responses or the three Harford employee depositions are accurate, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  That is correct.

BY MR. SANDOVAL-BUSHUR:

Q.    And you did not take any steps to validate the accuracy of the time estimates provided in the interrogatory responses, correct?

A.    Beyond just reviewing what

Page 105

was in the depositions.

Q.      And you did not take any steps to validate the accuracy of any time estimates that were provided in any employee depositions for any district, correct?

A.      Other than the context of the deposition itself or the affidavit or interrogatory.

Q.      You relied on the employees to accurately estimate time in their deposition testimony, correct?

A.      That is correct.

Q.      For purposes of your damages estimates for Harford, you assume that the time estimates and interrogatory responses and employee depositions are reliable and accurate, correct?

MR. GRADEN:  Objection.

THE WITNESS:  That is correct.

BY MR. SANDOVAL-BUSHUR:

Q.      If an employee estimated that school counselors spent 10 percent of their time addressing issues related to student use of social media, you are not offering

the opinion that employees in that position in fact spent 10 percent of their time addressing issues relating to student use of social media, correct?

A.    That is correct.

Q.    And that's the same for all estimates for all positions, correct?

A.    That is correct.

Q.    When you offer an estimate of damages relating to non-teacher salaries and benefits, your opinion is that your damages estimate is reliable if you assume that the interrogatory responses and employee deposition testimony is reliable and accurate, correct?

A.    That is correct.

Q.    If an interrogatory response or employee deposition overstated the amount of time that employees in a particular position spent addressing issues relating to student use of social media, then your damages estimate would overstate the amount of damages, correct?

A.    That's correct.

Q.    If the court or jury

CONFIDENTIAL

Page 107

concludes that the interrogatory response or employee deposition testimony included time spent on activities for which a school district cannot seek damages in this case, then your damages estimates relating to non-teacher salaries and benefits would not be accurate, correct?

A.    Not without adjustment to whatever the court found.

Q.    If the court or jury were to conclude that the interrogatory responses or employee deposition testimony is not reliable or accurate, then you would agree that they could not rely on your damages estimates for non-teacher salaries and benefits, correct?

A.    Not --

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Not without adjustment to whatever they found for the loss time.

BY MR. SANDOVAL-BUSHUR:

Q.    It was not part of your assignment in this case to determine whether any data from the bellwether school

districts corroborated the employee estimates of time spent addressing student use of social media, correct?

A. I take the time loss estimates as given by those who provided it to me.

Q. Was it part of your assignment in this case to determine whether any data from the bellwether districts corroborated the employee estimates of time spent addressing student use of social media?

A. No, it was not part of my assignment.

Q. You are not opining about whether any data from any bellwether school district in fact corroborates the employee estimates of time spent addressing student use of social media, correct?

A. Yes, I'm not opining on whether or not there's data that corroborates it.

Q. You relied on the time estimates from the Klein teacher time survey because that is what Plaintiffs'

Page 109

counsel assigned you to do, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I relied on it because it's the estimate of time loss that was provided to me by an expert witness.

BY MR. SANDOVAL-BUSHUR:

Q.    Did Plaintiffs' attorneys assign you to estimate damages using the results of the Klein teacher time survey?

A.    I mean, I was provided the Klein survey to estimate damages, so that's the information that I was provided.  I don't think it was assigned to me that I had to use it.  It's the information that I was provided and I have no reason to doubt its, you know, usefulness for my purposes.

Q.    Did you ask for the Klein teacher time survey to be conducted?

A.    I did not.

Q.    Plaintiffs' attorneys told you that the Klein teacher time survey was being conducted, correct?

A.    Yes.

Q.    And Plaintiffs' attorneys

Page 110

asked you to estimate damages using the results of the Klein teacher time survey, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: They asked me to calculate damages and I was provided the Klein survey. I don't think it was explicit that my assignment was you have to use this, but that's what was available to me.

BY MR. SANDOVAL-BUSHUR:

Q. Was there any other data that you considered using other than the Klein teacher time survey to estimate the time spent by teachers for purposes of your damages estimates?

A. No.

Q. Did you rely on the time estimates and employee affidavits because Plaintiffs' counsel asked you to do so in estimating damages for non-teacher positions?

A. I mean, I was asked to

Page 111

calculate damages using estimates of lost times and those are what I was provided to do those calculations.

Q.    Did you ask for Plaintiffs' counsel to collect affidavits of employees estimating the amount of time that they spent for purposes of your damages calculations?

A.    I did not ask them that, no.

Q.    Plaintiffs' attorneys provided you with the employee affidavits that you relied on in this case, correct?

A.    That is correct.

Q.    And did you ask Plaintiffs' attorneys for interrogatory responses or employee depositions identifying the amount of time they spent addressing issues relating to social media for purposes of your damages estimates?

MR. GRADEN:  Objection.

MR. LANDS:  Objection.

MR. GRADEN:  Objection.  Form.

BY MR. SANDOVAL-BUSHUR:

Q.    Did you ask Plaintiffs' attorney for interrogatory responses

Page 112

estimating the amount of time that employees spent for purposes of your damages calculations?

A.    I mean, I asked for anything that provided an estimate of time loss.  I don't know if I specifically asked for that one, but I said, hey, is there anything for this district and that's what I was provided.

Q.    It was not part of your assignment in this case to determine whether any employee's time estimates distinguished between time spent on issues relating to phones and time spent on issues relating to social media specifically, correct?

A.    No, that was not part of my assignment.

Q.    You are not opining that any employee's time estimates in fact distinguish between time spent on issues relating to phones and time spent on issues relating to social media specifically, correct?

A.    I'm trusting that they've

Page 113

provided me with the correct time estimate for use in this case.

Q.    But you are not opining that any employee's time estimates in fact distinguish between time spent on issues relating to phones and time spent on issues spent on social media specifically, correct?

A.    I am not offering that opinion.

Q.    I want to ask now about the other category of inputs in your damages estimate calculations.  That is the amount of money that school districts spent on salaries and benefits for certain employee positions; is that right that that's the other category?

A.    That's a fair characterization, yes.

Q.    You used different sources of information, depending on the district, to estimate the amount of money that each district spent on salaries and benefits for the relevant employee positions, correct?

A.    That is correct.

Page 114

Q.    For each district, you relied on data that was provided by the district for your calculation of employee salaries, correct?

A.    With the exception of DeKalb, and then I also incorporate some federal data for Breathitt as well.

Q.    Okay.  So let me ask the question then for Charleston, Harford, Irvington, and Tucson.  For Charleston, Harford, Irvington, and Tucson, you relied on data that was provided by the district for your calculation of employee salaries, correct?

A.    That is correct.

Q.    You relied on each district to provide you with reliable and accurate information on employee salaries, correct?

A.    That is correct.

Q.    You assumed that the information on employee salaries that each district provided you was accurate, correct?

A.    That is correct.

Q.    You do not know whether the

information that each district provided on employee salaries was in fact reliable and accurate, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I trusted that the district provided the information requested, which I then assumed was accurate.

BY MR. SANDOVAL-BUSHUR:

Q.    But you personally do not know whether the information that each district provided on employee salaries was reliable and accurate, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  That is correct.

BY MR. SANDOVAL-BUSHUR:

Q.    Your opinion is that your damages estimate is reliable if you assume that the information that the district provided about employee salaries was accurate, correct?

A.    That is correct.

Q.    For the Breathitt and DeKalb cases, you relied, in part, on data that was provided via the common core of data;

Page 116

is that correct?

A.    That's correct.

Q.    And you relied on the data for purposes of your calculation of employee salaries, right?  Correct?

A.    It's a little bit different for each of them, but, yes, I was using employee salary data from -- for purposes of the wage and benefit part of the calculation, I was using it for wages.

Q.    The common core data that you relied on is information that is reported by the school district; is that correct?

A.    That is correct.

Q.    And so for both Breathitt and DeKalb, you relied on each of those districts to provide reliable and accurate information on employee wages, correct?

A.    That's correct.

Q.    You assume that the information on employee wages that each district provided was accurate, correct?

A.    That is correct.

Q.    You do not personally know whether the information that each district

CONFIDENTIAL

Page 117

provided on employee wages was in fact reliable and accurate, correct?

A.    I assume what they report to the federal government is accurate.

Q.    But you do not know personally whether the information that the districts provided on employee wages is in fact reliable and accurate, correct?

A.    That's correct.

Q.    And your opinion is that your damages estimate is reliable if you assume that the information that the district has provided about employee wages was accurate, correct?

A.    That's correct.

Q.    For your damages calculations, you also relied on data that was provided by the district for your calculation of employee benefits, correct?

A.    Sorry, say that again.

Q.    For purposes of your damages calculations, you relied on data that was reported by the district for your calculation of employee benefits, correct?

A.    That's correct.

CONFIDENTIAL

Page 118

Q.   And you relied on each district to provide reliable and accurate information that you then relied on for your calculations of employee benefits, correct?

A.   That's correct.

Q.   And your opinion is that your damages estimate is reliable if you assume that the information on which you relied provides accurate information relating to employee benefits, correct?

MR. GRADEN:  Objection.

THE WITNESS:  That's correct.

BY MR. SANDOVAL-BUSHUR:

Q.   To estimate damages, you had to determine which employee positions from the employee salary data that you received should be multiplied by which time estimates, correct?

A.   That's correct.

Q.   And sometimes, the titles of employee positions in the employee salary data that you received did not match the titles of the positions that were used by the employees that provided time estimates

Page 119

in affidavits or depositions, correct?

A.    I don't recall there being a lot of mismatch, typically, they were matched almost identically if not exactly. In the affidavits, it's, you know, usually I'm providing information for vice principals or assistant principals and there was something called assistant principal in the data.

Q.    For example, an employee affidavit may have estimated time spent by counselors, but the employee salary data that you relied on identified people with the job title guidance?

A.    Oh.

Q.    Is that right?

A.    Fair, but, you know, the guidance counselor is the typical abbreviation for guidance counselor or counselor.

Q.    What methodology did you use to determine which employee positions from the employee salary data should be multiplied by which time estimates?

A.    I looked through the, you

Page 120

know, the job position descriptions to find the positions that would reasonably match the positions that were being listed.

Q.    How did you determine that the position descriptions reasonably matched the positions that were listed in an employee affidavit or described in an employee declaration?

A.    Because usually they matched identically and if not, it's something like guidance for guidance counselor, which is a pretty common and intuitive way of identifying positions in a database.

Q.    When the job title used in an employee affidavit estimating time did not exactly match the job title in the employee salary data, you looked at the titles and made your own judgments about whether you thought the job title used in the employee affidavit applied to the job title in the employee salary data, correct?

A.    Yes.

Q.    And you did not validate with any of the employees who submitted affidavits estimating time whether the job

Page 121

titles provided in their affidavits matched the job titles that you were using in the employee salary data, correct?

A.    I mean, it all seemed pretty straightforward to me.

Q.    But you did not validate with any of the employees who submitted affidavits whether the job titles provided in their affidavits matched or applied to the job titles that you used in the employee salary data, correct?

A.    Not that I recall.

Q.    Do you think it's possible that you did that?

A.    I'm going to say maybe in one case, there was some ambiguity, but I don't remember off the top of my head.

Q.    In that case, would you have spoken to the -- a district employee or would you have asked a question of the Plaintiffs' counsel?

A.    I would have asked the question of the attorneys.

Q.    You are not an offering an opinion on the amount of damages that

Page 122

Defendants' platforms as distinct from all social media caused any school district to incur, correct?

A.    Say that again.

Q.    You are not offering an opinion on the amount of damages that Defendants' platforms as distinct from all social media caused any school district to incur, correct?

A.    My understanding is that the affidavits and the survey, that that was part of how they were constructed was it's supposed to be time loss related to Defendants' conduct.

Q.    And can you explain to me the basis of that understanding?

A.    Well, I mean, A, it's being done in the context of litigation, so presumably, that's how it's being done, but, you know, I have asked that to make sure that, that's my understanding is that that's what people are asking.  It's also, I think, in some of the depositions that have since been taken place, I think they asked them those types of questions.

Page 123

Q.    Did you in the course of your work in this case read the questions that Klein -- the Klein teacher time survey asked teachers?

A.    I did.

Q.    And so you know that the Klein teacher time survey in its questions about social media is not limited to the Defendants, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I don't know. That's a question for him, whether or not he thinks it's limited to them or not.

BY MR. SANDOVAL-BUSHUR:

Q.    Well, I mean you can read the questions, right?

A.    That's a question for Klein.

Q.    Sorry, the question -- it's respectfully not.  My question to you is you can read the questions in Mr. Klein's survey, correct?

A.    Yeah.

Q.    And you have read them, correct?

Page 124

A.    I have.

Q.    And you know that his questions about social media are not limited to Defendants' platforms, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I do not know that.

BY MR. SANDOVAL-BUSHUR:

Q.    Okay.  Well, let's take a look at it.  Let's mark tab 6A as Exhibit 7.

- - - - -

(Robert L. Klein Breathitt Expert Report dated 5/18/25 marked Ward Exhibit 7 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And, Dr. Ward, Exhibit 6A -- I'm sorry, Exhibit 7 is Mr. Klein's report for the Breathitt case, correct?  If you turn to the page 3, paragraph 11, you'll see the identification of the Plaintiff.

A.    Okay.  I see that.

Q.    And you understand that

Page 125

Exhibit 7 is Mr. Klein's expert report for the Breathitt case, correct?

A.    That's what it appears to be.

Q.    Have you seen this before?

A.    I've seen one of his -- I mean, yes, I've seen this report, yes.

Q.    And you understand that Mr. Klein asked the same survey questions in all of the districts, right?

A.    That is my understanding, yes.

Q.    Okay.  Let's turn to page 8 of Mr. Klein's report.  And you see here question three, which is one of the questions that was asked as part of the Klein teacher time survey, correct?

A.    Uh-huh.

Q.    Okay.  And you see that Mr. Klein in the survey asked teachers about which of the following factors diverted time away from teaching during scheduled instruction time, correct?

A.    Yup.

Q.    And the first option that teachers could select is, "Unauthorized

Page 126

student use of social media (e.g., Facebook, Instagram, SnapChat, TikTok, YouTube, etc.) during class," correct?

A.    Okay.

Q.    Do you see that?

A.    Yes.

Q.    And you understand that teachers then estimated the amount of time that they spent relating to unauthorized use of social media, e.g., Facebook, Instagram, SnapChat, YouTube, et cetera, during class, and you relied on the results of teachers answering that question in providing the damages calculations in your report, correct?

A.    Correct.

Q.    Now, you would agree with me that the Klein survey when it asked teachers about social media, it did not limit the platforms included in the definition of social media to Defendants' platforms, correct?

A.    I mean, those are the ones it lists.

Q.    Well, it lists Defendants'

CONFIDENTIAL

Page 127

platforms, but it also says, "e.g." and that means, for example, correct?

A.   I think that's what it means, yeah.

Q.   And it also includes et cetera, correct?

A.   Okay.

Q.   So if I give -- if someone is provided with a list that says, for example, give some examples, and then says et cetera at the end, the category being described includes more than just the examples that are provided, correct?

A.   It doesn't have to, it could, but it doesn't have to.

Q.   Well, you know that there are other social media platforms besides just Defendants' platforms, correct?

A.   Again, I don't know what qualifies as social media personally, but if you're asking me, I would be thinking of these ones probably.

Q.   You would also be thinking of Twitter, right?

A.   Potentially, yeah.

CONFIDENTIAL

Page 128

Q.    Other people may be thinking of other platforms as well, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I don't know what other people are thinking.  I have no opinion about what other people are thinking.

BY MR. SANDOVAL-BUSHUR:

Q.    Well, Mr. Ward, you are aware that your damages estimate relating to teacher time is an estimate that relates to time spent relating to all social media, not just the Defendants' platforms, correct?

MR. GRADEN:  Objection.

THE WITNESS:  No, that's not my understanding.  My understanding is Mr. Klein and the affiants were tasked with estimating time loss related to this lawsuit.  I'm taking what they're giving and I'm saying, great, as we just went through, I assume that they have provided me with the -- a reliable estimate of time loss that is

Page 129

appropriate for use in this calculation. That is all I'm doing. I have no opinions about exactly what Mr. Klein's wording and what it means, I haven't thought about this. I don't know what it means. I'm not the survey expert.

BY MR. SANDOVAL-BUSHUR:

Q. So then, Dr. Ward, you have no idea whether your damages estimates are relating to all social media or just the Defendants' platforms, correct?

MR. GRADEN: Objection.

THE WITNESS: I have -- my estimates take the time loss estimates of the affiants and Mr. Klein, take them as given, whatever they've included I trust them to have included whatever is appropriate.

BY MR. SANDOVAL-BUSHUR:

Q. No one told you that Mr. Klein's survey includes only time spent relating to Defendants' platforms, correct?

Page 130

A.    I don't think I ever really thought about it.  I assume that it -- it's appropriate for use in this case, because he's an expert witness in this case, presumably, you know, he's thought about how to do this.  I'm just going to trust him to do his job.

Q.    Do you think that Mr. Klein told the teachers who participated in this survey, look, I know that the survey says social media, e.g., Facebook, Instagram, SnapChat, TikTok, YouTube, et cetera, however, when you provide your estimate, you should limit your response only to Facebook, Instagram, SnapChat, TikTok, or YouTube and include no other platforms?

MR. GRADEN:  Objection.

THE WITNESS:  I don't know what --

BY MR. SANDOVAL-BUSHUR:

Q.    So it's possible that Mr. Klein did that in administering his survey?

A.    I doubt it, but, again, that's not -- I have no opinions about -- or I have no knowledge about what he

Page 131

precisely did or didn't do. I've read his survey. I've read his report. I took those results as given. They are input into my report. So beyond that, like, as far as I'm concerned, he's got a report. He will be deposed. He will make all of the defense of his survey that is necessary. I'm not here to make it -- to offer an opinion about what his survey means, because I don't know what his survey means, because I didn't write it. I've spent almost no time really thinking about it. I'm just, like, okay, this has questions that I need for my report, great.

Q.   So you are not offering the opinion that the results of Mr. Klein's survey are limited to time spent addressing issues relating to Defendants' platforms as distinct from all social media, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Yeah, I'm making no opinions, I'm offering no opinions about what is or is not included in Mr. Klein's survey.

CONFIDENTIAL

Page 132

BY MR. SANDOVAL-BUSHUR:

Q.    And so you are offering no opinions about whether your damages estimates are -- let me ask the question again.

You are offering no opinions about whether your damages estimates relate to all social media or relate just to Defendants' platforms --

MR. GRADEN:  Objection.  Form.

MR. SANDOVAL-BUSHUR:  -- right?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I'm -- as we talked about at length a little while ago, right, I take the time loss estimates as given.  I assume they are accurate and reliable for purposes of calculating damages in this lawsuit.

BY MR. SANDOVAL-BUSHUR:

Q.    Do you know what you calculated time loss relating to?

A.    I don't understand your question.

Q.    What did you calculate time loss relating to in this case?  Or you're not sure because you're just -- you don't know?

MR. GRADEN:  I'll note for the record that Mr. -- that Dr. Ward was attempting to answer your question before you asked the second question.

THE WITNESS:  You know, so I'm using the affiants and Mr. Klein to answer the question of how much or what share of staff time was lost due to student social media use.

BY MR. SANDOVAL-BUSHUR:

Q.    In answering that question, you did not distinguish between time loss to student use of Defendants' platforms as distinct from time loss due to student use of all social media, correct?

A.    As we discussed, I make no distinctions.  I rely on them for the time loss estimates.  We just went through a very long series of questions about that.

Q.    And the answer is no, you did

CONFIDENTIAL

Page 134

not distinguish, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I've --

MR. GRADEN:  Asked and answered.

THE WITNESS:  Yes, we've covered that.  I make no distinctions for that.

BY MR. SANDOVAL-BUSHUR:

Q.    And you have not offered an opinion on how your damages estimates would change if they were limited only to time spent addressing issues caused by Defendants' platforms specifically as distinct from all social media, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I offer the one calculation I have based on the time loss estimates that I relied on.

BY MR. SANDOVAL-BUSHUR:

Q.    Have you offered any opinion on how your damages estimates would change if they were limited only to time spent addressing issues caused by Defendants'

Page 135

platforms as distinct from all social media?

MR. GRADEN: Objection.

THE WITNESS: The math is very straightforward. If there's some sort of share, it's just you multiply the numbers by whatever share reduction.

BY MR. SANDOVAL-BUSHUR:

Q. Well, Mr. Ward -- Dr. Ward, sorry, you're not answering my question. Can you point me to anywhere in your expert reports in which you have offered an opinion on how your damages estimates would change if they were limited only to time spent addressing issues caused by Defendants' platforms as distinct from all social media?

MR. GRADEN: Objection. Foundation.

THE WITNESS: As I understand it, that's what I've already done.

BY MR. SANDOVAL-BUSHUR:

Q. How -- what is your basis for -- for that opinion?

Page 136

A.    As I understand it, the affiants and Mr. Klein have estimated the time loss for Defendants' social media platforms.

Q.    And what is the basis of that understanding?

A.    We covered that.  Like, A, they were tasked to provide me time loss estimates in the context of this litigation.  I would be stunned if they provided me an estimate that wasn't germane to the litigation.

Q.    I don't think you would be stunned, Dr. Ward, because I think you know exactly what questions Dr. Klein asked --

MR. GRADEN:  Objection. That's not a question.

BY MR. SANDOVAL-BUSHUR:

Q.    Dr. Ward, if Mr. Klein performed a survey that asked teachers to estimate time spent addressing issues relating to all social media, not limited just to Defendants, if that's what Mr. Klein did, then your damages estimates are estimates relating to time spent addressing

Page 137

issues relating to all social media, not limited just to Defendants, correct?

MR. GRADEN: Objection. Form. Incomplete hypothetical.

THE WITNESS: If you assume that Mr. Klein's estimates are the estimates for all social media, then, yes, that's an input in my calculation and that's what my calculation would reflect.

BY MR. SANDOVAL-BUSHUR:

Q. And in order for the court or jury to decide whether that assumption is correct, whether the Klein estimates are estimates for all social media, you would agree that they can look at the Klein questions themselves and decide whether those estimates include all social media or are limited just to Defendants, correct?

A. I have no opinion about how the court or jury makes its decisions.

Q. Well, if you wanted to know whether the Klein estimates are estimates for all social media or just for Defendants, how would you answer the

Page 138

question?

A.      I don't know, I would have to think about it.

Q.      Your job in this case that you were paid over $300,000 to do was to multiply the results of the Klein survey and the percentages in employee affidavits by employee salary and benefit information, correct?

A.      Yes.

Q.      And your testimony is that, sitting here today, you do not know how you would figure out what question exactly the Klein survey was attempting to answer; is that right?

MR. GRADEN:  Objection.

THE WITNESS:  Sorry, I don't understand the question.

BY MR. SANDOVAL-BUSHUR:

Q.      Well, I'll move on.  The district employee affidavits and deposition testimony that you relied on for estimates of non-teacher damages included time spent addressing student use of all social media, not just Defendants' platforms, correct?

Page 139

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I don't have any basis to -- no, I don't know exactly what they included.  Again, I've assumed and relied upon that they provided me with the appropriate information to use for my calculations in the context of this lawsuit.

BY MR. SANDOVAL-BUSHUR:

Q.    Did the district employee affidavits and deposition testimony that you relied on for your estimates of non-teacher damages include time spent addressing student use of all social media, not just Defendants' platforms?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  Yeah, I feel like I just answered that.

BY MR. SANDOVAL-BUSHUR:

Q.    Well, it's a different question.

A.    I don't interpret it as a

Page 140

different question.

Q.    Well --

A.    You've asked me what I am essentially -- what I am assuming about what they know?  I'm saying I am assuming they provided me the information that I need for this calculation.

Q.    You do not know whether the employee affidavits and deposition testimony that you relied on provided estimates relating to all social media or just Defendants' platforms, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I don't know what each person included.  I'm not them.

BY MR. SANDOVAL-BUSHUR:

Q.    Did you see in any employee affidavit a statement of this is the amount of time that was spent addressing issues relating specifically to Defendants' platforms?

A.    I have no recollection of this precise language of all the affidavits.

Q.    You have not offered an opinion on how your estimates of non-teacher time damages would change if they were limited only to time spent addressing issues caused by Defendants' platforms as distinct from all social media, correct?

MR. GRADEN:  Objection to form.  Foundation.

THE WITNESS:  I've provided an estimate based on the information that was provided to me under the assumption that what was provided is limited to Defendants' platforms.

BY MR. SANDOVAL-BUSHUR:

Q.    And did you do anything at all to see if your assumption that the information that was provided to you that was limited to Defendants' platforms was an accurate assumption?

A.    I trusted the people who provided me with the affidavits.  They are knowledgeable staff.  They are doing this in the context of the lawsuit.  They are

Page 142

signing it.  This is sworn testimony. That's good enough for me.

Q.    Well, but, Dr. Ward, my question is not did the people who signed the affidavits think they were giving truthful information.  The question is what information those people who signed the affidavits were giving.

So did you do anything at all to see if your assumption that the information that was provided to you in the employee affidavits that was limited to Defendants' platforms was an accurate assumption?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  It may have come up in some of the depositions, but other than what's in their testimony, no, I'm relying on them. I'm relying on them to -- these are questions that you are welcome to ask them, but I have no basis or concern that they haven't provided me with the appropriate thing to

Page 143

use for calculating damages in this lawsuit.

BY MR. SANDOVAL-BUSHUR:

Q.    Is it your understanding that the people who provided the affidavits that you rely on for purposes of your damages calculations understood that they were giving estimates that would be used for the purposes of calculating damages?

A.    Sorry, say that again.

Q.    Is it your understanding that the people, the school employees, who provided the affidavits that you rely on understood that they were giving estimates that would be used for purposes of calculating damages?

A.    I don't know what they understood.

Q.    So you have no idea of what the people who provided the employee affidavits under that they were doing when they provided the affidavits, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I'm not them.  I don't know what they understood or

CONFIDENTIAL

Page 144

didn't understand.  I understand how I used it.

BY MR. SANDOVAL-BUSHUR:

Q.    Yeah.  Okay.  Your estimated damages include damages relating to time spent by teachers and other school staff addressing the effects of content, text, photos, videos that are posted by third parties on social media platforms, correct?

MR. GRADEN:  Objection to form.  Foundation.

THE WITNESS:  What was the question, I'm sorry?

BY MR. SANDOVAL-BUSHUR:

Q.    Do your damages estimates include damages relating to time spent by teachers and other school staff addressing the effects of content, that is, text, photos or videos posted by third parties on social media platforms?

MR. GRADEN:  Objection.  Form. Foundation.

THE WITNESS:  I have no opinion about that.  I don't -- again, that's a time loss question,

Page 145

right, so that's -- I'm taking the affiant affidavits and Mr. Klein's survey and I'm applying value to it. I don't have any opinion about what exactly they included or didn't include. I assume that it is appropriate for my purposes.

BY MR. SANDOVAL-BUSHUR:

Q. And what does that mean for something to be appropriate for your purposes?

A. It provides the time loss to be used to calculate damages in this lawsuit.

Q. So for your purposes, if it provided a time loss, it provided you a percentage, that was sufficient?

A. Again, I'm relying on them to provide the appropriate loss of time for this lawsuit. I don't -- I have no basis to evaluate what they did and didn't include, whether or not it's accurate or not, right, they're the experts. They're the people in the positions. As we talked about, I assume that it is accurate and

Page 146

reliable for my purposes.

Q.    If teachers and non-teachers included in their time estimates time spent addressing the effects of content, that is, texts, photos, or videos that were posted by third parties on social media platforms, that time would be included in your damages estimate, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I mean, if people include something in their time loss estimate that the time loss estimate that I relied on, by definition, yes, my time loss -- my calculation includes it.

BY MR. SANDOVAL-BUSHUR:

Q.    And you did not take any steps on your own to attempt to eliminate from any time estimates time spent addressing content posted on social media by third parties when you were calculating your damages estimates, correct?

A.    It was not part of --

MR. GRADEN:  Objection.  Foundation.

THE WITNESS:  That was not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.     And you are not aware of any data that would allow you to quantify what portion of damages you estimated relate to time spent by teachers and other school staff addressing the effects of content posted by third parties on social media platforms?

MR. GRADEN:  Objection to form.  Foundation.

THE WITNESS:  Not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.     And you're not aware of any such data?

A.     I'm not aware of any such data.

Q.     If two students are using a social media platform during class to message each other about plans to hang out after school and the teacher takes time to reprimand the students for messaging one another during class, is that teacher time

Page 148

included in your damages estimate?

A.      Again, I take the estimates from others.  I don't know any specific examples.  I assume that the others provide me with whatever is appropriate.

Q.      If teachers and non-teachers included in their time estimates time spent addressing students' use of social media platforms during class to message each other, that time is included in your damages estimate, correct?

MR. GRADEN:  Objection.

THE WITNESS:  So if you assume that it's included then, yes, it's included.

BY MR. SANDOVAL-BUSHUR:

Q.      And you did not attempt to eliminate from your damages calculations time spent addressing student use of social media platforms during class to send messages, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  That was not part of my assignment.

Page 149

BY MR. SANDOVAL-BUSHUR:

Q. If teachers and non-teachers included in their time estimates time spent addressing students who post videos of physical fights on social media platforms, is that time included in your damages estimate?

MR. GRADEN: Objection. Foundation.

THE WITNESS: Sorry, what was the first part of that question, if you assume it?

BY MR. SANDOVAL-BUSHUR:

Q. If teachers and non-teachers included in their time estimates time spent addressing students who post videos of physical fights on social media, is that included in your damage estimate?

MR. GRADEN: Same objection.

THE WITNESS: If you assume that it's in there, it's in there.

BY MR. SANDOVAL-BUSHUR:

Q. And you did not attempt to eliminate from your damages calculations time spent addressing students who post

Page 150

videos of physical fights on social media, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  That was not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.    Your estimated damages include damages relating to time spent by teachers and other school staff addressing the effects of all features of social media platforms, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Sorry, say that again.

BY MR. SANDOVAL-BUSHUR:

Q.    Your estimated damages include damages relating to time spent by teachers and other school staff addressing the effects of all features of social media platforms, correct?

MR. GRADEN:  Objection.  Form. Foundation.

THE WITNESS:  Again, I don't -- that was not part of my

Page 151

assignment.  That's part of the time loss estimate.  I don't know what they include or did not include.

BY MR. SANDOVAL-BUSHUR:

Q.     If the autoplay feature -- are you familiar with autoplay as a feature on social media?

A.     Is that when it just starts playing, like --

Q.     If one video ends, another video begins playing.

A.     Okay.  Okay.  Sure.

Q.     If the autoplay feature of a Defendants' platform is the reason why a teacher or non-teacher reports spending time addressing student use of social media, your damages estimate includes that time, correct?

MR. GRADEN:  Objection.

THE WITNESS:  If you assume that it's included in the time loss estimate, then my damage includes it.

Page 152

BY MR. SANDOVAL-BUSHUR:

Q.    And you have not taken any steps to exclude from your damages estimates time spent by teachers or non-teachers that is caused by the autoplay feature of any social media platform, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  That was not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.    And you didn't do that?

A.    Didn't do it, it wasn't my assignment.

Q.    If the algorithms on social media were the reason that teachers or non-teachers reported spending time addressing student use of social media, that time is included in your damages estimate, correct?

A.    If you assume that it's included, then it's included.

Q.    You have not taken any steps to exclude from your damages estimates time

CONFIDENTIAL

Page 153

spent by teachers or non-teachers that was caused by the algorithms of social media, correct?

MR. GRADEN: Objection. Form. Foundation.

THE WITNESS: It was not part of my assignment, so I didn't do it.

BY MR. SANDOVAL-BUSHUR:

Q. And you have not taken any steps to exclude from your damages estimates any time spent by teachers or non-teachers that was caused by any feature of any social media platform, correct?

MR. GRADEN: Objection. Form. Foundation.

THE WITNESS: No, I have not. Not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q. And you have not estimated damages specifically attributable to any Defendants' facilitation, promotion, development or participation in any particular online challenge, correct?

MR. GRADEN: Objection. Form.

Page 154

Foundation.

THE WITNESS:  Not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.    And you didn't do it?

A.    So I didn't do it.

Q.    And you have not estimated damages specifically attributable to any Defendants' facilitation, promotion, development, or participation in any particular filter or overlay, correct?

MR. GRADEN:  Objection.  Form. Foundation.

THE WITNESS:  It was not part of my assignment, so I didn't do it.

BY MR. SANDOVAL-BUSHUR:

Q.    If teachers and non-teachers included in their time estimates time spent addressing the effects of use of social media platforms on school-issued devices, then that time is included in your damages estimates, correct?

A.    If you assume it's included, it's included.

CONFIDENTIAL

Page 155

Q.      And you did not take any steps to eliminate from your damages calculations any time that was spent addressing the effects of the use of social media platforms on school-issued devices, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Not part of my assignment, so I didn't do it.

BY MR. SANDOVAL-BUSHUR:

Q.      And the fact that a school district could have used but did not use software to block students from accessing social media platforms on their school-issued devices does not affect your damages calculations, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  What is that?

BY MR. SANDOVAL-BUSHUR:

Q.      The possibility that a school district could have but did not use software to block students from assessing social media platforms on their

Page 156

school-issued devices does not affect your damages calculations, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: That's not included in my assignment of my calculations.

BY MR. SANDOVAL-BUSHUR:

Q. Are your estimated damages limited to time spent by teachers and other school staff addressing issues relating to students who are addicted to social media?

A. Sorry, say that again.

Q. Are your estimated damages limited to time spent by teachers and other school staff addressing issues relating to students who are addicted to social media?

A. My calculations include only what the people who calculated time loss include. I don't know if it includes that or not.

MR. GRADEN: We have been going about over an hour, are you about ready to break or --

MR. SANDOVAL-BUSHUR: We can

CONFIDENTIAL

Page 157

go about another five minutes.

MR. GRADEN:  That's fine.  As long as it's fine.

THE WITNESS:  Yeah, no, five minutes is great.

BY MR. SANDOVAL-BUSHUR:

Q.    If teachers and non-teachers included in their time estimates time spent addressing issues relating to students who are not addicted to social media, that time is included in your damages calculations, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  If you assume they included it, it's included.

BY MR. SANDOVAL-BUSHUR:

Q.    And you did not attempt to eliminate time spent addressing issues relating to students who are not addicted to social media from your damages estimates, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Not part of my

CONFIDENTIAL

Page 158

assignment, didn't do it.

BY MR. SANDOVAL-BUSHUR:

Q.    And you did not attempt to eliminate time spent addressing issues relating to students who are not addicted to any of Defendants' platforms specifically from your damages estimates, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Sorry, say it again.

BY MR. SANDOVAL-BUSHUR:

Q.    You did not attempt to eliminate time spent addressing issues relating to students who are not addicted to any of Defendants' platforms from your damages estimates, correct?

A.    Not part of my --

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Not part of my assignment, didn't do it.

BY MR. SANDOVAL-BUSHUR:

Q.    And you are not aware of any data that would allow you to quantify what

CONFIDENTIAL

Page 159

portion of the damages you estimate relate to time spent addressing issues for students who are not addicted to social media, correct?

A.    I have spent zero time looking for such data, so I have no idea if it exists.

Q.    If someone wanted to know how much in damages a school district incurred because of students who were addicted to social media only, the damages estimates that you have offered in this case would not answer that question, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Only if the time loss estimates are specific to addicted only.

BY MR. SANDOVAL-BUSHUR:

Q.    And they're not, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Again, I don't know exactly what they include, because you would have to ask them, but --

Page 160

BY MR. SANDOVAL-BUSHUR:

Q. I mean, again, you've read the Klein teacher time survey, right?

A. And I don't -- again, I don't -- I can't speak to what is exactly included or not. You're throwing out a million different buckets of things, but I think that one you tried to limit in some way and I'm, like, well, I don't know, so I don't know. But I don't think -- it's not part of, whatever it is, it's ultimately not part of my assignment.

Q. Did you see anything in the Klein survey that limited the information sought from teachers to time spent in connection with students who are addicted to social media?

A. Nothing that I know of that limited it to that, but it doesn't mean it could not only reflect that.

Q. Did you see anything in any of the affidavits or deposition testimony that you reviewed of non-teachers provided time estimates that limited their time estimates to time spent in connection with

Page 161

students who are addicted to social media?

        A.      Not that I'm aware of.

        Q.      And, similarly, if any of the estimates that you relied on included time spent addressing use of social media by students who do not compulsively use social media, that time is included in your damages estimates, correct?

        A.      I think that's an if you assume it, it's in there.

        Q.      So the answer is, if you assume that the estimates that you relied on were not limited to addressing use of social media by students who compulsively use social media, then your damages estimates are not limited to addressing use of social media by students who compulsively use social media, correct?

        A.      Sorry, we've got too many --

        Q.      Yeah, I know it's complicated --

        A.      -- moving parts here.

        Q.      -- I apologize.  I want you to assume that the time estimates that you rely on are not limited to addressing use

Page 162

of social media by students who compulsively use social media, okay?

A.     So they are not limited to just compulsive use?

Q.     Correct.

A.     Okay.

Q.     If that's the case, then your damages estimates are similarly not limited to just compulsive use, correct?

A.     Correct, if you assume it, that's what it is.

Q.     And if someone wanted to know how much in damages a school district incurred because of only compulsive use of social media by students, the damages estimates that you have offered in this case would not answer that question, correct?

A.     If you assume that, yes.

MR. SANDOVAL-BUSHUR:  We can take a break.

THE VIDEOGRAPHER:  Going off video record 11:57 a.m.

- - - - -

(A recess was taken at this time.)

CONFIDENTIAL

Page 163

- - - - -

THE VIDEOGRAPHER:  Back on video record 12:46 p.m.

BY MR. SANDOVAL-BUSHUR:

Q.    Dr. Ward, your estimated damages are not limited to time spent by teachers and other school staff addressing issues relating to students who have mental health problems, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  No, as we've discussed, they include all of the things that were included by the affiants and Mr. Klein's survey.

BY MR. SANDOVAL-BUSHUR:

Q.    And so if the employees who submitted affidavits and the teachers responding to the survey did not limit their time estimates to time spent addressing issues relating to students with mental health problems, then your damages estimates in turn are not limited to time spent relating to students with mental health problems, correct?

Page 164

MR. GRADEN: Objection. Form.

THE WITNESS: Yes, if you assume that they did not limit it, which I don't believe they did, then my damages would only reflect I think that's where -- if they did or didn't limit it, I can't remember if you have a negative in there or not, my damages either do or do not include it.

BY MR. SANDOVAL-BUSHUR:

Q. And you, as part of your work in this case, have not reviewed any data about how many students in any school district have mental health problems, correct?

A. Not that I recall, no.

Q. And you have not, as part of your work in this case, reviewed any data on how many students in any school district have mental health problems specifically allegedly caused by social media, correct?

A. No, I have reviewed such data.

Q. And you did not attempt to

eliminate from your damages estimates time spent addressing issues relating to students who do not have mental health problems, correct?

A.    I did -- I'm sorry.

Q.    I can ask it differently. Did you attempt to eliminate from your damages estimates time spent addressing issues relating to students who do not have mental health problems?

A.    No, I did not.

Q.    Teachers are salaried workers, not hourly workers, correct?

A.    Generally, yes.

Q.    In the six bellwether districts, teachers are salaried workers, not hourly workers, correct?

A.    I believe so, there may be a handful that were paid hourly, but, typically, no, they are salaried.

Q.    The amount of time that teachers spend addressing school -- student use of social media does not affect how much the school district pays the teacher, correct?

A.    I don't assume that it does, no.

Q.    And you're not aware of any information that would suggest that the amount of time that teachers spend addressing student use of social media affects how much the school district pays the teacher, correct?

A.    Yes.  Well, I assume that it doesn't change the contracted number of hours or the contracted wages.

Q.    The non-teacher employees for whom you calculated damages are salaried workers, not hourly workers, correct?

A.    Generally, as far as I can recall, yeah.

Q.    The amount of time that a non-teacher employee spends addressing student use of social media does not affect how much the school district pays that employee, correct?

A.    As far as I know, yes.

Q.    If all social media platforms disappeared tomorrow, school district employee salaries in the bellwether school

Page 167

districts presumably would not be affected, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I assume so, but I don't know that for sure.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not opining that because of social media a school district had to pay teachers more than the school district would have paid teachers if social media did not exist, correct?

A.    Correct.  I'm not assuming that salaries went up by some amount because of social media.

Q.    You are not opining that because of Defendants' platforms specifically a school district had to pay teachers more than the school district would have paid teachers if Defendants' platforms did not exist, correct?

A.    Yeah, no, I'm not assuming anything changed with respect to Defendants' platforms causing wages to go up.

Page 168

Q. And just so that I'm sure we have a clean answer for the record, are you opining that because of Defendants' platforms specifically any school district had to pay teachers more than they would have paid teachers if Defendants' platforms did not exist?

A. It's the same answer, so, no, there is -- I'm making no assumptions about the conduct at issue in this matter impacting the level of wages paid.

Q. To any employee in any district?

A. To any employee in any district.

Q. You are not opining that any school district hired more teacher or non-teacher staff because of social media, correct?

A. That's not part of my opinion, no.

Q. You are not opining that any school district hired more teachers or non-teacher staff because of Defendants' platforms, correct?

A.   It's the same answer.

Q.   So that answer is no?

A.   No, I'm not making any assumptions that the at-issue conduct impacted the number of staff in my calculations.

Q.   You are not opining that student use of social media caused school districts to spend more on any out-of-pocket costs, correct?

A.   That's not part of my opinion, no.

Q.   Your damages estimates are an estimate of opportunity costs, not out-of-pocket costs, correct?

A.   Yes, I'm -- yes.

Q.   And what is the difference between opportunity costs and out-of-pocket costs?

A.   Well, I think you just went through it, right?  So out-of-pocket costs would be, oh, we spent money that we otherwise wouldn't have spent, right?  So we're, you know, now if you're saying, oh, we spent more than we would have otherwise,

and then in my conception, I'm saying, well, look, you know, with opportunity costs, yeah, you're paying the teacher what you would have paid them anyway, but you're diverting their time from what it would have been used for something else and we have to put a value on that time and we call that value the opportunity cost.

Q. One of the job responsibilities of a teacher is to address student misbehavior in class, correct?

A. I assume so.

Q. And you were at one point in your life a student in a class, correct?

A. I went to many years of school.

Q. And I'm sure you experienced that something that teachers do is to address student misbehavior in class, correct?

A. Sometimes, yes.

Q. And addressing student misbehavior in class has been a job responsibility of teachers for decades, correct?

CONFIDENTIAL

Page 171

MR. GRADEN: Objection. Scope.

THE WITNESS: I assume so.

BY MR. SANDOVAL-BUSHUR:

Q. For decades, part of a teacher's job responsibility has included addressing students who were misbehaving in class by talking to each other when they were not supposed to, correct?

A. I mean, I don't know the specifics of exactly, but, you know, presumably teachers do that and they have done so for some time.

Q. For decades, part of a teacher's job responsibility has included addressing students who were misbehaving by passing notes to one another, correct?

MR. GRADEN: Objection. Scope.

THE WITNESS: Again, you know, I don't know the specifics of exactly what teachers do, but to the extent passing notes was a problem for a teacher, they may have used it.

CONFIDENTIAL

Page 172

BY MR. SANDOVAL-BUSHUR:

Q.    So, I mean, do you just know as a person who is in the world, went to school, that part of what teachers do is address students who are misbehaving in class by passing notes and that's something teachers have done for decades?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Yeah, to the extent that it happened while I was in school, sure, maybe that happened.  I think that probably happened at some point.

BY MR. SANDOVAL-BUSHUR:

Q.    For decades, part of a teacher's job responsibility has included addressing students who are misbehaving in class by reading material that they're not supposed to be reading in class, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  Again, you know, I can only base it on what I know from my own experience and, yeah, maybe they would have done that.

CONFIDENTIAL

Page 173

BY MR. SANDOVAL-BUSHUR:

Q.    Do you not have any understanding of what a teacher's job responsibilities do and do not entail outside of your own personal experience as a student?

A.    I don't know to this level of specificity.  So, yes, when you talked about does it include addressing student misbehavior, sure, you know, part of job responsibilities is maintaining classroom order.  The specifics of what a particular teacher chooses to include in that or a what a teacher -- that I don't know.  I can only speak as to what I saw and, you know, experienced, right?  So I can speak at a high level, but I probably can't speak at a very specific level.

Q.    And so for purposes of offering opinions in this case, you have not studied at any specific level how teachers spend their time in the course of a school day; is that right?

MR. GRADEN:  Objection.  Vague.

THE WITNESS: Yeah, not beyond just a basic understanding of what teachers do. I do not have some sort of granular database of every action that teachers may or may not take.

BY MR. SANDOVAL-BUSHUR:

Q. For decades, part of a teacher's job responsibility has included addressing students who are misbehaving by making fun of other students, correct?

MR. GRADEN: Another objection to scope here.

THE WITNESS: It's the same answer. Like, to the extent that it's part of what they consider as part of maintaining classroom order or whatever bucket you want to label it in, I would assume that it's included, but I don't know for decades or whether it's explicitly included or implicitly included, I just don't know.

BY MR. SANDOVAL-BUSHUR:

Q. For decades, part of a

CONFIDENTIAL

Page 175

teacher's job responsibility has included addressing students who were misbehaving by bullying other students, correct?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  It's the same basic thing, yes, I assume that there's probably some degree of addressing bullying, but I don't know any specifics.

BY MR. SANDOVAL-BUSHUR:

Q.    For decades, part of a teacher's job responsibility has included addressing students who brought distracting items to school and used them in class, like toys, a gun, et cetera?

MR. GRADEN:  Objection.  Asked and answered multiple times.

THE WITNESS:  Same exact answer, I don't know the specifics, but I assume that teachers have some part of their job, which is maintaining classroom order, protecting the learning environment, whatever you want to

call it.

BY MR. SANDOVAL-BUSHUR:

Q. Including by addressing students who are misbehaving in connection with bringing distracting items to school, correct?

A. That could be included.

Q. When a school makes a decision to hire a teacher to teach a class, the school understands that some of the time that the teacher is teaching class will be spent addressing student misbehavior, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: Perhaps.

BY MR. SANDOVAL-BUSHUR:

Q. Do you know?

A. I don't know the specifics of, you know, what percentage or whether they do -- what they exactly include or do not include. Yeah, that's not -- again, I have a general understanding, but if you're asking me if when they specifically hire them do they have some, like, will you do

Page 177

this exact thing, I don't know that.

Q.    Do you think it's possible that a -- do you think it's possible that when a school makes the decision to hire a teacher to teach a class, the school does not understand that some of the time that the teacher is teaching the class will be spent addressing student misbehavior?

MR. GRADEN:  Again, scope.

THE WITNESS:  Do I think that it's possible that they think that no time would be spent addressing student misbehavior?  I don't know for sure, but there's probably at least some assumption that there would be addressing of student misbehavior, but I don't know, you know, that's not -- it's not something I'm here to opine on.

BY MR. SANDOVAL-BUSHUR:

Q.    A school does not lose the time that a teacher spends addressing student misbehavior, the school receives exactly what it paid the teacher to do, correct?

CONFIDENTIAL

Page 178

MR. GRADEN:  Objection. Foundation.  Calls for a legal conclusion.

THE WITNESS:  What do you mean the school doesn't lose time?

BY MR. SANDOVAL-BUSHUR:

Q.    Does a school lose the value of the time that a teacher spends addressing student misbehavior?

A.    I mean, it's forgone for some other purpose.

Q.    Does the school --

A.    There's an opportunity cost associated with it.

Q.    Sure.  And there's opportunity costs associated with literally any activity that a teacher does in the course of a school day, correct?

A.    That is correct.

Q.    Does a school lose the value of the time that a teacher spends addressing student misbehavior?

A.    It incurs an opportunity cost.

Q.    Does the school still receive

CONFIDENTIAL

Page 179

the value of the time that the teacher spends addressing student misbehavior?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Does the school still receive the value of the time?  I mean, they receive the -- I mean, the teacher spent their time doing that, so they get whatever comes out of them doing that.

BY MR. SANDOVAL-BUSHUR:

Q.     The school gets the value of the teacher spending time addressing student misbehavior, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Does the school -- who gets the -- I'm not sure what the value of -- you know, there's, there is a -- to the extent that there's output associated with the input of time, they -- I'm sure the school receives -- I'm not sure who

CONFIDENTIAL

Page 180

receives the output, but there is output that is produced.

BY MR. SANDOVAL-BUSHUR:

Q.      For purposes of your damages opinions, you did not consider the value of any teacher time that a school district receives from that teacher time; is that correct?

MR. GRADEN:  Objection.  You can answer, if you understand.

THE WITNESS:  Yeah, I'm not focused on output.  I'm focused on inputs.

BY MR. SANDOVAL-BUSHUR:

Q.      So is it -- or let me ask that question differently.  In calculating opportunity costs, did you consider the value of the time that a teacher spends on any activity to the school district?

A.      Sorry, say that again.

Q.      Does the school district receive value when a teacher spends time doing something in the course of the school day?

A.      Yeah, you know, school

CONFIDENTIAL

Page 181

districts are just kind of weird, right? You know, because they produce output, but it's not clear that the school district receives the value of that output. It's not a business that's selling that output for profit. So it doesn't make sense to me the way you're phrasing it.

Q. So if a school district employee's time during the workday is diverted from one activity to another, the school district is not the entity that loses any value associated with that diversion; is that correct?

MR. GRADEN: Objection.

THE WITNESS: It incurs a cost. Right, so the school district incurs the opportunity cost of the time being diverted. Now, how do you value that time, right? In this case, we value it on the input side and we say, well, the school district paid for that time, it paid this amount for it, right, so what was the cost of diverting from one thing to another

Page 182

was the value of that time.  Right?
So it's the cost to the district
that's ultimately at issue for me.

BY MR. SANDOVAL-BUSHUR:

Q.     For your methodology of
calculating opportunity costs, you did not
consider and it was not part of your
methodology to consider what the value was
of any time that was lost because school
staff was addressing social media-related
issues?

A.     Are you trying to say output
instead of value or the value of output?
No, my understanding is that the school
districts are not seeking to recover the
value of lost output.  They're seeking to
recover the cost of the diverted input.

Q.     So when you refer to
opportunity costs, what you are referring
to is simply the amount that the district
paid an employee proportional to the amount
of time that the employee spent addressing
issues relating to social media; is that
right?

A.     I think that's correct, yes.

Q.    And you have not as part of your work in this case attempted to calculate the value of any activity by any school district staff that was forgone because the school district staff instead spent time addressing student use of social media, correct?

A.    I value the time at the wage, I'm not trying to figure out what the output loss and put a value on that. That's the standard approach in costing things in education.

Q.    When a teacher spends time during the day addressing student misbehavior, the school receives from the teacher what the school paid the teacher to do, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Sorry, say that again.

BY MR. SANDOVAL-BUSHUR:

Q.    One of the things that schools pay teachers to do is to address student misbehavior, correct?

Page 184

A.    Okay.  We've been over that, yeah, to some degree.

Q.    And so when a teacher spends time addressing student misbehavior, the school is receiving, in exchange for paying the teacher, the labor of the teacher doing what the school district paid the teacher to do, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I mean, they paid the teacher for that time, so, like, but again, this -- the school district recovering the value, that's where I'm losing you.  I said that because school districts produce output, but they don't recover the value of that output. So, yes, the school district paid the teacher for that time, right? So it incurred a cost associated with that time.  All of the activities that the teachers do, the school district is incurring costs.

The question for this matter

Page 185

is, okay, well, there's some share of that time that could have been put to some other use had the at-issue conduct not been present. And in that case, so it's what the cost of dealing with this thing and so the way you do that in education is you say, look, these are the inputs, this is the price of those inputs, in our case, the wages and benefits, so you say, okay, well, here's how much time, here's the wages and benefits, here is the cost and that is my understanding of what is at issue in this case. That's what the Plaintiffs are seeking to recover is the cost of the time, what they essentially expended during the period where their time was diverted, because there was an opportunity, there was a cost to doing this stuff to the district that they wouldn't have otherwise

Page 186

have had to incur.

BY MR. SANDOVAL-BUSHUR:

Q.    Calculating the value of any opportunity that was forgone was not part of your methodology in this case, correct?

A.    The opportunity, yeah, that's -- my methodology is, this is an opportunity cost methodology, right?  It's just in education specifically, right, and it can be applied in other places, but in education specifically, the methodology is what's called the ingredients approach. You say that you want to understand what the cost of something is, right, this intervention, that, you know, issue, you would say, okay, well, what is the time or other resources involved in it, what are the ingredients, right, and then what are the values of those ingredients?  And when it comes to personnel time, you know, you say what's the value of teacher time? Well, the standard is, okay, we're going to use wages and benefits.  We're not going to try and figure out -- oh, they produce too many things, too many things we don't even

Page 187

know the value of, to be honest.  So the standard is, the practical approach to doing this is to say, in practice, we find the time, whatever the intervention is, and we multiply that time by the wages and benefits and that's when we go to the district and say, well, what does this cost?  This is what this is costing you, this intervention, right?  What is it going to cost you?  It's going to cost this amount.  And what we're doing is here just directly analogous to that and the issue is at the time in the bucket of addressing at-issue conduct in this matter.

Q.    Was calculating the value of any opportunity that was forgone part of your methodology in this case?

A.    I don't --

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  We're not communicating on value, right?  Like, I'm valuing the time, so the opportunity of that time, the opportunity cost of that time, yes,

I'm valuing that time. I'm valuing it at the wage. If you're asking did I value the forgone output of that time, no, I'm not doing that. That's not the standard approach when it comes to doing costing in education.

BY MR. SANDOVAL-BUSHUR:

Q. You are not offering the opinion that teachers spent more time addressing student misbehavior in a world with social media than they would in a world without social media, correct?

A. No, I'm making -- I'm only offering opinions about the estimates of time loss that I was provided related to at-issue conduct by the affiants and/or the survey.

Q. You are not offering the opinion that teachers spent more time addressing student misbehavior because of social media, correct?

A. I'm doing nothing related to causality in my analysis.

Q. So the answer is, correct?

Page 189

A.    Yes, correct, I'm not doing anything related to causality.

Q.    You are not offering the opinion that teachers spent more time addressing bullying because of social media, correct?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  No, I am not offering any kind of causal opinion related to any output.

BY MR. SANDOVAL-BUSHUR:

Q.    For decades, teachers have had to deal with students who were tired in class because they stayed up too late, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  I have no idea. Certainly, there are probably kids who show up to school tired sometimes, but for decades, I have no idea.  The frequency, I have no idea.

CONFIDENTIAL

Page 190

BY MR. SANDOVAL-BUSHUR:

Q.    For decades, students have been tired in class because they stayed up too late watching TV or playing video games, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: I have done no analysis of the sources of student tiredness over time.

BY MR. SANDOVAL-BUSHUR:

Q.    When a school makes the decision to hire a teacher to teach a class, the school understands that some of the time that the teacher is teaching the class will be spent dealing with students who are tired because they stayed up too late, correct?

MR. GRADEN: Objection. Scope.

THE WITNESS: Again, I don't know what teachers or schools are assuming about whether or not teachers are spending time dealing with tiredness in class.

Page 191

BY MR. SANDOVAL-BUSHUR:

Q.    You just don't know?

A.    No, I don't know.

Q.    You are not offering the opinion that teachers spend more time dealing with students who are tired in class because they stayed up too late in a world with social media than they would have spent in a world without social media, correct?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  I'm offering no opinions related to the causality of social media on any outcome or a task of teacher time in schools.

BY MR. SANDOVAL-BUSHUR:

Q.    So, correct?

A.    Correct.

Q.    You are not offering the opinion that teachers spent more time dealing with students who are tired in class because they stayed up late because of social media, correct?

MR. GRADEN:  Again, asked and

CONFIDENTIAL

Page 192

answered.

THE WITNESS:  This is not the same question I just answered?

BY MR. SANDOVAL-BUSHUR:

Q.    If you think it's a simple correct, you're free to say it.

A.    Okay.  Correct, again, that's a causal question.  I did no causal analysis.

Q.    For decades, teachers have had to deal with student conflicts because of things that happened outside of class, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  I don't know exactly what teachers have had to deal with for decades.  Yeah, I don't know.

BY MR. SANDOVAL-BUSHUR:

Q.    You don't know if part of what teachers have had to do for many years is dealing with student conflicts because of things that happen outside of class?

MR. GRADEN:  Objection.

Scope.  Asked and answered.

THE WITNESS:  Perhaps they have.

BY MR. SANDOVAL-BUSHUR:

Q.    When a school makes a decision to hire a teacher to teach a class, the school understands that some of the time that the teacher is teaching will be spent dealing with student conflicts because of things that happen outside of class, correct?

MR. GRADEN:  Objection. Foundation.  Asked and answered. Scope.

THE WITNESS:  I don't know the specifics of what school districts hire teachers to do and I don't know the time frame over which they've hired them to do it.  I've done no analysis of anything related to the specifics of each teacher's actions during or what school districts assume each teacher will do over the course of their employment.

BY MR. SANDOVAL-BUSHUR:

Q.   You are not offering the opinion that teachers spend more time dealing with student conflicts because of the things that happen outside of class in a world with social media than they would have spent in a world without social media, correct?

MR. GRADEN:  Objection.  Form. Vague.

THE WITNESS:  I am offering no opinions on the causal -- of causal links between social media and whatever the specifics of this particular example are.

BY MR. SANDOVAL-BUSHUR:

Q.   So the answer is, correct?

A.   Correct.

Q.   You are not offering the opinion that teachers spend more time dealing with student conflicts relating to things that happen outside of class because of social media, correct?

MR. GRADEN:  Objection.  Asked and answered.

CONFIDENTIAL

Page 195

THE WITNESS:  I'm offering no opinions on causality, so correct.

BY MR. SANDOVAL-BUSHUR:

Q.    One of the job responsibilities of a teacher is to provide instruction and support relating to students' social and emotional needs, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  Again, I do not know the specifics for which all -- what is included and exactly what schools expect from teachers.

BY MR. SANDOVAL-BUSHUR:

Q.    You don't know that part of what teachers do and, actually, a very important part of what teachers do, is to provide instruction and support relating to students' social and emotional needs?

MR. GRADEN:  Objection. Foundation testimony.

THE WITNESS:  Sorry, so it's social and emotional --

Page 196

BY MR. SANDOVAL-BUSHUR:

Q.    Needs.

A.    Instruction related to social and emotional needs?

Q.    Yes.

A.    I mean, certainly, they address social and emotional things.  I don't know to what extent they're providing instruction related to them, but, certainly, yeah, teachers are concerned about students and making sure that they can learn.

Q.    One of the things that teachers do is to provide instruction and support relating to student social and emotional issues, correct?

A.    They could, they may.  I don't know if they all do.

Q.    Many -- that's commonplace, right?

MR. GRADEN:  Objection.

THE WITNESS:  I do not know the commonality of it.

BY MR. SANDOVAL-BUSHUR:

Q.    Okay.  When a school makes a

Page 197

decision to hire a teacher to teach a class, the school understands that some of the teacher's time will be spent providing instruction and support relating to students' social and emotional needs, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Again, I don't know if they assume that for every teacher they hire, I do not know that.

BY MR. SANDOVAL-BUSHUR:

Q.    And it was not part of your methodology in any way to compare what school districts expected teachers to do during a school day with what teachers actually did during a school day, correct?

A.    No, that's not my part of my -- what I needed to do to calculate the losses in my assignment.

Q.    And so if, from a school's perspective, teachers are spending their days doing exactly what the school expects and wants the teacher to be doing, that fact is immaterial to your damages

calculations in this case, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: I don't think we would be sitting here in a lawsuit if they weren't concerned about any changes in what teachers were doing.

BY MR. SANDOVAL-BUSHUR:

Q. That doesn't answer my question, Dr. Ward. If from a school's perspective, teachers are spending their days doing exactly what the school expects and wants the teacher to be doing, that fact is immaterial to your damages calculations in this case, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: You're making an assumption which is directly contradicted by the existence of the lawsuit, so I don't know how to answer that. You're asking me to assume something which I know to be false. So if you assume something that is obviously false, then I

CONFIDENTIAL

Page 199

guess you get a different answer, but --

BY MR. SANDOVAL-BUSHUR:

Q. You don't have any information about how any school district expects teachers to spend their workdays, correct?

MR. GRADEN: Objection. Vague.

THE WITNESS: I do not have any information about the time allocations that school districts expect for each teacher in their districts, no.

BY MR. SANDOVAL-BUSHUR:

Q. Or for teachers generally in the districts, correct?

A. Yes. No, I do not know the -- you know, I'm not sure that exists, but I don't -- to the extent that it does exist, I certainly don't know it.

Q. You are not offering the opinion that teachers spend more time providing instruction and support relating to students' social and emotional needs in

a world with social media than they would have spent in a world without social media, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  I'm making no opinions about causal links, so, no -- so, correct, I'm not doing that.

BY MR. SANDOVAL-BUSHUR:

Q.    You're not offering the opinion that teachers spent more time providing instructional support regarding students' social and emotional needs because of social media, correct?

A.    That's almost the same question, but, correct, I am not doing anything related to causality.

Q.    For decades, teachers have had to provide support to students with mental health challenges, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  Again, I don't know the time period over which

Page 201

they've done it. I don't know, you know, what you mean exactly by support, but I do know that they do deal with mental health issues, at least some people on staff do.

BY MR. SANDOVAL-BUSHUR:

Q. And school districts understand when they hire a teacher that some of that teacher's time is going to be spent dealing with mental health issues, correct?

MR. GRADEN: Objection. Scope.

THE WITNESS: That, I don't know. I don't know if, you know, they assume every teacher has it. I don't know if they're going to, you know, assume that that's mostly with others. I don't know. Specialists, counselors, I don't know.

BY MR. SANDOVAL-BUSHUR:

Q. Does a school district lose the time that a teacher spends dealing with students' mental health issues?

Page 202

MR. GRADEN: Objection. Vague.

THE WITNESS: There's an opportunity cost associated with it.

BY MR. SANDOVAL-BUSHUR:

Q. But schools -- well, I'll move on.

You're not offering the opinion that teachers spend more time providing support to students with mental health issues in a world with social media than they would have spent in a world without social media, correct?

A. I'm offering no opinions related to causality, so correct.

Q. You are not offering the opinions that teachers spent more time providing support to students with mental health challenges because of social media, correct?

A. Correct, I'm offering no opinions related to causality.

Q. One of the job responsibilities of many non-teacher school

Page 203

employees is to address student misbehavior, correct?

MR. GRADEN: Objection.

THE WITNESS: Sorry, say it again.

BY MR. SANDOVAL-BUSHUR:

Q. One of the job responsibilities of many non-teacher school employees is to address student misbehavior, correct?

A. I don't know if it's many, I know that it is certainly, you know, within the general purview of school district staff.

Q. Addressing student misbehavior has been a job function of many school district staff for decades, correct?

MR. GRADEN: Objection. Scope.

THE WITNESS: Again, I do not know the, you know, precise timing in here, but certainly it's, you know, part of the purview, generally speaking, of school district staff.

Page 204

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering the opinion that school employees spend more time dealing with student misbehavior in a world with social media than they would have spent in a world without social media, correct?

A.    Correct, I'm offering no opinions related to causality.

Q.    You are not offering the opinion that school employees spent more time dealing with student misbehavior because of social media, correct?

A.    Correct.  I'm making -- offering no opinions related to causality.

Q.    One of the job responsibilities of some non-teacher school employees is to provide support relating to student social and emotional needs, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  That is true.

BY MR. SANDOVAL-BUSHUR:

Q.    Providing support relating to

CONFIDENTIAL

Page 205

students' social and emotional needs has been a responsibility of certain non-teacher school employees for decades, correct?

MR. GRADEN:  Objection.

Scope.

THE WITNESS:  I think so.

BY MR. SANDOVAL-BUSHUR:

Q.    When a school district makes the decision to hire an employee like a counselor or psychologist, social worker, the school understands that some of the employee's time will be spent providing support relating to students' social and emotional needs, correct?

MR. GRADEN:  Objection.

Scope.  Asked and answered.

THE WITNESS:  They may assume that some of their employees deal with it.  I do not know if they assume that all of them will.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering the opinion that school employees spend more time providing support relating to

students' social and emotional needs in a world with social media than they would have spent in a world without social media, correct?

A.    Correct, I'm offering no opinions related to causality.

Q.    You are not offering the opinion that school employees spent more time providing instruction and support to students -- relating to students' social and emotional needs because of social media, correct?

A.    Correct. I'm offering no opinions related to causality.

Q.    And you are not offering the opinion that school employees spend more time providing support to students with mental health challenges in a world with social media than they would have spent in a world without social media, correct?

A.    Correct. I'm offering no opinions related to causality.

Q.    You are not offering the opinion that school employees spent more time providing support to students with

mental health challenges because of social media, correct?

A.    Correct.  I'm offering no opinions related to causality.

Q.    One way that a teacher may spend the time they are scheduled to be teaching a class is by proctoring a test, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Sorry, they may spend their time --

BY MR. SANDOVAL-BUSHUR:

Q.    Proctoring a test.

A.    That is one thing that a teacher could do during the school day.

Q.    If while proctoring a test a teacher sees a student engaging in unauthorized use of social media and spends time addressing that student's unauthorized use of social media, that time would be included in your damages estimate, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  I mean, I'm not

Page 208

sure on, again, the specific details. I'm relying on the affiants or the teachers in the survey to report time for at-issue conduct that's appropriate for me to use.

BY MR. SANDOVAL-BUSHUR:

Q. If teachers responding to the Klein teacher time survey included in their estimates the following example: The teacher is proctoring a test, the teacher sees a student engaging in unauthorized use of social media and spends time addressing that student's use of social media, that time would be included in your damages estimate, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: Again, you know, I have no opinions or knowledge of specifics. I am saying, look, the affiants or the teachers in the survey or Mr. Klein in his opinions regarding his survey, the time that they've provided to me is the time

at issue in this case. The details of it, that's not part of my assignment. I don't have opinions about the precise breakdowns or exactly what is or isn't included.

To me, it is reasonable to assume that we are part of a lawsuit, the affiants were instructed to, you know, provide sworn testimony under oath related as part of this lawsuit.

Mr. Klein, I don't know for sure, but I will assume he understood his assignment was to measure time at issue related to this lawsuit, so I'm assuming that what's in there is the stuff at issue. I do not have opinions about specifics.

BY MR. SANDOVAL-BUSHUR:

Q. Okay. That was not responsive to my question.

MR. GRADEN: I disagree.

BY MR. SANDOVAL-BUSHUR:

Q. I'm really trying to

Page 210

understand how your opportunity cost methodology applies in particular scenarios, so that is the import of my question. I have to ask about the specific examples of how teachers may spend their time in the school day in order to understand how your damages methodology applies to those examples. So when I'm asking this question, I am just asking you to assume that this time that is included in the estimates that you received.

MR. GRADEN: And Dr. Ward answered your question.

THE WITNESS: Okay. So you're assuming that this is at-issue conduct?

BY MR. SANDOVAL-BUSHUR:

Q.    We are assuming that it is time for which you are -- you are using in your calculation, in your damages calculation. So if we assume that time --

A.    Okay. So --

Q.    -- included in your damages calculations includes a teacher who is proctoring a test, sees a student engaging

Page 211

in unauthorized use of social media, and spends time addressing that student's unauthorized use of social media.

A.    Okay.

MR. GRADEN:   Is there a question?

BY MR. SANDOVAL-BUSHUR:

Q.    When the -- for purposes of your methodology, that time would be included in your damages calculation even though the teacher was spending that time proctoring the test doing exactly what the teacher was meant to be doing during that time; is that correct?

MR. GRADEN:   Objection. Vague.

THE WITNESS:   I mean, we stipulated that it's at-issue conduct, it's time at issue and is included in the time loss estimates.  So if it's included in the time loss estimate, then, yes, it's included in my estimate.

BY MR. SANDOVAL-BUSHUR:

Q.    Your opinion is that a school

Page 212

district should be able to recover damages for the amount of time a teacher spends addressing student social media-related misbehavior, even if in the absence of social media, the teacher would have still spent that time looking out for and addressing students' behavior, correct?

MR. GRADEN: Objection. Misstates opinion.

THE WITNESS: If it's time that was spent addressing at-issue conduct, it is relevant time for my calculation.

BY MR. SANDOVAL-BUSHUR:

Q. And so if it's an hour while a teacher is proctoring a test, they're going to spend that entire hour looking out for students who are cheating or misbehaving in some way, any portion of in time that is spent specifically on social media-related misbehavior is included in your damages calculation, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: They have opportunity costs associated with

Page 213

every choice that they make throughout the day. So there's an opportunity cost associated with dealing with this as opposed to paying attention to somebody else or whatever it might be, whatever else they may have been doing at the time. All choices of scarce resources impose opportunity costs. So, in this case, yeah, there is an opportunity cost associated with that particular example.

BY MR. SANDOVAL-BUSHUR:

Q. So if there's an hour while a teacher is proctoring a test, they're going to spend that entire hour looking out for students who are cheating or misbehaving in some way, any portion of that time that the teacher spends specifically addressing a student's social media-related misbehavior is included in your damages calculation, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: Assuming it's

Page 214

included in the time loss calculations, yeah, there's an opportunity cost associated with that time and effort.

BY MR. SANDOVAL-BUSHUR:

Q.    If the time that a district employee spends disciplining a student for posting a video of a fight on social media is included in the time estimates that you rely on for your damages calculations, you would include that time in your damages estimate regardless of how the district employee would have spent his or her time if he or she was not addressing the student posting the video of the fight on social media, correct?

MR. GRADEN:  Object.  Form. Vague.

THE WITNESS:  Yes, all choices to allocate scarce time and effort impose opportunity costs.  So there's an opportunity cost here, assuming it's included in the time loss estimates, it is -- there's an opportunity cost.

CONFIDENTIAL

Page 215

BY MR. SANDOVAL-BUSHUR:

Q.    And from your perspective, that is true even if had the district employee not spent that time disciplining the student, the district employee spent that time socializing with coworkers, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Yup.  There's an opportunity cost.  You know, what matters is there's time at issue and when you go through the process of valuing or costing out initiatives or programs in education, you just say what's the time at issue?  What's the value of that time?  It's what they got paid.  They got paid their wage and salary for that time, so there's an opportunity cost and it's valued at their wage and benefits.

BY MR. SANDOVAL-BUSHUR:

Q.    Your opinion is that time that district employees spend addressing

Page 216

issues relating to student use of social media is an opportunity cost and properly included in your damages estimates, even if in the absence of addressing that student social media issue, the teacher instead surfed the internet --

MR. GRADEN:  Objection. Vague.

MR. SANDOVAL-BUSHUR:  -- correct?

THE WITNESS:  Whatever the teacher does, right, during, while they're getting paid, that's what they get paid to do.  And so when you shift it from one thing to another like you incurred a cost as the district, right?  And, you know, I think there's something lurking in your -- in these examples that somehow they're valueless.  Well, surfing the internet could be quite valuable. Maybe I'm learning about a new assignment or a new way to teach or how to deal with some issue, right?

Page 217

So, you know, you're trying to posit that there's some way to judge or value each action that teachers do and that should change how I value the time. That's not how we do it in education when we're costing things. We just say how much time, what are wages and benefits.

BY MR. SANDOVAL-BUSHUR:

Q. Even if the time that a school district employee spends addresses student use of social media is more valuable than the time that the school district employee would have spent in the absence of dealing with the student social media use, your opinion is that the time spent addressing the student's social media use is an opportunity cost and properly considered part of damages, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: I'm sorry, what do you mean by, "time more valuable?" I'm confused.

Page 218

BY MR. SANDOVAL-BUSHUR:

Q. Where you were just talking about -- you said surfing the internet can be quite valuable.

A. Okay.

Q. So you have an understanding that time that teachers spend can be valuable and talked about in terms of value, correct?

A. Sure, I mean, you know, again, in terms of social output, we're talking about value, right? Again, this is back to that discussion earlier, right, like, we're not measuring output of each action that teachers do. Pretty much, actually, it's impossible to do that. All right? So we can't sit there and say, well, here's the output and here's the value of that output for every possible choice that teachers do. It's just not feasible, even if we wanted to, right? Because to be honest, we don't know the value of what teachers do, in fact, we don't know it for decades until we see what the kids that they're teaching grow up to

Page 219

be, right?  So we don't worry about output or specific value of that output when we're trying to cost education programs.  It's simply not feasible.

All right.  So what we do instead, which is also perfectly reasonable and a fair understanding of opportunity costs, is to say what's the value of the resource at issue, the time the teacher spends.  And each unit of teacher time, they don't get paid differently for each unit of teacher time, right?  There's not, like, oh, you did this, here's this amount of money, here's this, you get that amount of money.  No, they get paid their wage and salary for all of the minutes that they spend, right?  So the value of the resource at issue, teacher time, is their wages and benefits.

So that's what we're doing.  We're just saying, look, there is time and effort that were diverted due to social media, whatever it is, whatever it amounts to, it doesn't matter what they would have done in the absence of it, right, they

CONFIDENTIAL

Page 220

would have done something.  And what would we have paid them for that something, their wages and benefits.

Q.    If a principal spends 20 minutes disciplining a student for posting something mean about another student on a social media platform and that time was included in the damages estimates or the time estimates that you rely on, that 20 minutes would be included in your damages estimates, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I think we've done so by definition.

BY MR. SANDOVAL-BUSHUR:

Q.    I want you to assume that if the principal had not spent that 20 minutes disciplining the student, the principal would have instead done required paperwork during that period.  Because the principal spent the 20 minutes on student discipline, however, the principal works an extra 20 minutes at the end of the day to finish the paperwork.  The principal does not earn any

CONFIDENTIAL

Page 221

overtime, he just works 20 more minutes than he otherwise would have.  In your opinion, is there an opportunity cost in that scenario?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. SANDOVAL-BUSHUR:

Q.    And what is the proper measure of that opportunity cost?

A.    Look, again, there was time and effort expended, right, and we value that time at the hourly wage.

Q.    Even if the time and effort expended addressing the social media-related issue does not reduce the total amount of work that the school employee does in the course of the day --

MR. GRADEN:  Objection.  Foundation.

MR. SANDOVAL-BUSHUR:  -- is that correct?

THE WITNESS:  I mean, resources are scarce, when you put something to something, there's by definition something doesn't get

Page 222

done and it's valued at the wage.

BY MR. SANDOVAL-BUSHUR:

Q.      I want you -- I mean, you're kind of fighting my hypothetical, because in my hypothetical, there is not something that does not get done, right?  Do you want me to read it again?

A.      There's always something that doesn't get done, so I can't agree to the construct of your hypothetical --

Q.      Well, my --

A.      -- because it's, you know, yeah, maybe today they put the extra 20 minutes in and got it done because there was a deadline, but tomorrow they were tired, so they got 20 minutes less work done.  So on net, it's going to show up somewhere, right?  So, you know, it's not, like, you can just say, oh, well, the only -- the parameters of understanding opportunity costs are only like some sort of immediate linkage, right?  Time and effort are finite, right?  And anything that takes from one use means something else doesn't get done.  And, cumulatively,

Page 223

over the course of whatever amount of time, it's going to balance out, unless somehow social media makes teachers and principals somehow more productive that they get more done, but that's, you know, again, that doesn't seem relevant to this particular calculation, right?  Again, the way we calculate it is to say, look, there's time and effort that was spent on something that imposes a cost.  And there's a value on that cost.  It's the wages and benefits.

Q.    Your opinion is that a school district may seek damages for time that an employee spends addressing an issue relating to social media even if the employee spending time addressing that issue does not negatively affect the employee's ability to complete all of their responsibilities of their job?

MR. GRADEN:  Objection.  Misstates opinion.

THE WITNESS:  My opinion is is that people don't like to work for free, right?  So your hypothetical essentially is requiring that the

Page 224

principal is going to fully absorb the costs of this social media thing and do so in perpetuity, right?  So they'll just keep absorbing, they'll keep working, staying late, they'll keep working extra hours, right, and at no point will they go to their manager and say, I'm working too many hours, I want more money or I'm just going to stop working the same amount. There's always a push and pull, right?  Like, again, you can try and construct an unrealistic hypothetical that imagines that somehow there's no cost, but there's always a cost.  Economists, there's always a cost.  It's, like, literally day one of principles of economics.  Anything that has scarce resources imposes costs.

BY MR. SANDOVAL-BUSHUR:

Q.    The cost may not be imposed on the school district though?

MR. GRADEN:  Objection.

Page 225

Vague.

THE WITNESS:  No, I'm saying it eventually, it will -- it shows up somewhere in the school district, right?  Like, the employee is essentially part of the district.  If they're absorbing those costs, the district is absorbing those costs, because that employee is going to be more tired or maybe they're going to be more angry, maybe they'll ask for more money eventually.  Like, it's all part of the system of the district, right?  Like, the district isn't some other entity, right?  They're incurring those 20 minutes of cost.  It's part of the district.

BY MR. SANDOVAL-BUSHUR:

Q.    It was not part of your assignment in this case to determine how school employees would have spent time differently in the absence of social media, correct?

A.    That was not my assignment.

Page 226

Q.    It was not part of your assignment in this case to determine how school employees would have spent time differently in the absence of the conduct for which Plaintiffs seek to hold Defendants liable, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  That's the same question, but, no, that was not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.    It was not part of your assignment to identify what specific opportunities school employees gave up when they spent time addressing social media, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  As we've discussed, I don't even think that's possible.

BY MR. SANDOVAL-BUSHUR:

Q.    For purposes of your opinions, it did not matter what school employees would have been doing if they had

not been addressing student use of social media, you calculate damages for all of the time that employees reported addressing student use of social media, correct?

A. I'm not using an output standard. I am measuring the value of the input.

Q. And so the answer to my question is, correct?

A. I interpret that to be an output standard and I'm not doing that, so correct.

Q. And for purposes of your opinion, it did not matter if some of the time that school district employees spent addressing social media issues would otherwise have been spent on tasks that did not benefit the students, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: Sorry, say it again.

BY MR. SANDOVAL-BUSHUR:

Q. For purposes of your opinion, it did not matter if some of the time that

CONFIDENTIAL

Page 228

school district employees spent addressing social media issues would otherwise have been spent on tasks that did not benefit students, correct?

A.    Correct.  Just because it's not spent benefiting students doesn't mean that it's not part of their job or some part of what they do during the day.

Q.    And it is entirely possible that in a world without social media, all of the time that teachers have spent addressing unauthorized student use of social media would have been spent instead addressing other student misbehavior, correct?

MR. GRADEN:  Objection. Vague.  Scope.

THE WITNESS:  I have no idea what would have happened in the world without social media.  Again, that's a causal question that I have not been asked to address.

BY MR. SANDOVAL-BUSHUR:

Q.    It is entirely possible that in a world without social media, the time

that school employees spent addressing students who bully each other on social media would have instead been spent addressing students who bullied each other by text message or face to face, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: Again, this is the same question. You're asking me about, like, what would have happened in the world without social media, I have no sense of what that would be. I have not done any analysis of that. So I do not know whether or not it's possible, probable, anything of that sort.

BY MR. SANDOVAL-BUSHUR:

Q. Some of the time that school employees spent addressing social media issues might have been used to teach students about digital citizenship, online safety, social emotional skills, or responsible technology use, correct?

MR. GRADEN: Objection. Form.

Page 230

Foundation.

THE WITNESS:  Sorry, what was the first part of the question?

BY MR. SANDOVAL-BUSHUR:

Q.    Some of the time that school employees spent addressing social media issues might have been used to teach students about digital citizenship, online safety, social emotional skills, or responsible technology use, correct?

MR. GRADEN:  Same objection.

THE WITNESS:  It's possible, I don't know what they would have -- what they would have done with the time.  Again, that's not -- we just talked about that's not part of what my assignment was.

BY MR. SANDOVAL-BUSHUR:

Q.    You would agree that time spent by school employees teaching students about digital citizenship, online safety, social emotional skills, or responsible technology use can be beneficial to students, correct?

MR. GRADEN:  Objection.

Page 231

Scope.

THE WITNESS:  Assuming it's beneficial to students, yeah, it could be.

BY MR. SANDOVAL-BUSHUR:

Q.    In estimating damages, you did not attempt to distinguish between social media-related disciplinary time spent by school employees and time spent by employees teaching students about digital citizenship, online safety, social emotional skills, or responsible technology use, correct?

MR. GRADEN:  Objection.  Form. Foundation.

THE WITNESS:  Again, this seems to be an estimate of time loss question, which as we've discussed an ad nauseam was not part of my assignment.  I believe that, you know, the affiants and the survey include the relevant time for the -- for calculating damages in this matter.

BY MR. SANDOVAL-BUSHUR:

Q.    And so the answer is, correct?

MR. GRADEN:  Asked and answered.

THE WITNESS:  Correct.

BY MR. SANDOVAL-BUSHUR:

Q.    What benefits do school districts offer their employees?

A.    Like employee benefits?

Q.    Correct.

A.    Typically, you're going to get health insurance, retirement, and then it becomes a real hodgepodge of district by district what kind of additional kind of benefits and perks you get.

Q.    Why do school districts offer benefits to their employees?

MR. GRADEN:  Objection, scope.

THE WITNESS:  It's part of compensation.  It's a different way of providing compensation.  Some of it has to do with their tax treatment benefits.  Some of it has to do with employee preferences.

Page 233

BY MR. SANDOVAL-BUSHUR:

Q.    Do the benefits that school districts offer employees depend on how the employees spend their time during the workday?

A.    Not that I'm aware of, I think they're, like, salary, right, you get them based on whatever your position is.

Q.    If a school district employee spends time during the workday addressing student use of social media, does that in any way change the amount of money that a school district spends on providing benefits to that employee?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Not that I'm aware of, no.

BY MR. SANDOVAL-BUSHUR:

Q.    You're not offering the opinion that any school district spent more money on employee benefits because of social media, correct?

MR. GRADEN:  Objection. Vague.

Page 234

THE WITNESS:  No, that's a causal question.  I'm not answering any causal questions.

BY MR. SANDOVAL-BUSHUR:

Q.    You are not offering the opinion that any school district lost the value of any employee benefits because of social media, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Well, it's a causal question.  No, I'm offering no opinions that relate to causality.

Since we're starting a new topic, can I pause for just one minute, I have got to go to the bathroom?

MR. SANDOVAL-BUSHUR:  Sure.

THE VIDEOGRAPHER:  Going off video record 1:54 p.m.

- - - - -

(A recess was taken at this time.)

- - - - -

THE VIDEOGRAPHER:  Back on

Page 235

video record 2:10 p.m.

BY MR. SANDOVAL-BUSHUR:

Q.      Dr. Ward, you present your damages estimates separately for salaries and for salaries plus benefits, correct?

A.      That's correct.

Q.      Why do you do that?

A.      That's a good question.  I think it's a habit that comes from other times of calculations when I do salaries, I usually just have salaries and salaries plus benefits.

Q.      Are you aware of any reason why benefits should not be included in an opportunity cost calculation?

A.      No, the literature that I cite is pretty clear that it's wages and benefits that are relevant.

Q.      Literally ever activity that a teacher spends time on has an opportunity cost, correct?

A.      That is true.

Q.      So time that a teacher spends grading papers has an opportunity cost, right?

Page 236

A.    Yup.

Q.    And if you were going to calculate the opportunity cost of teachers grading papers, would you do the same thing essentially that you have done in this case, which is, you would calculate teachers' salaries and benefits, then identify using a survey or other data what portion of a teacher's time is spent grading papers and then multiply the salaries and benefits by that portion of time spent grading papers to arrive at the opportunity cost?

A.    That's correct.

Q.    So the fact that something has an opportunity cost does not mean that it is damages, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Not necessarily, no.

BY MR. SANDOVAL-BUSHUR:

Q.    You understand that it is a question for the court or the jury to decide whether the opportunity costs that you have calculated in this case are

Page 237

actually damages, correct?

A.    I think that's what they're for.

Q.    Are there any limitations associated with relying on the Klein teacher time survey for purposes of your damages estimates?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Mr. Klein provided time estimates that were use useful for me in my calculation.  I can't think of any specific limitation off the top of my head.

BY MR. SANDOVAL-BUSHUR:

Q.    If you were going to publish your damages estimates in a peer-reviewed journal, would you identify any limitations relating to your reliance on the Klein teacher time survey?

A.    I'm not sure I would ever publish this in a peer-reviewed journal, it's not that interesting.  I mean, you would probably put in the standard

discussion of limitations of any survey.

Q.    And what are those limitations?

A.    Oh, you know, just how -- how precise is the data, so how large is the sample.  You would -- might talk about the, you know, whatever validity of the survey or the survey methodology, you know, whatever the usual things are that you do when you put in -- publish some form of survey estimate.

Q.    Any other limitations you would identify?

A.    I mean, I don't -- I'm not usually the one who is doing published estimates of original surveys, so I can only kind of speak generally.

Q.    Do you hold yourself out as an expert in survey design?

A.    No.

Q.    There are downsides to relying on self-reported data, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  I guess there

Page 239

can be, there's --

BY MR. SANDOVAL-BUSHUR:

Q.      Self-reported data can be inaccurate, correct?

A.      All data can be inaccurate.

Q.      What are some of the reasons why self-reported data specifically can be inaccurate?

MR. GRADEN:  Objection. Foundation.  Vague.

THE WITNESS:  I mean, if you don't report whatever you're being asked accurately.

BY MR. SANDOVAL-BUSHUR:

Q.      And are you familiar with the term, "response bias"?

A.      I think I've heard the term. I couldn't define it for you.

Q.      Are you familiar with the idea that a potential limitation of self-reported data is that the respondents may provide responses that are in line with what they think they are expected to say in responding to the questions?

MR. GRADEN:  Objection.

Foundation.

THE WITNESS:  I know that's some issue that survey expert-type people like to worry about.

BY MR. SANDOVAL-BUSHUR:

Q.    Did you consider that issue in forming your opinions in this case?

A.    No, that's the type of technical thing that I'm relying on Mr. Klein to deal with.

Q.    Is your reliance on self-reported data for your damages estimate a limitation on your reliability of your damages estimates?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  I mean, any data you rely on likely have some form of limitation.  So what exactly what was the limitation you're worrying about here?

BY MR. SANDOVAL-BUSHUR:

Q.    Lack of reliability of self-reported data.

A.    I have no basis to assume

Page 241

that this data is unreliable.

Q.    And you have no reason to think that it's reliable either?

MR. GRADEN:  Objection.

THE WITNESS:  I'm assuming that Mr. Klein, because he has been doing surveys for a long time, understands how to do a survey that should produce reliable data.

BY MR. SANDOVAL-BUSHUR:

Q.    But that's your assumption, it's not something that you did or could validate, correct?

A.    I have --

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Yeah, I have no ability to validate, no expertise to even offer an opinion on the precise questions that Mr. Klein has used here.

BY MR. SANDOVAL-BUSHUR:

Q.    When relying on the results of a survey of a population, are there any guidelines regarding how many survey responses are necessary in order for the

Page 242

results to be reliable?

MR. GRADEN:  Objection.
Scope.

THE WITNESS:  No.

BY MR. SANDOVAL-BUSHUR:

Q.    So if a survey has one response, is that enough to be reliable?

A.    I mean, the size of the survey affects the precision of the estimate.  But it doesn't inherently suggest that the information provided is unreliable.  It just means that it's drawn from a smaller sample, so you should think of it as likely less precise.

Q.    If a survey has a small number of responses, does that limit your ability to draw conclusions about the application of that small number of responses across a broader population?

A.    It limits the precision of the estimate, but it doesn't limit the -- it doesn't suggest that it's biased inherently.  Small samples aren't inherently biased, right?  So the average in a small sample isn't inherently

Page 243

different from, you know, from the true average than the average in a large sample.

The difference between small and large samples is just with a large sample, I can trust the estimate, you know, is more precise, right, the confidence interval around it is narrower, because I have more observations.

With a small sample, there's no reason to think that the small sample is providing you a biased answer, but you should assume that the precision of the estimate is -- is smaller or is less precise. That's what small samples do and that's why I put confidence intervals in my calculations so that I'm accounting for sample size in those ways.

Q. In your professional work outside of litigation, have you ever determined that a survey question had too few responses to be reliable?

A. Never had occasion to.

Q. Are there any particular downsides associated with relying on a small sample size when you are ultimately

CONFIDENTIAL

Page 244

relying on the mean of the responses?

MR. GRADEN:  Objection.

THE WITNESS:  Just for the, you know, the precision issue that I discussed earlier, but that's why you use a confidence interval because that helps you convey that precision.

BY MR. SANDOVAL-BUSHUR:

Q.    When you rely on a small sample size, there is a greater risk that the mean of the results could be biased by outlier responses, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  It's -- that's what we mean by that precision being wider.

BY MR. SANDOVAL-BUSHUR:

Q.    But that's correct?

A.    Say it again.

Q.    When you rely on a small sample size, there is a greater risk that the mean of the results could be biased by outlier responses, correct?

A.      Yeah, they're influencing the mean by more, so you may end up further from the true mean than if you had a larger sample.

Q.      You did not take any steps to determine that the mean of the responses to Klein's teacher time survey was not biased by outlier responses, correct?

A.      If there's outliers in the data, I, actually, I have no problem with them being there, because it's part of the distribution which is relevant for calculating damages.

Q.      You did not take any steps to determine that the mean of the responses to the Klein teacher time survey was not biased by outlier responses, correct?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  If there -- you know, I am not concerned about outliers in the data, because there can be true outliers in the real world, right?  And so to the extent that there are people who deal

Page 246

with -- spend more time dealing with social media, I'm fine with that information being included. You know, unless it's an obvious outlier, it's an error, just because somebody is seven foot four doesn't mean that they are not part of something that I would want to include if I calculated the mean height of the people in the room.

BY MR. SANDOVAL-BUSHUR:

Q.    When relying on the results of a survey of a population, are there any guidelines regarding what response rate is necessary in order for the results to be reliable?

A.    I have no idea.

Q.    In your professional work outside of litigation, have you ever determined that a survey question had too low of a response rate to be reliable?

A.    Never been part of what I do.

Q.    You did not calculate the response rate for any of the Klein teacher time surveys, correct?

Page 247

A.    That is correct.

Q.    And offering your damages estimates based on the Klein teacher time survey responses, you did not consider what the response rate was, correct?

A.    Correct.  I'm assuming that Mr. Klein has provided me with data that's sufficient for what I'm trying to do.

Q.    Is it your understanding that it was part of Mr. Klein's assignment in this case to determine that the results of his survey had an appropriate response rate?

A.    I don't know what specifically, but I assumed that Mr. Klein -- part of Mr. Klein's assignment was to provide me with information that satisfied, you know, his opinion as an expert in survey design that it would provide me, the person downstream from him, with a usable estimate for the purposes of my calculation.

Q.    And so if Mr. Klein had given you a survey that had results for -- results based on only one teacher response,

Page 248

you would have still relied on that; is that right?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I mean, again, you know, assuming that he's okay with that, if he says that, yup, one is appropriate.  I don't know about one, but if he's, like, yeah, this is -- for this population, one is a reasonable estimate, then, yeah, I'm going to trust him, because that's his role, right? I'm downstream and I'm, like, great, if you -- if you believe that this is an appropriate estimate for me to use, I'm going to use it.  And if he said -- felt that some of his results were not sufficiently reliable for me, I assume he would have made some note in his report that I don't think these are sufficiently reliable to be used.

Page 249

BY MR. SANDOVAL-BUSHUR:

Q.    Do you know that Mr. Klein, in fact, believes that the results of his survey are sufficient for your use in a damages calculation?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Again, I'm assuming that based on the fact that that's what was provided to me and there was no indication that he had any hesitation about providing these results to me.

BY MR. SANDOVAL-BUSHUR:

Q.    I understand what you say you're assuming, but do you personally actually know that Mr. Klein in fact believes that the results of his survey are sufficient for your use in a damages calculation?

MR. GRADEN:  Objection. Asked and answered.

THE WITNESS:  I have not specifically asked him that question.

Page 250

BY MR. SANDOVAL-BUSHUR:

Q.    Nor has he provided you with that specific information, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Well, you know, I mean, he has provided a report, all of the means that are in -- I used in my report are reported in his report.  I recall no indication of him saying you shouldn't use this for the purposes of the damages calculation that I was hired to do this assignment for as part of.

BY MR. SANDOVAL-BUSHUR:

Q.    That's an assumption that you are reaching in connection with reading Mr. Klein's report, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  It's an assumption that I'm making based on all of the reasons that I've laid out over the last several

Page 251

questions.

BY MR. SANDOVAL-BUSHUR:

Q.    And so you personally in offering your damages estimates, based on the Klein teacher time survey responses, did not consider whether the response rate was sufficiently high to make the results reliable?

MR. GRADEN:  Objection.

MR. SANDOVAL-BUSHUR:  Correct?

MR. GRADEN:  Objection. Misstates testimony.

THE WITNESS:  I assumed that the information that Mr. Klein provided me was sufficient for my use.  I did not make any determination based on response rates or any other technical survey matter.

BY MR. SANDOVAL-BUSHUR:

Q.    What is nonresponse bias?

A.    I couldn't give you a definition off the top of my head.

Q.    Are you aware that nonresponse bias is when people who decline

Page 252

to complete a survey are systematically different from those who participate in the survey?

A.    Sure.  That sounds like nonresponse bias.

Q.    And you did not do anything to determine whether there was nonresponse bias in Klein's survey, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Again, I trusted Mr. Klein to address all of the potential biases that the survey expert-type people, you know, usually like to consider when they go through and design and implement a survey.

BY MR. SANDOVAL-BUSHUR:

Q.    You personally did not do anything to determine whether there was nonresponse bias in Klein's survey, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  It was not part of my assignment.

CONFIDENTIAL

Page 253

BY MR. SANDOVAL-BUSHUR:

Q.    And you didn't do that?

A.    I didn't do it.

Q.    You do not -- let me ask the question again, sorry.

You did not do anything to determine whether the teachers who completed Klein's survey are in any way systematically different from the teachers who did not participate in his survey, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I did not do that.

BY MR. SANDOVAL-BUSHUR:

Q.    For the results of the Klein teacher time survey, you present the upper and lower bounds of the 95 percent confidence interval for each of the time estimates that you rely on, correct?

A.    Correct.

Q.    The confidence interval can also be called the margin of error; is that right?

CONFIDENTIAL

Page 254

A.    Yeah.  Yeah, it's the same basic idea.

Q.    The confidence interval or margin of error does not account for all of the potential sources of inaccuracy or bias in survey results, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  No, it's a measure of precision, as opposed to bias is a measure of accuracy.

BY MR. SANDOVAL-BUSHUR:

Q.    The confidence interval or margin of error does not account for inaccuracy that results from questions being poorly worded, correct?

A.    You're giving me a little bit of a problem there, right, because, you know, you have to -- we have to make some assumptions about what are we talking about when we're saying inaccuracy?  What are we measuring and why is it inaccurate?

Q.    Well, the Klein teacher time survey is attempting to measure the amount of time that teachers spend addressing issues relating to student use of social

media, correct?

A.   Yes.

Q.   So if we use as the measure of accuracy the actual mean time that teachers spend addressing student use of social media, is that acceptable?

A.   Yes.  So there's some true measure and then we have some agreed-upon thing that we're measuring and we have some notion of, we don't observe it, but this is the truth.

Q.   Correct.

A.   Okay.

Q.   The confidence interval or margin of error does not account for inaccuracy that results from questions being poorly worded, correct?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  Okay.  So if you assume that there is inaccuracy in -- or poorly worded questions have caused inaccuracy, right, so that the measure that you're getting from the survey is

Page 256

systematically different than the true measure that we postulated, no, the confidence interval does not, you know, tell you anything about that bias.

BY MR. SANDOVAL-BUSHUR:

Q.    The confidence interval or margin of error does not account for inaccuracy that results from respondents providing responses that are inaccurate because, for example, they misremember the information they are reporting, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Sorry, say it again.

BY MR. SANDOVAL-BUSHUR:

Q.    Yeah.  The confidence interval or margin of error does not account for inaccuracy that results from respondents providing responses that are inaccurate because, for example, the respondents misremember the information they are providing, correct?

A.    Okay.  So in this case, the last time it was, you know, you think the

Page 257

question was poorly worded and that's what's introducing bias. And now you're saying that the respondent is just answering inaccurately. No, it's not -- it's not, again, it's a measure, it's about precision, it's sample size and, you know, how much variance is there in the data, you know. So that's, like, the way you teach it, right, is think of a bow and arrow and a target, right? So confidence interval speaks to how many -- how big is the target and, you know, oh, we're really hitting the bull's-eye, and, you know, we're all clustered right around the bull's-eye, right? But we may be, you know, above or below or whatever it is, right?

Accuracy is about how close are we hitting the bull's-eye, right? And so the confidence interval helps us understand distribution based on mostly sample size, but also variation that we observe in the data, right, known as a standard deviation.

Whereas bias, things that could bias, right, those are biases and the

CONFIDENTIAL

Page 258

confidence interval doesn't magically make bias go away.  That doesn't mean that the bias answer might not lay within the confidence interval, it could, right, but there's nothing that's inherent in the confidence interval that is speaking to bias.

Q.    One thing that can bias survey results is people providing inaccurate responses because they misremember the truth of the information they're providing, correct?

A.    If people don't answer the survey accuracy -- and it's systematic, right, you know, it doesn't have to be biased.  It could just be noise, right, if I misremember high and you misremember low, it doesn't mean that the mean is now inaccurate.  We have to -- what we have to measure is bias, right?  We have to say people systematically over or underrepresent for the mean to be wrong.

Q.    Okay.  If there is bias in a survey because the survey respondents systematically in the same direction

CONFIDENTIAL

Page 259

misremember, misreport information on the survey, that bias is not accounted for or included in the confidence interval or margin of error, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: No, again, that's speaking to the accuracy of the mean. You know, again, it doesn't mean it's outside the confidence interval, but, you know, it's not -- it's a bias.

BY MR. SANDOVAL-BUSHUR:

Q. And just so that the record is clear, the confidence interval or margin of error does not include or account for that type of bias we were just talking about?

MR. GRADEN: Objection. Form.

THE WITNESS: It does correct bias.

BY MR. SANDOVAL-BUSHUR:

Q. Okay. And you understand that survey respondents often misremember and misreport information in response to surveys, correct?

Page 260

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I mean, it can happen.

BY MR. SANDOVAL-BUSHUR:

Q.    Yeah.  So, for example --

A.    I don't know how often it happens.

Q.    For example, it's a well-known phenomenon that in election surveys, people often misremember who they voted for in the prior presidential election, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I mean, what do you mean by, "often"?

BY MR. SANDOVAL-BUSHUR:

Q.    Are you aware that in election surveys people misremember who they voted for in the previous presidential election?

A.    Yeah, there's some evidence of that.

Q.    And people tend to report

CONFIDENTIAL

Page 261

that they voted for the person who actually won the election more so than people actually who voted for that person in reality, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I don't know which direction the misremembering goes.

BY MR. SANDOVAL-BUSHUR:

Q.    And are you also aware that in election surveys, people misremember whether they voted at all in previous elections?

A.    I'm sure, you know, there's a potential margin of error of that nature in all election surveys, yeah.  Yeah, I think that happens.

Q.    The confidence interval or margin of error does not account for inaccuracy that results from nonresponse bias, correct?

A.    Again, to the extent that you're talking about something that introduces true bias, you know, so it

Page 262

causes a deviation in the measurement from the true, no, there's no -- confidence interval does not correct for bias.

Q.      And the confidence interval is not designed to nor could it correct for bias, correct?

A.      No, that's not what it's used for.

Q.      You write in your reports, "I assume that Mr. Klein's results for the typical day provide a reasonable approximation of time lost during the average instructional day;" is that right?

A.      Yup.

Q.      What do you mean when you say you, "assume that Mr. Klein's results for the typical day provide a reasonable approximation of time lost during the average instructional day"?

A.      So when you see questions that are asking about time, right, like, they don't use mathematical terms, like, what do you do on the average day, right? They typically use something like usual or typical, right? And so the assumption is

Page 263

is that the person is summarizing, you know, the center of their time distribution, right, or something, you know, approximating, you know, the, you know, the common middle or whatever, if you think about a distribution of potential days. And so I assumed that when we see typical, that we're going to assume that that means average.

Q. Is it possible that that assumption is not correct, that -- and that in fact, the information provided about a typical day does not represent the average instructional day?

A. It should be pretty close. You know, again, I don't have any basis to evaluate and so I don't have -- I can't go to some, you know, complete measure of each person's actual time use and then say, when we ask you about your typical day in the context, does it match the true distribution of your observed actual time? I can't do that. But it's pretty common in my world when you see usual or typical to make the inference that when somebody says

they usually work 40 hours a week, they're meaning that they work 40 hours a week on average.

Q.    And so I understand this distinction between typical and average. In the example you just gave, someone may say in the typical week, I work 40 hours a week, because that's what I work 80 percent of weeks.  But if you actually drill down and accounted for holidays and vacations, the person's average workweek is in fact less than 40 hours?

A.    Or more.  You know, usually we don't put holidays and vacations in, because we ask you about non-holiday weeks, but, like, if you're saying, yeah, if we wanted to include that in the measure, then, yeah, you want some sense of the full distribution, right?  Sometimes I work 43, sometimes I work 37, right, but, typically, I say 40, right.

Q.    And so in this case, when Mr. Klein asked teachers how much time they spend in their typical day, your hypothesis is that the teacher is probably responding

Page 265

in relation to the usual school day where they're just teaching classes and it is not relating to something like a day where there's a field trip, for example?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Yeah, they're trying to get to some, you know, the measure of central tendency, right?  Like, you know, the thing that, you know, if you imagine a distribution of time, right, you know, probably looks something like a bell curve, right, my assumption is that they're getting somewhere in the middle of that.

BY MR. SANDOVAL-BUSHUR:

Q.    And you are not offering the opinion that Klein's survey results for the typical day in fact provide a correct approximation of the time lost in the average instructional day, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I mean, we don't have the data to, in fact, prove that.  I'm just doing what's

typical and common when you have questions about typical or usual time to assume that it's a reasonable approximation for the average.

BY MR. SANDOVAL-BUSHUR:

Q.     Are you offering the opinion that Klein's survey results for the typical day in fact provide a correct approximation of the time lost in the average instructional day?

A.     Say that again.

Q.     Are you in fact -- sorry, let me start that again.

Are you offering the opinion that Klein's survey results for the typical day in fact provide a correct approximation of the time lost in the average instructional day?

A.     That's what I'm assuming, yes.

Q.     It's an assumption you're offering?

A.     Yes.

Q.     The Klein teacher time survey

Page 267

required teachers to estimate how much time they spent in a typical day addressing student use of social media going back one year, four years, five years, and ten years, correct?

MR. GRADEN: Objection. Form.

THE WITNESS: Correct.

BY MR. SANDOVAL-BUSHUR:

Q. You are not offering an opinion on whether it's possible for survey respondents to accurately estimate how much time they spent addressing student use of social media in a typical day going back years before taking the survey, correct?

A. That's Mr. Klein's opinion. I'm relying on him to -- I'm relying on his expertise to have designed the survey so that those are accurate, reliable data points.

Q. And you yourself are not offering the opinion that it is possible for survey respondents to accurately estimate how much time they spent addressing student use of social media in a typical day going back years before taking

Page 268

the survey, correct?

A.    I am not offering that specific opinion as part of my reports.

Q.    Have you ever previously used someone's estimate of how much time they spent on an activity years before providing the estimate?

A.    Yes.

Q.    In what context?

A.    So kind of graduate school to my post-doc, I worked on this thing called the Harvard and Beyond study and we asked questions retrospectively to people who graduated from Harvard or Radcliffe from, like, four-year increments from 1969 to maybe 2000 -- or maybe 1992, I can't remember. All right. And in that survey we asked people questions about what they did while they were in college. We asked questions about how many hours they worked when they first got out of college. So, yeah, I've certainly used questions that ask people about time use over very long periods.

Q.    So you asked people to report

Page 269

how many -- you asked people at one point in time to report based on how much time they spent working years before taking the survey?

A.    Yes, so taking a survey in 2006, we were asking them at the oldest cohorts to effectively describe things that were happening in 1969 or '70.

Q.    And what specific time estimates were you asking people to provide?

A.    Oh, so I know that we asked them about how many hours they worked and what jobs they had.  If you had kids at some point, like, we would ask what year did you have a kid, and we would ask similar questions about work and change in work.  But I also think we asked questions about, if not the precise value, the distribution of housework in the household at that time.  We asked questions about activity participation while in college. You know, I can't remember everything that we asked in that survey, but --

Q.    When you asked about work

Page 270

time, you asked for a total number of hours worked per week?

A.    Usual hours worked per week.

Q.    Did you ask for any more granular information about how people spent their workdays?

A.    Not in that survey that I recall.  Maybe it's in there, I don't remember.

Q.    Did you do anything to validate in your work on this Harvard and Beyond survey that the recalled estimates of time spent years prior were in fact accurate?

A.    I don't remember.  I was there largely through data collection.  I then moved on for most of data analysis.

Q.    But sitting here today, you're not aware of anything that was done in your work on the Harvard and Beyond survey to validate that the recalled estimates of time spent years prior were in fact accurate, correct?

A.    Not that I recall, but --

Q.    Are the results of that

Page 271

survey published?

A.      Yeah, I think there's a journal -- an article in the American Economic Review.

Q.      Are you an author on that?

A.      No, no, I was just kind of a grunt helping put the data together.

Q.      And for what purpose was that information, specifically estimates of time spent working years prior used?

A.      So the principals on that project are Nobel Prize winner Claudia Goldin and Larry Katz and the motivation for the project was, they were interested in understanding long-term labor dynamics of people who attended elite institutions, right?  So we were at Harvard, so we did Harvard.  And so part of what they were trying to understand is how does the trajectory of work-life change over time, in particular, comparing men to women both across cohorts, but then also as you span ages.  And so the reason for asking about usual hours worked is to understand, well, when they first got out of college, did men

Page 272

and women pursue different jobs?  Did they pursue jobs that had different hours?  And that is what essentially they find, right, is that there's some differences in -- I guess the term they eventually landed on is, you know, pursuit of greedy jobs that are, you know, very time intensive and time inflexible.  And so that was, that is one of the purposes for which we used the survey or they used the survey.

Q.     In the Harvard and Beyond survey, the estimates of hours worked years prior to taking the survey were not used as part of a damages calculation, correct?

A.     No, that was an academic endeavor.

Q.     And have you ever previously used someone's estimate of time spent years before taking a survey as part of a damages estimate?

A.     I don't think I've ever had occasion to.

Q.     When a student is using a cell phone in class, a teacher would not necessarily know what the student is doing

Page 273

on the cell phone, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I have no idea.

BY MR. SANDOVAL-BUSHUR:

Q.    You just don't know at all?

A.    No, I don't know what teachers do with -- I did not go to school with cell phones, so I don't know how the process goes down.

Q.    Do you think it's possible that every time a student is using a cell phone in class, the teacher knows exactly what the student is doing on the cell phone?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  It's possible that they wouldn't know, but I don't know the level or frequency.

BY MR. SANDOVAL-BUSHUR:

Q.    There is a risk that if teachers are asked to estimate how much they spend addressing unauthorized use of social media during class that they may

speculate about how much of the time they spent addressing student use of cell phones during class is related to social media, correct?

MR. GRADEN: Objection. Vague. Foundation. Form.

THE WITNESS: Say it again.

BY MR. SANDOVAL-BUSHUR:

Q. There is a risk that if teachers are asked to estimate how much time they spend addressing unauthorized use of social media during class, that they may speculate about how much of the time that they spend addressing student use of cell phones is related to social media, correct?

MR. GRADEN: Objection stands.

THE WITNESS: I mean, lots of things are possible. I have no idea of the likelihood. You know, as we went through, there's lots of ways that you can, you know, introduce inaccuracies into surveys. I'm going to trust that Mr. Klein has at least thought of these issues as part of his

Page 275

assignment.

BY MR. SANDOVAL-BUSHUR:

Q.    But you're not aware of either yourself or Dr. Klein doing anything to address the possibility of speculation in that context, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I was not involved in the discussions that led to the creation of the survey with Mr. Klein.  I certainly didn't do anything with it, because it's not part of my assignment.

BY MR. SANDOVAL-BUSHUR:

Q.    There are a large number of factors that can cause a student to suffer from mental health issues like anxiety or depression, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  Again, I don't know what the exact sources of anxiety and depression are, but I assume that there are not one cause.

CONFIDENTIAL

Page 276

BY MR. SANDOVAL-BUSHUR:

Q.    A school teacher is not qualified to diagnose mental health issues, correct?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  I have no idea whether or not that's part of teacher training.

BY MR. SANDOVAL-BUSHUR:

Q.    You think it's possible that a middle school teacher is qualified to diagnose mental health issues in students?

A.    What's the definition of a mental health issue?

Q.    Let's say clinical depression.  Is a middle school teacher qualified to diagnose clinical depression in a student?

A.    I don't know.  But once you move into some sort of specific clinical diagnosis, I don't know.  I would assume they are not trained clinically, but who knows where education is these days.  I haven't been in school for a while.

Page 277

Q.    Is a school teacher qualified to diagnose addiction?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  It's the same answer.  I don't know whether or not they're qualified or not.

BY MR. SANDOVAL-BUSHUR:

Q.    There are a number of different factors that could cause a student to suffer from sleep deprivation, correct?

A.    Again, I don't know what the causes of sleep deprivation are, I would be willing to accept that there's probably more than one.

Q.    Can a teacher, a school teacher, accurately and reliably diagnose the cause of a student suffering from sleep deprivation?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Again, I don't know how accurate a school teacher can be in diagnosing this type of

Page 278

thing, because, yeah, I don't know, never studied it.

BY MR. SANDOVAL-BUSHUR:

Q.    For purposes of your work in this case, you have not reviewed any data or information relating to whether school teachers can accurately diagnose the causes of any mental health issues or disorders, correct?

MR. GRADEN:  Object to form.

THE WITNESS:  Yes, I have not reviewed any information on school teacher powers when it comes to assessing mental health issues.

BY MR. SANDOVAL-BUSHUR:

Q.    Did the Klein teacher time survey suggest time amounts to the school district employees and then ask the employees to provide time estimates?

MR. GRADEN:  Objection.

THE WITNESS:  I have no recollection of that.

BY MR. SANDOVAL-BUSHUR:

Q.    When you are conducting research in which you ask someone to

CONFIDENTIAL

Page 279

estimate how much time they spend on an activity, is it best practice to present that person with suggestions of time and then ask the person to estimate how much time they spent on the activity?

MR. GRADEN: Objection. Scope. Form.

THE WITNESS: Again, I'm not an expert in survey design. I do not know what the best practices are when it comes to asking people time questions.

BY MR. SANDOVAL-BUSHUR:

Q. If, in your academic work, you were presented with the results of a survey that was conducted by presenting someone with suggested time estimates for an activity and then asking the person to estimate the amount of time they spend on that activity, would you have any concern that the results of that survey might be biased?

MR. GRADEN: Objection to form.

THE WITNESS: I would need to

CONFIDENTIAL

Page 280

see the actual survey as well as the data.

BY MR. SANDOVAL-BUSHUR:

Q.    Are you familiar with the concept of anchoring?

A.    I mean, I could not define it precisely, but I am familiar with the idea.

Q.    And the idea of anchoring is that if you provide somebody with a suggested answer and then ask them to give their own answer to a question, the answer that the person gives may be anchored to the suggestion that was provided to them, correct?

A.    I believe that's the concept that it's measuring.

Q.    And that's a real phenomenon in social sciences, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I do not -- I mean, presumably, it exists somewhere because there's a term for it.  I don't know the extent to which it happens.

BY MR. SANDOVAL-BUSHUR:

Q.    I mean, it's also kind of common sense, right, that if you provide someone with a suggested answer to a question and then ask them to provide the answer that their response may be influenced in some way by the suggested answer that was provided?

MR. GRADEN:  Objection.

THE WITNESS:  I'm sorry, what do you mean by, "suggested answer"?

BY MR. SANDOVAL-BUSHUR:

Q.    So if someone were to suggest to a school employee, you maybe spend 50 percent of your day addressing issues relating to social media and then asked the employee to estimate what percentage of their day they spend addressing issues relating to social media, do you think that providing the estimate, the suggested estimate, may influence the response that they provide?

MR. GRADEN:  Objection to form.  Foundation.

THE WITNESS:  I have no idea.

CONFIDENTIAL

Page 282

BY MR. SANDOVAL-BUSHUR:

Q.    You don't know?

A.    I mean, the way you phrased it, I can't imagine anybody would actually phrase it that way.  You know, so, but, yeah, I don't -- I don't know.

Q.    Why can you not imagine that someone would phrase it that way?

A.    Why would you say you may spend 50 percent of your time on social media, how much time do you spend on social media?

Q.    Well, you wouldn't do it because it wouldn't be a good way of gathering accurate information, correct?

A.    Typically, when you see some sort of suggestion, you know, it might be helping you understand units, right?  So that's -- you know, so I don't, you know, it's -- I have never encountered a question that was phrased the way that you just phrased that to me.  So it just rang in my ears as I don't even -- that would never, in my opinion, seem like something that I would read in a survey.  So, but no, I

Page 283

don't have any opinion. I mean, ultimately, when you want to understand anchoring, I'm sure you go to a literature and you would, you know, say, okay, let me, you know -- or if you're a student and you want to understand this, you would go to literature and would say, okay, help me understand these things and now I'm going to go off and, you know, do surveys. I'm assuming that Mr. Klein understands these issues and has addressed them.

Q.    Are there any limitations associated with relying on employee affidavits or declarations for the purposes of your damages estimates?

MR. GRADEN:  Objection.

THE WITNESS:  I'm comfortable relying on the information that I was provided by sworn testimony under oath by people who may or may not have been deposed to further evaluate the veracity of their testimony.

BY MR. SANDOVAL-BUSHUR:

Q.    If you were going to publish

Page 284

your damages estimates in a peer-reviewed journal, would you identify any limitations relating to your reliance on employee affidavits?

MR. GRADEN:  Objection. Vague.

THE WITNESS:  Sworn affidavits, I can't think of anything that I would, you know, say, oh, we have to talk about this necessarily, no.

BY MR. SANDOVAL-BUSHUR:

Q.    You relied on affidavits that were provided by employees from Breathitt, Charleston, DeKalb -- actually, let me ask that question a little differently.

You relied on the affidavits that were provided by employees from Breathitt, Charleston, Irvington, and Tucson without speaking with any of those employees, correct?

A.    That's correct.

Q.    You relied on the affidavits that were provided by employees from Breathitt, Charleston, Irvington, and

Page 285

Tucson without first having read or seen any deposition testimony from those employees, correct?

A.    I think all the depositions came afterwards.

Q.    You relied on the deposition testimony that was provided by employees from Harford without speaking with any of those employees, correct?

A.    That's correct.

Q.    Do you know what process any of the school employees who issued affidavits used to arrive at their estimates?

A.    Certainly the ones that are described in the depositions that have taken place since.  I feel like some, if not all, of those do describe the methods that they went through.  Sometimes I feel like it might actually have been included in the affidavits.  I don't recall all of the specifics, but I felt comfortable that these were the people that have the knowledge and that certainly after reading the depositions, that they had gone through

Page 286

a reasonable process to elicit the relevant information for my testimony.

Q. To the extent you were relying on -- you're relying now on what was said in depositions, you did not deem that information necessary to rely on the affidavits for Breathitt, Charleston, Irvington, and Tucson when you initially issued your reports in this case, correct?

A. Sorry, say that again.

Q. Yeah, I'll move on. It was not part of your assignment in this case to determine whether the employees who issued affidavits in this case used a reasonable process to arrive at their time estimates, correct?

MR. GRADEN: Objection.

THE WITNESS: State it again.

BY MR. SANDOVAL-BUSHUR:

Q. It was not part of your assignment in this case to determine whether the employees who issued affidavits used a reasonable process to arrive at their time estimates, correct?

A. No, I did not set out some

Page 287

standard of, you know, these are the details of their process and it's reasonable. I trusted that they engaged in a reasonable process because they are providing sworn testimony.

Q. You trusted that the employees who issued affidavits engaged in a reasonable process, but you didn't actually verify that they, in fact, used a reasonable process, correct?

MR. GRADEN: Objection.

THE WITNESS: I don't know what I have -- I don't have a definition of, quote, "reasonable process" that I would require them to go through. My assumption is I believe it's reasonable for me to rely on their data because they are people with the right -- in the positions where they would have knowledge or have access to people with knowledge. They were providing testimony as part of this litigation, sworn testimony, that I understood that you all would have

Page 288

the opportunity to depose them, if I hadn't already read those depositions under which, you know, their testimony would receive additional scrutiny.  So I felt comfortable that it was reasonable for me to rely upon.

BY MR. SANDOVAL-BUSHUR:

Q.    Are you aware that the employees who issued affidavits did not review data to ensure that their time estimates were accurate?

MR. GRADEN:  Objection, foundation.

THE WITNESS:  What do you mean they didn't review data?

BY MR. SANDOVAL-BUSHUR:

Q.    I'm not sure how much more I can be clear than to say reviewed any data. Are you aware that the employees who issued affidavits did not review any data to ensure that their time estimates were accurate, correct?

MR. GRADEN:  Objection. Foundation.

CONFIDENTIAL

Page 289

THE WITNESS:  What data are they not reviewing or reviewing?

BY MR. SANDOVAL-BUSHUR:

Q.     To your knowledge, did any of the employees who issued affidavits review any data to ensure that their time estimates were accurate?

A.     I feel like I recall them in depositions talking about, you know, they spoke with other people, that's data, right?  Like, when I'm talking to you, that's data, you're providing me data, right?  They also may have looked at incident reports, that's data.  Or other systems that they're tracking, I can't remember everything that's all across it, but I do recall some of the depositions where I feel like they said, yeah, we looked at some things, we got together, we talked about stuff.  So that's what I mean by what's data, right?  Like, you know, what is your definition of data?  Like, certainly, they assembled information, and a different word for assembling information is assembling data.

Page 290

Q.      Okay.  I'll define data to mean some sort of documentary records, okay?  Using that definition of data, are you aware that many of the employees who issued affidavits did not consult any data to ensure that their time estimates were accurate?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I have not read the deposition of everybody who has provided affidavits, so I certainly couldn't agree to anything about many.  But -- and I don't recall all of the details of each deposition off the top of my head, so I don't know to what extent any of them looked at quantitative records.  I just know that I feel like something of that nature came up in some of them.

BY MR. SANDOVAL-BUSHUR:

Q.      For your purposes for you to rely on the employee affidavits and deposition testimony, you did not require

Page 291

that the employee have reviewed any sort of documentary data records before providing their estimate, correct?

A. No, I don't think that's a requirement for being able to provide an estimate of time.

Q. And for your purposes for you to rely on the employee affidavits and deposition testimony, you did not require that the employees have relied on any particular form of information at all in reaching their estimates, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: I required no specific information. I trusted that, again, that they were people in positions where they would be able to directly or access the knowledge and information to provide an estimate under oath in this case.

BY MR. SANDOVAL-BUSHUR:

Q. And what is your basis for trusting that the people who provided

Page 292

affidavits provided accurate information?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: Again, they're providing sworn testimony as part of a lawsuit.

BY MR. SANDOVAL-BUSHUR:

Q. So because they sign sworn affidavits, it's your opinion that the information provided in those affidavits is therefore trustworthy?

A. You know, particularly once they've gone through a deposition and, you know, presumably provided a defense of their approach. Now, look, you know, I'm relying on them. I have no basis to believe that they provided me inaccurate data.

Q. You are not vouching for the accuracy of the time estimates provided in any employee affidavit or deposition, correct?

A. No, I'm vouching for the reasonableness of me relying on it because of all of the things we've just discussed.

Q.    Is it your understanding that Plaintiffs' attorneys suggested time estimates to employees who ultimately issued affidavits and then asked the employees to estimate time?

MR. GRADEN:  Objection.  Lacks foundation.

THE WITNESS:  I have no idea.

BY MR. SANDOVAL-BUSHUR:

Q.    It doesn't lack foundation, but that's okay.

Suggesting time estimates to an employee and then asking the employee to estimate time could create a risk of biasing the employees' estimates towards the suggestions, correct?

A.    Maybe, I don't know.

Q.    For time estimates for non-teacher employees, you relied on estimates provided by just a few people per district, correct?

A.    Typically, yeah.

Q.    I think between two and six, depending on the district; is that right?

A.    I think that's right.

CONFIDENTIAL

Page 294

Q.    The people whose time estimates you relied on for non-teacher employee time were selected by Plaintiffs' attorneys, correct?

A.    I don't know who selected them.

Q.    You did not identify the people who you thought should provide time estimates and then ask Plaintiffs' attorneys to get time estimates from those people, correct?

A.    No, I did not identify the specific people.

Q.    Plaintiffs' attorneys just presented you with affidavits saying here are the people who we have time estimates from from each of the districts, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Yeah, I didn't select them.  I received the affidavits from whoever was selected by whoever.

BY MR. SANDOVAL-BUSHUR:

Q.    But the affidavits were provided to you by Plaintiffs' attorneys,

Page 295

correct?

A.    That is correct.

Q.    You do not know why Plaintiffs' attorneys selected which employees would provide affidavits and which would not, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  No, I don't know why, other than that the people that ultimately provided them, frequently, they're supervisors or people who have reasonable knowledge, but that's my inference, not based on somebody telling me this is why we selected this person.

BY MR. SANDOVAL-BUSHUR:

Q.    And you do not know how your damages estimates may have changed if Plaintiffs' attorneys had selected additional employees to provide affidavits, correct?

MR. GRADEN:  Objection. Vague.

Page 296

THE WITNESS: I don't know what other data would have changed, because we don't have that data.

BY MR. SANDOVAL-BUSHUR:

Q. And you do not know how your damages estimates would have changed if Plaintiffs' attorneys had selected different employees to provide affidavits, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: I can't -- you know, no, I cannot describe what exists in data that we don't have.

BY MR. SANDOVAL-BUSHUR:

Q. It is entirely possible that if Plaintiffs' attorneys had provided you with affidavits from additional or different employees, then your damages estimates would be lower, correct?

MR. GRADEN: Objection.

THE WITNESS: Or they could be higher or they could be the same.

BY MR. SANDOVAL-BUSHUR:

Q. It's pretty unlikely that if

Page 297

the Plaintiffs' attorneys had gotten more declarations from more employees that they all would have contained the exact same estimates, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: I don't know. Maybe.

BY MR. SANDOVAL-BUSHUR:

Q.     The job roles of the employees submitting the affidavits were not identical across the six bellwether districts in which you're offering opinions, correct?

A.     No, I feel like there's variation in the positions that are in there.

Q.     Do you know why the positions of the employees submitting affidavits were not consistent across all of the districts in which you are offering opinions?

A.     I don't. I'm just assuming it has to do with differences in how they organize work across positions in a district.

Page 298

Q.      Do you know, for example, why in some districts you got estimates of how much time principals spent addressing social media issues and in other districts, you did not get such estimates?

A.      No, I took what was provided to me, most of them were principals, though.

Q.      But you didn't ask why you got some positions for some districts and different positions for other districts?

A.      No, you know, I took what -- I assumed that they got the affidavits from the people that were the relevant parties for -- from the perspective of that district.

Q.      In forming your opinions, did you consider the possibility that Plaintiffs' attorneys may have provided you with affidavits only from employees who estimated larger amounts of time spent addressing student use of social media and did not provide you with affidavits from employees who estimated lower amounts of time spent addressing student use of social

Page 299

media?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I got the affidavits that I got.  I don't know -- I don't know anything about any non -- you know, any affidavit that I did not see.

BY MR. SANDOVAL-BUSHUR:

Q.    The estimates of non-teacher employee time would have been more accurate if you had received estimates from more than just a few people per district, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Not necessarily, no.

BY MR. SANDOVAL-BUSHUR:

Q.    The estimates of non-teacher time that you used in your calculations could have been more accurate if you had received estimates from more than just a few people per district, correct?

A.    Maybe.  I mean, again, you

Page 300

know, sample size speaks to precision, not necessarily accuracy.

Q.    The employees offering estimates of non-teacher employee time spent addressing social media issues did not limit their estimates to just their own time, correct?

A.    That's correct.

Q.    The employees who provided estimates of non-teacher employee time offered estimates of the amount of time that other employees spent addressing social media-related issues, correct?

MR. GRADEN:  Objection.

THE WITNESS:  That's correct.

BY MR. SANDOVAL-BUSHUR:

Q.    And you relied on the estimates that employees offered of the amount of time that other employees spent addressing social media-related issues, correct?

MR. GRADEN:  Objection.

THE WITNESS:  That's correct. Their assignment was to summarize the time spent by not just

CONFIDENTIAL

Page 301

themselves, but whatever employees they were tasked with covering.

BY MR. SANDOVAL-BUSHUR:

Q.    The employees who provided estimates of non-teacher employee time offered estimates of the amount of time that other employees who worked in different buildings from themselves spent addressing social media-related issues, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Potentially.

BY MR. SANDOVAL-BUSHUR:

Q.    The employees who provided estimates of non-teacher employee time offered estimates of the amount of time that other employees who they did not directly or indirectly supervise spent addressing social media-related issues, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Potentially.

CONFIDENTIAL

Page 302

BY MR. SANDOVAL-BUSHUR:

Q.     And for purposes of your opinions in this case, it didn't matter whether the employees who provided estimates of non-teacher employee time offered estimates of the amount of time that employees who they did not directly or indirectly supervise spent addressing social media-related issues, correct?

A.     No.  I mean, it's perfectly reasonable to assume that somebody can assemble the information.  I don't have to be directly supervising you to be able to kind of learn about how much time is being spent.  I mean, this is what, you know, we learn all sorts of things about our colleagues.  I don't have to directly supervise or work in the same building with you to know things about you.

Q.     Is it your understanding that the time estimates in the employee affidavits are not based on the affiant's personal historical experience, but instead based on information specifically gathered by the affiant for the purpose of

Page 303

submitting the affidavit?

MR. GRADEN:  Objection to form.

THE WITNESS:  I believe in some cases, that is true.

BY MR. SANDOVAL-BUSHUR:

Q.    The employees who provided estimates of non-teacher employee time spent addressing social media issues offered estimates of the amount of time that other employees who they had never spoken to spent addressing social media-related issues, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Possibly, I don't know.

BY MR. SANDOVAL-BUSHUR:

Q.    And whether or not the employees providing the affidavits estimated the amount of time that employees who they had never spoken to spent addressing social media-related issues did not affect one way or the other your reliance on those estimates, correct?

Page 304

A.    It's perfectly reasonable to assume that you can collect information from a broad swath of the population without ever directly speaking to everybody.

Q.    You are not offering the opinion that the estimates that employees provided in affidavits or deposition testimony of how much time other employees spent addressing social media-related issues are reliable or accurate, correct?

A.    I am not testifying to their reliability or accuracy.  I am assuming their reliability and accuracy as a reasonable part -- thing for me to use as part of my calculation.

Q.    In your academic work outside of litigation, have you ever drawn conclusions based on one employee's estimate of how another employee who worked in a different building spent their day?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I don't think I've ever had any occasion to make that specific --

Page 305

BY MR. SANDOVAL-BUSHUR:

Q. Did you ever ask why the Klein survey was not simply administered to all of the categories of non-teacher employees who were ultimately covered by the affidavits?

A. I don't remember if that ever came up.

Q. For the employees whose estimates of nonemployee time spent addressing social media-related issues you relied on, you do not know how those employees defined social media, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: To the extent that they define it in their affidavits or in their depositions, then presumably, I have it. I also assume, again, because they're providing an affidavit specific to this litigation that they have defined it consistent with the definition that is appropriate for this case.

Page 306

BY MR. SANDOVAL-BUSHUR:

Q.     That's an assumption you can't -- you're not saying that's in fact true, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Sorry, what is not in fact true?

BY MR. SANDOVAL-BUSHUR:

Q.     You are not saying it is in fact true that the employees who issued the affidavits defined social media consistent with the definition that is appropriate for this case, correct?

A.     To the extent that they describe that in their affidavits or in their depositions, then if they have described it there, then, yes, I can tell you that it is.  To the ones that I have -- that they don't expressly state it in their affidavit or they have not been deposed, I can only assume based on the fact that it is an affidavit in a particular lawsuit that they have defined it in a way that is consistent with the lawsuit.

Q.     What is the definition of

Page 307

social media that is appropriate for this case?

MR. GRADEN:  Objection.

Scope.

THE WITNESS:  I couldn't tell you off the top of my head.  I believe that there's YouTube, Facebook, Instagram, TikTok, and SnapChat.  I believe those are the companies at issue.  But I don't -- you know, but all the conduct, so there's the Defendants and their conduct, I couldn't tell you all the conduct off the top of my head.

BY MR. SANDOVAL-BUSHUR:

Q.   So you have assumed that the employees who issued affidavits define social media in a way that was consistent with the lawsuit, but you personally are not sure of what definition exactly would be consistent with the lawsuit; is that right?

MR. GRADEN:  Objection.

THE WITNESS:  I mean, you know, like I said, there are

Page 308

details of this definition that I certainly cannot provide you right here right now, because, honestly, it's pretty far removed from what I'm doing in my part of the calculation. So it's not something that I have been reviewing on a regular basis.

BY MR. SANDOVAL-BUSHUR:

Q. You have spent somewhere on the order of four to 500 hours working on this case, correct?

A. We can sit here and try and calculate it.

Q. Well, you have worked several hundred hours on this case, correct? I mean, we talked about earlier you worked 20 hours a day for ten days straight?

A. Yeah, okay. Yeah.

Q. So you have worked several hundred hours on this case, correct?

A. Yup.

Q. But you do not have a definition for what is social media that is consistent with the lawsuit sitting here

Page 309

today, correct?

MR. GRADEN:  Objection.
Misstates testimony.

THE WITNESS:  Not off the top
of my head, as I sit here right
now.  Like, you know, I can only
speak in pretty broad general terms
because, again, as I mentioned,
it's not a particularly relevant
thing for the part of the
calculation that I am doing.

BY MR. SANDOVAL-BUSHUR:

Q.     But you are assuming that
every single employee who issued an
affidavit did in fact both have a
definition of social media that was -- and
had a definition that was appropriate for
this lawsuit, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I mean, that's
part of their assignment, right?
Like, I mean, I don't need to walk
around with that in my head,
because I'm, again, I'm assuming
that they have done their

Page 310

assignment in a manner that is appropriate for my calculation.  My calculation says, great, there's time loss.  That's all a time loss question.  My job is to say what's the value of that time?  I don't need a definition of social media or at-issue conduct to be able to do that and perform that calculation.

BY MR. SANDOVAL-BUSHUR:

Q.    And what is your source of belief that the employees who issued affidavits had as part of their assignment understanding what the appropriate definition of social media was for this lawsuit?

A.    Logic.

Q.    Okay.  But you haven't seen, you're not aware of actual facts that the employees who issued affidavits had as part of their assignment, understanding and applying an appropriate definition of social media for purposes of this lawsuit, correct?

Page 311

MR. GRADEN: Objection.

THE WITNESS: Again, to the extent that it's covered in their affidavit or in their depositions, then I have basis for that. But, like, I'm answering the same question again, right? But no, I did not sit down with them and say, please describe the definition of what you're using in this term. That's not for me to do, right? Like, the fact that I was provided it, it's perfectly reasonable for me to believe that that is true.

BY MR. SANDOVAL-BUSHUR:

Q. And you are not able to assess whether based on what is in an affidavit or in a deposition the employee used the appropriate definition of social media for purposes of this lawsuit, because you are not sure what that definition is yourself, correct?

MR. GRADEN: Objection. Misstates testimony. Form. Foundation.

CONFIDENTIAL

Page 312

THE WITNESS:  I'm not sure of it as I sit here right now.  At some point, I was aware of it.

BY MR. SANDOVAL-BUSHUR:

Q.    You don't say what that definition is in your reports, correct?

A.    No, again, it's not something that is integral to my portion of this calculation.

Q.    So it was not integral for your portion of the calculation to know what exactly was supposed to be being measured, correct?

MR. GRADEN:  Objection.  Misstates testimony.

THE WITNESS:  Again, that's time loss.  I'm doing value of time, right?  As we talked about earlier, I make no claim that social media use or social media has changed the value of time relative to its but-for world, right?  I'm here assembling data, right, and applying it to time loss estimates that I was provided by a

survey expert and by a bunch of affiants who are in positions where they should have knowledge of these issues and to the extent that they've described them in their affidavits or their depositions, I found it perfectly reasonable the way they approached it. Like, I don't need to know at all points in time the ins and outs of the definitions that are relevant for them to do their calculations, right, to be able to say I can trust that they should have done that. It's reasonable for me to assume that.

BY MR. SANDOVAL-BUSHUR:

Q. It was not part of your assignment in this case to determine that the Klein teacher time survey, the employee affidavits, or the employee testimony measured the right thing, correct?

MR. GRADEN: Objection. Form. Foundation.

THE WITNESS: I am taking

Page 314

their statements.  They are witnesses.  They can speak for themselves.

BY MR. SANDOVAL-BUSHUR:

Q.    Was it part of your assignment in this case to determine that the Klein teacher time survey, the employee affidavits, and the employee testimony measured the right thing?

MR. GRADEN:  Objection.

THE WITNESS:  No, my assignment was to take those things as given and apply the value of time to them.

BY MR. SANDOVAL-BUSHUR:

Q.    Is it possible that when employees referred to social media in their affidavits that they included websites and apps other than Defendants' websites and apps?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  You asked this before, but is it possible, anything is possible.  Does it seem

likely or reasonable, probably unlikely.

BY MR. SANDOVAL-BUSHUR:

Q.    For the employees --

A.    Can we actually pause?  It has been, like, an hour and a half.  I would like to stretch out.

MR. SANDOVAL-BUSHUR:  Sure.  We can take a break.  Go off the record.

THE VIDEOGRAPHER:  Going off video record 3:28 p.m.

- - - - -

(A recess was taken at this time.)

- - - - -

THE VIDEOGRAPHER:  Back on video record 3:45 p.m.

BY MR. SANDOVAL-BUSHUR:

Q.    For the employees whose estimates of nonemployee time you relied on, you do not know how those employees determined which issues were related to social media, correct?

A.    Sorry, say it again.

Q.    For the employees whose

Page 316

estimates of nonemployee time -- sorry, non-teacher time -- yeah, so I'll start that over, because, yeah, I messed that up.

For the employees whose estimates of non-teacher time spent addressing social media-related issues you relied on, you do not know how those employees determined which issues were related to social media, correct?

A.    No, again, I'm relying on them to provide me the time loss estimate that's relevant for this case.

Q.    No definition related to social media was provided to the client survey respondents or by the affidavit -- employees who issued affidavits, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  I don't know what the affiants, you know, any discussions they had about definitions and I can't recall what's in the client survey.

BY MR. SANDOVAL-BUSHUR:

Q.    If an employee provided an estimate of the amount of time spent on

Page 317

behavior concerns, that time estimate would not be a reliable input for a calculation of damages relating to social media specifically, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  If they're providing an estimate of something different than what's relevant here, then, no, it's not the relevant thing.

BY MR. SANDOVAL-BUSHUR:

Q.    And based on your understanding, is an estimate of all time spent on behavior concerns relevant to the damages that you are calculating?

A.    Say it again.

Q.    Based on your understanding, is an estimate of all time spent on behavior concerns relevant to the damages that you are calculating?

A.    It's not part of what I'm calculating.  I am not calculating losses related to all behavioral concerns.  I'm calculating damages associated with social

media-related issues.

Q.    If an employee provided an estimate of the time spent addressing all health impairments that have a connection to a mental health component, that time estimate would not be a reliable input for a calculation of damages relating to social media specifically, correct?

MR. GRADEN:  Objection.

THE WITNESS:  If they provided an estimate of something that's not social media-related damages, it's, you know, it's not the thing that you should use to calculate damages.

BY MR. SANDOVAL-BUSHUR:

Q.    And all time spent addressing health impairments that have a connection to a mental health component is a different question than time spent addressing social media, correct?

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  Yeah, I mean, it's the same thing, if it's not

Page 319

the social media, I mean, those things can be related, obviously, right, like, they may be related to social media, but if it's just, like, all this, unless it all is from social media, no, it's not the same thing.

BY MR. SANDOVAL-BUSHUR:

Q.    If an employee provided an estimate of the amount of time spent addressing all mental health issues in students who engaged in some use of social media, that time estimate would not be a reliable input for a calculation of damages relating to social media specifically, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Not unless all the mental health issues were related to their some use of social media.

BY MR. SANDOVAL-BUSHUR:

Q.    If an employee's estimate of time spent addressing social media-related concerns included all time spent addressing

Page 320

issues faced by students who were dealing with homelessness, that time estimate would not be a reliable input for a calculation of damages relating to social media specifically, correct?

A.    Unless all of the homelessness was attributable to social media.

Q.    And it's not plausible that all homelessness would be attributable to social media, correct?

MR. GRADEN:  Objection to the testimony.

THE WITNESS:  That, I don't know, but, you know, I'm just trying to make sure the math works in your question, right?  So if all the homelessness was attributable to social media, then it would be, but if it's not, if there are some parts of homelessness that are not attributable to social media, then, again, the estimate of time loss is not measuring at-issue conduct that is appropriate for the damages

Page 321

calculation.

BY MR. SANDOVAL-BUSHUR:

Q. If an employee estimated that 100 percent of her time is spent addressing social media-related issues because all students have been impacted with social media at some point, that time estimate would not be a reliable input for a calculation of damages relating to social media specifically, correct?

A. I mean, it would depend on that employee's job, right? If they're fundamentally just dealing with issues related to social media, then it's not unreasonable to assume that they would report 100 percent of their time.

Q. If the employee deals with some issues that are not directly related to social media, but estimated that 100 percent of their time is spent addressing social media-related issues because all students have been impacted with social media at some point, that time estimate would not be a reliable input for a calculation of damages relating to social

Page 322

media specifically, correct?

MR. GRADEN:  Objection to form.

THE WITNESS:  I mean, if by construction they're not spending some of their time on stuff that's stemming from social media, then you shouldn't assume 100 percent of the time.

BY MR. SANDOVAL-BUSHUR:

Q.    Who is able to more reliably estimate how many minutes an employee spends his or her workday on a particular issue, the employee or the employee's boss?

MR. GRADEN:  Objection to form.

THE WITNESS:  I mean, I'm not sure there's a definitive answer to that.  Either can be.

BY MR. SANDOVAL-BUSHUR:

Q.    Who is able to more reliably estimate how many minutes an employee spends in his or her workday on a particular issue, the employee or the employee's boss's boss?

Page 323

MR. GRADEN: Objection to form.

THE WITNESS: Again, it depends on what kind of monitoring we're doing, but, you know, you would presume that the employee would know more, but that doesn't mean that the boss doesn't know or the boss's boss doesn't have a reliable estimate.

BY MR. SANDOVAL-BUSHUR:

Q. The estimates that you rely on -- or let me ask the question a little bit differently.

Estimates of employee time spent on issues relating to social media would be more reliable if you got estimates from all of the employees who are addressed in the affidavits, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: It's not necessarily -- you wouldn't necessarily get the different answer. But to the extent that,

you know, again, if you got accurate reports from every single employee, obviously, that is -- you know, now you're at truth, whereas when you're summarizing, there's always going to be some potential for a margin of error. So you'll have a more precise, accurate estimate. It doesn't mean it would be a different estimate.

BY MR. SANDOVAL-BUSHUR:

Q. In your reports, you provide mean low and high damages estimates, correct?

A. That's correct.

Q. For the high damages estimate, you take the high end of the confidence interval or margin of error for the Klein teacher time survey and multiply the teacher salaries and benefits by that, correct?

A. By the share constructed from that, yes.

Q. The high damages estimate would only be accurate if the mean average

CONFIDENTIAL

Page 325

time reported by the Klein teacher time survey underestimated the time that teachers spent addressing social media-related issues, correct?

A.    Yes.

Q.    Which of the damages estimates mean, low, and high do you think is the most accurate?

A.    Well, the mean is the mean of the sample.  The confidence interval is just gives you some sense of understanding, because of sample size issues and just issues with, you know, the fact that -- you know, there's variance in the data, you know, we're just now speaking about we know that we're pretty confident that, assuming that the survey is accurate, that the mean, the true value lies within this range.  But the mean is still the middle, right?  It's still the estimate that we have.  So the mean is the estimate that actually comes from the survey.  The high and low come -- describe the margin of error around the survey.  So you have some sense of, okay, well, you could also be in here, just given

Page 326

sampling variance.

Q.    You think the mean estimate is a better estimate than the high estimate, correct?

A.    Yes, the high is the extension of the confidence interval.  It's the highest thing that we're -- you know, we're still within that range is 95 percent, but the odds of it lying right at that edge are low.  The odds are much higher for the middle.

Q.    In your reports you say that "Existing studies confirm that, across the nation, public school teachers are losing time in dealing with disruption from social media in their classrooms," correct?

A.    That's --

Q.    Look at tab, Exhibit 1F, which is your Tucson report at paragraph 23.

A.    Paragraph?

Q.    Twenty-three.

A.    Okay.  Yes, there you go.

Q.    So and that says, "Existing studies confirm that, across the nation,

CONFIDENTIAL

Page 327

public school teachers are losing time to dealing with disruptions from social media in their classrooms," correct?

A.     That's what it says, yes.

Q.     Did you perform a literature review to identify all studies that examined whether public school teachers are losing time to dealing with disruptions from social media in their classrooms?

A.     I looked, yeah, I mean, I didn't do a -- you know, there's a formal literature review process, I did not do a formal literature review process, but I did search for literature and I reported on the things that I found that seemed most relevant here.

Q.     And to search for literature relating to your statement that, "Existing studies confirm that, across the nation, public school teachers are losing time to dealing with disruptions from social media in their classrooms," one thing that you did was ask ChatGPT for articles, correct?

A.     I don't remember if I did this in ChatGPT.  I think I started with

Google Scholar and maybe then just Google. I don't remember if I did this with ChatGPT or not.

Q.    Well, if you look down at, in paragraph 25 -- let me take a step back.

You identify and discuss in your report a total of three existing studies in support of your opinion that existing studies confirm that, "across the nation, public school teachers are losing time to dealing with disruptions from social media in their classrooms," correct?

A.    I think that's right.

Q.    If you look at paragraph 25, you discuss one of those three surveys, correct?

A.    Uh-huh.

Q.    And if you look at footnote 17, that is one of the -- that is your citation --

A.    Yup.

Q.    -- correct, to the -- to that article?

A.    Yup.

Q.    And if you look at the end of

CONFIDENTIAL

Page 329

the URL, it says source equals ChatGPT.com, correct?

A.   Okay.   So that suggests that this was linked to from ChatGPT.

Q.   And so you understand that it says source equals ChatGPT.com at the end of the URL because ChatGPT provided you with that source in response to a question you posed to ChatGPT, and then you accessed that source by clicking that link, correct?

A.   That seems to be what it was, yes.

Q.   And if you look at paragraph 27, you describe another one of the three articles that you relied on to support your statement that, "Existing studies confirm that, across the nation, public school teachers are losing time to dealing with disruptions from social media in the classroom," correct?

A.   Uh-huh.

Q.   And if you look at footnote 18, you are citing another study and, again, the URL for that source ends source equals ChatGPT.com, correct?

Page 330

A.    Yes.

Q.    And so this is the second article in support of this proposition that you obtained via ChatGPT, correct?

A.    I mean, the link is, yes.

Q.    Okay.  The article was brought to your attention by ChatGPT?

A.    I actually think it's the other way around.  I actually think I found it and I then I forgot where it was, so then I asked ChatGPT to find them.  So I found them at some point doing a regular search, that's my recollection.  And then time passed and I forgot where they were, but so I used ChatGPT to refind them.

Q.    Okay.  Earlier today, you couldn't remember if you had used ChatGPT at all, correct?

A.    This is jogging my memory that I did that for this purpose.

Q.    Did you use ChatGPT to find the third article?

A.    It doesn't have that same link, so probably not.

Q.    Okay.  Aside from these three

Page 331

studies, you have not cited any other studies that confirm that across the nation public school teachers are losing time to dealing with disruptions from social media in their classrooms, correct?

MR. GRADEN: Objection to form.

THE WITNESS: Those are the three studies that I cite, yes.

BY MR. SANDOVAL-BUSHUR:

Q. And sitting here today, you're not aware of any other studies, correct?

A. Not that I was aware of, no.

Q. After you found these three studies, did you continue searching further for additional studies that either supported or contraindicated them?

A. I don't know which way the order is. I did do other searches, you know, I did a Google Scholar search trying to find, you know, more peer-reviewed academic literature that might actually have measured this. I did not find anything. Which came first, I don't

Page 332

remember.

Q.    You are not aware of any peer-reviewed literature that studies the question of whether public school teachers are losing time to dealing with disruptions from social media in classrooms, correct?

A.    Nothing that quantified the time, no.

Q.    And, in fact, you ultimately found only one study that quantified the time that teachers spend addressing disruptions from social media in their classrooms or that you characterize as supporting that opinion, correct?

A.    That's correct.

Q.    In forming your opinions in this case, did you look for any studies examining how the total level of classroom disruptions has changed over time?

A.    No, I wasn't looking for studies on classroom disruption levels specifically.

Q.    And you did not cite any studies examining how the total level of classroom disruptions has changed over

Page 333

time, correct?

A.      Nope.

Q.      Is it possible that the total level of classroom disruptions remains stable, even if classroom disruptions specifically relating to social media increased?

A.      It's possible.  I don't know.

Q.      Is it possible that the total level of classroom disruptions remained stable even if classroom disruptions specifically related to social media increased because students may have replaced distractions like talking or passing notes with social media-related distractions?

MR. GRADEN:  Objection to form.

THE WITNESS:  It's possible, I have no idea.

BY MR. SANDOVAL-BUSHUR:

Q.      Okay.  Let's take a look at one of the three articles that you cite relating to your opinion about public school teachers across the nation losing

Page 334

time to dealing with disruptions from social media in their classrooms. And look specifically at the article that you identified from Nominet.UK?

A. Okay.

Q. This is one of the studies that you relied on, one of the three studies you relied on, correct?

A. It's one of the three studies I cite, yes.

Q. And this study is not from this nation, it's from the UK, correct?

A. That's correct.

Q. And this study from the UK purported to find teachers losing time to a combination of smartphone use and social media, correct?

A. That's what it says here.

Q. That's what you wrote, correct?

A. Yeah.

Q. And that's accurate, correct?

A. I assume so, I haven't looked at this particular study in a while, but I assume I quoted it correctly.

Page 335

Q.    Okay.   The Nominet study did not measure or report the amount of time that teachers lost to social media specifically, correct?

A.    It doesn't appear to separate it.  It's just reporting social media and smartphones.

Q.    Would you have included that information in your report if the Nominet article had studied social media specifically?

A.    Presumably, but I don't remember what's actually in there.

Q.    Okay.   Let's take a look at the Nominet article, which is tab 12, we'll mark as Exhibit 8.

- - - - -

(Nominet Article marked Ward Exhibit 8 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Dr. Ward, this Exhibit 8 is an article from Nominet that you relied on for your opinions that you cite in your expert report, correct?

Page 336

A.    This is the article, yes.

Q.    And there is nothing in this Nominet article that measures or reports the amount of time being lost to social media specifically, correct?

A.    No, I mean, you know, it just describes the high level average that combines both.

Q.    It combines both social media and smart devices --

A.    And smart devices.

Q.    -- correct?  Is that correct?

A.    That's what it says.

Q.    And the Nominet article did not report any amount of time loss by teachers in connection with Defendants' social media platforms specifically, correct?

A.    I mean, you know, this article doesn't include all of the methodological details of the survey, it just summarizes the results of the survey, so I can't say that one way or the other what it included in its definition of social media.

Page 337

Q.     Well, your only knowledge about this Nominet study that took place is what is included in the article, right?

A.     That's correct.

Q.     And my question was, this Nominet article did not report any amount of time loss by teachers in connection with Defendants' platforms specifically, correct?

A.     It does not define -- you know, in what I -- you know, in the article, it does not include its definition of social media.

Q.     Okay.  And this article is not peer reviewed, correct?

A.     Not that I'm aware of.

Q.     This article comes from a company called Nominet, correct?

A.     That's who is publishing this article, yes.

Q.     What is Nominet?

A.     I would -- what does it say, it says something about -- does it say who they are here?  They don't describe who they are.

Q. Okay. Had you ever heard of Nominet before you reviewed this Nominet article that you cited in your expert report?

A. No.

Q. Do you know whether Nominet is a reliable source of information?

A. I mean, you know, they commissioned somebody else to do a survey, right, that's where this comes from. So this is just somebody -- them reporting on a survey that they commissioned.

Q. Who did they commission to do a survey?

A. A group called Opinium.

Q. Is Opinium a reliable source of information?

A. I'm assuming they're a survey research firm, so, you know, I assume that they can conduct a survey.

Q. But you have no knowledge of anything about Opinium other than that Nominet commissioned them to conduct a survey, right?

A. Sure.

Page 339

Q.    So you are not able to say one way or the other whether Opinium is a reliable source of information, correct?

A.    I found this somewhat informative for the purposes that it's being used for in my report.

Q.    That's not my question, Dr. Ward.  You are not able to say one way or the other whether Opinium is a reliable source of information, correct?

MR. GRADEN:  Asked and answered.

THE WITNESS:  I'm not sure I have that opinion about much of anything, but somebody is paying them to do a survey, I'll give them at least a starting benefit of the doubt.

BY MR. SANDOVAL-BUSHUR:

Q.    So if somebody pays somebody to do a survey, you give them the benefit of the doubt that they're a reliable source of information?

A.    Yeah, because, you know, if you're in the business of providing surveys

Page 340

that you generally are in the business of trying to provide accurate surveys. Now, if there's some evidence to the contrary that they're not a reliable source, I'm happy to consider it, but, you know, generally, when people say that they've done, you know, a survey, you know, and they describe what, you know, that they retained somebody to do it, I don't dismiss it immediately.

Q. I'm not asking whether you dismiss it immediately, Dr. Ward. I am asking a question, which is, you do not have any basis to say one way or the other whether Opinium is a reliable source of information, correct?

A. I found it sufficiently reliable to include it in the report for the purposes that I do.

Q. That's not my question, Dr. Ward. My question is, please tell me all information that you have that supports your belief that Opinium is a sufficiently reliable source of information for you to rely on it for purposes of your report?

CONFIDENTIAL

Page 341

A.      I've already provided that.

Q.      Which is, the only basis that you have for believing that Opinium is a reliable source of information is that an entity called Nominet that you have never heard them paid them to conduct a survey; is that right?

MR. GRADEN:  Objection. Misstates testimony.

THE WITNESS:  Well, I have the information that's included here that they are a company, that they were commissioned to provide a survey, and that they did so, a survey with 500 respondents.  That is, you know, that's what I'm relying on.

BY MR. SANDOVAL-BUSHUR:

Q.      So the fact that it's on a website and the website says that somebody paid Opinium to conduct the survey, that's what you're relying on to rely on it --

A.      Well, the results are also consistent with the other two surveys.

Q.      Well, actually, this is the

Page 342

only survey you rely on that provides an estimate of time, right?

A.    Yes, but it also has other questions that are also similar to the ones in the other survey.  So, you know, I mean, again, it's also UK data and it's from old.  I'm not relying on this information in any way in my calculations.  This is just background information.

Q.    You do not have any basis for relying on information provided by Nominet, correct?

A.    I've already provided my answer to that question.

Q.    I didn't hear any basis for you believing that Nominet is a reliable source of information.

A.    Okay.

Q.    Can you please tell me what information or basis you have for believing that Nominet is a reliable source of information?

MR. GRADEN:  Objection to testimony by counsel.

THE WITNESS:  I've already

Page 343

answered that question.

BY MR. SANDOVAL-BUSHUR:

Q.   Well, I don't believe that's correct, so I'm asking you to answer it.

Can you please tell me what information or basis you have for believing that Nominet is a reliable source of information?

MR. GRADEN:  Objection.

THE WITNESS:  They commissioned a survey.  That survey does not have facially invalid results and they retained a company who they published who they are. Presumably, we could look them up and see if they're biased or not. As a general rule, when I see survey data that's a survey-based data done by private entities, I do not dismiss it.  I do not think it's somehow inherently unreliable. If you have evidence that it is inherently unreliable, I'm happy to consider it.

Page 344

BY MR. SANDOVAL-BUSHUR:

Q.    In fact, when you see a survey that somebody has paid to do, you don't just not assume that it's unreliable, you presume that it is reliable, correct?

MR. GRADEN:  Objection. Misstates testimony.

THE WITNESS:  Again, if there's some evidence that this company is of ill repute or that there's something methodologically or, you know, the questions are somehow irrelevant, but, no, again, it depends on what weight we're putting on it, right?  So, again, all I'm doing here is I'm just saying just describing a little bit of background that I used and I found helpful for trying to understand this issue.  Whether this is completely reliable or only marginally reliable has no bearing on my opinions that I ultimately offer in this case.

Page 345

BY MR. SANDOVAL-BUSHUR:

Q.    Okay.  Let's look at another source that you rely on and and that is an article that comes from the NEA.

A.    Okay.

Q.    And the NEA article that you rely on is a press release from the NEA; is that right?

A.    I mean, I think that's what I cite that summarizes it.

Q.    The NEA is a labor union representing teachers, correct?

A.    That's correct.

Q.    The NEA press release that you rely on is not peer reviewed, correct?

A.    I don't know what they did to put it out, but, typically, probably not.

Q.    Nothing in the NEA press release reports an estimate of how much time teachers are losing to dealing with disruptions from social media in their classrooms, correct?

A.    No, there is no time estimate.

Q.    There's no time estimate of

Page 346

any kind relating to social media in the NEA press release that you rely on, correct?

A.    That's correct.

Q.    And nothing in the NEA press release reports any information relating to student use of Defendants' platforms specifically, correct?

A.    I would have to review the survey again.

Q.    Okay.  Let's look at tab ten, which we will mark as Exhibit 9.

- - - - -

(NEA Article marked Ward Exhibit 9 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    And Exhibit 9 is the NEA document that you relied on, correct?

A.    Yes.

Q.    And nothing in Exhibit 9, the NEA document that you relied on, reports information relating to Defendants -- to student use of Defendants' platforms specifically, correct?

Page 347

A.    This document does not describe any particular languages on how to define social media use.

Q.    You are also cite a -- well, I guess one more question, the NEA, do you know if the NEA is a reliable source of information?

A.    Yeah, frequently, yeah.  I mean, they produce a lot of useful information.

Q.    And what's your basis for saying that the NEA is a reliable --

A.    I have used other things from the NEA.  I mean, they're, you know, they represent teachers.  They have a strong vested interest in trying to make sure that certain issues around teaching are brought to light.  Again, they've hired a firm, the firm has done a really large actual survey of members.  They've got the -- all the margin of error, everything reported here.  This all seems pretty reliable to me.

Q.    The NEA is an advocacy organization, correct?

A.    Yeah.

Q.    And this article that you are relying on is framed as being an advocacy piece, correct?

A.    Yeah, but the poll results are on the back, right, and so you can look at the poll results themselves.

Q.    You also rely on an article from Pew, correct?

A.    That's correct.

Q.    And the Pew survey of teachers that you rely on asks teachers only about student distraction on cell phones.  It did not report any information about social media at all, correct?

A.    I would have to review it, I don't remember.

Q.    Okay.  Let's take a look at it, it's tab 11, which we'll mark as Exhibit 10.

- - - - -

(Pew Article marked Ward Exhibit 10 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.    Unfortunately, this printed

CONFIDENTIAL

Page 349

pretty small, so --

A.      Can we blow it up here on the screen?

Q.      Yeah, it's impossible to --

A.      My eyes are good, but they are fading as I get older.

Q.      Yeah, sorry?

A.      Can I scroll on here or do you have to scroll?

Okay.

Q.      The Pew survey of teachers that you relied on asks teachers only about student distraction on cell phones, it did not report any information about social media at all, correct?

A.      Not specifically, no.

Q.      One thing a school district can do to reduce the amount of time that teachers and other employees spend addressing issues relating to cell phones or social media is to ban student cell phone use during class or during a school day, correct?

MR. GRADEN:   Objection. Foundation.

Page 350

THE WITNESS: Potentially. I don't know how much evidence we have yet for that, but I think that's a hypothesis that we're currently trying to test.

BY MR. SANDOVAL-BUSHUR:

Q. You did not calculate how much lower your estimated damages would have been if school districts had banned student cell phone use during class, correct?

A. I have no basis to make those adjustments because that's a causal question that I didn't answer.

Q. For districts that have not implemented cell phone bans, you did not calculate how much lower your estimated damages would have been if the school districts had banned student cell phone use during the entire school day, correct?

A. No, I did not calculate any impact of hypothetical policies that I don't know the impact for, because I have not studied it.

Q. And for districts that

Page 351

implemented cell phone bans in the 24-25 school year, you did not calculate how much lower your estimated damages would have been if the school districts had banned student cell phone use during the entire school day sooner, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I have no evidence -- that, you know, of the effects of the cell phone bans to use to make a basis of that -- to use as a basis for that.

BY MR. SANDOVAL-BUSHUR:

Q.      In response to Dr. Lakdawalla, you point to declines in NAEP scores at the national level in U.S. history, civics, and geography, correct?

A.      That's correct.

Q.      It was not part of your assignment to evaluate what caused declines in scores in U.S. history, civics, or geography, correct?

A.      No, I'm just -- he was claiming that somehow the lack of declines in other areas suggested that there's no

harm for social media and I'm saying, well, look, with the other things, there are declines, so you can't make inferences just based on what trends we see in particular test score data.

Q. And you are not offering the opinion that Defendants' conduct caused declines in scores in U.S. history, civics, or geography, correct?

A. I am not.

Q. And you did not look at any data specific to any of the six bellwether districts relating to how they performed on tests relating to U.S. history, civics, or geography, correct?

A. No.

Q. It was not part of your assignment to determine whether any school output in any of the six bellwether districts has been adversely impacted by social media, correct?

A. No, I'm not doing anything that's trying to establish causal links.

Q. And you are not offering any opinion that any Defendants' conduct

Page 353

adversely impacted any school outputs, correct?

A.    That's not part of my assignment.

Q.    Separate from your work in this case, you do hold the opinion that conservative culture wars have contributed to declines in history and civics test scores, correct?

MR. GRADEN:  Objection. Scope.

THE WITNESS:  I have no idea.

BY MR. SANDOVAL-BUSHUR:

Q.    You've never -- you don't have any opinions outside of your work in this case on what has contributed to declines in history and civics test scores?

A.    Perhaps, you know, I'm not -- I'm certainly not thinking about that right now.

Q.    Okay.  And separate from your work in this case, do you hold the opinion that school disinvestment in teaching history and civics has contributed to declines in history and civics test scores?

Page 354

MR. GRADEN: Objection. Scope.

THE WITNESS: It certainly could.

BY MR. SANDOVAL-BUSHUR:

Q. And that's something you are aware has happened, right?

A. I don't recall, as I'm sitting here. I may have seen some study about that at some point, but I, you know, right now, it's not top of mind.

Q. You did not calculate your damages at an incident-by-incident level, by which I mean you did not break out each incident requiring a school employee to spend time addressing a social media-related issue, correct?

A. Sorry, say that again.

Q. You did not calculate your damages at an incident-by-incident level, by which I mean you did not break out each incident requiring a school employee to spend time addressing a social media-related issue, correct?

A. No, I did not.

Page 355

Q.    You do not have any data identifying each school incident allegedly related to Defendants' platforms, correct?

A.    No, I do not.

Q.    You do not have data identifying each school incident allegedly related to social media more broadly, correct?

A.    No, I have the aggregate summaries of the time loss that we've discussed before.

Q.    If you had that, identifying each incident requiring a school employee to spend time addressing a social media-related issues and the amount of time that the employee spent on that incident, you could have calculated damages on an incident-by-incident level, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I mean, if you had a complete record of all incidents, including the relevant measure of time, that's accurate. I guess, yeah, I think you could

CONFIDENTIAL

Page 356

calculate it.  Again, that's a big assumption in terms of what data exists, but if the data are sufficient to do it, then, yeah.

BY MR. SANDOVAL-BUSHUR:

Q.    The total damages that you estimate are comprised of many different incidents, correct?

A.    Yes, I think it's the accumulation of them, yes.

Q.    You don't know which incidents, if any, involved YouTube, correct?

A.    No, as we discussed earlier, I don't have any kind of breakout of time loss by YouTube.

Q.    You don't know which incidents, if any, involved SnapChat, correct?

A.    As we discussed earlier, no, I do not have any breakdown of time loss particular to SnapChat.

Q.    You don't know which incidents, if any, involved TikTok, correct?

CONFIDENTIAL

Page 357

A.    No, as we discussed earlier, I don't have any breakdown of time loss associated to TikTok.

Q.    You don't know which incidents, if any, involved Instagram, correct?

A.    No, I don't have any breakdown of time loss associated with Instagram.

Q.    You don't know which incidents, if any, involved Facebook, correct?

A.    I don't have any breakdown of time loss associated with Facebook specifically.

Q.    You have not calculated what your damages estimate would be if you limited your estimate to incidents, if any, that involved YouTube, correct?

A.    No, I mean, if I don't have a breakdown of time, I don't have a breakdown of total damages.

Q.    And you have not calculated what your damages estimate would be if you limited your estimate to incidents, if any,

CONFIDENTIAL

Page 358

that involved SnapChat, correct?

A.    I don't have a specific time estimate for SnapChat.  I don't have a specific damages estimate for SnapChat.

Q.    So the answer is you have not --

A.    No, I have not done that.

Q.    You have not calculated what your damages estimate would be if you limited your estimate to incidents, if any, that involved TikTok, correct?

A.    No.

Q.    You have not calculated what your damages estimate would be if you limited your estimate to incidents, if any, that involved Instagram, correct?

A.    No --

MR. GRADEN:  Objection.  Asked and answered.

THE WITNESS:  -- I have not provided a broken-out estimate for Facebook specifically.

BY MR. SANDOVAL-BUSHUR:

Q.    You have not calculated what your damages estimate would be if you

Page 359

limited your estimate to incidents that involved Facebook, correct?

A.    No, I have not.  I think we just answered that one.

Q.    I actually just asked about Instagram.  So I'll reask that --

A.    Oh, sorry, I thought we just did Facebook.

Q.    You have not calculated what your damages estimate would be if you limited your estimate to incidents, if any, that involved Instagram, correct?

A.    No, I have not.

Q.    If a teacher reports spending 15 minutes in a typical day addressing student use of social media, that teacher is likely addressing multiple different incidents throughout the day, each of which lasts less than 15 minutes, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Potentially, I don't know that for specifically.

BY MR. SANDOVAL-BUSHUR:

Q.    For example, a teacher who

reports spending 15 minutes in a typical day addressing student use of social media may spend three minutes one day disciplining for a student using Twitter during class, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: Again, you know, I do not know the breakdown of each teacher's report. It could be anything, as long as it's relevant to this case.

BY MR. SANDOVAL-BUSHUR:

Q. But it's possible that a teacher who reports spending 15 minutes in a typical day addressing student use of social media spends three minutes one day disciplining a student for using Twitter, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: I don't believe Twitter is part of this, so I don't know if Twitter would be a relevant one. So that goes back to all

CONFIDENTIAL

Page 361

these other issues we've had about what people are including or not. But, you know, if you want to pick any particular social media company, it could be three minutes for Facebook or two minutes for Instagram, none of that is broken down in my data.

BY MR. SANDOVAL-BUSHUR:

Q.   And it's possible that the student who the teacher disciplines for using one social media platform is not using any other social media platform, correct?

MR. GRADEN:   Objection. Foundation.

THE WITNESS:   Anything is possible.  I don't know -- correlations and student's social media use is not something I have knowledge of.

BY MR. SANDOVAL-BUSHUR:

Q.   So in an example where a teacher spends three minutes on a particular incident disciplining a student

CONFIDENTIAL

Page 362

for using one platform during class, those three minutes would be attributable to one platform, correct?

A.    I don't know if that, that -- the attribution of it, I would have to think about exactly how we were trying to attribute time to platform and how much potential interaction there is or overlap or accumulation of the facts.  I have no -- I have not spent any time thinking about how you would break down time estimates to allocate them to particular companies.

Q.    Part of your assignment was to identify and calculate the salaries and benefits paid to the employees who comprise the population subgroups included in the survey data and the affidavits with time estimates, correct?

A.    That's correct.

Q.    For Tucson, to identify and calculate the salaries and benefits to be paid to the employees who comprise the population subgroups included in the survey data and affidavits, you relied on Excel files that were provided to you, correct?

Page 363

A.      That's correct.

Q.      And you received those Excel files from Plaintiffs' attorneys, correct?

A.      That's correct.

Q.      And we can look at Exhibit 1F, which is your Tucson report at page 4 and footnote four.  And you see that those Excel files are titled, Fiscal Year 2017 Social Media Litigation Positions, with a date following that, through fiscal year 2024 Social Media Litigation Positions with numbers after that, correct?

A.      That's correct.

Q.      The titles of the Excel files you relied on indicate that they were created for this litigation shortly before you issued your report, correct?

A.      If we think of those as dates, that would be what is suggested, but I don't know specifically.

Q.      Okay.  Do the titles of the Excel files you relied on to identify and calculate salaries and benefits paid to Tucson employees indicate that those files were created for this litigation?

Page 364

MR. GRADEN:  Objection.

THE WITNESS:  It includes the language social media litigation positions.

BY MR. SANDOVAL-BUSHUR:

Q.    You do not know who created the Excel files that you relied on to identify and calculate the salaries and benefits paid to Tucson employees, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I don't recall that information, no.

BY MR. SANDOVAL-BUSHUR:

Q.    Is it possible that Plaintiffs' attorneys created those Excel files?

A.    I highly doubt it, because I did -- I did confirm some questions where I then got feedback through attorneys that were being confirmed by district people.

Q.    The Excel files that were provided to you by Plaintiffs' attorneys identified for you the employees who comprised the population subgroups included

Page 365

in the survey data and affidavits with --
correct?  I can ask that again because that
was a mess, I'm sorry.

A.     Yeah.

Q.     So the files that you were
provided by Plaintiffs' attorneys for the
Tucson case identified for you the
employees who comprised the population
subgroups that were included in the survey
data and affidavits, correct?

A.     It included -- I think it
includes all positions and I used it to
identify those populations.

Q.     The Excel file that you were
provided by Plaintiffs' attorneys told you,
for example, which employees were
counselors, correct?

A.     Yes.

Q.     And you relied solely on the
Excel files that were provided to you by
Plaintiffs' attorneys to identify the
employees who comprised the population
subgroups included in the survey data and
affidavits for purposes of your damages
calculation, correct?

A.    Say that again, I got lost.

Q.    Sure.  You relied solely on the Excel files that were provided to you by Plaintiffs' attorneys to identify the employees who comprised the population subgroups used in your damages estimates, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  Yes, I used these data, these are the data that I used to calculate those populations.

BY MR. SANDOVAL-BUSHUR:

Q.    And to calculate employee benefits, you rely on a statement in the Excel file that Plaintiffs' attorneys gave you that states that benefits are 30 percent of salaries, correct?

MR. GRADEN:  Objection. Foundation.  Form.

THE WITNESS:  That's what, you know, they -- the number that they provided me, yes.

Page 367

BY MR. SANDOVAL-BUSHUR:

Q.      For your estimate of damages relating to teacher salaries and benefits for Tucson, you rely on the results of Klein's teacher time survey, correct?

A.      Sorry, say that again.

Q.      For your estimate of damages relating to teacher salaries and benefits for Tucson, you rely on the results of Klein's teacher time survey, correct?

A.      That's correct.

Q.      And you do not know what percentage of teachers in Tucson responded to the Klein teacher time survey, correct?

A.      No, I do not.

Q.      For purposes of your opinion, it does not matter how few teachers in Tucson responded to the Klein teacher time survey, correct?

A.      I'm relying on the estimates that Dr. -- or Mr. Klein provides are reasonable for my purposes.

Q.      Even if only 1 percent of teachers responded to the Klein teacher time survey, your job was to apply the

Page 368

average response of that 1 percent of teachers who responded to calculate today damages, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I applied the estimates from the survey.

BY MR. SANDOVAL-BUSHUR:

Q.    Even if only 1 percent of teachers responded to the Klein teacher time survey, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Whatever is in there.

BY MR. SANDOVAL-BUSHUR:

Q.    So whatever is in the Klein teacher time survey, you applied for purposes of calculating your damages, it didn't matter what the response rate was, correct?

A.    That's correct.

MR. GRADEN:  Objection.

BY MR. SANDOVAL-BUSHUR:

Q.    And it was not part of your assignment to evaluate whether the teachers

Page 369

who responded to the Klein teacher time survey were different in any way from the teachers who did not respond to the Klein teacher time survey, correct?

A.    That's correct, that's not my part of my assignment.

Q.    For the time inputs for your Tucson damages estimates for non-teacher time, you relied on the declarations of Brian Lambert, Holly Hammel, Sabrina Salmon, and Julie Shivanonda, correct?  If you would like to look at paragraph 29 of your expert report.

A.    I don't know, is that the list, Lambert, Hammel, Salmon, Shivanonda, yes, correct.

Q.    And for the time inputs for your Tucson damages for non-teacher time, you do not rely on any source other than the declarations of Mr. Lambert, Ms. Hammel, Ms. Salmon, and Ms. Shivanonda, correct?

A.    That's correct.

Q.    For the time estimates for Tucson elementary, middle, and high school

Page 370

principals and assistant principals, you relied on the affidavits of two district employees and took the average of their estimates, correct?

MR. GRADEN:  Objection to form.

THE WITNESS:  If there were two estimates, I averaged them.  I don't remember in this specific case whether there were two estimates or not.

BY MR. SANDOVAL-BUSHUR:

Q.    Okay.  Does it -- is it familiar to you that you received estimates for elementary, middle, and high school principals and assistant principals from both Brian Lambert and Holly Hammel?

A.    The matching of who provided what, I cannot tell you off the top of my head, but -- so I don't know.

Q.    Do you understand that Mr. Lambert and Ms. Hammel are both regional superintendents for Tucson?

A.    I don't remember everybody's position.

Q.   Did it matter to you what anyone's position was for purposes of your calculation of damages?

A.   No, I assumed that the people who were providing it were people who had been identified because they had the relevant knowledge.

Q.   Do you know how many regions there are in the Tucson School District?

A.   Not off the top of my head, no.

Q.   Okay.  I'll represent to you that there are five.

A.   Okay.

Q.   And so you took the average of the estimates that Mr. Lambert and Ms. Hammel provided in their declarations and applied that average to calculate damages for Tucson elementary, middle, and high school principals and assistant principals for all five regions, does that sound correct?

A.   I applied those estimates to the whole district, that's correct.

Q.   You understand that

Mr. Lambert and Ms. Hammel offered different estimates of the percentages of time that principals and assistant principals spent addressing social media-related issues, correct?

A.    Potentially, I don't know exactly what they put in.

Q.    When two employees offered different estimates as part of your methodology, you did not attempt to understand why their estimates were different, correct?

A.    No, I didn't.

Q.    When two employees offered different estimates, you did not consider the possibility that the employee offering the higher estimate offered an inaccurate estimate, correct?

MR. GRADEN:  Objection. Foundation.

THE WITNESS:  I assumed that they provided me their best estimate of what the time loss was.

BY MR. SANDOVAL-BUSHUR:

Q.    When you received estimates

from two employees covering the same time period and same position, you took a simple average of their estimates, correct?

A.    That's correct.

Q.    You did not consider the possibility that one of the two estimates that you put in that simple average might have been an inaccurate estimate, correct?

MR. GRADEN:  Objection.  Asked and answered.  Foundation.

THE WITNESS:  I assumed they provided me accurate information.

BY MR. SANDOVAL-BUSHUR:

Q.    Well, but when you have two employees giving different estimates for the same position and the same time period, it is not possible that those two different estimates are both accurate, correct?

MR. GRADEN:  Objection to form.

THE WITNESS:  I mean, they're not precisely the same and so if you're saying, you know, if one is -- if there's a precise number and one is the precise number and

Page 374

the other isn't, then, yeah, one is by construction not accurate. But it doesn't mean that the average of them is not the accurate answer.

BY MR. SANDOVAL-BUSHUR:

Q.     But you would have no way of knowing whether the true answer of how much time employees in a position spend on social media is the low estimate, the high estimate, the average of the two estimates or something else entirely, right?

MR. GRADEN:  Object to form.

THE WITNESS:  Say it again.

BY MR. SANDOVAL-BUSHUR:

Q.     Okay.  We are talking about a situation where you have two employees who gave different estimates for the same position and same time period, correct?

A.     Yes.

Q.     When that occurs, you have no way of knowing whether the true answer of how much time employees in the position spend on social media is the lower estimate of the two, the higher estimate of the two, the average of the two, or some completely

Page 375

different number, correct?

MR. GRADEN: Objection to form.

THE WITNESS: I mean, the whole point is that the true answer is unknown. So, no, no one can tell me that one is accurate or not, because the truth by construction here is unknown, right, we don't know it. So we're eliciting information to try and uncover that truth.

BY MR. SANDOVAL-BUSHUR:

Q. Neither Mr. Lambert nor Ms. Hammel worked in the majority of the regions in the Tucson School District, they did not work in three of the five regions, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: I mean, I don't remember what they worked in or whether they've worked in other ones in at points in time or if we're just restricting this to the

Page 376

current point in time or whatnot.

BY MR. SANDOVAL-BUSHUR:

Q.      Let's assume that throughout the relevant time Mr. Lambert and Ms. Hammel worked in only one each out of the five regions, so neither of them worked in the three remaining regions.  Okay?

A.      Okay.

Q.      If that is true, it is entirely possible that Mr. Lambert and Ms. Hammel's estimates are higher, both higher than the estimates would have been from the regional superintendents, superintendents for the other three regions, correct?

MR. GRADEN:  Objection to form.

THE WITNESS:  I don't recall them offering estimates only for their region.  I believe they were attempting to describe the whole district.  And, presumably, they have information on the whole district for the reasons that we've talked about previously, which is I

Page 377

can elicit information or I can learn information about people in other regions.  These aren't, like, you know, they're not living in hermetically sealed bubbles where they have no information about the rest of the district.

BY MR. SANDOVAL-BUSHUR:

Q.    If Mr. Lambert and Ms. Hammel in fact stated that their estimates were only for their own regions, what would your basis be for assuming that the other three regions -- that those estimates could be applied to the other three regions?

MR. GRADEN:  Objection. Foundation.  And we're about at an hour too, so if we can take a break at the next convenient time.

THE WITNESS:  Well, I mean I've got 40 percent of the population, you know, or 40 percent of the regions directly covered and I don't recall there being a large difference between the two estimates, so it is not

unreasonable to assume that they would apply in the other areas.

BY MR. SANDOVAL-BUSHUR:

Q.    And what is your basis for saying it is not unreasonable to assume that the estimates of superintendents overseeing two regions would be a reliable metric for the three regions that they did not oversee?

A.    Because nothing that I've reviewed, either in the survey or any of the affidavits in any of the districts, you know, is suggesting that somehow that there's enormous variation across geography, particularly, and I don't even know what the regions are in Tucson, I don't know what regions they are representing, but it seems perfectly reasonable to say, look, this is the information that I have, this is what I was provided, it speaks to these positions, I'm going to apply it.

Q.    There is in fact very significant variation across geography of the amount of time that was provided to you

Page 379

in estimates of how school employees in different positions spent their time, correct?

MR. GRADEN: Objection to the testimony by counsel.

THE WITNESS: In what sense?

BY MR. SANDOVAL-BUSHUR:

Q. There are districts whose estimate of the amount of time that counselors spend addressing social media issues are five times higher than the estimates for other districts, correct?

A. Oh, across districts, yes. You know, but I'm saying within Tucson, right, so Tucson is a particular area, right, and I'm certainly willing to acknowledge that there may be regional effects or district effects, you know, at the larger region, but I don't know why there would be -- you know, I see no evidence that would suggest that within a single district, there should be enormous variation in these estimates.

Q. But you just haven't actually studied that question of if there is in

fact within district variation of the amount of time that is spent addressing social media issues, correct?

MR. GRADEN: Objection.

THE WITNESS: Nobody made any reference to that in any of the materials that I reviewed for people describing time estimates.

BY MR. SANDOVAL-BUSHUR:

Q. You haven't actually studied the question of if there is in fact within district variation of the amount of time that is spent addressing social media issues, correct?

MR. GRADEN: Objection. Asked and answered.

THE WITNESS: I've seen no evidence of that.

BY MR. SANDOVAL-BUSHUR:

Q. Have you actually studied that question?

A. I mean, I would have seen it in the evidence if it was there, but I haven't -- I didn't see any.

Q. You didn't look for

Page 381

information for it either, correct?

MR. GRADEN: Objection. Misstates.

THE WITNESS: I don't recall any of the affidavits describing that, that issue.

BY MR. SANDOVAL-BUSHUR:

Q. For the time estimates for the other Tucson non-teacher employees, you relied on affidavits from Sabrina Salmon and Julie Shivanonda, correct?

A. That's correct.

Q. And if you look at page 10 of your Tucson report, Table 4, those positions are listed in the right-hand column, correct?

A. I don't -- again, I don't remember who did what. But there are positions listed in the right-hand column.

Q. One of the positions listed in Table 4 of your Tucson report is director, social emotional learning, correct?

A. Correct.

Q. And that position has an

estimate of 100 percent, correct?

A.    That's what's here.

Q.    Do you think it's possible that literally 100 percent of the director of social emotional learning's time was spent addressing student use of social media?

A.    It's certainly possible.

Q.    Did you see any information that corroborated that that in fact happened?

MR. GRADEN:  Objection.

THE WITNESS:  Again, I'm taking the information provided to me by the affiant as sworn testimony and as a reliable estimate of the time for the positions that they give me.

BY MR. SANDOVAL-BUSHUR:

Q.    You do not know what the director of social emotional learning's job entails, correct?

A.    It may have been described in the affidavit, I don't remember.

Q.    For purposes of your opinion,

Page 383

you did not need to know what the director
of social emotional learning's job
entailed, correct?

MR. GRADEN:  Objection.

THE WITNESS:  No, I was -- I'm
taking time estimates and I needed
to be able to identify how much
they got paid.

BY MR. SANDOVAL-BUSHUR:

Q.    Do you think it's possible
that whoever provided that 100 percent
estimate may have misunderstood what they
were supposed to be estimating?

MR. GRADEN:  Objection.

THE WITNESS:  I have -- I
mean, anything is possible.  I have
no reason to believe that's the
case.

MR. SANDOVAL-BUSHUR:  So we
can take a break.

THE VIDEOGRAPHER:  Going off
video record 4:53 p.m.
- - - - -
(A recess was taken at this time.)
- - - - -

CONFIDENTIAL

Page 384

THE VIDEOGRAPHER:  Back on video record 5:10 p.m.

BY MR. SANDOVAL-BUSHUR:

Q.    Dr. Ward, could you please turn to Exhibit 1E, which is your amended Irvington report?

A.    Okay.

Q.    And go to paragraph 29.  For the time inputs to your Irvington damages estimate for non-teacher time, you relied on the declarations of Dr. April Vauss and Sandra Lopez, correct?

A.    That's correct.

Q.    For the time inputs to your Irvington damages estimates for non-teacher time, you did not rely on any sources other than the declarations of Dr. April Vauss and Sandra Lopez?

A.    That's correct.

Q.    I would like you to take a look at Exhibit 2E, which is your Irvington rebuttal report.  And if you turn to page 6, this is a list of materials considered, correct?

A.    Yes.

Page 385

Q.    And if you look under the heading Irvington documents, there is a set of documents that have the heading Bates and you list a series of documents there, correct?

A.    Correct.

Q.    Including documents that start with the Bates stamp BW__Irvington and a series of numbers, correct?

A.    That's correct.

Q.    You do not cite in your report -- you do not cite these documents in your report, correct?

MR. GRADEN:  Objection.

THE WITNESS:  I have no idea.

BY MR. SANDOVAL-BUSHUR:

Q.    Well, you could just --

A.    In the reply report here?

Q.    Correct.

A.    I don't see them in a footnote anywhere.

Q.    So you do not say in your report how these documents support or are related to your opinions, correct?

A.    No, I do not.

Page 386

Q.    Do these documents that start with the BW__Irvington Bates number support or relate to your opinions?

A.    I have no idea what they are.

Q.    Do you know how they wound up on your materials considered list?

A.    Well, presumably, they're part of the materials I've considered at some point for Irvington, but I don't know what Bates numbers, I don't recall documents based on Bates numbers, so I don't know what these -- I literally don't know what they are.

Q.    And so sitting here today, you are not able to tell me whether or how these documents support or are related to your opinions, correct?

A.    I do not.

Q.    Okay.  If you turn to tab 1B, Exhibit 1B, what is your amended Charleston report and go to paragraph 32.  For the time inputs for your Charleston damages estimates for non-teacher time, you relied on the declarations of Anita Huggins and Lisa Allison, correct?

Page 387

A.      That's correct.

Q.      For the time inputs to your Charleston damages estimate for non-teacher times, you do not rely on any other declarations other than the declarations of Anita Huggins and Lisa Allison, correct?

A.      That is correct.

Q.      Are you aware that Anita Huggins is the person who provided the estimate for principal time for the Charleston district?

A.      I don't remember who applies to what.

MR. SANDOVAL-BUSHUR:  Okay. Let's mark tab 21 as Exhibit 11.

- - - - -

(Affidavit of Lisa Kathryn Allison marked Ward Exhibit 11 for identification.)

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      And, Dr. Ward, this is the declaration of Lisa Allison, who is one of the two people who you relied on for your non-teacher time estimates for Charleston,

Page 388

correct?

A.    It's the affidavit, but yes.

Q.    And Ms. Allison does not provide an estimate for principals, correct?

A.    Sorry, what was your question again?

Q.    Ms. Allison's affidavit does not provide any estimate of time for principals or assistant principals, correct?

A.    She appears to do school psychologists, counselors, and social workers, so no principals.

Q.    Okay.  Great.  Let's mark tab 20, which is the affidavit of Anita Huggins as Exhibit 12.  And Ms. Huggins is the other of the two people who you rely on for Charleston for estimates of non-teacher time, correct?

A.    That's correct.

- - - - -

(Affidavit of Anita Huggins marked Ward Exhibit 12 for identification.)

CONFIDENTIAL

Page 389

- - - - -

BY MR. SANDOVAL-BUSHUR:

Q.      And you see that Ms. Huggins does in paragraph 12 of her affidavit provide a time estimate for principals, correct?

A.      It's also, it's 11 and 12, but, yeah.

Q.      So for high school principals, Ms. Huggins provides her estimate of time for high school principals and high school assistant principals in paragraph 12, correct?

A.      That's correct.

Q.      And if you look at what Ms. Huggins says, she writes that in the Charleston School District, high school principals and assistant principals currently spend 15 percent of their time dealing with social media issues, correct?

A.      Correct.

Q.      And she says, "This represents, on average, an increase of more than 150 percent of time spent on these issues since 2017," correct?

CONFIDENTIAL

Page 390

A.    Correct.

Q.    And so that means that in 2017, according to Huggins' estimate, high school principals and assistant principals spent 6 percent of their time addressing social media-related issues, correct?

A.    Correct.

Q.    Okay.  Let's now look back at your Charleston report, Exhibit 1B, and look at page 9, Table 4.

A.    All right.

Q.    Here for high school principals and high school assistant principals for the year 2017, you have put a share of 9 percent, correct?

A.    That's what's listed there.

Q.    And we just agreed that Ms. Huggins' affidavit said that teachers spent 6 percent of their -- sorry, not teachers, we just agreed that Ms. Huggins affidavit said high school principals and assistant principals spent 6 percent of their time in 2017 on social media-related issues, correct?

A.    Correct.

Page 391

Q.    So this 9 percent figure in your Charleston report for high school principals and high school principals for 2017 is erroneous, correct?

A.    It appears to be, yes.

Q.    And because that percentage for 2017 is erroneously high, your damages estimates for Charleston relating to high school principals and assistant principals is erroneously high for 2017-2018, 2019-2020, 2021-2022, 2023, and 2024, correct?

A.    Assuming it was applied in the calculation, and it's not just a typo in the table, that would be correct.

Q.    Okay.  But if what you said in your Charleston expert report is accurate -- accurately reflects the inputs that you used for your calculation, correct --

A.    If it does, yes.

Q.    -- then your damages estimates for Charleston relating to high school principals and assistant principals would be erroneously high from 2017 through

Page 392

2024, correct?

MR. GRADEN:  Objection.
Compound.

THE WITNESS:  If I've used the wrong percentage, then yes, it's improperly calculated.

BY MR. SANDOVAL-BUSHUR:

Q.    And if your high school principals and high school assistant principal damages are erroneous for Charleston, then your total damages estimates for Charleston are also incorrect, correct?

MR. GRADEN:  Objection.  Form.

THE WITNESS:  Yeah, they'll be pretty slight, but yeah.

BY MR. SANDOVAL-BUSHUR:

Q.    Okay.  I would like to turn to tab or Exhibit 1D, which is your Harford amended report and turn to paragraph 41.

A.    So 1D.

Q.    1D as in dog, in paragraph 41.

A.    Okay.

Q.    You describe here a mismatch

CONFIDENTIAL

Page 393

in the data you used to calculate Harford's damages related to counselors and school psychologists, correct?

A.    Okay.

Q.    That is correct, that you describe a mismatch in the data you used to calculate Harford's damages related to counselors and school psychologists?

A.    Yeah, a year mismatch, yeah.

Q.    Okay.  You calculated Harford's damages relating to counselors and school psychologists using an estimate of time spent addressing social media that covered 2017 to 2024 and applied that to the amount of salary and benefits paid to counselors and school psychologists in 2025, right?

A.    And assumed that applied to 2024.

Q.    What do you mean when you say, "and assumed that applied to 2024"?

A.    I only actually calculated losses for 2024 for this population, so I'm only applying the percentage to a wage estimate for one year.

Page 394

Q.     You acknowledge that because there is a mismatch between the time period covered by the time estimate and the time period for which you had data on counselor and psychologists' salaries and benefits, your Harford damages related to counselors and school psychologists may be inaccurate, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Well, I note that there's a slight mismatch and because the movement between wages is mostly just inflation anyway and I've adjusted for that, it's unlikely to have much of an effect, but there's a slight technical mismatch of what I'm applying in the wage column and what I'm applying in the shared estimate time.

BY MR. SANDOVAL-BUSHUR:

Q.     Why did you have to calculate damages for Harford using mismatched data?

A.     The only data that I had for wages was 24-25.

Page 395

Q.    Did you ask Harford for data for in the 2024 year?

A.    I asked all the districts for data for all of the years.

Q.    And Harford just didn't provide you with data for salaries for the years that you requested it?

A.    This is the only data I received.

Q.    Do you think that there's some reason why Harford was unable to provide you with salary data for 2024?

A.    I don't know why.  I used what I had.

Q.    Let's look at Exhibit 1A, which is your Breathitt report.  If you look at paragraph 36, for your estimates of time for non-teachers, you rely on the affidavits of Will Noble, Daphne Noble, Jeremy Hall, Phil Watts, and Kera Howard, correct?

A.    That's 34.

Q.    Oh, I apologize.

A.    Will Noble, Daphne Noble, Jeremy Hall, Phil Watts, Kera Howard.

Page 396

Q.    For the time inputs for your Breathitt damages estimates for non-teachers, you did not rely on any source other than the affidavits of Will Noble, Daphne Noble, Jeremy Hall, Phil Watts, and Kera Howard, correct?

A.    That's correct.

Q.    An essential part of your damages calculation for Breathitt was your calculation of the dollar amount of employee benefits paid to the relevant categories of employees, correct?

A.    That's part of the calculation, yes.

Q.    To calculate the amount of employee benefits, you used what you called a benefits multiplier, correct?

A.    That's correct.

Q.    And what is a benefits multiplier?

A.    Essentially, it's what you would multiply wages by to obtain total compensation that includes both wages and benefits, the value of benefits.

Q.    If you look at paragraph 22

Page 397

of your Breathitt report, Exhibit 1A, you say I used a benefit multiplier provided by the district to add benefits, correct?

A.    Correct.

Q.    You do not say what, in the text of your report, what that benefits multiplier is, correct?

A.    It doesn't appear to be there.

Q.    And you do not provide a source for what that benefit multiplier is, correct?

MR. GRADEN:  Objection.

THE WITNESS:  It doesn't appear to be here.  I received it from the district via counsel.

BY MR. SANDOVAL-BUSHUR:

Q.    So counsel provided you with the benefit multiplier for Breathitt?

A.    That's correct.

Q.    Did you do anything other than rely on the multiplier that counsel provided you to verify that that benefit multiplier was accurate?

A.    I actually did investigate it

CONFIDENTIAL

Page 398

and it actually appears to be low, so it was the most conservative number.  In the common core of data data, there's a benefits and wages calculation, so I could compare that.  And it suggested a higher number than what I got from the district, but when I was told the number by the district, I just said I'm going to trust -- trust what they tell me.

Q.     You do not know who from the district provided the benefit multiplier that you received from counsel?

A.     I may have been told at the time, but I don't remember right now.

Q.     And you didn't speak to anyone from Breathitt about what the benefit multiplier should be?

A.     I did not.

Q.     If you turn to Table 6 of your Breathitt report, Table 6 summarizes your calculation of damages for the 2016 to 2020 time period for Breathitt, correct?

A.     That's correct.

Q.     And, actually, let's -- and let's take a look at Table 5.  Table 5 of

CONFIDENTIAL

Page 399

your Breathitt report summarizes your calculation of damages for the 2021 to 2024 time period, correct?

A.      Correct.

Q.      And there's, like, two tables that sort of work together here.  You've got survey-related damages, affidavit-related damages and then combined survey plus affidavit total, correct?

A.      Correct.

Q.      And so for the 2021 to 2024 time period, you add together for base pay, the total mean share from the survey, 323,000, plus the total base pay for the affidavits, 1.133 million, and get a total of 1.457 million, correct?

A.      Correct.

Q.      Okay.  Let's look at Table 6. Now, if one were to attempt to perform that same mathematical equation on Table 6, the math doesn't add up, right?  You've got a mean share for survey based time loss of 428,000, a base pay for affidavit base damages of 323,000, though the number that is listed on the combined survey plus

Page 400

affidavit total should reflect the sum of 428,000 plus 323,000, correct?

A.    It should.  But these numbers, it's like we didn't get the corrected table in here.

Q.    I will -- and there's also a mathematical error when you look at base pay plus benefits for this Table 5, 2016 to 2020 time period, correct?

A.    Yeah.

Q.    And I will represent to you that the totals in the combined survey plus affidavit total line are calculated by taking two times the survey mean share plus the affidavit total.

A.    Sorry, say that again.

Q.    So the way that the combined survey plus affidavit total is equal to, if you multiply by two, the mean share in the survey section and add that to --

A.    So it doubled it somehow?

Q.    Correct.

A.    Okay.  So these are, yeah, so I think that the combined total somehow got subgrown [sic].

Page 401

Q. Okay. So that's an error in your Breathitt report, correct?

A. Yes, in comparing the old report to the corrected report, the top part of the table is correct, but the sum, sum, yeah, must have been gotten doubled.

Q. And every other damages estimate in your report that relies on the erroneously calculated total in Table 6 is also erroneous, correct?

A. Yeah, any time it's citing that number.

Q. And so sitting here today, you're not confident that all of the damages estimates reported in your Breathitt report are accurate, correct?

MR. GRADEN: Objection. Foundation.

THE WITNESS: It appears to be the error that you're calculating now that I've compared it to the other one, the top line number is the correct number, it's just the summing.

Page 402

BY MR. SANDOVAL-BUSHUR:

Q.      Will you issue second amended reports for each of Charleston and Breathitt to address the issues we have discussed today?

A.      Sure, assuming the Charleston one is an actual issue in the calculation and not just an issue in the table, but I will maybe issue that too just to correct the table.

Q.      For DeKalb, you are not offering any opinions on non-teacher damages, correct?

A.      That's correct.

Q.      And let's turn to your DeKalb report, which is Exhibit 1C, if you look at paragraph 17, to calculate your damages for DeKalb, you relied on common core data for information about teacher salaries and benefits, correct?

A.      For salaries.

Q.      How did you calculate benefits for DeKalb?

A.      For DeKalb, I had a separate document that actually provided a very good

Page 403

estimate for the benefit multiplier for teachers.

Q.      And is that document from DeKalb for a benefits multiplier for teachers something you received through counsel?

A.      Yes.

Q.      And do you know where in the DeKalb School District that estimate came from?

A.      Not off the top of my head, no.

Q.      If you look at paragraph 18 you say that you -- that because the common core data includes all payments to teachers including overtime, additional pay, summer, you reduced the estimated salary for DeKalb teachers by 25 percent for purposes of your calculations, correct?

A.      That's correct.

Q.      Why was it appropriate to exclude teacher overtime, additional pay, and summer payments when calculating damages for DeKalb?

A.      Mr. Klein's survey asked

Page 404

about instructional time on a typical day. So I interpret that to find, quote, unquote, "a normal day." It's not measuring time spent while coaching soccer or some sort of extra duty thing. You know, it doesn't specifically speak to summer, so I chose to be conservative and say I'm just using base pay, normal salary, regular school year.

Q.    What is additional pay?

A.    That would be kind of, you know, extra duty pay.

Q.    Did you confirm that the teacher salary data that you used for Breathitt, Charleston, Harford, Irvington, and Tucson excluded teacher overtime, additional pay, and summer payments?

A.    Yes.

Q.    What did you do to confirm that?

A.    I asked specifically -- Charleston actually sent us data that was gross pay and I was, like, this says gross pay, is this gross pay or base pay and they're, like, that's gross pay, it's

Page 405

everything.  So then I got a new file that said base pay.

And then for Irvington, the data had it all broken down, so I was able to breakdown extra duty payments, et cetera, it's in the data.

I also confirmed at Tucson that was the appropriate interpretation of their data.

Q.    What about for Harford?

A.    I think, yeah, I think I asked the same question for Harford.

Q.    And what about for Breathitt?

A.    Same, yes, I confirmed that that was what I was provided.

Q.    And when you confirmed for Breathitt, Harford, and Tucson that the salary data you received did not include overtime, additional pay, and summer payments, that is confirmation that you received from Plaintiffs' attorneys, correct?

MR. GRADEN:  Objection to form.

THE WITNESS:  That I received

Page 406

via Plaintiffs' attorneys, yes.

BY MR. SANDOVAL-BUSHUR:

Q.    And you do not know who from any of those districts provided that confirmation, correct?

A.    No.

Q.    If you look at Exhibit 1F, which is your Tucson report, paragraph 21, for purposes of your damages calculations in Tucson, you include additional supplemental pay to each teacher, correct?

A.    That's correct.

Q.    Why was it appropriate to include the supplemental pay for Tucson but necessary to exclude overtime, additional pay, and summer pay for DeKalb?

A.    As I understand it, the supplement pay is something that everyone on the contract gets.  It's not like -- I don't really understand why they have it broken out supplementally, but my understanding was that, you know, and then there's the footnote 14 where it's all teachers that are in this particular contract receive this amount, so it's

Page 407

essentially just part of their salary.  I don't know why they label it as supplemental pay.

Q.    But the district does break out the supplemental pay from the base salary, correct?

A.    They do, and I reported both.

Q.    In performing your damages estimates, you did not consider whether there were any confounding factors that affected the amount of time that school employees spent addressing social media-related issues, correct?

MR. GRADEN:  Objection.

THE WITNESS:  Sorry, what do you mean?

BY MR. SANDOVAL-BUSHUR:

Q.    In performing your damages estimate, you did not consider whether COVID-19 affected how much time school employees spent addressing social media-related issues, correct?

A.    I took the time loss estimates that I was provided as reliable.

Q.    And you, in performing your

damages estimates, did not consider whether COVID-19 affected how much time school employees spent addressing social media-related issues, correct?

A.    No.

Q.    That is correct?

A.    Oh, sorry, that is correct.

Q.    And in performing your damages estimates, you did not consider whether there were any other confounding factors other than COVID-19 that affected the amount of time that school employees spent addressing social media-related issues, correct?

MR. GRADEN:  Object to form.

THE WITNESS:  I took the time estimates that I was provided.

BY MR. SANDOVAL-BUSHUR:

Q.    Do you use any social media platforms?

A.    Again, we're into the definition of what is a social media platform.  Of the list that you started with that included all things like Pinterest and Twitch and everything, so the

Page 409

exhaustive list that you provided, the only one that I use at all is Twitter.

Q.    Okay.  How long have you used Twitter for?

A.    I have no idea.

Q.    What do you use Twitter for?

A.    Basically to learn what journal articles have been published.

Q.    Do you use YouTube?

A.    Oh, I mean, I've seen videos on YouTube, so I guess I also use YouTube.

Q.    What do you use YouTube for?

A.    Oh, I mean, when people post videos and wherever it might be, it's often on YouTube.  Perhaps if I want to, like, show my kids a music video, I'll search for it on YouTube.

Q.    Do you use Instagram?

A.    No.

Q.    Do you use Facebook?

A.    No.

Q.    Do you use SnapChat?

A.    No.

Q.    Do you use TikTok?

A.    No.

Page 410

Q.    Have you ever used any of Facebook, Instagram, SnapChat, or TikTok?

A.    I mean, I was at Harvard in 2004, so I have a very low user number on the Facebook, but no, I have not used it in a long time.

Q.    Congratulations.  Do you have children?

A.    I do.

Q.    And how old are they?

A.    Ten, 12, 14.

Q.    Do any of your children use social media?

A.    My 14-year-old recently was able to persuade me to allow her to have SnapChat to text with her friends.

Q.    Okay.  Do any of your other children have any other social media accounts?

A.    No.

Q.    And you have shown at least one of your children a YouTube video at some point?

A.    Oh, I'm sure they've seen YouTube videos, but they're not like --

Page 411

well, in my house, they're not supposed to be just going on and looking at videos on YouTube.

Q.    Do you know if any of your children have ever used YouTube in connection with school?

A.    Oh, I have no idea what they do at school.

Q.    You spoke earlier about prior experience you have relating to calculating opportunity costs in educational settings and you mentioned in an Oregon program. What program is that?

A.    It's called the ASPIRE program.

Q.    And what was the ASPIRE program?

A.    The ASPIRE program was effectively a program where school districts working through their counseling departments would recruit volunteers to come help kids fill out college applications and FAFSAs.

Q.    And what specifically did you do in connection with calculating

Page 412

opportunity costs in connection with the ASPIRE program?

A.    You know, I mean, the program was described to us in terms of it requires a room in the counseling center, you've got to recruit a certain number of volunteers. It takes a little bit of counselor time to kind of recruit the volunteers and manage the program.  I think that was the extent of it, but I don't remember.  This was a long time ago.

Q.    When did this take place?

A.    2008.

Q.    Okay.  And you also referred to prior experience calculating opportunity costs in an educational setting in connection with a national program?

A.    That's correct.

Q.    What program was that?

A.    It's called the Safe & Civil Schools program.

Q.    And what specifically did you do in connection with calculating opportunity costs relating to the Safe & Civil Schools program?

A.      So Safe & Civil Schools, that's a consultant program, right, so, like, the consultant comes in, they have trainers, they provide materials, so when you're trying to describe what the cost of this is going to be, so you're going to go to a district and say, okay, this is useful.  You know, we put together a little bit of a cost model that had the cost of the program, right, because you have to pay for the trainer, included the amount of time that teachers have to spend in the training, so that's the most directly relevant thing here.  And then whatever other materials, there's, like, posters and stuff like that.  Again, that was also, I think, roughly 2008, so I don't remember all of the details, but I do remember sitting in a meeting talking about what went into -- the ingredients that went into the program.

Q.      Is there any published document relating to your calculation of opportunity costs with the Safe & Civil Schools program?

Page 414

A.     So I published articles in there, I don't know if we did the cost piece for that or if that was just for discussions with the client.  You know, it may be in there, it may not be, I don't remember.

Q.     When did your work in connection with the Safe & Civil Schools program take place?

A.     You have to look at when the last publication was, but kind of roughly 2007 to maybe 2010, although my part was mostly 2008, I think.  You know, publication lags are long, so there was a lot of waiting to get it published, but, you know, I think the actual -- it was a randomized control study thing, the actual period where we were in the field collecting data, yeah, I want to say 2007, 2008.

Q.     Were there any documents, studies, et cetera published in connection with the Oregon ASPIRE program?

A.     I don't know.  I mean, we presented, you know, the funder is who paid

Page 415

for the evaluation.  I don't know if it was ever publicly disseminated.

Q.    You don't have a specific memory of an article or anything like that relating to your work?

A.    No, nothing that -- I mean, I don't remember if we just provided a presentation to the funder or if we actually wrote an article or what we did but I, you know, I don't remember.

MR. SANDOVAL-BUSHUR:  Okay. Let's go off the record.

THE VIDEOGRAPHER:  Going off video record 5:48 p.m.

- - - - -

(A recess was taken at this time.)

- - - - -

THE VIDEOGRAPHER:  Back on video record, 5:57 p.m.

MR. SANDOVAL-BUSHUR:  Dr. Ward, thank you very much for your time today.  YouTube is going to pass the witness.  I will give any other Defendants on by Zoom or in person to -- an opportunity to say

Page 416

if they want to ask any questions.

MR. LANDS:  No questions on behalf of Meta.  I don't have a mic, but.

MS. REAVES:  And no questions for Snap.

THE VIDEOGRAPHER:  Counsel on Zoom, anything for the record?

MR. GREEN:  No questions on behalf of the TikTok Defendants.

THE VIDEOGRAPHER:  Thank you. Please stand by.  This is the videographer stating total run time by party for the record.  Joseph Sandoval-Bushur for YouTube is at six hours 45 minutes.  This concludes today's video deposition. Going off video record 5:58 p.m.

- - - - -

(Whereupon, the deposition was concluded at 5:58 p.m.)

- - - - -

CONFIDENTIAL

Page 417

C E R T I F I C A T I O N

I HEREBY CERTIFY that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on August 15, 2025, and that this is a correct transcript of same.

*Robin L. Clark*

_____

Robin L. Clark

Registered Professional Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

CONFIDENTIAL

Page 418

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

CONFIDENTIAL

Page 419

```
                                -  -  -  -  -
                             E  R  R  A  T  A
                                -  -  -  -  -
    PAGE        LINE         CHANGE


    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____

    ----        ----         _____
```

CONFIDENTIAL

Page 420

ACKNOWLEDGMENT OF DEPONENT

I, BRYCE WARD, PhD, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

DATE                    SIGNATURE

Subscribed and sworn to before me this

         day of                    ,

2025.

My commission expires:


Notary Public

CONFIDENTIAL

**[& - 2018]**                                                            Page 1

**&**

**&**   1:17 2:2,10
  2:16 3:2,13 4:2
  4:8 412:20,24
  413:1,24 414:8

**0**

**000005**   6:21
  60:17
**03047**   1:5
**07068**   3:15
**08002**   3:20

**1**

**1**   49:8 87:6
  367:23 368:1,9
**1.133**   399:15
**1.457**   399:16
**10**   5:3 7:1
  105:23 106:2
  348:19,22
  381:13
**100**   64:16
  70:22 321:4,16
  321:20 322:8
  382:1,4 383:11
**101**   3:19
**1099**   73:20
**10:24**   86:14
**10:42**   86:19
**10th**   63:13,16
  63:21 66:2
**11**   5:8,9 7:1
  31:2 124:22

348:18 387:15
387:18 389:7
**1180**   4:9
**11:57**   162:23
**12**   5:11 7:3
  77:11,15,19
  80:13,15
  335:15 388:17
  388:24 389:4,7
  389:13 410:11
**124**   6:22
**12:46**   163:3
**13**   5:12,14
  27:25
**14**   5:15,17
  406:23 410:11
  410:14
**15**   1:12 5:18,20
  5:21 9:5
  359:15,19
  360:1,15
  389:19 417:7
**150**   389:24
**16**   5:23,24
**1600**   4:9
**17**   18:2 64:2
  328:19 402:17
**18**   329:23
  403:13
**19**   28:6 66:3
  407:20 408:2
  408:11
**19087**   2:5

**19103**   2:18
**1969**   268:15
  269:8
**1992**   268:16
**19th**   63:14,16
  63:21
**1:54**   234:21
**1a**   5:8 10:23,23
  11:5 16:23
  17:10,17,21
  18:1 22:24
  41:8,16 395:15
  397:1
**1b**   5:9 11:15,16
  11:20,24
  386:19,20
  390:9
**1c**   5:11 12:15
  12:22 402:16
**1d**   5:12 13:3,10
  392:19,21,22
**1e**   5:14 13:16
  13:22 384:5
**1f**   5:15 10:23
  14:3,9 16:23
  17:10,17 41:8
  41:17 326:18
  363:6 406:7

**2**

**2**   14:17 87:6
**20**   6:1 23:10
  25:7 28:6 64:1
  76:19 220:4,9

220:18,22,23
221:1 222:13
222:16 225:17
308:17 388:16
**200**   76:16
**2000**   268:16
**20001**   3:4
**2001**   2:18
**20024**   2:12
**2004**   410:4
**2006**   269:6
**2007**   414:12,19
**2008**   412:13
  413:17 414:13
  414:20
**2010**   414:12
**2014**   23:10
**2015**   23:10
  25:24 32:8,19
  32:24 33:5,7
**2016**   398:21
  400:8
**2016-17**   28:9
**2017**   28:11
  363:9 389:25
  390:3,14,23
  391:4,7,25
  393:14
**2017-18**   28:6
**2017-2018**
  28:11 391:10
**2018**   25:22,23
  25:24 72:2,4

CONFIDENTIAL

**[2019-2020 - 5]**                                                    Page 2

**2019-2020**
  391:11
**202-220-1126**
  3:5
**202-434-5013**
  2:12
**2020**  23:10
  398:22 400:9
**2021**  23:20
  71:10,19,23
  72:2,4,20
  74:17 399:2,11
**2021-2022**
  391:11
**2023**  391:11
**2024**  23:20
  27:14 363:11
  391:11 392:1
  393:14,19,21
  393:23 395:2
  395:12 399:2
  399:11
**2025**  1:12 9:6
  27:11,13 32:7
  32:19,24 59:16
  60:7 61:8
  62:15,19 65:20
  66:3,22 67:3,9
  67:15 68:4
  393:17 417:7
  420:14
**21**  6:2,4 28:7
  387:15 406:8

**210**  3:19
**215-278-2555**
  2:19
**22**  6:5,7 28:7
  396:25
**2200**  4:4
**23**  28:7 326:20
**23-24**  28:10
**24**  28:7
**24-25**  28:16
  351:1 394:25
**25**  101:23
  102:2 328:5,14
  403:18
**250**  59:12 62:1
**27**  329:14
**280**  1:18 2:5
  9:10
**29**  369:12
  384:8
**2:10**  235:1
**2a**  5:17 14:18
  14:19,24 16:24
  17:10,18 41:8
  41:17
**2b**  5:18 11:11
  15:3,8
**2c**  5:20 15:12
  15:17
**2d**  5:21 15:21
  16:1
**2e**  5:23 16:5,10
  384:21

**2f**  5:24 14:18
  16:14,19,24
  17:10,18 41:9
  41:17 87:6

**3**

**3**  18:4 124:22
**30**  6:8 23:1
  95:15,19
  366:19 418:15
**300,000**  138:5
**3000**  2:18
**30309**  4:10
**3047**  1:6
**31st**  31:19 63:2
**32**  386:21
**323,000**  399:14
  399:24 400:2
**335**  6:23
**335,000**  62:6,6
  62:11
**34**  26:17
  395:22
**346**  6:24
**36**  395:17
**37**  6:9 264:20
**38**  6:11
**387**  7:1
**388**  7:3
**39**  6:13,15
**3:28**  315:12
**3:45**  315:17
**3a**  6:1 20:14,20
  20:25 22:19

**3b**  6:2 21:4,10
**3c**  6:4 21:14,20
**3d**  6:5 21:24
  22:4
**3e**  6:7 20:14,15
  20:18 22:8,14
  22:19

**4**

**4**  6:8 30:9,12
  363:7 381:14
  381:21 390:10
**4/11/25**  6:8
  30:11
**40**  6:17,19 23:1
  25:7 59:22
  60:6 63:10,11
  264:1,2,7,12,21
  377:20,21
**404-572-2728**
  4:10
**409-763-3260**
  4:5
**41**  392:20,23
**428,000**  399:23
  400:2
**43**  264:19
**45**  416:16
**4:22**  1:5
**4:53**  383:22

**5**

**5**  3:14 23:19
  24:8 61:11
  398:25,25

CONFIDENTIAL

400:8

**5/18/25** 6:22 124:14

**50** 60:6 74:25 75:1,6 281:15 282:10

**50/50** 74:21 77:9

**500** 308:11 341:15

**500e** 3:4

**501** 4:4

**5:10** 384:2

**5:48** 415:14

**5:57** 415:19

**5:58** 416:18,21

**5a** 6:9 37:17,23 41:2,10,17

**5b** 6:11 38:20 39:2

**5c** 6:13 39:6,13

**5d** 6:15 39:17 39:24

**5e** 6:17 40:3,10

**5f** 6:19 40:14 40:21 41:2,10 41:18

**6**

**6** 6:20 24:6 60:14,18,21 61:6,21,25 384:23 390:5 390:19,22

398:19,20

399:18,20

401:9

**60** 6:20

**601** 3:3

**610-667-7706** 2:6

**665** 58:7,24,25 59:3 61:11,22

**680** 2:11

**6a** 124:10,19

**7**

**7** 6:22 124:11 124:15,20 125:1

**70** 269:8

**77550** 4:4

**8**

**8** 6:23 19:17 125:12 335:16 335:19,22

**80** 264:8

**856-667-0500** 3:20

**9**

**9** 6:24 346:12 346:15,18,21 390:10,15 391:1

**908** 417:13

**95** 253:19 326:9

**973-994-1700** 3:15

**9:06** 1:19 9:6

**a**

**a.m.** 1:19 9:6 86:14,19 162:23

**abbreviation** 119:19

**ability** 223:18 241:17 242:17

**able** 42:15 54:1 92:18 93:4,9 93:15 100:6 104:13 212:1 291:5,19 302:13 310:8 311:16 313:13 322:11,21 339:1,8 383:7 386:15 405:4 410:15

**abmj** 70:10,12 70:17,20,23,25 71:4,6,11 72:22 73:2,12 73:25 74:18 75:6

**above** 1:20 23:19 257:15

**absence** 212:4 216:4 217:16 219:25 225:23

226:4

**absolutely** 99:6

**absorb** 224:1

**absorbing** 224:5 225:7,9

**academic** 46:17 53:21 272:15 279:14 304:17 331:23

**accept** 277:15

**acceptable** 255:6

**access** 42:9 287:21 291:19

**accessed** 329:9

**accessing** 155:14

**account** 254:4 254:13 255:15 256:8,19 259:15 261:20

**accounted** 259:2 264:10

**accounting** 243:16

**accounts** 410:19

**accumulation** 356:10 362:9

**accuracy** 100:11,17 104:22 105:3 254:10 255:4 257:17 258:14

CONFIDENTIAL

**[accuracy - addressing]**

259:7 292:20 300:2 304:13 304:14

**accurate** 31:9 64:5 92:20 93:6 94:4,24 95:10 96:4,20 97:13 100:8 101:19 102:14 103:6,14 104:16 105:18 106:15 107:7 107:13 114:17 114:22 115:3,8 115:13,21 116:17,22 117:2,4,8,13 118:2,10 132:18 141:21 142:13 145:22 145:25 267:18 270:14,23 277:24 282:15 288:12,23 289:7 290:7 292:1 299:11 299:22 304:11 324:2,8,25 325:8,17 334:22 340:2 355:24 373:12 373:18 374:2,4 375:7 391:18 397:24 401:16

418:17

**accurately** 33:15 93:11,16 101:13 105:11 239:13 267:11 267:22 277:18 278:7 391:18 417:5

**acknowledge** 379:17 394:1

**acknowledg...** 420:1

**action** 174:5 217:3 218:15

**actions** 1:10 193:22

**activities** 96:16 103:2 107:3 184:22

**activity** 178:17 180:19 181:10 183:3 235:19 268:6 269:22 279:2,5,18,20

**actual** 255:4 263:19,22 280:1 310:20 347:19 402:7 414:16,17

**actually** 12:1 28:11 29:9 32:13 54:11 64:6 70:5 73:18 76:22

93:12 195:17 197:17 218:16 237:1 245:10 249:17 261:1,3 264:9 282:4 284:15 285:20 287:9 315:5 325:21 330:8,9 331:23 335:13 341:25 359:5 379:24 380:10 380:20 393:22 397:25 398:1 398:24 402:25 404:22 415:9

**ad** 231:19

**add** 34:24 397:3 399:12 399:21 400:20

**addicted** 156:12,17 157:10,20 158:5,15 159:3 159:10,18 160:16 161:1

**addiction** 1:5 9:12 277:2

**additional** 232:15 288:5 295:22 296:18 331:17 403:16 403:22 404:10 404:17 405:19 406:10,15

**address** 87:1,13 87:21 88:17 170:10,19 172:5 183:24 196:7 203:1,9 228:22 252:11 275:5 402:4

**addressed** 283:11 323:18

**addresses** 217:12

**addressing** 90:22 91:4 95:15,19 96:8 101:24 102:3 102:20 105:24 106:3,20 108:2 108:11,18 111:17 131:17 134:13,25 135:16 136:21 136:25 138:24 139:16 140:20 141:5 144:7,17 146:4,20 147:8 148:8,19 149:4 149:16,25 150:10,19 151:17 152:19 154:20 155:4 156:11,16 157:9,19 158:4 158:14 159:2 161:5,13,16,25

CONFIDENTIAL

**[addressing - affidavits]** Page 5

163:7,21 165:2
165:8,22 166:6
166:18 170:22
171:7,16
172:17 173:9
174:10 175:2,9
175:14 176:3
176:12 177:8
177:12,16,22
178:9,22 179:2
179:14 182:10
182:22 183:6
183:14 184:4
187:13 188:11
188:21 189:5
203:15 207:20
208:13 211:2
212:3,7,11
213:19 214:14
215:25 216:4
217:18 221:14
223:14,16
226:15 227:1,3
227:16 228:1
228:12,14
229:1,4,20
230:6 233:10
254:24 255:5
267:2,12,24
273:24 274:2
274:11,14
281:15,18
298:3,22,25
300:5,12,20

301:9,20 302:8
303:9,12,23
304:10 305:11
316:6 318:3,17
318:20 319:11
319:24,25
321:4,21 325:3
332:11 349:20
354:16,23
355:14 359:15
359:17 360:2
360:16 372:4
379:10 380:2
380:13 382:6
390:5 393:13
407:12,21
408:3,13
**adjusted**
  394:14
**adjustment**
  96:23 107:8,20
**adjustments**
  36:11 97:21
  103:9,20
  350:13
**administered**
  305:3
**administering**
  130:22
**administrators**
  86:25 87:12,20
  88:16 98:19
**adolescent**  1:5
  9:12

**adversely**
  352:20 353:1
**advocacy**
  347:23 348:2
**affect**  155:16
  156:1 165:23
  166:19 223:17
  303:24
**affected**  167:1
  407:11,20
  408:2,11
**affects**  166:7
  242:9
**affiant**  145:2
  302:25 382:15
**affiant's**  302:22
**affiants**  128:18
  129:17 133:11
  136:2 163:15
  188:17 208:3
  208:22 209:8
  231:21 313:2
  316:19
**affidavit**  7:1,3
  32:18 99:9
  101:22 105:8
  119:11 120:7
  120:15,20
  140:19 292:21
  299:7 303:1
  305:21 306:20
  306:22 309:15
  311:4,18
  316:15 382:24

387:17 388:2,8
388:16,23
389:4 390:18
390:21 399:8,9
399:23 400:1
400:13,15,18
**affidavits**  32:5
  52:23,24 67:11
  68:8,10,19,21
  98:20,25 99:2
  99:4,7,15,23
  100:8,12,19
  101:2,6,13,18
  102:13,18
  103:1,13
  110:21 111:5
  111:11 119:1,5
  120:25 121:1,8
  121:9 122:11
  138:7,21
  139:13 140:9
  140:25 141:23
  142:5,8,12
  143:5,13,21,22
  145:2 160:22
  163:18 283:14
  284:4,8,13,17
  284:23 285:13
  285:21 286:7
  286:14,22
  287:7 288:10
  288:21 289:5
  290:5,12,24
  291:8 292:1,9

CONFIDENTIAL

**[affidavits - answer]**                                    Page 6

292:10 293:4
294:15,21,24
295:5,22 296:8
296:18 297:11
297:19 298:13
298:20,23
299:5 302:22
303:20 304:8
305:6,18
306:11,15
307:17 310:14
310:21 313:6
313:21 314:8
314:18 316:16
323:19 362:17
362:24 365:1
365:10,24
370:2 378:12
381:5,10
395:19 396:4
399:15
**affiliated** 47:5
**ages** 271:23
**aggregate**
355:9
**agnello** 3:13
**ago** 36:25
132:16 412:11
**agree** 10:19
87:8 97:13
99:1 103:15
107:13 126:17
137:16 222:9
230:19 290:13

**agreed** 255:8
390:17,20
**ahead** 14:16
37:14
**algorithms**
152:16 153:2
**allegedly**
164:22 355:2,6
**allison** 7:2
386:25 387:6
387:18,23
388:3
**allison's** 388:8
**allocate** 214:20
362:12
**allocations**
199:12
**allow** 147:5
158:25 410:15
**alphabet** 2:14
**ambiguity**
121:16
**amended** 5:8,9
5:11,12,14,15
10:24 11:3,11
11:12,18 12:16
12:20 13:3,8
13:16,20 14:7
19:15,21 20:5
20:9 22:24
24:2 27:9
29:15 31:15,18
31:21 32:1
63:5 384:5

386:20 392:20
402:2
**american** 271:3
**amount** 65:11
86:23 87:10,18
88:6,14 89:1
90:18,21 91:3
96:7,10 102:19
102:23 106:19
106:23 111:6
111:16 112:1
113:13,22
121:25 122:6
126:8 140:19
165:21 166:5
166:17 167:14
181:23 182:20
182:21 187:11
212:2 219:13
219:14 221:16
223:1 224:11
233:12 254:23
279:19 300:11
300:19 301:6
301:17 302:6
303:10,21
316:25 319:10
335:2 336:4,15
337:6 349:18
355:15 378:25
379:9 380:2,12
393:15 396:10
396:15 406:25
407:11 408:12

413:11
**amounts**
219:23 278:17
298:21,24
**analogous**
187:12
**analysis** 53:7
70:14,15
188:24 190:8
192:9 193:20
229:14 270:17
**analyze** 75:17
**anchored**
280:12
**anchoring**
280:5,8 283:3
**anders** 56:6,11
56:17,23,24
**angry** 225:12
**anita** 7:3
386:24 387:6,8
388:16,23
**answer** 8:4
26:5 34:13
89:15 90:9
133:7,12,25
137:25 138:14
159:13 161:11
162:17 168:2,8
169:1,2 174:15
175:20 180:10
188:25 194:17
198:9,22 199:1
227:8 232:2

CONFIDENTIAL

**[answer - article]**                                                 Page 7

243:11 258:3
258:13 277:6
280:10,11,11
281:4,6,8,11
322:18 323:25
342:14 343:4
350:14 358:5
374:4,7,21
375:5
**answered**
134:5 139:19
139:21 142:16
175:5,18
187:20 189:8
191:12 192:1,3
193:1,13
194:25 198:17
205:17 208:18
210:13 227:20
229:7 232:5
245:19 249:22
255:19 277:4
291:14 292:3
296:11 318:23
323:21 339:12
343:1 358:19
359:4 360:21
373:10 380:16
**answering**
10:15 126:13
133:16 135:11
234:2 257:4
311:6

**answers**  93:12
93:17 420:5
**anxiety**  275:17
275:23
**anybody**  282:4
**anyone's**  371:2
**anyway**  170:4
394:13
**apologize**
161:23 395:23
**appear**  18:24
335:5 397:8,15
**appearances**
2:1 3:1,11 4:1
**appears**  125:3
388:12 391:5
398:1 401:19
**appendix**  6:9
6:11,13,15,17
6:19 37:4,8,15
37:21 38:20,25
39:6,11,17,22
40:3,8,15,19
**application**
242:18
**applications**
411:23
**applied**  23:16
23:19 26:23
27:1,13 32:7
120:20 121:9
186:10 368:6
368:17 371:18
371:23 377:14

391:13 393:14
393:18,21
**applies**  210:2,8
387:12
**apply**  29:23
32:10 58:4
314:13 367:25
378:2,22
417:22
**applying**  145:3
310:23 312:24
393:24 394:17
394:19
**approach**
183:11 186:12
187:2 188:5
292:15
**approached**
313:8
**appropriate**
27:1 53:21
129:1,21 130:3
139:8 142:25
145:7,10,19
148:5 208:5
247:12 248:8
248:16 305:24
306:12 307:1
309:17 310:2
310:15,23
311:19 320:25
403:21 405:8
406:13 418:5

**appropriately**
92:8,16
**approximately**
22:25 25:6
26:16 27:24
69:22
**approximating**
263:4
**approximation**
262:12,18
265:20 266:4,9
266:17
**apps**  314:19,20
**april**  67:15
68:2,4,11,14,17
384:11,17
**area**  379:15
**areas**  351:25
378:2
**arrive**  236:12
285:13 286:15
286:23
**arrow**  257:9
**article**  6:23,24
271:3 328:23
330:3,6,22
334:3 335:10
335:15,18,23
336:1,3,14,20
337:3,6,12,14
337:17,20
338:3 345:4,6
346:14 348:1,7
348:21 415:4,9

CONFIDENTIAL

**[articles - assume]**                                        Page 8

| | | | |
|---|---|---|---|
| **articles**  46:17 | 269:24,25 | **assembling** | 313:19 314:6 |
| 54:13,15 55:3 | 270:1 273:23 | 289:24,25 | 314:12 351:20 |
| 55:6 327:23 | 274:10 277:3 | 312:23 | 352:18 353:4 |
| 329:15 333:23 | 281:16 291:13 | **assess**  311:17 | 362:13 368:25 |
| 409:8 414:1 | 292:2 293:4 | **assessing** | 369:6 |
| **aside**  46:11 | 296:10 314:23 | 155:24 278:14 | **assist**  52:20 |
| 330:25 | 318:22 323:20 | **assign**  109:9 | **assistance** |
| **asked**  36:7 | 330:11 339:11 | **assigned**  28:9 | 51:19,23 53:3 |
| 42:13,16 48:4 | 358:18 359:5 | 28:12 57:23 | **assistant**  119:7 |
| 53:13 91:24 | 360:20 373:9 | 109:1,14 | 119:8 370:1,16 |
| 92:3 110:1,6 | 380:15 395:3 | **assignment** | 371:20 372:3 |
| 110:22,25 | 403:25 404:21 | 57:2,7,14,16 | 388:10 389:12 |
| 112:4,6 121:20 | 405:12 | 58:5 107:24 | 389:18 390:4 |
| 121:22 122:20 | **asking**  10:7,15 | 108:8,14 | 390:13,22 |
| 122:25 123:4 | 74:13 91:1 | 110:10 112:11 | 391:9,24 392:9 |
| 125:8,15,19 | 122:22 127:21 | 112:18 147:2 | **assisted**  51:25 |
| 126:18 133:8 | 176:24 188:2 | 147:14 148:25 | 52:5,12 |
| 134:4 136:15 | 198:22 210:9,9 | 150:6 151:1 | **associate**  72:5 |
| 136:20 139:18 | 229:9 262:21 | 152:11,15 | **associated** |
| 140:3 142:15 | 269:6,10 | 153:7,18 154:3 | 32:18 178:14 |
| 175:4,17 | 271:23 279:11 | 154:15 155:10 | 178:16 179:23 |
| 187:19 189:7 | 279:18 293:13 | 156:6 158:1,22 | 181:12 184:20 |
| 191:11,25 | 340:11,13 | 160:12 197:20 | 202:4 212:25 |
| 193:1,13 | 343:4 | 209:3,14 | 213:3,11 214:3 |
| 194:24 198:16 | **asks**  348:11 | 216:24 225:21 | 237:5 243:24 |
| 205:17 208:17 | 349:12 | 225:25 226:2 | 283:13 317:25 |
| 227:19 228:22 | **aspire**  411:14 | 226:10,13 | 357:3,8,14 |
| 229:6 232:4 | 411:16,18 | 230:17 231:20 | **assume**  35:13 |
| 239:13 245:18 | 412:2 414:23 | 247:10,16 | 76:19 94:22 |
| 249:21,24 | **assemble**  58:3 | 250:14 252:25 | 96:2 101:17 |
| 255:18 264:23 | 302:12 | 275:1,13 | 102:12 105:15 |
| 268:12,18,19 | **assembled** | 286:12,21 | 106:12 115:18 |
| 268:25 269:1 | 289:23 | 300:24 309:21 | 116:20 117:3 |
| 269:12,18,21 | | 310:1,14,22 | 117:11 118:8 |

128:23 130:2
132:17 137:5
145:6,25 148:4
148:13 149:12
149:20 151:21
152:22 154:24
157:15 161:10
161:12,24
162:10,19
164:3 166:1,9
167:5 170:12
171:3 174:19
175:7,21
193:23 197:9
198:23,24
201:16,18
205:18,21
209:7,13
210:10,21
220:17 240:25
243:12 248:21
255:21 262:10
262:16 263:8
266:3 275:24
276:22 302:11
304:2 305:20
306:21 313:16
321:15 322:8
334:23,25
338:19 344:4
376:3 378:1,5
**assumed**
  114:20 115:8
  139:6 247:15

251:13 263:7
298:13 307:16
371:4 372:21
373:11 393:18
393:21
**assuming** 62:10
  74:13 97:9
  140:4,5 167:13
  167:22 190:22
  209:16 210:15
  210:18 213:25
  214:23 231:2
  241:5 247:6
  248:6 249:9,16
  266:20 283:10
  297:22 304:13
  309:13,24
  325:16 338:18
  377:12 391:13
  402:6
**assumption**
  137:13 141:13
  141:18,21
  142:10,14
  177:15 198:19
  241:11 250:17
  250:23 262:25
  263:11 265:13
  266:22 287:16
  306:2 356:2
**assumptions**
  168:9 169:4
  254:19

**atlanta** 4:10
**attach** 12:3
**attached**
  418:12 420:8
**attempt** 146:18
  148:17 149:23
  157:18 158:3
  158:13 164:25
  165:7 231:7
  372:10 399:19
**attempted**
  183:2
**attempting**
  133:7 138:14
  254:23 376:21
**attended**
  271:16
**attention** 25:3
  29:9 213:5
  330:7
**attorney** 50:7
  56:1 111:25
  418:14
**attorneys** 1:13
  33:3 44:1,10
  45:6 46:6,7,14
  46:21 47:14
  50:2,2,13,25
  51:20 56:8
  57:23 69:8,10
  69:19,23 70:2
  109:8,21,25
  111:10,15
  121:23 293:2

294:4,10,14,25
295:4,21 296:7
296:17 297:1
298:19 363:3
364:16,20,23
365:6,15,21
366:4,17
405:21 406:1
**attributable**
  153:21 154:8
  320:7,10,18,22
  362:2
**attribute** 362:7
**attribution**
  362:5
**august** 1:12 9:5
  19:17 31:2
  62:19,21 63:1
  417:7
**author** 271:5
**autoplay** 151:6
  151:7,14 152:5
**available** 46:16
  80:1 110:11
**avenue** 2:11 3:3
**average** 45:23
  95:15,18
  242:24 243:2,2
  262:13,19,23
  263:9,13 264:3
  264:5,11
  265:21 266:5
  266:10,18
  324:25 336:7

CONFIDENTIAL

368:1 370:3 371:15,18 373:3,7 374:3 374:10,25 389:23

**averaged** 23:13 76:20 370:8

**aware** 25:12 89:25 128:9 147:4,16,18 158:24 161:2 166:3 233:6,18 235:13 251:24 260:19 261:11 270:19 275:3 288:9,20 290:4 310:20 312:3 331:12,14 332:2 337:16 354:7 387:8

**b**

**b** 5:5 6:9,11,13 6:15,17,19 12:3,13 37:4,8 37:16,21 38:20 38:25 39:6,11 39:17,22 40:3 40:8,15,19

**back** 19:24 34:2 37:17,19 50:4 86:18 163:2 218:13 234:25 267:3

267:13,25 315:16 328:5 348:5 360:25 384:1 390:8 415:18

**background** 342:9 344:18

**bacon** 2:16

**balance** 223:2

**ban** 349:21

**banana** 65:6

**banned** 350:9 350:19 351:4

**bans** 350:16 351:1,10

**base** 29:24 30:3 45:20 49:9 172:23 399:12 399:14,23,23 400:7 404:8,24 405:2 407:5

**based** 67:5,11 67:17,22 68:6 97:22 134:18 141:11 233:8 247:3,25 249:9 250:23 251:4 251:17 257:20 269:2 295:15 302:22,24 304:19 306:21 311:17 317:13 317:18 343:18 352:4 386:11

399:22

**basic** 56:3 174:2 175:7 254:2

**basically** 409:7

**basis** 17:13 82:20 95:3 122:16 135:24 136:5 139:4 142:23 145:20 240:25 263:16 291:24 292:16 308:8 311:5 340:14 341:2 342:10,15,20 343:6 347:11 350:12 351:11 351:12 377:12 378:4

**bates** 6:20 60:16 385:3,8 386:2,10,11

**bathroom** 234:18

**bearing** 344:22

**beat** 38:12

**becker** 3:14

**beginning** 57:9 60:1

**begins** 151:12

**behalf** 10:8 77:7 416:3,10

**behavior** 212:7 317:1,15,20

**behavioral** 317:24

**belief** 310:13 340:23

**believe** 17:18 25:16 31:20 38:5 47:11 53:14,20 164:4 165:18 231:20 248:15 280:15 287:17 292:17 303:4 307:7,9 311:14 343:3 360:22 376:20 383:17

**believes** 249:3 249:18

**believing** 341:3 342:16,20 343:6

**bell** 265:13

**bellwether** 17:4 17:13 41:5 42:22 47:6 85:25 100:24 107:25 108:9 108:16 165:15 166:25 297:12 352:12,19

**beneficial** 230:23 231:3

**benefit** 24:12 24:18 116:9 138:8 227:18

CONFIDENTIAL

**[benefit - breathitt]** Page 11

228:3 339:17
339:21 397:2
397:11,19,23
398:11,17
403:1
**benefiting**
228:6
**benefits** 23:15
23:16,23 45:23
48:5,7,11 49:2
49:4,14 90:19
91:14 96:1,20
97:16 100:1
102:11 103:6
103:17 104:9
106:11 107:6
107:16 113:15
113:23 117:19
117:24 118:4
118:11 185:12
185:14 186:23
187:6 215:22
217:9 219:19
220:3 223:11
232:8,10,16,18
232:24 233:2
233:14,22
234:7 235:5,12
235:14,18
236:7,11
324:20 362:15
362:21 363:23
364:9 366:16
366:18 367:3,8

393:15 394:5
396:11,16,17
396:19,24,24
397:3,6 398:4
400:8 402:20
402:23 403:4
**berezofsky**
3:19
**best** 60:5 279:2
279:10 372:22
**better** 326:3
**beyond** 104:25
131:4 174:1
268:12 270:12
270:20 272:11
**bias** 239:16
251:21,25
252:5,8,20
254:5,10 256:5
257:2,24,25
258:2,3,7,8,20
258:23 259:2
259:11,16,20
261:22,25
262:3,6
**biased** 242:22
242:24 243:11
244:12,24
245:7,17
258:16 279:22
343:16
**biases** 252:12
257:25

**biasing** 293:15
**big** 60:1 75:23
81:23 257:11
356:1
**bill** 59:2,5,9,12
**billed** 58:22
59:24 61:11,22
62:1,5,11,20
63:13,20,25
64:2
**binder** 10:22
10:22 14:16,17
20:13
**bit** 35:1 36:13
116:6 254:16
323:14 344:17
412:7 413:9
**blands** 2:19
**block** 155:14
155:24
**blow** 349:2
**bonnin** 4:2,3
**boss** 322:14,25
323:8,9
**boss's** 322:25
323:9
**bounds** 253:19
**bow** 257:9
**bower** 3:14
**brain** 99:8
**break** 10:16
38:14,16 86:8
156:24 162:21
315:9 354:14

354:21 362:11
377:17 383:20
407:4
**breakdown**
356:21 357:2,8
357:13,21,21
360:9 405:5
**breakdowns**
209:4
**breakout**
356:15
**breathitt** 5:8,17
6:1,10,22
10:25 11:4,9
14:20,23 17:5
17:21,25 18:6
19:16,21 20:16
20:21,24 22:23
23:2,7,24
24:11,19,22
25:2 37:16,22
99:13,19 114:7
115:23 116:15
124:13,21
125:2 284:14
284:19,25
286:7 395:16
396:2,9 397:1
397:19 398:16
398:20,22
399:1 401:2,16
402:4 404:15
405:13,17

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **brian** 2:17 | **bunch** 313:1 | 124:18 128:8 | 188:8 189:12 |
| 369:10 370:17 | **burrell** 2:11 | 129:9,22 | 190:1,10 191:1 |
| **brief** 47:10 | **bushur** 2:10,13 | 130:20 132:1 | 191:17 192:4 |
| **briefly** 30:22 | 5:3 10:2,6 11:7 | 132:11,21 | 192:20 193:4 |
| **bring** 25:3 50:4 | 11:16,22 12:24 | 133:15 134:9 | 194:1,16 195:3 |
| **bringing** 176:5 | 13:12,24 14:11 | 134:21 135:9 | 195:15 196:1 |
| **broad** 304:3 | 15:2,11,20 | 135:23 136:18 | 196:24 197:12 |
| 309:7 | 16:4,13,22 | 137:11 138:19 | 198:8 199:3,15 |
| **broader** 242:19 | 21:3,13,23 | 139:11,22 | 200:10 201:6 |
| **broadly** 355:7 | 22:7,17 30:15 | 140:17 141:16 | 201:22 202:6 |
| **brody** 3:12 | 35:18 36:3 | 143:3 144:3,14 | 203:6 204:1,24 |
| **broke** 89:16,21 | 38:1,7,15,19 | 145:8 146:16 | 205:8,22 |
| **broken** 90:1 | 39:5,16 40:2 | 147:3,15 | 207:13 208:7 |
| 358:21 361:7 | 40:13,24 44:6 | 148:16 149:1 | 209:20,24 |
| 405:4 406:21 | 46:2 47:15 | 149:13,22 | 210:17 211:7 |
| **brought** 12:5 | 48:23 50:21 | 150:7,16 151:5 | 211:24 212:14 |
| 175:14 330:7 | 51:6,17 55:1 | 152:1,12 153:9 | 213:13 214:5 |
| 347:17 | 55:14 60:4,12 | 153:19 154:4 | 215:1,23 216:9 |
| **bryce** 1:16 5:3 | 60:20 61:18 | 154:17 155:11 | 217:10 218:1 |
| 9:17,23 420:2 | 66:19 69:2 | 155:21 156:8 | 220:16 221:7 |
| **bubbles** 377:5 | 82:13 83:6 | 156:25 157:6 | 221:20 222:2 |
| **bucket** 174:18 | 85:8 86:11,20 | 157:17 158:2 | 224:22 225:19 |
| 187:13 | 88:1,12,24 | 158:12,23 | 226:11,22 |
| **buckets** 160:7 | 89:9 90:15 | 159:19 160:1 | 227:23 228:23 |
| **building** | 91:18 93:2,22 | 162:20 163:4 | 229:18 230:4 |
| 302:18 304:21 | 95:2,6 97:1,24 | 163:16 164:11 | 230:18 231:5 |
| **buildings** 301:8 | 100:5 102:17 | 167:7 171:4 | 232:1,7 233:1 |
| **bull's** 257:13 | 103:11,21 | 172:1,14 173:1 | 233:19 234:4 |
| 257:14,18 | 104:12,20 | 174:7,24 | 234:19 235:2 |
| **bullied** 229:4 | 105:21 107:22 | 175:11 176:2 | 236:21 237:16 |
| **bully** 85:11 | 109:7 110:13 | 176:17 177:20 | 239:2,14 240:5 |
| 229:2 | 111:23 115:9 | 178:6 179:12 | 240:22 241:10 |
| **bullying** 175:3 | 115:16 118:14 | 180:3,14 182:4 | 241:21 242:5 |
| 175:9 189:5 | 123:15 124:8 | 183:22 186:2 | 244:9,19 |

CONFIDENTIAL

246:11 249:1
249:14 250:1
250:16 251:2
251:10,20
252:17 253:1
253:16 254:11
256:6,16
259:12,21
260:5,18
261:10 265:16
266:6 267:8
273:5,21 274:8
275:2,14 276:1
276:10 277:8
278:3,15,23
279:13 280:3
281:1,12 282:1
283:24 284:12
286:19 288:8
288:17 289:3
290:22 291:23
292:7 293:9
294:23 295:18
296:4,15,24
297:9 299:9,19
300:16 301:3
301:14 302:1
303:6,18 305:1
306:1,8 307:15
308:9 309:12
310:11 311:15
312:4 313:17
314:4,15 315:3
315:8,18

316:23 317:12
318:16 319:8
319:22 321:2
322:10,20
323:11 324:11
331:10 333:21
335:21 339:19
341:18 343:2
344:1 345:1
346:17 348:24
350:6 351:13
353:13 354:5
356:5 358:23
359:24 360:13
361:9,22 364:5
364:14 366:14
367:1 368:8,15
368:23 370:12
372:24 373:13
374:5,14
375:13 376:2
377:8 378:3
379:7 380:9,19
381:7 382:19
383:9,19 384:3
385:16 387:14
387:21 389:2
392:7,17
394:21 397:17
402:1 406:2
407:17 408:18
415:11,20
416:15

**business**   181:5
  339:25 340:1
**bw**   385:8 386:2
**byrne**   3:12
**bytedance**   4:12
  4:13

**c**

**c**   417:1,1
**calculate**   81:12
  86:22 87:9
  97:8 110:7
  111:1 133:1
  145:13 183:3
  197:19 223:8
  227:2 236:3,6
  246:23 308:14
  318:14 350:7
  350:17,21
  351:2 354:12
  354:19 356:1
  362:14,21
  363:23 364:8
  366:12,15
  368:2 371:18
  393:1,7 394:22
  396:15 402:17
  402:22
**calculated**
  33:15 77:23
  78:3,7,10,15
  79:3,5,11,24
  80:11 81:9
  94:18 132:23

156:19 166:13
236:25 246:9
355:17 357:16
357:23 358:8
358:13,24
359:9 392:6
393:10,22
400:13 401:9
**calculating**
  57:21 66:21
  67:4,10,16,21
  68:5 132:19
  143:1,9,16
  146:21 180:16
  182:6 186:3
  187:15 231:23
  245:13 317:16
  317:21,23,23
  317:25 368:18
  401:20 403:23
  411:10,25
  412:15,23
**calculation**
  20:1 23:4,11
  23:18,21 24:15
  26:3 28:17,20
  36:2 46:1 91:6
  98:16 99:11
  103:23 114:3
  114:13 116:4
  116:10 117:19
  117:24 129:2
  134:18 137:9
  137:10 140:7

CONFIDENTIAL

**[calculation - cases]**

| | | | |
|---|---|---|---|
| 146:15 210:20 | 148:18 149:24 | 5:23,25 10:7 | 96:18 98:12 |
| 210:21 211:10 | 155:3,17 156:2 | 10:25 11:4,9 | 103:4 107:4,24 |
| 212:13,22 | 156:7,18 | 11:13,19,25 | 108:8 111:12 |
| 213:21 223:7 | 157:11 169:6 | 12:16,21 13:1 | 112:11 113:2 |
| 235:15 237:13 | 198:1,15 | 13:4,9,14,17,21 | 121:16,18 |
| 247:22 249:5 | 210:24 214:2 | 14:1,4,8,13,20 | 123:2 124:21 |
| 249:20 250:13 | 214:10 235:10 | 14:24 15:4,8 | 125:2 130:3,4 |
| 272:14 304:16 | 243:16 299:21 | 15:13,17,22 | 133:2 138:4 |
| 308:6 309:11 | 313:12 342:8 | 16:1,6,10,15,19 | 159:12 162:7 |
| 310:2,3,10 | 403:19 406:9 | 17:1,21 20:16 | 162:17 164:13 |
| 312:9,11 317:2 | **calendar** 59:16 | 20:21 21:5,15 | 164:19 173:20 |
| 318:7 319:14 | 60:7 62:15 | 21:25 22:9,10 | 181:20 183:2 |
| 320:3 321:1,9 | **california** 1:1 | 23:24 30:20 | 185:5,11,17 |
| 321:25 365:25 | 9:16 | 34:9 35:21 | 186:5 187:17 |
| 371:3 391:14 | **call** 45:5 48:6,7 | 38:22 39:7,18 | 198:1,15 209:1 |
| 391:19 396:9 | 48:25 65:24 | 40:5,16 41:21 | 213:10 225:21 |
| 396:10,14 | 75:16 170:8 | 42:1,8,14 | 226:2 236:6,25 |
| 398:4,21 399:2 | 176:1 | 43:20 44:9 | 240:7 247:11 |
| 402:7 413:23 | **called** 34:21 | 49:22 52:2,9 | 256:24 264:22 |
| **calculations** | 70:10 79:9 | 52:13,21 53:4 | 278:5 286:9,12 |
| 19:25 24:19,23 | 119:8 186:12 | 53:8,11 54:3 | 286:14,21 |
| 25:2 26:8,23 | 253:24 268:11 | 54:15,21 55:4 | 291:22 302:3 |
| 27:17 29:21,25 | 337:18 338:15 | 55:16 56:21 | 305:25 306:13 |
| 30:6 32:9 34:7 | 341:5 396:16 | 57:4,15,16 | 307:2 308:12 |
| 35:3 36:20 | 411:14 412:20 | 58:8,13,22,23 | 308:16,21 |
| 43:17 48:22 | **calls** 98:2 178:2 | 59:7,19 60:9 | 313:19 314:6 |
| 52:6 53:7 | **carefully** 418:3 | 60:23 61:2,8 | 316:12 332:17 |
| 65:17 68:22 | **carella** 3:12 | 62:2,7,12,16,20 | 344:24 353:6 |
| 69:7 88:22 | **carellabyrne....** | 64:18,22 65:3 | 353:16,22 |
| 91:3 111:3,8 | 3:16,16 | 65:19 66:10 | 360:12 365:7 |
| 112:3 113:13 | **carried** 25:25 | 77:23 78:2,7 | 370:10 383:18 |
| 117:17,22 | **case** 1:4 5:8,10 | 81:8 84:17,21 | **cases** 17:4,7,13 |
| 118:4 126:14 | 5:11,13,14,16 | 86:22 87:9 | 37:11 76:8,12 |
| 139:9 143:7 | 5:17,19,20,22 | 89:14 90:9 | 76:21,23 |

CONFIDENTIAL

115:24 303:5
**categories**
90:17 305:4
396:12
**category** 46:20
113:12,17
127:11
**caught** 35:17
**causal** 189:10
192:8,8 194:12
194:12 200:7
228:21 234:2,3
234:12 350:13
352:23
**causality**
188:24 189:2
191:14 195:2
200:18 202:16
202:23 204:9
204:15 206:6
206:14,22
207:4 234:14
**causation**
84:21 85:20
**cause** 275:16
275:25 277:10
277:19
**caused** 84:24
85:4,10,14,18
85:24 86:4
87:1,13,21
88:7,17 89:3
122:2,8 134:13
134:25 135:16

141:5 152:5
153:2,13
164:22 169:8
255:23 351:20
352:7
**causes** 262:1
277:14 278:7
**causing** 167:24
**cecchi** 3:12
**ceiland** 4:6
**cell** 272:24
273:1,9,12,14
274:2,14
348:12 349:13
349:20,21
350:10,16,19
351:1,5,10
**cells** 25:21 27:3
36:15,16
**center** 263:2
412:5
**central** 265:8
**certain** 29:19
36:18 90:20
113:15 205:2
347:17 412:6
**certainly** 54:10
80:9 189:20
196:6,10
199:21 203:12
203:22 268:22
275:11 285:15
285:24 289:23
290:12 308:2

353:19 354:3
379:16 382:8
**certification**
417:21
**certify** 417:4
420:3
**certifying**
417:24
**cetera** 126:11
127:6,11
130:12 175:16
405:6 414:22
**cfo** 47:12,17,22
47:25 48:3,10
48:18,25 49:14
49:21 51:21
**challenge**
153:24
**challenges**
200:21 202:20
206:18 207:1
**chan** 3:8 9:3
**chance** 51:7
**change** 20:3,6,7
23:9,15,22,25
24:5 29:18
57:7 62:13
66:20 67:1
134:12,23
135:15 141:3
166:10 217:4
233:12 269:17
271:20 419:4

**changed** 24:5
32:16,19 57:11
167:23 295:20
296:2,6 312:21
332:19,25
**changes** 29:12
30:24 31:7
198:6 418:11
420:7
**characterizati...**
113:19
**characterize**
86:23 87:10
332:13
**charleston** 5:10
5:18 6:2,12
11:13,19,25
12:14 15:4,7
17:6 19:16,22
21:5,9 27:23
29:13 30:2,6
35:9 38:21
39:1 47:12,17
47:24 48:3,10
48:18,25 49:14
49:15,21 51:20
99:13,19 114:9
114:10 284:15
284:19,25
286:7 386:20
386:22 387:3
387:11,25
388:19 389:17
390:9 391:2,8

391:17,23
392:11,12
402:3,6 404:15
404:22
**chatgpt** 53:10
53:14,21 54:2
54:5,9,14 55:2
327:23,25
328:2 329:4,7
329:9 330:4,7
330:11,15,17
330:21
**chatgpt.com**
329:1,6,25
**cheating**
212:18 213:17
**check** 1:18 2:2
9:9 52:22
73:18,23
**checked** 35:16
**checks** 33:22
**cherry** 3:20
**children** 410:8
410:12,18,22
411:5
**choice** 36:5
213:1 218:20
**choices** 213:8
214:19
**chooses** 173:13
**chose** 404:7
**chunk** 60:1
**citation** 101:8
328:20

**citations** 18:14
18:15,24
**cite** 235:17
331:9 332:23
333:23 334:10
335:24 345:10
347:4 385:11
385:12
**cited** 18:10
331:1 338:3
**citing** 329:23
401:11
**citizenship**
229:22 230:8
230:21 231:11
**civics** 351:17
351:21 352:8
352:14 353:8
353:17,24,25
**civil** 412:20,25
413:1,24 414:8
**claim** 312:19
**claiming**
351:24
**clarification**
34:19 98:24
**clarity** 61:16
**clark** 1:20 9:20
417:15
**class** 126:3,12
147:21,25
148:9,20
170:11,14,19
170:23 171:8

172:6,18,19
175:15 176:10
176:11 177:5,7
189:15 190:3
190:13,15,24
191:7,23
192:12,24
193:7,11 194:5
194:22 197:2
207:7 272:24
273:13,25
274:3,12
349:22 350:10
360:5 362:1
**classes** 265:2
**classroom**
173:11 174:17
175:23 329:20
332:18,21,25
333:4,5,10,11
**classrooms**
326:16 327:3,9
327:22 328:12
331:5 332:6,13
334:2 345:22
**claudia** 271:12
**clean** 37:14
41:1 168:2
**clear** 181:3
235:17 259:14
288:19
**clicking** 329:10
**client** 316:14
316:22 414:4

**clients** 58:18
75:21 78:22
**clinical** 276:16
276:18,21
**clinically**
276:23
**close** 29:9
257:17 263:15
**clustered**
257:14
**coaching** 404:4
**code** 29:6,7
33:20 34:7,16
35:20 49:3
**cofounder** 70:9
70:16
**cofounders**
70:20
**cohorts** 269:7
271:22
**colleagues**
302:17
**collect** 111:5
304:2
**collecting**
414:19
**collection**
270:16
**college** 268:19
268:21 269:22
271:25 411:22
**column** 381:16
381:19 394:18

CONFIDENTIAL

**combination** 334:16

**combined** 399:8,25 400:12,17,24

**combines** 336:8 336:9

**come** 28:25 59:18 60:8 73:22 142:17 325:22 411:22

**comes** 179:10 186:20 188:6 235:9 278:13 279:11 325:21 337:17 338:10 345:4 413:3

**comfortable** 283:17 285:22 288:6

**commencing** 1:19

**commerce** 2:17

**commission** 338:13 420:16

**commissioned** 338:9,12,23 341:13 343:11

**common** 115:25 116:11 120:12 263:5 263:23 266:1 281:3 398:3 402:18 403:14

**commonality** 196:23

**commonplace** 196:19

**commonwealth** 1:22

**communicate** 47:1 49:19 97:25 98:3

**communicating** 187:22

**communicati...** 98:9,13

**communities** 72:6

**companies** 82:17 88:23 89:8 307:10 362:12

**company** 88:4 88:11 89:18,22 90:2,13 337:18 341:12 343:13 344:10 361:5

**compare** 197:14 398:5

**compared** 34:10 401:21

**comparing** 271:21 401:3

**compensated** 58:12

**compensation** 59:18 60:8

62:14 72:21,25 232:21,22 396:23

**complete** 16:24 17:11 31:10 60:25 61:6 223:18 252:1 263:18 355:22

**completed** 253:8

**completely** 344:21 374:25

**complicated** 161:21

**component** 318:5,19

**compound** 44:4 47:9 48:20 392:3

**comprise** 362:15,22

**comprised** 356:7 364:25 365:8,22 366:5

**compulsive** 162:4,9,14

**compulsively** 161:6,14,18 162:2

**concept** 280:5 280:15

**conception** 170:1

**concern** 142:24 279:20

**concerned** 131:5 196:10 198:5 245:21

**concerns** 317:1 317:15,20,24 319:25

**conclude** 97:12 103:13 107:11

**concluded** 416:21

**concludes** 96:15 103:1 107:1 416:17

**conclusion** 178:3

**conclusions** 33:25 242:17 304:19

**conduct** 84:17 84:24 85:14,24 86:4 92:15 122:14 168:10 169:4 185:4 187:14 188:17 208:5 210:16 211:19 212:12 226:4 307:11 307:13,14 310:8 320:24 338:20,23 341:6,21 352:7 352:25

CONFIDENTIAL

**[conducted - contributed]**                                         Page 18

**conducted**  67:5
  67:18,22 91:9
  109:19,23
  279:16
**conducting**
  92:11 278:24
**confidence**
  94:19 243:6,15
  244:6 253:20
  253:23 254:3
  254:12 255:14
  256:3,7,17
  257:10,19
  258:1,4,6
  259:3,10,14
  261:19 262:2,4
  324:18 325:10
  326:6
**confident**
  325:16 401:14
**confidential**
  1:13
**confirm**  326:13
  326:25 327:19
  328:9 329:17
  331:2 364:19
  404:13,19
**confirmation**
  405:20 406:5
**confirmed**
  364:21 405:7
  405:14,16
**conflicts**
  192:11,23

193:9 194:4,21
**confounding**
  407:10 408:10
**confused**  44:21
  217:24
**congratulations**
  410:7
**connection**
  52:13,20 53:4
  58:13 59:6
  74:7 160:16,25
  176:4 250:18
  318:4,18
  336:16 337:7
  411:6,25 412:1
  412:17,23
  414:8,22
**connolly**  2:10
**conservative**
  353:7 398:2
  404:7
**consider**  41:21
  42:1 81:21,25
  82:4,9 83:7,11
  83:15,19,23
  84:2,6,11
  99:22 174:16
  180:5,17 182:7
  182:8 240:6
  247:4 251:6
  252:14 298:18
  340:5 343:24
  372:15 373:5
  407:9,19 408:1

408:9
**considered**
  6:10,12,14,15
  6:17,19 12:4
  37:4,7,10,16,22
  38:21 39:1,7
  39:12,18,23
  40:4,9,15,20
  41:2,4,11,15
  43:20 44:9
  110:15 217:20
  384:24 386:6,8
**consistent**
  297:20 305:23
  306:11,24
  307:18,21
  308:25 341:24
**construct**
  222:10 224:14
**constructed**
  122:12 324:22
**construction**
  322:5 374:2
  375:9
**consult**  290:5
**consultant**  75:3
  413:2,3
**consulting**
  70:10,12,15,17
  70:23 71:1,4,6
  71:12 72:22
  73:2,13 74:18
  75:7

**contacted**
  56:22
**contain**  17:11
  18:14 37:3
**contained**
  41:16 68:7
  297:3 417:5
**contains**  10:22
  14:17 20:14
**content**  144:7
  144:18 146:4
  146:20 147:8
**context**  105:7
  122:18 136:9
  139:9 141:25
  263:21 268:9
  275:6
**continue**
  331:16
**continued**  3:1
  4:1
**contract**  45:7
  406:19,25
**contracted**
  166:10,11
**contradicted**
  198:20
**contraindicated**
  331:18
**contrary**  340:3
**contributed**
  65:15 353:7,16
  353:24

CONFIDENTIAL

**[control - correct]** Page 19

| | | | |
|---|---|---|---|
| **control** 33:13 | 31:17,19,23 | 92:13,16,17,21 | 118:5,6,11,13 |
| 33:22,24 34:10 | 32:11 33:11 | 93:7,13,18 | 118:19,20 |
| 414:17 417:23 | 36:24 37:4,5 | 94:5,6,24 95:1 | 119:1 120:21 |
| **convenient** | 37:11,12 38:22 | 95:10,11,21,22 | 121:3,11 122:3 |
| 377:18 | 38:23 39:8,9 | 96:4,5,11,20 | 122:9 123:9,22 |
| **conversation** | 39:19,20 40:5 | 97:3,16 98:21 | 123:25 124:4 |
| 47:11 48:18 | 40:6,16,17 | 98:22 99:16,21 | 124:21 125:2 |
| **convey** 244:7 | 41:5,6,18,19,23 | 100:2,4,8,9,13 | 125:16,22 |
| **copies** 12:6 | 41:24 42:4,5 | 100:19,21 | 126:3,15,16,22 |
| 38:6,13 | 43:1,12,13,22 | 101:2,10,11,14 | 127:2,6,13,18 |
| **copy** 10:24 | 45:13 47:17,18 | 101:15,19,20 | 128:2,14 |
| 20:15,20 21:4 | 50:16 51:1,10 | 102:4,5,7,8,14 | 129:13,25 |
| 21:14,24 22:8 | 51:13 58:9,10 | 102:16,23,24 | 131:19 133:20 |
| 38:2,8 | 60:9,23 61:8,9 | 103:6,17 104:2 | 134:1,15 137:2 |
| **core** 115:25 | 61:13,15,23,24 | 104:3,11,17,19 | 137:14,19 |
| 116:11 398:3 | 62:3,4 63:18 | 104:24 105:6 | 138:9,25 |
| 402:18 403:15 | 63:19,22 64:4 | 105:12,13,18 | 140:12 141:7 |
| **correct** 10:10 | 70:10,11,18 | 105:20 106:4,5 | 143:22 144:9 |
| 10:11 11:9,10 | 71:15,16,19,20 | 106:7,8,15,16 | 146:8,22 |
| 11:25 12:14,17 | 72:7,8 77:12 | 106:23,24 | 148:11,21 |
| 13:1,5 14:1,2,4 | 77:13,16,17,20 | 107:7,16 108:3 | 150:2,12,21 |
| 14:5,20,21 | 77:21 78:9 | 108:19 109:1 | 151:19 152:7 |
| 15:4,5,13,14,23 | 84:18,19,21,22 | 109:23 110:3 | 152:21 153:3 |
| 16:7,15,16 | 84:25 85:1,5,7 | 111:12,13 | 153:14,24 |
| 17:1,2,8,14,15 | 85:11,12,15,16 | 112:16,24 | 154:11,23 |
| 18:14 19:18,19 | 85:21,22 86:1 | 113:1,8,24,25 | 155:6,17 156:2 |
| 20:17,21,22 | 86:2,5,6 87:2 | 114:4,14,15,18 | 157:12,22 |
| 21:6,7,16,17 | 87:15,16,21 | 114:19,23,24 | 158:8,17 159:4 |
| 22:1,10,11,21 | 88:2,8,18 89:4 | 115:3,13,15,21 | 159:13,20 |
| 22:22 23:2 | 89:6,15,23,24 | 115:22 116:1,2 | 161:8,18 162:5 |
| 24:16,18 25:8 | 90:10,24 91:9 | 116:5,13,14,18 | 162:9,10,18 |
| 25:15,16 26:4 | 91:10,15,17,21 | 116:19,22,23 | 163:9,25 |
| 26:5,18,19 | 91:22,25 92:1 | 117:2,8,9,14,15 | 164:16,22 |
| 28:1,2 31:16 | 92:4,5,8,9,12 | 117:19,24,25 | 165:4,13,17,25 |

**[correct - correct]**                                    Page 20

| | | | |
|---|---|---|---|
| 166:8,14,21 | 206:21 207:2,3 | 261:22 262:3,5 | 316:9,16 317:4 |
| 167:2,12,13,21 | 207:8,22 | 262:6 263:11 | 318:8,21 |
| 168:19,25 | 208:16 211:14 | 265:19,21 | 319:16 320:5 |
| 169:10,15 | 212:7,22 | 266:9,17 267:5 | 320:11 321:10 |
| 170:11,14,20 | 213:22 214:16 | 267:7,14 268:1 | 322:1 323:19 |
| 170:25 171:9 | 215:7 216:10 | 270:23 272:14 | 324:14,15,21 |
| 171:17 172:19 | 217:20 218:9 | 273:1 274:4,15 | 325:4 326:4,16 |
| 174:11 175:3 | 220:11 221:21 | 275:6,18 276:4 | 327:3,23 |
| 176:6,13 | 225:24 226:6 | 277:12 278:9 | 328:12,16,22 |
| 177:25 178:18 | 226:16 227:4,9 | 280:14,18 | 329:2,10,20,25 |
| 178:19 179:15 | 227:12,18 | 282:15 284:21 | 330:4,18 331:5 |
| 180:8 181:13 | 228:4,5,15 | 284:22 285:3,9 | 331:13 332:6 |
| 182:25 183:7 | 229:5,24 | 285:10 286:9 | 332:14,15 |
| 183:17,25 | 230:10,24 | 286:16,24 | 333:1 334:8,12 |
| 184:8 186:5 | 231:13 232:3,6 | 287:10 288:23 | 334:13,17,20 |
| 188:13,22,25 | 232:11 233:23 | 291:3,12 | 334:22 335:4 |
| 189:1,6,16 | 234:8 235:5,6 | 292:22 293:16 | 335:25 336:5 |
| 190:5,17 | 235:21 236:14 | 293:21 294:4 | 336:12,12,18 |
| 191:10,18,19 | 236:17 237:1 | 294:11,17 | 337:4,9,15,18 |
| 191:24 192:6,7 | 238:22 239:4 | 295:1,2,6,23 | 339:3,10 |
| 192:13 193:11 | 241:13 244:13 | 296:9,20 297:4 | 340:16 342:12 |
| 194:8,17,18,23 | 244:20,25 | 297:14 299:14 | 343:4 344:5 |
| 195:2,8 196:16 | 245:8,17 | 299:24 300:7,8 | 345:12,13,15 |
| 197:6,17 198:1 | 246:25 247:1,5 | 300:13,15,21 | 345:22 346:3,4 |
| 198:15 199:7 | 247:6 250:3,19 | 300:23 301:10 | 346:8,19,25 |
| 199:17 200:3,8 | 251:10 252:8 | 301:21 302:9 | 347:24 348:3,8 |
| 200:15,17,21 | 252:21 253:11 | 303:13,25 | 348:9,14 |
| 201:11 202:14 | 253:21,22 | 304:11 305:13 | 349:15,23 |
| 202:16,21,22 | 254:6,15 255:1 | 306:4,13 | 350:11,20 |
| 203:2,10,17 | 255:12,17 | 308:12,16,21 | 351:6,17,18,22 |
| 204:7,8,13,14 | 256:12,23 | 309:1,18 | 352:9,15,21 |
| 204:20 205:4 | 258:12 259:4 | 310:25 311:22 | 353:2,9 354:17 |
| 205:15 206:4,5 | 259:19,25 | 312:6,13 | 354:24 355:3,8 |
| 206:12,13,20 | 260:13 261:4 | 313:22 315:23 | 355:18 356:8 |

CONFIDENTIAL

356:13,19,25
357:6,12,19
358:1,11,16
359:2,12,19
360:5,19
361:14 362:3
362:18,19,25
363:1,3,4,12,13
363:17 364:9
365:2,10,17,25
366:7,19 367:5
367:10,11,14
367:19 368:3
368:11,20,21
369:4,5,11,16
369:22,23
370:4 371:22
371:24 372:5
372:12,18
373:3,4,8,18
374:18 375:1
375:18 376:15
379:3,12 380:3
380:14 381:1
381:11,12,16
381:23,24
382:1,22 383:3
384:12,13,19
384:24 385:5,6
385:9,10,13,19
385:24 386:17
386:25 387:1,6
387:7 388:1,5
388:11,20,21

389:6,13,14,20
389:21,25
390:1,6,7,15,24
390:25 391:4
391:12,15,20
392:1,13 393:3
393:5 394:8
395:21 396:6,7
396:12,17,18
397:3,4,7,12,20
398:22,23
399:3,4,9,10,16
399:17 400:2,9
400:22 401:2,5
401:10,16,23
402:9,13,14,20
403:19,20
405:22 406:5
406:11,12
407:6,13,22
408:4,6,7,14
412:18 417:8
420:4
**corrected**   17:19
32:12 400:5
401:4
**corrections**
27:5,8 418:4,6
420:7
**correctly**
100:15 334:25
**correlations**
361:19

**corresponding**
47:3
**corroborated**
108:1,10
382:10
**corroborates**
108:17,22
**cost**   78:24
81:10 170:8
178:13,24
181:16,18,24
182:2,17
184:20 185:6
185:15,19,23
186:8,14 187:8
187:10,10,25
202:4 210:1
213:3,11 214:3
214:22,25
215:11,21
216:2,16
217:19 219:3
221:3,9 223:10
223:11 224:16
224:17,18,23
225:17 235:15
235:21,24
236:3,13,16
413:5,9,9
414:2
**costing**   183:11
187:8 188:6
215:14 217:7

**costs**   78:8,16
78:23 79:3,6,9
79:11,24 80:12
81:13 169:10
169:14,15,18
169:19,21
170:3 178:16
180:17 182:6
182:19 184:24
212:25 213:9
214:21 219:8
222:21 224:2
224:21 225:8,9
236:24 411:11
412:1,16,24
413:24
**counsel**   9:18
30:18 38:1
95:3 109:1
110:22 111:5
121:21 342:24
379:5 397:16
397:18,22
398:12 403:6
416:7
**counseling**
411:20 412:5
**counselor**
119:18,19,20
120:11 205:11
394:4 412:7
**counselors**   43:6
86:25 87:12,19
88:15 98:18

CONFIDENTIAL

**[counselors - damages]**                                    Page 22

105:23 119:12
201:20 365:17
379:10 388:13
393:2,8,11,16
394:6

**couple** 69:18

**course** 52:8
57:8 123:1
173:22 178:18
180:23 193:24
221:17 223:1

**court** 1:1 9:15
9:20 96:14
97:11 102:25
103:9,12
106:25 107:9
107:10 137:12
137:21 236:23
418:18

**covered** 134:7
136:7 305:5
311:3 377:22
393:14 394:3

**covering** 301:2
373:1

**covid** 72:10
407:20 408:2
408:11

**coworkers**
215:6

**craig** 4:3

**cram** 66:8

**create** 293:14

**created** 363:16
363:25 364:6
364:16

**creation** 275:10

**culture** 353:7

**cumulatively**
222:25

**current** 42:3
376:1

**currently** 22:19
350:5 389:19

**curve** 265:13

**d**

**d** 5:1

**d.c.** 2:12 3:4

**damage** 149:18
151:23

**damages** 20:3
22:25 23:7
24:8,13,23
25:2,6,13,18
26:8,16 27:9
27:17,24 28:17
29:13 30:6
31:22 32:2
33:16 36:19
43:17 57:4,22
66:21 68:22
77:23 78:3
81:9,11 85:15
86:21 87:8
88:6 89:1,11
89:13 90:5,8

90:16 91:3,7
91:13 94:21
95:25 96:1,9
96:11,18,18
97:14 98:17
99:12,25
100:24 101:16
102:10,12,22
102:23 103:3,4
103:16,23
104:8 105:14
106:10,12,22
106:23 107:4,5
107:14 109:9
109:12 110:1,7
110:18,23
111:1,7,19
112:3 113:12
115:18 117:11
117:16,21
118:8,15
121:25 122:6
126:14 128:10
129:11 132:3,7
132:19 134:11
134:23 135:14
136:24 138:23
139:15 141:3
143:1,6,9,16
144:5,5,15,16
145:13 146:7
146:22 147:6
148:1,11,18
149:6,24 150:8

150:9,17,18
151:18 152:3
152:20,25
153:11,21
154:8,22 155:2
155:17 156:2,9
156:14 157:11
157:21 158:7
158:17 159:1,9
159:11 161:8
161:15 162:8
162:13,15
163:6,22 164:5
164:9 165:1,8
166:13 169:13
180:4 197:25
198:14 207:22
208:15 210:7
210:20,23
211:10 212:1
212:22 213:21
214:10,11
216:3 217:20
220:8,10
223:13 227:2
231:6,24 235:4
236:17 237:1,7
237:18 240:12
240:14 245:13
247:2 249:5,19
250:13 251:4
272:14,19
283:15 284:1
295:20 296:6

CONFIDENTIAL

**[damages - deadline]**                                                      Page 23

| | | | |
|---|---|---|---|
| 296:19 317:3 | 30:2,3 32:6 | 288:21 289:1,6 | 65:4 70:8 |
| 317:16,20,25 | 35:11,16 42:17 | 289:10,12,12 | 95:15,19 |
| 318:7,12,15 | 42:18,24 43:3 | 289:14,21,22 | 173:23 178:18 |
| 319:14 320:4 | 43:8,11,15 | 289:25 290:1,3 | 180:24 183:14 |
| 320:25 321:9 | 45:18,25 52:12 | 290:5 291:2 | 197:16,17 |
| 321:25 324:13 | 52:23 53:7 | 292:18 296:2,3 | 207:16 210:6 |
| 324:16,24 | 58:3 80:23 | 296:14 312:23 | 213:2 220:24 |
| 325:6 350:8,18 | 93:21,24 94:4 | 325:14 342:6 | 221:17 224:19 |
| 351:3 354:13 | 94:9,15,17 | 343:18,19 | 228:8 262:11 |
| 354:20 355:17 | 107:25 108:9 | 352:5,12 355:1 | 262:13,17,19 |
| 356:6 357:17 | 108:16,21 | 355:5 356:2,3 | 262:23 263:13 |
| 357:22,24 | 110:14 114:2,7 | 361:8 362:17 | 263:14,20 |
| 358:4,9,14,25 | 114:12 115:24 | 362:24 365:1 | 264:24 265:1,3 |
| 359:10 365:24 | 115:25 116:3,8 | 365:10,23 | 265:19,21 |
| 366:6 367:2,7 | 116:11 117:17 | 366:11,11 | 266:9,11,17,19 |
| 368:3,18 369:8 | 117:22 118:17 | 393:1,6 394:4 | 267:2,13,25 |
| 369:18 371:3 | 118:23 119:9 | 394:23,24 | 281:15,18 |
| 371:19 384:9 | 119:12,23 | 395:1,4,6,8,12 | 304:21 308:18 |
| 384:15 386:22 | 120:17,21 | 398:3,3 402:18 | 349:23 350:20 |
| 387:3 391:7,22 | 121:3,11 147:5 | 403:15 404:14 | 351:6 359:15 |
| 392:10,11 | 147:17,19 | 404:22 405:4,6 | 359:18 360:2,3 |
| 393:2,7,11 | 158:25 159:6 | 405:9,18 | 360:16,17 |
| 394:6,23 396:2 | 164:13,19,24 | 414:19 | 404:1,3 420:13 |
| 396:9 398:21 | 236:8 238:5,22 | **database** | **days** 63:17 64:1 |
| 399:2,7,8,24 | 239:3,5,7,21 | 120:13 174:4 | 64:2,7,11,21 |
| 401:7,15 | 240:12,17,24 | **date** 1:20 9:5 | 65:1,11 66:1,8 |
| 402:13,17 | 241:1,9 245:10 | 31:20 363:10 | 68:23 197:23 |
| 403:24 406:9 | 245:22 247:7 | 418:9 420:11 | 198:12 263:7 |
| 407:8,18 408:1 | 257:7,22 | **dated** 6:8,22 | 276:24 308:18 |
| 408:9 | 265:24 267:18 | 30:11 124:14 | 418:15 |
| **daphne** 395:19 | 270:16,17 | **dates** 363:19 | **dbonnin** 4:5 |
| 395:24 396:5 | 271:7 278:5 | **david** 4:3 | **deadline** |
| **data** 18:5 28:5 | 280:2 287:18 | **day** 10:13 | 222:15 |
| 28:12,16,19 | 288:11,16,19 | 64:13,14,25 | |

CONFIDENTIAL

**deal** 12:11 189:14 192:11 192:18 201:4 205:19 216:25 240:10 245:25

**dealing** 185:6 190:15,23 191:6,22 192:23 193:9 194:4,21 201:10,24 204:4,12 213:4 217:16 246:1 320:1 321:13 326:15 327:2,8 327:21 328:11 329:19 331:4 332:5 334:1 345:20 389:20

**deals** 321:17

**decades** 170:24 171:5,14 172:7 172:15 174:8 174:21,25 175:12 189:13 189:22 190:2 192:10,18 200:19 203:17 205:3 218:24

**decide** 91:23 137:13,17 236:24

**decided** 44:18

**decision** 176:9 177:4 190:12 193:6 197:1 205:10

**decisions** 137:21

**declaration** 99:8 120:8 387:23

**declarations** 67:12 68:8 99:1,3,5 283:14 297:2 369:9,20 371:17 384:11 384:17 386:24 387:5,5

**decline** 251:25

**declines** 351:15 351:20,24 352:3,8 353:8 353:17,25

**decrease** 28:19

**deem** 286:5

**deemed** 418:17

**defendant** 3:6 42:4 84:18 85:3,3,10

**defendants** 2:14,20 4:11 10:9 41:22 84:24 85:14,24 86:4 122:1,7 122:14 123:9

124:4 126:21 126:25 127:18 128:13 129:13 129:25 131:18 132:9 133:18 134:14,25 135:17 136:3 136:23 137:2 137:19,25 138:25 139:17 140:12,21 141:5,14,20 142:13 151:15 153:22 154:9 158:6,16 167:17,20,24 168:3,6,24 226:6 307:12 314:19 336:16 337:8 346:7,23 346:24 352:7 352:25 355:3 415:24 416:10

**defense** 131:7 292:14

**define** 77:1 239:18 280:6 290:1 305:17 307:17 337:10 347:3

**defined** 305:13 305:23 306:11 306:23

**definitely** 73:7

**definition** 81:16 82:19 84:14 126:21 146:14 220:15 221:25 251:23 276:14 287:14 289:22 290:3 305:24 306:12 306:25 307:20 308:1,24 309:16,17 310:7,16,23 311:9,19,21 312:6 316:13 336:24 337:12 408:22

**definitions** 313:11 316:21

**definitive** 322:18

**degree** 175:8 184:2

**dekalb** 5:11,20 6:4,14 12:16 12:21 13:1 15:13,16 17:6 19:17,22 21:15 21:19 25:5,13 25:18 26:7 39:7,12 42:17 42:23 43:10,14 114:5 115:23 116:16 284:15

CONFIDENTIAL

**[dekalb - different]**                                              Page 25

402:11,15,18
402:23,24
403:4,9,17,24
406:16
**demarcate**
82:21
**demarcation**
19:14
**departments**
411:21
**depend**  233:3
321:11
**depending**
113:21 293:24
**depends**  323:4
344:14
**depo**  63:3,8
**deponent**  9:16
420:1
**depose**  288:1
**deposed**  10:9
100:22 131:6
283:21 306:20
**deposing**
418:14
**deposition**  1:16
8:1 9:7 19:24
26:13,14 27:22
28:24 42:2
69:4,11,24
70:3,6 101:1,5
101:9 105:8,12
106:14,18
107:2,12

138:21 139:13
140:9 160:22
285:2,6 290:11
290:16,25
291:9 292:13
292:21 304:8
311:18 416:17
416:20 418:3
418:12,15,17
**depositions**
100:21 104:1,6
104:16 105:1,5
105:17 111:16
119:1 122:23
142:18 285:4
285:16,25
286:5 288:3
289:9,17
305:18 306:16
311:4 313:6
**depression**
275:18,23
276:17,18
**deprivation**
277:11,14,20
**describe**  58:1
269:7 285:18
296:13 306:15
311:9 325:23
329:14 337:24
340:8 347:2
376:21 392:25
393:6 413:5

**described**
48:11 50:8
120:7 127:12
285:16 306:17
313:5 382:23
412:4
**describes**  336:7
**describing**
344:17 380:8
381:5
**description**  5:6
48:8
**descriptions**
120:1,5
**design**  92:7
238:19 247:19
252:15 279:9
**designed**  262:5
267:17
**designing**
91:20
**desk**  18:12 19:2
**detailed**  57:14
**details**  208:2
209:1 287:2
290:15 308:1
336:21 413:18
**determination**
85:18,20
251:17
**determine**
107:24 108:8
112:11 118:16
119:22 120:4

225:21 226:2
245:6,15
247:11 252:7
252:19 253:7
286:13,21
313:19 314:6
352:18
**determined**
29:19 243:20
246:20 315:22
316:8
**development**
76:6 153:23
154:10
**deviation**
257:23 262:1
**devices**  154:21
155:5,16 156:1
336:10,11
**diagnose**  276:3
276:13,18
277:2,18 278:7
**diagnosing**
277:25
**diagnosis**
276:22
**difference**
169:17 243:3
377:24
**differences**
272:4 297:23
**different**  18:19
23:18 28:5
34:8 43:5

CONFIDENTIAL

**[different - district]** Page 26

58:12,18 78:18 97:7,23 113:20 116:6 139:23 140:1 160:7 199:1 232:21 243:1 252:2 253:9 256:1 272:1,2 277:10 289:24 296:8 296:19 298:11 301:8 304:21 317:9 318:19 323:24 324:10 356:7 359:17 369:2 372:2,9 372:12,15 373:15,17 374:17 375:1 379:2

**differently** 49:18 165:6 180:16 219:11 225:23 226:4 284:16 323:14

**digital** 229:22 230:8,21 231:10

**diligent** 35:1

**direct** 417:23

**direction** 8:4 258:25 261:8

**directly** 47:16 49:23,25 187:12 198:19

291:19 301:19 302:7,13,17 304:4 321:18 377:22 413:13

**director** 381:22 382:4,21 383:1

**disagree** 209:23

**disappeared** 166:24

**disciplinary** 231:8

**discipline** 220:22

**disciplines** 361:11

**disciplining** 214:7 215:4 220:5,19 360:4 360:18 361:25

**discord** 83:19 83:22

**discount** 29:23

**discover** 24:21 24:25 26:6 27:15 28:21 30:4

**discovered** 36:21

**discovery** 26:11 27:20 32:25

**discuss** 328:6 328:15

**discussed** 78:25 133:21 163:13 226:20 231:19 244:5 292:25 355:11 356:14 356:20 357:1 402:5

**discussion** 218:13 238:1

**discussions** 275:9 316:20 414:4

**disinvestment** 353:23

**dismiss** 340:9 340:12 343:20

**disorders** 278:8

**disputes** 74:20 74:22

**disruption** 326:15 332:21

**disruptions** 327:2,8,21 328:11 329:19 331:4 332:5,12 332:19,25 333:4,5,10,11 334:1 345:21

**disseminated** 415:2

**distinct** 122:1,7 131:19 133:19 134:15 135:1 135:17 141:6

**distinction** 264:5

**distinctions** 133:22 134:8

**distinguish** 112:21 113:5 133:17 134:1 231:7

**distinguished** 112:13

**distracting** 175:14 176:5

**distraction** 348:12 349:13

**distractions** 333:14,16

**distribution** 245:12 257:20 263:3,6,22 264:19 265:11 269:20

**district** 1:1,1 9:15,15 20:10 29:19 37:2 43:21 45:4,12 50:16,23 69:19 77:15,19,24 78:4,8,12 85:25 86:24 87:11,19 88:7 88:15 89:3,11 90:5 95:14 96:17 98:21 99:15,23 103:3

103:23 104:2,6
105:5 107:4
108:17 112:8
113:21,23
114:1,2,12,16
114:22 115:1,6
115:12,19
116:13,22,25
117:12,18,23
118:2 121:19
122:2,8 138:21
139:12 155:13
155:23 159:9
162:13 164:15
164:20 165:24
166:7,20,24
167:9,11,18,19
168:4,13,15,17
168:23 180:6
180:19,21
181:3,8,11,17
181:22 182:2
182:20 183:4,5
184:7,13,18,23
185:24 187:7
199:5 201:23
203:13,17,25
205:9 212:1
214:6,12 215:3
215:5,25
216:17 217:12
217:15 223:13
224:24 225:5,7
225:8,14,15,18

227:15 228:1
232:14,15
233:9,13,21
234:6 278:18
293:21,24
297:25 298:16
299:13,24
349:17 364:21
370:2 371:9,24
375:16 376:22
376:24 377:7
379:18,22
380:1,12
387:11 389:17
397:3,16 398:6
398:8,11 403:9
407:4 413:7

**districts** 19:16
22:21 37:8
41:5 42:19,23
43:25 44:8,25
47:6 49:21
50:7,15 57:5
81:1 90:19
98:19 99:17
100:25 108:1
108:10 113:14
116:17 117:7
125:9 165:16
167:1 169:9
181:1 182:15
184:15 193:16
193:23 197:15
199:12,14,17

201:7 232:9,17
233:3 294:17
297:13,20
298:2,4,10,11
350:9,15,19,25
351:4 352:13
352:20 378:12
379:8,12,13
395:3 406:4
411:20

**diversion**
181:13

**diverted** 86:25
87:13,20 88:16
125:20 181:10
181:18 182:17
185:22 219:22

**diverting** 170:5
181:25

**dividends**
74:12

**division** 9:4

**doc** 268:11

**document** 1:9
37:3 346:19,22
347:1 402:25
403:3 413:23

**documentary**
290:2 291:2

**documentation**
49:13

**documents**
6:10,12,14,16
6:18,19 8:7

10:22 37:22
39:1,12,23
40:9,20 41:22
42:12 43:20,24
44:7 45:11
46:3,11,13,17
46:19,24 385:2
385:3,4,7,12,23
386:1,11,16
414:21

**dog** 392:22

**doing** 26:21,25
32:8 33:18
35:2 36:14
65:25 68:1
72:11 73:21
79:1,16,19
80:9 88:3,21
129:3 141:24
143:21 179:9
179:10 180:23
184:6 185:24
187:3,11 188:4
188:6,23 189:1
197:23,24
198:7,12,13
200:8,17
211:12,13
213:7 219:20
226:25 227:11
238:15 241:7
265:25 272:25
273:14 275:4
308:5 309:11

CONFIDENTIAL

312:17 323:5
330:12 344:16
352:22 418:8
**dollar** 396:10
**doubled** 400:21
401:6
**doubt** 109:16
130:23 339:18
339:22 364:18
**downsides**
238:21 243:24
**downstream**
66:13 247:20
248:14
**dozens** 80:25
**dr** 10:3 60:21
86:21 124:19
129:10 133:6
135:10 136:14
136:15,19
142:3 163:5
198:10 210:12
235:3 275:4
335:22 339:7
340:12,20
351:15 367:21
384:4,11,17
387:22 415:20
**draw** 80:23
242:17
**drawn** 79:17
242:12 304:18
**drill** 10:13
264:9

**drive** 3:19
**drives** 28:19
**driving** 23:13
**due** 133:14,19
219:22
**duly** 9:24
**duty** 404:5,12
405:5
**dynamics**
271:15

**e**

**e** 3:19 5:1,5
19:8 417:1
419:2
**e.g.** 126:1,10
127:1 130:11
**earlier** 23:19
65:16 218:13
244:5 308:17
312:19 330:16
356:14,20
357:1 411:9
**early** 68:11
**earn** 220:25
**ears** 282:23
**easier** 35:25
36:13
**east** 3:19
**eastern** 1:19
9:7
**eat** 64:20,24
**eating** 64:25
65:3 70:7

**eberezofsky**
3:21
**economic** 70:14
75:25 76:6
271:4
**economics**
224:20
**economists**
224:17
**edge** 326:10
**education**
78:11,15 79:4
79:12,25 80:12
183:12 185:8
186:9,11 188:7
215:16 217:6
219:3 276:24
**educational**
77:11 78:18
80:13 86:1
411:11 412:16
**effect** 49:6
394:15
**effectively**
28:15,18 269:7
411:19
**effects** 81:3
144:7,18 146:4
147:8 150:11
150:20 154:20
155:4 351:10
379:18,18
**effort** 214:4,20
219:22 221:11

221:13 222:23
223:9
**eight** 64:1
76:20
**eiland** 4:2,3
**eilandlaw.com**
4:5,6
**either** 79:15
99:2 164:9
241:3 275:4
322:19 331:17
378:11 381:1
**election** 260:10
260:13,20,22
261:2,12,17
**elections**
261:14
**elementary**
369:25 370:15
371:19
**elicit** 286:1
377:1
**eliciting** 375:11
**eliminate**
146:18 148:18
149:24 155:2
157:19 158:4
158:14 165:1,7
**elite** 271:16
**email** 6:8 30:11
30:17 31:8
47:3
**emails** 41:23

CONFIDENTIAL

**[emotional - employees]**

| | | | |
|---|---|---|---|
| **emotional** | 117:24 118:4 | 313:21 314:7,8 | 204:3,11,18 |
| 195:7,20,24 | 118:11,16,17 | 316:24 318:2 | 205:3,19,24 |
| 196:4,7,16 | 118:22,22 | 319:9 321:3,17 | 206:8,16,24 |
| 197:5 199:25 | 119:10,12,22 | 322:12,14,22 | 215:25 225:22 |
| 200:14 204:19 | 119:23 120:7,8 | 322:24 323:6 | 226:3,14,25 |
| 205:1,15 206:1 | 120:15,16,19 | 323:15 324:3 | 227:3,15 228:1 |
| 206:11 229:23 | 120:21 121:3 | 354:15,22 | 229:1,20 230:6 |
| 230:9,22 | 121:11,19 | 355:13,16 | 230:20 231:9 |
| 231:12 381:22 | 138:7,8,21 | 366:15 372:16 | 231:10 232:9 |
| 382:5,21 383:2 | 139:12 140:9 | 396:11,16 | 232:18 233:3,4 |
| **employed** | 140:18 142:12 | **employee's** | 278:18,19 |
| 71:11,14,18,21 | 143:20 166:18 | 112:12,20 | 284:14,18,21 |
| 77:10,15 | 166:21,25 | 113:4 181:9 | 284:24 285:3,7 |
| **employee**  32:17 | 168:12,14 | 205:13 223:18 | 285:9,12 |
| 42:3,25 43:1,9 | 182:21,22 | 304:19 319:23 | 286:13,22 |
| 67:11 68:7,10 | 205:10 214:7 | 321:12 322:14 | 287:7 288:10 |
| 70:25 71:3,24 | 214:13 215:4,5 | 322:25 | 288:20 289:5 |
| 72:3 90:20 | 217:12,15 | **employees** | 290:4 291:10 |
| 100:8,12,18 | 221:17 223:14 | 29:20 43:12,16 | 293:3,5,15,19 |
| 101:18,22 | 223:16 225:6 | 47:4 49:20 | 295:5,22 296:8 |
| 102:13,18 | 225:10 232:10 | 50:14,16,23 | 296:19 297:2 |
| 103:1,13 104:6 | 232:25 233:9 | 51:1 71:7 | 297:11,19 |
| 104:16 105:5 | 233:14,22 | 79:14,17,22 | 298:20,24 |
| 105:17,22 | 234:7 281:14 | 90:21 91:4 | 300:3,9,12,18 |
| 106:14,18 | 281:17 283:13 | 98:21 99:16,24 | 300:19 301:1,4 |
| 107:2,12 108:1 | 284:3 290:24 | 100:14 101:6 | 301:7,15,18 |
| 108:10,17 | 291:1,8 292:21 | 101:12,22 | 302:4,7 303:7 |
| 110:21 111:11 | 293:13,13 | 102:1,19 104:2 | 303:11,20,21 |
| 111:16 113:15 | 294:3 299:11 | 105:10 106:1 | 304:7,9 305:5 |
| 113:24 114:3 | 300:4,10 301:5 | 106:19 111:5 | 305:9,13 |
| 114:13,18,21 | 301:16 302:5 | 112:2 118:25 | 306:10 307:17 |
| 115:2,12,20 | 302:21 303:8 | 120:24 121:7 | 310:13,21 |
| 116:5,8,18,21 | 304:20 309:14 | 143:12 163:17 | 314:17 315:4 |
| 117:1,7,13,19 | 311:18 313:20 | 166:12 203:1,9 | 315:19,21,25 |

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[employees - estimate]**

| | | | |
|---|---|---|---|
| 316:4,8,16 323:18 349:19 362:15,22 363:24 364:9 364:24 365:8 365:16,22 366:5 370:3 372:8,14 373:1 373:15 374:8 374:16,22 379:1 381:9 396:12 407:12 407:21 408:3 408:12 **employment** 193:25 **encompasses** 99:4 **encountered** 282:20 **endeavor** 272:16 **ended** 49:7 **ends** 151:11 329:24 **engaged** 76:18 287:3,7 319:12 **engaging** 207:18 208:12 210:25 **engine** 53:17,24 55:5 **enormous** 378:14 379:22 | **ensure** 33:14 288:11,22 289:6 290:6 **entail** 173:4 **entailed** 383:3 **entails** 382:22 **enter** 52:25 **entered** 32:7 36:16 **entering** 32:5 **entire** 65:21 67:2,8,15 68:3 212:17 213:16 350:20 351:5 **entirely** 228:9 228:24 296:16 374:11 376:10 **entities** 76:6 343:19 **entity** 71:11 73:1 181:11 225:16 341:5 **entry** 52:12,23 **environment** 87:2,14 175:25 **equal** 400:18 **equals** 329:1,6 329:25 **equation** 399:20 **equivalent** 79:1 **errata** 418:6,8 418:11,14 420:9 | **erroneous** 391:4 392:10 401:10 **erroneously** 391:7,10,25 401:9 **error** 24:22 25:1 26:7 27:16 28:22 30:5 33:1,9,11 246:5 253:24 254:4,13 255:15 256:8 256:18 259:4 259:15 261:16 261:20 324:7 324:18 325:23 347:21 400:7 401:1,20 **errors** 20:1 34:15 36:19 65:15 **esq** 2:3,3,4,4,10 2:11,17 3:3,13 3:14,19 4:3,3,8 **essential** 91:12 99:24 104:7 396:8 **essentially** 26:2 45:24 140:4 185:20 223:25 225:6 236:5 272:3 396:21 407:1 | **establish** 352:23 **esther** 3:19 **estimate** 32:17 32:19 57:18 60:5 62:13,24 76:11 78:24 91:13 95:24 96:2,10,19 99:25 101:14 102:9,12,22 103:4 104:8 105:11 106:9 106:12,22 109:4,9,12 110:1,16 112:5 113:1,13,22 115:18 117:11 118:8,15 128:10,11,25 130:13 136:11 136:21 141:11 146:8,12,13 148:1,11 149:7 149:18 151:2 151:18,23 152:21 159:1 169:14 207:22 208:16 211:22 211:23 214:12 231:17 238:11 240:13 242:10 242:21 243:5 243:13 247:21 |

CONFIDENTIAL

**[estimate - estimates]**                                        Page 31

| | | | |
|---|---|---|---|
| 248:11,17 | 388:9 389:5,11 | 105:4,15,16 | 188:15 208:10 |
| 267:1,11,23 | 390:3 393:12 | 106:7 107:5,15 | 210:11 211:21 |
| 268:5,7 272:18 | 393:25 394:3 | 108:2,5,11,18 | 214:9,24 216:3 |
| 272:20 273:23 | 394:19 401:8 | 108:24 110:18 | 220:8,9,11 |
| 274:10 279:1,4 | 403:1,9 407:19 | 110:21 111:1 | 235:4 237:7,11 |
| 279:19 281:17 | **estimated** 23:1 | 111:19 112:12 | 237:18 238:16 |
| 281:20,21 | 23:8 25:7,14 | 112:20 113:4 | 240:14 247:3 |
| 291:3,6,21 | 25:19 26:17 | 118:19,25 | 251:4 253:21 |
| 293:5,14 | 27:25 31:23 | 119:24 129:11 | 269:10 270:12 |
| 304:20 316:11 | 32:3 101:22 | 129:16,17 | 270:22 271:9 |
| 316:25 317:1,8 | 105:22 119:11 | 132:4,7,17 | 272:12 278:19 |
| 317:14,19 | 126:8 136:2 | 133:23 134:11 | 279:17 283:15 |
| 318:3,6,11 | 144:4 147:6 | 134:19,23 | 284:1 285:14 |
| 319:10,13,23 | 150:8,17 | 135:14 136:9 | 286:15,24 |
| 320:2,23 321:7 | 153:20 154:7 | 136:24,25 | 288:12,22 |
| 321:24 322:12 | 156:9,14 163:5 | 137:6,7,14,15 | 289:7 290:6 |
| 322:22 323:10 | 298:21,24 | 137:18,23,23 | 291:12 292:20 |
| 324:9,10,17,24 | 303:21 321:3 | 138:22 139:14 | 293:3,12,15,18 |
| 325:20,21 | 321:19 350:8 | 140:11 141:2 | 293:20 294:2,9 |
| 326:2,3,4 | 350:17 351:3 | 143:8,14 | 294:10,16 |
| 342:2 345:19 | 403:17 | 144:15 146:3 | 295:20 296:6 |
| 345:24,25 | **estimates** 24:14 | 146:19,22 | 296:20 297:4 |
| 356:7 357:17 | 29:13 33:16 | 148:2,7 149:3 | 298:2,5 299:10 |
| 357:18,24,25 | 58:1 68:18 | 149:15 152:4 | 299:12,20,23 |
| 358:3,4,9,10,14 | 79:13 89:13,17 | 152:25 153:12 | 300:4,6,10,11 |
| 358:15,21,25 | 89:22 90:1,8 | 154:19,23 | 300:18 301:5,6 |
| 359:1,10,11 | 90:13,17 94:22 | 157:8,22 158:7 | 301:16,17 |
| 367:2,7 372:17 | 95:23 97:15 | 158:17 159:11 | 302:5,6,21 |
| 372:18,23 | 98:20 99:15,23 | 159:17 160:24 | 303:8,10,25 |
| 373:8 374:9,10 | 100:7,11,18,24 | 160:25 161:4,8 | 304:7 305:10 |
| 374:23,24 | 101:17,18 | 161:12,16,24 | 312:25 315:20 |
| 379:9 382:1,17 | 102:7 103:16 | 162:8,16 | 316:1,5 323:12 |
| 383:12 384:10 | 103:25 104:4 | 163:20,23 | 323:15,17 |
| 387:3,10 388:4 | 104:14,23 | 165:1,8 169:13 | 324:13 325:7 |

CONFIDENTIAL

362:11,18
366:6 367:20
368:7 369:8,24
370:4,8,11,14
371:16,23
372:2,9,11,15
372:25 373:3,6
373:15,18
374:10,17
376:11,12,19
377:10,13,25
378:6 379:1,12
379:23 380:8
381:8 383:6
384:15 386:23
387:25 388:19
391:8,23
392:12 395:17
396:2 401:15
407:9,24 408:1
408:9,17

**estimating**  20:3
22:25 23:6
25:6,13,17
26:16 27:24
57:20 110:23
111:6 112:1
120:15,25
128:19 231:6
383:13

**et**  126:11 127:5
127:11 130:12
175:16 405:5
414:22

**evaluate**
145:21 263:17
283:22 351:20
368:25

**evaluating**
80:21

**evaluation**
78:21 415:1

**evaluations**
78:17,19

**eventually**
225:3,13 272:5

**everybody**
66:14,16
290:11 304:5

**everybody's**
370:24

**evidence**
260:23 340:3
343:22 344:9
350:2 351:9
379:21 380:18
380:23 417:5

**exact**  23:3
175:19 177:1
275:22 297:3

**exactly**  57:17
67:24 68:9
93:1 119:4
120:16 129:4
136:15 138:13
139:5 145:5
159:23 160:5
171:11,22

176:21 177:24
192:17 195:13
197:23 198:12
201:2 209:5
211:12 240:19
273:13 307:20
312:12 362:6
372:7

**examined**  9:24
327:7

**examining**
332:18,24

**example**  95:12
101:21 119:10
127:2,10
194:15 208:10
213:12 256:11
256:21 260:6,9
264:6 265:4
298:1 359:25
361:23 365:16

**examples**
127:10,13
148:4 210:5,8
216:20

**excel**  29:1 35:5
36:1,4,8,14
362:24 363:2,8
363:14,22
364:7,16,22
365:14,20
366:3,17

**except**  42:23
420:6

**exception**
114:5

**exchange**  30:17
184:5

**exclude**  152:3
152:25 153:11
403:22 406:15

**excluded**
404:16

**exhaustive**
409:1

**exhibit**  3:9 5:8
5:9,11,12,14,15
5:17,18,20,21
5:23,24 6:1,2,4
6:5,7,8,9,11,13
6:15,17,19,20
6:22,23,24 7:1
7:1,3 10:23
11:5,11,20,24
12:3,15,21
13:3,9,16,22
14:3,8,19,24
15:3,8,12,17,21
16:1,5,10,14,19
18:1 20:15,20
20:25 21:4,10
21:14,20,24
22:4,8,14,24
30:9,12 37:17
37:23 38:20
39:2,6,13,17,24
40:3,10,14,21
60:14,18,21

CONFIDENTIAL

61:6,11,17,21
61:25 87:6
124:11,15,19
124:20 125:1
326:18 335:16
335:19,22
346:12,15,18
346:21 348:19
348:22 363:6
384:5,21
386:20 387:15
387:18 388:17
388:24 390:9
392:19 395:15
397:1 402:16
406:7
**exhibits** 10:23
14:17,18 16:23
16:24 17:10,17
20:14 22:19
41:2,8,8,10
**exist** 167:12,21
168:7 199:21
**existence**
198:20
**existing** 326:13
326:24 327:18
328:7,9 329:16
**exists** 159:7
199:19 280:22
296:14 356:3
**expansion**
75:11

**expect** 10:12
195:14 199:13
**expected**
197:15 239:23
**expects** 197:23
198:12 199:6
**expended**
185:20 221:11
221:14
**experience**
85:25 172:24
173:5 302:23
411:10 412:15
**experienced**
170:17 173:16
**expert** 5:8,9,11
5:12,14,15 6:1
6:2,4,5,7,22
10:24 11:3,12
11:12,18,24
12:20 13:4,8
13:20 14:3,7
17:9,17 20:16
20:24 21:9,19
22:3,13 30:19
30:24 41:7
56:9,16,19
63:18 75:3
76:9,13,24
77:7 109:6
124:14 125:1
129:8 130:4
135:12 238:19
240:3 247:19

252:13 279:9
313:1 335:25
338:3 369:13
391:17
**expertise**
241:17 267:17
**experts** 56:13
145:23
**expires** 420:16
**explain** 48:24
122:15
**explicit** 110:9
**explicitly**
174:21
**express** 17:12
**expressly**
306:19
**extension** 326:6
**extent** 50:12
53:17 54:22
171:23 172:10
174:15 179:22
196:8 199:20
245:24 261:23
280:24 286:3
290:17 305:16
306:14 311:3
313:4 323:25
412:9
**extra** 28:15
220:23 222:13
224:7 404:5,12
405:5

**eye** 257:13,14
257:18
**eyes** 1:13 349:5

**f**

**f** 2:20 417:1
**face** 229:5,5
**facebook** 2:20
2:21,21,21,22
81:18 88:18
89:2 90:7
126:2,10
130:11,15
307:8 357:11
357:14 358:22
359:2,8 361:6
409:20 410:2,5
**faced** 320:1
**facially** 343:12
**facilitation**
153:22 154:9
**fact** 95:9,18
102:2 106:2
108:17 112:20
113:4 115:2
117:1,8 155:12
197:25 198:14
218:23 236:15
249:3,9,17
263:12 264:11
265:19,24
266:9,13,17
270:13,23
287:9 306:3,7

CONFIDENTIAL

**[fact - form]**                                                        Page 34

306:10,21
309:15 311:12
325:13 332:9
341:19 344:2
377:10 378:23
380:1,11
382:10
**factors** 125:20
275:16 277:10
407:10 408:11
**facts** 310:20
362:9
**fading** 349:6
**fafsas** 411:23
**fail** 418:16
**fair** 113:18
119:17 219:7
**fall** 55:17
**false** 198:24,25
**familiar** 151:7
239:15,19
280:4,7 370:14
**far** 131:5
166:15,22
308:4
**farm** 3:14
**feasible** 218:21
219:4
**feature** 151:6,7
151:14 152:6
153:13
**features** 150:11
150:20

**federal** 114:6
117:4
**feedback**
364:20
**feel** 36:18,23
56:2,18 139:20
285:17,19
289:8,18
290:19 297:15
**felt** 248:18
285:22 288:5
**field** 265:4
414:18
**fight** 214:8,15
**fighting** 222:4
**fights** 85:5
149:5,17 150:1
**figure** 58:3
138:13 183:9
186:24 391:1
**figuring** 32:9
54:6
**file** 28:4 29:5,7
365:14 366:17
405:1
**files** 18:6,18
27:21 29:4,10
362:25 363:3,8
363:14,22,24
364:7,17,22
365:5,20 366:3
**fill** 411:22
**film** 85:4

**filter** 154:11
**final** 80:7
**find** 54:13,15
55:3 120:1
187:3 272:3
330:11,21
331:22,24
334:15 404:2
**fine** 38:18
157:2,3 246:2
**finish** 10:14
220:24
**finite** 222:23
**firm** 55:20,22
70:9,13 73:19
74:4 338:19
347:18,19
**firms** 56:16,19
**first** 52:22
90:18 125:24
149:11 230:3
268:21 271:25
285:1 331:25
**fiscal** 28:8
363:8,10
**five** 18:7,10,13
18:22 19:5
43:3,7 60:13
77:5 157:1,4
267:4 371:13
371:21 375:17
376:6 379:11
**focused** 180:12
180:12

**folder** 38:8
**folders** 37:1
**follow** 35:19
53:18
**followed** 33:13
**following**
125:20 208:10
363:10
**follows** 9:25
**food** 64:24
**foot** 246:6
**footnote** 18:4,8
18:25 19:4,4
19:10,10
328:18 329:22
363:7 385:21
406:23
**footnotes** 18:4
18:7,10,13
69:6
**forces** 34:25
**foregoing**
417:6,21 420:3
**forget** 31:11
**forgone** 178:10
183:4 186:4
187:16 188:3
**forgot** 12:3
330:10,14
**forgotten** 68:13
**form** 42:13
45:13 55:9
81:12 87:22
88:20 89:5

CONFIDENTIAL

**[form - funder]** Page 35

| | | | |
|---|---|---|---|
| 90:11 91:16 | 375:3 376:17 | 148:23 149:9 | 375:20 377:16 |
| 97:17 100:3 | 392:14 405:24 | 150:4,23 152:9 | 401:18 |
| 103:18 104:10 | 408:15 420:7 | 153:5,16 154:1 | **foundations** |
| 104:18 107:18 | **formal** 81:16 | 154:13 155:8 | 76:5 |
| 111:22 115:4 | 327:11,13 | 155:19 156:4 | **four** 18:7,10,13 |
| 115:14 132:10 | **format** 53:1 | 157:14,24 | 18:22,25 19:16 |
| 132:13 137:3 | **formation** 52:1 | 158:20 159:15 | 30:9 64:12,13 |
| 141:9 144:11 | **former** 42:3 | 163:11 167:4 | 73:1,10,14 |
| 144:21 146:9 | **forming** 41:12 | 176:15 178:2 | 74:9 246:6 |
| 147:12 150:22 | 41:15,20,25 | 183:19 193:13 | 267:4 268:15 |
| 153:4,15,25 | 42:7 43:19 | 195:22 204:22 | 308:11 363:7 |
| 154:12 164:1 | 44:9 47:6 | 207:10 220:13 | **frame** 193:18 |
| 172:8 190:6 | 48:14 49:22 | 221:19 230:1 | **framed** 348:2 |
| 194:9 198:2 | 240:7 298:17 | 231:15 239:10 | **free** 192:6 |
| 212:23 213:24 | 332:16 | 240:1 244:15 | 223:24 |
| 214:17 217:21 | **formulating** | 248:4 249:7 | **frequency** |
| 221:5 226:7 | 45:9 | 250:5,21 | 189:23 273:20 |
| 229:25 231:14 | **forty** 59:21 | 252:23 253:13 | **frequently** |
| 238:10 240:18 | **found** 25:4 | 260:2,15 261:6 | 295:12 347:8 |
| 241:15 254:7 | 46:23,25 96:24 | 273:3,17 274:6 | **friday** 1:12 9:5 |
| 256:13 259:5 | 97:6,9,10,22,23 | 280:20 281:24 | 19:17 |
| 259:18 265:5 | 103:10 107:9 | 288:14,25 | **friends** 410:16 |
| 267:6 274:6 | 107:20 313:7 | 290:9 293:7,10 | **ftes** 45:22 |
| 275:7 278:10 | 327:15 330:9 | 295:8 297:6 | **full** 33:21 |
| 279:7,24 | 330:12 331:15 | 299:3,16 | 264:18 |
| 281:24 291:11 | 332:10 339:4 | 301:12,23 | **fully** 224:1 |
| 303:3 304:22 | 340:17 344:19 | 303:15 305:15 | 417:5 |
| 309:19 311:24 | **foundation** | 311:25 313:24 | **fun** 174:11 |
| 313:23 316:17 | 51:3 55:9 | 314:22 317:6 | **function** |
| 319:17 322:3 | 75:25 95:5 | 349:25 355:20 | 203:16 |
| 322:16 323:2 | 110:5 135:20 | 359:21 360:7 | **fundamentally** |
| 331:7 333:18 | 139:2 141:9 | 361:16 364:11 | 321:13 |
| 366:21 370:6 | 144:11,22 | 366:9,21 368:5 | **funder** 414:25 |
| 373:20 374:12 | 146:25 147:12 | 372:20 373:10 | 415:8 |

CONFIDENTIAL

**[further - graden]** Page 36

| | | | |
|---|---|---|---|
| **further** 245:2 283:21 331:16 | 251:22 280:10 339:16,21 382:18 415:23 | 48:5 57:3,18 60:13 67:4,9 67:16 68:5 | **gotten** 297:1 401:6 |
| **fy** 29:5 | **given** 98:5 108:5 129:18 | 73:7 81:5,18 86:13 121:15 | **government** 117:4 |
| **g** | 131:3 132:17 247:23 314:13 | 130:6 156:23 162:22 186:22 | **grabbed** 65:6 |
| **galveston** 4:4 | 325:25 420:5 | 186:23 187:9 | **graden** 2:3 11:14 30:18,23 |
| **games** 190:5 | **gives** 280:12 | 187:10 201:9 | 31:5 34:12 |
| **gathered** 302:24 | 325:11 | 201:17 212:17 213:15 222:17 | 35:22 38:5,11 38:17 44:3 |
| **gathering** 282:15 | **giving** 74:7 128:21 142:5,8 | 223:2 224:1,10 225:10,11 | 45:14 47:8 48:19 50:17 |
| **general** 176:23 203:13 309:7 | 143:8,14 254:16 373:15 | 232:12 234:20 236:2 237:17 | 51:2,15 54:17 55:8 59:20 |
| 343:17 | **go** 14:16 34:2 37:14 49:11 | 248:12,17 263:8 267:3,13 | 60:10 61:14,16 66:11 68:25 |
| **generally** 165:14 166:15 | 50:2 58:2 86:12 157:1 | 267:25 274:23 283:8,25 | 69:15 82:11 83:3 85:6 |
| 199:16 203:24 238:17 340:1,6 | 167:24 187:6 215:13 224:8 | 315:11 324:6 378:22 383:21 | 87:22 88:9,19 89:5 90:11 |
| **genesis** 44:23 | 234:17 252:15 258:2 263:17 | 398:8 411:2 413:6,6 415:13 | 91:16 92:22 93:19 94:25 |
| **geography** 351:17,22 | 273:8 283:3,6 283:9 287:16 | 415:22 416:18 | 95:5 96:21 97:17 100:3 |
| 352:9,15 378:15,24 | 315:9 326:23 384:8 386:21 | **goldin** 271:13 | 102:15 103:7 103:18 104:10 |
| **georgia** 4:10 | 413:6 415:12 | **golkow** 9:4 | 104:18 105:19 107:18 109:2 |
| **germane** 136:11 | **goes** 53:19 78:20 261:9 | **good** 10:3,4 36:23 53:24 | 110:4 111:20 111:22 115:4 |
| **getting** 49:2 65:10,17 68:18 | 273:10 360:25 | 142:2 235:8 282:14 349:5 | 115:14 118:12 123:10 124:5 |
| 86:8 216:13 255:25 265:14 | **going** 10:21 14:15 19:24 | 402:25 | 128:3,15 129:14 130:17 |
| **give** 14:16 20:12 44:19 73:16 75:18 127:8,10 | 20:12 29:3 35:12,12 37:15 | **google** 2:14 10:7 55:11,12 328:1,1 331:21 | |

CONFIDENTIAL

**[graden - granular]**                                                       Page 37

| | | | |
|---|---|---|---|
| 131:20 132:10 | 191:25 192:14 | 251:11 252:9 | 322:2,15 323:1 |
| 132:13 133:5 | 192:25 193:12 | 252:22 253:12 | 323:20 331:6 |
| 134:2,4,16 | 194:9,24 195:9 | 254:7 255:18 | 333:17 339:11 |
| 135:3,19 | 195:21 196:21 | 256:13 259:5 | 341:8 342:23 |
| 136:16 137:3 | 197:7 198:2,16 | 259:18 260:1 | 343:9 344:6 |
| 138:16 139:1 | 199:8 200:4,22 | 260:14 261:5 | 349:24 351:7 |
| 139:18 140:13 | 201:12 202:1 | 265:5,22 267:6 | 353:10 354:1 |
| 141:8 142:15 | 203:3,18 | 273:2,16 274:5 | 355:19 358:18 |
| 143:23 144:10 | 204:21 205:5 | 274:16 275:7 | 359:20 360:6 |
| 144:21 146:9 | 205:16 207:9 | 275:19 276:5 | 360:20 361:15 |
| 146:24 147:11 | 207:23 208:17 | 277:3,21 | 364:1,10 366:8 |
| 148:12,22 | 209:23 210:12 | 278:10,20 | 366:20 368:4 |
| 149:8,19 150:3 | 211:5,15 212:8 | 279:6,23 | 368:12,22 |
| 150:13,22 | 212:23 213:23 | 280:19 281:9 | 370:5 372:19 |
| 151:20 152:8 | 214:17 215:8 | 281:23 283:16 | 373:9,19 |
| 153:4,15,25 | 216:7 217:21 | 284:5 286:17 | 374:12 375:2 |
| 154:12 155:7 | 220:12 221:5 | 287:11 288:13 | 375:19 376:16 |
| 155:18 156:3 | 221:18 223:20 | 288:24 290:8 | 377:15 379:4 |
| 156:22 157:2 | 224:25 226:7 | 291:13 292:2 | 380:4,15 381:2 |
| 157:13,23 | 226:17 227:19 | 293:6 294:18 | 382:12 383:4 |
| 158:9,19 | 228:16 229:6 | 295:7,24 | 383:14 385:14 |
| 159:14,21 | 229:25 230:11 | 296:10,21 | 392:2,14 394:9 |
| 163:10 164:1 | 230:25 231:14 | 297:5 299:2,15 | 397:13 401:17 |
| 167:3 171:1,18 | 232:4,19 | 300:14,22 | 405:23 407:14 |
| 172:8,20 | 233:15,24 | 301:11,22 | 408:15 |
| 173:24 174:12 | 234:9 236:18 | 303:2,14 | **graden's**  31:8 |
| 175:4,17 | 237:8 238:23 | 304:22 305:14 | **grading**  235:24 |
| 176:14 177:9 | 239:9,25 | 306:5 307:3,23 | 236:4,10,12 |
| 178:1 179:3,16 | 240:15 241:4 | 309:2,19 311:1 | **graduate** |
| 180:9 181:14 | 241:15 242:2 | 311:23 312:14 | 268:10 |
| 183:18 184:9 | 244:2,14 | 313:23 314:10 | **graduated** |
| 187:19 189:7 | 245:18 248:3 | 314:21 316:17 | 268:14 |
| 189:17 190:6 | 249:6,21 250:4 | 317:5 318:9,22 | **granular**  174:4 |
| 190:18 191:11 | 250:20 251:9 | 319:17 320:12 | 270:5 |

CONFIDENTIAL

**[great - hesitation]**

**great** 99:11 128:22 131:14 157:5 248:15 310:3 388:15

**greater** 244:11 244:23

**greedy** 272:6

**green** 4:8 416:9

**gross** 19:12 404:23,23,24 404:25

**group** 42:19 56:3 338:15

**grow** 218:25

**grunt** 271:7

**guess** 23:10 37:17 55:12 199:1 238:25 272:5 347:5 355:25 409:11

**guidance** 119:14,18,19 120:11,11

**guidelines** 241:24 246:14

**gun** 175:16

**guy's** 69:21

**h**

**h** 5:5

**habit** 235:9

**half** 59:22 315:6

**hall** 395:20,25 396:5

**hammel** 369:10 369:15,21 370:17,22 371:17 372:1 375:15 376:5 377:9

**hammel's** 376:11

**hand** 10:21 12:8 37:17,19 381:15,19

**handed** 36:25

**handful** 165:19

**hang** 147:22

**happen** 192:24 193:10 194:5 194:22 260:4

**happened** 172:10,12,13 192:12 228:19 229:11 354:7 382:11

**happening** 74:1 74:3 269:8

**happens** 260:8 261:18 280:25

**happy** 53:18 340:5 343:23

**hardy** 2:16

**harford** 5:13 5:21 6:5,15 13:4,9,14

15:22,25 19:17 19:22 21:25 22:3 26:15 27:5,9,16 31:12 39:18,23 43:4 103:22 104:9,16 105:15 114:9 114:11 285:8 392:19 394:6 394:23 395:1,5 395:11 404:15 405:10,12,17

**harford's** 393:1 393:7,11

**harm** 352:1

**harms** 84:25

**harvard** 268:12 268:14 270:11 270:20 271:17 271:18 272:11 410:3

**head** 19:11 23:4 25:10 50:11 51:5 77:5 121:17 237:15 251:23 290:16 307:6 307:14 309:5 309:23 370:20 371:10 403:11

**heading** 385:2 385:3

**health** 163:9,22 163:25 164:15 164:21 165:3 165:10 200:21 201:4,10,25 202:12,20 206:18 207:1 232:13 275:17 276:3,13,15 278:8,14 318:4 318:5,18,19 319:11,19

**healthcare** 75:24

**hear** 342:15

**heard** 239:17 338:1 341:6

**height** 246:10

**held** 1:17 9:8

**help** 42:13 54:15,20 55:2 56:8 75:16 283:7 411:22

**helped** 52:25

**helpful** 42:7 344:19

**helping** 271:7 282:18

**helps** 244:7 257:19

**hermetically** 377:5

**hesitation** 249:12

CONFIDENTIAL

**[hey - identification]**                                             Page 39

**hey**  44:19 45:6
   45:17 48:6
   112:7
**high**  25:23
   26:22,25 27:1
   27:2 43:5
   95:13 173:17
   251:7 258:17
   324:13,16,17
   324:24 325:7
   325:22 326:3,5
   336:7 369:25
   370:15 371:20
   374:9 389:9,11
   389:12,17
   390:3,12,13,21
   391:2,3,7,8,10
   391:23,25
   392:8,9
**higher**  23:1,5,7
   25:7,14,18
   26:17 296:23
   326:11 372:17
   374:24 376:11
   376:12 379:11
   398:5
**highest**  326:7
**highly**  364:18
**hill**  3:20
**hire**  176:9,24
   177:4 190:12
   193:6,17 197:1
   197:10 201:8
   205:10

**hired**  75:2 76:9
   76:13,24 78:12
   168:17,23
   193:19 250:14
   347:18
**historical**
   302:23
**history**  351:17
   351:21 352:8
   352:14 353:8
   353:17,24,25
**hitting**  257:12
   257:18
**hodgepodge**
   232:14
**hold**  226:5
   238:18 353:6
   353:22
**holdings**  2:21
**holiday**  264:15
**holidays**
   264:10,14
**holly**  369:10
   370:17
**homelessness**
   320:2,7,10,18
   320:21
**honest**  187:1
   218:22
**honestly**  308:3
**hot**  86:9
**hour**  58:7,24
   58:25 59:3,13
   61:12,22 62:1

156:23 212:15
   212:17 213:14
   213:16 315:6
   377:17
**hourly**  165:13
   165:17,19
   166:14 221:12
**hours**  63:10,11
   64:1,2,6,12,13
   65:22 70:4,8
   166:11 224:7,9
   264:1,2,7,12
   268:20 269:13
   270:1,3 271:24
   272:2,12
   308:11,16,18
   308:21 416:16
**house**  411:1
**household**
   269:20
**housework**
   269:20
**howard**  395:20
   395:25 396:6
**huggins**  7:3
   386:24 387:6,9
   388:16,17,23
   389:3,10,16
   390:3,18,20
**huh**  19:3
   125:17 328:17
   329:21
**hundred**
   308:16,21

**hundreds**
   76:14,15 80:25
**hypothesis**
   264:24 350:4
**hypothetical**
   137:4 222:4,5
   222:10 223:24
   224:15 350:22

**i**

**idea**  62:22
   72:23,24 76:10
   76:17 82:12
   83:4,9,13,17,21
   83:25 84:4
   129:11 143:19
   159:6 189:19
   189:23,24
   228:18 239:20
   246:17 254:2
   273:4 274:19
   276:7 280:7,8
   281:25 293:8
   333:20 353:12
   385:15 386:4
   409:5 411:7
**identical**  37:9
   41:3 297:12
**identically**
   119:4 120:10
**identification**
   11:5,20 12:22
   13:10,22 14:9
   14:25 15:9,18

CONFIDENTIAL

**[identification - included]**                    Page 40

16:2,11,20
21:1,11,21
22:5,15 30:13
37:24 39:3,14
39:25 40:11,22
60:18 124:16
124:23 335:19
346:15 348:22
387:19 388:25
**identified**
42:24 43:11,15
45:10 119:13
334:4 364:24
365:7 371:6
**identifies** 45:19
**identify** 17:22
41:10 44:1,11
55:5 226:13
236:8 237:19
238:13 284:2
294:7,12 327:6
328:6 362:14
362:20 363:22
364:8 365:13
365:21 366:4
383:7
**identifying**
111:16 120:13
355:2,6,12
**identities** 50:15
**illness** 86:5
**imagine** 265:10
282:4,7

**imagines**
224:15
**immaterial**
197:25 198:14
**immediate**
222:22
**immediately**
340:10,12
**impact** 65:13
78:23 350:22
350:23
**impacted** 169:5
321:6,22
352:20 353:1
**impacting**
168:11
**impairments**
318:4,18
**imperative**
418:13
**implement** 81:6
252:15
**implemented**
80:24 350:16
351:1
**implicitly**
174:22
**import** 29:8
210:3
**important**
195:18
**importing**
29:10

**impose** 213:9
214:21
**imposed**
224:23
**imposes** 223:10
224:21
**impossible**
218:16 349:4
**improperly**
392:6
**inaccuracies**
274:22
**inaccuracy**
254:5,14,20
255:16,21,23
256:9,19
261:21
**inaccurate**
239:4,5,8
254:21 256:10
256:21 258:10
258:19 292:17
372:17 373:8
394:7
**inaccurately**
257:4
**incident** 289:14
354:13,13,15
354:20,20,22
355:2,6,13,16
355:18,18
361:25
**incidents**
355:23 356:8

356:12,18,24
357:5,11,18,25
358:10,15
359:1,11,18
**include** 82:18
130:16 137:18
139:15 144:5
144:16 145:6
145:22 146:11
150:9,18 151:3
151:4 156:18
156:20 159:23
163:13 164:10
173:9,13
176:21,22
214:11 231:22
246:9 259:15
264:17 336:20
337:12 340:18
405:18 406:10
406:14
**included** 28:15
29:20 43:17
96:16 101:8
103:2 107:2
126:20 129:19
129:20 131:24
138:23 139:5
140:15 145:5
146:3,7 148:1
148:7,10,14,15
149:3,6,15,18
151:22 152:20
152:23,23

CONFIDENTIAL

**[included - information]**                                    Page 41

154:19,22,24
154:25 156:6
157:8,11,16,16
160:6 161:4,7
163:14 171:6
171:15 172:16
174:9,20,22,22
175:1,13 176:7
195:13 207:22
208:9,15 209:5
210:10,23
211:10,20,21
211:23 212:21
213:21 214:1,9
214:23 216:3
220:8,10
235:14 246:3
259:3 285:20
314:18 319:25
335:8 336:24
337:3 341:11
362:16,23
364:25 365:9
365:11,23
408:24 413:11
**includes** 43:5,9
127:5,12
129:24 146:15
151:18,23
156:20 210:24
364:2 365:12
396:23 403:15
**including** 41:9
176:3 355:23

361:2 385:7
403:16
**inclusive** 72:6
**income** 59:17
60:7 73:12
74:8
**incomplete**
137:4
**inconsistent**
24:3
**incorporate**
114:6
**incorrect** 23:16
24:12 392:13
**increase** 23:14
32:2 389:23
**increased**
31:22 49:7
333:7,13
**increments**
268:15
**incur** 88:8 89:3
122:3,9 186:1
**incurred** 77:24
78:3 89:11
90:5 159:9
162:14 184:20
216:16
**incurring**
184:23 225:17
**incurs** 178:23
181:15,17
**index** 8:1

**indicate** 363:15
363:24
**indication**
249:11 250:10
**indirectly**
301:19 302:8
**individual**
42:18,25 43:12
43:16 47:20
89:7,7
**individuals**
45:18 76:2
**inference**
263:25 295:14
**inferences**
352:3
**inflation**
394:13
**inflexible** 272:8
**influence**
281:21
**influenced**
281:7
**influencing**
245:1
**inform** 54:19
55:3
**information**
31:5 42:10
44:25 45:3,7
45:11,22 48:4
48:9,14 50:3,6
50:13,24 53:15
53:25 54:12

66:17 68:7
91:2 100:15
109:13,15
113:21 114:18
114:21 115:1,7
115:11,19
116:12,18,21
116:25 117:6
117:12 118:3,9
118:10 119:6
138:8 139:8
140:6 141:11
141:19 142:6,7
142:11 160:14
166:4 199:5,11
242:11 246:3
247:17 250:3
251:14 256:12
256:22 258:11
259:1,24
263:12 270:5
271:9 278:6,12
282:15 283:18
286:2,6 289:23
289:24 291:11
291:16,20
292:1,10
302:12,24
304:2 335:9
338:7,17 339:3
339:10,23
340:16,22,24
341:4,11 342:7
342:9,11,17,20

CONFIDENTIAL

**[information - involved]**

342:22 343:6,8
346:6,23 347:7
347:10 348:13
349:14 364:13
373:12 375:11
376:23 377:1,2
377:6 378:20
381:1 382:9,14
402:19
**informative**
339:5
**ingredients**
186:12,18,19
413:20
**inherent** 258:5
**inherently**
242:10,23,24
242:25 343:21
343:23
**initial** 101:7
**initially** 56:22
100:23 286:8
**initiatives**
215:15
**injury** 1:6 9:13
**innes** 3:13
**input** 28:12
91:13 92:2
99:25 104:7
131:3 137:8
179:23 181:21
182:17 227:7
317:2 318:6
319:14 320:3

321:8,24
**inputs** 20:8
90:16 113:12
180:13 185:9
185:11 369:7
369:17 384:9
384:14 386:22
387:2 391:18
396:1
**ins** 313:10
**instagram** 2:22
81:18 88:18
89:2 90:7
126:2,11
130:11,15
307:8 357:5,9
358:16 359:6
359:12 361:7
409:18 410:2
**instances** 80:11
**institute** 72:6
**institutions**
271:16
**instructed**
209:9
**instruction**
125:22 195:6
195:19 196:3,9
196:14 197:4
199:24 206:9
**instructional**
200:13 262:13
262:19 263:14
265:21 266:11

266:19 404:1
**instructions**
418:1
**insurance**
232:13
**integral** 312:8
312:10
**intended** 23:12
24:9 25:20
**intensive** 272:7
**interaction**
362:8
**interest** 74:12
347:16
**interested**
271:14
**interesting**
237:24
**internal** 41:22
41:23
**internet** 54:23
216:6,22 218:3
**interpolating**
32:9
**interpret**
139:25 227:10
404:2
**interpretation**
405:8
**interrogatory**
104:1,5,15,23
105:9,16
106:13,17
107:1,11

111:15,25
**interval** 94:19
243:7 244:6
253:20,23
254:3,12
255:14 256:3,7
256:18 257:10
257:19 258:1,4
258:6 259:3,10
259:14 261:19
262:3,4 324:18
325:10 326:6
**intervals**
243:15
**intervention**
79:16,20 81:4
186:15 187:4,9
**introduce**
274:22
**introduces**
261:25
**introducing**
257:2
**intuitive**
120:12
**invalid** 343:12
**investigate**
397:25
**invoice** 62:18
**invoices** 6:20
59:15 60:16,22
61:1,7
**involved** 81:7
186:17 275:9

CONFIDENTIAL

**[involved - job]**                                                                 Page 43

356:12,18,24
357:5,11,19
358:1,11,16
359:2,12
**involving** 57:4
**irrelevant**
  344:13
**irvington** 3:17
  5:14,23 6:7,17
  13:17,21 14:1
  16:6,9 17:6
  22:10,13 31:16
  31:22,23 32:2
  32:3,4,16 33:2
  33:4 40:4,9
  69:19 99:14,20
  114:10,11
  284:19,25
  286:8 384:6,9
  384:15,21
  385:2,8 386:2
  386:9 404:15
  405:3
**isd** 4:6
**issue** 19:20
  31:12 32:4,24
  73:15,17,18
  168:10 169:4
  182:3 185:4,16
  186:15 187:12
  187:14 188:17
  208:4 209:1,15
  209:18 210:15
  211:18,19

212:11 215:12
215:17 216:5
216:25 219:9
219:18 221:15
223:14,17
240:3,6 244:4
276:15 307:10
310:8 320:24
322:14,24
344:20 354:17
354:24 381:6
402:2,7,8,9
**issued** 19:15
  31:15,18 33:14
  100:23 101:7
  154:21 155:5
  155:16 156:1
  285:12 286:9
  286:13,22
  287:7 288:10
  288:20 289:5
  290:5 293:4
  306:10 307:17
  309:14 310:13
  310:21 316:16
  363:17
**issues** 87:1,13
  87:21 88:17
  90:22 91:4
  95:16,19 96:8
  101:24 102:3
  102:21 105:24
  106:3,20
  111:17 112:13

112:14,21,22
113:5,6 131:18
134:13,25
135:16 136:21
137:1 140:20
141:5 156:11
156:16 157:9
157:19 158:4
158:14 159:2
163:8,21 165:2
165:9 182:11
182:23 196:16
201:4,10,25
202:12 216:1
227:16 228:2
229:21 230:7
254:25 274:25
275:17 276:3
276:13 278:8
278:14 281:15
281:18 283:11
298:4 300:5,13
300:20 301:9
301:20 302:9
303:9,13,23
304:11 305:11
313:4 315:22
316:6,8 318:1
319:11,19
320:1 321:5,13
321:18,21
323:16 325:4
325:12,13
347:17 349:20

355:15 361:1
372:5 379:11
380:3,14
389:20,25
390:6,24 402:4
407:13,22
408:4,14
**items** 175:15
  176:5

**j**

**jacobson** 2:3
  69:16
**jargony** 79:8
**jeremy** 395:20
  395:25 396:5
**jersey** 3:15,20
**jjacobson** 2:7
**job** 18:12 19:1
  119:14 120:1
  120:14,16,19
  120:20,25
  121:2,8,10
  130:7 138:4
  170:9,23 171:6
  171:15 172:16
  173:3,10 174:9
  175:1,13,22
  195:4 202:24
  203:7,16
  204:16 223:19
  228:7 297:10
  310:5 321:12
  367:25 382:21

**[job - know]** Page 44

| | | | |
|---|---|---|---|
| 383:2 | **kathryn** 7:1 | 91:9,20,24 | 313:20 314:7 |
| **jobs** 269:14 | 387:17 | 92:4,6,11,14,20 | 324:19 325:1 |
| 272:1,2,6 | **katz** 271:13 | 93:5,11,16,24 | 367:14,18,21 |
| **jogging** 330:19 | **kburrell** 2:13 | 94:2,3,8,9,15 | 367:24 368:10 |
| **join** 48:6 | **keep** 12:9 72:11 | 94:23 95:8,12 | 368:16 369:1,3 |
| **jordan** 2:3 | 224:4,5,6 | 96:3,6,15 | **klein's** 91:11 |
| **joseph** 2:10 | **kera** 395:20,25 | 97:12 98:1,4,9 | 95:23 123:21 |
| 10:5 416:14 | 396:6 | 98:13 108:24 | 124:20 125:1 |
| **journal** 237:19 | **kessler** 1:17 2:2 | 109:10,12,18 | 125:13 129:4 |
| 237:23 271:3 | 9:9 55:21,23 | 109:22 110:2,8 | 129:24 131:16 |
| 284:2 409:8 | 56:1 | 110:15 123:3,3 | 131:24 137:6 |
| **jsandoval** 2:13 | **key'toya** 2:11 | 123:7,18 | 145:2 163:15 |
| **jswofford** 2:8 | **kid** 269:16 | 124:13 125:8 | 245:7 247:10 |
| **judge** 217:3 | **kids** 189:20 | 125:16,19 | 247:16 250:19 |
| **judgments** | 218:25 269:14 | 126:18 128:18 | 252:8,20 253:8 |
| 120:18 | 409:16 411:22 | 129:18 130:8 | 262:10,16 |
| **julie** 369:11 | **kind** 33:19 | 130:22 133:11 | 265:18 266:8 |
| 381:11 | 34:25 36:11 | 136:2,15,19,24 | 266:16 267:15 |
| **july** 61:4,8 | 45:25 54:6 | 137:14,16,23 | 367:5,10 |
| 62:12 63:2 | 68:17 73:20 | 138:6,14 160:3 | 403:25 |
| 71:10,19,23 | 75:11 76:19,20 | 160:14 208:9 | **knew** 68:10 |
| 72:1,2,4,4,20 | 81:7 181:1 | 208:23 209:12 | **know** 10:12,17 |
| 74:17 | 189:10 222:4 | 237:5,10,20 | 19:13 23:3 |
| **jury** 96:14,23 | 232:15,15 | 240:10 241:6 | 25:10,21 26:1 |
| 97:9,11 102:25 | 238:17 268:10 | 241:19 245:16 | 29:8 33:19 |
| 103:12 106:25 | 271:6 281:2 | 246:24 247:3,7 | 34:1,5,6,14 |
| 107:10 137:13 | 302:14 323:4 | 247:16,23 | 35:6,10,14 |
| 137:21 236:23 | 346:1 356:15 | 249:2,17 251:5 | 36:14 42:16 |
| **justin** 2:4 69:17 | 404:11 412:8 | 251:14 252:11 | 43:4,14 45:24 |
| **k** | 414:11 | 253:17 254:22 | 47:21 49:1 |
| **k** 2:20 77:11,15 | **king** 1:18 2:5 | 264:23 266:25 | 50:15 54:6,20 |
| 77:19 80:13,15 | 4:8 9:10 | 274:24 275:4 | 54:22 56:12 |
| | **klein** 6:22 67:6 | 275:11 278:16 | 63:8 65:6,8 |
| | 67:18,23,25 | 283:10 305:3 | 66:17 67:3,9 |

CONFIDENTIAL

**[know - know]**                                                    Page 45

| | | | |
|---|---|---|---|
| 67:16 68:4,12 | 173:7,10,14,15 | 247:18 248:6,8 | 303:17 305:12 |
| 68:20 73:4,22 | 174:20,23 | 249:2,17 250:6 | 307:11,25 |
| 74:2 75:10,13 | 175:10,20 | 252:13 254:18 | 309:6 312:11 |
| 75:14,15 76:22 | 176:18,19,20 | 256:4,25 257:6 | 313:9 315:21 |
| 77:4 79:7 80:4 | 177:1,13,17,18 | 257:8,12,13,15 | 316:7,18,19 |
| 80:5,6,22,23 | 179:20 180:25 | 258:15 259:8 | 318:13 320:15 |
| 81:5 82:7 84:8 | 181:2 186:15 | 259:10 260:7 | 320:15 323:5,7 |
| 89:10 90:4 | 186:20 187:1 | 261:7,15,25 | 323:8 324:1,4 |
| 97:9 109:17 | 190:21 191:2,3 | 263:2,4,4,5,16 | 325:13,14,15 |
| 112:6 114:25 | 192:16,19,21 | 263:18 264:13 | 325:15 326:7 |
| 115:11 116:24 | 193:15,18 | 265:7,9,10,12 | 327:11 331:19 |
| 117:5 119:5,17 | 195:12,16 | 269:12,23 | 331:21,22 |
| 120:1 122:20 | 196:8,18,22 | 272:6,7,25 | 333:8 336:6,19 |
| 123:6,11 124:2 | 197:9,10 | 273:6,7,9,19,20 | 337:11,11 |
| 124:6 127:16 | 198:21,23 | 274:19,21 | 338:6,8,19 |
| 127:19 128:4 | 199:18,19,21 | 275:22 276:20 | 339:24 340:5,7 |
| 129:6 130:5,10 | 200:25 201:1,2 | 276:22 277:6 | 340:7,8 341:16 |
| 130:18 131:10 | 201:3,15,15,15 | 277:13,24 | 342:5 344:12 |
| 132:22 133:4 | 201:17,18,19 | 278:1 279:10 | 345:16 347:6 |
| 133:10 136:14 | 201:21 203:11 | 280:24 282:2,5 | 347:14 350:2 |
| 137:22 138:2 | 203:12,12,21 | 282:6,17,19,19 | 350:23 351:9 |
| 138:12 139:4 | 203:21,23 | 283:4,5,9 | 353:18 354:10 |
| 140:5,8,14 | 205:20 208:19 | 284:9 285:11 | 356:11,17,23 |
| 143:17,25 | 209:9,12 | 287:1,12 288:3 | 357:4,10 |
| 148:3 151:2 | 215:11 216:18 | 289:9,21 | 359:23 360:8,9 |
| 156:20 159:8 | 217:1 218:10 | 290:17,19 | 360:24 361:3 |
| 159:23 160:9 | 218:22,24 | 292:12,14,15 | 361:18 362:4 |
| 160:10,18 | 222:12,18 | 293:17 294:5 | 363:20 364:6 |
| 161:20 162:12 | 223:5 229:15 | 295:3,9,19 | 366:23 367:12 |
| 166:22 167:6 | 230:13 231:21 | 296:1,5,13 | 369:14 370:20 |
| 169:24 170:2 | 238:4,7,8 | 297:7,18 298:1 | 371:8 372:6 |
| 171:10,11,20 | 240:2 243:1,5 | 298:12 299:6,6 | 373:23 375:10 |
| 171:21 172:2 | 244:4 245:21 | 299:7 300:1 | 377:4,21 |
| 172:22,23 | 246:4 247:14 | 302:15,19 | 378:13,16,17 |

CONFIDENTIAL

**[know - limit]**                                                        Page 46

379:14,18,19
379:20 382:20
383:1 386:5,9
386:12,13
395:13 398:10
403:8 404:6,12
406:3,22 407:2
411:4 412:3
413:8 414:2,4
414:13,16,24
414:25 415:1
415:10
**knowing**  374:7
374:21
**knowledge**
130:25 208:20
285:24 287:21
287:22 289:4
291:20 295:14
313:3 337:1
338:21 361:21
371:7
**knowledgeable**
141:24
**known**  75:15
257:22 260:10
**knows**  49:16
273:13 276:24
**kslaw.com**  4:11
**ktmc.com**  2:6,7
2:7,8

**l**

**l**  1:20 6:22
124:13 417:15
**l.l.p.**  2:16
**label**  79:5
174:19 407:2
**labeled**  28:6,11
99:8
**labor**  75:13
184:6 271:15
345:11
**lack**  240:23
293:10 351:24
**lacks**  293:6
**lags**  414:14
**laid**  250:24
**lakdawalla**
351:15
**lake**  3:19
**lambert**  369:10
369:15,20
370:17,22
371:16 372:1
375:14 376:4
376:10 377:9
**landed**  272:5
**lands**  2:17
111:21 416:2
**language**
140:24 364:3
**languages**
347:2

**large**  238:5
243:2,4,4
275:15 347:19
377:23
**largely**  270:16
**larger**  245:3
298:21 379:19
**larry**  271:13
**lasts**  359:19
**late**  189:15
190:4,17 191:7
191:23 224:6
**lawsuit**  128:20
132:20 139:10
141:25 143:2
145:14,20
198:4,21 209:8
209:11,16
292:6 306:22
306:24 307:19
307:21 308:25
309:18 310:17
310:24 311:20
**lay**  258:3
**leading**  63:17
64:7,21 65:1
65:11 66:1,9
**learn**  67:20
196:12 302:14
302:16 377:2
409:7
**learning**
175:24 216:23
381:22

**learning's**
382:5,21 383:2
**led**  275:10
**legal**  74:20,22
178:2
**legs**  86:10
**length**  132:15
**level**  42:18,25
43:9 76:18
168:11 173:7
173:17,18,21
273:20 332:18
332:24 333:4
333:10 336:7
351:16 354:13
354:20 355:18
**levels**  332:21
**liability**  1:6
9:13
**liable**  226:6
**lies**  325:18
**life**  170:14
271:20
**light**  347:18
**likelihood**
274:19
**likely**  240:18
242:14 315:1
359:17
**limit**  126:20
130:14 160:8
163:19 164:3,7
242:16,21
300:6

CONFIDENTIAL

**[limitation - lose]**                                      Page 47

**limitation** 237:14 239:20 240:13,19,20

**limitations** 237:4,19 238:1 238:3,12 283:12 284:2

**limited** 123:8 123:13 124:4 131:17 134:12 134:24 135:15 136:22 137:2 137:19 141:4 141:14,20 142:12 156:10 156:15 160:14 160:19,24 161:13,16,25 162:3,8 163:6 163:23 357:18 357:25 358:10 358:15 359:1 359:11

**limits** 242:20

**line** 8:5,8,11 18:20 239:22 400:13 401:22 419:4

**lines** 19:13 82:23

**link** 53:18,19 329:10 330:5 330:24

**linkage** 222:22

**linked** 329:4

**links** 194:13 200:7 352:23

**lisa** 7:1 386:25 387:6,17,23

**list** 12:4 31:7 37:7,9 41:1,3,9 45:2,10,16,17 99:17 127:9 369:15 384:23 385:4 386:6 408:23 409:1

**listed** 18:8,11 18:21 120:3,6 381:15,19,20 390:16 399:25

**listen** 73:15

**lists** 126:24,25

**literally** 29:3 36:9 54:8 65:8 178:16 224:19 235:19 382:4 386:12

**literature** 235:16 283:3,7 327:5,12,13,14 327:17 331:23 332:3

**litigation** 1:7 9:14 74:19,24 75:8 81:9 122:18 136:10 136:12 243:19

246:19 287:24 304:18 305:22 363:9,11,16,25 364:3

**little** 35:1 36:13 49:3,18 56:13 62:6,11 81:6 116:6 132:15 254:16 284:16 323:13 344:17 412:7 413:8

**living** 377:4

**llc** 2:14,14,21 2:21,22,22 3:18 4:12

**llp** 1:18 2:2,10 3:2 4:8

**lobby** 76:4

**local** 76:5,5

**located** 18:1

**logic** 310:18

**long** 133:24 157:3 241:7 268:23 271:15 360:11 409:3 410:6 412:11 414:14

**look** 87:5 124:10 130:10 137:16 170:2 185:9 208:21 219:21 221:10 223:8 292:15 326:18 328:4

328:14,18,25 329:13,22 332:17 333:22 334:2 335:14 343:15 345:2 346:11 348:5 348:17 352:2 352:11 363:5 369:12 378:19 380:25 381:13 384:21 385:1 389:15 390:8 390:10 395:15 395:17 396:25 398:25 399:18 400:7 402:16 403:13 406:7 414:10

**looked** 119:25 120:17 289:13 289:19 290:18 327:10 334:23

**looking** 34:3 94:14 159:6 212:6,17 213:16 332:20 411:2

**looks** 34:6 63:25 265:12

**lopez** 384:12,18

**lose** 177:21 178:5,7,20 201:23

CONFIDENTIAL

**[loses - marked]**

**loses** 181:12

**losing** 184:14
326:14 327:1,8
327:20 328:10
329:18 331:3
332:5 333:25
334:15 345:20

**loss** 26:24 58:2
58:5 66:25
67:4,10,17,21
68:6,18 85:19
89:17,21 90:1
107:21 108:4
109:5 112:5
122:13 128:19
128:25 129:16
132:17,23
133:2,17,19,23
134:19 136:3,8
144:25 145:12
145:16,19
146:12,13,14
151:2,22
156:19 159:17
183:10 188:16
211:20,22
214:1,24
231:18 310:4,4
312:17,24
316:11 320:23
336:15 337:7
355:10 356:16
356:21 357:2,8
357:14 372:23

399:22 407:23

**losses** 197:20
317:23 393:23

**lost** 86:24
87:11,19 88:15
111:1 133:13
182:9,16 234:6
262:12,18
265:20 266:10
266:18 335:3
336:4 366:1

**lot** 63:20 75:10
75:24 119:3
347:9 414:15

**lots** 46:10
274:17,20

**low** 246:21
258:17 324:13
325:7,22
326:10 374:9
398:1 410:4

**lower** 26:1
27:25 253:19
296:20 298:24
350:8,17 351:3
374:23

**lunch** 70:7

**lurking** 216:19

**lying** 326:9

**m**

**m** 2:17

**made** 24:22
25:1 26:7 27:5

27:16 28:14,22
30:5 33:1 36:5
80:7 97:3
120:18 248:21
380:5 418:7

**magically**
258:1

**main** 55:13

**maine** 2:11

**maintaining**
173:11 174:17
175:23

**majority**
375:15

**make** 18:23
27:8 29:18
33:6 34:3,4,17
36:10 82:14
85:17,20 97:21
122:20 131:6,8
133:21 134:7
181:6 213:1
251:7,16
254:18 258:1
263:25 304:24
312:19 320:16
347:16 350:12
351:11 352:3
418:4

**makes** 137:21
176:8 177:4
190:11 193:5
196:25 205:9
223:3

**making** 103:20
131:21 168:9
169:3 174:11
188:14 196:11
198:18 200:6
204:14 250:23

**manage** 412:8

**management**
70:15

**manager** 224:8

**manner** 35:5
310:1

**margaret** 52:16
52:17,20 53:3
53:6

**margin** 253:24
254:4,13
255:15 256:8
256:18 259:4
259:14 261:16
261:20 324:7
324:18 325:23
347:21

**marginally**
344:22

**mark** 30:8
37:14,15 60:13
124:10 335:16
346:12 348:18
387:15 388:15

**marked** 5:6
8:10 10:23
11:4,19 12:21
13:9,21 14:8

CONFIDENTIAL

**[marked - measure]**                                          Page 49

| | | | |
|---|---|---|---|
| 14:16,18,24 | 42:6 80:1 | 94:16,19 | 309:22 318:24 |
| 15:8,17 16:1 | 380:7 384:23 | 109:11 110:25 | 319:1 321:11 |
| 16:10,19 20:25 | 386:6,8 413:4 | 112:4 121:4 | 322:4,17 323:8 |
| 21:10,20 22:4 | 413:15 | 122:17 123:16 | 324:9,13,25 |
| 22:14 30:11 | **math** 25:10,11 | 125:6 126:23 | 325:7,9,9,17,19 |
| 37:23 39:2,13 | 135:4 320:16 | 145:9 146:10 | 325:21 326:2 |
| 39:24 40:10,21 | 399:21 | 160:2,19 | 327:10 330:5 |
| 60:17 124:15 | **mathematical** | 171:10 172:2 | 336:6,19 338:8 |
| 335:18 346:14 | 262:22 399:20 | 178:4,10 179:7 | 342:5 345:9 |
| 348:21 387:18 | 400:7 | 179:8 184:10 | 347:9,14 |
| 388:24 | **matter** 57:8 | 196:6 201:2 | 354:14,21 |
| **market** 2:18 | 168:10 184:25 | 207:25 211:17 | 355:21 357:20 |
| 4:4 | 187:14 219:24 | 217:23 218:10 | 373:21 374:3 |
| **markets** 75:13 | 226:24 227:14 | 220:6 221:22 | 375:4,21 |
| **massachusetts** | 227:25 231:24 | 222:3 228:6 | 377:19 380:22 |
| 3:3 | 251:19 302:3 | 236:16 237:24 | 383:16 393:20 |
| **match** 56:8 | 367:17 368:19 | 238:14 239:11 | 399:13,22 |
| 118:23 120:2 | 371:1 417:7 | 240:17 242:8 | 400:14,19 |
| 120:16 263:21 | **matters** 65:19 | 244:1,12,17,24 | 407:16 409:10 |
| **matched** 24:8 | 66:4 215:12 | 245:2,3,6,15 | 409:13 410:3 |
| 119:4 120:6,9 | **md** 1:5 | 246:7,9 248:5 | 412:3 414:24 |
| 121:1,9 | **mdl** 1:6 | 250:7 255:4 | 415:6 |
| **matching** | **meal** 65:3,5 | 258:2,18,18,22 | **meaning** 264:2 |
| 370:18 | **meals** 64:20 | 259:8,9 260:3 | **means** 94:11 |
| **material** | **mean** 45:15 | 260:16,17 | 127:2,3 129:5 |
| 172:18 | 46:9 49:24 | 262:15 265:23 | 129:7 131:10 |
| **materials** 6:9 | 51:12,22 53:23 | 274:17 280:6 | 131:11 222:24 |
| 6:11,13,15,17 | 56:2,12 57:9 | 280:22 281:2 | 242:12 250:8 |
| 6:19 12:4 37:4 | 58:16 59:25 | 281:11 282:3 | 263:9 390:2 |
| 37:7,9,16,21 | 61:3 63:9 | 283:1 288:15 | 417:23 |
| 38:21,25 39:7 | 64:23 65:14,16 | 289:20 290:2 | **meant** 211:13 |
| 39:11,18,22 | 66:23 74:11,22 | 299:25 302:10 | **measure** |
| 40:4,8,15,19 | 75:10,23 76:16 | 302:15 307:24 | 209:15 221:9 |
| 41:1,3,9,11,15 | 80:4 81:11 | 308:17 309:20 | 254:9,10,23 |

CONFIDENTIAL

**[measure - media]**                                   Page 50

| | | | |
|---|---|---|---|
| 255:3,8,24 | 112:23 113:7 | 167:9,12,15 | 274:12,15 |
| 256:2 257:5 | 122:2,8 123:8 | 168:18 169:8 | 281:16,19 |
| 258:20 263:18 | 124:3 126:1,10 | 182:10,23 | 282:11,12 |
| 264:17 265:8 | 126:19,21 | 183:7 188:12 | 298:4,22 299:1 |
| 335:2 355:24 | 127:17,20 | 188:13,22 | 300:5,13,20 |
| **measured** | 128:12 129:12 | 189:6 191:8,9 | 301:9,20 302:9 |
| 312:13 313:22 | 130:11 131:19 | 191:15,24 | 303:9,13,23 |
| 314:9 331:24 | 132:8 133:14 | 194:6,7,13,23 | 304:10 305:11 |
| **measurement** | 133:20 134:15 | 200:1,2,15 | 305:13 306:11 |
| 262:1 | 135:2,18 136:3 | 202:12,14,20 | 307:1,18 |
| **measures**  336:3 | 136:22 137:1,7 | 204:5,6,13 | 308:24 309:16 |
| **measuring** | 137:15,18,24 | 206:2,3,12,19 | 310:7,16,24 |
| 218:14 227:6 | 138:24 139:16 | 206:20 207:2 | 311:20 312:20 |
| 254:21 255:9 | 140:11 141:7 | 207:19,21 | 312:20 314:17 |
| 280:16 320:24 | 144:9,20 146:6 | 208:13,14 | 315:23 316:6,9 |
| 404:4 | 146:20 147:9 | 211:1,3 212:3 | 316:14 317:3 |
| **media**  1:4 9:11 | 147:21 148:8 | 212:5,21 | 318:1,8,12,21 |
| 57:5 81:14,15 | 148:20 149:5 | 213:20 214:8 | 319:1,4,6,13,15 |
| 81:17,17,22 | 149:17 150:1 | 214:16 216:2,5 | 319:21,24 |
| 82:1,3,5,9,15 | 150:11,20 | 217:13,17,18 | 320:4,8,11,19 |
| 82:15,17,20,23 | 151:8,18 152:6 | 219:23 220:7 | 320:22 321:5,7 |
| 82:24 83:2,8 | 152:17,19 | 221:15 223:3 | 321:10,14,19 |
| 83:10,12,14,16 | 153:2,14 | 223:15 224:2 | 321:21,23 |
| 83:18,20,22,24 | 154:21 155:5 | 225:23 226:15 | 322:1,7 323:16 |
| 84:1,3,5,7,9,12 | 155:15,25 | 227:2,4,16 | 325:4 326:16 |
| 84:14 85:18 | 156:12,17 | 228:2,10,13,20 | 327:2,9,21 |
| 87:2,14 90:23 | 157:10,21 | 228:25 229:3 | 328:12 329:19 |
| 91:5 95:17,20 | 159:4,11 | 229:12,20 | 331:4 332:6,12 |
| 96:9 101:25 | 160:17 161:1,5 | 230:6 231:8 | 333:6,12,15 |
| 102:4,22 | 161:7,14,15,17 | 233:11,23 | 334:2,17 335:3 |
| 105:25 106:4 | 161:18 162:1,2 | 234:8 246:2 | 335:6,10 336:5 |
| 106:21 108:3 | 162:15 164:22 | 255:1,6 267:3 | 336:9,17,25 |
| 108:12,19 | 165:23 166:6 | 267:13,24 | 337:13 345:21 |
| 111:18 112:15 | 166:19,23 | 273:25 274:3 | 346:1 347:3 |

CONFIDENTIAL

**[media - misremember]** Page 51

| | | | |
|---|---|---|---|
| 348:14 349:15 | **mental** 86:5 | 186:5,7,8,11 | 361:5,6,24 |
| 349:21 352:1 | 163:8,22,24 | 187:17 197:14 | 362:2 416:16 |
| 352:21 354:17 | 164:15,21 | 210:2,7 211:9 | **misbehaving** |
| 354:24 355:7 | 165:3,10 | 238:8 372:10 | 171:7,16 172:5 |
| 355:15 359:16 | 200:21 201:4 | **methods** | 172:17 174:10 |
| 360:2,17 361:4 | 201:10,25 | 285:18 | 175:2 176:4 |
| 361:12,13,20 | 202:11,19 | **metric** 378:8 | 212:19 213:17 |
| 363:9,11 364:3 | 206:18 207:1 | **mic** 416:4 | **misbehavior** |
| 372:5 374:9,23 | 275:17 276:3 | **michael** 3:13 | 170:11,19,23 |
| 379:10 380:3 | 276:13,15 | 69:20 | 173:10 176:13 |
| 380:13 382:7 | 278:8,14 318:5 | **middle** 25:22 | 177:8,13,17,23 |
| 389:20 390:6 | 318:19 319:11 | 26:22,24,24 | 178:9,22 179:2 |
| 390:23 393:13 | 319:19 | 27:10 31:11 | 179:15 183:15 |
| 407:13,22 | **mentioned** | 43:5 263:5 | 183:25 184:4 |
| 408:4,13,19,22 | 309:8 411:12 | 265:15 276:12 | 188:11,21 |
| 410:13,18 | **mess** 365:3 | 276:17 325:19 | 203:2,10,16 |
| **mediated** 47:13 | **message** 147:22 | 326:11 369:25 | 204:4,12 212:4 |
| **medicaid** 75:11 | 148:9 229:5 | 370:15 371:19 | 212:21 213:20 |
| **meet** 69:14 | **messages** | **million** 160:7 | 228:14 |
| **meeting** 70:2,6 | 148:21 | 399:15,16 | **miserable** |
| 413:19 | **messaging** | **mind** 99:6 | 63:23 |
| **meetings** 69:9 | 147:24 | 354:11 | **misinterpreted** |
| **melissa** 2:4 | **messed** 316:3 | **minnes** 3:16 | 29:1 |
| 69:17 | **met** 69:8,12,22 | **minute** 234:17 | **mismatch** |
| **meltzer** 1:17 | **meta** 2:20 | **minutes** 36:25 | 119:3 392:25 |
| 2:2 9:9 55:23 | 416:3 | 95:15,19 157:1 | 393:6,9 394:2 |
| **members** | **methodologi...** | 157:5 219:16 | 394:11,17 |
| 347:20 | 336:21 | 220:5,10,18,22 | **mismatched** |
| **memorialize** | **methodologi...** | 220:24 221:1 | 394:23 |
| 48:17 | 344:11 | 222:14,16 | **misremember** |
| **memory** 330:19 | **methodology** | 225:17 322:12 | 256:11,22 |
| 415:4 | 20:3,6 66:21 | 322:22 359:15 | 258:11,17,17 |
| **men** 271:21,25 | 66:23 81:10 | 359:19 360:1,3 | 259:1,23 |
| | 119:21 182:5,8 | 360:15,17 | 260:11,20 |

CONFIDENTIAL

**[misremember - neither]**                                    Page 52

261:12
**misremember...**
  261:8
**misreport**
  259:1,24
**missed**  25:21
**missoula**  75:25
**misstated**
  20:19
**misstates**  212:9
  223:21 251:12
  309:3 311:24
  312:15 341:9
  344:7 381:3
**misunderstood**
  44:13 383:12
**mix**  75:14,19
  75:23
**model**  413:9
**money**  86:23
  87:10,18 88:14
  90:18 113:14
  113:22 169:22
  219:14,15
  224:10 225:13
  233:12,22
**monitoring**
  323:4
**montana**  71:15
  71:18,22,25
  72:7,14 75:12
  75:24 80:19
**month**  61:4
  62:19,21 65:20

65:21 66:22
  67:2,8,15 68:4
**morning**  10:3,4
**motivation**
  271:13
**motley**  3:18
**motleyrice.com**
  3:21
**move**  138:20
  202:8 276:21
  286:11
**moved**  270:17
**movement**
  394:12
**moving**  161:22
**mto.com**  3:5
**multiple**  38:6
  175:18 359:17
**multiplication**
  96:12
**multiplied**  27:3
  118:18 119:24
**multiplier**
  23:16,17,23
  24:13,18 48:12
  49:2,5,15
  396:17,20
  397:2,7,11,19
  397:22,24
  398:11,17
  403:1,4
**multiply**  34:23
  66:24 135:7
  138:6 187:5

236:10 324:19
  396:22 400:19
**munger**  3:2
**music**  409:16
**myeates**  2:7

**n**

**n**  5:1 417:1
**naep**  351:16
**name**  9:2 10:5
  19:2 37:1
  47:19,24 55:24
  69:21
**names**  18:9,21
  50:25 51:10
**narrower**
  243:7
**nation**  326:14
  326:25 327:19
  328:10 329:17
  331:2 333:25
  334:12
**national**  351:16
  412:17
**nationally**
  80:22
**nature**  261:16
  290:20
**nauseam**
  231:19
**ne**  4:9
**nea**  6:24 345:4
  345:6,7,11,14
  345:18 346:2,5

346:14,18,22
  347:5,6,12,14
  347:23
**nearly**  76:19
**necessarily**
  236:19 272:25
  284:11 299:17
  300:2 323:23
  323:24
**necessary**
  91:13 99:24
  104:7 131:8
  241:25 246:15
  286:6 406:15
  418:4
**need**  10:16
  36:10 58:2
  86:9 131:14
  140:7 279:25
  309:22 310:7
  313:9 383:1
**needed**  45:11
  197:19 383:6
**needs**  195:7,20
  196:2,4 197:5
  199:25 200:14
  204:19 205:1
  205:15 206:1
  206:11
**negative**  164:8
**negatively**
  65:13 223:17
**neither**  375:14
  376:6

CONFIDENTIAL

**[net - objection]** Page 53

**net** 222:17
**netflix** 84:6,8
**never** 42:17
77:10,14,18
78:7 243:22
246:22 278:2
282:20,23
303:11,22
341:5 353:14
**new** 3:15,20
216:23,24
234:15 405:1
**nobel** 271:12
**noble** 395:19
395:19,24,24
396:5,5
**noise** 258:16
**nominet** 6:23
335:1,9,15,18
335:23 336:3
336:14 337:2,6
337:18,21
338:2,2,6,23
341:5 342:11
342:16,21
343:7
**nominet.uk**
334:4
**non** 67:10 68:5
98:17 99:12
100:1 102:10
103:5,16,24
104:8 106:10
107:6,15

110:23 138:23
139:15 141:3
146:2 148:6
149:2,14
151:16 152:5
152:18 153:1
153:13 154:18
157:7 160:23
166:12,18
168:18,24
202:25 203:8
204:17 205:3
264:15 293:19
294:2 299:7,10
299:20 300:4
300:10 301:5
301:16 302:5
303:8 305:4
316:2,5 369:8
369:18 381:9
384:10,15
386:23 387:3
387:25 388:19
395:18 396:3
402:12
**nonemployee**
305:10 315:20
316:1
**nonintuitive**
34:5
**nonresponse**
251:21,25
252:5,7,20
261:21

**nope** 51:11
71:9 333:2
**normal** 33:19
33:23 34:10,16
35:20 404:3,8
**northern** 1:1
9:15
**notary** 1:21
420:20
**note** 133:5
248:21 394:10
**noted** 9:18
418:11 420:8
**notes** 48:16
171:17,23
172:6 333:15
417:6
**notice** 17:20
**noticed** 19:25
33:4
**noticing** 12:2
**notion** 255:10
**number** 5:6
10:9 33:7
76:12 97:7,10
97:23 166:10
169:5 242:16
242:18 270:1
275:15 277:9
366:23 373:24
373:25 375:1
386:2 398:2,6
398:7 399:24
401:12,22,23

410:4 412:6
**numbers** 23:12
49:11 97:7,19
97:21 135:7
363:12 385:9
386:10,11
400:4
**nw** 3:3

**o**

**o** 417:1
**oath** 209:10
283:20 291:21
**object** 90:11
214:17 278:10
374:12 408:15
**objection** 34:12
35:22 44:3
45:14 47:8
48:19 50:17
51:2,15 54:17
55:8 59:20
60:10 61:14
66:11 68:25
82:11 83:3
85:6 87:22
88:9,19 89:5
91:16 92:22
93:19 94:25
95:4 96:21
97:17 100:3
102:15 103:7
103:18 104:10
104:18 105:19

CONFIDENTIAL

**[objection - obtain]**                                                    Page 54

| | | | |
|---|---|---|---|
| 107:18 109:2 | 179:3,16 180:9 | 245:18 248:3 | 314:21 316:17 |
| 110:4 111:20 | 181:14 183:18 | 249:6,21 250:4 | 317:5 318:9,22 |
| 111:21,22 | 184:9 187:19 | 250:20 251:9 | 319:17 320:12 |
| 115:4,14 | 189:7,17 190:6 | 251:11 252:9 | 322:2,15 323:1 |
| 118:12 123:10 | 190:18 191:11 | 252:22 253:12 | 323:20 331:6 |
| 124:5 128:3,15 | 192:14,25 | 254:7 255:18 | 333:17 341:8 |
| 129:14 130:17 | 193:12 194:9 | 256:13 259:5 | 342:23 343:9 |
| 131:20 132:10 | 194:24 195:9 | 259:18 260:1 | 344:6 349:24 |
| 132:13 134:2 | 195:21 196:21 | 260:14 261:5 | 351:7 353:10 |
| 134:16 135:3 | 197:7 198:2,16 | 265:5,22 267:6 | 354:1 355:19 |
| 135:19 136:16 | 199:8 200:4,22 | 273:2,16 274:5 | 358:18 359:20 |
| 137:3 138:16 | 201:12 202:1 | 274:16 275:7 | 360:6,20 |
| 139:1,18 | 203:3,18 | 275:19 276:5 | 361:15 364:1 |
| 140:13 141:8 | 204:21 205:5 | 277:3,21 | 364:10 366:8 |
| 142:15 143:23 | 205:16 207:9 | 278:20 279:6 | 366:20 368:4 |
| 144:10,21 | 207:23 208:17 | 279:23 280:19 | 368:12,22 |
| 146:9,24 | 211:15 212:8 | 281:9,23 | 370:5 372:19 |
| 147:11 148:12 | 212:23 213:23 | 283:16 284:5 | 373:9,19 375:2 |
| 148:22 149:8 | 215:8 216:7 | 286:17 287:11 | 375:19 376:16 |
| 149:19 150:3 | 217:21 220:12 | 288:13,24 | 377:15 379:4 |
| 150:13,22 | 221:5,18 | 290:8 291:13 | 380:4,15 381:2 |
| 151:20 152:8 | 223:20 224:25 | 292:2 293:6 | 382:12 383:4 |
| 153:4,15,25 | 226:7,17 | 294:18 295:7 | 383:14 385:14 |
| 154:12 155:7 | 227:19 228:16 | 295:24 296:10 | 392:2,14 394:9 |
| 155:18 156:3 | 229:6,25 | 296:21 297:5 | 397:13 401:17 |
| 157:13,23 | 230:11,25 | 299:2,15 | 405:23 407:14 |
| 158:9,19 | 231:14 232:19 | 300:14,22 | **observations** |
| 159:14,21 | 233:15,24 | 301:11,22 | 243:8 |
| 163:10 164:1 | 234:9 236:18 | 303:2,14 | **observe** 255:10 |
| 167:3 171:1,18 | 237:8 238:23 | 304:22 305:14 | 257:22 |
| 172:8,20 | 239:9,25 | 306:5 307:3,23 | **observed** |
| 173:24 174:12 | 240:15 241:4 | 309:2,19 311:1 | 263:22 |
| 175:4,17 | 241:15 242:2 | 311:23 312:14 | **obtain** 42:15 |
| 176:14 178:1 | 244:2,14 | 313:23 314:10 | 396:22 |

CONFIDENTIAL

**[obtained - ones]**                                                     Page 55

| | | | |
|---|---|---|---|
| **obtained**  330:4 | 98:11 102:1 | 169:22,24 | 308:19 310:19 |
| **obvious**  246:4 | 105:25 113:9 | 186:24 219:13 | 325:24 326:23 |
| **obviously** | 121:24 122:5 | 222:19 238:4 | 329:3 330:6,16 |
| 33:21 198:25 | 131:15,22 | 257:12 269:12 | 330:25 333:22 |
| 319:2 324:3 | 132:2,6 173:20 | 284:10 359:7 | 334:5 335:1,14 |
| **occasion** | 188:9,15,19 | 379:13 395:23 | 337:14 338:1 |
| 243:22 272:22 | 189:3,10 191:4 | 408:7 409:10 | 342:18 345:2,5 |
| 304:24 | 191:13,20 | 409:13 410:24 | 346:11 348:17 |
| **occasionally** | 194:2,11,19 | 411:7 | 349:10 353:21 |
| 71:5,7 | 195:1 199:22 | **okay**  10:21 | 363:21 370:13 |
| **occurred**  66:22 | 200:11 202:9 | 12:7,10,13,15 | 371:12,14 |
| **occurs**  374:20 | 202:15,17,22 | 18:5 19:3,3,9 | 374:15 376:7,8 |
| **odds**  326:9,10 | 204:2,8,10,15 | 20:12 31:13,13 | 384:7 386:19 |
| **offer**  62:23 | 205:23 206:5,7 | 37:13 38:11 | 387:14 388:15 |
| 76:11 92:2 | 206:13,15,21 | 44:22 50:22 | 390:8 391:16 |
| 95:24 102:9 | 206:23 207:3 | 59:16 63:15 | 392:18,24 |
| 106:9 131:9 | 233:20 234:5 | 73:19 87:7 | 393:4,10 |
| 134:17 232:9 | 234:12 247:2 | 97:5 114:8 | 399:18 400:23 |
| 232:17 233:3 | 251:4 265:17 | 124:9,24 | 401:1 409:3 |
| 241:18 344:24 | 266:7,15,23 | 125:12,18 | 410:17 412:14 |
| **offered**  89:14 | 267:9,21 268:2 | 126:4 127:7 | 413:7 415:11 |
| 90:8 134:10,22 | 297:13,21 | 131:13 144:4 | **old**  342:6 401:3 |
| 135:13 141:1 | 300:3 304:6 | 151:13,13 | 410:10,14 |
| 159:12 162:16 | 352:6,24 | 162:2,6 184:1 | **older**  26:2 |
| 300:11,18 | 372:16 376:19 | 185:1,12 | 349:6 |
| 301:6,17 302:6 | 402:12 | 186:16,22 | **oldest**  269:6 |
| 303:10 372:1,8 | **offices**  1:17 9:8 | 192:7 196:25 | **olson**  3:2 |
| 372:14,17 | **oh**  27:12 29:3 | 209:21 210:14 | **once**  12:12 |
| **offering**  84:16 | 36:10 44:12 | 210:22 211:4 | 57:13 64:25 |
| 84:20,23 85:2 | 45:15 46:18 | 218:5 248:6 | 276:20 292:12 |
| 85:9,13,23 | 47:21 49:1 | 255:13,20 | **ones**  32:22 |
| 86:3 87:17 | 50:18 58:23 | 256:24 258:23 | 80:16 81:24 |
| 88:5,13,25 | 61:19 72:10,23 | 259:22 283:4,7 | 126:23 127:22 |
| 95:7,17 98:8 | 82:2 119:15 | 290:1,3 293:11 | 285:15 306:18 |

CONFIDENTIAL

342:4 375:24
**online**  153:24
229:22 230:8
230:21 231:11
**opened**  29:7
**opening**  33:14
37:10 41:4
**operating**
84:15
**operations**  2:21
**operative**  11:8
12:25 13:13,25
14:12,14 16:25
22:20
**opine**  177:19
**opining**  108:15
108:20 112:19
113:3 167:8,16
168:3,16,22
169:7
**opinion**  48:14
84:21,24 85:3
85:10,14,24
86:4 87:18
88:6,14 89:1
92:24 95:8,17
96:1 102:1,11
106:1,11
113:10 115:17
117:10 118:7
121:25 122:6
128:6 131:9,16
134:11,22
135:14,25

137:20 141:2
144:24 145:4
168:21 169:12
188:10,20
189:4,10 191:5
191:21 194:3
194:20 199:23
200:12 202:10
204:3,11
205:24 206:8
206:16,24
211:25 212:9
215:24 217:17
221:3 223:12
223:21,22
227:14,24
233:21 234:6
241:18 247:18
265:18 266:7
266:15 267:10
267:15,21
268:3 282:24
283:1 292:9
304:7 328:8
332:14 333:24
339:14 352:7
352:25 353:6
353:22 367:16
382:25
**opinions**  17:12
41:12,16,20,25
42:8,11,14
43:19 44:10
45:9,13 46:5

47:7 49:22
52:1 54:16,19
55:4 82:19,22
84:17 98:8,12
129:3 130:24
131:22,23
132:3,6 173:20
180:5 188:15
191:14 194:12
195:2 200:7
202:15,18,23
204:9,15 206:6
206:14,22
207:4 208:20
208:23 209:3
209:18 226:24
234:13 240:7
297:14,21
298:17 302:3
332:16 335:24
344:23 353:15
385:24 386:3
386:17 402:12
**opinium**
338:15,16,22
339:2,9 340:15
340:23 341:3
341:21
**opportunities**
226:14
**opportunity**
78:7,16 79:3,5
79:11,24 80:12
81:10,13

169:14,18
170:2,8 178:13
178:16,23
180:17 181:17
182:6,19
185:23 186:4,6
186:8 187:16
187:24,25
202:4 210:1
212:25 213:3,9
213:11 214:3
214:21,22,25
215:11,21
216:2 217:19
219:7 221:3,9
222:21 235:15
235:20,24
236:3,13,16,24
288:1 411:11
412:1,15,24
413:24 415:25
**opposed**  18:19
44:19 213:4
254:9
**option**  125:24
**order**  1:14
42:13 45:12
137:12 173:12
174:17 175:23
210:6 241:25
246:15 308:11
331:20
**oregon**  80:20
411:12 414:23

CONFIDENTIAL

**[organization - part]**                                          Page 57

**organization**
  347:24
**organize**
  297:24
**original** 6:1,2,4
  6:5,7 12:5 20:4
  20:8,15,20,24
  21:5,9,15,19,25
  22:3,9,9,13
  23:2,8,11 24:2
  24:11 25:8,15
  25:19 26:18
  28:1 29:14
  35:14 238:16
  418:14
**outcome**
  191:15
**outcomes** 86:1
**outlier** 244:13
  244:25 245:8
  245:17 246:5
**outliers** 245:9
  245:22,23
**output** 179:22
  180:1,2,12
  181:2,4,5
  182:12,13,16
  183:10 184:16
  184:17 188:3
  189:11 218:11
  218:14,18,19
  219:1,2 227:5
  227:11 352:19

**outputs** 353:1
**outs** 313:10
**outside** 28:17
  33:19 173:5
  192:12,24
  193:10 194:5
  194:22 243:19
  246:19 259:9
  304:17 353:15
**overlap** 362:8
**overlay** 154:11
**oversee** 378:9
**overseeing**
  378:7
**overstate** 96:10
  102:19,23
  106:22
**overstated**
  106:18
**overstates** 96:7
**overtime** 221:1
  403:16,22
  404:16 405:19
  406:15
**own** 46:24
  70:22 120:18
  146:18 172:24
  173:5 280:11
  300:6 377:11

**p**

**p.c.** 3:13 4:2
**p.m.** 163:3
  234:21 235:1

315:12,17
  383:22 384:2
  415:14,19
  416:18,21
**paced** 65:7
**page** 5:2 8:5,8
  8:11 87:6
  99:10 124:22
  125:12 363:7
  381:13 384:23
  390:10 419:4
**pages** 420:3
**paid** 29:8 43:1
  58:7 73:4,8
  138:5 165:19
  167:11,20
  168:6,11 170:4
  177:24 181:22
  181:23 182:21
  183:16 184:7
  184:11,18
  215:19,19
  216:13,14
  219:11,15
  220:2 341:6,21
  344:3 362:15
  362:22 363:23
  364:9 383:8
  393:15 396:11
  414:25
**papers** 235:24
  236:4,10,12
**paperwork**
  220:20,25

**paragraph**
  17:23 18:2
  87:6 124:22
  326:20,21
  328:5,14
  329:14 369:12
  384:8 386:21
  389:4,13
  392:20,23
  395:17 396:25
  402:17 403:13
  406:8
**parameters**
  222:20
**part** 23:14,20
  23:20 24:6,15
  26:3,13 27:21
  49:3 71:24
  72:3 107:23
  108:7,13
  112:10,17
  115:24 116:9
  122:12 125:15
  146:23 147:2
  147:13 148:25
  149:11 150:6
  150:25 151:1
  152:11 153:6
  153:18 154:2
  154:14 155:9
  157:25 158:18
  158:21 160:11
  160:12 164:12
  164:18 168:20

CONFIDENTIAL

**[part - people]**                                                    Page 58

| | | | |
|---|---|---|---|
| 169:11 171:5 | 372:9 386:8 | **parts** 161:22 | **pays** 165:24 |
| 171:14 172:4 | 396:8,13 401:5 | 320:21 | 166:7,20 |
| 172:15 173:10 | 407:1 414:12 | **party** 416:14 | 339:20 |
| 174:8,16,17,25 | **participate** | **pass** 415:23 | **peachtree** 4:9 |
| 175:12,22 | 252:2 253:10 | **passed** 330:14 | **peer** 237:18,23 |
| 182:7 183:1 | **participated** | **passing** 171:17 | 284:1 331:22 |
| 186:4 187:16 | 130:9 | 171:23 172:6 | 332:3 337:15 |
| 192:21 195:16 | **participation** | 333:15 | 345:15 |
| 195:18 197:13 | 153:23 154:10 | **past** 72:25 | **pennsylvania** |
| 197:18 203:23 | 269:22 | 73:10,14,21,23 | 1:19,22 2:5,18 |
| 209:2,7,11 | **particular** | 74:3,9 | 9:11 |
| 217:20 225:6 | 23:17 55:25 | **pause** 234:16 | **people** 47:4 |
| 225:14,18,20 | 95:14 101:23 | 315:5 | 51:8 56:9 |
| 226:1,10,12 | 102:20 106:20 | **pausing** 86:7 | 73:16 75:15 |
| 228:7,8 230:3 | 153:24 154:11 | **pay** 29:24 30:3 | 76:7 78:25 |
| 230:16 231:20 | 173:12 194:15 | 167:10,18 | 82:8,16 83:5 |
| 232:20 245:11 | 210:2 213:12 | 168:5 183:24 | 92:19 93:4 |
| 246:7,22 | 223:6 243:23 | 399:12,14,23 | 119:13 122:22 |
| 247:10,16 | 271:21 291:11 | 400:8 403:16 | 128:1,5,7 |
| 250:15 252:24 | 306:22 322:13 | 403:22 404:8 | 141:22 142:4,7 |
| 268:3 271:18 | 322:24 334:24 | 404:10,12,17 | 143:5,12,20 |
| 272:14,19 | 347:2 352:4 | 404:23,24,24 | 145:24 146:11 |
| 274:25 275:13 | 356:22 361:4 | 404:24,25 | 156:19 201:5 |
| 276:8 286:12 | 361:25 362:12 | 405:2,19 | 223:23 240:4 |
| 286:20 287:23 | 379:15 406:24 | 406:11,14,16 | 245:25 246:10 |
| 292:5 304:15 | **particularly** | 406:16,18 | 251:25 252:13 |
| 304:16 308:5 | 292:12 309:9 | 407:3,5 413:10 | 258:9,13,21 |
| 309:10,21 | 378:15 | **paying** 74:6 | 260:11,20,25 |
| 310:14,21 | **parties** 144:9 | 170:3 184:5 | 261:2,12 |
| 313:18 314:5 | 144:19 146:6 | 213:5 339:15 | 268:13,18,23 |
| 317:22 351:19 | 146:21 147:9 | **payments** 2:22 | 268:25 269:1 |
| 352:17 353:3 | 298:14 | 403:15,23 | 269:10 270:5 |
| 360:23 362:13 | **partnership** | 404:17 405:5 | 271:16 279:11 |
| 368:24 369:6 | 76:1 | 405:20 | 283:20 285:23 |

CONFIDENTIAL

**[people - place]**

287:19,21
289:10 291:17
291:25 293:20
294:1,8,11,13
294:16 295:10
295:13 298:14
299:13,24
340:6 361:2
364:21 371:4,5
377:2 380:8
387:24 388:18
409:13
**percent** 23:1
25:7 26:17
27:25 59:21
60:6 64:16
70:22 74:25
75:1,6 101:23
102:2 105:23
106:2 253:19
264:8 281:15
282:10 321:4
321:16,20
322:8 326:9
366:19 367:23
368:1,9 377:20
377:21 382:1,4
383:11 389:19
389:24 390:5
390:15,19,22
391:1 403:18
**percentage**
32:6,10 49:8
59:17 62:14

77:6 145:17
176:20 281:17
367:13 391:6
392:5 393:24
**percentages**
33:6 138:7
372:2
**perfectly** 219:6
302:10 304:1
311:13 313:7
378:18
**perform** 53:7
58:11 310:9
327:5 399:19
**performed** 59:6
136:20 352:13
**performing**
51:25 52:5
407:8,18,25
408:8
**period** 23:11
54:7 63:13,21
63:24 185:21
200:25 220:21
373:2,16
374:18 394:2,4
398:22 399:3
399:12 400:9
414:18
**periods** 58:17
268:24
**perks** 232:16
**perpetuity**
224:3

**person** 32:23
47:2 79:15,19
140:15 172:3
247:20 261:1,3
263:1 279:3,4
279:18 280:12
295:17 387:9
415:25
**person's**
263:19 264:11
**personal** 1:5
9:12 173:5
302:23
**personally**
61:12,23 93:4
93:9,15 115:10
116:24 117:6
127:20 249:16
251:3 252:18
307:19
**personnel**
186:20
**perspective**
197:22 198:11
215:2 298:15
**persuade**
410:15
**pew** 348:8,10
348:21 349:11
**pgreen** 4:11
**phd** 1:16 9:17
9:23 420:2
**phenomenon**
260:10 280:17

**phil** 395:20,25
396:5
**philadelphia**
2:18
**philip** 4:8
**phone** 65:23
98:2 272:24
273:1,13,15
349:22 350:10
350:16,19
351:1,5,10
**phones** 112:14
112:22 113:6
273:9 274:2,15
348:13 349:13
349:20
**photos** 144:8
144:19 146:5
**phrase** 282:5,8
**phrased** 282:3
282:21,22
**phrasing** 181:7
**physical** 149:5
149:17 150:1
**pick** 361:3
**piece** 348:3
414:3
**pinterest** 83:7
83:10 408:25
**place** 34:6
122:24 285:17
337:2 412:12
414:9

CONFIDENTIAL

**[places - positions]** Page 60

| | | | |
|---|---|---|---|
| **places** 186:10 | 122:1,7 124:4 | 342:19 343:5 | 304:3 362:16 |
| **plaintiff** 124:23 | 126:20,22 | 384:4 416:12 | 362:23 364:25 |
| **plaintiff's** | 127:1,17,18 | 418:3,8 | 365:8,22 366:5 |
| 30:18 | 128:2,13 | **plus** 235:5,12 | 377:21 393:23 |
| **plaintiffs** 2:8 | 129:13,25 | 399:9,14,25 | **populations** |
| 3:17,21 4:6 | 130:16 131:18 | 400:2,8,12,14 | 365:13 366:13 |
| 43:22 44:1,10 | 132:9 133:18 | 400:18 | **portion** 23:17 |
| 46:6,7,12,14,21 | 134:14 135:1 | **pocket** 169:10 | 147:6 159:1 |
| 50:13,24 51:20 | 135:17 136:4 | 169:15,18,21 | 212:19 213:18 |
| 55:16 56:22 | 138:25 139:17 | **point** 49:8 | 236:9,11 312:8 |
| 57:23 77:8 | 140:12,22 | 53:13 57:7 | 312:11 |
| 108:25 109:8 | 141:6,15,20 | 73:22 74:3 | **posed** 329:9 |
| 109:21,25 | 142:13 144:9 | 86:7 135:12 | **posit** 217:2 |
| 110:22 111:4 | 144:20 146:6 | 170:13 172:13 | **position** 45:19 |
| 111:10,14,24 | 147:10 148:9 | 224:7 269:1,15 | 72:9 101:23 |
| 121:21 185:18 | 148:20 149:5 | 312:3 321:7,23 | 102:2,20 106:1 |
| 226:5 293:2 | 150:12,21 | 330:12 351:15 | 106:20 120:1,5 |
| 294:3,9,14,25 | 154:21 155:5 | 354:10 375:5 | 233:8 370:25 |
| 295:4,21 296:7 | 155:15,25 | 376:1 386:9 | 371:2 373:2,16 |
| 296:17 297:1 | 158:6,16 | 410:23 | 374:8,18,22 |
| 298:19 363:3 | 166:23 167:17 | **pointed** 68:16 | 381:25 |
| 364:16,23 | 167:21,24 | **points** 69:25 | **positions** 90:20 |
| 365:6,15,21 | 168:4,6,25 | 267:19 313:9 | 90:22 98:17 |
| 366:4,17 | 336:17 337:8 | 375:24 | 99:13 102:7 |
| 405:21 406:1 | 346:7,24 355:3 | **policies** 350:22 | 103:24 106:7 |
| **plans** 147:22 | 408:20 | **policy** 70:14 | 110:24 113:16 |
| **platform** | **plausible** 320:9 | 75:9,12,22 | 113:24 118:16 |
| 147:21 151:15 | **play** 91:19 | **poll** 348:4,6 | 118:22,24 |
| 152:6 153:14 | 92:10 | **poorly** 254:15 | 119:22 120:2,3 |
| 220:7 361:12 | **playing** 151:10 | 255:17,22 | 120:6,13 |
| 361:13 362:1,3 | 151:12 190:4 | 257:1 | 145:24 287:20 |
| 362:7 408:23 | **please** 10:14,17 | **population** | 291:18 297:16 |
| **platforms** 2:20 | 17:22 54:13 | 241:23 242:19 | 297:18,24 |
| 81:21 84:10 | 311:9 340:21 | 246:13 248:10 | 298:10,11 |

CONFIDENTIAL

**[positions - principals]**                                    Page 61

313:2 363:9,11
364:4 365:12
378:21 379:2
381:15,19,20
382:18
**possibility**
155:22 275:5
298:18 372:16
373:6
**possible**   121:13
130:21 177:2,3
177:11 218:19
226:21 228:9
228:24 229:16
230:12 263:10
267:10,21
273:11,18
274:18 276:11
296:16 314:16
314:24,25
333:3,8,9,19
360:14 361:10
361:18 364:15
373:17 376:10
382:3,8 383:10
383:16
**possibly**   303:16
**post**   72:10
149:4,16,25
268:11 409:13
**posted**   144:8
144:19 146:5
146:20 147:9

**posters**   413:15
**posting**   214:8
214:15 220:5
**postulated**
256:2
**potential**
239:20 252:12
254:5 261:16
263:6 324:6
362:8
**potentially**
127:25 301:13
301:24 350:1
359:22 372:6
**powers**   278:13
**practical**   187:2
**practice**   187:3
279:2
**practices**
279:10
**precise**   140:24
203:21 209:4
238:5 241:19
242:14 243:6
243:14 269:19
324:8 373:24
373:25
**precisely**   131:1
280:7 373:22
**precision**   242:9
242:20 243:12
244:4,8,17
254:9 257:6
300:1

**prefer**   38:18
**preferences**
232:25
**prep**   63:3,8
**preparation**
27:22 28:24
**prepare**   69:3
69:10,23 70:2
**preparing**
26:13 51:21
**present**   3:7
185:5 235:3
253:18 279:2
**presentation**
75:18 415:8
**presentations**
41:23 80:6
**presented**
279:15 294:15
414:25
**presenting**
78:22 279:16
**presidential**
260:12,21
**press**   345:7,14
345:18 346:2,5
**presumably**
122:19 130:5
167:1 171:12
280:22 292:14
305:19 335:12
343:15 376:22
386:7

**presume**   323:6
344:5
**pretty**   35:7
36:23 53:24
65:24 66:14,24
120:12 121:4
218:15 235:17
263:15,23
296:25 308:4
309:7 325:16
347:22 349:1
392:16
**previous**
260:21 261:13
**previously**
71:14 78:15
79:2 81:9
268:4 272:17
376:25
**price**   185:10
**principal**   119:9
220:4,18,19,21
220:23,25
224:1 387:10
392:10
**principals**
32:21,21 119:7
119:7 223:3
271:11 298:3,7
370:1,1,16,16
371:20,21
372:3,4 388:4
388:10,10,14
389:5,10,11,12

CONFIDENTIAL

**[principals - provided]**

389:18,18
390:4,4,13,14
390:21,22
391:3,3,9,9,24
391:24 392:9
**principles**
224:19
**printed** 348:25
**prior** 77:22
78:2,6 79:10
79:23 80:10
81:8 260:12
270:13,22
271:10 272:13
411:9 412:15
**private** 76:2
343:19
**prize** 271:12
**probable**
229:16
**probably** 53:12
59:15 63:10
127:22 172:12
173:17 175:8
177:14 189:20
237:25 264:25
265:12 277:15
315:1 330:24
345:17
**problem**
171:24 245:10
254:17
**problems** 163:9
163:22,25

164:15,21
165:4,10
**proceedings**
417:4
**process** 33:13
33:19,24 34:10
34:11,16 35:20
45:9 215:13
273:10 285:11
286:1,15,23
287:2,4,8,10,15
327:12,13
**proctoring**
207:7,14,17
208:11 210:25
211:12 212:16
213:15
**produce** 181:2
184:16 186:24
241:9 347:9
**produced**
43:21,25 44:8
46:12 180:2
**production** 8:7
**productive**
223:4
**products** 1:6
9:13
**professional**
1:20 243:18
246:18 417:15
**professor** 72:14
72:16,18

**profile** 56:13
**profit** 181:6
**program** 29:11
49:4 80:21,24
81:6 411:12,13
411:15,17,18
411:19 412:2,3
412:9,17,19,21
412:25 413:2
413:10,21,25
414:9,23
**programs** 69:6
78:18 215:15
219:3
**project** 271:12
271:14
**projects** 65:19
66:4 79:4
**promotion**
153:22 154:9
**prompted**
19:20 26:10
27:19 32:25
**proper** 221:8
**properly** 216:2
217:19
**proportional**
182:21
**proposition**
330:3
**propounded**
420:6
**protecting**
175:24

**protection**
36:12
**protective** 1:14
**prove** 265:24
**provide** 31:4
43:15 44:1,11
48:10 50:25
53:3 58:1
66:16 90:13
94:4 114:17
116:17 118:2
130:13 136:8
145:19 148:4
195:5,19
196:14 200:20
204:18 209:9
239:22 247:17
247:20 262:11
262:17 265:19
266:9,17
269:11 278:19
280:9 281:3,5
281:22 291:5
291:21 294:8
295:5,22 296:8
298:23 308:2
316:11 324:12
340:2 341:13
388:4,9 389:5
395:6,12
397:10 413:4
**provided** 18:5
30:2,23 33:8
35:12 44:14

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 46:7,13,20 | 292:10,14,17 | 202:11,19 | 283:25 |
| 79:13 92:20 | 292:20 293:20 | 204:25 205:13 | **published** |
| 93:6 94:1,9,15 | 294:25 295:11 | 205:25 206:9 | 238:15 271:1 |
| 100:7,12,18 | 296:17 298:6 | 206:17,25 | 343:14 409:8 |
| 101:2,6,13 | 298:19 300:9 | 232:22 233:13 | 413:22 414:1 |
| 103:25 104:14 | 301:4,15 302:4 | 243:11 249:12 | 414:15,22 |
| 104:23 105:4 | 303:7 304:8 | 256:10,20,23 | **publishing** |
| 108:5 109:5,11 | 311:12 312:25 | 258:9,12 268:6 | 337:19 |
| 109:13,16 | 316:14,24 | 281:20 287:5 | **pull** 224:12 |
| 110:8 111:2,11 | 318:2,10 319:9 | 287:23 289:12 | **purported** |
| 112:5,9 113:1 | 329:7 341:1 | 291:2 292:5 | 334:15 |
| 114:2,12,22 | 342:11,13 | 303:20 305:21 | **purpose** 178:11 |
| 115:1,6,12,20 | 358:21 362:25 | 317:8 339:25 | 271:8 302:25 |
| 115:25 116:22 | 364:23 365:6 | 371:5 | 330:20 |
| 117:1,7,13,18 | 365:15,20 | **prussia** 1:18 | **purposes** 68:22 |
| 118:25 121:1,8 | 366:3,24 | 2:5 9:10 | 94:21 101:16 |
| 127:9,13 | 370:18 371:17 | **psychologist** | 105:14 109:17 |
| 128:24 136:11 | 372:22 373:12 | 205:11 | 110:17 111:7 |
| 139:7 140:6,10 | 378:21,25 | **psychologists** | 111:18 112:2 |
| 141:10,12,13 | 382:14 383:11 | 43:7 388:13 | 116:4,8 117:21 |
| 141:19,23 | 387:9 397:2,18 | 393:3,8,12,16 | 132:19 143:6,9 |
| 142:11,24 | 397:23 398:11 | 394:5,7 | 143:15 145:7 |
| 143:5,13,20,22 | 402:25 405:15 | **public** 1:21 | 145:11,15 |
| 145:16,16 | 406:4 407:24 | 80:8 326:14 | 146:1 173:19 |
| 160:23 188:16 | 408:17 409:1 | 327:1,7,20 | 180:4 211:8 |
| 208:25 237:11 | 415:7 | 328:10 329:18 | 226:23 227:13 |
| 242:11 247:7 | **provides** 53:18 | 331:3 332:4 | 227:24 237:6 |
| 249:10 250:2,7 | 118:10 145:12 | 333:24 420:20 | 247:21 250:12 |
| 251:15 263:12 | 342:1 367:21 | **publication** | 272:9 278:4 |
| 280:13 281:8 | 389:10 | 414:11,14 | 283:14 290:23 |
| 283:19 284:14 | **providing** | **publicly** 46:16 | 291:7 302:2 |
| 284:18,24 | 119:6 126:14 | 80:1 415:2 | 310:24 311:20 |
| 285:7 290:12 | 196:8 197:3 | **publish** 237:17 | 339:5 340:19 |
| 291:25 292:1 | 199:24 200:13 | 237:23 238:10 | 340:25 365:24 |

CONFIDENTIAL

**[purposes - read]**                                    Page 64

367:16,22
368:18 371:2
382:25 403:18
406:9
**pursuant** 1:14
**pursue** 272:1,2
**pursuit** 272:6
**purview** 203:13
203:23
**push** 224:12
**put** 90:17 170:7
183:10 185:3
221:23 222:13
237:25 238:10
243:15 264:14
271:7 345:17
372:7 373:7
390:14 413:8
**putting** 344:15

**q**

**qualified** 276:3
276:12,18
277:1,7
**qualifies**
127:20
**quality** 33:12
33:22,24 34:9
**quantified**
332:7,10
**quantify** 147:5
158:25
**quantitative**
290:18

**question** 8:10
10:15,16 44:16
53:13 58:20
61:20 75:12
89:15 90:9
92:25 94:13
114:9 121:20
121:23 123:12
123:18,19,20
125:14 126:13
132:4,25 133:8
133:9,12,16
135:11 136:17
138:1,13,18
139:24 140:1
142:4,6 144:13
144:25 149:11
159:13 162:17
180:16 184:25
192:3,8 198:10
200:17 209:22
210:4,9,13
211:6 226:9
227:9 228:21
229:9 230:3
231:18 234:2
234:12 235:8
236:23 243:20
246:20 249:25
253:5 257:1
280:11 281:5
282:20 284:16
310:5 311:7
318:20 320:17

323:13 329:8
332:4 337:5
339:7 340:13
340:20,21
342:14 343:1
347:5 350:14
379:25 380:11
380:21 388:6
405:12
**questions** 10:8
50:1 75:22
91:24 92:3
122:25 123:2,7
123:17,21
124:3 125:8,15
131:14 133:24
136:15 137:17
142:22 234:3
239:24 241:19
251:1 254:14
255:16,22
262:20 266:2
268:13,18,20
268:22 269:17
269:18,21
279:12 342:4
344:12 364:19
416:1,2,5,9
420:6
**quicker** 35:5,25
**quite** 31:9
216:22 218:4
**quote** 87:3
287:14 404:2

**quoted** 334:25

**r**

**r** 417:1 419:2,2
**radcliffe**
268:14
**radnor** 1:18 2:5
9:10
**random** 76:7
**randomized**
414:17
**rang** 282:22
**range** 325:18
326:8
**rate** 58:12 59:3
59:9 61:12
62:1 246:14,21
246:24 247:5
247:13 251:6
368:19
**rates** 58:16
251:18
**raw** 29:4,5
93:21,23 94:4
94:9,14,17
**reached** 56:24
**reaching** 33:24
46:4 250:18
291:12
**read** 123:2,16
123:21,24
131:1,2 160:2
222:7 282:25
285:1 288:2

CONFIDENTIAL

**[read - reflect]** Page 65

290:10 418:3 420:3

**reading** 100:20 172:18,19 250:18 285:24

**ready** 156:24

**real** 66:18 232:14 245:23 280:17

**reality** 261:4

**realize** 28:25

**really** 54:8 57:10 82:7 130:1 131:12 209:25 257:12 347:19 406:20

**reask** 58:19 61:20 359:6

**reason** 66:7 109:16 151:15 152:17 235:13 241:2 243:10 271:23 383:17 395:11 418:5

**reasonable** 209:6 219:6 248:11 262:11 262:17 266:4 286:1,14,23 287:3,4,8,10,14 287:17 288:6 295:13 302:11 304:1,15 311:13 313:7

313:15 315:1 367:22 378:19

**reasonableness** 292:24

**reasonably** 120:2,5

**reasons** 17:13 30:24 239:6 250:24 376:24

**reaves** 3:3 416:5

**rebuttal** 384:22

**recalculate** 94:7,16

**recall** 31:24 42:19 46:22 50:11 54:4,10 66:6 73:3,21 74:1,16 77:25 80:9 119:2 121:12 164:17 166:16 250:10 270:8,24 285:21 289:8 289:17 290:14 316:21 354:8 364:12 376:18 377:23 381:4 386:10

**recalled** 270:12 270:21

**receipt** 418:15

**receive** 50:5 51:18 68:21

178:25 179:6,7 180:22 288:4 406:25

**received** 42:23 50:12,24 57:13 72:21,25 73:14 74:9 118:17,23 210:11 294:20 299:12,23 363:2 370:14 372:25 395:9 397:15 398:12 403:5 405:18 405:21,25

**receives** 177:23 179:25 180:1,7 181:4 183:15

**receiving** 184:5

**recently** 410:14

**recess** 86:16 162:25 234:23 315:14 383:24 415:16

**recheck** 34:6

**recollection** 140:23 278:22 330:13

**record** 9:2,19 37:14 41:1 48:17 86:12,14 86:19 133:6 162:23 163:3 168:2 234:21 235:1 259:13

315:10,12,17 355:22 383:22 384:2 415:12 415:14,19 416:8,14,18

**records** 290:2 290:19 291:2

**recover** 182:15 182:17 184:17 185:18 212:1

**recovering** 184:13

**recruit** 411:21 412:6,8

**reddit** 82:4,7,9 82:15

**reduce** 221:15 349:18

**reduced** 403:17

**reduction** 135:8

**refer** 17:3 98:25 99:1,2 182:18

**reference** 380:6

**referred** 47:22 314:17 412:14

**referring** 17:5 18:3 182:19

**refind** 330:15

**reflect** 93:11 137:10 160:20 164:5 400:1

CONFIDENTIAL

**[reflects - relevant]**                                    Page 66

| | | | |
|---|---|---|---|
| **reflects**  391:18 | 188:23 189:2 | **relating**  27:10 | 204:18,25 |
| **regarding** | 189:11 191:14 | 30:19 52:1 | 205:14,25 |
| 30:23 34:9 | 193:21 196:3,9 | 58:8 59:2 | 206:10 216:1 |
| 200:13 208:24 | 200:18 202:16 | 60:22 61:1 | 223:15 237:20 |
| 241:24 246:14 | 202:23 204:9 | 74:19 75:7,22 | 254:25 265:3 |
| **regardless** | 204:15 206:6 | 79:4 80:2 | 278:6 281:16 |
| 214:12 | 206:14,22 | 90:22 91:5,7 | 281:19 284:3 |
| **region**  376:20 | 207:4 209:11 | 91:14 95:25 | 317:3 318:7 |
| 379:19 | 209:15 212:3 | 96:19 97:15 | 319:15 320:4 |
| **regional**  370:23 | 212:21 213:20 | 98:17 99:12,25 | 321:9,25 |
| 376:13 379:17 | 221:15 231:8 | 102:10 103:5 | 323:16 327:18 |
| **regions**  371:8 | 274:3,15 | 103:16,24 | 333:6,24 346:1 |
| 371:21 375:16 | 300:13,20 | 104:8 106:3,10 | 346:6,23 |
| 375:17 376:6,7 | 301:9,20 302:9 | 106:21 107:5 | 349:20 352:13 |
| 376:15 377:3 | 303:13,23 | 111:18 112:14 | 352:14 367:3,8 |
| 377:11,13,14 | 304:10 305:11 | 112:15,22,23 | 391:8,23 |
| 377:22 378:7,8 | 315:22 316:6,9 | 113:6 118:10 | 393:11 411:10 |
| 378:16,17 | 316:13 317:24 | 126:9 128:10 | 412:24 413:23 |
| **registered** | 318:1,12 319:2 | 128:12 129:12 | 415:5 |
| 417:15 | 319:3,20,24 | 129:25 131:18 | **relation**  79:3 |
| **regular**  308:8 | 321:5,14,18,21 | 132:23 133:2 | 265:1 |
| 330:12 404:9 | 325:4 333:12 | 136:22,25 | **relationship** |
| **relate**  80:13 | 333:15 354:17 | 137:1 140:11 | 56:11,15 |
| 132:7,8 147:6 | 354:24 355:3,7 | 140:21 144:5 | **relative**  312:22 |
| 159:1 234:13 | 355:15 372:5 | 144:16 150:9 | **relatively**  35:3 |
| 386:3 | 385:24 386:16 | 150:18 156:11 | 36:1 |
| **related**  57:4 | 390:6,23 393:2 | 156:16 157:9 | **release**  345:7 |
| 78:11,14 79:12 | 393:7 394:6 | 157:20 158:5 | 345:14,19 |
| 79:25 80:12 | 399:7,8 407:13 | 158:15 163:8 | 346:2,6 |
| 95:16,20 96:8 | 407:22 408:4 | 163:21,24 | **relevant**  113:24 |
| 101:24 102:3 | 408:13 | 165:2,9 182:23 | 212:12 223:6 |
| 102:21 105:24 | **relates**  1:9 | 194:21 195:6 | 231:22 235:18 |
| 122:13 128:20 | 62:15 128:11 | 195:19 196:15 | 245:12 286:1 |
| 182:10 188:16 | | 197:4 199:24 | 298:14 309:9 |

CONFIDENTIAL

**[relevant - remember]**

313:11 316:12
317:9,11,15,20
327:16 355:23
360:11,24
371:7 376:4
396:11 413:14
**reliability**
240:13,23
304:13,14
**reliable**  53:15
94:23 95:9
96:2,3 97:13
101:19 102:12
102:13 103:14
105:17 106:12
106:14 107:13
114:17 115:2
115:13,18
116:17 117:2,8
117:11 118:2,8
128:24 132:18
146:1 241:3,9
242:1,7 243:21
246:16,21
248:20,23
251:8 267:18
304:11 317:2
318:6 319:14
320:3 321:8,24
323:10,17
338:7,16 339:3
339:9,22 340:4
340:15,18,24
341:4 342:16

342:21 343:7
344:5,21,22
347:6,12,22
378:7 382:16
407:24
**reliably**  277:18
322:11,21
**reliance**  237:20
240:11 284:3
303:25
**relied**  18:5 46:4
92:6,14 94:3
101:12 105:10
108:23 109:3
111:12 114:1
114:11,16
115:24 116:3
116:12,16
117:17,22
118:1,3,9
119:13 126:12
134:19 138:22
139:6,14
140:10 146:13
161:4,12 248:1
284:13,17,23
285:6 291:10
293:19 294:2
300:17 305:12
315:20 316:7
329:15 334:7,8
335:23 346:19
346:22 349:12
362:24 363:15

363:22 364:7
365:19 366:2
369:9 370:2
381:10 384:10
386:23 387:24
402:18
**relies**  401:8
**rely**  48:13
79:13 85:17
91:2,7 97:14
97:19,20 98:19
99:14 103:15
103:24 107:14
110:20 133:22
143:6,13
161:25 214:10
220:9 240:18
244:10,22
253:21 286:6
287:18 288:7
290:24 291:8
323:12 340:25
341:22 342:1
345:3,7,15
346:2 348:7,11
366:16 367:4,9
369:19 384:16
387:4 388:18
395:18 396:3
397:22
**relying**  95:22
98:7,12,15
142:20,21
145:18 208:2

237:5 238:22
240:9 241:22
243:24 244:1
246:12 267:16
267:16 283:13
283:18 286:4,4
292:16,24
316:10 341:17
341:22 342:7
342:11 348:2
367:20
**remained**
333:10
**remaining**  64:2
376:7
**remains**  333:4
**remember**  25:9
32:13,14,23
50:10,19 59:11
67:24 68:9,14
69:20 73:6,8
74:2 77:5 78:5
80:3,17 93:1
121:17 164:8
268:17 269:23
270:9,15
289:16 305:7
327:24 328:2
330:17 332:1
335:13 348:16
370:9,24
375:22 381:18
382:24 387:12
398:14 412:10

CONFIDENTIAL

**[remember - requirement]**                                   Page 68

| | | | |
|---|---|---|---|
| 413:17,18 | 20:4,5,9,9,16 | 385:12,13,18 | 93:11 98:24,25 |
| 414:6 415:7,10 | 20:21,25 21:5 | 385:23 386:21 | 101:7 135:13 |
| **reminded** | 21:10,15,20,25 | 390:9 391:2,17 | 151:16 262:9 |
| 68:12 | 22:4,10,14,24 | 392:20 395:16 | 268:3 286:9 |
| **reminder**  10:14 | 23:2,8 24:2,2,4 | 397:1,6 398:20 | 289:14 312:6 |
| **remote**  3:11 4:1 | 24:12 25:8,15 | 399:1 401:2,4 | 324:2,12 |
| **removal**  28:18 | 25:19 26:18 | 401:4,8,16 | 326:12 336:3 |
| **removed**  308:4 | 27:6,9 28:1 | 402:16 406:8 | 345:19 346:6 |
| **replaced** | 29:14,15 31:16 | **reported**  93:17 | 346:22 359:14 |
| 333:14 | 31:19,21 32:1 | 95:13 100:15 | 360:1,15 402:3 |
| **replicated** | 33:2 63:18 | 116:12 117:23 | **represent**  10:6 |
| 94:11 | 65:12 66:2 | 152:18 227:3 | 263:13 347:15 |
| **reply**  5:17,18 | 68:23 75:17 | 238:22 239:3,7 | 371:12 400:11 |
| 5:20,21,23,24 | 76:3 97:8 | 239:21 240:12 | **representing** |
| 14:19,23 15:3 | 98:15 101:9 | 240:24 250:9 | 345:12 378:18 |
| 15:7,12,16,21 | 117:3 124:14 | 325:1 327:14 | **represents** |
| 15:25 16:5,9 | 124:20 125:1,6 | 347:21 401:15 | 389:23 |
| 16:14,18 62:25 | 125:13 126:15 | 407:7 | **reprimand** |
| 385:18 | 131:2,4,5,14 | **reporter**  1:21 | 147:24 |
| **report**  5:8,9,11 | 208:4 239:12 | 9:20 417:15,24 | **reproduction** |
| 5:12,14,15,17 | 248:22 250:7,9 | **reporting** | 417:22 |
| 5:18,20,21,23 | 250:10,19 | 256:12 335:6 | **repute**  344:10 |
| 5:24 6:1,3,4,6,7 | 260:25 268:25 | 338:11 | **request**  8:7 |
| 6:22 10:24 | 269:2 321:16 | **reports**  16:25 | 44:23,24 46:6 |
| 11:3,9,12,12,18 | 326:19 328:7 | 17:1,17 19:15 | **requested** |
| 11:25 12:5,16 | 335:2,9,25 | 19:21 22:18,20 | 42:21 45:3 |
| 12:20 13:1,4,8 | 336:15 337:6 | 30:19,25 33:14 | 115:7 395:7 |
| 13:14,17,20 | 338:4 339:6 | 37:10 41:4,7 | **require**  287:15 |
| 14:1,4,7,13,14 | 340:18,25 | 51:21 57:18 | 290:25 291:9 |
| 14:19,23 15:4 | 348:13 349:14 | 58:6 59:3 | **required** |
| 15:7,13,16,22 | 360:10 363:6 | 62:25 63:6 | 220:20 267:1 |
| 15:25 16:6,9 | 363:17 369:13 | 64:8,18,22 | 291:15 |
| 16:15,18 17:9 | 381:14,21 | 65:2 66:10,13 | **requirement** |
| 17:21 18:1 | 384:6,22 | 69:5 80:1,4,7 | 291:5 |

CONFIDENTIAL

**[requires - right]** Page 69

| | | | |
|---|---|---|---|
| **requires** 412:4 | 239:16 242:7 | **responsive** | 367:9 |
| **requiring** | 246:14,21,24 | 209:22 | **retained** 55:15 |
| 223:25 354:15 | 247:5,12,25 | **rest** 64:14 | 55:19 56:1 |
| 354:22 355:13 | 251:6,17 | 377:7 | 57:2 340:9 |
| **research** 51:25 | 259:24 281:6 | **restarted** 68:11 | 343:13 |
| 53:22 72:5,15 | 281:21 329:8 | 68:17 | **retirement** |
| 278:25 338:19 | 351:14 368:1 | **restate** 92:25 | 232:13 |
| **resource** 219:9 | 368:19 | **restricting** | **retrospectively** |
| 219:17 | **responses** | 375:25 | 268:13 |
| **resources** 81:7 | 92:21 93:6 | **results** 34:4 | **return** 418:13 |
| 186:17 213:9 | 104:15,24 | 67:5,17,22 | **review** 271:4 |
| 221:23 224:21 | 105:16 106:13 | 68:6 91:8,11 | 288:11,16,21 |
| **respect** 167:23 | 107:11 111:15 | 93:10 94:8,22 | 289:5 327:6,12 |
| **respectfully** | 111:25 239:22 | 95:8 96:3 | 327:13 346:9 |
| 123:20 | 241:25 242:16 | 109:10 110:2 | 348:15 |
| **respond** 369:3 | 242:19 243:21 | 126:12 131:3 | **reviewed** 69:5 |
| **responded** | 244:1,13,25 | 131:16 138:6 | 100:25 101:4 |
| 92:19 93:5 | 245:6,8,15,17 | 241:22 242:1 | 160:23 164:13 |
| 367:13,18,24 | 247:4 251:5 | 244:12,24 | 164:19,23 |
| 368:2,10 369:1 | 256:10,20 | 246:12,15 | 237:18,23 |
| **respondent** | 258:10 | 247:11,24,25 | 278:5,12 284:1 |
| 257:3 | **responsibilities** | 248:19 249:3 | 288:19 291:1 |
| **respondents** | 170:10 173:4 | 249:13,18 | 331:22 332:3 |
| 239:21 256:9 | 173:11 195:5 | 251:7 253:17 | 337:15 338:2 |
| 256:20,22 | 202:25 203:8 | 254:6,14 | 345:15 378:11 |
| 258:24 259:23 | 204:17 223:19 | 255:16 256:9 | 380:7 |
| 267:11,22 | **responsibility** | 256:19 258:9 | **reviewing** |
| 316:15 341:15 | 170:24 171:6 | 261:21 262:10 | 19:23 26:12 |
| **responding** | 171:15 172:16 | 262:16 265:18 | 27:21 28:23 |
| 163:19 208:8 | 174:9 175:1,13 | 266:8,16 | 33:4 104:25 |
| 239:24 264:25 | 205:2 | 270:25 279:15 | 289:2,2 308:7 |
| **response** 30:23 | **responsible** | 279:21 336:22 | **rice** 3:18 |
| 104:1,5 106:17 | 229:24 230:10 | 341:23 343:13 | **right** 10:25 |
| 107:1 130:14 | 230:22 231:12 | 348:4,6 367:4 | 13:17 14:15 |

CONFIDENTIAL

**[right - salaries]**                                                                           Page 70

| | | | |
|---|---|---|---|
| 18:16,19 24:4 | 245:24 248:2 | 398:14 399:21 | **s** |
| 30:8 31:10 | 248:13 253:25 | 413:2,10 | **s** 2:10 3:14 5:5 |
| 34:22,24 44:20 | 254:17 255:23 | **risk** 244:11,23 | 19:8 34:22 |
| 46:8 48:22 | 257:9,10,14,15 | 273:22 274:9 | **sabrina** 369:10 |
| 54:16 57:24 | 257:16,18,22 | 293:14 | 381:10 |
| 60:3 62:7,10 | 257:25 258:4 | **road** 1:18 2:5 | **safe** 412:20,24 |
| 63:1,11 64:3 | 258:15,16,20 | 3:14 9:10 | 413:1,24 414:8 |
| 66:15,24,25 | 262:13,21,23 | **robert** 6:22 | **safety** 229:23 |
| 74:15,23 78:4 | 262:25 263:3 | 67:6,18,23 | 230:9,21 |
| 104:9 113:16 | 264:19,20,21 | 91:9 124:13 | 231:11 |
| 116:5 119:16 | 265:9,11,13 | **robin** 1:20 9:20 | **salaried** 165:12 |
| 123:17 125:9 | 268:17 271:17 | 417:15 | 165:16,20 |
| 127:24 132:12 | 272:3 281:3 | **roblox** 83:23 | 166:13 |
| 132:16 138:15 | 282:18 287:19 | 83:25 | **salaries** 43:3 |
| 145:1,23 160:3 | 289:11,13,21 | **role** 91:19 | 45:7,23 90:19 |
| 169:21,23 | 293:24,25 | 92:10 248:13 | 91:14 95:25 |
| 173:16,23 | 307:22 308:2,3 | **roles** 297:10 | 96:19 97:15 |
| 181:1,16,20,24 | 309:5,21 311:7 | **room** 69:16 | 100:1 102:10 |
| 182:1,24 | 311:11 312:2 | 246:10 412:5 | 103:5,17 104:9 |
| 184:19 186:8,9 | 312:18,23,24 | **rose** 63:7 | 106:10 107:6 |
| 186:14,18 | 313:13,22 | **roseland** 3:15 | 107:15 113:15 |
| 187:9,22 | 314:9 319:3 | **rosica** 3:9 | 113:23 114:3 |
| 196:20 216:12 | 320:17 321:12 | **roughly** 413:17 | 114:13,18,21 |
| 216:17,25 | 325:19 326:9 | 414:11 | 115:2,12,20 |
| 218:12,13,17 | 328:13 337:3 | **rubin** 56:6,11 | 116:5 166:25 |
| 218:21 219:1,5 | 338:10,24 | 56:16,23,24 | 167:14 235:4,5 |
| 219:12,17,25 | 341:7 342:2 | **rule** 343:17 | 235:10,11,11 |
| 221:11 222:6 | 344:15 345:8 | **rules** 10:13 | 236:7,11 |
| 222:18,22,23 | 348:5 353:19 | **run** 74:4 | 324:20 362:14 |
| 223:7,24 224:4 | 354:7,11 | 416:13 | 362:21 363:23 |
| 224:7,13 225:5 | 374:11 375:10 | **running** 29:11 | 364:8 366:19 |
| 225:15,16 | 379:15,16 | 59:23 79:20 | 367:3,8 394:5 |
| 233:7 235:25 | 381:15,19 | **rural** 72:5 | 395:6 402:19 |
| 242:24 243:6 | 390:11 393:17 | | |

CONFIDENTIAL

**[salaries - sandoval]**

| | | | |
|---|---|---|---|
| 402:21 | 22:7,17 30:15 | 140:17 141:16 | 201:22 202:6 |
| **salary** 19:12,12 | 35:18 36:3 | 143:3 144:3,14 | 203:6 204:1,24 |
| 42:24,25 43:9 | 38:1,7,15,19 | 145:8 146:16 | 205:8,22 |
| 43:11,16 45:20 | 39:5,16 40:2 | 147:3,15 | 207:13 208:7 |
| 116:8 118:17 | 40:13,24 44:6 | 148:16 149:1 | 209:20,24 |
| 118:22 119:12 | 46:2 47:15 | 149:13,22 | 210:17 211:7 |
| 119:23 120:17 | 48:23 50:21 | 150:7,16 151:5 | 211:24 212:14 |
| 120:21 121:3 | 51:6,17 55:1 | 152:1,12 153:9 | 213:13 214:5 |
| 121:11 138:8 | 55:14 60:4,12 | 153:19 154:4 | 215:1,23 216:9 |
| 215:20 219:16 | 60:20 61:18 | 154:17 155:11 | 217:10 218:1 |
| 233:7 393:15 | 66:19 69:2 | 155:21 156:8 | 220:16 221:7 |
| 395:12 403:17 | 82:13 83:6 | 156:25 157:6 | 221:20 222:2 |
| 404:8,14 | 85:8 86:11,20 | 157:17 158:2 | 224:22 225:19 |
| 405:18 407:1,6 | 88:1,12,24 | 158:12,23 | 226:11,22 |
| **salmon** 369:11 | 89:9 90:15 | 159:19 160:1 | 227:23 228:23 |
| 369:15,21 | 91:18 93:2,22 | 162:20 163:4 | 229:18 230:4 |
| 381:10 | 95:2,6 97:1,24 | 163:16 164:11 | 230:18 231:5 |
| **sample** 238:6 | 100:5 102:17 | 167:7 171:4 | 232:1,7 233:1 |
| 242:13,25 | 103:11,21 | 172:1,14 173:1 | 233:19 234:4 |
| 243:2,5,9,10,17 | 104:12,20 | 174:7,24 | 234:19 235:2 |
| 243:25 244:11 | 105:21 107:22 | 175:11 176:2 | 236:21 237:16 |
| 244:23 245:4 | 109:7 110:13 | 176:17 177:20 | 239:2,14 240:5 |
| 257:6,21 300:1 | 111:23 115:9 | 178:6 179:12 | 240:22 241:10 |
| 325:10,12 | 115:16 118:14 | 180:3,14 182:4 | 241:21 242:5 |
| **samples** 242:23 | 123:15 124:8 | 183:22 186:2 | 244:9,19 |
| 243:4,14 | 124:18 128:8 | 188:8 189:12 | 246:11 249:1 |
| **sampling** 326:1 | 129:9,22 | 190:1,10 191:1 | 249:14 250:1 |
| **sandoval** 2:10 | 130:20 132:1 | 191:17 192:4 | 250:16 251:2 |
| 5:3 10:2,6 11:7 | 132:11,21 | 192:20 193:4 | 251:10,20 |
| 11:16,22 12:24 | 133:15 134:9 | 194:1,16 195:3 | 252:17 253:1 |
| 13:12,24 14:11 | 134:21 135:9 | 195:15 196:1 | 253:16 254:11 |
| 15:2,11,20 | 135:23 136:18 | 196:24 197:12 | 256:6,16 |
| 16:4,13,22 | 137:11 138:19 | 198:8 199:3,15 | 259:12,21 |
| 21:3,13,23 | 139:11,22 | 200:10 201:6 | 260:5,18 |

CONFIDENTIAL

**[sandoval - school]**

| | | | |
|---|---|---|---|
| 261:10 265:16 | 346:17 348:24 | 250:11 254:20 | 79:22 80:25 |
| 266:6 267:8 | 350:6 351:13 | 257:3 264:16 | 86:24 87:2,11 |
| 273:5,21 274:8 | 353:13 354:5 | 294:15 306:3,9 | 87:14,18 88:7 |
| 275:2,14 276:1 | 356:5 358:23 | 344:17 347:12 | 88:14 89:3,11 |
| 276:10 277:8 | 359:24 360:13 | 352:1 373:23 | 90:5,18 95:13 |
| 278:3,15,23 | 361:9,22 364:5 | 378:5 379:14 | 96:17 98:18 |
| 279:13 280:3 | 364:14 366:14 | **says** 29:5 127:1 | 103:3,22 |
| 281:1,12 282:1 | 367:1 368:8,15 | 127:9,10 | 105:23 107:3 |
| 283:24 284:12 | 368:23 370:12 | 130:10 248:7 | 107:25 108:16 |
| 286:19 288:8 | 372:24 373:13 | 263:25 310:3 | 113:14 116:13 |
| 288:17 289:3 | 374:5,14 | 326:24 327:4 | 122:2,8 143:12 |
| 290:22 291:23 | 375:13 376:2 | 329:1,6 334:18 | 144:6,17 147:7 |
| 292:7 293:9 | 377:8 378:3 | 336:13 337:23 | 147:23 150:10 |
| 294:23 295:18 | 379:7 380:9,19 | 341:20 389:16 | 150:19 154:21 |
| 296:4,15,24 | 381:7 382:19 | 389:22 404:23 | 155:5,12,16,22 |
| 297:9 299:9,19 | 383:9,19 384:3 | **scarce** 213:8 | 156:1,11,16 |
| 300:16 301:3 | 385:16 387:14 | 214:20 221:23 | 159:9 162:13 |
| 301:14 302:1 | 387:21 389:2 | 224:21 | 163:7 164:14 |
| 303:6,18 305:1 | 392:7,17 | **scenario** 221:4 | 164:20 165:22 |
| 306:1,8 307:15 | 394:21 397:17 | **scenarios** 210:3 | 165:24 166:7 |
| 308:9 309:12 | 402:1 406:2 | **scheduled** | 166:20,24,25 |
| 310:11 311:15 | 407:17 408:18 | 125:21 207:6 | 167:9,10,18,19 |
| 312:4 313:17 | 415:11,20 | **scholar** 328:1 | 168:4,17,23 |
| 314:4,15 315:3 | 416:15 | 331:21 | 169:8 170:16 |
| 315:8,18 | **sandra** 384:12 | **school** 26:22,22 | 172:4,11 |
| 316:23 317:12 | 384:18 | 26:24,25 27:1 | 173:23 175:15 |
| 318:16 319:8 | **satisfied** 247:18 | 27:2,10,11 | 176:5,8,10 |
| 319:22 321:2 | **saw** 173:15 | 31:12 37:2 | 177:4,5,21,23 |
| 322:10,20 | **saying** 44:18 | 43:6,21,25 | 178:5,7,12,18 |
| 323:11 324:11 | 45:25 61:19 | 44:8,25 45:4 | 178:20,25 |
| 331:10 333:21 | 97:6 128:22 | 49:21 50:6,14 | 179:5,13,19,24 |
| 335:21 339:19 | 140:5 169:24 | 57:5 77:15,19 | 180:6,19,21,23 |
| 341:18 343:2 | 170:1 208:21 | 77:24 78:4,8 | 180:25 181:3,8 |
| 344:1 345:1 | 219:21 225:2 | 78:12 79:13,17 | 181:11,16,22 |

CONFIDENTIAL

**[school - seen]**                                                Page 73

| | | | |
|---|---|---|---|
| 182:9,14 183:4 | 327:20 328:10 | **sciences** 280:18 | 330:2 402:2 |
| 183:5,15,16 | 329:18 331:3 | **scientific** 56:7 | **section** 400:20 |
| 184:5,7,12,15 | 332:4 333:25 | 56:11 | **see** 28:8 30:16 |
| 184:18,23 | 349:17,22 | **scope** 171:2,19 | 38:8 53:19 |
| 189:21 190:11 | 350:9,18,20 | 172:21 174:13 | 87:7 124:23,24 |
| 190:13 193:5,7 | 351:2,4,6 | 177:9 189:18 | 125:13,18 |
| 193:16,23 | 352:18 353:1 | 190:19 192:15 | 126:5 140:18 |
| 196:25 197:2 | 353:23 354:15 | 193:1,14 | 141:18 142:10 |
| 197:15,16,17 | 354:22 355:2,6 | 195:10 200:23 | 160:13,21 |
| 197:23 198:12 | 355:13 369:25 | 201:13 203:19 | 218:24 262:20 |
| 199:5,12 201:7 | 370:15 371:9 | 205:6,17 | 263:7,24 280:1 |
| 201:23 202:25 | 371:20 375:16 | 228:17 231:1 | 282:16 299:8 |
| 203:8,13,17,24 | 379:1 388:12 | 232:19 242:3 | 343:16,17 |
| 204:3,11,17 | 389:9,11,12,17 | 275:20 279:7 | 344:2 352:4 |
| 205:3,9,12,24 | 389:17 390:4 | 307:4 353:11 | 363:7 379:20 |
| 206:8,16,24 | 390:12,13,21 | 354:2 | 380:24 382:9 |
| 207:16 210:6 | 391:2,3,9,24 | **score** 352:5 | 385:20 389:3 |
| 211:25 217:12 | 392:8,9 393:2 | **scores** 351:16 | **seek** 96:17 |
| 217:14 221:16 | 393:8,12,16 | 351:21 352:8 | 103:3 107:4 |
| 223:12 224:24 | 394:7 403:9 | 353:9,17,25 | 223:13 226:5 |
| 225:4,22 226:3 | 404:9 407:11 | **screen** 349:3 | **seeking** 182:15 |
| 226:14,24 | 407:20 408:2 | **scroll** 349:8,9 | 182:16 185:18 |
| 227:15 228:1 | 408:12 411:6,8 | **scrutiny** 288:5 | **seem** 35:24 |
| 229:1,19 230:5 | 411:19 | **sealed** 377:5 | 223:6 282:24 |
| 230:20 231:9 | **school's** 197:21 | **search** 53:16,24 | 314:25 |
| 232:8,17 233:2 | 198:10 | 55:5 327:14,17 | **seemed** 121:4 |
| 233:9,13,21 | **schoolers** 25:23 | 330:13 331:21 | 327:15 |
| 234:6 265:1 | 25:23 | 409:16 | **seems** 33:9 |
| 268:10 273:8 | **schools** 183:24 | **searches** 54:5 | 59:25 60:2 |
| 276:2,12,17,25 | 190:21 191:16 | 54:23 331:20 | 231:17 329:11 |
| 277:1,17,24 | 195:14 202:7 | **searching** | 347:22 378:18 |
| 278:6,12,17 | 412:21,25 | 331:16 | **seen** 30:22 |
| 281:14 285:12 | 413:1,25 414:8 | **second** 12:11 | 125:4,5,6 |
| 326:14 327:1,7 | | 24:6,7 133:9 | 285:1 310:19 |

CONFIDENTIAL

**[seen - slightly]**

354:9 380:17
380:22 409:10
410:24

**sees** 207:18
208:12 210:25

**select** 125:25
294:20

**selected** 294:3
294:5,22 295:4
295:16,21
296:7

**self** 238:22
239:3,7,21
240:12,24

**selling** 181:5

**send** 45:16
148:20

**sense** 33:6 34:4
181:6 229:12
264:18 281:3
325:11,24
379:6

**sent** 28:4 46:9
404:22

**separate** 18:17
73:25 335:5
353:5,21
402:24

**separately**
235:4

**september**
68:14,15

**series** 133:24
385:4,9

**serve** 75:3 76:9
76:13

**set** 16:25 37:1
60:21,25 61:7
286:25 385:2

**setting** 77:11
77:19 78:14
79:12,25 80:13
80:14 412:16

**settings** 78:18
80:16 411:11

**seven** 246:6

**several** 250:25
308:15,20

**share** 26:23
27:1 85:4
133:13 135:6,8
185:2 324:22
390:15 399:13
399:22 400:14
400:19

**shared** 394:19

**shb.com** 2:19

**sheet** 418:6,9
418:11,14
420:9

**shift** 216:15

**shifted** 28:13

**shifting** 29:17

**shivanonda**
369:11,15,21
381:11

**shook** 2:16

**shortly** 363:16

**show** 189:21
222:17 409:16

**shown** 410:21

**shows** 225:3

**sic** 400:25

**siculus** 2:22

**side** 181:21

**sign** 292:8
418:8

**signature**
417:13 420:11

**signed** 142:4,7

**significant**
378:24

**signing** 142:1
418:10

**similar** 269:17
342:4

**similarly** 67:14
161:3 162:8

**simple** 35:3
192:5 373:2,7

**simpler** 35:4

**simply** 182:20
219:4 305:3

**single** 32:17
309:14 324:2
379:22

**sit** 218:17
308:13 309:5
311:8 312:2

**site** 19:6

**sites** 45:20

**sitting** 47:23
50:20,22 51:9
78:1 138:12
198:4 270:18
308:25 331:11
354:9 386:14
401:13 413:19

**situation**
374:16

**six** 18:7,11,14
18:22 19:10
41:5 69:23
70:8 77:5
165:15 293:23
297:12 352:12
352:19 416:16

**size** 242:8
243:17,25
244:11,23
257:6,21 300:1
325:12

**skills** 229:23
230:9,22
231:12

**sleep** 64:10,13
65:11 277:11
277:14,19

**sleeping** 64:17

**slight** 23:15
392:16 394:11
394:16

**slightly** 43:4

CONFIDENTIAL

**[small - social]** Page 75

| | | | |
|---|---|---|---|
| **small** 65:10 | 87:1,14 90:23 | 157:10,21 | 223:3,15 224:2 |
| 242:15,18,23 | 91:5 95:16,20 | 159:3,11 | 225:23 226:15 |
| 242:25 243:3,9 | 96:9 101:25 | 160:17 161:1,5 | 227:1,4,16 |
| 243:10,14,25 | 102:4,21 | 161:6,14,15,17 | 228:2,10,13,20 |
| 244:10,22 | 105:25 106:4 | 161:18 162:1,2 | 228:25 229:2 |
| 349:1 | 106:21 108:3 | 162:15 164:22 | 229:12,20,23 |
| **smaller** 242:13 | 108:12,19 | 165:23 166:6 | 230:6,9,22 |
| 243:13 | 111:18 112:15 | 166:19,23 | 231:8,11 |
| **smart** 336:10 | 112:23 113:7 | 167:9,11,15 | 233:11,23 |
| 336:11 | 122:2,8 123:8 | 168:18 169:8 | 234:8 246:2 |
| **smartphone** | 124:3 126:1,10 | 182:10,23 | 254:25 255:6 |
| 334:16 | 126:19,21 | 183:6 188:12 | 267:3,13,24 |
| **smartphones** | 127:17,20 | 188:13,22 | 273:25 274:3 |
| 335:7 | 128:12 129:12 | 189:5 191:8,9 | 274:12,15 |
| **snap** 3:6 416:6 | 130:11 131:19 | 191:15,24 | 280:18 281:16 |
| **snapchat** 81:19 | 132:8 133:14 | 194:6,7,13,23 | 281:19 282:10 |
| 88:17 89:2 | 133:20 134:15 | 195:7,20,24 | 282:11 298:4 |
| 90:6 126:2,11 | 135:1,18 136:3 | 196:3,7,15 | 298:22,25 |
| 130:12,15 | 136:22 137:1,7 | 197:5 199:25 | 300:5,13,20 |
| 307:9 356:18 | 137:15,18,24 | 200:1,2,14,15 | 301:9,20 302:9 |
| 356:22 358:1,3 | 138:24 139:16 | 202:12,14,20 | 303:9,12,23 |
| 358:4 409:22 | 140:11 141:6 | 204:5,6,13,19 | 304:10 305:11 |
| 410:2,16 | 144:9,20 146:6 | 205:1,11,14 | 305:13 306:11 |
| **soccer** 404:4 | 146:20 147:9 | 206:1,2,3,10,11 | 307:1,18 |
| **social** 1:4 9:11 | 147:21 148:8 | 206:19,20 | 308:24 309:16 |
| 57:5 81:14,15 | 148:19 149:5 | 207:1,19,21 | 310:7,16,24 |
| 81:16,17,22 | 149:17 150:1 | 208:13,14 | 311:19 312:20 |
| 82:1,3,5,9,15 | 150:11,20 | 211:1,3 212:3 | 312:20 314:17 |
| 82:15,17,20,23 | 151:8,17 152:6 | 212:5,20 | 315:23 316:6,9 |
| 82:24 83:2,8 | 152:16,19 | 213:20 214:8 | 316:14 317:3 |
| 83:10,12,14,16 | 153:2,14 | 214:15 216:1,5 | 317:25 318:7 |
| 83:18,20,22,24 | 154:20 155:4 | 217:13,16,18 | 318:12,20 |
| 84:1,3,5,7,9,12 | 155:15,25 | 218:11 219:22 | 319:1,4,6,12,15 |
| 84:14 85:18 | 156:12,17 | 220:7 221:14 | 319:20,24 |

CONFIDENTIAL

**[social - specific]**

| | | | |
|---|---|---|---|
| 320:4,7,11,19 | **socializing** | 180:20 183:20 | 369:19 396:4 |
| 320:22 321:5,6 | 215:6 | 195:23 203:4 | 397:11 |
| 321:9,14,19,21 | **software** | 207:11 217:22 | **sources**  73:11 |
| 321:23,25 | 155:14,24 | 227:21 230:2 | 74:8 113:20 |
| 322:7 323:16 | **solely**  365:19 | 253:5 256:14 | 190:8 254:5 |
| 325:3 326:15 | 366:2 | 266:13 281:10 | 275:22 384:16 |
| 327:2,9,21 | **somebody**  58:2 | 286:10 306:6 | **space**  418:6 |
| 328:12 329:19 | 73:23 89:16 | 315:24 316:1 | **spalding**  4:8 |
| 331:4 332:6,12 | 213:5 246:6 | 349:7 354:18 | **span**  271:22 |
| 333:6,12,15 | 263:25 280:9 | 359:7 365:3 | **speak**  48:2 |
| 334:2,16 335:3 | 295:15 302:11 | 367:6 388:6 | 49:17 160:5 |
| 335:6,10 336:4 | 338:9,11 | 390:19 400:16 | 173:15,16,17 |
| 336:9,17,25 | 339:15,20,20 | 407:15 408:7 | 238:17 309:7 |
| 337:13 345:21 | 340:9 341:20 | **sort**  62:23 | 314:2 398:15 |
| 346:1 347:3 | 344:3 | 135:6 174:4 | 404:6 |
| 348:14 349:14 | **someone's** | 222:21 229:17 | **speaking**  47:2 |
| 349:21 352:1 | 268:5 272:18 | 276:21 282:17 | 203:24 258:6 |
| 352:21 354:16 | **somewhat** | 290:2 291:1 | 259:7 284:20 |
| 354:23 355:7 | 339:4 | 399:6 404:5 | 285:8 304:4 |
| 355:14 359:16 | **sooner**  351:6 | **sorts**  58:17 | 325:15 |
| 360:2,17 361:4 | **sorry**  10:20 | 302:16 | **speaks**  43:3 |
| 361:12,13,19 | 11:14,23 18:23 | **sought**  160:15 | 257:11 300:1 |
| 363:9,11 364:3 | 20:19 23:25 | **sound**  371:22 | 378:21 |
| 372:4 374:9,23 | 24:1 31:3 | **sounds**  51:9 | **specialists** |
| 379:10 380:3 | 44:12,14 46:15 | 252:4 | 201:20 |
| 380:13 381:22 | 51:14 58:19 | **source**  53:15 | **specific**  88:4,11 |
| 382:5,6,21 | 74:24 93:14 | 310:12 329:1,6 | 88:22 148:3 |
| 383:2 388:13 | 98:10 117:20 | 329:8,10,24,24 | 159:17 173:18 |
| 389:20 390:6 | 123:19 124:20 | 338:7,16 339:3 | 173:21 208:1 |
| 390:23 393:13 | 135:11 138:17 | 339:10,22 | 210:4 219:2 |
| 407:12,21 | 143:10 144:13 | 340:4,15,24 | 226:13 237:14 |
| 408:3,13,19,22 | 149:10 150:14 | 341:4 342:17 | 250:3 268:3 |
| 410:13,18 | 156:13 158:10 | 342:21 343:7 | 269:9 276:21 |
| | 161:19 165:5 | 345:3 347:6 | 291:16 294:13 |

CONFIDENTIAL

**[specific - spent]** Page 77

304:25 305:21
352:12 358:2,4
370:9 415:3
**specifically**
46:5 52:19
56:5 68:16
73:24 87:24
89:13 112:6,15
112:23 113:7
134:14 140:21
153:21 154:8
158:7 164:21
167:18 168:4
176:24 186:9
186:11 212:20
213:19 239:7
247:15 249:24
271:9 302:24
317:4 318:8
319:15 320:5
321:10 322:1
332:22 333:6
333:12 334:3
335:4,11 336:5
336:17 337:8
346:8,25
349:16 357:15
358:22 359:23
363:20 404:6
404:21 411:24
412:22
**specificity**
173:8

**specifics** 89:17
89:22 90:2
171:11,21
173:12 175:10
175:20 176:19
193:16,21
194:14 195:12
208:21 209:19
285:22
**speculate** 274:1
274:13
**speculation**
275:5
**speech** 74:7
**speeches** 73:16
**spell** 19:7
**spend** 70:2
90:19 96:8
102:20 165:22
166:5 169:9
173:22 191:5
194:3,20 199:6
199:23 202:10
204:3 205:24
206:16 207:6
207:12 210:5
212:17 213:16
215:25 218:7
219:17 233:4
246:1 254:24
255:5 264:24
273:24 274:11
274:14 279:1
279:19 281:14

281:18 282:10
282:11 332:11
349:19 354:16
354:23 355:14
360:3 374:8,23
379:10 389:19
413:12
**spending**
151:16 152:18
179:14 190:23
197:22 198:11
211:11 223:16
322:5 359:14
360:1,15
**spends** 166:18
177:22 178:8
178:21 179:2
180:18,22
183:13 184:3
201:24 207:19
208:13 211:2
212:2 213:19
214:7 217:12
219:10 220:4
223:14 233:10
233:13 235:20
235:23 322:13
322:23 360:17
361:24
**spent** 62:2
64:16,17 90:22
91:4 95:14,18
96:16 101:23
102:2 103:2

105:23 106:2
106:20 107:3
108:2,11,18
110:17 111:7
111:17 112:2
112:13,14,21
112:22 113:5,6
113:7,14,23
119:11 126:9
128:12 129:24
131:12,17
134:13,24
135:16 136:21
136:25 138:23
139:15 140:20
141:4 144:6,16
146:3,19 147:7
148:7,19 149:3
149:15,25
150:9,18 152:4
153:1,12
154:19 155:3
156:10,15
157:8,19 158:4
158:14 159:2,5
160:15,25
161:5 163:6,20
163:24 165:2,8
169:22,23,25
176:12 177:8
177:12 179:8
182:22 183:6
188:10,20
189:4 190:15

CONFIDENTIAL

**[spent - student]**                                                Page 78

191:9,21 193:9
194:7 197:3
200:2,12
201:10 202:13
202:18 204:6
204:11 205:13
206:3,8,19,24
212:6,11,20
214:13 215:4,5
217:15,18
220:18,22
223:9 225:22
226:3,15
227:15,17
228:1,3,6,11,13
229:1,3,20
230:6,20 231:9
231:9 233:21
236:9,12 267:2
267:12,23
268:6 269:3
270:5,13,22
271:10 272:18
274:2 279:5
298:3,21,25
300:5,12,19,25
301:8,19 302:8
302:15 303:9
303:12,22
304:10,21
305:10 308:10
316:5,25
317:15,19
318:3,17,20

319:10,24,25
321:4,20
323:16 325:3
355:16 362:10
372:4 379:2
380:2,13 382:6
389:24 390:5
390:19,22
393:13 404:4
407:12,21
408:3,13
**spoke** 47:16,25
289:10 411:9
**spoken** 121:19
303:12,22
**spreadsheet**
25:21 29:2
34:15
**spreadsheets**
69:7
**sprint** 66:18
**square** 2:17
**stable** 333:5,11
**staff** 57:19,21
133:13 141:24
144:6,17 147:8
150:10,19
156:11,16
163:7 168:18
168:24 169:5
182:10 183:4,5
201:5 203:14
203:17,25

**stamp** 385:8
**stand** 416:12
**standard**
183:11 186:22
187:2 188:5
227:6,11
237:25 257:23
287:1
**stands** 274:16
**start** 77:2 91:1
266:14 316:2
385:8 386:1
**started** 49:6
327:25 408:23
**starting** 54:8
234:15 339:17
**starts** 151:9
**stata** 33:20
34:16,22 35:20
36:5
**state** 75:15
80:18 286:18
306:19 418:5
**stated** 377:10
**statement**
17:11 97:2
140:19 327:18
329:16 366:16
**statements**
314:1
**states** 1:1 9:14
366:18
**stating** 416:13

**stayed** 189:15
190:3,16 191:7
191:23
**staying** 224:6
**stemming**
322:7
**stems** 29:16
**stenographer**
34:19
**stenographic**
9:19 417:6
**step** 45:8 328:5
**stephany** 3:3
**stephany.rea...**
3:5
**steps** 100:10,17
104:22 105:3
146:18 152:3
152:24 153:11
155:2 245:5,14
**stipulated**
211:18
**stop** 224:11
**straight** 308:18
**straightforward**
36:2 66:24
121:5 135:5
**street** 2:18 4:4
4:9
**stretch** 86:9
315:7
**strong** 347:15
**student** 85:4,11
85:11 89:12

CONFIDENTIAL

90:6,23 91:5
95:16,20 96:8
101:25 102:3
102:21 105:24
106:3,21 108:2
108:11,18
126:1 133:14
133:18,19
138:24 139:16
148:19 151:17
152:19 165:22
166:6,19 169:8
170:11,14,19
170:22 173:6,9
176:12 177:8
177:13,16,23
178:9,22 179:2
179:15 183:6
183:14,25
184:4 188:11
188:21 190:8
192:11,23
193:9 194:4,21
196:15 203:1,9
203:15 204:4
204:12,19
207:18 208:12
210:25 212:3
214:7,14 215:5
216:1,4 217:13
217:16 220:5,6
220:19,22
227:1,4 228:12
228:14 233:11

254:25 255:5
267:3,12,24
272:23,25
273:12,14
274:2,14
275:16 276:19
277:11,19
283:5 298:22
298:25 346:7
346:24 348:12
349:13,21
350:10,19
351:5 359:16
360:2,4,16,18
361:11,25
382:6
**student's**
  207:20 208:14
  211:2 213:20
  217:18 361:19
**students**
  147:20,24
  148:8 149:4,16
  149:25 155:14
  155:24 156:12
  156:17 157:9
  157:20 158:5
  158:15 159:3
  159:10 160:16
  161:1,6,14,17
  162:1,15 163:8
  163:21,24
  164:14,20
  165:3,9 171:7

171:16 172:5
172:17 174:10
174:11 175:2,3
175:14 176:4
189:14 190:2
190:15 191:6
191:22 195:7
195:20 196:11
197:5 199:25
200:14,20
201:25 202:11
202:19 205:1
205:14 206:1
206:10,10,17
206:25 212:7
212:18 213:17
227:18 228:4,6
229:2,4,22
230:8,20,24
231:3,10
276:13 319:12
320:1 321:6,22
333:13
**studied**   173:21
  278:2 335:10
  350:24 379:25
  380:10,20
**studies**   326:13
  326:25 327:6
  327:19 328:8,9
  329:17 331:1,2
  331:9,12,16,17
  332:3,17,21,24
  334:6,8,9

414:22
**study**   268:12
  329:23 332:10
  334:11,14,24
  335:1 337:2
  354:9 414:17
**stuff**   18:12
  26:13 33:18
  46:10 61:3
  65:7 75:11
  81:7 185:24
  209:17 289:20
  322:6 413:16
**stunned**   136:10
  136:14
**subgroups**
  362:16,23
  364:25 365:9
  365:23 366:6
**subgrown**
  400:25
**subject**   418:10
**submission**
  63:17 64:7,22
  65:2,12 66:2,9
**submitted**   12:2
  63:1,5 68:24
  120:24 121:7
  163:18
**submitting**
  297:11,19
  303:1
**subscribed**
  420:12

CONFIDENTIAL

**[substance - survey]**

| | | | |
|---|---|---|---|
| **substance** 420:8 | **summaries** 355:10 | **supplemental** 406:11,14 407:3,5 | 172:11 173:10 177:14 178:15 179:20,24,25 |
| **suffer** 275:16 277:11 | **summarize** 54:11 300:24 | **supplementally** 406:21 | 196:11 199:19 208:1 209:13 |
| **suffering** 277:19 | **summarizes** 336:22 345:10 398:20 399:1 | **support** 8:1 42:11 49:13 195:6,19 | 218:10 234:19 237:22 252:4 261:15 283:3 |
| **sufficient** 42:11 145:17 247:8 249:4,19 251:15 356:4 | **summarizing** 263:1 324:5 | 196:15 197:4 199:24 200:13 200:20 201:3 | 288:18 307:20 311:21 312:1 315:8 320:16 |
| **sufficiently** 248:20,23 251:7 340:17 340:23 | **summary** 24:7 **summed** 62:8 **summer** 55:17 403:16,23 404:7,17 405:19 406:16 | 202:11,19 204:18,25 205:14,25 206:9,17,25 328:8 329:16 330:3 385:23 386:2,16 | 322:18 338:25 339:13 347:16 366:2 402:6 410:24 **surfacing** 53:25 **surfed** 216:6 |
| **suggest** 166:4 242:11,22 278:17 281:13 379:21 | **summing** 25:22 401:24 | **supported** 54:16 331:18 | **surfing** 216:21 218:3 |
| **suggested** 279:17 280:10 281:4,7,11,20 293:2 351:25 363:19 398:5 | **superintende...** 370:23 376:13 376:14 378:6 | **supporting** 332:14 **supports** 340:22 | **survey** 67:5,18 67:22 68:1 91:8,12,20,25 92:4,7,11,15,20 93:6,10,18,21 |
| **suggesting** 293:12 378:13 | **supervise** 301:19 302:8 302:18 | **supposed** 18:21 122:13 171:9 172:19 312:12 383:13 411:1 | 93:24 94:5,8 94:23 95:9,13 95:23 96:3,6 96:16 97:12 |
| **suggestion** 280:13 282:17 | **supervising** 302:13 | **sure** 18:23 34:3 54:20 73:7 86:11 93:3 | 98:1,4,4 108:25 109:10 109:12,19,22 |
| **suggestions** 279:3 293:16 | **supervision** 417:24 | 122:21 133:3 151:13 167:6 168:1 170:17 | 110:2,8,16 122:11 123:3,7 123:22 125:8 |
| **suggests** 329:3 | **supervisors** 295:12 | | |
| **suite** 2:18 3:4 3:19 4:4,9 | **supplanted** 18:20 | | |
| **sum** 23:12 400:1 401:5,6 | **supplement** 406:18 | | |

CONFIDENTIAL

**[survey - take]**                                    Page 81

125:16,19
126:18 129:7
129:24 130:10
130:10,22
131:2,7,9,10,17
131:24 136:20
138:6,14 145:3
160:3,14
163:15,19
188:18 208:4,9
208:23,24
231:22 236:8
237:6,21 238:1
238:7,8,11,19
240:3 241:8,23
241:24 242:6,9
242:15 243:20
245:7,16
246:13,20
247:4,12,19,24
249:4,18 251:5
251:18 252:1,3
252:8,12,16,20
253:8,10,18
254:6,23
255:25 258:9
258:14,24,24
259:2,23
265:18 266:8
266:16,25
267:10,14,17
267:22 268:1
268:17 269:4,5
269:24 270:7

270:12,21
271:1 272:10
272:10,12,13
272:19 275:10
278:17 279:9
279:16,21
280:1 282:25
305:3 313:1,20
314:7 316:15
316:22 324:19
325:2,17,22,24
336:21,22
338:9,12,14,18
338:20,24
339:16,21
340:7 341:6,14
341:15,21
342:1,5 343:11
343:11,18,18
344:3 346:10
347:19 348:10
349:11 362:17
362:23 365:1,9
365:23 367:5
367:10,14,19
367:25 368:7
368:11,17
369:2,4 378:11
399:7,9,13,22
399:25 400:12
400:14,18,20
403:25
**surveys**   238:16
241:7 246:25

259:25 260:11
260:20 261:12
261:17 274:23
283:9 328:15
339:25 340:2
341:24
**sw**   2:11
**swath**   304:3
**swear**   9:21
**swofford**   2:4
69:17
**sworn**   9:24
142:1 209:10
283:19 284:7
287:5,24 292:5
292:8 382:15
420:12
**system**   225:14
**systematic**
258:14
**systematically**
252:1 253:9
256:1 258:21
258:25
**systems**   289:15

**t**

**t**   5:5 19:8 34:22
34:22 417:1,1
419:2
**tab**   14:16 20:13
30:8 37:2
60:13 124:10
326:18 335:15

346:11 348:18
386:19 387:15
388:15 392:19
**table**   23:19
24:6,7,7,8 33:5
33:6 381:14,21
390:10 391:15
398:19,20,25
398:25 399:18
399:20 400:5,8
401:5,9 402:8
402:10
**tables**   24:4
53:1 399:5
**tabs**   28:6
**take**   12:10
38:12 48:16
65:23 81:4
86:8 87:5
100:10,16
104:21 105:2
108:4 124:9
129:16,18
132:16 146:17
148:2 155:1
162:21 174:6
245:5,14
314:12 315:9
324:17 328:5
333:22 335:14
348:17 377:17
383:20 384:20
398:25 412:12
414:9

CONFIDENTIAL

**[taken - teachers]**                                                  Page 82

| | | | |
|---|---|---|---|
| **taken**  86:16 | **taxes**  74:1 | 176:11 177:5,7 | 293:19 294:2 |
| 122:24 152:2 | **teach**  176:9 | 177:22,24 | 299:10,20 |
| 152:24 153:10 | 177:5 190:12 | 178:8,17,21 | 300:4,10 301:5 |
| 162:25 234:23 | 193:6 197:1 | 179:1,8,14 | 301:16 302:5 |
| 285:17 315:14 | 216:24 229:21 | 180:6,7,18,22 | 303:8 305:4 |
| 383:24 415:16 | 230:7 257:8 | 183:13,16,16 | 313:20 314:7 |
| 417:6 | **teacher**  26:22 | 184:3,6,6,7,11 | 316:2,5 324:19 |
| **takes**  147:23 | 67:4,10,17,21 | 184:19 186:21 | 324:20 325:1 |
| 222:24 412:7 | 68:5 91:8,12 | 190:12,14 | 359:14,16,25 |
| **talk**  80:5 238:6 | 91:14,20,25 | 191:16 193:6,8 | 360:15 361:11 |
| 284:10 | 92:4,7,11,15,20 | 193:24 195:5 | 361:24 367:3,5 |
| **talked**  50:10 | 93:5,18,24 | 197:1,10,24 | 367:8,10,14,18 |
| 65:15 68:15 | 94:8,23 95:9 | 198:13 199:13 | 367:24 368:10 |
| 132:15 145:24 | 95:25 96:15,19 | 201:8,16,24 | 368:17 369:1,4 |
| 173:8 218:8 | 97:15 98:17 | 202:25 203:8 | 369:8,18 381:9 |
| 230:16 289:20 | 99:12 100:1 | 204:17 205:3 | 384:10,15 |
| 308:17 312:18 | 102:10 103:5 | 207:5,16,18 | 386:23 387:3 |
| 376:25 | 103:16,24 | 208:9,11,11 | 387:25 388:19 |
| **talking**  50:9 | 104:8 106:10 | 210:24 211:11 | 402:12,19 |
| 81:2 171:8 | 107:6,15 | 211:13 212:2,5 | 403:22 404:14 |
| 218:2,12 | 108:24 109:10 | 212:16 213:15 | 404:16 406:11 |
| 254:19 259:16 | 109:19,22 | 213:19 216:5 | **teacher's**  171:6 |
| 261:24 289:9 | 110:2,16,23 | 216:12 219:9 | 171:15 172:16 |
| 289:11 333:14 | 123:3,7 125:16 | 219:10,12,18 | 173:3 174:9 |
| 374:15 413:19 | 128:11 138:23 | 235:20,23 | 175:1,13 |
| **target**  257:10 | 139:15 141:3 | 237:6,21 245:7 | 193:22 197:3 |
| 257:11 | 147:23,25 | 245:16 246:24 | 201:9 236:9 |
| **task**  191:16 | 151:16,16 | 247:3,25 251:5 | 360:10 |
| **tasked**  128:19 | 160:3 165:24 | 253:18 254:22 | **teachers**  27:10 |
| 136:8 301:2 | 166:8,12,18 | 264:25 266:25 | 29:20 43:6 |
| **tasks**  227:17 | 168:17,18,24 | 272:24 273:13 | 57:19,21 86:24 |
| 228:3 | 170:3,10 | 276:2,9,12,17 | 87:12,19 88:15 |
| **tax**  232:23 | 171:24 173:13 | 277:1,17,18,24 | 91:7 93:12,17 |
| | 173:14 176:9 | 278:13,16 | 95:13,18 96:7 |

CONFIDENTIAL

**[teachers - testimony]**                                    Page 83

110:17 123:4
125:19,25
126:8,13,19
130:9 136:20
144:6,17 146:2
146:2 147:7
148:6,6 149:2
149:2,14,14
150:10,19
152:4,5,17,18
153:1,1,12,13
154:18,18
156:10,15
157:7,7 160:15
160:23 163:7
163:18 165:12
165:16,22
166:5 167:10
167:11,19,20
168:5,6,23
170:18,24
171:12,22
172:4,7 173:22
174:3,5 175:21
183:24 184:22
188:10,20
189:4,13
190:21,23
191:5,21
192:10,17,22
193:17 194:3
194:20 195:14
195:17,18
196:10,14

197:15,16,22
198:6,11 199:6
199:16,23
200:12,19
202:10,18
208:3,8,22
210:5 217:4
218:7,15,20,23
223:3 228:11
236:3,7 253:7
253:9 254:24
255:5 264:23
267:1 273:8,23
274:10 278:7
325:3 326:14
327:1,7,20
328:10 329:18
331:3 332:4,11
333:25 334:15
335:3 336:16
337:7 345:12
345:20 347:15
348:11,11
349:11,12,19
367:13,17,24
368:2,10,25
369:3 390:18
390:20 395:18
396:3 403:2,5
403:15,18
406:24 413:12
**teaching**
125:21 176:11
177:7 190:14

193:8 207:7
218:25 230:20
231:10 265:2
347:17 353:23
**tech** 3:9
**technical** 79:8
240:9 251:18
394:16
**technologies**
2:22
**technology**
229:24 230:10
230:23 231:12
**telephone** 47:3
**tell** 47:24 51:10
54:1 56:4,20
256:4 306:17
307:5,13
340:21 342:19
343:5 370:19
375:7 386:15
398:9
**telling** 79:21
295:15
**ten** 63:17 64:1
64:6,11,21
65:1,11 66:1,8
267:4 308:18
346:11 410:11
**tend** 260:25
**tendency** 265:8
**tenure** 72:13,17
**term** 79:9
239:16,17

271:15 272:5
280:23 311:10
**terms** 78:21
218:8,11
262:22 309:7
356:2 412:4
**test** 207:7,14,17
208:11 210:25
211:12 212:16
213:15 350:5
352:5 353:8,17
353:25
**testified** 9:25
76:25 77:1,2
**testifying**
304:12
**testimony**
32:15 37:6
42:2 56:9
64:15 101:1,5
101:9 105:12
106:14 107:2
107:12 138:11
138:22 139:13
140:10 142:1
142:20 160:22
195:22 209:10
251:12 283:19
283:23 285:2,7
286:2 287:5,23
287:24 288:4
290:25 291:9
292:5 304:9
309:3 311:24

CONFIDENTIAL

**[testimony - tiktok]**

312:15 313:21 314:8 320:13 341:9 342:24 344:7 379:5 382:16

**tests** 352:14

**texas** 4:4,6

**text** 144:7,18 229:5 397:6 410:16

**texts** 146:5

**tgraden** 2:6

**thank** 11:24 61:19 415:21 416:11

**thing** 32:16 35:9 73:20,25 142:25 175:7 177:1 181:25 185:7 207:15 216:15 224:3 236:4 240:9 255:9 258:8 265:9 268:11 278:1 304:15 309:10 313:22 314:9 317:11 318:13,25 319:7 326:7 327:22 349:17 404:5 413:14 414:17

**things** 18:19 36:12 72:12

73:5 74:11,12 78:10 160:7 163:14 183:12 183:23 186:25 186:25 192:12 192:24 193:10 194:5,22 196:7 196:13 217:7 238:9 257:24 269:7 274:18 283:8 289:19 292:25 302:16 302:19 314:12 319:2 327:15 347:13 352:2 408:24

**think** 18:2 19:6 19:12 27:7 32:20,21 33:3 53:17,23,24 60:11 65:22 71:13 72:1 73:6,13 74:8 78:2,11 79:18 81:17,18 82:8 82:17,25 83:5 84:11 101:3 109:14 110:9 121:13 122:23 122:24 127:3 130:1,8 136:13 136:14 138:3 142:5 160:8,10 161:9 164:6

169:20 172:12 177:2,3,10,11 182:25 192:5 198:3 205:7 216:18 220:14 226:20 233:7 235:9 237:2,13 239:17,23 241:3 242:13 243:10 248:22 256:25 257:9 261:17 263:6 269:18 271:2 272:21 273:11 276:11 281:19 284:8 285:4 291:4 293:23 293:25 304:23 325:7 326:2 327:25 328:13 330:8,9 343:20 345:9 350:3 355:25 356:9 359:3 362:6 363:18 365:11 382:3 383:10 395:10 400:24 405:11,11 412:9 413:17 414:13,16

**thinking** 35:11 127:21,23 128:1,5,7 131:12 353:19

362:10

**thinks** 123:13

**third** 144:8,19 146:6,21 147:9 330:22

**thirty** 418:15

**thought** 35:2 35:24 44:17 65:7 120:19 129:6 130:2,5 274:24 294:8 359:7

**three** 18:7,9,16 18:17 20:13 73:10 104:2,5 104:15 125:14 326:22 328:7 328:15 329:15 330:25 331:9 331:15 333:23 334:7,9 360:3 360:17 361:5 361:24 362:2 375:17 376:7 376:14 377:12 377:14 378:8

**throwing** 160:6

**thursday** 26:9 27:18 69:13

**tiktok** 4:12,12 4:12 81:19 88:17 89:2 90:7 126:2 130:12,15

CONFIDENTIAL

**[tiktok - time]**                                                      Page 85

| | | | |
|---|---|---|---|
| 307:8 356:24 | 106:2,19 107:3 | 149:25 150:9 | 191:5,16,21 |
| 357:3 358:11 | 107:21 108:2,4 | 150:18 151:2 | 193:8,18 194:3 |
| 409:24 410:2 | 108:11,18,23 | 151:17,19,22 | 194:20 197:3 |
| 416:10 | 108:24 109:4 | 152:4,18,20,25 | 199:11,23 |
| **time** 9:6 10:17 | 109:10,19,22 | 153:12 154:19 | 200:12,25 |
| 26:23 32:17 | 110:2,16,16,20 | 154:19,22 | 201:9,24 |
| 48:12 54:7 | 111:6,17 112:1 | 155:3 156:10 | 202:10,18 |
| 56:3,14 57:19 | 112:5,12,13,14 | 156:15,19 | 204:4,12 |
| 57:21 58:2,4,5 | 112:20,21,22 | 157:8,8,10,19 | 205:13,25 |
| 58:17,21 61:10 | 113:1,4,5,6 | 158:4,14 159:2 | 206:9,17,25 |
| 61:12,21,22,25 | 118:18,25 | 159:5,16 160:3 | 207:6,12,20,21 |
| 62:2,19 63:3,4 | 119:11,24 | 160:15,24,24 | 208:4,9,13,15 |
| 63:9,13,20 | 120:15,25 | 160:25 161:4,7 | 208:24,25 |
| 64:16 66:25,25 | 122:13 123:3,7 | 161:24 162:25 | 209:15 210:6 |
| 67:4,10,17,21 | 125:16,21,22 | 163:6,20,20,23 | 210:10,19,21 |
| 68:6,18 70:1,5 | 126:8 128:11 | 165:1,8,21 | 211:2,9,11,14 |
| 71:24 72:3,12 | 128:12,19,25 | 166:5,17 170:5 | 211:19,20,22 |
| 79:13 85:19 | 129:16,24 | 170:7 171:13 | 212:2,6,10,12 |
| 86:16 87:1,13 | 131:12,17 | 173:22 176:11 | 212:20 213:8 |
| 87:20 88:16 | 132:16,23 | 177:6,12,22 | 213:18 214:1,4 |
| 89:17,21 90:1 | 133:1,13,17,19 | 178:5,8,21 | 214:6,9,11,13 |
| 90:21 91:4,8 | 133:22 134:12 | 179:1,7,9,14,23 | 214:20,23 |
| 91:12,20,25 | 134:19,24 | 180:6,7,18,22 | 215:4,6,12,17 |
| 92:4,7,11,15,20 | 135:15 136:3,8 | 181:9,18,19,23 | 215:18,20,24 |
| 93:5,18,24 | 136:21,25 | 182:1,9,22 | 217:5,8,11,14 |
| 94:8,23 95:9 | 138:23 139:15 | 183:6,8,13 | 217:17,23 |
| 96:7,15,16 | 140:20 141:3,4 | 184:4,11,19,21 | 218:7 219:9,10 |
| 98:20 99:14,22 | 144:5,16,25 | 185:2,13,19,21 | 219:12,18,21 |
| 100:7,11,17 | 145:12,16,19 | 186:16,20,21 | 220:7,9 221:10 |
| 101:7,14,17,24 | 146:3,3,7,12,12 | 187:4,5,13,23 | 221:12,13 |
| 102:3,19 103:2 | 146:14,19,19 | 187:24,25 | 222:22 223:1,8 |
| 103:25 104:4 | 147:7,23,25 | 188:1,4,10,16 | 223:13,16 |
| 104:14,22 | 148:7,7,10,19 | 188:20 189:4 | 225:22 226:3 |
| 105:3,11,16,24 | 149:3,3,6,15,15 | 190:9,14,23 | 226:15 227:3 |

CONFIDENTIAL

**[time - today]**                                                     Page 86

| | | | |
|---|---|---|---|
| 227:15,25 | 288:22 289:6 | 335:2 336:4,15 | 399:3,12,22 |
| 228:11,25 | 290:6 291:6 | 337:7 342:2 | 400:9 401:11 |
| 229:19 230:5 | 292:20 293:2,5 | 345:20,23,25 | 404:1,4 407:11 |
| 230:15,19 | 293:12,14,18 | 349:18 354:16 | 407:20,23 |
| 231:8,9,17,23 | 294:1,3,8,10,16 | 354:23 355:10 | 408:2,12,16 |
| 233:4,10 | 298:3,21,25 | 355:14,15,24 | 410:6 412:7,11 |
| 234:23 235:20 | 299:11,21 | 356:15,21 | 413:12 415:16 |
| 235:23 236:9 | 300:4,7,10,11 | 357:2,8,14,21 | 415:22 416:13 |
| 236:12 237:6 | 300:19,25 | 358:2 362:7,10 | **times**  10:10 |
| 237:11,21 | 301:5,6,16,17 | 362:11,17 | 79:11,24 111:2 |
| 241:7 245:7,16 | 302:5,6,14,21 | 367:5,10,14,18 | 175:18 235:10 |
| 246:1,25 247:3 | 303:8,10,21 | 367:25 368:11 | 379:11 387:4 |
| 251:5 253:18 | 304:9 305:10 | 368:17 369:1,4 | 400:14 |
| 253:20 254:22 | 310:4,4,6 | 369:7,9,17,18 | **timing**  203:21 |
| 254:24 255:4 | 312:17,18,21 | 369:24 372:3 | **tired**  189:14,21 |
| 256:25 262:12 | 312:24 313:10 | 372:23 373:1 | 190:3,16 191:6 |
| 262:18,21 | 313:20 314:7 | 373:16 374:8 | 191:22 222:16 |
| 263:2,19,22 | 314:14 315:14 | 374:18,22 | 225:10 |
| 264:23 265:11 | 315:20 316:1,2 | 375:24 376:1,4 | **tiredness**  190:9 |
| 265:20 266:3 | 316:5,11,25 | 377:18 378:25 | 190:24 |
| 266:10,18,25 | 317:1,14,19 | 379:2,9 380:2 | **title**  119:14 |
| 267:1,12,23 | 318:3,5,17,20 | 380:8,12 381:8 | 120:14,16,19 |
| 268:5,23 269:2 | 319:10,13,24 | 382:5,17 383:6 | 120:20 |
| 269:2,9,21 | 319:25 320:2 | 383:24 384:9 | **titled**  20:13 |
| 270:1,13,22 | 320:23 321:4,7 | 384:10,14,16 | 37:3 363:8 |
| 271:9,20 272:7 | 321:16,20,23 | 386:22,23 | **titles**  118:21,24 |
| 272:7,18 | 322:6,9 323:15 | 387:2,10,25 | 120:17 121:1,2 |
| 273:12 274:1 | 324:19 325:1,1 | 388:9,20 389:5 | 121:8,10 |
| 274:11,13 | 325:2 326:15 | 389:11,19,24 | 363:14,21 |
| 278:16,17,19 | 327:1,8,20 | 390:5,23 | **today**  10:8 12:6 |
| 279:1,3,5,12,17 | 328:11 329:18 | 393:13 394:2,3 | 47:23 50:22 |
| 279:19 282:10 | 330:14 331:3 | 394:3,20 | 51:9 69:11,24 |
| 282:11 286:15 | 332:5,8,11,19 | 395:18 396:1 | 70:3 78:1 |
| 286:24 288:11 | 333:1 334:1,15 | 398:14,22 | 138:12 222:13 |

CONFIDENTIAL

**[today - tucson]**

270:18 309:1
330:16 331:11
368:2 386:14
401:13 402:5
415:22
**today's** 9:5
416:17
**together** 27:3
271:7 289:19
399:6,12 413:8
**told** 49:14
50:19 67:25
109:21 129:23
130:9 365:15
398:7,13
**tolles** 3:2
**tomorrow**
166:24 222:15
**ton** 63:8
**took** 131:2
298:6,12 337:2
370:3 371:15
373:2 407:23
408:16
**tool** 54:24
**top** 19:11 23:4
25:10 50:11
51:4 77:4
121:17 237:14
251:23 290:16
307:6,14 309:4
354:11 370:19
371:10 401:4
401:22 403:11

**topaz** 1:17 2:2
9:9 55:21,23
56:1
**topic** 234:16
**total** 27:13
59:17,23 60:7
62:5,14 70:1
221:16 270:1
328:7 332:18
332:24 333:3,9
356:6 357:22
392:11 396:22
399:9,13,14,15
400:1,13,15,18
400:24 401:9
416:13
**totals** 400:12
**towards** 293:15
**toys** 175:16
**track** 72:13,18
**tracking**
289:15
**trained** 276:23
**trainer** 413:11
**trainers** 413:4
**training** 276:9
413:13
**trajectory**
271:20
**transcript**
417:8,22
418:16,17
**transcription**
420:5

**treatment**
232:24
**trends** 352:4
**trial** 77:3
**tried** 160:8
**trip** 265:4
**true** 204:23
215:3 235:22
243:1 245:3,23
255:7 256:2
261:25 262:2
263:21 303:5
306:4,7,10
311:14 325:18
374:7,21 375:5
376:9
**trust** 25:11
31:25 62:9
129:19 130:6
243:5 248:12
274:23 313:14
398:8,9
**trusted** 49:16
100:14 115:5
141:22 252:10
287:3,6 291:16
**trusting** 112:25
291:25
**trustworthy**
292:11
**truth** 255:11
258:11 324:4
375:8,12

**truthful** 142:6
**try** 186:24
224:13 308:13
375:11
**trying** 76:3
81:1 182:12
183:9 209:25
217:1 219:3
247:8 265:7
271:19 320:16
331:21 340:2
344:19 347:16
350:5 352:23
362:6 413:5
**tucson** 5:16,24
6:19 14:4,8,13
16:15,18 17:6
40:16,20 99:14
99:20 114:10
114:11 284:20
285:1 286:8
326:19 362:20
363:6,24 364:9
365:7 367:4,9
367:13,18
369:8,18,25
370:23 371:9
371:19 375:16
378:16 379:14
379:15 381:9
381:14,21
404:16 405:7
405:17 406:8
406:10,14

CONFIDENTIAL

**tumblr** 83:11 83:13

**turn** 124:22 125:12 163:23 384:5,22 386:19 392:18 392:20 398:19 402:15

**turns** 28:10

**tv** 190:4

**twelve** 70:4

**twenty** 326:22

**twitch** 83:15,17 408:25

**twitter** 81:25 82:2,14,18 127:24 360:4 360:18,23,24 409:2,4,6

**two** 2:17 23:12 24:4 64:2 90:17,20 147:20 293:23 341:24 361:6 370:2,8,10 372:8,14 373:1 373:6,14,17 374:10,16,24 374:24,25 377:24 378:7 387:24 388:18 399:5 400:14 400:19

**tyler** 2:3 30:18 69:15

**type** 75:5,20 240:3,8 252:13 259:16 277:25

**typed** 48:21 49:9,9,10

**types** 58:18 122:25

**typical** 119:18 262:11,17,25 263:8,13,20,24 264:5,7,24 265:19 266:1,2 266:8,16 267:2 267:13,25 359:15 360:1 360:16 404:1

**typically** 64:24 74:4,21 75:9 78:19 119:3 165:20 232:12 262:24 264:20 282:16 293:22 345:17

**typo** 17:20,25 35:15 391:14

**typos** 35:6

**u**

**u.s.** 351:16,21 352:8,14

**uh** 19:3 125:17 328:17 329:21

**uk** 334:12,14 342:6

**ultimately** 81:12 97:9 98:14 160:11 182:3 243:25 283:2 293:3 295:11 305:5 332:9 344:23

**unable** 395:11

**unauthorized** 125:25 126:9 207:19,20 208:12 211:1,3 228:12 273:24 274:11

**uncover** 375:12

**under** 18:8,16 141:12 143:21 209:10 283:20 288:3 291:21 385:1 417:23

**underestimated** 325:2

**underrepresent** 258:22

**understand** 10:18,19 17:4 18:24 57:1,10 57:15 76:4 99:3 124:25 125:7 126:7 132:24 135:21 136:1 138:18

144:1,1 177:6 180:10 186:13 201:8 210:1,7 236:22 249:15 257:20 259:22 264:4 271:19 271:24 282:18 283:2,6,8 329:5 344:20 370:21 371:25 372:11 406:17 406:20

**understanding** 30:1 57:6 83:1 122:10,16,21 125:10 128:17 128:17 136:6 143:4,11 173:3 174:2 176:23 182:14 185:16 218:6 219:7 222:20 247:9 271:15 293:1 302:20 310:15 310:22 317:14 317:18 325:11 406:22

**understands** 176:10 190:13 193:7 197:2 205:12 241:8 283:10

**understood** 143:7,14,18,25

CONFIDENTIAL

**[understood - using]**                                        Page 89

| | | | |
|---|---|---|---|
| 209:14 287:25 | 108:12,19 | 267:12,24 | 286:23 287:9 |
| **unfortunately** | 109:15 110:10 | 268:23 273:24 | 299:21 311:19 |
| 348:25 | 113:2 119:21 | 274:2,11,14 | 330:15,17 |
| **union** 345:11 | 126:1,10 129:1 | 298:22,25 | 339:6 344:18 |
| **unit** 219:10,12 | 130:3 133:14 | 304:15 312:20 | 347:13 365:12 |
| **united** 1:1 9:14 | 133:18,19 | 318:14 319:12 | 366:6,10,12 |
| **units** 282:18 | 138:24 139:8 | 319:20 330:21 | 391:19 392:4 |
| **university** | 139:16 143:1 | 334:16 346:7 | 393:1,6 395:13 |
| 71:15,18,21,24 | 148:8,19 | 346:24 347:3 | 396:16 397:2 |
| 72:7,14,18 | 151:17 152:19 | 349:22 350:10 | 404:14 409:3 |
| **unknown** 375:6 | 154:20 155:4 | 350:19 351:5 | 410:1,5 411:5 |
| 375:9 | 155:13,23 | 351:11,12 | 418:18 |
| **unquote** 404:3 | 161:5,6,13,15 | 359:16 360:2 | **useful** 53:25 |
| **unrealistic** | 161:16,18,25 | 360:16 361:20 | 237:12 347:9 |
| 224:14 | 162:2,4,9,14 | 382:6 408:19 | 413:8 |
| **unreasonable** | 165:23 166:6 | 409:2,6,9,11,12 | **usefulness** |
| 321:15 378:1,5 | 166:19 169:8 | 409:18,20,22 | 109:17 |
| **unreliable** | 183:6 185:3 | 409:24 410:12 | **user** 410:4 |
| 241:1 242:12 | 186:23 207:19 | **used** 20:8 23:23 | **using** 24:17 |
| 343:21,23 | 207:21 208:6 | 24:12 29:24 | 35:20 36:4 |
| 344:4 | 208:12,14 | 54:2,14 55:2,5 | 54:5,7 55:11 |
| **upper** 253:18 | 211:1,3 216:1 | 113:20 118:24 | 68:21 81:10 |
| **url** 329:1,7,24 | 217:13,17,19 | 120:14,19 | 94:9 109:9 |
| **usable** 247:21 | 222:24 227:1,4 | 121:10 143:8 | 110:1,15 111:1 |
| **use** 24:10 53:10 | 228:12 229:24 | 143:15 144:2 | 116:7,10 121:2 |
| 53:16,21 54:9 | 230:10,23 | 145:13 155:13 | 133:11 147:20 |
| 54:11,24 55:13 | 231:13 233:11 | 170:6 171:25 | 210:19 227:5 |
| 82:7 89:12 | 237:12 244:6 | 175:15 229:21 | 236:8 272:23 |
| 90:6,23 91:5 | 248:17,18 | 230:7 241:20 | 273:12 290:3 |
| 95:16,20 96:9 | 249:4,19 | 248:24 250:9 | 311:10 360:4 |
| 97:7 101:25 | 250:11 251:16 | 262:7 268:4,22 | 360:18 361:12 |
| 102:4,21 | 254:25 255:3,5 | 271:10 272:9 | 361:13 362:1 |
| 105:25 106:3 | 262:22,24 | 272:10,13,18 | 393:12 394:23 |
| 106:21 108:3 | 263:19 267:3 | 285:13 286:14 | 404:8 |

CONFIDENTIAL

**[usual - wages]**                                                    Page 90

**usual** 238:9 262:24 263:24 265:1 266:2 270:3 271:24

**usually** 119:5 120:9 235:11 238:15 252:14 264:1,13

**v**

**vacations** 264:10,14

**vague** 51:3,16 173:25 179:4 179:17 194:10 199:9 200:5 202:2 207:24 211:16 214:18 215:9 216:8 225:1 226:18 228:17 233:16 233:25 234:10 237:9 238:24 239:10 240:16 274:6 276:6 277:22 284:6 295:25

**vaguely** 74:2

**validate** 100:11 100:17 104:22 105:3 120:23 121:6 241:13 241:17 270:11 270:21

**validity** 238:7

**valuable** 216:22 217:14 217:24 218:4,8

**value** 27:2,13 57:18,20 58:4 66:25 145:3 170:7,8 178:7 178:20 179:1,6 179:13,20 180:5,18,22 181:4,12,19,20 182:1,8,13,13 182:16 183:3,8 183:10 184:13 184:17 186:3 186:21 187:1 187:15,22 188:3 215:17 217:3,5 218:9 218:12,19,23 219:2,8,17 221:11 223:10 227:6 234:7 269:19 310:6 312:17,21 314:13 325:18 396:24

**valued** 215:21 222:1

**valueless** 216:21

**values** 29:24 186:19

**valuing** 187:23 188:1,1 215:14

**variable** 18:9 18:20 19:2

**variance** 257:7 325:14 326:1

**variation** 257:21 297:16 378:14,24 379:23 380:1 380:12

**various** 58:18 69:25

**vauss** 384:11 384:17

**veracity** 283:22

**verify** 287:9 397:23

**veritext** 9:4

**vested** 347:16

**vice** 32:21 119:6

**video** 9:7 86:14 86:19 151:11 151:12 162:23 163:3 190:4 214:8,15 234:21 235:1 315:12,17 383:22 384:2 409:16 410:22 415:14,19 416:17,18

**videographer** 3:8 9:1,3 86:13 86:18 162:22 163:2 234:20 234:25 315:11 315:16 383:21 384:1 415:13 415:18 416:7 416:11,13

**videos** 85:4 144:8,19 146:5 149:4,16 150:1 409:10,14 410:25 411:2

**videotaped** 1:16

**vince** 3:9

**volunteers** 411:21 412:6,8

**voted** 260:12 260:21 261:1,3 261:13

**vouching** 292:19,23

**w**

**wage** 116:9 183:8 188:2 215:19,22 219:15 221:12 222:1 393:24 394:18

**wages** 19:14 116:10,18,21

CONFIDENTIAL

**[wages - witness]**

117:1,7,13
166:11 167:24
168:11 185:11
185:14 186:23
187:5 217:8
219:18 220:3
223:11 235:17
394:12,25
396:22,23
398:4
**wait**   10:14
66:15
**waiting**   414:15
**walk**   309:22
**want**   34:23
38:12 57:11,12
72:11 75:13
87:5 91:1
113:11 161:23
174:18 175:25
186:13 220:17
222:3,6 224:10
246:8 264:18
283:2,6 361:3
409:15 414:19
416:1
**wanted**   45:12
89:10 90:4
137:22 159:8
162:12 218:21
264:17
**wanting**   76:2
**wants**   197:24
198:13

**ward**   1:16 5:3,7
6:21 9:17,23
10:3 11:4,19
12:21 13:9,21
14:8,24 15:8
15:17 16:1,10
16:19 20:25
21:10,20 22:4
22:14 30:12,16
37:23 39:2,13
39:24 40:10,21
52:16,17,20
53:3,6 60:17
60:17,21 86:21
124:15,19
128:9 129:10
133:6 135:10
135:10 136:14
136:19 142:3
163:5 198:10
210:12 235:3
335:18,22
339:8 340:12
340:21 346:14
348:21 384:4
387:18,22
388:24 415:21
420:2
**ward000001**
6:20 60:16
**wars**   353:7
**washington**
2:12 3:4

**watching**   190:4
**watts**   395:20
395:25 396:6
**way**   47:2 49:20
50:7 57:22
81:2 98:7,12
120:12 160:9
181:7 185:7
197:14 207:5
212:19 213:18
216:24 217:2
223:7 232:21
233:12 253:8
257:8 281:7
282:3,5,8,14,21
303:24 306:23
307:18 313:8
330:9 331:19
336:23 339:2,8
340:14 342:8
369:2 374:6,21
400:17
**ways**   243:17
274:21
**wc.com**   2:13,13
**we've**   31:8
134:6 161:19
163:12 184:1
220:14 226:19
231:18 292:25
355:10 361:1
376:24
**website**   341:20
341:20

**websites**
314:18,19
**wednesday**
24:24 30:7
69:12
**week**   264:1,2,7
264:8 270:2,3
**weeks**   264:9,15
**weight**   344:14
**weird**   181:1
**welcome**
142:22
**went**   32:14
33:10 46:23
128:22 133:23
167:14 169:20
170:15 172:3
274:20 285:19
413:20,20
**whatnot**   376:1
**whatsapp**   84:2
84:5
**wider**   244:18
**wife**   52:18 53:6
59:5,12 62:2
70:17,24 71:3
71:8
**william**   3:8 9:2
**williams**   2:10
**willing**   277:15
379:16
**winner**   271:12
**witness**   5:2 8:4
9:21 34:14,21

CONFIDENTIAL

**[witness - witness]**

| | | | |
|---|---|---|---|
| 35:23 38:3,9 | 147:1,13 | 210:14 211:17 | 281:25 283:17 |
| 44:5 45:15 | 148:13,24 | 212:10,24 | 284:7 286:18 |
| 47:10 48:21 | 149:10,20 | 213:25 214:19 | 287:12 288:15 |
| 50:18 51:4 | 150:5,14,24 | 215:10 216:11 | 289:1 290:10 |
| 54:18 55:10 | 151:21 152:10 | 217:22 220:14 | 291:15 292:4 |
| 56:9 59:21 | 153:6,17 154:2 | 221:6,22 | 293:8 294:19 |
| 60:11 61:15 | 154:14 155:9 | 223:22 225:2 | 295:9 296:1,12 |
| 66:12 69:1 | 155:20 156:5 | 226:8,19 | 296:22 297:7 |
| 75:3 76:9,13 | 157:4,15,25 | 227:21 228:18 | 299:4,17 |
| 76:24 77:7 | 158:10,21 | 229:8 230:2,12 | 300:15,23 |
| 82:12 83:4 | 159:16,22 | 231:2,16 232:6 | 301:13,24 |
| 85:7 87:23 | 163:12 164:2 | 232:20 233:17 | 303:4,16 |
| 88:10,21 89:6 | 167:5 171:3,20 | 234:1,11 | 304:23 305:16 |
| 90:12 91:17 | 172:9,22 174:1 | 236:19 237:10 | 306:6 307:5,24 |
| 92:23 93:20 | 174:14 175:6 | 238:25 239:11 | 309:4,20 311:2 |
| 95:1 96:22 | 175:19 176:16 | 240:2,17 241:5 | 312:1,16 |
| 97:18 100:4 | 177:10 178:4 | 241:16 242:4 | 313:25 314:11 |
| 102:16 103:8 | 179:5,18 | 244:3,16 | 314:23 316:18 |
| 103:19 104:11 | 180:11 181:15 | 245:20 248:5 | 317:7 318:10 |
| 104:19 105:20 | 183:20 184:10 | 249:8,23 250:6 | 318:24 319:18 |
| 107:19 109:3,6 | 187:21 189:9 | 250:22 251:13 | 320:14 322:4 |
| 110:6 115:5,15 | 189:19 190:7 | 252:10,24 | 322:17 323:3 |
| 118:13 123:11 | 190:20 191:13 | 253:14 254:8 | 323:22 331:8 |
| 124:6 128:4,16 | 192:2,16 193:2 | 255:20 256:14 | 333:19 339:13 |
| 129:15 130:4 | 193:15 194:11 | 259:6,19 260:3 | 341:10 342:25 |
| 130:18 131:21 | 195:1,11,23 | 260:16 261:7 | 343:10 344:8 |
| 132:14 133:10 | 196:22 197:8 | 265:6,23 267:7 | 350:1 351:8 |
| 134:3,6,17 | 198:3,18 | 273:4,18 274:7 | 353:12 354:3 |
| 135:4,21 137:5 | 199:10 200:6 | 274:17 275:8 | 355:21 358:20 |
| 138:17 139:3 | 200:24 201:14 | 275:21 276:7 | 359:22 360:8 |
| 139:20 140:14 | 202:3 203:4,20 | 277:5,23 | 360:22 361:17 |
| 141:10 142:17 | 204:23 205:7 | 278:11,21 | 364:2,12 |
| 143:24 144:12 | 205:18 207:11 | 279:8,25 | 366:10,22 |
| 144:23 146:10 | 207:25 208:19 | 280:21 281:10 | 368:6,13 370:7 |

CONFIDENTIAL

**[witness - yeah]**                                                            Page 93

| | | | |
|---|---|---|---|
| 372:21 373:11 | 70:13 72:22 | 376:5,6 | **write** 45:16 |
| 373:21 374:13 | 73:2,12 74:18 | **worker** 205:11 | 66:12 75:17 |
| 375:4,21 | 74:19 75:2,5,6 | **workers** 165:13 | 131:11 262:9 |
| 376:18 377:19 | 75:7,10,20,21 | 165:13,16,17 | **writes** 389:16 |
| 379:6 380:5,17 | 76:18 77:6,22 | 166:14,14 | **writing** 34:23 |
| 381:4 382:13 | 78:6 123:2 | 388:14 | **written** 29:6,7 |
| 383:5,15 | 164:12,19 | **working** 62:20 | **wrong** 27:3 |
| 385:15 392:4 | 183:2 221:16 | 64:17 65:18 | 28:13 32:11 |
| 392:15 394:10 | 222:16 223:23 | 66:3 79:19 | 36:15,16 |
| 397:14 401:19 | 243:18 246:18 | 224:5,6,9,11 | 258:22 392:5 |
| 405:25 407:15 | 264:1,2,7,8,19 | 269:3 271:10 | **wrote** 334:19 |
| 408:16 415:23 | 264:20 269:17 | 308:11 411:20 | 415:9 |
| 418:1 | 269:18,25 | **works** 96:13 | **x** |
| **witnesses** 101:2 | 270:11,20 | 220:23 221:1 | **x** 5:1,5 54:13 |
| 314:2 | 271:20 278:4 | 320:16 | 81:25 82:2 |
| **women** 271:21 | 279:14 297:24 | **workweek** | **xlsx** 18:6 |
| 272:1 | 302:18 304:17 | 264:11 | **y** |
| **won** 261:2 | 353:5,15,22 | **world** 28:7 | **yeah** 12:10,13 |
| **word** 289:24 | 375:17 399:6 | 172:3 188:11 | 27:12 32:20,23 |
| **worded** 254:15 | 414:7 415:5 | 188:13 191:8,9 | 36:6 37:19 |
| 255:17,22 | **workday** 181:9 | 194:6,7 200:1 | 38:9 43:2 |
| 257:1 | 233:5,10 | 200:2 202:12 | 44:13,17 46:9 |
| **wording** 98:23 | 322:13,23 | 202:13 204:5,6 | 49:1 55:12 |
| 129:4 | **workdays** | 206:2,3,18,20 | 56:18,24 57:11 |
| **work** 34:2,2,9 | 199:6 270:6 | 228:10,20,25 | 57:25 58:15,16 |
| 35:21 36:7 | **worked** 61:13 | 229:11 245:24 | 58:25 63:7 |
| 52:9 53:11 | 61:23 64:6 | 263:24 312:22 | 66:17 69:25 |
| 54:3 55:16 | 77:18 268:11 | **worry** 219:1 | 75:19 76:5 |
| 56:21 57:8,14 | 268:20 269:13 | 240:4 | 79:18 82:2,21 |
| 58:8,11 59:2,6 | 270:2,3 271:24 | **worrying** | 94:11 96:13 |
| 59:18 60:8,22 | 272:12 301:7 | 240:21 | 123:23 127:4 |
| 61:1,7 62:7,12 | 304:20 308:15 | **worse** 85:25 | 127:25 131:21 |
| 62:15 64:13,23 | 308:17,20 | **wound** 386:5 | 139:20 144:4 |
| 65:9,13 66:8 | 375:15,22,23 | | |

CONFIDENTIAL

**[yeah - zoom]**                                                Page 94

| | | |
|---|---|---|
| 157:4 161:20 | 28:9,13,14,15 | 307:7 356:12 |
| 166:16 167:22 | 28:18 31:12 | 356:16 357:19 |
| 170:3 172:9,24 | 32:10,18 49:5 | 409:9,11,11,12 |
| 174:1 176:22 | 49:9,10 59:16 | 409:15,17 |
| 180:11,25 | 59:24 60:2,7 | 410:22,25 |
| 184:2 186:6 | 62:15 76:21 | 411:3,5 415:22 |
| 192:18 196:10 | 95:14 267:4 | 416:15 |
| 213:10 214:2 | 268:15 269:15 | **yup** 12:18 13:6 |
| 222:13 231:3 | 351:2 363:8,11 | 13:15,18 64:19 |
| 241:16 245:1 | 390:14 393:9 | 125:23 215:10 |
| 248:9,12 254:1 | 393:25 395:2 | 236:1 248:7 |
| 254:1 256:17 | 404:9 410:14 | 262:14 308:22 |
| 260:6,23 | **years** 25:25 | 328:21,24 |
| 261:17,17 | 26:1,2 28:5 | **z** |
| 264:16,18 | 29:17 73:1,10 | |
| 265:6 268:22 | 73:10,14,21 | **zachary** 3:14 |
| 271:2 278:1 | 74:10 76:19 | **zbower** 3:16 |
| 282:6 286:11 | 170:15 192:22 | **zero** 159:5 |
| 289:18 293:22 | 267:4,4,5,14,25 | **zoom** 2:4,4 |
| 294:19 308:19 | 268:6 269:3 | 415:24 416:8 |
| 308:19 316:2,3 | 270:13,22 | |
| 318:24 327:10 | 271:10 272:12 | |
| 334:21 339:24 | 272:18 395:4,7 | |
| 347:8,8,25 | **yeates** 2:4 | |
| 348:4 349:4,7 | 69:17 | |
| 355:25 356:4 | **yesterday** | |
| 365:4 374:1 | 69:18 | |
| 389:8 392:15 | **ygr** 1:5 | |
| 392:16 393:9,9 | **youtube** 2:14 | |
| 400:10,23 | 10:6 81:23 | |
| 401:6,11 | 87:21,23 88:4 | |
| 405:11 414:19 | 88:7 89:12 | |
| **year** 18:17 | 126:3,11 | |
| 27:14 28:8,8,8 | 130:12,16 | |

Golkow Technologies,
877-370-3377             A Veritext Division             www.veritext.com