**Exhibit 61**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT    )
ADDICTION/PERSONAL INJURY         ) MDL No.
PRODUCTS LIABILITY LITIGATION     ) 4:22-md-3047-YGR
_____)

THIS DOCUMENT RELATES TO:         )
                                  )
BOARD OF EDUCATION OF HARFORD     )
COUNTY V. META PLATFORMS INC.,    )
ET AL.                            )
                                  )
CASE NO.: 4:23-CV-03065           )

VIDEOTAPED DEPOSITION BERNARD HENNIGAN
Harford County Public Schools Central
Administration Building
102 South Hickory Avenue,
Bell Air, Maryland
Wednesday, May 7, 2025, 2:21 p.m.

Page 2

APPEARANCES:
For Plaintiff:
          BY: MATTHEW P. LEGG, ESQ. (VIA ZOOM)
          Brockstedt Mandalas Federico LLC
          2850 Quarry Lake Drive - Suite 220
          Baltimore, Maryland 21209
          410.421.7777
          mlegg@lawbmf.com

For Plaintiff:
          BY:  KENNETH S. BYRD, ESQ.
          BY:  KELLY McNABB, ESQ. (VIA ZOOM)
          Lieff Cabraser Heimann & Bernstein
          250 Hudson Street, 8th Floor
          New York, New York 10013
          212.355.9500
          kbyrd@lchb.com
          kmcnabb@lchb.com

For the Defendants Meta Platforms, Inc., f/k/a
Facebook, Inc.; Facebook Holdings, LLC; Facebook
Operations, LLC; Facebook Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC; Siculus, Inc.;
and Mark Elliot Zuckerberg:
          BY:  SCOTT JAMES, ESQ.
          BY:  EBEN S. FLASTER, ESQ. (Philadelphia)
          BY:  RANA FREEMAN, ESQ. (VIA ZOOM)
          Shook, Hardy & Bacon LLP
          JPMorgan Chase Tower
          600 Travis Street, Suite 3400
          Houston, Texas 77002
          713.227.8008
          sjames@shb.com
          eflaster@shb.com
          rfreeman@shb.com

          (Appearance continued on next page.)

Page 3

APPEARANCES CONTINUED:

For the Defendant Snap:

BY:  ALEX INGOGLIA, ESQ. (VIA ZOOM)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
312.862.1083
alex.ingoglia@kirkland.com

For the Defendants Alphabet Inc., Google LLC, and
YouTube LLC:

BY:  J. ANDREW KEYES, ESQ.
BY:  LYDIA WEIANT, ESQ.
Williams & Connolly LLP
680 Maine Street SW
Washington, DC 20024
202.434.5584
akeyes@wc.com
lweiant@wc.com

For the Defendants TikTok, Ltd.; TikTok, LLC;
TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:

BY:  ADAM REINKE, ESQ. (VIA ZOOM)
King & Spalding LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
404.572.2774
areinke@kslaw.com

Also Present:  Bradley Loy, Videographer
Jacob Arndt, Exhibit Technician
Lauren R. Drive, Deputy General Counsel
Harford County Public Schools

Page 4

I N D E X

                                                    PAGE

EXAMINATION BY MR. KEYES                               5
EXAMINATION BY MR. BYRD                              126
EXAMINATION BY MR. KEYES                             141


                    E X H I B I T S


NUMBER                  DESCRIPTION                 PAGE


EXHIBIT 1    Resume of Bernard Hennigan               8

EXHIBIT 2    Plaintiff Board of Education            47
             of Harford County's Amended
             Objections and Responses to
             Defendants' Interrogatories
             (Set 3)

EXHIBIT 3    2021-2022 Maryland YRBS/YTS             64
             Adverse Childhood Experiences
             Overview, July 17, 2023

EXHIBIT 4    Emails dated 4/21/21, Subject:         102
             MSDE Report, Bates
             HCPS_00199774-777

EXHIBIT 5    Document titled Mental Health          106
             Statistics and Initiatives in
             HCPS

Page 5

P R O C E E D I N G S

* * *

THE VIDEOGRAPHER:  We are now on the record.

My name is Bradley Loy.  I'm a videographer for Golkow, a Veritext division.

Today's date is May 7th, 2025.  The time is 1421.

This video deposition is being held in Bel Air, Maryland, in the matter of Social Media Adolescent Addiction/Personal Injury Products Litigation for the U.S. District Court, Northern District of California.

The deponent is Bernard Hennigan.

Counsel will be noted on the stenographic record.

The court reporter is Cindy Hayden and will now swear in the witness.

* * *

BERNARD HENNIGAN,

having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

BY MR. KEYES:

Page 6

Q.   Good afternoon, Mr. Hennigan.  We've met before.  But for the record, my name is Andrew Keyes.  I'm an attorney with the law firm of Williams & Connolly, and we represent the Google and YouTube defendants.

Well, would you please state your full name for the record?

A.   Bernard Paul Hennigan.

Q.   And do you understand that you are still under oath?

A.   Yes.

Q.   Do you understand that you are still under oath and giving testimony as if you were in a courtroom before a judge and a jury?

A.   Yes.

Q.   Have you ever given a deposition before today?

A.   No.

Q.   Have you ever given testimony under oath before today?

A.   Yes.

Q.   How many times?

A.   Many.

Q.   In what setting or settings?

A.   As a pupil personnel worker in

Page 7

Baltimore County Public Schools, I would charge parents with failure to send child to school and have to represent the district in court for those cases.

Q.   How many times did you do that?

A.   Hundreds.

Q.   Separate from those occasions where you testified in a court as a pupil personnel worker, have there been other circumstances where you've testified under oath?

A.   I don't think so.

Q.   I took your deposition earlier today as Harford County Public Schools' corporate representative on a number of topics.

And you told me that to prepare for that deposition, you met with counsel three times for roughly three hours and you reviewed three documents:  the complaint, the list of topics for which you were the designated corporate representative and an interrogatory answer.

I understand you reviewed that before today.  Did you review anything else to prepare for your deposition as a fact witness, where you're testifying as Mr. Hennigan as opposed to testifying as Harford County Public Schools?

Page 8

A.    No.

Q.    Have you ever asked any of the defendants in this case to modify any feature or function of any of their platforms?

A.    Me personally?

Q.    Yes.

MR. BYRD:  Object to form.

You can answer.

THE WITNESS:  No.

BY MR. KEYES:

Q.    Have you asked anyone else to do so?

A.    No.

Q.    Have you ever asked any of the defendants to discontinue any of the features or functions of their platforms?

A.    No.

Q.    Have you asked anyone else to do so?

A.    No.

Q.    Have you ever spoken with any representative of any of the defendants about any of their features or functions on their platforms?

A.    No.

Q.    Have you ever spoken with any representative of any of the defendants about anything?

A.   I don't believe so.

(HENNIGAN EXHIBIT 1, Resume of Bernard Hennigan, was marked for identification.)

BY MR. KEYES:

Q.   I'm showing you what has been marked as Hennigan Exhibit 1.  What is this?

A.   It looks like my resume.

Q.   Is this something you prepared?

A.   Yes.

Q.   When did you last update it?

A.   Well, based on the title change, it would have been within the last month.  My current title has recently changed.

Q.   Your current title is assistant superintendent of student support services?

A.   Yeah.  It -- it's just -- just because I said earlier I was the executive director, it's kind of weird.  I don't even know if this is in effect now or till July 1st.  But I think this is official.

We've had a reorganization.  Our -- nothing has changed about my job or my pay.  Just the title.

Q.   Okay.

A.   But we had a -- we did a whole

Page 10

reorganization, and some positions are, quote, unquote, effective. So I think this is my current title.

Q. You've been employed by Harford County Public Schools since January of 2017?

A. Yes, sir.

Q. And your first position was as the executive director of student services?

A. The director of student services?

Q. I'm sorry. The director of student services?

A. Yes. And then --

Q. And then you became the executive director of student support services?

A. Correct.

Q. And then, at some point, you became the assistant superintendent of student support services; is that right?

A. Yes. I think it's official now.

Q. When you got the new title assistant superintendent of student support services, did you get any added responsibilities compared to the responsibilities you had with the prior title?

A. No.

Q. When you got the title of executive

Page 11

director of student support services back in July of 2019, did you get any added responsibilities compared to the responsibilities you had when you were the director of student services?

A.    Yes.

Q.    And what was the difference, then, in responsibilities?

A.    So as a director of student services, I oversaw our student services department, which is our counselors, nurses, psychologists, PPWs, social workers.

When I became the executive director, Title I and special education came under my purview and then, eventually, community schools.

Q.    When you were the director of student services, to whom did you report?

A.    The superintendent. No. Sorry. When I first started here, I reported to the executive director of ed services.

Q.    Who was that when you first --

A.    Joe Schmitz.

Q.    And did you report to him throughout the time you were the director of student services?

A.    Yes.

Page 12

Q.   When you became the executive director of student support services, who did you report to?

A.   The superintendent.

Q.   And do you still report to the superintendent as an assistant superintendent of student support services?

A.   Yes.  For the time being.

Q.   Do you anticipate that changing?

A.   I believe July 1st part of the reorganization is I will report to a deputy superintendent.

Q.   Who will that be?

A.   Dyann Mack, Dr. Dyann Mack.

Q.   And what position will she have?

A.   The deputy superintendent.

Q.   What will be within her portfolio as deputy superintendent?

A.   She will oversee my office, the office of education services and the office of curriculum. I don't think that's official until July 1st.

Q.   Have you ever worked as a teacher in Harford County Public Schools?

A.   No.

Q.   Have you ever been an assistant principal in Harford County Public Schools?

Page 13

A.    No.

Q.    Have you ever been a principal in Harford County Public Schools?

A.    No.

Q.    Have you ever worked in the IT department of the Harford County Public Schools?

A.    No.

Q.    Have you ever worked in the finance or budget departments of Harford County Public Schools?

A.    No.

Q.    Your resume shows that you have a bachelor's of science in secondary education in English?

A.    Yes.

Q.    From Towson University?

A.    Correct.

Q.    And you have a master's of education in school counseling from the Loyola College of Maryland?

A.    Yes.

Q.    Do you have any other professional degrees?

A.    Degrees, no.

Q.    Okay.  You do have certifications?

Page 14

A.    Yes.  And I'm also a licensed clinical professional counselor.

Q.    Okay.  And I believe that's listed here as one of your certifications.

A.    Yeah.  Oh, yes.  Okay.

Q.    Okay.  When did you first become a licensed clinical professional counselor?

A.    I believe that was in 2010.

Q.    And where were you licensed?

A.    In Maryland.

Q.    Have you kept that license active since 2010?

A.    Yes.

Q.    Do you have continuing education requirements in order to keep your license in good standing?

A.    Yes.  40 hours every two years.

Q.    And have you fulfilled those continuing education requirements such that you've kept your license in good standing?

A.    Yes.

Q.    Do you have a license to be a clinical professional counselor anywhere outside Maryland?

A.    No.

Q.    You list a number of certifications on

Page 15

your resume.  Do you have any certifications that aren't listed here?

A.    I don't believe so.

Q.    And what entity or entities give these certifications?

A.    So the Superintendent -- it's not -- well, Superintendent endorsement is just a matter of classes.  There wasn't a specific track that I went.  I just have what I need to qualify for that. So I received that endorsement by virtue of the classes I took.

The Supervisor of Pupil Personnel is through Maryland State Department of Education. The same with Administrator I.  Same with Pupil Personnel Worker.  Same with Professional School Counselor.

Certified Youth Mental Health First Aid Instructor is through the Mental Health First Aid organization.

Q.    Did you get any degree in psychology?

A.    No.

Q.    Did you get any degree in psychiatry?

A.    No.

Q.    Have you ever practiced as a psychologist?

Page 16

A.    As a LCPC, but not as a psychologist.

Q.    Okay.  So have you ever practiced as a psychologist?

A.    No.

Q.    Have you ever practiced as a psychiatrist?

A.    No.

Q.    Have you ever worked as a clinical professional counselor or a licensed clinical professional counselor in Harford County Public Schools?

A.    Oh, for the school system?  No.

Q.    When you say "for the school system," you -- you have not worked as a licensed clinical professional counselor in Harford County Public Schools, correct?

A.    Correct.  It's not really a position we have.

Q.    Have you worked as a licensed clinical professional counselor in any other school district?

A.    No.

Q.    Have you ever practiced as a licensed clinical professional counselor outside a school district?

Page 17

A.    Yes.

Q.    When was the last time you did that?

A.    I currently do.

Q.    And tell me about how you have a practice as a licensed clinical professional counselor outside Harford County Public Schools?

A.    So 2010 I started working with an organization, the Human Development Center, as a practicing LCPC, and then eventually went out on my own, and then eventually opened my own practice, which I still operate today.

Q.    For how long did you serve as a licensed clinical professional counselor with the Human Development Center?  From 2010 until when?

A.    I stopped when I came here.  So until 2017.

Q.    And did you see clients then through the Human Development Center?

A.    Yes.

Q.    Was the Human Development Center a nonprofit organization or a for-profit entity?

A.    For profit.

Q.    And was that a full-time job or a part-time job?

A.    Part-time.

Page 18

Q.    And so for each year from 2010 to 2017, roughly how many patients or clients did you see?

A.    It might be easier to say hours per week than people.  I worked about 15, 20 hours a week.

Q.    Okay.  And if you worked 15 to 20 hours per week, roughly how many patients or clients would you see during -- during a week?

A.    I was running groups at the time, so -- actually, let me rephrase that, because I was probably getting 15 to 20 billable hours.  So I was probably seeing 15 to 20 people a week, but some of that was in groups.  So one hour may have been five children.

Q.    And what was the age range of the patients or clients you were seeing through the Human Development Center?

A.    I would say roughly probably from 8 years old to adults in their 40s.

Q.    Are you able to give me an estimate of how many clients or patients you saw per year during your time at Human Development Center?

A.    Different, you mean?

Q.    Different.

A.    30 maybe would be an estimate.

Page 19

Q.    Okay.    And -- and of the 30 or so patients you saw per year through the Human Development Center, what percentage were adults?

A.    Probably 15 percent, 10 percent.

Q.    10 to 15 percent?

A.    Yes.

Q.    And what percentage were teens?

A.    80 percent.    75 percent, let me say.

Q.    And what percentage were preteens?

A.    The other 10 to 15.

Q.    What prompted you to move from the Human Development Center to starting your own practice?

A.    I was approached by another therapist in town who did not see children, and she was seeing a patient who told her that I was doing good work with her child.    And so she asked if someone were to ask her to see children, could she refer them to me, at which time she said that I could see them in her office, and she wouldn't charge me, which means I could keep the full amount of money. Because currently, at the Human Development Center, I was only keeping a partial amount of the money.

So I began to work in her office.    And then eventually she moved to Virginia, at which

Case 4:22-md-03047-YGR   Document 2407-69   Filed 11/07/25   Page 21 of 190

Page 20

time I kept the office and opened my own practice.

Q. When did she move to Virginia and you opened your own practice?

A. Probably around 2017, possibly. 2015, maybe.

Q. So did you work as a licensed clinical professional counselor in her office for a year or under a year?

A. 2010 -- I would say two years.

Q. And does your practice have a name?

A. Guided Wellness Counseling.

Q. Are there other clinicians in your practice?

A. No.

Q. Has it always just been you as the only clinician in Guided Wellness Counseling?

A. Yes.

Q. And from the time you started the practice in 2017 until the present, roughly how many patients do you see each year through Guided Wellness Counseling?

A. Currently, now? Because --

Q. Well, we can start currently.

A. -- it's drastically changed. I would say five.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

Page 21

Q.   Five patients per year?

A.   Yes.

Q.   And how was that number per year in prior years?

A.   Probably closer to 10.  10 or 12.

Q.   And for the years when you had 10 to 12 patients per year, what percentage of them were adults?

A.   80 percent, 90 percent.

Q.   What percentage were teens?

A.   10 percent.

Q.   And what percentage were preteens?

A.   None.

Q.   Okay.  And then when it changed to around five patients a year, what is the breakdown of those roughly five patients across adults, teens or preteens?

A.   All adults.

Q.   All adults?

So when was the last time you had a preteen who was a client when you worked as a licensed clinical professional counselor?

A.   I would say over four years ago.  I couldn't be specific, though.

Q.   And when was the last time you had a

Page 22

teen who was a client when you worked as a licensed clinical professional counselor?

A.    Probably a year -- probably two years ago.

Q.    Have you practiced as a licensed clinical professional counselor anywhere outside the Human Development Center and Guided Wellness Counseling?

A.    No.

Q.    When you were at the Human Development Center, you said you were running groups.  Did you also see clients on an individual basis?

A.    I did.

Q.    So of the 30 patients or so you saw per year, how many did you see on an individual basis?

A.    I would say probably about half, 15.

Q.    So roughly 15 patients you saw in groups and roughly 15 you saw on an individual basis?

A.    Roughly, yeah.

Q.    Okay.  Have you run groups during your time at Guided Wellness Counseling?

A.    Yes.

Q.    And so during the time when you had 10 to 12 patients per year, how many of those did you

Page 23

see on an individual basis?

A.    I'd say about four -- oh, about eight individual, four group -- four in group.

Q.    And during the time when you've had roughly five patients a year, how many of those did you see on an individual basis?

A.    All individual.

Q.    So -- okay.

A.    I haven't done groups in years.

Q.    When was the last time you ran a group or did counseling as a licensed clinical professional counselor in a group setting?

A.    Maybe 2018.

Q.    Have you ever worked as a counselor of any sort in Harford County Public Schools?

A.    No.

Q.    You were asked earlier about a presentation you heard from Leonard Sax?

A.    Yes.

Q.    Do you recall those questions from plaintiff's counsel?

A.    Yes.

Q.    How many times did you hear a presentation from Mr. Sax?

MR. BYRD:    Object to form.    It was in a

Page 24

prior depo.  But, yes.

THE WITNESS:  I saw it in person once, and I remember watching it again in video form maybe one other time.

BY MR. KEYES:

Q.    Was it the same presentation?

A.    Yes.

Q.    So you saw it once in person and later you watched a recording of it?

A.    Yes.

Q.    And when did you see the presentation in person?

A.    I honestly don't recall.

Q.    When did you see the video of the presentation?

A.    I honestly don't recall.  It was soon after.

Q.    Who is Leonard Sax?

A.    I believe he's a psychologist.

Q.    And what was his presentation on?

A.    The negative impacts of social media and video games on children.

Q.    Did he have any handouts that he gave to participants or attendees?

A.    I don't recall.

Page 25

Q.    Did he have a slide deck that he used?

A.    Yes.

Q.    Did you follow up with Leonard Sax after the presentation and speak with him?

A.    No.

Q.    Did you ever follow up with Leonard Sax?

A.    No.

Q.    Have you ever had any communications with Leonard Sax other than attending his presentation?

A.    Not that I recall.

Q.    Are you able to estimate for me when you saw the presentation?  Was it two years ago?  Five years ago?  Ten years ago?

A.    I would say 2019 would be best guess.

Q.    And how did his presentation come to your attention?

A.    It was advertised through -- I believe it was our office of mental health in Harford County.

Q.    Who went with you to see the presentation?

A.    I believe my daughter -- my oldest daughter and wife at the time.  Well, my oldest

Page 26

daughter and wife.

Q.    How -- how old was your daughter at the time she went with you to see Leonard Sax' presentation?

A.    She would have been about 14.

Q.    Is that an 8th grader?  9th grader?

A.    She was -- she's older because of her birthday.  Probably 7th or 8th grade.

Q.    Do you use YouTube?

A.    Sometimes.

Q.    Do you have a YouTube account?

A.    I may.  I tried to share a video, as I said earlier, of a celebration we did for one of our staff members with everybody who was there, and the link was too big.

And so I think somehow I was taken to some ability to create it on YouTube, and then I shared it.

So I -- I think I may have, but that would be -- that would be the only time I actually had an account.  So I -- I may currently have one. I don't know how that works.

Q.    When was the last time that you used YouTube?

A.    I don't know.

Page 27

Q.    Well, how often have you used it in the last six months?

MR. BYRD:  Object to form.

THE WITNESS:  I don't know.  Five, ten times.

BY MR. KEYES:

Q.    When you've used YouTube, in what context?

A.    Sometimes I'll use it for music. Sometimes I'll use it for DIY information.  That's typically.

Q.    "DIY," "do-it-yourself"?

A.    Yeah.

Q.    Okay.  Do you have a Facebook account?

A.    I do not.

Q.    Do you have an Instagram account?

A.    I do not.

Q.    Do you have a TikTok account?

A.    I do.

Q.    You do?

A.    Well, I have the app.  I don't know if that means I have an account.

Q.    Okay.

A.    I'm not sure if you automatically have an account by default.

Page 28

Q.    Do you have a Snapchat account?

A.    I do not.

Q.    For how long have you had a TikTok app?

A.    I had it and then I got rid of it, and then I got it again.  I don't remember when.  Probably four or five months ago.

Q.    You got it again four to five months ago?

A.    Yes.

Q.    Why?

A.    I was getting videos sent to me that I couldn't see.  And then -- so I downloaded it to see a video that someone sent me, and then I just kept it.

Q.    You said you had it, you got rid of it, then you got it again?

A.    Uh-huh.

Q.    When you got rid it, why did you get rid of it?

A.    It was Lent, so I was using that as my reason to get off of it.  It was causing problems with me just getting sucked into it and not being able to get off it.  So I used Lent as the catalyst to get off it and stayed off it for about a year.

Q.    You said "Lent," L-E-N-T?

Page 29

A. Uh-huh.

Q. The season before Easter?

A. Yes.

Q. Okay. When -- during the period when you had TikTok, how often have you used it?

A. When I had it or now?

Q. Well, let's start with -- you got it again four to five months ago?

A. Yeah.

Q. Since then, how often do you use it?

A. I probably look at it once every other day.

Q. And during your first stint, before you got rid of it during Lent, how often did you use it?

A. Daily.

Q. Have you ever posted anything to Harford County Public Schools' YouTube channel?

A. I was in a video that was posted, but I -- I never posted personally.

Q. Have you posted any content to Harford County Public Schools' Facebook or Instagram accounts?

A. No.

Q. You testified earlier you have three

Page 30

daughters?

A.    Yes.

Q.    And are they at middle school age or above?

A.    7th, 8th and a freshman in college.

Q.    So is it the freshman in college who went with you to the Leonard Sax presentation?

A.    Correct.

Q.    Does your 7th grade daughter have a YouTube account?

A.    Not to my knowledge.

Q.    Does she have a Facebook account?

A.    Not to my knowledge.

Q.    How about an Instagram account?

A.    Not to my knowledge.

Q.    How about a TikTok account?

A.    Not to my knowledge.

Q.    How about a Snapchat account?

A.    Not to my knowledge.

Q.    How about your 8th grade daughter? Does she have a YouTube account?

A.    Not to my knowledge.

Q.    Does she have a Facebook, Instagram, TikTok or Snapchat account?

A.    Not to my knowledge.

Page 31

Q.   Have -- have your 7th grade or 8th grade daughters asked you for any of those accounts?

MR. BYRD:  Object to the form. Relevance.

But go ahead.

THE WITNESS:  Yes.  Regularly.

BY MR. KEYES:

Q.   And have you said no?

A.   Yes.

Q.   Your oldest daughter, who's a freshman in college, has she ever had a YouTube account?

A.   I don't know.

Q.   Has -- did she ever have a YouTube account when she was in high school or middle school?

A.   I don't know.  I don't think so.

Q.   Did she ever have a Facebook, Instagram, TikTok or Snapchat account when she was in high school or in middle school?

A.   She may -- I think -- yeah.  She had a Snapchat account in high school -- later high school years.

Q.   When she was in high school, did she have a Facebook, Instagram or TikTok account?

Page 32

A.   She took herself off Snapchat and moved to Facebook on her own.  I think that may have been her senior year of high school.  And I think she currently has a TikTok account.

Q.   When she was in middle school, did she have any Facebook, Instagram, TikTok or Snapchat accounts?

A.   No.

Q.   Did she have a YouTube account in middle school?

A.   No, not to my knowledge.

Q.   Did she get the Snapchat account in her senior year of high school with your permission?

A.   I believe it was maybe junior year, and yes.

Q.   When she had a Snapchat account in her junior year and senior years of high school, did you impose any limits on her use of Snapchat?

A.   Sort of.  There was limits on access because the phone was charged in our bedroom, so she didn't have access to it at night.

And I had an app, which I can't remember the name of now, which sort of monitored the activity on her phone.

Q.   Was that an app that was part of the

Page 33

phone, or is this a separate app?

A.   Separate.   A separate app that I purchased.

Q.   And that allowed you to set limits on her use of Snapchat?

A.   No.

Q.   Or the phone in general?

A.   It would alert me if there was problematic content.

Q.   So it was like a content filter for her phone?

A.   Not a filter.  It would just tell me -- well, maybe it filtered it.  I don't know.  But I would get an alert if there was, you know, nudity or explicit language or something.

Q.   Okay.  So in her junior and senior year of high school, your daughter had a Snapchat account.  You imposed limits on her access to her cell phone by requiring her to charge it in your bedroom at night.

Were there other limits on when she could access the phone before she checked it in for the night, either time of day or the amount of time?

A.   I feel like at some point we had

Page 34

time -- time constraints on it.  But it, frankly, wasn't an issue that we needed to deal with with her.  She wasn't succumbing to, really -- by it as much as the younger two are now.

Q.    And then separate from any time limits, you -- you downloaded an app that would monitor the content on her cell phone and alert you?

A.    Correct.

Q.    Were there any --

A.    And my wife.

Q.    Sorry.  What?

A.    And my wife.

Q.    Okay.  Were there any other limits or controls that you used for her use of her cell phone when she was a junior or a senior in high school?

MR. BYRD:  Object to form.

THE WITNESS:  I mean, I think what might fall under the word "control" is me looking through her phone regularly to see, you know, what the activity was in there.

BY MR. KEYES:

Q.    Anything else that you would view as a limit or a control regarding her access to or her use of her cell phone when she was a junior or

Page 35

senior in high school?

A.   Well, it definitely has become the best consequence for a child.

Q.   I'm not sure I follow.  When you say, "it definitely has become the best" --

A.   So removing the phone because of some other poor behavior --

Q.   Okay.

A.   -- instead of --

Q.   You confiscated the phone at some point?

A.   Yes.

Q.   For some period of time?

A.   Yes.

Q.   Did you at some point restore it?

A.   Yes.

Q.   That was independent of the phone itself; that was a consequence for some other behavior?

A.   Sure.  Yeah.

Q.   Okay.  Were there other controls that you were aware of that you elected not to use, such as controls on the device itself?

A.   I don't know if "elected."  I don't know that I was as savvy back then as to what we

Page 36

could or could not do.  So we -- we didn't impose any, but there may have been something that we didn't know about.

Q.   Okay.  When you say "back then," she's a freshman in college, right?

A.   (Nods head.)

Q.   Yes?

A.   Yeah.

Q.   And we're talking about her junior and senior year, assuming a year or two ago?

A.   Yeah.  I guess I'm kind of thinking the full complement of when she had her phone.  So I guess the answer is no.

Q.   Okay.  Were there other limits you imposed on her access to or use of her phone before she was a junior?

A.   The same.  Charging it in our room, having the app on it to regulate content.

Q.   When did she get a cell phone?

A.   I believe it was 7th grade.

Q.   When did your 8th grade daughter get a cell phone?

A.   I think that was middle of her 6th grade year.

Q.   And when did your 7th grade daughter

Page 37

get a cell phone?

