**Exhibit 62**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT    )
ADDICTION/PERSONAL INJURY         ) MDL No.
PRODUCTS LIABILITY LITIGATION     ) 4:22-md-3047-YGR
_____)

THIS DOCUMENT RELATES TO:          )
                                   )
BOARD OF EDUCATION OF HARFORD      )
COUNTY V. META PLATFORMS INC.,     )
ET AL.                             )
                                   )
CASE NO.: 4:23-CV-03065            )

Confidential - Pursuant to Protective Order
VIDEOTAPED DEPOSITION DONOVEN BROOKS
Harford County Public Schools Central
Administration Building
102 South Hickory Avenue,
Bel Air, Maryland
Thursday, May 8, 2025, 10:28 a.m.

CONFIDENTIAL

Page 2

APPEARANCES:

For Plaintiff Harford County Public Schools:

BY:  MATTHEW P. LEGG, ESQ.
Brockstedt Mandalas Federico LLC
2850 Quarry Lake Drive - Suite 220
Baltimore, Maryland 21209
410.421.7777
mlegg@lawbmf.com

For the Defendants Meta Platforms, Inc., f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg:

BY:  EBEN S. FLASTER, ESQ.
BY:  WILLIAM S. WALBERG (VIA ZOOM)
Shook, Hardy & Bacon LLP
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, Pennsylvania 19103-7014
215.278.2555
eflaster@shb.com
wwalberg@shb.com

For the Defendant Snap:

BY:  ALEX INGOGLIA, ESQ. (VIA ZOOM)
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
312.862.1083
alex.ingoglia@kirkland.com

(Appearance continued on next page.)

CONFIDENTIAL

Page 3

APPEARANCES CONTINUED:

For the Defendants Alphabet Inc., Google LLC, and YouTube LLC:

BY:  J. ANDREW KEYES, ESQ.
BY:  LYDIA WEIANT, ESQ.
Williams & Connolly LLP
680 Maine Street SW
Washington, DC 20024
202.434.5584
akeyes@wc.com
lweiant@wc.com

For the Defendants TikTok, Ltd.; TikTok, LLC; TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:

BY:  KATRINA JACKSON, ESQ. (VIA ZOOM)
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
202.626.2640
kjackson@KSLAW.com

Also Present:  Ryan Sohmer, Videographer
Jacob Arndt, Exhibit Technician
Lauren R. Drive, Deputy General Counsel
Harford County Public Schools

CONFIDENTIAL

Page 4

I N D E X

PAGE

EXAMINATION BY MS. WEIANT                              5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| EXHIBIT 1 | Curriculum Vitae of Donoven Brooks | 8 |
| EXHIBIT 2 | News article dated 1/8/19 titled Harford Schools Include Mental Health Component in Active Assailant Training | 66 |
| EXHIBIT 3 | Emails, top one dated 10/30/18, Subject:  Gang member placements, Bates HCPS_00226861-62 | 82 |
| EXHIBIT 4 | Article dated 8/24/18 titled Harford Students Returning Sept. 4 Should Feel Safer in School, HCPS Security Chief Says | 122 |
| EXHIBIT 5 | Plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories (Set 3) | 129 |
| EXHIBIT 6 | Email dated 1/15/18, Subject: MCFSS Conference Call Notes - Call Reminder Tuesday January 16, 2018 @ 10 am EST, Bates HCPS_00553865-70 | 143 |

CONFIDENTIAL

Page 5

P R O C E E D I N G S

* * *

THE VIDEOGRAPHER:  We are now on the record.  My name is Ryan Sohmer.  I'm a videographer for Golkow, a Veritext division.  Today's date is May 8th, 2025.  The time now is 10:28 a.m.

This video deposition is being held at 102 South Hickory Avenue, Bel Air, Maryland.  We're here in the matter of Social Media CA MDL 3047, Board of Education of Harford County versus Meta, for the United States District Court, Northern District of California.  Our deponent is Donoven Brooks.

Counsel will be noted on the stenographic record.  Our court reporter is Cindy Hayden and will reswear the witness.

* * *

DONOVEN BROOKS, having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

BY MS. WEIANT:

Q.   Good morning, Mr. Brooks.

CONFIDENTIAL

Page 6

A.    Good morning.

Q.    We met earlier, but my name is Lydia Weiant.  I'm with the firm Williams & Connolly.  I'm joined by -- with my colleague Andy Keyes, and we represent Google and YouTube in this case.

Can you please state your name for the record?

A.    Donoven Ray Brooks.

Q.    And you're aware that you are under oath today?

A.    I am.

Q.    You gave testimony earlier this morning as a corporate representative of Harford County Public Schools, right?

A.    Yes.

Q.    Other than your testimony this morning, have you ever given testimony under oath before?

A.    Yes.

Q.    When?

A.    Over my 23 years as a law enforcement officer.

Q.    Have you ever been deposed before?

A.    Yes.

Q.    Were those depositions in connection

CONFIDENTIAL

Page 7

with your work as a law enforcement officer?

A.   Yes.

Q.   Can you estimate how many depositions?

A.   One.

Q.   You've given one.

Do you recall what matter that was for?

A.   Yes.

Q.   What was it for?

A.   It's for a police officer that I terminated from the police department when I was a chief of police who brought about a tortious lawsuit and named me and the town and the -- the mayor in -- in the suit.

Q.   And that's the -- is that the only testimony you've given under oath before at deposition?

A.   Yes.

Q.   Did you do anything to prepare for this deposition?

A.   Just had brief conversations with the two attorneys here at the table.

Q.   Did you review any documents?

A.   No.

Q.   Did you speak to anyone other than your lawyers about your deposition today?

A.    No.

Q.    Okay.

(BROOKS EXHIBIT 1, Curriculum Vitae of Donoven Brooks, was marked for identification.)

BY MS. WEIANT:

Q.    I'm going to show you what has been marked Brooks Exhibit 1.  This is a copy of your CV, right?

A.    Yes.

Q.    Did you prepare this?

A.    Yes.

Q.    When did you prepare this?

A.    2017 and updated it in 2024.

Q.    Okay.  So is it up to date with your most recent information?

A.    Yes.

Q.    So on the third page, it lists your educational background.  You received an associate of applied science in law enforcement administration from Baltimore City Community College in 2009; is that right?

A.    Yes.

Q.    And a bachelor in management and leadership from Johns Hopkins?

A.    Yes.

Q.    And a master of science in public safety management from Johns Hopkins?

A.    Yes.

Q.    What -- what was your job coming out of school, first job coming out of school?

A.    What level of school are you talking?

Q.    I guess, what job did you begin your career with?

A.    Oh, as -- out of high school or -- I mean, I'm just trying to -- did I begin my career with?

Q.    Okay.  Sorry.  Strike that.

The first employment history you have listed on your CV is United States Air Force.

A.    Yes.

Q.    Okay.  And you spent nine years in the Air Force?

A.    Yeah.  Just under ten years, yeah. Like nine years, ten months, yes.

Q.    What was your position?

A.    I held a few.  Do you want the last one?

Q.    Can you just give me a quick list of your various positions in the Air Force?

A.    My first position was presidential

Page 10

support.  I was in the Air Force Presidential Honor Guard.  I had top secret clearance.  Did work at the White House, the Pentagon.

From there, I left and went to a NATO international police unit in Naples, Italy, where I spent time working in a top secret capacity there.

And then I came back to the U.S. and worked at Central Command and Special Operations Command.  And closed out my career finally doing what I first got trained to do, which was law enforcement, which I didn't really do the first six or seven years of my career.

Q.  So what did you do after leaving the Air Force?

A.  Came home and joined the police department.  Went to the Baltimore City Police Academy and started my career in civilian law enforcement.

Q.  And your first position in civilian law enforcement, you said was with the Baltimore City Police --

A.  Yeah.  I went through the Baltimore City Police Academy and started with the Baltimore City School Police in '97.

Q.  Okay.  How long were you with the

CONFIDENTIAL

Page 11

Baltimore City School Police?

A.    20 years.

Q.    Did you attend school during that time as well?

A.    Yes.

Q.    Some of the degrees you've listed earlier?

A.    All of those happened -- yeah, all those happened well into my career with Baltimore City School Police.

Q.    And so those were degrees that you received while --

A.    Yeah, while --

Q.    -- working at Baltimore City Police?

A.    Yeah, while I was with the department, yes.

Q.    And you -- during that time, you also served part-time as the chief of police at Fairmount Heights Police Department --

A.    Yes.

Q.    -- right?

What did you do in that position?

A.    I was the chief of police.  So I oversaw the police department.  Primarily, what I really spent my time doing was saving the -- the

CONFIDENTIAL

Page 12

commission and the accreditation of the department because it was about to lose its Maryland state commission and accreditation as a police department.

Q.   Why was it about to lose its accreditation?

A.   A lot of mismanagement with the previous chief who was there and just a lot of administrative and operational things.

And primarily, at that time, we code -- uniform code reporting to the FBI had not been reported for several years, so -- and, also, mandated statistics that should have been reported to the Maryland State Police.  So when I was hired, that was one of the things I was asked to focus on so that they would not lose commission.

Q.   And you said your time was spent saving the commission.  Do you think you saved the commission?

A.   Oh, I know I did.  The department is thriving.

Q.   So over the course of your 20 years with the Baltimore City School Police Force, what were your various positions throughout that time? Did they change?

A.    They did.  I started off as a school-based officer, which I refer to as "school resource officers."  And I operated in that capacity for a number of years.

And I pretty much worked in every academic environment during that time period from pre-K through 12, special programs.  Yeah, I touched -- during that time period, I touched every type of population in our school district in Baltimore City that we had -- student population we had.

Q.   Were you stationed at different schools, or were you stationed at a central office and then would travel for work to the --

A.    No.  In the very beginning, I was -- yeah, when -- when the school year would start, officers would get their assignment, so...

And there were schools that I was the officer there for two years.  There were schools I was there for three years.

Q.   And that was all within your capacity as a school resource officer?  You --

A.    Yes.

Q.   Okay.  What was your next position after-school resource officer?

Page 14

A.    The next position, I was promoted to -- well, I -- I was placed -- I was still a school resource officer.  I -- it wasn't a promotion, but I was placed in patrol.

Q.    And what is patrol?

A.    So patrol units are responsible for responding -- we call them "sectors."  So there were 18 schools in a sector.  When calls for service came out, if that school did not have its own full-time SRO, I would respond to that call for service as a patrol unit.

Q.    How many schools in that district did not have SROs; do you recall?

A.    That fluctuated.  I mean, you got -- at any given time actually deployed inside of a school, we might have had -- like, actually in a school, maybe 70, something like that, at that time, when I first joined, 180-something schools.

Q.    So you would go out when you received calls for service.  What types of calls for service would you respond to?

A.    When I first went on patrol -- I mean, it varied.  Theft, assaults, vandalism, disorderly, a lot of -- lots and lots of disorderly, and lots of emergency petitions for mental health situations

CONFIDENTIAL

Page 15

because we were the transport.  If a student was declared needing any of mental health intervention, we did the transport to the hospital.

Q.   How often would you say you did that?

A.   The --

Q.   The transportation for mental health?

A.   Frequently.

Q.   So you started as an SRO stationed at schools -- at the various schools, and then you went to SRO patrol?

A.   Yes.

Q.   What position did you hold after that?

A.   I was promoted to corporal.

Q.   And what is that?

A.   That is first-line supervisory duties, working under the guidance of the sector sergeant, sector corporal.

So now it's a little bit different because -- responsible for other officers, scheduling, reviewing reports; constantly in the car all day now, you know, except, you know, riding around, checking on officers; stopping in, speaking with administrators; collecting reports at the end of every day; checking in with officers to see what their needs are; delivering items out in the field

Page 16

to officers and responding to calls for service on a radio.

So even if a patrol unit gets a call, depending on what that call is, probably as a corporal will show up to back up and support the patrol officer.

Q. Did you hold any other positions after corporal?

A. Yes.

Q. What position did you hold after that?

A. Sergeant, or as we -- as we refer to it, area commander sergeant.

Q. And what were your responsibilities as sergeant, area commander?

A. Responsible for all of the schools in my sector, all of the police officers; writing evaluations on the officers, biannual evaluation, evaluating corporal; determining what resources were needed for my officers in the field; reviewing reports; scheduling training; assigning, directing and scheduling both regular duty-hour assignments and after-hour assignments for officers.

Q. Any positions after sergeant?

A. Not with the Baltimore City School Force.

Page 17

Q.    When did you leave the Baltimore City School Force?

A.    January of 2018.

Q.    And in your time with Baltimore City, you mentioned you would respond to calls for service.  Did you respond to violent incidents at the schools?

A.    Yes.

Q.    What types of violent incidents?

A.    Primarily, fights.

Q.    Did you ever respond to incidents of gun violence?

A.    Yes.

Q.    Do you know how many?

A.    I do not.

Q.    Would you say less than five, more than five?

A.    More than five.

Q.    More than ten?

A.    Yes.

Q.    25?

A.    So I need to clarify, because you're asking me about gun violence proximity.  So because schools in Baltimore City are like -- community school, like, sit right in the middle of

CONFIDENTIAL

Page 18

communities, you know, you can have the front door to school, and then you can have Ms. Ethel's house like 20 feet away, right?

Q. Yeah.

A. So, oftentimes, because of proximity, yeah, I would respond to gun violence because, you know, if there was a run and gun battle at 11:00 in the morning and we're locking the school down and we're responding, yeah, that -- you know, you got two people shooting at each other, which was not infrequent -- which was pretty frequent in proximity of a school, then it impacted the school, even if it wasn't somebody bringing the gun in the school or whatever.

So there were lots of situations where there was gun violence that surrounded school that I had to respond to.

Q. Would you -- throughout your 20-year career with Baltimore City, did you -- Baltimore City Schools Police, did you respond to violent incidents in all of the positions you listed earlier, or was that at certain points in your career?

A. All of them.

MR. LEGG: Objection to form.

Page 19

THE WITNESS:  I'm sorry?

MR. LEGG:  It's okay.

THE WITNESS:  All of them.

BY MS. WEIANT:

Q.    What was your next position after Baltimore City School Police?

A.    The position here at Harford County.

Q.    And you said you left --

A.    Supervisor.

Q.    -- in January of 2018.  Is that also when you started with Harford County Public Schools?

A.    Yes.

Q.    And what was your title when you started with Harford County Public Schools?

A.    Coordinator of safety and security.

Q.    Is that your current title as well?

A.    Supervisor of safety and security.

Q.    When did you switch from coordinator of safety and security to supervisor?

A.    When I wrote a proposal to the superintendent of the board to expand the -- the department.  So manpower increased and subsequently aligned with a different title based on the growth of the department.

Page 20

Q. Do you remember what year that was?

A. That was 2023.

Q. When you began as coordinator of safety and security, what were your primary job responsibilities?

A. To respond to situations inside of -- at our schools; support the schools; to, you know -- everything safety and security.

When I started this job, it was literally a two-person office. Safety and security for the district was handled by myself, and my support person was my assistant, my office assistant.

Q. Was that their title, "office assistant"?

A. Yeah, she was my -- yeah, she was my -- "administrative assistant" was her title.

Q. And what was her name?

A. Susan Cuomo.

Q. Is she still with --

A. No. She retired.

Q. What year did she retire?

A. She retired in 2022. I want to say 2022.

Q. So between the time -- while serving as

Page 21

coordinator of safety and security until 2023, did you have staff under you before you took the position of supervisor?

A.    Yes.  I had my assistant and seven -- it started with seven.  We piloted an expansion of the office.  We piloted a program, and we hired seven people.

Q.    What year was that?

A.    That was 2021 when we started the pilot.

Q.    So until 2021, was there any other -- were there any other staff members in the safety and security department other than you and Ms. Cuomo?

A.    No.  That was pretty much it.  2020 is when we started to -- well, I'm sorry.  2020 is when we -- when we started to expand, right around the time of COVID, when we were just getting into bringing on our school safe liaisons.

Q.    Who do you report to?

A.    Now I report to Ms. Cathy Bendis and Dr. Eric Davis.  Those are two -- my two reports.

Q.    Who is Cathy Bendis?

A.    She is the assistant superintendent of operations.

CONFIDENTIAL

Page 22

Q. And who is Eric Davis?

A. He is the chief of administration, second in command of the school district.

Q. Over the course of your career, have you ever worked as a teacher?

A. I've worked as an instructor but not as a teacher.

Q. What do you mean by "instructor"?

A. I was a certified law enforcement instructor for ten years, both firearms and academic classroom instructor, certified through the Maryland State Police.

Q. And who were you instructing?

A. Well, in classroom instruction, law enforcement. Firearms instruction, I'm a certified firearms instructor for both civilian and law enforcement.

Q. Have you ever taught in a public school setting?

A. Yes. I've trained in a public school setting but not classroom teacher, no.

Q. Okay. Have you ever taught in any other school setting in K through 12 classrooms?

A. No.

Q. Have you ever worked as a principal?

Page 23

A.    Never.  No.

Q.    Have you ever worked as a mental health counselor?

A.    I don't know.  If being a police officer in Baltimore City for 25, 20 years counts, yeah.  But other than that, no.

Q.    Your formal titles have not involved --

A.    No.

Q.    -- mental health counseling responsibilities?

A.    No.

Q.    And have you ever worked as a nurse?

A.    No.

Q.    Or other healthcare provider?

A.    No.

Q.    Have you ever worked as a school counselor?

A.    No.

Q.    Have you ever worked in a school's IT department?

A.    No.

Q.    Can you tell me more about how the department developed and changed between when you joined in 2018 and today?

MR. LEGG:  Objection to form.

Page 24

THE WITNESS:  Yeah.  So, in 2018, when I -- when I came, it was -- I stepped into the role that my -- my, you know, predecessor was in, in the same position as coordinator and any office. Oversaw -- excuse me -- safety and security throughout the district.  Supported schools with their safety and security measures and emergency incident plans.  Responded for really significant events that schools needed support for.

And coming from where I came from, both -- both my military and police background, I just did not see how it was going to be possible to -- for one person to, you know, continue doing those duties.  So started changing first in my mind and then, you know, putting it on paper and what -- what that vision looked like to be able to support the schools with more than just me.

So we piloted a program, the school safe liaison, where we started with seven school safety liaisons who were deployed to schools.

And the way I deployed those particular seven was based on data and information I collected on support, looking at what schools I had provided the most support to when it was just myself.  So those were schools I said would probably benefit

Page 25

most.  And the program, you know, met with success over the next couple of years.

And then, you know, I made requests to increase our manpower there and also made requests to provide supervisory positions as we grew the department, so...

So from then to now, yeah, we went from a 2-person operation to now just under a 40-person operation.

BY MS. WEIANT:

Q.  Okay.  So you said between 2018 and roughly 2020, it was just you and Ms. Cuomo in the department?

A.  Yes.

Q.  Around 2020, you added seven school safety liaisons?

A.  Yeah.  We started that process in '19, but, yeah, we started adding them -- like, started the process of creating the title, the -- working all the HR stuff and then started adding folks.

Q.  And it was your idea to add these positions?

A.  Yeah.  We talked -- I talked that over with -- at that time, my direct report was Dr. Eric Davis.  So we had numerous conversations

of what that would look like.

Q. And the -- part of that you mentioned with your military and law enforcement background, you did not see how it was going to be possible for one person to continue fulfilling your duties in the safety and security department. What do you mean by that?

A. What I mean by that is that, when you have multiple schools that need various levels of support, it's just not going to be possible for one person to be heading -- heading to Darlington Elementary for a school that's 2 miles from the Pennsylvania line and get a phone call from Joppatowne High School, which is right on the Baltimore County -- on Harford County line, almost an hour away, to say, "Could you come support this?" or what -- you're one person.

And so -- also knowing that there were incidents -- one of the things that I saw were, there were incidents that arise to the level of intervention but not necessarily law enforcement intervention.

So just based on my background, I started to become a little concerned about things that SROs were being asked to get involved in

Page 27

where, yeah, although it needed intervention to support the principals a little bit higher than where they were, I didn't necessarily think we needed law enforcement involved in those things. That was part of what I saw as well.

And so from a support role and a problem-solving role, I just felt we needed to grow the -- the department and have that type of personnel available to support our schools.

Q. When you joined in 2018, were there school resource officers at every school in Harford County Public Schools?

A. No.

Q. How many were there?

A. There were resource officers in every high school and almost every middle. But shortly thereafter -- within a year of me joining, we had them at every high school and every middle school within a year of me joining.

Q. As of today are there school resource officers in every high school and every middle school?

A. Yes.

Q. Do you have any supervisory role over school resource officers?

Page 28

A.    No.

Q.    So you said you -- there were too many incidents to respond to -- for one person to respond to each incident in the school district on a given day or week?

A.    Yeah.    Not just too many incidents, but there's too much responsibility and safety and security for one person to be responsible for 55 schools, 40,000 -- roughly 40,000 students, 6,000 employees for one person to be able to support the needs.

So not just necessarily incidents, but just the needs, you know, reviewing critical incident reports, emergency plans.    You're just one person.    You know, you're just not -- you're not -- you're just not going to be able to provide adequate support to that many schools and that many communities.

Q.    And you mentioned situations that might need intervention but not law enforcement intervention and, therefore, maybe not an SRO intervention.    What types of interventions are you talking about?

(Discussion off the record.)

MS. WEIANT:    Can we take a break real

quick?

MR. LEGG:  Looks like we're having some technical difficulties.

THE WITNESS:  Oh, okay.

MR. LEGG:  So we're going to take a --

MR. KEYES:  The Zoom participants got disconnected.

THE WITNESS:  Uh-huh.

THE VIDEOGRAPHER:  We are now going off the record at 10:58 a.m.

* * *

(Whereupon, there was a recess in the proceedings from 10:58 a.m. to 12:21 p.m.)

* * *

THE VIDEOGRAPHER:  We're now going back on the record at 12:21 p.m.

BY MS. WEIANT:

Q.  Welcome back, Mr. Brooks.  We just took a short break to address some technical issues. Before we left, we were discussing the structure and changes to the safety and security department since you've joined.  We actually had a question pending before we left.  So I'm going to reask that question for you.

Earlier in your testimony, you

Page 30

mentioned that there were situations that might need intervention but not law enforcement intervention; and, therefore, they may not need SRO intervention. What types of interventions were you talking about?

A. I was talking more about situations where students may have an incident that's a safety-and-security-related incident but more in alignment with breaking a policy or procedure, school policy or procedure, and not necessarily rising to the level of law enforcement, which for me, coming from where I came from, really only wanted law enforcement involved when there was infractions or -- or breaking the law, and, you know, you need that expertise to determine the elements of an incident and whether or not it rises to law enforcement.

And I started seeing, you know, fights, minor frays, minor vandalism, de-escalation of students that might be escalated due to agitation, irritation.

When teachers aren't necessarily in a place to de-escalate and deal with that because they've got 20 other students in the class, I don't -- I didn't really want them calling SROs to

the class to deal with that, even if the administrator shows up and the person refuses. I'd rather have another layer of safety and security.

So that's what I mean by "rise to a level of intervention" but not necessarily wanting a police officer to show up.

Q. So that was one of the reasons you adopted safety -- school safety liaisons?

A. Yes.

Q. You also mentioned that at some point you requested supervisory positions. When was that?

A. That would have been the 2022-2023 school year.

Q. And what position did you think needed to be created?

MR. LEGG: Objection to form.

THE WITNESS: Regional supervisors. Because with the addition of and the growth of the school safe liaison position, now I just went right back to a situation I had previously.

Because now I have the folks, but then if it's all reliant on me to supervise every one of them and address the needs of everyone, then at some point we're going to reach, you know, law of

Page 32

diminishing returns in terms of what support I can give.  So I needed other people to be able to do that.

BY MS. WEIANT:

Q.    And how many -- how many regional supervisors did you request?

A.    I think initially I requested like five.

Q.    How many did you -- well, did you get any regional supervisors?

A.    Three.

Q.    And that -- those positions began in 2022 to 2023 school year?

A.    Yeah.

Q.    So as of today, the safety and security department includes yourself, three regional security or three regional supervisors, and then the school safety liaisons below them?

A.    Yes.

Q.    How many school safety liaisons are there?

A.    We have, right now, approximately 30. We've had some to leave and get other positions. Just brought some on recently.  But slots, about 30 slots.

Q.   Are they assigned to specific schools?

A.   Some.  The majority of them are.

Q.   How do you determine which schools get assigned a specific school safety liaison?

A.   So what we've done heretofore is we post the position when we have -- so we have two types of SSLs, just to be clear.  We have floaters, and then we have those SSLs who are, for all intents and purposes, permanently assigned to a school or fixed to a school.

If there's a vacancy at a school where the individual will be assigned to that particular school, the position will be posted.  We will say, this school is hiring for an SSL.  Once we look at the pool of candidates, we interview with the principal, some other member of their staff and a member of my team, sometimes myself.  And that's pretty much --

So it's not like I hire ten people and say, "You're going to go here"; "you're going to go there"; "you're going to go there."  The school is involved in the hiring process when there's an opening at their school for the SSL.  And that's how we did it from its inception.

Q.   Okay.  Are there any other positions

within your department that we have not discussed?

A.    Just my assistant.  That's it.

Q.    Yeah.

And when you are -- when Ms. Cuomo retired, did you hire a new assistant?

A.    Yes.

Q.    What -- what's their name?

A.    Christina Paquette.

Q.    Outside of your department, who within Harford Public -- Harford County Public Schools do you work most closely with?

MR. LEGG:  Objection to form.

THE WITNESS:  I work very closely with technology department.  I work very closely with our PIO, our communications office.  And I work very closely with Mr. Hennigan's office, Buck Hennigan.

BY MS. WEIANT:

Q.    And which department is that, Mr. Hennigan's department?

A.    Yeah.  The pupil services office, student services.

I work with -- I work with the suspension services folks for long term for students that are referred.  So I work with Buzz's

Page 35

office, which is -- all falls under Buck's office. And then I work collaboratively with the office to get my folks trained in CPI training.

Q. When you joined Harford County Public Schools and initially hired that first round of school safety liaisons, what prompted you to create that position and hire those employees?

A. The fact that I felt there should be a stopgap of support between principals, teachers and law enforcement and that there should be someone to be able to liaise in between there, again, for things that I saw.

Like, coming from where I had come from, you know, we had that. There was nothing like that that existed here. So as I saw things happening and got a better grasp of the lay of the land, I felt like we could use this position, you know, to help in our schools.

Q. Was anyone else asking to increase safety and security measures at the school around that time?

MR. LEGG: Objection to form.

THE WITNESS: Safety and security measures? Yeah, safety and security measures. Personnel? At that time, when I first started? I

Page 36

mean, because I immediately started assessing a need in 2018 shortly after I was here.

But security measures, yeah. Because shortly after I was here, we had the tragedy in Parkland. So whenever you have those type of tragedies, you know, security measures and focus on security measures become a lot more magnified.

BY MS. WEIANT:

Q. At some point, did legislators become more interested in safety and security on school campuses, that you're aware of?

A. Absolutely.

Q. When was that?

A. Is your question, when -- when do I think they became more interested? Is that --

Q. Yes.

A. -- what you're asking me?

Definitely in the aftermath of the Stoneman Douglas shooting, I saw what I would consider an escalation of interest surrounding security measures.

Q. And are you familiar with the Maryland Safe to Learn Act?

A. Absolutely.

Q. Did that play a role in how you hired

Page 37

new positions for your department?

A. I wouldn't say that played a role in the hiring of new positions. I think for -- for me here in the immediate aftermath, that played a role in some security upgrades --

Q. What security upgrades?

A. -- throughout the district.

Some refreshing of cameras and purchasing more radios, things of that nature. But, yeah, here in -- yeah, because I worked very closely with the county executive's office in the aftermath -- in the immediate aftermath of that. And we had conversation about some additional funding for physical security resources, technology -- mostly surrounding technology.

But there was no conversation about increasing manpower in the -- in the immediate aftermath of the Stoneman Douglas shooting as it relates to, you know, conversations that was being had with me.

Q. Aside from cameras, refreshing cameras and purchasing radios, were the -- were there other safety measures you implemented in response to the Safe to Learn Act?

A. Yeah. So we -- yeah, we implemented

every measure that was -- that was passed in the bill.  We hired a mental health coordinator.  We -- we had to either contract or develop an active shooter, active assailant program.  We had to create drills and training surrounding active shooter programs.

We had to look at threat assessment, threat assessment -- look at our processes, our threat assessment teams, training surrounding threat assessment.

So, yeah, we -- we -- yeah, we carried out the mandates based on Maryland Safe to Learn Act.

Q.   The mental health coordinators you mentioned, are those employees that sit in your department?

A.   No.

Q.   Do you have any role in supervising them?

A.   No.

Q.   In 2022 to 2023, that school year when you hired regional security coordinators, did you make any other changes to the size of the department?

A.   Yeah.  We hired more school safe

Page 39

liaisons.

Q. Why did you hire more in that 2022 to 2023 school year?

A. Because we were just having an escalation of, again, those situations that rise to the level of intervention where we -- we -- one, the success of the pilot program; and, two, just the need to support schools with that position.

Q. So there was a greater need to support schools at that time?

A. There was a need to -- to provide the same services that we were providing at the other -- that the -- that the other schools were not previously getting, that we were only getting that service at seven schools. So we wanted to expand it to other schools.

Q. You've mentioned security cameras. When did Harford County Public Schools first install security cameras?

A. I have no idea.

Q. They were in the buildings when you joined --

A. Absolutely.

Q. -- in 2018?

A. Yeah.

Page 40

Q.   Are -- does Harford County Public Schools have live feed cameras?

A.   Yes.

Q.   Where?

A.   In all of our school buildings.

Q.   All of the cameras in the school buildings are live feed?

A.   Yes.

Q.   Do you have cameras in every classroom?

A.   We have cameras in no classrooms.

Q.   Do you have cameras in hallways?

A.   Yes.

Q.   In every hallway?

A.   That, I don't know if we have them in every hallway.  But if I had to -- if I had to estimate, we've probably got them in 99 percent of our hallways.  But I'm sure there's a hallway here or there that probably could use a camera, maybe.

Q.   So there are cameras in every school within the school district?

A.   Yes.

Q.   Do you have cameras at every entrance of the schools?

A.   Yes.

Q.   Do you have cameras on buses?

Page 41

A.    Yes.

Q.    How does Harford County Public Schools use the footage from these security cameras, if at all?

A.    How do we use the footage?  Sometimes we use it to fulfill subpoena requests when it's requested.  And we use it to view incidents, accidents.

Yeah, that's pretty much how -- we -- we use it to review anything that comes up that we need to, you know, take a look and see if we can get -- if footage even exists on it.  So we use it as an investigative tool.  Yes.

Q.    During your time at -- in your position, has anyone requested an upgrade in security cameras?

A.    Has anyone requested an upgrade?  I don't know if I understand your question.

Q.    Have any teachers or administrators requested that Harford County Public School buy new security cameras to increase their quality or their effectiveness?

A.    I'm going to say no, because I think our folks understand that we have what are called "camera refreshes."  So if a school did reach out

Page 42

and say, you know, "I want a newer camera over here," we're going to look at where that school falls in the refresh and -- because, you know, those cameras only have a certain lifecycle.

So if your school is scheduled for a refresh the 2027-2028 school year and you want newer cameras and that's where your refresh cycle is, then we'll let you know, like, "Hey, 2027-2028 you're going to get better cameras than you have now because these cameras are coming to the end of their lifecycle." So these cameras will be whatever it is in 2027 -- you'll have the newer stuff.

Q. Does Harford County Public Schools utilize any weapons detection devices?

A. Yes.

Q. How?

A. We utilize -- right now, we utilize it on a -- we utilize one weapons detection system right now that we're try- -- that we're looking at at Joppatowne High School. We use that for entry of students in the morning.

We are in a piloting phase of using another weapons detection, which is called OPENGATE. And we are using those weapons

Page 43

detections to -- we're -- we're using this time to collect data so we can determine how we're going to drive our policy in the future with using these weapons detection devices.  So we're using them on a random basis for some after-school events.

Q.    So Joppatowne High School is the only one that uses weapon detection devices on a daily basis?

A.    On a daily basis, yes.

Q.    When did that begin?

A.    That began, I want to say -- we went go live on that end of October-November time frame.  I can't remember exact.

Q.    Why did you add a weapons -- weapons detection device at Joppatowne High School?

A.    That weapons detection device was added in the aftermath of the shooting that occurred in September.

Q.    And before the fall of 2024, Harford County Public Schools did not use any weapons detection devices at any other school?

A.    No.

Q.    Did it use it at any events prior to that time?

A.    No.

Page 44

Q.   Does Harford County Public Schools search its students' property?

MR. LEGG:  Objection to form.

THE WITNESS:  When -- are you saying just in general or -- I mean, I'm trying to understand the question.

BY MS. WEIANT:

Q.   Has there ever been a time when school officials have searched students' property?

A.   Yes.

Q.   Why would you search students' property?

A.   You would search a student's property if you have reason to believe or cause to believe that the student may be in possession of contraband, if they may be in possession of a weapon.

And based on Maryland law, you would search a student if an administrator determines that the locker or personal belongings of a student should be searched for any of those items as well.

Q.   Who performs those searches?

A.   Those searches are typically performed by an administrator or a school safe liaison or school security person.

Page 45

Q.   Do you do any random searches?

A.   Of student -- no, no random searches of students.  If you mean like when they're coming in the door, every fifth student we're going to pull to the side and search their book bag, no, we don't just do random searches like that.

Q.   Do you do random property searches?  So when students are not present, searching their lockers?

A.   We used to.  We suspended that during COVID, and we have not -- we have not resumed that yet.

Q.   Why haven't you?

A.   Well, because a lot of the law enforcement agencies have gotten away from the marijuana-sniffing dogs, and that's pretty much what we were doing.  We were doing drug dog scans.

