**Exhibit 75**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - -

IN RE: SOCIAL MEDIA            : Case No.

ADOLESCENT                     : 4:22-MD-03047-YGR

ADDICTION/PERSONAL             : MDL No. 3047

INJURY PRODUCTS                :

LIABILITY LITIGATION,          :

                               :

This Document Relates to:

All Actions                    :

- - -

AUGUST 22, 2025

- - -

Videotaped deposition of JEFFREY MEYERS, taken pursuant to notice, was held at the law offices of Kessler Topaz Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, Pennsylvania 19087, commencing at 9:05 a.m., on the above date, before Amanda Dee Maslynsky-Miller, a Certified Realtime Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

GOLKOW, A VERITEXT COMPANY

877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 2

APPEARANCES:


      KESSLER TOPAZ MELTZER & CHECK, LLP
      BY: TYLER S. GRADEN, ESQUIRE
      280 King of Prussia Road
      Radnor, Pennsylvania 19087
      (610) 667-7706
      tgraden@ktmc.com
      Representing the Plaintiff


      WILLIAMS & CONNOLLY LLP
      BY: JOSEPH S. SANDOVAL-BUSHUR, ESQUIRE
      BY: SYDNEY J. VIGRAN, ESQUIRE
      680 Maine Avenue SW
      Washington, DC 20024
      (202) 434-5000
      jsandoval-bushur@wc.com
      Representing the Defendants,
      YouTube, LLC, and Google LLC


      SHOOK, HARDY & BACON L.L.P.
      BY: MATT DEPAZ, ESQUIRE
      2555 Grand Boulevard
      Kansas City, Missouri 64108
      (816) 474-6550
      mdepaz@shb.com
      Representing the Defendants,
      Meta Platforms, Instagram, Siculus

CONFIDENTIAL

Page 3

APPEARANCES: (Continued)
VIA ZOOM:

          KESSLER TOPAZ MELTZER & CHECK, LLP
          BY: JUSTIN J. SWOFFORD, ESQUIRE
          280 King of Prussia Road
          Radnor, Pennsylvania 19087
          (610) 667-7706
          jswofford@ktmc.com
          Representing the Plaintiffs


          CARELLA, BYRNE, CECCHI, BRODY &
          AGNELLO, P.C.
          BY: DAVID G. GILFILLAN, ESQUIRE
          5 Becker Farm Road
          Roseland, New Jersey 07068
          (973) 994-1700
          dgilfillan@carellabyrne.com
          Representing the Plaintiff,
          Irvington Public Schools


          EILAND & BONNIN LAW FIRM
          BY: DAVID BONNIN, ESQUIRE
          2200 Market Street
          Suite 501
          Galveston, Texas 77550
          (409) 763-3260
          dbonnin@eilandlaw.com
          Representing the Plaintiffs

CONFIDENTIAL

Page 4

APPEARANCES: (Continued)
VIA ZOOM:


        SEEGER WEISS LLP
        BY: CARLOS F. RIVERA, ESQUIRE
        55 Challenger Road
        Ridgefield Park, New Jersey 07660
        (973) 639-9100
        crivera@seegerweiss.com
        Representing the Plaintiffs


        BUCHANAN INGERSOLL & ROONEY PC
        BY: JORDYNN E. JACKSON, ESQUIRE
        550 Broad Street
        Newark, New Jersey 07102
        (973) 273-9800
        jordynn.jackson@bipc.com
        Representing the Plaintiffs


        MUNGER, TOLLES & OLSON LLP
        BY: STEPHANY REAVES, ESQUIRE
        601 Massachusetts Avenue NW
        Suite 500 E
        Washington, D.C. 20001
        (202) 220-1100
        stephany.reaves@mto.com
        Representing the Defendant,
        Snap, Inc.

CONFIDENTIAL

APPEARANCES: (Continued)

VIA ZOOM:

      KING & SPALDING LLP
      BY: KEVIN DONOVAN BOYCE, ESQUIRE
      Southeast Financial Center
      200 South Biscayne Boulevard
      Suite 4700
      Miami, Florida 33131
      (305) 462-6000
      kboyce@kslaw.com
      Representing the Defendants,
      TikTok Inc., ByteDance Inc.,
      ByteDance Ltd., TikTok Ltd., and
      TikTok, LLC

ALSO PRESENT:
William Chan, Videographer
Will Davis, Trial Technician

             - - -

CONFIDENTIAL

Page 6

- - -

I N D E X

- - -

Testimony of:  JEFFREY MEYERS

By Attorney Sandoval-Bushur                 12

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION                         PAGE

Meyers-1A     No Bates
              5/19/25 Expert Report,
              Breathitt County School
              District                             13

Meyers-1B     No Bates
              5/19/25 Expert Report,
              Charleston County School
              District                             14

Meyers-1C     No Bates
              5/19/25 Expert Report,
              DeKalb County School
              District                             14

Meyers-1D     No Bates
              5/19/25 Expert Report,
              Board of Education of
              Harford County                       15

CONFIDENTIAL

Page 7

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Meyers-1E | No Bates 5/19/25 Expert Report, Irvington Public Schools | 16 |
| Meyers-1F | No Bates 5/19/25 Expert Report, Tucson Unified School District | 16 |
| Meyers-2A | No Bates 7/25/25 Expert Reply Report, Breathitt County School District | 17 |
| Meyers-2B | No Bates 7/25/25 Expert Reply Report, Charleston County School District | 17 |
| Meyers-2C | No Bates 7/25/25 Expert Reply Report, DeKalb County School District | 18 |
| Meyers-2D | No Bates 7/25/25 Expert Reply Report, Board of Education of Harford County | 19 |
| Meyers-2E | No Bates 7/25/25 Expert Reply Report, Irvington Public Schools | 19 |
| Meyers-2F | No Bates 7/25/25 Expert Reply Report, Tucson Unified School District | 20 |

CONFIDENTIAL

Page 8

- - -
E X H I B I T S
- - -

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Meyers-3 | Meyers000011-0018 Asher-Meyers Invoices | 43 |
| Meyers-4 | Meyers000001-0010 Curriculum Vitae of Jeffrey Meyers | 51 |
| Meyers-5 | No Bates Affidavit of Lisa Kathryn Allison | 124 |
| Meyers-6 | No Bates Affidavit of Phil Watts | 287 |
| Meyers-7 | No Bates Affidavit of Will Noble | 304 |
| Meyers-8 | No Bates Affidavit of Daniel Prentice | 309 |
| Meyers-9 | No Bates Plaintiff's First Supplemental Answers to Defendants' Interrogatories to Charleston County School District, Set 3 | 329 |
| Meyers-10 | No Bates Affidavit of Monika Davis | 349 |
| Meyers-11 | No Bates Plaintiff's Amended Objections and Responses to Defendants' Interrogatories to Dekalb County School District, Set 3 | 364 |

CONFIDENTIAL

Page 9

E X H I B I T S

NO.            DESCRIPTION                    PAGE

Meyers-12     No Bates
              Cost Estimates                   368
Meyers-13     No Bates
              Video-Recorded Rule 30(b)(6)
              Deposition of DeKalb County
              School District By
              Byron Schueneman                  371
Meyers-14     No Bates
              Plaintiff Board of Education
              of Harford County's Amended
              Objections and Responses
              to Defendants'
              Interrogatories, Set 3      386

Meyers-15     No Bates
              Plaintiff's Third Amended
              Answers to Defendants'
              Interrogatories To
              Irvington Public Schools,
              Set 3                            400
Meyers-16     SM_TUSD_00185554
              Reactive Work Order              438

Meyers-17     SM_TUSD_00185580
              10/27/21 Letter,
              Tucson Unified School
              District                         441

CONFIDENTIAL

Page 10

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line     Page Line     Page Line

None

Request for Production of Documents

Page Line     Page Line     Page Line

None

Stipulations

Page Line     Page Line     Page Line

11     1

Question Marked

Page Line     Page Line     Page Line

None

CONFIDENTIAL

Page 11

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:   We are now on the record.  My name is William Chan.  I'm a videographer for Golkow, a Veritext division. Today's date is Friday, August 22nd, 2025.  The time is 9:05 a.m. Eastern.

This video deposition is being held at the offices of Kessler Topaz Meltzer & Check, 280 King of Prussia Road, Radnor, Pennsylvania, In Re:  Social Media Adolescent Addiction Personal Injury Products Liability Litigation for the United States

Page 12

District Court, Northern District of California.  The deponent is Jeffrey Meyers.

All counsel will be noted on the stenographic record.  The court reporter is Amanda Miller, who will now swear in the witness.

- - -

JEFFREY MEYERS, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Good morning, Mr. Meyers.

A.    Good morning.

Q.    Could you please state your name for the record?

A.    Jeffrey Meyers.

Q.    You've been deposed a number of times before, correct?

A.    Yes, sir.

Q.    I expect that you know the

CONFIDENTIAL

Page 13

drill.  But just as a reminder, please wait until I finish asking a question before you begin giving your answer.

And if at any point today you need a break, please just let me know.

A.    I'll do my best.

Q.    Thank you.

ATTORNEY SANDOVAL-BUSHUR:

Let's go ahead and mark Exhibits-1A through 1F.  I'll give you a binder with all of those in them.

- - -

(Whereupon, Exhibit Meyers-1A, No Bates, 5/19/25 Expert Report, Breathitt County School District, was marked for identification.)

- - -

TRIAL TECHNICIAN:  Do you want that Exhibit-1A and from there?

ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

Page 14

Yes, correct.  1A will be 1A.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, do you recognize Exhibit-1A as your expert report in the Breathitt case?

A.    I do.  This is the report that I issued on May 19th, 2025, this year on behalf of Breathitt.

- - -

(Whereupon, Exhibit Meyers-1B, No Bates, 5/19/25 Expert Report, Charleston County School District, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-1B as your expert report in the Charleston case?

A.    I do.  This is the expert report that I issued on May 19th, 2025, on behalf of Charleston.

- - -

(Whereupon, Exhibit

Page 15

Meyers-1C, No Bates, 5/19/25
Expert Report, DeKalb County
School District, was marked for
identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-1C
as your expert report in the DeKalb case?

A.    I do.  This is a copy of my
report, dated May 19th, 2025, on behalf
of DeKalb.

- - -

(Whereupon, Exhibit
Meyers-1D, No Bates, 5/19/25
Expert Report, Board of Education
of Harford County, was marked for
identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-1D
as your expert report in the Harford
case?

A.    That is correct.  This is
the expert that I issued on May 19th,

CONFIDENTIAL

Page 16

2025, on behalf of the Board of Education of Harford.

- - -

(Whereupon, Exhibit Meyers-1E, No Bates, 5/19/25 Expert Report, Irvington Public Schools, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-1E as your expert report in the Irvington case?

A.    That's correct.  This is a copy, on Tab 1E to the record, of my report dated May 19th, 2025, on behalf of Irvington Public Schools.

- - -

(Whereupon, Exhibit Meyers-1F, No Bates, 5/19/25 Expert Report, Tucson Unified School District, was marked for identification.)

- - -

Page 17

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit 1-F as your expert report in the Tucson case?

A.    That is correct.  This is my expert report, dated May 19th, 2025, on behalf of Tucson.

Q.    And I will hand you a second binder labeled Exhibits-2A through 2F.

A.    Thank you.

- - -

(Whereupon, Exhibit Meyers-2A, No Bates, 7/25/25 Expert Reply Report, Breathitt County School District, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, do you recognize Exhibit-2A as your reply report in the Breathitt case?

A.    I do.  This is the reply report that I issued on May 20 -- sorry, July 25th, 2025, on behalf of Breathitt.

- - -

Page 18

(Whereupon, Exhibit Meyers-2B, No Bates, 7/25/25 Expert Reply Report, Charleston County School District, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-2B as your reply report in the Charleston case?

A.    I do.  This is the expert reply report that I issued on July 25th, 2025, on behalf of Charleston.

- - -

(Whereupon, Exhibit Meyers-2C, No Bates, 7/25/25 Expert Reply Report, DeKalb County School District, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-2C as the reply report in the DeKalb case?

A.    I do.  This is my expert

Page 19

report -- reply report, dated July 25th, 2025, on behalf of DeKalb.

- - -

(Whereupon, Exhibit Meyers-2D, No Bates, 7/25/25 Expert Reply Report, Board of Education of Harford County, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-2D as your reply report in the Harford case?

A.    I do.  This is the expert reply report, dated July 25th, 2025, for the Board of Education of Harford.

- - -

(Whereupon, Exhibit Meyers-2E, No Bates, 7/25/25 Expert Reply Report, Irvington Public Schools, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-2E

CONFIDENTIAL

Page 20

as your reply report in the Irvington case?

A.    I do.   This is the expert reply report, dated July 25th, 2025, that I issued on behalf of Irvington.

-   -   -

(Whereupon, Exhibit Meyers-2F, No Bates, 7/25/25 Expert Reply Report, Tucson Unified School District, was marked for identification.)

-   -   -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Do you recognize Exhibit-2F as your reply report in the Tucson case?

A.    I do.  This is the expert reply report, dated July 25th, 2025, that I issued on behalf of Tucson.

Q.    Exhibits-1A through 1F and 2A through 2F are the complete set of expert reports that you submitted for the six bellwether school district cases, which are Breathitt, Charleston, DeKalb, Harford, Irvington and Tucson, correct?

Page 21

A.    I believe that's correct.

And I've had an opportunity, as we went through these, to go in and check to make sure that these appear to be complete copies of all of the six original reports dated May 19th and all of the complete reports of the reply reports dated July 25th.

Q.    If I refer to the bellwether cases, will you understand that I am referring to the Breathitt, Charleston, DeKalb, Harford, Irvington and Tucson cases?

A.    I will.  Yes, sir.

Q.    Your expert reports, Exhibits-1A through 1F and 2A through 2F, contain a complete statement of all opinions you may express in the bellwether cases and the bases and reasons for them, correct?

A.    At this time, correct, yes, sir.

Q.    Is there anything in your expert reports, Exhibits-1A through 1F

Page 22

and 2A through 2F, that you believe should be corrected?

A.    No, sir, not at this time as I sit here.

Q.    Do you feel certain, sitting here today, that there are no errors in your damages calculations?

A.    I do.

Q.    Is there any opinion or basis for any opinion that is not contained in Exhibits-1A through 1F or 2A through 2F that you intend to add between now and trial?

A.    Could you ask that again, please?

Q.    Are there any opinions that you intend to offer at trial that are not contained within Exhibits-1A through 1F and 2A through 2F?

A.    At this time, the accumulation of the 12 reports that we went over contain all of my opinions as of today's date for this deposition.

                To the extent that

Page 23

additional information would come to my attention that would cause me to edit or amend my report, those additional opinions would be contained therein.

But as of today these reports do contain all of the opinions I intend to give and expect to give in these bellwether trials, if you don't mind me referring to them as such.

Q.    Your expert reports, Exhibits-1A through 1F and 2A through 2F, identify all the materials that you considered in forming your opinions, correct?

A.    At the time that those reports were issued, they do.  Yes, sir.

And the reply reports contain additional documents that were reviewed in connection with the actual reply to the rebuttal reports, as well as confirming any opinions that were given at the original reports.

Q.    There are no materials that you considered in forming your opinions

CONFIDENTIAL

Page 24

that are not contained in Exhibits-1A through 1F and 2A through 2F, correct?

A.    I agree with that, with the caveat that there were things that were received in connection with the reply report, such as depositions that were given after the date of the original reports, that just further confirm or bolster the opinions in the reports.

So if you take them collectively as a whole, I agree with you, yes, sir.

Q.    In forming your opinions in these cases, you did not consider any internal documents of any defendant, like internal e-mails or presentations, correct?

A.    You would have to be more specific on that.

As you can go through the materials reviewed, and perhaps we'll do that today, there were a lot of range of information.  Some of those vendor expense reports had information that may

have contained e-mails or internal documents attached to invoices, attached to purchase orders.

So I cannot agree with you on that. I do believe that that information is contained in the materials reviewed for these six bellwethers and the other reports, as well, that we're not talking about today.

Q. And I was asking about any internal documents of any defendant, not of the plaintiffs but of the defendants.

In forming your opinions in these cases, did you consider any internal documents of any defendant?

A. I guess I'm confused that -- internal documents of the defendant.

So any e-mails or correspondence or documents among the defendants not produced in this case?

Q. Did you -- you did not review any documents in forming your opinions in this case that were produced by the defendants, correct?

A.    That's not correct.

Q.    What documents did you review in this case that were produced by the defendants?

A.    All of the rebuttal reports that I cite in my materials reviewed, including -- I believe there were four reports prepared by Dr. Lakdawalla in connection with a rebuttal analysis that he performed on -- it was, Breathitt.  He prepared a report on behalf of Charleston.  He prepared a report on behalf of Harford.  He prepared a report on behalf of Tucson.

Q.    Yes.

A.    Matthew Springer prepared a report on behalf of Tucson.  And Mr. Hyman prepared a report on behalf of DeKalb and --

Q.    Irvington, correct?

A.    I believe that's correct. I'm just trying to find it to confirm.

Q.    Mr. Meyers, I'm not --

A.    Irvington.  Correct.

Page 27

Q.    I'm not asking about expert reports.  I'm asking about, setting aside expert reports, documents produced by the defendants in this litigation.

You did not --

A.    So you're asking me to assume that documents produced by the defendants do not include the expert reports that were produced by the defendants?  I got it.

Q.    You did not review any documents, in forming your opinions in this case, that were produced by the defendants, correct?

A.    Other than the ones we just discussed.

Q.    Other than the expert reports?

A.    Yes, sir.

Q.    In forming your opinions in this case, you did not consider any deposition or other testimony of any current or former employees of any defendant, correct?

Page 28

A.    Any defendant?  I think that's fair.

Q.    Were there any materials that you -- that would have been helpful to you in forming your opinions in this case that you were not able to review?

A.    No, sir, not that I'm aware of today.

Q.    In forming your opinions in this case, you relied on documents that were provided to you by plaintiffs' attorneys, correct?

A.    Could you ask it again, please?

Q.    In forming your opinions in this case, you relied on documents that were provided to you by plaintiffs' attorneys, correct?

A.    Either directly or indirectly.  All the documents went through counsel in this particular case.

But the documents are what was relied upon, not the information from counsel.

Page 29

So they did act as the medium to provide documents to me.

Q. And when you say "directly or indirectly," do you mean that some of the documents you relied on were provided directly to you, Jeffrey Meyers, by plaintiffs' attorneys and other documents that you relied on were provided to your support staff at Ashley -- at Ascher-Meyers by plaintiffs' attorneys?

A. No, that's not what I'm saying. Some of these were documents that were requested by me through the plaintiffs; so let me see the invoices, let's see the general ledgers, please provide those.

Other documents were directly requested by me, such as interview Byron Scheuneman of DeKalb, looking at the documents. And then he produced them to counsel to produce to me.

So some of them were me asking for the documents generally and

not necessarily speaking to a representative. And in other cases, as detailed in the report, it was me directly speaking to the CFO or the head of the financial department to request information that would be utilized in connection with my report.

Q. There were no documents that you relied on in this case that you received directly from an employee of one of the plaintiffs, correct?

A. I know that happened in one or two cases. But I don't think it's on any of these six bellwethers.

Q. Okay.

A. But it would have been to counsel, and me copied on the e-mail, as a result of a phone call. So it all went through counsel, I guess I would say, but may have come directly from an individual at one of the schools.

Q. All of the documents that you relied on in calculating damages in these six bellwether cases were provided

CONFIDENTIAL

Page 31

to you by plaintiffs' attorneys, correct?

A.    Directly or indirectly, as we just discussed.

Q.    Did you receive any assistance from anyone other than plaintiffs' attorneys in preparing your reports?

A.    I do want to go back and clarify one of my answers.

Some of the documents were actually pulled by myself.  They are in the materials reviewed.  I'm just thinking about this now and, perhaps, we should go through these one by one, while I answer these questions.

But, for instance -- let's see.  So a good example would be in Charleston.  There were publicly available information on Charleston, such as the budget reports.  They were provided by counsel.  But they were also downloaded by me directly as publicly available at my review.

So if you'd like to go

CONFIDENTIAL

Page 32

through that, I'm happy to go through all the materials reviewed and tell you which ones were not given by counsel.

But anything that would have an e-mail -- not an e-mail but have a website address, such as Number 3, budget reports, or Number 2, audited financial statements for Charleston, those were actually downloaded by me or my firm directly.

So there is a third bucket. It's either plaintiffs' counsel directly or indirectly or downloaded by me directly in connection with my analysis on publicly available information.

Thank you for allowing me to clarify.

Q.    Did you receive any assistance from anyone other than plaintiffs' attorneys in preparing your reports?

A.    Assistance --

ATTORNEY GRADEN:   Object to form.

Page 33

THE WITNESS:  Outside of my firm?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Let's start with assistance from within your firm.

And your firm is called Asher-Meyers, correct?

A.    It is.

Q.    What assistance did you receive from individuals from within your firm, Asher-Meyers, in preparing your reports?

A.    Sure.  So at my direction, I had a number of associates who assisted me in this case.  Generally, their role was in connection with accumulating data, organizing the files, preparing spreadsheets such as have been incorporated with this report, to organize the documents for me to analyze.

So it was largely a data-gathering exercise, as I'm sure we'll talk about today.

This forensic accounting was

millions of invoices and general ledger reports, hundreds of thousands of pages of documents that were having to be culled down to the exhibits as they are here.

Vendors of all sorts over all different mechanisms. When you're looking at the general ledgers or vendor expense reports for these schools, it's a lot of information and data.

So they helped organize the data and get the data in a form that I could analyze it. And so that was their role generally.

Q. In this case, you received assistance from Harold Asher, David Curtin, Chris Johnson, Taylor Jones?

A. Jobs.

Q. Jobs?

A. Jobs.

Q. Jobs. And Caroline Marks, who changed her name?

A. She did. She got married in May -- well, first week of June. I

Page 35

should put that on the record accurately.

Q.    So Caroline Marks and Caroline Towns are the same person?

A.    That is correct.  She is.

Q.    So I'll just ask the question so it's a little bit clearer.

In this case, you received assistance from Harold Asher, David Curtin, Chris Johnson, Taylor Jones --

A.    Jobs.

Q.    -- Jobs, sorry, thank you -- and Caroline Towns, correct?

A.    Town, not with an S.

Q.    Town.

What did -- what assistance did you receive from Harold Asher?

A.    Harold Asher and I spoke largely about the theoretical components on the lost-profits calculation that's been done here in the forensic accounting.

So our discussions were more about the formulation of how to prepare and finalize the actual lost profits

Page 36

calculations as you see on Exhibit-1.

Q.    What assistance did you receive from David Curtin?

A.    Administrative, kind of clerical information, as far as organizing documents, putting them in buckets, identifying what we had and preparing the spreadsheets that take the information from those PDFs and put them into a more usable format.

Q.    What are Mr. Curtin's qualifications?

A.    Mr. Curtin has a Master's Degree in accounting.  I think he has an MBA -- no, it's an MBA not a -- an MBA. He's a certified valuation analyst with the NACVA, the National Association of Certified Valuation Analysts.

And he's been working in this role with me as an associate for almost four years now.

Q.    What assistance did you receive from Chris Johnson?

A.    Chris Johnson was data

entry.

Q.    What assistance did you receive from Taylor Jobs?

A.    Taylor Jobs acts mostly as my assistant.  It would be mostly data entry or organizing the documents and putting them into folders as I request.

Q.    What assistance did you receive from Caroline Town?

A.    Caroline would have assisted with preparing spreadsheets and working through some of the forensic accounting with me in this matter.

Q.    Did you receive any assistance from anyone outside of the Asher-Meyers law firm?

A.    Not a law firm.

Q.    Sorry.  Thank you for that. I apologize.

A.    I just want the record to be clear.  We are not a law firm.

Q.    No, I -- yes.

Did you receive any assistance from anyone other than

CONFIDENTIAL

Page 38

individuals at the Asher-Meyers firm and plaintiffs' attorneys in preparing your reports?

A.    Excluding the interviews that I had directly with either plaintiff witnesses or plaintiff personnel as detailed in my report or including them?

Because I did have those discussions as well, which that would be outside of my firm or outside of plaintiffs' counsel.

But those would be the three buckets, the people inside my firm, plaintiff counsel and documents that have been received by them, and then the interviews that were done by me as detailed in all of the six reports.

Q.    The plaintiffs' attorneys in this case hired you to serve as an expert witness, correct?

A.    I believe that's correct.

Q.    Which of plaintiffs' attorneys specifically hired you?

A.    I don't know the answer to

that question.  There's a lot of attorneys in this case.  I do not know who specifically hired me.

I think that the invoices go to a number of firms.  So I guess you would have to ask them specifically who hired me.

Q.    Which plaintiffs' attorneys first contacted you to serve as an expert witness in this case?

A.    It would have been attorneys at this firm here, Kessler Topaz.

Q.    And who specifically from Kessler Topaz?

A.    I don't recall directly if it was Melissa Yeates or Tyler Graden, but it would have been one of the two of them.

Q.    Were you given an assignment when you were hired?

A.    I don't know that I was given an assignment, necessarily, at the time of my hiring.

We were talking about

calculating damages, and that's an expert role that I have done throughout my career.

Q.    Did your understanding of your assignment in this case change at any point during the course of your work?

A.    I don't think so.  I mean, it was always contemplated that I was going to do past lost damages, basically, a calculation, and a forensic accounting, which is why I was hired, to do a forensic accounting of costs.

And that's effectively what the reports that I've issued have done.

You'd have to ask them if they had any other thoughts in mind of things other than what I did that I could have done.

But this was the role that I was asked to prepare in this, and I did do it.

Q.    Was it always your assignment to use allocation percentages in your damages calculations that were

derived from either employee affidavits or interrogatory responses?

A. Could you ask that again?

Q. Was it always your assignment to use allocation percentages in your damages calculations that were derived from either employee affidavits or interrogatory responses?

A. I don't know that it was or wasn't. The original scope was to analyze hundreds if not thousands of vendors, organize them, basically do a forensic accounting on what the costs were by vendor and be in a position to work with counsel as to what the damages would be in any particular case.

And so the allocation percentages which are derived directly from the persons most knowledgeable in this case, either through verified interrogatory responses or affidavits, declarations, provided a component of what went into that damages calculation.

Q. You get paid for your work

CONFIDENTIAL

Page 42

as an expert witness, correct?

A.    I do.

Q.    How much are you getting paid for your work in this case?

A.    I'm getting paid on an hourly basis.

Q.    You are getting paid $475 an hour for your work in this case, correct?

A.    I believe that's correct.

Q.    And you are compensated for the first hour of a deposition at $950 an hour; is that correct?

A.    That is correct.  For depositions and trials.

Q.    All work other than the first hour of any deposition or trial testimony that you do in this case is billed at $475 an hour; is that correct?

A.    That's what it is for this year.  It's subject to go up in 2026.  But that is correct as of this point in time.

ATTORNEY SANDOVAL-BUSHUR:

Let's mark Tab 3 as Exhibit-3.

CONFIDENTIAL

Page 43

- - -

(Whereupon, Exhibit Meyers-3, Meyers000011-0018, Asher-Meyers Invoices, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Mr. Meyers, do you recognize Exhibit-3 as a copy of the invoices for Asher-Meyers' work on this case?

A. I do.

Q. And the invoices in Exhibit-3 contain the billings for you as well as other people affiliated with Asher-Meyers, correct?

A. That is fair, sir.

Q. You have billed a little over $185,000 for your time between December 2024 and July 2025.

Does that sound right to you?

A. I have no idea. I can -- if you want to give me a pad or let me pull up my phone and do a calculation, I can

do it very quickly for you.

But I have not done that math.

Q. Would it surprise you if you have been paid $185,000 for your work so far on this case?

A. Let me go ahead and check it, because I don't know that it would surprise me or not.

But I'm just going to take out my phone and pull out a calculator real quick.

So a couple of things. One, to clarify, I don't get paid, my firm gets paid.

But subject to that clarification, for the time that Jeffrey E. Meyers has worked, Jeffrey E. Meyers's time has been compensated to Harold -- to Asher-Meyers at $159,255.

That's what has been paid, which is your question.

Q. Okay.

A. There's additional time that

has been billed that has not been paid as of the date of this deposition.  So if you'd like me to add up the rest of that and see how much has been billed through the end of July, I'm happy to -- I still have the number up, I'm happy to make that clarification.

Q.    Please do.

A.    Sure.

So through July, the biller at Asher-Meyers, Jeffrey E. Meyers, which is me, has billed time totaling $181,075.

I did that slow for you.

Q.    Okay.

A.    Okay.

Q.    So there is a little over $20,000 of your time that you have billed but you have not yet been paid?

A.    That's fair.

And I say that as of the date this invoice went out, it had not been paid.  I don't do the billing at my firm.  So it may have been paid between when this July bill went out, which

CONFIDENTIAL

Page 46

probably would have been, my guess is ten days ago and today.

So I don't know that it hasn't been paid.  But as I sit here right now, I'm not aware of whether it is -- has or has not.  But according to these bills, it had not at the time it went out.

Q.    Between December 2024 and July 2025, the biller at Asher-Meyers, Jeffrey E. Meyers, which is you, has billed time totalling $181,075, correct?

A.    That's what I calculated as well, yes, sir.

Q.    Are you a co-owner of the Asher-Meyers firm?

A.    I am, yes, sir.

Q.    What percentage of Asher-Meyers do you own?

A.    I don't know how that's relevant here today.

Q.    Are you refusing to answer my question?

A.    I'm just saying I don't

CONFIDENTIAL

Page 47

think it's relevant here today.

I'm a co-owner with Harold Asher.  We are the two owners of Asher-Meyers.

Q.    What percentage of Asher-Meyers do you own?

A.    I'm not going to answer that today.

Q.    Okay.  Do you receive any portion of the profits of Asher-Meyers?

A.    I would say indirectly; not directly, but indirectly.

Q.    What do you mean?

A.    Well, Asher-Meyers -- I'll give you a little bit of leeway on this.

Asher-Meyers is owned by two entities, Jeffrey E.  Meyers, Consulting, and Harold A. Asher, CPA, LLC.  And those entities do not share profit-sharing, because we get consulting fees based on our ownership in the business and the way that we provide our work.

Q.    Are you a 100 percent owner of Jeffrey E. Meyers Consulting?

A.    I don't know how that's relevant.  But I'll tell you that I am.

Q.    And so the more money that Asher-Meyers earns, the more money that Jeffrey E. Meyers Consulting earns and the more money you earn, correct?

A.    That may or may not be the case.

Q.    Why would that not be the case?

A.    Because sometimes Jeffrey E. Meyers may not have an interest in something that Asher-Meyers owns or earns.

Q.    Okay.  Do you receive any portion of the time that is billed by people other than you who worked on this matter at Asher-Meyers?

A.    I would say indirectly, perhaps, yes.

Q.    How do you receive money relating to the time billed by people other than you who worked on this matter at Asher-Meyers?

Page 49

A.    Well, Asher-Meyers is an entity and a firm, and it has overhead. Overhead has to be paid.

And to the extent that there are additional amounts throughout the course of a year that are in my excess of what that overhead would otherwise be, the two owners of Asher-Meyers would participate in a percentage of that additional earning, if you will, or that profit.

Q.    Do you have -- your invoices that we received do not include the time that you spent working on this case in the month of August 2025, correct?

A.    That's correct.

Q.    How much time have you spent working on this case in the month of August 2025?

A.    I do not know.

Q.    And do you anticipate billing for additional work in this case between now and trial?

A.    If there's additional work

Page 50

performed by me on an hourly basis for me or anyone at my firm, then it will be billed in connection with my engagement with this firm on an hourly basis, yes, sir.

Q.    Looking at calendar year 2025, what percentage of your total compensation has come from your work on this case?

A.    I wouldn't be able to tell you.

Q.    To prepare for this deposition, did you meet with plaintiffs' attorneys?

A.    I did.

Q.    How many meetings did you have with plaintiffs' attorneys?

A.    Two.

Q.    How long were each of those meetings?

A.    I don't know exactly.  I met on Wednesday afternoon for a few hours and then intermittently throughout the day yesterday.  So there was time we were

Page 51

meeting and time we weren't meeting.

So, you know, over the last two days I would say I've been at this office maybe 11 or 12 hours. So some period less than that.

Q. And did you meet with attorneys from the Kessler Topaz firm to prepare for your deposition today?

A. I did.

Q. Did you meet with any attorneys who are not affiliated with the Kessler Topaz firm to prepare for your deposition?

A. I believe there was one other attorney yesterday who was not affiliated with Kessler Topaz.

I don't know that he's not, but I do not believe that he was.

Q. Who was that?

A. I believe it was Mr. Carlos Rivera.

ATTORNEY SANDOVAL-BUSHUR:

Let's mark Tab 4 as Exhibit-4.

- - -

CONFIDENTIAL

Page 52

(Whereupon, Exhibit Meyers-4, Meyers000001-0010, Curriculum Vitae of Jeffrey Meyers, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And, Mr. Meyers, I will represent to you that this is the copy of your CV that your counsel provided to us earlier this week.

Is Exhibit-4 the current version of your CV?

A.    I believe it is.  That's correct.

Q.    You live and work in Louisiana; is that correct?

A.    Well, I live in Louisiana. I work all throughout the country.  But my office is located in Louisiana.

Q.    You are a professional expert witness, correct?

A.    That -- I perform expert witness work as one of the things that I

Page 53

do.  I don't particularly say a professional expert witness.  I'm a litigation consulting expert who testifies in trials.

But other than that distinction, that is one of the hats that I wear.

Q.    Do you professionally offer your services as an expert witness in litigation and other legal disputes?

A.    Well, I offer my services in the fields that I'm qualified, whether it's lost profits or business valuation, forensic accounting.

And depending on whether or not, you know, it goes to trial and they need somebody to testify, that's the only time you become the witness.

Otherwise, I do expert work on all those fields.  I would say the vast majority of cases don't go to deposition or trial; and there's no expert witness work that's being performed in those cases.

CONFIDENTIAL

Page 54

Q.     Do you professionally offer your services as an expert witness or expert consultant in litigation and other legal matters?

A.     I would say expert consultant.  I'm comfortable answering that question that I do offer my services as a consulting expert in the fields in which I've been, you know, qualified or are within my scope of range.

Q.     Is serving as a paid expert a major part of your professional work?

A.     As opposed to serving as an unpaid expert?

Q.     Sure.

A.     I would say that both of them are a part.  There's oftentimes that I serve as an expert in my capacity and don't get paid.

So it's within the role of what I do to both do expert work or additional business consulting that's not in the firm of expert consulting, if you will.  And some of those cases involve

being paid and some of them don't.

Q.    How much of your professional time is spent serving as an expert in legal matters?

A.    We didn't go through all of the initial formalities.  So I'm going to make a statement.

I'm asking you to re-clarify.  Are we -- I'm going to say litigation consulting.  Are you okay with that clarification on litigation consulting?

Because you want to say legal matters, and I don't want to get into a bag that I know what a legal matter is or not.

I might help with a business consulting engagement that talks about leases that you may say is a -- is a legal matter, but I would not consider it a litigation consulting if it has no dispute involved between two parties.

So either please re-clarify your question or define the terms,

Page 56

because I don't want to misstate the testimony that I'm giving.

Q.    How much of your professional time is spent serving as an expert in connection with litigation?

A.    I would say somewhere -- and it ranges from year to year -- between 85 and 95 percent.

Q.    What percentage of your income comes from serving as an expert in connection with litigation?

A.    I wouldn't know the answer to that.

Q.    What do you hold yourself out as an expert in?

A.    Okay.  Let's see if I can do it.

I am an expert in forensic accounting.  I am an expert in lost profits.  I'm an expert in business valuation.  I've been qualified and tendered and accepted without exception as an expert economist, statistician, fraud examiner.

CONFIDENTIAL

Page 57

I have -- and some of these are on my CV.  I have been qualified in the calculation of income, determinations, securities, damages, lost value.

I'm trying to think.

Community property partition issues, I'll just say generally.

I guess that's the vast majority.  If you'd like me to read back what I said and see if I think of anything else.

But it's -- I've been qualified and tendered in quite a number of different fields.

Q.    How many times have you been hired by attorneys to serve as an expert in connection with litigation?

A.    I would not know the answer to that question over my 21-year career.

Q.    Have you been hired by attorneys to serve as an expert in connection with hundreds of litigation matters?

CONFIDENTIAL

Page 58

A.     Sure.

Q.     I believe I counted on your CV that there were 60 cases in which you served as an expert in the past four years.

Does that sound approximately right to you?

A.     Would you like me to count them?

Q.     No.

Are you able to say whether that would be in the ballpark?

A.     Again, this is -- our CV -- my CV is updated.  Harold's CV is updated every time we testify in a case.

So I haven't counted it recently.  It normally ranges, over a four-year period, in the average -- sixty sounds okay without me going through and counting these seven pages.

But I'm taking your word for that.

Q.     And you are not able to say how many cases, over the course of your

Page 59

career, you have served as an expert in; is that correct?

A. Okay. Well, so that's a different question.

The answer is no, I cannot. But these cases, these 60, are only cases in which I provided deposition or trial testimony. So these do not represent the cases that I've served in in the last four years.

Q. In a majority of the cases where you've served as an expert were you an expert for plaintiffs?

A. Absolutely not.

Q. In a majority of the cases where you served as an expert, you were an expert for defendants?

A. Absolutely not. So we have to go break it down. So if you'd like, I will try to give you an explanation of how it's broken down. Because my particular side of Asher-Meyers is different than Mr. Asher's.

So I'm going to assume,

Page 60

first of all, that you're asking me about Jeffrey Meyers and not Asher-Meyers.

Q.    Correct.

A.    Okay.  Jeffrey Meyers normally performs consulting services in three different buckets in the litigation category.

One, I'll call them economic loss calculations.  You may call them personal injury, wrongful death, wrongful termination, medical malpractice, present values of future life care plans.

In those cases, I have a very different kind of split, okay.  So my plaintiff work on cases in that, and I don't have it measured exactly, but generally, if it's cases in the door, like, just hired and not time spent, it's probably 70 to 80 percent plaintiff on just that bucket.

And then as it relates to time actually spent, closer to 50/50.  One of the larger clients that I have is the Department of Justice.  I represent

CONFIDENTIAL

Page 61

the Department of Justice in calculating economic damages for military hospitals throughout the United States as one of the things that I do.

So when I get involved in those cases, whether it's a wrongful death case or present value of a future life care plan on a catastrophic injury, the time spent on that dwarfs the amount of time spent on a car accident case where I'm calculating somebody's three weeks of lost earnings.

So 50/50 if you're looking at it on hours spent; 70 or 80/20 -- 20/30 on plaintiff in and out the door.

The other bucket, which is probably where about 30 to 40 percent of the work I do is, divorce cases.

Would you like to skip that bucket? Because it really doesn't matter if you're a plaintiff or defendant in that case.

Q.    We can skip that bucket.

A.    But a lot of those cases, I

am the defendant.  So I just -- that's why I can't give you a number.

The other bucket that I have is everything else.  It could be white collar crime, fraud cases in federal court, criminal stuff.  It could be for lost profits.  It could be business interruption.

That's another one I've been qualified as an expert in, a lot of business interruption.

It could be business interruption cases.  It could be lost profits cases.  It could be securities arbitration work.  And in those cases, some years it's almost 100 percent defendants; some years it's almost 100 percent plaintiff.

Hurricane Ida came through Louisiana in 2021.  I represented a number of insurance companies during Hurricane Ida that a lot of them went to trial or deposition.  You'll see some of them on here.  That was all defense work.

Page 63

So the work that we perform at Asher-Meyers, plaintiff work, defense work, I would generally say it's about 50/50 over the period of time I've been doing this.

But at any particular time, the measurement may be different. I've never done that measurement, though.

Q.    Mr. Meyers, do you have a degree in accounting?

A.    I do not, no, sir.

Q.    Are you a certified public accountant, or CPA?

A.    I am not.

Q.    Are you an accountant?

A.    I am.

Q.    You are not a teacher, correct?

A.    I am.

Q.    Sorry. You are not a K -- a teacher in a K-12 educational setting, correct?

A.    I have.

Q.    When were you a teacher in a

Page 64

K-12 educational setting?

A.    What was the year of that? 2001, '02, I taught summer school for a local high school in New Orleans while I was in grad school.

Q.    Okay.  Since teaching summer school at a local high school in New Orleans in approximately 2001 to 2002 --

A.    It was probably a little later than that, now that I'm thinking about it.  It was probably '04, '05.

Q.    Since teaching summer school at a local high school in New Orleans in approximately 2004 to 2005 have you worked in any K-12 educational setting?

A.    Can you define "work"?  Do you mean teach?

Q.    Well, let's start there.

Since teaching summer school at a local high school in New Orleans from approximately 2005 -- let me start that over.

Since teaching summer school at a local high school in New Orleans

from approximately 2004 to 2005, have you taught in any K-12 educational setting?

A.    I have not taught in any K-12 setting during that period subsequent to the period in which I taught summer school at a local high school in New Orleans.

Q.    Since teaching summer school at a local high school in New Orleans from approximately 2004 to 2005, have you been employed in any K-12 educational setting?

A.    I do not believe I have been employed in any K-12 educational setting subsequent to that period.  I think that's fair.

Q.    Since teaching summer school at a local high school in New Orleans from approximately 2004 to 2005, have you worked at all in a K-12 educational setting?

A.    I have.

Q.    How so?

A.    I've served on a number of

CONFIDENTIAL

Page 66

boards at schools in New Orleans.  That would be, you know, in connection with -- some of it was fundraising, some of it was legacy donation, some of it is simply sitting on the board now as a parent.  As a high school student I've served on volunteer boards.

So I have served on a number of boards, if you will, for local high schools in the K-12 setting over the last -- I guess we'll call it 20 years, if you will.

Q.    Have you served on a school board?

A.    I guess you'll have to define -- I've served on -- I don't know the answer to the question as you're defining it.

I have served formally on certain boards.  There was a legacy fundraising board for a local high school that I sat on for a number of years.

I don't know how you would define school board.  I mean, it was a

Page 67

formal board for the school, but it wasn't in connection with, necessarily, that Board of Education, if that helps.

Q.    So you understand that school districts are generally governed by a school board?

A.    Boy.    That's a very loaded question.

I understand in the cases that we're talking about here that is generally the case.    In New Orleans, I would say that you're probably not correct.    A lot of the schools in New Orleans are governed by the Archdiocese, which is not a school board, it's a religious organization.

So I think that that generalization is not necessarily true on all places.    But for the purposes of what we're talking about, I will accept that hypothet, that school boards in a public setting are generally served by a board where people will sit on that.

And I have not sat on one of

Page 68

those, if that's the question you're trying to ask me.

Q.    So have you ever served on the school board whose responsibility it is to govern a school district?

A.    I have not.

Q.    And have you ever served on a school board whose responsibility it is to govern a school?

A.    I would say a qualified no. Only to the extent that when you're doing actual legacy donation fundraising, which is part of the endowment committee, that money does govern the school in some capacity.

So I would say probably not. But they may distinctly disagree with me, that by me serving on that board, which was part of the endowment committee, that that does, in fact, serve the school's purposes.

Q.    You served on a fundraising board for a school, correct?

A.    It was partly fundraising

Page 69

but also part endowment stuff.  But yes, that's fair.

Q.    What was that school?

(Reporter clarification.)

THE WITNESS:  Brother Martin High School.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Is that a private school?

A.    It's a private parochial school, Catholic school, down in New Orleans.

Q.    Other than serving on the fundraising and endowment board for Brother Martin High School, have you served on a board for any other school?

A.    I have served on a fundraising board for Metairie Park Country Day School in New Orleans.  I have served on the board for a local organization called Son of a Saint that directs students; it's kind of a Big Brother program, and they deal with a bunch of schools.  So I've assisted with dealing with the other schools and trying

to get admission for students and working through admission process for students going into the high school process at Brother Martin.

But subject to those other two caveats, no.

Q. And is Metairie Park Country Day School a private school?

A. It is.

Q. You are not a mental health professional, correct?

A. That's fair to say. I'm not an expert in mental health.

Q. Prior to your work in this case, had you ever calculated damages for a school district?

A. I think the answer to that is yes.

Q. In what case, prior to this case, did you calculate damages for a school district?

A. I don't -- there were at least three schools. Newman was one, and there were other -- I'd have to go back.

Page 71

I mean, that's a long time ago. During Hurricane Katrina -- you may know about Hurricane Katrina, but for those of us who lived it know that the entire community was shut down.

So one of the things that I was intimately involved in during Hurricane Katrina, for the years subsequent to it, was business interruption calculations. And we represented a number of schools and school districts in calculating their business interruption losses with their insurance companies, because their physical plants were down and they were not able to attend school or host school anymore. And so that was one of the things that we were very much involved on.

So during my career, I've had the opportunity to calculate damages for business interruption losses for schools a number of times.

And I couldn't tell you the

Page 72

other schools. Newman would have been one, which is one of the independent private schools down in New Orleans.

But as I sit here right now, I can't recall the others.

Q. Prior to your work in this case, have you ever calculated damages incurred by a school district other than cases relating to Hurricane Katrina?

A. I believe that we also represented school districts as it related to BP losses. There was the British Petroleum oil spill in 2010. It was a pretty big thing.

And so we had the opportunity to assist with the calculation of their either contractual losses under the settlement agreement or lost profits during the period that, you know, they had issues during that.

Q. Prior to your work in this case, have you ever calculated damages incurred by a school district other than in cases relating to Hurricane Katrina

Page 73

and the BP oil spill?

A.    I may have.  But as I sit here right now, other than those two buckets, I can't recall.

Q.    School districts do not have profits, correct?

A.    It depends on the school districts.  But generally, they are not-for-profit organizations.

Q.    A school district cannot have lost profits, correct?

A.    Please define "school district" for me.  Because I think you and I are defining them in very different ways.

Q.    Well, this -- you understand this case is about public school districts, correct?

A.    I do.

I also understand you didn't ask me about public school districts.

Q.    Well, when I refer to school districts, I'm referring to public school districts, okay?

Page 74

A.    Okay.

Q.    Public school districts cannot have lost profits, correct?

A.    If they are not-for-profit organizations, then they do not have profits in the traditional sense as a business would.

Q.    In this case, it was not part of your assignment to look for evidence of fraud in any school district's financial records, correct?

A.    That's fair.

Q.    In this case, it was not part of your assignment to look for evidence of financial misconduct in any school district's records, correct?

A.    That's fair.  That was not within my scope.

Q.    And you, in fact, did not look for any evidence of fraud or financial misconduct in any school district's records, correct?

A.    I did not look at it in any particular way.

CONFIDENTIAL

Page 75

But during the course of my forensic accounting, I certainly did not see anything that didn't reconcile or was not consistent with the previous auditor's findings and the financial statements.

But I was not asked to conduct a fraud analysis, if that's what you're trying to ask.

Q.    Is the field of forensic accounting concerned with identification of financial misconduct?

A.    Not on its face, no, sir.

Q.    Okay.  You have not calculated lost profits in this case, correct?

A.    I would disagree with you.

Q.    Can you please explain how you have calculated lost profits in this case?

A.    Sure.  So lost profits, as a general theory, comprises of a few different things.

I'll try to give you the

high-level theory, and you can walk down.

When you're dealing with a lost profits case, you're generally trying to figure out what the but-for profits would be, which can be defined as revenues less expenses. And then you're trying to compare that to what the actual were, revenue less expenses.

Another component of a lost profits case is extra expenses. So you deal with both saved expenses and extra expenses.

So even though you're dealing with a company, say a not-for-profit, not-for-profits can still have a lost-profits calculation. The fact that the word is "lost profits" doesn't mean that not-for-profits can't have a diminution of their revenues or an overage on their expenditures and still have a differential between the but-for world and the actual world. That's just not simply the case.

But an additional component

of lost profits is those extra expenses. So if an expense was incurred that otherwise would not have been incurred but for the allegedly improper actions of the defendants, that is a compensable component of a lost-profits calculation, so.

Q.    When a school district spends money, it has no expectation that it will earn a profitable monetary return on that spending, correct?

A.    Would you please ask it again?

Q.    When a school district spends money, it has no expectation that it will earn a profitable monetary return on that spending, correct?

A.    I don't think I can answer that question.

You're generalizing school districts.  And monetary return could mean different things to other people.

I've done a lot of time dealing with non-profits over my career,

Page 78

and the ability to generate revenues and minimize expenses is part of the business model.

You may not call that profits, but they would call that profits. Because what goes into their fund, general fund, specific special funds, allow them to continue to do additional programatic stuff. So if the amount of reserve they have -- or deficit they have is increased, the reserve is lessened, then it provides that they cannot do additional things into the future.

So not-for-profits sustain lost profits like any other entity. Just because they're not distributing profits to shareholders does not mean that they do not have the opportunity to use surplus or savings from reduced expenses for other components of what their general mission is to serve.

I would call that a monetary gain, if you will. I'm not going to

Page 79

quibble over the word "profit." But if they have more money, they can do more things and that does have a monetary return to the mission of the not-for-profit.

Q. When a school district spends money, it may expect to receive a non-monetary benefit in exchange for spending that money, correct?

A. It may. Or it may -- it may consider that it's receiving a monetary benefit in exchange for that.

I can't generalize what any particular school district would think or say. I think if you got 100 boards in here, half of them may agree with you and the other half would say you're dead wrong on that question.

Q. You are not opining on what any school district expected to receive in exchange for spending any money, correct?

A. Could you repeat it, please?

Q. You are not opining on what

CONFIDENTIAL

Page 80

any school district expected to receive in exchange for spending any money, correct?

A.    I'm -- I don't understand what you mean expended -- "expected to receive."

Q.    Well, you just told me that you can't say what -- whether a school district expected to receive a non-monetary benefit in exchange for spending money, correct?

A.    Okay.  Yes.

Q.    So can you -- are you opining on what any school district expected to receive in exchange for spending any money?

A.    I don't believe that's within the scope of what my expert report is here.

But I certainly could not tell you whether or not or what they expected to receive, if anything, for spending money.  They spend money contemporaneously based on the people and

Page 81

place who are doing their best to put the programs in place, whether it's a not-for-profit for a charity fundraiser or public school district.

So I wouldn't purport to go in and supercede the actualities with speculation.

Q. It was not part of your assignment in this case to determine whether any school district received any non-monetary value in exchange for spending any money, correct?

A. Could you say it again?

It's a very long, compound question. So I'm trying to get all the pieces and many ill-defined -- or undefined terms at this point. So I'm trying my best.

Q. It was not part of your assignment in this case to determine whether any school district received value in the form of improved educational achievement in exchange for spending any money, correct?

Page 82

A.    That, I think, is a fair statement.  That I was not asked or tasked with whether or not spending increased or led to any additional educational achievement within the school district for the students.

Q.    And you, in fact, have not determined whether any school district received value in the form of improved educational achievement in exchange for spending any money, correct?

A.    I have done no analysis in this case to determine anything related to educational achievement, as I believe it's defined, I'm defining it as student achievement, in any of these particular cases.

Q.    It was not part of your assignment in this case to determine whether any school district received value in the form of improved student social-emotional outcomes, correct?

A.    I don't know that I agree with you on that.

To the extent that the damages that I've quantified include a loss related to -- whether it would be an SEL-type program or mental health-type program, those out-of-pocket or, you know, lost costs could have impacted, one way or another, the health of the children, as you stated it.

Q. But it was not part of your assignment to determine whether, in fact, any school district received value in the form of improved social-emotional student outcomes in exchange for spending money, correct?

A. It was my role to quantify the damages related to costs that were expended for which the benefit had not been received as a result of certain programs that may overlap your definition right now, which they would not have received the benefit of those.

Q. I'm not sure I understand your answer.

Was it part of your

assignment to determine whether, in fact, any school district received value in the form of improved social-emotional student outcomes in exchange for spending money?

A.    I guess let's go back to the beginning.

Define student social-emotional outcomes.

Q.    Did you examine student social-emotional outcomes in this case?

A.    I would ask you to define student social and emotional outcomes.

Q.    Well, you discuss social-emotional learning in your reports, correct?

A.    No.  I said that that was one of the things that we looked at, were programs related to social-emotional learning and/or mental health.

You're asking me a question. And I don't know how you define social-emotional outcomes, which was not a term that was used in my report.

So I'm asking you to define

Page 85

it, please.

Q.    In your report, you look at programs related to social-emotional learning, correct?

A.    That is correct.

Q.    You did not examine what value, if any, any school district received in exchange for spending money on programs relating to social-emotional learning, correct?

A.    And I'm saying I don't necessarily agree with you on that.

Q.    Well, can you please explain to me how you examined what value any school district received in exchange for spending money on programs relating to social-emotional learning?

A.    Well, to the extent -- let's just take an example.  Let's go to one.

Let's look at Irvington.  As part of the Irvington report -- and this is E -- Exhibit-1E attached to the deposition that we went over earlier.

There were a number of

CONFIDENTIAL

Page 86

vendors in Irvington in which I quantified damages.  Those vendors are identified on Page 5 of the report.  One of those vendors that I'm talking about specifically is CarePlus New Jersey, Inc.

$3,124,586 was incurred with CarePlus NJ, Inc. during the period fiscal school year ending June 30th, 2016, through fiscal school year ending June 30th, 2024.  The damages that were quantified in that particular case for that 3.1, approximate, million dollars was $624,917.

Based on the persons most knowledgeable about that program, who are going to testify at trial and have already attested to in verified interrogatories or in affidavit -- I guess I would have to go look for Irvington -- that the portion of damages related in this case to the alleged improper actions of the defendants was 20 percent.

So by nature of that,

Page 87

80 percent of those costs went to the benefit of the students, to the mission that the school had.

That's how I understand it.

Q.   Okay.

THE WITNESS:  I don't know when a good time to take a break is.

ATTORNEY SANDOVAL-BUSHUR: We can take a break now.

THE WITNESS:  Great.

VIDEO TECHNICIAN:  Going off video record.  The time is 10:11 a.m.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  Back on video record.  10:29 a.m.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Mr. Meyers, what is social media?

A.   I don't know that I have a

distinct definition.  In this particular case, I would define social media to be the defendants in this particular matter.

Q.    Is Twitter social media?

A.    Again, I don't have a definition of social media.

So I would define social media, in this case, for the purpose of my expert report, to be Facebook, Instagram, Snapchat, TikTok and YouTube.

Q.    When a person out in the world refers to social media, do you know what platforms that person is including in that phrase "social media"?

A.    I don't know what any hypothetical person making a hypothetical statement is referring to in their hypothet.  I do not.

Q.    And when any employee of any school district in this case refers to social media and does not define the platforms that they are including in that definition of social media, you do not know which platforms they are referring

Page 89

to, correct?

A.    I guess it would depend on who the people are and what the statements are.

For the purposes of the sworn testimony that I'm relying upon and the affidavits that I'm relying upon, my understanding is that the definition of social media, for those people, are the defendants in this matter as it relates specifically to the alleged improper actions of those defendants, when they define social media in that way.

Q.    What is your basis for that understanding?

A.    The interrogatory response, which asked the questions about the defendants in this matter, the affidavits, or declarations, as they may be.  Those are the reasons.

Q.    If you wanted to know how an employee who submitted an affidavit defined social media for purposes of their affidavit, how would you go about

CONFIDENTIAL

Page 90

answering that question?

A. You'd have to be more specific.

I think what we should do is go through the affidavits and answer them one at a time. Because it would be different for each and every person.

Q. We'll come back to that.

A. Sure.

Q. You have no data on how many students in any school district used YouTube, correct?

A. I don't have any data relating to any student information at all.

Q. And so you do not have any data on how many students in any school district used TikTok, Snapchat, Facebook or Instagram, correct?

A. I don't have any information as to any student information at all in this matter.

Q. Do you use social media?

A. I do not. As I'm defining

it the way you've defined it, which is the way I defined it, which is the five defendants in this case.

Q.    If we use a broader definition of social media to include all social media platforms, do you use social media?

A.    I don't have a definition of social media.  So if you want to talk about specific platforms, I might be better able to answer your question.

Q.    Sorry.  Just to be clear, is Twitter social media?

A.    For the purpose of this case, I'm not defining it as social media.

I would generally say not in the matter of this case.  That I would probably generally say, as someone who has never used Twitter, that I would consider it social media.  But not social media as defined in this matter.

Q.    Is Reddit social media?

A.    I would not define that as

CONFIDENTIAL

Page 92

social media inside or outside of this case.

Q.    Is Pinterest social media?

A.    What is Pinterest?

Q.    Is Tumblr social media?

A.    I don't know Tumblr.

Q.    Is Twitch social media?

A.    I would not say Twitch is social media.

Q.    Why not?

A.    It's a platform that people play video games.  I wouldn't define that as social media.

I don't define it in this case as social media.  And I wouldn't define it outside of social media.

Q.    Is Netflix social media?

A.    I do not believe so, no.

Q.    Why not?

A.    Watching videos.

Q.    So a platform on which people watch videos is not, in your view, social media?

A.    It may be or it may not be.

Page 93

You're asking for my lay opinion right now. I do not believe that entertainment platforms such as Netflix would be considered social media in my lay non-expert opinion.

As an expert, the social media platforms that I've defined herein are the five that I mentioned and the actions related to them in this particular matter.

Q. For the definition of social media to mean the five defendant platforms in this case, are you relying on a definition that was provided to you by plaintiffs' counsel?

A. No. That's my understanding of how the pleadings are and who is at issue in this case and the answers to the interrogatory questions and disclosures.

Q. You are not offering any opinions about the conduct of any defendant in this case, correct?

A. I think it's fair. As you know, in my reply reports I'm not

Page 94

offering an opinion on causation.  And I would think that a question regarding conduct would go to a causal issue or causation issue.

So I'm not offering an opinion as to the conduct of any of the defendants in this matter.

Q.    You are not offering the opinion that defendants' conduct caused harms, correct?

A.    Again, that's specifically a causation issue, in that you used the word "cause" in it.

So I'm not offering an opinion of causation in this matter.

Q.    You are not offering the opinion that the defendants' conduct caused damages, correct?

A.    As it relates to a causation issue, I am not offering an opinion of causation in this matter.

Q.    You rely on others to make the determination that school districts incurred certain expenses because of

Page 95

social media, correct?

A.     Ask it again, please.

Q.     You rely on others to make the determination that school districts incurred expenses because of social media, correct?

A.     In part or in whole; not necessarily that they in whole incurred expenses, but that a portion of those expenses relates to the alleged improper actions of the defendants in this matter, defined as social media as I previously defined it for you.

Q.     You are not offering an opinion on how much of any school district's damages are attributable to each individual defendant, correct?

A.     That's fair.

Q.     Your damages calculations do not differentiate between individual defendants, correct?

A.     I believe that's correct.

Q.     You are not offering an opinion on the amount of damages that

Page 96

YouTube caused any school district to incur, correct?

A.    I am not.   In these cases, just like a personal injury case where you would have two different defendants, you've got the trucking company and you have the insurance company and you have the other driver and then the third-party driver, when calculating damages, the expert calculating a lost profits or an economic loss claim is not giving opinion on the apportionment of how those would go.

So I've given no weight to any particular defendant.  The damages calculated by me herein relate to the damages caused by the alleged improper actions of the defendants in this matter as a whole.

Q.    Okay.  Respectfully, Mr. Meyers, a lot of that response was not responsive to my question.  And just to get through the day, I'd ask that you limit your responses to responding to my

Page 97

question.

ATTORNEY GRADEN:  He did answer your question, counsel.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You are not offering an opinion on the amount of damages that Snapchat caused any school district to incur, correct?

A.    As I just told you, the damages calculations that I've done apply the damages to all the defendants without any apportionment to any particular defendant or platform.

Q.    So the answer is correct, you are not offering an opinion on the amount of damages that Snapchat caused any school district to incur?

A.    As I said, I am not offering an opinion on any particular defendant in this matter and have calculated the damages for the entirety of the alleged improper actions of the defendants in this matter.

Q.    Can you answer the question

Page 98

yes or no?

Are you offering an opinion on the amount of damages that Snapchat specifically caused any school district to incur?

A.    I cannot.  Because the damages may be utilized by the trial court or somebody else to determine how that gets apportioned.

So how my damages are used after I testify with them -- I'm not opining on causation, but without, apportionment may be as a result of testimony or the damages as they've been defined.

So I don't know what's going to happen yet.  I am only giving the opinion that the damages in this case that I've calculated are as a result of the alleged improper actions of the defendants, plural, the defendants, without any apportionment to any specific defendant.

I don't know how -- a better

way to answer it for you.

Q. Well, if I wanted to know what your opinion is on the amount of damages that Snapchat specifically caused any school district to incur, can I find that anywhere in your expert reports in this case?

A. I do not have an opinion specifically to Snapchat, because the damages that I've calculated are for the alleged improper actions of the defendants, plural, as a whole.

Q. You are not offering an opinion on the amount of damages that TikTok specifically caused any school district to incur, correct?

A. I don't know that I agree with you on that.

I have not calculated or quantified specifically what -- which one were you on? TikTok?

Q. TikTok.

A. -- TikTok has. But the damages have been calculated as a result

Page 100

of the alleged improper actions of the defendants in this matter.

Q.    If I wanted to know what your opinion is on the amount of damages that TikTok specifically caused any school district, can I find that anywhere in your expert reports?

ATTORNEY GRADEN:  Objection. Asked and answered.

THE WITNESS:  As I've told you before, and I'm happy to tell you again, I've calculated the damages as it relates to the alleged improper actions of the defendants as a whole, plural.

I have not itemized them for any particular defendant.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And that is also true for Instagram and Facebook, correct?

A.    Same answer.

VIDEO TECHNICIAN:  Mr. Graden, could you grab your mike?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If someone wanted to know how much in damages a school district incurred because of student use of YouTube specifically, the damages estimates that you offered in this case would not answer that question, correct?

A.    They may or may not, based on the testimony that's given by the plaintiffs in this matter.

Q.    If someone wanted to know how much in damages a school district incurred because student use of Snapchat specifically, the damages estimates that you offered in this case would not answer that question, correct?

A.    They may or may not, depending on the testimony of the plaintiff in this matter.

Q.    If someone wanted to know how much in damages a school district incurred because of student use of TikTok specifically, the damages estimates that you offered in this case would not answer that question, correct?

A.    They may or may not, based on the testimony of the plaintiffs in this matter.

Q.    If someone wanted to know how much in damages a school district incurred because of student use of Instagram or Facebook specifically, the damages estimates that you offered in this case would not answer that question, correct?

A.    They may or may not, based on the testimony of plaintiffs in this matter.

Q.    The inputs to your damages calculations can be put into two categories; one, the out-of-pocket costs incurred by the school districts and, two, the percentage of those out-of-pocket costs allegedly incurred due to social media; is that fair?

A.    Could you ask it again?

Q.    The inputs to your damages calculations can be put into two categories; first, out-of-pocket costs

Page 103

incurred by school districts, and,
second, the percentage of those
out-of-pocket costs allegedly incurred
due to social media; is that correct?

A.    It's correct in part.

Let me go ahead and clarify
and see if I can do it better for you.

The -- what has been
utilized in this particular case was the
sustained past damages related to certain
out-of-pocket costs for select vendors,
and then it's multiplied by the
allocation percentages.

So there's two components.
You put it into two buckets.  There may
be two columns that yield the damages,
one being the total cost of the vendor
and one being the allocation percentages.

But those are only two
assumptions of various assumptions that
go into the overall damages calculation.

So if all you're asking me
is does Exhibit-1 have a column for
vendor cost multiplied by a column for

CONFIDENTIAL

Page 104

allocation percent to get the total, I would agree with you, yes.

But to get to the vendor cost itself was the tremendous amount of work doing forensic accounting to determine all of these invoices as they are.

But starting with the fact that that has been done and those are the numbers, A times B equals C, I would agree with you on those two buckets.

Q.    The out-of-pocket costs that you include in your damages calculations are all payments that a school district made to a third-party vendor, correct?

A.    The select out-of-pocket costs are all costs that have been paid to a third-party vendor, that's correct.

Well, I take -- with the exception of, I believe, one of the bellwethers has some property damage cases, and some of the property damage costs were -- they may have been an independent contractor who is affiliated

Page 105

with the school.

So I don't know if they were technically a third party or not. But that would be the only exception to that -- to that, yes.

Q. You estimate damages by adding up the total vendor costs for each identified vendor and multiply that total by the corresponding allocation percent, correct?

A. I guess conclusory that's correct. That marginalizes hundreds of hours of work preparing the forensic accounting to get the numbers to do the addition.

But if we're starting with the end game, yes, it's the math of the sum of the vendor costs by the selected vendors for the costs that have been verified, confirmed and accurately reliable, times the allocation percentage that was used based on the sworn testimony of the plaintiffs in this matter as a result of the direct alleged

Page 106

actions of the defendants.

Q.    I want to start by asking about the information that you rely on for the allocation percents that you use in your damages calculations.

You had no role in determining what any allocation percent should be for any vendor for any school district, correct?

A.    I think that's fair to say.

Q.    You do not have the knowledge you would need to determine what any allocation percent should be for any vendor for any district, correct?

A.    I haven't performed any analysis, in my role as an expert in this case, to try to determine an allocation percentage for any particular vendor.

So it's not -- it's outside the scope of what I've been asked to do in this case.

Q.    And you do not personally have the knowledge, sitting here today, that you would need to determine what any

Page 107

allocation percent should be for any vendor for any bellwether school district --

A.    I'm not --

Q.    -- correct?

A.    I'm not prepared to give a lay, fact or expert opinion in this trial on the allocation percentage.

What we relied upon is the persons most knowledgeable for each of the bellwether school districts as it relates to the allocation percentages that they have determined, because of their inherent and internal knowledge, as a direct result of the alleged improper actions of the defendants in this case.

Q.    You did not offer input on what the allocation percents should be for any vendor for any district, correct?

A.    That's correct.  That's fair.

Q.    Did you receive any allocation percents directly from any school districts or did you receive all

Page 108

of the allocation percents directly from plaintiffs' attorneys?

A.   I didn't receive any from plaintiffs' attorneys.  They all came from the plaintiffs directly.

Q.   And when you say they "came from the plaintiffs directly," do you mean that you received them on employee affidavits or in interrogatory responses?

A.   I do.

Q.   And did you receive those employee affidavits or interrogatory responses directly from an employee of one of the school districts?

A.   Oh, you're asking me mechanically if the attorneys e-mailed me the sworn statements of the parties most knowledgeable?  Yes, they did.

Q.   Okay.  When you offer an amount of damages for a district, your opinion is that your damage estimate is reliable and accurate if you assume that the allocation percents are reliable and accurate, correct?

Page 109

A.    The calculations are reliable and accurate on their face.  And I have absolutely assumed that the allocation percentages are accurate and reliable in this particular matter.

Q.    Your calculations are only as accurate as the information you relied on, correct?

A.    I disagree with that.

The calculation -- again, there's two parts to the calculations here.  I know you want to start with the latter, and maybe we'll get back to the former.

But this -- the work that I performed as a forensic accountant, which is the large role of what I played here, involved hundreds of hours doing the forensic accounting.

So what I will tell you is I believe that it's inaccurate for you to say that an allocation percentage would change the accuracy or correctness or reliability of any number, considering

that the costs in here are costs that have all been confirmed, audited and, you know, accurate and reliable.

If what you're trying to ask me, if the math changes if you use a another multiple in a different column, sure, math can change.

But the calculations are reliable regardless of the allocation percentage.

Q. So, Mr. Meyers, your opinion is that your damages calculations are accurate and reliable even if the allocation percentages that you relied on are inaccurate?

A. You're asking me to assume something is inaccurate. Fine.

What I'm telling you is the calculations themselves of the multiplication is accurate, and that input that goes into the select vendor cost is accurate.

If what you're trying to ask me is if a different allocation

Page 111

percentage would be used or determined to be used, if a judge would ask me to use a different one, if it would change the resulting Column C for damages, it would. It could go up or it could go down.

But it doesn't change the accuracy or reliability of the work that I've performed herein.

Q.    If the allocation percentages that you relied on are too high, then your calculated damages would be too high as well, correct?

A.    I have no reason to believe that the allocation percentages are too high.

But mechanically, mathematically speaking, if the allocation percentages, Column B on Exhibit-1 to these six bellwether reports, were to be reduced by a percent, then the damages would be produced -- reduced.  And if the allocation percent would be increased, then the damages would be increased.

Page 112

That's the way the math works.

Q.    If the court or jury were to conclude that the allocation percentages that you relied on are not reliable or accurate, then you would agree that they should also conclude that your damages estimates are unreliable, correct?

A.    Absolutely not.  I think that's where we're talking over each other.

I think that to the extent that the judge or the jury, as you determined it, would determine a different allocation percentage, they would have every ability to use the report that I did, which is correct, accurate and reliable, make those changes and get the resulting calculations.

That's why the report is accurate and reliable.  The calculations are done correctly.

So to the extent that they believe a different percentage would be

Page 113

used, they would take the report, my exact report, multiply it by the forensically accounted-for select vendor cost and multiply it by whatever percentage they would choose to see fit as a result of the alleged improper actions of the defendants.

They can assume that all of these are 100, and the math would just be done like that.

Q.    Mr. Meyers, I'm not asking about the mechanics of your calculation.

A.    You are.

Q.    I'm asking about the output of your damages calculation, okay?

Is there -- is there a term that you would like me to use to refer to that final output number from your calculations?

A.    You're asking me to assume that the output of a calculation --

Q.    Mr. Meyers, you're not answering my question.  I'm not asking you --

Page 114

A.   I am.

Q.   -- to assume anything.

I asked you, is there a term that you would like me to use to refer to the final output number from your calculations?

A.   Call it total damages. That's --

Q.   Total damages.

A.   -- what it is on Exhibit-1.

Q.   Okay.  If the court or jury were to conclude that the allocation percentages that you relied on are not reliable or accurate, then you would agree that they should also conclude that your total damages are unreliable, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I disagree.  I disagree with you.

They would determine that the total damages should be recalculated by a percentage that they determined, in their own role

Page 115

in this case, and that the new resulting math would be the total damages.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. For your calculation of damages related to costs incurred by Breathitt, Charleston and DeKalb, you relied on affidavits of district employees for the allocation percents, correct?

A. Give me a moment, please. Breathitt?

That's correct. On Breathitt I relied on the affidavit of Phillip Watts and Will Noble.

What was the second one?

Q. Just, we'll go through them and ask I'll a question and make sure we have a clean record.

For Charleston, did you rely on the affidavit of a district employee for allocation percents?

A. I did. I relied on the affidavit of Allison -- I think it was

Lisa Allison, executive director of student support.

Q.    For DeKalb, you relied on the affidavit of a district employee for allocation percents, correct?

A.    That is correct.  It was the affidavit of Monika Davis.

Q.    For your calculations of damages relating to costs incurred by Breathitt, Charleston and DeKalb, you rely on affidavits of district employees for the allocation percents, correct?

A.    That is correct, yes, sir.

Q.    You consider the allocation percents from the affidavits of the district employees to be an essential and necessary input to your total damages number, correct?

A.    I agree that it's one of the two inputs that calculate damages, based on the testimony -- the sworn testimony of the persons most knowledgeable related to the damages caused by the alleged improper actions of the defendants in

Page 117

this matter.

Q.    You are not able to say whether the allocation percents provided in the employee affidavits are accurate, correct?

A.    I believe that they are accurate.  They're sworn testimony of individuals.

Q.    What have you done to validate that the allocation percents provided in the employee affidavits are accurate?

A.    I've relied upon the sworn written statements of the persons most knowledgeable, testifying under oath, that the damages in this case for these select particular vendors were caused as a direct result of the alleged actions of the defendants in this matter.

Q.    Your testimony is that the allocation percents in the employee affidavits are accurate because they are sworn statements; is that correct?

A.    They are sworn statements by

CONFIDENTIAL

Page 118

the persons most knowledgeable to testify as to the harm caused by the alleged improper actions of the defendants in this matter.

Q.    What did you do to determine that each of the employees whose affidavits you relied on is the person most knowledgeable?

A.    They are the ones providing the affidavits and are going to provide testimony at trial, is my understanding, related to the allocation percentages.

Q.    Okay.  So your testimony is that you believe the allocation percents provided in the employee affidavits are accurate because they are sworn statements from the people most knowledgeable; and they are the people most knowledgeable, in your belief, because they submitted affidavits, correct?

A.    No.  Because they are the people most knowledgeable about the impact of the damages caused as a result

of the alleged improper actions of the defendants.

Q. What did you do to determine that each of the employees who submitted an affidavit is the person most knowledgeable about the impact of the damages caused as a result of the alleged improper actions of the defendants?

A. If you'd like, we can go through the affidavits.

The affidavits speak for themselves of the sworn testimony, where they go through the reasons why they are the people most knowledgeable. They go over their history with the school. They go over all the reasons.

I have no reason to assume or believe that the testimony that they're giving is anything other than the truthful testimony of those people.

And the fact that they are standing in a position to testify at trial as the persons most knowledgeable is the reasons that they are the persons

Page 120

most knowledgeable.

Q.    Mr. Meyers, you assume that the allocation percents provided in the employee affidavits are accurate, correct?

A.    I do.

Q.    You assume that the allocation percents provided in the employee affidavits are provided by the persons most knowledgeable, correct?

A.    Who are going to provide testimony at trial related to the alleged improper actions of the defendants in this matter.

Q.    Mr. Meyers, you did not answer my question.

Do you assume that the allocation percents provided in the employee affidavits are provided by the persons most knowledgeable?

A.    The persons most knowledgeable who are going to provide testimony at the trial relating to the alleged improper actions of the

Page 121

defendants in this matter.

I don't know why you want to keep taking off the result of my answer.

Q.   Well, you're not -- you're not giving an answer.  You're just adding words to the end of my question.

So I guess maybe I'll try a different way of asking the question.

ATTORNEY GRADEN:   Objection to the misstatement by counsel.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Do you assume that the allocation percents are provided by -- sorry.  Let me start that again.

Do you assume that the allocation percents provided in the employee affidavits are provided by the persons most knowledgeable who you understand are going to provide testimony at trial relating to those percentages?

A.   As a result of the damages of the alleged improper actions of the defendants, yes.

Q.   And what is the basis of

CONFIDENTIAL

Page 122

your understanding that the employees whose affidavits you rely on will testify relating to the alleged improper actions of defendants?

A.    Because of the -- the statements themselves.

Again, let's -- let's look at the declarations or affidavits together.

Q.    Well --

A.    They speak for themselves.

Q.    The affidavits do speak for themselves.

And so if the affidavits that you relied on do not mention defendants, then the -- you have no basis for saying that the affidavits refer to defendants; is that fair?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Are you asking me a legal conclusion -- for a legal conclusion?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    In no way, shape or form am

Page 123

I asking for a legal conclusion.

If an affidavit does not mention defendants, you have no basis for saying that the affidavit relates to the defendants, correct?

A.    Let's go through the affidavits.  Please give me a copy.

Q.    Can you --

A.    Without looking at the affidavits, I'm not going to answer that question.

Q.    Okay.

A.    So let's please look at them.

Because you're making an implicit representation that their affidavits do not relate to the defendants.  And I don't, as I sit here right now, agree with that or believe that to be the case.

Q.    Okay.

ATTORNEY SANDOVAL-BUSHUR:  We're on 5.

THE WITNESS:  We were on --

Page 124

yes.  Exhibit-5.  We had the invoices as 3 and 4, respectively.

- - -

(Whereupon, Exhibit Meyers-5, No Bates, Affidavit of Lisa Kathryn Allison, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, I'm handing you what has been marked as Exhibit-5, which is the affidavit of Lisa Kathryn Allison.

Do you see that?

A.    I do.

Q.    And this is the affidavit that you relied on for your damages calculations relating to Charleston, correct?

A.    That is correct.

Q.    Okay.  Ms. Allison's affidavit does not mention any of the defendants, correct?

A.    I guess let me take a minute to read it.

Page 125

Okay.  Could you ask the question again?

Q.  Exhibit-5, Ms. Allison's affidavit, does not mention any of the defendants, correct?

A.  I disagree.

Q.  Please show me where Ms. Allison's affidavit mentions any of the defendants.

A.  Everywhere that it mentions social media or social media-related relates to the defendants.

My understanding is that the persons most knowledgeable, including Ms. Allison, who are going to testify are very well aware and understand this case.

And when they define social media in this case, they are defining it, for the purposes of the allocation percentages, to define social media to be the five platforms that we talked about earlier, and specifically defendants in this matter, and the alleged improper actions as a result of it.

Q.    Mr. Meyers, what is the basis of your understanding that when an affidavit refers to social media it is referring specifically to defendants?

A.    I just gave you my reason. Would you like me to restate it?

Q.    I didn't hear any factual basis.

Do you have any factual basis for your understanding?

A.    My understanding is that in the affidavits that were provided to me, the social media related to the persons most knowledgeable who are offering this opinion understand that social media in this case relates to the defendants in this matter and the platforms at issue specifically in all these cases.

And we can go through each one where she says social media.

But the representation that because she doesn't mention a specific platform, that her use of social media does not relate to the defendants in this

Page 127

matter is not my understanding.

Q.    You assume that when an affidavit refers to social media that the affidavit is referring only to defendants, correct?

A.    My understanding is that the definition of social media that's being used by the persons who are involved in this case, who are going to provide testimony at this trial, are utilizing social media to define the defendants in this matter and the impact of their alleged improper actions on these particular vendors, to the extent that we're talking just about my role in the affidavit component.

Q.    Nothing in Ms. Allison's affidavit says that social media is limited to defendants, correct?

ATTORNEY GRADEN:  Objection. Asked and answered.

THE WITNESS:  I don't know that I agree with that.  But there is not a definition of social

media in this affidavit.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   And you cannot --

A.   That's my understanding.

Q.   You cannot point me to anywhere in Ms. Allison's affidavit where she refers to defendants or refers to YouTube or refers to Snapchat or refers to TikTok or refers to Instagram or refers to Facebook, correct?

ATTORNEY GRADEN:  Objection to form.

THE WITNESS:  Can you ask them one at a time, it's a compound question, please?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   You can't -- really can't answer that question, Mr. Meyers?

A.   Well, the whole affidavit starts with that this case is in re: social media adolescent.  It's defined in the pleadings that this affidavit is on.

So your expectation -- respectfully, it's unprofessional for you

Page 129

to roll your eyes at the answer I'm giving. I'm doing my best here, and whether you like or dislike my answers, it's not professional. So I'd please ask you to stop.

Is there a question pending?

Q. No.

You are not able to say whether the allocation percents provided in the employee affidavits are reliable, correct?

A. I am not giving any fact testimony as to the allocation percentages. I have assumed that the testimony given in the sworn statements of the persons most knowledgeable is correct and accurate and reliable as it relates specifically to the alleged improper actions caused by the defendants in this matter.

Q. You relied on the employees who provided the affidavits to provide accurate allocation percentages, correct?

A. I assumed that their

allegation percentages are accurate based on the testimony that they will give as to the impact of the alleged improper actions of the defendants in this matter.

Q.   You did not take any steps to validate the accuracy of the allocation percentages provided in the employee affidavits, correct?

A.   I have no reason to believe they are not accurate.  But I did not take any additional steps to validate or not validate anything in them, other than to accept that the sworn written statements of the persons most knowledgeable are going to -- and who are going to testify in this matter have accurately, correctly and properly represented how they will testify as it relates to the direct impact of the alleged improper actions of the defendants in this matter.

Q.   For purposes of -- well, I'll move on.

If, for example, an employee

CONFIDENTIAL

Page 131

affidavit estimated that 50 percent of a vendor's cost was attributable to social media, you are not offering the opinion that 50 percent of that vendor's cost was, in fact, attributable to social media, correct?

A.    I am not giving an expert opinion as to the validation of an allocation percentage, other than it's reliable to -- sorry -- it's acceptable and reliable to utilize the affidavit or sworn testimony of the person most knowledgeable who is going to testify as to that percentage, that 50 percent hypothet that you've given me, as it impacts those select vendors as a direct result of the alleged impact -- the impact of the alleged improper actions of the defendants.

Q.    And that is the same for all percentages for all vendors in all of the employee affidavits, correct?

You are not offering the opinion that any percentage is, in fact,

Page 132

attributable to social media, correct?

A.    Other than in each and every one of the affidavits and sworn interrogatories -- verified interrogatory responses that the testimony is and will be accurately given as it relates hereto that these are as a direct result of the alleged improper actions of the defendants.

It's -- it was -- maybe to help that along, it's the same for each and every one of the assumptions in the bellwethers as we talked about here in Charleston.

Q.    So for all of the percentages for all the vendors for all the employee affidavits, you are not offering the opinion that any percentage is, in fact, attributable to social media, correct?

A.    I am not offering an expert opinion as to the allocation.  I have relied upon the sworn testimony of the persons most knowledgeable to provide the

Page 133

percentage or allocation percentage as to the alleged improper actions of the defendants and the damages that they have caused.

Q. When you offer a damages amount for a district, your opinion is that your total damages are reliable if you assume that the percentages provided in the employee affidavits are reliable and accurate, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: We've gone through this. Asked and answered.

I do not assume that. The calculations are accurate and reliable. The math is accurate and reliable.

To the extent that the allocation percentages would change, the math may change. But it has nothing to do with the reliability or accuracy of the report as calculated and provided herein.

Page 134

BY ATTORNEY SANDOVAL-BUSHUR:

Q. If the court or jury concludes that the employee affidavits included costs attributable to issues for which a school district cannot seek damages in their allocation percentages, you would agree that the total damages that you present in your expert reports would need to be recalculated, correct?

A. I would agree with that.

Q. For your calculation of damages related to costs incurred by Harford, Irvington and Tucson, you relied on responses to interrogatories for each of the allocation percentages, correct?

A. That's correct for Harford. That is correct for Irvington. And that is correct for Tucson. Yes, sir.

Q. You consider the allocation percents from the responses to the interrogatories to be an essential and necessary input to your damages calculations, correct?

A. It's one of the inputs that

goes into the damages calculation.

Q.    And it's an essential and necessary input to reaching the total damages that you present in your reports, correct?

A.    It's one of the two, as we talked about, buckets of information; Column A times Column B.

So, yes, it is a -- I guess I'll agree with you that it is a necessary component of multiplying A and B to get C.

Q.    You are not able to say whether the allocation percents provided in the interrogatory responses are accurate, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  It's the same question.

I believe that they are accurate.  I have no reason to believe that they are not accurate.  And it's sworn testimony from the plaintiff in

the verified interrogatory related specifically to the damages of the out-of-pocket hard costs by the persons most knowledgeable.

My understanding is that there will be testimony that goes with the interrogatory sworn responses for the allocation percentages as it relates specifically to the alleged improper actions of the defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. You did not take any steps to validate the accuracy of the allocation percents provided in any interrogatory responses, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Same as the affidavits. I have no reason to believe that they are inaccurate. They're sworn testimony from the plaintiffs specifically in these matters.

Page 137

But I have not done any additional investigation as to the percentages themselves.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   You relied on the district to provide, in the interrogatory responses, accurate allocation percentages, correct?

A.   I've relied upon the sworn statements of the plaintiffs in these three particular matters, who have provided an answer to the damages caused, and the allocation of those damages caused, due to the alleged improper actions of the defendants in this matter as one of the inputs into the calculations that I have done for this court.

Q.   Are you personally vouching for the accuracy of any of the allocation percentages provided in any of the interrogatory responses?

A.   I am vouching for the fact that it is reasonable, it's expected,

Page 138

it's peer accepted to utilize sworn testimony, a fact witness and/or expert witnesses as an assumption into a calculation of a lost profits damage component.

Q.    But I'm asking about the accuracy of the input to that calculation.

You are not personally vouching for the accuracy of the allocation percentages provided in any of the interrogatory responses, correct?

A.    I am assuming that the sworn statement of the persons most knowledgeable who will testify at trial have accurately represented what their testimony will be related to the damages that have been caused as a result of the alleged improper actions of the defendants in this matter.

Q.    Are you vouching for the accuracy of the allocation percentages provided in any of the interrogatory responses?

CONFIDENTIAL

Page 139

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I think I just answered your question.

I'm vouching that the information that was provided in the interrogatory response is an accurate response for me to rely upon as it relates to the allocation percentage of the damages caused for those select vendors as a result of the direct actions and -- alleged improper actions of the defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    I understand that you believe that it is appropriate for you to rely, for your calculations, on the percentages in the interrogatory responses.

A.    Thank you.

Q.    I am asking about the actual percentages provided in the interrogatory responses and whether those are accurate

Page 140

or inaccurate estimations of the percentage of any of these vendor costs that are, in fact, attributable to defendants' conduct.

A.    Okay.  So -- are you still going?

Q.    You are not vouching that the percentages provided in the interrogatory responses that you rely on are accurate estimations of the percentage of any vendor costs that are, in fact, attributable to defendants' conduct, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I think where I'm getting hung up, counselor, is the determination of the percentages may be a fact that is in dispute in this case.

So I'll make the record clear that I am vouching for the accuracy of the people who are going to testify as to that.

How that allocation

percentage gets determined at trial doesn't make it accurate or inaccurate.

So you keep using the term "accuracy" or "accurately." It is accurate. The interrogatory response is accurate as to the percentage that is being assigned to the alleged improper actions of the defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. You understand that if, in an interrogatory response, a district said that 20 percent of a vendor cost was attributable to the conduct of defendants, that may be true or it may not be true, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: I disagree with you. It is true that they have allocated it.

Whether or not that -- it's like a personal injury case, right. A doctor on one side comes

Page 142

in and says, you know, I believe that this person needs injections for the rest of their life, epidural injections, at the cost of $5,500, bilateral, on the lumbar, twice a year for the remainder of their life expectancy.  And another doctor comes by and says, I disagree with that.  I don't believe that to be the case.

I don't believe that the doctor on either side that I'm on is wrong.  Their representation is accurate.  It's subject to the reasons we're here, going to trial.

So it is accurate and it is reliable what the interrogatory percentage says.

Now, whether or not the trier determines something differently, I just don't understand why -- I don't

understand your question, I guess.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. And I'm not sure I understand the confusion. Because your response seems to indicate that you understand that there can be a disputed fact as to whether any of these allocation percentages provided in the interrogatory and affidavits that you rely on are perfectly correct, are too low or too high; is that right?

A. And I guess what I don't understand is how you can understand that there can be a disputed fact and then call it untruthful or inaccurate.

It's accurate to the person who is going to testify that that is the percentage as a direct result of the alleged improper actions of the defendant.

I am not vetting the percentage. It is going to be provided at trial. And it has been provided in sworn written responses in this matter.

Page 144

Q.     Mr. Meyers, you have not vetted any of the percentages in any of the employee affidavits or interrogatories responses, correct?

A.     That is correct.

Q.     Okay.  And the percentages that I am referring to, you understand, are the allocation percentages, correct?

A.     I agree.  Yes, that is my assumption, too, that you're speaking about specifically the allocation percentage that is different for each vendor as detailed on Exhibits-1 to my six reports.

Q.     It was not part of your assignment in this case to determine whether any data from any of the bellwether districts corroborated the allocation percentages that you relied on in your damages calculations, correct?

A.     I think that's fair to say.

Q.     And you are not opining about whether any data from the bellwether school districts corroborated

Page 145

the allocation percents that you use in your damages calculations, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I think that's fair to say.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.  You relied on the allocation percents from the employee affidavits and interrogatory responses, correct?

A.  That is one of the inputs in calculating my report, as the persons most knowledgeable providing testimony as to the damages caused as a result of the alleged improper actions of the defendants in this matter.

Q.  And it was not part of your assignment in this case to determine whether any data from any bellwether school district corroborated that any vendor costs were attributable to any defendants' platforms, correct?

A.  I think that's fair.

Q.  And you are not opining about whether data from the bellwether

Page 146

school districts corroborated that any vendor costs were attributable to any defendants' platform, correct?

A. Ask it again, please.

Q. You are not opining about whether data from the bellwether school districts corroborated that any vendor costs were attributable to any defendants' platform?

ATTORNEY GRADEN: Objection.

THE WITNESS: So long -- we're both talking about the data to compile the actual cost of the invoices, which I don't believe you are, but I just want to make the record clear, then I agree.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. I want to pivot now to asking you about the information about the out-of-pocket vendor costs that you rely on for your damages calculations.

A. Sure.

Q. For each district, you relied on data or documents that were

Page 147

provided by the district for your calculation of vendor costs, correct?

A.    Either by the district or, as we talked about before, my clarification earlier, through the district on publicly available websites.

Sometimes it was easier to just go grab the audit myself as opposed to waiting for discovery.  And you'll see in some cases, I went and pulled the audit myself and then they produced it in discovery.  So as an abundance of caution, I put the Bates stamps numbers as well.

But from those two buckets, that's correct.

Q.    And you relied on the districts to provide you with reliable and accurate information on vendor costs, correct?

A.    I don't know that I would agree with that.  I relied on the information and confirmed that the costs that were expended were actually expended

Page 148

and were accurate and reliable.

I relied upon the audits, which were there.  I relied upon the general ledgers.

But one of the things within my scope of doing the forensic accounting was to not necessarily rely on anything that was given to me but to test everything that was given to me.

There were costs that are not included in this report because I did not have verification that that cost was necessarily expended.

So I don't know that I agree with that, because I tested the reliability of it as part of the scope of my course in this case.

Q.    Is it your testimony that you know that the -- each district actually paid the money to each of the vendors that are included in your damages calculations?

A.    Yes.  That's what I'm telling you.

Page 149

Q.     And what did you do to determine that each district actually paid money to each of the vendors included in your damages calculation?

A.     Reconciled the purchase orders with the general ledgers with the vendor cost; in some cases cancelled checks; confirmed that the actual costs that were being put forth in that first column were actually expended by the vendors -- to the vendors by the school districts.

That was the forensic accounting.  That was the hundreds and hundreds of hours that were spent making sure that every cost that's on here had a reliable basis that it was actually paid; not necessarily incurred but not paid, but actually paid.

So -- and we have reference numbers on everything.  I'm happy to go through each and every one of these invoices, general ledgers, vendor reports with you today.

Q.   Did you receive from plaintiffs' attorneys information about -- let me ask that question a little differently.

Did you receive from plaintiffs' attorneys information identifying which vendors should be included in your damages calculations?

ATTORNEY GRADEN:   Objection to form.

THE WITNESS:   Not at the start, no.  Everything that I had asked for originally was all the vendor costs.

So when you go look at -- we can go look at any one of them -- the entirety of the general ledger, so all vendors.  All vendors.

Some of them call them vendor reports.  Some of them call them general ledgers.  Some of them call them expense reports.  Some of them call them purchase

Page 151

order reports.  Every school district has their own accounting system and what they do.  But that was the start.

So when you go look at DeKalb, for instance, they have purchase order ledger reports and vendor spend reports.  All of those include all the vendors for all the years, all the spend.  And then from there, you can go identify.

So then to the extent that they identified Yondr and Lightspeed, I further asked for additional information to confirm that the general ledgers, even on their face which are reliable because it's audited financial statements, also had additional proof, in which they gave us additional cost information related specifically there to those vendors.

Page 152

So that was part of the interactive projections, if you will, of looking at the financial statements and confirming that the costs were actually incurred and paid at each of these school districts for these six, and the other five.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Who identified to you which vendors should be included in your damages calculations?

A.    It would have been either the representatives themselves or through counsel or through the affidavits and declarations.

Q.    For some of the districts, the identification of vendors that should be included in your damages calculations was provided through counsel; is that correct?

A.    It would have been from the districts and through counsel.  It would be better to go through -- we only have

Page 153

six of them, it may be better to go through all six of them individually because it may be different for each one.

Q.    Mr. Meyers, do you agree that there are social media platforms other than defendants' platforms?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  It depends on whose definition it is.  But I think you've already heard my testimony that generally, as a lay person, without a real definition, I would agree that Twitter was a social media platform.  And that's not one of the five defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And if you wanted to know whether any employee whose affidavit you relied on included Twitter, or any other social media platform, in their allocation percents, what would you do?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Read the

Page 154

affidavit in connection with this case. The interrogatory responses clearly respond to damages caused by the defendants in this case. So those three are specifically related to the defendants.

And the affidavits all speak to the social media as the defendants in this matter, is my understanding.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. If you wanted to know whether an employee whose affidavit you relied on included Twitter, or any other non-defendant social media platform in their allocation percents, would you look to the deposition testimony of the employee who provided the affidavit?

ATTORNEY GRADEN: Objection.

THE WITNESS: I may. That's something that could be considered.

In some of these cases, I had done that. Mr. Scheuneman was

Page 155

somebody who didn't provide an affidavit but had a deposition that spoke about the two vendors that are included in the report, and that was considered.

Mr. Watts provided an affidavit in this case. And I had an interview with him where he identified each and every one of the vendors that were being included. And then his affidavit was issued sometime after that meeting and confirmed all of the things that he told me personally that were caused directly as a result of the alleged improper actions of the defendants.

So it depends on the individual school district, if you will.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   You mentioned Mr. Watts, correct?

A.   I did.

Page 156

Q.    And Mr. Watts is a superintendent of the Breathitt School District, correct?

A.    I have his title.

He is the superintendent of the Breathitt School District, that's correct.

Q.    And you relied on his affidavit for allocation percents for Breathitt, correct?

A.    I did, yes, sir.

Q.    And --

A.    And Mr. Noble as well.

Q.    And your understanding is that Mr. Watts' allocation percents in his affidavit are limited to the defendants in this case; is that correct?

A.    That's my understanding, yes, sir.

Q.    And what is the basis for that understanding?

A.    Both my discussions with him and having read and reviewed the affidavit.

Page 157

Q.   Did you review Mr. Watts' deposition testimony in this case?

A.   I'd have to go look.

I don't believe that I have, no, sir.

Q.   Okay.  I want you to assume that the allocation percents that you rely on for your damages calculations include costs attributable to all social media, not just defendants' platforms, okay?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Okay.  You want me to assume -- let's take one at a time.

You want to do Phillip Watts?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   No.  I want to just ask this question generally about your methodology, okay?

I want you to assume that the allocation percents that you rely on for your damages calculations include

CONFIDENTIAL

Page 158

costs attributable to all social media, not just defendants' platforms, okay?

A.    Okay.  I will see what I can -- I don't know that that's a complete hypothet.  But I guess it depends on what your next question is.

Q.    If it is true that the allocation percents that you rely on for your damages calculations include costs attributable to all social media, not just defendants' platforms, then you are not offering an opinion on the amount of damages that defendants' platforms, as distinct from all social media, caused any school district to incur, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Ask it again, please.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If it is true that the allocation percents that you rely on for your damages calculations include costs attributable to all social media, not just defendants' platforms, then the

Page 159

total damages numbers that you present in your reports are not the amount of damages that defendants' platforms specifically, as distinct from all social media, caused any school district to incur, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know that that's correct or incorrect.

It could be that the determination by the trier in this case determines that 100 percent of the damages are still caused in this case -- I think that's beyond my expertise or scope, that hypothet.  And it assumes a result.

So I don't think I can answer that question as posed.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.  Your damages calculations include damages that relate to the effects of content, that is, text, photos or videos that were posted by third

Page 160

parties on social media platforms, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Say that again, please.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Your damages calculations include damages relating to the effects of content, that is, text, photos or videos that were posted by third parties on social media platforms, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Absolutely not.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. How not?

A. Because that's not one of the alleged improper actions of the defendants in this matter.

Q. And what have you done to determine that the allocation percents that you have relied on have excluded the effects of content that was posted by third parties on social media platforms?

Page 161

A.    Because the persons most knowledgeable who are providing testimony and have already provided testimony in an interrogatory or a sworn affidavit are directly relating the causes of the percentages to the alleged improper actions of the defendants in this matter.

They are not allocating it to non-issues in this case.  They have limited their damages, as is stated in the allocation percentage, to those issues at issue in this matter.

Q.    If someone wanted to know if the damages -- let me ask that different. Well, I'll start that question over.

If someone wanted to know if the allocation percentages from the employee affidavits that you rely on include the effects of content posted by third parties on social media platforms, do you agree that that person could look to the employee's deposition to find that out?

A.    Maybe in part.

Page 162

ATTORNEY GRADEN:  Objection.

THE WITNESS:  It depends on the deposition.  It depends on what questions were asked.  It depends on whether or not the person taking the deposition asked questions to solicit this testimony or how the question was asked.

It may or may not.  You'd have to look to the deposition to see if it's in any way indicative of answering the question you're trying to answer -- or posing before me, rather.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If the district employee affidavits and interrogatory responses included, in their allocation percents, costs related to the effects of content posted by third parties on social media platforms, then those costs would be included in your damages estimates, correct?

Page 163

A.    They may or may --

ATTORNEY GRADEN:  Objection. Asked and answered.

THE WITNESS:  They may or may not be.

Again, my understanding is that all of the sworn testimony that's given here is related specifically to the defendants as social media and the alleged improper actions in this matter, not actions outside of the course of the scope of this litigation, when they are providing deposition -- I mean, affidavits or declarations in the course of this case or answering a direct response to an interrogatory as to, what are your damages as a result of the defendants in this matter?  It's even more clear.

But even still, under your hypothet, that somebody did want to include content, that doesn't

Page 164

necessarily change the reliability or accuracy of the calculations or how a trier would determine the accuracy and reliability of those calculations. It may be that those damages are all still 100 percent recoverable as a result of the defendants under that hypothet.

It's just I have no way of knowing the result, again, as to how the issues of material fact in this case will result.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Mr. Meyers, your understanding is that all of the employee affidavits that you relied on, the percentages in those affidavits are related specifically to the defendants, correct?

A. The alleged improper actions of the defendants.

Q. Is it --

A. I feel -- I feel like -- I'm

Page 165

going to continue to say it. And you don't want to ask the question with it.

But my damages calculations on every single one where I make an assumption or an opinion talk about the alleged improper actions of the defendants.

So to call them the defendants does not seek what I have calculated here. It's the alleged improper actions of the defendants.

The defendants may do a lot of other things that are not improper or not alleged in this case.

Q. Okay.

A. And so you continue --

Q. Mr. Meyers, your understanding is that all of the sworn testimony in the employee affidavits that you rely on, the percentages in those affidavits are related specifically to the defendants' alleged improper actions, correct?

A. As a result of the

Page 166

defendants' alleged improper actions, yes.  As a result of the defendants' alleged improper actions.

Q.    Can you point me to any language in any affidavit of any employee that states that they limited the percentages that they provided to costs that were the result of defendants' alleged improper actions?

ATTORNEY GRADEN:  Objection. Asked and answered.

THE WITNESS:  If you would like, let's go through all the affidavits.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Well, let's look at Exhibit-5, the Allison -- you have that already -- the Allison affidavit which you relied on for Charleston.

A.    Sure.

Q.    Can you point me to any text in Exhibit-5, the Allison affidavit, that states that any of the percentages she provided are limited to costs that were

Page 167

the result of defendants' alleged improper actions?

A.    Are you asking for those specific words?  Because I don't see those specific words.

However, Number 13 directly addresses it.  Number 14 addresses it. Number 15 addresses it.  Number 17 addresses it.  Number 18 --

Q.    Okay.  Mr. Meyers --

ATTORNEY GRADEN:  Let him finish.

THE WITNESS:  Number 18 addresses it.  Number 24 addresses it.  Number 27 addresses it. Number 26 addresses it.  Number 25 addresses it.  Number 28 addresses it.  Number 29 addresses it. Number 31 addresses it.  Number 32 addresses it.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, your testimony is that Paragraph 13 of the Allison affidavit, Exhibit-5, contains language

that states that Ms. Allison has limited the percentages that she provided to costs that were the result of defendants' alleged improper actions; is that correct?

A. Yes, sir.

And I had previously identified how I defined social media in her affidavit to be the defendants in this matter.

Q. I'm not asking how you define --

A. You are.

Q. -- Ms. Allison -- please let me finish my question.

I'm not asking how you define a term in Ms. Allison's statement. I'm asking for the factual basis you have for -- in the text of Ms. Allison's affidavit -- for your belief that her affidavit contains language that her percentages are limited to costs that were the result of defendants' alleged improper actions.

Page 169

A.    And I gave you the specific numbers that I believe say that.

Q.    And you believe that Paragraph 13 says that because it refers to problems arising out of students' use of social media platforms, correct?

A.    That's correct.

Q.    And so you believe that when Ms. Allison says, Problems arising out of students' use of social media platforms, she is referring only to defendants' social media platforms, and she is referring only to certain aspects of defendants' social media platforms; that's your testimony?

A.    In connection with providing allocation percentages for distinct vendors as a result of those social media usages, yes, sir.

Q.    Other than the fact that her affidavit refers to social media, can you point me to any text in the Allison affidavit that supports your belief that that affidavit's estimates are limited to

Page 170

only certain aspects of defendants' social media platforms?

A.    Other than the numbers that I previously read into the record, no, sir.

Q.    Do you think that it would be illogical if, in one of the employee affidavits, the employee had included in any of the percentages that they provided costs that related to social media platforms other than defendants' platforms?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  We're talking specifically about Lisa Allison or generally?  I can't answer it --

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    I'm talking about --

A.    I can't answer it generally because everybody says different things.

So it may be that Phillip Watts' affidavit says, my definition of social media is as a direct result of the allegations of the defendants in this

Page 171

matter.

So I'm not going to answer it generally. But if you want to ask it specifically, I can. I can't answer it generally. It's too general. It's an incomplete hypothet.

Do I think it's illogical that some person whose affidavit I don't know and haven't read or maybe have read may or may not have said something? I --

Q. Well, your understanding, Mr. Meyers, is that all of the employee affidavits and all the interrogatory responses that you relied on for all the districts, when they refer to social media, they are referring to certain aspects of defendants' platforms, correct?

A. That is not what I said.

Q. Okay.

A. And let me clarify. No, I'm going to finish.

You said refer to social media. You haven't shown me another

Page 172

affidavit that refers to social media. You haven't shown me any of the interrogatory responses.

So my testimony is, and will remain, that I'm relying on the sworn testimony, either via affidavit or verified interrogatory responses, that those answers relate to the actions -- the direct alleged improper actions of the defendants in this matter.

The interrogatory responses for Interrogatory Number 5 specifically asked what damages the defendants have caused in this matter. So the representation that the use of social media is even in there, I cannot tell you unless you want to provide me a copy. And I'm happy to look over them and go over them.

But in the generality, I'm relying on the sworn testimony of the persons most knowledgeable who are aware of this case and will provide testimony that the percentages they provided relate

to the direct actions of -- the alleged improper actions of the defendants in this matter.

THE WITNESS: When you get to a breaking point.

ATTORNEY SANDOVAL-BUSHUR: We can take a break.

VIDEO TECHNICIAN: Going off video record. 11:40 a.m.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: Back on video record. 11:55 a.m.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Mr. Meyers, is a bullying page on a social media platform content?

A. Is a what?

Q. Bullying page.

A. I wouldn't know one way or the other.

Q. Is a page on social media where students post videos of fights

Page 174

content?

A.    I wouldn't have an opinion on that.

Q.    Is a gossip page content?

A.    I wouldn't have an opinion on that.

Q.    If one student sends a meme message to another, is that meme message content?

A.    I don't know the answer to that.  I don't have an opinion on that.

Q.    You do not have an opinion on what is and is not content on social media; is that correct?

A.    That's fair.

Q.    And is it fair that you would not be able, then, to determine whether a cost was related to content on social media?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I think generally that's fair, that I'm not giving an opinion related to the cause -- any causation related

CONFIDENTIAL

Page 175

in this issue.

So whether it's content or something else, the damages, as calculated herein, are as a result of the alleged improper actions of the defendants.

So what I can tell you is the two buckets, kind of how you defined them earlier this morning, the cost bucket, which is the first bucket, I can tell you with certainty that all those costs were actually incurred and paid at the time and during the periods.

And then as it relates to the allocation percentage, which is the other bucket, we're relying on the sworn written statement of the persons most knowledgeable who will provide testimony at trial as it relates to the direct actions of -- the alleged improper actions of the defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

Page 176

Q.    Mr. Meyers, what are the alleged improper actions of the defendants in this matter?

A.    You'd have to show me the pleadings.  I generally know what they are.  But I couldn't sit here and recite them to you.

I know it has to do with the platforms and certain -- I guess you all may call them features.  I don't know what they call them.

But there's a number of alleged improper actions.  The people most knowledgeable are the ones who know those better than I do.

Q.    So your understanding is that the district employees who provided affidavits understood what the at-issue improper actions of the defendants were in this matter?

A.    That's my understanding, yes, sir.

Q.    And is it your understanding that the district employees who provided

Page 177

affidavits understood who the defendants were in this matter?

A.    That's my understanding, yes.

Q.    And have you done anything to vet your understanding that the district employees who provided affidavits understood what the at-issue improper actions of the defendants were in this matter?

ATTORNEY GRADEN:  Objection. Asked and answered.

THE WITNESS:  I think the only one that I would say I had any direct involvement with having a conversation was Phillip Watts, who I had spoken to prior to the issuance of his affidavit.

And he clearly, when he provided that information to me, before he put it in an affidavit, could not have been more crystal clear that these were as a result of the actions at issue in this

Page 178

trial.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Did he tell you what the actions were that were at issue and which were not at issue?

A. He did not.

Q. But aside from Mr. Watts, have you done anything -- let me ask the question a little differently.

Aside from your conversation with Mr. Watts, have you done anything to vet your understanding that the district employees who provided affidavits understood what the at-issue improper actions of the defendants are in this matter?

A. Other than the affidavits and the interrogatory responses as they are written, no, sir.

Q. And other than a conversation with Phillip Watts, have you done anything to vet your understanding that the district employees who provided affidavits understood who the defendants

Page 179

were in this matter?

A.    Nothing directly with the people other than Phillip Watts, no, sir.

Q.    Have all of the employees who provided affidavits that you relied on been deposed?

A.    I don't know the answer to that question.

Q.    Did you ask for the deposition testimony of the employees who provided the affidavits that you relied on?

A.    I don't recall if I did or didn't.  We can go through the affidavits or the depositions that I have reviewed and look at the dates on them.

I know a number of depositions were still continuing subsequent to the issuance of the original reports on May 19th, 2025.  Some of that has been provided to me subsequent and is in my possession and itemized in the reply reports.

But the reports that I have

Page 180

speak to the depositions that I've reviewed in this matter and at what points in time -- or at least between what points in time I've reviewed them.

Q. It was not part of your methodology in this case to attempt to eliminate from your damages estimate costs that related to the effects of content on social media platforms, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Not one way or the other. The only cost that I have eliminated in my regard were the ones that could not be verified. To the extent that they were a select vendor that I couldn't verify the cost, they are not included in my report.

But my analysis does not speak to the causation or the content versus anything non-content. It is -- that is not within the four corners of my

Page 181

report.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    It was not part of your methodology in this case to attempt to eliminate from your damages estimate costs that related to the effects of any particular features of any social media platforms, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  My understanding is that the features are one of the things that are at issue.  So the features that are at issue are directly as a result of what the report is written, and any features not at issue are not covered by the report.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If each plaintiff had told you how much in damages it believed was attributable to each individual defendant, you could have separately calculated damages for each individual defendant, correct?

Page 182

ATTORNEY GRADEN: Objection.

THE WITNESS: Walk me back through your hypothet.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. If each plaintiff had told you how much in damages it believed was attributable to each individual defendant, you could have separately calculated damages for each individual defendant, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Well, the plaintiffs never gave me anything related to damages.

So when you say they give me damages, I'm confused of what my role is if they're giving me the damages --

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Let me ask that question differently.

A. -- in this hypothet.

Q. If each plaintiff had told you what percentage of vendor costs it

Page 183

believed were attributable to each individual defendant, you could have separately calculated damages for each individual defendant, correct?

A.    I guess theoretically if there were different charts attributable to different people, we may or may not have done it differently.

I mean, we talked about my litigation experience in providing cases for plaintiffs and defendants.  It is not routine, and it actually would be very, very rare that, as a damage expert, you would apportion damages specifically to defendants in that manner, because that issue is something that is kind of going to be decided along the way.

So we talked about my example about the truck driver and multiple defendants.  I don't know that if a doctor would try to apportion it I would use that.

So I don't know what I would have done in that circumstance.  It was

not presented to me here.  But I think it's just as equally likely that I would have aggregated them, and they would have had to break it back out then as if I would have done them separately.  It's an interesting question.

Q.    It would have been possible for you to have calculated damages separately for each individual defendant if the plaintiffs had provided you with allocation percentages specific to each defendant, correct?

ATTORNEY GRADEN:  Objection.  Asked and answered.

THE WITNESS:  Let me try it.  Mathematically I could have done a mathematical calculation to demonstrate what the impact of that is.  I don't know that I would or would not have.  But I could have certainly done an -- a percentage.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Your damages are not limited

CONFIDENTIAL

Page 185

to issues relating to students who are addicted to social media, correct?

A.    As I sit here right now, I don't know if they are or not.  Because I don't know that that's one of the alleged harms.  I'd have to go back and refamiliarize myself with whether or not that is.

If you want to ask me to assume that it's in or out as a matter of what's still being tried in this case, but without knowing that here.

To the extent that addicted harm -- or I don't know exactly the terminology you used -- is a material issue of fact in this case still and it's one of the alleged improper actions, then it's in; to the extent that it's not, then it's out.

Q.    You do not know whether any of the affidavits that you relied on limited the allocation percents that they provided to issues relating to students who are addicted to social media,

Page 186

correct?

A.    I don't know specifically one way or the other on the affidavits, because the affidavits -- my understanding and assumption is that they are based on the alleged improper actions.

And as I just told you, I don't know if that's one of the alleged improper actions.  So I can't answer that question.

Q.    You do not know whether the interrogatory responses that you relied on for allocation percentages are limited to issues relating to students who are addicted to social media, correct?

A.    My understanding is that the interrogatory responses are limited to the damages in this case as a result of the alleged improper actions of the defendants.

And I don't know whether that is one of the alleged improper actions.  So I can't answer that

Page 187

question.

Q.    If someone wanted to know how much in damages a school district incurred because of students who are addicted to social media, the damages estimates that you have offered in this case would not answer that question, correct?

ATTORNEY GRADEN:  Objection. Asked and answered.

THE WITNESS:  I don't know if they do or if they don't, for the reasons I just told you.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If someone wanted to know how much in damages a school district incurred because of students who were addicted to defendants' platforms, would the damages estimates that you have offered in this case answer that question?

A.    I don't know if they do or if they don't.

Q.    If someone wanted to know

how much in damages a school district incurred because of only compulsive use of social media by students, would the damages estimates that you have offered in this case answer that question?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  To the extent that compulsive use is one of the alleged improper actions of the defendants that's being tried in this case, yes; to the extent that it's not, no.

I don't know and can't answer that question without further understanding.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Your estimated damages are not limited to addressing issues relating to students who have mental health problems, correct?

A.    May I ask you a question?  I know you're not going to answer it.

But you call it estimated damages.  I call them damages.  So are

Page 189

we -- are we having a difference here on -- because I don't want the answer to reflect the word "estimated." So I just ask you to clarify.

Q.    Your damages are not limited to addressing issues relating to students who have mental health problems, correct?

A.    To the extent it's one of the alleged improper actions, it would; to the extent that it's not, it would not.

Q.    You don't know, sitting here today, if your estimated damages are limited to addressing issues relating to students who have mental health problems, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  That's correct.  I do not know one way or the other.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And you did not yourself make any attempt to limit your damages to costs relating to students who have

mental health problems, correct?

A.    No.    That -- first of all, that question would be outside of the field of expertise of me.  I'm not a mental health expert.  So I wouldn't be able to make that determination anyway.

But for the purposes of the calculations, they are only including the damages that result -- as a -- stemming from the alleged improper actions of the defendants in this case.

So to the extent that they do, yes; to the extent that they don't, no.  And otherwise, I can't answer it more distinctly than that.

Q.    You do not have any data that would allow you to quantify what portion of your damages relate to students who have mental health problems versus students who do not have mental health problems, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't have any data related to student mental

CONFIDENTIAL

Page 191

health.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Schools have long had to address student behavioral issues, correct?

A.    You're asking me to assume that?  Or as a lay -- you want a lay opinion?  I don't have an expert opinion on that one.

I guess it depends on the school.  But I would generally agree with you that behavioral issues are one of the things that schools deal with.

Q.    In a world without defendants' platforms, school districts would still have had to address student behavioral issues, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  They may.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You are not opining that in a world without social media any school district would have spent less money addressing student behavioral issues than

Page 192

it spent in a world with social media, correct?

A.     I'm not opining at all about a world without social media.  That's not the but-for scenario here.  The but-for scenario for the lost profits is the world that includes social media but does not include the alleged improper actions of the defendants.

This hypothet that social media ceases to exist is certainly not something that's been considered by me in the course of this analysis.

Q.     You are not opining that in a world without the alleged improper actions of defendants any school district would have spent less money addressing student behavioral issues than it spent in the world that included defendants' alleged improper actions, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  To the extent that behavioral issues is not defined to include SEL curriculum

CONFIDENTIAL

Page 193

and/or mental health third-party programs, I would agree with you.

But to the extent that behavioral issues may include SEL curriculum and/or mental health platforms, then I would disagree with you.

Because my damages do quantify a reduction in cost or damages, if you will, out-of-pocket cost related to various SEL curriculum and/or mental health platforms as a result of the alleged improper actions of the defendants in this matter.

So I guess the answer to that question depends on how we were to define behavioral issues.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If a plaintiff was required by law, since before the existence of social media -- let me ask that question again.

CONFIDENTIAL

Page 194

If a -- the plaintiff was required by law, since before the existence of any of defendants' platforms, to pay a cost, then that cost is not attributable to defendants, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Absolutely not correct.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Why is that not correct?

A.    Because costs change and costs may be incurred in different ways.

So to the extent that additional costs were made or additional considerations were made but the cost was still incurred, that doesn't in any way negate the fact that the defendants have caused harm as a result of the alleged improper actions.

So fixed costs can still be considered extra costs just because they're fixed.  They don't have to be -- they don't have to be variable.

Page 195

Q.    Your opinion is that a school district's fixed costs can be considered extra costs?

A.    Absolutely.

Extra costs for the purposes of quantifying damages under a lost profits model, which I've done here, yes, sir.

Q.    You rely on allocation percents in your damages calculations, correct?

A.    Yes.  Subject to my prior answers without reiterating them.

Q.    The allocation percent does not reflect the amount by which a cost would change in the absence of defendants' conduct, correct?

A.    It may or may not.  That is, the affiant or the verified interrogatory response, it could include a couple of things.  It could be the cost that would change or not have been incurred.  It could be a reduction by which the cost could change.  Or it could be an

Page 196

additional cost that was spent that would not have been spent but-for.  It could also include an allocation of the apportionment of a cost related to the issues.

So those particular determinations are made by the actual person who is most knowledgeable who is going to talk about it.  And maybe we should talk about each one of the vendors one at a time, because maybe that would give a better understanding.

But in general, the allocation percentages could relate to a number of things.

Q.    Okay.  Well, I would like to understand what you -- you use the word "allocation percent" in your report --

A.    I do.

Q.    -- correct?

What do you understand allocation percent to represent?

A.    The amount of harm caused and the incurrence of that expense as a

CONFIDENTIAL

Page 197

result of the alleged improper actions of the defendants, as testified to by the persons most knowledgeable and who will give testimony in this trial related to those particular costs.

Q.   The allocation percent does not necessarily reflect the amount by which a cost would change in the absence of defendants' at-issue conduct, correct?

A.   It may or may not.

Q.   If the allocation percent does not reflect the amount by which a cost would change in the absence of defendants' at-issue conduct, what does it represent?

A.   So now we're going into the hypothetical world where we're trying to identify what a cost would have been in the world where the defendants had not performed these alleged improper actions.

And that world, unfortunately, doesn't exist.  So when you're negotiating a contract with a vendor, if one of the things that they

are going to do in the course of the contract of that vendor they do not have to do any longer, it could change the cost, it could change the term, it could change the pricing.

So unfortunately, we live in this world where we don't have a retroactive crystal ball to know what would have happened in the absence of the alleged improper actions of the defendants. So you use the best evidence.

So, again, to go vendor by vendor may be important. But, for instance, if you had a web content filter, maybe you're required to have a web content filter, there are a lot of additional add-ons that go on that. Perhaps you would spend less money on that content filter if you were not trying to deal with the impact contemporaneously of the alleged improper actions of the defendants.

But because all of the

Page 199

decisions related to the hard cost that I've calculated here are contemporaneous, they're retro, they're not into the future, they're not prospective, it's in the -- you know, the school at the time they made the decision is in the position, and in the best position to determine what portion of those costs was incurred as a direct result of the alleged improper actions of the defendants.

Q.    Is it -- you are not yourself --

A.    Wow.

Q.    -- opining --

A.    Sorry.

Q.    What?

A.    You just said you are not yourself and stopped.  I didn't know -- I didn't know what the question was.  I am.

Q.    You are not yourself opining that any vendor cost would be less in a world in which there is no defendant at-issue conduct, correct?

Page 200

A.    That is not my opinion. They may or may not be, depending on the vendor.

Q.    And nothing in the text of your reports identifies whether, for any given vendor, your opinion is that the vendor cost would be less in a world in which there was no defendant at-issue conduct, correct?

A.    I don't know that I agree with that.  It depends on the report.

I think some of them are very clear in the report.  Let's go, for instance, with the first cost on Breathitt, which is the Yondr pads -- the Yondr pouches.

Not only is the affidavit of Phillip Watts in there, but my discussions with Phillip Watts were that the alleged improper actions at issue in this case were the catalyst to get them.

Cell phones have been around since the '90s.  He told me he had been dealing with that for a very long time.

CONFIDENTIAL

Page 201

People had beepers.  People had cell phones.  People had other issues, they text messaged, they played phones.

But it wasn't until the alleged improper actions of the defendants in this case that we decided we needed to try something different, because the things they had tried were not.

And in the world where the improper actions of the defendants do not exist, that cost may not be incurred at all.

You know, I liken it to a business interruption claim, for instance, where your building gets flooded and you go out immediately, because you're trying to save the carpet, you think it's the best thing to do, and you go buy ten box fans.  It's a real example, for what it's worth.  And you go buy ten box fans and you put them on contemporaneously thinking you're doing the best you can to get the carpet dried

CONFIDENTIAL

Page 202

out, prevent the mold from growing so you can get back into business.

And the insurance company goes in and says, we're not going to pay for those.  Well, 100 percent of the fan cost were borne as a result of the actions, in that case, of the hurricane.  And that's a recoverable loss.

So to the extent that the fans may have use beyond what they were purchased for doesn't mean that the cost is not 100 percent recoverable.

So the Yondr pouches or the cell phone lockers are an example, at 100 percent, of a cost that the testimony, I understand it to be, would not have been incurred but for the alleged improper actions of the defendants.  And that's very clear in the report.

Q.   Okay.  Let's set aside the Yondr pouches and cell phone lockers.

For other vendor costs, is -- are you opining that those vendor

Page 203

costs would be less in a world in which there is no defendant at-issue conduct?

A. They may or may not be less in the but-for world where there is no alleged improper actions of the defendants during the time periods for which the report calculates damages.

Q. Let's look at the Breathitt report, Exhibit-1A, Appendix C, Exhibit-1.

And the first two costs there are for cell phone caddies and cell phone lockers, correct?

A. They are, yes.

Q. And then the third cost that you include in your damages calculation is costs relating to the vendor Kids First, correct?

A. That's what it says.

Q. And you have an allocation percent of 50 percent, correct?

A. Correct.

Q. Would the Breathitt vendor costs for Kids First be 50 percent lower

Page 204

in a world without defendants' at-issue conduct?

A. They may have been 50 percent less or they may have been zero.

The allocation that Phillip Watts and Will Noble assigned to them was 50 percent as a result of the direct alleged improper actions of the defendants.

Q. And I'm trying to understand what you understand 50 percent to mean.

A. Fifty percent is the damage component -- it is the portion of the cost that is allocated to the alleged improper actions of the defendants.

So these contemporaneously paid costs at this time to combat the alleged improper actions of the defendants were -- were, in part, incurred for that purpose. And at this point, it was 50 percent in part incurred with that purpose.

So I can't go into the

Page 205

hypothetical world and have their actions not be there. It may be that the cost wouldn't have been incurred at all for Kids First particularly.

But that Phillip Watts has determined in his affidavit that he is only willing to assign 50 percent of whether it's the benefit or the utilization of Kids First toward the actions of the defendants, that's a question for Phillip Watts to answer.

Q. Looking at Kids First, the first vendor cost that you list is $400, correct?

A. It is.

Q. In a world without defendants' at-issue conduct, the vendor cost for Kids First may have still been $400, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: It may have been $400. It may not have existed at all. That's a question for Phillip Watts as it relates to

Page 206

his determination of what percentage of the cost incurred for Kids First contemporaneously as a result of the alleged improper actions of the defendants.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And for every vendor cost that does not have an allocation percent of 100 percent --

A.    Okay.

Q.    -- is it your understanding that in a world without defendants' at-issue conduct each of those vendor costs may have been exactly the same as what you present in your report?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't have a way of knowing in that but-for hypothetical world if they are the same or if they're zero.  They may not have been incurred at all or they may have been incurred at the same.

Page 207

But the percentage allocable to the alleged improper actions of the defendants, as determined in these particular cases, and I don't know if it's Phil Watts for some of these or Will Noble for some of these, are the people who are going to testify as to the impact of those harms on these costs.

And, like I said before, those costs could go into a couple of buckets, which we talked about.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    So looking at the Kids First example, the vendor cost is $400.  You apply an allocation percent of 50 percent, and result in a damages total of $200, right?

A.    That is the math, yes, sir.

Q.    And your understanding is that $200 does not necessarily reflect the difference between what Breathitt actually paid Kids First and what

Page 208

Breathitt would have paid Kids First in a world without defendants' conduct, correct?

A.    It may or may not.  Like I said, it could be that it was still $400 and that none was assigned to it; it could have been that the cost would have been $200, which would be your hypothet that you're asking, or it could have been that the cost would have been zero and Phillip Watts determined that even though that cost would not have been incurred, he was more comfortable assigning a 50 percent weighting to it.

But those questions would be asked of those persons most knowledgeable who are going to provide the foundation at trial for the allocation percentages by vendor.

Q.    And your understanding is the same for all of the vendor costs that have an allocation percent of less than 100 percent, that the damages total does not necessarily reflect the difference

between what the school district actually paid the vendor and what the school district would have paid the vendor in a world without defendants' conduct, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I will agree with it does not necessarily reflect.  It could reflect a number of things.

So, yes, I will agree with the question as worded.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Is a cost properly considered damages even if a plaintiff would have paid the exact same cost in the absence of defendants' at-issue conduct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  My answer is yes.  But I do believe that that's a legal determination whether or not a cost is recoverable under whatever law.  So I'm not going to

certainly step in the purview of the trier in this case.

But over the course of my career, whether it's representing plaintiffs or defendants, this methodology has been employed by me without exception and utilized in federal and state courts all over the country.

So I have not had anyone take exception with that.  But I certainly don't want to make a legal determination of what is or not recoverable.  I'm only calculating the damages here.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And your damages totals include amounts that plaintiffs might have paid in the absence of defendants' conduct, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  They may have paid or they may not have paid or they may have paid at a lesser

Page 211

amount.

And that's assuming not the 100 percents, or they may not have paid at all because it's 100 percent related to.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You relied on the affidavits that were provided by employees from Breathitt, Charleston and DeKalb, correct?

A.    Yes.

Q.    And you spoke with Mr. Watts who provided an affidavit for Breathitt, correct?

A.    I spoke with Mr. Watts.  And I also spoke with Stacy -- Stacy McKnight, the CFO, just for clarity of the record.

Q.    For those individuals whose affidavits you relied on for your damages calculations, the only one who you spoke with was Mr. Watts, correct?

A.    Related to the six bellwether cases herein.

Page 212

Q.    Correct.

A.    I don't know that that's accurate for all of the cases.  But for the six that we're talking about and the three with affidavits, Phillip Watts was the only one of the three -- or one of the four deponents -- well, not deponents but affiants that I spoke with.

Q.    And at the time that you issued your expert reports, your initial expert reports with your damages calculations, you had not reviewed the deposition testimony of any of the employees from Breathitt, Charleston or DeKalb who issued affidavits, correct?

A.    That's correct.  Who issued affidavits.  That's fair.

I don't know that they had given depositions prior to the issuance of my report.  So with that caveat, I had not -- obviously, I couldn't have reviewed something that didn't exist at the time.

But for the ones who may

have given depositions prior to, I did not review them if they're not in my materials reviewed.

Q.    You relied on the interrogatory responses that were provided by Harford, Irvington and Tucson for your damages calculations, correct?

A.    In part.

Q.    Did you know, when you issued your reports for Harford, Irvington or Tucson, who from the districts provided the information that was included in the interrogatory responses that you relied upon?

A.    I don't know which individuals would have given that sworn testimony.  I know that they were all verified, which was something that we checked.

But that sworn testimony could have been from one person or a consolidation of a number of people who will provide testimony.

Q.    When you relied on the

Page 214

interrogatory responses from Harford, Irvington and Tucson, did you know whether it was the school district's attorneys who had provided the information in the responses?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I have been dealing with litigation work for a long time.  The general representation that the attorneys are providing sworn statements is not my understanding.

The people who are giving the answers are the ones who are swearing that the answers are true, correct and reliable under penalty of perjury.

So I don't believe or accept any acknowledgment that the attorneys are the ones who are drafting the answers in any way.

They may have physically written them.  But it's the people who are going to swear at trial

Page 215

that this is the true and accurate -- who are giving them those answers.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And it's your understanding that the people who signed the interrogatory responses for Harford, Irvington and Tucson are not attorneys; is that correct?

A.    I don't know if they're attorneys or not.  But they're not counsel of record in this case.

They were verified by the actual representatives of those districts --

Q.    In your --

A.    -- that's my understanding.

Q.    In your experience, it would be unusual if an interrogatory was verified by an attorney, correct?

A.    I don't know if that's unusual or not.  I've worked a lot on discovery in many matters.  I do a lot of discovery working with the attorneys on

Page 216

behalf of divorce clients.  One of the things I do in my domestic practice is assist with discovery a lot.

And it may not be unusual for an attorney to verify an interrogatory that's attested to by the client.

So I think that's a legal conclusion.  I don't recall any attorneys signing those verifications.  I think they were all signed by the representatives.

But I don't know that that changes my opinion at all that their sworn testimony as an interrogatory in an answer to a direct question on damages from the defendants in this matter.

Q.    Is it your understanding that the individuals who signed the interrogatory responses will be the ones who will testify to the validity of those percentages?

A.    I don't know that they necessarily will be the ones.  It could

Page 217

be multiple people.

But they are the ones who have gathered up the information to make sure that it's correct, reliable and accurate as representatives of those districts to give truthful testimony in an interrogatory response. That's my understanding.

Q. For Harford, Irvington and Tucson, you do not know who will testify to the accuracy, validity or reliability of the percentages provided in those interrogatory responses, correct?

A. That's fair. I do not know at this time.

Q. It was not part of your assignment in this case to vet the process that any school district employees used to arrive at the allocation percents in their affidavits, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Could you ask it again, please?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    It was not part of your assignment in this case to vet the process that any school district employees used to arrive at the allocation percents in their affidavits, correct?

A.    I think that's fair.

Q.    And you did not, in fact, vet the process that any school district employee used to arrive at the allocation percents in their affidavits, correct?

A.    That's fair.

Q.    And you do not know, one way or the other, whether the employees whose affidavits you relied on used a reasonable or unreasonable process to arrive at their allocation percents, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I can't speak to their process.  I don't believe they used an unreasonable one.  But I have no way of knowing one

Page 219

way or the other, only that the testimony that they're going to give and that they have already given is sworn to under penalty of perjury.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. And you do not know, one way or the other, what process, if any, any school district employee whose affidavit you relied on used to determine whether or to what extent a vendor's costs were related to defendants' at-issue conduct, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Could you read it back? It had a few different pieces to it.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Yeah.

You do not know, one way or the other, what process any school district employee whose affidavit you relied on used to determine whether or to what extent a vendor's costs were related

Page 220

to defendants' at-issue conduct, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: I think that's right. I mean, I certainly couldn't speak for somebody like Phillip Watts or Byron Scheuneman's involvement with DeKalb, for instance, or any of the other people I talked to's discussions with me and what role it had.

So I was not involved with that process and do not speak to the process itself, because I have no knowledge of it. So I think that's accurate.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. And you do not know whether any of the employees who issued affidavits reviewed any data before arriving at the allocation percents that they put in their affidavits, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Define data.

Page 221

Many of the allocation percentages have a chart of the costs, and some of those costs may have come from me as having been verified and forensically analyzed in the cost chart.

The percentages, no. But you just said in their affidavit generally.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Okay.

A. So I'm not certain that the fact that I had already reconciled the cost of the Yondr pouches for Phillip Watts and he put the number of the dollar, that he didn't get that from me.

He may or may not have gotten it from me. And they didn't always reconcile with what I said. But some of them did. And to the extent that they did, it may have been as a result of the work I had performed in advance of declaration or affidavit they provided or interrogatory responses provided.

Page 222

Q. Yeah. And my question was actually limited to the allocation percents.

A. That was --

Q. Understood. I'll just re-ask the question.

A. Yeah. Please.

Q. You do not know whether any of the employees who issued affidavits reviewed any data before arriving at the allocation percents that they put in their affidavits, correct?

A. Subject to the fact that they may have reviewed the data on the costs and that may have had some impact, I do not know otherwise.

I don't know what data they reviewed, I guess, is the right answer.

Q. You do not know whether or to whom any of the employees who issued affidavits interviewed before arriving at the allocation percents presented in the affidavit, correct?

ATTORNEY GRADEN: Objection.

Page 223

THE WITNESS: I'm not aware of the process that any of the people who will provide the sworn testimony went through in order to get their sworn testimony before the court, whether in a declaration or in a response to a verified interrogatory, as it relates to calculating damages as a result of the alleged improper actions of the defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. For the districts whose interrogatory responses you relied on for allocation percentages, you do not know what process was used to arrive at the allocation percents, correct?

A. Same answer, if you'd like me to read it back.

I'll put them both together.

I don't know either for the affidavits or for the interrogatory response what portion they went through

to determine that the damages allegedly caused by the defendants in this matter relate to the allocation percentages, neither for the interrogatory responses or the declarations, affidavits.

Q. Do you know whether the plaintiffs' attorneys suggested allocation percents to the employees who ultimately issued affidavits and then asked the employees to estimate allocation percents?

ATTORNEY GRADEN: Objection.

THE WITNESS: I don't know one way or the other. I have no reason to believe that the attorneys are suggesting the answer to the plaintiffs.

But I have no way of knowing one way or the other.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Would you be surprised if plaintiffs' attorneys suggested allocation percents to the employees who ultimately issued affidavits and then

Page 225

asked the employees to estimate the percents?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I would be very surprised if people who were prepared to offer and have already offered sworn testimony under penalty of perjury are given an opinion that's not their own.

Yes, that would surprise me.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    For the allocation percents, you relied, for Breathitt, on two employee affidavits, correct?

A.    That is correct, yes, sir.

Q.    For the allocation percents, you relied, for Charleston, on one employee affidavit, correct?

A.    Yes.  That's Allison, correct.

Q.    And for DeKalb for allocation percents, you relied on one employee affidavit, correct?

A.    That's correct.

Q.    The employees whose allocation percents you relied on were selected by plaintiffs' attorneys, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know that to be the case.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You did not identify the people who you thought should provide allocation percents and then ask plaintiffs' attorneys to get information from those people, correct?

A.    I didn't identify anybody to provide sworn testimony in this case one way or the other.  I was not involved in any process.

Q.    You did not have any say in who provided affidavits in this case?

A.    I think that's fair to say that I could not cause an affidavit to be made.

Q.    And you did not ask plaintiffs' attorneys to obtain or seek

Page 227

to obtain affidavits from any particular individuals from any particular school district, correct?

A. I think that's fair to say.

ATTORNEY GRADEN: Objection.

THE WITNESS: That was not a process I was involved in in any way.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. And you do not know why plaintiffs' attorneys selected which employees would provide affidavits and which would not, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: I don't know other than to know that the people who are providing sworn testimony in this case as a result of the alleged improper actions of the defendants are the persons knowledgeable to say what they've said in their affidavits. It wouldn't be in their affidavit if it wasn't within the scope of

Page 228

their personal knowledge during this period.

So other than that, no.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You did not receive any affidavits from Harford, Irvington or Tucson, correct?

A.    I think that's correct, yes, sir.

Q.    What is your understanding of why you received affidavits from some districts but not from others?

A.    I have no idea.  My speculation is that some attorneys like affidavits and some attorneys like response to interrogatories.  Perhaps just a preference of the local counsels that are representing those particular school districts.

But I would simply be guessing like I just did in that answer.

Q.    For the employees whose affidavits you rely on, do you understand that those employees do not personally

CONFIDENTIAL

Page 229

make the decision to pay each and every one of the vendors identified in their affidavits?

ATTORNEY GRADEN: Objection.

THE WITNESS: I have no way of knowing that. I don't know that I agree with that on its face.

I think Phillip Watts has been there a long time. He may have been the cause for single -- every single cost on Breathitt.

I think if I remember correctly, Monika Davis was in the school system long before the allegations here.

And I'm looking at Lisa Allison at Charleston, and she's been the executive director and working with these programs maybe since 2001.

So I don't know the answer to that. I'm not the right person to ask on who caused any expense

to be incurred.

I'm the right person to ask on was it incurred and was it paid. And they were.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. So you do not know, one way or the other, which of the vendor costs in the employee affidavits the employee who issued the affidavit was personally involved in; is that fair?

A. I think it's fair that I don't have direct knowledge on that.

I mean, we could take them one at a time. Phillip Watts was the superintendent. And I believe Will Noble was the CFO. The CFO is going to have direct knowledge of any expense that goes through his, you know, payment system while he's the CFO for as long as he is the CFO.

Then Monika Davis, I believe, was perhaps also the CFO or filled that role as a CFO.

So I don't know the answer.

CONFIDENTIAL

Page 231

But the people who have given those affidavits certainly were in the role and were in positions that would have been intimately familiar with the knowledge of the costs incurred during the periods we're talking about.

Q.   You did not require that an employee have personal knowledge about a vendor or payments to a vendor in order for you to rely on the percentages in the employee's affidavit, correct?

ATTORNEY GRADEN:   Objection.

THE WITNESS:   That's fair. So long as the employee is standing ready to testify that they are the person most knowledgeable and have the information to provide to the court that's truthful and accurate as to the -- what the affidavits say resulting from the damages of the alleged improper actions of the defendants, they are the people who are the ones to rely

CONFIDENTIAL

Page 232

upon.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And you did not require that the information in an interrogatory response be provided by someone with knowledge of the vendors or payments to the vendors in order for you to rely on the interrogatory response; is that fair?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I didn't require anything in any interrogatory response.  I didn't have anything to do with discovery in this matter.

ATTORNEY GRADEN:  Joseph, it's almost 1:00.  If you want to take a lunch break.

ATTORNEY SANDOVAL-BUSHUR: Yeah.  We can take a break.

VIDEO TECHNICIAN:  Going off the video record, 12:44 p.m.

-   -   -

(Whereupon, a luncheon recess was taken.)

CONFIDENTIAL

Page 233

- - -

VIDEO TECHNICIAN:  Back on video record, 1:18 p.m.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, it was not part of your assignment in this case to determine whether any school district paid any of the costs included in your damages calculations using external funds, such as federal funds, correct?

A.    I don't know that I agree with that.  To the extent that the federal funds are part of the general budget, I confirmed that all the costs came from the school funding itself.

So whether or not the original source of the funding, call it revenues, if you will -- I know we talked about not-for-profits, but they can still have revenues -- call it revenues of the not-for-profit school districts, those would include federal grants, state grants, private grants, all of these other different funding sources.

Page 234

So my focus was on making sure that the school expended the funds to pay for the costs that are in there, this is, not a third-party grant paying it directly.

But that does not necessarily mean that the original source of the funding or a portion of the source of the funding may have originated from the general budget having federal or state funds as a part of its revenue stream, if that makes sense.

Q. It was not part of your assignment to determine what funds any school district used to pay any of the costs included in your damages calculations, correct?

A. I think that's fair. The source of the funds at the school district level were not part of what I was asked to do.

But I did confirm that the costs were borne at the school level, if that makes sense.

Page 235

Q.    And you're not opining on what the source of any of the funds are for any of the costs included in your damages calculations, correct?

A.    That is fair.  The source is not a concern for me in the report that I've done.  This is on the expenditures, not what funded those.

Q.    It was not part of your assignment to determine whether any school district paid for any of the costs included in your damages calculations using grant funding, correct?

A.    That's fair.  Grant funding, federal funding, any source of revenue that would come into the school district was outside of the scope of what I did.

I did not start with the revenue.  I made sure that the expenditures that are calculated for the select vendors in my Exhibit-1 to the six reports were all borne at the school level.  But whether or not it was from the general fund or a specific specially

CONFIDENTIAL

Page 236

allocated fund or what funded those particular funds, if you will, was not part of what I was asked to do in this case.

Q.    It was not part of your assignment to determine whether any school district was reimbursed using any third-party funds for any of the costs included in your damages calculations, correct?

A.    I think that's fair. It's -- the reimbursements would still come in as regular revenues under that business model generally. So that would go back into the inputs on those particular sources.

Q.    And you did not -- and you were not opining that any school district was or was not reimbursed using any third-party funds for any of the costs included in your damages calculations, correct?

A.    Again, yes, that's correct. I don't have an opinion on the source of

Page 237

any of the funds, whether it was reimbursed and booked as revenues.

I can tell you that none of the costs that I have included have contra offsets. So if in the general ledger it was a cost that was borne by the school but then it was paid back and netted out as if it were not paid by the school, that cost would not have been incurred -- or included in this report, which could be indicative of a reimbursement to pay for it so that it did not come from the source of the funds from the school.

But to the extent that the funds all go into different pots for a school that has to go, whether it's a teacher fund or general fund or specific allocated fund or capital campaign, whatever those pots were, I didn't touch those buckets at all.

It was all in the expenditure -- the use side, not the source side.

Page 238

Q.    It was not part of your assignment to determine whether any school district spent money on a particular vendor cost specifically because the district received external funding to pay that cost; is that correct?

A.    No, that was not within the scope, for the reasons we just talked about.

Q.    And you did not, in fact -- well, let me ask my question a little differently.

You are not opining on whether any school district spent money on a particular vendor cost specifically because the district received external funding to pay that cost, correct?

A.    That's fair.  I'm actually specifically opining that the expenditures in my report are as a direct result of the alleged improper actions of the defendants, not as a result of some other external force, which would include

Page 239

some direct grant funding.

So I'm opining specifically that they were incurred as a result of the alleged actions of the defendants.

Q. It was not part of your assignment in this case to study what specific services or products any school district purchased or received from any vendor; is that correct?

A. I think that's fair, with the one caveat that, as is detailed in my report, there are certain buckets of information I've been asked to opine on; capital cost, such as the Yondr pouches or the lockers, SEL curriculum, mental health, technology, and, in a couple of cases, property damage.

But other than those buckets -- I mean, I had to make sure that it wasn't put on a new roof. But it was one of those five buckets that I was asked to opine on.

So once I was satisfied that those vendors met one of those

Page 240

definitions that I was asked to review, because there may be other damages in this case that I'm not aware of or opining on related to other vendor costs that are not the select vendor costs that I'm doing, that it fell into one of those four buckets or five buckets, if you will.

But outside of that, no additional work.

Q.    You just testified that you were asked to opine on costs in certain buckets, including capital costs, social-emotional learning curriculum, mental health, technology and property damage, correct?

A.    That's correct.

Q.    Who came up with those buckets?

A.    I don't know the answer to that.  I know there's multiple experts in this case.  Some are dealing with payroll costs.  Some are dealing with the past costs.  Some are dealing with future

Page 241

costs. I'm not involved with the role of any of the other experts.

But for my role in this case, I was asked to, I guess, only focus on the costs in those five buckets for these particular schools related to the past. So only past -- certain select vendor out-of-pocket past damages in those four or five buckets, as you just identified.

But I don't know --

Q. You -- let me start that again.

Did plaintiffs' attorneys tell you that your damages analysis should relate to past costs in the buckets of capital costs, social -- social-emotional learning curriculum, mental health, technology and property damage?

ATTORNEY GRADEN: Objection.

THE WITNESS: I think it's -- that's fair to say.

Originally when we got all

Page 242

the general ledgers and started having to go through vendors, the focus was that I was not dealing with any employee costs. I was not dealing with any purchase cost of things outside of these.

So in an initial scope to narrow -- and as you can see through these reports, some of them don't have all of those five buckets. They -- only costs were identified in sometimes two or three of those buckets for me to quantify in this particular case.

But that was the initial part of the narrowing of my scope. When I got every vendor that's ever been paid over a period of eight years for a school that's got 92 different schools inside of it, it's a lot of costs to go through.

So that was the first narrowing of the forensic

accounting to get those buckets.

And then it was further narrowed, as you can see, to just select vendors that are being identified by the persons most knowledgeable as to the alleged improper actions of the defendants where damages were caused.

So it's not all the technology. And it's not all the mental health. And it's not all the SEL. And it's not all the capital cost. It's very small in comparison to the general budgets of these schools, costs that were eventually finally identified for me.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. If you take, for example, the social-emotional learning curriculum costs.

A. Okay.

Q. You are not opining on the details of any of the social-emotional

curriculum that any district purchased from any vendor, correct?

A. When you say "details," you mean what services are provided under that particular vendor?

Q. Correct.

A. That's fair. My work is not concerned with, if you will, what the services were provided. The vendors were identified by the people who are going to testify as to how those vendor costs were impacted as a result of the alleged improper actions.

So, I mean, I can see what they are by the invoices and the purchase orders. But what services they provided or what technology -- technology they provided or what type of mental health they provided is irrelevant to the quantification of damages in my report. That's an assumption that I'm making in those buckets.

Q. So for all of the vendor costs, you are not opining on what

CONFIDENTIAL

Page 245

services were provided by each particular vendor?

A.    That's fair.  I will not give an expert opinion at trial that some particular vendor was directly attributable to some particular function of that.  Not at that level, no, sir.

Q.    And you are not opining that any particular service received from any vendor was, in fact, connected to social media or to defendants' at-issue conduct, correct?

A.    Well, I don't believe that's correct.  I'm opining on that as a result of the affidavit and sworn testimony of the persons that these are the vendors that were impacted and whose costs were impacted as a direct result.

So I am opining that it's a direct result of the impact of the alleged improper actions of the defendants as a result of the sworn testimony of the persons most knowledgeable.

Page 246

Q.    And you are opining that a particular vendor cost was -- let me ask my question differently.

Is it fair to say that you are opining that, based on the information provided in the affidavits or the interrogatory responses, certain vendor costs were connected to defendants' at-issue conduct?

A.    Yes.

Q.    And you have not, as part of your work in this case, vetted whether the information provided in the affidavits or interrogatory responses is accurate, correct?

A.    Except as far as it relates to the quantification of cost that may be in those interrogatory responses or that may be in those affidavits that had already been performed forensically by me and were utilized at that point in time.

So as it relates to the selection of the vendors, that was not a determination that I made or an opinion

Page 247

that I'm giving in this particular matter.

And as it relates to the allocation percentage as a result of the alleged improper actions of the defendants, that is going to be borne with the same testimony as those persons most knowledgeable.

As it relates to the number that they're using to go with the allocation percentage, that may, in fact, have come from me or the work I had done prior to the issuance of my report and the forensic accounting related to those select vendors, if that makes sense.

Q. You are not opining on whether any school district needed to purchase any particular service or product from any vendor; is that correct?

A. I'm not opining to the need of any school district at any particular point in time one way or the other.

Q. And you are not opining that the amount of money that any school

Page 248

district paid to any vendor was reasonable, correct?

A. I'm opining that the amount of money that they paid to any particular vendor is accurate and reliable, that that was the amount they paid for the time period they paid it.

Whether or not it's reasonable is outside the scope of my report. That's going to be for the people who purchased it and their contemporaneous reasons for purchasing it and its relationship to why it was purchased at that time. And the impact is why it was harmed as a result of the alleged actions of the defendants.

Q. You are not opining on whether any school district got a good deal or a bad deal from any vendor; is that fair?

A. That's fair. I'm not going beneath the surface on what the costs were and whether or not they were fair market value price at the time for which

Page 249

they were purchased, I guess would be one way I would say it.

Now I understand what you mean by "reasonable."

But they were incurred at that rate. And it stands to reason that the persons, you know, who purchased it at that time would not have overpaid for any type of software, technology or property.

But it is not an opinion I'm giving.

Q.    Would you agree that smartphones have many different uses?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  As a lay person?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Yes.

A.    Sure.

Q.    You can use a cell phone to place calls, correct?

A.    Most cell phones, yes.

Q.    You can use a cell phone to

Page 250

text, correct?

A.    Most cell phones, yes.

Q.    You can use a cell phone to play games on your phone?

A.    Some people do.

Q.    You can use a smartphone to shop on your phone?

A.    Some people do.

Q.    You can use a smartphone to stream entertainment?

A.    Some people do, yes, sir.

Q.    And people use smartphones for things other than accessing defendants' social media platforms, correct?

A.    I think that's fair.

Different people use cell phones for different purposes.

Q.    And students who use smartphones during the school day use them for purposes other than only accessing defendants' platforms, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I couldn't

Page 251

tell you what students use them for. I'd be speculating to what they use them for.

So I don't have any knowledge, one way or the other, to what they use them for, whether they're students or other people.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. You do not know how any school district determined that the need for any physical repairs was attributable to either social media generally or to any defendants' at-issue conduct specifically, correct?

A. Define physical repairs.

Q. You have calculated damages relating to physical repairs, correct?

A. I believe in two of the six bellwethers there are quantifications for the damages as a result of the alleged improper actions of the defendants related to the cost associated with property repair damage, I think -- I don't know exactly what I called it --

CONFIDENTIAL

property damage.

Q.    You calculated property damage -- damages for both Breathitt and Tucson; is that correct?

A.    I know it is yes for Breathitt.  I'll just check real quick.

Yes, that's correct.

Q.    Did you ask for information on any property damage costs that were attributable to defendants' at-issue conduct from Charleston, Harford, DeKalb or Irvington?

A.    I don't recall if I had asked or not.  I know that during the course of the information that was provided, property damage was given to me on a number of cases in regards to, as you can see on Exhibit-1 for Tucson and Breathitt.  I don't recall if I had received anything on the others.

But I don't -- I didn't request anything of them specifically.

Q.    Okay.  How were the vendor costs that were allegedly related to

CONFIDENTIAL

Page 253

defendants' at-issue conduct identified to you?

A.   I think there's two ways that they were identified.  I'd have to go back and look at the pleadings filed.

But if I remember correctly, there was an additional verified interrogatory that I had for a number of them.  It might have been Interrogatory Number 3 -- I'd have to go back and look -- where they were asked specifically about property damage.  And those were outlined in a number of the interrogatory responses related to that property damage.

And in addition to that, it was information that was provided related to the cost of select property damage that the persons most knowledgeable had identified was as a direct result of the alleged actions of the defendants in this matter.

Q.   You have not done anything to vet any plaintiffs' allocation

Page 254

percentage relating to property damage, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  My understanding is that the property damage, that is the same as the Yondr pouches we talked about before, it's 100 percent related to the alleged improper actions, that the allocation percentages that the property damage would not have needed to have been repaired but for the alleged improper actions of the defendants, which is -- the 100 percent is allocated.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You did not do anything to vet whether, in fact, any property damage was due to the alleged improper actions of the defendants, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I did not personally do any additional

Page 255

information -- ask for any additional information other than the sworn testimony of the persons who will speak to the property damage.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And you do not know what the persons who either signed the affidavits or provided the interrogatory responses did to determine that any property damage would not have needed to have happened but for the alleged improper actions of the defendants, correct?

A.    I'm not personally aware of the rationale that they used to determine that the property damage that needed to be repaired was as a result of the alleged improper actions of the defendants, only that it was.

Q.    The alleged -- let me ask that a little differently.

You do not know which of defendants' platforms or at-issue conduct any school district believes is linked to

Page 256

the need for any physical repairs, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  That's fair. I don't know the source of the determination that this was caused by the alleged improper actions of the defendants.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Property damage would not have happened if students had not engaged in destructive behavior, correct?

A.    It may or may not have.

Q.    Well, each of the -- this is the property damage that you include in your damages calculations.

Those instances of property damage would not have incurred if students had not engaged in destructive behavior, correct?

A.    I think that's fair.  I don't know that it was just students. But I know it was as a result of the alleged improper actions.

Page 257

But I think the -- I don't know what you would call it -- the term is vandalism, but with it being 100 percent, it would not have happened but for the persons who did it.

And the reasons they did it, I guess, will be a determination for someone else other than me.

Q.    So for the instances of property damage, there would be an allocation percent of 100 percent to the individual person who actually engaged in the property damage, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  No, I don't know that I agree with -- that's certainly a legal determination or maybe an issue of fact of some kind of, you know -- to say that because somebody did it, it's not the fault of somebody else is a legal determination.

And that's not been my experience in a lot of personal

Page 258

injury cases. Sometimes it's not the fault of the person who did it or the cause of the fault of the person who did it. But that's certainly beyond my scope and expertise.

And I'm not giving an opinion on causation either. So I don't know who caused it or for -- who is responsible for the damage.

I can only tell you what the costs were to repair the damages caused by the alleged improper actions of the defendants.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. The fact that there is a 100 percent allocation percent for a particular vendor cost does not mean that there is no one else in the world who contributed to the cost being incurred other than defendants; is that correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: The 100 percent assumes that but for

Page 259

the improper actions of the defendants, the cost would not have been incurred to repair the damage.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Does the fact that there is a 100 percent allocation percent for a particular vendor cost mean that there is no one else in the world who contributed to the costs being incurred other than the defendants?

A.   It doesn't necessarily mean that at all.  But that doesn't mean that one person may not be liable or responsible for 100 percent of it.

You know, take a person who gets in an automobile accident, which I see all the time, who had bad knees and needed surgery, but he got smashed on his knees and had to have both knees replaced as a result of the injury.

In those cases, I've seen the trial court routinely award 100 percent of the cost of the knee

CONFIDENTIAL

Page 260

surgery, even though he may have had a preexisting condition that would have required him to have surgery later on in life.

So the fact that there could be other factors in it does not in any way obviate 100 percent could be the cause -- the catalyst which caused it could be 100 percent recoverable as a damage. And that's pretty consistent over my career.

Q. You include vendor costs relating to something called E-hall passes; is that correct?

A. Do you want to tell me who that's on?

Q. If you look at Exhibit-1A, your Breathitt report.

A. I don't see E-hall passes on that report.

But I do think that Eduspire and Securly may have been technology platforms that had that type of technology.

Page 261

Q.    Do you know how any district determined that E-hall pass costs were attributable to social media or to defendants' at-issue conduct?

A.    I do not.  For the same reasons we've talked about before on the allocation percentages that were placed on by the persons most knowledgeable.

Q.    And you are not offering the opinion that using E-hall passes is a necessary expense for a school district, correct?

A.    I'm not giving an opinion one way or the other on that.

Q.    You include in your damages calculations vendor costs relating to Internet filters, correct?

A.    I do.

Q.    You do not know how any district determined that Internet filter costs were attributable to social media generally or to defendants' at-issue conduct, correct?

A.    That's fair.  For the same

CONFIDENTIAL

Page 262

reasons we talked about before, that the persons most knowledgeable will speak to the allocation percentage utilized by them for those select vendors related to web filters as a result of the alleged improper actions of the defendants.

Q.   Are you aware that school districts are required under law to provide Internet content filters regardless of whether students use social media or not?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I'm not aware, because I'm not a lawyer, to be able to tell you if they are required by law.

I've seen that allegation by some of the rebuttal experts, that that's in there.  And I know there may be deposition testimony.

That alone doesn't necessarily have any impact on the fact that those web filters may have been at a lesser rate or

Page 263

might not have been incurred at the same cost.

And it certainly doesn't give any consideration to what the but-for world would look like if the defendants' platforms had not performed the alleged improper actions as far as back as '16 and '17. It's a whole different hypothetical world.

So I'm certainly not giving any opinions on what the law requires. But the fact alone that you may be required, hypothetically, in some states or federally to have web filters doesn't necessarily mean that they all have the same web filter.

We've done 11 of these, and they don't all have the same web filter. And they are just 11 schools from 11 different districts.

So surely if that law is as

you purport it to be, there's a whole lot more to it than the one sentence that we're talking about here and goes into what defines a web filter and what's required federally or statewide.

So -- and I haven't researched any of that.

But in no way does that mean that a damage cannot be associated with a web filter just because it may be required by state or federal law.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. You have not undertaken any analysis to determine whether or not, in the absence of social media or defendants' at-issue conduct, any school district would have paid a lesser rate for an Internet content filter, correct?

A. I don't think that's correct. The affidavits in and of themselves are the people most knowledgeable. The contemporaneous folks

CONFIDENTIAL

Page 265

who have determined what web filters to put in there have attested, under oath and will testify at trial under penalty of perjury, the percentage that they attribute to the alleged improper actions of the defendants.

So to the extent that, you know, there are a lot of web filters out there, vendor costs on a lot of these had Microsoft Defender, that may qualify as a web filter. You don't see that on any of them.

So the fact that any individual plaintiff has reduced the number of web filters to the ones that are listed in here, those are the ones that caused the harm.

I am aware of many other web filters that these other school districts, the six bellwethers and the other five, have and pay for and have paid for for a very long time that are not being claimed as damages.

So I believe that the people

Page 266

who are most knowledgeable about the laws and regulations that govern their schools in their districts have considered that duly when they put forth their affidavit as to what the reduction would be or what the allocation percentage should be as a result of the defendants' alleged improper actions.

Q.    Mr. Meyers, I'm asking about what you personally have undertaken.

Have you -- have you undertaken any analysis to determine whether or not, in the absence of social media or defendants' at-issue conduct, any school district would have paid a lesser rate for an Internet content filter?

A.    And I said but for the affidavit, no.

But those affidavits and those interrogatory responses indicate that they would have been at a lesser rate or at a lower cost.

Q.    And it's your testimony that

Page 267

the affidavits and the interrogatory responses state that each school district would have paid less for Internet content filter in the absence of defendants' conduct?

A.      Remember, we went through the three buckets earlier.

It could have been that they paid less.  It could have been that they paid the same and negotiated a different contract.  It could have been in the but-for world that these ten contracts didn't exist because the web content filter didn't require as many of the add-ons or platforms as it is.  It could have been that they were less add-ons.

So I can't speak to what any of the individual fact witnesses will testify as to the basis of the 20 percent or 30 percent, or whatever percent they attribute to it, only that they have deliberately included it at an allocation percentage and only those web filters that they have determined have sustained

damages as a result of the alleged improper actions.

What I can tell you is that I looked at all of the school districts, and all of them have more than one, multiple web filters throughout their system that are being paid by their technology department. Because as a technology expense, it was something that we forensically analyzed before the selected vendors were provided to us.

So this in no way constitutes the entirety of that particular web filter comment as we're talking about herein.

But I am relying upon the affidavits.

Q. It is possible that in the absence of social media or defendants' at-issue conduct, each school district may have paid the same amount for Internet content filters, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: It is possible

CONFIDENTIAL

Page 269

they may have paid the same.  But that doesn't mean that there's not a damage associated with the platforms or the alleged improper actions of the defendants as the web filter would relate to those actions.  That's a legal determination.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And just so my prior question was clear, because I think maybe it was -- I'll just re-ask it a little bit differently.

Is it possible that in the absence of social media or defendants' at-issue conduct, each school district may have paid the same amount for Internet content filters as they actually paid?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know the answer to that.  We're back now to the hypothet of no social media, not social media, not

CONFIDENTIAL

Page 270

impacted as a result of the alleged improper actions of the defendants.

So in the world of no social media, who knows what web filters could look like. I don't know.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Is it possible that in the absence of defendants' at-issue conduct, each district may have paid the same amount for Internet content filters as each school district actually paid?

ATTORNEY GRADEN: Objection.

THE WITNESS: I have no way of knowing, in the hypothetical world, whether it would have been the same or less or more.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. But it's possible it would have been the same?

A. It's -- anything is possible.

Q. For the social-emotional learning curriculum and training costs,

Page 271

you do not know how any district determined what costs were attributable to social media or to defendants' at-issue conduct, correct?

A.    That is correct, considering the same caveats that I've given you before on the others.

Q.    Are you aware that school districts are required under law to provide instruction on social-emotional learning regardless of whether students use social media or not?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I'm not aware one way or the other.  It has no impact on the conclusions in this report.

Just like the technology, the social and emotional component, this is far -- the number of select vendors that are included herein are a small fraction of the total SEL curriculum that these schools have

imparted to their students during the period of time for which damages were measured.

And, specifically, the ones that were included herein include only those that caused damage as a result of the alleged improper actions of the defendants pursuant to the persons most knowledgeable who have given sworn testimony and will testify in this trial.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. If a school district implemented social-emotional learning curriculum in response to the COVID-19 pandemic, would it be appropriate to attribute those curriculum costs to defendants?

ATTORNEY GRADEN: Objection.

THE WITNESS: It may.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. And why would it be appropriate for a school district to attribute curriculum costs that were

implemented in response to the COVID-19 pandemic to defendants?

A.    Because COVID-19 may have had reasons to attribute those to the direct actions of the defendants in this matter.

I mean, COVID-19 is obviously not part of this case as a plaintiff or a defendant.  But I don't know the motivations on why any COVID-19 restrictions or allocations would not necessarily be caused by the actions of the defendants in this matter.

The people who have given the sworn testimony who are going to testify have all been through COVID-19. They were boots on the ground while the pandemic was going on and have continued to include these costs as allocable to the alleged improper actions of defendants and would have considered, surely, COVID-19 as part of their consideration.

Q.    I would like to ask you some

Page 274

questions relating to Breathitt.

A.    Sure.

Q.    Did you communicate in any way, whether by speaking in person, by telephone, corresponding by e-mail or otherwise, with any employees or people otherwise affiliated with Breathitt in forming your opinion?

A.    The only two people would have been discussions with Phillip Watts and Stacy McKnight, as detailed in my report on Footnote 2 of Page 4.

Q.    Why did you communicate with Phillip Watts?

A.    I don't recall why we had that conversation.  I believe that the call initially took place because Stacy McKnight, as chief financial officer, was going to provide some additional information related to reconciliation of these expenses.

Phillip Watts participated on that, and I was able to ask him questions.

Page 275

Q.    So you had a single conversation with both Mr. Watts and Ms. McKnight together?

A.    It was, yes, sir.

Q.    Other than having that single conversation with Mr. Watts and Ms. McKnight, did you have any other form of communication with Mr. Watts --

A.    No, sir.

Q.    -- or Ms. McKnight?

A.    I did not.

Q.    What information did Ms. McKnight provide you in your conversation with her?

A.    I don't know the answer to that right now.  I'd have to go back and look at the file and when the documents were produced.

But it would have been additional information related to either vendor costs, invoices or purchase orders.

Q.    Did you take notes on your conversation with Ms. McKnight?

A.    The only notes that I had on that was I was drafting the report at the time and the materials reviewed, and I had missing places.

So once those were filled in, they're incorporated into the reports. I didn't take any handwritten notes.

Q.    Did you take any notes on your conversation with Mr. Watts?

A.    I did not, no, sir.

Q.    So it sounds like Ms. McKnight provided you with missing invoice information; is that correct?

A.    Yes. The chief financial officer provided me financial information in connection with my analysis and reconciliation of costs for select vendors.

Q.    Did Ms. McKnight provide you with anything other than missing invoice information?

A.    No, not that I recall.

Q.    Did plaintiffs' counsel

suggest that you communicate with Ms. McKnight?

A.    I don't recall.  Normally, when I was talking to the CFO, it was at my direction.

I had an opportunity to speak, on these six cases, to Ms. McKnight.  I spoke -- that was on Breathitt, to be specific for the record.

I know on DeKalb I initiated the request to speak with Byron Scheuneman, who is the chief financial officer.

And I initiated the conversation with, I believe, Daniel Prentice.  I forget which district he's from.

Q.    Mr. Meyers, I'm just asking you now about Breathitt.  I'll get to the others.

A.    Okay.  So, yes, for Breathitt, those are the only ones.  And I initiated the conversation with Ms. McKnight.

Page 278

Q.    Did plaintiffs' counsel suggest what questions you should ask Ms. McKnight?

A.    Absolutely not.

Q.    What information did Mr. Watts provide you during your conversation with him?

A.    At that time, we talked through all of the vendors that are in the report.  And he was very wanting to give me context as to how they related to the alleged improper damages.

Specifically one of the questions I had was the same question you had was about the Yondr pouches at 100 percent.  And he gave the testimony that they had tried so many things at that point in time that it was the, you know, straw that broke the camel's back. That they were willing to try something else directly as a result of the improper actions.

And that but for the alleged improper actions, they would not have

Page 279

gone through that process to incur those costs, which is why he did 100 percent.

Q. Which specific improper actions of defendants did Mr. Watts tell you were the cause of Breathitt's purchase of the Yondr pouches?

A. As we talked about earlier, I didn't ask him specifically what those improper actions were.

Q. So how did Mr. Watts characterize what you were referring to as the defendants' improper actions that caused the districts to purchase -- the district to purchase Yondr pouches?

A. Because that was the questions that I posed to him.

All of my questions, as you can see in my report, are directly related to the alleged improper actions of defendants.

Q. You did not take any notes on this conversation with Mr. Watts?

A. No. The notes are incorporated into the body of the report.

CONFIDENTIAL

Page 280

Q.    And your conversation with Mr. Watts and Ms. McKnight were not recorded in any way?

A.    No, sir.

Q.    It was not part of your assignment to determine what value, if any, Breathitt received in exchange for paying any vendor, correct?

A.    I think that's fair to say. I'm not looking at the -- I'm trying to define value in my terms.

I'm not looking at the results of having incurred the costs, whether they were beneficial or detrimental.  It's the timing of when the cost was incurred and the reason for which the cost was incurred that is relevant to the analysis and the testimony that I'll give in this trial.

Q.    For the allocation percents that you use for your Breathitt damages calculations, you relied on the affidavits of Phillip Watts and Will Noble, correct?

Page 281

A.    That's correct.

Q.    For the allocation percents you used for your Breathitt damages calculations, you did not rely on any source other than the affidavits of Phillip Watts --

A.    As it relates --

Q.    -- and Will Noble, correct?

A.    Correct.  As it relates to the allocation percentages, yes, sir.

Q.    Do you know whether Mr. Noble reviewed any documents or data in preparing his affidavit?

A.    I don't know what Mr. Noble did in preparation for his sworn testimony, no, sir.

Q.    If it is true that Mr. Noble did not review any documents or data in preparing his affidavit, would that affect your decision to rely on any allocation percent in his affidavit?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  It absolutely would not.

Page 282

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Are you aware that Mr. Watts assigned the percentages in his affidavit in discussion with plaintiffs' attorneys?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I wouldn't know one way or the other.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If it is true that Mr. Watts assigned the percentages in his affidavit in discussion with the plaintiffs' attorneys, would that affect your decision to rely on the allocation percents in his affidavit?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  As I said before, it absolutely would not.

These are the people who are going to get up on the stand and testify as to the alleged improper actions of defendants and assign a number.

They are the ones on the stand under oath under penalty of

Page 283

perjury.  The discussions that they may have had and the impact that it may or may not have had on what eventually went into the affidavit has nothing to do to me to what's in the affidavit that they are going to attest to under oath.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    For all of the affidavits that you relied on, if it is true that the employee who assigned the percentages in the affidavits did so in discussion with the plaintiffs' attorneys, that would not affect your decision to rely on the allocation percents in those affidavits, correct?

A.    It would not impact me in the slightest, no, sir, for the reasons I just testified to.

Q.    Are you aware that Mr. Watts testified that he believes the allocation percents in his affidavit are subjective?

ATTORNEY GRADEN:  Objection.

Page 284

THE WITNESS: I have no reason to believe he believes or doesn't believe that.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. If it is true that the allocation percents in Mr. Watts's affidavit are subjective, would that affect your decision to rely on the allocation percents in his affidavit?

ATTORNEY GRADEN: Objection.

THE WITNESS: Absolutely not. He's the one who is going to testify as to the basis for it. Whether or not he believes that number could be a lot higher and just decided to use 20 percent, when he really thinks it could be as high as 50 percent, this is what he's attested to.

So whether -- however he assigns subjectivity or not, this is what I understand he's going to testify as to and has already testified as to as the damage

caused as a result of the alleged improper actions of the defendants.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. For all of the affidavits that you relied on, if it is true that the employee who assigned the percentages in the affidavits believes that the percentages are subjective, that would not affect your decision to rely on the allocation percents in those affidavits, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: It would not, for the same reasons.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Do you know whether Mr. Watts discussed any of the allocation percentages in his affidavit with any teachers?

A. I have no idea what Mr. Watts did in preparation for his affidavit, as I previously told you, or any of the affiants.

Page 286

Q.    If it is true that Mr. Watts did not discuss any of the allocation percentages in his affidavit with teachers, that would not affect your decision to rely on the allocation percents in his affidavit, correct?

A.    It would have absolutely no impact on my reliance on his sworn testimony.

Q.    And that's true for all the affidavits that you relied on; if it is true that the employee who assigned the percentages in the affidavits did not discuss any of those percentages with teachers, that would not affect your decision to rely on the allocation percents, correct?

A.    It would have no impact, insofar as they are the people most knowledgeable to get up and testify as to it.  They are the ones who are carrying the ball on that.

ATTORNEY SANDOVAL-BUSHUR:

Let's mark Tab 10 as Exhibit-6.

Page 287

- - -

(Whereupon, Exhibit Meyers-6, No Bates, Affidavit of Phil Watts, was marked for identification.)

- - -

THE WITNESS: Thank you.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, Exhibit-6 is the affidavit of Phillip Watts, which you relied on for allocation percents for your Breathitt damages calculations, correct?

A.    Correct, in part.

Q.    And if -- in particular, you rely on the percentages in the table on Page 2 of Mr. Watts' affidavit, correct?

A.    In part, but not in whole.

Q.    For some of the allocation percents in your Breathitt damages calculations, you rely on percentages that were provided by Mr. Watts in his affidavit, correct?

A.    In part.

CONFIDENTIAL

Page 288

Q.    And you rely, for some of the Breathitt allocation percents, on the percentages in the table on Page 2 of Mr. Watts' affidavit, correct?

A.    In part, yes.

Q.    Mr. Watts says in his affidavit that he is providing for each vendor a percentage attributable to social media, correct?

A.    Where -- is there something you're looking at specifically?

Q.    In the table on Page 2.

A.    Oh, the table itself?

Q.    Correct.

A.    Sure.

Q.    Just so the record is clear, Mr. Watts says in his affidavit, in the table on Page 2, that he is providing for each vendor a percentage attributable to social media, correct?

A.    That's correct.

Q.    And for some of the vendors, you use the percentages that are under that column heading, Percentage

Page 289

Attributable to Social Media, for your damages calculations, correct?

A.    Some of the percentages I use are from Mr. Noble and from Mr. Watts, some are from Mr. Noble and some are from Mr. Watts.

Q.    Mr. Watts does not, anywhere in his affidavit, define social media, correct?

A.    You're asking for him -- just like we talked about for Ms. Allison, there is not a definition of social media in his affidavit that I can see.

Q.    Mr. Watts does not say, in any of the text in his affidavit, that the term "social media" is limited to defendants, correct?

A.    I don't see him say it one way or the other.

My understanding of his affidavit in relation to the damages that are incurred as a result of the alleged improper actions of the defendants is

Page 290

that social media is defined as the defendants in this matter by Mr. Watts.

Q. So this is based on --

A. This is Mr. Watts you gave me?

Hold on. Am I looking at the wrong one?

Q. Correct.

A. I'm sorry. I thought you had Noble in front of me.

All right. Watts, yes.

Q. And Mr. Watts does not say, in any of the text in his affidavit, that the term "social media" is limited to the alleged improper actions of defendants, correct?

A. I don't see those words in having reviewed this affidavit.

Q. Mr. Watts' affidavit does not mention YouTube, correct?

A. Let me read it more carefully.

I do not see a reference to the words "YouTube."

Q. Mr. Watts' affidavit does not mention Snapchat or Instagram or Facebook, correct?

A. That is correct. I did not see mentions to either of those three.

Q. It's your understanding that even though Mr. Watts does not state this in the text of his affidavit that when he refers to social media, he's referring only to the defendants' at-issue conduct?

A. He does capitalize it in the text of the chart.

Q. Well, he capitalizes every word in the text of the chart, right?

A. He does not. He doesn't capitalize "or" or "to."

But I understand your point. I don't know. My understanding is -- as I've told you before, is that when he's relating to social media in this case, as the person most knowledgeable about the damages, he is referring to social media as the defendants in this matter and the alleged improper actions of those

Page 292

defendants.

Q.   And if Mr. Watts understood the defendants in this case to include Twitter, Mr. Watts' percentage allocations would have included Twitter, correct?

ATTORNEY GRADEN:   Objection.

THE WITNESS:   It may or it may not.   You'd have to ask Mr. Watts.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Well, you said that you understood his allocations to be his understanding of the -- what he understood the at-issue conduct of defendants to be, correct?

A.   Okay.   Yes.

Q.   So if --

A.   But I don't know when he understood or believed Twitter was in there.

Was this a year ago?   Was it six years ago?   Is it as of today?   Is it as of the date of his affidavit?

Page 293

Q.    So you think that it's possible that when Mr. Watts issued his affidavit on May 5th, he understood that the defendants did not include Twitter, but at some point prior to the affidavit he believed that the defendants did include Twitter?

A.    He may have, yes.

Q.    Do you think it's possible that when Mr. Watts issued his affidavit on May 4th he understood the defendants did not include Twitter, but at some point after he signed the affidavit he believed that the defendants included Twitter?

A.    He may have.  I can't speak to the testimony that Mr. Watts may or may not have given, only the sworn affidavit that he's provided herein.

Q.    And the sworn affidavit does not define social media?

A.    As we talked about, it does not have a definition in the affidavit.

Q.    Okay.  Are you aware that

Page 294

Mr. Watts, in fact, testified about this affidavit after he issued it?

A.    Let me see.

No, I am not.  I don't have a copy of his deposition nor have I read that, if a deposition was given before or after the affidavit.

Q.    Did you ask plaintiffs' attorneys to provide you with the depositions of any of the employees who testified about the affidavits that you relied on?

A.    I did not, no, sir.

Q.    Why not?

A.    Not relevant to the sworn testimony that they're going to give here.

Q.    So the sworn testimony in deposition that Mr. Watts provided about what he meant when he wrote this affidavit was not relevant to your damages calculations?

A.    It may or may not be.

You're asking me to assume

Page 295

something that I haven't seen and look it over as something I don't have.

If you want me to look at something and review it and see if it's consistent or inconsistent, I'm happy to do that.

Q.    Okay.

A.    But you're asking me to assume something that I have no knowledge of.  And to the extent that any testimony he may have given that would edit or amend the testimony he intends to give pursuant to his affidavit, should a new affidavit be issued that would change in any way what he's relying upon or what he has stated, it may cause my report to be amended.

But until such time as the sworn statement is amended, my report stands.

You asked me today if I thought Twitter was social media, and I said yes.  But I've also, at least 100 times, defined them as the five

Page 296

platforms.

So I can read the whole deposition if you'd like. But short of that, I don't know how I could take it out of context.

Q. So short of you sitting down and reading the entire deposition of Phillip Watts, which you've never seen before, you would not be prepared to say that anything that you saw in the deposition undermined your belief that Mr. Watts' reference to social media -- undefined reference to social media was limited only to the at-issue conduct of the defendants?

A. Without having an opportunity to read it in its full context, I would not.

You could provide an excerpt of our deposition today and say that Jeff Meyers said Twitter is social media. And I don't know what you would represent it to say. But that would be incorrect as it defined social media as the defendants

CONFIDENTIAL

Page 297

no less than 100 times during this deposition.

So as much as I do want to trust you, without verifying it for myself, I'm not going to sit here and take your word for it.

ATTORNEY SANDOVAL-BUSHUR: Well, counsel, I mean, are we going to agree -- are we going to agree to unlimited time for this deposition?

ATTORNEY GRADEN: Absolutely not. If you want him to read a document or a transcript, it's on you.

ATTORNEY SANDOVAL-BUSHUR: And the witness is representing that he is not going to agree to read a deposition unless he has the opportunity to read the entire deposition.

ATTORNEY GRADEN: That's his testimony.

ATTORNEY SANDOVAL-BUSHUR:

Page 298

Okay.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    How did you determine which vendors should be included in your Breathitt damages calculation?

A.    Those vendors were provided to me in the form of the affidavit or interrogatory responses, as we've previously talked about.

Q.    Once you determined which vendors should be included in your Breathitt damages calculation, how did you determine which costs relating to each vendor should be included in your damages calculation?

A.    All costs that were able to be reconciled are included for those particular vendors.

Q.    So if a vendor was identified to you as being a vendor associated with an allocation percentage -- is that --

A.    I would say if a vendor has been identified as a select vendor in

this case such that costs associated with those select vendors are the subject of an allegation of damages as a result of the actions of the defendants in this matter, then all of the costs that were able to be reconciled and confirmed related to those vendors has been included in those costs.

Q. You assume that if a vendor was identified by a district as a select vendor, then every single payment that the district made to that vendor should be included in your damages calculations, correct?

A. Before the allocation percentage is applied. That is correct.

That the total cost is the total cost paid for each and every one of those select vendors during the period for which damages are calculated. And then the allocation percentage is applied to the entirety of the cost incurred by the school district respectively during the damage period as a result of the

Page 300

alleged improper actions of the defendants.

Q. You did not confirm with anyone from Breathitt that, in fact, every single district that the district made to each select vendor should be included in your damages calculations, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: Could you ask it again? You said district twice and it threw me off.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Did you confirm with anyone from Breathitt that, in fact, every single payment that the district made to each select vendor should be included in your damages calculations?

A. For the purposes of Breathitt, the answer is absolutely yes. Because I had discussions with Phillip Watts as to the total cost that existed at that time. And we're including all the costs.

Page 301

So for Breathitt, absolutely.

Q.   Did you confirm with anyone from Charleston that, in fact, every single payment that the district made to each select vendor should be included in your damages calculations?

ATTORNEY GRADEN:   When you're ready, Joseph, we're at about an hour.

THE WITNESS:   For Charleston, it's based on the affidavit of Ms. Allison, who goes through the vendors as to what they do and the percentage of the total expenditures identified.

She is the one who identified that it's based -- the percentage is based on total expenditures for those particular select vendors.

So she has made that determination on behalf of Charleston.

Page 302

BY ATTORNEY SANDOVAL-BUSHUR:

Q. For DeKalb, did you confirm with anyone from DeKalb that, in fact, every single payment that the district made to each select vendor should be included in your damages calculation?

A. I had that discussion with Byron Scheuneman, and I believe it's also in the Monika Davis affidavit, that it's on total costs.

Q. Did you confirm with anyone from Harford that, in fact, every single payment that the district made to each select vendor should be included in your damages calculations?

A. I don't have it in front of me. But if you would put it in front of me, I could confirm. I believe Harford, in their interrogatory responses, included the total cost as part of the chart for the damages associated in that particular case.

Q. Did you confirm with anyone from Irvington that, in fact, every

Page 303

single payment that the district made to each select vendor should be included in your damages calculations?

A.    I believe Irvington, just like Harford, in its interrogatory responses, list the quantum of the damages and the percentage for each one in the chart as part of the verified interrogatory response.

Q.    Did you confirm with anyone from Tucson that, in fact, every single payment that the district made to each select vendor should be included in your damages calculations?

A.    Same answer for Tucson; I believe their interrogatory response has a chart that includes the total damages and the percentage, yes, sir.

Q.    And when we refer to select vendors, you understand that we are referring to the vendors that -- well, what is your -- what is your -- let me re-ask --

A.    A better question.

Page 304

Q.    -- my question.

Can you -- can you define select vendors?

A.    I define select vendors as I have defined it in each and every one of my reports, as a defined term in my report.

Q.    Okay.

ATTORNEY SANDOVAL-BUSHUR: We can take a break.

VIDEO TECHNICIAN:  Going off video record, 2:23 p.m.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  Back on video record, 2:41 p.m.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, I am marking Tab 9 as Exhibit-7.

- - -

(Whereupon, Exhibit Meyers-7, No Bates, Affidavit of

Page 305

Will Noble, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q. This is the affidavit of Will Noble, correct?

A. That appears to be correct, yes, sir.

Q. And this is the second of the two affidavits that you relied on for allocation percentages for Breathitt, correct?

A. That's correct.

Q. Along with the Phillip Watts affidavit, correct?

A. That's fair.

Q. There actually is no allocation percentage in the Will Noble affidavit that you relied on; is that right?

A. I believe that's correct, yes, sir.

Q. Okay. You testified earlier that for the allocation percentages for

Breathitt you relied, in part, on the Watts affidavit.

Do you recall that testimony?

A. Yeah, that's correct.

Q. What is the other part of what you relied on for the allocation percentages for Breathitt?

A. It would have been these two. It would have been in connection with the Will Noble affidavit as well.

Q. So there is nothing aside from the Phillip Watts affidavit, Exhibit-6, and the Will Noble affidavit, Exhibit-7, that you relied upon for your Breathitt allocation percents, correct?

A. And discussions with Phillip Watts that we talked about before. But that's correct.

Q. So you're testifying now that you relied additionally on conversations with Phillip Watts?

A. No. It's on the two affidavits. But I can't take out the

Page 307

fact that I had conversations with Phillip Watts.

Q.    Okay.  But you did not change any of the allocations percentages that you used for Breathitt based on a conversation with Phillip Watts, did you?

A.    No, I would not have.

Q.    You would have relied on Mr. Watts' affidavit, correct?

A.    I would have, yes.

Q.    Okay.  Did you communicate in any way, whether by speaking in person, by phone, corresponding by e-mail or otherwise, with any employees or people otherwise affiliated with Charleston in forming your opinions?

A.    Daniel Prentice.

Q.    Did you speak with -- let me ask it differently.

Did you communicate in any way with any employees or people otherwise affiliated with Charleston other than Daniel Prentice?

A.    Not that I recall, no, sir.

Page 308

Q.    Mr. Prentice was or is the CFO for Charleston, correct?

A.    He is.

Q.    Why did you communicate with Mr. Prentice?

A.    To receive additional information related to the reconciliation of certain costs for select vendors included in the damage analysis for Charleston.

Q.    And what information did Mr. Prentice provide you?

A.    He provided me -- in addition to the discussions we had about the select vendors at that time, he actually provided me an affidavit as well, that's in the documents that I -- have been produced in this case, confirming questions that I had for him as sworn testimony.

Q.    Are you relying on any information that Mr. Prentice provided to you for your opinions in this case that is not contained in his affidavit?

Page 309

A.    Can you give me a copy of his affidavit, please?

Q.    Yes.  We can do that.

ATTORNEY SANDOVAL-BUSHUR: I'm marking Tab 11 as Exhibit-8.

-   -   -

(Whereupon, Exhibit Meyers-8, No Bates, Affidavit of Daniel Prentice, was marked for identification.)

-   -   -

THE WITNESS:  Thank you.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    This is the affidavit of Daniel Prentice, correct?

A.    That is correct, yes, sir.

Q.    Okay.  Are you relying on any information that Mr. Prentice provided to you for your opinions in this case that is not contained in his affidavit?

A.    No, sir.

Q.    How did you decide that you should communicate with Mr. Prentice?

Page 310

A.    So Charleston had a strange accounting software.  When you have a general ledger, you can see both sides of the entries.

Their form of a ledger was provided, I believe it's Bates stamped, it's called something a little different than a general ledger.  It was called a monthly expenditure report.  And then he also provided a vendor expense ledger report.

And on the vendor expense ledger report, some of the information showed whether there was a balance or not a balance.  And there was no way to reconcile both sides of the entries.

So I needed to have a conversation with him while I'm reconciling both sides of the entries to close the loop, if you will, to make sure that all of these costs that are identified are not just invoiced costs but are actually from the ledger of actual amounts paid.

Page 311

And so I had a conversation with him. They did not have a system that would go back and allow him to provide the type of report I was asking for.

And I said, well, please, I need you, as the CFO, to prepare an affidavit attesting that the schedule you've given me does reflect the amounts actually paid to those vendors, not any amounts outstanding, not any amounts invoiced but not paid, but actual checks written and expenses incurred and paid as represented on the dates in the schedules. And he verified that orally.

I asked him if he would follow up with an affidavit so I could have it for my file. Because their system did not allow or provide for them to give additional ledger information that would allow me to do the reconciliation on my own.

Q. For districts other than Charleston, you and your team at

Asher-Meyers actually validated yourselves that the vendor costs included in your damages calculations were paid by the districts, correct?

A.    We were able to do, on the face of the documents, the reconciliation, without having to talk to the CFO, from those general ledgers.

And in some cases, as we talked about earlier, we would talk to somebody like Stacy McKnight and say, hey, do you have any additional invoices that go with these costs?

And they oftentimes did, and those have all been provided and are part of my materials reviewed and considered.

Charleston did not have that capability at the time.

Q.    For Charleston, you and your team at Asher-Meyers were not able to yourselves validate that the vendor costs included in your damages calculations were actually paid by Charleston, correct?

CONFIDENTIAL

Page 313

A.    I don't agree with that.  I think that part of a normal forensic accounting, and even audit, part of an audit process, would include taking the representation of the person who is in control of the ledger.

And in this case, he even went so far as to -- and perhaps didn't even need to, but at my request did -- prepare an affidavit to show me that what the report showed was what it was.

Had I been able to be on site for Charleston at some point in time, maybe I could have confirmed it for myself.

But this, to me, is as good a gold standard as having reconciled it myself.

All of the costs showed all of the expenses.  And it did have a column for paid and unpaid.  So we knew which ones weren't paid.  I just needed him to further close the loop that this was all of the expenditures that he had.

CONFIDENTIAL

Page 314

And that's what he did.

So I -- I consider this to be part of the forensic accounting reconciliation process just as much as anything else.

Q.    For Charleston, you relied on Mr. Prentice to validate that Charleston actually paid the vendor costs that were included in your damages calculations for Charleston, correct?

A.    For Charleston, I relied on Mr. Prentice to confirm that the report he had previously given me demonstrated what I thought it demonstrated, that it was costs actually paid.

It was an Excel spreadsheet. It didn't have headers.  It didn't have all these other things.  So I confirmed that the report as it was represented what it was.

Q.    And aside from the information provided to you by Mr. Prentice, for Charleston you were not able to confirm with Charleston's own

Page 315

documents that the vendor costs included
in your damages calculation were actually
paid --

    A.    That is --

        ATTORNEY GRADEN:  Objection.

        THE WITNESS:  Sorry.

BY ATTORNEY SANDOVAL-BUSHUR:

    Q.    -- by Charleston, correct?

    A.    That is incorrect.

        There are multiple vendors
that fall -- fell into different buckets.

        So some of the vendors were
sub-vendors.  Because Charleston has an
expenditure report that they put forth
every month, publicly available, which is
part of my materials reviewed that I
pulled.

        So there were costs that
were direct vendor pay costs that I was
able to actually go in.  And you can see
them on here.  If they do not say
Prentice affidavit as one of the
reference sources, then they were
reconciled; Committee for Children,

Page 316

Second Step, for instance, both the expenditure report and was able to reconcile it, all of those costs. Costs related to -- so that's what it was.

So to the extent that some of them were part of the spreadsheet 779236, Bates stamp, MR_CCSD_779236, those were included as part of the Prentice affidavit. But other of these charges in here were reconciled without the need.

The other thing that's important to note, that in addition to the Prentice affidavit, we also had the expenditure reports that are publicly available that also reconciled these costs as well.

So this was an additional check by me to get Mr. Prentice to confirm that the Excel spreadsheet without headers provided what I understood it to provide.

Q. For Breathitt, DeKalb, Harford, Irvington and Tucson, you did

Page 317

not receive an affidavit from the school district confirming that the documents that you relied on for your vendor costs accurately reflected the districts' vendor costs, correct?

A.    That's correct.

And I just -- accurately reflected is not the word; that the report purports to be what the report is.

But the other ones, the general ledgers on their face showed the reconciliation.  So I could look at both sides of the entry.

But, no, I do not have any other affidavits relating to financial statements, other than in Charleston, for the six bellwethers.

Q.    How did -- in what format did you communicate with Mr. Prentice?

A.    A telephone conference.

Q.    Did you take any notes or otherwise record or memorialize your communication with Mr. Prentice?

A.    I did not.  It was a very

CONFIDENTIAL

Page 318

quick conversation.

Q.    It was not part of your assignment to determine what value, if any, Charleston received in exchange for paying any vendor, correct?

A.    Could you ask it again, please?

Q.    It was not part of your assignment to determine what value, if any, Charleston received in exchange for paying any vendor, correct?

A.    That's correct.

Going back to the definition of value that I had defined for Breathitt for that same question.  That was not within my scope.

Q.    For the allocation percents you used for your Charleston damages calculations, you relied on the affidavit of Lisa Allison, correct?

A.    I believe that's correct, yes.

Q.    If you want to take a look at Exhibit-1B, Paragraphs 21 to 22.

Page 319

A.    That's correct.

Q.    For the allocation percents you used for your Charleston damages calculations, you did not rely on any source other than the affidavit of Lisa Allison, correct?

A.    That's fair to say.

Q.    You have not reviewed the deposition testimony of Ms. Allison, correct?

A.    That's correct.

Q.    Why not?

A.    I had no need to review her deposition testimony.  I have her affidavit, sworn as to what she's going to attest to at trial.  And I have received no indication that that affidavit has been amended in any way.

Q.    If Ms. Allison provided any testimony in a deposition that clarified what she meant in her affidavit, you would have no basis to disagree with what Ms. Allison said in her testimony, correct?

Page 320

ATTORNEY GRADEN: Objection.

THE WITNESS: You're asking me to assume she made it or you're hypothetically asking me if she made it?

BY ATTORNEY SANDOVAL-BUSHUR:

Q. I'm asking you, if Ms. Allison provided any testimony in a deposition that clarified what she meant in her affidavit, you would have no basis to disagree with what Ms. Allison said in her testimony, correct?

ATTORNEY GRADEN: Objection.

THE WITNESS: I would have to take a look at it. To the extent that she has amended her testimony in her affidavit through her testimony in a deposition, I would have to see what weight it gave, if any, to make changes to my report, so.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. So it's possible that you would determine that you disagreed with

Page 321

what Ms. Allison said in her deposition testimony and -- is that what you're saying?

A. No. It's possible that it would have no impact on my report is what I'm saying.

Q. Okay. How did you determine which vendors should be included in your Charleston damages calculations?

A. Provided to me by the persons most knowledgeable who will testify at this trial related to select vendors impacted as a result of the alleged improper actions of the defendants in this matter.

Q. And who specifically told you which vendors should be included in your Charleston damages calculations?

A. Those are found in the Lisa Allison affidavit.

Q. Once you determined which vendors should be included in your Charleston damages calculation, how did you determine which costs relating to

CONFIDENTIAL

Page 322

each vendor should be included in your damages calculation?

A.    As we talked about before for Breathitt, the entirety of the cost for those select vendors has been included before the application of the allocation percentages.

And we -- I mentioned a little bit before, and then we went back to Breathitt, but Ms. Allison very specifically says that the total cost expenditures for those particular select vendors.

Q.    Mr. Prentice's affidavit, Exhibit-8, does not cover the vendor costs for one of the vendors that you include in your Charleston damages calculation, correct?

A.    I think that's right.  I think that's Second Step.

That was the one I was talking to you about just a moment ago that we were able to look at the expenditure report and then tie it back

Page 323

to additional reference materials.

Q. Who provided you with the invoice data for the vendor Committee for Children (Second Step)?

A. Well, I believe that the expenditure reports is a defined term that I put together, which was provided in various Bates stamps.

If you go to materials reviewed, which is Appendix D to my report, it's Number 5, for 2014 through 2024. It was Bates stamped pages MR_CCSD_749128 through MR_CCSD_777609, plus discovery. I don't know when it had closed, but there were additional reports.

This is that monthly report that I said goes out for all the charges that Charleston has on a contemporaneous basis that's published publicly on their -- on the district's website.

So I was able to supplement what had been produced in this case. And going forward from May 2024 through April

Page 324

2025 at the website listed therein. And then that information was then coordinated with the additional reference Bates stamps that are identified herein.

So that was information directly related to what costs were expended in those months.

Q. Did plaintiffs' attorneys provide you with the Charleston trial balance ledger reports that you relied on for your damages calculations?

A. I think everything would have been provided directly or indirectly through counsel. And it's Bates stamped, so yes.

Q. And similarly, did plaintiffs' attorneys provide you with the Charleston monthly expenditure reports that you relied on for your damages calculations?

A. They did, up through April 2024, as has been produced in discovery in this matter.

Q. Were you granted complete

Page 325

access to all of Charleston's financial records?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know what you mean by "complete access."

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Did you rely on Charleston's attorneys to provide you with the set of financial records that you used for your damages calculations?

A.    In part, but not in whole.

As you can see here on Charleston, on Number 2, as we talked about earlier in this deposition, I had gone and pulled all the financial statements from fiscal year ending 2016 through fiscal year ending 2024 from the website.

These are all school districts that all the information is publicly available on these. Charleston's budget reports, went and pulled all of those.

Page 326

As I said, as discovery continued to come in or was produced, additional information was provided to me with Bates stamps.

But all of the transparency reports for the monthly expenditures, we had initially gone in and downloaded all of those off the website before we went in and got the Bates-stamped version.  So everything comes from the website originally.

I don't know the answer to your question.  I couldn't have gotten more information.  They gave all the information that they had.  Unfortunately, the report that they had just needed somebody to, you know, ask the question to confirm that it was what it purported to be.  And it was.

Q.   Can you please take a look at Exhibit-5, which you already have, the affidavit of Lisa Allison.

A.   I have it.

Q.   And this is the affidavit of

Page 327

Lisa Allison which you relied on for allocation percents for your Charleston damages calculations, correct?

A.    That's correct.

Q.    Ms. Allison's affidavit does not mention Yondr, correct?

A.    That's correct.

Q.    You had no information from Charleston informing you of what the allocation percent should be for Yondr, correct?

A.    I think that's fair.  It did not come from Ms. Allison.

Q.    You had no information from Charleston informing you of how much of its Yondr costs were attributable to defendants' at-issue conduct, correct?

A.    Ask it again, please.

Q.    You had no information from Charleston informing you of how much of Charleston's Yondr costs were attributable to defendants' at-issue conduct, correct?

A.    I don't know that that's the

Page 328

case. But it certainly is not in Ms. Allison's affidavit.

I guess what I would ask for is a copy of the initial disclosures and the supplemental disclosures and the answers to interrogatory set Number 3, dated April 23rd, 2025.

Q. You -- you testified that you relied exclusively on Ms. Allison's affidavit for allocation percentages for Charleston, correct?

A. I did.

Q. And that's what you say in your report, correct?

A. It is.

And I'm asking you to provide me a copy of the discovery, because the Yondr pouches may have been in there and this may be a typo in the report, that it may have also come from the interrogatory responses.

Q. Sitting here right now, do you know what, if any, basis you had for using a 100 percent allocation percentage

Page 329

for Yondr pouches for the Charleston School District?

A.    Sitting here right now, without my materials reviewed in front of me, and you not giving it to me as I'm asking for them, I do not know.

ATTORNEY SANDOVAL-BUSHUR: I am marking as Exhibit-9 Charleston's First Supplemental Answers to Defendants' Interrogatories to Charleston County School District, Set 3, dated April 23rd, 2025.

- - -

(Whereupon, Exhibit Meyers-9, No Bates, Plaintiff's First Supplemental Answers to Defendants' Interrogatories to Charleston County School District, Set 3, was marked for identification.)

- - -

TRIAL TECHNICIAN:  Counsel,

Page 330

is there a tab number?

ATTORNEY SANDOVAL-BUSHUR:
Yes.  It's Tab 16.

TRIAL TECHNICIAN:  Thank
you.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers --

A.    Just one second, counsel.
Okay.

Q.    Exhibit-9, Charleston's
First Supplemental Answers to Defendants'
Interrogatories to Charleston County
School District, Set 3, does not provide
an allocation percentage for Yondr
pouches, correct?

A.    I disagree with you.

Q.    Please identify to me where
the interrogatory response provides an
allocation percent for Yondr pouches?

A.    It includes technology,
software, and then Yondr pouches as a
separate line item as part of the damages
that are being alleged.

Q.    What is your basis for your

CONFIDENTIAL

Page 331

statement that there -- can you point me to where the text in Exhibit-9, the interrogatory responses for Charleston, that identifies a 100 percent allocation percent for Yondr pouches?

A.    I'm pointing you right now to the actual fact that the only one that has a single vendor of all the things was Yondr pouches, and it was what I relied upon at 100 percent.

And in my report, as I will correct right now on the record, should say -- Number 21, it should say, based on the Allison affidavit and it should include the updated interrogatory responses.

That was inadvertently left out by me.  And that should be included like it is on all the other reports on Number 21 and 22.

Yondr pouches is included as a single line item in -- separately from all the technology and all the software. So I've included it at 100 percent.

CONFIDENTIAL

Q.    Sorry, Mr. Meyers, where are you seeing Yondr pouches included as a separate line item, separate from all the technology and software?

A.    In the category chart.

Are you looking at the same chart as me?

Q.    Yes.

A.    Okay.  Everything in the category of damages are all categories of buckets of things with the exception of one, Yondr pouches.

Yondr pouches is the only actual specific cost identified herein. So the technology that's been included in the Allison affidavit, she identified the select vendors that went in, and those select vendors, she put a percentage to.

This identifies Yondr pouches at its full value, which is why it's included at 100 percent.

Q.    I'm sorry, Mr. Meyers, but this says, Technology/software/Yondr pouches.

CONFIDENTIAL

Page 333

That -- we're looking at the same thing, right?

A.   We are.

We're looking at --

Q.   And is it your --

A.   -- technology, which is a category of expenses; we're looking at software, which is a category of expenses; and we're looking at Yondr pouches, which is a single vendor.

Q.   So is it your -- you do not know, in the interrogatory responses in Exhibit-9, what percentage of Yondr pouch costs are included in the approximate damages amount, correct?

A.   I do.

ATTORNEY GRADEN:   Objection.

THE WITNESS:   They have included all of the expenditures for those categories in all of these.

Ms. Allison's affidavit takes the select vendors that are being included for technology and

software, which is one of the buckets, and further reduces those by what's been caused by the defendants in this matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    So I'm having a hard time understanding your testimony.

A.    I think we're both having a hard time understanding each other.

Q.    Ms. Allison does not say 100 percent of Yondr costs are attributable to social media or to defendants' at-issue conduct, correct?

A.    You and I can agree on that.

Q.    Okay. Okay. Ms. Allison does not say 100 percent of technology costs are attributable to defendants except for certain vendors that I have specifically called out in my affidavit, correct?

A.    No. Ms. Anita Huggins, superintendent of schools for Charleston School District, who verified the answer to Interrogatory Number 5, which is, For

Page 335

each category of damages you are seeking explain them and itemize them, itemizes Yondr pouches as their full cost.

I'm confused at the confusion.

Q.    Mr. Meyers, how much, in the year -- 2023/2024 school year, did the Charleston School District spend on technology?

A.    I would have -- that's not a cost that I've reconciled.

Q.    Mr. Meyers, in the -- for the 2023/2024 school year, how much did the Charleston School District spend on software?

A.    It's not a cost that I've reconciled.

Q.    So please explain to me how you know that in the category technology/software/Yondr pouches the total amount of $6,984,000 is inclusive of all Yondr pouch costs?

A.    That's my understanding of what the interrogatory says.

Page 336

Q.    And can you point me to any text in the interrogatory that supports that understanding?

A.    I've just pointed you to the chart and the verification that supports that understanding.

Q.    So is your.  Your opinion or your understanding, rather -- let me ask that differently.

Your understanding is that Charleston is asserting that -- in this interrogatory response that 100 percent of its technology costs, 100 percent of its software costs and 100 percent of its Yondr pouch costs are damages attributable to defendants' at-issue conduct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  That's what I understand the interrogatory to say.

And as I have been asked to do was to identify the select vendors for certain categories.

CONFIDENTIAL

Page 337

And one of those vendors is Yondr bag.

So of the $6,984,000 of costs in those buckets, Yondr pouches, for that fiscal year, appear to have totaled $2,601. And that's what's been included.

Now, I don't know and can't tell you whether or not Charleston is continuing to assert damages on these other components that were outside of the scope of what I'm asking for. I don't know the answer to that.

But what I can tell you is when they have incurred all of the Yondr pouch cost and included it as a separate line item, where everything else is a category of information, and they have picked a direct vendor, my understanding, whether you like it or not, is that that is 100 percent for the Yondr pouches and is included in

Page 338

that cost.

So I have reconciled the Yondr pouch costs and included that as a damage at 100 percent.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You know that, in fact, Charleston is not claiming 100 percent of its technology and 100 percent of its software costs as damages, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I know as it relates to the select vendors that I have calculated damages for, as a result of the superceding affidavit of Lisa Allison, a month after this was verified.

I have reduced at least those technology costs to the amounts identified herein.  That I can agree with you on.

So to the extent that these technology costs for Panorama Education are at 100 percent in there, and they are now at

20 percent, I do believe that that supercedes that interrogatory response as a result of the affidavit.

But I do not read Ms. Allison's affidavit to be silent on Yondr pouches to mean they're not making a claim on Yondr pouches. They have a verified affidavit -- affidavit or interrogatory response where they're making a claim for Yondr pouches at no reduction, which is what I've calculated here.

And, you know, I apologize. And on the record, I will amend the report to include the verified interrogatories.

But that's what the basis of it is from.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Did you consider the possibility that Ms. Allison did not include the Yondr pouches in her

CONFIDENTIAL

Page 340

affidavit because she did not believe that she had a basis for asserting any damages relating to Yondr pouches?

A.     Absolutely not.  That's actually quite contrary to what I understand this case to be.

Because under your premise, then Charleston has walked away from teacher costs, which I know there's other experts dealing with, property damage costs, mental health costs.  These are all things that other experts are dealing with.

So the absence of it in an affidavit she provided is in no way indicative of those costs being somehow withdrawn as damages in this matter. That's just simply incorrect.

Q.     Other than the existence in this interrogatory response of a category titled, Technology/software/Yondr pouches and corresponding dollar amounts for each school year for 2016 through 2024, do you have any other basis for using a

Page 341

100 percent allocation percent for Yondr pouches for Charleston?

A.    Not that I can recall sitting here right now.

Q.    Did you ask anyone at Charleston if the Yondr -- let me ask my question a little differently.

Did you consider asking Ms. Allison why her affidavit did not address Yondr pouches?

A.    I did not, no, sir.

Q.    Did you ask anyone at the -- from any of the plaintiffs' law firms if they could get you information on what the allocation percent was for Yondr?

A.    It wouldn't -- ask the question again --

ATTORNEY GRADEN:   Objection.

THE WITNESS:   -- please.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Did you ask any of the plaintiffs' attorneys if they could obtain from you information on what the allocation percent should be for Yondr

Page 342

for the Charleston School District?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't recall that I did or that I didn't.

What I do recall, as I'm sitting here right now, is that the schedule that was provided by Daniel Prentice actually had a specific tab for the costs related to Yondr, which was one of the things that I was asked to reconcile.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Yondr's affidavit --

A.    Mr. Yondr?

Q.    Sorry.

Mr. Prentice's affidavit included the full cost for all of the vendors that were included in his spreadsheet, correct?

A.    That is not correct.  There were many costs that were associated in that spreadsheet that are not included in these damages.

Page 343

Q.    Mr. Prentice did not purport to provide an allocation percentage for any vendor, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  He did not purport to provide an allocation percentage, but he did limit the vendors to select vendors, which happen to be some of the select vendors that Ms. Allison included and some that she did not, that I did not include in my report.

But the Yondr pouches were one that was already verified in the interrogatory response and was included in the report.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Just so the record is clear.

Did Mr. Prentice provide or purport to provide any allocation percentages for any vendor?

A.    I do not believe that he did, no, sir.

Q.    And you're not relying on

Page 344

Mr. Prentice to provide any allocation percentages in this matter, correct?

A.    I don't know that he's going to provide allocation percentages or not. I don't know who is going to verify the interrogatory responses related to Yondr pouches.  It may be him.  I don't know.

Q.    Sitting here today --

A.    Sitting here today --

Q.    -- you are not relying on -- can I -- just so the record is clear.

A.    Please.

Q.    Sitting here today, you're not relying on Mr. Prentice for any allocation percentages, correct?

A.    That's fair.

Q.    Turning to DeKalb.

Did you communicate in any way with any employees or people otherwise affiliated with DeKalb?

A.    I had a meeting with Byron Scheuneman.

Q.    Did you communicate in any way, whether by person -- in person, by

Page 345

telephone, corresponding by e-mail or otherwise, with any employees or people otherwise affiliated with DeKalb other than Byron Scheuneman?

A.    Just to be complete in the answer, only the people that I may have introduced myself to when I was at DeKalb's site when I went and met with Mr. Scheuneman personally.

Q.    You met with Mr. Scheuneman in person?

A.    I did.

Q.    Is that the only way in which you communicated with Mr. Scheuneman was in person?

A.    I don't -- we may have had a phone call before, but -- no, I think that was the only time we had actually met was in person.

Q.    Why did you meet with Mr. Scheuneman in person?

A.    To help get additional information out of his general ledger system, which was pretty complex.

Page 346

DeKalb's system is unique insofar as they not only run their own school district, but they also run their own all district; they run their own police force, they run all these different things.

So they have this proprietary software. And when I kept requesting information, he said, it would be a whole lot easier if you came and sat in the conference room and told me exactly what you need out of this because it would be quicker for my people and for me to get it for you.

So I was able to get on site and meet with him. And after a very short period of time, he realized exactly what it is I was looking for and was able to provide it without further incident.

Q.    So have you described all of the information that Mr. Scheuneman provided?

A.    It's all in the materials reviewed. All of it has been produced in

discovery and Bates stamped, I believe, yes, sir.

Q.    Other than the documents that Mr. Scheuneman provided to you, are you relying on any of the oral communication that you had with Mr. Scheuneman for purposes of your opinions in this case?

A.    No, that's fair.

But, again, just to clarify the record, Mr. Scheuneman didn't provide anything to me.  I met with him, he understood what he needed to provide.  He provided it to counsel, and counsel got it to me at my request.

Q.    How did you decide that you should communicate with Mr. Scheuneman?

A.    I had requested the general ledgers.  And I was told it would be much more easy to get on site and ask for those in person so that we didn't go run 20,000 pages of reports that weren't exactly what you wanted.

Q.    Did you take any notes or

Page 348

otherwise record or memorialize your communications with Mr. Scheuneman?

A. I did not, no, sir.

Q. And you are not relying on Mr. Scheuneman for any of the allocation percent information for DeKalb, correct?

A. That's fair. I -- well, I don't know -- I think that's fair to say, yes.

Q. Okay. It was not part of your assignment to determine what value, if any, DeKalb received in exchange for paying any vendor, correct?

A. That's correct.

Q. For the allocation percents you use for your DeKalb damages calculations, you relied on the affidavit of Monika Davis, correct?

A. I believe that's correct.

Q. For the allocation percents you used for your DeKalb damages calculations, you did not rely on any source other than the affidavit of Monika Davis, correct?

A.    I believe that's correct.  I don't have a copy of Ms. Davis's affidavit in front of me.

Q.    Do you know whether Ms. Davis has ever testified about how she prepared her affidavit?

A.    I don't know.  Subsequent to the issuance of my report, I received a copy of Ms. Davis's deposition.  But that was -- that predated -- and the exhibits thereto, but that predated the affidavit.

So anything that she would have said in that would have been superceded by the affidavit at that point in time.

ATTORNEY SANDOVAL-BUSHUR: I am going to mark as Exhibit-10 the affidavit of Monika Davis.  This is Tab 17.

- - -

(Whereupon, Exhibit Meyers-10, No Bates, Affidavit of Monika Davis, was marked for identification.)

Page 350

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, Exhibit-10 is the affidavit of Monika Davis that you relied upon for the allocation percentages for the DeKalb case, correct?

A.    I believe that's correct.

Q.    You rely on Ms. Davis's affidavit for the percentages of -- or the allocation percent for costs relating to Lightspeed, correct?

A.    That's correct.

Q.    And if you look at Page 15 -- I'm sorry, not Page 15, Paragraph 15.  Apologies.

If you look at Paragraph 15, Ms. Allison says that 30 percent of Lightspeed costs are related to the district's attempts to block and/or limit social media, correct?

A.    I see that, yes, sir.

Q.    Ms. Davis does not provide, in her affidavit, a definition of social media, correct?

Page 351

A.    I do not see a definition for social media in the traditional sense, other than my understanding of this affidavit, which we've talked about before.

Q.    Okay.  And Ms. Davis does not, in her affidavit, refer to defendants, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I do not see a reference to Facebook, Instagram, Snapchat, TikTok or YouTube.

But I do believe when she refers to social media, she is absolutely referring to defendants in this particular matter.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And you also do not see in her affidavit a reference to the word "defendants," correct?

A.    I do not think I see the word "defendants" in here.  I did not read it.

Q.    And you cannot point me to

any language in the affidavit of Monika Davis, Exhibit-10, stating that when she refers to social media that is limited to the defendants' at-issue conduct, correct?

A. I don't see a definition, if that's what you're asking for.

But I've given you what my understanding of her acknowledgment of social media refers to in this particular case.

Q. You've never spoken to Monika Davis, correct?

A. I don't believe so, no, sir.

Q. And you've never communicated in any way with Monika Davis?

A. Not that I'm aware of.

Q. How did you determine which vendors should be included in your DeKalb damages calculations?

A. They were from two different things. One was the affidavit of Monika Davis. The second for select vendors was

Page 353

in connection with the deposition and attachments thereto of Mr. Scheuneman, which I believe are also part of the interrogatory responses, wherein he identified select vendors at that point in time.

Q.    Once you determined which vendors should be included in your DeKalb damages calculation, how did you determine which costs relating to each vendor should be included in your damages calculation?

A.    Part of that would have been through the Scheuneman deposition. Expense -- I think there were only two or three costs for this. One was Lightspeed and the other two were the Yondr and the cell phone locker; so the pouches and the lockers, which came directly out of Scheuneman and, I believe, was part of an interrogatory response as well at 100 percent.

So a total of the cost -- I believe this was a trial in just a

CONFIDENTIAL

Page 354

portion of the school for which they were doing the Yondr pouches which is included herein.

Q. You assumed that if a vendor was identified by DeKalb as a select vendor, then every single payment that DeKalb made to that vendor should be included in your damages calculations, correct?

A. Only on the ones that's included. There were other select vendors that Mr. Scheuneman had that were no longer included in my report, either as a result of the forensic accounting or because they weren't considered to be included for the purposes of damages as it relates to the alleged improper actions of the defendants.

Q. Were there some vendors who Mr. Scheuneman identified as a select vendor for DeKalb that, in the process of your forensic accounting, you determined should not be part of the damages calculation?

Page 355

A.    If you have a copy --

ATTORNEY GRADEN:  Objection.

THE WITNESS:  If you have a copy of the exhibit, that would help me refresh my recollection.

The answer is I believe that there were a couple that were not included.  And as I sit here right now, I can't recall, certainly without seeing their names, whether it was that I couldn't reconcile the costs in a way that was satisfactory to me or if no one was going to attest that those were continuing to be claimed as losses as a result of the alleged improper actions of the defendants.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Did you confirm with anyone from DeKalb that every payment that the district made to each individual vendor should be included in your damages calculations?

Page 356

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Could you ask again?

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Did you confirm with anyone from DeKalb that every payment that the district made to each select vendor should be included in your damages calculations?

A.   I don't know who, at the end of the day, confirmed.  I know that originally the list of select vendors was longer than this.  And this is the only ones that DeKalb is setting forth as damages, from these particular select vendors, through my report.

Q.   Did you confirm with anyone from DeKalb that this set of invoices that you used for any of the select vendors was the right set of invoices to use for your damages calculation?

A.   Oh, no, definitely the invoices that were used were confirmed. I got all of that information directly

Page 357

from the CFO.

So the costs as actually incurred are absolutely reconciled therein.

Q.    What do you mean when you say that "the invoices that you used were confirmed.  I got all that information directly from the CFO"?

A.    Sure.  So we're talking about three vendors here.  So for Yondr, I had the invoice, I had the check number and I had a reference, which I would have to go look up, too, which I think is a purchase order.

For the cell phone lockers, we had a PO and a proof of evidence of purchase.

And for the Lightspeed, we had the invoice, we had the PO and we had the evidence of the payment in the ledger.

So I was able to confirm all the costs for those particular select vendors.

CONFIDENTIAL

Page 358

Q.    If you'd turn back to Exhibit-10, the affidavit of Monika Davis, and turn to Paragraph 7 on the first page.

You see that Ms. Davis says, DeKalb County School District uses the Lightspeed system to filter content on its network and district-issued laptops.

Do you see that?

A.    I do.

Q.    You have no reason to disagree with Ms. Davis that DeKalb County School District uses the Lightspeed system to filter content on its network and district-issued laptops, correct?

A.    I have no reason to suggest that what she's saying is incorrect, no, sir.

Q.    And we talked a little bit earlier, but if you turn to Paragraph 15, do you see that in Paragraph 15 Ms. Davis says, 30 percent of Lightspeed costs are related to the district's attempts to

Page 359

block and/or limit social media?

A.    I definitely do.

Q.    You do not know how Ms. Davis came to that 30 percent number, correct?

A.    I do not know how she came to the 30 percent number.

But when she's -- it goes back to Paragraph 7, she also says in the following sentence that you read on the record, This system blocks access to social media platforms on the networks and servers.

So it speaks to Lightspeed, which does a lot of things. She has limited Lightspeed to 30 percent related to the alleged improper actions of the defendants.

This supercedes the original testimony of Mr. Scheuneman that had it at 100 percent. So in this particular case, Ms. Davis, who is the person who is going to be most knowledgeable and testify as it relates to Lightspeed and

Page 360

has provided an affidavit, has stated that it's not 100 percent of Lightspeed that should be included as a result of the alleged improper actions of the defendants in this matter, but only 30 percent relating to the alleged improper actions of the defendants in this matter.

Q. Which vendor cost is Mr. Scheuneman the person most knowledgeable about?

A. Vendor cost?

Q. Uh-huh.

A. I don't know the answer to that. You'd have to ask Mr. Scheuneman. I don't know what he's going to give testimony in at the trial.

Q. You believe that Ms. Davis is more knowledgeable about the Lightspeed vendor costs than Mr. Scheuneman, correct?

A. I'm not going to say one of them is more knowledgeable than anything. One of them is the CFO and one of them is the CIO, the chief information officer.

Page 361

And I would think that Ms. Davis is absolutely in a position to say that only 30 percent of the Lightspeed costs are attributable -- the damages are only 30 percent of the Lightspeed costs attributable to the damages.

Q.    Okay.

A.    I certainly used the lower of the two percentages.

Q.    Your damages estimate for DeKalb includes costs relating to Yondr, correct?

A.    As we just talked about, yes, sir.

Q.    Ms. Davis's affidavit does not mention Yondr, correct?

A.    That is correct.

Q.    In calculating damages for DeKalb, you did not rely on information from DeKalb informing you of what the allocation percent should be for Yondr, correct?

ATTORNEY GRADEN:  Objection.

Page 362

THE WITNESS:  I think I just testified that that information is in their interrogatory responses.

And part of the sworn testimony of Byron Scheuneman and attached to his deposition related to 100 percent for the Yondr pouch and the cell phone lockers.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Okay.  So is that another omitted citation in your report that you believe needs to be corrected?

A.   Let's take a look.

I think that's fair. Because that's where that number comes from, is the Scheuneman affidavit, where he has a schedule of select vendors as well as, I believe, there's an amended interrogatory response as well on March 24, 2025.

But I don't have a copy of that in front of me.

Q.   You received the Monika Davis -- well, the Monika Davis

affidavit, Exhibit-10, is dated May 16th, 2025, correct?

A.    It is, yes.

Q.    And your report for DeKalb is dated May 19th, 2025, correct?

A.    That's correct, yes, sir.

Q.    You received it only three days, at most, before you finalized your DeKalb report, correct?

A.    I think that's right, yes, sir.

Q.    Were you anticipating, in drafting your DeKalb report, that you were going to receive from Ms. Davis an affidavit that would provide an allocation percent for Yondr?

A.    I do not believe that I was waiting on anything from anybody.

At this point in time, we had determined the select vendors and we were including at 100 percent Lightspeed, Yondr pouches and cell phone lockers, based on Mr. Scheuneman.

And then Ms. Davis, who has

Page 364

been identified as a person who is most knowledgeable about the impact of the alleged improper damages of the defendants, as it relates to Lightspeed, has prepared an affidavit saying that it's not 100 percent and it should only be 30 percent, which certainly gave me the consideration which I gave it, to reduce that percentage from 100 percent to 30 percent on the eve of the issuance of this report.

Q.    Okay.

ATTORNEY SANDOVAL-BUSHUR:

Let's take a look at Tab 20, which we will mark as Exhibit-11.

-   -   -

(Whereupon, Exhibit Meyers-11, No Bates, Plaintiff's Amended Objections and Responses to Defendants' Interrogatories to Dekalb County School District, Set 3, was marked for identification.)

-   -   -

ATTORNEY GRADEN:  Just note

we're at about an hour.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Exhibit-11 is DeKalb's Amended Objections and Responses to Defendants' Interrogatories to DeKalb County School District, Set 3, correct?

A.    Yes, sir.

Q.    And I believe you testified that there is information in this interrogatory response that you may have relied on in connection with the decision to use a 100 percent allocation percent for Yondr; is that correct?

A.    And the initial decision to use 100 percent for the Lightspeed filters, yes, sir.

Q.    Okay.

A.    In connection with both of them.

Q.    And can you point me to what language in the --

A.    Sure.  It's Page 6.

Q.    Sorry.  Can I just -- so we have a clean record, I just want to

Page 366

ask -- finish asking the question.

A.    My apologies.

Q.    Can you point me to what language in Exhibit-11, DeKalb's interrogatory responses, you are relying on for the use of 100 percent allocation percent for Yondr?

A.    Sure.  It's the last paragraph on the bottom of Page 6, in connection with the rest of the answer where it goes through how they reached the numbers, as detailed on Exhibit-2 to Byron Scheuneman's deposition, which is incorporated herein but not attached to what you handed me -- maybe it is attached to what you handed me.

I don't want to speak too soon.

It is not attached to what you handed me, even though it's incorporated herein as part of the interrogatory response.

But on the bottom of Page 6, it says, For student services, DeKalb

Page 367

identified three categories of cost to date, cell phone lockers, Yondr pouches and safe rooms. As to cell phone lockers, they have expended $35,000 --

(Reporter clarification.)

THE WITNESS: As to cell phone lockers, DeKalb has expended $35,000 to date purchasing and implementing these products in approximately eight school campuses. As to Yondr pouches, DeKalb has expended $390,000 to date purchasing and implementing these products in approximately ten school campuses.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. As you noted, the interrogatory response from DeKalb refers to and incorporates the deposition testimony of Byron Scheuneman and Exhibit-2 to Mr. Scheuneman's deposition, correct?

A. It does, yes, sir.

Q. And you are relying, in

Page 368

part, on Mr. Scheuneman's testimony in Exhibit-2 to his deposition for the 100 percent allocation to Yondr?

A.    Well, in addition to the interrogatory response for which it's made a part thereof.

ATTORNEY SANDOVAL-BUSHUR:

Let's mark Tab 21 as Exhibit-12.

- - -

(Whereupon, Exhibit Meyers-12, No Bates, Cost Estimates, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, do you recognize Exhibit-12 as Exhibit-2 to Mr. Scheuneman's deposition?

A.    I very much do, yes, sir.

Q.    Okay.  And you see that in the table labeled, Hard Costs -- do you see that table?

A.    I do, yes, sir.

Q.    You see the fourth line down

Page 369

states, Student services, cell phone locker, correct?

A.    Yes, sir.

Q.    And you see that there is a 100 percent weight assigned to student services, cell phone locker, correct?

A.    I do, yes, sir.

Q.    And do you also see that there is a line titled, Student Services, Yondr Pouches?

A.    Yes, sir, I do.

Q.    And there is a 100 percent weight assigned to Yondr pouches?

A.    Yes, sir, there is.

Q.    Do you know what Mr. Scheuneman testified was the basis for that 100 percent weight for cell phone lockers and Yondr pouches?

A.    As I sit here right now, I don't recall.  His deposition was certainly one I had read in advance of the issuance, because his Exhibit-2 became the subject of an interrogatory response.

It even says, at the bottom, that in accordance with Rule 26, they effectively supplemented their discovery with this exhibit as to his testimony.

Q.    And you understand that Mr. Scheuneman was testifying as DeKalb's corporate representative, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't --

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If you want to take a look back at the interrogatory responses for DeKalb, Exhibit-11, and look at Page 4.

Do you see that it refers to the deposition testimony of DeKalb 30(b)(6) witness Byron Scheuneman and Exhibit-2 as introduced in the DeKalb 30(b)(6) deposition of Mr. Scheuneman?

A.    Then, yes, I would agree with you he was testifying in this capacity as corporate rep.

ATTORNEY SANDOVAL-BUSHUR:

Let's take a look at Tab 22, which we will mark as Exhibit-13.

Page 371

- - -

(Whereupon, Exhibit Meyers-13, No Bates, Video-Recorded Rule 30(b)(6) Deposition of DeKalb County School District By Byron Schueneman, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q. And, Mr. Meyers, this is the 30(b)(6) deposition of Mr. Scheuneman, correct?

A. It appears to be.

Q. Have you ever seen this before today?

A. I have seen the deposition of Mr. Scheuneman. I have read, reviewed and considered it as material reviewed dated March 11th, 2025.

So if you're purporting to tell me this is the same one, because I didn't bring a copy of that, then that's what this is.

Q. If you could please turn to

Page 372

Page 53 of the transcript.

A.    Sure.

Q.    And I really should say Page 52, starting at Line 24.

Do you see the question: Okay.  Now, each of the hard cost items, with the exception of the first line on this bottom chart, are weighted at 100 percent?

A.    I do see that.

Q.    And do you understand that that is referring to the hard cost items from Exhibit-2 to Mr. Scheuneman's deposition which we were just looking at?

A.    That's what it appears to be, yes, sir.

Q.    Okay.  And do you see that Mr. Scheuneman was asked if that indicates that the 100 percent weight -- let me start the question over.

Do you see that Mr. Scheuneman was asked if the 100 percent weight indicated that DeKalb is attributing 100 percent of each of the

Page 373

costs to social media?

A.    I see the question on Line 3 and the answer on Line 6.

Q.    And Mr. Scheuneman said: That's correct.

A.    That is what he says.

Q.    Do you see, then, that Mr. Scheuneman was asked:  Other than DeKalb's lawyers, are you aware of anybody who decided to assign 100 percent to those categories?

A.    I see the question.

Q.    And do you see that Mr. Scheuneman's answer was:  No, sir?

ATTORNEY GRADEN:  Objection. There's an objection on the record in this transcript that you skipped over.

THE WITNESS:  I do see his answer, yes, sir.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Okay.  Do you have any reason to doubt Mr. Scheuneman's testimony that the 100 percent weight for

CONFIDENTIAL

Page 374

the hard costs in his Exhibit-2, including the Yondr pouches and cell phone lockers, was a weight that was assigned by DeKalb's lawyers?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know the context of his answer here.

What I can tell you is that when you look at the verified interrogatories, which are directly in response to the question at issue about damages in this case, as amended -- they are amended subsequent to the date of this deposition on March 24th and they're verified by Kishia Towns, who is the chief of Wrap Around Services for DeKalb.

My understanding is that this verified interrogatory identifies that these costs are going to be put forth at trial by somebody most knowledgeable to identify that these costs were

Page 375

incurred as a direct result of the alleged improper actions of defendants.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    If the 100 percent allocation percent for cell phone lockers and Yondr pouches for DeKalb was a percent that was assigned by DeKalb's lawyers, would that affect your opinion that a 100 percent allocation for Yondr pouches is appropriate in your damages calculation?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  It absolutely would not.  I'm not aware of any of DeKalb's lawyers who are going to get on the stand and testify under oath as to damages.

And this verified interrogatory not only adds up at, 100 percent, the Yondr pouches and the cell phone lockers on a date later than this deposition but incorporates the exhibit from the

deposition as the proof of the testimony that's going to be given at trial for the damages as it relates to the alleged improper actions of the defendants.

If anything, this confirms that, regardless of where Mr. Scheuneman believed it came from, that 100 percent is what's going to be represented at trial.

And I've seen no document that supercedes or amends that those would be at 100 percent by the witnesses most knowledgeable.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Are you aware of any factual basis for DeKalb for a 100 percent allocation percent for Yondr pouches and cell phone lockers, other than the testimony of Mr. Scheuneman?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't -- I'm not here to give any factual opinions.  I'm giving expert

Page 377

opinions and relying on the sworn testimony of the persons most knowledgeable to give those opinions as to what percentage of all the select vendor costs are attributable to damages as a result of the alleged improper actions of the defendants.

ATTORNEY SANDOVAL-BUSHUR: We can take a break.

VIDEO TECHNICIAN: Going off video record, 3:51 p.m.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: Back on video record, 4:05 p.m.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Mr. Meyers, did you communicate in any way with any employees or people otherwise affiliated with Harford in forming your opinions?

A. I had a conversation with

Page 378

Deborah Judd.

Q.    Who is Deborah Judd?

A.    She's Harford's assistant superintendent for business services.

Q.    Why did you communicate with Ms. Judd?

A.    It was in connection with confirming the cost on Skyline Network and CDW-Government, Inc., the two vendors that are included in the damages calculation for Harford as a result of the alleged improper actions of the defendants in this matter.

Q.    What information did Ms. Judd provide you?

A.    As I sit here right now, I can't recall if it was Number 3 on the materials reviewed, the expenditure detail activity report, or if it was the spending freeze data collection report.

I can't recall which of those that it was.

Q.    How did you decide that you should communicate with Ms. Judd?

Page 379

A.    Well, based on the vendors that wanted to be included.  I had one side of the transaction but needed the other side of the transaction, which I was able to get in communications by asking for it directly, just to be very clear what I needed.

I believe that conversation was pretty close, if I remember, to the expert report deadline.

Yeah.  May 14th.  So I was trying to get that additional information, which I received.

Q.    What form did your communication with Ms. Judd take?

A.    I think it was just a telephone call.

Q.    Did you communicate in any way with any employees or people otherwise affiliated with Harford other than Ms. Judd?

A.    Not that I recall as I sit here right now.

Q.    Did you take any notes or

Page 380

otherwise record or memorialize your communication with Ms. Judd?

A.    I did not, no, sir.

Q.    It was not part of your assignment to determine what value, if any, Harford received in exchange for paying any vendor, correct?

A.    That's fair, subject to the same qualifications I previously gave you regarding that answer.

Q.    For the allocation percents you used for your Harford damages calculations, you relied on Harford's Amended Objections and Responses to Defendants' Interrogatories, Set 3, dated April 14th, 2025, correct?

A.    That's correct, yes, sir.

Q.    For the allocation percents you used for your Harford damages calculations, you did not rely on any source other than Harford's Amended Objections and Responses to Defendants' Interrogatories, Set 3, dated April 14th, 2025, correct?

Page 381

A.    Could you either ask it again or confirm that you said allocation percents in that question?

Q.    I did say allocation percents.

A.    Then that is correct.

Q.    You do not know how Harford arrived at the allocation percents that you relied on from the Harford interrogatory responses, correct?

A.    That's fair.  I had no involvement in the drafting of their interrogatory responses or what went into the determination to answer them the way that they had.

Q.    How did you determine which vendors should be included in your Harford damages calculation?

A.    I believe those vendors were identified in the interrogatory responses, and those were the ones that specifically related to the work that I was doing relating to the past hard cost damages for select vendors during the

damage period in this matter.

Q. So for Harford, you calculate damages relating to the vendors Skyline Network, or Palo Alto, CDW-Government, Inc., or Cisco umbrella, correct?

A. That's correct, yes, sir.

Q. And it's your belief that the vendor Skyline Networks, or Palo Alto, and CDW-Government, Inc., or Cisco umbrella, are identified in the Harford interrogatory responses?

A. I don't have a copy in front of me. But that was the basis for the allocation percentages.

Q. Once you determined which vendors should be included in your Harford damages calculation, how did you determine which costs relating to each vendor should be included in your damages calculation?

A. Based on the materials reviewed, we knew both of these were for direct costs.

So for the Palo Alto, it was two years of Palo Alto costs through another third-party vendor called Skyline Networks.

As you may or may not know, CDW-Government Inc. is a big vendor that sells a lot of stuff. So we had to make sure on those invoices and those costs that this was just related to the Cisco umbrella for the web filtering for those years.

And those were the years for which we had the information related to these web filtering costs, which were the select vendors identified for Harford.

Q. In order to determine that the CDW-Government, Inc., costs were the Cisco umbrella costs that you believe should be included in your damages calculation, did you rely on anything other than the face of the invoices themselves?

A. I think there was another report, too. There was two things; one

was the invoice report, and I think there was also, if I remember correctly additional expenditure reports for the years '21, '22 and '23 which were effectively the general ledgers for those years that also identified those costs.

They had the vendor, but they also had the purpose for the cost. So web filtering and how it was coded. And I believe it actually said Cisco umbrella as well on the expenditure reports.

So it was in connection with the detail activity reports, as well as the expenditure reports as it relates to Cisco.

And for the spending freeze data, that would have been for Palo Alto.

Q.    What is spending freeze data?

A.    It was an Excel spreadsheet that they had put together in 2018.  I don't know what all the other tabs related to.

Page 385

But one of the tabs were the historical costs for the periods leading up to it and the reference on what the costs were and how they were made and itemized.

So it was a contemporaneously prepared historical document that matched back to the detail activity report that identified the costs for those two Palo Altos at that period of time.

The expenditure reports did not go back further. So we had the expenditure detail activity reports going back to '15. But the spending freeze data collection reports is how we reconciled the two earlier charges for the Palo Alto.

Q. Are you aware that the Harford interrogatory responses that you relied on do not mention Skyline Network/Palo Alto or CDW-Government, Inc./Cisco umbrella?

A. As I sit here, I don't

CONFIDENTIAL

Page 386

recall.  They may have just referenced web filtering in general.  And those were the two web filtering vendors that I was provided.

But I'm happy to look at it.

Q.    Sure.

ATTORNEY SANDOVAL-BUSHUR:  I will hand you Tab 23, which we are marking as Exhibit-14.

-   -   -

(Whereupon, Exhibit Meyers-14, No Bates, Plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories, Set 3, was marked for identification.)

-   -   -

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And this is plaintiff Board of Education of Harford County's Amended Objections and Responses to Defendants' Interrogatories, Set 3, correct?

A.    That's correct.

Page 387

Q.    And this is what you relied on for your allocation percents for Harford, correct?

A.    Correct.  And that's found on Page 2 of the program department worksheet, which was the percentage weight allocated for the Office of Technology and Information.

Q.    So you would agree that nothing in the Harford interrogatory response that you relied on specifically refers to Skyline Network/Palo Alto or CDW-Government, Inc./Cisco umbrella, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  Yeah, I don't see those words here.  Those were the vendors that we were analyzing for the purposes of this in the Office of Technology and Information.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    What is your basis for applying a 20 percent allocation

Page 388

percentage to costs relating to Skyline Network/Palo Alto and CDW-Government Inc./Cisco umbrella?

A.    It's just what we talked about, the verified interrogatory response that the person most knowledgeable who is going to speak to the damages for Harford, as it relates to the alleged improper actions of the defendants in this matter, has assigned a weight for the costs associated with the Office of Technology at 20 percent, which is what these costs fall under.

Q.    How did you determine that the Skyline Network/Palo Alto and CDW-Government Inc./Cisco umbrella costs should be included within the Office of Technology and Information?

A.    They're in the general ledger.  They have a subcategory coding. That's how that -- it was set forth.

So it's identified on the expense that it's from the Office of Technology, because they're paid by

different vendor departments.

Q.   Did anyone at Harford County Public Schools tell you that a 20 percent allocation percentage should apply to Skyline Network/Palo Alto or CDW-Government Inc./Cisco umbrella?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  The interrogatory responses is the basis I have for the application of the 20 percent for the cost for those select vendors included in the Office of Technology.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Did you ask anyone from Harford if 20 percent was an appropriate allocation percentage to use for costs relating to Skyline Network/Palo Alto and CDW-Government Inc./Cisco umbrella?

A.   I don't recall having that conversation.  And I relied upon these interrogatory responses.

Q.   Do you know whether anyone from Harford testified about what was

Page 390

meant by the 20 percent weight in Exhibit-14, the interrogatory response that you relied upon?

A.    I don't recall.

Q.    For your purpose, the -- just the 20 percent statement in the interrogatory response was sufficient in order to apply a 20 percent allocation percent to Skyline Network/Palo Alto and CDW-Government Inc./Cisco umbrella; is that correct?

A.    That's correct.

And subsequent to the issuance of my report, I received a deposition of Andrew Moore, later in May, that further supported that assumption and conclusion in my report.

Q.    Okay.  Are you aware that Mr. Moore, in his deposition, did not testify that 20 percent of the costs for Skyline Network/Palo Alto or CDW-Government Inc./Cisco umbrella were related to social media?

ATTORNEY GRADEN:  Objection.

THE WITNESS: As I sit here right now, I can't recall everything that he said.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Okay. Well, you just said that Mr. Moore had a deposition in May that further supported your assumption and conclusion that 20 percent was an appropriate allocation percent, correct?

A. That's correct.

Q. What specifically in Mr. Moore's deposition further supported your assumption and conclusion that 20 percent was an appropriate allocation percent?

A. I'd be happy to look at it and try to point you to it.

As I sit here right now, I can't tell you from memory exactly what that was.

Q. You believe and understand that Mr. Moore's testimony is reliable on -- let me ask my question a little differently.

Page 392

Do you believe that Mr. Moore's testimony is reliable in explaining what the 20 percent allocation weight in the Harford interrogatory responses represents?

ATTORNEY GRADEN: Objection.

THE WITNESS: As I sit here right now, I can't recall the detail.

I know that I read it and it's supported, the interrogatory responses. But that level of specificity that you're asking for without it in front of me, I can't answer that question with specificity.

So -- but I do believe that his testimony is reliable. So I can answer the first part of that question.

But I don't know either whether Mr. Moore is going to be the person who is going to be testifying related specifically to

Page 393

all these questions.

So I don't know if he was the person specifically referenced in the interrogatory responses or the person who is most knowledgeable.

He is not the person that I relied upon necessarily at the time I issued my report. I just saw his testimony after that was supportive of the inclusion of those two vendors for damage purposes.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. You do not know how Harford arrived at the 20 percent allocation percents that you relied on from the interrogatory responses, correct?

A. That's fair. I do not know what went into their -- the plaintiffs' determination and decision-making that that would be the amount that would be testified as to at trial related to the damages in this matter.

Page 394

Q.    Do you understand that Harford purchases both Palo Alto and Cisco umbrella for the purpose of complying with the Children's Internet Protection Act?

A.    They --

ATTORNEY GRADEN:  Objection.

THE WITNESS:  They may.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Are you aware that Harford has purchased an Internet content filter every year since 2000 in order to comply with the Internet -- the Children's Internet Protection Act?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  They may have. I'm not aware one way or the other.

I haven't reviewed financial statements that far back.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    And if it were, in fact, true that Harford has purchased an Internet content filter every year since

the year 2000 in order to comply with the Children's Internet Protection Act, that would not affect your opinion that Harford has incurred damages in connection with purchasing the Internet content filters, correct?

A.    It would have no impact on my calculation, insofar as the people most knowledgeable are surely aware of any state, federal or whatever regulatory organization you just named and would have considered that in connection with their allocation percentage.

Q.    Did you communicate in any way with any employees or people otherwise affiliated with Irvington in forming your opinions?

A.    Not that I recall, no, sir.

Q.    Was there a reason why you did not communicate with any employees or people otherwise affiliated with Irvington in forming your opinions?

A.    No reason specifically one way or the other.

Page 396

Irvington's financial statements were extremely comprehensive and good.  So I didn't need to ask for any additional information to do any of the reconciliations with Irvington.

Q.    It was --

A.    Which is primarily why I had communications with any of the plaintiffs directly, as we previously discussed.

Q.    It was not part of your assignment to determine what value, if any, Irvington received in exchange for paying any vendor, correct?

A.    That's fair, for the same reasons I've qualified before on the other four plaintiffs in this matter.

Q.    For the allocation percents you used for your Irvington damages calculations, you relied on Irvington's Third Amended Answers to defendants' interrogatories, Set 3, dated May 14th, 2025, correct?

A.    In part, yes.

Q.    What else did you rely on?

Page 397

A.    I relied on the financial accounting that I had done in this case.

If I remember correctly, hopefully you'll put it in front of me, Irvington's third set had different total costs than I had.

So you may have said allocation percentages.  And if I missed it, then the answer is yes.

But if you didn't, I used the reconciled numbers that I had used, multiplied by those allocation percentages.  So there was a difference between the total costs that were calculated by Irvington and those that I could actually reconcile for the purposes of damages in this matter.

Q.    Okay.  I did ask about allocation percentages so let me just re-ask --

A.    Please.

Q.    -- the question so we have a clean record.

A.    Please.  Sorry.

CONFIDENTIAL

Page 398

Q.     For the allocation percents you used for your Irvington damages calculations, you relied on Irvington's Third Amended Answers to Defendants' Interrogatories, Set 3, dated May 14th, 2025, correct?

A.     That is correct, yes, sir.

Q.     For the allocation percents you used for your Irvington damages calculations, you did not rely on any source other than Irvington's Third Amended Answers to Defendants' Interrogatories, Set 3, dated May 14th, 2025, correct?

A.     That's correct, I did not.

Q.     You do not know how Irvington arrived at the allocation percents that you relied on from Irvington's interrogatory responses, correct?

A.     I do not know what process any of the representatives of Irvington who are those people most knowledgeable who will testify at trial relating to the

allocation percentages as it relates to damages as a result of the alleged improper actions of the defendants in this matter, what went into that process or the basis for their determinations.

Q.    How did you determine which vendors should be included in your Irvington damages calculations?

A.    I believe that they are included in the interrogatory responses, the third set.

Q.    Once you determined which vendors should be included in your Irvington's damages calculations, how did you determine which costs relating to each vendor should be included in your damages calculation?

A.    So all of the costs for each and every one of those vendors is included and all the costs that I can confirm for those vendors.

Q.    And what was your basis for determining that all of the costs for each vendor should be included in your

Page 400

damages calculation?

A.    The interrogatory response speaks to that.  They put total cost and then they did a percentage and they quantified the damages.  It's part of the interrogatory response.

Q.    If the interrogatory response -- well, let's just take a look at the interrogatory response.

A.    Sure.

ATTORNEY SANDOVAL-BUSHUR:

I'm marking Tab 25 as Exhibit-15.

- - -

(Whereupon, Exhibit Meyers-15, No Bates, Plaintiff's Third Amended Answers to Defendants' Interrogatories To Irvington Public Schools, Set 3, was marked for identification.)

- - -

THE WITNESS:  Thank you.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Exhibit-15 is Plaintiffs' Third Amended Answers to Defendants'

Page 401

Interrogatories to Irvington -- let me start that over.

Exhibit-15 is Plaintiffs' Third Amended Answers to Defendants' Interrogatories to Irvington Public Schools, Set 3, correct?

A.    That's correct.

Q.    You relied on the information in Exhibit-15, the Irvington interrogatory responses, for your allocation percents, correct?

A.    Yes, sir.

Q.    And you relied on the information in Exhibit-15, the Irvington interrogatory responses, to determine which costs relating to each vendor should be included in your damages calculation, correct?

A.    I utilized the Exhibit B to the Exhibit-15 deposition to determine the select vendors which would be included with alleged harms alleged in the complaint for expenditures on external programs and services.

Page 402

They have a column called, Proximate total spend, total spend. Their approximates were not always right. Some of these are round numbers. They were not doing the forensic accounting, I was.

So I did use the actual total spend, multiplied it by the percent allocation to harms, which is their third column, which gives you the damages in my report.

But they are representing very clearly herein that it is the total spend for the vendors that is inclusive of the damages.

Q. For example, and we are looking at Exhibit B to Exhibit-15, which is the Irvington interrogatory responses, correct?

A. That's correct.

Q. Okay. There is a table here titled, Costs Associated With the Harms Alleged in the Complaint for Expenditures on External Programs and Services,

Page 403

correct?

A.    You read that correctly.

Q.    And there is then a column titled, Vendor, correct?

A.    There is.

Q.    A column titled, Approximate Total Spend, correct?

A.    Correct.

Q.    And a column titled, Percent Allocation to Harms, correct?

A.    Correct.

Q.    And the first vendor listed is New Jersey Coalition for Inclusive Education, correct?

A.    Correct.

Q.    And this lists an approximate total spend of $1,043,432, correct?

A.    That is what it says.

Q.    And then the interrogatory response that you relied on says that there should be a 20 percent allocation to harms relating to the identified approximate total spend, correct?

Page 404

A.    Relating to the approximate total spend, which in my report is relating to the total spend.  I got rid of the approximate.

Q.    So even though the Irvington interrogatory response that you refer -- relied on included a dollar amount for the approximate total spend that the -- according to the interrogatory response was associated with harms, you essentially disregarded the approximation that was provided and calculated your own total spend for each vendor, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I wouldn't say I disregarded it at all.  The entire purpose of my engagement here, as we talked about earlier on, but haven't talked about a lot throughout the day, was to perform a forensic accounting on select vendors.  This is what they asked me to do.

This was issued before my

Page 405

report was finalized.  They are not the experts in reconciling and analyzing and performing a forensic accounting.  That's why I'm involved.  That's one of the major and primary roles of what I've been asked to do.

So if you look at these, some of mine are higher, some of mine are lower.  And it's based on the actual costs that we were able to verify during the period of damages.

So I don't know how they prepared their numbers.  I can only tell you that my role, as I was hired by Irvington, was to perform a forensic accounting to figure out what the total spend was for select vendors, which I did, and multiply it by the column identified as percent allocation to harms times total spend.

I'm here to remove that

approximate. I'm telling you what the actual costs were. And that's why they call it total spend.

If they didn't want to call it approximate, they would have just used their numbers. It's approximate because they had hired an expert, in me, to perform, as you point out, a lot of time spent to reconcile hundreds if not thousands of invoices, costs, to be able to remove that approximate and tell you what the total spend was, which is what I've done.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Mr. Meyers, is it possible that when Irvington took the trouble of putting together a response to the interrogatory and identified an approximate total spend for the vendor New Jersey Coalition for Inclusive Education that it determined that there were some costs connected with the New Jersey Coalition for Inclusive Education

Page 407

that should be allocated to harms and some that should not?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I do not believe that is possible or probable.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Why is that not possible?

A.    Because the exercise that I was asked to perform was to do the analysis of the forensic accounting.  And to the extent that -- if that were the case, they would disregard the use of approximate.

The word "approximate" is in connection with knowing that those numbers will be amended, as they have been, by the report that I would be -- issued in this matter.

Q.    Mr. Meyers, you do not know who came up with any of the numbers that were included in the Irvington interrogatory response, correct?

A.    That's fair to say.

Q.    You do not know what -- you do not know who wrote the phrase, "approximate total spend," correct?

A.    Also fair to say.

Q.    You do not know what was in the mind of the person who wrote the phrase "approximate total spend," correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I know that they believed it to be approximate when they wrote the word "approximate."

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You don't know --

A.    Which means it wasn't exact and it wasn't necessarily complete.

Q.    Mr. Meyers, you said earlier that you were asked to perform an analysis of forensic accounting, correct?

A.    That was a primary role in my -- in this case.

Q.    Did anyone from Irvington ask you to calculate all costs that

Page 409

Irvington paid to the New Jersey Coalition for Inclusive Education?

A.    The total costs for all select vendors was my assignment as given to me in this matter.

Q.    Plaintiffs' attorneys asked you to calculate all costs that Irvington paid to the New Jersey Coalition for Inclusive Education, correct?

A.    My --

ATTORNEY GRADEN:  Objection.

THE WITNESS:  My role was to calculate the total costs for select vendors in this matter during the period as it relates to those vendors identified by the parties at issue who will testify as to the percentages in order to calculate damages.  Yes, sir, that was my objective in calculating this.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Okay.  I'm asking -- what I -- I genuinely think -- I don't think

Page 410

I've done this yet today, but I would ask you to give me a yes-or-no answer.

A.    You did it once.

Q.    Maybe the second time, okay.

Yes or no, did plaintiffs' attorneys ask you to calculate all costs that Irvington paid to the New Jersey Coalition for Inclusive Education?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't recall necessarily that they said all costs.  I was to calculate, initially, all vendor costs for everybody.  And then those select vendors were determined, as you can see, as a result of the interrogatory responses and the sworn testimony.  And in this case, it was the total cost.

What I can tell you is I received the total invoices for all of the New Jersey Coalition and Inclusive and the CarePlus NJ, Inc., which are the two that are

Page 411

above.  And the ones that are below I received all the invoices on those.

So to the extent that in the continuation of asking for documents they provided the documents for those costs, it goes with the assignment that I understand that I have, which was to calculate the total costs for the select vendors and apply the percentage applicable to harms, as they say, to come up with the damages.

And that's consistent with what the interrogatory says, which is approximate total spend.  It could just say approximate spend. But I can't read total spend to mean anything other than total expense.

If it was a portion, approximate spend, maybe.  A portion of cost allocable to New

Page 412

Jersey, maybe.  But maybe total spend means something different to you than it means to me as a forensic accountant.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, did anyone from the Irvington School District who is not a lawyer ask you to calculate the total spend on all invoices that Irvington paid to the New Jersey Coalition for Inclusive Education?

A.    As we've talked --

ATTORNEY GRADEN:  Objection.

THE WITNESS:  -- about before, I haven't talked to anybody at the Irvington School District as a plaintiff, whether they are an attorney or not.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Okay.  What did Irvington pay the New Jersey Coalition for Inclusive Education for?

A.    What did they pay it for?

Q.    Yes.

Page 413

A.    I would have to see the invoices.  But that was certainly not part of the assignment that I had.

I was here to calculate the cost and then apply the sworn testimony percentages that will be testified to at trial as the damages as it relates to the alleged improper actions of the defendants.

So as I sit here right now, I don't recall exactly what the Coalition of Inclusive Education was for.

Q.    And do you believe it is possible that there are some costs relating to the New Jersey Coalition for Inclusive Education that whoever provided the information for the interrogatory responses believed should be allocated to harms at a 20 percent allocation percentage and some costs relating to the New Jersey Coalition for Inclusive Education that should not be allocated to harms at all?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  No, sir, I do not believe it's possible.

In connection with the assignment, in connection with the plaintiffs having an opportunity to review the chart in advance of the issuance of the report, if there was a distinction that needed to be made, it would have been relayed to me either directly or indirectly through counsel, and it would be contrary to what I believe the interrogatory responses very clearly say, which is the total cost for the New Jersey Coalition For Inclusion in Education, so.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    The interrogatory response from Irvington in Exhibit-15 says that there was an approximate total spend of $1,043,432 on the vendor New Jersey Coalition for Inclusive Education, correct?

Page 415

A.    It does say that.

Q.    If you'd turn to Paragraph 20 of your Irvington report, which is Exhibit-1E.

A.    Yes, sir.

Q.    You calculate a total vendor cost relating to the New Jersey Coalition for Inclusive Education in the amount of $1,625,737, correct?

A.    I would say that I verified costs totaling $1,625,737.

But I guess I can agree with calculate and verify as similar.

Q.    The difference between the amount of spend that Irvington identified in its interrogatory response relating to the New Jersey Coalition for Inclusive Education and the amount that you calculated in your expert report is over $500,000, correct?

A.    I think that's fair.  The math is the math.  The difference between 1 million 625 and 1 million 43 is approximately $580,000.

Page 416

Q. Did you realize, when you were forming your opinions on Irvington's damages, that there was a difference between what Irvington had calculated as the approximate total spend on the New Jersey Coalition for Inclusive Education and what you had calculated as the total spend for that vendor?

A. Absolutely. And I believe that the plaintiff also knew as well, because some of the numbers were much less or less than as calculated on the approximate.

I had to be in a position to explain why those numbers were less, because the costs did not total what the approximate spend was.

So I was aware. Plaintiffs' counsel was aware. And my expectation and understanding is that the plaintiffs themselves was aware, prior to the issuance of my report, that those numbers were different.

Q. What is the basis for your

Page 417

expectation and understanding that the plaintiff was aware, prior to the issuance of your report, that there was a difference between the amount that the plaintiff put in its interrogatory response and the amount that you had in your expert report?

A.    Just based on discussions with counsel at that time saying there's a difference between these numbers.  This is the verified cost as total.  Have any changes or comments related to it?  And there were none.

Q.    Did you -- sorry.  I'm not sure I understand the end of your answer there.

You said, have any changes or comments related to it?  And there were none.

A.    Sure.  It's part of the report writing process, right, you provide what you have.  This is the results of my forensic accounting.  It's different than the numbers in your chart.

Page 418

Are there any other questions you have about why there's any differences?  Mine relates to the total cost.  Yours are approximate.

There were no changes or questions related to the use of the total costs.

Q.    You are describing a conversation that you had with plaintiffs' attorneys; is that right?

A.    Part of the report writing process, yes.

Q.    Okay.  Are you relying on a conversation you had with plaintiffs' attorneys to support the notion that you correctly calculated the vendor costs for the New Jersey Coalition for Inclusive Education?

A.    No.  I'm relying on the interrogatory responses and the clear language there in them and the fact that it's approximate.  And I'm telling you that I verified that there was a difference, made known there was a

difference, because I calculated total cost, and there was no comments back to me.

So, to me, that's an additional verification that my understanding of the interrogatory responses was correct and reliable and accurate.

Q. Your opinion is that you received additional verification that your understanding of the interrogatory responses was correct and reliable and accurate because you pointed out the difference between the interrogatory response calculation and your calculation and plaintiffs' attorneys seemed okay with it --

ATTORNEY GRADEN: Objection.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. -- is that right?

A. I don't know if they seemed okay with it or not. That's not what I said at all.

I said I have gotten no

Page 420

further indication to review, edit or revise those calculations in addition -- in connection with the issuance of the report.

Q. Did you ask to speak with anyone at Irvington to discuss what the reasons might be for the approximately $582,000 difference between what Irvington had identified as the approximate total spend for the New Jersey Coalition for Inclusive Education and what you had identified as the total spend for that vendor?

A. Absolutely not. Just like I didn't talk to any of the other bellwethers when a cost that they had put forth turned out not to be the verified cost.

That was the role of my assignment here was to perform a forensic accounting on the total cost for select vendors, which I've done, and to multiply it by the allocation percentages on that total spend to come up with the damages

Page 421

herein.

That was the assignment.

Q.    That came from the attorneys?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  That's part of what my scope and engagement was.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    From the attorneys?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I guess it was relayed to me from the attorneys, but I don't know that it was not from the clients.  I don't speak for who the attorneys speak for.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    What steps did you take to ensure that you did not include, in your calculation for Irvington, invoices paid to the New Jersey Coalition for Inclusive Education that Irvington believed had nothing to do with social media or defendants' at-issue conduct?

A.    I have no basis to believe

Page 422

that Irvington believed anything should be excluded from what they called total spend to New Jersey Coalition for Inclusion in Education and the chart that they prepared that details the methodology which they undertook for them to approximate cost of harm in connection with any analysis of calculating damages in this case as it relates to the alleged improper actions of the defendants.

Q.    So you assumed that you should use -- well, I'll move on to the next question.

For the -- let's look again at the Irvington interrogatory responses, which are marked as Exhibit-15.  I'm looking at Exhibit B thereto.

The second vendor listed is CarePlus New Jersey, Inc., Correct?

A.    It is, yes, sir.

Q.    And there is identified in the interrogatory response from Irvington an approximate total spend relating to CarePlus New Jersey, Inc. of $2,513,686,

Page 423

correct?

A.    There is.

Q.    And if you look at your report for Irvington, Exhibit-1E, and look at Paragraph 20, you calculated a total spend by Irvington relating to CarePlus New Jersey of $3,124,586, correct?

A.    I did, yes, sir.

Q.    That is a difference of approximately $610,000, correct?

A.    That's fair.

Q.    Did you realize, in the course of forming your opinions on damages, that there was a difference between Irvington's calculation of its approximate total spend on CarePlus New Jersey in its interrogatory response and your calculation of Irvington's total spend on CarePlus New Jersey?

A.    I think I answered that before.  But I'll answer it globally for you now.

I'm aware, at the time I

Page 424

issued my report and at the time that I received this document prior to issuing my report, that there was a difference, either up or down, on any one that there is a difference up or down.

I was aware, yes, sir, absolutely.

Q.    What steps did you take to ensure that you did not include, in your calculation of Irvington's damages, invoices that were paid to CarePlus New Jersey that Irvington believed had nothing to do with social media or defendants' at-issue conduct?

A.    For the same reason that we talked about New Jersey Coalition, I was asked to calculate the total spend, which I did, which is what they're attempting to do here in their calculation. Their approximate did not include all of the spend. I've reconciled, through my forensic accounting, that the total spend was $3,124,586 to which we multiplied it by the 20 percent assigned by those

Page 425

representatives most knowledgeable who will testify at trial as to the alleged harm caused by the alleged actions of the defendants in this matter resulting from the use of this vendor, or any of the vendors on this chart, as you will.

And the answer is the same for each and every one of them, counselor.

Q.    For districts other than Irvington, you testified earlier, I believe, that you provided affiants with information on total spend on vendors that, then, you believe the affiants considered in determining their allocation percentages; is that right?

A.    I don't believe I gave that testimony.

Q.    Okay.  I maybe misunderstood.

I would like to take a look at your Irvington report, Exhibit-1E, and turning to Appendix C and look at Page 6.

A.    I'm there.

Q.    Okay.  And you see that one of the vendors identified here in your damages summary is Live Breathe Calm?

A.    I do, yes, sir.

Q.    You have a total of four purchase orders relating to Live Breathe Calm listed here, correct?

A.    I do, yes, sir.

Q.    And if you look at the second and third invoices for Live Breathe Calm -- do you see what I'm looking at?

A.    I do.

Q.    Do you see that both of those invoices have the same date, the same purchase order number, the same exact vendor cost, correct?

A.    And a different reference in the reference column.  Sometimes purchase orders are for multiple years.  And if it was multiple years and I could split it up, I did my best to do so.

Q.    Okay.  So just so I'm sure that we have a clean record.

Page 427

You do see that both the second and third invoices for Live Breathe Calm --

A.    I do.

Q.    -- have the same date, the same purchase order number and the same exact vendor cost, correct?

A.    I do, yes, sir.

Q.    And you cite two different references for those two different invoices, correct?

A.    I do.

Q.    What did you do to determine that you were not double-counting the same invoice when you had the same vendor with the same purchase order and the same vendor cost?

A.    If you want to ask me about it, I would ask you to put the references in front of me, because sometimes purchase orders -- or put a copy of the purchase order in front of me to confirm.

Obviously, when we're doing our forensic accounting, we do our best

Page 428

to make sure we've confirmed all the costs. So -- and they have, as you can see, different years.

Do you see that? The date may be the same. But the year is not the same for which it is.

So the purchase order being double is not indicative of anything, actually. That's not uncommon at all that a lot of these schools pay $80,000 for a two-year contract, and I would have allocated it 40 and 40.

So without the documents in front of me that I've referenced in my report, I would have a very hard time commenting on any -- I don't want to say that you're implying -- but implication that it is a double-dip.

Q. I'm just -- I'm asking about as a matter of your methodology.

What did you do to determine that you were not double-counting the same invoice when you had the same vendor, the same purchase order for the

Page 429

same amount?

A.    Look at the invoice.  Look at the purchase order.  Look at the general ledger.  Make sure that there's two separate entries for them.  All the things that go into the forensic accounting, so.

Q.    Okay.

A.    I mean, if you look up above for Sinewave Inc. for Palo Alto, there's two with the same date, different years, same purchase order, different reference numbers and different vendor cost amounts.

And if you were to turn to Page 7, you can see for Center for Partnership Services there's two with the same date, same year, same purchase order and different reference numbers and different vendor cost.

So, you know, it's a little frustrating you won't just put the documents in front of me.  But it's not uncommon to have a purchase order that

Page 430

would have multiple years and multiple charges on it, and that would not be indicative of double-counting just because the amount on the vendor cost is duplicative.

Q.    Mr. Meyers, these are extremely voluminous documents that would take a long time to --

A.    It's --

Q.    -- orient to, so I'm not --

A.    -- your deposition.  I understand.

Q.    If a school district's payments to a -- well, actually, I will move on.

If a school district's spending on a vendor would have been exactly the same in a world in which there was no defendant at-issue conduct, did the school district incur any damages in connection with spending on that vendor?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  It may have.

Page 431

We've talked about this, that the fact that an expense is fixed does not mean that there's not a damage associated with it.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Did you communicate in any way, whether by speaking in person, by telephone, corresponding by e-mail, or otherwise with any employees or people otherwise affiliated with Irvington in forming -- sorry, Tucson in forming your opinions?

A.    I do not believe so, no, sir.

Q.    So since I sort of messed up that question.

You did not communicate in any way with any employees or people otherwise affiliated with Tucson, correct?

A.    I did not.

Q.    It was not part of your assignment to determine what value, if any, Tucson received in exchange for

Page 432

paying any vendor, correct?

A.    It was not, as I've previously stated and is qualified in all of my previous answers related to the other five districts herein for that question.

Q.    For the allocation percents you used for your Tucson damages calculations, you relied on Tucson's Second Amended Answers to Defendants' Interrogatories, Set 3, correct?

A.    That's correct, yes, sir.

Q.    For your allocation percents you used for your Tucson damages calculations, you did not rely on any source other than Tucson's Second Amended Answers to Defendants' Interrogatories, Set 3, correct?

A.    I believe that's correct, yes, sir.

Q.    You do not know how Tucson arrived at the allocation percents that you relied on from its interrogatory responses, correct?

Page 433

A.    I did not have any involvement in any way related to Tucson's drafting or the testimony that they provided in their second amended answers to interrogatory responses related to the damages caused to them by the alleged improper actions of defendants in this matter.

Q.    You do not know how Tucson arrived at the allocation percents that you relied on from its interrogatory responses, correct?

A.    As I just stated, I didn't have any involvement, one way or the other, with the drafting of them, including but not limited to how they came to any particular allocation percentages in that sworn testimony that they provided relating to the damages caused by the alleged improper actions of defendants.

Q.    How did you determine which vendors should be included in your Tucson damages calculation?

Page 434

A.    I believe it's from the third response to Interrogatory Number 5, as I sit here right now.

Q.    Once you determined which vendors should be included in your Tucson damages calculation, how did you determine which costs relating to each vendor should be included in your damages calculation?

A.    I included the total cost as I was able to reconcile for each of the vendors that were identified as select vendors in our report related to the alleged improper actions of the defendants before applying the allocation percentage thereto.

Q.    You assumed that if a vendor was identified by Tucson as a select vendor, then every single payment that the district made to that vendor should be included in your damages calculation, correct?

A.    That's correct.  The total costs for each select vendor multiplied

by the applicable allocation percentage to quantify damage in this matter.

Q. Did you confirm with anyone from Tucson that, in fact, every single payment that the district made to each select vendor should be included in your damages calculations?

A. As I sit here right now, I don't have the interrogatories in front of me. They may have a chart in there that reconciled the numbers that I had already reconciled.

But I have not spoken to anybody specifically at Tucson related to that, no, sir.

Q. What would be the relevance of a chart in the interrogatories reconciling the numbers that you had already reconciled?

A. To the extent that the interrogatory specifically states the numbers and you're asking me if it includes the total and the number is the total, then the chart answers the

question.

Q.   But you did not believe that the -- well, I'll move on.

Your Tucson damages calculations include work orders relating to property damage, correct?

A.   They do, yes, sir.

Q.   You do not know how Tucson determined that any invoice relating to property damage is related to any defendant, correct?

A.   As I stated before, I don't have any knowledge as to how Tucson prepared any of its responses in discovery related to their allocation of alleged harms as a cause -- as it relates to the alleged improper action of defendants, so neither what the actions were or how the harm was caused.  It's not within my scope.

Q.   You assigned a 100 percent allocation to every work order relating to property damage for Tucson, correct?

A.   My recollection is that

Tucson assigned 100 percent to every work order for Tucson, which is what I rely upon -- relying upon in my calculation herein.

Q.    Do you believe it would be reasonable to say that a student who decides to engage in property damage bears zero responsibility for the property damage?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know what responsibility they would bear at all.  I couldn't give you an opinion on that one way or the other.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    You are aware that when a student commits property damage, Tucson takes steps to recover repair costs from the parents of the student, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I'm not aware of that one way or the other.

BY ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

Page 438

Q.    Your reports cite multiple documents showing that when a student commits property damage, Tucson takes steps to recover repair costs from the parents, are you aware of that?

A.    They may.  I don't have them in front of me.  If you'd like to show them to me, I'm happy to look at them.

Q.    Sure.

ATTORNEY SANDOVAL-BUSHUR:
Let's take a look at Tab 29, we'll mark as Exhibit-17 -- sorry, Exhibit -- we'll mark it as Exhibit-16.

- - -

(Whereupon, Exhibit Meyers-16, SM_TUSD_00185554, Reactive Work Order, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:
Q.    And this is a document with the Bates stamp SM_TUSD_00185554.
Do you see this document,

Page 439

Mr. Meyers?

A.    I do.

Q.    Do you recognize it as a type of document that you relied on in forming your opinions relating to Tucson's damages?

A.    I can recognize the Bates stamp number.

I don't believe that this number is part of my report, sir.  As I sit here right now, I do not see that Bates stamp number referenced at all in the documents that I've reviewed in connection with the property damage vendor costs.

Q.    Mr. Meyers, if you look at Appendix B to your Tucson report, which is Exhibit-1F, and look at Page 4 of Appendix B to that report.

A.    Okay.

Q.    Do you see an entry for Tucson reactive work orders?

A.    I do.

Q.    Okay.

Page 440

A.    And I see that on Exhibit-1 I've identified probably no less than 25 costs that fall into that Bates range.

And you handed me an example of one that is not one that I used that makes a reference.  Would you -- can you hand me an example of one that I used that has a reference, a cost to charge for restitution?

Because I don't know how the restitution would work.  I don't know that it's a collateral source or not as it relates to a damage theory or a legal theory.  I'm not here to give that opinion.

But I find it a little strange that one that was not included herein you have handed me.  Maybe it was not included herein because the plaintiff had said that they did get restitution and it should not be included.  I don't know.

But I did not include this cost in any way.

Page 441

ATTORNEY SANDOVAL-BUSHUR:

Mr. Meyers, I am handing you Tab 30, which we're marking as Exhibit-17.

- - -

(Whereupon, Exhibit Meyers-17, SM_TUSD_00185580, 10/27/21 Letter, Tucson Unified School District, was marked for identification.)

- - -

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Why don't you take a look at that?

This is a document with a Bates number SM_TUSD_00185580, correct?

A. It appears to be.

Q. And if you look at your damages summary in your Tucson expert report, Exhibit-1F, do you see that this was included in your damages calculation?

A. It certainly falls inside the Bates range. There's no doubt about that.

Page 442

Q.    And, in fact, this specific -- I'm talking about in Appendix C to your report.

Are you there?  On Page 3, under the property damage vendors section, you include in your damages calculation the costs that are reflected in the document that we just marked as Exhibit-17.

A.    You're going to have to point me to it.

Q.    Okay.

A.    I don't see where --

Q.    Yeah.  I mean, do you see the entry that has the -- that has the invoice/purchase order NA?

A.    I do.

Q.    And do you see that that is -- refers to the document that we have marked as Exhibit-17?

A.    It appears that it does, yes, because of the date.

Q.    It has the same Bates number, right?

Page 443

A. It has the same Bates number and it has the same date. So yes.

Q. Okay. And this is the only property damage vendor cost that does not have an invoice or purchase order, correct?

A. I think that's correct.

Q. Do you know why that's the case?

A. I do not know, sir.

Q. And this document -- and just so the record is clear, it was produced to us with the markings out of -- of components and the SII blocks, that is not something that we have added.

A. We can agree it's neither your redactions nor mine.

Q. Okay. And you see that this is a letter from the Tucson Unified School District to the parents of a student, correct?

A. You're asking me to make those assumptions. There's redactions on here.

Page 444

It appears to be a letter. It appears to go to the parents. There's no indication that this letter was sent, nor does it say anything else in the body of the letter. It cites a statute. No evidence that this amount was restored or not.

But it's not -- I have not considered any reimbursements to any of the property damage in connection with the analysis that I have performed.

Q.    Okay.

A.    Nor have I seen any indication that any of them were reimbursed.

Q.    You did not, in the course of calculating your damages for Tucson, consider any reimbursement that the school district received for any property damage, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  As I just said, I have not considered any reimbursements that they may or

may not have received as it relates to the specific reactive work orders identified in my report herein.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. So when you look at the total, $6,444, that you calculate for property damage costs for Tucson, you do not know how much of that $6,444 Tucson may have already collected from students or students' parents, correct?

A. I'm not aware that they have or have not collected any, nor am I aware that it would -- that the collection of said receipts would reduce the damages in this matter at hand.

Q. Okay. You have not -- did you ever ask Tucson if any of the property damage costs that they provided to you were costs that had been reimbursed by any students or student's parents?

A. I have not.

Q. Did you take any steps to

Page 446

exclude from your damages calculation any costs that any school district recovered from students or from a student's parents?

A.    I have not, no, sir.

Q.    Looking at Exhibit-17, you relied on this document for your calculation of damages for Tucson, correct?

A.    In part.

Q.    It is one of the invoices you relied on in the category of property damage vendors, correct?

A.    It is.

Q.    Okay.

A.    But it's not the only thing that was utilized for the reactive work orders.

If I remember correctly -- and you see I don't list any of the interrogatories in the exhibits, it goes back to the Bates stamp pages -- I believe that this is addressed in the interrogatory responses for Interrogatory

Page 447

Question Number 5.

And it may also be included -- I believe we talked about property damage also having a different interrogatory response. I think this may also be addressed in Tucson's Third Amended Answers to Defendants' Interrogatory, Set 1, which I believe is Interrogatory Response Number 3 that relates to property damage, where these costs may have been itemized distinctly in -- explicitly in that interrogatory response.

So without both of those, I cannot necessarily agree with you that this is the only piece of information. It is the only one referenced on Exhibit-1. But it's also referenced on Appendix B to the extent that it is indicative of those costs having been incurred in damages.

Q. If you had an actual work order relating to this alleged property damage cost, would you have cited the

Page 448

actual work order or would you have cited this letter to the student's parents?

A.    I probably would have cited both.

Q.    Okay.  And so since you didn't cite an actual work order, it's your belief that you do not have an actual work order relating to this property damage?

A.    That's fair.  I don't believe that I've seen that, based on the references within the report.

But I'd have to go back and look at the materials reviewed as detailed in Appendix B just to confirm.

Q.    This letter states, Tucson Unified School District, TUSD, is seeking restitution for district property that was damaged by student -- the student's name is redacted -- on October 27th -- and it says 1021, but I believe it's probably supposed to say 2021.

Do you see that?

A.    I don't know what it's

supposed to say.  This could have been a long time ago.

Q.   Well, the date on the letter at the top is October 27th, 2021, correct?

A.   I will agree with you that I do believe that also to be a typo.

Q.   Okay.  So you understand this is a letter in which Tucson Unified School District is seeking restitution for district property damage that was instituted by a student, correct?

A.   I see that this letter was drafted.  And it says what it says.

I have no indication that this letter was ever sent to parents of SII redacted.  I'm not aware.

This is not a transmittal letter.  There's no transmission to it. I don't know that it was sent.  I don't know if anything was received.

But we've talked about that already.

Q.   Do you know that the amount

Page 450

of $50.69 that is identified in this letter is accurate?

A.    This is the basis for the $50.69.

Q.    You do not know, though, if that is the correct -- that that's an actual amount that Tucson incurred though, correct?

A.    I believe it to be an actual amount.  But as we talked about before, I don't have a work order for this one.  So I am relying on the letter to indicate the cost for the reimbursement.

Q.    How do you perform a forensic accounting on this letter, Exhibit-17, to determine that the school actually spent the $50.69?

A.    I think you have to go back and look at the interrogatories that I told you.

The work orders are a little different under a forensic accounting insofar as they are internal costs to the school.  So they're not the same as an

CONFIDENTIAL

Page 451

invoice to a third-party vendor.

For Breathitt, they are, because they had to purchase supplies. So it was a Home Depot charge, as you may or may not remember, and Jackson Electric charge, as you may or may not remember.

But for Tucson they're handled internally. So this is the internal costs that are paid. So there's not necessarily going to be a check to verify that this amount was paid. This is the amount that was incurred as a result of the costs.

Q. The letter, Exhibit-17, states, This behavior is unacceptable and the district is required to seek reimbursement for damages caused by this student -- and then it cites an Arizona statute, correct?

A. That's what it says.

Q. And you do not have any reason to doubt that the Tucson Unified School District is required to seek reimbursement for property damages caused

Page 452

by students, correct?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know -- I'm not an expert in this, but the statute that it cites doesn't say that they're required to seek reimbursement.  It says that the parents shall be liable.

So I don't know whose legal determination this is that the district is required to seek a reimbursement because of a statute that doesn't say that they're -- that the school is required to request reimbursement.

It says that the property -- the minor who has injured the school shall be liable for all damages caused by their children or wards.

So I cannot agree with you that it says what you think it says or have represented it says, because it does not.

Page 453

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, I was just asking about this letter, which is a letter that was produced by the Tucson Unified School District that has the Tucson Unified School District's heading at the top and that you relied on for your damages calculations.

Are we on board?

A.    I relied on for the amount of $50.69 for a school chair.  That is what I relied upon.

Q.    So you think that perhaps this letter from the Tucson Unified School District is inaccurate when it says that the school district is required to seek reimbursement for damages caused by the student but was accurate when it reported the amount of damages?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I'm not saying it's accurate or inaccurate.  Your previous question was that because of the statute it was required to

seek reimbursement.  You said it was required to seek reimbursement and then it cites the statute.

Those two things are very separate.  So if you want to read it in, I'm happy to read it all into the record.

This letter, whether sent or not sent, says what it says.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Do you think that the Tucson Unified School District might be lying to parents?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  No, I don't believe that they're lying.  And I didn't indicate as much.

I'm just not going to agree that a letter that doesn't, on its face, say what you represented it to say, says that.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   Okay.  Would you agree that one thing a school district can do to

Page 455

reduce the amount of issues that it faces relating to cell phones is to ban student cell phone use in class?

ATTORNEY GRADEN:  Objection.

THE WITNESS:  I don't know that I'm qualified to give you that opinion.  I don't know that that's one thing it can or cannot do.

That may call for a legal conclusion.  It may be, you know, subject to state and federal requirements.  I don't know that some school districts are even allowed to take students' cell phones away from them.

So I can't give you an opinion on that.  And it's outside my scope as an expert for what I'm being offered here.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.   You did not calculate how your damages estimates or -- sorry.

You do not calculate how

CONFIDENTIAL

Page 456

your damages would have changed if school districts had banned student cell phone use during the school day, correct?

A.    I don't agree with that at all, because some of the depositions that we've seen, and I believe some of the testimony in this case is that certain schools or district -- schools inside of districts did attempt to ban cell phones.

So to the extent that your predicate is that it has not happened, I don't believe that to be accurate.

But to the extent that I'm relying on the people who were the boots on the ground, that whatever did happen during the periods that they're representing damages, have considered the impact of school bans -- school cell phone bans, whether they were or not instituted, in determining, through their sworn testimony and written affidavit and interrogatory responses, that the applicable damages apply, as we've talked about before, as a result of the alleged

Page 457

improper actions of the defendants.

Q. Mr. Meyers, for districts that have not implemented cell phone bans, did you calculate how your damages would have changed if the school districts had banned student cell phone use during the entire school day?

ATTORNEY GRADEN: Objection.

THE WITNESS: I'm not aware of cell phone bans one way or the other. And whether or not a school district has or has not done it has not had any impact on my opinion in relying on the persons who are aware and have been giving their opinion, which is what my opinion is based upon.

BY ATTORNEY SANDOVAL-BUSHUR:

Q. Is there anywhere in any of your expert reports, Exhibits-1A through 1F or 2A through 2F, where I can find a calculation of how any school district's damages would have changed if it had banned student cell phone use during the

Page 458

school day?

A.    Ask it again.

Q.    Is there anywhere in any of your expert reports, Exhibits-1A through 1F and 2A through 2F, where I can find a calculation of how any school district's damages would have changed if it had banned student cell phone use during the school day?

A.    That's what I thought you said.  I'll ask it -- I'll answer it again for you.

I have not considered in any way, one way or the other, whether cell phone bans have or have not been instituted for any of the school districts herein.  And it is not an opinion that I am giving anywhere.  Any opinion on the impact of school cell phone bans would already be contained in the sworn testimony provided by the people most knowledgeable who will provide testimony at trial related to the alleged improper actions of the

Page 459

defendants in this matter.

I personally have not given any weight to a cell phone ban, whether it exists or doesn't exist, or the impact it would or would not have on any schools that may or may not have instituted one at any point in time during which the damages have been calculated.

ATTORNEY SANDOVAL-BUSHUR: Let's take a break.

VIDEO TECHNICIAN:  Going off video record, 5:21 p.m.

-   -   -

(Whereupon, a brief recess was taken.)

-   -   -

VIDEO TECHNICIAN:  Back on video record, 5:35 p.m.

BY ATTORNEY SANDOVAL-BUSHUR:

Q.    Mr. Meyers, I just had one more question about Exhibit-17, which we had just been looking at, the --

A.    Yes, sir.

Q.    -- letter relating to a

Page 460

property damage incident.

Do you know why the $59.69 for a school chair has been struck-through on this document?

A.    I do not.

Q.    Okay.  And did you ask anyone from Tucson what that meant?

A.    I don't recall asking anyone from Tucson what that meant.

It may be explained in the interrogatory responses that I talked about that I think itemized these.  But I did not talk to anybody at Tucson about that.

Q.    Mr. Meyers, do you use YouTube?

A.    I would say very occasionally I will use YouTube.

Q.    What do you use YouTube for?

A.    Usually just to watch YouTube TV or watch a video.

Q.    Do you ever use YouTube to watch videos about how to do something?

A.    I don't.

CONFIDENTIAL

Page 461

Q.    Okay.  Have you ever used Snapchat?

A.    I have never used Snapchat.

Q.    Have you ever used TikTok?

A.    I have never used TikTok.

Q.    Have you ever used Facebook?

A.    I have never used Facebook.

Q.    Have you ever used Instagram?

A.    I have an Instagram account. I've never used Instagram.  I've never posted or done anything.

But I have an account, mostly to be able to monitor in case something would come up.  I do have young kids.

Q.    Do you have children?

A.    I do.

Q.    How old are your children?

A.    15 and almost 13.

Q.    Do either of your children have any social media accounts or use social media apps?

A.    They do not.

Page 462

Q.    Okay.  All right.

ATTORNEY SANDOVAL-BUSHUR:
No further questions from YouTube.

ATTORNEY DEPAZ:  I have no questions.

VIDEO TECHNICIAN:  Please stand by.  This is the videographer stating total run time by party for the record.

Joseph Sandoval-Bushur, for YouTube, is six hours, 37 minutes.

This concludes today's video deposition.  Going off video record, 5:37 p.m.

-   -   -

(Whereupon, the deposition concluded at 5:37 p.m.)

-   -   -

CONFIDENTIAL

Page 463

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

*Amanda Miller*

Amanda Maslynsky-Miller

Certified Realtime Reporter

Dated:  August 25, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

CONFIDENTIAL

Page 464

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

CONFIDENTIAL

Page 465

- - - - - -

E R R A T A

- - - - - -

PAGE    LINE    CHANGE

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

CONFIDENTIAL

Page 466

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 462, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
JEFFREY MEYERS                      DATE

Subscribed and sworn
to before me this
\_\_\_\_\_ day of _____, 20\_\_\_\_.

My commission expires:_____

_____
Notary Public

CONFIDENTIAL

Page 467

LAWYER'S NOTES

PAGE   LINE

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

____   ____   _____

CONFIDENTIAL

**[& - 19th]**                                                    Page 1

| **&** | | | |
|---|---|---|---|
| **&**  1:15 2:3,9,16 3:4,9,16 4:9,15 5:3 11:19 | 358:2 363:1<br>**10/27/21**  9:19 441:8<br>**100**  47:23 62:16,18 79:15 113:9 159:12 164:7 202:5,12 202:15 206:10 208:23 211:3,5 254:8,15 257:4 257:11 258:17 258:24 259:7 259:15,24 260:7,9 278:16 279:2 295:23 297:1 328:24 331:4,10,24 332:21 334:11 334:16 336:12 336:13,14 337:23 338:4,7 338:8,23 341:1 353:22 359:21 360:2 362:7 363:21 364:6,9 365:12,15 366:6 368:3 369:5,12,17 372:9,19,23,24 373:10,24 375:5,10,21 376:9,13,17 436:21 437:1 | **1021**  448:21<br>**10:11**  87:14<br>**10:29**  87:20<br>**11**  8:21 10:17 51:4 263:19,21 263:22 309:5 364:15,18 365:3 366:4 370:13<br>**11:40**  173:9<br>**11:55**  173:15<br>**11th**  371:19<br>**12**  6:6 9:5 22:21 51:4 63:21 64:1,15 65:2,4,11,14,20 66:10 368:8,11 368:17<br>**124**  8:10<br>**12:44**  232:21<br>**13**  6:14 9:7 167:6,23 169:4 370:24 371:3 461:20<br>**14**  6:16,19 9:10 167:7 386:9,12 390:2<br>**14th**  379:11 380:16,23 396:21 398:5 398:13<br>**15**  6:21 9:13 167:8 350:14 350:14,15,16 | 358:21,22<br>385:15 400:12<br>400:15,23<br>401:3,9,14,20<br>402:17 414:20<br>422:16 461:20<br>**159,255**  44:20<br>**16**  7:6,9 9:17 263:8 330:3 438:14,17<br>**16th**  363:1<br>**17**  7:11,14 9:18 167:8 263:9 349:19 438:12 441:4,7 442:9 442:20 446:6 450:16 451:14 459:21<br>**18**  7:16 167:9 167:13<br>**181,075**  45:12 46:12<br>**185,000**  43:18 44:5<br>**19**  7:19,21 272:15 273:1,3 273:7,10,16,22<br>**19087**  1:16 2:4 3:5<br>**19th**  14:7,21 15:10,24 16:16 17:5 21:6 179:20 363:5 |
| **0** | | | |
| **00185554**  9:17 438:17,23<br>**00185580**  9:18 441:7,16<br>**02**  64:3<br>**03047**  1:3<br>**04**  64:11<br>**05**  64:11<br>**07068**  3:11<br>**07102**  4:11<br>**07660**  4:5 | | | |
| **1** | | | |
| **1**  10:17 17:2 36:1 103:23 111:19 114:10 144:13 203:10 235:21 252:18 415:23,23 440:1 447:8,18 466:3<br>**1,043,432** 403:17 414:22<br>**1,625,737**  415:9 415:11<br>**10**  8:19 286:24 349:17,22 350:3 352:2 | | | |

CONFIDENTIAL

**[1:00 - 2:41]**                                                                          Page 2

| | | | |
|---|---|---|---|
| **1:00** 232:16 | 370:17 372:13 | **2010** 72:13 | **22** 1:9 318:24 |
| **1:18** 233:3 | 374:1 387:5 | **2014** 323:11 | 331:20 370:23 |
| **1a** 6:12 13:11 | **2,513,686** | **2016** 86:9 | 384:4 |
| 13:16,22 14:1 | 422:24 | 325:17 340:23 | **220-1100** 4:17 |
| 14:1,4 20:19 | **2,601** 337:6 | **2018** 384:22 | **2200** 3:17 |
| 21:16,24 22:11 | **20** 7:23 17:22 | **202** 2:11 4:17 | **22nd** 11:15 |
| 22:18 23:11 | 66:11 86:23 | **2021** 62:20 | **23** 384:4 386:8 |
| 24:1 203:9 | 141:14 267:19 | 448:22 449:4 | **23rd** 328:7 |
| 260:17 457:20 | 284:16 339:1 | **2023/2024** | 329:13 |
| 458:4 | 364:14 387:24 | 335:7,13 | **24** 167:14 |
| **1b** 6:15 14:11 | 388:12 389:3 | **2024** 43:19 | 362:20 372:4 |
| 14:17 318:24 | 389:11,16 | 46:9 86:10 | **24th** 374:15 |
| **1c** 6:17 15:1,7 | 390:1,6,8,20 | 323:12,24 | **25** 167:16 |
| **1d** 6:20 15:14 | 391:8,14 392:3 | 324:22 325:18 | 400:12 440:2 |
| 15:20 | 393:16 403:22 | 340:23 | 463:11 |
| **1e** 7:5 16:5,11 | 413:19 415:3 | **2025** 1:9 11:15 | **2555** 2:17 |
| 16:15 85:22 | 423:5 424:24 | 14:7,21 15:10 | **25th** 17:23 |
| 415:4 423:4 | 466:11 | 16:1,16 17:5 | 18:12 19:1,14 |
| 425:22 | **20,000** 45:17 | 17:23 18:13 | 20:4,17 21:8 |
| **1f** 7:7 13:11 | 347:22 | 19:2,14 20:4 | **26** 167:16 |
| 16:20 20:19 | **20/30** 61:15 | 20:17 43:19 | 370:2 |
| 21:16,24 22:11 | **200** 5:5 207:19 | 46:10 49:15,19 | **27** 167:15 |
| 22:18 23:11 | 207:22 208:8 | 50:7 179:20 | **273-9800** 4:11 |
| 24:2 439:18 | **2000** 394:12 | 324:1 328:7 | **27th** 448:20 |
| 441:20 457:21 | 395:1 | 329:13 362:20 | 449:4 |
| 458:5 | **20001** 4:17 | 363:2,5 371:19 | **28** 167:17 |
| **2** | **2001** 64:3,8 | 380:16,24 | **280** 1:15 2:4 |
| **2** 32:7 274:12 | 229:21 | 396:22 398:6 | 3:5 11:19 |
| 287:17 288:3 | **2002** 64:8 | 398:14 463:11 | **287** 8:11 |
| 288:12,18 | **20024** 2:11 | **2026** 42:20 | **29** 167:18 |
| 325:14 366:12 | **2004** 64:14 | **21** 57:20 | 438:11 |
| 367:21 368:2 | 65:1,10,19 | 318:24 331:13 | **2:23** 304:12 |
| 368:17 369:22 | **2005** 64:14,21 | 331:20 368:8 | **2:41** 304:18 |
| | 65:1,10,19 | 384:4 | |

CONFIDENTIAL

**[2a - 5th]**                                                                          Page 3

| | | | |
|---|---|---|---|
| **2a** 7:10 17:8,12 17:19 20:20 21:16 22:1,11 22:19 23:11 24:2 457:21 458:5 | 442:4 447:9 | **4** | **5,500** 142:5 |

**2a** 7:10 17:8,12
17:19 20:20
21:16 22:1,11
22:19 23:11
24:2 457:21
458:5
**2b** 7:12 18:2,8
**2c** 7:15 18:16
18:22
**2d** 7:17 19:5,11
**2e** 7:20 19:18
19:24
**2f** 7:22 17:8
20:8,14,20
21:16 22:1,12
22:19 23:11
24:2 457:21
458:5

**3**

**3** 8:5,18,23
9:12,16 32:6
42:24,24 43:3
43:9,13 124:2
253:10 328:6
329:12,20
330:13 364:22
365:6 373:2
378:17 380:15
380:23 386:16
386:23 396:21
398:5,13
400:18 401:6
432:11,18

442:4 447:9
**3,124,586** 86:6
423:7 424:23
**3.1** 86:12
**30** 9:7 61:17
267:20 350:17
358:23 359:4,7
359:16 360:5
361:3,5 364:7
364:10 370:16
370:18 371:4
371:11 441:3
464:16
**304** 8:13
**3047** 1:4
**305** 5:6
**309** 8:15
**30th** 86:8,10
**31** 167:19
**31605** 463:10
**32** 167:19
**329** 8:18
**33131** 5:6
**349** 8:20
**35,000** 367:4,8
**364** 8:23
**368** 9:6
**37** 462:11
**371** 9:9
**386** 9:12
**390,000** 367:12
**3:51** 377:12

**4**

**4** 8:7 51:23,23
52:2,12 124:2
274:12 370:13
439:18
**40** 61:17
428:12,12
**400** 9:16
205:13,19,22
207:16 208:5
**409** 3:18
**43** 8:6 415:23
**434-5000** 2:11
**438** 9:17
**441** 9:20
**462** 466:3
**462-6000** 5:6
**4700** 5:5
**474-6550** 2:18
**475** 42:7,18
**4:05** 377:18
**4:22** 1:3
**4th** 293:11

**5**

**5** 3:11 8:9 86:3
123:23 124:1,5
124:11 125:3
166:17,22
167:24 172:12
323:11 326:21
334:24 434:2
447:1

**5,500** 142:5
**5/19/25** 6:13,15
6:18,20 7:6,8
13:16 14:11
15:1,14 16:5
16:20
**50** 131:1,4,14
203:21,24
204:4,8,12,22
205:7 207:18
208:14 284:18
**50.69** 450:1,17
453:11
**50.69.** 450:4
**50/50** 60:22
61:13 63:4
**500** 4:16
**500,000** 415:20
**501** 3:17
**51** 8:8
**52** 372:4
**53** 372:1
**55** 4:5
**550** 4:10
**580,000** 415:24
**582,000** 420:8
**59.69** 460:2
**5:21** 459:12
**5:35** 459:18
**5:37** 462:14,17
**5th** 293:3

CONFIDENTIAL

**[6 - accounting]**                                                          Page 4

| 6 | | | |
|---|---|---|---|
| **6**  8:11 9:7 286:24 287:3,9 306:14 365:22 366:9,23 370:16,18 371:4,11 373:3 425:23 | **749128**  323:13 **763-3260**  3:18 **77550**  3:18 **777609**  323:13 **779236**  316:7,7 | 173:15 **ability**  78:1 112:16 **able**  28:6 50:10 58:11,23 71:16 91:11 117:2 | 300:20 301:2 340:4 351:15 357:3 361:2 375:14 416:9 420:14 424:7 **abundance** |

**6**  8:11 9:7
286:24 287:3,9
306:14 365:22
366:9,23
370:16,18
371:4,11 373:3
425:23
**6,444**  445:7,9
**6,984,000**
335:21 337:3
**60**  58:3 59:6
**601**  4:16
**610**  2:5 3:6
**610,000**  423:11
**624,917**  86:13
**625**  415:23
**639-9100**  4:6
**64108**  2:17
**667-7706**  2:5
3:6
**680**  2:10

**7**

**7**  8:12 304:21
304:24 306:15
358:3 359:9
429:16
**7/25/25**  7:10,13
7:15,18,20,22
17:12 18:2,16
19:5,18 20:8
**70**  60:19 61:14

**749128**  323:13
**763-3260**  3:18
**77550**  3:18
**777609**  323:13
**779236**  316:7,7

**8**

**8**  8:14 309:5,8
322:15
**80**  60:19 87:1
**80,000**  428:10
**80/20**  61:14
**816**  2:18
**85**  56:7
**877.370.3377**
1:24

**9**

**9**  8:16 304:21
329:8,16
330:10 331:2
333:13
**90s**  200:23
**917.591.5672**
1:24
**92**  242:20
**95**  56:8
**950**  42:11
**973**  3:12 4:6,11
**994-1700**  3:12
**9:05**  1:17 11:15

**a**

**a.m.**  1:17 11:15
87:14,20 173:9

173:15
**ability**  78:1
112:16
**able**  28:6 50:10
58:11,23 71:16
91:11 117:2
129:8 135:13
174:17 190:6
262:15 274:23
298:16 299:6
312:5,20
313:12 314:24
315:20 316:2
322:23 323:22
346:15,18
357:22 379:5
405:11 406:12
434:11 461:14
**above**  1:17
411:1 429:9
**absence**  195:16
197:8,13 198:9
209:17 210:19
264:17 266:13
267:4 268:19
269:15 270:9
340:14
**absolutely**
59:14,18 109:3
112:9 160:13
194:8 195:4
278:4 281:23
282:17 284:11
286:7 297:12

300:20 301:2
340:4 351:15
357:3 361:2
375:14 416:9
420:14 424:7
**abundance**
147:12
**accept**  67:20
130:13 214:18
**acceptable**
131:10
**accepted**  56:22
138:1
**access**  325:1,6
359:11
**accessing**
250:13,22
**accident**  61:10
259:17
**accordance**
370:2
**account**  461:10
461:13
**accountant**
63:13,15
109:16 412:4
**accounted**
113:3
**accounting**
33:24 35:21
36:14 37:12
40:10,12 41:13
53:14 56:19
63:10 75:2,11

CONFIDENTIAL

104:5 105:14
109:19 148:6
149:14 151:2
243:1 247:14
310:2 313:3
314:3 354:14
354:22 397:2
402:5 404:21
405:4,18
407:11 408:20
417:23 420:21
424:22 427:24
429:7 450:15
450:22

**accounts**
461:22

**accumulating**
33:16

**accumulation**
22:21

**accuracy**
109:23 111:7
130:6 133:22
136:15 137:20
138:7,10,22
140:22 141:5
164:2,4 217:11

**accurate**
108:22,24
109:2,4,7
110:3,13,20,22
112:6,18,21
114:14 117:4,7
117:12,22

118:16 120:4
129:17,23
130:1,10
133:10,15,16
135:16,21,23
137:7 139:7,24
140:10 141:2,6
141:7 142:15
142:18 143:16
147:19 148:1
212:3 215:2
217:5 220:16
231:19 246:15
248:5 419:8,13
450:2 453:18
453:22 456:12
464:20

**accurately**   35:1
105:20 130:17
132:6 138:16
141:5 317:4,7

**achievement**
81:23 82:5,10
82:14,16

**acknowledg...**
214:19 352:9
466:1

**act**   29:1 394:5
394:14 395:2

**action**   436:17

**actions**   1:6
77:4 86:22
89:12 93:9
95:11 96:18

97:22 98:20
99:11 100:1,14
106:1 107:16
113:7 116:24
117:18 118:3
119:1,8 120:13
120:24 121:22
122:3 125:24
127:13 129:19
130:4,20
131:18 132:8
133:2 136:11
137:15 138:19
139:12,13
141:9 143:19
145:14 155:17
160:18 161:7
163:11,12
164:21 165:6
165:11,22
166:1,3,9
167:2 168:4,24
172:8,9 173:1
173:2 175:5,21
175:22 176:2
176:13,19
177:9,24 178:4
178:15 185:17
186:7,10,20,24
188:9 189:9
190:10 192:8
192:16,20
193:15 194:20
197:1,20

198:10,23
199:10 200:20
201:5,11 202:7
202:18 203:5
204:9,16,19
205:1,10 206:5
207:2 223:11
227:19 231:22
238:22 239:4
243:7 244:13
245:21 247:5
248:16 251:21
253:21 254:9
254:14,20
255:12,18
256:7,24
258:14 259:1
262:6 263:8
265:5 266:8
268:2 269:5,7
270:2 272:8
273:5,12,20
278:22,24
279:4,9,12,19
282:21 285:2
289:24 290:15
291:24 299:4
300:1 321:14
354:18 355:17
359:17 360:4,7
375:2 376:5
377:8 378:12
388:9 399:3
413:8 422:10

CONFIDENTIAL

**[actions - affidavit]**                                    Page 6

| | | | |
|---|---|---|---|
| 425:3 433:7,20 | 357:2 384:10 | 326:3 345:22 | **affiant**  195:19 |
| 434:14 436:18 | 397:16 428:9 | 379:12 384:3 | **affiants**  212:8 |
| 457:1 458:24 | 430:14 450:17 | 396:4 419:5,10 | 285:24 425:12 |
| **activity**  378:19 | **add**  22:12 45:3 | **additionally** | 425:14 |
| 384:14 385:9 | 198:18 267:15 | 306:21 | **affidavit**  8:9,11 |
| 385:14 | 267:16 | **address**  32:6 | 8:13,14,20 |
| **acts**  37:4 | **added**  443:15 | 191:4,16 | 86:18 89:22,24 |
| **actual**  23:19 | **addicted**  185:2 | 341:10 | 115:14,21,24 |
| 35:24 68:12 | 185:13,24 | **addressed** | 116:4,7 119:5 |
| 76:7,22 139:22 | 186:16 187:5 | 446:23 447:6 | 123:2,4 124:5 |
| 146:13 149:8 | 187:18 | **addresses** | 124:12,15,21 |
| 196:7 215:14 | **addiction**  1:4 | 167:7,7,8,9,14 | 125:4,8 126:3 |
| 310:24 311:12 | 11:22 | 167:14,15,16 | 127:3,4,16,18 |
| 331:7 332:14 | **adding**  105:7 | 167:17,17,18 | 128:1,6,19,22 |
| 402:7 405:11 | 121:5 | 167:19,20 | 131:1,11 |
| 406:2 447:22 | **addition** | **addressing** | 153:19 154:1 |
| 448:1,6,8 | 105:15 253:16 | 188:18 189:6 | 154:13,18 |
| 450:7,9 | 308:14 316:13 | 189:14 191:24 | 155:2,7,11 |
| **actualities**  81:6 | 368:4 420:2 | 192:17 | 156:9,16,24 |
| **actually**  31:11 | **additional**  23:1 | **adds**  375:20 | 161:4 166:5,18 |
| 32:9 60:22 | 23:3,18 44:24 | **administrative** | 166:22 167:24 |
| 147:24 148:20 | 49:5,10,22,24 | 36:4 | 168:9,20,21 |
| 149:2,10,17,19 | 54:22 76:24 | **admission**  70:1 | 169:21,23 |
| 152:5 175:13 | 78:9,13 82:4 | 70:2 | 170:22 171:8 |
| 183:12 207:24 | 130:11 137:2 | **adolescent**  1:3 | 172:1,6 177:18 |
| 209:1 222:2 | 151:16,20,22 | 11:22 128:21 | 177:21 200:17 |
| 238:19 257:12 | 194:15,15 | **advance**  221:22 | 205:6 211:13 |
| 269:18 270:12 | 196:1 198:18 | 369:21 414:6 | 219:9,22 221:8 |
| 305:17 308:16 | 240:10 253:7 | **affect**  281:20 | 221:23 222:23 |
| 310:23 311:10 | 254:24 255:2 | 282:12 283:15 | 225:18,23 |
| 312:1,23 314:8 | 274:19 275:20 | 284:8 285:10 | 226:21 227:23 |
| 314:15 315:2 | 308:6 311:20 | 286:4,15 375:9 | 230:9 231:11 |
| 315:20 340:5 | 312:12 316:18 | 395:3 | 245:15 266:4 |
| 342:8 345:18 | 323:1,15 324:3 | | 266:19 281:13 |

CONFIDENTIAL

**[affidavit - agree]**                                                      Page 7

| | | | |
|---|---|---|---|
| 281:19,21 | 340:1,15 341:9 | 162:18 163:15 | 104:24 274:7 |
| 282:3,10,14 | 342:14,17 | 164:17,18 | 307:15,22 |
| 283:5,6,23 | 348:17,23 | 165:19,21 | 344:20 345:3 |
| 284:7,9 285:19 | 349:3,6,11,14 | 166:14 170:8 | 377:22 379:20 |
| 285:23 286:3,6 | 349:18,22 | 171:13 176:18 | 395:16,21 |
| 287:3,10,17,23 | 350:4,9,23 | 177:1,8 178:13 | 431:10,19 |
| 288:4,7,17 | 351:4,7,19 | 178:17,24 | **afternoon** |
| 289:8,13,16,22 | 352:1,23 358:2 | 179:5,11,14 | 50:22 |
| 290:13,18,19 | 360:1 361:16 | 185:21 186:3,4 | **aggregated** |
| 291:1,8 292:24 | 362:16 363:1 | 211:7,20 212:5 | 184:3 |
| 293:3,5,10,13 | 363:15 364:5 | 212:15,17 | **agnello**  3:10 |
| 293:19,20,23 | 456:21 | 217:20 218:6 | **ago**  46:2 71:2 |
| 294:2,7,21 | **affidavit's** | 218:12,16 | 292:22,23 |
| 295:13,14 | 169:24 | 220:20,22 | 322:22 449:2 |
| 298:7 301:13 | **affidavits**  41:1 | 222:9,12,21 | **agree**  24:3,11 |
| 302:9 304:24 | 41:7,21 89:7 | 223:23 224:5,9 | 25:4 79:16 |
| 305:5,15,19 | 89:19 90:5 | 224:24 225:14 | 82:23 85:12 |
| 306:2,11,13,14 | 108:9,12 115:8 | 226:19 227:1 | 99:17 104:2,11 |
| 307:9 308:16 | 116:11,15 | 227:12,22 | 112:6 114:15 |
| 308:24 309:2,8 | 117:4,11,22 | 228:6,11,15,23 | 116:19 123:19 |
| 309:14,21 | 118:7,10,15,20 | 229:3 230:8 | 127:23 134:7 |
| 311:8,17 | 119:10,11 | 231:2,20 246:6 | 134:10 135:10 |
| 313:10 315:22 | 120:4,9,19 | 246:14,19 | 144:9 146:16 |
| 316:9,14 317:1 | 121:17 122:2,8 | 255:8 264:22 | 147:22 148:14 |
| 318:19 319:5 | 122:12,14,17 | 266:20 267:1 | 153:4,13 |
| 319:15,18,21 | 123:7,10,17 | 268:17 280:23 | 161:21 191:11 |
| 320:10,17 | 126:12 129:10 | 281:5 283:10 | 193:2 200:10 |
| 321:20 322:14 | 129:22 130:8 | 283:13,17 | 209:7,11 229:7 |
| 326:22,24 | 131:22 132:3 | 285:5,8,11 | 233:11 249:13 |
| 327:5 328:2,10 | 132:17 133:9 | 286:11,13 | 257:16 297:9 |
| 331:14 332:16 | 134:3 136:20 | 294:11 305:10 | 297:10,18 |
| 333:22 334:19 | 143:9 144:3 | 306:24 317:15 | 313:1 334:14 |
| 338:15 339:4,6 | 145:8 152:15 | **affiliated**  43:14 | 338:20 370:19 |
| 339:10,10 | 154:7 161:18 | 51:11,16 | 387:9 415:12 |

**[agree - allocation]** Page 8

| | | | |
|---|---|---|---|
| 443:16 447:15 | 163:10 164:21 | 278:12,23 | 321:20 322:10 |
| 449:6 452:21 | 165:6,10,14,22 | 279:19 282:20 | 326:22 327:1 |
| 454:18,23 | 166:1,3,9 | 285:1 289:23 | 327:13 331:14 |
| 456:4 | 167:1 168:4,23 | 290:15 291:24 | 332:16 334:10 |
| **agreed** 11:3 | 172:9 173:1 | 300:1 321:14 | 334:15 338:15 |
| **agreement** | 175:5,22 176:2 | 330:23 354:17 | 339:23 341:9 |
| 72:18 | 176:13 185:5 | 355:16 359:17 | 343:10 350:17 |
| **ahead** 13:10 | 185:17 186:6,9 | 360:4,6 364:3 | **allison's** 124:20 |
| 44:7 103:6 | 186:20,23 | 375:2 376:4 | 125:3,8 127:17 |
| **allegation** | 188:9 189:9 | 377:7 378:12 | 128:6 168:17 |
| 130:1 262:17 | 190:10 192:8 | 388:9 399:2 | 168:19 327:5 |
| 299:3 | 192:15,20 | 401:22,22 | 328:2,9 333:22 |
| **allegations** | 193:14 194:19 | 402:23 413:8 | 339:6 |
| 170:24 229:16 | 197:1,20 | 422:9 425:2,3 | **allocable** 207:1 |
| **alleged** 86:21 | 198:10,22 | 433:7,20 | 273:19 411:24 |
| 89:11 95:10 | 199:10 200:20 | 434:14 436:16 | **allocated** |
| 96:17 97:21 | 201:5 202:18 | 436:17 447:23 | 141:21 204:15 |
| 98:20 99:11 | 203:5 204:9,15 | 456:24 458:24 | 236:1 237:19 |
| 100:1,14 | 204:19 206:4 | **allegedly** 77:4 | 254:16 387:7 |
| 105:24 107:15 | 207:2 223:10 | 102:19 103:3 | 407:1 413:18 |
| 113:6 116:23 | 227:19 231:22 | 224:1 252:24 | 413:22 428:12 |
| 117:18 118:2 | 238:22 239:4 | **allison** 8:10 | **allocating** |
| 119:1,7 120:12 | 243:6 244:12 | 115:24 116:1 | 161:8 |
| 120:24 121:22 | 245:21 247:5 | 124:6,12 | **allocation** |
| 122:3 125:23 | 248:16 251:20 | 125:15 166:17 | 40:23 41:5,17 |
| 127:13 129:18 | 253:21 254:9 | 166:18,22 | 103:13,18 |
| 130:3,20 | 254:13,20 | 167:23 168:1 | 104:1 105:9,21 |
| 131:17,18 | 255:12,18,20 | 168:14 169:9 | 106:4,7,13,17 |
| 132:8 133:2 | 256:7,24 | 169:22 170:15 | 107:1,8,12,18 |
| 136:10 137:14 | 258:13 262:5 | 225:19 229:18 | 107:23 108:1 |
| 138:19 139:12 | 263:7 265:5 | 289:12 301:13 | 108:23 109:4 |
| 141:9 143:19 | 266:7 268:1 | 318:20 319:6,9 | 109:22 110:9 |
| 145:14 155:16 | 269:4 270:2 | 319:19,23 | 110:14,24 |
| 160:18 161:6 | 272:7 273:20 | 320:8,11 321:1 | 111:9,14,18,22 |

CONFIDENTIAL

**[allocation - amount]**                                                      Page 9

| | | | |
|---|---|---|---|
| 112:4,15 | 208:18,22 | 350:5,10 | 387:12 388:2 |
| 114:12 115:9 | 217:20 218:6 | 361:22 363:16 | 388:15 389:5 |
| 115:22 116:5 | 218:11,18 | 365:12 366:6 | 389:18 390:9 |
| 116:12,14 | 220:21 221:1 | 368:3 375:6,10 | 390:21 394:2 |
| 117:3,10,21 | 222:2,11,22 | 376:18 380:11 | 429:10 |
| 118:12,14 | 223:16,18 | 380:18 381:2,4 | **altos**  385:10 |
| 120:3,8,18 | 224:3,8,11,23 | 381:8 382:15 | **amanda**  1:18 |
| 121:13,16 | 225:12,16,22 | 387:2,24 389:4 | 12:6 463:10 |
| 125:19 129:9 | 226:2,11 247:4 | 389:17 390:8 | **amend**  23:3 |
| 129:13,23 | 247:11 253:24 | 391:9,14 392:3 | 295:12 339:16 |
| 130:7 131:9 | 254:10 257:11 | 393:16 395:13 | **amended**  8:21 |
| 132:22 133:1 | 258:17 259:7 | 396:17 397:8 | 9:11,14 295:17 |
| 133:19 134:6 | 261:7 262:3 | 397:12,19 | 295:19 319:18 |
| 134:15,19 | 266:6 267:22 | 398:1,8,17 | 320:16 362:18 |
| 135:14 136:8 | 280:20 281:2 | 399:1 401:11 | 364:19 365:4 |
| 136:16 137:7 | 281:10,21 | 402:9 403:10 | 374:13,14 |
| 137:13,20 | 282:13 283:16 | 403:22 405:22 | 380:14,21 |
| 138:11,22 | 283:22 284:6,9 | 413:19 420:23 | 386:14,21 |
| 139:9 140:24 | 285:11,18 | 425:16 432:7 | 396:20 398:4 |
| 143:8 144:8,11 | 286:2,5,16 | 432:13,22 | 398:12 400:16 |
| 144:19 145:1,7 | 287:11,19 | 433:10,17 | 400:24 401:4 |
| 153:22 154:16 | 288:2 298:21 | 434:15 435:1 | 407:17 432:10 |
| 156:9,15 157:7 | 299:15,21 | 436:15,22 | 432:16 433:4 |
| 157:23 158:8 | 305:11,18,24 | **allocations** | 447:7 |
| 158:21 160:21 | 306:7,16 | 273:11 292:5 | **amends**  376:12 |
| 161:11,17 | 318:17 319:2 | 292:13 307:4 | **amount**  61:9 |
| 162:19 169:17 | 322:7 327:2,10 | **allow**  78:8 | 78:10 95:24 |
| 175:16 184:11 | 328:10,24 | 190:17 311:3 | 97:6,16 98:3 |
| 185:22 186:14 | 330:14,19 | 311:19,21 | 99:3,14 100:4 |
| 195:9,14 196:3 | 331:4 341:1,15 | **allowed**  455:15 | 104:4 108:20 |
| 196:14,18,22 | 341:24 343:2,6 | **allowing**  32:16 | 133:6 158:12 |
| 197:6,11 | 343:20 344:1,4 | **alto**  382:4,10 | 159:2 195:15 |
| 203:20 204:6 | 344:15 348:5 | 383:1,2 384:18 | 196:23 197:7 |
| 206:9 207:17 | 348:15,20 | 385:18,22 | 197:12 211:1 |

CONFIDENTIAL

**[amount - apply]**

247:24 248:3,6
268:21 269:17
270:11 333:15
335:21 393:22
404:7 415:8,15
415:18 417:4,6
429:1 430:4
444:6 449:24
450:7,10
451:11,12
453:10,19
455:1
**amounts** 49:5
210:18 310:24
311:9,11,11
338:19 340:22
429:14
**analysis** 26:9
32:14 75:8
82:12 106:16
180:20 192:13
241:15 264:16
266:12 276:17
280:18 308:9
407:11 408:20
422:8 444:11
**analyst** 36:16
**analysts** 36:18
**analyze** 33:20
34:13 41:11
**analyzed** 221:5
268:10
**analyzing**
387:18 405:3

**andrew** 390:15
**anita** 334:21
**answer** 10:5
13:3 31:15
38:24 46:22
47:7 56:12
57:19 59:5
66:17 70:17
77:18 83:23
90:5 91:11
97:3,14,24
99:1 100:21
101:6,14,23
102:9 120:16
121:3,5 123:10
128:18 129:1
137:12 159:19
162:14 170:16
170:19 171:2,4
174:10 179:7
186:10,24
187:7,20 188:5
188:14,22
189:2 190:14
193:17 205:11
209:20 216:16
222:18 223:19
224:17 228:21
229:22 230:24
240:20 269:22
275:15 300:20
303:15 326:12
334:23 337:14
345:6 355:6

360:13 366:10
373:3,14,20
374:7 380:10
381:14 392:15
392:19 397:9
410:2 417:15
423:22 425:7
458:11
**answered**
100:9 127:21
133:13 139:3
163:3 166:11
177:12 184:14
187:10 423:21
**answering** 54:6
90:1 113:23
162:13 163:17
**answers** 8:17
9:14 31:9
93:18 129:3
172:8 195:13
214:14,15,21
215:3 328:6
329:10,17
330:11 396:20
398:4,12
400:16,24
401:4 432:4,10
432:17 433:5
435:24 447:7
466:4
**anticipate**
49:21

**anticipating**
363:12
**anybody**
226:14 363:18
373:10 412:16
435:14 460:13
**anymore** 71:17
**anyway** 190:6
**apologies**
350:15 366:2
**apologize** 37:19
339:15
**appear** 21:4
337:6
**appearances**
2:1 3:1 4:1 5:1
**appears** 305:7
371:13 372:15
441:17 442:21
444:1,2
**appendix** 203:9
323:10 425:23
439:17,19
442:3 447:19
448:15
**applicable**
411:12 435:1
456:23
**application**
322:6 389:10
**applied** 299:16
299:21
**apply** 97:10
207:17 389:4

CONFIDENTIAL

**[apply - assign]**

390:8 411:11
413:5 456:23
463:18
**applying**
387:24 434:15
**apportion**
183:14,21
**apportioned**
98:9
**apportionment**
96:12 97:12
98:13,22 196:4
**appropriate**
139:17 272:16
272:23 375:11
389:16 391:9
391:14 464:6
**approximate**
86:12 333:14
403:6,17,24
404:1,4,8
406:1,5,7,12,20
407:14,15
408:3,7,11,13
411:17,18,23
414:21 416:5
416:13,17
418:4,22
420:10 422:7
422:23 423:17
424:20
**approximately**
58:7 64:8,14
64:21 65:1,10

65:19 367:10
367:14 415:24
420:7 423:11
**approximates**
402:3
**approximation**
404:11
**apps** 461:23
**april** 323:24
324:21 328:7
329:13 380:16
380:23
**arbitration**
62:15
**archdiocese**
67:14
**arising** 169:5,9
**arizona** 451:18
**arrive** 217:19
218:5,11,18
223:17
**arrived** 381:8
393:16 398:17
432:22 433:10
**arriving** 220:21
222:10,21
**ascher** 29:10
**asher** 8:6 33:7
33:11 34:16
35:8,16,17
37:16 38:1
43:4,10,15
44:20 45:11
46:10,16,19

47:3,4,6,10,14
47:16,18 48:4
48:13,18,24
49:1,8 59:22
60:2 63:2
312:1,20
**asher's** 59:23
**ashley** 29:9
**aside** 27:2
178:7,10
202:21 306:12
314:21
**asked** 40:20
75:7 82:2
89:17 100:9
106:20 114:3
127:21 133:13
150:13 151:15
162:4,6,9
163:3 166:11
172:13 177:12
184:14 187:10
208:16 224:10
225:1 234:21
236:3 239:13
239:22 240:1
240:12 241:4
252:14 253:11
295:21 311:16
336:22 342:11
372:18,22
373:8 404:22
405:7 407:10
408:19 409:6

424:17
**asking** 13:2
25:10 27:1,2,6
29:24 55:8
60:1 84:20,24
93:1 103:22
106:2 108:15
110:16 113:11
113:14,20,23
121:8 122:20
123:1 138:6
139:22 146:19
167:3 168:11
168:16,18
191:6 208:9
266:9 277:18
289:10 294:24
295:8 311:4
320:2,4,7
328:16 329:6
337:13 341:8
352:7 366:1
379:6 392:13
409:23 411:5
428:19 435:22
443:22 453:3
460:8
**aspects** 169:13
170:1 171:17
**assert** 337:10
**asserting**
336:11 340:2
**assign** 205:7
282:21 373:10

CONFIDENTIAL

**[assigned - attorney]** Page 12

**assigned** 141:8 204:7 208:6 282:3,10 283:12 285:7 286:12 369:5 369:13 374:4 375:8 388:10 424:24 436:21 437:1
**assigning** 208:13
**assignment** 39:19,22 40:5 40:23 41:5 74:9,14 81:9 81:20 82:19 83:10 84:1 144:16 145:17 217:17 218:3 233:6 234:14 235:10 236:6 238:2 239:6 280:6 318:3,9 348:11 380:5 396:11 409:4 411:8 413:3 414:4 420:20 421:2 431:23
**assigns** 284:21
**assist** 72:16 216:3
**assistance** 31:5 32:19,22 33:4 33:9 34:16

35:8,15 36:2 36:22 37:2,8 37:15,24
**assistant** 37:5 378:3
**assisted** 33:14 37:10 69:23
**associate** 36:20
**associated** 251:22 264:10 269:3 298:21 299:1 302:21 342:22 388:11 402:22 404:10 431:4
**associates** 33:14
**association** 36:17
**assume** 27:7 59:24 108:22 110:16 113:8 113:20 114:2 119:17 120:2,7 120:17 121:12 121:15 127:2 133:8,14 157:6 157:14,22 185:10 191:6 294:24 295:9 299:9 320:3
**assumed** 109:3 129:14,24 354:4 422:11

434:17
**assumes** 159:16 258:24
**assuming** 138:13 211:2
**assumption** 138:3 144:10 165:5 186:5 244:21 390:16 391:7,13
**assumptions** 103:20,20 132:12 443:23
**attached** 25:2,2 85:22 362:6 366:14,16,19 464:12 466:6
**attachments** 353:2
**attempt** 180:6 181:4 189:23 456:9
**attempting** 424:18
**attempts** 350:19 358:24
**attend** 71:16
**attention** 23:2
**attest** 283:7 319:16 355:14
**attested** 86:17 216:6 265:2 284:19

**attesting** 311:8
**attorney** 6:6 12:15 13:9,24 14:2,16 15:6 15:19 16:10 17:1,17 18:7 18:21 19:10,23 20:13 32:23 33:3 42:23 43:7 51:15,22 52:7 69:7 87:9 87:21 97:2,4 100:8,18,24 114:18 115:4 121:9,11 122:19,23 123:22 124:9 127:20 128:2 128:11,16 133:11 134:1 135:17 136:13 136:18 137:4 139:1,15 140:14 141:11 141:18 143:2 145:3,6 146:10 146:17 150:9 152:9 153:7,17 153:23 154:11 154:19 155:21 157:12,18 158:16,19 159:7,20 160:3 160:6,12,15

CONFIDENTIAL

**[attorney - attributable]**

162:1,16 163:2
164:14 166:10
166:15 167:11
167:21 170:13
170:17 173:6
173:16 174:20
175:24 177:11
178:2 180:11
181:2,9,18
182:1,4,11,19
184:13,23
187:9,14 188:6
188:16 189:17
189:21 190:22
191:2,18,20
192:21 193:20
194:7,10
205:20 206:7
206:17 207:14
209:6,13,19
210:16,21
211:6 214:6
215:4,20 216:5
217:22 218:1
218:20 219:6
219:14,18
220:2,17,23
221:10 222:24
223:13 224:12
224:20 225:3
225:11 226:5,8
227:5,9,14
228:4 229:4
230:5 231:12

232:2,9,15,18
233:4 241:21
243:18 249:15
249:18 250:23
251:8 254:3,17
254:22 255:6
256:3,9 257:14
258:15,22
259:5 262:12
264:14 268:23
269:9,20 270:7
270:13,18
271:13 272:12
272:19,21
281:22 282:1,5
282:8,15 283:9
283:24 284:4
284:10 285:4
285:13,16
286:23 287:8
292:7,11 297:7
297:12,16,22
297:24 298:2
300:9,13 301:8
302:1 304:9,19
305:4 309:4,13
315:5,7 320:1
320:6,13,22
325:3,7 329:7
330:2,6 333:17
334:5 336:18
338:5,10
339:21 341:18
341:20 342:2

342:13 343:4
343:17 349:16
350:2 351:9,17
355:2,19 356:1
356:4 361:24
362:9 364:13
364:24 365:2
367:16 368:7
368:15 370:8
370:10,22
371:9 373:15
373:21 374:5
375:4,13
376:15,21
377:9,19 386:7
386:19 387:15
387:22 389:7
389:14 390:24
391:4 392:6
393:14 394:7,9
394:15,21
400:11,22
404:14 406:15
407:3,7 408:9
408:14 409:11
409:22 410:9
412:5,13,18,19
413:24 414:18
419:18,19
421:5,8,10,16
430:23 431:5
437:10,16,21
437:24 438:10
438:21 441:1

441:12 444:21
445:5 452:2
453:1,20
454:10,14,22
455:4,21 457:8
457:18 459:9
459:19 462:2,4
464:16
**attorneys**   28:12
28:18 29:7,10
31:1,6 32:20
38:2,18,23
39:2,8,11
50:14,17 51:7
51:11 57:17,22
108:2,4,16
150:2,6 214:4
214:10,20
215:8,11,24
216:9 224:7,16
224:22 226:3
226:12,24
227:11 228:14
228:15 241:14
282:4,12
283:14 294:9
324:8,17 325:9
341:22 409:6
410:6 418:10
418:15 419:16
421:4,9,12,15
**attributable**
95:16 131:2,5
132:1,19 134:4

CONFIDENTIAL

**[attributable - basis]**

| | | | |
|---|---|---|---|
| 140:3,12 | **avenue** 2:10 | 447:19 448:15 | **banned** 456:2 |
| 141:15 145:20 | 4:16 | **back** 31:8 | 457:6,24 458:8 |
| 146:2,8 157:9 | **average** 58:18 | 57:10 70:24 | **bans** 456:18,19 |
| 158:1,10,23 | **award** 259:23 | 84:5 87:19 | 457:4,10 |
| 181:21 182:7 | **aware** 28:7 | 90:8 109:13 | 458:15,20 |
| 183:1,6 194:5 | 46:5 125:16 | 173:14 182:2 | **based** 47:20 |
| 245:6 251:11 | 172:22 223:1 | 184:4 185:6 | 80:24 86:14 |
| 252:10 261:3 | 240:3 255:14 | 202:2 219:16 | 101:7 102:1,11 |
| 261:21 271:2 | 262:7,13 | 223:20 233:2 | 105:22 116:20 |
| 288:8,19 289:1 | 265:18 271:8 | 236:15 237:7 | 130:1 186:6 |
| 327:16,22 | 271:14 282:2 | 253:5,10 263:8 | 246:5 290:3 |
| 334:12,17 | 283:21 293:24 | 269:22 275:16 | 301:12,18,19 |
| 336:16 361:4,6 | 352:18 373:9 | 278:19 304:17 | 307:5 331:13 |
| 377:6 | 375:15 376:16 | 311:3 318:13 | 363:23 379:1 |
| **attribute** 265:5 | 385:19 390:18 | 322:9,24 358:1 | 382:22 405:10 |
| 267:21 272:17 | 394:10,17 | 359:9 370:12 | 417:8 448:11 |
| 272:24 273:4 | 395:9 416:18 | 377:17 385:8 | 457:17 |
| **attributing** | 416:19,21 | 385:13,15 | **bases** 21:19 |
| 372:24 | 417:2 423:24 | 394:20 419:2 | **basically** 40:9 |
| **audit** 147:8,11 | 424:6 437:17 | 446:22 448:13 | 41:12 |
| 313:3,4 | 437:22 438:5 | 450:18 459:17 | **basis** 22:10 |
| **audited** 32:7 | 445:12,13 | **bacon** 2:16 | 42:6 50:1,4 |
| 110:2 151:19 | 449:17 457:9 | **bad** 248:19 | 89:14 121:24 |
| **auditor's** 75:5 | 457:15 | 259:18 | 122:16 123:3 |
| **audits** 148:2 | | **bag** 55:15 | 126:2,8,10 |
| **august** 1:9 | **b** | 337:2 | 149:17 156:20 |
| 11:14 49:15,19 | **b** 6:9 7:2 8:2 | **balance** 310:14 | 168:18 267:19 |
| 463:11 | 9:2,7 104:10 | 310:15 324:10 | 284:13 319:22 |
| **automobile** | 111:18 135:8 | **ball** 198:8 | 320:10 323:20 |
| 259:17 | 135:12 370:16 | 286:22 | 328:23 330:24 |
| **available** 31:19 | 370:18 371:4 | **ballpark** 58:12 | 339:19 340:2 |
| 31:23 32:15 | 371:11 401:19 | **ban** 455:2 | 340:24 369:16 |
| 147:6 315:15 | 402:17 422:17 | 456:9 459:3 | 376:17 382:14 |
| 316:16 325:22 | 439:17,19 | | 387:23 389:10 |

CONFIDENTIAL

399:5,22
416:24 421:24
450:3
**bates**  6:12,15
6:17,20 7:5,7
7:10,12,15,17
7:20,22 8:9,11
8:12,14,16,19
8:21 9:5,7,10
9:13 13:16
14:11 15:1,14
16:5,20 17:12
18:2,16 19:5
19:18 20:8
124:5 147:13
287:3 304:24
309:8 310:6
316:7 323:8,12
324:4,14 326:4
326:9 329:16
347:1 349:22
364:18 368:11
371:3 386:12
400:15 438:23
439:7,12 440:3
441:16,23
442:23 443:1
446:22
**bear**  437:13
**bears**  437:8
**becker**  3:11
**beepers**  201:1
**beginning**  84:6

**behalf**  14:8,22
15:10 16:1,16
17:6,23 18:13
19:2 20:5,18
26:11,13,14,17
26:18 216:1
301:23
**behavior**
256:12,20
451:15
**behavioral**
191:4,12,17,24
192:18,23
193:4,19
**belief**  118:19
168:20 169:23
296:11 382:8
448:7
**believe**  21:1
22:1 25:5 26:7
26:21 38:21
42:9 51:14,18
51:20 52:14
58:2 65:13
72:10 80:17
82:14 92:18
93:2 95:22
104:20 109:21
111:13 112:24
117:6 118:14
119:18 123:19
130:9 135:20
135:22 136:21
139:17 142:1

142:10,12
146:14 157:4
169:2,3,8
209:21 214:18
218:22 224:15
230:15,22
245:13 251:18
265:24 274:16
277:15 284:2,3
302:8,18 303:4
303:16 305:21
310:6 318:21
323:5 339:1
340:1 343:22
347:1 348:19
349:1 350:7
351:13 352:14
353:3,20,24
355:6 360:17
362:12,18
363:17 365:8
379:8 381:19
383:18 384:10
391:21 392:1
392:17 399:9
407:5 413:13
414:2,13 416:9
421:24 425:12
425:14,17
431:13 432:19
434:1 436:2
437:5 439:9
446:23 447:3,8
448:11,21

449:7 450:9
454:16 456:6
456:12
**believed**  181:20
182:6 183:1
292:20 293:6
293:14 376:8
408:11 413:18
421:21 422:1
424:12
**believes**  255:24
283:22 284:2
284:14 285:8
**bellwether**
20:22 21:9,19
23:8 30:24
107:2,11
111:19 144:18
144:24 145:18
145:24 146:6
211:24
**bellwethers**
25:7 30:14
104:21 132:13
251:19 265:20
317:17 420:16
**beneath**  248:22
**beneficial**
280:14
**benefit**  79:8,12
80:10 83:17,21
87:2 205:8
**best**  13:7 81:1
81:18 129:2

CONFIDENTIAL

**[best - buckets]** Page 16

198:11 199:7
201:19,24
426:22 427:24
**better** 91:11
98:24 103:7
152:24 153:1
176:15 196:12
303:24
**beyond** 159:14
202:10 258:5
**big** 69:21 72:14
383:6
**bilateral** 142:5
**bill** 45:24
**billed** 42:18
43:17 45:1,4
45:12,17 46:12
48:16,22 50:3
**biller** 45:10
46:10
**billing** 45:22
49:22
**billings** 43:13
**bills** 46:7
**binder** 13:12
17:8
**bipc.com** 4:12
**biscayne** 5:5
**bit** 35:6 47:15
269:13 322:9
358:20
**block** 350:19
359:1

**blocks** 359:11
443:14
**board** 6:21
7:18 9:10
15:15 16:1
19:6,15 66:5
66:14,21,24
67:1,3,6,15,22
68:4,8,18,23
69:13,15,17,19
386:13,20
453:9
**boards** 66:1,7,9
66:20 67:21
79:15
**body** 279:24
444:4
**bolster** 24:9
**bonnin** 3:16,16
**booked** 237:2
**boots** 273:17
456:14
**borne** 202:6
234:23 235:22
237:6 247:6
**bottom** 366:9
366:23 370:1
372:8
**boulevard** 2:17
5:5
**box** 201:20,22
**boy** 67:7
**boyce** 5:4

**bp** 72:12 73:1
**break** 13:5
59:19 87:7,10
173:7 184:4
232:17,19
304:10 377:10
459:10
**breaking** 173:5
**breathe** 426:3,6
426:11 427:3
**breathitt** 6:13
7:11 13:17
14:5,8 17:13
17:20,23 20:23
21:11 26:10
115:7,12,14
116:10 156:2,6
156:10 200:15
203:8,23
207:23 208:1
211:9,13
212:14 225:13
229:12 252:3,6
252:19 260:18
274:1,7 277:9
277:19,22
280:7,21 281:3
287:12,20
288:2 298:5,12
300:4,15,20
301:1 305:11
306:1,8,16
307:5 316:23
318:14 322:4

322:10 451:2
**breathitt's**
279:5
**brief** 87:16
173:11 304:14
377:14 459:14
**bring** 371:22
**british** 72:13
**broad** 4:10
**broader** 91:4
**brody** 3:9
**broke** 278:19
**broken** 59:21
**brother** 69:5,14
69:22 70:4
**buchanan** 4:9
**bucket** 32:11
60:20 61:16,20
61:23 62:3
175:10,11,17
**buckets** 36:7
38:13 60:6
73:4 103:15
104:11 135:7
147:15 175:8
207:13 237:21
239:12,19,21
240:7,7,13,19
241:5,9,17
242:11,13
243:1 244:22
267:7 315:11
332:11 334:2
337:4

CONFIDENTIAL

**budget** 31:20 32:6 233:14 234:10 325:23

**budgets** 243:14

**building** 201:16

**bullying** 173:17 173:20

**bunch** 69:23

**bushur** 2:9,12 6:6 12:15 13:9 13:24 14:2,16 15:6,19 16:10 17:1,17 18:7 18:21 19:10,23 20:13 33:3 42:23 43:7 51:22 52:7 69:7 87:9,21 97:4 100:18,24 115:4 121:11 122:23 123:22 124:9 128:2,16 134:1 136:13 137:4 139:15 141:11 143:2 145:6 146:17 152:9 153:17 154:11 155:21 157:18 158:19 159:20 160:6 160:15 162:16 164:14 166:15 167:21 170:17 173:6,16 175:24 178:2 181:2,18 182:4 182:19 184:23 187:14 188:16 189:21 191:2 191:20 193:20 194:10 206:7 207:14 209:13 210:16 211:6 215:4 218:1 219:6,18 220:17 221:10 223:13 224:20 225:11 226:8 227:9 228:4 230:5 232:2,18 233:4 243:18 249:18 251:8 254:17 255:6 256:9 258:15 259:5 264:14 269:9 270:7,18 272:12,21 282:1,8 283:9 284:4 285:4,16 286:23 287:8 292:11 297:7 297:16,24 298:2 300:13 302:1 304:9,19 305:4 309:4,13 315:7 320:6,22 325:7 329:7 330:2,6 334:5 338:5 339:21 341:20 342:13 343:17 349:16 350:2 351:17 355:19 356:4 362:9 364:13 365:2 367:16 368:7,15 370:10,22 371:9 373:21 375:4 376:15 377:9,19 386:7 386:19 387:22 389:14 391:4 393:14 394:9 394:21 400:11 400:22 406:15 407:7 408:14 409:22 412:5 412:19 414:18 419:19 421:8 421:16 431:5 437:16,24 438:10,21 441:1,12 445:5 453:1 454:10 454:22 455:21 457:18 459:9 459:19 462:2 462:10

**business** 47:21 53:13 54:22 55:17 56:20 62:7,11,12 71:9,13,22 74:7 78:2 201:15 202:2 236:14 378:4

**buy** 201:20,22

**byrne** 3:9

**byron** 9:9 29:19 220:6 277:11 302:8 344:21 345:4 362:5 366:13 367:20 370:16 371:6

**bytedance** 5:8 5:8

**c**

**c** 104:10 111:4 135:12 203:9 425:23 442:3

**caddies** 203:12

**calculate** 70:20 71:21 116:20 382:3 408:24 409:7,13,19 410:6,12 411:10 412:8 413:4 415:6,13 424:17 445:7 455:22,24 457:4

**calculated** 46:13 70:15

CONFIDENTIAL

**[calculated - cancelled]**

72:7,22 75:15
75:19 96:16
97:20 98:19
99:10,19,24
100:12 111:11
133:23 165:10
175:4 181:23
182:9 183:3
184:8 199:2
235:20 251:16
252:2 299:20
338:13 339:14
397:15 404:12
415:19 416:4,7
416:12 418:16
419:1 423:5
459:8
**calculates**
203:7
**calculating**
30:23 40:1
61:1,11 71:12
96:9,10 145:11
210:15 223:9
361:19 409:20
422:8 444:17
**calculation**
35:19 40:10
41:23 43:24
57:3 72:17
76:16 77:6
103:21 109:10
113:12,15,21
115:5 134:11

135:1 138:4,8
147:2 149:4
184:17 203:16
298:5,12,15
302:6 315:2
321:23 322:2
322:18 353:9
353:12 354:24
356:21 375:12
378:11 381:18
382:18,21
383:20 395:8
399:17 400:1
401:18 419:15
419:15 421:19
423:16,19
424:10,19
433:24 434:6,9
434:21 437:3
441:21 442:7
446:1,8 457:22
458:6
**calculations**
22:7 36:1
40:24 41:6
60:9 71:10
95:19 97:10
102:15,23
104:13 106:5
109:1,6,11
110:8,12,19
112:19,21
113:19 114:6
116:8 124:17

133:15 134:23
137:17 139:18
144:20 145:2
146:21 148:22
150:8 152:12
152:19 157:8
157:24 158:9
158:22 159:21
160:7 164:2,5
165:3 190:8
195:10 211:21
212:12 213:7
233:9 234:17
235:4,12 236:9
236:21 256:16
261:16 280:22
281:4 287:12
287:21 289:2
294:22 299:13
300:7,18 301:7
302:15 303:3
303:14 312:3
312:22 314:10
318:19 319:4
321:9,18
324:11,20
325:11 327:3
348:17,22
352:21 354:8
355:24 356:9
380:13,20
396:19 398:3
398:10 399:8
399:14 420:2

432:9,15 435:7
436:5 453:8
**calculator**
44:11
**calendar** 50:6
**california** 1:1
12:2
**call** 30:18 60:8
60:9 66:11
78:4,5,23
114:7 143:15
150:20,21,23
150:24 165:8
176:10,11
188:23,24
233:17,20
257:2 274:17
345:17 379:17
406:3,4 455:10
**called** 33:6
69:20 251:24
260:13 310:7,8
334:19 383:3
402:1 422:2
**calls** 249:22
**calm** 426:3,7
426:11 427:3
**camel's** 278:19
**campaign**
237:19
**campuses**
367:11,15
**cancelled** 149:7

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **capability** 312:18 | **carrying** 286:21 | 106:17,21 107:16 115:1 | 350:6 352:11 359:22 374:13 |
| **capacity** 54:18 68:15 370:21 | **case** 1:3 14:5 14:19 15:8,22 | 117:16 123:20 125:16,18 | 397:2 407:13 408:22 410:19 |
| **capital** 237:19 239:14 240:13 241:17 243:13 | 16:13 17:3,20 18:10,23 19:12 20:2,15 25:20 | 126:16 127:9 128:20 140:19 141:23 142:11 | 422:9 443:9 456:7 461:14 **cases** 20:22 |
| **capitalize** 291:11,16 | 25:23 26:3 27:13,21 28:6 | 144:16 145:17 148:17 154:2,4 | 21:10,13,19 24:14 25:14 |
| **capitalizes** 291:13 | 28:10,16,21 30:9 33:15 | 155:7 156:17 157:2 159:12 | 30:2,13,24 53:21,24 54:24 |
| **car** 61:10 | 34:15 35:7 | 159:14 161:9 | 58:3,24 59:6,6 |
| **care** 60:12 61:8 | 38:19 39:2,10 | 163:17 164:13 | 59:9,11,15 |
| **career** 40:3 57:20 59:1 71:20 77:24 210:4 260:11 | 40:5 41:16,20 42:4,8,17 43:10 44:6 48:8,10 49:14 | 165:14 172:23 180:6 181:4 185:11,16 186:19 187:7 | 60:13,15,17 61:6,18,24 62:5,13,14,15 67:9 72:9,24 |
| **carefully** 290:22 464:4 | 49:18,22 50:9 58:15 61:7,10 | 187:20 188:5 188:11 190:11 | 82:17 96:3 104:22 126:18 |
| **carella** 3:9 | 61:22 67:11 | 200:21 201:6 | 147:10 149:7 |
| **carellabyrne....** 3:12 | 70:15,19,20 72:7,22 73:17 | 202:7 210:2 215:12 217:17 | 154:23 183:10 207:4 211:24 |
| **careplus** 86:5,7 410:23 422:19 422:24 423:7 423:17,20 424:11 | 74:8,13 75:15 75:20 76:3,10 76:23 81:9,20 82:13,19 84:10 86:11,21 88:2 | 218:3 226:7,15 226:19 227:18 233:6 236:4 239:6 240:3,22 241:4 242:14 | 212:3 239:17 252:17 258:1 259:22 277:7 312:9 **catalyst** 200:21 |
| **carlos** 4:4 51:20 | 88:8,20 91:3 91:15,18 92:2 | 246:12 273:8 291:20 292:3 | 260:8 **catastrophic** |
| **caroline** 34:21 35:2,3,12 37:9 37:10 | 92:15 93:13,18 93:22 96:4 98:18 99:7 | 299:1 302:22 308:18,23 309:20 313:7 | 61:8 **categories** 102:16,24 |
| **carpet** 201:18 201:24 | 101:5,14,23 102:9 103:9 | 323:23 328:1 340:6 347:8 | 332:10 333:20 336:24 367:1 |

CONFIDENTIAL

373:11
**category**  60:7
  332:5,10 333:7
  333:8 335:1,19
  337:19 340:20
  446:12
**catholic**  69:10
**causal**  94:3
**causation**  94:1
  94:4,12,15,19
  94:21 98:12
  174:24 180:21
  258:8
**cause**  23:2
  94:13 174:24
  226:21 229:11
  258:3 260:8
  279:5 295:16
  436:16
**caused**  94:9,18
  96:1,17 97:7
  97:16 98:4
  99:4,15 100:5
  116:23 117:17
  118:2,24 119:7
  129:19 133:4
  137:12,14
  138:18 139:10
  145:13 154:3
  155:15 158:14
  159:5,13
  172:14 194:19
  196:23 224:2
  229:24 243:8

256:6 258:9,13
260:8 265:17
272:6 273:12
279:13 285:1
334:3 425:3
433:6,20
436:19 451:17
451:24 452:19
453:17
**causes**  161:5
**caution**  147:13
**caveat**  24:4
  212:20 239:11
**caveats**  70:6
  271:6
**ccsd**  316:7
  323:13,13
**cdw**  378:9
  382:5,10 383:6
  383:17 385:22
  387:13 388:2
  388:16 389:6
  389:19 390:10
  390:22
**ceases**  192:11
**cecchi**  3:9
**cell**  200:22
  201:1 202:14
  202:22 203:12
  203:12 249:21
  249:23,24
  250:2,3,17
  353:18 357:15
  362:8 363:22

367:2,3,6
369:1,6,17
374:2 375:6,22
376:19 455:2,3
455:15 456:2,9
456:18 457:3,6
457:10,24
458:8,14,19
459:3
**center**  5:4
  429:16
**certain**  22:5
  66:20 83:18
  94:24 103:10
  169:13 170:1
  171:16 176:9
  221:12 239:12
  240:12 241:7
  246:7 308:8
  334:18 336:24
  456:7
**certainly**  75:2
  80:20 184:21
  192:11 210:1
  210:12 220:4
  231:2 257:17
  258:5 263:3,11
  328:1 355:9
  361:9 364:7
  369:21 413:2
  441:22
**certainty**
  175:12

**certificate**
  463:1
**certification**
  11:4 463:17
**certified**  1:19
  36:16,18 63:12
  463:11
**certify**  463:4
  466:3
**certifying**
  463:21
**cfo**  30:4 211:17
  230:16,16,19
  230:20,22,23
  277:4 308:2
  311:7 312:8
  357:1,8 360:23
**chair**  453:11
  460:3
**challenger**  4:5
**chan**  5:13
  11:12
**change**  40:5
  109:23 110:7
  111:3,6 133:20
  133:20 164:1
  194:12 195:16
  195:22,24
  197:8,13 198:3
  198:4,5 295:14
  307:4 465:3
**changed**  34:22
  456:1 457:5,23
  458:7

CONFIDENTIAL

**[changes - clearly]** Page 21

**changes** 110:5
  112:18 216:14
  320:20 417:12
  417:17 418:5
  464:11 466:5
**characterize**
  279:11
**charge** 440:8
  451:4,6
**charges** 316:10
  323:18 385:17
  430:2
**charity** 81:3
**charleston** 6:16
  7:13 8:17
  14:12,18,22
  18:3,9,13
  20:23 21:11
  26:12 31:18,19
  32:8 115:7,20
  116:10 124:17
  132:14 166:19
  211:9 212:14
  225:17 229:18
  252:11 301:4
  301:12,24
  307:16,22
  308:2,10 310:1
  311:24 312:17
  312:19,23
  313:13 314:6,8
  314:10,11,23
  315:8,13
  317:16 318:4

318:10,18
  319:3 321:9,18
  321:23 322:17
  323:19 324:9
  324:18 325:14
  327:2,9,15,20
  328:11 329:1
  329:11,19
  330:12 331:3
  334:22 335:8
  335:14 336:11
  337:9 338:7
  340:8 341:2,6
  342:1
**charleston's**
  314:24 325:1,8
  325:23 327:21
  329:9 330:10
**chart** 221:2,6
  291:12,14
  302:21 303:8
  303:17 332:5,7
  336:5 372:8
  414:6 417:24
  422:4 425:6
  435:10,17,24
**charts** 183:6
**check** 1:15 2:3
  3:4 11:19 21:4
  44:7 252:6
  316:19 357:11
  451:10
**checked** 213:19

**checks** 149:8
  311:12
**chief** 274:18
  276:15 277:12
  360:24 374:17
**children** 83:8
  315:24 323:4
  452:19 461:17
  461:19,21
**children's**
  394:4,13 395:2
**choose** 113:5
**chris** 34:17
  35:9 36:23,24
**cio** 360:24
**circumstance**
  183:24
**cisco** 382:5,10
  383:9,18
  384:10,16
  385:23 387:13
  388:3,16 389:6
  389:19 390:10
  390:22 394:3
**citation** 362:11
**cite** 26:6 427:9
  438:1 448:6
**cited** 447:24
  448:1,3
**cites** 444:5
  451:18 452:5
  454:3
**city** 2:17

**claim** 96:11
  201:15 339:8
  339:12
**claimed** 265:23
  355:15
**claiming** 338:7
**clarification**
  44:17 45:7
  55:11 69:4
  147:5 367:5
**clarified**
  319:20 320:9
**clarify** 31:9
  32:17 44:14
  55:9,23 103:6
  171:21 189:4
  347:10
**clarity** 211:17
**class** 455:3
**clean** 115:19
  365:24 397:23
  426:24
**clear** 37:21
  91:12 140:21
  146:16 163:21
  177:23 200:13
  202:19 269:11
  288:16 343:18
  344:11 379:7
  418:20 443:12
**clearer** 35:6
**clearly** 154:3
  177:19 402:13
  414:14

CONFIDENTIAL

clerical 36:5
client 216:7
clients 60:23
  216:1 421:14
close 310:20
  313:23 379:9
closed 323:15
closer 60:22
coalition
  403:13 406:21
  406:24 409:2,8
  410:8,22
  412:10,21
  413:11,15,21
  414:16,23
  415:7,17 416:6
  418:17 420:11
  421:20 422:3
  424:16
coded 384:9
coding 388:20
collar 62:5
collateral
  440:12
collected
  445:10,13
collection
  378:20 385:16
  445:14
collectively
  24:11
column 103:23
  103:24 110:6
  111:4,18 135:8

135:8 149:10
288:24 313:21
402:1,10 403:3
403:6,9 405:21
426:19
columns
  103:16
combat 204:18
come 23:1
  30:20 50:8
  90:8 221:3
  235:16 236:13
  237:13 247:12
  326:2 327:13
  328:20 411:13
  420:24 461:15
comes 56:10
  141:24 142:9
  326:10 362:15
comfortable
  54:6 208:13
commencing
  1:17
comment
  268:14
commenting
  428:16
comments
  417:12,18
  419:2
commission
  466:12
commits
  437:18 438:3

committee
  68:14,19
  315:24 323:3
commonwealth
  1:20
communicate
  274:3,13 277:1
  307:11,20
  308:4 309:24
  317:19 344:18
  344:23 347:17
  377:21 378:5
  378:24 379:18
  395:14,20
  431:6,17
communicated
  345:14 352:16
communication
  275:8 317:23
  347:6 379:15
  380:2
communicati...
  348:2 379:5
  396:8
community
  57:7 71:5
companies
  62:21 71:14
company 1:23
  76:14 96:6,7
  202:3
compare 76:7
comparison
  243:14

compensable
  77:5
compensated
  42:10 44:19
compensation
  50:8
compile 146:13
complaint
  401:23 402:23
complete 20:20
  21:5,7,17
  158:5 324:24
  325:5 345:5
  408:17
complex
  345:24
comply 394:12
  395:1
complying
  394:4
component
  41:22 76:9,24
  77:6 127:16
  135:11 138:5
  204:14 271:20
components
  35:18 78:21
  103:14 337:11
  443:14
compound
  81:14 128:15
comprehensive
  396:2

CONFIDENTIAL

**[comprises - consulting]**

**comprises**
  75:22
**compulsive**
  188:2,8
**concern** 235:6
**concerned**
  75:11 244:8
**conclude** 112:4
  112:7 114:12
  114:15
**concluded**
  462:17
**concludes**
  134:3 462:12
**conclusion**
  122:21,22
  123:1 216:9
  390:17 391:8
  391:13 455:11
**conclusions**
  271:16
**conclusory**
  105:11
**condition** 260:2
**conduct** 75:8
  93:21 94:3,6,9
  94:17 140:4,13
  141:15 195:17
  197:9,14
  199:24 200:9
  203:2 204:2
  205:17 206:14
  208:2 209:4,18
  210:20 219:12

220:1 245:11
246:9 251:13
252:11 253:1
255:23 261:4
261:23 264:18
266:14 267:5
268:20 269:16
270:9 271:4
291:10 292:15
296:14 327:17
327:23 334:13
336:17 352:4
421:23 424:14
430:19
**conference**
  317:20 346:11
**confirm** 24:8
  26:22 151:16
  234:22 300:3
  300:14 301:3
  302:2,11,18,23
  303:10 314:12
  314:24 316:20
  326:18 355:20
  356:5,17
  357:22 381:2
  399:21 427:22
  435:3 448:15
**confirmed**
  105:20 110:2
  147:23 149:8
  155:13 233:14
  299:6 313:14
  314:18 356:11

356:23 357:7
428:1
**confirming**
  23:21 152:4
  308:19 317:2
  378:8
**confirms** 376:6
**confused** 25:16
  182:16 335:4
**confusion**
  143:4 335:5
**connected**
  245:10 246:8
  406:23
**connection**
  23:19 24:5
  26:9 30:7
  32:14 33:16
  50:3 56:5,11
  57:18,23 66:2
  67:2 154:1
  169:16 276:17
  306:10 353:1
  365:11,18
  366:10 378:7
  384:13 395:5
  395:12 407:16
  414:3,4 420:3
  422:7 430:21
  439:14 444:10
**connolly** 2:9
**consider** 24:14
  25:14 27:21
  55:20 79:11

91:21 116:14
134:19 314:2
339:22 341:8
444:18
**consideration**
  263:4 273:23
  364:8
**considerations**
  194:16
**considered**
  23:13,24 93:4
  154:22 155:5
  192:12 194:22
  195:3 209:15
  266:3 273:21
  312:16 354:15
  371:18 395:12
  425:15 444:9
  444:23 456:17
  458:13
**considering**
  109:24 271:5
**consistent** 75:4
  260:10 295:5
  411:15
**consolidation**
  213:22
**constitutes**
  268:13
**consultant** 54:3
  54:6
**consulting**
  47:17,20,24
  48:5 53:3 54:8

CONFIDENTIAL

**[consulting - correct]** Page 24

54:22,23 55:10
55:12,18,21
60:5
**contacted** 39:9
**contain** 21:17
22:22 23:6,18
43:13
**contained**
22:11,18 23:4
24:1 25:1,6
308:24 309:20
458:20
**contains**
167:24 168:21
**contemplated**
40:8
**contemporan...**
199:3 248:12
264:24 323:19
**contemporan...**
80:24 198:22
201:23 204:17
206:3 385:7
**content** 159:23
160:9,23
161:19 162:20
163:24 173:18
174:1,4,9,13,18
175:2 180:9,22
180:23 198:15
198:17,20
262:9 264:20
266:16 267:3
267:13 268:22

269:18 270:11
358:7,14
394:11,24
395:6
**context** 278:11
296:5,18 374:7
**continuation**
411:5
**continue** 78:8
165:1,16
**continued** 3:1
4:1 5:1 273:18
326:2
**continuing**
179:18 337:10
355:15
**contra** 237:5
**contract**
197:23 198:2
267:11 428:11
**contractor**
104:24
**contracts**
267:12
**contractual**
72:17
**contrary** 340:5
414:12
**contributed**
258:20 259:9
**control** 313:6
463:20
**conversation**
177:16 178:10

178:21 274:16
275:2,6,14,24
276:10 277:15
277:23 278:7
279:22 280:1
307:6 310:18
311:1 318:1
377:24 379:8
389:21 418:9
418:14
**conversations**
306:22 307:1
**coordinated**
324:3
**copied** 30:17
**copies** 21:5
**copy** 15:9
16:15 43:9
52:9 123:7
172:17 294:5
309:1 328:4,17
349:2,9 355:1
355:4 362:21
371:22 382:13
427:21
**corners** 180:24
**corporate**
370:7,21
**correct** 12:22
14:1 15:23
16:14 17:4
20:24 21:1,20
21:21 23:14
24:2,17 25:24

26:1,20,21,24
27:14,24 28:12
28:18 30:11
31:1 33:7 35:4
35:12 38:20,21
42:1,8,9,12,13
42:18,21 43:15
46:12 48:6
49:15,16 52:15
52:17,22 59:2
60:3 63:18,22
67:13 68:23
70:11 73:6,11
73:18 74:3,11
74:16,22 75:16
77:11,17 79:9
79:22 80:3,11
81:12,24 82:11
82:22 83:14
84:15 85:4,5
85:10 89:1
90:12,19 93:22
94:10,18 95:1
95:6,17,21,22
96:2 97:8,14
99:16 100:20
101:6,15,24
102:10 103:4,5
104:15,18
105:10,12
106:9,14 107:5
107:19,20
108:24 109:8
111:12 112:8

CONFIDENTIAL

**[correct - correct]**                                                     Page 25

| | | | |
|---|---|---|---|
| 112:17 114:17 | 186:1,16 187:8 | 245:14 246:15 | 318:11,12,20 |
| 115:10,13 | 188:20 189:7 | 247:19 248:2 | 318:21 319:1,6 |
| 116:5,6,12,13 | 189:16,19 | 249:22 250:1 | 319:10,11,24 |
| 116:18 117:5 | 190:1,21 191:5 | 250:15,22 | 320:12 322:18 |
| 117:23 118:21 | 191:17 192:2 | 251:14,17 | 327:3,4,6,7,11 |
| 120:5,10 123:5 | 192:20 194:6,9 | 252:4,7 254:2 | 327:17,23 |
| 124:18,19,22 | 194:11 195:11 | 254:21 255:13 | 328:11,14 |
| 125:5 127:5,19 | 195:17 196:20 | 256:2,12,20 | 330:15 331:12 |
| 128:10 129:11 | 197:9 199:24 | 257:13 258:21 | 333:15 334:13 |
| 129:17,23 | 200:9 203:13 | 260:14 261:12 | 334:20 338:9 |
| 130:8 131:6,22 | 203:18,21,22 | 261:17,23 | 342:20,21 |
| 132:1,20 | 205:14,19 | 264:20,22 | 343:3 344:2,15 |
| 133:10 134:9 | 208:3 209:5 | 268:22 271:4,5 | 348:6,13,14,18 |
| 134:15,16,17 | 210:20 211:10 | 276:14 280:8 | 348:19,24 |
| 134:18,23 | 211:14,22 | 280:24 281:1,8 | 349:1 350:6,7 |
| 135:5,16 | 212:1,15,16 | 281:9 283:17 | 350:11,12,20 |
| 136:17 137:8 | 213:7 214:16 | 285:12 286:6 | 350:24 351:8 |
| 138:12 140:13 | 215:9,20 217:4 | 286:17 287:13 | 351:20 352:5 |
| 141:17 143:10 | 217:13,21 | 287:14,17,23 | 352:13 354:9 |
| 144:4,5,8,20 | 218:7,12,19 | 288:4,9,14,20 | 358:16 359:5 |
| 145:2,9,21 | 219:13 220:1 | 288:21 289:2,9 | 360:20 361:13 |
| 146:3 147:2,16 | 220:22 222:12 | 289:18 290:8 | 361:17,18,23 |
| 147:20 152:21 | 222:23 223:18 | 290:16,20 | 363:2,5,6,9 |
| 155:23 156:3,7 | 225:14,15,18 | 291:3,4 292:6 | 365:6,13 |
| 156:10,17 | 225:20,23,24 | 292:16 299:14 | 367:22 369:2,6 |
| 158:15 159:6,9 | 226:4,13 227:3 | 299:16 300:8 | 370:7 371:12 |
| 160:2,11 | 227:13 228:7,8 | 305:6,7,12,13 | 373:5 380:7,16 |
| 162:24 164:20 | 231:11 233:10 | 305:15,21 | 380:17,24 |
| 165:23 168:5 | 234:17 235:4 | 306:5,16,19 | 381:6,10 382:6 |
| 169:6,7 171:18 | 235:13 236:10 | 307:9 308:2 | 382:7 386:23 |
| 174:14 180:10 | 236:22,23 | 309:15,16 | 386:24 387:3,4 |
| 181:8,24 | 238:7,18 239:9 | 312:4,24 | 387:14 390:11 |
| 182:10 183:4 | 240:16,17 | 314:10 315:8 | 390:12 391:9 |
| 184:12 185:2 | 244:2,6 245:12 | 317:5,6 318:5 | 391:10 393:18 |

CONFIDENTIAL

**[correct - costs]**

395:6 396:13
396:22 398:6,7
398:14,15,20
401:6,7,11,18
402:19,20
403:1,4,7,8,10
403:11,14,15
403:18,24
404:13 407:23
408:3,8,20
409:9 414:24
415:9,20 419:7
419:12 422:19
423:1,8,11
426:7,17 427:7
427:11 431:20
432:1,11,12,18
432:19,24
433:12 434:22
434:23 436:6
436:11,23
437:20 441:16
443:6,7,21
444:20 445:11
446:9,13 449:5
449:12 450:6,8
451:19 452:1
456:3 466:4
**corrected**  22:2
362:12
**corrections**
464:5,7 466:5
**correctly**
112:22 130:17

229:14 253:6
384:2 397:3
403:2 418:16
446:19
**correctness**
109:23
**corresponden...**
25:19
**corresponding**
105:9 274:5
307:13 340:22
345:1 431:8
**corroborated**
144:18,24
145:19 146:1,7
**cost**  9:6 103:17
103:24 104:4
110:22 113:4
131:2,4 141:14
142:4 146:13
148:12 149:7
149:16 151:22
174:18 175:10
180:13,18
193:9,11 194:4
194:4,16
195:15,21,23
196:1,4 197:8
197:13,18
198:4 199:1,22
200:7,14
201:12 202:6
202:11,15
203:15 204:15

205:2,13,18
206:2,8 207:16
208:7,10,12
209:14,16,23
221:6,14
229:12 237:6,9
238:4,6,16,18
239:14 242:5
243:13 246:2
246:17 251:22
253:18 258:18
258:20 259:2,8
259:24 263:2
266:23 280:16
280:17 299:17
299:18,22
300:22 302:20
322:4,11
332:14 335:3
335:11,16
337:17 338:1
342:18 353:23
360:8,11 367:1
368:11 372:6
372:12 378:8
381:23 384:8
389:11 400:3
410:19 411:24
413:5 414:15
415:7 417:11
418:3 419:2
420:16,18,21
422:7 426:17
427:7,17

429:13,20
430:4 434:10
440:8,24 443:4
447:24 450:13
**costs**  40:12
41:13 83:6,16
87:1 102:16,19
102:24 103:3
103:11 104:12
104:17,17,23
105:7,18,19
110:1,1 115:6
116:9 134:4,12
136:3 140:2,11
145:20 146:2,8
146:20 147:2
147:19,23
148:10 149:8
150:14 152:5
157:9 158:1,9
158:22 162:20
162:22 166:7
166:24 168:3
168:22 170:10
175:12 180:8
181:6 182:24
189:24 194:12
194:13,15,21
194:22 195:2,3
195:5 197:5
199:9 202:23
203:1,11,17,24
204:18 206:15
207:10,12

CONFIDENTIAL

208:21 219:11
219:24 221:2,3
222:15 230:7
231:5 233:8,14
234:3,16,23
235:3,11 236:8
236:20 237:4
240:4,5,12,13
240:23,24
241:1,5,16,17
242:4,11,21
243:15,21
244:11,24
245:17 246:8
248:22 252:9
252:24 258:12
259:10 260:12
261:2,16,21
265:9 270:24
271:2 272:17
272:24 273:19
275:21 276:18
279:2 280:13
298:13,16
299:1,5,8
300:24 302:10
308:8 310:21
310:22 312:2
312:13,21
313:19 314:8
314:15 315:1
315:18,19
316:3,3,17
317:3,5 321:24

322:16 324:6
327:16,21
333:14 334:11
334:17 335:22
336:13,14,15
337:4 338:3,9
338:18,22
340:9,11,11,16
342:9,22
350:10,18
353:10,16
355:12 357:2
357:23 358:23
360:19 361:4,6
361:12 368:21
373:1 374:1,21
374:24 377:5
382:19,24
383:2,8,14,17
383:18 384:6
385:2,4,9
388:1,11,13,16
389:17 390:20
397:6,14
399:15,18,20
399:23 401:16
402:22 405:11
406:2,11,23
408:24 409:3,7
409:13 410:6
410:12,13
411:7,10
413:14,20
415:11 416:16

418:7,16 428:2
434:7,24
437:19 438:4
439:15 440:3
442:7 445:8,19
445:20 446:2
447:11,20
450:23 451:9
451:13
**counsel**  11:3
12:4 28:21,24
29:21 30:17,19
31:21 32:3,12
38:11,14 41:15
52:10 93:15
97:3 121:10
152:15,20,23
215:12 276:24
278:1 297:8
324:14 329:24
330:8 347:14
347:14 414:11
416:19 417:9
**counselor**
140:16 425:9
**counsels**
228:17
**count**  58:8
**counted**  58:2
58:16
**counting**  58:20
427:14 428:22
430:3

**country**  52:19
69:18 70:7
210:9
**county**  6:13,16
6:18,21 7:11
7:13,16,19
8:18,23 9:8
13:17 14:12
15:2,16 17:14
18:4,17 19:7
329:12,19
330:12 358:6
358:13 364:21
365:6 371:5
389:2
**county's**
386:21
**county's**  9:11
386:14
**couple**  44:13
195:20 207:12
239:16 355:7
**course**  40:6
49:6 58:24
75:1 148:17
163:12,16
192:13 198:1
210:3 252:15
423:14 444:16
**court**  1:1 12:1
12:6 62:6 98:8
112:3 114:11
134:2 137:18
223:6 231:19

CONFIDENTIAL

[court - damages]                                          Page 28

| | | | |
|---|---|---|---|
| 259:23 464:20 | **d** | **damaged** | 135:1,4 136:2 |
| **courts** 210:8 | **d** 6:2 323:10 | 448:19 | 137:12,13 |
| **cover** 322:15 | **d.c.** 4:17 | **damages** 22:7 | 138:17 139:10 |
| **covered** 181:17 | **damage** 104:21 | 30:23 40:1,9 | 144:20 145:2 |
| **covid** 272:15 | 104:22 108:21 | 40:24 41:6,15 | 145:13 146:21 |
| 273:1,3,7,10,16 | 138:4 183:13 | 41:23 57:4 | 148:21 149:4 |
| 273:22 | 204:13 239:17 | 61:2 70:15,20 | 150:8 152:12 |
| **cpa** 47:18 | 240:16 241:20 | 71:21 72:7,22 | 152:19 154:3 |
| 63:13 | 251:23 252:1,3 | 83:2,16 86:2 | 157:8,24 158:9 |
| **crime** 62:5 | 252:9,16 | 86:10,20 94:18 | 158:13,22 |
| **criminal** 62:6 | 253:12,15,18 | 95:16,19,24 | 159:1,3,13,21 |
| **crivera** 4:6 | 254:1,6,11,19 | 96:9,15,17 | 159:22 160:7,8 |
| **crystal** 177:22 | 255:5,10,16 | 97:6,10,11,16 | 161:10,14 |
| 198:8 | 256:10,15,18 | 97:21 98:3,7 | 162:23 163:19 |
| **culled** 34:4 | 257:10,13 | 98:10,14,18 | 164:6 165:3 |
| **current** 27:23 | 258:10 259:4 | 99:4,10,14,24 | 172:13 175:3 |
| 52:12 | 260:10 264:10 | 100:4,13 101:2 | 180:7 181:5,20 |
| **curriculum** 8:7 | 269:3 272:6 | 101:4,11,13,20 | 181:23 182:6,9 |
| 52:3 192:24 | 284:24 299:24 | 101:22 102:5,8 | 182:14,16,18 |
| 193:5,12 | 308:9 338:4 | 102:14,22 | 183:3,14 184:8 |
| 239:15 240:14 | 340:10 382:1 | 103:10,16,21 | 184:24 186:19 |
| 241:18 243:20 | 393:12 431:3 | 104:13 105:6 | 187:3,5,16,19 |
| 244:1 270:24 | 435:2 436:6,10 | 106:5 108:20 | 188:1,4,17,24 |
| 271:24 272:15 | 436:23 437:7,9 | 110:12 111:4 | 188:24 189:5 |
| 272:17,24 | 437:18 438:3 | 111:11,21,23 | 189:13,23 |
| **curtin** 34:17 | 439:14 440:13 | 112:7 113:15 | 190:9,18 193:8 |
| 35:9 36:3,13 | 442:5 443:4 | 114:7,9,16,22 | 193:10 195:6 |
| **curtin's** 36:11 | 444:10,20 | 115:3,6 116:9 | 195:10 203:7 |
| **cv** 52:10,13 | 445:8,19 | 116:17,20,23 | 203:16 207:18 |
| 57:2 58:3,13 | 446:13 447:4 | 117:16 118:24 | 208:23 209:15 |
| 58:14,14 | 447:10,24 | 119:7 121:21 | 210:15,17 |
| | 448:9 449:11 | 124:16 133:3,5 | 211:20 212:11 |
| | 460:1 | 133:7 134:6,7 | 213:7 216:16 |
| | | 134:12,22 | 223:9 224:1 |

CONFIDENTIAL

**[damages - day]** Page 29

| | | | |
|---|---|---|---|
| 231:21 233:9 | 353:11 354:8 | 452:19 453:8 | **dated** 15:10 |
| 234:16 235:4 | 354:16,23 | 453:17,19 | 16:16 17:5 |
| 235:12 236:9 | 355:23 356:8 | 455:23 456:1 | 19:1,14 20:4 |
| 236:21 240:2 | 356:15,21 | 456:17,23 | 20:17 21:6,8 |
| 241:8,15 243:8 | 361:5,7,11,19 | 457:4,23 458:7 | 328:7 329:13 |
| 244:20 251:16 | 364:3 374:12 | 459:8 | 363:1,5 371:19 |
| 251:20 252:3 | 375:11,18 | **daniel** 8:14 | 380:15,23 |
| 256:16 258:12 | 376:3 377:6 | 277:15 307:17 | 396:21 398:5 |
| 261:15 265:23 | 378:10 380:12 | 307:23 309:9 | 398:13 463:11 |
| 268:1 272:3 | 380:19 381:18 | 309:15 342:8 | **dates** 179:16 |
| 278:12 280:21 | 381:24 382:3 | **data** 33:16,22 | 311:14 |
| 281:3 287:12 | 382:18,20 | 34:10,12,12 | **david** 3:10,16 |
| 287:20 289:2 | 383:19 388:8 | 36:24 37:5 | 34:16 35:8 |
| 289:22 291:22 | 393:24 395:4 | 90:10,13,17 | 36:3 |
| 294:22 298:5 | 396:18 397:17 | 144:17,23 | **davis** 5:14 8:20 |
| 298:12,15 | 398:2,9 399:2 | 145:18,24 | 116:7 229:14 |
| 299:3,13,20 | 399:8,14,17 | 146:6,12,24 | 230:21 302:9 |
| 300:7,18 301:7 | 400:1,5 401:17 | 190:16,24 | 348:18,24 |
| 302:6,15,21 | 402:10,15 | 220:20,24 | 349:5,18,23 |
| 303:3,7,14,17 | 405:13 409:19 | 222:10,14,17 | 350:4,22 351:6 |
| 312:3,22 314:9 | 411:14 413:7 | 281:12,18 | 352:2,13,17,24 |
| 315:2 318:18 | 416:3 420:24 | 323:3 378:20 | 358:3,5,12,22 |
| 319:3 321:9,18 | 422:8 423:15 | 384:18,20 | 359:4,22 |
| 321:23 322:2 | 424:10 426:3 | 385:16 | 360:17 361:2 |
| 322:17 324:11 | 430:20 432:8 | **date** 1:18 11:14 | 362:24,24 |
| 324:20 325:11 | 432:14 433:6 | 22:23 24:7 | 363:14,24 |
| 327:3 330:22 | 433:19,24 | 45:2,21 292:24 | **davis's** 349:2,9 |
| 332:10 333:15 | 434:6,8,21 | 367:2,8,13 | 350:8 361:16 |
| 335:1 336:15 | 435:7 436:4 | 374:14 375:22 | **day** 50:24 |
| 337:10 338:9 | 439:6 441:19 | 426:15 427:5 | 69:18 70:8 |
| 338:13 340:3 | 441:21 442:6 | 428:4 429:11 | 96:23 250:20 |
| 340:17 342:24 | 444:17 445:15 | 429:18 442:22 | 356:11 404:20 |
| 348:16,21 | 446:1,8 447:21 | 443:2 449:3 | 456:3 457:7 |
| 352:21 353:9 | 451:17,24 | 464:9 466:8 | 458:1,9 466:11 |

CONFIDENTIAL

**[days - defendants]**

**days** 46:2 51:3
363:8 464:16
**dbonnin** 3:19
**dc** 2:11
**dead** 79:17
**deadline**
379:10
**deal** 69:22
76:11 191:13
198:21 248:19
248:19
**dealing** 69:24
76:2,14 77:24
200:24 214:8
240:22,23,24
242:3,5 340:10
340:12
**death** 60:10
61:7
**deborah** 378:1
378:2
**december**
43:19 46:9
**decide** 309:23
347:16 378:23
**decided** 183:17
201:6 284:16
373:10
**decides** 437:7
**decision** 199:6
229:1 281:20
282:13 283:15
284:8 285:10
286:5,16

365:11,14
393:21
**decisions** 199:1
**declaration**
221:23 223:7
**declarations**
41:22 89:19
122:8 152:16
163:16 224:5
**dee** 1:18
**deemed** 464:19
**defendant** 4:18
24:15 25:11,15
25:17 27:24
28:1 61:21
62:1 93:12,22
95:17 96:15
97:13,19 98:23
100:17 143:20
154:15 181:22
181:24 182:8
182:10 183:2,4
184:9,12
199:23 200:8
203:2 273:9
430:19 436:11
**defendants**
2:12,19 5:7
25:12,20,24
26:4 27:4,8,10
27:14 59:17
62:17 77:5
86:22 88:3
89:10,12,18

91:3 94:7,9,17
95:11,21 96:5
96:18 97:11,22
98:21,21 99:12
100:2,15 106:1
107:16 113:7
116:24 117:19
118:3 119:2,8
120:13 121:1
121:23 122:4
122:16,18
123:3,5,18
124:22 125:5,9
125:12,22
126:4,16,24
127:5,11,19
128:7 129:19
130:4,21
131:19 132:9
133:3 136:11
137:15 138:20
139:13 140:4
140:12 141:10
141:16 145:15
145:21 146:3,9
153:6,15 154:4
154:6,9 155:17
156:17 157:10
158:2,11,13,24
159:3 160:19
161:7 163:9,20
164:8,19,22
165:7,9,11,12
165:22 166:1,2

166:8 167:1
168:3,9,23
169:11,14
170:1,11,24
171:17 172:10
172:13 173:2
175:6,23 176:3
176:19 177:1,9
178:15,24
183:11,15,20
186:21 187:18
188:10 190:11
191:15 192:9
192:16,19
193:15 194:3,5
194:18 195:17
197:2,9,14,19
198:11,23
199:11 201:6
201:11 202:19
203:6 204:1,10
204:16,20
205:10,17
206:6,13 207:3
208:2 209:4,17
210:5,19
216:17 219:12
220:1 223:11
224:2 227:20
231:23 238:23
239:4 243:7
245:11,22
246:9 247:6
248:16 250:14

| | | | |
|---|---|---|---|
| 250:22 251:13 | 365:5 375:3 | 251:15 280:11 | **dekalb**  6:18 |
| 251:21 252:10 | 376:5 377:8 | 289:8 293:21 | 7:16 8:22 9:8 |
| 253:1,21 | 378:13 380:15 | 304:2,4 | 15:2,8,11 |
| 254:14,21 | 380:22 386:22 | **defined**  76:5 | 18:17,23 19:2 |
| 255:13,19,23 | 388:10 396:20 | 81:16 82:15 | 20:23 21:12 |
| 256:8 258:14 | 398:4,12 399:3 | 89:23 91:1,2 | 26:19 29:19 |
| 258:21 259:2 | 400:24 401:4 | 91:22 93:7 | 115:7 116:3,10 |
| 259:11 261:4 | 413:9 421:23 | 95:12,13 98:15 | 151:6 211:9 |
| 261:22 262:6 | 422:10 424:14 | 128:21 168:8 | 212:15 220:8 |
| 263:6 264:18 | 425:4 432:10 | 175:9 192:24 | 225:21 252:11 |
| 265:6 266:7,14 | 432:17 433:8 | 290:1 295:24 | 277:10 302:2,3 |
| 267:4 268:19 | 433:21 434:15 | 296:24 304:5,6 | 316:23 344:17 |
| 269:5,15 270:3 | 436:18 447:7 | 318:14 323:6 | 344:20 345:3 |
| 270:9 271:3 | 457:1 459:1 | **defines**  264:4 | 348:6,12,16,21 |
| 272:8,18 273:2 | **defendants'** | **defining**  66:18 | 350:6 352:20 |
| 273:5,13,21 | 8:17,22 9:12 | 73:14 82:15 | 353:8 354:5,7 |
| 279:4,12,20 | 9:14 329:18 | 90:24 91:15 | 354:21 355:21 |
| 282:21 285:3 | 364:20 386:15 | 125:18 | 356:6,14,18 |
| 289:18,24 | 400:17 | **definitely** | 358:6,12 |
| 290:2,15 | **defender** | 356:22 359:2 | 361:12,20,21 |
| 291:10,23 | 265:10 | **definition** | 363:4,9,13 |
| 292:1,3,16 | **defense**  62:24 | 83:19 88:1,6 | 364:21 365:5 |
| 293:4,6,11,14 | 63:2 | 88:23 89:8 | 366:24 367:7 |
| 296:15,24 | **deficit**  78:10 | 91:5,8 93:11 | 367:12,18 |
| 299:4 300:2 | **define**  55:24 | 93:14 127:7,24 | 370:13,15,17 |
| 321:15 327:17 | 64:16 66:16,24 | 153:9,12 | 371:5 372:23 |
| 327:22 329:10 | 73:12 84:7,11 | 170:22 289:12 | 374:18 375:7 |
| 330:11 334:4 | 84:21,24 88:2 | 293:23 318:13 | 376:17 |
| 334:13,17 | 88:7,21 89:13 | 350:23 351:1 | **dekalb's**  345:8 |
| 336:16 351:8 | 91:24 92:12,14 | 352:6 | 346:1 365:3 |
| 351:15,20,22 | 92:16 125:17 | **definitions** | 366:4 370:6 |
| 352:4 354:18 | 125:20 127:11 | 240:1 | 373:9 374:4 |
| 355:18 359:18 | 168:12,17 | **degree**  36:14 | 375:8,16 |
| 360:5,7 364:4 | 193:19 220:24 | 63:10 | |

CONFIDENTIAL

**[deliberately - determined]**

| | | | |
|---|---|---|---|
| **deliberately** 267:22 | 42:11,16 45:2 50:13 51:8,13 | 456:5 **depot** 451:4 | 399:5 **determine** 81:9 |
| **demonstrate** 184:18 | 53:22 59:7 62:23 85:23 | **derived** 41:1,7 41:18 | 81:20 82:13,19 83:10 84:1 |
| **demonstrated** 314:13,14 | 154:17 155:2 157:2 161:22 | **described** 346:20 | 98:8 104:6 106:12,17,24 |
| **department** 30:5 60:24 | 162:3,6,11 163:15 179:10 | **describing** 418:8 | 112:14 114:21 118:5 119:3 |
| 61:1 268:8 387:5 | 212:13 262:20 294:5,6,19 | **description** 6:11 7:4 8:4 | 144:16 145:17 149:2 160:21 |
| **departments** 389:1 | 296:3,7,11,20 297:2,11,19,21 | 9:4 **destructive** | 164:3 174:17 199:8 219:10 |
| **depaz** 2:16 462:4 | 319:9,14,20 320:9,18 321:1 | 256:12,19 **detail** 378:19 | 219:23 224:1 233:7 234:14 |
| **depend** 89:2 | 325:15 349:9 353:1,14 362:6 | 384:14 385:8 385:14 392:9 | 235:10 236:6 238:2 255:10 |
| **depending** 53:15 101:17 | 366:13 367:19 367:21 368:2 | **detailed** 30:3 38:7,17 144:13 | 255:15 264:16 266:12 280:6 |
| 200:2 | 368:18 369:20 370:15,18 | 239:11 274:11 366:12 448:15 | 298:3,13 318:3 318:9 320:24 |
| **depends** 73:7 153:8 155:18 | 371:5,11,16 372:14 374:15 | **details** 243:24 244:3 422:5 | 321:7,24 348:11 352:19 |
| 158:6 162:2,3 162:5 191:10 | 375:23 376:1 390:15,19 | **determination** 94:23 95:4 | 353:10 380:5 381:16 382:19 |
| 193:18 200:11 | 391:6,12 401:20 430:11 | 140:17 159:11 190:6 206:1 | 383:16 388:14 396:11 399:6 |
| **deponent** 12:2 466:1 | 462:13,16 463:6 464:3,13 | 209:22 210:13 246:24 256:6 | 399:15 401:15 401:20 427:13 |
| **deponents** 212:7,7 | 464:17,19 **depositions** | 257:7,17,22 269:8 301:23 | 428:21 431:23 433:22 434:7 |
| **deposed** 12:21 179:6 | 24:6 42:14 179:15,18 | 381:14 393:21 452:10 | 450:16 **determined** |
| **deposing** 464:16 | 180:1 212:19 213:1 294:10 | **determinations** 57:4 196:7 | 82:8 107:13 111:1 112:14 |
| **deposition** 1:12 9:8 10:2 11:17 22:23 27:22 | | | |

CONFIDENTIAL

114:24 141:1
205:6 207:3
208:11 251:10
261:2,20 265:1
267:24 271:2
298:10 321:21
353:7 354:22
363:20 382:16
399:12 406:22
410:15 434:4
436:9
**determines**
142:22 159:12
**determining**
106:7 399:23
425:15 456:20
**detrimental**
280:15
**dgilfillan**  3:12
**difference**
189:1 207:23
208:24 397:13
415:14,22
416:3 417:4,10
418:24 419:1
419:14 420:8
423:10,15
424:3,5
**differences**
418:2
**different**  34:7
57:15 59:4,23
60:6,14 63:7
73:14 75:23

77:22 90:7
96:5 110:6,24
111:3 112:15
112:24 121:8
144:12 153:3
161:14 170:20
183:6,7 194:13
201:7 219:16
233:24 237:16
242:20 249:14
250:17,18
263:9,22
267:10 310:7
315:11 346:6
352:22 389:1
397:5 412:2
416:23 417:24
426:18 427:9
427:10 428:3
429:11,12,13
429:19,20
447:4 450:22
**differential**
76:21
**differentiate**
95:20
**differently**
142:23 150:4
178:9 182:21
183:8 238:13
246:3 255:21
269:13 307:19
336:9 341:7
391:24

**diminution**
76:19
**dip**  428:18
**direct**  105:24
107:15 117:18
130:19 131:16
132:7 139:11
143:18 163:17
170:23 172:9
173:1 175:21
177:15 199:9
204:8 216:16
230:12,17
238:21 239:1
245:18,20
253:20 273:5
315:19 337:21
375:1 382:24
463:20
**direction**  10:5
33:13 277:5
**directly**  28:19
29:3,6,18 30:4
30:10,20 31:2
31:22 32:10,12
32:14 38:5
39:15 41:18
47:12 107:23
108:1,5,7,13
155:15 161:5
167:6 179:2
181:14 234:5
245:5 278:21
279:18 324:6

324:13 353:19
356:24 357:8
374:11 379:6
396:9 414:10
**director**  116:1
229:19
**directs**  69:21
**disagree**  68:17
75:17 109:9
114:19,20
125:6 141:19
142:9 193:6
319:22 320:11
330:16 358:12
**disagreed**
320:24
**disclosures**
93:19 328:4,5
**discovery**
147:9,12
215:23,24
216:3 232:13
323:14 324:22
326:1 328:17
347:1 370:3
436:15
**discuss**  84:13
286:2,14 420:6
**discussed**  27:16
31:3 285:18
396:9
**discussion**
282:4,11
283:13 302:7

CONFIDENTIAL

**discussions**
35:22 38:9
156:22 200:19
220:10 274:10
283:1 300:21
306:17 308:14
417:8
**dislike**  129:3
**dispute**  55:22
140:19
**disputed**  143:6
143:14
**disputes**  53:10
**disregard**
407:13
**disregarded**
404:11,16
**distinct**  88:1
158:14 159:4
169:17
**distinction**  53:6
414:8
**distinctly**  68:17
190:15 447:11
**distributing**
78:17
**district**  1:1,1
6:14,16,19 7:9
7:11,14,16,23
8:18,23 9:8,20
12:1,1 13:18
14:13 15:3
16:22 17:14
18:4,18 20:10

20:22 68:5
70:16,21 72:8
72:23 73:10,13
77:8,14 79:6
79:14,20 80:1
80:9,14 81:4
81:10,21 82:6
82:8,20 83:11
84:2 85:7,15
88:20 90:11,18
96:1 97:7,17
98:4 99:5,16
100:6 101:2,11
101:20 102:5
104:14 106:9
106:14 107:3
107:19 108:20
115:8,21 116:4
116:11,16
133:6 134:5
137:5 141:13
145:19 146:23
147:1,3,6
148:19 149:2
151:2 155:19
156:3,6 158:15
159:5 162:17
176:17,24
177:7 178:12
178:23 187:3
187:16 188:1
191:23 192:16
209:1,3 217:18
218:4,10 219:9

219:22 227:3
233:7 234:15
234:20 235:11
235:16 236:7
236:18 238:3,5
238:15,17
239:8 244:1
247:17,21
248:1,18
251:10 255:24
261:1,11,20
264:19 266:15
267:2 268:20
269:16 270:10
270:12 271:1
272:13,23
277:16 279:14
299:10,12,23
300:5,5,11,16
301:5 302:4,13
303:1,12 317:2
329:2,12,19
330:13 334:23
335:8,14 342:1
346:3,4 355:22
356:7 358:6,8
358:13,15
364:21 365:6
371:6 412:7,17
430:20 434:20
435:5 441:9
443:20 444:19
446:2 448:17
448:18 449:10

449:11 451:16
451:23 452:11
453:5,15,16
454:12,24
456:8 457:12
**district's**  74:11
74:16,22 95:16
195:2 214:3
323:21 350:19
358:24 430:13
430:16 453:6
457:22 458:6
**districts**  67:5
71:12 72:11
73:5,8,18,21,23
73:24 74:2
77:21 94:23
95:4 102:17
103:1 107:11
107:24 108:14
144:18,24
146:1,7 147:18
149:12 152:7
152:17,23
171:15 191:15
213:12 215:15
217:6 223:14
228:12,19
233:21 262:8
263:23 265:20
266:3 268:4
271:9 279:13
311:23 312:4
317:4 325:21

CONFIDENTIAL

**[districts - educational]** Page 35

425:10 432:5
455:14 456:2,9
457:2,6 458:17
**division** 11:13
**divorce** 61:18
216:1
**doctor** 141:24
142:8,13
183:21
**document** 1:6
297:14 376:11
385:8 424:2
438:22,24
439:4 441:15
442:8,19
443:11 446:7
460:4
**documents**
10:10 23:18
24:15 25:2,11
25:15,17,19,22
26:2 27:3,7,12
28:10,16,20,22
29:2,5,7,12,17
29:20,24 30:8
30:22 31:10
33:20 34:3
36:6 37:6
38:14 146:24
275:17 281:12
281:18 308:17
312:6 315:1
317:2 347:3
411:6,7 428:13

429:23 430:7
438:2 439:13
**doing** 63:5
68:12 81:1
104:5 109:18
129:2 148:6
201:23 240:6
354:2 381:23
402:5 427:23
464:8
**dollar** 221:16
340:22 404:7
**dollars** 86:12
**domestic** 216:2
**donation** 66:4
68:12
**donovan** 5:4
**door** 60:17
61:15
**double** 427:14
428:8,18,22
430:3
**doubt** 373:23
441:23 451:22
**downloaded**
31:22 32:9,13
326:7
**dr** 26:8
**drafted** 449:14
**drafting** 214:21
276:2 363:13
381:12 433:3
433:15

**dried** 201:24
**drill** 13:1
**driver** 96:8,9
183:19
**due** 102:20
103:4 137:14
254:20
**duly** 12:10
266:4 463:5
**duplicative**
430:5
**dwarfs** 61:9

**e**

**e** 4:10,16 6:2,9
7:2 8:2 9:2
24:16 25:1,18
30:17 32:5,5
44:18,18 45:11
46:11 47:17,24
48:5,11 85:22
108:16 260:13
260:19 261:2
261:10 274:5
307:13 345:1
431:8 465:1
**earlier** 52:11
85:23 125:22
147:5 175:9
267:7 279:7
305:23 312:10
325:15 358:21
385:17 404:18
408:18 425:11

**earn** 48:6 77:10
77:16
**earning** 49:10
**earnings** 61:12
**earns** 48:4,5,14
**easier** 147:7
346:10
**eastern** 11:16
**easy** 347:20
**economic** 60:8
61:2 96:11
**economist**
56:23
**edit** 23:2
295:11 420:1
**education** 6:21
7:18 9:10
15:15 16:1
19:7,15 67:3
338:23 386:13
386:21 403:14
406:22,24
409:2,9 410:8
412:11,22
413:12,16,22
414:17,23
415:8,18 416:6
418:18 420:11
421:21 422:4
**educational**
63:21 64:1,15
65:2,11,14,20
81:22 82:5,10
82:14

CONFIDENTIAL

**eduspire**
  260:21
**effectively**
  40:13 370:3
  384:5
**effects** 159:23
  160:8,23
  161:19 162:20
  180:8 181:6
**eight** 242:19
  367:10
**eiland** 3:16
**eilandlaw.com**
  3:19
**either** 28:19
  32:12 38:5
  41:1,7,20
  55:23 72:17
  142:13 147:3
  152:13 172:6
  223:22 251:12
  255:8 258:8
  275:20 291:5
  354:13 381:1
  392:21 414:10
  424:4 461:21
**electric** 451:5
**eliminate** 180:7
  181:5
**eliminated**
  180:14
**emotional**
  82:22 83:12
  84:3,8,10,12,14

84:18,22 85:3
  85:9,17 240:14
  241:18 243:20
  243:24 270:23
  271:10,19
  272:14
**employed**
  65:11,14 210:6
**employee** 30:10
  41:1,7 88:19
  89:22 108:8,12
  108:13 115:21
  116:4 117:4,11
  117:21 118:15
  120:4,9,19
  121:17 129:10
  130:8,24
  131:22 132:17
  133:9 134:3
  144:3 145:8
  153:19 154:13
  154:18 161:18
  162:17 164:16
  165:19 166:5
  170:7,8 171:12
  218:11 219:9
  219:22 225:14
  225:18,23
  230:8,8 231:8
  231:14 242:4
  283:12 285:7
  286:12
**employee's**
  161:22 231:11

**employees**
  27:23 115:9
  116:11,16
  118:6 119:4
  122:1 129:21
  176:17,24
  177:7 178:13
  178:23 179:4
  179:10 211:8
  212:14 217:19
  218:5,15
  220:19 222:9
  222:20 224:8
  224:10,23
  225:1 226:1
  227:12 228:22
  228:24 274:6
  294:10 307:14
  307:21 344:19
  345:2 377:21
  379:19 395:15
  395:20 431:9
  431:18
**endowment**
  68:14,19 69:1
  69:13
**engage** 437:7
**engaged** 256:11
  256:19 257:12
**engagement**
  50:3 55:18
  404:17 421:7
**ensure** 421:18
  424:9

**entertainment**
  93:3 250:10
**entire** 71:5
  296:7 297:20
  404:17 457:7
**entirety** 97:21
  150:17 268:13
  299:22 322:4
**entities** 47:17
  47:19
**entity** 49:2
  78:16
**entries** 310:4
  310:16,19
  429:5
**entry** 37:1,6
  317:13 439:21
  442:15
**epidural** 142:4
**equally** 184:2
**equals** 104:10
**errata** 464:6,9
  464:12,15
  466:6
**errors** 22:6
**esquire** 2:3,9
  2:10,16 3:4,10
  3:16 4:4,10,15
  5:4
**essential**
  116:16 134:21
  135:2
**essentially**
  404:11

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **estimate** 105:6 108:21 180:7 181:5 224:10 225:1 361:11 | **examination** 12:13 | **exclude** 446:1 | 329:8,15 330:10 331:2 333:13 349:17 |
| | **examine** 84:9 85:6 | **excluded** 160:22 422:2 | 349:21 350:3 352:2 355:4 |
| **estimated** 131:1 188:17 188:23 189:3 189:13 | **examined** 12:10 85:14 | **excluding** 38:4 | 358:2 363:1 364:15,17 |
| | **examiner** 56:24 | **exclusively** 328:9 | 365:3 366:4,12 367:21 368:2,8 |
| **estimates** 9:6 101:5,13,22 102:8 112:8 162:23 169:24 187:6,19 188:4 368:12 455:23 | **example** 31:17 85:19 130:24 183:19 201:21 202:14 207:16 243:19 402:16 440:4,7 | **executive** 116:1 229:19 | 368:10,17,17 369:22 370:4 370:13,17,24 371:2 372:13 374:1 375:24 |
| | | **exercise** 33:22 407:9 | |
| | | **exhibit** 13:15 13:22 14:4,10 14:17,24 15:7 15:13,20 16:4 16:11,19 17:2 17:11,19 18:1 18:8,15,22 19:4,11,17,24 20:7,14 36:1 42:24 43:2,9 43:13 51:23 52:1,12 85:22 103:23 111:19 114:10 124:1,4 124:11 125:3 166:17,22 167:24 203:9 203:10 235:21 252:18 260:17 286:24 287:2,9 304:21,23 306:14,15 309:5,7 318:24 322:15 326:21 | 386:9,11 390:2 400:12,14,23 401:3,9,14,19 401:20 402:17 402:17 414:20 415:4 422:16 422:17 423:4 425:22 438:12 438:13,14,16 439:18 440:1 441:4,6,20 442:9,20 446:6 447:18 450:16 451:14 459:21 |
| **estimations** 140:1,10 | **excel** 314:16 316:20 384:21 | | |
| **eve** 364:10 | **except** 11:6 246:16 334:18 466:5 | | |
| **eventually** 243:16 283:4 | | | |
| **everybody** 170:20 410:14 | **exception** 56:22 104:20 105:4 210:7,11 332:11 372:7 | | |
| **evidence** 74:10 74:15,20 198:12 357:16 357:20 444:6 | **excerpt** 296:19 | | |
| | **excess** 49:6 | | |
| **exact** 113:2 209:16 408:16 426:17 427:7 | **exchange** 79:8 79:12,21 80:2 80:10,15 81:11 81:23 82:10 83:13 84:4 85:8,15 280:7 318:4,10 348:12 380:6 396:12 431:24 | | **exhibits** 13:11 17:8 20:19 21:16,24 22:11 22:18 23:11 24:1 34:4 144:13 349:10 |
| **exactly** 50:21 60:16 185:14 206:15 251:24 346:12,17 347:23 391:19 413:11 430:18 | | | |

CONFIDENTIAL

**[exhibits - extent]**                                      Page 38

446:21 457:20
458:4

**exist**  192:11
197:22 201:12
212:22 267:13
459:4

**existed**  205:23
300:22

**existence**
193:22 194:3
340:19

**exists**  459:4

**expect**  12:24
23:7 79:7

**expectancy**
142:8

**expectation**
77:9,15 128:23
416:19 417:1

**expected**  79:20
80:1,5,9,15,22
137:24

**expended**  80:5
83:17 147:24
147:24 148:13
149:10 234:2
324:7 367:4,7
367:12

**expenditure**
237:23 310:9
315:14 316:2
316:15 322:24
323:6 324:18
378:18 384:3

384:11,15
385:12,14

**expenditures**
76:20 235:7,20
238:21 301:16
301:20 313:24
322:12 326:6
333:19 401:23
402:23

**expense**  24:24
34:9 77:2
150:23 196:24
229:24 230:17
261:11 268:9
310:10,12
353:15 388:23
411:21 431:2

**expenses**  76:6,8
76:10,11,12
77:1 78:2,20
94:24 95:5,9
95:10 274:21
311:13 313:20
333:7,9

**experience**
183:10 215:18
257:24

**expert**  6:13,15
6:18,20 7:6,8
7:10,13,15,18
7:20,22 13:17
14:4,12,18,20
15:2,8,15,21,24
16:6,12,21

17:3,5,13 18:3
18:11,17,24
19:6,13,19
20:3,9,16,21
21:15,24 23:10
27:1,3,8,17
38:19 39:9
40:1 42:1
52:22,23 53:2
53:3,9,19,23
54:2,3,5,8,11
54:14,18,21,23
55:4 56:5,10
56:15,18,19,20
56:23 57:17,22
58:4 59:1,12
59:13,16,17
62:10 70:13
80:18 88:9
93:5,6 96:10
99:6 100:7
106:16 107:7
131:7 132:21
134:8 138:2
183:13 190:5
191:8 212:10
212:11 245:4
376:24 379:10
406:8 415:19
417:7 441:19
452:4 455:19
457:20 458:4

**expertise**
159:15 190:4

258:6

**experts**  240:21
241:2 262:18
340:10,12
405:2

**expires**  466:12

**explain**  75:18
85:13 335:2,18
416:15

**explained**
460:10

**explaining**
392:3

**explanation**
59:20

**explicitly**
447:12

**express**  21:18

**extent**  22:24
49:4 68:11
83:1 85:18
112:12,23
127:14 133:18
151:13 180:16
185:13,18
188:7,11 189:8
189:10 190:12
190:13 192:22
193:3 194:14
202:9 219:11
219:24 221:20
233:12 237:15
265:7 295:10
316:5 320:16

CONFIDENTIAL

**[extent - filled]**

338:21 407:12
411:4 435:20
447:19 456:10
456:13
**external** 233:9
238:5,17,24
401:24 402:24
**extra** 76:10,11
77:1 194:22
195:3,5
**extremely**
396:2 430:7
**eyes** 129:1

**f**

**f** 4:4 17:2
**face** 75:13
109:2 151:18
229:8 312:6
317:11 383:21
454:20
**facebook** 88:9
90:18 100:20
102:7 128:10
291:3 351:11
461:6,7
**faces** 455:1
**fact** 68:20
74:19 76:17
82:7 83:10
84:1 104:8
107:7 119:21
129:12 131:5
131:24 132:19

137:23 138:2
140:3,12,18
143:7,14
164:12 169:20
185:16 194:18
218:9 221:13
222:13 238:11
245:10 247:11
254:19 257:18
258:16 259:6
260:5 262:23
263:13 265:13
267:18 294:1
300:4,15 301:4
302:3,12,24
303:11 307:1
331:7 338:6
394:22 418:21
431:2 435:4
442:1
**factors** 260:6
**factual** 126:7,9
168:18 376:16
376:23
**fail** 464:18
**fair** 28:2 43:16
45:19 65:16
69:2 70:12
74:12,17 82:1
93:23 95:18
102:20 106:10
107:21 122:18
144:21 145:5
145:22 174:15

174:16,22
212:17 217:14
218:8,13
226:20 227:4
230:10,11
231:13 232:8
234:18 235:5
235:14 236:11
238:19 239:10
241:23 244:7
245:3 246:4
248:20,21,23
250:16 256:4
256:21 261:24
280:9 305:16
319:7 327:12
344:16 347:9
348:7,8 362:14
380:8 381:11
393:19 396:14
407:24 408:4
415:21 423:12
448:10
**fall** 315:11
388:13 440:3
**falls** 441:22
**familiar** 231:4
**fan** 202:5
**fans** 201:20,22
202:10
**far** 36:5 44:6
246:16 263:8
271:20 313:8
394:20

**farm** 3:11
**fault** 257:21
258:2,3
**fax** 1:24
**features** 176:10
181:7,11,13,16
**federal** 62:5
210:8 233:10
233:13,22
234:10 235:15
264:13 395:10
455:12
**federally**
263:16 264:6
**feel** 22:5 164:24
164:24
**fees** 47:20
**fell** 240:6
315:11
**field** 75:10
190:4
**fields** 53:12,20
54:8 57:15
**fifty** 204:13
**fights** 173:24
**figure** 76:4
405:19
**file** 275:17
311:18
**filed** 253:5
**files** 33:17
**filing** 11:4
**filled** 230:23
276:5

CONFIDENTIAL

**[filter - former]**

**filter** 198:16,17
198:20 261:20
263:18,21
264:5,11,20
265:11 266:17
267:4,14
268:14 269:6
358:7,14
394:11,24
**filtering** 383:10
383:14 384:9
386:2,3
**filters** 261:17
262:5,9,23
263:16 265:1,8
265:15,19
267:23 268:6
268:22 269:18
270:5,11
365:16 395:6
**final** 113:18
114:5
**finalize** 35:24
**finalized** 363:8
405:1
**finally** 243:16
**financial** 5:4
30:5 32:7
74:11,15,21
75:5,12 151:19
152:3 274:18
276:15,16
277:12 317:15
325:1,10,16

394:19 396:1
397:1
**find** 26:22 99:5
100:6 161:22
440:16 457:21
458:5
**findings** 75:5
**fine** 110:17
**finish** 13:2
167:12 168:15
171:22 366:1
**firm** 3:16 32:9
33:2,5,6,11
37:16,17,21
38:1,10,13
39:12 44:14
45:23 46:16
49:2 50:2,4
51:7,12 54:23
**firms** 39:5
341:13
**first** 8:16 34:24
39:9 42:11,16
60:1 102:24
149:9 175:11
190:2 200:14
203:11,18,24
205:4,9,12,13
205:18 206:3
207:15,24
208:1 242:23
329:9,17
330:11 358:4
372:7 392:19

403:12
**fiscal** 86:8,9
325:17,18
337:5
**fit** 113:5
**five** 91:2 93:8
93:12 125:21
152:8 153:15
239:21 240:7
241:5,9 242:10
265:21 295:24
432:5
**fixed** 194:21,23
195:2 431:2
**flooded** 201:17
**florida** 5:6
**focus** 234:1
241:4 242:3
**folders** 37:7
**folks** 264:24
**follow** 311:17
**following**
359:10
**follows** 12:11
**footnote** 274:12
**force** 238:24
346:5
**foregoing**
463:17 466:3
**forensic** 33:24
35:20 37:12
40:10,12 41:13
53:14 56:18
75:2,10 104:5

105:13 109:16
109:19 148:6
149:13 242:24
247:14 313:2
314:3 354:14
354:22 402:5
404:21 405:4
405:18 407:11
408:20 412:4
417:23 420:20
424:22 427:24
429:6 450:15
450:22
**forensically**
113:3 221:5
246:20 268:10
**forget** 277:16
**form** 11:6
32:24 34:12
81:22 82:9,21
83:12 84:3
122:24 128:12
150:10 275:7
298:7 310:5
379:14 466:5
**formal** 67:1
**formalities**
55:6
**formally** 66:19
**format** 36:10
317:18
**former** 27:23
109:14

CONFIDENTIAL

**forming** 23:13 23:24 24:13 25:13,22 27:12 27:20 28:5,9 28:15 274:8 307:16 377:23 395:17,22 416:2 423:14 431:11,11 439:5

**formulation** 35:23

**forth** 149:9 266:4 315:14 356:14 374:22 388:21 420:17

**forward** 323:24

**found** 321:19 387:4

**foundation** 208:17

**four** 26:7 36:21 58:4,18 59:10 180:24 212:7 240:7 241:9 396:16 426:5

**fourth** 368:24

**fraction** 271:23

**fraud** 56:24 62:5 74:10,20 75:8

**freeze** 378:20 384:17,19 385:15

**friday** 11:14

**front** 290:10 302:16,17 329:4 349:3 362:22 382:13 392:14 397:4 427:20,22 428:14 429:23 435:9 438:7

**frustrating** 429:22

**full** 296:17 332:20 335:3 342:18

**function** 245:6

**fund** 78:7,7 235:24 236:1 237:18,18,19

**funded** 235:8 236:1

**funding** 233:15 233:17,24 234:8,9 235:13 235:14,15 238:6,18 239:1

**fundraiser** 81:3

**fundraising** 66:3,21 68:13 68:22,24 69:13 69:17

**funds** 78:8 233:10,10,13 234:2,11,14,19 235:2 236:2,8

236:20 237:1 237:13,16

**further** 24:8 151:15 188:15 243:2 313:23 334:2 346:19 385:13 390:16 391:7,12 420:1 462:3

**future** 60:12 61:7 78:14 199:4 240:24

**g**

**g** 3:10

**gain** 78:24

**galveston** 3:18

**game** 105:17

**games** 92:12 250:4

**gathered** 217:3

**gathering** 33:22

**general** 29:15 34:1,8 75:22 78:7,22 148:4 149:6,23 150:17,22 151:17 171:5 196:13 214:9 233:13 234:10 235:24 237:5 237:18 242:1 243:14 310:3,8

312:8 317:11 345:23 347:18 384:5 386:2 388:19 429:4

**generality** 172:20

**generalization** 67:18

**generalize** 79:13

**generalizing** 77:20

**generally** 29:24 33:15 34:14 57:8 60:17 63:3 67:5,11 67:22 73:8 76:3 91:17,19 153:11 157:20 170:16,19 171:3,5 174:22 176:5 191:11 221:9 236:14 251:12 261:22

**generate** 78:1

**genuinely** 409:24

**getting** 42:3,5,7 140:16

**gilfillan** 3:10

**give** 13:11 23:7 23:7 43:23 47:15 59:20 62:2 75:24

CONFIDENTIAL

**[give - gossip]**

| | | | |
|---|---|---|---|
| 107:6 115:11 | 121:5 129:2,12 | 237:17 242:2 | 207:8 208:17 |
| 123:7 130:2 | 131:7 174:23 | 242:21 247:10 | 209:24 214:24 |
| 182:15 196:12 | 182:17 214:13 | 253:5,10 | 219:2 230:16 |
| 197:4 217:6 | 215:2 247:1 | 275:16 311:3 | 232:20 244:10 |
| 219:3 245:4 | 249:12 258:7 | 312:13 315:20 | 247:6 248:10 |
| 263:4 278:11 | 261:13 263:11 | 323:9 347:21 | 248:21 273:15 |
| 280:19 294:16 | 329:5 376:24 | 357:13 385:13 | 273:18 274:19 |
| 295:12 309:1 | 457:16 458:18 | 429:6 444:2 | 282:19 283:7 |
| 311:20 360:15 | **globally** 423:22 | 448:13 450:18 | 284:12,22 |
| 376:23 377:3 | **go** 13:10 21:3 | **goes** 53:16 78:6 | 294:16 297:5,9 |
| 410:2 437:13 | 24:20 31:8,14 | 110:21 135:1 | 297:9,18 |
| 440:14 455:6 | 31:24 32:1 | 136:6 202:4 | 304:11 318:13 |
| 455:17 | 39:4 42:20 | 230:17 264:4 | 319:15 323:24 |
| **given** 23:21 | 44:7 53:21 | 301:13 323:18 | 344:3,5 349:17 |
| 24:7 32:3 | 55:5 59:19 | 359:8 366:11 | 355:14 359:23 |
| 39:19,22 96:14 | 70:24 81:5 | 411:7 446:21 | 360:15,21 |
| 101:8 129:15 | 84:5 85:19 | **going** 40:9 | 363:14 374:22 |
| 131:15 132:6 | 86:19 89:24 | 44:10 47:7 | 375:16 376:2 |
| 148:8,9 163:8 | 90:5 94:3 | 55:6,9 58:19 | 376:10 377:11 |
| 200:6 212:19 | 96:13 103:6,21 | 59:24 70:3 | 385:14 388:7 |
| 213:1,16 219:4 | 111:5,5 115:17 | 78:24 86:16 | 392:22,23 |
| 225:8 231:2 | 119:9,13,14,16 | 87:12 98:16 | 442:10 451:10 |
| 252:16 271:6 | 123:6 126:19 | 118:10 120:11 | 454:18 459:11 |
| 272:10 273:14 | 147:8 149:21 | 120:22 121:19 | 462:13 |
| 293:18 294:6 | 150:15,16 | 123:10 125:15 | **gold** 313:17 |
| 295:11 311:9 | 151:5,11 | 127:9 130:15 | **golkow** 1:23 |
| 314:13 352:8 | 152:24 153:1 | 130:16 131:13 | 11:13 |
| 376:2 409:4 | 157:3 166:13 | 140:6,23 | **good** 12:16,17 |
| 459:2 463:7 | 172:18 179:14 | 142:16 143:17 | 31:17 87:7 |
| 466:4 | 185:6 198:13 | 143:22 165:1 | 248:18 313:16 |
| **gives** 402:10 | 198:18 200:13 | 171:2,22 173:8 | 396:3 |
| **giving** 13:3 | 201:17,20,21 | 183:16 188:22 | **google** 2:13 |
| 56:2 96:11 | 204:24 207:12 | 196:9 197:16 | **gossip** 174:4 |
| 98:17 119:19 | 236:15 237:16 | 198:1 202:4 | |

CONFIDENTIAL

**[gotten - happened]**                                                     Page 43

**gotten**  221:18
  326:13 419:24
**govern**  68:5,9
  68:15 266:2
**governed**  67:5
  67:14
**government**
  378:9 382:5,10
  383:6,17
  385:22 387:13
  388:2,16 389:6
  389:19 390:10
  390:22
**grab**  100:23
  147:8
**grad**  64:5
**graden**  2:3
  32:23 39:16
  97:2 100:8,23
  114:18 121:9
  122:19 127:20
  128:11 133:11
  135:17 136:18
  139:1 140:14
  141:18 145:3
  146:10 150:9
  153:7,23
  154:19 157:12
  158:16 159:7
  160:3,12 162:1
  163:2 166:10
  167:11 170:13
  174:20 177:11
  180:11 181:9

182:1,11
184:13 187:9
188:6 189:17
190:22 191:18
192:21 194:7
205:20 206:17
209:6,19
210:21 214:6
217:22 218:20
219:14 220:2
220:23 222:24
224:12 225:3
226:5 227:5,14
229:4 231:12
232:9,15
241:21 249:15
250:23 254:3
254:22 256:3
257:14 258:22
262:12 268:23
269:20 270:13
271:13 272:19
281:22 282:5
282:15 283:24
284:10 285:13
292:7 297:12
297:22 300:9
301:8 315:5
320:1,13 325:3
333:17 336:18
338:10 341:18
342:2 343:4
351:9 355:2
356:1 361:24

364:24 370:8
373:15 374:5
375:13 376:21
387:15 389:7
390:24 392:6
394:7,15
404:14 407:3
408:9 409:11
410:9 412:13
413:24 419:18
421:5,10
430:23 437:10
437:21 444:21
452:2 453:20
454:14 455:4
457:8
**grand**  2:17
**grant**  234:4
  235:13,14
  239:1
**granted**  324:24
**grants**  233:22
  233:23,23
**great**  87:11
**ground**  273:17
  456:15
**growing**  202:1
**guess**  25:16
  30:19 39:5
  46:1 57:9
  66:11,15 84:5
  86:19 89:2
  105:11 121:7
  124:23 135:9

143:1,12 158:5
176:9 183:5
191:10 193:17
222:18 241:4
249:1 257:7
328:3 415:12
421:11
**guessing**
  228:21

**h**

**h**  6:9 7:2 8:2
  9:2
**half**  79:16,17
**hall**  260:13,19
  261:2,10
**hand**  17:7
  386:8 440:7
  445:16
**handed**  366:15
  366:16,20
  440:4,18
**handing**  124:10
  441:2
**handled**  451:8
**handwritten**
  276:7
**happen**  98:17
  343:9 456:15
**happened**
  30:12 198:9
  255:11 256:11
  257:4 456:11

CONFIDENTIAL

**[happy - hypothet]**                                                                 Page 44

| | | | |
|---|---|---|---|
| **happy** 32:1 45:5,6 100:11 149:21 172:18 295:5 386:5 391:16 438:8 454:6 | 394:2,10,23 395:4 | 193:13 239:16 240:15 241:19 243:11 244:18 340:11 | **hold** 56:14 290:6 |
| | **harford's** 378:3 380:13,21 | **hear** 126:7 | **home** 451:4 |
| **hard** 136:3 199:1 334:6,9 368:21 372:6 372:12 374:1 381:23 428:15 | **harm** 118:2 185:14 194:19 196:23 265:17 422:7 425:3 436:19 | **heard** 153:10 | **hopefully** 397:4 |
| | | **held** 1:14 11:18 | **hospitals** 61:2 |
| | | **help** 55:17 132:11 345:22 355:5 | **host** 71:16 |
| | | | **hour** 42:8,11 42:12,16,18 301:10 365:1 |
| **hardy** 2:16 | **harmed** 248:15 | **helped** 34:11 | |
| **harford** 6:21 7:19 9:11 15:16,21 16:2 19:7,12,15 20:24 21:12 26:13 134:13 134:16 213:6 213:10 214:1 215:7 217:9 228:6 252:11 302:12,18 303:5 316:24 377:23 378:11 379:20 380:6 380:12,19 381:7,9,18 382:2,11,18 383:15 385:20 386:13,21 387:3,10 388:8 389:2,16,24 392:4 393:15 | **harms** 94:10 185:6 207:9 401:22 402:9 402:22 403:10 403:23 404:10 405:23 407:1 411:12 413:19 413:23 436:16 | **helpful** 28:4 | **hourly** 42:6 50:1,4 |
| | | **helps** 67:3 | **hours** 50:22 51:4 61:14 105:13 109:18 149:15 462:11 |
| | | **hereto** 132:6 | |
| | | **hey** 312:12 | |
| | | **high** 64:4,7,13 64:20,24 65:6 65:9,18 66:6,9 66:21 69:6,14 70:3 76:1 111:11,12,15 143:11 284:18 | **huggins** 334:21 |
| | **harold** 34:16 35:8,16,17 44:20 47:2,18 | | **huh** 360:12 |
| | | | **hundreds** 34:2 41:11 57:23 105:12 109:18 149:14,15 406:10 |
| | **harold's** 58:14 | | |
| | **hats** 53:6 | | |
| | **head** 30:4 | **higher** 284:15 405:9 | **hung** 140:16 |
| | **headers** 314:17 316:21 | | **hurricane** 62:19,22 71:2 71:3,8 72:9,24 202:7 |
| | | **hired** 38:19,23 39:3,7,20 40:11 57:17,21 60:18 405:17 406:7 | |
| | **heading** 288:24 453:6 | | |
| | **health** 70:10,13 83:4,7 84:19 188:19 189:7 189:15 190:1,5 190:19,21 191:1 193:1,5 | | **hyman** 26:18 |
| | | **hiring** 39:23 | **hypothet** 67:21 88:18 131:15 158:5 159:16 163:23 164:9 171:6 182:3,22 192:10 208:8 |
| | | **historical** 385:2 385:7 | |
| | | **history** 119:15 | |

CONFIDENTIAL

**[hypothet - improper]**                                          Page 45

269:23
**hypothetical**
88:16,16
197:17 205:1
206:20 263:10
270:15
**hypothetically**
263:15 320:4

**i**

**ida** 62:19,22
**idea** 43:22
228:13 285:21
**identification**
13:19 14:14
15:4,17 16:8
16:23 17:15
18:5,19 19:8
19:21 20:11
43:5 52:5
75:11 124:7
152:18 287:5
305:2 309:10
329:21 349:24
364:22 368:13
371:7 386:17
400:19 438:19
441:10
**identified** 86:3
105:8 151:14
152:10 155:9
168:8 229:2
241:10 242:12
243:5,16

244:10 253:1,4
253:20 298:20
298:24 299:10
301:16,18
310:22 324:4
332:14,16
338:19 353:5
354:5,20 364:1
367:1 381:20
382:11 383:15
384:6 385:9
388:22 403:23
405:22 406:19
409:16 415:15
420:9,12
422:21 426:2
434:12,18
440:2 445:3
450:1
**identifies** 200:5
331:4 332:19
374:21
**identify** 23:12
151:12 197:18
226:9,14
330:17 336:23
374:24
**identifying**
36:7 150:7
**illogical** 170:7
171:7
**immediately**
201:17

**impact** 118:24
119:6 127:12
130:3,19
131:17,18
184:18 198:21
207:9 222:15
245:20 248:14
262:22 271:16
283:2,18 286:8
286:18 321:5
364:2 395:7
456:18 457:13
458:19 459:4
**impacted** 83:6
244:12 245:17
245:18 270:1
321:13
**impacts** 131:16
**imparted** 272:1
**imperative**
464:14
**implemented**
272:14 273:1
457:3
**implementing**
367:9,13
**implication**
428:17
**implicit** 123:16
**implying**
428:17
**important**
198:14 316:13

**improper** 77:4
86:22 89:11
95:10 96:17
97:22 98:20
99:11 100:1,14
107:15 113:6
116:24 118:3
119:1,8 120:13
120:24 121:22
122:3 125:23
127:13 129:19
130:3,20
131:18 132:8
133:2 136:11
137:14 138:19
139:12 141:9
143:19 145:14
155:16 160:18
161:6 163:11
164:21 165:6
165:11,13,22
166:1,3,9
167:2 168:4,24
172:9 173:2
175:5,22 176:2
176:13,19
177:9 178:14
185:17 186:6
186:10,20,23
188:9 189:9
190:10 192:8
192:15,20
193:14 194:20
197:1,20

CONFIDENTIAL

**[improper - inclusive]**                                                    Page 46

| | | | |
|---|---|---|---|
| 198:10,22 | 457:1 458:24 | 440:23 442:6 | 354:11,13,16 |
| 199:10 200:20 | **improved** | **included**   134:4 | 355:8,23 356:8 |
| 201:5,11 | 81:22 82:9,21 | 148:11,21 | 360:3 378:10 |
| 202:18 203:5 | 83:12 84:3 | 149:4 150:8 | 379:2 381:17 |
| 204:9,16,19 | **inaccurate** | 152:11,19 | 382:17,20 |
| 206:5 207:2 | 109:21 110:15 | 153:20 154:14 | 383:19 388:17 |
| 223:10 227:19 | 110:17 136:21 | 155:4,11 | 389:12 399:7 |
| 231:22 238:22 | 140:1 141:3 | 162:19,23 | 399:10,13,16 |
| 243:7 244:13 | 143:15 453:15 | 170:8 180:19 | 399:20,24 |
| 245:21 247:5 | 453:22 | 192:19 213:13 | 401:17,22 |
| 251:21 254:9 | **inadvertently** | 233:8 234:16 | 404:7 407:22 |
| 254:13,20 | 331:17 | 235:3,12 236:9 | 433:23 434:5,8 |
| 255:12,18 | **incident**   346:19 | 236:21 237:4 | 434:10,21 |
| 256:7,24 | 460:1 | 237:10 267:22 | 435:6 440:17 |
| 258:13 259:1 | **include**   27:8 | 271:22 272:5 | 440:19,21 |
| 262:6 263:7 | 49:13 83:2 | 292:5 293:14 | 441:21 447:3 |
| 265:5 266:8 | 91:5 104:13 | 298:4,11,14,17 | **includes**   192:7 |
| 268:2 269:4 | 151:9 157:9,24 | 299:8,13 300:7 | 303:17 330:20 |
| 270:2 272:7 | 158:9,22 | 300:17 301:6 | 361:12 435:23 |
| 273:20 278:12 | 159:22 160:8 | 302:6,14,20 | **including**   26:7 |
| 278:21,24 | 161:19 163:24 | 303:2,13 308:9 | 38:7 88:13,22 |
| 279:3,9,12,19 | 192:8,24 193:4 | 312:2,22 314:9 | 125:14 190:8 |
| 282:20 285:2 | 195:20 196:3 | 315:1 316:8 | 240:13 300:23 |
| 289:24 290:15 | 203:16 210:18 | 321:8,17,22 | 363:21 374:2 |
| 291:24 300:1 | 233:22 238:24 | 322:1,6 331:18 | 433:16 |
| 321:14 354:17 | 256:15 260:12 | 331:21,24 | **inclusion** |
| 355:17 359:17 | 261:15 272:5 | 332:2,15,21 | 393:11 414:16 |
| 360:4,6 364:3 | 273:19 292:3 | 333:14,19,24 | 422:4 |
| 375:2 376:4 | 293:4,7,12 | 337:7,17,24 | **inclusive** |
| 377:7 378:12 | 313:4 322:17 | 338:3 342:18 | 335:21 402:14 |
| 388:9 399:3 | 331:15 339:17 | 342:19,23 | 403:13 406:21 |
| 413:8 422:10 | 339:24 343:12 | 343:10,16 | 406:24 409:2,9 |
| 433:7,20 | 421:18 424:9 | 352:20 353:8 | 410:8,23 |
| 434:14 436:17 | 424:20 436:5 | 353:11 354:2,8 | 412:10,22 |

CONFIDENTIAL

413:12,16,21 414:23 415:8 415:17 416:6 418:17 420:11 421:20

**income** 56:10 57:3

**incomplete** 171:6

**inconsistent** 295:5

**incorporated** 33:19 276:6 279:24 366:14 366:21

**incorporates** 367:19 375:24

**incorrect** 159:9 296:23 315:9 340:18 358:18

**increased** 78:11 82:4 111:23,24

**incur** 96:2 97:8 97:17 98:5 99:5,16 158:15 159:6 279:1 430:20

**incurred** 72:8 72:23 77:2,3 86:6 94:24 95:5,8 101:3 101:12,21 102:6,17,19

103:1,3 115:6 116:9 134:12 149:18 152:5 175:13 187:4 187:17 188:2 194:13,17 195:22 199:9 201:12 202:17 204:21,22 205:3 206:2,22 206:23 208:12 230:1,3 231:5 237:10 239:3 249:5 256:18 258:20 259:3 259:10 263:1 280:13,16,17 289:23 299:22 311:13 337:16 357:3 375:1 395:4 447:21 450:7 451:12

**incurrence** 196:24

**independent** 72:2 104:24

**index** 10:2

**indicate** 143:5 266:21 450:12 454:17

**indicated** 372:23

**indicates** 372:19

**indication** 319:17 420:1 444:3,14 449:15

**indicative** 162:12 237:11 340:16 428:8 430:3 447:20

**indirectly** 28:20 29:4 31:2 32:13 47:11,12 48:19 324:13 414:11

**individual** 30:20 95:17,20 155:19 181:21 181:23 182:7,9 183:2,4 184:9 257:12 265:14 267:18 355:22

**individually** 153:2

**individuals** 33:10 38:1 117:8 211:19 213:16 216:19 227:2

**information** 23:1 24:23,24 25:6 28:23 30:6 31:19 32:15 34:10 36:5,9 90:14 90:20,21 106:3

109:7 135:7 139:5 146:19 147:19,23 150:2,6 151:16 151:22 177:20 213:12 214:5 217:3 226:12 231:18 232:4 239:13 246:6 246:13 252:8 252:15 253:17 255:1,2 274:20 275:12,20 276:14,16,22 278:5 308:7,11 308:22 309:18 310:13 311:20 314:22 324:2,5 325:21 326:3 326:14,15 327:8,14,19 337:20 341:14 341:23 345:23 346:9,21 348:6 356:24 357:7 360:24 361:20 362:2 365:9 378:14 379:13 383:13 387:8 387:21 388:18 396:4 401:9,14 413:17 425:13 447:16

CONFIDENTIAL

**[informing - interrogatory]**

**informing**
327:9,15,20
361:21
**ingersoll** 4:9
**inherent**
107:14
**initial** 55:6
212:10 242:7
242:15 328:4
365:14
**initially** 274:17
326:7 410:13
**initiated**
277:10,14,23
**injections**
142:2,4
**injured** 452:17
**injury** 1:4
11:23 60:10
61:8 96:4
141:23 258:1
259:21
**input** 107:17
110:21 116:17
134:22 135:3
138:7
**inputs** 102:14
102:22 116:20
134:24 137:16
145:10 236:15
**inside** 38:13
92:1 242:20
441:22 456:8

**insofar** 286:19
346:2 395:8
450:23
**instagram** 2:19
88:10 90:19
100:20 102:7
128:9 291:2
351:11 461:9
461:10,11
**instance** 31:16
151:6 198:15
200:14 201:16
220:8 316:1
**instances**
256:17 257:9
**instituted**
449:12 456:20
458:16 459:6
**instruction**
271:10
**instructions**
464:1
**insurance**
62:21 71:14
96:7 202:3
**intend** 22:12,17
23:7
**intends** 295:12
**interactive**
152:2
**interest** 48:12
**interesting**
184:6

**intermittently**
50:23
**internal** 24:15
24:16 25:1,11
25:15,17
107:14 450:23
451:9
**internally**
451:8
**internet** 261:17
261:20 262:9
264:20 266:16
267:3 268:22
269:18 270:11
394:4,11,13,14
394:24 395:2,5
**interrogatories**
8:17,22 9:12
9:15 86:18
132:4 134:14
134:21 144:4
228:16 329:11
329:18 330:12
339:18 364:20
365:5 374:10
380:15,23
386:16,23
396:21 398:5
398:13 400:17
401:1,5 432:11
432:17 435:9
435:17 446:21
450:19

**interrogatory**
41:2,8,21
89:16 93:19
108:9,12 132:4
135:15 136:1,7
136:17 137:6
137:22 138:12
138:23 139:6
139:19,23
140:9 141:6,13
142:19 143:9
145:9 154:2
161:4 162:18
163:18 171:13
172:3,7,11,12
178:18 186:13
186:18 195:19
213:5,13 214:1
215:7,19 216:6
216:15,20
217:7,13
221:24 223:8
223:15,23
224:4 232:4,8
232:12 246:7
246:14,18
253:8,9,14
255:9 266:21
267:1 298:8
302:19 303:5,9
303:16 328:6
328:21 330:18
331:3,15
333:12 334:24

CONFIDENTIAL

**[interrogatory - issuance]**

| | | | |
|---|---|---|---|
| 335:24 336:2 | 456:22 460:11 | 312:12 356:18 | 316:24 395:16 |
| 336:12,20 | **interruption** | 356:20,23 | 395:22 396:5 |
| 339:2,11 | 62:8,11,13 | 357:6 383:8,21 | 396:12,18 |
| 340:20 343:15 | 71:10,13,22 | 406:11 410:21 | 397:15 398:2,9 |
| 344:6 353:4,21 | 201:15 | 411:2 412:9 | 398:17,22 |
| 362:3,19 | **interview** 29:19 | 413:2 421:19 | 399:8 400:18 |
| 365:10 366:5 | 155:8 | 424:11 426:10 | 401:1,5,9,14 |
| 366:22 367:18 | **interviewed** | 426:15 427:2 | 402:18 404:5 |
| 368:5 369:23 | 222:21 | 427:11 446:11 | 405:17 406:17 |
| 370:12 374:20 | **interviews** 38:4 | **involve** 54:24 | 407:22 408:23 |
| 375:20 381:10 | 38:16 | **involved** 55:22 | 409:1,7 410:7 |
| 381:13,20 | **intimately** 71:7 | 61:5 71:7,18 | 412:7,9,16,20 |
| 382:12 385:20 | 231:4 | 109:18 127:8 | 414:20 415:3 |
| 387:10 388:5 | **introduced** | 220:12 226:16 | 415:15 416:4 |
| 389:9,22 390:2 | 345:7 370:17 | 227:7 230:10 | 420:6,9 421:19 |
| 390:7 392:4,11 | **investigation** | 241:1 405:5 | 421:21 422:1 |
| 393:4,18 | 137:2 | **involvement** | 422:15,22 |
| 398:19 399:10 | **invoice** 45:21 | 177:15 220:7 | 423:4,6 424:12 |
| 400:2,6,7,9 | 276:14,21 | 381:12 433:2 | 425:11,22 |
| 401:10,15 | 323:3 357:11 | 433:14 | 431:10 |
| 402:18 403:20 | 357:19 384:1 | **irrelevant** | **irvington's** |
| 404:6,9 406:19 | 427:15 428:23 | 244:19 | 396:1,19 397:5 |
| 407:23 410:17 | 429:2 436:9 | **irvington** 3:13 | 398:3,11,19 |
| 411:16 413:17 | 442:16 443:5 | 7:6,21 9:15 | 399:14 416:2 |
| 414:13,19 | 451:1 | 16:6,12,17 | 423:16,19 |
| 415:16 417:5 | **invoiced** | 19:19 20:1,5 | 424:10 |
| 418:20 419:6 | 310:22 311:12 | 20:24 21:12 | **issuance** |
| 419:11,14 | **invoices** 8:6 | 26:20,24 85:20 | 177:18 179:19 |
| 422:15,22 | 25:2 29:14 | 85:21 86:1,20 | 212:19 247:13 |
| 423:18 432:23 | 34:1 39:4 43:4 | 134:13,17 | 349:8 364:10 |
| 433:5,11 434:2 | 43:9,12 49:12 | 213:6,11 214:2 | 369:22 390:14 |
| 435:21 446:24 | 104:6 124:2 | 215:8 217:9 | 414:7 416:22 |
| 446:24 447:5,8 | 146:14 149:23 | 228:6 252:12 | 417:3 420:3 |
| 447:9,12 | 244:15 275:21 | 302:24 303:4 | |

CONFIDENTIAL

**[issue - katrina]**                                                    Page 50

**issue**  93:18
  94:3,4,12,20
  126:17 161:12
  175:1 176:18
  177:8,24 178:4
  178:5,14
  181:13,14,16
  183:16 185:16
  197:9,14
  199:24 200:8
  200:20 203:2
  204:1 205:17
  206:14 209:17
  219:12 220:1
  245:11 246:9
  251:13 252:10
  253:1 255:23
  257:18 261:4
  261:22 264:18
  266:14 268:20
  269:16 270:9
  271:4 291:10
  292:15 296:14
  327:17,22
  334:13 336:16
  352:4 374:12
  409:17 421:23
  424:14 430:19
**issued**  14:7,21
  15:24 17:22
  18:12 20:5,18
  23:16 40:14
  155:12 212:10
  212:15,16

213:10 220:19
222:9,20 224:9
224:24 230:9
293:2,10 294:2
295:14 358:8
358:15 393:9
404:24 407:19
424:1
**issues**  57:8
  72:20 134:4
  161:9,12
  164:12 185:1
  185:23 186:15
  188:18 189:6
  189:14 191:4
  191:12,17,24
  192:18,23
  193:4,19 196:5
  201:2 455:1
**issuing**  424:2
**item**  330:22
  331:22 332:3
  337:18
**itemize**  335:2
**itemized**
  100:16 179:23
  385:5 447:11
  460:12
**itemizes**  335:2
**items**  372:6,12

**j**

**j**  2:10 3:4

**jackson**  4:10
  451:5
**jeff**  296:20
**jeffrey**  1:13 6:4
  8:8 12:3,9,20
  29:6 44:18,18
  45:11 46:11
  47:17,24 48:5
  48:11 52:3
  60:2,4 466:8
**jersey**  3:11 4:5
  4:11 86:5
  403:13 406:21
  406:24 409:1,8
  410:7,22 412:1
  412:10,21
  413:15,21
  414:16,22
  415:7,17 416:6
  418:17 420:11
  421:20 422:3
  422:19,24
  423:7,18,20
  424:12,16
**jobs**  34:18,19
  34:20,21 35:10
  35:11 37:3,4
**johnson**  34:17
  35:9 36:23,24
**jones**  34:17
  35:9
**jordynn**  4:10
**jordynn.jacks...**
  4:12

**joseph**  2:9
  232:15 301:9
  462:10
**jsandoval**  2:12
**jswofford**  3:6
**judd**  378:1,2,6
  378:15,24
  379:15,21
  380:2
**judge**  111:2
  112:13
**july**  17:23
  18:12 19:1,14
  20:4,17 21:8
  43:19 45:5,10
  45:24 46:10
**june**  34:24 86:8
  86:10
**jury**  112:3,13
  114:11 134:2
**justice**  60:24
  61:1
**justin**  3:4

**k**

**k**  63:20,21 64:1
  64:15 65:2,4
  65:11,14,20
  66:10
**kansas**  2:17
**kathryn**  8:9
  124:6,12
**katrina**  71:2,3
  71:8 72:9,24

CONFIDENTIAL

**[kboyce - knowledge]**                                                    Page 51

| | | | |
|---|---|---|---|
| **kboyce** 5:7 | 66:2,16,23 | 215:21 216:13 | 337:8,13 338:6 |
| **keep** 121:3 | 71:3,4 72:20 | 216:23 217:10 | 338:11 339:15 |
| 141:4 | 82:23 83:6 | 217:14 218:14 | 340:9 344:3,5 |
| **kept** 346:8 | 84:21 87:6,24 | 219:7,20 | 344:7 348:8 |
| **kessler** 1:14 2:3 | 88:12,15,24 | 220:18 222:8 | 349:4,7 356:10 |
| 3:4 11:19 | 89:21 92:6 | 222:16,17,19 | 356:11 359:3,6 |
| 39:12,14 51:7 | 93:24 98:16,24 | 223:16,22 | 360:13,15 |
| 51:12,16 | 99:2,17 100:3 | 224:6,13 226:6 | 369:15 374:6 |
| **kevin** 5:4 | 101:1,10,19 | 227:10,15,16 | 381:7 383:5 |
| **kids** 203:17,24 | 102:4 105:2 | 229:6,22 230:6 | 384:23 389:23 |
| 205:4,9,12,18 | 109:12 110:3 | 230:18,24 | 392:10,21 |
| 206:3 207:15 | 121:2 127:22 | 233:11,18 | 393:2,15,19 |
| 207:24 208:1 | 142:1 147:21 | 240:20,21 | 398:16,21 |
| 461:16 | 148:14,19 | 241:11 249:7 | 405:14 407:20 |
| **kind** 36:4 60:14 | 153:18 154:12 | 251:9,24 252:5 | 408:1,2,5,10,15 |
| 69:21 175:8 | 158:4 159:8 | 252:14 255:7 | 419:21 421:13 |
| 183:16 257:19 | 161:13,16 | 255:22 256:5 | 429:21 432:21 |
| **king** 1:15 2:4 | 171:9 173:21 | 256:22,23 | 433:9 436:8 |
| 3:5 5:3 11:20 | 174:10 176:5,8 | 257:2,16,19 | 437:11 440:10 |
| **kishia** 374:16 | 176:10,14 | 258:9 259:16 | 440:11,22 |
| **knee** 259:24 | 179:7,17 | 261:1,19 | 443:8,10 445:9 |
| **knees** 259:18 | 183:20,23 | 262:19 265:8 | 448:24 449:20 |
| 259:20,20 | 184:19 185:4,5 | 269:21 270:6 | 449:21,24 |
| **knew** 313:21 | 185:14,20 | 271:1 273:10 | 450:5 452:4,9 |
| 382:23 416:10 | 186:2,9,12,22 | 275:15 277:10 | 455:5,7,11,13 |
| **know** 12:24 | 187:2,11,15,22 | 278:19 281:11 | 460:2 |
| 13:6 30:12 | 187:24 188:13 | 281:14 282:7 | **knowing** |
| 38:24 39:2,21 | 188:22 189:12 | 285:17 291:18 | 164:11 185:12 |
| 41:9 44:8 46:3 | 189:19 198:8 | 292:19 296:4 | 206:19 218:24 |
| 46:20 48:1 | 199:5,19,20 | 296:22 323:14 | 224:18 229:6 |
| 49:20 50:21 | 200:10 201:14 | 325:4 326:12 | 270:15 407:16 |
| 51:2,17 53:16 | 207:5 212:2,18 | 326:17 327:24 | **knowledge** |
| 54:9 55:15 | 213:9,15,17 | 328:23 329:6 | 106:12,23 |
| 56:12 57:19 | 214:2 215:10 | 333:12 335:19 | 107:14 220:15 |

CONFIDENTIAL

228:1 230:12 230:17 231:5,8 232:6 251:5 295:9 436:13

**knowledgeable** 41:19 86:15 107:10 108:18 116:22 117:15 118:1,8,18,19 118:23 119:6 119:14,23 120:1,10,20,22 121:18 125:14 126:14 129:16 130:15 131:13 132:24 136:4 138:15 145:12 161:2 172:22 175:19 176:14 196:8 197:3 208:16 227:21 231:17 243:6 245:24 247:8 253:19 261:8 262:2 264:24 266:1 272:9 286:20 291:21 321:11 359:23 360:10,18,22 364:2 374:23 376:14 377:3 388:7 393:6 395:9 398:23 425:1 458:22

**known** 418:24
**knows** 270:5
**kslaw.com** 5:7
**ktmc.com** 2:5 3:6

**l**

**l.l.p.** 2:16
**labeled** 17:8 368:21
**lakdawalla** 26:8
**language** 166:5 167:24 168:21 352:1 365:21 366:4 418:21
**laptops** 358:8 358:15
**large** 109:17
**largely** 33:21 35:18
**larger** 60:23
**law** 1:14 3:16 37:16,17,21 193:22 194:2 209:24 262:8 262:16 263:12 263:24 264:13 271:9 341:13
**laws** 266:1
**lawyer** 262:14 412:8
**lawyer's** 467:1

**lawyers** 373:9 374:4 375:9,16
**lay** 93:1,5 107:7 153:11 191:7,7 249:16
**leading** 385:2
**learning** 84:14 84:19 85:4,10 85:17 240:14 241:18 243:20 270:24 271:11 272:14
**leases** 55:19
**led** 82:4
**ledger** 34:1 150:18 151:7 237:6 310:3,5 310:8,10,13,23 311:20 313:6 324:10 345:23 357:21 388:20 429:4
**ledgers** 29:15 34:8 148:4 149:6,23 150:22 151:17 242:1 312:8 317:11 347:19 384:5
**leeway** 47:15
**left** 331:17
**legacy** 66:4,20 68:12

**legal** 53:10 54:4 55:4,14 55:15,20 122:21,22 123:1 209:22 210:13 216:8 257:17,22 269:7 440:13 452:9 455:10
**lessened** 78:12
**lesser** 210:24 262:24 264:19 266:16,22
**letter** 9:19 441:8 443:19 444:1,3,5 448:2,16 449:3 449:9,13,16,19 450:2,12,15 451:14 453:3,4 453:14 454:8 454:19 459:24
**level** 76:1 234:20,23 235:23 245:7 392:12
**liability** 1:5 11:23
**liable** 259:14 452:8,18
**life** 60:12 61:8 142:3,7 260:4
**lightspeed** 151:15 350:11

CONFIDENTIAL

350:18 353:16
357:18 358:7
358:14,23
359:14,16,24
360:2,19 361:4
361:6 363:21
364:4 365:15
**likely** 184:2
**liken** 201:14
**limit** 96:24
189:23 343:7
350:19 359:1
**limited** 127:19
156:16 161:10
166:6,24 168:1
168:22 169:24
184:24 185:22
186:14,18
188:18 189:5
189:14 222:2
289:17 290:14
296:14 352:3
359:16 433:16
**line** 10:6,6,6,11
10:11,11,16,16
10:16,21,21,21
330:22 331:22
332:3 337:18
368:24 369:9
372:4,7 373:2
373:3 465:3
467:2
**linked** 255:24

**lisa** 8:9 116:1
124:6,12
170:15 229:17
318:20 319:5
321:19 326:22
327:1 338:15
**list** 205:13
303:6 356:12
446:20
**listed** 265:16
324:1 403:12
422:18 426:7
**lists** 403:16
**litigation** 1:5
11:24 27:4
53:3,10 54:3
55:10,11,21
56:5,11 57:18
57:23 60:6
163:13 183:10
214:8
**little** 35:6 43:17
45:16 47:15
64:9 150:4
178:9 238:12
255:21 269:12
310:7 322:9
341:7 358:20
391:23 429:21
440:16 450:21
**live** 52:16,18
198:6 426:3,6
426:10 427:2

**lived** 71:4
**llc** 2:13,13 5:9
47:18
**llp** 1:15 2:3,9
3:4 4:4,15 5:3
**loaded** 67:7
**local** 64:4,7,13
64:20,24 65:6
65:9,18 66:9
66:21 69:19
228:17
**located** 52:20
**locker** 353:18
369:2,6
**lockers** 202:14
202:22 203:13
239:15 353:19
357:15 362:8
363:22 367:2,4
367:7 369:18
374:3 375:6,22
376:19
**long** 50:19 71:1
81:14 146:11
191:3 200:24
214:9 229:10
229:15 230:19
231:14 265:22
430:8 449:2
**longer** 198:3
354:13 356:13
**look** 74:9,14,20
74:23 85:2,20
86:19 122:7

123:13 150:15
150:16 151:5
154:16 157:3
161:21 162:11
166:16 172:18
179:16 203:8
253:5,11
260:17 263:5
270:6 275:17
295:1,3 317:12
318:23 320:15
322:23 326:20
350:13,16
357:13 362:13
364:14 370:11
370:13,23
374:9 386:5
391:16 400:8
405:8 422:14
423:3,5 425:21
425:23 426:9
429:2,2,3,9
438:8,11
439:16,18
441:13,18
445:6 448:14
450:19
**looked** 84:17
268:4
**looking** 29:20
34:8 50:6
61:13 123:9
152:3 205:12
207:15 229:17

CONFIDENTIAL

**[looking - marks]**                                              Page 54

280:10,12
288:11 290:6
332:6 333:1,4
333:7,9 346:18
372:14 402:17
422:17 426:12
446:6 459:22
**loop** 310:20
313:23
**loss** 60:9 83:3
96:11 202:8
**losses** 71:13,22
72:12,18
355:16
**lost** 35:19,24
40:9 53:13
56:19 57:4
61:12 62:7,13
72:19 73:11
74:3 75:15,19
75:21 76:3,9
76:16,17 77:1
77:6 78:16
83:6 96:10
138:4 192:6
195:6
**lot** 24:22 34:10
39:1 61:24
62:10,22 67:13
77:23 96:21
165:12 198:17
215:22,23
216:3 242:21
257:24 264:2

265:8,9 284:15
346:10 359:15
383:7 404:19
406:9 428:10
**louisiana** 52:17
52:18,20 62:20
**low** 143:11
**lower** 203:24
266:23 361:9
405:10
**lumbar** 142:6
**lunch** 232:17
**luncheon**
232:23
**lying** 454:12,16

**m**

**made** 104:15
194:15,16
196:7 199:6
226:22 235:19
246:24 299:12
300:6,16 301:5
301:22 302:5
302:13 303:1
303:12 320:3,5
354:7 355:22
356:7 368:6
385:4 414:9
418:24 434:20
435:5 464:7
**mail** 30:17 32:5
32:5 274:5
307:13 345:1

431:8
**mailed** 108:16
**mails** 24:16
25:1,18
**maine** 2:10
**major** 54:12
405:6
**majority** 53:21
57:10 59:11,15
**make** 21:4 45:6
55:7 94:22
95:3 112:18
115:18 140:20
141:2 146:15
165:4 189:23
190:6 210:12
217:3 229:1
239:19 310:20
320:20 383:7
428:1 429:4
443:22 464:4
**makes** 234:12
234:24 247:15
440:6
**making** 88:16
123:15 149:15
234:1 244:21
339:8,12
393:21
**malpractice**
60:11
**manner** 183:15
**march** 362:20
371:19 374:15

**marginalizes**
105:12
**mark** 13:10
42:24 51:23
286:24 349:17
364:15 368:8
370:24 438:12
438:13
**marked** 10:20
13:18 14:13
15:3,16 16:7
16:22 17:14
18:4,18 19:8
19:20 20:11
43:4 52:4
124:6,11 287:4
305:1 309:9
329:20 349:23
364:22 368:12
371:7 386:16
400:19 422:16
438:18 441:9
442:8,20
**market** 3:17
248:24
**marking**
304:20 309:5
329:8 386:9
400:12 441:3
**markings**
443:13
**marks** 34:21
35:2

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **married** 34:23 | 55:20 61:20 | 321:15 324:23 | 78:18 80:5 |
| **martin** 69:5,14 | 88:3 89:10,18 | 334:4 340:17 | 93:12 108:8 |
| 70:4 | 90:22 91:18,22 | 344:2 351:16 | 163:15 183:9 |
| **maslynsky** 1:18 | 93:10 94:7,15 | 360:5,7 378:13 | 202:11 204:12 |
| 463:10 | 94:21 95:11 | 382:1 388:10 | 220:4 230:13 |
| **massachusetts** | 96:18 97:20,23 | 393:24 396:16 | 234:7 239:19 |
| 4:16 | 100:2 101:9,18 | 397:17 399:4 | 244:4,14 249:4 |
| **master's** 36:13 | 102:3,13 | 407:19 409:5 | 258:18 259:8 |
| **matched** 385:8 | 105:24 109:5 | 409:14 425:4 | 259:12,13 |
| **material** | 117:1,19 118:4 | 428:20 433:8 | 263:17 264:9 |
| 164:12 185:15 | 120:14 121:1 | 435:2 445:16 | 269:2 273:7 |
| 371:18 | 125:23 126:17 | 459:1 | 297:8 325:5 |
| **materials** 23:12 | 127:1,12 | **matters** 54:4 | 339:7 357:5 |
| 23:23 24:21 | 129:20 130:4 | 55:4,14 57:24 | 411:20 429:9 |
| 25:6 26:6 28:3 | 130:16,21 | 136:24 137:11 | 431:3 442:14 |
| 31:12 32:2 | 136:12 137:15 | 215:23 | **means** 408:16 |
| 213:3 276:3 | 138:20 139:14 | **matthew** 26:16 | 412:2,3 463:19 |
| 312:16 315:16 | 141:10 143:24 | **mba** 36:15,15 | **meant** 294:20 |
| 323:1,9 329:4 | 145:15 153:16 | 36:15 | 319:21 320:9 |
| 346:23 378:18 | 154:9 160:19 | **mcknight** | 390:1 460:7,9 |
| 382:22 448:14 | 161:7,12 | 211:17 274:11 | **measured** |
| **math** 44:3 | 163:11,21 | 274:18 275:3,7 | 60:16 272:3 |
| 105:17 110:5,7 | 168:10 171:1 | 275:10,13,24 | **measurement** |
| 112:1 113:9 | 172:10,14 | 276:13,20 | 63:7,8 |
| 115:2 133:16 | 173:3 175:23 | 277:2,8,24 | **mechanically** |
| 133:20 207:20 | 176:3,20 177:2 | 278:3 280:2 | 108:16 111:16 |
| 415:22,22 | 177:10 178:16 | 312:11 | **mechanics** |
| **mathematical** | 179:1 180:2 | **md** 1:3 | 113:12 |
| 184:17 | 185:10 193:16 | **mdepaz** 2:18 | **mechanisms** |
| **mathematically** | 216:17 223:12 | **mdl** 1:4 | 34:7 |
| 111:17 184:16 | 224:2 232:14 | **mean** 29:4 40:7 | **media** 1:3 |
| **matt** 2:16 | 247:2 253:22 | 47:13 64:17 | 11:21 87:23 |
| **matter** 37:13 | 273:6,13 290:2 | 66:24 71:1 | 88:2,4,6,8,12 |
| 48:18,23 55:16 | 291:23 299:5 | 76:18 77:22 | 88:14,21,23 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 89:9,13,23 | 192:1,4,7,11 | **meme** 174:7,8 | **meta** 2:19 |
| 90:23 91:5,6,7 | 193:23 245:11 | **memorialize** | **metairie** 69:17 |
| 91:9,13,16,21 | 250:14 251:12 | 317:22 348:1 | 70:7 |
| 91:22,23 92:1 | 261:3,21 | 380:1 | **methodology** |
| 92:3,5,7,9,13 | 262:11 264:17 | **memory** 391:19 | 157:21 180:6 |
| 92:15,16,17,23 | 266:14 268:19 | **mental** 70:10 | 181:4 210:6 |
| 93:4,7,12 95:1 | 269:15,24,24 | 70:13 83:4 | 422:6 428:20 |
| 95:6,12 102:20 | 270:5 271:3,12 | 84:19 188:19 | **meyers** 1:13 |
| 103:4 125:11 | 288:9,20 289:1 | 189:7,15 190:1 | 6:4,12,15,17,20 |
| 125:11,18,20 | 289:8,13,17 | 190:5,19,20,24 | 7:5,7,10,12,15 |
| 126:3,13,15,20 | 290:1,14 291:9 | 193:1,5,13 | 7:17,20,22 8:5 |
| 126:23 127:3,7 | 291:20,22 | 239:15 240:15 | 8:6,7,8,9,11,12 |
| 127:11,18 | 293:21 295:22 | 241:19 243:11 | 8:14,16,19,21 |
| 128:1,21 131:3 | 296:12,13,21 | 244:18 340:11 | 9:5,7,10,13,17 |
| 131:6 132:1,20 | 296:24 334:12 | **mention** 122:15 | 9:18 12:3,9,16 |
| 153:5,14,21 | 350:20,24 | 123:3 124:21 | 12:20 13:16 |
| 154:8,15 | 351:2,14 352:3 | 125:4 126:22 | 14:3,11 15:1 |
| 157:10 158:1 | 352:10 359:1 | 290:20 291:2 | 15:14 16:5,20 |
| 158:10,14,23 | 359:12 373:1 | 327:6 361:17 | 17:12,18 18:2 |
| 159:5 160:1,11 | 390:23 421:22 | 385:21 | 18:16 19:5,18 |
| 160:24 161:20 | 424:13 461:22 | **mentioned** 93:8 | 20:8 26:23 |
| 162:21 163:10 | 461:23 | 155:22 322:8 | 29:6,10 33:7 |
| 168:8 169:6,10 | **medical** 60:11 | **mentions** 125:8 | 33:11 37:16 |
| 169:12,14,18 | **medium** 29:2 | 125:10 291:5 | 38:1 43:3,4,8 |
| 169:21 170:2 | **meet** 50:13 | **message** 174:8 | 43:10,15 44:18 |
| 170:10,23 | 51:6,10 345:20 | 174:8 | 44:20 45:11,11 |
| 171:16,24 | 346:16 | **messaged** | 46:10,11,16,19 |
| 172:1,16 | **meeting** 51:1,1 | 201:3 | 47:4,6,10,14,16 |
| 173:18,23 | 155:13 344:21 | **messed** 431:15 | 47:17,24 48:4 |
| 174:14,19 | **meetings** 50:16 | **met** 50:21 | 48:5,12,13,18 |
| 180:9 181:7 | 50:20 | 239:24 345:8 | 48:24 49:1,8 |
| 185:2,24 | **melissa** 39:16 | 345:10,19 | 52:2,4,8 59:22 |
| 186:16 187:5 | **meltzer** 1:15 | 347:12 | 60:2,2,4 63:2,9 |
| 188:3 191:22 | 2:3 3:4 11:19 | | 87:22 96:21 |

CONFIDENTIAL

**[meyers - munger]**                                    Page 57

110:11 113:11
113:22 120:2
120:15 124:5
124:10 126:1
128:18 144:1
153:4 164:15
165:17 167:10
167:22 171:12
173:17 176:1
233:5 266:9
277:18 287:3,9
296:21 304:20
304:24 309:8
312:1,20
329:16 330:7
332:1,22 335:6
335:12 349:22
350:3 364:18
368:11,16
371:3,10
377:20 386:12
400:15 406:16
407:20 408:18
412:6 430:6
438:17 439:1
439:16 441:2,7
453:2 457:2
459:20 460:15
466:8
**meyers's**  44:19
**meyers00000...**
8:7 52:2
**meyers00001...**
8:5 43:3

**miami**  5:6
**microsoft**
265:10
**mike**  100:23
**military**  61:2
**miller**  1:18
12:6 463:10
**million**  86:12
415:23,23
**millions**  34:1
**mind**  23:9
40:16 408:6
**mine**  405:9,10
418:2 443:17
**minimize**  78:2
**minor**  452:17
**minute**  124:23
**minutes**  462:11
**misconduct**
74:15,21 75:12
**missed**  397:8
**missing**  276:4
276:13,21
**mission**  78:22
79:4 87:2
**missouri**  2:17
**misstate**  56:1
**misstatement**
121:10
**misunderstood**
425:20
**model**  78:3
195:7 236:14

**mold**  202:1
**moment**  115:11
322:22
**monetary**
77:10,16,21
78:23 79:3,8
79:11 80:10
81:11
**money**  48:3,4,6
48:21 68:14
77:9,15 79:2,7
79:9,21 80:2
80:11,16,23,23
81:12,24 82:11
83:13 84:4
85:8,16 148:20
149:3 191:23
192:17 198:19
238:3,15
247:24 248:4
**monika**  8:20
116:7 229:14
230:21 302:9
348:18,23
349:18,23
350:4 352:1,13
352:16,23
358:2 362:23
362:24
**monitor**  461:14
**month**  49:15,18
315:15 338:15
**monthly**  310:9
323:17 324:18

326:6
**months**  324:7
**moore**  390:15
390:19 391:6
392:22
**moore's**  391:12
391:22 392:2
**morning**  12:16
12:17 175:9
**motivations**
273:10
**move**  130:23
422:12 430:15
436:3
**mto.com**  4:18
**multiple**  110:6
183:20 217:1
240:21 268:6
315:10 426:20
426:21 430:1,1
438:1
**multiplication**
110:20
**multiplied**
103:12,24
397:12 402:8
424:23 434:24
**multiply**  105:8
113:2,4 405:21
420:22
**multiplying**
135:11
**munger**  4:15

CONFIDENTIAL

**[n - number]**

| n | | | |
|---|---|---|---|
| **n**  6:2 | **need**  13:5 53:17 | **networks** | 204:7 207:6 |
| **nacva**  36:17 | 106:12,24 | 359:12 382:9 | 230:15 280:24 |
| **name**  11:11 | 134:9 247:20 | 383:4 | 281:8,12,14,17 |
| 12:19 34:22 | 251:10 256:1 | **never**  63:8 | 289:4,5 290:10 |
| 448:20 | 311:7 313:9 | 91:20 182:13 | 305:1,6,18 |
| **named**  395:11 | 316:11 319:13 | 296:8 352:12 | 306:11,14 |
| **names**  355:10 | 346:12 396:3 | 352:15 461:3,5 | **non**  77:24 79:8 |
| **narrow**  242:8 | **needed**  201:7 | 461:7,11,11 | 80:10 81:11 |
| **narrowed** | 247:17 254:12 | **new**  3:11 4:5,11 | 93:5 154:15 |
| 243:3 | 255:11,16 | 64:4,7,13,20,24 | 161:9 180:23 |
| **narrowing** | 259:19 310:17 | 65:7,9,18 66:1 | **normal**  313:2 |
| 242:16,24 | 313:22 326:17 | 67:11,13 69:10 | **normally**  58:17 |
| **national**  36:17 | 347:13 379:3,7 | 69:18 72:3 | 60:5 277:3 |
| **nature**  86:24 | 414:9 | 86:5 115:1 | **northern**  1:1 |
| **necessarily** | **needs**  142:2 | 239:20 295:13 | 12:1 |
| 30:1 39:22 | 362:12 | 403:13 406:21 | **notary**  1:19 |
| 67:2,18 85:12 | **negate**  194:18 | 406:23 409:1,8 | 466:14 |
| 95:8 148:7,13 | **negotiated** | 410:7,22 | **note**  316:13 |
| 149:18 164:1 | 267:10 | 411:24 412:10 | 364:24 |
| 197:7 207:22 | **negotiating** | 412:21 413:15 | **noted**  12:4 |
| 208:24 209:8 | 197:23 | 413:21 414:15 | 367:17 464:11 |
| 216:24 234:7 | **neither**  224:4 | 414:22 415:7 | 466:6 |
| 259:12 262:22 | 436:18 443:16 | 415:17 416:5 | **notes**  275:23 |
| 263:17 273:12 | **netflix**  92:17 | 418:17 420:10 | 276:1,8,9 |
| 393:8 408:17 | 93:3 | 421:20 422:3 | 279:21,23 |
| 410:11 447:15 | **netted**  237:8 | 422:19,24 | 317:21 347:24 |
| 451:10 | **network**  358:8 | 423:7,17,20 | 379:24 467:1 |
| **necessary** | 358:15 378:8 | 424:11,16 | **notice**  1:13 |
| 116:17 134:22 | 382:4 385:22 | **newark**  4:11 | **notion**  418:15 |
| 135:3,11 | 387:12 388:2 | **newman**  70:23 | **number**  12:21 |
| 261:11 464:4 | 388:15 389:5 | 72:1 | 32:6,7 33:14 |
| | 389:18 390:9 | **nj**  86:7 410:23 | 39:5 45:6 |
| | 390:21 | **noble**  8:13 | 57:14 62:2,21 |
| | | 115:15 156:13 | 65:24 66:8,22 |

CONFIDENTIAL

71:11,23 85:24
109:24 113:18
114:5 116:18
167:6,7,8,8,9
167:13,14,15
167:16,16,17
167:18,19,19
172:12 176:12
179:17 196:15
209:10 213:22
221:15 247:9
252:17 253:8
253:10,13
265:15 271:21
282:22 284:15
323:11 325:14
328:6 330:1
331:13,20
334:24 357:11
359:4,7 362:15
378:17 426:16
427:6 434:2
435:23 439:8
439:10,12
441:16 442:24
443:1 447:1,9

**numbers**
104:10 105:14
147:13 149:21
159:1 169:2
170:3 366:12
397:11 402:4
405:15 406:6
407:17,21

416:11,15,22
417:10,24
429:13,19
435:11,18,22

**nw** 4:16

**o**

**oath** 117:15
265:2 282:24
283:8 375:18
**object** 32:23
**objection** 100:8
114:18 121:9
122:19 127:20
128:11 133:11
135:17 136:18
139:1 140:14
141:18 145:3
146:10 150:9
153:7,23
154:19 157:12
158:16 159:7
160:3,12 162:1
163:2 166:10
170:13 174:20
177:11 180:11
181:9 182:1,11
184:13 187:9
188:6 189:17
190:22 191:18
192:21 194:7
205:20 206:17
209:6,19
210:21 214:6

217:22 218:20
219:14 220:2
220:23 222:24
224:12 225:3
226:5 227:5,14
229:4 231:12
232:9 241:21
249:15 250:23
254:3,22 256:3
257:14 258:22
262:12 268:23
269:20 270:13
271:13 272:19
281:22 282:5
282:15 283:24
284:10 285:13
292:7 300:9
315:5 320:1,13
325:3 333:17
336:18 338:10
341:18 342:2
343:4 351:9
355:2 356:1
361:24 370:8
373:15,16
374:5 375:13
376:21 387:15
389:7 390:24
392:6 394:7,15
404:14 407:3
408:9 409:11
410:9 412:13
413:24 419:18
421:5,10

430:23 437:10
437:21 444:21
452:2 453:20
454:14 455:4
457:8
**objections** 8:21
9:11 11:6
364:19 365:4
380:14,22
386:14,22
**objective**
409:20
**obtain** 226:24
227:1 341:23
**obviate** 260:7
**obviously**
212:21 273:8
427:23
**occasionally**
460:18
**october** 448:20
449:4
**offer** 22:17
53:8,11 54:1,7
107:17 108:19
133:5 225:6
**offered** 101:5
101:14,23
102:8 187:6,20
188:4 225:7
455:20
**offering** 93:20
94:1,5,8,14,16
94:20 95:14,23

CONFIDENTIAL

**[offering - opinions]**

97:5,15,18
98:2 99:13
126:14 131:3
131:23 132:18
132:21 158:12
261:9
**office**  51:4
52:20 387:7,20
388:12,17,23
389:13
**officer**  274:18
276:16 277:13
360:24
**offices**  1:14
11:18
**offsets**  237:5
**oftentimes**
54:17 312:14
**oh**  108:15
288:13 356:22
**oil**  72:13 73:1
**okay**  30:15
44:23 45:14,15
47:9 48:15
55:10 56:16
58:19 59:3
60:4,14 64:6
73:24 74:1
75:14 80:12
87:5 96:20
108:19 113:15
114:11 118:13
123:12,21
124:20 125:1

140:5 144:6
157:6,11,13,21
158:2,3 165:15
167:10 171:20
196:16 202:21
206:11 221:11
243:22 252:23
277:21 292:17
293:24 295:7
298:1 304:8
305:23 307:3
307:11 309:17
321:7 330:9
332:9 334:15
334:15 348:10
351:6 361:8
362:10 364:12
365:17 368:20
372:6,17
373:22 390:18
391:5 397:18
402:21 409:23
410:4 412:20
418:13 419:16
419:22 425:19
426:1,23 429:8
439:20,24
442:12 443:3
443:18 444:12
445:17 446:15
448:5 449:8
454:23 460:6
461:1 462:1

**old**  461:19
**olson**  4:15
**omitted**  362:11
**once**  239:23
276:5 298:10
321:21 353:7
382:16 399:12
410:3 434:4
**ones**  27:15 32:3
118:9 176:14
180:15 212:24
214:14,20
216:20,24
217:2 231:24
265:15,16
272:4 277:22
282:23 286:21
313:22 317:10
354:10 356:14
381:21 411:1
**ons**  198:18
267:15,16
**opine**  239:13
239:22 240:12
**opining**  79:19
79:24 80:14
98:12 144:22
145:23 146:5
191:21 192:3
192:14 199:15
199:21 202:24
235:1 236:18
238:14,20
239:2 240:4

243:23 244:24
245:8,14,19
246:1,5 247:16
247:20,23
248:3,17
**opinion**  22:9,10
93:2,5 94:1,6,9
94:15,17,20
95:15,24 96:11
97:6,15,19
98:2,18 99:3,8
99:14 100:4
107:7 108:21
110:11 126:15
131:3,8,24
132:18,22
133:6 158:12
165:5 174:2,5
174:11,12,23
191:8,8 195:1
200:1,6 216:14
225:9 236:24
245:4 246:24
249:11 258:8
261:10,13
274:8 336:7
375:9 395:3
419:9 437:14
440:15 455:7
455:18 457:14
457:16,17
458:18,19
**opinions**  21:18
22:16,22 23:4

CONFIDENTIAL

**[opinions - pages]**                                                Page 61

23:6,13,21,24
24:9,13 25:13
25:23 27:12,20
28:5,9,15
93:21 263:12
307:16 308:23
309:19 347:8
376:24 377:1,4
377:23 395:17
395:22 416:2
423:14 431:12
439:5
**opportunity**
  21:2 71:21
  72:16 78:19
  277:6 296:17
  297:20 414:5
**opposed** 54:13
  147:8
**oral** 347:5
**orally** 311:15
**order** 9:17
  151:1,7 223:4
  231:9 232:7
  357:14 383:16
  390:8 394:12
  395:1 409:18
  426:16 427:6
  427:16,22
  428:7,24 429:3
  429:12,18,24
  436:22 437:2
  438:18 442:16
  443:5 447:23

448:1,6,8
450:11
**orders** 25:3
  149:6 244:16
  275:22 426:6
  426:20 427:21
  436:5 439:22
  445:3 446:18
  450:21
**organization**
  67:16 69:20
  395:11
**organizations**
  73:9 74:5
**organize** 33:20
  34:11 41:12
**organizing**
  33:17 36:6
  37:6
**orient** 430:10
**original** 21:6
  23:22 24:7
  41:10 179:20
  233:17 234:7
  359:19 464:15
**originally**
  150:13 241:24
  326:11 356:12
**originated**
  234:9
**orleans** 64:4,8
  64:13,20,24
  65:7,9,18 66:1
  67:11,14 69:11

69:18 72:3
**outcomes** 82:22
  83:13 84:4,8
  84:10,12,22
**outlined** 253:13
**output** 113:14
  113:18,21
  114:5
**outside** 33:1
  37:15 38:10,10
  92:1,16 106:19
  163:12 190:3
  235:17 240:9
  242:6 248:9
  337:12 455:18
**outstanding**
  311:11
**overage** 76:20
**overall** 103:21
**overhead** 49:2
  49:3,7
**overlap** 83:19
**overpaid** 249:8
**own** 46:19 47:6
  114:24 151:2
  225:9 311:22
  314:24 346:2,4
  346:4 404:12
**owned** 47:16
**owner** 46:15
  47:2,23
**owners** 47:3
  49:8

**ownership**
  47:21
**owns** 48:13

**p**

**p.c.** 3:10
**p.m.** 232:21
  233:3 304:12
  304:18 377:12
  377:18 459:12
  459:18 462:14
  462:17
**pad** 43:23
**pads** 200:15
**page** 6:11 7:4
  8:4 9:4 10:6,6
  10:6,11,11,11
  10:16,16,16,21
  10:21,21 86:3
  173:18,20,23
  174:4 274:12
  287:17 288:3
  288:12,18
  350:13,14
  358:4 365:22
  366:9,23
  370:13 372:1,4
  387:5 425:23
  429:16 439:18
  442:4 465:3
  467:2
**pages** 34:2
  58:20 323:12
  347:22 446:22

CONFIDENTIAL

**[pages - parties]**                                                    Page 62

466:3
**paid** 41:24 42:4
42:5,7 44:5,14
44:15,21 45:1
45:18,22,23
46:4 49:3
54:11,19 55:1
104:17 148:20
149:3,17,18,19
152:6 175:13
204:18 207:24
208:1 209:2,3
209:16 210:19
210:23,23,24
211:4 230:4
233:8 235:11
237:7,8 242:18
248:1,4,6,7
264:19 265:22
266:15 267:3,9
267:10 268:7
268:21 269:1
269:17,19
270:10,12
299:18 310:24
311:10,12,13
312:3,23
313:21,22
314:8,15 315:3
388:24 409:1,8
410:7 412:9
421:19 424:11
451:9,11

**palo** 382:4,9
383:1,2 384:18
385:10,18,22
387:12 388:2
388:15 389:5
389:18 390:9
390:21 394:2
429:10
**pandemic**
272:16 273:2
273:18
**panorama**
338:22
**paragraph**
167:23 169:4
350:14,16
358:3,21,22
359:9 366:9
415:2 423:5
**paragraphs**
318:24
**parent** 66:5
**parents** 437:20
438:5 443:20
444:2 445:11
445:22 446:4
448:2 449:16
452:8 454:13
**park** 4:5 69:17
70:7
**parochial** 69:9
**part** 54:12,17
68:13,19 69:1
74:9,14 78:2

81:8,19 82:18
83:9,24 85:21
95:7 103:5
144:15 145:16
148:16 152:1
161:24 180:5
181:3 204:20
204:22 213:8
217:16 218:2
233:5,13
234:11,13,20
235:9 236:3,5
238:1 239:5
242:16 246:11
273:8,22 280:5
287:14,18,24
288:5 302:20
303:8 306:1,6
312:15 313:2,3
314:3 315:16
316:6,8 318:2
318:8 325:12
330:22 348:10
353:3,13,20
354:23 362:4
366:21 368:1,6
380:4 392:19
396:10,23
400:5 413:3
417:20 418:11
421:6 431:22
439:10 446:10
**participate**
49:9

**participated**
274:22
**particular**
28:21 41:16
59:22 63:6
74:24 79:14
82:16 86:11
88:1,3 93:10
96:15 97:12,19
100:17 103:9
106:18 109:5
117:17 127:14
137:11 181:7
196:6 197:5
207:4 227:1,2
228:18 236:2
236:16 238:4
238:16 241:6
242:14 244:5
245:1,5,6,9
246:2 247:1,18
247:21 248:4
258:18 259:8
268:14 287:15
298:18 301:20
302:22 322:12
351:16 352:10
356:15 357:23
359:21 433:17
**particularly**
53:1 205:4
**parties** 55:22
108:17 160:1
160:10,24

CONFIDENTIAL

**[parties - percent]**

161:20 162:21
409:17
**partition** 57:7
**partly** 68:24
**partnership**
429:17
**parts** 109:11
**party** 96:8
104:15,18
105:3 193:1
234:4 236:8,20
383:3 451:1
462:9
**pass** 261:2
**passes** 260:14
260:19 261:10
**past** 40:9 58:4
103:10 240:23
241:7,7,8,16
381:23
**pay** 194:4
202:4 229:1
234:3,15
237:12 238:6
238:18 265:21
315:19 412:21
412:23 428:10
**paying** 234:4
280:8 318:5,11
348:13 380:7
396:13 432:1
**payment**
230:18 299:11
300:16 301:5

302:4,13 303:1
303:12 354:6
355:21 356:6
357:20 434:19
435:5
**payments**
104:14 231:9
232:6 430:14
**payroll** 240:22
**pc** 4:9
**pdfs** 36:9
**peer** 138:1
**penalty** 214:17
219:4 225:8
265:3 282:24
**pending** 129:6
**pennsylvania**
1:16,21 2:4 3:5
11:21
**people** 38:13
43:14 48:17,22
67:23 77:22
80:24 89:3,9
92:11,22
118:17,18,23
119:14,20
140:22 176:13
179:3 183:7
201:1,1,2
207:7 213:22
214:13,23
215:6 217:1
220:9 223:3
225:5 226:10

226:13 227:16
231:1,24
244:10 248:11
250:5,8,11,12
250:17 251:7
264:23 265:24
273:14 274:6,9
282:18 286:19
307:15,21
344:19 345:2,6
346:13 377:22
379:19 395:8
395:15,21
398:23 431:9
431:18 456:14
458:22
**percent** 47:23
56:8 60:19
61:17 62:16,18
86:23 87:1
104:1 105:9
106:7,13 107:1
111:20,22
131:1,4,14
141:14 159:12
164:7 195:14
196:18,22
197:6,11 202:5
202:12,15
203:21,21,24
204:4,8,12,13
204:22 205:7
206:9,10
207:17,18

208:14,22,23
211:5 254:8,15
257:4,11,11
258:17,17,24
259:7,7,15,24
260:7,9 267:19
267:20,20
278:16 279:2
281:21 284:16
284:18 327:10
328:24 330:19
331:4,5,10,24
332:21 334:11
334:16 336:12
336:13,14
337:23 338:4,7
338:8,23 339:1
341:1,1,15,24
348:6 350:10
350:17 353:22
358:23 359:4,7
359:16,21
360:2,6 361:3
361:5,22 362:7
363:16,21
364:6,7,9,10
365:12,12,15
366:6,7 368:3
369:5,12,17
372:9,19,23,24
373:10,24
375:5,6,8,10,21
376:9,13,17,18
387:24 388:12

CONFIDENTIAL

**[percent - perform]**

389:3,11,16
390:1,6,8,9,20
391:8,9,14,15
392:3 393:16
402:8 403:9,22
405:22 413:19
424:24 436:21
437:1
**percentage**
46:18 47:5
49:9 50:7 56:9
102:18 103:2
105:21 106:18
107:8 109:22
110:10 111:1
112:15,24
113:5 114:23
131:9,14,24
132:18 133:1,1
139:9 140:2,11
141:1,8 142:20
143:18,22
144:12 161:11
175:16 182:24
184:22 206:2
207:1 247:4,11
254:1 262:3
265:4 266:6
267:23 288:8
288:19,24
292:4 298:22
299:16,21
301:15,19
303:7,18

305:18 328:24
330:14 332:18
333:13 343:2,7
364:9 377:4
387:6 388:1
389:4,17
395:13 400:4
411:12 413:20
434:16 435:1
**percentages**
40:23 41:5,18
103:13,18
107:12 109:4
110:14 111:10
111:14,18
112:4 114:13
118:12 121:20
125:20 129:14
129:23 130:1,7
131:21 132:16
133:8,19 134:6
134:15 136:9
137:3,8,21
138:11,22
139:19,23
140:8,18 143:8
144:2,6,8,19
161:6,17
164:18 165:20
166:7,23 168:2
168:22 169:17
170:9 172:24
184:11 186:14
196:14 208:18

216:22 217:12
221:1,7 223:16
224:3 231:10
254:10 261:7
281:10 282:3
282:10 283:12
285:7,9,19
286:3,13,14
287:16,21
288:3,23 289:3
305:11,24
306:8 307:4
322:7 328:10
343:21 344:2,4
344:15 350:6,9
361:10 382:15
397:8,13,19
399:1 409:18
413:6 420:23
425:16 433:18
**percents**   106:4
107:18,23
108:1,23 115:9
115:22 116:5
116:12,15
117:3,10,21
118:14 120:3,8
120:18 121:13
121:16 129:9
134:20 135:14
136:16 145:1,8
153:22 154:16
156:9,15 157:7
157:23 158:8

158:21 160:21
162:19 185:22
195:10 211:3
217:20 218:6
218:12,18
220:21 222:3
222:11,22
223:18 224:8
224:11,23
225:2,12,16,22
226:2,11
280:20 281:2
282:14 283:16
283:23 284:6,9
285:11 286:6
286:17 287:11
287:20 288:2
306:16 318:17
319:2 327:2
348:15,20
380:11,18
381:3,5,8
387:2 393:17
396:17 398:1,8
398:18 401:11
432:7,13,22
433:10
**perfectly**
143:10
**perform**   52:23
63:1 404:20
405:18 406:8
407:10 408:19
420:20 450:14

CONFIDENTIAL

**[performed - pieces]** Page 65

**performed**
26:10 50:1
53:24 106:15
109:16 111:8
197:20 221:22
246:20 263:7
444:11
**performing**
405:3
**performs** 60:5
**period** 51:5
58:18 63:4
65:4,5,15
72:19 86:7
228:2 242:18
248:7 272:2
299:19,24
346:17 382:1
385:10 405:12
409:15
**periods** 175:14
203:6 231:6
385:2 456:16
**perjury** 214:17
219:5 225:8
265:4 283:1
**person** 35:3
88:11,13,16
90:7 118:7
119:5 131:12
142:2 143:16
153:12 161:21
162:6 171:8
196:8 213:21

229:23 230:2
231:16 249:17
257:12 258:2,4
259:14,16
274:4 291:21
307:13 313:5
344:24,24
345:11,15,19
345:21 347:21
359:22 360:9
364:1 388:6
392:23 393:3,5
393:7 408:6
431:7
**personal** 1:4
11:22 60:10
96:4 141:23
228:1 231:8
257:24
**personally**
106:22 137:19
138:9 155:14
228:24 230:9
254:24 255:14
266:10 345:9
459:2
**personnel** 38:6
**persons** 41:19
86:14 107:10
116:22 117:14
118:1 119:23
119:24 120:10
120:20,21
121:18 125:14

126:13 127:8
129:16 130:14
132:24 136:4
138:14 145:11
161:1 172:22
175:19 197:3
208:16 227:20
243:5 245:16
245:23 247:7
249:7 253:19
255:3,8 257:5
261:8 262:2
272:9 321:11
377:2 457:15
**petroleum**
72:13
**ph** 1:24
**phil** 8:11 207:5
287:4
**phillip** 115:15
157:16 170:21
177:16 178:21
179:3 200:18
200:19 204:6
205:5,11,24
208:11 212:5
220:6 221:14
229:9 230:14
274:10,14,22
280:23 281:6
287:10 296:8
300:21 305:14
306:13,17,22
307:2,6

**phone** 30:18
43:24 44:11
202:14,22
203:12,13
249:21,24
250:3,4,7
307:13 345:17
353:18 357:15
362:8 363:22
367:2,3,7
369:1,6,18
374:3 375:6,22
376:19 455:3
456:2,19 457:3
457:6,10,24
458:8,15,20
459:3
**phones** 200:22
201:2,3 249:23
250:2,18 455:2
455:16 456:9
**photos** 159:23
160:9
**phrase** 88:14
408:2,7
**physical** 71:15
251:11,15,17
256:1
**physically**
214:22
**picked** 337:20
**piece** 447:16
**pieces** 81:16
219:17

CONFIDENTIAL

**[pinterest - point]**                                                      Page 66

| | | | |
|---|---|---|---|
| **pinterest** 92:3,4 | 184:10 210:5 | 153:5,6 157:10 | 160:5 168:14 |
| **pivot** 146:18 | 210:18 224:7 | 158:2,11,13,24 | 217:24 222:7 |
| **place** 81:1,2 | 224:17,22 | 159:3 160:1,11 | 309:2 311:6 |
| 249:22 274:17 | 226:3,12,24 | 160:24 161:20 | 318:7 326:20 |
| **placed** 261:7 | 227:11 241:14 | 162:22 169:6 | 327:18 330:17 |
| **places** 67:19 | 253:24 276:24 | 169:10,12,14 | 335:18 341:19 |
| 276:4 | 278:1 282:4,11 | 170:2,11,12 | 344:12 371:24 |
| **plaintiff** 2:6 | 283:14 294:8 | 171:17 176:9 | 397:21,24 |
| 3:13 9:10 38:5 | 324:8,17 | 180:9 181:8 | 462:6 464:3,8 |
| 38:6,14 60:15 | 341:13,22 | 187:18 191:15 | **plural** 98:21 |
| 60:19 61:15,21 | 393:20 396:8 | 193:6,13 194:4 | 99:12 100:15 |
| 62:18 63:2 | 396:16 400:23 | 250:14,22 | **plus** 323:14 |
| 101:18 135:24 | 401:3 409:6 | 255:23 260:23 | **po** 357:16,19 |
| 181:19 182:5 | 410:5 414:5 | 263:6 267:15 | **pocket** 83:5 |
| 182:23 193:21 | 416:18,20 | 269:4 296:1 | 102:16,19,24 |
| 194:1 209:15 | 418:10,14 | 359:12 | 103:3,11 |
| 265:14 273:9 | 419:16 | **play** 92:12 | 104:12,16 |
| 386:12,20 | **plaintiff's** 8:16 | 250:4 | 136:3 146:20 |
| 412:17 416:10 | 8:21 9:14 | **played** 109:17 | 193:11 241:8 |
| 417:2,5 440:19 | 329:16 364:18 | 201:3 | **point** 13:4 40:6 |
| **plaintiffs** 3:7 | 400:15 | **pleadings** | 42:21 81:17 |
| 3:19 4:7,12 | **plan** 61:8 | 93:17 128:22 | 128:5 166:4,21 |
| 25:12 28:11,17 | **plans** 60:12 | 176:5 253:5 | 169:22 173:5 |
| 29:7,10,14 | **plants** 71:15 | **please** 12:18 | 204:22 246:21 |
| 30:11 31:1,6 | **platform** 92:11 | 13:1,5 22:15 | 247:22 278:18 |
| 32:12,20 38:2 | 92:21 97:13 | 28:14 29:15 | 291:17 293:5 |
| 38:11,18,22 | 126:23 146:3,9 | 45:8 55:23 | 293:13 313:13 |
| 39:8 50:13,17 | 153:14,21 | 73:12 75:18 | 331:1 336:1 |
| 59:13 93:15 | 154:15 173:18 | 77:12 79:23 | 349:14 351:24 |
| 101:9 102:2,12 | **platforms** 2:19 | 85:1,13 95:2 | 353:5 363:19 |
| 105:23 108:2,4 | 88:13,22,24 | 115:11 123:7 | 365:20 366:3 |
| 108:5,7 136:23 | 91:6,10 93:3,7 | 123:13 125:7 | 391:17 406:9 |
| 137:10 150:2,6 | 93:13 125:21 | 128:15 129:4 | 442:11 459:7 |
| 182:13 183:11 | 126:17 145:21 | 146:4 158:18 | |

CONFIDENTIAL

**pointed** 336:4 419:13
**pointing** 331:6
**points** 180:3,4
**police** 346:5
**portion** 47:10 48:16 86:20 95:9 190:18 199:8 204:14 223:24 234:8 354:1 411:22 411:24
**posed** 159:19 279:16
**posing** 162:14
**position** 41:14 119:22 199:7,8 361:2 416:14
**positions** 231:3
**possession** 179:22
**possibility** 339:23
**possible** 184:7 268:18,24 269:14 270:8 270:19,22 293:2,9 320:23 321:4 406:16 407:5,8 413:14 414:2
**post** 173:24
**posted** 159:24 160:10,23

161:19 162:21 461:12
**pots** 237:16,20
**pouch** 333:13 335:22 336:15 337:17 338:3 362:7
**pouches** 200:16 202:13,22 221:14 239:14 254:7 278:15 279:6,14 328:18 329:1 330:15,19,21 331:5,9,21 332:2,12,13,20 332:24 333:10 335:3,20 337:5 337:24 339:7,9 339:13,24 340:3,21 341:2 341:10 343:13 344:7 353:18 354:2 363:22 367:2,11 369:10,13,18 374:2 375:7,11 375:21 376:18
**practice** 216:2
**predated** 349:10,11
**predicate** 456:11

**preexisting** 260:2
**preference** 228:17
**premise** 340:7
**prentice** 8:15 277:16 307:17 307:23 308:1,5 308:12,22 309:9,15,18,24 314:7,12,23 315:22 316:9 316:14,19 317:19,23 342:8 343:1,19 344:1,14
**prentice's** 322:14 342:17
**preparation** 281:15 285:22
**prepare** 35:23 40:20 50:12 51:8,12 311:7 313:10
**prepared** 26:8 26:11,12,13,16 26:18 107:6 225:6 296:9 349:6 364:5 385:7 405:15 422:5 436:14
**preparing** 31:6 32:20 33:11,17 36:8 37:11

38:2 105:13 281:13,19
**present** 5:13 60:11 61:7 134:8 135:4 159:1 206:16
**presentations** 24:16
**presented** 184:1 222:22
**pretty** 72:14 260:10 345:24 379:9
**prevent** 202:1
**previous** 75:4 432:4 453:23
**previously** 95:12 168:7 170:4 285:23 298:9 314:13 380:9 396:9 432:3
**price** 248:24
**pricing** 198:5
**primarily** 396:7
**primary** 405:6 408:21
**prior** 70:14,19 72:6,21 177:17 195:12 212:19 213:1 247:13 269:10 293:5 416:21 417:2

CONFIDENTIAL

**[prior - provide]** Page 68

424:2
**private** 69:8,9
  70:8 72:3
  233:23
**probable** 407:6
**probably** 46:1
  60:19 61:17
  64:9,11 67:12
  68:16 91:19
  440:2 448:3,22
**problems** 169:5
  169:9 188:20
  189:7,15 190:1
  190:19,21
**process** 70:2,3
  217:18 218:4
  218:10,17,22
  219:8,21
  220:13,14
  223:2,17
  226:17 227:7
  279:1 313:4
  314:4 354:21
  398:21 399:4
  417:21 418:12
**produce** 29:21
**produced**
  25:20,23 26:3
  27:3,7,9,13
  29:21 111:21
  147:11 275:18
  308:18 323:23
  324:22 326:2
  346:24 443:13

453:4
**product** 247:19
**production**
  10:10
**products** 1:4
  11:23 239:7
  367:9,14
**professional**
  52:21 53:2
  54:12 55:3
  56:4 70:11
  129:4
**professionally**
  53:8 54:1
**profit** 47:19
  49:11 73:9
  74:4 76:15
  79:1,5 81:3
  233:21
**profitable**
  77:10,16
**profits** 35:19
  35:24 47:10
  53:13 56:20
  62:7,14 72:19
  73:6,11 74:3,6
  75:15,19,21
  76:3,5,10,15,16
  76:17,18 77:1
  77:6,24 78:5,6
  78:15,16,17
  96:10 138:4
  192:6 195:7
  233:19

**program** 69:22
  83:4,5 86:15
  387:5
**programatic**
  78:9
**programs** 81:2
  83:19 84:18
  85:3,9,16
  193:2 229:20
  401:24 402:24
**projections**
  152:2
**proof** 151:21
  357:16 376:1
**properly**
  130:17 209:14
**property** 57:7
  104:21,22
  239:17 240:15
  241:19 249:10
  251:23 252:1,2
  252:9,16
  253:12,15,18
  254:1,5,11,19
  255:4,10,16
  256:10,15,17
  257:10,13
  340:10 436:6
  436:10,23
  437:7,9,18
  438:3 439:14
  442:5 443:4
  444:10,19
  445:8,19

446:12 447:4
  447:10,23
  448:9,18
  449:11 451:24
  452:16 460:1
**propounded**
  466:5
**proprietary**
  346:8
**prospective**
  199:5
**protection**
  394:5,14 395:2
**provide** 29:2,16
  47:22 118:10
  120:11,22
  121:19 127:9
  129:22 132:24
  137:6 147:18
  155:1 172:17
  172:23 175:20
  208:17 213:23
  223:3 226:10
  226:15 227:12
  231:18 262:9
  271:10 274:19
  275:13 276:20
  278:6 294:9
  296:19 308:12
  311:4,19
  316:22 324:9
  324:17 325:9
  328:17 330:13
  343:2,6,19,20

**[provide - purposes]**                                          Page 69

344:1,4 346:19
347:11,13
350:22 363:15
378:15 417:22
458:23
**provided** 28:11
28:17 29:5,8
30:24 31:21
41:22 52:10
59:7 93:14
117:3,11
118:15 120:3,8
120:9,18,19
121:13,16,17
126:12 129:9
129:22 130:7
133:8,23
135:14 136:16
137:12,21
138:11,23
139:5,23 140:8
143:8,22,23
147:1 152:20
154:18 155:6
161:3 166:7,24
168:2 170:9
172:24 176:17
176:24 177:7
177:20 178:13
178:23 179:5
179:11,21
184:10 185:23
211:8,13 213:6
213:12 214:4

217:12 221:23
221:24 226:19
232:5 244:4,9
244:16,18,19
245:1 246:6,13
252:16 253:17
255:9 268:11
276:13,16
287:22 293:19
294:19 298:6
308:13,16,22
309:19 310:6
310:10 312:15
314:22 316:21
319:19 320:8
321:10 323:2,7
324:13 326:3
340:15 342:7
346:22 347:4
347:14 360:1
386:4 404:12
411:6 413:16
425:12 433:4
433:19 445:19
458:21
**provides** 78:12
330:18
**providing**
118:9 145:12
161:2 163:14
169:16 183:10
214:11 227:17
288:7,18

**proximate**
402:2
**prussia** 1:16
2:4 3:5 11:20
**public** 1:20
3:13 7:6,21
9:15 16:6,17
19:20 63:12
67:21 73:17,21
73:23 74:2
81:4 389:3
400:18 401:5
466:14
**publicly** 31:18
31:22 32:15
147:6 315:15
316:15 323:20
325:22
**published**
323:20
**pull** 43:23
44:11
**pulled** 31:11
147:10 315:17
325:16,24
**purchase** 25:3
149:5 150:24
151:7 242:5
244:15 247:18
275:21 279:6
279:13,14
357:14,17
426:6,16,19
427:6,16,21,22

428:7,24 429:3
429:12,18,24
442:16 443:5
451:3
**purchased**
202:11 239:8
244:1 248:11
248:14 249:1,7
394:11,23
**purchases**
394:2
**purchasing**
248:12 367:8
367:13 395:5
**purport** 81:5
264:1 343:1,6
343:20
**purported**
326:19
**purporting**
371:20
**purports** 317:9
**purpose** 88:8
91:14 204:21
204:23 384:8
390:5 394:3
404:17
**purposes** 67:19
68:21 89:5,23
125:19 130:22
190:7 195:5
250:18,21
300:19 347:7
354:16 387:19

CONFIDENTIAL

393:13 397:16
**pursuant** 1:13
272:8 295:13
**purview** 210:1
**put** 35:1 36:9
81:1 102:15,23
103:15 147:13
149:9 177:21
201:22 220:22
221:15 222:11
223:21 239:20
265:2 266:4
302:17 315:14
323:7 332:18
374:22 384:22
397:4 400:3
417:5 420:16
427:19,21
429:22
**putting** 36:6
37:7 406:18

**q**

**qualifications**
36:12 380:9
**qualified** 53:12
54:9 56:21
57:2,14 62:10
68:10 396:15
432:3 455:6
**qualify** 265:10
**quantification**
244:20 246:17

**quantifications**
251:19
**quantified** 83:2
86:2,11 99:20
400:5
**quantify** 83:15
190:17 193:9
242:14 435:2
**quantifying**
195:6
**quantum** 303:6
**question** 10:20
11:7 13:2 35:6
39:1 44:22
46:23 54:7
55:24 57:20
59:4 66:17
67:8 68:1
77:19 79:18
81:15 84:20
90:1 91:11
94:2 96:22
97:1,3,24
101:6,15,24
102:9 113:23
115:18 120:16
121:6,8 123:11
125:2 128:15
128:18 129:6
135:19 139:3
143:1 150:3
157:20 158:6
159:19 161:15
162:8,13 165:2

168:15 178:9
179:8 182:20
184:6 186:11
187:1,7,21
188:5,14,21
190:3 193:18
193:23 199:20
205:11,23
209:12 216:16
222:1,6 238:12
246:3 269:11
278:14 303:24
304:1 318:15
326:13,18
341:7,17 366:1
372:5,20 373:2
373:12 374:12
381:3 391:23
392:15,20
397:22 422:13
431:16 432:6
436:1 447:1
453:23 459:21
**questions** 31:15
89:17 93:19
162:4,7 208:15
274:1,24 278:2
278:14 279:16
279:17 308:19
393:1 418:1,6
462:3,5 466:4
**quibble** 79:1
**quick** 44:12
252:6 318:1

**quicker** 346:13
**quickly** 44:1
**quite** 57:14
340:5

**r**

**r** 465:1,1
**radnor** 1:16 2:4
3:5 11:20
**range** 24:22
54:10 440:3
441:23
**ranges** 56:7
58:17
**rare** 183:13
**rate** 249:6
262:24 264:19
266:16,23
**rather** 162:15
336:8
**rationale**
255:15
**reached** 366:11
**reaching** 135:3
**reactive** 9:17
438:18 439:22
445:2 446:17
**read** 57:10
124:24 153:24
156:23 170:4
171:9,9 219:15
223:20 290:21
294:5 296:2,17
297:13,19,20

CONFIDENTIAL

339:5 351:23
359:10 369:21
371:17 392:10
403:2 411:19
454:5,6 464:3
466:3
**reading**  296:7
**ready**  231:15
301:9
**real**  44:12
153:12 201:20
252:6
**realize**  416:1
423:13
**realized**  346:17
**really**  61:20
128:17 284:17
372:3
**realtime**  1:19
463:11
**reason**  111:13
119:17 126:5
130:9 135:21
136:20 224:15
249:6 280:16
284:2 358:11
358:17 373:23
395:19,23
424:15 451:22
464:5
**reasonable**
137:24 218:17
248:2,9 249:4
437:6

**reasons**  21:20
89:20 119:13
119:16,24
142:16 187:13
238:9 248:12
257:6 261:6
262:1 273:4
283:19 285:15
396:15 420:7
**reaves**  4:15
**rebuttal**  23:20
26:5,9 262:18
**recalculated**
114:23 134:9
**recall**  39:15
72:5 73:4
179:13 216:9
252:13,19
274:15 276:23
277:3 306:3
307:24 341:3
342:3,5 355:9
369:20 378:17
378:21 379:22
386:1 389:20
390:4 391:2
392:8 395:18
410:10 413:11
460:8
**receipt**  464:17
**receipts**  445:15
**receive**  31:4
32:18 33:10
35:16 36:3,23

37:3,9,14,23
47:9 48:15,21
79:7,20 80:1,6
80:9,15,22
107:22,24
108:3,11 150:1
150:5 228:5
308:6 317:1
363:14
**received**  24:5
30:10 34:15
35:7 38:15
49:13 81:10,21
82:9,20 83:11
83:18,21 84:2
85:8,15 108:8
228:11 238:5
238:17 239:8
245:9 252:20
280:7 318:4,10
319:17 348:12
349:8 362:23
363:7 379:13
380:6 390:14
396:12 410:21
411:2 419:10
424:2 431:24
444:19 445:1
449:21
**receiving**  79:11
**recently**  58:17
**recess**  87:16
173:11 232:24
304:14 377:14

459:14
**recite**  176:6
**recognize**  14:3
14:17 15:7,20
16:11 17:2,18
18:8,22 19:11
19:24 20:14
43:8 368:16
439:3,7
**recollection**
355:5 436:24
**reconcile**  75:3
221:19 310:16
316:3 342:12
355:12 397:16
406:10 434:11
**reconciled**
149:5 221:13
298:17 299:6
313:17 315:24
316:10,16
335:11,17
338:2 357:3
385:17 397:11
424:21 435:11
435:12,19
**reconciliation**
274:20 276:18
308:7 311:22
312:7 314:4
317:12
**reconciliations**
396:5

CONFIDENTIAL

**[reconciling - relate]**                                          Page 72

**reconciling**
310:19 405:2
435:18
**record**  11:11
12:5,19 16:15
35:1 37:20
87:13,20
115:19 140:20
146:16 170:4
173:9,15
211:18 215:12
232:21 233:3
277:9 288:16
304:12,18
317:22 331:12
339:16 343:18
344:11 347:11
348:1 359:11
365:24 373:16
377:12,18
380:1 397:23
426:24 443:12
454:7 459:12
459:18 462:9
462:14 463:6
**recorded**  9:7
280:3 371:4
**records**  74:11
74:16,22 325:2
325:10
**recover**  437:19
438:4
**recoverable**
164:7 202:8,12

209:23 210:14
260:9
**recovered**
446:2
**redacted**
448:20 449:17
**redactions**
443:17,23
**reddit**  91:23
**reduce**  364:9
445:15 455:1
**reduced**  78:20
111:20,22
265:14 338:17
**reduces**  334:2
**reduction**
193:9 195:23
266:5 339:13
**refamiliarize**
185:7
**refer**  21:9
73:22 113:17
114:4 122:17
171:15,23
303:19 351:7
404:6
**reference**
149:20 290:23
296:12,13
315:23 323:1
324:3 351:11
351:19 357:12
385:3 426:18
426:19 429:12

429:19 440:6,8
**referenced**
386:1 393:3
428:14 439:12
447:17,18
**references**
427:10,19
448:12
**referring**  21:11
23:9 73:23
88:17,24 126:4
127:4 144:7
169:11,13
171:16 279:11
291:9,22
303:21 351:15
372:12
**refers**  88:12,20
126:3 127:3
128:7,7,8,8,9
128:10 169:4
169:21 172:1
291:9 351:14
352:3,10
367:18 370:14
387:12 442:19
**reflect**  189:3
195:15 197:7
197:12 207:22
208:24 209:9,9
311:9
**reflected**  317:4
317:8 442:7

**refresh**  355:5
**refusing**  46:22
**regard**  180:14
**regarding**  94:2
380:10
**regardless**
110:9 262:10
271:11 376:7
**regards**  252:17
**regular**  236:13
**regulations**
266:2
**regulatory**
395:10
**reimbursed**
236:7,19 237:2
444:15 445:21
**reimbursement**
237:12 444:18
450:13 451:17
451:24 452:7
452:12,15
453:17 454:1,2
**reimburseme...**
236:12 444:9
444:24
**reiterating**
195:13
**relate**  96:16
123:17 126:24
159:22 172:8
172:24 190:18
196:14 224:3
241:16 269:6

CONFIDENTIAL

**related** 72:12 82:13 83:3,16 84:18 85:3 86:21 93:9 103:10 115:6 116:22 118:12 120:12 125:11 126:13 134:12 136:1 138:17 151:23 154:6 162:20 163:8 164:19 165:21 170:10 174:18 174:23,24 180:8 181:6 182:14 190:24 193:11 196:4 197:4 199:1 211:5,23 219:12,24 240:4 241:6 247:14 251:22 252:24 253:14 253:17 254:8 262:4 274:20 275:20 278:11 279:19 299:7 308:7 316:4 321:12 324:6 342:9 344:6 350:18 358:24 359:16 362:6 381:22 383:9 383:13 384:24 390:23 392:24 393:23 417:12 417:18 418:6 432:4 433:2,6 434:13 435:14 436:10,15 458:23

**relates** 1:6 60:21 89:10 94:19 95:10 100:13 107:12 123:4 125:12 126:16 129:18 130:19 132:6 136:9 139:8 175:15,21 205:24 223:9 246:16,22 247:3,9 281:7 281:9 338:12 354:17 359:24 364:4 376:4 384:15 388:8 399:1 409:15 413:7 418:3 422:9 436:16 440:13 445:2 447:10

**relating** 48:22 72:9,24 85:9 85:16 90:14 116:9 120:23 121:20 122:3 124:17 160:8

161:5 185:1,23 186:15 188:18 189:6,14,24 203:17 251:17 254:1 260:13 261:16 274:1 291:20 298:13 317:15 321:24 340:3 350:10 353:10 360:6 361:12 381:23 382:3,19 388:1 389:18 398:24 399:15 401:16 403:23 404:1,3 413:15,20 415:7,16 422:23 423:6 426:6 433:19 434:7 436:5,9 436:22 439:5 447:23 448:8 455:2 459:24

**relation** 289:22

**relationship** 248:13

**relayed** 414:10 421:12

**relevance** 435:16

**relevant** 46:21 47:1 48:2 280:18 294:15 294:21

**reliability** 109:24 111:7 133:22 148:16 164:1,4 217:11

**reliable** 105:21 108:22,23 109:2,5 110:3 110:9,13 112:5 112:18,21 114:14 129:10 129:17 131:10 131:11 133:7,9 133:16,17 142:19 147:18 148:1 149:17 151:18 214:16 217:4 248:5 391:22 392:2 392:18 419:7 419:12

**reliance** 286:8

**relied** 28:10,16 28:23 29:5,8 30:9,23 107:9 109:7 110:14 111:10 112:5 114:13 115:8 115:14,23 116:3 117:13 118:7 122:15 124:16 129:21 132:23 134:13 137:5,9 144:19 145:7 146:24

CONFIDENTIAL

**[relied - report]**                                                    Page 74

| | | | |
|---|---|---|---|
| 147:17,22 | 453:10,12 | 457:14 | **report**  6:13,15 |
| 148:2,3 153:20 | **religious**  67:16 | **remain**  172:5 | 6:18,20 7:6,8 |
| 154:14 156:8 | **rely**  94:22 95:3 | **remainder** | 7:10,13,15,18 |
| 160:22 164:17 | 106:3 115:20 | 142:7 | 7:20,22 13:17 |
| 166:19 171:14 | 116:11 122:2 | **remember** | 14:4,6,12,18,21 |
| 179:5,11 | 139:7,18 140:9 | 229:13 253:6 | 15:2,8,10,15,21 |
| 185:21 186:13 | 143:10 146:21 | 267:6 379:9 | 16:6,12,16,21 |
| 211:7,20 213:4 | 148:7 157:8,23 | 384:2 397:3 | 17:3,5,13,19,22 |
| 213:14,24 | 158:8,21 | 446:19 451:5,6 | 18:3,9,12,17,23 |
| 218:16 219:10 | 161:18 165:20 | **reminder**  13:1 | 19:1,1,6,12,14 |
| 219:23 223:15 | 195:9 228:23 | **remove**  405:24 | 19:19 20:1,4,9 |
| 225:13,17,22 | 231:10,24 | 406:12 | 20:15,17 23:3 |
| 226:2 280:22 | 232:7 281:4,20 | **rep**  370:21 | 24:6 26:11,12 |
| 283:11 285:6 | 282:13 283:15 | **repair**  251:23 | 26:13,17,18 |
| 286:11 287:11 | 284:8 285:10 | 258:12 259:3 | 30:3,7 33:19 |
| 294:12 305:10 | 286:5,16 | 437:19 438:4 | 38:7 80:18 |
| 305:19 306:1,7 | 287:16,21 | **repaired** | 84:23 85:2,21 |
| 306:15,21 | 288:1 319:4 | 254:12 255:17 | 86:3 88:9 |
| 307:8 314:6,11 | 325:8 348:22 | **repairs**  251:11 | 112:17,20 |
| 317:3 318:19 | 350:8 361:20 | 251:15,17 | 113:1,2 133:23 |
| 324:10,19 | 380:20 383:20 | 256:1 | 145:11 148:11 |
| 327:1 328:9 | 396:24 398:10 | **repeat**  79:23 | 155:4 180:19 |
| 331:9 348:17 | 432:15 437:2 | **replaced** | 181:1,15,17 |
| 350:5 365:11 | **relying**  89:6,7 | 259:20 | 196:18 200:11 |
| 380:13 381:9 | 93:13 172:5,21 | **reply**  7:10,13 | 200:13 202:20 |
| 385:21 387:1 | 175:17 268:16 | 7:15,18,20,22 | 203:7,9 206:16 |
| 387:11 389:21 | 295:15 308:21 | 17:13,19,21 | 212:20 235:6 |
| 390:3 393:8,17 | 309:17 343:24 | 18:3,9,12,17,23 | 237:10 238:21 |
| 396:19 397:1 | 344:10,14 | 19:1,6,12,14,19 | 239:12 244:20 |
| 398:3,18 401:8 | 347:5 348:4 | 20:1,4,9,15,17 | 247:13 248:10 |
| 401:13 403:21 | 366:5 367:24 | 21:7 23:17,20 | 260:18,20 |
| 404:7 432:9,23 | 377:1 418:13 | 24:5 93:24 | 271:17 274:12 |
| 433:11 439:4 | 418:19 437:3 | 179:23 | 276:2 278:10 |
| 446:7,12 453:7 | 450:12 456:14 | | 279:18,24 |

CONFIDENTIAL

**[report - respectively]**

| | | | |
|---|---|---|---|
| 295:16,19 | **reporter** 1:19 | 458:4 | 313:9 347:15 |
| 304:7 310:9,11 | 12:6 69:4 | **represent** 52:9 | 452:15 |
| 310:13 311:4 | 367:5 463:11 | 59:8 60:24 | **requested** |
| 313:11 314:12 | 463:21 | 196:22 197:15 | 29:13,18 |
| 314:19 315:14 | **reports** 20:21 | 296:22 | 347:18 |
| 316:2 317:9,9 | 21:6,7,8,15,24 | **representation** | **requesting** |
| 320:21 321:5 | 22:21 23:6,10 | 123:16 126:21 | 346:9 |
| 322:24 323:11 | 23:16,17,20,22 | 142:14 172:15 | **require** 231:7 |
| 323:17 326:16 | 24:8,9,24 25:8 | 214:10 313:5 | 232:3,11 |
| 328:14,20 | 26:5,8 27:2,3,9 | **representative** | 267:14 |
| 331:11 339:17 | 27:18 31:7,20 | 30:2 370:7 | **required** |
| 343:12,16 | 32:7,21 33:12 | **representatives** | 193:21 194:2 |
| 349:8 354:13 | 34:2,9 38:3,17 | 152:14 215:14 | 198:16 260:3 |
| 356:16 362:11 | 40:14 84:15 | 216:12 217:5 | 262:8,16 |
| 363:4,9,13 | 93:24 99:6 | 398:22 425:1 | 263:14 264:5 |
| 364:11 378:19 | 100:7 111:20 | **represented** | 264:12 271:9 |
| 378:20 379:10 | 134:8 135:4 | 62:20 71:11 | 451:16,23 |
| 383:24 384:1 | 144:14 149:23 | 72:11 130:18 | 452:6,11,14 |
| 385:9 390:14 | 150:21,23 | 138:16 311:14 | 453:16,24 |
| 390:17 393:9 | 151:1,7,8 | 314:19 376:10 | 454:2 |
| 402:11 404:2 | 159:2 179:20 | 452:23 454:20 | **requirements** |
| 405:1 407:18 | 179:23,24 | **representing** | 455:13 |
| 414:7 415:3,19 | 200:5 212:10 | 2:6,12,19 3:7 | **requires** |
| 416:22 417:3,7 | 212:11 213:10 | 3:13,19 4:7,12 | 263:13 |
| 417:21 418:11 | 235:22 242:9 | 4:18 5:7 210:4 | **researched** |
| 420:4 423:4 | 276:7 304:6 | 228:18 297:17 | 264:8 |
| 424:1,3 425:22 | 316:15 323:6 | 402:12 456:17 | **reserve** 78:10 |
| 428:15 434:13 | 323:16 324:10 | **represents** | 78:11 |
| 439:10,17,19 | 324:19 325:23 | 392:5 | **reserved** 11:7 |
| 441:20 442:3 | 326:6 331:19 | **reproduction** | **respectfully** |
| 445:4 448:12 | 347:22 384:3 | 463:19 | 96:20 128:24 |
| **reported** | 384:12,14,15 | **request** 10:10 | **respectively** |
| 453:19 | 385:12,14,16 | 30:5 37:7 | 124:2 299:23 |
| | 438:1 457:20 | 252:22 277:11 | |

CONFIDENTIAL

**[respond - results]**                                    Page 76

| | | | |
|---|---|---|---|
| **respond**  154:3 | 137:22 138:12 | 419:7,12 | 167:1 168:3,23 |
| **responding** | 138:24 139:20 | 422:15 432:24 | 169:18 170:23 |
| 96:24 | 139:24 140:9 | 433:5,12 | 175:4 177:23 |
| **response**  89:16 | 143:24 144:4 | 436:14 446:24 | 181:14 186:19 |
| 96:21 139:6,7 | 145:9 154:2 | 456:22 460:11 | 190:9 193:14 |
| 141:7,13 143:5 | 162:18 171:14 | **responsibility** | 194:19 197:1 |
| 163:18 195:20 | 172:3,7,11 | 68:4,8 437:8 | 199:10 202:6 |
| 217:7 223:7,24 | 178:18 186:13 | 437:12 | 204:8 206:4 |
| 228:16 232:5,8 | 186:18 213:5 | **responsible** | 207:18 221:21 |
| 232:12 272:15 | 213:14 214:1,5 | 258:10 259:15 | 223:10 227:18 |
| 273:1 303:9,16 | 215:7 216:20 | **responsive** | 238:22,23 |
| 330:18 336:12 | 217:13 221:24 | 96:22 | 239:3 244:12 |
| 339:3,11 | 223:15 224:4 | **rest**  45:3 142:3 | 245:14,18,20 |
| 340:20 343:15 | 246:7,14,18 | 366:10 | 245:22 247:4 |
| 353:21 362:19 | 253:14 255:9 | **restate**  126:6 | 248:15 251:20 |
| 365:10 366:22 | 266:21 267:2 | **restitution** | 253:20 255:17 |
| 367:18 368:5 | 298:8 302:19 | 440:9,11,20 | 256:23 259:21 |
| 369:24 374:11 | 303:6 328:21 | 448:18 449:10 | 262:5 266:7 |
| 387:11 388:6 | 331:3,16 | **restored**  444:6 | 268:1 270:1 |
| 390:2,7 400:2 | 333:12 344:6 | **restrictions** | 272:7 278:21 |
| 400:6,8,9 | 353:4 362:3 | 273:11 | 285:1 289:23 |
| 403:21 404:6,9 | 364:19 365:4 | **result**  30:18 | 299:3,24 |
| 406:18 407:23 | 366:5 370:12 | 83:18 98:13,19 | 321:13 338:14 |
| 414:19 415:16 | 380:14,22 | 99:24 105:24 | 339:3 354:14 |
| 417:6 419:15 | 381:10,13,21 | 107:15 113:6 | 355:16 360:3 |
| 422:22 423:18 | 382:12 385:20 | 117:18 118:24 | 375:1 377:7 |
| 434:2 447:5,9 | 386:15,22 | 119:7 121:3,21 | 378:11 399:2 |
| 447:13 | 389:9,22 392:5 | 125:24 131:17 | 410:16 451:13 |
| **responses**  8:22 | 392:12 393:4 | 132:7 138:18 | 456:24 |
| 9:11 41:2,8,21 | 393:18 398:19 | 139:11 143:18 | **resulting**  111:4 |
| 96:24 108:9,13 | 399:10 401:10 | 145:13 155:16 | 112:19 115:2 |
| 132:5 134:14 | 401:15 402:18 | 159:17 163:20 | 231:21 425:4 |
| 134:20 135:15 | 410:17 413:18 | 164:8,11,13 | **results**  280:13 |
| 136:8,17 137:7 | 414:14 418:20 | 165:24 166:2,8 | 417:23 |

CONFIDENTIAL

**[retro - sandoval]**                                                    Page 77

**retro** 199:3
**retroactive**
  198:8
**return** 77:10,16
  77:21 79:4
  464:15
**revenue** 76:8
  234:11 235:15
  235:19
**revenues** 76:6
  76:19 78:1
  233:18,20,20
  236:13 237:2
**review** 25:22
  26:3 27:11
  28:6 31:23
  157:1 213:2
  240:1 281:18
  295:4 319:13
  414:6 420:1
**reviewed** 23:19
  24:21 25:7
  26:6 31:12
  32:2 156:23
  179:15 180:2,4
  212:12,22
  213:3 220:20
  222:10,14,18
  276:3 281:12
  290:18 312:16
  315:16 319:8
  323:10 329:4
  346:24 371:17
  371:18 378:18

382:23 394:19
  439:13 448:14
**revise** 420:2
**rid** 404:3
**ridgefield** 4:5
**right** 43:20
  46:5 58:7 72:4
  73:3 83:20
  93:2 123:19
  141:24 143:11
  185:3 207:19
  220:4 222:18
  229:23 230:2
  275:16 290:11
  291:14 305:20
  322:19 328:22
  329:3 331:6,12
  333:2 341:4
  342:6 355:8
  356:20 363:10
  369:19 378:16
  379:23 391:2
  391:18 392:8
  402:3 413:10
  417:21 418:10
  419:20 425:16
  434:3 435:8
  439:11 442:24
  462:1
**rivera** 4:4
  51:21
**road** 1:16 2:4
  3:5,11 4:5
  11:20

**role** 33:15
  34:14 36:20
  40:2,19 54:20
  83:15 106:6,16
  109:17 114:24
  127:15 182:17
  220:10 230:23
  231:3 241:1,3
  405:16 408:21
  409:12 420:19
**roles** 405:6
**roll** 129:1
**roof** 239:20
**room** 346:11
**rooms** 367:3
**rooney** 4:9
**roseland** 3:11
**round** 402:4
**routine** 183:12
**routinely**
  259:23
**rule** 9:7 370:2
  371:4
**run** 346:2,3,4,5
  347:21 462:8

_____
        s
_____

**s** 2:3,9 6:9 7:2
  8:2 9:2 35:13
**safe** 367:3
**saint** 69:20
**sandoval** 2:9
  6:6 12:15 13:9
  13:24 14:2,16

15:6,19 16:10
  17:1,17 18:7
  18:21 19:10,23
  20:13 33:3
  42:23 43:7
  51:22 52:7
  69:7 87:9,21
  97:4 100:18,24
  115:4 121:11
  122:23 123:22
  124:9 128:2,16
  134:1 136:13
  137:4 139:15
  141:11 143:2
  145:6 146:17
  152:9 153:17
  154:11 155:21
  157:18 158:19
  159:20 160:6
  160:15 162:16
  164:14 166:15
  167:21 170:17
  173:6,16
  175:24 178:2
  181:2,18 182:4
  182:19 184:23
  187:14 188:16
  189:21 191:2
  191:20 193:20
  194:10 206:7
  207:14 209:13
  210:16 211:6
  215:4 218:1
  219:6,18

CONFIDENTIAL

**[sandoval - school]**

| | | | |
|---|---|---|---|
| 220:17 221:10 | 377:9,19 386:7 | 453:21 | 354:12,20 |
| 223:13 224:20 | 386:19 387:22 | **says**  126:20 | 359:20 360:9 |
| 225:11 226:8 | 389:14 391:4 | 127:18 142:1,9 | 360:14,20 |
| 227:9 228:4 | 393:14 394:9 | 142:20 169:4,9 | 362:5,16 |
| 230:5 232:2,18 | 394:21 400:11 | 170:20,22 | 363:23 367:20 |
| 233:4 243:18 | 400:22 406:15 | 202:4 203:19 | 369:16 370:6 |
| 249:18 251:8 | 407:7 408:14 | 288:6,17 | 370:16,18 |
| 254:17 255:6 | 409:22 412:5 | 322:11 332:23 | 371:11,17 |
| 256:9 258:15 | 412:19 414:18 | 335:24 350:17 | 372:18,22 |
| 259:5 264:14 | 419:19 421:8 | 358:5,23 359:9 | 373:4,8 376:8 |
| 269:9 270:7,18 | 421:16 431:5 | 366:24 370:1 | 376:20 |
| 272:12,21 | 437:16,24 | 373:6 403:19 | **scheuneman's** |
| 282:1,8 283:9 | 438:10,21 | 403:21 411:16 | 220:7 366:13 |
| 284:4 285:4,16 | 441:1,12 445:5 | 414:20 448:21 | 367:21 368:1 |
| 286:23 287:8 | 453:1 454:10 | 449:14,14 | 368:18 372:13 |
| 292:11 297:7 | 454:22 455:21 | 451:20 452:7 | 373:14,23 |
| 297:16,24 | 457:18 459:9 | 452:16,22,23 | **school**  6:13,16 |
| 298:2 300:13 | 459:19 462:2 | 452:23 453:16 | 6:18 7:8,11,13 |
| 302:1 304:9,19 | 462:10 | 454:9,9,21 | 7:16,23 8:18 |
| 305:4 309:4,13 | **sat**  66:22 67:24 | **scenario**  192:5 | 8:23 9:8,19 |
| 315:7 320:6,22 | 346:10 | 192:6 | 13:18 14:13 |
| 325:7 329:7 | **satisfactory** | **schedule**  311:8 | 15:3 16:22 |
| 330:2,6 334:5 | 355:13 | 342:7 362:17 | 17:14 18:4,18 |
| 338:5 339:21 | **satisfied**  239:23 | **schedules** | 20:10,22 64:3 |
| 341:20 342:13 | **save**  201:18 | 311:15 | 64:4,5,7,7,12 |
| 343:17 349:16 | **saved**  76:11 | **scheuneman** | 64:13,19,20,23 |
| 350:2 351:17 | **savings**  78:20 | 29:19 154:24 | 64:24 65:6,7,8 |
| 355:19 356:4 | **saw**  296:10 | 277:12 302:8 | 65:9,17,18 |
| 362:9 364:13 | 393:10 | 344:22 345:4,9 | 66:6,13,21,24 |
| 365:2 367:16 | **saying**  29:12 | 345:10,15,21 | 67:1,5,6,15,21 |
| 368:7,15 | 46:24 85:11 | 346:21 347:4,7 | 68:4,5,8,9,15 |
| 370:10,22 | 122:17 123:4 | 347:11,17 | 68:23 69:3,6,8 |
| 371:9 373:21 | 321:3,6 358:18 | 348:2,5 353:2 | 69:10,10,14,15 |
| 375:4 376:15 | 364:5 417:9 | 353:14,20 | 69:18 70:3,8,8 |

CONFIDENTIAL

70:16,21 71:12
71:16,16 72:8
72:11,23 73:5
73:7,10,12,17
73:21,22,23
74:2,10,16,21
77:8,14,20
79:6,14,20
80:1,8,14 81:4
81:10,21 82:5
82:8,20 83:11
84:2 85:7,15
86:8,9 87:3
88:20 90:11,17
94:23 95:4,15
96:1 97:7,17
98:4 99:5,15
100:6 101:2,11
101:20 102:5
102:17 103:1
104:14 105:1
106:8 107:2,11
107:24 108:14
119:15 134:5
144:24 145:19
146:1,6 149:11
151:1 152:6
155:19 156:2,6
158:15 159:5
187:3,16 188:1
191:11,15,22
192:16 195:2
199:6 209:1,2
214:3 217:18

218:4,10 219:9
219:21 227:2
228:19 229:15
233:7,15,21
234:2,15,19,23
235:11,16,22
236:7,18 237:7
237:9,14,17
238:3,15 239:7
242:19 247:17
247:21,24
248:18 250:20
251:10 255:24
261:11 262:7
264:18 265:19
266:15 267:2
268:4,20
269:16 270:12
271:8 272:13
272:23 299:23
317:1 325:20
329:2,12,19
330:13 334:23
335:7,8,13,14
340:23 342:1
346:3 354:1
358:6,13
364:21 365:6
367:10,15
371:5 412:7,16
430:13,16,20
441:9 443:20
444:19 446:2
448:17 449:10

450:16,24
451:23 452:14
452:18 453:5,6
453:11,15,16
454:12,24
455:14 456:1,3
456:18,18
457:5,7,12,22
458:1,6,9,16,19
460:3
**school's** 68:20
**schools** 3:13
7:6,21 9:15
16:7,17 19:20
30:21 34:9
66:1,10 67:13
69:23,24 70:23
71:11,23 72:1
72:3 191:3,13
241:6 242:20
243:15 263:22
266:2 271:24
334:22 389:3
400:18 401:6
428:10 456:8,8
459:5
**schueneman**
9:9 371:6
**scope** 41:10
54:10 74:18
80:18 106:20
148:6,16
159:15 163:13
227:24 235:17

238:9 242:7,16
248:9 258:5
318:16 337:12
421:7 436:20
455:19
**sealing** 11:4
**second** 17:7
103:2 115:16
305:9 316:1
322:20 323:4
330:8 352:24
410:4 422:18
426:10 427:2
432:10,16
433:4
**section** 442:6
**securities** 57:4
62:14
**securly** 260:22
**see** 29:14,15
31:17 36:1
45:4 56:16
57:11 62:23
75:3 103:7
113:5 124:13
147:9 158:3
162:12 167:4
242:8 243:3
244:14 252:18
259:18 260:19
265:11 279:18
289:14,19
290:17,23
291:5 294:3

**[see - set]**

295:4 310:3
315:20 320:19
325:13 350:21
351:1,10,18,21
352:6 358:5,9
358:22 368:20
368:22,24
369:4,8 370:14
372:5,10,17,21
373:2,7,12,13
373:19 387:17
410:16 413:1
426:1,11,14
427:1 428:3,4
429:16 438:24
439:11,21
440:1 441:20
442:13,14,18
443:18 446:20
448:23 449:13
**seeger** 4:4
**seegerweiss.c...**
4:6
**seeing** 332:2
355:10
**seek** 134:5
165:9 226:24
451:16,23
452:7,11
453:17 454:1,2
**seeking** 335:1
448:17 449:10
**seemed** 419:16
419:21

**seems** 143:5
**seen** 259:22
262:17 295:1
296:8 371:14
371:16 376:11
444:13 448:11
456:6
**sel** 83:4 192:24
193:4,12
239:15 243:12
271:23
**select** 103:11
104:16 110:21
113:3 117:17
131:16 139:10
180:17 235:21
240:5 241:7
243:4 247:15
253:18 262:4
271:21 276:18
298:24 299:2
299:10,19
300:6,17 301:6
301:21 302:5
302:14 303:2
303:13,19
304:3,4 308:8
308:15 321:12
322:5,12
332:17,18
333:23 336:23
338:12 343:8,9
352:24 353:5
354:5,11,20

356:7,12,15,19
357:23 362:17
363:20 377:5
381:24 383:15
389:12 401:21
404:21 405:20
409:4,14
410:14 411:11
420:21 434:12
434:18,24
435:6
**selected** 105:18
226:3 227:11
268:11
**selection**
246:23
**sells** 383:7
**sends** 174:7
**sense** 74:6
234:12,24
247:15 351:3
**sent** 444:3
449:16,20
454:8,9
**sentence** 264:3
359:10
**separate**
330:22 332:3,3
337:18 429:5
454:5
**separately**
181:22 182:8
183:3 184:5,9
331:22

**serve** 38:19
39:9 54:18
57:17,22 68:20
78:22
**served** 58:4
59:1,9,12,16
65:24 66:6,8
66:13,16,19
67:22 68:3,7
68:22 69:15,16
69:19
**servers** 359:13
**service** 245:9
247:18
**services** 53:9
53:11 54:2,7
60:5 239:7
244:4,9,16
245:1 366:24
369:1,6,9
374:18 378:4
401:24 402:24
429:17
**serving** 54:11
54:13 55:3
56:4,10 68:18
69:12
**set** 8:18,23 9:12
9:16 20:20
202:21 325:9
328:6 329:12
329:20 330:13
356:18,20
364:21 365:6

**[set - sitting]**

380:15,23
386:16,23
388:21 396:21
397:5 398:5,13
399:11 400:18
401:6 432:11
432:18 447:8
**setting**  27:2
63:21 64:1,15
65:2,4,12,14,21
66:10 67:22
356:14
**settlement**
72:18
**seven**  58:20
**shape**  122:24
**share**  47:19
**shareholders**
78:18
**sharing**  47:19
**shb.com**  2:18
**sheet**  464:7,9
464:12,15
466:6
**shook**  2:16
**shop**  250:7
**short**  296:3,6
346:17
**show**  125:7
176:4 313:10
438:7
**showed**  310:14
313:11,19
317:11

**showing**  438:2
**shown**  171:24
172:2
**shut**  71:5
**siculus**  2:19
**side**  59:22
141:24 142:13
237:23,24
379:3,4
**sides**  310:3,16
310:19 317:13
**sign**  464:8
**signature**
463:10
**signed**  215:6
216:11,19
255:8 293:13
**signing**  216:10
464:10
**sii**  443:14
449:17
**silent**  339:7
**similar**  415:13
**similarly**
324:16
**simply**  66:4
76:23 228:20
340:18
**sinewave**
429:10
**single**  165:4
229:11,12
275:1,6 299:11
300:5,16 301:5

302:4,12 303:1
303:11 331:8
331:22 333:10
354:6 434:19
435:4
**sir**  12:23 21:14
21:22 22:3
23:16 24:12
27:19 28:7
43:16 46:14,17
50:5 63:11
75:13 116:13
134:18 156:11
156:19 157:5
168:6 169:19
170:5 176:22
178:19 179:3
195:8 207:20
225:15 228:9
245:7 250:11
275:4,9 276:11
280:4 281:10
281:16 283:19
294:13 303:18
305:8,22
307:24 309:16
309:22 341:11
343:23 347:2
348:3 350:21
352:14 358:19
361:15 363:6
363:11 365:7
365:16 367:23
368:19,23

369:3,7,11,14
372:16 373:14
373:20 380:3
380:17 382:7
395:18 398:7
401:12 409:19
414:1 415:5
422:20 423:9
424:6 426:4,8
427:8 431:14
432:12,20
435:15 436:7
439:10 443:10
446:5 459:23
**sit**  22:4 46:4
67:23 72:4
73:2 123:18
176:6 185:3
297:5 355:8
369:19 378:16
379:22 385:24
391:1,18 392:7
413:10 434:3
435:8 439:11
**site**  313:13
345:8 346:15
347:20
**sitting**  22:5
66:5 106:23
189:12 296:6
328:22 329:3
341:4 342:6
344:8,9,13

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **six** 20:22 21:5 25:7 30:14,24 38:17 111:19 144:14 152:7 153:1,2 211:23 212:4 235:21 251:18 265:20 277:7 292:23 317:17 462:11 | **snapchat** 88:10 90:18 97:7,16 98:3 99:4,9 101:12 128:8 291:2 351:12 461:2,3 | 168:8 169:6,10 169:12,14,18 169:21 170:2 170:10,23 171:15,23 172:1,15 173:18,23 174:13,19 180:9 181:7 | 352:10 359:1 359:12 373:1 390:23 421:22 424:13 461:22 461:23 |
| **sixty** 58:18 | **social** 1:3 11:21 82:22 83:12 84:3,8,10,12,14 84:18,22 85:3 | 185:2,24 186:16 187:5 | **software** 249:9 310:2 330:21 331:23 332:4 332:23 333:8 334:1 335:15 335:20 336:14 338:9 340:21 346:8 |
| **skip** 61:19,23 | | | |
| **skipped** 373:18 | 85:9,17 87:22 | 188:3 191:22 | |
| **skyline** 378:8 382:4,9 383:3 385:21 387:12 388:1,15 389:5 389:18 390:9 390:21 | 88:2,4,6,7,12 88:14,21,23 89:9,13,23 90:23 91:5,6,6 91:9,13,15,21 91:21,23 92:1 92:3,5,7,9,13 92:15,16,17,23 | 192:1,4,7,10 193:23 240:14 241:17,18 243:20,24 245:10 250:14 251:12 261:3 261:21 262:10 264:17 266:13 | |
| | | | **solicit** 162:7 |
| | | | **somebody** 53:17 98:8 155:1 163:23 220:5 257:20 257:21 312:11 326:17 374:23 |
| **slightest** 283:19 | | | |
| **slow** 45:13 | 93:4,6,11 95:1 | 268:19 269:15 | |
| **sm** 9:17,18 438:17,23 441:7,16 | 95:5,12 102:20 103:4 125:11 125:11,17,20 126:3,13,15,20 126:23 127:3,7 | 269:23,24 270:4,23 271:3 271:10,12,19 272:14 288:9 | **somebody's** 61:11 |
| | | | **son** 69:20 |
| **small** 243:13 271:22 | | | **soon** 366:18 |
| | 127:11,18,24 | 288:20 289:1,8 | **sorry** 17:22 35:11 37:18 63:20 91:12 121:14 131:10 199:16 290:9 315:6 332:1,22 342:16 350:14 365:23 397:24 417:14 431:11 438:12 455:23 |
| **smartphone** 250:6,9 | 128:21 131:2,5 132:1,19 153:5 153:14,21 | 289:13,17 290:1,14 291:9 291:20,22 | |
| **smartphones** 249:14 250:12 250:20 | 154:8,15 157:9 158:1,10,14,23 159:4 160:1,11 | 293:21 295:22 296:12,13,21 296:24 334:12 | |
| **smashed** 259:19 | 160:24 161:20 162:21 163:10 | 350:20,23 351:2,14 352:3 | |
| **snap** 4:19 | | | |

CONFIDENTIAL

**[sort - spreadsheet]**                                    Page 83

**sort**  431:15
**sorts**  34:6
**sound**  43:20
  58:6
**sounds**  58:19
  276:12
**source**  233:17
  234:7,8,19
  235:2,5,15
  236:24 237:13
  237:24 256:5
  281:5 319:5
  348:23 380:21
  398:11 432:16
  440:12
**sources**  233:24
  236:16 315:23
**south**  5:5
**southeast**  5:4
**space**  464:6
**spalding**  5:3
**speak**  119:11
  122:11,12
  154:7 180:1,21
  218:21 220:5
  220:13 255:4
  262:2 267:17
  277:7,11
  293:16 307:18
  366:17 388:7
  420:5 421:14
  421:15
**speaking**  30:1,4
  111:17 144:10

274:4 307:12
  431:7
**speaks**  359:14
  400:3
**special**  78:7
**specially**
  235:24
**specific**  24:19
  78:7 90:3
  91:10 98:22
  126:22 167:4,5
  169:1 184:11
  235:24 237:18
  239:7 277:9
  279:3 332:14
  342:9 442:2
  445:2
**specifically**
  38:23 39:3,6
  39:13 86:5
  89:11 94:11
  98:4 99:4,9,15
  99:20 100:5
  101:4,13,22
  102:7 125:22
  126:4,18
  129:18 136:2
  136:10,23
  144:11 151:23
  154:5 159:4
  163:9 164:19
  165:21 170:15
  171:4 172:12
  183:14 186:2

238:4,16,20
  239:2 251:14
  252:22 253:12
  272:4 278:13
  279:8 288:11
  321:16 322:11
  334:19 381:22
  387:11 391:11
  392:24 393:3
  395:23 435:14
  435:21
**specificity**
  392:13,16
**speculating**
  251:2
**speculation**
  81:7 228:14
**spend**  80:23
  151:8,10
  198:19 335:8
  335:14 402:2,2
  402:8,14 403:7
  403:17,24
  404:2,3,8,13
  405:19,23
  406:3,13,20
  408:3,7 411:17
  411:18,19,23
  412:2,9 414:21
  415:15 416:5,8
  416:17 420:10
  420:13,24
  422:3,23 423:6
  423:17,20

424:17,21,22
  425:13
**spending**  77:11
  77:17 79:9,21
  80:2,11,16,23
  81:12,23 82:3
  82:11 83:13
  84:4 85:8,16
  378:20 384:17
  384:19 385:15
  430:17,21
**spends**  77:9,15
  79:7
**spent**  49:14,17
  55:3 56:4
  60:18,22 61:9
  61:10,14
  149:15 191:23
  192:1,17,18
  196:1,2 238:3
  238:15 406:9
  450:17
**spill**  72:13 73:1
**split**  60:14
  426:21
**spoke**  35:17
  155:3 211:12
  211:15,16,21
  212:8 277:8
**spoken**  177:17
  352:12 435:13
**spreadsheet**
  314:16 316:6
  316:20 342:20

CONFIDENTIAL

**[spreadsheet - students]**                                            Page 84

342:23 384:21
**spreadsheets**
33:18 36:8
37:11
**springer** 26:16
**stacy** 211:16,16
274:11,17
312:11
**staff** 29:9
**stamp** 316:7
438:23 439:8
439:12 446:22
**stamped** 310:6
323:12 324:14
326:9 347:1
**stamps** 147:13
323:8 324:4
326:4
**stand** 282:19
282:24 375:17
462:7
**standard**
313:17
**standing**
119:22 231:15
**stands** 249:6
295:20
**start** 33:4
64:18,21 106:2
109:12 121:14
150:12 151:4
161:15 235:18
241:12 372:20
401:2

**started** 242:1
**starting** 104:8
105:16 372:4
**starts** 128:20
**state** 12:18
210:8 233:22
234:11 264:12
267:2 291:7
395:10 455:12
464:5
**stated** 83:8
161:10 295:16
360:1 432:3
433:13 436:12
**statement**
21:17 55:7
82:2 88:17
138:14 168:17
175:18 295:19
331:1 390:6
**statements**
32:8 75:6 89:4
108:17 117:14
117:23,24
118:17 122:6
129:15 130:14
137:10 151:20
152:4 214:11
317:16 325:17
394:20 396:2
**states** 1:1 11:24
61:3 166:6,23
168:1 263:15
369:1 435:21

448:16 451:15
**statewide** 264:6
**stating** 352:2
462:8
**statistician**
56:23
**statute** 444:5
451:19 452:5
452:12 453:24
454:3
**stemming**
190:9
**stenographic**
12:5
**step** 210:1
316:1 322:20
323:4
**stephany** 4:15
**stephany.rea...**
4:18
**steps** 130:5,11
136:14 421:17
424:8 437:19
438:4 445:24
**stipulated** 11:2
**stipulations**
10:15
**stop** 129:5
**stopped** 199:19
**strange** 310:1
440:17
**straw** 278:19
**stream** 234:12
250:10

**street** 3:17 4:10
**struck** 460:4
**student** 66:6
82:15,21 83:12
84:3,7,9,12
90:14,21 101:3
101:12,21
102:6 116:2
174:7 190:24
191:4,16,24
192:18 366:24
369:1,5,9
437:6,18,20
438:2 443:21
448:19 449:12
451:18 453:18
455:2 456:2
457:6,24 458:8
**student's**
445:21 446:3
448:2,19
**students** 69:21
70:1,2 82:6
87:2 90:11,17
169:5,10
173:24 185:1
185:23 186:15
187:4,17 188:3
188:19 189:6
189:15,24
190:19,20
250:19 251:1,7
256:11,19,22
262:10 271:11

CONFIDENTIAL

**[students - sworn]** Page 85

272:1 445:10 445:11,21 446:3 452:1 455:15
**study** 239:6
**stuff** 62:6 69:1 78:9 383:7
**sub** 315:13
**subcategory** 388:20
**subject** 42:20 44:16 70:5 142:15 195:12 222:13 299:2 369:23 380:8 455:12 464:10
**subjective** 283:23 284:7 285:9
**subjectivity** 284:21
**submitted** 20:21 89:22 118:20 119:4
**subscribed** 466:10
**subsequent** 65:5,15 71:9 179:19,22 349:7 374:14 390:13
**substance** 466:6

**sufficient** 390:7
**suggest** 277:1 278:2 358:17
**suggested** 224:7,22
**suggesting** 224:16
**suite** 3:17 4:16 5:5
**sum** 105:18
**summary** 426:3 441:19
**summer** 64:3,6 64:12,19,23 65:6,8,17
**supercede** 81:6
**superceded** 349:14
**supercedes** 339:2 359:19 376:12
**superceding** 338:14
**superintendent** 156:2,5 230:15 334:22 378:4
**supervision** 463:21
**supplement** 323:22
**supplemental** 8:16 328:5 329:9,17 330:11

**supplemented** 370:3
**supplies** 451:3
**support** 10:2 29:9 116:2 418:15
**supported** 390:16 391:7 391:12 392:11
**supportive** 393:11
**supports** 169:23 336:2,5
**supposed** 448:22 449:1
**sure** 21:4 33:13 33:22 45:9 54:15 58:1 75:21 83:22 90:9 110:7 115:18 143:3 146:22 149:16 166:20 217:4 234:2 235:19 239:19 249:20 274:2 288:15 310:20 357:9 365:22 366:8 372:2 383:8 386:6 400:10 417:15,20 426:23 428:1 429:4 438:9

**surely** 263:24 273:22 395:9
**surface** 248:22
**surgery** 259:19 260:1,3
**surplus** 78:20
**surprise** 44:4,9 225:10
**surprised** 224:21 225:5
**sustain** 78:15
**sustained** 103:10 267:24
**sw** 2:10
**swear** 12:7 214:24
**swearing** 214:15
**swofford** 3:4
**sworn** 12:10 89:6 105:22 108:17 116:21 117:7,13,23,24 118:16 119:12 129:15 130:13 131:12 132:3 132:23 135:23 136:7,22 137:9 138:1,13 143:24 161:4 163:7 165:18 172:5,21 175:18 213:16 213:20 214:11

CONFIDENTIAL

**[sworn - technology]**

216:15 219:4
223:3,5 225:7
226:15 227:17
245:15,22
255:3 272:10
273:15 281:15
286:8 293:18
293:20 294:15
294:18 295:19
308:20 319:15
362:4 377:1
410:18 413:5
433:18 456:21
458:21 463:5
466:10
**sydney** 2:10
**system** 151:3
229:15 230:18
268:7 311:2,19
345:24 346:1
358:7,14
359:11

**t**

**t** 6:9 7:2 8:2 9:2
465:1
**tab** 16:15 42:24
51:23 286:24
304:21 309:5
330:1,3 342:9
349:19 364:14
368:8 370:23
386:8 400:12
438:11 441:2

**table** 287:16
288:3,12,13,18
368:21,22
402:21
**tabs** 384:23
385:1
**take** 24:10 36:8
44:10 85:19
87:7,10 104:19
113:1 124:23
130:5,11
136:14 157:14
173:7 210:11
230:13 232:17
232:19 243:19
259:16 275:23
276:7,9 279:21
296:4 297:6
304:10 306:24
317:21 318:23
320:15 326:20
347:24 362:13
364:14 370:11
370:23 377:10
379:15,24
400:8 421:17
424:8 425:21
430:8 438:11
441:13 445:24
455:15 459:10
**taken** 1:13
87:17 173:12
232:24 304:15
377:15 459:15

**takes** 333:23
437:19 438:3
**talk** 33:23 91:9
165:5 196:9,10
312:7,10
420:15 460:13
**talked** 125:21
132:13 135:7
147:4 183:9,18
207:13 220:9
233:18 238:9
254:7 261:6
262:1 278:8
279:7 289:11
293:22 298:9
306:18 312:10
322:3 325:14
351:4 358:20
361:14 388:4
404:18,19
412:12,15
424:16 431:1
447:3 449:22
450:10 456:23
460:11
**talking** 25:9
39:24 67:10,20
86:4 112:10
127:15 146:12
170:14,18
212:4 231:6
264:3 268:15
277:4 322:22
357:9 442:2

**talks** 55:18
**tasked** 82:3
**taught** 64:3
65:2,3,6
**taylor** 34:17
35:9 37:3,4
**teach** 64:17
**teacher** 63:17
63:21,24
237:18 340:9
**teachers**
285:20 286:4
286:15
**teaching** 64:6
64:12,19,23
65:8,17
**team** 311:24
312:20
**technically**
105:3
**technician** 5:14
11:10 13:21
87:12,19
100:22 173:8
173:14 232:20
233:2 304:11
304:17 329:24
330:4 377:11
377:17 459:11
459:17 462:6
**technology**
239:16 240:15
241:19 243:10
244:17,17

CONFIDENTIAL

249:9 260:22
260:24 268:8,9
271:18 330:20
331:23 332:4
332:15,23
333:6,24
334:16 335:9
335:20 336:13
338:8,18,22
340:21 387:8
387:20 388:12
388:18,24
389:13

**telephone**
274:5 317:20
345:1 379:17
431:8

**tell** 32:2 48:2
50:10 71:24
80:21 100:11
109:20 172:16
175:7,11 178:3
237:3 241:15
251:1 258:11
260:15 262:15
268:3 279:4
337:9,15
371:21 374:8
389:3 391:19
405:16 406:13
410:20

**telling** 110:18
148:24 406:1
418:22

**ten** 46:1 201:20
201:22 267:12
367:15

**tendered** 56:22
57:14

**term** 84:23
113:16 114:3
141:4 168:17
198:4 257:2
289:17 290:14
304:6 323:6

**termination**
60:11

**terminology**
185:15

**terms** 55:24
81:17 280:11

**test** 148:8

**tested** 148:15

**testified** 12:11
197:2 240:11
283:20,22
284:24 294:1
294:11 305:23
328:8 349:5
362:2 365:8
369:16 389:24
393:23 413:6
425:11

**testifies** 53:4

**testify** 53:17
58:15 86:16
98:11 118:1
119:22 122:2

125:15 130:16
130:18 131:13
138:15 140:23
143:17 207:8
216:21 217:10
231:15 244:11
265:3 267:19
272:11 273:16
282:20 284:13
284:23 286:20
321:12 359:24
375:17 390:20
398:24 409:17
425:2

**testifying**
117:15 306:20
370:6,20
392:24

**testimony** 6:4
27:22 42:17
56:2 59:8 89:6
98:14 101:8,17
102:2,12
105:23 116:21
116:21 117:7
117:20 118:11
118:13 119:12
119:18,20
120:12,23
121:19 127:10
129:13,15
130:2 131:12
132:5,23
135:24 136:6

136:22 138:2
138:17 145:12
148:18 153:11
154:17 157:2
161:2,3 162:8
163:7 165:19
167:22 169:15
172:4,6,21,23
175:20 179:10
197:4 202:16
212:13 213:17
213:20,23
216:15 217:6
219:2 223:4,5
225:7 226:15
227:17 245:15
245:23 247:7
255:3 262:20
266:24 272:10
273:15 278:16
280:19 281:16
286:9 293:17
294:16,18
295:10,12
297:23 306:4
308:20 319:9
319:14,20,23
320:8,12,17,18
321:2 334:7
359:20 360:16
362:5 367:20
368:1 370:4,15
373:24 376:2
376:20 377:2

CONFIDENTIAL

**[testimony - tie]**

391:22 392:2
392:18 393:10
410:18 413:5
425:18 433:3
433:18 456:7
456:21 458:21
458:23 463:7
**texas** 3:18
**text** 159:23
160:9 166:21
168:19 169:22
200:4 201:3
250:1 289:16
290:13 291:8
291:12,14
331:2 336:2
**tgraden** 2:5
**thank** 13:8 17:9
32:16 35:11
37:18 139:21
287:7 309:12
330:4 400:21
**theoretical**
35:18
**theoretically**
183:5
**theory** 75:22
76:1 440:13,14
**thereof** 368:6
**thereto** 349:11
353:2 422:17
434:16
**thing** 72:14
201:19 316:12

333:2 446:16
454:24 455:8
**things** 24:4
40:17 44:13
52:24 61:4
71:6,18 75:23
77:22 78:13
79:3 84:17
148:5 155:14
165:13 170:20
181:12 191:13
195:21 196:15
197:24 201:8
209:10 216:2
242:6 250:13
278:17 314:18
331:8 332:11
340:12 342:11
346:6 352:23
359:15 383:24
429:6 454:4
**think** 28:1
30:13 36:14
39:4 40:7 47:1
57:6,11 65:15
67:17 70:17
73:13 77:18
79:14,15 82:1
90:4 93:23
94:2 106:10
112:9,12
115:24 139:2
140:15 144:21
145:4,22

153:10 159:14
159:18 170:6
171:7 174:21
177:13 184:1
200:12 201:19
216:8,10 218:8
220:3,15
226:20 227:4
228:8 229:9,13
230:11 234:18
236:11 239:10
241:22 250:16
251:23 253:3
256:21 257:1
260:21 264:21
269:11 280:9
293:1,9 313:2
322:19,20
324:12 327:12
334:8 345:17
348:8 351:21
353:15 357:13
361:1 362:1,14
363:10 379:16
383:23 384:1
409:24,24
415:21 423:21
443:7 447:5
450:18 452:22
453:13 454:11
460:12
**thinking** 31:13
64:10 201:23

**thinks** 284:17
**third** 9:14
32:11 96:8
104:15,18
105:3 159:24
160:10,24
161:20 162:21
193:1 203:15
234:4 236:8,20
383:3 396:20
397:5 398:4,11
399:11 400:16
400:24 401:4
402:9 426:10
427:2 434:2
447:6 451:1
**thirty** 464:16
**thought** 226:10
290:9 295:22
314:14 458:10
**thoughts** 40:16
**thousands** 34:2
41:11 406:11
**three** 38:12
60:6 61:11
70:23 137:11
154:5 212:5,6
242:13 267:7
291:5 353:16
357:10 363:7
367:1
**threw** 300:12
**tie** 322:24

CONFIDENTIAL

**[tiktok - towns]**

| | | | |
|---|---|---|---|
| **tiktok** 5:8,8,9 | 300:23 308:15 | **together** 122:9 | 397:5,14 400:3 |
| 88:10 90:18 | 312:18 313:14 | 223:21 275:3 | 402:2,2,8,13 |
| 99:15,21,22,23 | 334:6,9 345:18 | 323:7 384:22 | 403:7,17,24 |
| 100:5 101:21 | 346:17 349:15 | 406:18 | 404:2,3,8,13 |
| 128:9 351:12 | 353:6 363:19 | **told** 80:7 97:9 | 405:19,23 |
| 461:4,5 | 385:11 393:9 | 100:10 155:14 | 406:3,13,20 |
| **time** 11:8,15 | 406:9 410:4 | 181:19 182:5 | 408:3,7 409:3 |
| 21:21 22:3,20 | 417:9 423:24 | 182:23 186:8 | 409:13 410:19 |
| 23:15 39:23 | 424:1 428:15 | 187:13 200:23 | 410:21 411:10 |
| 42:22 43:18 | 430:8 449:2 | 285:23 291:19 | 411:17,19,20 |
| 44:17,19,24 | 459:7 462:9 | 321:16 346:11 | 412:1,8 414:15 |
| 45:12,17 46:7 | **times** 12:22 | 347:19 450:20 | 414:21 415:6 |
| 46:12 48:16,22 | 57:16 71:23 | **tolles** 4:15 | 416:5,7,16 |
| 49:13,17 50:24 | 104:10 105:21 | **took** 274:17 | 417:11 418:3,6 |
| 51:1 53:18 | 135:8 295:24 | 406:17 | 419:1 420:10 |
| 55:3 56:4 | 297:1 405:23 | **top** 449:4 453:7 | 420:12,21,24 |
| 58:15 60:18,22 | **timing** 280:15 | **topaz** 1:15 2:3 | 422:2,23 423:6 |
| 61:9,10 63:4,6 | **title** 156:4 | 3:4 11:19 | 423:17,19 |
| 71:1 77:23 | **titled** 340:21 | 39:12,14 51:7 | 424:17,22 |
| 87:7,13 90:6 | 369:9 402:22 | 51:12,16 | 425:13 426:5 |
| 128:14 157:15 | 403:4,6,9 | **total** 50:7 | 434:10,23 |
| 175:14 180:3,4 | **to's** 220:9 | 103:17 104:1 | 435:23,24 |
| 196:11 199:6 | **today** 13:4 22:6 | 105:7,8 114:7 | 445:7 462:8 |
| 200:24 203:6 | 23:5 24:22 | 114:9,16,22 | **totaled** 337:6 |
| 204:18 212:9 | 25:9 28:8 | 115:2 116:17 | **totaling** 45:12 |
| 212:23 214:9 | 33:23 46:2,21 | 133:7 134:7 | 415:11 |
| 217:15 229:10 | 47:1,8 51:8 | 135:3 159:1 | **totalling** 46:12 |
| 230:14 246:21 | 106:23 149:24 | 207:18 208:23 | **totals** 210:17 |
| 247:22 248:7 | 189:13 292:23 | 271:23 299:17 | **touch** 237:20 |
| 248:14,24 | 295:21 296:20 | 299:18 300:22 | **toward** 205:9 |
| 249:8 259:18 | 344:8,9,13 | 301:16,19 | **town** 35:13,14 |
| 265:22 272:2 | 371:15 410:1 | 302:10,20 | 37:9 |
| 276:3 278:8,18 | **today's** 11:14 | 303:17 322:11 | **towns** 35:3,12 |
| 295:18 297:10 | 22:23 462:12 | 335:21 353:23 | 374:16 |

CONFIDENTIAL

**traditional**
74:6 351:2
**training** 270:24
**transaction**
379:3,4
**transcript**
297:14 372:1
373:17 463:18
464:17,19
**transcription**
466:4
**transmission**
449:19
**transmittal**
449:18
**transparency**
326:5
**tremendous**
104:4
**trial** 5:14 11:8
13:21 22:13,17
42:16 49:23
53:16,22 59:7
62:23 86:16
98:7 107:7
118:11 119:23
120:12,23
121:20 127:10
138:15 141:2
142:17 143:23
175:20 178:1
197:4 208:18
214:24 245:4
259:23 265:3

272:11 280:19
319:16 321:12
324:9 329:24
330:4 353:24
360:16 374:22
376:3,10
393:23 398:24
413:7 425:2
458:23
**trials** 23:8
42:14 53:4
**tried** 185:11
188:10 201:8
278:17
**trier** 142:22
159:11 164:3
210:2
**trouble** 406:17
**truck** 183:19
**trucking** 96:6
**true** 67:18
100:19 141:16
141:17,20
158:7,20
214:16 215:1
281:17 282:9
283:11 284:5
285:6 286:1,10
286:12 394:23
463:6
**trust** 297:4
**truthful** 119:20
217:6 231:19

**try** 59:20 75:24
106:17 121:7
183:21 184:15
201:7 278:20
391:17
**trying** 26:22
57:6 68:2
69:24 75:9
76:4,7 81:15
81:18 110:4,23
162:14 197:17
198:21 201:18
204:11 280:10
379:12
**tucson** 7:8,23
9:19 16:21
17:3,6 20:9,15
20:18,24 21:12
26:14,17
134:13,18
213:6,11 214:2
215:8 217:10
228:7 252:4,18
303:11,15
316:24 431:11
431:19,24
432:8,14,21
433:9,23 434:5
434:18 435:4
435:14 436:4,8
436:13,23
437:1,2,18
438:3 439:17
439:22 441:8

441:19 443:19
444:17 445:8,9
445:18 446:8
448:16 449:9
450:7 451:7,22
453:4,6,14
454:11 460:7,9
460:13
**tucson's** 432:9
432:16 433:3
439:6 447:6
**tumblr** 92:5,6
**turn** 358:1,3,21
371:24 415:2
429:15
**turned** 420:17
**turning** 344:17
425:23
**tusd** 9:17,18
438:17,23
441:7,16
448:17
**tv** 460:21
**twice** 142:6
300:11
**twitch** 92:7,8
**twitter** 88:4
91:13,20
153:13,20
154:14 292:4,5
292:20 293:4,7
293:12,15
295:22 296:21

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **two** 30:13 39:17 47:3,16 49:8 50:18 51:3 55:22 70:6 73:3 96:5 102:15,18,23 103:14,15,16 103:19 104:11 109:11 116:20 135:6 147:15 155:3 175:8 203:11 225:13 242:12 251:18 253:3 274:9 305:10 306:10 306:23 352:22 353:15,17 361:10 378:9 383:2,24 385:10,17 386:3 393:12 410:24 427:9 427:10 428:11 429:5,11,17 454:4<br>**tyler** 2:3 39:16<br>**type** 83:4,4 244:18 249:9 260:23 311:4 439:4<br>**typo** 328:19 449:7 | **u**<br>**uh** 360:12<br>**ultimately** 224:9,24<br>**umbrella** 382:5 382:11 383:10 383:18 384:11 385:23 387:13 388:3,16 389:6 389:19 390:10 390:22 394:3<br>**unacceptable** 451:15<br>**uncommon** 428:9 429:24<br>**undefined** 81:17 296:13<br>**under** 72:18 117:15 163:22 164:8 195:6 209:23 214:16 219:4 225:7 236:13 244:4 262:8 265:2,3 271:9 282:24 282:24 283:7 288:23 340:7 375:18 388:13 442:5 450:22 463:20<br>**undermined** 296:11 | **understand** 21:10 67:4,9 73:16,20 80:4 83:22 87:4 121:19 125:16 126:15 139:16 141:12 142:24 143:1,4,6,13,13 144:7 196:17 196:21 202:16 204:11,12 228:23 249:3 284:22 291:17 303:20 336:20 340:6 370:5 372:11 391:21 394:1 411:9 417:15 430:12 449:8<br>**understanding** 40:4 89:8,15 93:16 118:11 122:1 125:13 126:2,10,11 127:1,6 128:4 136:5 154:10 156:14,18,21 163:6 164:16 165:18 171:11 176:16,21,23 177:3,6 178:12 178:22 181:11 186:5,17 188:15 196:12 | 206:12 207:21 208:20 214:12 215:5,17 216:18 217:8 228:10 254:5 289:21 291:6 291:18 292:14 334:7,9 335:23 336:3,6,8,10 337:21 351:3 352:9 374:19 416:20 417:1 419:6,11<br>**understood** 176:18 177:1,8 178:14,24 222:5 292:2,13 292:15,20 293:3,11 316:22 347:13<br>**undertaken** 264:15 266:10 266:12<br>**undertook** 422:6<br>**unfortunately** 197:22 198:6 326:16<br>**unified** 7:8,23 9:19 16:21 20:10 441:8 443:19 448:17 449:9 451:22 453:5,6,14 |

CONFIDENTIAL

**[unified - vendor]**                                                          Page 92

| | | | |
|---|---|---|---|
| 454:12 | 237:23 249:21 | 398:2,9 406:6 | **valuation** 36:16 |
| **unique** 346:1 | 249:24 250:3,6 | 432:8,14 440:5 | 36:18 53:13 |
| **united** 1:1 | 250:9,12,17,19 | 440:7 461:1,3 | 56:21 |
| 11:24 61:3 | 250:20 251:1,3 | 461:4,5,6,7,8 | **value** 57:5 61:7 |
| **unlimited** | 251:6 262:10 | 461:11 464:20 | 81:11,22 82:9 |
| 297:10 | 271:12 280:21 | **uses** 249:14 | 82:21 83:11 |
| **unpaid** 54:14 | 284:16 288:23 | 358:6,13 | 84:2 85:7,14 |
| 313:21 | 289:4 348:16 | **using** 141:4 | 248:24 280:6 |
| **unprofessional** | 356:21 365:12 | 233:9 235:13 | 280:11 318:3,9 |
| 128:24 | 365:15 366:6 | 236:7,19 | 318:14 332:20 |
| **unreasonable** | 389:17 402:7 | 247:10 261:10 | 348:11 380:5 |
| 218:17,23 | 407:13 418:6 | 328:24 340:24 | 396:11 431:23 |
| **unreliable** | 422:12 425:5 | **usually** 460:20 | **values** 60:12 |
| 112:8 114:16 | 455:3 456:3 | **utilization** | **vandalism** |
| **untruthful** | 457:7,24 458:8 | 205:9 | 257:3 |
| 143:15 | 460:15,18,19 | **utilize** 131:11 | **variable** 194:24 |
| **unusual** 215:19 | 460:22 461:22 | 138:1 | **various** 103:20 |
| 215:22 216:4 | **used** 84:23 | **utilized** 30:6 | 193:12 323:8 |
| **updated** 58:14 | 90:11,18 91:20 | 98:7 103:9 | **vast** 53:21 57:9 |
| 58:14 331:15 | 94:12 98:10 | 210:7 246:21 | **vendor** 24:23 |
| **usable** 36:10 | 105:22 111:1,2 | 262:3 401:19 | 34:8 41:14 |
| **usages** 169:19 | 113:1 127:8 | 446:17 | 103:17,24 |
| **use** 40:23 41:5 | 185:15 217:19 | **utilizing** 127:10 | 104:3,15,18 |
| 78:19 90:23 | 218:5,11,16,23 | **v** | 105:7,8,18 |
| 91:4,6 101:3 | 219:10,23 | | 106:8,14,18 |
| 101:12,21 | 223:17 234:15 | **validate** 117:10 | 107:2,19 |
| 102:6 106:4 | 255:15 281:3 | 130:6,11,12 | 110:21 113:3 |
| 110:5 111:2 | 307:5 318:18 | 136:15 312:21 | 140:2,11 |
| 112:16 113:17 | 319:3 325:10 | 314:7 | 141:14 144:13 |
| 114:4 126:23 | 348:21 356:19 | **validated** 312:1 | 145:20 146:2,7 |
| 145:1 169:5,10 | 356:23 357:6 | **validation** | 146:20 147:2 |
| 172:15 183:22 | 361:9 380:12 | 131:8 | 147:19 149:7 |
| 188:2,8 196:17 | 380:19 396:18 | **validity** 216:21 | 149:23 150:14 |
| 198:11 202:10 | 397:10,11 | 217:11 | 150:21 151:8 |

Golkow Technologies,
877-370-3377                    A Veritext Division                    www.veritext.com

CONFIDENTIAL

**[vendor - verified]**

| | | | |
|---|---|---|---|
| 180:17 182:24 | 322:1,15 323:3 | 117:17 127:14 | 354:19 356:12 |
| 197:24 198:2 | 331:8 333:10 | 131:16,21 | 356:16,20 |
| 198:13,14 | 337:21 343:3 | 132:16 139:11 | 357:10,24 |
| 199:22 200:3,6 | 343:21 348:13 | 148:21 149:3 | 362:17 363:20 |
| 200:7 202:23 | 353:11 354:4,6 | 149:11,11 | 378:9 379:1 |
| 202:24 203:17 | 354:7,21 | 150:7,18,19 | 381:17,19,24 |
| 203:23 205:13 | 355:22 356:7 | 151:9,24 | 382:3,17 |
| 205:17 206:8 | 360:8,11,19 | 152:11,18 | 383:15 386:3 |
| 206:14 207:16 | 377:5 380:7 | 155:3,10 | 387:18 389:12 |
| 208:19,21 | 382:9,20 383:3 | 169:18 196:10 | 393:12 399:7 |
| 209:2,3 230:7 | 383:6 384:7 | 229:2 232:6,7 | 399:13,19,21 |
| 231:9,9 238:4 | 389:1 396:13 | 235:21 239:24 | 401:21 402:14 |
| 238:16 239:9 | 399:16,24 | 242:2 243:4 | 404:22 405:20 |
| 240:4,5 241:8 | 401:16 403:4 | 244:9 245:16 | 409:4,14,16 |
| 242:17 244:2,5 | 403:12 404:13 | 246:23 247:15 | 410:15 411:11 |
| 244:11,23 | 406:20 410:13 | 262:4 268:11 | 420:22 425:6 |
| 245:2,5,10 | 414:22 415:6 | 271:21 276:19 | 425:13 426:2 |
| 246:2,8 247:19 | 416:8 418:16 | 278:9 288:22 | 433:23 434:5 |
| 248:1,5,19 | 420:13 422:18 | 298:4,6,11,18 | 434:12,13 |
| 252:23 258:18 | 425:5 426:17 | 299:2,7,19 | 442:5 446:13 |
| 259:8 260:12 | 427:7,15,17 | 301:14,21 | **verification** |
| 261:16 265:9 | 428:24 429:13 | 303:20,21 | 148:12 336:5 |
| 275:21 280:8 | 429:20 430:4 | 304:3,4 308:8 | 419:5,10 |
| 288:8,19 | 430:17,22 | 308:15 311:10 | **verifications** |
| 298:14,19,20 | 432:1 434:8,17 | 315:10,12,13 | 216:10 |
| 298:23,24 | 434:19,20,24 | 321:8,13,17,22 | **verified**   41:20 |
| 299:9,11,12 | 435:6 439:15 | 322:5,13,16 | 86:17 105:20 |
| 300:6,17 301:6 | 443:4 451:1 | 332:17,18 | 132:4 136:1 |
| 302:5,14 303:2 | **vendor's**   131:2 | 333:23 334:18 | 172:7 180:16 |
| 303:13 310:10 | 131:4 219:11 | 336:24 337:1 | 195:19 213:18 |
| 310:12 312:2 | 219:24 | 338:12 342:19 | 215:13,20 |
| 312:21 314:8 | **vendors**   34:6 | 343:8,8,10 | 221:4 223:8 |
| 315:1,19 317:3 | 41:12 86:1,2,4 | 352:20,24 | 253:7 303:8 |
| 317:5 318:5,11 | 103:11 105:19 | 353:5,8 354:12 | 311:15 334:23 |

CONFIDENTIAL

**[verified - watts's]**                                    Page 94

338:16 339:10
339:17 343:14
374:9,16,20
375:19 388:5
415:10 417:11
418:23 420:17
**verify** 180:18
216:5 344:5
405:12 415:13
451:11
**verifying** 297:4
**veritext** 1:23
11:13
**version** 52:13
326:9
**versus** 180:22
190:20
**vet** 177:6
178:12,22
217:17 218:3
218:10 253:24
254:19
**vetted** 144:2
246:12
**vetting** 143:21
**video** 9:7 11:10
11:17 87:12,13
87:19,20 92:12
100:22 173:8,9
173:14,15
232:20,21
233:2,3 304:11
304:12,17,18
371:4 377:11

377:12,17,18
459:11,12,17
459:18 460:21
462:6,12,13
**videographer**
5:13 11:12
462:8
**videos** 92:20,22
159:24 160:10
173:24 460:23
**videotaped**
1:12
**view** 92:22
**vigran** 2:10
**vitae** 8:7 52:3
**voluminous**
430:7
**volunteer** 66:7
**vouching**
137:19,23
138:10,21
139:4 140:7,21

| w |
| --- |

**wait** 13:2
**waiting** 147:9
363:18
**waived** 11:5
**walk** 76:1
182:2
**walked** 340:8
**want** 13:22
31:8 37:20
43:23 55:13,14

56:1 91:9
106:2 109:12
121:2 146:15
146:18 157:6
157:14,16,19
157:22 163:23
165:2 171:3
172:17 185:9
189:2 191:7
210:12 232:16
260:15 295:3
297:3,13
318:23 365:24
366:17 370:11
406:4 427:18
428:16 454:5
**wanted** 89:21
99:2 100:3
101:1,10,19
102:4 153:18
154:12 161:13
161:16 187:2
187:15,24
347:23 379:2
**wanting** 278:10
**wards** 452:20
**washington**
2:11 4:17
**watch** 92:22
460:20,21,23
**watching** 92:20
**watts** 8:11
115:15 155:6
155:22 156:1

156:15 157:1
157:17 170:22
177:16 178:7
178:11,21
179:3 200:18
200:19 204:7
205:5,11,24
207:5 208:11
211:12,15,22
212:5 220:6
221:15 229:9
230:14 274:10
274:14,22
275:2,6,8
276:10 278:6
279:4,10,22
280:2,23 281:6
282:2,9 283:21
285:18,22
286:1 287:4,10
287:17,22
288:4,6,17
289:5,6,7,15
290:2,4,11,12
290:19 291:1,7
292:2,4,10
293:2,10,17
294:1,19 296:8
296:12 300:22
305:14 306:2
306:13,18,22
307:2,6,9
**watts's** 284:6

CONFIDENTIAL

**[way - witness]** Page 95

**way** 47:21
74:24 83:7
89:13 91:1,2
99:1 112:1
121:8 122:24
162:12 164:10
173:21 180:12
183:17 186:3
189:19 194:17
206:19 214:21
218:14,24
219:1,7,20
224:14,18,19
226:16 227:8
229:5 230:6
247:22 249:2
251:5 260:7
261:14 264:9
268:12 270:14
271:15 274:4
280:3 282:7
289:20 295:15
307:12,21
310:15 319:18
340:15 344:19
344:24 345:13
352:16 355:12
377:21 379:19
381:14 394:17
395:15,24
431:7,18 433:2
433:14 437:14
437:23 440:24
457:10 458:14

458:14
**ways** 73:15
194:13 253:3
**wc.com** 2:12
**we've** 133:12
261:6 263:19
298:8 351:4
412:12 428:1
431:1 449:22
456:6,23
**wear** 53:7
**web** 198:15,17
262:5,23
263:16,18,20
264:5,11 265:1
265:8,11,15,18
267:13,23
268:6,14 269:6
270:5 383:10
383:14 384:9
386:2,3
**website** 32:6
323:21 324:1
325:19 326:8
326:10
**websites** 147:6
**wednesday**
50:22
**week** 34:24
52:11
**weeks** 61:12
**weight** 96:14
320:19 369:5
369:13,17

372:19,23
373:24 374:3
387:7 388:11
390:1 392:4
459:3
**weighted** 372:8
**weighting**
208:14
**weiss** 4:4
**went** 21:3
22:22 28:20
30:18 41:23
45:21,24 46:8
62:22 85:23
87:1 147:10
223:4,24 267:6
283:4 313:8
322:9 325:23
326:8 332:17
345:8 381:13
393:20 399:4
**white** 62:4
**william** 5:13
11:12
**williams** 2:9
**willing** 205:7
278:20
**withdrawn**
340:17
**witness** 10:5
12:7 33:1
38:20 39:10
42:1 52:22,24
53:2,9,18,23

54:2 69:5 87:6
87:11 100:10
114:19 122:20
123:24 127:22
128:13 133:12
135:18 136:19
138:2 139:2
140:15 141:19
145:4 146:11
150:11 153:8
153:24 154:20
157:13 158:17
159:8 160:4,13
162:2 163:4
166:12 167:13
170:14 173:4
174:21 177:13
180:12 181:10
182:2,12
184:15 187:11
188:7 189:18
190:23 191:19
192:22 194:8
205:21 206:18
209:7,20
210:22 214:7
217:23 218:21
219:15 220:3
220:24 223:1
224:13 225:4
226:6 227:6,15
229:5 231:13
232:10 241:22
249:16 250:24

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 254:4,23 256:4 257:15 258:23 262:13 268:24 269:21 270:14 271:14 272:20 281:23 282:6 282:16 284:1 284:11 285:14 287:7 292:8 297:17 300:10 301:11 309:12 315:6 320:2,14 325:4 333:18 336:19 338:11 341:19 342:3 343:5 351:10 355:3 356:2 362:1 367:6 370:9,16 373:19 374:6 375:14 376:22 387:16 389:8 391:1 392:7 394:8,16 400:21 404:15 407:4 408:10 409:12 410:10 412:14 414:1 421:6,11 430:24 437:11 437:22 444:22 452:3 453:21 454:15 455:5 457:9 463:5,7 | 464:1 **witnesses** 38:6 138:3 267:18 376:14 **word** 58:21 76:17 79:1 94:13 189:3 196:17 291:14 297:6 317:8 351:19,22 407:15 408:12 **worded** 209:12 **words** 121:6 167:4,5 290:17 290:24 387:17 **work** 9:17 40:6 41:15,24 42:4 42:8,15 43:10 44:5 47:22 49:22,24 50:8 52:16,19,24 53:19,23 54:12 54:21 60:15 61:18 62:15,24 63:1,2,3 64:16 70:14 72:6,21 104:5 105:13 109:15 111:7 214:8 221:22 240:10 244:7 246:12 247:12 381:22 436:5 436:22 437:1 438:18 439:22 | 440:11 445:3 446:17 447:22 448:1,6,8 450:11,21 **worked** 44:18 48:17,23 64:15 65:20 215:22 **working** 36:19 37:11 49:14,18 70:1 215:24 229:20 **works** 112:2 **worksheet** 387:6 **world** 76:22,22 88:12 191:14 191:22 192:1,4 192:7,15,19 197:17,19,21 198:7 199:23 200:7 201:10 203:1,4 204:1 205:1,16 206:13,20 208:2 209:4 258:19 259:9 263:5,10 267:12 270:4 270:16 430:18 **worth** 201:21 **wow** 199:14 **wrap** 374:17 **writing** 417:21 418:11 | **written** 117:14 130:13 143:24 175:18 178:19 181:15 214:23 311:13 456:21 **wrong** 79:18 142:14 290:7 **wrongful** 60:10 60:10 61:6 **wrote** 294:20 408:2,6,12 |
| | | **x** | |
| | | **x** 6:2,9 7:2 8:2 9:2 | |
| | | **y** | |
| | | **yeah** 219:19 222:1,7 232:19 306:5 379:11 387:16 442:14 **year** 14:8 42:20 49:6 50:6 56:7 56:7 57:20 58:18 64:2 86:8,9 142:6 292:22 325:17 325:18 335:7,7 335:13 337:5 340:23 394:12 394:24 395:1 428:5,11 429:18 **years** 36:21 58:5 59:10 | |

CONFIDENTIAL

**[years - zoom]**

Page 97

| | |
|---|---|
| 62:16,17 66:11 | 343:13 344:6 |
| 66:22 71:8 | 353:17 354:2 |
| 151:10 242:19 | 357:10 361:12 |
| 292:23 383:2 | 361:17,22 |
| 383:11,12 | 362:7 363:16 |
| 384:4,6 426:20 | 363:22 365:13 |
| 426:21 428:3 | 366:7 367:2,11 |
| 429:11 430:1 | 368:3 369:10 |
| **yeates** 39:16 | 369:13,18 |
| **yesterday** | 374:2 375:7,10 |
| 50:24 51:15 | 375:21 376:18 |
| **ygr** 1:3 | **yondr's** 342:14 |
| **yield** 103:16 | **young** 461:15 |
| **yondr** 151:14 | **youtube** 2:13 |
| 200:15,16 | 88:10 90:12 |
| 202:13,22 | 96:1 101:4 |
| 221:14 239:14 | 128:8 290:20 |
| 254:7 278:15 | 290:24 351:12 |
| 279:6,14 327:6 | 460:16,18,19 |
| 327:10,16,21 | 460:21,22 |
| 328:18 329:1 | 462:3,11 |
| 330:14,19,21 | **z** |
| 331:5,9,21 | |
| 332:2,12,13,19 | **zero** 204:5 |
| 332:23 333:9 | 206:21 208:10 |
| 333:13 334:11 | 437:8 |
| 335:3,20,22 | **zoom** 3:2 4:2 |
| 336:15 337:1,4 | 5:2 |
| 337:17,24 | |
| 338:3 339:7,9 | |
| 339:12,24 | |
| 340:3,21 341:1 | |
| 341:6,10,15,24 | |
| 342:10,15 | |