**Exhibit 93**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          : MDL No.

ADOLESCENT                   : 4:22-md-3047-YGR

ADDICTION/PERSONAL INJURY    :

PRODUCTS LIABILITY           : MDL No. 3047

LITIGATION                   :

_____

THIS DOCUMENT RELATES TO:    :

ALL CASES                    :

- - -

AUGUST 12, 2025

- - -

Videotape deposition of SHARON A. HOOVER, Ph.D., taken pursuant to notice, was held at the law offices of Kessler Topaz Meltzer & Check LLP, 280 King of Prussia Road, Radnor, Pennsylvania 19087, commencing at 9:05 a.m, on the above date, before Amanda Dee Maslynsky-Miller, a Court Reporter and Certified Realtime Reporter.

- - -

GOLKOW, A Veritext Company

877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 2

APPEARANCES:

          KESSLER TOPAZ MELTZER & CHECK, LLP
          BY: MELISSA L. YEATES, ESQUIRE
          BY: JORDAN E. JACOBSON, ESQUIRE
          280 King of Prussia Road
          Radnor, Pennsylvania 19087
          (610) 667-7706
          myeates@ktmc.com
          jjacobson@ktmc.com
          Representing the Plaintiff


          KING & SPALDING LLP
          BY: KATHRYN S. LEHMAN, ESQUIRE
          Southeast Financial Center
          200 S Biscayne Boulevard
          Suite 4700
          Miami, Florida 33131
          (305) 462-6000
          Klehman@kslaw.com
          - and -
          BY: YELENA KOTLARSKY, ESQUIRE
          1185 Avenue of the Americas
          34th Floor
          New York, New York 10036
          (212) 556-2100
          ykotlarsky@kslaw.com
          Representing the Defendants,
          TikTok Inc., ByteDance Inc.,
          ByteDance Ltd., TikTok Ltd., and
          TikTok, LLC

CONFIDENTIAL

Page 3

APPEARANCES: (Continued)


        WILLIAMS & CONNOLLY LLP
        BY: J. ANDREW KEYES, ESQUIRE
        BY: DANIEL WHITELEY, ESQUIRE
        680 Maine Avenue SW
        Washington, DC 20024
        (202) 434-5000
        akeyes@wc.com
        dwhiteley@wc.com
        Representing the Defendants,
        YouTube, LLC, Google LLC, and
        Alphabet Inc.


        COVINGTON & BURLING LLP
        BY: MICHAEL N. KENNEDY, ESQUIRE
        One CityCenter
        850 Tenth Street, NW
        Washington, DC 20001
        (202) 662-6000
        mkennedy@cov.com
        Representing the Defendants,
        Meta Platforms, Inc. f/k/a
        Facebook, Inc.; Facebook Holdings, LLC;
        Facebook Operations, LLC; Facebook
        Payments, Inc.; Facebook
        Technologies, LLC; Instagram, LLC
        Siculus, Inc.; and Mark Elliot
        Zuckerberg


        KIRKLAND & ELLIS LLP
        BY: JACK NOLAN, ESQUIRE
        601 Lexington Avenue
        New York, New York 10022
        (212) 446-4800
        jack.nolan@kirkland.com
        Representing the Defendants,
        Snap Inc.

CONFIDENTIAL

Page 4

APPEARANCES: (Continued)
VIA ZOOM:


        BEASLEY ALLEN LAW FIRM
        BY: SLADE METHVIN, ESQUIRE
        301 St Louis Street
        Mobile, Alabama 36602
        (251) 308-1515
        slade.methvin@beasleyallen.com
        Representing the Plaintiff,
        DeKalb County School District



        CARELLA, BYRNE, CECCHI, BRODY &
        AGNELLO, P.C.
        BY: MICHAEL A. INNES, ESQUIRE
        BY: DAVID G. GILFILLAN, ESQUIRE
        5 Becker Farm Road
        Roseland, New Jersey 07068
        (973) 994-1700
        minnes@carellabyrne.com
        dgilfillan@carellabyrne.com
        - and -
        BY: ZACHARY S. BOWER, ESQUIRE
        2222 Ponce De Leon Boulevard
        Miami, Florida 33134
        (973) 994-1700
        zbower@carellabyrne.com
        Representing the Plaintiff,
        Irvington Public Schools

CONFIDENTIAL

Page 5

APPEARANCES: (Continued)
VIA ZOOM:


        EILAND & BONNIN LAW FIRM
        BY: CRAIG EILAND, ESQUIRE
        BY: DAVID BONNIN, ESQUIRE
        2200 Market Street
        Suite 501
        Galveston, Texas 77550
        (409) 763-3260
        ceiland@eilandlaw.com
        dbonnin@eilandlaw.com
        Representing the Plaintiffs


        WAGSTAFF & CARTMELL
        BY: JONATHAN P. KIEFFER, ESQUIRE
        4740 Grand Avenue
        Suite 300
        Kansas City, Missouri 64112
        (816) 701-1100
        jpkieffer@wcllp.com
        Representing the Plaintiffs



        BROCKSTEDT MANDALAS FEDERICO, LLC
        BY: MATTHEW P. LEGG, ESQUIRE
        BY: ERIKA SNEERINGER, PARALEGAL
        2850 Quarry Lake Drive
        Suite 220
        Baltimore, Maryland 21209
        (410) 421-7777
        mlegg@lawbmf.com
        Representing the Plaintiff's
        Steering Committee

CONFIDENTIAL

Page 6

APPEARANCES: (Continued)

VIA ZOOM:

GURSKI LAW FIRM
BY: PATRICK H. GURSKI, ESQUIRE
2200 Market Street
Suite 502
Galveston, Texas 77550
(409) 331-5956
Representing the Plaintiffs

LEVIN SEDRAN & BERMAN LLP
BY: MICHAEL M. WEINKOWITZ, ESQUIRE
510 Walnut Street
Suite 500
Philadelphia, Pennsylvania 19106
(877) 882-1011
mweinkowitz@lfsblaw.com
Representing the Plaintiffs

O'HANLON, DEMERATH & CASTILLO
BY: KAYLIE MORGAN, ESQUIRE
117 West Craig Place
San Antonio, Texas 78212
(210) 310-3030
kmorgan@808west.com
Representing the Plaintiff,
Texas School Districts

ALSO PRESENT:
Brian McGee, Videographer
Vince Rosica, Trial Technician

CONFIDENTIAL

Page 7

- - -

I N D E X

- - -

Testimony of:  SHARON A. HOOVER, PhD

By Attorney Lehman                                    13

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION                        PAGE

Hoover-1       No Bates
              Interviewee List                      25
Hoover-2       No Bates
              No Bates, 5/16/25 Expert
              Report                                 33
Hoover-3       No Bates
              5/10/25 Curriculum Vitae of
              Sharon A. Hoover, Ph.D.         34
Hoover-4       No Bates
              8/1/25 Curriculum Vitae of
              Sharon A. Hoover, Ph.D.         34
Hoover-5       No Bates
              Materials Considered List       37

Hoover-6       No Bates
              7/30/25 Rebuttal Report          38
Hoover-7       No Bates
              6/20/25 Amended Expert Report
              for Breathitt County Board

CONFIDENTIAL

Page 8

- - -

E X H I B I T S

- - -

NO.            DESCRIPTION                    PAGE

Hoover-8        No Bates
               8/7/25 Rebuttal Report
               for Breathitt County Board
               of Education                    39
Hoover-9        No Bates
               6/20/25 Case-Specific Report
               for  Charleston County School
               District                        40

Hoover-10       No Bates
               8/1/25 Case-Specific Rebuttal
               Report for Charleston
               County School District        41
Hoover-11       No Bates
               6/20/25 Case-Specific Amended
               Report for DeKalb County
               Schools                         41

Hoover-12       8/7/25 Case-Specific Rebuttal
               Report for DeKalb County
               Schools                         42

Hoover-13       No Bates
               6/20/25 Case-Specific Report
               for Board of Education for
               Harford County                  43
Hoover-14       No Bates
               8/1/25 Case-Specific Rebuttal
               Report Harford County
               Public Schools                  43

Hoover-15       No Bates
               6/20/25 Case-Specific Amended
               Expert Report for Irvington
               Public Schools                  44

CONFIDENTIAL

- - -
E X H I B I T S
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hoover-16 | No Bates 8/7/25 Case-Specific Rebuttal Report for Irvington Public Schools | 45 |
| Hoover-17 | No Bates 6/20/25 Case-Specific Report for Tucson Unified School District | 45 |
| Hoover-18 | No Bates 8/7/25 Case-Specific Rebuttal Report for Tucson Unified School District | 46 |
| Hoover-19 | No Bates Notice of Deposition | 55 |
| Hoover-20 | HOOVER000081-0087 Hoover Behavioral Health Invoices | 67 |
| Hoover-21 | No Bates University of Maryland School of Medicine Web Page, Sharon A. Hoover, Ph.D. | 97 |
| Hoover-22 | No Bates Hoover Behavioral Health Invoice | 121 |
| Hoover-23 | No Bates American Psychological Association Health Advisory on Social Media Use in Adolescence | 173 |

CONFIDENTIAL

Page 10

```
                                - - -
                        E X H I B I T S
                                - - -


  NO.                DESCRIPTION                    PAGE

  Hoover-24      No Bates
                 What Is Driving Youth Mental
                 Health Problems? It's Not Just
                 About Social Media,
                 Prothero                           202

  Hoover-25      No Bates
                 Written Testimony Submitted
                 to the United States Senate
                 Committee on Finance For the
                 Full Committee Hearing     207

  Hoover-26      No Bates
                 Written Testimony Submitted
                 to the United States Senate
                 Committee on Health, Education,
                 Labor, and Pensions (HELP)
                 For the Subcommittee on
                 Children and Families      208
                 Hearing
  Hoover-27      No Bates
                 Burnout in Urban Teachers:
                 The Predictive Role of
                 Supports and Situational
                 Responses                          334
  Hoover-28      No Bates
                 Schools As a Vital Component
                 of the Child and Adolescent
                 Mental Health System        338

  Hoover-29      No Bates
                 Healthy Students and Thriving
                 Schools: A Comprehensive
                 Approach for Addressing
                 Students' Trauma and
                 Mental Health Needs         376
```

CONFIDENTIAL

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line      Page Line      Page Line

None

Request for Production of Documents

Page Line      Page Line      Page Line

31      7

Stipulations

Page Line      Page Line      Page Line

12      1

Question Marked

Page Line      Page Line      Page Line

171     16

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 12

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:   We are now on the record.  My name is Brian McGee.  I'm a videographer for Golkow, a Veritext division. Today's date is August 12th, 2025, and the time is 9:05 a.m.

This video deposition is being held in Radnor, PA, in the matter of In Re: Social Media Adolescence Addiction/Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.  The deponent is Sharon A. Hoover, Ph.D.

CONFIDENTIAL

Page 13

Counsel will be noted on the stenographic record.

The court reporter is Amanda Miller and will now swear in the witness.

- - -

SHARON HOOVER, Ph.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY LEHMAN:

Q.    Good morning.

A.    Good morning.

Q.    How are you today?

A.    I'm doing well.  Thank you.

Q.    What is your full name, please?

A.    Sharon Ann Hoover.

Q.    Dr. Hoover, as I said when we met a few moments ago, my name is Kathryn Lehman.  I'm going to be taking the first part of your deposition today.

Page 14

A.    Okay.

Q.    What is your professional address?

A.    So my professional address is 737 West Lombard Street in Baltimore, Maryland.

And that's where the National Center for School Mental Health is located.

Q.    And do you currently work for any entity other than the National Center for School Mental Health?

A.    So I work, actually, technically, for the University of Maryland School of Medicine. And I do not currently work for another entity.

I do some consulting, though, so.

Q.    And do you do your consulting through any consulting firm?

A.    So I have my own S Corp, which is Hoover Behavioral Health Incorporated, and most of it goes through that.

Page 15

Q.    And is all of your consulting through the Hoover Behavioral Health Incorporated?

A.    I would say most of it.  So I -- any speaking engagement that I might do, for example, would go through that.  Yeah.

Q.    When you say "most of it," the lawyer in me wants to ask, well, what about the rest of it?

A.    Okay.  Well, I think as far as I know, all of it would go through Hoover Behavioral Health.

I'm just thinking that sometimes, erroneously, someone might pay, like, a stipend for a talk that I would do to my personal name; you know, they would write something to Sharon Hoover, but then I would transfer it over to my corporation.  If that makes sense.

Q.    And what is your current position at the University of Maryland School of Health?

A.    So, actually, as of

CONFIDENTIAL

Page 16

June 1st, I retired as a professor.  But I still retained status as professor. They granted me emeritus professor status, then.

So I've been on faculty there since 2004 and am currently emeritus professor tenured in the division of child and adolescent psychology.

Q.    As a professor emeritus, do you have any ongoing obligations to the university in terms of teaching, administration or anything else?

A.    So we have an understanding, when you become an emeritus professor, that you do still have a partnership and a role with the university.

And so my role would be to continue to mentor faculty and to continue to contribute to their -- their mission, which includes teaching and research work.

Q.    Are you currently teaching any classes at the University of

CONFIDENTIAL

Page 17

Maryland?

A.    I'm not currently teaching classes.  And that, honestly, was never a large part of my role, since my role was really primarily around clinical work and research work.

So teaching was something I did, but it wasn't in the traditional sense of teaching coursework.

Q.    Are you currently engaged in clinical work at the University of Maryland?

A.    I'm not currently engaged in clinical work at the University of Maryland.

Q.    When was the last time that you were actively engaged in clinical work at the University of Maryland?

A.    I would probably want you to define what you mean by "clinical work."  Because the term is a bit broad.

So there's kind of direct clinical work with patients, there's other -- there's supervisory work,

Page 18

there's clinical programming work.

So when you say "clinical work" --

Q.    Sure.

A.    -- I want to understand.

Q.    That was your term, but let's use direct patient care.

Do you provide direct patient care at the University of Maryland?

A.    I have.  Not currently, no.

Q.    When is the last time that you provided direct patient care at the University of Maryland?

A.    I'd probably have to look at my CV to know the exact date.

Q.    Okay.  Well, I'm happy for you to look at your CV.

Do you have a copy of it?

A.    I do.

Q.    Okay.

A.    Yeah.  I think it's in here. So I can do that.

Sorry.  My CV is about

CONFIDENTIAL

Page 19

70 pages long, so it may take just a moment.

I'm looking for where it says the actual clinical work in the schools. My teaching service. International. Okay.

Yeah. So according to this, the last direct clinical work I would have done in the schools would have been through 2008. I provided direct clinical supervision to trainees, psychology interns, postdoctoral fellows up until probably about a year or two ago.

So I'm involved in the direct patient care in that way. So when cases come up, I'll work with them on that.

Q.   Okay. But in terms of you personally, not in a supervisory role or a teaching role, but providing direct patient care, the last time was approximately 17 years ago?

ATTORNEY YEATES:   Object to the form.

Page 20

THE WITNESS:  So as I stated, the last time that I worked directly in patient care was about 2008.

And we consider clinical supervision still related to direct patient care so.  So -- and I've done that up until probably about a year or two ago.

BY ATTORNEY LEHMAN:

Q.    And are you currently working anywhere other than your consulting work and any work that you do as a professor emeritus at the University of Maryland?

A.    No.

Q.    Okay.  Are you prepared today to express your final opinions in this case?

A.    Am I prepared to express my opinions?  Yes.

Q.    Your final opinions.

A.    Yes.

ATTORNEY YEATES:  Object to

the form.

BY ATTORNEY LEHMAN:

Q.    Do you need to perform any additional work in order to reach your final opinions?

A.    No.

Q.    Do you anticipate conducting any work between now and any testimony at trial?

A.    When you say do I "anticipate conducting any work," tell me what you mean by that.

Q.    Right.  So I mean do you anticipate doing anything other than maybe re-reviewing in order to prepare for trial?

A.    So what I'll say is that in the course of my work as a professor, and, you know, I'm an editor for school mental health journals, for example, I would anticipate reviewing articles that come my way for that.

But, no, I don't anticipate doing additional work specific to this

CONFIDENTIAL

Page 22

litigation, unless, you know, instructed to do otherwise.

But, I'm -- you know, again, that's probably a legal process that I'm less familiar with.

Q. So we're going to be here for, I suspect, the day today. So I usually take a break about every 60 to 90 minutes. But if you need a break before then, please let me know.

A. Will do.

Q. My only request will be we sort of finish maybe the question or whatever topic we're talking about and then happy to take a break, all right?

A. That sounds good.

Q. If at any point I ask a question and you don't understand, please let me know. I'm happy to talk about that; that way you and I are -- are effectively communicating.

A. Uh-huh.

Q. All right. Now, unfortunately -- so I'm just going to use

CONFIDENTIAL

Page 23

this as an example.

So our court reporter is taking down everything you and I say.  So if you can try to give verbal answers instead of uh-huh or uh-uh, that makes her job much harder, and you and I will get a talking to at a break.

So if you can answer yes or no, that would make her job easier, okay?

A.    Will do.

Q.    I will do my best to remind you.  Please don't think I'm being rude if I do that; just trying to making sure we have a clear transcript, okay?

A.    Understood.

Q.    Now, the final thing I'll say, this is just normal human conversation.  There's going to come a time when you know where I'm going with a question or I think you're done with an answer, and we sort of talk over each other.

Again, let's both -- we can both remind each other.  If I start a

CONFIDENTIAL

Page 24

question before you're done, let me know and I'm happy to let you finish; and vice versa, if you sort of start before I finish my question, I'll remind you.

Again, just making sure we have a clean transcript, okay?

A.    Will do.

Q.    All right.  Are you taking any medications or suffering from any illnesses that would interfere with your ability to accurately and truthfully testify today?

A.    No.

Q.    Is there any health reason or any other reason why you would not be able to provide your best and most complete opinions today?

A.    No.

Q.    Now, I see that you have brought a notebook with you.

What do you have in your notebook?

A.    So these are just the binders of my reports.  So -- and my CV

Page 25

copies.

Q.    All right.  So let's -- in the front flap of the notebook, I think you have a page which your counsel reminder -- handed us and described as a reminder.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-1.

-  -  -

(Whereupon, Exhibit Hoover-1, No Bates, Interviewee List, was marked for identification.)

-  -  -

BY ATTORNEY LEHMAN:

Q.    Did you prepare this document?

A.    I did.

Q.    All right.  And what is it?

A.    So it's just a document of the dates and the names and titles of the folks that I spoke with for the key informant interviews as part of this process.

And I generated it, really, just as a reminder for myself as to, kind of, the names and titles of who I spoke with, in case asked about it today.

Q. And are the dates listed in the left column, are those the dates that you spoke to these individuals?

A. Yes.

Q. Who selected the individuals that you would interview?

A. So I provided guidance to counsel, based on the typical methodology that I would use when talking with school districts to get key informant interviews, about the types of folks in a district that I need to speak with.

So it would be people, for example, who are knowledgeable about the impact of social media on students and the school environment. It would include people who are familiar with the comprehensive school mental health system.

And they took that

Page 27

information and provided it, I believe, to the school district, to select those folks.  So it was the typical methodology that I would use here.

Q.    And is this list that we've marked as Exhibit-1, is this a complete list of the key informant interviews that you conducted?

A.    Yes.

Q.    All right.  And it reflects individuals from all six of the school districts?

A.    It reflects individuals from twelve school districts, including the six school districts, yes.

Q.    All right.  Is there anyone that you interviewed who was not listed on Exhibit-1?

A.    I don't believe so, no.

Q.    All right.  Is there anyone that you asked to interview or a type of person that you asked to interview that you were not allowed to interview?

A.    No.

Page 28

Q.    Did you personally interview each of these individuals listed on Exhibit-1?

A.    I did.

Q.    Did anyone else participate in the interviews other than you and the interviewee?

A.    Nobody participated in the interviews.  Counsel was present but did not participate in the interviews, if that's what you mean.

Q.    All right.  So when you say "counsel was present," you're referring to counsel representing the plaintiff in this matter?

A.    Yes.

Q.    All right.  And how many attorneys were present on behalf of the plaintiffs in these interviews?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Typically, one was present, to my recollection.

I mean, I -- again, I was

Page 29

more focused on the people I was interviewing, so.

BY ATTORNEY LEHMAN:

Q.    Were the interviews conducted in person or using a remote medium?

A.    They were conducted using a remote medium.

Q.    All right.  So were they video or phone?

A.    They were over video.

Q.    All right.  How long was each interview?

A.    I was going to see if I listed it there, but I didn't.

So the interviews were anywhere from one to two hours.

Q.    Was there anyone that you spoke to on more than one occasion?

A.    No.

Q.    Was there a script that you used for the interviews?

A.    No.  I have kind of a standard set of, you know, kind of topics

Page 30

that I cover when I'm doing the interviews. And those are what contributes to the report. So it's outlined that way in my report.

Q.    And so is there a written set of topics that you use to guide these conversations?

A.    No.  I mean, I had the report outline and then followed according to that, so.

Yeah.  I can point you to, you know, the outline in the report if needed.

Q.    Sure.  We'll talk about that in a moment.

Would those -- when you say the "outline" from the report, is that just the major topic headings from your report?

A.    Exactly.

Q.    Did you record the interviews in any way?

A.    No -- well, let me -- let me clarify.

So I took contemporaneous notes, which is what I would typically do when I'm interviewing folks for my district. So I took notes that were essentially part of the report. Yeah.

Q. Okay. So I don't believe we have received those notes.

So we are going to ask to receive those, okay?

A. There's no notes beyond what's in the actual report. So when I say I took notes, they, then, were iteratively developed into the report.

So it's not a separate set of notes. So that's why I was clarifying.

Q. Okay. And so, then, are all of the comments made by each of these interviewees reflected in the individual district reports?

A. So as you'll see in the reports, what I did, which, again, would be typical of what I would do when I'm interviewing any district -- and I

CONFIDENTIAL

Page 32

interview districts all the time -- is I take notes through the interview and then I synthesize the information and pull in illustrative quotes, for example.

And that's what's in the report.

Q.    And so are there any -- is there any remaining documentation of the entirety of what these interviewees have said other than the illustrative quotes that have remained in your reports?

A.    No.

ATTORNEY YEATES:    Object to the form.  Misstates testimony.

BY ATTORNEY LEHMAN:

Q.    Did you invite any counsel from the defense to attend any of the interviews that you conducted?

A.    I don't think that would have been my role.  So if you're asking if I did, no.

Q.    Do you anticipate conducting any other key informant interviews beyond what's reflected in Exhibit-1?

Page 33

A.    No.

Q.    All right.  I think we were going through what's in your notebook.

You said the second thing was -- was your report.

Which report is that? What's the date of it?

A.    Let me take a look.

So the first thing that's in here, other than the cover page, is the expert report from May 16th, 2025.

Q.    Okay.  What's next?

ATTORNEY LEHMAN:  We'll mark that as Exhibit Number 2.

- - -

(Whereupon, Exhibit Hoover-2, No Bates, 5/16/25 Expert Report, was marked for identification.)

- - -

THE WITNESS:  So what's next is a copy of my CV, dated May 10th, 2025.

ATTORNEY LEHMAN:  All right.

Page 34

So we'll mark that as Exhibit-3.

- - -

(Whereupon, Exhibit
Hoover-3, No Bates, 5/10/25
Curriculum Vitae of Sharon A.
Hoover, Ph.D., was marked for
identification.)

- - -

BY ATTORNEY LEHMAN:

Q. We received, within the last
week, an updated CV.

Is that the same as the CV
that you have in front of you?

A. The next part that's in
here, behind this blue sheet, is the
updated CV.

Q. All right. And what's the
date of the updated CV?

A. August 1st, 2025.

ATTORNEY LEHMAN: We'll mark
that as Exhibit Number 4.

- - -

(Whereupon, Exhibit
Hoover-4, No Bates, 8/1/25

Page 35

Curriculum Vitae of Sharon A. Hoover, Ph.D., was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    And what was the change or changes that were made between the May 10th and August 1st CVs?

A.    I'd have to go through line by line to actually recall.

But it would have -- to my recollection, it would have been the date, it would have been any changes in positions or if -- you know, for example, in a standard academic CV, if you have a funding -- a grant that has ended, you move it to the completed grant.  So I would have indicated that.

I added several publications, because I'm continuously publishing.  So I try to keep those updated.  So those would have been added in.

And any other speaking

Page 36

engagements I would have added in as well.

And that's just part -- typically what we do when we're updating our CVs.

Q.    Do you have any active grants at present?

A.    So because I retired June 1st, I'm not currently on the grants.  So I transferred those to colleagues within our National Center for School Mental Health.

Q.    And do you have any updates that would need to be made to your August 10th -- I'm sorry.

Do you have any updates that would need to be made to the August 1st, 2025, CV in order to bring it fully up to date?

A.    I'm trying to think if I've published anything in the last week.

I don't think so.

Q.    Okay.  Do you have any publications that have been accepted for

Page 37

publication but not yet been published?

A.    I -- yes.  And that's indicated in there.  So I included that.

Q.    All right.  What else is in your notebook?

A.    Let's see.  So there's Exhibit-B, materials considered.  And this would have been materials considered for that May 16th report.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-5.

- - -

(Whereupon, Exhibit Hoover-5, No Bates, Materials Considered List, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in your notebook?

A.    So this is the rebuttal report -- my rebuttal report that was submitted -- or that's dated July 30th, 2025.

CONFIDENTIAL

Page 38

- - -

(Whereupon, Exhibit Hoover-6, No Bates, 7/30/25 Rebuttal Report, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. All right. So both the report from May 16th, 2025, and the rebuttal report from July 30th, 2025, those are both your general reports that are not specific to any individual school district; is that correct?

A. That's correct.

Q. Okay. Is there anything else in your notebook?

A. Not this first notebook, no.

Q. Do you have a second notebook in front of you or is that a copy of the same notebook?

A. I have a second and a third.

Q. Okay. What's in your second notebook?

A. So the first thing that's in

Page 39

here is an amended expert report for Breathitt.  So this was the expert report.  It's dated June 20th, 2025.

ATTORNEY LEHMAN:  All right. We'll mark that as Exhibit Number 7.

- - -

(Whereupon, Exhibit Hoover-7, No Bates, 6/20/25 Expert Report for Breathitt County Board of Education, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in the notebook?

A.   The rebuttal -- amended rebuttal report for Breathitt dated August 7th.

ATTORNEY LEHMAN:  We'll mark that as Exhibit Number 8.

- - -

(Whereupon, Exhibit Hoover-8, No Bates, 8/7/25

Page 40

Rebuttal Report for Breathitt County Board of Education, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in that book?

A.    The next thing that's in here is the amended expert report for Charleston County School District, dated June 20th, 2025.

ATTORNEY LEHMAN:  All right. We'll mark that as Exhibit-9.

- - -

(Whereupon, Exhibit Hoover-9, No Bates, 6/20/25 Case-Specific Report for Charleston County School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in the notebook?

A.    Rebuttal report for

CONFIDENTIAL

Page 41

Charleston County School District, August 1st, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-10.

- - -

(Whereupon, Exhibit Hoover-10, No Bates, 8/1/25 Case-Specific Rebuttal Report for Charleston County School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in the notebook?

A.    The amended expert report for DeKalb County schools, June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit Number 11.

- - -

(Whereupon, Exhibit Hoover-11, No Bates, 6/20/25 Case-Specific Amended Report for DeKalb County Schools, was marked

Page 42

for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in the notebook?

A.    The rebuttal report for DeKalb County School District, amended, and it's dated August 7th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-12.

- - -

(Whereupon, Exhibit Hoover-12, 8/7/25 Case-Specific Rebuttal, Report for DeKalb County Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    Does that complete the second notebook?

A.    That is Binder 2.

Q.    All right.  And what is in Binder 3?

A.    Binder 3, we've got our

cover page, just like in the other ones.

And the first thing that's in here is the amended expert report -- my amended expert report for the Board of Education for Harford County, and that's June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-13.

- - -

(Whereupon, Exhibit Hoover-13, No Bates, 6/20/25 Case-Specific Report for Board of Education for Harford County, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in the notebook?

A.    The next thing is the rebuttal -- my rebuttal report for Harford County Public Schools, August 1st, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-14.

Page 44

- - -

(Whereupon, Exhibit Hoover-14, No Bates, 8/1/25 Case-Specific Rebuttal Report Harford County Public Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    What else is in your notebook?

A.    So it's the amended expert report for Irvington Public Schools, dated June 20th, 2025.

ATTORNEY LEHMAN:   We'll mark that as Exhibit-15.

- - -

(Whereupon, Exhibit Hoover-15, No Bates, 6/20/25 Case-Specific Amended Expert Report for Irvington Public Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Page 45

Q.    And what's -- what's next in your notebook?

A.    The amended rebuttal report for Irvington Public Schools, dated August 7th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-16.

-   -   -

(Whereupon, Exhibit Hoover-16, No Bates, 8/7/25 Case-Specific Rebuttal Report for Irvington Public Schools, was marked for identification.)

-   -   -

BY ATTORNEY LEHMAN:

Q.    All right.  What else is in the notebook?

A.    The amended expert report -- my amended expert report for Tucson Unified School District, dated June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-17.

-   -   -

CONFIDENTIAL

Page 46

(Whereupon, Exhibit Hoover-17, No Bates, 6/20/25 Case-Specific Report for Tucson Unified School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   And anything else in your notebook?

A.   One more thing.

Q.   Okay.

A.   The amended rebuttal report for Tucson Unified School District, dated August 7th, 2025.

ATTORNEY LEHMAN:  All right.

- - -

(Whereupon, Exhibit Hoover-18, No Bates, 8/7/25 Case-Specific Rebuttal Report for Tucson Unified School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   And does that complete all

Page 47

of the materials that you've brought with you?

A.    It does.

Q.    All right.  Based on my math, given -- if we count for the amendments -- so you initially -- you have the general report dated May 16th, 2025, and then you have the rebuttal general report dated August -- or, sorry, July 30th, 2025.

So that's two reports, correct?

And then you issued a report in each of the six districts, which was subsequently amended, and those amendments were dated June 20th, 2025, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think I just stated the -- all of them.  Do you want me to go back and look through --

BY ATTORNEY LEHMAN:

Page 48

Q.     No, no, no.

A.     Oh, okay.

Q.     I'm just trying to make sure.  Right.  So by my count --

A.     Okay.

Q.     -- we have -- for each school district individually there was a report that was amended and then there was a rebuttal report which was also amended; is that correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yes.  I mean, to my understanding, that -- that's correct.

So for each district I've got the expert report and then the rebuttal report and -- yes.

BY ATTORNEY LEHMAN:

Q.     Right.  And the ones that you have are actually the amended reports of the dates that you've just indicated when we went through them?

ATTORNEY YEATES:  Object to

Page 49

the form.  Misstates facts.

THE WITNESS:  So they are the reports that were submitted on the dates that I stated.

BY ATTORNEY LEHMAN:

Q.    Okay.  Is that a complete set -- meaning the three notebooks that we've just walked through, is that a complete set of your operative reports, both general reports and for the school districts?

A.    Yes.

Q.    Okay.  Is there another report that you have prepared that is not included in those notebooks?

A.    No.

Q.    Is there anything in -- contained in the reports that we have just marked as Exhibits-2, 6 and 7 through 18, that is inaccurate?

A.    Not to my knowledge, no.

Q.    Do you have any opinions that are not included in the reports that we have just marked in Exhibits-2 and 6

Page 50

through 18?

A.    Do I have any opinions with respect to this litigation --

Q.    Yes.

A.    -- that are not in there?

Q.    Yes.

A.    No.

Q.    Did anyone help you prepare your reports?

A.    No.  I drafted the reports, wrote the reports myself.

Q.    Now, as we -- as we talk today and -- if I refer to social media, I'm going to refer to either the platform or the associated app, okay?

A.    Okay.

Q.    Is that acceptable to you?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'm not sure what you mean by "acceptable."

BY ATTORNEY LEHMAN:

Q.    Okay.  Well, I guess I just want to clarify for you that that's how

Page 51

we're going to use the terms.

And if, for some reason, you would need to clarify your answer --

A. Okay.

Q. -- based on a distinction, please go ahead and do so, okay?

A. Okay. Will do.

Q. All right. And I would also tell you that I will use psychiatric disorders and mental health disorders to mean the same thing, okay?

A. Okay.

Q. All right. What is your definition of adolescence?

A. So typically when we think about adolescence, as a clinical psychologist, I would think about roughly the age range of about 11 to 18.

But often that age range we also extend beyond that if we're talking about kind of young adulthood.

So adolescence, though, can be anywhere, again, from about 11 to 18. We use different age ranges sometimes as

Page 52

we're thinking about adolescence.  But it's in the period beyond, you know, elementary school, childhood and we're really thinking about -- you know, I work in schools a lot, so we often are thinking about middle and high school students.

Q.    Have you been deposed before?

A.    So I -- I want to say it was about eight or nine years ago, I think, I was deposed for a -- and I know that might sound strange to an attorney, but I'm not typically involved in legal proceedings.  And so I think I was deposed for a small case.

Q.    What kind of case was that?

A.    It was a case where I was brought in as an expert around promotion. It was somebody who was challenging a university about being promoted -- or, excuse me, about being denied promotion.

And so because I have experience in academic promotion and

Page 53

tenure, I was brought on for that.

Q.    Is that the only time that you've been deposed?

A.    Yes.

Q.    Have you previously testified before any legislatures?

A.    Yes.

Q.    Tell me about that.

A.    So most recently it would have been -- again, I'm happy to look at my CV if you need dates.

But most recently I've testified a couple of times for the United States Senate.

Q.    Other than testifying before the United States Senate, have you ever testified in front of any other legislative body?

A.    To my recollection, I would have testified for the Maryland Congress as well.  So Maryland State Senate and House of Representatives.

Q.    And what did you testify before the U.S. Senate about?

CONFIDENTIAL

Page 54

A.    So I testified -- two different hearings.  And in one hearing, I was testifying about the transition supports from high school to college and kind of what supports need to be put in place in terms of comprehensive school mental health supports for young people, again, particularly with a focus on transitioning from high school to college.

And in the other hearing, which would have been for the Senate Finance Committee, it was really looking at kind of how school mental health services are financed and what some of the, you know, mechanisms are that need to be improved, really, including better leveraging Medicaid for school mental health services.

Q.    What was the topic of your testimony before the Maryland Congress?

A.    Oh, honestly, it's been a few years.  I'd have to -- I might have to go back to my CV to recall what the

CONFIDENTIAL

Page 55

topic was.

We -- you know, working at the state university, we often get called on to provide knowledge translation. And so I would have been asked probably to go in and speak to school mental health.

But the exact testimony, I'd have to retrieve.

Q. And have there been any occasions where you have submitted an affidavit or other sworn statement in any other setting?

A. Not to my knowledge.

Q. Now I want to look at your notice of deposition.

ATTORNEY LEHMAN: We'll mark this as Exhibit Number 19.

- - -

(Whereupon, Exhibit Hoover-19, No Bates, Notice of Deposition, was marked for identification.)

- - -

ATTORNEY LEHMAN: This is

Page 56

Tab Number 1.

BY ATTORNEY LEHMAN:

Q.    All right.  Can you confirm that what I've handed you is defendants' notice of videotaped deposition of plaintiffs' retained expert witness, Dr. Sharon A. Hoover and request for production of documents at time of deposition?

A.    Are you asking me to confirm that?

Q.    Yes.  I'm just asking you to confirm --

A.    Yes.

Q.    -- that that's actually --

A.    I confirm that's what it says here.  Yes.

Q.    Have you seen this document before today?

A.    I have.

Q.    All right.  And I know we've already gone through what you've brought with you.

Have you either provided to

Page 57

us in advance or brought with you all of the documents responsive to Exhibit A?

ATTORNEY YEATES:   Object to the form.   Subject to objections that were served.

THE WITNESS:   Yeah, I'm not sure.   I'd have to --

BY ATTORNEY LEHMAN:

Q.     Sure.   And if you look -- if you look on Page 6, there's Exhibit A, which is appended to what we have now marked --

A.     Right.

Q.     -- as Exhibit Number 19.

A.     I remember that, yeah.

Q.     All right.   And so have you provided all of the documents or materials that are in your file for this litigation?

A.     Yes, I believe so.

Q.     And are the materials considered lists that were previously provided, are they full and complete lists of the materials that you

considered in developing your opinions in this matter?

A. Sorry, can you repeat the question? I was also just reviewing this.

And I note here that compensation, I don't think I've provided a list of all of the compensation received.

ATTORNEY YEATES: We objected to that.

THE WITNESS: Okay. So.

So if you don't mind restating your -- your most recent question.

BY ATTORNEY LEHMAN:

Q. No problem.

Are the materials considered lists that were previously provided full and complete lists of the materials that you considered in developing your opinions in this matter?

A. Yes.

Q. Now, in your materials

considered lists, there are -- are a list of expert reports that you reviewed.

Is that a complete and accurate list of the expert reports that you reviewed?

A.    I'm happy to look in the report at the materials considered.  It was at the end of the reports.

Yes.

Q.    Who selected which expert reports you would review?

A.    I asked for expert reports that would be relevant, and these were the ones provided to me by counsel.

Q.    Did you ask to review any other expert reports --

A.    I did --

Q.    -- aside from the witnesses listed?

A.    I did not.

Q.    Have you spoken to anyone who has been named as an expert witness in this case?

A.    No.

CONFIDENTIAL

Page 60

Q. Have you ever worked with anyone else who has been named as an expert witness in this case?

A. I don't know all of the experts that have been named.

But I've never worked with the ones that are on the documents that I reviewed.

Q. Have you ever met any of the expert witnesses who are listed in the reports that you reviewed?

A. I have not.

Q. When were you first contacted in connection with this litigation?

A. I'd have to go back to my e-mail, to be honest with you.

But I want to say it was roughly spring of last year. So maybe April, May.

Q. So spring of 2024?

A. Spring or summer. I can't -- yeah. I -- I'd have to go back if you need an exact date, because I

CONFIDENTIAL

Page 61

don't have that in my memory.

Q.    Who first contacted you?

A.    That's, again -- jog -- I'd have to jog my memory.

I don't remember the name of the person who first contacted me.

Q.    Was it someone that you had worked with previously?

A.    No.

Q.    Did they -- did -- whoever contacted you, did they -- did they tell you how they had found you?

A.    To my recollection, it was they were seeking someone with expertise in comprehensive school mental health, and my name had been recommended to them by most people they had talked with, given my experience in the field.

Q.    When did you first agree to serve as an expert for the plaintiffs in this litigation?

A.    Again, that's challenging my memory a bit.

It would have been after

CONFIDENTIAL

Page 62

that conversation and after consideration, you know.  So it would have been sometime within that kind of spring to summer of 2024.

Q.    Before you were retained as an expert in this litigation, before you -- before that -- you made the agreement, did counsel provide you with any materials to review?

A.    I don't think so, no.

Q.    Have you previously worked with any of the plaintiffs' counsel in this litigation on other matters?

A.    No.

Q.    What were you asked to do as an expert?

A.    So I was asked to consider the impact of social media on young people with respect to their mental health, but also the impact on schools, and to develop a strategic plan, if warranted, for school districts, bellwether school districts, to both prevent and mitigate the -- the harms

Page 63

discovered on young people and on schools.

Q.    And is the -- are the plans that you developed, are those isolated to dealing solely with the impacts of social media or are those broader comprehensive plans intended to address all caused student mental health?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So the plans I developed are very specific to the impacts of social media.  And to the extent that social media might intersect with other mental health factors, it -- you know, you could argue that it would be part of those reports.

But the reports that I developed are really specific to the impacts of social media.

BY ATTORNEY LEHMAN:

Q.    For any district, do you have quantitative information about how

Page 64

much time district students spend on social media during the school day?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So for the specific bellwether districts, to my knowledge, I do not have specific time that students spend.

And, frankly, you know, in working with hundreds of districts, they don't have the capacity to gather that data on their students.  It's just not something that there -- that we would have been able to even retrieve in terms of the number of minutes that students spend.

BY ATTORNEY LEHMAN:

Q.    For any district, do you have quantitative information about how much time students spend on screen time that is not social media?

ATTORNEY YEATES:  Object to the form.

Page 65

THE WITNESS:  So for the bellwether districts, I do not have the number of minutes that students were on screens.

But I relied on the extensive data that does exist for the amount of time that teenagers and children spend on screens to inform some of my opinions.

BY ATTORNEY LEHMAN:

Q.    What -- is it correct that your fee is $625 an hour for reviewing materials and writing your report?

A.    That's correct.  For this litigation, yes.

Q.    And are you also charging $625 an hour when consulting with counsel?

A.    When I have calls with counsel, yes.

Q.    And do you charge $625 an hour for testifying in deposition and trial?

A.    Yes.

Page 66

Q.    Are there any other activities where you charge a different hourly rate for your work in this case?

A.    No.

Q.    Do you charge for travel time?

A.    You know, I don't think we've discussed that, to be honest with you.  So that's something I'd have to talk with counsel about.

But I don't know that that's actually -- that that's been discussed yet.

Q.    All right.  Well, so we're sitting here today in Radnor, Pennsylvania, outside Philadelphia.

And you do not live within a few miles of this location, correct?

A.    That's correct.

Q.    All right.

A.    Yeah.

Q.    So you had to travel here from your home in Maryland?

A.    I did.  I don't live in

Page 67

Radnor.

Q.    Okay.  And do you -- do you plan to submit an expense -- or bill for the time it took you to travel here?

A.    Again, that's something I'd have to discuss with counsel.  We haven't, I don't think, actually discussed that yet.

ATTORNEY LEHMAN:  Let's mark Tab 3, your invoices, as Exhibit Number 20.

- - -

(Whereupon, Exhibit Hoover-20, HOOVER000081-0087, Hoover Behavioral Health Invoices, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    And those will be displayed on the screen.

And I apologize, I don't have a written copy because we received those after I was already in transit. But we received these from counsel.

CONFIDENTIAL

Page 68

ATTORNEY LEHMAN:  Can you just scroll through quickly, just at the page level?

ATTORNEY YEATES:  Do any of defense counsel have a copy printed?

ATTORNEY KEYES:  Excuse me?

ATTORNEY YEATES:  Do any defense counsel have a copy of the invoices printed?  It's hard for me to see on the screen here.

ATTORNEY KEYES:  I do not.

ATTORNEY LEHMAN:  These are the ones we received from your office within the last two days.

ATTORNEY YEATES:  I know where they came from.

BY ATTORNEY LEHMAN:

Q.    All right.  So how many invoices have you submitted in this case, Dr. Hoover?

A.    I don't know if I recall the number.  And you just went through them pretty quickly, so I didn't count as you

CONFIDENTIAL

Page 69

were doing it.

But I'd have to go back to my own records, which these appear to reflect.

Q. All right. So looking at Page 1, down at the bottom, do you see that there's a page number or a Bates number that's Hoover and ends in 81?

A. Yes, I do.

Q. Okay. And do you see up at the top, the date on this is January 16th, 2025?

A. I do.

Q. All right. And along the left column, there's a date and then there's a description of service, the number of hours and the fee, correct?

A. I see.

Q. And the earliest date that I see on this invoice is July 10th, 2024.

A. Correct.

Q. All right. And would that be consistent with your memory of approximately when you agreed to serve as

CONFIDENTIAL

Page 70

an expert in this matter?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  As I said, I don't recall the exact date that I agreed to serve as an expert.

BY ATTORNEY LEHMAN:

Q.    Okay.  Well, are you -- do you have any invoices reflecting time that you spent on this matter before July 10th, 2024?

A.    This is the first invoice I would have submitted.  So this is the time that -- the first time that I would have invoiced for.  And this is the time that I would have spent on the litigation.

Q.    Okay.

ATTORNEY LEHMAN:  Now, if we can go to the last page, please.

BY ATTORNEY LEHMAN:

Q.    And do you see the date at the top here is May 24th, 2025?

A.    I see that, yes.

Page 71

Q.    Have you submitted any invoices in this matter for work since May 24th, 2025?

A.    I'm not sure.  I'd have to go back to my records, honestly.

Q.    How much additional time, if any, have you spent working on this matter since May 19th, 2025?

A.    Do you mean May 24th?

Oh, I see, the 19th.

Q.    I don't.

A.    I didn't see -- it hadn't scrolled yet.  May 19th.

I don't know the exact number of hours.  Again, I'd have to go back to my own, you know, records or my invoice draft, if I haven't submitted an invoice yet.

Q.    Do you have an invoice drafted for time spent since May 19th, 2025?

A.    Perhaps.  I'd have to look -- I'd have to look at my records.

Q.    Okay.

CONFIDENTIAL

Page 72

A.     Yeah.

Q.     Do you believe that you've spent more than 20 hours working on this matter since May 19th, 2025?

A.     Yes.

Q.     Do you think that you spent more than 50 hours since that time?

A.     It's hard for me to estimate beyond the 20 hours.  I know it's been at least 20.

Q.     Now, by my count, the invoices submitted reflect $152,343.75 that you have billed on this matter.

Is that accurate?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know. Sorry.

I'd have to go and add it all up again.

BY ATTORNEY LEHMAN:

Q.     Well, if -- if I have correctly added up the amounts reflected in these invoices, would that reflect the

Page 73

full amount that you have billed in this matter?

A.    I don't know.  Are you asking me to assume that the math is correct?

Q.    No, actually, I'm not. That's --

A.    Okay.

Q.    That's why I phrased --

A.    I may have a misunderstanding.

Q.    -- the question as I did.

If I correctly add up the amounts reflected in the invoices received from counsel, is that the full amount that you have submitted for payment in this matter?

A.    I don't know.

Q.    Okay.  All right.  So I want to make sure.

We're not sure if we have all of the invoices and we're not sure how much time has not been invoiced.

Is that -- is that the sum

Page 74

and substance of where we are on this?

A. I --

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can't speak to whether you're not sure about it.

I can tell you that what I'm seeing are invoices that I have submitted.

BY ATTORNEY LEHMAN:

Q. Okay. Well, I don't -- I don't -- let's not quibble.

This is my question: I have received these invoices from your counsel. I need to know if there are more that exist.

And so what would you need to look at in order to tell me the dates of the invoices that you have submitted?

A. I would need to look at my invoices.

Q. Okay. And where are they?

A. They would be -- well,

Page 75

counsel would have ones that I've submitted, I assume. Or I would have them in my invoice record.

Q. Okay. And where is your invoice record kept?

A. That would be in my invoice folder of, you know, my --

Q. Is that on your computer?

A. Yes.

Q. Is that something that you have with you?

A. No.

Q. All right. Is that something that you have with you in Pennsylvania?

A. It's on a drive that I could access from there, yes.

Q. Okay. All right. We are going to need confirmation about the invoices.

So is that something that you could look at tonight and let us know tomorrow?

A. I could. I could let you

know, yes.

Q. Okay. Did you prepare your materials considered list?

A. Yes.

Q. Did anyone help you prepare those lists?

A. I reviewed it with counsel. So I'm not sure what you mean by "did anyone help" me.

But I generated the materials reviewed list that went along with the reports.

Q. Did anyone suggest to you materials that should be added or deleted to the materials considered list?

A. No.

Q. Were there any materials that you reviewed that are not reflected in your materials considered list?

A. Were there any materials reviewed?

Q. Yes.

A. No.

The only qualification I

would make is that, you know, as an academic professional, I'm, you know, consistently reading articles as part of my work.  And, you know, I edit journals. I review for journals.

So -- but as far as materials considered for this, it's -- the list is inclusive of all that's been considered to inform the opinions, yeah.

Q.    Now, putting aside for a moment the -- the depositions that you received from counsel.

Did you receive any of the articles or other materials in your materials considered list from plaintiffs' counsel?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.

BY ATTORNEY LEHMAN:

Q.    For the articles and depositions that are identified in your materials considered list, did you review every page of those?

Page 78

A.    I reviewed the articles thoroughly.  You know, I've -- over 25 years in academia, I've gotten to be a pretty fast reader.  So yeah.

Q.    And for the depositions, did you review every page or did you review selectively?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I don't know what you mean by "review selectively."  I looked at all of the depositions that were included.  If I included them in my list of materials considered, I would have reviewed them all.

BY ATTORNEY LEHMAN:

Q.    When you say you "reviewed" them, does that mean that you reviewed every page?

A.    So I probably looked at every page.  Did I -- did I memorize each word in the deposition?  No.  And did I read word for word?  No.

CONFIDENTIAL

Page 79

I mean, I -- there's a difference, I would say, between skimming and reading quickly and then, you know, noting every word.

But did I read the depositions?  Yes.  Did I review them?  Yes.

Q.    Did you take any notes while you reviewed the depositions?

A.    Nothing that -- that wasn't part of my report.

Q.    Did you take any notes while you reviewed the articles included in your materials considered list?

A.    No.

Q.    Now, there is a heading on your materials considered list called, TikTok Documents, and it lists four documents.

A.    Correct.

Q.    Did you select those four documents?

A.    I did not.

Q.    Who selected those four

CONFIDENTIAL

Page 80

documents?

A.    When you say "who selected" them, they were sent to me, I believe, by counsel.

Q.    Are those -- is it correct that you have only reviewed, in total, four internal TikTok documents?

A.    Yes.

Q.    Have you reviewed any documents internal to any other defendant in this case?

A.    No.

Q.    Do you know who the defendants in this litigation are?

A.    Yes.

Q.    Who are they?

A.    So they are the defendants' platforms.  Let's see if I can -- so Snapchat, TikTok, Instagram, Meta or Facebook.

Which one am I leaving out here?  Snapchat, TikTok, Instagram, Meta -- YouTube.

Q.    In your review, did you

Page 81

review the Steinsbekk article from 2023 titled Social Media Behavior and Symptoms of Depression and Anxiety, a Four-Year Cohort Study From Ages 10 to 16?

A.    I'd have to look through my -- I reviewed a lot of studies.  So I can go --

Q.    And please do look at your materials considered list.

A.    I will, yeah.

So I don't see that listed here in this first list.  And I don't see it in this rebuttal report.

Q.    In your review, did you review the 2024 article by Maheux titled, Longitudinal Change in Appearance-Related to Social Media Consciousness and Depressive Symptoms, a Within Person Analysis During Middle and Early Adolescence?

ATTORNEY YEATES:  Can you spell the name of that author.

ATTORNEY LEHMAN:  Yes.  It's M-A-H-E-U-X.

Page 82

ATTORNEY YEATES:  Thank you.

THE WITNESS:  It's not in this list considered.

No.

BY ATTORNEY LEHMAN:

Q.    In your review of materials, did you consider the 2021 article by Boer entitled, Social Media Use Intensity, Social Media Problems, and Mental Health Among Adolescents in Investigating Directionality and Mediating Processes?

A.    Not that I see here.  Let me look here just to confirm.

No.

Q.    In your review, did you review the 2021 article by Beeres titled, Social Media and Mental Health Among Early Adolescents in Sweden, a Longitudinal Study With Two-Year Follow-Up?

ATTORNEY YEATES:  What is that author's name.

ATTORNEY LEHMAN:  Beeres, B-E-E-R-E-S.

Page 83

THE WITNESS: No.

BY ATTORNEY LEHMAN:

Q. Did you -- in your review, did you review the 2020 article by Puukko -- that's spelled P-U-U-K-K-O, entitled, Social Media Use and Depressive Symptoms, a Longitudinal Study From Early to Late Adolescence?

A. No.

Q. In your review, did you review the 2018 article by George titled, Concurrent and Subsequent Associations Between Daily Digital Technology Use and High-Risk Adolescents' Neuro Health Symptoms?

A. George spelled G-E-O-R-G-E?

Q. Correct.

A. Okay. No.

Q. In your review, did you review the 2019 article by Jensen entitled, Youth Adolescence Digital Technology Use and Media Health Symptoms, Little Evidence of Longitudinal or Daily Linkages?

Page 84

A.    No.

Q.    In your review, did you review the 2018 article by Houghton entitled, Reciprocal Relationships Between Trajectories of Depressive Symptoms and Screen Media Use During Adolescence?

A.    No.

Q.    In your review, did you review the 2023 article by Leggett-James entitled, The Consequences of Social Media Use Across the Transition Into Adolescence, Body Image and Physical Activity?

A.    No.

Q.    In your review, did you review the 2022 article by Maes -- spelled M-A-E-S -- entitled, Adolescent Girls' Instagram and TikTok Use Examining Relations With Body-Image Related Constructs Over Time Using Random Interpretation Cross-Lagged Models?

A.    No.

Q.    In your review, did you

review the 2017 article by Russo entitled, The Reciprocal and Indirect Relationship Between Facebook Use Comparison on Facebook and Adolescents' Body Dissatisfaction?

A.    No.

Q.    In your review, did you review the 2023 article by Chu entitled, Screen Time and Suicidal Behavior Among U.S. Children 9 to 11 Years of Age, a Prospective Cohort Study?

A.    Chu, C-H-U?

Q.    Correct.

A.    I just want to make sure I'm looking in the right place on the list.

No.

Q.    In your review, did you review the 2022 article by Achterberg -- spelled A-C-H-T-E-R-B-E-R-G -- entitled, Longitudinal Associations Between Social Media Use, Mental Health Well-Being and Structural Brain Development Across Adolescence?

A.    No.

Page 86

Q. In your review, did you review the 2020 article by Odgers -- O-D-G-E-R-S -- entitled, Screen Time Social Media Use and Adolescent Development?

A. No.

Q. Did you review any deposition of someone employed by any defendant?

A. Not to my knowledge, no.

Q. Looking at your report, and this is in Paragraph 25, you reference, quote, Direct interactions with state and local education leaders, including district and school administrators, teachers and school mental health and health professionals.

ATTORNEY YEATES: Which report?

THE WITNESS: I was just going to ask that.

ATTORNEY LEHMAN: It's the May 16th report.

THE WITNESS: You said it

was Paragraph 25?

BY ATTORNEY LEHMAN:

Q.    Yes.  Under methodology.

A.    Yes.

Q.    Okay.  Who are the education leaders that you're referring to?

A.    Yeah.  So -- so I've worked at the National Center for School Mental Health for 25 years.  And in that role -- or in that capacity, I served as director of research for a few years and then co-director for 15 years of the National Center.

And as part of that role, we -- and I specifically -- have spoken with education leaders from state departments of education, districts and schools.

So when I speak about -- did you ask about education administrators or educators?

Q.    Yeah.

I asked, who were the education leaders referred to in

Page 88

Paragraph 25?

A.    Yeah.  So that would include state superintendents.  It would include district leaders of student support, district superintendents.  It would include school principals from hundreds of school districts across the country.

Q.    And so is the reference in Paragraph 25, is that a general reference to the interactions that you have had over the years in your profession as opposed to specific conversations that you had for purposes of developing opinions in this litigation?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Let me look as to how I phrased it.

So in Paragraph 25 that you referenced, I spoke about interviews with people from the specific bellwether districts, and I spoke about interactions with state and local education leaders,

including district and school administrators, teachers and school mental health and health professionals.

So that's really -- that last part that you quoted is really speaking to my years of experience in the field broadly, which did inform my opinions.

BY ATTORNEY LEHMAN:

Q. Okay. And just to be clear, that's the last part.

And the previous section, those are the key informants from the school districts, and those are the individuals who were listed in the list that you provided and that we've marked as Exhibit-1, correct?

A. That's correct.

Q. All right. When you were hired to testify in this case, were you hired as an individual consultant as opposed to the National Center being hired?

Page 90

A.    I was hired as an independent expert, yeah.

Q.    And so when you speak, you're not speaking on behalf of the National Center, you're speaking on behalf of Dr. Sharon Hoover?

A.    I'm speaking based on my experience working at the National Center for 25 years.

Q.    Understanding that.  I can't -- you're not divorced from your experience --

A.    Right.

Q.    -- your background is your background.

A.    Right.

Q.    I just want to make sure that you're sitting here today speaking on your behalf as a consultant.

You're not actually speaking on behalf of the National Center, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS: Yeah, I'm not -- I'm not sure, you know, if the legal term "speaking on behalf of," kind of what that means.

The university was aware that I was participating in this, and I had approval to do so. So -- and I'm still employed there.

So I'm speaking as Dr. Sharon Hoover, who, again, was co-director of the National Center and remains an emeritus professor there.

So it's hard to divorce those two, I would say.

BY ATTORNEY LEHMAN:

Q. But your retention agreement, or whatever agreement you have, that's on behalf of Dr. Sharon Hoover, correct?

A. That's -- it's in my name.

Q. Did you do anything to prepare for your deposition?

CONFIDENTIAL

Page 92

A.    Yes.

Q.    What did you do to prepare for your deposition?

A.    I reviewed all of my reports, and I met with counsel.

Q.    Anything else?

A.    I reviewed -- I went and reviewed some of the literature and documents cited.

So that's -- yeah.

Q.    How much time did you spend reviewing your reports in preparation for your deposition?

A.    I don't -- I didn't add the hours up.  So I'm not sure.

Q.    How many times did you meet with counsel in order to prepare for your deposition?

A.    How many times?  I would say three specific to preparing for deposition.

Q.    How much time did you spend meeting with counsel in order to prepare for your deposition?

Page 93

A.    Maybe 15 hours.

Q.    Over what -- how long ago was the first meeting that you had to prepare for your deposition?

A.    Four days ago.

Q.    So 15 hours over the last four days?

A.    Yes.

Q.    All right.  What literature or documents did you re-review for preparation for your deposition?

ATTORNEY YEATES:  And I'll just counsel you, Dr. Hoover, not to talk about anything that you discussed with counsel during the course of your preparation.

THE WITNESS:  Yeah, so I don't know that your question is different than the one you asked before.

But I reviewed my reports and the source documents.

Maybe I misunderstood.

BY ATTORNEY LEHMAN:

Page 94

Q.    So when I asked you before what you did, you told me you reviewed reports, you met with counsel.  And then you separately said you reviewed literature and documents cited in the report.

So I'm just asking what literature and documents cited in the report you re-reviewed for purposes of preparing for your deposition?

ATTORNEY YEATES:  And, again, I'll just counsel you not to disclose which documents you reviewed with counsel.

THE WITNESS:  Okay.  So I reviewed the reports that are in my binders.

BY ATTORNEY LEHMAN:

Q.    All right.  So let me -- let me ask it differently.

Did you -- outside of conversations and documents that you reviewed with plaintiffs' counsel, did you review any other literature and

Page 95

documents cited in the reports to prepare for your deposition?

A.    I did my own review of my reports, just to review, right, just to look at them, yeah.

Is that what you're asking?

Q.    I'm asking -- putting aside -- I know you reviewed the reports, and I know you reviewed documents with counsel.

Did you review anything else to prepare for your deposition?

A.    Just looked at some of the source materials that are in my report. So articles, for example, I may have looked at, you know.

So, no, there's nothing else outside of that.

Q.    And are there -- what articles did you look at, other than articles that you reviewed with plaintiffs' counsel, in order to prepare for your deposition?

A.    So I looked at -- I don't

know the specific articles.  But I went back through my article list just to review what was in my reports.

Q.    How much time, on a monthly basis, do you spend in your professor emeritus capacity serving the University of Maryland?

A.    Well, this is new, since I've worked, you know, full time about 60 to 80 hours a week, probably, prior to -- prior to June 1st.

So in emeritus capacity, I would say a few hours a week.

Q.    Less than five?

A.    It depends.  It depends.

You know, again, as I mentioned, the role involves supervising, you know, faculty that are there.  Given that I've worked there for so long, there's a lot of questions that folks still have about taking over the Center and how to engage with school districts, et cetera.

So there's a lot of

communication and engagement.

Q. How much time did you spend on behalf of the University of Maryland last week?

A. I don't know. I don't know the number of hours.

Q. All right.

ATTORNEY LEHMAN: If we can look at Tab Number 6, and we'll mark this as Exhibit Number 21.

- - -

(Whereupon, Exhibit Hoover-21, No Bates, University of Maryland School of Medicine Web Page, Sharon A. Hoover, Ph.D., was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. Can you confirm that this is a printout of your biography from the University of Maryland web page?

A. I haven't visited the web page in a -- in a little while, so I'm not sure if this is -- you know, when

Page 98

this was dated.

But this looks like something that I've seen on the web page before.

Q.    All right.

ATTORNEY LEHMAN:  Just scroll down to the bottom.

BY ATTORNEY LEHMAN:

Q.    All right.  Do you maintain the biography on the web page?

A.    So the -- it's kind of multi-pronged.

But when I say that basically they have us, to my recollection -- I'm trying to remember how this website -- this particular website, because I'm on a few different websites for the university.

So this particular one, I think that we are able to go in and update certain things on the website.

And I can't -- this must be for the School of Medicine website.  It's a pretty cumbersome interface.  So I

Page 99

think I've -- you know, the last time I went in here, I'm not certain.

Q.    Have you ever recommended to the University of Maryland that it discontinue using social media?

A.    I have not recommended to the university that they discontinue using social media.

Q.    Does the University of Maryland have any warnings about social media use in its student handbook?

A.    I have no idea.

Q.    Have you ever recommended to the University of Maryland that it add warnings about social media use to its student handbook?

A.    I have never recommended that they add warnings to their student handbook.

Q.    Does the University of Maryland School of Medicine have classes that teach medical students about diagnosing and treating addiction?

A.    So let me clarify, because

I'm at the School of Medicine.

So the University of Maryland is a very big system. So are you talking about within the whole system of the University of Maryland, within the University of Maryland School of Medicine?

Q. My question is confined to the University of Maryland School of Medicine.

A. Right. And so you're asking about whether they teach courses about addiction?

Q. About diagnosing and treating addiction in patients.

A. They teach their medical residents about diagnosing and treating.

Do they teach a full course? I'm not familiar with the entire course handbook at the University of Maryland School of Medicine.

Q. Have you ever taught any class to a med student at the University of Maryland School of Medicine about

Page 101

diagnosing or treating addiction?

A.    I have not.  We have addiction departments at the university.

Q.    And have you ever been a member of an addiction department at the University of Maryland School of Medicine?

A.    I've worked on grants related to addiction.  I've never been a member of the division of addiction. It's a part of the department that I'm a part of.

Q.    And what is the name of that department?

A.    I'd have to look.

Q.    Is it the department of psychiatry?

A.    Oh, of the department? Sorry.  I thought you were asking specifically about the division related to addiction.

Our department is the department of psychiatry, yes.

Q.    So let me --

Page 102

A.    I know that.

Q.    Let me -- let me make sure.

You were talking -- the department of psychiatry is the one that you're in.  But there's a separate division for addiction, and you're not sure of the name of that division, correct?

A.    That's correct.

And it's not -- let me, if I may.

The -- it's not a separate division from the department.  It falls under the umbrella of the department.

Q.    Sure.  It's sort of a subspecialty within the department of psychiatry?

A.    Correct.

Q.    So you've never been a part of that addiction subspecialty?

A.    I've never been faculty within the addiction division.

Q.    Do you continue to receive compensation from the University of

Page 103

Maryland as a professor emeritus?

A.    I do not.

Q.    By education, are you a psychologist?

A.    I'm a clinical psychologist.

Q.    Are you a psychiatrist?

A.    No.  I'm a clinical psychologist.

Q.    Are you an educational psychologist?

A.    No.  I'm a clinical psychologist.

Q.    All right.  And so when you make that distinction, when you -- when you point out, well, no, I'm a clinical psychologist, what is -- what is the importance of that clinical distinction to you?

A.    So it's just the degree that we receive.  And clinical psychology, really, you are trained to be a scientist practitioner who can work in a variety of settings, including in schools.

Q.    Do you have any degrees in

epidemiology?

A.    I do not.

Q.    Do you have any degrees in public health?

A.    I do not have a degree in public health.  But I work in the area of public health and have for over 20 years.

Q.    Since 2008 -- well, strike that.

For those patients that you either directly treated or supervised those who were providing direct patient care, what were the types of conditions that they were receiving treatment for?

A.    So that's a wide range of issues that they were receiving treatment for.

Do you want me to provide a list?  I can give some examples.

Q.    Give some examples, please.

A.    Yeah.  So it would include mood disorders, depressive disorders, anxiety disorders.  It would include behavioral disorders, including, for

Page 105

example, attention deficit hyperactivity disorder, ADHD.  It would include substance use disorders, comorbid disorders, certainly, between substance use and mental health disorders.  It would include post-traumatic stress disorders.

So there's a number of different disorders that we would have treated and supervised -- I would have treated and supervised.

Q.    It sounds like it ran the gamut of mental health conditions?

A.    Correct.

Q.    Okay.

A.    Well, let me -- let me actually clarify my answer, if I may.

There are some conditions that are specific to adulthood.  And so I was treating in the capacity of the university primarily the child and adolescent population.

Q.    And so is that age zero to 18?

A.    Typically, my -- the students I'm serving are K through 12. So that's more roughly age 5 to 18 or 19.

We do have an early childhood center as well that's a part of our division.

Q.    Did you -- did you personally make mental health diagnoses in that -- in your role at the University of Maryland?

A.    I did.

Q.    Okay.  And during your work as a clinician, that was before the advent of many of defendants' social media platforms, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I don't know the start date of all of the social media platforms, the defendants' platforms.

During my supervision of many clinicians in the last, you know, decade plus, that would not

Page 107

have been before that time.  So that would have overlapped with the defendants' platforms.

BY ATTORNEY LEHMAN:

Q.   Okay.  Is it correct that you started providing patient care at the University of Maryland in 2001?

A.   That sounds right, yes. 2001.

Q.   Okay.  And from the period from -- the first decade, so from 2001 to 2011, did you diagnose and treat children and adolescents with psychological and behavioral problems?

A.   Yes.

Q.   Including all of those examples that you just gave, mood disorder, depression, behavioral, et cetera?

A.   Generally speaking, yes. I'd have to go back to patient charts, which I don't have access to, to actually know all of the different diagnoses.

But I would have treated

children and adolescents with that range, yes.

Q. Have you ever diagnosed anyone with social media addiction disorder?

A. No, I have not.

Q. And is it correct that from 2006 to 2008 you served as the director at the Maryland Psychological Assessment and Consultation Center?

A. That's right.

Q. And what is the Maryland Psychological Assessment and Consultation Center?

A. So it's within the division of child and adolescent psychiatry. And it is an assessment clinic for children and adolescents where we do -- you know, we get referrals to assess mental health issues in children.

And it's, again -- well, it actually includes early childhood as well, so that goes a bit below the kindergarten level.

CONFIDENTIAL

Page 109

And so that operates once a week. We do assessments on children. We do a wide variety of assessments, and then generate reports, meet with schools and students and families about them.

Q. Are those assessments that you're talking about through the Maryland Psychological Assessment and Consultation Center, are those different from diagnoses that you would have reached while you were providing patient care?

A. So the process is different. We do -- to my recollection, within the reporting for the assessment clinic, we may offer diagnoses, if those are things either that we retrieve from the history of the patient files or that come out as part of the assessment process.

So when you say is it different, some of the diagnoses that I would have offered as a clinician treater, you know, may overlap with diagnoses that are in reports from the assessment center.

Q.    Did you continue to either perform or oversee those types of assessments even after 2018, once you were no longer the director?

A.    There may have been an overlap time.  But no, I don't think I would have overseen them after that.

Q.    During the time -- up until you stopped overseeing patient care by others, was there a standard set of questions that were asked to collect medical history from patients to make a diagnosis?

A.    Well, are you asking within the context of the assessment clinic or as a clinician?

Q.    As a clinician.

A.    Oh, as a clinician.

So there are always questions that we ask, as a clinician, to understand diagnoses.  But does the process look the same for every student that I would have met with?  No.

Q.    Okay.  Did you have, at any

CONFIDENTIAL

Page 111

point during your clinical practice, a
written set of questions that you would
either give to patients or their parents
or guardians?

A.    There may have been surveys.
I don't recall.

Yeah.  I don't recall.

Q.    When you were making an
initial -- well, strike that.  Let me
start again.

When you were collecting a
patient's history in your clinical
practice or when you were overseeing
someone who was doing that, was it
standard practice to ask about their
digital usage?

A.    I'd have to think back.

ATTORNEY YEATES:  Object to
the form.

THE WITNESS:  So I'd have to
think back.

And you're -- you're talking
about my clinical practice or the
practice I supervise?

CONFIDENTIAL

Page 112

BY ATTORNEY LEHMAN:

Q.    Both.

A.    Both.

I would say as technology and the use of social media has become more prevalent for children and adolescents it's become more typical, probably, to ask about it in the context of clinical settings.

Q.    At any time when you were personally practicing, so distinct from when you were overseeing others, did you ever ask a patient about their social media use?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I may have.

BY ATTORNEY LEHMAN:

Q.    You don't -- as you sit here today --

A.    It's been -- it's been a while, so it's hard to say.

Q.    When you were overseeing others who were providing patient care,

Page 113

did you ever recommend or encourage them to ask about a patient's social media use?

A.    Absolutely.  The topic of social media and student use, because it's now so related to student mental health challenges, this would be something that comes up in the context of the interviews that my supervisees would ask about.

Q.    Would they also ask about other digital usage, such as gaming or television watching?

A.    Well, television watching, I think we might get laughed at if we ask adolescents that question these days.

But gaming may be asked about.

Q.    Okay.  What about -- so maybe not watching on TV, but streaming Netflix or Hulu or --

A.    YouTube.

Q.    -- Apple TV?

A.    I don't know that they're

CONFIDENTIAL

Page 114

asking that question specifically.  I
just don't know.

Q.    Would you ever make -- or
strike that.

During your practice, did
you assess the cause of adolescents'
mental health problems?

A.    Did I assess the cause?  We
certainly inquired about the causes of
mental health issues of our adolescents,
yeah.

Q.    When you say you "inquired,"
what does that mean?

A.    Well, when you're in a
clinical setting and you're meeting with
a patient, in this case, a student, often
if I was in the context of a school, we
would try to understand the factors that
might contribute to their mental health
issues.  And so we would ask about
that -- we would ask about those.

Q.    Would you ever make an
assumption about the cause of an
individual's mental health problem?

A.    I try not to make assumptions.  So I'm not sure what you mean by that.

So we -- I try to -- I would have tried to really understand what was happening with the students that I work with to understand or certainly to inform a diagnosis.

Q.    Do you agree that the cause of a person's mental health issues can be a complex multifactorial question?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So do I agree that there might be multiple factors that contribute to a mental health challenge?  Yes.  I think most people in the field would understand that.

BY ATTORNEY LEHMAN:

Q.    In your clinical practice, did you use the DSM?

A.    Yes.

Q.    How did you use the DSM?

CONFIDENTIAL

Page 116

A.    So the DSM is one tool in the field that is used as a way to establish criteria for making diagnose -- mental health diagnoses.

So I would have used it as a reference for -- it's often used, frankly, in the context of insurance billing.  So if you're making a diagnosis and you're billing, then you would use that diagnosis.  So that's one way that it's used.

But, certainly, just in the context of working with students and families, if we make a diagnosis, that would be one reference that I would use.

Q.    Did you use the diagnostic criteria from the DSM throughout your clinical practice and then into the period when you were overseeing others in their clinical practice?

A.    It's one of the --

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's one of

the references that I would have used, yes.

BY ATTORNEY LEHMAN:

Q. What are the other references that you used?

A. So, you know, there's -- so the DSM is -- is one reference that's commonly used in the U.S.

The ICD-10 is another reference that's more globally accepted.

I typically would have referred to the DSM if I was using, like, a manual. But I also would have relied on my graduate training, which was -- you know, informed me about diagnoses and mental health conditions of young people.

Q. Now, in addition to listing specific diagnostic criteria, the DSM also lists risk factors for various mental health conditions, correct?

A. It does.

Q. And so, for example, some of the risk factors listed for major depressive disorder are adverse childhood

Page 118

experiences and genetics, correct?

A.    I'd have --

ATTORNEY YEATES:  Object to the form.  Foundation.

THE WITNESS:  I'd have to look at the most recent version of the DSM to see what is specifically listed.  I'm happy to look at it if you want me to look.

BY ATTORNEY LEHMAN:

Q.    Well, what is your understanding about the risk factors for major depressive disorder?

A.    So there are potentially a number of risk factors for major depressive disorder.  And that might include adverse childhood experiences.

Q.    Okay.  What others would be -- would that include?

A.    I don't know that I could give you an exhaustive list of risk factors.

It might include -- I mean, adverse childhood conditions or

experiences, or what we would call ACES in the field, come to mind.

There may be other predisposing factors -- you know, biological factors in a young person, for example.

Q. And in the field, when you talk about ACES, what are some examples of ACES?

A. So the field has evolved over time. When it was first established in the late '90s, ACES was really just based on a research questionnaire of about ten questions that looked at things, you know, that included having a substance-using family member, being exposed to violence.

It's expanded over the years conceptually to include things like poverty, for example, as a social determinant of how there's a social factor that can contribute to health.

ATTORNEY YEATES: Counsel, can we take a break soon? It's

been about an hour, 15.

ATTORNEY LEHMAN:  Sure.  We can take a break now.

THE WITNESS:  Great.  I need some tea.

VIDEO TECHNICIAN:  The time is 10:29 a.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 10:45 a.m.  We are on the record.

ATTORNEY YEATES:  Counsel, I wanted to note for the record that Dr. Hoover did produce all of her invoices to counsel.  And we went back and looked, and there was a mistake with the production, which was a technical mistake on our part; the last invoice was left off of the production from this

CONFIDENTIAL

Page 121

weekend.

And so the June and July invoice is here.

ATTORNEY LEHMAN:  All right. So this is -- this is an additional invoice beyond what was produced to us previously?

ATTORNEY YEATES:  Correct.

ATTORNEY LEHMAN:  Okay.  And so we'll mark this as Exhibit Number 22.

- - -

(Whereupon, Exhibit Hoover-22, No Bates, Hoover Behavioral Health Invoice, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.    And so do you have a copy of this in front of you, Dr. Hoover?

A.    I don't.

Q.    All right.

A.    Now I do.

Q.    Now you do.  Okay.

Can you confirm this is dated August 6th, 2025?

A.    Let me grab my glasses.

Yes.

Q.    And this reflects time between June 4th and July 30th?

A.    Correct.

Q.    All right.  Between July 30th and August 12th, have you billed any additional time on this matter?

A.    Have I billed any additional time yet?  And invoiced?  Or what do you mean?

Q.    Let me ask a better question.

Have you worked any additional time on this matter between July 30th and August 12th that is not yet invoiced?

A.    Yes.

Q.    How much time have you worked on this matter since July 30th?

A.    I would roughly say about -- somewhere, roughly, 20, 25 hours.  I'd

have to -- I'd have to --

Q.    Okay.  When you conducted the key informant interviews that we looked at previously, did you record all of that time on your invoices?

A.    I'm happy to go back to the invoices to look at them.  But to my knowledge, I would have recorded that time, yes.

Q.    That -- that would have been your standard practice, to record --

A.    That would --

Q.    -- that time on your invoices?

A.    That would be my standard practice.

Q.    All right.  Would you agree that social media use is not a diagnostic criteria for any mental health condition listed in the DSM?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Sorry, can you state that one more time?

Page 124

BY ATTORNEY LEHMAN:

Q.    Would you agree that social media use is not a diagnostic criteria for any mental health condition listed in the DSM?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'd have to look through the DSM to see if it's listed or not as a criteria.

BY ATTORNEY LEHMAN:

Q.    Are you aware of social media use being listed -- well, strike that.

Based on your clinical practice, was social media use a diagnostic criteria for any mental health diagnosis?

A.    When you're talking about clinical practice, are we talking about my direct patient care?

Q.    Well, I am including both your direct patient care and when you were overseeing others in their direct

CONFIDENTIAL

Page 125

patient care.

A.    Okay.  So you're saying within the clinical practice.

And the question was?

Q.    Are you aware of social media use being a diagnostic criteria for any mental health diagnosis?

A.    So it depends how you define "diagnostic criteria."  We think about -- when we're making a diagnosis, we do think about the factors that are a part of, you know, what contributes to a diagnosis.

So in my supervision of clinicians, oftentimes the impact of social media would be something, for example, that may contribute to the diagnosis of depression or anxiety.

Q.    Okay.  And is -- when you say it "may contribute to the diagnosis," it is correct that someone is not diagnosed with depression based on whether or not they use social media, correct?

CONFIDENTIAL

Page 126

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't think I would agree with how the question -- how you put it in the question, that they would not be diagnosed based on their use of social media.

Somebody is diagnosed with depression. And the cause of that depression or the things that influence that would be a part of that diagnostic process, if that makes sense.

And social media has been a part of that diagnose -- diagnostic process, if that makes sense.

BY ATTORNEY LEHMAN:

Q. All right. So my question is a little bit different.

So if you have two patients that come into a clinical practice and they have the exact same clinical

Page 127

presentation, one uses social media and the other does not use social media, they would receive the same diagnoses irrespective of their social media use, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I never had two patients come in with the exact presentation, first of all.

And so it's a -- it's a hypothetical that would be hard to answer.  So I don't know that I can actually answer it as asked.

BY ATTORNEY LEHMAN:

Q.   Okay.  So are you telling me that if someone has all -- meets all of the diagnostic criteria for depression, whether they are actually diagnosed as depressed depends on whether or not they use social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't think

Page 128

I stated that, no.

BY ATTORNEY LEHMAN:

Q.    Okay.  Do you agree that social media addiction is not a recognized clinical disorder in the DSM?

A.    So my understanding of the DSM -- again, I'm happy to take a look at the DSM in its most recent version -- but is that social media -- did you use the term "social media addiction"?

Q.    Yes, I did.

A.    That that's not currently in the DSM.

But it -- there is general consensus that it is something that contributes to mental health diagnoses.

And, frankly, it doesn't surprise me that something may not be in the DSM that is a relatively novel issue for young people.

It takes a long time for things to actually get into the DSM.

ATTORNEY LEHMAN:  And I'm going to respectfully move to

strike as nonresponsive starting with "but there is."

BY ATTORNEY LEHMAN:

Q. When you say there is "general consensus," general consensus among whom?

A. So I would say that mental health practitioners, and many experts in the field of child and adolescent mental health, would agree that there is a significant problem with social media use among adolescents and children that's impacting their mental health, certainly in the work that I do in schools.

This is something that we see daily. So if you want to think about who I'm talking about with general consensus, it's not just experts and practitioners, it's also all of the schools that we work with.

There's not a school that I would go into that doesn't speak to how social media is impacting their schooling and the mental health of their students.

Q.    Do you agree that self-reported symptoms do not provide objective evidence of a psychiatric disorder?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No, I don't agree with that, actually.

BY ATTORNEY LEHMAN:

Q.    Do you agree that self-reports of symptoms of anxiety or depression are not the same as a diagnosis of a psychiatric disorder?

A.    Actually, we rely on self-reported symptoms all the time when informing diagnoses.

Q.    Well, and my question is a little bit different.

Because do you not -- in reaching a diagnosis, do you not also apply your training and education and other information that you collect in order to reach a diagnosis rather than simply asking the patients, do you have,

you know, insert diagnosis?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't -- I can't imagine any practitioner that would just simply ask, do you have X diagnosis.

So we rely on self-reported information all the time to inform our diagnoses. I mean, that is part of how you determine a diagnosis is to understand what a student or patient is experiencing.

BY ATTORNEY LEHMAN:

Q. Would you agree that the self-report is only one source of information, one data point that you rely on in reaching a diagnosis?

A. It depends on the clinical situation we're talking about.

So, you know, when I think about patients that I've interacted with, sometimes the self -- their self-reported

symptoms and experiences are what is used to inform that diagnosis.

Q. Conversely, have you had situations where a patient has come in and told you that they are depressed but you find that they -- they do not meet the criteria for a clinical diagnosis of depression?

A. Again, that's -- that's a hypothetical situation. I'd have to go back if, you know, we're really talking about specific cases of people that I've seen.

So it's hard -- it's hard for me to answer that.

Q. Okay. So, just, I want to make sure I understand.

Is it correct that, sitting here today, you can't tell me if you ever had -- I'm going to start again.

Is it correct that, sitting here today, that you can't tell us that you ever had a situation where a patient came in and reported something that they

were having, for example, depression and, in fact, you did not diagnose them as clinically depressed?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can't tell you whether that has happened or not, no.

BY ATTORNEY LEHMAN:

Q. Well, if that's the case, Doctor, is it correct that you are still collecting a history and doing your own assessment or did there come a time when you would just ask patients what they thought that their diagnosis should be?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Are you asking if I asked my patients what they thought their diagnosis should be?

BY ATTORNEY LEHMAN:

Q. Yes.

A. Not that I recall, no.

Q. It would be almost laughable

Page 134

to do that, wouldn't it?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   I don't think it would be laughable, actually, to ask an opinion of a patient about their experiences, no.

BY ATTORNEY LEHMAN:

Q.   Well, but I'm not asking -- that's not the question that I'm positing.

I'm asking, do you think it would be an appropriate thing for a clinician to do, to simply ask a patient, what do you think your diagnosis should be and allow that to, in fact, be the diagnosis --

ATTORNEY YEATES:   Object to --

BY ATTORNEY LEHMAN:

Q.   -- just based on their self-report?

ATTORNEY YEATES:   Object to the form.

THE WITNESS: I mean, that's a hypothetical that I don't -- again, I'd go back to what I said, which is I -- I would think it would be appropriate, in certain circumstances, to ask a patient their perspective on their diagnosis and to allow that to inform your, you know, clinical work.

BY ATTORNEY LEHMAN:

Q. And would it ever be appropriate for a clinician to simply accept that diagnosis, to do -- to exercise no discretion or experience or knowledge, but to simply accept what the patient has said and allow that to be the diagnosis?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So you're asking, I believe, if -- if you asked one question of a patient, what is -- what do you think your

CONFIDENTIAL

Page 136

diagnosis is, would you then make that diagnosis with having no other conversation with a student?

BY ATTORNEY LEHMAN:

Q.    That's precisely what I'm asking.

A.    I can't think of a circumstance where that would have happened in terms of a diagnosis.

Q.    Is it accurate to say that adolescents' mental health is affected by a variety of factors?

A.    Yes, it would be accurate.

Q.    Do you agree that societal issues such as racial discrimination or community violence can -- can contribute to an adolescents' stress or anxiety?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So there are certain circumstances where things like racism or -- what was the other example that you used?

BY ATTORNEY LEHMAN:

Q. Community violence.

A. -- or community violence may impact adolescents' mental health.

Q. Would you agree that a student's home life plays a significant role in their emotional and psychological development?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So there are, as I've said, a number of factors that may contribute to young people's mental health, children and adolescents' mental health, including their home life; it may contribute.

BY ATTORNEY LEHMAN:

Q. Do you agree that students living in households with financial hardship are at greater risk of mental health illness?

A. So I would say that financial hardship can present adversity to some children that could influence

Page 138

their mental health.

Q.    Do you agree that students living in households with domestic conflict or abuse may be at greater risk for mental health illness?

A.    They may be.

Q.    Have you ever served as a school psychologist?

A.    I've served as a clinical psychologist in schools.

Q.    And was there ever a time that you were employed in a high school or middle school?

A.    Yes.

Q.    When was that?

A.    So -- well, let me clarify.

So oftentimes in school mental health, you have community mental health partners who work in high schools. And so I did that throughout my 20-plus years.

So -- where I would have been an employee of the University of Maryland, for example, but then was based

Page 139

primarily in schools, in -- in high schools. I also worked in other levels of schooling.

Q. When was the last time that you were based primarily in a high school or middle school?

A. So that would have been my last direct clinical role. And I believe that would have been, as we talked about earlier, in 2008, where I was primarily based in a high school.

Q. Have you ever served as a school superintendent or school board member?

A. I have not served as a school board member or superintendent. I've just worked with them throughout my practice.

Q. Now, in 2002 to 2004, you developed a program called Healthy Choices?

A. I'd have to look to my CV for the exact dates. But --

Q. Well, I'll represent to you

Page 140

that I actually got the dates from --
from your CV.

A.    Uh-huh.

Q.    What was Healthy Choices?

A.    It's been a while, so I'm
going to refer back to my CV.

From what I can recall, it
was a program that we developed for
adolescents in high schools to help them
make healthy relationship choices.

Q.    What kind of relationships?

A.    It's been a while, again.
So I'd have to go back.

I don't know that we have
the documentation at this point for it.
But it would have been relationships
with -- you know, their dating
relationships and their friendships, to
my recollection.

Q.    And do you agree that dating
and friendship relationships can impact
an adolescent's mental health?

A.    Do I think that, you know,
relationships in general are part of the

composition of young people's mental health?  Yeah, I do.

Q.    From 2004 to 2006, you developed modules related to family engagement wellness and other program development?

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY LEHMAN:

Q.    What kind of modules -- can you tell us more about those modules?

A.    You're jogging my memory here, because it's been over 20 years since that particular set of modules.

But it -- do I have it in my CV?  It likely would have been, at that time period, part of some of our NIMH-funded work on bolstering school mental health through better engaging families, promoting wellness and program development.

I believe it would have been kind of evidence-based interventions for -- for young people in schools.

Page 142

Q.    Have you ever worked for a technology company?

A.    No.

Q.    Have you ever developed a technology product?

A.    So I've partnered with technology companies to develop online systems, for example, that help schools and districts assess their comprehensive school mental health programming.

So am I the tech person on that?  No.  I'm the -- the mental health expert.

Q.    What are the names of those technology products that you worked with?

A.    So the one that comes to mind -- well, there's a couple that come to mind.  And they are clearly detailed in my CV.

But one of them is the School Health Assessment and Performance Evaluation System, or the SHAPE system. And that is essentially a quality improvement platform that school

Page 143

districts and schools can use to improve their quality.

There's also Maryland Behavioral Health, or MD Behavioral Health, which is an online learning system for mental health practitioners to engage in professional development.

So those are two of the more kind of prominent technology products that I've been a part of working with.

Q.   Have you ever worked for or consulted with a social media company?

A.   No.

Q.   Have you ever published a peer-reviewed article about social media?

A.   Let me look at my list of publications, more recent years.

So I'm just looking through my list of publications.  And can you just restate the question so I make sure I'm answering it?

Q.   Yes.

Have you ever published a peer-reviewed article about social media?

A.   So it depends how you think about it.  You know, I've published about 100 peer-reviewed articles about school mental health.  And I would say that when we're talking about mental health in schools, that social media contributes to that.

So it depends how you think about the question.

Q.   Have you ever published a peer-reviewed article that talks about social media?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  I don't know if I've -- I don't know if I've specifically talked about social media in these articles.  I'd have to go back to each of the articles to look at the language.

Again, we're talking 100 publications and multiple pages within those.  So I would -- it wouldn't surprise me if I had

spoken about social media as part of the publications.

BY ATTORNEY LEHMAN:

Q.    As we sit here today, do you recall any peer-reviewed article that you published that speaks about social media?

A.    Well, again, when I think about speaking about social media, I think about it as a contributing factor to student mental health.

So I would say, in that sense, yes.

Q.    Okay.  Can you, as you sit here today, recall any peer-reviewed article that you published that specifically and explicitly names any social media platform from the -- of any defendant?

A.    As I sit here today, no.  My research and publications typically focus on comprehensive school mental health systems.

Q.    Now, the majority of your articles listed in your CV -- and this is

CONFIDENTIAL

Page 146

Page 33 to 65.

A.    Yes.

Q.    -- those are described as web-based articles.

Are --

A.    The majority of my articles are not web-based articles.

Q.    Okay.  Well, so this is a question that I have for you.

Because looking at your CV, and we can start on Page 33, the title there is, Web-Based Articles.

Do you see that?

A.    I see that on Page 33.

Q.    Right.  And that list, by my count, goes through Page 61, Number 426.

A.    Can I ask a clarifying question?

Are you looking at the August 1st copy of this or the --

Q.    I don't -- no.  The one I have is May 10th.

A.    Okay.  So I'm there.

So the list of web-based

articles in what I'm looking at goes from Page 33 to 34. And then it moves to major invited speeches.

Q. Okay. So, then -- all right. Thank you.

So the major invited speeches start on Page 35?

A. Correct.

Q. All right. And when you say a "major invited speech," what constitutes major?

A. It's -- it's a term that's used in academia where you -- essentially if you're invited to give a talk or a speech, then it's listed here.

And so then it's broken down, as you can see, by local, national, international.

Q. Is there such a thing as a minor invited speech?

A. Well, I would say that I've done, you know, several informal discussions with school districts, for example, quality improvement,

consultation, that kind of thing, that may not be listed as a major invited speech.

So there is kind of a -- you know, in academia, an understanding of a major speech under this category would be something that you're invited to present.

Q.   And are -- the web-based articles listed in your CV, are those peer-reviewed?

A.   So let me -- let me answer kind of in two ways.

So I do have a section on peer-reviewed journal articles.

Q.   Correct.

And my question is based on the articles that are listed under the subheading web-based articles.

A.   Okay.  All right.  So I'd have to look at these to see if these are peer reviewed or not.

So what I can say is that most of these would have gone through a -- in fact, all of them would have gone

through a review process within the organization with which they were designed for the web-based articles.

The 100 or so peer-reviewed articles are listed elsewhere.

Q.    And so the web-based articles, although they may have gone through an internal review process within the organization, they are not, in fact, peer reviewed, correct?

A.    It depends what you mean by "peer reviewed."

Q.    Well, you have peer-reviewed articles separated out.

So what is the definition that you were using of "peer reviewed" in your CV?

A.    So the definition for these peer-reviewed articles are typically within a journal -- an academic journal that you submit for formal peer review.

And there's a peer-review process that's under an editorial board.

Q.    And so is it correct that

the web-based articles were not subject to that formal peer-reviewed process that you have just outlined?

A.    That's correct.  That would be typical in academic work, that you list your web-based articles that are not part of an editorial process in a separate section.

Q.    Okay.  What is your definition of social media?

A.    So for the purpose of the opinions that I generated in the reports, I was -- under the umbrella of social media were the defendants' platforms; so the ones that we spoke about earlier.

Q.    And so do you have a working definition of what constitutes social media other than the specific defense platforms?

A.    Do I have a working definition?  No.  I considered social media in this case to be the defendants' platforms.

Q.    Okay.  Would you consider

Twitter, or X, to be social media?

A.    So for the purpose of this litigation, when I'm using the term "social media," I'm talking about the defendants' platforms.

Q.    Okay.  Do you see a distinction between the defendants' platforms and Twitter or X?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'm not offering an opinion on the distinction between Twitter and the defendants' platforms.

BY ATTORNEY LEHMAN:

Q.    Okay.

A.    My understanding -- if I may just -- my understanding is they may, you know, share features.  But I don't really have an opinion on the distinction between them.

Q.    Okay.  Do you see a distinction between defendants' platforms and Pinterest?

CONFIDENTIAL

Page 152

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, I'm not offering an opinion on the distinction between the defendants' platforms and Pinterest.

BY ATTORNEY LEHMAN:

Q.    Do you know whether or not Pinterest shares features with the defendants' platforms?

A.    I do not know.

Q.    Do you consider Discord to be social media?

A.    Again, I'm not offering an opinion on that.

Q.    Do you know if Discord shares features with defendants' platforms?

A.    I don't know.

Q.    Do you consider Substack to be social media?

A.    I'm not offering an opinion on that.

CONFIDENTIAL

Page 153

Q.    Do you know whether Substack shares features with any of the defense platforms?

A.    I don't -- I don't know.

Q.    In your opinion, is there a difference between the defense social media platforms?

A.    Is there a difference between the defense social media platforms?  Sure.  There are differences between the platforms.

Q.    And what are the differences that are significant for your opinions?

A.    So I didn't see my role as, you know, really looking at all of the specific features across every platform and the distinctions between them.  But I did rely on other expert reports who really did do a deeper dive into some of the design features of the different platforms.

But if you're asking me, you know, for the details of each of the different platforms' features, that's not

Page 154

something I offered an opinion on.

Q.    Do your opinions apply equally to all of the defense social media platforms?

A.    I'm not sure I know how to answer that question.

Do my opinions apply equally?  I didn't necessarily think about them as -- I didn't parse out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera.  So I didn't think about it that way.

So it applies to the defendants' platforms -- the opinions that I offer apply to the defendants' platforms.

Q.    Have you ever used any of the defendants' social media platforms or apps?

A.    I have.

Q.    Which ones?

A.    Sorry.  Hold on.  Mike fell off, if you couldn't see.

CONFIDENTIAL

Page 155

So I would have used YouTube, Instagram.  I would have used Facebook, under Meta.  I have very lightly used Snapchat.

So -- and then which did I not say?

Q.    Have you ever used TikTok?

A.    Again, very lightly.  Yeah.

Q.    When you say that you have "lightly" used TikTok, what does that mean?

A.    So I think that I may have downloaded an app and looked at videos on it.  And I've seen -- you know, so I've seen kind of that interface, the platform.

But it's not something that I use regularly.  And I honestly can't think of the last time I would have looked at it.

Q.    Have you ever signed up for an account on TikTok?

A.    Probably.  But honestly, I don't know.

Page 156

Q.    Can you say that you spent more than an hour looking at TikTok?

A.    Maybe.  I think it has that continuous thing where you just -- it kind of keeps you engaged.

Q.    So when you say "maybe," does that mean you're not sure how much time you've spent on TikTok?

A.    Yeah, I'm not sure.  If you're asking me the number of minutes I've spent on TikTok, I absolutely could not tell you that.

Q.    Have you looked at the interface from TikTok more than once?

A.    I would think so, yeah. Yes.

Q.    When was the last time you looked at TikTok?

A.    As I said, I'm not sure the last time I looked at it.

Q.    When you said that you have used Snapchat lightly, what does that mean?

A.    So I believe I may have

Page 157

downloaded it.  And I'm not sure if I have an account.  I think, actually, yes, I do have an account, because I was engaging with it at one point.  So I remember seeing some of the features of Snapchat.

But when I say use it lightly, I haven't used it in a long time, as far as I know.

Q.    Has it been more than a year since you used Snapchat?

A.    I don't know.

Q.    How often do you use YouTube?

A.    I would say that I use more regularly.  So that may be something I use, you know, at least during the course of a week.

Q.    And during a week, how much time, on average, would you spend on YouTube?

A.    I have no idea.  I think oftentimes we underestimate the amount of time that we spend on social media.

Page 158

Q.    When was the last time you were on YouTube?

A.    I don't know.  It may have been as recently as yesterday, but I'm not sure.

Q.    What did you look at if -- the last time you were on YouTube?

A.    I'm not sure, to be honest with you.  I can't recall the exact content that I looked at.  Maybe a newscast.

Q.    When you -- when you go on YouTube, is that what you usually look at, newscasts?

A.    No, not necessarily.

Q.    Is there any particular type of video that you like to watch on YouTube?

A.    I think I've watched different things on YouTube.  So it's not that I like a particular thing or not. I've viewed different things on YouTube.

Q.    And when was the last time you were on Instagram?

Page 159

A.    Probably within the last week.  I often have used it, really, as a way to attempt to monitor kids' -- my kids' own use.

Q.    Meaning your offspring?

A.    My off -- well, my children, yes.

Q.    Okay.  I just wanted to clarify that it wasn't --

A.    Not my students?

Q.    Correct.

And do you have an Instagram account?

A.    Yes, yes.

Q.    How often do you go on Instagram?

A.    I don't know.

Q.    When was the last time?

Oh, you already told me that.

A.    Didn't you just ask me that?

Q.    I did.  Sorry.

A.    That's okay.

Q.    When was the last time you

Page 160

were on Facebook?

        A.    It would have been within
the last week, probably.

        Q.    How often do you use
Facebook?

        A.    I've tried to limit my use,
so -- but I would say it varies over
time.

              So it may be regularly.
Over the course of a day or week, I
might, you know, open it on occasion
because I have it on my phone.  So it's
there and it's easy to open.

        Q.    When you go on Facebook, how
much time do you usually spend?

        A.    I've set limits on myself
because of some of the features on it
that are, you know, perpetually engaged.

              So I spend, I think my --
the limit I set on there is no more than
20 or 25 minutes in a day.  You know,
they have -- so.

        Q.    And what do you typically
look at when you go on Facebook?

CONFIDENTIAL

Page 161

A.    It depends.  I mean, it's --
you know, the feed kind of feeds you
certain things and so there's -- I
certainly, you know, see advertisements
or things that are fed to me on a feed.

I also will look at, you
know, pictures of friends and colleagues.

Q.    Are there any other social
media platforms that you use other than
the defense platforms that we just
discussed?

A.    Can you identify which
platforms you're talking about?

Q.    Sure.

A.    That's hard for me to --

Q.    Do you use any programs such
as Twitter, or X, LinkedIn?

A.    So I don't necessarily -- so
do I use Twitter and X?  I have used
Twitter and X before.  I used it more
frequently at one point, and then,
really, I can't think of the last time
I've been on it.

And then what was the other

Page 162

one you asked about?

Q.    LinkedIn.

A.    Oh, I have a LinkedIn account.

Q.    How often do you use LinkedIn?

A.    I would say maybe every couple of weeks or so.

Q.    Do you have a Substack account?

A.    I think I did create a Substack account, yes.

Q.    When was the last time you used Substack?

A.    In fact, I think I used it yesterday, because I had -- for the first time in I don't even know how long, I don't know that I had used it before that -- but I had a friend who -- yes, I had somebody who engaged me in a Substack account, and I opened it.

So I recall that.

Q.    When you say they "engaged" you in a Substack account, what does that

CONFIDENTIAL

Page 163

mean?

A.    It means their husband had an accident.  So they were informing me about it.  They were creating a blog about that.

Q.    Have you conducted any research specific to any of the defense platforms?

A.    No.  That's not my role is -- to conduct research on the defense platforms.

What I do conduct research on is school mental health.

Q.    Have you examined the extent to which the harms you describe in your report result from students' use of defendants' platforms as opposed to other digital media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, you know, in forming the opinions for this report, I relied on a number of sources, including the

peer-reviewed literature and including expert reports.

And within the expert reports specifically, and within the peer-reviewed literature, those did look specifically at the defendants' platforms, yes.

BY ATTORNEY LEHMAN:

Q.   And so when you say "they looked specifically at the defendants' platforms," what article or articles would you refer me to as you -- that are unique to TikTok that you relied on?

A.   I'd have -- I mean, you would have to present -- I'd have to go back to all the articles again.  I cited probably well over 100 in review articles consistently.  So I don't know that I could point you to a specific article.

But if you'd like me to look at all my articles --

Q.   Well --

A.   -- and go back through, I'm happy to.

CONFIDENTIAL

Page 165

Q.    Well, we're certainly -- we're certainly going to look at specific articles.

But would it be accurate, then, that as we sit here, without me walking you through each individual article, that you're not able to identify specific articles that relate to your opinions that are specific to any individual defense platform?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think that's a really, frankly, confusing way to ask it.  Because the majority, I would say, of -- or most -- many of the articles that I looked at and that -- that I looked at or that -- excuse me, the plaintiff experts that I reviewed -- looked at were specifically referring to the defendants' platforms.

And so, you know, when I think about the -- the Telzer's

report, for example, and some of the other information I looked at, the defendants' platforms were clearly the most predominantly used social media platforms of young people.

So the research that I looked at on the social media platforms very consistently were specific to the defendants' platforms, if that makes sense.

BY ATTORNEY LEHMAN:

Q. Okay. And so my question is just a little bit different, right.

So I'm not talking about research that looks globally at the defense platforms. I'm looking at any effort to individually examine a single defense platform.

And so my question is, as you sit here today, for any individual defense platform, can you identify a peer-reviewed study that identifies the harms unique to that platform as opposed

to social media writ large?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I believe I've already answered that, that I'd have to go back to every specific article to look through to see if they actually looked at specific, you know, distinct platforms.

But, again, the literature that I looked at did look at -- and some of them looked at one platform or two platforms, to my recollection.

But, again, I'd have to go back to the articles to see which platforms they were specifically looking at.

BY ATTORNEY LEHMAN:

Q.    All right.  You mentioned before that you have children.

How many children do you have?

Page 168

A.    I have three children.

Q.    How old are your children?

A.    They are 17, 19 and 21.

Q.    Do any of your children use social media, the defense platforms?

A.    They do.

Q.    Which children?

A.    All three of my children.

Q.    All right.  Have you ever forbidden any of your children from using social media?

A.    Yes.

Q.    Tell me about that.

A.    Tell you about forbidding my children to use social media?

Q.    Yes.

A.    Do you mean what the process was or --

Q.    When did it happen?  Why did it happen?

A.    So --

ATTORNEY YEATES:  I would just sort of object to this line of questioning to the extent that

you're uncomfortable.

If you're comfortable talking generally. But I don't think you need to go into the specifics of, you know, each of your children and the conversations you've had with them.

THE WITNESS: Yeah, that's helpful. Because I don't, you know, tend to talk about my children in, you know -- so I can tell you generally that we have put in place different mechanisms, whether it's the plastic phone box where we keep it out of their bedrooms at night or the, you know, disallowing it at the dinner table or when they have friends over, or waiting until certain ages for them to be able to use the defendants' platforms.

So in -- so we've done several things to limit their use.

CONFIDENTIAL

Page 170

BY ATTORNEY LEHMAN:

Q.    At what age did you allow your children to use the defense platforms?

A.    I can't give you a specific age.

Q.    Have any of your children ever received a mental health diagnosis that you attributed to social media use?

A.    So is this the point that I can say that I would prefer to --

Q.    Well, I -- I would tell you, as -- as the defense lawyer who is asking these questions, I think -- I think it's a fair question.

So I would ask that you answer it.

ATTORNEY YEATES:  My position is that any mental health diagnoses of her children are not relevant to this litigation.

ATTORNEY LEHMAN:  They go directly to bias.  So if you want to take that to the judge, we can

argue it.

BY ATTORNEY LEHMAN:

Q.    Or you can just answer the question.

ATTORNEY YEATES:  If you're not comfortable talking about your children's mental health, then I think we can take that to the judge.

THE WITNESS:  Yeah, I mean, I just think it's -- it feels like it goes beyond what I'm typically comfortable speaking about in a public forum.

ATTORNEY LEHMAN:  All right. Then we will make a note about that and address that with the court.

BY ATTORNEY LEHMAN:

Q.    Do you agree that there is a difference between the amount of time that a user spends on social media depending on the content that they're looking at?

Page 172

A.    Sorry, can you rephrase the question?

Q.    Yes.

Do you agree there's a difference between -- do you agree there is a difference in the nature of a user's experience on social media depending on the content that they are reviewing?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'd have to understand what you mean by "nature."

I mean, if they're looking at one thing versus another, might their experience be different? Yes.

So it's a general -- it's a pretty broad question, so.

BY ATTORNEY LEHMAN:

Q.    Do you agree that every individual has a unique and personal experience on social media?

ATTORNEY YEATES:  Object to

Page 173

the form.

THE WITNESS:  I would agree, in general, people's experiences are unique and individual, whether they are walking in the park or looking at social media, so.

BY ATTORNEY LEHMAN:

Q.    Are you offering an opinion about any single individual's experience on social media in this case?

A.    So I'm offering an opinion about the impact of social media on students and on schools.  So I'm not focusing on one specific individual.

ATTORNEY LEHMAN:  Can we look at Tab 7, please?  And we will mark this as Exhibit Number 23.

-   -   -

(Whereupon, Exhibit Hoover-23, No Bates, American Psychological Association Health Advisory on Social Media Use in Adolescence, was marked for

Page 174

identification.)

- - -

BY ATTORNEY LEHMAN:

Q. Can you confirm that I've handed you, and that we're showing on the screen, the publication from the American Psychological Association entitled, Health Advisory on Social Media Use in Adolescence?

A. Yes.

Q. Are you a member of the American Psychological Association?

A. Yes.

Q. How long have you been a member?

A. I'd have to look at my CV, if you want the exact dates.

So 1996.

Q. Have you been a member of the American Psychological Association continuously since 1996?

A. It's hard to say. I mean, I believe so. Did I let membership lapse and have to renew it? Possibly. But

Page 175

yes, essentially.

Q.    Have you ever served as an officer in the American Psychological Association?

A.    No.

Q.    Have you ever been asked to serve on a committee?

A.    Have I been asked to serve on a committee?  I don't recall being asked, but I get asked to serve on a lot of committees, so.

Q.    Have you ever, in fact, served on a committee for the American Psychological Association that related to social media?

A.    I don't think so, no.

Q.    Do you agree that the American Psychological Association is a well-respected organization?

A.    I would say that there are many in the field who respect the American Psychological Association. Yeah, that's reasonable.

Q.    All right.  If you will turn

to Page 3.

And looking under Section A, do you see that it says, Social media is not inherently beneficial or harmful to young people?

A.   I see that.

Q.   And do you agree with the American Psychological Association that social media is not inherently beneficial or harmful to young people?

A.   I would not --

ATTORNEY YEATES:   Dr. Hoover, I would just let you know this is a long document, so if you need to take a chance to take a look through it, you're welcome to do so.

THE WITNESS:   So I'm happy to look through the document.

But with respect to that one statement, are you asking do I agree with the American Psychological Association that it's not inherently beneficial or

CONFIDENTIAL

Page 177

harmful?  I wouldn't agree with that statement outright in the -- you know, absent the context -- absent the context of actually reviewing this entire document.

BY ATTORNEY LEHMAN:

Q.    Okay.  Why would you disagree with the statement that social media is not inherently beneficial or harmful?

A.    Because what I would say is that based on my review of the literature and based on my review of expert reports who really looked into the impacts of social media, there is overwhelming evidence of the harms of social media to young people's mental health and -- and to the school environment.

So, no, I think that this statement itself, taken kind of outside of -- out of context is -- you know, could be misleading.

It would suggest that -- it could suggest, oh, it's not -- it's not

Page 178

harmful to young people.  And I would wholeheartedly disagree with that, based on the literature and the science at this point.

Q.    And do you agree that for some adolescents that social media use is beneficial?

A.    So, you know, frankly, it's not what I hear on a regular basis when I'm working with schools.  I'm not hearing about the benefits.  I'm hearing about the harms of social media.

And when you look to, you know, again, the literature what you're typically seeing are the harms and the, again, overwhelming evidence around those.

Is there some discussion in the field about potential benefits of social media?  Yes.  You know, just -- yes, there's some discussion in the field about that, that there's, you know, potential benefits of social media.

Do they negate or outweigh

Page 179

the harms and risks of social media?
Absolutely not.

Q.    Well, let's keep looking
at -- and I want to look at some specific
statements in this document.  But let's
stay in Paragraph A.

All right.  Do you see there
it says, quote, In most cases, the
effects of social media are dependent on
adolescents' own personal and
psychological characteristics and social
circumstances, intersecting with the
specific content, features or functions
that are afforded within many social
media platforms?

A.    I see that, yes.

Q.    And do you agree that the
impact of social media is dependent on
the adolescent's own personal
psychological characteristics, including
the content that they view on social
media?

ATTORNEY YEATES:  Object to
the form.

Page 180

THE WITNESS: So, you know, again, based on my review of the literature, my review of expert reports, my interactions with adolescents and families and with schools, I would say that, first of all, it's very hard to divorce the content from the features.

And, actually, I'd say what I've seen more of is that the features themselves are actually what are really kind of interfering with young people's mental health and with the school environment.

So I think your question was asking specifically about content and if that's what's involved here. And I would tend to actually agree with the later part of this statement, which is that the features or functions that are afforded on social media platforms are problematic.

Page 181

BY ATTORNEY LEHMAN:

Q.    Okay.  Would you agree with the American Psychological Association where it says, The effects of social media likely depend on what teens can do and see online, teen's pre-existing --

A.    I'm sorry, we're at the next sentence?

Q.    The next sentence.
-- the teen's pre-existing strengths or vulnerabilities and the contexts in which they grow up?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So just give me a minute to look at this.

So the effects of social media -- so I wouldn't agree with it as it's stated.  Because I think it's saying it likely depends on this.

But, actually, I think that there's significant research that says that -- that demonstrates

Page 182

that actually independent of content, young people's mental health is harmed and the school environment is harmed.

So, actually, I don't agree with how it's stated here, no.

BY ATTORNEY LEHMAN:

Q.   What research is that, that you're referencing, that demonstrates that harm is independent of content?

A.   So, again, if you are asking me to cite specific studies, which I did in my report, I'm happy to go back and look through the specific studies.

But I did cite studies that speak specifically to -- and I looked at the expert reports who actually dove into this much more deeply, where they look at, in the absence of contact -- content, rather, that it's actually the features that are driving some of the harm.

And what I can tell you is that regardless -- when I think about the work that I do in school environments,

for example, regardless of the content, it is that compulsive checking of the phones, the social media platforms.  It is the -- kind of the need to know, whether content, whatever that content is, is, you know, engaged in by peers, et cetera.

So I derive that kind of response, really, more from the research and from my experience in the field.

Q.   Okay.  And so separating other expert reports that you have reviewed, right.  So we will depose them about their opinions.

My question to you is, as we sit here today, can you identify any peer-reviewed article that separates content from features to identify what caused the harm?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So a couple of things.

First of all, my opinions

Page 184

are informed, in part, by the other expert reports.  So if you're asking me to, you know, kind of forget what I, you know, read and understood from those reports, it's going to be hard to do.

And I would have to go back to the -- each specific article to know which ones it was that actually -- you know, which ones referenced content in the absence of the features, or that separated it out, as you put it, I think.

BY ATTORNEY LEHMAN:

Q.    Let's go down to -- stay on the same page, let's look at F.

A.    Okay.

Q.    And we're going to look in the middle of the paragraph, about roughly eight lines up.  It says, Second. All right.

Do you see where it says, Second, long-term, i.e., multi-year

Page 185

longitudinal research often is unavailable; thus, the associations between adolescents' social media use and long-term outcomes, i.e., into adulthood, are largely unknown.

Did I read that correctly?

A.    I don't know if you read it correctly.  But I see the sentence, yes.

Q.    Well, do you agree with the American Psychological Association that associations between adolescents' social media use and long-term outcomes are largely unknown?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So I don't agree with that statement.  I think that there has been research that has looked, longitudinally, at young people's experience over time.  You know, have the platforms been around long enough to look longitudinally at all adolescents' experiences over time

CONFIDENTIAL

Page 186

into adulthood, as its referencing in this? Perhaps not.

But I don't agree with this statement that longitudinal research is often unavailable. I think it's, actually, an odd statement.

There is available longitudinal research. So I think we do have information about the impacts on adolescents beyond their first use of social media, if that makes sense.

BY ATTORNEY LEHMAN:

Q. Okay. Let's turn to Page 4. And I want to look at the fourth bullet here.

And do you see here that the APA says, quote, Social media may be psychologically beneficial, particularly among those experiencing mental health crises or members of marginalized groups that have been disproportionately harmed in online contexts?

Page 187

Do you see that?

A.    I do see that.

Q.    And do you agree that social media may be psychologically beneficial, particularly among those who are experiencing mental health crises?

A.    I don't have evidence to suggest that that's the case.

In fact, I think it can be very risky for those who are experiencing mental health challenges.

Q.    So you actually think that what the APA is recommending here is, in your words, risky?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    So I was referring to this specific sentence.    You're talking about recommendations.    I think I would have to review the whole document.

But if you're asking me about this specific sentence, I think I stated the answer.

Page 188

BY ATTORNEY LEHMAN:

Q.    Let's look at the top of the page.

Do you see where it has the word "recommendations"?

A.    So this is the top of Page 4?

Q.    Yes.  This is the page we're looking at, Page 4.

A.    Okay.  Yes.  I see that.

Q.    All right.  And then do you see the recommendation underneath that, where it says, quote, Youth using social media should be encouraged to use functions that create opportunities for social support, online companionship and emotional intimacy that can promote healthy socialization.

Do you see that?

A.    I do see that.

Q.    Now, do you agree that one of the potential benefits of social media use is that active use on social media can allow adolescents to actually

communicate with others and build social networks?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I would say is that may be something that adolescents attempt to use social media for. And while they do that, they are being exposed to risk.

I mean, it's just -- you know, it's like adolescents may attempt to form, you know, connectedness by joining a group where they're smoking tobacco, right. And that doesn't mean that it's not inherent with risks, so.

ATTORNEY LEHMAN: Let's look at Tab Number 19.

BY ATTORNEY LEHMAN:

Q. All right. Can you confirm this is an article entitled, What is Driving Youth Mental Health Problems? It's Not Just About Social Media, from

Page 190

Education Week?

A.    Yes.

Q.    And this is an article by Arianna Prothero, dated November 29th, 2023?

A.    Yes.

Q.    And do you remember being interviewed by Ms. Prothero for this article?

A.    So I get interviewed for a lot of things.

Do I remember this specific interview?  Not necessarily.  But I believe I was interviewed for this.

Q.    All right.  And if you -- if you turn to Page 3 of 7, do you see it says, In a recent conversation with Education Week, Hoover, who is also a co-director of the National Center for School Mental Health, explained why adults tend to focus on social media-related causes of mental health problems and what other factors educators should be attuned to?

Page 191

A.    I do see that, yes.

Q.    And do you remember that that was part of your conversation with Ms. Prothero for this article?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So what I recall is that Ms. Prothero was trying to understand kind of how adults and young people attribute mental health -- what -- what, you know, young people and adults attribute youth mental health issues to.

BY ATTORNEY LEHMAN:

Q.    So let's -- let's look at the first paragraph on this page -- or, sorry, we'll start with, But it's oversimplifying.

A.    Uh-huh.

Q.    Do you see here you're reported as saying, But it's oversimplifying the issue to say that social media is the root cause of youth

mental health problems, say experts such as Sharon Hoover, a professor of child and adolescent psychiatry at the University of Maryland School of Medicine. Hoover and others argue that fixating on just one variable such as social media as the cause of mental health problems is counterproductive.

Do you see that?

A. I do see that.

Q. And do you agree with the statement that you previously made in 2023 that focusing on just one variable, such as social media as the cause of mental health problems, is counterproductive?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I don't think this is a direct quote, first of all. It's not stated as a quote.

But do I think that -- you know, I stand by the statement or

Case 4:22-md-03047-YGR    Document 2407-101    Filed 11/07/25    Page 194 of 488

the concept that if one were to only focus on one factor as being the only cause of mental health issues in young people, that that may be an oversimplification.

That's consistent with what I've said, that there are other factors that may contribute to youth mental health problems.

I believe also later in that article I speak about the negative impacts of social media on youth mental health.

BY ATTORNEY LEHMAN:

Q. Well, you do talk about social media. And so I want to turn to Page 5. So this is 5 of 7.

And we're going to look at the second paragraph starting, I don't.

And there you do acknowledge that there can be harms from exposure to social media.

But what I want to focus on is I want to look at the last sentence.

Page 194

There it says, Versus what teens may be more attuned to, which is active use of social media where they are actually finding the benefits, like communicating with others, building social networks.

Do you see that?

A.    Yes.

Q.    Okay.  And you agree that in your interactions with teenagers that they report actually finding benefits to social media, such as communicating with others and building social networks, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Actually, I think what I'm speaking to here was what Ms. Prothero was asking about specifically.

So this was not me reporting that I identified these benefits. I think she was saying, if teens, you know -- and, again, I'm -- you're asking me to remember an

Page 195

interview that was a couple of years ago.

But I think she was pointing out that teens may have identified these. And I was saying -- peers versus what teens may be more attuned to, which is the -- what they may be perceiving as benefits.

So I'm just -- sorry. I'm just trying to reread this statement here.

Yeah. So I think I was acknowledging that teens may be looking at other -- other factors of social media use. So I don't think, again, that it's contrary to what I said.

BY ATTORNEY LEHMAN:

Q. Okay. Well, and we can -- why don't we turn back to Page 3 of 7, because I just want to be clear.

This is not just an article where you're quoted once. This is

CONFIDENTIAL

actually an interview.  And we can see down at the bottom of what's on the screen, it says, The interview has been edited for length and clarity, correct?

So this isn't just an article where you're quoted once.  This is actually an article summarizing an interview with you, correct?

A.    Let me just look through.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yeah, it appears to be, based on that statement.  Yep.

BY ATTORNEY LEHMAN:

Q.    Okay.  All right.  And if we turn back to Page 5, and I want to look at the last paragraph here -- I'm sorry -- yeah.  The last paragraph.

And it says, quote, The other piece is that sometimes when we do this, when we look to blame one thing, social media or homework, we end up with and all -- with all-or-none solutions

Page 197

that don't recognize the complexity of each of these issues. So, for social media, there is harm caused by certain types of exposure, but there's also benefits.

Did I read that correctly?

A. I think that's what's stated here, yes.

Q. Okay. And as we sit here today in 2025, do you agree with the statements that you made in this interview in November 2023, that looking to blame one thing, whether it's social media or homework, that you end up with solutions that don't really recognize the complexity of mental health issues?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I would say is that I don't think any mental health professional, including me, would only blame one thing for child mental health issues.

Page 198

So I think that what I said here makes sense. That if you only blame one thing, whether it's homework or something else, or social media in this case, that you would not recognize the complexity of youth mental health.

And I do, again, in this article, speak about the harms of social media as one of the significant contributing factors to youth mental health.

BY ATTORNEY LEHMAN:

Q.    And do you agree in 2025 with the statement that you made in 2023 that social media, although there may be harm, there are also benefits?

A.    So what I would say, which is what I've said before, is that some young people and, you know, some people in the field may say that there's benefits of -- you know, that I've found -- I think I've said here, you know, that there are certain types of

Page 199

exposure where they may be trying to identify a connection, for example.

I think when there's benefits of something in the context of significant public health harm, you focus on the harm. And it's not to suggest that there may not be some benefits.

But, again, you know, I think about the analogy of smoking, where if you asked adolescents, do I feel, you know, more comfortable or more included in a group where they're vaping or smoking, just because they recognize it as a benefit doesn't mean that it's not something that's incredibly harmful to them.

Q. Just so we don't lose my question.

You agree that there can be benefits to social media, correct?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: I was just about to say, I think I've already

Page 200

answered that.

That I think that some adolescents, for example, might, you know, identify that they are feeling, you know, a benefit of engaging with social media. And that in no way negates the harms that they may be exposed to.

BY ATTORNEY LEHMAN:

Q. Are you offering the opinion that all adolescents are harmed by social media?

A. No. I mean, we have a lot of adolescents -- well, not so many these days, but some that don't use social media. So I think it would be unfair to say that all adolescents.

But what I will say is that, you know, again, I'm working in schools and with schools. And so even those who aren't using, unfortunately, are now impacted by their peers who are using social media.

So, you know, it's --

Page 201

it's -- the argument can certainly be made that if peer -- if adolescents are engaging with peers who are using social media, even if they're not using it, they are impacted by the classroom disruptions and by the -- you know, the kind of viral things that are happening in their school context that are, you know, fed by these platforms.

Q.    All right.  Do you agree that content on social media can be educational?

A.    So you'd have to give me a specific example.

But can content that is on a platform -- on a social media, on one of the defendants' platforms, could it be educational?

Q.    Yes.

A.    Could be.

Q.    Do you agree that material that is on social media platforms can be motivational?

A.    I'm not sure.

Page 202

Q.    And I want to -- I apologize that I didn't ask this before.

ATTORNEY LEHMAN:   I want to go back to the article that we were just looking at from Education Week, and I need to mark this as Exhibit Number 24.

-   -   -

(Whereupon, Exhibit Hoover-24, No Bates, What Is Driving Youth Mental Health Problems? It's Not Just About Social Media, Prothero, was marked for identification.)

-   -   -

BY ATTORNEY LEHMAN:

Q.    And my other question for you is, in this article, when you were talking to the reporter, Ms. Prothero, how did you define social media?

A.    I'm not sure.  I'd have to go back and look through the whole article.

Q.    Okay.  Well, at that point

when you were talking to Ms. Prothero, you didn't confine or make your definition consistent with just the four defense platforms, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So it doesn't look like I offered a definition of social media.

What I can tell you is that the -- since you've asked about the four defendants' platforms, those are, you know, by the work that I do with students and schools, the ones that are most often brought up and used.

So can I speak to, you know, the exact definition?  No, because there wasn't one offered here. When I speak about social media, it's talking about the platforms that young people are using, and those happen to be the defendants' platforms.

BY ATTORNEY LEHMAN:

Q. Are you aware that there is material on the defense social media platforms that actually supports mental health?

ATTORNEY YEATES: Object to the form.

THE WITNESS: You'd have to point me to specific information that you're speaking about.

BY ATTORNEY LEHMAN:

Q. Okay. Are you aware that content can be delivered in different ways depending on the specific platform?

A. I don't claim to be expert in all the delivery mechanisms of the defendants' platforms. So it's hard for me to answer that.

I imagine that they might be delivered differently.

Q. When did you personally form the belief that social media can harm adolescents?

A. When did I personally form

that belief?  That's an interesting question.

I mean, I think, you know, frankly, it would be impossible for me to put a date on it, right.  But I would say that it's -- it's been pretty clear, as we've seen more and more young people engaging with social media, that it's harmful.

So it's a hard question to answer because I think you're asking for a specific date or time period that I established an opinion on this or -- and I couldn't do that.  If that's what you're asking for.

Q.  Can you recall the first time that you publicly expressed concern about social media's impact on mental health?

A.  Oh, well, when you say publicly, I mean, again, I'm working in public with schools all the time.

So if you're saying if it's something, you know, on the record

Page 206

versus -- I mean, publicly, I would have been talking about this with schools for at least a decade.

Q. And was that -- was that belief influenced by any specific event or study or personal experience?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Event, study or personal experience? I mean, as you would imagine, as director of the National Center for School Mental Health, who's worked with about every state and hundreds of school districts, there are lots of events that -- you know, where social media comes up.

So is it one specific event that informed that opinion? No. It's lots of information and interactions that I have with schools and districts.

ATTORNEY LEHMAN: I am turning to a new topic, I just

Page 207

wanted to check in.  Do you need a break?  I didn't know what the plan was for lunch, because it's noon.

ATTORNEY YEATES:  Okay. Let's take a break, and I'll check on the lunch.

VIDEO TECHNICIAN:  The time is 12 o'clock p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 12:16 p.m., and we are on the record.

BY ATTORNEY LEHMAN:

Q.  We spoke earlier about your testimony before Congress.

ATTORNEY LEHMAN:  So I want to look at that.  And we'll mark these next two exhibits as 25 and 26.

Page 208

- - -

(Whereupon, Exhibit Hoover-25, No Bates, Written Testimony Submitted to the United States Senate Committee on Finance For the Full Committee Hearing, was marked for identification.)

- - -

(Whereupon, Exhibit Hoover-26, No Bates, Written Testimony Submitted to the United States Senate Committee on Health, Education, Labor, and Pensions (HELP) For the Subcommittee on Children and Families Hearing, was marked for identification.)

- - -

ATTORNEY LEHMAN:  So if we can start with Tab Number 21.

BY ATTORNEY LEHMAN:

Q.    And can you confirm this is your written testimony submitted to the United States Senate Committee on Finance for the full committee hearing?

Page 209

A.    Yes.    It appears to be my written testimony.

Yes.    There it is at the top.    Sorry, I was making sure it wasn't my oral testimony.    So, yes, I can see it was my written testimony.

Q.    And this was testimony you gave on February 15th, 2022?

A.    Yes.

Q.    And the topic here is protecting youth mental health?

A.    Yes.

Q.    All right.    And you testified about rising youth mental health needs, correct?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    I'd want to refresh my memory on exactly what I spoke to.

So it looks like the topic was protecting youth mental health and identifying and addressing barriers to care.    So this was for

Page 210

the finance committee.

And I'm just looking.

So I was speaking specifically to barriers to care. So if you're speaking about something specific, let me know.

BY ATTORNEY LEHMAN:

Q. Well, certainly, you were talking about factors that impact student mental health and the care that is available to those students, correct?

A. I have to go through to see where I spoke about factors that contribute to mental health.

Q. Well, let me ask you this: In this testimony before Congress on February 15th, 2022, did you mention social media at all?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'll have to read through the testimony to see if I mention social media.

It looks like I was speaking

more about what systems need to have and what policies need to be in place, not about -- I wasn't -- I wasn't really speaking about the contributing factors to youth mental health, upon my quick read of this.

BY ATTORNEY LEHMAN:

Q. Okay. You did not take the opportunity of your February 15th, 2022, testimony to the Senate committee on finance to at all address social media, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So let me just be clear about what happens when you go testify.

So, for example, for this committee, I was being asked to speak specifically about the topic at hand, which looks like identifying and addressing barriers to care. And I would

Page 212

have been, probably, asked to speak specific to comprehensive school mental health systems and what needs to be put in place for that, which it looks like I did, as well as what are some of the policies that need to be put in place to increase access to school mental health services.

So -- and then, you know, we spoke about, because it's a finance committee, what are some of the financing mechanisms to do that.

BY ATTORNEY LEHMAN:

Q.    Okay.  And none of the policies that you recommended during your testimony in February 2022 related to social media, correct?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    I can go back to the policies.

So what I would say, just in

Page 213

my view of looking at the policies, is that I'm talking about different aspects of school mental health promotion and prevention policies, as well as intervention and treatment policies.

It wasn't really specific to factors that contribute to mental health.

BY ATTORNEY LEHMAN:

Q. Okay. And just so we're clear, when you talked about the different aspects of school mental health, including promotion, prevention policies, none of those policies related to social media, correct?

A. I disagree with that, actually, I think.

Q. Okay. Then tell me -- tell me where -- what page -- we're looking at a five-page written testimony, where does -- where is social media referenced?

A. So --

Page 214

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So the question you asked, I believe, was -- and maybe we need to go back to the question.

But as I understood your original question, it was, do the policies that you recommended relate to social media?  And I would say -- in fact, I probably want to look at -- through each and every one of them, but just even the first few here, I would say, absolutely do.

BY ATTORNEY LEHMAN:

Q.  Okay.  So let's, as a starting point, point me to where the phrase "social media" or the name of any social media platform appears in this testimony.

A.  So I can go word by word. But I don't think that the term "social media" or the platforms need to be named

Page 215

for the policies to be related to social media or the defendants' platforms.

So, for example, if I'm suggesting the requirement of indicators for student mental health and well-being, and we know, from the body of literature and from our experiences working in and with schools, that social media is related to student mental health and well-being, then when we're requiring a selection of indicators, or recommending that, it would be related to social media.

So when you're speaking in front of a Senate finance hearing committee you have limited time. And so you also know that they're going to read, you know, the precise recommendations.

And so the absence of naming a single platform, for example, does not suggest that it's not related to the platforms or to the policies recommended.

Q. As you crafted your policy recommendations that you submitted to the

Senate, both orally and in writing, were you careful to specifically address the most important policies that you wanted the Senate to adopt?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So when crafting the policies, I would have likely considered the policies that I thought were most pertinent to the Senate Finance Committee with respect to identifying barriers and facilitators to school mental health.

BY ATTORNEY LEHMAN:

Q.    So that would -- that included, for example, to require a selection -- require the selection of indicators of student mental health and well-being, incentivize teacher education programs, establish mental health as a required component of the curriculum; those were the types of recommendations

Page 217

that you made, correct?

A.    Those are three of the list of recommendations that I made, that's correct.

Q.    Okay.

ATTORNEY LEHMAN:  Let's turn now to Tab Number 22, and we'll mark this as Exhibit Number 26.

BY ATTORNEY LEHMAN:

Q.    All right.  And can you confirm that this is your written testimony submitted to the United States Senate Committee on Health, Education, Labor and Pensions for the Subcommittee on Children and Families hearing on November 27th, 2022?

A.    Yes.

Q.    And here the topic was, Caring for Our Kids:  Supporting Mental Health in the Transition From High School to College?

A.    That's correct.

Q.    And your testimony here is a little bit lengthier.

Page 218

Do you know how much time you had to testify?

A.    Well, so let me be clear.

This is the written testimony.  So that doesn't suggest that my time to testify is actually lengthier than the time I had to testify for the other document you referenced, because that was written testimony.

Q.    How much time did you have for oral testimony in November of 2022?

A.    I don't recall the exact number of minutes.

Q.    And how much time did you have to testify when you testified in February of 2022?

A.    I don't recall the exact number of minutes.

Q.    Okay.  Is any social media platform, or even social media generally, referenced in your testimony from November 27th, 2022, to Congress?

A.    I'd have to read through the document.  It's multi -- multiple pages.

Page 219

So I'm happy to read through it.

So I've seen one so far on the second page.

Q.    Second page?

A.    Uh-huh.

Q.    Where does -- tell me where.

A.    Tell you where it references -- so it says, Make environments more nurturing in three of four ways.  And one of those is, Monitoring and setting limits on influences and opportunities to engage in problem behavior.

Q.    All right.  Where does it call out either social media generally or one of the platforms?

A.    Well, when -- it doesn't call out one of the platforms.

And as I said earlier, you wouldn't necessarily -- the absence of naming a platform in this context would not suggest that it's not pertinent here.

So when I'm talking about monitoring and setting limits on

influences and opportunities to engage in problem behavior, I -- most people who are working with young people and who are working in schools would recognize that social media is a part of that.

Q. Well, if you look at the bullet point above that, you specifically call out -- in what you describe as socially and biologically toxic conditions, you call out poor nutrition and housing insecurity.

Do you see that?

A. I do see that.

Q. So there you call out two specific instances.

Can we agree that not all adolescents suffer from poor nutrition or housing insecurity?

A. So not all adolescents suffer from poor nutrition and housing insecurity.

Q. Okay. So given that not all adolescents suffer from poor nutrition and housing security. But I understand

Page 221

you to have told me that social media is harming every adolescent.

There is no place in this testimony where you actually call out, like you do poor nutrition and housing insecurity, a social media platform, do you?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So to be clear, I think it's well understood by -- by the readers of this and by the Senate hearing that I was speaking to that social media is causing harms.

In the case of providing the context of poor nutrition and housing insecurity, it was likely because I thought they might not understand what biologically toxic conditions would be, so I was giving an illustrative example.

I think the third, Monitoring and setting limits on

Page 222

influences and opportunities to engage in problem behavior -- you asked if I referenced social media; to me, that's a clear reference.

BY ATTORNEY LEHMAN:

Q.    So are there any other -- any other references where the actual phrase "social media" or the name of a platform is used?

A.    I'd have to read through the document.

So, again, on Pages 3 and 4, we're referencing -- I'm referencing policies that are certainly relevant in the context of the impact and harms of social media.

Q.    Okay.  Point me to where it specifically either identifies a defendant's platform or talks about social media.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, it

doesn't specifically identify one of the defendants' platforms. And there's no need to in this context when I'm talking about policies here to support the mental health of young people in schools.

That's what I'm speaking to, the policies themselves. And I don't specifically use the term that you're asking about.

But if you're asking am I referring to the harms that are caused by social media in recommending these policies, the answer would be yes.

BY ATTORNEY LEHMAN:

Q. Okay. Let me just make sure I understand.

So you had the opportunity to submit written testimony to the Senate. These are literally the decision-makers of our country.

And you are making policy recommendations about how to support the

mental health of adolescents. And you do not take the time to call out social media, even though, according to your own words today, it is harming every adolescent in our country; am I understanding that correctly?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So to provide some context, this was also on the heels of the testimony of the Surgeon General, Dr. Vivek Murthy. And I had carefully reviewed Dr. Murthy's testimony as well, and there was ample information around social media.

My role in this was to speak specifically to policies that should be implemented in schools and in comprehensive school mental health systems. And that's what I did.

So there's already an understanding -- I think there's a

Page 225

general understanding in the field and the world around the impacts of social media on young people.

But my job here was to lay out policies specific to comprehensive school mental health and specific, you know, recommendations, for example, that could be taken legislatively to build and sustain comprehensive school mental health systems.

BY ATTORNEY LEHMAN:

Q. Have you ever written to any government official asking that there be changes in access to social media for adolescents?

A. That wouldn't be part of my role.

Q. Have you ever, in any of the presentations that you've given -- so we just looked at two, but we talked earlier about the many -- I think you called them major invited presentations.

In any of those major

CONFIDENTIAL

Page 226

invited presentations, have you ever taken the opportunity to encourage that social media be banned?

A.    I'd have to go back through.

I mean, again, I've had over 600 invited presentations at conferences. So to ask me to remember the specific content may be hard.  So I'm not sure if I can answer that.

I don't know that my role, typically though in those presentations, is to talk about whether -- you know, the banning of certain things or not.  I'm usually speaking to, you know, the science and what's happening in schools and school mental health.

So I don't know that I would have, but I may have.  I may have spoken about, you know, cell phone bans for -- in particular, to limit the use of the defendants' platforms.

Q.    And are you supportive of cell phone bans within schools to limit students' access to cell phones during

the instructional day?

A.    You know, what I can say is that we've seen some very well-intended attempts at cell phone bans in schools to try to mitigate some of the risk caused by social media engagement.

And I think that they are very hard to implement.  We've seen schools struggle to actually implement them.  So -- and for a variety of reasons, you know, families may want their children to have phones.  They don't necessarily want them to be on social media.  But there are a variety of reasons.

The engagement features of social media make it really tempting and almost impossible for schools to not have students on phones during the day.

So it's a tough question.  Am I supportive of them?  You know, I would say that they're hard to implement.  So I'm supportive of measures that attempt to limit social media engagement

CONFIDENTIAL

Page 228

by young people because it's inherently risky.

Q.    And what are the measures that you support that attempt to limit social media engagement by young people?

A.    You know, again, I wouldn't say that I'm savvy with every measure that could be taken.  You know, I think a lot of measures that could be taken are, really, in the hands and control of the defendants' platforms themselves, whether it's, you know, parental control features or age verification.  And those, you know, I think can actually, you know, potentially really limit some of the engagement.

So there are a variety of, you know, actions that possibly could be taken to limit control -- excuse me, to limit exposure to social media.

The things that I'm most familiar with are what, you know, schools can do to, you know, prevent and mitigate the harms of social media.  And that's

Page 229

really what I laid out in my report.

So that would be things like educating young people, educators, families about the harms of social media and educating them about navigating a landscape in which social media is consistently grabbing for their attention.

There's a lot of other things that we can do in schools in terms of mitigating. And those are, I think, pretty well laid out in my report.

Q.   Have you studied the parental control abilities of any of the defense platforms?

A.   So I know that they were discussed in some of the depositions that I reviewed.

But have I studied them in particular?  No.  That would not be something I had spent my time studying.

Q.   Have you studied the age verifications mechanisms for any of the defense platforms?

CONFIDENTIAL

A.    So the -- when you say have I "studied them," first of all, I would think the technology involved in that is not really at the fingertips of most people that are outside of the defendants' platforms' kind of knowledge base.

But I don't study that as part of my typical day-to-day work.

Am I familiar with, you know, the idea that there are age -- attempts at age verification, I should say, perhaps. But my interactions with young people, with families, with teachers is that they're really ineffective. They're not well known about. They're not well understood. They're hard to access.

So that's my understanding of the age verification features.

Q.    Okay.  Other than talking to people in your -- in your work and sort of anecdotally discussing with them their experience with age verification on the

defendants' platforms, have you undertaken any other effort to understand or learn about the age verification on the defense platforms?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, I mean, I'll restate that I looked to the depositions where they -- it was spoken about, the specific -- some of the specific, I imagine, attempts at age verification.

But, you know, is it something that I study? No. I mean, you know, the experts in the reports that I relied on in part for my opinions, they went more deeply into looking at the actual features of the defendants' platforms. So that's not -- that doesn't really fall specifically within my wheelhouse.

And, you know, you

characterize the discussions I have with people as anecdotes. But, you know, when you're hearing the same thing over and over and over from, again, parents, administrators, school districts, there does tend to be conclusions that you can draw, in part from that information, about the age verification quality, for example, and the ability to keep young people off of the platforms.

BY ATTORNEY LEHMAN:

Q.    Do you agree that you're not an expert in the actual design of defendants' social media platforms?

A.    I am not expert in the design.  I would think that the experts in the design of the defendants' platforms are in-house in the defendants' platforms companies themselves.

So they are the folks who have that know-how.

Q.    And is it correct that

Page 233

you're not offering an opinion about the actual design of defendants' social media platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, yeah, I probably would want to understand what you mean a little bit more by that question, because I certainly offer -- my opinions have to do with the design -- or at least some of the opinions that I offer have to do with the design features.

But I'm not offering specific opinions about specific features, as I believe maybe some of the other experts may have done.

So when I talk about social media and I detail this in my report, the design features themselves do certainly play a role in the harms that I'm

Page 234

speaking to and in the harms that I'm proposing to prevent and mitigate in the strategic plan.

BY ATTORNEY LEHMAN:

Q.    And do you have an opinion as to the specific harms caused by any one specific feature on a -- on a defense platform?

A.    So, again, I would rely more on the experts who dove more deeply into that, right, who looked at each specific feature.

What I can say is that, you know, some of the features that I'm aware of and that I've, you know, certainly spoken, during the key informant interviews and during discussions with school districts and school leaders and families in my work, speak about specific features, whether it's the auto play and scrolling or the -- again, I've already spoken to some, the lack of parental controls, the age verification; those things certainly get our young people on

Page 235

social media.

The features that keep them engaged and kind of amplify things that happen and then cause disruptions in the schools, those are the things that we hear about.

Am I expert in the technology that drives that?  No.  Am I -- do I consider myself expert in kind of the -- what happens as a consequence of some of the design features in our school settings and in terms of the young people's mental health?  Yes.

Q.    Do you agree that you're not an expert in how algorithms work?

A.    Well, algorithms is a broad statement -- or a broad term, I should say.

So I know what an algorithm is, I believe.  But it's probably -- that term is probably used differently in different contexts.

So maybe you can specify a little bit.

Q.    Well, when you think about an algorithm, what does it mean to you?

A.    Kind of -- let me think about how I would define algorithm.

So kind of a sequencing where if one thing happens -- this is not going to be an eloquent definition -- but if one thing occurs and it takes -- you know, there could be two pathways, right, after that thing occurs, if it's a yes/no -- I mean, I'm imagining a visual algorithm -- and if it goes one way, it would lead to one set of outcomes; if it goes another way, it would lead to another set of outcomes.

Q.    Have you ever reviewed the source code for an algorithm?

A.    I don't believe so.  That's not something I would necessarily do.

I certainly have done, you know, coding and work in statistics.  But I don't think I've looked at coding for algorithms for social media platforms.

My guess is a lot of that

nobody has reviewed, other than those folks who are working within the platform organizations.

Q.    Do you have a degree in computer science?

A.    No, I do not.

Q.    Have you ever taken a class in computer science?

A.    I have to think about that.

I don't think I've taken a class in computer science, but I'm not sure.

Q.    Do you have a degree in data science?

A.    Well, my -- part of my role as a clinical psychologist is to be able to understand data. And we're -- as I said earlier we're trained as scientist practitioners. So I can certainly understand data when I look at, you know, an academic article, for example.

But I think if you're talking about a data science degree, the answer would be no. A specific degree,

Page 238

no.

Q.    Do you hold yourself out as an expert in warnings?

A.    I do not hold myself as an expert in warnings.

Q.    Do you intend to offer any opinion about whether any of the defendants' social media platforms did or did not meet industry standards?

A.    I don't see that as my role in terms of the opinions.

I'm thinking through all the opinions that I offer.  They were not about industry standards, no.

Q.    Do you intend to offer any opinions about a safer alternative design for social media platforms?

A.    I'm trying to -- my opinions don't get at the -- no.  The answer would be no to that.

Q.    Are you offering any opinions about how the defendants responded to any concerns that have been expressed about their platforms?

Page 239

A. Can you say that one more time?

Q. Yes.

Are you offering any opinions about how the defendants responded to any concerns that have been expressed about their platforms?

A. No, that's not part of my opinions.

Q. Are you offering any opinion about the motive for any of defendants' actions or conduct?

A. I can't speak to the motives of -- no, I'm not offering an opinion on that.

Q. Are you offering any opinion about whether any of defendants' platforms should be banned?

A. That's not in my opinions, no.

Q. Are you offering any opinion about whether -- or strike that.

Are you offering any opinion about any of defendants' conduct or their

business practices?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yeah, it's an interesting -- I mean, so I certainly offer opinions about how the design of these -- of the defendants' platforms impact student mental health in schools.

So I don't know if that fits with -- under -- under the umbrella of what you're asking about in that question.

BY ATTORNEY LEHMAN:

Q.  Okay.  Understanding the opinion that you have just carved out.

Other than that, do you intend to offer any opinion about defendants' conduct or business practices?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I mean, it's hard to say.  I don't -- I am

Page 241

speaking, in my opinions, about the -- you know, how these defendants' platforms have impacted young people.

Whether that gets at their conduct? I mean, arguably their conduct is the development and design of these platforms. And so if I'm offering opinions about how those have negatively impacted our children and adolescents, I suppose it's -- I suppose the answer could be yes.

It's a little hard for me to understand, because the term "conduct" is quite broad. So if it's about all of the behaviors that have led to the design and development of these, perhaps.

BY ATTORNEY LEHMAN:

Q. Are you offering an opinion about who should pay for the 15-year comprehensive plan outlined in your report?

Page 242

A.    That's not part of the opinions that I offered.  I may have spoken to that in the context of the report.  It wasn't part of the opinions.

Q.    Do you hold yourself out to your colleagues an expert in digital technology?

A.    So what I would say is that under my expertise as, you know, director of the National Center for School Mental Health, part of that is looking at programming that is offered in schools.

And part of that is sometimes things that have to do with digital technology or digital literacy. So in that respect, yes.

Q.    Have you performed a Bradford Hill analysis in reaching your opinions in this case?

A.    Well, it depends how you would define how I've done a Bradford Hill analysis.

I mean, my understanding of the Bradford Hill -- I don't know if

you'd like to define it, but I'm happy to answer the question based on my understanding of that concept.

Q.    Sure.  What do you understand the Bradford Hill to be?

A.    So it's essentially a set of criteria that you use to determine or infer causality.  Often it's used in the absence of a, you know, randomized controlled trial, for example.

And it's a set of criteria that's, as I understand it, really widely accepted in the field in the absence of RCTs, for example, randomized controlled trials, which are often not feasible to do, right, and -- whether there's ethics considerations or logistics considerations.

So the criteria for Bradford Hill is really thinking about kind of what would need to exist or what are some of the things that would be in place for you to be able to infer or determine causality.

Page 244

Q.    And have you performed a Bradford Hill analysis in reaching your opinions in this case?

A.    So I've certainly used some of the criteria in the Bradford Hill kind of mechanism for determining, you know, whether something is causal or not, yes.

I mean, because, you know, as I mentioned, there are certain things that align with the research that I reviewed and the expert reports that show that there is data to suggest things like temporal sequencing, like multiple studies that show correlation, for example.

Q.    And what study do you believe shows temporal sequencing?

A.    Again, just like I answered before, given all of the studies I looked at, I would probably need to go back and review each of the studies to see which one actually looks -- one or more look at temporal sequencing.

And also, as I said, I also

relied on the expert reports that also used, you know, different articles.

So there's a lot of articles. So I can't name a specific article.

Q. Your report does not include a Bradford Hill analysis, correct?

A. I wouldn't say that. I mean, it's -- a Bradford Hill analysis, as you're calling it, is really using that criteria to determine whether there is causality or whether there's reason to believe that one variable might cause another.

And so actually I would argue that I did, I used that criteria.

Q. Okay. And do you set out anywhere in your report the Bradford Hill analysis, the evaluation of the nine criteria?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It's, I would say, throughout my report. If you

look at the background where I spoke through kind of the -- and referenced many different studies that look at the impact of social media on young people's mental health or on schooling, the -- many of those really fit with under -- fit under, rather, the criteria.

So, yeah, it's throughout the report.

BY ATTORNEY LEHMAN:

Q. But we can -- we can agree that there's nowhere in any of your reports where you identify each of the nine factors and go through an analysis with respect to each individual factor, correct?

A. You don't need to --

ATTORNEY YEATES: Object to the form.

THE WITNESS: That's not typically something I would do in practice, nor would many folks.

They wouldn't necessarily always say, I'm using the Bradford Hill criteria. It's kind of a well established set of criteria in the field.

So I think, you know, when you're publishing, for example, in peer-reviewed literature, or when you're speaking to it amongst academics, you wouldn't necessarily always say, and here are the specific criteria that fall under this, because it's a well understood set of criteria.

BY ATTORNEY LEHMAN:

Q. Do you agree that correlation is not the same as causation?

A. Of course.

Q. So do you agree that two things can be associated with each other but there might not be a causal relationship between the two?

A. Yes. There's certainly instances where there is a correlation or

association but not causation.

Q.    So, for example, a correlation might reflect bidirectional influences?

A.    Bidirectional influences, certainly.  Or reverse, yes; one way that you're anticipating it's not, yes.

Q.    And other factors commonly known as confounders or confounding factors can also come into play?

A.    When you say they can "come into play," you mean that that could -- tell me what you mean by that.

Q.    What I mean is a third factor could actually be causing the effect that you're attempting to evaluate.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know if you're talking about a specific study or a specific -- because I'm not attempting to evaluate anything in the context of that.

Page 249

But in terms of -- yeah, so I -- you probably have to restate it.

BY ATTORNEY LEHMAN:

Q. Sure.

Do you agree that -- well, what is your understanding of what a confounder is?

A. So in the context of a study --

Q. In the context of a study.

A. -- a confounder might be a variable that is influencing one or more of the variables that you're looking at that may not have been a hypothesized variable that you're directly studying.

Q. Okay. Do you agree that saying that there is an increased risk does not mean that there is a causal relationship?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Can you provide context for that?

Page 250

BY ATTORNEY LEHMAN:

Q.    Sure.

So would you agree that, for example, if you're looking at risk factors for a mental health illness, that just because someone has a risk factor doesn't necessarily mean that that risk factor has caused their mental health illness?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So if someone has a risk factor, does that mean that it has caused their mental health challenge or illness?

BY ATTORNEY LEHMAN:

Q.    Yes.

A.    Not necessarily.  But that may be hard to -- it may be hard to determine.

Q.    Okay.  When you use impact or association in your expert report, you do not mean causation, do you?

ATTORNEY YEATES:  Object to

Page 251

the form.

THE WITNESS:  So, you know, you'd have to point -- point me to a specific place in the report. But I certainly speak about causation in the report.

And, actually, when I'm talking about impact in many instances in the report, and certainly in my opinions, I'm speaking about social media causing the harms that we're talking about here.

So that one variable, social media, leading to the outcomes that we're talking about, whether it's school outcomes or student mental health and well-being, yes.

BY ATTORNEY LEHMAN:

Q.    Do you agree that in order to determine whether or not an association is valid or true that bias and confounding must be ruled out?

A.    So what I would say is that,

Page 252

you know, there's a lot of -- a lot of ways that we might come to the determination, in the public health field or in the mental health field, about causation.

And it's certainly important to look at confounding factors.  Can you rule out every single confounding factor in a study?  Most studies don't have every possible confounder.  Do we attempt to look at confounders?  Certainly.

And you talked about -- I think you said -- it was kind of a double question.  You also --

Q.    I also asked bias.

A.    So about bias.

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY LEHMAN:

Q.    So let -- I'll --

A.    If you want to restate that.

Q.    Sure.

Do you agree that in order to determine whether an association is

Page 253

true or valid, bias must be ruled out?

A.    I don't even know that I know what you mean by that, when you say "bias must be ruled out."

What kind of bias are we talking about?

Q.    Well, you're aware that there are multiple different kinds of bias, correct?

A.    There's -- yes.  That's, I think, why I'm asking the question.

What do you mean by bias?

Q.    So, then, my question to you is this:  What are the types of bias that you're aware of?

A.    In terms of, I mean, there's -- I can name some.

There's implicit bias.  I mean, I often think about bias when we're -- when we're talking about the school context.

So in teaching, for example, you might have implicit bias or explicit bias.  You may have bias -- you know,

someone might be biased against someone because of their prior experiences, which is related to the implicit and explicit bias that we're talking about.

So if you're talking about a specific bias, I'm happy to know what you're talking about.

Q. Well, let's -- let's walk through them.

Do you agree that bias can produce error in the outcome of a study?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Can you just tell me what you mean by "bias"? Since you said there's many forms of bias.

BY ATTORNEY LEHMAN:

Q. Sure.

A. What kind of bias are you speaking about?

Q. So I'm speaking largely about selection bias, dropout bias, information bias, recall bias and

Page 255

confirmation bias.

A.    So those are all things that we may want to consider in the context of a study, certainly.

Q.    And so do you agree that bias, including the biases I've just set out, can produce error in the outcome of a study?

A.    They can produce error.  And that's why we are rigorous in our studies about trying to rule those things out.

You know, there are certainly other things, you know, that we just talked about that could introduce potential error.

Just because there are things that can cause error, though, certainly does not mean that you can't draw conclusions, even if there is the potential for error in a study.

I mean, that's why you do multiple studies, it's why you have peer-reviewed processes, so that you can look at the rigor of the study and the

Page 256

potential for error to actually influence the outcomes.

Q.    Do you agree that causation cannot be determined based on a correlational study?

A.    No, I disagree with that, actually.

So, first of all, I would never necessarily draw a conclusion just from one study.  But, you know, there's -- it's well established, and I think we just talked about some of the criteria that's used to draw conclusions about causation.

And one of those is, if you have multiple correlational studies, now that's just one criteria, but if you do have multiple correlational studies, that certainly can contribute to our understanding of whether something is causal.

There are other things you might want to consider as well.

Q.    Okay.  Do you agree that it

Page 257

is not appropriate to make a causation determination based solely on correlational studies?

A.    So I wouldn't agree with it how you said it.

I think that correlational studies is one of the things that you can use to draw conclusions about causation.

And cross-sectional studies can actually offer a lot of good information about causation, right. Especially if you have, I mentioned already, temporal sequencing within it or if you have multiple correlational studies and if those studies have been conducted, you know, with different populations or in different settings.

Again, we're kind of going back to the Bradford Hill criteria.  But yeah.

Q.    And you said that you offer opinions about causation in your report.

And are you able to reach those causation opinions without relying

on correlational studies?

A. Well, that would be a hypothetical, I think, because there are correlational studies that demonstrate the social -- the impact of social media.

Q. And let me -- let me just be clear. I'm not asking you at all a hypothetical question.

I am asking you in your analysis of causation, are you able to reach that causation opinion irrespective of the correlational studies?

A. I don't have to.

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't have to. I mean, again, it is a hypothetical, because the correlational studies exist.

So I don't have to -- I wasn't asked to draw a conclusion without the wealth of studies that do exist looking at association, for example.

Page 259

BY ATTORNEY LEHMAN:

Q.    All right.  So that's not an analysis that you have performed, i.e., determining if social media causes the harms outlined in your report without relying on the correlational studies?

A.    That would be very --

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That would be very atypical, that somebody would then just disregard the correlational studies that exist and say, well, could I just determine this without those?

That's just not -- I wasn't -- that wouldn't be something that I would do.  And I think you use the studies that you have -- in this case that you're speaking about, the hypothetical case, you know, correlational studies, you would use those to contribute as one piece of

Page 260

information towards your conclusions, which is what I did.

BY ATTORNEY LEHMAN:

Q.   Okay.  All right.

ATTORNEY LEHMAN:  It's shortly after 1:00, and I think our lunch has been sitting around for maybe an hour.  So I don't know if there's mayonnaise on those sandwiches.  But perhaps now is a good time to take a lunch break.

THE WITNESS:  Sounds good.

VIDEO TECHNICIAN:  The time is 1:02 p.m., and we are off the record.

- - -

(Whereupon, a luncheon recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 1:52 p.m., and we are on the record.

BY ATTORNEY LEHMAN:

Page 261

Q.    What are the Bradford Hill criteria, like, what are the specific factors?

A.    I don't know that I can name every one of them offhand.  But I can speak to some of them.

So they include things like having multiple correlational studies.  I know one of them is having kind of temporal sequencing.  I believe one is having multiple studies across -- or, rather, let me rephrase that, having studies across various populations or areas.

So those are a few of the criteria.

Q.    Can you remember any other of the specific factors in Bradford Hill?

A.    I'm not sure if I can offhand.

Q.    Okay.  In your analysis that you performed, how did you weight each of the Bradford Hill criteria against each other?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I took all of the information I had to inform my opinion. Generally, when I'm forming an opinion, I don't think about it like that, like, I don't think, you know, this criteria was 3 percent of my decision and this criteria was 10 percent of my decision.

So I don't -- I don't think about it like that. I don't think that's typical as kind of how I would form opinions or conclusions.

BY ATTORNEY LEHMAN:

Q. Did you perform a Bradford Hill analysis for any individual social media platform?

A. So I didn't distinguish -- the answer would be no to that. Did I conduct a Bradford Hill analysis for any individual platform? No.

Page 263

Q.    Did you perform a Bradford Hill analysis for any specific feature on a social media platform?

A.    Well, I mean, so it's an interesting question, I guess, even thinking about the last question you're asking, did I form a Bradford Hill analysis.

We think about -- or at least when I think about Bradford Hill, you're using a set of criteria, and the idea is that if you have some of these criteria, it helps you to make a determination about causation, especially in the absence of other, you know, types of evidence.

And so did I use -- I think the question was -- you can restate the question.  But I believe -- go ahead.

Q.    So my specific question was, did you perform a Bradford Hill analysis for any specific feature on a social media platform?

A.    So, again, I mean, I think

Page 264

as I thought about and as I formed the opinions, it's really -- you know, I wasn't thinking or pulling -- teasing apart each specific feature.

And, frankly, you know, when I look to the reports of some of the other experts, they, as I mentioned earlier, dove much more deeply into the kind of distinctions between features.

So I wouldn't say that I was performing an analysis. But did I consider kind of the studies, as I was reading different studies, which elements of Bradford Hill may be relevant for that particular study? Yes. And did some of the studies that I looked at possibly focus on specific features? Yes.

But, again, if you're asking about did you look at this specific study and consider it, I would have to go back to each of the studies.

Q. And as we sit here, are you able to identify any specific study that is relevant to any specific element of

CONFIDENTIAL

Page 265

the Bradford Hill analysis that you performed?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So as we sit here, I would have to go back and look at every one of the studies.

But what I can say is that the Bradford Hill criteria is something that you -- that you and that I would consider, that I considered generally in looking at the information that I get.

It's just something that you do as part of your practice. You're thinking about -- I mean, it really is a way of thinking about all of the evidence that you have.  And so you're thinking about, you know, each of these different things and how does it inform your conclusions.

So I'm not sure that I would be able to say, this study, you

know, just sitting here, because I don't have the studies in front of me, and I don't -- you know, I can't infer just from the list of studies.

BY ATTORNEY LEHMAN:

Q.    What conditions do you intend to testify are caused by social media?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    It's hard for me to predict what would be asked. So I don't know that I'm intending to testify to anything specific, because I can't necessarily predict what would come up in the context of testimony.

BY ATTORNEY LEHMAN:

Q.    I understood your testimony before lunch to state that you had made -- reached an opinion that social media caused harms.

And so what I'm -- what I'm

CONFIDENTIAL

Page 267

asking for is when we say -- when you talk about what harms are caused by social media, what harms is it your opinion are caused by social media?

A.     Okay.  I mean, I'm happy to go back to my report and lay out what I've described in my opinions as far as the specific harms.

So in Opinion 1 in the May 16th report, I spoke about negative impacts on their ability to effectively learn and succeed in school and on their mental health and overall well-being.

And in Opinion 2, I went on to describe impacts or harms specifically associated with students' social media use, including increased distraction from instruction and decreased academic focus and learning; erosion of in-person social skills development; diminished teaching effectiveness; and detrimental effects on student mental health.

And I named a few here, including disruptive sleep pattern --

Page 268

disrupted sleep patterns, increased symptoms of anxiety, depression and self-harm and greater levels of body dissatisfaction and negative self-comparison.

In Opinion 3, I then went on to talk about how schools have then been required to expend and redirect already limited resources. So I would consider that a harm.

And districts and schools, I spoke about what they've been increasingly tasked with doing, so addressing mental health challenges arising from students' social media use, educating students on the risk and responsible use of social media, managing behaviors such as distraction during instruction, peer conflict, emotional disregulation and addiction as a result of social media, and navigating strained family-school partnerships, with social media-related concerns dominating time meant for educational engagement.

So those are the opinions that I offered in my general report.

Q.    And have you performed a Bradford Hill analysis for each individual condition that you outlined, including negative impacts on learning, mental health, distraction, decreased academic focus, decreased social skills, disrupted sleep patterns, body -- body dissatisfaction?

A.    I mean --

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So arguably, yes, in the sense that did I consider the -- all of the factors that would lead me to infer causation?  Yes.

And that's really what Bradford Hill is about.  It's about looking at different criteria that you can use to infer causation.

And so part of my opinion

Page 270

development was using that criteria.  Part of it, as I laid out in the report, was also relying on the information from the expert reports.  And part of it is relying on my work with school districts for decades.

BY ATTORNEY LEHMAN:

Q.    Okay.  Is there any place in your report where you specifically set out each of the Bradford Hill criteria and address them uniquely for each of these individual harms that we've just talked about, including mental health, negative impacts on learning, distractions and so on?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Doubtful, because that would be very atypical to do in this type of report.  That would not be how I typically would write a report, is to go through every harm and then

write out every single Bradford Hill criteria and think about it in -- I shouldn't say think about it -- but write about it in a report like this.

So that would be very atypical.

BY ATTORNEY LEHMAN:

Q.    And other than in the social media litigation, how many other times have you submitted an expert report?

A.    I haven't.

Q.    When you say -- you've referred me back to your report and the specific opinions about harms and you've just outlined them for individual opinions.

In your report, you have, in a number of locations, footnoted support for a specific sentence or statement.

In those footnotes, are you citing all of the support that you rely on for that individual statement?

A.    I'd have to go through

CONFIDENTIAL

Page 272

statement by statement.  I'm happy to look at specific statements.

But I can tell you, generally, that, as I stated in the methodology in the report at the outset of the report, that the opinions are informed not just by the literature cited but also by expert reports, which I did cite, but also by my extensive experience working with schools and families.

Q.    And appreciating that this is all informed by your experience with schools and families, as you wrote the report and you included footnotes with either references to other expert reports and/or studies, were you including the best support that you had for your assertions in the footnotes?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think the term "the best" is a bit subjective.  Because I would argue in many cases some of -- some good

information that you can get -- I don't know that I'll restate the term "the best," because, again, I think that's subjective -- but there's a lot of really valuable ways that you can gather information to draw conclusions, part of which really is based on working directly in the field with families and schools.

So I think that's often some of the most realtime information that I can get, you know. When I'm hearing daily from teachers, administrators, school board professionals, school administrators, superintendents that social media is harming their children, to me, that is a piece of very good information.

So is that the best -- are you asking if one citation is the best information I can get? I'd have to say no. And that the term

Page 274

"best" is pretty subjective.

BY ATTORNEY LEHMAN:

Q.    Okay.  Well, let's just --
let's take an example.

So in Paragraph 63 of your
report --

A.    The May 16th report?

Q.    The May 16th report.

Paragraph 63.  You make the
assertion, that quote, Many students
engage with social media late into the
night, disrupting their sleep and
negatively affecting their academic
performance.

And immediately following
that is Footnote 44.

Do you see that?

A.    I do.

Q.    Okay.  And Footnote 44 cites
to a study published in 2024 by Nafisah.

Do you see that?

A.    I see that.

Q.    And I apologize, how do you
say that, the lead author's last name?

A.    Your guess would be as good as mine.

Nafisah would be my guess.

Q.    Okay.  So, just, I want to make sure, in circumstances like this, you didn't -- you didn't hold back citations to studies that supported your point, you included them in the footnotes, didn't you?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  If I understand your question, you're asking did I include a footnote that supported the sentence?

BY ATTORNEY LEHMAN:

Q.    Well, it's a little bit different.

A.    Okay.  So restate it.

Q.    In the footnotes that you include, you include the references that support your point, don't you?

A.    So we're talking about one specific sentence.  So here I include one

reference that supports my point.

This particular sentence, since you've called it out, is also completely aligned with my experience from the key informant interviews for all of the bellwether districts and from speaking with school personnel and district personnel for years about the impact of social media.

Q. Okay. So I understand.

It would be impossible for you to put in your 20 years of experience, right? Hard to -- hard to footnote that.

But my question is this: Does your report accurately reflect what you believe is the scientific peer-reviewed literature that supports these opinions?

And, yes, I've called out this one example with the sentence in Paragraph 63 and Footnote 44.

And so my question is, have you -- have you documented what you

believe is the science that supports the opinions that you have included in your reports?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I've absolutely documented science that I think speaks to the statement in this particular sentence related to social media disrupting students because they're engaging with it late into their night and disrupting their sleep.

And I don't think it's hard to document my level of experience.  In fact, I start the report out with that, with 25 years of experience.  And I'm very clear that a number of the conclusions really are also formed based on that extensive experience.

BY ATTORNEY LEHMAN:

Q.  Okay.  And so is it correct

that throughout your report you have included footnotes with the peer-reviewed scientific literature that supports your statements, or is it that you have failed to do that?

ATTORNEY YEATES:  Object.

BY ATTORNEY LEHMAN:

Q.    I just want to make sure.

I -- I feel like -- to me, I'm asking a very clear question.  And I feel like we're talking past each other.  So I just want to make sure.

Have you included footnotes with the literature that you believe supports your assertions in your report?

A.    I think I've already answered that.

I've put citations in my report that I do believe support the statements that they are directly coming after.

Q.    Okay.  So yes.  All right.  Understood.  All right.

Are you able to separate out

what percentage of the harms that you have outlined for us were caused by any specific platform?

A. So I would not be able to, sitting here at this moment, be able to say, for example, TikTok contributed 30 percent to sleep disruption and, you know, Meta contributed 20 percent.

I'm making an -- you know, coming up with a hypothetical example here.

So, you know, the -- as I mentioned earlier, the experts who looked more specifically into the plat -- distinctions between platform use may have, you know, gotten into that a little bit more, in terms of the distinctions.

But I could not tell you nor would it be typical for me to be able to say, you know, that this platform contributed this and this platform contributed this.

Q. Are you able to separate out what percentage of the harms you have

Page 280

outlined were caused by features of social media versus the content on social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yeah, I mean, you know, what I can tell you is I think it's quite difficult, first of all, to separate the two, to separate content from features.

I think there's this kind of false notion that, you know, it's -- there's positive content and negative content and the negative content harms our young people, our children, adolescents, when in fact it's often just the process of engagement of our young people, right.  They are engaging compulsively.

So I think about -- when I think about kind of what's harming schools, we see students who are checking their phones, you know,

Page 281

hundreds of times, right, during the school day.

I think it was during the school hours, you know, the Telzer report looked at an average of six -- I think -- I think, I'd have to reference my report -- but an average of 65 times in a day.

So you can imagine in a school day that that's directly impacting what's happening with, you know, classroom instruction, students' ability to learn, et cetera.

So I would say that, you know, the design features that you're talking about, regardless of the content, are absolutely contributing to the disruptions and the harm.

And I find it -- I would find it very hard to divorce the two.

BY ATTORNEY LEHMAN:

Page 282

Q.    All right.  Can you name any study that looked at features and controlled for the content?

A.    I'd have to go back to all the studies to look through them.

Q.    For what population are you analyzing potential cause and effect in your Bradford Hill analysis?

A.    I'm sorry, can you just say that one more time.  I got distracted.

Q.    No problem.

A.    I just looked away.

Q.    For what population are you analyzing the potential cause and effect in your Bradford Hill analysis?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  For what population?  So my report is specifically, you know, looking at -- well, it looked at studies that had different age ranges.  So it's a bit of a difficult question to answer in that sense.  Because

the different studies I looked at had different age ranges.

The recommendations in the strategic plan are specific to K through 12, which is typically about age 5 to age 18.

BY ATTORNEY LEHMAN:

Q.    Do you agree that studies performed on social media use for, say, college students in another country, such as China or Pakistan, would not be generalizable to high school or middle school students in the United States?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So I would not agree that you would not use that information in drawing opinions. It doesn't mean that you would use that information from one study -- I wouldn't use any information from one study from a sample in the United States.

But generally, you know, we

Page 284

are -- we're -- we think about studies that come from across the globe. Like, we don't just restrict ourselves to thinking about students in the U.S.

Do we think about students in the U.S. in some of the studies? Certainly. But would I discard a study because it was about, you know, students from another country? No.

And with respect to college students versus high school students, I think you can gather, actually, some information about what's happening with students at the college level and consider what the experience might be for high school students as well.

Again, would that be the only piece of data that's used? Not necessarily.

BY ATTORNEY LEHMAN:

Q.    If an author wrote in their

Page 285

paper that it's not generalizable to students in the United States, would you disagree with the author?

A.    Well, what I can say is that very often, you know, it's standard practice for authors to list out their limitations.  And I would say it's pretty common for authors to say this information is not generalizable, because they don't want to suggest that this is going to apply to every single student that was not within the study.

That does not mean, though, that you can't actually use the information.  If -- I mean, if a study was only relevant to the students that were in that study, there's no reason to publish it, right.

The reason that things get put into the peer-reviewed literature is because it can have implications and application to other populations.

Q.    Well, but the reason that authors put limitations in their paper is

Page 286

to ensure that the study is not used inappropriately by other people, correct?

A.   I -- I don't know that I would agree with that, actually.

Q.   Then is it your -- do you believe that papers should contain limitations at all?

A.   Do I believe that papers should contain limitations?

Q.   Yes.

A.   Yes.  I think that's pretty standard practice, for people to include limitations as part of their, you know, submitted peer-reviewed literature, yes.

Q.   And don't you agree that the limitations are beneficial to allowing other people who are reading the paper to understand how that information can be interpreted and applied?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It depends.  I mean, you know, there are hundreds of thousands of research articles

that are published, right. And so people put -- I can't speak to the intention of why people are putting limitations in.

Generally, as a scientist, we might read the limitation section and use that information to kind of think through how we might interpret the data.

But I have to say, many authors don't list out the limitations of their studies or they might list some limitations and not others.

So I wouldn't, you know, rely exclusively on what an author says about their own limitations.

I would also, as a scientist, think about what do I see the limitations of this study being?

BY ATTORNEY LEHMAN:

Q. When was the first -- when was there first a statistically

significant association between social media and the harms outlined in your report?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know that I can answer that. I'm not sure the specific date that an association was determined.

BY ATTORNEY LEHMAN:

Q. Is it correct that correlational studies assess both exposure, so in this case, social media, and the outcome, in this case, the harms in your report, at the same point in time?

A. It completely depends on the study. So it depends, is the answer.

Q. What is your definition of a correlational study?

A. So a correlational study is a study that looks at the association between variables. It could be two variables. It could be more than two

Page 289

variables.

Q.    Do you agree that correlational studies cannot establish temporality, namely which event came first?

A.    No, not necessarily, if a study actually has a temporal sequencing.

So, for example, if somebody is studying the -- you know, exposure to social media platforms, and then within that study they look at its association to sleep disruption, and they're looking at use of social media during the day and then sleep disruption that night, that could be considered a correlational study, but it has temporal sequencing in it.  And so it can be used to consider causal -- causal inference.

Q.    Okay.  So you would disagree, then, with all of the literature that states that correlational studies cannot establish temporality; is that correct?

ATTORNEY YEATES:  Object to

the form.

THE WITNESS:  So you're asking me to know every study, then, that's ever been written about that?

BY ATTORNEY LEHMAN:

Q.    No, not all.

A.    Maybe rephrase the question. Okay.

Q.    Not at all.

A.    Because you said would I disagree with all of the studies.

Q.    Would you disagree with the textbooks and other statistical manuals that state that correlational studies cannot establish temporality?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I -- that's not something that I would agree with in general, that correlation cannot include temporal sequencing.

BY ATTORNEY LEHMAN:

Q.    You mentioned, when we were talking before lunch, that correlational studies were part of the material that you reviewed.

So in addition to correlational studies, what are the other types of studies that you reviewed?

A.    Oh, well, I'd have to go back and look at all the studies to know the specific designs of each of the different studies.

Q.    And did you -- in making your analysis and reaching your conclusions, how did you weight the different types of studies that you reviewed?

A.    Well, again, I weighted -- I weighed the studies that I was looking at along with other sources of information.

So I looked at studies.  And usually we think about the scientific rigor of studies as we're looking at them.  The studies I included were largely, for the most part -- I would

Page 292

say, the studies specifically were from peer-reviewed articles. And so with that, once they're in a peer-reviewed journal, there's some level of scientific rigor.

But, you know, in terms of how I looked at the different articles, I don't know that I, then, looked at them relative to each other with respect to strength of the science.

So I'm not sure if I answered your question specifically, but --

Q. When you were performing your analysis and reaching your conclusions, how did you weight different study designs?

A. I don't know that I thought about it in that sense, weighting the different study designs.

I mean, I certainly considered the study designs as I was reading through the articles. That's something I would do as a scientist.

CONFIDENTIAL

Page 293

But, you know, you weight -- you weigh a lot of things as you're drawing opinions, not just kind of the study design. That might be a piece of it.

Q. What is the relative risk of an adolescent who uses social media for one hour a day to experience mental health impacts compared to a student who does not use social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know. That's not my area of study.

BY ATTORNEY LEHMAN:

Q. Okay. What is the magnitude of the association between student social media use and mental health harms?

A. Can you repeat the question? I'm not sure that I know what you mean by that.

Q. What is the magnitude of the association -- I'm speaking of quantification of the association --

Page 294

between student social media use and mental health harms?

A. I don't think I can answer that specifically.

Different studies have determined different magnitudes of association. So I don't know that there is an agreed-upon specific magnitude, a number, if you're looking for a specific number. I don't know that I can say there is one number.

There is consensus that there is harm. And, again, my role was to think about the harm that's being caused to children and adolescents. And as a public health issue, then, what should be put in place, what could be put in place to prevent and mitigate that harm.

Q. So I want to follow up on something you just said.

You said, quote/unquote, there is consensus that there is harm.

So are you telling me that

Page 295

you did not review any peer-reviewed studies that found that there was no causation between social media and mental health harms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I would not say that that's accurate.  I reviewed literature that included information about association, as I've already said.

And from the information, the articles that I reviewed, it certainly pointed to the conclusions that I came to in the opinions, which had to do with causation.

BY ATTORNEY LEHMAN:

Q.   Okay.  Did you analyze dose response?

A.   If I recall correctly -- again, I'd have to look to the specific studies -- but I know that there were certain studies that do look at dose

Page 296

response in terms of kind of the -- the time spent and the relative impact.

Q.    Can you identify any of the studies that you rely on in your personal analysis of dose response?

A.    Not offhand.  Again, there's so many articles that it would be something I'd have to go back and look at them all again.

Q.    In a school where students do not use social media, would you still recommend the same comprehensive plan that you outlined in your report?

A.    I have yet to be in a school where students are not using social media, so that would be really hard to imagine.

It's a hypothetical that's, frankly, almost impossible to imagine at this point.

Q.    Okay.  But I'm asking, if you -- if you were asked to consult -- you're hired as a consultant for a school and they say -- you know, you get there

Page 297

on day one, they're informing you about their student population, what's going on, and they say, our students do not use social media.

Would you still want to implement the same plan?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's a hypothetical that just doesn't exist.

If they said that, I would say, then you don't have an understanding, probably, of your students.

I mean, because, you know, again, the number of schools I've worked with over the years, the number of districts, it certainly would be completely out of step with any school that I've encountered.

So it's -- it's -- you know -- and I wouldn't even know

Page 298

what is meant by that, they don't use social media during the day, which I've also not seen, they don't use social media at night.

It doesn't exist. I mean, that would be a world in which the defendants' platforms didn't exist, frankly.

And so I just -- I don't know how to answer that question.

BY ATTORNEY LEHMAN:

Q. Do you attempt to quantify how much students in a school or school district are using social media before you develop a plan?

A. Are you talking about this specific plan?

Q. No. I'm talking about in your consulting practice, outside of litigation, when you -- when you're going to help a school district and you've put together a plan -- have you done that situation, where outside of this litigation, you go and develop a

comprehensive multiyear plan for a school district?

A. So I worked with many school districts, and I've developed plans for them. I've worked with them on developing their own continuous quality improvement plan.

Yes. So the answer is yes.

I think you asked a different question before, but I've forgotten it already.

Q. My question is, when you do that, when you go to a school -- this is outside of litigation and you're going to help them develop a plan -- do you attempt to quantify how much their students are using social media?

A. What I've done before in the context of many of those consultations is talked with them about their perspective on the impact of social media on young people, which, to me, would be important to understand versus necessarily the number of minutes that each student -- I

mean, frankly, I know from working with school systems that they likely don't have the data infrastructure yet to capture the data that you're even asking me about.

So, instead, what I would ask is -- what I would typically ask, what do you imagine the harm -- not what do you imagine -- what do you experience the harms to be of the students in your schools?

Or the "impact" is usually the term I would use. So that they could give their perspective on their perception and their experience of the impact of social media.

Q. A student who does not use social media -- let me start again.

Do you agree that a student who does not use social media should still have access to a school counselor?

A. Yes. I would agree that a student who does not use social media should have access to a school counselor.

Q.    Do you agree that a student who does not use social media should still receive digital literacy education?

A.    Yes.  I would argue that students should receive digital literacy education.

Q.    Do you agree that a student who does not use social media should still receive mental health literacy education?

A.    Yes.  I would argue that they should.  The content of the mental health -- mental health literacy may, you know, be impacted by their behaviors, including whether they're engaging with social media.

But, yes, I think that student should receive social media -- excuse me, mental health literacy.

Q.    Do you agree that a student who does not use social media should still receive training and education about life skills?

A.    I do.  And if we're talking

Page 302

about life skills specific to social media -- I mean, again, there's so few students at this point who are not exposed to social media, or at least the harms associated with social media, that it would be, I think, irresponsible to suggest that people not get educated about social media when there is certainly a likelihood that they will be exposed and that they will be, then, exposed to the risks.

Q. Do you agree that a student who does not use social media should still receive education about screen time management for uses of digital devices other than social media?

A. Sure. I mean, there's no reason that student shouldn't receive education about screen time management.

And they should also receive information about screen time management that is specific to social media, because we know from the data that most screen time for children and adolescents is

social media.

Q.    When you use the term "cyberbullying," what is your definition of cyberbullying?

A.    So in the context of this report, when I'm speaking about cyberbullying, I'm talking about bullying that is occurring in the context of the defendants' platforms.

Q.    Do you agree that cyberbullying can occur via text message?

A.    I think that cyberbullying -- that's interesting.  I mean, I wouldn't have used that term necessarily to describe bullying behavior that happens over texting.

And certainly in the context of this report when I spoke about cyberbullying, it was really with respect to what's happening on the defendants' platforms.

Q.    Do you agree that cyberbullying -- let me ask it this way: Do you agree that bullying can occur via

text message?

A.    I agree that bullying could occur via text message.

Q.    Do you agree that bullying could occur via e-mail?

A.    I -- so bullying could occur in a variety of different forms, including on e-mail, yes.

Q.    Do you agree that bullying could occur via other digital communications where there's a messaging component, whether that's a gaming platform or some other social application that's not one of the defendants' social media platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So bullying could occur on a different mechanism.  I think you mentioned gaming as one example.  It could occur on that platform.

BY ATTORNEY LEHMAN:

Q.    Do you agree that a student

Page 305

who does not use social media should still receive anti-bullying, including cyberbullying, support?

A.    So when you say anti-cyberbullying support, what I would say is that I think it's incumbent upon schools, given, you know, the exposure to cyberbullying, that there is -- when I say "incumbent upon schools," it -- schools are a good place for this to happen, because we know that schools are where kids can get educated about things.

So do I think that students who are not using social media should be educated about cyberbullying that occurs on social media?  Yes.  Because they are at risk for engaging with social media.

And they also -- whether they're a bystander or whether they're a peer of somebody who is getting bullied, let's say on social media platforms, it's pretty important for them to understand that and what that's like.

So I do think that it's

Page 306

important, yeah.

Q. Do you agree that a student who does not use social media should still experience a positive school culture?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I would hope that all students would experience a positive school culture.

BY ATTORNEY LEHMAN:

Q. Do you agree that a student who does not use social media should still receive targeted mental health support if needed?

A. Yes. I would agree that students who need social media -- excuse me, who need mental health services should get it -- should get them.

Q. Do you agree that a student who does not use social media should still receive a referral to community-based wellness programs, if needed?

A.    Students who need mental health services should receive the supports that they need, whether it's a referral to a community provider or an on-site provider, yes.

Q.    Do you agree that technology has changed over the last 15 years?

A.    Certainly technology has changed over the last 15 years.

Q.    In the plan that you outline in your report, do you address the development and spread of artificial intelligence?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    That was outside of the scope of my report.

BY ATTORNEY LEHMAN:

Q.    Do you agree that social media platforms have changed in the last five years?

A.    Again, I don't consider myself expert in all of the features of the defendants' platforms, for example,

Page 308

but I would imagine that they have increased ways of engaging students and that there are ways that it's likely changed over time.

Q.    Do you know whether social media platforms have been created or disappeared over the last five years?

A.    I can't speak to that specifically, no.  I imagine possibly yes.

Q.    Have you studied, in any way, the changes in the last 15 years on any social media platform?

A.    Have I studied specifically the changes on the social media platforms?

Q.    Yes.

A.    No, not -- not systematically, I haven't studied the changes on the social media platforms.

Q.    Have you looked at any data about how content changes on social media platforms?

ATTORNEY YEATES:  Object to

Page 309

the form.

THE WITNESS:  I don't even know that I understand what you're asking with that question.

BY ATTORNEY LEHMAN:

Q.    Sure.  Sure.

Are you aware, based on your use of social media and conversations that you've had, that the form of content on social media platforms is constantly changing?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know. I'm not sure what you mean by the "form of content."

BY ATTORNEY LEHMAN:

Q.    Well, are you aware that the content that is popular is constantly changing?

A.    I mean, would it surprise me that content might change over time?  No.

Q.    Does your -- does the program that you outline in your report

have any mechanism to keep up with changes in social media, whether it's features or content or even broad platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So first of all, it's -- you mention a program.  So what I've recommended is a comprehensive set of recommendations.  And it's laid out over a number of years to address changes -- and I speak specifically to this in my report -- to address changes that might occur, but also to really address the harms that have already occurred for young people and that may continue to occur with exposure to social media.

BY ATTORNEY LEHMAN:

Q.    Now, you state in your report that the 15-year timeline mirrors other successful public health responses

Page 311

to youth risk behaviors.  And you used tobacco as an example.

Is there any other peer-reviewed article that you would cite supporting the analogy that you are making between addressing social media and tobacco?

A.    So can you point to where it is in my report so I can just look to the citation that I did use?

Because you're asking me about other citations, so I want to make sure that I --

Q.    Sure.  It's Paragraph 107.

A.    Right.  So here I cited the Office of the Surgeon General report, which, to my understanding, is really the most kind of comprehensive look at the study.  So I didn't see a need to cite a different reference here.

Are there other reports and studies on this?  Perhaps.  That was not necessarily what I needed to cite to demonstrate what I was indicating in this

Page 312

particular paragraph.

Q. Okay. Well, the citation here is to the 2012 Surgeon General's report on smoking and health, correct?

A. It's to the 2012 public health service, Office of the Surgeon General, a National Center for Chronic Disease Prevention and Health Promotion, Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General.

Q. And this 2012 report of the Surgeon General, it doesn't outline a 15-year plan with the same types of components that your plan does, correct?

A. So there are actually some overlapping components.

I mean, first of all, you wouldn't expect it to be identical, right. We're talking about two different things. We're talking about smoking cessation and the harms caused by tobacco and we're talking about social media.

So it's not identical. But

there are certainly overlapping
components.

So health education, as I've outlined here; capacity building in schools; and the integration of behavior change supports through students' developmental years.

So there are certainly overlapping components, as there would be with public health kind of interventions around this type of harm caused to young people.

Q.   What is your understanding of the school-based prevention of efforts -- hold on.  Let me start again.

What is your understanding of the school-based prevention efforts related to tobacco?

A.   Yeah, so I don't come here pretending to be an expert on tobacco prevention.

But I do know and have reviewed the particular public health efforts that showed this massive decrease

Page 314

in harm -- or in use, in this case, of 73 percent over this time period from 1997 to 2015.

As far as the school-based efforts, I'd have to go deeper at this point or refresh into the report to really understand all of the specific school-based components.

Q.    Okay.  Well, certainly there is a difference between social media and tobacco in the sense that social media use is behavior and tobacco is a substance that is ingested, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think both tobacco and social media involve behaviors.  And, I mean, you're ingesting -- you're ingesting -- well, I won't -- I won't expand upon that.

They both involve behavior.

BY ATTORNEY LEHMAN:

Q.    Okay.  You understand that

the DSM has recognized tobacco use disorder as a substance addiction not as a behavioral addiction, correct?

A. So I think that's actually an artificial distinction, that we wouldn't describe it that way in the mental health field.

Because substance use is behavioral, right. In fact, we've changed the term, often in the context of talking about mental health, to behavioral health specifically to describe substance use disorder.

So the term "behavioral health disorders" very commonly is used as an umbrella term to talk about substance use disorders.

Q. So would you disagree with the DSM characterization of tobacco use disorder as a substance use disorder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It's classified within the DSM as a

Page 316

substance use disorder, which is a behavioral health disorder.

BY ATTORNEY LEHMAN:

Q. What behavioral addictions does the DSM recognize?

A. I'd have to have a copy of the DSM to make sure that I'm giving a list of those.

Q. What evidence do you have, other than the 2012 report from the Surgeon General that you cite in Footnote 117 of your report, that school-based prevention efforts actually caused youth tobacco use to decline?

A. So, again, this was part of a -- as I understand it, again, not being a tobacco expert, but as I understand it, schools were a part of the public health effort to decrease this, including building capacity in schools and behavior change, intervention programming at schools.

Do I know all the details of it? No. Again, that's not my area.

Page 317

Tobacco prevention is not my area.  So I'd have to go back and look at all the specific components.

Q.    And do you have an understanding about when the public health effort to decrease youth tobacco use began?

A.    Do I have an understanding of when it began --

Q.    Yes.

A.    -- in general?

I suppose it depends on what you mean by when did the public health effort begin.  This particular report talks about the change from '97 to 2015.

Q.    And do you have any information about what efforts were underway to curb youth tobacco use prior to 1997?

A.    I don't have that at my disposal, no.

Q.    In your rebuttal report, you referenced the anti-obesity initiatives in Opinion 5.

What anti-obesity initiatives are you referencing?

A.     Let me just turn to my rebuttal report.

Okay.  So here I don't know that I'm referring to -- and I haven't cited a specific obesity initiative or anti-obesity initiative, but I'm talking about the public health effort to reduce childhood obesity.

Q.     And is it your opinion that that has been successful?

A.     So, again, I don't come as an obesity expert.  So I'm not offering an opinion on that.

Q.     Okay.  And then what is -- what are the parts of the plan that you are proposing that are also part of the anti-obesity initiative that you reference in Opinion 5?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  What are the parts of the plan that I developed

Page 319

that are part of the anti-obesity initiative?

BY ATTORNEY LEHMAN:

Q.    Yes.

Is there overlap between the two plans?

A.    So to go back to Opinion 5, I was referencing anti-obesity efforts to describe that, often, pervasive public health issues take long-term investment, stage implementation and ongoing evaluation.

So to the question of what parts of my program are related to anti-obesity, my strategic plan is very specific to the harms of social media.

Q.    How did you select the 15-year duration of your proposed plan?

A.    Yeah.  I mean, you know, the 15 years, I would say, is really grounded in kind of three different pillars of, you know, input.  And I go into detail on that in my report.  But I can describe those.

CONFIDENTIAL

Page 320

So the first is really, you know, basing it on other public health frameworks. So we've talked a little bit about that. We've talked about the tobacco exemplar of a large public health effort that was harming our youth that took a multi-component effort to actually cause deep and sustained change in young people's behavior.

So I look to those public health examples as one part of really thinking through, you know, what would best practice be in the length of this type of plan.

And we are talking about a highly complex issue, social media impact, with multiple harms in a system, education, that is pretty complex. So I thought the -- you know, the corollary there is important.

The second piece, you know, is I thought about -- we're talking about K-through-12 education, where we know that, first of all, most young people who

receive mental health services receive those in schools. And it offers the opportunity for multi-tiered systems of support, as I go into pretty great detail in my report.

So that often happens in a K-through-12 setting, right, young people spend about 15,000 hours, between kindergarten and 12th grade, in schools. And so it does offer an opportunity for this type of public health intervention.

And so the second pillar was really around that K-through-12 cohort that in order to really be able to look at a cohort over time from kindergarten, age 5, up until 18, that you would want to have a multi-year -- in this case, I propose 15 years because it covers that full cohort with enough time, as I laid out in the plan, a little bit of planning and hiring time, and a bit of time for sustaining the implementation.

So that cohort, the K-through-12 cohort is kind of that

Page 322

second pillar, right.

So we've talked about the public health frameworks and the K through 12 pillar -- cohort, rather.

And the third piece is really, as I detailed in here, I looked to the implementation science literature. So, in particular, I know I referenced the National Implementation Research Network, amongst others, who really have looked at, what does it look like to implement programming?

Now, in that report, they do look at what does it look like to implement a single program in a single setting. What I'm talking about is a multi-component plan. So I looked within the implementation literature to what does it take to actually implement multi-component interventions in a complex system like education.

And that very clearly lays out that it's often multiple years. In fact, they cite over ten years in that

particular monograph.

So those three things combined really informed the decision for laying out a 15-year plan that I think is not only reasonable in this case but really necessary to address the harm over time, to be able to study it, evaluate it, and adjust it as needed over time. And I talk about that in the evaluation component.

And also just to be able to implement something with fidelity over time, you need the time to do that. And that's what is really -- when I talk about a third pillar, you know, the NIRNians, the National Implementation Research Network folks, who really are considered kind of the -- they're -- they're leading in this area of implementation science, that's what they've suggested.

So those were the factors.

Q.    Just to be clear, the NIRNians, they didn't actually suggest 15

years, do they?

A.    So I'd have to go back to the report that I cited.

But what I can tell you is that they very specifically talk about different kind of types of interventions and different lengths of years depending on that.

And I think I've -- I mean, I'm happy to go back to the report to pull out specific things that I used to draw my conclusions from their information.

So they do talk about, I believe -- but, again, it would probably be more helpful if I just looked at the report.  So I can do that.

Q.    You mentioned things in sort of Bucket 1, in response to my question, other public health frameworks.

Did you look at other public health frameworks other than tobacco and anti-obesity?

A.    So I think in my report I

Page 325

probably also referenced trauma-informed school efforts.  And certainly in my own experience when I've looked at -- you know, so I was referencing my own experience in the field of working in implementation science in schools for years.

And so, for example, one of the -- one of the efforts and frameworks that comes to mind for me is positive behavior interventions and supports or multi-tiered systems of support.

And what we do see in the field is that it can take a very long time, in this case, over a decade, to actually implement those things with fidelity.

Q.    What is the longest program that one of your consultant clients has ever implemented at your recommendation?

A.    When you say "the longest program," I'm not entirely sure what you mean by that.

Q.    Sure.  What was the

CONFIDENTIAL

Page 326

duration -- the longest duration of a plan that one of your consulting clients implemented at your recommendation?

A.    Well, so when you think about the length of time that I've been a part of the National Center, we've worked with some of our school districts -- again, I've been there for 25 years -- I would say many of them are still doing continuous quality improvement on multi-tiered systems of support, for example.  So that would be roughly two decades that they are implementing that.

I mean, it often is a continuous quality-improvement effort.

Q.    Well -- and my question is different.

When you started -- when those school districts started implementing that multi-tiered system, did they say at the outset, I intend to implement this for 20 or 25 years, or did they say, we intend to implement a multi-tiered system and they've been

Page 327

changing it ever since they implemented it?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yeah, I don't -- I don't know what a district would have said.  I mean, we're talking about multiple districts, first of all.

But would they have said, I intend to implement and then stop this in five years, for example?

No, not necessarily.

BY ATTORNEY LEHMAN:

Q.    What is the average tenure of school superintendents across the country?

A.    I don't know the actual answer to the number of years.  I know that it's highly variable, having worked with a lot of school districts.  Some stay for shorter terms, some stay for longer terms.

Q.    Do you know what the average

Page 328

turnover is amongst school superintendents in a given year?

A.    Do I know the exact number? Not off the top of my head.

Q.    Can you approximate?

A.    No.  I wouldn't feel comfortable approximating.  It's not necessary.

Q.    Do you agree that implementing a multi-tiered program, such as the program that you have suggested, that it requires consistency and sustained implementation?

A.    So what I would suggest is that it requires -- consistency is an interesting word, because what I would say is that it requires continuous quality improvement.  And I speak to that in the report.

And the second term you used was sustainment -- or sustainability, does it require --

Q.    I said sustained implementation.

CONFIDENTIAL

A.    Sustained implementation.

It's ideal if there is sustained implementation.

Q.    Do you agree that superintendents often bring their own agendas when they are hired by a school district?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So I think superintendents, you know, are very different in every district I've worked in.

So many superintendents build on what's already there and they, you know, leverage the programming that already exists.

But part of the reason, I mean, I have to say, that you want to implement a longer-term plan is so that you're not kind of driven by the whims of somebody who might come in and have a specific agenda.

Page 330

And usually when there is kind of a longer-term comprehensive plan that is well resourced, a superintendent is not going to just shut that down, typically, overnight.

BY ATTORNEY LEHMAN:

Q. Well, I mean, isn't the reason that new superintendents are hired, in many circumstances, is so that the school district can change and evolve?

A. There are so many reasons that new superintendents are hired. I think that calls for some speculation that, you know -- I think oftentimes superintendents are hired, you know, for various reasons. I'll just say that.

Q. Okay. In your -- within your consulting clients, have you seen school districts who stop following a program when a new superintendent is hired?

A. I don't know if I can think

of a specific example of that. I mean, what I can say is that, based on my experience, most programming that is in place when a new superintendent is -- you know, comes into a district remains in place.

I mean, there's not typically an entire upheaval of all programming when a new superintendent comes in. That's not been my experience.

Q. Do you know how long the average tenure is of school board members?

A. Again, it does vary across districts. So if you're talking about a national average and a specific number, I don't have that off the top of my head.

Q. In general, do you agree that schools face -- face persistent recruitment challenges?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, that's a broad question. So can you be

CONFIDENTIAL

Page 332

more specific?

Are you -- recruitment of --

BY ATTORNEY LEHMAN:

Q.    Sure.

Let's -- let's start with in general.  Do you agree that schools face challenges hiring qualified, certified teachers?

A.    Again, I'm not a hiring expert.  So I don't know that I can answer that question in good faith.

I know that, you know, there's attrition in the field, just like any other field.  And that they put hiring practices in place to hire educators.

Q.    Have you ever looked at -- let me start again.

Have you ever studied or attempted to quantify the impact of teacher turnover on the implementation of educational programs?

A.    Have I ever looked at it or studied it?

Q. Yes.

A. So I've certainly in my editorial role at the School of Mental Health Journal, and in reading hundreds if not thousands of school mental health articles, I'm sure that I have looked at implementation science that speaks to the role of educator turnover on, you know, the fidelity with which interventions are implemented.

Q. And in your review of that literature, have you seen that urban teachers are particularly at risk for burnout?

A. So I recall -- again, I'm not going to be able to cite a specific study right now because, you know, we're talking about a general area.

But I do recall reviewing information that speaks to and maybe even written about and spoken about burnout. You know, I've worked in Baltimore city schools, for example, for 30 years.

So I'm familiar with an

Page 334

urban context, as well as other school district contexts.  And I know that there is some literature looking specifically at burnout of educators in urban school settings.

Q.    All right.

ATTORNEY LEHMAN:  I'm going to hand you what -- this is going to be Tab 47.  We've marked it as Exhibit Number 27.

-   -   -

(Whereupon, Exhibit Hoover-27, No Bates, Burnout in Urban Teachers: The Predictive Role of Supports and Situational Responses, was marked for identification.)

-   -   -

BY ATTORNEY LEHMAN:

Q.    All right.  Can you confirm that this is an article that you co-wrote entitled, Burnout in Urban Teachers:  The Predictive Role of Supports and Situational Responses?

A.    I can.  See, I was right.  I thought I may have written about something in this area.

Q.    And this was -- it looks like it was accepted for publication on April 28th, 2021.

A.    Correct.

Q.    All right.  And I want to turn to the second page, Page 817.

And looking at the paragraph directly above the header for 1.1.  Do you see that it says, Urban teachers are particularly at risk for burnout and leaving the profession early, with certain urban districts exhibiting yearly turnover rates which exceed 40 percent.

Did I read that correctly?

A.    Yes.  I see that here.

Q.    All right.  And so was it your understanding, at the time you published this article in 2021, that some urban districts were experiencing yearly turnover rates in excess of 40 percent?

A.    So it looks like I'm citing

Page 336

a specific study, Barnes, et al, 2007. So I would have to go back to that study to understand.

Because I use a bit of a general term there, with certain urban districts. So that could be, you know, .01 percent of urban districts, it could be more than that. I just don't know, so.

Q. Well, would it -- it would have been your practice, when you were drafting and editing this article, that if that information was no longer accurate, you would not have included it in your article, correct?

A. So I wouldn't have used it if it weren't accurate.

And what I'm saying is that when I use the term "certain urban districts exhibiting yearly turnover rates," it's certainly not implying that that's the average or that that's even common.

Q. What is the average turnover

Page 337

rate in urban districts?

A.    I don't know that offhand.

Q.    Okay.  And do you agree that there is a tight labor market for specialized professionals who work in the educational system?

A.    You know, I don't know. Again, I would come back to that I'm -- as someone who is not a hiring specialist, I don't know that I know -- the term you just used was "a tight labor market for specialized professionals."  I don't -- I don't know the answer to that.

Q.    Does your plan include any information about how the districts are to go about retaining the numbers of individuals that you propose that they hire?

A.    So what I would say is that the plan, first of all, accounts for some attrition.  And -- and I speak about -- I'm trying to think, in my -- I have to go reference my rebuttal reports.  So I'm happy to do that, if that's useful.

But I do -- I do speak to this topic, about recruiting and retaining staff.

So I'm happy to look to that if that would be helpful.

Q.    Well, I guess I'm not -- I'm not asking to just repeat the rebuttal report.

A.    Okay.

Q.    So let's look at something else that you published in.

ATTORNEY LEHMAN:   Let's look at Tab 48.

THE WITNESS:   Okay.

ATTORNEY LEHMAN:   And we'll mark this as Exhibit Number 28.

- - -

(Whereupon, Exhibit Hoover-28, No Bates, Schools As a Vital Component of the Child and Adolescent Mental Health System, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

CONFIDENTIAL

Page 339

Q.    And we're going to turn to Page 39, under persistent obstacles.

But just -- just to be clear, can you confirm that I've handed you an article entitled, Schools As a Vital Component of the Child and Adolescent Mental Health System?

A.    Yes.

Q.    And this is an article that you co-wrote and published in January of 2021?

A.    Yes.

Q.    So, then, if you'll turn to Page 39, under persistent obstacles.

And you wrote here, quote, Several challenges impede the integration of mental health supports and services into schools.  First, schools are driven by competing and frequently changing priorities, often not informed by data. Despite evidence that school mental health positively influences students' academic and psychosocial functioning, competing interests sometimes make it

Page 340

difficult to sustain resources and momentum for school mental health.

Did I read that correctly?

A.    Yes.

Q.    And do you agree today, in 2025, that there are a number of challenges that impede the integration of mental health supports and services into school, including competing and frequently changing priorities?

A.    So I think what I would say there is that the context for the competing interests and priorities often has much more to do with resource constraints.

So if there are not the resources, for example, to fund a school psychologist or to -- you know, let's say there's enough resources to hire either a school psychologist or an English teacher, a school might have to make a tough decision there.

So -- and the priorities of one school board member versus another

may have to speak to that.

So often these competing priorities are in the context of limited resources to address specific areas.

Q. Other than limited resources, what are the other challenges that you see in terms of implementing mental health supports and services into schools?

A. Yeah, I mean, I would say that, frankly, resources is a big one. Because, oftentimes, resources will dictate whether you can get appropriate staffing or professional development to implement something that's important to do, whether it's, you know, English literacy or mental health literacy.

And so you could say, well, there's a challenge of limited professional development. But, frankly, when you kind of dig down into what's driving that, it's often limited resources to do what's needed, to support kids, whether it's in their academics or

Page 342

their social-emotional development.

So those are some of the issues that come along with that resource constraint.

Q. Does your plan take into account leveraging existing resources that the school districts already have in place?

A. So what I would say is this: The -- I did take a look at the services and staffing, as I always do, in my methodology when I'm working with school districts. I look at who their staff is, what their service array is, what resources they might have in place and how to best leverage it.

And in this report, I was really addressing the impacts of social media, which, as I outline in the report, are a novel and unique set of new circumstances for young people that are causing new harms that are laid out in my report and the reports of other experts.

And so what we found, and,

Page 343

again, this is not inconsistent -- what we found in the bellwether districts is not inconsistent with other districts, is that their current programming was often piecemeal, patchwork, limited, and that their staffing would not have been adequate to address -- the current staffing would not have been adequate to address the new needs.

So did I consider it?  Yes.

Q.    Okay.

A.    But would it -- you know, their -- their current folks are being pulled into social media, that's causing a lot of fragmenting of current systems, if that makes -- if that's understandable.

Q.    And so, then, when you wrote out your plans, did you make adjustments for each district based on the resources they already have?

A.    So because we're talking about a new set of harms to young people and a new set of concerns, let's say,

Page 344

that our young people are experiencing with respect to mental health, and a new set of concerns that the schools are experiencing with classroom disruption and impacts on teaching, the interventions that I -- or the programming that I offered is really additive to what's there.

Did I consider in every district that I spoke with and that I looked at the data from kind of how their current resources would intersect with the plan?  Yes.  And I laid that out in each of the district reports.

Q.     In your previous answer, you said -- and I'm just going to read it from the transcript that's in front of me -- And so what we found -- and, again, this is not inconsistent, what we found in the bellwether districts is not inconsistent with other districts.  And then you went on.

But my question is, who is "we"?

Page 345

A.    Oh, I'm probably using the term -- I often use that colloquially to mean me, I; what I found.

Q.    Okay.  All right.  So when you said "we" --

A.    I meant me.

Q.    -- what -- what Dr. Hoover found?

A.    What I found, yes.  What I found.

I mean, I'd have to go back to the exact statement I was making.  But I imagine that if I was talking about what I found in the bellwether districts, it would be me.

Q.    Okay.

A.    Yeah.

ATTORNEY YEATES:  Counsel, can we take a break soon?

ATTORNEY LEHMAN:  Sure.  We can take a break now.

VIDEO TECHNICIAN:  The time is 3:07 p.m., and we are off the record.

Page 346

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 3:29 p.m., and we are on the record.

BY ATTORNEY LEHMAN:

Q. Dr. Hoover, do you have any quantitative data about how adolescents use their time when they are on social media?

A. So I recall in my report -- and if I need to, you know, cite specific numbers, I'm happy to go through the report.

But I recall in the report speaking to the expert reports and their kind of deeper dive into how time was spent, as well as referencing the peer-reviewed literature that the predominance of time was spent on the defendants' platforms.

Q. And my question was a little

Page 347

bit different.  So I'm not -- I'm not asking about how much time is spent on platforms.

What I'm asking is, do you have any information about how the users spend their time while they are on the defendants' platforms?

So to use an example, whether they're posting versus reading something versus watching movies or doing something else?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I want to go back to the actual studies, because I seem to recall there being information about, you know -- at least in some studies, looking at how they spent time.

I don't have it at my fingertips at the moment, no.

BY ATTORNEY LEHMAN:

Q.    Have you ever, prior to this litigation, created a plan for a school

Page 348

district that is intended to address only impacts of social media?

A.    So outside of the context of this litigation, I have not created a plan only to address social media for a school district.

Social media has been something that's been considered in the context of creating other plans.  But no, not specifically outside of this litigation.

Q.    And when you say that in prior plans that you've created outside of litigation social media is something that has been "considered," what do you mean?

A.    So what I would say is that in -- you know, when I'm meeting with districts, it would be rare these days for social media not to come up as a concern for students and the harms to the schools, the harms to students.

I don't know how much depth you want me to go into there, but that's

what I mean by that.  That it's something that would have been considered.

Because when I meet with schools, they're consistently talking about this.

Q.    In the last five years, have you created any plans for school districts intended to be a comprehensive plan to address the social emotional, mental health needs of their students?

A.    In the last five years, yes, I would have come up with plans and also just supported districts in developing their social, emotional and mental health needs, yes.

Q.    How many -- in the last five years, how many of those plans have you come up with?

A.    It would be hard for me to quantify, to be honest with you.

Again, as co-director of the National Center for School of Mental Health, it's a large part of our job to actually, you know, run learning

collaboratives with school districts and help them develop quality improvement plans for mental health services.

So the nature of the plans can be different as well.  So to say, you know, X number of plans would be virtually impossible, because I've worked with so many districts over five years, much less 20-something years.

Q.    For those plans that you have created in the last five years that are intended to be a comprehensive plan to address the social, emotional, mental health needs of the students, what is the planned duration of those plans?

A.    What I would say is that it's variable.  And, you know, some plans have a specific time period that may be, for example, shaped by the inquiry -- or by the request, rather.

So if a school district says, we need a five-year plan, we'll say, to, you know, really put into place health education programming.

CONFIDENTIAL

Page 351

And so I do want to be clear, you're talking about comprehensive plans. Oftentimes, school districts do come and say, like, we really want to focus on a specific area, you know, and that could be resource constrained, right. So it could be, we need to focus on school mental health screening.

And so sometimes they'll put a request in that says, you know, we need -- we have five years within which we can do this. Sometimes that may be because they have a certain, you know, set of grant funds that shape a time period and the topics that they can focus on.

There are other times, and this is not infrequent, this is actually pretty frequent, that we work with school districts where they are wanting to, you know, improve their mental health systems -- and it may be a specific part of their mental health system -- and we give them guidance on that without

Page 352

specifying X number of years.  So it would be, here is a continuous quality improvement plan.

Q.    Has any school district ever come to you and asked you to develop a plan solely to address social media?

A.    Not that I can recall.  Not that I can recall, no.

Q.    Has any school district ever come to you and asked you to develop a plan with a 15-year duration?

A.    I would guess that many school districts wish that they could come with that.

But, you know, frankly, as I've already alluded to, a lot of school districts may, you know, say, we have a grant that's three years long, and so we need to establish a plan that we can be funded for, for three years, to do X.

And what I will say is that, you know, it's -- we have school districts, as I've already kind of indicated, that will come to us knowing

Page 353

that they -- that, you know, supporting student mental health, for example, is part of, you know, what they do.

And so they may not come with X number of years, but that doesn't mean that they don't intend to carry something out for several years.

Q.    And so is it correct, then, you don't recall any district ever coming to you and asking for a 5-year plan -- I'm sorry, asking for a 15-year plan?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So do I recall a district coming to me and saying, we need a 15-year plan for X?  No.

BY ATTORNEY LEHMAN:

Q.    In the plans that you developed in this litigation, did you adjust the plan based on prior professional development that had already been provided to teachers and staff?

A.    So in the bell -- in the

Page 354

districts for these specific plans?  All the specific district reports --

Q.    Yes.

A.    -- you're talking about now?

Q.    Yes.  Yes.

A.    So I did inquire about and take a look at the professional development, for example, in the key informant interviews and in documents reviewed.

It was something I considered in terms of then developing a strategic plan.

Q.    And did you make any adjustments based on their prior professional development that had been provided?

A.    So what I found, really, across the districts, was that even if they were implementing, let's say, components of social emotional learning or components of, you know, teacher training on social media policies, they were -- they might have looked different

in the districts, but there was a consistency in that they were not adequate to address the social media as it currently is and in terms of the harms that we're seeing in young people.

And, also, the staffing is -- well, we were talking about professional development. So I'll stop there.

Q. Okay. Is it correct, then, that you found the prior professional development in all of the districts that you evaluated to have been inadequate?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think that's probably a bit too broad of a question for me to be able to answer.

Certainly, you know, the districts are putting in effort. And I think I note that in my reports. They're putting in effort to try to -- with respect

to social media professional development, they are trying their best.

But, frankly, you know, it's a whole new layer of issues that are being introduced to their students and to their schools.

So, you know, I don't want to say that everything they're doing is inadequate. That wouldn't be fair. But, you know, they're just not equipped or resourced to actually address what's happening with respect to the schools and students in terms of the impact of social media.

BY ATTORNEY LEHMAN:

Q. You mentioned earlier that you had done work with Baltimore.

How long have you been working with the Baltimore School District?

A. Well, so I've -- I've lived in, you know, that area and been -- you

know, the School of Medicine is located in Baltimore. Some of my first clinical experiences were in the Baltimore schools.

So I would say almost 30 years now.

Q. Outside of litigation, have you ever provided Baltimore with a plan to address social media?

A. With a plan only to address social media?

Q. Yes.

A. No, not that I'm aware of.

Q. Outside of litigation, have you provided Baltimore with a plan that would address social media?

A. I'm trying to remember if I personally have provided a specific plan. I mean, I don't know that that would have fallen within my role.

You know, has our center provided guidance to Baltimore city schools on mental health services? Yes. And would mental health services

Page 358

inevitably, in this day and age, be addressing social media?  Likely so.

Q.    How would you describe your role with Baltimore schools?

A.    So it's evolved over the years.  So I'm going to have to look to my CV for exact dates.  But roughly speaking, I was a clinician in the schools.  And I've been in at least a couple of schools as a clinician in the schools.  And then I was a direct supervisor for clinicians who were in the schools.

And then, you know, again, as co-director of a National Center, we work with lots of districts.  So how I work with Baltimore city may be quite similar to how I would work with other districts in that capacity, in that we provide best practices, we provide guidance, we provide updated research to school districts.

And if they reach out to us with inquiries about mental health

Page 359

supports and services, we'll often respond to those.

Q.   And have Baltimore city schools implemented the plans that the National Center put together to address the mental health issues within their district?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   Yeah, I mean, I -- to be honest, I feel like that question is probably a little bit too broad for me to answer.

Like, their -- the plans is -- is -- I'm not sure what you mean by "the plans," because we provide, as I mentioned, general technical assistance.  They may have attended a Webinar from our National Center.  We may have talked with them about continuous quality improvement.  We may have provided a specific training for Baltimore city school clinicians.

Page 360

So have they implemented some of the things that we have offered to them?  Perhaps.  I would think so.

But, you know, have they implemented everything?  I couldn't say.

BY ATTORNEY LEHMAN:

Q.    Okay.  Are you able to specifically identify any of the guidance that the center provided to Baltimore city schools that have been implemented?

A.    I know -- and, again, I'm speaking now more broadly for the National Center.

I believe that there was guidance around measurement-based care, for example, that was offered to Baltimore city clinicians that was implemented over the course of the last several years.

So that's one example.

Q.    How did you decide which studies to review in forming your

CONFIDENTIAL

Page 361

opinions in this case?

A.    So we're moving away from Baltimore city now?

Q.    Yes.

A.    Okay.  All right.  I just want to make sure I understand where you're going here.

So can you repeat the question?

Q.    How did you decide which studies to review in forming your opinions in this case?

A.    So, you know, I used my typical process, the methodology, which is to really look to the databases, or what we might think of as repositories, that might include PsycInfo or PubMed, those are some of the databases that I use.

I also, in my role, you know, as an editor in school mental health, often come across studies.  So I looked to the literature using, you know, within those repositories, certain search

terms, for example, school mental health, those kinds of things.

That's how you would typically do a search for articles. So I drew upon that, looked at impact, social media, school mental health, that kind of thing.

And then, also, if I happened to have an article that came across my desk as an editor or in my work as the director of the -- or co-director of the National Center for School Mental Health, that may have been an article that was included for consideration.

I also did consider articles -- some of the articles that some of the expert witnesses, the other experts, the other plaintiff experts, may have included in their reports. But I generally, in that case, would rely on the opinions of those experts.

Q. On circumstances when you reviewed the expert reports of defense experts, did you go and look at any of

Page 363

the articles that they had cited that you had not already reviewed?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So just so I can clarify, because all the legal language is new to me.

So the defense experts, you're talking about the rebuttal reports that they would have sent?

BY ATTORNEY LEHMAN:

Q.    Well, so I saw in your list, you had a number of defense experts that were listed as people that you had reviewed their reports.

A.    I assume those are the rebuttal reports.

Q.    When you reviewed the reports of the defense experts, and so --

A.    Do you want to specify who?

Q.    Sure.

A.    Okay.

Q.    By that I'm referring to Diana Wildermuth, Ethan Hutt, Stephen

Page 364

Aguilar and so on.

When you reviewed those reports, did you go and look at any of the articles that they cited you had not previously reviewed?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Honestly, I can't recall.  I mean, I'm -- if I did, I likely would have -- they would have been in the articles considered in my response to their rebuttals, so.

BY ATTORNEY LEHMAN:

Q.    Okay.  So you don't remember doing it.  But it would be reflected in those materials --

A.    That's what I'm saying --

Q.    -- considered list?

A.    -- if I did, it would be in the -- in the documents considered.

And I think there were a few new things that were included in the response to the rebuttals.

CONFIDENTIAL

Page 365

Q.    When you looked in the databases and you said that you ran search terms, did you review all of the articles that came back in response to the search terms or did you cull them down in some way?

A.    So I'm trying to recall.  I mean, oftentimes we cull it down.

And I may have looked for articles that seemed particularly pertinent to the question at hand, right, looking at social media and its impacts on students, mental health and on schooling.

So that's how -- when I think about how I would have culled it down, that would be -- you know, if I'm thinking about broad impacts, that's how I would have culled it down.

Q.    Okay.  How would you have made that cut?  Would you have done that based on the abstract or would you have read the entire article?  How would you go about that?

A.    It depends.  I mean, as a -- as a scientist who's reviewed and read articles, again, for over 30 years at this point, including graduate training, you get kind of pretty savvy about being able to determine -- I would never make a conclusion from one abstract, but you can determine whether it's going to be relevant to, you know, your task at hand.

So I may have looked at an abstract, for example, and determined this is really kind of outside of the scope of what we're thinking about here, what I'm thinking about.

But, yeah, oftentimes it was doing a skim or a review of a full article to determine whether to consider it.

Q.    Did any studies in your materials considered list not find correlation?

A.    Oh, I'd have to go back to all the studies to really determine that.

Q.    Do you agree that sexual

Page 367

identity or sexual orientation is a potential cause of mental health issues in adolescents?

A.    I think that's quite complicated.  I know that certainly some young people do struggle with their sexual identity.

Did you include sexual identity and sexual orientation --

Q.    I did.

A.    -- were those the two terms?

So I know that, certainly, those can be issues that young people struggle with in terms of their experience and that can impact their mental health functioning.

Q.    Do you agree that neglect or abuse in the home is a potential cause of mental health issues in adolescents?

A.    So I do -- I certainly would say that neglect in the home can be a factor for mental health in adolescents.

Q.    Do you agree that the death of a loved one or a chronic illness in a

Page 368

loved one can be a cause of mental health issues in adolescents?

A.    Yes.

Q.    Do you agree that COVID was a potential cause of mental health issues in adolescents?

A.    I would say that one is a little bit different.  Because, I mean, COVID caused -- you know, it's a virus, right.

So it's really kind of what happened in the context of the pandemic that we may look to to understand how it may have impacted young people's mental health.

So I'll give you an example.

So young people, we know, not all, but many, were engaged in distance learning or they were at least isolated.  And in that context, many of them were using social media platforms, including the defendants' platforms, at a greater degree than prior to.

So if they're home, they are

Page 369

isolated, they're distance learning, they may have been exposed to more social media.

So it's the factors that occurred in the context of the pandemic. So the question is a little tough, you know.

Does the pandemic itself cause mental health challenges?  It's really kind of the circumstances around that that I need more specificity around, if that makes sense.

Q.    All right.  Well, do you agree with this statement --

A.    Okay.

Q.    -- the Covid-19 pandemic and the resulting impact of social isolation, economic hardship, grief and trauma is related to mental health concerns for children and adolescents?

A.    It sounds like something that I would have said, because I think that the resulting hardships that may occur -- and that's really aligned with

what I had just said, that it's really not the virus itself, it may be some other contextual factors around the pandemic that may have contributed to mental health challenges in our young people.

Q.    Do you agree that school shootings can be a cause of mental health issues in adolescents?

A.    So, again, having worked with a number of school districts that have experienced school shootings, what I would say is that there's kind of a concentric circle of impact when there's, you know, an incident of violence.

So do I think that a school shooting could have an impact on young people and their mental health?  Sure. Yes, of course that could be the case.

Is it, you know, to the same degree as other mental health challenges that we're seeing that are more pervasive or other influencers or factors like social media platforms?  Probably not.

Q.    Have you seen any studies that compare the pervasiveness or influence of social media as compared to school shootings on adolescent mental health?

A.    So, you know, I can't think of particular studies that look at that directly.

What I can tell you is that, you know, I've worked with lots of schools and students who -- and, you know, the amount that I hear about school shootings is often really quite constrained to the schools where that has occurred.  And social media comes up as harmful in about every school if not every school that I engage with.

So it's not necessarily a study that would inform that, because I don't know that the study has been done. If there is, it doesn't come to mind at this moment.

Q.    Do you agree that the impacts of a school shooting are not

CONFIDENTIAL

Page 372

confined to only the school where the shooting happened, but, in fact, spread out across the school district and, indeed, across the state?

A.    Yeah.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Well, actually, let me -- I didn't hear the -- I answered you before you finished.  So I broke the rules here.

So you said indeed across the state.  So that was kind of added on at the end.

So what I would -- what I would say is that the impacts of a school shooting are not constrained to just the people in the school.

And, frankly, even within a school where a school shooting happens, there's, you know, variability in terms of the

CONFIDENTIAL

Page 373

impacts of an incident like that on the people in the school.

BY ATTORNEY LEHMAN:

Q.   Do you agree that having a school shooting incident within a school district can impact the mental health of students across the district, not just those who are physically present in the building where the shooting happened?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   You know, again, I mean, does an incident of community violence -- you're talking about a school shooting here, does it impact people in the district?  Maybe.  Could it?  Maybe.

BY ATTORNEY LEHMAN:

Q.   Do you agree that when there is an incident, within a school district, of sexual abuse between either a teacher or staff member with a student, that that can impact the mental health of students

Page 374

throughout the district?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It depends what you mean by "impact" students throughout the district.  Impact their mental health?

BY ATTORNEY LEHMAN:

Q.    Yes.

A.    Impact -- perhaps.

Q.    Do you agree that if a student experiences personal trauma, that that can cause a mental health issue?

A.    If a student experiences personal trauma, can that cause a mental health issue in that student?

Q.    Yes.

A.    It could.  We know that about 80 percent -- 80 to 90 percent of people -- actually, of children, don't go on to develop post-traumatic stress after an incident of trauma.

So there's often kind of an overestimate as to how many people will

CONFIDENTIAL

Page 375

go on to experience that.  But could they be impacted?  Sure.

Q.    Okay.  Are you also aware that at least 50 percent of American youth have experienced a potentially traumatic event?

ATTORNEY YEATES:  Object to the form.  Foundation.

THE WITNESS:  I mean, there's -- frankly, you know, I'm aware of the data looking at the prevalence of traumatic incidents and adverse child experiences we talked about earlier.

The numbers look different depending on, you know, the data that you're looking at.  But am I aware that it is a large number of children, adolescents, perhaps over 50 percent, that have been exposed to what we would call a potentially traumatic event, it doesn't mean that it's traumatic, but to -- I don't know the term

CONFIDENTIAL

Page 376

that you used -- did you use a traumatic event?

BY ATTORNEY LEHMAN:

Q.    The term that I used was a potentially traumatic event.

A.    Yeah.  So may have been exposed to a potentially traumatic event.

So what -- just to kind of clarify what that means, that's an event that may or may not be experienced as traumatic, right.  It's something that could happen to a student that may lead to traumatic stress or may not.

Q.    Okay.

ATTORNEY LEHMAN: I want to look at an article, and we'll mark this as Exhibit Number 28.

-   -   -

(Whereupon, Exhibit Hoover-29, No Bates, Healthy Students and Thriving Schools: A Comprehensive Approach for Addressing Students' Trauma and Mental Health Needs, was marked

for identification.)

- - -

ATTORNEY LEHMAN: This is Tab 17. Oh, we're on 29. All right. Then I correct myself. We'll mark this as Exhibit-29.

BY ATTORNEY LEHMAN:

Q. All right. Can you confirm that I have handed you a document titled, Healthy Students and Thriving Schools: A Comprehensive Approach for Addressing Students' Trauma and Mental Health Needs?

A. Yes.

Q. And you were one of the co-authors of this document?

A. Correct.

Q. All right. And what was the purpose behind preparing this report?

A. Well, it may be stated differently in the executive summary.

But I can tell you the context for developing this -- well, actually, if you don't mind, I just want to make sure, because it's been a few

Page 378

years.  So I want to make sure that I'm refreshing my memory for a moment when you ask about the purpose of it.

Q.    All right.  Why don't we -- let's go to Page 6.

A.    Okay.

Q.    And do you see Page 6 is the introduction?

A.    Yes.

Q.    All right.  And here it talks about, Highlighting the connection between mental health and educational outcomes?

A.    Where is here?  Oh, right in the beginning.

Q.    Right at the beginning.

A.    In recent decades, research highlighting the connection between mental health and educational outcomes -- okay.

Q.    All right.  And then if you -- if you look at the second paragraph in that left column, it says, Federal, state and local interest in

Page 379

school-based health services accelerated following the tragic school shooting in Newtown, Connecticut, in 2012 and has continued to accelerate following additional school shootings and high-profile cases of youth suicide associated with bullying over the past several years.

Did I read that correctly?

A.    Yes.

Q.    And so was -- was interest in health services, that renewed or that increased interest following the school shooting in Newtown and additional shootings and youth suicide, was that what drove the creation of this report?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So not to my recollection, in terms of, you know, the purpose of this report. And -- no.  I mean, that's not what -- what drove the writing of this specific report, if that's

Page 380

what you're asking me.

Not to my recollection, at least.

BY ATTORNEY LEHMAN:

Q.    All right.  And was this report issued on behalf of For the Child Health and Development Institute of Connecticut?

A.    Yes.

Q.    Do you agree with the statement that interest, at the federal, state and local interest in health services, accelerated following the school shooting in Newtown, Connecticut, in 2012?

A.    So what we often see, not surprisingly, is after a well-publicized incident in a school or school community, there is a rush to invest in or to, you know, intervene around an incident.  Not always, but sometimes that's the case.

And so in this instance, you know, we're talking about a school shooting in Newtown, Connecticut.  I

Page 381

certainly recall that at that time there was increased interest and attention. And we see that sometimes after school shootings, that there's --

And that's for a variety of reasons. You have, you know, lawmakers who may be interested in -- I don't want to say leveraging, because that sounds opportunistic, but in kind of addressing something when it occurs like that.

Q. If you'll turn to the next page, Page 7.

And we're going to look in that first paragraph, about midway down it starts, Exposure.

All right. Do you see it says, Exposure to adverse experiences and potentially traumatic events also significantly contributes to children's mental health concerns and increases risk for academic difficulties. It is estimated that at least 50 percent of American youth have experienced a potentially traumatic event, with rates

Page 382

of exposure being even higher in urban communities.

A.    Yeah.

Q.    Do you see that?

A.    I do.

Q.    And do you -- do you agree that rates of exposure to potentially traumatic events are even higher in urban communities?

A.    So there is data to suggest that rates of exposure to potentially traumatic events, and, in particular, traumatic events like community violence, are higher in some urban communities, yes.

Q.    Do you agree that children suffer when a close family member has a substance abuse problem?

A.    So certainly sometimes, in the context of substance use disorders in the family, children may struggle.

Q.    And can that struggle, as a result of a family member's substance use or abuse, can that be the cause of a

Page 383

mental health concern?

A.     It could contribute to a mental health concern for a young person.

Q.     Do you agree that political divisiveness or the tenor of the community can contribute to an overall decrease in well-being?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That's a very broad statement.  So decrease in well-being, is that -- is there a context for that?  Because that -- I'm not sure what you're asking me to agree to.

If it's something I said, it would be helpful to have the context for it.

BY ATTORNEY LEHMAN:

Q.     Sure.  Sure.  And I'll tell you this is actually something that you said in the interview that I believe we've marked as Exhibit Number 24.

A.     Okay.

CONFIDENTIAL

Page 384

ATTORNEY LEHMAN:  So if we can just go back to 24.  I say 24 --

ATTORNEY YEATES:  Counsel, I've given you some leeway here, but you were limited to five hours on the general report.

Are you planning on switching to the case-specific reports soon?

ATTORNEY LEHMAN:  We are going to switch soon.  I'm just wrapping up a few things, since we did have to spend a few minutes on -- on sort of case-specific issues in the earlier section.

So just wrapping up a few issues.

ATTORNEY YEATES:  Okay. You're about 30 -- 30 or so minutes over, so.

ATTORNEY LEHMAN:  I don't think that's right, because we started --

Page 385

ATTORNEY YEATES:  How much time is on the record?

VIDEO TECHNICIAN:  Five hours and 13 minutes.

ATTORNEY YEATES:  You're 13 minutes over.  So you can take a minute or two, but then let's move on.

ATTORNEY LEHMAN:  Okay. Well, I don't know I agree we need to move on that quickly.  But we can take a break in a minute or two.

BY ATTORNEY LEHMAN:

Q.   All right.  So if you'll go to Page 6.

And I want to look at the paragraph that starts, Not to ignore.

And just for context, do you see we're talking about other issues that can impact mental health, such as poverty, food insecurity, housing insecurity?

A.   Where are you referring to

Page 386

right now?

Q. Well, right now, I'm looking at the top of what's on the screen.

A. Okay. I see what's on the top of the screen.

Q. Right. And then -- then you go through and talk about how grief and loss can also impact adolescents' mental health.

Do you see that?

A. I see that.

Q. And then just looking at the last paragraph, do you see it says, Not to ignore some of the more systemic issues -- what do you want to call it, political divisiveness or just the tenor of the nation right now, a lot of people will say that's contributing to an overall decrease in well-being among the general population.

A. Okay.

Q. So do you agree with the statement that you made during your interview in 2023 that political

divisiveness or just the tenor of the nation can contribute to an overall decrease in well-being?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think actually I would agree with the statement as it's said here, not as you kind of changed it.

So the way it's said here is that a lot of people will say that it's contributing to an overall decrease in well-being among the general population.

BY ATTORNEY LEHMAN:

Q. And do you agree that that would be true for adolescents as well?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That a lot of people are talking about it?

BY ATTORNEY LEHMAN:

Q. Yes.

A. I don't know, actually. I

Page 388

mean, I talked about the general population here.

Q. Do you agree that not all body dissatisfaction is part of an eating disorder?

A. So if I understand the question correctly, could people have body dissatisfaction and not meet criteria for an eating disorder?

Q. Yes.

A. Yes. We have a lot of instances of, you know, subthreshold, you might want to think about it, that still impact functioning.

Q. Do you agree that poor-quality sleep does not necessarily rise to the level of a diagnosable sleep disorder?

A. What I would say is that there's a lot of sleep disruption that may not rise to the criteria of a sleep disorder but that still may cause significant impairment in one's functioning, especially when we're

talking about child and adolescent development and brain functioning and their ability to engage in the school environment.

So just because an adolescent, for example, doesn't meet criteria for a sleep disorder would in no way suggest that it doesn't impede their ability to get school work done, to sleep at night, or to -- excuse me, to engage in the classroom, et cetera.

Q.    Okay.

ATTORNEY LEHMAN: And I would move to strike, respectfully, starting with "but that still."

BY ATTORNEY LEHMAN:

Q.    In your clinical practice -- and I refer to your direct patient care clinical practice -- did you treat eating disorders?

A.    So I'm trying to -- yes, I mean, I would have treated eating disorders in that context.  Yes.

Q.    In your clinical practice --

CONFIDENTIAL

Page 390

what percentage of your clinical practice was eating disorders?

A.    I was just going to say, it was a relatively small percentage of my -- the students and patients that I saw, which is consistent with the prevalence in the population.

But it's -- it was relatively small, I would say.

Q.    Are you able to estimate or quantify?

A.    I don't know that I can, because it's been some time now.

Q.    In your clinical practice -- and here I'm referring, again, to your direct patient care clinical practice --

A.    Okay.

Q.    -- did you treat sleep disorders?

A.    So I saw a lot of young people who had sleep issues.  It was not often a primary diagnosis that I was treating.

Q.    Okay.

CONFIDENTIAL

Page 391

ATTORNEY LEHMAN:  All right. Why don't we -- let's call a break, and we can go off the record and talk about next steps.

VIDEO TECHNICIAN:  The time is 4:07 p.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 4:10 p.m., and we are on the record.

ATTORNEY LEHMAN:  Okay.  At this point, I'm going to pass the questioning to counsel to start talking about the case or district-specific questioning.

Mr. Keyes is going to handle that questioning.  And since this is a natural break and we are near the end of the day, we will resume that in the morning.

CONFIDENTIAL

ATTORNEY YEATES:  And I would just like to note there's been a conversation among counsel off the record where we have asked defense counsel to continue the deposition today over the normal course of a seven-hour deposition day.

I let them know at 9 o'clock this morning that Dr. Hoover has a hard stop tomorrow at 4 o'clock so that she can catch a flight.  And so we expected this to be a full seven-hour deposition day.

Defense counsel is indicating they do not want to continue today.  They need to take a break and start tomorrow morning.

And as a result, I have told them that is their choice, our preference is to continue, seven hours on the record today. They're refusing to do that.  And

so they are taking the choice to start again tomorrow at 9 o'clock.

We will conclude the deposition at 4:00 p.m., along with a 45-minute lunch break, as we took today, and the same number and length of breaks that we took today, which we can calculate and put on the record tomorrow morning.

And if they do not meet their 11 hours that they have been granted by the court, the deposition will not remain open. And we will not bring Dr. Hoover back.

ATTORNEY LEHMAN:  And we would respectfully disagree with all of that, including the characterization of the conversation.

What counsel has said is correct, that we were first informed for the first time this

Page 394

morning that there would be a hard stop tomorrow, despite the fact that these dates were agreed to, the deposition was properly noticed well in advance for both today and tomorrow.

We have, however, in an accommodation, agreed that we will respect the 4 o'clock hard stop but that we have plenty of time tomorrow to accommodate the rest of the balance of questioning in the time that has been allotted by the court.

We do, however, note that if counsel intends to filibuster or otherwise delay the deposition, that we may not be able to accommodate the hard stop and would need to either continue after 4 o'clock or on another date.

As we have already told counsel, we do not anticipate that

that will be a problem, because there is plenty of time for the allotted seven hours between the start time of 9 o'clock and the hard stop that we have been informed of.

ATTORNEY YEATES:  And I'll just further clarify for the record that defense counsel has given no reason as to why they cannot continue this deposition for a seven-hour typical deposition day, other than a natural stopping point.

ATTORNEY LEHMAN:  And I will just let the record reflect that it's 4:15.  And once we take a break, it will be 4:40.  And that's why we're not starting. Thank you.

ATTORNEY KEYES:  See you tomorrow.

VIDEO TECHNICIAN:  I'll now be stating the on the record times

for each party.

Katie Lehman, representing TikTok, went five hours and 18 minutes.

The time is 4:13 p.m. We are off the record.

- - -

(Whereupon, the deposition was adjourned at 4:13 p.m.)

- - -

CONFIDENTIAL

Page 397

CERTIFICATE

         I HEREBY CERTIFY that the
witness was duly sworn by me and that the
deposition is a true record of the
testimony given by the witness.


*Amanda Miller*

         Amanda Maslynsky-Miller
         Certified Realtime Reporter
         Dated:  August 14, 2025


              (The foregoing certification
of this transcript does not apply to any
reproduction of the same by any means,
unless under the direct control and/or
supervision of the certifying reporter.)

CONFIDENTIAL

Page 398

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

CONFIDENTIAL

Page 399

- - - - - -

E  R  R  A  T  A

- - - - - -

PAGE    LINE    CHANGE

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

CONFIDENTIAL

Page 400

ACKNOWLEDGMENT OF DEPONENT


                I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 396, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.


 _____
  SHARON A. HOOVER, Ph.D.                    DATE


Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____


_____
Notary Public

CONFIDENTIAL

Page 401

LAWYER'S NOTES

PAGE   LINE

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

CONFIDENTIAL

**[& - 2015]**                                                     Page 1

| & | 117 6:17 | 16 9:5 11:22 | 96:11 146:20 |
|---|---|---|---|

**&**

**&** 1:16 2:3,10
3:3,10,20 4:11
5:4,11 6:10,16

**0**

**01** 336:7
**07068** 4:13

**1**

**1** 7:12 11:17
25:8,11 27:6
27:18 28:3
32:24 56:1
69:6 89:18
267:9 324:19
400:3
**1.1.** 335:11
**10** 8:10 41:4,7
81:4 117:9
262:10
**100** 144:3,21
149:4 164:17
**10022** 3:21
**10036** 2:17
**107** 311:14
**10:29** 120:7
**10:45** 120:14
**10th** 33:23 35:8
36:15 69:20
70:11 146:22
**11** 8:13 41:19
41:22 51:18,23
85:10 393:12

**117** 6:17
316:12
**1185** 2:16
**12** 1:10 8:15
11:17 42:10,13
106:2 207:9
283:5 320:23
321:7,13,24
322:4
**121** 9:20
**12:16** 207:16
**12th** 12:14
122:9,18 321:9
**13** 7:6 8:17
43:8,11 385:4
385:5
**14** 8:20 43:24
44:3 397:11
**15** 8:22 44:15
44:18 87:12
93:1,6 120:1
241:22 307:7,9
308:12 310:23
312:14 319:18
319:20 321:18
323:4,24
352:11 353:11
353:16
**15,000** 321:8
**152,343.75**
72:12
**15th** 209:8
210:17 211:10

**16** 9:5 11:22
45:7,10 81:4
**16th** 33:11 37:9
38:9 47:7
69:12 86:23
267:10 274:7,8
**17** 9:8 19:22
45:23 46:2
168:3 377:4
**171** 11:22
**173** 9:23
**18** 9:10 46:18
49:20 50:1
51:18,23
105:24 106:3
283:6 321:16
396:3
**19** 9:13 55:17
55:20 57:14
106:3 168:3
189:19 369:16
**19087** 1:18 2:5
**19106** 6:12
**1996** 174:18,21
**1997** 314:3
317:19
**19th** 71:8,10,13
71:20 72:4
**1:00** 260:6
**1:02** 260:15
**1:52** 260:22
**1st** 16:1 34:19
35:8 36:9,17
41:2 43:22

**2**

**2** 7:14 33:14,17
42:21 49:19,24
267:14
**20** 9:14 67:11
67:14 72:3,9
72:10 104:7
122:24 138:20
141:13 154:10
160:21 276:12
279:8 326:22
350:9 400:11
**200** 2:12
**20001** 3:12
**2001** 107:7,9,11
**2002** 139:19
**20024** 3:5
**2004** 16:6
139:19 141:3
**2006** 108:8
141:3
**2007** 336:1
**2008** 19:10
20:4 104:8
108:8 139:10
**2011** 107:12
**2012** 312:3,5,12
316:10 379:3
380:15
**2015** 314:3
317:15

Golkow Technologies,
877-370-3377      A Veritext Division      www.veritext.com

**[2017 - 4]**                                          Page 2

| | | | |
|---|---|---|---|
| **2017** 85:1 | 122:2 197:10 | 326:22 | **305** 2:13 |
| **2018** 83:11 | 198:14 340:6 | **251** 4:6 | **308-1515** 4:6 |
| 84:3 110:3 | 397:11 | **26** 10:11 | **30th** 37:23 |
| **2019** 83:20 | **207** 10:10 | 207:24 208:10 | 38:10 47:10 |
| **202** 3:6,13 10:7 | **208** 10:14 | 217:8 | 122:6,9,18,22 |
| **2020** 83:4 86:2 | **20th** 39:3 40:10 | **27** 10:16 | **31** 11:12 |
| **2021** 82:7,16 | 41:16 43:6 | 334:10,13 | **310-3030** 6:18 |
| 335:6,21 | 44:13 45:20 | **27th** 217:16 | **31605** 397:10 |
| 339:11 | 47:16 | 218:22 | **33** 7:15 146:1 |
| **2022** 84:17 | **21** 9:16 97:10 | **28** 10:19 | 146:11,14 |
| 85:18 209:8 | 97:13 168:3 | 338:16,19 | 147:2 |
| 210:17 211:10 | 208:19 | 376:17 | **331-5956** 6:6 |
| 212:18 217:16 | **210** 6:18 | **280** 1:16 2:5 | **33131** 2:13 |
| 218:11,16,22 | **212** 2:18 3:22 | **2850** 5:19 | **33134** 4:18 |
| **2023** 81:1 | **21209** 5:20 | **28th** 335:6 | **334** 10:18 |
| 84:10 85:8 | **22** 9:19 121:11 | **29** 10:21 | **338** 10:20 |
| 190:5 192:13 | 121:14 217:7 | 376:20 377:4,6 | **34** 7:17,19 |
| 197:12 198:15 | **220** 5:19 | **29th** 190:4 | 147:2 |
| 386:24 | **2200** 5:5 6:5 | **3** | **34th** 2:17 |
| **2024** 60:21 | **2222** 4:17 | **3** 7:16 34:1,4 | **35** 147:7 |
| 62:4 69:20 | **23** 9:21 173:18 | 42:23,24 67:10 | **36602** 4:5 |
| 70:11 81:15 | 173:21 | 176:1 190:16 | **37** 7:20 |
| 274:20 | **24** 10:5 202:7 | 195:21 222:13 | **376** 10:24 |
| **2025** 1:10 | 202:10 383:23 | 262:9 268:6 | **38** 7:22 |
| 12:14 33:11,23 | 384:2,3 | **30** 154:11 | **39** 8:7 339:2,14 |
| 34:19 36:18 | **24th** 70:23 71:3 | 279:7 333:23 | **396** 400:3 |
| 37:24 38:9,10 | 71:9 | 357:5 366:3 | **3:07** 345:23 |
| 39:3 40:10 | **25** 7:13 10:8 | 384:20,20 | **3:29** 346:6 |
| 41:2,17 42:8 | 78:2 86:12 | 398:16 | **4** |
| 43:6,22 44:13 | 87:1,9 88:1,9 | **300** 5:12 | **4** 7:18 34:21,24 |
| 45:5,21 46:14 | 88:19 90:9 | **301** 4:5 | 186:15 188:7,9 |
| 47:8,10,16 | 122:24 160:21 | **3047** 1:3,4 | 222:13 392:11 |
| 69:12 70:23 | 207:23 208:3 | | 394:9,21 |
| 71:3,8,21 72:4 | 277:17 326:8 | | |

CONFIDENTIAL

**[40 - ability]**

**40**  8:9 335:16 335:23
**409**  5:7 6:6
**41**  8:12,14
**410**  5:20
**42**  8:16
**421-7777**  5:20
**426**  146:16
**43**  8:19,21
**434-5000**  3:6
**44**  8:24 274:16 274:19 276:22
**446-4800**  3:22
**45**  9:7,9 393:5
**46**  9:12
**462-6000**  2:13
**47**  334:9
**4700**  2:12
**4740**  5:12
**48**  338:13
**4:00**  393:4
**4:07**  391:6
**4:10**  391:13
**4:13**  396:5,9
**4:15**  395:17
**4:22**  1:3
**4:40**  395:18
**4th**  122:6

**5**

**5**  4:13 7:20 37:11,14 106:3 193:17,17 196:17 283:6

317:24 318:20 319:7 321:16 353:10
**5/10/25**  7:16 34:4
**5/16/25**  7:14 33:17
**50**  72:7 375:4 375:20 381:22
**500**  6:11
**501**  5:6
**502**  6:5
**510**  6:11
**55**  9:13
**556-2100**  2:18

**6**

**6**  7:21 38:3 49:19,24 57:10 97:9 378:5,7 385:16
**6/20/25**  7:23 8:8,13,18,23 9:8 39:9 40:15 41:22 43:11 44:18 46:2
**60**  22:8 96:9
**600**  226:6
**601**  3:21
**61**  146:16
**610**  2:6
**625**  65:12,17,21
**63**  274:5,9 276:22

**64112**  5:13
**65**  146:1 281:8
**662-6000**  3:13
**667-7706**  2:6
**67**  9:15
**680**  3:5
**6th**  122:2

**7**

**7**  7:23 11:12 39:6,9 49:19 173:16 190:16 193:17 195:21 381:12
**7/30/25**  7:22 38:3
**70**  19:1
**701-1100**  5:13
**73**  314:2
**737**  14:5
**763-3260**  5:7
**77550**  5:6 6:6
**78212**  6:18
**7th**  39:19 42:8 45:5 46:14

**8**

**8**  8:5 39:21,24
**8/1/25**  7:18 8:11,20 34:24 41:7 44:3
**8/7/25**  8:6,15 9:6,11 39:24 42:13 45:10 46:18

**80**  96:10 374:19,19
**808west.com**  6:19
**81**  69:8
**816**  5:13
**817**  335:9
**850**  3:12
**877**  6:12
**877.370.3377**  1:24
**882-1011**  6:12

**9**

**9**  8:8 40:12,15 85:10 392:9 393:2 395:4
**90**  22:8 374:19
**90s**  119:12
**917.591.5672**  1:24
**97**  9:18 317:15
**973**  4:14,18
**994-1700**  4:14 4:18

**a**

**a.m**  1:19
**a.m.**  12:15 120:7,14
**abilities**  229:14
**ability**  24:11 232:11 267:11 281:13 389:3,9

CONFIDENTIAL

**[able - added]**                                              Page 4

**able**  24:16 64:15 98:20 165:7 169:21 237:16 243:23 257:23 258:10 264:23 265:24 278:24 279:4,5 279:19,23 321:14 323:7 323:11 333:16 355:18 360:9 366:6 390:10 394:18

**above**  1:19 220:7 335:11

**absence**  182:19 184:12 215:19 219:20 243:9 243:13 263:15

**absent**  177:3,4

**absolutely** 113:4 156:11 179:2 214:15 277:7 281:18

**abstract**  365:22 366:7,11

**abuse**  138:4 367:18 373:22 382:18,24

**academia**  78:3 147:13 148:5

**academic**  35:15 52:24 77:2 149:20 150:5

237:21 267:18 269:8 274:13 339:23 381:21

**academics** 247:10 341:24

**accelerate** 379:4

**accelerated** 379:1 380:13

**accept**  135:14 135:16

**acceptable** 50:17,21

**accepted**  36:24 117:10 243:13 335:5

**access**  75:17 107:22 212:8 225:15 226:24 230:18 300:21 300:24

**accident**  163:3

**accommodate** 394:11,19

**accommodati...** 394:8

**account**  155:22 157:2,3 159:13 162:4,10,12,21 162:24 342:6

**accounts** 337:20

**accurate**  59:4 72:14 136:10

136:13 165:4 295:8 336:14 336:17 398:20

**accurately** 24:11 276:16

**aces**  119:1,8,9 119:12

**achterberg** 85:18

**acknowledge** 193:20

**acknowledging** 195:14

**acknowledg...** 400:1

**actions**  228:18 239:12

**active**  36:6 188:23 194:2

**actively**  17:17

**activities**  66:2

**activity**  84:14

**actual**  19:4 31:11 222:8 231:19 232:15 233:2 327:18 347:15

**actually**  14:13 15:24 35:10 48:21 56:15 66:12 67:7 73:6 90:20 105:17 107:22 108:22 127:14

127:19 128:22 130:8,14 134:5 140:1 157:2 167:8 177:4 180:9,11,20 181:22 182:1,5 182:17,20 184:11 186:6 187:12 188:24 194:3,10,16 196:1,7 204:4 213:19 218:6 221:4 227:9 228:14 244:22 245:15 248:15 251:7 256:1,7 257:10 284:15 285:14 286:4 289:7 312:16 315:4 316:13 320:7 322:19 323:24 325:16 349:24 351:18 356:13 372:9 374:20 377:23 383:21 387:7 387:24

**add**  72:19 73:13 92:14 99:14,18

**added**  35:19,22 36:1 72:23 76:14 372:15

CONFIDENTIAL

**[addiction - agnello]** Page 5

**addiction** 1:4
12:19 99:23
100:13,15
101:1,3,5,9,10
101:21 102:6
102:20,22
108:4 128:4,10
268:20 315:2,3
**addictions**
316:4
**addition**
117:17 291:5
**additional** 21:4
21:24 71:6
121:6 122:10
122:11,17
379:5,14
**additive** 344:8
**address** 14:3,4
63:7 171:17
211:12 216:2
270:12 307:11
310:13,15,17
323:6 341:4
343:7,9 348:1
348:5 349:9
350:13 352:6
355:3 356:13
357:9,10,16
359:5
**addressing**
10:23 209:23
211:23 268:14
311:6 342:18

358:2 376:23
377:11 381:9
**adequate** 343:7
343:8 355:3
**adhd** 105:2
**adjourned**
396:9
**adjust** 323:8
353:21
**adjustments**
343:19 354:15
**administration**
16:13
**administrators**
86:15 87:20
89:2 232:6
273:15,17
**adolescence**
9:23 12:19
51:14,16,22
52:1 81:20
83:8,21 84:7
84:13 85:23
173:24 174:9
**adolescent** 1:3
10:20 16:8
84:18 86:4
105:22 108:16
129:9 192:3
221:2 224:5
293:7 338:21
339:7 371:4
389:1,6

**adolescent's**
140:22 179:19
**adolescents**
82:10,18 83:14
85:4 107:13
108:1,18 112:7
113:16 114:6
114:10 129:12
136:11,17
137:3,14 140:9
178:6 179:10
180:5 185:3,11
185:24 186:11
188:24 189:7
189:12 199:10
200:3,11,14,17
201:2 204:23
220:17,19,23
224:1 225:16
241:11 280:16
294:15 302:24
346:10 367:3
367:19,22
368:2,6 369:20
370:9 375:19
386:8 387:17
**adopt** 216:4
**adulthood**
51:21 105:19
185:4 186:1
**adults** 190:21
191:10,12
312:10

**advance** 57:1
394:5
**advent** 106:14
**adverse** 117:24
118:17,24
375:13 381:17
**adversity**
137:23
**advertisements**
161:4
**advisory** 9:22
173:23 174:8
**affected** 136:11
**affecting**
274:13
**affidavit** 55:11
**afforded**
179:14 180:23
**age** 51:18,19,24
85:10 105:23
106:3 170:2,6
228:13 229:22
230:11,12,20
230:24 231:3
231:12 232:9
234:23 282:22
283:2,6,6
321:16 358:1
**agenda** 329:24
**agendas** 329:6
**ages** 81:4
169:21
**agnello** 4:11

CONFIDENTIAL

**[ago - anecdotally]**                                                    Page 6

**ago** 13:22 19:13,22 20:9 52:11 93:2,5 195:2

**agree** 61:19 115:9,14 123:17 124:2 126:4 128:3 129:10 130:1,8 130:10 131:16 136:14 137:4 137:18 138:2 140:20 171:20 172:4,5,21 173:2 175:17 176:7,22 177:1 178:5 179:17 180:20 181:2 181:18 182:5 185:9,17 186:3 187:3 188:21 192:11 194:8 197:10 198:14 199:19 201:10 201:21 220:16 232:14 235:14 246:13 247:16 247:19 249:6 249:17 250:3 251:20 252:23 254:10 255:5 256:3,24 257:4 283:8,17 286:4 286:15 289:2

290:20 300:19 300:22 301:1,7 301:20 302:12 303:10,22,24 304:2,4,9,24 306:2,12,16,20 307:6,19 328:9 329:4 331:18 332:6 337:3 340:5 366:24 367:17,23 368:4 369:14 370:7 371:23 373:4,20 374:11 380:10 382:6,16 383:4 383:15 385:10 386:22 387:7 387:16 388:3 388:15

**agreed** 12:3 69:24 70:6 294:8 394:3,8

**agreement** 62:8 91:19,19

**aguilar** 364:1

**ahead** 51:6 263:19

**akeyes** 3:6

**al** 336:1

**alabama** 4:5

**algorithm** 235:19 236:2,4 236:12,17

**algorithms** 235:15,16 236:23

**align** 244:10

**aligned** 276:4 369:24

**allen** 4:4

**allotted** 394:13 395:3

**allow** 134:16 135:8,17 170:2 188:24

**allowed** 27:23

**allowing** 286:16

**alluded** 352:16

**alphabet** 3:8

**alternative** 238:16

**amanda** 1:19 13:3 397:10

**amended** 7:23 8:13,23 39:1 39:17 40:8 41:15,23 42:7 43:3,4 44:11 44:19 45:3,18 45:19 46:12 47:15 48:8,10 48:21

**amendments** 47:6,16

**american** 9:21 173:21 174:6

174:12,20 175:3,13,18,22 176:8,22 181:3 185:10 375:4 381:23

**americas** 2:16

**amount** 65:7 73:1,16 157:23 171:21 371:12

**amounts** 72:23 73:14

**ample** 224:15

**amplify** 235:3

**analogy** 199:9 311:5

**analysis** 81:19 242:18,22 244:2 245:7,9 245:19 246:16 258:10 259:3 261:21 262:19 262:23 263:2,8 263:21 264:11 265:1 269:4 282:8,15 291:13 292:15 296:5

**analyze** 295:19

**analyzing** 282:7,14

**andrew** 3:4

**anecdotally** 230:23

[anecdotes - articles]                                                Page 7

**anecdotes** 232:2
**ann** 13:20
**answer** 11:5
23:8,21 51:3
105:17 127:13
127:14 132:15
148:11 154:6
170:17 171:3
187:24 204:18
205:11 223:15
226:9 237:24
238:19 241:13
243:2 262:22
282:24 288:7
288:18 294:3
298:10 299:8
327:19 332:11
337:13 344:15
355:19 359:13
**answered**
144:14 167:5
199:22 200:1
244:18 278:17
292:12 372:10
**answering**
143:21
**answers** 23:4
400:4
**anti** 305:2,5
317:23 318:1,8
318:19 319:1,8
319:15 324:23

**anticipate** 21:7
21:11,14,21,23
32:22 394:24
**anticipating**
248:7
**antonio** 6:18
**anxiety** 81:3
104:23 125:18
130:11 136:17
268:2
**apa** 186:19
187:13
**apart** 264:4
**apologize** 67:21
202:1 274:23
**app** 50:15
155:13
**appear** 69:3
**appearance**
81:16
**appearances**
2:1 3:1 4:1 5:1
6:1
**appears** 196:13
209:1 214:20
**appended**
57:11
**apple** 113:23
**application**
285:22 304:13
**applied** 286:19
**applies** 154:14
**apply** 130:21
154:2,7,16

285:11 397:18
**appreciating**
272:11
**approach**
10:23 376:22
377:11
**appropriate**
134:13 135:5
135:13 257:1
341:13 398:6
**approval** 91:7
**approximate**
328:5
**approximately**
19:22 69:24
**approximating**
328:7
**apps** 154:20
**april** 60:20
335:6
**area** 104:6
293:14 316:24
317:1 323:19
333:18 335:3
351:5 356:24
**areas** 261:14
341:4
**arguably** 241:6
269:14
**argue** 63:17
171:1 192:5
245:16 272:23
301:4,11

**argument**
201:1
**arianna** 190:4
**arising** 268:15
**array** 342:14
**article** 81:1,15
82:7,16 83:4
83:11,20 84:3
84:10,17 85:1
85:8,18 86:2
96:2 143:15,24
144:11 145:5
145:15 164:11
164:19 165:7
167:7 183:17
184:9 189:22
190:3,9 191:4
193:11 195:23
196:6,7 198:9
202:4,18,23
237:21 245:5
311:4 334:21
335:21 336:12
336:15 339:5,9
362:9,13
365:23 366:17
376:16
**articles** 21:21
77:3,14,21
78:1 79:13
95:15,20,21
96:1 144:3,18
144:19 145:24
146:4,6,7,12

**[articles - attorney]**                                    Page 8

| | | | |
|---|---|---|---|
| 147:1 148:9,14 | **asking**   32:20 | 288:12 | **assumptions** |
| 148:17,18 | 56:10,12 73:4 | **assessment** | 115:2 |
| 149:3,5,7,14,19 | 94:7 95:6,7 | 108:9,13,17 | **attached** |
| 150:1,6 164:11 | 100:11 101:19 | 109:8,14,18,24 | 398:12 400:6 |
| 164:16,17,21 | 110:14 114:1 | 110:15 133:13 | **attempt**   159:3 |
| 165:3,8,17 | 130:24 133:18 | 142:21 | 189:7,13 |
| 167:17 245:2,4 | 134:9,12 | **assessments** | 227:24 228:4 |
| 286:24 292:2,7 | 135:22 136:6 | 109:2,3,6 | 252:10 298:12 |
| 292:23 295:13 | 153:22 156:10 | 110:3 | 299:16 |
| 296:7 333:6 | 170:13 176:21 | **assistance** | **attempted** |
| 362:4,16,16 | 180:17 182:11 | 359:18 | 332:20 |
| 363:1 364:4,11 | 184:3 187:22 | **associated** | **attempting** |
| 365:4,10 366:3 | 194:18,24 | 50:15 247:20 | 248:16,23 |
| **artificial** | 205:11,15 | 267:16 302:5 | **attempts**   227:4 |
| 307:12 315:5 | 223:10,11 | 379:7 | 230:12 231:12 |
| **aside**   59:18 | 225:14 240:12 | **association** | **attend**   32:17 |
| 77:10 95:8 | 253:11 258:7,9 | 9:22 173:22 | **attended** |
| **asked**   26:4 | 263:7 264:18 | 174:7,12,20 | 359:19 |
| 27:21,22 55:5 | 267:1 273:22 | 175:4,14,18,22 | **attention**   105:1 |
| 59:12 62:15,17 | 275:14 278:10 | 176:8,23 181:3 | 229:8 381:2 |
| 87:23 93:19 | 290:3 296:21 | 185:10 248:1 | **attorney**   7:6 |
| 94:1 110:11 | 300:4 309:4 | 250:22 251:22 | 13:13 19:23 |
| 113:17 127:14 | 311:11 338:7 | 252:24 258:23 | 20:10,24 21:2 |
| 133:19 135:23 | 347:2,4 353:10 | 288:1,9,22 | 25:7,15 28:20 |
| 144:14 162:1 | 353:11 380:1 | 289:11 293:17 | 29:3 32:13,15 |
| 175:6,8,10,10 | 383:14 | 293:23,24 | 33:13,24 34:9 |
| 199:10,22 | **aspects**   213:3 | 294:7 295:10 | 34:20 35:5 |
| 203:11 211:20 | 213:14 | **associations** | 37:10,18 38:7 |
| 212:1 214:4 | **assertion** | 83:12 85:20 | 39:4,14,20 |
| 222:3 252:15 | 274:10 | 185:2,11 | 40:5,11,21 |
| 258:21 266:13 | **assertions** | **assume**   73:4 | 41:3,12,18 |
| 296:22 299:9 | 272:18 278:15 | 75:2 363:16 | 42:3,9,18 43:7 |
| 352:5,10 392:4 | **assess**   108:19 | **assumption** | 43:16,23 44:8 |
| | 114:6,8 142:9 | 114:23 | 44:14,24 45:6 |

CONFIDENTIAL

**[attorney - attorney]** Page 9

| | | | |
|---|---|---|---|
| 45:15,22 46:7 | 126:19 127:6 | 202:3,16 203:5 | 278:7 280:4 |
| 46:15,23 47:18 | 127:15,22 | 204:1,6,11 | 281:24 282:16 |
| 47:24 48:11,19 | 128:2,23 129:3 | 206:7,23 207:5 | 283:7,14 |
| 48:24 49:5 | 130:5,9 131:2 | 207:18,21 | 284:23 286:20 |
| 50:18,22 52:13 | 131:15 133:4,9 | 208:18,20 | 287:22 288:4 |
| 55:16,24 56:2 | 133:16,21 | 209:16 210:7 | 288:10 289:24 |
| 57:3,8 58:10 | 134:2,8,18,20 | 210:19 211:8 | 290:6,17,24 |
| 58:16 63:9,22 | 134:23 135:11 | 211:14 212:15 | 293:11,15 |
| 64:3,18,23 | 135:19 136:4 | 212:20 213:11 | 295:5,18 297:7 |
| 65:10 67:9,18 | 136:18,24 | 214:1,16 216:5 | 298:11 304:16 |
| 68:1,4,7,8,12 | 137:8,17 141:7 | 216:16 217:6,9 | 304:23 306:6 |
| 68:13,16,18 | 141:9 144:13 | 221:8 222:6,22 | 306:11 307:14 |
| 70:2,7,19,21 | 145:3 151:9,15 | 223:16 224:7 | 307:18 308:24 |
| 72:15,21 74:3 | 152:1,8 163:19 | 225:12 231:5 | 309:5,12,17 |
| 74:11 77:17,20 | 164:8 165:11 | 232:13 233:4 | 310:5,21 |
| 78:8,17 81:21 | 166:12 167:2 | 234:4 240:2,14 | 314:14,23 |
| 81:23 82:1,5 | 167:20 168:22 | 240:21 241:20 | 315:21 316:3 |
| 82:21,23 83:2 | 170:1,18,22 | 245:21 246:12 | 318:21 319:3 |
| 86:18,22 87:2 | 171:2,5,15,19 | 246:20 247:15 | 327:3,14 329:8 |
| 88:15 89:10 | 172:9,20,24 | 248:18 249:4 | 330:7 331:21 |
| 90:23 91:17 | 173:7,15 174:3 | 249:21 250:1 | 332:3 334:7,19 |
| 93:12,24 94:11 | 176:12 177:6 | 250:10,16,24 | 338:12,15,24 |
| 94:18 97:8,18 | 179:23 181:1 | 251:19 252:17 | 345:18,20 |
| 98:6,8 106:16 | 181:13 182:7 | 252:19 254:12 | 346:8 347:12 |
| 107:4 111:18 | 183:20 184:15 | 254:18 258:14 | 347:22 353:12 |
| 112:1,15,18 | 185:14 186:14 | 259:1,8 260:3 | 353:18 355:14 |
| 115:12,20 | 187:15 188:1 | 260:5,24 262:1 | 356:17 359:8 |
| 116:22 117:3 | 189:3,18,20 | 262:17 265:3 | 360:8 363:3,11 |
| 118:3,10 | 191:5,15 | 266:6,10,19 | 364:6,14 372:6 |
| 119:23 120:2 | 192:17 193:14 | 269:12 270:8 | 373:3,10,19 |
| 120:16 121:4,8 | 194:14 195:19 | 270:17 271:8 | 374:2,8 375:7 |
| 121:9,18 | 196:10,15 | 272:19 274:2 | 376:3,15 377:3 |
| 123:21 124:1,6 | 197:17 198:13 | 275:10,16 | 377:7 379:17 |
| 124:11 126:1 | 199:21 200:9 | 277:4,23 278:6 | 380:4 383:8,19 |

CONFIDENTIAL

**[attorney - bates]**

384:1,4,11,19
384:22 385:1,5
385:9,14 387:4
387:15,18,22
389:13,16
391:1,15 392:1
393:17 395:7
395:15,21
398:16
**attorneys** 28:18
**attribute**
191:10,13
**attributed**
170:9
**attrition**
332:13 337:21
**attuned** 190:24
194:2 195:7
**atypical** 259:11
270:21 271:7
**august** 1:10
12:14 34:19
35:8 36:15,17
39:19 41:1
42:8 43:21
45:5 46:14
47:9 122:2,9
122:18 146:20
397:11
**author** 81:22
284:24 285:3
287:16
**author's** 82:22
274:24

**authors** 285:6
285:8,24
287:11 377:15
**auto** 234:20
**available** 186:8
210:11
**avenue** 2:16 3:5
3:21 5:12
**average** 157:20
281:5,8 327:15
327:24 331:12
331:16 336:22
336:24
**aware** 91:5
124:12 125:5
204:2,12
234:14 253:7
253:15 309:7
309:18 357:13
375:3,11,18

| **b** |
| --- |

**b** 7:9 8:2 9:2
10:2 37:7
82:24 85:19
**back** 47:22
54:24 60:16,23
69:2 71:5,16
96:2 107:21
111:17,21
120:20 123:6
132:11 135:3
140:6,13
144:19 164:16

164:23 167:6
167:17 182:13
184:8 195:21
196:17 202:4
202:22 212:22
214:6 226:4
244:20 257:19
264:20 265:6
267:6 271:14
275:6 282:4
291:9 296:8
317:2 319:7
324:2,10 336:2
337:8 345:11
347:15 365:4
366:22 384:2
393:16
**background**
90:14,15 246:1
**balance** 394:12
**baltimore** 5:20
14:5 333:22
356:19,21
357:2,3,8,15,22
358:4,17 359:3
359:24 360:11
360:19 361:3
**banned** 226:3
239:18
**banning** 226:13
**bans** 226:19,23
227:4
**barnes** 336:1

**barriers** 209:24
210:4 211:24
216:13
**base** 230:7
**based** 26:12
47:4 51:5 90:7
119:13 124:15
125:22 126:7
134:21 138:24
139:5,11
141:23 146:4,7
146:12,24
148:8,16,18
149:3,6 150:1
150:6 177:12
177:13 178:2
180:2 196:13
243:2 256:4
257:2 273:8
277:21 306:23
309:7 313:14
313:17 314:4,8
316:12 331:2
343:20 353:21
354:15 360:17
365:22 379:1
**basically** 98:14
**basing** 320:2
**basis** 96:5
178:9
**bates** 7:12,14
7:14,16,18,20
7:21,23 8:5,8
8:10,13,17,20

CONFIDENTIAL

**[bates - bit]**                                                        Page 11

8:22 9:5,8,10
9:13,16,19,21
10:5,8,11,16,19
10:21 25:11
33:17 34:4,24
37:14 38:3
39:9,24 40:15
41:7,22 43:11
44:3,18 45:10
46:2,18 55:20
69:7 97:13
121:14 173:21
202:10 208:3
208:10 334:13
338:19 376:20
**beasley** 4:4
**beasleyallen....**
4:6
**becker** 4:13
**bedrooms**
169:17
**beeres** 82:16,23
**began** 317:7,9
**beginning**
378:15,16
**behalf** 28:18
90:4,6,19,21
91:3,20 97:3
380:6
**behavior** 81:2
85:9 219:13
220:2 222:2
303:15 313:5
314:12,22

316:20 320:9
325:11
**behavioral**
9:15,19 14:22
15:2,13 67:15
104:24 107:14
107:18 121:15
143:4,4 315:3
315:9,12,14
316:2,4
**behaviors**
241:17 268:18
301:14 311:1
314:18
**belief** 204:22
205:1 206:5
**believe** 27:1,19
31:6 57:20
72:2 80:3
135:22 139:8
141:22 156:24
167:4 174:23
190:14 193:10
214:4 233:17
235:20 236:18
244:17 245:13
261:10 263:19
276:17 277:1
278:14,19
286:6,8 324:15
360:16 383:22
**bell** 353:24
**bellwether**
62:23 64:6

65:2 88:22
276:6 343:2
344:20 345:14
**beneficial**
176:4,9,24
177:9 178:7
186:20 187:4
286:16
**benefit** 199:14
200:5
**benefits** 178:11
178:19,23
188:22 194:4
194:10,21
195:9 197:5
198:17,22
199:4,7,20
**berman** 6:10
**best** 23:11
24:16 272:17
272:22 273:3
273:21,23
274:1 320:13
342:16 356:3
358:20
**better** 54:17
122:14 141:19
**beyond** 31:10
32:23 51:20
52:2 72:9
121:6 171:12
186:11
**bias** 170:23
251:22 252:15

252:16 253:1,4
253:5,9,12,14
253:18,19,23
253:24,24
254:4,6,10,15
254:17,20,23
254:23,24,24
255:1,6
**biased** 254:1
**biases** 255:6
**bidirectional**
248:3,5
**big** 100:3
341:11
**bill** 67:3
**billed** 72:13
73:1 122:9,11
**billing** 116:8,9
**binder** 42:21
42:23,24
**binders** 24:24
94:17
**biography**
97:20 98:10
**biological**
119:5
**biologically**
220:9 221:20
**biscayne** 2:12
**bit** 17:21 61:23
108:23 126:21
130:18 166:14
217:24 233:8
235:24 272:22

275:17 279:17 282:23 320:3 321:20,21 336:4 347:1 355:17 359:13 368:8
**blame** 196:22 197:13,22 198:3
**blog** 163:4
**blue** 34:15
**board** 7:24 8:6 8:18 39:10 40:2 43:4,12 139:13,16 149:23 273:15 331:12 340:24
**body** 53:18 84:13,20 85:5 215:6 268:3 269:9,9 388:4 388:8
**boer** 82:7
**bolstering** 141:18
**bonnin** 5:4,5
**book** 40:6
**bottom** 69:6 98:7 196:2
**boulevard** 2:12 4:17
**bower** 4:17
**box** 169:15

**bradford** 242:18,21,24 243:5,19 244:2 244:5 245:7,9 245:18 247:2 257:19 261:1 261:18,23 262:18,23 263:1,7,10,21 264:14 265:1,9 269:4,20 270:11 271:1 282:8,15
**brain** 85:22 389:2
**break** 22:8,9,15 23:7 119:24 120:3 207:2,6 260:12 345:19 345:21 385:12 391:3,22 392:18 393:5 395:18
**breaks** 393:7
**breathitt** 7:24 8:6 39:2,10,18 40:1
**brian** 6:22 12:12
**brief** 120:10 207:12 346:2 391:9
**bring** 36:18 329:5 393:15

**broad** 17:21 172:19 235:16 235:17 241:16 310:3 331:24 355:17 359:13 365:18 383:11
**broader** 63:6
**broadly** 89:8 360:14
**brockstedt** 5:17
**brody** 4:11
**broke** 372:11
**broken** 147:16
**brought** 24:20 47:1 52:19 53:1 56:22 57:1 203:16
**bucket** 324:19
**build** 189:1 225:10 329:15
**building** 194:5 194:12 313:4 316:20 373:9
**bullet** 186:16 220:7
**bullied** 305:20
**bullying** 303:7 303:15,24 304:2,4,6,9,18 305:2 379:7
**burling** 3:10
**burnout** 10:16 333:14,21

334:4,13,22 335:13
**business** 240:1 240:19
**byrne** 4:11
**bystander** 305:19
**bytedance** 2:19 2:20

**c**

**c** 85:12,19
**calculate** 393:8
**california** 1:1 12:23
**call** 119:1 219:15,18 220:8,10,14 221:4 224:2 375:21 386:15 391:2
**called** 55:3 79:17 139:20 225:22 276:3 276:20
**calling** 245:10
**calls** 65:19 330:15
**capacity** 64:12 87:10 96:6,12 105:20 313:4 316:20 358:19
**capture** 300:4

**[care - certainly]**

**care** 18:7,9,13
19:15,21 20:3
20:7 104:13
107:6 109:11
110:9 112:24
124:21,23
125:1 209:24
210:4,10
211:24 360:17
389:18 390:16
**careful** 216:2
**carefully**
224:13 398:4
**carella** 4:11
**carellabyrne....**
4:14,15,19
**caring** 217:19
**carry** 353:6
**cartmell** 5:11
**carved** 240:16
**case** 8:8,11,13
8:15,18,20,23
9:6,8,11 20:19
26:4 40:16
41:8,23 42:13
43:12 44:4,19
45:11 46:3,19
52:16,17,18
59:23 60:3
66:3 68:20
80:11 89:21
114:16 133:10
150:22 173:10
187:8 198:5

221:16 242:19
244:3 259:20
259:22 288:13
288:14 314:1
321:17 323:5
325:15 361:1
361:12 362:20
370:19 380:21
384:9,15
391:18
**cases** 1:7 19:16
132:12 179:8
272:24 379:6
**castillo** 6:16
**catch** 392:12
**category** 148:6
**causal** 244:7
247:21 249:19
256:21 289:18
289:18
**causality** 243:8
243:24 245:12
**causation**
247:17 248:1
250:23 251:6
252:5 256:3,14
257:1,8,11,22
257:24 258:10
258:11 263:14
269:18,23
295:3,17
**cause** 114:6,8
114:23 115:9
126:10 191:24

192:7,14 193:3
235:4 245:13
255:17 282:7
282:14 320:8
367:2,18 368:1
368:5 369:9
370:8 374:13
374:15 382:24
388:22
**caused** 63:7
183:19 197:3
223:13 227:5
234:6 250:8,14
266:8,23 267:2
267:4 279:2
280:1 294:15
312:22 313:11
316:13 368:9
**causes** 114:9
190:22 259:4
**causing** 221:15
248:15 251:12
342:22 343:14
**cecchi** 4:11
**ceiland** 5:7
**cell** 226:19,23
226:24 227:4
**center** 2:11
14:8,12 36:11
87:8,13 89:23
90:5,8,21
91:12 96:21
106:5 108:10
108:14 109:9

109:24 190:19
206:12 242:10
312:7 326:6
349:22 357:21
358:15 359:5
359:20 360:11
360:15 362:12
**certain** 98:21
99:2 135:5
136:21 161:3
169:20 197:3
198:24 226:13
244:9 295:24
335:15 336:5
336:19 351:13
361:24
**certainly** 105:4
114:9 115:7
116:12 129:13
161:4 165:1,2
201:1 210:8
222:15 233:9
233:23 234:15
234:24 236:20
237:19 240:6
244:4 247:23
248:6 251:5,10
252:6,11 255:4
255:13,18
256:19 284:8
292:21 295:14
297:19 302:9
303:17 307:8
313:1,8 314:9

CONFIDENTIAL

325:2 333:2 336:21 355:20 367:5,12,20 381:1 382:19
**certificate** 397:1
**certification** 12:4 397:17
**certified** 1:21 332:7 397:11
**certify** 397:4 400:3
**certifying** 397:21
**cessation** 312:22
**cetera** 96:23 107:19 154:12 183:7 281:14 389:11
**challenge** 115:17 250:15 341:19
**challenges** 113:7 187:11 268:14 331:20 332:7 339:16 340:7 341:6 369:9 370:5,21
**challenging** 52:20 61:22
**chance** 176:15
**change** 35:6 81:16 309:22

313:6 316:21 317:15 320:8 330:11 399:3
**changed** 307:7 307:9,20 308:4 315:10 387:9
**changes** 35:7 35:13 225:15 308:12,15,20 308:22 310:2 310:13,15 398:11 400:5
**changing** 309:11,20 327:1 339:19 340:10
**characteristics** 179:11,20
**characterizati...** 315:19 393:20
**characterize** 232:1
**charge** 65:21 66:2,5
**charging** 65:16
**charleston** 8:9 8:11 40:9,17 41:1,9
**charts** 107:21
**check** 1:16 2:3 207:1,6
**checking** 183:2 280:24

**child** 10:20 16:8 105:21 108:16 129:9 192:2 197:23 338:20 339:6 375:13 380:6 389:1
**childhood** 52:3 106:5 108:22 117:24 118:17 118:24 318:10
**children** 10:14 65:8 85:10 107:12 108:1 108:17,20 109:2 112:6 129:12 137:13 137:24 159:6 167:22,23 168:1,2,4,7,8 168:10,15 169:6,12 170:3 170:7,20 208:15 217:15 227:12 241:11 273:19 280:16 294:15 302:24 369:20 374:20 375:19 382:16 382:21
**children's** 171:7 381:19
**china** 283:11

**choice** 392:21 393:1
**choices** 139:21 140:4,10
**chronic** 312:7 367:24
**chu** 85:8,12
**circle** 370:14
**circumstance** 136:8
**circumstances** 135:6 136:21 179:12 275:5 330:10 342:21 362:22 369:10
**citation** 273:22 311:10 312:2
**citations** 275:7 278:18 311:12
**cite** 182:12,15 272:9 311:4,19 311:23 316:11 322:24 333:16 346:14
**cited** 92:9 94:5 94:8 95:1 164:16 272:7 311:15 318:7 324:3 363:1 364:4
**cites** 274:19
**citing** 271:22 335:24

CONFIDENTIAL

**city** 5:13
333:22 357:22
358:17 359:3
359:24 360:12
360:19 361:3
**citycenter** 3:11
**claim** 204:15
**clarify** 30:24
50:24 51:3
99:24 105:17
138:16 159:9
363:6 376:9
395:8
**clarifying**
31:16 146:17
**clarity** 196:4
**class** 100:23
237:7,11
**classes** 16:24
17:3 99:21
**classified**
315:24
**classroom**
201:5 281:12
344:4 389:11
**clean** 24:6
**clear** 23:14
89:11 195:22
205:6 211:17
213:13 218:3
221:11 222:4
258:7 277:19
278:10 323:23
339:4 351:2

**clearly** 142:18
166:4 322:22
**clients** 325:19
326:2 330:20
**clinic** 108:17
109:14 110:15
**clinical** 17:5,11
17:14,17,20,23
18:1,2 19:4,8
19:10 20:5
51:16 103:5,7
103:11,15,17
103:20 111:1
111:12,23
112:9 114:15
115:21 116:18
116:20 124:15
124:20 125:3
126:23,24
128:5 131:20
132:7 135:9
138:9 139:8
237:16 357:2
389:17,19,24
390:1,14,16
**clinically** 133:3
**clinician**
106:13 109:21
110:16,17,18
110:20 134:14
135:13 358:8
358:10
**clinicians**
106:23 125:15

358:12 359:24
360:19
**close** 382:17
**code** 236:17
**coding** 236:21
236:22
**cohort** 81:4
85:11 321:13
321:15,19,23
321:24 322:4
**collaboratives**
350:1
**colleagues**
36:11 161:7
242:6
**collect** 110:11
130:22
**collecting**
111:11 133:12
**college** 54:4,10
217:21 283:10
284:12,17
**colloquially**
345:2
**column** 26:6
69:15 378:23
**combined**
323:3
**come** 19:16
21:22 23:18
109:17 119:2
126:23 127:9
132:4 133:13
142:17 248:10

248:11 252:2
266:17 284:2
313:19 318:13
329:23 337:8
342:3 348:20
349:12,18
351:4 352:5,10
352:14,24
353:4 361:22
371:21
**comes** 113:8
142:16 206:17
325:10 331:5
331:10 371:15
**comfortable**
169:2 171:6,13
199:11 328:7
**coming** 278:20
279:10 353:9
353:15
**commencing**
1:18
**comments**
31:18
**commission**
400:12
**committee** 5:22
10:10,10,13
54:13 175:7,9
175:13 208:5,6
208:12,23,24
210:1 211:11
211:20 212:12
215:16 216:12

CONFIDENTIAL

**[committee - conducted]**                                          Page 16

217:13
**committees**
175:11
**common**  285:8
336:23
**commonly**
117:8 248:8
315:15
**communicate**
189:1
**communicating**
22:21 194:4,11
**communication**
97:1
**communicati...**
304:11
**communities**
382:2,9,14
**community**
136:16 137:1,2
138:18 306:23
307:4 373:14
380:18 382:13
383:6
**comorbid**
105:3
**companies**
142:7 232:21
**companionship**
188:16
**company**  1:23
142:2 143:12
**compare**  371:2

**compared**
293:9 371:3
**comparison**
85:4 268:5
**compensation**
58:7,8 102:24
**competing**
339:19,24
340:9,13 341:2
**complete**  24:17
27:6 42:19
46:24 49:6,9
57:23 58:20
59:3
**completed**
35:17
**completely**
276:4 288:17
297:20
**complex**
115:11 320:16
320:18 322:21
**complexity**
197:1,16 198:7
**complicated**
367:5
**component**
10:19 216:23
304:12 320:7
322:17,20
323:10 338:20
339:6
**components**
312:15,17

313:2,9 314:8
317:3 354:21
354:22
**composition**
141:1
**comprehensive**
10:22 26:22
54:6 61:15
63:6 142:9
145:21 212:2
224:20 225:6
225:10 241:23
296:12 299:1
310:10 311:18
330:3 349:8
350:12 351:2
376:22 377:11
**compulsive**
183:2
**compulsively**
280:20
**computer**  75:8
237:5,8,11
**concentric**
370:14
**concept**  193:1
243:3
**conceptually**
119:19
**concern**  205:17
348:21 383:1,3
**concerns**
238:23 239:6
268:23 343:24

344:3 369:19
381:20
**conclude**  393:3
**conclusion**
256:9 258:21
366:7
**conclusions**
232:7 255:19
256:13 257:8
260:2 262:16
265:22 273:7
277:20 291:14
292:16 295:15
324:12
**concurrent**
83:12
**condition**
123:19 124:4
269:5
**conditions**
104:13 105:13
105:18 117:16
117:20 118:24
220:10 221:21
266:7
**conduct**  163:10
163:12 239:12
239:24 240:19
241:6,7,16
262:23
**conducted**  27:8
29:5,7 32:18
123:2 163:6
257:16

CONFIDENTIAL

**[conducting - content]**    Page 17

**conducting**
21:7,11 32:22
**conferences**
226:6
**confine**  203:2
**confined**  100:8
372:1
**confirm**  56:3
56:10,13,16
82:13 97:19
122:1 174:4
189:21 208:21
217:11 334:20
339:4 377:8
**confirmation**
75:19 255:1
**conflict**  138:4
268:19
**confounder**
249:8,12
252:10
**confounders**
248:9 252:11
**confounding**
248:9 251:23
252:7,8
**confusing**
165:14
**congress**  53:20
54:21 207:20
210:16 218:22
**connectedness**
189:14

**connecticut**
379:3 380:8,14
380:24
**connection**
60:14 199:2
378:11,18
**connolly**  3:3
**consciousness**
81:17
**consensus**
128:15 129:5,5
129:18 294:12
294:23
**consequence**
235:10
**consequences**
84:11
**consider**  20:5
62:17 82:7
150:24 152:13
152:21 235:9
255:3 256:23
264:12,20
265:11 268:9
269:16 284:17
289:17 307:22
343:10 344:9
362:15 366:17
**consideration**
62:2 362:14
**considerations**
243:17,18
**considered**
7:20 37:7,8,15

57:22 58:1,18
58:21 59:1,7
76:3,15,19
77:7,9,15,23
78:15 79:14,17
81:9 82:3
150:21 216:9
265:12 289:15
292:22 323:18
348:8,15 349:2
354:12 364:12
364:19,21
366:20
**consistency**
328:12,15
355:2
**consistent**
69:23 193:6
203:3 390:6
**consistently**
77:3 164:18
166:9 229:7
349:4
**constantly**
309:10,19
**constitutes**
147:11 150:17
**constrained**
351:6 371:14
372:19
**constraint**
342:4
**constraints**
340:15

**constructs**
84:21
**consult**  296:22
**consultant**
89:22 90:19
296:23 325:19
**consultation**
108:10,13
109:8 148:1
**consultations**
299:19
**consulted**
143:12
**consulting**
14:17,20,20
15:2 20:13
65:17 298:19
326:2 330:20
**contact**  182:19
**contacted**
60:14 61:2,6
61:11
**contain**  286:6,9
**contained**
49:18
**contemporan...**
31:1
**content**  158:10
171:23 172:8
179:13,21
180:8,17 182:2
182:10,19
183:1,5,5,18
184:12 201:11

CONFIDENTIAL

**[content - corrections]**

201:15 204:13 226:8 280:2,10 280:13,14,15 281:18 282:3 301:12 308:22 309:9,16,19,22 310:3

**context** 110:15 112:8 113:8 114:17 116:7 116:13 177:3,4 177:21 199:4 201:8 219:21 221:17 222:16 223:3 224:10 242:3 248:24 249:9,11,24 253:21 255:3 266:18 299:19 303:5,8,17 315:10 334:1 340:12 341:3 348:3,9 368:12 368:20 369:5 377:22 382:20 383:13,18 385:19 389:23

**contexts** 181:12 186:24 235:22 334:2

**contextual** 370:3

**continue** 16:19 16:20 102:23

110:1 310:19 392:5,17,22 394:20 395:11

**continued** 3:1 4:1 5:1 6:1 379:4

**continuous** 156:4 299:6 326:10,15 328:17 352:2 359:21

**continuously** 35:20 174:21

**contrary** 195:17

**contribute** 16:20 114:19 115:16 119:22 125:17,20 136:16 137:12 137:16 193:8 210:14 213:9 256:19 259:24 383:2,6 387:2

**contributed** 279:6,8,21,22 370:4

**contributes** 30:3 125:12 128:16 144:6 381:19

**contributing** 145:9 198:11 211:5 281:19

386:18 387:12

**control** 228:10 228:12,19 229:14 397:20

**controlled** 243:10,14 282:3

**controls** 234:23

**conversation** 23:18 62:1 136:3 190:17 191:3 392:3 393:21

**conversations** 30:7 88:12 94:22 169:7 309:8

**conversely** 132:3

**copies** 25:1

**copy** 18:19 33:22 38:20 67:22 68:5,9 121:19 146:20 316:6

**corollary** 320:19

**corp** 14:21

**corporation** 15:20

**correct** 38:13 38:14 47:12,17 48:10,15 65:11 65:14 66:18,19

69:17,21 73:5 79:20 80:5 83:17 85:13 89:18,19 90:22 91:21 102:8,9 102:18 105:14 106:15 107:5 108:7 117:20 118:1 121:8 122:7 125:21 125:24 127:5 132:18,21 133:11 147:8 148:15 149:10 149:24 150:4 159:11 194:13 196:4,8 199:20 203:4 209:15 210:11 211:13 212:19 213:17 217:1,4,22 232:24 245:7 246:18 253:9 277:24 286:2 288:11 289:23 312:4,15 314:13 315:3 335:7 336:15 353:8 355:10 377:5,16 393:23 400:4

**corrections** 398:5,7 400:5

CONFIDENTIAL

**[correctly - curriculum]**

**correctly** 72:23
73:13 185:6,8
197:6 224:6
295:21 335:17
340:3 379:9
388:7
**correlation**
244:14 247:17
247:24 248:3
290:21 366:21
**correlational**
256:5,16,18
257:3,6,14
258:1,4,12,19
259:6,13,22
261:8 288:12
288:20,21
289:3,15,21
290:15 291:2,6
**counsel** 12:3
13:1 25:4
26:12 28:9,13
28:14 32:16
59:14 62:8,12
65:18,20 66:10
67:6,24 68:5,9
73:15 74:16
75:1 76:7
77:12,16 80:4
92:5,17,23
93:13,15 94:3
94:12,14,23
95:10,22
119:23 120:16

120:19 345:18
384:4 391:17
392:3,5,15
393:22 394:16
394:24 395:9
**counselor**
300:21,24
**count** 47:5 48:4
68:24 72:11
146:16
**counterprodu...**
192:8,16
**country** 88:7
223:22 224:5
283:10 284:11
327:17
**county** 4:7 7:24
8:6,9,12,14,16
8:19,21 39:10
40:2,9,17 41:1
41:9,16,24
42:7,14 43:5
43:13,21 44:5
**couple** 53:13
142:17 162:8
183:22 195:1
358:10
**course** 21:18
93:16 100:18
100:19 157:17
160:10 247:18
360:20 370:19
392:7

**courses** 100:12
**coursework**
17:9
**court** 1:1,20
12:22 13:3
23:2 171:18
393:13 394:14
398:20
**cov.com** 3:13
**cover** 30:1
33:10 43:1
**covers** 321:18
**covid** 368:4,9
369:16
**covington** 3:10
**crafted** 215:23
**crafting** 216:8
**craig** 5:4 6:17
**create** 162:11
188:15
**created** 308:6
347:24 348:4
348:13 349:7
350:11
**creating** 163:4
348:9
**creation** 379:16
**crises** 186:22
187:6
**criteria** 116:3
116:17 117:18
123:19 124:3
124:10,17
125:6,9 127:18

132:7 243:7,11
243:19 244:5
245:11,16,20
246:9 247:3,4
247:12,14
256:13,17
257:19 261:2
261:16,23
262:8,10
263:11,13
265:9 269:22
270:2,11 271:2
388:9,21 389:7
**cross** 84:22
257:9
**cull** 365:5,8
**culled** 365:16
365:19
**culture** 306:5
306:10
**cumbersome**
98:24
**curb** 317:18
**current** 15:21
343:4,7,13,15
344:12
**currently** 14:10
14:16 16:6,23
17:2,10,13
18:11 20:11
36:9 128:12
355:4
**curriculum**
7:16,18 34:5

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 35:1 216:23 | 365:2 | 391:23 392:8 | **deeper** 153:19 |
| **cut** 365:21 | **date** 1:19 12:14 | 392:14 395:13 | 314:5 346:19 |
| **cv** 18:16,18,24 | 18:16 33:7 | 400:11 | **deeply** 182:18 |
| 24:24 33:22 | 34:18 35:13 | **days** 68:15 93:5 | 231:19 234:10 |
| 34:11,12,16,18 | 36:19 60:24 | 93:7 113:16 | 264:8 |
| 35:15 36:18 | 69:11,15,19 | 200:15 348:19 | **defendant** |
| 53:11 54:24 | 70:5,22 106:19 | 398:16 | 80:10 86:9 |
| 139:22 140:2,6 | 205:5,12 288:8 | **dbonnin** 5:8 | 145:18 |
| 141:16 142:19 | 394:22 398:9 | **dc** 3:5,12 | **defendant's** |
| 145:24 146:10 | 400:8 | **de** 4:17 | 222:20 |
| 148:9 149:17 | **dated** 33:22 | **dealing** 63:5 | **defendants** |
| 174:16 358:7 | 37:23 39:3,18 | **death** 367:23 | 2:19 3:7,14,23 |
| **cvs** 35:8 36:5 | 40:9 42:8 | **decade** 106:24 | 56:4 80:14,17 |
| **cyberbullying** | 44:13 45:4,20 | 107:11 206:3 | 106:14,21 |
| 303:3,4,7,11,13 | 46:13 47:7,9 | 325:15 | 107:3 150:14 |
| 303:19,23 | 47:16 98:1 | **decades** 270:7 | 150:22 151:5,7 |
| 305:3,5,8,15 | 122:2 190:4 | 326:13 378:17 | 151:14,23 |
| **d** | 397:11 | **decide** 360:23 | 152:6,11,18 |
| **d** 7:2 86:3 | **dates** 25:21 | 361:10 | 154:15,16,19 |
| **daily** 83:13,23 | 26:5,6 48:22 | **decision** 223:22 | 163:17 164:7 |
| 129:16 273:14 | 49:4 53:11 | 262:9,11 323:3 | 164:10 165:22 |
| **daniel** 3:4 | 74:19 139:23 | 340:22 | 166:3,10 |
| **data** 64:12 65:6 | 140:1 174:17 | **decline** 316:14 | 169:22 201:17 |
| 131:18 237:13 | 358:7 394:3 | **decrease** | 203:12,23 |
| 237:17,20,23 | **dating** 140:17 | 313:24 316:19 | 204:17 215:2 |
| 244:12 284:21 | 140:20 | 317:6 383:7,11 | 223:2 226:21 |
| 287:9 300:3,4 | **david** 4:12 5:5 | 386:19 387:3 | 228:11 230:6 |
| 302:23 308:21 | **day** 22:7 64:2 | 387:13 | 231:1,20 |
| 339:20 344:11 | 160:10,21 | **decreased** | 232:16,19,20 |
| 346:10 375:11 | 227:1,19 230:9 | 267:18 269:7,8 | 233:2 238:8,22 |
| 375:16 382:10 | 230:9 281:2,8 | **dee** 1:19 | 239:5,11,17,24 |
| **databases** | 281:10 289:13 | **deemed** 398:19 | 240:8,19 241:3 |
| 361:15,18 | 293:8 297:1 | **deep** 320:8 | 298:7 303:9,20 |
| | 298:2 358:1 | | 304:14 307:24 |

CONFIDENTIAL

**[defendants - despite]**                                                    Page 21

346:23 347:7 368:22

**defense** 32:17 68:5,9 150:18 153:2,6,9 154:3 161:10 163:7,10 165:10 166:17 166:19,22 168:5 170:3,13 203:4 204:3 229:15,24 231:4 234:7 362:23 363:8 363:13,19 392:5,15 395:9

**deficit** 105:1

**define** 17:20 125:8 202:20 236:4 242:21 243:1

**definition** 51:14 149:15 149:18 150:10 150:17,21 203:3,8,18 236:7 288:19 303:3

**degree** 103:19 104:5 237:4,13 237:23,24 368:23 370:21

**degrees** 103:24 104:3

**dekalb** 4:7 8:14 8:16 41:16,24 42:7,14

**delay** 394:17

**deleted** 76:14

**delivered** 204:13,20

**delivery** 204:16

**demerath** 6:16

**demonstrate** 258:4 311:24

**demonstrates** 181:24 182:9

**denied** 52:22

**department** 101:5,11,14,16 101:18,22,23 102:4,13,14,16

**departments** 87:17 101:3

**depend** 181:5

**dependent** 179:9,18

**depending** 171:23 172:7 204:14 324:7 375:16

**depends** 96:15 96:15 125:8 127:20 131:20 144:1,8 149:11 161:1 181:21 242:20 286:22 288:17,18

317:12 366:1 374:4

**deponent** 12:23 400:1

**depose** 183:13

**deposed** 52:8 52:12,16 53:3

**deposing** 398:16

**deposition** 1:13 9:13 11:2 12:16 13:24 55:15,21 56:5 56:9 65:22 78:23 86:8 91:24 92:3,13 92:18,21,24 93:4,11 94:10 95:2,12,23 392:6,7,14 393:4,14 394:4 394:17 395:11 395:13 396:8 397:6 398:3,13 398:17,19

**depositions** 77:11,22 78:5 78:13 79:6,9 229:17 231:9

**depressed** 127:20 132:5 133:3

**depression** 81:3 107:18

125:18,22 126:10,11 127:18 130:12 132:8 133:1 268:2

**depressive** 81:18 83:6 84:5 104:22 117:24 118:13 118:16

**depth** 348:23

**derive** 183:8

**describe** 163:15 220:8 267:15 303:15 315:6,13 319:9 319:23 358:3

**described** 25:5 146:3 267:7

**description** 7:11 8:4 9:4 10:4 69:16

**design** 153:20 232:15,18,19 233:2,11,13,22 235:11 238:16 240:7 241:8,18 281:16 293:4

**designed** 149:3

**designs** 291:10 292:17,20,22

**desk** 362:10

**despite** 339:21 394:2

CONFIDENTIAL

**detail** 233:21 319:22 321:4

**detailed** 142:18 322:6

**details** 153:23 316:23

**determinant** 119:21

**determination** 252:3 257:2 263:14

**determine** 131:11 243:7 243:23 245:11 250:20 251:21 252:24 259:15 366:6,8,17,23

**determined** 256:4 288:9 294:6 366:11

**determining** 244:6 259:4

**detrimental** 267:21

**develop** 62:21 142:7 298:15 298:24 299:15 350:2 352:5,10 374:21

**developed** 31:13 63:4,12 63:20 139:20 140:8 141:4 142:4 299:4

318:24 353:20

**developing** 58:1,21 88:13 299:6 349:13 354:12 377:22

**development** 85:22 86:5 137:7 141:6,21 143:7 241:7,19 267:20 270:1 307:12 341:14 341:20 342:1 353:22 354:8 354:16 355:8 355:12 356:2 380:7 389:2

**developmental** 313:7

**devices** 302:15

**dgilfillan** 4:15

**diagnosable** 388:17

**diagnose** 107:12 116:3 126:16 133:2

**diagnosed** 108:3 125:22 126:7,9 127:19

**diagnoses** 106:8 107:23 109:10,15,20 109:23 110:21 116:4 117:15 127:3 128:16

130:16 131:10 170:20

**diagnosing** 99:23 100:14 100:17 101:1

**diagnosis** 110:13 115:8 116:8,10,14 124:18 125:7 125:10,13,18 125:20 130:13 130:20,23 131:1,7,12,19 132:2,7 133:15 133:20 134:15 134:17 135:8 135:14,18 136:1,2,9 170:8 390:22

**diagnostic** 116:16 117:18 123:18 124:3 124:17 125:6,9 126:13,17 127:18

**diana** 363:24

**dictate** 341:13

**difference** 79:2 153:6,8 171:21 172:5,6 314:10

**differences** 153:10,12

**different** 51:24 54:2 66:2

93:19 98:17 105:9 107:23 109:9,12,20 126:21 130:18 153:20,24 158:20,22 166:14 169:14 172:16 204:13 213:3,14 235:22 245:2 246:3 253:8 257:16,17 264:13 265:21 269:21 275:18 282:22 283:1,2 291:11,15 292:7,16,20 294:5,6 299:10 304:7,19 311:20 312:20 319:21 324:6,7 326:17 329:12 347:1 350:5 354:24 368:8 375:15

**differently** 94:20 204:20 235:21 377:20

**difficult** 280:8 282:23 340:1

**difficulties** 381:21

**dig** 341:21

CONFIDENTIAL

**digital** 83:13,21 111:16 113:12 163:18 242:6 242:15,15 301:3,5 302:15 304:10

**diminished** 267:20

**dinner** 169:18

**direct** 17:22 18:7,8,13 19:8 19:10,15,20 20:7 86:13 104:12 124:21 124:23,24 139:8 192:20 358:11 389:18 390:16 397:20

**direction** 11:5

**directionality** 82:11

**directly** 20:3 104:11 170:23 249:16 273:9 278:20 281:10 335:11 371:8

**director** 87:10 87:12 91:12 108:8 110:4 190:19 206:11 242:9 349:21 358:15 362:11 362:11

**disagree** 177:8 178:2 213:18 256:6 285:3 289:20 290:12 290:13 315:18 393:18

**disallowing** 169:18

**disappeared** 308:7

**discard** 284:9

**disclose** 94:13

**discontinue** 99:5,7

**discord** 152:13 152:17

**discovered** 63:1

**discretion** 135:15

**discrimination** 136:15

**discuss** 67:6

**discussed** 66:8 66:12 67:8 93:15 161:11 229:17

**discussing** 230:23

**discussion** 178:18,21

**discussions** 147:23 232:1 234:17

**disease** 312:8

**disorder** 105:2 107:18 108:5 117:24 118:13 118:16 128:5 130:4,13 315:2 315:13,20,20 316:1,2 388:5 388:9,18,22 389:7

**disorders** 51:10 51:10 104:22 104:22,23,24 105:3,4,5,7,9 315:15,17 382:20 389:20 389:23 390:2 390:19

**displayed** 67:19

**disposal** 317:21

**disproportion...** 186:23

**disregard** 259:12

**disregulation** 268:20

**disrupted** 268:1 269:9

**disrupting** 274:12 277:10 277:13

**disruption** 279:7 289:12

289:14 344:4 388:20

**disruptions** 201:5 235:4 281:19

**disruptive** 267:24

**dissatisfaction** 85:5 268:4 269:10 388:4,8

**distance** 368:19 369:1

**distinct** 112:11 167:9

**distinction** 51:5 103:14,17 151:7,13,20,23 152:5 315:5

**distinctions** 153:17 264:9 279:15,17

**distinguish** 262:21

**distracted** 282:10

**distraction** 267:17 268:18 269:7

**distractions** 270:16

**district** 1:1,1 4:7 8:9,12 9:9 9:12 12:22,22 26:16 27:2

**[district - drove]**

31:4,20,24
38:13 40:9,18
41:1,9 42:7
45:20 46:4,13
46:20 48:7,16
63:23 64:1,19
86:15 88:4,5
89:1 276:8
298:14,21
299:2 327:7
329:7,12
330:11 331:5
334:2 343:20
344:10,14
348:1,6 350:21
352:4,9 353:9
353:15 354:2
356:22 359:7
372:3 373:6,7
373:17,21
374:1,6 391:19
**districts** 6:20
26:14 27:12,14
27:15 32:1
47:14 49:11
62:22,23 64:6
64:11 65:2
87:17 88:7,22
89:15 96:22
142:9 143:1
147:23 206:15
206:22 232:6
234:18 268:11
270:7 276:6

297:19 299:4
326:7,19 327:9
327:21 330:21
331:15 335:15
335:22 336:6,7
336:20 337:1
337:15 342:7
342:13 343:2,3
344:20,21
345:14 348:19
349:8,13 350:1
350:8 351:3,20
352:13,17,23
354:1,19 355:1
355:12,21
358:16,19,22
370:11
**dive** 153:19
346:19
**division** 12:13
16:8 101:10,20
102:6,7,13,22
106:6 108:15
**divisiveness**
383:5 386:16
387:1
**divorce** 91:15
180:7 281:22
**divorced** 90:11
**doctor** 133:11
**document** 1:6
25:17,20 56:18
176:14,19
177:5 179:5

187:21 218:8
218:24 222:12
277:15 377:9
377:15
**documentation**
32:8 140:15
**documented**
276:24 277:7
**documents**
11:10 56:8
57:2,17 60:7
79:18,19,22
80:1,7,10 92:9
93:10,22 94:5
94:8,13,22
95:1,9 354:9
364:21
**doing** 13:17
21:14,24 30:1
69:1 111:14
133:12 268:13
326:9 347:10
356:10 364:16
366:16 398:8
**domestic** 138:3
**dominating**
268:23
**dose** 295:19,24
296:5
**double** 252:13
**doubtful**
270:19
**dove** 182:17
234:10 264:8

**downloaded**
155:13 157:1
**dr** 13:21 56:7
68:21 90:6
91:11,20 93:13
120:18 121:20
176:12 224:12
224:14 345:7
346:9 392:10
393:15
**draft** 71:17
**drafted** 50:10
71:20
**drafting** 336:12
**draw** 232:8
255:19 256:9
256:13 257:8
258:21 273:7
324:12
**drawing**
283:18 293:3
**drew** 362:5
**drive** 5:19
75:16
**driven** 329:21
339:18
**drives** 235:8
**driving** 10:6
182:21 189:23
202:11 341:22
**dropout** 254:23
**drove** 379:16
379:23

**[dsm - encouraged]** Page 25

**dsm** 115:22,24 116:1,17 117:7 117:12,18 118:7 123:20 124:5,9 128:5 128:7,8,13,19 128:22 315:1 315:19,24 316:5,7

**duly** 13:8 397:5

**duration** 319:18 326:1,1 350:15 352:11

**dwhiteley** 3:7

**e**

**e** 2:4 7:2,9 8:2 9:2 10:2 60:17 81:24 82:24,24 82:24 83:16,16 84:18 85:19,19 86:3 304:5,8 399:1

**earlier** 139:10 150:15 207:19 219:19 225:21 237:18 264:8 279:13 356:18 375:14 384:16

**earliest** 69:19

**early** 81:19 82:18 83:7 106:4 108:22 335:14

**easier** 23:9

**easy** 160:13

**eating** 388:4,9 389:19,22 390:2

**economic** 369:18

**edit** 77:4

**edited** 196:4

**editing** 336:12

**editor** 21:19 361:21 362:10

**editorial** 149:23 150:7 333:3

**educated** 302:7 305:12,15

**educating** 229:3,5 268:16

**education** 8:7 8:18 10:13 39:11 40:2 43:5,13 86:14 87:5,16,17,20 87:24 88:24 103:3 130:21 190:1,18 202:6 208:13 216:21 217:13 301:3,6 301:10,22 302:14,19 313:3 320:18 320:23 322:21 350:24

**educational** 103:9 201:12 201:18 268:24 332:22 337:6 378:12,19

**educator** 333:8

**educators** 87:21 190:23 229:3 332:16 334:4

**effect** 248:16 282:7,14

**effectively** 22:21 267:11

**effectiveness** 267:21

**effects** 179:9 181:4,17 267:21

**effort** 166:18 231:2 316:19 317:6,14 318:9 320:6,7 326:15 355:21,24

**efforts** 313:15 313:17,24 314:5 316:13 317:17 319:8 325:2,9

**eight** 52:11 184:21

**eiland** 5:4,4

**eilandlaw.com** 5:7,8

**either** 50:14 56:24 104:11 109:16 110:1 111:3 219:15 222:19 272:15 340:19 373:22 394:20

**element** 264:24

**elementary** 52:3

**elements** 264:13

**elliot** 3:17

**ellis** 3:20

**eloquent** 236:7

**emeritus** 16:3,7 16:10,15 20:14 91:13 96:6,12 103:1

**emotional** 137:6 188:17 268:19 342:1 349:9,14 350:13 354:21

**employed** 86:8 91:8 138:12

**employee** 138:23

**encountered** 297:22

**encourage** 113:1 226:2

**encouraged** 188:14

**[ended - examining]**

| | | | |
|---|---|---|---|
| **ended** 35:16 | **entirety** 32:9 | 3:11,20 4:4,12 | 375:6,22 376:2 |
| **ends** 69:8 | **entitled** 82:8 | 4:12,17 5:4,5 | 376:5,7,9 |
| **engage** 96:22 | 83:6,21 84:4 | 5:11,18 6:4,10 | 381:24 |
| 143:7 219:12 | 84:11,18 85:2 | 6:17 | **events** 206:16 |
| 220:1 222:2 | 85:8,19 86:3 | **essentially** 31:5 | 381:18 382:8 |
| 274:11 371:17 | 174:7 189:22 | 142:23 147:13 | 382:12,13 |
| 389:3,10 | 334:22 339:5 | 175:1 243:6 | **evidence** 83:23 |
| **engaged** 17:10 | **entity** 14:11,16 | **establish** 116:3 | 130:3 141:23 |
| 17:13,17 156:5 | **environment** | 216:22 289:3 | 177:16 178:16 |
| 160:18 162:20 | 26:20 177:18 | 289:22 290:16 | 187:7 263:16 |
| 162:23 183:6 | 180:15 182:4 | 352:19 | 265:18 316:9 |
| 235:3 368:18 | 389:4 | **established** | 339:21 |
| **engagement** | **environments** | 119:11 205:13 | **evolve** 330:12 |
| 15:5 97:1 | 182:24 219:9 | 247:4 256:11 | **evolved** 119:10 |
| 141:5 227:6,16 | **epidemiology** | **estimate** 72:8 | 358:5 |
| 227:24 228:5 | 104:1 | 390:10 | **exact** 18:16 |
| 228:16 268:24 | **equally** 154:3,8 | **estimated** | 55:7 60:24 |
| 280:18 | **equipped** | 381:22 | 70:5 71:14 |
| **engagements** | 356:12 | **et** 96:23 107:18 | 126:24 127:10 |
| 36:1 | **erika** 5:18 | 154:12 183:6 | 139:23 158:9 |
| **engaging** | **erosion** 267:19 | 281:13 336:1 | 174:17 203:18 |
| 141:19 157:4 | **errata** 398:6,9 | 389:11 | 218:12,17 |
| 200:6 201:3 | 398:12,15 | **ethan** 363:24 | 328:3 345:12 |
| 205:8 277:11 | 400:6 | **ethics** 243:16 | 358:7 |
| 280:19 301:15 | **erroneously** | **evaluate** | **exactly** 30:20 |
| 305:17 308:2 | 15:15 | 248:17,23 | 209:19 |
| **english** 340:20 | **error** 254:11 | 323:7 | **examination** |
| 341:16 | 255:7,9,15,17 | **evaluated** | 13:11 |
| **ensure** 286:1 | 255:20 256:1 | 355:13 | **examine** |
| **entire** 100:19 | **especially** | **evaluation** | 166:18 |
| 177:5 331:8 | 257:12 263:14 | 142:22 245:19 | **examined** 13:9 |
| 365:23 | 388:24 | 319:12 323:9 | 163:14 |
| **entirely** 325:22 | **esquire** 2:4,4 | **event** 206:5,9 | **examining** |
| | 2:11,16 3:4,4 | 206:18 289:4 | 84:19 |

CONFIDENTIAL

**[example - expert]** Page 27

| | | | |
|---|---|---|---|
| **example** 15:6 21:20 23:1 26:18 32:4 35:14 95:15 105:1 117:22 119:6,20 125:17 133:1 136:23 138:24 142:8 147:24 166:1 183:1 199:2 200:3 201:14 211:19 215:3,20 216:18 221:22 225:8 232:10 237:21 243:10 243:14 244:15 247:7 248:2 250:4 253:22 258:24 274:4 276:21 279:6 279:10 289:8 304:21 307:24 311:2 325:8 326:12 327:12 331:1 333:23 340:17 347:8 350:19 353:2 354:8 360:18 360:22 362:1 366:11 368:16 389:6 **examples** 104:19,20 | 107:17 119:8 320:11 **exceed** 335:16 **except** 12:6 400:5 **excess** 335:23 **exclusively** 287:16 **excuse** 52:22 68:7 165:19 228:19 301:19 306:17 389:10 **executive** 377:20 **exemplar** 320:5 **exercise** 135:15 **exhaustive** 118:21 **exhibit** 25:8,10 27:6,18 28:3 32:24 33:14,16 34:1,3,21,23 37:7,11,13 38:2 39:5,8,21 39:23 40:12,14 41:4,6,19,21 42:10,12 43:8 43:10,24 44:2 44:15,17 45:7 45:9,23 46:1 46:17 55:17,19 57:2,10,14 67:10,13 89:18 97:10,12 | 121:10,13 173:17,20 202:7,9 208:2 208:9 217:8 334:10,12 338:16,18 376:17,19 377:6 383:23 **exhibiting** 335:15 336:20 **exhibits** 49:19 49:24 207:23 **exist** 65:6 74:17 243:21 258:19 258:23 259:13 297:11 298:5,8 **existing** 181:6 181:10 342:6 **exists** 329:17 **expand** 314:20 **expanded** 119:18 **expect** 312:19 **expected** 392:13 **expend** 268:8 **expense** 67:3 **experience** 52:24 61:18 89:8 90:8,12 135:15 172:7 172:16,23 173:9 183:10 185:20 206:6 | 206:10 230:24 272:9,12 276:4 276:13 277:16 277:18,22 284:18 293:8 300:9,15 306:4 306:9 325:3,5 331:3,10 367:15 375:1 **experienced** 370:12 375:5 376:10 381:23 **experiences** 118:1,17 119:1 132:1 134:7 173:3 185:24 215:7 254:2 357:3 374:12 374:14 375:13 381:17 **experiencing** 131:14 186:21 187:6,10 335:22 344:1,4 **expert** 7:14,23 8:23 33:11,17 39:1,2,9 40:8 41:15 43:3,4 44:11,19 45:18 45:19 48:17 52:19 56:6 59:2,4,10,12,16 59:22 60:3,10 61:20 62:6,16 |

CONFIDENTIAL

**[expert - features]**                                                     Page 28

70:1,6 90:2 142:13 153:18 164:2,3 177:13 180:3 182:17 183:12 184:2 204:15 232:15 232:17 235:7,9 235:15 238:3,5 242:6 244:11 245:1 250:22 270:5 271:11 272:8,15 307:23 313:20 316:17 318:14 332:10 346:18 362:17,23

**expertise** 61:14 242:9

**experts** 60:5 129:8,18 165:20 192:1 231:16 232:18 233:18 234:10 264:7 279:13 342:23 362:18 362:18,21,24 363:8,13,19

**expires** 400:12

**explained** 190:20

**explicit** 253:23 254:3

**explicitly** 145:16

**exposed** 119:17 189:9 200:8 302:4,10,11 369:2 375:21 376:7

**exposure** 193:21 197:4 199:1 228:20 288:13 289:9 305:7 310:20 381:15,17 382:1,7,11

**express** 20:18 20:20

**expressed** 205:17 238:24 239:7

**extend** 51:20

**extensive** 65:6 272:9 277:21

**extent** 63:14 163:14 168:24

**f**

**f** 3:14 184:17

**face** 331:19,19 332:6

**facebook** 3:15 3:15,15,15,16 80:20 85:3,4 155:3 160:1,5 160:14,24

**facilitators** 216:14

**fact** 133:2 134:16 148:24 149:9 162:15 175:12 187:9 214:11 277:16 280:17 315:9 322:24 372:2 394:2

**factor** 119:22 145:9 193:2 246:17 248:15 250:6,8,13 252:8 367:22

**factors** 63:16 114:18 115:16 117:19,23 118:12,15,22 119:4,5 125:11 136:12 137:11 190:23 193:8 195:15 198:11 210:9,13 211:5 213:9 246:16 248:8,10 250:5 252:7 261:3,18 269:16 323:22 369:4 370:3,23

**facts** 49:1

**faculty** 16:5,19 96:18 102:21

**fail** 398:18

**failed** 278:4

**fair** 170:15 356:11

**faith** 332:11

**fall** 231:22 247:13

**fallen** 357:20

**falls** 102:13

**false** 280:12

**familiar** 22:5 26:21 100:19 228:22 230:10 333:24

**families** 10:14 109:5 116:14 141:20 180:5 208:15 217:15 227:11 229:4 230:14 234:19 272:10,13 273:10

**family** 119:16 141:4 268:22 382:17,21,23

**far** 15:11 77:6 157:9 219:2 267:7 314:4

**farm** 4:13

**fast** 78:4

**fax** 1:24

**feasible** 243:15

**feature** 234:7 234:12 263:2 263:22 264:4

**features** 151:19 152:10,18 153:2,16,20,24

CONFIDENTIAL

**[features - footnote]**                                     Page 29

| | | | |
|---|---|---|---|
| 157:5 160:17 179:13 180:8 180:11,22 182:20 183:18 184:13 227:16 228:12 230:20 231:20 233:14 233:17,22 234:14,20 235:2,11 264:9 264:17 280:1 280:10 281:16 282:2 307:23 310:3 | **field** 61:18 89:8 115:18 116:2 119:2,7,10 129:9 175:21 178:19,21 183:10 198:21 225:1 243:13 247:5 252:3,4 273:9 315:7 325:5,14 332:13,14 | **fingertips** 230:4 347:21 | 385:3 396:3 |
| **february** 209:8 210:17 211:10 212:18 218:16 | **file** 57:18 | **finish** 22:13 24:2,4 | **fixating** 192:6 |
| **fed** 161:5 201:8 | **files** 109:17 | **finished** 372:11 | **flap** 25:3 |
| **federal** 378:24 380:11 | **filibuster** 394:16 | **firm** 4:4 5:4 6:4 14:20 | **flight** 392:12 |
| **federico** 5:17 | **filing** 12:4 | **first** 13:24 33:9 38:17,24 43:2 60:13 61:2,6 61:19 70:12,14 81:12 93:3 107:11 119:11 127:10 162:16 180:6 183:24 186:12 191:17 192:21 205:16 214:14 230:2 256:8 280:8 287:23,24 289:5 310:7 312:18 320:1 320:24 327:9 337:20 339:18 357:2 381:14 393:23,24 | **floor** 2:17 |
| **fee** 65:12 69:17 | **final** 20:18,22 21:5 23:16 | | **florida** 2:13 4:18 |
| **feed** 161:2,5 | **finance** 10:10 54:13 208:5,23 210:1 211:12 212:12 215:15 216:11 | | **focus** 54:8 145:20 190:21 193:2,23 199:5 264:17 267:18 269:8 351:5,7 351:15 |
| **feeds** 161:2 | **financed** 54:15 | | **focused** 29:1 |
| **feel** 199:10 278:9,11 328:6 359:11 | **financial** 2:11 137:19,23 | | **focusing** 173:14 192:13 |
| **feeling** 200:5 | **financing** 212:13 | | **folder** 75:7 |
| **feels** 171:11 | **find** 132:6 281:21,22 366:20 | **fit** 246:7,8 | **folks** 25:22 26:15 27:3 31:3 96:20 232:22 237:2 246:24 323:17 343:13 |
| **fell** 154:23 | | **fits** 240:10 | |
| **fellows** 19:12 | **finding** 194:4 194:10 | **five** 96:14 213:22 307:21 308:7 327:12 349:6,11,16 350:8,11,22 351:11 384:6 | **follow** 82:20 294:20 |
| **fidelity** 323:12 325:17 333:9 | | | **followed** 30:9 |
| | | | **following** 274:15 330:21 379:2,4,13 380:13 |
| | | | **follows** 13:9 |
| | | | **food** 385:22 |
| | | | **footnote** 274:16 274:19 275:14 |

CONFIDENTIAL

**[footnote - friendships]**                                    Page 30

276:14,22
316:11
**footnoted**
271:19
**footnotes**
271:21 272:14
272:18 275:9
275:20 278:2
278:13
**forbidden**
168:10
**forbidding**
168:14
**foregoing**
397:17 400:3
**forget**  184:4
**forgotten**
299:11
**form**  12:6
19:24 21:1
28:21 32:14
47:19 48:12
49:1 50:19
57:4 63:10
64:4,24 70:3
72:16 74:4
77:18 78:9
88:16 90:24
106:17 111:19
112:16 115:13
116:23 118:4
123:22 124:7
126:2 127:7,23
130:6 131:3

133:5,17 134:3
134:24 135:20
136:19 137:9
141:8 144:14
151:10 152:2
163:20 165:12
167:3 172:10
173:1 179:24
181:14 183:21
185:15 187:16
189:4,13 191:6
192:18 194:15
196:11 197:18
199:22 203:6
204:7,21,24
206:8 209:17
210:20 211:15
212:21 214:2
216:6 221:9
222:23 224:8
231:6 233:5
240:3,22
245:22 246:21
248:19 249:22
250:11 251:1
252:18 254:13
258:15 259:9
262:2,15 263:7
265:4 266:11
269:13 270:18
272:20 275:11
277:5 280:5
282:17 283:15
286:21 288:5

290:1,18
293:12 295:6
297:8 304:17
306:7 307:15
309:1,9,13,16
310:6 314:15
315:22 318:22
327:4 329:9
331:22 347:13
353:13 355:15
359:9 363:4
364:7 372:7
373:11 374:3
375:8 379:18
383:9 387:5,19
400:5
**formal**  149:21
150:2
**formed**  264:1
277:20
**forming**  163:22
262:6 360:24
361:11
**forms**  254:16
304:7
**forum**  171:14
**found**  61:12
198:23 295:2
342:24 343:2
344:18,19
345:3,8,9,10,14
354:18 355:11
**foundation**
118:4 375:8

**four**  79:18,21
79:24 80:7
81:3 93:5,7
203:3,12
219:10
**fourth**  186:16
**fragmenting**
343:15
**frameworks**
320:3 322:3
324:20,22
325:9
**frankly**  64:9
116:7 128:17
165:14 178:8
205:4 264:5
296:19 298:8
300:1 341:11
341:20 352:15
356:4 372:21
375:10
**frequent**
351:19
**frequently**
161:21 339:19
340:10
**friend**  162:19
**friends**  161:7
169:19
**friendship**
140:21
**friendships**
140:18

CONFIDENTIAL

**[front - going]**                                                 Page 31

| | | | |
|---|---|---|---|
| **front** 25:3 34:13 38:19 53:17 121:20 215:15 266:2 344:17 | **gamut** 105:13 | **getting** 305:20 | 160:14,24 |
| | **gather** 64:12 273:6 284:14 | **gilfillan** 4:12 | 164:15,23 |
| | **general** 38:11 | **girls** 84:19 | 167:6,16 169:4 |
| **full** 10:10 13:18 57:23 58:19 73:1,15 96:9 100:18 208:6 208:24 321:19 366:16 392:13 | 47:7,9 49:10 88:9 128:14 129:5,5,17 140:24 172:18 173:3 224:12 225:1 269:2 290:21 311:16 312:7,11,13 316:11 317:11 331:18 332:6 333:18 336:5 359:17 384:7 386:20 387:14 388:1 | **give** 23:4 104:19,20 111:3 118:21 147:14 170:5 181:15 201:13 300:14 351:24 368:16 | 170:22 182:13 184:8,16 202:4 202:22 210:12 211:18 212:22 214:5,22 226:4 244:20 246:16 263:19 264:20 265:6 267:6 270:24 271:24 282:4 291:8 296:8 298:24 299:13 314:5 317:2 319:7,22 321:4 324:2,10 336:2 337:16 337:23 345:11 346:15 347:15 348:24 362:24 364:3 365:24 366:22 374:20 375:1 378:5 384:2 385:15 386:7 391:3 |
| **fully** 36:18 | | **given** 47:5 61:18 96:18 220:22 225:20 244:19 305:7 328:2 384:5 395:10 397:7 400:4 | |
| **functioning** 339:23 367:16 388:14,24 389:2 | | | |
| **functions** 179:13 180:22 188:15 | | **giving** 221:22 316:7 | |
| | **general's** 312:3 | **glasses** 122:3 | |
| **fund** 340:17 | **generalizable** 283:12 285:1,9 | **globally** 117:10 166:16 | |
| **funded** 141:18 352:20 | **generally** 107:20 169:3 169:13 218:20 219:15 262:5 265:12 272:4 283:24 287:5 362:20 | **globe** 284:3 | |
| **funding** 35:16 | | **go** 15:6,12 35:9 47:22 51:6 54:24 55:5 60:16,23 69:2 70:20 71:5,15 72:19 81:7 98:20 107:21 123:6 129:22 132:10 135:3 140:13 144:19 158:12 159:15 | **goes** 14:23 108:23 146:16 147:1 171:12 236:12,14 |
| **funds** 351:14 | | | |
| **further** 395:8 | | | |
| **g** | | | |
| **g** 4:12 83:16,16 85:19 86:3 | | | **going** 13:23 22:6,24 23:18 23:19 29:14 31:8 33:3 |
| **galveston** 5:6 6:6 | **generate** 109:4 | | |
| | **generated** 26:1 76:10 150:12 | | |
| **gaming** 113:12 113:17 304:12 304:21 | **genetics** 118:1 | | |
| | **george** 83:11 83:16 | | |

CONFIDENTIAL

**[going - hardships]**

50:14 51:1
75:19 86:21
128:24 132:20
140:6 165:2
184:6,19
193:18 215:17
236:7 257:18
285:11 297:2
298:20 299:14
330:5 333:16
334:7,8 339:1
344:16 358:6
361:7 366:8
381:13 384:12
390:3 391:16
391:20
**golkow** 1:23
12:13
**good** 13:14,15
22:16 257:10
260:11,13
272:24 273:20
275:1 305:10
332:11
**google** 3:8
**gotten** 78:3
279:16
**government**
225:14
**grab** 122:3
**grabbing** 229:7
**grade** 321:9
**graduate**
117:14 366:4

**grand** 5:12
**grant** 35:16,17
351:14 352:18
**granted** 16:3
393:13
**grants** 36:7,10
101:8
**great** 120:4
321:4
**greater** 137:20
138:4 268:3
368:23
**grief** 369:18
386:7
**grounded**
319:20
**group** 189:14
199:12
**groups** 186:22
**grow** 181:12
**guardians**
111:4
**guess** 50:23
236:24 263:5
275:1,3 338:6
352:12
**guidance** 26:11
351:24 357:22
358:21 360:10
360:17
**guide** 30:6
**gurski** 6:4,4

**h**

**h** 6:4 7:9 8:2
9:2 10:2 81:24
85:12,19
**hand** 211:22
334:8 365:11
366:9
**handbook**
99:11,16,19
100:20
**handed** 25:5
56:4 174:5
339:4 377:9
**handle** 391:20
**hands** 228:10
**happen** 168:19
168:20 203:23
235:4 305:11
376:12
**happened**
133:7 136:9
362:9 368:12
372:2 373:9
**happening**
115:6 201:7
226:15 281:11
284:16 303:20
356:14
**happens**
211:17 235:10
236:6 303:16
321:6 372:23

**happy** 18:17
22:15,19 24:2
53:10 59:6
118:8 123:6
128:7 164:24
176:18 182:13
219:1 243:1
254:6 267:5
272:1 324:10
337:24 338:4
346:15
**hard** 68:10
72:8 91:15
112:22 127:12
132:14,14
161:15 174:22
180:7 184:6
204:17 205:10
226:8 227:8,22
230:18 240:24
241:14 250:19
250:19 266:12
276:13,13
277:14 281:22
296:16 349:19
392:11 394:1,9
394:19 395:5
**harder** 23:6
**hardship**
137:20,23
369:18
**hardships**
369:23

CONFIDENTIAL

**[harford - health]**                                                    Page 33

| | | | |
|---|---|---|---|
| **harford** 8:19 | 266:23 267:2,3 | 113:7 114:7,10 | 210:10,14 |
| 8:21 43:5,13 | 267:8,15 | 114:19,24 | 211:6 212:3,9 |
| 43:21 44:5 | 270:13 271:15 | 115:10,17 | 213:4,10,15 |
| **harm** 182:10 | 279:1,24 | 116:4 117:16 | 215:5,9 216:15 |
| 182:21 183:19 | 280:15 288:2 | 117:20 119:22 | 216:20,22 |
| 197:3 198:17 | 288:14 293:18 | 121:15 123:19 | 217:13,20 |
| 199:5,6 204:22 | 294:2 295:4 | 124:4,17 125:7 | 223:5 224:1,21 |
| 268:3,10 | 300:10 302:5 | 128:16 129:8 | 225:6,11 |
| 270:24 281:20 | 310:17 312:22 | 129:10,13,24 | 226:16 235:13 |
| 294:13,14,19 | 319:16 320:17 | 136:11 137:3 | 240:9 242:11 |
| 294:23 300:8 | 342:22 343:23 | 137:13,14,21 | 246:6 250:5,8 |
| 313:11 314:1 | 348:21,22 | 138:1,5,18,19 | 250:15 251:18 |
| 323:6 | 355:4 | 140:22 141:2 | 252:3,4 267:13 |
| **harmed** 182:3 | **head** 328:4 | 141:19 142:10 | 267:22 268:14 |
| 182:4 186:23 | 331:17 | 142:12,21 | 269:7 270:14 |
| 200:11 | **header** 335:11 | 143:4,5,6 | 293:9,18 294:2 |
| **harmful** 176:4 | **heading** 79:16 | 144:4,5 145:10 | 294:16 295:4 |
| 176:10 177:1 | **headings** 30:18 | 145:21 163:13 | 301:9,13,13,19 |
| 177:10 178:1 | **health** 9:15,19 | 170:8,19 171:7 | 306:14,18 |
| 199:15 205:9 | 9:22 10:6,13 | 173:22 174:8 | 307:2 310:24 |
| 371:16 | 10:20,24 14:8 | 177:17 180:14 | 312:4,6,8 |
| **harming** 221:2 | 14:12,22 15:3 | 182:3 186:21 | 313:3,10,23 |
| 224:4 273:18 | 15:13,23 21:20 | 187:6,11 | 315:7,11,12,15 |
| 280:22 320:6 | 24:14 26:22 | 189:23 190:20 | 316:2,18 317:6 |
| **harms** 62:24 | 36:12 51:10 | 190:22 191:11 | 317:13 318:9 |
| 163:15 166:24 | 54:7,14,19 | 191:13 192:1,8 | 319:10 320:2,5 |
| 177:16 178:12 | 55:6 61:15 | 192:15 193:3,9 | 320:11 321:1 |
| 178:15 179:1 | 62:20 63:8,15 | 193:13 197:16 | 321:11 322:3 |
| 193:21 198:9 | 67:15 82:9,17 | 197:21,23 | 324:20,22 |
| 200:7 221:15 | 83:14,22 85:21 | 198:7,12 199:5 | 333:4,5 338:21 |
| 222:16 223:12 | 86:16,17 87:9 | 202:11 204:5 | 339:7,17,22 |
| 228:24 229:4 | 89:3,3 104:4,6 | 205:19 206:13 | 340:2,8 341:8 |
| 233:24 234:1,6 | 104:7 105:5,13 | 208:12 209:11 | 341:17 344:2 |
| 251:12 259:5 | 106:8 108:19 | 209:15,22 | 349:10,14,23 |

CONFIDENTIAL

**[health - hoover]**

350:3,14,24
351:8,21,23
353:2 357:23
357:24 358:24
359:6 361:22
362:1,6,13
365:13 367:2
367:16,19,22
368:1,5,15
369:9,19 370:5
370:8,18,21
371:5 373:6,24
374:7,13,16
376:24 377:12
378:12,19
379:1,12 380:7
380:12 381:20
383:1,3 385:21
386:9
**healthy**  10:22
139:20 140:4
140:10 188:18
376:20 377:10
**hear**  178:9
235:6 371:12
372:9
**hearing**  10:10
10:15 54:2,11
178:11,11
208:6,15,24
215:15 217:15
221:13 232:3
273:14

**hearings**  54:2
**heels**  224:11
**held**  1:15 12:17
**help**  10:13 50:8
76:5,9 140:9
142:8 208:14
298:21 299:15
350:2
**helpful**  169:10
324:16 338:5
383:17
**helps**  263:13
**high**  52:6 54:4
54:9 83:14
138:12,19
139:1,5,11
140:9 217:20
283:12 284:13
284:19 379:6
**higher**  382:1,8
382:14
**highlighting**
378:11,18
**highly**  320:16
327:20
**hill**  242:18,22
242:24 243:5
243:20 244:2,5
245:7,9,18
247:3 257:19
261:1,18,23
262:19,23
263:2,7,10,21
264:14 265:1,9

269:4,20
270:11 271:2
282:8,15
**hire**  332:15
337:18 340:19
**hired**  89:21,22
89:24 90:1
296:23 329:6
330:10,14,17
330:23
**hiring**  321:21
332:7,9,15
337:9
**history**  109:16
110:12 111:12
133:12
**hold**  154:23
238:2,4 242:5
275:6 313:15
**holdings**  3:15
**home**  66:23
137:5,15
367:18,21
368:24
**homework**
196:23 197:14
198:4
**honest**  60:17
66:8 158:8
349:20 359:11
**honestly**  17:3
54:22 71:5
155:18,23
364:8

**hoover**  1:14 7:4
7:12,14,16,17
7:18,19,20,21
7:23 8:5,8,10
8:13,15,17,20
8:22 9:5,8,10
9:13,14,15,16
9:18,19,19,21
10:5,8,11,16,19
10:21 12:24
13:7,20,21
14:22 15:2,13
15:19 25:11
33:17 34:4,6
34:24 35:2
37:14 38:3
39:9,24 40:15
41:7,22 42:13
43:11 44:3,18
45:10 46:2,18
55:20 56:7
67:14,15 68:21
69:8 90:6
91:11,21 93:13
97:13,15
120:18 121:14
121:14,20
173:21 176:13
190:18 192:2,5
202:10 208:3
208:10 334:13
338:19 345:7
346:9 376:20
392:10 393:15

CONFIDENTIAL

400:8

**hoover00008...**
9:14 67:14

**hope** 306:8

**houghton** 84:3

**hour** 65:12,17
65:22 120:1
156:2 260:8
293:8 392:7,14
395:12

**hourly** 66:3

**hours** 29:17
69:17 71:15
72:3,7,9 92:15
93:1,6 96:10
96:13 97:6
122:24 281:4
321:8 384:6
385:4 392:23
393:12 395:3
396:3

**house** 53:22
232:20

**households**
137:19 138:3

**housing** 220:11
220:18,20,24
221:5,18
385:22

**huh** 22:22 23:5
140:3 191:20
219:5

**hulu** 113:21

**human** 23:17

**hundreds**
64:10 88:6
206:14 281:1
286:23 333:4

**husband** 163:2

**hutt** 363:24

**hyperactivity**
105:1

**hypothesized**
249:15

**hypothetical**
127:12 132:10
135:2 258:3,8
258:18 259:21
279:10 296:18
297:10

**i**

**i.e.** 184:24
185:4 259:3

**icd** 117:9

**idea** 99:12
157:22 230:11
263:12

**ideal** 329:2

**identical**
312:19,24

**identification**
25:13 33:19
34:7 35:3
37:16 38:5
39:12 40:3,19
41:10 42:1,16

43:14 44:6,22
45:13 46:5,21
55:22 67:16
97:16 121:16
174:1 202:14
208:7,16
334:17 338:22
377:1

**identified**
77:22 194:21
195:4

**identifies**
166:23 222:19

**identify** 161:12
165:7 166:22
183:16,18
199:2 200:4
223:1 246:15
264:23 296:3
360:10

**identifying**
209:23 211:23
216:13

**identity** 367:1
367:7,9

**ignore** 385:18
386:14

**illness** 137:21
138:5 250:5,9
250:15 367:24

**illnesses** 24:10

**illustrative**
32:4,10 221:22

**image** 84:13,20

**imagine** 131:5
204:19 206:11
231:12 281:9
296:17,19
300:8,9 308:1
308:9 345:13

**imagining**
236:11

**immediately**
274:15

**impact** 26:19
62:18,20
125:15 137:3
140:21 173:12
179:18 205:18
210:9 222:16
240:8 246:4
250:21 251:8
258:5 276:9
296:2 299:21
300:12,16
320:17 332:20
356:16 362:5
367:15 369:17
370:14,17
373:6,16,24
374:5,6,10
385:21 386:8
388:14

**impacted**
200:22 201:5
241:4,10
301:14 368:14

CONFIDENTIAL

375:2
**impacting**
129:13,23
281:11
**impacts**  63:5
63:13,21
177:14 186:11
193:12 225:2
267:11,15
269:6 270:15
293:9 342:18
344:5 348:2
365:12,18
371:24 372:17
373:1
**impairment**
388:23
**impede**  339:16
340:7 389:8
**imperative**
398:14
**implement**
227:8,9,22
297:6 322:12
322:15,19
323:12 325:16
326:22,23
327:11 329:20
341:15
**implementati...**
319:11 321:22
322:7,9,18
323:16,20
325:6 328:13

328:24 329:1,3
332:21 333:7
**implemented**
224:19 325:20
326:3 327:1
333:10 359:4
360:1,6,12,20
**implementing**
326:13,20
328:10 341:7
354:20
**implications**
285:21
**implicit**  253:18
253:23 254:3
**implying**
336:21
**importance**
103:17
**important**
216:3 252:6
299:22 305:22
306:1 320:20
341:15
**impossible**
205:4 227:18
276:11 296:19
350:7
**improve**  143:1
351:21
**improved**
54:17
**improvement**
142:24 147:24

299:7 326:10
326:15 328:18
350:2 352:3
359:22
**inaccurate**
49:20
**inadequate**
355:13 356:10
**inappropriately**
286:2
**incentivize**
216:21
**incident**  370:15
373:1,5,13,21
374:22 380:18
380:20
**incidents**
375:12
**include**  26:20
88:2,3,6
104:21,23
105:2,6 118:17
118:19,23
119:19 245:6
261:7 275:14
275:21,21,24
286:12 290:22
337:14 361:17
367:8
**included**  37:3
49:15,23 78:14
78:14 79:13
119:15 199:11
216:18 272:14

275:8 277:2
278:2,13
291:23 295:9
336:14 362:14
362:19 364:23
**includes**  16:21
108:22
**including**  27:14
54:17 86:14
89:1 103:23
104:24 107:16
124:22 137:15
163:24 164:2
179:20 197:22
213:15 255:6
267:17,24
269:6 270:14
272:16 301:15
304:8 305:2
316:19 340:9
366:4 368:22
393:19
**inclusive**  77:8
**inconsistent**
343:1,3 344:19
344:21
**incorporated**
14:23 15:3
**increase**  212:8
**increased**
249:18 267:17
268:1 308:2
379:13 381:2

CONFIDENTIAL

**[increases - inquiry]**                                Page 37

| | | | |
|---|---|---|---|
| **increases** 381:20 | **individuals** 26:7,9 27:11 27:13 28:2 89:16 337:17 | **informal** 147:22 | 325:1 339:20 393:24 395:6 |
| **increasingly** 268:13 | | **informant** 25:23 26:14 27:7 32:23 123:3 234:16 276:5 354:9 | **informing** 130:16 163:3 297:1 |
| **incredibly** 199:15 | **industry** 238:9 238:14 | | **infrastructure** 300:3 |
| **incumbent** 305:6,9 | **ineffective** 230:16 | **informants** 89:14 | **infrequent** 351:18 |
| **independent** 90:2 182:1,10 | **inevitably** 358:1 | **information** 27:1 32:3 63:24 64:20 130:22 131:9 131:18 166:2 186:10 204:9 206:20 224:15 232:9 254:24 257:11 260:1 262:4 265:13 270:4 273:1,7 273:12,20,23 283:18,20,21 284:15 285:9 285:15 286:18 287:7 291:19 295:10,12 302:21 317:17 324:13 333:20 336:13 337:15 347:5,17 | **ingested** 314:13 |
| **index** 11:2 | **infer** 243:8,23 266:4 269:17 269:22 | | **ingesting** 314:19,19 |
| **indicated** 35:18 37:3 48:22 352:24 | | | **inherent** 189:17 |
| **indicating** 311:24 392:16 | **inference** 289:18 | | **inherently** 176:4,9,24 177:9 228:1 |
| **indicators** 215:4,11 216:20 | **influence** 126:12 137:24 256:1 371:3 | | **initial** 111:9 |
| **indirect** 85:2 | **influenced** 206:5 | | **initially** 47:6 |
| **individual** 31:19 38:12 89:22 165:6,10 166:21 172:22 173:4,14 246:17 262:19 262:24 269:5 270:13 271:16 271:23 | **influencers** 370:23 | | **initiative** 318:7 318:8,19 319:2 |
| | **influences** 219:12 220:1 222:1 248:4,5 339:22 | | **initiatives** 317:23 318:2 |
| | **influencing** 249:13 | **informed** 117:15 184:1 206:19 272:7 272:12 323:3 | **injury** 1:4 12:20 |
| | **inform** 65:9 77:9 89:9 115:7 131:9 132:2 135:9 262:4 265:22 371:19 | | **innes** 4:12 |
| **individual's** 114:24 173:9 | | | **input** 319:22 |
| | | | **inquire** 354:6 |
| **individually** 48:7 166:18 | | | **inquired** 114:9 114:12 |
| | | | **inquiries** 358:24 |
| | | | **inquiry** 350:19 |

CONFIDENTIAL

**insecurity** 220:11,18,21 221:6,18 385:22,23

**insert** 131:1

**instagram** 3:16 80:19,22 84:19 155:2 158:24 159:12,16

**instance** 380:22

**instances** 220:15 247:24 251:9 388:12

**institute** 380:7

**instructed** 22:1

**instruction** 267:18 268:19 281:12

**instructional** 227:1

**instructions** 398:1

**insurance** 116:7

**integration** 313:5 339:16 340:7

**intelligence** 307:13

**intend** 238:6,15 240:18 266:8 326:21,23 327:11 353:6

**intended** 63:7 227:3 348:1 349:8 350:12

**intending** 266:14

**intends** 394:16

**intensity** 82:8

**intention** 287:3

**interacted** 131:23

**interactions** 86:13 88:10,23 180:4 194:9 206:21 230:13

**interest** 378:24 379:11,13 380:11,12 381:2

**interested** 381:7

**interesting** 205:1 240:5 263:5 303:13 328:16

**interests** 339:24 340:13

**interface** 98:24 155:15 156:14

**interfere** 24:10

**interfering** 180:13

**internal** 80:7 80:10 149:8

**international** 19:6 147:18

**interns** 19:12

**interpret** 287:9

**interpretation** 84:22

**interpreted** 286:19

**intersect** 63:15 344:12

**intersecting** 179:12

**intervene** 380:20

**intervention** 213:6 316:21 321:11

**interventions** 141:23 313:10 322:20 324:6 325:11 333:9 344:6

**interview** 26:10 27:21,22,23 28:1 29:13 32:1,2 190:13 195:1 196:1,3 196:8 197:12 383:22 386:24

**interviewed** 27:17 190:8,10 190:14

**interviewee** 7:13 25:11

28:7

**interviewees** 31:19 32:9

**interviewing** 29:2 31:3,24

**interviews** 25:23 26:15 27:7 28:6,9,10 28:19 29:4,16 29:22 30:2,22 32:18,23 88:21 113:9 123:3 234:17 276:5 354:9

**intimacy** 188:17

**introduce** 255:14

**introduced** 356:6

**introduction** 378:8

**invest** 380:19

**investigating** 82:10

**investment** 319:10

**invite** 32:16

**invited** 147:3,6 147:10,14,20 148:2,7 225:23 226:1,6

**invoice** 9:20 69:20 70:12

CONFIDENTIAL

**[invoice - kind]**

71:17,18,19
75:3,5,6
120:23 121:3,6
121:15
**invoiced** 70:15
73:23 122:12
122:19
**invoices** 9:15
67:10,15 68:10
68:20 70:9
71:2 72:12,24
73:14,22 74:9
74:15,20,22
75:20 120:19
123:5,7,14
**involve** 314:17
314:22
**involved** 19:14
52:14 180:18
230:3
**involves** 96:17
**irrespective**
127:4 258:11
**irresponsible**
302:6
**irvington** 4:20
8:23 9:6 44:12
44:20 45:4,12
**isolated** 63:4
368:20 369:1
**isolation**
369:17
**issue** 128:19
191:23 294:16

320:16 374:13
374:16
**issued** 47:13
380:6
**issues** 104:16
108:20 114:10
114:20 115:10
136:15 191:14
193:4 197:2,16
197:24 319:10
342:3 356:5
359:6 367:2,13
367:19 368:2,5
370:9 384:16
384:18 385:20
386:15 390:21
**iteratively**
31:13
**it's** 10:6 202:12

**j**

**j** 3:4
**jack** 3:20
**jack.nolan** 3:22
**jacobson** 2:4
**james** 84:10
**january** 69:11
339:10
**jensen** 83:20
**jersey** 4:13
**jjacobson** 2:7
**job** 23:6,9
225:4 349:23

**jog** 61:3,4
**jogging** 141:12
**joining** 189:14
**jonathan** 5:11
**jordan** 2:4
**journal** 148:14
149:20,20
292:4 333:4
**journals** 21:20
77:4,5
**jpkieffer** 5:14
**judge** 170:24
171:9
**july** 37:23
38:10 47:10
69:20 70:11
121:2 122:6,8
122:18,22
**june** 16:1 36:9
39:3 40:10
41:16 43:6
44:13 45:20
47:16 96:11
121:2 122:6

**k**

**k** 3:14 83:5,5
106:2 283:4
320:23 321:7
321:13,24
322:3
**kansas** 5:13
**kathryn** 2:11
13:23

**katie** 396:2
**kaylie** 6:17
**keep** 35:21
169:16 179:3
232:11 235:2
310:1
**keeps** 156:5
**kennedy** 3:11
**kept** 75:5
**kessler** 1:16 2:3
**key** 25:22 26:14
27:7 32:23
89:14 123:3
234:16 276:5
354:8
**keyes** 3:4 68:7
68:12 391:20
395:21
**kids** 159:3,4
217:19 305:12
341:24
**kieffer** 5:11
**kind** 17:22 26:2
29:23,24 51:21
52:17 54:5,14
62:3 91:4
98:11 140:11
141:10,23
143:9 148:1,4
148:12 155:15
156:5 161:2
177:20 180:12
183:4,8 184:4
191:9 201:6

CONFIDENTIAL

**[kind - know]**                                                    Page 40

| | | | |
|---|---|---|---|
| 230:6 235:3,9 | **know**  15:12,17 | 147:22 148:5 | 226:17,19 |
| 236:3,5 243:20 | 18:16 21:19 | 151:19 152:9 | 227:2,11,21 |
| 244:5 246:2 | 22:1,3,10,19 | 152:12,17,20 | 228:6,8,12,14 |
| 247:3 252:13 | 23:19 24:1 | 153:1,4,15,23 | 228:14,18,22 |
| 253:5 254:20 | 29:24 30:12 | 154:5,10,11 | 228:23 229:16 |
| 257:18 261:9 | 35:14 52:2,4 | 155:14,24 | 230:11 231:14 |
| 262:14 264:9 | 52:12 54:16 | 157:9,12,17 | 231:16,24 |
| 264:12 280:11 | 55:2 56:21 | 158:3 159:17 | 232:3,23 |
| 280:22 287:8 | 60:4 62:2 | 160:11,18,21 | 234:14,15 |
| 293:3 296:1 | 63:16 64:9 | 161:2,4,7 | 235:19 236:9 |
| 311:18 313:10 | 66:7,11 68:16 | 162:17,18 | 236:21 237:20 |
| 319:21 321:24 | 68:22 71:14,16 | 163:21 164:18 | 240:10 241:2 |
| 323:18 324:6 | 72:9,17 73:3 | 165:23 167:9 | 242:9,24 243:9 |
| 329:21 330:2 | 73:18 74:16 | 169:5,11,12,18 | 244:6,8 245:2 |
| 341:21 344:11 | 75:7,22 76:1 | 176:13 177:3 | 247:6 248:20 |
| 346:19 352:23 | 77:1,2,4 78:2 | 177:21 178:8 | 251:2 252:1 |
| 362:6 366:5,12 | 78:11 79:3 | 178:14,20,22 | 253:2,3,24 |
| 368:11 369:10 | 80:13 91:2 | 180:1 183:4,6 | 254:6 255:12 |
| 370:13 372:14 | 93:18 95:8,9 | 184:3,4,10,11 | 255:13 256:10 |
| 374:23 376:8 | 95:16 96:1,9 | 185:7,21 | 257:16 259:22 |
| 381:9 387:9 | 96:16,18 97:5 | 189:12,13 | 260:9 261:4,9 |
| **kindergarten** | 97:5,24 99:1 | 191:12 192:24 | 262:8 263:15 |
| 108:24 321:9 | 102:1 106:19 | 194:23 198:20 | 264:2,5 265:20 |
| 321:15 | 106:24 107:23 | 198:22,24 | 266:1,3,14 |
| **kinds**  253:8 | 108:18 109:22 | 199:8,11 200:4 | 273:2,13 279:8 |
| 362:2 | 113:24 114:2 | 200:5,19,24 | 279:9,12,16,20 |
| **king**  1:17 2:5 | 117:6,15 | 201:6,8 203:13 | 280:7,12,24 |
| 2:10 | 118:20 119:4 | 203:17 205:3 | 281:4,12,16 |
| **kirkland**  3:20 | 119:15 125:12 | 205:24 206:16 | 282:20 283:24 |
| **kirkland.com** | 127:13 131:1 | 207:2 210:6 | 284:10 285:5 |
| 3:22 | 131:22 132:11 | 212:10 215:6 | 286:3,13,23 |
| **klehman**  2:14 | 135:9 140:14 | 215:17,18 | 287:15 288:6 |
| **kmorgan**  6:19 | 140:17,23 | 218:1 225:7 | 289:9 290:3 |
| | 144:2,15,16 | 226:10,12,14 | 291:9 292:6,8 |

CONFIDENTIAL

**[know - legal]**

292:18 293:1
293:13,20
294:7,10
295:23 296:24
297:16,24,24
298:10 300:1
301:14 302:23
305:7,11 308:5
309:3,14
313:22 316:23
318:5 319:19
319:22 320:2
320:12,19,21
320:23 322:8
323:15 325:4
327:6,18,19,24
328:3 329:11
329:16 330:16
330:17,24
331:5,11
332:10,12,12
333:8,17,22
334:2 336:6,8
337:2,7,7,10,10
337:13 340:18
341:16 343:12
346:14 347:18
348:18,23
349:24 350:6
350:17,23
351:5,10,13,21
352:15,17,22
353:1,3 354:22
355:20 356:4,8

356:11,24
357:1,19,21
358:14 360:5
360:13 361:13
361:21,23
365:17 366:9
367:5,12 368:9
368:17 369:7
370:15,20
371:6,10,12,20
372:23 373:12
374:18 375:10
375:16,24
379:21 380:20
380:23 381:6
385:10 387:24
388:12 390:12
392:9
**knowing**
352:24
**knowledge**
49:21 55:4,13
64:7 86:10
123:8 135:16
230:6
**knowledgeable**
26:18
**known**  230:16
248:9
**kotlarsky**  2:16
**kslaw.com**  2:14
2:18
**ktmc.com**  2:6,7

**l**

**l**  2:4
**labor**  10:13
208:13 217:14
337:4,11
**lack**  234:22
**lagged**  84:22
**laid**  229:1,12
270:2 310:11
321:19 342:22
344:13
**lake**  5:19
**landscape**
229:6
**language**
144:20 363:7
**lapse**  174:23
**large**  17:4
167:1 320:5
349:23 375:18
**largely**  185:5
185:13 254:22
291:24
**late**  83:8
119:12 274:11
277:12
**laughable**
133:24 134:5
**laughed**  113:15
**law**  1:15 4:4
5:4 6:4
**lawbmf.com**
5:21

**lawmakers**
381:6
**lawyer**  15:9
170:13
**lawyer's**  401:1
**lay**  225:4 267:6
**layer**  356:5
**laying**  323:4
**lays**  322:22
**lead**  236:13,14
269:17 274:24
376:12
**leaders**  86:14
87:6,16,24
88:4,24 234:18
**leading**  251:15
323:19
**learn**  231:3
267:12 281:13
**learning**  143:5
267:19 269:6
270:15 349:24
354:21 368:19
369:1
**leaving**  80:21
335:14
**led**  241:18
**leeway**  384:5
**left**  26:6 69:15
120:23 378:23
**legal**  22:4
52:14 91:3
363:6

CONFIDENTIAL

**[legg - liability]**

| | | | |
|---|---|---|---|
| **legg**  5:18 | 86:22 87:2 | 210:7 211:8 | 376:3,15 377:3 |
| **leggett**  84:10 | 89:10 91:17 | 212:15 213:11 | 377:7 380:4 |
| **legislative** | 93:24 94:18 | 214:16 216:16 | 383:19 384:1 |
| 53:18 | 97:8,18 98:6,8 | 217:6,9 222:6 | 384:11,22 |
| **legislatively** | 107:4 112:1,18 | 223:16 225:12 | 385:9,14 |
| 225:9 | 115:20 117:3 | 232:13 234:4 | 387:15,22 |
| **legislatures** | 118:10 120:2 | 240:14 241:20 | 389:13,16 |
| 53:6 | 121:4,9,18 | 246:12 247:15 | 391:1,15 |
| **lehman**  2:11 | 124:1,11 | 249:4 250:1,16 | 393:17 395:15 |
| 7:6 13:13,23 | 126:19 127:15 | 251:19 252:19 | 396:2 |
| 20:10 21:2 | 128:2,23 129:3 | 254:18 259:1 | **length**  196:4 |
| 25:7,15 29:3 | 130:9 131:15 | 260:3,5,24 | 320:13 326:5 |
| 32:15 33:13,24 | 133:9,21 134:8 | 262:17 266:6 | 393:7 |
| 34:9,20 35:5 | 134:20 135:11 | 266:19 270:8 | **lengthier** |
| 37:10,18 38:7 | 136:4,24 | 271:8 274:2 | 217:24 218:6 |
| 39:4,14,20 | 137:17 141:9 | 275:16 277:23 | **lengths**  324:7 |
| 40:5,11,21 | 145:3 151:15 | 278:7 281:24 | **leon**  4:17 |
| 41:3,12,18 | 152:8 164:8 | 283:7 284:23 | **level**  68:3 |
| 42:3,9,18 43:7 | 166:12 167:20 | 287:22 288:10 | 108:24 277:15 |
| 43:16,23 44:8 | 170:1,22 171:2 | 290:6,24 | 284:17 292:4 |
| 44:14,24 45:6 | 171:15,19 | 293:15 295:18 | 388:17 |
| 45:15,22 46:7 | 172:20 173:7 | 298:11 304:23 | **levels**  139:2 |
| 46:15,23 47:24 | 173:15 174:3 | 306:11 307:18 | 268:3 |
| 48:19 49:5 | 177:6 181:1 | 309:5,17 | **leverage** |
| 50:22 55:16,24 | 182:7 184:15 | 310:21 314:23 | 329:16 342:16 |
| 56:2 57:8 | 186:14 188:1 | 316:3 319:3 | **leveraging** |
| 58:16 63:22 | 189:18,20 | 327:14 330:7 | 54:18 342:6 |
| 64:18 65:10 | 191:15 193:14 | 332:3 334:7,19 | 381:8 |
| 67:9,18 68:1 | 195:19 196:15 | 338:12,15,24 | **levin**  6:10 |
| 68:13,18 70:7 | 198:13 200:9 | 345:20 346:8 | **lexington**  3:21 |
| 70:19,21 72:21 | 202:3,16 204:1 | 347:22 353:18 | **lfsblaw.com** |
| 74:11 77:20 | 204:11 206:23 | 356:17 360:8 | 6:13 |
| 78:17 81:23 | 207:18,21 | 363:11 364:14 | **liability**  1:4 |
| 82:5,23 83:2 | 208:18,20 | 373:3,19 374:8 | 12:20 |

CONFIDENTIAL

**[life - long]**                                                        Page 43

**life**  137:5,15 301:23 302:1

**lightly**  155:4,8 155:10 156:22 157:8

**likelihood** 302:9

**likely**  141:16 181:5,20 216:9 221:18 300:2 308:3 358:2 364:10

**limit**  160:6,20 169:24 226:20 226:23 227:24 228:4,15,19,20

**limitation** 287:6

**limitations** 285:7,24 286:7 286:9,13,16 287:4,12,13,17 287:20

**limited**  215:16 268:9 341:3,5 341:19,22 343:5 384:6

**limits**  160:16 219:11,24 221:24

**line**  11:6,6,6,11 11:11,11,16,16 11:16,21,21,21 35:9,10 168:23

399:3 401:2

**lines**  184:21

**linkages**  83:24

**linkedin**  161:17 162:2,3,6

**list**  7:13,20 25:12 27:5,7 37:15 58:8 59:1,4 76:3,11 76:15,19 77:8 77:15,23 78:15 79:14,17 81:9 81:12 82:3 85:15 89:16 96:2 104:19 118:21 143:16 143:19 146:15 146:24 150:6 217:2 266:4 285:6 287:11 287:13 316:8 363:12 364:19 366:20

**listed**  26:5 27:17 28:2 29:15 59:19 60:10 81:11 89:16 117:23 118:8 123:20 124:4,10,13 145:24 147:15 148:2,9,17 149:5 363:14

**listing**  117:17

**lists**  57:22,24 58:19,20 59:1 76:6 79:18 117:19

**literacy**  242:15 301:3,5,9,13,19 341:17,17

**literally**  223:21

**literature**  92:8 93:9 94:5,8,24 164:1,5 167:11 177:12 178:3 178:14 180:3 215:6 247:8 272:7 276:18 278:3,14 285:20 286:14 289:21 295:9 322:7,18 333:12 334:3 346:21 361:23

**litigation**  1:5 12:21 22:1 50:3 57:19 60:15 61:21 62:6,13 65:15 70:17 80:14 88:14 151:3 170:21 271:10 298:20,24 299:14 347:24 348:4,11,14 353:20 357:7

357:14

**little**  83:23 97:23 126:21 130:18 166:14 217:24 233:8 235:24 241:14 275:17 279:16 320:3 321:20 346:24 359:12 368:8 369:6

**live**  66:17,24

**lived**  356:23

**living**  137:19 138:3

**llc**  2:20 3:8,8,15 3:15,16,16 5:17

**llp**  1:16 2:3,10 3:3,10,20 6:10

**local**  86:14 88:24 147:17 378:24 380:12

**located**  14:9 357:1

**location**  66:18

**locations** 271:19

**logistics**  243:17

**lombard**  14:5

**long**  19:1 29:12 93:2 96:19 128:21 157:8 162:17 174:14 176:14 184:24

CONFIDENTIAL

**[long - lot]**                                                    Page 44

| | | | |
|---|---|---|---|
| 185:4,12,22 | 176:16,19 | 95:24 119:14 | 195:15 197:12 |
| 319:10 325:14 | 178:13 179:4 | 120:20 123:4 | 202:5 210:2 |
| 331:11 352:18 | 181:16 182:14 | 155:13,20 | 213:1,21 |
| 356:20 | 182:18 184:17 | 156:13,18,20 | 231:19 242:11 |
| **longer** 110:4 | 184:19 185:23 | 158:10 164:10 | 249:14 250:4 |
| 327:23 329:20 | 186:16 188:2 | 165:17,18,20 | 258:23 265:12 |
| 330:2 336:13 | 189:18 191:16 | 166:2,8 167:8 | 269:21 282:20 |
| **longest** 325:18 | 193:18,24 | 167:12,13 | 289:12 291:18 |
| 325:21 326:1 | 196:9,17,22 | 177:14 182:16 | 291:22 294:9 |
| **longitudinal** | 202:22 203:8 | 185:19 225:21 | 334:3 335:10 |
| 81:16 82:19 | 207:22 214:12 | 231:8 234:11 | 347:19 365:12 |
| 83:7,23 85:20 | 220:6 237:20 | 236:22 244:19 | 375:11,17 |
| 185:1 186:4,9 | 244:22 246:1,4 | 264:16 279:13 | 386:2,12 |
| **longitudinally** | 252:7,11 | 281:5 282:2,12 | **looks** 98:2 |
| 185:19,23 | 255:24 264:6 | 282:21 283:1 | 166:16 209:21 |
| **look** 18:15,18 | 264:19 265:7 | 291:20 292:7,8 | 210:24 211:22 |
| 33:8 47:22 | 272:2 282:5 | 308:21 322:6 | 212:5 244:22 |
| 53:10 55:14 | 289:11 291:9 | 322:11,17 | 288:22 335:4 |
| 57:9,10 59:6 | 295:22,24 | 324:16 325:3 | 335:24 |
| 71:23,23 74:19 | 296:8 311:9,18 | 332:17,23 | **lose** 199:17 |
| 74:21 75:22 | 317:2 320:10 | 333:6 344:11 | **loss** 386:8 |
| 81:5,8 82:13 | 321:14 322:11 | 354:24 361:23 | **lot** 52:5 81:6 |
| 88:17 95:5,20 | 322:14,14 | 362:5 365:1,9 | 96:20,24 |
| 97:9 101:15 | 324:21 338:4 | 366:10 | 175:10 190:11 |
| 110:22 118:6,9 | 338:10,12 | **looking** 19:3 | 200:13 228:9 |
| 118:9 123:7 | 342:10,13 | 54:13 69:5 | 229:9 236:24 |
| 124:9 128:7 | 354:7 358:6 | 85:15 86:11 | 245:3 252:1,1 |
| 139:22 143:16 | 361:15 362:24 | 143:18 146:10 | 257:10 273:5 |
| 144:20 148:20 | 364:3 368:13 | 146:19 147:1 | 293:2 327:21 |
| 158:6,13 | 371:7 375:15 | 153:15 156:2 | 343:15 352:16 |
| 160:24 161:6 | 376:16 378:22 | 166:17 167:19 | 386:17 387:11 |
| 164:6,20 165:2 | 381:13 385:17 | 171:24 172:14 | 387:20 388:11 |
| 167:7,12 | **looked** 78:12 | 173:6 176:2 | 388:20 390:20 |
| 173:16 174:16 | 78:21 95:13,16 | 179:3 188:9 | |

CONFIDENTIAL

**[lots - material]**                                    Page 45

**lots**  206:15,20
  358:16 371:10
**louis**  4:5
**loved**  367:24
  368:1
**lunch**  207:3,7
  260:7,11
  266:21 291:2
  393:5
**luncheon**
  260:18

**m**

**m**  6:10 81:24
  84:18
**made**  31:18
  35:7 36:14,17
  62:7 192:12
  197:11 198:15
  201:2 217:1,3
  266:22 365:21
  386:23 398:7
**maes**  84:17
**magnitude**
  293:16,22
  294:8
**magnitudes**
  294:6
**maheux**  81:15
**mail**  60:17
  304:5,8
**maine**  3:5
**maintain**  98:9

**major**  30:18
  117:23 118:13
  118:15 147:3,6
  147:10,11
  148:2,6 225:23
  225:24
**majority**
  145:23 146:6
  165:15
**make**  23:9 48:3
  73:20 77:1
  85:14 90:17
  102:2 103:14
  106:8 110:12
  114:3,22 115:1
  116:14 132:17
  136:1 140:10
  143:20 171:16
  203:2 219:8
  223:17 227:17
  257:1 263:13
  274:9 275:5
  278:8,12
  311:12 316:7
  339:24 340:21
  343:19 354:14
  361:6 366:6
  377:24 378:1
  398:4
**makers**  223:22
**makes**  15:20
  23:5 126:14,17
  166:11 186:13
  198:2 343:16

  369:12
**making**  23:13
  24:5 111:8
  116:3,8 125:10
  209:4 223:23
  279:9 291:12
  311:6 345:12
**management**
  302:15,19,21
**managing**
  268:17
**mandalas**  5:17
**manual**  117:13
**manuals**
  290:14
**marginalized**
  186:22
**mark**  3:17 25:7
  33:13 34:1,20
  37:10 39:5,20
  40:12 41:3,18
  42:9 43:7,23
  44:14 45:6,22
  55:16 67:9
  97:10 121:10
  173:17 202:6
  207:22 217:8
  338:16 376:16
  377:6
**marked**  11:20
  25:12 27:6
  33:18 34:6
  35:2 37:15
  38:4 39:11

  40:3,18 41:10
  41:24 42:15
  43:14 44:6,21
  45:13 46:5,21
  49:19,24 55:21
  57:12 67:16
  89:17 97:16
  121:16 173:24
  202:13 208:7
  208:16 334:9
  334:16 338:22
  376:24 383:23
**market**  5:5 6:5
  337:4,12
**maryland**  5:20
  9:17 14:6,15
  15:22 17:1,12
  17:15,18 18:10
  18:14 20:15
  53:20,21 54:21
  66:23 96:7
  97:3,14,21
  99:4,10,14,21
  100:3,5,6,9,20
  100:24 101:6
  103:1 106:10
  107:7 108:9,12
  109:7 138:24
  143:3 192:4
**maslynsky**  1:20
  397:10
**massive**  313:24
**material**
  201:21 204:3

CONFIDENTIAL

**[material - media]**                                                    Page 46

291:3
**materials** 7:20
  37:7,8,14 47:1
  57:18,21,24
  58:18,20,24
  59:7 62:9
  65:13 76:3,11
  76:14,15,17,19
  76:20 77:7,14
  77:15,23 78:15
  79:14,17 81:9
  82:6 95:14
  364:17 366:20
**math** 47:5 73:4
**matter** 12:18
  28:15 58:2,22
  70:1,10 71:2,8
  72:4,13 73:2
  73:17 122:10
  122:17,22
**matters** 62:13
**matthew** 5:18
**mayonnaise**
  260:9
**mcgee** 6:22
  12:12
**md** 1:3 143:4
**mdl** 1:3,4
**mean** 17:20
  21:12,13 28:11
  28:24 30:8
  48:13 50:21
  51:11 71:9
  76:8 78:11,19

79:1 114:13
115:3 118:23
122:13 131:10
135:1 149:11
155:11 156:7
156:23 161:1
163:1 164:14
168:17 171:10
172:12,14
174:22 189:11
189:16 199:14
200:13 205:3
205:21 206:1
206:10 226:5
231:8,16 233:8
236:2,11 240:5
240:23 241:6
242:23 244:8
245:9 248:12
248:13,14
249:19 250:7
250:13,23
253:3,12,16,19
254:15 255:18
255:21 258:17
263:4,24
265:16 267:5
269:11 280:6
283:19 285:13
285:15 286:23
292:21 293:20
297:16 298:5
300:1 302:2,17
303:14 309:15

309:21 312:18
314:18 317:13
319:19 324:9
325:23 326:14
327:7 329:19
330:8 331:1,7
341:10 345:3
345:11 348:16
349:1 353:6
357:19 359:10
359:16 364:9
365:8 366:1
368:8 373:13
374:5 375:9,23
379:22 388:1
389:22
**meaning** 49:7
  159:5
**means** 91:4
  163:2 376:9
  397:19
**meant** 268:24
  298:1 345:6
**measure** 228:7
**measurement**
  360:17
**measures**
  227:23 228:3,9
**mechanism**
  244:6 304:20
  310:1
**mechanisms**
  54:16 169:14
  204:16 212:13

229:23
**med** 100:23
**media** 1:3 9:22
  10:7 12:18
  26:19 50:13
  62:18 63:6,13
  63:14,21 64:2
  64:22 81:2,17
  82:8,9,17 83:6
  83:22 84:6,12
  85:21 86:4
  99:5,8,11,15
  106:15,20
  108:4 112:5,14
  113:2,5 123:18
  124:3,13,16
  125:6,16,23
  126:8,15 127:1
  127:2,4,21
  128:4,9,10
  129:11,23
  143:12,15,24
  144:6,12,18
  145:1,6,8,17
  150:10,14,18
  150:22 151:1,4
  152:14,22
  153:7,9 154:4
  154:19 157:24
  161:9 163:18
  166:5,8 167:1
  168:5,11,15
  170:9 171:22
  172:7,23 173:6

**[media - memory]** Page 47

| | | | |
|---|---|---|---|
| 173:10,12,23 | 221:1,6,15 | 304:15 305:1 | 100:24 101:7 |
| 174:8 175:15 | 222:4,9,17,21 | 305:14,16,17 | 192:5 357:1 |
| 176:3,9 177:9 | 223:13 224:3 | 305:21 306:3 | **medium** 29:6,8 |
| 177:15,16 | 224:16 225:3 | 306:13,17,21 | **meet** 92:16 |
| 178:6,12,20,23 | 225:15 226:3 | 307:20 308:6 | 109:4 132:6 |
| 179:1,9,15,18 | 227:6,14,17,24 | 308:13,15,20 | 238:9 349:3 |
| 179:22 180:23 | 228:5,20,24 | 308:22 309:8 | 388:8 389:6 |
| 181:5,18 183:3 | 229:4,6 232:16 | 309:10 310:2 | 393:11 |
| 185:3,12 | 233:2,21 235:1 | 310:20 311:6 | **meeting** 92:23 |
| 186:12,19 | 236:23 238:8 | 312:23 314:10 | 93:3 114:15 |
| 187:4 188:14 | 238:17 246:5 | 314:11,17 | 348:18 |
| 188:22,23 | 251:11,15 | 319:16 320:16 | **meets** 127:17 |
| 189:8,24 | 258:5 259:4 | 342:19 343:14 | **melissa** 2:4 |
| 190:22 191:24 | 262:20 263:3 | 346:12 348:2,5 | **meltzer** 1:16 |
| 192:7,14 | 263:23 266:9 | 348:7,14,20 | 2:3 |
| 193:12,16,22 | 266:23 267:3,4 | 352:6 354:23 | **member** 101:5 |
| 194:3,11 | 267:16 268:15 | 355:3 356:1,16 | 101:10 119:16 |
| 195:16 196:23 | 268:17,21,23 | 357:9,11,16 | 139:14,16 |
| 197:3,14 198:5 | 271:10 273:18 | 358:2 362:6 | 174:11,15,19 |
| 198:10,16 | 274:11 276:9 | 365:12 368:21 | 340:24 373:23 |
| 199:20 200:6 | 277:10 280:2,3 | 369:3 370:24 | 382:17 |
| 200:12,16,23 | 283:9 288:2,13 | 371:3,15 | **member's** |
| 201:4,11,16,22 | 289:10,13 | **media's** 205:18 | 382:23 |
| 202:13,20 | 293:7,10,18 | **mediating** | **members** |
| 203:9,20 204:3 | 294:1 295:3 | 82:11 | 186:22 331:13 |
| 204:22 205:8 | 296:11,16 | **medicaid** 54:18 | **membership** |
| 206:17 210:18 | 297:4 298:2,4 | **medical** 99:22 | 174:23 |
| 210:23 211:12 | 298:14 299:17 | 100:16 110:12 | **memorize** |
| 212:19 213:17 | 299:21 300:16 | **medications** | 78:22 |
| 213:23 214:10 | 300:18,20,23 | 24:9 | **memory** 61:1,4 |
| 214:19,20,24 | 301:2,8,16,18 | **medicine** 9:17 | 61:23 69:23 |
| 215:2,8,13 | 301:21 302:2,4 | 14:15 97:14 | 141:12 209:19 |
| 218:19,20 | 302:5,8,13,16 | 98:23 99:21 | 378:2 |
| 219:15 220:5 | 302:22 303:1 | 100:1,7,10,21 | |

CONFIDENTIAL

**[mental - minutes]**                                                            Page 48

| | | | |
|---|---|---|---|
| **mental** 10:6,20 | 192:15 193:3,9 | 351:21,23 | **meta** 3:14 |
| 10:24 14:8,12 | 193:13 197:16 | 353:2 357:23 | 80:19,23 |
| 21:20 26:22 | 197:21,23 | 357:24 358:24 | 154:11 155:3 |
| 36:12 51:10 | 198:7,12 | 359:6 361:21 | 279:8 |
| 54:7,14,18 | 202:11 204:4 | 362:1,6,12 | **methodology** |
| 55:6 61:15 | 205:18 206:13 | 365:13 367:2 | 26:12 27:3 |
| 62:19 63:8,15 | 209:11,14,22 | 367:16,19,22 | 87:3 272:5 |
| 82:9,17 85:21 | 210:10,14 | 368:1,5,14 | 342:12 361:14 |
| 86:16 87:8 | 211:6 212:3,9 | 369:9,19 370:5 | **methvin** 4:4 |
| 89:3 105:5,13 | 213:4,9,14 | 370:8,18,21 | **miami** 2:13 |
| 106:8 108:19 | 215:5,9 216:14 | 371:4 373:6,24 | 4:18 |
| 113:6 114:7,10 | 216:20,22 | 374:7,13,15 | **michael** 3:11 |
| 114:19,24 | 217:19 223:5 | 376:24 377:12 | 4:12 6:10 |
| 115:10,17 | 224:1,20 225:6 | 378:12,19 | **middle** 52:6 |
| 116:4 117:16 | 225:11 226:16 | 381:20 383:1,3 | 81:19 138:13 |
| 117:20 123:19 | 235:13 240:9 | 385:21 386:8 | 139:6 184:20 |
| 124:4,17 125:7 | 242:10 246:5 | **mention** 210:17 | 283:12 |
| 128:16 129:7,9 | 250:5,8,14 | 210:23 310:8 | **midway** 381:14 |
| 129:13,24 | 251:18 252:4 | **mentioned** | **mike** 154:23 |
| 136:11 137:3 | 267:13,22 | 96:17 167:21 | **miles** 66:18 |
| 137:13,14,20 | 268:14 269:7 | 244:9 257:12 | **miller** 1:20 |
| 138:1,5,18,18 | 270:14 293:8 | 264:7 279:13 | 13:4 397:10 |
| 140:22 141:1 | 293:18 294:2 | 291:1 304:20 | **mind** 58:13 |
| 141:19 142:10 | 295:3 301:9,12 | 324:18 356:18 | 119:2 142:17 |
| 142:12 143:6 | 301:13,19 | 359:17 | 142:18 325:10 |
| 144:4,5 145:10 | 306:14,18 | **mentor** 16:19 | 371:21 377:23 |
| 145:21 163:13 | 307:1 315:7,11 | **message** 303:11 | **mine** 275:2 |
| 170:8,19 171:7 | 321:1 333:3,5 | 304:1,3 | **minnes** 4:14 |
| 177:17 180:14 | 338:21 339:7 | **messaging** | **minor** 147:20 |
| 182:2 186:21 | 339:17,21 | 304:11 | **minute** 181:16 |
| 187:6,11 | 340:2,8 341:8 | **met** 13:22 60:9 | 385:7,12 393:5 |
| 189:23 190:20 | 341:17 344:2 | 92:5 94:3 | **minutes** 22:9 |
| 190:22 191:11 | 349:10,14,22 | 110:23 | 64:17 65:3 |
| 191:13 192:1,7 | 350:3,13 351:8 | | 156:10 160:21 |

**[minutes - necessarily]**

218:13,18 299:24 384:14 384:21 385:4,6 396:4

**mirrors** 310:23

**misleading** 177:22

**mission** 16:21

**missouri** 5:13

**misstates** 32:14 49:1

**mistake** 120:21 120:22

**misunderstan...** 73:11

**misunderstood** 93:23

**mitigate** 62:24 227:5 228:23 234:3 294:18

**mitigating** 229:11

**mkennedy** 3:13

**mlegg** 5:21

**mobile** 4:5

**models** 84:22

**modules** 141:4 141:10,11,14

**moment** 19:2 30:15 77:11 279:5 347:21 371:22 378:2

**moments** 13:22

**momentum** 340:2

**monitor** 159:3

**monitoring** 219:11,24 221:24

**monograph** 323:1

**monthly** 96:4

**mood** 104:22 107:17

**morgan** 6:17

**morning** 13:14 13:15 391:24 392:10,19 393:10 394:1

**motivational** 201:23

**motive** 239:11

**motives** 239:13

**move** 35:17 128:24 385:7 385:11 389:14

**moves** 147:2

**movies** 347:10

**moving** 361:2

**multi** 98:12 184:24 218:24 320:7 321:3,17 322:17,20 325:12 326:11 326:20,24 328:10

**multifactorial** 115:11

**multiple** 115:15 144:22 218:24 244:13 253:8 255:22 256:16,18 257:14 261:8 261:11 320:17 322:23 327:8

**multiyear** 299:1

**murthy** 224:12

**murthy's** 224:14

**mweinkowitz** 6:13

**myeates** 2:6

**n**

**n** 3:11 7:2

**nafisah** 274:20 275:3

**name** 12:11 13:18,22 15:17 61:5,16 81:22 82:22 91:22 101:13 102:7 214:19 222:9 245:4 253:17 261:4 274:24 282:1

**named** 59:22 60:2,5 214:24

267:23

**names** 25:21 26:3 142:14 145:16

**naming** 215:19 219:21

**nation** 386:17 387:2

**national** 14:8 14:11 36:11 87:8,12 89:23 90:5,8,21 91:12 147:17 190:19 206:12 242:10 312:7 322:9 323:16 326:6 331:16 349:22 358:15 359:5,20 360:15 362:12

**natural** 391:22 395:14

**nature** 172:6 172:13 350:4

**navigating** 229:5 268:21

**near** 391:22

**necessarily** 154:8 158:15 161:18 190:13 219:20 227:13 236:19 247:1 247:11 250:7 250:18 256:9

CONFIDENTIAL

**[necessarily - number]**                                             Page 50

266:16 284:22
289:6 299:23
303:15 311:23
327:13 371:18
388:16
**necessary**
 323:6 328:8
 398:4
**need** 21:3 22:9
 26:16 36:14,17
 51:3 53:11
 54:5,16 60:24
 74:16,18,21
 75:19 120:4
 169:4 176:15
 183:4 202:6
 207:1 211:1,2
 212:7 214:5,24
 223:3 243:21
 244:20 246:19
 306:17,18
 307:1,3 311:19
 323:13 346:14
 350:22 351:7
 351:11 352:19
 353:16 369:11
 385:10 392:17
 394:20
**needed** 30:13
 306:15,24
 311:23 323:8
 341:23
**needs** 10:24
 209:15 212:4

343:9 349:10
349:15 350:14
376:24 377:12
**negate** 178:24
**negates** 200:7
**negative**
 193:11 267:10
 268:4 269:6
 270:15 280:14
 280:15
**negatively**
 241:10 274:13
**neglect** 367:17
 367:21
**netflix** 113:21
**network**
 322:10 323:17
**networks** 189:2
 194:5,12
**neuro** 83:14
**never** 17:3 60:6
 99:17 101:9
 102:19,21
 127:8 256:9
 366:6
**new** 2:17,17
 3:21,21 4:13
 96:8 206:24
 330:9,14,22
 331:4,9 342:20
 342:22 343:9
 343:23,24
 344:2 356:5
 363:7 364:23

**newscast**
 158:11
**newscasts**
 158:14
**newtown** 379:3
 379:14 380:14
 380:24
**night** 169:17
 274:12 277:12
 289:14 298:4
 389:10
**nimh** 141:18
**nine** 52:11
 245:19 246:16
**nirnians**
 323:16,24
**nolan** 3:20
**nonresponsive**
 129:1
**noon** 207:4
**normal** 23:17
 392:6
**northern** 1:1
 12:22
**notary** 400:14
**note** 58:6
 120:17 171:16
 355:22 392:2
 394:15
**notebook** 24:20
 24:22 25:3
 33:3 37:5,20
 38:16,17,19,20
 38:23 39:16

40:23 41:14
42:5,20 43:18
44:10 45:2,17
46:9
**notebooks** 49:7
 49:15
**noted** 13:1
 398:11 400:6
**notes** 31:2,4,7
 31:10,12,15
 32:2 79:8,12
 401:1
**notice** 1:15
 9:13 55:15,20
 56:5
**noticed** 394:5
**noting** 79:4
**notion** 280:12
**novel** 128:19
 342:20
**november**
 190:4 197:12
 217:16 218:11
 218:22
**number** 33:14
 34:21 39:6,21
 41:19 55:17
 56:1 57:14
 64:16 65:3
 67:11 68:23
 69:7,8,17
 71:15 97:6,9
 97:10 105:8
 118:15 121:11

CONFIDENTIAL

**[number - offer]** Page 51

137:11 146:16
156:10 163:23
173:17 189:19
202:7 208:19
217:7,8 218:13
218:18 271:19
277:19 294:9
294:10,11
297:17,19
299:24 310:12
327:19 328:3
331:16 334:10
338:16 340:6
350:6 352:1
353:5 363:13
370:11 375:18
376:17 383:23
393:6
**numbers**
337:16 346:15
375:15
**nurturing**
219:9
**nutrition**
220:10,17,20
220:23 221:5
221:17
**nw** 3:12

**o**

**o** 83:5,16 86:3
**o'clock** 207:9
392:9,11 393:2
394:9,21 395:4

**o'hanlon** 6:16
**obesity** 317:23
318:1,7,8,10,14
318:19 319:1,8
319:15 324:23
**object** 19:23
20:24 28:20
32:13 47:18
48:11,24 50:18
57:3 63:9 64:3
64:23 70:2
72:15 74:3
77:17 78:8
88:15 90:23
106:16 111:18
112:15 115:12
116:22 118:3
123:21 124:6
126:1 127:6,22
130:5 131:2
133:4,16 134:2
134:18,23
135:19 136:18
137:8 141:7
144:13 151:9
152:1 163:19
165:11 167:2
168:23 172:9
172:24 179:23
181:13 183:20
185:14 187:15
189:3 191:5
192:17 194:14
196:10 197:17

199:21 203:5
204:6 206:7
209:16 210:19
211:14 212:20
214:1 216:5
221:8 222:22
224:7 231:5
233:4 240:2,21
245:21 246:20
248:18 249:21
250:10,24
252:17 254:12
258:14 259:8
262:1 265:3
266:10 269:12
270:17 272:19
275:10 277:4
278:6 280:4
282:16 283:14
286:20 288:4
289:24 290:17
293:11 295:5
297:7 304:16
306:6 307:14
308:24 309:12
310:5 314:14
315:21 318:21
327:3 329:8
331:21 347:12
353:12 355:14
359:8 363:3
364:6 372:6
373:10 374:2
375:7 379:17

383:8 387:4,18
**objected** 58:11
**objections** 12:6
57:4
**objective** 130:3
**obligations**
16:11
**obstacles** 339:2
339:14
**occasion** 29:19
160:11
**occasions** 55:10
**occur** 303:11
303:24 304:3,5
304:6,10,19,22
310:16,19
369:24
**occurred**
310:18 369:5
371:15
**occurring**
303:8
**occurs** 236:8,10
305:15 381:10
**odd** 186:6
**odgers** 86:2
**offer** 109:15
154:16 233:10
233:12 238:6
238:13,15
240:6,18
257:10,21
321:10

CONFIDENTIAL

**[offered - opinion]**                                                      Page 52

| | | | |
|---|---|---|---|
| **offered** 109:21 | 377:4 378:14 | 188:10 194:8 | **old** 168:2 |
| 154:1 203:8,19 | **okay** 14:1 | 195:20 196:16 | **once** 109:1 |
| 242:2,12 269:2 | 15:11 18:17,21 | 197:9 202:24 | 110:3 156:14 |
| 344:7 360:3,18 | 19:6,18 20:17 | 204:12 207:5 | 195:24 196:6 |
| **offering** 151:12 | 23:9,14 24:6 | 211:9 212:16 | 292:3 395:17 |
| 152:4,15,23 | 31:6,9,17 | 213:12,20 | **one's** 388:23 |
| 173:8,11 | 33:12 36:23 | 214:17 217:5 | **ones** 43:1 48:20 |
| 200:10 233:1 | 38:15,22 46:11 | 218:19 220:22 | 59:14 60:7 |
| 233:15 238:21 | 48:2,5 49:6,13 | 222:18 223:17 | 68:14 75:1 |
| 239:4,10,14,16 | 50:15,16,23 | 230:21 240:15 | 150:15 154:22 |
| 239:21,23 | 51:4,6,7,11,12 | 245:17 249:17 | 184:10,11 |
| 241:9,21 | 58:12 67:2 | 250:21 256:24 | 203:15 |
| 318:14 | 69:10 70:8,18 | 260:4 261:21 | **ongoing** 16:11 |
| **offers** 321:2 | 71:24 73:8,19 | 267:5 270:9 | 319:11 |
| **offhand** 261:5 | 74:12,23 75:4 | 274:3,19 275:4 | **online** 142:7 |
| 261:20 296:6 | 75:18 76:2 | 275:19 276:10 | 143:5 181:6 |
| 337:2 | 83:18 87:5 | 277:24 278:22 | 186:24 188:16 |
| **office** 68:15 | 89:11 94:15 | 289:19 290:9 | **open** 160:11,13 |
| 311:16 312:6 | 105:15 106:12 | 293:16 295:19 | 393:14 |
| **officer** 175:3 | 107:5,10 | 296:21 312:2 | **opened** 162:21 |
| **offices** 1:15 | 110:24 113:19 | 314:9,24 318:5 | **operates** 109:1 |
| **official** 225:14 | 118:18 121:9 | 318:16 330:19 | **operations** 3:15 |
| **offspring** 159:5 | 121:24 123:2 | 337:3 338:9,14 | **operative** 49:9 |
| **oftentimes** | 125:2,19 | 343:11 345:4 | **opinion** 134:6 |
| 125:15 138:17 | 127:16 128:3 | 345:16 355:10 | 151:12,20 |
| 157:23 330:16 | 132:16 145:13 | 360:9 361:5 | 152:4,16,23 |
| 341:12 351:3 | 146:8,23 147:4 | 363:22 364:15 | 153:5 154:1,10 |
| 365:8 366:15 | 148:19 150:9 | 365:20 369:15 | 173:8,11 |
| **oh** 48:2 54:22 | 150:24 151:6 | 375:3 376:14 | 200:10 205:13 |
| 71:10 101:18 | 151:16,22 | 378:6,20 | 206:19 233:1 |
| 110:18 159:19 | 159:8,23 | 383:24 384:19 | 234:5 238:7 |
| 162:3 177:24 | 166:13 177:7 | 385:9 386:4,21 | 239:10,14,16 |
| 205:20 291:8 | 181:2 183:11 | 389:12 390:17 | 239:21,23 |
| 345:1 366:22 | 184:18 186:15 | 390:24 391:15 | 240:16,18 |

CONFIDENTIAL

**[opinion - pa]**

241:21 258:11 262:5,6 266:22 267:4,9,14 268:6 269:24 317:24 318:11 318:15,20 319:7

**opinions**  20:18 20:21,22 21:5 24:17 49:22 50:2 58:1,22 65:9 77:9 88:14 89:9 150:12 153:13 154:2,7,15 163:22 165:9 183:14,24 231:18 233:10 233:12,16 238:11,13,16 238:18,22 239:5,9,19 240:6 241:1,9 242:2,4,19 244:3 251:10 257:22,24 262:15 264:2 267:7 269:1 271:15,17 272:6 276:19 277:2 283:18 293:3 295:16 361:1,12 362:21

**opportunistic** 381:9

**opportunities** 188:15 219:12 220:1 222:1

**opportunity** 211:10 223:19 226:2 321:3,10

**opposed**  88:12 89:23 163:17 166:24

**oral**  209:5 218:11

**orally**  216:1

**order**  21:4,15 36:18 74:19 92:17,23 95:22 130:23 251:20 252:23 321:14

**organization** 149:2,9 175:19

**organizations** 237:3

**orientation** 367:1,9

**original**  214:8 398:15

**outcome** 254:11 255:7 288:14

**outcomes**  185:4 185:12 236:13 236:15 251:15 251:17 256:2

378:13,19

**outline**  30:9,12 30:17 307:10 309:24 312:13 342:19

**outlined**  30:4 150:3 241:23 259:5 269:5 271:16 279:2 280:1 288:2 296:13 313:4

**outright**  177:2

**outset**  272:5 326:21

**outside**  66:16 94:21 95:18 177:20 230:5 298:19,23 299:14 307:17 348:3,10,13 357:7,14 366:12

**outweigh** 178:24

**overall**  267:13 383:6 386:19 387:2,12

**overestimate** 374:24

**overlap**  109:22 110:6 319:5

**overlapped** 107:2

**overlapping** 312:17 313:1,9

**overnight** 330:6

**oversee**  110:2

**overseeing** 110:9 111:13 112:12,23 116:19 124:24

**overseen**  110:7

**oversimplific...** 193:5

**oversimplifyi...** 191:19,23

**overwhelming** 177:15 178:16

**own**  14:21 69:3 71:16 95:3 133:12 159:4 179:10,19 224:3 287:17 299:6 325:2,4 329:5

| p |
|---|
| **p**  5:11,18 83:5 |
| **p.c.**  4:11 |
| **p.m.**  207:9,16 260:15,22 345:23 346:6 391:6,13 393:4 396:5,9 |
| **pa**  12:17 |

CONFIDENTIAL

**[page - patient]**                                                    Page 54

| | | | |
|---|---|---|---|
| **page** 7:11 8:4 9:4,17 10:4 11:6,6,6,11,11 11:11,16,16,16 11:21,21,21 25:4 33:10 43:1 57:10 68:3 69:6,7 70:20 77:24 78:6,20,22 97:15,21,23 98:3,10 146:1 146:11,14,16 147:2,7 176:1 184:17 186:15 188:3,7,8,9 190:16 191:17 193:17 195:21 196:17 213:21 213:22 219:3,4 335:9,9 339:2 339:14 378:5,7 381:12,12 385:16 399:3 401:2 **pages** 19:1 144:22 218:24 222:13 400:3 **pakistan** 283:11 **pandemic** 368:12 369:5,8 369:16 370:4 | **paper** 285:1,24 286:17 **papers** 286:6,8 **paragraph** 86:12 87:1 88:1,9,19 179:6 184:20 191:17 193:19 196:18,19 274:5,9 276:22 311:14 312:1 335:10 378:23 381:14 385:18 386:13 **paralegal** 5:18 **parental** 228:12 229:14 234:22 **parents** 111:3 232:5 **park** 173:5 **parse** 154:9 **part** 13:24 17:4 25:23 31:5 34:14 36:3 63:17 77:3 79:11 87:14 89:6,12 101:11 101:12 102:19 106:5 109:18 120:23 125:11 126:12,16 131:11 140:24 141:17 143:10 | 145:1 150:7 180:20 184:1 191:3 220:5 225:17 230:9 231:17 232:8 237:15 239:8 242:1,4,11,13 265:15 269:24 270:2,5 273:8 286:13 291:3 291:24 316:15 316:18 318:18 319:1 320:11 326:6 329:18 349:23 351:22 353:3 388:4 **participate** 28:5,10 **participated** 28:8 **participating** 91:6 **particular** 98:16,19 141:14 158:16 158:21 226:20 229:20 264:15 276:2 277:9 312:1 313:23 317:14 322:8 323:1 371:7 382:12 **particularly** 54:8 186:20 | 187:5 333:13 335:13 365:10 **partnered** 142:6 **partners** 138:19 **partnership** 16:16 **partnerships** 268:22 **parts** 318:17,24 319:14 **party** 396:1 **pass** 391:16 **past** 278:11 379:7 **patchwork** 343:5 **pathways** 236:9 **patient** 18:7,9 18:13 19:15,21 20:3,7 104:12 107:6,21 109:11,17 110:9 112:13 112:24 114:16 124:21,23 125:1 131:13 132:4,23 134:6 134:14 135:6 135:17,23 389:18 390:16 |

CONFIDENTIAL

**[patient's - personnel]**                                          Page 55

**patient's**
  111:12 113:2
**patients**  17:23
  100:15 104:10
  110:12 111:3
  126:22 127:9
  130:24 131:23
  133:14,19
  390:5
**patrick**  6:4
**pattern**  267:24
**patterns**  268:1
  269:9
**pay**  15:16
  241:22
**payment**  73:17
**payments**  3:16
**peer**  143:15,24
  144:3,11 145:5
  145:14 148:10
  148:14,21
  149:4,10,12,13
  149:16,19,21
  149:22 150:2
  164:1,5 166:23
  183:17 201:2
  247:8 255:23
  268:19 276:18
  278:2 285:20
  286:14 292:2,3
  295:1 305:20
  311:4 346:21
**peers**  183:6
  195:5 200:22

201:3
**pennsylvania**
  1:18 2:5 6:12
  66:16 75:15
**pensions**  10:13
  208:13 217:14
**people**  26:17,21
  29:1 54:7
  61:17 62:19
  63:1 88:21
  115:18 117:16
  128:20 132:12
  141:24 166:6
  176:5,10 178:1
  191:10,12
  193:4 198:20
  198:20 203:22
  205:7 220:2,3
  223:6 225:3
  228:1,5 229:3
  230:5,14,22
  232:2,12
  234:24 241:4
  280:16,19
  286:2,12,17
  287:2,3 299:22
  302:7 310:18
  313:12 320:24
  321:7 342:21
  343:23 344:1
  355:5 363:14
  367:6,13
  368:17 370:6
  370:18 372:19

373:2,16
  374:20,24
  386:17 387:11
  387:21 388:7
  390:21
**people's**  137:13
  141:1 173:3
  177:17 180:13
  182:2 185:20
  235:13 246:5
  320:9 368:14
**perceiving**
  195:8
**percent**  154:10
  154:11 262:9
  262:10 279:7,8
  314:2 335:16
  335:23 336:7
  374:19,19
  375:4,20
  381:22
**percentage**
  279:1,24 390:1
  390:4
**perception**
  300:15
**perform**  21:3
  110:2 262:18
  263:1,21
**performance**
  142:21 274:14
**performed**
  242:17 244:1
  259:3 261:22

265:2 269:3
  283:9
**performing**
  264:11 292:14
**period**  52:2
  107:10 116:19
  141:17 205:12
  314:2 350:18
  351:15
**perpetually**
  160:18
**persistent**
  331:19 339:2
  339:14
**person**  27:22
  29:5 61:6
  81:18 119:5
  142:11 267:19
  383:3
**person's**
  115:10
**personal**  1:4
  12:19 15:17
  172:22 179:10
  179:19 206:6
  206:10 296:4
  374:12,15
**personally**
  19:19 28:1
  106:8 112:11
  204:21,24
  357:18
**personnel**
  276:7,8

CONFIDENTIAL

**[perspective - platforms]**                                   Page 56

**perspective**
  135:7 299:20
  300:14
**pertinent**
  216:11 219:22
  365:11
**pervasive**
  319:9 370:22
**pervasiveness**
  371:2
**ph** 1:24
**ph.d.** 1:14 7:17
  7:19 9:18
  12:24 13:7
  34:6 35:2
  97:15 400:8
**phd** 7:4
**philadelphia**
  6:12 66:16
**phone** 29:10
  160:12 169:15
  226:19,23
  227:4
**phones** 183:3
  226:24 227:12
  227:19 280:24
**phrase** 214:19
  222:9
**phrased** 73:9
  88:18
**physical** 84:13
**physically**
  373:8

**pictures** 161:7
**piece** 196:21
  259:24 273:19
  284:21 293:4
  320:21 322:5
**piecemeal**
  343:5
**pillar** 321:12
  322:1,4 323:15
**pillars** 319:21
**pinterest**
  151:24 152:7
  152:10
**place** 6:17 54:6
  85:15 169:14
  211:3 212:4,8
  221:3 243:22
  251:4 270:9
  294:17,18
  305:10 331:4,6
  332:15 342:8
  342:15 350:23
**plaintiff** 2:7 4:7
  4:19 6:19
  28:14 165:19
  362:18
**plaintiff's** 5:21
**plaintiffs** 5:8
  5:14 6:7,13
  28:19 56:6
  61:20 62:12
  77:16 94:23
  95:22

**plan** 62:21 67:3
  207:3 234:3
  241:23 283:4
  296:12 297:6
  298:15,17,22
  299:1,7,15
  307:10 312:14
  312:15 318:17
  318:24 319:15
  319:18 320:14
  321:20 322:17
  323:4 326:2
  329:20 330:3
  337:14,20
  342:5 344:13
  347:24 348:5
  349:9 350:12
  350:22 352:3,6
  352:11,19
  353:10,11,16
  353:21 354:13
  357:8,10,15,18
**planned** 350:15
**planning**
  321:20 384:8
**plans** 63:3,7,11
  299:4 319:6
  343:19 348:9
  348:13 349:7
  349:12,17
  350:3,4,6,10,15
  350:17 351:3
  353:19 354:1
  359:4,14,16

**plastic** 169:15
**plat** 279:14
**platform** 50:14
  142:24 145:17
  153:16 155:16
  165:10 166:19
  166:22,24
  167:14 201:16
  204:14 214:20
  215:20 218:20
  219:21 221:6
  222:10,20
  234:8 237:2
  262:20,24
  263:3,23 279:3
  279:15,20,21
  304:13,22
  308:13
**platforms** 3:14
  80:18 106:15
  106:20,21
  107:3 150:14
  150:19,23
  151:5,8,14,23
  152:6,11,19
  153:3,7,10,11
  153:21,24
  154:4,15,17,19
  161:9,10,13
  163:8,11,17
  164:7,11
  165:22 166:3,5
  166:9,11,17
  167:10,14,18

CONFIDENTIAL

**[platforms - practicing]**                                    Page 57

168:5 169:22
170:4 179:15
180:23 183:3
185:22 201:9
201:17,22
203:4,12,21,24
204:4,17
214:24 215:2
215:22 219:16
219:18 223:2
226:21 228:11
229:15,24
230:6 231:1,4
231:21 232:12
232:16,20,21
233:3 236:23
238:8,17,24
239:7,18 240:8
241:3,8 289:10
298:7 303:9,21
304:15 305:21
307:20,24
308:6,16,20,23
309:10 310:4
346:23 347:3,7
368:21,22
370:24
**play**  233:23
234:20 248:10
248:12
**plays**  137:5
**please**  13:19
22:10,18 23:12
51:6 70:20

81:8 104:20
173:16 398:3,8
**plenty**  394:10
395:2
**plus**  106:24
138:20
**point**  22:17
30:11 103:15
111:1 131:18
140:15 157:4
161:21 164:19
170:10 178:4
202:24 204:9
214:18,18
220:7 222:18
251:3,3 275:8
275:22 276:1
288:15 296:20
302:3 311:8
314:6 366:4
391:16 395:14
**pointed**  295:14
**pointing**  195:3
**policies**  211:2
212:7,17,23
213:2,5,7,16,16
214:9 215:1,22
216:3,8,10
222:15 223:4,8
223:14 224:18
225:5 354:23
**policy**  215:23
223:23

**political**  383:4
386:16,24
**ponce**  4:17
**poor**  220:10,17
220:20,23
221:5,17
388:16
**popular**  309:19
**population**
105:22 282:6
282:13,19
297:2 386:20
387:14 388:2
390:7
**populations**
257:17 261:13
285:22
**positing**  134:11
**position**  15:22
170:19
**positions**  35:14
**positive**  280:13
306:4,10
325:10
**positively**
339:22
**possible**  252:10
**possibly**  174:24
228:18 264:16
308:9
**post**  105:6
374:21
**postdoctoral**
19:12

**posting**  347:9
**potential**
178:19,23
188:22 255:15
255:20 256:1
282:7,14 367:2
367:18 368:5
**potentially**
118:14 228:15
375:5,22 376:5
376:7 381:18
381:24 382:7
382:11
**poverty**  119:20
385:22
**practice**  111:1
111:13,15,23
111:24 114:5
115:21 116:18
116:20 123:11
123:16 124:16
124:20 125:3
126:23 139:18
246:24 265:15
285:6 286:12
298:19 320:13
336:11 389:17
389:19,24
390:1,14,16
**practices**  240:1
240:20 332:15
358:20
**practicing**
112:11

CONFIDENTIAL

**practitioner** 103:22 131:5

**practitioners** 129:8,19 143:6 237:19

**pre** 181:6,10

**precise** 215:18

**precisely** 136:5

**predict** 266:13 266:17

**predictive** 10:17 334:14 334:23

**predisposing** 119:4

**predominance** 346:22

**predominantly** 166:4

**prefer** 170:11

**preference** 392:22

**preparation** 92:12 93:11,16

**prepare** 21:15 25:16 50:8 76:2,5 91:24 92:2,17,23 93:4 95:1,12 95:22

**prepared** 20:17 20:20 49:14

**preparing** 92:20 94:10

377:18

**present** 6:22 28:9,13,18,23 36:7 137:23 148:7 164:15 373:8

**presentation** 127:1,10

**presentations** 225:20,23 226:1,6,11

**pretending** 313:20

**pretty** 68:24 78:4 98:24 172:19 205:6 229:12 274:1 285:7 286:11 305:22 320:18 321:4 351:19 366:5

**prevalence** 375:12 390:7

**prevalent** 112:6

**prevent** 62:24 228:23 234:2 294:18

**preventing** 312:9

**prevention** 213:5,15 312:8 313:14,17,21 316:13 317:1

**previous** 89:13 344:15

**previously** 53:5 57:22 58:19 61:8 62:11 121:7 123:4 192:12 364:5

**primarily** 17:5 105:21 139:1,5 139:10

**primary** 390:22

**principals** 88:6

**printed** 68:6,10

**printout** 97:20

**prior** 96:10,11 254:2 317:18 347:23 348:13 353:21 354:15 355:11 368:23

**priorities** 339:20 340:10 340:13,23 341:3

**probably** 17:19 18:15 19:13 20:8 22:4 55:5 78:21 96:10 112:8 155:23 159:1 160:3 164:17 212:1 214:11 233:7 235:20,21 244:20 249:2

297:14 324:15 325:1 345:1 355:17 359:12 370:24

**problem** 58:17 114:24 129:11 219:13 220:2 222:2 282:11 382:18 395:1

**problematic** 180:24

**problems** 10:6 82:9 107:14 114:7 189:23 190:23 192:1,8 192:15 193:9 202:12

**proceedings** 52:15

**process** 22:4 25:24 109:12 109:18 110:22 126:13,17 149:1,8,23 150:2,7 168:17 280:18 361:14

**processes** 82:11 255:23

**produce** 120:18 254:11 255:7,9

**produced** 121:7

**product** 142:5

CONFIDENTIAL

**production**
  11:10 56:8
  120:21,24
**products**  1:4
  12:20 142:15
  143:9
**profession**
  88:11 335:14
**professional**
  14:2,4 77:2
  143:7 197:21
  341:14,20
  353:22 354:7
  354:16 355:8
  355:11 356:1
**professionals**
  86:17 89:4
  273:16 337:5
  337:12
**professor**  16:1
  16:2,3,7,10,15
  20:14 21:18
  91:13 96:5
  103:1 192:2
**profile**  379:6
**program**
  139:20 140:8
  141:5,20
  309:24 310:9
  319:14 322:15
  325:18,22
  328:10,11
  330:22

**programming**
  18:1 142:10
  242:12 316:21
  322:12 329:17
  331:3,9 343:4
  344:7 350:24
**programs**
  161:16 216:22
  306:23 332:22
**prominent**
  143:9
**promote**
  188:17
**promoted**
  52:21
**promoting**
  141:20
**promotion**
  52:19,22,24
  213:4,15 312:8
**pronged**  98:12
**properly**  394:4
**propose**  321:18
  337:17
**proposed**
  319:18
**proposing**
  234:2 318:18
**propounded**
  400:5
**prospective**
  85:11
**protecting**
  209:11,22

**prothero**  10:7
  190:4,8 191:4
  191:8 194:18
  202:13,19
  203:1
**provide**  18:8
  24:16 55:4
  62:8 104:18
  130:2 224:9
  249:24 358:20
  358:20,21
  359:17
**provided**  18:13
  19:10 26:11
  27:1 56:24
  57:17,23 58:7
  58:19 59:14
  89:17 353:23
  354:17 357:8
  357:15,18,22
  359:23 360:11
**provider**  307:4
  307:5
**providing**
  19:20 104:12
  107:6 109:11
  112:24 221:16
**prussia**  1:17
  2:5
**psychiatric**
  51:9 130:3,13
**psychiatrist**
  103:6

**psychiatry**
  101:17,23
  102:4,17
  108:16 192:3
**psychological**
  9:21 107:13
  108:9,13 109:8
  137:6 173:22
  174:7,12,20
  175:3,14,18,22
  176:8,23
  179:11,20
  181:3 185:10
**psychologica...**
  186:20 187:4
**psychologist**
  51:17 103:4,5
  103:8,10,12,16
  138:8,10
  237:16 340:18
  340:20
**psychology**
  16:9 19:11
  103:20
**psychosocial**
  339:23
**psycinfo**
  361:17
**public**  4:20
  8:21,24 9:7
  43:21 44:5,12
  44:20 45:4,12
  104:4,6,7
  171:14 199:5

CONFIDENTIAL

**[public - quote]**                                                    Page 60

205:22 252:3
294:16 310:24
312:5 313:10
313:23 316:18
317:5,13 318:9
319:9 320:2,5
320:10 321:11
322:3 324:20
324:21 400:14
**publication**
37:1 174:6
335:5
**publications**
35:20 36:24
143:17,19
144:22 145:2
145:20
**publicized**
380:17
**publicly** 205:17
205:21 206:1
**publish** 285:18
**published**
36:21 37:1
143:14,23
144:2,10 145:6
145:15 274:20
287:1 335:21
338:11 339:10
**publishing**
35:21 247:7
**pubmed** 361:17
**pull** 32:3
324:11

**pulled** 343:14
**pulling** 264:3
**purpose** 150:11
151:2 377:18
378:3 379:21
**purposes** 88:13
94:9
**pursuant** 1:14
**put** 54:5 126:5
169:14 184:14
205:5 212:4,7
276:12 278:18
285:20,24
287:2 294:17
294:17 298:21
332:14 350:23
351:9 359:5
393:9
**putting** 77:10
95:7 287:4
355:21,23
**puukko** 83:5

**q**

**qualification**
76:24
**qualified** 332:7
**quality** 142:23
143:2 147:24
232:10 299:6
326:10,15
328:18 350:2
352:2 359:22
388:16

**quantification**
293:24
**quantify**
298:12 299:16
332:20 349:20
390:11
**quantitative**
63:24 64:20
346:10
**quarry** 5:19
**question** 11:20
12:7 22:13,18
23:20 24:1,4
58:4,15 73:12
74:14 93:18
100:8 113:16
114:1 115:11
122:15 125:4
126:5,6,20
130:17 134:10
135:23 143:20
144:9 146:9,18
148:16 154:6
166:13,20
170:15 171:4
172:2,19
180:16 183:15
199:18 202:17
205:2,10 214:4
214:6,8 227:20
233:9 240:13
243:2 252:14
253:11,13
258:8 263:5,6

263:18,19,20
275:13 276:15
276:23 278:10
282:23 290:8
292:12 293:19
298:10 299:10
299:12 309:4
319:13 324:19
326:16 331:24
332:11 344:23
346:24 355:18
359:12 361:9
365:11 369:6
388:7
**questioning**
168:24 391:17
391:19,21
394:12
**questionnaire**
119:13
**questions** 96:20
110:11,20
111:2 119:14
170:14 400:4
**quibble** 74:13
**quick** 211:6
**quickly** 68:2,24
79:3 385:11
**quite** 241:16
280:8 358:17
367:4 371:13
**quote** 86:13
179:8 186:19
188:13 192:20

CONFIDENTIAL

**[quote - recall]**

192:22 196:20 274:10 294:22 339:15
**quoted** 89:6 195:24 196:6
**quotes** 32:4,10

**r**

**r** 82:24 83:16 85:19,19 86:3 399:1,1
**racial** 136:15
**racism** 136:22
**radnor** 1:17 2:5 12:17 66:15 67:1
**ran** 105:12 365:2
**random** 84:21
**randomized** 243:9,14
**range** 51:18,19 104:15 108:1
**ranges** 51:24 282:22 283:2
**rare** 348:19
**rate** 66:3 337:1
**rates** 335:16,23 336:21 381:24 382:7,11
**rather** 130:23 182:20 246:8 261:12 322:4 350:20

**rcts** 243:14
**reach** 21:4 130:23 257:23 258:11 358:23
**reached** 109:10 266:22
**reaching** 130:20 131:19 242:18 244:2 291:13 292:15
**read** 78:24 79:5 184:5 185:6,7 197:6 210:22 211:6 215:17 218:23 219:1 222:11 287:6 335:17 340:3 344:16 365:23 366:2 379:9 398:3 400:3
**reader** 78:4
**readers** 221:12
**reading** 77:3 79:3 264:13 286:17 292:23 333:4 347:9
**really** 17:5 26:1 52:4 54:13,17 63:20 89:5,7 103:21 115:5 119:12 132:11 151:19 153:15 153:19 159:2 161:22 165:14

177:14 180:12 183:9 197:15 211:4 213:8 227:17 228:10 228:15 229:1 230:4,15 231:22 243:12 243:20 245:10 246:7 264:2 265:17 269:19 273:5,8 277:20 296:16 303:19 310:16 311:17 314:7 319:20 320:1,11 321:13,14 322:6,10 323:3 323:6,14,17 342:18 344:7 350:23 351:4 354:18 361:15 366:12,23 368:11 369:10 369:24 370:1 371:13
**realtime** 1:21 273:12 397:11
**reason** 24:14 24:15 51:2 245:12 285:17 285:19,23 302:18 329:18 330:9 395:10 398:5

**reasonable** 175:23 323:5
**reasons** 227:11 227:15 330:13 330:18 381:6
**rebuttal** 7:22 8:6,11,15,20 9:6,11 37:21 37:22 38:4,10 39:17,18 40:1 40:24 41:8 42:6,14 43:20 43:20 44:4 45:3,11 46:12 46:19 47:8 48:9,18 81:13 317:22 318:4 337:23 338:7 363:9,17
**rebuttals** 364:13,24
**recall** 35:10 54:24 68:22 70:5 111:6,7 133:23 140:7 145:5,14 158:9 162:22 175:9 191:8 205:16 218:12,17 254:24 295:21 333:15,19 346:13,17 347:16 352:7,8 353:9,14 364:9

CONFIDENTIAL

**[recall - regardless]**                                        Page 62

365:7 381:1
**receipt** 398:17
**receive** 31:9
77:13 102:23
103:20 127:3
301:3,5,9,18,22
302:14,18,20
305:2 306:14
306:22 307:2
321:1,1
**received** 31:7
34:10 58:9
67:22,24 68:14
73:15 74:15
77:12 170:8
**receiving**
104:14,16
**recent** 58:14
118:6 128:8
143:17 190:17
378:17
**recently** 53:9
53:12 158:4
**recess** 120:10
207:12 260:19
346:2 391:9
**reciprocal** 84:4
85:2
**recognize**
197:1,15 198:6
199:13 220:4
316:5
**recognized**
128:5 315:1

**recollection**
28:23 35:12
53:19 61:13
98:15 109:13
140:19 167:15
379:20 380:2
**recommend**
113:1 296:12
**recommendat...**
188:12 325:20
326:3
**recommendat...**
187:20 188:5
215:18,24
216:24 217:3
223:24 225:8
283:3 310:11
**recommended**
61:16 99:3,6
99:13,17
212:17 214:9
215:22 310:9
**recommending**
187:13 215:11
223:14
**record** 12:11
13:2 30:21
75:3,5 120:8
120:15,17
123:4,11
205:24 207:10
207:17 260:16
260:23 345:24
346:7 385:2

391:4,7,14
392:4,23 393:9
395:9,16,24
396:6 397:6
**recorded** 123:8
**records** 69:3
71:5,16,23
**recruiting**
338:2
**recruitment**
331:20 332:2
**redirect** 268:8
**reduce** 318:9
**refer** 50:13,14
140:6 164:12
389:18
**reference** 86:12
88:8,9 116:6
116:15 117:7
117:10 222:5
276:1 281:7
311:20 318:20
337:23
**referenced**
88:20 184:12
213:23 218:8
218:21 222:3
246:3 317:23
322:8 325:1
**references**
117:1,5 219:8
222:8 272:15
275:21

**referencing**
182:9 186:1
222:14,14
318:2 319:8
325:4 346:20
**referral** 306:22
307:4
**referrals**
108:19
**referred** 87:24
117:12 271:14
**referring** 28:13
87:6 165:21
187:18 223:12
318:6 363:23
385:24 390:15
**reflect** 69:4
72:12,24 248:3
276:16 395:16
**reflected** 31:19
32:24 72:23
73:14 76:18
364:16
**reflecting** 70:9
**reflects** 27:10
27:13 122:5
**refresh** 209:19
314:6
**refreshing**
378:2
**refusing** 392:24
**regardless**
182:23 183:1
281:17

CONFIDENTIAL

**[regular - reporter]**                                    Page 63

**regular** 178:9
**regularly**
  155:18 157:16
  160:9
**relate** 165:8
  214:10
**related** 20:6
  81:16 84:20
  101:9,20 113:6
  141:4 175:14
  190:22 212:18
  213:16 215:1,9
  215:12,21
  254:3 268:23
  277:9 313:18
  319:14 369:19
**relates** 1:6
**relations** 84:20
**relationship**
  85:3 140:10
  247:22 249:20
**relationships**
  84:4 140:11,16
  140:18,21,24
**relative** 292:9
  293:6 296:2
**relatively**
  128:19 390:4,9
**relevant** 59:13
  170:21 222:15
  264:14,24
  285:16 366:9
**relied** 65:5
  117:13 163:23

164:13 231:17
  245:1
**rely** 130:14
  131:8,18
  153:18 234:9
  271:22 287:16
  296:4 362:20
**relying** 257:24
  259:6 270:4,6
**remain** 393:14
**remained** 32:11
**remaining** 32:8
**remains** 91:13
  331:5
**remember**
  57:15 61:5
  98:15 157:5
  190:7,12 191:2
  194:24 226:7
  261:17 357:17
  364:15
**remind** 23:11
  23:24 24:4
**reminder** 25:5
  25:6 26:2
**remote** 29:5,8
**renew** 174:24
**renewed**
  379:12
**repeat** 58:3
  293:19 338:7
  361:8
**rephrase** 172:1
  261:12 290:8

**report** 7:15,22
  7:23 8:6,8,11
  8:14,16,18,21
  8:23 9:6,8,11
  30:3,4,9,12,17
  30:19 31:5,11
  31:13 32:6
  33:5,6,11,18
  37:9,22,22
  38:4,9,10 39:1
  39:3,10,18
  40:1,8,16,24
  41:8,15,23
  42:6,14 43:3,4
  43:12,20 44:4
  44:12,20 45:3
  45:11,18,19
  46:3,12,19
  47:7,9,13 48:8
  48:9,17,18
  49:14 59:7
  65:13 79:11
  81:13 86:11,19
  86:23 94:6,9
  95:14 131:17
  134:22 163:16
  163:23 166:1
  182:13 194:10
  229:1,12
  233:22 241:24
  242:4 245:6,18
  245:24 246:11
  250:22 251:4,6
  251:9 257:22

259:5 267:6,10
  269:2 270:3,10
  270:22,23
  271:5,11,14,18
  272:5,6,14
  274:6,7,8
  276:16 277:17
  278:1,15,19
  281:5,7 282:19
  288:3,15
  296:13 303:6
  303:18 307:11
  307:17 309:24
  310:15,23
  311:9,16 312:4
  312:10,12
  314:6 316:10
  316:12 317:14
  317:22 318:4
  319:23 321:5
  322:13 324:3
  324:10,17,24
  328:19 338:8
  342:17,19,23
  346:13,16,17
  377:18 379:16
  379:21,24
  380:6 384:7
**reported** 130:2
  130:15 131:8
  131:24 132:24
  191:22
**reporter** 1:20
  1:21 13:3 23:2

CONFIDENTIAL

**[reporter - retired]**

202:19 397:11
397:21
**reporting**
109:14 194:20
**reports** 24:24
31:20,22 32:11
38:11 47:11
48:21 49:3,9
49:10,18,23
50:9,10,11
59:2,4,8,11,12
59:16 60:11
63:18,19 76:12
92:5,12 93:21
94:3,16 95:1,4
95:8 96:3
109:4,23
130:11 150:12
153:18 164:2,4
177:13 180:4
182:17 183:12
184:2,6 231:17
244:11 245:1
246:15 264:6
270:5 272:8,15
277:3 311:21
337:23 342:23
344:14 346:18
354:2 355:23
362:19,23
363:10,15,17
363:19 364:3
384:10

**repositories**
361:16,24
**represent**
139:24
**representatives**
53:22
**representing**
2:7,19 3:7,14
3:23 4:7,19 5:8
5:14,21 6:7,13
6:19 28:14
396:2
**reproduction**
397:19
**request** 11:10
22:12 56:7
350:20 351:10
**require** 216:18
216:19 328:22
**required**
216:23 268:8
**requirement**
215:4
**requires**
328:12,15,17
**requiring**
215:10
**reread** 195:11
**research** 16:22
17:6 87:11
119:13 145:20
163:7,10,12
166:7,16
181:23 182:8

183:9 185:1,18
186:5,9 244:10
286:24 322:9
323:17 358:21
378:17
**reserved** 12:7
**residents**
100:17
**resource**
340:14 342:3
351:6
**resourced**
330:4 356:13
**resources**
268:9 340:1,17
340:19 341:4,6
341:11,12,23
342:6,15
343:20 344:12
**respect** 50:3
62:19 175:21
176:20 216:12
242:16 246:17
284:12 292:9
303:19 344:2
355:24 356:14
394:9
**respected**
175:19
**respectfully**
128:24 389:14
393:18
**respond** 359:2

**responded**
238:23 239:6
**response** 183:9
295:20 296:1,5
324:19 364:12
364:24 365:4
**responses**
10:18 310:24
334:16,24
**responsible**
268:17
**responsive** 57:2
**rest** 15:10
394:11
**restate** 143:20
231:8 249:2
252:21 263:18
273:2 275:19
**restating** 58:14
**restrict** 284:4
**result** 163:16
268:20 382:23
392:20
**resulting**
369:17,23
**resume** 391:23
**retained** 16:2
56:6 62:5
**retaining**
337:16 338:3
**retention** 91:18
**retired** 16:1
36:8

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **retrieve** 55:8 | 143:15,24 | 40:11 42:22 | 312:20 315:9 |
| 64:16 109:16 | 144:3,11 145:5 | 45:16 46:15 | 321:7 322:1 |
| **return** 398:15 | 145:14 148:10 | 47:4 48:4,20 | 333:17 334:6 |
| **reverse** 248:6 | 148:14,21 | 51:8,13 56:3 | 334:20 335:1,8 |
| **review** 59:11 | 149:4,10,12,13 | 56:21 57:13,16 | 335:19 345:4 |
| 59:15 62:9 | 149:16,19 | 66:14,20 68:19 | 351:7 361:5 |
| 77:5,23 78:6,6 | 150:2 164:1,5 | 69:5,14,22 | 365:11 368:10 |
| 78:11 79:6 | 165:20 166:23 | 73:19 75:13,18 | 369:13 376:11 |
| 80:24 81:1,14 | 183:13,17 | 85:15 89:20 | 377:5,8,17 |
| 81:15 82:6,15 | 224:13 229:18 | 90:13,16 93:9 | 378:4,10,14,16 |
| 82:16 83:3,4 | 236:16 237:1 | 94:19 95:4 | 378:21 380:5 |
| 83:10,11,19,20 | 244:11 247:8 | 97:7 98:5,9 | 381:16 384:23 |
| 84:2,3,9,10,16 | 255:23 276:18 | 100:11 103:13 | 385:15 386:1,2 |
| 84:17,24 85:1 | 278:2 285:20 | 107:8 108:11 | 386:6,17 391:1 |
| 85:7,8,17,18 | 286:14 291:4,7 | 121:4,22 122:8 | **rigor** 255:24 |
| 86:1,2,7 93:10 | 291:16 292:2,3 | 123:17 126:20 | 291:22 292:5 |
| 94:24 95:3,4 | 295:1,9,13 | 146:15 147:5,9 | **rigorous** |
| 95:11 96:3 | 311:4 313:23 | 148:19 166:14 | 255:10 |
| 149:1,8,21,22 | 346:21 354:10 | 167:21 168:9 | **rise** 388:17,21 |
| 164:17 177:12 | 362:23 363:2 | 171:15 175:24 | **rising** 209:14 |
| 177:13 180:2,3 | 363:15,18 | 179:7 183:13 | **risk** 83:14 |
| 187:21 244:21 | 364:2,5 366:2 | 184:22 188:11 | 117:19,23 |
| 295:1 333:11 | **reviewing** | 189:16,21 | 118:12,15,21 |
| 360:24 361:11 | 21:15,21 58:4 | 190:15 196:16 | 137:20 138:4 |
| 365:3 366:16 | 65:12 92:12 | 201:10 205:5 | 189:10 227:5 |
| **reviewed** 59:2 | 172:8 177:5 | 209:13 217:10 | 249:18 250:4,6 |
| 59:5 60:8,11 | 333:19 | 219:14 234:11 | 250:7,13 |
| 76:7,11,18,21 | **right** 21:13 | 236:9 243:16 | 268:16 293:6 |
| 78:1,16,18,19 | 22:15,23 24:8 | 257:11 259:2 | 305:17 311:1 |
| 79:9,13 80:6,9 | 25:2,19 27:10 | 260:4 276:13 | 333:13 335:13 |
| 81:6 92:4,7,8 | 27:16,20 28:12 | 278:22,23 | 381:20 |
| 93:21 94:2,4,9 | 28:17 29:9,12 | 280:19 281:1 | **risks** 179:1 |
| 94:14,16,23 | 33:2,24 34:17 | 282:1 285:18 | 189:17 302:11 |
| 95:8,9,21 | 37:4 38:8 39:4 | 287:1 311:15 | |

CONFIDENTIAL

**[risky - school]**

**risky** 187:10,14 228:2

**road** 1:17 2:5 4:13

**role** 10:17 16:17,18 17:4 17:4 19:19,20 32:20 87:9,14 96:17 106:9 137:6 139:8 153:14 163:9 224:17 225:18 226:10 233:24 237:15 238:10 294:13 333:3,8 334:15,23 357:20 358:4 361:20

**root** 191:24

**roseland** 4:13

**rosica** 6:23

**roughly** 51:17 60:19 106:3 122:23,24 184:21 326:12 358:7

**rude** 23:12

**rule** 252:8 255:11

**ruled** 251:23 253:1,4

**rules** 372:11

**run** 349:24

**rush** 380:19

**russo** 85:1

**s**

**s** 2:11,12 4:17 7:9 8:2 9:2 10:2 14:21 82:24 84:18 86:3

**safer** 238:16

**sample** 283:22

**san** 6:18

**sandwiches** 260:10

**savvy** 228:7 366:5

**saw** 363:12 390:6,20

**saying** 125:2 181:20 191:22 194:22 195:5 205:23 249:18 336:18 353:16 364:18

**says** 19:4 56:17 176:3 179:8 181:4,24 184:21,23 186:19 188:13 190:17 194:1 196:3,20 219:8 287:17 335:12 350:22 351:10 378:23 381:17

386:13

**school** 4:7 6:20 8:9,12 9:9,12 9:17 14:8,12 14:15 15:23 21:19 26:13,20 26:22 27:2,11 27:14,15 36:12 38:12 40:9,17 41:1,9 42:7 45:20 46:4,13 46:20 48:7 49:10 52:3,6 54:4,6,9,14,18 55:6 61:15 62:22,23 64:2 86:15,16 87:8 88:6,7 89:1,3 89:15 96:22 97:14 98:23 99:21 100:1,6 100:9,21,24 101:6 114:17 129:21 138:8 138:12,13,17 139:5,6,11,13 139:13,16 141:18 142:10 142:21,24 144:3 145:21 147:23 163:13 177:18 180:14 182:3,24 190:20 192:4

201:7 206:12 206:15 212:3,8 213:3,14 216:14 217:20 224:20 225:6 225:11 226:16 232:6 234:18 234:18 235:12 242:10 251:17 253:21 267:12 268:22 270:7 273:15,16 276:7 281:2,4 281:10 283:12 283:13 284:13 284:19 296:10 296:14,23 297:21 298:13 298:13,21 299:1,3,13 300:2,21,24 306:4,10 313:14,17 314:4,8 316:12 325:2 326:7,19 327:16,21 328:1 329:6 330:11,21 331:12 333:3,5 334:1,4 339:21 340:2,9,17,20 340:21,24 342:7,12 347:24 348:6

**[school - see]**                                                    Page 67

349:7,22 350:1
350:21 351:3,8
351:19 352:4,9
352:13,16,22
356:21 357:1
358:22 359:24
361:21 362:1,6
362:12 370:7
370:11,12,16
371:4,12,16,17
371:24 372:1,3
372:18,20,22
372:22 373:2,5
373:5,15,21
379:1,2,5,13
380:14,18,18
380:23 381:3
389:3,9
**schooling**
  129:23 139:3
  246:6 365:14
**schools**  4:20
  8:14,16,21,24
  9:7 10:19,22
  19:5,9 41:16
  41:24 42:15
  43:21 44:5,12
  44:21 45:4,12
  52:5 62:20
  63:2 87:18
  103:23 109:4
  129:14,20
  138:10,19
  139:1,2 140:9

141:24 142:8
143:1 144:6
173:13 178:10
180:6 200:19
200:20 203:15
205:22 206:2
206:22 215:8
220:4 223:6
224:19 226:15
226:23 227:4,9
227:18 228:22
229:10 235:5
240:9 242:12
268:7,11
272:10,13
273:10 280:23
297:17 300:11
305:7,9,10,11
313:5 316:18
316:20,22
321:2,9 325:6
331:19 332:6
333:23 338:19
339:5,18,18
341:9 344:3
348:22 349:4
356:7,15 357:4
357:23 358:4,9
358:10,11,13
359:4 360:12
371:11,14
376:21 377:10
**science**  178:3
  226:15 237:5,8

237:11,14,23
277:1,7 292:10
322:7 323:20
325:6 333:7
**scientific**
  276:17 278:3
  291:21 292:4
**scientist**  103:21
  237:18 287:5
  287:19 292:24
  366:2
**scope**  307:17
  366:13
**screen**  64:21
  67:20 68:11
  84:6 85:9 86:3
  174:6 196:3
  302:14,19,21
  302:23 386:3,5
**screening**
  351:8
**screens**  65:4,8
**script**  29:21
**scroll**  68:2 98:7
**scrolled**  71:13
**scrolling**
  234:21
**sealing**  12:4
**search**  361:24
  362:4 365:3,5
**second**  33:4
  38:18,21,22
  42:20 184:21
  184:24 193:19

219:3,4 320:21
321:12 322:1
328:20 335:9
378:22
**section**  89:13
  148:13 150:8
  176:2 287:7
  384:16
**sectional**  257:9
**security**  220:24
**sedran**  6:10
**see**  24:19 29:14
  31:21 37:6
  68:11 69:6,10
  69:18,20 70:22
  70:24 71:10,12
  80:18 81:11,12
  82:12 118:7
  124:9 129:16
  146:13,14
  147:17 148:20
  151:6,22
  153:14 154:24
  161:4 167:8,17
  176:3,6 179:7
  179:16 181:6
  184:23 185:8
  186:18 187:1,2
  188:4,10,12,19
  188:20 190:16
  191:1,21 192:9
  192:10 194:6
  196:1 209:5
  210:12,22

CONFIDENTIAL

**[see - share]** Page 68

220:12,13
238:10 244:21
274:17,21,22
280:23 287:20
311:19 325:13
335:1,12,18
341:7 378:7
380:16 381:3
381:16 382:4
385:20 386:4
386:10,11,13
395:21
**seeing**  74:9
157:5 178:15
355:5 370:22
**seeking**  61:14
**seem**  347:16
**seemed**  365:10
**seen**  56:18 98:3
132:13 155:14
155:15 180:10
205:7 219:2
227:3,8 298:3
330:20 333:12
371:1
**select**  27:2
79:21 319:17
**selected**  26:9
59:10 79:24
80:2
**selection**
215:11 216:19
216:19 254:23

**selectively**  78:7
78:12
**self**  130:2,11,15
131:8,17,24,24
134:22 268:3,5
**senate**  10:9,12
53:14,16,21,24
54:12 208:5,12
208:23 211:11
215:15 216:1,4
216:11 217:13
221:13 223:21
**sense**  15:20
17:9 126:14,18
145:12 166:11
186:13 198:2
269:15 282:24
292:19 314:11
369:12
**sent**  80:3
363:10
**sentence**  181:8
181:9 185:8
187:19,23
193:24 271:20
275:15,24
276:2,21 277:9
**separate**  31:14
102:5,12 150:8
278:24 279:23
280:9,10
**separated**
149:14 184:13

**separately**  94:4
**separates**
183:17
**separating**
183:11
**sequencing**
236:5 244:13
244:17,23
257:13 261:10
289:7,16
290:23
**serve**  61:20
69:24 70:6
175:7,8,10
**served**  57:5
87:10 108:8
138:7,9 139:12
139:15 175:2
175:13
**service**  19:5
69:16 312:6
342:14
**services**  54:15
54:19 212:9
306:18 307:2
321:1 339:17
340:8 341:8
342:10 350:3
357:23,24
359:1 379:1,12
380:13
**serving**  96:6
106:2

**set**  29:24 30:6
31:14 49:7,9
110:10 111:2
141:14 160:16
160:20 236:13
236:15 243:6
243:11 245:17
247:4,14 255:6
263:11 270:10
310:10 342:20
343:23,24
344:3 351:14
**setting**  55:12
114:15 219:11
219:24 221:24
321:7 322:16
**settings**  103:23
112:9 235:12
257:17 334:5
**seven**  392:7,14
392:22 395:3
395:12
**several**  35:19
147:22 169:24
339:16 353:7
360:21 379:8
**sexual**  366:24
367:1,7,8,9
373:22
**shape**  142:22
351:14
**shaped**  350:19
**share**  151:19

CONFIDENTIAL

**[shares - social]** Page 69

| | | | |
|---|---|---|---|
| **shares** 152:10 152:18 153:2 | **signed** 155:21 | **situations** 132:4 | 26:19 50:13 62:18 63:5,13 |
| **sharon** 1:14 7:4 7:17,19 9:18 12:24 13:7,20 15:18 34:5 35:1 56:7 90:6 91:11,20 97:15 192:2 400:8 | **significant** 129:11 137:5 153:13 181:23 198:11 199:5 288:1 388:23 | **six** 27:11,15 47:14 281:6 | 63:14,21 64:2 64:22 81:2,17 82:8,9,17 83:6 84:11 85:20 86:4 99:5,8,10 99:15 106:14 106:20 108:4 112:5,13 113:2 113:5 119:20 119:21 123:18 124:2,12,16 125:5,16,23 126:8,15 127:1 127:2,4,21 128:4,9,10 129:11,23 143:12,15,24 144:6,12,17 145:1,6,8,17 150:10,13,17 150:21 151:1,4 152:14,22 153:6,9 154:3 154:19 157:24 161:8 166:5,8 167:1 168:5,11 168:15 170:9 171:22 172:7 172:23 173:6 173:10,12,23 174:8 175:15 176:3,9 177:8 |
| **sheet** 34:15 398:7,9,12,15 400:6 | **significantly** 381:19 | **skills** 267:20 269:8 301:23 302:1 | |
| **shooting** 370:17 371:24 372:2,18,22 373:5,9,15 379:2,14 380:14,24 | **signing** 398:10 | **skim** 366:16 | |
| | **similar** 358:18 | **skimming** 79:2 | |
| | **simply** 130:24 131:6 134:14 135:13,16 | **slade** 4:4 | |
| | | **slade.methvin** 4:6 | |
| | **single** 166:18 173:9 215:20 252:8 271:1 285:11 322:15 322:15 | **sleep** 267:24 268:1 269:9 274:12 277:13 279:7 289:12 289:14 388:16 388:17,20,21 389:7,9 390:18 390:21 | |
| **shootings** 370:8 370:12 371:4 371:13 379:5 379:15 381:4 | **sit** 112:19 145:4,13,19 165:5 166:21 183:16 197:9 264:22 265:5 | **small** 52:16 390:4,9 | |
| **shorter** 327:22 | **site** 307:5 | **smoking** 189:15 199:9 199:13 312:4 312:21 | |
| **shortly** 260:6 | **sitting** 66:15 90:18 132:18 132:21 260:7 266:1 279:5 | | |
| **show** 244:11,14 | | **snap** 3:23 | |
| **showed** 313:24 | | **snapchat** 80:19 80:22 155:4 156:22 157:6 157:11 | |
| **showing** 174:5 | | | |
| **shows** 244:17 | **situation** 131:21 132:10 132:23 298:23 | | |
| **shut** 330:5 | | **sneeringer** 5:18 | |
| **siculus** 3:17 | | **social** 1:3 9:22 10:7 12:18 | |
| **sign** 398:8 | | | |
| **signature** 397:10 | **situational** 10:17 334:15 334:24 | | |

CONFIDENTIAL

**[social - southeast]**                                      Page 70

| | | | |
|---|---|---|---|
| 177:15,16 | 222:17,21 | 304:13,14 | **somebody** |
| 178:6,12,20,23 | 223:13 224:2 | 305:1,14,16,17 | 52:20 126:9 |
| 179:1,9,11,14 | 224:16 225:3 | 305:21 306:3 | 162:20 259:11 |
| 179:18,21 | 225:15 226:3 | 306:13,17,21 | 289:8 305:20 |
| 180:23 181:4 | 227:6,14,17,24 | 307:19 308:5 | 329:22 |
| 181:17 183:3 | 228:5,20,24 | 308:13,15,20 | **soon** 119:24 |
| 185:3,11 | 229:4,6 232:16 | 308:22 309:8 | 345:19 384:10 |
| 186:12,19 | 233:2,20 235:1 | 309:10 310:2 | 384:12 |
| 187:3 188:13 | 236:23 238:8 | 310:20 311:6 | **sorry** 18:24 |
| 188:16,22,23 | 238:17 246:4 | 312:23 314:10 | 36:15 47:9 |
| 189:1,8,24 | 251:11,14 | 314:11,17 | 58:3 72:18 |
| 190:21 191:24 | 258:5,5 259:4 | 319:16 320:16 | 101:19 123:23 |
| 192:7,14 | 262:19 263:3 | 342:1,18 | 154:23 159:22 |
| 193:12,16,22 | 263:22 266:8 | 343:14 346:11 | 172:1 181:7 |
| 194:3,5,11,12 | 266:22 267:3,4 | 348:2,5,7,14,20 | 191:18 195:10 |
| 195:16 196:23 | 267:16,19 | 349:9,14 | 196:19 209:4 |
| 197:2,13 198:5 | 268:15,17,21 | 350:13 352:6 | 282:9 353:11 |
| 198:10,16 | 268:22 269:8 | 354:21,23 | **sort** 22:13 |
| 199:20 200:6 | 271:9 273:18 | 355:3 356:1,16 | 23:21 24:3 |
| 200:11,15,23 | 274:11 276:9 | 357:9,11,16 | 102:15 168:23 |
| 201:3,11,16,22 | 277:10 280:2,2 | 358:2 362:5 | 230:22 324:18 |
| 202:13,20 | 283:9 288:1,13 | 365:12 368:21 | 384:15 |
| 203:9,20 204:3 | 289:10,13 | 369:2,17 | **sound** 52:13 |
| 204:22 205:8 | 293:7,10,17 | 370:24 371:3 | **sounds** 22:16 |
| 205:18 206:17 | 294:1 295:3 | 371:15 | 105:12 107:8 |
| 210:18,23 | 296:11,15 | **socialization** | 260:13 369:21 |
| 211:12 212:19 | 297:4 298:2,4 | 188:18 | 381:8 |
| 213:17,23 | 298:14 299:17 | **socially** 220:9 | **source** 93:22 |
| 214:10,19,20 | 299:21 300:16 | **societal** 136:14 | 95:14 131:17 |
| 214:23 215:1,8 | 300:18,20,23 | **solely** 63:5 | 236:17 |
| 215:12 218:19 | 301:2,8,16,18 | 257:2 352:6 | **sources** 163:24 |
| 218:20 219:15 | 301:21 302:1,4 | **solutions** | 291:19 |
| 220:5 221:1,6 | 302:5,8,13,16 | 196:24 197:15 | **southeast** 2:11 |
| 221:14 222:3,9 | 302:22 303:1 | | |

CONFIDENTIAL

**[space - spend]**                                          Page 71

| | | | |
|---|---|---|---|
| **space**  398:6 | **specialist** 337:10 | 237:24 245:4 | 220:7 222:19 |
| **spalding**  2:10 | **specialized** 337:5,12 | 247:12 248:21 | 223:1,9 224:18 |
| **speak**  26:16 | **specific**  8:8,11 | 248:22 251:4 | 231:22 267:15 |
| 55:6 74:5 | 8:13,15,18,20 | 254:6 261:2,18 | 270:10 279:14 |
| 87:19 90:3 | 8:23 9:6,8,11 | 263:2,20,22 | 282:20 292:1 |
| 129:22 182:16 | 21:24 38:12 | 264:4,17,19,23 | 292:12 294:4 |
| 193:11 198:9 | 40:16 41:8,23 | 264:24 266:15 | 308:9,14 |
| 203:17,20 | 42:13 43:12 | 267:8 271:15 | 310:14 315:12 |
| 211:21 212:2 | 44:4,19 45:11 | 271:20 272:2 | 324:5 334:3 |
| 224:17 234:19 | 46:3,19 63:12 | 275:24 279:3 | 348:10 360:10 |
| 239:13 251:5 | 63:20 64:6,8 | 283:4 288:8 | **specificity** |
| 261:6 287:2 | 88:12,22 92:20 | 291:10 294:8,9 | 369:11 |
| 308:8 310:13 | 96:1 105:19 | 295:22 298:17 | **specifics**  169:5 |
| 328:18 337:21 | 117:18 132:12 | 302:1,22 314:7 | **specify**  235:23 |
| 338:1 341:1 | 150:18 153:16 | 317:3 318:7 | 363:20 |
| **speaking**  15:5 | 163:7 164:19 | 319:16 324:11 | **specifying** |
| 35:24 89:7 | 165:2,8,9 | 329:23 331:1 | 352:1 |
| 90:4,5,7,18,20 | 166:10 167:7,9 | 331:16 332:1 | **speculation** |
| 91:3,10 107:20 | 170:5 173:14 | 333:16 336:1 | 330:15 |
| 145:8 171:13 | 179:4,13 | 341:4 346:14 | **speech**  147:10 |
| 194:17 204:10 | 182:12,14 | 350:18 351:5 | 147:15,20 |
| 210:3,5,24 | 184:9 187:18 | 351:22 354:1,2 | 148:3,6 |
| 211:4 215:14 | 187:23 190:12 | 357:18 359:23 | **speeches**  147:3 |
| 221:14 223:7 | 201:14 204:9 | 379:24 384:9 | 147:7 |
| 226:14 234:1 | 204:14 205:12 | 384:15 391:19 | **spell**  81:22 |
| 241:1 247:9 | 206:5,18 210:6 | **specifically** | **spelled**  83:5,16 |
| 251:11 254:21 | 212:2 213:8 | 87:15 101:20 | 84:18 85:19 |
| 254:22 259:21 | 220:15 225:5,7 | 114:1 118:8 | **spend**  64:1,8,17 |
| 276:7 293:23 | 226:7 231:11 | 144:17 145:16 | 64:21 65:8 |
| 303:6 346:18 | 231:11 233:16 | 164:4,6,10 | 92:11,22 96:5 |
| 358:8 360:14 | 233:16 234:6,7 | 165:21 167:18 | 97:2 157:20,24 |
| **speaks**  145:6 | 234:11,19 | 180:17 182:16 | 160:15,19 |
| 277:8 333:7,20 | | 194:19 210:4 | 321:8 347:6 |
| | | 211:21 216:2 | 384:14 |

CONFIDENTIAL

**[spends - street]**                                    Page 72

| | | | |
|---|---|---|---|
| **spends** 171:22 | **standard** 29:24 | **stated** 20:2 | **statistics** |
| **spent** 70:10,16 | 35:15 110:10 | 47:21 49:4 | 236:21 |
| 71:7,20 72:3,6 | 111:15 123:11 | 128:1 181:19 | **status** 16:2,4 |
| 156:1,8,11 | 123:15 285:5 | 182:6 187:24 | **stay** 179:6 |
| 229:21 296:2 | 286:12 | 192:21 197:7 | 184:16 327:22 |
| 346:20,22 | **standards** | 272:4 377:19 | 327:22 |
| 347:2,19 | 238:9,14 | **statement** | **steering** 5:22 |
| **spoke** 25:22 | **start** 23:24 | 55:11 176:21 | **steinsbekk** 81:1 |
| 26:3,7 29:19 | 24:3 106:19 | 177:2,8,20 | **stenographic** |
| 88:20,23 | 111:10 132:20 | 180:21 185:17 | 13:2 |
| 150:15 207:19 | 146:11 147:7 | 186:4,7 192:12 | **step** 297:20 |
| 209:20 210:13 | 191:18 208:19 | 192:24 195:12 | **stephen** 363:24 |
| 212:11 246:2 | 277:16 300:18 | 196:14 198:15 | **steps** 391:4 |
| 267:10 268:12 | 313:15 332:5 | 235:17 271:20 | **stipend** 15:16 |
| 303:18 344:10 | 332:18 391:17 | 271:23 272:1,1 | **stipulated** 12:2 |
| **spoken** 59:21 | 392:18 393:2 | 277:8 345:12 | **stipulations** |
| 87:15 145:1 | 395:4 | 369:14 380:11 | 11:15 |
| 226:18 231:10 | **started** 107:6 | 383:11 386:23 | **stop** 327:11 |
| 234:16,22 | 326:18,19 | 387:8 | 330:21 355:8 |
| 242:3 333:21 | 384:24 | **statements** | 392:11 394:2,9 |
| **spread** 307:12 | **starting** 129:1 | 179:5 197:11 | 394:19 395:5 |
| 372:2 | 193:19 214:18 | 272:2 278:4,20 | **stopped** 110:9 |
| **spring** 60:19,21 | 389:15 395:19 | **states** 1:1 10:9 | **stopping** |
| 60:22 62:4 | **starts** 381:15 | 10:12 12:21 | 395:14 |
| **st** 4:5 | 385:18 | 53:14,16 208:5 | **strained** 268:21 |
| **staff** 338:3 | **state** 53:21 | 208:12,23 | **strange** 52:13 |
| 342:13 353:23 | 55:3 86:13 | 217:12 283:13 | **strategic** 62:21 |
| 373:23 | 87:16 88:3,24 | 283:23 285:2 | 234:3 283:4 |
| **staffing** 341:14 | 123:24 206:14 | 289:21 | 319:15 354:13 |
| 342:11 343:6,8 | 266:21 290:15 | **stating** 395:24 | **streaming** |
| 355:6 | 310:22 372:4 | **statistical** | 113:20 |
| **stage** 319:11 | 372:14 378:24 | 290:14 | **street** 3:12 4:5 |
| **stand** 192:24 | 380:12 398:5 | **statistically** | 5:5 6:5,11 14:5 |
| | | 287:24 | |

CONFIDENTIAL

**[strength - studying]**                                    Page 73

| | | | |
|---|---|---|---|
| **strength** | 374:12,14,16 | 373:24 374:5 | 295:24 296:4 |
| 292:10 | 376:12 | 376:21 377:10 | 311:22 347:15 |
| **strengths** | **student's** 137:5 | 377:12 390:5 | 347:18 360:24 |
| 181:11 | **students** 10:22 | **students'** 10:23 | 361:11,22 |
| **stress** 105:6 | 26:19 52:7 | 376:23 | 366:19,23 |
| 136:17 374:21 | 64:1,8,13,17,21 | **studied** 229:13 | 371:1,7 |
| 376:13 | 65:4 99:22 | 229:19,22 | **study** 81:4 |
| **strike** 104:8 | 106:2 109:5 | 230:2 308:11 | 82:19 83:7 |
| 111:9 114:4 | 115:6 116:13 | 308:14,19 | 85:11 166:23 |
| 124:13 129:1 | 129:24 137:18 | 332:19,24 | 206:6,9 230:8 |
| 239:22 389:14 | 138:2 159:10 | **studies** 81:6 | 231:15 244:16 |
| **structural** | 163:16 173:13 | 182:12,14,15 | 248:22 249:10 |
| 85:22 | 203:14 210:11 | 244:14,19,21 | 249:11 252:9 |
| **struggle** 227:9 | 226:24 227:19 | 246:3 252:9 | 254:11 255:4,8 |
| 367:6,14 | 267:16 268:15 | 255:10,22 | 255:20,24 |
| 382:21,22 | 268:16 274:10 | 256:16,18 | 256:5,10 |
| **student** 63:8 | 277:11 280:23 | 257:3,7,9,15,15 | 264:15,19,23 |
| 88:4 99:11,16 | 281:13 283:10 | 258:1,4,12,19 | 265:24 274:20 |
| 99:18 100:23 | 283:13 284:5,6 | 258:22 259:6 | 282:2 283:20 |
| 110:22 113:5,6 | 284:10,13,14 | 259:13,19,23 | 283:22 284:9 |
| 114:16 131:13 | 284:16,19 | 261:8,11,13 | 285:12,15,17 |
| 136:3 145:10 | 285:2,16 | 264:12,13,16 | 286:1 287:20 |
| 210:9 215:5,9 | 296:10,15 | 264:21 265:7 | 288:18,20,21 |
| 216:20 240:9 | 297:3,15 | 266:2,5 272:16 | 288:22 289:7 |
| 251:17 267:22 | 298:13 299:17 | 275:7 282:5,21 | 289:11,16 |
| 285:11 293:9 | 300:10 301:5 | 283:1,8 284:2 | 290:3 292:17 |
| 293:17 294:1 | 302:3 305:13 | 284:8 287:12 | 292:20,22 |
| 297:2 299:24 | 306:9,17 307:1 | 288:12 289:3 | 293:4,14 |
| 300:17,19,23 | 308:2 313:6 | 289:22 290:12 | 311:19 323:7 |
| 301:1,7,18,20 | 339:22 348:21 | 290:15 291:3,6 | 333:17 336:1,2 |
| 302:12,18 | 348:22 349:10 | 291:7,9,11,15 | 371:19,20 |
| 304:24 306:2 | 350:14 356:7 | 291:18,20,22 | **studying** |
| 306:12,20 | 356:15 365:13 | 291:23 292:1 | 229:21 249:16 |
| 353:2 373:23 | 371:11 373:7 | 294:5 295:2,23 | 289:9 |

CONFIDENTIAL

**[subcommittee - sure]**                                              Page 74

**subcommittee**
10:14 208:14
217:14
**subheading**
148:18
**subject** 57:4
150:1 398:10
**subjective**
272:23 273:4
274:1
**submit** 67:3
149:21 223:20
**submitted** 10:9
10:12 37:23
49:3 55:10
68:20 70:13
71:1,17 72:12
73:16 74:10,20
75:2 208:4,11
208:22 215:24
217:12 271:11
286:14
**subscribed**
400:10
**subsequent**
83:12
**subsequently**
47:15
**subspecialty**
102:16,20
**substack**
152:21 153:1
162:9,12,14,20
162:24

**substance** 74:1
105:3,4 119:16
314:13 315:2,8
315:13,17,20
316:1 382:18
382:20,23
400:6
**subthreshold**
388:12
**succeed** 267:12
**successful**
310:24 318:12
**suffer** 220:17
220:20,23
382:17
**suffering** 24:9
**suggest** 76:13
177:23,24
187:8 199:6
215:21 218:5
219:22 244:12
285:10 302:7
323:24 328:14
382:10 389:8
**suggested**
323:21 328:11
**suggesting**
215:4
**suicidal** 85:9
**suicide** 379:6
379:15
**suite** 2:12 5:6
5:12,19 6:5,11

**sum** 73:24
**summarizing**
196:7
**summary**
377:20
**summer** 60:22
62:4
**superintendent**
139:13,16
330:4,22 331:4
331:9
**superintende...**
88:3,5 273:17
327:16 328:2
329:5,11,14
330:9,14,17
**supervise**
111:24
**supervised**
104:11 105:10
105:11
**supervisees**
113:9
**supervising**
96:17
**supervision**
19:11 20:6
106:22 125:14
397:21
**supervisor**
358:12
**supervisory**
17:24 19:19

**support** 11:2
88:4 188:16
223:5,24 228:4
271:19,22
272:17 275:22
278:19 305:3,5
306:15 321:4
325:12 326:11
341:23
**supported**
275:7,15
349:13
**supporting**
217:19 311:5
353:1
**supportive**
226:22 227:21
227:23
**supports** 10:17
54:4,5,7 204:4
276:1,18 277:1
278:3,15 307:3
313:6 325:11
334:15,23
339:17 340:8
341:8 359:1
**suppose** 241:12
241:12 317:12
**sure** 18:4 23:13
24:5 30:14
48:4 50:20
57:7,9 71:4
73:20,21,22
74:6 76:8

CONFIDENTIAL

**[sure - talked]**                                                       Page 75

| | | | |
|---|---|---|---|
| 85:14 90:17 | **surprisingly** | 322:21 326:20 | 260:11 274:4 |
| 91:2 92:15 | 380:17 | 326:24 337:6 | 319:10 322:19 |
| 97:24 102:2,7 | **surveys** 111:5 | 338:21 339:7 | 325:14 342:5 |
| 102:15 115:2 | **suspect** 22:7 | 351:23 | 342:10 345:19 |
| 120:2 132:17 | **sustain** 225:10 | **systematically** | 345:21 354:7 |
| 143:20 153:10 | 340:1 | 308:19 | 385:6,12 |
| 154:5 156:7,9 | **sustainability** | **systemic** | 392:17 395:17 |
| 156:19 157:1 | 328:21 | 386:14 | **taken** 1:14 |
| 158:5,8 161:14 | **sustained** 320:8 | **systems** 142:8 | 120:11 177:20 |
| 201:24 202:21 | 328:13,23 | 145:22 211:1 | 207:13 225:9 |
| 209:4 223:17 | 329:1,3 | 212:3 224:21 | 226:2 228:8,9 |
| 226:8 237:12 | **sustaining** | 225:11 300:2 | 228:19 237:7 |
| 243:4 249:5 | 321:22 | 321:3 325:12 | 237:10 260:19 |
| 250:2 252:22 | **sustainment** | 326:11 343:15 | 346:3 391:10 |
| 254:19 261:19 | 328:21 | 351:22 | **takes** 128:21 |
| 265:23 275:5 | **sw** 3:5 | | 236:8 |
| 278:8,12 288:8 | **swear** 13:4 | **t** | **talk** 15:16 |
| 292:11 293:20 | **sweden** 82:18 | **t** 7:9 8:2 9:2 | 22:19 23:21 |
| 302:17 309:6,6 | **switch** 384:12 | 10:2 85:19 | 30:14 50:12 |
| 309:15 311:13 | **switching** | 399:1 | 66:10 93:14 |
| 311:14 316:7 | 384:9 | **tab** 56:1 67:10 | 119:8 147:14 |
| 325:22,24 | **sworn** 13:8 | 97:9 173:16 | 169:11 193:15 |
| 332:4 333:6 | 55:11 397:5 | 189:19 208:19 | 226:12 233:20 |
| 345:20 359:15 | 400:10 | 217:7 334:9 | 267:2 268:7 |
| 361:6 363:21 | **symptoms** 81:2 | 338:13 377:4 | 315:16 323:9 |
| 370:18 375:2 | 81:18 83:7,15 | **table** 169:19 | 323:14 324:5 |
| 377:24 378:1 | 83:22 84:6 | **take** 19:1 22:8 | 324:14 386:7 |
| 383:14,20,20 | 130:2,11,15 | 22:15 32:2 | 391:4 |
| **surgeon** 224:12 | 132:1 268:2 | 33:8 79:8,12 | **talked** 61:17 |
| 311:16 312:3,6 | **synthesize** 32:3 | 119:24 120:3 | 139:9 144:17 |
| 312:10,13 | **system** 10:20 | 128:7 170:24 | 213:13 225:21 |
| 316:11 | 26:23 100:3,4 | 171:8 176:15 | 252:12 255:14 |
| **surprise** 128:18 | 142:22,22 | 176:15 207:6 | 256:12 270:14 |
| 144:24 309:21 | 143:6 320:17 | 211:9 224:2 | 299:20 320:3,4 |

CONFIDENTIAL

**[talked - term]**                                                    Page 76

322:2 359:21
375:14 388:1
**talking**  22:14
23:7 26:13
51:20 100:4
102:3 109:7
111:22 124:19
124:20 129:17
131:21 132:11
144:5,21 151:4
161:13 166:15
169:3 171:6
187:19 202:19
203:1,21 206:2
210:9 213:2
219:23 223:4
230:21 237:23
248:21 251:8
251:13,16
253:6,20 254:4
254:5,7 275:23
278:11 281:17
291:2 298:16
298:18 301:24
303:7 312:20
312:21,23
315:11 318:8
320:15,22
322:16 327:8
331:15 333:18
343:22 345:13
349:4 351:2
354:4 355:7
363:9 373:15

380:23 385:20
387:21 389:1
391:18
**talks**  144:11
222:20 317:15
378:11
**targeted**
306:14
**task**  366:9
**tasked**  268:13
**taught**  100:22
**tea**  120:5
**teach**  99:22
100:12,16,18
**teacher**  216:21
332:21 340:21
354:22 373:22
**teachers**  10:16
86:16 89:2
230:15 273:14
332:8 333:13
334:14,22
335:12 353:23
**teaching**  16:12
16:21,23 17:2
17:7,9 19:5,20
253:22 267:20
344:5
**teasing**  264:3
**tech**  142:11
**technical**
120:22 359:18
**technically**
14:14

**technician**  6:23
12:10 120:6,13
207:8,15
260:14,21
345:22 346:5
385:3 391:5,12
395:23
**technologies**
3:16
**technology**
83:13,22 112:4
142:2,5,7,15
143:9 230:3
235:8 242:7,15
307:6,8
**teen's**  181:6,10
**teenagers**  65:7
194:9
**teens**  181:5
194:1,22 195:4
195:6,14
**television**
113:13,14
**tell**  21:11 51:9
53:8 61:11
74:8,19 132:19
132:22 133:6
141:11 156:12
168:13,14
169:13 170:12
182:22 203:10
213:20,20
219:6,7 248:13
254:15 272:3

279:18 280:7
324:4 371:9
377:21 383:20
**telling**  127:16
294:24
**telzer**  281:4
**telzer's**  165:24
**temporal**
244:13,17,23
257:13 261:10
289:7,16
290:22
**temporality**
289:4,22
290:16
**tempting**
227:17
**ten**  119:14
322:24
**tend**  169:11
180:19 190:21
232:7
**tenor**  383:5
386:16 387:1
**tenth**  3:12
**tenure**  53:1
327:15 331:12
**tenured**  16:7
**term**  17:21
18:6 91:3
128:10 147:12
151:3 184:24
185:4,12
214:23 223:9

CONFIDENTIAL

**[term - think]**                                                    Page 77

| | | | |
|---|---|---|---|
| 235:17,21 | **testifying** 53:15 | 196:22 197:13 | 98:20 99:1 |
| 241:15 272:22 | 54:3 65:22 | 197:23 198:3 | 110:6 111:17 |
| 273:3,24 | **testimony** 7:4 | 232:4 236:6,8 | 111:21 113:15 |
| 300:13 303:2 | 10:9,12 21:8 | 236:10 362:7 | 115:18 125:9 |
| 303:14 315:10 | 32:14 54:21 | **things** 98:21 | 125:11 126:3 |
| 315:14,16 | 55:7 207:20 | 109:15 119:15 | 127:24 129:16 |
| 319:10 328:20 | 208:4,11,22 | 119:19 126:11 | 131:22 134:4 |
| 329:20 330:2 | 209:2,5,6,7 | 128:22 136:21 | 134:12,15 |
| 336:5,19 | 210:16,22 | 158:20,22 | 135:4,24 136:7 |
| 337:11 345:2 | 211:11 212:18 | 161:3,5 169:24 | 140:23 144:1,8 |
| 375:24 376:4 | 213:22 214:21 | 183:23 190:11 | 145:7,9 154:8 |
| **terms** 16:12 | 217:12,23 | 201:7 226:13 | 154:12 155:12 |
| 19:18 51:1 | 218:5,9,11,21 | 228:21 229:2 | 155:19 156:3 |
| 54:6 64:16 | 221:4 223:20 | 229:10 234:24 | 156:15 157:2 |
| 136:9 229:10 | 224:11,14 | 235:3,5 242:14 | 157:22 158:19 |
| 235:12 238:11 | 266:18,20 | 243:22 244:9 | 160:19 161:22 |
| 249:1 253:16 | 397:7 | 244:12 247:20 | 162:11,15 |
| 279:17 292:6 | **texas** 5:6 6:6,18 | 255:2,11,13,17 | 165:13,24 |
| 296:1 327:22 | 6:20 | 256:22 257:7 | 169:4 170:14 |
| 327:23 341:7 | **text** 303:11 | 261:7 265:21 | 170:14 171:8 |
| 354:12 355:4 | 304:1,3 | 285:19 293:2 | 171:11 175:16 |
| 356:15 362:1 | **textbooks** | 305:12 312:21 | 177:19 180:16 |
| 365:3,5 367:11 | 290:14 | 323:2 324:11 | 181:20,22 |
| 367:14 372:24 | **texting** 303:16 | 324:18 325:16 | 182:23 184:14 |
| 379:20 | **thank** 13:17 | 360:2 362:2 | 185:18 186:6,9 |
| **testified** 13:9 | 82:1 147:5 | 364:23 384:13 | 187:9,12,20,24 |
| 53:6,13,17,20 | 395:20 | **think** 15:11 | 192:20,23 |
| 54:1 209:14 | **thing** 23:16 | 18:22 23:12,20 | 194:17,22 |
| 218:15 | 33:4,9 38:24 | 25:3 32:19 | 195:3,13,17 |
| **testify** 24:12 | 40:7 43:2,19 | 33:2 36:20,22 | 197:7,20 198:1 |
| 53:23 89:21 | 46:10 51:11 | 47:20 51:15,17 | 198:23 199:3,9 |
| 211:18 218:2,6 | 134:13 147:19 | 52:11,15 58:7 | 199:24 200:2 |
| 218:7,15 266:8 | 148:1 156:4 | 62:10 66:7 | 200:16 205:3 |
| 266:15 | 158:21 172:15 | 67:7 72:6 | 205:11 213:19 |

CONFIDENTIAL

**[think - time]**

214:23 221:11
221:23 224:24
225:22 227:7
228:8,14
229:11 230:3
232:18 236:1,3
236:22 237:9
237:10,22
247:6 252:13
253:11,19
256:12 257:6
258:3 259:19
260:6 262:6,8
262:12,13
263:9,10,17,24
271:2,3 272:21
273:4,11 277:8
277:14 278:16
280:8,11,21,22
281:3,6,6
284:1,6,14
286:11 287:8
287:19 291:21
294:3,14 299:9
301:17 302:6
303:12 304:20
305:6,13,24
314:16 315:4
323:4 324:9,24
326:4 329:10
330:15,16,24
337:22 340:11
355:16,22
360:4 361:16

364:22 365:16
367:4 369:22
370:16 371:6
384:23 387:6
388:13
**thinking** 15:14
52:1,4,6
238:12 243:20
263:6 264:3
265:16,17,19
284:4 320:12
365:18 366:13
366:14
**third** 38:21
221:23 248:14
322:5 323:15
**thirty** 398:16
**thoroughly**
78:2
**thought** 101:19
133:15,20
216:10 221:19
264:1 292:18
320:19,22
335:2
**thousands**
286:24 333:5
**three** 49:7
92:20 168:1,8
217:2 219:9
319:21 323:2
352:18,20
**thriving** 10:22
376:21 377:10

**tiered** 321:3
325:12 326:11
326:20,24
328:10
**tight** 337:4,11
**tiktok** 2:19,20
2:20 79:18
80:7,19,22
84:19 155:7,10
155:22 156:2,8
156:11,14,18
164:13 279:6
396:3
**time** 12:8,15
17:16 18:12
19:21 20:2
23:19 32:1
53:2 56:8 64:1
64:8,21,21
65:7 66:6 67:4
70:9,14,14,15
71:6,20 72:7
73:23 84:21
85:9 86:3
92:11,22 96:4
96:9 97:2 99:1
107:1 110:6,8
112:10 119:11
120:6,13 122:5
122:10,12,17
122:21 123:5,9
123:13,24
128:21 130:15
131:9 133:13

138:11 139:4
141:17 155:19
156:8,17,20
157:9,20,24
158:1,7,23
159:18,24
160:8,15
161:22 162:13
162:17 171:21
185:21,24
205:12,17,22
207:8,15
215:16 218:1,6
218:7,10,14
224:2 229:21
239:2 260:11
260:14,21
268:23 282:10
288:16 296:2
302:14,19,21
302:24 308:4
309:22 314:2
321:15,19,21
321:21 323:7,8
323:13,13
325:15 326:5
335:20 345:22
346:5,11,19,22
347:2,6,19
350:18 351:14
381:1 385:2
390:13 391:5
391:12 393:24
394:10,13

CONFIDENTIAL

**[time - truthfully]**                                                      Page 79

395:2,4 396:5
**timeline**  310:23
**times**  53:13
92:16,19
271:10 281:1,8
351:17 395:24
**title**  146:11
**titled**  81:2,15
82:16 83:11
377:9
**titles**  25:21
26:3
**tobacco**  189:15
311:2,7 312:9
312:22 313:18
313:20 314:11
314:12,17
315:1,19
316:14,17
317:1,6,18
320:5 324:22
**today**  13:16,24
20:18 22:7
24:12,17 26:4
50:13 56:19
66:15 90:18
112:20 132:19
132:22 145:4
145:14,19
166:21 183:16
197:10 224:4
340:5 392:6,17
392:23 393:6,8
394:6

**today's**  12:14
**together**
298:22 359:5
**told**  94:2 132:5
159:19 221:1
392:20 394:23
**tomorrow**
75:23 392:11
392:18 393:2,9
394:2,6,11
395:22
**tonight**  75:22
**took**  26:24 31:1
31:4,12 67:4
262:3 320:7
393:6,7
**tool**  116:1
**top**  69:11 70:23
188:2,6 209:4
328:4 331:17
386:3,5
**topaz**  1:16 2:3
**topic**  22:14
30:18 54:20
55:1 113:4
206:24 209:10
209:21 211:21
217:18 338:2
**topics**  29:24
30:6 351:15
**total**  80:6
**tough**  227:20
340:22 369:6

**towards**  260:1
**toxic**  220:9
221:20
**traditional**
17:8
**tragic**  379:2
**trained**  103:21
237:18
**trainees**  19:11
**training**  117:14
130:21 301:22
354:23 359:23
366:4
**trajectories**
84:5
**transcript**
23:14 24:6
344:17 397:18
398:17,19
**transcription**
400:4
**transfer**  15:19
**transferred**
36:10
**transit**  67:23
**transition**  54:3
84:12 217:20
**transitioning**
54:9
**translation**
55:4
**trauma**  10:23
325:1 369:18
374:12,15,22

376:23 377:12
**traumatic**
105:6 374:21
375:6,12,22,23
376:2,5,7,11,13
381:18,24
382:8,12,13
**travel**  66:5,22
67:4
**treat**  107:12
389:19 390:18
**treated**  104:11
105:10,11
107:24 389:22
**treater**  109:22
**treating**  99:23
100:15,17
101:1 105:20
390:23
**treatment**
104:14,16
213:6
**trial**  6:23 12:8
21:9,16 65:23
243:10
**trials**  243:15
**tried**  115:5
160:6
**true**  251:22
253:1 387:17
397:6
**truthfully**
24:11

CONFIDENTIAL

**try**  23:4 35:21 114:18 115:1,4 227:5 355:24
**trying**  23:13 36:20 48:3 98:15 191:9 195:11 199:1 238:18 255:11 337:22 356:2 357:17 365:7 389:21
**tucson**  9:9,11 45:19 46:3,13 46:20
**turn**  175:24 186:15 190:16 193:16 195:21 196:17 217:6 318:3 335:9 339:1,13 381:11
**turning**  206:24
**turnover**  328:1 332:21 333:8 335:16,23 336:20,24
**tv**  113:20,23
**twelve**  27:14
**twitter**  151:1,8 151:13 161:17 161:19,20
**two**  19:13 20:9 29:17 47:11 54:1 68:15

82:19 91:16 126:22 127:9 143:8 148:12 167:14 207:23 220:14 225:21 236:9 247:19 247:22 280:9 281:23 288:23 288:24 312:20 319:6 326:12 367:11 385:7 385:13
**type**  27:21 158:16 270:21 313:11 320:14 321:11
**types**  26:15 104:13 110:2 197:4 198:24 216:24 253:14 263:15 291:7 291:15 312:14 324:6
**typical**  26:12 27:3 31:23 112:7 150:5 230:9 262:14 279:19 361:14 395:12
**typically**  28:22 31:2 36:4 51:15 52:14 106:1 117:11 145:20 149:19

160:23 171:12 178:15 226:11 246:23 270:23 283:5 300:7 330:6 331:8 362:4

**u**

**u**  81:24 83:5,5 85:12
**u.s.**  53:24 85:10 117:8 284:5,7
**uh**  22:22 23:5,5 23:5 140:3 191:20 219:5
**umbrella**  102:14 150:13 240:12 315:16
**unavailable**  185:2 186:5
**uncomfortable**  169:1
**under**  87:3 102:14 148:6 148:17 149:23 150:13 155:3 176:2 240:11 240:11 242:9 246:8,8 247:13 339:2,14 397:20
**underestimate**  157:23

**underneath**  188:12
**understand**  18:5 22:18 110:21 114:18 115:5,7,19 131:12 132:17 172:12 191:9 220:24 221:20 223:18 231:2 233:7 237:17 237:20 241:15 243:5,12 275:13 276:10 286:18 299:23 305:22 309:3 314:7,24 316:16,17 336:3 361:6 368:13 388:6
**understandable**  343:17
**understanding**  16:14 48:14 90:10 118:12 128:6 148:5 151:17,18 224:6,24 225:1 230:19 240:15 242:23 243:3 249:7 256:20 297:14 311:17 313:13,16 317:5,8 335:20

CONFIDENTIAL

**[understood - used]** Page 81

| | | | |
|---|---|---|---|
| **understood** 23:15 184:5 214:7 221:12 230:17 247:14 266:20 278:23 | 99:4,7,9,14,20 100:2,5,6,9,20 100:23 101:3,6 102:24 105:21 106:9 107:7 138:23 192:4 | 105:5 112:5,14 113:3,5 115:22 115:24 116:9 116:15,16 123:18 124:3 124:13,16 | 296:11 297:3 298:2,4 300:13 300:17,20,23 301:2,8,21 302:13 303:2 305:1 306:3,13 |
| **undertaken** 231:2 | **unknown** 185:5 185:13 | 125:6,23 126:7 127:2,4,21 | 306:21 309:8 311:10 312:9 |
| **underway** 317:18 | **unquote** 294:22 | 128:9 129:11 143:1 155:18 | 314:1,12 315:1 315:8,13,17,19 |
| **unfair** 200:16 | **update** 98:21 | 157:7,13,15,17 | 315:20 316:1 |
| **unfortunately** 22:24 200:21 | **updated** 34:11 34:16,18 35:22 358:21 | 159:4 160:4,6 161:9,16,19 162:5 163:16 | 316:14 317:7 317:18 336:4 336:19 345:2 |
| **unified** 9:9,12 45:20 46:4,13 46:20 | **updates** 36:13 36:16 | 168:4,15 169:21,24 | 346:11 347:8 361:19 376:1 |
| **unique** 164:13 166:24 172:22 173:4 342:20 | **updating** 36:4 **upheaval** 331:8 | 170:3,9 173:23 174:8 178:6 | 382:20,23 **used** 29:22 |
| **uniquely** 270:12 | **urban** 10:16 333:12 334:1,4 334:14,22 | 185:3,12 186:12 188:14 188:23,23 | 116:2,5,6,11 117:2,5,8 |
| **united** 1:1 10:9 10:12 12:21 53:14,16 208:4 208:11,23 217:12 283:13 283:23 285:2 | 335:12,15,22 336:5,7,19 337:1 382:1,8 382:14 | 189:7 194:2 195:16 200:15 223:9 226:20 243:7 250:21 257:8 259:19 | 132:1 136:23 147:13 154:18 155:1,2,4,7,10 156:22 157:8 157:11 159:2 161:19,20 |
| **university** 9:17 14:14 15:22 16:12,17,24 17:11,14,18 18:9,14 20:14 52:21 55:3 91:5 96:6 97:3 97:13,21 98:18 | **usage** 111:16 113:12 **use** 9:22 18:7 22:24 26:13 27:4 30:6 51:1 51:9,24 82:8 83:6,13,22 84:6,12,19 85:3,21 86:4 99:11,15 105:3 | 259:23 263:17 267:17 268:15 268:17 269:22 279:15 283:9 283:17,19,21 285:14 287:7 289:13 293:10 293:18 294:1 | 162:14,15,18 166:5 203:16 222:10 235:21 243:8 244:4 245:2,16 256:13 284:21 286:1 289:17 303:14 311:1 |

**[used - want]** Page 82

315:15 324:11
328:20 336:16
337:11 361:13
376:1,4 398:20
**useful** 337:24
**user** 171:22
**user's** 172:6
**users** 347:5
**uses** 127:1
293:7 302:15
**using** 29:5,7
84:21 99:5,8
117:12 119:16
149:16 151:3
168:10 188:13
200:21,22
201:3,4 203:22
245:10 247:2
263:11 270:1
296:15 298:14
299:17 305:14
345:1 361:23
368:21
**usually** 22:8
158:13 160:15
226:14 291:21
300:12 330:1

**v**

**valid** 251:22
253:1
**valuable** 273:5
**vaping** 199:12

**variability**
372:24
**variable** 192:6
192:13 245:13
249:13,16
251:14 327:20
350:17
**variables**
249:14 288:23
288:24 289:1
**varies** 160:7
**variety** 103:22
109:3 136:12
227:10,14
228:17 304:7
381:5
**various** 117:19
261:13 330:18
**vary** 331:14
**verbal** 23:4
**verification**
228:13 230:12
230:20,24
231:3,13
232:10 234:23
**verifications**
229:23
**veritext** 1:23
12:13
**versa** 24:3
**version** 118:6
128:8
**versus** 172:15
194:1 195:6

206:1 280:2
284:13 299:23
340:24 347:9
347:10
**vice** 24:2
**video** 12:10,16
29:10,11 120:6
120:13 158:17
207:8,15
260:14,21
345:22 346:5
385:3 391:5,12
395:23
**videographer**
6:22 12:12
**videos** 155:13
**videotape** 1:13
**videotaped**
56:5
**view** 179:21
213:1
**viewed** 158:22
**vince** 6:23
**violence** 119:17
136:16 137:1,2
370:15 373:14
382:13
**viral** 201:6
**virtually** 350:7
**virus** 368:9
370:2
**visited** 97:22
**visual** 236:11

**vitae** 7:16,18
34:5 35:1
**vital** 10:19
338:20 339:6
**vivek** 224:12
**vulnerabilities**
181:11

**w**

**wagstaff** 5:11
**waiting** 169:20
**waived** 12:5
**walk** 254:8
**walked** 49:8
**walking** 165:6
173:5
**walnut** 6:11
**want** 17:19
18:5 47:22
50:24 52:10
55:14 60:18
73:19 85:14
90:17 104:18
118:9 129:16
132:16 170:23
174:17 179:4
186:16 193:16
193:23,24
195:22 196:17
202:1,3 207:21
209:18 214:12
227:11,13
233:7 252:21
255:3 256:23

CONFIDENTIAL

275:4 278:8,12 285:10 294:20 297:5 311:12 321:16 329:19 335:8 347:14 348:24 351:1,4 356:8 361:6 363:20 376:15 377:23 378:1 381:7 385:17 386:15 388:13 392:16

**wanted** 120:17 159:8 207:1 216:3

**wanting** 351:20

**wants** 15:9

**warnings** 99:10 99:15,18 238:3 238:5

**warranted** 62:22

**washington** 3:5 3:12

**watch** 158:17

**watched** 158:19

**watching** 113:13,14,20 347:10

**way** 19:15 21:22 22:20 30:4,22 116:2 116:10 154:13

159:3 165:14 200:7 236:12 236:14 248:6 265:17 303:23 308:12 315:6 365:6 387:10 389:8

**ways** 148:12 204:14 219:10 252:2 273:6 308:2,3

**wc.com** 3:6,7

**wcllp.com** 5:14

**we've** 27:5 42:24 49:8 56:21 66:8 89:17 169:23 205:7 227:3,8 270:13 315:9 320:3,4 322:2 326:6 334:9 383:23

**wealth** 258:22

**web** 9:17 97:14 97:21,22 98:3 98:10 146:4,7 146:12,24 148:8,18 149:3 149:6 150:1,6

**webinar** 359:19

**website** 98:16 98:17,21,23

**websites** 98:18

**week** 34:11 36:21 96:10,13 97:4 109:2 157:18,19 159:2 160:3,10 190:1,18 202:6

**weekend** 121:1

**weeks** 162:8

**weigh** 293:2

**weighed** 291:18

**weight** 261:22 291:14 292:16 293:1

**weighted** 291:17

**weighting** 292:19

**weinkowitz** 6:10

**welcome** 176:16

**wellness** 141:5 141:20 306:23

**went** 48:23 68:23 76:11 92:7 96:1 99:2 120:19 231:18 267:14 268:6 344:22 396:3

**west** 6:17 14:5

**wheelhouse** 231:23

**whims** 329:22

**whiteley** 3:4

**wholeheartedly** 178:2

**wide** 104:15 109:3

**widely** 243:12

**wildermuth** 363:24

**williams** 3:3

**wish** 352:13

**witness** 11:5 13:5 20:1 28:22 33:21 47:20 48:13 49:2 50:20 56:6 57:6 58:12 59:22 60:3 63:11 64:5 65:1 70:4 72:17 74:5 77:19 78:10 82:2 83:1 86:20,24 88:17 91:1 93:17 94:15 106:18 111:20 112:17 115:14 116:24 118:5 120:4 123:23 124:8 126:3 127:8,24 130:7 131:4 133:6,18 134:4 135:1,21 136:20 137:10

CONFIDENTIAL

144:15 151:11
152:3 163:21
165:13 167:4
169:9 171:10
172:11 173:2
176:18 180:1
181:15 183:22
185:16 187:17
189:5 191:7
192:19 194:16
196:12 197:19
199:23 203:7
204:8 206:9
209:18 210:21
211:16 212:22
214:3 216:7
221:10 222:24
224:9 231:7
233:6 240:4,23
245:23 246:22
248:20 249:23
250:12 251:2
254:14 258:16
259:10 260:13
262:3 265:5
266:12 269:14
270:19 272:21
275:12 277:6
280:6 282:18
283:16 286:22
288:6 290:2,19
293:13 295:7
297:9 304:18
306:8 307:16

309:2,14 310:7
314:16 315:23
318:23 327:5
329:10 331:23
338:14 347:14
353:14 355:16
359:10 363:5
364:8 372:8
373:12 374:4
375:9 379:19
383:10 387:6
387:20 397:5,7
398:1
**witnesses** 59:18
60:10 362:17
**word** 78:23,24
78:24 79:4
188:5 214:22
214:22 328:16
**words** 187:14
224:4
**work** 14:10,13
14:16 16:22
17:5,6,11,14,18
17:20,23,24
18:1,3 19:4,8
19:16 20:13,13
21:4,8,11,18,24
52:4 66:3 71:2
77:4 103:22
104:6 106:12
115:6 129:14
129:20 135:10
138:19 141:18

150:5 182:24
203:13 230:9
230:22 234:19
235:15 236:21
270:6 337:5
351:19 356:19
358:16,17,18
362:10 389:9
**worked** 20:3
60:1,6 61:8
62:11 87:7
96:9,19 101:8
122:16,22
139:2,17 142:1
142:15 143:11
206:13 297:18
299:3,5 326:6
327:20 329:13
333:22 350:7
370:10 371:10
**working** 20:12
55:2 64:10
71:7 72:3 90:8
116:13 143:10
150:16,20
178:10 200:19
205:21 215:7
220:3,4 237:2
272:10 273:9
300:1 325:5
342:12 356:21
**world** 225:2
298:6

**wrapping**
384:13,17
**writ** 167:1
**write** 15:18
270:23 271:1,4
**writing** 65:13
216:1 379:23
**written** 10:9,12
30:5 67:22
111:2 208:3,10
208:22 209:2,6
213:22 217:11
218:4,9 223:20
225:13 290:4
333:21 335:2
**wrote** 50:11
272:13 284:24
334:21 339:10
339:15 343:18

**x**

**x** 7:2,9 8:2 9:2
10:2 81:24
131:7 151:1,8
161:17,19,20
350:6 352:1,20
353:5,17

**y**

**yeah** 15:7
18:22 19:7
30:11 31:5
57:6,15 60:23
66:21 72:1
77:9 78:4

CONFIDENTIAL

**[yeah - yesterday]**                                                  Page 85

| | | | |
|---|---|---|---|
| 81:10 87:7,22 | 88:11 89:7 | 86:18 88:15 | 245:21 246:20 |
| 88:2 90:2 91:1 | 90:9 104:7 | 90:23 93:12 | 248:18 249:21 |
| 92:10 93:17 | 119:18 138:21 | 94:11 106:16 | 250:10,24 |
| 95:5 104:21 | 141:13 143:17 | 111:18 112:15 | 252:17 254:12 |
| 111:7 114:11 | 195:2 276:8,12 | 115:12 116:22 | 258:14 259:8 |
| 141:2 155:8 | 277:18 297:18 | 118:3 119:23 | 262:1 265:3 |
| 156:9,15 169:9 | 307:7,9,21 | 120:16 121:8 | 266:10 269:12 |
| 171:10 175:23 | 308:7,12 | 123:21 124:6 | 270:17 272:19 |
| 195:13 196:12 | 310:12 313:7 | 126:1 127:6,22 | 275:10 277:4 |
| 196:19 233:6 | 319:20 321:18 | 130:5 131:2 | 278:6 280:4 |
| 240:4 246:10 | 322:23,24 | 133:4,16 134:2 | 282:16 283:14 |
| 249:1 257:20 | 324:1,7 325:7 | 134:18,23 | 286:20 288:4 |
| 280:6 306:1 | 326:8,22 | 135:19 136:18 | 289:24 290:17 |
| 313:19 319:19 | 327:12,19 | 137:8 141:7 | 293:11 295:5 |
| 327:5 331:23 | 333:23 349:6 | 144:13 151:9 | 297:7 304:16 |
| 341:10 345:17 | 349:11,17 | 152:1 163:19 | 306:6 307:14 |
| 359:10 366:15 | 350:8,9,11 | 165:11 167:2 | 308:24 309:12 |
| 372:5 376:6 | 351:11 352:1 | 168:22 170:18 | 310:5 314:14 |
| 382:3 | 352:18,20 | 171:5 172:9,24 | 315:21 318:21 |
| **year**  19:13 20:9 | 353:5,7 357:6 | 176:12 179:23 | 327:3 329:8 |
| 60:19 81:3 | 358:6 360:21 | 181:13 183:20 | 331:21 345:18 |
| 82:19 157:10 | 366:3 378:1 | 185:14 187:15 | 347:12 353:12 |
| 184:24 241:22 | 379:8 | 189:3 191:5 | 355:14 359:8 |
| 310:23 312:14 | **yeates**  2:4 | 192:17 194:14 | 363:3 364:6 |
| 319:18 321:17 | 19:23 20:24 | 196:10 197:17 | 372:6 373:10 |
| 323:4 328:2 | 28:20 32:13 | 199:21 203:5 | 374:2 375:7 |
| 350:22 352:11 | 47:18 48:11,24 | 204:6 206:7 | 379:17 383:8 |
| 353:10,11,16 | 50:18 57:3 | 207:5 209:16 | 384:4,19 385:1 |
| **yearly**  335:15 | 58:10 63:9 | 210:19 211:14 | 385:5 387:4,18 |
| 335:22 336:20 | 64:3,23 68:4,8 | 212:20 214:1 | 392:1 395:7 |
| **years**  19:22 | 68:16 70:2 | 216:5 221:8 | **yelena**  2:16 |
| 52:11 54:23 | 72:15 74:3 | 222:22 224:7 | **yep**  196:14 |
| 78:3 85:10 | 77:17 78:8 | 231:5 233:4 | **yesterday** |
| 87:9,11,12 | 81:21 82:1,21 | 240:2,21 | 158:4 162:16 |

CONFIDENTIAL

**[ygr - zuckerberg]**                                    Page 86

**ygr**  1:3
**ykotlarsky**
 2:18
**york**  2:17,17
 3:21,21
**young**  51:21
 54:7 62:18
 63:1 117:16
 119:5 128:20
 137:12 141:1
 141:24 166:6
 176:5,10
 177:17 178:1
 180:13 182:2
 185:20 191:10
 191:12 193:4
 198:20 203:22
 205:7 220:3
 223:6 225:3
 228:1,5 229:3
 230:14 232:11
 234:24 235:12
 241:4 246:5
 280:15,18
 299:21 310:18
 312:10 313:11
 320:8,24 321:7
 342:21 343:23
 344:1 355:5
 367:6,13
 368:14,17
 370:5,17 383:3
 390:20

**youth**  10:6
 83:21 188:13
 189:23 191:13
 191:24 193:9
 193:12 198:7
 198:12 202:11
 209:11,14,22
 211:5 311:1
 312:9 316:13
 317:6,18 320:6
 375:5 379:6,15
 381:23
**youtube**  3:8
 80:23 113:22
 154:11 155:2
 157:14,21
 158:2,7,13,18
 158:20,22

**z**

**zachary**  4:17
**zbower**  4:19
**zero**  105:23
**zoom**  4:2 5:2
 6:2
**zuckerberg**
 3:17