**Exhibit 94**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 402

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          : MDL No.
ADOLESCENT                   : 4:22-md-3047-YGR
ADDICTION/PERSONAL INJURY    :
PRODUCTS LIABILITY           : MDL No. 3047
LITIGATION                   :

_____

THIS DOCUMENT RELATES TO:    :
ALL CASES                    :

- - -

AUGUST 13, 2025
VOLUME II
- - -

Videotape deposition of
SHARON A. HOOVER, Ph.D., taken pursuant
to notice, was held at the law offices of
Kessler Topaz Meltzer & Check LLP, 280
King of Prussia Road, Radnor,
Pennsylvania 19087, commencing at
8:59 a.m, on the above date, before
Amanda Dee Maslynsky-Miller, a Court
Reporter and Certified Realtime Reporter.

- - -

GOLKOW, A Veritext Company
877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 403

APPEARANCES:


        KESSLER TOPAZ MELTZER & CHECK, LLP
        BY: MELISSA L. YEATES, ESQUIRE
        BY: MATTHEW T. MACKEN, ESQUIRE
        280 King of Prussia Road
        Radnor, Pennsylvania 19087
        (610) 667-7706
        myeates@ktmc.com
        mmacken@ktmc.com
        Representing the Plaintiff



        KING & SPALDING LLP
        BY: KATHRYN S. LEHMAN, ESQUIRE
        Southeast Financial Center
        200 S Biscayne Boulevard
        Suite 4700
        Miami, Florida 33131
        (305) 462-6000
        Klehman@kslaw.com
        Representing the Defendants,
        TikTok Inc., ByteDance Inc.,
        ByteDance Ltd., TikTok Ltd., and
        TikTok, LLC

CONFIDENTIAL

APPEARANCES: (Continued)


         WILLIAMS & CONNOLLY LLP
         BY: J. ANDREW KEYES, ESQUIRE
         BY: DANIEL WHITELEY, ESQUIRE
         680 Maine Avenue SW
         Washington, DC 20024
         (202) 434-5000
         akeyes@wc.com
         dwhiteley@wc.com
         Representing the Defendants,
         YouTube, LLC, Google LLC, and
         Alphabet Inc.


         COVINGTON & BURLING LLP
         BY: MICHAEL N. KENNEDY, ESQUIRE
         One CityCenter
         850 Tenth Street, NW
         Washington, DC 20001
         (202) 662-6000
         mkennedy@cov.com
         Representing the Defendants,
         Meta Platforms, Inc. f/k/a
         Facebook, Inc.; Facebook Holdings, LLC;
         Facebook Operations, LLC; Facebook
         Payments, Inc.; Facebook
         Technologies, LLC; Instagram, LLC
         Siculus, Inc.; and Mark Elliot
         Zuckerberg


         KIRKLAND & ELLIS LLP
         BY: JACK NOLAN, ESQUIRE
         601 Lexington Avenue
         New York, New York 10022
         (212) 446-4800
         jack.nolan@kirkland.com
         Representing the Defendants,
         Snap Inc.

CONFIDENTIAL

Page 405

APPEARANCES: (Continued)

VIA ZOOM:

        BEASLEY ALLEN LAW FIRM
        BY: SLADE METHVIN, ESQUIRE
        301 St Louis Street
        Mobile, Alabama 36602
        (251) 308-1515
        slade.methvin@beasleyallen.com
        Representing the Plaintiff,
        DeKalb County School District


        CARELLA, BYRNE, CECCHI, BRODY &
        AGNELLO, P.C.
        BY: DAVID G. GILFILLAN, ESQUIRE
        5 Becker Farm Road
        Roseland, New Jersey 07068
        (973) 994-1700
        dgilfillan@carellabyrne.com
        - and -
        BY: ZACHARY S. BOWER, ESQUIRE
        2222 Ponce De Leon Boulevard
        Miami, Florida 33134
        (973) 994-1700
        zbower@carellabyrne.com
        Representing the Plaintiff,
        Irvington Public Schools

CONFIDENTIAL

Page 406

APPEARANCES: (Continued)
VIA ZOOM:

 EILAND & BONNIN LAW FIRM
 BY: CRAIG EILAND, ESQUIRE
 BY: DAVID BONNIN, ESQUIRE
 2200 Market Street
 Suite 501
 Galveston, Texas 77550
 (409) 763-3260
 ceiland@eilandlaw.com
 dbonnin@eilandlaw.com
 Representing the Plaintiffs


 O'HANLON, DEMERATH & CASTILLO
 BY: KAYLIE MORGAN, ESQUIRE
 117 West Craig Place
 San Antonio, Texas 78212
 (210) 310-3030
 kmorgan@808west.com
 Representing the Plaintiff,
 Texas School Districts


 KING & SPALDING LLP
 BY: YELENA KOTLARSKY, ESQUIRE
 1185 Avenue of the Americas
 34th Floor
 New York, New York 10036
 (212) 556-2100
 ykotlarsky@kslaw.com
 Representing the Defendants,
 TikTok Inc., ByteDance Inc.,
 ByteDance Ltd., TikTok Ltd., and
 TikTok, LLC

ALSO PRESENT: Brian McGee, Videographer
Vince Rosica, Trial Technician

CONFIDENTIAL

Page 407

- - -

I N D E X

- - -

Testimony of:  SHARON A. HOOVER, PhD

By Attorney Keyes                              410
By Attorney Nolan                              808

- - -

E X H I B I T S

- - -

NO.              DESCRIPTION                      PAGE

Hoover-30     No Bates
              SHAPE District Profile,
              School Mental Health
              Profile?District Version    564
Hoover-31     No Bates
              The National Association of
              School Psychologists, Student
              to School Psychologist Ratio
              2023?2024 Based on the U.S.
              Department of Education
              Common Core of Data          642
Hoover-32     No Bates
              American School Counselor
              Association
              Student-to-School-Counselor
              Ratio 2023?2024              648

CONFIDENTIAL

Page 408

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

| Page Line | Page Line | Page Line |
|-----------|-----------|-----------|
| None      |           |           |

Request for Production of Documents

| Page Line | Page Line | Page Line |
|-----------|-----------|-----------|
| None      |           |           |

Stipulations

| Page Line | Page Line | Page Line |
|-----------|-----------|-----------|
| 409   1   | 1         |           |

Question Marked

| Page Line | Page Line | Page Line |
|-----------|-----------|-----------|
| None      |           |           |

CONFIDENTIAL

Page 409

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:   We are now on the record.  My name is Brian McGee.  I'm a videographer for Golkow, a Veritext division. Today's date is August 13th, 2025, and the time is 8:59 a.m.

This video deposition is being held in Radnor, PA, in the matter of In Re: Social Media, Adolescent Addiction Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.

The deponent is Sharon A.

CONFIDENTIAL

Page 410

Hoover, Ph.D.

Counsel will be noted on the stenographic record.  The court reporter is Amanda Miller and will now swear in the witness.

- - -

SHARON A. HOOVER, Ph.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY KEYES:

Q.   Good morning, Dr. Hoover. We met yesterday.

A.   Good morning.

Q.   As a reminder, my name is Andrew Keyes.  I'm with the law firm of Williams and Connolly, and we represent the Google and YouTube defendants.

A.   Great.

Q.   Do you understand that you are still under oath?

A.   I do.

Page 411

Q.    And this is a continuation of the deposition that began yesterday?

A.    I do.

Q.    Did you review anything in connection with this matter since the end of your deposition yesterday evening?

A.    I just reviewed my reports.

Q.    Which reports did you review?

A.    Frankly, I looked through kind of all of the reports; the expert report from May, as well as the rebuttal reports and the district-specific reports.

Q.    Since the end of the first day of your deposition yesterday, did you review anything besides your reports?

A.    No.

Q.    Did you speak with counsel about this matter?

A.    No.

Q.    Did you speak with anyone else about this matter?

A.    No.

Page 412

Q.    You have submitted reports that relate to six school districts in particular, correct?

A.    Correct.

Q.    Tucson, Charleston, Breathitt, Irvington, DeKalb and Harford.

Did I get that list correct?

A.    Yes.

Q.    Okay.  For any year from 2017 to the present, can you tell me what percentage of Tucson High School students had access to a cell phone or personal electronic device outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I could not give you that number off the top of my head, no.

BY ATTORNEY KEYES:

Q.    Did you get that data from Tucson or its counsel?

ATTORNEY YEATES:  Object to the form.  Foundation.

THE WITNESS:  So ask the

question again, because the way I heard it, as stated, that likely it would be very difficult to get.

But you're welcome to ask it again.

BY ATTORNEY KEYES:

Q.    Sure.

For any year from 2017 to the present, can you tell me what percentage of Tucson High School students had access to a cell phone or personal electronic device outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I cannot tell you that.  And I think the data would be very difficult to get.  Even if there was a metric of it, I think it would be difficult to interpret.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, can you tell me what percentage of Tucson Middle School

CONFIDENTIAL

Page 414

students had access to a cell phone or personal electronic device outside of school?

A.    No.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Sorry.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, can you tell me what percentage of Tucson High School students spent time on defendants' platforms outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I can't tell you specific to Tucson what percentage, no.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, can you tell me what percentage of Tucson Middle School students spent time on defendants' platforms outside of school?

Page 415

A.    No, not specific to Tucson.

Q.    For any year from 2017 to the present, can you tell me what percentage of Tucson High School students spent time on social media outside of school?

A.    Outside of school?

Q.    Yes.

A.    I couldn't tell you specifically.

I could tell you what we know based on national data.  But if you're asking specifically for Tucson, no.

Q.    For any year from 2017 to the present, can you tell me what percentage of Tucson Middle School students spent time on social media outside of school?

A.    I don't know that that data exists.

Q.    For any year from 2017 to the present, can you tell me what percentage of Charleston High School

Page 416

students had access to a cell phone or personal electronic device outside of school?

A.    So just so I understand, we're moving to Charleston now?

Q.    We are.

A.    Okay.

No.

Q.    For any year from 2017 to the present, can you tell me what percentage of Charleston Middle School students had access to a cell phone or personal electronic device outside of school?

A.    No.  Again, I think that that data would be very hard to identify.

Q.    For any year from 2017 to 2025, can you tell me what percentage of Charleston High School students spent time on defendants' platforms outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.

Page 417

BY ATTORNEY KEYES:

Q. For any year from 2017 to 2025, can you tell me what percentage of Charleston Middle School students spent time on defendants' platforms outside of school?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No.

BY ATTORNEY KEYES:

Q. For any year from 2017 to 2025, can you tell me what percentage of Charleston High School students spent time on social media outside of school?

A. No, not a specific amount of time that they spent.

Q. For any year from 2017 to 2025, can you tell me what percentage of Charleston Middle School students spent time on social media outside of school?

A. The specific percentage in Charleston, no.

Q. Okay. So let me broaden it a bit, then.

Page 418

For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to -- to the present, what percentage of either high school students or middle school students had access to a cell phone or a personal electronic device outside of school?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So based on national data, it would be a significant number of the students.

But do I have it specifically for those districts? No.

BY ATTORNEY KEYES:

Q.    For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to the present, what percentage of either high school students or middle school students spent time on defendants' platforms outside of school?

Page 419

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I can't.  Nor would it change the conclusions that I came to or the opinions that I offered.

BY ATTORNEY KEYES:

Q.    For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to the present, what percentage of either high school students or middle school students spent time on social media outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I cannot, nor would it change the opinions I offered.

BY ATTORNEY KEYES:

Q.    I've asked you a number of questions about whether you can tell me what percentage of students in a particular district had access to a cell phone outside school, had access to a

Page 420

personal electronic device outside of school, or what percentage of those students spent time on defendants' platforms or social media outside school.

Did you ask any of those plaintiffs or their counsel for that data?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I didn't specifically ask.  And part of that is because in working with schools for so long, I know that their data systems don't typically collect that information.  And that's, in part, because the data systems are still trying to catch up to the information that you're asking about.

So it wasn't something that I would have needed to inform the opinions that I made.

BY ATTORNEY KEYES:

Q.    Okay.  But to be clear, you

Page 421

didn't ask for that data, correct?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  Not that I recall.  I don't recall asking specifically for the data that you spoke about.

BY ATTORNEY KEYES:

Q.   Okay.  Can you tell me, for any year from 2017 to the present, how many Tucson students were diagnosed with social media addiction?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I can't tell you that.

And, frankly, it wouldn't be something I would have access to, given that that would be confidential information.

BY ATTORNEY KEYES:

Q.   Can you tell me, for any year from 2017 to the present, how many Charleston students were diagnosed with

Page 422

social media addiction?

A.    Again --

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   -- that would be confidential information that I wouldn't have access to.

BY ATTORNEY KEYES:

Q.    For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to the present, how many students were diagnosed with social media addiction?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   Again, that's not something that I would have access to.  It's confidential information.

BY ATTORNEY KEYES:

Q.    Can you tell me, for any year from 2017 to 2025, how many Charleston students were identified as needing an assessment for social media

Page 423

addiction?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So what I can say is that that's not something that I can imagine a school district collecting at this point. And so I don't have that data.

But it's not because of any reason other than I doubt that it exists.

BY ATTORNEY KEYES:

Q.    Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as needing an assessment for social media addiction?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, working with schools, that's not something that would be collected at this point in time.

BY ATTORNEY KEYES:

Page 424

Q.    Can you tell me, for any year from 2017 to the present, how many Breathitt students, how many Irvington students, how many DeKalb students or how many Harford students were identified as needing an assessment for social media addiction?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I cannot tell you, because that data likely doesn't exist.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, can you tell me how many Tucson students were identified as being distracted?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I can tell you, based on the interviews that I did with Tucson folks, that they said that it was a constant --
that the defendants' platforms

Page 425

were a constant, consistent form of distraction in their classrooms.

BY ATTORNEY KEYES:

Q.   Did the Tucson folks, as you use the term, identify for you how many Tucson students had been identified as being distracted?

A.   So let me be clear.  I'm talking about Tucson education leaders and was using the term "folks" colloquially.

But they didn't have a percentage, if that's what you're asking for.

Did they have a specific number of students who were distracted? That's not something that would be collected.

Q.   Okay.  For any year from 2017 to the present, can you tell me how many students in Breathitt or Irvington or DeKalb or Harford were identified as being distracted?

CONFIDENTIAL

Page 426

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That's not something that would typically be collected, as far as a number of students.  So it's not something that I would have, no.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, can you tell me how many Tucson students were identified as having diminished social skills?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, as I -- as I detailed in the report, a number of district leaders indicated that students had deficits in social skills.  It's also consistent with what we see nationally.

As far as do I have the exact number of students who have deficit in social skills, no.

CONFIDENTIAL

Page 427

BY ATTORNEY KEYES:

Q.    I didn't ask for an exact number.

I said, can you tell me, from 2017 to the present, how many Tucson students were identified as having diminished social skills?

Are you able to quantify that in any way?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  I'm happy to quantify it.

It's a significant number of students.  When you asked how many, I assumed that that's an exact number.  But certainly from the reports of the educators and the school administrators and the district leaders, it's a large number of students that are distracted by defendants' platforms during the school day.

BY ATTORNEY KEYES:

Page 428

Q.    And you say the number was significant, and you say the number was large.

Did they give you a number, a number of Tucson students who were identified as having diminished social skills?

A.    Okay.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So you didn't want a number, but you want a number now.

They wouldn't have had that data system in place to be able to extract a specific number of students.

BY ATTORNEY KEYES:

Q.    I do want numbers, Dr. Hoover.  I'm asking about numbers.

So if you don't have the numbers, that's fine.  But I am asking for numbers, not adjectives that you heard from interviews you had with

CONFIDENTIAL

Page 429

unspecified people in the district, okay. So I am asking for numbers.

A. I --

ATTORNEY YEATES: I'm going to --

THE WITNESS: If I may.

ATTORNEY YEATES: Sorry. I'm going to object. That's argumentative. And you did just tell her you didn't want a specific number. So you're also being a little confusing.

So now that you want numbers that's fine. But don't be argumentative with the witness, please.

ATTORNEY KEYES: I'm not being argumentative. She said -- when I asked how many, she assumed that I wanted an exact number.

BY ATTORNEY KEYES:

Q. I want as precise a number as you can give, if you can give a number.

Page 430

But I am asking you if you have any data at all to quantify any of the things that you've been talking about, okay?

So, for the record, are you able to tell me, for any year from 2017 to the present, how many Tucson students were identified as having diminished social skills?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.

And just, also, I want to be clear that the people were not unspecified.  You mentioned in your last comment that this was unspecified individuals.

And the -- I was not at all unclear about who the people were whose information -- it's all in my sources reviewed.

BY ATTORNEY KEYES:

Q.    Are you able to tell me, for any year from 2017 to the present, how

many Charleston students were identified as having diminished social skills?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No, I cannot give you a number.

What I can say is that according to the administrators and the frontline educators, it was a significant amount.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me how many Breathitt or Irvington or DeKalb or Harford students were identified as having diminished social skills?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So, again, I can tell you that it came up consistently, across all of the interviews that I did, that students are consistently distracted or have decreased

social skills and that that's increased over time in -- through their engagement with social media platforms.

BY ATTORNEY KEYES:

Q. Could you tell me, for any year from 2017 to the present, how many Tucson students were identified as being bullied?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't think I have that specific data. So no.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Charleston students were identified as being bullied?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: No. Again, you know, you're asking me for data that I think inadequate data systems don't fully capture.

Page 433

So we know, for example, that bullying goes underreported. So if you're asking me how many students are bullied, I just don't think our data systems capture the full scope of bullying at this point. So it would be hard to say.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Breathitt, Irvington, DeKalb or Harford students were identified as being bullied?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So what we often do when we're estimating numbers like this for a district if the data doesn't exist, is we would look to national data. And there's been enough study of things like bullying, and even distraction, to understand the

CONFIDENTIAL

Page 434

picture across districts.

If you're asking for specific numbers from those districts, the data doesn't exist.

BY ATTORNEY KEYES:

Q.    Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom?

ATTORNEY YEATES:  Objection. Form.

THE WITNESS:  So, again, the data systems in Tucson, very similar to many districts, do not capture the full extent of classroom disruption.

So we often, in typical practice, also speak to the people who are experiencing disruption. And from the reports of district leaders and frontline educators in Tucson, they were very clear that there are a lot of disruptions in the classroom and that they are

Page 435

related to engagement with social media platforms.

BY ATTORNEY KEYES:

Q.   Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom because of their use of social media?

ATTORNEY YEATES:   Objection. Form.

THE WITNESS:   So what I can tell you is that the discussions that I had with the leadership from Tucson indicated that the disruptions that were happening in the classroom were largely related to defendants' social media platforms; that students were consistently on the platforms during classroom instruction, which is consistent with the data that was reported in the expert reports where they noted that students are spending, you know,

Page 436

over two hours a day during instructional time on social media platforms.

So all of the data corroborates that this is a significant disruption in the classroom.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom because of their use of social media?

A. That data doesn't exist, because the data systems have not been able to catch up to this new, evolving harm to young people, so.

Q. Can you tell me, for any year --

ATTORNEY YEATES: Can I just -- just to remind you to give me a moment to object.

THE WITNESS: Yes. Will do.

ATTORNEY YEATES: So I have

Page 437

an objection to the form to the last one.  Thank you.  I appreciate that.

BY ATTORNEY KEYES:

Q.    Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom because of their use of defendants' platforms?

ATTORNEY YEATES:  Objection. Form.

THE WITNESS:  So, what I would say is that, again, the data systems do not yet capture what you're asking for in specific detail.  So it would be impossible to give you the exact number that you're asking for.

BY ATTORNEY KEYES:

Q.    Could you tell me, for any year from 2017 to 2025, the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the

Page 438

classroom?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So as you may know, part of my plan is to help the districts develop data systems to capture the things that you're asking about, because those data systems have not had to exist in the way that they do now, in light of the defendants' social media platforms and how they are significantly disrupting the classroom.

BY ATTORNEY KEYES:

Q.   All right.  But my question was, can you tell me today, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the classroom?

A.   It would be --

ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 439

the form.  Asked and answered.

THE WITNESS:  It would be hard to give you that information, because, as I said, the data systems have not been able to catch up to the need to collect disruptions in the classroom related to social media platforms.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, can you tell me how many Charleston or Breathitt or Irvington or DeKalb or Harford students were identified as being disruptive in the classroom because of their use of social media?

ATTORNEY YEATES:  Objection to form.

THE WITNESS:  So having spoken with leadership from all of those districts consistently, as I noted in my report, the specific statements from the individuals that I listed as to who I

Page 440

interviewed, and from the deposition data, they were clear that there is a significant number of students who are disrupted in the classroom due to social media platform engagement.

They do not yet have the data systems in place to be able to capture what's happening in terms of disruption to social media -- disruption due to social media engagement.

And that's part of why it's included in my plan.

BY ATTORNEY KEYES:

Q.    So you -- it is true to say that you cannot tell me, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the classroom because of their use of social media, correct?

ATTORNEY YEATES:  Objection.

Form. Asked and answered.

THE WITNESS: So as I stated, the data systems within the school districts have not been able to keep up with the increasing and rapid and evolving issues that are being caused by the defendants' social media platforms, including significant disruption in the class, which is why we go to multiple sources of data, including national data and including speaking directly with the people who are working in the districts and in the schools, to understand what's happening on the ground.

And I detailed in the reports that across those districts, they are experiencing significant disruption in the classroom based on engagement with social media platforms.

BY ATTORNEY KEYES:

Page 442

Q.    Can you tell me, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the classroom because of their use of defendants' platforms?

ATTORNEY YEATES:    Objection. Form.

THE WITNESS:    So I thought I just answered that.  But I can answer again.

So the data systems do not yet exist to be able to capture specifically the disruptions in classroom due to engagement with social media.

And that's part of why it's included in the plan.  So there is other information that we have to rely on, including speaking directly with the district leadership, which I did in every district, as well as school

Page 443

building-level leadership and educators. And they all indicated that there is significant disruption in the classroom specific to the defendants' social media platforms.

And those platforms were specifically identified by the individuals from the districts that I spoke with. And they've been documented in the national literature to be the primary sources of disruption for students.

BY ATTORNEY KEYES:

Q. Okay. So you, in your answers, have said you don't have any data specific to one of these six school districts. You have information that was supplied by these key informants and you have national data.

Did I get that right?

ATTORNEY YEATES: Objection. Form. Misstates testimony.

Page 444

THE WITNESS:  So we consider all data when we're doing work with districts.  And it's actually a very well-accepted form of data to speak with the leadership who are actually on the ground in classrooms leading schools, leading student support services and leading districts.

That is a part of our inquiry process when we meet with districts to understand what's happening, because we understand both that -- that quantitative data doesn't always capture especially new and evolving harms, and that the data systems that exist, as I detail in my report in each district, have significant limitations in terms of their ability to capture some of the information about the new, evolving harms of the social media platforms, the defendants'

platforms.

BY ATTORNEY KEYES:

Q. Okay. And when you refer to the qualitative descriptions you've gotten from people in the district, you're talking about the key informants that you describe in your reports and that you identified in what we previously marked as Exhibit-1, correct?

A. So that's a part of what I'm talking about when I say "qualitative information." So it also includes information from the depositions that were gathered from people in the district.

And I have a list of those, if you'd like me to refer to it. It's in the list of documents reviewed.

Q. So you've identified key informant interviews. You've identified deposition testimony. And you've identified national data.

Can you point to anything else that you are relying on to say that

Page 446

there is a problem with students either being diagnosed with social media addiction, being identified as needing an assessment for social media addiction, identified as being distracted or having diminished social skills, identified as being bullied or identified as being disruptive in the classroom; all of the things I've been asking you about?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So as I listed in my report, there are several sources of information.  So you named some.

There's also the plaintiff fact sheets that detailed the experiences of district and school leadership with respect to the indicators that you just asked about.

In some of the districts, there is other data about, for example, mental health referrals.

Page 447

But some of the questions you asked -- in fact, to my recollection, most of them were about social media assessments or social media impact.

And, as I said, and it's detailed in my report, the data systems have not yet been able to capture some of that, which is precisely why it's included as a necessary part of the strategic plan for addressing the harms of social media.

And when there is an absence of data, typical in the field, as a scientist, we would look to what forms of data actually do exist. And so as part of our scientific inquiry, we would do qualitative data, we would ask, as was done from the plaintiff fact sheets, what information do you have about this issue? And we would look to national data.

Page 448

I also, of course, as someone who has worked with districts across the country for 25 years, would lean on some of my experience in working with school administrators and district administrators and families and students regularly.

BY ATTORNEY KEYES:

Q. Okay. Is Tucson urban, suburban or rural?

A. So those -- just to -- to clarify a little bit.

Districts sometimes will classify themselves as urban, sometimes urban-suburban, sometimes suburban-rural. And when you look at different kind of sources of that information, it's not always the same.

So my understanding of Tucson is that it's urban. But in some areas, it might be classified as urban-suburban.

Q. Based on what source?

CONFIDENTIAL

Page 449

A.    I can't name the source right now.  When I spoke with the school district leaders and gained an understanding of the school district, as well as when I looked at the plaintiff fact sheets, there's information about the school districts.

So when you're asking about a specific source, again, I've worked with school districts for 25 years.  So you start to get to know the school districts as well and where they are located, and you have an understanding of them.

Q.    Can you tell me, for any year from 2017 to the present, how many Tucson students were diagnosed with depression?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So that data would not be at my disposal.  So, no, it's not something I can tell you.

Page 450

BY ATTORNEY KEYES:

Q. Okay.

A. Usually -- sorry. If I may just finish.

The -- the mental health records of students are usually kept confidential. So that's information that I wouldn't have at my fingertips, no.

Q. Can you tell me how many Tucson students, for any year from 2017 to the present, were treated for depression?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: What I can say is that that information is both confidential, but, also, across a variety of providers, it would be hard for me to know, at this point, how many were treated.

But that information just wouldn't be something I could access, how many were treated for depression.

CONFIDENTIAL

Page 451

BY ATTORNEY KEYES:

Q.    Are you telling me that the number of Tucson students who were treated for depression, at any year from 2017 to the present, would be confidential?

A.    So very often in mental health records, students' specific diagnoses and the challenges that they are facing are not something that's accessible.

That's covered, often, under FERPA or HIPAA privacy laws.  And so those are not things that are typically accessible to somebody who is just engaging with a district to understand what's happening with their mental health services, for example.

Q.    Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being depressed?

ATTORNEY YEATES:  Objection to the form.

Page 452

THE WITNESS:  Okay.  I thought I had answered that, but --

BY ATTORNEY KEYES:

Q.    Well, I asked you about diagnosed.

A.    Oh, okay.

Q.    I asked about treated.

And now I'm asking you about identified as being depressed.

A.    Got it.  Okay.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, no, for the same reasons, that that information would be confidential, unless, you know -- well, it would be confidential, to my knowledge.

And I don't have that data.

BY ATTORNEY KEYES:

Q.    For any year from 2017 to the present, are you able to tell me how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were

Page 453

treated for depression?

ATTORNEY YEATES:  Objection. Form.

THE WITNESS:  Again, that data is confidential and it would not be something I have.  So no.

BY ATTORNEY KEYES:

Q.    Are you able to tell me, for any year from 2017 to 2025, how many Charleston, Breathitt, Irvington, DeKalb or Harford students were treated for depression?

ATTORNEY YEATES:  Objection to form.

THE WITNESS:  So, again, that data would not be something I have, nor would it have changed the opinions in any of my reports or my strategic plan.

BY ATTORNEY KEYES:

Q.    Well, you say that data wouldn't be something that you have.

So you're not able to tell me, correct?

Page 454

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.    Are you -- my question was, are you able to tell me, for any year from 2017 to 2025, how many Charleston, Breathitt, Irvington, DeKalb or Harford students were treated for depression?

ATTORNEY YEATES:  Object to the --

BY ATTORNEY KEYES:

Q.    Are you able to tell me?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  Again, I thought I answered that.

So I'm not able to tell you that.  And that information, I would assume -- well, that information is typically confidential within a treatment situation or within a school district, for example.

BY ATTORNEY KEYES:

Q.    Are you able to tell me, for any year from 2017 to the present, how many Charleston, Breathitt, Irvington, DeKalb or Harford students were identified as being depressed?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   No.   That is not something that would typically be shared, as far as how many students were identified as being depressed.   That's not something that I have, nor would it be something that I would need or would have needed to inform the opinions in this case.

BY ATTORNEY KEYES:

Q.    Are you able to tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford self-reported that they felt depressed?

ATTORNEY YEATES:   Object to

CONFIDENTIAL

Page 456

the form.

THE WITNESS:  So I don't believe that I could tell you how many students self-reported being depressed, no.  Nor would it change the opinions that I offered in my reports nor my strategic plan.

It's just not information, necessarily, that I would have needed to inform these opinions.

BY ATTORNEY KEYES:

Q.    Are you able to tell me how many Tucson students, in any year from 2017 to the present, were diagnosed as being suicidal?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.  That's, again, something that would be confidential, typically, within a school district.

It may be something -- I'd have to look back specifically

CONFIDENTIAL

Page 457

to -- because I know that some of the plaintiff fact sheets have information about some of the mental health supports or services offered.

So I would have to go back -- if you're asking me about every single district, I'd have to go back. So I reviewed a lot of documents for this.

But if you're asking me as I sit here, can I tell you exactly the number? No. Is it something that I may have reviewed if the district had it? If they -- I may have looked at that data. But I can't tell you just sitting here today.

BY ATTORNEY KEYES:

Q. And you didn't put it in any of your reports, correct?

A. I would not have put -- well, I'd have to go back, honestly, through all my reports to indicate -- to

Page 458

indicate if I had listed specific -- if a district supplied it, I may have put it in the report. But I don't know that I did.

Again, it's not something that -- the exact numbers of students who may have been diagnosed with depression is not something I would have put in to inform the opinion.

Q. Are you able to tell me, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were diagnosed as being suicidal?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I mean, I can go to the reports to see if there's anything in there that would have indicated it.

But, again, I -- I don't recall, sitting here, a specific number of students who reported being suicidal or expressing

Page 459

suicidal ideation.

BY ATTORNEY KEYES:

Q.    Do you have any data from any of those districts that show how many students were identified as being diagnosed as being suicidal?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So there's a lot of information I looked at from the districts.  So I'm happy to go back and look through it.

But I don't have it right at my fingertips here.  So I would have to go back.  If you want me to look at a specific document or something that I reviewed -- again, I was reviewing documents from these six districts.  So I'd have to go back and look.

And, you know, it may have come up in testimony as well.  So it's a lot of documents.

So if there's something

specific you would like me to look at, I certainly could do that.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as engaging in self-harm?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, it's something I probably have to look to -- back through the data and the depositions to see if there was any information specific to that.

Sitting here in this moment, do I have the numbers in my head? No.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or

Breathitt or Irvington or DeKalb or Harford were identified as being diagnosed with body dysmorphic disorder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, I would have to go back through my reports. So if there's something specific or a source of data that you want me to -- that you want to point to, I'm happy to look to it.

But I'd have to go back to all of the source documents.

Sitting here in this moment, do I know the exact number of students who would have been diagnosed with body dysmorphic disorder from each of those districts? No.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or

Page 462

Harford were identified as having issues with negative body image?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, you know, if there's specific data that you're referring to that you'd like me to look at, I can.

Otherwise, to answer that question as to whether that was something that I have, I'd have to go back through all of the source documents.

But I can't sit here and say, here is the specific number of students who would have been diagnosed with those things.

BY ATTORNEY KEYES:

Q.    Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being sleep deprived?

ATTORNEY YEATES: Object to the form.

THE WITNESS: What I would say is that the -- it would be very atypical of any data systems, and certainly not something I would typically ask in my typical interactions with the school district, because I know that that data would be -- could be difficult to produce.

Is there something in the source documents I reviewed for one of the districts or some of the districts that spoke to sleep deprivation, probably, but I would have to go through all of the source data to look at that.

So can I give you a specific number about any of those districts sitting here with you today about the number of students who are sleep deprived? No.

BY ATTORNEY KEYES:

Page 464

Q.    Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being diagnosed with anxiety disorder?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, I'd have to go back to all of the information that I reviewed to see if there was specific information about anxiety disorders for any of those districts.

BY ATTORNEY KEYES:

Q.    Can you tell me, from any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being treated for an anxiety disorder?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I'd have to

go back to the source data to -- to -- to see whether that was something, within each of those districts, that they reported.

But I don't have that number off the top of my head for any of those districts, no.

BY ATTORNEY KEYES:

Q.    Can you -- can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being anxious?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So, again, could that information have been in something I reviewed? Possibly.  I'd have to go back to every one of the source documents to see.  So I don't want to guess at that.

But if you're asking off the top of my head sitting here with

CONFIDENTIAL

Page 466

you today, do I know the numbers of students who may have been identified as being anxious? No.

And, again, I'll just restate that the data systems that exist typically would not be an accurate count of the number of students who feel anxious. That's not something that's -- I mean, sometimes you might have surveillance data or something along those lines.

But I would have to, again, look in the source documents to see if there was something available with that information.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as self-reporting that they felt anxious?

ATTORNEY YEATES: Object to

Page 467

the form.

THE WITNESS:  If you'd like me to look at a specific piece of data for a district, I'm happy to do that.

But I'd have to go through all the source information to see, for each district, if that was something that was within their documents.

BY ATTORNEY KEYES:

Q.    Well, you're the expert and you've offered opinions that these are all, quote, significant problems.

And so I'm trying to probe whether you have any data -- certainly you didn't include any data in your reports -- whether you have any data to quantify any of these -- any of these problems.

ATTORNEY YEATES:  Objection.

BY ATTORNEY KEYES:

Q.    So do you have any data to quantify any of these problems that are

specific to one of these six school districts?

ATTORNEY YEATES:  Objection to form.  Argumentative.  And misstates the reports.

THE WITNESS:  So I think I actually provided significant data around the mental health challenges that young people are experiencing.

And there's a variety of forms of data, as we've already gone over, including information from the directors of student supports and others who are directly involved with mental health supports for young people.

And they consistently reported high numbers of mental health concerns and, as we've already talked through, the impact of the defendants' social media platforms on mental health as providers of mental health

CONFIDENTIAL

Page 469

services in the schools.

I also indicated that we do look to national data to understand mental health challenges, especially where data systems are limited.

And I detailed that in my reports. And certainly in my general report, I spoke to that and drew on a lot of the national data with respect to mental health challenges in young people and indicated that I relied on other expert testimony or reports that describe, at length, the mental health challenges that young people are experiencing and their intersection with social media platforms.

So I actually think it's not accurate at all to suggest that I didn't have specific data to inform my opinions with respect to the mental health challenges that

Page 470

are experienced in the districts and their intersection with social media platforms.

BY ATTORNEY KEYES:

Q. Do you offer any opinion in your reports on what the measurable impact of your plan would be in any of the six districts?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So -- so you want me to summarize across all six districts?

BY ATTORNEY KEYES:

Q. Well, I'm happy to address any one of the six districts.

A. Okay.

Q. But you have offered reports for six districts.

And I want to know, in any of your reports for any of those six districts, have you offered an opinion on what the measurable impact of your plan will be if the strategic plan you're

Page 471

recommending is implemented by the district?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, look, with any long-term strategic plan that addresses a complex public health issue, it is -- it would be challenging to say this is going to be the exact percentage of decrease of social media use, for example, or, here is the specific or exact impact on mental health challenges.

I don't have a crystal ball. I can't look into the future and determine exactly what that's going to be.

So what I did in the reports is look at other public health frameworks, including the tobacco prevention effort, and I did note that if a multi-pronged approach, such as the tobacco effort, as

Page 472

well as other types of public health efforts were implemented, we would anticipate a steep and sustained decrease in the challenges, not only in social media use, but also in the challenges and the harms that have been experienced as a result of that use.

BY ATTORNEY KEYES:

Q.    For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who are diagnosed with depression would go down?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    That wouldn't be something that would be standard practice when you're proposing a strategic plan.

What I did do was overall indicate that we would expect a

steep and sustained decrease in the mental health challenges and in the harms to schools that are being experienced.

So I'll leave it at that.

BY ATTORNEY KEYES:

Q.    And are you able to offer any quantification of what this, quote, deep and sustained decline, that you project?

A.    Sure.  So the exemplar that we use, which is probably one of the best exemplars in the field of a concerted public health effort for something that's harming young people, was tobacco.

And over the 18-year period in that particular effort, there was a demonstrated 73 percent decrease.  It's detailed in the report.

So oftentimes when you're doing, you know, implementation of this type of sustained effort over a long period of time, you're not in a position to predict it's going to be exactly this

CONFIDENTIAL

Page 474

number of students.

I mean, I think it's -- it's honestly -- well, I don't want to criticize the question.

I just -- it's not something that would be typical to be able to say, and you're going to see this specific percentage of decrease in depressed students because of an intervention.

What you can say is that if you put your public health framework that's multi-component, based on evidence-based practices and programming, based on the best available science right now, you can expect to see a significant improvement and decrease of harm and risk to young people.

And that's very typical when you're talking about any public health approach to a significant harm for young people.

Q. For any of the six school districts for which you submitted reports, do your reports include any

estimate of the extent to which the number of students who are diagnosed with anxiety would go down if your plan were implemented?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, that would not be something that's typical when you're laying out this type of plan.

And, again, I don't have a -- a crystal ball to look into the future to say, here is exactly the precise number, or estimate, even, of students who would decrease in their anxiety.

What we would predict is that there would be a substantial decrease. And we draw on public health frameworks that do exist and have been tested, which is what you would do in implementation science, it's what you would do in the public health

field when you are dealing with a new -- new and evolving harm to young people.

We just don't have the data for past testing of that, because it's a new and evolving harm.  So we draw on former public health frameworks.

And, as I said, the percentage decrease that we saw within the best exemplar for that was 73 percent decrease in use.

BY ATTORNEY KEYES:

Q.    For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who are identified as being suicidal or engaging in self-harm would go down if your plan were implemented?

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Page 477

Q.    Same answer?

A.    So I'm happy to restate it again.

That we would not be able to predict with specificity because this is a new and evolving harm.  So what we would do in implementation science is rely on past implementation efforts that have addressed, successfully, the improvement in or the effectiveness of this type of multi-factor or multi-pronged approach to address a complex issue, which is exactly what I did in my reports.

Q.    For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who were diagnosed with body dysmorphic disorder or identified as having issues with negative body image would go down if your plan were implemented?

ATTORNEY YEATES:  Object to

Page 478

the form.

THE WITNESS:  Yes.  Again, we -- I indicated in my reports that there would be a steep and sustained, akin to the 73 percent decrease in the tobacco exemplar.

So that's typical of what you would do when you're proposing a public health effort that is relying on frameworks that have been successful in the past for a new and evolving harm.

It's typical of what you would do.  You would rely on the data, including quantitative data, which I did include in my report.  It's very difficult to predict specifically for each specific disorder for a new and evolving harm how a new public health approach would specifically alter those diagnoses that you're asking about.

BY ATTORNEY KEYES:

CONFIDENTIAL

Page 479

Q.    For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who were identified as being sleep deprived would go down if your plan were implemented?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    Again, yes. So when you consider this type of public health approach for a new and evolving harm, you look to existing successful public health approaches, like the tobacco effort, to reduce youth tobacco use.    And we saw a 73 percent decrease in that over time.

And so we pull from that existing science to apply it to the new approach for a new, evolving harm.

Because this is a new, evolving harm, you have to rely --

Page 480

and it's typical in the field to rely on existing public health approaches that have been successful.

BY ATTORNEY KEYES:

Q.   For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who were disruptive in the classroom or were disciplined for misconduct in connection with their use of social media would go down if your plan were implemented?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I think I'm very clear in the report that the disruptions would be expected to go down with the implementation of this strategic plan.

And if you're asking about specific estimates, what I include in the report is based on existing

Page 481

public health frameworks.  Because that is typically what you would use when you're predicting how a new, evolving harm framework, a public health framework to address that, would improve outcomes.

BY ATTORNEY KEYES:

Q.    And you've used the tobacco analogy, correct?

And you've said that there was a 73 percent improvement there, correct?

A.    I did say that.

If you want me to look to my report, I certainly can do that.  But that's the number that I recall sitting here.

Q.    If your plan were implemented by any of the six school districts, it would be impossible to quantify whether your plan is making a difference; because we have no data specific to any of these school districts about any of these problems, you can't

Page 482

come up with a percentage, correct?

ATTORNEY YEATES:  Object to the form.  Foundation.

THE WITNESS:  I totally disagree, actually.  And it's part of why we actually recommend a long-term plan that includes data infrastructure and a -- an evaluation.  That's what you would use to actually collect the data.

So as I've said, data are limited, schools are strapped right now to try to understand the impact and even get baseline information about the harms of social media.

They have been attempting their best to be able to measure the harms of social media.  But it's an external factor that has really been put upon schools to navigate, which is why it's necessary to build an evaluation structure, which I've laid out in

detail in the report, and to have a data system that actually can measure the outcomes that we're talking about.

This is why you wouldn't do this in a two-year effort. You have to have a long-term plan that actually allows for measuring.

So what we do, when we don't have -- or when we have limited data systems, is you rely on the sources of data that you do have, which is what, as you know, I did in my reports.

We relied on direct information from leaders who are actually contending with these issues every day in their schools, we relied on national data, we relied on experts who spend their -- have spent their careers, in recent years, trying to study and understand the impact of social media.

Page 484

That's the data that we've relied on.

BY ATTORNEY KEYES:

Q.    Your plan that you are recommending to each of the school districts is intended, in part, to deal with disruptions in the classroom in that school from students' use of social media in the classroom or at school, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So the plan is intended to address holistically the harms of social media.  And I have laid out that a part of those harms that has been well documented in the research literature are disruptions to classrooms.

And specific to the districts, it's very clear from the administrators, student support personnel and educators that disruptions are a significant

part of the harm in schools. Students just are not able to access the instructional material because they're consistently being disrupted by social media alerts and notifications and engagement and all of the features that keep them engaged for hours during when they're supposed to be learning in the school system.

BY ATTORNEY KEYES:

Q.    And those disruptions would be eliminated or significantly reduced if students were not allowed access to their cell phones or personal electronic devices during the school day, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I actually would have to disagree with that. Because, you know, we've seen some attempts at reducing cell phone use during the school day.  And they are incredibly challenging to

CONFIDENTIAL

Page 486

implement, as I noted throughout my reports.

We heard that from the school district leaders, both during my interviews with them and also from deposition data that -- and we know this, having watched this nationally at this point, there are many reasons why reducing cell phone time during the day is quite difficult.

And, frankly, even if you were to eliminate cell phone use during the day, which we've seen is virtually impossible for a variety of reasons, students are able to get around it with VPNs on their Chromebooks, they are able to bring burner phones, families are insistent upon students having a phone for safety reasons, et cetera, et cetera, it would still in no way suggest that if you were to eliminate cell phone use during

CONFIDENTIAL

Page 487

the day that they would -- that the disruptive behaviors would be eliminated.  No.

BY ATTORNEY KEYES:

Q.    Well, my question was about eliminated or significantly reduced.

A.    Okay.  I heard it.

Q.    Do you -- do you offer the opinion that a cell phone ban implemented by a school district would not significantly reduce distractions and disruptions from cell phone use in the -- in the school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I did not offer an opinion on that.

Frankly, in the field, I can tell you it's still an evolving question.  We still don't know the answer to that.  It is such a new area, that districts are attempting to implement cell phone bans, states are attempting to.

But what I can tell you is that there are a lot of challenges. And within the six districts, we heard that over and over for those that had attempted to -- because of social media engagement, right, because of the platform use, they've tried with the limited resources they've had. So they've had to make very difficult decisions. And some of those have had to be put towards locking up cell phones, for example. And even with that, they have consistently said that it remains a challenge.

So would it significantly reduce disruptions? Not from what I've heard to this point. And I think the data is still -- you know, it's unclear.

BY ATTORNEY KEYES:

Q. Have any of the six school districts, Tucson, Charleston, Breathitt,

CONFIDENTIAL

Page 489

Irvington, DeKalb or Harford, instituted a cell phone ban at any point from 2017 through the present?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So you're asking me to consider whether they've implemented one.  I know that across the districts there have been.  I'd have to go and look specifically into each district, just to make sure I'm recalling the specific attempts that they've had.

So I don't want to misstate which district it was.

BY ATTORNEY KEYES:

Q.   Well, do you know, sitting here, whether any of the six districts instituted a cell phone ban at any point since 2017?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  Again, to my

Page 490

recollection, at least one of the districts has attempted -- eliminating cell phones during the day.

I'd really have to go into the reports to look at specifically which district did what with respect to eliminating cell phones -- or attempting to eliminate them, I should say, during the day.

BY ATTORNEY KEYES:

Q.    Okay.  And for the school district you have in mind, I realize you don't know the name of the school district, when was that cell phone ban instituted?

A.    That's something I can't answer.

ATTORNEY YEATES:    Object to the form.

BY ATTORNEY KEYES:

Q.    And was there any testimony by anyone from that school district about

CONFIDENTIAL

Page 491

the results of the cell phone ban?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Honestly, I'd have to go back and look through the testimony.  So if you have something you'd like me to look at, I'm happy to look at it.

But we're talking about six districts, lots of people I've spoken with, lots of depositions I've read, lots of school district documents.

So I wouldn't feel comfortable stating, you know, a specific from an arbitrary school district at this point.  I would need to look at the school district data, which I did, but I would have to look again.

BY ATTORNEY KEYES:

Q.    Well, did you undertake, in preparing your opinions in this matter, to see what school leaders said in their

Page 492

deposition about the results of a cell phone ban?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I was, as you know, not in control of what was asked during the deposition.

So the question, I think, is a little confusing. Because it suggested I attempt to understand, I think. So maybe I'm not understanding your question. Maybe you can restate it or ask it again.

BY ATTORNEY KEYES:

Q. Did you undertake, in preparing your opinions in this matter, to see what school leaders said in their deposition about the results of a cell phone ban?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I looked holistically at all of the

deposition data that is listed in my source documents from district leaders and administrators and student support personnel across the districts to understand their experience of platform use, the defendants' platform use.

Some of the testimony included information about cell phone bans. So it would have been something that I considered in forming my opinions.

ATTORNEY YEATES: Counsel, can we take a break?

ATTORNEY KEYES: Sure. Let me just try to finish up this topic.

BY ATTORNEY KEYES:

Q. Did you see any testimony from anyone in any of the six districts about the results, as they described them, of instituting a cell phone ban?

ATTORNEY YEATES: Object to the form.

Page 494

THE WITNESS:  I'd have to go back and look at the information.

BY ATTORNEY KEYES:

Q.    Did you discuss a cell phone ban with any of the so-called key informants you spoke with in any of the six districts?

ATTORNEY YEATES:  Object to the form.  And the use of "so-called."

THE WITNESS:  I was just going to say, that's an interesting term "so-called." They were key informants.  These are the leaders of the school districts that are at issue here. So they're real people who are experiencing this every day.

So can you restate the question?  That term threw me off also.

BY ATTORNEY KEYES:

Q.    Well, you've called them -- you've referred to them as key

Page 495

informants, right?

A.    Correct.  It just --

Q.    Okay.  And the folks --

A.    -- felt like a dismissive term.  That's all.

Q.    I'm not dismissing anything. I'm trying to use your terminology.

You have referred to them as so-called key informants.

A.    I've referred to them as key informants.

Q.    Okay.  In any of your conversations with any of these key informants, did you discuss with them cell phone bans?

A.    I'd have to go back to the interviews.  But I do recall, in discussion, that there was discussion of cell phone -- attempts to remove cell phones from students.

That's about as good as I'm going to be able to give you without actually going back to the specific data. Because I don't want to misrepresent what

Page 496

I spoke with them about.

Q.    And I asked you before about any cell phone bans instituted by the school districts.

Did you look for any testimony from any school district employees about cell phone bans instituted at a school level?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, I mean, I think the question is interesting.  I didn't look for specific information, as you're describing it.

I looked to the depositions in -- in totality, right.  I looked through the depositions to understand the impact of the defendants' platforms on a variety of factors that I speak about in my report.

BY ATTORNEY KEYES:

Q.    So you didn't say, hey, I'd

like to know what the -- what the school districts did in terms of instituting a cell phone ban or not; that isn't an area of inquiry that you focused on?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   I disagree with the kind of underlying suggestion that it's not something I focused on.

What I asked about when I spoke with interview -- interviewees, key informants interviews, was the measures that they were taking in their schools to address the harms of the social media platforms.

BY ATTORNEY KEYES:

Q.   Do you recall any testimony from any school district employee about the results of cell phone bans at the school level?

A.   So, again, I would have to go back to the actual testimony or

Page 498

depositions to see if that information was in there.

Q.    Did you discuss with any of the key informants any cell phone bans that have been instituted at the school level?

A.    So, again, I would have to go back.  Specifically, you're asking across six districts, multiple people per district.  So it would be something I would have to go back.

I can go back through the key informant information that's in the reports.  But I'd have to go back to that.

Q.    Well, you include in your reports some quotes that you attribute to key informants, not by name but by category, right?

A.    As would be typical practice, I included information that was gathered during the key informants.  I included some quotes, if they were illustrative of the information I was

sharing in the report.  That's correct.

Q.    So separate from whatever you put in the reports, sitting here today, do you have a recollection of speaking with any of these key informants about the results of any cell phone ban instituted at the school level?

A.    I would have a hard time recalling, because you're talking about the distinction between a district level and a school level.

So I don't think I can answer that question to my recollection.

ATTORNEY KEYES:  Why don't we take a ten-minute break?

THE WITNESS:  Okay.

VIDEO TECHNICIAN:  The time is 10:05 a.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time

Page 500

is 10:18 a.m., and we are on the record.

BY ATTORNEY KEYES:

Q.   Dr. Hoover, have you ever made a request to any of the defendants in this case to discontinue any feature or function on its platform?

ATTORNEY YEATES:   Object to the form.  And not case specific.

THE WITNESS:   Any -- that would not be my role.

BY ATTORNEY KEYES:

Q.   Have you ever made a request to any defendant in this case to modify any feature or function on its platform?

ATTORNEY YEATES:   Object to the form.  And not case specific. You've already used that time.

THE WITNESS:   Not that I'm aware of.

BY ATTORNEY KEYES:

Q.   Have you ever publicly advocated, any speech or presentation or article, that any of the defendants'

CONFIDENTIAL

Page 501

platforms not be made available to middle school students?

ATTORNEY YEATES:  Object to the form.  And not case specific. You're over your time allotted by Judge Kang.

BY ATTORNEY KEYES:

Q.    You can answer.

A.    So what I would say is I've given, you know, over 600-plus presentations.  So it's hard to recall the specific details of every one of those presentations.

And I wouldn't see it in, you know, my role to advocate in a way that you're suggesting.

Q.    So can you think of any instance where you've publicly advocated, in any speech or presentation or article, that any of the defendants' platforms not be made available to middle school students?

ATTORNEY YEATES:  Are you going to continue to ask

non-case-specific questions today during the case-specific part of the deposition, which you reserved for today?

ATTORNEY KEYES:  I am going to ask my questions.  This is consistent with the court's order.

ATTORNEY YEATES:  This is not --

ATTORNEY KEYES:  She can answer.

ATTORNEY YEATES:  This is not consistent.  How is this a case-specific question?

ATTORNEY KEYES:  It falls squarely within lots of the statements she's made in her reports, if she's offering these opinions as to these six school districts.

BY ATTORNEY KEYES:

Q.   So you can answer.

ATTORNEY KEYES:  I'm not going to argue with you.

Page 503

ATTORNEY YEATES:  So today you have six hours, one hour for each of the districts.  So which district does this question relate to?

ATTORNEY KEYES:  Judge Kang did not limit us to one-hour blocks for each of the districts. He gave us 11 hours and explained his reasoning for how he arrived at the 11 hours.

We're going to finish our deposition within that 11 hours. But we are going to ask our questions.

ATTORNEY YEATES:  Which case-specific report are you asking about?

ATTORNEY KEYES:  I'm asking about all six of the reports about these school districts.

ATTORNEY YEATES:  What is case specific about that question?

ATTORNEY KEYES:  Melissa,

Page 504

I'm not going to argue with you. You can -- you can object.

If you want to instruct her not to answer, you can do that. I don't think it's advisable.

But I am going to ask the questions I have.

ATTORNEY YEATES: Okay. Why don't we take a break and call the judge, then?

ATTORNEY KEYES: Sure.

VIDEO TECHNICIAN: The time is 10:21 a.m. We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 10:26 a.m. We are on the record.

BY ATTORNEY KEYES:

Q. Dr. Hoover, have you ever publicly advocated, in any speech,

presentation or article, that any of the defendants' platforms not be made available to middle school students?

ATTORNEY YEATES:  Object to the form.  And not case specific.  You're over your time allotted by Judge Kang.

THE WITNESS:  So, as I've said, I've given hundreds of presentations.  So it would be virtually impossible for me to remember every single thing that I said in the presentations.

I likely -- well, I don't want to make a guess at it.

But have I spoken, in my work with school districts, about the harms of social media?  Yes.  Would I necessarily consider it within my role to advocate for what you're talking about or have I said that before?  I can't recall that.

BY ATTORNEY KEYES:

Page 506

Q.    Have you ever publicly advocated, in a speech or presentation or article, that any of defendants' platforms not be made available to high school students?

ATTORNEY YEATES:  Object to the form.  And not case specific. You're over your time allotted by Judge Kang.

THE WITNESS:  I don't think that that's -- I can't recall, when thinking back to the hundreds of presentations I've given, whether that's something I've specifically advocated for.

BY ATTORNEY KEYES:

Q.    Have you publicly advocated, in any speech, presentation or article, that social media not be made available to middle school or high school students?

ATTORNEY YEATES:  Object to the form.  And not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: Again, I don't recall everything I've said in the hundreds of presentations that I've given.

So I can't recall if I've specifically advocated for what you're asking about.

BY ATTORNEY KEYES:

Q. Have you ever publicly advocated, in any speech, presentation or article, that any of the defendants' platforms discontinue or modify any feature or function?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: I'd be reluctant to try to recall the specific detail about a function of a social media platform from the hundreds of presentations that I've given, because I don't want to misspeak.

CONFIDENTIAL

Page 508

BY ATTORNEY KEYES:

Q.    During your work on this matter, have you advocated to any of the six school districts that they block students' access to YouTube on their network?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That would have absolutely fallen outside of my role in this -- in this engagement.

My role with these districts, as I think you know, was to get an understanding of their experience with the defendants' platforms in the school environment and its impacts there, as well as on their students, and to develop an aligned strategic plan according to the harms.

BY ATTORNEY KEYES:

Q.    During your work on this

Page 509

matter, have you advocated to any of the six school districts that they block students' access to YouTube on school district-issued devices?

A.    Again, that would have fallen outside of my responsibilities and role on this, and I think would have been, actually, quite inconsistent with what I was intending to do here, which was to get an understanding of the impact of the defendants' platforms in their schools and on their students, and then develop a prevention and mitigation strategic plan for them.

So that would have not been a part of my role.

Q.    During your work on this matter, have you advocated to any of the school districts that they pull down their YouTube channel for purposes of communicating with students, families or the community?

A.    So, again, that would not have been part of my role in working with

these six districts to understand the impact of social media platforms, the defendants' platforms in their schools and on their students and to develop a strategic plan.

Q.   During your work in this matter, have you advocated to any of the school districts that they pull down their social media accounts for purposes of communicating with students, families or the community?

A.   I want to clarify something, because I actually -- I'm wondering.  I want to make sure I'm interpreting your question correctly.

When you say are you -- have you advocated to the school districts, I'm -- I've interpreted that, for maybe the last three questions or so, however often you asked that, was I doing that actively when speaking with the school districts.

Are you asking if that was in my strategic plan and report or did I

Page 511

advocate to them in the course of discussion with them?

Because I may have misinterpreted your questions.

Q.    Well, let's take them one at a time.

A.    Okay.

Q.    In any of your conversations with any of the people you identify as key informants for the six school districts, did you urge them to block students' access to YouTube on their school district network?

A.    Okay.  So I understand that you're asking that about the conversations that I had during key informant interviews, and did I urge them to act during those, with respect to the specifics that you mentioned across all of the interviews.

My role -- that would have been inconsistent with my role in interviewing them to understand the impacts of social media and to understand

CONFIDENTIAL

Page 512

their comprehensive school mental health system.

When I go in to do key informant interviews, I'm not there serving to advocate for them to do A, B, or C or to, you know, address -- I'm going in to inquire about their experiences.

Q.    In any of your conversations with any of the people you identify as key informants for the six school districts, did you urge them to block students' access to YouTube on school district-issued devices?

A.    Again, that would have been inconsistent with my typical process for conducting key informant interviews, which is to understand from them what the impacts of social media are and the platforms are on their schools and on their students and to then go and develop a report after that.

So my role would not have been to urge them to do something with

their school district YouTube site, for example.

I think it was a multi-part question. But, no, I did not urge them to do something as part of my interview, nor would that be consistent with my practices doing key informant interviews.

That's just not what you do, as a scientist, when you're going in to research or understand a district.

Q. So in any of your conversations with any of the people you identify as key informants for the six school districts, did you urge them to bring down their YouTube channel and not use it to communicate with students, parents or the community?

ATTORNEY YEATES: Object to the form. And asked and answered.

THE WITNESS: So when you're going in as a consultant, as a scientist to talk with school districts, to inquire about their experiences to inform a strategic

Page 514

plan, my role would not have been to urge them to take action in that moment. That was not my role with these school districts.

My role was to do a process of scientific inquiry with them, which is what I did.

BY ATTORNEY KEYES:

Q. And in any of those conversations with any of the people you say are key informants, did you encourage them to stop having their school districts use social media to communicate with students or parents or the community?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, as I spoke with the key informants, through my typical process of inquiry to understand the impact of the platforms on students and on their schools, my role would not have been to urge them to do

Page 515

anything specific with the platforms in their schools.

So that wouldn't have been something that I typically would have done in that type of interview, no.

BY ATTORNEY KEYES:

Q.    So in any of your speeches or any of your presentations or any of your articles, have you ever advocated that any school districts block students' access to YouTube on its network, block students' access to YouTube on school district-issued devices, bring down its YouTube channel and stop using it to communicate with students, faculty, parents or the community, or stop using social media to communicate with students; ever -- ever advocate for any of those things?

ATTORNEY YEATES:  Object to the form.  And not case specific. You're over your time allotted by Judge Kang.

CONFIDENTIAL

Page 516

THE WITNESS:  So, again, you're asking me to remember the details from over, you know, 25 years of hundreds of presentations.

So I want to be, you know, careful about saying I never said something specific to a specific platform with -- you know, with districts.

What I can -- well, so the answer is, I can't recall if I said anything specific to what you're asking about in the hundreds of presentations that I've done.

BY ATTORNEY KEYES:

Q.    Have you offered any opinion, in any of the reports that you've issued in this case, that defendants' platforms not be made available to middle school or high school students?

A.    So the opinions that I

Page 517

offered were related to the strategic plan, which I can go through the specific -- I'm happy to go -- is there a specific district you'd like me to look at to go through --

Q.    Well --

A.    -- the plan.

Q.    -- I assume you're familiar with your reports.

A.    I am.

Q.    You prepared them and you reviewed them last night.

My question is, in any of those reports, did you offer an opinion that defendants' platforms not be made available to middle school or high school students?

A.    So I'm very familiar with my report. And I've written them.

But there's also several reports and there's six districts. And I was responding to multiple experts in the rebuttal.

So I just want to make sure

CONFIDENTIAL

Page 518

that I'm stating -- I want to make sure, because you're asking specifically whether I spoke about this in my opinions.

So did I ask them to limit their use of a specific platform in -- for middle or high school students? Did I use that terminology? Is that what you're asking?

Q. I'm not asking about terminology.

I'm asking you, in any of your reports --

A. Okay.

Q. -- that you've prepared in this case, have you offered an opinion that defendants' platforms should not be made available to middle school or high school students?

A. So I'll answer -- because the question is general, I can answer generally that I don't think I made that broad sweeping of a recommendation that the platforms not be available to them.

Page 519

What I think I've done is clearly lay out the harms of students' personal social media use and the harms, then, that causes both for schools, in terms of disruption, sleep deprivation for students, et cetera, and for students.

Q.    In any of the reports that you've prepared in this case, have you offered any opinion that any of defendants' platforms discontinue or modify any particular feature or function?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    So to be clear, my role was to come up with a strategic plan for schools and for districts.

So if you're asking about modifying the features of the platforms, again, I'm not a tech expert, but my understanding is the ability to do that usually

Page 520

resides within the defendants' organizations themselves.

So I don't know that I would have made a recommendation to the school districts to say, for example, YouTube needs to change their settings, their features, their design. That would be up to the organizations.

BY ATTORNEY KEYES:

Q. You said you don't know whether you would have. My question is very specific about the reports that you did prepare.

In any of the reports that you prepared in this case, did you offer an opinion that any of the defendants' platforms should discontinue or modify any particular feature or function?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That would not have been something I would have done, because I was offering

opinions for the school districts, in terms of the strategic plan.

So let me back up, because I want to -- I want to look to the opinions that were related to the harms, because I want to just make sure that I'm comprehensively -- hold on. Let me go back to the general report, which is in Binder 1.

And if you have a specific opinion in mind, feel free to point me to it. But otherwise I'm just going to look through, since you're asking about my opinions, which there were multiple across multiple reports.

BY ATTORNEY KEYES:

Q. Well, I've reviewed your reports carefully, and there is no such opinion.

But I want to make sure you're not disagreeing. That's why I'm asking the question.

Page 522

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So what I can say, I'm looking -- again, I'm looking at my general report, May 16, is that I offer opinions that are related to the real and observable harms.  And I do speak, in those opinions, about the design and the engagement of the platforms themselves being harmful to students.

So my opinions are related to the facts that demonstrate the harm, the cause of the harm  I then speak about.  Because of the harm, these are the opinions being offered to develop a strategic plan; this is what I think schools need to do in response to that.

BY ATTORNEY KEYES:

Q.   Dr. Hoover, we have limited time, and I need you to answer the questions I ask.

Page 523

My question was not about, hey, tell me what you said in your reports. And I don't need you to keep telling me what you said in your reports. I just want you to answer my question.

My question was, in any of the reports that you prepared in this case, did you offer an opinion that any of the defendants' platforms should discontinue or modify any particular feature or function; yes or no?

ATTORNEY YEATES: Object to the form. And the speech. Dr. Hoover is doing her best to answer your question.

THE WITNESS: So I was about to say, I'm doing my best to answer the question. And I didn't see it as a yes-or-no question, because I'm really thinking through the opinions that I offered and want to be really precise about whether that's something I offered in the context

of the opinions, which is why I've gone through at least -- you know, respecting time, just going through one of, I don't know, 20 reports -- I don't know how many exactly it is. But it's a lot of reports that I had to write.

So to the question did I specifically recommend -- do you want to rephrase -- or not rephrase but just restate the --

BY ATTORNEY KEYES:

Q. I'm not going to rephrase it.

A. Not rephrase --

Q. I'm going to --

A. -- that's why I said restate.

Q. I'll repeat to you again. But, again, just please answer my question.

My question is, in any of the reports that you prepared in this case, did you offer an opinion that any

of the defendants' platforms should discontinue or modify any particular feature or function?

ATTORNEY YEATES: Object to the form. And argumentative.

THE WITNESS: So, again, I'm doing my best to answer the questions. And I just want to be thorough with my response and make sure I'm understanding your question.

BY ATTORNEY KEYES:

Q. I'll take that as a given for every answer you give me. So you don't need to tell me that anymore.

A. Okay. Well, then, likewise, I would say I know, when you suggest, answer your question, I am just reminding you that I am doing my best to answer the question.

So I don't think in my opinions that I have suggested that -- given that my role in the opinions here was around strategic planning for

schools, I don't think I'm offering an opinion that the social media companies change their design.

Do I speak to that in my report about the design features and how they harm children?  Yes.

Q.    In any of the reports that you've issued in this case, have you offered an opinion that the defendants in this case should be required to do something or should be prohibited from doing something?

A.    So that's an interesting question.

I mean, I would argue that I've spoken to the design features of the social media platforms and the harms that they've caused.  And inherent in that, I've indicated that the design features are what are causing the harm.  And that would include things like, you know, parental monitoring not being in place and age restrictions not being verifiable, et cetera, which is what's

Page 527

implied in the opinions here.

So I'm talking -- and then I go into much greater detail in the report about that. So it's inherent in the opinions that I've offered.

I don't know how to answer --

Q. When you say it's --

A. -- beyond that.

Q. -- inherent in your opinions, please identify for me anything specific that you said the defendants should be required to do or should be prohibited from doing.

A. There's nothing that states they should be required or prohibited, because my role was to look at and identify the harms, which I did, which are specific to the features and the design of the platforms and how they harm young people.

So my opinions are specific to the evidence for those harms related to the features.

CONFIDENTIAL

Page 528

Look, I don't have, you know, control over what the social media companies are doing at this point.  So my -- what I've offered is opinions about the harm that they are causing to young people and what school districts need to do as a result of those harms.  That's -- that's my role.

Q.    When did you first become the co-director of the National Center for School Mental Health?

ATTORNEY YEATES:  Object. Not case specific.  You're over your time allotted by Judge Kang. And we covered this yesterday.

THE WITNESS:  So I first became the co-director of the National Center in 2010.

BY ATTORNEY KEYES:

Q.    And you stopped serving as the co-director of the National Center for School Mental Health on June 1st, 2025.

Who, if anyone, succeeded

you or replaced you as co-director?

A.    So --

ATTORNEY YEATES:    Same objections.

THE WITNESS:    So the structure of the National Center was modified slightly when I retired, so that my co-director for the last 15 years, Dr. Nancy Lever, became executive director of School Mental Health and then we identified two new co-directors, Dr. Jill Bohnenkamp and Dr. Brittany Patterson.

BY ATTORNEY KEYES:

Q.    Did you show a draft of any of your reports to Dr. Lever, Dr. Bohnenkamp or Dr. Patterson?

A.    Absolutely not.

Q.    Did you show a draft of any of your reports to anyone who was a director or an officer or an employee of the National Center of School Mental Health?

CONFIDENTIAL

Page 530

A.    Absolutely not.

Q.    Has anyone at all at the National Center of the School for Mental Health seen your reports in this case?

A.    Nobody has seen my reports in this case, as far as I'm aware, other than me and counsel, and then who counsel would have shared it with, you.

Q.    And why do you say "absolutely not," you did not show it -- the drafts to anyone who was affiliated with the National Center for School Mental Health?

A.    Because it was part of my agreement, in serving as an expert, that I not share information about this with my colleagues.  And so I adhered to that.

Q.    Does the National Center for School Mental Health have a website?

A.    Yes.

Q.    Does the website have any discussion about the impact of students' use of social media on schools or the school environment?

Page 531

ATTORNEY YEATES:  Object to the form.  Not case specific.  You're over your time allotted by Judge Kang.

THE WITNESS:  So does our website, which has a lot of tabs and a lot of resources on there, does it have anything specific to the impact of social media?

BY ATTORNEY KEYES:

Q.    Does the website have any discussion about the impact of students' use of social media on schools or the school environment?

ATTORNEY YEATES:  Same objections.

THE WITNESS:  I would honestly have to go through all of the -- you know, our website is constantly updated -- I shouldn't say constantly updated.  It's updated regularly.  And I'd have to go through to see what's on the website and through the documents

on the website to be able to answer that question.

BY ATTORNEY KEYES:

Q.    Does the National Center for School Mental Health publish reports?

ATTORNEY YEATES:  Same objection.

THE WITNESS:  So the National Center is involved in contributing to reports and we contribute to peer-reviewed literature.  So we've certainly contributed to reports.

BY ATTORNEY KEYES:

Q.    Has the National Center for School Mental Health published any reports that discuss the impact of students' use of social media on schools?

ATTORNEY YEATES:  Object to the form.  Not case specific. You're over your time allotted by Judge Kang.

THE WITNESS:  So you have to understand our National Center has

been in existence for 30 years and we've produced a lot of reports and documents over time.

So I can't say to you whether any of those reports have any mention of the impact of social media, that you're asking me to remember a whole series of reports.

BY ATTORNEY KEYES:

Q.    Well, in preparing your opinions and reports in this case, did you go to any repository to see whether the National Center for School Mental Health has published any reports that discuss the impact of students' use of social media on schools?

A.    So as I laid out in the report, my methodology was to do a standard literature review.  And any of the sources that I used in forming the opinions were in the report.

To my recollection, there was not a National Center for School

Page 534

Mental Health report that I included in those source documents.

Q.    In your reports, you say that the National Center for School Mental Health has partnered with the U.S. Department of Health and Human Services, the Substance Abuse and Mental Health Services Administration, the Centers for Disease Control and Prevention and the U.S. Department of Education on, quote, multiple initiatives.

Did you discuss any of those initiatives in any of your reports in this case?

A.    If I need to answer specifically, I'd have to go to the report.

But what I can say is, to my recollection, I recall speaking about SAMHSA evaluation practices, as one example, when drawing upon best practices for school mental health evaluation.

So that would be an example of where I would have referenced work

Page 535

that we had done with the Substance Abuse Mental Health Services Administration in the report.

Frankly, I speak to my years of experience throughout the report.  And a lot of it is informed by those partnerships with federal partners and certainly state agencies, because this is the work we do.

So it's hard to tease apart, you know, did you mention a specific initiative, because a lot of the work that we do with the Department of Education, with SAMHSA, with HHS, and others, is really woven into, you know, decades' worth of experience.  And that did inform the entire report.  It is one of the sources I drew upon.

Q.    Did any of the partnerships that you mentioned as being between the National Center for School Mental Health and the U.S. Department of Health and Human Services, the Substance Abuse and Mental Health Services Administration,

Page 536

the Centers for Disease Control and Prevention or the U.S. Department of Education target the issue of the impact of students using social media on schools?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's a very broad question.  And I'll answer kind of equally broadly.

The -- the efforts that we've done in partnership include efforts to improve comprehensive school mental health systems across the United States.  And in those efforts, when we are improving mental health systems over the last several years, there is no doubt that social media would have been a part of something that school -- schools and districts are attempting to navigate and address and mitigate the harms of.

BY ATTORNEY KEYES:

Q. Can you identify any initiative between the National Center for School Mental Health and these agencies that you've listed that targeted the impact of students using social media on schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I would say is that when we're -- especially thinking about recent years, when we've been gaining more and more evidence about the harms of the defendants' platforms on young people's mental health in schooling, when you look to -- I mean, you're asking about specific initiatives.

I can go into specific initiatives that we've been involved in, like Project AWARE, you know, comprehensive school safety initiatives with the

Page 538

National Institute for Justice, the school-based mental health professionals, services across the state, those are grants that are awarded to states.

There are many initiatives that we've been involved in partnering around. And inevitably those address if they're looking to enhance either the workforce pipeline or school mental health systems in states and districts. Because social media has such an impact on the mental health of young people and on schooling, school districts would have been addressing those within the context of those initiatives.

BY ATTORNEY KEYES:

Q. Ma'am, my question was, can you identify an initiative between the National Center for School Mental Health and these agencies that you've listed that targeted the issue of the impact of

Page 539

students using social media on schools?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  I think I just did.

BY ATTORNEY KEYES:

Q.   The initiatives you just described targeted the issue of the impact of students' use of social media on schools?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I suppose it's an interesting question, because you'd have to define what you mean by "targeted."

Targeted in -- you know, in the way that I think about it as a scientist working with schools, as somebody who consults with schools to improve their services, means that the efforts that they are being supported -- through technical assistance, through

Page 540

funding, some of the grants that I mentioned, that part of what they're targeting could include social media.

So I answered and gave you several specific examples.

BY ATTORNEY KEYES:

Q.    You say in your reports that as the co-director of the National Center of School Mental Health, you've co-hosted the Annual Conference on Advancing School Mental Health for 15 years.

Your report doesn't identify any program or presentation or paper that was made at this annual conference about the issue of students using social media or the impact of that use on schools.

Can you identify for me any program or presentation or paper that addressed that topic?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  In the 30 years of our conference?  I'm

happy to go back and look through the program booklets for each of them.

BY ATTORNEY KEYES:

Q.    Well, can you -- can you identify one for me now?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.

And just to be clear, we usually have over 100 sessions in each of our conferences.  So I'd have to go back to the program booklets to look at that.

BY ATTORNEY KEYES:

Q.    Did any program or presentation or paper that was made at any of these annual conferences discuss a strategic plan for how schools should address the consequences of students using social media?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  I can't answer

Page 542

that.  I wouldn't know offhand, from several years of conferences, if a specific presentation addressed that.

BY ATTORNEY KEYES:

Q.    You also say in your reports that you co-hosted a pre-conference school mental health summit.

And your reports doesn't identify any program or presentation or paper that was made in any of these pre-conferences about the issue of students using social media or the impact of that use on schools.

Can you identify for me any such program or presentation or paper that touched on those topics?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'd have to go back to the research summit information to know if those were presented.

So the answer is no, can I,

sitting here with you today, name every paper or anything that was presented specific to social media?  No.

BY ATTORNEY KEYES:

Q.    Did any program or presentation or paper that was made at this pre-conference summit discuss a strategic plan for how schools should address the consequences of students using social media?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  As I've said, I cannot tell you the details of the presentations from 12 years of research summits and 30 years of the conference.

BY ATTORNEY KEYES:

Q.    Did you yourself present, at any of these conferences or pre-conference summits, a strategic plan for how schools should address the consequences of students using social

CONFIDENTIAL

Page 544

media?

A.    No, I would not have presented that.  I've not presented that at the conference or at the research summit.

And that honestly -- if I may finish -- I often was serving in a host role with other people presenting for the research summit.  So we try to leave space for others in the field to present as well.

Q.    Well, you say you've delivered over 600 professional presentations.

In any of those 600 professional presentations, have you presented a strategic plan for how schools should address the consequences of students using social media?

A.    I think we talked about this yesterday.  But I'm happy to revisit that.

First of all, I want to preface by saying it's hard to remember

Page 545

the details from over 600 presentations.

Do I recall presenting a comprehensive strategic plan to address the impacts of social media in my public presentations?  No.

Q.    In your reports, you reference a few materials that you've prepared over the course of your career. And one of them that you refer to is the National School Mental Health Best Practices: Implementation Guidance Modules For States, Districts, and Schools.

That's a series of documents that consists of two guides, one for participants, one for trainers, and a series of PowerPoint presentations.

Did I get that right?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  Essentially. There's also -- yes, essentially. That's a -- that's a reasonable description of what that is.

Page 546

BY ATTORNEY KEYES:

Q.    Okay.  And did you participate in drafting them?

ATTORNEY YEATES:  Same objections.

THE WITNESS:  I did participate in drafting them.

BY ATTORNEY KEYES:

Q.    Okay.  So focusing on the training guide for trainers, does that guide discuss the impact of teen use of social media on schools?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Do you have the guide for me to read through?  Because it's been a few years since it was developed.  So I would not want to misspeak and say that it doesn't -- you know, does or doesn't contain specific information.

BY ATTORNEY KEYES:

Q.    I have limited time.  And I

don't have the time to let you scroll through long documents.

But sitting here today, can you think of anything in that guide that discusses the impact of teen use of social media on schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  Again, those are really quite comprehensive modules.  So I wouldn't be comfortable saying specifically the content that's in them.

They are addressing the, you know, different components of comprehensive school mental health systems.

BY ATTORNEY KEYES:

Q.    I had asked you about the guide for trainers.  Now I want to turn to the guide for participants.

Can you think of anything in the guide for participants that discusses the impact of teen use of social media on

schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  So, again, I'm happy to look through the documents, if you have them.  It sounds like that would be beyond the time limits you have.

But I want to be cautious about trying to remember all of the details of the content in either the trainer's or the participant's manuals.

And, you know, what I can tell you is that these are manuals that cover the broad core components of quality school mental health systems.  So I can leave it at that.

But if you want me to get into kind of the details of what's actually in each of those set of multiple modules that were developed a few years back, I'd

Page 549

probably want to look to the actual documents.

BY ATTORNEY KEYES:

Q.    And then turning to these six PowerPoint presentations, do any of those PowerPoint presentations that you participated in drafting discuss the impact of teen use of social media on schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  Again, I'd probably need to look through them.  If you're asking me to remember what we developed specifically, you know, in several modules and whether it contained specific information about social media, I'd have to look at the documents.

BY ATTORNEY KEYES:

Q.    Can you think of anything, sitting here right now, in any of those Power -- PowerPoint presentations that

Page 550

discusses the impact of teen use of social media on schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  So I would have difficulty recalling specifically all of the details of multiple modules that were developed several years ago, given that we develop many documents and do many presentations.

So I'm just cautious to speak to the specifics of, you know, a -- if I recall, it was hundreds of slides for each module.

So it gets a little complicated to jog my brain for a specific topic within those.  I'm happy to look through the documents.

BY ATTORNEY KEYES:

Q.    In your reports, you reference your scholarship, including

Page 551

three school mental health intervention manuals.

Can you identify for me what those manuals are?

A.    I can.  I can reference my CV to get the exact titles.

But I'll give you -- so there's the second edition of the Cognitive Behavioral Intervention for Trauma in Schools.  There's an adaptation of that for Native American Alaska native youth.  And there's also an intervention called Supporting Transition Resilience of Newcomer Groups, or STRONG, which is to support the coping skills of newcomer students.

Q.    Would you pull out your August 1st, 2025, CV, which was previously marked as Exhibit-4?

A.    Got it.

Q.    And can you identify for me on your CV where those manuals are listed?

A.    So they are listed under

Page 552

books on Page 31 of the August 1st CV.

Q.    Okay.  And there are three items listed under the books section?

A.    Correct.

Q.    Those are the three school mental health intervention manuals you're referring to in your reports?

A.    Correct.

Q.    Okay.  Do any of those three mental health intervention manuals discuss the impact of teen use of social media on schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  So to be clear, the intervention manuals are specific to specific topic areas.

So the Cognitive Behavioral Intervention for Trauma in Schools manual and its adaptation were specific to addressing trauma in students.

And the Supporting

Page 553

Transition Resilience of Newcomer Groups was specific to addressing their transition to new communities, new countries, new schools.

Whether we spoke in the manuals about social media use, I want to say it was probably included as examples.  But, again, these are, you know, hundred-plus -- I think the STRONG manual is about 200 pages.

So to my recollection, we use social media -- we may use social media as an example, certainly when it's being trained in.  It might be something that comes up because it's a common experience of the age range, because we're talking about K through 12 students in those.

So in those manuals and in this type of cognitive behavioral intervention, you're often

CONFIDENTIAL

Page 554

bringing in real-world examples, including students' engagement with social media.

I can tell you for the CBITS manuals, the first edition of that was in the early 2000s, likely before we knew about, certainly to the extent that we do today, the harms of social media and likely before students were engaging.

And one of the attempts in the second edition -- iteration of it was to not make too many changes. But we may have included examples related to social media in that. I would have to go back and look through the manual.

BY ATTORNEY KEYES:

Q. My question was very specific. I didn't ask whether these manuals discussed social media.

A. Oh, I must have --

Q. And I didn't ask whether they discussed teens using social media.

Page 555

My question was, do any of those three manuals -- mental health intervention manuals discuss the impact of teen use of social media on schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  Not that I'm aware of, because that would not have been the intention of group cognitive behavioral intervention manuals.  That's not the purpose of those manuals.

BY ATTORNEY KEYES:

Q.  You discuss in your reports being an investigator and co-investigator on various grants.

Did any of the grants for which you are a principal investigator study the impact of students' use of social media on schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  So the grants on which I was a principal

Page 556

investigator looked at comprehensive school mental health systems among other things.

And as part of comprehensive school mental health systems, we do consider factors that impact young people. So is social media a part of that? Certainly.

BY ATTORNEY KEYES:

Q. Well, did any of the grants for which you are a principal investigator focus on the issue of the impact of students' use of social media on schools?

A. Exclusively?

ATTORNEY YEATES: Object --

THE WITNESS: Go ahead.

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Did any of the grants on which I'm a principal investigator or co-investigator -- were you asking PI or co-I?

BY ATTORNEY KEYES:

Page 557

Q.   I was asking about PI.

A.   PI.

So any of the grants that I was a PI on, did they look at the impacts of social media exclusive to all other factors?

Q.   No.

Did they look at the impacts of students' use of social media on schools?

ATTORNEY YEATES:   Same objections.

THE WITNESS:   So, arguably, the grants that I was PI on that were looking broadly at school mental health systems would have -- social media would have fallen under that umbrella, so.

BY ATTORNEY KEYES:

Q.   How about the grants for which you were a co-investigator as opposed to a principal investigator?

ATTORNEY YEATES:   Object to the form.   And not case specific.

Page 558

THE WITNESS:  Again, there's probably over 50 grants that I spoke about or that I reference in my CV.  So I can answer broadly, because it's a broad question.  But I'm also happy to go through different grants.

So because the grants -- I mean, I'm not only a co-I on grants related to school mental health.  But the grants for which I'm a co-I related to school mental health, certainly in recent years, if they are addressing comprehensive school mental health systems, social media would likely have been something that came up in the context of those grants.

BY ATTORNEY KEYES:

Q.    Something that came up, but it wasn't the focus of the -- of the grant investigation?

ATTORNEY YEATES:  Object to the form.  Not case specific.  And

misstates testimony.

THE WITNESS: I think "focus" is a bit of a tricky word.

Was it, you know, the one independent variable exclusive to other variables that were looked at in terms of impact? I mean, none of the grants -- well, I'll state it similar to how I stated it before.

Social media was something that would have been considered or looked at in the context of those grants. But was it the -- done exclusive of other factors? No, I can't say that.

BY ATTORNEY KEYES:

Q. You reference in your reports the National Center for School Mental Health's SHAPE profiles.

What is a SHAPE profile?

A. Sure. So SHAPE stands for the School Health Assessment and Performance Evaluation System, which is a

CONFIDENTIAL

Page 560

platform that is intended for state leaders and districts and schools and individuals to assess different components of their school mental health system.

And the SHAPE profile is an assessment that gets at -- that inquires about the service array that's offered within a comprehensive school mental health system, the staffing and the data infrastructure that exists in a school mental health system.

Q.   When was the SHAPE profile first released?

A.   I honestly don't know the date.  I'd have to look.  I don't -- I don't know the specific date and not even the year.  I don't know that I can say what year it was.

I'd have to go back to see what the date was for it.

Q.   Has it been revised or amended over time since it was first released?

Page 561

A.    The SHAPE profile, I honestly would have to go back to look to see if it's been revised since its -- since we first developed it.

Q.    What was your role in the development of the SHAPE profile?

A.    I was one of the contributors to it.  It was a team effort at the National Center for School Mental Health.

Q.    And who at the National Center for School Mental Health had to approve the SHAPE profile before it was issued as a recommendation that school districts or school administrators use it as an assessment of their mental health system?

A.    So I think I probably would respond -- or phrase it a bit differently.

It wasn't necessarily an approval process.  It was, you know, a collaborative development process of an instrument that was used.  And I couldn't

name for you every person at the center who was involved in that co-development process.

Q. Your reports cite SHAPE profiles for the six school districts in this case, correct?

A. Yes.

Q. And are those SHAPE profiles that the school districts had filled out separate from this case or as part of your engagement?

A. As part of my engagement with this case.

Q. And do you know who at each of the school districts filled out the SHAPE profile?

A. I do not know specifically who filled out the SHAPE profile for each of the districts.

What we recommend is that it's filled out by leadership within the school district that has the most knowledge about the different dimensions that are being asked about; so in this

case, staffing, services and the data infrastructure.

So sometimes it might be filled out by one leader, if they have the most knowledge about that; sometimes it's a collective effort at the district.

Q. Did you make any tweaks or additions to the SHAPE profile that you asked the school -- six school districts to fill out?

A. No, I don't recall doing that.

Q. Did you not make any changes because you thought the SHAPE profile was an appropriate vehicle for assessing the school district's mental health system?

A. I didn't make any changes, in part, because I was asked to follow standard practice, right. So I was -- I know my understanding is that when engaging with the school districts, I would be following the standard practice to understand their school mental health system.

Page 564

So it is a common tool that we use. It does get at many of the domains that are -- that were important to informing my opinions in this case.

So I thought it would be a helpful tool to get a snapshot, a look at what their service array, their staffing and their data systems were.

ATTORNEY KEYES: Vince, can you display Tab 36, which we'll mark as Exhibit-30?

- - -

(Whereupon, Exhibit Hoover-30, No Bates, SHAPE District Profile, School Mental Health Profile?District Version, was marked for identification.)

- - -

BY ATTORNEY KEYES:

Q. Do you see that on your screen --

A. I do.

Q. -- Dr. Hoover?

ATTORNEY KEYES: And, Vince,

Page 565

if you can just scroll through so she can see the document in its entirety.

BY ATTORNEY KEYES:

Q.    Does that look like the SHAPE profile that you've used in the past and you used in this case?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It does.

ATTORNEY KEYES:  Can you go to Section 2, Vince?

BY ATTORNEY KEYES:

Q.    Section 2 is on staffing, correct?

A.    Yes, correct.

Q.    And it lists a variety of team members and asks the school district to identify whether someone holds that position; if so, whether they are employed by the school or employed by the community, correct?

A.    Yes.

Q.    Okay.  Does this SHAPE

Page 566

profile include a district director of digital safety position?

A.    You have to scroll down through the whole list for me to look at. If you have a hard copy, I'm happy to look at that also.

Sorry to make whoever is scrolling go up and down. But I just want to -- I think there's a second page here.

It includes a category for other, but it does not specifically have a category for that, no.

Q.    Does this SHAPE profile include a district director of digital literacy?

A.    No.

Q.    Does this SHAPE profile include a district director of life skills education?

A.    No, not that -- I'm trying to remember what was on the first tab now.

But no.

Page 567

Q.    Does this SHAPE profile include a district director of mental health literacy?

A.    No, not in -- not in this profile.

Thank you whoever did that. Now I can see both tabs.

Q.    Does this SHAPE profile include a district director of student mental health?

A.    No.

I mean, it doesn't surprise me that it doesn't include any of these, because there's often district-level positions that are not reflected in -- in this report.

This is -- you know, as I'm looking at the staffing that's included here, these are often school building level staff.

But, no, to the last question that you had.  No.

Q.    Does this SHAPE profile include a district director of family

Page 568

engagement and education?

A.   No.   It includes what you would see at the -- the school level, possibly, which is family support partner or family member.

Q.   Does this SHAPE profile include an educational technology specialist position?

A.   That would have been under the other category, if included.   It's not listed specifically on here.

Q.   Does this SHAPE profile include a digital literacy specialist position?

A.   No.

Q.   Does this SHAPE profile include a life skills specialist position?

A.   Sometimes school counselors offer life skills or social/emotional learning.   But it's not stated in that way on this profile.

Q.   Does this SHAPE profile include a mental health literacy

Page 569

specialist?

A.    No.

Q.    Does this SHAPE profile include a family engagement coordinator position?

A.    It includes a family support partner.  So it's a different title that you're asking about.

But, oftentimes, if you have a family support partner, they would be a person who is involved in family engagement.

Q.    I've just gone through a list of the positions that you are recommending that each of the school districts create.

Why doesn't the SHAPE profile assessment form that the National Center for School Mental Health uses include any of those positions?

A.    Well, I think, as you're well aware, the -- the harms of the defendants' platforms to schools and students is being increasingly understood

Page 570

and it's a relatively, relatively, new and evolving issue.

So we know, having worked with lots of districts and schools, who they might typically have on staff. And the -- some of -- many of the positions that you just spoke about that are more specific to social media, which is what my plan was intended to address, are things that schools have not yet been able to put in place because they don't have the resources to do so or because they're still just trying to understand and navigate the impact of social media on their schools and students.

When we developed this particular profile, our thinking would have been to capture -- because you have to be careful about trying to ask everything under the sun of a school district, right, we wanted to capture, what are the typical employees or roles that are part of your school mental health system.

Page 571

And, unfortunately, because schools don't have the resources and they're still trying to understand and grapple with the impacts of social media, the positions that I recommend in the strategic plan are often not yet available to schools because they don't have the resources to actually support the -- you know, address the harms that they're seeing every day in their schools.

So it doesn't surprise me that those positions are not on a profile that was developed a few years back, because we would have been looking at, what do schools typically have?

Q. Did you make any recommendation, at any point, to the National Center for School Mental Health that it revise the SHAPE profile to include any of the positions that you are recommending these six school districts hire?

A. So we have internal

CONFIDENTIAL

Page 572

discussions about iterations to assessments. And, again, there's kind of a -- you have to be cautious about constantly updating platforms, not only because there's an expense, right, we have limited funds, as well, to update specific instruments.

So to my recollection, we have -- we had not planned in the immediate future, in part due to cost, to update this. And this was funded under a specific, you know, set of funding, the development of this would have been.

So to my knowledge, the National Center doesn't have funding to update. So, again, it wouldn't surprise me that we're not able to add specific positions.

And, frankly, again, based on the logic that I just talked about, while I would, you know, hope that schools were positioned to hire the folks to address the impacts of social media, the reality is they are not yet equipped

to do that.  They did not anticipate this new external imposed harm on them.

So, you know, I wouldn't anticipate that even if we did put that there that there would be a lot of response.

So, again, in the interest of being parsimonious with the data you collect from school districts, in the interest of time and respecting their time to fill things out, you typically put the things that they're likely to have.

If schools were somehow equipped to start addressing social media, then that could be something that's added.  But, again, it makes sense to me that the positions that are listed here are the ones listed.

Q.    You have referenced key informants and your interviews with them.

And you said yesterday that you did not record those interviews and you did not take notes of those

interviews, correct?

A.    That's incorrect.  I took contemporaneous notes as I was conducting the interviews, which then became part of the body of each of the school district reports.

Q.    Are you able to attribute any specific quoted statement in one of these reports to a particular, quote, key informant?

A.    So part of my standard practice is to take notes, including direct statements made, and to not attribute them to specific people, as we talked about yesterday, in part, to retain their individual confidentiality.

To balance that, I provided a list of the names of the individuals that were interviewed as part of the key informant interviews.

Q.    Are you able to attribute any specific quoted statement in one of these reports to a particular key informant?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  Yes.  I think in several of the reports I actually cite specific statements that are made as part of the deposition testimony of individuals who are, you know, in leadership positions, of which there was large overlap with the people that I interviewed for the key informant interviews.

And I used their direct quotes and cited them within the reports.

BY ATTORNEY KEYES:

Q.    I'm not asking about deposition testimony.  I'm asking about your interviews with these, quote, key informants.

And in your reports, you purport to quote key informants, based on your interviews with them.

My question is, for those

Page 576

quotes that purport to come from your conversations with key informants, are you able to attribute particular quotes to particular people?

ATTORNEY YEATES:  Object to the form.  And the use of air quotes every time you say "key informants."

THE WITNESS:  So the question initially asked was actually, was there anybody that you had directly quoted in your reports and identified them, which is why I referenced the deposition information.

But the question you just asked, as I understand it, was with respect to key informant interviews.

So you're asking, I believe, did I attribute those to individuals?  And I think I've already answered that.  But, no, because it's part of my standard

Page 577

practice not to do so.

BY ATTORNEY KEYES:

Q.    Well, you don't attribute particular quotes to particular key informants.

My question is, sitting here today, are you able to attribute particular quotes to particular informants?

A.    No.   That wouldn't be part of my standard practice, to go back to key informant interviews where I indicated that I wouldn't be tying their direct statements to their names in the interest of, you know, supporting a comfortable key informant interview process, which is very standard for practice when you're conducting key informant interviews.

Q.    When you spoke with each of the key informants in these six school districts, did you tell them, at the beginning of the conversation, that you would not be attributing particular

CONFIDENTIAL

Page 578

statements to them?

A.    Yes, I believe I did.

Q.    And you assured them of that confidentiality at the outset of these interviews with key informants?

A.    I believe I let them know that I wouldn't be tying their names to specific quotes.  But yeah.

Q.    Okay.  And so you have no record and no recollection that allows you to go through, quote by quote that you've attributed to key informants, and identify the specific person who said that --

ATTORNEY YEATES:  Object --

BY ATTORNEY KEYES:

Q.    -- is that fair?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think I've already answered that.

But I would not.  And, again, this is very typical of key informant practice, that you

interview the individuals and that when you report it, you're doing it in aggregate, which is exactly what I did.

So I did it in aggregate, it's not that quotes, outside of the deposition testimony, are not attributable to specific individuals.

The specific individuals are, however, named in terms of who I interviewed.

BY ATTORNEY KEYES:

Q.    Did you estimate in any of your reports how much, if your strategic plan were implemented, students' use of social media would decline?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:   I'm sorry, I think I'm -- I was in the space of key informant interviews.

So can you just ask that again?

Page 580

BY ATTORNEY KEYES:

Q.    Sure.

A.    Are we still talking about key informant interviews?

Q.    No.

A.    Okay.

Q.    Did you estimate in any of your reports how much, if your strategic plan were implemented, students' use of social media in that district would decline?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So as we talked about, because this is a 15-year plan that, you know, looks into the future, of course, and it's something that -- that there's a built-in proposal for evaluation into the future, it's hard to predict exactly the extent to which social media will decline.

And so, what we did, which

Page 581

is standard for public health science, is you look to other existing exemplars of similar public health frameworks to address issues that are harming young people.

And within that context, I describe a decrease, a substantial decrease, the number, if I recall correctly, over roughly a 15-year period was a 73 percent decrease.

And so the way that, then, I extrapolated that data was to say, this is likely -- this is good evidence that with this type of public health multi-part framework, you would expect a steep and sustained decline.

Can I give you the exact percentage that students' social media use would decline over a 15-year period?  No.  That would be virtually impossible in the context of this type of public

CONFIDENTIAL

Page 582

health framework proposal.

BY ATTORNEY KEYES:

Q.    Would you turn to your June 20th amended expert report for Charleston County School District, which we previously marked as Hoover Exhibit-9.

ATTORNEY YEATES:  Counsel, I'd like to take a break.  Is now a good time?

ATTORNEY KEYES:  Sure.

ATTORNEY YEATES:  Okay. Great.

VIDEO TECHNICIAN:  The time is 11:31 a.m.  We are off the record.

-  -  -

(Whereupon, a brief recess was taken.)

-  -  -

VIDEO TECHNICIAN:  The time is 11:45 a.m.  We are on the record.

BY ATTORNEY KEYES:

Q.    Dr. Hoover, do you have

Page 583

Hoover Exhibit-9 in front of you?

A.    I don't know that I have them listed that way.  Could you just say what it -- the document actually is?

Q.    Sure.  It's your amended expert report for Charleston County School District, dated June 20th, 2025.

A.    Yes, I have that.

Q.    And would you -- this is the report you issued mapping out the strategic plan that you recommend Charleston County voluntarily implement, yes?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I just want to clarify, because you're talking about voluntarily implement.

This is a plan that I'm recommending be implemented by Charleston County in order to address the harms of social media platforms, the defendants' platforms, yes.

I don't know --

BY ATTORNEY KEYES:

Q. Okay.

A. I think what threw me is the term "voluntarily."

Q. Okay. But the goal of the strategic plan that you're recommending is to address the harms of students' use of social media on schools?

A. So, again, part of the purpose of the plan is to address the broad impacts of the defendants' platforms on the harms that they have caused, which include schools.

But there are many harms that I laid out in the opinions and in the content of the report.

Q. And what harms are you attempting to mitigate through the plan, separate from harms to schools?

A. So as I detail in the report, I'm speaking about harms to students, including their mental health and well-being, which intersect with

harms to schools, but also harms to schools and the school environment.

So they all fall within kind of what's happening in schools. So if students' mental health is harmed, schools are having to deal with it.

So that's why I'm saying to schools. But, yes, it's kind of what's also -- as students are experiencing it, it's the schools who are having to address it. And that's why the plan is targeting schools.

Q. Okay. If I understand you correctly, you're saying that students' use of social media causes them harms, which harms then have a spillover effect and cause harms to schools or the school environment.

Did I get that right?

ATTORNEY YEATES: Object to the form. Misstates testimony.

BY ATTORNEY KEYES:

Q. How is that wrong?

A. I don't think that's what I

said.

What I said is that the strategic plan that I laid out in the report is intended to address the harms caused by platforms to schools, which includes how students' mental health impacts how they are, you know, showing up in schools and the things that schools have to contend with.  I can put it that way.

So schools are having to contend with many issues, including disruptions to their classroom, interference with class instruction, having to think about technologies to put in place to try to address the design features that are taking away their students from instruction.  They're having to put mental health supports in place, et cetera, et cetera.

So there are many things that schools are having to do that I would say kind of fall within the umbrella of harms that I talk about in

much more detail in the report.

Q.   You say in your report for each of the six school districts that, The strategic plan is to prevent and mitigate the negative impact of social media on the school district, its schools, the school environment, student learning and mental health.

Did I get that right?

A.   Can you refer me to the page?

Q.   Sure.  Paragraph 9 on Page 3 of your report.

A.   Page 3 of the report, Paragraph 9.  So is this Opinion 6?

I just want to make sure we're looking at the same thing. Paragraph 9, Opinion 6?

Q.   That's what it says.

A.   Okay.

Q.   So do you agree that in your report you say that for each of the six school districts, The strategic plan is to prevent and mitigate the negative

impact of social media on Charleston County School District, its schools, the school environment, student learning and mental health?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I think you asked me does it say that in every school district report.  And the answer would be no, because I'm looking at Charleston County School District report.

So in this school district report for Charleston County, it talks about that.  It says, Prevent and mitigate the negative impact of social media on Charleston County School District, its schools, the school environment, student learning and mental health.

BY ATTORNEY KEYES:

Q.   Okay.  Maybe we're having a nomenclature issue.

CONFIDENTIAL

Page 589

A.    Okay.

Q.    You have six separate reports, one for each school district.

And the goal of each of those reports is to lay out a strategic plan for a particular school district?

A.    So the -- part of the goal of the report for each of the six school districts is to detail a district-specific strategic plan that prevents and mitigates the harms of the defendants' platforms.  That's --

Q.    Okay.  Then if you'd go to Page 23 of the same report.

A.    Okay.

Q.    One component of your strategic plan for Charleston is new staffing, correct?

A.    That's correct.

Q.    And you also have a component of new staffing in your strategic plan for each of the other five school districts, correct?

A.    I do.

Page 590

Q.    Another component of your strategic plan for Charleston is training?

A.    I call it professional development.  And that's part of the plan for Charleston, yes.

Q.    And you also have a component of professional development in your strategic plan for each of the other five school districts, correct?

A.    I do have professional development as part of the other five school district plans.

Q.    And another component of your strategic plan for Charleston is data systems?

A.    That's correct.  I do have a component of the plan that's to build and sustain a data system to address the harms, that's correct.

Q.    And you also have a component of data systems in your strategic plan for each of the other five school districts, correct?

Page 591

A.   Yes.  I have -- I have a data system proposed in each of the five other district plans.

Q.   Okay.  Focusing first on the strategic plan for Charleston, on Page 23, you identify the hiring that you are recommending Charleston undertake as part of the strategic plan, correct?

A.   Yes.

Q.   And you are recommending that Charleston hire six district staff; a director of digital safety, a director of digital literacy, a director of life skills education, a director of mental health literacy, a director of student mental health and a director of family engagement and education, correct?

A.   That's correct.

Q.   You also recommend in the strategic plan for each of the five other school districts hiring the same six positions at the district level?

A.   So they would be specific to their -- to each of the other districts.

But one of the things that we know, having done this work for a long time with districts, is that it's really essential to have district-level leadership in positions where you are creating new supports in the schools.

So it makes sense that these positions would be both -- or in Charleston as well as proposed in the other five districts.

So these same positions -- position titles, I should say, are recommended across the district reports. That's correct.

Q.   Okay.   My question was a yes or no.

You also recommend in the strategic plan for each of the five other school districts hiring the same six positions at the district level?

ATTORNEY YEATES:   Object to the form.

BY ATTORNEY KEYES:

Q.   The answer is correct,

Page 593

right?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  So I'm giving context, because you're saying the same positions.

It's the same position titles in each of the six districts.

BY ATTORNEY KEYES:

Q.   Okay.  Then in addition to the positions that you recommend the district create at the district level, you also recommend hiring positions at the school level, correct?

A.   In Charleston?  Or are you asking about all --

Q.   Yes.

A.   -- six districts?

Q.   In Charleston.

A.   Yes.

Q.   And you also do the same thing for the other five school districts?

CONFIDENTIAL

Page 594

A.    Yes.

Q.    Okay.  And there are some positions that you suggest the school district hire one per school, right?

A.    Yes.

Q.    Specifically, you recommend in your strategic plan for each of the six school districts that they hire one IT staff for educational technology specialist per school?

A.    Yes.

Q.    You recommend in your strategic plan for each of the school districts that they hire one life skills specialist per school?

A.    Yes.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yes.

BY ATTORNEY KEYES:

Q.    You recommend in your strategic plan for each of the six school districts that they hire one family engagement coordinator per school?

Page 595

A.    Yes.

Q.    You recommend in your strategic plan for each of the six school districts that they hire one peer coordinator per school?

A.    Yes.

Q.    You recommend in your strategic plan for each of the six school districts that they hire one crisis intervention specialist per school?

A.    Yes.

Q.    Okay.  And then for Charleston you recommend that it hire, as part of your strategic plan, certain positions where the number of positions is based on the number of students, correct?

A.    Yes.

Q.    And you do the same thing for the five other school districts?

A.    Yes.

Q.    And for each of the six school districts, you recommend that the school district hire a digital literacy

specialist for every 500 students in the district?

A.    Yes.

Q.    And for each of the school districts, you recommend that the school district hire a mental health literacy specialist position for every 500 students in the district?

A.    Yes.

Q.    And you -- for each of the school districts, you recommend that the school district hire a school-based mental health clinician for every 500 students in the district?

A.    Yes.

Q.    And for each of the school districts, you recommend that the school district hire a school psychologist for every 500 students in the district?

A.    Yes.

Q.    And then there are other positions where, for each of the school districts, you've recommended that the school district hire a position for every

Page 597

250 students, correct?

A.    I see one position where it's per 250 students, yes.

Q.    And what position is that?

A.    The school counselor position.

Q.    Okay.  And so for each of the six school districts, you've recommended that the school district hire one school counselor for every 250 students in the district?

A.    Yes.

Q.    And then you have recommended that each school district, as part of your recommended strategic plan, hire one school-based therapist for every 750 students?

A.    Yes.

Q.    So other than the number of schools or the number of students in one of these six districts changing, have you made any different recommendations across your strategic plans for these six school districts?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So yes. What professional development looks like, based on whether they have a certain number of elementary, middle or high school students, and the number of people who would be trained and the corresponding number of hours that new staff would be trained would vary across the school districts.

And as would be expected, when you're offering a strategic plan, you want it to be based in best practice and have some consistency, in terms of drawing on best practice programs and best practices related to staffing.

So there's some consistency across districts, as you would hope for when you're designing a plan based on evidence-based practices.

BY ATTORNEY KEYES:

Q. Okay. With respect to the staffing recommendations that you're making in these six strategic plans, do your recommendations regarding staffing vary from school district to school district?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the recommendations do vary with respect to the number of people to be hired, based on the number of students in the school district and the types of schools, whether it be elementary, middle or high school.

BY ATTORNEY KEYES:

Q. Okay. So the only variation in the number of staff that you're recommending be hired by each school district is based on how many schools they have or the size of their student population; but, otherwise, your staffing

Page 600

recommendations are consistent across the strategic plans?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So the staffing recommendations based on the ratios are consistent across the districts.  Because they are based on the same principles of what it would take to actually remedy -- or address, would probably be the better term, address, you know, prevent and mitigate the harms of social media.

So you're drawing on the same logic for staffing across districts.  The number of folks would depend on the students.

And this is very typical.  When you're thinking about staffing up a program for a certain intervention, you look to the student body, the number of

Page 601

students that you have, to determine what staffing would be needed, for example, to do curriculum; so number of teachers may be based on how many students you have in a district, the number of school psychologists might be based on that as well.

So that consistency across districts is not only to be expected that would be, you know, what you do to draw on best practices.

BY ATTORNEY KEYES:

Q. How many school districts in the country have a district director of digital safety?

A. I could not tell you how many districts across the country have a director of digital safety.

Q. How many school districts in the country have a district director of digital literacy?

A. Again, to my point earlier,

CONFIDENTIAL

Page 602

some of these roles are more newly being developed because of the impacts of social media being newer.  So I would not be surprised if they don't yet have them.

But I don't have the exact number, if you're asking me, across, you know, the -- the tens of thousands of schools across the country how many have that.  I don't know.

Q.   How many school districts in the country have a district director of life skills education?

A.    I would not know that.  In fact, I don't think the data would exist in one place.  And I don't know how many have a director of life skills.

Q.   How many school districts in the country have a district director of mental health literacy?

A.    I don't know.

Q.   How many school districts in the country have a district director of student mental health?

A.    So, again, I don't have a

Page 603

specific number there.

But what I can say is that many districts have district-level leadership around mental health.

What I'm calling for in the plan is specific to mental health issues that arise related to social media. So because school systems are often not resourced to do that, I would be surprised to find that many had them.

Q. How many school districts in the country have a district director of family engagement and education?

A. Again, I couldn't give you an exact number. I'm not sure who could give you an exact number of that.

But what I can tell you is that there are a number of districts who hire -- they may call them family support specialists or family engagement specialist or family liaisons.

That's different than the district director role that I'm -- that I talk about in my strategic plans, which

Page 604

focuses on a family -- a district director of family engagement specific to the harms of social media.

Q.    When advocating that these six school districts hire a district director of digital safety, did you look to any model and borrow that position from another model?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So the general answer is yes.  Because, again -- so, you know, I've worked in developing multi-tiered systems of supports for schools for two decades-plus.

And the -- when you look to the implementation science around how to actually implement multi-tiered systems of support, consistently across the literature, it documents that those types of kind of comprehensive school mental health

systems are more successful when you hire and utilize district-level supports.

So if you're recommending a certain body of work, let's say a new mental health area, the science would say it's important that if you're going to try to do this across schools, you need to hire someone at the district.

One framework that comes to mind for that would be the positive behavior interventions and supports, where they consistently document, and, in fact, start with, the district-level leadership in order to support the school-level leadership.

So those are the frameworks that I would have based that on.

BY ATTORNEY KEYES:

Q.    Can you identify any specific districts that have the staffing

plan that you are advocating these six school districts adopt?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I would be surprised, given the resource constraints of schools and the relatively new and evolving harms to social -- of social media and the defendants' platforms on young people and on schools, if they have yet staffed up this.

Again, this plan is really looking, you know, holistically at what are schools experiencing as a result of the platforms and what would be best practices to address those harms?

So, unfortunately, schools really haven't had the luxury of putting that in place.  They are trying their best, as you see throughout the testimony of all of the school folks, they are trying

Page 607

their best to address the harms. They are putting certain pieces in place and plugging certain holes.

But, again, it wouldn't surprise me that this particular district staffing model, which is, really, what would -- what would need to be in place to address the harms, if you don't see that in districts.

BY ATTORNEY KEYES:

Q.    Can you identify any specific districts that have the staffing plan that you are advocating these six school districts adopt?

A.    No.

ATTORNEY YEATES:  Object to the form.  And asked and answered.

BY ATTORNEY KEYES:

Q.    You say in your report that the position of district director of student mental health should have social media expertise.

A.    Are you asking me that?

Page 608

Q.    Well, I'm -- I'm referring you to that.

A.    Okay.

Q.    What do you --

A.    Yes.  I see it.

Q.    -- mean when you say that position should have, quote, social media expertise?

A.    So in my plan, I lay out pretty comprehensively -- I'm happy to read it, but I won't belabor it, unless you'd like me to -- the school mental health -- or the mental health competencies that a team would need to have in a school to address the harms of social media.

And the district-level person would, as is laid out in the professional development plan, need to be able to oversee not only the professional development but also the implementation of those specific competencies.

So that would include things like -- I won't give you an exhaustive

Page 609

list, it's in the -- a list of those competencies is in the report.

But it would include things like being able to screen for the impacts of social media harm on young people, being able to support students who are experiencing impairment in their mental health functioning.

Those are a couple of the ones that are listed.

Q.   Is there any specific degree or certification that demonstrates someone has, quote, social media expertise, end quote, as you use the term?

A.   So this person would likely be a licensed certified mental health professional.  And there's various degrees that would fall under that, right.  So that could be a psychology degree, a social work degree, a counseling degree, a licensed marriage family therapist.

Those are often people who

work in schools to support student mental health.

The field, to my understanding, has not yet developed a certificate for social media expertise, which is -- when that's the case, you often lay out the competencies that would be necessary for someone to demonstrate that expertise, which is what I did in the plan.

Q. So how would a school district, under your plan, evaluate whether someone applying for the position has, quote, social media expertise, as you use the term?

A. So I'm happy to turn to the list of competencies.

But, first of all, there would not necessarily be the expectation that they would be hired with all of the expertise, which is why there is a professional development plan in place.

And part of that is having district-level leaders who would be newly

Page 611

hired engage in professional development on those topics.

But as we would do when we hire school mental health clinicians, just as you would do if you hire a district-level leader position, you would go through the competencies.

And I imagine during the interview process you would be asking about that and their experience with that and also areas where they might need additional professional development.

Given that the mental health impacts of social media platform engagement for students is a relatively new area, there may be some new training that needs to happen for those staff.

And that would not be unprecedented. That's what you do when, you know, there's a new harm to students. So it would have been done, for example, when students started using tobacco, when they started using specific types of substances. New trainings are developed,

Page 612

new competencies are developed.

It doesn't mean that overnight there's a certificate or a license for that competency or that area of expertise.  But the field evolves to develop those competencies.

Q.    Can you identify for me any professional organization that recommends that school districts hire the six district-level positions you're advocating for?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know that I can point to one professional organization that recommends all six positions.

There are professional organizations that recommend hiring of different competency areas, like life skills or social/emotional learning or digital literacy.

BY ATTORNEY KEYES:

Q. What are those organizations?

A. So, for example, for life skills, you have the Collaborative For Academic and Social Emotional Learning. That's probably the go-to national resource for social emotional learning. They work with districts all across the country to support social emotional learning, sometimes called life skills. I chose life skills because it's often a more accepted term.

But that's a national organization that would recommend life skills professionals in each school that can support that instruction for students.

I'd have to go back to my report to look at the national body around digital literacy, if you're looking for the exact name.

Q. Okay. Can you name any other professional organization that recommends hiring of the positions that

Page 614

you've recommended these school districts hire?

A.    Sure.  So with respect to a director of student mental health, for example, or school mental health, if you look to the mental health organizations, like the National Association of School Psychologists, the School Social Workers of America, the American School Counseling Association, they recommend district-level leadership to support school mental health.

Again, I think most of, if not all of, those organizations are still navigating how to address and staff this new area of social media harms on students.

So do they recommend district-level leadership for school mental health?  Yes.

Q.    Would the six district-level positions that you're advocating be created only do work relating to defendants' platforms?

CONFIDENTIAL

Page 615

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So what I recommended in the plan is that the positions are overseeing the work related to the harms caused by defendants' platforms.

That work involves a wide area of topics, including life skills, digital literacy, mental health literacy.  Those are specific to the harms of the defendants' platforms.  That's what I was instructed to do.

BY ATTORNEY KEYES:

Q.    Instructed by whom?

A.    By myself.  I mean, I'm saying instructed to do.  That's kind of what I see as, like, my role in this, is to develop a plan.  And so --

Q.    Okay.  So would the district-level positions that you're advocating these six school districts create provide services to students who

had not used defendants' platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So you're asking would these positions have anything to do with students who might not have yet engaged with the defendants' platforms?

BY ATTORNEY KEYES:

Q.    Yes.

Would they provide services that would be received by students who had not used the defendants' platforms?

A.    Okay.  So what I laid out included, as I've said, a multi-tiered system of support, which is based on a public health framework which includes prevention.

And so especially for our younger kids, let's say our kindergarten, first grade students, who may not yet -- although they certainly may have, but may not yet -- have had direct exposure or be personally using a defendants' platform,

Page 617

they would still be a part of receiving support from those professionals because they would be, for example, receiving the skills for how to navigate the impacts on the schools and also potential mental health impacts for exposure.

Given how many young people, even at the elementary age, do start using, you want to start prevention early.

Just like most kindergarteners are not perhaps smoking cigarettes, but you still start substance abuse prevention early with them just to help them gain the skills so they know how to navigate it.

And there are other skills that are within, you know, the programming that I offer that would be quite relevant to preparing students to not only engage with social media, if they do so, but also to be learning in environments where there's disruptions related to social media.

So even if a young person is not experiencing it themselves, they may be impacted by the harm in their school, if that makes sense.

Q. Okay. Separate from the education or prevention component of your plan, with respect to the remainder of your plan that is providing services to students, would students who have never used defendants' platforms be eligible for those services?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So it's hard for me to say what the eligibility criteria would be for the services, first of all.

But can I imagine, since you're asking me to, you know, kind of think about implementation of the specific plan, can I imagine students who may have not engaged with a social media platform still benefiting from the

services because they had been harmed by or impacted by exposure of other students?  Yes.

So if a student is in a classroom where they are trying to learn and the teacher is spending a third of their time trying to re-engage students who are disengaged, that impacts other students.  They may suffer, their academics may suffer, they may seek the support of a school counselor.  In that case, sure.

BY ATTORNEY KEYES:

Q.  Okay.  So you do envision the services, besides education being provided under your strategic plan, being available to students who have never used defendants' platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think I've already answered that services -- the plan is intended to address

CONFIDENTIAL

Page 620

the -- to prevent and mitigate harms.

Harms include disruptions to the classroom, mental health harms to students, just, you know, problems in the classroom environment and in the school climate.

Those impact the broader swath of students, not just those who are immediately engaged, but also other students in the school building.

So you would hope that any plan to mitigate the harms that impact the entire -- or at least a substantial part of a student population would engage students who may be suffering as a result.

So I would hate to see, you know, criteria be only for a student who happened to be on a platform at a particular time. Because other students may also be

Page 621

feeling the impact of student
engagement and how that impacts
the schools.

BY ATTORNEY KEYES:

Q.    So under the plan that
you're recommending these six school
districts adopt, the staffing that is
created by your plan would be available
to services who have never used
defendants' platforms, yes?

ATTORNEY YEATES:  Object to
the form.  And asked and answered.

THE WITNESS:  So what I said
is --

BY ATTORNEY KEYES:

Q.    I didn't ask under -- under
what circumstances.

I asked you to confirm that
the staffing that is created by your plan
would be available to provide services to
students who never used defendants'
platforms?

ATTORNEY YEATES:  Please do
not cut off the witness.  Let her

CONFIDENTIAL

Page 622

answer the question.

ATTORNEY KEYES:  Well, I want her to answer my question and not give me another speech. Because we have limited time.

ATTORNEY YEATES:  Objection. Argumentative.

THE WITNESS:  So the services that would be available to students under this plan would be for students who are experiencing harm related to the platforms.

That doesn't necessitate that they would have used the defendants' platform directly themselves, because we see harm to other students who are in a school building that's impacted by the defendants' platforms.

BY ATTORNEY KEYES:

Q.  Okay.  And I'm not asking for your rationale on whether it's appropriate or not.

I just want you to confirm for me that students could get the benefit of services provided under these new staffing positions even if they had never used defendants' platforms.

Is that correct?

ATTORNEY YEATES:  I object to the form.  And asked and answered multiple times.

THE WITNESS:  I think I've said that that's -- that, yes, students who may not have used the platforms could still benefit from services that are offered to address the harms, because the harms are not exclusive to those students who may have used the platforms.

They pervade the school. They pervade peer relationships. They pervade learning across the board.  And there's a prevention mechanism as well.

So for all of those reasons,

it would be essential to put services in place for those students who may not have yet used a platform directly themselves.

BY ATTORNEY KEYES:

Q.    And that would include students who have never used social media at all?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  So the plan itself is for the entire school, which includes universal interventions for all students in the school, including things like digital literacy, mental health literacy, life skills, so that they can navigate a learning landscape that is negatively impacted by the defendants' platforms.

BY ATTORNEY KEYES:

Q.    And that would include students who have never claimed to be

Page 625

addicted to defendants' platforms or social media?

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.    You can laugh all you want. I'm trying to understand the parameters of your plan.  So I --

A.    No, I'm laughing --

Q.    -- appreciate the respect of just answering the question.

A.    I'm absolutely intending to answer the question.  I'm laughing because of my daily experience with students.

So I'm imagining students, you know, and kind of how they talk about themselves and their engagement to social media.  I'm not laughing at you nor the question.

ATTORNEY YEATES:  I object to the form.  And argumentative.

THE WITNESS:  So forgive me for the distraction there.

Page 626

But can you repeat the question?

BY ATTORNEY KEYES:

Q.    Yeah.

I want you to confirm that students could get the benefit of services provided under these new staffing positions even if they had never claimed to be addicted to defendants' platforms or social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, it's a broad question.

But could a student who had never claimed to be addicted to social media platforms or the defendants' platforms benefit from some of the services in the plan? Of course.  You would hope so.

BY ATTORNEY KEYES:

Q.    And they would be eligible for the services you've outlined?

ATTORNEY YEATES:  Object to

Page 627

the form.

THE WITNESS:  Again, eligibility for the services is often defined upon implementation.

So, you know, these are -- part of the plan is -- you know, it's tailored at the district level and districts would determine specific eligibility, perhaps.

But inherent in the plan is that students who may not have been exposed to or may not be saying that they're addicted to social media could engage in the services.

But, again, there's a variety of services that are offered here, including things like restorative practices after conflict that may erupt in relation to social media, which often involves many students, whether they're on social media,

Page 628

not on social media, saying they're addicted to social media or not.

The services themselves could apply to students who, you know, don't meet the criteria that you're laying out here.

BY ATTORNEY KEYES:

Q.    Okay.  So students would be eligible to receive non-education services from the various positions that you're recommending without having to make a showing of some sort that they have a need connected to social media?

You're intending to benefit the entire student population?

ATTORNEY YEATES:  Object to the form.  And misstates testimony.

THE WITNESS:  So there's a few parts of how you said that that I wouldn't be -- I think you're asking me to agree with something.  And I would not agree

Page 629

with it.

First of all, I think you called the services non-educational?

BY ATTORNEY KEYES:

Q. I'm asking about the component of your plan that is not education, that is actually providing services to individual students.

A. That's what I --

Q. And I want to -- I want to understand, are those services available to anyone or do students need to make some kind of showing that they have some kind of need that relates to social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'm going to address the first part of how you phrased the question, because I just want to make it clear that I would not describe the services here as non-educational.

Page 630

When we talk about even mental health services that happen in schools, they are directly related to a student's education and their learning. It's -- you know, part of the primary role of child development is to engage in a school setting.

And so I just -- I would just, you know, kind of not want to say, yes, I agree, non-educational, right, because they are educational services in the way that we think about them.

Would a -- the second part of your question, I think, was more about would a student have to show something related to social media to be eligible.

So the positions and the services are specific to the impact of social media. And so they would be, in some way, for some of the services -- I'm

Page 631

thinking through the list of services that we have.

For some of them, they would be specific to social media. So a student might indicate that they were harmed by social media, for example, or someone referring them might.

But there are other services within the plan where -- for example, a prevention service, where they're learning skills to navigate a social media landscape or a learning environment where they wouldn't have to say, hello, I'm being impacted by social media. They would receive the service because we know that they are impacted by social media.

That's very consistent with how we do multi-tiered systems of support in schools.

BY ATTORNEY KEYES:

Q. Do you agree that every

Page 632

teenager can benefit from learning better stress management?

A.    I think most people, so teenagers included, always can develop skills around stress management.

Q.    Do you agree that every teenager can benefit from coping skills education?

A.    So I certainly think that teenagers can benefit, in general, from coping skills education.

Q.    Do you agree that every teenager can benefit from social emotional learning?

A.    So I think -- you know, we're talking about every teenager.  And my mind starts going to, also, students who have severe developmental, cognitive issues, et cetera.

But can most -- so I'm going to use the term "most," because I think that there's always, you know -- so can most students benefit from social emotional learning?  I think so.  Yeah.

Q.   Okay.  Do you agree that every teenager can benefit from education on digital misconduct?

A.   So I think teenagers can benefit from education on digital misconduct.

I mean, I would be curious what you mean by "digital misconduct." But yes.

Q.   You use that term in your plan.

A.   So if it's how I used it, sure.

Q.   Okay.  Do you agree that every teenager can benefit from education on digital literacy?

A.   I think teenagers can benefit from education on digital literacy.

Q.   Do you agree that every teenager can benefit from education on healthy online behaviors?

A.   Yes, I think teenagers can benefit from that.

Page 634

Q.     Do you agree that every teenager can benefit from positive digital habits education?

A.     I think teenagers can benefit from that, yes.

Q.     Do you agree that every teenager can benefit from education on emotional regulation?

A.     Yes.

Q.     Do you agree that every teenager can benefit from education on responsible decision-making?

A.     Yes.

Q.     Do you agree that every teenager can benefit from education on mental health awareness?

A.     I do think that most teenagers can benefit from that.

Q.     Do you agree that every teenager can benefit from help-seeking behaviors?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Can they

benefit from help-seeking behaviors?  I actually don't -- I'm not totally sure what you mean by that.

Can they benefit from education on --

BY ATTORNEY KEYES:

Q. Do you agree that every teenager can benefit from education on help-seeking behaviors?

A. I think that that's a helpful thing for teenagers to have.

Q. Do you agree every teenager can benefit from stigma reduction education?

A. So I think teenagers can benefit from stigma reduction around mental health.  Sure.

Q. Including education on it?

A. Oh, yeah.  Yeah.  Education on mental health stigma and how to decrease that?  Yes.  I think it's -- I think it's valuable for teachers -- excuse me, for teenagers -- to use your

CONFIDENTIAL

Page 636

term -- to have that, yes.

Q.    And I just gave a list of the components of your plan, right?

Because your plan envisions education on all of those topics.

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.    Yes?

A.    So you gave me a list of components -- some components from my plan.  That was not a comprehensive list of all of the components of the plan.

Q.    Okay.  I gave you a list.

You agreed that all or most teenagers would benefit from education for -- on all of those topics?

A.    So to be clear, because the plan that I lay out -- I think the terms that you use were actually quite broad, and I think I'm quite specific in the plan to suggest that those categories would be specific to social media engagement.

So I agreed with the statements or the -- some of the questions you asked earlier about, could students benefit from mental health literacy? Could they benefit from digital literacy? Yes.

Do I also think students could benefit from some of the types of mental health literacy and digital literacy laid out in the plan that are specific to how to engage with social media or how to engage with school systems that are impacted by social media harms? Yes.

Q. And under your plan, all students in the school could participate in all of this education?

A. So in the plan, there's clearly laid out a multi-tiered system, part of which is Tier 1, which is considered universal, which is usually for most students in a school building.

You're not always going to be able to capture every student, whether

CONFIDENTIAL

Page 638

there's a student who is missing a day of school, et cetera.  So I'm always reluctant to use the term "all."

But is it intended for the school population, the universal Tier 1 supports?  Yes.

Q.    And in order to get the benefit or participate in any of that education, do students need to make any showing at all?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:  Any showing of --

BY ATTORNEY KEYES:

Q.    Any showing of harm?  Any showing of need?  Any showing of eligibility?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:  So the nature -- to kind of go through the public health model, the nature of Tier 1 universal

Page 639

supports is actually that you're providing a foundation of, broadly speaking, health prevention and promotion, just like you would for tobacco prevention.

It's another, you know, kind of helpful analogy here in the sense that you would provide that type of education universally, recognizing that there's lots of evidence to suggest that when you provide that, given the risk that's in the environment for children and adolescents of, in this case, we're talking about tobacco, but in our case, we're talking about social media, there's a lot of evidence to suggest that when you put in early intervention, including education, promotion and prevention, that it mitigates the risk.

So by its very nature, you would not have to show that you've

been harmed.  Because it's to prevent harm moving forward.  For some of the services.

BY ATTORNEY KEYES:

Q.    In your plan for each of the six school districts, you recommend a ratio of 1 school psychologist to 500 students, correct?

A.    Yes.

Q.    And that's based on a ratio recommended by the National Association of School Psychologists?

A.    That's correct, yes.

Q.    Do you belong to the National Association of School Psychologists?

A.    I want to say that my membership is current.  I've certainly belonged, and I think I have current membership.  You have to renew every year.

Q.    You recommend in your plan for each of the six school districts that they hire one counselor for every 250

Page 641

students, correct?

A.    Yes.  Yes.

Q.    And that's based on the ratio recommended by the American School Counselor Association?

A.    Yes.  And recognized by the field, yes.

Q.    Do you belong to the American School Counselor Association?

A.    No.

Q.    How many states meet the National Association of School Psychologists recommendation of one psychologist for every 500 students?

A.    I don't know offhand that number.  So I can't answer that offhand, how many states meet that.

Q.    Did you check at all or look into that as part of your work?

A.    I don't know that I checked the number across the states.  I don't think that that information would have been necessary when looking for the specific information or when developing

Page 642

opinions around the six specific school districts who are only within six states, no.

ATTORNEY KEYES:  Vince, would you display Tab 32, which we'll mark as Exhibit-31?

- - -

(Whereupon, Exhibit Hoover-31, No Bates, The National Association of School Psychologists, Student to School Psychologist Ratio 2023?2024 Based on the U.S. Department of Education Common Core of Data, was marked for identification.)

- - -

BY ATTORNEY KEYES:

Q.    This is a document from the National Association of School Psychologists.  It's titled, Student to School Psychologist Ratio, 2023 to 2024.

Have you seen this document before?

A.    I may have.  I look at lots

of documents in my work, including some from the National Association of School Psychologists.  So it's hard to say.

Q.    If you scroll to the bottom, you'll see that this data is as of January 24th, 2025.

Do you see that?

A.    I do.

Q.    And do you see that the data is from the U.S. Department of Education National Center for Education Statistics, the Common Core of Data?

A.    I do.

Q.    Are you familiar with the Common Core of Data?

A.    I am, to a degree.

Q.    Did you look at any Common Core of Data as you formed your opinions in this case?

A.    Not to my recollection.  I would have cited it in my sources if so.  But it wasn't necessary to inform my opinions in this case.

Q.    Did you look at any Common

Page 644

Core of Data as you prepared your recommended strategic plan?

A.   I don't think I cited that. And if not, it's not something I would have considered, nor would I have needed to, to inform my opinions in this case.

Q.   According to this list, do you see that there are only two states that meet the National Association of School Psychologists' recommendation of one psychologist for every 500 students?

A.   You're going to have to give me --

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   You're going to have to give me a minute to actually look at what this is.

Because, again, I'm not sure if I've seen it before.  But I certainly don't recall it.

So the data was provided -- will be monitoring.  I'm trying to figure out what the numbers on the

Page 645

right mean and what the bars mean.

I don't see the --

BY ATTORNEY KEYES:

Q.    Well, if you scroll down, the bar shows a ratio of 500 students to one school psychologist.  And the number on the right shows what the ratio actually --

A.    The ratio number.

Q.    -- is for each state.

So as you scroll down, do you agree with me that, according to the National Association of School Psychologists, which sponsors this recommended ratio, there are only two states, Maine and Connecticut, that meet it?

ATTORNEY YEATES:  Object to the form.  Dr. Hoover, you can take your time to review the data.

THE WITNESS:  Yeah.  I'm just looking.

So I see that Maine, it appears to meet it.  I see Puerto

CONFIDENTIAL

Rico. And then I see Connecticut. And -- yes.

And there's variability across the other states.

So I see those meeting the 1 to 500 ratio, yes.

BY ATTORNEY KEYES:

Q. Okay. So of the 50 states there are only two, Maine and Connecticut, that meet the ratio?

A. According to this piece of data.

Q. Do you have any understanding as to why 48 of the 50 states do not meet the recommended ratio?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know that I can speak specifically to what's happening in each of the states with respect to why they don't meet the ratio.

I can speak to some of the general issues.

Page 647

I'm aware, as I detail in the report, that there has been -- we have a context and a history of a context of workforce challenges with respect to school psychologists.  And I'm aware of that, you know, because of the work that I do in the field.

Each state is a bit different in terms of some of the challenges.

Oftentimes -- and, again, in my experience with districts, it's because they don't have the resources to hire the needed professionals.  So when I'm working with schools, they are often lamenting, you know, if they, you know, need an additional psychologist but might not have one.  So it's often because they don't have the funding to hire a needed school psychologist.

So this doesn't surprise me

that schools can't meet the ratios, because they are often -- they often have very limited funding to do so.

So I think I mentioned yesterday, they might have to make a decision between a teacher or a school psychologist. It's a hard decision to make.

ATTORNEY KEYES: Vince, would you show Tab 33, which we'll mark as Hoover Exhibit-32?

- - -

(Whereupon, Exhibit Hoover-32, No Bates, American School Counselor Association Student-to-School-Counselor Ratio 2023?2024, was marked for identification.)

- - -

BY ATTORNEY KEYES:

Q. This is a document that's available from the American School Counselor Association. It lists the

student to school counselor ratio for 2023 to 2024.

Do you see that?

A.   I do see that.

Q.   Did you undertake, in forming your opinions in this case, to look at what the actual student to school counselor ratio was across the country?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   It would have been unnecessary to inform my opinions.

BY ATTORNEY KEYES:

Q.   Did you undertake, in formulating your strategic plan that you're recommending, to look at what the actual student to school counselor ratio is across the country in different states?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   It would not have altered my opinions.  So it

was not part of informing the opinion.

ATTORNEY KEYES:  If you scroll to the bottom, Vince.

BY ATTORNEY KEYES:

Q.    Dr. Hoover, do you see that the data source for these ratios is also the U.S. Department of Education, National Center for Education Statistics, Common Core of Data?

A.    I do see that.

Q.    And do you see that this chart has an entry for each U.S. state, and it shows a bar graph and the number that reflects the actual student-to-school-counselor ratio for that state?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It appears so. I would have to go through my state song if I want to actually count them all out.

But I think so, yeah.

Page 651

BY ATTORNEY KEYES:

Q.   Okay.  And do you see that if you scroll from the top to the bottom, there are only three states that have a student-to-school-counselor ratio of 250 or less?  It's Hawaii, New Hampshire, and Vermont.

Do you see that?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I do see that. I also see that the American School Counselor Association recommends a ratio of 250 to 1 on the form.

BY ATTORNEY KEYES:

Q.   Right.  Which you said before.

A.   Correct.

Q.   Yes.

Do you know what research went into either of the recommended ratios that we've reviewed, either the one for the National Association of

School Psychologists or the American School Counselor Association?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I don't know that I could speak to the exact research methodology because I was not a part of it.

I did note in my report that these have been long-established ratios in the field. They are widely accepted in the field. And they're generally based on -- first of all, I should say, they are coming from the organizations that represent these professions.

And they, to my understanding, are revisited and looked at. And they reflect the types of services that these professionals may provide in schools, you know, at a certain point in time. They've been around for some time now.

Page 653

BY ATTORNEY KEYES:

Q. And these ratios for both organizations are aspirational; that is, they hope the school districts over time will some day get to those ratios?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm laughing because I think that they might wish that they were in place today. But for limited resources in our education system, they may not be.

I can't speak to whether they might describe them as only aspirational. I think that, rather, where I've heard them described, it's this would be best practice to meet kind of the, you know, minimum standards of baseline mental health care and support for students or for school counselors. You know, they also do some college and career

Page 654

readiness work.

So how I understand these is this is considered best practice in the field, best practice standards, not just kind of something we would wish for but it's okay if it doesn't happen.

BY ATTORNEY KEYES:

Q. So when you formulated your strategic plan for each of the six school districts and you identified how many school counselors or school psychologists should be hired under your plan, you took the total population of students for that district and then divided it by the recommended ratio?

A. For the -- for the different categories. So for the school counselor -- the ones that we went over that said, you know, 1 to 500, 1 to 250, that would be accurate.

Q. And then for purposes of identifying how many school counselors or school psychologists you recommend be

Page 655

hired under your plan, you ignored however many school counselors or school psychologists the school district already has --

ATTORNEY YEATES:   Object to the form.

BY ATTORNEY KEYES:

Q.    -- correct?

You didn't factor that into the new staffing?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So I certainly didn't ignore the staffing they already had.   I asked about it.   I documented it in my report.   It's on the SHAPE profile.   It came up in the context of interviews and deposition information.   Much of it was in the plaintiff fact sheet.

So far from ignoring it, I actually considered the staffing that they had.   And without fail,

the staffing was, in many cases -- most cases, I would say, for many of the existing mental health supports, they didn't even meet the basic national standards for some of these disciplines.

And beyond that, the testimony, whether it was depositions or informant interviews, was very clear that the existing capacity they had was stretched thin, having to do work to try to address some of the social media harms that were taking them away from some of the other intended roles for their positions.

So in developing a staffing plan, I absolutely considered who they had and the number of positions and the nature of what their work looks like right now in the school system.

BY ATTORNEY KEYES:

CONFIDENTIAL

Page 657

Q. But you didn't include the existing school counselors or school psychologists in your calculation of how many new school counselors or school psychologists should be hired to get a particular ratio?

A. Very intentionally so.

Q. Okay.

A. Because it's well documented that when you try to lay on new -- especially something of this magnitude that is causing significant harm, you will likely diminish the other activities that they can do and their effectiveness. And the fidelity with which they're going to be able to implement will suffer.

Q. Okay. Have you calculated what the ratio would be for school counselors in any of the six school districts if you include both the school counselors that they already have and the school counselors you suggest they hire?

A. I wouldn't have done that, because that would have been inconsistent

Page 658

with the plan that I'm proposing.

Q. Have you calculated what the ratio would be for school psychologists for -- in any of the six school districts if you include both the school psychologists they already have and the school psychologists you suggest they hire?

A. Again, I wouldn't have done that. That would have been inconsistent with my plan, because I'm proposing that you need new staffing to address new harms.

Q. Okay. And going back to the ratios that the National Association of School Psychologists and the American School Counselors Association recommend, those are ratios they recommend for all purposes in a school district, correct?

ATTORNEY YEATES: Object to the form.

ATTORNEY KEYES: You can take that down, Vince.

THE WITNESS: So as we've

talked about, the ratios have been around for some time, well before the impacts of social media.

And so I don't think I would -- I know I wouldn't respond to your question in the affirmative, in the sense that I don't think these ratios -- I know they were established before the impacts of social media.

And so do I think that the ratios, as established, took into account the potential harm and resource strain of what's happening right now in schools from the defendants' platforms? Absolutely not.

BY ATTORNEY KEYES:

Q. Have you seen anything from the National Association of School Psychologists that the ratio should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES: Object to

the form.

THE WITNESS:  So I have not seen the ratios shift in recent years, nor would that suggest that they're not recognizing the harms of social media.

BY ATTORNEY KEYES:

Q.    Have you seen anything from the American School Counselor Association that the ratio should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, the ratios have been longstanding.  I know they use that to advocate for kind of the basic mental health supports prior to the advent, even, of social media and certainly prior to our better understanding of the impacts.

So they have not necessarily changed it.  But that doesn't

Page 661

surprise me.  Again, when you're contending with a new and evolving harm, you're still trying to navigate how to best staff and support that.

BY ATTORNEY KEYES:

Q.   My question was, have you seen anything from the American School Counselor Association that the ratio should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.   Have you seen anything?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  I think I answered.

But I see lots of documents in the course of my work.  I should preface with that.

To my recollection, I haven't seen that they have

Page 662

recommended adjusting the ratios that they've had in place for many years at this point.

But that doesn't negate that they recognize the impacts of social media.

BY ATTORNEY KEYES:

Q. Have you seen anything from the National Association of School Psychologists that their recommended ratios should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, I look at lots of documents. I believe that I've seen things related to the impacts of social media by national professional guild groups that represent school folks.

Do I recall seeing a specific document where they recommend changing their ratios?

Page 663

No.  But it wouldn't surprise me.

Again, these are longstanding ratios that were established before the advent of social media and our understanding of its harms.

BY ATTORNEY KEYES:

Q.   Have you gone to the National Association of School Psychologists and suggested that they change the recommended ratio?

A.   That -- that would be outside of my role to do that.

Q.   Have you gone to the American Association of School Counselors and suggested that they change the recommended ratio?

A.   No.  That would not be outside -- that would be outside of my role to do that for those national professional guild groups.

So the answer is no, I have not made a recommendation that they change their ratios to date.

Page 664

Q.    And why would that be outside of your role, given that you hold yourself out as an expert on school mental health and you're the co-director of the National Center for School Mental Health?

A.    Because those ratios are established internal to the organizations and to the leadership of the organization.

Again, I can't speak to the specific methodology or timing of the establishment of the ratios, but those are done within the organization.  I'm not an employee of the National Association of School Psychologists or the American School Counselors Association.

So if asked to be a part of a committee around that, in a hypothetical, would I give my input, given my expertise?  Perhaps.  But would I assume to be able to go to an organization that I'm not an employee of

and tell them to change those national ratios? No.

That doesn't mean that I think -- and in my conversations with districts, many people suggest that these ratios are actually quite conservative. So even if they're close to meeting the ratio or they meet the ratio, they are still struggling with mental health concerns of their students to meet the demand in the schools.

Q. And so it's never occurred to you to reach out to either organization and say, based on everything I know and based on everything I believe, these ratios are too low or these ratios need to be adjusted because of this problem of students using social media and the consequences that imposes on schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So in fact, I have had conversations over the

CONFIDENTIAL

Page 666

years with folks in these organizations.  They've all -- leadership from these organizations have been on our advisory board, for example.

And in conversation, it is not uncommon at all, over the years, for us to lament the ratios being inadequate to address the mental health needs, especially as they've increased over recent years.

ATTORNEY KEYES:  Why don't we take a break for lunch?

ATTORNEY YEATES:  Sure.

VIDEO TECHNICIAN:  The time is 12:50 p.m.  We are off the record.

-   -   -

(Whereupon, a luncheon recess was taken.)

-   -   -

VIDEO TECHNICIAN:  The time is 1:33 p.m., and we are on the

Page 667

record.

BY ATTORNEY KEYES:

Q.    Dr. Hoover, other than the key informant interviews that you reference in your reports, did you speak with anyone else from any of the six school districts?

A.    Outside of the key informant interviews, no, I did not.

Unless -- at least not as part of this litigation, no.

Q.    Did you conduct any kind of survey of the staff or employees of any of the six school districts for whom you offered reports in this case?

A.    So the survey that I got data from was the SHAPE profile, the school mental health profile.

Outside of that, I didn't personally conduct surveys with staff, no.

Q.    Before this engagement, did you do any consulting for any of the six school districts?

CONFIDENTIAL

Page 668

A.    I don't believe so, no.  Not specifically with any of these school districts.

Q.    In connection with this engagement, did you speak with anyone who was a consultant for any of the six school districts?

A.    Outside of the litigation are you asking?  Sorry.  I may have --

Q.    No.  I said --

A.    -- missed the beginning.

Q.    No.  I asked in connection with this engagement, did you speak with anyone who was a consultant for any of the six school districts?

A.    Not that I'm aware of, no.

Q.    Have you ever been in any of the schools in Breathitt, Kentucky?

A.    Not that I'm aware of.

And the reason I'm pausing is because I know I've presented across the state of Kentucky before.  And I know I've been in schools.

But I don't believe that

Page 669

I've been in a school in Breathitt.

Q.    Have you ever been in any of the schools in Charleston, South Carolina?

A.    I've worked -- I presented in Charleston, South Carolina, at some point.

I don't know that I've been in the schools in Charleston, inside of a school building, no.

Q.    Have you ever been in any of the schools in Harford, Maryland?

A.    I may have over the course of my time living in Maryland.  I honestly cannot recall.

I've been in many schools across the state.  I don't know if I've been in a school in Harford County.

Q.    Have you ever been in any of the schools in DeKalb, Georgia?

A.    So, again, I know I've worked in the state.  I don't recall being in a school in DeKalb.

Q.    Have you ever been in any of

Page 670

the schools in Irvington, New Jersey?

A.    I'd have to say the same, that I know I've worked in New Jersey; I've presented in New Jersey.

I can't recall being in school buildings in Irvington over the course of, you know, two decades or so.

Q.    Have you ever been in any of the schools in Tucson, Arizona?

A.    Similar here; I've worked a fair amount in the state of Arizona with state Department of Ed people, for example.

But I don't know that I've been in schools -- in a school building in Tucson.

Q.    Is it your opinion that Breathitt has inadequately funded its schools?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think that's, honestly, a bit of a -- too general of a question for me

Page 671

to answer, whether Breathitt has inadequately funded its schools.

School funding is complicated. And I'm not budget expert for schools. So I think that falls a little bit outside of my expertise. And I did not offer an opinion on that specific question, to my knowledge.

BY ATTORNEY KEYES:

Q. Is it your opinion that Breathitt has inadequately funded mental health resources in its schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, I think my opinions were more around whether they have adequate staffing to address the current issues.

So the question -- I don't think I can answer the question of have they inadequately funded. I think that feels a bit subjective

Page 672

and, again, comes down to a budget question that, to me, would require, you know, more budget expertise.

BY ATTORNEY KEYES:

Q.    Is it your opinion that Breathitt has not provided funding for the right number or right type of positions for mental health resources in its schools?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   Again, I think that's a loaded question in one way, in the sense that I think that, as I've talked about in detail in my report, the mental health needs of students have evolved recently due to external, you know, harms.

So whether they have adequate resources -- I feel more equipped to say that they don't have adequate resources to address

the issues that they're contending with.

BY ATTORNEY KEYES:

Q.    For Charleston, Harford, DeKalb, Irvington or Tucson, are you offering an opinion that any of those school districts have inadequately funded their schools?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  The opinion that I offered is that they don't have adequate resources to address the harms.

BY ATTORNEY KEYES:

Q.    For Charleston or Harford, DeKalb, Irvington or Tucson, is it your opinion that those school districts have inadequately funded mental health resources in their schools?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, I think that's -- the way the question is

Page 674

phrased, to me -- the reason I'm reluctant to agree to that is because it suggests that the schools would -- in my opinion, this is how I'm hearing the question -- that they should be responsible for funding certain services.

And I, as I offer in my report, indicate that they are inadequately resourced to address some of the mental health needs that their students are experiencing.

BY ATTORNEY KEYES:

Q.    Is it your opinion that Charleston or Harford or DeKalb or Irvington or Tucson has not provided funding for the right number or right type of positions for mental health resources in their schools?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  The reality is

I think they are often doing the best they can.

I think the districts -- I mean, you're asking me a broad question across six districts.  I don't think that I can speak to the specific budgets without, you know, doing an analysis, which I would not necessarily be equipped to do to look budget line item by budget line item.  So I did not offer that opinion.

What I did offer was that they are inadequately resourced to address the mental health issues of their students, particularly when it comes to -- in the context of this, I talk -- I did offer an opinion about they're not adequately resourced to support the mental health impact related to social media.

BY ATTORNEY KEYES:

Q.    Well, who bears

Page 676

responsibility for the schools in these six districts being inadequately resourced to address some of the mental health needs their students are experiencing?

ATTORNEY YEATES:   Object to the form.  Scope.

THE WITNESS:   So I don't, first of all, think I said that they were -- well, did you say inadequately funded or inadequately resourced?

BY ATTORNEY KEYES:

Q.      I used your term.

You said before --

A.      Okay.

Q.      -- that these schools are inadequately resourced to address some of the mental health needs their students are experiencing.

So my question is, who bears responsibility for that inadequate resourcing?

ATTORNEY YEATES:   Object to

Page 677

the form.  Scope.

THE WITNESS:  So, again, I don't know that it falls within my scope to say who bears responsibility for addressing the harms of the, you know, defendants' platforms.

My experience in the field is that when there is an externally imposed harm, let's say, vaping or tobacco, for examples that I've seen in schools, that responsibility sometimes does, often does, fall on those who are imposing that harm.

BY ATTORNEY KEYES:

Q.   Did Breathitt seek more funding from the state of Kentucky for mental health resources, as far as you know?

A.   I don't know off the top of my head, nor did I do -- I don't know, is the --

Page 678

Q.    Did Charleston seek more funding from the state of South Carolina for mental health resources, as far as you know?

A.    I don't know whether they sought additional resources from the state.

What I can tell you, both in Breathitt and in Charleston, given the conversations that I had with their district and school leaders, is that they are wishing for more support.

So whether they actually were able to seek that -- often the funding is unavailable, you know, to seek for the harms that we're talking about here.

So I don't know whether they did or not.  But, to me, that would not speak to whether or not they're experiencing the harms.  They're directly saying they are.

Q.    In your prior answer, when you refer to district and school leaders

in Breathitt and Charleston, are you referring to the key informants you spoke with?

A.    I'm referring to the key informants.  But also the information from the plaintiff fact sheets and also the deposition testimony.  And any other documents, you know, that I would have cited that pertain to the question.

Q.    And do you have an understanding whether, given your belief that these district and school leaders in Breathitt and Charleston wished for more support, whether they had actually taken steps to get more financial support from the state or from other -- some other source to fund their mental health resources?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I'd have to go into each of the district reports to see what information I had with respect to requesting

Page 680

additional supports.

What I can tell you generally is that many of the districts -- or districts that I spoke with as part of this referred, for example, to grants that they had tried to secure and other funds to try to address mental health services as one example.

Again, you know, the fact is they all clearly laid out that they could benefit from and desperately need additional supports to deal with the harms that are caused by the defendants' platforms, so.

BY ATTORNEY KEYES:

Q.    Did Harford seek more funding from the state of Maryland for mental health resources?

A.    Again, I don't know whether Harford sought additional funding from the state of Maryland, outside of I am --

CONFIDENTIAL

Page 681

because, you know, I'm closely tied to the work in the state of Maryland, I know that they've been part of a statewide effort and sought additional funds through something called the Consortium on Coordinated Community Supports Partnerships, where they did seek additional mental health supports as part of a statewide-funded initiative. So I am aware of that.

But what I will say is that there may be other areas where they've sought support that I'm unaware of.

Q. Did Harford, Maryland, participate in that statewide effort?

A. To my knowledge, yes.

Q. And what was the result of that statewide effort?

A. It's an ongoing effort.

Q. So as far as you know, as a result of the statewide effort, the state of Maryland has not provided more mental health resources to Harford?

ATTORNEY YEATES: Object to

Page 682

the form.

THE WITNESS:  I'm not sure what you're asking.  Did they not provide more resources?

BY ATTORNEY KEYES:

Q.    I'm asking, as far as you know, did the state of Maryland provide more mental health resources to Harford as a result of the statewide effort you just described?

A.    I don't believe in that effort they -- they provided funding directly to the schools.  There may be training and technical assistance support that they've offered.

And similar to other school districts and, you know, as detailed in the report, there may be ways that the districts have sought support.

I don't know if you're speaking only about financial support, for example, but training and technical assistance support, et cetera, from the states.

Page 683

Q.    Did DeKalb seek more funding from the state of Georgia for mental health resources?

A.    I don't know offhand whether -- and if it's -- if it's documented in their -- in the documents that I reviewed and if I -- I would have included it -- I may have included it, I should say, in the section on the resources that they have.

Q.    Did Irvington seek more funding from the state of New Jersey for more mental health resources?

A.    I don't know just sitting here, without looking into the details of the report.

And I don't know that I would have -- I know that I wouldn't have all of the details, nor would it have informed or shaped whether -- the opinions that I drew in this case.

Q.    And did Tucson seek more funding from the state of Arizona for more mental health resources?

CONFIDENTIAL

Page 684

A.    I don't know.  There may be information documented.

Again, I recall documenting some information, for example, about grants that were sought, additional efforts, ways that they had to re-allocate their funds.

And I detailed those in my report across districts.  They re-allocated existing funds towards social media-related efforts.

Q.    So when you reach the conclusion, for each of these six school districts, that they had inadequate resources to address some of their mental health needs, did you undertake any systematic effort to figure out whether, in fact, any of these school districts had asked for more mental health resources?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So in the course of the key informant

Page 685

interviews, as well as in looking at the plaintiff fact sheets, and in some of the deposition testimony -- again, we're talking across six school districts, so, you know, I'm happy to look into that for each of the school districts.

Can I recall generally that they spoke to the resources that had been sought to try to support this issue? Yes. But if you're asking for specific -- within specific districts or for specific people or what they said, I'd have to go back to the source.

BY ATTORNEY KEYES:

Q. In formulating what you are recommending as a strategic plan for each of the six school districts, did you undertake to estimate the cost of implementing those plans?

A. So that was not part of my role in this.

Page 686

What I did was lay out best practices. As a part of that, do I consider, you know, is this something -- what does staffing look like and do I have some understanding of kind of some costs associated? Yes.

But I don't pretend to be an economist or somebody who knows all of the salaries of the different positions.

Q. So did you consider any kind of budget that would be required to fund any of your strategic plans as you were working on formulating them?

A. It depends on what you mean by consider the budget. I mean, I think, you know, as we -- as I develop plans, having worked with schools and districts, I understand some information about budgets and about salaries.

But did I develop a budget for this? No. That was not something I was asked to do.

Q. Well, separate from whether you formed a budget, did you think about

the budgetary implications of your strategic plan as you were formulating it for any of the six school districts?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So it's hard to, you know, develop a plan, working in schools without thinking about potential budgets.

But frankly, my -- what I envisioned, you know, really, my role to be in developing the plan was to lean on what would the best practices be to actually have an effective, comprehensive plan to prevent and mitigate the harms of the defendants' platforms.

So did I consider those things?  Did it come into my mind? What could this cost?  First of all, I'm not an econometrics -- an economist, rather.  But it wouldn't be, necessarily, what would have formed or influenced

Page 688

the opinions about what should be in the plan.

Because my plan is based on here is what best practices would need to be. Here is what it would need to look like to address the issue at hand.

BY ATTORNEY KEYES:

Q. Without regard to cost?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't think -- again, to restate, I don't think, again, that my plan was completely without regard. I think I certainly, as you're developing plans, think about it.

But the components, the staffing of the plan was really focused on, what would it take to actually address the impacts of the defendants' platforms on students and on schools?

BY ATTORNEY KEYES:

Q.    At any point during your engagement on this matter, did you suggest or encourage that any of the six school districts block access to any of the defendants' platforms on their network?

A.    That would not have been something I would have done in the course of a key informant interview.  That would have been highly unusual to do in that type of work.

When you're doing a key informant interview, you're going in with scientific inquiry to kind of understand what's happening on the ground level.

My role there would not have been to say, and here is the actions that you need to take.  That wasn't part of the process, nor would it be typical.

Q.    At any point during your engagement on this matter, did you suggest or encourage that any of the six school districts block access to any of the defendants' platforms on their

Page 690

school-issued devices?

A. So, again, I just want to clarify. This is similar to something I raised earlier, because I want to make sure I'm understanding the question as you intend it, or the intent of the question.

So you say "in the course of this" did I suggest this. Are you talking about in my direct communication with the districts, is this something I recommended? Or are you talking about is this something that's in the plan?

I just want to make sure I know what you're talking about.

Q. At any point since the time you started working on this engagement, did you suggest or encourage to anyone in any of the six school districts that they block access to any of the defendants' platforms, either on their network or on school-issued devices?

ATTORNEY YEATES: Object to the form.

Page 691

THE WITNESS: So you're talking about including what I included in the reports, not just in speaking with the districts? I just want to make sure I understand the full umbrella.

When you say in any -- in any communication --

BY ATTORNEY KEYES:

Q. Well --

A. Because I don't think -- go ahead.

Q. You're seeking clarification.

You don't say anywhere in any of your written reports that the school districts should block access to the defendants' platforms either on their network or on school-issued devices?

A. So you are --

ATTORNEY YEATES: Objection to form.

THE WITNESS: -- asking about the reports?

Page 692

BY ATTORNEY KEYES:

Q.    I'm not asking about the reports.  Because I know those reports don't say that.

A.    Well, I --

Q.    I'm not asking about the reports.

I'm asking about in any of your dealings --

A.    Including --

Q.    -- with school --

A.    -- the reports?

Q.    -- district -- no, not in the reports.

A.    Not the reports.

Q.    Because I know what the reports say and I know what they don't say.  I'm not asking about the reports.

In any of your dealings with anyone in any of the six school districts, anyone you talked to, anyone you otherwise correspond with, any of their consultants, any of the lawyers, did you suggest to any of them that the

school districts block access to any social media platforms, including the defendants' platforms, either on the school district's network or on school-issued devices?

ATTORNEY YEATES:  Object to the form.

And you don't need to talk about anything you discussed with lawyers.

THE WITNESS:  So as I said, the only direct interactions that I've had with the district would have been in the -- for this litigation, would have been in the conduct of key informant interviews. And it would have been something I wouldn't have done as part of that.

So in that context, in my direct communications with key informant interviews in each of these districts, those are not recommendations that would have

Page 694

even come up.

BY ATTORNEY KEYES:

Q.    As you were formulating your strategic plan for any of the six school districts, is there any suggestion or recommendation that you ended up excluding from the plan because you thought it would be too expensive?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Not that I can think of.  I mean, I really was designing a plan that I felt aligned with public health frameworks on how to address complex issues that harm children and aligning a plan directly to, how do you address the harms that have been identified for social media with respect to schools and young people?

So the plan was what it would take to actually do this effectively.  It was not

CONFIDENTIAL

Page 695

intended -- or wasn't informed by, is this going to cost, you know, a certain amount?  It was, what is best practice to address the issues at hand?

BY ATTORNEY KEYES:

Q.    Have you worked with any school district in your career that could afford a plan of the magnitude that you're proposing in these six strategic plans?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, that's, frankly, hard to say, because school budgets are -- they are highly variable, first of all. You have small rural districts.

You're asking about any district I've worked with.  I don't know.  Again, I'm not an economist.  I don't manage school budgets.

Schools have to make

Page 696

decisions about how they spend. And to my knowledge, none has been able to -- at least let me speak to the six bellwether districts, since that is what we're talking about.

They haven't been able to address the issues here and fully implement this type of plan, no.

BY ATTORNEY KEYES:

Q. Earlier in this deposition you said that you need new staffing to address new harms.

Do you remember that testimony?

A. I remember saying that -- that in my reports, I recommended that the six school districts include new staffing or hire new staffing to address new harms.

Q. So is it the case, then, that if there are new harms in the future that are attributable to something else, such as video gaming, you will need yet

CONFIDENTIAL

Page 697

additional new staffing to address that new set of harms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, first of all, it's hard to predict what new harms may come.

What I can say is that we're talking here not just about a harm, we're talking about a significant, pervasive novel harm that is directly impacting the student population in the districts that we're talking about and across districts nationally.

So it's hard to imagine. Could it happen?  It's hard to imagine something of this scale.

But because of this scale of magnitude, right, we're talking about the number of students, the degree of harm, it warrants the new staffing that is described in the plans.

Page 698

BY ATTORNEY KEYES:

Q.    So if, in the future, there is a significant, pervasive new harm that's directly impacting the student population in these six school districts, is it your opinion that you would need yet additional staffing on top of that to address that new harm?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's hard to say.  I mean, you know, you're asking me to look into a future that we don't know yet and to understand kind of what the staffing might look like if these had, in fact, been implemented, and then what would the staffing look like if a new harm came.

So it's -- it's almost impossible to answer the question. I can't -- I can't answer that.

BY ATTORNEY KEYES:

Q.    Well, I'm not asking you to

predict whether there will be or won't be a, to use your term, significant, pervasive new harm.

I'm asking you, if there is a significant, pervasive new harm that directly impacts the student population, will we need a whole other strategic plan to address that harm --

ATTORNEY YEATES: Object --

BY ATTORNEY KEYES:

Q. -- whether it be from artificial intelligence or online gambling or video gaming or something else?

A. It's hard to say.

ATTORNEY YEATES: Object to the form. Asked and answered.

BY ATTORNEY KEYES:

Q. Why is it hard to say?

A. Because you'd have to actually look at what the data was telling you then. You would have to speak to school districts to understand what their experience was. You would

Page 700

have to understand how students are being harmed, how schools are being harmed as a result.

So to say if there was a new harm, it's -- it's just too much of a hypothetical to know what that would look like, to then say, so you would need to do A, B and C.

That's why you do an analysis of what the harm looks like now. You look to the science that exists. And you look at what's happening in the school districts on the ground.

Q. So you might need new staffing if the additional staffing is maxed out and you might not need new staffing if the current staffing has capacity; you don't know?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think it's fair to say that I don't know what new harms could warrant new staffing.

CONFIDENTIAL

Page 701

BY ATTORNEY KEYES:

Q.    If sometime in the next 15 years one of the defendants' platforms stop being available, would you make any adjustments to your strategic plan?

A.    Not -- not that I'm aware of, right.

So my plan is based on the -- this moment in time and the harms that we're seeing.  And the plan is based on the platforms being in existence and the harms that exist.

So, again, that's a hypothetical that I think you would have to look at, at the time.

But in this moment sitting here, I would say the plan would remain the same.  There is built into the plan, as it says in the evaluation section, an opportunity for continuous quality improvement.

But once harm has occurred, it's often the case that you need that continued mental health treatment, right,

Page 702

when -- let's say if social media platform engagement has led to or exacerbated anxiety in a young person. That mental health treatment wouldn't end the moment, you know, YouTube went offline, for example.

Q.    I asked you earlier whether there was any kind of eligibility requirement for students to get the benefit of the services provided by the new positions that you suggest be created.

And I understood you to say that at least when it comes to education or prevention efforts, those could benefit everybody and, therefore, everybody would be eligible; is that fair?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So what I said is that within a public health framework, as is the case in other public health initiatives, as is

Page 703

the one that I laid out here, you have a universal level of support that includes education and prevention efforts that would apply to all students.

My -- as I asserted earlier, that's not to suggest that they are not experiencing potential harms as a result of social media exposure or as a result of the harms in the school. But that would be at the universal level.

Then you have your Tier 2, your Tier 3, as I lay out in the plan, where Tier 2 would be for students identified as at risk or experiencing mild to moderate concerns related to social media harms. Tier 3 would be for those who are experiencing more moderate to severe harms.

BY ATTORNEY KEYES:

Q.    So what is the gating mechanism, under your plan, for deciding

Page 704

who can participate in Tier 2 services?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So as laid out in the mental health competency section, and in kind of the data structure -- it's in a couple of places in the report -- there would need to be mechanisms to identify which students are actually experiencing, again, at risk for, mild to moderate concerns, or, you know, do they meet criteria for Tier 3 services?

There would need to -- and that's -- part of the plan is to develop the data infrastructure and to develop the competencies and to train your staff, it's part of the policies and programming and professional development, to train staff to be able to identify those.

And it's very consistent

with how you would implement other training and screening and identification systems for an issue that a young person might experience.

BY ATTORNEY KEYES:

Q.   Okay.  So students would need to meet criteria for Tier 2 or Tier 3 services?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'm not sure what you're asking me.  Would need to meet it for what?

BY ATTORNEY KEYES:

Q.   You said there would need to be mechanisms to identify which students are actually experiencing, again, at risk for, mild to moderate concerns or, you know, do they meet criteria for Tier 3 services.

They are your words.

A.   Right.

Q.   So I just want a straight

CONFIDENTIAL

Page 706

answer.

Do students, under your plan, need to meet some kind of criteria to get services under Tier 2 or Tier 3?

ATTORNEY YEATES: Object to the form. And asked and answered.

THE WITNESS: So to be clear, within a public health framework, Tier 2 services are not intended for the entire service population -- or the entire student population, rather.

It's typically only for students who are experiencing mild to moderate concerns or who are at risk for, let's say, mental health concerns in this case.

But we'll -- in the plan here, it's around harms where they may be experiencing mild to moderate impairment related to those harms.

And to receive those services, typically, again, they

Page 707

would be at risk for or they would be experiencing mild to moderate.

So I don't know how to phrase it other than that. That's how we define Tier 2 in our framework.

BY ATTORNEY KEYES:

Q. Ma'am, with all due respect, I mean, I've been, I think, quite patient over the day, with you giving long answers that don't really answer the question.

And we're going to come back -- or we're going to at least go to the judge and ask for more time, because we're going to point to him the hundreds of instances where we -- I ask straightforward questions that call for a yes or no, and you then give a long answer that doesn't answer the question.

My question was, do students under your plan need to meet some kind of criteria to get services under Tier 2 or Tier 3?

CONFIDENTIAL

Page 708

You can say yes, no, or I don't know.

ATTORNEY YEATES:  Objection.

BY ATTORNEY KEYES:

Q.    Which is it?

ATTORNEY YEATES:  Object --

BY ATTORNEY KEYES:

Q.    I can't get a straight answer from you as to what you need to do under your plan to get services under Tier 2 or Tier 3.

Is it everyone?  Is it everyone who shows some kind of risk?  Is it someone who shows some kind of risk attributable to social media?  What is it?

The jury and the judge are going to want to know.  So I'd like to hear the answer today.

ATTORNEY YEATES:  Object to the form.  Argumentative.

Dr. Hoover has been doing her best to answer your questions.  Many questions cannot be answered with

Page 709

a yes or no.  She's giving context, and that's totally appropriate.

BY ATTORNEY KEYES:

Q.    Dr. Hoover, your counsel can ask you whatever questions she wants to provide context.  I'm entitled to the answer to my question.

Do students, under your plan, need to meet some kind of criteria to get services under Tier 2 or Tier 3; yes or no?

ATTORNEY YEATES:  Object to the form.  Asked and answered multiple times.  And object to the multiple speeches that were inappropriate and unnecessary.

THE WITNESS:  So as I stated, this is not a yes-or-no question, because I think it warrants the context that students -- and I've already said this -- would need to meet criteria for having -- being at

Page 710

risk for harm or at risk for impairment or be experiencing mild to moderate concerns.

I think I've already said that.

BY ATTORNEY KEYES:

Q.    So you just said students would need to meet criteria for being at risk for harm or at risk for impairment and to be experiencing mild to moderate concerns.

Is that for Tier 2 or Tier 3 or both?

A.    So what I just described that you just restated was for Tier 2.

Q.    So there are criteria for students to get Tier 2 services?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    So it depends what you're asking about.

Are you talking about specific to this plan?  In general, there -- Tier 2 can be

Page 711

applied to other areas.

For this plan, yes, there would be, as what -- there would be for other areas, there's specific criteria that defines what would constitute appropriateness for Tier 2 services.

And I just laid those out.

BY ATTORNEY KEYES:

Q.   Okay.  And for those students who need to meet criteria to show they're at risk for harm or at risk for impairment and to be experiencing mild to moderate concerns, do they need to link up that risk or those impairment concerns to someone's use of social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So for this plan in particular, the risk for Tier 2 or the mild to moderate concerns would have to be related

CONFIDENTIAL

Page 712

to social media impact.  That's the intent of the plan.

That doesn't mean, necessarily, that it had to be that student's personal use of social media, or the defendants' platforms, it could also be that they were experiencing mild to moderate concerns related to the impacts in the classroom, for example, that we talked about many times.

BY ATTORNEY KEYES:

Q.    Okay.  And so if a student could not show a risk for -- a risk of harm or mild to moderate concerns that were somehow related to social media impact, they would not be eligible for services under Tier 2?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Under Tier 2 in this plan or in -- Tier 2 in a school in general?

Page 713

BY ATTORNEY KEYES:

Q.    I'm talking about -- I'm talking about your plan.  Your plan.  Your plan.

A.    Okay.

Q.    Just as we have been for the bulk of today.

ATTORNEY YEATES:  Objection.  Form.

THE WITNESS:  Okay.  Sometimes you're asking about kind of broader things in a school and sometimes you're asking about the plan.  So I just want to make sure that I'm being clear.

So the -- the services -- I want to make sure I have the question right now.

BY ATTORNEY KEYES:

Q.    I'll ask it again.

A.    Okay.

Q.    If a student could not show a risk of harm or impairment or mild to moderate concerns that were somehow

related to social media impact, they would not be eligible for services under Tier 2 under your plan for these six school districts?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So that's consistent with how I have described Tier 2 in the plans, yes, that they would -- to be eligible, essentially, and -- I mean, to be appropriate for the services that would be offered in Tier 2 in this plan, yes, that would be the general criteria that you would consider for someone to be eligible for Tier 2.

BY ATTORNEY KEYES:

Q. Okay. And are there eligibility criteria for a student in one of these six school districts to be eligible for Tier 3 services under your strategic plan?

ATTORNEY YEATES: Object to

the form.

THE WITNESS: So in general, for students to be appropriate for services at the Tier -- Tier 3 level, they would be experiencing moderate to severe distress or impairment. Those are kind of the general ways that we think about who would be eligible for Tier 3.

And in this case, within the district plans, it would be related to social media harm.

BY ATTORNEY KEYES:

Q. What is your estimate of the percentage of the population of any of the six school districts' students who are at risk for harm or risk for impairment with moderate concerns --

ATTORNEY YEATES: Object --

BY ATTORNEY KEYES:

Q. -- mild to moderate concerns?

ATTORNEY YEATES: Object to the form.

Page 716

THE WITNESS:  So because you asked about what percent are at risk for, I would say 100 percent.

If you mean -- I don't know what you mean.  But because you used the term "at risk for," it could be anybody in the school building.

At what level would we estimate the number of students who might be eligible for Tier 2 services or who might be appropriate for Tier 2 services, if we look at our typical public health frameworks and multi-tiered systems of support and how it applies to these plans, the top tier is typically about 3 to 5 percent of students.  The next tier is typically about 10 to 15 percent -- or excuse me -- I've got to get the numbers correct here.

They talk about the 10 to

CONFIDENTIAL

Page 717

15 percent, 3 to 5, and then at the bottom, roughly 85 percent of students.

However, what I will say is that, in fact, literature cited -- literature recently talked about how the numbers need to be adjusted at those tiers because of the increase in mental health issues in students in recent years.

So I could point to specific literature that talks about how those numbers at Tier 2 and Tier 3 have increased over time.

BY ATTORNEY KEYES:

Q.   That's within a typical MTSS?

A.   That's within a multi-tiered system of support for school mental health services.

Q.   But you are offering a strategic plan that creates a separate MTSS for students who have some risk of

Page 718

harm or some impairment concerns linked with social media, right?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I'm offering a tiered framework for how you would address the harms for social media, yes.

BY ATTORNEY KEYES:

Q.   Okay.  So do you have an estimate of what percentage of the student body for any of these six school districts is at risk of harm or risk of impairment with mild to moderate concerns that are related to social media such that they would be eligible for your Tier 2 services?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  In some respects, it's hard to put a number on it right now because, you know -- so I'm leaning on, as I have with other things here,

Page 719

other public health frameworks like multi-tiered system of support for school mental health. And that's why I provided the numbers that I did.

Because data systems are still to be built and the screening is still in process of -- or would need to be created, some of these numbers are to be determined.

It's hard to estimate, because this is a new, novel harm to schools. And so to give you precise numbers or even estimates about, here is the number of students that are specifically suffering today would be hard to do.

In terms of that term "at risk," I would say that the majority of your school population, if not all, are at some level of risk.

CONFIDENTIAL

Page 720

But as far as mild to moderate concerns, it would be a bit hard to estimate, I would say, right now.

BY ATTORNEY KEYES:

Q.    And when you say it's "hard to estimate" because this is a new and novel harm to schools, how novel is it, based on all of your work on these cases?

A.    Well, it would be hard to give you a precise date at which the harms started.

But I know we've talked about the time window for these cases of 2017 to 2025.  And I would say certainly over that time, that relatively limited time period, eight years, this has been something they have been contending with.

Q.    And do you have an understanding of why none of these school districts for which you're offering strategic plans have any data systems to track all of the harms that you say exist, that you say are significant but

that you cannot quantify?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Do I have -- first of all, you're asking about all the data systems in all the districts.  But I think if you're -- if you want me to answer generally do I have an understanding about why systems -- school systems, including these six districts, do not yet have the capacity to track all of the harms of the defendants' platforms, I think it's because they're woefully underresourced to have been able to develop the platforms, and we're still, as a science, really understanding how to best measure some of this.

But school districts don't have the funding, at this point, to measure and address every harm of social media that they are

CONFIDENTIAL

Page 722

experiencing, which is why we are using other forms of data, including speaking with the personnel who are working in the school districts and in the schools.

BY ATTORNEY KEYES:

Q.    Did you have any conversation with any of the key informants for any of the six school districts about why they didn't track any of these harms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yes.

BY ATTORNEY KEYES:

Q.    What did they tell you?

A.    In -- just generally across all the school districts?

Q.    Well, across the six school districts for which you're offering these strategic plans.

A.    Right.

ATTORNEY YEATES:  Object to

Page 723

the form.

THE WITNESS:  So generally across those school districts? You prefer that I not look specifically to the testimony, just kind of give you a general recollection of what they said?

BY ATTORNEY KEYES:

Q.   I want your understanding of what people from the six school districts said to explain why they don't have any systems to track any of the harms that you say are significant based on your conversations with them.

ATTORNEY YEATES:  Object to the form.  Foundation.

THE WITNESS:  So to be clear, it wasn't just the conversations with them that informed my opinions about the -- the extent -- or the existence and extent of harm.

But generally, in the discussions and the key informant

CONFIDENTIAL

Page 724

interviews, it was shared -- and, again, I'm not going to be specific, because I'm not opening the reports.  I'm happy to go -- detail through the reports.

But in general, there was a consistent theme that they did not have the data infrastructure to do so yet, and that that was likely due to limited resources.

So that certainly came up in the discussions in the key informant interviews.

BY ATTORNEY KEYES:

Q.    And didn't modify their data infrastructure at all over an eight-year period to track what they claim is a significant problem?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I didn't say that.

So --

BY ATTORNEY KEYES:

Case 4:22-md-03047-YGR    Document 2407-102    Filed 11/07/25    Page 325 of 545

Page 725

Q.    You did tell me they don't have the data infrastructure that tracks the harms.

ATTORNEY YEATES:  Please let Dr. Hoover answer the question.

Object to the form.

BY ATTORNEY KEYES:

Q.    So my question is, why didn't they modify their data infrastructure over an eight-year period so that they could track, for some period of time, what they claim is a significant problem in their school districts?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I didn't say that in each of the these six school districts that they have made no modifications to their data infrastructure.

What I did say is -- and what I experienced and documented in the context of the key informant interviews and in

looking at the other source documents, including plaintiff fact sheets, is that the data systems, if -- if they exist, do not yet track enough to understand the impact of the platforms on students and on schools.

If you're asking why, I think I've answered that.  But I'm happy to go into more detail.

BY ATTORNEY KEYES:

Q.    In each of your reports for the six school districts, you say that your opinions were also informed by scientific literature on the subject matter.

And you say that you used literature review methods that are a regular and ongoing part of your practice and you said you routinely utilize academic search engines.

Did I get that right?

A.    I can look at what I referenced in the -- the language sounds

Page 727

familiar.

Q. Paragraph 26 of your reports.

A. Which report?

Q. Any one of them for any of the six school districts.

A. Yes.

Q. Okay. You say, I routinely use academic search engines to identify relevant scientific literature.

Did you use academic search engines to identify relevant scientific literature for purposes of your six school district reports?

A. Yes.

Q. Did you use PubMed?

A. I -- honestly, I don't know. I can't recall which specific search engines I used, in part, because I use search engines regularly.

So I'm not sure which specific search engines I used.

Q. So you don't know whether you used PubMed or PsycInfo or Google

Page 728

Scholar for purposes of identifying relevant scientific literature for these six school district reports?

A.    Correct.

ATTORNEY YEATES:    Object to the form.

BY ATTORNEY KEYES:

Q.    You say that you, Routinely use academic search engines to identify relevant scientific literature using different combinations of keywords, such as -- and then you give a number of those keywords in quotes.

Do you see that?

A.    I do see that.

Q.    Did you actually use all of these keywords in your search of the scientific literature for purposes of this engagement?

A.    I don't have the list of search terms that I used.  It would not surprise me if I used these in conjunction with others like social media.

Q. Okay. Well, do you have a list somewhere of the search terms that you ran against some search engine to identify relevant scientific literature for purposes of your work in this case?

A. I do not.

ATTORNEY YEATES: Object to the form. And asked and answered.

BY ATTORNEY KEYES:

Q. No way of reconstructing which words you actually used?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No.

BY ATTORNEY KEYES:

Q. Okay. Is it your belief that you used all of the keywords that you list in Paragraph 26 of your reports for purposes of identifying scientific literature that's relevant to your opinions in this case?

A. I don't know. I can't recall.

Q. Do you have a recollection

of using any other keywords besides the ones that are listed in Paragraph 26 of your report for purposes of identifying scientific literature that's relevant to your opinions in this case?

A.    As I said, a term that I would have used would have been social media.

Q.    You're confident that you used social media as a term in searching for relevant scientific literature by using academic search engines?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  As far as I can recall, yes.

BY ATTORNEY KEYES:

Q.    For whatever keywords you used in these academic search engine or engines, when they hit on scientific literature, did you print out or put in a folder all of the studies or literature that were hit on?

A.    No.  The articles that --

Page 731

that I ended up using for this I have in a folder.

But no.  I mean, I scan them as they are coming -- you know, as I'm pulling them.  So I'll look at them in that way.

So did I save them all in a folder?  No.

Q.    Okay.  So as I understand it, you used some search terms, you don't remember what they are, against some search engine, but you're not -- you don't know which one.

But when it -- when a search term hit on a study, you would review the study and some of the studies you would then pull into a separate folder?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That's my recollection of how -- how I saved the documents.

I mean, you have to understand I do this as part of my

regular academic work as well.

I'm consistently reviewing.

And I also may have used articles that came across my desk as an editor of a journal or just in my regular reading of journals, if that makes sense. As an academic, that's something we do, so.

BY ATTORNEY KEYES:

Q. And what is that separate folder called?

A. No idea.

Q. Where is that separate folder located?

A. I -- I have it as the source documents folder. So I don't know.

Q. And are all of the studies or reports in that folder included on your materials considered list?

A. Yes.

Q. So if you looked in your folder, you don't believe there's a study or a report sitting in that folder that

Page 733

you failed to list in your school district-specific reports?

A.   Correct.

Q.   And so would you just sort of skim a study or a report that hit on one of these keywords to decide whether you thought it was relevant?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   It really depends.  Again, having done this for 30 years now, you get pretty experienced at being able to review abstracts, as well as determining if there are articles that you need to go more deeply into to determine, in this case, whether they would inform the opinions.

So whether I skimmed or looked at abstracts or went into more detail would vary.

BY ATTORNEY KEYES:

Q.   So given whatever keywords

CONFIDENTIAL

Page 734

you used against whatever search engine you used, that didn't hit on the National Academies of Sciences, Engineering and Medicine's publication entitled, quote, Social Media and Adolescent Health?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know if it hit on that.  And I'd have to look to my source documents to say whether it was something that I included as a source document.

BY ATTORNEY KEYES:

Q.    Well, it's not listed in your source documents.

Are you familiar with the National Academies of Sciences, Engineering and Medicine?

A.    Yes.

Q.    Are you a member?

A.    No.

Q.    Have you ever been a member in the past?

A.    No.

Q.    Have you ever been invited to be a member?

A.    Not that I'm aware of.

Q.    Is the National Academies of Sciences, Engineering and Medicine part of the National Institute of Health, also known as NIH?

A.    To be honest, I don't know.

Q.    Do you agree that the National Academies of Sciences, Engineering and Medicine is a preeminent source for research and objective advice on science, engineering and health matters?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  You know, I think it's a source that is respected in the field.

I think you used the word "preeminent."  I don't know that all scholars in the field would think of that as the preeminent source for scholarship, no.

CONFIDENTIAL

Page 736

BY ATTORNEY KEYES:

Q.    Have you ever presented your views on any subject to the National Academies of Sciences, Engineering and Medicine?

A.    I think I may have.  But I'd actually have to go to my CV to -- to look.

Q.    On what topic or topics did you present your views to the National Academies of Sciences, Engineering and Medicine?

A.    I'm going to have to look through my presentations, unless you have it offhand.

But I would have to go through to see what topic it was.

Q.    Well, if you listed it in your CV, it would be identified as something you presented to the National Academies?

A.    Correct.

Q.    Okay.  Given your confidence that you used the term "social media" as

Page 737

one of the keywords against some academic search engine and that the National Academies of Sciences, Engineering and Medicine published something titled, quote, Social Media and Adolescent Health, end quote, do you think you reviewed it --

A.    I don't --

Q.    -- as part --

ATTORNEY YEATES:   Object to the form.

BY ATTORNEY KEYES:

Q.    -- of your work in this engagement?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   I don't know if I reviewed it.  If it was something that I considered, it would have been listed in the documents reviewed.

BY ATTORNEY KEYES:

Q.    But it's not listed in the documents reviewed.

Page 738

A.    Okay.

Q.    So I'm trying to understand, did you -- did your search not pick up on it?  Or your search picked up on it and you made a determination that it wasn't something you were going to move into this folder?

A.    I don't know.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know. And I don't know if it was in the peer-reviewed literature or if this is a monograph you're speaking about.

I don't know if it's a document that you're -- I'd have to see it to know what you're talking about.

But the answer to your question is, I don't know.

BY ATTORNEY KEYES:

Q.    Well, before I asked you about this report titled, Social Media

CONFIDENTIAL

Page 739

and Adolescent Health, did you know about it? Had you ever heard of it?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know. I'm not sure.

BY ATTORNEY KEYES:

Q. Did you see it referenced in any of the other expert reports in the case?

A. I don't know. I'd have to go back to their reports.

Q. Is it something you're curious about now because the National Academies of Sciences, Engineering and Medicine has published something on, quote, Social Media and Adolescent Health?

A. I'm a curious person. So I'm always curious.

Q. Okay. Well, given that you're a curious person, did you know that the National Academies' report concluded that, quote, The committee's

Page 740

review of the literature did not support the conclusion that social media causes changes in adolescent health at the population level?

Did you know they had a report that found that?

ATTORNEY YEATES: Object to the form. And not case specific. You've already exceeded -- well exceeded your time allotted by Judge Kang.

BY ATTORNEY KEYES:

Q. You can answer.

A. So you're asking if I know about a report that I can't recall reviewing and a specific sentence it says in there that I don't have in front of me.

But I can look at it.

Q. You said you reviewed the Telzer and Christakis reports --

A. Correct.

Q. -- as part of your work in this case?

Page 741

A.   Correct.

Q.   Were you ever apprised that there were other experts in this case who offered responses to Telzer and Christakis?

A.   I'm trying to remember, because I was focused on my rebuttal responses.

So I don't know that I saw responses to their reports, no.

Q.   Did you ever ask plaintiffs' counsel, hey, I've read Telzer and Christakis, which are plaintiffs' side, did the defendants offer any kind of rebuttal expert to those opinions?

Did you ever ask?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't recall asking that.  What I recall focusing on were the rebuttals to the reports that I did, which included, you know, references to Telzer and Christakis.

Page 742

So my -- I would, you know -- I would have focused on any concerns that came out with respect to my reports at that time.

BY ATTORNEY KEYES:

Q.    Well, given that you said you reviewed the -- the relevant scientific literature and you reviewed Telzer and Christakis, whom you say looked at the literature, weren't you curious to know what other experts in the case said about the same literature --

ATTORNEY YEATES:  Object to form.

BY ATTORNEY KEYES:

Q.    -- or what they identified as the relevant literature?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know what you mean, wasn't I curious about it.

I mean, I honestly was quite

CONFIDENTIAL

Page 743

focused on making sure I did a very thorough job responding to the responses to my reports.

BY ATTORNEY KEYES:

Q.    Okay.  But I'm asking about something else.

I'm saying you said that you tried to identify the relevant scientific literature.  And you did that using keywords, albeit ones you can't remember, and you did it against a search engine or engines, albeit ones you don't know which, right?

If you were trying to identify the relevant scientific literature, why didn't you look at what other experts in the case flagged as the relevant scientific literature?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I would disagree that I didn't look at what other experts noted in the literature.

Page 744

I reviewed their reports.  I looked at what they presented.  But it does not mean that I didn't consider things that they were citing.

BY ATTORNEY KEYES:

Q.    You said your materials considered list was complete, right?

A.    Correct.

Q.    Your materials considered list doesn't cite any of the expert reports that were offered in rebuttal to Telzer or Christakis.

So you didn't review any of the rebuttal reports --

ATTORNEY YEATES:  Object to the form.  Misstates facts.

BY ATTORNEY KEYES:

Q.    -- right?

A.    My understanding is that I reviewed all of the rebuttal reports for my reports.  And I reviewed the original expert reports, for example, I listed them all, but Telzer, Christakis, and

Page 745

others that are listed.

Q.   I'm asking you about rebuttals to Telzer and Christakis that talk about the, quote, relevant scientific literature.

And I'm trying to understand why you didn't look at what any of the other experts in the case said in response to Telzer or Christakis, whom you cite, or what they say about the relevant scientific literature, which you say you were seeking to find.

Why didn't you read those rebuttals to Telzer and Christakis?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So, first of all, I was focused on the review of the response to my rebuttals. And I had the information that I needed to inform the opinions that I offered.

So I certainly didn't feel that I needed additional

information to inform those opinions.

BY ATTORNEY KEYES:

Q.   Did you review, as part of your work in this case, the 2022 study by Sewall, S-E-W-A-L-L, titled, Does Objectively Measured Social Media or Smart Phone Use Predict Depression, Anxiety or Social Isolation Among Young Adults?

ATTORNEY YEATES:   Object to the form.  And not case specific.

THE WITNESS:   So I have a few areas that I'm going to have to look, if you want me to speak to one specific study and whether I cited it.

It's not in this one.

So I'm looking across multiple reports.

BY ATTORNEY KEYES:

Q.   I don't think your lists are different by report.  But if you want to check them all, that's fine.

Let me know if you find any reference in any of the materials considered list to the Sewall report from 2022.

A.   The lists are different, which is why I'm checking multiple reports.

Q.   You reviewed different -- scientific literature for different school-district-specific reports?

A.   No, sorry.  I was speaking to the main report and the -- or the general report, I should say, using your language, and then the follow-up reports.

So I just wanted to make sure, because I have articles listed at the end of each of these, so.

Okay.  I don't see that particular report -- or particular article cited, no.

Q.   Again, in Paragraph 26, you talk about identifying the relevant scientific literature, which is literature that you then cited and

considered for your opinions, correct?

ATTORNEY YEATES:   Where are you reading that from?

ATTORNEY KEYES:   Paragraph 26.

ATTORNEY YEATES:   Of which report?

ATTORNEY KEYES:   Any of them.

THE WITNESS:   Paragraph 26 of any of them.   So I can look to the district reports?

BY ATTORNEY KEYES:

Q.    Yes.

A.    Okay.   So I've just got to Paragraph 26.

Your -- did you have a question?

Q.    Yes.

Paragraph 26, you talk about identifying the relevant scientific literature.   And that's the literature that you then cited in your report and considered for your opinions, correct?

Page 749

A.    That's correct.  The opinions in the report were cited -- were informed by scientific literature.  And that's what I cited in the reports.

Q.    So can you explain for me whether it's a failure of your keywords to identify the report or it was your determination that it wasn't relevant that you didn't review the 2023 Steinsbekk report or study?

ATTORNEY YEATES:  Object to the form.  And asked and answered.  And not case specific.

THE WITNESS:  I thought you were actually asking me earlier about a Sewall study.

BY ATTORNEY KEYES:

Q.    I was.

Now I'm asking about Steinsbekk.

A.    So would you like me to go back and identify whether that's something I cited?

Q.    No.  Because you were

Page 750

already asked a whole bunch of studies whether you reviewed, and you said no. I'm not going to cover that.

What I am asking you is, when you talk about reviewing the relevant scientific literature for the purposes of these six school districts, do you have an explanation for why studies weren't included in your analysis?

Was it because the keywords you used didn't flag the study or the report, or is it that based on your review you decided it wasn't relevant and you didn't put it in the folder?

And so I'd like to know, what is your answer when it comes to the 2023 Steinsbekk report?

ATTORNEY YEATES:  Object to the form.  And not case specific. And if you're asking about studies she was asked about yesterday during the general piece of this deposition, then counsel should

CONFIDENTIAL

Page 751

have asked follow-up questions yesterday.

It's not for you, today, to use your case-specific time to ask follow-ups that were left out yesterday.

ATTORNEY KEYES: I'm asking specifically about the relevant scientific literature she talked about identifying and relying on for her six school district reports.

ATTORNEY YEATES: And we covered it yesterday.

BY ATTORNEY KEYES:

Q. Dr. Hoover, you can answer.

Was it because the keywords you used didn't flag the study or the report or is it based on your review, you decided it wasn't relevant and you didn't put it in the folder?

ATTORNEY YEATES: Object to --

BY ATTORNEY KEYES:

Page 752

Q.    Which is it?

ATTORNEY YEATES:  -- the form.

THE WITNESS:  I don't think either of those would be a correct characterization.

And, frankly, if you're speaking about specific studies, I'd have to look at the study, just as I would have done then, if I -- if I saw it and reviewed it, to make a determination about why.

But I can't speak to a specific study that I don't see or that I'm not sure about and what I would have thought in that moment if I did happen to review it.

BY ATTORNEY KEYES:

Q.    Is it the same answer for all the other studies that Ms. Lehman asked you about yesterday?

ATTORNEY YEATES:  Object to the form.  And not case specific. And I'd like to take a break.

ATTORNEY KEYES:  I'm going to finish this line of questioning.

BY ATTORNEY KEYES:

Q.    Is it the same answer?

A.    Is what the same answer?

Q.    I can go through each one of these.

But I'm trying to understand, for all these studies that you were specifically asked about yesterday, did you review it, and you said no, I'm trying to understand what is your explanation?

Is it that your keywords didn't flag the study or they did flag the study and you determined, based on your review, it wasn't relevant?

What is the explanation for not having reviewed all of these studies?

ATTORNEY YEATES:  Object to the form.  And asked and answered.  And not case specific.  You've exceeded your allotted time by

Judge Kang.

THE WITNESS: So the documents that I cited in my reports were the ones that were considered for the opinion.

Just because it's not listed in a document cited doesn't mean it was something that wouldn't have been looked at, right. But it doesn't -- it means that it wasn't considered for this opinion -- the opinions that were offered here.

So when you say, like, what was the decision point about was it something that wasn't flagged or that I didn't think was pertinent, for example, to rephrase what you said, I can't speak to articles that I don't have in front of me, because I don't know.

So it is -- so if you're asking if my answer is the same, I

guess it's the same.  Because I don't have each of those articles.

I can't remember from yesterday's deposition what the articles were, nor do I think I had them in front of me.  I was just looking through my sources to see if I had cited them.

BY ATTORNEY KEYES:

Q.    You just testified that the documents you cited in your reports, your school district-specific reports, were the ones that you were -- that were considered for your opinions.

A.    That's correct.

Q.    Okay.  And that's what the materials considered list is for, right?

It's to have a comprehensive list of everything that you considered in forming your opinions and preparing your report, right?

A.    Correct.

Q.    And that's the definition you used in preparing your materials

considered list?

A. Correct. That's my understanding of what a materials considered list is, that it's the materials that you considered -- that I considered as I was developing the report and informing the opinions.

Q. So all of the studies that Ms. Lehman reviewed with you that you said you didn't review and aren't on your materials considered list, by definition, are things you didn't consider, right?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Suppose it -- it's -- it's dependent upon what you mean by "considered."

So in the course of my review process and in the course of my daily reading, et cetera, I may have considered that it wasn't pertinent to an opinion. That doesn't mean it didn't come across my desk or come up in a search

engine, right.

So if you were to include, for example, everything that came up in a search engine, that would not -- that would be more than what's in the materials considered, if that makes sense.

BY ATTORNEY KEYES:

Q. Okay. So your materials considered list is actually the materials you considered and deemed pertinent as opposed to the materials you just considered?

A. That's what you do as a scientist, right, is you're looking through -- as you're doing a literature review, if there's a study that comes up, and let's say the abstract has nothing to do with the question at hand, or it feels like it would not be helpful in informing your opinion, that would not be something that you would use to consider it.

Q. So for these studies that you, yesterday, said you didn't review

Page 758

and today you're saying aren't things you considered and deemed pertinent, is it because you just overlooked them or because you decided you weren't going to view them as pertinent?

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.    I'm trying to understand.

Like, you've got a methodology.  I'm entitled to understand your methodology.

And, clearly, your methodology didn't cover all of these studies.  Why not?

ATTORNEY YEATES:  Object to the form.  And the speech.  And not case specific.

THE WITNESS:  So I was going to answer.  I'm forgetting the first part of your question, because you followed it up with I'm trying to understand, et cetera.

CONFIDENTIAL

Page 759

So I think you -- you perhaps misstated that yesterday I indicated that I had never reviewed documents or reviewed articles.

I think what I was answering, but I'd have to go back to the deposition testimony, because it was yesterday about the general report, I think I indicated that those were not in my source documents, so that they were not used in formulating the report and considering -- and the opinions in the report.

Does it mean it never came up in a search engine?  Does it mean that it wasn't something that could have appeared in a search? No.

I think that's very standard for academic searches, so.

BY ATTORNEY KEYES:

Q.    Can you go to the last page

Page 760

of your report on Page 45?

A.    Which report are you looking at?

Q.    The same one we were looking at a moment ago.  But you can look at any of them.

A.    Which is which one?

Q.    How about your amended expert report for the Charleston County dated June --

A.    Charleston?

ATTORNEY YEATES:  Counsel, are you going to let me go to the restroom any time soon?

ATTORNEY KEYES:  I'd be happy to in just one minute.

ATTORNEY YEATES:  Thank you.

THE WITNESS:  So the June 20th, amended report on, Page -- say it again.  Page?

BY ATTORNEY KEYES:

Q.    45.

A.    45.  Okay.

Q.    Okay.  Do you see that

certification at the bottom?

A. I do.

Q. Did you include that certification on each of your reports in this case?

A. As far as I know, at least something similar to it.

I think it was similar or if not identical in language, yes.

Q. And did you sign each report showing that you were signing the certification?

A. I did.

Q. And do you believe that this report meets that certification?

A. Let me just review it.

I'd have no reason to believe otherwise. But I want to -- yes, the primary -- yes.

Q. Do you believe that that certification requires you to make a balanced presentation of what the scientific literature shows to the court?

ATTORNEY YEATES: Object to

the form.

THE WITNESS: I believe what I attested to here is that I have a duty of candor and professional integrity, which, to me, means being honest, being truthful and presenting with professional integrity, which I absolutely have done in this case.

BY ATTORNEY KEYES:

Q. And do you believe or understand that that certification requires you to make a balanced presentation of what the scientific literature shows to the court?

ATTORNEY YEATES: Object to the form.

THE WITNESS: What I believe I attested to is that I have an overriding duty of candor and professional integrity to help the court on matters within my expertise and in all submissions, et cetera.

So I don't see the word "balanced" in here. So you're saying something that's actually not within this.

BY ATTORNEY KEYES:

Q. I'm asking for your understanding of the certification you signed.

My question is, do you believe or understand that this certification requires you to make a balanced presentation to the court of what the scientific literature shows?

You can say, yes, I have that understanding; no, I don't have that understanding; or I don't know.

ATTORNEY YEATES: Object to -- object to the form. And asked and answered.

THE WITNESS: Or I can say what I actually believe it means, which is that I have a duty to be truthful and honest and to act with professional integrity, which

Page 764

is what I am attesting to.

BY ATTORNEY KEYES:

Q.    And you can't say whether that requires you, as part of that duty, to give a balanced presentation to the court of what the scientific literature shows and doesn't show?

You're not willing to say it covers that?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I'm willing to say what I said, which is that I'm attesting that I'm being truthful and honest and acting with professional integrity throughout the entire case.

I think the term "balanced," as you're using it, is very hard to define.  I don't know even what you mean by that.

BY ATTORNEY KEYES:

Q.    I mean present both sides of what the scientific literature shows.

CONFIDENTIAL

Page 765

With that explanation, do you have an understanding as to whether this certification requires you to give a balanced presentation to the court of what the scientific literature shows?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I would argue that there aren't just two sides to any issue here and that there's multiple factors that I considered and presented truthfully, with candor and professional integrity.

ATTORNEY KEYES:  Why don't we take a break?

VIDEO TECHNICIAN:  The time is 2:46 p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time

Page 766

is 3:01 p.m.  We are on the record.

BY ATTORNEY KEYES:

Q.    Dr. Hoover, are you currently helping any of the six school districts implement the strategic plan that you've recommended?

A.    Am I currently helping them implement the plan?  No.

Q.    Have any of the six school districts approached you about you helping them implement the strategic plan, in whole or in part?

A.    No.

Q.    Is it your expectation that if the school district implements the strategic plan, in whole or in part, they would consult with you or hire you to help them in that effort?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I can't predict what the districts are going to do.  But I have no

intention of that.

BY ATTORNEY KEYES:

Q.    Have you ever been an associate superintendent for any school district?

A.    No.

Q.    Have you ever been an administrator for any school district?

A.    No.

Q.    Have you ever been a school social worker?

A.    No.

Q.    Have you ever been a school counselor?

A.    No.

Q.    Have you ever been a school nurse?

A.    No.

Q.    Have you ever been a school administrator?

A.    No.

Q.    Have you ever been a principal?

A.    No.

CONFIDENTIAL

Page 768

Q.    Have you ever taught in a middle school?

A.    No.

Q.    Have you ever taught in an elementary school?

A.    No.

Q.    Have you taught in a high school since 2008?

A.    The reason I'm pausing is because I'm trying to think in the context of supervision, would I have gone in and taught a class or a seminar?

But outside of that, no.

Q.    Have you taught any class or any seminar in a high school in the last ten years?

A.    Honestly, that would be hard for me to know.  Because I work in and with schools a fair amount.

I don't know that I've taught in a high school, a seminar, in the last ten years.  Is it out of the question?  No.  But I don't recall doing that.

Q.    In a recent update to your CV, you identified some recent publications or articles where you were quoted.  One of them was a July 2025 Ed Week article.

Do you remember talking to a reporter from Ed Week?

ATTORNEY YEATES:  Object to the form.  And this was covered yesterday.  And it's not case specific.  We're not going to go through that article again.

BY ATTORNEY KEYES:

Q.    Do you remember that article?

A.    I do.  So I just pulled up my CV to make sure, because there are a few from Ed Week.

But you're talking about the July 2025 one?

Q.    Yes.

A.    Yes.

Q.    Did you disclose to the journalist preparing that article that

Page 770

you were a paid expert for the plaintiffs?

ATTORNEY YEATES:  Object to the form.  And not case specific. And we covered this article yesterday.  Today is not a day to do the cleanup for yesterday.

BY ATTORNEY KEYES:

Q.    You can answer.

A.    I don't recall the specifics of the conversation.  I've seen the article.  But I don't recall the specifics of the conversation.

I don't know that I would have.  My understanding is that I'm not to share that I'm a part of the litigation, so.

Q.    Well, have you disclosed to any journalist you've spoken with that you're a paid expert for the plaintiffs?

ATTORNEY YEATES:  Object to the form.  And not case specific. You've exceeded your time allotted by Judge Kang.

Page 771

THE WITNESS:  Not that I'm aware of, no.

BY ATTORNEY KEYES:

Q.    Have you disclosed to any professional journal to which you've submitted any kind of article for publication that you're a paid expert for the plaintiffs?

ATTORNEY YEATES:  Do you have any case specific questions?

BY ATTORNEY KEYES:

Q.    You can answer.

ATTORNEY YEATES:  Object to the form.  And not case specific. You've exceeded -- well exceeded your time allotted by Judge Kang. And we covered this yesterday.

THE WITNESS:  So, typically, when you're submitting, if you perceive a conflict of interest, you may submit -- or you may be asked to submit.  To my recollection, I would not have done that for any of the recently

published articles.

BY ATTORNEY KEYES:

Q. You don't view it as a disclosable conflict of interest to let the journal know that you are a paid expert in civil litigation for the plaintiffs and have been paid almost a quarter of a million dollars when asking the publication to publish your work?

ATTORNEY YEATES: Object to the form. Foundation. And not case specific. You've exceeded your time allotted by Judge Kang.

THE WITNESS: So the reason I'm looking through my CV is because the conflict of interest that you state for a publication is typically if you perceive it to be a conflict of interest related to a topic that you're presenting on and if that's part of the journal requirement, et cetera.

So it's not as easy as saying, you know, kind of just

broad sweeping, you present every consulting agreement you're working with or every litigation you might be working with.

So the -- so in these cases -- or in these most recent publications, I don't believe that that's something that I would have submitted, no.

BY ATTORNEY KEYES:

Q.    Since July of 2024, when you were engaged by the plaintiffs in this litigation, have you disclosed to any professional journal or any reporter that you are a paid expert for the plaintiffs?

A.    No.

ATTORNEY YEATES:    Object to the form.    And not case specific.

THE WITNESS:    I don't believe I would have.    And I don't believe that it would have been a conflict of interest that would have been reportable in those circumstances.

Page 774

BY ATTORNEY KEYES:

Q.    When you reviewed the relevant scientific literature for purposes of your opinions in the reports you've issued, what did you need to see in order to determine that there was a causal link between students' use of social media and harms to schools?

ATTORNEY YEATES:  Object to the form.  Not case specific.  And covered yesterday.

THE WITNESS:  So when I'm reviewing the literature, I don't look at it as, you know, I'm -- I'm looking at this article to determine whether there is a causal link.

Really, when I'm forming the opinions in this case, I'm looking at the totality of the literature that I've used to form the opinions.  And those are the things that you consider together.

And we went over this,

again, yesterday. But in the absence of certain types of studies, you would look to other factors, whether there is multiple correlational studies across settings, whether there is temporal sequencing, whether there is a mechanism of change that's theoretically defensible, et cetera, et cetera.

So those are some of the factors I would look at in the literature to determine whether it's relevant for causality.

BY ATTORNEY KEYES:

Q. All right. You say you're looking at the totality of the literature, and you said you're looking for certain factors.

And you mentioned three of them. You mentioned temporal sequencing, whether there's a mechanism of change that's theoretical -- theoretically defensible and whether there are multiple

Page 776

correlational studies across settings.

Are there other factors that you're looking for as you review the literature before you offer an opinion that there is a causal link between students' use of social media and harms to schools?

ATTORNEY YEATES:  Counsel, we're not going to go through a deposition today of what we covered yesterday.  This is not case specific.  This is not a day two of yesterday's deposition where you get to re-ask questions that were asked by other counsel. I'm sure Judge Kang is now available.  So I'd like to know if you have any case-specific questions.

ATTORNEY KEYES:  It is case specific.

ATTORNEY YEATES:  It is not. And it was already covered.

BY ATTORNEY KEYES:

Page 777

Q.    In your first report, the very first report, did you talk about the six school districts?

A.    The first report being the May 16th general report?

Q.    Yes.

A.    Honestly, I have to go back to it.  It's been a while.

Did I speak to the specific districts?  I don't know that I did.  I'd have to go look.

Do you want --

Q.    You said --

A.    -- to point me to a specific place in here, I'm happy to --

Q.    You said you were going to offer separate reports that were specific to the school districts.

A.    Where was that?

Q.    Do you dispute that your general report said that you were going to submit separate school district-specific reports?

A.    I've written so many reports

Page 778

at this point, I just want to make sure that it's actually in here that I said I was going to submit them.

Q.    Well, separate from whether you said it in your first report, you did submit six school district-specific reports?

A.    That is correct.  As well as the response to the rebuttals, six of those as well.

Q.    Okay.  And you, in those six school district-specific reports, talk about the impact of student social media use on those school districts and those school environments and the student mental health and learning in those school districts, correct?

A.    Yes.  I speak about that in the district-specific reports.

Q.    Okay.  And so you are drawing a connection between students' use of social media and what you say is the impact on school districts, schools and the school environment and student

Page 779

mental health and learning.

It's Paragraph 2 of each of your reports, right?

A.    Paragraph 2?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:  I'm looking at one district report and Paragraph 2 of my report, I'm speaking about what I've been retained as an expert for and that I'm talking about the impact of students' social media use on school districts, schools and the school environment, student mental health and learning.

BY ATTORNEY KEYES:

Q.    And so for each of these six school district-specific reports, you're offering an opinion that students' use of social media causes adverse consequences to that particular school district, the schools in that district, that school's environment and the student mental health

CONFIDENTIAL

Page 780

and learning of students in that school district?

A.    So in Opinion 2 -- I'm looking specifically at the Breathitt report right now -- I offer that, as I opined in my general report, that the damaging effects of students' social media use on school district, schools and the school environment, student well-being and learning can be addressed through a plan specific to Breathitt.

Q.    Okay.

A.    In terms of the impact that's stated in Opinion 1, and I'm talking about the cumulative negative impacts of social media use on school districts and -- and including Breathitt County Board of Education.

Q.    And when you say "the cumulative negative impacts of students' social media use," you're saying that students' use of social media has a cumulative negative impact on the particular school district, its schools

and its school environment, as well as the mental health and learning of the students in that school district?

A.    So what I'm saying in Opinion 1 -- I'm looking at Breathitt County's report right now -- is that -- that I have opined that the cumulative negative impacts -- and I am general in that beginning of the statement -- and then I speak specifically here about Breathitt County having to expend and redirect already limited resources and what they're increasingly tasked with as a result of that.

Q.    Are you offering an opinion that students' use of social media causes harm to each of the six school districts?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I do offer the opinion that the defendants' platforms have caused harm in each of the school districts, on the schools, and on the students in

the schools.

BY ATTORNEY KEYES:

Q. Okay. So for purposes of your opinion that the defendants' platforms have caused harm in each of the six school districts and their schools and the students in those schools, I'm trying to understand what you need to find in order to conclude or support your opinion that there is a causal connection, a causal link between the two.

A. Okay. So you want me to go into the data --

ATTORNEY YEATES: There's no question pending.

THE WITNESS: Okay. You're trying to understand that.

BY ATTORNEY KEYES:

Q. You said --

A. So what is the question?

Q. -- I said I look at the totality of the literature and I look at factors. And you mentioned three

factors.

And I'm asking, for purposes of your opinion on causation for these school districts, are you looking at any other factors, besides the three you listed, to support your opinion that there is a causal link between students' use of social media and the harms you're identifying.

A.    So, first of all --

ATTORNEY YEATES:   Object to the form.  Not case specific.  And covered yesterday.

ATTORNEY KEYES:   It's totally case specific.

THE WITNESS:   So, first of all, I think I referred to the totality of the literature that I used in consideration for this, not the totality of the literature in the statement that I made before.

I think you were referencing a prior statement.  To my

Page 784

recollection, I was talking about that I reviewed the totality of literature that I documented considering for this case, and with respect to other information that I used to demonstrate causation.

So I started speaking -- I didn't provide an exhaustive list of what I consider in the literature when considering causation, right.  So that would include prospective cohort studies, longitudinal studies, et cetera.

Outside of the peer-reviewed literature, looking specifically to the cases, that is exactly why it was important to actually look at district-specific information.

So as I've mentioned, I looked through the plaintiff fact sheets, which detail their experiences with mental health

Page 785

systems and with the impact of social media.  And it's why I spoke with the people who are actually leading the district and who are working directly in schools.

It's also why I looked to the depositions, as one part of the report, to understand the experiences of the individuals who are leading and working in schools.

So those are part -- part of what informed the causation of -- within the districts.

BY ATTORNEY KEYES:

Q.    So is part of your opinion that there's a causal link here the fact that some people said there was in their depositions?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, the deposition testimony was one piece

Page 786

of information that I used to inform the opinions in this case.

In terms of the causation, the testimony and the depositions may have spoken to that. Certainly the key informant interviews also spoke to some of the elements of causation as well.

BY ATTORNEY KEYES:

Q.   I'm trying to understand the basis for your opinion that there's a causal link between students' use of social media and the harms you've identified for these six school districts.

Are you saying that part of the basis for that opinion is that some people in their deposition said there's a causal link?

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So I think I considered all of the information that I had when forming my

opinions.  And that included information from the depositions, that included information from the key informant interviews, that included the scientific literature on this, this included information received from the districts or information about the districts on the plaintiff fact sheets.

BY ATTORNEY KEYES:

Q.    And can you identify for me any other factor or any other framework, besides what you've said, that, from the perspective of the scientific literature, is the basis for your opinion that there's a causal link between students' use of social media and the harms that you're talking about?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  So the scientific literature certainly informed, and the expert reports that I reviewed that went into

Page 788

great detail about the science on the -- not only the association but the causation of social media, the defendants' platforms, in this case, on schools and on students. So that was a piece of the information.

And then I also looked to other information when forming my opinions.

BY ATTORNEY KEYES:

Q. You say that the opinions that you're offering in these six school district reports draw upon your more than 25 years of experience as a researcher.

That's in Paragraph 2. Do you see that?

A. Twenty-five years as a clinician, researcher and consultant in child and adolescent mental health within school settings.

Q. So you see the language I'm referring to?

A. I see the term "researcher"

and I see the "25 years," yes.

Q. Have you conducted any peer-reviewed research on whether students' use of social media causes harm to those students' mental health?

ATTORNEY YEATES: Object to the form. Not case specific. And covered yesterday.

THE WITNESS: So my research is quite broad. I've got about 100 peer-reviewed articles, most of which focus generally on comprehensive school mental health systems.

My -- I wouldn't say that my specific research area has been the focus of social media impact. My articles -- and reflect more the school mental health. And the research that I've done have looked at school mental health broadly.

That being said, when we think about student mental health,

we're looking at different impacts on student mental health.  We're talking about children, adolescents, and, certainly, social media is something that impacts student mental health.

So there are some experts who -- whose, you know, specific areas are looking at the design of social media, for instance.

My area of expertise, as I laid out here, is really in comprehensive school mental health, part of which includes the factors that might impact student mental health.  A significant and relatively new one being social media.

So it's a little hard to tease apart, I guess, is the answer.

BY ATTORNEY KEYES:

Q.    My question was very specific.

Have you conducted any peer-reviewed research on whether students' use of social media causes harm to those students' mental health?

ATTORNEY YEATES:  Objection. Form.  Asked and answered.  Not case specific.  And covered yesterday.

THE WITNESS:  I think my research has looked at factors that impact student mental health.

It has not exclusively looked at the impact of social media on student mental health.

BY ATTORNEY KEYES:

Q.    Well, can you identify -- can you go to your CV and identify for me any peer-reviewed research that you've conducted on whether students' use of social media causes harm to those students' mental health?

ATTORNEY YEATES:  Object to the form.  Asked and answered. Not case specific.  Covered

Page 792

yesterday.

THE WITNESS:  So I'm going to go back to my CV and look through my publications or my grants or --

BY ATTORNEY KEYES:

Q.    You can look wherever you want.

I just want you to identify with specificity any research -- peer-reviewed research that you've conducted on whether students' use of social media causes harm to their mental health.

A.    Well --

ATTORNEY YEATES:  Object to the form.  Asked and answered. Not case specific.  Covered yesterday.

THE WITNESS:  I think what I just said is that the research that I've conducted would not have looked at the -- that social media as a factor exclusive of other

factors that impact student mental health.

And much of my research is looking at the implementation of school mental health systems.

BY ATTORNEY KEYES:

Q.    So is that to say you can't identify what I'm asking for?

ATTORNEY YEATES:  Same objections.

THE WITNESS:  I'm happy to look through to see if there's something specific to social media.  I think we went through most of this yesterday.

But I don't recall, within the peer-reviewed literature or within the grants, specifically studying the impact of social media on student mental health.

BY ATTORNEY KEYES:

Q.    Have you conducted any peer-reviewed research on whether students' use of social media causes harm

to schools?

ATTORNEY YEATES:  Object to the form.  Not case specific.  Covered yesterday.

THE WITNESS:  Okay.  I thought I just answered that.

But I would say, no, that I don't think that my research focus has been specifically looking at social media exclusive of other factors on mental health of young people or student mental health.

BY ATTORNEY KEYES:

Q.  Have you published any article, peer reviewed or not, that says students' use of social media causes harm to their schools?

ATTORNEY YEATES:  Object to the form.  Not case specific.  Covered yesterday.

THE WITNESS:  Peer reviewed or not?  I honestly cannot -- given all the publishing that I've done, I don't know if I've

mentioned social media in my publications or not.

Have I done unique research? Part of the reason that, you know, if you're a general specialist in school mental health, that you look to other experts who are doing that research is because they specialize in a certain topic, like the direct impact of social media.

So you know I reviewed other experts here.

BY ATTORNEY KEYES:

Q.    I'm just trying to understand whether, prior to issuing the school district-specific reports that we've been talking about, you can point to any research that you conducted, or any research that you published about, that talks about students' use of social media causing harm to schools.

Can you identify any such research or publication?

CONFIDENTIAL

Page 796

A.      So as I've said --

ATTORNEY YEATES:   Object to the form.

THE WITNESS:   So as I've said, to know whether I had actually spoken about specifically social media within the context of my publications, both peer reviewed and not, I would have to go back and look at the publications.

BY ATTORNEY KEYES:

Q.      Ma'am, I'm not asking whether you've spoken specifically about social media.  My question is very specific.

It's about whether students' use of social media causes harm to schools.  That's what my question is about.

So I'm asking you, sitting here today, with the benefit of your extensive CV and given all of your publications and all of your

Page 797

presentations and all of your -- your articles, have you, in any of those, talked about students' use of social media causing harm to schools?

ATTORNEY YEATES:  Object to form.

BY ATTORNEY KEYES:

Q.    If you can't identify one, that's fine.

But if you can, tell me what it is specifically.

ATTORNEY YEATES:  Object to the form.  Argumentative.  Not case specific.  Covered yesterday.

THE WITNESS:  So now we're including the presentations, just to be clear, so the over 600 presentations.

You want me to think about, in addition to the publications, all the presentations, whether I've ever talked about the impact, the cause, or the fact that social media causes mental health harms

Page 798

in young people?

That would be virtually impossible for me to do.

BY ATTORNEY KEYES:

Q.    I'll break it down.  I'll break it down.

A.    Great.

Q.    Okay.  So to be very clear, have you published any peer-reviewed article or non-peer-reviewed article where you talk about students' use of social media causing harm to schools?

Can you identify that?

ATTORNEY YEATES:  Object to the form.  Not case specific. Already covered yesterday.  You've allotted your time -- you've exceeded your allotment of time offered by Judge Kang.

THE WITNESS:  I would have to go back, given that there's about -- there's over 100 articles, to see whether I spoke about social media causing mental

CONFIDENTIAL

health impact within my publications.

BY ATTORNEY KEYES:

Q.   Can you think of any one sitting here right now?

ATTORNEY YEATES:  Same objections.

THE WITNESS:  No.  I couldn't do that, because I would have to go back to them to look through them.

BY ATTORNEY KEYES:

Q.   Okay.  Have you given any presentations to any professional audience where you talk about students' use of social media causing harm to schools?

ATTORNEY YEATES:  Object to the form.  Not case specific. Covered yesterday.

THE WITNESS:  So it would be hard for me to know, within over 600 presentations, whether I've made that statement or not.

Page 800

BY ATTORNEY KEYES:

Q.    Can you think of any one sitting here right now?

A.    No.

Q.    Have you given any speech to any audience where you talk about students' use of social media causing harm to schools?

ATTORNEY YEATES:  Object to the form.  Not case specific.  Covered yesterday.  Asked and answered.

THE WITNESS:  I certainly may have.  But it would hard -- would be hard for me, without the transcripts from all my presentations, to know whether I had made that statement.

BY ATTORNEY KEYES:

Q.    Can you think of any sitting here right now?

ATTORNEY YEATES:  Same objections.

THE WITNESS:  No.  No.

Page 801

BY ATTORNEY KEYES:

Q.    What is Myspace?

A.    What is Myspace?

Q.    Uh-huh.

ATTORNEY YEATES:  That's certainly not case specific.  I'll object to that.

THE WITNESS:  I think it was an online -- I don't even know what I would call it.

I don't know.

BY ATTORNEY KEYES:

Q.    Did you understand that Myspace was social media?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I just said I didn't --

ATTORNEY YEATES:  Covered yesterday.

THE WITNESS:  I just said I didn't know what it was, so.

BY ATTORNEY KEYES:

Q.    Have you ever heard of

Page 802

Myspace?

ATTORNEY YEATES:  Same objection.

THE WITNESS:  I've heard of Myspace.

BY ATTORNEY KEYES:

Q.    Did you understand it to be a social media company that ultimately failed?

ATTORNEY YEATES:  Object to the form.  Outside the scope.  Not case specific.

THE WITNESS:  I don't -- I don't think I know enough about it to know what it was, to be totally honest with you.

BY ATTORNEY KEYES:

Q.    Do you know whether adolescents will be using social media at all 15 years from now?

A.    I think it would be hard to predict what social media will look like.

I think, given its pervasiveness and in its current form,

the design features are such that it would be pretty hard for young people to move away from it.

So I can't predict what the defendants' platforms are going to do or if they're going to put, you know, age restrictions on or if they're going to -- it's really hard for me to know what that is going to look like 15 years from now.

Q. Do you know whether adolescents will be using social media ten years from now?

A. Again, it would be hard for me to predict. I would imagine that they certainly would, given the current climate and limited support that the defendants' platforms have put in place to cut -- cut back on this.

So I can't imagine. But it's hard for me to predict.

Q. Have you conducted any studies yourself attempting to forecast any anticipated changes in how adolescents use social media?

A.    No, I have not.

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.    Have you done any research of any studies by anyone else forecasting anticipated changes in how adolescents will use social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'm actually trying to think if any of the literature that I looked at spoke about forecasting into the future. It may have, and I can't recall.

What I can say is that I've certainly -- well, I don't know if it's in the peer-reviewed literature, but there are certainly statements like, it's not going anywhere, it's not going away, the harms are not going away.

So I don't know if that

speaks to your question. But that's the best forecast that I can recall hearing about.

BY ATTORNEY KEYES:

Q. For the strategic plans that you are recommending in these reports on the six school districts, can you identify any school district that has adopted such a strategic plan because of the purported consequences of students using social media?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: So I just want to make sure I understand the question, because you said for the specific -- the six districts and then you said can you identify any district.

Do you mean any of the six districts or any district in the universe that has adopted this plan?

BY ATTORNEY KEYES:

Page 806

Q.    Well, we know the six districts have not --

A.    Okay.

Q.    -- adopted the strategic plan.

A.    You started the question with the six districts.  So I just wanted to make sure that I understood the question.

Q.    But I want to zero you in on the strategic plan you're recommending --

A.    Okay.

Q.    -- for these six school districts.

A.    Okay.

Q.    Okay.  Can you identify any district, anywhere in the country, that has adopted the strategic plan that you are recommending in these six reports?

ATTORNEY YEATES:  Object to form.  Asked and answered.

THE WITNESS:  So I thought we had covered that.  But I'm happy to restate that, to my

CONFIDENTIAL

Page 807

knowledge, no district has been able to yet fully implement what it would take to prevent and mitigate the impact of the defendants' platforms as I've laid out in the strategic plans.

ATTORNEY KEYES:  Dr. Hoover, thank you for your time.  I'll pass the witness.

VIDEO TECHNICIAN:  The time is 3:33 p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 3:34 p.m., and we are on the record.

- - -

EXAMINATION

- - -

BY ATTORNEY NOLAN:

Q.  Good afternoon, Dr. Hoover.

My name is Jack Nolan.  I represent Snap.

A.    Good afternoon.

Q.    So for the district-specific plans that you propose, you use the term "social media" throughout those plans, fair?

A.    I do use the term throughout the plans.

Q.    But what you mean by social media is the defendants' platforms; YouTube, Facebook, Instagram, TikTok and Snapchat, true?

A.    That is what I'm using it in reference in these plans, yes.

Q.    All right.  If a student were to be cyberbullied over text message, would -- and they required Tier 2 services -- or Tier 2 services were appropriate for them, would they be able to receive any of the Tier 2 services you are recommending in your district-specific plans?

ATTORNEY YEATES:  Object to the form.

Page 809

THE WITNESS:  So the district-specific plans are specific to the impacts of the defendants' platforms.

There may be services in place at their school to address other forms of bullying.

BY ATTORNEY NOLAN:

Q.   Okay.  So in terms of the plans that you're proposing, the additional staffing, the additional programming, the additional interventions that are provided would not apply to certain students who are bullied over Discord, text message, Bluesky, Truth Social, Reddit, any of those platforms that are not belonging to the defendants, true?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  What I can say is that the plan was intended to address the harms caused by the defendants' platforms.

And so the staffing that would be put in place, the plans, the programs, et cetera, are intended to address students who are harmed specifically by those platforms.

BY ATTORNEY NOLAN:

Q.   And so if a student were harmed by actions on another platform that wasn't one of the defendants, would they be turned away under your strategic plans?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So to be clear, my plans are to be built on a foundation of existing services in a school.  And many schools do support students who may have been bullied in -- in the context you're offering of text messaging. They might have that.

So when you say would they be turned away, they may receive

services.  So it's not that they would never get a service.  But would they be considered within this strategic plan?  That's not what we were looking at.

BY ATTORNEY NOLAN:

Q.   Okay.  So they would have to use some of the resources that currently exist at the school if they had to deal with cyberbullying over text message, true?

A.   Not necessarily.  They may choose to use school resources or they may have -- they may not choose to use school resources.

But they would not be specifically part of the plan that we've laid out for the districts.

Q.   Okay.  Sitting here today, have you -- are you offering any opinions with respect to Snapchat that are not covered in your reports?

A.   Am I offering opinions -- I don't think I'm offering opinions that

are outside of the report.

Q.    Okay. And that's true for Snapchat, as well as every other platform?

A.    The -- I mean, the opinions I offer are with respect to the defendants' platforms.  Understood.

But I'm not offering opinions that are not in the reports, if that's what you're asking.

Q.    Understood.

A.    Okay.

Q.    So if your opinion -- if your reports are silent on a particular issue, that means you're not offering that opinion, true?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I'm not offering that opinion in the context of these reports.  I laid out the opinions that I had to offer in the context up -- to date.

CONFIDENTIAL

Page 813

BY ATTORNEY NOLAN:

Q.    Now, do you have any sense, for any of the school districts, the six school districts, how many students are bullied on text message or some other platform versus how many are bullied on a defendants' platform?

ATTORNEY YEATES:    Object to the form.

THE WITNESS:    I don't know that -- I certainly don't know that offhand.    I don't know that I have the data on that.

And, frankly, related to some of the things I talked about earlier, the data infrastructure for a lot of the schools that we work with, including in these districts, likely would not have been resourced enough and advanced to be able to make those distinctions.

So unfortunately not.

BY ATTORNEY NOLAN:

Page 814

Q.    Does the technology exist to make those distinctions currently?

A.    So that's -- I mean, that's an interesting question.

Does the technology exist to make the distinctions?  You could certainly attempt, with existing technology, to make distinctions between sources of bullying.  And that may have happened.  I'm not a tech expert.

But, again, I don't -- you know, part of the plan is to help build data infrastructure to allow for that, to allow for at least an understanding of the source of impact, and you mentioned cyberbullying.

Q.    But what the school districts would implement with respect to -- I'm going to call it data collection.

Is that a fair term?

A.    Sure.

Q.    What the school districts would implement with respect to data

Page 815

collection to gather this information, nothing new needs to be invented in order for them to do that, true?

A.   I don't know that that's true.  I don't know the tech -- in terms of the technology for creating, you know, an intra-operable data system.

Again, I don't -- know that systems exist to collect mental health data, for example, or mental health referral data.  I don't know that it has caught up to some of the direct impacts of social media harm in schools.

And, you know, you're talking about distinguishing between platforms.  I don't know that that technology exists, because I'm not a technologist.

Q.   So with respect to mental health referrals, that technology exists currently, true?

A.   The technology to --

Q.   Track them.

A.   -- track mental health

CONFIDENTIAL

Page 816

referrals?

It exists to an extent. And a lot of school districts do not have it or have it in very limited and poor form.

Q. Understood. But it exists. And so if they had the money, they could buy it today?

A. Maybe. Would there need to be, you know, improvements on it? Perhaps. Could there be -- could it be improved? Perhaps. But is there some technology that exists? Yes.

Q. But are you saying that the technology needed to implement your plans does not exist in full form currently?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm not suggesting that. Again, not a technologist here, so I want to be a little bit cautious about what I say exists in the technology field and what doesn't.

In my experience in schools,

Page 817

there exists data systems that help with tracking referrals and that help in identifying students who may have mental health concerns.

BY ATTORNEY NOLAN:

Q. Okay. So there are certain data systems that exist?

A. Yes.

Q. And these school districts have just chosen not to purchase or implement those data systems, fair?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Not fair.

BY ATTORNEY NOLAN:

Q. Well --

A. No.

Q. -- true or -- yes or no, have they implemented the data systems that exist?

A. So you're --

ATTORNEY YEATES: Object to the form.

THE WITNESS:  So you're asking broadly across six districts and each of them has different technology systems.  And some, you know, may have more limitations than others, which is very consistent with what we see in districts across the country.

And so you phrased the question as they've chosen not to.  I would say that they are limited by what they're -- they've been able to resource.

BY ATTORNEY NOLAN:

Q.    Because they've made the decision to spend their resources on other things, right?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Well, what I would -- how I would phrase it is that they have limited budgets and have -- I can't, first of all, speak to the intentions behind

CONFIDENTIAL

Page 819

these specific school districts and their purchasing.

What I can say is that I know school districts struggle to prioritize.  And they have to make very difficult decisions.

And so every one of the six districts that I spoke with did report in investing in some way of trying to track mental health, whether it's the, you know, student referrals that we talked about or mental health outcomes.

BY ATTORNEY NOLAN:

Q.   And for the six districts that you issued reports on, was there investment in mental health referrals or tracking mental health following the COVID-19 pandemic?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Was there a specific distinct investment?

BY ATTORNEY NOLAN:

CONFIDENTIAL

Page 820

Q.    Well, yeah, did they start doing that after COVID?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know, honestly.  I don't know the date at which some of the systems were put into place.  I believe that some of their mental health data systems have been in place for longer than the pandemic, so.

BY ATTORNEY NOLAN:

Q.    Okay.  And even though those mental health tracking systems have been in place for years at this point, they don't track the reason for the referral --

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY NOLAN:

Q.    -- to the level that would say it was related to one of the defendants' platforms or some other reason?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, we're talking about data systems across six different districts, because they are under the umbrella of the one question.

But in -- in my experience looking at the information about the data systems, and in my discussions during key informant interviews, I do not believe, at this point, that they had the capacity in their data systems to consistently track whether a -- one of the defendants' platforms was involved -- I think you gave the example of an incident of cyberbullying or a mental health referral, I guess, was the next question that you asked.

Do I think some data systems attempt to capture that? I recall people saying, you know, sometimes

CONFIDENTIAL

Page 822

they were able to add notes.

Having working -- having worked with lots of school districts, and even in speaking with these particular school districts, they often said that they were not able to document even within the existing systems.

BY ATTORNEY NOLAN:

Q.   They were completely unable to document the cause or the suspected cause of the mental health referral?

ATTORNEY YEATES:   Object the form.

THE WITNESS:   Across all six districts or are you asking about --

BY ATTORNEY NOLAN:

Q.   Is there a particular district that you're thinking of right now that was completely unable to document the underlying cause for the mental health referral?

ATTORNEY YEATES:   Object to

CONFIDENTIAL

Page 823

the form.

THE WITNESS:  I can't recall.  I'd have to go back to see what the different systems allowed for in terms of being able to capture this.

But, in general, you know, you're asking about were they able to document?  And I would say, as I've said, they had limited capacity to capture the data, to understand all of the unique causes or impacts of social media harm.

BY ATTORNEY NOLAN:

Q.    Okay.  So they don't have the data to understand all of the unique causes or impacts of social media harm; was that your testimony?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  What I am saying is that their data systems are limited.  And that's part of

Page 824

why I included a data infrastructure need as part of the strategic plan.

BY ATTORNEY NOLAN:

Q.   Okay.  Did you consider any Snap internal documents in formulating your opinions?

A.   No.

Q.   Did you consider the deposition testimony of any Snap employee in formulating your opinions?

A.   No.

Q.   Did you review any academic literature that was specific to Snap or Snap -- the Snapchat platform?

A.   So the scientific literature that I reviewed, as well as scientific literature that was cited by experts that I cited in my reports, much of that included Snap.

Q.   But were any of the articles just about the Snapchat platform?

ATTORNEY YEATES:  Object to the form.  And not case specific.

Page 825

THE WITNESS:  I don't recall.

Sorry.

I don't recall.

BY ATTORNEY NOLAN:

Q.    You mentioned yesterday that you do have a Snapchat account, right?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  I think so.

BY ATTORNEY NOLAN:

Q.    Okay.  Do you know what the user name is?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I have no idea.

BY ATTORNEY NOLAN:

Q.    Okay.  Do you have any sense of when the last time you used Snapchat was?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  No.

CONFIDENTIAL

Page 826

BY ATTORNEY NOLAN:

Q.    Any sense of how much time, in total, you've ever spent on Snapchat?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Maybe a couple of hours total.

BY ATTORNEY NOLAN:

Q.    Over what period of time?

A.    My life.

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  My life.

BY ATTORNEY NOLAN:

Q.    Okay.  That's fine.

And when you created the Snapchat account, was this, like, a couple of months ago?  A decade ago?  A couple of years ago?  Like, any -- any sense of when in time?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't recall.  It was not in the last

CONFIDENTIAL

Page 827

month.

BY ATTORNEY NOLAN:

Q.    Okay.

A.    It was more than a year ago.

Q.    Okay.  Have you ever sent or received a Snap?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Yes.

BY ATTORNEY NOLAN:

Q.    Okay.  Have you ever sent or received a chat on Snapchat?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  So the difference between a Snap and a chat on Snapchat is?

BY ATTORNEY NOLAN:

Q.    Snap is a picture.  A chat is a message.

ATTORNEY YEATES:  Same objections.

THE WITNESS:  So I've sent a chat.  I don't know if I've sent a

Page 828

picture.

BY ATTORNEY NOLAN:

Q.   Okay.  Have you ever used Snapchat to view, like, a story or video?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I have no idea.

BY ATTORNEY NOLAN:

Q.   Okay.  Have you ever used a Snapchat lens?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  What is that? Is that the things that --

BY ATTORNEY NOLAN:

Q.   You know, like, the doggy ears?

A.   Oh.  Yes.

Q.   Okay.  Was the doggy ears the one that you used?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't know.

Page 829

BY ATTORNEY NOLAN:

Q.    Okay.  Have you ever had a streak on Snapchat with a friend?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  No.

BY ATTORNEY NOLAN:

Q.    Do you know what a Snap streak is?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  So I'll give you my understanding, is that it's when you have a consistent communication between people and you.

So I don't know if it's daily.  I not sure exactly what it is.  But that's my understanding.

It's another mechanism to -- what I understand -- the reason I understand it is because young people say they have to stay on it, even when they're at camp or

CONFIDENTIAL

Page 830

on vacation, so that they can maintain a streak. That's why I know what it is.

BY ATTORNEY NOLAN:

Q. Do you have any sense of how long it takes to maintain a streak?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I do not.

BY ATTORNEY NOLAN:

Q. Have you ever used the Snap Map feature?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I don't think so.

BY ATTORNEY NOLAN:

Q. Have you ever visited Snapchat's Here For You resources?

ATTORNEY YEATES: Object to the form. Not case specific. You've exceeded your time allotted by Judge Kang.

THE WITNESS: I don't know.

Page 831

BY ATTORNEY NOLAN:

Q.    Okay.  If you did, would it be in your materials considered list?

ATTORNEY YEATES:  Same objection.

THE WITNESS:  Not necessarily.

I think you just asked have I seen it or reviewed it.  But I don't know that it would be in my materials reviewed.

BY ATTORNEY NOLAN:

Q.    Has your use of Snapchat for a couple of hours over the course of your life harmed your mental health?

ATTORNEY YEATES:  Object to the form.  Not case specific. You've exceeded your time allotted by Judge Kang.

THE WITNESS:  I don't know.

BY ATTORNEY NOLAN:

Q.    Have you ever spoken to a doctor or medical professional or mental health professional about your use of

Page 832

Snapchat and its -- any effect on you?

ATTORNEY YEATES:  Object to the form.  Not case specific. Outside the scope.

THE WITNESS:  I was going to say, are we going to detail my personal health history here? That feels like a private matter.

But the answer would be no.

BY ATTORNEY NOLAN:

Q.    Okay.  Could you explain to me, at a high level, the different sections or tabs within Snapchat?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't think I could, no.

BY ATTORNEY NOLAN:

Q.    Are you aware of any other applications that use streaks?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I'm actually not.

Page 833

BY ATTORNEY NOLAN:

Q.    Have you ever used Duolingo?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I think I may have used it, like, downloaded it, used it, and then never used it again.  It was -- it was an ambitious goal.

BY ATTORNEY NOLAN:

Q.    What about Headspace?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I think I've seen Headspace.

BY ATTORNEY NOLAN:

Q.    Is it your opinion that all apps with streaks are necessarily harmful?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I didn't offer an opinion on that.

BY ATTORNEY NOLAN:

CONFIDENTIAL

Page 834

Q.    Do you have any idea what sort of information is displayed on a Snapchat user's profile?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I could not say with specificity.

BY ATTORNEY NOLAN:

Q.    Do you know what Spotlight is within Snapchat?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Spotlight? No.

BY ATTORNEY NOLAN:

Q.    Do you know if Snap has likes?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't know that.

BY ATTORNEY NOLAN:

Q.    When a user posts a public story on Snapchat, is the number of times

Page 835

a story has been viewed public?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I do not know.

BY ATTORNEY NOLAN:

Q.   Do you know what the average age of a Snapchat user is?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I want to say that some of that was detailed in the expert reports I looked at.

I know we certainly -- you know, as I was writing, they certainly looked at, you know, age of different platform use.

Can I tell you, in this moment, the average age of a Snap user?  No.

BY ATTORNEY NOLAN:

Q.   Can you tell me what percentage of students within any of the school districts -- any of the six school districts use Snapchat?

CONFIDENTIAL

Page 836

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I cannot give you that number.  Usually when that number -- part of the reason you couldn't get that number is because the data might not exist within the school district.  So you would have to extrapolate it from national data, which is pretty typical in the field, that you would do that.

If you don't have the data infrastructure to collect that within a certain site, you would look to nationally collected data.

BY ATTORNEY NOLAN:

Q.    Okay.  But you don't know if, for any of the six school districts, that data varies from the national rate?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I wouldn't know.  Because the data

infrastructure might not be there within the district, which is why we recommend building district data infrastructure so that they can actually navigate this issue.

BY ATTORNEY NOLAN:

Q.   And since you don't know for the specific districts and you're using national data, do you know how much time Snapchat users, on average, spend using different features on the Snapchat app?

ATTORNEY YEATES:   Objection to the form.  Not case specific.

THE WITNESS:   So, again, I would have to recall specifically the expert reports, where they did go into some detail about features and the different platforms and time spent.

But do I have that number for you right now?  No.

BY ATTORNEY NOLAN:

Q.   And in order to get those numbers, you would be relying on the

Page 838

other experts in this case; you didn't independently identify that information, true?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  So I looked to the other experts because I recall -- just since we're doing a bit of a memory test here, I could recall, you know -- I'd have to look to the expert.

Could that have also been in some of the literature that I reviewed?  Possibly.

BY ATTORNEY NOLAN:

Q.    Okay.  And you believe that the literature you reviewed may have included a breakdown of how much time Snapchat users spend using different aspects of the platform?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  What I'm saying is I -- it could be

Page 839

possible.  I didn't say I believe that.  I don't know.

BY ATTORNEY NOLAN:

Q.    Sitting here today, you don't know?

A.    I don't know --

ATTORNEY YEATES:  Same objections.

THE WITNESS:  -- sitting here today.

BY ATTORNEY NOLAN:

Q.    So, for example, you don't know how much time Snapchat users spend messaging using the chat feature on Snap, true?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  So sitting here today, I can't give you the number of minutes that users on Snap use messaging.

BY ATTORNEY NOLAN:

Q.    Have you seen that number anywhere to your recollection?

ATTORNEY YEATES:  Same objection.  And you have three more minutes.

THE WITNESS:  So I don't know if that specific number you're asking about, about that feature of Snap, was in the literature I've reviewed or the expert reports.

BY ATTORNEY NOLAN:

Q.    Did you ask the plaintiffs' lawyers for that information?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Did I ask or could I ask?

BY ATTORNEY NOLAN:

Q.    Did you --

A.    I misunderstood your question.

Q.    Did you --

A.    Did I --

Q.    -- ask the plaintiffs' lawyers?

Page 841

A.    -- ask that information?

Q.    Did you ask the plaintiffs' lawyers for that information, the amount of time Snapchat users spend using the messaging portion of the app?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Did I ask that question specifically?  No.

BY ATTORNEY NOLAN:

Q.    Okay.  When a user opens the Snapchat app, what do they see?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't know every user and what they see when they open it.

BY ATTORNEY NOLAN:

Q.    Well, every user, when they open it, sees the camera.

Any reason to dispute that?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I just don't

Page 842

know what they see when they open it.

BY ATTORNEY NOLAN:

Q.    Okay.  And I just have a few more questions here.

Did you recommend to any of the school districts that you consult for that they bring a lawsuit against the defendants in this case?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  Did I recommend that they bring a lawsuit?  No.

BY ATTORNEY NOLAN:

Q.    Okay.  Have you -- do you believe that social media should be banned?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  So I don't think I've ever called for a ban on social media.

What I've called for is that

Page 843

we support schools, in this case in these six districts, to address the harms that the defendants' platforms have caused to the students in their schools and on the school experience itself.

BY ATTORNEY NOLAN:

Q.    But only the defendants' platforms, right?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  In the case of this litigation, that's what I'm offering an opinion on, are these six districts.

BY ATTORNEY NOLAN:

Q.    Is it your opinion that no other social media platform has caused any harm at all to students or schools?

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  I didn't offer an opinion on that.

What I did detail in my

Page 844

report is that the defendants' platforms account for a -- the vast majority of use by young people; so elementary and secondary students.

BY ATTORNEY NOLAN:

Q.    And by "vast majority," what do you mean?

ATTORNEY YEATES:    Object to the form.    Not case specific.    And covered yesterday.

THE WITNESS:    So I detail -- I provided detailed numbers in the reports around the different plat -- the defendants' platforms and levels of use.

So -- and it's gone into in much more detail in some of the expert reports that I reviewed.

BY ATTORNEY NOLAN:

Q.    Okay.    What percentage of your income, since you've started working on this litigation, has been from your work as an expert in this case?

Page 845

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I'd have to calculate that. I do trainings that generate income and some consulting work. So I'm not entirely sure.

BY ATTORNEY NOLAN:

Q. So sitting here today, you can't tell me what percentage of your income, since you were retained in this case, is from your expert work for these six school districts, true?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I can't give you a percentage, no.

BY ATTORNEY NOLAN:

Q. Okay.

ATTORNEY NOLAN: Anybody else?

ATTORNEY YEATES: I have no questions. Thank you.

VIDEO TECHNICIAN: I will

Page 846

now be stating the on-record times for each party.

Andrew Keyes, representing YouTube, went five hours, four minutes.  John Nolan, representing Snap, went 25 minutes.

The time is 3:59 p.m.  We are off the record.

- - -

(Whereupon, the deposition concluded at 3:59 p.m.)

- - -

CONFIDENTIAL

Page 847

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

*Amanda Miller*

Amanda Maslynsky-Miller

Certified Realtime Reporter

Dated:  August 14, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

CONFIDENTIAL

Page 848

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

CONFIDENTIAL

Page 849

- - - - - -

E   R   R   A   T   A

- - - - - -

PAGE    LINE    CHANGE

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

CONFIDENTIAL

Page 850

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 847, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

SHARON A. HOOVER, Ph.D.                    DATE

Subscribed and sworn to before me this _____ day of _____, 20____.

My commission expires:_____

_____

Notary Public

CONFIDENTIAL

Page 851

LAWYER'S NOTES

PAGE   LINE

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

CONFIDENTIAL

**[& - 20th]**                                                                    Page 1

| **&** | | | |
|---|---|---|---|
| **&**  402:16 403:3 403:10 404:3 404:10,19 405:11 406:3 406:10,16 | **11:45**  582:21<br>**12**  543:16 553:21<br>**12:50**  666:17<br>**13**  402:9<br>**13th**  409:14<br>**14**  847:11<br>**15**  529:9 540:12 580:16 581:10,22 701:2 716:21 717:1 802:20 803:9 | 716:11,13<br>717:14 718:17<br>779:2,4,9<br>780:3 788:16<br>808:18,18,20<br>**20**  524:4 850:11<br>**200**  403:12 553:12<br>**20001**  404:12<br>**2000s**  554:6<br>**20024**  404:5 | 450:10 451:5<br>451:20 452:21<br>453:9 454:6<br>455:2,19<br>456:15 458:11<br>460:5,23<br>461:22 462:20<br>464:2,17<br>465:10 466:19<br>489:2,21<br>720:15 |

**0**

**07068**  405:13

**1**

**1**  408:17,17
445:9 521:10
637:20 638:5
638:24 640:7
646:6 651:14
654:20,20
780:14 781:5
850:3
**10**  716:20,24
**100**  541:11
716:3 789:11
798:22
**10022**  404:21
**10036**  406:18
**10:05**  499:18
**10:18**  500:1
**10:21**  504:13
**10:26**  504:20
**11**  503:9,11,13
**117**  406:11
**1185**  406:17
**11:31**  582:14

**16**  522:6
**16th**  777:5
**18**  473:16
**19**  819:19
**19087**  402:18
403:5
**1:33**  666:24
**1st**  528:22
551:18 552:1

**2**

**2**  565:12,14
703:13,15
704:1 705:8
706:4,9 707:5
707:23 708:11
709:11 710:12
710:15,17,24
711:7,23
712:19,22,23
714:3,9,14,17

**2008**  768:8
**2010**  528:18
**2017**  412:10
413:8,22 414:9
414:20 415:2
415:15,22
416:9,17 417:2
417:11,17
418:3,20
419:10 421:10
421:23 422:11
422:22 423:14
424:2,14
425:21 426:9
427:5 430:6,24
431:12 432:7
432:16 433:11
434:7 435:5
436:10 437:6
437:21 438:18
439:10 440:18
442:2 449:16

**202**  404:6,13
**2022**  746:5
747:4
**2023**  407:17,21
642:12,21
648:18 649:2
749:9 750:18
**2024**  407:17,21
642:12,21
648:18 649:2
773:11
**2025**  402:9
409:14 416:18
417:3,12,18
422:22 437:21
453:9 454:6
528:23 551:18
583:7 643:6
720:15 769:4
769:20 847:11
**20th**  582:4
583:7 760:19

CONFIDENTIAL

**[210 - 973]**

**210** 406:12
**212** 404:21
406:19
**2200** 406:5
**2222** 405:16
**23** 589:14
591:6
**24th** 643:6
**25** 448:4
449:10 516:3
788:15 789:1
846:6
**250** 597:1,3,10
640:24 651:5
651:14 654:20
**251** 405:6
**26** 727:2
729:18 730:2
747:21 748:5
748:10,16,20
**280** 402:16
403:5
**2:46** 765:18

**3**

**3** 587:12,14
703:14,19
704:14 705:9
705:20 706:4
707:24 708:11
709:11 710:12
714:22 715:4,9
716:18 717:1
717:14

**30** 407:12
533:1 540:23
543:17 564:11
564:14 733:12
848:16
**301** 405:5
**3047** 402:3,4
**305** 403:13
**308-1515** 405:6
**31** 407:15
552:1 642:6,9
**310-3030**
406:12
**31605** 847:10
**32** 407:19
642:5 648:12
648:15
**33** 648:11
**33131** 403:13
**33134** 405:17
**34th** 406:18
**36** 564:10
**36602** 405:5
**3:01** 766:1
**3:33** 807:11
**3:34** 807:18
**3:59** 846:7,11

**4**

**4** 551:19
**409** 406:6
408:17
**410** 407:6

**434-5000** 404:6
**446-4800**
404:21
**45** 760:1,22,23
**462-6000**
403:13
**4700** 403:12
**48** 646:14
**4:22** 402:3

**5**

**5** 405:12
716:19 717:1
**50** 558:2 646:8
646:14
**500** 596:1,7,13
596:19 640:7
641:14 644:11
645:5 646:6
654:20
**501** 406:5
**556-2100**
406:19
**564** 407:14

**6**

**6** 587:15,18
**600** 501:10
544:13,15
545:1 797:17
799:23
**601** 404:20
**610** 403:6
**642** 407:18

**648** 407:21
**662-6000**
404:13
**667-7706** 403:6
**680** 404:5

**7**

**73** 473:18
476:12 478:5
479:17 481:11
581:11
**750** 597:17
**763-3260** 406:6
**77550** 406:6
**78212** 406:12

**8**

**808** 407:6
**808west.com**
406:13
**847** 850:3
**85** 717:2
**850** 404:12
**877.370.3377**
402:24
**8:59** 402:19
409:15

**9**

**9** 582:6 583:1
587:12,15,18
**917.591.5672**
402:24
**973** 405:13,17

CONFIDENTIAL

**994-1700**
405:13,17

**a**

**a.m** 402:19
**a.m.** 409:15
499:18 500:1
504:13,20
582:14,21
**ability** 444:21
519:24
**able** 427:8
428:15 430:6
430:23 436:16
439:5 440:8
441:5 442:14
447:8 452:22
453:8,23 454:5
454:12,17
455:1,18
456:13 458:10
473:7 474:6
477:4 482:18
485:2 486:17
486:18 495:22
532:1 570:11
572:17 574:7
574:21 576:3
577:7 608:20
609:4,6 637:24
657:16 664:23
678:14 696:3,7
704:22 721:17
733:13 807:2

808:20 813:21
818:13 822:1,7
823:5,8
**above** 402:19
**absence** 447:14
775:2
**absolutely**
508:10 529:19
530:1,10
625:12 656:19
659:17 762:8
**abstract** 757:18
**abstracts**
733:14,21
**abuse** 534:7
535:1,23
617:14
**academic** 613:5
726:21 727:9
727:11 728:9
730:12,19
732:1,8 737:1
759:22 824:13
**academics**
619:11
**academies**
734:3,17 735:4
735:10 736:4
736:11,21
737:3 739:15
739:23
**accepted** 444:4
613:12 652:12

**access** 412:12
413:11 414:1
416:1,12 418:6
419:23,24
421:18 422:7
422:18 450:23
485:3,14 508:5
509:3 511:12
512:13 515:12
515:13 689:4
689:23 690:20
691:17 693:1
**accessible**
451:11,15
**account** 659:13
825:7 826:17
844:2
**accounts** 510:9
**accurate** 466:7
469:21 654:21
848:20
**acknowledg...**
850:1
**act** 511:18
763:23
**acting** 764:15
**action** 514:2
**actions** 689:17
810:9
**actively** 510:21
**activities**
657:13
**actual** 497:24
549:2 649:7,18

650:15
**actually** 444:3
444:6 447:17
468:7 469:20
482:5,6,10
483:2,8,17
485:19 495:23
509:8 510:13
548:22 571:8
575:5 576:11
583:4 600:10
604:19 629:8
635:2 636:20
639:1 644:18
645:8 650:22
655:23 665:6
678:13 679:14
687:14 688:21
694:23 699:21
704:11 705:18
728:16 729:11
736:7 749:15
757:10 763:3
763:21 778:2
784:19 785:4
796:6 804:11
832:23 837:5
**adaptation**
551:10 552:21
**add** 572:17
822:1
**added** 573:17
**addicted** 625:1
626:9,16

CONFIDENTIAL

**[addicted - aggregate]**                                          Page 4

627:14 628:2
**addiction** 402:4
  409:19 421:12
  422:1,13 423:1
  423:17 424:7
  446:3,4
**addition**
  593:11 797:20
**additional**
  611:12 647:19
  678:6 680:1,14
  680:23 681:4,8
  684:5 697:1
  698:7 700:15
  745:24 809:11
  809:11,12
**additions** 563:8
**address** 470:15
  477:12 481:5
  484:13 497:16
  512:6 536:23
  538:9 541:20
  543:10,23
  544:18 545:3
  570:9 571:9
  572:23 581:5
  583:22 584:8
  584:11 585:11
  586:4,16
  590:19 600:11
  600:13 606:17
  607:1,8 608:15
  614:15 619:24
  623:15 629:20

656:13 658:12
666:9 671:19
672:24 673:13
674:11 675:15
676:3,18 680:8
684:15 688:6
688:21 694:15
694:18 695:4
696:8,13,19
697:1 698:8
699:8 718:7
721:23 809:6
809:23 810:4
843:2
**addressed**
  477:9 540:20
  542:4 780:10
**addresses**
  471:7
**addressing**
  447:12 538:17
  547:14 552:22
  553:2 558:14
  573:15 677:5
**adequate**
  671:18 672:22
  672:24 673:13
**adequately**
  675:20
**adhered** 530:17
**adjectives**
  428:23
**adjusted**
  659:22 660:10

661:10 662:11
665:17 717:8
**adjusting** 662:1
**adjustments**
  701:5
**administration**
  534:8 535:2,24
**administrator**
  767:8,20
**administrators**
  427:19 431:8
  448:6,7 484:22
  493:3 561:15
**adolescent**
  402:3 409:19
  734:5 737:5
  739:1,17 740:3
  788:20
**adolescents**
  639:14 790:4
  802:19 803:11
  803:24 804:7
**adopt** 606:2
  607:15 621:7
**adopted** 805:9
  805:22 806:4
  806:18
**adults** 746:10
**advanced**
  813:20
**advancing**
  540:11
**advent** 660:19
  663:4

**adverse** 779:21
**advice** 735:12
**advisable** 504:5
**advisory** 666:5
**advocate**
  501:15 505:20
  511:1 512:5
  515:19 660:17
**advocated**
  500:23 501:18
  504:24 506:2
  506:15,17
  507:6,10 508:3
  509:1,18 510:7
  510:17 515:10
**advocating**
  604:4 606:1
  607:14 612:11
  614:22 615:23
**affiliated**
  530:11
**affirmative**
  659:7
**afford** 695:9
**afternoon**
  807:24 808:2
**age** 526:23
  553:19 617:8
  803:6 835:7,15
  835:18
**agencies** 535:8
  537:5 538:23
**aggregate**
  579:3,5

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **agnello** 405:11 | **allocated** 684:10 | 651:12 652:1 | 622:1,3 625:13 |
| **ago** 550:9 | **allotment** 798:18 | 658:16 660:9 | 641:16 663:22 |
| 760:5 826:18 | **allotted** 501:5 | 661:8 663:15 | 671:1,22 |
| 826:18,19 | 505:6 506:8,23 | 664:17 | 678:23 698:21 |
| 827:4 | 507:16 515:23 | **americas** | 698:22 706:1 |
| **agree** 587:21 | 528:14 531:3 | 406:17 | 707:11,20,20 |
| 628:23,24 | 532:21 740:10 | **amount** 417:15 | 708:9,19,23 |
| 630:11 631:24 | 753:24 770:23 | 431:10 670:11 | 709:8 721:8 |
| 632:6,12 633:1 | 771:16 772:13 | 695:3 768:19 | 725:5 738:20 |
| 633:14,20 | 798:17 830:22 | 841:3 | 740:13 750:17 |
| 634:1,6,10,14 | 831:18 | **analogy** 481:9 | 751:16 752:19 |
| 634:19 635:8 | **allow** 814:13 | 639:7 | 753:5,6 754:24 |
| 635:13 645:12 | 814:14 | **analysis** 675:8 | 758:20 770:9 |
| 674:2 735:9 | **allowed** 485:14 | 700:10 750:10 | 771:12 790:21 |
| **agreed** 409:3 | 823:5 | **andrew** 404:4 | 832:9 |
| 636:15 637:1 | **allows** 483:8 | 410:18 846:3 | **answered** |
| **agreement** | 578:10 | **annual** 540:11 | 421:3 427:11 |
| 530:15 773:2 | **alphabet** 404:8 | 540:15 541:18 | 439:1 441:1 |
| **ahead** 556:17 | **alter** 478:21 | **answer** 408:5 | 442:11 452:2 |
| 691:12 | **altered** 649:24 | 442:12 462:9 | 454:14,16 |
| **air** 576:6 | **amanda** 402:20 | 477:1 487:21 | 489:23 513:19 |
| **akeyes** 404:6 | 410:4 847:10 | 490:19 499:13 | 539:3 540:5 |
| **akin** 478:5 | **ambitious** | 501:8 502:11 | 575:2 576:23 |
| **alabama** 405:5 | 833:9 | 502:22 504:4 | 578:21 579:19 |
| **alaska** 551:11 | **amended** | 516:12 518:20 | 593:3 607:18 |
| **albeit** 743:10 | 560:23 582:4 | 518:21 522:23 | 619:23 621:12 |
| 743:12 | 583:5 760:8,19 | 523:5,15,18 | 623:9 624:10 |
| **alerts** 485:5 | **america** 614:9 | 524:20 525:7 | 661:17,19 |
| **aligned** 508:21 | **american** | 525:14,18,19 | 699:17 706:6 |
| 694:14 | 407:19 551:11 | 527:7 532:2 | 708:24 709:14 |
| **aligning** 694:17 | 614:9 641:4,9 | 534:15 536:9 | 726:9 729:8 |
| **allen** 405:4 | 648:15,23 | 541:24 542:24 | 735:16 749:12 |
| **allocate** 684:7 | | 558:4 588:10 | 753:22 763:19 |
| | | 592:24 604:12 | 791:6,23 |

CONFIDENTIAL

**[answered - asked]**                                              Page 6

792:17 794:6
800:12 805:13
806:21
**answering**
625:11 759:7
**answers** 443:17
707:11 850:4
**anticipate**
472:3 573:1,4
**anticipated**
803:23 804:7
**antonio** 406:12
**anxiety** 464:6
464:13,21
475:3,16 702:3
746:9
**anxious** 465:13
466:3,8,23
**anybody**
576:11 716:7
845:20
**anymore**
525:15
**apart** 535:10
790:20
**app** 837:11
841:5,12
**appearances**
403:1 404:1
405:1 406:1
**appeared**
759:19
**appears** 645:24
650:20

**applications**
832:20
**applied** 711:1
**applies** 716:17
**apply** 479:20
628:5 703:5
809:13 847:18
**applying**
610:13
**appreciate**
437:3 625:10
**apprised** 741:2
**approach**
471:23 474:20
477:12 478:21
479:12,21
**approached**
766:11
**approaches**
479:15 480:3
**appropriate**
563:15 622:24
709:3 714:12
715:3 716:13
808:19 848:6
**appropriaten...**
711:7
**approval**
561:22
**approve** 561:13
**apps** 833:18
**arbitrary**
491:16

**area** 487:22
497:3 605:6
611:16 612:4
614:16 615:9
789:16 790:11
**areas** 448:22
552:18 611:11
612:21 681:12
711:1,4 746:14
790:9
**arguably**
557:13
**argue** 502:24
504:1 526:15
765:9
**argumentative**
429:9,15,18
468:4 525:5
622:7 625:22
708:21 797:13
**arizona** 670:9
670:11 683:23
**array** 560:8
564:7
**arrived** 503:10
**article** 500:24
501:19 505:1
506:3,18
507:11 747:20
769:5,12,15,24
770:5,12 771:6
774:15 794:15
798:10,10

**articles** 515:10
730:24 732:4
733:15 747:16
754:20 755:2,5
759:5 769:3
772:1 789:11
789:18 797:2
798:23 824:21
**artificial**
699:12
**asked** 419:20
421:3 427:11
427:15 429:19
439:1 441:1
446:20 447:2
452:5,8 454:14
489:23 492:7
496:2 497:11
510:20 513:19
539:3 547:19
562:24 563:9
563:18 575:2
576:10,17
579:19 588:8
593:3 607:18
621:12,18
623:8 624:10
637:3 655:15
661:17 664:19
668:12 684:19
686:22 699:17
702:7 706:6
709:14 716:2
729:8 735:16

CONFIDENTIAL

**[asked - attorney]**

738:23 749:12 750:1,22 751:1 752:21 753:11 753:22 763:19 771:22 776:15 791:6,23 792:17 800:11 805:13 806:21 821:21 831:8

**asking** 415:13 420:19 421:5 425:14 428:20 428:22 429:2 430:1 432:22 433:3 434:2 437:15,18 438:8 446:9 449:8 452:9 457:7,11 465:23 478:22 480:22 489:7 498:8 503:18 503:19 507:7 510:23 511:15 516:2,14 518:2 518:9,10,12 519:20 521:15 521:24 533:7 537:18 549:14 556:23 557:1 569:8 575:17 575:18 576:20 593:17 602:6 607:24 611:9

616:5 618:19 622:22 628:23 629:6 668:9 675:4 682:3,6 685:13 691:23 692:2,6,8,18 695:19 698:13 698:24 699:4 705:13 710:21 713:11,13 721:5 726:8 740:14 741:20 743:5 745:2 749:15,19 750:4,21 751:7 754:24 763:6 772:8 783:2 793:8 796:13 796:21 812:10 818:2 822:16 823:8 840:6

**asks** 565:18

**aspects** 838:20

**aspirational** 653:3,16

**asserted** 703:6

**assess** 560:3

**assessing** 563:15

**assessment** 422:24 423:16 424:6 446:4 559:23 560:7 561:16 569:18

**assessments** 447:4 572:2

**assistance** 539:24 682:14 682:23

**associate** 767:4

**associated** 686:6

**association** 407:15,20 614:7,10 640:11,15 641:5,9,12 642:10,19 643:2 644:9 645:13 648:16 648:24 651:13 651:24 652:2 658:15,17 659:20 660:9 661:9 662:9 663:9,15 664:16,18 788:2

**assume** 454:19 517:8 664:23

**assumed** 427:16 429:19

**assured** 578:3

**attached** 848:12 850:6

**attempt** 492:10 814:7 821:23

**attempted** 488:5 490:2

**attempting** 482:17 487:23 487:24 490:9 536:22 584:19 803:22

**attempts** 485:22 489:13 495:19 554:11

**attested** 762:3 762:19

**attesting** 764:1 764:14

**attorney** 407:6 407:6 410:13 412:14,19,22 413:6,13,21 414:5,8,14,19 416:22 417:1,7 417:10 418:8 418:17 419:1,7 419:14,19 420:8,23 421:2 421:8,13,21 422:3,8,14,20 423:2,12,18,24 424:8,13,18 425:4 426:1,8 426:13 427:1 427:10,24 428:9,18 429:4 429:7,17,21 430:10,22

CONFIDENTIAL

**[attorney - attorney]** Page 8

| | | | |
|---|---|---|---|
| 431:3,11,17 | 473:6 475:5 | 520:20 521:18 | 583:14 584:2 |
| 432:5,10,14,19 | 476:13,22,24 | 522:1,21 | 585:20,22 |
| 433:9,15 434:5 | 477:24 478:24 | 523:12 524:12 | 588:5,22 |
| 434:10 435:3,9 | 479:8 480:5,15 | 525:4,12 | 592:21,23 |
| 436:8,20,24 | 481:7 482:2 | 528:12,19 | 593:2,10 |
| 437:4,10,19 | 484:3,10 | 529:3,15 531:1 | 594:17,20 |
| 438:2,15,24 | 485:11,17 | 531:10,15 | 598:1 599:1,8 |
| 439:9,17 | 487:4,14 | 532:3,6,14,19 | 599:18 600:3 |
| 440:15,24 | 488:22 489:4 | 533:10 536:6 | 601:14 604:9 |
| 441:24 442:8 | 489:17,22 | 537:1,8 538:19 | 605:22 606:3 |
| 443:15,23 | 490:12,20,22 | 539:2,6,11 | 607:11,17,19 |
| 445:2 446:10 | 491:2,21 492:3 | 540:7,21 541:4 | 612:12,24 |
| 448:9 449:19 | 492:15,21 | 541:7,15,22 | 615:1,15 616:2 |
| 450:1,13 451:1 | 493:13,15,18 | 542:5,18 543:5 | 616:9 618:12 |
| 451:23 452:4 | 493:23 494:3,8 | 543:12,19 | 619:14,20 |
| 452:12,20 | 494:22 496:9 | 545:19 546:1,4 | 621:4,11,15,23 |
| 453:2,7,13,20 | 496:23 497:5 | 546:8,13,23 | 622:2,6,21 |
| 454:1,3,9,11,13 | 497:18 499:14 | 547:7,18 548:2 | 623:7 624:5,9 |
| 454:24 455:6 | 500:3,8,12,16 | 549:3,10,21 | 624:22 625:3,5 |
| 455:17,24 | 500:21 501:3,7 | 550:3,22 | 625:21 626:3 |
| 456:12,17 | 501:23 502:5,8 | 552:13 554:18 | 626:11,21,24 |
| 457:19 458:15 | 502:10,12,15 | 555:5,13,21 | 628:8,17 629:5 |
| 459:2,7 460:3 | 502:21,23 | 556:9,16,18,24 | 629:17 631:23 |
| 460:10,21 | 503:1,6,16,19 | 557:11,19,23 | 634:22 635:7 |
| 461:4,20 462:3 | 503:22,24 | 558:19,23 | 636:6,8 638:11 |
| 462:18 463:1 | 504:8,11,22 | 559:17 564:9 | 638:15,19 |
| 463:24 464:7 | 505:4,24 506:6 | 564:19,24 | 640:4 642:4,17 |
| 464:15,22 | 506:16,21 | 565:4,8,11,13 | 644:14 645:3 |
| 465:8,14 | 507:8,14 508:1 | 575:1,16 576:5 | 645:18 646:7 |
| 466:17,24 | 508:7,23 | 577:2 578:15 | 646:16 648:10 |
| 467:11,21,22 | 513:18 514:8 | 578:16,18 | 648:21 649:9 |
| 468:3 470:4,9 | 514:16 515:7 | 579:13,18 | 649:14,21 |
| 470:14 471:3 | 515:21 516:17 | 580:1,12 582:2 | 650:3,5,18 |
| 472:10,17 | 519:14 520:10 | 582:7,10,11,23 | 651:1,9,16 |

CONFIDENTIAL

**[attorney - attorney]**                                                    Page 9

| | | | |
|---|---|---|---|
| 652:3 653:1,6 | 708:6,7,20 | 751:13,15,22 | 795:14 796:2 |
| 654:8 655:5,7 | 709:4,13 710:6 | 751:24 752:2 | 796:12 797:5,7 |
| 655:11 656:24 | 710:18 711:10 | 752:18,22 | 797:12 798:4 |
| 658:20,22 | 711:19 712:13 | 753:1,4,21 | 798:14 799:3,6 |
| 659:18,24 | 712:20 713:1,8 | 755:9 756:13 | 799:12,18 |
| 660:7,13 661:6 | 713:19 714:5 | 757:8 758:6,8 | 800:1,9,19,22 |
| 661:12,14,16 | 714:18,24 | 758:16 759:23 | 801:1,5,12,15 |
| 662:7,13 663:7 | 715:13,19,20 | 760:12,15,17 | 801:19,23 |
| 665:21 666:13 | 715:23 717:16 | 760:21 761:24 | 802:2,6,10,17 |
| 666:15 667:2 | 718:3,9,18 | 762:10,16 | 804:2,4,9 |
| 670:20 671:10 | 720:5 721:2 | 763:5,17 764:2 | 805:4,12,24 |
| 671:14 672:5 | 722:7,13,16,24 | 764:10,22 | 806:20 807:7 |
| 672:11 673:3,9 | 723:8,15 | 765:6,15 766:3 | 807:23 808:23 |
| 673:15,21 | 724:14,19,24 | 766:20 767:2 | 809:8,19 810:7 |
| 674:15,22 | 725:4,7,14 | 769:8,13 770:3 | 810:13 811:6 |
| 675:23 676:6 | 726:11 728:5,7 | 770:8,21 771:3 | 812:17 813:1,8 |
| 676:13,24 | 729:7,9,12,15 | 771:9,11,13 | 813:24 816:16 |
| 677:17 679:19 | 730:13,17 | 772:2,10 | 817:6,13,16,23 |
| 680:18 681:24 | 731:18 732:10 | 773:10,17 | 818:14,18 |
| 682:5 684:21 | 733:8,23 734:6 | 774:1,9 775:15 | 819:14,20,24 |
| 685:17 687:4 | 734:13 735:15 | 776:8,20,22,24 | 820:3,12,18,20 |
| 688:8,10,24 | 736:1 737:10 | 779:5,17 | 821:1 822:9,13 |
| 690:23 691:9 | 737:12,15,22 | 781:18 782:2 | 822:18,24 |
| 691:21 692:1 | 738:9,22 739:3 | 782:15,19 | 823:15,20 |
| 693:6 694:2,9 | 739:7 740:7,12 | 783:11,14 | 824:4,23 825:5 |
| 695:6,12 | 741:17 742:6 | 785:16,21 | 825:8,11,14,18 |
| 696:10 697:3 | 742:14,16,19 | 786:9,20 | 825:22 826:1,4 |
| 698:1,9,23 | 743:4,19 744:6 | 787:10,19 | 826:8,11,14,21 |
| 699:9,10,16,18 | 744:16,18 | 788:11 789:6 | 827:2,7,10,13 |
| 700:19 701:1 | 745:15 746:3 | 790:22 791:5 | 827:18,21 |
| 702:19 703:22 | 746:11,21 | 791:15,22 | 828:2,5,9,12,16 |
| 704:2 705:6,10 | 748:2,4,6,8,13 | 792:6,16 793:6 | 828:22 829:1,4 |
| 705:15 706:5 | 749:11,17 | 793:9,21 794:2 | 829:7,10 830:4 |
| 707:7 708:3,4 | 750:19 751:7 | 794:13,18 | 830:7,10,13,17 |

**[attorney - based]**

830:20 831:1,4
831:12,16,21
832:2,10,14,18
832:21 833:1,3
833:10,12,16
833:20,24
834:4,8,11,15
834:18,22
835:2,5,8,20
836:1,17,21
837:6,12,22
838:4,15,21
839:3,7,11,16
839:22 840:1
840:10,13,17
841:6,10,13,18
841:22 842:3
842:10,15,19
843:7,10,16,20
844:6,9,20
845:1,8,14,18
845:20,22
848:16
**attributable**
579:8 696:23
708:15
**attribute**
498:17 574:7
574:14,21
576:3,21 577:3
577:7
**attributed**
578:12

**attributing**
577:24
**atypical** 463:5
**audience**
799:15 800:6
**august** 402:9
409:14 551:18
552:1 847:11
**available**
466:16 474:14
501:1,21 505:3
506:4,19
516:22 517:16
518:18,24
571:7 619:18
621:8,20 622:9
629:12 648:23
701:4 776:17
**avenue** 404:5
404:20 406:17
**average** 835:6
835:18 837:10
**awarded** 538:5
**aware** 500:20
530:6 537:22
555:8 569:22
647:1,6 668:16
668:19 681:10
701:6 735:3
771:2 832:19
**awareness**
634:16

**b**

**b** 407:9 512:5
700:8
**back** 456:24
457:7,9,23
459:12,15,20
460:14 461:7
461:12 462:12
464:10 465:1
465:19 491:5
494:2 495:16
495:23 497:24
498:8,11,12,14
506:12 521:3,8
541:1,13
542:21 548:24
554:16 560:20
561:2 571:14
577:11 613:18
658:14 685:16
707:14 739:12
749:22 759:7
777:7 792:3
796:10 798:21
799:10 803:18
823:3
**balance** 574:17
**balanced**
761:22 762:13
763:2,12 764:5
764:18 765:4
**ball** 471:15
475:12

**ban** 487:9
489:2,20
490:16 491:1
492:2,20
493:22 494:5
497:3 499:6
842:22
**banned** 842:18
**bans** 487:24
493:10 495:15
496:3,7 497:21
498:4
**bar** 645:5
650:14
**bars** 645:1
**based** 407:17
415:12 418:10
424:21 441:22
448:24 474:12
474:13,14
480:24 538:2
572:19 575:22
595:16 596:12
597:16 598:5
598:15,23,23
599:13,22
600:6,9 601:5
601:8 605:21
616:16 640:10
641:3 642:12
652:13 665:14
665:15 688:3
701:8,10 720:9
723:13 750:13

CONFIDENTIAL

751:19 753:17

**baseline** 482:14
653:21

**basic** 656:5
660:18

**basis** 786:11,17
787:15

**bates** 407:12,15
407:19 564:14
642:9 648:15

**bears** 675:24
676:21 677:4

**beasley** 405:4

**beasleyallen....**
405:6

**becker** 405:12

**began** 411:2

**beginning**
577:23 668:11
781:9

**behavior**
605:13

**behavioral**
551:9 552:19
553:23 555:10

**behaviors**
487:2 633:22
634:21 635:2
635:10

**belabor** 608:11

**belief** 679:11
729:16

**believe** 456:3
576:20 578:2,6

662:17 665:15
668:1,24
682:11 732:23
761:14,18,20
762:2,11,18
763:10,21
773:7,20,21
820:8 821:12
838:16 839:1
842:17

**bellwether**
696:4

**belong** 640:14
641:8

**belonged**
640:19

**belonging**
809:17

**benefit** 623:3
623:13 626:6
626:18 628:15
632:1,7,10,13
632:23 633:2,5
633:15,18,21
633:24 634:2,5
634:7,11,15,18
634:20 635:1,5
635:9,14,17
636:16 637:4,5
637:8 638:8
680:13 702:10
702:16 796:22

**benefiting**
618:24

**best** 473:12
474:14 476:11
482:18 523:14
523:17 525:7
525:19 534:21
545:10 598:16
598:18,18
601:12 606:17
606:22 607:1
653:18 654:3,4
661:4 675:2
686:1 687:13
688:4 695:4
708:22 721:20
805:2

**better** 600:12
632:1 660:21

**beyond** 527:9
548:7 656:7

**binder** 521:10

**biscayne**
403:12

**bit** 417:24
448:13 559:3
561:19 647:9
670:23 671:6
671:24 720:3
816:21 838:9

**block** 508:4
509:2 511:11
512:12 515:11
515:12 689:4
689:23 690:20
691:17 693:1

**blocks** 503:8

**bluesky** 809:15

**board** 623:22
666:5 780:18

**body** 461:3,17
462:2 477:20
477:22 574:5
600:24 605:5
613:19 718:12

**bohnenkamp**
529:13,18

**bonnin** 406:3,4

**booklets** 541:2
541:14

**books** 552:1,3

**borrow** 604:7

**bottom** 643:4
650:4 651:3
717:2 761:1

**boulevard**
403:12 405:16

**bower** 405:16

**brain** 550:18

**break** 493:14
499:15 504:9
582:8 666:14
752:24 765:16
798:5,6

**breakdown**
838:18

**breathitt** 412:6
418:1,18 419:8
422:9 424:3
425:22 431:14

CONFIDENTIAL

433:12 437:22 438:19 439:12 440:19 442:3 452:23 453:10 454:7 455:3,21 458:12 460:7 461:1,24 462:22 464:4 464:19 465:12 466:21 488:24 668:18 669:1 670:18 671:1 671:12 672:7 677:18 678:9 679:1,13 780:4 780:11,17 781:5,11

**brian** 406:23 409:12

**brief** 499:21 504:16 582:17 765:21 807:14

**bring** 486:19 513:15 515:14 842:8,13

**bringing** 554:1

**brittany** 529:14

**broad** 518:23 536:9 548:16 558:5 584:12 626:14 636:20 675:4 773:1 789:10

**broaden** 417:23

**broader** 620:9 713:12

**broadly** 536:10 557:15 558:4 639:2 789:22 818:2

**brody** 405:11

**budget** 671:4 672:1,3 675:10 675:11 686:11 686:15,20,24

**budgetary** 687:1

**budgets** 675:7 686:19 687:9 695:16,23 818:22

**build** 482:23 590:18 814:12

**building** 443:1 567:19 620:13 622:19 637:22 669:10 670:15 716:8 837:3

**buildings** 670:6

**built** 580:19 701:18 719:7 810:16

**bulk** 713:7

**bullied** 432:9 432:18 433:4 433:14 446:7

809:14 810:20 813:5,6

**bullying** 433:2 433:6,23 809:7 814:9

**bunch** 750:1

**burling** 404:10

**burner** 486:19

**buy** 816:7

**byrne** 405:11

**bytedance** 403:15,15 406:20,21

c

**c** 512:6 700:8

**calculate** 845:4

**calculated** 657:17 658:2

**calculation** 657:3

**california** 402:1 409:23

**call** 504:9 590:4 603:19 707:18 801:10 814:19

**called** 494:5,10 494:13,23 495:9 551:13 613:10 629:3 681:5 732:12 842:22,24

**calling** 603:5

**camera** 841:20

**camp** 829:24

**candor** 762:4 762:20 765:13

**capacity** 656:11 700:18 721:13 821:14 823:11

**capture** 432:24 433:5 434:15 437:14 438:7 440:9 442:14 444:15,21 447:9 570:18 570:21 637:24 821:23 823:6 823:11

**care** 653:21

**career** 545:8 653:24 695:8

**careers** 483:21

**careful** 516:7 570:19

**carefully** 521:20 848:4

**carella** 405:11

**carellabyrne....** 405:14,18

**carolina** 669:4 669:6 678:2

**case** 455:16 500:6,9,14,17 501:4 502:1,2

CONFIDENTIAL

**[case - cell]** Page 13

| | | | |
|---|---|---|---|
| 502:14 503:17 | 751:4 752:23 | 843:1,12,21 | 782:5 809:23 |
| 503:23 505:5 | 753:23 758:18 | 844:10,24 | 843:4,18 |
| 506:7,22 | 761:5 762:9 | 845:2,12,15 | **causes** 519:4 |
| 507:15 515:22 | 764:17 769:10 | **cases** 402:7 | 585:15 740:2 |
| 516:20 518:16 | 770:4,22 | 656:1,2 720:9 | 779:21 781:16 |
| 519:9 520:16 | 771:10,14 | 720:14 773:6 | 789:4 791:3,20 |
| 523:8 524:24 | 772:12 773:18 | 784:18 | 792:13 793:24 |
| 526:8,10 | 774:10,19 | **castillo** 406:10 | 794:16 796:18 |
| 528:13 530:4,6 | 776:12,18,20 | **catch** 420:17 | 797:24 823:13 |
| 531:2 532:20 | 783:12,15 | 436:16 439:6 | 823:18 |
| 533:12 534:14 | 784:4 786:2 | **categories** | **causing** 526:20 |
| 541:23 543:13 | 787:20 788:5 | 636:22 654:18 | 528:5 657:12 |
| 545:20 546:14 | 789:7 791:7,24 | **category** | 795:22 797:4 |
| 547:8 548:3 | 792:18 794:3 | 498:19 566:11 | 798:12,24 |
| 549:11 550:4 | 794:19 797:14 | 566:13 568:10 | 799:16 800:7 |
| 552:14 555:6 | 798:15 799:19 | **caught** 815:12 | **cautious** 548:9 |
| 555:22 556:19 | 800:10 801:6 | **causal** 774:7,17 | 550:12 572:3 |
| 557:24 558:24 | 801:16 802:12 | 776:5 782:10 | 816:21 |
| 562:6,10,13 | 824:24 825:9 | 782:11 783:7 | **cbits** 554:4 |
| 563:1 564:4 | 825:15,23 | 785:18 786:12 | **cecchi** 405:11 |
| 565:7 610:6 | 826:5,12,22 | 786:19 787:16 | **ceiland** 406:7 |
| 619:13 639:15 | 827:8,14 828:6 | **causality** | **cell** 412:12 |
| 639:16 643:19 | 828:13,23 | 775:14 | 413:11 414:1 |
| 643:23 644:6 | 829:5,11 830:8 | **causation** | 416:1,12 418:6 |
| 649:6 667:15 | 830:14,21 | 783:3 784:7,12 | 419:23 485:15 |
| 683:21 696:21 | 831:17 832:3 | 785:14 786:3,8 | 485:22 486:10 |
| 701:23 702:23 | 832:15,22 | 788:3 | 486:13,24 |
| 706:17 715:10 | 833:4,13,21 | **cause** 522:15 | 487:9,12,23 |
| 729:5,21 730:5 | 834:5,12,19 | 585:17 797:23 | 488:13 489:2 |
| 733:17 739:10 | 835:3,9 837:13 | 822:11,12,22 | 489:20 490:3,9 |
| 740:8,24 741:3 | 838:1,5,22 | **caused** 441:7 | 490:16 491:1 |
| 742:13 743:17 | 839:17 840:14 | 526:18 584:14 | 492:1,19 493:9 |
| 745:8 746:5,12 | 841:7,14,23 | 586:5 615:6 | 493:22 494:4 |
| 749:13 750:20 | 842:9,11,20 | 680:16 781:22 | 495:15,19,19 |

CONFIDENTIAL

**[cell - child]**                                                                Page 14

496:3,7 497:3
497:21 498:4
499:6
**center** 403:11
528:10,18,21
529:6,23 530:3
530:12,18
532:4,9,15,24
533:14,24
534:4 535:21
537:3 538:22
540:9 559:19
561:9,12 562:1
569:19 571:19
572:15 643:11
650:9 664:5
**centers** 534:8
536:1
**certain** 595:14
598:6 600:23
605:5 607:2,3
652:22 674:7
695:3 775:2,19
795:9 809:14
817:7 836:15
**certainly**
427:17 460:2
463:6 467:16
469:8 481:15
532:12 535:8
553:16 554:7
556:8 558:13
616:22 632:9
640:18 644:21

655:13 660:21
688:16 720:15
724:11 745:23
786:6 787:22
790:4 800:13
801:6 803:15
804:17,20
813:11 814:7
835:13,15
**certificate**
610:5 612:3
847:1
**certification**
409:4 609:12
761:1,4,12,15
761:21 762:12
763:7,11 765:3
847:17
**certified**
402:21 609:17
847:11
**certify** 847:4
850:3
**certifying**
847:21
**cetera** 486:22
486:22 519:6
526:24 586:20
586:20 632:19
638:2 682:23
756:20 758:24
762:24 772:22
775:10,10
784:15 810:3

**challenge**
488:16
**challenges**
451:9 468:9
469:5,12,16,24
471:14 472:5,7
473:2 488:3
647:4,11
**challenging**
471:9 485:24
**change** 419:4
419:17 456:6
520:6 526:3
663:11,16,24
665:1 775:8,22
849:3
**changed**
453:17 660:24
**changes** 554:14
563:13,17
740:3 803:23
804:7 848:11
850:5
**changing**
597:21 662:24
**channel** 509:20
513:15 515:15
**characterizati...**
752:6
**charleston**
412:5 415:24
416:5,11,19
417:4,13,19,22
421:24 422:23

431:1 432:17
437:22 438:19
439:12 440:19
442:3 452:23
453:10 454:6
455:3,20
458:12 460:6
460:24 461:23
462:21 464:3
464:18 465:11
466:20 488:24
582:4 583:6,12
583:21 588:1
588:11,14,18
589:17 590:2,6
590:15 591:5,7
591:11 592:9
593:16,20
595:13 669:3,6
669:9 673:4,16
674:17 678:1,9
679:1,13 760:9
760:11
**chart** 650:13
**chat** 827:12,17
827:19,24
839:14
**check** 402:16
403:3 641:18
746:24
**checked** 641:20
**checking** 747:6
**child** 630:7
788:20

CONFIDENTIAL

**[children - committee]** Page 15

| | | | |
|---|---|---|---|
| **children** 526:6 639:14 694:16 790:3 | **civil** 772:6 | 434:22 440:2 480:18 484:21 519:17 541:10 552:16 629:22 636:18 656:10 706:8 713:15 723:18 797:17 798:8 810:16 | **collecting** 423:7 |
| **choose** 811:13 811:14 | **claim** 724:17 725:12 | | **collection** 814:20 815:1 |
| **chose** 613:11 | **claimed** 624:24 626:9,16 | | **collective** 563:6 |
| **chosen** 817:11 818:10 | **clarification** 691:14 | | **college** 653:24 |
| **christakis** 740:21 741:5 741:13,24 742:10 744:13 744:24 745:3,9 745:14 | **clarify** 448:13 510:12 583:17 690:3 | **clearly** 519:2 637:19 680:12 758:13 | **colloquially** 425:12 |
| | **class** 441:10 586:14 768:12 768:14 | | **combinations** 728:11 |
| | | **climate** 620:8 803:16 | **come** 459:22 482:1 519:17 576:1 687:19 694:1 697:7 707:13 756:23 756:24 |
| **chromebooks** 486:18 | **classified** 448:22 | **clinician** 596:13 788:19 | |
| **cigarettes** 617:13 | **classify** 448:15 | **clinicians** 611:4 | |
| **circumstances** 621:17 773:24 | **classroom** 434:9,16,24 435:7,16,20 436:7,12 437:8 438:1,14,22 439:7,15 440:5 440:22 441:22 442:6,16 443:4 446:8 480:11 484:7,9 586:13 619:5 620:4,6 712:10 | **close** 665:7 | **comes** 553:18 605:11 672:1 675:17 702:14 750:17 757:17 |
| | | **closely** 681:1 | |
| **cite** 562:4 575:5 744:11 745:10 | | **cognitive** 551:9 552:19 553:23 555:10 632:18 | **comfortable** 491:15 547:12 577:16 |
| **cited** 575:14 643:21 644:3 679:9 717:5 746:17 747:20 747:24 748:23 749:2,4,23 754:3,7 755:8 755:11 824:18 824:19 | | **cohort** 784:13 | **coming** 652:15 731:4 |
| | | **collaborative** 561:23 613:4 | |
| | | **colleagues** 530:17 | **commencing** 402:18 |
| | | **collect** 420:15 439:6 482:10 573:9 815:9 836:14 | **comment** 430:16 |
| | **classrooms** 425:3 444:7 484:19 | | **commission** 850:12 |
| | | **collected** 423:22 425:19 426:5 836:16 | |
| **citing** 744:5 | **cleanup** 770:7 | | **committee** 664:20 |
| **citycenter** 404:11 | **clear** 420:24 425:9 430:14 | | |

**[committee's - connection]**

**committee's**
739:24
**common**
407:18 553:18
564:1 642:14
643:12,15,17
643:24 650:10
**communicate**
513:16 514:13
515:16,18
**communicating**
509:21 510:10
**communication**
690:10 691:8
829:15
**communicati...**
693:21
**communities**
553:4
**community**
509:22 510:11
513:17 514:15
515:17 565:22
681:6
**companies**
526:2 528:3
**company**
402:23 802:8
**competencies**
608:14,22
609:2 610:7,17
611:7 612:1,6
704:18

**competency**
612:4,20 704:5
**complete**  744:8
**completely**
688:15 822:10
822:21
**complex**  471:7
477:13 694:16
**complicated**
550:18 671:4
**component**
474:12 589:16
589:21 590:1,8
590:14,18,22
618:6 629:7
**components**
547:15 548:17
560:4 636:3,11
636:11,13
688:18
**comprehensive**
512:1 536:13
537:23 545:3
547:10,16
556:2,4 558:15
560:9 604:24
636:12 687:15
755:18 789:13
790:13
**comprehensi...**
521:7 608:10
**concerns**
468:20 665:10
703:18 704:13

705:19 706:15
706:17 710:3
710:11 711:15
711:17,24
712:9,16
713:24 715:18
715:22 718:1
718:14 720:2
742:3 817:5
**concerted**
473:13
**conclude**  782:9
**concluded**
739:24 846:11
**conclusion**
684:13 740:2
**conclusions**
419:4
**conduct**  667:12
667:20 693:16
**conducted**
789:2 791:1,19
792:12,22
793:22 795:19
803:21
**conducting**
512:17 574:3
577:18
**conference**
540:11,15,24
542:7 543:8,18
543:22 544:4
**conferences**
541:12,18

542:2,12
543:21
**confidence**
736:23
**confident**  730:9
**confidential**
421:20 422:6
422:18 450:7
450:17 451:6
452:16,18
453:5 454:21
456:21
**confidentiality**
574:16 578:4
**confirm**  621:18
623:1 626:5
**conflict**  627:21
771:20 772:4
772:16,19
773:22
**confusing**
429:12 492:9
**conjunction**
728:23
**connected**
628:14
**connecticut**
645:16 646:1
646:10
**connection**
411:5 480:12
668:4,12
778:21 782:11

CONFIDENTIAL

**[connolly - coordinated]**                                            Page 17

| | | | |
|---|---|---|---|
| **connolly** 404:3 410:19 | 831:3 | **consult** 766:18 842:7 | **continuation** 411:1 |
| **consequences** 541:20 543:10 543:24 544:18 665:19 779:21 805:10 | **considering** 759:14 784:4 784:11 | **consultant** 513:21 668:6 668:14 788:19 | **continue** 501:24 |
| **conservative** 665:6 | **consistency** 598:17,20 601:9 | **consultants** 692:23 | **continued** 404:1 405:1 406:1 701:24 |
| **consider** 444:1 479:11 489:7 505:19 556:6 686:3,10,15 687:18 714:16 744:4 756:12 757:22 774:23 784:10 824:5,9 | **consistent** 425:1 426:20 435:21 502:7 502:13 513:6 600:1,7 631:20 704:24 714:8 724:7 818:7 829:14 | **consulting** 667:23 773:2 845:6 | **continuous** 701:20 |
| | | **consults** 539:20 | **contribute** 532:11 |
| | | **contain** 546:21 | **contributed** 532:13 |
| | | **contained** 549:17 | **contributing** 532:10 |
| **consideration** 783:19 | **consistently** 431:21,23 435:19 439:21 468:18 485:4 488:15 604:21 605:15 732:2 821:15 | **contemporan...** 574:3 | **contributors** 561:8 |
| | | **contend** 586:9 586:12 | **control** 492:6 528:2 534:9 536:1 847:20 |
| **considered** 493:11 559:12 637:21 644:5 654:3 655:23 656:19 732:20 737:19 744:8 744:10 747:3 748:1,24 754:5 754:11 755:14 755:17,19 756:1,4,5,6,11 756:17,21 757:7,10,11,13 758:2 765:12 786:23 811:3 | | **contending** 483:17 661:2 673:1 720:18 | **conversation** 577:23 666:6 722:9 770:11 770:13 |
| | **consists** 545:15 | **content** 547:13 548:11 584:17 | |
| | **consortium** 681:5 | **context** 523:24 538:18 558:18 559:13 581:7 581:24 593:5 647:3,4 655:18 675:17 693:20 709:2,7,21 725:23 768:11 796:7 810:20 812:21,23 | **conversations** 495:13 511:8 511:16 512:9 513:12 514:10 576:2 665:4,24 678:10 723:14 723:19 |
| | **constant** 424:23 425:1 | | |
| | **constantly** 531:20,21 572:4 | | |
| | **constitute** 711:6 | | **coordinated** 681:6 |
| | **constraints** 606:7 | | |

Golkow Technologies,
877-370-3377              A Veritext Division              www.veritext.com

CONFIDENTIAL

**[coordinator - covid]**                                    Page 18

**coordinator**
  569:4 594:24
  595:5
**coping** 551:15
  632:7,11
**copy** 566:5
**core** 407:18
  548:16 642:14
  643:12,15,18
  644:1 650:10
**correct** 412:3,4
  412:7 421:1
  440:23 445:9
  453:24 457:21
  481:9,12 482:1
  484:9 485:16
  495:2 499:1
  552:4,8 562:6
  565:15,16,22
  574:1 589:18
  589:19,23
  590:10,17,20
  590:24 591:8
  591:17,18
  592:14,24
  593:15 595:17
  597:1 623:6
  640:8,13 641:1
  651:19 655:8
  658:19 716:22
  728:4 733:3
  736:22 740:22
  741:1 744:9
  748:1,24 749:1

  752:5 755:15
  755:22 756:2
  778:8,17 850:4
**corrections**
  848:5,7 850:5
**correctly**
  510:15 581:10
  585:14
**correlational**
  775:5 776:1
**correspond**
  692:22
**corresponding**
  598:9
**corroborates**
  436:5
**cost** 572:10
  685:21 687:20
  688:9 695:2
**costs** 686:6
**counsel** 409:3
  410:2 411:19
  412:21 420:6
  493:13 530:7,7
  582:7 709:5
  741:12 750:24
  760:12 776:8
  776:15
**counseling**
  609:22 614:10
**counselor**
  407:19,20
  597:5,10
  619:13 640:24

  641:5,9 648:16
  648:17,24
  649:1,8,18
  650:16 651:5
  651:13 652:2
  654:19 660:9
  661:9 767:14
**counselors**
  568:19 653:23
  654:12,23
  655:2 657:2,4
  657:19,21,22
  658:17 663:15
  664:17
**count** 466:7
  650:23
**countries** 553:4
**country** 448:3
  601:16,19,22
  602:8,11,18,22
  603:12 613:9
  649:8,19
  806:17 818:8
**county** 405:7
  582:5 583:6,12
  583:21 588:2
  588:11,14,18
  669:18 760:9
  780:18 781:11
**county's** 781:6
**couple** 609:9
  704:7 826:6,18
  826:19 831:14

**course** 448:1
  511:1 545:8
  580:17 626:20
  661:21 669:13
  670:7 684:24
  689:8 690:8
  756:18,19
  831:14
**court** 402:1,20
  409:22 410:3
  761:23 762:15
  762:22 763:12
  764:6 765:4
  848:20
**court's** 502:7
**cov.com** 404:13
**cover** 548:16
  750:3 758:14
**covered** 451:12
  528:15 751:14
  769:9 770:5
  771:17 774:11
  776:11,23
  783:13 789:8
  791:7,24
  792:18 794:4
  794:20 797:14
  798:16 799:20
  800:11 801:19
  806:23 811:22
  844:11
**covers** 764:9
**covid** 819:19
  820:2

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **covington** 404:10 | 700:17 802:24 803:15 | 421:1,6 423:8 424:11 428:15 | 493:1 495:23 560:10 563:1 |
| **craig** 406:4,11 | **currently** 766:5 | 430:2 432:13 | 564:8 573:8 |
| **create** 569:16 | 766:8 811:8 | 432:23,23 | 581:13 590:16 |
| 593:13 615:24 | 814:2 815:21 | 433:5,20,21 | 590:19,22 |
| **created** 614:23 | 816:15 | 434:4,13 | 591:2 602:14 |
| 621:8,19 | **curriculum** | 435:21 436:4 | 642:14 643:5,9 |
| 702:12 719:9 | 601:4 | 436:14,15 | 643:12,15,18 |
| 826:16 | **cut** 621:24 | 437:13 438:6,8 | 644:1,22 |
| **creates** 717:23 | 803:18,18 | 439:4 440:2,8 | 645:20 646:12 |
| **creating** 592:6 | **cv** 551:6,18,22 | 441:3,12,12 | 650:7,10 |
| 815:6 | 552:1 558:4 | 442:13 443:18 | 667:17 699:21 |
| **crisis** 595:9 | 736:7,19 769:2 | 443:21 444:2,4 | 704:6,17 719:6 |
| **criteria** 618:16 | 769:17 772:15 | 444:15,17 | 720:22 721:6 |
| 620:21 628:6 | 791:17 792:3 | 445:22 446:23 | 722:2 724:8,15 |
| 704:14 705:8 | 796:23 | 447:7,15,17,20 | 725:2,9,20 |
| 705:20 706:3 | **cyberbullied** | 447:24 449:21 | 726:3 782:14 |
| 707:23 709:10 | 808:16 | 452:19 453:5 | 813:13,16 |
| 709:24 710:8 | **cyberbullying** | 453:16,21 | 814:13,19,24 |
| 710:16 711:5 | 811:10 814:16 | 457:16 459:3 | 815:7,10,11 |
| 711:12 714:15 | 821:19 | 460:14 461:9 | 817:1,8,12,20 |
| 714:20 | | 462:6 463:5,10 | 820:9 821:4,10 |
| **criticize** 474:4 | **d** | 463:18 465:1 | 821:14,22 |
| **crystal** 471:15 | **d** 407:2 | 466:5,11 467:4 | 823:11,17,23 |
| 475:12 | **daily** 625:14 | 467:16,17,18 | 824:1 836:7,10 |
| **cumulative** | 756:20 829:18 | 467:23 468:7 | 836:13,16,20 |
| 780:15,20,23 | **damaging** | 468:12 469:3,5 | 836:24 837:4,9 |
| 781:7 | 780:7 | 469:11,22 | **date** 402:19 |
| **curious** 633:7 | **daniel** 404:4 | 476:4 478:15 | 409:14 560:16 |
| 739:14,19,20 | **data** 407:18 | 478:15 481:22 | 560:17,21 |
| 739:22 742:12 | 412:20 413:16 | 482:7,10,11 | 663:24 720:11 |
| 742:22 | 415:12,20 | 483:2,11,12,19 | 812:24 820:6 |
| **current** 640:18 | 416:16 418:11 | 484:1 486:6 | 848:9 850:8 |
| 640:19 671:19 | 420:7,14,16 | 488:20 491:19 | |

**[dated - dekalb]**                                    Page 20

**dated** 583:7
 760:10 847:11
**david** 405:12
 406:4
**day** 411:16
 427:23 436:1
 483:18 485:16
 485:23 486:11
 486:14 487:1
 490:4,11
 494:18 571:10
 638:1 653:5
 707:10 770:6
 776:12 850:11
**days** 848:16
**dbonnin** 406:7
**dc** 404:5,12
**de** 405:16
**deal** 484:6
 585:6 680:15
 811:9
**dealing** 476:1
**dealings** 692:9
 692:19
**decade** 826:18
**decades** 535:16
 604:16 670:7
**decide** 733:6
**decided** 750:14
 751:20 758:4
**deciding**
 703:24
**decision** 634:12
 648:7,9 754:15

818:16
**decisions**
 488:11 696:1
 819:6
**decline** 473:9
 579:17 580:11
 580:23 581:18
 581:21
**decrease**
 471:11 472:4
 473:1,18 474:8
 474:16 475:16
 475:19 476:10
 476:12 478:6
 479:18 581:8,9
 581:11 635:22
**decreased**
 431:24
**dee** 402:20
**deemed** 757:11
 758:2 848:19
**deep** 473:9
**deeply** 733:16
**defendant**
 500:14
**defendants**
 403:14 404:7
 404:14,22
 406:20 410:20
 414:12,23
 416:20 417:5
 418:23 420:3
 424:24 427:22
 435:17 437:9

438:11 441:8
 442:7 443:5
 444:24 468:22
 493:7 496:20
 500:5,24
 501:20 505:2
 506:3 507:11
 508:17 509:11
 510:3 516:21
 517:15 518:17
 519:11 520:1
 520:17 523:9
 525:1 526:9
 527:12 537:15
 569:23 583:23
 584:12 589:12
 606:10 614:24
 615:7,13 616:1
 616:8,13,24
 618:10 619:19
 621:10,21
 622:16,20
 623:5 624:20
 625:1 626:9,18
 659:16 677:7
 680:16 687:17
 688:22 689:5
 689:24 690:20
 691:18 693:3
 701:3 712:6
 721:14 741:14
 781:21 782:4
 788:4 803:5,17
 807:5 808:10

809:4,17,24
 810:10 812:7
 813:7 820:23
 821:16 842:9
 843:3,8 844:1
 844:15
**defensible**
 775:9,24
**deficit** 426:24
**deficits** 426:19
**define** 539:15
 707:5 764:20
**defined** 627:4
**defines** 711:5
**definition**
 755:23 756:11
**degree** 609:11
 609:21,21,22
 643:16 697:22
**degrees** 609:19
**dekalb** 405:7
 412:6 418:2,19
 419:9 422:10
 424:4 425:23
 431:14 433:12
 437:23 438:20
 439:13 440:20
 442:4 452:24
 453:10 454:7
 455:4,21
 458:13 460:7
 461:1,24
 462:22 464:4
 464:19 465:12

CONFIDENTIAL

**[dekalb - develop]**

466:21 489:1
669:20,23
673:5,17
674:17 683:1
**delivered**
544:13
**demand** 665:11
**demerath**
406:10
**demonstrate**
522:14 610:8
784:6
**demonstrated**
473:18
**demonstrates**
609:12
**department**
407:17 534:6
534:10 535:13
535:22 536:2
642:13 643:10
650:8 670:12
**depend** 600:19
**dependent**
756:16
**depends** 686:14
710:20 733:11
**deponent**
409:24 850:1
**deposing**
848:16
**deposition**
402:13 408:2
409:16 411:2,6

411:16 440:2
445:21 486:6
492:1,7,19
493:1 502:3
503:13 575:7
575:18 576:14
579:7 655:19
679:7 685:3
696:11 750:24
755:4 759:8
776:10,13
785:24 786:18
824:10 846:10
847:6 848:3,13
848:17,19
**depositions**
445:13 460:15
491:11 496:16
496:18 498:1
656:9 785:8,20
786:4 787:2
**depressed**
451:22 452:10
455:5,12,23
456:5 474:8
**depression**
449:18 450:12
450:24 451:4
453:1,12 454:8
458:7 472:16
746:8
**deprivation**
463:16 519:5

**deprived**
462:24 463:23
479:6
**describe** 445:7
469:15 581:8
629:23 653:15
**described**
493:21 539:8
653:18 682:10
697:23 710:14
714:9
**describing**
496:15
**description**
407:11 545:24
**descriptions**
445:4
**design** 520:8
522:10 526:3,5
526:16,19
527:20 586:16
790:9 803:1
**designing**
598:22 694:13
**desk** 732:4
756:24
**desperately**
680:14
**detail** 437:16
444:18 483:1
507:20 527:3
584:21 587:1
589:9 647:1
672:17 724:5

726:10 733:22
784:23 788:1
832:6 837:17
843:24 844:12
844:18
**detailed** 426:16
441:18 446:17
447:7 469:7
473:19 682:17
684:8 835:11
844:13
**details** 501:12
516:3 543:15
545:1 548:11
548:21 550:7
683:15,19
**determination**
738:5 749:8
752:12
**determine**
471:17 601:2
627:9 733:17
774:6,16
775:13
**determined**
719:11 753:17
**determining**
733:15
**develop** 438:6
508:20 509:13
510:4 512:21
522:18 550:10
612:6 615:20
632:4 686:16

CONFIDENTIAL

**[develop - disclosed]**                                Page 22

| | | | |
|---|---|---|---|
| 686:20 687:7 704:17,18 721:17 | **dgilfillan** 405:14 | **difficult** 413:3 413:17,19 463:11 478:17 486:11 488:11 819:6 | 678:21 682:13 694:17 697:12 698:4 699:6 785:5 |
| **developed** 546:18 548:24 549:15 550:9 561:4 570:16 571:14 602:2 610:4 611:24 612:1 | **diagnosed** 421:11,24 422:12 446:2 449:17 452:6 456:15 458:7 458:14 459:6 461:3,17 462:17 464:6 472:15 475:2 477:19 | **difficulty** 550:6 **digital** 566:2,15 568:13 591:12 591:13 595:24 601:17,20,23 604:6 612:23 613:20 615:10 624:16 633:3,5 633:8,16,18 634:3 637:6,9 | **director** 528:10 528:17,21 529:1,8,10,22 540:9 566:1,15 566:19 567:2,9 567:24 591:12 591:12,13,14 591:15,16 601:16,20,22 602:11,16,18 602:22 603:12 603:23 604:2,6 607:21 614:4 664:4 |
| **developing** 604:14 641:24 656:18 687:12 688:17 756:6 | **diagnoses** 451:9 478:22 | **dimensions** 562:23 | **directors** 468:14 529:13 |
| **development** 561:6,23 562:2 572:13 590:5,8 590:12 598:4 608:19,21 610:22 611:1 611:12 630:7 704:21 | **difference** 481:22 827:16 **different** 448:17 547:15 558:7 560:3 562:23 569:7 597:22 603:22 612:20 647:10 649:19 654:17 686:9 728:11 746:23 747:5,8 747:9 790:1 818:4 821:5 823:4 832:12 835:16 837:11 837:18 838:19 844:14 | **diminish** 657:13 **diminished** 426:12 427:7 428:6 430:8 431:2,16 446:6 **direct** 483:15 574:13 575:13 577:14 616:23 690:10 693:12 693:21 795:10 815:12 847:20 | **disagree** 482:5 485:20 497:7 743:22 **disagreeing** 521:23 **disciplined** 480:11 **disciplines** 656:6 |
| **developmental** 632:18 | | | **disclosable** 772:4 |
| **device** 412:13 413:12 414:2 416:2,13 418:7 420:1 | | **direction** 408:5 **directly** 441:13 442:22 468:16 576:12 622:16 624:4 630:3 | **disclose** 769:23 **disclosed** 770:18 771:4 |
| **devices** 485:16 509:4 512:14 515:14 690:1 690:22 691:19 693:5 | **differently** 561:20 | | |

CONFIDENTIAL

**[disclosed - district]**

773:13
**discontinue**
  500:6 507:12
  519:11 520:18
  523:10 525:2
**discord** 809:15
**discuss** 494:4
  495:14 498:3
  532:17 533:16
  534:12 541:18
  543:8 546:11
  549:7 552:11
  555:3,14
**discussed**
  554:21,24
  693:9
**discusses** 547:5
  547:23 550:1
**discussion**
  495:18,18
  511:2 530:22
  531:12
**discussions**
  435:12 572:1
  723:24 724:12
  821:11
**disease** 534:9
  536:1
**disengaged**
  619:9
**dismissing**
  495:6
**dismissive**
  495:4

**disorder** 461:3
  461:18 464:6
  464:21 477:20
  478:19
**disorders**
  464:13
**display** 564:10
  642:5
**displayed**
  834:2
**disposal** 449:22
**dispute** 777:20
  841:21
**disrupted**
  440:4 485:5
**disrupting**
  438:13
**disruption**
  434:16,19
  436:6 440:10
  440:11 441:10
  441:21 443:4
  443:13 519:5
**disruptions**
  434:23 435:15
  439:7 442:15
  480:19 484:7
  484:18,24
  485:12 487:12
  488:18 586:13
  617:23 620:3
**disruptive**
  434:9 435:7
  436:12 437:8

437:24 438:21
  439:14 440:21
  442:5 446:8
  480:10 487:2
**distinct** 819:23
**distinction**
  499:10
**distinctions**
  813:22 814:2,6
  814:8
**distinguishing**
  815:15
**distracted**
  424:17 425:8
  425:17,24
  427:22 431:24
  446:5
**distraction**
  425:2 433:24
  625:24
**distractions**
  487:11
**distress** 715:6
**district** 402:1,1
  405:7 407:13
  407:14 409:22
  409:22 411:13
  419:23 423:7
  426:17 427:20
  429:1 433:19
  434:20 442:22
  442:24 444:19
  445:5,15
  446:18 448:6

449:3,4 451:16
  454:23 456:22
  457:8,15 458:2
  463:9 467:4,8
  471:2 486:4
  487:10 489:12
  489:16 490:7
  490:14,16,24
  491:12,17,19
  493:2 496:6
  497:20 498:10
  499:10 503:4
  509:4 511:13
  512:14 513:1
  513:10 515:14
  517:4 562:22
  563:6 564:15
  564:16 565:18
  566:1,15,19
  567:2,9,14,24
  570:21 574:5
  580:10 582:5
  583:7 587:6
  588:2,9,12,13
  588:18 589:3,6
  589:10 590:13
  591:3,11,22
  592:4,13,20
  593:13,13
  594:4 595:24
  596:2,6,8,12,14
  596:18,19,24
  597:9,11,14
  599:6,7,14,22

CONFIDENTIAL

**[district - districts]**                                                  Page 24

| | | | |
|---|---|---|---|
| 601:6,16,22 | **district's** | 510:17,22 | 607:13,15 |
| 602:11,18,22 | 563:16 693:4 | 511:11 512:12 | 612:9 613:8 |
| 603:3,12,23 | **districts** 406:14 | 513:14,23 | 614:1 615:23 |
| 604:1,5 605:3 | 412:2 418:15 | 514:4,13 | 621:7 627:8 |
| 605:10,17 | 434:1,4,14 | 515:11 516:10 | 640:6,23 642:2 |
| 607:6,21 | 438:6 439:21 | 517:21 519:19 | 647:13 653:4 |
| 608:17 610:12 | 441:4,15,20 | 520:5 521:1 | 654:11 657:20 |
| 610:24 611:6 | 443:9,19 444:3 | 528:6 536:22 | 658:4 665:5 |
| 612:10 614:11 | 444:9,12 | 538:12,16 | 667:7,14,24 |
| 614:19,21 | 446:22 448:3 | 545:12 560:2 | 668:3,7,15 |
| 615:22 627:7 | 448:14 449:7 | 561:15 562:5,9 | 673:7,18 675:3 |
| 654:15 655:3 | 449:10,12 | 562:15,19 | 675:5 676:2 |
| 658:19 678:11 | 459:4,11,19 | 563:9,21 | 680:4,4 682:17 |
| 678:24 679:12 | 461:19 463:14 | 569:16 570:4 | 682:19 684:9 |
| 679:22 692:13 | 463:15,21 | 571:22 573:9 | 684:14,18 |
| 693:13 695:8 | 464:14 465:4,7 | 577:22 587:3 | 685:5,8,14,20 |
| 695:20 715:11 | 468:2 470:1,8 | 587:23 589:9 | 686:17 687:3 |
| 727:14 728:3 | 470:13,16,19 | 589:23 590:10 | 689:4,23 |
| 733:2 747:10 | 470:22 472:12 | 590:24 591:21 | 690:11,19 |
| 748:12 751:11 | 474:23 476:15 | 591:24 592:3 | 691:4,17 |
| 755:12 766:16 | 477:16 479:2 | 592:10,19 | 692:21 693:1 |
| 767:5,8 777:23 | 480:7 481:20 | 593:9,19,24 | 693:23 694:5 |
| 778:6,12,19 | 481:23 484:6 | 594:8,14,23 | 695:18 696:4 |
| 779:8,19,22,23 | 484:21 487:22 | 595:4,9,20,23 | 696:18 697:14 |
| 780:2,8,24 | 488:4,24 489:9 | 596:5,11,17,23 | 697:15 698:5 |
| 781:3 784:20 | 489:19 490:2 | 597:8,21,24 | 699:23 700:13 |
| 785:4 788:14 | 491:10 493:5 | 598:12,21 | 714:4,21 |
| 795:17 805:8 | 493:20 494:7 | 600:8,18 | 715:16 718:13 |
| 805:19,21 | 494:16 496:4 | 601:10,15,19 | 720:21 721:7 |
| 806:17 807:1 | 497:2 498:9 | 601:21 602:10 | 721:12,21 |
| 808:3,22 809:2 | 502:20 503:3,8 | 602:17,21 | 722:5,11,19,21 |
| 822:20 836:8 | 503:21 505:17 | 603:3,11,18 | 723:3,10 |
| 837:2,3 | 508:4,14 509:2 | 604:5 605:24 | 725:13,18 |
| | 509:19 510:1,8 | 606:2 607:10 | 726:13 727:6 |

CONFIDENTIAL

**[districts - easy]**                                                  Page 25

750:7 766:6,11
766:23 777:3
777:10,18
778:14,17,23
779:14 780:17
781:17,23
782:6 783:4
785:15 786:15
787:7,8 805:7
805:17,21
806:2,7,14
811:18 813:3,4
813:19 814:18
814:23 816:3
817:10 818:3,8
819:1,4,8,15
821:5 822:4,6
822:16 835:23
835:24 836:19
837:8 842:7
843:2,15
845:13
**divided** 654:15
**division** 409:13
**doctor** 831:23
**document**
402:6 459:16
565:2 583:4
605:15 642:18
642:22 648:22
662:23 734:12
738:17 754:7
822:7,11,22
823:9

**documented**
443:11 484:17
655:16 657:9
683:6 684:2
725:22 784:3
**documenting**
684:3
**documents**
408:10 445:18
457:10 459:18
459:23 461:13
462:13 463:13
465:20 466:14
467:10 491:13
493:2 531:24
533:3 534:2
545:14 547:2
548:6 549:2,20
550:10,21
604:22 643:1
661:20 662:16
679:8 683:6
726:2 731:22
732:17 734:10
734:15 737:21
737:24 754:3
755:11 759:4
759:12 824:6
**doggy** 828:17
828:20
**doing** 444:2
473:21 510:20
513:7 523:14
523:17 525:7

525:19 526:12
527:14 528:3
563:11 579:2
675:1,8 689:12
708:22 757:16
768:23 795:8
820:2 838:8
848:8
**dollars** 772:8
**domains** 564:3
**doubt** 423:10
536:19
**downloaded**
833:6
**dr** 410:14
428:20 500:4
504:23 522:22
523:14 529:9
529:13,14,17
529:18,18
564:23 582:24
645:19 650:6
667:3 708:22
709:5 725:5
751:16 766:4
807:7,24
**draft** 529:16,20
**drafting** 546:3
546:7 549:7
**drafts** 530:11
**draw** 475:19
476:7 601:12
788:14

**drawing**
534:21 598:17
600:16 778:21
**drew** 469:10
535:18 683:21
**due** 440:5,11
442:16 572:10
672:19 707:8
724:10
**duly** 410:8
847:5
**duolingo** 833:2
**duty** 762:4,20
763:22 764:4
**dwhiteley**
404:7
**dysmorphic**
461:3,17
477:20

**e**

**e** 407:2,9 746:6
849:1
**earlier** 601:24
637:3 690:4
696:11 702:7
703:6 749:15
813:16
**early** 554:6
617:10,14
639:19
**ears** 828:18,20
**easy** 772:23

CONFIDENTIAL

**[econometrics - engagement]**                                    Page 26

**econometrics**
687:21
**economist**
686:8 687:22
695:22
**ed** 670:12
769:4,7,18
**edition** 551:8
554:5,12
**editor** 732:5
**education**
407:17 425:10
534:10 535:14
536:3 566:20
568:1 591:14
591:17 602:12
603:13 618:6
619:16 628:10
629:8 630:4
632:8,11 633:2
633:5,15,18,21
634:3,7,11,15
635:6,9,15,19
635:20 636:5
636:16 637:17
638:9 639:9,20
642:14 643:10
643:11 650:8,9
653:12 702:14
703:3 780:18
**educational**
568:7 594:9
629:4,24
630:12,13

**educators**
427:18 431:9
434:21 443:2
484:23
**effect** 585:16
832:1
**effective**
687:15
**effectively**
694:24
**effectiveness**
477:10 657:14
**effects** 780:7
**effort** 471:22
471:24 473:14
473:17,22
478:9 479:16
483:6 561:8
563:6 681:4,15
681:18,19,21
682:9,12
684:17 766:19
**efforts** 472:2
477:8 536:11
536:13,16
539:22 684:6
684:11 702:15
703:4
**eight** 720:17
724:16 725:10
**eiland** 406:3,4
**eilandlaw.com**
406:7,7

**either** 418:4,21
419:11 446:1
538:10 548:12
651:22,23
665:13 690:21
691:18 693:3
752:5
**electronic**
412:13 413:12
414:2 416:2,13
418:7 420:1
485:15
**elementary**
598:6 599:16
617:8 768:5
844:4
**elements** 786:8
**eligibility**
618:15 627:3,9
638:18 702:8
714:20
**eligible** 618:10
626:22 628:10
630:19 702:17
712:18 714:2
714:11,17,22
715:9 716:11
718:16
**eliminate**
486:13,24
490:10
**eliminated**
485:13 487:3,6

**eliminating**
490:3,8
**elliot** 404:17
**ellis** 404:19
**emotional**
568:20 612:22
613:5,7,9
632:14,24
634:8
**employed**
565:21,21
**employee**
497:20 529:22
664:15,24
824:10
**employees**
496:7 570:22
667:13
**encourage**
514:11 689:3
689:22 690:18
**ended** 694:6
731:1
**engage** 611:1
617:21 619:8
620:18 627:15
630:7 637:11
637:12
**engaged** 485:8
616:7 618:23
620:11 773:12
**engagement**
432:3 435:1
440:6,12

CONFIDENTIAL

**[engagement - evolving]**                    Page 27

441:22 442:16 485:6 488:7 508:12 522:10 554:2 562:11 562:12 568:1 569:4,12 591:17 594:24 603:13,20 604:2 611:15 621:2 625:18 636:24 667:22 668:5,13 689:2 689:21 690:17 702:2 728:19 737:14

**engaging** 451:16 460:8 476:19 554:10 563:21

**engine** 729:3 730:19 731:12 734:1 737:2 743:11 757:1,4 759:17

**engineering** 734:3,18 735:5 735:11,13 736:4,11 737:3 739:15

**engines** 726:21 727:9,12,19,20 727:22 728:9 730:12,20 743:12

**enhance** 538:10
**entire** 535:17 620:16 624:12 628:16 706:10 706:11 764:17
**entirely** 845:7
**entirety** 565:3
**entitled** 709:7 734:4 758:11
**entry** 650:13
**environment** 508:18 530:24 531:14 585:2 585:18 587:7 588:3,20 620:7 631:14 639:13 778:24 779:15 779:24 780:9 781:1
**environments** 617:23 778:15
**envision** 619:15
**envisioned** 687:11
**envisions** 636:4
**equally** 536:10
**equipped** 572:24 573:15 672:23 675:9
**errata** 848:6,9 848:12,15 850:6
**erupt** 627:21

**especially** 444:16 469:5 537:12 616:19 657:11 666:10
**esquire** 403:4,4 403:11 404:4,4 404:11,20 405:4,12,16 406:4,4,11,17
**essential** 592:4 624:1
**essentially** 545:21,22 714:11
**established** 652:10 659:9 659:12 663:4 664:8
**establishment** 664:13
**estimate** 472:14 475:1 475:14 476:17 477:18 479:4 480:9 579:14 580:7 685:21 715:14 716:10 718:11 719:12 720:3,7
**estimates** 480:23 719:15
**estimating** 433:18

**et** 486:21,22 519:6 526:24 586:20,20 632:19 638:2 682:23 756:20 758:23 762:24 772:22 775:9 775:10 784:14 810:3
**evaluate** 610:12
**evaluation** 482:9,23 534:20,22 559:24 580:20 701:19
**evening** 411:6
**everybody** 702:16,17
**evidence** 474:13 527:23 537:14 581:15 598:23 639:11 639:18
**evolved** 672:19
**evolves** 612:5
**evolving** 436:16 441:6 444:16,23 476:2,6 477:6 478:12,19 479:13,22,24 481:4 487:19 570:2 606:8

CONFIDENTIAL

**[evolving - experiencing]**                                    Page 28

661:2
**exacerbated**
  702:3
**exact**  426:23
  427:2,17
  429:20 437:17
  458:6 461:15
  471:10,13
  551:6 581:19
  602:5 603:15
  603:16 613:21
  652:7
**exactly**  457:12
  471:17 473:24
  475:13 477:13
  524:6 579:3
  580:21 784:18
  829:18
**examination**
  410:11 807:21
**examined**
  410:9
**example**  433:1
  446:24 451:18
  454:23 471:12
  488:14 513:2
  520:6 534:21
  534:23 553:15
  601:3 611:21
  613:3 614:5
  617:3 631:7,11
  666:5 670:13
  680:6,10
  682:22 684:4

702:6 712:11
744:23 754:18
757:3 815:10
821:18 839:12
**examples**  540:6
  553:9 554:1,15
  677:12
**exceeded**  740:9
  740:10 753:24
  770:23 771:15
  771:15 772:12
  798:18 830:22
  831:18
**except**  409:6
  850:5
**excluding**
  694:7
**exclusive**  557:5
  559:5,15
  623:16 792:24
  794:10
**exclusively**
  556:15 791:12
**excuse**  635:24
  716:21
**executive**
  529:10
**exemplar**
  473:11 476:11
  478:6
**exemplars**
  473:13 581:3
**exhaustive**
  608:24 784:9

**exhibit**  445:9
  551:19 564:11
  564:13 582:6
  583:1 642:6,8
  648:12,14
**exist**  424:12
  433:20 434:4
  436:14 438:9
  442:14 444:18
  447:17 466:6
  475:20 602:14
  701:12 720:24
  726:4 811:9
  814:1,5 815:9
  816:15 817:8
  817:21 836:7
**existence**  533:1
  701:11 723:21
**existing**  479:14
  479:20 480:2
  480:24 581:3
  656:3,11 657:2
  684:10 810:17
  814:7 822:8
**exists**  415:21
  423:11 560:11
  700:11 815:17
  815:20 816:2,5
  816:12,22
  817:1
**expect**  472:24
  474:15 581:17
**expectation**
  610:19 766:15

**expected**
  480:19 598:13
  601:11
**expend**  781:11
**expense**  572:5
**expensive**
  694:8
**experience**
  448:5 493:6
  508:16 535:5
  535:16 553:19
  611:10 625:14
  647:13 677:8
  699:24 705:5
  788:15 816:24
  821:8 843:6
**experienced**
  470:1 472:8
  473:4 725:22
  733:13
**experiences**
  446:18 512:8
  513:24 784:24
  785:10
**experiencing**
  434:19 441:20
  468:10 469:17
  494:18 585:9
  606:15 609:7
  618:2 622:12
  674:14 676:5
  676:20 678:21
  703:8,17,20
  704:11 705:18

706:14,20 707:2 710:2,10 711:14 712:8 715:5 722:1

**expert** 411:11 435:22 467:12 469:14 519:23 530:15 582:4 583:6 664:3 671:5 739:9 741:15 744:11 744:23 760:9 770:1,20 771:7 772:6 773:15 779:11 787:23 814:10 835:12 837:16 838:11 840:9 844:19 844:24 845:12

**expertise** 607:23 608:8 609:14 610:5,9 610:14,21 612:5 664:22 671:7 672:4 762:23 790:11

**experts** 483:20 517:22 741:3 742:12 743:17 743:23 745:8 790:7 795:7,13 824:18 838:1,7

**expires** 850:12

**explain** 723:11 749:5 832:11

**explained** 503:9

**explanation** 750:8 753:14 753:19 765:1

**exposed** 627:13

**exposure** 616:23 617:6 619:2 703:10

**expressing** 458:24

**extensive** 796:23

**extent** 434:15 472:14 475:1 476:17 477:18 479:4 480:9 554:8 580:21 723:21,22 816:2

**external** 482:20 573:2 672:19

**externally** 677:10

**extract** 428:16

**extrapolate** 836:9

**extrapolated** 581:13

**f**

**f** 404:14

**facebook** 404:15,15,15 404:15,16 808:11

**facing** 451:10

**fact** 446:17 447:2,21 449:6 457:2 602:14 605:16 655:20 665:23 679:6 680:11 684:18 685:2 698:17 717:5 726:3 784:22 785:18 787:9 797:23

**factor** 477:11 482:20 655:9 787:12 792:24

**factors** 496:21 556:6 557:6 559:15 765:11 775:4,12,19 776:2 782:24 783:1,5 790:15 791:10 793:1 794:11

**facts** 522:14 744:17

**faculty** 515:16

**fail** 655:24 848:18

**failed** 733:1 802:9

**failure** 749:6

**fair** 578:17 670:11 700:22 702:18 768:19 808:6 814:21 817:12,15

**fall** 585:3 586:23 609:19 677:14

**fallen** 508:10 509:6 557:18

**falls** 502:15 671:6 677:3

**familiar** 517:8 517:18 643:14 727:1 734:16

**families** 448:7 486:19 509:21 510:10

**family** 567:24 568:4,5 569:4 569:6,10,11 591:16 594:23 603:13,19,20 603:21 604:1,2 609:23

**far** 426:5,22 455:10 530:6 655:22 677:20 678:3 681:20 682:6 720:1 730:15 761:6

CONFIDENTIAL

**[farm - form]**

Page 30

farm 405:12

fax 402:24

feature 500:6
500:15 507:13
519:12 520:19
523:11 525:3
830:12 839:14
840:7

features 485:7
519:21 520:7
526:5,16,19
527:19,24
586:17 803:1
837:11,17

federal 535:7

feel 466:8
491:14 521:12
672:22 745:23

feeling 621:1

feels 671:24
757:19 832:8

felt 455:22
466:23 495:4
694:13

ferpa 451:13

fidelity 657:15

field 447:15
473:13 476:1
480:1 487:18
544:10 610:3
612:5 641:7
647:8 652:11
652:12 654:4
677:8 735:19

735:22 816:22
836:11

figure 644:24
684:17

filing 409:4

fill 563:10
573:11

filled 562:9,15
562:18,21
563:4

financial
403:11 679:15
682:21

find 603:10
745:12 747:1
782:9

fine 428:22
429:14 746:24
797:9 826:15

fingertips
450:8 459:14

finish 450:4
493:16 503:12
544:7 753:2

firm 405:4
406:3 410:18

first 411:15
528:9,16
544:23 554:5
560:14,23
561:4 566:22
591:4 610:18
616:21 618:17
629:2,20

652:14 676:9
687:20 695:17
697:5 721:5
745:17 758:21
777:1,2,4
778:5 783:10
783:16 818:23

five 589:22
590:10,12,23
591:2,20
592:10,18
593:23 595:20
788:18 846:4

flag 750:12
751:18 753:16
753:16

flagged 743:17
754:16

floor 406:18

florida 403:13
405:17

focus 556:12
558:21 559:3
789:12,17
794:8

focused 497:4
497:10 688:20
741:7 742:2
743:1 745:18

focuses 604:1

focusing 546:9
591:4 741:21

folder 730:22
731:2,8,17

732:12,15,17
732:19,23,24
738:7 750:15
751:21

folks 424:22
425:5,11 495:3
572:22 600:18
606:24 662:21
666:1

follow 563:18
747:14 751:1,5

followed
758:22

following
563:22 819:18

follows 410:9

forecast 803:22
805:2

forecasting
804:6,14

foregoing
847:17 850:3

forgetting
758:20

forgive 625:23

form 409:6
412:15,23
413:14 414:6
414:15 416:23
417:8 418:9
419:2,15 420:9
421:3,14 422:4
422:15 423:3
423:19 424:9

CONFIDENTIAL

**[form - form]**                                                   Page 31

| | | | |
|---|---|---|---|
| 424:19 425:1 | 507:15 508:8 | 638:12,20 | 733:9 734:7 |
| 426:2,14 | 513:19 514:17 | 644:15 645:19 | 735:16 737:11 |
| 427:11 428:10 | 515:22 519:15 | 646:17 649:10 | 737:16 738:10 |
| 430:11 431:4 | 520:21 522:2 | 649:22 650:19 | 739:4 740:8 |
| 431:18 432:11 | 523:13 525:5 | 651:10,15 | 741:18 742:15 |
| 432:20 433:16 | 531:2 532:20 | 652:4 653:7 | 742:20 743:20 |
| 434:11 435:10 | 536:7 537:9 | 655:6,12 | 744:17 745:16 |
| 437:1,11 438:3 | 539:3,12 | 658:21 660:1 | 746:12 749:12 |
| 439:1,18 441:1 | 540:22 541:8 | 660:14 661:13 | 750:20 752:3 |
| 442:9 443:24 | 541:23 542:19 | 661:17 662:14 | 752:23 753:22 |
| 444:4 446:11 | 543:13 545:20 | 665:22 670:21 | 756:14 758:7 |
| 449:20 450:14 | 546:14 547:8 | 671:15 672:12 | 758:17 762:1 |
| 451:24 452:13 | 548:3 549:11 | 673:10,22 | 762:17 763:18 |
| 453:3,14 454:2 | 550:4 552:14 | 674:23 676:7 | 764:11 765:7 |
| 454:14 455:7 | 555:6,22 | 677:1 679:20 | 766:21 769:9 |
| 456:1,18 | 556:19 557:24 | 682:1 684:22 | 770:4,22 |
| 458:16 459:8 | 558:24 565:9 | 687:5 688:11 | 771:14 772:11 |
| 460:11 461:5 | 569:18 575:2 | 690:24 691:22 | 773:18 774:10 |
| 462:4 463:2 | 576:6 578:19 | 693:7 694:10 | 774:21 779:6 |
| 464:8,23 | 579:19 580:13 | 695:13 697:4 | 781:19 783:12 |
| 465:15 467:1 | 583:15 585:21 | 698:10 699:17 | 785:22 786:21 |
| 468:4 470:10 | 588:6 592:22 | 700:20 702:20 | 787:20 789:7 |
| 471:4 472:18 | 593:3 594:18 | 704:3 705:11 | 791:6,23 |
| 475:6 476:23 | 598:2 599:9 | 706:6 708:21 | 792:17 794:3 |
| 478:1 479:9 | 600:4 604:10 | 709:14 710:19 | 794:19 796:3 |
| 480:16 482:3 | 606:4 607:18 | 711:20 712:21 | 797:6,13 |
| 484:11 485:18 | 612:13 615:2 | 713:9 714:6 | 798:15 799:19 |
| 487:15 489:5 | 616:3 618:13 | 715:1,24 718:4 | 800:10 801:16 |
| 489:23 490:21 | 619:21 621:12 | 718:19 721:3 | 802:11,24 |
| 491:3 492:4,22 | 623:8 624:10 | 722:14 723:1 | 804:3,10 |
| 493:24 494:9 | 625:4,22 | 723:16 724:20 | 805:13 806:21 |
| 496:10 497:6 | 626:12 627:1 | 725:6,15 728:6 | 808:24 809:20 |
| 500:9,17 501:4 | 628:18 629:18 | 729:8,13 | 810:14 812:18 |
| 505:5 506:7,22 | 634:23 636:7 | 730:14 731:19 | 813:9 816:4,15 |

CONFIDENTIAL

**[form - general]**                                                    Page 32

816:17 817:14
817:24 818:19
819:21 820:4
820:19 821:2
822:14 823:1
823:21 824:24
825:9,15,23
826:5,12,22
827:8,14 828:6
828:13,23
829:5,11 830:8
830:14,21
831:17 832:3
832:15,22
833:4,13,21
834:5,12,19
835:3,9 836:2
836:22 837:13
838:5,22
839:17 840:14
841:7,14,23
842:11,20
843:11,21
844:10 845:2
845:15 850:5
**formed**  643:18
686:24 687:24
**former**  476:7
**forming**  493:12
533:21 649:6
755:20 774:18
786:24 788:9
**forms**  447:17
468:12 722:2

809:7
**formulated**
654:9
**formulating**
649:16 685:18
686:13 687:2
694:3 759:13
824:6,11
**forward**  640:2
**found**  740:6
**foundation**
412:23 482:3
639:2 723:16
772:11 810:17
**four**  846:4
**framework**
474:11 481:4,5
581:17 582:1
605:11 616:17
702:23 706:9
707:6 718:6
787:12
**frameworks**
471:21 475:20
476:8 478:10
481:1 581:4
605:20 694:15
716:15 719:1
**frankly**  411:10
421:17 486:12
487:18 535:4
572:19 687:10
695:15 752:7
813:14

**free**  521:12
**friend**  829:3
**front**  583:1
740:17 754:21
755:6
**frontline**  431:9
434:21
**full**  433:6
434:15 691:6
816:15
**fully**  432:24
696:8 807:2
**function**  500:7
500:15 507:13
507:20 519:13
520:19 523:11
525:3
**functioning**
609:8
**fund**  679:17
686:11
**funded**  572:11
670:18 671:2
671:12,23
673:7,19
676:11 681:9
**funding**  540:1
572:12,15
647:22 648:4
671:3 672:7
674:7,19
677:19 678:2
678:15 680:20
680:23 682:12

683:1,12,23
721:22
**funds**  572:6
680:8 681:4
684:7,10
**future**  471:16
475:13 572:10
580:17,20
696:22 698:2
698:13 804:14

**g**

**g**  405:12
**gain**  617:15
**gained**  449:3
**gaining**  537:13
**galveston**  406:6
**gambling**
699:13
**gaming**  696:24
699:13
**gather**  815:1
**gathered**
445:14 498:22
**gating**  703:23
**general**  469:9
518:21 521:9
522:5 604:11
632:10 646:24
670:24 710:24
712:24 714:15
715:2,8 723:6
724:6 747:13
750:23 759:10

CONFIDENTIAL

777:5,21 780:6
781:8 795:5
823:7
**generally**
  518:22 652:13
  680:3 685:9
  721:9 722:18
  723:2,23
  789:12
**generate** 845:5
**georgia** 669:20
  683:2
**gilfillan** 405:12
**give** 412:17
  428:4 429:23
  429:23 431:6
  436:21 437:17
  439:3 463:19
  495:22 525:14
  551:7 581:19
  603:14,16
  608:24 622:4
  644:12,17
  664:21 707:19
  719:14 720:11
  723:6 728:12
  764:5 765:3
  829:12 836:3
  839:19 845:16
**given** 421:19
  501:10 505:9
  506:13 507:4
  507:23 525:13
  525:23 550:9

606:6 611:13
617:7 639:12
664:2,22 678:9
679:11 733:24
736:23 739:21
742:7 794:23
796:23 798:21
799:13 800:5
802:23 803:15
847:7 850:4
**giving** 593:4
  707:10 709:1
**go** 441:11
  457:6,9,23
  458:18 459:12
  459:15,20
  461:7,12
  462:12 463:17
  464:10 465:1
  465:19 467:6
  472:16 475:3
  476:20 477:22
  479:6 480:13
  480:20 489:10
  490:5 491:5
  494:1 495:16
  497:24 498:8
  498:11,12,14
  512:3,21 517:2
  517:3,5 521:8
  527:3 531:18
  531:23 533:13
  534:16 537:20
  541:1,13

542:20 554:16
556:17 558:6
560:20 561:2
565:11 566:8
577:11 578:11
589:13 611:7
613:6,18
638:22 650:21
664:23 679:22
685:16 691:11
707:14 724:4
726:10 733:16
736:7,16
739:12 749:21
753:7 759:7,24
760:13 769:11
776:9 777:7,11
782:13 791:17
792:3 796:10
798:21 799:10
823:3 837:17
**goal** 584:6
  589:4,7 833:9
**goes** 433:2
**going** 429:4,8
  471:9,18
  473:24 474:7
  494:12 495:22
  495:23 501:24
  502:5,24
  503:12,14
  504:1,6 512:7
  513:9,21
  521:14 524:3

524:13,16
605:8 629:19
632:17,20
637:23 644:12
644:16 657:15
658:14 689:13
695:2 707:13
707:14,16
708:18 724:2
736:13 738:6
746:14 750:3
753:1 758:4,19
760:13 766:24
769:11 776:9
777:16,21
778:3 792:2
803:5,6,7,9
804:21,21,22
814:19 832:5,6
**golkow** 402:23
  409:13
**good** 410:14,16
  495:21 581:14
  582:9 807:24
  808:2
**google** 404:8
  410:20 727:24
**gotten** 445:5
**grade** 616:21
**grant** 558:22
**grants** 538:4
  540:1 555:16
  555:17,23
  556:10,21

CONFIDENTIAL

**[grants - harm]**

557:3,14,20 558:2,7,8,10,11 558:18 559:8 559:14 680:6 684:5 792:5 793:18

**graph** 650:14

**grapple** 571:4

**great** 410:21 582:12 788:1 798:7

**greater** 527:3

**ground** 441:17 444:6 689:15 700:13

**group** 555:9

**groups** 551:14 553:2 662:20 663:21

**guess** 465:21 505:15 755:1 790:20 821:20

**guidance** 545:11

**guide** 546:10 546:11,16 547:4,20,21,23

**guides** 545:15

**guild** 662:20 663:21

**h**

**h** 407:9

**habits** 634:3

**hampshire** 651:6

**hand** 688:7 695:5 757:19

**happen** 611:17 630:2 654:7 697:17 752:17

**happened** 620:22 814:10

**happening** 435:15 440:9 441:16 444:13 451:17 585:4 646:20 659:15 689:15 700:12

**happy** 427:12 459:11 461:11 467:4 470:15 477:2 491:8 517:3 541:1 544:21 548:5 550:20 558:6 566:5 608:10 610:16 685:6 724:4 726:10 760:16 777:15 793:11 806:24

**hard** 416:16 433:7 439:3 450:19 499:8 501:11 535:10 544:24 566:5 580:21 618:14

643:3 648:8 687:6 695:15 697:6,16,17 698:11 699:15 699:19 718:21 719:12,18 720:3,6,10 764:19 768:17 790:19 799:22 800:14,15 802:21 803:2,8 803:13,20

**harford** 412:6 418:2,19 419:9 422:10 424:5 425:23 431:15 433:12 437:23 438:20 439:13 440:20 442:4 452:24 453:11 454:7 455:4,22 458:13 460:8 461:2 462:1,23 464:5,20 465:13 466:22 489:1 669:12 669:18 673:4 673:16 674:17 680:19,23 681:14,23 682:8

**harm** 436:17 460:9 474:16 474:20 476:2,6

476:19 477:6 478:12,20 479:13,22,24 481:4 485:1 522:15,15,17 526:6,20 527:20 528:5 573:2 609:5 611:20 618:3 622:12,17 638:16 640:2 657:12 659:13 661:3 677:10 677:16 694:16 697:10,11,22 698:3,8,19 699:3,5,8 700:5,10 701:22 710:1,9 711:13 712:16 713:23 715:12 715:17 718:1 718:13 719:13 720:8 721:23 723:22 781:17 781:22 782:5 789:4 791:3,20 792:13 793:24 794:16 795:22 796:18 797:4 798:12 799:16 800:8 815:13 823:14,18 843:19

CONFIDENTIAL

**[harmed - health]** Page 35

| | | | |
|---|---|---|---|
| **harmed** 585:5 | 658:13 660:5 | 474:11,19 | 588:4,21 |
| 619:2 631:6 | 663:6 672:20 | 475:20,24 | 591:15,16 |
| 640:1 700:2,2 | 673:14 677:6 | 476:7 478:9,20 | 596:6,13 |
| 810:5,9 831:15 | 678:16,21 | 479:12,14 | 602:19,23 |
| **harmful** 522:11 | 680:15 687:16 | 480:2 481:1,5 | 603:4,6 604:24 |
| 833:19 | 694:18 696:13 | 512:1 528:11 | 605:6 607:22 |
| **harming** | 696:20,22 | 528:22 529:11 | 608:13,13 |
| 473:15 581:5 | 697:2,7 700:23 | 529:24 530:4 | 609:8,17 610:2 |
| **harms** 444:16 | 701:9,12 703:9 | 530:13,19 | 611:4,13 614:4 |
| 444:23 447:12 | 703:11,19,21 | 532:5,16 | 614:5,6,12,20 |
| 472:7 473:3 | 706:19,22 | 533:15 534:1,5 | 615:11 616:17 |
| 482:15,19 | 718:7 720:12 | 534:6,7,22 | 617:6 620:4 |
| 484:14,16 | 720:23 721:13 | 535:2,21,22,24 | 624:16 630:2 |
| 497:16 505:18 | 722:12 723:12 | 536:14,17 | 634:16 635:18 |
| 508:22 519:2,3 | 725:3 774:8 | 537:4,16 538:2 | 635:21 637:4,9 |
| 521:6 522:8 | 776:6 783:8 | 538:11,14,22 | 638:23 639:3 |
| 526:17 527:18 | 786:13 787:17 | 540:10,12 | 653:21 656:3 |
| 527:23 528:7 | 797:24 804:22 | 542:8 545:10 | 660:18 664:4,6 |
| 536:24 537:15 | 809:23 843:3 | 547:16 548:18 | 665:9 666:10 |
| 554:9 569:22 | **hate** 620:20 | 551:1 552:6,10 | 667:18 671:13 |
| 571:9 583:22 | **hawaii** 651:6 | 555:2 556:2,5 | 672:9,18 |
| 584:8,13,15,18 | **head** 412:18 | 557:16 558:11 | 673:19 674:12 |
| 584:20,22 | 460:19 465:6 | 558:13,15 | 674:20 675:15 |
| 585:1,1,15,16 | 465:24 677:23 | 559:23 560:4 | 675:21 676:4 |
| 585:17 586:4 | **headspace** | 560:10,12 | 676:19 677:20 |
| 586:24 589:11 | 833:11,15 | 561:10,12,16 | 678:3 679:17 |
| 590:20 600:14 | **health** 407:13 | 563:16,23 | 680:9,21 681:8 |
| 604:3 606:8,18 | 446:24 450:5 | 564:16 567:3 | 681:23 682:8 |
| 607:1,9 608:15 | 451:8,17 457:4 | 567:10 568:24 | 683:3,13,24 |
| 614:16 615:6 | 468:8,17,20,23 | 569:19 570:24 | 684:16,19 |
| 615:12 620:2,3 | 468:24 469:4 | 571:19 581:1,4 | 694:14 701:24 |
| 620:4,15 | 469:11,16,24 | 581:16 582:1 | 702:4,22,24 |
| 623:15,16 | 471:7,13,20 | 584:23 585:5 | 704:5 706:8,16 |
| 637:14 656:14 | 472:2 473:2,14 | 586:6,19 587:8 | 716:15 717:9 |

717:21 719:1,3
734:5 735:6,13
737:6 739:1,18
740:3 778:16
779:1,16,24
781:2 784:24
788:20 789:5
789:13,19,21
789:24 790:2,6
790:14,16
791:4,11,14,21
792:14 793:2,5
793:20 794:11
794:12 795:6
797:24 799:1
815:9,10,20,24
817:4 819:10
819:13,17,18
820:9,14
821:19 822:12
822:23 831:15
831:24 832:7
**health's** 559:20
**healthy** 633:22
**hear** 708:19
**heard** 413:2
428:24 486:3
487:7 488:4,19
653:17 739:2
801:24 802:4
**hearing** 674:5
805:3
**held** 402:15
409:17

**hello** 631:15
**help** 438:5
617:15 634:20
635:1,10
762:21 766:19
814:12 817:2,3
**helpful** 564:6
635:12 639:7
757:20
**helping** 766:5,8
766:12
**hey** 496:24
523:2 741:12
**hhs** 535:14
**high** 412:11
413:10 414:11
415:4,24
416:19 417:13
418:4,21
419:11 468:19
506:4,20
516:22 517:16
518:7,18 598:7
599:16 768:7
768:15,21
832:12
**highly** 689:10
695:17
**hipaa** 451:13
**hire** 571:23
572:22 591:11
594:4,8,14,23
595:4,9,13,24
596:6,12,18,24

597:9,16
603:19 604:5
605:2,10 611:4
611:5 612:9
614:2 640:24
647:15,22
657:22 658:8
696:19 766:18
**hired** 599:13,21
610:20 611:1
654:13 655:1
657:5
**hiring** 591:6,21
592:19 593:14
612:20 613:24
**history** 647:3
832:7
**hit** 730:20,23
731:15 733:5
734:2,9
**hold** 521:8
664:2
**holdings**
404:15
**holds** 565:19
**holes** 607:3
**holistically**
484:13 492:24
606:14
**honest** 735:8
762:6 763:23
764:15 802:16
**honestly**
457:23 474:3

491:4 531:18
544:6 560:15
561:2 669:15
670:23 727:17
742:24 768:17
777:7 794:22
820:6
**hoover** 402:14
407:4,12,15,19
410:1,7,14
428:20 500:4
504:23 522:22
523:14 564:14
564:23 582:6
582:24 583:1
642:9 645:19
648:12,15
650:6 667:3
708:22 709:5
725:5 751:16
766:4 807:7,24
850:8
**hope** 572:21
598:22 620:14
626:20 653:4
**host** 544:8
**hosted** 540:10
542:7
**hour** 503:2,7
**hours** 436:1
485:8 503:2,9
503:11,13
598:10 826:7
831:14 846:4

CONFIDENTIAL

**[huh - impacting]**

| | | | |
|---|---|---|---|
| **huh** 801:4 | 440:21 442:5 | 793:8 795:23 | 496:19 509:10 |
| **human** 534:6 | 443:8 445:8,19 | 797:8 798:13 | 510:2 514:21 |
| 535:23 | 445:20,22 | 805:8,18 | 530:22 531:9 |
| **hundred** | 446:3,5,6,7 | 806:16 838:2 | 531:12 532:17 |
| 553:11 | 451:21 452:10 | **identifying** | 533:6,16 536:3 |
| **hundreds** | 455:5,11 459:5 | 654:23 728:1 | 537:6 538:14 |
| 505:9 506:12 | 460:8 461:2 | 729:19 730:3 | 538:24 539:9 |
| 507:3,22 516:4 | 462:1,23 464:5 | 747:22 748:21 | 540:17 542:13 |
| 516:15 550:15 | 464:20 465:13 | 751:10 783:9 | 546:11 547:5 |
| 707:16 | 466:3,22 | 817:3 | 547:24 549:8 |
| **hypothetical** | 476:18 477:21 | **ignore** 655:14 | 550:1 552:11 |
| 664:21 700:6 | 479:5 529:12 | **ignored** 655:1 | 555:3,19 556:6 |
| 701:14 | 576:13 654:11 | **ignoring** | 556:13 559:7 |
| **i** | 694:19 703:16 | 655:22 | 570:14 587:5 |
| | 736:19 742:17 | **ii** 402:10 | 588:1,17 620:9 |
| **idea** 732:13 | 769:2 786:14 | **illustrative** | 620:16 621:1 |
| 825:17 828:8 | **identify** 416:16 | 498:24 | 630:22 675:21 |
| 834:1 | 425:6 511:9 | **image** 462:2 | 712:1,18 714:1 |
| **ideation** 459:1 | 512:10 513:13 | 477:22 | 726:6 778:13 |
| **identical** 761:9 | 527:11,18 | **imagine** 423:6 | 778:23 779:12 |
| **identification** | 537:2 538:21 | 611:8 618:18 | 780:13,23 |
| 564:17 642:15 | 540:13,18 | 618:22 697:16 | 785:1 789:17 |
| 648:19 705:3 | 541:6 542:10 | 697:18 803:14 | 790:15 791:11 |
| **identified** | 542:15 551:3 | 803:19 | 791:13 793:1 |
| 422:23 423:15 | 551:21 565:19 | **imagining** | 793:19 795:10 |
| 424:5,16 425:7 | 578:13 591:6 | 625:16 | 797:22 799:1 |
| 425:23 426:11 | 605:23 607:12 | **immediate** | 807:4 814:15 |
| 427:6 428:6 | 612:7 704:10 | 572:10 | **impacted** 618:3 |
| 430:8 431:1,15 | 704:22 705:17 | **immediately** | 619:2 622:19 |
| 432:8,17 | 727:9,12 728:9 | 620:11 | 624:20 631:16 |
| 433:13 434:8 | 729:4 743:8,15 | **impact** 447:5 | 631:19 637:13 |
| 435:6 436:11 | 749:7,22 | 468:21 470:7 | **impacting** |
| 437:7,24 | 787:11 791:16 | 470:23 471:13 | 697:12 698:4 |
| 438:21 439:14 | 791:17 792:9 | 482:14 483:23 | |

CONFIDENTIAL

**[impacts - including]** Page 38

**impacts** 508:18
511:24 512:19
545:4 557:4,8
571:4 572:23
584:12 586:7
602:2 609:4
611:14 617:4,6
619:9 621:2
659:3,10
660:22 662:5
662:18 688:21
699:6 712:10
780:16,20
781:8 790:1,6
809:3 815:12
823:13,18
**impairment**
609:7 706:21
710:2,9 711:14
711:16 713:23
715:7,18 718:1
718:14
**imperative**
848:14
**implement**
486:1 487:23
583:12,18
604:19 657:16
696:9 705:1
766:6,9,12
807:2 814:18
814:24 816:14
817:12

**implementati...**
473:21 475:23
477:7,8 480:20
545:11 604:18
608:21 618:20
627:4 793:4
**implemented**
471:1 472:2
475:4 476:21
477:23 479:7
480:14 481:19
487:9 489:8
579:16 580:9
583:20 698:17
817:20
**implementing**
685:22
**implements**
766:16
**implications**
687:1
**implied** 527:1
**important**
564:3 605:7
784:19
**imposed** 573:2
677:10
**imposes** 665:19
**imposing**
677:15
**impossible**
437:16 481:20
486:15 505:11
581:23 698:21

798:3
**improve** 481:6
536:13 539:21
**improved**
816:11
**improvement**
474:16 477:10
481:11 701:21
**improvements**
816:9
**improving**
536:17
**inadequate**
432:23 666:9
676:22 684:14
**inadequately**
670:18 671:2
671:12,23
673:7,19
674:11 675:14
676:2,11,12,18
**inappropriate**
709:17
**incident** 821:18
**include** 467:17
472:13 474:24
476:16 477:17
478:16 479:3
480:8,23
498:16 526:21
536:12 540:3
566:1,15,19
567:2,9,13,24
568:7,13,17,24

569:4,20
571:21 584:14
608:23 609:3
620:3 624:6,23
657:1,20 658:5
696:18 757:2
761:3 784:13
**included**
440:14 442:19
447:10 493:9
498:21,23
534:1 553:9
554:14 567:18
568:10 616:15
632:4 683:8,8
691:3 732:19
734:12 741:23
750:9 787:1,3
787:5,6 824:1
824:20 838:18
**includes** 445:12
482:7 566:11
568:2 569:6
586:6 616:17
624:13 703:3
790:14
**including** 441:9
441:12,13
442:21 468:13
471:21 478:15
550:24 554:2
574:12 584:23
586:12 615:9
624:15 627:19

CONFIDENTIAL

635:19 639:20
643:1 691:2
692:10 693:2
721:11 722:3
726:2 780:17
797:16 813:18
**income** 844:22
845:5,11
**inconsistent**
509:8 511:22
512:16 657:24
658:10
**incorrect** 574:2
**increase** 717:9
**increased**
432:2 666:11
717:15
**increasing**
441:6
**increasingly**
569:24 781:13
**incredibly**
485:24
**independent**
559:5
**independently**
838:2
**index** 408:2
**indicate** 457:24
458:1 472:24
631:5 674:10
**indicated**
426:18 435:14
443:2 458:20

469:2,13 478:3
526:19 577:13
759:3,11
**indicators**
446:20
**individual**
574:16 629:9
**individuals**
430:17 439:23
443:9 560:3
574:18 575:8
576:22 579:1,9
579:10 785:10
**inevitably**
538:8
**influenced**
687:24
**inform** 420:21
455:15 456:11
458:9 469:23
513:24 535:17
643:22 644:6
649:12 733:18
745:21 746:1
786:2
**informant**
445:20 498:13
511:17 512:4
512:17 513:7
574:10,20,24
575:12 576:18
577:12,16,19
578:24 579:22
580:4 656:9

667:4,8 684:24
689:9,13
693:16,22
723:24 724:13
725:24 786:6
787:4 821:11
**informants**
443:20 445:6
494:6,14 495:1
495:9,11,14
497:13 498:4
498:18,22
499:5 511:10
512:11 513:13
514:11,19
573:21 575:20
575:22 576:2,8
577:5,9,21
578:5,12 679:2
679:5 722:10
**information**
420:15,18
421:20 422:6
422:19 430:20
439:3 442:20
443:19 444:22
445:12,13
446:14 447:22
448:18 449:6
450:7,16,21
452:16 454:18
454:20 456:9
457:3 459:10
460:16 464:11

464:12 465:17
466:16 467:7
468:13 482:15
483:16 493:9
494:2 496:14
498:1,13,21,24
530:16 542:22
546:22 549:18
576:15 641:22
641:24 655:19
679:5,23 684:2
684:4 686:18
745:20 746:1
784:5,20 786:1
786:23 787:2,3
787:6,8 788:7
788:9 815:1
821:9 834:2
838:2 840:12
841:1,3
**informed** 535:6
683:20 695:1
723:20 726:14
749:3 785:14
787:23
**informing**
564:4 650:1
756:7 757:20
**infrastructure**
482:8 560:11
563:2 704:17
724:8,16 725:2
725:10,20
813:16 814:13

CONFIDENTIAL

**[infrastructure - interviews]**                                    Page 40

824:2 836:14 837:1,4

**inherent** 526:18 527:4 527:10 627:11

**initially** 576:10

**initiative** 535:12 537:3 538:21 681:9

**initiatives** 534:11,13 537:19,21,24 538:6,18 539:7 702:24

**injury** 402:4 409:20

**input** 664:21

**inquire** 512:7 513:23

**inquires** 560:7

**inquiry** 444:11 447:19 497:4 514:6,21 689:14

**inside** 669:9

**insistent** 486:20

**instagram** 404:16 808:11

**instance** 501:18 790:10

**instances** 707:17

**institute** 538:1 735:6

**instituted** 489:1,20 490:17 496:3,8 498:5 499:7

**instituting** 493:22 497:2

**instruct** 504:3

**instructed** 615:14,16,18

**instruction** 435:20 586:14 586:18 613:16

**instructional** 436:2 485:3

**instructions** 848:1

**instrument** 561:24

**instruments** 572:7

**integrity** 762:5 762:8,21 763:24 764:16 765:14

**intelligence** 699:12

**intend** 690:6

**intended** 484:6 484:13 560:1 570:9 586:4 619:24 638:4 656:16 695:1

706:10 809:22 810:4

**intending** 509:9 625:12 628:15

**intent** 690:6 712:2

**intention** 555:9 767:1

**intentionally** 657:7

**intentions** 818:24

**interactions** 463:8 693:12

**interest** 573:7 573:10 577:15 771:20 772:4 772:16,19 773:22

**interesting** 494:13 496:13 526:13 539:14 814:4

**interference** 586:14

**internal** 571:24 664:8 824:6

**interpret** 413:20

**interpreted** 510:18

**interpreting** 510:14

**intersect** 584:24

**intersection** 469:18 470:2

**intervention** 474:9 551:1,9 551:12 552:6 552:10,16,20 553:24 555:3 555:10 595:10 600:23 639:20

**interventions** 605:13 624:14 809:12

**interview** 497:12 513:5 515:6 577:16 579:1 611:9 689:9,13

**interviewed** 440:1 574:19 575:11 579:12

**interviewees** 497:13

**interviewing** 511:23

**interviews** 424:21 428:24 431:22 445:20 486:5 495:17 497:14 511:17 511:20 512:4 512:17 513:7 573:21,23

CONFIDENTIAL

574:1,4,20
575:12,19,23
576:19 577:12
577:19 578:5
579:22 580:4
655:18 656:10
667:4,9 685:1
693:17,22
724:1,13
725:24 786:7
787:4 821:12
**intra** 815:7
**invented** 815:2
**investigation**
 558:22
**investigator**
 555:15,15,18
 556:1,12,22,22
 557:21,22
**investing** 819:9
**investment**
 819:17,23
**invited** 735:1
**involved**
 468:16 532:9
 537:22 538:7
 562:2 569:11
 821:17
**involves** 615:8
 627:23
**irvington**
 405:19 412:6
 418:1,18 419:8
 422:9 424:3

425:22 431:14
433:12 437:23
438:20 439:12
440:20 442:4
452:24 453:10
454:7 455:3,21
458:13 460:7
461:1,24
462:22 464:4
464:19 465:12
466:21 489:1
670:1,6 673:5
673:17 674:18
683:11
**isolation** 746:9
**issue** 447:23
 471:8 477:13
 494:16 536:3
 538:24 539:8
 540:16 542:12
 556:12 570:2
 588:24 659:22
 660:11 661:10
 662:12 685:12
 688:7 705:4
 765:10 812:15
 837:5
**issued** 509:4
 512:14 515:14
 516:20 526:8
 561:14 583:10
 690:1,22
 691:19 693:5
 774:5 819:16

**issues** 441:7
 462:1 477:21
 483:18 581:5
 586:12 603:6
 632:19 646:24
 671:20 673:1
 675:15 694:16
 695:5 696:8
 717:10
**issuing** 795:16
**item** 675:10,11
**items** 552:3
**iteration**
 554:12
**iterations**
 572:1

**j**

**j** 404:4
**jack** 404:20
 808:1
**jack.nolan**
 404:22
**january** 643:6
**jersey** 405:13
 670:1,3,4
 683:12
**jill** 529:13
**job** 743:2
**jog** 550:18
**john** 846:5
**journal** 732:5
 771:5 772:5,22
 773:14

**journalist**
 769:24 770:19
**journals** 732:6
**judge** 501:6
 503:6 504:10
 505:7 506:9,24
 507:17 515:24
 528:14 531:4
 532:22 707:15
 708:17 740:11
 754:1 770:24
 771:16 772:13
 776:16 798:19
 830:23 831:19
**july** 769:4,20
 773:11
**june** 528:22
 582:3 583:7
 760:10,18
**jury** 708:17
**justice** 538:1

**k**

**k** 404:14
 553:20
**kang** 501:6
 503:6 505:7
 506:9,24
 507:17 515:24
 528:14 531:4
 532:22 740:11
 754:1 770:24
 771:16 772:13
 776:16 798:19

CONFIDENTIAL

**[kang - keyes]**                                                    Page 42

| | | | |
|---|---|---|---|
| 830:23 831:19 | 689:9,12 | 460:3,21 | 541:4,15 542:5 |
| **kathryn** 403:11 | 693:16,21 | 461:20 462:18 | 543:5,19 546:1 |
| **kaylie** 406:11 | 722:9 723:24 | 463:24 464:15 | 546:8,23 |
| **keep** 441:5 | 724:12 725:23 | 465:8 466:17 | 547:18 549:3 |
| 485:7 523:3 | 786:6 787:4 | 467:11,22 | 549:21 550:22 |
| **kennedy** | 821:11 | 470:4,14 | 554:18 555:13 |
| 404:11 | **keyes** 404:4 | 472:10 473:6 | 556:9,24 |
| **kentucky** | 407:6 410:13 | 476:13,24 | 557:19 558:19 |
| 668:18,22 | 410:18 412:19 | 478:24 480:5 | 559:17 564:9 |
| 677:19 | 413:6,21 414:8 | 481:7 484:3 | 564:19,24 |
| **kept** 450:6 | 414:19 417:1 | 485:11 487:4 | 565:4,11,13 |
| **kessler** 402:16 | 417:10 418:17 | 488:22 489:17 | 575:16 577:2 |
| 403:3 | 419:7,19 | 490:12,22 | 578:16 579:13 |
| **key** 443:20 | 420:23 421:8 | 491:21 492:15 | 580:1 582:2,10 |
| 445:6,19 494:5 | 421:21 422:8 | 493:15,18 | 582:23 584:2 |
| 494:14,24 | 422:20 423:12 | 494:3,22 | 585:22 588:22 |
| 495:9,10,13 | 423:24 424:13 | 496:23 497:18 | 592:23 593:10 |
| 497:13 498:4 | 425:4 426:8 | 499:14 500:3 | 594:20 599:1 |
| 498:13,18,22 | 427:1,24 | 500:12,21 | 599:18 601:14 |
| 499:5 511:10 | 428:18 429:17 | 501:7 502:5,10 | 605:22 607:11 |
| 511:16 512:3 | 429:21 430:22 | 502:15,21,23 | 607:19 612:24 |
| 512:11,17 | 431:11 432:5 | 503:6,19,24 | 615:15 616:9 |
| 513:7,13 | 432:14 433:9 | 504:11,22 | 619:14 621:4 |
| 514:11,19 | 434:5 435:3 | 505:24 506:16 | 621:15 622:2 |
| 573:20 574:9 | 436:8 437:4,19 | 507:8 508:1,23 | 622:21 624:5 |
| 574:19,23 | 438:15 439:9 | 514:8 515:7 | 624:22 625:5 |
| 575:12,19,22 | 440:15 441:24 | 516:17 520:10 | 626:3,21 628:8 |
| 576:2,7,18 | 443:15 445:2 | 521:18 522:21 | 629:5 631:23 |
| 577:4,12,16,18 | 448:9 450:1 | 524:12 525:12 | 635:7 636:8 |
| 577:21 578:5 | 451:1 452:4,20 | 528:19 529:15 | 638:15 640:4 |
| 578:12,23 | 453:7,20 454:3 | 531:10 532:3 | 642:4,17 645:3 |
| 579:22 580:4 | 454:11,24 | 532:14 533:10 | 646:7 648:10 |
| 667:4,8 679:2 | 455:17 456:12 | 537:1 538:19 | 648:21 649:14 |
| 679:4 684:24 | 457:19 459:2 | 539:6 540:7 | 650:3,5 651:1 |

CONFIDENTIAL

**[keyes - know]**                                                                 Page 43

| | | | |
|---|---|---|---|
| 651:16 653:1 | 739:7 740:12 | 729:17 730:1 | **kirkland** |
| 654:8 655:7 | 742:6,16 743:4 | 730:18 733:6 | 404:19 |
| 656:24 658:22 | 744:6,18 746:3 | 733:24 737:1 | **kirkland.com** |
| 659:18 660:7 | 746:21 748:4,8 | 743:10 749:6 | 404:22 |
| 661:6,14 662:7 | 748:13 749:17 | 750:11 751:17 | **klehman** |
| 663:7 666:13 | 751:7,15,24 | 753:15 | 403:14 |
| 667:2 671:10 | 752:18 753:1,4 | **kids** 616:20 | **kmorgan** |
| 672:5 673:3,15 | 755:9 757:8 | **kind** 411:11 | 406:13 |
| 674:15 675:23 | 758:8 759:23 | 448:17 497:8 | **knew** 554:7 |
| 676:13 677:17 | 760:15,21 | 536:10 548:21 | **know** 415:12 |
| 680:18 682:5 | 762:10 763:5 | 572:2 585:3,8 | 415:20 420:13 |
| 685:17 688:8 | 764:2,22 | 586:23 604:23 | 432:22 433:1 |
| 688:24 691:9 | 765:15 766:3 | 615:18 618:20 | 435:24 438:5 |
| 692:1 694:2 | 767:2 769:13 | 625:17 629:14 | 449:11 450:19 |
| 695:6 696:10 | 770:8 771:3,11 | 629:15 630:10 | 452:17 457:1 |
| 698:1,23 | 772:2 773:10 | 638:22 639:6 | 458:3 459:21 |
| 699:10,18 | 774:1 775:15 | 653:19 654:5 | 461:15 462:6 |
| 701:1 703:22 | 776:20,24 | 660:18 667:12 | 463:9 466:1 |
| 705:6,15 707:7 | 779:17 782:2 | 686:5,10 | 470:20 473:21 |
| 708:4,7 709:4 | 782:19 783:14 | 689:14 698:15 | 483:13 485:21 |
| 710:6 711:10 | 785:16 786:9 | 702:8 704:6 | 486:7 487:20 |
| 712:13 713:1 | 787:10 788:11 | 706:3 707:22 | 488:21 489:8 |
| 713:19 714:18 | 790:22 791:15 | 708:13,14 | 489:18 490:15 |
| 715:13,20 | 792:6 793:6,21 | 709:10 713:11 | 491:15 492:6 |
| 717:16 718:9 | 794:13 795:14 | 715:7 723:6 | 497:1 501:10 |
| 720:5 722:7,16 | 796:12 797:7 | 741:14 771:6 | 501:15 508:14 |
| 723:8 724:14 | 798:4 799:3,12 | 772:24 | 512:6 516:3,6 |
| 724:24 725:7 | 800:1,19 801:1 | **kindergarten** | 516:9 520:3,11 |
| 726:11 728:7 | 801:12,23 | 616:20 | 524:2,4,5 |
| 729:9,15 | 802:6,17 804:4 | **kindergarten...** | 525:17 526:21 |
| 730:17 732:10 | 805:4,24 807:7 | 617:12 | 527:6 528:2 |
| 733:23 734:13 | 846:3 | **king** 402:17 | 531:19 535:11 |
| 736:1 737:12 | **keywords** | 403:5,10 | 535:15 537:23 |
| 737:22 738:22 | 728:11,13,17 | 406:16 | 539:17 542:1 |

CONFIDENTIAL

**[know - language]** Page 44

| | | | |
|---|---|---|---|
| 542:22 546:20 | 669:17,21 | 750:16 754:22 | **knowledge** |
| 547:15 548:14 | 670:3,7,14 | 761:6 763:16 | 452:18 562:23 |
| 549:16 550:14 | 672:3,20 675:8 | 764:20 768:18 | 563:5 572:14 |
| 553:10 559:4 | 677:3,6,21,22 | 768:20 770:14 | 671:9 681:16 |
| 560:15,17,18 | 677:23 678:4,5 | 772:5,24 | 696:2 807:1 |
| 561:22 562:14 | 678:15,18 | 774:14 776:17 | **known** 735:7 |
| 562:17 563:20 | 679:8 680:11 | 777:10 790:8 | **knows** 686:8 |
| 567:17 570:3 | 680:22 681:1,2 | 794:24 795:4 | **kotlarsky** |
| 571:9 572:12 | 681:20 682:7 | 795:12 796:5 | 406:17 |
| 572:21 573:3 | 682:17,20 | 799:22 800:17 | **kslaw.com** |
| 575:8 577:15 | 683:4,14,17,18 | 801:9,11,22 | 403:14 406:19 |
| 578:6 580:16 | 684:1 685:6 | 802:14,15,18 | **ktmc.com** |
| 583:2 584:1 | 686:3,16 687:7 | 803:6,8,10 | 403:6,7 |
| 586:7 592:2 | 687:11 690:15 | 804:17,24 | **l** |
| 600:13 601:11 | 692:3,16,17 | 806:1 813:10 | |
| 602:7,9,13,15 | 695:2,21 | 813:11,12 | **l** 403:4 746:6,6 |
| 602:20 604:13 | 698:12,14 | 814:12 815:4,5 | **laid** 482:24 |
| 606:14 611:20 | 700:6,18,22 | 815:6,8,11,14 | 484:15 533:18 |
| 612:14 617:15 | 702:5 704:13 | 815:16 816:9 | 584:16 586:3 |
| 617:18 618:19 | 705:20 707:3 | 818:5 819:4,11 | 608:18 616:14 |
| 620:5,21 | 708:2,18 716:4 | 820:5,6 821:24 | 637:10,19 |
| 625:17 627:5,6 | 718:23 720:13 | 823:7 825:12 | 680:12 703:1 |
| 628:6 630:6,10 | 727:17,23 | 827:24 828:17 | 704:4 711:9 |
| 631:18 632:15 | 729:22 731:4 | 828:24 829:8 | 790:12 807:5 |
| 632:22 639:6 | 731:13 732:17 | 829:17 830:3 | 811:18 812:21 |
| 641:15,20 | 734:8 735:8,17 | 830:24 831:10 | **lament** 666:8 |
| 646:18 647:7 | 735:21 737:17 | 831:20 834:9 | **lamenting** |
| 647:18,19 | 738:8,11,12,16 | 834:16,20 | 647:18 |
| 651:21 652:6 | 738:18,21 | 835:4,6,13,14 | **landscape** |
| 652:22 653:20 | 739:1,5,11,22 | 835:15 836:18 | 624:19 631:13 |
| 653:23 654:20 | 740:5,14 741:9 | 836:24 837:7,9 | **language** |
| 659:5,8 660:17 | 741:23 742:2 | 838:10 839:2,5 | 726:24 747:14 |
| 665:15 668:21 | 742:12,21 | 839:6,13 840:5 | 761:9 788:22 |
| 668:22 669:8 | 743:12 747:1 | 841:15 842:1 | |

CONFIDENTIAL

**[large - line]**                                      Page 45

large   427:20
  428:3 575:10
largely   435:16
laugh   625:6
laughing   625:9
  625:13,19
  653:8
law   402:15
  405:4 406:3
  410:18
laws   451:13
lawsuit   842:8
  842:14
lawyer's   851:1
lawyers   692:23
  693:10 840:12
  840:24 841:3
lay   519:2 589:5
  608:9 610:7
  636:19 657:10
  686:1 703:14
laying   475:9
  628:7
leader   563:4
  611:6
leaders   425:10
  426:17 427:20
  434:21 449:3
  483:16 486:4
  491:24 492:18
  493:3 494:15
  560:2 610:24
  678:11,24
  679:12

leadership
  435:13 439:20
  442:23 443:1
  444:5 446:19
  562:21 575:9
  592:5 603:4
  605:17,19
  614:11,19
  664:9 666:3
leading   444:7,8
  444:9 785:4,11
lean   448:4
  687:13
leaning   718:23
learn   619:6
learning   485:9
  568:21 587:8
  588:3,20
  612:22 613:5,7
  613:10 617:22
  623:21 624:18
  630:5 631:12
  631:14 632:1
  632:14,24
  778:16 779:1
  779:16 780:1
  780:10 781:2
leave   473:5
  544:10 548:19
led   702:2
left   751:5
lehman   403:11
  752:20 756:9

length   469:15
lens   828:11
leon   405:16
level   443:1
  496:8 497:22
  498:6 499:7,10
  499:11 567:14
  567:20 568:3
  591:22 592:4
  592:20 593:13
  593:15 603:3
  605:3,17,18
  608:17 610:24
  611:6 612:10
  614:11,19,21
  615:22 627:8
  689:15 703:2
  703:12 715:5
  716:9 719:24
  740:4 820:21
  832:12
levels   844:16
lever   529:10,17
lexington
  404:20
liability   402:4
  409:20
liaisons   603:21
license   612:4
licensed   609:17
  609:22
life   566:19
  568:17,20
  591:13 594:14

  602:12,16
  612:21 613:3
  613:10,11,14
  615:9 624:17
  826:10,13
  831:15
light   438:10
likely   413:2
  424:11 505:14
  554:6,9 558:16
  573:12 581:14
  609:16 657:13
  724:9 813:19
likes   834:17
likewise   525:16
limit   503:7
  518:5
limitations
  444:20 818:6
limited   469:6
  482:12 483:10
  488:9 522:22
  546:24 572:6
  622:5 648:3
  653:11 720:16
  724:10 781:12
  803:16 816:4
  818:11,22
  823:10,24
limits   548:8
line   408:6,6,6
  408:11,11,11
  408:16,16,16
  408:21,21,21

CONFIDENTIAL

**[line - look]**

Page 46

675:10,11
753:2 849:3
851:2
**lines** 466:12
**link** 711:16
774:7,17 776:5
782:11 783:7
785:18 786:12
786:19 787:16
**linked** 718:1
**list** 412:7
445:16,18
566:4 569:14
574:18 609:1,1
610:17 631:1
636:2,10,12,14
644:7 728:20
729:2,18
732:20 733:1
744:8,11 747:3
755:17,19
756:1,4,11
757:10 784:9
831:3
**listed** 439:24
446:12 458:1
493:1 537:5
538:23 551:23
551:24 552:3
568:11 573:18
573:19 583:3
609:10 730:2
734:14 736:18
737:20,23

744:23 745:1
747:16 754:6
783:6
**lists** 565:17
648:24 746:22
747:5
**literacy** 566:16
567:3 568:13
568:24 591:13
591:15 595:24
596:6 601:23
602:19 612:23
613:20 615:10
615:11 624:16
624:17 633:16
633:19 637:5,6
637:9,10
**literature**
443:12 484:18
532:12 533:20
604:22 717:5,6
717:13 726:15
726:18 727:10
727:13 728:2
728:10,18
729:4,20 730:4
730:11,21,22
738:13 740:1
742:9,11,13,18
743:9,16,18,24
745:5,11 747:9
747:23,24
748:22,22
749:3 750:6

751:9 757:16
761:23 762:15
763:13 764:6
764:24 765:5
774:3,13,20
775:13,18
776:4 782:23
783:18,20
784:3,11,17
787:5,14,22
793:17 804:13
804:19 824:14
824:16,18
838:13,17
840:8
**litigation** 402:5
409:21 667:11
668:8 693:15
770:17 772:6
773:3,13
843:13 844:23
**little** 429:12
448:13 492:9
550:17 671:6
790:19 816:21
**living** 669:14
**llc** 403:16
404:8,8,15,15
404:16,16
406:21
**llp** 402:16
403:3,10 404:3
404:10,19
406:16

**loaded** 672:14
**located** 449:13
732:15
**locking** 488:13
**logic** 572:20
600:17
**long** 420:13
471:6 473:22
482:7 483:7
547:2 592:2
652:10 707:10
707:19 830:6
**longer** 820:11
**longitudinal**
784:14
**longstanding**
660:16 663:3
**look** 433:21
447:16,23
448:17 456:24
459:12,16,20
460:1,14
461:11 462:8
463:18 466:14
467:3 469:3
471:5,16,20
475:12 479:13
481:14 489:11
490:6 491:5,7
491:8,18,20
494:2 496:5,13
517:4 521:4,14
527:17 528:1
537:17 541:1

CONFIDENTIAL

**[look - make]**                                                    Page 47

541:14 548:5
549:1,13,19
550:20 554:17
557:4,8 560:16
561:2 564:6
565:5 566:4,6
581:2 600:23
604:6,17
613:19 614:6
641:18 642:24
643:17,24
644:18 649:7
649:17 662:16
675:10 685:6
686:4 688:6
698:13,16,19
699:21 700:6
700:11,12
701:15 716:14
723:4 726:23
731:5 734:10
736:8,13
740:19 743:16
743:22 745:7
746:15 748:11
752:9 760:5
774:14 775:3
775:12 777:11
782:22,23
784:19 792:3,7
793:12 795:7
796:10 799:10
802:22 803:9
836:16 838:11

**looked** 411:10
449:5 457:16
459:10 492:23
496:16,18
556:1 559:6,13
652:19 732:22
733:21 742:11
744:2 754:9
784:22 785:7
788:8 789:21
791:10,13
792:23 804:13
835:12,15
838:6
**looking** 522:4,5
538:9 557:15
567:18 571:15
587:17 588:11
606:14 613:21
641:23 645:22
683:15 685:1
726:1 746:19
755:7 757:15
760:2,4 772:15
774:15,19
775:17,18
776:3 779:7
780:4 781:5
783:4 784:17
790:1,9 793:4
794:9 811:5
821:9
**looks** 580:16
598:4 656:22

700:10
**lot** 434:23
457:9 459:10
459:23 469:10
488:2 524:6
531:6,7 533:2
535:6,12 573:5
639:18 813:17
816:3
**lots** 491:10,11
491:12 502:16
570:4 639:10
642:24 661:20
662:16 822:3
**louis** 405:5
**low** 665:16
**lunch** 666:14
**luncheon**
666:20
**luxury** 606:20

**m**

**ma'am** 538:20
707:8 796:13
**macken** 403:4
**made** 420:22
500:5,13 501:1
501:21 502:17
505:2 506:4,19
516:21 517:15
518:18,22
520:4 540:15
541:17 542:11
543:7 574:13

575:6 597:22
663:23 725:19
738:5 783:21
799:24 800:18
818:15 848:7
**magnitude**
657:11 695:9
697:20
**main** 747:12
**maine** 404:5
645:16,23
646:9
**maintain** 830:2
830:6
**majority**
719:22 844:3,7
**make** 488:10
489:12 505:15
510:14 517:24
518:1 521:6,22
525:9 554:13
563:7,13,17
566:7 571:17
587:16 628:13
629:13,22
638:9 648:6,9
690:4,14 691:5
695:24 701:4
713:14,17
747:15 752:12
761:21 762:13
763:11 769:17
778:1 805:15
806:8 813:21

CONFIDENTIAL

**[make - media]**

814:2,6,8
819:5 848:4
**makes** 573:17
592:7 618:4
732:7 757:7
**making** 481:21
599:4 634:12
743:1
**manage** 695:22
**management**
632:2,5
**manual** 552:21
553:12 554:17
**manuals**
548:13,15
551:2,4,22
552:6,10,16
553:7,22 554:5
554:21 555:2,3
555:11,12
**map** 830:12
**mapping**
583:10
**mark** 404:17
564:11 642:6
648:12
**marked** 408:20
445:9 551:19
564:17 582:6
642:15 648:18
**market** 406:5
**marriage**
609:22

**maryland**
669:12,14
680:20,24
681:2,14,22
682:7
**maslynsky**
402:20 847:10
**material** 485:3
**materials** 545:7
732:20 744:7
744:10 747:2
755:17,24
756:3,5,11
757:6,9,10,12
831:3,11
**matter** 409:18
411:5,20,23
491:23 492:17
508:3 509:1,18
510:7 689:2,21
726:16 832:8
**matters** 735:14
762:22
**matthew** 403:4
**maxed** 700:16
**mcgee** 406:23
409:12
**md** 402:3
**mdl** 402:3,4
**mean** 458:17
466:9 474:2
496:12 526:15
537:18 539:16
558:9 559:7

567:12 608:6
612:2 615:17
633:7,8 635:3
645:1,1 665:3
675:4 686:14
686:15 694:12
698:12 707:9
712:3 714:12
716:4,5 731:3
731:23 742:22
742:24 744:3
754:7 756:17
756:23 759:16
759:18 764:21
764:23 805:20
808:9 812:5
814:3 844:8
**means** 539:21
754:10 762:5
763:21 812:15
847:19
**measurable**
470:6,23
**measure**
482:18 483:3
721:20,23
**measured**
746:7
**measures**
497:14
**measuring**
483:8
**mechanism**
623:23 703:24

775:8,22
829:20
**mechanisms**
704:9 705:17
**media** 402:3
409:18 415:5
415:18 417:14
417:20 419:13
420:4 421:12
422:1,13,24
423:16 424:6
432:3 435:2,8
435:17 436:2
436:13 438:11
439:8,16 440:5
440:11,12,23
441:8,23
442:17 443:6
444:23 446:2,4
447:4,5,13
468:22 469:18
470:3 471:11
472:6 480:13
482:16,19
483:24 484:8
484:14 485:5
488:6 497:17
505:18 506:19
507:21 510:2,9
511:24 512:19
514:13 515:18
519:3 526:2,17
528:2 530:23
531:9,13

CONFIDENTIAL

**[media - mental]**

| | | | |
|---|---|---|---|
| 532:18 533:7 | 624:7 625:2,19 | 789:4,17 790:5 | 704:14 705:8 |
| 533:17 536:4 | 626:10,17 | 790:10,18 | 705:14,20 |
| 536:19 537:6 | 627:15,22,24 | 791:3,14,20 | 706:3 707:22 |
| 538:13 539:1,9 | 628:1,2,14 | 792:13,23 | 709:10,23 |
| 540:4,16 | 629:16 630:19 | 793:14,20,24 | 710:8 711:12 |
| 541:21 542:13 | 630:22 631:4,6 | 794:10,16 | **meeting** 646:5 |
| 543:4,11 544:1 | 631:13,17,19 | 795:1,11,22 | 665:7 |
| 544:19 545:4 | 636:23 637:12 | 796:7,15,18 | **meets** 761:15 |
| 546:12 547:6 | 637:13 639:17 | 797:4,24 | **melissa** 403:4 |
| 547:24 549:8 | 656:14 659:3 | 798:12,24 | 503:24 |
| 549:19 550:2 | 659:10,23 | 799:16 800:7 | **meltzer** 402:16 |
| 552:12 553:7 | 660:6,12,20 | 801:14 802:8 | 403:3 |
| 553:14,15 | 661:11 662:6 | 802:19,22 | **member** 568:5 |
| 554:3,9,15,21 | 662:12,19 | 803:11,24 | 734:20,22 |
| 554:24 555:4 | 663:5 665:18 | 804:8 805:11 | 735:2 |
| 555:20 556:7 | 675:22 684:11 | 808:5,10 | **members** |
| 556:13 557:5,9 | 693:2 694:20 | 815:13 823:13 | 565:18 |
| 557:17 558:16 | 702:1 703:9,18 | 823:18 842:17 | **membership** |
| 559:11 570:8 | 708:15 711:18 | 842:23 843:18 | 640:18,20 |
| 570:14 571:4 | 712:1,6,17 | **medical** 831:23 | **memory** 838:9 |
| 572:23 573:16 | 714:1 715:12 | **medicine** | **mental** 407:13 |
| 579:17 580:10 | 718:2,8,15 | 734:18 735:5 | 446:24 450:5 |
| 580:22 581:21 | 721:24 728:24 | 735:11 736:5 | 451:7,17 457:4 |
| 583:22 584:9 | 730:8,10 734:5 | 736:12 737:4 | 468:8,16,19,23 |
| 585:15 587:6 | 736:24 737:5 | 739:16 | 468:24 469:4 |
| 588:1,17 | 738:24 739:17 | **medicine's** | 469:11,15,24 |
| 600:15 602:3 | 740:2 746:7 | 734:4 | 471:13 473:2 |
| 603:7 604:3 | 774:8 776:6 | **meet** 444:11 | 512:1 528:11 |
| 606:9 607:23 | 778:13,22 | 628:6 641:11 | 528:22 529:11 |
| 608:7,16 609:5 | 779:13,21 | 641:17 644:9 | 529:23 530:3 |
| 609:13 610:5 | 780:8,16,21,22 | 645:16,24 | 530:13,19 |
| 610:14 611:14 | 781:16 783:8 | 646:10,15,22 | 532:5,16 |
| 614:16 617:21 | 785:2 786:13 | 648:1 653:19 | 533:14 534:1,5 |
| 617:24 618:23 | 787:17 788:3 | 656:4 665:8,10 | 534:7,22 535:2 |

CONFIDENTIAL

**[mental - misrepresent]** Page 50

| | | | |
|---|---|---|---|
| 535:21,24 | 637:4,9 653:21 | 821:19 822:12 | 417:19 418:5 |
| 536:14,17 | 656:3 660:18 | 822:23 831:15 | 418:22 419:12 |
| 537:4,16 538:2 | 664:4,5 665:9 | 831:23 | 501:1,21 505:3 |
| 538:11,14,22 | 666:10 667:18 | **mention** 533:6 | 506:20 516:22 |
| 540:10,12 | 671:12 672:9 | 535:11 | 517:16 518:7 |
| 542:8 545:10 | 672:17 673:19 | **mentioned** | 518:18 598:7 |
| 547:16 548:18 | 674:12,20 | 430:15 511:19 | 599:16 768:2 |
| 551:1 552:6,10 | 675:15,21 | 535:20 540:2 | **mild** 703:17 |
| 555:2 556:2,5 | 676:3,19 | 648:5 775:20 | 704:12 705:19 |
| 557:16 558:10 | 677:20 678:3 | 775:21 782:24 | 706:14,20 |
| 558:13,15 | 679:17 680:9 | 784:21 795:1 | 707:2 710:2,10 |
| 559:20 560:4,9 | 680:21 681:8 | 814:15 825:6 | 711:15,23 |
| 560:12 561:9 | 681:22 682:8 | **message** 808:17 | 712:8,16 |
| 561:12,16 | 683:2,13,24 | 809:15 811:10 | 713:23 715:21 |
| 563:16,23 | 684:15,19 | 813:5 827:20 | 718:14 720:1 |
| 564:15 567:2 | 701:24 702:4 | **messaging** | **miller** 402:20 |
| 567:10 568:24 | 704:5 706:16 | 810:21 839:14 | 410:4 847:10 |
| 569:19 570:23 | 717:9,20 719:3 | 839:21 841:5 | **million** 772:8 |
| 571:19 584:23 | 778:16 779:1 | **met** 410:15 | **mind** 490:14 |
| 585:5 586:6,19 | 779:15,24 | **meta** 404:14 | 521:12 605:12 |
| 587:8 588:4,21 | 781:2 784:24 | **methodology** | 632:17 687:19 |
| 591:14,16 | 788:20 789:5 | 533:19 652:7 | **minimum** |
| 596:6,13 | 789:13,19,21 | 664:12 758:11 | 653:20 |
| 602:19,23 | 789:24 790:2,6 | 758:12,14 | **minute** 499:15 |
| 603:4,6 604:24 | 790:13,16 | **methods** | 644:17 760:16 |
| 605:6 607:22 | 791:4,11,14,21 | 726:18 | **minutes** 839:20 |
| 608:12,13 | 792:13 793:1,5 | **methvin** 405:4 | 840:3 846:5,6 |
| 609:7,17 610:1 | 793:20 794:11 | **metric** 413:18 | **misconduct** |
| 611:4,13 614:4 | 794:12 795:6 | **miami** 403:13 | 480:12 633:3,6 |
| 614:5,6,12,20 | 797:24 798:24 | 405:17 | 633:8 |
| 615:10 617:5 | 815:9,10,19,24 | **michael** 404:11 | **misinterpreted** |
| 620:4 624:16 | 817:4 819:10 | **middle** 413:24 | 511:4 |
| 630:2 634:16 | 819:13,17,18 | 414:22 415:17 | **misrepresent** |
| 635:18,21 | 820:9,14 | 416:11 417:4 | 495:24 |

Golkow Technologies,
A Veritext Division
877-370-3377  www.veritext.com

CONFIDENTIAL

**[missed - national]** Page 51

missed 668:11

missing 638:1

misspeak
507:24 546:19

misstate 489:15

misstated
759:2

misstates
443:24 468:5
559:1 585:21
628:18 744:17

misunderstood
840:19

mitigate 536:23
584:19 587:5
587:24 588:16
600:14 620:1
620:15 687:16
807:4

mitigates
589:11 639:22

mitigation
509:13

mkennedy
404:13

mmacken
403:7

mobile 405:5

model 604:7,8
607:6 638:23

moderate
703:17,20
704:12 705:19
706:15,21

707:2 710:3,10
711:15,23
712:9,16
713:24 715:6
715:18,21
718:14 720:2

modifications
725:19

modified 529:7

modify 500:14
507:12 519:12
520:18 523:10
525:2 724:15
725:9

modifying
519:21

module 550:16

modules
545:12 547:11
548:23 549:17
550:8

moment 436:22
460:18 461:14
514:3 701:9,16
702:5 752:16
760:5 835:18

money 816:6

monitoring
526:22 644:23

monograph
738:14

month 827:1

months 826:18

morgan 406:11

morning
410:14,16

move 738:6
803:3

moving 416:5
640:2

mtss 717:18,24

multi 471:23
474:12 477:11
477:12 513:3
581:16 604:14
604:20 616:15
631:21 637:19
716:15 717:19
719:2

multiple
441:11 498:9
517:22 521:16
521:17 534:11
548:23 550:8
623:9 709:15
709:16 746:20
747:6 765:11
775:4,24

myeates 403:6

myspace 801:2
801:3,14 802:1
802:5

**n**

n 404:11 407:2

name 409:11
410:17 449:1

490:15 498:18
543:1 562:1
613:21,22
808:1 825:13

named 446:15
579:11

names 574:18
577:14 578:7

nancy 529:9

national 407:15
415:12 418:11
433:21 441:12
443:11,21
445:22 447:24
469:3,10
483:19 528:10
528:18,21
529:6,23 530:3
530:12,18
532:4,9,15,24
533:14,24
534:4 535:21
537:3 538:1,22
540:9 545:10
559:19 561:9
561:11 569:18
571:19 572:15
613:6,13,19
614:7 640:11
640:15 641:12
642:9,19 643:2
643:11 644:9
645:13 650:9
651:24 656:5

CONFIDENTIAL

658:15 659:20 662:9,19 663:9 663:20 664:5 664:15 665:1 734:2,17 735:4 735:6,10 736:3 736:10,20 737:2 739:14 739:23 836:10 836:20 837:9

**nationally** 426:21 486:8 697:15 836:16

**native** 551:11 551:11

**nature** 638:22 638:24 639:23 656:21

**navigate** 482:22 536:23 570:14 617:4 617:16 624:18 631:13 661:4 837:5

**navigating** 614:15

**necessarily** 456:10 505:19 561:21 610:19 660:23 675:9 687:23 712:4 811:12 831:7 833:18

**necessary** 447:11 482:23 610:8 641:23 643:22 848:4

**necessitate** 622:14

**need** 439:6 455:14 491:18 522:20,23 523:3 525:15 528:6 534:15 549:13 605:9 607:8 608:14 608:19 611:11 628:14 629:13 629:15 638:9 638:17 647:19 658:12 665:17 680:14 688:5,6 689:18 693:8 696:12,24 698:6 699:7 700:7,14,16 701:23 704:9 704:15 705:8 705:13,16 706:3 707:22 708:9 709:10 709:23 710:8 711:12,15 717:7 719:9 733:16 774:5 782:8 816:8 824:2

**needed** 420:21 455:15 456:11 601:3 644:5 647:15,23 745:21,24 816:14

**needing** 422:24 423:16 424:6 446:3

**needs** 520:6 611:17 666:10 672:18 674:12 676:4,19 684:16 815:2

**negate** 662:4

**negative** 462:2 477:21 587:5 587:24 588:16 780:15,20,23 781:8

**negatively** 624:19

**network** 508:6 511:13 515:12 689:6 690:21 691:19 693:4

**never** 516:7 618:9 619:18 621:9,21 623:5 624:7,24 626:8 626:16 665:12 759:3,16 811:2 833:7

**new** 404:21,21 405:13 406:18 406:18 436:16 444:16,22 476:2,2,6 477:6 478:12 478:19,20 479:12,21,21 479:23 481:4 487:21 529:12 553:3,4,4 570:1 573:2 589:17,21 592:6 598:10 605:6 606:8 611:16,16,20 611:24 612:1 614:16 623:4 626:7 651:6 655:10 657:4 657:10 658:12 658:12 661:2 670:1,3,4 683:12 696:12 696:13,18,19 696:20,22 697:1,2,6,23 698:3,8,19 699:3,5 700:4 700:14,16,23 700:23 702:11 719:13 720:7 790:17 815:2

CONFIDENTIAL

**newcomer**
551:14,15
553:1
**newer**  602:3
**newly**  602:1
610:24
**night**  517:12
**nih**  735:7
**nolan**  404:20
407:6 807:23
808:1 809:8
810:7 811:6
813:1,24 817:6
817:16 818:14
819:14,24
820:12,20
822:9,18
823:15 824:4
825:5,11,18
826:1,8,14
827:2,10,18
828:2,9,16
829:1,7 830:4
830:10,17
831:1,12,21
832:10,18
833:1,10,16,24
834:8,15,22
835:5,20
836:17 837:6
837:22 838:15
839:3,11,22
840:10,17
841:10,18

842:3,15 843:7
843:16 844:6
844:20 845:8
845:18,20
846:5
**nomenclature**
588:24
**non**  502:1
628:10 629:4
629:24 630:12
798:10
**northern**  402:1
409:22
**notary**  850:14
**note**  471:22
652:9
**noted**  410:2
435:23 439:22
486:1 743:23
848:11 850:6
**notes**  573:24
574:3,12 822:1
851:1
**notice**  402:15
**notifications**
485:6
**novel**  697:11
719:13 720:8,8
**number**  412:17
418:12 419:20
425:17 426:5
426:17,23
427:3,14,17,21
428:1,2,4,5,12

428:13,16
429:11,20,22
429:24 431:6
437:17 440:3
451:3 457:13
458:23 461:15
462:15 463:20
463:22 465:5
466:7 472:15
474:1 475:2,14
476:18 477:19
479:5 480:10
481:16 581:9
595:15,16
597:19,20
598:6,8,10
599:12,13,20
600:18,24
601:4,6 602:6
603:1,15,16,18
641:16,21
645:6,9 650:14
656:20 672:8
674:19 697:21
716:10 718:22
719:16 728:12
834:24 836:4,5
836:6 837:20
839:20,23
840:5
**numbers**
428:19,20,22
428:23 429:2
429:13 433:19

434:3 458:6
460:19 466:1
468:19 644:24
716:22 717:7
717:14 719:5
719:10,15
837:24 844:13
**nurse**  767:17
**nw**  404:12

**o**

**o'hanlon**
406:10
**oath**  410:23
**object**  412:14
412:22 413:13
414:5,14
416:22 417:7
418:8 419:1,14
420:8 421:2,13
422:3,14 423:2
423:18 424:8
424:18 426:1
426:13 427:10
428:9 429:8
430:10 431:3
432:10 436:22
438:2,24
446:10 449:19
452:12 454:1,9
454:13 455:6
455:24 456:17
458:15 459:7
460:10 461:4

CONFIDENTIAL

**[object - object]**                                                                 Page 54

| | | | |
|---|---|---|---|
| 462:3 463:1 | 565:8 575:1 | 694:9 695:12 | 773:17 774:9 |
| 464:7,22 | 576:5 578:15 | 697:3 698:9 | 779:5 781:18 |
| 465:14 466:24 | 578:18 579:18 | 699:9,16 | 783:11 785:21 |
| 470:9 471:3 | 580:12 583:14 | 700:19 702:19 | 786:20 787:19 |
| 472:17 475:5 | 585:20 588:5 | 704:2 705:10 | 789:6 791:22 |
| 476:22 477:24 | 592:21 593:2 | 706:5 708:6,20 | 792:16 794:2 |
| 479:8 480:15 | 594:17 598:1 | 709:13,15 | 794:18 796:2 |
| 482:2 484:10 | 599:8 600:3 | 710:18 711:19 | 797:5,12 |
| 485:17 487:14 | 604:9 606:3 | 712:20 714:5 | 798:14 799:18 |
| 489:4,22 | 607:17 612:12 | 714:24 715:19 | 800:9 801:7,15 |
| 490:20 491:2 | 615:1 616:2 | 715:23 718:3 | 802:10 804:2,9 |
| 492:3,21 | 618:12 619:20 | 718:18 721:2 | 805:12 806:20 |
| 493:23 494:8 | 621:11 623:7 | 722:13,24 | 808:23 809:19 |
| 496:9 497:5 | 624:9 625:3,21 | 723:15 724:19 | 810:13 812:17 |
| 500:8,16 501:3 | 626:11,24 | 725:6,14 728:5 | 813:8 816:16 |
| 504:2 505:4 | 628:17 629:17 | 729:7,12 | 817:13,23 |
| 506:6,21 | 634:22 636:6 | 730:13 731:18 | 818:18 819:20 |
| 507:14 508:7 | 638:11,19 | 733:8 734:6 | 820:3,18 821:1 |
| 513:18 514:16 | 644:14 645:18 | 735:15 737:10 | 822:13,24 |
| 515:21 519:14 | 646:16 649:9 | 737:15 738:9 | 823:20 824:23 |
| 520:20 522:1 | 649:21 650:18 | 739:3 740:7 | 825:8,14,22 |
| 523:12 525:4 | 651:9 652:3 | 741:17 742:14 | 826:4,11,21 |
| 528:12 531:1 | 653:6 655:5,11 | 742:19 743:19 | 827:7,13 828:5 |
| 532:19 536:6 | 658:20 659:24 | 744:16 745:15 | 828:12,22 |
| 537:8 539:2,11 | 660:13 661:12 | 746:11 749:11 | 829:4,10 830:7 |
| 540:21 541:7 | 661:16 662:13 | 750:19 751:22 | 830:13,20 |
| 541:22 542:18 | 665:21 670:20 | 752:22 753:21 | 831:16 832:2 |
| 543:12 545:19 | 671:14 672:11 | 756:13 758:6 | 832:14,21 |
| 546:13 547:7 | 673:9,21 | 758:16 761:24 | 833:3,12,20 |
| 548:2 549:10 | 674:22 676:6 | 762:16 763:17 | 834:4,11,18 |
| 550:3 552:13 | 676:24 679:19 | 763:18 764:10 | 835:2,8 836:1 |
| 555:5,21 | 681:24 684:21 | 765:6 766:20 | 836:21 838:4 |
| 556:16,18 | 687:4 688:10 | 769:8 770:3,21 | 838:21 839:16 |
| 557:23 558:23 | 690:23 693:6 | 771:13 772:10 | 840:13 841:6 |

CONFIDENTIAL

**[object - okay]**                                                    Page 55

| | | | |
|---|---|---|---|
| 841:13,22 | 517:14 520:16 | 812:8,15,20 | 589:13,15 |
| 842:10,19 | 522:6 523:8 | 843:14 | 591:4 592:15 |
| 843:10,20 | 524:24 568:20 | **offhand**  542:1 | 593:11 594:2 |
| 844:9 845:1,14 | 617:19 671:7 | 641:15,16 | 595:12 597:7 |
| **objection** | 674:9 675:12 | 683:4 736:15 | 599:2,19 608:3 |
| 431:17 432:19 | 675:13,18 | 813:12 | 613:22 615:21 |
| 433:15 434:10 | 741:14 776:4 | **officer**  529:22 | 616:14 618:5 |
| 435:9 437:1,10 | 777:17 780:5 | **offices**  402:15 | 619:15 622:22 |
| 439:17 440:24 | 781:20 812:6 | **offline**  702:6 | 628:9 633:1,14 |
| 442:8 443:23 | 812:23 833:22 | **oftentimes** | 636:14 646:8 |
| 450:13 451:23 | 843:22 | 473:20 569:9 | 651:2 654:7 |
| 453:2,13 | **offered**  419:6 | 647:12 | 657:8,17 |
| 467:21 468:3 | 419:18 456:6 | **oh**  452:7 | 658:14 676:16 |
| 532:7 622:6 | 457:5 467:13 | 554:22 635:20 | 705:7 711:11 |
| 691:21 708:3 | 470:18,22 | 828:19 | 712:14 713:5 |
| 713:8 791:5 | 516:18 517:1 | **okay**  412:9 | 713:10,21 |
| 802:3 831:5 | 518:16 519:10 | 416:7 417:23 | 714:19 718:10 |
| 837:12 840:2 | 522:18 523:22 | 420:24 421:9 | 727:8 729:1,16 |
| **objections** | 523:24 526:9 | 425:20 428:8 | 731:9 736:23 |
| 409:6 529:4 | 527:5 528:4 | 429:1 430:4 | 738:1 739:21 |
| 531:16 546:5 | 560:8 623:14 | 443:16 445:3 | 743:5 747:18 |
| 557:12 793:10 | 627:19 667:15 | 448:10 450:2 | 748:15 755:16 |
| 799:7 800:23 | 673:12 682:15 | 452:1,7,11 | 757:9 760:23 |
| 827:22 839:8 | 714:13 741:4 | 470:17 487:7 | 760:24 778:11 |
| **objective** | 744:12 745:22 | 490:13 495:3 | 778:20 780:12 |
| 735:12 | 754:13 798:19 | 495:12 499:16 | 782:3,13,17 |
| **objectively** | **offering**  502:18 | 504:8 511:7,14 | 794:5 798:8 |
| 746:7 | 520:24 526:1 | 518:14 525:16 | 799:13 806:3 |
| **observable** | 598:14 673:6 | 546:2,9 552:2 | 806:12,15,16 |
| 522:8 | 717:22 718:6 | 552:9 565:24 | 809:9 811:7,19 |
| **occurred** | 720:21 722:21 | 578:9 580:6 | 812:2,12 817:7 |
| 665:12 701:22 | 779:20 781:15 | 582:11 584:3,6 | 820:13 823:16 |
| **offer**  470:5 | 788:13 810:21 | 585:13 587:20 | 824:5 825:12 |
| 473:7 487:8,17 | 811:20,23,24 | 588:23 589:1 | 825:19 826:15 |

CONFIDENTIAL

**[okay - overriding]**    Page 56

| | | | |
|---|---|---|---|
| 827:3,5,11 | 587:18 650:2 | 643:18,23 | 613:2 614:6,14 |
| 828:3,10,20 | 670:17 671:8 | 644:6 649:6,13 | 652:15 653:3 |
| 829:2 831:2 | 671:11 672:6 | 649:24 671:17 | 664:8 666:2,4 |
| 832:11 836:18 | 673:6,11,18 | 683:21 688:1 | **original** 744:22 |
| 838:16 841:11 | 674:4,16 | 723:20 726:14 | 848:15 |
| 842:4,16 | 675:12,19 | 729:21 730:5 | **outcomes** 481:6 |
| 844:21 845:19 | 698:6 754:5,12 | 733:19 741:15 | 483:3 819:13 |
| **once** 701:22 | 756:22 757:21 | 745:21 746:2 | **outlined** 626:23 |
| **ones** 573:19 | 776:4 779:20 | 748:1,24 749:2 | **outset** 578:4 |
| 609:10 654:19 | 780:3,14 781:5 | 754:12 755:14 | **outside** 412:13 |
| 730:2 743:10 | 781:15,21 | 755:20 756:7 | 413:12 414:2 |
| 743:12 754:4 | 782:4,10 783:3 | 759:15 774:4 | 414:13,24 |
| 755:13 | 783:6 785:17 | 774:19,22 | 415:5,7,19 |
| **ongoing** 681:19 | 786:11,17 | 786:2 787:1 | 416:2,13,20 |
| 726:19 | 787:15 812:13 | 788:10,12 | 417:5,14,20 |
| **online** 633:22 | 812:16,20 | 811:20,23,24 | 418:7,23 |
| 699:12 801:9 | 833:17,23 | 812:5,9,22 | 419:13,24 |
| **open** 841:17,20 | 843:14,17,23 | 824:7,11 | 420:1,4 508:10 |
| 842:1 | **opinions** 419:5 | **opportunity** | 509:6 579:6 |
| **opening** 724:3 | 419:17 420:22 | 701:20 | 663:13,19,19 |
| **opens** 841:11 | 453:18 455:16 | **opposed** 557:22 | 664:2 667:8,19 |
| **operable** 815:7 | 456:6,11 | 757:12 | 668:8 671:6 |
| **operations** | 467:13 469:23 | **order** 502:7 | 680:24 768:13 |
| 404:15 | 491:23 492:17 | 583:21 605:17 | 784:16 802:11 |
| **opined** 780:6 | 493:12 502:19 | 638:7 774:6 | 812:1 832:4 |
| 781:7 | 516:24 518:4 | 782:9 815:2 | **overall** 472:23 |
| **opinion** 458:9 | 521:1,5,15 | 837:23 | **overlap** 575:10 |
| 470:5,22 487:9 | 522:6,9,13,17 | **organization** | **overlooked** |
| 487:17 516:19 | 523:21 524:1 | 612:8,16 | 758:3 |
| 517:14 518:16 | 525:22,23 | 613:14,23 | **overnight** |
| 519:10 520:17 | 527:1,5,11,22 | 664:10,14,24 | 612:3 |
| 521:12,21 | 528:4 533:12 | 665:14 | **overriding** |
| 523:8 524:24 | 533:22 564:4 | **organizations** | 762:20 |
| 526:2,9 587:15 | 584:16 642:1 | 520:2,9 612:19 | |

CONFIDENTIAL

**[oversee - past]**                                                            Page 57

**oversee** 608:20
**overseeing**
   615:5

**p**

**p.c.** 405:11
**p.m.** 666:17,24
   765:18 766:1
   807:11,18
   846:7,11
**pa** 409:17
**page** 407:11
   408:6,6,6,11,11
   408:11,16,16
   408:16,21,21
   408:21 552:1
   566:9 587:11
   587:12,14
   589:14 591:6
   759:24 760:1
   760:19,20
   849:3 851:2
**pages** 553:12
   850:3
**paid** 770:1,20
   771:7 772:5,7
   773:15
**pandemic**
   819:19 820:11
**paper** 540:14
   540:19 541:17
   542:11,16
   543:2,7

**paragraph**
   587:12,15,18
   727:2 729:18
   730:2 747:21
   748:4,10,16,20
   779:2,4,9
   788:16
**parameters**
   625:7
**parental**
   526:22
**parents** 513:17
   514:14 515:17
**parsimonious**
   573:8
**part** 420:11,16
   438:5 440:13
   442:18 444:10
   445:10 447:11
   447:18 482:5
   484:6,15 485:1
   502:2 509:16
   509:24 513:3,5
   530:14 536:20
   540:2 556:4,8
   562:10,12
   563:18 570:23
   572:10 574:4
   574:11,15,19
   575:6 576:24
   577:10 581:16
   584:10 589:7
   590:5,12 591:8
   595:14 597:15

   610:23 617:1
   620:17 627:6
   629:20 630:6
   630:15 637:20
   641:19 650:1
   652:8 664:19
   667:11 680:5
   681:3,8 685:23
   686:2 689:18
   693:19 704:16
   704:19 726:19
   727:19 731:24
   735:5 737:9
   740:23 746:4
   758:21 764:4
   766:13,17
   770:16 772:21
   785:8,13,13,17
   786:16 790:14
   795:4 811:17
   814:12 823:24
   824:2 836:5
**participant's**
   548:13
**participants**
   545:16 547:21
   547:23
**participate**
   546:3,7 637:16
   638:8 681:15
   704:1
**participated**
   549:7

**particular**
   412:3 419:23
   473:17 519:12
   520:19 523:10
   525:2 570:17
   574:9,23 576:3
   576:4 577:4,4
   577:8,8,24
   589:6 607:5
   620:23 657:6
   711:22 747:19
   747:19 779:22
   780:24 812:14
   822:5,19
**particularly**
   675:16
**partner** 568:4
   569:7,10
**partnered**
   534:5
**partnering**
   538:8
**partners** 535:7
**partnership**
   536:12
**partnerships**
   535:7,19 681:7
**parts** 628:21
**party** 846:2
**pass** 807:9
**past** 476:5
   477:8 478:11
   565:7 734:23

CONFIDENTIAL

**patient** 707:9
**patterson** 529:14,18
**pausing** 668:20 768:9
**payments** 404:16
**peer** 532:11 595:4 623:20 738:13 784:16 789:3,11 791:2 791:18 792:11 793:17,23 794:15,21 796:8 798:9,10 804:18
**pending** 782:16
**pennsylvania** 402:18 403:5
**people** 429:1 430:14,19 434:18 436:17 441:14 445:5 445:14 468:9 468:17 469:12 469:17 473:15 474:17,21 476:3 491:10 494:17 498:9 511:9 512:10 513:12 514:10 527:21 528:6 538:15 544:8 556:7 574:14

575:11 576:4 581:6 598:8 599:12 606:11 609:5,24 617:7 632:3 665:5 670:12 685:15 694:21 723:10 785:3,19 786:18 794:12 798:1 803:2 821:24 829:15 829:23 844:4
**people's** 537:16
**perceive** 771:20 772:18
**percent** 473:18 476:12 478:5 479:17 481:11 581:11 716:2,3 716:19,21 717:1,2
**percentage** 412:11 413:10 413:24 414:11 414:18,22 415:4,17,24 416:11,18 417:3,12,18,21 418:4,21 419:11,22 420:2 425:14 471:10 474:8 476:10 482:1 581:20 715:15

718:11 835:22 844:21 845:10 845:17
**performance** 559:24
**period** 473:16 473:23 581:11 581:22 720:17 724:17 725:10 725:11 826:9
**person** 562:1 569:11 578:13 608:18 609:16 618:1 702:3 705:4 739:19 739:22
**personal** 402:4 409:19 412:12 413:11 414:2 416:2,13 418:6 420:1 485:15 519:3 712:5 832:7
**personally** 616:24 667:20
**personnel** 484:23 493:4 722:4
**perspective** 787:14
**pertain** 679:9
**pertinent** 754:18 756:22 757:11 758:2,5

**pervade** 623:19 623:20,21
**pervasive** 697:11 698:3 699:3,5
**pervasiveness** 802:24
**ph** 402:24
**ph.d.** 402:14 410:1,7 850:8
**phd** 407:4
**phone** 412:12 413:11 414:1 416:1,12 418:6 419:24 485:22 486:10,13,21 486:24 487:9 487:12,23 489:2,20 490:16 491:1 492:2,20 493:10,22 494:4 495:15 495:19 496:3,7 497:3,21 498:4 499:6 746:8
**phones** 485:15 486:19 488:13 490:3,9 495:20
**phrase** 561:19 707:4 818:21
**phrased** 629:21 674:1 818:9

CONFIDENTIAL

**[pi - platform]**                                                          Page 59

**pi**  556:23 557:1
 557:2,4,14
**pick**  738:3
**picked**  738:4
**picture**  434:1
 827:19 828:1
**piece**  467:3
 646:11 750:23
 785:24 788:6
**pieces**  607:2
**pipeline**  538:11
**place**  406:11
 428:15 440:8
 526:22 570:11
 586:16,20
 602:15 606:21
 607:3,8 610:22
 624:2 653:10
 662:2 777:15
 803:17 809:6
 810:2 820:8,10
 820:15
**places**  704:8
**plaintiff**  403:7
 405:7,18
 406:13 446:16
 447:21 449:5
 457:2 655:20
 679:6 685:2
 726:2 784:22
 787:9
**plaintiffs**  406:8
 420:6 741:11
 741:13 770:2

770:20 771:8
772:7 773:12
773:15 840:11
840:23 841:2
**plan**  438:5
 440:14 442:19
 447:12 453:19
 456:8 470:7,23
 470:24 471:6
 472:22 475:3
 475:10 476:20
 477:22 479:7
 480:14,21
 481:18,21
 482:7 483:7
 484:4,12
 508:21 509:14
 510:5,24 514:1
 517:2,7 519:18
 521:2 522:19
 541:19 543:9
 543:22 544:17
 545:3 570:9
 571:6 579:16
 580:9,16
 583:11,19
 584:7,11,19
 585:11 586:3
 587:4,23 589:6
 589:10,17,22
 590:2,5,9,15,18
 590:23 591:5,8
 591:20 592:18
 594:7,13,22

595:3,8,14
597:15 598:15
598:23 603:6
606:1,13
607:14 608:9
608:19 610:10
610:12,22
615:4,20 618:7
618:8,21
619:17,24
620:15 621:5,8
621:19 622:10
624:11 625:8
626:19 627:6
627:11 629:7
631:10 633:11
636:3,4,12,13
636:19,22
637:10,15,18
640:5,22 644:2
649:16 654:10
654:13 655:1
656:19 658:1
658:11 685:19
687:2,7,12,15
688:2,3,14,19
690:13 694:4,7
694:13,17,22
695:9 696:9
699:7 701:5,8
701:10,17,18
703:15,24
704:16 706:3
706:18 707:22

708:10 709:10
710:23 711:2
711:22 712:2
712:23 713:3,3
713:4,14 714:3
714:14,23
717:23 766:6,9
766:13,17
780:11 805:9
805:23 806:5
806:11,18
809:22 811:4
811:17 814:12
824:3
**planned**  572:9
**planning**
 525:24
**plans**  590:13
 591:3 597:23
 599:4 600:2
 603:24 685:22
 686:12,16
 688:17 695:11
 697:24 714:9
 715:11 716:17
 720:22 722:22
 805:5 807:6
 808:4,5,8,14,22
 809:2,10 810:2
 810:12,16
 816:14
**plat**  844:15
**platform**  440:6
 488:8 493:6,7

**[platform - possible]**                                    Page 60

| | | | |
|---|---|---|---|
| 500:7,15 | 523:9 525:1 | **please**  429:16 | **portion**  841:5 |
| 507:21 516:9 | 526:17 527:20 | 524:20 527:11 | **position**  473:23 |
| 518:6 560:1 | 537:15 569:23 | 621:23 725:4 | 565:20 566:2 |
| 611:14 616:24 | 572:4 583:23 | 848:3,8 | 568:8,14,18 |
| 618:24 620:23 | 583:24 584:13 | **plugging**  607:3 | 569:5 592:12 |
| 622:16 624:4 | 586:5 589:12 | **plus**  501:10 | 593:7 596:7,24 |
| 702:2 810:9 | 606:10,16 | 553:11 604:16 | 597:2,4,6 |
| 812:4 813:6,7 | 614:24 615:7 | **point**  423:7,23 | 604:7 607:21 |
| 824:15,22 | 615:13 616:1,8 | 433:7 445:23 | 608:7 610:13 |
| 835:16 838:20 | 616:13 618:10 | 450:20 461:11 | 611:6 |
| 843:18 | 619:19 621:10 | 486:8 488:19 | **positioned** |
| **platforms** | 621:22 622:13 | 489:2,20 | 572:22 |
| 404:14 414:12 | 622:20 623:5 | 491:17 521:13 | **positions** |
| 414:24 416:20 | 623:13,18 | 528:3 571:18 | 567:15 569:14 |
| 417:5 418:23 | 624:21 625:1 | 601:24 612:15 | 569:20 570:6 |
| 420:4 424:24 | 626:10,17,18 | 652:23 662:3 | 571:5,13,21 |
| 427:23 432:4 | 659:16 677:7 | 669:7 689:1,20 | 572:18 573:18 |
| 435:2,18,19 | 680:17 687:17 | 690:16 707:16 | 575:9 591:22 |
| 436:3 437:9 | 688:22 689:5 | 717:12 721:22 | 592:5,8,11,20 |
| 438:12 439:8 | 689:24 690:21 | 754:15 777:14 | 593:6,12,14 |
| 441:9,23 442:7 | 691:18 693:2,3 | 778:1 795:18 | 594:3 595:15 |
| 443:6,7 444:24 | 701:3,11 712:7 | 820:15 821:13 | 595:15 596:22 |
| 445:1 468:23 | 721:14,18 | **policies**  704:20 | 612:10,17 |
| 469:19 470:3 | 726:6 781:22 | **ponce**  405:16 | 613:24 614:22 |
| 496:20 497:17 | 782:5 788:4 | **poor**  816:4 | 615:5,22 616:5 |
| 501:1,20 505:2 | 803:5,17 807:5 | **population** | 623:4 626:8 |
| 506:4 507:12 | 808:10 809:4 | 599:24 620:18 | 628:11 630:20 |
| 508:17 509:11 | 809:16,24 | 628:16 638:5 | 656:17,21 |
| 510:2,3 512:20 | 810:6 812:7 | 654:14 697:13 | 672:9 674:20 |
| 514:22 515:2 | 815:16 820:23 | 698:5 699:6 | 686:9 702:11 |
| 516:21 517:15 | 821:16 837:18 | 706:11,12 | **positive**  605:13 |
| 518:17,24 | 843:4,9 844:2 | 715:15 719:23 | 634:2 |
| 519:11,22 | 844:15 | 740:4 | **possible**  839:1 |
| 520:18 522:11 | | | |

CONFIDENTIAL

**[possibly - prevention]**                                          Page 61

| | | | |
|---|---|---|---|
| **possibly** 465:19 | **predict** 473:24 | 424:2,15 | 507:22 515:9 |
| 568:4 838:14 | 475:17 477:5 | 425:21 426:10 | 516:5,15 |
| **posts** 834:23 | 478:17 580:21 | 427:5 430:7,24 | 543:16 544:14 |
| **potential** 617:5 | 697:6 699:1 | 431:13 432:7 | 544:16 545:1,5 |
| 659:13 687:9 | 746:8 766:23 | 432:16 433:11 | 545:17 549:5,6 |
| 703:8 | 802:22 803:4 | 434:7 435:5 | 549:24 550:11 |
| **power** 549:24 | 803:14,20 | 436:10 437:6 | 736:14 797:1 |
| **powerpoint** | **predicting** | 437:21 438:18 | 797:16,18,21 |
| 545:17 549:5,6 | 481:3 | 439:11 440:18 | 799:14,23 |
| 549:24 | **preeminent** | 442:2 449:16 | 800:17 |
| **practice** 434:18 | 735:11,21,23 | 450:11 451:5 | **presented** |
| 472:21 498:21 | **preface** 544:24 | 451:20 452:22 | 542:23 543:3 |
| 563:19,22 | 661:22 | 455:2,19 | 544:3,3,17 |
| 574:12 577:1 | **prefer** 723:4 | 456:15 458:11 | 668:21 669:5 |
| 577:11,18 | **prepare** 520:14 | 460:5,23 | 670:4 736:2,20 |
| 578:24 598:16 | **prepared** | 461:22 462:20 | 744:2 765:12 |
| 598:18 653:19 | 517:11 518:15 | 464:2,17 | **presenting** |
| 654:3,4 695:4 | 519:9 520:16 | 465:10 466:19 | 544:8 545:2 |
| 726:19 | 523:7 524:23 | 489:3 543:20 | 762:7 772:20 |
| **practices** | 545:8 644:1 | 544:11 736:10 | **pretend** 686:7 |
| 474:13 513:7 | **preparing** | 764:23 773:1 | **pretty** 608:10 |
| 534:20,21 | 491:23 492:17 | **presentation** | 733:12 803:2 |
| 545:11 598:19 | 533:11 617:20 | 500:23 501:19 | 836:11 |
| 598:24 601:13 | 755:20,24 | 505:1 506:2,18 | **prevent** 587:4 |
| 606:17 627:20 | 769:24 | 507:10 540:14 | 587:24 588:16 |
| 686:2 687:14 | **present** 406:23 | 540:19 541:17 | 600:13 620:1 |
| 688:4 | 412:10 413:9 | 542:3,10,16 | 640:2 687:16 |
| **pre** 542:7,12 | 413:23 414:10 | 543:7 761:22 | 807:3 |
| 543:8,22 | 414:21 415:3 | 762:14 763:12 | **prevention** |
| **precise** 429:22 | 415:16,23 | 764:5 765:4 | 471:22 509:13 |
| 475:14 523:23 | 416:10 418:4 | **presentations** | 534:9 536:2 |
| 719:15 720:11 | 418:20 419:10 | 501:11,13 | 616:18 617:9 |
| **precisely** | 421:10,23 | 505:10,13 | 617:14 618:6 |
| 447:10 | 422:11 423:14 | 506:13 507:3 | 623:22 631:11 |

CONFIDENTIAL

**[prevention - provided]**                                            Page 62

639:3,5,21
702:15 703:4
**prevents**
589:11
**previously**
445:8 551:19
582:6
**primary**
443:12 630:6
761:19
**principal**
555:18,24
556:11,21
557:22 767:23
**principles**
600:9
**print**  730:21
**prior**  660:19,21
678:23 783:24
795:16
**prioritize**  819:5
**privacy**  451:13
**private**  832:8
**probably**
460:13 463:16
473:12 549:1
549:13 553:8
558:2 561:18
600:12 613:6
**probe**  467:15
**problem**  446:1
665:18 724:18
725:13

**problems**
467:14,20,24
481:24 620:6
**process**  444:11
512:16 514:5
514:20 561:22
561:23 562:3
577:17 611:9
689:19 719:8
756:19
**produce**  463:11
**produced**
533:2
**production**
408:10
**products**  402:4
409:20
**professional**
544:13,16
590:4,8,11
598:4 608:19
608:20 609:18
610:22 611:1
611:12 612:8
612:16,18
613:23 662:19
663:21 704:21
762:4,7,21
763:24 764:16
765:14 771:5
773:14 799:14
831:23,24
**professionals**
538:3 613:15

617:2 647:16
652:21
**professions**
652:16
**profile**  407:13
407:14 559:21
560:6,13 561:1
561:6,13
562:16,18
563:8,14
564:15,16
565:6 566:1,14
566:18 567:1,5
567:8,23 568:6
568:12,16,22
568:23 569:3
569:18 570:17
571:13,20
655:17 667:17
667:18 834:3
**profiles**  559:20
562:5,8
**program**
540:14,19
541:2,13,16
542:10,16
543:6 600:22
**programming**
474:13 617:19
704:20 809:12
**programs**
598:18 810:3
**prohibited**
526:11 527:14

527:16
**project**  473:10
537:22
**promotion**
639:4,21
**pronged**
471:23 477:12
**proposal**
580:19 582:1
**propose**  808:4
**proposed**  591:2
592:9
**proposing**
472:22 478:8
658:1,11
695:10 809:10
**propounded**
850:5
**prospective**
784:13
**provide**  615:24
616:11 621:20
639:8,12
652:21 682:4,7
709:7 784:9
**provided**  468:7
574:17 619:17
623:3 626:7
644:22 672:7
674:18 681:22
682:12 702:10
719:4 809:13
844:13

CONFIDENTIAL

**[providers - question]** Page 63

| | | | |
|---|---|---|---|
| **providers** 450:18 468:24 | 474:19 475:19 475:24 476:7 478:9,20 479:12,14 480:2 481:1,5 545:4 581:1,4 581:16,24 616:17 638:23 694:14 702:22 702:24 706:8 716:14 719:1 834:23 835:1 850:14 | **pubmed** 727:16 727:24 | 624:1 639:19 718:21 730:21 750:15 751:21 803:6,17 810:2 820:8 |
| **providing** 618:8 629:8 639:2 | | **puerto** 645:24 | **putting** 606:21 607:2 |
| **prussia** 402:17 403:5 | | **pull** 479:19 509:19 510:8 551:17 731:17 | |
| **psychologist** 407:16 596:18 640:7 641:14 642:12,21 644:11 645:6 647:20,23 648:8 | | **pulled** 769:16 | **q** |
| | | **pulling** 731:5 | **qualitative** 445:4,11 447:19 |
| | | **purchase** 817:11 | **quality** 548:17 701:20 |
| **psychologists** 407:16 601:7 614:8 640:12 640:16 641:13 642:11,20 643:3 644:10 645:14 647:6 652:1 654:12 654:24 655:3 657:3,5 658:3 658:6,7,16 659:21 662:10 663:10 664:16 | **publication** 734:4 771:7 772:9,17 795:24 | **purchasing** 819:2 | **quantification** 473:8 |
| | | **purport** 575:22 576:1 | **quantify** 427:8 427:13 430:2 467:19,24 481:21 721:1 |
| | **publications** 769:3 773:7 792:4 795:2 796:8,11,24 797:20 799:2 | **purported** 805:10 | **quantitative** 444:14 478:15 |
| | | **purpose** 555:11 584:11 | **quarter** 772:8 |
| | **publicly** 500:22 501:18 504:24 506:1,17 507:9 | **purposes** 509:20 510:9 654:22 658:19 727:13 728:1 728:18 729:5 729:19 730:3 750:7 774:4 782:3 783:2 | **question** 408:20 409:7 413:1 438:16 454:4 462:10 474:4 487:5,20 492:8,12 494:20 496:12 499:13 502:14 503:4,23 510:15 513:4 517:13 518:21 |
| **psychology** 609:20 | | | |
| | **publish** 532:5 772:9 | | |
| **psycinfo** 727:24 | **published** 532:16 533:15 737:4 739:16 772:1 794:14 795:20 798:9 | **pursuant** 402:14 | |
| **public** 405:19 471:7,20 472:1 473:14 474:11 | | **put** 457:20,22 458:2,8 474:11 482:21 488:12 499:3 570:11 573:4,12 586:9 586:15,19 | |
| | **publishing** 794:23 | | |

CONFIDENTIAL

**[question - really]**                                    Page 64

520:12 521:24
523:1,5,6,15,18
523:19 524:8
524:21,22
525:11,18,20
526:14 532:2
536:9 538:20
539:14 554:19
555:1 558:5
567:22 575:24
576:10,16
577:6 592:15
622:1,3 625:11
625:13,20
626:2,14
629:21 630:16
659:6 661:7
670:24 671:9
671:21,22
672:2,14
673:24 674:6
675:5 676:21
679:9 690:5,7
698:21 707:12
707:20,21
709:8,20
713:18 725:5,8
738:21 748:18
757:19 758:21
763:9 768:23
782:16,21
790:23 796:15
796:19 805:1
805:16 806:6,9

814:4 818:10
821:7,21
840:20 841:9
**questioning**
753:3
**questions**
419:21 447:1
502:1,6 503:15
504:7 510:19
511:4 522:24
525:8 637:3
707:18 708:23
708:24 709:6
751:1 771:10
776:14,19
842:5 845:23
850:4
**quite** 486:11
509:8 547:10
617:20 636:20
636:21 665:6
707:9 742:24
789:10
**quote** 467:14
473:8 534:10
574:9 575:19
575:22 578:11
578:11 608:7
609:13,14
610:14 734:4
737:5,6 739:17
739:24 745:4
**quoted** 574:8
574:22 576:12

769:4
**quotes** 498:17
498:23 575:14
576:1,3,7
577:4,8 578:8
579:6 728:13

**r**

**r** 849:1,1
**radnor** 402:17
403:5 409:17
**raised** 690:4
**ran** 729:3
**range** 553:19
**rapid** 441:6
**rate** 836:20
**rather** 653:17
687:22 706:12
**ratio** 407:16,21
640:7,10 641:4
642:12,21
645:5,7,9,15
646:6,10,15,22
648:17 649:1,8
649:18 650:16
651:5,14
654:16 657:6
657:18 658:3
659:21 660:10
661:9 663:11
663:17 665:8,8
**rationale**
622:23

**ratios** 600:7
648:2 650:7
651:23 652:11
653:2,5 658:15
658:18 659:1,8
659:12 660:3
660:16 662:1
662:11,24
663:3,24 664:7
664:13 665:2,6
665:16,16
666:8
**reach** 665:13
684:12
**read** 491:12
546:16 608:11
741:12 745:13
848:3 850:3
**readiness** 654:1
**reading** 732:6
748:3 756:20
**real** 494:17
522:7 554:1
**reality** 572:24
674:24
**realize** 490:14
**really** 482:21
490:5 523:20
523:22 535:15
547:10 592:3
606:13,20
607:7 687:11
688:19 694:12
707:11 721:19

CONFIDENTIAL

**[really - recommends]** Page 65

| | | | |
|---|---|---|---|
| 733:10 774:18 790:12 803:8 | 581:9 644:21 662:22 669:15 669:22 670:5 684:3 685:9 727:18 729:23 730:16 740:15 741:19,20 768:23 770:10 770:12 793:16 804:15 805:3 821:23 823:3 825:2,4 826:24 837:15 838:8 838:10 | **recess** 499:21 504:16 582:17 666:21 765:21 807:14 | 837:3 842:6,13 |
| **realtime** 402:21 847:11 | | | **recommendat...** 518:23 520:4 561:14 571:18 641:13 644:10 663:23 694:6 |
| **reason** 423:10 668:20 674:1 761:17 768:9 772:14 795:4 820:16,24 829:21 836:5 841:21 848:5 | | **recognize** 662:5 | |
| | | **recognized** 641:6 | **recommendat...** 597:22 599:3,5 599:11 600:1,6 693:24 |
| | | **recognizing** 639:10 660:5 | |
| | | **recollection** 447:3 490:1 499:4,13 533:23 534:19 553:13 572:8 578:10 643:20 661:23 723:7 729:24 731:21 771:23 784:1 839:24 | **recommended** 592:13 596:23 597:9,14,15 614:1 615:4 640:11 641:4 644:2 645:15 646:15 651:22 654:16 662:1 662:10 663:11 663:17 690:12 696:17 766:7 |
| **reasonable** 545:23 | | | |
| **reasoning** 503:10 | **recalling** 489:13 499:9 550:6 | | |
| **reasons** 452:15 486:9,16,21 623:24 | **receipt** 848:17 | | |
| | **receive** 628:10 631:17 706:23 808:20 810:24 | | |
| **rebuttal** 411:12 517:23 741:7 741:15 744:12 744:15,21 | | **recommend** 482:6 524:9 562:20 571:5 583:11 591:19 592:17 593:12 593:14 594:6 594:12,21 595:2,7,13,23 596:5,11,17 612:19 613:14 614:10,18 640:6,22 654:24 658:17 658:18 662:24 | **recommending** 471:1 484:5 569:15 571:22 583:20 584:7 591:7,10 599:21 605:4 621:6 628:12 649:17 685:19 805:6 806:11 806:19 808:21 |
| | **received** 616:12 787:7 827:6,12 | | |
| **rebuttals** 741:21 745:3 745:14,19 778:9 | **receiving** 617:1 617:3 | | |
| | **recent** 483:22 537:12 558:13 660:3 666:11 717:10 769:1,2 773:6 | | |
| **recall** 421:5,5 458:22 481:16 495:17 497:19 501:11 505:23 506:11 507:2,5 507:19 516:12 534:19 545:2 550:14 563:11 | | | **recommends** 612:8,17 613:24 651:14 |
| | **recently** 672:19 717:6 771:24 | | |

CONFIDENTIAL

**[reconstructing - remember]**                                    Page 66

| | | | |
|---|---|---|---|
| **reconstructing** 729:10 | 576:14 726:24 739:8 | **regulation** 634:8 | **relevant** 617:20 727:10,12 |
| **record** 409:11 410:3 430:5 499:19 500:2 504:14,21 573:23 578:10 582:15,22 666:18 667:1 765:19 766:2 807:12,19 846:1,8 847:6 | **references** 741:23 | **relate** 412:2 503:4 | 728:2,10 729:4 729:20 730:4 730:11 733:7 742:8,18 743:8 743:15,18 745:4,11 747:22 748:21 749:8 750:6,14 751:8,20 753:18 774:3 775:14 |
| | **referencing** 783:23 | **related** 435:1 435:16 439:8 517:1 521:5 522:7,13 527:23 554:15 558:10,12 598:19 603:7 615:6 617:24 622:12 630:4 630:18 662:18 675:21 684:11 703:18 706:21 711:24 712:9 712:17 714:1 715:12 718:15 772:19 813:14 820:22 | |
| | **referral** 815:11 820:17 821:20 822:12,23 | | |
| | **referrals** 446:24 815:20 816:1 817:2 819:12,17 | | |
| **records** 450:6 451:8 | **referred** 494:24 495:8,10 680:6 783:17 | | **relied** 469:13 483:15,19,20 484:2 |
| **reddit** 809:16 | | | |
| **redirect** 781:12 | **referring** 462:7 552:7 608:1 631:7 679:2,4 788:23 | | **reluctant** 507:19 638:3 674:2 |
| **reduce** 479:16 487:11 488:18 | | | |
| **reduced** 485:13 487:6 | **reflect** 652:19 789:18 | **relates** 402:6 629:15 | **rely** 442:21 477:8 478:14 479:24 480:2 483:11 |
| **reducing** 485:22 486:10 | **reflected** 567:15 | **relating** 614:23 | **relying** 445:24 478:10 751:10 837:24 |
| **reduction** 635:14,17 | **reflects** 650:15 | **relation** 627:22 | |
| | **regard** 688:9 688:15 | **relationships** 623:20 | |
| **refer** 445:3,17 545:9 587:10 678:24 | **regarding** 599:5 | **relatively** 570:1 570:1 606:8 611:15 720:16 790:17 | **remain** 701:17 |
| | | | **remainder** 618:7 |
| **reference** 545:7 550:24 551:5 558:3 559:18 667:5 747:2 808:14 | **regular** 726:19 732:1,6 | | **remains** 488:16 |
| | **regularly** 448:8 531:22 727:20 | **released** 560:14 560:24 | **remedy** 600:11 |
| **referenced** 534:24 573:20 | | | **remember** 505:12 516:2 533:8 544:24 |

Golkow Technologies,
877-370-3377                    A Veritext Division                    www.veritext.com

**[remember - reports]**                                    Page 67

| | | | |
|---|---|---|---|
| 548:10 549:15 | 567:16 579:2 | **reported** | 518:13 519:8 |
| 566:22 696:14 | 582:4 583:6,10 | 435:22 455:22 | 520:13,15 |
| 696:16 731:11 | 584:17,22 | 456:4 458:23 | 521:17,20 |
| 741:6 743:10 | 586:4 587:1,2 | 465:4 468:19 | 523:3,4,7 |
| 755:3 769:6,14 | 587:13,14,22 | **reporter** | 524:5,7,23 |
| **remind** 436:21 | 588:9,12,14 | 402:21,21 | 526:7 529:17 |
| **reminder** | 589:8,14 | 410:4 769:7 | 529:21 530:4,5 |
| 410:17 | 607:20 609:2 | 773:14 847:11 | 532:5,10,13,17 |
| **reminding** | 613:19 647:2 | 847:21 | 533:2,5,9,12,15 |
| 525:18 | 652:9 655:16 | **reporting** | 534:3,13 540:8 |
| **remove** 495:19 | 672:17 674:10 | 466:22 | 542:6,9 545:6 |
| **renew** 640:20 | 682:18 683:16 | **reports** 411:7,8 | 550:23 552:7 |
| **repeat** 524:19 | 684:9 704:8 | 411:11,13,14 | 555:14 559:19 |
| 626:1 | 727:4 730:3 | 411:17 412:1 | 562:4 574:6,9 |
| **rephrase** | 732:24 733:5 | 427:18 434:20 | 574:23 575:4 |
| 524:10,11,13 | 738:24 739:23 | 435:23 441:19 | 575:15,21 |
| 524:15 754:19 | 740:6,15 | 445:7 453:18 | 576:13 579:15 |
| **replaced** 529:1 | 746:23 747:3 | 456:7 457:21 | 580:8 589:3,5 |
| **report** 411:12 | 747:12,13,19 | 457:24 458:18 | 592:13 667:5 |
| 426:16 439:22 | 748:7,23 749:2 | 461:8 467:18 | 667:15 679:23 |
| 444:18 446:13 | 749:7,10 | 468:5 469:8,14 | 691:3,16,24 |
| 447:7 458:3 | 750:13,18 | 470:6,18,21 | 692:3,3,7,12,14 |
| 469:9 473:19 | 751:19 755:21 | 471:19 472:13 | 692:15,17,18 |
| 478:16 480:18 | 756:6 759:10 | 472:13 474:24 | 696:17 724:4,5 |
| 480:24 481:15 | 759:14,15 | 474:24 476:16 | 726:12 727:3 |
| 483:1 496:22 | 760:1,2,9,19 | 476:16 477:14 | 727:14 728:3 |
| 499:1 503:17 | 761:10,15 | 477:17,17 | 729:18 732:19 |
| 510:24 512:22 | 777:1,2,4,5,21 | 478:3 479:3,3 | 733:2 739:9,12 |
| 517:19 521:9 | 778:5 779:8,9 | 480:8,8 483:14 | 740:21 741:10 |
| 522:5 526:5 | 780:5,6 781:6 | 486:2 490:6 | 741:22 742:4 |
| 527:3 533:19 | 785:9 812:1 | 498:14,17 | 743:3 744:1,12 |
| 533:22 534:1 | 819:9 844:1 | 499:3 502:18 | 744:15,21,22 |
| 534:17 535:3,5 | **reportable** | 503:20 516:19 | 744:23 746:20 |
| 535:17 540:13 | 773:23 | 517:9,14,21 | 747:7,10,14 |

CONFIDENTIAL

**[reports - restrictions]** Page 68

748:12 749:4 751:12 754:4 755:11,12 761:4 774:4 777:17,23,24 778:7,12,19 779:3,19 787:23 788:14 795:17 805:6 806:19 811:22 812:9,14,21 819:16 824:19 835:12 837:16 840:9 844:14 844:19

**repository** 533:13

**represent** 410:19 652:16 662:20 808:1

**representing** 403:7,14 404:7 404:14,22 405:7,18 406:8 406:13,20 846:3,5

**reproduction** 847:19

**request** 408:10 500:5,13

**requesting** 679:24

**require** 672:3

**required** 526:10 527:13 527:16 686:11 808:17

**requirement** 702:9 772:22

**requires** 761:21 762:13 763:11 764:4 765:3

**research** 484:17 513:10 542:21 543:17 544:4,9 651:21 652:7 735:12 789:3,9,16,20 791:2,10,18 792:10,11,21 793:3,23 794:8 795:3,8,19,20 795:24 804:5

**researcher** 788:15,19,24

**reserved** 409:7 502:3

**resides** 520:1

**resilience** 551:13 553:1

**resource** 606:6 613:7 659:14 818:13

**resourced** 603:9 674:11 675:14,20

676:3,12,18 813:20

**resources** 488:9 531:7 570:12 571:2,8 647:15 653:11 671:13 672:9 672:22,24 673:13,20 674:21 677:20 678:3,6 679:18 680:21 681:23 682:4,8 683:3 683:10,13,24 684:15,20 685:10 724:10 781:12 811:8 811:13,15 818:16 830:19

**resourcing** 676:23

**respect** 446:19 469:11,23 490:8 511:18 576:18 599:2 599:12 614:3 618:7 625:10 646:21 647:5 679:24 694:20 707:8 742:4 784:5 811:21 812:6 814:18 814:24 815:19

**respected** 735:19

**respecting** 524:3 573:10

**respects** 718:21

**respond** 561:19 659:5

**responding** 517:22 743:2

**response** 522:20 525:9 573:6 745:9,19 778:9

**responses** 741:4,8,10 743:3

**responsibilities** 509:6

**responsibility** 676:1,22 677:5 677:13

**responsible** 634:12 674:7

**restate** 466:5 477:2 492:13 494:19 524:11 524:18 688:13 806:24

**restated** 710:15

**restorative** 627:20

**restrictions** 526:23 803:7

CONFIDENTIAL

**[restroom - roseland]**                                             Page 69

**restroom**
  760:14
**result**  472:8
  528:7 606:16
  620:19 681:17
  681:21 682:9
  700:3 703:9,10
  781:14
**results**  491:1
  492:1,19
  493:21 497:21
  499:6
**retain**  574:16
**retained**
  779:11 845:11
**retired**  529:8
**return**  848:15
**review**  411:4,9
  411:17 533:20
  645:20 726:18
  731:15 733:14
  740:1 744:14
  745:18 746:4
  749:9 750:14
  751:19 752:17
  753:12,18
  756:10,19
  757:17,24
  761:16 776:3
  824:13
**reviewed**  411:7
  430:21 445:18
  457:9,14
  459:17 463:13

  464:11 465:18
  517:12 521:19
  532:11 651:23
  683:7 737:7,18
  737:21,24
  738:13 740:20
  742:8,9 744:1
  744:21,22
  747:8 750:2
  752:11 753:20
  756:9 759:4,4
  774:2 784:2,16
  787:24 789:3
  789:11 791:2
  791:18 792:11
  793:17,23
  794:15,21
  795:12 796:9
  798:9,10
  804:18 824:17
  831:9,11
  838:14,17
  840:8 844:19
**reviewing**
  459:18 732:2
  740:16 750:5
  774:13
**revise**  571:20
**revised**  560:22
  561:3
**revisit**  544:21
**revisited**
  652:18

**rico**  646:1
**right**  438:16
  443:22 449:2
  459:13 474:14
  482:13 488:7
  495:1 496:17
  498:19 545:18
  549:23 563:19
  570:21 572:5
  585:19 587:9
  593:1 594:4
  609:20 630:12
  636:3 645:1,7
  651:17 656:22
  659:15 672:8,8
  674:19,19
  697:20 701:7
  701:24 705:23
  713:18 718:2
  718:22 720:4
  722:23 726:22
  743:13 744:8
  744:19 754:9
  755:17,21
  756:12 757:1
  757:15 775:16
  779:3 780:5
  781:6 784:12
  799:5 800:3,21
  808:15 818:17
  822:20 825:7
  837:21 843:9
**risk**  474:16
  639:12,22

  703:16 704:12
  705:18 706:16
  707:1 708:13
  708:14 710:1,1
  710:9,9 711:13
  711:13,16,22
  712:15,15
  713:23 715:17
  715:17 716:3,6
  717:24 718:13
  718:13 719:21
  719:24
**road**  402:17
  403:5 405:12
**role**  500:11
  501:15 505:20
  508:11,13
  509:7,16,24
  511:21,22
  512:23 514:1,3
  514:5,23
  519:17 525:23
  527:17 528:8
  544:8 561:5
  603:23 615:19
  630:6 663:13
  663:20 664:2
  685:24 687:12
  689:16
**roles**  570:22
  602:1 656:16
**roseland**
  405:13

[rosica - school]                                                    Page 70

**rosica** 406:23
**roughly** 581:10
  717:2
**routinely**
  726:20 727:8
  728:8
**rural** 448:11,16
  695:18

| s |

**s** 403:11,12
  405:16 407:9
  746:6
**safety** 486:21
  537:24 566:2
  591:12 601:17
  601:20 604:6
**salaries** 686:9
  686:19
**samhsa** 534:20
  535:14
**san** 406:12
**save** 731:7
**saved** 731:21
**saw** 476:10
  479:17 741:9
  752:11
**saying** 516:7
  544:24 547:12
  585:7,14 593:5
  615:18 627:14
  628:1 678:22
  696:16 743:7
  758:1 763:3

772:24 780:21
781:4 786:16
816:13 821:24
823:23 838:24
**says** 587:19
  588:15 701:19
  740:16 794:15
**scale** 697:18,19
**scan** 731:3
**scholar** 728:1
**scholars** 735:22
**scholarship**
  550:24 735:24
**school** 405:7
  406:14 407:13
  407:16,16,19
  407:20 412:2
  412:11,13
  413:10,12,24
  414:3,11,13,22
  414:24 415:4,6
  415:7,17,19,24
  416:3,11,14,19
  416:21 417:4,6
  417:13,14,19
  417:20 418:5,5
  418:7,21,22,24
  419:11,12,13
  419:24 420:2,4
  423:6 427:19
  427:23 441:4
  442:24 443:18
  446:18 448:5
  449:2,4,7,10,11

454:22 456:22
463:8 468:1
472:11 474:22
476:14 477:15
479:1 480:6
481:19,23
484:5,8,9
485:10,16,23
486:4 487:10
487:13 488:23
490:13,15,24
491:12,16,18
491:24 492:18
494:15 496:4,6
496:8 497:1,20
497:22 498:5
499:7,11 501:2
501:21 502:19
503:21 505:3
505:17 506:5
506:20,20
508:4,18 509:2
509:3,19 510:8
510:17,21
511:10,13
512:1,11,13
513:1,14,22
514:4,12
515:11,13
516:22,22
517:16,16
518:7,18,19
520:5 521:1
528:6,11,22

529:11,23
530:3,12,19,24
531:14 532:5
532:16 533:14
533:24 534:4
534:22 535:21
536:14,21
537:4,23 538:2
538:11,16,22
540:10,11
542:8 545:10
547:16 548:17
551:1 552:5
556:2,5 557:15
558:10,12,15
559:19,23
560:4,9,11
561:9,12,14,15
562:5,9,15,22
563:9,9,16,21
563:23 564:15
565:18,21
567:19 568:3
568:19 569:15
569:19 570:20
570:23 571:19
571:22 573:9
574:5 577:21
582:5 583:7
585:2,17 587:3
587:6,7,23
588:2,3,9,12,13
588:18,19
589:3,6,8,23

CONFIDENTIAL

**[school - schools]**                                                    Page 71

| | | | |
|---|---|---|---|
| 590:10,13,24 | 642:1,10,11,19 | 692:11,20 | 788:21 789:13 |
| 591:21 592:19 | 642:21 643:2 | 693:1,4,5 | 789:19,21 |
| 593:15,23 | 644:10 645:6 | 694:4 695:8,16 | 790:13 793:5 |
| 594:3,4,8,10,13 | 645:13 647:5 | 695:22 696:18 | 795:6,17 805:7 |
| 594:15,22,24 | 647:23 648:8 | 698:5 699:23 | 805:8 806:13 |
| 595:3,5,8,10,20 | 648:16,17,23 | 700:13 703:11 | 809:6 810:18 |
| 595:23,24 | 649:1,7,18 | 712:24 713:12 | 811:9,13,15 |
| 596:4,5,11,12 | 650:16 651:5 | 714:4,21 | 813:3,4 814:17 |
| 596:12,16,17 | 651:13 652:1,2 | 715:16 716:7 | 814:23 816:3 |
| 596:18,22,24 | 653:4,22 | 717:20 718:12 | 817:10 819:1,4 |
| 597:5,8,9,10,14 | 654:10,12,12 | 719:3,22 | 822:3,5 835:23 |
| 597:16,23 | 654:18,23,24 | 720:20 721:11 | 835:23 836:8 |
| 598:7,12 599:6 | 655:2,2,3 | 721:21 722:5 | 836:19 842:7 |
| 599:6,14,17,21 | 656:23 657:2,2 | 722:10,19,20 | 843:6 845:13 |
| 601:7,15,21 | 657:4,4,18,19 | 723:3,10 | **school's**   779:23 |
| 602:10,17,21 | 657:20,22 | 725:13,18 | **schooling** |
| 603:8,11 604:5 | 658:3,4,5,7,16 | 726:13 727:6 | 537:17 538:15 |
| 604:24 605:18 | 658:17,19 | 727:14 728:3 | **schools**   405:19 |
| 606:2,24 | 659:20 660:9 | 733:1 747:10 | 420:13 423:21 |
| 607:15 608:12 | 661:8 662:9,20 | 750:7 751:11 | 441:15 444:7 |
| 608:15 610:11 | 663:9,15 664:3 | 755:12 766:5 | 469:1 473:3 |
| 611:4 612:9 | 664:5,16,17 | 766:10,16 | 482:12,21 |
| 613:15 614:1,5 | 667:7,14,18,24 | 767:4,8,10,13 | 483:18 485:1 |
| 614:7,8,9,12,19 | 668:2,7,15 | 767:16,19 | 497:15 509:12 |
| 615:23 618:3 | 669:1,10,18,23 | 768:2,5,8,15,21 | 510:3 512:20 |
| 619:12 620:7 | 670:6,15 671:3 | 777:3,18,22 | 514:23 515:2 |
| 620:12 621:6 | 673:7,18 | 778:6,12,14,15 | 519:4,18 |
| 622:18 623:19 | 678:11,24 | 778:17,23,24 | 522:19 526:1 |
| 624:12,15 | 679:12 682:16 | 779:14,15,19 | 530:23 531:13 |
| 630:8 637:12 | 684:13,18 | 779:22 780:1,8 | 532:18 533:17 |
| 637:16,22 | 685:5,7,20 | 780:9,16,24 | 536:5,21 537:7 |
| 638:2,5 640:6 | 687:3 689:4,23 | 781:1,3,17,23 | 539:1,10,19,20 |
| 640:7,12,15,23 | 690:1,19,22 | 782:6 783:4 | 540:17 541:19 |
| 641:4,9,12 | 691:17,19 | 786:14 788:13 | 542:14 543:9 |

**[schools - see]**

543:23 544:18
545:13 546:12
547:6 548:1
549:9 550:2
551:10 552:12
552:20 553:5
555:4,20
556:14 557:10
560:2 569:23
570:4,10,15
571:2,7,11,16
572:22 573:14
584:9,14,20
585:1,2,4,6,8
585:10,12,17
586:5,8,8,11,22
587:7 588:2,19
592:6 597:20
599:15,22
602:8 604:15
605:9 606:7,11
606:15,19
610:1 617:5
621:3 630:3
631:22 647:17
648:1 652:22
659:15 665:11
665:20 668:18
668:23 669:3,9
669:12,16,20
670:1,9,15,19
671:2,5,13
672:10 673:8
673:20 674:4

674:21 676:1
676:17 677:13
682:13 686:17
687:8 688:23
694:20 695:24
700:2 719:14
720:8 722:6
726:7 768:19
774:8 776:7
778:23 779:14
779:23 780:8
780:24 781:24
782:1,6,7
785:6,12 788:5
794:1,17
795:22 796:19
797:4 798:12
799:17 800:8
810:18 813:17
815:13 816:24
843:1,5,19
**science** 474:14
475:23 477:7
479:20 581:2
604:18 605:7
700:11 721:19
735:13 788:1
**sciences** 734:3
734:17 735:5
735:10 736:4
736:11 737:3
739:15
**scientific**
447:18 514:6

689:14 726:15
727:10,12
728:2,10,18
729:4,19 730:4
730:11,20
742:9 743:8,15
743:18 745:5
745:11 747:9
747:23 748:21
749:3 750:6
751:9 761:23
762:14 763:13
764:6,24 765:5
774:3 787:5,14
787:22 824:16
824:17
**scientist** 447:16
513:9,22
539:19 757:15
**scope** 433:6
676:7 677:1,4
802:11 832:4
**screen** 564:21
609:4
**screening**
705:2 719:8
**scroll** 547:1
565:1 566:3
643:4 645:4,11
650:4 651:3
**scrolling** 566:8
**sealing** 409:4
**search** 726:21
727:9,11,18,20

727:22 728:9
728:17,21
729:2,3 730:12
730:19 731:10
731:12,14
734:1 737:2
738:3,4 743:11
756:24 757:4
759:17,19
**searches**
759:22
**searching**
730:10
**second** 551:8
554:12 566:9
630:15
**secondary**
844:5
**section** 552:3
565:12,14
683:9 701:19
704:6
**sections** 832:13
**secure** 680:7
**see** 426:20
458:18 460:15
464:11 465:2
465:21 466:15
467:7 474:7,15
491:24 492:18
493:19 498:1
501:14 523:19
531:23 533:13
560:20 561:3

CONFIDENTIAL

**[see - shape]**

| | | | |
|---|---|---|---|
| 564:20 565:2 | **seen** 485:21 | **sequencing** | 715:4 716:12 |
| 567:7 568:3 | 486:14 530:4,5 | 775:7,21 | 716:13 717:21 |
| 597:2 606:22 | 642:22 644:20 | **series** 533:8 | 718:17 808:18 |
| 607:9 608:5 | 659:19 660:3,8 | 545:14,17 | 808:18,21 |
| 615:19 620:20 | 661:8,15,24 | **service** 560:8 | 809:5 810:17 |
| 622:17 643:5,7 | 662:8,17 | 564:7 631:11 | 811:1 |
| 643:9 644:8 | 677:12 770:11 | 631:18 706:10 | **serving** 512:5 |
| 645:2,23,24 | 831:9 833:15 | 811:2 | 528:20 530:15 |
| 646:1,5 649:3 | 839:23 | **services** 444:8 | 544:7 |
| 649:4 650:6,11 | **sees** 841:20 | 451:18 457:4 | **sessions** 541:11 |
| 650:12 651:2,8 | **self** 455:22 | 469:1 534:6,8 | **set** 548:22 |
| 651:11,12 | 456:4 460:9 | 535:2,23,24 | 572:12 697:2 |
| 661:20 679:23 | 466:22 476:19 | 538:3 539:21 | **setting** 630:8 |
| 728:14,15 | **seminar** 768:12 | 563:1 615:24 | **settings** 520:7 |
| 736:17 738:18 | 768:15,21 | 616:11 618:8 | 775:6 776:1 |
| 739:8 747:18 | **sense** 573:17 | 618:11,17 | 788:21 |
| 752:14 755:8 | 592:7 618:4 | 619:1,16,23 | **several** 446:13 |
| 760:24 763:1 | 639:8 659:7 | 621:9,20 622:9 | 517:20 536:18 |
| 774:5 788:17 | 672:15 732:7 | 623:3,14 624:2 | 540:6 542:2 |
| 788:22,24 | 757:7 813:2 | 626:7,19,23 | 549:16 550:9 |
| 789:1 793:12 | 825:19 826:2 | 627:3,16,18 | 575:4 |
| 798:23 818:7 | 826:20 830:5 | 628:4,11 629:3 | **severe** 632:18 |
| 823:4 841:12 | **sent** 827:5,11 | 629:9,12,23 | 703:21 715:6 |
| 841:16 842:1 | 827:23,24 | 630:2,13,21,24 | **sewall** 746:6 |
| **seeing** 571:10 | **sentence** | 631:2,9 640:3 | 747:3 749:16 |
| 662:22 701:10 | 740:16 | 652:20 674:8 | **shape** 407:13 |
| **seek** 619:12 | **separate** 499:2 | 680:9 702:10 | 559:20,21,22 |
| 677:18 678:1 | 562:10 584:20 | 704:1,14 705:9 | 560:6,13 561:1 |
| 678:14,15 | 589:2 618:5 | 705:21 706:4,9 | 561:6,13 562:4 |
| 680:19 681:7 | 686:23 717:23 | 706:24 707:23 | 562:8,16,18 |
| 683:1,11,22 | 731:17 732:11 | 708:10 709:11 | 563:8,14 |
| **seeking** 634:20 | 732:14 777:17 | 710:17 711:8 | 564:14 565:6 |
| 635:1,10 | 777:22 778:4 | 712:19 713:16 | 565:24 566:14 |
| 691:13 745:12 | | 714:2,13,22 | 566:18 567:1,8 |

**[shape - six]**                                                      Page 74

567:23 568:6
568:12,16,23
569:3,17
571:20 655:17
667:17
**shaped** 683:20
**share** 530:16
770:16
**shared** 455:10
530:8 724:1
**sharing** 499:1
**sharon** 402:14
407:4 409:24
410:7 850:8
**sheet** 655:21
848:7,9,12,15
850:6
**sheets** 446:17
447:21 449:6
457:2 679:6
685:2 726:3
784:23 787:9
**shift** 660:3
**show** 459:4
529:16,20
530:10 630:18
639:24 648:11
711:13 712:15
713:22 764:7
**showing** 586:7
628:13 629:14
638:10,13,16
638:17,17
761:11

**shows** 645:5,7
650:14 708:13
708:14 761:23
762:15 763:13
764:7,24 765:5
**siculus** 404:17
**side** 741:13
**sides** 764:23
765:10
**sign** 761:10
848:8
**signature**
847:10
**signed** 763:8
**significant**
418:12 427:14
428:2 431:10
436:6 440:3
441:9,21 443:3
444:19 467:14
468:7 474:15
474:20 484:24
657:12 697:11
698:3 699:2,5
720:24 723:13
724:18 725:12
790:16
**significantly**
438:13 485:13
487:6,11
488:17
**signing** 761:11
848:10

**silent** 812:14
**similar** 434:14
559:9 581:3
670:10 682:16
690:3 761:7,8
**single** 457:8
505:12
**sit** 457:12
462:14
**site** 513:1
836:15
**sitting** 457:17
458:22 460:18
461:14 463:21
465:24 481:16
489:18 499:3
543:1 547:3
549:23 577:6
683:14 701:16
732:24 796:21
799:5 800:3,20
811:19 839:4,9
839:18 845:9
**situation**
454:22
**six** 412:2
443:18 459:19
468:1 470:8,13
470:16,19,21
472:11 474:22
476:14 477:15
479:1 480:6
481:19 488:3
488:23 489:19

491:9 493:20
494:7 498:9
502:19 503:2
503:20 508:4
509:2 510:1
511:10 512:11
513:13 517:21
549:5 562:5
563:9 571:22
577:21 587:3
587:22 589:2,8
591:11,21
592:19 593:8
593:19 594:8
594:22 595:3,8
595:22 597:8
597:21,23
599:4 604:5
606:1 607:14
612:9,17
614:21 615:23
621:6 640:6,23
642:1,2 654:10
657:19 658:4
667:6,14,23
668:6,15 675:5
676:2 684:13
685:5,20 687:3
689:3,22
690:19 692:20
694:4 695:10
696:4,18 698:5
714:3,21
715:16 718:12

CONFIDENTIAL

**[six - social]**

721:12 722:10 722:20 723:10 725:17 726:13 727:6,13 728:3 750:7 751:11 766:5,10 777:3 778:6,9,11 779:18 781:17 782:6 786:14 788:13 805:7 805:17,20 806:1,7,13,19 813:3 818:2 819:7,15 821:5 822:15 835:23 836:19 843:2 843:15 845:13

**size** 599:23

**skills** 426:12,19 426:24 427:7 428:7 430:9 431:2,16 432:1 446:6 551:15 566:20 568:17 568:20 591:14 594:14 602:12 602:16 612:21 613:4,10,11,15 615:10 617:4 617:15,17 624:17 631:12 632:5,7,11

**skim** 733:5

**skimmed** 733:20

**slade** 405:4

**slade.methvin** 405:6

**sleep** 462:23 463:15,23 479:6 519:5

**slides** 550:15

**slightly** 529:7

**small** 695:18

**smart** 746:8

**smoking** 617:12

**snap** 404:23 808:1 824:6,10 824:14,15,20 827:6,16,19 829:8 830:11 834:16 835:18 839:14,21 840:7 846:6

**snapchat** 808:12 811:21 812:3 824:15 824:22 825:7 825:20 826:3 826:17 827:12 827:17 828:4 828:11 829:3 831:13 832:1 832:13 834:3 834:10,24 835:7,24

837:10,11 838:19 839:13 841:4,12

**snapchat's** 830:19

**snapshot** 564:6

**social** 402:3 409:18 415:5 415:18 417:14 417:20 419:13 420:4 421:12 422:1,13,24 423:16 424:6 426:12,19,24 427:7 428:6 430:9 431:2,16 432:1,3 435:1 435:8,17 436:2 436:13 438:11 439:8,15 440:5 440:10,11,22 441:8,23 442:17 443:5 444:23 446:2,4 446:6 447:4,5 447:13 468:22 469:18 470:2 471:11 472:5 480:13 482:16 482:19 483:24 484:8,14 485:5 488:6 497:16 505:18 506:19 507:21 510:2,9

511:24 512:19 514:13 515:18 519:3 526:2,17 528:2 530:23 531:9,13 532:18 533:7 533:17 536:4 536:19 537:6 538:13 539:1,9 540:4,16 541:21 542:13 543:3,11,24 544:19 545:4 546:12 547:6 547:24 549:8 549:18 550:2 552:11 553:7 553:14,15 554:3,9,15,21 554:24 555:4 555:20 556:7 556:13 557:5,9 557:17 558:16 559:11 568:20 570:8,14 571:4 572:23 573:15 579:17 580:10 580:22 581:20 583:22 584:9 585:15 587:5 588:1,17 600:14 602:3 603:7 604:3 606:9,9 607:22

CONFIDENTIAL

**[social - specialist]**                                                Page 76

608:7,16 609:5
609:13,21
610:5,14
611:14 612:22
613:5,7,9
614:8,16
617:21,24
618:23 624:7
625:2,18
626:10,17
627:15,22,24
628:1,2,14
629:15 630:18
630:22 631:4,6
631:13,16,19
632:13,23
636:23 637:11
637:13 639:17
656:14 659:3
659:10,23
660:6,11,20
661:11 662:6
662:12,18
663:5 665:18
675:22 684:11
693:2 694:19
702:1 703:9,18
708:15 711:17
712:1,6,17
714:1 715:12
718:2,8,15
721:24 728:23
730:7,10 734:5
736:24 737:5

738:24 739:17
740:2 746:7,9
767:11 774:8
776:6 778:13
778:22 779:13
779:21 780:7
780:16,21,22
781:16 783:8
785:2 786:13
787:17 788:3
789:4,17 790:5
790:10,17
791:3,13,20
792:13,23
793:13,19,24
794:10,16
795:1,11,21
796:7,15,18
797:3,23
798:12,24
799:16 800:7
801:14 802:8
802:19,22
803:11,24
804:8 805:11
808:5,9 809:16
815:13 823:13
823:18 842:17
842:23 843:18
**somebody**
451:15 539:20
686:8
**someone's**
711:17

**song** 650:22
**soon** 760:14
**sorry** 414:7
429:7 450:3
566:7 579:20
668:9 747:11
825:3
**sort** 628:13
733:4 834:2
**sought** 678:6
680:23 681:4
681:13 682:19
684:5 685:11
**sounds** 548:7
726:24
**source** 448:24
449:1,9 461:9
461:13 462:12
463:13,18
465:1,20
466:14 467:7
493:2 534:2
650:7 679:17
685:16 726:1
732:16 734:10
734:12,15
735:12,18,24
759:12 814:15
**sources** 430:21
441:11 443:13
446:14 448:18
483:12 533:21
535:18 643:21
755:7 814:9

**south** 669:3,6
678:2
**southeast**
403:11
**space** 544:10
579:21 848:6
**spalding**
403:10 406:16
**speak** 411:19
411:22 434:18
444:5 496:21
522:8,16 526:4
535:4 550:13
646:19,23
652:6 653:14
664:11 667:5
668:5,13 675:6
678:20 696:3
699:23 746:15
752:13 754:20
777:9 778:18
781:10 818:24
**speaking**
441:13 442:21
499:5 510:21
534:19 584:22
639:3 682:21
691:4 722:3
738:15 747:11
752:8 779:10
784:8 822:4
**speaks** 805:1
**specialist** 568:8
568:13,17

CONFIDENTIAL

**[specialist - specifically]**                                     Page 77

| | | | |
|---|---|---|---|
| 569:1 594:10 | 515:1,22 516:8 | 642:1 662:23 | 808:22 809:2,3 |
| 594:15 595:10 | 516:8,13 517:3 | 664:12 671:8 | 819:1,23 |
| 596:1,7 603:21 | 517:4 518:6 | 675:7 685:13 | 824:14,24 |
| 795:5 | 520:13 521:11 | 685:14,14 | 825:9,15,23 |
| **specialists** | 527:12,19,22 | 710:23 711:5 | 826:5,12,22 |
| 603:20 | 528:13 531:2,8 | 717:12 724:3 | 827:8,14 828:6 |
| **specialize** | 532:20 535:11 | 727:18,22 | 828:13,23 |
| 795:9 | 537:18,20 | 733:2 740:8,16 | 829:5,11 830:8 |
| **specific**  411:13 | 540:6 541:23 | 746:12,16 | 830:14,21 |
| 414:17 415:1 | 542:3 543:3,13 | 747:10 749:13 | 831:17 832:3 |
| 417:15,21 | 545:20 546:14 | 750:20 751:4 | 832:15,22 |
| 425:16 428:16 | 546:21 547:8 | 752:8,14,23 | 833:4,13,21 |
| 429:11 432:13 | 548:3 549:11 | 753:23 755:12 | 834:5,12,19 |
| 434:3 437:15 | 549:18 550:4 | 758:18 769:11 | 835:3,9 837:8 |
| 439:22 443:5 | 550:19 552:14 | 770:4,22 | 837:13 838:5 |
| 443:18 449:9 | 552:17,17,22 | 771:10,14 | 838:22 839:17 |
| 451:8 458:1,22 | 553:2 554:20 | 772:12 773:18 | 840:5,14 841:7 |
| 459:16 460:1 | 555:6,22 | 774:10 776:12 | 841:14,23 |
| 460:16 461:9 | 556:19 557:24 | 776:18,21 | 842:11,20 |
| 462:6,15 | 558:24 560:17 | 777:9,14,17,23 | 843:21 844:10 |
| 463:19 464:12 | 570:8 572:7,12 | 778:6,12,19 | 845:2,15 |
| 467:3 468:1 | 572:17 574:8 | 779:19 780:11 | **specifically** |
| 469:22 471:12 | 574:14,22 | 783:12,15 | 415:10,13 |
| 474:7 478:18 | 575:5 578:8,13 | 784:20 787:20 | 418:15 420:11 |
| 480:23 481:23 | 579:8,10 | 789:7,16 790:8 | 421:6 442:15 |
| 484:20 489:13 | 589:10 591:23 | 790:24 791:7 | 443:8 456:24 |
| 491:16 495:23 | 603:1,6 604:2 | 791:24 792:18 | 478:18,21 |
| 496:14 500:9 | 605:24 607:13 | 793:13 794:3 | 489:11 490:7 |
| 500:17 501:4 | 608:22 609:11 | 794:19 795:17 | 498:8 506:15 |
| 501:12 502:1,2 | 611:23 615:12 | 796:16 797:14 | 507:6 518:2 |
| 502:14 503:17 | 618:21 627:9 | 798:15 799:19 | 524:9 534:16 |
| 503:23 505:5 | 630:21 631:4 | 800:10 801:6 | 547:12 549:16 |
| 506:7,22 | 636:21,23 | 801:16 802:12 | 550:7 562:17 |
| 507:15,20 | 637:11 641:24 | 805:17 808:3 | 566:12 568:11 |

CONFIDENTIAL

**[specifically - statements]**                                        Page 78

594:6 646:19
668:2 719:17
723:5 751:8
753:11 780:4
781:10 784:17
793:18 794:9
796:6,14
797:11 810:5
811:17 837:15
841:9
**specificity**
477:5 792:10
834:7
**specifics**
511:19 550:13
770:10,13
**speech**  500:23
501:19 504:24
506:2,18
507:10 523:13
622:4 758:17
800:5
**speeches**  515:8
709:16
**spend**  483:20
696:1 818:16
837:10 838:19
839:13 841:4
**spending**
435:24 619:6
**spent**  414:12
414:23 415:5
415:18 416:19
417:4,13,16,19

418:22 419:12
420:3 483:21
826:3 837:19
**spillover**
585:16
**spoke**  421:7
443:10 449:2
463:15 469:9
494:6 496:1
497:12 514:19
518:3 553:6
558:3 570:7
577:20 679:2
680:5 685:10
785:3 786:7
798:23 804:13
819:8
**spoken**  439:20
491:11 505:16
526:16 770:19
786:5 796:6,14
831:22
**sponsors**
645:14
**spotlight**  834:9
834:13
**squarely**
502:16
**st**  405:5
**staff**  567:20
570:5 591:11
594:9 598:10
599:20 611:17
614:15 661:4

667:13,20
704:19,22
**staffed**  606:12
**staffing**  560:10
563:1 564:7
565:14 567:18
589:18,21
598:19 599:3,5
599:24 600:6
600:17,22
601:2 605:24
607:6,13 621:7
621:19 623:4
626:8 655:10
655:14,23
656:1,18
658:12 671:19
686:4 688:19
696:12,19,19
697:1,23 698:7
698:16,18
700:15,15,17
700:17,24
809:11 810:1
**standard**
472:21 533:20
563:19,22
574:11 576:24
577:11,17
581:1 759:21
**standards**
653:20 654:5
656:5

**stands**  559:22
**start**  449:11
573:15 605:16
617:8,9,13
820:1
**started**  611:22
611:23 690:17
720:12 784:8
806:6 844:22
**starts**  632:17
**state**  535:8
538:4 559:9
560:1 645:10
647:9 650:13
650:17,22
668:22 669:17
669:22 670:11
670:12 677:19
678:2,7 679:16
680:20,24
681:2,21 682:7
683:2,12,23
772:17 848:5
**stated**  413:2
441:3 559:9
568:21 709:19
780:14
**statement**
574:8,22 781:9
783:21,24
799:24 800:18
**statements**
439:23 502:17
574:13 575:5

CONFIDENTIAL

**[statements - student's]**                                   Page 79

577:14 578:1
637:2 804:20
**states**  402:1
409:21 487:24
527:15 536:15
538:5,12
545:12 641:11
641:17,21
642:2 644:8
645:16 646:4,8
646:15,21
649:20 651:4
682:24
**statewide**  681:3
681:9,15,18,21
682:9
**stating**  491:15
518:1 846:1
**statistics**
643:11 650:9
**stay**  829:23
**steep**  472:3
473:1 478:4
581:18
**steinsbekk**
749:10,20
750:18
**stenographic**
410:3
**steps**  679:15
**stigma**  635:14
635:17,21
**stipulated**
409:2

**stipulations**
408:15
**stop**  514:12
515:15,17
701:4
**stopped**  528:20
**story**  828:4
834:24 835:1
**straight**  705:24
708:8
**straightforward**
707:18
**strain**  659:14
**strapped**
482:12
**strategic**
447:11 453:19
456:7 470:24
471:6 472:22
480:21 508:21
509:14 510:5
510:24 513:24
517:1 519:18
521:2 522:18
525:24 541:19
543:9,22
544:17 545:3
571:6 579:15
580:8 583:11
584:7 586:3
587:4,23 589:5
589:10,17,22
590:2,9,15,23
591:5,8,20

592:18 594:7
594:13,22
595:3,8,14
597:15,23
598:14 599:4
600:2 603:24
619:17 644:2
649:16 654:10
685:19 686:12
687:2 694:4
695:10 699:7
701:5 714:23
717:23 720:22
722:22 766:6
766:12,17
805:5,9 806:4
806:11,18
807:6 810:11
811:4 824:3
**streak**  829:3,9
830:2,6
**streaks**  832:20
833:18
**street**  404:12
405:5 406:5
**stress**  632:2,5
**stretched**
656:12
**strong**  551:14
553:11
**structure**
482:24 529:6
704:7

**struggle**  819:4
**struggling**
665:9
**student**  407:16
407:20 444:8
468:14 484:22
493:4 567:9
587:7 588:3,20
591:15 599:23
600:24 602:23
607:22 610:1
614:4 619:4
620:17,22
621:1 626:15
628:16 630:17
631:5 637:24
638:1 642:11
642:20 648:17
649:1,7,18
650:16 651:5
697:13 698:4
699:6 706:12
712:14 713:22
714:20 718:12
778:13,15,24
779:15,24
780:9 789:24
790:2,6,15
791:11,14
793:1,20
794:12 808:15
810:8 819:12
**student's**  630:4
712:5

CONFIDENTIAL

**[students - students]**

| students | | | |
|---|---|---|---|
| 412:11 413:10 | 459:5 460:6,24 | 554:2,10 | 653:22 654:14 |
| 414:1,11,23 | 461:16,23 | 555:19 556:13 | 659:23 660:11 |
| 415:4,18 416:1 | 462:16,21 | 557:9 569:24 | 661:11 662:12 |
| 416:12,19 | 463:22 464:3 | 570:15 579:16 | 665:10,18 |
| 417:4,13,19 | 464:18 465:11 | 580:9 581:20 | 672:18 674:13 |
| 418:5,5,13,22 | 466:2,8,20 | 584:8,23 585:5 | 675:16 676:4 |
| 418:22 419:12 | 472:15 474:1,9 | 585:9,14 586:6 | 676:19 688:23 |
| 419:12,22 | 475:2,15 | 586:18 595:16 | 697:21 700:1 |
| 420:3 421:11 | 476:18 477:19 | 596:1,8,14,19 | 702:9 703:5,16 |
| 421:24 422:12 | 479:5 480:10 | 597:1,3,11,17 | 704:10 705:7 |
| 422:23 423:15 | 484:8 485:2,14 | 597:20 598:7 | 705:17 706:2 |
| 424:3,4,4,5,16 | 486:16,20 | 599:14 600:19 | 706:14 707:21 |
| 425:7,17,22 | 495:20 501:2 | 601:1,5 609:6 | 709:9,22 710:7 |
| 426:6,11,18,23 | 501:22 505:3 | 611:15,20,22 | 710:17 711:12 |
| 427:6,15,21 | 506:5,20 508:5 | 613:17 614:17 | 715:3,16 |
| 428:5,17 430:7 | 508:20 509:3 | 615:24 616:6 | 716:10,19 |
| 431:1,15,23 | 509:12,21 | 616:12,21 | 717:3,10,24 |
| 432:8,17 433:4 | 510:4,10 | 617:20 618:9,9 | 719:17 726:7 |
| 433:13 434:8 | 511:12 512:13 | 618:22 619:3,8 | 774:7 776:6 |
| 435:6,18,24 | 512:21 513:16 | 619:10,18 | 778:21 779:13 |
| 436:11 437:7 | 514:14,22 | 620:5,10,12,18 | 779:20 780:1,7 |
| 437:22 438:19 | 515:11,13,16 | 620:24 621:21 | 780:20,22 |
| 439:13 440:4 | 515:19 516:23 | 622:10,11,18 | 781:3,16,24 |
| 440:19 442:3 | 517:17 518:7 | 623:2,12,17 | 782:7 783:7 |
| 443:14 446:1 | 518:19 519:2,6 | 624:3,7,14,24 | 786:12 787:16 |
| 448:8 449:17 | 519:7 522:12 | 625:15,16 | 788:5 789:4,5 |
| 450:6,10 451:3 | 530:22 531:12 | 626:6 627:12 | 791:3,4,19,21 |
| 451:8,21 | 532:18 533:16 | 627:23 628:5,9 | 792:12 793:24 |
| 452:23 453:11 | 536:4 537:6 | 629:9,13 | 794:16 795:21 |
| 454:8 455:4,11 | 539:1,9 540:16 | 632:17,23 | 796:17 797:3 |
| 455:20 456:4 | 541:20 542:13 | 637:4,7,16,22 | 798:11 799:15 |
| 456:14 458:6 | 543:10,24 | 638:9 640:8 | 800:7 805:10 |
| 458:12,23 | 544:19 551:16 | 641:1,14 | 809:14 810:4 |
| | 552:23 553:21 | 644:11 645:5 | 810:19 813:4 |

CONFIDENTIAL

**[students - supports]** Page 81

817:3 835:22
843:5,19 844:5
**studies** 730:22
731:16 732:18
750:1,9,21
752:8,20
753:10,20
756:8 757:23
758:15 775:3,5
776:1 784:14
784:14 803:22
804:6
**study** 433:22
483:22 555:19
731:15,16
732:23 733:5
746:5,16
749:10,16
750:12 751:18
752:9,14
753:16,17
757:17
**studying**
793:19
**subject** 726:15
736:3 848:10
**subjective**
671:24
**submissions**
762:23
**submit** 771:21
771:22 777:22
778:3,6

**submitted**
412:1 472:12
474:23 476:15
477:16 479:2
480:7 771:6
773:9
**submitting**
771:19
**subscribed**
850:10
**substance**
534:7 535:1,23
617:13 850:6
**substances**
611:24
**substantial**
475:18 581:8
620:17
**suburban**
448:11,16,16
448:23
**succeeded**
528:24
**successful**
478:11 479:14
480:4 605:1
**successfully**
477:9
**suffer** 619:10
619:11 657:16
**suffering**
620:19 719:18
**suggest** 469:21
486:23 525:17

594:3 636:22
639:11,19
657:22 658:7
660:4 665:5
689:3,22 690:9
690:18 692:24
702:11 703:7
**suggested**
492:10 525:22
663:10,16
**suggesting**
501:16 816:19
**suggestion**
497:9 694:5
**suggests** 674:3
**suicidal** 456:16
458:14,24
459:1,6 476:19
**suite** 403:12
406:5
**summarize**
470:12
**summit** 542:8
542:21 543:8
544:5,9
**summits**
543:17,22
**sun** 570:20
**superintendent**
767:4
**supervision**
768:11 847:21
**supplied**
443:20 458:2

**support** 408:2
444:8 484:23
493:4 551:15
568:4 569:6,10
571:8 603:19
604:20 605:18
609:6 610:1
613:9,16
614:11 616:16
617:2 619:12
631:22 653:22
661:5 675:20
678:12 679:14
679:15 681:13
682:14,19,21
682:23 685:11
703:2 716:16
717:20 719:3
740:1 782:9
783:6 803:16
810:19 843:1
**supported**
539:23
**supporting**
551:13 552:24
577:15
**supports** 457:4
468:15,17
586:19 592:6
604:15 605:3
605:14 638:6
639:1 656:4
660:19 680:1
680:15 681:6,8

CONFIDENTIAL

suppose 539:13 756:15

supposed 485:9

sure 413:7 473:11 489:12 493:15 504:11 510:14 517:24 518:1 521:7,22 525:10 559:22 580:2 582:10 583:5 587:12 587:16 603:15 614:3 619:13 633:13 635:3 635:18 644:19 666:15 682:2 690:5,14 691:5 705:12 713:14 713:17 727:21 739:6 743:1 747:16 752:15 769:17 776:16 778:1 805:15 806:8 814:22 829:18 845:7

surprise 567:12 571:12 572:16 607:5 647:24 661:1 663:1 728:22

surprised 602:4 603:10 606:6

surveillance 466:11

survey 667:13 667:16

surveys 667:20

suspected 822:11

sustain 590:19

sustained 472:4 473:1,9,22 478:5 581:18

sw 404:5

swath 620:10

swear 410:5

sweeping 518:23 773:1

sworn 410:8 847:5 850:10

system 428:15 483:2 485:10 512:2 559:24 560:5,10,12 561:17 563:16 563:24 570:24 590:19 591:2 616:16 637:19 653:12 656:23 717:20 719:2 815:7

systematic 684:17

systems 420:14 420:17 432:24 433:5 434:13

436:15 437:14 438:6,9 439:5 440:8 441:3 442:13 444:17 447:8 463:5 466:5 469:6 483:11 536:14 536:17 538:12 547:17 548:18 556:3,5 557:16 558:16 564:8 590:16,22 603:8 604:14 604:20 605:1 631:21 637:13 705:3 716:16 719:6 720:22 721:6,10,11 723:12 726:4 785:1 789:14 793:5 815:9 817:1,8,12,20 818:4 820:7,10 820:14 821:4 821:10,14,22 822:8 823:4,23

t

t 403:4 407:9 849:1

tab 564:10 566:22 642:5 648:11

tabs 531:6 567:7 832:13

tailored 627:7

take 493:14 499:15 504:9 511:5 514:2 525:13 573:24 574:12 582:8 600:10 645:20 658:23 666:14 688:20 689:18 694:23 752:24 765:16 807:3

taken 402:14 499:22 504:17 582:18 666:21 679:14 765:22 807:15

takes 830:6

talk 513:22 586:24 603:24 625:17 630:1 675:18 693:8 716:24 745:4 747:22 748:20 750:5 777:2 778:12 798:11 799:15 800:6

talked 468:21 544:20 572:20 574:15 580:15 659:1 672:16 692:21 712:11 717:6 720:13

**[talked - ten]** Page 83

| | | | |
|---|---|---|---|
| 751:9 797:3,22 813:15 819:12 | **teachers** 601:4 635:23 | **teenager** 632:1 632:7,13,16 | 437:20 438:17 439:11 440:17 |
| **talking** 425:10 430:3 445:6,11 474:19 483:4 491:9 499:9 505:21 527:2 553:20 580:3 583:17 632:16 639:15,17 678:16 685:4 690:10,12,15 691:2 696:5 697:9,10,14,20 710:22 713:2,3 738:19 769:6 769:19 779:12 780:15 784:1 787:18 790:3 795:18 815:15 821:4 | **team** 561:8 565:18 608:14 **tease** 535:10 790:20 **tech** 519:22 814:10 815:5 **technical** 539:24 682:14 682:22 **technician** 406:23 409:10 499:17,24 504:12,19 582:13,20 666:16,23 765:17,24 807:10,17 845:24 | 633:2,15,21 634:2,7,11,15 634:20 635:9 635:13 **teenagers** 632:4,10 633:4 633:17,23 634:4,18 635:12,16,24 636:16 **teens** 554:24 **tell** 412:10 413:9,15,23 414:10,17,21 415:3,9,11,16 415:23 416:10 416:18 417:3 417:12,18 | 442:1 449:15 449:23 450:9 451:19 452:22 453:8,23 454:5 454:12,17 455:1,18 456:3 456:13 457:12 457:17 458:10 460:4,22 461:21 462:19 464:1,16 465:9 466:18 487:19 488:1 523:2 525:15 543:15 548:15 554:4 577:22 601:18 603:17 665:1 678:8 680:2 722:17 725:1 |
| **talks** 588:15 717:13 795:21 **target** 536:3 **targeted** 537:5 538:24 539:8 539:16,17 **targeting** 540:3 585:12 **tasked** 781:13 **taught** 768:1,4 768:7,12,14,21 **teacher** 619:6 648:7 | **technologies** 404:16 586:15 **technologist** 815:18 816:20 **technology** 568:7 594:9 814:1,5,8 815:6,17,20,22 816:12,14,22 818:4 **teen** 546:11 547:5,24 549:8 550:1 552:11 555:4 | 418:2,19 419:9 419:21 421:9 421:15,22 422:10,21 423:13 424:1 424:10,15,20 425:21 426:10 427:4 429:10 430:6,23 431:13,20 432:6,15 433:10 434:6 435:4,12 436:9 436:18 437:5 | 797:10 835:17 835:21 845:10 **telling** 451:2 523:4 699:22 **telzer** 740:21 741:4,12,24 742:10 744:13 744:24 745:3,9 745:14 **temporal** 775:7 775:21 **ten** 499:15 768:16,22 |

CONFIDENTIAL

**[ten - think]**                                                     Page 84

| | | | |
|---|---|---|---|
| 803:12 | **testimony** | 595:19 635:12 | 561:18 566:9 |
| **tens**  602:7 | 407:4 443:24 | **things**  430:3 | 569:21 575:3 |
| **tenth**  404:12 | 445:21 459:22 | 433:23 438:7 | 576:22 578:20 |
| **term**  425:6,11 | 469:14 490:23 | 446:9 451:14 | 579:21 584:4 |
| 471:6 482:7 | 491:6 493:8,19 | 462:17 515:20 | 585:24 586:15 |
| 483:7 494:13 | 496:6 497:19 | 526:21 556:3 | 588:7 602:14 |
| 494:20 495:5 | 497:24 559:1 | 570:10 573:11 | 614:13 618:20 |
| 584:5 600:12 | 575:7,18 579:7 | 573:12 586:8 | 619:22 623:10 |
| 609:15 610:15 | 585:21 606:23 | 586:21 592:1 | 628:22 629:2 |
| 613:12 632:21 | 628:19 656:8 | 608:23 609:3 | 630:14,16 |
| 633:10 636:1 | 679:7 685:4 | 624:15 627:19 | 632:3,9,15,21 |
| 638:3 676:14 | 696:15 723:5 | 662:17 687:19 | 632:24 633:4 |
| 699:2 716:6 | 759:8 785:24 | 713:12 718:24 | 633:17,23 |
| 719:20 730:6 | 786:4 823:19 | 744:4 756:12 | 634:4,17 |
| 730:10 731:15 | 824:10 847:7 | 758:1 774:23 | 635:11,16,22 |
| 736:24 764:18 | **testing**  476:5 | 813:15 818:17 | 635:23 636:19 |
| 788:24 808:4,7 | **texas**  406:6,12 | 828:15 | 636:21 637:7 |
| 814:21 | 406:14 | **think**  413:16,19 | 640:19 641:22 |
| **terminology** | **text**  808:16 | 416:15 432:12 | 644:3 648:5 |
| 495:7 518:8,11 | 809:15 810:21 | 432:23 433:5 | 650:24 653:9 |
| **terms**  440:10 | 811:10 813:5 | 468:6 469:20 | 653:16 659:4,8 |
| 444:20 497:2 | **thank**  437:2 | 474:2 480:17 | 659:11 661:18 |
| 519:5 521:2 | 567:6 760:17 | 488:20 492:8 | 665:4 670:22 |
| 559:7 579:11 | 807:8 845:23 | 492:11 496:12 | 671:5,16,22,24 |
| 598:17 636:19 | **theme**  724:7 | 499:12 501:17 | 672:13,15 |
| 647:10 719:20 | **theoretical** | 504:5 506:10 | 673:23 675:1,3 |
| 728:21 729:2 | 775:23 | 508:14 509:7 | 675:6 676:9 |
| 731:10 780:13 | **theoretically** | 513:3 518:22 | 686:15,24 |
| 786:3 809:9 | 775:9,23 | 519:1 522:19 | 688:13,14,16 |
| 815:5 823:5 | **therapist** | 525:21 526:1 | 688:17 691:11 |
| **test**  838:9 | 597:16 609:23 | 539:4,18 | 694:12 700:21 |
| **tested**  475:21 | **thin**  656:12 | 544:20 547:4 | 701:14 707:9 |
| **testified**  410:9 | **thing**  505:12 | 547:22 549:22 | 709:20 710:4 |
| 755:10 | 587:17 593:23 | 553:11 559:2 | 715:8 721:7,15 |

CONFIDENTIAL

**[think - titles]**

726:9 735:18
735:20,23
736:6 737:6
746:22 752:4
754:17 755:5
759:1,6,10,21
761:8 764:18
768:10 783:17
783:23 786:22
789:24 791:9
792:20 793:14
794:8 797:19
799:4 800:2,20
801:8 802:14
802:21,23
804:12 811:24
821:17,22
825:10 830:15
831:8 832:16
833:5,14
842:22
**thinking**
506:12 523:20
537:12 570:17
600:21 631:1
687:9 822:20
**third**  619:7
**thirty**  848:16
**thorough**  525:9
743:2
**thought**  442:10
452:2 454:16
563:14 564:5
694:8 733:7

749:14 752:16
794:6 806:22
**thousands**
602:7
**three**  510:19
551:1 552:2,5
552:9 555:2
651:4 775:20
782:24 783:5
840:2
**threw**  494:20
584:4
**tied**  681:1
**tier**  637:20
638:5,24
703:13,14,15
703:19 704:1
704:14 705:8,9
705:20 706:4,4
706:9 707:5,23
707:24 708:11
708:11 709:11
709:11 710:12
710:12,15,17
710:24 711:7
711:23 712:19
712:22,23
714:3,9,14,17
714:22 715:4,4
715:9 716:11
716:13,18,20
717:14,14
718:17 808:18
808:18,20

**tiered**  604:14
604:20 616:15
631:21 637:19
716:15 717:19
718:6 719:2
**tiers**  717:8
**tiktok**  403:15
403:15,16
406:20,21,21
808:11
**time**  409:8,15
414:12,23
415:5,18
416:20 417:5
417:14,16,20
418:23 419:13
420:3 423:23
432:2 436:2
473:23 479:18
486:10 499:8
499:17,24
500:18 501:5
504:12,19
505:6 506:8,23
507:16 511:6
515:23 522:23
524:3 528:14
531:3 532:21
533:3 546:24
547:1 548:8
560:23 573:10
573:11 576:7
582:9,13,20
592:3 619:7

620:23 622:5
645:20 652:23
652:24 653:4
659:2 666:16
666:23 669:14
690:16 701:9
701:15 707:15
717:15 720:14
720:16,17
725:12 740:10
742:5 751:4
753:24 760:14
765:17,24
770:23 771:16
772:13 798:17
798:18 807:8
807:10,17
825:20 826:2,9
826:20 830:22
831:18 837:9
837:19 838:18
839:13 841:4
846:7
**times**  623:9
709:15 712:12
834:24 846:1
**timing**  664:12
**title**  569:7
**titled**  642:20
737:4 738:24
746:6
**titles**  551:6
592:12 593:8

CONFIDENTIAL

**[tobacco - tucson]** Page 86

**tobacco** 471:21 471:24 473:15 478:6 479:15 479:16 481:8 611:22 639:5 639:16 677:11

**today** 438:17 457:18 463:22 466:1 499:4 502:1,4 503:1 543:1 547:3 554:8 577:7 653:11 708:19 713:7 719:18 751:3 758:1 770:6 776:10 796:22 811:19 816:7 839:4,10 839:19 845:9

**today's** 409:14

**together** 774:23

**took** 574:2 654:13 659:12

**tool** 564:1,6

**top** 412:17 465:6,24 651:3 677:22 698:7 716:17

**topaz** 402:16 403:3

**topic** 493:17 540:20 550:19 552:17 736:9

736:17 772:20 795:10

**topics** 542:17 611:2 615:9 636:5,17 736:9

**total** 654:14 826:3,7

**totality** 496:17 774:20 775:17 782:23 783:18 783:20 784:2

**totally** 482:4 635:3 709:2 783:15 802:15

**touched** 542:17

**towards** 488:12 684:10

**track** 720:23 721:13 722:11 723:12 724:17 725:11 726:5 815:23,24 819:10 820:16 821:15

**tracking** 817:2 819:18 820:14

**tracks** 725:2

**train** 704:19,22

**trained** 553:16 598:9,11

**trainer's** 548:12

**trainers** 545:16 546:10 547:20

**training** 546:10 590:3 611:16 682:14,22 705:2

**trainings** 611:24 845:4

**transcript** 847:18 848:17 848:19

**transcription** 850:4

**transcripts** 800:16

**transition** 551:13 553:1,3

**trauma** 551:10 552:20,22

**treated** 450:11 450:20,23 451:4 452:8 453:1,11 454:8 464:20

**treatment** 454:21 701:24 702:4

**trial** 406:23 409:8

**tricky** 559:3

**tried** 488:8 680:7 743:8

**true** 440:16 808:12 809:18 811:11 812:2 812:16 815:3,5

815:21 817:19 838:3 839:15 845:13 847:6

**truth** 809:15

**truthful** 762:6 763:23 764:15

**truthfully** 765:13

**try** 482:13 493:16 507:19 544:9 586:16 605:8 656:13 657:10 680:8 685:11

**trying** 420:17 467:15 483:22 495:7 548:10 566:21 570:13 570:19 571:3 606:22,24 619:5,7 625:7 644:23 661:3 738:2 741:6 743:14 745:6 753:9,13 758:9 758:23 768:10 782:8,18 786:10 795:15 804:12 819:10

**tucson** 412:5 412:11,21 413:10,24 414:11,17,22 415:1,4,13,17

CONFIDENTIAL

**[tucson - understand]**                                        Page 87

| | | | |
|---|---|---|---|
| 421:11 423:15 | tying 577:13 | **u** | 707:22,23 |
| 424:16,22 | 578:7 | | 708:10,10 |

421:11 423:15
424:16,22
425:5,7,10
426:11 427:5
428:5 430:7
432:8 434:8,13
434:22 435:6
435:14 436:11
437:7 448:10
448:21 449:17
450:10 451:3
451:21 455:20
456:14 460:6
460:24 461:23
462:21 464:3
464:18 465:11
466:20 488:24
670:9,16 673:5
673:17 674:18
683:22
**turn** 547:20
582:3 610:16
**turned** 810:11
810:24
**turning** 549:4
**tweaks** 563:7
**twenty** 788:18
**two** 436:1
483:6 529:12
545:15 604:15
644:8 645:15
646:9 670:7
765:9 776:13
782:12

tying 577:13
578:7
**type** 473:22
475:10 477:11
479:11 515:5
553:23 581:15
581:24 639:9
672:8 674:20
689:11 696:9
**types** 472:1
599:15 604:23
611:23 637:8
652:20 775:2
**typical** 434:17
447:15 463:7
474:6,18 475:9
478:7,13 480:1
498:20 512:16
514:20 570:22
578:23 600:20
689:19 716:14
717:17 836:11
**typically**
420:14 426:4
451:14 454:20
455:9 456:21
463:7 466:6
481:2 515:4
570:5 571:16
573:11 706:13
706:24 716:18
716:20 771:18
772:18

**u**
**u.s.** 407:17
534:5,10
535:22 536:2
642:13 643:10
650:8,13
**uh** 801:4
**ultimately**
802:8
**umbrella**
557:18 586:24
691:6 821:7
**unable** 822:10
822:21
**unavailable**
678:15
**unaware**
681:13
**unclear** 430:19
488:21
**uncommon**
666:7
**under** 410:23
451:12 551:24
552:3 557:18
568:9 570:20
572:11 609:19
610:12 619:17
621:5,16,16
622:10 623:3
626:7 637:15
654:13 655:1
703:24 706:2,4

707:22,23
708:10,10
709:9,11
712:19,22
714:2,3,22
810:11 821:6
847:20
**underlying**
497:8 822:22
**underreported**
433:2
**underresourced**
721:16
**understand**
410:22 416:4
433:24 441:16
444:12,13
451:16 469:4
482:13 483:23
492:10 493:5
496:19 510:1
511:14,23,24
512:18 513:10
514:21 532:24
563:23 570:13
571:3 576:17
585:13 625:7
629:12 654:2
686:18 689:14
691:6 698:15
699:23 700:1
726:5 731:9,24
738:2 745:6
753:10,13

CONFIDENTIAL

**[understand - used]** Page 88

| | | | |
|---|---|---|---|
| 758:9,11,23 | 813:23 | 514:24 | 699:2 711:17 |
| 762:12 763:10 | **unique** 795:3 | **use** 425:6 435:8 | 712:5 727:9,11 |
| 782:8,18 785:9 | 823:12,17 | 436:13 437:9 | 727:16,19 |
| 786:10 795:16 | **united** 402:1 | 439:15 440:22 | 728:9,16 746:8 |
| 801:13 802:7 | 409:21 536:15 | 442:6 471:11 | 751:4 757:22 |
| 805:15 823:12 | **universal** | 472:6,9 473:12 | 774:7 776:6 |
| 823:17 829:21 | 624:13 637:21 | 476:12 479:17 | 778:14,22 |
| 829:22 | 638:5,24 703:2 | 480:12 481:3 | 779:13,20 |
| **understanding** | 703:12 | 482:10 484:8 | 780:8,16,21,22 |
| 448:20 449:4 | **universally** | 485:23 486:13 | 781:16 783:8 |
| 449:13 492:12 | 639:9 | 486:24 487:12 | 786:12 787:17 |
| 508:15 509:10 | **universe** | 488:8 493:6,7 | 789:4 791:3,19 |
| 519:23 525:10 | 805:22 | 494:9 495:7 | 792:12 793:24 |
| 563:20 610:4 | **unnecessary** | 513:16 514:13 | 794:16 795:21 |
| 646:14 652:18 | 649:12 709:17 | 518:6,8 519:3 | 796:18 797:3 |
| 660:22 663:5 | **unprecedented** | 530:23 531:13 | 798:11 799:16 |
| 679:11 686:5 | 611:19 | 532:18 533:16 | 800:7 803:24 |
| 690:5 720:20 | **unspecified** | 539:9 540:17 | 804:8 808:4,7 |
| 721:10,19 | 429:1 430:15 | 542:14 546:11 | 811:8,13,14 |
| 723:9 744:20 | 430:17 | 547:5,24 549:8 | 831:13,24 |
| 756:3 763:7,15 | **unusual** 689:10 | 550:1 552:11 | 832:20 835:16 |
| 763:16 765:2 | **update** 572:6 | 553:7,14,14 | 835:24 839:21 |
| 770:15 814:14 | 572:11,16 | 555:4,19 | 844:3,16 |
| 829:13,19 | 769:1 | 556:13 557:9 | **used** 481:8 |
| **understood** | **updated** 531:20 | 561:15 564:2 | 500:18 533:21 |
| 569:24 702:13 | 531:21,22 | 576:6 579:16 | 561:24 565:6,7 |
| 806:8 812:7,11 | **updating** 572:4 | 580:9 581:21 | 575:13 616:1 |
| 816:5 | **ups** 751:5 | 584:8 585:15 | 616:13 618:10 |
| **undertake** | **urban** 448:10 | 609:14 610:15 | 619:18 621:9 |
| 491:22 492:16 | 448:15,16,21 | 632:21 633:10 | 621:21 622:15 |
| 591:7 649:5,15 | 448:23 | 635:24 636:20 | 623:5,12,17 |
| 684:16 685:21 | **urge** 511:11,17 | 638:3 659:23 | 624:3,7 633:12 |
| **unfortunately** | 512:12,24 | 660:11,17 | 676:14 716:6 |
| 571:1 606:19 | 513:4,14 514:2 | 661:11 662:12 | 726:17 727:19 |

CONFIDENTIAL

**[used - want]**

Page 89

727:22,24
728:21,22
729:11,17
730:7,10,19
731:10 732:3
734:1,2 735:20
736:24 750:12
751:18 755:24
759:13 774:21
783:19 784:6
786:1 825:20
828:3,10,21
830:11 833:2,6
833:7,7 848:20
**user** 825:13
834:23 835:7
835:19 841:11
841:16,19
**user's** 834:3
**users** 837:10
838:19 839:13
839:20 841:4
**uses** 569:19
**using** 425:11
515:15,17
536:4 537:6
539:1 540:16
541:21 542:13
543:11,24
544:19 554:24
611:22,23
616:24 617:9
665:18 722:2
728:10 730:1

730:12 731:1
743:9 747:13
764:19 802:19
803:11 805:11
808:13 837:8
837:10 838:19
839:14 841:4
**usually** 450:3,6
519:24 541:11
637:21 836:4
**utilize** 605:2
726:20

**v**

**vacation** 830:1
**valuable**
635:23
**vaping** 677:11
**variability**
646:3
**variable** 559:5
695:17
**variables** 559:6
**variation**
599:19
**varies** 836:20
**variety** 450:18
468:11 486:16
496:20 565:17
627:18
**various** 555:16
609:18 628:11
**vary** 598:11
599:6,11

733:22
**vast** 844:3,7
**vehicle** 563:15
**verifiable**
526:24
**veritext** 402:23
409:13
**vermont** 651:7
**version** 407:14
564:16
**versus** 813:6
**video** 409:10
409:16 499:17
499:24 504:12
504:19 582:13
582:20 666:16
666:23 696:24
699:13 765:17
765:24 807:10
807:17 828:4
845:24
**videographer**
406:23 409:12
**videotape**
402:13
**view** 758:5
772:3 828:4
**viewed** 835:1
**views** 736:3,10
**vince** 406:23
564:9,24
565:12 642:4
648:10 650:4
658:23

**virtually**
486:15 505:11
581:23 798:2
**visited** 830:18
**volume** 402:10
**voluntarily**
583:12,18
584:5
**vpns** 486:17

**w**

**w** 746:6
**waived** 409:5
**want** 428:12,12
428:19 429:10
429:13,22
430:13 459:15
461:10,10
465:21 470:12
470:20 474:3
481:14 489:15
495:24 504:3
505:15 507:23
510:12,14
516:6 517:24
518:1 521:4,4
521:6,22 523:5
523:22 524:10
525:8 544:23
546:19 547:20
548:9,20 549:1
553:8 566:9
583:16 587:16
598:15 617:9

**[want - witness]**

622:3 623:1
625:6 626:5
629:11,11,22
630:10 640:17
650:22 690:2,4
690:14 691:5
705:24 708:18
713:14,17
721:8 723:9
746:15,23
761:18 777:12
778:1 782:13
792:8,9 797:19
805:14 806:10
816:20 835:10
**wanted**  429:20
  570:21 747:15
  806:7
**wants**  709:6
**warrant**  700:23
**warrants**
  697:22 709:21
**washington**
  404:5,12
**watched**  486:7
**way**  413:1
  427:9 438:10
  486:23 501:15
  539:18 568:22
  581:12 583:3
  586:10 630:14
  630:23 672:15
  673:24 729:10
  731:6 819:9

**ways**  682:18
  684:6 715:8
**wc.com**  404:6,7
**we've**  468:12
  468:20 484:1
  485:21 486:14
  532:12 533:2
  536:12 537:13
  537:21 538:7
  651:23 658:24
  720:13 795:18
  811:17
**website**  530:19
  530:21 531:6
  531:11,19,24
  532:1
**week**  769:5,7
  769:18
**welcome**  413:4
**went**  651:22
  654:19 702:5
  733:21 774:24
  787:24 793:14
  846:4,6
**west**  406:11
**whiteley**  404:4
**wide**  615:8
**widely**  652:12
**williams**  404:3
  410:19
**willing**  764:8
  764:12
**window**  720:14

**wish**  653:10
  654:6
**wished**  679:13
**wishing**  678:12
**witness**  408:5
  410:5 412:16
  412:24 413:15
  414:7,16
  416:24 417:9
  418:10 419:3
  419:16 420:10
  421:4,15 422:5
  422:16 423:4
  423:20 424:10
  424:20 426:3
  426:15 427:12
  428:11 429:6
  429:15 430:12
  431:5,19
  432:12,21
  433:17 434:12
  435:11 436:23
  437:12 438:4
  439:2,19 441:2
  442:10 444:1
  446:12 449:21
  450:15 452:1
  452:14 453:4
  453:15 454:15
  455:8 456:2,19
  458:17 459:9
  460:12 461:6
  462:5 463:3
  464:9,24

465:16 467:2
468:6 470:11
471:5 472:19
475:7 478:2
479:10 480:17
482:4 484:12
485:19 487:16
489:6,24 491:4
492:5,23 494:1
494:11 496:11
497:7 499:16
500:10,19
505:8 506:10
507:1,18 508:9
513:20 514:18
516:1 519:16
520:22 522:3
523:16 525:6
528:16 529:5
531:5,17 532:8
532:23 536:8
537:10 539:4
539:13 540:23
541:9,24
542:20 543:14
545:21 546:6
546:15 547:9
548:4 549:12
550:5 552:15
555:7,23
556:17,20
557:13 558:1
559:2 565:10
575:3 576:9

**[witness - worked]**                                         Page 91

| | | | |
|---|---|---|---|
| 578:20 579:20 | 704:4 705:12 | 800:13,24 | **woefully** |
| 580:14 583:16 | 706:7 709:18 | 801:8,17,21 | 721:16 |
| 588:7 593:4 | 710:20 711:21 | 802:4,13 | **wondering** |
| 594:19 598:3 | 712:22 713:10 | 804:11 805:14 | 510:13 |
| 599:10 600:5 | 714:7 715:2 | 806:22 807:9 | **word** 559:3 |
| 604:11 606:5 | 716:1 718:5,20 | 809:1,21 | 735:20 763:1 |
| 612:14 615:3 | 721:4 722:15 | 810:15 812:19 | **words** 705:22 |
| 616:4 618:14 | 723:2,17 | 813:10 816:18 | 729:11 |
| 619:22 621:13 | 724:21 725:16 | 817:15 818:1 | **work** 444:2 |
| 621:24 622:8 | 729:14 730:15 | 818:20 819:22 | 505:17 508:2 |
| 623:10 624:11 | 731:20 733:10 | 820:5 821:3 | 508:24 509:17 |
| 625:23 626:13 | 734:8 735:17 | 822:15 823:2 | 510:6 534:24 |
| 627:2 628:20 | 737:17 738:11 | 823:22 825:1 | 535:9,12 592:2 |
| 629:19 634:24 | 739:5 741:19 | 825:10,16,24 | 605:5 609:21 |
| 638:13,21 | 742:21 743:21 | 826:6,13,23 | 610:1 613:8 |
| 644:16 645:21 | 745:17 746:13 | 827:9,15,23 | 614:23 615:6,8 |
| 646:18 649:11 | 748:10 749:14 | 828:7,14,24 | 641:19 643:1 |
| 649:23 650:20 | 752:4 754:2 | 829:6,12 830:9 | 647:8 654:1 |
| 651:11 652:5 | 756:15 758:19 | 830:15,24 | 656:12,22 |
| 653:8 655:13 | 760:18 762:2 | 831:6,20 832:5 | 661:21 681:2 |
| 658:24 660:2 | 762:18 763:20 | 832:16,23 | 689:11 720:9 |
| 660:15 661:18 | 764:12 765:8 | 833:5,14,22 | 729:5 732:1 |
| 662:15 665:23 | 766:22 771:1 | 834:6,13,20 | 737:13 740:23 |
| 670:22 671:16 | 771:18 772:14 | 835:4,10 836:3 | 746:5 768:18 |
| 672:13 673:11 | 773:19 774:12 | 836:23 837:14 | 772:9 813:18 |
| 673:23 674:24 | 779:7 781:20 | 838:6,23 839:9 | 844:24 845:6 |
| 676:8 677:2 | 782:17 783:16 | 839:18 840:4 | 845:12 |
| 679:21 682:2 | 785:23 786:22 | 840:15 841:8 | **worked** 448:2 |
| 684:23 687:6 | 787:21 789:9 | 841:15,24 | 449:9 570:3 |
| 688:12 691:1 | 791:9 792:2,20 | 842:12,21 | 604:13 669:5 |
| 691:23 693:11 | 793:11 794:5 | 843:12,22 | 669:22 670:3 |
| 694:11 695:14 | 794:21 796:4 | 844:12 845:3 | 670:10 686:17 |
| 697:5 698:11 | 797:15 798:20 | 845:16 847:5,7 | 695:7,20 822:3 |
| 700:21 702:21 | 799:8,21 | 848:1 | |

CONFIDENTIAL

**[worker - yeates]**                                    Page 92

| | | | |
|---|---|---|---|
| **worker** 767:11 | 416:9,17 417:2 | 533:1 535:4 | 438:24 439:17 |
| **workers** 614:8 | 417:11,17 | 536:18 537:13 | 440:24 442:8 |
| **workforce** | 418:3,20 | 540:12,24 | 443:23 446:10 |
| 538:10 647:4 | 419:10 421:10 | 542:2 543:16 | 449:19 450:13 |
| **working** | 421:23 422:11 | 543:17 546:17 | 451:23 452:12 |
| 420:12 423:20 | 422:22 423:14 | 548:24 550:9 | 453:2,13 454:1 |
| 441:14 448:5 | 424:2,14 | 558:14 571:14 | 454:9,13 455:6 |
| 509:24 539:19 | 425:20 426:9 | 660:4 662:3 | 455:24 456:17 |
| 647:17 686:13 | 430:6,24 | 666:1,8,12 | 458:15 459:7 |
| 687:8 690:17 | 431:12 432:7 | 701:3 717:11 | 460:10 461:4 |
| 722:4 773:3,4 | 432:16 433:11 | 720:17 733:12 | 462:3 463:1 |
| 785:5,11 822:2 | 434:7 435:5 | 768:16,22 | 464:7,22 |
| 844:22 | 436:10,19 | 788:15,18 | 465:14 466:24 |
| **world** 554:1 | 437:6,21 | 789:1 802:20 | 467:21 468:3 |
| **worth** 535:16 | 438:17 439:10 | 803:9,12 | 470:9 471:3 |
| **woven** 535:15 | 440:17 442:2 | 820:15 826:19 | 472:17 475:5 |
| **write** 524:7 | 449:16 450:10 | **yeates** 403:4 | 476:22 477:24 |
| **writing** 835:14 | 451:4,20 | 412:14,22 | 479:8 480:15 |
| **written** 517:19 | 452:21 453:9 | 413:13 414:5 | 482:2 484:10 |
| 691:16 777:24 | 454:5 455:2,19 | 414:14 416:22 | 485:17 487:14 |
| **wrong** 585:23 | 456:14 458:11 | 417:7 418:8 | 489:4,22 |
| **x** | 460:5,23 | 419:1,14 420:8 | 490:20 491:2 |
| **x** 407:2,9 | 461:22 462:20 | 421:2,13 422:3 | 492:3,21 |
| **y** | 464:2,17 | 422:14 423:2 | 493:13,23 |
| | 465:10 466:19 | 423:18 424:8 | 494:8 496:9 |
| **yeah** 578:8 | 473:16 483:6 | 424:18 426:1 | 497:5 500:8,16 |
| 626:4 632:24 | 560:18,19 | 426:13 427:10 | 501:3,23 502:8 |
| 635:20,20 | 580:16 581:10 | 428:9 429:4,7 | 502:12 503:1 |
| 645:21 650:24 | 581:22 640:21 | 430:10 431:3 | 503:16,22 |
| 820:1 | 724:16 725:10 | 431:17 432:10 | 504:8 505:4 |
| **year** 412:9 | 827:4 | 432:19 433:15 | 506:6,21 |
| 413:8,22 414:9 | **years** 448:4 | 434:10 435:9 | 507:14 508:7 |
| 414:20 415:2 | 449:10 483:22 | 436:20,24 | 513:18 514:16 |
| 415:15,22 | 516:4 529:9 | 437:10 438:2 | 515:21 519:14 |

CONFIDENTIAL

**[yeates - yelena]**

| | | | |
|---|---|---|---|
| 520:20 522:1 | 634:22 636:6 | 729:7,12 | 801:15,19 |
| 523:12 525:4 | 638:11,19 | 730:13 731:18 | 802:2,10 804:2 |
| 528:12 529:3 | 644:14 645:18 | 733:8 734:6 | 804:9 805:12 |
| 531:1,15 532:6 | 646:16 649:9 | 735:15 737:10 | 806:20 808:23 |
| 532:19 536:6 | 649:21 650:18 | 737:15 738:9 | 809:19 810:13 |
| 537:8 539:2,11 | 651:9 652:3 | 739:3 740:7 | 812:17 813:8 |
| 540:21 541:7 | 653:6 655:5,11 | 741:17 742:14 | 816:16 817:13 |
| 541:22 542:18 | 658:20 659:24 | 742:19 743:19 | 817:23 818:18 |
| 543:12 545:19 | 660:13 661:12 | 744:16 745:15 | 819:20 820:3 |
| 546:4,13 547:7 | 661:16 662:13 | 746:11 748:2,6 | 820:18 821:1 |
| 548:2 549:10 | 665:21 666:15 | 749:11 750:19 | 822:13,24 |
| 550:3 552:13 | 670:20 671:14 | 751:13,22 | 823:20 824:23 |
| 555:5,21 | 672:11 673:9 | 752:2,22 | 825:8,14,22 |
| 556:16,18 | 673:21 674:22 | 753:21 756:13 | 826:4,11,21 |
| 557:11,23 | 676:6,24 | 758:6,16 | 827:7,13,21 |
| 558:23 565:8 | 679:19 681:24 | 760:12,17 | 828:5,12,22 |
| 575:1 576:5 | 684:21 687:4 | 761:24 762:16 | 829:4,10 830:7 |
| 578:15,18 | 688:10 690:23 | 763:17 764:10 | 830:13,20 |
| 579:18 580:12 | 691:21 693:6 | 765:6 766:20 | 831:4,16 832:2 |
| 582:7,11 | 694:9 695:12 | 769:8 770:3,21 | 832:14,21 |
| 583:14 585:20 | 697:3 698:9 | 771:9,13 | 833:3,12,20 |
| 588:5 592:21 | 699:9,16 | 772:10 773:17 | 834:4,11,18 |
| 593:2 594:17 | 700:19 702:19 | 774:9 776:8,22 | 835:2,8 836:1 |
| 598:1 599:8 | 704:2 705:10 | 779:5 781:18 | 836:21 837:12 |
| 600:3 604:9 | 706:5 708:3,6 | 782:15 783:11 | 838:4,21 839:7 |
| 606:3 607:17 | 708:20 709:13 | 785:21 786:20 | 839:16 840:1 |
| 612:12 615:1 | 710:18 711:19 | 787:19 789:6 | 840:13 841:6 |
| 616:2 618:12 | 712:20 713:8 | 791:5,22 | 841:13,22 |
| 619:20 621:11 | 714:5,24 | 792:16 793:9 | 842:10,19 |
| 621:23 622:6 | 715:19,23 | 794:2,18 796:2 | 843:10,20 |
| 623:7 624:9 | 718:3,18 721:2 | 797:5,12 | 844:9 845:1,14 |
| 625:3,21 | 722:13,24 | 798:14 799:6 | 845:22 |
| 626:11,24 | 723:15 724:19 | 799:18 800:9 | **yelena** 406:17 |
| 628:17 629:17 | 725:4,14 728:5 | 800:22 801:5 | |

CONFIDENTIAL

**[yesterday - zuckerberg]**                                    Page 94

**yesterday**
  410:15 411:2,6
  411:16 528:15
  544:21 573:22
  574:15 648:6
  750:22 751:2,6
  751:14 752:21
  753:12 757:24
  759:2,9 769:10
  770:6,7 771:17
  774:11 775:1
  776:11 783:13
  789:8 791:8
  792:1,19
  793:15 794:4
  794:20 797:14
  798:16 799:20
  800:11 801:20
  825:6 844:11
**yesterday's**
  755:4 776:13
**ygr** 402:3
**ykotlarsky**
  406:19
**york** 404:21,21
  406:18,18
**young** 436:17
  468:9,17
  469:12,16
  473:15 474:17
  474:20 476:3
  527:21 528:5
  537:16 538:15
  556:7 581:6

  606:10 609:5
  617:7 618:1
  694:21 702:3
  705:4 746:9
  794:11 798:1
  803:2 829:22
  844:3
**younger** 616:20
**youth** 479:16
  551:12
**youtube** 404:8
  410:20 508:5
  509:3,20
  511:12 512:13
  513:1,15
  515:12,13,15
  520:6 702:5
  808:11 846:4

**z**

**zachary** 405:16
**zbower** 405:18
**zero** 806:10
**zoom** 405:2
  406:2
**zuckerberg**
  404:17