A.    I think that's about the same, middle of 6th grade year.

Q.    Okay.  So for your 7th grade daughter and your 8th grade daughter, they each got a cell phone at some point during their 6th grade year, yes?

A.    For my youngest two?

Q.    Yes.

A.    Yes.

Q.    And then for your oldest, she got her cell phone sometime in 7th grade?

A.    If I recall correctly, yes.

Q.    And you've described for me the controls you had in place or the limits you had in place for your oldest daughter.  Are those the same controls or limits you put in place on your 7th grade and 8th grade daughters' use of their cell phones?

A.    No.  So we do -- we still don't allow for it to be charged in their rooms, but I do not any longer use the app to monitor the activity.

Q.    Why did you stop using the app to monitor activity?

A.    I didn't find it to be incredibly

Page 38

useful.  I would see things on their phone that didn't come through on the app, so it was -- I felt like I was paying for something that only gave me -- that gave me inadequate data.

Q.   Did you explore other apps to either block or monitor content on any of your daughters' phones?

A.   Yes.  So, currently, my 8th grade daughter, which this is perplexing to me, but she needs to get me to sign into the -- I guess it's called the Apple cloud and put my password in to approve her getting an app.  But for some confounding reason, I can't get that same to sync with my 7th grade daughter, so... I'm trying.

Q.   If the 8th grader wants to download an app, she needs to go through you and get your permission?

A.   I get an alert.  I have to put a password in and approve it.

Q.   But for some reason, it doesn't apply to your 7th grader's phone?

A.   Yeah.  I just keep trying to figure it out, and I'm not smart enough to figure out why.

Q.   So then you periodically check your 7th grade daughter's phone on your own to see what

Page 39

apps are on there?

A.    Both, yeah.

Q.    Okay.  Middle school kids use their phones for all sorts of reasons, correct?

A.    Correct.

MR. BYRD:  Object to form.

BY MR. KEYES:

Q.    I know you've said before students use social media apps.  Besides the defendants' platforms, are you aware of other social media apps that students use on their phones?

A.    I don't know if Minecraft is considered an app.  Did you say "app"?  Social media --

Q.    I said social media apps.

A.    Yeah, I don't know if Minecraft is considered social media.  That seems to be a big one, but I don't know if that's more of a game.

Q.    Okay.  Are you able to identify any other social media apps that students use on their cell phones?

MR. BYRD:  Object to form.

THE WITNESS:  Where is that list?  Oh, here it is.  Not offhand.  I can't think of any that aren't listed.

MR. BYRD:  I'm sorry.  What are you

Page 40

referring to?

THE WITNESS:  Oh, sorry.  Under the "Online Media & Communications Services" definition.

BY MR. KEYES:

Q.  Okay.  So are you on Exhibit 2?

A.  Sorry.  Yes.  Exhibit 2, Page 6.

Q.  Definition 3?

A.  Yes.

Q.  Okay.  So the defendants as you flagged before are Facebook, Instagram, Snapchat, TikTok and YouTube, which are on this list.  Do you see that?

A.  Okay.  Yeah.

Q.  What other social media platforms do students use on their cell phones?

A.  I feel like the other ones in this list are probably a full complement of that.  BeReal, Discord, GroupMe, Kik, Omegle, Pinterest, Reddit, Twitch, Tumblr, WhatsApp, Twitter and Yik Yak.

Q.  And then you mention students also use Minecraft on their phones?

A.  That's a game.  I don't know if it's necessarily social media.

Q.  Right.  I wasn't asking about social

Page 41

media.  I just -- you mentioned students also use Minecraft on their phones?

A.    Correct.

MR. BYRD:  Object to form.

Yeah, you did mention social media. That was your question, but okay.

BY MR. KEYES:

Q.    What other video games do students use on their cell phones?

MR. BYRD:  Object to form.

And, also, just to be clear, he's only speaking in his individual capacity here, and I don't know what students you're talking about.

MR. KEYES:  Students in general.  And you're right.

BY MR. KEYES:

Q.    You're just testifying as Mr. Hennigan.

But based on your experience and your interactions, what other video games besides Minecraft do students use on their cell phones?

A.    I've seen them play a pool game when they're playing pool against each other.  I can't think of any other games I've seen them play.

Q.    Fortnite?

MR. BYRD:  Object to form.

Page 42

THE WITNESS:  I suppose that's a thing, yeah.  I don't -- they don't play that as far as I know, but --

BY MR. KEYES:

Q.    Clash of Clans?

A.    Never heard of that.

Q.    Brawl Stars?

A.    Never heard of that.  You must have boys.

Q.    I have four kids.  Three boys, one girl.

Do kids also use their cell phones to listen to music?

A.    Absolutely.

MR. BYRD:  Object to form.

BY MR. KEYES:

Q.    And do they use Spotify?

MR. BYRD:  Objection.

THE WITNESS:  Some do.

BY MR. KEYES:

Q.    What other services have you seen students use to listen to music on their cell phones?

A.    YouTube, Pandora, Apple Music.

Q.    What else?

Page 43

A.    That's all I can think of.

Q.    And do students also use their cell phones to access sports apps like ESPN?

MR. BYRD:  Objection.  Foundation.

THE WITNESS:  Yes, I suppose.

BY MR. KEYES:

Q.    Well, have you seen students who use their phones to access ESPN?

MR. BYRD:  Objection.

THE WITNESS:  I haven't.

BY MR. KEYES:

Q.    Have you seen --

MR. KEYES:  What's the objection?

MR. BYRD:  Well, he's testified that they don't have phones -- there's phones that are not out in school.  So I don't -- I don't know about the time -- timing of when you're talking about.  And I don't know -- when you say "students," are you talking about students outside Harford, his own kids who could also be students?

He's testified that, you know, there was a new school policy or whatever, so I don't know about the foundation of being able to see stuff within the school.

BY MR. KEYES:

Page 44

Q.    Have you --

MR. BYRD:  I have a lot of objections.

BY MR. KEYES:

Q.    Have you seen Harford County Public Schools' students use their phones to access ESPN or any sports app?

A.    No.

Q.    Do students use their cell phones to -- to watch content on streaming services like Netflix?

MR. BYRD:  Same objection --

THE WITNESS:  Yes.

BY MR. KEYES:

Q.    Are you able to identify --

MR. BYRD:  -- as to time.

Hold on.

-- as to time.  Vague.

BY MR. KEYES:

Q.    Are you able to identify for me any streaming services that students use their cell phones to watch besides Netflix?

MR. BYRD:  Same objection.

THE WITNESS:  Hulu.

BY MR. KEYES:

Q.    What else?

Page 45

A.    Disney+.

Q.    What else?

A.    YouTube TV.  That's all I can think of.

Q.    And in your observations, do students also use their cell phones to text each other?

MR. BYRD:  Objection.  Vague as to time.

THE WITNESS:  Yes.

BY MR. KEYES:

Q.    Are you able to identify for me other ways that students use their cell phones in your experience?

You've listed social media.  You've listed video games.  You've listed music platforms.  You've listed streaming services.  And you've listed texting.

Any other ways that, in your experience and your observation, Harford County Public Schools' students have used their cell phones?

MR. BYRD:  Objection.

THE WITNESS:  Yeah.  I mean, when I think about when I look at my daughters' phones, the first place I go is the -- is the camera app and to see the pictures that they're taking of themselves and of other people.

Page 46

And I think that's probably one of the most widely used app on their phone is the camera.

BY MR. KEYES:

Q.   And are you referring to a particular camera app?

A.   No, just the standard -- well, I always assume everyone has an iPhone.  The standard iPhone camera app.

Q.   Okay.  So you're referring to the camera itself in the phone?

A.   Correct.

Q.   Okay.

A.   Taking pictures of themselves and others.

Q.   And then are you -- have you seen students in Harford County Public Schools not only take the pictures but then transmit them to other people?

A.   Yes.

MR. BYRD:  Object to form.

BY MR. KEYES:

Q.   In your experience, how do they do that?  What platform or platforms do they use?

A.   Social media, typically.

Q.   Are there other ways they also transmit

Page 47

photos?

A.   Through WhatsApp or text messaging.

Q.   Are there any other ways that, in your experience and your observations, students have transmitted photos on their cell phones?

A.   Other than social media apps or texting?

Q.   Other -- other than social media apps, WhatsApp and text messaging?

A.   They show it to people directly.

Q.   Any other ways?

A.   They have -- they can screenshot it and show it during a FaceTime phone call.

Q.   Any other ways?

A.   Not that I can think of.

(HENNIGAN EXHIBIT 2, Plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories (Set 3), was marked for identification.)

BY MR. KEYES:

Q.   Let me show you what has been marked as Hennigan Exhibit 2.  This is titled "Plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories (Set 3)."

Page 48

MR. BYRD:  And, again, you had an opportunity to ask about this in the 30(b)(6).  So, just to be clear, you're asking him only in his individual capacity.

And, you know, to the extent you try to use this in a 30(b)(6) use down the road, that will be impermissible and we'll object to that.

BY MR. KEYES:

Q.  Have you seen -- have you seen Hennigan Exhibit 2 before?

A.  I have.

Q.  Did you review it in your prep sessions with the lawyers?

A.  Not necessarily the whole exhibit, but the category of damages chart.

Q.  Are you referring to the chart on Page 3?

A.  Yes.

Q.  That continues onto Page 4?

A.  Yes.

Q.  So did you see that chart in your prep sessions with the lawyers?

A.  Yes.

Q.  Had you seen that chart before your prep sessions with the lawyers?

Page 49

A.    Yes.

Q.    When did you first see that chart?

A.    In an email.  I was asked to --

MR. BYRD:  Yeah, and hold on.

If -- if -- to the extent that those were emails from lawyers or with lawyers on it directing you to do stuff, then don't discuss that.

If you -- if you say you've seen it before, I think that's enough.  But don't discuss anything that was discussed with the lawyers.

BY MR. KEYES:

Q.    My question was just:  When?

A.    Yeah.

Q.    When did you first see the chart in terms of time?

A.    I don't know.  I'd say within the last three months.

Q.    That was the first time you saw the chart?

A.    (Nods head.)

Q.    Is that a "yes"?

A.    Yes.

Q.    Okay.  There is also an Attachment A in this document.  And Attachment A actually has two worksheets.  The first one is titled

Page 50

"Program/Department Worksheet."

Do you see that?

A.   Yes.

Q.   Have you seen that worksheet before?

A.   Yes.

Q.   Did you review that worksheet with the lawyers in the prep sessions?

A.   Yes.

Q.   Had you seen that worksheet before your prep sessions with the lawyers?

A.   Yes.

Q.   When did you first see this worksheet?

A.   At the same time, about three months ago.

Q.   Okay.

A.   Within the last three months.

Q.   And then there's a second chart called a Full-Time Equivalent Worksheet.

Do you see that?

A.   Yes.

Q.   Have you seen that worksheet before?

A.   Yes.

Q.   Did you review that worksheet with the lawyers in the prep sessions?

A.   Yes.

Page 51

Q.   And had you seen that worksheet before your prep sessions with the lawyers?

A.   I'm not sure.

Q.   When did you first see this worksheet?

A.   Either at the same time I saw the other one or just yesterday.

Q.   Okay.  Did you have any role in the preparation of the full-time equivalent worksheet?

MR. BYRD:  Well, object to form.

You can answer what contributions you had, but just don't disclose any conversations with counsel.

THE WITNESS:  I did not.  But I contributed to the program/department worksheet.

BY MR. KEYES:

Q.   Okay.  What role did you play in the preparation of the program/department worksheet?

A.   I provided percentages for the psychological services as well as the school counseling services.

Q.   Did you play any role in -- in deciding what department/programs to list on the worksheet?

A.   I don't recall.  I don't believe so.

Q.   Did you provide any of the weight percentages for any of the other departments or

Page 52

programs listed here besides psychological services and school counseling services?

A. I may have been a part of the pupil personnel services, but I don't recall specifically if I left that to Mr. Williams.

Q. Who is Mr. Williams?

A. He is the supervisor of the pupil personnel services.

Q. Does he report to you?

A. Yes.

Q. For how long has he reported to you?

A. Since I got here in January of '17.

Q. Do you have any recollection of speaking with Mr. Williams about pupil personnel services and a weight percentage?

A. I don't.

Q. Did you have a conversation with anyone else, including Buzz Williams, about any weight percentage for any of the other departments or programs besides psychological services and school counseling services?

A. No.

Q. Did anyone work with you to prepare the 5 percent weight that is listed here for psychological services?

Page 53

MR. BYRD:  Object to form.

Wait.  Hold on.  Okay.  Yeah.

Obviously, you can answer that to the extent that it does not include your conversations with counsel or the work product directed by counsel.

You can answer it.

THE WITNESS:  I don't believe so.

BY MR. KEYES:

Q.   Did anyone work with you to prepare the 10 percent weight that is listed here for school counseling services?

MR. BYRD:  Same instruction.  Just don't disclose any communications or direction of counsel.  But you can answer that otherwise.

THE WITNESS:  I don't believe so.

BY MR. KEYES:

Q.   Okay.  Why -- why did you choose a 5 percent weight for the psychological services department or program?

A.   So --

MR. BYRD:  Same objection.

But go ahead.

THE WITNESS:  Sure.

When I look at the role of a school

Page 54

psychologist and the amount of time they spend in the various activities they're doing, I then begin to think about how often those activities would involve issues concerning social media and their impacts, and determined that, based on all the other activities that they would be doing outside of that, there would be a -- 5 percent of their time dedicated or involving issues concerning social media.

BY MR. KEYES:

Q.    You believe that 5 percent of the time of people in the psychological services department or program is spent on issues concerning social media?

A.    Correct.

Q.    Why did you choose a 10 percent weight for the school counseling services department or program?

A.    For the same reason.  But our school counselors have a lot more face time with students and get involved at a -- well, our school counselors deal with all the students in the building, whereas psychological services do not.

So school counseling staff has more face time with students during the day but also

Page 55

have face time with all students, not just a select group.

Q. So did you estimate that 10 percent of the staff who work in the school counseling services department or program spend 10 percent of their issues -- spend 10 percent of their time on issues concerning social media?

A. No. I concluded that all school counseling services spend 10 percent of their time.

Q. Fair enough.

Did you estimate that the staff who worked in the school counseling services department or program spent 10 percent of their time on issues concerning social media?

A. Yes.

Q. So, first, for psychological services, what did you look at, if anything, to arrive at that 5 percent estimate they spend 5 percent of their time on issues concerning social media?

MR. BYRD: Objection.

Again, only in your individual capacity. Go ahead.

THE WITNESS: So I took into account the number of students that they would be working with, the amount of time they would be involved in

Page 56

testing, the amount of time they would be involved in meetings with families, the amount of time they would be involved in crisis response coupled with the amount of those issues which then tie back to issues concerning phones and social media and arrived at 5 percent of their time being dedicated to dealing with issues that were impacted by social media.

BY MR. KEYES:

Q.   Did you look at any documents when you arrived at the 5 percent weight?

A.   I believe I looked at our special education data because they're primarily working with special education students.  I don't recall if I had availability to look at testing data.

Q.   And did you -- were you finished?

A.   Yes.

Q.   Did you speak with any nonlawyers about what information or factors to consider in assigning this 5 percent weight to psychological services?

A.   I don't recall if I consulted with Mr. Richards or not.  I'm, frankly, not sure.

Q.   Okay.  Same questions for the 10 percent weight on school counseling services.

Page 57

What did you consider in arriving at that weight?

A.    So taking into account the caseloads of our counselors, that they're working with anywhere from three to five hundred students each and also taking into account the number of students that they're meeting with daily, the number of groups they're running, the number of classroom sessions they're doing based on social media and responsible use in addition to their response to crisis concerns that would be drawn back to social media and then arrived at that 10 percent of their time being impacted by the social media concerns.

Q.    Did you look at any documents when you arrived at this 10 percent weight?

MR. BYRD:  Object to form.

You can answer that literally, I guess.

THE WITNESS:  I believe I remember looking at our wellness needs assessment data to get some -- some data regarding what our students are reporting as far as social media and phone use and sleep and things of this nature, which then end up on the school counselors' doorstep with -- impacting students in several different ways.

BY MR. KEYES:

Q.    Did you speak with any nonlawyers about

Page 58

what information or factors to consider in assigning this 10 percent weight to school counseling services?

A.    I don't think in this instance I did consult with the supervisor.  I don't believe I did.

Q.    Did you consult with anyone else?

A.    I don't believe so.

Q.    For the 5 percent weight that you assigned to psychological services, when you say that you believe that 5 percent of their time is spent on issues concerning social media, would that include work that they spend with students dealing with the consequences of cyberbullying?

A.    For -- for psychological services, it wouldn't be necessarily directly linked to the bullying, but indirectly.  So things that may have occurred as a result of the bullying that then required the psychologist to meet with the student, whether that be risk assessment, suicide ideation report, threat assessment, IEP, counseling as a related service, things of that nature.

So not directly because they were bullied, but because of things that occurred because they were bullied, if that makes sense.

Page 59

Q.    Let me make sure I understand.  So when you're looking at staff in the psychological services department and you're concluding that they spend 5 percent of their time on issues concerning social media, that 5 percent includes time that they spent helping the student with things that were the result of the bullying?

A.    Correct.

Q.    Does that 5 percent also include time they spent helping the student with things that are the result of fighting that was publicized on social media?

A.    For the psychologist, probably not.

Q.    What about for the school counseling services?

A.    There's higher potential there, but less so this year because there hasn't been as much of that.

Q.    Does the 5 percent for psychological services include time that's spent -- staff spent helping the student with mental health issues attributable to content they watched, including on social media?

MR. BYRD:  Object to form.

THE WITNESS:  Indirectly, yes.

Page 60

BY MR. KEYES:

Q. Does the 10 percent for school counseling services include time that that staff spent helping students with -- who have mental health issues that are attributable to content they watched, including on social media?

A. Yes.

Q. Can you give me some other examples of what the psychological services staff were spending their time on when they were spending time on what you say are issues concerning social media?

A. So you could have students who are not performing well academically because of social media, because they're not getting the proper sleep, because they are feeling depressed based on their interactions on there.

They could also be students who are dysregulated, and they are seen in a counseling capacity or in a testing capacity or in a crisis capacity. And that dysregulation being a result of, in some cases, things that they've seen, done, posted, been posted about them on social media.

Q. Okay. And is the same true for what the school counseling services staff were spending their time on when they were spending time on what

Page 61

you say are issues concerning social media?

A.    It would be more so for the school counseling staff because they have a more -- a closer relationship with students that they see on a regular basis.  Again, they're also seeing every student and not just some students like the psychologists see.

In addition to that, they're running groups which have content that is sometimes indirectly the result of social media; in addition to, they oftentimes are a link between the student and the parent, so parents reporting to them concerns they have with their child's sleep, mood, overall mental health that they would like the counselor to look into.

So the counselor tends to be more the frontline staff and the psychologist more of the higher-incident staff.

Q.    You referenced the school counseling staff running groups which have content that is sometimes indirectly the result of social media. What content are you referring to?

A.    So some of our school counselors are running groups for children with poor self-esteem, for children who are suffering with anxiety and

Page 62

depression, for children who have had issues with self-harm, with issues struggling with their own sexuality.

And these are all things that have just -- we've seen in recent years been exacerbated by social media, which has then caused us to -- like I said, I think, earlier today, my staff and my department has exponentially grown because of that.

Q.   And for these children you referenced who have poor self-esteem, who are suffering with anxiety and self-harm, who are struggling with their own sexuality, you attribute that at least indirectly to social media because of what the children are -- are seeing or posting on social media?

A.   Not everyone, but in -- in part, yeah.

Q.   But some of the children who have poor self-esteem, who are suffering with anxiety and depression, who have had issues with self-harm are experiencing those issues with no connection to social media --

MR. BYRD:   Object to form.

BY MR. KEYES:

Q.   -- right?

Page 63

MR. BYRD:  Object to form.

THE WITNESS:  Correct.

BY MR. KEYES:

Q.  Okay.  For the ones where they -- they are, in your view, experiencing poor self-esteem or suffering with anxiety and depression or who have issues with self-harm or struggling with their sexuality because of social media, is that because of what they're -- they're seeing, what messages they're receiving, and -- and what they're posting on social media?

A.  In addition to what's being posted about them.

Q.  Okay.  Thank you.

A.  We had the most extreme case.  We've had children kill themselves because someone posted pictures about them on social media.

MR. KEYES:  Off the record?

MR. BYRD:  Yeah.

THE VIDEOGRAPHER:  Stand by.

MR. KEYES:  Take a break?

MR. BYRD:  Yeah.

THE VIDEOGRAPHER:  We are off the record at 1527.

* * *

Page 64

(Whereupon, there was a recess in the proceedings from 3:27 p.m. to 3:50 p.m.)

* * *

THE VIDEOGRAPHER:  We are on the record at 1550.

(HENNIGAN EXHIBIT 3, 2021-2022 Maryland YRBS/YTS Adverse Childhood Experiences Overview, July 17, 2023, was marked for identification.)

BY MR. KEYES:

Q.   Mr. Hennigan, I'm showing you what has been marked as Hennigan Exhibit 3.  This is a document that was produced by the Maryland Department of Health with the Bates Number F12936-000065843.

MR. BYRD:  I don't see any Bates numbers on here, but you're -- that's --

MR. KEYES:  It was produced in native.

MR. BYRD:  -- probably a native file.

BY MR. KEYES:

Q.   Have you seen this document before, Mr. Hennigan?

A.   I don't know.  I'm not sure.

Q.   Do you know what it is?

MR. BYRD:  Well, objection.

Take your time and look at it if you

Page 65

don't know what it is.

THE WITNESS:  I mean, it seems like the results of YRBS and ACEs and youth tobacco survey data from '21-'22.

BY MR. KEYES:

Q.  "YRBS" stands for "Youth Risk Behavioral Survey"?

A.  Yes.

Q.  "YTS" stands for "Youth Tobacco Survey"?

A.  Yes.

Q.  And are you aware that the Maryland Department of Health conducts a periodic youth risk behavioral survey?

A.  Yes.

Q.  And does that survey include students in Harford County Public Schools?

A.  Periodically, yes.

Q.  Are there any documents that reflect how particular Harford County Public Schools are selected for participation in the youth risk behavioral survey?

A.  I'm pretty sure we find out from them and it's at random.

Q.  Do they randomly choose the grades?

Page 66

A.    They definitely randomly choose the schools.  I'm not sure about the grades.

Q.    And then who administers the survey within Harford County Public Schools that are selected?

MR. BYRD:  Objection.  Foundation.

THE WITNESS:  I'm not sure.  I'm assuming it probably happens in the classroom with teachers, but it could be administered by --
actually, I think -- yeah.  It either happens in a general classroom or in a health classroom.

BY MR. KEYES:

Q.    And how often does the department of health conduct this youth risk behavioral survey?

A.    I don't know.  I'm not sure if it's annually or not.  I feel like it's not annually, like, maybe more like biannually, but...

Q.    When the results of this survey are released, do they send you or anyone else in Harford County Public Schools a summary of what the survey shows?

MR. BYRD:  Objection.  Foundation.

You can answer as it relates to you or what you know.

THE WITNESS:  I've received copies in

Page 67

the past.  I don't know who from, but I'm assuming it's from them or from MSDE.

BY MR. KEYES:

Q.   And do you understand this to be a survey of Maryland students', including Harford County students', experiences with ACEs or --

MR. BYRD:  Object.

BY MR. KEYES:

Q.   -- adverse childhood experiences?

MR. BYRD:  Sorry.  Object to form. Foundation as to which students.

THE WITNESS:  It appears as though they do, yes.

BY MR. KEYES:

Q.   Okay.  And does this report also show that the more ACEs a student experiences, the greater the risk of poor health outcomes for them?

MR. BYRD:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. KEYES:

Q.   And do those poor health outcomes include both physical, mental and emotional health?

A.   Yes.

Q.   Can you turn to Slide 14?

Page 68

A. Yes.

Q. Are you on Slide 14? It's titled "Emotional Abuse"?

A. Yes.

Q. And then in parentheses it says "(MAP)," M-A-P.

Do you know what "MAP" stands for?

A. I don't.

Q. And this slide says that in 2021-2022, 12.1 percent of students exposed to emotional abuse.

Do you see that?

A. Yes.

Q. Emotional abuse or exposure to emotional abuse is an ACE, correct?

A. Abuse in general. So I'm assuming emotional would be a part of that.

Q. And this chart also shows that 12.3 percent of high school students in Harford County are exposed to emotional abuse.

Do you see that?

A. Correct.

Q. Do you have any reason to challenge that 12.3 percent of high school students in Harford County are exposed to emotional abuse?

Page 69

MR. BYRD:  Object to form.  Foundation.
Hypothetical.  He didn't put this together.

But you can answer if you know.

THE WITNESS:  Personally, because I'm
speaking from my own personal perspective, I would
challenge it, yes.

BY MR. KEYES:

Q.   Why would you challenge it or on what
basis?

A.   Because I think the stigma is so great
that some children, even though it's anonymous,
would feel uncomfortable answering in the
affirmative to that question.

Q.   So do you think the 12.3 percent
understates the percentage of high school students
who are exposed to emotional abuse?

A.   I do.

Q.   Do you have a basis for offering what
you think is the correct higher percentage of high
school students who are exposed to emotional abuse
in Harford County?

A.   No.  It's just a inclination on my
part.  I don't have an exact response to that.

Q.   Would you turn to Slide 16?  Are you
there?

Page 70

A.   Yes.

Q.   And this slide says that in 2021-2022, 25.3 percent of students were exposed to substance abuse.

Do you see that?

A.   Yes.

Q.   And exposure to substance use in the household is another ACE, adverse childhood experience?

A.   Yes.

Q.   And this chart also shows that 27.9 percent of high school students in Harford County were exposed to substance use in the household, correct?

A.   Yes.

Q.   Do you believe that that percentage is underreporting the problem of high school students in Harford County being exposed to substance use in the household?

A.   I think that's hard to say.

Q.   Do --

A.   I think -- unless they've defined a "problem drinker," a student could think that their -- their parent having any alcohol makes them a problem drinker.  So they may answer in the

Page 71

affirmative to that.

So it's -- it's hard to say how kids are interpreting the term "problem drinker."

The other ones pretty -- seem pretty clear.

So I might say, "Yeah, my parent is a problem drinker," but maybe, by definition, they're not.

Q. Do you have any reason to identify a different percentage for high school students in Harford County who are exposed to substance use in the household?

MR. BYRD: Object to form. Asked and answered.

THE WITNESS: I don't know what that difference would be. I just know it's hard to say if this is accurate or not.

BY MR. KEYES:

Q. Would you turn to Slide 18?

Are you there?

A. Yes.

Q. This slide says that in 2021 to 2022, 33.5 percent of students were exposed to mental illness in the household.

Do you see that?

Page 72

A.    Yes.

Q.    And exposure to mental illness in the household is another ACE, adverse childhood experience?

A.    Yes.

Q.    This chart shows that 38.7 percent of high school students in Harford County were exposed to mental illness in the household, correct?

A.    Yes.

Q.    Do you believe that that percentage is underreporting the problem of high school students in Harford County being exposed to mental illness in the household?

A.    Underreporting, no.

Q.    Okay.  Do you have a reason to identify a different percentage for high school students in Harford County who are exposed to mental illness in the household?

MR. BYRD:  Object to form.  Foundation.