And so a lot of them are -- I mean, you know, because of the laws changing, a lot of agencies are not spending money to have canines trained on a substance that has either been decriminalized in -- in some cases.  You know, the laws have just become more lenient.  And -- and I don't think you want to train a dog to sniff fentanyl because it might be the last sniff.

CONFIDENTIAL

Page 46

Q.    Do you ever go to a student's home and search their home --

MR. LEGG:  Objection to form.

BY MS. WEIANT:

Q.    -- for any reason?

MR. LEGG:  Objection to form.

THE WITNESS:  Do I, or does anybody representing my office?

BY MS. WEIANT:

Q.    Does anyone at Harford County Public Schools go to a student's home to search their home at any time?

MR. LEGG:  Objection to form.

THE WITNESS:  No.

BY MS. WEIANT:

Q.    If you received information that led you to believe a student possessed a weapon at home, would you do anything to investigate --

A.    Can you ask --

Q.    -- that information?

A.    Can you ask the question again?

Q.    If you received information that led you to believe that a student possessed a weapon or had access to a weapon at home, would you do anything to investigate that allegation?

Page 47

A.    Just merely that they might have a weapon in their home?

Q.    If --

A.    No.

Q.    If they also made a threat?

A.    Yes.

Q.    How would you investigate their access to a weapon?

A.    We would notify law enforcement partners and give -- provide them the information that we've been given, especially if there's a nexus to a threat.  And then from there, our law enforcement partners would deal with any search that took place at the home.

Q.    Would that be school resource officers or separate law enforcement partners?

A.    It could be --

MR. LEGG:  Object to the scope.

THE WITNESS:  It could be both or either.  If the threat comes in at 10:00 at night, and the nature of the threat dictates that immediate investigation needs to start, that could be a patrol deputy who receives the call.  Because, you know, SROs are typically off at 4:00, you know.

BY MS. WEIANT:

Page 48

Q.   Does Harford County Public Schools do any searches specifically to find weapons that might be in the schools?

MR. LEGG:  Objection to the extent this goes beyond the scope.

THE WITNESS:  If you're talking about weapons detection that you walk through, yes.

BY MS. WEIANT:

Q.   Yes.

Aside from the weapons detection devices we've discussed, are there any other measures in place to identify when the student brings a weapon to school?

MR. LEGG:  Object to the extent it goes beyond the scope.

You may answer if you have personal knowledge.

THE WITNESS:  Do we at this time?  No. Other than the weapons detection, do we at this time?  No.

BY MS. WEIANT:

Q.   So beyond weapons detection devices, security cameras and searches in certain circumstances, what other technology or devices does Harford -- Harford County Public Schools use

Page 49

to identify threats?

MR. LEGG:  Object again to the extent it goes beyond the scope of this deposition.

To the extent you can answer personally, you may go ahead.

MS. WEIANT:  Counsel, just to clarify, this is his fact witness portion of the deposition --

MR. LEGG:  I understand.

MS. WEIANT:  -- correct?

MR. LEGG:  Yeah.  You're asking questions on behalf of Harford County Public Schools.  So I'm just objecting to the extent that you're asking him to seek testimony on behalf of the school district rather than himself.

But you may answer.

THE WITNESS:  I just need you to read the question again.

BY MS. WEIANT:

Q.   Yes, of course.

So beyond weapons detection devices, security cameras and searches, are you aware of any other technology or device that the schools use to identify threats?

A.   That we're currently using to identify

Page 50

threats, no.

Q.    All of the safety and security measures, including staffing and the various technologies and devices we've discussed, require funding, right?

A.    Correct.

Q.    Since you've joined Harford County Public Schools, how has the safety and security budget changed?

A.    Safety has been increased in terms of being able to cover the hiring of our school safe liaisons as well as our regional security coordinators, allocation of funding now for the weapons detection systems and, you know, increased line items to help procure more radios and cover some more of the camera -- camera needs.

Q.    Do you know how much the budget has grown since you joined in 2018?

A.    Without having it in front of me, no.

Q.    Would you be able to estimate a percentage amount of growth?

A.    No.

Q.    When the school is making the budget every year, do you put in requests for new projects or positions that you would like to fund?

Page 51

A.    Yes.

Q.    Have you ever been denied funds for safety and security initiatives?

A.    Yes.

Q.    What initiatives have you been denied funding for?

A.    There have been a number of them. Without having it in front of me, I can't -- I don't -- wouldn't recall off the top of my head.

Q.    Can you recall any specific things that have -- you've been denied funding for?

A.    No, I can't think of anything specific.

Q.    Does your department receive any grant funding?

A.    Yes.

Q.    How much of your budget would you say is from grants?

A.    I wouldn't know that information off the top of my head.

Q.    Who would?

A.    Who would know it off the top of their head?  I don't know.

Q.    Would you be able to find that information?

A.    Oh, I'll be able to find the

Page 52

information, yes.

Q.    Is there one place where you could identify all of that information, or would you have to look at specific grant proposals?

A.    I would have to look at, at least, at a minimum, three places, because safety and security touches other offices.  There are other things that are safety and security related but are not necessarily managed by my office.

Q.    You said you would have to look at three things.  What are those three things?

A.    I said a minimum of three.

Q.    Oh, a minimum.

A.    So I would -- I would have to -- I would have to get some information from Mr. Hennigan's office, the threat assessment and all of the things encapsulated in it, our safety and security measures.  That's not managed by my office.  I don't manage those teams.  Those teams are academic folks that are on the ground, inside of the school.

So any funding that would go to that, you know, I would have to collaborate, you know, with that office.

I definitely would have to collaborate

Page 53

with the office of technology, because there's so much that we do that is in collaboration with the office of technology. And then our grants office itself.

Q. Earlier, we discussed the Maryland Safe to Learn Act, correct?

A. Yes.

Q. And that legislation requires active shooter training, right?

A. It did. That law has changed.

Q. How has it changed?

A. So when that -- when that law was first passed, the way we conducted our training, we could, you know, freely do simulations as close to real world as possible. But with most recent legislation, there's been pretty much a 180 on how those trainings should look, how they should be conducted and things that are now expressly prohibited.

Q. What things are now expressly prohibited?

A. Loud noises, loud bangs, any simulation of a weapon, any simulation of a person being injured or harmed by a weapon, you know, full-scale -- no full-scale drills with

Page 54

role-playing of someone being an assailant or someone being a victim. None of those things were precluded in the initial law, but they -- we -- we can't do those things now.

Q. Do you have an understanding of why you can't do those things anymore?

A. No, I don't really have an understanding of -- I don't necessarily know of an understanding of why. But I know that this became a very divided issue on what's needed to prepare students and staff and what's not needed, so...

I understand that there became this divide where it was very polarizing in '18 where everybody was saying. But I can't say I fully understand it.

And the reason I can't fully understand is because when these events around the country occurred, the biggest question was: Why aren't you doing more to protect my children? Why aren't you doing more to protect, you know, our students? Why aren't you doing more to protect our staff? What more are you going to do? Those were the questions in '18.

And so the legislature said, "Okay. These are the things that we're going to do. We

Page 55

weren't doing this.  This is what we're going to do."

So we checked those boxes that the community was asking, that the legislature -- because the legislators were even asking.  And if we -- if you don't do this, how come you don't do this?  If -- if students don't know how to respond to this, why don't they know how to respond to this?

So when you asked me, do I understand why all of a sudden those questions aren't still being asked, why we don't still want our students prepared in the same way, why we don't want our staff prepared in the same way as we wanted them prepared in April of 2018, I don't fully understand why that changed.

Q.    When did it change?

A.    Over the past couple of years, it started changing when new legislation was coming out that was changing the way that we approached training and drills for our students.  Though these events have not changed, our approach to preparing for them has definitely changed.

Q.    And when you say "these events," what are you referring to?

A.    I'm referring to escalating violent events that still occur in schools.

Q.    What would that include?

A.    Excuse me.  That would include events where schools have still experienced violence, gun violence.

Q.    What did your critical response training look like beginning in 2018?

A.    Critical response training in 2018 looked like mainly lockdown.  Like, we locked down for everything.  That's -- in 2018, critical response, the way you responded to most critical incidents was locking down.  And really didn't matter what it -- what it was; it was pretty much lockdown.

That was one of the things that the legislature was concerned about.  That was one of the questions.  Why is that the only thing we know how to do?  Why don't we know how to do other things?  Those were the questions.

Q.    And lockdown, is that also referred to as shelter in place?  Are they similar?

A.    They're similar, yeah.  Slight -- slight differences.  I mean, if I --

Q.    Slight differences?

Page 57

A.   Yeah.  If I got a hurricane outside, I might want to shelter in place, but I might not want to lock people out who are trying to get inside the building.

If I got a shooter outside, I'm sheltering in place, but I also don't want anybody getting in the building because I don't know if you're the assailant.  So there are some slight nuances.

Q.   Did that change in -- sorry.  Strike that.

Did the critical response training change in 2019?

A.   Critical response training had some additions to it after the Maryland Safe to Learn Act.

Q.   What were those additions?

A.   Well, the active shooter training.

Q.   And what did the active shooter training look like?

A.   Our active shooter training looked like about an hour and a half -- like 90 minutes of presentation and then in preparation for practical exercises.

And our training -- I mean, we had --

we had Nerf guns.  We had -- you know, we had vests.  You know, we had simulation equipment.  We collaborated with our law enforcement partners.

And we -- after we did our presentation portion, we broke down, and we put our staff members in situations that would allow them to understand response mechanisms and options.  It was -- it was really rooted in options.

Because when all you've done in a school system -- not just our school system.  When all you've done since the '70s is this thing called "lockdown," that doesn't necessarily give way to options.  And that was one of the biggest questions that the community and the legislator asked, "How come our folks don't have options?"  And so our training was options-based.

Q.    And to clarify what you just described, that training was for staff and teachers?

A.    The initial training is for staff and teachers and to be able to conduct drills with our students.

Q.    And what do the student drills look like?

A.    So our student drills were scaled down some.  More of a talk-through, walk-through type of

Page 59

situation.  We didn't use Nerf -- so we didn't use Nerf guns.  We didn't use any of those type of equipment or apparatus with our students.

However, we did go through the continuum of optional response.  Like, you do have the option to run if you hear gunfire on the west side of the building and you're on the east side.

You do have the option to not wait for the gunman to get to the west side of the building from the east side.  You have an option to run and evacuate.

You do have the option other than just, yeah, lock the door, but you've got an option if you've got file cabinets and desks and whatever else you can pile, and explaining the mindset behind that, explaining the mindset based on data, that people who commit these offenses want to do the most amount of damage in the shortest period of time.  They're not going to spend five minutes trying to get through a door that you barricaded.

But if nobody's ever talked to you about that, nobody ever shown you what that looks like, then you don't necessarily think about that. You don't necessarily develop that motor memory or sensory skill when these things happen.

Page 60

And then, ultimately, to talk about the option of fighting back. You don't just have to be a willing participant in your own demise. So that's what those things look like.

Q. Can you give examples of how you help students develop sensory skills that would allow them to respond to an active shooter situation?

A. More of motor -- more of a motor skills. Showing them, from their classroom, exits, you know, exit areas or whatever. And not just for a fire drill, right? Because you do these fire drills or whatever, we're pretty much taking, you know, kids to the nearest exit/entry or whatever.

Getting students in the mindset, again, of following instruction, taking direction when you get a critical life-threatening event where there's someone trying to create harm by violence.

And so just practicing and training what that response looks like as opposed to having a situation in the aftermath and saying, "Oh, I never knew I could do that." "I never knew that exit was right there." "Nobody ever walked us through here." "Nobody ever told me if I hit the corner of a window, even on a 21st century building, that I can spiderweb that window instead

Page 61

of throwing a chair in the middle of it and wondering why the chair keeps bouncing back."

So if you don't -- if no one tells you these things, then you don't know these things. And so that's what we worked on training our students on.

Q.    Is one of your goals in these student drills to help students understand how serious the situation could be?

A.    Yes.

Q.    How do you do that?

A.    Well, in terms of showing them how serious the situation can be, the biggest thing we're teaching them is the preservation of -- of life, you know, of their own life when we start to talk about these specific drills.

We see these drills -- or we saw these drills as having been meant to help our students understand that these can be life-saving measures.

But I think it's also important to note that we've also let our staff and our students know that these are transferable skills.  So it doesn't matter.  If you're with your parents somewhere and something like this happens, you can utilize these same skills.  You can utilize this thinking.

Page 62

And so we also help them by letting them know that it's not just response. It's also about thinking. It's not just about immediately reacting or responding, but it's always -- it's also about thinking your way through the situation.

Q. So when you were doing drills, what did a full talk-through, walk-through drill look like with students?

A. So if we -- at a particular school, if the active assailant drill -- well, first of all, I didn't -- the state said active shooter. When I wrote the program, I decided to call it "active assailant," because not every assailant has a gun that can do damage.

So in our active assailant drills, we would determine whether or not we were going to do a run, hide or fight portion of that drill based on that particular classroom.

And so let's just say it was a barricade situation. What we did is we talked through. We didn't necessarily have our students take desks or whatever.

So to really tell you what it looks like, if everyone here were students and I was the teacher, I would say, "Can you point out three

CONFIDENTIAL

Page 63

things that you would use to block that door if we knew somebody was down the hallway and making their way down here?"  And then the teacher can shut it down, and students can start talking.

Me and Mike would grab your desk, Ms. Jones, because it's the heaviest, and we will push it in front of the door.  That projector cart right there, we'll try to put it on top of the desk.  We would make sure we get out of the sight of the window if -- if it has a window, you know. And they would talk through it.

When it comes to the evacuation piece, we actually would walk out into the hallway and talk about what that evacuation would look like from that particular classroom.

If it was the last resort of having to defend -- fight and defend your life, then, again, the teacher would say, "I want you all to think about, when you look around this classroom, what are some things that we might be able to use to neutralize and defend ourselves from someone if they were to breach the barricade we put up, if they were to get in.  What are some things that we would do?" you know.

You know, me and John Doe would stand,

CONFIDENTIAL

Page 64

you know, next to the door with, you know, a chair. We'd be prepared to throw the stapler. We'd be prepared to throw things at -- and this is what we were training the students.

So that's what our drills looked like. Did we have a kid throw, you know, a stapler at the door? No. Did we get up and move stuff physically in front of the door? No.

We -- we decided to take the route of talking these things through with our students and having them paint pictures in their mind of what it would look like if they were confronted with these situations.

Q. You mentioned that there might be a run, hide or fight portion of these drills. In any given drill, would you cover all three of those options?

A. Typically, no. We wouldn't -- we would just do -- we would pick a time to really focus on one and then do another one at another time. Although, schools were not prohibited from touching on all three if a teacher wanted to touch on all three of those things.

Q. How often would students participate in these drills?

A.    When we first started, at least once, maybe twice a year they would participate in those drills.

Q.    After the laws changed, did you continue to do any type of active assailant drills with students?

A.    Instruction.

Q.    What does that look like?

A.    Just talking about what the response would look like if someone comes in, but pointing stuff out and all that --

Anything that could, I don't know, incite or invoke -- evoke some type of emotional type of response, with actually describing or what does it look like, somebody is coming through the door with a gun and all that, got away from -- from that stuff.  Because the law pretty much says you really can't go into all that type of stuff, anything that might be considered creating trauma to a student.

So now we can do an evacuation drill like -- because you can evacuate for any number of reasons.  And we can cite that as a part of our evacuation drill, that our students would know how to evacuate in the case of an active assailant.

We can still do lockdown drills.  We don't have to give a reason.  We can just say, "Hey, if we get the notice from the office that we're going into lockdown, this is what lockdown means.  We're going to lock the door.  We're going to shut off the lights.  We're not going to leave out until we're given the clear."

Well, we don't necessarily have to say that was for because it's an active -- as I say, it could be for any reason.  It could be for a medical emergency.  And we've got emergency services people coming in.  We don't want anybody in the hallway.

So we go in and say we're in a lockdown because we've got, you know, somebody that just had a medical emergency, and we're going to have some emergency apparatus moving through the hallways.  And we don't need anybody out here, so we're locked down until further notice.

So when we do a lockdown drill now, we don't specifically have to put the reason.  We just need to know our kids know how to do a lockdown drill.

(BROOKS EXHIBIT 2, News article dated 1/8/19 titled Harford Schools Include Mental Health Component in Active Assailant Training, was marked

Page 67

for identification.)

BY MS. WEIANT:

Q.   I'm going to show you what has been marked Brooks Exhibit 2.

MS. WEIANT:   This is Tab 13.

BY MS. WEIANT:

Q.   Go ahead and take a moment to review this document.

Have you had time to review?

A.   Yes.

Q.   So this is a news article dated January 8th, 2019, titled "Harford Schools Include Mental Health Component in Active Assailant Training."   Do you see that?

A.   Yes.

Q.   Are you familiar with this article?

A.   Yes.

Q.   Did you provide comments for this article?

A.   Yes.

Q.   And this -- in 2019, Harford County Public Schools was still doing active assailant drills with their students, right?

A.   In 2019?

Q.   Yes.

A.    Yes.

Q.    Can you turn to the second page, the first full paragraph --

A.    I'm sorry.  I'm sorry.  Say that again.

Q.    The first full paragraph.

A.    Okay.  Where it starts with "reunify"?

Q.    No.  So it's the one right below that. Sorry.  It says:  Some students and adults.

A.    Uh-huh.

Q.    So, some students and adults, especially those who suffer from anxiety, could have reactions to the training, and Board Vice President Laura Runy -- Runyeon asked how trainers would handle that.

The first part there, "Some students and adults, especially those who suffer from anxiety, could have reactions to the training" --

A.    Uh-huh.

Q.    -- do you agree with that?

A.    Yes.

Q.    A few lines down, there's a quote that says:  Students and even adults who take the training are impacted by it, he said.  Past trauma could impact how people receive training.

A.    Uh-huh.

Page 69

Q.   Is that your view?

A.   Yes.

Q.   Do you believe that students and adults might be impacted by the training?

A.   Yes.

Q.   And that people who have experienced trauma in their past might be impacted more heavily?

A.   I don't know about more heavily, but they could be, depending on what that trauma is. But, yeah, it could be.

Q.   But -- so -- sorry.  Strike that.

Experiencing past trauma could change the way that you experience the training?

A.   Yes.  Could change the way you receive it, yeah.

Q.   Was it your understanding that these drills might be traumatic for students?

A.   No, not our drills.  No.  Not the way we conducted ours.

Q.   But it was your understanding that they might -- it might -- they might cause anxiety?

A.   Yes.

Q.   They might cause stress?

A.   Well, yeah, I guess they could,

CONFIDENTIAL

Page 70

depending on the -- the child.  But, yes, it could cause stress.

Q.   But you believed it was still important to do it?

A.   Yes.

Q.   Why?

A.   Because it's what our community asked for.  And it is -- it's also a part of the changing landscape of our society when we started looking at the increase in these incidents.

So either you're going to be -- you're going to take steps to be prepared and prepare your people to be able to respond, or you just don't prepare and you don't take steps.

Q.   You believe that helping students and teachers prepare might ultimately save their life, right?

A.   Might ultimately, yes.

Q.   You can set that document aside.

MS. WEIANT:  Let's take a quick break.

MR. LEGG:  How long do you want?

MS. WEIANT:  Five minutes?

MR. LEGG:  Cool.

THE VIDEOGRAPHER:  We are now going off the record at 1:15 p.m.

Page 71

* * *

(Whereupon, there was a recess in the proceedings from 1:15 p.m. to 1:38 p.m.)

* * *

THE VIDEOGRAPHER: We are now going back on the record at 1:38 p.m.

BY MS. WEIANT:

Q. As supervisor of safety and security, what types of threats or incidents do you -- are you responsible for? Strike that.

As supervisor of safety and security, what types of threats or incidents does your team respond to?

A. Excuse me. A wide variety of threats and incidents. My team responds to threats of -- all threats of violence we're going to, you know, be involved in, sometimes threats -- threats of self-harm. But pretty much any type of threat to the safety, security and well-being of our students and staff, we're going to respond to those threats.

Q. Does that include things like fires or natural disasters?

A. Yes.

Q. It includes fights?

A. Yes.

Page 72

Q.   Does it include abuse?

A.   The threat of abuse?  Because you asked me about threats.  Are you talking about somebody threatening to abuse somebody?

Q.   So -- either incidents or threats, would you respond to reports of abuse or threats of abuse?

Let's start with reports.  Would your team respond to reports of abuse involving students?

A.   In some cases, yes, because it might be reported -- they might be the first person it's reported to.

Q.   What types of incidents have you seen involving abuse?

A.   I can't recall off the top of my head.

Q.   Would it include abuse occurring outside of school?

A.   If it's reported to -- to one of our people.

Q.   And how would you respond to a report of abuse outside of school?

A.   Determine what -- what the elements of the report is.  So, I mean, we're going to notify any other respective parties that should be

Page 73

involved.  It just depends on what type of abuse it is.

Q.   Could it include reports of domestic abuse?

A.   If it's reported to us, yeah, we're going to report it.

Q.   Could it include reports of sexual abuse and assault?

A.   Yes.

Q.   Are you aware of any incidents involving sexual abuse and assault that have been reported to you or your team?

A.   Not specifically.  I mean, no.

Q.   Would you or your team respond to incidents involving human trafficking?

A.   When you say "respond," I need you to explain what you mean by "respond."

Q.   If someone reports a violent incident or activity, abuse, any of these things that we've discussed --

A.   Uh-huh.

Q.   -- what does your team do with that information?

A.   We'll make notifications to law -- if it's abuse involved in those type of situations,

CONFIDENTIAL

Page 74

we're immediately getting law enforcement involved, immediately.

Q.   Okay.   So one response would be passing that information along to law enforcement?

A.   No, that's going to be a response.   If it's the things that you outline, we're calling law enforcement.

Q.   So one response includes sharing information.   Who else would you share information with once you receive a report?

A.   It just depends on what it is.   Not everybody is on the same notification list for different incidents.   But it just depends on what it is.

I mean, if it's something of a sexual nature involving our -- our student, or you say sexual abuse or something like that or human trafficking, then, yeah, we're going to notify law enforcement.   Because now you're talking about, you know, something that's illegal, against the law. But then if it's involving our student, we've got to notify people because we've got to be able to support the student.

So, you know, we're going to be notifying some folks from Mr. Hennigan's office,

Page 75

you know, so that they are aware.

And then to a lesser extent, if it -- if it involves harassment type of stuff, then we're going to notify our person that handles our Title -- Title IX complaints. We're going to notify them.

But everything is on a case-by-case, but we're going to make notifications.

Q. What types of incidents would you respond to in person or send somebody to respond to in person?

A. I don't understand what you mean. What type of incidents? I don't -- I mean, that's so broad.

Q. If there is a fight at school --

A. Uh-huh.

Q. -- would you or one of your school safety liaisons go to the location where that fight happened to intervene in any way?

A. That's on a case-by-case basis. If two eight-year-olds get into a fight in a cafeteria in a school that doesn't have a school safe liaison, I'm not calling the school safe liaison to go over there to do anything about those two eight-year-olds who fought in the cafeteria. I'm

Page 76

going to let the school administrator and the teachers mediate that situation.

If there's no school safe liaison assigned there, I'm not sending my regional there because those two students fought. We don't have the -- the manpower. Fights happen every single day across the school district.

So we wouldn't necessarily send them to every single situation in the event of a fight.

Q. Okay. So help me understand a little bit. If you get a report of some kind of violent incident or threat of violence, what is your team's primary responsibility with that information?

A. To triage it, to see whether or not it needs to go to, one, law enforcement; and then, two, when we triage that report of violence that we receive, determine what other notifications should be made and to determine whether or not we need to respond to the location. But we do all that through triaging of the information when we get it.

Q. Okay. Do you generate any reports about specific incidents or threats?

A. Do I generate any? I generate -- for major critical incidents, I will generate a after-action report if it falls under the matrix

Page 77

requirement for the Maryland Center for School Safety.

Q. You've mentioned threat assessments earlier.

A. Uh-huh.

Q. Is that something that you and your team are responsible for?

A. No.

Q. Are there any other documents or forms that are primarily your team's responsibility to complete?

A. No.

Q. How do you track -- sorry. Strike that.

Do you track every violent incident or threat that you learn about?

A. Every violent incident or threat that we learn about? Yeah, those are -- if we learn about it, yeah, because, I mean, that information has been distributed. So, yeah, we -- we're able to track that.

Q. Do you have a system for tracking it?

A. We have a communication process we track it. And that's our SOS. So if something violent or a threat comes out, I'll receive that

Page 78

information from my SOS.

Q.   Do you draft and send out the SOS, or do you receive them?

A.   I receive them.

Q.   If I wanted to know how many fights occurred at a specific school in a given year, how would I find that information?

A.   I don't know.

Q.   If I wanted to know what caused those fights at a given school in a given year, how would I find that information?

A.   That could be in -- well, if you're asking about every single fight, I don't know.  But for fights that are documented, you can get that information based on a number of ways, I would imagine.  We don't deal with that.

But student disciplinary record if any sanctions were doled out.  If threats were made, then, of course, there would be an assessment.  You could capture some of that information through threat assessments.

And if a police report was written, you can caption it through -- if there's an assault that created a police report, you can capture that information as to why.

Page 79

Q.   So the documents you just mentioned, a threat assessment, disciplinary reports and potentially a police report, none of those are documents that you are responsible for drafting, are they?

A.   No.

Q.   Do you receive every threat assessment, disciplinary report or police report that is created?

A.   No.

Q.   Would you have access to every threat assessment, disciplinary report or police report?

A.   No.

Q.   How do you keep track of the circumstances surrounding any particular violent incident at Harford County Public Schools?

MR. LEGG:   Objection to form.

THE WITNESS:   How do I keep track of any violent incident?

BY MS. WEIANT:

Q.   So if you wanted to go back and look up what happened in a given fight --

A.   Uh-huh.

Q.   -- where would you look?

A.   A fight that occurred inside of a

Page 80

school building?

Q.    Yes.

A.    I would -- if I wanted to know background information, if it was captured, then I would talk to the administrator of the school.

Q.    So we talked about various threats or safety threat -- safety and security threats, including natural disasters, violence on school property, threats of violence, potentially abuse, human trafficking.  Do you ever receive reports of gang activity at Harford County Public Schools?

A.    Yes.

Q.    How often would you say you've received reports of gang activity?

A.    I don't have the measurement of the frequency that I receive that information.

Q.    In a given school year, how many times would you say you receive information about gang activity at schools?

A.    I don't have that measurement.

Q.    Are you aware that some Harford County Public School students are members of gangs?

A.    Yes.

Q.    Do you track student gang activity in any way?

Page 81

A.   No.

Q.   Would you agree that the risk of violence is much -- sorry.  Strike that.

Do you agree that the risk of violence increases in situations involving gang activity?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  Does the risk of violence increase based on gang activity?

BY MS. WEIANT:

Q.   Yes.  So would you agree that the risk of violence increases --

MR. LEGG:  Same --

BY MS. WEIANT:

Q.   -- in situations involving gang activity?

MR. LEGG:  Same objection.

THE WITNESS:  Yes.

BY MS. WEIANT:

Q.   Would you agree that the risk of gun violence increases in situations involving gang activity?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  Yes.

Page 82

BY MS. WEIANT:

Q.    In your 20-plus years in school safety and in law enforcement, have you encountered a lot of gang activity in your career?

A.    No.

Q.    You said that you are aware that some Harford County Public School students are members of gangs.  How did you learn that information?

A.    The times I've learned that information, I've learned it through law enforcement partners sharing validated -- using their validation process, students who were validated as being gang members.

I don't know what their process is, but they've shared that this particular individual we validated.  But they've never shared with me their whole process they go through to do that validation.

(BROOKS EXHIBIT 3, Emails, top one dated 10/30/18, Subject:  Gang member placements, Bates HCPS_00226861-62, was marked for identification.)

BY MS. WEIANT:

Q.    I'm going to show you what has been marked as Brooks Exhibit 3.

Page 83

MS. WEIANT:  This is Tab 33.

BY MS. WEIANT:

Q.    There's a printing error.  The version you have does not have the Bates stamp.  I will represent to you that the Bates stamp on this document is HCPS_00226861 through HCPS_00226862.  Go ahead and take a moment to look at that document.

So in the first email in this thread, which is the back -- the second page of the document, it's an email from Buzz Williams, dated October 26, 2018, to Bernard Hennigan, copying you.

And it starts:  Buck, Erica and I discussed the risks associated with placing known gang members in the -- the day school at Alt Ed.

Do you see that?

A.    Yes.

Q.    Do you know what the day school at Alt Ed is?

A.    Yes.

Q.    What is that?

A.    It's a alternative education setting for students who -- who have been placed there either temporarily or long term.

Q.    What do you mean by an "alternative

Page 84

education setting"?

A.    It is not necessarily their comprehensive educational environment at the school that they are zoned to attend.

Q.    And why might they be placed in alternative education settings?

A.    Oh, wow.    I don't really get involved in that.    So I don't know all the reasons that Ed services or suspension services were placed in there.    But I imagine there's a number of different reasons, not the least of which is students request to go there sometimes.

Q.    In the next paragraph, Buzz writes: Unless I am directed otherwise, for the foreseeable future, known gang members with violent histories who received extended suspensions or expulsions will be placed online for the duration of their removals.

Do you see that?

A.    Yes.

Q.    Did you have any involvement with that decision?

A.    No.

Q.    Were you -- strike that.

The next paragraph says:  I'm hoping

Page 85

that Donoven may have some ideas about a gang intervention to get increased commitment to truce while in school.

Do you see that?

A. Yes.

Q. Do you know what this is referring to?

A. Yeah. I think it's referring to, like, trying to figure out how we can get the people who have been identified as gang members to really not engage in those activities in or on school grounds.

Q. Do you remember Mr. Williams asking you for ideas about a gang intervention strategy?

A. Yeah, I do.

Q. What became of that request?

A. I talked to -- I talked to a former commander in Baltimore City, Rick Hite, after this -- I pretty -- I pretty distinctively remember it. Because I remember when I was in Baltimore City School Police, he was part of this program called "Get Out of the Game." "Get Out of the Game."

So I reached out to him at the time he was the chief of police in Indiana and just told him I just got here to Harford County, and, you know, I was now experiencing, you know, stuff that

Page 86

I hadn't previously experienced with being involved with trying to find solutions.

And he was a busy guy, so he never really followed up. He gave me a lot of information on Get Out of the Game. We had a conversation, but it was nothing that was useful to me after we got off the -- the phone. And I had no background or expertise on mitigating conflict between gang members.

Q. Do you know if you responded to this email?

A. I don't recall. I may have -- I may have -- I -- I know there were follow-up in-person conversations because I know I went around to Buzz Williams' office, and we kind of had conversations about some of these students.

Q. Do you recall any of those conversations?

A. Yeah. A few of those conversations, I really needed him to kind of explain to me what it was that, you know, Harford County had been experiencing with some of this stuff. Because even though I was coming from Baltimore City, again, I wasn't involved in, you know, some of the stuff that I was seeing in the few short months that I

Page 87

had come here.

So he kind of had to brush me up on, you know, what exactly all this stuff meant in here. Clearly, they didn't know if I had any ideas since they said I was hoping that I might be able to come up with some. But that just wasn't my background.

Q. So you mentioned some of the stuff that you were seeing when you came to Harford County Public Schools. What do you mean by that?

A. These -- this type of, you know, email stuff with these -- these young folks were getting into conflicts in the community and then some of that stuff spilling over when it got to school with fights taking place.

Q. Do you mean fights generally, or are you talking specifically about students who have involvement with gangs?

A. Yeah, oppositional. Students who are oppositional, belonging to one side or the other of the gang.

Q. Do you know how many different gangs are active amongst the students at Harford County Public Schools?

A. I don't.

Q.    Do you know the types of gangs that are active amongst students at Harford County Public Schools?

A.    I'm going to be -- from my -- I know that I was dealing with this a lot more before COVID.  The gang stuff was very much more pervasive in terms of conversations that I was being included in.

After COVID, I'm not -- I have not received a lot of -- I have not had a lot of conversations after COVID at the level about gangs that was happening pre-COVID.  And pre-COVID, it was a huge learning curve for me.

After we went into that lockdown, schools were totally locked down, society was locked down.  When we came back, some of these students aged out; they graduated.  So...

Q.    And in the top email on this -- on the first page, Erica Harris responds.  Who is Erica Harris?

A.    So Erica Harris, when I first arrived in the district, she was the principal at the alternative ed school.

Q.    Okay.

A.    So she was probably my expert, really,

Page 89

to be honest, even regarding the information that Buzz gave me.  I think Erica was giving me more of a lesson than anybody.  Because as the principal at that school, she -- she was the one receiving students.  So she was really giving me an education.

Q.    What kind of lesson or education was she giving you?

A.    About the particular students involved in the gangs.  Like, she gave me background of some of these students belonging to families where she had the fathers as students in high school, and the fathers now have 14- to 15-year-old sons who were students.  So that type of background, trying to help me understand, you know, 80 East.

But I guess the -- the question that was never really answered for me is, if these kids grew up playing in rec ball leagues and little leagues, and you got pictures of these kids when they were on the same baseball team, where was the intersection when they turned 15 and 16 and all of a sudden they don't like each other, or their --
one kid's --

Like, that's the stuff Erica would give me.  Like, oh, yeah, believe it or not, when they

CONFIDENTIAL

Page 90

were 12, look at this picture. This -- he worked -- he played for his father. They were both on the same baseball team.

So I'm -- I'm trying to figure out, well, where do we reach this impasse where now they're 16 and they've chosen sides and they're fighting each other?

So that's the kind of stuff that Erica would give me, because I didn't understand the dynamics of that.

Q.   And what insight did she provide on how that happened?

A.   I don't know if she ever -- I don't know if she knows how that particularly happened except for, you know, these students getting involved in a culture, I guess.

Q.   And in the first -- in her email, when she responds, she copies you, and she says: Currently, we have two nights of twilight school for online students.