THE WITNESS:  I, again, think this is a hard one to really get a clear answer on, especially when we're dealing with adolescents who often are at odds with their parents and may think they're, quote, unquote, crazy because of their philosophy on things.

Page 73

And so how a teenager views their parent being mentally ill or -- I mean, suicidal is pretty clear-cut.

But I think a lot of teenagers think their parents are way off base. And so then would they put that in the category of mentally ill? It's hard to say.

So I -- I just -- you know, I don't know if these surveys really spell out what these words mean for kids.

So when you're sitting in class and you want to get this over with, you might just check "yes" because you had a fight with your mom that morning and you think she's crazy.

And so -- because 38.7 percent seems extremely high to me of households with a mentally ill, depressed or suicidal parent in the home.

But it could be accurate. I just -- it's -- I would -- I'd have to see whether they've truly defined these words for the kids who are taking the survey.

BY MR. KEYES:

Q. Would you turn to Slide 20. Are you there?

A. Yes.

Page 74

Q.   This slide says that in 2021-2022, 14.8 percent of students were exposed to household incarceration.  Do you see that?

A.   Yes.

Q.   And having someone in the household incarcerated is another ACE, adverse childhood experience?

A.   Yes.

Q.   Yes?

A.   Yes.

Q.   This chart shows that 16.4 percent of high school students in Harford County were exposed to household incarceration, correct?

A.   Yes.

Q.   Do you have any reason to believe that number is underreporting the problem?

MR. BYRD:  Object to form.  Foundation.

THE WITNESS:  Underreporting?  No.

BY MR. KEYES:

Q.   Do you have a reason to identify a different percentage for high school students in Harford County who are exposed to incarceration of someone in the household?

MR. BYRD:  Objection.

THE WITNESS:  This is a much more

Page 75

concrete question.  So I don't think there would be any issues with definition here.  I only think there could be issues with, again, the stigma associated with it and people not answering in the affirmative because they're embarrassed by it. Even though we know no one else is going to see it, some people don't believe that.

So the other only piece about this that I have had concerns with the YRBS in general is, are kids just going through and answering quickly to get it over with, so...

But as far as definitionwise, this is pretty clear on what they're asking, so...

BY MR. KEYES:

Q.   Would you turn to Slide 26.  This slide shows the relationship between the number of ACEs reported by students and the percentage of the time they claim their mental health is either most of the time or always not good, correct?

A.   26?

Q.   Yes, sir.

A.   Oh, you're looking on the right.  I'm sorry.  I was looking at the physical fights.

Q.   Sure.  Do you want me to repeat the question?

Page 76

A.    No.   So one of the charts -- I'm not -- I just -- I just saw these two as well.

"Mental health most of the time/always not good."  That's an odd way to phrase that. Yeah, so it's showing that the more ACEs you have, the poorer mental health you have.

Q.    And here, it reports that for students in the survey who reported zero adverse childhood experiences, 17.7 percent of them said their mental health is not good most of the time or always?

A.    Correct.

Q.    And it also reports that for students in the survey who reported more than four adverse childhood experiences, 70.8 percent of them said their mental health is not good most of the time or always?

MR. BYRD:  Object to form.

THE WITNESS:  Correct.

MR. BYRD:  Foundation.

BY MR. KEYES:

Q.    Is that consistent with your training and experience about the relationship between the number of adverse childhood experiences a student has and how they view their mental health?

MR. BYRD:  Object to form.  Foundation.

Page 77

THE WITNESS:  Yes.

BY MR. KEYES:

Q.    The more adverse childhood experiences a student experiences, the worse their mental health is, in general?

A.    Not necessarily.  The higher the likelihood, because on the next page, which you'll see is what we talked about this morning of positive childhood experiences, which research has shown that -- this is a little off topic.  But research has shown that the absence of the positive is actually more detrimental than the presence of the negative.

And the same researcher shows that students with four or more ACEs, the more of the positive that they have, it dramatically drops that.

So you could take a child with zero ACEs and a child with four ACEs; the child with four ACEs has all seven of these PCEs, and they have a much better mental state than a child with zero ACEs but none of these PCEs.

Q.    The positive childhood experiences can reduce or negate the effect of --

A.    Absolutely.

Page 78

Q.    -- adverse childhood experiences?

A.    Yes.  So you have to kind of look at both -- the whole picture of the child.

Q.    And this is also sort of child-specific?

A.    Absolutely, yeah.  Resilience is the big factor.  So for those of you with kids, ask your children these seven questions.

Q.    Will do.

How many school psychologists does Harford County Public Schools employ now?

A.    Roughly, I think somewhere in the neighborhood of 43 plus 3 or 4 -- 4 interns.

Q.    And how many school psychologists did Harford County Public Schools employ in the 2016-2017 school year?

A.    '16-'17?  That's the year I got here? I would say mid-30s.

Q.    And does Harford County Public Schools employ counselors?

A.    Correct.

Q.    How many counselors does it employ now?

A.    Approximately 110.

Q.    How many counselors did it employ in the 2016-2017 school year?

Page 79

A.    I would say approximately 100.

Q.    Does Harford County Public Schools employ other people besides school psychologists and counselors to provide counseling or mental health treatment?

A.    Yes.

Q.    What are those positions?

A.    Social workers.

Q.    Any other positions?

A.    Pupil personnel workers.

Q.    Okay.  Any others?

A.    Behavior coaches.

Q.    Any others?

A.    To some degree, nurses.  I'm going through -- going through the offices in my suite.

Social workers, psychologists, counselors, nurses, behavior coaches, pupil personnel workers.

And you said that -- I'm sorry.  What's the -- what's the -- they're -- what are they providing?

Q.    Counseling or mental health treatment.

A.    We have one LCPC.  We have two LCPCs.  Sorry.  And this is just that we employ?

Q.    Yes.

Page 80

A.   I think that's it.

Q.   Okay.  So how many social workers does Harford County Public Schools employ now?

A.   Approximately 20.

Q.   And how many did it employ back in the 2016-2017 school year?

A.   Probably seven.

Q.   How many behavior coaches does Harford County Public Schools employ now?

A.   Approximately 20.

Q.   And how many did it employ in 2016-2017 school year?

A.   Zero.

Q.   How many pupil personnel workers does Harford County Public Schools employ now?

A.   I would say 15.

Q.   How many did it employ in the 2016-2017 school year?

MR. BYRD:  Object to form.  Foundation.

THE WITNESS:  Seven, I believe.  Seven or eight.

BY MR. KEYES:

Q.   And did Harford County Public Schools have licensed clinical professional counselors in the 2016-2017 school year?

Page 81

A.    No.

Q.    How many nurses does Harford County Public Schools employ now?

A.    I would say roughly 62.

Q.    How many did it employ in the 2016-2017 school year?

A.    That has not grown as high.  I don't know.  Say 57, roughly.

Q.    And what are the counseling or mental health services that nurses provide to students?

A.    So some of them provide help with students, mostly with anxiety, because students will present to them with physical ailments that they are sometimes able to determine aren't really -- well, they're somatic complaints that they know aren't related to anything physical but more mental health related.

Some participate in something called the Calm Study, which I think is an acronym that helps work with students with anxiety.  But that's the primary -- primary role, that, and it's not really therapy, but providing medication to address those issues.

Q.    Does the federal government provide funding for any of these positions?

Page 82

A.   The -- I think one social worker is on our Title I grant, which is federal dollars, not the PPWs, not the psychs' nurses.  I think just one social worker as of today.  The LC -- one of the LCPCs until this year.

Q.   One of the LCPCs was funded with federal --

A.   Title I, yeah.

Q.   Title I, until this year?

A.   Yeah.  We moved it.

Q.   And you moved it to what?

A.   Medical assistance funding, which I'm not sure if that's federal or state.

Q.   For -- for psychologists, was there a steady increase in the number of psychologists from 2016-2017 school year to now?

A.   Yes.  I think we went to two interns. Then we went to four, went to six, back down to four.  So that's been sort of up and down.  I don't know that we had a large growth year.  It's sort of been a steady growth to reduce caseloads based on the duties that are becoming unmanageable with the caseloads they have.

Q.   Was there a big jump in the need for school psychologists during or after COVID?

Page 83

A.    I don't think we grew any more post-COVID than we did from '16 to '20.  At a great of a rate, rather.

Q.    COVID had a negative effect on students' mental health, correct?

A.    Well, again, as we talked about this morning, "COVID" is a very ambiguous term.  I mean, people say "COVID," but there's a lot of detail wrapped up in that.

So I guess, generally speaking, all the things that happened during COVID impacted children.

Q.    Well, let's try to unpack it.  There was a fear of the health consequences of COVID, correct?

MR. BYRD:  Object to form.

THE WITNESS:  For some, yeah.

BY MR. KEYES:

Q.    Some people were afraid of getting COVID.  Yes?

A.    Of course.

Q.    Getting sick and possibly dying.  Yes?

A.    Yeah.

Q.    Some people were afraid of loved ones getting sick and possibly dying.  Yes?

Page 84

A.    Yes.

Q.    So in that sense, do you agree that the COVID pandemic was a stressor on students' mental health?

MR. BYRD:    Object to form.

THE WITNESS:    Yes.

BY MR. KEYES:

Q.    You've said before that one of the issues during COVID was undetected abuse in the home, correct?

A.    Correct.

Q.    That before COVID and after COVID, if students were coming into school, there would be more oversight.  People could see the warning signs, maybe report the abuse and try to tackle the abuse.  Is that fair?

A.    Correct.

Q.    But during COVID, when people weren't coming into school, they were at home and it was easier for that abuse to go undetected.

A.    Correct.

Q.    Yes?

A.    Correct.

Q.    So do you agree that for students who were exposed to abuse -- they were either abused or

Page 85

there was abuse going on around them in the home that was undetected -- that was a stressor on students' mental health?

A. Well, again, when I -- when I talk about those reports, it's not just abuse. It's abuse and neglect. And I think we need to talk about them equally.

Because I think part of it was the physical, sexual, emotional abuse that was occurring, but also some of it was the neglect that was occurring.

You had babies who are now in our classrooms being born into a world where they weren't being paid attention to because the parents were engaged on their phones or computers or tablets working and not able to do the typical childrearing or get them to a day care to get the typical childrearing.

So it's really, probably, equal parts of abuse and neglect.

Q. I should expand my question.

Do you agree, then, for -- for students who were exposed to abuse -- either they were abused themselves or there was abuse going on around them in the home that was undetected -- and

students who were neglected in the home, all of that were stressors on students' mental health?

MR. BYRD: Object to form.

THE WITNESS: Yes.

BY MR. KEYES:

Q. Do you agree that many students felt isolated during COVID because they couldn't be in close personal contact with people, they couldn't go to school, and they felt isolated as a result?

A. Some, yes.

Q. And do you agree that for those students, COVID and the consequences of COVID and the isolation was a stressor on their mental health?

MR. BYRD: Object to form.

THE WITNESS: Yes.

BY MR. KEYES:

Q. Okay. So do you agree, then, that given the fear of getting sick or dying from COVID, the fear of loved ones getting sick or dying from COVID, the risk of being exposed to abuse that went undetected, the neglect that went on in the home, the inability to be in close contact with people, and the isolation -- for all of those reasons, COVID-19 had a negative effect on students' mental

health?

MR. BYRD:  Object to form.

THE WITNESS:  But not exclusively those reasons.

BY MR. KEYES:

Q.   Okay.  But do you agree that for all of those reasons, COVID-19 had a negative effect on students' mental health?

MR. BYRD:  Object to form.  It's asked and answered.

THE WITNESS:  That's part of the reason.

BY MR. KEYES:

Q.   Okay.  You believe there are other reasons why COVID had a negative effect on students' mental health?

A.   I do.

Q.   But what I just listed, those also caused or -- or were reasons why COVID-19 had a negative effect on students' mental health.

MR. BYRD:  Object to form.  Asked and answered.

BY MR. KEYES:

Q.   Is that correct?

A.   Yes.

Page 88

Q.   Okay.  Can you go back to Exhibit 2, please.  And I just want you to pull out the two worksheets and focus on the program/department worksheet.

A.   Yeah.

Q.   Okay.  And I want to focus on the two percentage weights that you gave, the 5 percent for psychological services and the 10 percent of school counseling services.

A.   And I may have weighed in on the pupil personnel.  I just don't want to be -- I don't want to misrepresent whether I did or not.

Q.   Sure.  You said you may have spoken with Mr. Williams, but you can't recall?

A.   Correct.

Q.   Okay.  For the two that you do recall, if -- for the 5 percent of time that staff in the psychological services department spent on issues concerning social media, if they hadn't spent that 5 percent of their time on issues concerning social media, what would they have been doing with the freed-up time?

A.   So that -- that's a great question.

The -- the issue we have with both of these groups of staff members is they are forced

Page 89

because of their caseloads and because of the drain of these percentages to be reactive.

And they all -- "they all."  Most of the staff members in these two groups would love to spend a lot more of their time being proactive and trying to heed off the issues that lead to crisis that they then have to deal with.

So if these percentages were taken away and this social media issue was no longer present, they would be able to be a lot more proactive in working with students to reduce the issues that then cause the crisis response.

Q.    Does that mean that they would get to see other students or more students?

A.    In some cases, depending on the size of their caseload.

But it really would mean that they would be able to work with students on developing skills that they can't spend on time with them now that that skill deficit leads to behavioral, academic, social and emotional issues.

Q.    So for the psychological services staff and the school counseling services staff, if they didn't spend the 5 percent or the 10 percent that you estimate they spent on issues concerning social

Page 90

media, they could have spent that freed-up time either seeing more students, seeing existing students for more time, and they could have worked with those students on developing skills; is that correct?

MR. BYRD:  Object to form.

THE WITNESS:  Yeah.  I -- I think -- and even if that isn't 100 percent accurate, what they're working with students on is probably the more apt issue on the table in working with students on college planning or career exploration rather than, "Why did you feel like you wanted to kill yourself?" or, "Why did you get in that fight yesterday?" or, "What's going on with you failing your classes?" or, "Why aren't you coming to school?"

So those are the -- a lot of the reactive issues that they have to work on with, based on this percentage, stemming from social media.

Like, for instance, if we look at attendance and a lot of students not coming to school because they're not getting the proper sleep because they're up all night on their phones.

Or they've been bullied on social

Page 91

media.  Or they, you know, put something on there that now they're embarrassed about and they don't want to come in.

So these are the things that prompt them to have to work on things.

They would much rather sit with a student on the positive.  But, instead, they're sitting there working with trying to recover from the things that they've done that they shouldn't have done.

And I think the -- you know, the community, in essence, is paying the salaries of these people who now have to work on addressing the societal issues that have been thrust upon them.

And that's just -- it's an unfortunate -- it's not why a lot of these people got into these roles.

BY MR. KEYES:

Q.    Are you able to identify for me the number of students who are not getting proper sleep?

A.    I would have to consult the wellness needs assessment data on that.  We had students respond to questions about the sleep they get.

And I don't believe it's in the

Page 92

wellness needs assessment you have in front of you. I think that was this year's iteration that asked them about their sleep, why they're not going to sleep, if they have a bedtime, how much sleep they get, if they're up on their phones and that is a barrier to sleep.

So we have the data. I just don't have it at recall.

Q. And when you say it's "this year's iteration," are you talking about for the 2024-2025 school year?

A. Correct. I don't believe -- I could be wrong. I don't believe we asked that in last year's survey.

Q. And has the 2024-2025 wellness needs assessment survey results been put into a final report?

A. Not a final report.

Q. Has it been put into a draft report?

A. Not in report form. But certain people such as myself can go in and pull the data, but not in an officially -- see, the report you have has been made clear to the public whereas, depending on permissions, we can go in and look by school and by grade.

Page 93

Q.   Is -- is there any schedule for converting the 2024-2025 wellness needs assessment survey results into a final report?

A.   I'm sure there is, yes.

Q.   What is the schedule?

A.   I don't know.  That's something that Mr. Yakoubou works on, so...

Q.   Okay.

A.   In fact, maybe it's published and I'm not even aware of it.

Q.   But you're not aware of a final report and you're not aware of a draft report at this point?

A.   Correct.

Q.   And are you able to identify for me the number of students who are not coming to school because they're not getting proper sleep?

MR. BYRD:  Object to form.

THE WITNESS:  I don't have a report on that, no.

BY MR. KEYES:

Q.   Do you have any --

A.   That's -- that's anecdotal.

Q.   Do you have any quantitative data that you can point to?

Page 94

A.   Anecdotal.

Q.   And are you able to identify for me the number of students who are not getting proper sleep because they're on their phones all night?

A.   I don't know about all night, but based on self-reporting of students who didn't go to sleep at the time they normally would because of their phone, yes.

Q.   Where is that data?

A.   In the wellness needs assessment.

Q.   For this current year?

A.   Correct.

Q.   The one that hasn't been put in a draft or final report yet?

A.   Correct.

Q.   And are you able to identify for me what the students are doing on their phones when they aren't getting proper sleep because of their phone?

A.   So, again, from -- because you're asking me personally, it would be anecdotal of what they're doing.

Q.   Is that addressed in the data that was collected in the 2024-2025 wellness needs assessment?

Page 95

MR. BYRD: Object to form.

You can answer.

THE WITNESS: I don't remember. I'm not sure if -- if we just asked them is their phone the issue or what they're doing on their phone. I feel like we may have asked them what they're doing on their phone, but I'd need to look at it.

BY MR. KEYES:

Q. Are you able to point me to any instance where you made a request that Harford County Public Schools hire more psychologists and attributed that need to students' use of social media?

MR. BYRD: Object to form.

THE WITNESS: So every year except this year I've made that request. Whether I've indicated the need is due to social media, I don't remember.

BY MR. KEYES:

Q. Okay. So you said every year you made a request for more psychologists, yes?

A. Except for this year.

Q. Except for this year.

And -- but you don't know whether in making that request for more psychologists you've

Page 96

ever attributed that need to students' use of social media in your funding request?

MR. BYRD:  Object to form.

BY MR. KEYES:

Q.    Is that fair?

A.    I don't know.  Yes --

Q.    Okay.

A.    -- that is correct.

Q.    Are you able to point me to any instance where you made a request that Harford County Public Schools hire more counselors where you attributed that need to students' use of social media?  Same answer?

A.    Same answer.

Q.    Are you able to point me to any instance where you made a request that Harford County Public Schools hire more social workers where you attributed that need to students' use of social media in your funding request?

MR. BYRD:  Object to form.

BY MR. KEYES:

Q.    Same answer?

A.    Same answer.

Q.    Would the same be true for PPWs?

A.    Correct.

Q.    Would the same be true for behavior coaches?

MR. BYRD:  Object to form.

THE WITNESS:  Not -- not the same.

BY MR. KEYES:

Q.    Why not?

A.    Because they came into existence through funding sources where principals were choosing to have that position.  It wasn't my request as a system.  It was more principals requesting to use funding they were provided for those positions.

Q.    So let's --

A.    It's actually probably true for social workers, too.

Q.    Okay.  So let's make sure we're clear. For social workers and behavior coaches, that wasn't a request that you made?

A.    Correct.

Q.    That's a request that principals may have made for how to spend a certain pot of money?

A.    Correct.

Q.    And are you aware of any principals requesting funding for more social workers or for more behavior coaches where they attributed that

Page 98

need to students' use of social media in their funding request?

MR. BYRD:  Object to form.

THE WITNESS:  I can't say either way.

BY MR. KEYES:

Q.  Okay.  You know they made a request --

A.  Yeah.

Q.  -- for the position?

A.  I don't remember the conversations of why.

Q.  You don't remember anyone saying, "I need these positions because of the way students are using social media."

A.  No.

Q.  Fair?

A.  Correct.  Yes.

Q.  When were the two licensed clinical professional counselor positions created?

A.  So the second one started last year. And the first one has probably been about three or four years.

Q.  And are these positions where you requested funding to create the position?

A.  No.  These were similar to those last two.  Funding was provided.  Principals had

Page 99

discretion on what they needed.  This came into existence.

Q.    Okay.  So are you able to point me to any instance where principals requested the creation of a licensed clinical professional counselor position where they attributed that need to students' use of social media?

A.    Not directly, no.

Q.    And are you able to point me to any instance where you made a request that Harford County Public Schools hire more nurses where you attributed the need for more nurses to students' use of social media in your funding request?

MR. BYRD:  Object to form.

THE WITNESS:  No.

BY MR. KEYES:

Q.    Are you able to identify for me any funding request you made for a new position where you attributed the need for that position to students' use of social media in your funding request?

MR. BYRD:  Object to form.

THE WITNESS:  I guess it depends if you're asking directly or not directly because the need is based on behaviors and mental health

Page 100

concerns, which in some part is related to social media.

But my exact words weren't, "We need this because of social media." We need it because of the behavior and mental health, the suicide ideation reports, the depression, anxiety that's on the rise, knowing, in my professional opinion, that that, in part, is due to social media use.

So it's a -- it's an indirect yes, but not a verbatim literal that's what I asked for and why.

BY MR. KEYES:

Q. Now, separate from professionals who are employed by Harford County Public Schools, you also engage third-party vendors to provide counseling and treatment services?

A. Correct.

Q. Who are the vendors that Harford County Public Schools currently uses?

A. I don't know the names -- all the names off the top of my head.

Q. Well, how many are there?

A. Probably 5 to 8 providers covering all 55 schools.

Q. And how many were there in 2016-2017

Page 101

school year?

A.    I think we probably had 2 to 3 covering 16 schools when I first got here.

Q.    And so these are third-party professionals, either individuals or organizations, that will provide counselors to provide counseling or treatment services to students in the school --

A.    Correct.

Q.    -- during the school day?

A.    Correct.

Q.    And where would someone find a list of the vendors that provided these services in any particular year since 2016-2017 school year?

A.    We have a mental health specialist, and she manages all those contracts.  So she would -- I don't know if she has a year-by-year summary of who was in what buildings, but she would know the history of it.

Q.    What's her name?

A.    Christina Alton.

Q.    Does she do other things besides that, or is that the --

A.    For the first --

Q.    -- extent of her work?

A.    Oh, yeah.  So from 2019 until last

Page 102

year, that was not -- not that duty, but the title of mental health specialist was her entire role.

But because of the exponential growth of the social workers, she's also now the supervisor of the social workers in addition to the mental health specialists.

And in 2018, Maryland mandated that every school system -- because of the mental health concerns that were being manifested in the school buildings, they mandated that every school system has a mental health specialist and provided state funding to every school system to pay for that position in part, which is why she came to be.

(HENNIGAN EXHIBIT 4, Emails dated 4/21/21, Subject:  MSDE Report, Bates HCPS_00199774-777, was marked for identification.)

BY MR. KEYES:

Q.    I'm showing you what has been marked as Hennigan Exhibit 4.  This was produced with the Bates Numbers HCPS_00199774 through 199777.  It's a series of emails between you and Stephen Richards, the supervisor of psychological services.  Tell me when you've read this exchange.

A.    All of it?

Q.    Sure.

Page 103

A.    Because there's --

Q.    I think there are only --

A.    There's others on the original email.

Q.    Yeah.  You can read as much of it as you want.  I'm going to ask you about your email at the bottom of the first page.

A.    Oh, this is COVID-related?

Q.    This is what?

A.    The first part is COVID-related?

Q.    Yes.

A.    Okay.

Q.    Okay.  Would you focus on your email on the bottom, the first page of Exhibit 4.  It's an email from you to Steve Richards on April 21st, 2021.  Do you see that?

A.    Yes.

Q.    And you said a moment ago this exchange is "COVID-related."  What makes you say that?

A.    Well, what I meant was the first email because MSDE was asking us how many students we haven't had contact with.

But, as I read on, the whole thing seems to be related to students returning to school following the shutdown.

Q.    Okay.  And in your email to

Page 104

Mr. Richards, you say: My guess is the academic frustration will lead to mental health issues in the fall, unfortunately. The first time they are given homework after a year and a half may have to be approached carefully by teachers.

Do you see that?

A. Yeah.

Q. So are you looking at a scenario where virtual learning is ending and in-person schooling is resuming?

A. April of '21? We had -- well, in the fall of -- in the fall of '20, we had some students in. And then from the fall of '20 through May of '21, students were brought back incrementally based on grade level.

Q. And you said: My guess is the academic frustration will lead to mental health issues in the fall.

Are you referring to frustration from students who have fallen behind academically during the shutdown of in-person learning for whatever reason?

MR. BYRD: Object. Object to form.

THE WITNESS: Yes. But we're only talking about a small portion of our population.

Page 105

BY MR. KEYES:

Q.    And can you tell me what your guess was about academic frustration leading to mental health issues?

A.    Well, again, let me just direct you to Steve Richards' email because the -- the group may not understand what he meant by "the bulk of SE concern."  He meant special education, which is only 15 percent of our student body.  So this email is just about the 15 percent of our students who have IEPs.

Q.    Okay.

A.    So my concern was those students who have IEPs, they'll be more frustrated academically, which may -- some of them also have mental health diagnoses as well, which would be exacerbated by the academic deficits they have and coming back and being forced to do some things they hadn't done in a while.

Q.    Well, what is the academic frustration you're talking about?

MR. BYRD:  Object to form.

Go ahead.

THE WITNESS:  The academic frustration would be more rigor than they'd had in the last few

months.

BY MR. KEYES:

Q.   And then feeling stressed about not being able to keep up or having to work harder to keep up?

A.   Well, again, we're talking about a very small part of our population who struggle to keep up regularly.  So, yeah.  Even pre-COVID.

Q.   You said in April of 2021 that this was your guess.  Did your guess prove to be right?

A.   I don't know.  I don't know that our special education students presented mental health concerns more so than the rest of the population. I can't say that clearly.

Q.   You have not studied that issue?

A.   No.

(HENNIGAN EXHIBIT 5, Document titled Mental Health Statistics and Initiatives in HCPS, was marked for identification.)

BY MR. KEYES:

Q.   I'm showing you what has been marked as Hennigan Exhibit 6.

MR. BYRD:  5.

MR. KEYES:  I'm sorry.  Strike that.

BY MR. KEYES:

Page 107

Q.   I'm showing you what has been marked as Hennigan Exhibit 5.

THE WITNESS:   Thank you.

BY MR. KEYES:

Q.   Sure.

This was produced with the Bates Number HCPS_00039108 in native format.

What -- what is Hennigan Exhibit 5?

A.   So this appears to be a presentation that my team and I delivered to the Board of Education.

Q.   And do you know when you delivered this presentation?

A.   So based on my title, it would have been somewhere between January of '17 and June of '19.

My guess is probably in 2018.  I don't think I would have taken this on in my first year. '18 or '19.  '18 or the first half of '19.

Q.   These pages don't seem to be numbered, but could you go to the page that has Mental Health Initiatives?  It's got your -- Buzz Williams' name and "Superintendent's Designee"?

A.   Uh-huh.  Yes.

Q.   Do you see the page that -- that says:

Page 108

Reduced Suspensions For Counseling?

A.    Yes.

Q.    And then it lists:  Drugs, Alcohol, Tobacco, Conflict resolution, Fire setting and Bullying?

A.    Yeah.

Q.    What was this telling the board about reduced suspensions for counseling on these issues?

A.    So Mr. Williams became pretty adept at finding ways to try to help children learn from their mistakes rather than punishing them for their mistakes.

So, for instance, students caught smoking or vaping may have to complete a class, which would reduce their suspensions.

Students caught pulling the fire alarm might have to meet with the fire chief.  Students caught in possession of or use of drugs or alcohol may end up going through a class.