Do you know what twilight school is?

A.   Yeah. I think twilight school, like, starts after 5:00 up until like maybe like 8:00 or something like that.

Q.   Okay. She continues: On those

Page 91

evenings, students separated in the following ways:
1), Different gangs on different nights, currently
400 Savage and KBE (both Bloods) are on Tuesday,
and Thug Entertainment, 80 East and Problem Kids
(Crips) are on Thursday nights.

Do you see that?

A.   Yes.

Q.   Were you familiar with any of these
gangs being active -- sorry.  Strike that.

Were you familiar with these gangs
prior to receiving this email?

A.   Yes.

Q.   Had you -- were you aware of their
activity on -- strike that.

Were you aware that they were active at
Harford County Public Schools?

A.   No.

Q.   She goes on:  Number 2, For greater
separation, we will be opining -- I believe it's
supposed to be "opening" -- Wednesday nights in
November.

And Number 3, she says:  The students
are placed in several different rooms, including
two with cameras that allow us to more closely
monitor behaviors and safety provisions.

Page 92

Do you see that?

A.    Yes.

Q.    Why might you put them in different rooms with cameras to allow you to more closely monitor behaviors and safety?

A.    I don't know.  You're talking about why did she write that?

Q.    More generally, why might you put these students in different rooms and use cameras to monitor their behaviors?

A.    I don't know what the rationale was behind that.

Q.    You don't know why you might want to separate members of competing gangs when placed in the same room or in the same vicinity?

A.    With cameras and all that other stuff? No.  I mean, to be honest, no.  I -- again, this was not my -- even coming from Baltimore City, this was not my background.  This was a huge learning curve for about the first 18 months I was here to really kind of understand this whole gang dynamic.

Q.    Did it surprise you?

A.    It did.

Q.    So going back to the first email where Buzz asks:  I'm hoping that Donoven may have some

CONFIDENTIAL

Page 93

ideas about a gang intervention.

Did you ever implement a gang intervention --

A.   No.

Q.   -- as discussed here?

A.   No.

Q.   Has there been much follow-up on that since?

A.   No, because our law enforcement partners really started to make a lot of arrests in the community.  And since that time -- like, these emails were probably a lot more frequent than we're going to find emails like that over the past at least two years.

Q.   In your experience, does law enforcement usually notify you if they learn of a Harford County Public School student that is involved in gang activity?

A.   If they are charged with a reportable offense.

Q.   What's a reportable offense?

A.   So the Maryland -- Maryland law requires that if a student is arrested in the community for a number of enumerated crimes that fall under a category, that they have to notify the

Page 94

school system that they made the arrest of the student because it's a reportable offense, meaning an offense that needs to be reported to the school to let us know that this person was involved in a carjacking Saturday night, and Baltimore County -- and was arrested by Baltimore County police.

That's a reportable offense, so that they would notify us and let us know that. Are they going to say, "And they were also a member of the Blood gangs"? Not necessarily. That may not come up when they get arrested.

Q. And if there was no reportable offense -- let's say law enforcement has -- separately, without any incident, has intelligence or a reason to believe that a student is involved in gang activity. Would they report that to you or inform you of that?

A. They may inform me of it. It depends. If they -- if they have an investigation going on related to something else, they may not inform me of it.

Q. Have you ever received information like that from law enforcement where there was no reportable offense?

A. Like what? Specifically, what are you

Page 95

asking me?

Q. Has law enforcement ever informed you of a student's involvement in gang activity separate from a reportable offense?

A. Yeah. When I first got here, yeah. The first couple years I was here, yeah. Once they realized I didn't have a clue, yeah, they started trying to build my capacity, understanding.

Q. Has there been any effort to coordinate more closely with law enforcement to identify students who might be involved in gang activity?

A. Since -- again, since COVID, I would have to say, no, we haven't -- we haven't been working or talking or having conversations about working more closely to identify gang members. Prior to that, yes, absolutely.

Q. What conversations were you having prior to COVID about?

A. The groups that Ms. -- Ms. Harris listed in here, because there was -- you know, we were just constantly having, like, fights. I was constantly trying to figure out who was with who.

Because then you would have small -- smaller groups that would name themselves. You know, they come up with some name, and they would

Page 96

start off with four or five of these kids.  And then you would have to determine, okay, you just came up with the -- you know, I don't know -- the Captain Crunch Group.  Who are they associated with?  Are they -- are they Bloods?  Are they Crips?

Then you would try to further dissect. Or are they just like some independent group of kids that just decided they're going to organize what they -- what they call "a gang"?  So a lot more information was shared during that time period.

Q.    Earlier, you testified that there would be -- there might be a higher risk of violence, including gun violence, in situations involving gang activity.  Do you recall that?

A.    Yes.

Q.    Are you aware of situations involving violence, including gun violence, where the students involved were members of gangs?

A.    Yes.

Q.    Can you tell me about those incidents?

A.    Yeah.  We had -- yeah.  Unfortunately, we lost a student -- I think it was 20 -- 2022, 4th of July -- I think it was the 4th of

Page 97

July weekend.

There was cookout out in the community. And a student who was alleged to have been -- I think he was alleged to have been a member of the Crip gang, was at a cookout in the community on that Saturday night. And some other members were in the community, drove through, saw him or something and double back and came back and shot at him, and he was shot and killed.

Q. Were you involved in that -- in responding to that incident at all in your job at Harford County Public Schools?

A. I was involved in trying to determine whether or not any of that was going to filter back into the school building; whether or not there was any connection to what had happened, the people who were involved; whether or not, you know, we needed to, you know, prepare for any of that to come back into the school building.

Q. Why might you need to prepare for some of that to come back into the school building?

A. Because when you lose students out in the -- in the community like that and students are grieving, it has an impact. Students will be on edge. Say, a student that might ordinarily not be

Page 98

aggressive or agitated easily, at the loss of, you know, a friend or whatever, could be very easily agitated.

So we just want to make sure we have people and resources in places to be able to address the -- the range of emotions that we might deal with our students coming back into the building.

Q. So you agree that -- sorry. Strike that.

A student who is grieving in the wake of a loss might be more agitated than they ordinarily would?

A. Yes.

Q. Have you encountered other students who have suffered from grief or loss in their time at Harford County Public Schools?

A. Have I encountered them?

Q. Yes.

A. I haven't encountered them personally, no. But I know that we've sent teams out to be able to address that. Have I sat down and talked to any of them? No.

Q. You -- what teams have you sent out to address that?

CONFIDENTIAL

Page 99

A.    The district?  I think the district sends out, like, grieving and counseling teams. That's not from my office, though.

Q.    Are you aware of other situations where the Harford County Public School community has lost students?

A.    Yes.

Q.    How many?

A.    I don't know how many.

Q.    Can you tell me about those --

A.    Yeah.  We --

Q.    -- situations?

A.    Yeah.  We lost a kid that was -- we lost a kid who was in the car with his mom, and a tractor-trailer driver -- I don't know what happened, but it was a very bad accident.  We lost that kid.

We also lost a guy who owns the Klein ShopRite Supermarket, because his car was -- was there, too.  But we lost one of our kids in that.

We lost a couple of kids who got hit crossing the street after getting off buses.  We had one kid that was running to try to catch up, and the -- and the car didn't see him and hit and

Page 100

killed him.

Q.   In your experience, how has the community responded to those losses?

A.   In my experience, the way they respond to those losses is -- is, you know, grief and, you know, trying to support students who were close to the students who's lost their lives, you know, trying to support the families.

Q.   Are you aware of any memorials or vigils that were held for those students?

A.   Yeah, there have been memorials held for some of the students.  I don't recall all of them, but I do recall memorials or vigils being held.

Q.   Are you familiar with the Maryland Department of Health's Youth Risk Behavior Survey results?

A.   No.

Q.   You've not heard of that before?

A.   I have -- I'm not familiar with the results.

Q.   Are you familiar with the survey?

A.   Yes.

Q.   What is it, in your understanding?

A.   It's a survey that -- to my

recollection, that asks questions about the -- basically, surrounding the -- feeling safe, the risk of incidents or events happening or risk of students being involved in incidents.

Q.   Do you use any of the data that comes out of those surveys in your line of work?

A.   Perhaps I do.  I may not be fully aware of how we are utilizing that data because we work with other offices.  So, perhaps.

Q.   Are there specific data points in there that you would pay closer attention to?

A.   If I had it in front of me, the results in front of me, I can determine that.

Q.   Do you remember any types of results in there that you might --

A.   No.

Q.   -- pay attention to?

A.   Not off -- not offhand.

Q.   Are you aware that it includes data about students that carry weapons, including carrying weapons to school?

A.   I don't have a recollection.

Q.   So you don't recall reviewing data about --

A.   I don't recall the information -- I --

I'm not recalling the information, no.

Q. And if you're not recalling the information, I imagine you're not recalling reviewing that information or consulting those numbers?

A. Not consulting the numbers, no.

Q. Okay. Separate from the survey, do you have any other data or statistics that tracks whether students are carrying weapons to school?

A. Do I have data that tracks whether they're carrying weapons to school? No.

Q. Have you done any studies to determine how often students at Harford County Public Schools carry weapons?

A. No.

Q. Have you done any study to determine how often students at Harford County Public Schools are carrying weapons to school?

A. No.

Q. Have you done any study to determine how often students at Harford County Public Schools are the victims of violent crime?

A. No.

Q. Are you aware of any data that tracks that number?

Page 103

A.   No.

Q.   You testified earlier that your department does not independently track reports of fights or incidents of violence beyond reports that are kept by other departments; is that right?

A.   Right.

Q.   So you don't independently keep track of what might have led to those fights?

A.   No.

Q.   You don't independently keep any data -- sorry.  Strike that.

Have you done any study into how often social media plays a role in those fights?

A.   A study, no.

Q.   Do you have any data reflecting how often social media plays a role in those fights?

A.   No.

Q.   Have you done any study to see how often social media plays a role in other types of violence other than fights?

A.   No study, no.

Q.   Do you have any data reflecting how often social media plays a role in other types of violence?

A.   No.

Page 104

Q.    Are you familiar with the term "climate response team"?

A.    Yes.

Q.    What is that?

A.    That's a team of school safe liaisons that I put together two years ago, provided them with some additional training, and designed that team to be able to respond to schools to help them restore and maintain climate in the aftermath of a major situation.

Q.    When did you create -- or when did you coordinate that team?

A.    2023.

Q.    Since they've existed, have they responded to any major situations?

A.    Yes.

Q.    How many?

A.    Approximately, I would say six or seven.

Q.    And what types of major situations would you send out the climate response team?

A.    I would send out a climate response team, once confirmed with the principal, if there's a loss of life of a student or a staff member; if there was a major incident inside of the school

Page 105

building -- excuse me -- a huge, major fight; if there was an incident like the incident that we experienced in September with the shooting and the loss of life of a student.

And so any incident where -- when an event occurs and I talk to the administrator and say, "Do you need any" -- "do you feel you need any additional safety and security support because of" -- so I can deploy members of my climate response team.

And my climate response team is designed to be inside of the school building as it tries to -- if it's something that has disrupted the normal day-to-day climate of the school, the team is designed to go in and just -- be just close enough to step in and assist with things, if need be, and just far enough back to let the school proceed as it would typically proceed, but to help them restore and maintain a positive culture and climate in that school in the aftermath of whatever that major situation might be.

Q. So you're talking about helping and restoring. What does that look like?

A. So when your climate has been disrupted and you've had students that may have missed, you

Page 106

know, time from school, if you have to make modifications when students reenter a building, you should have some support staff to help students know, A, I know your cafeteria period might typically be during this time period, or you might typically have a change, here's what we're temporarily doing, or what have you, to take that load off of the hands of teachers and principals, to have someone step in and kind of help facilitate whatever temporary change is taking place and to help the students feel safe. Because when it's members of our climate response team, it's either there are safety -- school safe liaisons that are assisting.

So that's what it kind of looks like when you're helping to restore and maintain the normal flow of things when they've been knocked off track at a school.

Q. How big is the team?

A. Oh, it can be as big as 15 people. We have -- we train, extra training, 15 school safe liaisons. But it could be that we deploy 5; it could be that we deploy 3, depending on what the need is for the school.

Q. And you mentioned six or seven

Page 107

instances in which you've deployed --

A.    Yeah.

Q.    -- the climate response team since it was founded in 2023, one of which being the shooting last fall?

A.    Yeah.

Q.    What were the other incidents?

A.    We've had students, unfortunately, take their lives.  So when it comes to the climate of schools, just keep an eye on -- putting people in the school just to kind of keep an eye on students that need support.  Just, you know, being there to support and facilitate.  Students who have lost their lives maybe.

We've had situations where we had student protests at a school.  It was like a national-scale issue.  However, our students -- we had students that, one approach, had some -- some issues at a school.

So the school couldn't just try to have normal operations and -- and deal with the group -- the subset of students that wanted to engage in a process -- protest.  So we deployed our climate response team to help support the school --

Q.    Do you recall what they were

Page 108

protesting?

A.   So we -- there was -- it was a national walkout for some -- one of the many national walkouts that students were organizing or what have you.

And so if our students did, in fact, walk out, we wanted to make sure they're safe, you know.  We want to make sure, if they're walking, they're protesting, whatever, they're not, you know, in harm's way.  So I don't recall what the specific issue was this time, but I know we deployed students [sic].

Q.   Do you know recall other instances of protest even if it didn't involve the climate response team?

A.   Yes.  Before we ever had a climate response team, yeah, we had a major protest one time I recall.

Q.   What happened then?

A.   We had a -- when you say "what happened," the incident?

Q.   I guess let's start with:  What were they protesting; do you recall?

A.   They did -- they did not like the outcome of the allegations that a student

Page 109

inappropriately touched another student.  It was investigated.  There were a group of students that didn't like the outcome, and so they staged a -- a walkout.

Q.   Do you know if there was any change of policy or any response from administration in light of that protest?

A.   A response, yeah.  I mean, they had to respond to it to make sure the students remained safe.  But -- but, no.  It was -- no, no policy change based on that.  It was -- it was truly a groupthink situation.

There were some folks that really seized on an opportunity and was able to create this -- this polarizing groupthink situation with some students, and so...

Q.   How was it polarizing?

A.   Because they added and injected things that were just not true and, you know, invoked a lot of internal emotion in people.

Like, they just -- they were really -- it ended up not even being a protest.  It ended up being more of a -- I don't know.  It was a mess. But it wasn't -- it wasn't really a -- it ended -- and in the final analysis, it ended up not really

Page 110

being a protest.  It ended up being more of a disorderly disruption.

Q.   To the extent it was organized in any way, do you recall what they were demanding or asking for?

A.   For things to happen to a specific student, specific male student.

Q.   Disciplinary action?

A.   Yes.

Q.   Do you recall how large that disruption or protest was at the time?

A.   Yeah.  It was -- it grew -- it grew pretty large, yeah.  Because they did it, like, near when -- probably maybe an hour before the school day was going to end.

It was -- it was pretty disruptive because we had -- we had to bring in law enforcement.  You had parents that got involved and, you know, kids walking and stepping on top of people's cars and dancing on the rooftops, damaging people's hoods on their cars.  It was -- it was a mess.

And we had kids we asked, "Why are you out here?"

"Well, because everybody else is."

Page 111

"Okay.  Other than that, why?"

"Well, because everybody else is."

Q.   Do you recall when that was?

A.   Yeah.  That was 20 -- that was before COVID.  So that was 2019, I think.

Q.   Do you recall any other similar incidents involving protests?

A.   To that level, no.

Q.   Anything short of that level that you can recall?

A.   Yeah.  We had a large protest outside of this window right here because people didn't want -- there were a subset of people in the community that didn't believe people should have to wear masks.  So there was a big protest.  We had to have law enforcement involved in controlling that situation.

Q.   Did that one involve students, or was it community members?

A.   Both.  It was just -- everybody was out there, students that didn't want to wear masks, community members that didn't want them to wear them, parents that didn't want -- and then probably on the other side of the street, there was a bunch of people with masks on, saying, "No, we need to

Page 112

wear masks."  So it was -- it was pretty -- it was a pretty big to-do.  I mean, it -- it was on news media.

Q.   You mentioned law enforcement had to get involved in that situation.  What was the outcome of that situation?

A.   I think one -- one young lady was charged.  One of my school safe liaisons had to go to the hospital because he was elbowed in his side, and he had had a kidney transplant.  He had returned from a kidney transplant two months before all that took place, and one of the people elbowed him.  So he had to be taken to the hospital.

And -- and law enforcement gave a couple of ultimatums.  Some people left.  And then when we moved it inside of here, it continued.  So what we had to do that night is finish the board meeting by having law enforcement clear everybody out of -- out of here.

Q.   Are there any other protests or disorderly situations like that that you can recall?

A.   No, not like that.

Q.   So we were discussing the climate response team, and you mentioned some types of

Page 113

situations that they might respond to, including shooting incidents, suicides, large fights, protests.  Anything else that they might respond to or have responded to?

A.    For climate response?  No.

Q.    Are you familiar with the term "school safety council"?

A.    "School safety council"?  I'm -- I'm familiar with the term, yes.

Q.    Do you -- does Harford County Public Schools have a school safety council, as far as you're aware?

A.    A school safety council?  They should have -- every school has a safety team, has a school safety team.  And then on the superintendent's student advisory council, we have a student safety advisory.

Q.    What is that?

A.    That's a group of students from each one of our three regions over the past couple of years; that when the superintendent has his meetings with his student advisory council, a subgroup of those students participate to talk about ways that we can improve safety in Harford County Public Schools, ideas that they have from

Page 114

the lens of a student surrounding safety concerns that they have, and they have an opportunity to express those things during those meetings.

Q.   Do you recall any of the feedback they provided in any of those meetings?

A.   Yes, I recall some of the feedback they provided in some of those meetings.

Q.   What types of feedback did you receive from them?

A.   Ideas that they have around the weapons detection before we ever got weapons detection. When we first started it, they had questions about, you know, if we would get them, what their thoughts were about them.

They discussed the active assailant drills.  A lot of discussion about bullying would come up.  That has always been a hot topic of our student safety council, bullying.

They were really concerned that -- they were really concerned that when bullying starts in this day and age, it never really seems to end. Because you can -- you know, you -- I remember one young lady talking to me from -- I can't remember what school.  But we were having one of our sessions, and she says, "You know, there probably

Page 115

used to be a time where the bullying stopped until the next day when you started bullying in school again, but now you can get bullied 24 hours a day on social media. People can create, you know, accounts and target you. And even if you think you block them, they can keep sending stuff to you."

So there was never a session that we had in that meeting -- even if we talked about other things, bullying was a recurring theme with that team and trying to figure out how we could work around it. And then we just realized in some -- in some areas, there were impossibilities because you can't stop a person from, you know, making an account.

And then, you know, they would talk about -- you know, some of them would talk about friends that they had. They were just forced to not even be able to participate in social media because of bullying; so, therefore, they don't have any type of -- they don't have to worry about it. The only thing they have to deal with is the in-person stuff inside of the school.

Q. Is your team responsible for responding to reports of bullying?

A. When you say "responding," what do you

Page 116

mean?

Q.   In the -- sorry.  Strike that.

Who at Harford County Public Schools is primarily responsible for handling incidents of bullying?

A.   Well, I would say, at the school level, it will start with the administrator, with the -- with the principal.  If a person makes a report of bullying and harassment, then that would go to a separate -- I don't know the title of the office, but I know Dr. Stanton, you know, helps to process those forms or whatever of bullying and harassment.

Q.   Your team is not responsible for those bullying and harassment forms?

A.   No, not at all.

Q.   Do you have access to them?

A.   No.  I mean, I could probably request them.  But me having some portal that I go to and just access the bullying reports, no.

Q.   Have you ever reviewed them?

A.   Yes.

Q.   Do you review them regularly?

A.   When they come through the Maryland Center for School Safety.  Because what happens is, now that we have the -- the safe schools hotline,

CONFIDENTIAL

Page 117

I'm the primary on that.  So if a tip comes in, it comes to me, I review it, triage it to determine where it needs to go.  And then I send it off and -- to say, "Hey, this came through the Maryland safe schools tip line.  John Doe's parent went on and said this is happening to their child.  Here's what it looks like.  Here's what's happening.  Here's how it's impacting their child, and it's happening at this school."

It could be anonymous.  It could be a student saying, "My friend is consistently being bullied and harassed, and they attend this school," whatever.  So I get that, and then I forward that on to the school and Dr. Stanton and so that they can start to work through whatever that situation is.

Q.  How long have you been responsible for the school -- safe schools hotline?

A.  Since it started.

Q.  When did it start?

A.  20 -- with the Maryland Safe to -- Maryland Safe to Learn Act.

Q.  And what is the Maryland Center of School Safety?

A.  What is it?

CONFIDENTIAL

Page 118

Q.   Yes.

A.   It's a -- it's a group that works under the governor's office that really makes sure that all the security directors in the school districts around the state has and receives information and shares information.

But it also ensures that the mandates under the Maryland Safe to Learn Act, the reporting mandates and all of that, Maryland Center for School Safety makes sure that all that information is sent to them and maintained by them.

Q.   So in operating the safe schools hotline, when you get a report of bullying, you said you forward it on to the school and Dr. Stanton so they can start to work through whatever that situation is --

A.   Yes.

Q.   -- right?

A.   Yes.

Q.   Who is Dr. Stanton?

A.   I don't know what her exact title is, but she works with our students.  And she's actually the student advisory -- all the particular student advisory committees.  She heads that up for the superintendent.

Q. Once forwarding that information along to them, do you or your team do any further investigation --

A. No. No.

Q. -- in a bullying report?

A. No, we don't do any further investigation of a -- of a bullying report.

Q. Do you document the report of bullying in any way?

A. When it comes to me through the Maryland safe schools tip line, yeah, I maintain documentation of that.

Q. What is that documentation?

A. Email.

Q. And what would you include in an email reporting that?

A. I don't -- I don't include anything it. When I get it -- when I get that --

Q. Okay.

A. -- it has all of the information in it. All I do is save it.

Q. So the safe schools hotline, is it a telephone line or is it also online or email communications?

A. Yeah, I think they have three or four

Page 120

different modes that you can report.

Q.   What are those modes?

A.   I don't know them all.  But I know that you can do it online.  I know that you can call.  I think you can send a text to a number -- to a code or whatever.  And they may have a couple more, but those are what I'm familiar with.

Q.   And so whatever form that comes in as, whether it's an email or another form, that would be your documentation of the situation?

A.   I'm only -- I'm always going to get it in one format.  So no matter how the center receives it, they -- they -- they transcribe all that information into what's called the "tip manager."  And they fill it all out.

So every time I see it -- it doesn't matter what -- what the tip is, every time I see it, it looks the same on my end.

Q.   Do you know if there's a database or software they use to manage that?

A.   I don't know.

MS. WEIANT:  Let's take a five-minute break.

MR. LEGG:  Sounds good.

THE VIDEOGRAPHER:  We are now going off

Page 121

the record at 2:41 p.m.

                        * * *

            (Whereupon, there was a recess in the proceedings from 2:41 p.m. to 3:02 p.m.)

                        * * *

            THE VIDEOGRAPHER:  We're now going back on the record at 3:02 p.m.

BY MS. WEIANT:

      Q.   So we have talked about several different ways that you and your team go about protecting students' safety, including human resources, so student resource officers, school safety liaisons, regional safety supervisors, climate response teams, and then resources or services, including safe schools hotline.  You do active assailant drills, or at least did in the past; although, they might have changed.  Weapons detection devices, security cameras.

            Are there any other programs or services that you would like to highlight?

      A.   No.

      Q.   And many of those have been implemented since you joined Harford County Public Schools in 2018, right?

      A.   Yes.

CONFIDENTIAL

Page 122

Q.    All with the goal of protecting staff and students?

A.    Yes.

Q.    Keeping them safe at school?

A.    Yes.

Q.    And despite all of these efforts to strengthen security, can you guarantee that students will be safe at school?

MR. LEGG:  Objection to form. Foundation.

THE WITNESS:  No.

(BROOKS EXHIBIT 4, Article dated 8/24/18 titled Harford Students Returning Sept. 4 Should Feel Safer in School, HCPS Security Chief Says, was marked for identification.)

BY MS. WEIANT:

Q.    I'm going to show you what has been marked as Brooks Exhibit 4.

MS. WEIANT:  This is Tab 42.

BY MS. WEIANT:

Q.    Go ahead and take a moment to review this document.

Have you had time to review the document?

A.    Yes.

CONFIDENTIAL

Page 123

Q.   And this is a news article dated August 24th, 2018, titled "Harford students returning September 4th should feel safer in school, HCPS security chief says."

Do you see that?

A.   Yes.

Q.   Are you familiar with this article?

A.   Yes.

Q.   This article quotes you?

A.   Yes.

Q.   In the second paragraph, it says: There have been a number of school shootings in recent years, and local officials have acknowledged that it's not if but, rather, when an incident might happen in one of Harford's public or private schools.

Do you see that?

A.   Yes.

Q.   Do you agree with that statement?

A.   Yes.

MR. LEGG:  Objection to form.

THE WITNESS:  I'm sorry.

BY MS. WEIANT:

Q.   And as we've discussed today, since this article was published in 2018, unfortunately,

Page 124

there have been school shooting incidents at Harford County Public Schools, correct?

A.    Correct.

Q.    About halfway down the page, there's a paragraph starting with "Right now."  Do you see that?

A.    Yes.

Q.    In quotes, it says:  Right now, when it comes to your student walking through the doors of Harford County Public Schools, you can know that we do take our security protocol safety -- seriously, end quote.

And it attributes that quote to you. Do you see that?

A.    Yeah, I do.

Q.    Is that your view?

A.    Yes.

Q.    And that includes all of the various measures that we've discussed today?

A.    Well, not during that time because some of those weren't even in place, but yes.

Q.    And -- okay.  So at the time, in 2018, when you were saying you were taking your security protocol seriously, part of that was that in the future you planned to strengthen your security

Page 125

protocols?

A. Yes.

Q. And you have done so?

A. Yes.

Q. In the next paragraph, again, in quotes, it says: Are there any absolutes? I tell people there are no absolutes.

Again, it attributes that quote to you. Do you see that?

A. Yes.

Q. Is that your view?

A. Yes.

Q. And is that what you tell people?

A. Yes.

Q. Do you make any promises that students and staff will remain safe when at school?

A. No.

MR. LEGG: Object to the form.

BY MS. WEIANT:

Q. Could you make any promises that students and staff will remain safe --

MR. LEGG: Objection to form.

BY MS. WEIANT:

Q. -- while at school?

A. No.

CONFIDENTIAL

Page 126

Q.   You can set that exhibit aside.

Do you agree that social media has its benefits for young people?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  Yes.

BY MS. WEIANT:

Q.   And you've said so publicly?

A.   I don't recall if I've ever said so publicly, but I do agree with what you just asked me.

Q.   Do you agree that they can find opportunities to volunteer and get service learning hours from social media?

A.   Yes.

Q.   Do you agree they can connect with their peers on social media?

A.   Yes.

Q.   Do you agree that during the pandemic it allowed students to connect with their teachers?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  Yes.

BY MS. WEIANT:

Q.   And do you agree that social media is

Page 127

not all gloom and doom?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  Yes, I do agree with that.

BY MS. WEIANT:

Q.  You agree there are some positive aspects?

A.  Yes.

MR. LEGG:  Objection to form and foundation.

BY MS. WEIANT:

Q.  Do you believe that parents need to monitor what their children are doing on the Internet?

A.  Yes.

Q.  Do you know how much time staff in the safety and security department devote to addressing issues related to social media?

A.  Yes.  A large -- a great amount of time.

Q.  How much?

A.  My staff?  Throughout their -- their day, their week, I would say anywhere from 40 to 45 percent of their time is dealing with students and

CONFIDENTIAL

Page 128

situations where we're finding out conflicts either originated on using social media, or if they started in school, continue via the use of social media in these conflicts.

There's almost nothing that we deal with now when it comes to interpersonal conflict between students that doesn't have a nexus to social media.

Q.   So when you say "has a nexus to social media," are you talking about students making threats on social media?

A.    Making threats on social media; using social media to bully, using social media to make fake accounts and put out embarrassing pictures and information about other students; going on social media to discuss private and personal things about students and their families.

I mean, the stuff -- the stuff I can tell you is just the stuff that comes off the top of my head because it's stuff that we're dealing with on the regular.  And sometimes, unfortunately, it escalates to the point that we have to try to use some preventive measures to make sure the students don't escalate to physical confrontation. That doesn't always work, but -- because we might

Page 129

not always be able to stop that.

But we spend -- there's very little that we spend time on when it comes to conflict between students where it has not -- it doesn't come up where somebody either posted something about somebody, somebody invited somebody to meet them in the bathroom at a certain period.  Things are said, and it allows a layer of anonymity for some students.

(BROOKS EXHIBIT 5, Plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories (Set 3), was marked for identification.)

BY MS. WEIANT:

Q.   I'm going to show you what has been marked Brooks Exhibit 5.

MS. WEIANT:  Which is Tab 60.

BY MS. WEIANT:

Q.   I'll give you a moment to skim it.  You don't have to read -- you're welcome to review, but you don't have to read the whole thing.  I'll point you to specific sections.

A.   Okay.

Q.   You've had time to review this document?

Page 130

A.   Yes.

Q.   And on the first page, it says this is Plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories (Set 3).

Have you seen this document before?

A.   No, I don't recall seeing this document before.

Q.   On Page 3 and over on to Page 4, there is a table.  Have you seen that table before?

A.   No.

Q.   If you go to Page 2, under Interrogatory Number 5, this is a question that was presented to plaintiffs.  It asks Plaintiff for -- Board of Education of Harford County for each category of damages to calculate how much of that was related to social media.

So on Page 4, starting on Line 23, it says:  These assessments are plaintiff's estimate of the proportion of staff time lost and the proportion of costs and expenditures that are attributable to defendants' conduct.

Do you see that?

A.   Yes.

Q.   Do you know what "defendants' conduct"

Page 131

here is referring to?

A.   No.

Q.   Are you familiar with the allegations in this lawsuit?

A.   Somewhat.

Q.   Do you know who the defendants are in this lawsuit?

A.   Yeah, I think the people that introduced themselves representing the companies earlier.

Q.   Do you recall which companies those are?

A.   Yeah.  YouTube, Facebook, Snapchat, Instagram.  Yeah.  YouTube, Snapchat, Instagram, Facebook.

Q.   Have you read the complaint in this lawsuit?

A.   No.

Q.   What is your understanding of the allegations against the defendants in this lawsuit?

A.   My understanding of the allegations for the lawsuit is that there's a connection between events that take place in the schools -- in our schools and access to -- students have to social media, to use those platforms to further any of

CONFIDENTIAL

Page 132

those agendas that they have for using social media to engage in activities that we don't want to have in -- in the schools.

Q.  So going back to Exhibit -- Exhibit 5, on the -- towards the end --

A.  Uh-huh.

Q.  -- there's an Attachment A.

A.  Uh-huh.

Q.  And there is a chart titled "Program/Department Worksheet."

A.  Uh-huh.

Q.  Do you see that?

A.  Yes.

Q.  Have you seen this chart before?

A.  No.

Q.  Roughly two-thirds of the way down in that chart, there is an entry for safety and security.

A.  Uh-huh.

Q.  Do you see that?

A.  Yes.

Q.  And in the column next to that, under column titled "Subtotal Fiscal Year 2016 to 2024" --

A.  Uh-huh.

Page 133

Q.    -- it says $12,055,311.  Do you see that?

A.    Yes.

Q.    The column next to that is titled "Weight in Percentage," and it lists 40 percent. Do you see that?

A.    Yes.

Q.    Do you know what that 40 percent number is referring to?

A.    Well, based on the top of the sheet, this says "damages."  I would say the amount of time -- measuring the amount of time that the office of safety and security spends with issues related to our students and social media.

Q.    And that is based on your review of this document in the past few minutes?

MR. LEGG:  Objection to form.

THE WITNESS:  No.  That's based on me being asked before we were ever here to talk about how much time -- I was asked about how much time, I think, my office -- our people spend on issues that are related to our students and conflicts with social media on investigating.  I was asked that question before.

BY MS. WEIANT:

CONFIDENTIAL

Page 134

Q.   Are you referring to my question earlier or somebody else's question?

A.   Somebody else's question earlier, yes.

Q.   Did you help generate -- did you help create this document?

A.   No.

Q.   On Page 4, beginning on Line 25, picking up where we left off earlier, it says:  The proportion of time or money spent is expressed as a percentage of the overall budget for each relevant department/program, which is deemed a weight percentage.

A.   Uh-huh.

Q.   The weight percentages assigned to each department/program are stated in Attachment A.

Do you see that?

A.   Yes.

Q.   Did you select the weight percentage that appears next to the safety and security department in Attachment A?

A.   Yes.

Q.   How did you do that?

A.   Based on the amount of time that we spend investigating, responding to or mitigating conflicts with students that we have to go back and

CONFIDENTIAL

Page 135

a lot of cases investigate and try to find the social media posts, or a lot of times students will have it. They will have screenshots. They will have other things.

And so, again, I came up with looking at what we do on a daily basis and how much of it we do and what the connection is to social media and our students avoiding conflict.

Q. When selecting the 40 percent number, did you talk to any of your staff members about how much time they spend addressing issues related to social media?

A. Yeah, I did talk to my folks about that, the amount of time, but not necessarily based on this question alone.

I talked to them about -- before this ever came along, we were talking about how we could address those issues because we were spending so much time chasing down and trying to sort these things out and trying to figure out, you know, who posted what, who said what, whether it's real, whether we can connect it back to somebody.

So I already knew the amount of time and effort we were putting into these situations connected to social media.

CONFIDENTIAL

Page 136

Q.   When selecting the 40 percent number more recently --

A.   Uh-huh.

Q.   -- did you talk to any of your staff members about how much time they spend addressing issues related to social media?