So all things that may help -- one, help them to learn from their mistakes; and, two, reduce their suspension.

Q.    Would you turn a few pages later, and you'll see a slide that says:  Mental Health Initiatives School Psychologists/Pupil Personnel

Page 109

Workers, and it lists Steve Richards?

A. Yes.

Q. Okay. Does that indicate that the next few slides were presented by Mr. Richards?

A. Yes. At that time, Mr. Richards also oversaw the pupil personnel workers that Mr. Williams currently now oversees.

Q. And is this a slide presentation where you would have reviewed it in advance of it being presented to the Board of Education?

A. Yes.

Q. The very first slide in the deck associated with Mr. Richards is a list of suicide risk factors.

Do you see that?

A. Yes.

Q. Do you think that is an accurate list of suicide risk factors?

A. I believe at the time it was.

Q. Okay. There's no mention of social media use here, correct?

A. Correct. It's sort of embedded throughout.

Q. How so?

A. Well, we know that social media is

directly tied to increase in depression.  So you have depression, but you don't have the factor which created it listed.

The same thing with suicide attempts. The same thing with substance abuse.  Family histories of depression.  Poor adaptability.

So all those things have been adversely impacted by social media as -- but this is sort of the end result of what was caused.

Q.   And what is your basis for saying social media is directly tied to an increase in depression?  What are you relying on?

MR. BYRD:  Object to form.  Asked and answered.

But go ahead.

THE WITNESS:  Research that I've read.

BY MR. KEYES:

Q.   What research can you point me to?

A.   So starting with something we've already discussed, which is "The Anxious Generation."

Q.   Mr. Haidt's book?

A.   Yeah.

Q.   Okay.  Anything else?

A.   Other reports that I can't cite by name

Page 111

but just, in my position -- in my position, I end up reading a lot of information about mental health concerns and causation in addition to my work with our partners in the health department.

And so I can't speak to any specific article or research, but I anecdotally can report that I've read a lot about it and heard a lot about it.

Q. And -- and Mr. Haidt's book and this other reports that you can't cite by name talk about how the content that a student can -- can read or comments about the student that are posted on social media can tie to depression and these other adverse consequences you list?

MR. BYRD: Object to form.

You can answer.

THE WITNESS: It's not just the content. It's the format. It's the way it's delivered. It's the addictive nature of it. It's all those things. So it's not just the content.

BY MR. KEYES:

Q. But the content is part of it?

A. Part of it.

Q. And would you say a minor part?

MR. BYRD: Object to form.

Page 112

THE WITNESS:  I can't -- I can't quantitatively answer that.

BY MR. KEYES:

Q.   You can't speak to what -- --

A.   What percentage content plays.

Q.   -- percentage of the -- of the causal force is attributable to content as opposed to something else?

A.   No.  I don't know that the kids could either.

Q.   And are you able -- even with a bit of reflection able to identify any of these reports that you mentioned before other than Mr. Haidt's book?

A.   Not off the top of my head, no.

Q.   Okay.  Either the -- the names of the author or the names of the reports or the names --

A.   I know your question.  I don't know the answer.

Q.   Okay.

MR. KEYES:  Off the record.

Let's take a break.

THE VIDEOGRAPHER:  We are off the record at 1649.

                    * * *

Page 113

(Whereupon, there was a recess in the proceedings from 4:49 p.m. to 5:08 p.m.)

* * *

THE VIDEOGRAPHER:  We are on the record at 1708.

BY MR. KEYES:

Q.   Mr. Hennigan, when you treated clients at the Human Development Center, were any of your clients students of Harford County Public Schools?

A.   Yes.

Q.   How many?

A.   I'll have to ballpark that.  Ten.

Q.   And did you treat any of those ten for social media addiction?

A.   No.

Q.   Did you treat any of them for addiction issues in general?

A.   No.

Q.   When you saw patients or clients at Guided Wellness Counseling, were any of your clients students of Harford County Public Schools?

A.   No.  Part of my -- that transition was I wasn't going to see students anymore because of my role here.  So I stopped seeing any Harford County Public School students.  I only saw either

Page 114

private school or adults.

Q. And did you treat any of the clients you did see at Guided Wellness Counseling for social media addiction?

A. No.

Q. Did you treat any of those clients for addiction issues in general?

A. Yes.

Q. What types of addictions did you treat them for?

A. Opioid use. I think that's probably the only clinical addiction that I dealt with as far as people that I saw.

Q. And what training do you have in treatment of patients for addiction?

A. I don't have specific training in that.

Q. But do you -- do you have any training in the treatment of patients for addiction?

A. Just in my regular clinical training, not specifically with an addiction.

Q. What do you mean just in your regular clinical training?

A. So when you get trained to be a clinician, you get trained in a myriad of areas, but you don't necessarily become an addictions

Page 115

counselor, a family marriage counselor, unless you do additional training and then market yourself as such.

Q. Have you ever marketed yourself as being a counselor who provides addiction treatment?

A. No.

Q. Have you ever published any articles on addiction treatment?

A. No.

Q. Have you ever lectured on addiction treatment?

A. No.

Q. Have you ever researched addiction treatment?

MR. BYRD: Object to form.

THE WITNESS: Probably.

BY MR. KEYES:

Q. What research did you do in the area of addiction treatment?

A. I don't know. I'm just thinking, over these past 15 years, I'm sure I've -- many times when I'm working with patients that have issues that I maybe don't have expertise -- direct expertise on, I'll do research.

So I imagine that I've come across

Page 116

research on that.  But I can't remember a specific instance or specific research.

Q.   Have you diagnosed any Harford County Public Schools' student with social media addiction?

A.   That's not my role; so, no.

Q.   So you've never done it?

A.   No.

Q.   Have you diagnosed any Harford County Public School student with any addiction?

A.   Not my role.

Q.   So you haven't done it?

A.   No.

Q.   Have you done any clinical research into addiction?

A.    I think you already asked me that. Yeah, I -- I think I have.

Q.   Okay.  What is the clinical research you've done regarding addiction?

A.   To restate what I said a minute ago, I don't know that I have or what I have.  I just would assume that probably over the years I have had some -- come across some research on addiction.

Q.   By Googling it or something else?

A.   Or in -- yeah, I don't know if it's

through Googling or not.  I'm not sure.  I'm just -- I'm sure I've come across research on addiction in my years of working in this field. How I came across it, I don't know, but it seems like a logical conclusion that I would have.

Q.   Okay.  I was asking about clinical research.  You're saying you -- you may have come across research on addiction that you read, correct?

A.   Uh-huh.

Q.   Is that -- is that a "yes"?

A.   Yes.

Q.   But you're not able to identify any of the research that you may have come across, correct?

A.   Correct.  Correct.

Q.   Have you done any clinical research into addiction, that is, working with patients who participate in any kind of clinical study?

A.   Oh, no.

Q.   Has any Harford County Public student come to you to say they were diagnosed with social media addiction?

A.   No.  I don't -- no.

Q.   Has any Harford County Public School

Page 118

student come to you to say they think they have social media addiction?

A.    Would you define pornography as social media?

Q.    No.

A.    Clinical diagnosed addiction or their own -- in their own verbiage?

Q.    Well, I already asked, has any Harford County Public School student come to you to say they were diagnosed with social media addiction.

A.    Uh-huh.

Q.    You said no.

So now I'm asking, has any Harford County Public School student come to you to say, "I think I have social media addiction"?

A.    Potentially.

MR. BYRD:    Object to form.

BY MR. KEYES:

Q.    Potentially.

Can you -- can you identify any for a specific instance where that happened?

A.    So --

MR. BYRD:    And -- and, obviously, objection.    And as far as revealing some student's name, we're not going to do that.    But if there's

Page 119

an instance that's specific, he can talk about it genically.

THE WITNESS: So since this portion is to do with my personal life, I've had a lot of discussions with my children and their friends, and they've had a lot of discussion about having issues with getting off social media.

So whether they've used the word "addiction" or not, I can't say. But I've had conversations with Harford County Public School students who have discussed their concern with their inability to stop accessing social media.

BY MR. KEYES:

Q. And are these Harford County Public School students, you're identifying your children and their friends?

A. My children's friends, not my children.

Q. Okay. So you've had discussions with your children's friends where they say they have issues with getting off social media?

A. Yes.

Q. But you don't know whether they've ever used the word "addiction" or not?

A. Correct.

Q. Have you had discussions with any

Page 120

Harford County Public students, other than your children's friends, where those students have said, "I think I have social media addiction"?

A. Not that I recall.

Q. And have you had any discussions with any Harford County Public School students, other than your children's friends, where they've said they have issues with getting off social media?

A. Possibly.

Q. Can you recall any specific instance?

A. No. But I spend a lot of time hearing students, being in classrooms, being in buildings, and that possibly could have been a discussion.

Q. So you'd say it's possible. You just don't remember any specific instance?

A. Correct.

Q. Have you discussed with any teachers the percentage of time they spend on issues related to social media in the classroom?

A. Yes.

Q. What teachers?

A. By name?

Q. Yes.

A. I'm thinking of faces. Ms. Ackley, Kelly Ackley.

Page 121

Q.   Anyone else?

A.   Ms. Jester.

Q.   Anyone else?

MR. BYRD:  Give him a second here. He's said he's thinking.

THE WITNESS:  Kelly -- Kelly Jester, same as Kelly Ackley.  I can't think of other people's names --

BY MR. KEYES:

Q.   Okay.

A.   -- at the moment.

Q.   Have you given me two names?

A.   I have.

Q.   Kelly Ackley and Ms. Jester?

A.   Kelly Jester, yeah.

Q.   Kelly Ackley and Kelly Jester?

A.   Correct.

Q.   Okay.  And where does Kelly Ackley teach?

A.   South Hampton Middle School.

Q.   What grade or grades?

A.   She's a special educator.

Q.   And where does Kelly Jester work?

A.   Bel Air Middle School.

Q.   What grade or grades does she teach?

Page 122

A.    Either 7th or 8th.  There's also a Ms. Forbes, F-O-R-B-E-S.  I don't know her first name.

Q.    Where does she teach?

A.    Bel Air Middle School.

Q.    What grade or grades?

A.    At the time -- well, sorry.  She's Bel Air High School now.  At the time that we talked about this, she was at Bel Air Middle School.  And we had some lengthy discussion about it as I was there for a group response following a suicide of one of their children.

Q.    What grade or grades did she teach?

A.    8th grade at the time.

Q.    Okay.  Anyone else?

A.    Mindy Durante, D-U-R-A-N-T-E.  She is an art teacher at Edgewood High School.

Q.    Anyone else?

A.    Not that I can think of.

Q.    Okay.  What did Ms. Ackley say about the percentage of time she spent on issues related to social media?

A.    She didn't give me a percentage.

Q.    What -- what did she say in terms of characterizing it?

Page 123

A.    We just spoke about the policy that was coming out this year and her being excited about it because of the issues they have trying to get kids to put their phones away and the issues they're having with inattention due to students preferring to be on social media apps rather than attend to the teacher.

Q.    So she was pleased that the Board of Education was adopting the current policy?

A.    Correct.

Q.    Have you talked to her since the policy was adopted about the percentage of time she spends on issues related to social media?

A.    No.

Q.    What did Ms. Jester say about the percentage of time she spent on issues related to social media?

A.    She did not indicate percentages.

Q.    What did she say in terms of characterizing it?

A.    Similar to Ms. Ackley in that it was a struggle to keep the attention of the students in part because of wanting to access their phones during the day and in part because of their rewiring of their brain due to social media outside

Page 124

of the school day.

Q. Anything else?

A. Nothing that I can recall.

Q. What did Ms. Forbes say about the percentage of time she spent on issues related to social media?

A. Did not indicate a percentage.

Q. What did she say about the time she spent on issues related to social media in terms of quantity of time?

A. Quantity of time, she didn't indicate the quantity of time.

Q. What did Ms. Durante say about the percentage of time she spent on issues related to social media?

A. She didn't indicate a quantity of time or a percentage.

Q. Okay. So have you spoken with any teacher in Harford County Public Schools who has described for you the quantity of time they spent on issues related to social media?

MR. BYRD: Object to form.

THE WITNESS: Possibly, but not that I can recall clearly enough to state.

BY MR. KEYES:

Page 125

Q.    Okay.    Have you spoken with any administrator in Harford County Public Schools who has described for you the quantity of time they spend on issues related to social media?

MR. BYRD:    Object to form.    Asked and answered on whatever exhibit number we are in now.

THE WITNESS:    It is a conversation that I have with administrators, but I don't have detailed information about quantity of time.

BY MR. KEYES:

Q.    Are you able to identify for me any administrator in Harford County Public Schools who describe for you the quantity of time they spend on issues related to social media?

A.    No.

MR. BYRD:    Object to form.

BY MR. KEYES:

Q.    Are you able to identify for me any quantitative data that shows how many Harford County Public School students are -- have social media addiction?

MR. BYRD:    Object to form.

THE WITNESS:    No, because I'm not privy to their clinical diagnoses.

BY MR. KEYES:

Page 126

Q.   Are you able to identify for me any quantitative data that shows how many Harford County Public School students are addicted to the use of cell phones?

A.   No, because I don't have access to that data.

Q.   Are you able to identify for me any quantitative data that shows how many Harford County Public School students are addicted to cell phones or social media because of the defendants' platforms?

A.   No.

MR. KEYES:  Okay.  I have no questions at this time.

Does anyone else on the Zoom have questions for Mr. Hennigan?

MR. FLASTER:  No questions from Meta.

MR. BYRD:  Okay.  Just a couple follow-ups here.

                    * * *

                 EXAMINATION

BY MR. BYRD:

Q.   You were asked about this PowerPoint here, this State of Maryland YRBS PowerPoint.  I think it's Exhibit Number --

Page 127

A.    3.

Q.    -- 3.  Do you recall those questions?

A.    I believe so, yes.

Q.    If you can turn to Page 7 of the PowerPoint.  It's titled -- it says:  Overall trends from the most recent YRBS/YTS.

Do you see that?

A.    Yes.

Q.    And it looks like the trend is up.  The trend is up for mental health indicators, which are:  sad or -- well, can you read what those are?

A.    Sad or hopeless, suicide ideation, suicide attempt.

Q.    And the trends, according to this document, say that those are going up, right?

A.    Yes.

Q.    Is that consistent with what you were discussing as it relates to social media?

MR. KEYES:  Objection to form.

THE WITNESS:  Absolutely.  I think the -- a lot of what we talked about today are societal factors that have existed for decades and have not spiked this data and with any comparison to the spike in the data once social media became prevalent and accessible to students.

Page 128

BY MR. BYRD:

Q. And Mr. -- the defense counsel asked you -- Mr. Keyes asked you about some of these other things all throughout today and earlier today about tobacco and alcohol and other things.

And then what does it say the trend is for that in this document that he -- that he showed you?

MR. KEYES: Objection to form.

THE WITNESS: So substance indicators -- substance use indicators are on a downward trend.

BY MR. BYRD:

Q. So for the ACEs, the substance indicators that form some of these ACEs are going down, right?

MR. KEYES: Objection to form.

THE WITNESS: So the -- yeah. So for -- as far as substances, yes.

BY MR. BYRD:

Q. While the mental health indicators are going up, right?

A. Correct. Yes.

Q. And this is in 2021. This -- this is -- this report covered 2021 to '22, right?

Page 129

A. Yes.

Q. It talks on that same page about female students more likely to report mental health.

Is that consistent with what you've been saying about social media?

A. Yes. And -- and if I can expound.

These two data points, the mental health indicators going up and substance use going down, are more directly linked than you might think.

The alcohol, tobacco, marijuana use is down in part because kids are not going out and leaving their houses and socializing.

And, as a result, they're in their homes alone or without socialization, without friends, which is then leading to hopelessness and sadness and suicidal ideation.

And in part because, as I said earlier, a lot of our -- and especially females know that they are imperfect. But yet on social media, it appears to them that everybody else is perfect.

So when you don't go out of your house to socialize with others the way children have in past years, you're not going to engage in risky behavior because you're not going to smoke a

Page 130

cigarette in your bedroom the same way you might in a woods somewhere or something. So you're going to see those go down.

But yet we've -- now we've got these socially isolated children who are comparing themselves to people based on filters and based on inaccurate portrayals that people are putting of themselves on social media.

So then it kind of makes sense why it's happening.

Q.   So turn to Page 14.  You were asked about this emotional abuse map by county.

Do you see that?

A.   Good thing you said that because I thought that was an acronym.

Q.   Oh.  I don't know.

A.   No, I don't think it is.

Q.   It is a map.

A.   I think you're right.  It's a map.

Q.   I don't know if I'm referring to the acronym "MAP," but who knows.

A.   No, it's a map.

Q.   But you were asked questions about this, right?

A.   Yes.

Page 131

Q. Well, now, is -- from your observations and expertise and time in this field with students, is social media leading to emotional abuse?

MR. KEYES: Objection to form. Foundation.

THE WITNESS: I definitely -- I definitely think there's -- there's some correlation.

I -- we have seen, as I said, a generalized deterioration of parenting. And so when parents are themselves addicted to social media, they are annoyed by a child who needs attention --

BY MR. BYRD:

Q. Can it lead --

A. -- which can lead to emotional abuse.

Q. So can it -- can it exacerbate emotional abuse that's already occurring?

A. I believe so.

MR. KEYES: Objection to form.

BY MR. BYRD:

Q. Huh?

A. I believe so.

Q. What about household mental illness that you were asked about on 18? Can social media

Page 132

exacerbate or even cause household mental illness problems?

MR. KEYES: Objection to form.

THE WITNESS: Well, social media has created a new diagnosis of mental illness that didn't exist in prior years. So you now have a new addiction on the streets that wasn't there prior. So, yes.

BY MR. BYRD:

Q. And if you turn to Page 27, I think we've talked about it.

The idea is that you have these ACEs, right?

A. Yes.

Q. We listed all of them.

Are -- are -- are kids that have ACEs or multiple ACEs, are they more vulnerable to social media -- to -- to problems from social media use?

MR. KEYES: Objection to form.

THE WITNESS: They can be. Because the impact of an ACE is all dependent on the presence or absence of protective factors, the presence or absence of resilience.

So a child who is already down and out

Page 133

is going to be more adversely affected by an ACE and by negative inferences that are drawn from social media than a child who, let's say, has a very sound home life, who maybe can write off a fleeting feeling of sadness or depression or -- I won't call it "depression."

-- of sadness or inadequacy because they then can look around at the rest of their life and see, Okay, I can deal with that small blip.

But other students who have a lot of ACEs can then just see those feelings of inadequacy and sadness and hopelessness as just one more straw in the pile, which is why we have seen an increase in -- in suicides.

BY MR. BYRD:

Q.   If you -- it's Page 27.  And so as I understand what you said, you have these ACEs.

And to mitigate the -- it says to mitigate the effects of ACEs, communities can focus on these, like -- on positive experiences.  And they list these seven things right here, right?

A.   Uh-huh.  Yeah.

Q.   Just -- just looking at some of these, does social media help or hurt these childhood positive experiences?

Page 134

MR. KEYES:  Objection to form.  Lack of foundation.

THE WITNESS:  I think it hurts several of them.  I think children are not -- are not engaging in community traditions and volunteerism as much as they were, because they don't want to engage in those things because they're -- would rather sit in their room and stare at videos all day.  And, frankly, that was one that surprised me as a parent.  I didn't know how important it was to have my children involved in community events and volunteerism.

I would also say feeling safe and protected by an adult in your home, a lot of our children have grown up with -- with adults who they don't feel safe around because they're not paying attention to them because they're more interested in what's happening in their phone.

Feeling supported by friends, we know by research that children are not socializing and don't have the friendships to the degree they did pre-social media.  So that's an absolute impact.

Feeling a sense of belonging in high school, again, social media has created more of a feeling of isolation than of belonging.

Page 135

Those are the -- those are the big ones I would say that have been negatively impacted by social media.

BY MR. BYRD:

Q. You were asked by counsel about COVID several times, and you remember he -- he asked you questions but wanted you to exclude any -- any relationship that COVID had to -- to social media use, right?

So I think you started to say that there were other reasons, and he said, "I don't want to hear about the other reasons."

Can you tell the jury about, how does -- how is COVID and social media related?

MR. KEYES: Objection to form. Totally mischaracterizes the record. If you're going to characterize the record, let's be accurate.

MR. BYRD: Yeah, we can read it.

Go ahead.

THE WITNESS: So part of the -- part of the problem, again, when people use the word "COVID," it's too general because there's a million things associated with COVID; that some of it was positive, to be honest with you.

But part of the issue with COVID is

Page 136

people -- a lot of parents wanted to find a way to connect their children because they weren't able to connect in person.  They thought using social media or phones would be a good avenue to do that and then were hoodwinked into believing that that was going to be a positive thing, and then it turned into the crisis we're in today.

So I think if not for COVID, the statistics on when children are introduced to phones and social media would probably -- that sort of bell curve probably would be moved because it's now become socially acceptable to do those things at a much younger age.

BY MR. BYRD:

Q.   So social media made the isolation problems from COVID worse, right?

MR. KEYES:  Objection to form.

THE WITNESS:  In the long run, I think. In the short term, maybe not.  But in the long term, it absolutely created an environment where children felt that they were making friends with people they never met.  They were socializing and talking, quote, unquote, to people when they weren't even opening their mouth.

And, frankly, it had -- has opened the

Page 137

doors for a lot of sexual predators and child trafficking. The average age of an online gamer is 30, and most of our kids probably think it's 12. So a lot of our ten-year-olds are playing games with 50-year-olds who they think are 12.

And child sex trafficking has become the Number 2 highest crime in our country. And I think social media has allowed for people to enter the lives of children, who in person those children would have been savvy enough to never let that happen, and parents wouldn't have let them in.

But the issue is, all those places and people that my parents wouldn't let me go be and see, my child doesn't have to leave her bedroom to go see them. So they're all right there inside that phone preying on them, where I had to leave my house and go find those things.

So the problem with social media that has been exacerbated through COVID is all those demons are right there inside your child's bedroom.

BY MR. BYRD:

Q. Let me just ask you a couple of quick follow-up things. You were asked about hiring -- hiring more professionals to deal with social media and whether you put that on the form or not.

Page 138

Just to confirm, you did hire more professionals because of the social media issues you've been dealing with, correct?

MR. KEYES:  Objection to form. Mischaracterizes the testimony.

THE WITNESS:  We hired more individuals because the mental health crisis spiked so sharply in -- in response to increased social media access.

BY MR. BYRD:

Q.   And that's true even though you didn't write it down somewhere in the funding request, right?

A.   Correct.

Q.   You were asked about this Interrogatory 5 --

A.   Yes.

Q.   -- that I think is Exhibit Number 2.

A.   Yes.

Q.   You were asked about two of the categories, and I think you said you may have contributed to the pupil personnel services was one.  You couldn't recall.  Do you remember those questions?

A.   I do.

Q.   Let me just ask you.  From what I

Page 139

understand what pupil personnel services do, well, explain what that is, and how could that relate to social media?  Even if you gave the weight or didn't give the weight, how can that relate to social media?

MR. KEYES:  Objection to form.

THE WITNESS:  So pupil personnel workers do a lot of things, but a large part of their job is managing attendance at the most egregious levels.  So working with families when children's attendance has become unresolved by letters and phone calls.

So the pupil personnel workers will do a lot of home visits, taking families to court, taking them to truancy court for children who are missing a lot of school.

And one of the things that we've seen in my presentation to the Board of Education is we have seen, you know, changes in our attendance. And part of that, anecdotally speaking, we have children not wanting to come to school either because of how they feel about themselves, how they've been made to feel by other people, bullying and harassment that's occurred on social media, all these things.

Page 140

So when you look at a caseload of children not coming to school, every single one of them has a different reason. But a lot of what our pupil personnel workers are seeing is students wanting to be isolated for two reasons.

One, they've become uncomfortable being in social situations because social media has stripped that away from them. But they also don't feel as though they can get up and go a lot of times because of the lack of sleep.

And I know that in California and Florida, they're looking at changing school times because of -- there's a recognition that school starts too early because kids are not going to sleep on time. And some of that is because parents are allowing them to have their phones in their bedrooms at night. And they can't figure out why their child is so tired and looks depressed when they're not monitoring the fact that their child may have been on the phone until 4:00 in the morning and then getting up at 6:00 for school.

So the PPWs are spending a lot of their time trying to address attendance issues that would not be issues if it not for some social media.

BY MR. BYRD:

Page 141

Q.   Okay.  And finally, at the beginning of this deposition, you were asked about whether you had done anything -- you had done anything to ask the defendants to change their conduct or change their platforms.  Do you recall that question?

A.   I do.

Q.   And you asked, do you mean me personally; is that right?

A.   In this part.  I believe this morning I was asked if the system had, but, yes, me personally --

Q.   Yeah.  Has the district done anything to ask the social media companies about --

A.   Absolutely, yeah, in this complaint, because they recognize that they have all the power in changing how -- in how this information is delivered to children and, frankly, the impact that that's having on them, so...

MR. BYRD:  Okay.  That's all I have.

* * *

EXAMINATION

BY MR. KEYES:

Q.   For Exhibit 2, the program/department worksheet, where it says:  Pupil personnel services, 5 percent.

Page 142

A.   Uh-huh.

Q.   Are you there?

A.   I am.

Q.   You said you may have spoken with Buzz Williams?

A.   Yes.  I just remember getting this and debating if I was going to look into it and answer it or if he was.  I don't remember where that shook out.

Q.   If Mr. Williams testified that he picked the 5 percent weight for pupil personnel services, would you defer to his testimony on how he arrived at that 5 percent?

MR. BYRD:  Object to form.

THE WITNESS:  I'd say in part.  The PowerPoint that you noticed earlier had Mr. Richards as the supervisor of pupil personnel services, so it's -- you know, he understands the job and works with those -- with that staff and has for years but doesn't have the historical knowledge that I have having been a pupil personnel worker for 12 years of my career.

BY MR. KEYES:

Q.   Well, but if Mr. Williams testified that he picked the 5 percent weight for pupil

Page 143

personnel services --

A.    Uh-huh.

Q.    -- without consulting you --

A.    Uh-huh.

Q.    -- would you defer to his testimony on how he arrived at the 5 percent weight?

MR. BYRD:  Objection.  And speculation and vague.  And he doesn't know about what the testimony was to be able to tell you whether he --

MR. KEYES:  Well, it's a --

MR. BYRD:  -- defers to it or not.

MR. KEYES:  Well, it's a speaking objection.

BY MR. KEYES:

Q.    But if someone else said, "I picked the 5 percent," and you don't have any recollection of picking the 5 percent, would you defer to his testimony on how he picked the 5 percent?

MR. BYRD:  Object to form.

THE WITNESS:  I suppose I would have to.

BY MR. KEYES:

Q.    You testified earlier that without COVID, families, parents and students would not have allowed students access to phones or social

Page 144

media as early as they did.  Did I get that right?

A.   I said I don't think they would have. I think the --

Q.   Do you -- do you have any -- any --

A.   -- the trajectory would be different.

Q.   Do you have any data or research --

A.   No.

Q.   -- to support that opinion?

A.   No.

Q.   That's your impression?

A.   Yeah.

MR. KEYES:  Okay.  I have no further questions.  Thank you, Mr. Hennigan.

MR. BYRD:  Okay.  We're done.

MR. KEYES:  Does anyone else?

MR. FLASTER:  None from Meta.