A.   No.

Q.   Did you ask any of them exactly how much time they spend addressing issues related --

A.   Exactly, no.

Q.   -- to social media?

A.   No.

Q.   Did you look at any documents to determine how much time you and your staff are spending addressing issues related to social media?

A.   Just the reports that -- that come across where -- well, I shouldn't say "reports."

Just information that comes across where my people are working on trying to resolve issues and trying to figure out where the -- the beginning of the issue started or how the issue continued to be carried on very often is social media-related investigations that they're doing.

Q.   What reports?

A.   That's why I said not "reports," but --

Page 137

Q.    I'm sorry.

A.    -- information.  Yeah, information.

Q.    And what documents would those be in?

A.    Those would be in like the email documents, documents that they might have where they have captured copies of threats like you sent me -- I'm sorry.  You showed me something earlier that was written on a desk.  But way more exponentially than that do we get shown stuff in students' phones that was captured where they were either harassed, bullied, threatened or whatever.

Q.    So in calculating this 40 percent number, you looked at emails and reports of threats often that came in via email or other means.  Did you look at any other documents?

A.    No.

Q.    Do those emails say how much time was spent addressing --

A.    I don't recall saying emails.  Did I say emails, if I said I get that during emails?  I'm not sure if I said emails.

Q.    Yes.  So you said, "Those would be in like the email documents, documents that they might have where they have captured copies of threats like you showed me earlier."

Page 138

A.    That shouldn't be email documents, then.  Those should be captured images on students' phones.

Q.    How would you see those captured images?

A.    Our people would see those, capture them, and just when the students show it to them when they're investigating and they're asking, "Why did this occur?"

"Well, this was said about me on social media, or this threat."

"Well, do you have it?"

"Yeah."  And students will have it. They'll show it to our people.

Q.    And from your staff, would there be any documents showing what your staff did after the student reported that or after they saw it or had that conversation --

A.    There wouldn't be any documents of what they did because they're going to involve -- they're never going to -- they're never going to take the full lead on something like that without the administrators being involved in that situation.

They don't have as much authority to

Page 139

determine where it's going to go in terms of outcome, determine where it's going to go in terms of discipline. They don't have that type of authority.

So they're always going to get the administrator involved, even if they are the primary person who it was shown to.

Q. So when selecting this 40 percent number, specifically this 40 percent number, you did not have any renewed conversations with your staff about how they spend their time and how that might relate to social media?

A. No.

Q. And of documents you might have reviewed, you may have reviewed emails, but primarily most of the information that you were relying on would not be documented in any form?

A. Correct.

Q. In the 40 percent of time that you believe your staff -- you and your staff spend addressing issues related to social media, what exactly are you doing in that 40 percent of time?

A. Determining who all is involved in the content on social media; determining how long it's been going on; trying to backtrack, you know, how

Page 140

long it's been going on; specifically what's been said in there; whether or not it's been a mutual back-and-forth; whether it's not -- whether it's been a bullying; whether threats have been associated with it.

When it's anonymous, it's a little more difficult, but sometimes we've been able to work our way through those as well and determine who the individual was.

And then trying to go on, if we can, go on, ourselves, to the platforms to try to see if we can see -- see if the content is still there.

And then from there, spending time, you know, trying to mediate whatever the conflict was; spending time with the parents; have the parents come in for conferences so we can talk to them; you know, see if we can get their support to get students to cease and desist.

And then, you know, you've got to do follow-up. You know, have you gotten any more of these types of messages? Is this -- is this continuing or whatever? Because you only have so much control when trying to work these things out before somebody stops. It's, like, difficult to stop it. So, you know, you just continue to work

CONFIDENTIAL

Page 141

through it the best way you can.

Q. Earlier, you testified that there's very little that we spend time on when it comes to conflict between students where it has not come up related to social media.

So you said there was very little time spent that did not connect to that. So why did you select 40 percent?

A. Because not every situation between the students involves us necessarily having to go deep -- do a deep scrub on. Some of them do; some of them don't.

So even though there's very few issues of conflict, there are other issues. There are issues where students -- there's safety issues where there's no other students involved. There's just -- we spend time doing a number of things when it comes to students that -- outside of them having a conflict with another student.

You know, we -- we deal with safety issues where students are in conflict with adults where they try to assault adults. It has nothing to do with the social media piece.

We have students who are in conflict with, you know, people from the community who may

CONFIDENTIAL

Page 142

not even be other students inside of the school or whatever.  So we have to deal with those issues as well.

But when we get our students inside of the school who got into a fight in the cafeteria and we find out it's been an ongoing situation, there's been some -- most of the time when we look at that, there's been some portion of that conflict that had some social -- something that was said on social media.

Q.   In this conversation we have just had, when you say "social media," what platforms are you talking about?

A.   Facebook, Snapchat, YouTube -- some -- when I first got here, definitely YouTube when I first got here.  These kids were making rap videos and saying things -- sending subliminal messages to each other in these rap videos in this -- in the music.  Instagram.  And then you have so many other, you know, platforms that these students uses.

But, yeah, typically, those are the platforms that they use to engage in the back-and-forth or what have you.

Q.   You said there are many other

Page 143

platforms.  What platforms are those?

A.    I have no idea.  But I have a 17-year-old son, so I just know that there -- he says stuff that I never even heard of before.

Q.    You can't name any of them?

A.    No.

Q.    But you know there are others --

A.    I know there are others.

Q.    -- they use?

Discord?

A.    I'm familiar with Discord.  More like Patreon, is what you mean?

Q.    I have to check on that one.

Have you heard of BeReal?

A.    No.

Q.    GroupMe?

A.    Who?

Q.    GroupMe?

A.    GroupMe?  GroupMe?  Was it GroupMe? No.  Not -- maybe.  Maybe I've heard of GroupMe.

Q.    What about X or Twitter?

A.    Yes.

Q.    Students use that?

A.    Yes.

(BROOKS EXHIBIT 6, Email dated 1/15/18,

CONFIDENTIAL

Page 144

Subject:  MCFSS Conference Call Notes - Call Reminder Tuesday January 16, 2018 @ 10 am EST, Bates HCPS_00553865-70, was marked for identification.)

BY MS. WEIANT:

Q.   I'm going to show you what has been marked Brooks Exhibit 6.

MS. WEIANT:  This is Tab 34.

BY MS. WEIANT:

Q.   It's a email dated January 15th, 2018, from Edward Clarke.  There's a very long list of recipients before the email itself begins.

Do you know who Edward Clarke is?

A.   Yes.

Q.   Who is Edward Clarke?

A.   Retired -- I will forget what his title was.  I think he might have been director of the Maryland Center for School Safety.

Q.   And the subject of this email is "MCFSS Conference Call Notes."  Do you know what "MCFSS" stands for?

A.   No, but that might be -- no, I don't know.  I just know Maryland Center for School Safety.  I'm not sure of the other -- what the F or whatever.

Page 145

Q.   Do you attend conference calls for the Maryland Center for School Safety?

A.   Yes.

Q.   On the second page of the substantive email, the page ending in 869 in the bottom right, about halfway down, there's a -- a bullet point that starts with "Donoven Brooks."  Do you see that?

A.   Yes.  Yes.

Q.   It says:  Donoven Brooks, new Harford County Public Schools Security Director, discussed an anonymous social media app known as "Sarahah" that students have been using to post threatening messages without being detected.

Do you see that?

A.   Yes.

Q.   What is Sarahah?

A.   I don't really know.  It's -- it's an app, but I'm not really sure.

Q.   Do you recall discussing this issue with the Maryland Center for School Safety?

A.   I do.

Q.   So when it says you discussed an anonymous social media app known as "Sarahah" where students have been posting threatening messages,

CONFIDENTIAL

Page 146

did you report that to the Maryland Center for School Safety?

A.   Yes.

Q.   Do you recall -- scratch that.  I'm sorry.  Strike that.

Do you recall what happened during this conversation when you raised this issue, anonymous messages on Sarahah?

A.   Yeah.  So when we first started these calls, the reason that this list is so long is because it wasn't just the security directors on the call.  It was every law enforcement agency as well.  So my colleagues from the sheriff's office and the other three jurisdictions were also on these calls.

So we had our intel meeting for law enforcement, which I would attend weekly.  I learned about this app at the intel meeting from my law enforcement partners.

So they -- when we did this -- your law enforcement partners really didn't say anything.  They would -- anything they wanted to provide, they would give to the directors of security for each jurisdiction, because that would be the person that would do, like, the talking.

Page 147

And I remember very specifically that our sheriff's office SRO supervisor had said, "Hey, when you do the call, you want to share this information with them, because we've been getting a couple of situations that we've been investigating, and it's coming back to this app."

Their CID department was investigating some threats that were coming back to that app. So when it was time, the information that they gave me, I shared it out so it could be shared with the other jurisdictions, which was common, not just for us, but other jurisdictions would share stuff, and it would be coming from their law enforcement.

Q.   When you and your staff spend time addressing issues related to social media, that could include things like anonymous social media posts on something like Sarahah, right?

A.   Yes.

Q.   When -- when responding to situations or incidents or threats on social media, do you document where each threat was made?

A.   Do we document where each threat was made?

Q.   Sorry.  Yes.

When responding to situations or

incidents or threats on social media, do you respond where students or other community members made that threat?

A.    We provide that information to law enforcement when we give them the information so it can be included in their report.

Q.    So you would have a document of every threat that was made on social media that you have learned of?

A.    We wouldn't, no.  But anyone that was reported to law enforcement, yes, they would have a document, if they wrote a report on it.

Q.    And that specifically --

A.    But every single threat that's ever been reported, I would say I don't -- we don't -- my office doesn't have a copy of every single report, no.

Q.    Does Harford County Public Schools have a YouTube channel?

A.    Yes.

Q.    Who runs that channel?

A.    Office of communications.

Q.    And who is in charge of the office of communications?

A.    Ms. Jillian Lader.

Page 149

Q.    Are you familiar with what content is posted on the Harford County Public Schools' YouTube page?

A.    Yes.

Q.    What type of content?

A.    Content to provide information to our families and communities.  General information about our school district from different various offices and departments will provide information that's useful to our students in the community.

Q.    Have you appeared in videos on the Harford County Public Schools YouTube channel?

A.    Yes.

Q.    Do you know how many?

A.    I don't.

Q.    What were those videos about?

A.    Safety and security.

Q.    Do you know roughly when those videos were posted on YouTube?

A.    Between -- probably -- the first video I ever made?  I don't know.  Probably between 2020 and 2024.

Q.    And what was the purpose of making videos about safety and security and posting them on YouTube?

A.   The purpose is to give parents strategies -- parents and students strategies, things to look -- to be aware of, and strategies for maintaining safety and security, and providing useful information to parents.

Q.   Does Harford County Public Schools have a Facebook page?

A.   Yes.

Q.   Do you know who runs that page?

A.   I believe it's Ms. Jillian Lader who runs that page as well, office of communication.

Q.   Have you ever posted content to the Harford County Public Schools Facebook page?

A.   Have I posted content?

Q.   Yes.

A.   No.  If I did, I don't remember.

Q.   Have you appeared in content posted to that Facebook page?

A.   I don't know.  I don't know if they posted the videos I've done to the -- I don't really go to the HCPS Facebook page.

Q.   Does Harford County Public Schools have a TikTok account?

A.   Oh, that, I don't know.

Q.   Does Harford County Public Schools have

Page 151

an Instagram account?

A.    I don't know.

Q.    Does Harford County Public Schools have a Snapchat account?

A.    I don't know.

Q.    Have you ever used YouTube?

A.    Yes.

Q.    Do you have a YouTube account?

A.    Yes.

Q.    Do you log in to YouTube when you use YouTube?

A.    Do I log in?  Yeah.  Uh-huh.

Q.    Do you post content to your YouTube account?

A.    Not now, no.

Q.    Have you ever?

A.    Yes.

Q.    When was that?

A.    2024.

Q.    So last year?

A.    Yes.

Q.    Did you post content -- how -- sorry. Strike that.

How often did you post content to your YouTube account?

CONFIDENTIAL

Page 152

A.   How often?  I don't know.  I might have published -- when you say "content," can you describe what "content" is, what you're -- what you're meaning as context?

Q.   Have you uploaded videos to a YouTube channel?

A.   Oh, yes.  How frequent have I done that?  I don't know.  Every -- when I was doing it, every couple of weeks or so.  Every week, every couple of weeks.

Q.   And that was all in 2024?

A.   As far as uploading content, yeah, 2020 -- yeah, 2023, 2024.  I would say 2023, 2024.

Q.   What type of videos did you upload?

A.   I don't know.  Fun videos.

Q.   What would you consider fun videos?

A.   Talking about current events.  Yeah.

Q.   Who was your intended audience?

A.   I would say probably people between like 35 and up.

Q.   Do you ever use YouTube to watch videos?

A.   Yes, I do.

Q.   What types of videos do you watch?

A.   Primarily, investment videos.  So

Page 153

probably 95 percent, stock market videos.

Q.    What would you say the other 5 percent is?

A.    Other 5 percent is sports training. I'm a big boxing enthusiast.  So the other 5, 10 percent is probably boxing-related stuff.

Q.    Anything else that you can recall?

A.    On the regular, no, unless it's just something I scroll past on a short or something. But stuff that I actively seek out is investment stuff and sports stuff.

Q.    Do you use YouTube to listen to music?

A.    Yes.  I have YouTube music.

Q.    Do you use YouTube as a streaming service?

A.    Like -- for, like, my primary television-type stuff and all that?

Q.    Do you use YouTube TV?

A.    No.  If it's included in a subscription I have or something, maybe I'm not taking advantage of it.

Q.    How often would you say you use YouTube?

A.    Every day.

Q.    How much time do you spend on YouTube

Page 154

every day?

A.    Probably anywhere from 45 minutes to maybe an hour, like that.

Q.    And that's primarily on the investment videos --

A.    Yes.

Q.    -- you talked about?

A.    I start -- that's how I start my day. I'm brushing my teeth, and I'm listening to market updates and, you know, why the market may be trending up or down or whatever.  That's how I start my day, so...

I'm doing other stuff, but it's playing in the background.  I'm listening.

Q.    Do you also use -- strike that.

How often do you use YouTube to listen to music?

A.    In my car.

Q.    And how frequently would you say you listen to music from YouTube in your car?

A.    Maybe three or four times a week, because, again, in my car I'm putting on investment stuff.  I'm riding up the road listening to one of my guys that I subscribe to.

Q.    When was the last time you used

CONFIDENTIAL

Page 155

YouTube?

A.    Yesterday.

Q.    Do you have any children?

A.    I do.

Q.    How many children do you have?

A.    Why do you want to know that?  Four.

Q.    How old are your children?

A.    36, 32, 26, and 17.

THE REPORTER:  You dropped your mic.

THE WITNESS:  Oh, I'm sorry.

BY MS. WEIANT:

Q.    Is your 17-year-old still living at home?

A.    Yes.

Q.    Are they in high school?

A.    He's a -- is a senior year at high school.

Q.    Do you know if he has ever used YouTube?

A.    Yes.

Q.    Do you know if he has a YouTube account?

A.    Yes.

Q.    Do you know how he uses his YouTube account?

CONFIDENTIAL

Page 156

A.    Yeah.  I've seen him load his basketball and track videos.  He -- he's an athlete, so he's loaded his videos.

Q.    How often does he upload to YouTube?

A.    Not often.

Q.    Did you help him set up his YouTube account?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  No, I didn't help him set up his -- I believe his mother did because he wasn't with me when he set it up.

BY MS. WEIANT:

Q.    Do you know if he also uses YouTube to watch videos or listen to music?

A.    Yes.  He does both.

Q.    Do you know if he has used YouTube in the classroom?

A.    Yes, I know he has used it because he's done a couple projects that we did together where he had to interview people.  And it was uploaded to YouTube, and it was part of his class project.  Those interviews were put on YouTube.

Q.    Do you know if they're still available on YouTube?

Page 157

A.    I don't know.

Q.    Did you ever complain to the school about allowing him to use YouTube in connection with a class project?

A.    Did I complain?  No.

Q.    Are you aware of any other instances where he used YouTube for homework assignments or in the classroom?

A.    Yes, I'm aware he's used YouTube for homework assignments.  In fact, his YouTube links have been included in homework assignments from the teacher to be able to watch a video at a specific -- connected to a specific link.

Q.    Is he a student at Harford County Public Schools?

A.    He is not.

Q.    For your 26-year-old -- actually, scratch that.

For your high school son, does he have a cell phone?

A.    Yes, he does.

Q.    Is it a smartphone?

A.    Yes, it is.

Q.    When did he get his cell phone?

A.    He got that cell phone in -- the

particular one he has right now, he got it in December for Christmas.

Q. When did he first get a cell phone?

A. That, I don't know. I got custody of him when he was 11, and he already had a cell phone at that time. So I don't know when his mom provided his first cell phone to him.

Q. Did he -- when he was 11 and had a phone, was it a smartphone?

A. Yeah. When he came to me, he had a smartphone, yeah.

Q. And he has used a smartphone ever since?

A. Yes.

Q. Before he started high school, did you place any restrictions on how many hours a day he could use his cell phone?

A. Yes.

Q. How many hours a day did you allow him to use his phone?

A. No more than like one or two hours for recreational use. And I had parental controls on his phone.

Q. How did you enforce the time limit?

A. Because I could shut it down from my

Page 159

phone.

Q.   How would you do that?

A.   Going to -- going to the settings on my phone because I had already set up the parental controls.  First of all, I had already filtered where he couldn't go to certain -- he could go to YouTube.  In fact, up until about a year and a half ago, he could go to YouTube, but there was certain content he wouldn't be able to access because of the way I set up the -- the permissions.

But in terms of how I controlled it, I just go into the phone app into T-Mobile and go into family controls, and I could just -- I can do a number of things.  I can make his phone where he can just get incoming calls, can't make outgoing.

And like I said, up until about a year and a half ago, I still exercised those.  So I've always had pretty good reins on his cell phone use. It was never really an issue for him when it came to school.  Like, that wasn't something I was getting called from school about, his cell phone use, because I can control it.

Q.   And those parental -- parental controls that you were talking about, are they all through the T-Mobile platform?

Page 160

A.    Yes.

Q.    Did you -- using your family or parental controls that were on his device, did you control them through his device?

A.    No.  So once it's registered and I'm the owner of the account, the fact that his -- when I first set his phone up, it asked if -- it went through a series of things about asking about permissions.  And, you know, there were things that I checked off.

And then I could control -- I could even control his connections.  If he was trying to connect to Wi-Fi, I could just shut the -- I -- I could, from my phone, shut his Wi-Fi down on his phone.

Q.    So aside from those parental controls from the T-Mobile phone setup, did you use any other parental controls to monitor his screen time or his use of his phone?

A.    Periodically, I would check to see, because I could also see what sites he visit.  When I went into my app, I could see what sites he went to, what sites he visit.  So, yes, I would periodically do that.

Q.    And you said you used these parental

Page 161

controls until about a year and half ago?

A.    Yeah.   When he was -- when he turned 16, I relaxed some of that stuff a little bit.  He was a little older now and showed responsibility, so -- for some of the stuff.  Some of the screening I went on and took off.

Like, for instance, at 16 I wasn't shutting his phone down at 9:00 where he couldn't make phone calls and receive calls and all that, not at 16.

Q.    Do you still exercise some control over his phone?

A.    I absolutely do.

Q.    What do you -- what do those controls look like now?

A.    On apps -- like, on the app that I have on mine, I could -- if I want to shut down -- even now, although he's 17, he's doing what he's supposed to do, but if he wasn't, and I wanted to shut down apps because I feel like he should be focused on homework or a project or something, I could go in.  And he'll call me.  He's like, "Did you shut whatever down?"

"Yep, I sure did."

(Discussion off the record.)

Page 162

BY MS. WEIANT:

Q. For your older children -- let's start with your 26-year-old. Did they have a phone in high school?

A. My 26-year-old, did Kai have a phone in high school? I'm going to say, yeah, he had a phone in high school.

Q. Did you implement any controls over his phone when he was in high school?

A. He didn't live with me.

THE REPORTER: I'm sorry. I didn't hear you.

THE WITNESS: He didn't live with me. I didn't provide his phone.

BY MS. WEIANT:

Q. What about your 32-year-old?

A. He didn't have a cell phone. She -- she -- I'm sorry. My 32-year-old is my daughter. No, she did not have a cell phone in high school.

Q. And your 36-year-old, I assume, did not have a cell phone --

A. No.

Q. -- in high school?

A. No. That was my 36 -- that was 18 years ago? No, he didn't have -- he didn't have a

Page 163

cell phone in high school.

Q.   Have you ever asked YouTube to modify any feature or function on YouTube?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  I don't understand that question.

BY MS. WEIANT:

Q.   Have you ever asked YouTube to change a feature or change something about how the platform works?

MR. LEGG:  Same objections.

THE WITNESS:  How -- no.

BY MS. WEIANT:

Q.   Have you ever asked YouTube to discontinue any feature about how the -- or how the platform works?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  If I -- I want to understand correctly.  Like, as a -- as a consumer, have I reached out to YouTube and say, I want you to change how you're doing something -- a particular thing on your platform?  Is that what you're asking me?

CONFIDENTIAL

Page 164

BY MS. WEIANT:

Q. In any capacity, not just as a consumer. But, yes, have you asked them?

A. No.

Q. Have you ever spoken with anyone at Google or YouTube about YouTube?

MR. LEGG: Objection to form and foundation.

THE WITNESS: No.

MS. WEIANT: All right. Let's take a quick break.

THE VIDEOGRAPHER: We are now going off the record at 3:59 p.m.

* * *

(Whereupon, there was a recess in the proceedings from 3:59 p.m. to 4:15 p.m.)

* * *

THE VIDEOGRAPHER: We're now going back on the record at 4:15 p.m.

BY MS. WEIANT:

Q. Do you have a Facebook account?

A. I do.

Q. When did you create that account?

A. 2009.

Q. How often do you use that account?

Page 165

A.   Probably about once a week.

Q.   How do you use that account?

A.   I'll go on.  If I don't post something, I'll scroll.

Q.   When scrolling on Facebook, how much time do you scroll -- spend scrolling?

A.   Not long.  15, 20 minutes just to see -- just to see what the friends are doing or family members or whatever, see if they posted anything.

Q.   Do you ever post to Facebook?

A.   Yes.

Q.   How often do you post -- post to Facebook?

A.   Whenever me and my wife take a nice-looking picture together.

Q.   How often would you say that is?

A.   Oh, I think we're good-looking, so pretty often.

Q.   Do you have a Instagram account?

A.   I do.

Q.   When did you create that account?

A.   I think about maybe a year or two ago.

Q.   How do you use your Instagram account?

A.   I really don't.

CONFIDENTIAL

Page 166

Q. When was the last time you used your Instagram account?

A. I think I used it to help me get back into my Facebook account. They got -- something happened with my Facebook, me forgetting my Facebook password. I was reading something.

So probably over the past month, I might have used it once or twice, but not using it to post anything or anything like that.

Q. Have you ever posted anything to Instagram?

A. Yes.

Q. When was the last time you posted something to Instagram?

A. I don't remember.

Q. Do you use Instagram to keep up with friends or family?

A. No.

Q. Do you have a TikTok account?

A. No.

Q. Do you have a Snapchat account?

A. No.

Q. Does your 17-year-old son have a Facebook account?

A. Yes.

CONFIDENTIAL

Page 167

Q. Do you know when he got his Facebook account?

A. No, I don't know exactly when he got it.

Q. Do you know how he uses his Facebook account?

A. From what I've seen, mostly posts basketball and track stuff, athletic stuff that he's involved in.

Q. Do you know how often he uses Facebook?

A. I don't.

Q. Do you monitor how he uses Facebook?

A. Not at this point, no.

Q. Have you ever monitored how he uses Facebook?

A. Yes.

Q. Is that through the same controls, through T-Mobile that we discussed earlier?

A. That and by going to his account, his Facebook account.

Q. How often did you go into his Facebook account to monitor it?

A. Frequently when I was monitoring it. Up until about the age of 15, pretty frequently.

Q. So until about two years ago --

CONFIDENTIAL

Page 168

A.    Yeah.

Q.    -- you monitored -- you went into his account and monitor it --

A.    Yes.

Q.    -- monitored it?

When you went into his account, what did you monitor?

A.    Who he was having communication with and, you know, what he was posting, if he was posting anything.  But he wasn't really a big poster.  Even now, he's not a big poster if you go to his page.  He's never really been a major poster-type guy.

Q.    Does your 17-year-old son have an Instagram account?

A.    I don't know.

Q.    Does your 17-year-old --

A.    No, wait a minute.  Instagram?

Q.    Yes.

A.    Yes, I'm pretty sure he has a Instagram account.

Q.    Do you know when he created his Instagram account?

A.    I don't.

Q.    Do you know how he uses his Instagram

Page 169

account?

A. I don't.

Q. Do you know how often he uses his Instagram account?

A. I don't.

Q. Do you place any time limits on how often he uses his Instagram account?

A. No.

Q. Do you monitor his Instagram account?

A. No.

Q. Have you ever monitored his Instagram account?

A. No.

Q. Does your 17-year-old son have a TikTok account?

A. That, I don't know.

Q. Does your 17-year-old son have a Snapchat account?

A. That, I don't know either.

Q. Have you ever asked Facebook to modify any feature or function on its platform?

MR. LEGG: Objection to form. Foundation.

THE WITNESS: Un-hun. No. I'm sorry. No.

BY MS. WEIANT:

Q.   Have you ever asked Instagram to modify any feature or function on its platform?

A.   Ask who?

MR. LEGG:  Objection to form and foundation.

BY MS. WEIANT:

Q.   Instagram.

A.   No.

Q.   Have you ever asked TikTok to modify any feature or function on its platform?

A.   No.

MR. LEGG:  Objection to form. Foundation.

BY MS. WEIANT:

Q.   Have you ever asked Snapchat to modify any feature or function on its platform?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  No.

BY MS. WEIANT:

Q.   Have you ever asked any of those platforms to discontinue any feature or function?

MR. LEGG:  Objection to form and foundation.

CONFIDENTIAL

Page 171

THE WITNESS:  No.

BY MS. WEIANT:

Q.   Have you ever spoken with anyone at any of those platforms about -- about their platforms?

A.   No.

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  No.

BY MS. WEIANT:

Q.   Earlier today, you testified that you have not been a schoolteacher; is that right?

A.   Correct.

Q.   So you are not in classrooms on a regular basis?

A.   That's correct.

Q.   You can't speak to how students are typically using their cell phones or electronic devices in the classroom, can you?

A.   No.

Q.   You can't speak to what websites they are looking at?

A.   No.

Q.   You can't speak to what apps they are using?

A.   No.

CONFIDENTIAL

Page 172

Q.   You can't speak to how students are using -- are typically using their cell phones or electronic devices at school generally, can you?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  How they are using it generally?  How they are using it, no.

BY MS. WEIANT:

Q.   So the first questions were about how they were using their devices in the classroom.

A.   Right.

Q.   The second one, you can't speak to how they are typically using their cell phones at school more generally, can you?

MR. LEGG:  Same objections.

THE WITNESS:  No.

BY MS. WEIANT:

Q.   You can't say what websites they are looking at while using their phones at school?

MR. LEGG:  Objection to form --

THE WITNESS:  No.

MR. LEGG:  -- and foundation.

BY MS. WEIANT:

Q.   You can't say what apps they are using while using their phones at school?

Page 173

MR. LEGG:  Same objections.

THE WITNESS:  No.

BY MS. WEIANT:

Q.   Do you have any data about how often students use cell phones or electronic devices?

A.   No.

Q.   Do you have any data about how much time students are spending on their cell phones or electronic devices?

A.   No.

Q.   Do you have any data about how often students use social media?

A.   No.

Q.   Do you have any data about how much time they spend on social media?

A.   No.

Q.   Do you have any data about how students use social media?

A.   No.

Q.   Earlier today, you testified that you were not a school counselor, right?

A.   Correct.

Q.   So have you counseled any Harford County Public School students about social media addiction?

CONFIDENTIAL

Page 174

A.   About addiction, no.

Q.   Have you counseled any Harford County Public School students about problems resulting from their use of social media?

A.   No.

Q.   Do you have any data on how many Harford County Public School students are counseled or treated for social media addiction?

A.   No.

Q.   Do you have any data on how many Harford County Public School students are counseled or treated for mental health issues?

A.   No.

Q.   Do you have any data on how many Harford County Public School students are counseled or treated for anything connected to their use of cell phones?

A.   No.

Q.   Do you have any data on how many Harford County Public School students are counseled or treated for anything connected to their use of social media?

A.   No.

Q.   So you can't speak to how many Harford County Public School students have social media

Page 175

addiction, can you?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  No.

BY MS. WEIANT:

Q.  You can't speak to how many Harford County Public School students have experienced any kind of mental health problems because of their use of social media?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  No.

BY MS. WEIANT:

Q.  You would agree that students can make threats in a variety of ways, correct?

MR. LEGG:  Objection to form and foundation.

THE WITNESS:  I would agree.

BY MS. WEIANT:

Q.  Earlier today, we looked at a document with an example of a threat written on a desk; is that right?

A.  Yes.

Q.  Some threats are made by making a phone call?

CONFIDENTIAL

Page 176

A.   Yes.

Q.   Some threats can be made by text message?

A.   Yes.

Q.   Some threats occur in person without the involvement of any devices?

A.   Yes.

Q.   And you have had experience acting on some threats being made on social media, right?

A.   Yes.

Q.   Or with -- you've had some experience with fights or other violence that was promoted on social media?

A.   Yes.

Q.   Separate from responding to threats, fights or violence that may have been promoted on social media, your work doesn't involve issues related to student use of social media, does it?

MR. LEGG:  Objection.  Form. Foundation.

THE WITNESS:  My work doesn't relate to students' use of social media?

BY MS. WEIANT:

Q.   Aside from --

A.   Oh, responding to the threat.  No.

CONFIDENTIAL

Page 177

Q. Your work is focused on addressing these threats and incidents and keeping students safe and not evaluating the specific role that social media plays in the matters you're handling, right?

MR. LEGG: Objection to form and foundation.

THE WITNESS: Correct.

MS. WEIANT: I have no further questions at this time.

Does anybody on the Zoom have any questions?

MR. COTLER: No questions from Snap.

MR. FLASTER: No questions from Meta.

MS. JACKSON: Nothing from TikTok.

MR. LEGG: I will reserve my questions for trial.

THE VIDEOGRAPHER: We are now going off the record at 4:27 p.m.

This now concludes today's video testimony given by Donoven Brooks.

Total time for Google/YouTube is 3 hours and 32 minutes.

(WHEREUPON, the deposition was concluded at 4:27 p.m.)

CONFIDENTIAL

Page 178

(Signature Reserved.)

CONFIDENTIAL

Page 179

DEPOSITION ERRATA SHEET

Case Caption:  In Re:  Social Media Adolescent Addiction/Personal Injury Liability Litigation

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20____.


_____

DONOVEN BROOKS

CONFIDENTIAL

Page 180

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

DONOVEN BROOKS

CONFIDENTIAL

Page 181

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

DONOVEN BROOKS

CONFIDENTIAL

Page 182

CERTIFICATE OF REPORTER

I, Cindy A. Hayden, Registered Merit Reporter and Notary Public for the State of Maryland, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.  Witness my hand, this 9th of May, 2025.