MR. KEYES:  Anyone else on Zoom have any questions for Mr. Hennigan?

MR. KEYES:  Okay.

MR. BYRD:  I think we're done.  I will say, for the court reporter, that I believe our side has looked at your redact- -- they've proposed redactions and are going to send it.  And you all please chime in or do whatever.  And that's that we -- we either have sent it or are soon sending it

Page 145

to you, to the court reporter.

THE VIDEOGRAPHER:  Stand by.  We are off the record at 1743.

MR. KEYES:  Can you offer our times?

THE VIDEOGRAPHER:  Yes.  Mr. Keyes is at 2 hours and 22 minutes.  And Mr. Byrd is at 16 minutes.

(WHEREUPON, the deposition was concluded at 5:44 p.m.)

(Signature Reserved.)

Page 146

DEPOSITION ERRATA SHEET


Case Caption:  In Re:  Social Media Adolescent
Addition/Personal Injury Liability Litigation
        DECLARATION UNDER PENALTY OF PERJURY


            I declare under penalty of perjury that
I have read the entire transcript of my deposition
taken in the captioned matter or the same has been
read to me, and the same is true and accurate, save
and except for changes and/or corrections, if any,
as indicated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer these
changes as if still under oath.



            Signed on the _____ day of
_____, 20___.



_____
            BERNARD HENNIGAN

Page 147

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

BERNARD HENNIGAN

Page 148

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

BERNARD HENNIGAN

CERTIFICATE OF REPORTER

I, Cindy A. Hayden, Registered Merit Reporter and Notary Public for the State of Maryland, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof. Witness my hand, this 8th of May, 2025.



_____
Cindy A. Hayden,
Registered Merit Reporter
Notary Public
State of Maryland
My Commission expires:
April 26, 2029

**[& - 3]**

| & |
| --- |
| **&** 2:9,17 3:4,10 3:16 6:4 40:3 |

| 0 |
| --- |
| **00039108** 107:7 |
| **00199774** 102:20 |
| **00199774-777** 4:17 102:16 |
| **03065** 1:8 |

| 1 |
| --- |
| **1** 4:10 9:2,6 149:5 |
| **10** 19:4,5,10 21:5,5,6,11 22:24 53:11 54:16 55:3,5,6 55:9,13 56:25 57:11,14 58:2 60:2 88:8 89:24 |
| **100** 79:1 90:8 |
| **10013** 2:10 |
| **102** 1:14 4:16 |
| **106** 4:18 |
| **110** 78:23 |
| **1180** 3:16 |
| **12** 21:5,6 22:25 137:3,5 142:22 |
| **12.1** 68:10 |
| **12.3** 68:19,24 69:14 |

**12466** 149:15
**126** 4:4
**14** 26:5 67:25 68:2 130:11
**14.8** 74:2
**141** 4:5
**1421** 5:8
**15** 18:4,6,11,12 19:4,5,10 22:16,17,18 80:16 105:9,10 115:21
**1527** 63:24
**1550** 64:5
**16** 69:24 78:17 83:2 101:3 145:7
**16.4** 74:11
**1600** 3:17
**1649** 112:24
**17** 4:15 52:12 64:8 78:17 107:15
**17.7** 76:9
**1708** 113:5
**1743** 145:3
**18** 71:19 107:19,19 131:25
**19** 86:25 87:7 87:19 107:16 107:19,19
**199777** 102:20

**1st** 9:19 12:9,20

| 2 |
| --- |
| **2** 4:11 40:6,7 47:16,22 48:10 88:1 101:2 137:7 138:17 141:23 145:6 |
| **20** 18:4,6,11,12 73:23 80:4,10 83:2 104:12,13 146:17 |
| **20024** 3:11 |
| **2010** 14:8,12 17:7,14 18:1 20:9 |
| **2015** 20:4 |
| **2016-2017** 78:16,25 80:6 80:11,17,25 81:5 82:16 100:25 101:13 |
| **2017** 10:5 17:16 18:1 20:4,19 |
| **2018** 23:13 102:7 107:17 |
| **2019** 11:2 25:16 101:25 |
| **202.434.5584** 3:11 |
| **2021** 71:22 103:15 106:9 128:24,25 |

**2021-2022** 4:14 64:6 68:9 70:2 74:1
**2022** 71:22
**2023** 4:15 64:8
**2024-2025** 92:10,15 93:2 94:24
**2025** 1:16 5:7 149:13
**2029** 149:19
**21** 65:4 104:11 104:14
**212.355.9500** 2:10
**21209** 2:4
**21st** 103:14
**22** 65:4 128:25 145:6
**220** 2:4
**25.3** 70:3
**250** 2:9
**26** 75:15,20 149:19
**27** 132:10 133:16
**27.9** 70:12
**2850** 2:4
**2:21** 1:16

| 3 |
| --- |
| **3** 4:13,14 40:8 47:19,25 48:17 64:6,11 78:13 |

101:2 127:1,2
**30** 18:25 19:1
  22:14 48:2,6
  137:3
**30309** 3:17
**3047** 1:4
**30s** 78:18
**312.862.1083**
  3:5
**33.5** 71:23
**333** 3:4
**3400** 2:18
**38.7** 72:6 73:15
**3:27** 64:2
**3:50** 64:2

**4**

**4** 4:16 48:19
  78:13,13
  102:14,19
  103:13
**4/21/21** 4:16
  102:15
**40** 14:17
**404.572.2774**
  3:18
**40s** 18:19
**410.421.7777**
  2:5
**43** 78:13
**47** 4:11
**4:00** 140:20
**4:22** 1:4

**4:23** 1:8
**4:49** 113:2

**5**

**5** 4:3,18 52:24
  53:19 54:7,11
  55:18,18 56:6
  56:11,20 58:9
  58:11 59:4,5,9
  59:19 88:7,17
  88:20 89:24
  100:23 106:17
  106:23 107:2,8
  138:15 141:25
  142:11,13,25
  143:6,16,17,18
**50** 137:5
**55** 100:24
**57** 81:8
**5:08** 113:2
**5:44** 145:9

**6**

**6** 40:7 48:2,6
  106:22
**600** 2:18
**60654** 3:5
**62** 81:4
**64** 4:14
**680** 3:10
**6:00** 140:21
**6th** 36:23 37:3
  37:6

**7**

**7** 1:16 127:4
**70.8** 76:14
**713.227.8008**
  2:19
**75** 19:8
**77002** 2:19
**7th** 5:7 26:8
  30:5,9 31:1
  36:20,25 37:4
  37:12,18 38:14
  38:21,25 122:1

**8**

**8** 4:10 18:19
  100:23
**80** 19:8 21:9
**8th** 2:9 26:6,8
  30:5,20 31:2
  36:21 37:5,18
  38:8,15 122:1
  122:14 149:13

**9**

**90** 21:9
**9th** 26:6

**a**

**ability** 26:17
  149:10
**able** 18:20
  25:13 28:23
  39:18 43:23
  44:14,19 45:10
  81:14 85:16

89:10,18 91:19
93:15 94:2,16
95:9 96:9,15
99:3,9,17
106:4 112:11
112:12 117:13
125:11,18
126:1,7 136:2
143:9
**above** 30:4
**absence** 77:11
  132:23,24
**absolute**
  134:22
**absolutely**
  42:14 77:25
  78:6 127:20
  136:20 141:14
**abuse** 68:3,11
  68:14,15,16,20
  68:25 69:16,20
  70:4 84:9,15
  84:16,20,25
  85:1,5,6,9,20
  85:23,24 86:21
  110:5 130:12
  131:3,16,18
**abused** 84:25
  85:24
**academic** 89:21
  104:1,16 105:3
  105:17,20,24
**academically**
  60:13 104:20

105:14
**acceptable**
  136:12
**access** 32:19,21
  33:18,22 34:24
  36:15 43:3,8
  44:5 123:23
  126:5 138:8
  143:25
**accessible**
  127:25
**accessing**
  119:12
**account** 26:11
  26:21 27:14,16
  27:18,22,25
  28:1 30:10,12
  30:14,16,18,21
  30:24 31:12,15
  31:19,22,25
  32:4,9,12,16
  33:18 55:23
  57:2,5
**accounts** 29:23
  31:3 32:7
**accurate** 71:17
  73:18 90:8
  109:17 135:17
  146:9 149:9
**ace** 68:15 70:8
  72:3 74:6
  132:22 133:1
**aces** 65:3 67:6
  67:16 75:16

76:5 77:15,19
77:19,20,22
128:14,15
132:12,16,17
133:11,17,19
**ackley** 120:24
  120:25 121:7
  121:14,16,18
  122:20 123:21
**acronym** 81:19
  130:15,21
**active** 14:11
**activities** 54:2,3
  54:6
**activity** 32:24
  34:21 37:22,24
**actually** 18:10
  26:20 49:24
  66:10 77:12
  97:14
**adam** 3:15
**adaptability**
  110:6
**added** 10:22
  11:2
**addicted** 126:3
  126:9 131:11
**addiction** 1:3
  5:11 113:14,16
  114:4,7,12,15
  114:18,20
  115:5,8,10,13
  115:19 116:5
  116:10,15,19

116:23 117:3,8
117:18,23
118:2,6,10,15
119:9,23 120:3
125:21 132:7
**addictions**
  114:9,25
**addictive**
  111:19
**addition** 57:9
  61:8,10 63:12
  102:5 111:3
  146:3
**additional**
  115:2
**address** 81:22
  140:23
**addressed**
  94:23
**addressing**
  91:13
**adept** 108:9
**administered**
  66:9
**administers**
  66:3
**administration**
  1:13
**administrator**
  15:14 125:2,12
**administrators**
  125:8
**adolescent** 1:3
  5:11 146:2

**adolescents**
  72:22
**adopted** 123:12
**adopting** 123:9
**adult** 134:14
**adults** 18:19
  19:3 21:8,16
  21:18,19 114:1
  134:15
**advance** 109:9
**adverse** 4:15
  64:7 67:9 70:8
  72:3 74:6 76:8
  76:13,23 77:3
  78:1 111:14
**adversely**
  110:7 133:1
**advertised**
  25:19
**affected** 133:1
**affirmative**
  69:13 71:1
  75:5
**afraid** 83:19,24
**afternoon** 6:1
**age** 18:15 30:3
  136:13 137:2
**ago** 21:23 22:4
  25:14,15,15
  28:6,8 29:8
  36:10 50:14
  103:17 116:20
**agree** 84:2,24
  85:22 86:6,11

86:18 87:6
**ahead** 31:6
53:23 55:22
105:23 110:15
135:19
**aid** 15:17,18
**ailments** 81:13
**air** 1:15 5:10
121:24 122:5,8
122:9
**akeyes** 3:12
**al** 1:7
**alarm** 108:16
**alcohol** 70:24
108:3,18 128:5
129:11
**alert** 33:8,14
34:7 38:18
**alex** 3:3
**alex.ingoglia**
3:6
**allow** 37:20
**allowed** 33:4
137:8 143:25
**allowing**
140:16
**alphabet** 3:7
**alton** 101:20
**ambiguous**
83:7
**amended** 4:12
47:17,23
**amount** 19:21
19:23 33:23

54:1 55:25
56:1,2,4
**andrew** 3:9 6:2
**anecdotal**
93:23 94:1,21
**anecdotally**
111:6 139:20
**annoyed**
131:12
**annually** 66:16
66:16
**anonymous**
69:11
**answer** 7:20
8:8 36:13
51:10 53:3,7
53:15 57:16
66:23 69:3
70:25 72:21
95:2 96:13,14
96:22,23
111:16 112:2
112:19 142:7
**answered**
71:14 87:10,22
110:14 125:6
**answering**
69:12 75:4,10
**anticipate** 12:8
**anxiety** 61:25
62:12,19 63:6
81:12,20 100:6
**anxious** 110:20

**anymore**
113:23
**app** 27:21 28:3
32:22,25 33:1
33:2 34:6
36:18 37:22,23
38:2,12,16
39:13,13 44:6
45:23 46:2,5,8
**appearance**
2:22
**appearances**
2:1 3:1
**appears** 67:12
107:9 129:21
**apple** 38:11
42:24
**apply** 38:20
**approached**
19:14 104:5
**approve** 38:12
38:19
**approximately**
78:23 79:1
80:4,10
**apps** 38:5 39:1
39:9,10,14,19
43:3 47:6,8
123:6
**april** 103:14
104:11 106:9
149:19
**apt** 90:10

**area** 115:18
**areas** 114:24
**areinke** 3:18
**arndt** 3:20
**arrive** 55:17
**arrived** 56:6,11
57:11,14
142:13 143:6
**arriving** 57:1
**art** 122:17
**article** 111:6
**articles** 115:7
**asked** 8:2,11,13
8:17 19:17
23:17 31:2
49:3 71:13
87:9,21 92:2
92:13 95:4,6
100:10 110:13
116:16 118:8
125:5 126:23
128:2,3 130:11
130:23 131:25
135:5,6 137:23
138:14,19
141:2,7,10
**asking** 40:25
48:3 75:13
94:21 99:24
103:20 117:6
118:13
**assessment**
57:18 58:20,21
91:23 92:1,16

93:2 94:10,25
**assigned** 58:10
**assigning** 56:20
 58:2
**assistance**
 82:12
**assistant** 9:14
 10:17,20 12:5
 12:24
**associated** 75:4
 109:13 135:23
**assume** 46:7
 116:22
**assuming** 36:10
 66:8 67:1
 68:16
**atlanta** 3:17
**attachment**
 49:23,24
**attempt** 127:13
**attempts** 110:4
**attend** 123:6
**attendance**
 90:22 139:9,11
 139:19 140:23
**attendees** 24:24
**attending**
 25:10
**attention** 25:18
 85:14 123:22
 131:13 134:17
**attorney** 6:3
**attributable**
 59:22 60:5

112:7
**attribute** 62:13
**attributed**
 95:12 96:1,12
 96:18 97:25
 99:6,12,19
**author** 112:17
**automatically**
 27:24
**availability**
 56:15
**avenue** 1:14
 136:4
**average** 137:2
**aware** 35:22
 39:10 65:12
 93:10,11,12
 97:23

**b**

**b** 4:7 48:2,6
 122:2
**babies** 85:12
**bachelor's**
 13:13
**back** 11:1
 35:25 36:4
 56:4 57:10
 80:5 82:18
 88:1 104:14
 105:17
**bacon** 2:17
**ballpark**
 113:12

**baltimore** 2:4
 7:1
**barrier** 92:6
**base** 73:5
**based** 9:11
 41:18 54:5
 57:8 60:15
 82:21 90:19
 94:5 99:25
 104:14 107:14
 130:6,6
**basis** 22:12,15
 22:19 23:1,6
 61:5 69:9,18
 110:10
**bates** 4:17
 64:13,15
 102:15,20
 107:6
**becoming**
 82:22
**bedroom** 32:20
 33:20 130:1
 137:14,20
**bedrooms**
 140:17
**bedtime** 92:4
**began** 19:24
**beginning**
 141:1
**behavior** 35:7
 35:19 79:12,17
 80:8 97:1,17
 97:25 100:5

129:25
**behavioral**
 65:7,14,22
 66:14 89:20
**behaviors**
 99:25
**bel** 5:10 121:24
 122:5,8,9
**believe** 9:1 12:9
 14:3,8 15:3
 24:19 25:19,24
 32:14 36:20
 51:23 53:8,16
 54:11 56:12
 57:17 58:5,8
 58:11 70:16
 72:10 74:15
 75:7 80:20
 87:14 91:25
 92:12,13
 109:19 127:3
 131:19,23
 141:9 144:21
**believing** 136:5
**bell** 1:15
 136:11
**belonging**
 134:23,25
**bereal** 40:18
**bernard** 1:11
 4:10 5:14,20
 6:8 9:2 146:21
 147:24 148:24

**bernstein**  2:9
**best**  25:16 35:2
  35:5 149:10
**better**  77:21
**biannually**
  66:17
**big**  26:15 39:16
  78:7 82:24
  135:1
**billable**  18:11
**birthday**  26:8
**bit**  112:11
**blip**  133:9
**block**  38:6
**board**  1:6 4:11
  47:16,23
  107:10 108:7
  109:10 123:8
  139:18
**body**  105:9
**book**  110:22
  111:9 112:14
**born**  85:13
**bottom**  103:6
  103:13
**boys**  42:9,10
**bradley**  3:20
  5:5
**brain**  123:25
**brawl**  42:7
**break**  63:21
  112:22
**breakdown**
  21:15

**brockstedt**  2:3
**brought**  104:14
**budget**  13:9
**building**  1:13
  54:23
**buildings**
  101:17 102:10
  120:12
**bulk**  105:7
**bullied**  58:24
  58:25 90:25
**bullying**  58:17
  58:18 59:7
  108:5 139:23
**buzz**  52:18
  107:22 142:5
**byrd**  2:8 4:4
  8:7 23:25 27:3
  31:4 34:17
  39:6,21,25
  41:4,10,25
  42:15,18 43:4
  43:9,14 44:2
  44:11,15,22
  45:6,20 46:20
  48:1 49:4 51:9
  53:1,13,22
  55:20 57:15
  59:24 62:23
  63:1,19,22
  64:15,18,24
  66:6,22 67:7
  67:10,18 69:1
  71:13 72:19

  74:17,24 76:17
  76:19,25 80:19
  83:16 84:5
  86:3,15 87:2,9
  87:21 90:6
  93:18 95:1,14
  96:3,20 97:3
  98:3 99:14,22
  104:23 105:22
  106:23 110:13
  111:15,25
  115:15 118:17
  118:23 121:4
  124:22 125:5
  125:16,22
  126:18,22
  128:1,13,20
  131:14,21
  132:9 133:15
  135:4,18
  136:14 137:21
  138:9 140:25
  141:19 142:14
  143:7,11,19
  144:14,20
  145:6
**bytedance**  3:14
  3:14

**c**

**c**  5:1
**cabraser**  2:9
**california**  1:1
  5:13 140:11

**call**  47:13
  133:6
**called**  38:11
  50:17 81:18
**calls**  139:12
**calm**  81:19
**camera**  45:23
  46:2,5,8,10
**capacity**  41:12
  48:4 55:22
  60:19,19,20
**caption**  146:2
**captioned**
  146:8
**care**  85:17
**career**  90:11
  142:22
**carefully**  104:5
**case**  1:8 8:3
  63:15 146:2
**caseload**  89:16
  140:1
**caseloads**  57:2
  82:21,23 89:1
**cases**  7:4 60:21
  89:15
**catalyst**  28:23
**categories**
  138:20
**category**  48:15
  73:6
**caught**  108:13
  108:16,18

causal  112:6
causation
  111:3
cause  89:12
  132:1 149:12
caused  62:6
  87:19 110:9
causing  28:21
celebration
  26:13
cell  33:19 34:7
  34:14,25 36:19
  36:22 37:1,5
  37:12,19 39:20
  40:16 41:9,20
  42:12,22 43:2
  44:8,20 45:5
  45:11,19 47:5
  126:4,9
center  17:8,14
  17:18,20 18:17
  18:22 19:3,12
  19:22 22:7,11
  113:8
central  1:12
certain  92:20
  97:21
certificate
  149:1
certifications
  13:25 14:4,25
  15:1,5
certified  15:17

certify  149:3,11
challenge  68:23
  69:6,8
change  9:11
  141:4,4 147:2
  147:4,5,7,8,10
  147:11,13,14
  147:16,17,19
  147:20,22
  148:2,4,5,7,8
  148:10,11,13
  148:14,16,17
  148:19,20,22
changed  9:13
  9:22 20:24
  21:14
changes  139:19
  146:10,13
changing  12:8
  140:12 141:16
channel  29:18
characterize
  135:17
characterizing
  122:25 123:20
charge  7:1
  19:20 33:19
charged  32:20
  37:21
charging  36:17
chart  48:15,16
  48:21,24 49:2
  49:14,19 50:17
  68:18 70:11

72:6 74:11
charts  76:1
chase  2:18
check  38:24
  73:12
checked  33:22
chicago  3:5
chief  108:17
child  7:2 19:17
  35:3 77:18,19
  77:19,21 78:3
  78:5 131:12
  132:25 133:3
  137:1,6,14
  140:18,19
child's  61:13
  137:20
childhood  4:15
  64:7 67:9 70:8
  72:3 74:6 76:8
  76:14,23 77:3
  77:9,23 78:1
  133:24
childrearing
  85:17,18
children  18:14
  19:15,18 24:22
  61:24,25 62:1
  62:10,15,18
  63:16 69:11
  78:8 83:12
  108:10 119:5
  119:15,17
  122:12 129:23

130:5 134:4,11
  134:15,20
  136:2,9,21
  137:9,9 139:15
  139:21 140:2
  141:17
children's
  119:17,19
  120:2,7 139:11
chime  144:24
choose  53:18
  54:16 65:25
  66:1
choosing  97:9
christina
  101:20
cigarette  130:1
cindy  5:17
  149:2,17
circumstances
  7:9
cite  110:25
  111:10
claim  75:18
clans  42:5
clash  42:5
class  73:11
  108:14,19
classes  15:8,11
  90:15
classroom  57:7
  66:8,11,11
  120:19

**classrooms** 85:13 120:12

**clear** 41:11 48:3 71:5 72:21 73:3 75:13 92:23 97:16

**clearly** 106:14 124:24

**client** 21:21 22:1

**clients** 17:17 18:2,7,16,21 22:12 113:7,9 113:19,21 114:2,6

**clinical** 14:1,7 14:22 16:8,9 16:14,19,24 17:5,13 20:6 21:22 22:2,6 23:11 80:24 98:17 99:5 114:12,19,22 116:14,18 117:6,17,19 118:6 125:24

**clinician** 20:16 114:24

**clinicians** 20:12

**close** 86:8,23

**closer** 21:5 61:4

**cloud** 38:11

**coaches** 79:12 79:17 80:8 97:2,17,25

**collected** 94:24

**college** 13:19 30:5,6 31:12 36:5 90:11

**come** 25:17 38:2 91:3 115:25 116:23 117:2,7,14,22 118:1,9,14 139:21

**coming** 84:13 84:19 90:15,22 93:16 105:17 123:2 140:2

**comments** 111:12

**commission** 149:19

**communicati...** 25:9 40:3 53:14

**communities** 133:19

**community** 11:15 91:12 134:5,11

**companies** 141:13

**compared** 10:22 11:3

**comparing** 130:5

**comparison** 127:23

**complaint** 7:18 141:14

**complaints** 81:15

**complement** 36:12 40:18

**complete** 108:14 149:9

**computers** 85:15

**concern** 105:8 105:13 119:11

**concerning** 54:4,8,13 55:7 55:14,19 56:5 58:12 59:4 60:11 61:1 88:19,20 89:25

**concerns** 57:10 57:12 61:13 75:9 100:1 102:9 106:13 111:3

**concluded** 55:8 145:9

**concluding** 59:3

**conclusion** 117:5

**concrete** 75:1

**conduct** 66:14 141:4

**conducts** 65:13

**confirm** 138:1

**confiscated** 35:10

**conflict** 108:4

**confounding** 38:13

**connect** 136:2,3

**connection** 62:21

**connolly** 3:10 6:4

**consequence** 35:3,18

**consequences** 58:14 83:14 86:12 111:14

**consider** 56:19 57:1 58:1

**considered** 39:12,16

**consistent** 76:21 127:17 129:4

**constraints** 34:1

**consult** 58:5,7 91:22

**consulted** 56:22

**[consulting - county]**

| | | | |
|---|---|---|---|
| **consulting** 143:3 | 98:9 119:10 | **correctly** 37:13 | **counselors** |
| **contact** 86:8,23 | **converting** 93:2 | **correlation** 131:8 | 11:11 54:20,22 |
| 103:21 | **copies** 66:25 | **counsel** 3:21 | 57:3,22 61:23 |
| **content** 29:21 | **corporate** 7:13 | 5:15 7:16 | 78:20,22,24 |
| 33:9,10 34:7 | 7:19 | 23:21 51:12 | 79:4,17 80:24 |
| 36:18 38:6 | **correct** 10:15 | 53:5,6,15 | 96:11 101:6 |
| 44:9 59:22 | 13:17 16:16,17 | 128:2 135:5 | **country** 137:7 |
| 60:5 61:9,20 | 30:8 34:8 39:4 | 149:12 | **county** 1:7,12 |
| 61:22 111:11 | 39:5 41:3 | **counseling** | 3:21 7:1,13,25 |
| 111:18,20,22 | 46:11 54:15 | 13:19 20:11,16 | 10:4 12:22,25 |
| 112:5,7 | 59:8 63:2 | 20:21 22:8,22 | 13:3,6,9 16:10 |
| **context** 27:8 | 68:15,22 69:19 | 23:11 51:20 | 16:15 17:6 |
| **continued** 2:22 | 70:14 72:8 | 52:2,21 53:12 | 23:15 25:21 |
| 3:1 | 74:13 75:19 | 54:17,24 55:4 | 29:18,22 44:4 |
| **continues** | 76:11,18 78:21 | 55:9,12 56:25 | 45:18 46:16 |
| 48:19 | 83:5,15 84:10 | 58:3,21 59:14 | 65:17,20 66:4 |
| **continuing** | 84:11,17,21,23 | 60:3,18,24 | 66:20 67:6 |
| 14:14,18 | 87:24 88:15 | 61:3,19 79:4 | 68:20,25 69:21 |
| **contracts** | 90:5 92:12 | 79:22 81:9 | 70:13,18 71:11 |
| 101:15 | 93:14 94:12,15 | 88:9 89:23 | 72:7,12,17 |
| **contributed** | 96:8,25 97:19 | 100:16 101:6 | 74:12,22 78:11 |
| 51:14 138:21 | 97:22 98:16 | 108:1,8 113:20 | 78:15,19 79:2 |
| **contributions** | 100:17 101:8 | 114:3 | 80:3,9,15,23 |
| 51:10 | 101:10 109:21 | **counselor** 14:2 | 81:2 95:11 |
| **control** 34:19 | 109:22 117:9 | 14:7,23 15:16 | 96:11,17 99:11 |
| 34:24 | 117:15,16,16 | 16:9,10,15,20 | 100:14,18 |
| **controls** 34:14 | 119:24 120:16 | 16:24 17:6,13 | 113:9,21,25 |
| 35:21,23 37:15 | 121:17 123:10 | 20:7 21:22 | 116:3,9 117:21 |
| 37:17 | 128:23 138:3 | 22:2,6 23:12 | 117:25 118:9 |
| **conversation** | 138:13 | 23:14 61:15,16 | 118:14 119:10 |
| 52:17 125:7 | **corrections** | 98:18 99:6 | 119:14 120:1,6 |
| **conversations** | 146:10 | 115:1,1,5 | 124:19 125:2 |
| 51:11 53:4 | | | 125:12,20 |
| | | | 126:3,9 130:12 |

**[county's - degrees]** Page 10

county's 4:12 47:17,23
couple 126:18 137:22
coupled 56:3
course 83:21
court 1:1 5:12 5:17 7:3,8 139:14,15 144:21 145:1
courtroom 6:14
covered 128:25
covering 100:23 101:2
covid 82:25 83:2,4,7,8,11 83:14,20 84:3 84:9,12,12,18 86:7,12,12,19 86:21,25 87:7 87:15,19 103:7 103:9,18 106:8 135:5,8,14,22 135:23,25 136:8,16 137:19 143:24
crazy 72:24 73:14
create 26:17 98:23
created 98:18 110:3 132:5 134:24 136:20

creation 99:5
crime 137:7
crisis 56:3 57:9 60:19 89:6,12 136:7 138:7
current 9:12,14 10:2 94:11 123:9
currently 17:3 19:22 20:22,23 26:21 32:4 38:8 100:19 109:7
curriculum 12:19
curve 136:11
cut 73:3
cv 1:8
cyberbullying 58:14