_____

Cindy A. Hayden,
Registered Merit Reporter
Notary Public
State of Maryland
My Commission expires:
April 26, 2029

CONFIDENTIAL

**[& - 26]**                                                Page 1

**&**

**&**  2:11,17 3:5
  3:11 6:3

**0**

**00226861**  83:6
**00226861-62**
  4:13 82:21
**00226862**  83:6
**00553865-70**
  4:22 144:3
**03065**  1:8

**1**

**1**  4:8 8:3,7 91:2
  182:5
**1/15/18**  4:20
  143:25
**1/8/19**  4:9
  66:24
**10**  4:22 144:2
  153:6
**10/30/18**  4:12
  82:20
**102**  1:15 5:9
**10:00**  47:20
**10:28**  1:17 5:7
**10:58**  29:10,13
**11**  158:5,8
**11:00**  18:7
**12**  13:7 22:23
  90:1
**12,055,311**
  133:1

**122**  4:14
**12466**  182:15
**129**  4:17
**12:21**  29:13,16
**13**  67:5
**14**  89:13
**143**  4:20
**15**  89:13,21
  106:20,21
  165:7 167:24
**15th**  144:10
**16**  4:22 89:21
  90:6 144:2
  161:3,7,10
**17**  143:3 155:8
  155:12 161:18
  166:23 168:14
  168:17 169:14
  169:17
**1700**  3:11
**18**  14:8 54:13
  54:23 92:20
  162:24
**180**  14:18
  53:16
**19**  25:17
**19103-7014**
  2:12
**1:15**  70:25 71:3
**1:38**  71:3,6

**2**

**2**  4:9 25:8
  26:12 66:23

67:4 91:18
  130:12
**20**  11:2 12:22
  18:3,18 23:5
  30:24 82:2
  96:24 111:4
  117:21 165:7
  179:17
**20006**  3:12
**2001**  2:12
**20024**  3:6
**2009**  8:21
  164:24
**2016**  132:23
**2017**  8:13
**2018**  4:22 17:3
  19:10 23:24
  24:1 25:11
  27:10 36:2
  39:24 50:18
  55:15 56:8,9
  56:11 83:12
  121:24 123:2
  123:25 124:22
  144:2,10
**2019**  57:13
  67:12,21,24
  111:5
**202.434.5584**
  3:6
**202.626.2640**
  3:13
**2020**  21:15,16
  25:12,15

149:21 152:13
**2021**  21:9,11
**2022**  20:23,24
  32:13 38:21
  39:2 96:24
**2022-2023**
  31:13
**2023**  20:2 21:1
  32:13 38:21
  39:3 104:13
  107:4 152:13
  152:13
**2024**  8:13
  43:19 132:24
  149:22 151:19
  152:11,13,13
**2025**  1:17 5:6
  182:13
**2027**  42:12
**2027-2028**  42:6
  42:8
**2029**  182:19
**21209**  2:4
**215.278.2555**
  2:13
**21st**  60:24
**220**  2:4
**23**  6:21 130:18
**24**  115:3
**24th**  123:2
**25**  17:21 23:5
  134:7
**26**  83:12 155:8
  157:17 162:3,5

182:19
**2850** 2:4
**2:41** 121:1,4

**3**

**3** 4:12,19 82:19
82:25 91:22
106:23 129:13
130:5,9 177:22
**30** 32:22,24
**3000** 2:12
**3047** 1:4 5:10
**312.862.1083**
2:18
**32** 155:8
162:16,18
177:23
**33** 83:1
**333** 2:17
**34** 144:8
**35** 152:20
**36** 155:8
162:20,24
**3:02** 121:4,7
**3:59** 164:13,16

**4**

**4** 4:14,15
122:12,13,18
130:9,18 134:7
**40** 25:8 127:24
133:5,8 135:9
136:1 137:12
139:8,9,19,22
141:8

**40,000** 28:9,9
**400** 91:3
**410.421.7777**
2:5
**42** 122:19
**45** 127:24
154:2
**4:00** 47:24
**4:15** 164:16,19
**4:22** 1:4
**4:23** 1:8
**4:27** 177:19,25
**4th** 96:25,25
123:3

**5**

**5** 4:3,17 106:22
129:10,16
130:13 132:4
153:2,4,5
**55** 28:8
**5:00** 90:23

**6**

**6** 4:20 143:25
144:7
**6,000** 28:9
**60** 129:17
**60654** 2:18
**66** 4:9
**680** 3:5

**7**

**70** 14:17

**70s** 58:11

**8**

**8** 1:17 4:8
**8/24/18** 4:14
122:13
**80** 89:15 91:4
**82** 4:12
**869** 145:5
**8:00** 90:23
**8th** 5:6 67:12

**9**

**90** 57:22
**900** 3:12
**95** 153:1
**97** 10:24
**99** 40:16
**9:00** 161:8
**9th** 182:13

**a**

**a.m.** 1:17 5:7
29:10,13
**ability** 182:10
**able** 24:16
28:10,16 32:2
35:11 50:11,20
51:23,25 58:20
63:20 70:13
74:22 77:20
87:5 98:5,22
104:8 109:14
115:18 129:1
140:7 157:12

159:9
**absolutely**
36:12,24 39:23
95:16 161:13
**absolutes** 125:6
125:7
**abuse** 72:1,2,4
72:6,7,9,15,17
72:22 73:1,4,8
73:11,19,25
74:17 80:9
**academic** 13:6
22:11 52:20
**academy** 10:17
10:23
**access** 46:24
47:7 79:11
116:16,19
131:24 159:9
**accident** 99:16
**accidents** 41:8
**account** 115:14
150:23 151:1,4
151:8,14,25
155:22,25
156:7 160:6
164:21,23,25
165:2,20,22,24
166:2,4,19,21
166:24 167:2,6
167:19,20,22
168:3,6,15,21
168:23 169:1,4
169:7,9,12,15

CONFIDENTIAL

**[account - allocation]** Page 3

169:18
**accounts** 115:5
128:14
**accreditation**
12:1,3,6
**accurate** 179:9
182:9
**acknowledged**
123:13
**act** 36:23 37:24
38:13 53:6
57:16 117:22
118:8
**acting** 176:8
**action** 76:25
110:8
**active** 4:11 38:3
38:4,5 53:8
57:18,19,21
60:7 62:10,11
62:12,15 65:5
65:25 66:9,25
67:13,22 87:23
88:2 91:9,15
114:15 121:16
**actively** 153:10
**activities** 85:10
132:2
**activity** 73:19
80:11,14,19,24
81:5,9,16,22
82:4 91:14
93:18 94:16
95:3,11 96:16

**actually** 14:15
14:16 29:22
63:13 65:14
118:23 157:17
**add** 25:21
43:14
**added** 25:15
43:16 109:18
**addiction** 1:3
173:25 174:1,8
175:1 179:3
**adding** 25:18
25:20
**addition** 31:19
**additional**
37:13 104:7
105:8
**additions** 57:15
57:17
**address** 29:19
31:24 98:6,22
98:25 135:18
**addressing**
127:18 135:11
136:5,9,15
137:18 139:21
147:15 177:1
**adequate** 28:17
**administration**
1:14 8:20 22:2
109:6
**administrative**
12:9 20:17

**administrator**
31:2 44:19,24
76:1 80:5
105:6 116:7
139:6
**administrators**
15:23 41:19
138:23
**adolescent** 1:3
179:2
**adopted** 31:8
**adults** 68:8,10
68:16,22 69:3
141:21,22
**advantage**
153:20
**advisory**
113:16,17,22
118:23,24
**aftermath**
36:18 37:4,12
37:12,18 43:17
60:20 104:9
105:20
**age** 114:21
167:24
**aged** 88:17
**agencies** 45:15
45:20
**agency** 146:12
**agendas** 132:1
**aggressive** 98:1
**agitated** 98:1,3
98:12

**agitation** 30:20
**ago** 104:6
159:8,17 161:1
162:25 165:23
167:25
**agree** 68:19
81:2,4,11,20
98:9 123:19
126:2,10,12,16
126:19,25
127:4,7 175:14
175:18
**ahead** 49:5
67:7 83:7
122:21
**air** 1:16 5:9
9:14,17,24
10:1,14
**akeyes** 3:7
**al** 1:7
**alex** 2:16
**alex.ingoglia**
2:19
**aligned** 19:24
**alignment** 30:9
**allegation**
46:25
**allegations**
108:25 131:3
131:20,21
**alleged** 97:3,4
**allocation**
50:13

**[allow - associated]**                                                                 Page 4

**allow** 58:6 60:6
  91:24 92:4
  158:19
**allowed** 126:20
**allowing** 157:3
**allows** 129:8
**alphabet** 3:2
**alt** 83:15,19
**alternative**
  83:22,25 84:6
  88:23
**amended** 4:18
  129:11 130:4
**amount** 50:21
  59:18 127:20
  133:11,12
  134:23 135:14
  135:23
**analysis** 109:25
**andrew** 3:4
**andy** 6:5
**anonymity**
  129:8
**anonymous**
  117:10 140:6
  145:12,24
  146:7 147:16
**answer** 48:16
  49:4,16
**answered**
  89:17
**anxiety** 68:11
  68:17 69:22

**anybody** 46:7
  57:6 66:12,17
  89:3 177:11
**anymore** 54:6
**app** 145:12,19
  145:24 146:18
  147:6,8 159:12
  160:22 161:16
**apparatus** 59:3
  66:16
**appearance**
  2:21
**appearances**
  2:1 3:1
**appeared**
  149:11 150:17
**appears** 134:19
**applied** 8:19
**approach**
  55:22 107:18
**approached**
  55:20
**approximately**
  32:22 104:18
**apps** 161:16,20
  171:23 172:24
**april** 55:15
  182:19
**area** 16:12,14
**areas** 60:10
  115:12
**arndt** 3:15
**arrest** 94:1

**arrested** 93:23
  94:6,11
**arrests** 93:10
**arrived** 88:21
**article** 4:9,14
  66:23 67:11,16
  67:19 122:12
  123:1,7,9,25
**aside** 37:21
  48:10 70:19
  126:1 160:16
  176:24
**asked** 12:15
  26:25 55:10,12
  58:14 68:13
  70:7 72:2
  110:23 126:10
  133:19,20,23
  160:7 163:2,9
  163:15 164:3
  169:20 170:2
  170:10,16,22
**asking** 17:23
  35:19 36:17
  49:11,14 55:4
  55:5 78:13
  85:11 95:1
  110:5 138:8
  160:8 163:25
**asks** 92:25
  101:1 130:14
**aspects** 127:8
**assailant** 4:11
  38:4 54:1 57:8

  62:10,13,13,15
  65:5,25 66:25
  67:13,22
  114:15 121:16
**assault** 73:8,11
  78:23 141:22
**assaults** 14:23
**assessing** 36:1
**assessment**
  38:7,8,9,10
  52:16 78:19
  79:2,7,12
**assessments**
  77:3 78:21
  130:19
**assigned** 33:1,4
  33:9,12 76:4
  134:14
**assigning** 16:20
**assignment**
  13:17
**assignments**
  16:21,22 157:7
  157:10,11
**assist** 105:16
**assistant** 20:12
  20:13,15,17
  21:4,24 34:2,5
**assisting**
  106:14
**associate** 8:18
**associated**
  83:14 96:4
  140:5

CONFIDENTIAL

**[assume - better]**                                              Page 5

**assume**  162:20
**athlete**  156:3
**athletic**  167:8
**attachment**
  132:7 134:15
  134:20
**attend**  11:3
  84:4 117:12
  145:1 146:17
**attention**
  101:11,17
**attorneys**  7:21
**attributable**
  130:22
**attributes**
  124:13 125:8
**audience**
  152:18
**august**  123:2
**authority**
  138:25 139:4
**available**  27:9
  156:24
**avenue**  1:15
  3:11 5:9
**avoiding**  135:8
**aware**  6:10
  36:11 49:22
  73:10 75:1
  80:21 82:6
  91:13,15 96:18
  99:4 100:9
  101:7,19
  102:24 113:12

  150:3 157:6,9

**b**

**b**  4:5
**bachelor**  8:23
**back**  10:7 16:5
  29:15,18 31:21
  60:2 61:2 71:6
  79:21 83:10
  88:16 92:24
  97:8,8,14,18,21
  98:7 105:17
  121:6 132:4
  134:25 135:22
  140:3 142:24
  147:6,8 164:18
  166:3
**background**
  8:18 24:11
  26:3,23 80:4
  86:8 87:7
  89:10,14 92:19
  154:14
**backtrack**
  139:25
**bacon**  2:11
**bad**  99:16
**bag**  45:5
**ball**  89:18
**baltimore**  2:4
  8:20 10:16,20
  10:22,23 11:1
  11:10,14 12:23
  13:10 16:24

  17:1,4,24
  18:19,19 19:6
  23:5 26:15
  85:16,18 86:23
  92:18 94:5,6
**bangs**  53:22
**barricade**
  62:20 63:22
**barricaded**
  59:20
**baseball**  89:20
  90:3
**based**  13:2
  19:24 24:22
  26:23 38:12
  44:18 58:16
  59:16 62:17
  78:15 81:9
  109:11 133:10
  133:15,18
  134:23 135:14
**basically**  101:2
**basis**  43:5,8,9
  75:20 135:6
  171:14
**basketball**
  156:2 167:8
**bates**  4:13,22
  82:21 83:4,5
  144:3
**bathroom**
  129:7
**battle**  18:7

**began**  20:3
  32:12 43:11
**beginning**
  13:15 56:8
  134:7 136:21
**begins**  144:12
**behalf**  49:12,14
**behavior**
  100:16
**behaviors**
  91:25 92:5,10
**bel**  1:16 5:9
**believe**  44:14
  44:14 46:17,23
  69:3 70:15
  89:25 91:19
  94:15 111:14
  127:13 139:20
  150:10 156:11
**believed**  70:3
**belonging**
  87:20 89:11
**belongings**
  44:20
**bendis**  21:21
  21:23
**benefit**  24:25
**benefits**  126:3
**bereal**  143:14
**bernard**  83:12
**best**  141:1
  182:10
**better**  35:16
  42:9

CONFIDENTIAL

**[beyond - cameras]**

**beyond** 48:5,15 48:22 49:3,21 103:4

**biannual** 16:17

**big** 106:19,20 111:15 112:2 153:5 168:10 168:11

**biggest** 54:18 58:13 61:13

**bill** 38:2

**bit** 15:18 27:2 76:11 161:3

**block** 63:1 115:6

**blood** 94:10

**bloods** 91:3 96:5

**board** 1:6 4:17 5:11 19:22 68:12 112:17 129:10 130:3 130:15

**book** 45:5

**bottom** 145:5

**bouncing** 61:2

**boxes** 55:3

**boxing** 153:5,6

**breach** 63:22

**break** 28:25 29:19 70:20 120:23 164:11

**breaking** 30:9 30:14

**brief** 7:20

**bring** 110:17

**bringing** 18:13 21:19

**brings** 48:13

**broad** 75:14

**brockstedt** 2:3

**broke** 58:5

**brooks** 1:12 4:8 5:14,19,25 6:9 8:3,4,7 29:18 66:23 67:4 82:19,25 122:12,18 129:10,16 143:25 144:7 145:7,10 177:21 179:21 180:24 181:24

**brought** 7:11 32:24

**brush** 87:2

**brushing** 154:9

**buck** 34:17 83:13

**buck's** 35:1

**budget** 50:9,17 50:23 51:16 134:10

**build** 95:8

**building** 1:14 57:4,7 59:7,9 60:25 80:1 97:15,19,21

98:8 105:1,12 106:2

**buildings** 39:21 40:5,7

**bullet** 145:6

**bullied** 115:3 117:12 137:11

**bully** 128:13

**bullying** 114:16 114:18,20 115:1,2,9,19,24 116:5,9,12,14 116:19 118:13 119:5,7,8 140:4

**bunch** 111:24

**buses** 40:25 99:23

**busy** 86:3

**buy** 41:20

**buzz** 83:11 84:13 86:15 89:2 92:25

**buzz's** 34:25

**bytedance** 3:9 3:9

**c**

**c** 5:1

**ca** 5:10

**cabinets** 59:14

**cafeteria** 75:21 75:25 106:4 142:5

**calculate** 130:16

**calculating** 137:12

**california** 1:1 5:13

**call** 4:21,21 14:7,10 16:3,4 26:13 47:23 62:12 96:10 120:4 144:1,1 144:20 146:12 147:3 161:22 175:25

**called** 41:24 42:24 58:11 85:20 120:14 159:21

**calling** 30:25 74:6 75:23

**calls** 14:8,20,20 16:1 17:5 145:1 146:10 146:15 159:15 161:9,9

**camera** 40:18 41:25 42:1 50:16,16

**cameras** 37:8 37:21,21 39:17 39:19 40:2,6,9 40:10,11,19,22 40:25 41:3,16 41:21 42:4,7,9

CONFIDENTIAL

**[cameras - cid]** Page 7

42:10,11 48:23 49:22 91:24 92:4,9,16 121:18

**campuses** 36:11

**candidates** 33:15

**canines** 45:20

**capacity** 10:6 13:4,21 95:8 164:2

**captain** 96:4

**caption** 78:23 179:2

**captioned** 179:8

**capture** 78:20 78:24 138:6

**captured** 80:4 137:6,10,24 138:2,4

**car** 15:21 99:14 99:19,25 154:18,20,22

**career** 9:8,10 10:9,12,17 11:9 18:19,23 22:4 82:4

**carjacking** 94:5

**carried** 38:11 136:22

**carry** 101:20 102:14

**carrying** 101:21 102:9 102:11,18

**cars** 110:20,21

**cart** 63:7

**case** 1:8 6:6 65:25 75:7,7 75:20,20 179:2

**cases** 45:22 72:11 135:1

**catch** 99:24

**category** 93:25 130:16

**cathy** 21:21,23

**cause** 44:14 69:22,24 70:2 182:12

**caused** 78:9

**cease** 140:18

**cell** 157:20,24 157:25 158:3,5 158:7,17 159:18,21 162:17,19,21 163:1 171:17 172:2,13 173:5 173:8 174:17

**center** 77:1 116:24 117:23 118:9 120:12 144:18,23 145:2,21 146:1

**central** 1:13 10:8 13:13

**century** 60:24

**certain** 18:22 42:4 48:23 129:7 159:6,8

**certificate** 182:1

**certified** 22:9 22:11,15

**certify** 182:3,11

**chair** 61:1,2 64:1

**change** 12:25 55:17 57:10,13 69:13,15 106:6 106:10 109:5 109:11 163:9 163:10,23 180:2,4,5,7,8 180:10,11,13 180:14,16,17 180:19,20,22 181:2,4,5,7,8 181:10,11,13 181:14,16,17 181:19,20,22

**changed** 23:23 50:9 53:10,11 55:16,22,23 65:4 121:17

**changes** 29:21 38:23 179:10 179:13

**changing** 24:14 45:19 55:19,20 70:8

**channel** 148:19 148:21 149:12 152:6

**charge** 148:23

**charged** 93:19 112:8

**chart** 132:9,14 132:17

**chasing** 135:19

**check** 143:13 160:20

**checked** 55:3 160:10

**checking** 15:22 15:24

**chicago** 2:18

**chief** 4:16 7:11 11:18,23 12:8 22:2 85:23 122:14 123:4

**child** 70:1 117:6,8

**children** 54:19 127:14 155:3,5 155:7 162:2

**chosen** 90:6

**christina** 34:8

**christmas** 158:2

**cid** 147:7

CONFIDENTIAL

**[cindy - community]** Page 8

| | | | |
|---|---|---|---|
| **cindy** 5:17 182:2,17 | **clearance** 10:2 | **collected** 24:22 | **commander** 16:12,14 85:16 |
| **circumstances** 48:24 79:15 | **clearly** 87:4 | **collecting** 15:23 | **comments** 67:18 |
| **cite** 65:23 | **climate** 104:1,9 104:21,22 105:9,11,14,20 105:24 106:12 107:3,9,23 108:14,16 112:24 113:5 121:14 | **college** 8:21 | **commerce** 2:11 |
| **city** 8:20 10:16 10:20,23,24 11:1,10,14 12:23 13:10 16:24 17:1,4 17:24 18:19,20 19:6 23:5 85:16,19 86:23 92:18 | | **column** 132:22 132:23 133:4 | **commission** 12:1,3,16,18,19 182:19 |
| | | **come** 26:16 35:13 55:6 58:15 87:1,6 94:11 95:25 97:18,21 114:17 116:23 129:5 136:16 140:16 141:4 | **commit** 59:17 |
| | | | **commitment** 85:2 |
| **civilian** 10:17 10:19 22:16 | **close** 53:14 100:6 105:15 | | **committees** 118:24 |
| **clarify** 17:22 49:6 58:17 | **closed** 10:9 | **comes** 41:10 47:20 63:12 65:10 77:25 101:5 107:9 117:1,2 119:10 120:8 124:9 128:6,19 129:3 136:18 141:3 141:18 | **common** 147:11 |
| | **closely** 34:11 34:13,14,16 37:11 91:24 92:4 95:10,15 | | **communication** 77:23 150:11 168:8 |
| **clarke** 144:11 144:13,15 | | | **communicati...** 34:15 119:24 148:22,24 |
| **class** 30:24 31:1 156:22 157:4 | **closer** 101:11 | | |
| | **clue** 95:7 | | |
| | **code** 12:10,11 120:5 | **coming** 9:4,5 24:10 30:12 35:13 42:10 45:3 55:19 65:15 66:12 86:23 92:18 98:7 147:6,8 147:13 | **communities** 18:1 28:18 149:7 |
| **classroom** 22:11,14,21 40:9 60:9 62:18 63:15,19 156:18 157:8 171:18 172:10 | **collaborate** 52:23,25 | | **community** 8:20 17:24 55:4 58:14 70:7 87:13 93:11,24 97:2 97:5,7,23 99:5 100:3 111:14 111:19,22 141:25 148:2 149:10 |
| | **collaborated** 58:3 | | |
| | **collaboration** 53:2 | | |
| | **collaboratively** 35:2 | | |
| **classrooms** 22:23 40:10 171:13 | **colleague** 6:4 | | |
| | **colleagues** 146:13 | **command** 10:8 10:9 22:3 | |
| **clear** 33:7 66:7 112:18 | **collect** 43:2 | | |

CONFIDENTIAL

**[companies - copy]**                                    Page 9

**companies**
  131:9,11
**competing**
  92:14
**complain**  157:2
  157:5
**complaint**
  131:16
**complaints**
  75:5
**complete**  77:11
  182:9
**component**
  4:10 66:25
  67:13
**comprehensive**
  84:3
**concerned**
  26:24 56:17
  114:19,20
**concerns**  114:1
**concluded**
  177:25
**concludes**
  177:20
**conduct**  58:20
  130:22,25
**conducted**
  53:13,18 69:20
**conference**
  4:21 144:1,20
  145:1
**conferences**
  140:16

**confidential**
  1:11
**confirmed**
  104:23
**conflict**  86:8
  128:6 129:3
  135:8 140:14
  141:4,14,19,21
  141:24 142:8
**conflicts**  87:13
  128:1,4 133:22
  134:25
**confrontation**
  128:24
**confronted**
  64:12
**connect**  126:16
  126:20 135:22
  141:7 160:13
**connected**
  135:25 157:13
  174:16,21
**connection**
  6:25 97:16
  131:22 135:7
  157:3
**connections**
  160:12
**connolly**  3:5
  6:4
**consider**  36:20
  152:16
**considered**
  65:19

**consistently**
  117:11
**constantly**
  15:20 95:21,22
**consulting**
  102:4,6
**consumer**
  163:21 164:3
**content**  139:24
  140:12 149:1,5
  149:6 150:12
  150:14,17
  151:13,22,24
  152:2,3,12
  159:9
**context**  152:4
**continue**  24:13
  26:5 65:5
  128:3 140:25
**continued**  2:21
  3:1 112:16
  136:22
**continues**
  90:25
**continuing**
  140:22
**continuum**
  59:5
**contraband**
  44:16
**contract**  38:3
**control**  140:23
  159:22 160:4
  160:11,12

  161:11
**controlled**
  159:11
**controlling**
  111:16
**controls**  158:22
  159:5,13,23
  160:3,16,18
  161:1,14 162:8
  167:17
**conversation**
  37:13,16 86:6
  138:18 142:11
  146:7
**conversations**
  7:20 25:25
  37:19 86:14,16
  86:18,19 88:7
  88:11 95:14,17
  139:10
**cookout**  97:2,5
**cool**  70:23
**coordinate**
  95:9 104:12
**coordinator**
  19:16,19 20:3
  21:1 24:4 38:2
**coordinators**
  38:14,22 50:13
**copies**  90:18
  137:6,24
**copy**  8:7
  148:16

CONFIDENTIAL

**[copying - darlington]**

copying 83:12
corner 60:24
corporal 15:13
  15:17 16:5,8
  16:18
corporate 6:14
correct 49:10
  50:6 53:6
  124:2,3 139:18
  171:12,15
  173:22 175:15
  177:8
corrections
  179:10
correctly
  163:21
costs 130:21
cotler 177:13
council 113:7,8
  113:11,13,16
  113:22 114:18
counsel 3:16
  5:15 49:6
  182:12
counseled
  173:23 174:2,7
  174:11,15,20
counseling 23:9
  99:2
counselor 23:3
  23:17 173:21
country 54:17
counts 23:5

county 1:7,13
  2:2 3:16 5:11
  6:14 19:7,11
  19:15 26:15,15
  27:12 34:10
  35:4 37:11
  39:18 40:1
  41:2,20 42:14
  43:20 44:1
  46:10 48:1,25
  49:12 50:7
  67:21 79:16
  80:11,21 82:7
  85:24 86:21
  87:9,23 88:2
  91:16 93:17
  94:5,6 97:12
  98:17 99:5
  102:13,17,21
  113:10,25
  116:3 121:23
  124:2,10
  130:15 145:11
  148:18 149:2
  149:12 150:6
  150:13,22,25
  151:3 157:14
  173:24 174:2,7
  174:11,15,20
  174:25 175:7
county's 4:18
  129:11 130:3
couple 25:2
  55:18 95:6

99:22 112:15
  113:20 120:6
  147:5 152:9,10
  156:20
course 12:22
  22:4 49:20
  78:19
court 1:1 5:12
  5:16
cover 50:11,15
  64:16
covid 21:18
  45:11 88:6,9
  88:11,12,12
  95:12,18 111:5
cpi 35:3
create 35:6
  38:5 60:17
  104:11 109:14
  115:4 134:5
  164:23 165:22
created 31:16
  78:24 79:9
  168:22
creating 25:19
  65:19
crime 102:22
crimes 93:24
crip 97:5
crips 91:5 96:6
critical 28:13
  56:7,9,11,12
  57:12,14 60:16
  76:24

crossing 99:23
crunch 96:4
culture 90:16
  105:19
cuomo 20:19
  21:14 25:12
  34:4
current 19:17
  152:17
currently 49:25
  90:19 91:2
curriculum 4:8
  8:3
curve 88:13
  92:20
custody 158:4
cv 1:8 8:8 9:14
cycle 42:7

**d**

d 4:1 5:1
d.c. 3:12
daily 43:7,9
  135:6
damage 59:18
  62:14
damages
  130:16 133:11
damaging
  110:20
dancing 110:20
darlington
  26:11

CONFIDENTIAL

**[data - detection]**                                                    Page 11

**data**  24:22 43:2
  59:16 101:5,8
  101:10,19,23
  102:8,10,24
  103:11,15,22
  173:4,7,11,14
  173:17 174:6
  174:10,14,19
**database**
  120:19
**date**  5:6 8:14
  180:23 181:23
  182:5
**dated**  4:9,12,14
  4:20 66:23
  67:11 82:20
  83:11 122:12
  123:1 143:25
  144:10
**daughter**
  162:18
**davis**  21:22
  22:1 25:25
**day**  15:21,24
  28:5 76:7
  83:15,18
  105:14,14
  110:15 114:21
  115:2,3 127:24
  153:24 154:1,8
  154:12 158:16
  158:19 179:16
**dc**  3:6

**de**  30:19,23
**deal**  30:23 31:1
  47:13 78:16
  98:7 107:21
  115:21 128:5
  141:20 142:2
**dealing**  88:5
  127:25 128:20
**december**
  158:2
**decided**  62:12
  64:9 96:9
**decision**  84:22
**declaration**
  179:4
**declare**  179:6
**declared**  15:2
**decriminalized**
  45:22
**deemed**  134:11
**deep**  141:11,11
**defend**  63:17
  63:17,21
**defendant**  2:15
**defendants**  2:7
  3:2,9 4:19
  129:12 130:4
  130:22,25
  131:6,20
**definitely**  36:18
  52:25 55:23
  142:15
**degrees**  11:6,11

**delivering**
  15:25
**demanding**
  110:4
**demise**  60:3
**denied**  51:2,5
  51:11
**department**
  7:10 10:16
  11:15,19,24
  12:1,4,20
  19:23,25 21:13
  23:20,23 25:6
  25:13 26:6
  27:8 29:21
  32:16 34:1,9
  34:14,19,20
  37:1 38:16,24
  51:13 100:16
  103:3 127:18
  132:10 134:11
  134:15,20
  147:7
**departments**
  103:5 149:9
**depending**  16:4
  69:10 70:1
  106:23
**depends**  73:1
  74:11,13 94:18
**deploy**  105:9
  106:22,23
**deployed**  14:15
  24:20,21 107:1

  107:23 108:12
**deponent**  5:13
  182:6,7,9
**deposed**  6:23
**deposition**  1:12
  5:8 7:16,19,25
  49:3,8 177:24
  179:1,7,11
  180:1 181:1
  182:4,8
**depositions**
  6:25 7:3
**deputy**  3:16
  47:23
**describe**  152:3
**described**
  58:17
**describing**
  65:14
**description**  4:7
**designed**  104:7
  105:12,15
**desist**  140:18
**desk**  63:5,9
  137:8 175:21
**desks**  59:14
  62:22
**despite**  122:6
**detected**
  145:14
**detection**  42:15
  42:19,24 43:4
  43:7,15,16,21
  48:7,10,19,22

CONFIDENTIAL

49:21 50:14
114:11,11
121:18
**detections**  43:1
**determine**
30:15 33:3
43:2 62:16
72:23 76:17,18
96:2 97:13
101:13 102:12
102:16,20
117:2 136:14
139:1,2 140:8
**determines**
44:19
**determining**
16:18 139:23
139:24
**develop**  38:3
59:24 60:6
**developed**
23:23
**device**  43:15,16
49:23 160:3,4
**devices**  42:15
43:4,7,21
48:11,22,24
49:21 50:4
121:18 171:18
172:3,10 173:5
173:9 176:6
**devote**  127:18
**dictates**  47:21

**differences**
56:24,25
**different**  13:12
15:18 19:24
74:13 84:10
87:22 91:2,2
91:23 92:3,9
120:1 121:10
149:8
**difficult**  140:7
140:24
**difficulties**  29:3
**diminishing**
32:1
**direct**  25:24
**directed**  84:14
**directing**  16:20
**direction**  60:15
**director**  144:17
145:11
**directors**  118:4
146:11,23
**disasters**  71:22
80:8
**disciplinary**
78:17 79:2,8
79:12 110:8
**discipline**
139:3
**disconnected**
29:7
**discontinue**
163:16 170:23

**discord**  143:10
143:11
**discuss**  128:16
**discussed**  34:1
48:11 50:4
53:5 73:20
83:14 93:5
114:15 123:24
124:19 145:11
145:23 167:18
**discussing**
29:20 112:24
145:20
**discussion**
28:24 114:16
161:25
**disorderly**
14:23,24 110:2
112:21
**disrupted**
105:13,24
**disruption**
110:2,10
**disruptive**
110:16
**dissect**  96:7
**distinctively**
85:17
**distributed**
77:20
**district**  1:1,1
5:12,13 13:9
14:12 20:11
22:3 24:6 28:4

37:7 40:20
49:15 76:7
88:22 99:1,1
149:8
**districts**  118:4
**divide**  54:13
**divided**  54:10
**division**  5:5
**document**  1:5
67:8 70:19
83:6,8,11
119:8 122:22
122:24 129:25
130:6,7 133:16
134:5 147:21
147:22 148:7
148:12 175:20
**documentation**
119:12,13
120:10
**documented**
78:14 139:17
**documents**
7:22 77:9 79:1
79:4 136:13
137:3,5,5,15,23
137:23 138:1
138:16,19
139:14
**doe**  63:25
**dog**  45:17,24
**dogs**  45:16
**doing**  10:9
11:25 24:13

CONFIDENTIAL

**[doing - emotion]**                                               Page 13

45:17,17 54:19
54:20,21 55:1
62:6 67:22
106:7 127:14
136:23 139:22
141:17 152:8
154:13 161:18
163:23 165:8
**doled** 78:18
**domestic** 73:3
**donoven** 1:12
4:8 5:13,19 6:9
8:4 85:1 92:25
145:7,10
177:21 179:21
180:24 181:24
**doom** 127:1
**door** 18:1 45:4
59:13,20 63:1
63:7 64:1,7,8
65:16 66:5
**doors** 124:9
**double** 97:8
**douglas** 36:19
37:18
**dr** 21:22 25:25
116:11 117:14
118:15,20
**draft** 78:2
**drafting** 79:4
**drill** 60:11 62:7
62:10,17 64:16
65:21,24 66:19
66:22

**drills** 38:5
53:25 55:21
58:20,22,24
60:12 61:8,16
61:17,18 62:6
62:15 64:5,15
64:25 65:3,5
66:1 67:23
69:18,19
114:16 121:16
**drive** 2:4 3:16
43:3
**driver** 99:15
**dropped** 155:9
**drove** 97:7
**drug** 45:17
**due** 30:20
**duly** 5:20 182:6
**duration** 84:17
**duties** 15:15
24:14 26:5
**duty** 16:21
**dynamic** 92:21
**dynamics**
90:10

**e**

**e** 4:1,5 5:1,1
**earlier** 6:2,13
11:7 18:22
29:25 53:5
77:4 96:13
103:2 131:10
134:2,3,8

137:7,25 141:2
167:18 171:10
173:20 175:20
**easily** 98:1,2
**east** 59:7,10
89:15 91:4
**eben** 2:10
**ed** 83:15,19
84:8 88:23
**edge** 97:25
**education** 1:6
4:17 5:11
83:22 84:1,6
89:6,7 129:11
130:3,15
**educational**
8:18 84:3
**edward** 144:11
144:13,15
**effectiveness**
41:22
**effort** 95:9
135:24
**efforts** 122:6
**eflaster** 2:13
**eight** 75:21,25
**either** 38:3
45:21 47:20
70:11 72:5
83:24 106:12
128:1 129:5
137:11 169:19
**elbowed** 112:9
112:12

**electronic**
171:17 172:3
173:5,9
**elementary**
26:12
**elements** 30:16
72:23
**elliot** 2:9
**ellis** 2:17
**else's** 134:2,3
**email** 4:20 83:9
83:11 86:11
87:11 88:18
90:17 91:11
92:24 119:14
119:15,23
120:9 137:4,14
137:23 138:1
143:25 144:10
144:12,19
145:5
**emails** 4:12
82:19 93:12,13
137:13,17,19
137:20,20,21
139:15
**embarrassing**
128:14
**emergency**
14:25 24:7
28:14 66:11,11
66:15,16
**emotion** 109:20

CONFIDENTIAL

**emotional**
65:13
**emotions** 98:6
**employees**
28:10 35:7
38:15
**employment**
9:13
**encapsulated**
52:17
**encountered**
82:3 98:15,18
98:20
**ended** 109:22
109:22,24,25
110:1
**enforce** 158:24
**enforcement**
6:21 7:1 8:19
10:11,18,20
22:9,15,17
26:3,21 27:4
28:20 30:2,11
30:13,17 35:10
45:15 47:9,13
47:16 58:3
74:1,4,7,19
76:15 82:3,11
93:9,16 94:13
94:23 95:2,10
110:18 111:16
112:4,14,18
146:12,17,19
146:21 147:13

148:5,11
**engage** 85:10
107:22 132:2
142:23
**ensures** 118:7
**entertainment**
91:4
**enthusiast**
153:5
**entire** 179:7
**entrance** 40:22
**entry** 42:21
60:13 132:17
**enumerated**
93:24
**environment**
13:6 84:3
**equipment**
58:2 59:3
**eric** 21:22 22:1
25:25
**erica** 83:13
88:19,19,21
89:2,24 90:8
**errata** 179:1,11
180:1 181:1
**error** 83:3
**escalate** 30:23
128:24
**escalated** 30:20
**escalates**
128:22
**escalating** 56:1