**d**

d 4:1 5:1 122:16
daily 29:16 57:6
damages 48:15
data 38:4 56:13 56:15 57:18,19 65:4 91:23 92:7,21 93:24 94:9,23 125:19 126:2,6,8 127:23,24

129:7 144:6
date 5:7 147:23 148:23 149:5
dated 4:16 102:14
daughter 25:24 25:25 26:1,2 30:9,20 31:11 33:17 36:21,25 37:4,5,16 38:9 38:14
daughter's 38:25
daughters 30:1 31:2 37:18 38:6 45:22
day 29:12 33:23 54:25 85:17 101:9 123:24 124:1 134:9 146:16
dc 3:11
deal 34:2 54:22 89:7 133:9 137:24
dealing 56:7 58:13 72:22 138:3
dealt 114:12
debating 142:7
decades 127:22
deciding 51:21
deck 25:1 109:12

declaration 146:4
declare 146:6
dedicated 54:8 56:6
default 27:25
defendant 3:2
defendants 2:13 3:7,14 4:13 6:5 8:3,14 8:20,24 39:9 40:10 47:18,24 126:10 141:4
defense 128:2
defer 142:12 143:5,17
defers 143:11
deficit 89:20
deficits 105:17
define 118:3
defined 70:22 73:20
definitely 35:2 35:5 66:1 131:6,7
definition 40:4 40:8 71:7 75:2
definitionwise 75:12
degree 15:20 15:22 79:14 134:21
degrees 13:23 13:24

**delivered** 107:10,12 111:19 141:17
**demons** 137:20
**department** 11:10 13:6 15:13 50:1 51:14,17,22 53:20 54:12,17 55:5,12 59:3 62:8 64:13 65:13 66:13 88:3,18 111:4 141:23
**departments** 13:9 51:25 52:19
**dependent** 132:22
**depending** 89:15 92:23
**depends** 99:23
**depo** 24:1
**deponent** 5:14 149:6,7,9
**deposition** 1:11 5:9 6:16 7:12 7:16,23 141:2 145:8 146:1,7 146:11 147:1 148:1 149:4,8
**depressed** 60:15 73:17 140:18

**depression** 62:1,20 63:6 100:6 110:1,2 110:6,12 111:13 133:5,6
**deputy** 3:21 12:10,15,17
**describe** 125:13
**described** 37:14 124:20 125:3
**description** 4:9
**designated** 7:19
**designee** 107:23
**detail** 83:8
**detailed** 125:9
**deterioration** 131:10
**determine** 81:14
**determined** 54:5
**detrimental** 77:12
**developing** 89:18 90:4
**development** 17:8,14,18,20 18:17,22 19:3 19:12,22 22:7 22:10 113:8

**device** 35:23
**diagnosed** 116:3,9 117:22 118:6,10
**diagnoses** 105:16 125:24
**diagnosis** 132:5
**difference** 11:7 71:16
**different** 18:23 18:24 57:23 71:10 72:16 74:21 140:3 144:5
**direct** 105:5 115:23
**directed** 53:5
**directing** 49:7
**direction** 53:14
**directly** 47:10 58:16,23 99:8 99:24,24 110:1 110:11 129:9
**director** 9:17 10:8,9,10,14 11:1,4,9,13,16 11:20,24 12:1
**disclose** 51:11 53:14
**discontinue** 8:14
**discord** 40:19
**discretion** 99:1

**discuss** 49:7,9
**discussed** 49:10 110:20 119:11 120:17
**discussing** 127:18
**discussion** 119:6 120:13 122:10
**discussions** 119:5,18,25 120:5
**disney** 45:1
**district** 1:1,1 5:12,13 7:3 16:21,25 141:12
**division** 5:6
**diy** 27:10,12
**document** 1:5 4:18 49:24 64:12,20 106:17 127:15 128:7
**documents** 7:18 56:10 57:13 65:19
**doing** 19:16 54:2,6 57:8 88:21 94:17,22 95:5,6
**dollars** 82:2
**doors** 137:1

**doorstep** 57:22
**download** 38:15
**downloaded** 28:12 34:6
**downward** 128:12
**dr** 12:13
**draft** 92:19 93:12 94:13
**drain** 89:1
**dramatically** 77:16
**drastically** 20:24
**drawn** 57:10 133:2
**drinker** 70:23 70:25 71:3,7
**drive** 2:4 3:21
**drops** 77:16
**drugs** 108:3,18
**due** 95:17 100:8 123:5,25
**duly** 5:21 149:6
**durante** 122:16 124:13
**duties** 82:22
**duty** 102:1
**dyann** 12:13,13
**dying** 83:22,25 86:19,20
**dysregulated** 60:18

**dysregulation** 60:20

**e**

**e** 4:1,7 5:1,1 28:25 122:2,16
**earlier** 7:12 9:17 23:17 26:13 29:25 62:7 128:4 129:18 142:16 143:23
**early** 140:14 144:1
**easier** 18:3 84:20
**easter** 29:2
**eben** 2:16
**ed** 11:20
**edgewood** 122:17
**education** 1:6 4:11 11:14 12:19 13:13,18 14:14,19 15:13 47:17,23 56:13 56:14 105:8 106:12 107:11 109:10 123:9 139:18
**educator** 121:22
**effect** 9:19 77:24 83:4

86:25 87:7,15 87:20
**effective** 10:2
**effects** 133:19
**eflaster** 2:20
**egregious** 139:10
**eight** 23:2 80:21
**either** 33:23 38:5 51:5 66:10 75:18 84:25 85:23 90:2 98:4 101:5 112:10 112:16 113:25 122:1 139:21 144:25
**elected** 35:22 35:24
**elliot** 2:15
**ellis** 3:4
**email** 49:3 103:3,5,12,14 103:19,25 105:6,9
**emails** 4:16 49:6 102:14,21
**embarrassed** 75:5 91:2
**embedded** 109:22
**emotional** 67:23 68:3,10

68:14,15,17,20 68:25 69:16,20 85:9 89:21 130:12 131:3 131:16,18
**employ** 78:11 78:15,20,22,24 79:3,24 80:3,5 80:9,11,15,17 81:3,5
**employed** 10:4 100:14
**endorsement** 15:7,10
**engage** 100:15 129:24 134:7
**engaged** 85:15
**engaging** 134:5
**english** 13:14
**enter** 137:8
**entire** 102:2 146:7
**entities** 15:4
**entity** 15:4 17:21
**environment** 136:20
**equal** 85:19
**equally** 85:7
**equivalent** 50:18 51:8
**errata** 146:1,11 147:1 148:1

**especially** 72:22 129:19

**espn** 43:3,8 44:5

**esq** 2:3,8,8,16 2:16,17 3:3,9,9 3:15

**essence** 91:12

**esteem** 61:24 62:11,19 63:5

**estimate** 18:20 18:25 25:13 55:3,11,18 89:25

**et** 1:7

**events** 134:11 149:12

**eventually** 11:15 17:9,10 19:25

**everybody** 26:14 129:21

**exacerbate** 131:17 132:1

**exacerbated** 62:5 105:16 137:19

**exact** 69:23 100:3

**examination** 4:3,4,5 5:24 126:21 141:21 149:7,10

**examined** 5:21

**examples** 60:8

**except** 95:15,22 95:23 146:10

**exchange** 102:23 103:17

**excited** 123:2

**exclude** 135:7

**exclusively** 87:3

**executive** 9:17 10:8,13,25 11:13,19 12:1

**exhibit** 3:20 4:10,11,14,16 4:18 9:2,6 40:6 40:7 47:16,22 48:10,14 64:6 64:11 88:1 102:14,19 103:13 106:17 106:22 107:2,8 125:6 126:25 138:17 141:23

**exist** 132:6

**existed** 127:22

**existence** 97:7 99:2

**existing** 90:2

**expand** 85:21

**experience** 41:18 45:12,17 46:22 47:4 70:9 72:4 74:7

76:22

**experiences** 4:15 64:7 67:6 67:9,16 76:9 76:14,23 77:3 77:4,9,23 78:1 133:20,25

**experiencing** 62:21 63:5

**expertise** 115:23,24 131:2

**expires** 149:19

**explain** 139:2

**explicit** 33:15

**exploration** 90:11

**explore** 38:5

**exponential** 102:3

**exponentially** 62:8

**exposed** 68:10 68:20,25 69:16 69:20 70:3,13 70:18 71:11,23 72:7,12,17 74:2,12,22 84:25 85:23 86:21

**exposure** 68:14 70:7 72:2

**expound** 129:6

**extent** 48:5 49:5 53:4 101:24

**extreme** 63:15

**extremely** 73:16

**f**

**f** 2:13 122:2

**f12936-0000...** 64:14

**face** 54:20,25 55:1

**facebook** 2:13 2:13,13,14,14 27:14 29:22 30:12,23 31:18 31:25 32:2,6 40:11

**faces** 120:24

**facetime** 47:13

**fact** 7:23 93:9 140:19

**factor** 78:7 110:2

**factors** 56:19 58:1 109:14,18 127:22 132:23

**failing** 90:14

**failure** 7:2

**fair** 55:10 84:16 96:5 98:15

**fall** 34:19 104:3 104:12,12,13 104:18
**fallen** 104:20
**families** 56:2 139:10,14 143:24
**family** 110:5 115:1
**far** 42:2 57:20 75:12 114:13 118:24 128:19
**fear** 83:14 86:19,20
**feature** 8:3
**features** 8:14 8:21
**federal** 81:24 82:2,7,13
**federico** 2:3
**feel** 33:25 40:17 66:16 69:12 90:12 95:6 134:16 139:22 139:23 140:9
**feeling** 60:15 106:3 133:5 134:13,19,23 134:25
**feelings** 133:11
**felt** 38:2 86:6,9 136:21
**female** 129:2

**females** 129:19
**field** 117:3 131:2
**fight** 73:13 90:13
**fighting** 59:11
**fights** 75:23
**figure** 38:22,23 140:17
**file** 64:18
**filter** 33:10,12
**filtered** 33:13
**filters** 130:6
**final** 92:16,18 93:3,11 94:14
**finally** 141:1
**finance** 13:8
**find** 37:25 65:23 101:11 136:1 137:17
**finding** 108:10
**finished** 56:16
**fire** 108:4,16,17
**firm** 6:3
**first** 5:21 10:7 11:19,21 14:6 15:17,18 29:13 45:23 49:2,14 49:18,25 50:12 51:4 55:16 98:20 101:3,23 103:6,9,13,19 104:3 107:18 107:19 109:12

122:2
**five** 18:13 20:25 21:1,15 21:16 23:5 25:15 27:4 28:6,7 29:8 57:4
**flagged** 40:10
**flaster** 2:16 126:17 144:16
**fleeting** 133:5
**floor** 2:9
**florida** 140:12
**focus** 88:3,6 103:12 133:19
**follow** 25:3,6 35:4 126:19 137:23
**following** 103:24 122:11
**follows** 5:22
**forbes** 122:2 124:4
**force** 112:7
**forced** 88:25 105:18
**foregoing** 149:4,8
**form** 8:7 23:25 24:3 27:3 31:4 34:17 39:6,21 41:4,10,25 42:15 46:20 51:9 53:1

57:15 59:24 62:23 63:1 67:10,18 69:1 71:13 72:19 74:17 76:17,25 80:19 83:16 84:5 86:3,15 87:2,9,21 90:6 92:20 93:18 95:1,14 96:3 96:20 97:3 98:3 99:14,22 104:23 105:22 110:13 111:15 111:25 115:15 118:17 124:22 125:5,16,22 127:19 128:9 128:15,17 131:4,20 132:3 132:20 134:1 135:15 136:17 137:25 138:4 139:6 142:14 143:19
**format** 107:7 111:18
**fortnite** 41:24
**foundation** 43:4,23 66:6 66:22 67:11,19 69:1 72:19 74:17 76:19,25 80:19 131:5

134:2

**four** 21:23 23:2 23:3,3 28:6,7 29:8 42:10 76:13 77:15,19 77:20 82:18,19 98:21

**frankly** 34:1 56:23 134:9 136:25 141:17

**freed** 88:22 90:1

**freeman** 2:17

**freshman** 30:5 30:6 31:11 36:5

**friends** 119:5 119:16,17,19 120:2,7 129:16 134:19 136:21

**friendships** 134:21

**front** 92:1

**frontline** 61:17

**frustrated** 105:14

**frustration** 104:2,17,19 105:3,20,24

**fulfilled** 14:18

**full** 6:6 17:23 19:21 36:12 40:18 50:18 51:8

**function** 8:4

**functions** 8:15 8:21

**funded** 82:6

**funding** 81:25 82:12 96:2,19 97:8,11,24 98:2,23,25 99:13,18,20 102:12 138:11

**further** 144:12 149:11

**g**

**g** 5:1

**game** 39:17 40:23 41:21

**gamer** 137:2

**games** 24:22 41:8,19,23 45:14 137:4

**general** 3:21 33:7 41:14 66:11 68:16 75:9 77:5 113:17 114:7 135:22

**generalized** 131:10

**generally** 83:10

**generation** 110:21

**generically** 119:2

**georgia** 3:17

**getting** 18:11 28:11,22 38:12 60:14 83:19,22 83:25 86:19,20 90:23 91:20 93:17 94:3,18 119:7,20 120:8 140:21 142:6

**girl** 42:11

**give** 15:4 18:20 60:8 121:4 122:23 139:4

**given** 6:16,19 86:19 104:4 121:12

**giving** 6:13

**go** 31:6 38:16 45:23 53:23 55:22 84:20 86:9 88:1 92:21,24 94:6 105:23 107:21 110:15 129:22 130:3 135:19 137:13,15,17 140:9

**going** 75:6,10 79:14,15 85:1 85:24 90:14 92:3 103:5 108:19 113:23 118:25 127:15 128:15,22

129:8,8,12,24 129:25 130:2 133:1 135:16 136:6 140:14 142:7 144:23

**golkow** 5:6

**good** 6:1 14:15 14:20 19:16 75:19 76:4,10 76:15 130:14 136:4

**google** 3:7 6:4

**googling** 116:24 117:1

**government** 81:24

**grade** 26:8 30:9 30:20 31:1,2 36:20,21,24,25 37:3,4,5,6,12 37:18,18 38:8 38:14,25 92:25 104:15 121:21 121:25 122:6 122:13,14

**grader** 26:6,6 38:15

**grader's** 38:21

**grades** 65:25 66:2 121:21,25 122:6,13

**grant** 82:2

**great** 69:10 83:2 88:23

**greater** 67:17
**grew** 83:1
**group** 23:3,3
23:10,12 55:2
105:6 122:11
**groupme** 40:19
**groups** 18:9,13
22:11,18,21
23:9 57:6 61:9
61:20,24 88:25
89:4
**grown** 62:8
81:7 134:15
**growth** 82:20
82:21 102:3
**guess** 25:16
36:11,13 38:10
57:16 83:10
99:23 104:1,16
105:2 106:10
106:10 107:17
**guided** 20:11
20:16,21 22:7
22:22 113:20
114:3

**h**

**h** 4:7
**haidt's** 110:22
111:9 112:13
**half** 22:16
104:4 107:19
**hampton**
121:20

**hand** 149:13
**handouts** 24:23
**happen** 137:11
**happened**
83:11 118:21
**happening**
130:10 134:18
**happens** 66:8
66:10
**harassment**
139:24
**hard** 70:20
71:2,16 72:21
73:7
**harder** 106:4
**hardy** 2:17
**harford** 1:6,12
3:21 4:12 7:13
7:25 10:4
12:22,25 13:3
13:6,9 16:10
16:15 17:6
23:15 25:20
29:18,21 43:20
44:4 45:18
46:16 47:17,23
65:17,20 66:4
66:20 67:5
68:19,25 69:21
70:12,18 71:11
72:7,12,17
74:12,22 78:11
78:15,19 79:2
80:3,8,15,23

81:2 95:10
96:10,16 99:10
100:14,18
113:9,21,24
116:3,9 117:21
117:25 118:8
118:13 119:10
119:14 120:1,6
124:19 125:2
125:12,19
126:2,8
**harm** 62:2,12
62:20 63:7
**hayden** 5:17
149:2,17
**hcps** 4:17,19
102:16,20
106:18 107:7
**head** 36:6
49:20 100:21
112:15
**health** 4:18
15:17,18 25:20
59:21 60:5
61:14 64:13
65:13 66:11,14
67:17,22,23
75:18 76:3,6
76:10,15,24
77:5 79:5,22
81:10,17 83:5
83:14 84:4
85:3 86:2,14
87:1,8,16,20

99:25 100:5
101:14 102:2,6
102:8,11 104:2
104:17 105:3
105:15 106:12
106:18 107:21
108:24 111:2,4
127:10 128:21
129:3,8 138:7
**hear** 23:23
135:12
**heard** 23:18
42:6,8 111:7
**hearing** 120:11
**heed** 89:6
**heimann** 2:9
**held** 5:9
**help** 81:11
108:10,20,21
133:24
**helping** 59:6,10
59:21 60:4
**helps** 81:20
**hennigan** 1:11
4:10 5:14,20
6:1,8 7:24 9:2
9:3,6 41:17
47:16,22 48:9
64:6,10,11,21
102:14,19
106:17,22
107:2,8 113:7
126:16 144:13
144:18 146:21

147:24 148:24
**hereof** 146:12
**hickory** 1:14
**high** 31:15,20
31:22,22,24
32:3,13,17
33:17 34:15
35:1 68:19,24
69:15,19 70:12
70:17 71:10
72:7,11,16
73:16 74:12,21
81:7 122:8,17
134:23
**higher** 59:16
61:18 69:19
77:6
**highest** 137:7
**hire** 95:11
96:11,17 99:11
138:1
**hired** 138:6
**hiring** 137:23
137:24
**historical**
142:20
**histories** 110:6
**history** 101:18
**hold** 44:16 49:4
53:2
**holdings** 2:13
**home** 73:17
84:10,19 85:1
85:25 86:1,22

133:4 134:14
139:14
**homes** 129:15
**homework**
104:4
**honest** 135:24
**honestly** 24:13
24:16
**hoodwinked**
136:5
**hopeless**
127:12
**hopelessness**
129:16 133:12
**hour** 18:13
**hours** 7:17
14:17 18:3,4,6
18:11 145:6
**house** 129:22
137:17
**household** 70:8
70:14,19 71:12
71:24 72:3,8
72:13,18 74:2
74:5,13,23
131:24 132:1
**households**
73:16
**houses** 129:13
**houston** 2:19
**hudson** 2:9
**huh** 28:17 29:1
107:24 117:10
118:11 131:22

133:22 142:1
143:2,4
**hulu** 44:23
**human** 17:8,14
17:18,20 18:17
18:22 19:2,12
19:22 22:7,10
113:8
**hundred** 57:4
**hundreds** 7:6
**hurt** 133:24
**hurts** 134:3
**hypothetical**
69:2

**i**

**idea** 132:12
**ideation** 58:20
100:6 127:12
129:17
**identification**
9:3 47:19 64:8
102:16 106:19
**identify** 39:18
44:14,19 45:10
71:9 72:15
74:20 91:19
93:15 94:2,16
99:17 112:12
117:13 118:20
125:11,18
126:1,7
**identifying**
119:15

**iep** 58:21
**ieps** 105:11,14
**illinois** 3:5
**illness** 71:24
72:2,8,12,17
131:24 132:1,5
**imagine** 115:25
**impact** 132:22
134:22 141:17
**impacted** 56:7
57:12 83:11
110:8 135:2
**impacting**
57:23
**impacts** 24:21
54:5
**imperfect**
129:20
**impermissible**
48:7
**important**
134:10
**impose** 32:18
36:1
**imposed** 33:18
36:15
**impression**
144:10
**inability** 86:23
119:12
**inaccurate**
130:7
**inadequacy**
133:7,11

**inadequate** 38:4

**inattention** 123:5

**incarcerated** 74:6

**incarceration** 74:3,13,22

**incident** 61:18

**inclination** 69:22

**include** 53:4 58:13 59:9,20 60:3 65:16 67:23

**includes** 59:5

**including** 52:18 59:22 60:6 67:5

**increase** 82:15 110:1,11 133:13

**increased** 138:8

**incredibly** 37:25

**incrementally** 104:14

**independent** 35:17

**indicate** 109:3 123:18 124:7 124:11,16

**indicated** 95:17 146:11

**indicators** 127:10 128:11 128:11,15,21 129:8

**indirect** 100:9

**indirectly** 58:17 59:25 61:10,21 62:14

**individual** 22:12,15,18 23:1,3,6,7 41:12 48:4 55:21

**individuals** 101:5 138:6

**inferences** 133:2

**information** 27:10 56:19 58:1 111:2 125:9 141:16

**ingoglia** 3:3

**initiatives** 4:19 106:18 107:22 108:25

**injury** 1:3 5:11 146:3

**inside** 137:15 137:20

**instagram** 2:14 27:16 29:22 30:14,23 31:19

31:25 32:6 40:11

**instance** 58:4 90:21 95:10 96:10,16 99:4 99:10 108:13 116:2 118:21 119:1 120:10 120:15

**instruction** 53:13

**instructor** 15:18

**interactions** 41:19 60:16

**interested** 134:17 149:12

**interns** 78:13 82:17

**interpreting** 71:3

**interrogatories** 4:13 47:18,25

**interrogatory** 7:20 138:15

**introduced** 136:9

**involve** 54:4

**involved** 54:21 55:25 56:1,3 134:11

**involving** 54:8

**iphone** 46:7,7

**isolated** 86:7,9 130:5 140:5

**isolation** 86:13 86:24 134:25 136:15

**issue** 34:2 88:24 89:9 90:10 95:5 106:15 135:25 137:12

**issues** 54:4,8,13 55:6,7,13,19 56:4,5,7 58:12 59:4,21 60:5 60:11 61:1 62:1,2,20,21 63:7 75:2,3 81:23 84:9 88:18,20 89:6 89:11,21,25 90:18 91:14 104:2,17 105:4 108:8 113:17 114:7 115:22 119:6,20 120:8 120:18 122:21 123:3,4,13,16 124:5,9,14,21 125:4,14 138:2 140:23,24

**iteration** 92:2 92:10

**j**

**j** 3:9
**jacob** 3:20
**james** 2:16
**january** 10:5
  52:12 107:15
**jester** 121:2,6
  121:14,15,16
  121:23 123:15
**job** 9:22 17:23
  17:24 139:9
  142:19
**joe** 11:22
**jpmorgan** 2:18
**judge** 6:14
**july** 4:15 9:19
  11:2 12:9,20
  64:8
**jump** 82:24
**june** 107:15
**junior** 32:14,17
  33:16 34:15,25
  36:9,16
**jury** 6:14
  135:13

**k**

**k** 2:13
**kbyrd** 2:11
**keep** 14:15
  19:21 38:22
  106:4,5,7
  123:22

**keeping** 19:23
**kelly** 2:8
  120:25 121:6,6
  121:7,14,15,16
  121:16,18,23
**kenneth** 2:8
**kept** 14:11,19
  20:1 28:14
**keyes** 3:9 4:3,5
  5:25 6:3 8:10
  9:4 24:5 27:6
  31:8 34:22
  39:7 40:5 41:7
  41:14,16 42:4
  42:16,20 43:6
  43:11,13,25
  44:3,13,18,24
  45:9 46:3,21
  47:20 48:8
  49:11 51:15
  53:9,17 54:10
  56:9 57:24
  60:1 62:24
  63:3,18,21
  64:9,17,19
  65:5 66:12
  67:3,8,14,21
  69:7 71:18
  73:22 74:19
  75:14 76:20
  77:2 80:22
  83:18 84:7
  86:5,17 87:5
  87:13,23 91:18

93:21 95:8,19
96:4,21 97:5
98:5 99:16
100:12 102:17
105:1 106:2,20
106:24,25
107:4 110:17
111:21 112:3
112:21 113:6
115:17 118:18
119:13 121:9
124:25 125:10
125:17,25
126:13 127:19
128:3,9,17
131:4,20 132:3
132:20 134:1
135:15 136:17
138:4 139:6
141:22 142:23
143:10,12,14
143:22 144:12
144:15,17,19
145:4,5
**kids** 39:3 42:10
  42:12 43:20
  71:2 73:10,20
  75:10 78:7
  112:9 123:3
  129:12 132:16
  137:3 140:14
**kik** 40:19
**kill** 63:16 90:13

**kind** 9:18 36:11
  78:2 117:19
  130:9
**king** 3:16
**kirkland** 3:4
**kirkland.com**
  3:6
**kmcnabb** 2:11
**know** 9:18
  26:22,25 27:4
  27:21 31:13,17
  33:13,14 34:20
  35:24,25 36:3
  39:8,12,15,17
  40:23 41:13
  42:3 43:16,18
  43:21,23 48:5
  49:16 64:22,23
  65:1 66:15,24
  67:1 68:7 69:3
  71:15,16 73:8
  73:9 75:6 81:8
  81:16 82:20
  91:1,11 93:6
  94:5 95:24
  96:6 98:6
  100:20 101:16
  101:17 106:11
  106:11 107:12
  109:25 112:9
  112:18,18
  115:20 116:21
  116:25 117:4
  119:22 122:2

129:19 130:16 130:20 134:10 134:19 139:19 140:11 142:18 143:8

**knowing** 100:7

**knowledge** 30:11,13,15,17 30:19,22,25 32:11 142:20

**knows** 130:21

**kslaw.com** 3:18

**l**

**l** 28:25

**lack** 134:1 140:10

**lake** 2:4

**language** 33:15

**large** 82:20 139:8

**lauren** 3:21

**law** 6:3

**lawbmf.com** 2:5

**lawyers** 48:13 48:22,25 49:6 49:6,10 50:7 50:10,24 51:2

**lc** 82:4

**lchb.com** 2:11 2:11

**lcpc** 16:1 17:9 79:23

**lcpcs** 79:23 82:5,6

**lead** 89:6 104:2 104:17 131:15 131:16

**leading** 105:3 129:16 131:3

**leads** 89:20

**learn** 108:10,21

**learning** 104:9 104:21

**leave** 137:14,16

**leaving** 129:13

**lectured** 115:10

**left** 52:5

**legg** 2:3

**lengthy** 122:10

**lent** 28:20,23 28:25 29:14

**leonard** 23:18 24:18 25:3,6 25:10 26:3 30:7

**letters** 139:12

**level** 104:15

**levels** 139:10

**liability** 1:4 146:3

**license** 14:11 14:15,20,22

**licensed** 14:1,7 14:9 16:9,14 16:19,23 17:5 17:13 20:6

21:22 22:1,5 23:11 80:24 98:17 99:5

**lieff** 2:9

**life** 119:4 133:4 133:8

**likelihood** 77:7

**likely** 129:3

**limit** 34:24

**limits** 32:18,19 33:4,18,21 34:5,13 36:14 37:15,17

**line** 147:2,5,8 147:11,14,17 147:20 148:2,5 148:8,11,14,17 148:20

**link** 26:15 61:11

**linked** 58:16 129:9

**list** 7:18 14:25 39:22 40:12,17 51:22 101:11 109:13,17 111:14 133:21

**listed** 14:3 15:2 39:24 45:13,14 45:14,15,16 52:1,24 53:11 87:18 110:3 132:15

**listen** 42:13,22

**lists** 108:3 109:1

**literal** 100:10

**literally** 57:16

**litigation** 1:4 5:12 146:3

**little** 77:10

**lives** 137:9

**llc** 2:3,13,14,14 2:14 3:7,8,14

**llp** 2:17 3:4,10 3:16

**location** 149:5

**logical** 117:5

**long** 17:12 28:3 52:11 136:18 136:19

**longer** 37:22 89:9

**look** 29:11 45:22 53:25 55:17 56:10,15 57:13 61:15 64:25 78:2 90:21 92:24 95:7 133:8 140:1 142:7

**looked** 56:12 144:22

**looking** 34:19 57:18 59:2 75:22,23 104:8 133:23 140:12

**looks** 9:7 127:9 140:18
**lot** 44:2 54:20 73:4 83:8 89:5 89:10 90:17,22 91:16 111:2,7 111:7 119:4,6 120:11 127:21 129:19 133:10 134:14 136:1 137:1,4 139:8 139:14,16 140:3,9,22
**love** 89:4
**loved** 83:24 86:20
**loy** 3:20 5:5
**loyola** 13:19
**lweiant** 3:12
**lydia** 3:9