**escalation**
30:19 36:20
39:5
**especially**
47:11 68:11,16
**esq** 2:3,10,16
3:4,4,10
**est** 4:22 144:2
**estimate** 7:3
40:16 50:20
130:19
**et** 1:7
**ethel's** 18:2
**evacuate** 59:11
65:22,25
**evacuation**
63:12,14 65:21
65:24
**evaluating**
16:18 177:3
**evaluation**
16:17
**evaluations**
16:17
**evenings** 91:1
**event** 60:16
76:9 105:6
**events** 24:9
43:5,23 54:17
55:22,24 56:2
56:4 101:3
131:23 152:17
182:12

**everybody**
54:14 74:12
110:25 111:2
111:20 112:18
**evoke** 65:13
**exact** 43:13
118:21
**exactly** 87:3
136:8,10
139:22 167:3
**examination**
4:3 5:23 182:7
182:10
**examined** 5:20
**example**
175:21
**examples** 60:5
**except** 15:21
90:15 179:10
**excuse** 24:5
56:4 71:14
105:1
**executive's**
37:11
**exercise** 161:11
**exercised**
159:17
**exercises** 57:24
**exhibit** 3:15 4:8
4:9,12,14,17,20
8:3,7 66:23
67:4 82:19,25
122:12,18
126:1 129:10

CONFIDENTIAL

**[exhibit - filter]** Page 15

129:16 132:4,4 143:25 144:7
**existed** 35:15 104:14
**exists** 41:12
**exit** 60:10,13 60:22
**exits** 60:9
**expand** 19:22 21:17 39:16
**expansion** 21:5
**expenditures** 130:21
**experience** 69:14 93:15 100:2,4 176:8 176:11
**experienced** 56:5 69:6 86:1 105:3 175:7
**experiencing** 69:13 85:25 86:22
**expert** 88:25
**expertise** 30:15 86:8
**expires** 182:19
**explain** 73:17 86:20
**explaining** 59:15,16
**exponentially** 137:9

**express** 114:3
**expressed** 134:9
**expressly** 53:18 53:20
**expulsions** 84:16
**extended** 84:16
**extent** 48:4,14 49:2,4,13 75:2 110:3
**extra** 106:21
**eye** 107:10,11

**f**

**f** 2:7 144:24
**facebook** 2:7,7 2:7,8,8 131:13 131:15 142:14 150:7,13,18,21 164:21 165:5 165:11,14 166:4,5,6,24 167:1,5,10,12 167:15,20,21 169:20
**facilitate** 106:9 107:13
**fact** 35:8 49:7 108:6 157:10 159:7 160:6
**fairmount** 11:19

**fake** 128:14
**fall** 43:19 93:25 107:5
**falls** 35:1 42:3 76:25
**familiar** 36:22 67:16 91:8,10 100:15,20,22 104:1 113:6,9 120:7 123:7 131:3 143:11 149:1
**families** 89:11 100:8 128:17 149:7
**family** 159:13 160:2 165:9 166:17
**far** 105:17 113:11 152:12
**father** 90:2
**fathers** 89:12 89:13
**fbi** 12:11
**feature** 163:3 163:10,16 169:21 170:3 170:11,17,23
**federico** 2:3
**feed** 40:2,7
**feedback** 114:4 114:6,8
**feel** 4:15 105:7 106:11 122:14

123:3 161:20
**feeling** 101:2
**feet** 18:3
**felt** 27:7 35:8 35:17
**fentanyl** 45:25
**fi** 160:13,14
**field** 15:25 16:19
**fifth** 45:4
**fight** 62:17 63:17 64:15 75:15,18,21 76:9 78:13 79:22,25 105:1 142:5
**fighting** 60:2 90:7
**fights** 17:10 30:18 71:24 76:6 78:5,10 78:14 87:15,16 95:21 103:4,8 103:13,16,20 113:2 176:12 176:16
**figure** 85:8 90:4 95:22 115:10 135:20 136:20
**file** 59:14
**fill** 120:15
**filter** 97:14

CONFIDENTIAL

**[filtered - front]**                                                                   Page 16

| | | | |
|---|---|---|---|
| **filtered**  159:5 | **five**  17:16,17 | **forced**  115:17 | **forwarding** |
| **final**  109:25 | 17:18 32:8 | **foregoing** | 119:1 |
| **finally**  10:9 | 59:19 70:22 | 182:4,8 | **fought**  75:25 |
| **find**  48:2 51:23 | 96:1 120:22 | **foreseeable** | 76:5 |
| 51:25 78:7,11 | **fixed**  33:10 | 84:14 | **foundation** |
| 86:2 93:13 | **flaster**  2:10 | **forget**  144:16 | 81:7,24 122:10 |
| 126:12 135:1 | 177:14 | **forgetting** | 126:5,22 127:3 |
| 142:6 | **floaters**  33:7 | 166:5 | 127:11 156:9 |
| **finding**  128:1 | **flow**  106:17 | **form**  18:25 | 163:5,19 164:8 |
| **finish**  112:17 | **fluctuated** | 23:25 31:17 | 169:23 170:6 |
| **fire**  60:11,11 | 14:14 | 34:12 35:22 | 170:14,19,25 |
| **firearms**  22:10 | **focus**  12:15 | 44:3 46:3,6,13 | 171:7 172:5,22 |
| 22:15,16 | 36:6 64:19 | 79:17 81:6,23 | 175:3,11,17 |
| **fires**  71:21 | **focused**  161:21 | 120:8,9 122:9 | 176:20 177:7 |
| **firm**  6:3 | 177:1 | 123:21 125:18 | **founded**  107:4 |
| **first**  5:20 9:5 | **folks**  25:20 | 125:22 126:4 | **four**  96:1 |
| 9:13,25 10:10 | 31:22 34:24 | 126:21 127:2 | 119:25 154:21 |
| 10:11,19 14:18 | 35:3 41:24 | 127:10 133:17 | 155:6 |
| 14:22 15:15 | 52:20 58:15 | 139:17 156:8 | **frame**  43:12 |
| 24:14 35:5,25 | 74:25 87:12 | 163:4,18 164:7 | **frays**  30:19 |
| 39:18 53:12 | 109:13 135:13 | 169:22 170:5 | **freely**  53:14 |
| 62:10 65:1 | **follow**  86:13 | 170:13,18,24 | **frequency** |
| 68:3,5,15 | 93:7 140:20 | 171:6 172:4,20 | 80:16 |
| 72:12 83:9 | **followed**  86:4 | 175:2,10,16 | **frequent**  18:11 |
| 88:19,21 90:17 | **following**  60:15 | 176:19 177:6 | 93:12 152:7 |
| 92:20,24 95:5 | 91:1 | **formal**  23:7 | **frequently**  15:7 |
| 95:6 114:12 | **follows**  5:21 | **format**  120:12 | 154:19 167:23 |
| 130:2 142:15 | **footage**  41:3,5 | **former**  85:15 | 167:24 |
| 142:16 146:9 | 41:12 | **forms**  77:9 | **friend**  98:2 |
| 149:20 158:3,7 | **force**  9:14,17 | 116:12,14 | 117:11 |
| 159:5 160:7 | 9:24 10:1,14 | **forth**  140:3 | **friends**  115:17 |
| 172:9 | 12:23 16:25 | 142:24 | 165:8 166:17 |
| **fiscal**  132:23 | 17:2 | **forward**  117:13 | **front**  18:1 |
| | | 118:14 | 50:19 51:8 |

CONFIDENTIAL

**[front - governor's]**                                                    Page 17

63:7 64:8
101:12,13
**fulfill** 41:6
**fulfilling** 26:5
**full** 14:10 53:25
53:25 62:7
68:3,5 138:22
**fully** 54:14,16
55:15 101:7
**fun** 152:15,16
**function** 163:3
169:21 170:3
170:11,17,23
**fund** 50:25
**funding** 37:14
50:5,13 51:6
51:11,14 52:22
**funds** 51:2
**further** 66:18
96:7 119:2,6
131:25 177:9
182:11
**future** 43:3
84:15 124:25

**g**

**g** 5:1
**game** 85:20,21
86:5
**gang** 4:12
80:11,14,18,24
81:5,9,15,21
82:4,13,20
83:15 84:15

85:1,9,12 86:9
87:21 88:6
92:21 93:1,2
93:18 94:16
95:3,11,15
96:10,16 97:5
**gangs** 80:22
82:8 87:18,22
88:1,11 89:10
91:2,9,10
92:14 94:10
96:20
**general** 3:16
44:5 149:7
**generally** 87:16
92:8 172:3,7
172:14
**generate** 76:21
76:23,23,24
134:4
**getting** 21:18
39:14,14 57:7
60:14 74:1
87:12 90:15
99:23 147:4
159:21
**give** 9:23 32:2
47:10 58:12
60:5 66:2
89:24 90:9
129:19 146:23
148:5 150:1
**given** 6:18 7:5
7:15 14:15

28:5 47:11
64:16 66:7
78:6,10,10
79:22 80:17
177:21
**giving** 89:2,5,8
**gloom** 127:1
**go** 14:19 33:20
33:20,21 43:11
46:1,11 49:5
52:22 59:4
65:18 66:13
67:7 75:18,23
76:15 79:21
82:17 83:7
84:12 105:15
112:8 116:9,18
117:3 121:10
122:21 130:12
134:25 139:1,2
140:10,10
141:10 150:21
159:6,6,8,12,12
161:22 165:3
167:21 168:11
**goal** 122:1
**goals** 61:7
**goes** 48:5,14
49:3 91:18
**going** 8:6 24:12
26:4,10 28:16
29:5,9,15,23
31:25 33:20,20
33:21 41:23

42:2,9 43:2
45:4 54:22,25
55:1 59:19
62:16 66:4,5,5
66:6,15 67:3
70:11,12,24
71:5,16,20
72:24 73:6
74:5,18,24
75:4,5,8 76:1
82:24 88:4
92:24 93:13
94:9,19 96:9
97:14 110:15
120:11,25
121:6 122:17
128:15 129:15
132:4 138:20
138:21,21
139:1,2,5,25
140:1 144:6
159:3,3 162:6
164:12,18
167:19 177:18
**golkow** 5:5
**good** 5:25 6:1
120:24 159:18
165:18
**google** 3:2 6:5
164:6 177:22
**gotten** 45:15
140:20
**governor's**
118:3

CONFIDENTIAL

**[grab - hayden]**                                         Page 18

**grab**  63:5

**graduated**  88:17

**grant**  51:13 52:4

**grants**  51:17 53:3

**grasp**  35:16

**great**  127:20

**greater**  39:9 91:18

**grew**  25:5 89:18 110:12 110:12

**grief**  98:16 100:5

**grieving**  97:24 98:11 99:2

**ground**  52:20

**grounds**  85:10

**group**  96:4,8 107:21 109:2 113:19 118:2

**groupme**  143:16,18,19 143:19,19,20

**groups**  95:19 95:24

**groupthink**  109:12,15

**grow**  27:7

**grown**  50:18

**growth**  19:24 31:19 50:21

**guarantee**  122:7

**guard**  10:2

**guess**  9:7 69:25 89:16 90:16 108:22

**guidance**  15:16

**gun**  17:12,23 18:6,7,13,16 56:5 62:13 65:16 81:20 96:15,19

**gunfire**  59:6

**gunman**  59:9

**guns**  58:1 59:2

**guy**  86:3 99:18 168:13

**guys**  154:24

**h**

**h**  4:5

**half**  57:22 159:7,17 161:1

**halfway**  124:4 145:6

**hallway**  40:13 40:15,17 63:2 63:13 66:12

**hallways**  40:11 40:17 66:16

**hand**  182:13

**handle**  68:14

**handled**  20:11

**handles**  75:4

**handling**  116:4 177:4

**hands**  106:8

**happen**  59:25 76:6 110:6 123:15

**happened**  11:8 11:9 75:19 79:22 90:12,14 97:16 99:16 108:19,21 146:6 166:5

**happening**  35:16 88:12 101:3 117:6,7 117:9

**happens**  61:24 116:24

**harassed**  117:12 137:11

**harassment**  75:3 116:9,12 116:14

**hardy**  2:11

**harford**  1:6,13 2:2 3:16 4:10 4:15,18 5:11 6:14 19:7,11 19:15 26:15 27:12 34:10,10 35:4 39:18 40:1 41:2,20 42:14 43:19

44:1 46:10 48:1,25,25 49:12 50:7 66:24 67:12,21 79:16 80:11,21 82:7 85:24 86:21 87:9,23 88:2 91:16 93:17 97:12 98:17 99:5 102:13,17,21 113:10,24 116:3 121:23 122:13 123:2 124:2,10 129:11 130:3 130:15 145:10 148:18 149:2 149:12 150:6 150:13,22,25 151:3 157:14 173:23 174:2,7 174:11,15,20 174:24 175:6

**harford's**  123:15

**harm**  60:17 71:18

**harm's**  108:10

**harmed**  53:24

**harris**  88:19,20 88:21 95:19

**hayden**  5:17 182:2,17

CONFIDENTIAL

**[hcps - identification]**                                    Page 19

**hcps** 4:13,16,22 82:21 83:6,6 122:14 123:4 144:3 150:21
**he'll** 161:22
**head** 51:9,19 51:22 72:16 128:20
**heading** 26:11 26:11
**heads** 118:24
**health** 4:10 14:25 15:2,6 23:2,9 38:2,14 66:24 67:13 174:12 175:8
**health's** 100:16
**healthcare** 23:14
**hear** 59:6 162:12
**heard** 100:19 143:4,14,20
**heaviest** 63:6
**heavily** 69:8,9
**heights** 11:19
**held** 5:8 9:21 100:10,11,14
**help** 35:18 50:15 60:5 61:8,18 62:1 76:10 89:15 104:8 105:18 106:3,9,11

107:24 134:4,4 156:6,10 166:3
**helping** 70:15 105:22 106:16
**helps** 116:11
**hennigan** 34:17 83:12
**hennigan's** 34:16,20 52:16 74:25
**hereof** 179:12
**heretofore** 33:5
**hey** 42:8 66:3 117:4 147:3
**hickory** 1:15 5:9
**hide** 62:17 64:15
**high** 9:9 26:14 27:16,18,21 42:21 43:6,15 89:12 155:15 155:16 157:19 158:15 162:4,6 162:7,9,19,23 163:1
**higher** 27:2 96:14
**highlight** 121:20
**hire** 33:19 34:5 35:7 39:2
**hired** 12:14 21:6 35:5

36:25 38:2,22 38:25
**hiring** 33:14,22 37:3 50:11
**histories** 84:15
**history** 9:13
**hit** 60:23 99:22 99:25
**hite** 85:16
**hold** 15:12 16:7 16:10
**holdings** 2:7
**home** 10:15 46:1,2,11,11,18 46:24 47:2,14 155:13
**homework** 157:7,10,11 161:21
**honest** 89:1 92:17
**honor** 10:1
**hoods** 110:21
**hoping** 84:25 87:5 92:25
**hopkins** 8:24 9:2
**hospital** 15:3 112:9,13
**hot** 114:17
**hotline** 116:25 117:18 118:13 119:22 121:15

**hour** 16:21,22 26:16 57:22 110:14 154:3
**hours** 115:3 126:14 158:16 158:19,21 177:23
**house** 10:3 18:2
**hr** 25:20
**huge** 88:13 92:19 105:1
**huh** 29:8 68:9 68:18,25 73:21 75:16 77:5 79:23 132:6,8 132:11,19,25 134:13 136:3 151:12
**human** 73:15 74:17 80:10 121:11
**hun** 169:24
**hurricane** 57:1

**i**

**idea** 25:21 39:20 143:2
**ideas** 85:1,12 87:4 93:1 113:25 114:10
**identification** 8:4 67:1 82:22 122:15 129:13 144:4

CONFIDENTIAL

**identified** 85:9

**identify** 48:12
49:1,24,25
52:3 95:10,15

**illegal** 74:20

**illinois** 2:18

**images** 138:2,5

**imagine** 78:16
84:10 102:3

**immediate** 37:4
37:12,17 47:22

**immediately**
36:1 62:3 74:1
74:2

**impact** 68:24
97:24

**impacted** 18:12
68:23 69:4,7

**impacting**
117:8

**impasse** 90:5

**implement** 93:2
162:8

**implemented**
37:23,25
121:22

**important**
61:20 70:3

**impossibilities**
115:12

**improve**
113:24

**inappropriately**
109:1

**inception** 33:24

**incident** 24:8
28:4,14 30:7,8
30:16 73:18
76:12 77:15,17
79:16,19 94:14
97:11 104:25
105:2,2,5
108:21 123:14

**incidents** 17:6
17:9,11 18:21
26:19,20 28:3
28:6,12 41:7
56:13 70:10
71:9,12,15
72:5,14 73:10
73:15 74:13
75:9,13 76:22
76:24 96:22
101:3,4 103:4
107:7 111:7
113:2 116:4
124:1 147:20
148:1 177:2

**incite** 65:13

**include** 4:10
56:3,4 66:24
67:12 71:21
72:1,17 73:3,7
119:15,17
147:16

**included** 88:7
148:6 153:19
157:11

**includes** 32:16
71:24 74:8
101:19 124:18

**including** 50:3
80:8 91:23
96:15,19
101:20 113:1
121:11,15

**incoming**
159:15

**increase** 25:4
35:19 41:21
70:10 81:9

**increased**
19:23 50:10,14
85:2

**increases** 81:5
81:12,21

**increasing**
37:17

**independent**
96:8

**independently**
103:3,7,10

**indiana** 85:23

**indicated**
179:11

**individual**
33:12 82:15
140:9

**inform** 94:17
94:18,20

**information**
8:15 24:22

46:16,20,22
47:10 51:18,24
52:1,3,15
73:23 74:4,9,9
76:13,20 77:19
78:1,7,11,15,20
78:25 80:4,16
80:18 82:8,10
86:5 89:1
94:22 96:11
101:25 102:1,3
102:4 118:5,6
118:10 119:1
119:20 120:14
128:15 136:18
137:2,2 139:16
147:4,9 148:4
148:5 149:6,7
149:9 150:5

**informed** 95:2

**infractions**
30:14

**infrequent**
18:11

**ingoglia** 2:16

**initial** 54:3
58:19

**initially** 32:7
35:5

**initiatives** 51:3
51:5

**injected** 109:18

**injured** 53:24

CONFIDENTIAL

**[injury - items]** Page 21

**injury** 1:3 179:3
**inside** 14:15 20:6 52:20 57:4 79:25 104:25 105:12 112:16 115:22 142:1,4
**insight** 90:11
**instagram** 2:8 131:14,14 142:19 151:1 165:20,24 166:2,11,14,16 168:15,18,20 168:23,25 169:4,7,9,11 170:2,8
**install** 39:19
**instance** 161:7
**instances** 107:1 108:13 157:6
**instructing** 22:13
**instruction** 22:14,15 60:15 65:7
**instructor** 22:6 22:8,10,11,16
**intel** 146:16,18
**intelligence** 94:14
**intended** 152:18

**intents** 33:9
**interest** 36:20
**interested** 36:10,15 182:12
**internal** 109:20
**international** 10:5
**internet** 127:15
**interpersonal** 128:6
**interrogatories** 4:19 129:12 130:5
**interrogatory** 130:13
**intersection** 89:21
**intervene** 75:19
**intervention** 15:2 26:21,22 27:1 28:20,21 28:22 30:2,3,4 31:5 39:6 85:2 85:12 93:1,3
**interventions** 28:22 30:4
**interview** 33:15 156:21
**interviews** 156:23
**introduced** 131:9

**investigate** 46:18,25 47:7 135:1
**investigated** 109:2
**investigating** 133:23 134:24 138:8 147:5,7
**investigation** 47:22 94:19 119:3,7
**investigations** 136:23
**investigative** 41:13
**investment** 152:25 153:10 154:4,22
**invited** 129:6
**invoke** 65:13
**invoked** 109:19
**involve** 108:14 111:18 138:20 176:17
**involved** 23:7 26:25 27:4 30:13 33:22 71:17 73:1,25 74:1 84:7 86:1 86:24 89:9 90:16 93:18 94:4,15 95:11 96:20 97:10,13 97:17 101:4

110:18 111:16 112:5 138:23 139:6,23 141:16 167:9
**involvement** 84:21 87:18 95:3 176:6
**involves** 75:3 141:10
**involving** 72:9 72:15 73:11,15 74:16,21 81:5 81:15,21 96:15 96:18 111:7
**irritation** 30:21
**issue** 54:10 107:17 108:11 136:21,21 145:20 146:7 159:19
**issues** 29:19 107:19 127:19 133:13,21 135:11,18 136:6,9,15,20 139:21 141:13 141:14,15,15 141:21 142:2 147:15 174:12 176:17
**italy** 10:5
**items** 15:25 44:21 50:15

CONFIDENTIAL

**[ix - know]** Page 22

| ix  75:5 | 147:12 | 92:21 106:9,15 | 65:24 66:14,21 |
|---|---|---|---|
| **j** | **k** | 107:11 175:8 | 66:21 69:9 |
| **j**  3:4 | **k**  2:7 13:7 | **king**  3:11 | 71:16 74:20,24 |
| **jackson**  3:10 | 22:23 | **kirkland**  2:17 | 75:1 78:5,8,9 |
| 177:15 | **kai**  162:5 | **kirkland.com** | 78:13 80:3 |
| **jacob**  3:15 | **katrina**  3:10 | 2:19 | 82:14 83:18 |
| **january**  4:21 | **kbe**  91:3 | **kjackson**  3:13 | 84:8 85:6,25 |
| 17:3 19:10 | **keep**  79:14,18 | **klein**  99:19 | 85:25 86:10,13 |
| 67:12 144:2,10 | 103:7,10 | **knew**  60:21,21 | 86:14,21,24 |
| **jillian**  148:25 | 107:10,11 | 63:2 135:23 | 87:3,4,11,22 |
| 150:10 | 115:6 166:16 | **knocked** | 88:1,4 89:15 |
| **job**  9:4,5,7 20:4 | **keeping**  122:4 | 106:17 | 90:13,14,15,21 |
| 20:9 97:11 | 177:2 | **know**  12:20 | 92:6,11,13 |
| **john**  63:25 | **keeps**  61:2 | 15:21,21 17:14 | 94:4,8 95:20 |
| 117:5 | **kept**  103:5 | 18:1,7,9 20:8 | 95:25 96:3,3 |
| **johns**  8:24 9:2 | **keyes**  3:4 6:5 | 23:4 24:3,13 | 97:17,18 98:2 |
| **joined**  6:4 | 29:6 | 24:15 25:1,3 | 98:21 99:9,15 |
| 10:15 14:18 | **kid**  64:6 99:13 | 28:13,15 30:15 | 100:5,6,7 |
| 23:24 27:10 | 99:14,17,24 | 30:18 31:25 | 106:1,4,4 |
| 29:22 35:4 | **kid's**  89:23 | 35:14,18 36:6 | 107:12 108:8 |
| 39:22 50:7,18 | **kidney**  112:10 | 37:19 40:14 | 108:10,11,13 |
| 121:23 | 112:11 | 41:11,18 42:1 | 109:5,19,23 |
| **joining**  27:17 | **kids**  60:13 | 42:3,8 45:19 | 110:19 114:13 |
| 27:19 | 66:21 89:17,19 | 45:22 47:24,24 | 114:22,25 |
| **jones**  63:6 | 91:4 96:1,9 | 50:14,17 51:18 | 115:4,13,15,16 |
| **joppatowne** | 99:20,22 | 51:21,22 52:23 | 116:10,11,11 |
| 26:14 42:21 | 110:19,23 | 52:23 53:14,24 | 118:21 120:3,3 |
| 43:6,15 | 142:16 | 54:8,9,20 55:7 | 120:4,19,21 |
| **july**  96:25 97:1 | **killed**  97:9 | 55:8 56:18,19 | 124:10 127:17 |
| **jurisdiction** | 100:1 | 57:7 58:1,2 | 130:25 131:6 |
| 146:24 | **kind**  76:11 | 60:10,13 61:4 | 133:8 135:20 |
| **jurisdictions** | 86:15,20 87:2 | 61:15,21 62:2 | 139:25 140:14 |
| 146:14 147:11 | 89:7 90:8 | 63:10,24,25 | 140:17,19,20 |
| | | 64:1,1,6 65:12 | 140:25 141:20 |

CONFIDENTIAL

**[know - levels]** Page 23

141:25 142:20
143:3,7,8
144:13,20,23
144:23 145:18
149:14,18,21
150:9,19,19,24
151:2,5 152:1
152:8,15
154:10 155:6
155:18,21,24
156:14,17,19
156:24 157:1
158:4,6 160:9
167:1,3,5,10
168:9,16,22,25
169:3,16,19
**knowing** 26:18
**knowledge**
48:17
**known** 83:14
84:15 145:12
145:24
**knows** 90:14
**kslaw.com** 3:13

**l**

**lader** 148:25
150:10
**lady** 112:7
114:23
**lake** 2:4
**land** 35:17
**landscape** 70:9

**large** 110:10,13
111:11 113:2
127:20
**laura** 68:13
**lauren** 3:16
**law** 6:21 7:1
8:19 10:10,17
10:19 22:9,14
22:16 26:3,21
27:4 28:20
30:2,11,13,14
30:17 31:25
35:10 44:18
45:14 47:9,12
47:16 53:10,12
54:3 58:3
65:17 73:24
74:1,4,6,18,20
76:15 82:3,10
93:9,15,22
94:13,23 95:2
95:10 110:17
111:16 112:4
112:14,18
146:12,16,19
146:20 147:13
148:4,11
**lawbmf.com**
2:5
**laws** 45:19,23
65:4
**lawsuit** 7:12
131:4,7,17,20
131:22

**lawyers** 7:25
**lay** 35:16
**layer** 31:3
129:8
**lead** 138:22
**leadership** 8:24
**leagues** 89:18
89:19
**learn** 36:23
37:24 38:12
53:6 57:15
77:16,18,18
82:8 93:16
117:22 118:8
**learned** 82:9,10
146:18 148:9
**learning** 88:13
92:19 126:13
**leave** 17:1
32:23 66:6
**leaving** 10:13
**led** 46:16,22
103:8
**left** 10:4 19:8
29:20,23
112:15 134:8
**legg** 2:3 18:25
19:2 23:25
29:2,5 31:17
34:12 35:22
44:3 46:3,6,13
47:18 48:4,14
49:2,9,11
70:21,23 79:17

81:6,13,17,23
120:24 122:9
123:21 125:18
125:22 126:4
126:21 127:2
127:10 133:17
156:8 163:4,12
163:18 164:7
169:22 170:5
170:13,18,24
171:6 172:4,15
172:20,22
173:1 175:2,10
175:16 176:19
177:6,16
**legislation** 53:8
53:16 55:19
**legislator** 58:14
**legislators** 36:9
55:5
**legislature**
54:24 55:4
56:17
**lenient** 45:23
**lens** 114:1
**lesser** 75:2
**lesson** 89:3,7
**letting** 62:1
**level** 9:6 26:20
30:11 31:5
39:6 88:11
111:8,9 116:6
**levels** 26:9

CONFIDENTIAL

**[liability - lots]**

**liability** 1:4 179:3
**liaise** 35:11
**liaison** 24:19 31:20 33:4 44:24 75:22,23 76:3
**liaisons** 21:19 24:20 25:16 31:8 32:18,20 35:6 39:1 50:12 75:18 104:5 106:13 106:22 112:8 121:13
**life** 60:16 61:15 61:15,19 63:17 70:16 104:24 105:4
**lifecycle** 42:4 42:11
**light** 109:6
**lights** 66:6
**limit** 158:24
**limits** 169:6
**line** 15:15 26:13,15 50:15 101:6 117:5 119:11,23 130:18 134:7 180:2,5,8,11,14 180:17,20 181:2,5,8,11,14 181:17,20

**lines** 68:21
**link** 157:13
**links** 157:10
**list** 9:23 74:12 144:11 146:10
**listed** 9:14 11:6 18:21 95:20
**listen** 153:12 154:16,20 156:15
**listening** 154:9 154:14,23
**lists** 8:17 133:5
**literally** 20:10
**litigation** 1:4 179:3
**little** 15:18 26:24 27:2 76:10 89:18 129:2 140:6 141:3,6 161:3 161:4
**live** 40:2,7 43:12 162:10 162:13
**lives** 100:7 107:9,14
**living** 155:12
**llc** 2:3,7,8,8,8 3:2,3,9
**llp** 2:11,17 3:5 3:11
**load** 106:8 156:1

**loaded** 156:3
**local** 123:13
**location** 75:18 76:19 182:5
**lock** 57:3 59:13 66:5
**lockdown** 56:10,15,21 58:12 66:1,4,4 66:13,19,21 88:14
**locked** 56:10 66:17 88:15,16
**locker** 44:20
**lockers** 45:9
**locking** 18:8 56:13
**log** 151:10,12
**long** 10:25 34:24 70:21 83:24 117:17 139:24 140:1 144:11 146:10 165:7
**look** 26:1 33:14 38:7,8 41:11 42:2 52:4,5,10 53:17 56:8 57:20 58:22 60:4 62:7 63:14,19 64:12 65:8,10,15 79:21,24 83:7 90:1 105:23

136:13 137:15 142:7 150:3 161:15
**looked** 24:16 56:10 57:21 64:5 137:13 175:20
**looking** 24:23 42:20 70:9 135:5 165:16 165:18 171:21 172:19
**looks** 29:2 59:22 60:19 62:23 106:15 117:7 120:18
**lose** 12:2,5,16 97:22
**loss** 98:1,12,16 104:24 105:4
**losses** 100:3,5
**lost** 96:24 99:5 99:13,14,16,18 99:20,22 100:7 107:13 130:20
**lot** 12:7,8 14:24 36:7 45:14,18 45:19 82:3 86:4 88:5,10 88:10 93:10,12 96:10 109:20 114:16 135:1,2
**lots** 14:24,24,24 18:15

CONFIDENTIAL

**[loud - media]**                                                    Page 25

| | | | |
|---|---|---|---|
| **loud** 53:22,22 | 159:14,15 | 144:3,7 | 36:1 44:5 45:3 |
| **lweiant** 3:7 | 161:9 175:14 | **market** 2:12 | 45:18 56:24 |
| **lydia** 3:4 6:3 | **makes** 116:8 | 153:1 154:9,10 | 57:25 72:24 |
| **m** | 118:3,10 | **maryland** 1:16 | 73:13,17 74:15 |
| **made** 25:3,4 | **making** 50:23 | 2:4 5:9 12:2,14 | 75:12,13 77:19 |
| 47:5 76:18 | 63:2 115:14 | 22:12 36:23 | 83:25 87:10,16 |
| 78:18 94:1 | 128:10,12 | 38:12 44:18 | 92:17 109:8 |
| 147:21,23 | 142:16 149:23 | 53:5 57:15 | 112:2 116:1,17 |
| 148:3,8 149:21 | 175:24 | 77:1 93:22,22 | 128:18 143:12 |
| 175:24 176:2,9 | **male** 110:7 | 100:15 116:23 | **meaning** 94:2 |
| 182:7,10 | **manage** 52:19 | 117:4,21,22,23 | 152:4 |
| **magnified** 36:7 | 120:20 | 118:8,9 119:11 | **means** 66:5 |
| **maine** 3:5 | **managed** 52:9 | 144:18,23 | 137:14 |
| **maintain** 104:9 | 52:18 | 145:2,21 146:1 | **meant** 61:18 |
| 105:19 106:16 | **management** | 182:3,18 | 87:3 |
| 119:11 | 8:23 9:2 | **masks** 111:15 | **measure** 38:1 |
| **maintained** | **manager** | 111:21,25 | **measurement** |
| 118:11 | 120:15 | 112:1 | 80:15,20 |
| **maintaining** | **mandalas** 2:3 | **master** 9:1 | **measures** 24:7 |
| 150:4 | **mandated** | **matrix** 76:25 | 35:20,24,24 |
| **major** 76:24 | 12:13 | **matter** 5:10 7:6 | 36:3,6,7,21 |
| 104:10,15,20 | **mandates** | 56:14 61:23 | 37:23 48:12 |
| 104:25 105:1 | 38:12 118:7,9 | 120:12,17 | 50:3 52:18 |
| 105:21 108:17 | **manpower** | 179:8 | 61:19 124:19 |
| 168:12 | 19:23 25:4 | **matters** 177:4 | 128:23 |
| **majority** 33:2 | 37:17 76:6 | **matthew** 2:3 | **measuring** |
| **make** 38:23 | **marijuana** | **mayor** 7:13 | 133:12 |
| 63:9 73:24 | 45:16 | **mcfss** 4:21 | **mechanisms** |
| 75:8 93:10 | **mark** 2:9 | 144:1,20,21 | 58:7 |
| 98:4 106:1 | **marked** 8:4,7 | **md** 1:4 | **media** 1:3 5:10 |
| 108:7,8 109:9 | 66:25 67:4 | **mdl** 1:3 5:10 | 103:13,16,19 |
| 125:15,20 | 82:21,25 | **mean** 9:10 | 103:23 112:3 |
| 128:13,23 | 122:15,18 | 14:14,22 22:8 | 115:4,18 126:2 |
| | 129:13,16 | 26:7,8 31:4 | 126:14,17,25 |

CONFIDENTIAL

**[media - morning]**                                                   Page 26

127:19 128:2,4
128:8,10,11,12
128:13,13,16
130:17 131:25
132:1 133:14
133:23 135:2,7
135:12,25
136:6,11,15,23
138:11 139:12
139:21,24
141:5,23
142:10,12
145:12,24
147:15,16,20
148:1,8 173:12
173:15,18,24
174:4,8,22,25
175:9 176:9,13
176:17,18,22
177:4 179:2
**mediate**  76:2
  140:14
**medical**  66:10
  66:15
**meet**  129:6
**meeting**  112:18
  115:8 146:16
  146:18
**meetings**
  113:22 114:3,5
  114:7
**member**  4:13
  33:16,17 82:20
  94:9 97:4