**m**

**m** 68:6
**mack** 12:13,13
**made** 92:23 95:10,16,20 96:10,16 97:18 97:21 98:6 99:10,18 136:15 139:23 149:7,10
**maine** 3:10
**make** 59:1 97:16

**makes** 58:25 70:24 103:18 130:9
**making** 95:25 136:21
**manages** 101:15
**managing** 139:9
**mandalas** 2:3
**mandated** 102:7,10
**manifested** 102:9
**map** 68:6,7 130:12,18,19 130:21,22
**marijuana** 129:11
**mark** 2:15
**marked** 9:3,5 47:19,21 64:8 64:11 102:16 102:18 106:19 106:21 107:1
**market** 115:2
**marketed** 115:4
**marriage** 115:1
**maryland** 1:15 2:4 4:14 5:10 13:20 14:10,23 15:13 64:6,12 65:12 67:5

102:7 126:24 149:3,18
**master's** 13:18
**matter** 5:10 15:7 146:8
**matthew** 2:3
**mcnabb** 2:8
**md** 1:4
**mdl** 1:3
**mean** 18:23 34:18 45:21 65:2 73:2,10 83:7 89:13,17 114:21 141:7
**means** 19:21 27:22
**meant** 103:19 105:7,8
**media** 1:3 5:10 24:21 39:9,10 39:13,14,16,19 40:3,15,24 41:1,5 45:13 46:24 47:6,8 54:4,9,14 55:7 55:14,19 56:5 56:8 57:8,10 57:12,20 58:12 59:5,12,23 60:6,11,14,22 61:1,10,21 62:6,14,16,22 63:8,11,17 88:19,21 89:9

90:1,20 91:1 95:13,17 96:2 96:13,19 98:1 98:13 99:7,13 99:20 100:2,4 100:8 109:21 109:25 110:8 110:11 111:13 113:14 114:4 116:4 117:23 118:2,4,10,15 119:7,12,20 120:3,8,19 122:22 123:6 123:13,17,25 124:6,9,15,21 125:4,14,21 126:10 127:18 127:24 129:5 129:20 130:8 131:3,12,25 132:4,18,18 133:3,24 134:22,24 135:3,8,14 136:3,10,15 137:8,18,24 138:2,8 139:3 139:5,24 140:7 140:24 141:13 144:1 146:2
**medical** 82:12
**medication** 81:22

**meet** 58:19 108:17
**meeting** 57:6
**meetings** 56:2
**members** 26:14 88:25 89:4
**mental** 4:18 15:17,18 25:20 59:21 60:4 61:14 67:23 71:23 72:2,8 72:12,17 75:18 76:3,6,9,15,24 77:4,21 79:4 79:22 81:9,17 83:5 84:3 85:3 86:2,13,25 87:8,16,20 99:25 100:5 101:14 102:2,6 102:8,11 104:2 104:17 105:3 105:15 106:12 106:18 107:21 108:24 111:2 127:10 128:21 129:3,7 131:24 132:1,5 138:7
**mentally** 73:2,6 73:16
**mention** 40:21 41:5 109:20
**mentioned** 41:1 112:13

**merit** 149:2,17
**messages** 63:9
**messaging** 47:2 47:9
**met** 6:2 7:16 136:22
**meta** 1:7 2:13 126:17 144:16
**mid** 78:18
**middle** 30:3 31:15,20 32:5 32:10 36:23 37:2 39:3 121:20,24 122:5,9
**million** 135:22
**mindy** 122:16
**minecraft** 39:12,15 40:22 41:2,20
**minor** 111:24
**minute** 116:20
**minutes** 145:6 145:7
**mischaracteri...** 135:16 138:5
**misrepresent** 88:12
**missing** 139:16
**mistakes** 108:11,12,21
**mitigate** 133:18 133:19

**mlegg** 2:5
**modify** 8:3
**mom** 73:13
**moment** 103:17 121:11
**money** 19:21 19:23 97:21
**monitor** 34:6 37:22,24 38:6
**monitored** 32:23
**monitoring** 140:19
**month** 9:12
**months** 27:2 28:6,7 29:8 49:17 50:13,16 106:1
**mood** 61:13
**morning** 73:14 77:8 83:7 140:21 141:9
**mouth** 136:24
**move** 19:11 20:2
**moved** 19:25 32:1 82:10,11 136:11
**msde** 4:17 67:2 102:15 103:20
**multiple** 132:17
**music** 27:9 42:13,22,24

45:14
**myriad** 114:24

**n**

**n** 4:1 5:1 28:25 122:16
**name** 5:5 6:2,7 20:10 32:23 101:19 107:22 110:25 111:10 118:25 120:22 122:3
**names** 100:20 100:20 112:16 112:17,17 121:8,12
**native** 64:17,18 107:7
**nature** 57:21 58:22 111:19
**ne** 3:16
**necessarily** 40:24 48:14 58:16 77:6 114:25
**need** 15:9 82:24 85:6 95:7,12 95:17 96:1,12 96:18 98:1,12 99:6,12,19,25 100:3,4
**needed** 34:2 99:1

**needs** 38:10,16 57:18 91:23 92:1,15 93:2 94:10,24 131:12

**negate** 77:24

**negative** 24:21 77:13 83:4 86:25 87:7,15 87:20 133:2

**negatively** 135:2

**neglect** 85:6,10 85:20 86:22

**neglected** 86:1

**neighborhood** 78:13

**neither** 149:11

**netflix** 44:10,21

**never** 29:20 42:6,8 116:7 136:22 137:10

**new** 2:10,10 10:20 43:22 99:18 132:5,6

**night** 32:21 33:20,23 90:24 94:4,5 140:17

**nods** 36:6 49:20

**nonlawyers** 56:18 57:25

**nonprofit** 17:21

**normally** 94:7

**northern** 1:1 5:12

**notary** 149:3 149:18

**noted** 5:15

**noticed** 142:16

**nudity** 33:14

**number** 4:9 7:14 14:25 21:3 55:24 57:5,6,7 64:13 74:16 75:16 76:23 82:15 91:20 93:16 94:3 107:6 125:6 126:25 137:7 138:17

**numbered** 107:20

**numbers** 64:16 102:20

**nurses** 11:11 79:14,17 81:2 81:10 82:3 99:11,12

**o**

**o** 5:1 122:2

**oath** 6:10,13,20 7:10 146:13

**object** 8:7 23:25 27:3 31:4 34:17

39:6,21 41:4 41:10,25 42:15 46:20 48:7 51:9 53:1 57:15 59:24 62:23 63:1 67:7,10,18 69:1 71:13 72:19 74:17 76:17,25 80:19 83:16 84:5 86:3,15 87:2,9 87:21 90:6 93:18 95:1,14 96:3,20 97:3 98:3 99:14,22 104:23,23 105:22 110:13 111:15,25 115:15 118:17 124:22 125:5 125:16,22 142:14 143:19

**objection** 42:18 43:4,9,13 44:11,22 45:6 45:20 53:22 55:20 64:24 66:6,22 74:24 118:24 127:19 128:9,17 131:4 131:20 132:3 132:20 134:1 135:15 136:17

138:4 139:6 143:7,13

**objections** 4:12 44:2 47:17,24 149:7,9

**observation** 45:18

**observations** 45:4 47:4 131:1

**obviously** 53:3 118:23

**occasions** 7:7

**occurred** 58:18 58:24 139:24

**occurring** 85:10,11 131:18

**odd** 76:4

**odds** 72:23

**offer** 145:4 146:12

**offering** 69:18

**offhand** 39:23

**office** 12:18,18 12:19 19:20,24 20:1,7 25:20

**offices** 79:15

**official** 9:20 10:19 12:20

**officially** 92:22

**oftentimes** 61:11

**oh** 14:5 16:12 23:2 39:22 40:2 75:22 101:25 103:7 117:20 130:16

**okay** 9:24 13:25 14:3,5,6 16:2 18:6 19:1 21:14 22:21 23:8 27:14,23 29:4 33:16 34:13 35:8,21 36:4,14 37:4 39:3,18 40:6 40:10,14 41:6 46:9,12 49:23 50:15 51:7,16 53:2,18 56:24 60:23 63:4,14 67:15 72:15 79:11 80:2 86:18 87:6,14 88:1,6,16 93:8 95:20 96:7 97:16 98:6 99:3 103:11,12 103:25 105:12 109:3,20 110:24 112:16 112:20 116:18 117:6 119:18 121:10,18 122:15,20 124:18 125:1

126:13,18 133:9 141:1,19 144:12,14,19

**old** 18:19 26:2

**older** 26:7

**oldest** 25:24,25 31:11 37:11,16

**olds** 137:4,5

**omegle** 40:19

**once** 24:2,8 29:11 127:24

**ones** 40:17 63:4 71:4 83:24 86:20 135:1

**online** 40:3 137:2

**opened** 17:10 20:1,3 136:25

**opening** 136:24

**operate** 17:11

**operations** 2:14

**opinion** 100:7 144:8

**opioid** 114:11

**opportunity** 48:2

**opposed** 7:24 112:7

**order** 14:15

**organization** 15:19 17:8,21

**organizations** 101:5

**original** 103:3

**outcomes** 67:17 67:22

**outside** 14:23 16:24 17:6 22:6 43:19 54:6 123:25

**overall** 61:14 127:5

**oversaw** 11:10 109:6

**oversee** 12:18

**oversees** 109:7

**oversight** 84:14

**overview** 4:15 64:7

**own** 17:10,10 19:12 20:1,3 32:2 38:25 43:20 62:2,13 69:5 118:7,7

**p**

**p** 2:3 5:1 68:6

**p.m.** 1:16 64:2 64:2 113:2,2 145:9

**page** 2:22 4:2,9 40:7 48:17,19 77:7 103:6,13 107:21,25 127:4 129:2 130:11 132:10 133:16 147:2,5

147:8,11,14,17 147:20 148:2,5 148:8,11,14,17 148:20 149:5

**pages** 107:20 108:23

**paid** 85:14

**pandemic** 84:3

**pandora** 42:24

**parent** 61:12 70:24 71:6 73:2,17 134:10

**parentheses** 68:5

**parenting** 131:10

**parents** 7:2 61:12 72:23 73:5 85:14 131:11 136:1 137:11,13 140:15 143:24

**part** 12:9 17:24 17:25 32:25 52:3 62:17 68:17 69:23 85:8 87:11 100:1,8 102:13 103:9 106:7 111:22,23,24 113:22 123:23 123:24 129:12 129:18 135:20 135:20,25

139:8,20 141:9
142:15
**partial** 19:23
**participants**
24:24
**participate**
81:18 117:19
**participation**
65:21
**particular** 46:4
65:20 101:13
**partners** 111:4
**parts** 85:19
**party** 100:15
101:4 149:12
**password**
38:11,19
**past** 67:1
115:21 129:24
**patient** 19:16
**patients** 18:2,7
18:16,21 19:2
20:20 21:1,7
21:15,16 22:14
22:17,25 23:5
113:19 114:15
114:18 115:22
117:18
**paul** 6:8
**pay** 9:22
102:12
**paying** 38:3
91:12 134:16

**payments** 2:14
**pces** 77:20,22
**peachtree** 3:16
**penalty** 146:4,6
**pending** 149:12
**people** 18:4,12
45:25 46:18
47:10 54:12
75:4,7 79:3
83:8,19,24
84:14,18 86:8
86:23 91:13,16
92:20 114:13
130:6,7 135:21
136:1,22,23
137:8,13
139:23
**people's** 121:8
**percent** 19:4,4
19:5,8,8 21:9,9
21:11 52:24
53:11,19 54:7
54:11,16 55:3
55:5,6,9,13,18
55:18 56:6,11
56:20,25 57:11
57:14 58:2,9
58:11 59:4,5,9
59:19 60:2
68:10,19,24
69:14 70:3,12
71:23 72:6
73:15 74:2,11
76:9,14 88:7,8

88:17,20 89:24
89:24 90:8
105:9,10
141:25 142:11
142:13,25
143:6,16,17,18
**percentage**
19:3,7,9 21:7
21:10,12 52:15
52:19 69:15,19
70:16 71:10
72:10,16 74:21
75:17 88:7
90:19 112:5,6
120:18 122:21
122:23 123:12
123:16 124:5,7
124:14,17
**percentages**
51:18,25 89:2
89:8 123:18
**perfect** 129:21
**performing**
60:13
**period** 29:4
35:13
**periodic** 65:13
**periodically**
38:24 65:18
**perjury** 146:4,6
**permission**
32:13 38:17
**permissions**
92:24

**perplexing**
38:9
**person** 24:2,8
24:12 104:9,21
136:3 137:9
**personal** 1:3
5:11 69:5 86:8
119:4 146:3
**personally** 8:5
29:20 69:4
94:21 141:8,11
**personnel** 6:25
7:8 15:12,15
52:4,8,14
79:10,18 80:14
88:11 108:25
109:6 138:21
139:1,7,13
140:4 141:24
142:11,17,21
143:1
**perspective**
69:5
**philadelphia**
2:16
**philosophy**
72:25
**phone** 32:20,24
33:1,7,11,19,22
34:7,15,20,25
35:6,10,17
36:12,15,19,22
37:1,6,12 38:1
38:21,25 46:2

46:10 47:13 57:20 94:8,19 95:4,5,7 134:18 137:16 139:12 140:20
**phones** 37:19 38:7 39:4,11 39:20 40:16,22 41:2,9,20 42:12,23 43:3 43:8,15,15 44:5,8,21 45:5 45:11,19,22 47:5 56:5 85:15 90:24 92:5 94:4,17 123:4,23 126:4 126:10 136:4 136:10 140:16 143:25
**photos** 47:1,5
**phrase** 76:4
**physical** 67:23 75:23 81:13,16 85:9
**picked** 142:11 142:25 143:15 143:18
**picking** 143:17
**picture** 78:3
**pictures** 45:24 46:13,17 63:17
**piece** 75:8

**pile** 133:13
**pinterest** 40:19
**place** 37:15,16 37:17 45:23
**places** 137:12
**plaintiff** 2:2,7 4:11 47:16,22
**plaintiff's** 23:21
**planning** 90:11
**platform** 46:23
**platforms** 1:7 2:13 8:4,15,21 39:10 40:15 45:14 46:23 126:11 141:5
**play** 41:21,23 42:2 51:16,21
**playing** 41:22 137:4
**plays** 112:5
**plaza** 3:4
**please** 6:6 88:2 144:24
**pleased** 123:8
**plus** 78:13
**point** 3:4 10:16 33:25 35:11,15 37:6 93:13,25 95:9 96:9,15 99:3,9 110:18
**points** 129:7
**policy** 43:22 123:1,9,11

**pool** 41:21,22
**poor** 35:7 61:24 62:11,18 63:5 67:17,22 110:6
**poorer** 76:6
**population** 104:25 106:7 106:13
**pornography** 118:3
**portfolio** 12:16
**portion** 104:25 119:3
**portrayals** 130:7
**position** 10:7 12:14 16:17 97:9 98:8,23 99:6,18,19 102:13 111:1,1
**positions** 10:1 79:7,9 81:25 97:12 98:12,18 98:22
**positive** 77:9 77:11,16,23 91:7 133:20,25 135:24 136:6
**possession** 108:18
**possible** 120:14
**possibly** 20:4 83:22,25 120:9

120:13 124:23
**post** 83:2
**posted** 29:17 29:19,20,21 60:22,22 63:12 63:16 111:12
**posting** 62:15 63:10
**pot** 97:21
**potential** 59:16
**potentially** 118:16,19
**power** 141:15
**powerpoint** 126:23,24 127:5 142:16
**ppws** 11:11 82:3 96:24 140:22
**practice** 17:5 17:10 19:13 20:1,3,10,13,19
**practiced** 15:24 16:2,5,23 22:5
**practicing** 17:9
**pre** 106:8 134:22
**predators** 137:1
**preferring** 123:5
**prep** 48:12,21 48:25 50:7,10 50:24 51:2

**preparation**
51:8,17
**prepare** 7:15
7:22 52:23
53:10
**prepared** 9:8
**presence** 77:12
132:22,23
**present** 3:20
20:19 81:13
89:9
**presentation**
23:18,24 24:6
24:11,15,20
25:4,11,14,17
25:23 26:4
30:7 107:9,13
109:8 139:18
**presented**
106:12 109:4
109:10
**preteen** 21:21
**preteens** 19:9
21:12,17
**pretty** 65:23
71:4,4 73:3
75:13 108:9
**prevalent**
127:25
**preying** 137:16
**primarily**
56:13
**primary** 81:21
81:21

**principal** 12:25
13:2
**principals** 97:8
97:10,20,23
98:25 99:4
**prior** 10:23
21:4 24:1
132:6,7
**private** 114:1
**privy** 125:23
**proactive** 89:5
89:10
**probably** 18:11
18:12,18 19:4
20:4 21:5 22:3
22:3,16 26:8
28:6 29:11
40:18 46:1
59:13 64:18
66:8 80:7
85:19 90:9
97:14 98:20
100:23 101:2
107:17 114:11
115:16 116:22
136:10,11
137:3
**problem** 70:17
70:23,25 71:3
71:7 72:11
74:16 135:21
137:18
**problematic**
33:9

**problems** 28:21
132:2,18
136:16
**proceedings**
64:2 113:2
**produced**
64:12,17
102:19 107:6
**product** 53:5
**products** 1:4
5:11
**professional**
13:22 14:2,7
14:23 15:15
16:9,10,15,20
16:24 17:5,13
20:7 21:22
22:2,6 23:12
80:24 98:18
99:5 100:7
**professionals**
100:13 101:5
137:24 138:2
**profit** 17:21,22
**program** 50:1
51:14,17 53:20
54:13,18 55:5
55:13 88:3
141:23
**programs**
51:22 52:1,20
**prompt** 91:4
**prompted**
19:11

**proper** 60:14
90:23 91:20
93:17 94:3,18
**proposed**
144:22
**protected**
134:14
**protective**
132:23
**prove** 106:10
**provide** 51:24
79:4 81:10,11
81:24 100:15
101:6,6
**provided** 51:18
97:11 98:25
101:12 102:11
**providers**
100:23
**provides** 115:5
**providing**
79:21 81:22
**psychiatrist**
16:6
**psychiatry**
15:22
**psychological**
51:19 52:1,20
52:25 53:19
54:12,23 55:16
56:20 58:10,15
59:2,19 60:9
88:8,18 89:22
102:22

**psychologist**
15:25 16:1,3
24:19 54:1
58:19 59:13
61:17
**psychologists**
11:11 61:7
78:10,14 79:3
79:16 82:14,15
82:25 95:11,21
95:25 108:25
**psychology**
15:20
**psychs** 82:3
**public** 1:12
3:21 7:1,13,25
10:5 12:22,25
13:3,6,9 16:10
16:15 17:6
23:15 29:18,22
44:4 45:18
46:16 65:17,20
66:4,20 78:11
78:15,19 79:2
80:3,9,15,23
81:3 92:23
95:11 96:11,17
99:11 100:14
100:19 113:9
113:21,25
116:4,10
117:21,25
118:9,14
119:10,14

120:1,6 124:19
125:2,12,20
126:3,9 149:3
149:18
**publicized**
59:11
**published** 93:9
115:7
**pull** 88:2 92:21
**pulling** 108:16
**punishing**
108:11
**pupil** 6:25 7:8
15:12,14 52:3
52:7,14 79:10
79:17 80:14
88:10 108:25
109:6 138:21
139:1,7,13
140:4 141:24
142:11,17,21
142:25
**purchased** 33:3
**purview** 11:14
**put** 37:17 38:11
38:18 69:2
73:6 91:1
92:16,19 94:13
123:4 137:25
**putting** 130:7

**q**

**qualify** 15:9

**quantitative**
93:24 125:19
126:2,8
**quantitatively**
112:2
**quantity**
124:10,11,12
124:16,20
125:3,9,13
**quarry** 2:4
**question** 41:6
49:12 69:13
75:1,25 85:21
88:23 112:18
141:5
**questions** 23:20
56:24 78:8
91:24 126:13
126:16,17
127:2 130:23
135:7 138:23
144:13,18
**quick** 137:22
**quickly** 75:10
**quote** 10:1
72:24 136:23

**r**

**r** 3:21 5:1 122:2
122:16
**ran** 23:10
**rana** 2:17
**random** 65:24

**randomly**
65:25 66:1
**range** 18:15
**rate** 83:3
**rather** 83:3
90:12 91:6
108:11 123:6
134:8
**reactive** 89:2
90:18
**read** 102:23
103:4,22
110:16 111:7
111:12 117:8
127:11 135:18
146:7,9
**reading** 111:2
**really** 16:17
34:3 72:21
73:9 81:15,22
85:19 89:17
**reason** 28:21
38:13,20 54:19
68:23 71:9
72:15 74:15,20
87:12 104:22
140:3 147:4,7
147:10,13,16
147:19,22
148:4,7,10,13
148:16,19,22
**reasons** 39:4
86:24 87:4,7
87:15,19

135:11,12 140:5

**recall** 23:20 24:13,16,25 25:12 37:13 51:23 52:4 56:14,22 88:14 88:16 92:8 120:4,10 124:3 124:24 127:2 138:22 141:5

**received** 15:10 66:25

**receiving** 63:10

**recent** 62:5 127:6

**recently** 9:13

**recess** 64:1 113:1

**recognition** 140:13

**recognize** 141:15

**recollection** 52:13 143:16

**record** 5:4,16 6:2,7 63:18,24 64:4 112:21,24 113:4 135:16 135:17 145:3 149:9

**recorded** 149:7

**recording** 24:9

**recover** 91:8

**redact** 144:22

**redactions** 144:23

**reddit** 40:19

**reduce** 77:24 82:21 89:11 108:15,22

**reduced** 108:1 108:8

**refer** 19:18

**referenced** 61:19 62:10

**referring** 40:1 46:4,9 48:16 61:22 104:19 130:20

**reflect** 65:19

**reflection** 112:12

**regarding** 34:24 57:19 116:19

**registered** 149:2,17

**regular** 61:5 114:19,21

**regularly** 31:7 34:20 106:8

**regulate** 36:18

**reinke** 3:15

**relate** 139:2,4

**related** 58:22 81:16,17 100:1

103:7,9,18,23 120:18 122:21 123:13,16 124:5,9,14,21 125:4,14 135:14 149:11

**relates** 1:5 66:23 127:18

**relationship** 61:4 75:16 76:22 135:8

**released** 66:19

**relevance** 31:5

**relying** 110:12

**remember** 24:3 28:5 32:23 57:17 95:3,18 98:9,11 116:1 120:15 135:6 138:22 142:6,8

**removing** 35:6

**reorganization** 9:21 10:1 12:10

**repeat** 75:24

**rephrase** 18:10

**report** 4:17 11:17,23 12:2 12:4,10 52:9 58:21 67:15 84:15 92:17,18 92:19,20,22 93:3,11,12,19 94:14 102:15

111:6 128:25 129:3

**reported** 11:19 52:11 75:17 76:8,13

**reporter** 5:17 144:21 145:1 149:1,3,17

**reporting** 57:20 61:12 94:6

**reports** 76:7,12 85:5 100:6 110:25 111:10 112:12,17

**represent** 6:4 7:3

**representative** 7:14,20 8:20 8:24

**request** 95:10 95:16,21,25 96:2,10,16,19 97:10,18,20 98:2,6 99:10 99:13,18,21 138:11

**requested** 98:23 99:4

**requesting** 97:11,24

**required** 58:19

**requirements** 14:15,19

| | | | |
|---|---|---|---|
| **requiring** 33:19 | **restate** 116:20 | 41:15 62:25 | **running** 18:9 |
| **research** 77:9 | **restore** 35:15 | 75:22 106:10 | 22:11 57:7 |
| 77:11 110:16 | **result** 58:18 | 127:15 128:16 | 61:8,20,24 |
| 110:18 111:6 | 59:7,11 60:20 | 128:22,25 | **s** |
| 115:18,24 | 61:10,21 86:9 | 130:19,24 | |
| 116:1,2,14,18 | 110:9 129:14 | 132:13 133:21 | **s** 2:8,16 4:7 5:1 |
| 116:23 117:2,7 | **results** 65:3 | 133:21 135:9 | 122:2 |
| 117:8,14,17 | 66:18 92:16 | 136:16 137:15 | **sad** 127:11,12 |
| 134:20 144:6 | 93:3 | 137:20 138:12 | **sadness** 129:17 |
| **researched** | **resume** 4:10 | 141:8 144:1 | 133:5,7,12 |
| 115:13 | 9:2,7 13:12 | **rigor** 105:25 | **safe** 134:13,16 |
| **researcher** | 15:1 | **rise** 100:7 | **salaries** 91:12 |
| 77:14 | **resuming** | **risk** 58:20 65:6 | **save** 146:9 |
| **reserved** | 104:10 | 65:13,21 66:14 | **savvy** 35:25 |
| 145:10 | **returning** | 67:17 86:21 | 137:10 |
| **resilience** 78:6 | 103:23 | 109:14,18 | **saw** 18:21 19:2 |
| 132:24 | **revealing** | **risky** 129:24 | 22:14,17,18 |
| **resolution** | 118:24 | **road** 48:6 | 24:2,8 25:14 |
| 108:4 | **review** 7:22 | **role** 51:7,16,21 | 49:18 51:5 |
| **respond** 91:24 | 48:12 50:6,23 | 53:25 81:21 | 76:2 113:19,25 |
| **response** 56:3 | **reviewed** 7:17 | 102:2 113:24 | 114:13 |
| 57:9 69:23 | 7:21 109:9 | 116:6,11 | **sax** 23:18,24 |
| 89:12 122:11 | **rewiring** | **roles** 91:17 | 24:18 25:3,7 |
| 138:8 | 123:25 | **room** 36:17 | 25:10 26:3 |
| **responses** 4:12 | **rfreeman** 2:21 | 134:8 | 30:7 |
| 47:18,24 | **richards** 56:23 | **rooms** 37:21 | **saying** 98:11 |
| **responsibilities** | 102:21 103:14 | **roughly** 7:17 | 110:10 117:7 |
| 10:22,23 11:3 | 104:1 105:6 | 18:2,7,18 | 129:5 |
| 11:3,8 | 109:1,4,5,13 | 20:19 21:16 | **says** 68:5,9 |
| **responsible** | 142:17 | 22:17,18,20 | 70:2 71:22 |
| 57:8 | **rid** 28:4,15,18 | 23:5 78:12 | 74:1 107:25 |
| **rest** 106:13 | 28:19 29:14 | 81:4,8 | 108:24 127:5 |
| 133:8 | **right** 10:18 | **run** 22:21 | 133:18 141:24 |
| | 36:5 40:25 | 136:18 | |