104:24
**members**  21:12
  58:6 80:22
  82:7,13 83:15
  84:15 85:9
  86:9 92:14
  95:15 96:20
  97:6 105:9
  106:12 111:19
  111:22 135:10
  136:5 148:2
  165:9
**memorials**
  100:9,11,13
**memory**  59:24
**mental**  4:10
  14:25 15:2,6
  23:2,9 38:2,14
  66:24 67:13
  174:12 175:8
**mentioned**  17:5
  26:2 28:19
  30:1 31:10
  38:15 39:17
  64:14 77:3
  79:1 87:8
  106:25 112:4
  112:25
**merely**  47:1
**merit**  182:2,17
**mess**  109:23
  110:22
**message**  176:3

**messages**
  140:21 142:17
  145:14,25
  146:8
**met**  6:2 25:1
**meta**  1:7 2:7
  5:11 177:14
**mic**  155:9
**middle**  17:25
  27:16,18,21
  61:1
**mike**  63:5
**miles**  26:12
**military**  24:11
  26:3
**mind**  24:14
  64:11
**mindset**  59:15
  59:16 60:14
**mine**  161:17
**minimum**  52:6
  52:12,13
**minor**  30:19,19
**minute**  120:22
  168:18
**minutes**  57:22
  59:19 70:22
  133:16 154:2
  165:7 177:23
**mismanagem...**
  12:7
**missed**  105:25
**mitigating**  86:8
  134:24

**mlegg**  2:5
**mobile**  159:12
  159:25 160:17
  167:18
**modes**  120:1,2
**modifications**
  106:2
**modify**  163:2
  169:20 170:2
  170:10,16
**mom**  99:14
  158:6
**moment**  67:7
  83:7 122:21
  129:19
**money**  45:20
  134:9
**monitor**  91:25
  92:5,10 127:14
  160:18 167:12
  167:22 168:3,7
  169:9
**monitored**
  167:14 168:2,5
  169:11
**monitoring**
  167:23
**month**  166:7
**months**  9:19
  86:25 92:20
  112:11
**morning**  5:25
  6:1,13,17 18:8
  42:22

CONFIDENTIAL

**[mother - oath]**                                                              Page 27

| | | | |
|---|---|---|---|
| **mother** 156:11 | 62:21 66:8 | 138:21,21 | **notification** |
| **motor** 59:24 | 76:8 84:2 | 143:4 159:19 | 74:12 |
| 60:8,8 | 94:10 135:14 | 168:12 | **notifications** |
| **move** 64:7 | 141:10 | **new** 34:5 37:1,3 | 73:24 75:8 |
| **moved** 112:16 | **need** 17:22 26:9 | 41:20 50:24 | 76:17 |
| **moving** 66:16 | 28:20 30:2,3 | 55:19 145:10 | **notify** 47:9 |
| **multiple** 26:9 | 30:15 36:2 | **newer** 42:1,7 | 72:24 74:18,22 |
| **music** 142:19 | 39:8,9,11 | 42:12 | 75:4,6 93:16 |
| 153:12,13 | 41:11 49:17 | **news** 4:9 66:23 | 93:25 94:8 |
| 154:17,20 | 66:17,21 73:16 | 67:11 112:2 | **notifying** 74:25 |
| 156:15 | 76:18 97:20 | 123:1 | **november** |
| **mutual** 140:2 | 105:7,7,16 | **nexus** 47:12 | 43:12 91:21 |
| **n** | 106:24 107:12 | 128:7,9 | **nuances** 57:9 |
| **n** 4:1 5:1 | 111:25 127:13 | **nice** 165:16 | **number** 4:7 |
| **name** 5:4 6:2,7 | **needed** 16:19 | **night** 47:20 | 13:4 51:7 |
| 20:18 34:7 | 24:9 27:1,4,7 | 94:5 97:6 | 65:22 78:15 |
| 95:24,25 143:5 | 31:15 32:2 | 112:17 | 84:10 91:18,22 |
| **named** 7:12 | 54:10,11 86:20 | **nights** 90:19 | 93:24 102:25 |
| **naples** 10:5 | 97:17 | 91:2,5,20 | 120:5 123:12 |
| **national** 107:17 | **needing** 15:2 | **nine** 9:16,19 | 130:13 133:8 |
| 108:2,3 | **needs** 15:25 | **nobody's** 59:21 | 135:9 136:1 |
| **nato** 10:4 | 28:11,13 31:24 | **noises** 53:22 | 137:13 139:9,9 |
| **natural** 71:22 | 47:22 50:16 | **normal** 105:14 | 141:17 159:14 |
| 80:8 | 76:15 94:3 | 106:17 107:21 | **numbers** 102:5 |
| **nature** 37:9 | 117:3 | **northern** 1:1 | 102:6 |
| 47:21 74:16 | **neither** 182:11 | 5:12 | **numerous** |
| **near** 110:14 | **nerf** 58:1 59:1 | **notary** 182:3 | 25:25 |
| **nearest** 60:13 | 59:2 | 182:18 | **nurse** 23:12 |
| **necessarily** | **neutralize** | **note** 61:20 | **nw** 3:11 |
| 26:21 27:3 | 63:21 | **noted** 5:15 | **o** |
| 28:12 30:10,22 | **never** 23:1 | **notes** 4:21 | **o** 5:1 |
| 31:5 52:9 54:8 | 60:21,21 82:16 | 144:1,20 | **oath** 6:11,18 |
| 58:12 59:23,24 | 86:3 89:17 | **notice** 66:3,18 | 7:15 179:13 |
| | 114:21 115:7 | | |

CONFIDENTIAL

**[object - options]**                                                              Page 28

**object** 47:18 48:14 49:2 125:18
**objecting** 49:13
**objection** 18:25 23:25 31:17 34:12 35:22 44:3 46:3,6,13 48:4 79:17 81:6,17,23 122:9 123:21 125:22 126:4 126:21 127:2 127:10 133:17 156:8 163:4,18 164:7 169:22 170:5,13,18,24 171:6 172:4,20 175:2,10,16 176:19 177:6
**objections** 4:18 129:11 130:4 163:12 172:15 173:1 182:7,9
**occur** 56:2 138:9 176:5
**occurred** 43:17 54:18 78:6 79:25
**occurring** 72:17
**occurs** 105:6
**october** 43:12 83:12

**offense** 93:20 93:21 94:2,3,7 94:13,24 95:4
**offenses** 59:17
**offer** 179:12
**offhand** 101:18
**office** 13:13 20:10,12,14 21:6 24:4 34:15,16,21 35:1,1,2 37:11 46:8 52:9,16 52:19,24 53:1 53:3,3 66:3 74:25 86:15 99:3 116:10 118:3 133:13 133:21 146:13 147:2 148:16 148:22,23 150:11
**officer** 6:22 7:1 7:9 13:2,19,22 13:25 14:3 16:6 23:5 31:6
**officers** 13:3,17 15:19,22,24 16:1,16,17,19 16:22 27:11,15 27:21,25 47:15 121:12
**offices** 52:7 101:9 149:9

**officials** 44:9 123:13
**oftentimes** 18:5
**oh** 9:9 12:20 29:4 51:25 52:13 60:20 84:7 89:25 106:20 150:24 152:7 155:10 165:18 176:25
**okay** 8:2,14 9:12,16 10:25 13:24 19:2 22:22 25:11 29:4 33:25 54:24 68:6 74:3 76:10,21 88:24 90:25 96:2 102:7 111:1 119:19 124:22 129:23
**old** 89:13 143:3 155:7,12 157:17 162:3,5 162:16,18,20 166:23 168:14 168:17 169:14 169:17
**older** 161:4 162:2
**olds** 75:21,25
**once** 33:14 65:1 74:10 95:6 104:23 119:1

160:5 165:1 166:8
**ongoing** 142:6
**online** 84:17 90:20 119:23 120:4
**opengate** 42:25
**opening** 33:23 91:20
**operated** 13:3
**operating** 118:12
**operation** 25:8 25:9
**operational** 12:9
**operations** 2:8 10:8 21:25 107:21
**opining** 91:19
**opportunities** 126:13
**opportunity** 109:14 114:2
**opposed** 60:19
**oppositional** 87:19,20
**option** 59:6,8 59:10,12,13 60:2
**optional** 59:5
**options** 58:7,8 58:13,15,16 64:17

CONFIDENTIAL

**[order - people]**                                    Page 29

| | | | |
|---|---|---|---|
| **order** 1:11 | 164:19 177:19 | 150:5 | **past** 55:18 |
| **ordinarily** | 177:25 | **parkland** 36:5 | 68:23 69:7,13 |
| 97:25 98:13 | **page** 2:21 4:2,7 | **part** 11:18 26:2 | 93:13 113:20 |
| **organize** 96:9 | 8:17 68:2 | 27:5 65:23 | 121:17 133:16 |
| **organized** | 83:10 88:19 | 68:15 70:8 | 153:9 166:7 |
| 110:3 | 124:4 130:2,9 | 85:19 124:24 | **patreon** 143:12 |
| **organizing** | 130:9,12,18 | 156:22 | **patrol** 14:4,5,6 |
| 108:4 | 134:7 145:4,5 | **participant** | 14:11,22 15:10 |
| **originated** | 149:3 150:7,9 | 60:3 | 16:3,6 47:23 |
| 128:2 | 150:11,13,18 | **participants** | **pay** 101:11,17 |
| **outcome** | 150:21 168:12 | 29:6 | **payments** 2:8 |
| 108:25 109:3 | 180:2,5,8,11,14 | **participate** | **peers** 126:17 |
| 112:6 139:2 | 180:17,20 | 64:24 65:2 | **penalty** 179:4,6 |
| **outgoing** | 181:2,5,8,11,14 | 113:23 115:18 | **pending** 29:23 |
| 159:15 | 181:17,20 | **particular** | 182:12 |
| **outline** 74:6 | 182:5 | 24:21 33:12 | **pennsylvania** |
| **outside** 34:9 | **paint** 64:11 | 62:9,18 63:15 | 2:12 3:11 |
| 57:1,5 72:18 | **pandemic** | 79:15 82:15 | 26:13 |
| 72:22 111:11 | 126:19 | 89:9 118:23 | **pentagon** 10:3 |
| 141:18 | **paper** 24:15 | 158:1 163:24 | **people** 18:10 |
| **overall** 134:10 | **paquette** 34:8 | **particularly** | 21:7 32:2 |
| **oversaw** 11:24 | **paragraph** | 90:14 | 33:19 57:3 |
| 24:5 | 68:3,5 84:13 | **parties** 72:25 | 59:17 66:11 |
| **own** 14:10 60:3 | 84:25 123:11 | **partners** 47:10 | 68:24 69:6 |
| 61:15 | 124:5 125:5 | 47:13,16 58:3 | 70:13 72:20 |
| **owner** 160:6 | **parent** 117:5 | 82:11 93:10 | 74:22 85:8 |
| **owns** 99:18 | **parental** | 146:19,21 | 97:16 98:5 |
| **p** | 158:22 159:4 | **party** 182:12 | 106:20 107:10 |
| **p** 2:3 5:1 | 159:23,23 | **passed** 38:1 | 109:20 111:12 |
| **p.m.** 29:13,16 | 160:3,16,18,25 | 53:13 | 111:13,14,25 |
| 70:25 71:3,3,6 | **parents** 61:23 | **passing** 74:3 | 112:12,15 |
| 121:1,4,4,7 | 110:18 111:23 | **password** | 115:4 125:7,13 |
| 164:13,16,16 | 127:13 140:15 | 166:6 | 126:3 131:8 |
| | 140:15 150:1,2 | | 133:21 136:19 |

CONFIDENTIAL

**[people - plus]**

138:6,14
141:25 152:19
156:21
**people's** 110:20
110:21
**percent** 40:16
127:25 133:5,8
135:9 136:1
137:12 139:8,9
139:19,22
141:8 153:1,2
153:4,6
**percentage**
50:21 133:5
134:10,12,18
**percentages**
134:14
**performed**
44:23
**performs** 44:22
**period** 13:6,8
59:18 96:12
106:4,5 129:7
**periodically**
160:20,24
**perjury** 179:4,6
**permanently**
33:9
**permissions**
159:10 160:9
**person** 20:10
20:12 24:13
25:8,8 26:5,11
26:17 28:3,8

28:10,15 31:2
44:25 53:23
72:12 75:4,10
75:11 86:13
94:4 115:13,22
116:8 139:7
146:24 176:5
**personal** 1:3
44:20 48:16
128:16 179:3
**personally** 49:5
98:20
**personnel** 27:9
35:25
**pervasive** 88:6
**petitions** 14:25
**phase** 42:23
**philadelphia**
2:12
**phone** 26:13
86:7 157:20,24
157:25 158:3,5
158:7,9,17,20
158:23 159:1,4
159:12,14,18
159:21 160:7
160:14,15,17
160:19 161:8,9
161:12 162:3,5
162:7,9,14,17
162:19,21
163:1 175:24
**phones** 137:10
138:3 171:17

172:2,13,19,25
173:5,8 174:17
**physical** 37:14
128:24
**physically** 64:7
**pick** 64:19
**picking** 134:8
**picture** 90:1
165:16
**pictures** 64:11
89:19 128:14
**piece** 63:12
141:23
**pile** 59:15
**pilot** 21:10 39:7
**piloted** 21:5,6
24:18
**piloting** 42:23
**pio** 34:15
**place** 30:23
47:14 48:12
52:2 56:22
57:2,6 87:15
106:10 112:12
124:21 131:23
158:16 169:6
**placed** 14:2,4
83:23 84:5,9
84:17 91:23
92:14
**placements**
4:13 82:20
**places** 52:6
98:5

**placing** 83:14
**plaintiff** 2:2
4:17 129:10
130:3,14
**plaintiff's**
130:19
**plaintiffs**
130:14
**planned** 124:25
**plans** 24:8
28:14
**platform**
159:25 163:10
163:17,24
169:21 170:3
170:11,17
**platforms** 1:7
2:7 131:25
140:11 142:12
142:20,23
143:1,1 170:23
171:4,4
**play** 36:25
**played** 37:2,4
90:2
**playing** 54:1
89:18 154:13
**plays** 103:13,16
103:19,23
177:4
**plaza** 2:17
**please** 6:7
**plus** 82:2

CONFIDENTIAL

**[point - principals]**

**point**  2:17 31:10,25 36:9 62:25 128:22 129:21 145:6 167:13
**pointing**  65:10
**points**  18:22 101:10
**polarizing** 54:13 109:15 109:17
**police**  7:9,10,11 10:5,15,16,21 10:23,24 11:1 11:10,14,18,19 11:23,24 12:3 12:14,23 16:16 18:20 19:6 22:12 23:4 24:11 31:6 78:22,24 79:3 79:8,12 85:19 85:23 94:6
**policy**  30:9,10 43:3 109:6,10
**pool**  33:15
**population** 13:9,10
**portal**  116:18
**portion**  49:7 58:5 62:17 64:15 142:8
**position**  9:20 9:25 10:19

11:22 13:24 14:1 15:12 16:10 19:5,7 21:3 24:4 31:15,20 33:6 33:13 35:7,17 39:8 41:15
**positions**  9:24 12:24 16:7,23 18:21 25:5,22 31:11 32:12,23 33:25 37:1,3 50:25
**positive**  105:19 127:7
**possessed** 46:17,23
**possession** 44:15,16
**possible**  24:12 26:4,10 53:15
**post**  33:6 145:13 151:13 151:22,24 165:3,11,13,13 166:9
**posted**  33:13 129:5 135:21 149:2,19 150:12,14,17 150:20 165:9 166:10,13
**poster**  168:11 168:11,13

**posting**  145:25 149:24 168:9 168:10
**posts**  135:2 147:17 167:7
**potentially** 79:3 80:9
**practical**  57:23
**practicing** 60:18
**pre**  13:7 88:12 88:12
**precluded**  54:3
**predecessor** 24:3
**preparation** 57:23
**prepare**  7:18 8:10,12 54:10 70:12,14,16 97:18,20
**prepared**  55:13 55:14,15 64:2 64:3 70:12
**preparing** 55:22
**present**  3:15 45:8
**presentation** 57:23 58:4
**presented** 130:14
**preservation** 61:14

**president**  68:13
**presidential** 9:25 10:1
**pretty**  13:5 18:11 21:15 33:18 41:9 45:16 53:16 56:14 60:12 65:17 71:18 85:17,17 110:13,16 112:1,2 159:18 165:19 167:24 168:20
**preventive** 128:23
**previous**  12:8
**previously** 31:21 39:14 86:1
**primarily** 11:24 12:10 17:10 77:10 116:4 139:16 152:25 154:4
**primary**  20:4 76:13 117:1 139:7 153:16
**principal**  22:25 33:16 88:22 89:3 104:23 116:8
**principals**  27:2 35:9 106:8

CONFIDENTIAL

**[printing - purpose]** Page 32

**printing** 83:3
**prior** 43:23
   91:11 95:16,18
**private** 123:15
   128:16
**probably** 16:4
   24:25 40:16,18
   88:25 93:12
   110:14 111:23
   114:25 116:17
   149:20,21
   152:19 153:1,6
   154:2 165:1
   166:7
**problem** 27:7
   91:4
**problems** 174:3
   175:8
**procedure** 30:9
   30:10
**proceed** 105:18
   105:18
**proceedings**
   29:13 71:3
   121:4 164:16
**process** 25:17
   25:19 33:22
   77:23 82:12,14
   82:17 107:23
   116:11
**processes** 38:8
**procure** 50:15
**products** 1:4

**program** 21:6
   24:18 25:1
   38:4 39:7
   62:12 85:19
   132:10 134:11
   134:15
**programs** 13:7
   38:6 121:19
**prohibited**
   53:19,21 64:21
**project** 156:22
   157:4 161:21
**projector** 63:7
**projects** 50:24
   156:20
**promises**
   125:15,20
**promoted** 14:1
   15:13 176:12
   176:16
**promotion** 14:3
**prompted** 35:6
**property** 44:2,9
   44:12,13 45:7
   80:9
**proportion**
   130:20,21
   134:9
**proposal** 19:21
**proposals** 52:4
**protect** 54:19
   54:20,21
**protecting**
   121:11 122:1

**protective** 1:11
**protest** 107:23
   108:14,17
   109:7,22 110:1
   110:11 111:11
   111:15
**protesting**
   108:1,9,23
**protests** 107:16
   111:7 112:20
   113:3
**protocol**
   124:11,24
**protocols** 125:1
**provide** 25:5
   28:16 39:11
   47:10 67:18
   90:11 146:22
   148:4 149:6,9
   162:14
**provided** 24:23
   104:6 114:5,7
   158:7
**provider** 23:14
**providing**
   39:12 150:4
**provisions**
   91:25
**proximity**
   17:23 18:5,12
**public** 1:13 2:2
   3:16 6:15 9:1
   19:11,15 22:18
   22:20 27:12

   34:10,10 35:4
   39:18 40:1
   41:2,20 42:14
   43:20 44:1
   46:10 48:1,25
   49:12 50:8
   67:22 79:16
   80:11,22 82:7
   87:10,24 88:2
   91:16 93:17
   97:12 98:17
   99:5 102:13,17
   102:21 113:10
   113:25 116:3
   121:23 123:15
   124:2,10
   145:11 148:18
   149:2,12 150:6
   150:13,22,25
   151:3 157:15
   173:24 174:3,7
   174:11,15,20
   174:25 175:7
   182:3,18
**publicly** 126:8
   126:10
**published**
   123:25 152:2
**pull** 45:4
**pupil** 34:21
**purchasing**
   37:9,22
**purpose** 149:23
   150:1

CONFIDENTIAL

**purposes** 33:9
**pursuant** 1:11
**push** 63:7
**put** 50:24 58:5
   63:8,22 66:20
   92:3,8 104:6
   128:14 156:23
**putting** 24:15
   107:10 135:24
   154:22

**q**

**quality** 41:21
**quarry** 2:4
**question** 29:22
   29:24 36:14
   41:18 44:6
   46:21 49:18
   54:18 89:16
   130:13 133:24
   134:1,2,3
   135:15 163:7
**questions** 49:12
   54:22 55:11
   56:18,20 58:13
   101:1 114:12
   172:9 177:10
   177:12,13,14
   177:16
**quick** 9:23 29:1
   70:20 164:11
**quote** 68:21
   124:12,13
   125:8

**quotes** 123:9
   124:8 125:6

**r**

**r** 3:16 5:1
**radio** 16:2
**radios** 37:9,22
   50:15
**raised** 146:7
**random** 43:5
   45:1,2,6,7
**range** 98:6
**rap** 142:16,18
**rather** 31:3
   49:15 123:14
**rationale** 92:11
**ray** 6:9
**reach** 31:25
   41:25 90:5
**reached** 85:22
   163:22
**reacting** 62:4
**reactions** 68:12
   68:17
**read** 49:17
   129:20,21
   131:16 179:7,9
**reading** 166:6
**real** 28:25
   53:15 135:21
**realized** 95:7
   115:11
**really** 10:11
   11:25 24:8

30:12,25 54:7
56:13 58:8
62:23 64:19
65:18 84:7
85:9 86:4,20
88:25 89:5,17
92:21 93:10
109:13,21,24
109:25 114:19
114:20,21
118:3 145:18
145:19 146:21
150:21 159:19
165:25 168:10
168:12
**reask** 29:23
**reason** 44:14
   46:5 54:16
   66:2,10,20
   94:15 146:10
   180:4,7,10,13
   180:16,19,22
   181:4,7,10,13
   181:16,19,22
**reasons** 31:7
   65:23 84:8,11
**rec** 89:18
**recall** 7:6 14:13
   51:9,10 72:16
   86:12,17 96:16
   100:12,13
   101:23,25
   107:25 108:10
   108:13,18,23

110:4,10 111:3
111:6,10
112:22 114:4,6
126:9 130:7
131:11 137:19
145:20 146:4,6
153:7
**recalling** 102:1
   102:2,3
**receive** 51:13
   68:24 69:15
   74:10 76:17
   77:25 78:3,4
   79:7 80:10,16
   80:18 114:8
   161:9
**received** 8:18
   11:12 14:19
   46:16,22 80:13
   84:16 88:10
   94:22
**receives** 47:23
   118:5 120:13
**receiving** 89:4
   91:11
**recent** 8:15
   53:15 123:13
**recently** 32:24
   136:2
**recess** 29:12
   71:2 121:3
   164:15
**recipients**
   144:12

CONFIDENTIAL

**recollection** 101:1,22

**record** 5:4,16 6:8 28:24 29:10,16 70:25 71:6 78:17 121:1,7 161:25 164:13,19 177:19 182:9

**recorded** 182:7

**recreational** 158:22

**recurring** 115:9

**reenter** 106:2

**refer** 13:2 16:11

**referred** 34:25 56:21

**referring** 55:25 56:1 85:6,7 131:1 133:9 134:1

**reflecting** 103:15,22

**refresh** 42:3,6 42:7

**refreshes** 41:25

**refreshing** 37:8 37:21

**refuses** 31:2

**regarding** 89:1

**regional** 31:18 32:5,10,16,17

38:22 50:12 76:4 121:13

**regions** 113:20

**registered** 160:5 182:2,17

**regular** 16:21 128:21 153:8 171:14

**regularly** 116:22

**reins** 159:18

**relate** 139:12 176:21

**related** 30:8 52:8 94:20 127:19 130:17 133:14,22 135:11 136:6,9 136:15,23 139:21 141:5 147:15 153:6 176:18 182:11

**relates** 1:5 37:19

**relaxed** 161:3

**relevant** 134:10

**reliant** 31:23

**relying** 139:17

**remain** 125:16 125:21

**remained** 109:9

**remember** 20:1 43:13 85:11,17 85:18 101:14

114:22,23 147:1 150:16 166:15

**reminder** 4:21 144:2

**removals** 84:18

**renewed** 139:10

**report** 21:20,21 25:24 72:21,24 73:6 74:10 76:11,16,25 78:22,24 79:3 79:8,8,12,12 94:16 116:8 118:13 119:5,7 119:8 120:1 146:1 148:6,12 148:17

**reportable** 93:19,21 94:2 94:7,12,24 95:4

**reported** 12:12 12:13 72:12,13 72:19 73:5,12 94:3 138:17 148:11,15

**reporter** 5:16 155:9 162:11 182:1,3,17

**reporting** 12:11 118:8 119:16

**reports** 15:20 15:23 16:20 21:22 28:14 72:6,8,9 73:3,7 73:18 76:21 79:2 80:10,14 103:3,4 115:24 116:19 136:16 136:17,24,25 137:13

**represent** 6:5 83:5

**representative** 6:14

**representing** 46:8 131:9

**request** 32:6 84:11 85:14 116:17

**requested** 31:11 32:7 41:7,15,17,20

**requests** 25:3,4 41:6 50:24

**require** 50:4

**requirement** 77:1

**requires** 53:8 93:23

**reserve** 177:16

**reserved** 178:1

**resolve** 136:19

**resort** 63:16

CONFIDENTIAL

**[resource - rooftops]**                                  Page 35

resource 13:3 13:22,25 14:3 27:11,15,20,25 47:15 121:12

resources 16:18 37:14 98:5 121:12,14

respective 72:25

respond 14:10 14:21 17:5,6 17:11 18:6,17 18:20 20:6 28:3,4 55:7,8 60:7 70:13 71:13,20 72:6 72:9,21 73:14 73:16,17 75:10 75:10 76:19 100:4 104:8 109:9 113:1,3 148:2

responded 24:8 56:12 86:10 100:3 104:15 113:4

responding 14:7 16:1 18:9 62:4 97:11 115:23,25 134:24 147:19 147:25 176:15 176:25

responds 71:15 88:19 90:18

response 37:23 56:7,9,12 57:12,14 58:7 59:5 60:19 62:2 65:9,14 74:3,5,8 104:2 104:21,22 105:10,11 106:12 107:3 107:24 108:15 108:17 109:6,8 112:25 113:5 121:14

responses 4:18 129:12 130:4

responsibilities 16:13 20:5 23:10

responsibility 28:7 76:13 77:10 161:4

responsible 14:6 15:19 16:15 28:8 71:10 77:7 79:4 115:23 116:4,13 117:17

restore 104:9 105:19 106:16

restoring 105:23

restrictions 158:16

resulting 174:3

results 100:17 100:21 101:12 101:14

resumed 45:11

reswear 5:17

retire 20:22

retired 20:21 20:23 34:5 144:16

returned 112:11

returning 4:15 122:13 123:3

returns 32:1

reunify 68:6

review 7:22 41:10 67:7,9 116:22 117:2 122:21,23 129:20,24 133:15

reviewed 116:20 139:15 139:15

reviewing 15:20 16:19 28:13 101:23 102:4

rick 85:16

riding 15:21 154:23

right 6:15 8:8 8:21 11:21 17:25 18:3 21:17 26:14 31:20 32:22 42:18,20 50:5 53:9 60:11,22 63:8 67:23 68:7 70:17 103:5,6 111:12 118:18 121:24 124:5,8 145:5 147:17 158:1 164:10 171:11 172:11 173:21 175:22 176:9 177:5

rise 31:4 39:5

rises 30:16

rising 30:11

risk 81:2,4,8,11 81:20 96:14 100:16 101:3,3

risks 83:14

road 154:23

role 24:2 27:6,7 27:24 36:25 37:2,4 38:18 54:1 103:13,16 103:19,23 177:3

rooftops 110:20

CONFIDENTIAL

**[room - school]** Page 36

| | | | |
|---|---|---|---|
| **room** 92:15 | 118:8,12 | 141:20 144:18 | 143:4 145:10 |
| **rooms** 91:23 | 119:11,22 | 144:24 145:2 | 145:23 |
| 92:4,9 | 121:15 122:4,8 | 145:21 146:2 | **scale** 53:25,25 |
| **rooted** 58:8 | 125:16,21 | 149:17,24 | 107:17 |
| **roughly** 25:12 | 177:3 | 150:4 | **scaled** 58:24 |
| 28:9 132:16 | **safer** 4:15 | **sanctions** 78:18 | **scans** 45:17 |
| 149:18 | 122:14 123:3 | **sarahah** 145:12 | **scheduled** 42:5 |
| **round** 35:5 | **safety** 9:2 | 145:17,24 | **scheduling** |
| **route** 64:9 | 19:16,18,20 | 146:8 147:17 | 15:20 16:20,21 |
| **run** 18:7 59:6 | 20:3,8,10 21:1 | **sat** 98:22 | **school** 4:16 9:5 |
| 59:10 62:17 | 21:12 24:5,7 | **saturday** 94:5 | 9:5,6,9 10:24 |
| 64:15 | 24:20 25:16 | 97:6 | 11:1,3,10 |
| **running** 99:24 | 26:6 28:7 | **savage** 91:3 | 12:23 13:2,2,9 |
| **runs** 148:21 | 29:21 30:8 | **save** 70:16 | 13:16,22,25 |
| 150:9,11 | 31:3,8,8 32:15 | 119:21 179:9 | 14:2,9,16,17 |
| **runy** 68:13 | 32:18,20 33:4 | **saved** 12:18 | 16:24 17:2,25 |
| **runyeon** 68:13 | 35:6,20,23,24 | **saving** 11:25 | 18:2,8,12,12,14 |
| **ryan** 3:15 5:4 | 36:10 37:23 | 12:17 61:19 | 18:16 19:6 |
| | 50:2,8,10 51:3 | **saw** 26:19 27:5 | 21:19 22:3,18 |
| **s** | 52:6,8,17 71:8 | 35:12,15 36:19 | 22:20,23 23:16 |
| **s** 2:10,10 4:5 | 71:11,19 75:18 | 61:17 97:7 | 24:18,19 25:15 |
| 5:1 | 77:2 80:7,7 | 138:17 | 26:12,14 27:11 |
| **safe** 21:19 | 82:2 91:25 | **saying** 44:4 | 27:11,16,18,18 |
| 24:19 31:20 | 92:5 105:8 | 54:14 60:20 | 27:20,21,22,25 |
| 36:23 37:24 | 106:13 113:7,8 | 111:25 117:11 | 28:4 30:10 |
| 38:12,25 44:24 | 113:11,13,14 | 124:23 137:19 | 31:8,14,20 |
| 50:11 53:5 | 113:15,17,24 | 142:17 | 32:13,18,20 |
| 57:15 75:22,23 | 114:1,18 | **says** 4:16 65:17 | 33:4,10,10,11 |
| 76:3 101:2 | 116:24 117:24 | 68:8,22 84:25 | 33:13,14,21,23 |
| 104:5 106:11 | 118:10 121:11 | 90:18 91:22 | 35:6,20 36:10 |
| 106:13,21 | 121:13,13 | 114:25 122:15 | 38:21,25 39:3 |
| 108:7 109:10 | 124:11 127:18 | 123:4,11 124:8 | 40:5,6,19,20 |
| 112:8 116:25 | 132:17 133:13 | 125:6 130:2,19 | 41:20,25 42:2 |
| 117:5,18,21,22 | 134:19 141:15 | 133:1,11 134:8 | 42:5,6,21 43:5 |

CONFIDENTIAL

**[school - security]**

43:6,15,21
44:8,24,25
47:15 48:13
49:15 50:11,23
52:21 58:10,10
62:9 72:18,22
75:15,17,22,22
75:23 76:1,3,7
77:1 78:6,10
80:1,5,8,17,22
82:2,7 83:15
83:18 84:3
85:3,10,19
87:14 88:23
89:4,12 90:19
90:21,22 93:17
94:1,3 97:15
97:19,21 99:5
101:21 102:9
102:11,18
104:5,25
105:12,14,17
105:20 106:1
106:13,18,21
106:24 107:11
107:16,19,20
107:24 110:15
112:8 113:7,8
113:11,13,14
113:15 114:24
115:2,22 116:6
116:24 117:9
117:12,14,18
117:24 118:4

118:10,14
121:12 122:4,8
122:14 123:4
123:12 124:1
125:16,24
128:3 142:1,5
144:18,23
145:2,21 146:2
149:8 155:15
155:17 157:2
157:19 158:15
159:20,21
162:4,6,7,9,19
162:23 163:1
172:3,14,19,25
173:21,24
174:3,7,11,15
174:20,25
175:7
**school's**  23:19
**schools**  1:13
  2:2 3:16 4:10
  6:15 13:13,18
  13:19 14:8,12
  14:18 15:9,9
  16:15 17:7,24
  18:20 19:12,15
  20:7,7 24:6,9
  24:17,20,23,25
  26:9 27:9,12
  28:9,17 33:1,3
  34:10 35:5,18
  39:8,10,13,15
  39:16,18 40:2

40:23 41:2
42:14 43:20
44:1 46:11
48:1,3,25
49:13,23 50:8
56:2,5 64:21
66:24 67:12,22
79:16 80:11,19
87:10,24 88:3
88:15 91:16
97:12 98:17
102:13,17,21
104:8 107:10
113:11,25
116:3,25 117:5
117:18 118:12
119:11,22
121:15,23
123:16 124:2
124:10 131:23
131:24 132:3
145:11 148:18
149:2,12 150:6
150:13,22,25
151:3 157:15
**schoolteacher**
  171:11
**science**  8:19 9:1
**scope**  47:18
  48:5,15 49:3
**scratch**  146:4
  157:18
**screen**  160:18

**screening**
  161:5
**screenshots**
  135:3
**scroll**  153:9
  165:4,6
**scrolling**  165:5
  165:6
**scrub**  141:11
**search**  44:2,11
  44:13,19 45:5
  46:2,11 47:13
**searched**  44:9
  44:21
**searches**  44:22
  44:23 45:1,2,6
  45:7 48:2,23
  49:22
**searching**  45:8
**second**  22:3
  68:2 83:10
  123:11 145:4
  172:12
**secret**  10:2,6
**sections**  129:22
**sector**  14:8
  15:16,17 16:16
**sectors**  14:7
**security**  4:16
  19:16,18,20
  20:4,8,10 21:1
  21:13 24:5,7
  26:6 28:8
  29:21 30:8