**scenario** 104:8
**schedule** 93:1,5
**schmitz** 11:22
**school** 7:2
  13:19 15:15
  16:12,13,20,24
  30:3 31:15,16
  31:20,20,22,23
  31:24 32:3,5
  32:10,13,17
  33:17 34:16
  35:1 39:3
  43:16,22,24
  51:19 52:2,20
  53:11,25 54:17
  54:19,21,24
  55:4,8,12
  56:25 57:22
  58:2 59:14
  60:2,24 61:2
  61:19,23 68:19
  68:24 69:15,20
  70:12,17 71:10
  72:7,11,16
  74:12,21 78:10
  78:14,16,25
  79:3 80:6,12
  80:18,25 81:6
  82:16,25 84:13
  84:19 86:9
  88:8 89:23
  90:16,23 92:11
  92:24 93:16
  101:1,7,9,13

102:8,9,10,12
103:23 108:25
113:25 114:1
116:10 117:25
118:9,14
119:10,15
120:6 121:20
121:24 122:5,8
122:10,17
124:1 125:20
126:3,9 134:24
139:16,21
140:2,12,13,21
**schooling** 104:9
**schools** 1:12
  3:21 7:1,13,25
  10:5 11:15
  12:22,25 13:3
  13:6,10 16:11
  16:16 17:6
  23:15 29:18,22
  44:5 45:19
  46:16 65:17,20
  66:2,4,20
  78:11,15,19
  79:2 80:3,9,15
  80:23 81:3
  95:11 96:11,17
  99:11 100:14
  100:19,24
  101:3 113:9,21
  116:4 124:19
  125:2,12

**science** 13:13
**scott** 2:16
**screenshot**
  47:12
**se** 105:7
**season** 29:2
**second** 50:17
  98:19 121:4
**secondary**
  13:13
**see** 17:17 18:2
  18:8 19:15,18
  19:19 20:20
  22:12,15 23:1
  23:6 24:11,14
  25:22 26:3
  28:12,13 34:20
  38:1,25 40:12
  43:23 45:24
  48:21 49:2,14
  50:2,12,19
  51:4 61:4,7
  64:15 68:12,21
  70:5 71:25
  73:19 74:3
  75:6 77:8
  84:14 89:14
  92:22 103:15
  104:6 107:25
  108:24 109:15
  113:23 114:3
  127:7 130:3,13
  133:9,11
  137:14,15

**seeing** 18:12,16
  19:16 61:5
  62:15 63:9
  90:2,2 113:24
  140:4
**seem** 71:4
  107:20
**seems** 39:16
  65:2 73:15
  103:23 117:4
**seen** 41:21,23
  42:21 43:7,12
  44:4 46:15
  48:9,9,24 49:8
  50:4,9,21 51:1
  60:18,21 62:5
  64:20 131:9
  133:13 139:17
  139:19
**select** 55:1
**selected** 65:21
  66:5
**self** 61:24 62:2
  62:11,12,19,20
  63:5,7 94:6
**send** 7:2 66:19
  144:23
**sending** 144:25
**senior** 32:3,13
  32:17 33:16
  34:15 35:1
  36:10
**sense** 58:25
  84:2 130:9

134:23

**sent** 28:11,13
144:25

**separate** 7:7
33:1,2,2 34:5
100:13

**series** 102:21

**serve** 17:12

**service** 58:22

**services** 9:15
10:8,9,11,14,18
10:21 11:1,5,9
11:10,17,20,24
12:2,6,19 40:3
42:21 44:9,20
45:15 51:19,20
52:1,2,4,8,15
52:20,21,25
53:12,19 54:12
54:17,23 55:5
55:9,12,16
56:21,25 58:3
58:10,15 59:3
59:15,20 60:3
60:9,24 81:10
88:8,9,18
89:22,23
100:16 101:7
101:12 102:22
138:21 139:1
141:25 142:12
142:18 143:1

**sessions** 48:12
48:22,25 50:7

50:10,24 51:2
57:7

**set** 4:13 33:4
47:19,25

**setting** 6:24
23:12 108:4

**settings** 6:24

**seven** 77:20
78:8 80:7,20
80:20 133:21

**several** 57:23
134:3 135:6

**sex** 137:6

**sexual** 85:9
137:1

**sexuality** 62:3
62:13 63:8

**share** 26:12

**shared** 26:18

**sharply** 138:7

**shb.com** 2:20
2:20,21

**sheet** 146:1,11
147:1 148:1

**shook** 2:17
142:8

**short** 136:19

**show** 47:10,13
47:21 67:15

**showed** 128:7

**showing** 9:5
64:10 76:5
102:18 106:21
107:1

**shown** 77:10,11

**shows** 13:12
66:21 68:18
70:11 72:6
74:11 75:16
77:14 125:19
126:2,8

**shutdown**
103:24 104:21

**sick** 83:22,25
86:19,20

**siculus** 2:14

**side** 144:22

**sign** 38:10

**signature**
145:10 147:23
148:23 149:15

**signed** 146:16

**signs** 84:15

**similar** 98:24
123:21

**single** 140:2

**sir** 10:6 75:21

**sit** 91:6 134:8

**sitting** 73:11
91:8

**situations**
140:7

**six** 27:2 82:18

**size** 89:15

**sjames** 2:20

**skill** 89:20

**skills** 89:19
90:4

**sleep** 57:21
60:15 61:13
90:23 91:21,24
92:3,4,4,6
93:17 94:3,7
94:18 140:10
140:15

**slide** 25:1 67:25
68:2,9 69:24
70:2 71:19,22
73:23 74:1
75:15,15
108:24 109:8
109:12

**slides** 109:4

**small** 104:25
106:7 133:9

**smart** 38:23

**smoke** 129:25

**smoking**
108:14

**snap** 3:2

**snapchat** 28:1
30:18,24 31:19
31:22 32:1,6
32:12,16,18
33:5,17 40:11

**social** 1:3 5:10
11:11 24:21
39:9,10,13,14
39:16,19 40:15
40:24,25 41:5
45:13 46:24
47:6,8 54:4,9

54:13 55:7,14
55:19 56:5,7
57:8,10,12,20
58:12 59:5,12
59:23 60:6,11
60:13,22 61:1
61:10,21 62:6
62:14,15,22
63:8,11,17
79:8,16 80:2
82:1,4 88:19
88:20 89:9,21
89:25 90:19,25
95:12,17 96:2
96:12,17,19
97:14,17,24
98:1,13 99:7
99:13,20 100:1
100:4,8 102:4
102:5 109:20
109:25 110:8
110:11 111:13
113:14 114:4
116:4 117:22
118:2,3,10,15
119:7,12,20
120:3,8,19
122:22 123:6
123:13,17,25
124:6,9,15,21
125:4,14,20
126:10 127:18
127:24 129:5
129:20 130:8

131:3,11,25
132:4,18,18
133:3,24
134:22,24
135:3,8,14
136:3,10,15
137:8,18,24
138:2,8 139:3
139:5,24 140:7
140:7,24
141:13 143:25
146:2
**socialization**
129:15
**socialize**
129:23
**socializing**
129:13 134:20
136:22
**socially** 130:5
136:12
**societal** 91:14
127:22
**somatic** 81:15
**soon** 24:16
144:25
**sorry** 10:10
11:18 34:11
39:25 40:2,7
67:10 75:23
79:19,24
106:24 122:7
**sort** 23:15
32:19,23 78:4

82:19,20
109:22 110:8
136:10
**sorts** 39:4
**sound** 133:4
**sources** 97:8
**south** 1:14
121:20
**spalding** 3:16
**speak** 25:4
56:18 57:25
111:5 112:4
**speaking** 41:12
52:14 69:5
83:10 139:20
143:12
**special** 11:14
56:12,14 105:8
106:12 121:22
**specialist**
101:14 102:2
102:11
**specialists**
102:6
**specific** 15:8
21:24 78:5
111:5 114:16
116:1,2 118:21
119:1 120:10
120:15
**specifically**
52:4 114:20
**speculation**
143:7

**spell** 73:9
**spend** 54:1
55:5,6,9,18
58:13 59:4
89:5,19,24
97:21 120:11
120:18 125:4
125:13
**spending** 60:9
60:10,24,25
140:22
**spends** 123:12
**spent** 54:13
55:13 58:12
59:6,10,20,20
60:4 88:18,19
89:25 90:1
122:21 123:16
124:5,9,14,20
**spike** 127:24
**spiked** 127:23
138:7
**spoke** 123:1
**spoken** 8:19,23
88:13 124:18
125:1 142:4
**sports** 43:3
44:6
**spotify** 42:17
**staff** 26:14
54:24 55:4,11
59:2,20 60:3,9
60:24 61:3,17
61:18,20 62:7

88:17,25 89:4 89:22,23 142:19
**stand** 63:20 145:2
**standard** 46:6 46:7
**standing** 14:16 14:20
**stands** 65:6,9 68:7
**stare** 134:8
**stars** 42:7
**start** 20:23 29:7
**started** 11:19 17:7 20:18 98:19 135:10
**starting** 19:12 110:19
**starts** 140:14
**state** 6:6 15:13 77:21 82:13 102:11 124:24 126:24 149:3 149:18
**stated** 149:5
**states** 1:1
**statistics** 4:19 106:18 136:9
**stayed** 28:24
**steady** 82:15,21
**stemming** 90:19

**stenographic** 5:16
**stenographic...** 149:8
**stephen** 102:21
**steve** 103:14 105:6 109:1
**stigma** 69:10 75:3
**stint** 29:13
**stop** 37:23 119:12
**stopped** 17:15 113:24
**straw** 133:12
**streaming** 44:9 44:20 45:15
**street** 2:9,18 3:10,16
**streets** 132:7
**stressed** 106:3
**stressor** 84:3 85:2 86:13
**stressors** 86:2
**strike** 106:24
**stripped** 140:8
**struggle** 106:7 123:22
**struggling** 62:2 62:12 63:7
**student** 9:15 10:8,9,10,14,17 10:21 11:1,4,9 11:10,16,24

12:2,6 58:19 59:6,10,21 61:6,11 67:16 70:23 76:23 77:4 91:7 105:9 111:11 111:12 116:4 116:10 117:21 118:1,9,14
**student's** 118:24
**students** 39:8 39:11,19 40:16 40:21 41:1,8 41:13,14,20 42:22 43:2,7 43:19,19,20 44:5,8,20 45:4 45:11,19 46:16 47:4 54:20,22 54:25 55:1,24 56:14 57:4,5 57:19,23 58:13 60:4,12,17 61:4,6 65:16 67:5,6,11 68:10,19,24 69:15,20 70:3 70:12,17 71:10 71:23 72:7,11 72:16 74:2,12 74:21 75:17 76:7,12 77:15 81:10,12,12,20

83:5 84:3,13 84:24 85:3,22 86:1,2,6,12,25 87:8,16,20 89:11,14,14,18 90:2,3,4,9,11 90:22 91:20,23 93:16 94:3,6 94:17 95:12 96:1,12,18 98:1,12 99:7 99:12,20 101:7 103:20,23 104:12,14,20 105:10,13 106:12 108:13 108:16,17 113:9,21,23,25 119:11,15 120:1,2,6,12 123:5,22 125:20 126:3,9 127:25 129:3 131:2 133:10 140:4 143:24 143:25
**studied** 106:15
**study** 81:19 117:19
**stuff** 43:24 49:7
**subject** 4:16 102:15
**substance** 70:3 70:7,13,18

71:11 110:5 128:10,11,14 129:8

**substances** 128:19

**succumbing** 34:3

**sucked** 28:22

**suffering** 61:25 62:11,19 63:6

**suicidal** 73:2 73:17 129:17

**suicide** 58:20 100:5 109:13 109:18 110:4 122:12 127:12 127:13

**suicides** 133:14

**suite** 2:4,18 3:17 79:15

**summary** 66:20 101:16

**superintendent** 9:15 10:17,21 11:18 12:3,5,5 12:11,15,17 15:6,7

**superintende...** 107:23

**supervisor** 15:12 52:7 58:5 102:5,22 142:17

**support** 9:15 10:14,17,21 11:1 12:2,6 144:8

**supported** 134:19

**suppose** 42:1 43:5 143:20

**sure** 27:24 35:4 35:20 51:3 53:24 56:23 59:1 64:22 65:23 66:2,7 66:15 75:24 82:13 88:13 93:4 95:4 97:16 102:25 107:5 115:21 117:1,2

**surprised** 134:9

**survey** 65:3,7 65:10,14,16,22 66:3,14,18,21 67:5 73:21 76:8,13 92:14 92:16 93:3

**surveys** 73:9

**suspension** 108:22

**suspensions** 108:1,8,15

**sw** 3:10

**swear** 5:18

**sworn** 5:21 149:6

**sync** 38:13

**system** 16:12 16:13 97:10 102:8,10,12 141:10

**t**

**t** 4:7 28:25 122:16

**table** 90:10

**tablets** 85:16

**tackle** 84:15

**take** 46:17 63:21 64:25 77:18 112:22

**taken** 26:16 89:8 107:18 146:8 149:4

**talk** 85:4,6 111:10 119:1

**talked** 77:8 83:6 122:9 123:11 127:21 132:11

**talking** 36:9 41:13 43:17,19 92:10 104:25 105:21 106:6 136:23

**talks** 129:2

**teach** 121:19,25 122:4,13

**teacher** 12:21 122:17 123:7 124:19

**teachers** 66:9 104:5 120:17 120:21

**team** 107:10

**technician** 3:20

**technologies** 2:14

**teen** 22:1

**teenager** 73:1

**teenagers** 73:4

**teens** 19:7 21:10,16

**tell** 17:4 33:12 102:22 105:2 135:13 143:9

**telling** 108:7

**ten** 25:15 27:4 113:12,13 137:4

**tends** 61:16

**term** 71:3 83:7 136:19,20

**terms** 49:15 122:24 123:19 124:9

**testified** 5:22 7:8,10 29:25 43:14,21 142:10,24

**[testified - tired]**

143:23

**testify** 149:6

**testifying** 7:24 7:24 41:17

**testimony** 6:13 6:19 138:5 142:12 143:5,9 143:18 149:7,9

**testing** 56:1,15 60:19

**texas** 2:19

**text** 45:5 47:2,9

**texting** 45:16 47:7

**thank** 63:14 107:3 144:13

**therapist** 19:14

**therapy** 81:22

**thereof** 149:12

**thing** 42:1 103:22 110:4,5 130:14 136:6

**things** 38:1 57:21 58:17,22 58:24 59:6,10 60:21 62:4 72:25 83:11 91:4,5,9 101:21 105:18 108:20 110:7 111:20 128:4,5 133:21 134:7 135:23 136:12 137:17,23

139:8,17,25

**think** 7:11 9:19 10:2,19 12:20 26:16,19 31:17 31:21 32:2,3 34:18 36:23 37:2 39:23 41:23 43:1 45:3,22 46:1 47:15 49:9 54:3 58:4 62:7 66:10 69:10,14 69:19 70:20,22 70:23 72:20,23 73:4,4,14 75:1 75:2 78:12 80:1 81:19 82:1,3,17 83:1 85:6,8 90:7 91:11 92:2 101:2 103:2 107:18 109:17 114:11 116:16 116:17 118:1 118:15 120:3 121:7 122:19 126:25 127:20 129:10 130:17 130:19 131:7 132:10 134:3,4 135:10 136:8 136:18 137:3,5 137:8 138:17 138:20 144:2,3

144:20

**thinking** 36:11 115:20 120:24 121:5

**third** 100:15 101:4

**thought** 130:15 136:3

**threat** 58:21

**three** 7:16,17 7:17 29:25 42:10 49:17 50:13,16 57:4 98:20

**thrust** 91:14

**tie** 56:4 111:13

**tied** 110:1,11

**tiktok** 3:14,14 3:14 27:18 28:3 29:5 30:16,24 31:19 31:25 32:4,6 40:11

**till** 9:19

**time** 5:8 11:24 12:7 17:2,23 17:24,25 18:9 18:22 19:19 20:1,18 21:20 21:25 22:22,24 23:4,10 24:4 25:25 26:3,20 26:23 33:23,24 34:1,1,5 35:13

43:17 44:15,17 45:7 49:15,18 50:13,18 51:5 51:8 54:1,8,11 54:20,25 55:1 55:6,9,13,19,25 56:1,2,6 57:11 58:11 59:4,5,9 59:20 60:3,10 60:10,25,25 64:25 75:17,19 76:3,10,15 88:17,20,22 89:5,19 90:1,3 94:7 104:3 109:5,19 120:11,18 122:7,8,14,21 123:12,16 124:5,8,10,11 124:12,14,16 124:20 125:3,9 125:13 126:14 131:2 140:15 140:23 149:5,7 149:10

**times** 6:22 7:5 7:16 23:23 27:5 115:21 135:6 140:10 140:12 145:4

**timing** 43:17

**tired** 140:18

**title** 9:11,13,14 9:23 10:3,20 10:23,25 11:14 82:2,8,9 102:1 107:14
**titled** 4:18 47:22 49:25 68:2 106:17 127:5
**tobacco** 65:3,9 108:4 128:5 129:11
**today** 6:17,20 7:12,22 17:11 62:7 82:4 127:21 128:4,4 136:7
**today's** 5:7
**together** 69:2
**told** 7:15 19:16
**took** 7:12 15:11 32:1 55:23
**top** 100:21 112:15
**topic** 77:10
**topics** 7:14,18
**totally** 135:15
**tower** 2:18
**town** 19:15
**towson** 13:16
**track** 15:8
**traditions** 134:5

**trafficking** 137:2,6
**trained** 114:23 114:24
**training** 76:21 114:14,16,17 114:19,22 115:2
**trajectory** 144:5
**transcribed** 149:8
**transcript** 146:7 149:5
**transition** 113:22
**transmit** 46:17 46:25
**transmitted** 47:5
**travis** 2:18
**treat** 113:13,16 114:2,6,9
**treated** 113:7
**treatment** 79:5 79:22 100:16 101:7 114:15 114:18 115:5,8 115:11,14,19
**trend** 127:9,10 128:6,12
**trends** 127:6,14
**tried** 26:12

**truancy** 139:15
**true** 60:23 96:24 97:1,14 138:10 146:9 149:9
**truly** 73:20
**truth** 149:6,6,6
**try** 48:5 83:13 84:15 108:10
**trying** 38:14,22 89:6 91:8 123:3 140:23
**tumblr** 40:20
**turn** 67:25 69:24 71:19 73:23 75:15 108:23 127:4 130:11 132:10
**turned** 136:6
**tv** 45:3
**twitch** 40:20
**twitter** 40:20
**two** 14:17 20:9 22:3 25:14 34:4 36:10 37:8 49:24 76:2 79:23 82:17 88:2,6 88:16 89:4 98:17,25 108:21 121:12 129:7 138:19 140:5

**typed** 149:8
**types** 114:9
**typical** 85:16 85:18
**typically** 27:11 46:24

**u**

**u** 122:16
**u.s.** 5:12
**uh** 28:17 29:1 107:24 117:10 118:11 133:22 142:1 143:2,4
**uncomfortable** 69:12 140:6
**under** 6:10,13 6:19 7:10 11:14 20:8 34:19 40:2 146:4,6,13
**underreporting** 70:17 72:11,14 74:16,18
**understand** 6:9 6:12 7:21 59:1 67:4 105:7 133:17 139:1
**understanding** 146:12
**understands** 142:18
**understates** 69:15

**undetected** 84:9,20 85:2 85:25 86:22

**unfortunate** 91:16

**unfortunately** 104:3

**united** 1:1

**university** 13:16

**unmanageable** 82:22

**unpack** 83:13

**unquote** 10:2 72:24 136:23

**unresolved** 139:11

**update** 9:10

**ups** 126:19

**use** 26:9 27:9 27:10 29:10,14 32:18 33:5 34:14,25 35:22 36:15 37:18,22 39:3,8,11,19 40:16,21 41:1 41:8,20 42:12 42:17,22 43:2 43:7 44:5,8,20 45:5,11 46:23 48:6,6 57:9,20 70:7,13,18 71:11 95:12 96:1,12,18

97:11 98:1 99:7,13,20 100:8 108:18 109:21 114:11 126:4 128:11 129:8,11 132:19 135:9 135:21

**used** 25:1 26:23 27:1,7 28:23 29:5 34:14 45:19 46:2 119:8,23

**useful** 38:1

**uses** 100:19

**using** 28:20 37:23 98:13 136:3

**v**

**v** 1:7

**vague** 44:17 45:6 143:8

**vaping** 108:14

**various** 54:2

**vendors** 100:15 100:18 101:12

**verbatim** 100:10

**verbiage** 118:7

**veritext** 5:6

**video** 5:9 24:3 24:14,22 26:12 28:13 29:19

41:8,19 45:14

**videographer** 3:20 5:3,6 63:20,23 64:4 112:23 113:4 145:2,5

**videos** 28:11 134:8

**videotaped** 1:11

**view** 34:23 63:5 76:24

**views** 73:1

**virginia** 19:25 20:2

**virtual** 104:9

**virtue** 15:10

**visits** 139:14

**volunteerism** 134:5,12

**vulnerable** 132:17

**w**

**wait** 53:2

**want** 73:12 75:24 88:2,6 88:11,11 91:3 103:5 134:6 135:12

**wanted** 90:12 135:7 136:1

**wanting** 123:23 139:21 140:5

**wants** 38:15

**warning** 84:14

**washington** 3:11

**watch** 44:9,21

**watched** 24:9 59:22 60:6

**watching** 24:3

**way** 73:5 76:4 98:4,12 111:18 129:23 130:1 136:1

**ways** 45:11,17 46:25 47:3,11 47:14 57:23 108:10

**wc.com** 3:12,12

**we've** 6:1 9:21 62:5 63:15 110:19 130:4,4 132:11 139:17

**wednesday** 1:16

**week** 18:4,5,7,8 18:12

**weiant** 3:9

**weighed** 88:10

**weight** 51:24 52:15,18,24 53:11,19 54:16 56:11,20,25 57:1,14 58:2,9 139:3,4 142:11 142:25 143:6

| | | | |
|---|---|---|---|
| **weights** 88:7 | 63:2 65:2 66:7 | 58:13 81:20 | 88:4 141:24 |
| **weird** 9:18 | 66:25 67:12,20 | 89:18 90:18 | **worksheets** |
| **wellness** 20:11 | 69:4 71:15 | 91:5,13 101:24 | 49:25 88:3 |
| 20:16,21 22:7 | 72:20 74:18,25 | 106:4 111:3 | **world** 85:13 |
| 22:22 57:18 | 76:18 77:1 | 121:23 | **worse** 77:4 |
| 91:22 92:1,15 | 80:20 83:17 | **worked** 12:21 | 136:16 |
| 93:2 94:10,24 | 84:6 86:4,16 | 13:5,8 16:8,14 | **wrapped** 83:9 |
| 113:20 114:3 | 87:3,11 90:7 | 16:19 18:4,6 | **write** 133:4 |
| **went** 15:9 17:9 | 93:19 95:3,15 | 21:21 22:1 | 138:11 |
| 25:22 26:3 | 97:4 98:4 | 23:14 55:12 | **wrong** 92:13 |
| 30:7 82:17,18 | 99:15,23 | 90:3 | **x** |
| 82:18 86:21,22 | 104:24 105:24 | **worker** 6:25 | **x** 4:1,7 |
| **west** 3:4 | 107:3 110:16 | 7:8 15:15 82:1 | **y** |
| **whatsapp** | 111:17 112:1 | 82:4 142:21 | |
| 40:20 47:2,9 | 115:16 119:3 | **workers** 11:12 | **yak** 40:20 |
| **widely** 46:2 | 121:6 124:23 | 79:8,10,16,18 | **yakoubou** 93:7 |
| **wife** 25:25 26:1 | 125:7,23 | 80:2,14 96:17 | **yeah** 9:16 14:5 |
| 34:10,12 | 127:20 128:10 | 97:15,17,24 | 22:20 27:13 |
| **williams** 3:10 | 128:18 131:6 | 102:4,5 109:1 | 29:9 31:21 |
| 6:4 52:5,6,14 | 132:4,21 134:3 | 109:6 139:8,13 | 35:20 36:8,11 |
| 52:18 88:14 | 135:20 136:18 | 140:4 | 38:22 39:2,15 |
| 107:22 108:9 | 138:6 139:7 | **working** 17:7 | 40:14 41:5 |
| 109:7 142:5,10 | 142:15 143:20 | 55:24 56:13 | 42:2 45:21 |
| 142:24 | 149:12 | 57:3 85:16 | 49:4,13 53:2 |
| **witness** 5:18 | **wolf** 3:4 | 89:11 90:9,10 | 62:17 63:19,22 |
| 7:23 8:9 24:2 | **woods** 130:2 | 91:8 115:22 | 66:10 71:6 |
| 27:4 31:7 | **word** 34:19 | 117:3,18 | 76:5 78:6 82:8 |
| 34:18 39:22 | 119:8,23 | 139:10 | 82:10 83:17,23 |
| 40:2 42:1,19 | 135:21 | **works** 26:22 | 88:5 90:7 98:7 |
| 43:5,10 44:12 | **words** 73:10,20 | 93:7 142:19 | 101:25 103:4 |
| 44:23 45:8,21 | 100:3 | **worksheet** 50:1 | 104:7 106:8 |
| 51:13 53:8,16 | **work** 19:17,24 | 50:4,6,9,12,18 | 108:6 110:23 |
| 53:24 55:23 | 20:6 52:23 | 50:21,23 51:1 | 116:17,25 |
| 57:17 59:25 | 53:5,10 55:4 | 51:4,8,14,17,22 | 121:15 128:18 |

133:22 135:18
141:12,14
144:11
**year** 18:1,21
19:2 20:7,8,20
21:1,3,7,15
22:3,15,25
23:5 28:24
32:3,13,14,17
33:16 36:10,10
36:24 37:3,6
59:17 78:16,17
78:25 80:6,12
80:18,25 81:6
82:5,9,16,20
92:11 94:11
95:15,16,20,22
95:23 98:19
101:1,13,13,16
101:16 102:1
104:4 107:18
123:2 137:4,5
**year's** 92:2,9
92:14
**years** 14:17
18:19 20:9
21:4,6,23 22:3
23:9 25:14,15
25:15 31:23
32:17 62:5
98:21 115:21
116:22 117:3
129:24 132:6
142:20,22

**yesterday** 51:6
90:14
**ygr** 1:4
**yik** 40:20
**york** 2:10,10
**younger** 34:4
136:13
**youngest** 37:8
**youth** 15:17
65:3,6,9,13,21
66:14
**youtube** 3:8 6:5
26:9,11,17,24
27:7 29:18
30:10,21 31:12
31:14 32:9
40:12 42:24
45:3
**yrbs** 4:14 64:7
65:3,6 75:9
126:24 127:6
**yts** 4:14 64:7
65:9 127:6

**z**

**zero** 76:8 77:18
77:22 80:13
**zoom** 2:3,8,17
3:3,15 126:15
144:17
**zuckerberg**
2:15

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com