CONFIDENTIAL

**[security - sheriff's]** Page 38

31:3 32:15,17
35:20,23,24
36:3,6,7,10,21
37:5,6,14
38:22 39:17,19
41:3,16,21
44:25 48:23
49:22 50:2,8
50:12 51:3
52:6,8,18 71:8
71:11,19 80:7
105:8 118:4
121:18 122:7
122:14 123:4
124:11,23,25
127:18 132:18
133:13 134:19
145:11 146:11
146:23 149:17
149:24 150:4
**see** 15:24 24:12
  26:4 41:11
  61:17 67:14
  76:14 83:16
  84:19 85:4
  91:6 92:1
  99:25 103:18
  120:16,17
  123:5,17 124:5
  124:14 125:9
  130:23 132:12
  132:20 133:1,6
  134:16 138:4,6
  140:11,12,12

140:17 145:7
145:15 160:20
160:21,22
165:8,8,9
**seeing** 30:18
  86:25 87:9
  130:7
**seek** 49:14
  153:10
**seems** 114:21
**seen** 72:14
  130:6,10
  132:14 156:1
  167:7
**seized** 109:14
**select** 134:18
  141:8
**selecting** 135:9
  136:1 139:8
**self** 71:18
**send** 75:10 76:8
  78:2 104:21,22
  117:3 120:5
**sending** 76:4
  115:6 142:17
**sends** 99:2
**senior** 155:16
**sensory** 59:25
  60:6
**sent** 98:21,24
  118:11 137:6
**separate** 47:16
  92:14 95:4
  102:7 116:10

176:15
**separated** 91:1
**separately**
  94:14
**separation**
  91:19
**sept** 4:15
  122:13
**september**
  43:18 105:3
  123:3
**sergeant** 15:16
  16:11,12,14,23
**series** 160:8
**serious** 61:8,13
**seriously**
  124:11,24
**served** 11:18
**service** 14:9,11
  14:20,20 16:1
  17:6 39:15
  126:13 153:15
**services** 34:21
  34:22,24 39:12
  66:11 84:9,9
  121:15,20
**serving** 20:25
**session** 115:7
**sessions** 114:25
**set** 4:19 70:19
  126:1 129:13
  130:5 156:6,10
  156:12 159:4
  159:10 160:7

**setting** 22:19
  22:21,23 83:22
  84:1
**settings** 84:6
  159:3
**setup** 160:17
**seven** 10:12
  21:4,5,7 24:19
  24:22 25:15
  39:15 104:19
  106:25
**several** 12:12
  91:23 121:9
**sexual** 73:7,11
  74:15,17
**share** 74:9
  147:3,12
**shared** 82:15
  82:16 96:11
  147:10,10
**shares** 118:6
**sharing** 74:8
  82:11
**shb.com** 2:13
  2:14
**sheet** 133:10
  179:1,11 180:1
  181:1
**shelter** 56:22
  57:2
**sheltering** 57:6
**sheriff's** 146:13
  147:2

CONFIDENTIAL

**shook** 2:11
**shooter** 38:4,6
  53:9 57:5,18
  57:19,21 60:7
  62:11
**shooting** 18:10
  36:19 37:18
  43:17 105:3
  107:5 113:2
  124:1
**shootings**
  123:12
**shoprite** 99:19
**short** 29:19
  86:25 111:9
  153:9
**shortest** 59:18
**shortly** 27:16
  36:2,4
**shot** 97:8,9
**show** 8:6 16:5
  31:6 67:3
  82:24 122:17
  129:15 138:7
  138:14 144:6
**showed** 137:7
  137:25 161:4
**showing** 60:9
  61:12 138:16
**shown** 59:22
  137:9 139:7
**shows** 31:2
**shut** 63:3 66:6
  158:25 160:13

160:14 161:17
  161:20,23
**shutting** 161:8
**sic** 108:12
**siculus** 2:8
**side** 45:5 59:7,7
  59:9,10 87:20
  111:24 112:9
**sides** 90:6
**sight** 63:9
**signature** 178:1
  180:23 181:23
  182:15
**signed** 179:16
**significant** 24:8
**similar** 56:22
  56:23 111:6
**simulation**
  53:22,23 58:2
**simulations**
  53:14
**single** 76:6,9
  78:13 148:14
  148:16
**sit** 17:25 38:15
**sites** 160:21,22
  160:23
**situation** 31:21
  59:1 60:7,20
  61:9,13 62:5
  62:20 76:2,9
  104:10 105:21
  109:12,15
  111:17 112:5,6

117:15 118:16
  120:10 138:24
  141:9 142:6
**situations**
  14:25 18:15
  20:6 28:19
  30:1,6 39:5
  58:6 64:13
  73:25 81:5,15
  81:21 96:15,18
  99:4,12 104:15
  104:20 107:15
  112:21 113:1
  128:1 135:24
  147:5,19,25
**six** 10:11
  104:18 106:25
**size** 38:23
**skill** 59:25
**skills** 60:6,9
  61:22,25
**skim** 129:19
**slight** 56:23,24
  56:25 57:8
**slots** 32:24,25
**small** 95:23
**smaller** 95:24
**smartphone**
  157:22 158:9
  158:11,12
**snap** 2:15
  177:13
**snapchat**
  131:13,14

142:14 151:4
  166:21 169:18
  170:16
**sniff** 45:24,25
**sniffing** 45:16
**social** 1:3 5:10
  103:13,16,19
  103:23 115:4
  115:18 126:2
  126:14,17,25
  127:19 128:2,3
  128:8,9,11,12
  128:13,13,15
  130:17 131:24
  132:1 133:14
  133:23 135:2,7
  135:12,25
  136:6,11,15,22
  138:10 139:12
  139:21,24
  141:5,23 142:9
  142:10,12
  145:12,24
  147:15,16,20
  148:1,8 173:12
  173:15,18,24
  174:4,8,22,25
  175:9 176:9,13
  176:17,18,22
  177:4 179:2
**society** 70:9
  88:15
**software**
  120:20

CONFIDENTIAL

**[sohmer - starts]**                                    Page 40

**sohmer** 3:15 5:4

**solutions** 86:2

**solving** 27:7

**somebody** 18:13 63:2 65:15 66:14 72:3,4 75:10 129:5,6,6,6 134:2,3 135:22 140:24

**somewhat** 131:5

**son** 143:3 157:19 166:23 168:14 169:14 169:17

**sons** 89:13

**sorry** 9:12 19:1 21:16 57:10 68:4,4,8 69:12 77:13 81:3 91:9 98:9 103:11 116:2 123:22 137:1,7 146:5 147:24 151:22 155:10 162:11,18 169:24

**sort** 135:19

**sos** 77:24 78:1 78:2

**sounds** 120:24

**south** 1:15 5:9

**spalding** 3:11

**speak** 7:24 171:16,20,23 172:1,12 174:24 175:6

**speaking** 15:22

**special** 10:8 13:7

**specific** 33:1,4 51:10,12 52:4 61:16 76:22 78:6 101:10 108:11 110:6,7 129:22 157:13 157:13 177:3

**specifically** 48:2 66:20 73:13 87:17 94:25 139:9 140:1 147:1 148:13

**spend** 59:19 129:2,3 133:21 134:24 135:11 136:5,9 139:11 139:20 141:3 141:17 147:14 153:25 165:6 173:15

**spending** 45:20 135:18 136:15 140:13,15 173:8

**spends** 133:13

**spent** 9:16 10:6 11:25 12:17 134:9 137:18 141:7

**spiderweb** 60:25

**spilling** 87:14

**spoken** 164:5 171:3

**sports** 153:4,11

**square** 2:11

**sro** 14:10 15:8 15:10 28:21 30:3 147:2

**sros** 14:13 26:25 30:25 47:24

**ssl** 33:14,23

**ssls** 33:7,8

**staff** 21:2,12 33:16 54:11,21 55:14 58:5,18 58:19 61:21 71:20 104:24 106:3 122:1 125:16,21 127:17,23 130:20 135:10 136:4,14 138:15,16 139:11,20,20 147:14

**staffing** 50:3

**staged** 109:3

**stamp** 83:4,5

**stand** 63:25

**stands** 144:21

**stanton** 116:11 117:14 118:15 118:20

**stapler** 64:2,6

**start** 13:16 47:22 61:15 63:4 72:8 96:1 108:22 116:7 117:15,20 118:15 154:8,8 154:12 162:2

**started** 10:17 10:23 13:1 15:8 19:11,15 20:9 21:5,9,16 21:17 24:14,19 25:17,18,18,20 26:24 30:18 35:25 36:1 55:19 65:1 70:9 93:10 95:7 114:12 115:2 117:19 128:3 136:21 146:9 158:15

**starting** 124:5 130:18

**starts** 68:6 83:13 90:23

CONFIDENTIAL

**[starts - students]**                                                        Page 41

| | | | |
|---|---|---|---|
| 114:20 145:7 | **stops** 140:24 | 109:1 110:7,7 | 95:11 96:20 |
| **state** 6:7 12:2 | **strategies** | 113:16,17,22 | 97:22,23,24 |
| 12:14 22:12 | 150:2,2,3 | 114:1,18 | 98:7,15 99:6 |
| 62:11 118:5 | **strategy** 85:12 | 117:11 118:23 | 100:6,7,10,12 |
| 182:3,18 | **streaming** | 118:24 121:12 | 101:4,20 102:9 |
| **stated** 134:15 | 153:14 | 124:9 138:17 | 102:13,17,21 |
| 182:5 | **street** 2:12 3:5 | 141:19 157:14 | 105:25 106:2,3 |
| **statement** | 99:23 111:24 | 176:18 | 106:11 107:8 |
| 123:19 | **strengthen** | **student's** 44:13 | 107:11,13,17 |
| **states** 1:1 5:12 | 122:7 124:25 | 46:1,11 95:3 | 107:18,22 |
| 9:14 | **stress** 69:24 | **students** 4:15 | 108:4,6,12 |
| **stationed** 13:12 | 70:2 | 28:9 30:7,20 | 109:2,9,16 |
| 13:13 15:8 | **strike** 9:12 | 30:24 34:25 | 111:18,21 |
| **statistics** 12:13 | 57:10 69:12 | 42:22 44:2,9 | 113:19,23 |
| 102:8 | 71:10 77:13 | 44:11 45:3,8 | 118:22 121:11 |
| **stenographic** | 81:3 84:24 | 54:11,20 55:7 | 122:2,8,13 |
| 5:16 | 91:9,14 98:9 | 55:12,21 58:21 | 123:2 125:15 |
| **stenographic...** | 103:11 116:2 | 59:3 60:6,14 | 125:21 126:20 |
| 182:8 | 146:5 151:23 | 61:6,8,18,21 | 127:25 128:7 |
| **step** 105:16 | 154:15 | 62:8,21,24 | 128:10,15,17 |
| 106:9 | **structure** 29:20 | 63:4 64:4,10 | 128:24 129:4,9 |
| **stepped** 24:2 | **student** 13:10 | 64:24 65:6,24 | 131:24 133:14 |
| **stepping** | 15:1 34:22 | 67:23 68:8,10 | 133:22 134:25 |
| 110:19 | 44:15,19,20 | 68:15,22 69:3 | 135:2,8 137:10 |
| **steps** 70:12,14 | 45:2,4 46:17 | 69:18 70:15 | 138:2,7,13 |
| **stock** 153:1 | 46:23 48:12 | 71:19 72:10 | 140:18 141:4 |
| **stoneman** | 58:22,24 61:7 | 76:5 80:22 | 141:10,15,16 |
| 36:19 37:18 | 65:20 74:16,21 | 82:7,12 83:23 | 141:18,21,24 |
| **stop** 115:13 | 74:23 78:17 | 84:11 86:16 | 142:1,4,20 |
| 129:1 140:25 | 80:24 93:17,23 | 87:17,19,23 | 143:23 145:13 |
| **stopgap** 35:9 | 94:2,15 96:24 | 88:2,17 89:5,9 | 145:25 148:2 |
| **stopped** 115:1 | 97:3,25 98:11 | 89:11,12,14 | 149:10 150:2 |
| **stopping** 15:22 | 104:24 105:4 | 90:15,20 91:1 | 171:16 172:1 |
| | 107:16 108:25 | 91:22 92:9 | 173:5,8,12,17 |

CONFIDENTIAL

**[students - take]**                                              Page 42

173:24 174:3,7
174:11,15,20
174:25 175:7
175:14 176:22
177:2
**studies**  102:12
**study**  102:16
  102:20 103:12
  103:14,18,21
**stuff**  25:20
  42:13 64:7
  65:11,17,18
  75:3 85:25
  86:22,24 87:3
  87:8,12,14
  88:6 89:24
  90:8 92:16
  115:6,22
  128:18,18,19
  128:20 137:9
  143:4 147:12
  153:6,10,11,11
  153:17 154:13
  154:23 161:3,5
  167:8,8
**subgroup**
  113:23
**subject**  4:12,20
  82:20 144:1,19
**subliminal**
  142:17
**subpoena**  41:6
**subscribe**
  154:24

**subscription**
  153:19
**subsequently**
  19:23
**subset**  107:22
  111:13
**substance**
  45:21
**substantive**
  145:4
**subtotal**  132:23
**success**  25:1
  39:7
**sudden**  55:11
  89:22
**suffer**  68:11,16
**suffered**  98:16
**suicides**  113:2
**suit**  7:13
**suite**  2:4,12
  3:12
**superintendent**
  19:22 21:24
  113:21 118:25
**superintende...**
  113:16
**supermarket**
  99:19
**supervise**  31:23
**supervising**
  38:18
**supervisor**  19:9
  19:18,20 21:3
  71:8,11 147:2

**supervisors**
  31:18 32:6,10
  32:17 121:13
**supervisory**
  15:15 25:5
  27:24 31:11
**support**  10:1
  16:5 20:7,12
  24:9,16,23,24
  26:10,16 27:2
  27:6,9 28:10
  28:17 32:1
  35:9 39:8,9
  74:23 100:6,8
  105:8 106:3
  107:12,13,24
  140:17
**supported**  24:6
**supposed**  91:20
  161:19
**sure**  40:17 63:9
  98:4 108:7,8
  109:9 118:3,10
  128:23 137:21
  144:24 145:19
  161:24 168:20
**surprise**  92:22
**surrounded**
  18:16
**surrounding**
  36:20 37:15
  38:5,9 79:15
  101:2 114:1

**survey**  100:16
  100:22,25
  102:7
**surveys**  101:6
**susan**  20:19
**suspended**
  45:10
**suspension**
  34:24 84:9
**suspensions**
  84:16
**sw**  3:5
**switch**  19:19
**sworn**  5:20
  182:6
**system**  42:19
  58:10,10 77:22
  94:1
**systems**  50:14

**t**

**t**  4:5 159:12,25
  160:17 167:18
**tab**  67:5 83:1
  122:19 129:17
  144:8
**table**  7:21
  130:10,10
**take**  28:25 29:5
  41:11 62:22
  64:9 67:7
  68:22 70:12,14
  70:20 83:7
  106:7 107:8

CONFIDENTIAL

**[take - things]** Page 43

120:22 122:21 124:11 131:23 138:22 164:10 165:15

**taken** 112:13 179:8 182:4

**talk** 58:25 60:1 61:16 62:7 63:11,14 80:5 105:6 113:23 115:15,16 133:19 135:10 135:13 136:4 140:16

**talked** 25:23,23 59:21 62:20 80:6 85:15,15 98:22 115:8 121:9 135:16 154:7

**talking** 9:6 28:23 30:5,6 48:6 63:4 64:10 65:9 72:3 74:19 87:17 92:6 95:14 105:22 114:23 128:10 135:17 142:13 146:25 152:17 159:24

**target** 115:5

**taught** 22:18 22:22

**teacher** 22:5,7 22:21 62:25 63:3,18 64:22 157:12

**teachers** 30:22 35:9 41:19 58:18,20 70:16 76:2 106:8 126:20

**teaching** 61:14

**team** 33:17 71:12,15 72:9 73:12,14,22 77:7 89:20 90:3 104:2,5,8 104:12,21,23 105:10,11,15 106:12,19 107:3,24 108:15,17 112:25 113:14 113:15 115:10 115:23 116:13 119:2 121:10

**team's** 76:12 77:10

**teams** 38:9 52:19,19 98:21 98:24 99:2 121:14

**technical** 29:3 29:19

**technician** 3:15

**technologies** 2:8 50:4

**technology** 34:14 37:15,15 48:24 49:23 53:1,3

**teeth** 154:9

**telephone** 119:23

**television** 153:17

**tell** 23:22 62:23 96:22 99:10 125:6,13 128:19

**tells** 61:3

**temporarily** 83:24 106:7

**temporary** 106:10

**ten** 9:18,19 17:19 22:10 33:19

**term** 34:24 83:24 104:1 113:6,9

**terminated** 7:10

**terms** 32:1 50:10 61:12 88:7 139:1,2 159:11

**testified** 5:21 96:13 103:2

141:2 171:10 173:20

**testify** 182:6

**testimony** 6:13 6:17,18 7:15 29:25 49:14 177:21 182:7,9

**text** 120:5 176:2

**theft** 14:23

**theme** 115:9

**thereof** 182:12

**thing** 56:18 58:11 61:13 115:21 129:21 163:24

**things** 12:9,15 26:19,24 27:4 35:12,15 37:9 51:10 52:7,11 52:11,17 53:18 53:20 54:2,4,6 54:25 56:16,20 59:25 60:4 61:4,4 63:1,20 63:23 64:3,10 64:23 71:21 73:19 74:6 105:16 106:17 109:18 110:6 114:3 115:9 128:16 129:7 135:4,20 140:23 141:17

CONFIDENTIAL

**[things - told]** Page 44

142:17 147:16
150:3 159:14
160:8,9
**think** 12:18
27:3 31:15
32:7 36:15
37:3 41:23
45:24 51:12
59:23 61:20
63:18 85:7
89:2 90:22
96:24,25 97:4
99:1 111:5
112:7 115:5
119:25 120:5
131:8 133:21
144:17 165:18
165:23 166:3
**thinking** 61:25
62:3,5
**third** 8:17
**thirds** 132:16
**thoughts**
114:13
**thread** 83:9
**threat** 38:7,8,9
38:10 47:5,12
47:20,21 52:16
71:18 72:2
76:12 77:3,16
77:17,25 78:21
79:2,7,11 80:7
138:11 147:21
147:22 148:3,8

148:14 175:21
176:25
**threatened**
137:11
**threatening**
60:16 72:4
145:13,25
**threats** 49:1,24
50:1 71:9,12
71:14,15,16,17
71:17,20 72:3
72:5,6 76:22
78:18 80:6,7,9
128:11,12
137:6,13,24
140:4 147:8,20
148:1 175:15
175:24 176:2,5
176:9,15 177:2
**three** 13:20
32:11,16,17
52:6,11,11,12
62:25 64:16,22
64:23 113:20
119:25 146:14
154:21
**thriving** 12:21
**throw** 64:2,3,6
**throwing** 61:1
**thug** 91:4
**thursday** 1:17
91:5
**tiktok** 3:9,9,9
150:23 166:19

169:14 170:10
177:15
**time** 5:6 10:6
11:3,17,18,25
12:10,17,24
13:6,8 14:10
14:15,18 17:4
20:25 21:18
25:24 35:21,25
39:10 41:14
43:1,12,24
44:8 46:12
48:18,20 59:19
64:19,20 67:9
85:22 93:11
96:11 98:16
106:1,5 108:11
108:18 110:11
115:1 120:16
120:17 122:23
124:20,22
127:17,21,25
129:3,24
130:20 133:12
133:12,20,20
134:9,23
135:11,14,19
135:23 136:5,9
136:14 137:17
139:11,19,22
140:13,15
141:3,6,17
142:7 147:9,14
153:25 154:25

158:6,24
160:18 165:6
166:1,13 169:6
173:8,15
177:10,22
182:5,7,10
**times** 80:17
82:9 135:2
154:21
**tip** 117:1,5
119:11 120:14
120:17
**title** 19:14,17
19:24 20:14,17
25:19 75:5,5
116:10 118:21
144:16
**titled** 4:10,14
66:24 67:12
122:13 123:2
132:9,23 133:4
**titles** 23:7
**today** 6:11 7:25
23:24 27:20
32:15 123:24
124:19 171:10
173:20 175:20
**today's** 5:6
177:20
**together** 104:6
156:20 165:16
**told** 60:23
85:23

CONFIDENTIAL

took 21:2 29:18 47:14 112:12 161:6
tool 41:13
top 4:12 10:2,6 51:9,19,21 63:8 72:16 82:19 88:18 110:19 128:19 133:10
topic 114:17
tortious 7:11
total 177:22
totally 88:15
touch 64:22
touched 13:8,8 109:1
touches 52:7
touching 64:21
towards 132:5
town 7:12
track 77:13,15 77:21,24 79:14 79:18 80:24 103:3,7 106:18 156:2 167:8
tracking 77:22
tracks 102:8,10 102:24
tractor 99:15
trafficking 73:15 74:18 80:10

tragedies 36:6
tragedy 36:4
trailer 99:15
train 45:24 106:21
trained 10:10 22:20 35:3 45:21
trainers 68:13
training 4:11 16:20 35:3 38:5,9 53:9,13 55:21 56:8,9 57:12,14,18,20 57:21,25 58:16 58:18,19 60:18 61:5 64:4 66:25 67:14 68:12,17,23,24 69:4,14 104:7 106:21 153:4
trainings 53:17
transcribe 120:13
transcribed 182:8
transcript 179:7 182:5
transferable 61:22
transplant 112:10,11
transport 15:1 15:3

transportation 15:6
trauma 65:19 68:23 69:7,10 69:13
traumatic 69:18
travel 13:14
treated 174:8 174:12,16,21
trending 154:11
triage 76:14,16 117:2
triaging 76:20
trial 177:17
tries 105:13
truce 85:2
true 109:19 179:9 182:9
truly 109:11
truth 182:6,6,6
try 42:20 63:8 96:7 99:24 107:20 128:22 135:1 140:11 141:22
trying 9:10 44:5 57:3 59:20 60:17 85:8 86:2 89:14 90:4 95:8,22 97:13 100:6,8 115:10

135:19,20 136:19,20 139:25 140:10 140:14,23 160:12
tuesday 4:21 91:3 144:2
turn 68:2
turned 89:21 161:2
tv 153:18
twice 65:2 166:8
twilight 90:19 90:21,22
twitter 143:21
two 2:11 7:21 13:19 18:10 20:10 21:22,22 33:6 39:7 75:20,24 76:5 76:16 90:19 91:24 93:14 104:6 112:11 132:16 158:21 165:23 167:25
type 13:9 27:8 36:5 58:25 59:2 65:5,13 65:14,18 71:18 73:1,25 75:3 75:13 87:11 89:14 115:20 139:3 149:5

CONFIDENTIAL

**[type - vandalism]**                                                          Page 46

152:14 153:17
168:13
**typed**  182:8
**types**  14:20
17:9 28:22
30:4 33:7 71:9
71:12 72:14
75:9 88:1
101:14 103:19
103:23 104:20
112:25 114:8
140:21 152:24
**typically**  44:23
47:24 64:18
105:18 106:5,6
142:22 171:17
172:2,13

**u**

**u.s.**  10:7
**uh**  29:8 68:9,18
68:25 73:21
75:16 77:5
79:23 132:6,8
132:11,19,25
134:13 136:3
151:12
**ultimately**  60:1
70:16,18
**ultimatums**
112:15
**un**  169:24
**under**  6:10,18
7:15 9:18

15:16 21:2
25:8 35:1
76:25 93:25
118:2,8 130:12
132:22 179:4,6
179:13
**understand**
41:18,24 44:6
49:9 54:12,15
54:16 55:10,15
58:7 61:8,19
75:12 76:10
89:15 90:9
92:21 163:6,21
**understanding**
54:5,8,9 69:17
69:21 95:8
100:24 131:19
131:21 179:12
**unfortunately**
96:23 107:8
123:25 128:21
**uniform**  12:11
**unit**  10:5 14:11
16:3
**united**  1:1 5:12
9:14
**units**  14:6
**updated**  8:13
**updates**  154:10
**upgrade**  41:15
41:17
**upgrades**  37:5
37:6

**upload**  152:14
156:4
**uploaded**  152:5
156:21
**uploading**
152:12
**use**  35:17 40:18
41:3,5,6,7,10
41:12 42:21
43:20,23 48:25
49:23 59:1,1,2
63:1,20 92:9
101:5 120:20
128:3,23
131:25 142:23
143:9,23
151:10 152:21
153:12,14,18
153:22 154:15
154:16 157:3
158:17,20,22
159:18,22
160:17,19
164:25 165:2
165:24 166:16
173:5,12,18
174:4,16,21
175:8 176:18
176:22
**used**  45:10
115:1 151:6
154:25 155:18
156:17,19
157:7,9 158:12

160:25 166:1,3
166:8
**useful**  86:6
149:10 150:5
**uses**  43:7
142:21 155:24
156:14 167:5
167:10,12,14
168:25 169:3,7
**using**  42:23,25
43:1,3,4 49:25
82:11 128:2,12
128:13 132:1
145:13 160:2
166:8 171:17
171:24 172:2,2
172:6,7,10,13
172:19,24,25
**usually**  93:16
**utilize**  42:15,18
42:18,19 61:24
61:25
**utilizing**  101:8

**v**

**v**  1:7
**vacancy**  33:11
**validated**  82:11
82:13,16
**validation**
82:12,18
**vandalism**
14:23 30:19

CONFIDENTIAL

**[varied - weapons]**

**varied** 14:23
**variety** 71:14
 175:15
**various** 9:24
 12:24 15:9
 26:9 50:3 80:6
 124:18 149:8
**veritext** 5:5
**version** 83:3
**versus** 5:11
**vests** 58:2
**vice** 68:12
**vicinity** 92:15
**victim** 54:2
**victims** 102:22
**video** 5:8
 149:20 157:12
 177:20
**videographer**
 3:15 5:3,5 29:9
 29:15 70:24
 71:5 120:25
 121:6 164:12
 164:18 177:18
**videos** 142:16
 142:18 149:11
 149:16,18,24
 150:20 152:5
 152:14,15,16
 152:22,24,25
 153:1 154:5
 156:2,3,15
**videotaped**
 1:12

**view** 41:7 69:1
 124:16 125:11
**vigils** 100:10,13
**violence** 17:12
 17:23 18:6,16
 56:5,6 60:17
 71:16 76:12,16
 80:8,9 81:3,4,8
 81:12,21 96:14
 96:15,19,19
 103:4,20,24
 176:12,16
**violent** 17:6,9
 18:20 56:1
 73:18 76:11
 77:15,17,25
 79:15,19 84:15
 102:22
**vision** 24:16
**visit** 160:21,23
**vitae** 4:8 8:3
**volunteer**
 126:13

**w**

**wait** 59:8
 168:18
**wake** 98:11
**walberg** 2:10
**walk** 48:7
 58:25 62:7
 63:13 108:7
**walked** 60:22

**walking** 108:8
 110:19 124:9
**walkout** 108:3
 109:4
**walkouts** 108:4
**want** 9:21
 20:23 30:25
 42:1,6 43:11
 45:24 55:12,13
 57:2,3,6 59:17
 63:18 66:12
 70:21 92:13
 98:4 108:8
 111:13,21,22
 111:23 132:2
 147:3 155:6
 161:17 163:20
 163:22
**wanted** 30:13
 39:15 55:14
 64:22 78:5,9
 79:21 80:3
 107:22 108:7
 146:22 161:19
**wanting** 31:5
**washington** 3:6
 3:12
**watch** 152:21
 152:24 156:15
 157:12
**way** 24:21
 53:13 55:13,14
 55:20 56:12
 58:12 62:5

 63:3 69:14,15
 69:19 75:19
 80:25 100:4
 108:10 110:4
 119:9 132:16
 137:8 140:8
 141:1 159:10
**ways** 78:15
 91:1 113:24
 121:10 175:15
**wc.com** 3:7,7
**we've** 32:23
 33:5 40:16
 47:11 48:11
 50:4 61:21
 66:11,14 73:19
 74:21,22 98:21
 107:8,15
 123:24 124:19
 140:7 147:4,5
**weapon** 43:7
 44:17 46:17,23
 46:24 47:2,8
 48:13 53:23,24
**weapons** 42:15
 42:19,24,25
 43:4,14,14,16
 43:20 48:2,7
 48:10,19,22
 49:21 50:14
 101:20,21
 102:9,11,14,18
 114:10,11
 121:17

CONFIDENTIAL

**[wear - yeah]**                                                         Page 48

| | | | |
|---|---|---|---|
| **wear** 111:15,21 111:22 112:1 | 144:9 155:11 156:13 162:1 162:15 163:8 163:14 164:1 164:10,20 170:1,7,15,21 171:2,9 172:8 172:17,23 173:3 175:5,13 175:19 176:23 177:9 | **willing** 60:3 | 176:17,21 177:1 |
| **websites** 171:20 172:18 | | **window** 60:24 60:25 63:10,10 111:12 | **worked** 10:8 13:5 22:5,6,25 23:2,12,16,19 37:10 61:5 90:2 |
| **wednesday** 91:20 | | **witness** 5:17 19:1,3 24:1 29:4,8 31:18 34:13 35:23 44:4 46:7,14 47:19 48:6,18 49:7,17 79:18 81:8,18,25 122:11 123:22 126:6,23 127:4 133:18 155:10 156:10 162:13 163:6,13,20 164:9 169:24 170:20 171:1,8 172:6,16,21 173:2 175:4,12 175:18 176:21 177:8 182:12 | **working** 10:6 11:14 15:16 25:19 95:14,15 136:19 |
| **week** 28:5 127:24 152:9 154:21 165:1 | | | **works** 118:2,22 163:11,17 |
| **weekend** 97:1 | | | **worksheet** 132:10 |
| **weekly** 146:17 | **weight** 133:5 134:11,14,18 | | **world** 53:15 |
| **weeks** 152:9,10 | **welcome** 29:18 129:20 | | **worry** 115:20 |
| **weiant** 3:4 4:3 5:24 6:3 8:5 19:4 25:10 28:25 29:17 32:4 34:18 36:8 44:7 46:4 46:9,15 47:25 48:8,21 49:6 49:10,19 67:2 67:5,6 70:20 70:22 71:7 79:20 81:10,14 81:19 82:1,23 83:1,2 120:22 121:8 122:16 122:19,20 123:23 125:19 125:23 126:7 126:24 127:6 127:12 129:14 129:17,18 133:25 144:5,8 | **went** 10:4,16 10:22 14:22 15:10 25:7 31:20 43:11 86:14 88:14 117:5 160:7,22 160:22 161:6 168:2,6 | | **wow** 84:7 |
| | | **wolf** 2:17 | **write** 92:7 |
| | **west** 2:17 59:6 59:9 | **wondering** 61:2 | **writes** 84:13 |
| | **white** 10:3 | **work** 7:1 10:2 13:14 34:11,13 34:14,15,23,23 34:25 35:2 101:6,8 115:11 117:15 118:15 128:25 140:7 140:23,25 | **writing** 16:16 |
| | **wi** 160:13,14 | | **written** 78:22 137:8 175:21 |
| | **wide** 71:14 | | **wrote** 19:21 62:12 148:12 |
| | **wife** 165:15 | | **wwalberg** 2:14 |
| | **william** 2:10 | | |
| | **williams** 3:5 6:3 83:11 85:11 86:15 | | **x** |
| | | | **x** 4:1,5 143:21 |
| | | | **y** |
| | | | **yeah** 9:18,18 10:22 11:8,13 11:15 13:7,16 18:4,6,9 20:16 |

CONFIDENTIAL

**[yeah - zuckerberg]**                                      Page 49

20:16 23:6
24:1 25:7,17
25:18,23 27:1
28:6 32:14
34:3,21 35:24
36:3 37:10,10
37:25,25 38:11
38:11,25 39:25
41:9 49:11
56:23 57:1
59:13 69:11,16
69:25 73:5
74:18 77:18,19
77:20 85:7,13
86:19 87:19
89:25 90:22
95:5,5,6,7
96:23,23 99:11
99:13 100:11
107:2,6 108:17
109:8 110:12
110:13 111:4
111:11 119:11
119:25 124:15
131:8,13,14
135:13 137:2
138:13 142:22
146:9 151:12
152:12,13,17
156:1 158:10
158:11 161:2
162:6 168:1
**year**   13:16
  18:18 20:1,22

21:8 27:17,19
31:14 32:13
38:21 39:3
42:6 50:24
65:2 75:21,25
78:6,10 80:17
89:13 132:23
143:3 151:20
155:12,16
157:17 159:7
159:16 161:1
162:3,5,16,18
162:20 165:23
166:23 168:14
168:17 169:14
169:17
**years**   6:21 9:16
  9:18,19 10:12
  11:2 12:12,22
  13:4,19,20
  22:10 23:5
  25:2 55:18
  82:2 93:14
  95:6 104:6
  113:21 123:13
  162:25 167:25
**yep**   161:24
**yesterday**
  155:2
**ygr**   1:4
**young**   87:12
  112:7 114:23
  126:3

**youth**   100:16
**youtube**   3:3 6:5
  131:13,14
  142:14,15
  148:19 149:3
  149:12,19,25
  151:6,8,10,11
  151:13,25
  152:5,21
  153:12,13,14
  153:18,23,25
  154:16,20
  155:1,19,21,24
  156:4,6,14,17
  156:22,23,25
  157:3,7,9,10
  159:7,8 163:2
  163:3,9,15,22
  164:6,6 177:22

**z**

**zoned**   84:4
**zoom**   2:10,16
  3:10 29:6
  177:11
**zuckerberg**   2:9