**Exhibit 110**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

- - -

IN RE: SOCIAL MEDIA        : Case No.
ADOLESCENT                 : 4:22-MD-03047-YGR
ADDICTION/PERSONAL         : MDL No. 3047
INJURY PRODUCTS            :
LIABILITY LITIGATION,      :
                           :
This Document Relates to:
All Actions                :

- - -

SEPTEMBER 4, 2025

- - -

Videotaped deposition of
BRIAN OSBORNE, Ed.D., taken pursuant to
notice, was held at the law offices of
Kessler Topaz Meltzer & Check, LLP, 280
King of Prussia Road, Radnor,
Pennsylvania 19087, commencing at 9:09
a.m., on the above date, before Amanda
Dee Maslynsky-Miller, a Court Reporter
and Certified Realtime Reporter.

- - -

GOLKOW, A VERITEXT COMPANY
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

CONFIDENTIAL

Page 2

APPEARANCES:


        MEHRI & SKALET, PLLC
        BY: CYRUS MEHRI, ESQUIRE
        2000 K Street NW
        Suite 325
        Washington, DC 20006
        (202) 822-5100
        cmehri@findjustice.com
        Representing the Plaintiffs



        BROCKSTEDT MANDALAS FEDERICO, LLC
        BY: MATTHEW P. LEGG, ESQUIRE
        2850 Quarry Lake Drive
        Suite 220
        Baltimore, Maryland 21209
        (410) 421-7777
        mlegg@lawbmf.com
        Representing the Plaintiffs


        WILLIAMS & CONNOLLY LLP
        BY: DANIEL WHITELEY, ESQUIRE
        680 Maine Avenue SW
        Washington, DC 20024
        (202) 434-5000
        dwhiteley@wc.com
        Representing the Defendants,
        YouTube, LLC, and Google LLC

CONFIDENTIAL

Page 3

APPEARANCES: (Continued)


        COVINGTON & BURLING LLP
        BY: CHRISTIAN J. PISTILLI, ESQUIRE
        One CityCenter
        850 Tenth Street, NW
        Washington, DC 20001
        (202) 662-6000
        cpistilli@cov.com

        - and -

        BY: CONNOR KENNEDY, ESQUIRE
        3000 El Camino Real
        5 Palo Alto Square
        10th Floor
        Palo Alto, California 94306
        (650) 632-4700
        ckennedy@cov.com
        Representing the Defendant,
        Meta Platforms, Instagram and
        Siculus


        KING & SPALDING LLP
        BY: KATHRYN S. LEHMAN, ESQUIRE
        Southeast Financial Center
        200 S Biscayne Boulevard
        Suite 4700
        Miami, Florida 33131
        klehman@kslaw.com
        Representing the Defendants,
        TikTok Inc., ByteDance Inc.,
        ByteDance Ltd., TikTok Ltd., and
        TikTok, LLC

CONFIDENTIAL

Page 4

APPEARANCES: (Continued)

VIA ZOOM:

     MUNGER, TOLLES & OLSON LLP
     BY: ROWLEY J. RICE, ESQUIRE
     350 South Grand Avenue
     50th Floor
     Los Angeles, California 90071
     (213) 683-9100
     rowley.rice@mto.com
     Representing the Defendant,
     Snap, Inc.


     KESSLER TOPAZ MELTZER & CHECK, LLP
     BY: TYLER S. GRADEN, ESQUIRE
     280 King of Prussia Road
     Radnor, Pennsylvania 19087
     (610) 667-7706
     tgraden@ktmc.com
     Representing the MDL and JCCP
     Plaintiffs


     BROCKSTEDT MANDALAS FEDERICO, LLC
     BY: JUSTIN WEATHERS, PARALEGAL
     2850 Quarry Lake Drive
     Suite 220
     Baltimore, Maryland 21209
     (410) 421-7777
     jweathers@lawbmf.com
     Representing the Plaintiffs

CONFIDENTIAL

Page 5

APPEARANCES: (Continued)
VIA ZOOM:

          LEVIN SEDRAN & BERMAN LLP
          BY: FREDERICK S. LONGER, ESQUIRE
          BY: MICHAEL M. WEINKOWITZ, ESQUIRE
          510 Walnut Street
          Suite 500
          Philadelphia, Pennsylvania 19106
          (877) 882-1011
          flonger@lfsblaw.com
          mweinkowitz@lfsblaw.com
          Representing the Plaintiffs


          EILAND & BONNIN LAW FIRM
          BY: CRAIG EILAND, ESQUIRE
          BY: DAVID BONNIN, ESQUIRE
          2200 Market Street
          Suite 501
          Galveston, Texas 77550
          (409) 763-3260
          ceiland@eilandlaw.com
          dbonnin@eilandlaw.com
          Representing the Plaintiffs

          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
          BY: KELLY MCNABB, ESQUIRE
          250 Hudson Street
          8th Floor
          New York, New York 10013
          (212) 355-9500
          Kmcnabb@lchb.com
          Representing the Plaintiffs

CONFIDENTIAL

Page 6

APPEARANCES: (Continued)

VIA ZOOM:


        COVINGTON & BURLING LLP
        BY: AUSTIN BEAUDOIN, LAW CLERK
        The New York Times Building
        620 Eighth Avenue
        New York, New York 10018
        (212) 841-1000
        Representing Meta Platforms,
        Instagram and Siculus



ALSO PRESENT:
Olivia Sattan, Videographer
Ray Moore, Trial Technician

                        -   -   -

CONFIDENTIAL

Page 7

- - -

I N D E X

- - -

Testimony of:  BRIAN OSBORNE, Ed.D.

By Attorney Pistilli                13

By Attorney Rice                   352

By Attorney Lehman                 359

By Attorney Whiteley               374

By Attorney Mehri                  383

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Osborne-1 | No Bates Curriculum Vitae of Brian Osborne, Ed.D. | 20 |
| Osborne-2 | No Bates 1/8/25 E-mail, Osborne to Kennedy | 81 |
| Osborne-3 | No Bates Invoices | 84 |
| Osborne-4 | No Bates Promoting Equity in the Modern Superintendency | 89 |
| Osborne-5 | No Bates Pioneering Use of Technology Transforms Teaching in New York Schools | 96 |

CONFIDENTIAL

Page 8

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Osborne-6 | No Bates Materials Considered List | 100 |
| Osborne-7 | No Bates 5/16/25 Expert Report of Brian G. Osborne | 109 |
| Osborne-8 | No Bates 7/30/25 Rebuttal Expert Report of Brian G. Osborne | 110 |
| Osborne-9 | No Bates Qualitative research and Educational leadership: Essential dynamics to consider When designing and conducting Studies | 200 |
| Osborne-10 | No Bates Leadership Behaviours of Principals in Inclusive Educational Settings | 219 |
| Osborne-11 | No Bates Journal of Youth Studies, Volume 26 | 294 |
| Osborne-12 | No Bates Neuroscience and Biobehavioral Reviews, Volume 120 | 303 |
| Osborne-13 | No Bates Plaintiffs Fact Sheet | 331 |
| Osborne-14 | No Bates Dekalb County, Social Media Guidelines for Students | 334 |

CONFIDENTIAL

Page 9

- - -
E X H I B I T S
- - -

NO.            DESCRIPTION                    PAGE

Osborne-15   No Bates
             Frontiers in Psychology; An
             Affective Neuroscience
             Framework for the Molecular
             Study of Internet Addiction;
             Montag                             383
Osborne-16   No Bates
             Psychological Inquiry;
             Adolescent Development in
             the Digital Media Context;
             Nesi                               385
Osborne-17   No Bates
             Journal of Psychoeducational
             Assessment; Distress Among
             Adolescents: An Exploration
             of Mattering, Social Media
             Addiction, and School
             Connectedness; Watson             386
Osborne-18   No Bates
             Clinical Child Psychology;
             Exploring Adolescents'
             Perspectives on Social Media
             and Mental Health and
             Well-Being – A Qualitative
             Literature Review;
             Anjali Popat and Carolyn
             Tarrant                            388
Osborne-19   No Bates
             Science Daily; March 22, 2026,
             Social Media Use Associated
             With Depression Among U.S.
             Young Adults                       389

CONFIDENTIAL

Page 10

- - -

E X H I B I T S

- - -

NO.                DESCRIPTION                          PAGE

Osborne-20    No Bates
              Learning Policy Institute -
              How Money Matters for
              Schools; Bruce D. Baker        391

CONFIDENTIAL

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line        Page Line        Page Line

None

Request for Production of Documents

Page Line        Page Line        Page Line

294      2

Stipulations

Page Line        Page Line        Page Line

12        1

Question Marked

Page Line        Page Line        Page Line

None

CONFIDENTIAL

Page 12

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:  We are now on the record.  My name is Olivia Sattan, and I'm a videographer for Golkow.  Today's date is September 4th, 2025, and the time is 9:09 a.m.

This video deposition is being held in Radnor, Pennsylvania, in the matter of In Re: Social Media Adolescent Addiction Personal Injury Products Liability Litigation for the Court of the United States District Court, Northern District of California.  The deponent is Brian

CONFIDENTIAL

Page 13

Osborne.

Counsel will be noted on the stenographic record.  The court reporter is Amanda Miller, and will now swear in the witness.

- - -

BRIAN OSBORNE, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY PISTILLI:

Q.    Good morning, Dr. Osborne.

A.    Good morning.

Q.    My name is Chris Pistilli. I'm an attorney with the law firm of Covington and Burling.  I represent Meta, and I'm going to be deposing you today on behalf of Meta, TikTok, Snap and YouTube.

If I refer to those companies collectively as "defendants," will you understand what I mean?

A.    I will.

CONFIDENTIAL

Page 14

Q.    Could you please state your full name for the record?

A.    Brian Osborne.

Q.    Could you please state your current employer and job title?

A.    Lehigh College of Education. I'm a professor of practice.

Q.    Have you ever been deposed before?

A.    I have.

Q.    How many times?

A.    Once.

Q.    And what was that matter?

A.    That was a matter involving the United Federation of Teachers in New York City.  And it was about due process rights for probationary teachers.

This was in 2012.

Q.    Did you testify as an expert in that matter?

A.    No.

Q.    Have you ever testified at a trial before?

A.    I have, yes.

Page 15

Q.    And what was that matter?

A.    I testified in two trials. One was a tenure case. It was an administrative law judge proceeding. I don't remember exactly when; I think it was the '11/'12 school year. I was superintendent in South Orange Maplewood at the time, and it was a tenure case.

And the second time was in New York in 2022. And that was a discrimination case against New Rochelle where I had been superintendent.

Q.    And you were a fact witness in both of those trials? Strike that.

Were you an expert in either of those matters?

A.    No. No.

Q.    Before we go any further, I'd like to go over a few ground rules with you.

You understand you're under oath today, right?

A.    I do.

Q.    That means you have to offer

CONFIDENTIAL

Page 16

truthful, accurate, complete testimony?

A.   That's my understanding.

Q.   Is there any reason you can't do that today?

A.   No.

Q.   Is there anything that would adversely affect your ability to understand my questions or recall information today?

A.   No.  No.

Q.   The court reporter is going to be writing down what we say today. That means that your answers to my questions need to be verbal so they can appear on the record.

Is that fair?  Do you understand that?

A.   I understand that.

Q.   Okay.  And because the court reporter can only write down what one of us is saying at a time, let's both do our best to not speak over one another.

I'll try to wait for you to finish your answer before I ask my next

Page 17

question. And I'd ask you to let me finish my question before you start answering.

Is that fair?

A. That makes sense to me.

Q. If at any point I say something that's unclear, you don't understand my question, please let me know, and I'll clarify it for you.

Otherwise, I'm going to assume that you understand my question.

Is that fair?

A. Okay. I'll do that.

Q. And if you need to take a break, just let me know. I'll want you to answer the question that's pending, but I'm always happy to accommodate a break, okay?

A. Thank you.

Q. What, if anything, did you do to prepare for your deposition today?

A. I read the reports that I wrote and some of the other depositions.

Q. What other depositions?

Page 18

A.    I skimmed the one from Hoover, just to get an idea of, like, what this is -- how this goes.

Q.    Any other depositions?

A.    Yes.  I read -- I skimmed, I think it's Leslie.

That's it.

Q.    Leslie and Hoover depositions?

A.    Yeah.

Q.    Other than those deposition transcripts and your reports, did you read anything else to prepare for your deposition today?

A.    No.

Q.    Did you meet with counsel to prepare for your deposition?

A.    I did.

Q.    Who did you meet with?

A.    With Cyrus, Matt and Nick Lee.

Q.    On how many occasions did you meet?

A.    Three times, I think.

Page 19

Q.    For about how long each time?

A.    The first one was short, maybe an hour.  And then I met again for just a short half-hour.

And then the third time was longer, it was a few hours.

Q.    Like, three hours?

A.    Three -- three, four hours, yeah.

Q.    Did you speak with anyone other than counsel about your deposition?

A.    No.

Q.    Do you know what the bellwether school districts in this case are?

A.    You know, I don't think I recall all of them.

I know Tucson is one. Irvington is one.  Charleston is one, I think.  And then there are three others I know.

Q.    Breathitt, DeKalb and Harford, are those the other three?

Page 20

A.    Okay.  Yes.

Q.    If I say so.

A.    No.  I recall that, yes.

Q.    Did you speak to anyone at those districts?

A.    I did not, no.

Q.    Other than what we've already discussed, did you do anything to prepare for your deposition today?

A.    Other than what we discussed, no, not that I recall.

Thought a lot about what I might say.

ATTORNEY PISTILLI:  Let's pull up Tab 1.  And we can mark this for identification as Exhibit-1.

- - -

(Whereupon, Exhibit Osborne-1, No Bates, Curriculum Vitae of Brian Osborne, Ed.D., was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 21

Q.    Is this a copy of your CV?

A.    Yes, this is my resume.

Q.    And could you just briefly describe your educational background?

A.    Sure.  My educational background is one of -- do you mean my -- my -- like, the education I received?

Q.    Yes.  Your education.

A.    Oh, okay.  I earned a Bachelor's degree from Colgate University in philosophy and religion.  A Master's degree in teaching of mathematics from New York University.  A Master's degree in public administration and policy from Harvard Graduate School of Education that I had a concentration in the urban superintendents program.  And a Doctoral degree also from Harvard Graduate School of Education in public policy and administration, also with a concentration in the urban superintendents program.

I see here that the degrees are administration, planning and social policy.  I think I just called them the

CONFIDENTIAL

Page 22

wrong thing just now.

Q. In 2003, 2004, you were the director of the office of instructional technology?

A. In the New York City Department of Education, that's right.

Q. What did that position entail?

A. That position entailed responsibility for Title IID planning and expenditure for the New York City Department of Education, as well as coordinating with regional instructional technology specialists across the city.

Q. And then from 2004 to 2007, you had a different position with the New York City Department of Education?

A. Yes.

Q. What position was that?

A. Chief of staff of teaching and learning.

Q. And what did that position entail?

A. That position entailed

Page 23

directly supporting the deputy chancellor for teaching and learning. So there was a large set of responsibilities and an expansive portfolio.

The deputy chancellor was responsible for all of teaching and learning and instruction, central offices, oversaw the regional instructional superintendents and, through them, the principals of all the schools in the city.

So in that capacity, I led central office instructional support for the initiatives of ten regional superintendents for the local instructional superintendents. There was another district called District 75, which was specific to special education, and schools citywide.

And that involved supporting on operations, on curriculum and instruction. All the teaching and learning initiatives.

Q. And during your time with

Page 24

the New York City Department of Education, were students allowed unfettered access to their digital devices?

A. I can't answer that. There's -- there's a -- the system is vast, you know; it has more than one million kids. It has, like, 1,500 schools. So I'm sure practices varied from place to place.

I don't know if kids were allowed unfettered access in all places.

Q. Were there any district-wide policies at the time you were with the New York City Department of Education?

ATTORNEY MEHRI: Objection.

Go ahead.

THE WITNESS: Were there any --

BY ATTORNEY PISTILLI:

Q. Any district-wide policies relating to the use of digital devices?

A. I suppose there were. I mean, I don't recall specifically.

Page 25

Q.    You don't recall what those policies were?

A.    I don't recall what those policies were, no.  This was 20 years ago.

Q.    And then why did you leave the New York City Department of Education?

A.    I left the New York City Department of Education because I was recruited to become superintendent in South Orange Maplewood, New Jersey.

Q.    During what period of time were you superintendent in South Orange Maplewood?

A.    From 2007 to 2014.

Q.    How many students were in that district?

A.    There were about 7,000 students in that district.

Q.    And how many schools?

A.    We had nine schools.

Q.    And during your time as a superintendent, were students allowed

Page 26

unfettered access to their digital devices?

A. You know, I don't -- I don't exactly recall. And I'm not sure exactly what the policies would have been in every classroom and in every school during that time.

2007, things were -- digital -- portable personal digital devices were pretty new on the scene. So I'm not sure what the rules were in every place.

Q. Do you recall any district-wide policies, at any time while you were superintendent, relating to the use of digital devices?

A. I don't recall specific policies, no.

Q. Why did you leave your position with the South Orange Maplewood public schools?

A. I left South Orange Maplewood public schools because I was recruited to be superintendent in New

Page 27

Rochelle, New York.

Q.    And for how long were you superintendent in New Rochelle, New York?

A.    About four years.  A little more than four years.

Q.    From 2014 to 2018?

A.    Yes.

Q.    How many students in that district?

A.    New Rochelle had, at the time, about 11,000 students.

Q.    And how many schools?

A.    There were 11 schools.

Q.    And from 2014 to 2018 when you were superintendent in New Rochelle, were students allowed unfettered access to their digital devices?

A.    Again, I can't -- I'm -- I can't answer that question, because there's a large system with variation across schools and classrooms.  So some may have been.

Q.    Did you, as superintendent, put in place any district-wide policies

Page 28

relating to the use of digital devices?

A.    Not that I recall.

Q.    And since 2008, you've worked primarily as a consultant and a professor at Lehigh University; is that right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  No.

BY ATTORNEY PISTILLI:

Q.    Could you describe your employment since 2018?

A.    Oh.  Since 2018, yes.

Q.    So since 2018, you've worked as a professor at Lehigh and as a consultant?

A.    Yes.

Q.    Could you generally describe what your work as a consultant entails?

A.    Sure.  As an educational consultant in educational leadership, I provide a number of services to different organizations.

The primary one being that I serve as an executive coach, usually for

Page 29

new principals or new superintendents or new district, like, central office leaders.

Occasionally, if someone needs extra support, they're not new but they're struggling and they need extra support, that's one area of my work as an educational consultant.

Another area is providing support for superintendents and their boards of education on issues of governance and improving governance practices.

I also will provide some professional development to leaders as a whole or whatever a superintendent may be facing as a problem of practice.

Q.    And in your consulting roles, do you assist with developing or changing district-wide policies?

A.    Generally, no.  My work with regard to policy promulgation as an educational consultant would not be direct.  It would be supporting a school

or a school district leader in thinking through the implications of a particular policy and anticipating unintended negative consequences, in communicating well with various constituents and understanding, like, law and regulation.

So my role isn't to develop policy or suggest policy.  My role is to support their leader -- the leaders in their work about how they think about promulgating policy.

Q.    And have you ever been asked, in your role as a consultant, to develop policies relating to social media?

A.    I've not been asked in my role as an educational consultant to develop policies about anything, including social media.

Q.    When was the last time you taught in a classroom?

A.    What do you mean by "classroom"?

Q.    Fair enough.

CONFIDENTIAL

Page 31

A K-through-12 classroom.

A.    The last time I was the primary teacher in a K-through-12 classroom, is that what you mean?

Q.    Yes.

A.    Like, as my full-time job, not as a visiting teacher or something like that?

Q.    Yes.

A.    It was in -- I was last a teacher in 2000, yeah.

VIDEO TECHNICIAN:    Can we go off the record for a second?

ATTORNEY PISTILLI:    Sure.

VIDEO TECHNICIAN:    The time is 9:26 a.m.    We are going off the record.

-  -  -

(Whereupon, a brief recess was taken.)

-  -  -

VIDEO TECHNICIAN:    The time is 9:29 a.m.    We are going back on the record.

Page 32

BY ATTORNEY PISTILLI:

Q. Before we went off the record, you said you thought the last time you were a classroom teacher was 2000?

A. That's right.

Q. So if you could look at Page 3 of your CV with me.

It says in 2000 you were a principal intern at the Edwards Middle School; is that right?

A. It does say that, yes.

Q. What's a principal intern?

A. So I interned with a principal in Boston, and this was part of my graduate program that was specific to students who were in the Harvard's urban superintendents program who had not yet been principals as a way to ensure that we had some learning about the principal's day-to-day work.

Q. But so that -- that wasn't a classroom teaching position, was it?

A. No. I was intern to the

Page 33

principal.

Q.    Okay.  Then just continuing to look at your resume, I see from 1991 to 1994 you were a fifth grade bilingual teacher; is that right?

A.    Yes.

Q.    And that was a classroom teaching position?

A.    Yes.

Q.    And then were any of the positions listed here on your resume after 1994 classroom teaching positions?

A.    Yes.

Q.    Which?

A.    The -- my role at The New School for Arts and Sciences.  I had a teaching position there.

Q.    Okay.  You were a co-founder of that school?

A.    Yes.

Q.    You also taught a class?

A.    My primary responsibility was as a teacher.

Q.    Are you employed by any of

Page 34

the plaintiffs in this litigation?

A.    No, not to my knowledge.

Q.    Have you ever been?

A.    By "plaintiffs" you mean the six districts?

Q.    Let's start with the six districts, yes.

A.    I -- you said -- no, I have not been employed by any of those six districts, no.

Q.    Were you employed by other districts that you are aware are plaintiffs in the social media litigation?

A.    No.

Q.    Were you employed by Baltimore?

A.    No.

Q.    Are you an expert in technology?

A.    My expertise is not as a technologist, no.

Q.    Are you an expert in digital design?

CONFIDENTIAL

Page 35

A.    My expertise is not in digital design.

Q.    Are you an expert in social media platform design?

A.    My expertise is not in social media platform design.

Q.    Are you an expert in algorithms?

A.    My expertise is not in algorithms.

Q.    Are you an expert in data science?

A.    My expertise is not in data science.

Q.    Are you an expert in statistics?

A.    My expertise is not in statistics.

Q.    Are you an expert on product safety?

A.    My expertise is not in product safety.

Q.    Are you a psychologist?

A.    I am not a psychologist.

Page 36

Q.    Are you a psychiatrist?

A.    I am not a psychiatrist.

Q.    Are you an epidemiologist?

A.    I am not an epidemiologist.

Q.    Are you a public health expert?

A.    I'm not a public health expert.

Q.    Are you an expert on mental health?

A.    I am not an expert on mental health.

Q.    Are you an expert on addictive behavior?

A.    I'm not an expert on addictive behavior.

Q.    Are you an expert on compulsive behavior?

A.    I'm not an expert on compulsive behavior.

Q.    Are you an expert on attention deficit disorders?

A.    I'm not an expert on attention deficit disorders.

Q. Are you an expert on emotional dysregulation?

A. I'm not an expert on emotional dysregulation.

Q. Are you an expert on burnout?

A. I'm not an expert on burnout.

Q. Are you an expert on cognitive disorders or deficits?

A. I'm not an expert on cognitive disorders or deficits.

Q. You're not qualified to diagnose mental health problems or disorders, are you?

A. I'm not a psychologist or a psychiatrist, so I don't diagnose mental health problems.

Q. And you don't diagnose behavioral problems or disorders either?

A. I don't diagnose disorders.

Q. Have you ever been hired to write a 15-year plan for a school district?

Page 38

A.    I've never been hired specifically to write a plan for a school district, no.

Q.    Other than what we've already discussed, do you have any other professional roles currently?

A.    No.

Q.    Around what percentage of your time is spent on teaching at Lehigh?

A.    I'm not sure my exact percentage of time.  And, of course, it would depend on time of year.

And I would say during the semesters or the time when -- when courses are in session, half my time, roughly.

Q.    And when courses are not in session, it's less?

A.    Right.  When courses are not in session, then my teaching responsibility would be around, you know, planning and refining syllabi or developing a new course or something like that, yeah.

CONFIDENTIAL

Page 39

Q.    And so what would the percentage be during the non-session times?

A.    I don't -- I can't say an exact percentage.  I think it varies depending on -- like, if what I'm teaching next is a course I've taught before, then that percentage might be very high.

If what I'm teaching next is something that I have taught before, then it might be a little bit lower.

So it's no -- there's no, like, real good way to answer that.

Q.    But so even when class is in session, around half of your time is spent on your private consulting work?

A.    No.  I think that there's a portion of my time as a professor of practice that's not strictly dedicated to teaching.

Q.    What percentage of your time during -- when classes are in session do you spend on private consulting work?

Page 40

A.    When classes are in session, 20 percent, about, more or less.

Q.    And when classes are not in session?

A.    It varies depending on, you know, what I'm engaged to do.  It could be higher or lower.

Q.    More than 50 percent?

A.    Only for short bits of time if an engagement demands it.

Q.    And just to confirm, you have not been a superintendent since 2018, right?

A.    That's correct.

Q.    So you were no longer a superintendent during the COVID-19 pandemic?

A.    That's correct, yeah.

Q.    You agree that that had a profound impact on K-through-12 education in the United States?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  COVID had a profound impact on K-through-12

Page 41

education in the United States, certainly.

BY ATTORNEY PISTILLI:

Q.    Do you agree with bans on electronic devices in schools?

A.    Will you ask that again?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  What do you mean?

Go ahead.  Sorry.

BY ATTORNEY PISTILLI:

Q.    Do you agree with policies banning electronic devices in schools?

A.    So like I said before, my role isn't to, like, promulgate policy or advocate for any particular policy.  It's really to assist and support the educational leaders who would have that responsibility to think through all the sort of, like, complexities, unintended negative consequences, constituency communication, like, regulation, that -- that kind of stuff, to make sure they're considering everything.

Page 42

So I don't have a position on, like, banning anything. I think it depends on what the leader is facing in that context.

Q. So in your consulting work, you don't advocate for banning electronic devices in schools?

ATTORNEY MEHRI: Objection.

THE WITNESS: Yeah, I think that's what I just said.

BY ATTORNEY PISTILLI:

Q. What do you understand to be the purpose of electronic device bans in schools?

A. Do you have -- do you have, like, a particular one in mind? I think the purposes might vary.

Q. A ban on using cell phones during school hours.

A. And so your question is?

Q. What do you understand the purpose of such policies to be?

A. So I -- I don't know. I would need to talk with the leaders who

promulgated that policy.

But in light of the -- of the compulsive use of social media by students and its sort of negative impact on the schools, I would think that it would be about trying to mitigate some of that impact.

Q.   Well, have you ever -- you said you've never recommended a policy around electronic device use to a school, right?

A.   Well, I can't recall, as superintendent, like, what we did specifically about device use.

But since then, as an educational consultant, I've not really advocated or recommended a policy about anything, including social media or device uses.

Because that's not really my role.  It's not what I do in relation to the leaders that I'm coaching or supporting.  My role with them is really to support their thinking, like, to try

to help them understand the complexities of policies that they might be considering, helping them understand, like, how policy gets promulgated, if it's a superintendent, like how they might discuss it with their Board of Education.

But the kind of policy decision or selection or advocacy, that's not really within the realm of what I do.

Q.   You understand that cell phones can be used for many different purposes, right?

A.   Sure.

Q.   It can be used for texting?

A.   Yes.

Q.   It can be used to conduct research?

A.   Yes.

Q.   It can be used to take notes?

A.   I suppose.

Q.   It can be used to take pictures?

Page 45

A.    Okay.

Q.    You agree that they can be used to take pictures, right?

A.    Cell phones can be used to take pictures, yeah.  Sure.

Q.    They can be used as a calculator to do math, right?

A.    Correct.  They can.

Q.    They can be used to write e-mails?

A.    Yes.

Q.    To read e-mails?

A.    Yes.

Q.    To browse the Internet? Read the news?  Check the weather?

A.    Cell phones can be used to browse the Internet, check the weather, yes.

Q.    To play video games?

A.    Cell phones can be used to play video games, sure.

Q.    To stream movies?

A.    Yes.

Q.    To find directions?

CONFIDENTIAL

Page 46

A. Uh-huh, yes.

Q. To check the time?

A. Cell phones can be used to check the time.

Q. To organize your calendar?

A. Cell phones can be used for scheduling and calendaring, yes.

Q. It can be used to pay someone money you owe them?

A. Yes. Cell phones can be used to transfer funds, yes.

Q. And all of those are things that can cause distraction if they're occurring during class, right?

ATTORNEY MEHRI: Objection.

THE WITNESS: I suppose. In my experience, those are not the functions of personal digital -- digital device use that is causing the kind of widespread distraction that I describe in my report and that has an adverse impact on school operations and school leaders.

Page 47

Those -- those aspects are not the focus. The focus is really on social media use, because there are design features on the platforms that lead to more compulsive use.

I'm not an expert in this, but that's -- that's the focus of my report.

BY ATTORNEY PISTILLI:

Q. Well, what's your basis for saying that that's what students are doing on their phones?

A. So the basis of me saying that that's what students are doing on their phones comes from several places.

One, it comes from my experience in schools, supporting school leaders. I have been in schools -- since leaving the superintendency, I've been in schools some 40 to 50 days a year, at least part -- part days. I've talked with aspiring leaders that I train and teach as graduate students in my classes.

Page 48

I talk with the school principals and school superintendents and district leaders that I'm contracted to support as an educational consultant and an executive coach.

When I go to schools to do that work, I'm using a methodology that couples some direct observation as well as some interviews with those leaders to understand their leadership practice.

So there's been -- there's been hundreds of people that I have interacted with -- with during this time in these ways that I'm describing in all sorts of schools, elementary schools, middle schools, high schools, different districts, different types of districts.

And the observations are direct of student use. My interactions with these principals, I'm also listening to what they tell me. I'm sometimes present when they have to intervene or deal with different situations.

So that's one area that

CONFIDENTIAL

Page 49

gives me some insight into the fact that students are using these particular platforms rather compulsively.

Then I also read the depositions from the plaintiff districts, and that sort of converged with what I was seeing. It was, like, very much clear that the patterns that I had observed over the last six years were some that the -- you know, the testimony on record was also, like, seeing the same thing.

And I conducted a literature review also, where I read some reports. I read some -- I read the Surgeon General's statement. I looked at Pew Research Center stuff, CDC stuff.

Like, those kind of research reports, which is -- which are suggesting that, you know, there's research and studies that show that these are the platforms that students are predominantly using.

So that's kind of, like, the

CONFIDENTIAL

Page 50

basis is sort of multifaceted, if you will.

Q.    So let's break those down by categories.

A.    Sure.

Q.    As I understand it, you mentioned four things.

Deposition transcripts from this case, right?

A.    Uh-huh.

Q.    A literature review that we'll get to later; that was another one, right?

A.    Okay.  Yes.

Q.    And then the other two were based on your consulting work, which was a combination of interviews with school leaders and direct observation, correct?

A.    Yes.

Q.    And so, then, just sort of interviews with school leaders, essentially what you're saying is they told you that their kids were using social media, right?

Page 51

ATTORNEY MEHRI:  Objection.

THE WITNESS:  That's partially what I'm saying, yes. It's not limited to that.

I'm also there when they're experiencing, like, their leadership responsibilities and observing how they handle different situations.

And there I see, like, there's a rather constant stream of workload that comes to the principals that involves -- has its genesis where something is going on on social media or is related to the kids' generalized anxiety about how they might appear on social media or what might happen or their concern about what happened previously, like the night before, something like that.

So a lot of this ends up being -- you know, a lot of it

Page 52

comes to the principal's office or a lot of it is the principals working with their staff on these issues for their students. Like, it's pretty pervasive.

BY ATTORNEY PISTILLI:

Q. So can you give me an example of an incident that you directly observed relating to social media?

A. There are lots of incidents where -- that I could describe. There's no one particular anecdote that's going to be illustrative of the entire pattern.

The pattern that I'm seeing is that -- this is -- this is multifaceted. It can't be, like, encapsulated in a particular story.

Because what we're seeing is that -- we're seeing that students' attention is really fragmented. It's not just the pull to check, but it's also the thought process that is going on, that students are seriously preoccupied by what's going on on social media. It's

Page 53

become part of the social fabric of their lives.

Students are often coming to school sleep deprived because of their compulsive use of social media.

And then instances get amplified on social media.  They get either started on social media or they get amplified by social media.  And students' preoccupation with their standing, their social standing, becomes part of -- sort of the fabric that is destabilizing schools.

Q.    If a student arrives tired or preoccupied, how do you know the reason they're tired or preoccupied?

A.    I think some people will ask them, certainly.  It would come out in the course of conversations that they have with their teachers or their counselors.

But that's -- again, that's not really, like -- my particular area of expertise is not to diagnose, like, those

Page 54

individual instances.

What I'm looking at is the way that the work of school leaders has changed and continues to change and is becoming more challenging because of these issues that are now, like, prevalent in the student body.

Q.    You told me that you've directly observed leaders responding to incidents involving social media.

Could you please describe one such incident for me?

ATTORNEY MEHRI:  Asked and answered.

THE WITNESS:  Yeah.  I mean, what inevitably is happening is when students are agitated and upset and they're in the principal's office and they're talking about what's going on, their -- much of what is happening with them is that they have social concerns.

I mean, that's really

particular to adolescents, right, the frontal cortex isn't yet developed, their interactions and relationships with their peers is of primary importance to them.

And their -- whatever it is that's going on, they feel, like, this sense of social accountability. They need to be responding really fast. Or they feel some kind of pull to -- to be involved so that they don't miss out.

Or if there's conflict happening, you know, then that gets exacerbated as well.

Students are also in a state of, I would say, like, a generalized anxiety. Like, there's this low-level humming anxiety within the fabric of the student body. It affects the schools because they're concerned about being evaluated, being,

Page 56

like, ranked.  They want their validation.  They're afraid somebody is going to expose them for something.

It's that underlying preoccupation that so often is permeating through whatever the issue is that the -- that the principal needs to intervene.

BY ATTORNEY PISTILLI:

Q.   But I'm -- I'm asking you a different question, sir.

I'm asking you to describe to me a specific instance where you observed a school leader responding to what you refer to as social media concerns.

ATTORNEY MEHRI:  Asked and answered.

THE WITNESS:  Yeah, it's not that I'm reluctant to share stories.  It's just that I don't -- that is not the point and it wasn't part of my report.

Page 57

So I feel like a particular -- a particular story, anecdote, is -- is not helpful to understanding the pattern and the way that the patterns, then, accumulate to having an adverse impact on schools.

BY ATTORNEY PISTILLI:

Q.    Well, you said you've directly observed instances involving social media during the time you've spent at schools, correct?

A.    Yeah.

Q.    And I would just like to understand what you've directly observed.

ATTORNEY MEHRI:  Asked and answered.

Go ahead.

THE WITNESS:  I appreciate that -- your desire to know that.

It's not contained in my report.  And those kind of descriptions come from the deposition testimony that you

already have.  There's lots of instances where notifications are interrupting instruction, where students are concerned and they're bringing up, like, emotional concerns to their counselors or their principals about things that are happening with their friends that are exacerbated on social media.

There's issues of complexity around limitations and personal device use interrupting instruction.  Teachers being frustrated about students' lack of attention span.

I mean, this is what's happening virtually in -- in my interactions with these school leaders pretty much all the time.

BY ATTORNEY PISTILLI:

Q.   Well, I'm trying to ask you a different question.  We'll get to what school leaders tell you.

I'm asking, you say you've observed personally instances in specific schools where specific individuals are responding to social media-related issues.

And I want to understand what your direct observations are.

ATTORNEY MEHRI: Objection. Mischaracterizes testimony.

But go ahead.

THE WITNESS: Yeah, so the -- what I'm reporting on here in my report is the patterns that I've observed across my work in supporting school leaders and school district leaders. Particular instances inform those patterns.

But what's prevalent, what is -- what's salient to me in my observation is how they pervade so much of the interactions that are going on between -- between students, among students, between

Page 60

students and staff that then end up having an impact on the leader's work.

This could be interactions between -- like, nonstop interactions between students and teachers about not checking.  It could be students who are feeling left out.  Students who are feeling exposed.  Students who are preoccupied with the validation that they're getting online.

All of this stuff gets untangled in the conversations that sometimes leaders have with students.

BY ATTORNEY PISTILLI:

Q.    It could be any of those things.

But I'm asking, which of those things have you directly observed?

A.    Oh, I've observed all of them frequently --

Q.    Sure. Please describe --

CONFIDENTIAL

Page 61

A.    -- across many, many different schools.

Q.    Please describe your direct observations.

A.    I think I'm trying to do that.

So in my work with school leaders and school district leaders, the purpose of my interaction with them is to try to strengthen their leadership.

I ask them about what their pressing problems of practice are.  I ask them about what kinds of issues are most pressing on them, where their biggest opportunities are.  And I couple those kind of conferencing conversations and interviews with observations of their leadership in action, like, in their school context.

And what I'm -- what I'm trying to describe to you, in response to your question, is that throughout those interactions, elements of incursion on time -- so schools and school leaders

Page 62

are -- school leaders and district leaders are feeling, like, the imperative to protect kids, to provide them safety emotionally and physically is really heightened.  And it's diverting their attention from some of their core responsibilities about improving teaching and learning or maintaining a positive school culture.

And it's because -- not because of any particular, like, one single incident.  It's because there's a cumulative effect of the generalized anxiety that is now woven into the social fabric of primarily adolescents but also children, children and adolescents.

So principals and superintendents and district leaders, they're telling me that this is becoming a time diversion, a resource strain in trying to meet all of these needs.

It's not incumbent in a particular incident.  It's a generalized pattern.

Page 63

Q.    Sitting here today, can you describe to me any specific incident that you directly observed involving social media in a school?

ATTORNEY MEHRI:  Asked and answered.

THE WITNESS:  I guess I -- I guess I couldn't necessarily, because, number one, the work that I'm doing with the school and school leaders, like, there's an element of trust and even confidentiality that enters into that conversation with them.

And, also, the instances where students are fighting and it comes down to something that happened on a platform or students are distracted, it comes down to something that happened on a platform, students are not sustaining their attention and it's frustrating teachers because they're not completing readings or

Page 64

assignments.  Students are coming worn out and sleep deprived to school and that's affecting their performance and interactions.  Or students are just not interacting, like, face-to-face with their peers or others.

It's pervasive, it's happening, like, all the time in schools.

BY ATTORNEY PISTILLI:

Q.   But you're unable to provide a single example of it happening, correct?

ATTORNEY MEHRI:  Objection. Asked and answered.

THE WITNESS:  It's that to look at a single example, I didn't -- I didn't go about preparing my report in trying to document or describe a bunch of different examples.

Other testimony does that. Like, the depositions from the --

Page 65

from the plaintiff districts, district leaders, they do that; they describe a lot of those particular anecdotes.

My -- what my report offers and what I'm offering here is a convergence of evidence that shows that the pervasive effects, like, the compulsive personal use of social media by the student body is imposing leadership -- it's imposing on leaders in their attempt to fulfill their responsibilities. And that that's happening on a widespread basis.

And my -- my pattern identification is over six years of being in schools and talking with lots of aspiring leaders and lots of school leaders.

No one anecdote will capture that or stand out or even -- or I would even be able to, like, accurately describe it right now

Page 66

sitting here.

BY ATTORNEY PISTILLI:

Q.    A pattern is made up of discrete instances, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  A pattern, to me, is when something reaches a point where it's predictable in nature.

So the patterns that we're seeing now that are predictable are these negative impacts on students, in terms of attention fragmentation and sleep deprivation and fear of missing out, all this stuff that is associated with their social media use, creating a generalized anxiety and destabilizing school district operations and imposing on school leaders so that their time is taken off task, off their mission and purpose of improving teaching and learning in order to

Page 67

deal with the mental health issues and the disruptions that occur as a result of the students' compulsive social media use.

BY ATTORNEY PISTILLI:

Q.    But you don't have a single instance of a negative impact that you directly observed that you can share with me today?

ATTORNEY MEHRI:    Asked and answered.

THE WITNESS:    Yeah, there are instances in my report that I included that I could look at now and share with you, if you want.

BY ATTORNEY PISTILLI:

Q.    Things that you personally directly observed in a school?

A.    I didn't include those in my report.    I --

Q.    Okay.    I'm asking, do you have any?

ATTORNEY MEHRI:    Asked and answered.

Page 68

THE WITNESS:  Yeah, I do think I answered that question already.

BY ATTORNEY PISTILLI:

Q.   And your answer was no, you can't, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  That mischaracterizes my answer.

BY ATTORNEY PISTILLI:

Q.   Sorry.  Please tell me what the negative instances are?

A.   I did already.  I -- so I'll say -- I'll say it again.

But the -- the negative instances are cumulative in effect.  You want me to describe a particular one. The research does that.  Other expert testimonies -- testimony does that.

I'm telling you that as I interact with aspiring leaders or school leaders, the overwhelming patterns are that there's a pervasive effect that -- that is present in the school community,

Page 69

in the student body that leaders are now needing to respond to.

So I'm not going to describe a particular incident. But I will tell you that when there's conflict among students, the conflict is exacerbated because of the interactions on social media. When students are feeling insecure or want attention, that's fueled by their need for validation, which is linked to their social media use.

Students' ability to focus on lessons and complete all their work is -- teachers are now saying is compromised because of their social media use.

All of that stuff shows up in my interactions with school district -- with school leaders and school district leaders.

Q. That's not something you've ever personally witnessed?

ATTORNEY MEHRI: Objection. Mischaracterizes testimony.

THE WITNESS:  You know, that is a mischaracterization.  Thank you.

As I stated before, I witness it, like, all the time when I'm in schools.

BY ATTORNEY PISTILLI:

Q.  Okay.  So tell me about one time that you witnessed it.

ATTORNEY MEHRI:  Asked and answered.

THE WITNESS:  Yeah, yeah.  I understand your insistence to try to boil this -- like, narrow this down to a particular instance so then we can talk about the nature of that instance and what is going on and who is at fault, I suppose.

But what I'm telling you is that the particular instances at this point, it's the -- it's the pervasiveness, the way that there's a social media saturation that's woven into the social

Page 71

fabric of teens and adolescents; it's affecting their mental health on a -- on a two-scale basis in schools.

And what I see, because my work is really with school leaders and trying to strengthen their leadership, I see that this is imposing constraints and impositions on their leadership time and their leadership capacity to fulfill their -- their primary duties.

BY ATTORNEY PISTILLI:

Q. So it's pervasive, but you're unwilling tell a jury about one single instance when it's happened that you've personally observed?

ATTORNEY MEHRI: Objection.

THE WITNESS: I think there's -- I think there's ample testimony already on record from the school districts who were deposed that describe specific

instances.

BY ATTORNEY PISTILLI:

Q.   I'm asking about what you've witnessed in schools.

A.   Yeah.  I understand that's what you're asking.  And I'm really trying to answer your question.

What I see in schools mirrors what the testimony on record is saying about specific instances.  So -- and I've described them in terms of students' attention and it frustrating teachers, conflict among students being exacerbated, students' sort of self-esteem and self-concept being -- being compulsively linked to, like, how much validation they're getting on the social media platforms.

And that this is underlying what is interrupting and intervening in the leaders' work.  It's also creating resource allocation issues at the district level.

Q.   I'm going to go back to what

Page 73

we were talking about earlier.

You agree that there are lots of things that kids can do on a phone, right?  We talked about a lot of them?

A.   Yeah.  You named a whole bunch of things that a phone could be used for.  And then I don't recall exactly our conversation there.

But I did note that the social media platform use has a different quality.  Like, there's a different level of engagement that, although I'm not an expert in the features, I understand is attributable to the features in the platforms themselves.

Q.   If a teacher sees a student on their phone during class, they don't know what they're doing on their phone, right, if they're standing in the front of the classroom?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yeah, I can't answer that.  Like, sometimes

Page 74

teachers circulate and they actually look at what's on the phones. Sometimes they have interactions with the kid and what exactly they were doing comes out.

BY ATTORNEY PISTILLI:

Q. I mean, I've got my phone right here, you can't tell what app I'm using, right?

A. Obviously, I can't see the screen on your phone.

Q. And if a teacher is standing in front of a student they, similarly, can't see the screen on the phone, right?

ATTORNEY MEHRI: Objection.

THE WITNESS: So I don't know if you've been in -- in classrooms, but teachers, one practice that they frequently use that's pretty common in teaching is circulating.

So, yeah, sometimes teachers are in the front of the room and in that case, I suppose they

Page 75

wouldn't be able to see what's on student devices.  But oftentimes they're circulating, and they can.

BY ATTORNEY PISTILLI:

Q.    But unless they're directly looking at the screen, they don't know what the kid is doing?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I don't -- like, this is -- this is -- I don't have an opinion about that. Like, that's not what I'm writing about here or what I'm here to testify to.

I've been in lots of classrooms, and oftentimes teachers know what the students are doing even if they can't directly see what's in front of them.

Teachers tend to know their students and have insight into what they're doing in their class.

BY ATTORNEY PISTILLI:

Page 76

Q.    You've been paid by the plaintiffs to provide opinions in this case, right?

A.    Yes.

Q.    How did you first become involved in this litigation?

A.    I first got contacted by -- I think it's called Rubin Anders.  So they contacted me to ask if I might be interested.

Q.    Is that, like, a search firm or law firm?

A.    I don't -- I'm not exactly sure.  My understanding is they, like, find expert witnesses for cases.

But this is my first time doing this.  So I don't really know how that works.

Q.    And when were you contacted?

A.    I was contacted in summer, sometime summer of 2024 initially.

Q.    Summer of 2024?

A.    Yeah.

Q.    And when did you actually

become retained?

A.    In, I think it was, late March of 2025.

Q.    So you weren't retained until March of 2025?

A.    Yeah.  Yes.

Q.    And between the summer of 2024 and 2025, were you in any way involved in these matters?

A.    No, I was not.  I had an initial conversation with Rubin Anders and a conference call.  And then I didn't hear anything until January.  And then I didn't hear anything until March.

Q.    Who was involved in the conference call in 2024?

A.    I don't exactly -- I think Tyler Garden -- is Tyler's last name Garden?  And Melissa Yeates.  I think they were the two people that I talked to.

But I'm not exactly sure.

Q.    And then what -- there was another contact in January of 2025?

Page 78

A. Yeah. Early -- early January, somewhere, like, New Year's or the day after, Rubin Anders, they let me know that the -- the plaintiffs' side was, like, all set.

So I interpreted that as, you know, they don't need me, and I won't be working on it.

Q. And then they contacted you again in March of 2025?

A. Yes.

Q. And what specific opinions were you asked to provide?

A. I wasn't asked to provide any specific opinions.

Q. What were you asked to do?

A. I was asked to -- to generate an expert report that would give my perspective and opinions about the effects of social media use by students on educational leaders.

So the scope was kind of, like, describing what educational leaders do and then describing whether --

CONFIDENTIAL

Page 79

how what they do is affected by social media use.

Q.    And you were asked to be an independent expert, right?

A.    I don't -- what does that mean?

Q.    Well, were -- what do -- what do you understand your role as an expert to be?

A.    I think I just described it.

So to offer my expert opinion of the work that leaders do in schools and school districts and how social media is impacting that, their responsibilities, their ability to fulfill their duties.

Q.    And when you approached that task, were you approaching it with a view toward helping the plaintiffs in these cases?

A.    I was approaching it as a view towards taking on a task such that I would be able to reflect on my experiences, look at the deposition

testimony, and do a literature review to better understand, like, what are the interactions here, what is -- what is going on?

Q. Did you come to that task with preconceived notions?

A. The -- the patterns that I had been seeing in schools and school districts did lead me to wonder what is going on, in terms of student social media use.

Q. But you were attempting to reach objective and unbiased conclusions, right?

A. I was, based on -- based on these convergence of evidence that I described before, yeah.

Q. Right. And when you were retained in March of 2025, you weren't rooting for either side, right?

A. Was I rooting for either side? No, I didn't think of it in terms of rooting for either side.

ATTORNEY PISTILLI: If we

Page 81

can pull up Tab 3, please.

- - -

(Whereupon, Exhibit
Osborne-2, No Bates, 1/8/25
E-mail, Osborne to Kennedy, was
marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q. Do you recognize this e-mail, sir?

ATTORNEY PISTILLI: We can mark this as Exhibit-2.

THE WITNESS: Yes, I recognize this e-mail.

BY ATTORNEY PISTILLI:

Q. This is an e-mail from you to attorneys at the Covington and Burling law firm, correct?

A. Yes.

Q. And you stated in that e-mail in January of 2025 that you are, quote, rooting for the other guys, right?

A. I did put that in this e-mail, yeah.

Page 82

ATTORNEY PISTILLI:  Is this a good time for a break?

VIDEO TECHNICIAN:  The time is 10:16 a.m.  We are going off the record.  This is the end of Media 1.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 10:31 a.m.  We are going back on the record.  This is the beginning of Media 2.

BY ATTORNEY PISTILLI:

Q.    Dr. Osborne, what are your current sources of income?

A.    My current sources of income are the work that I'm doing for this case, obviously, my role at Lehigh's College of Education as a professor of practice, and then some consulting income from different school districts.

Q.    And what were your sources

of income last year?

A.   My sources of income last year were Lehigh College of Education position as a professor of practice, and some consulting earnings from a few different school districts.

Q.   And for this year, approximately what percentage of your earnings come from your work on this litigation?

A.   Oh, I don't know.  It's not over yet.

Q.   So far this year.

A.   So far what percentage?

Q.   Yes.

A.   I don't -- I don't know exactly.  I'd need to calculate it out.  Like, I'm not -- I'm not sure.

Q.   You're getting paid $465 per hour for your work for plaintiffs in this litigation?

A.   No.

Q.   How much are you getting paid?

Page 84

A.      $300 per hour.

- - -

(Whereupon, Exhibit Osborne-3, No Bates, Invoices, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I'm handing you what's been marked as Exhibit-3, which is Tab 72.

ATTORNEY PISTILLI:  We'll go ahead and mark this as Exhibit-3.

BY ATTORNEY PISTILLI:

Q.    Do you recognize Exhibit-3?

A.    Yes.

Q.    Do you see a rate listed there of $465 per hour?

A.    I do.

Q.    Is that your rate for this litigation?

A.    No.

Q.    Do you understand that plaintiffs are paying $465 per hour for your time in this litigation?

ATTORNEY MEHRI:  Objection.

CONFIDENTIAL

Page 85

THE WITNESS:  That's my assumption, looking at this invoice.

BY ATTORNEY PISTILLI:

Q.    But you personally are only getting $300 per hour; that's your testimony?

A.    Yes, that's correct.

Q.    And approximately how many hours have you worked on this litigation during the 2025 calendar year to date?

A.    I don't know.  There's -- there aren't totals of hours on this.  So I'd -- I'd have to add them all up.

Q.    We -- we may come back to this.

What's your compensation from Lehigh for a year, approximately?

A.    You're asking how much I get paid by Lehigh?

Q.    Yes.

A.    I don't know the exact number. ██████ █ ██ ██ █ ████████ I think.

Q.    And approximately how much have you made from private consulting work this year, other than work on this litigation?

A.    What do you mean by "this year"?

Q.    Calendar year 2025 to date.

A.    I don't know.

Q.    More or less than what you've made from Lehigh?

A.    Less.

Q.    Less than $100,000?

A.    Yes.  The earnings so far this year, less than $100,000 for sure. Yeah.

Q.    Less than $50,000?

A.    I don't -- I don't know.

That's retrievable if it's important to know.  I can find out.

Q.    Sure.  That would be great. Thank you.

Your CV notes that you're an associate editor of the American Association of School Administrators; is

Page 87

that right?

A.    Not exactly.  I've become editor, and I guess I didn't update my CV with that.  I became editor starting in July, I guess.

Q.    You were previously on the editorial review board?

A.    No.

Q.    No?  Just what is your -- you're currently editor of the -- strike that.

You said you became an editor starting in July.

Did you have a role with that organization prior to July?

A.    With the Journal of Scholarship & Practice --

Q.    Yes.

A.    -- at AASA?

Yes.  Prior to July, I was associate editor.

Q.    Okay.  And you're also on the editorial review board of the AASA Journal of Scholarship & Practice; is

that right?

A. Oh, that's -- yes.

Q. And what is the Journal of Scholarship & Practice?

A. The Journal of Scholarship & Practice is a quarterly publication by AASA, which is the National Superintendents Association.

It's a peer-reviewed journal that publishes articles that are submitted from researchers for publication and are of interest to a superintendent audience.

Q. It includes articles about challenges facing schools and educators?

ATTORNEY MEHRI: Objection.

THE WITNESS: Yeah, I think you could say that. It includes research products from people who are researching in education and submitted to be published in the journal.

ATTORNEY PISTILLI: Let's take a look at Tab 4.

Page 89

- - -

(Whereupon, Exhibit Osborne-4, No Bates, Promoting Equity in the Modern Superintendency, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    Do you recognize Tab 4, which we can mark as Exhibit-4?

A.    What I'm seeing here looks like an article from fall 2021 of the Journal of Scholarship & Practice.

Q.    And this was --

A.    Give me -- give me a moment.

Q.    This is an article that was published in the AASA Journal of Scholarship & Practice while you were on the editorial board, right?

A.    I'm just familiarizing myself.

I don't recall when I joined the editorial board.  Let me look at my CV.  But it may be.

Page 90

Okay.  Yeah, I started in 2019.  So I started on the editorial board in 2019, yes.  So this would have been published while I was on the editorial board, correct.

Q.    Do you recognize this article?

A.    No.  I'm just familiarizing myself now.

Q.    Do you know the authors of the article?

A.    I don't think so.

Q.    And this article that your journal published was based on results from the American Superintendent 2020 Decennial Study, correct?

A.    Sorry, I'm trying to -- I'm just seeing this for the first time, so it will just take me a minute.  I need to go back now and see what it says here.

It does reference the American Superintendent 2020 Decennial Study.

And so it says here that, in

Page 91

this article, We endeavor to take another look at the data from the American Superintendent 2020 Decennial Study using equity as a lens to reexamine the data set.  We will describe the findings from the decennial study, but in the discussion compare and contrast those to the systemic levels of inequity as posited by Radd, Generett, Gooden and Theoharris.  Additionally, using the framework for action, we will discuss how superintendents might go -- might best go about promoting equity and building support for equitable practices in their districts.

So that paragraph is, like, at the end of, I guess, what you would call the introduction here.

Q.    Sure.  And just looking with me at the abstract if you would.

Do you see where it says, The article focuses on how equity operates within and around issues of community relations and social media and

Page 92

further considers the extent to which these issues help obfuscate -- help or obfuscate promoting equity and the benefits and banes of superintendents attempting to do so.

Do you see that?

A.    Yes.  You read that from the abstract.

Q.    And so this article considers whether social media helps promote equity?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  So I haven't had a chance to read the whole article.  So I can't really comment on that.  But if you give me a minute, I'll -- I can -- I can familiarize myself.

I don't draw that conclusion, necessarily, from, like, the abstract that you read, that that's, like, the point of the article.  I don't think that is -- that's the point.

Page 93

But, like I said, I haven't -- I don't know this article. So give me a minute.

BY ATTORNEY PISTILLI:

Q.   Maybe I can help. If we take a look at Page 16 on the screen.

Do you see where the article says, More than three out of five superintendents urged principals and teachers to maintain social media accounts to communicate with parents and students?

A.   I'm getting there. Hang on.

This is 16? I see, you've highlighted it here. Let me just get the context.

I see. So the article is --

ATTORNEY MEHRI: Is there a question pending?

THE WITNESS: Oh. I beg your pardon.

BY ATTORNEY PISTILLI:

Q.   If you wanted to share something about the article, please go

Page 94

ahead.

A.    No.  I'd rather be responsive to your questions.

Q.    Sure.

So do you understand that this article is reporting that the majority of America's superintendents reported that social media was a valuable communication tool?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I see here that the article is examining -- and I still haven't read the whole thing.  I haven't had time to read the whole thing.

But the article is looking at ways that superintendents address equity as an issue in their school communities.  And among the many strategies that it seems to describe in this article, one is the intentional, institutional, curated use of social media accounts by

Page 95

educational leaders as a communication tool with parents and students.

I do see -- I do see that, yes.

BY ATTORNEY PISTILLI:

Q.    And, in fact, three out of five superintendents were advocating for the use of social media accounts to communicate with parents and students, right?

A.    There --

ATTORNEY MEHRI:  Objection. Go ahead.

THE WITNESS:  Sure.  What this article is reporting -- and, again, I haven't had time to read the whole thing or examine its basis.

The members of the editorial review board don't read all the articles.  That's not the role of that position.

But now reading it in part

here and seeing the part that you've highlighted, I think what you're pointing out is that superintendents encourage principals to use social media as a communications tool.

And that does -- that does comport with what I've -- that does comport with an element of my report.

ATTORNEY PISTILLI:  Let's take a look at Tab 6.

- - -

(Whereupon, Exhibit Osborne-5, No Bates, Pioneering Use of Technology Transforms Teaching in New York Schools, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I'm handing you what's been marked as Exhibit-5.

A.    Thank you.

Q.    Do you recognize Exhibit-5?

Page 97

A.    Hang on.  Not immediately.

Yes.  This was a long time ago.  Yes, I recognize Exhibit-5.

Well, hang on.  I recognize this first page.

ATTORNEY MEHRI:  Chris, just a quick question.  Did you mean to mark the back half of this with all these photos?

ATTORNEY PISTILLI:  I think that's probably just the complete document as it printed.

ATTORNEY MEHRI:  Okay.  It seems to have a different date.  Like, the first few pages say 129 -- oh, those are Bates numbers.  Okay.  I just wanted to check that's what you intended.

BY ATTORNEY PISTILLI:

Q.    Dr. Osborne, this is an article you wrote entitled, Pioneering Use of Technology Transforms Teaching in New York Schools, right?

A.    The first three pages is

Page 98

that, yes.  I don't recognize the rest.

Q.    And in this article, you advocate for integrating technology in the classroom, correct?

A.    Give me a minute.  This was, like, ten years ago.  So I want to be accurate about what I said here.

Okay.  Yes.  This is -- I wrote this in 2015.

Q.    Right.  And in 2015, before you were hired by plaintiffs as an expert, you advocated for integrating technology into American classrooms, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  That's -- that's accurate.  I did do that in this article, and in other roles that I held as well.

There was good reason to believe that the educational benefits in 2015 would be transformative for learning and education and that one of the

Page 99

primary equity concerns was addressing the digital divide.

And as superintendent, what I'm describing -- what I'm describing in this article is how, as superintendent, we increased Internet access in our schools and in the areas surrounding our schools. And that would have been in the '14/'15 school year.

BY ATTORNEY PISTILLI:

Q. And you also advocated for reinforcing ways to harness the powerful resources for learning that exist in the increasingly technology-rich world, right?

A. Sorry. Where are you looking here?

Q. The last sentence of your article.

A. The last sentence.

What's your question?

Q. So you advocated, before you were hired as an expert in this

Page 100

litigation, for harnessing the powerful resources for learning that exist in the increasingly technology-rich world, right?

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  Yes.

ATTORNEY PISTILLI:  Let's go ahead and take a look at Tab 9.

-   -   -

(Whereupon, Exhibit Osborne-6, No Bates, Materials Considered List, was marked for identification.)

-   -   -

BY ATTORNEY PISTILLI:

Q.    I'm handing you a document that's been marked as Exhibit-6.

Do you recognize this document?

A.    Yes.  This is the materials considered list.

Q.    Who generated this list?

A.    I generated this list.

Q.    How did you determine which documents to include on this list?

A.    Okay.  So the documents I included in this list came from -- oh, I see.

I included on this list documents that I accessed or skimmed or looked at when I was generating the report.  Some of them might not have gotten into the citations, but I did look at them.

Q.    And is this a complete list of all the materials you considered in forming your opinions?

A.    Yes, to the best of my knowledge, it is -- should be, yeah.

Q.    How did you go about deciding which documents to review for purposes of drafting your report?

A.    For purposes of drafting my report, I found documents mostly using Google Scholar.  I put in keywords.

I mean, some of them I knew and I was familiar with.  So I wanted to

establish, like, a baseline understanding of what school leader and superintendents' responsibilities were.

So I went to documents that I understood to be, like, source documents for that. For example, the -- like, the National Standards documents.

And then for the ones that were, you know, more outside the scope of my experience but that I wanted to learn about for purposes of understanding better how social media impacts the work of leaders and schools, I did a search using Google Scholar.

Q. Because that was not previously within the scope of your experience?

ATTORNEY MEHRI: Objection.

THE WITNESS: I don't know what you mean by that.

BY ATTORNEY PISTILLI:

Q. You referred to those as -- that as a topic that was more outside the scope of your experience that you wanted

Page 103

to learn about, correct?

A.    The -- I wanted to do a literature review to understand better what the impact of the design features of the platforms were, you know, like, what the harms were.

And what I learned from the literature -- much of what I learned from the literature, there was a convergence with the experience that I was having as I interacted with educational leaders on a regular basis over those six years and even back to when I was superintendent in New Rochelle.

Like, much of the frustrations and the impact that I was seeing in the schools or that was reported to me by school leaders or part of my interaction with them as I developed, worked -- endeavored to develop their leadership effectiveness, the literature review, then, added to my knowledge base, sort of insight into some of the design of the features and how the

CONFIDENTIAL

Page 104

features were, basically, intentionally engineered to prolong students' engagement on the platforms. So that was one convergence also.

And then the -- there's a long list of depositions considered here. And I skimmed a lot of these. I didn't read them all carefully.

But I looked at the specific kind of instances that the school district representatives were testifying to. And what I found was that the experience that I had and the patterns that I recognized and the literature and the reports from, like, the Surgeon General, that kind of thing, and the testimony on record were all converging in ways that really provided sort of, like, a reflection of or even validation of what I was seeing school leaders dealing with.

So that's why I did the literature review. Because up until doing the literature review, I wasn't,

like, really well informed about the linkages between the platform features and the students' compulsive personal use of social media that I knew was having a big impact on schools.

But the convergence of these things sort of formed the basis for the opinions that I offered in my report.

Q. Right. But just so we're clear, you referred to needing to do the literature review because it was outside the scope of your experience.

And you were referring, then, to the impact of platform design on students, correct?

A. Yeah. I guess what I meant to say was outside my expertise. And because I hadn't -- up until, really, doing this literature review, I hadn't read much of the peer-reviewed literature that shows that the features in the social media platforms are heavily linked to students' compulsive use of social media.

What I -- what that did for my understanding was validate a lot of the interactions that I had with school leaders. Like, oh, no wonder they're having such a problem with this. Like, I knew the problem was there and existed, you could see it in the work that the school leaders were doing.

But the understanding of the specific intentional design features was something that really came out of the literature for me.

Q. Right. But just so we're clear, you're not here today as an expert in platform design, right? We already agreed to that?

A. Oh, yes. I'm not an expert in the platform design.

Like, I -- I read literature from people who researched this. That would not make me an expert. But it would make me have, like, some knowledge into some of those linkages that they found in their research.

CONFIDENTIAL

Q.    So getting back to your materials considered list.

Did you request any documents from plaintiffs' counsel?

A.    Yeah.  I requested the -- the depositions.  Because I thought it would be good for me to see what the school and school district leaders were putting on the record as a way to sort of triangulate what I was seeing in my interactions with school leaders and my direct observations of schools and then what they were reporting, as well as sort of what the -- what the literature was showing.

So that -- that triangulation or convergence, like, the way that those sort of streams of evidence and knowledge came together for me is what led to the opinions in my report.

Q.    Did you request any primary documents from the school districts?

ATTORNEY MEHRI:  Objection.

Page 108

THE WITNESS: What are primary documents?

BY ATTORNEY PISTILLI:

Q. Rather than deposition testimony, actual documents produced by the school districts.

ATTORNEY MEHRI: Objection. Go ahead.

THE WITNESS: What do you mean?

BY ATTORNEY PISTILLI:

Q. So you're aware that, for instance, school districts have annual budgeting processes and, you know, publish various documents around that, right?

A. Oh, yes.

Q. Yes.

And they have policy and procedure documents?

A. Yes.

Q. Did you request any of those sorts of materials for any of the school district plaintiffs?

Page 109

A.    No.  I didn't think that that was necessary.

Q.    Were there any documents you asked the plaintiffs' lawyers for that they didn't give you?

A.    I don't think so.  Not that I recall.

ATTORNEY PISTILLI:  Let's take a look at Tab 10.

- - -

(Whereupon, Exhibit Osborne-7, No Bates, 5/16/25 Expert Report of Brian G. Osborne, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I'm handing you what we're marking as Exhibit-7.

Is Exhibit-7 a copy of the report you submitted in this case?

A.    Yes, it appears so.

Q.    You submitted this report on May 16, 2025?

A.    Yes.

Q. And is there anything in your report that you need to correct?

A. There is. There are a couple of places where I found that the references, the citation text itself is -- is incorrect.

Q. What are those?

A. I don't remember exactly. But there's a couple -- there's a couple, like, places where there's a year wrong or the author's name is wrong or something like that.

But other than that, the opinions in the text of the report, I stand by that.

- - -

(Whereupon, Exhibit Osborne-8, No Bates, 7/30/25 Rebuttal Expert Report of Brian G. Osborne, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q. I'm going to hand you what

has been marked as Exhibit-8, which is Tab 11.

A.    Thank you.

Q.    Is this the rebuttal report that you submitted in this litigation?

A.    This is my reply to the 13 rebuttal reports, yes.

Q.    And you submitted this on July 30 of 2025?

A.    Yes.

Q.    Anything you need to amend or correct in this report?

A.    I don't think so, no.

Q.    Did you author these reports yourself?

A.    Yes.

Q.    Did anyone assist you in the drafting of the reports?

A.    No.

Q.    Did the lawyers play any role in the drafting process?

A.    They did not -- some light editing.

Q.    Is there any opinion that

Page 112

you currently plan to offer at trial
that's not contained in your two reports?

A.    No.

Q.    Let's go back to your
opening report, Tab 10, Exhibit-7, and
take a look at Page 5.

A.    Okay.

Q.    Do you see where you wrote,
In preparing this report, I relied on a
combination of professional expertise,
field-based knowledge, review of relevant
materials and current research in
educational leadership, educational
operations and student well-being?

Do you see that?

A.    Yes.

Q.    And does that accurately
describe the methodology you used in your
reports?

A.    It's not a complete
explanation of the methodology.  But that
is the sources that I used, yes.

Q.    Well, let's take a look at
the different sources you list.

Page 113

You say you consulted peer-reviewed studies, national surveys, professional standards documents, such as PSEL, and public reporting from organizations like the Pew Research Center.  These resources confirmed and contextualized my experience in the field.

Do you see that in Paragraph 18?

A.    That's Paragraph 18?

Yes, I see that.

Q.    And are those the public sources that you reviewed to form your opinions in this case?

A.    Yes.

Q.    And those sources generally discuss national trends or general professional standards, right?

A.    Some of them do.

Q.    None of them are specific to any of the plaintiff school districts in this case, correct?

A.    Not to my knowledge, no.

Page 114

Q.     And in your original report, you don't discuss any potential alternative causes to the alleged harm on students in schools that you address in your report, correct?

A.     I think I do touch on that. One minute.  Let me find it.

Okay.  I must have done that in the other report.  Sorry to take all that time, but I thought I had it here.

Okay.  Thanks for letting me look through this.  I think I was thinking of the -- of the reply.

Q.     So in forming your opinions that you offered in your opening report, you don't consider any potential alternative causes, correct?

A.     I was --

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  Sorry.

I was looking at the --

specifically, I was looking at the impact of compulsive personal

social media use by students.

That was the -- sort of the scope of the task.

BY ATTORNEY PISTILLI:

Q.    Did the scope of the task understand -- involve understanding alleged mental health harms that school districts were dealing with?

A.    Sorry, would you ask me that again?

Q.    Sure.

Did the scope of your assignment include looking at alleged mental health harms that the plaintiff school districts were experiencing and responding to?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  In -- in part. But the scope was about the students' compulsive personal use of social media and its impact on the work of school leaders and school district leaders.

BY ATTORNEY PISTILLI:

Q.    Are you offering any opinions that student mental health harms have impacted schools and school leaders?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yes, I think so.

Opinion 1 is the emotionally destabilizing effects of social media, particularly students' compulsive use -- oh, wait, this may be more.

I think this is -- the emotional destabilizing effects of social media, particularly students' compulsive use, fear of exposure, exclusion or public shaming are now shaping behavior and mental health in ways that fundamentally disrupt school operations, school climate, and the educational experience.

So that's the first opinion that I offer.  And I think you're asking me if I offer an opinion

about how mental health is affecting school district operations or school leaders or, like, the other things that I looked at.

BY ATTORNEY PISTILLI:

Q. Yes. I'm asking, are you offering the opinion that schools have been impacted as a result of student mental health harms?

ATTORNEY MEHRI: Asked and answered.

THE WITNESS: Yeah. I mean, I'm happy to read this again, if you want. This is my opinion. The text is here.

BY ATTORNEY PISTILLI:

Q. And your opinion refers to behavioral and -- and mental health issues.

And so my question is whether you made any effort to determine whether it was, in fact, social media causing the behavioral and mental health

Page 118

issues as opposed to any potential other causes of behavioral and mental health issues?

A.     That was a really long question.  Would you, like, help me understand your question?

Q.     Sure.

So did you consider whether, in fact, any behavioral and mental health issues that were impacting school districts were, in fact, caused by something other than social media in the course of forming your opinions in this case?

A.     I see.

I looked at the impact of the students' compulsive personal social media use on school district operations and on the work of leaders.  And in the -- in the reading that I did from the research literature, in the examination of testimony on the record from school district and school leaders, and in my own interactions with lots and lots of

school leaders or aspiring school leaders or district leaders over the course of the last six years, it's clear to me that the mental health harms and the impact on school district operations that is attributable to the students' compulsive social media use is a specific, unique, qualitatively different problem than many of the others that form the context in which public education functions.

So while your question is, did I consider other factors. I mean, it's always in my work, other factors. But the scope of this was about social media use.

And as I wrote in my reply, the social media use is of a different quality than many of the other factors that the rebuttal reports -- reports took great pains to identify.

It's unique in its effect on the student body and on school operations. It also exacerbates, basically, all the other problems that

you're likely to name next.

And unlike many of the other ills that students face and that create issues for schools and school districts, the prolonged engagement leading to compulsive use of social media is predictable by design and known.

So that's -- yeah.  That's my answer to your question.

Q.    How do you know that social media is unique if your methodology didn't involve even considering other potential causes of student mental health issues?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I think that mischaracterizes my methodology.

One part of my methodology was doing a literature review. And you asked how I found the literature.  I told you that I used Google Scholar, and I looked for research articles that were about student mental health and

social media so that I could understand that interaction.

But there's other parts of my methodology that inform my opinion, my claim that the compulsive personal use of social media by students is creating new harms to school district operations and the work of school leaders, as well as exacerbating other problems that exist in the context of public education.

And that part of the methodology comes from -- largely from my experience of interacting with school and school district leaders, a career of working on improving educational outcomes for all students, as well as my reading of the testimony on record.

BY ATTORNEY PISTILLI:

Q.    Let's take a look at Paragraph 15 of your report.

Page 122

Sorry.  My apologies. Let's -- if we could switch over to Exhibit-8, let's take a look at Paragraph 15 of your rebuttal report.

And this, again, is a portion of your report describing your methodology, correct?

A.   This describes a bit about the -- my approach to the leadership advising I do in my capacity as a teacher of graduate students who are aspiring leaders or the direct support that I provide, usually as an executive coach or a provider of professional development for new leaders, or, sometimes, leaders who are -- who are struggling with different issues.

That's what -- that's what this describes here, as opposed to my methodology for the report as a whole.

Q.   So just so I'm clear, you're saying this describes the methodology that you use in your professional consulting work, correct?

Page 123

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yeah, so the beginning of the paragraph says, This kind of leadership advising.

And the "this kind of leadership advising" is a reference back to the prior paragraph where I put, Overall, I have substantial experience working directly with the school and school district -- with school and district leaders to navigate real-world educational challenges.

And I added this here because the work that I do when I'm supporting those school and district leaders is not haphazard. It is dependent on methodology that is core to the field of educational leadership study, even though my role as a practitioner and not an academic is not to produce research studies but, rather, to try to help the leader

Page 124

who I'm working with directly.

Nevertheless, I draw from a tradition of methodology that is well established in the field of study of educational leadership.

BY ATTORNEY PISTILLI:

Q.    And is that same methodology that you rely on in working with school districts the methodology and experience that you are bringing to bear in forming your opinions in this case?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yes, in part. I think I described before how the evidence based -- base that leads to my opinions is really a convergence of, essentially, four different things.

One is my experience as a superintendent -- well, as an educator and, in part, a superintendent.

Second, the work that I do as an educational consultant,

especially in my capacity as executive coach but also other -- other related work.

Third, the literature review that I did after being prompted to -- to engage in this task for this case.

And, fourth, the testimony on record from school and school district leaders.

These things converged in a way that leads to a reliability and a rigor and resulted in my -- in the opinions that I offered in my report.

BY ATTORNEY PISTILLI:

Q.    Sure.  And when you are serving as a consultant to school districts, the structured approach that you employ draws from data when available, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I suppose when relevant.  Like, it depends on

what the school district leader is grappling with.

So if a school district leader is needing to plan some professional development that's data informed or present results that are based on data, then they may want me to provide support to them in their engagement with that data.

So that's a way in which I guess what you're calling data would be -- would be used.

I would also call data the -- my direct observations of the context in which the leader is working. So my executive coaching is not only one-on-one conferencing with the leader, but I want to make sure that I get a fuller picture by coupling that with direct observations of their leadership and practice.

And that kind of

triangulation, if you will, is part of the discipline of study of educational leadership.

BY ATTORNEY PISTILLI:

Q.    In Paragraph 15 of your rebuttal report you wrote, I use a structured approach that draws from data when available, such as survey feedback, district documents, correct?

A.    It does say that, yes.

Q.    And that's an accurate description of the work that you do advising school leaders and school districts, correct?

A.    It -- it can be a part, yes.

So the structured approach that I'm trying to describe here, it may vary by context, but it includes sort of multiple ways of interacting with that school leader, understanding the context that the district is in.

So if a superintendent is considering a policy change on something that would have -- that would impact on

Page 128

the entire community, then they might collect survey feedback about that. And I would engage with that leader to look at their -- their documents, like, what does their policy say? What does the survey say? What are their people saying across the schools? Like, what do the teachers say? What does the teachers' union say? So that they're collecting a variety of perspectives and data on whatever the particular problem or practice is that they're trying to address.

Q. Right. Because district documents that shed light on the issues a school district is confronting are relevant to the work you do in consulting, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: Often, yes.

BY ATTORNEY PISTILLI:

Q. Are you aware that the six bellwether school district plaintiffs in this case have produced nearly 900,000

documents in this litigation?

A. No. That's a lot of documents. No, I wasn't aware.

Q. And you reviewed zero of them; is that right?

A. I didn't see it as necessary for my role in the -- in producing my opinions.

Q. Let's go back to Exhibit-7, if we could. Take a look at Paragraph 65 on Page 18, if you would.

Do you see where you wrote, The mental health toll on young people caused by social media use has resulted in student emotional needs that, in many schools, overwhelm the capacity of school-based mental health providers, who often serve as the primary providers of youth mental health services?

Do you see that?

A. I do.

Q. But you don't know how many school-based mental health providers any of the six bellwether school districts

Page 130

have, right?

A.   I do not know that specific information, no.

Q.   You haven't reviewed any documents relating to the school-based mental health providers at any of the six bellwether plaintiff districts, correct?

A.   I didn't see that as necessary to my task.

Q.   So, then, I take it you're not offering an opinion that the capacity of school-based mental health providers in any of the six plaintiff districts have been overwhelmed, correct?

ATTORNEY MEHRI:  Objection. Asked and answered.

THE WITNESS:  What I'm offering is an opinion that this is common to schools.  It's common to the schools that I've seen in my interactions with school leaders and visits to schools.

It appears in the literature.  And it is also

evident in the testimony on record.

So as to the specifics of those particular schools, as I already said, I didn't review those specifics. But there is a generalized pattern that is unmistakable that the mental health providers in the school are often maxed out because of the mental health issues that the research shows are clearly linked to the students' compulsive personal use of social media.

BY ATTORNEY PISTILLI:

Q. But just to -- to make sure it's clear to the jury, whether that general trend is true at any of the six specific plaintiffs in this case, that's not something you looked at?

ATTORNEY MEHRI: Objection. Mischaracterizes the testimony.

THE WITNESS: That isn't something that I looked at. It

would be a supposition.

The prevalence is undeniable across schools.  So although it would be supposition, it would not be surprising if that is the case.

And testimony on the record, I think from others, may demonstrate that that is so.

BY ATTORNEY PISTILLI:

Q.    But for you, it would just be a supposition?

A.    It wasn't --

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Sorry.

It wasn't within the scope of the task that I took on.

ATTORNEY PISTILLI:  Let's take another quick break.

VIDEO TECHNICIAN:  The time is 11:34 a.m.  This is the end of Media 2, and we are going off the record.

- - -

(Whereupon, a brief recess

was taken.)

- - -

VIDEO TECHNICIAN:  The time is 11:50 a.m.  This is the beginning of Media 3, and we're going back on the record.

BY ATTORNEY PISTILLI:

Q.    If we could continue looking at Exhibit-7, Page 18, please.  And in particular, I'd draw your attention to Paragraph 66.

You wrote, Student social media use has led to attention span deficiencies that hinder learning objectives and negatively impact teacher morale.

Do you see that?

A.    Yes.

Q.    Did you look at any documents or data regarding teacher morale for any of the six plaintiff school districts?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  No, I didn't

look at documents pertaining to the six districts.  I didn't think it was necessary for the task.

BY ATTORNEY PISTILLI:

Q.    So you don't have any understanding as to teacher morale in those six specific districts, correct?

A.    My understanding of teacher morale is more general and draws from the sources of evidence that I've already cited.

Q.    None of which relate to the six specific plaintiffs, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  They -- you're asking if I looked at documents from the six plaintiff districts?

You've asked me several times.  I've answered the same way every time.  I didn't look at any of those documents.

You can keep asking me if you want.

BY ATTORNEY PISTILLI:

Q.    So any -- any opinions regarding teacher morale for the six specific districts would be a supposition on your part?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  It would be.

It's my understanding that plaintiffs have other experts that looked at district-specific data.

BY ATTORNEY PISTILLI:

Q.    Take a look now with me, if you would, at Paragraph 67.

You wrote, Third, routine discipline issues have escalated in both frequency and intensity.

Do you see that?

A.    I do.

Q.    Do you have a general understanding that school districts maintain documents and data regarding disciplinary issues?

A.    Schools and districts maintain documents regarding disciplinary issues, yes.

CONFIDENTIAL

Page 136

Q. And do you have an understanding as to whether any of the six plaintiffs maintain such documents?

A. Only insofar as they're public school entities; and in my experience, basically, a lot of them do to some extent.

Q. But you've not reviewed any documents or data from any of the six plaintiffs relating to discipline issues, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: No, I've not looked at any documents or data from the six school districts.

BY ATTORNEY PISTILLI:

Q. So as to those six districts specifically, you don't have any information regarding the frequency and intensity of disciplinary issues, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: From the six specific districts, I don't have

any direct information that is about those particular districts. I didn't see that as necessary for the task.

BY ATTORNEY PISTILLI:

Q.   And then in Paragraph 68, you reference bullying.

You also don't have any information about bullying for any of the six plaintiff school districts, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  My observations here and the opinions that I offer are generalized across public schools.  I don't have specific information regarding those instances in the six school districts.

I didn't review any documents of those districts.  I didn't think it was necessary for the task.

BY ATTORNEY PISTILLI:

Q.   So sitting here today, you

don't know whether social media has facilitated and amplified bullying for any of the six specific plaintiff school districts, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Looking at the effects of social media and its use on the six districts in particular was not within the scope of my task.

Rather, I looked at the impact of compulsive personal social media use by students on schools and the work that school leaders do, school and school district operations more generally.

BY ATTORNEY PISTILLI:

Q.  You don't know what work schools and school districts have done specifically at any of the six plaintiff school districts, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Correct.  As I

stated before, I didn't talk with anyone from those six districts. I didn't review any documents from those six districts. I didn't think that it was necessary for the task.

BY ATTORNEY PISTILLI:

Q. Sure. If we could turn to Page 21 and look at Paragraph 75.

You see where you wrote, These effects are not abstract. They manifest in schools every day through reduced student focus, escalating peer conflict, emotional dysregulation, and rising demand for mental health services.

Do you see that?

A. Yes. Well put.

Q. And am I correct that you didn't look at any documents or data relating to whether there's been reduced student focus at any of the six specific plaintiff school districts, correct?

A. That's right. I didn't look at whether there was any data regarding

reduced student focus at any of the six specific districts.

My report is more generalized than that. I didn't think looking at those specific districts was necessary for the task.

Q. So you don't know whether there is reduced student focus at any of the six specific plaintiff districts, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: What I know is that in schools there's a link between students' compulsive personal use of social media and reduced student focus and that that is a present reality in all the schools that I've worked in and the schools that my graduate students who are aspiring leaders work in.

BY ATTORNEY PISTILLI:

Q. But it would be supposition on your part to say that there was

CONFIDENTIAL

Page 141

reduced student focus specifically in any of those six districts, because you've never looked at any information relevant to that, correct?

ATTORNEY MEHRI:  Objection. Mischaracterizes the testimony.

THE WITNESS:  While it would not be a difficult extrapolation to make, I don't make it here.

BY ATTORNEY PISTILLI:

Q.    So you're not offering the opinion that there's reduced student focus, escalating peer conflict, emotional dysregulation at any of the six specific plaintiffs, correct?

A.    What I'm offering is that the effects of students' personal compulsive social media use manifest in schools every day through reduced student focus, escalating peer conflict, emotional dysregulation and rising demand for health services.

My claims are from the literature that I read, the testimony

that I reviewed, and my own experience as superintendent, as well as an educational consultant working in many schools of different types over a long period of time and interacting with many leaders and aspiring leaders within those school environments.

The research that I've read and the experience that I have did not, to my knowledge, specifically include the six districts.

The testimony that I reviewed may have. But I don't recall, because at that point I think I reviewed testimony from plaintiff districts that may not have been in the six.

Q. So let's focus for a minute on the rising demand for mental health services.

You didn't look at any documents or data relating to the demands for mental health services at any of the six plaintiff school districts, correct?

A. I did not look at documents

Page 143

related to the demand -- rising demand for mental health services in any of the six districts.  I didn't see that as necessary to the task.

Q.    So you don't have any basis, sitting here today, to say there is a rising demand at any of the six specific plaintiff school districts, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I didn't review any documents from the six districts.  I didn't interview any people from the six districts.  I can't claim specifically that there is a rise in demand for mental health services in the six districts.

What I can say is that based on my experience, my interactions with school leaders and aspiring school leaders, my review of the research and my reading of the testimony on record is that there's a convergence of evidence

that demonstrates rising demand for mental health services to meet the needs that are created by the students' compulsive use of social media that I understand, from the literature, is linked to the design features of the platforms.

And I can say that across the scope of evidence that I was considering to reach my opinions. I think it would not be hard to extrapolate that there is likely to be, in the six districts, a rising demand for mental health services.

But that was outside of the scope of what I looked at specifically, because I didn't think that it was necessary to the task.

BY ATTORNEY PISTILLI:

Q.    All right.  So just so it's clear to the jury, you can't claim that there is a rise in demand for mental

CONFIDENTIAL

Page 145

health services in the six districts, correct?

ATTORNEY MEHRI:   Objection. Asked and answered.

THE WITNESS:   I think I would answer the question the same way that I just did.

BY ATTORNEY PISTILLI:

Q.    If you could turn back to Page 17.  Take a look at Opinion 1.

Do you see where you write, The emotionally destabilizing effects of social media, particularly students' compulsive use, fear of exposure, exclusion or public shaming, are now shaping behavior and mental health in ways that fundamentally disrupt school operations, school climate and the educational experience.

Do you see that?

A.    I do.  Well put.

Q.    Did you look at any documents or data relating specifically to whether and to what extent students in

any of the six specific school districts at issue here engage in, quote/unquote, compulsive use?

A.    I didn't look at any data or documents regarding students' compulsive use specific to the six districts.

I didn't think that that was necessary for the task.

Q.    And so, then, I take it the same is true for fear of exposure, exclusion or public shaming, you didn't look at anything specific to the six districts, correct?

ATTORNEY MEHRI:   Objection.

THE WITNESS:   I didn't look at anything specific to the six districts in terms of documents or direct reports or observation regarding fear of exposure, exclusion or public shaming in the six particular districts.

I didn't think that it was necessary to the task.  And I understand other plaintiff experts

Page 147

have done so.

BY ATTORNEY PISTILLI:

Q.   So, then, I take it, sitting here today, you don't know whether school operations, school climate and the educational experience have been disrupted at any of these six specific school districts, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  What I know is that, by and large, across schools and school districts, public education, are experiencing disruption in school operations and school climate and in the educational experience, attributable to students' compulsive personal use of social media that is driven by the design features in the platforms.

And I reached that opinion based on my personal experience, the interactions that I've had with school leaders and aspiring

Page 148

school leaders on a regular basis over a long period of time in a variety of schools and school districts, my review of the literature and my reading of the testimony on record.

It would not be a difficult extrapolation to suppose that that's happening in the six districts as well.  But I am not prepared to make that claim today.

BY ATTORNEY PISTILLI:

Q.    So you've not done the work to know whether there are school operations, school climate and educational experience disruptions specifically in any of the six districts, correct?

ATTORNEY MEHRI:  Objection. Asked and answered.

THE WITNESS:  I would answer verbatim with the answer that I just gave.

BY ATTORNEY PISTILLI:

Page 149

Q.    You didn't look at any documents or data from any of the six districts relating in any way to disruptions of school operations, school claimant or educational experience, correct?

A.    I did not look at any data specific to the six districts nor talk with anyone in the six districts, because I didn't think that that was necessary for the task.

Q.    If you could please turn to Page 21.  Take a look at Opinion 2.

You write, The cumulative impact of social media saturation and its associated emotional strain diminishes educator morale, increases staff burnout, contributes to a pervasive sense of instability in school environments.

Do you see that?

A.    Yes.  Well put.

Q.    Did you look at any documents or data relating to educator morale in any of the six plaintiff school

CONFIDENTIAL

Page 150

districts?

A.    I did not look at any data related to educator morale in the six specific school districts.

I didn't think that that was necessary to the task.

Q.    You didn't look at any documents either, right?

A.    I beg your pardon?

Q.    You said you didn't look at data.

My question was about documents and data.  So I just want to make sure the record is clear.

You didn't look at any documents or data relating to educator morale, correct?

A.    I looked at a lot of data -- a lot of documents related to the impact of students' compulsive personal use of social media.

And among the documents that I looked at, one of the adverse impacts is on educator morale and staff burnout,

Page 151

insofar as teachers are now needing to instruct students who are experiencing fragmented attention and increased anxiety to scale.

I looked at -- I looked at documents related to that --

Q.    So my --

A.    -- in the research.

A.    It's in my --

Q.    My question was --

A.    -- materials considered list.

Q.    My question, sir, was --

ATTORNEY MEHRI:   Let him answer the question.

THE WITNESS:   I'm done. Thank you.

BY ATTORNEY PISTILLI:

Q.    -- specifically, did you look at any documents or data relating to educator morale at the six school district plaintiffs?

A.    Oh, I see.  I think you asked it differently before.

CONFIDENTIAL

Page 152

I did not look at any documents or data related to educator morale in the six specific districts.

I did not think that it was necessary to the task.

Q. And is the same true for staff burnout?

A. Are you asking me whether I reviewed data or documents related to staff burnout in any of the six specific districts?

Q. Yes.

A. My answer would be the same.

Q. And you, similarly, didn't look at any documents or data relating to the school environment at any of the six specific districts, correct?

A. I did not look at data or documents related to instability of school environment for -- specific to the six districts.

I did not think that it was necessary to the task.

Q. So I take it, then, you're

Page 153

not offering any opinions about educator morale, staff burnout or the school environment specific to the six plaintiff school districts, correct?

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  I'm offering an opinion that in schools generally, based on my experience as an educational leader, the educational consulting work that I've done, which has had many -- which has included many interactions with school leaders and aspiring school district leaders -- or aspiring school leaders and school district leaders in a variety of contexts over a long period of time.

And the research that I reviewed, as well as the testimony on record from the school districts, that there is a pervasive sense of instability in

school environments that is attributable to the students' compulsive personal social media use. And that compulsion is driven by features that are in the designs of the platforms.

I did not look at data or documents specific to the six districts, because I did not think that it was necessary to the task.

However, I think it would be an easy extrapolation to make. I'm just not doing that today. I'm not making that claim about those districts.

BY ATTORNEY PISTILLI:

Q. You're not doing it because you don't have the basis in fact to do it, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: I'm not sure what you mean.

BY ATTORNEY PISTILLI:

Q. It would be a supposition on

your part, given what you have and haven't looked at, to offer any opinions about educator morale, staff burnout or the school environment at the six specific school districts, correct?

ATTORNEY MEHRI:  Objection. And mischaracterizes his testimony.

THE WITNESS:  I guess I would say that if extrapolation is inherently supposition, then yes, it would be supposition.

It would take some extrapolation to make the claim on these six districts.  I think it would be an easy extrapolation to make.  But I'm not making that here today.

BY ATTORNEY PISTILLI:

Q.    And do you plan to make that extrapolation at a later time?

A.    I -- I do not plan to, not unless I'm asked to look at data and documents from the specific six districts

CONFIDENTIAL

Page 156

and the scope of my task changes.

Q.    Right.    Because that would be a change in the scope of your task, correct?

A.    You're asking me if looking at the six specific districts, their data and documents, would be a change in the scope of my task?  Yes, it would be.

Q.    Let's take a look at Opinion 3 on Page 23.

You say, The growing need to allocate additional funding for mental health and student support services is intensifying already difficult tradeoffs in resource allocation.

You've not looked at any documents or data relating to funding for mental health and student support services in any of the six plaintiff school districts, correct?

A.    I've not looked at data or documents related to the need for additional funding for mental health or student support services in any of the

six districts.

Q. So --

A. I did not think that it was necessary to the task.

Q. So sitting here today, you don't have any basis to know whether, in fact, there is a need for additional funding for mental health and student support services in the six districts, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: My basis for the opinion that there's a growing need to allocate general funding for mental health and student support services and that that is intensifying already difficult tradeoffs in resource allocation is based on the sources of evidence that I considered that converged to show that this is a reality in schools and school districts across a variety of settings in a variety of places

Page 158

and that the -- my experience, the research, the testimony on record suggests that this is pervasive across public education settings in the country.

BY ATTORNEY PISTILLI:

Q. But it would be --

A. The --

ATTORNEY MEHRI: Let him --

THE WITNESS: The -- for me to claim that it would be -- that that is also true in the six specific districts would be an extrapolation, because I did not review data or documents specific to the six districts.

I think that it would be an easy extrapolation to make. But I'm not making that claim here today.

BY ATTORNEY PISTILLI:

Q. And you've not looked at the documents or data that would be needed to do so, correct?

Page 159

A.    I've looked at enough documents and data to think that it would be reasonable to make the extrapolation, although I'm not doing that here.

But I've not looked at specific documents and data in the six school districts specifically that would be required to verify such a claim.

I didn't think that it was necessary to my task.  And further, it's my understanding that other plaintiff experts have done so.

Q.    If you could please turn to Opinion 4 of your report on Page 25.

You say, Promulgating and enforcing rules to limit social media and personal electronic devices in schools is operationally complex and often a source of conflict among school staff, students and families.

Do you see that?

A.    Yes.  Well put.

Q.    Do you know whether any of the bellwether school districts have

instituted cell phone policies or other rules limiting the use of electronic devices in their schools?

A.    I do not know whether the six specific districts have instituted policies or rules to limit social media and personal electronic devices in their schools.

I didn't look at data and documents from the six specific districts.  I didn't think that it was necessary to the task that I was given.

Q.    So, again, this opinion you're offering here that promulgating and enforcing rules to limit social media and personal electronic devices in schools is operationally complex and often a source of conflict is not based on any information specific to the six school district plaintiffs, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  The basis of my opinion that promulgating and enforcing rules to limit social

Page 161

media and personal electronic devices in schools is operationally complex and often a source of conflict among school staff, students and families is a result of convergence of evidence from my experience, my work over the last six years as an educational consultant interacting with school leaders and aspiring school leaders, district leaders, as well as my review of relevant literature from peer-reviewed journals and the testimony on record.

And that forms the basis of my claim that, in schools, these kind of enforcement rules are difficult and complex and sometimes have unintended negative consequences.

It would be supposition, extrapolation to know that that is true in the six districts.  I did

not look at data or documents to verify that that is true in the six specific districts, because it wasn't within the -- it wasn't necessary to the task. And it's my understanding that other plaintiff experts may have done so.

BY ATTORNEY PISTILLI:

Q. Please turn to Page 29 and look with me at Opinion 5.

You say, The cumulative effect of these demands is increased cost, diverted resources, heightened emotional strain, and reduced leadership capacity, negatively impacting school districts, schools and public education.

Do you see that?

A. I do.

Q. Did you look at any documents or data relating to whether there are increased costs at any of the six plaintiff school districts?

A. I did not look at any data

Page 163

or documents specific to the six school districts.

The basis of my opinion here is on the experience that I've had, the interactions I've had with numerous school leaders and aspiring school leaders in a variety of contexts over multiple years, including time in those schools, my review of relevant literature and my reading of the testimony on record.

This suggests to me -- my opinion, as a result, is that this cumulative effect is present in schools and school districts across the country.

I think that the evidence that I looked at and suggest may well be transferable to other sites and schools. The transferability idea is well established in the practice of academia and educational leadership.

I'm not suggesting that here today, because I did not make that extrapolation.  And I did not examine

Page 164

data and documents related to the school districts in order to -- or specific to those school districts in order to verify that that opinion and claim would be true in those specific districts, because I did not think that it was necessary to my task. And it's my understanding that other plaintiff experts may have done so.

Q. And am I also right that you didn't look at any documents or data relating to whether any of the six plaintiff school districts had any diverted resources?

A. I did not look at any data or documents specific to the school -- to the six school districts.

Q. And the same is true for heightened emotional strain, right, you didn't look at any documents or data relating to the six plaintiffs, correct?

A. With regard to heightened emotional strain, I did not look at data or documents that are specific to the six districts.

I make that opinion and claim about schools and school districts generally based on a convergence of evidence that derives from my experience as an educational leader and an educator in public education, my interactions with school leaders and aspiring school leaders and district leaders in my capacity as an educational consultant, the research that I reviewed when I conducted a literature review, and the testimony on record.

I did not look at data and documents from the six districts specifically. So I can't make claims that are specific to those districts about heightened emotional strain, except insofar as it may be easy to extrapolate on the evidence that converged in my work to those districts.

But I'm not saying that it's transferable, because I didn't myself do the investigation to verify those claims.

It did not seem to me that

CONFIDENTIAL

Page 166

doing so was necessary to my task.  And it's also my understanding that other plaintiff experts may have done so.

Q.    And you also didn't look at any documents or data relating to any reduced leadership capacity of the six plaintiff school districts, correct?

A.    I did not look at data or documents from the six specific school districts.

Q.    And so it would be supposition on your part to say that those six specific districts have had increased costs, diverted resources, heightened emotional strain or reduced leadership capacity, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  If you were to characterize extrapolation or a reasonable assumption of transferability as supposition, then I would agree with you.

BY ATTORNEY PISTILLI:

Q.    Do you characterize it as

supposition?

A. Do I characterize extrapolation and transferability as supposition? I haven't given the question much consideration previously, so I'm not sure.

But I think that reasonable extrapolation and transferability on the basis of strong evidence of patterns in like settings is probably stronger than supposition.

But I'm not making those claims here today, because I didn't review any data or documents related to the six specific districts. It wasn't within the scope of my task to do so, so I didn't think that it was necessary.

And it's my understanding that other plaintiff experts may have considered those sources of evidence.

Q. And you would -- you would need to look at that specific documents and data before you made a reasonable extrapolation, correct?

CONFIDENTIAL

Page 168

ATTORNEY MEHRI:  Objection.

THE WITNESS:  While I'm not making a reasonable extrapolation here today, I do think that one could make a reasonable extrapolation through the concept of transferability to like settings to make such claims about the six specific school districts.

But for me to feel comfortable doing that as an expert witness, I would need to verify those reasonable extrapolations and transferability assumptions using data and documents from the specific school districts.

And since I did not review data and documents from those specific districts, I would stop short of saying that they could be verified in those particular settings.

I would suggest that a

CONFIDENTIAL

Page 169

concept of transferability and extrapolation probably would apply here, since there's so many similarities among schools and school districts.  But I didn't do that.

It was -- didn't seem necessary to me for my task.  And it's my understanding that other plaintiff experts may have looked at that specific data set.

BY ATTORNEY PISTILLI:

Q.    And doing that is not within the scope of your work in this case, correct?

A.    I think I've said that repeatedly and clearly, yes.

Q.    In your report, all of your opinions relate to social media generally, correct?

A.    They relate to social media specifically as it pertains to Facebook, Instagram, Snapchat, TikTok and YouTube.

Q.    Well, you understand that

Page 170

social media is more than just those five platforms, right?

A.   It may be.  But that's not part of what I considered here.

When I thought of social media, I thought of Facebook, Instagram, Snapchat, TikTok and YouTube.

Q.   Where do you define social media in your report?

A.   I may not have defined it specifically in the report.

I'm reviewing now.  I don't recall exactly.

I don't think I have a precise definition of social media in my report.

As I was working on it and as I speak with you today, my understanding of social media is Facebook, Instagram, Snapchat, TikTok and YouTube.

Q.   Is Twitter social media?

A.   I don't really have an opinion about that.

Page 171

Q.    Is Discord social media?

A.    I don't have an opinion about that.

Q.    You just don't know one way or the other?

A.    I -- I don't have an opinion about that.  The scope of social media that is within my consideration here as I talk with you today and was in my head as I wrote the report was Facebook, Instagram, Snapchat, TikTok and YouTube.

Q.    Now, you rely on literature that you reviewed in forming your opinions about social media, correct?

A.    In part, yes.

Q.    And is that literature's discussion of social media limited to those five platforms?

A.    I don't recall.

Is there -- is there one that you're specifically thinking about?

Q.    Well, right now I'm just asking.

Do you have a recollection

as to whether the literature you reviewed regarding social media was limited to the five specific platforms at issue in this litigation?

A.   I don't recall whether the literature was specifically limited to Facebook, Instagram, Snapchat, TikTok and YouTube.

No, I'm not -- I don't -- I don't recall.  I'd need to look at, like, a specific piece of research and see whether the authors defined it that way.

Q.   We can come back to that.

You also relied on testimony from school district personnel in their depositions, correct?

A.   Yes.

Q.   And they offered testimony about social media, correct?

A.   They did.  That was what the topic was, yes.

Q.   Yes.  And the testimony that they offered was not limited to those five platforms you reference, correct?

Page 173

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I don't -- I don't recall.  I mean, I read or skimmed, like, hundreds of pages of deposition documents.  I don't recall.

If you want me to look at one, I'd be happy to review it. But I don't know.

BY ATTORNEY PISTILLI:

Q.    You also, in your report, reference the design features of social media platforms, correct?

A.    Are you referencing a specific part?

Q.    Well, it comes up quite a bit in your report, but we can look at Paragraph 106 as an example.

A.    106.  This is in the May 16th report?

Q.    Yes.

ATTORNEY MEHRI:  What paragraph, please?

ATTORNEY PISTILLI:  106.

Page 174

ATTORNEY MEHRI:  106.

THE WITNESS:  Okay.  Thank you.

BY ATTORNEY PISTILLI:

Q.    And there you refer to the structural design of the social media platforms?

A.    Yes.

Q.    And then, similarly, you can take a look, if you would, at Paragraph 68.

You see in Paragraph 68 you say, The features of social media companies.  The features social media companies choose to build into their platforms facilitate and amplify bullying.

A.    Yes.  Well put.

Q.    So do you now -- are you with me when you talk about -- when I ask you questions about the design features of defendants' platforms?

A.    I understand now you're asking me about Paragraphs 68 and 106 --

CONFIDENTIAL

Page 175

106.

Q.    Was it -- is it your testimony to the jury that the design features of defendants' platforms have an adverse impact on school districts?

A.    I believe so, yes.

Q.    And is the use of -- use of algorithms to promote addictive engagement on defendants' platforms one of the design features that you have in mind?

A.    So I'm not an expert on all the myriad of design features.  I'm not an expert in how they're engineered.  I wouldn't be a good source of naming all of them or knowing or understanding the difference across the platforms.

What I would say is that they are designed and engineered in a way to capture and manufacture student attention, where the time that students are on the platforms is the product and that the design of the features is intended to prolong that engagement.

How exactly that works, what the students are actually thinking about, how it's engineered and coded, that is, really, like, a level of detail that I'm not an expert in.

I have a couple of things here because they seemed, like, salient to me. But I by no means understand, like, how all of that specifically works.

Q. But the -- the publishing of content to promote addictive engagement is part of the harmful impacts that you're opining on, correct?

ATTORNEY MEHRI: Objection. Mischaracterizes the testimony.

THE WITNESS: Yeah, I'm not -- I'm not actually opining about that.

What I'm actually opining on is the -- is that the social media -- the design of the social media platforms is intended to prolong student engagement.

There's a multiple -- there

Page 177

are multiple features that -- that are used for this, is my understanding.  I don't -- I don't really understand how that's coded.  I'm not an expert in that stuff.

What I do know is that the students' need for continued validation, that their -- that the social media platforms now make up a great deal of their social fabric, that students experience a fear of missing out, that they experience, like, a social accountability where they need to respond in realtime, where they want to know what people think about them all the time.

If you think about children, teens, adolescents and the fact that their frontal cortex is not yet fully developed and that their -- their attention -- their interaction with their peers is of

such primary importance to them and their brain development at that age, then this manipulation of their attention around their social connections that is designed to prolong their attention so that it can be commodotized, that's what I think causes the serious harms to school district operations and to the work of school leaders and school district leaders.

BY ATTORNEY PISTILLI:

Q.    Turn again with me to Paragraph 106 of your report, please.

A.    What -- 106, you said?

Q.    Yes.

You say, Thus, while platforms have become normalized in youth culture, their structural design contributes to serious educational and emotional harm, and schools disproportionately bear the burden of response.  This burden must be understood

not as a by-product of school failure but as a predictable consequence of platform design decisions that prioritize engagement over well-being.

Do you see your opinion that you wrote there?

A. Yes. Well put. I stand by that.

Q. Okay. What platform design decisions are you referring to in Paragraph 106?

A. So I'll repeat what I said before.

I'm not an expert in the platform designs. I don't have the background nor did I look at the specific, like, design features and -- to be able to list all of them or understand how they interact with each other or the differences across the different platforms.

But what I know is that there are features that are baked into the design that are intended to

prioritize engagement over the students' well-being, over their education, over their learning. And that it's predictable that that's going to lead to a compulsive use.

It's also predictable that that compulsive use will have negative effects on their health and that that predictability is something that the design platforms may have even known about but not really warned schools, warned what was going to happen and have not really taken responsibility for.

That's my -- that's my understanding.

It's about the design decisions and the features sort of as a whole and their -- the way students are interacting with the platforms and the impact on school district operations, on diverted leadership time, on resource allocation decisions, on school environments that are unsettled, with this sort of generalized anxiety that

Page 181

hums in the background as a result.

Q. You just testified, sir, What I know is that there are features that are baked into the design that are intended to prioritize engagement over the students' well-being, over their education, over their learning.

What features are you referring to?

A. Yeah, the list of specific features is not really something that I'm an expert on or am prepared to talk about.

What I know is that they're there, they exist, they're in the design and they're designed intentionally so that students will spend more time on the apps, on the platforms, engage more, and that that leads to compulsive use on the part of students, and that that compulsive use, those design features have a negative impact on school district operations and on the work of school leaders and school -- school district

leaders.

The ins-and-outs of the specific designs, how they work, how they're coded, how they're engineered, the psychology of dopamine hits and how exactly they take advantage of children and youth when they're vulnerable and their frontal cortex is not fully developed, like, the specifics of all of that, that's not within the realm of my expertise.

I understand that other plaintiff experts may have specific expertise about that. And I'll leave that to the experts.

Q. I'm not asking you for engineering specifics, with all due respect.

You said that you know there are features that, in your opinion, have certain impacts.

What features are you referring to when you make that statement?

A.    The design of the social media platforms, Facebook, Instagram, Snapchat, TikTok, YouTube, the design results in features.  And the design is intended to prolong engagement, whether that's for the well-being of the student or not.

The prolonged engagement is a way of capturing and monetizing attention.  That's the intent, and that's the way -- the way that much of the features were designed.

What those features are, how they interact with one another, how they're coded, what the differences are across the platforms, like, that was outside the scope of what I was asked to do.  And it's outside the scope of my expertise.

Q.    But so you include in your opinions about social media any and all design features that allegedly promote prolonged engagement; is that fair?

ATTORNEY MEHRI:    Object.

Mischaracterizes his testimony.

THE WITNESS:  No, I don't think that's fair.  I don't think I put any and all anywhere in the report.

And I don't understand the nuances of the features and the way that they might be changing and all of that well enough to say which ones are the specific culprits.

What I know is that as a result of them, sort of the cumulative effect is leading to a mental health -- increased mental health issues, drains on school research -- resources, diverted leadership time and a generalized anxiety that burdens the school environment and causes harms to school district operations and the work of school leaders and school district leaders.

BY ATTORNEY PISTILLI:

Q.    Let's turn back quickly to Paragraph 68.

A.    Sure.  One second.

Okay.  Got it.

Q.    There you say, The features that social media companies choose to build into their platform facilitate and amplify bullying.

Do you see that?

A.    I do see that.

Q.    And are -- does the -- does part of the harmful impact that you attribute to social media relate to cyberbullying that occurs in posts or comments that appear on defendants' platforms?

A.    The -- will you ask that question again, please?

Q.    Does part of the harmful impact that you attribute to social media relate to cyberbullying that occurs in posts or comments on defendants' platforms?

A.    The harmful impact that I

CONFIDENTIAL

Page 186

attribute to the design features of the social media platforms are those features that lead to compulsive use.

I think that that includes a whole bunch of different attention-seeking behaviors on the parts of kids that is compelled by their need to stay engaged with the -- with the platforms. And it has effects in the way that they are experiencing the school day, their social life inside and outside of school.

Students now, as a result of sort of the saturation of social media use and the interactions that students are having on the platforms and the platforms themselves are creating, like, a -- like a compulsion, where students -- they're going to, in the regular course of their development, seek validation.

But now that validation is -- is external and compulsive to the platforms. For example, wanting to get attention for whatever it is that

they're -- that they're putting out there into the world.

Certainly it can amplify acts of cruelty.  It can make students be fearful of exposure.  But by no means is my testimony here related specifically to that particular use of the platform. It's the overall effect of the platforms and their design that seeks to prolong engagement that's leading to the compulsive use.

Q.    Well, bullying has been around long before social media, right?

A.    Yes.  Bullying has been around long before social media, as well as many other things that schools grapple with.

And like all those other factors, social media creates new problems and it also exacerbates existing problems.  Bullying is one of those examples where it makes -- gives students access to students, students will engage in attention-seeking behavior.  They may

CONFIDENTIAL

Page 188

be more likely to bully because of the attention that it gets online.  Victims are accessible, like, all the time.

So bullying that existed before might have been temporal in nature, it didn't necessarily create a permanent record.  It was, like, interactions between kids in a specific place and time.

And, you know, you could extrapolate this to all sorts of things that negatively affect kids in schools, that the social media use, the compulsive social media use, creates new harms and actually exacerbates old harms.  And the bullying is a perfect example of that, I think.

Q.    Right.  Like, kids would write mean things about other kids on bathroom walls, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  What -- sure. Yes.

BY ATTORNEY PISTILLI:

Page 189

Q.    Yeah.  And that would be bullying?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Well, I don't want -- like, I'm not here as an expert in bullying.

But bullying has a certain definition.  And maybe it would be and maybe it wouldn't be.  It kind of depends on the context and what's being said and who the kids are.

Probably.  It probably sounds like it could be a form of bullying.  It certainly is not nice.

BY ATTORNEY PISTILLI:

Q.    You know, so-and-so is fat and ugly and I'm going to beat her up; that would be bullying, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  A statement like that may or may not be considered bullying in the context

of schools, yeah.

BY ATTORNEY PISTILLI:

Q.    How would it not be considered bullying?

A.    Okay.  So I'm not here to be an expert on bullying or talk about bullying.

I think what you're -- what you're trying to say is that the harm is caused by the specific instance of the bullying.  What I'm saying is that that's not the case.  There may be harm.  But the harm is in the compulsive use of the students of the social media platforms.

The fact that it leads them to be so attention seeking, because the design features are created to prolong their attention so that their attention can be curated and manufactured as a product, in and of itself leads to mental health issues, generalized anxiety, need for compulsive use of the platforms themselves, and that that is what is creating the harm that is affecting

Page 191

school district operations, school leaders and school district leaders in the course of doing their work.

Q.    So it's your testimony to the jury that there's not harm that flows from the words a kid uses, whether it be in a social media post or otherwise, that are threatening and demeaning to other students in and of itself?

ATTORNEY MEHRI:    Objection. Mischaracterizes his testimony.

THE WITNESS:    It does -- I do think that mischaracterizes my testimony.

I don't think that my testimony is about those specific words.  I think that my testimony is about the compulsive personal use of social media by young people in early stages of their development and the way in which that leads to compulsive use, the effect that has on a school environment and, therefore, the

Page 192

strain on resource allocation and the impact on leadership time and the work that leaders need to do to further education and improve the school culture.

BY ATTORNEY PISTILLI:

Q.    And my question is, is part, at least, of the harm from bullying, whether it occurs online or in person, the actual derogatory or threatening words said to another student and the impact of those words on the student?

ATTORNEY MEHRI:  Objection. Asked and answered.

THE WITNESS:  So embedded in your question is about the harm of bullying.

Of course bullying does harm.  But that's not what my report is about and that's not what I'm speaking about here.  I'm not talking about the harm of bullying.

I'm talking about the harm

CONFIDENTIAL

Page 193

of compulsive personal student use of social media platforms, Facebook, Instagram, Snapchat, TikTok and YouTube.

You seem to be trying to get me to say that bullying does or does not do harm.  As an educator, of course bullying does harm.  But that's not the point of what we're talking about here.

What we're talking about here is the social media platforms' intention to engage attention in a prolonged way that is leading to compulsive personal social media use by students.

ATTORNEY PISTILLI:  This is probably a pretty good natural stopping point.

ATTORNEY MEHRI:  Okay.

VIDEO TECHNICIAN:  The time is 12:50 p.m.  We are going off the record.  This ends Media Unit 3.

Page 194

- - -

(Whereupon, a luncheon recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 1:43 p.m.  This is the beginning of Media 4, and we're going back on the record.

BY ATTORNEY PISTILLI:

Q.    If you could just, please, go back and take a look at Exhibit-3. It's your invoice.

A.    Okay.

Q.    And does this reflect all of the time that you've spent working on this matter through the end of August?

A.    It does, yes.

Q.    And so you didn't perform any work on this matter between May 16th of 2025, and July 10th, 2025; that's correct?

A.    That's correct.

Q.    If I were to tell you that we've added up the total number of hours

here and it reflects 166.75 hours, does that sound about right to you?

A.    I didn't -- I didn't add them, so I don't -- I don't know what the total is.

I could -- I could do addition now if you want.  I'd need, like, a pen or a calculator or something like that.

Did you -- did you want me to add it up?

Q.    Whatever you need to do to let me know if you agree that it's around 166, 167 hours.

A.    Okay.  Sorry, I didn't know you were waiting for me to agree with that.  Okay.

Does anybody have a pen?

Thank you, Cyrus.

If I added correctly, I got 166.75.

Q.    Since you have your calculator out, could you multiply that by $300, which is your hourly rate?

CONFIDENTIAL

Page 196

A.     Sure.  But there's one entry that's travel where the rate is less, so that wouldn't match up exactly.

But to do what you asked, it's $50,025, is 166 -- shoot, 166.75 times 300.

Q.     And recognizing there's the one travel, would you agree that you've made approximately $50,000 working on this matter from April through the end of August of this year?

A.     A little less than $50,000 during that time, looks -- that looks right.

Q.     Thanks.

If you could now turn to Exhibit-8, I believe, is your rebuttal report.

A.     Okay.

Q.     All right.  And then we talked a little bit about this earlier where you described the professional methodology that you employ in your consulting work, correct?

Page 197

And that's included on Paragraphs 14 and 15?

A. Are you asking me if you asked me questions about this?

Q. Do you recall that we discussed earlier the work that you use in your -- the methodology that you use in your professional consulting work and leadership advising?

A. Yes.

Q. Yes.

And you discuss some of that on -- in Paragraphs 14 and 15 of your rebuttal, right?

A. Yes.

Q. And then you go on in Paragraph 16 to say, This approach reflects a widely accepted and practiced methodology in the field of educational leadership and executive coaching.

Do you see that?

A. I do, yes.

Q. You don't cite anything to support that proposition in your report

here, do you?

A.    Here in Paragraph 16, no.

Q.    And so what -- is there any literature that supports your assertion that your approach reflects a widely accepted and practiced methodology?

A.    Yes.

Q.    What would that be?

A.    There are two articles that I pulled from -- I don't have them with me.

But there's -- there's an article about educational leadership and qualitative research and another one about educational leadership in context, both around 2015 or so.

Q.    Are they cited elsewhere in your report?

A.    Yeah.  The Brooks and Normore piece, I think, is one.  And then there's -- there's another one that I have here, but I don't know if that's -- there are two -- there are two articles that appeared in academic journals

Page 199

related to qualitative research and the study of educational leadership.

And I drew on those as a way to reflect that the methodology and approach that I used to -- in my executive coaching to support the leaders in their leadership development is grounded in an established, acceptable methodology.

The difference, I would add, is that the work product for me is not a research article for submission in a journal but, rather, the improvement of the educational leaders' effectiveness with whom I'm working.

Q.    But the accepted and practiced methodology that you claim to bring to bear in this report is what's reflected in those articles?

A.    It is, yes.

Q.    And then just so I'm clear, the Brooks and Normore article cited in Footnote 4, that's one of them.

What's the other?  Is it

Page 200

Footnote 5?

A. Yeah, I think so. I don't -- I didn't bring all those articles with me, and I'm not sure exactly, like, how things line up. I don't remember exactly.

But those are -- those are articles that are guiding in terms of researchers, like, doctoral students and their study of educational leadership.

Q. Let's take a look at the Brooks and Normore article. It's Tab 13.

- - -

(Whereupon, Exhibit Osborne-9, No Bates, Qualitative Research and Educational Leadership: Essential dynamics to Consider When Designing and Conducting Studies, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q. I'm handing you what's been marked as Exhibit-9.

Page 201

A. Thank you.

ATTORNEY MEHRI: What exhibit number is this one?

ATTORNEY PISTILLI: Exhibit-9.

BY ATTORNEY PISTILLI:

Q. Have you had a chance to look at the article?

A. I'm reading as quickly as I can. I just need to refresh.

Okay. Thank you. I read quickly. I might need to read certain parts again.

Q. Sure. Well, take a look at Page 800 with me, if you would, please.

There's a section that starts, Data collection and qualitative studies of educational leadership.

A. Got it.

Q. Do you see in the, I think, third sentence, it says, There are three basic types of qualitative data that scholars have generated in order to explore their research questions,

CONFIDENTIAL

Page 202

interviews, observations and documents.

Do you see that?

A.    I do see that, yes.

Q.    And do you agree that those are the three basic types of qualitative data that are used in the methodology you're relying on?

A.    I would agree with that, yes.

Q.    So let's talk about each in turn.

The first is interviews, correct?

A.    The first of the three is interviews, yes.

Q.    And did you conduct any interviews of any of the six plaintiff school districts in this case?

A.    We covered this well before lunch.

But, no, I did not conduct any interviews of the -- of people from the six specific school districts.

Q.    And then the second is

Page 203

observations; is that right?

A.    That's right.

Q.    Did you undertake any observations of any of the six school districts?

A.    I did not undertake observations of any of the six school districts.

It didn't seem necessary to the task that I was given.

Q.    And the last of the three is documents, correct?

A.    It is.

Q.    And the article explains that, Document analysis is a systematic procedure for reviewing or evaluating documents.

A.    I don't --

Q.    Sorry.  I'm looking at the bottom of Page 801.

A.    Okay.  I see that sentence now, yep.

Q.    Do you agree that document analysis is a systematic procedure for

reviewing or evaluating documents, both printed and electronic material?

A.    I would agree with that, yes.

Q.    And did you undertake any document analysis relating to the six plaintiff school districts in this case?

A.    I did not do any document analysis or review any documents from the six specific school districts in this case.

It wasn't necessary for my task.  And it's my understanding that other plaintiff experts may have done so.

Q.    Do you see on the next page, 802, first full paragraph, it says, It is common for scholars to use school improvement plans, meeting agenda/minutes, school newsletters, letters home to the parents and the like as qualitative documents.

Do you see that?

A.    I do see that.

Q.    Did you review any of those

Page 205

categories of qualitative documents in forming your opinions in this case?

A. Will you ask me that question again?

Q. Sure.

Did you review any of those categories of qualitative documents in forming your opinions in this case for the six specific school districts?

A. I see.

No. For the six specific school districts, I did not review any of the described qualitative documents in this sentence.

It wasn't necessary for the task that I had. And it's my understanding that other plaintiff experts may have done so.

Q. And you see on the bottom of Page 802, it references this concept of triangulation?

ATTORNEY MEHRI: What sentence?

BY ATTORNEY PISTILLI:

Page 206

Q.     The very bottom of Page 802.

A.     That begins, If triangulation?  Yes.

Q.     Well, it also appears in the immediately prior sentence.

A.     I see.

Yes.

Q.     And that refers, right, to the idea that a rigorous application of this methodology would involve bringing to bear multiple categories of information.

So you would want to look at interviews, observations and documents rather than -- rather than just rely on one in isolation, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I think that that's a fair statement.

And I also think that I did do that in the context of your question specifically.  Because my evidence base that I used to render the opinions that I offer

CONFIDENTIAL

Page 207

comes from my experience, it comes from my interactions with school leaders and aspiring school leaders who are graduate students, it comes from a review of the literature and it comes from testimony on record.

So I believe that I have triangulated to come to the opinions that I offer in my expert reports.

BY ATTORNEY PISTILLI:

Q.   Well, you've not looked at any documents relating to the six school districts, you've not conducted any interviews of personnel of the six school districts, and you've not undertaken any observations of the six school districts, correct?

A.   That's correct.  But I don't think that's what you asked me.

Q.   The question was, so you would want to look at interviews, observations and documents rather than

just rely on one in isolation?

A.    Yes.   Correct.

And my response is that that's what I did, in two respects.

Number one, the methodology that we're talking about here, where you started in the reply to the 13 rebuttals, is an explanation of the methodology that I use in my work as an educational consultant providing educational -- excuse me, providing executive coaching to new leaders or leaders who may be struggling or aspiring leaders.

And the reference to this particular piece of scholarship is to explain that the work that I do in endeavoring to improve those leaders' leadership performance reflects a level of standard and rigor that is common to the field of the study of educational leadership, even though the product, for me, is not a piece of research literature submitted to a journal but, rather, I use the methods in order to improve the

performance of the person with whom I am working.

Q.    So when you do your professional consulting work, you conduct interviews of the personnel, the district you're working with, you do observations of the district, and you look at the district's documents, correct?

ATTORNEY MEHRI:  Objection. Mischaracterizes testimony.

Go ahead.

THE WITNESS:  When I work with a particular client on improving their leadership, I use the concept, from the study of educational leadership, of triangulation.

The triangulation that I use involves interviewing the person that I am there to support as well as the person who evaluates that person, others in their school community.  So there's a series of what you would call interviews,

Page 210

conversations, interactions in order to try to make meaning out of the challenges that this particular leader may be facing.

I also make sure to observe the leader in their context, in the course of performing their leadership duties so that I can triangulate what I'm hearing from the leader and other informants with what I'm actually seeing about the leader's behaviors and the influence that that leader has within their school community.

Lastly, in terms of documents, it depends.  My reach to documents in order to help an individual improve their leadership performance will depend on the context of what are the set of leadership challenges or emerging circumstances that that person may be facing.

BY ATTORNEY PISTILLI:

Q.    But just so we're clear, when you did your report for this litigation, you didn't do any interviews, observations or documents relating to the six plaintiff school districts, correct?

A.    That's correct.  I've been consistent about that for the majority of the day.  It's well described in the report.

And I didn't see that doing that was necessary for the task that I was given.  I think that other plaintiff experts may have done so.

My opinions were based on a convergence of evidence that comes from my experience as a school practitioner and district leader, the work that I do as an educational consultant providing executive coaching to current leaders who may be new or struggling, as well as aspiring leaders, the research -- the literature review that I conducted and the research that I was able to access and read, as well as the testimony on

Page 212

record from school and school district leaders about the impact of students' compulsive personal social media use on their school or school environments or communities.

Q.    Do you see the sentence on the first paragraph of 803, If there is an imbalance, say if there is only or primarily interview data and only a sprinkling of observation or document data, we should call into question the rigor and quality of the study?

A.    I do see that.

Q.    Do you agree with that statement?

A.    It depends.  The authors here are describing methods for conducting a single study of a phenomena associated with school leadership.  And their audience is geared towards researchers in the field, doctoral students or research faculty, in an attempt to provide some guidance about what kind of standards a study should

meet within that discipline.

And insofar as that's what they're meaning here, then I would think that if there seems to be an imbalance in, say, a student's doctoral work where they're over-relying on only one form of evidence, that questions could be raised about the degree to which they're triangulating and the degree to which the study could benefit from the use of other observation or data -- other -- other types of data.

Q. So just to make sure I understand you, that's -- you agree that that's an accurate statement as it applies to rigorous academic work in the field?

ATTORNEY MEHRI: Objection. Mischaracterizes his testimony.

THE WITNESS: I think -- I think the authors here are trying to offer ideas and guidance to strengthen the quality of research about educational leadership by

describing methods that could be brought to bear on particular research studies.

And they're making the point here that a research study that endeavors to study a question in the area of educational leadership ought to have different kinds of evidence so that the study benefits from the triangulation of types of evidence.

BY ATTORNEY PISTILLI:

Q.    Let's -- let's talk about the other article that you referenced a few moments ago.

There's an article cited in Footnote 5 of your rebuttal report.  We can go back to that.  I believe it's Exhibit-8, Page 7.

A.    You said Page 8?

Q.    Page 7.

A.    Okay.

Q.    You write, In educational leadership, it is widely recognized that

CONFIDENTIAL

Page 215

effective research and decision-making must be grounded in an understanding of context.  As Crow, Miskel and Peterson argue, the study of leadership cannot be meaningfully separated from the dynamic, lived realities of the school environment.

Do you see that?

A.    I do see that.

Q.    And then you go on to say, Educational leadership is deeply contextual, requiring inquiry methods that attend to cultures, relationships and complexities that characterize actual practice, right?

A.    Sorry, where are you with that one?

Q.    Oh.  Just the next sentence in Paragraph 24.

A.    You read the sentence, They emphasize that --

Q.    Yes.

A.    -- is that what you read?

Okay.  Yes, I see that.

Q.    And do you agree that your field involves contextual inquiry into the schools and school districts that you're studying?

A.    I'm not sure how you mean contextual inquiry.  But I think I'm going to agree with what you're saying.

That the authors here, what they're -- what they're saying and what is an understanding in the discipline of the study of educational leadership, which is usually about the study of an educational leader or an -- or a leadership strategy or leadership behaviors, that to gain an understanding of that requires an understanding of the context in which that leader is leading.

Q.    And so you would need to understand things like the budget that the leader is dealing with?

A.    I think it depends upon -- in the case of research methodology, it would depend on what the research questions are.

CONFIDENTIAL

Page 217

For me, because I am not a producer of research, it would depend -- what I -- what I work on, the end result of my work, if you will, or the purpose, is to help a leader in their leadership development and help them grow to be stronger leaders.

In either case, whether it's to produce a leadership study or to help a particular leader, the understanding of the context in which they're working is important.

That may or may not include specific access or specific review of budget documents. Budget documents, in and of themselves, may be outside the scope of the research question, if it's a research article being produced or a -- or a research project being undertaken.

Or, for me in the work of executive coaching, it may not be within the scope of those areas where a leader will most benefit from attention, where the leader's leadership development will

benefit from attention.

Q.   So if it's a research project, what you're saying is they would need to understand the context of the budget if the research question related to the district's expenditures, but not if it was about something else; is that fair?

A.   Yes, I think that's fair.

If the research question was about, say, a superintendent's decision-making process, either in substance or in process how they go about creating a school district budget, then the researcher would need, I think, to review budget documents as part of their triangulation in addition to interviewing the superintendent, maybe observing what happens in those kind of process meetings.

That would be an important part of the triangulation exercise that's being called for by these authors in their attention to methods for

Page 219

educational leadership studies.

Q.   And the authors you're referring to are Crow, Miskel and Peterson; is that right?

A.   I don't have -- I think so. I don't have the article in front of me.

Q.   Sure.  Well, do you know who Crow, Miskel or Peterson are?

A.   I don't know them, no.

Q.   And the article that you're citing here is entitled, Leadership Behaviors of Principals in Inclusive Educational Settings; is that right?

A.   That's the -- that's the language here.  I don't -- I don't have the article in front of me to verify that.

Q.   Sure.  Well, let's take a look at the article.

- - -

(Whereupon, Exhibit

Osborne-10, No Bates, Leadership

Behaviours of Principals in

Inclusive Educational Settings,

was marked for identification.)

                    -   -   -

BY ATTORNEY PISTILLI:

Q.    I'm handing you what's been marked as Exhibit-10.

A.    Thank you.

ATTORNEY MEHRI:   This is a different article.

ATTORNEY PISTILLI:   Sorry.

Is it Exhibit-10?

BY ATTORNEY PISTILLI:

Q.    So my question for you, sir, is, is this the article that you intended to cite in your report?

A.    Give me a minute to read.

You know, I don't recall.  I do see that there's a mismatch with the citation and the author's name.  So I mentioned earlier that there was -- there might have been some mistakes there.

Q.    So look with me again at Footnote 5 of your rebuttal report.

A.    Sorry.  One second.

Yes.  I'm looking at that.

Page 221

Q.    And you cite in Footnote 5 an article entitled, Leadership Behaviors of Principals in Inclusive Educational Settings.

Do you see that?

A.    I do.

Q.    And do you see that that is the title of the article in Exhibit-10?

A.    I do see that, yes.

Q.    And then do you see you include in your citation in your report, Journal of Educational Administration, 35/5?

Do you see that?

A.    I do.

Q.    And do you see that the article I've handed you in Exhibit-10 is, in fact, from the Journal of Educational Administration, Volume 35, Number 5?

A.    Yes, I see that.

Q.    And your citation includes the year 1997.

And Volume 35, Number 5 of the Journal of Educational Administration

is also from 1997, correct?

A.    I see that, yes.

Q.    And your citation is to Pages 411 to 427; is that right?

A.    That's the citation here, yes.

Q.    And the article I've handed you is on Pages 411 to 427 of the Journal of Educational Administration, Volume 35, Number 5, correct?

A.    It is, yes.

Q.    But the author's name is different, right?

A.    It is different.  It looks like I messed this up a bit.  I might have -- I might have confused articles. I'm not -- I'm not sure.  I would need to go back and double check.

This may be -- this may be an error in the citation or it may be that I confused the articles as I was reading.  I'm not sure.

Whether -- you know, the import of that would be determined by

other people.

But I think the point here about leadership being contextual and understanding the context that -- in which leaders are acting is both a standard part -- expectation of methodology for educational research studies and also informs my practice as an educational consultant providing executive coaching to educational leaders.

Q. Could we go back to Exhibit-8, please, for a minute? Take a look again at Footnote 5.

And if -- you see you've included in your report a hyperlink to the article that you are citing?

A. I do see that, yes.

ATTORNEY PISTILLI: And could we click on that, please?

TRIAL TECHNICIAN: (Trial technician complies with request.)

BY ATTORNEY PISTILLI:

Q. Do you agree that when we

Page 224

click on the hyperlink you provided, it takes us to the article by Patreese D. Ingram we've just been looking at?

A.    Yes, it looks like it.

Q.    Sitting here today, is there some Crow, Miskel and Peterson article that you believe you actually read and that exists?

A.    You know, sitting here today, I'm actually not sure now.

I see the -- I see the author's name is incorrect here.  And was it another article I was drawing from around educational leadership being deeply contextual?  I would need to go back and kind of recreate.  Yeah, I'm not -- I'm not -- I'm not sure.

Again, I think it doesn't really detract from the point about methodology or the way that it attaches to the work that I do.

Q.    Do you agree with me that the article that you've actually linked to here entitled, Leadership Behaviors of

Principals in Inclusive Educational Settings, does not support the proposition that the study of leadership cannot be meaningfully separated from the dynamic, lived realities of the school environment?

A.    So --

ATTORNEY MEHRI:   Objection.

THE WITNESS:   -- I would -- I would need to read this to either -- to refresh my memory, to see what I think of that.

I'd be happy to do that if you'd like.

You're asking me whether this article supports the concept of educational -- supports the concept of the importance of context in the study of educational leadership, if I'm understanding you right.

BY ATTORNEY PISTILLI:

Q.    Well, just take a look with me, if you would, at Page 411 of the

Page 226

article.

A.    I'll need to -- I'll need to review the whole thing, I think, here. At least give it a skim.  I'll try to be efficient in time.

Okay.  What are you asking me now?

Q.    So you say in Paragraph 24 that the Leadership Behaviors of Principals in Inclusive Educational Settings article argues that the study of leadership cannot be meaningfully separated from the dynamic lived realities of the school environment.

The authors of the article emphasize that educational leadership is deeply contextual, requiring inquiry methods that attend to cultures, relationships and complexities that characterize actual practice.  My methodology reflects this stance.

And my question for you, sir, is just whether the article we're looking at in Exhibit-10 supports that

CONFIDENTIAL

Page 227

description of the methodology?

A.    No.  You know, reading it now, I don't think it does.

I think this is a -- I think this is a mistake that I made in the citation.  There was, indeed, another -- a second article that spoke to this issue and that I meant to be referring to here, but I don't -- I don't recall what it was.

Yeah.  So that I -- that, I think, is a mistake.

The overall point, of course, is between the two articles what I'm trying to demonstrate here is that there's a discipline to the study of educational leadership, and it's usually talked about insofar as it applies to the production of research reports that are then submitted to academic journals.

I use many of the concepts, triangulation, contextualization, use of coupling observations with interviews in the methodology that I employ in the

educational consulting that I do to provide executive coaching to school leaders or aspiring school leaders.

And that that approach is rigorous and not haphazard and lends to the credibility of that strand of my evidence base that relies on my work in those schools and my pattern identification across those schools. It's just one of the strands.

But that is the general approach that I take.

Q. But just so we're clear, the only sources that you cite for the proposition that your approach reflects a widely accepted and practiced methodology in the field are the articles cited in Footnotes 4 and 5 of your reply, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: Give me a second to just skim through and see if that's the only place. I think that that's true.

This is the one.

Page 229

There's one further article by Clark and O'Donahue, hopefully I didn't mess up this citation as well, but it is in Footnote 23 on Page 21.

And I'd have to look at the article and examine that prior paragraph that you were asking me about. I think I may have intended to reference this article, not the Ingram one. I think that was an error in the citation.

I don't know if you have the Clark and O'Donahue article. But if you do, I think that's the other piece of literature that suggests that education -- scholarship and research in the areas of educational leadership benefits from the concept of context.

ATTORNEY PISTILLI: It's probably about time for a break.

Page 230

Let us see if we can find the article.

THE WITNESS:  Okay.  Cool. I don't know -- yeah.

VIDEO TECHNICIAN:  The time is 2:44 p.m.  This is the end of Media 4, and we are going off the record.

-   -   -

(Whereupon, a brief recess was taken.)

-   -   -

VIDEO TECHNICIAN:  The time is 3 o'clock p.m.  This is the beginning of Media 5, and we're going back on the record.

ATTORNEY MEHRI:  Thank you for giving me a second.

Before the break, there was some discussion about the correct citations to peer-reviewed articles.  And I think this article from Clark and Donahue is the one that you guys are -- or

Page 231

O'Donahue are the one you guys might have been looking for. But you have to ask the witness to clarify.

BY ATTORNEY PISTILLI:

Q. Actually, if you would, please, could we take a look at Exhibit-7? And turn to Page 5.

Do you see Paragraph 16?

A. Okay.

Q. And this is your report, correct?

A. Yes.

Q. You write, This report draws on my experience as a school and district leader, including service as a superintendent. As a consultant and coach to educational leaders, I regularly engage with superintendents, principals, and district teams in urban, suburban, and rural contexts across the country. These interactions provided a broad understanding of the systemic challenges schools face due to social media use and

Page 232

the design of social media platforms.

Do you see that?

A.    I do.

Q.    And you're referring there to conversations you've had with school officials, correct?

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  In part, yes.

BY ATTORNEY PISTILLI:

Q.    And in your report on a number of occasions you relay information that was conveyed to you by different school officials, correct?

A.    I don't know what you mean by "convey."  I don't think I, like, conveyed anything specific that was reported to me.

I think that the opinions that I offer that reflect, in part, many of these interactions are indicative of the patterns of leadership challenges that I am learning about through these interactions with, as you call it,

Page 233

official officials, school -- school leaders and school district leaders.

Q. Right. And so your opinions are based on interactions with school leaders, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: My opinions are based on a convergence of evidence or data sources, if you will.

One is my experience as a practitioner and a leader in K-12 educational systems.

A second area of reliance is on my interactions with a variety of school leaders, school district leaders, and aspiring leaders in multiple contexts across various schools and school districts over a long period of time.

The third area is the literature review and some of the research studies that I read.

And a fourth is the

testimony on record.

So it's on the basis of a convergence of -- of evidence that demonstrates that students' personal compulsive use of social media is destabilizing schools and school communities in ways that strain resources and divert leadership attention.

BY ATTORNEY PISTILLI:

Q. But one of the sources you're relying on, just to, please, focus on the question I'm asking, is information you learned from conversations and interactions with individuals in school districts other than the six plaintiff school districts, correct?

A. Yeah. I think you asked if my opinions are based on what I'm hearing from those school leaders.

So I just wanted to be clear that in part it is. But it's based on more than that, and it's based on sort of

Page 235

this concept of convergence and

triangulation across these different

areas of work and attention.

Q.    And do you have any records

of the conversations on which your

opinions are based in part?

A.    You mean, like, notes and

stuff like that?

Q.    Yes.

A.    No, I don't.  I don't.

Q.    Do you have records of who

the conversations were with that your

opinions are based on?

A.    I don't know what you mean

by "records."  I've talked with a lot of

people.

Q.    But you don't have notes of

those conversations?

A.    I don't -- I don't generally

keep -- sometimes I keep notes for the

purposes of that engagement; like, if I'm

working with a particular leader, they're

describing something to me, I don't want

to forget it, I might write it down.

Page 236

But usually those notes don't really survive the engagement.

Q.    You didn't consult any notes from those conversations in preparing your report, did you?

A.    No.

Q.    And did all of your conversations with those school leaders follow the same methodology?

A.    No.  There were different -- the interactions with the school leaders or the aspiring school leaders, happened for a variety of purposes and in many different contexts.

So the methodology I would have adjusted to be -- to be specific to those circumstances, I think.  For example, if I'm at a conference and I'm talking with educational leaders, it might just be more conversational.

Where my methodology is more consistent is if I'm doing executive coaching for a particular school leader or a struggling leader, like, somebody

new or somebody who is a school district official who might be new.

Then I bring to bear sort of a more -- maybe not consistent in every way, but conceptually consistent approach in which I value the concept of triangulation and context that is in the literature around studies of educational leadership.

Q.   Did you discuss the same topics with all of the educational leaders?

A.   No.  I mean, the -- since leaving the superintendency, I've talked with hundreds of school leaders in a variety of contexts.  And my focus is always on the things that are most pressing on them.  So sometimes the conversations vary.

The use of time, and time is a scarce resource, and the degree to which it's being diverted by mental health concerns linked to students' compulsive personal social media use is a

resounding theme across those conversations.

Q. But you didn't systematically go about inquiring into that subject using consistent methods in having all these disparate conversations, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: No, that wasn't the purpose of that work.

BY ATTORNEY PISTILLI:

Q. And sitting here today, you can't tell me who these people are who underlie at least some portion of your opinion in this case, correct?

A. It wouldn't add value to do so. I mean, I've talked with quite a number of people, like, hundreds of people in different contexts, in different places.

My professional life is spent interacting with educational leaders or aspiring educational leaders, students who are graduate students in the

classes that I teach, clients, colleagues in some of the networks that I run or participate in running, colleagues that I interact with at conferences or know from my graduate program or other connections in what I would -- you would -- I would think of as, like, a wide professional network.

Q. But these conversations form an important part of the basis for your opinions, correct?

A. Yeah, I think they do.

These -- these conversations, over a long period of time, have enabled me to identify patterns in what kinds of emerging problems are now most pressing on the field of educational leadership, on educational leaders.

So the fact that issues related to social media use -- to students' social media use and the accompanying mental health issues, distractions, attention fragmentation,

Page 240

lack of sleep, generalized anxiety around social status and social inclusion, fear of missing out, all of that stuff is a regular part of those conversations -- becomes a regular part of those conversations when I'm demonstrating my interest in what is most pressing upon people, how would those leaders describe their leadership challenges.

Q.    But despite the importance of those conversations to your opinion, you're not willing to tell the jury even who you had them with, right?

ATTORNEY MEHRI:  Objection. Mischaracterizes.

THE WITNESS:  The -- the -- those conversations form a basis of understanding what is happening in schools generally and has -- when converging with the testimony on record and the literature that I reviewed, my own experience as superintendent forms a basis for the general opinions that I offer

here.

And my opinions are reflective of those general patterns.

ATTORNEY PISTILLI: Move to strike as nonresponsive.

BY ATTORNEY PISTILLI:

Q. Are you willing to tell a jury who you spoke with or not?

A. It's not that I'm unwilling tell the jury, which is different from agreeing to do so.

It's that the case that I'm making doesn't rely on a particular informant in this process that I've gone on.

There -- my firsthand observations or my interpretation of understanding from the accounts and interactions that I've had with a very large sample size of leaders across various types of schools with different demographic student profiles over a long period of time, that's what I relied on

for my report. And I wouldn't want to go beyond the -- the context of that report.

Q. So you have no notes of these conversations, right?

ATTORNEY MEHRI: Objection. Asked and answered.

THE WITNESS: I don't generally keep notes on the conversations. Those interactions are part of what I do professionally on a regular basis.

I will occasionally take notes if those notes help me to support a particular leader by noting something that I want to make sure that I don't forget or that I follow up for that person or that I consider.

But generally speaking, when the engagement is over, you know, so are my notes. I pretty much toss them.

BY ATTORNEY PISTILLI:

Q. So without notes of the

Page 243

conversation or without knowing who those people are, you're essentially asking the jury to take your word for what they said without any ability to independently test that?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I think it's -- I think it's testable.  I think that to independently test, one could at least approximate my methodology.  And, you know, I would submit that it's highly likely that the same opinions would result.

BY ATTORNEY PISTILLI:

Q.    But there's no way anyone could know who you spoke with or what they told you, other than taking your word for it, correct?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  The report describes my methodology, the kinds of people I talk with, the kinds of schools, variety of

schools in which I've had those interactions, the methodology that I use when I provide executive coaching or educational consulting to a school or a school district.

And it's from those interactions and that activity that I've gained the view reflective in my opinions about the negative impact of students' compulsive personal social media use on schools and school districts.

ATTORNEY PISTILLI:   Move to strike as nonresponsive.

BY ATTORNEY PISTILLI:

Q.    My question was, there's no way anyone could know who you spoke with or what they told you other than taking your word for it, correct?

ATTORNEY MEHRI:   Objection. Asked and answered.  And argumentative.

THE WITNESS:   Yeah, I guess

Page 245

I -- I think I answered the question already.

BY ATTORNEY PISTILLI:

Q. How would I go about knowing who you spoke with or what they told you?

A. I don't know that knowing the specifics of what schools I went to or who I talked to would shed light.

I think that anyone who spends time, as I have, in the ways that I have with some background in how schools work and in public education, who talks to -- you know, it doesn't have to be, like, 350 to 400 people over six years, but a fairly decent sample size of school leaders and school district leaders would learn from those interactions that there are patterns of harm to school districts and schools that emanate from the compulsive personal use of social media -- student use of social media.

It's not just my word for it. It's also existent in the testimony

on record from lots of different school and school district leaders, as well as in much of the literature.

And my understanding is some of the other experts have some similar things to say.

ATTORNEY PISTILLI:  Move to strike as nonresponsive.

BY ATTORNEY PISTILLI:

Q.   How would I go about knowing who you spoke with or what they told you?

ATTORNEY MEHRI:  Objection. Asked and answered.  And you're being argumentative.

THE WITNESS:  Yeah, I think you asked me this question three times now.  I don't have anything new to say.

BY ATTORNEY PISTILLI:

Q.   It's not possible for me to know who you spoke with or what they told you; true or false?

A.   That's the same question in a different form.  I've already answered

it a couple of times.

Q. You have not, sir. You have not answered it.

I would like you to tell the jury how they could know who you spoke with and what they told you.

ATTORNEY MEHRI: Objection. Asked and answered.

THE WITNESS: I understand that that's what you would like.

I've already --

BY ATTORNEY PISTILLI:

Q. But you're not willing to do it, correct?

A. I've answered.

The opinions that I rely on reflect a methodology of interaction across a large number of -- of school leaders and aspiring school leaders.

Their experiences are also reflected in testimony on record, where you have a large body of accounts.

ATTORNEY PISTILLI: Move to strike as nonresponsive.

Page 248

BY ATTORNEY PISTILLI:

Q.     Let's take a look at Paragraph 18 of your report.

ATTORNEY MEHRI:  Say that again, Chris.  Where are we again?

ATTORNEY PISTILLI:  18 of the rebuttal report.

ATTORNEY MEHRI:  Paragraph 18?

ATTORNEY PISTILLI:  Yes.

BY ATTORNEY PISTILLI:

Q.     Do you see in Paragraph 18 you write, Quantitatively, my insights are built from sustained interactions with hundreds of leaders over time.

Who are those hundreds of leaders?

A.     Those are leaders in school districts where I either have graduate students who are aspiring leaders and they work in those schools.  Some of them are also already leaders and they are aspiring to a higher position.  They are leaders in the school districts where I

have worked as an educational consultant.

There are also leaders outside of that pool in two respects. One, I -- as part of my responsibilities, I lead a school study council that includes about 25 districts and their -- members of their leadership teams. And I also participate in a network in New Jersey that has a dozen or so districts a year.

As well as interactions that are more informal and less contracted with colleagues that I know professionally and encounter at conferences or in other conversations across the country.

Q. What are the names of those leaders?

A. Yeah. I realize you're going to keep asking me the names of the leaders over and over again.

And what I'm testifying to in the report is that the specific anecdotes, the specific schools, the

specific leaders, they're all informative of the generalized patterns that I'm attesting to in my report on the basis of my experience, these interactions, the research and literature that I read, and the testimony on record.

So similar to what you asked me earlier, to account -- to recount specific observations, you're now asking me to identify specific conversations.

And they're just not -- they don't -- they don't add to the weight of my report in isolation.

Q.    So I take it you're also not willing to tell me about any of the specific anecdotes on which your opinions are based in part?

A.    I think we went over that territory this morning.  My response has not changed.

Q.    So you're not going to do it?

A.    I'm not.  Because what's going to happen if we do -- if we go

Page 251

there is then you're going to pick apart the particular anecdote in an attempt to deflect blame or isolate something that is not at issue.

What I'm saying here is that as a result of all of this evidence, the convergence of evidence, declarations at a high level like the Surgeon General, we're seeing increases in mental health stress, we're seeing increases in interruptions to the school environment, we're seeing increases in generalized anxiety and students being apprehensive about their social standing in their compulsive need for validation on the platforms in ways that is impacting on the school environment, school operations, the work of school leaders, the work of school district leaders, making it more difficult for those school officials and teachers to advance teaching and learning in their schools.

Q.    You don't think the jury is entitled to pick apart the particular

Page 252

anecdotes on which your opinions are based to determine for themselves whether they actually support your sweeping conclusions?

ATTORNEY MEHRI:  Objection to asking him for a legal conclusion.

THE WITNESS:  Yes, that's what I -- thank you.  That's what I was just going to say.

I'm not -- I'm not a lawyer. I don't know what the jury is entitled to or not.

BY ATTORNEY PISTILLI:

Q.    Well, you understand that you're here under oath today to provide testimony to the jury, right?

A.    I understand that, yes.

Q.    Right.  But you're not willing to tell the jury the particular anecdotes because you don't want them picked apart, right?

ATTORNEY MEHRI:  Objection. Mischaracterizes testimony.

THE WITNESS: And I may have misheard your prior question.

Would you reframe, please?

BY ATTORNEY PISTILLI:

Q. You're not willing to tell the jury the particular anecdotes because you don't want them picked apart, right?

ATTORNEY MEHRI: Objection.

THE WITNESS: That's not it. It's that it's my belief that the opinions that I offer and the methodology that I describe within the report stands on its own merit, stands on its own two feet, so to speak, and that I do not need to deliver now new or additional evidence that exceeds what I've already described in my report or in the reply to the rebuttals.

BY ATTORNEY PISTILLI:

Q. Sir, this is the evidence you rely on in your report.

Those anecdotes form the

basis for your opinion; true or false?

ATTORNEY MEHRI:  Objection.
And argumentative.
Mischaracterizes his testimony.

THE WITNESS:  It is a
mischaracterization to call them
anecdotes.

BY ATTORNEY PISTILLI:

Q.    You called them anecdotes,
sir.

ATTORNEY MEHRI:  We're
getting into an argument.  Let's
ask questions and --

THE WITNESS:  Yeah.  I
thought you said at the beginning
that if I was answering a question
you would allow me to finish and
that I wasn't also to interrupt
you.

BY ATTORNEY PISTILLI:

Q.    We've both lapsed on
occasion.  I apologize.

A.    Okay.  I don't -- I don't
think that I have.  But I appreciate your

CONFIDENTIAL

apology.

The -- it's a mischaracterization to call what I'm describing anecdotal. You are asking for anecdotes, and that's what I'm describing as anecdotes, the particular one-off stories that you want me to provide in response to your question.

But my -- the basis of my opinion is not anecdotal. If it were a single story or a handful of stories, it could be characterized as anecdotal. But it's not.

I've been doing this for a long time in a lot of different places, interacting with a lot of different school leaders, with a primary concern of assisting them in being effective in their positions so that they can deliver the best possible education for our nation's kids.

And I'm attuned to the challenges and struggles that they face in doing their work as a result of all of

Page 256

these interactions and the bulk of my career being involved in this work.

Q.    You rely, as a basis for your opinions, on conversations you've had with school leaders; true or false?

A.    I rely in part, as a basis for my opinions, on the patterns that I've gleaned from numerous conversations over a long period of time in different types of schools with school leaders and aspiring school leaders.

I say "in part" because it's not my sole reliance.  I also rely on the experience that I bring to this as a school leader and practitioner, on the research that I reviewed as a result of doing a literature review, as well as the testimony on record from many others who attested to the harmful effects of compulsive personal student use of social media on their school environments or their school districts.

Q.    In Paragraph 18, you use the word "quantitatively."

CONFIDENTIAL

Page 257

What do you mean by that?

A.    What I meant by that is I wanted to provide a way to understand the robustness of the sample size that I'm talking about.

Since my methodology relies on qualitative methods, I wanted to make sure I included something that indicates that this isn't just going to a school or two, this isn't just a single district, this isn't just one year of paying attention to the problems because I got asked to do this.

This is a career's worth of work that reflects teaching graduate students, about 40 a year, who are public school leaders or aspiring leaders; executive coaching one-on-one to a couple dozen, maybe 15, 20 school and school district leaders annually, that varies by year; working with districts who participate in the study council or in the network of superintendents; and that since leaving the superintendency, this

has become a large number of interactions and touch points from which my opinions are, in part, derived.

Q.   You've not done any quantitative analyses, have you?

A.   This is another area that we've been over well.  So I'll repeat again that I've not done any quantitative analysis.

My report does not claim to have done any quantitative analysis. It's not the basis of my expertise.

I also didn't see it as necessary for the task that I was given. And it's my understanding that other experts may have done so.

Q.   You implemented budgets when you were a superintendent, correct?

A.   I'm sorry, I didn't hear you.  Sorry.

Q.   You implemented budgets when you were a superintendent?

A.   I guess you could call -- I don't know what you mean by "implemented

Page 259

budgets."  But yes --

Q.    You were in charge of the budgeting process?

A.    As superintendent, I had a role in the development of the school district budget, yes.

Q.    And, typically, you would be the one who would present it to the board?

A.    Yes, typically.

Q.    And would you agree that part of the budgeting process is making sure that the plans for spending for the next year align with the district's current priorities?

A.    I would agree, yes, that that's a -- that's a major part of the budgeting -- budget developing process is to align resource allocation with initiatives and priorities, yes.

Q.    Because you want the budget to align with addressing any significant areas of concern that the district is facing, right?

Page 260

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  To the extent possible.  There's quite a number of constraints.  But, yes, I would agree with that.

BY ATTORNEY PISTILLI:

Q.    And school district budgeting processes are typically public and well documented processes, correct?

A.    Typically, there's public discourse, as well as public documentation regarding a school district's budget.

The degree to which that's -- what -- what did you call -- you used an adjective there, I think.

Q.    Typically public and well documented processes?

A.    Yeah.  The degree to which you might call it well documented is maybe a little subjective and would vary across districts.

But typically they all have

Page 261

some kind of public-facing documentation, yes.

Q. Switching gears.

We agreed earlier that you're not an expert in platform design, right?

A. We did. I'm not an expert in platform design.

Q. Sure. And I just want to probe that a little bit.

Do you know what the acronym "UI" stands for?

A. I do not know what the acronym "UI" stands for.

Q. Do you know what content ranking is?

A. I don't know what content ranking is.

Q. Do you know what candidate generation is?

A. I don't know what candidate generation is.

Q. Do you know what a classifier is in the context of

Page 262

recommendation algorithms?

A.    I don't know what a classifier is in the context of algorithm recommendations, no.

Q.    Do you know what an interface -- interface interference is?

A.    I don't know what interface interference is.

Q.    Do you know what UX design principles are?

A.    I don't know what UX design principles are.

Q.    Do you have any technical knowledge of how recommendation algorithms work?

A.    I don't have any technical knowledge of how algorithm recommendations work.

Q.    Do you have an Instagram account?

A.    I don't have an Instagram -- I might have an Instagram account.  I think at one point I probably opened one.

But if it still exists, I

Page 263

don't know.  It's not something I ever use anymore.

Q.    Have you ever posted anything on Instagram?

A.    I don't think I've ever posted anything on Instagram, no.

Q.    When was the last time, approximately, that you opened your Instagram account?

A.    I have no idea.  Years.

Q.    Do you have any firsthand experience with Instagram's features?

A.    No, not really.  None to speak of.

Q.    Do you know what Reels is?

A.    I think I know what Reels is, yeah.

Q.    What's Reels?

A.    I think Reels are the little videos that play on Facetime.  I think that's what they are.

But this is not really my expertise, so I'm not sure.  They're called different things in different

places.  And I'm not one to keep track of all that.

Q.   Do you know the difference between Reels and Explore?

A.   The difference between Reels and Explore?

Q.   Yes.

A.   No.

Q.   Can you explain how autoplay works on Instagram Reels?

A.   I don't think so.  I don't know how this stuff works.  Like, I don't know how the coding works and everything.

I think what you mean is that when one reel is over another one starts.  I think.

But I don't -- I don't know if that's what you mean by autoplay.

Q.   So, then, I take it you're not able to explain to me how autoplay works on Reels?

A.   Didn't I just answer that question?

ATTORNEY MEHRI:  Do you need

Page 265

more water?

THE WITNESS:  No.

ATTORNEY MEHRI:  Okay.

BY ATTORNEY PISTILLI:

Q.    You said, I don't know what you mean by autoplay.

My question was, do you know how autoplay works on Reels?

A.    No, I think I said more than that.  But I'll try to say it again.

I don't know what auto -- I don't know how autoplay works on Reels, like, I don't know how that stuff is coded or how it really works.

I think autoplay is when one reel ends and another one starts.  I think that's what you mean by autoplay. But I don't know, because this is, like, not really my area of expertise.

Q.    Do you have a Facebook account?

A.    I do have a Facebook account, yes.

Q.    How often do you use it?

CONFIDENTIAL

Page 266

A.    I use the Facebook account occasionally.  Like, it depends on the time of year.  I primarily use the Facebook account to stay in touch with an interest group around parents of a particular college.

So there's -- like, there might be more activity in September, say, and then I stop looking.

So not very often.

Q.    How long have you had a Facebook account?

A.    Oh, I have no idea.  A long time.

Q.    Do you post things on Facebook?

A.    I don't.

Sorry.  Occasionally if I have a specific question that I need answered by that interest group that I spoke about, I will sometimes post there as a way to try to get information.

Q.    Do you know --

A.    I have done that, yeah.

Page 267

Q.    Do you know what Facebook's News Feed feature is?

A.    Okay.  Not really.  But what I think it is is that in the -- in what people see is included news pieces in what they see in I guess what's called their feed.

I think that's what it means.  I'm not quite sure.  This is not my area of expertise.

ATTORNEY MEHRI:  I'll just caution the witness not to speculate.

If you know the answer --

THE WITNESS:  Okay.

ATTORNEY MEHRI:  -- you can answer.

THE WITNESS:  Thank you.

BY ATTORNEY PISTILLI:

Q.    Do you have any firsthand experience with the Facebook Messenger feature?

A.    I do.  Very limited, yes.

Q.    What is that experience?

Page 268

A.    That experience is that there was something that someone said that they found on Facebook Marketplace that we might be interested in getting, because we wanted this, like, particular thing.

And I found it and I messaged the person who was selling it, and they messaged me back.

Q.    Do you have familiarity with Facebook Stories?

A.    No, I don't know what Stories are.

Q.    Do you know what Facebook Live is?

A.    Sort of, because there -- I don't want to speculate.

But I saw a movie where somebody put somebody on Facebook Live. So I think it's just a way of broadcasting live what's happening in realtime through the phone's video functionality.

Q.    Do you have a Snapchat

Page 269

account?

A.    I do not have a Snapchat account, no.

Q.    Do you have any firsthand experience with any of Snapchat's features?

A.    I don't.

Q.    No firsthand experience with its chat function?

A.    I don't have any firsthand experience with any of Snapchat's features.

Q.    Do you have a TikTok account?

A.    No.

Q.    Do you have any firsthand experience with any of TikTok's features?

A.    Yes.

Q.    Which features are those?

A.    I don't know what the features would be called.  But, like, I've seen the videos on my phone.

Q.    Do you know what TikTok's For You feed is?

Page 270

A.     No.

Q.     Do you know what TikTok's Following feed is?

A.     No.

Q.     Do you know what TikTok's Discover feed is?

A.     No.

Q.     Do you know what TikTok Live is?

A.     No.

Q.     Do you have a YouTube account?

A.     I don't think I have a YouTube account.  That's -- like, I've looked at YouTube.  But I think it's a different thing to have an account then to look at videos.

Q.     Do you post things on YouTube?

A.     No.

Q.     Do you have any firsthand experience with YouTube's features?

A.     Yes.

Q.     What is that experience?

CONFIDENTIAL

Page 271

A.    Well, so I've accessed videos on YouTube occasionally and watch them.  And I see that there's a content -- a comment section, I think that's a feature.  I've not posted comments, but I've seen it.

And then on the right side they have, like, other things that you might be interested in looking at.  And I think that that's a -- what you would consider a feature.

So I've seen -- like, I've seen that.

Q.    Do you have firsthand experience with YouTube's home page?

A.    No.  I didn't know there was a home page for YouTube.

Q.    Any experience with its subscriptions page?

A.    No.

Q.    Any experience with YouTube Shorts?

A.    YouTube Shorts?  I don't think so.

Page 272

Q.    If we could, let's go back to Exhibit-7, which is your original report.  And we'll take a look at Page 30.

Do you see Paragraph 104?

A.    Yes.

Q.    You say there, The current school context has been radically altered by social media platforms' unregulated and psychologically manipulative nature. Designed to capture and hold user attention through feeds, infinite scrolling, and realtime notifications, these platforms have created conditions of compulsive use, particularly among adolescents.

My question for you, sir, is what is your basis as an expert for that statement?

A.    So mostly my learning about this comes through the literature review that I did.  I think some of it may have come through the testimony on record as well, but I'm not -- I'm not entirely

CONFIDENTIAL

sure of that.

And it was in doing some of the reading that I came to really understand that there are design features that are intended to capture and manufacture attention as the product that is being sold.

And that the design of the social media platforms also exploits vulnerabilities in young people, in children and teens and adolescents whose frontal cortex is still developing, as a way to encourage their compulsive use so that they extend their engagement on the platforms.

And that that is linked to mental health issues that are rising, to attention span issues, to students -- to children, adolescents feeling, like, socially anxious.  The way that they're concerned about their social status is now, you know, quantified, I guess, in a way by how much attention they get on the platforms; their -- their need to feel

sort of continuously connected so that they don't miss anything or they don't -- you know, there's like a social accountability, I guess you could say, where they need to respond and be in the mix on the platforms all the time.

So that learning from the literature also converged with much of what I was seeing about the effects on schools and what school leaders are dealing with. Like, the ideas really came together there about what is really going on and led to the opinions that I offer in the report.

Q. I believe you agreed with me that you're not a platform design expert, right?

A. I am not a platform design expert.

Q. You're not a psychologist or a psychiatrist or people -- someone who studies the frontal cortex, right?

A. I'm not a psychologist or a psychiatrist or someone who studies brain

development specifically, no.

Q. And do you plan to tell the jury that it is your expert opinion that defendants' platforms were designed to capture and hold user attention?

A. Let me -- let me just check my -- my intent is to testify to the opinions that I offer.

And the paragraph that you pointed to is, like, supporting of an opinion. So let me just look at the opinions.

You're asking me, I think, if I specifically intend to offer an opinion that there's an intentional nature to the design of the platforms in order to engage student attention and prolong that attention?

Q. I'm asking whether you plan to tell the jury that it's your expert opinion that defendants' platforms are designed to capture and hold user attention.

A. I think that would be

Page 276

outside my opinions and outside of my expertise.

So sitting here now, it wouldn't be my intention and it's not in the language of my opinions, although there is, as you just pointed out, some language in a supporting section.

But that would not be my intention. I think I would leave that to other experts who would know more about that than me.

Q. And do you recall earlier that we had some discussions about platform features that, in your opinion, contribute to schools' social media-related harm? Do you recall that discussion this morning?

A. I think I remember it a little bit differently than you just described it.

Because I think what I recall is you asking me about a number of features and me replying that the specific features, like, how they worked,

Page 277

how they're designed, how they're coded, which platforms have which features, when and how the features change, how they interact with each other, all that kind of thing is something that I don't know about and is outside the area of expertise.

And you just asked me right now if we had a conversation about the features.

So maybe we're talking about the same thing. But I just wanted to characterize it the way that I remember it.

Q.    Sure.

So you -- broadly speaking, your testimony is that schools and school districts have been harmed as a result of students' social media use, correct?

A.    Well put. Yes.

Q.    And when you talk about those harms caused by social media, you mean to include in that harms caused by feeds, infinite scrolling and realtime

notifications, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: I know I put them here as sort of illustrative examples, but I don't -- it's not my intention to really talk about any particular features. There -- that's sort of outside my area of expertise.

BY ATTORNEY PISTILLI:

Q. But it's also not your intention, when considering whether school districts have suffered social media harm, to exclude feeds or infinite scrolling or realtime notifications, right?

ATTORNEY MEHRI: Objection.

THE WITNESS: I'm having trouble with the logic of your question, because you're asking me, like, my intention to not include something or something like that?

Just, will you help me

Page 279

understand what you're asking me?

BY ATTORNEY PISTILLI:

Q.    Sure.

When you offer testimony about what you view as social media harms, you're -- you're not excluding from that harms that flow from interactions with features that include feeds, infinite scrolling and realtime notifications, are you?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  It's really a, like, particular -- particular sort of phrasing of the question.

It's not my intent to exclude or include any particular features.  It would be my intent to say I'm not really an expert on the features, because that's true, I think they change a lot.

As you just established, I don't have a ton of firsthand experience.

It would be my intent to say

Page 280

that there are these features that lead to compulsive use on the part of young people and adolescents. And that that compulsive personal use of social media by school-aged children is creating a burden on schools that challenge resource allocation, divert leadership time.

So I wouldn't -- I would make the link between the design features' intention to prolong engagement having an impact on the school environment and posing new harms and exacerbating existing harms, especially to the leaders who are attempting to fulfill their leadership duties.

BY ATTORNEY PISTILLI:

Q. And the features that impose harms on school districts include the ones you reference in Paragraph 104 of your report, right, feeds, infinite scrolling and realtime notifications?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  My -- my reading of the literature is that, yeah, they do.  And probably some others.

I just am not able to speak to the details of all of this, because I don't understand how they're coded or what their particulars are or the differences among the platforms or how the features interact with one another.

So I think in terms of, like, naming particular features, that wouldn't be my intent.  I would leave that for other experts who understand this stuff better than me to do.

But what I have observed and what I see in a convergence of evidence is that the cumulative effects of this have created, like, a generalized anxiety,

destabilized school environments, challenged resource allocations because of the greater need for mental health services, diverted leadership attention so now they're paying attention to intervening in social media associated crises and addressing students' increased anxiety and teachers' struggles with attention, student attention, that kind of thing.

That's where -- that's where I think my expertise lies.

BY ATTORNEY PISTILLI:

Q.    If we could go back to your rebuttal report, Exhibit-8, and look at Page 3, please.

A.    Sure.

Q.    And in Footnote 1, you say, In their July 2025 reports, Robert W. Platt, Ian Gotlib and Randy Auerbach each assert that I opine in my May 16th, 2025, report that the scientific evidence

Page 283

supports the position that social media causes poor mental health outcomes among students in educational settings. Although -- although it is my understanding that other experts have offered opinions in support of this position, neither my May 2025 report nor this rebuttal report addresses that issue.

Q.    Do you see that?

A.    I do, yeah.

Q.    And do you stand by that statement in your rebuttal report?

A.    For the most part.  I mean, I'm not a statistician.  I'm not a clinical psychologist.  I'm not a mental health expert.  I don't conduct, like, controlled studies.

So my understanding here of scientific evidence, that -- the use of scientific evidence is kind of best left to people who are statisticians or scientists or engaged deeply in this material.  They are the people who

Page 284

conduct the research themselves.

For me, I would -- in this respect, as far as reading literature, I'm more of a -- of a consumer of their reports. And their reports have, you know, informed how I think about these -- about these issues.

Q. But you don't intend to offer to the jury the expert opinion that the scientific evidence supports the position that social media causes poor mental health outcomes among students in educational settings, do you?

A. I think that's best left to other experts who understand the statistics and the research design that would enable someone to make such a claim.

Q. You are not qualified to offer an expert opinion that the scientific evidence supports the position that social media causes poor mental health outcomes among students in educational settings, right?

A.    I can read the literature. So I can say that these studies influence how I think about these things and that is part of how I came to the opinions that I have.

But as far as the -- the exact, like, nature of the causality and how it works, like, how exactly it causes these mental health outcomes, I would want to leave that to other experts who are statisticians or scientists or conduct research into this particular question.

Q.    Right.  Because you're not an expert in mental health, right?

A.    Yeah, I think you asked me that earlier, maybe a couple of times. And I think I also just said that.

I'm not an expert in mental health.  And I'm not a statistician.  And I'm not, like, a data scientist or clinical psychologist or any of those things.

ATTORNEY PISTILLI:  Good

CONFIDENTIAL

Page 286

time for a break.

THE WITNESS:  Yes.  I have to go to the bathroom again. Thank you.

VIDEO TECHNICIAN:  The time is 3:57 p.m.  This is the end of Media 5, and we are going off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 4:22 p.m.  This is the beginning of Media 6, and we're going back on the record.

BY ATTORNEY PISTILLI:

Q.    Dr. Osborne, you've referred at various points today to a literature review you conducted.

Could you please describe that literature review?

A.    Sure.  My literature review was I used Google Scholar to find

articles related to social media and student mental health. I entered, like, various keywords in there. I can't remember exactly what, but social media, mental health, schools.

And then I just downloaded and skimmed and read articles that seemed like they would be relevant.

Q. And in the course of that literature review, did you identify any articles that suggested there was not a causal connection between social media use and mental health harms?

A. I didn't -- that the article suggested that there's not a causal link?

I don't know. I don't remember. Throughout the articles, it seems like the preponderance of evidence is that there's linkages to -- to mental health concerns.

Q. You don't recall whether you reviewed any articles that contradicted that view?

A. I don't recall any specific

articles that, like, contradicted that view.

There were -- there were articles that may have said that there's evidence mixed or there's a need for more research or something statistically wasn't significant or something like that.

Q. And was your literature review limited to the impact to -- of social media and student mental health?

ATTORNEY MEHRI: Objection.

THE WITNESS: No, because part of the literature review that I was doing initially was around the importance of school leaders and what their scope of duties and responsibilities are.

So I did some on the, like, the purpose of public education. Some on the role of educational leaders, like what's the importance of them being able to do their work well. And then

social -- like, adolescent, childhood social media use and mental health.

I don't remember all, like, the keywords that I used. But that's -- I felt like finding literature and research that addressed those questions would help enable me to understand the task that I was given to take a look at what's the impact of social media on schools and school leaders.

BY ATTORNEY PISTILLI:

Q. And did you do a literature review on any topics other than the purpose of public education, educational leadership and social media use and its connection to mental health issues?

A. Probably, because I used a variety of different keywords.

But I think that, in the main, captures what I did.

Q. Anything else that you can

Page 290

recall as you sit here today?

A.   As I sit here today, no, I don't -- I don't remember specifically, like, what other keywords I would have put into Google Scholar to identify articles that I should read.

Q.   And, then, did you read all the articles that you relied on in your report?

A.   I did, yeah.

Q.   And you ensured yourself that they were well founded?

A.   What do you mean by that?

Q.   That they were credible scholarship, that it would be appropriate to rely on?

A.   Yeah, I think that's fair.
Like, I don't -- I'm not a researcher, a methodologist.  So I don't have a rubric for what would be, what did you call it, well -- well --

Q.   Well founded?

A.   -- well founded methodology.
But what I was paying

Page 291

attention to was, you know, where did it appear; because some of the scholarly journals, I would infer an inclusion in some of those journals means that it's pretty well founded.

And I did look at the methodology to get whether it was, like, a meta-analysis of other literature or a qualitative study or a case -- single case study, like what kind of study it was.  Yes.

Q.    Let's take a look at your rebuttal report, which I believe is Exhibit-8, if you go to Page 10.

You see in the footnote there you cite an article by Popat, S., and Tarrant, A., 2023, Social Media, Mental Health and Young People:  Emerging Research and Implications in the Youth Studies Journal?

A.    Yes.

Q.    Do you know who S. Popat or A. Tarrant are?

A.    Beyond them being authors

about this, no.
Q. So you don't -- besides the fact that they authored this article, you don't know anything about them?
A. I didn't, as part of my literature review, like, look into the background or particularities of the authors.
I didn't think it was necessary. And I didn't take the time to do that.
Q. Are you aware that there's no journal called Youth Studies Journal?
A. I guess I am now.
I said I know that there are a couple of places, this may be one, where my citations are faulty.
Q. When -- when did you learn that your citations were faulty?
ATTORNEY MEHRI: Objection.
THE WITNESS: I don't recall. When -- when preparing for this.
BY ATTORNEY PISTILLI:

Page 293

Q.     Did you make any effort to correct your citations?

A.     Yes.

Q.     What efforts were those?

A.     I looked at the materials cited in the May 16th report and recreated the citations to identify if there were any errors.  And if there were, what errors there were.

Q.     Did you identify your citation to S. Popat and A. Tarrant in the Youth Studies Journal as an error?

A.     I think that I did, yes. But I don't recall exactly.

Because I think this is one where there was a -- there was an article by the same authors that is the article that I used and referred to.

Q.     By S. Popat and A. Tarrant?

A.     Yeah.  Yeah.  This is the -- yeah, I don't have those articles here.

But I downloaded articles, and I put them in the folder with names of -- the names of the authors or the

organization.  And that's what I worked from.

ATTORNEY PISTILLI:  We'd call for the production of those articles.

BY ATTORNEY PISTILLI:

Q.    Were you, perchance, meaning to refer here to the Journal of Youth Studies?

A.    I don't know.  I don't recall.

Q.    Well, unlike Youth Studies Journal, are you aware that there is a journal that exists called the Journal of Youth Studies?

A.    I'm not really familiar with all the journals that exist.  So I don't know.  I'd have to look for that.

ATTORNEY PISTILLI:  Let's take a look at Tab 59, please.

- - -

(Whereupon, Exhibit Osborne-11, No Bates, Journal of Youth Studies, Volume 26, was

marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I'll represent to you that this is a composite exhibit with all ten issues of the 2023 volume of the Journal of Youth Studies.

We're going to go ahead and mark this as the next exhibit in turn.

I've now handed you Exhibit-11.

A.    Okay.  Thank you.

Q.    And I can represent to you that Exhibit-11 is a composite with all ten issues of the Journal of Youth Studies for 2023.

A.    Okay.

Q.    And looking at that composite exhibit, do you agree with me that there's no article by S. Popat and A. Tarrant that was published in 2023 in the Journal of Youth Studies?

A.    Yes, I would agree with that.

That -- I think I was trying to explain that that citation is a mistaken duplicate of the other article by the same authors.

Q. What's the other article by the same authors?

A. I think it's this 2022 article. There may be errors in here as well.

But there is a Popat and Tarrant article that I used as part of my literature review.

Q. Is it cited in your materials considered?

A. It's cited in the -- it's cited, maybe incorrectly, in my May 16th report.

Q. All right. Let's take a look at another citation in your report.

Do you see you've cited there an article by D. Watson, K. Topping and S. Drew from 2022 entitled, The Impact of Social Media Use on Adolescent Mental Health, Systematic Review, Journal

Page 297

of Adolescence.

Do you see that?

A.    I do.  And I do recall that this citation is flawed.

There's an article by Watson that I used that -- I think you just asked for all the articles, so we can make sure we provide them -- but the citation here doesn't match the article.

The references to Watson in the text should line up and match the article that I intended to cite.  But that's the wrong citation.

Q.    What's the name of the Watson that you intended to cite?

A.    I don't -- I don't recall, and I didn't bring that corrected list with me.

Q.    But you have a corrected list?

A.    I -- yeah, I just -- you asked if I did anything to correct the citations, and I responded to you that I did.

Page 298

In the materials cited from the May report, I went through the ones that I had downloaded into that folder, and then I double-checked the citations to see if they matched. And I found a number of errors in the citations.

This one I do recall because, to my dismay, the last name of the first author matches, but the rest of the citation is -- is faulty.

Q. Well, if we can go to Exhibit-7 and look at Page 35 real quick.

A. Exhibit-7. Sure.

Q. You see on Page 35, in this alphabetical list of references you provide, there's one reference to Watson on Page 35, right?

A. Yes. That's the one I just described, that there is an article by a Watson, though last name of the first author is Watson, but it doesn't match the rest of this citation. This citation is erroneous.

Q. But this -- it's the same

Page 299

erroneous citation in both of your reports, correct?

A.    That's a good question.  I think so.

Because as I was working through the reply to the rebuttals, I was going back to these citations and looking at where I had made the similar points already in my initial report and then copying and pasting those citations into the footnote.

So if it was wrong in the first one, then it's most likely wrong in the second one.

Q.    And to your knowledge, there is no article by D. Watson, K. Topping and S. Drew entitled, The Impact of Social Media Use on Adolescent Mental Health: Systematic Review?

A.    Yes.

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  Oh, I'm sorry.

That's correct, yeah.

There's an article by a Watson.

But the rest of this citation

is -- is erroneous.  It's faulty.

BY ATTORNEY PISTILLI:

Q.    Sure.  And then if we could just go back to the native version of Exhibit-8, the rebuttal report.

A.    Sorry, where are we?

Q.    Page 10 of your rebuttal report.

A.    Okay.  I'm there.

Q.    Do you see that in your report you provide a URL link to your citation?

A.    Yeah, I do.

ATTORNEY PISTILLI:  And if I could just ask if we could, please click on the link that you provide there.

BY ATTORNEY PISTILLI:

Q.    This article doesn't exist, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yeah, that's

CONFIDENTIAL

Page 301

correct. To my dismay, I discovered that the article that was authored by a Watson that I did use and is in my list of articles that were part of my literature review and that I did read and inform my opinions doesn't match this citation, to my dismay.

And so it's not surprising that this link also does not work.

I apologize for that.

BY ATTORNEY PISTILLI:

Q. Well, you say it's in the list of articles that were part of your literature review.

You're referring to your materials considered list, correct?

A. Well, no. I was referring to the -- the articles that, as a result of my search for scholarly articles using Google Scholar, that I downloaded into a folder on my computer and named after the last name of the -- like, the file name

Page 302

itself was named after the last name of the author or, like, the organization that the article was from.

And then I worked through -- I worked through that. So that's where that article actually, like, sits.

And I wish that I had brought the -- the corrected list. But I didn't bring that.

Q.    Let's take a look at Page 9 of your report, Footnote 9.

ATTORNEY MEHRI:  Page 9 or Footnote 9?

ATTORNEY PISTILLI:  Both.

BY ATTORNEY PISTILLI:

Q.    Do you see that in Footnote 9 you purport to cite an article by Montag, C., Sindermann, C., Becker, B., and Panksepp, J., from 2021?

A.    I do.

Q.    And that's an article entitled, An Affective Neuroscience Framework For the Molecular Study of Internet and Smartphone Use Disorder.

Page 303

Do you see that?

A.    I do.

Q.    And that is from Neuroscience and Biobehavioral Reviews, on Page 571 to 582?

A.    Yeah.  That's what it says here.

I'm anticipating you're going to tell me that it doesn't exist or this citation is faulty and the link is broken.

That may very well be true. I made some mistakes on the citations.

ATTORNEY PISTILLI:  Let's take a look at Tab 62, please.

- - -

(Whereupon, Exhibit Osborne-12, No Bates, Neuroscience and Biobehavioral Reviews, Volume 120, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    This is from the -- the

Page 304

121st volume of Neuroscience and Biobehavioral Reviews that you cite.

And I would just ask you to please confirm for the jury that the article you purport to cite does not, in fact, appear in the Neuroscience and Biobehavioral Reviews?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yes, I will -- I will confirm that.

BY ATTORNEY PISTILLI:

Q.    I'll hand you what's been marked as Exhibit-12, which is what we've been looking at together on the screen.

ATTORNEY PISTILLI:  And, then, Ray, if we could click again on the link.

BY ATTORNEY PISTILLI:

Q.    Do you -- do you see, Dr. Osborne, you again have provided a link that purports to take us to the journal article that you've purported to cite?

Do you see that?

A.    Yeah, I see that.

ATTORNEY PISTILLI:  And then can we please click on that link?

TRIAL TECHNICIAN:  Which page is that again?  I'm sorry.

ATTORNEY PISTILLI:  Page 9, the Montag article.

TRIAL TECHNICIAN:  (Trial tech complies with request.)

BY ATTORNEY PISTILLI:

Q.    And, in fact, you've provided a link to an article entitled, Probiotics Treatment Improves Cognitive Impairment in Patients and Animals:  A Systematic Review and Meta-Analysis, correct?

A.    Yes, I see that that's what it links to.

Q.    All right.  Let's take a look at the immediately following article cited by you in your expert report purportedly by J. Nesi, M.J. Prinstein, and E.H. Telzer.

Do you see that one?

A.    Yes.

CONFIDENTIAL

Page 306

Q.   And at least according to your citation, this is a 2018 article entitled, Adolescent Social Media Use and Mental Health, a Developmental Neuroscience Perspective in Current Directions in Psychological Science.

Do you see that?

A.   Yeah, I do.  I think that's also a bad citation.

These authors exist and there's an article that I read and used as part of my literature review.  And I think when I -- when I reference it in text, even if the details of the citations are wrong it points to that article.

So while it's my intention to provide all of the articles that I used, I think this citation is also off.

ATTORNEY PISTILLI:  Let's go ahead and again click on the link you provided.

TRIAL TECHNICIAN:  (Trial tech complies with request.)

BY ATTORNEY PISTILLI:

Q.    Again, this article doesn't exist, right, even though you cited it?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Well, the -- so there is an article that exists by these authors that I did use.

You know, I guess this link doesn't go to that article.  Some of the other details of the -- of the citation might be incorrect.

But there is, yes, an article that exists by these authors that I used.

BY ATTORNEY PISTILLI:

Q.    So your representation is that there's an article by J. Nessi, M.J. Prinstein and E.H. Telzer that you relied on?

A.    Yeah, that's what I recall, sitting here right now.

As I was doing the -- the check on all the citations after realizing that some weren't good, I

Page 308

matched the citations to the articles that I had downloaded, when I did my search using Google Scholar to match up articles with the -- you know, the citations with actual articles that I read. And this one is one that I recall resides in that folder and that I read and used in the literature review.

Q. So we've discussed a number of instances now where you've cited articles that don't exist or at least don't exist by the name they are cited by or don't appear in the -- the journal that you've cited, correct?

A. I think there are two that -- that don't exist. The second Popat and Tarrant is actually a duplicate of the first. And then the other one is -- oh, where were we just -- is the Montag, Sindermann article.

The others, to my knowledge, actually do exist. I downloaded them into this folder and used them in my literature review. I then, you know,

CONFIDENTIAL

Page 309

made the -- what I realize now -- very unfortunate error of trying to use Gemini to APA format those citations and got back bad citations.

So there are a couple like that. You -- you found, though, one for Watson, Popat, Montag.

But as far as I -- as far as I know, the two -- well, one it's not that it doesn't exist, it's, like, a bad duplicate. And then there's one that I think doesn't exist.

But I would have to go back and check. And that's just -- that's just my error for not carefully double checking that.

Q. Well, so we'll go through each of them.

You agree that there's at least one article you've cited that doesn't exist, right?

A. Yeah, I think that that's right. I have to double check.

Q. And --

CONFIDENTIAL

Page 310

A.    When I realized the error, I double checked everything in the citations of the May report, and then I kind of stopped doing that work.

So I -- I would have to do the rest of the -- any citation that I put anywhere to double check all that.

Q.    And it's your testimony that this resulted as a use of your -- as a -- as a result of your use of Gemini?

A.    For the purpose of formatting APA citations.  So I took the articles that I read -- I was working from the articles in the alphabetical order as they appeared using the file name that I -- that I downloaded and worked from that list.

And then when it just came to, you know, creating citations that comported with the -- with the APA format and structure, instead of using, like, Citation Machine, which I had used before, I just used a tool that was new to me to see if it would work, as an

experiment.

And I'm learning the lesson that it didn't work so good.

Q. Gemini is artificial intelligence, right?

A. Yes.

Q. And as a result of your use of artificial intelligence, you agree you've cited at least one article in your report that, in fact, doesn't exist?

A. There is -- there is an article in the footnote that I need to double check to see if it was an article that I actually gave to it or how that got in there.

Q. What article is that?

A. Well, I think it's the one you found. The Montag article.

But as I said, when I realized there were these citation errors I went through the work cited in the May 16th report. And I haven't gone through all of them in the other reports or the longer list of materials considered to

Page 312

identify -- like, match them to a specific article or see if they're duplicates or what.

Q.    So sitting here today, you're not even certain that some of the materials that you cited to the court and to the jury in your report are real, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  No, I'm fairly certain that they're -- they're all real or maybe all real except for this one.

Granted, there's some more due diligence that I -- that I need to do for verification purposes.

BY ATTORNEY PISTILLI:

Q.    Were you informed that there's an order in this case that says, Parties and counsel shall not file or otherwise present to the court any briefs, pleadings, materials, other documents or argument which contain

AI-hallucinated citations to law, case or legal citations which are fictitious or nonexistent or any uncorraboratible assertions of fact?

Did your lawyers tell you that?

A.    Not that I recall specifically.

Q.    And I think you would agree with me that you've cited several fictitious articles in your report, right?

ATTORNEY MEHRI:  Objection. Mischaracterizes his testimony.

BY ATTORNEY PISTILLI:

Q.    They don't exist, right?

ATTORNEY MEHRI:  Objection. Mischaracterizes his testimony.

THE WITNESS:  No, I'm not sure.  I think all the articles that I use in my citations in the May 16th report do exist, even if there are errors on the citation list itself.

Page 314

The other one you noticed, I have to look.  I have to look at that -- all of those and see what happened there.

BY ATTORNEY PISTILLI:

Q.    Certainly, you've agreed with me that there are several articles cited in your rebuttal report that don't exist by the name and title and journal that you've cited, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I think what I said is I have the articles.  And when I used the tool for APA formatting, I got back some bad results.  I didn't double check.  That was a big mistake, obviously.

But those articles exist, the ones in the -- in the May 16th report that I went through, like, citation by citation.  I need to do it for the other -- for the other report.

BY ATTORNEY PISTILLI:

Page 315

Q.    Could you turn to Page 16 of your rebuttal report, Paragraph 57?

Do you see where you wrote, Several defense experts have also cherry-picked data to support their arguments while ignoring other data points?

Do you see that?

A.    I do.

ATTORNEY MEHRI:  Did you say 57?

ATTORNEY PISTILLI:

Paragraph 57.

BY ATTORNEY PISTILLI:

Q.    You previously agreed with me, right, that you yourself didn't review any documents or data produced by any of the six plaintiff school districts in this case, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  That's -- yes, I did not review any data or documents from the specific school districts.

Page 316

I did read the rebuttal reports. And their use of data seemed to me to be selective.

BY ATTORNEY PISTILLI:

Q. But you have no knowledge or understanding of what data actually exists for any of the six bellwether districts, correct?

A. Not so much -- like, for example, I know that there are reports on discipline in school districts, there are reports on budgets in school districts, there are reports on staffing in school districts.

So if I see that someone chose a particular data source that acts as a counterfactual without context, you know, it raises, for me, questions about selectivity.

Q. Well, to say it was cherry-picked you would need to have an understanding that other data is available, correct?

ATTORNEY MEHRI: Objection.

Page 317

THE WITNESS: Well, it's based on the understanding that other data is available, data that would also be, like, quantitative reports but also data that would explain, like, the context of any particular data that's being examined.

I don't think it requires me to know, like, all the existing data in a particular district to see that there's a selective use in the district-specific rebuttal reports.

BY ATTORNEY PISTILLI:

Q. Well, in order to know that it's cherry-picked, you would have to understand whether or not it's representative of what actually exists, correct?

ATTORNEY MEHRI: Objection. And asked and answered.

THE WITNESS: You know, I don't know what you mean by

Page 318

"representative."  I don't think so.

BY ATTORNEY PISTILLI:

Q.    What do you mean when you say something is cherry-picked?

A.    What I mean is that it seems to me that there's a selectivity about a particular data set in order to try to prove a counterfactual.

A.    And the selectivity could be excluding other potentially relevant data or, you know, other explanations of what is going on in that data set.

Q.    So it could be excluding other data.

But in order to know whether it actually is, you would have to look at the data itself, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I think it suffices to observe that there's a selectivity by reading the report itself and how data is used by that author.

Page 319

BY ATTORNEY PISTILLI:

Q. But sitting here today, you're not aware of any data from any of the six bellwether school districts that contradicts any of the assertions in defendants' experts reports, correct?

ATTORNEY MEHRI: Objection.

THE WITNESS: I would agree with that. I think that's a fair statement.

BY ATTORNEY PISTILLI:

Q. You agree, don't you, that social media alone is not the sole cause of challenges faced by school districts?

A. I would agree that there is -- it's not a sole cause. It's not a mono-causal issue, correct.

Q. And you also agree that issues like poverty and school violence shape the educational environment and place ongoing demands on schools?

A. You named poverty and gun violence? I would agree that poverty and gun violence place demands on schools,

yes.

And I would say that -- I think we went over this a little bit earlier, that students' compulsive personal use of social media seems to me of a different quality than those other contextual realities that schools confront when they're executing on their educational mission to educate all students.

That poverty has, of course, long existed and creates issues. Those issues are exacerbated by social media issues.

I would say gun violence is a little bit different in that although it is very traumatic if it happens, where it happens, and if it happens in a school, extremely traumatic, and that has some ripple effects across school communities.

But there's something pervasive in the social media use that is of a different quality.

Page 321

Q.    You didn't do any statistical analysis to determine the extent to which any of these other issues that cause mental health strains on students and can impact the school environment drove any increases in mental health expenditures that any of the districts faced, have you?

A.    That was a really long question.  What -- what are you asking me?

Q.    You didn't do any work to try to determine the extent to which, in your opinion, social media is driving the increase in mental health expenditures for schools versus all of the other potential factors that could be driving mental health expenditures in schools, did you?

A.    I didn't do a statistical analysis about the contributive power of different factors.  I'm not a statistician.

And I didn't think that that

was necessary for the task that I was given.

Q. It's always been the responsibility of public schools to address new issues in society as they emerge, right?

ATTORNEY MEHRI: Objection.

THE WITNESS: I'm not sure I want to agree with that fully.

I think public schools exist as public institutions in our nation's democracy and, therefore, of course, they're affected by emerging issues, various things that happen in school communities, circumstances in which students are living. Yeah.

But I think I -- I think I need to be reminded of your question.

BY ATTORNEY PISTILLI:

Q. Well, in order to serve their core mission of educating students, schools have long had to respond to

Page 323

changes and developments in society, right?

A.    Sure, yes.

Q.    And there have always been obstacles that have made it more difficult for schools to fulfill their mission of teaching students, right?

A.    There have always been challenges, yes.

I think that this particular challenge created by students' personal compulsive use of social media is of a different quality.  And also, the source is sort of more identifiable, if you will.

So the fact that, of course, it impacts on schools and school districts should not mean that it is an expectation that schools and school districts alone are responsible for addressing and ameliorating the harms, when they themselves have no control over the design of the platforms that's leading to this kind of compulsive use.

CONFIDENTIAL

Page 324

Q. But kids have always, from time to time, misbehaved or not paid attention during instructional time, right?

A. Issues of behavior management in classes, student disciplinary practices -- like, school's disciplinary practices, that's beyond the opinions of what I'm offering here.

But I do acknowledge that many of these problematic interactions have, of course, preceded the use of social media.

But it's different now, because social media exacerbates their impact as students engage in ever more attention-seeking behaviors or become preoccupied and anxious about their place in the social fabric of their social media use.

It's also created new levels of problems as students' misbehavior might be driven by, triggered by something that happened online, driven by

their fears that come from a fear of overexposure or a fear of missing out or the generalized anxiety of their need for validation.

Like, those kinds of things make what may have been for school leaders relatively routine incidents of misbehavior into things that can become much more disruptive or much more widespread, can be much more harmful to individual kids, but overall have the impact on the school environment itself that is a bit destabilizing and means that educational leaders need to be intervening, attending to the issues that are all stemming from social media use.

Q. Well, respectfully, sir, my question was a little different and substantially narrower.

I'm just asking if you agree that long before there was social media kids sometimes misbehaved or didn't pay attention during instructional time?

ATTORNEY MEHRI: Objection.

Page 326

Asked and answered.

THE WITNESS:  I recognize that you're asking a narrower question.

Yet, this is in the context of an examination of social media and its impact on the school environment.  So it's hard for me to answer the narrow question in isolation of the broader questions that are on the table in this discussion.

BY ATTORNEY PISTILLI:

Q.    Are you just willing to tell the jury, one way or the other, whether, in your expert opinion, as a lifetime educator, kids sometimes acted out in class or didn't pay attention before social media existed?

A.    I think I want to stay within the opinions that I offer.

So I would say that a number of issues, of course, preceded social media.  That's, like, undeniable.  Kids'

misbehavior is one.

The concern that I'm bringing and the opinions that I'm offering are about how those kinds of I guess what you would call problems or challenges to the school environment, are affected by a school environment now that is -- where social media use in the student body is so pervasive and unregulated social media use without much guardrails intended to increase engagement, leading to sort of this need for constant validation, knowing what's going on online, so -- on the platforms.

So it's like the routine misbehaviors that might have happened in the past, there's a different level of risk, exposure and threat now, I think, that is affecting a school community.

Q.    It's always been the part of classroom teachers to engage in classroom management, right?

A.    Yeah, I'm not here to talk much about effective instruction.

But certainly teachers managing the -- their classroom is part of their responsibilities, yes.

Q. Can you take a look at Page 13 of your rebuttal report, Paragraph 45?

A. Okay.

Q. And do you agree that educators in school systems utilize social media in positive and productive ways?

A. Yes. And this also gets to the article that you had me review this morning that appeared in the Journal of Leadership and Practice, where you highlighted that superintendents encourage principals to use social media for purposes of communication.

And so -- well, ask me your question again, please. I lost track of it.

Q. I just asked you if you agree that educators in school systems utilize social media in positive and

Page 329

productive ways?

A.    Educators and leaders in schools and school districts can use social media in positive and productive ways, yes.

Q.    It can use it to do things like share information with families?

A.    They can use social media to -- as a communication vehicle, primarily to share information with families or with the wider community as well.

Q.    They can use social media to celebrate students' successes?

A.    They can use social media to highlight student accomplishment or celebrate student successes, yes.

Q.    And they can use social media to promote school events?

A.    Educators and district leaders and school leaders can use social media to promote school events, yes.

Q.    And they can use social media to foster professional learning

communities?

A.   Educators and educational leaders can use social media to foster professional learning communities, yes.

Q.   Are you aware that many of the districts at issue in this litigation use social media in these ways?

A.   I don't have any direct knowledge of that.  But it doesn't surprise me, because it's a widespread practice in educational leadership.

Q.   So it wouldn't surprise you, for instance, to learn that the Irvington Public School system has and uses a YouTube channel?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  That would not surprise me to learn that the Irvington School District has a YouTube channel that they use to -- for purposes of communication with their school communities.

BY ATTORNEY PISTILLI:

Page 331

Q.    And are you aware that some of the plaintiff school district bellwethers in this litigation also integrate social media into their classroom instruction?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  How do you mean?

ATTORNEY PISTILLI:  Let's take a look at Tab 42.

-   -   -

(Whereupon, Exhibit Osborne-13, No Bates, Plaintiffs Fact Sheet, was marked for identification.)

-   -   -

BY ATTORNEY PISTILLI:

Q.    So this is the plaintiff fact sheet for the Board of Education of Harford County.

Do you see that?

A.    Yeah.  Do --

Q.    We're getting you the paper copy.

CONFIDENTIAL

Page 332

A.    Thank you.

Q.    And I take it you didn't review any of the plaintiff fact sheets for any of the specific bellwether plaintiffs in these cases, right?

A.    No, not that I recall.  To the best of my recollection, I'm seeing this for the first time.

Q.    Sure.  If you could just take a quick look at Page 23.

A.    Sure.  Let me just get an idea of what this is.

Okay.  Thanks.  And this is for?

Q.    Harford.

A.    Harford.

And you want me to look at what part?

Q.    Sure.  Page 23.

A.    Thank you.

Q.    Do you see there where Harford was asked, Has your district incorporated the use of any of defendants' platforms in its curriculum

CONFIDENTIAL

since the 2017-2018 school year?

A.    Let's see.

Yes.  I see that.

Q.    And you see that Harford answered yes to that question?

A.    Yeah, I do.

Q.    And they indicated that they use YouTube videos in the science curriculum, right?

A.    Yeah.  They do have science here, YouTube videos in the curriculum.

Q.    And they also use YouTube channels and posts in connection with the mathematics curriculum, right?

A.    Yeah, I see that here.  They have a -- they have YouTube -- YouTube, Math Fail.  I don't know what that is.

Okay.

Q.    And they also use Twitter and Facebook, it says?

A.    I see that.

ATTORNEY PISTILLI:  Let's take a look at Tab 55.

Can I see that for one

Page 334

second?

THE WITNESS:  This one?

ATTORNEY PISTILLI:  I'm just not certain that I noted for the record that this has been marked as Exhibit-13.  Thank you.

- - -

(Whereupon, Exhibit Osborne-14, No Bates, Dekalb County, Social Media Guidelines for Students, was marked for identification.)

- - -

BY ATTORNEY PISTILLI:

Q.    I'll give you now a document that's been marked as Exhibit-14.

A.    Thank you.

Q.    I take it, since you didn't look at any of the plaintiff districts' documents, that this is not something you've seen before?

A.    That's right.  I think I'm seeing this for the first time.

Q.    You're generally familiar

Page 335

with the idea that some schools may issue guidelines on various topics?

A.    Sure.  Of course.

Q.    And this appears to you to be a DeKalb County School District social media guidelines for students?

A.    It does.

Q.    And if you could take a look at Page 6.

A.    Just give me one second to get the full context here.

Okay.  Thank you.  Got it.

Q.    And do you see where DeKalb tells its students that social media is a powerful tool when used correctly?

A.    No.  Sorry.  Where is that?

Q.    The bottom of Page 6.

A.    Bottom of 6.

A.    Okay.  It's a pretty powerful tool whether used correctly or incorrectly, I guess.

Q.    And DeKalb also told its students that social media is a way to have fun, right?

CONFIDENTIAL

Page 336

A.    Oh, the preceding sentence, right?  You can have fun by participating, blah, blah, blah.  That?

Q.    Yes.

A.    Yes, I see that.

Q.    Yeah.  You can have fun by participating in trending topics, right?

A.    Yes, I see that.

Q.    You can use social media to have fun by participating in dance challenges, right?

A.    I see that here, yes.

Q.    You can have fun by commenting during your favorite television show, right?

A.    That's what it says here.

Q.    Yep.  So these guidelines are highlighting some positive aspects of social media, right?

A.    They are.

Q.    And they're not saying students shouldn't use social media at all, right?

ATTORNEY MEHRI:  Objection.

Page 337

THE WITNESS:  Correct.

That's not what they're saying

here.

BY ATTORNEY PISTILLI:

Q.    In fact, they're encouraging
them to use social media, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  I don't know
if I would characterize this as
encouragement or just an
acknowledgment that it's going to
happen, so they're trying to offer
some guidelines in a way that will
be well received by students and
families.

BY ATTORNEY PISTILLI:

Q.    Well, and they're
highlighting positive uses of social
media, right?

ATTORNEY MEHRI:  Objection.

THE WITNESS:  Yeah, let's
see.

If I look at what they're
doing, they're -- they're

highlighting a number of things. The importance of being respectful. They're saying that there should be some responsibility for posts, asking for permission.

They are also highlighting some dangers of cyberbullying. Its potential to be disruptive. That students have no right to privacy. That poor behavior and inappropriate digital communication may violate the student code of conduct. The importance of protecting identity and privacy, following rules, reporting problems.

There's just a little bit at the end here about what you highlighted, having fun and it being a powerful tool.

It's definitely a powerful tool.

BY ATTORNEY PISTILLI:

Page 339

Q.    And they're -- they're highlighting the fact that social media can be used to connect different people and views from across the world, right?

ATTORNEY MEHRI:  Objection. Mischaracterizing his testimony about the full document.

THE WITNESS:  Well, sure, they are.

Is there a question?

BY ATTORNEY PISTILLI:

Q.    Yes.

And they are also highlighting that social media can be used to share with family or friends or to get to know about your favorite brands or celebrities, right?

A.    Sorry.  I had -- I had pulled away.

Oh, yeah.  That's also in that minor paragraph at the end of the document, yeah.

Q.    So they are -- they are both promoting the responsible use of social

media but also highlighting the ways that it can be used responsibly and in a positive way?

A.    I don't know that I would characterize it as a promo.  But sure.

They're trying to offer some guidance to enable students to have better control of their social media use, be respectful, and avoid some of the obvious negative things like cyberbullying and posting somebody without their permission, violating the code of conduct, issues like account impersonation, bullying, criminal activity, harassment, hate speech, inappropriate photos, spam, violence.

They're -- they're talking about a number of things here in an attempt to provide some guidance to their students about following rules, I guess because they know that students are going to be on social media.

Q.    And they are attempting to provide a balanced view, right?

CONFIDENTIAL

Page 341

ATTORNEY MEHRI:   Objection. I'd caution the witness to speculate about things that you don't have knowledge about.

THE WITNESS:   Yeah.   Thanks. I was just going to say, I don't know what they're intending to do here.   And sitting here, I'm not sure that I would -- I don't know that they're attempting to provide a balanced view or that this is a balanced view.

BY ATTORNEY PISTILLI:

Q.    Well, do you agree that it's important to assess both the -- any potential benefits or positive impacts of social media alongside any potential negative effects?

A.    Sure.  I think that -- I think that that's important.  And I think that I've done that in the course of developing my opinions.

So you've pointed to two different categories of beneficial social

media use.  One is from Page 13, Paragraph 45, of my reply to the 13 rebuttal reports.

And there I describe how the rebuttals indicate that schools -- and you asked me a whole line of questions and you also showed me a document about a school -- I think it was a school -- a school district -- this is the fact sheet, if I remember -- yeah -- Harford fact sheet, about educators using some social media platforms integrated into part of their curriculum.

So this one I think I address pretty clearly, at least in the rebuttal report.  And I think is -- is an important concept, that educators' and school leaders' use of social media in a way that is curated, intentional, purposeful is an entirely different usage of the platforms than students who are using it in an unregulated sort of unsupervised, very frequent basis in ways that expose them to -- expose them and

make them vulnerable to compulsive use and to some of the design features that create prolonged engagement and capture students' attention as a product in and of itself.

Those two uses are very separate and distinct, in my mind, and in my reports.

Q.    Well, just --

A.    Educators are going to use educational materials, they're available from wherever they come, if they think it's going to improve the education of their students.

The example in the Harford fact sheet is YouTube videos, for example.  A teacher who shows a YouTube video that is about something educational in their classroom, that -- I think it would be fair to say that's, like -- that's a beneficial use.  Like, that's a -- that's not a bad thing.  That's a positive thing.

And school district leaders

CONFIDENTIAL

Page 344

that -- you know, I think you made the example of, like, using Facebook to -- to promote a student event or something like that, that's -- that's a positive use.

Like, that's adults using the platforms in a very positive way to communicate with their school community about goings on in the school or even to use some educational materials as part of their -- of their curriculum and instruction.

I think that, you know, schools and school -- educators who are doing that are doing it, you know, because it's useful and, in part, because social media has become so ubiquitous.

And school leaders and school district leaders are doing it because that's the way that they can, like, reach their parents. Because a lot of people are on social media. So it's, like, an effective way of conducting public relations.

The other -- and that --

Page 345

that whole category of use, I never -- like, I don't think that that's necessarily problematic. I think that it could have beneficial uses in those -- in those circumstances.

What -- the important distinction for me is that those are adults using tools at their disposal in ways that are going to further the educational mission of the stool or school district.

The other category of positive use you said is, like, well, kids getting validation or kids having fun. You -- you quoted here from DeKalb, they can have fund by participating in trending topics, dance challenges and commenting on their favorite television show.

Yeah, I think that there can be some positive aspects to a sense of belonging, to finding common interests, to validation and connection.

The difficulty here is that

Page 346

those avenues are then a gateway to the exposure to some of the more manipulative aspects of the social media platforms, and it exposes young people to risks of -- of compulsive use and of being compelled by the way that the platforms work to uses that then create mental health problems or fragment their attention or interrupt their sleep or just create, like, a generalized kind of anxiety, needing more and more of that external validation.

So you're asking about positive uses.  And just to sum up -- I know it's been a long answer --

Q.    It's been over six minutes, sir.

A.    -- but one is the adult use when intentional, sure.  Students being validated, finding common interests, maybe a sense of belonging, maybe fun and enjoyment, yes.  But it comes with great risks.

And in the end, the

cumulative effects of the harms far outweigh the positive benefits that are described in those couple of sentences.

Q. And in your opening report, sir, when you formed your opinions in this case, you didn't take into account or address in any way those positive uses, correct?

ATTORNEY MEHRI: Objection.

BY ATTORNEY PISTILLI:

Q. And if you could please answer my question.

A. I think -- I think I did.

I beg your pardon. It must be in the -- in the reply to the rebuttal.

I thought I had put something in here about adult use for communication purposes and the like not being conflated with students' compulsive personal use of the social media platforms.

I thought I had that in here. But it might -- it might be in

the -- in the reply.

Q. Now that you've had a chance to review it, you agree with me that you don't address at all positive uses of social media by either students or school districts or educators in your opening report?

ATTORNEY MEHRI: Objection.

THE WITNESS: I think I would agree with you.

I'm not going to read every word of the report. I'm sort of skimming paragraph by paragraph to see if I address that adult use aspect.

Because I recall doing it, but I'm just not finding it in a really quick reread here.

And the -- the -- you know, the -- it's not that I didn't consider it or it's not mentioned in the literature. It's just that, to me, the -- the harms so outweigh those benefits,

CONFIDENTIAL

Page 349

especially when it comes to the way that students are using it and how they're set up to compel compulsive use.

BY ATTORNEY PISTILLI:

Q.    But even though it's in the literature and you acknowledge that student use of social media can have some benefits, you chose not to acknowledge that at all in offering your affirmative opinions in your opening report, correct?

A.    Yeah, again, I'd need to read every bit.  But I think that that's true.

And it basically reflects my opinion that there -- yes, I would acknowledge those benefits.  But they're not really noteworthy in that the issue here is that if students are going on for fun, for entertainment, for a sense of validation, to find common interests, to be, like, entertained by the dance videos, those might have, like, some kind of potential or hypothetical benefit to

the user.

They expose the students to the harms that I think are pervasive in the platforms, in -- in Facebook, Instagram, Snapchat, TikTok and YouTube.

So you're getting students who are still in an age of development, where they need that social connection or they're looking for that sense of validation, and they might go on the platforms for, like, some reason that you would say is beneficial or is positive. Then they're on the platforms. And the platforms are designed, then, to try to capture their attention and prolong their engagement.

So even the benefits, hypothetical or real, come with a risk to students, to children and adolescents. And that risk is that, then, they're going to be compelled to use social media compulsively or compare themselves to others on social media or develop negative self-concept or the fear of

CONFIDENTIAL

Page 351

missing out or end up using it when they should be sleeping or have their sort of attention split so much and so frequently that it's hard for them to persist in prolonged tasks related to their learning.

That's what I think is happening and why I probably gave short thrift to what you would call, you know, the potential or hypothetical benefits of social media use by children and adolescents.

ATTORNEY PISTILLI:  Why don't we take a break?

ATTORNEY MEHRI:  Yeah, we've been going for a while.  Yeah, okay.

VIDEO TECHNICIAN:  The time is 5:40 p.m.  This is the end of Media 6.  And we are going off the record.

-  -  -

(Whereupon, a brief recess was taken.)

CONFIDENTIAL

Page 352

- - -

VIDEO TECHNICIAN:  The time is 5:57 p.m.  This is the beginning of Media 7, and we are going back on the record.

ATTORNEY PISTILLI:  Chris Pistilli, counsel for Meta just wanted to say that I have no further questions at this time and I'm going to be passing the witness to my co-counsel and also going to be holding the deposition open pending production of the articles that we discussed earlier today.

- - -

EXAMINATION

- - -

BY ATTORNEY RICE:

Q.   Good afternoon, Mr. Osborne. My name is Rowley Rice.  I'm counsel for Snap.  I just have a few questions for you.

In connection with providing

CONFIDENTIAL

Page 353

your opinions in this case, did you do anything to learn how the Snapchat app works?

A.    No.

Q.    And so I take it, then, you're not familiar with streaks on Snapchat, correct?

A.    There -- it was referenced in one of the articles that I read.  So my understanding is streak is, like, a reward system, I guess, where two people who are communicating with each other on Snapchat would try to do it, I think every day.

The idea is like -- the streak is, like, the daily sending of a message.  And the idea is to keep up the streak by doing it every day without a break in a day communicating.

I think that's what the article described.

Q.    And do you understand that for a user to maintain a streak on Snapchat, it only takes a few seconds for

them to send a picture?

A.    Oh, I -- I don't -- I don't know what it takes, yeah.

Q.    And are you aware that there are other apps that use streaks?

A.    No, I guess I'm not.  I think when I read that it was specific to Snapchat.

But it doesn't surprise me. I'm not an expert in the features.

Q.    And you're not familiar with the use of lenses on Snapchat, correct?

A.    Lenses?

Q.    Lenses.

A.    I don't know what that is.

Q.    And are you familiar with how stories work on Snapchat?

A.    So this was also described, because I think -- I don't want to speculate.

I think stories is a way that a user will have multiple posts that they can then invite other people to see, I think.  I don't know.

CONFIDENTIAL

Page 355

Q.    And are you -- are you aware if, when a user posts a public story on Snapchat, if the number of times a story has been viewed is public?

A.    The number of times the story has been viewed is public?

Q.    Are you aware, one way of the other, whether that's true?

A.    No, I don't know.

Q.    And are you familiar with any data regarding how much time Snapchat users, on average, spend using different features of the Snapchat app?

A.    I'm not -- I don't have that information, no.

Q.    For instance, so you're not aware, then, how much time Snapchat users spend messaging with friends versus engaging with other aspects of the platform, correct?

A.    That's right.  I don't have that information.

Q.    And you did not review any internal Snap documents in formulating

Page 356

your opinions, correct?

A.   No, not to my knowledge.

Q.   And you did not review any deposition testimony of Snap employees, correct?

A.   I don't think so, no.

Q.   Are you a parent, Mr. Osborne?

A.   Yes.

Q.   What age are your children?

ATTORNEY MEHRI:   Let me just instruct the witness, to the extent they get into the personal use of your kids of the platforms, only testify to the extent you're comfortable.

THE WITNESS:   Okay.   Thank you.

They are 23 and 20.

BY ATTORNEY RICE:

Q.   Do you know if they have Snapchat?

A.   Yeah, I don't really want to talk about my kids.

Page 357

Q. So you're unwilling to answer, one way or the other, whether your children have Snapchat accounts?

A. Well, they're, like, young adults. I don't know what they have.

Q. Do you know if they had Snapchat accounts when they were teenagers?

A. Yeah. I'm aware that they had Snapchat accounts when they were teenagers.

Q. Do you think their use of Snapchat as teenagers harmed their mental health?

A. I don't know.

Q. To your knowledge, have your children ever sought diagnosis or treatment from a medical professional for their use of Snapchat?

ATTORNEY MEHRI: And, again, I'm going to instruct the witness that you only testify to the extent that you're comfortable about your kids.

Page 358

THE WITNESS:  You're asking me if my kids sought -- ask me the question again, please.

BY ATTORNEY RICE:

Q.   Yes.  To your knowledge, have your children ever sought medical treatment relating to their use of Snapchat?

A.   To my knowledge, they have not sought medical assistance related to their use of Snapchat, no.

Q.   When a user opens Snapchat on their phone, are you aware what part of the app they initially see?

A.   No.

Q.   So is it fair to say, then, before today you were unaware that when a user opens the Snapchat app, it opens to a camera?

A.   I -- I didn't know that, no.

Q.   Earlier we discussed your work with superintendents and principals.

Have you ever recommended to any of the superintendents or principals

Page 359

you work with that they bring a lawsuit against the defendants in this case?

A.    No, I have not.

Q.    Do you believe social media should be banned, Mr. Osborne?

A.    I don't have an opinion about that.

ATTORNEY RICE:  No further questions.

ATTORNEY LEHMAN:  Let's go off the record while we --

VIDEO TECHNICIAN:  The time is 6:04 p.m.  We are going off the record.

-   -   -

(Whereupon, a brief recess was taken.)

-   -   -

VIDEO TECHNICIAN:  The time is 6:05 p.m.  We are going back on the record.

-   -   -

EXAMINATION

-   -   -

CONFIDENTIAL

Page 360

BY ATTORNEY LEHMAN:

Q.   Good evening.  I want to make sure -- you've been testifying for a number of hours today.

I want to make sure that you are still able to give full and complete answers to questions at this point?

A.   Sure.  Thank you for checking.

Q.   Okay.  We haven't met.  My name is Katie Lehman.  Although we did walk in together at the same time this morning.  And I'm here on behalf of the TikTok defendants.  So I have some -- some questions for you.

Are you able to estimate how much time you have spent watching videos from TikTok?

A.   You mean over the course of my life?

Q.   Yes, sir.

A.   No, I couldn't estimate that.  But I would say it's not very much.

Page 361

Q.    Less than five hours?

A.    Sounds about right.  Maybe five hours total time.

Q.    And I believe you said you do not have a TikTok account, correct?

A.    Correct.

Q.    All right.  And so what have been the circumstances for those occasions when you have seen TikTok videos?

A.    Yeah, someone will send them to me.  Usually, like, my wife finds something that she thinks is funny.

So she'll send it to me in a text.  I'll open it.  It will always ask me if I want to, like, open an app or start an app.  I just put no.

I think the other link is, like, view in browser or something like that.  So I click that and that enables me to see the video --

Q.    Okay.

A.    -- without having an account.

Page 362

Q.    And so on those occasions, you watch the one video that your wife or someone else has sent you and that's sort of a discrete experience that you have?

A.    Yeah, pretty much.

Q.    Have you --

A.    Yeah.

Q.    When you say "pretty much," is there more to that experience?

A.    I think I just -- I think that once it plays, then another one will play.

Q.    Are you sure about that?

A.    I'm not sure about that.  So let me not speculate.

I think I just watch the one video, and I'm done, but.

Q.    Okay.  Have you ever actually been with someone and gone on the TikTok app or platform directly with someone who is an account holder?

A.    You mean someone who, like, has their phone and they say, hey, look at this --

Page 363

Q.    Exactly.  Something like that.

A.    -- this is on TikTok?

Yes.

Q.    So at any time have you ever watched more than one or maybe two videos in a row on TikTok?

A.    Oh, I don't recall.  Maybe.

Q.    You mentioned that you serve as an executive coach?

A.    Yes.

Q.    Okay.  Have you ever recommended to one of your executive coaching clients that they should not use TikTok?

A.    I've never recommended that, no.

Q.    Have you ever recommended to one of your executive coaching clients that they not use any social media platform?

A.    No, I wouldn't -- that wouldn't be my role and not something I would ever recommend, no.

Q.    Have you ever advised one of the school districts that you're working with that they should not use TikTok?

A.    No, I've never -- I've never advised that to a school or school district, no.

Q.    Have you ever advised one of the school districts that you're working with that they should not use any social media platform?

A.    No, I've never -- I've never made that recommendation.

Q.    Did you review any TikTok company documents in forming your opinions?

A.    I don't think so.  Not to my knowledge.

Q.    Did you review any internal company documents from any social media company?

A.    I don't think so.  Only, maybe, insofar as somebody referenced it in another report.

But I don't think I accessed

Page 365

any of those documents, no.

Q.    Did you review the deposition of any TikTok employee?

A.    No.

Q.    Did you review the deposition of any employee of any social media company?

A.    I don't think so.

Q.    Have you performed any analysis that looked not at social media generally, but specifically at TikTok?

A.    No, I have not performed any analysis like that.

Q.    Are you offering any opinions that are unique to TikTok as opposed to social media generally?

ATTORNEY MEHRI:  Objection.

Go ahead.

THE WITNESS:  I'm not, no.

BY ATTORNEY LEHMAN:

Q.    Have you ever reviewed TikTok's user agreement?

A.    No, I don't think so.

Q.    Do you know what the default

Page 366

settings are on TikTok accounts for users who are under 18?

A.    I don't.

Q.    Do you know what limits are placed on accounts for TikTok users who are under 18?

A.    I don't.

Q.    Do you know what features are available to TikTok users who are under 18?

A.    No, I don't.

Q.    Did you attempt to determine what percentage of the impacts of social media that you have discussed are attributable specifically to TikTok?

A.    No, I did not attempt to do that.

Q.    Have you attempted to determine what percentage of the impacts of social media that you have discussed are attributable to any specific social media platform?

A.    No, I didn't make an analysis like that.  I didn't think it

was necessary to my task.

Q. Can you say, to a reasonable degree of scientific certainty, that the impacts of social media would be different if TikTok did not exist?

A. Ask me that question again.

Q. Of course.

Can you say, to a reasonable degree of scientific certainty, that the impacts of social media would be different if TikTok did not exist?

A. No, I don't think I could.

I don't know what you mean by "scientific certainty." But I'm not a data scientist, so I'm pretty sure the answer is no.

Q. Okay. Well, so, then, let me -- let me ask a better question.

Based on your area of expertise and the scope of your testimony, could you say with any certainty that the impacts of social media would be different if TikTok did not exist?

Page 368

A.   I can't make that claim, no.

Q.   Okay.  And would your answer be the same if I asked you about any of the other individual platforms who are named as defendants in this litigation?

A.   I think my answer would be the same.

Q.   Okay.  Outside of this litigation, have you ever before reviewed an order issued by a trial court?

A.   I don't -- I don't know.  I was involved in that one in -- in New York, and I don't know if that's characterized as a trial court.  And I don't recall what orders I might have reviewed.

So I think the answer is no.  But I did testify in that one case, so maybe.

Q.   Okay.  Well, so, then, let me -- let me ask you a follow-up question.

Outside of this litigation, have you ever reviewed a motion or a

Page 369

brief that a party submitted to a court in litigation?

A. Sure. Probably. I teach a class in school law and ethics. So I suppose as part of the materials I would have reviewed motions like that, as part of cases.

But nothing specific that I recall.

Q. Have you ever taught anything about social media in the class that you teach about school law and ethics?

A. No, I have not.

Q. Now, you have in your materials considered list several news articles about TikTok challenges about fires in Chromebooks.

A. Yeah.

Q. And also a single article about students who were creating fake teacher accounts.

A. Right.

Q. Other than those -- and I

think it's approximately five articles on those two topics -- does your materials considered list include any other article that is specific to TikTok?

A.    I don't think so.  I don't think it does.

And those were just meant to be illustrative examples.

Q.    And just so we're clear, the challenge that was referenced in the articles on your materials considered list, that was about students putting something metal in a USB port on their Chromebook so it might catch fire?

A.    That's right.

Q.    Okay.  And that was just something that was posted by different people who were on the TikTok platform?

A.    That caught -- that -- something -- sure, I guess it was, yeah. Yeah.

ATTORNEY MEHRI:  I would just ask you not to speculate when you're answering questions.

THE WITNESS:  Yeah.  Your question is?

BY ATTORNEY LEHMAN:

Q.    My question is, what -- the sort of backstory on those articles was that a number of people on TikTok posted videos encouraging other students to put something metal in the USB port in their Chromebook to see what would happen, correct?

A.    Yeah.  My -- my use of it is an illustrative example of sort of the extent of attention-seeking behaviors that can result as a -- as a result from the students' attention-seeking behaviors related to their social media use.

Q.    Okay.  And then the other article that we referenced, and it was a single article, it was a New York Times article about some middle school students who created accounts pretending to be their teachers, correct?

A.    Uh-huh.  That's right.

And that I -- my intention

Page 372

of using that was to sort of show that school communities, even when not directly affected by some particular thing, there is this sort of generalized anxiety that happens that can even include staff. Because now staff are also vulnerable to things that might happen on social media.

Q. And in that circumstance, the staff were being impacted by the accounts that were created and the things that were said in posts by students at their own school, correct?

A. They were being affected by a lot of things. That's -- that's certainly one of them.

But I think the ability of students to create accounts that were impersonating their teachers was, like, one thing that caught my attention in that.

Another was the -- the way -- there's a -- there's a spread and a permanence to the kind of messaging

that was going on that caught my attention and I thought was -- was illustrative of some of the problems of the attention-seeking incentives that are baked into social -- students' use of social media platforms.

ATTORNEY LEHMAN:  Those are all the questions that I have at this time.  But I would join in the request to keep the deposition open pending the production of additional articles.

That will be off the record.

ATTORNEY MEHRI:  Any other defense counsel?  Okay.  More defendants.  We have to pass the baton.

ATTORNEY WHITELEY:  You can drop us from the case whenever you want.

ATTORNEY MEHRI:  Oh, that's not happening.  If they run out of time, I'm just asking the videographer keep us --

CONFIDENTIAL

Page 374

ATTORNEY WHITELEY:  How much time?

VIDEO TECHNICIAN:  Right now, from this segment, it's about 17, 18 minutes of the 33 we had left.

ATTORNEY WHITELEY:  We can go back on the record.

VIDEO TECHNICIAN:  We were on.  We didn't go off.

ATTORNEY WHITELEY:  That's fine.

- - -

EXAMINATION

- - -

BY ATTORNEY WHITELEY:

Q.    Hello, Dr. Osborne.  My name is Daniel Whiteley.  I represent the Google and YouTube defendants.  And I just have a few more questions for you, okay?

A.    Sure.

Q.    You earlier talked about your children and whether or not they had

CONFIDENTIAL

Page 375

Snapchat accounts.

My question is, do you know if your children had YouTube accounts when they were under the age of 18?

ATTORNEY MEHRI:  Again, I'll instruct you to answer these kind of questions to the extent you're comfortable.

THE WITNESS:  Sure.  Thank you.

I don't know.

BY ATTORNEY WHITELEY:

Q.  Okay.  Do you know if they used YouTube, even if they did not have a YouTube account, before they were 18?

A.  I don't know.

Q.  Do you know if your children have ever used YouTube?

A.  Do I know for sure that they've used YouTube?  Like, it's hard for me to imagine that they hadn't, but I guess that's speculation.

I don't recall an instance where I saw them, like, watching YouTube.

Page 376

But -- yeah, but -- yeah, that's my answer.

Q.    Have you ever instructed your children not to use YouTube?

A.    I've never instructed my children not to use YouTube, no.

Q.    And in your reports and today, if I'm getting this right, you talked about identifying patterns, right?

A.    Uh-huh, yes.

Q.    Is identifying patterns a recognized methodology in your field?

A.    I -- I would think that it is, yes, it is -- it is an identifiable methodology to the extent that someone who is researching in educational leadership has a research question that's answerable through a methodology that says, okay, identify patterns.

For me, the -- the pattern identification comes from, like, a really large sample size over time of the leaders and aspiring leaders with whom I've interacted.

Q.    And can you identify for me any published research in educational leadership that uses pattern identification to identify a nationwide pattern affecting students across the country?

A.    That's a difficult question to answer, because there's -- like, there's a number of studies about a variety of things that look at nationwide trends.  And those nationwide trends are, of course, like, the culmination of pattern identification.

So I'm not -- I'm not sure what you're asking or if I'm -- if I'm getting it.

I want to be responsive to your question, but I don't think I understand it.

Q.    Sure.  I'll try asking it in a more simple way.

Can you point me to any particular article in your field where someone used pattern identification to

Page 378

identify a pattern that is affecting all students in the K-through-12 cohort in the country?

A.    As I sit here today, like, nothing in particular comes to mind. There might be a limiting part of your question about "all students."

But there are, like, lots of studies that look at trends and patterns across the nation as they affect students and K-12 education. I can't name one that would be helpful. But that -- that is certainly something that exists.

Q.    And what are the steps in pattern identification?

A.    So the steps in pattern identification, for me, were a result of those numerous interactions that I've had with school leaders and aspiring school leaders in a variety of schools of different types over a number of years.

And the interactions that I've had, the observations that I've made, the circumstances that I've looked

at across these different sites, the patterns emerge that inform my impressions and my opinion that the compulsive use of social media and the accompanying increases in mental health are impacting on school leaders' ability to perform their essential duties.

Q.   So separate from what you considered your steps for pattern identification to be, what are the recognized or accepted steps in the field for pattern identification?

A.   You mean, like, where is the educational leadership template, rubric for doing something that would be called pattern identification?

Q.   Well, let's start there, sure.

A.   Yeah, I don't know that there -- that there is one.

Q.   Okay.  Is there a certain number of data points that you need for an instance or a phenomenon to rise to the level of a pattern?

CONFIDENTIAL

Page 380

A.    Oh, that's a very interesting question.

I guess it depends what you're considering and for what purpose.

Q.    So you can't point me to any particular standard or threshold?

A.    Of -- I'm not a statistician.  So I'm aware that there's, like, a concept of statistical significance and that kind of thing.

But my methods were qualitative.  And what I'm submitting is that my opinions are based on a pretty large sample size that, to me, seems to be sufficient to say, okay, I have expertise in educational leadership and this is what I'm seeing and, therefore, these are the opinions that I'm rendering when asked about social media and its impact on schools and school leaders.

I don't know that there's, like, a threshold that would be independently verifiable, as, you know, okay, this is enough of a sample size.

CONFIDENTIAL

Page 381

But I would say that, you know, I've spent a lot of time in schools. I've been with a lot of school leaders. It's been over a long period of time. I think that this gives me a pretty good basis from which to say I have a good pulse on what's happening in schools.

Q. And on the time point, is there a, you know, specific length of time over which a phenomenon must occur for it to rise to the level of a pattern?

A. I think my answer would be, like, really parallel to the other -- to my other answers.

I'm not sure. I don't think that there's a template for this. I'm not a statistician.

I know that the observations that I made about this particular phenomenon started when I was superintendent in New Rochelle, and they were really salient as I left that school district and started as a professor of

Page 382

practice in 2018, and have persisted and intensified since.

Q.    Do you know what percent of teachers in the U.S. use YouTube in the classroom?

A.    I don't know what percent of teachers in the U.S. use YouTube in the classroom, no.

ATTORNEY WHITELEY:   No further questions from me.   Thank you for your time.   And YouTube joins the request to hold open the deposition.

ATTORNEY MEHRI:   Give us a chance for a short break.

ATTORNEY WHITELEY:   Sure. We can go off the record.

VIDEO TECHNICIAN:   The time is 6:25 p.m.   We are going off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 6:41 p.m.  We are going back on the record.

- - -

EXAMINATION

- - -

BY ATTORNEY MEHRI:

Q.    Dr. Osborne, I appreciate your perseverance and patience, we've been going for about nine plus hours.

You started this morning saying that you've had some citation typos.  And I want to give you a chance to go through some of those and have an opportunity to correct that.

A.    Okay.

ATTORNEY MEHRI:  This is a document I'm going to mark as Exhibit-15.

- - -

(Whereupon, Exhibit Osborne-15, No Bates, Frontiers in Psychology; An Affective Neuroscience Framework for the

Page 384

Molecular Study of Internet Addiction; Montag, was marked for identification.)

- - -

BY ATTORNEY MEHRI:

Q. This is an article called, An Affective Neuroscience Framework for the Molecular Study of Internet Addiction. And the first author on it is Christian Montag, and then there's also Sindermann, Becker and Panksepp.

Are you familiar with this?

A. Yes.

Q. And did you review this and rely on it as part of your reports?

A. I did.

Q. And was this -- did you intend to cite this in your report?

A. Yes.

Q. If you can pull up your July 30th report and look at Page 9.

A. Got it.

Q. Do you see a cite to Montag, Sindermann, Becker and Panksepp at the

Page 385

bottom of Page 9?

A.    I do.

Q.    Is Exhibit-15 the article you meant to cite?

A.    It is.

Q.    Okay.

ATTORNEY MEHRI:   I'm going to mark a new document Exhibit-16.

-   -   -

(Whereupon, Exhibit Osborne-16, No Bates, Psychological Inquiry; Adolescent Development in the Digital Media Context; Nesi, was marked for identification.)

-   -   -

BY ATTORNEY MEHRI:

Q.    Dr. Osborne, before you is a document entitled -- or an article entitled, Adolescent Development in the Digital Media Context.  The first author is Jacquelyn Nesi, N-E-S-I, and then there's Telzer and Prinstein as other authors.

Have you seen this before today?

A.  Yes.

Q.  Was this a peer-reviewed article that you reviewed and relied on as part of your report?

A.  I did.

Q.  Okay.  Can you look at your July 30th report on Page 9?

A.  Yes.

Q.  Was this a cite you meant to have at the bottom of Page 9 where it mentions Nesi, Princeton and Telzer?

A.  Yes, yes.

ATTORNEY MEHRI:  I'm going to mark Exhibit-17.

-  -  -

(Whereupon, Exhibit Osborne-17, No Bates, Journal of Psychoeducational Assessment; Distress Among Adolescents: An Exploration of Mattering, Social Media Addiction, and School Connectedness; Watson, was marked

Page 387

for identification.)

- - -

BY ATTORNEY MEHRI:

Q.    Dr. Osborne, this is a peer-reviewed article entitled, Distress Among Adolescents, an Exploration of Mattering Social Media Addiction and School Connectedness by Joshua Watson as the first author, and then also there's an author named Prosek, P-R-O-S-E-K, and Giordano, G-I-O-R-D-A-N-O.

Have you seen this article before today?

A.    Yes.  This was part of my literature review.

Q.    And was this an article that you -- well, I'll turn your attention to your July 30th report on Page 10.

And you'll see near the bottom in the citations there's an article regarding Watson.

Do you see that?

A.    Yes.

Q.    Was this the article that

Page 388

you intended to cite --

A.    It is.

Q.    -- on the bottom of Page 10?

A.    It is, yes.

Q.    Okay.

ATTORNEY MEHRI:  I'm going to mark Exhibit-18.

- - -

(Whereupon, Exhibit Osborne-18, No Bates, Clinical Child Psychology; Exploring Adolescents' Perspectives on Social Media and Mental Health and Well-Being - A Qualitative Literature Review; Anjali Popat and Carolyn Tarrant, was marked for identification.)

- - -

BY ATTORNEY MEHRI:

Q.    Dr. Osborne, before you is a document -- or a peer-reviewed article entitled, Exploring Adolescents' Perspectives on Social Media and Mental Health and Well-Being:  A Qualitative

Literature Review.  The first author is Angeli Popat and then the second is -- last name is Tarrant, T-A-R-R-A-N-T.

Have you seen this before today?

A.    Yes.

Q.    Was this one of the articles you relied on and found as part of your literature review?

A.    It is.

Q.    And turning your attention to your July 30th report, on Page 10 where it mentions Popat and Tarrant, was this the article you intended to cite?

A.    Yes.

Q.    Okay.

- - -

(Whereupon, Exhibit Osborne-19, No Bates, Science Daily; March 22, 2026, Social Media Use Associated With Depression Among U.S. Young Adults, was marked for identification.)

CONFIDENTIAL

Page 390

- - -

BY ATTORNEY MEHRI:

Q. Dr. Osborne, before you is an article in Science Daily, March 22nd, 2016.

Have you seen this document before?

A. Yes.

Q. And this is a document you reviewed as part of your literature review?

A. Yes.

Q. And you cited -- intended to cite in your report?

A. I did, yes.

Q. I'd ask for you to look at Page 35 on your initial report from May -- May 16th, 2025.

A. Okay.

Q. Is Exhibit-19 what you intended to cite on Page 35 where there's a reference to Science Daily?

A. Yes.

Q. Okay.

CONFIDENTIAL

Page 391

ATTORNEY MEHRI:  I'm going to mark Exhibit-20.

- - -

(Whereupon, Exhibit Osborne-20, No Bates, Learning Policy Institute – How Money Matters for Schools; Bruce D. Baker, was marked for identification.)

- - -

BY ATTORNEY MEHRI:

Q.    Dr. Osborne, there's an article in front of you that's marked Exhibit-20 from The Learning Policy Institute, the author is Bruce D. Baker, How Money Matters for Schools.

Do you see that?

A.    I do.

Q.    Was it your intent to have this article as the correct cite on the bottom of Page 33 of your initial report --

A.    Yes.

Q.    -- where it says Learning

Page 392

Policy Institute?

A.     Yes.

Q.     Okay.

ATTORNEY MEHRI:  I don't have any further questions.

But I will represent to defense counsel that next week we'll send both reports with typos fixed on the citations.

ATTORNEY PISTILLI:  Sure. We are going to continue to hold the deposition open because, obviously, we've just received these and haven't had a chance to look at them.

But with that caveat, I don't know that we have anything further at this time.

ATTORNEY MEHRI:  We're happy to meet and confer with you in a reasonable way at a reasonable time after you get the typos corrected.

Okay.  Thank you for your

patience.

VIDEO TECHNICIAN: The time is 6:52 p.m. We are going off the record. This concludes today's video testimony.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: So Meta was on the record for six hours, 26. Snap was on for five. TikTok was on for 11. Google YouTube was on for nine. And plaintiffs were on for ten.

ATTORNEY MEHRI: Can you go through those numbers again, if you don't mind?

VIDEO TECHNICIAN: Meta was on for six hours 26 minutes. Snapchat was on for five minutes. TikTok was on for eleven minutes. Google YouTube was on for nine minutes. Plaintiffs were on for

Page 394

ten minutes.

ATTORNEY MEHRI:  Okay.

Anything else?  Safe travels, everybody.

-   -   -

(Whereupon, the deposition concluded at 6:53 p.m.)

-   -   -

CONFIDENTIAL

Page 395

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

*Amanda Miller*

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated:   September 7, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 396

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

CONFIDENTIAL

Page 397

- - - - - -

E  R  R  A  T  A

- - - - - -

PAGE    LINE    CHANGE

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

CONFIDENTIAL

Page 398

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages,  1 - 391, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.


_____
BRIAN OSBORNE, Ed.D.                DATE


Subscribed and sworn
to before me this
_____ day of _____, 20_____.

My commission expires:_____


_____
Notary Public

CONFIDENTIAL

Page 399

LAWYER'S NOTES

PAGE  LINE

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

CONFIDENTIAL

**[& - 2008]**

| & |
|---|
| **&** 1:15 2:3,15 3:3,16 4:4,10 5:3,10,17 6:4 87:17,24 88:4 88:5 89:13,18 |

| 0 |
|---|
| **03047** 1:3 |

| 1 |
|---|
| **1** 7:14 11:17 20:15,17,20 82:6 116:7 145:10 282:20 398:3 |
| **1,500** 24:8 |
| **1/8/25** 7:17 81:4 |
| **10** 8:15 109:9 112:5 219:22 220:5,10 221:8 221:17 226:24 291:14 300:9 387:18 388:3 389:12 |
| **100** 8:6 |
| **100,000** 86:12 86:14 |
| **10013** 5:19 |
| **10018** 6:6 |
| **104** 272:5 280:22 |

**106** 173:18,19 173:24 174:1 174:24 175:1 178:15,16 179:11
**109** 8:8
**10:16** 82:4
**10:31** 82:12
**10th** 3:10 194:20
**11** 8:17 15:6 27:13 111:2 294:23 295:11 295:14 393:13
**11,000** 27:11
**110** 8:10
**11:34** 132:20
**11:50** 133:4
**12** 8:19 11:17 15:6 31:1,3 40:20,24 233:12 303:18 304:13 378:2 378:11
**120** 8:20 303:20
**121st** 304:1
**129** 97:16
**12:50** 193:22
**13** 7:6 8:21 111:6 200:12 208:7 328:5 331:13 334:6 342:1,2

**14** 8:23 99:10 197:2,13 334:9 334:16
**15** 9:5 37:23 99:10 121:24 122:4 127:5 197:2,13 257:19 383:19 383:22 385:3
**16** 9:9 93:6,14 109:23 197:17 198:2 231:9 315:1 385:8,11
**166** 195:14 196:5
**166.75** 195:1 196:5
**166.75.** 195:21
**167** 195:14
**16th** 173:20 194:19 282:23 293:6 296:16 311:22 313:22 314:19 390:18
**17** 9:12 145:10 374:5 386:16 386:19
**18** 9:16 113:10 113:11 129:11 133:9 248:3,6 248:9,12 256:23 366:2,6 366:10 374:5 375:4,15 388:7

388:10
**180,000** 85:23
**19** 9:21 40:16 389:19 390:20
**19087** 1:17 4:12
**19106** 5:6
**1991** 33:3
**1994** 33:4,12
**1997** 221:22 222:1
**1:43** 194:6

| 2 |
|---|
| **2** 7:16 11:12 81:4,12 82:14 132:21 149:13 |
| **20** 7:15 10:5 25:4 40:2 257:19 356:19 391:2,5,14 398:11 |
| **200** 3:17 8:14 |
| **2000** 2:4 31:11 32:5,9 |
| **20001** 3:5 |
| **20006** 2:5 |
| **20024** 2:17 |
| **2003** 22:2 |
| **2004** 22:2,15 |
| **2007** 22:15 25:16 26:8 |
| **2008** 28:3 |

CONFIDENTIAL

**[2012 - 5]**

**2012** 14:18
**2014** 25:16
27:6,14
**2015** 98:9,10,22
198:16
**2016** 390:5
**2017-2018**
333:1
**2018** 27:6,14
28:11,12,13
40:13 306:2
382:1
**2019** 90:2,3
**202** 2:5,17 3:6
**2020** 90:15,22
91:3
**2021** 89:12
302:19
**2022** 15:10
296:7,22
**2023** 291:17
295:6,16,21
**2024** 76:21,22
77:8,16
**2025** 1:9 12:14
77:3,5,8,24
78:10 80:19
81:21 85:11
86:7 109:23
111:9 194:20
194:20 282:21
282:23 283:7
390:18 395:11

**2026** 9:21
389:20
**21** 139:9
149:13 229:5
**212** 5:19 6:6
**21209** 2:11
4:18
**213** 4:6
**219** 8:16
**22** 9:21 389:20
**220** 2:11 4:18
**2200** 5:12
**22nd** 390:4
**23** 156:10
229:4 332:10
332:19 356:19
**24** 215:19
226:8
**25** 159:14
249:6
**250** 5:18
**26** 8:18 294:24
393:12,20
**280** 1:15 4:11
**2850** 2:10 4:17
**29** 162:10
**294** 8:18 11:12
**2:44** 230:6

**3**

**3** 7:18 32:8
81:1 84:4,9,11
84:13 133:5
156:10 193:24

194:11 230:14
282:18
**30** 111:9 272:4
396:16
**300** 84:1 85:6
195:24 196:6
**3000** 3:9
**303** 8:20
**3047** 1:4
**30th** 384:21
386:9 387:18
389:12
**31605** 395:10
**325** 2:4
**33** 374:5
391:21
**331** 8:22
**33131** 3:18
**334** 8:24
**35** 221:19,23
222:9 298:12
298:14,17
390:17,21
**35/5** 221:13
**350** 4:5 245:14
**352** 7:6
**355-9500** 5:19
**359** 7:7
**374** 7:7
**383** 7:8 9:8
**385** 9:11
**386** 9:15
**388** 9:20

**389** 9:23
**391** 10:7 398:3
**3:57** 286:6

**4**

**4** 1:9 7:20
88:24 89:3,9
89:10 159:14
194:7 199:23
228:18 230:7
**40** 47:21
257:16
**400** 245:14
**409** 5:13
**410** 2:12 4:19
**411** 222:4,8
225:24
**42** 331:10
**421-7777** 2:12
4:19
**427** 222:4,8
**434-5000** 2:17
**45** 328:6 342:2
**465** 83:19
84:16,22
**4700** 3:18
**4:22** 1:3 286:14
**4th** 12:14

**5**

**5** 3:9 7:22
96:15,22,24
97:3 112:6
162:11 200:1
214:17 220:22

CONFIDENTIAL

**[5 - acceptable]**

221:1,19,23
222:10 223:14
228:18 230:15
231:8 286:7
**5/16/25** 8:8
109:12
**50** 40:8 47:21
**50,000** 86:16
196:9,12
**50,025** 196:5
**500** 5:5
**501** 5:12
**50th** 4:5
**510** 5:5
**55** 333:23
**57** 315:2,11,13
**571** 303:5
**582** 303:5
**59** 294:20
**5:40** 351:19
**5:57** 352:3

**6**

**6** 8:5 96:12
100:12,18
286:15 335:9
335:17,18
351:20
**610** 4:12
**62** 303:15
**620** 6:5
**632-4700** 3:11
**65** 129:10

**650** 3:11
**66** 133:11
**662-6000** 3:6
**667-7706** 4:12
**67** 135:12
**68** 137:6
174:11,12,24
185:2
**680** 2:16
**683-9100** 4:6
**6:04** 359:13
**6:05** 359:20
**6:25** 382:19
**6:41** 383:2
**6:52** 393:3
**6:53** 394:7

**7**

**7** 8:7 109:12,18
109:19 112:5
129:9 133:9
214:19,21
231:8 272:2
298:12,13
352:4 395:11
**7,000** 25:19
**7/30/25** 8:10
110:18
**72** 84:9
**75** 23:17 139:9
**763-3260** 5:13
**77550** 5:13

**8**

**8** 8:9 110:18
111:1 122:3
196:17 214:19
214:20 223:13
282:17 291:14
300:7
**800** 201:15
**801** 203:20
**802** 204:16
205:20 206:1
**803** 212:7
**81** 7:17
**822-5100** 2:5
**84** 7:19
**841-1000** 6:6
**850** 3:5
**877** 5:6
**877.370.3377**
1:23
**882-1011** 5:6
**89** 7:21
**8th** 5:18

**9**

**9** 8:11 100:9
200:15,24
201:5 302:10
302:11,12,13
302:17 305:5
384:21 385:1
386:9,12
**900,000** 128:24

**90071** 4:6
**917.591.5672**
1:23
**94306** 3:10
**96** 7:23
**9:26** 31:16
**9:29** 31:23

**a**

**a.m.** 1:18 12:15
31:16,23 82:4
82:12 132:20
133:4
**aasa** 87:19,23
88:7 89:17
**ability** 16:7
69:12 79:15
243:4 372:17
379:6
**able** 65:23 75:1
79:23 179:18
211:23 264:20
281:6 288:23
360:6,16
**above** 1:18
**abstract** 91:20
92:8,21 139:11
**academia**
163:20
**academic**
123:22 198:24
213:16 227:20
**acceptable**
199:8

CONFIDENTIAL

**accepted**
197:18 198:6
199:16 228:16
379:11
**access** 24:3,12
26:1 27:16
99:7 187:23
211:23 217:14
**accessed** 101:7
271:1 364:24
**accessible**
188:3
**accommodate**
17:17
**accompanying**
239:23 379:5
**accomplishm...**
329:16
**account** 250:8
262:20,22
263:9 265:21
265:23 266:1,4
266:12 269:1,3
269:14 270:12
270:14,16
340:13 347:6
361:5,24
362:21 375:15
**accountability**
55:9 177:15
274:4
**accounts** 93:11
94:24 95:9
241:19 247:22

357:3,7,10
366:1,5 369:22
371:21 372:11
372:18 375:1,3
**accumulate**
57:6
**accurate** 16:1
98:7,17 127:11
213:15 396:20
**accurately**
65:24 112:17
**acknowledge**
324:10 349:7,9
349:17
**acknowledg...**
337:11 398:1
**acronym**
261:11,14
**acted** 326:17
**acting** 223:5
**action** 61:18
91:11
**actions** 1:6
**activity** 244:7
266:8 340:15
**acts** 187:4
316:16
**actual** 108:5
192:10 215:14
226:20 308:5
**actually** 74:2
76:24 176:2,17
176:19 188:15
210:11 224:7

224:10,23
231:6 252:3
302:6 308:17
308:22 311:14
316:6 317:19
318:17 362:19
**add** 85:14
195:3,11
199:10 238:16
250:12
**added** 103:22
123:14 194:24
195:20
**addiction** 1:4
9:7,14 12:20
384:2,9 386:23
387:7
**addictive** 36:14
36:16 175:8
176:11
**addition** 195:7
218:17
**additional**
156:12,23
157:7 253:17
373:12
**additionally**
91:10
**address** 94:18
114:4 128:13
322:5 342:15
347:7 348:4,14
**addressed**
289:8

**addresses**
283:8
**addressing**
99:2 259:22
282:8 323:21
**adjective**
260:17
**adjusted**
236:16
**administration**
21:14,20,23
221:12,19,24
222:9
**administrative**
15:4
**administrators**
86:24
**adolescence**
297:1
**adolescent** 1:3
9:10 12:19
289:1 296:23
299:18 306:3
385:12,20
**adolescents**
9:13 55:1
62:15,16 71:1
177:20 272:16
273:11,19
280:3 350:19
351:12 386:21
387:6 388:22
**adolescents'**
9:17 388:12

CONFIDENTIAL

**[adult - analysis]**                                              Page 5

| | | | |
|---|---|---|---|
| **adult** 346:18 347:18 348:14 | **affective** 9:6 302:22 383:23 384:7 | **agreed** 12:3 106:16 261:4 274:15 314:6 315:15 | 157:18 180:22 192:1 259:19 280:8 |
| **adults** 9:23 344:5 345:8 357:5 389:23 | **affects** 55:22 **affirmative** 349:10 | **agreeing** 241:12 | **allocations** 282:2 |
| **advance** 251:21 | **afraid** 56:2 | **agreement** 365:22 | **allow** 254:17 |
| **advantage** 182:6 | **afternoon** 352:20 | **ahead** 24:17 41:10 57:18 | **allowed** 24:2 24:12 25:24 27:16 |
| **adverse** 46:22 57:6 150:23 175:5 | **age** 178:3 350:7 356:10 375:4 | 59:10 84:11 94:1 95:14 100:6,9 108:8 | **alongside** 341:17 |
| **adversely** 16:7 | **aged** 280:5 | 114:20 153:6 209:11 232:8 | **alphabetical** 298:15 310:14 |
| **advised** 364:1,5 364:7 | **agenda** 204:19 **agitated** 54:17 | 260:2 295:8 299:22 306:21 | **altered** 272:8 **alternative** 114:3,17 |
| **advising** 122:10 123:4,6 127:13 197:9 | **ago** 25:5 97:3 98:6 214:15 | 365:18 **ai** 313:1 | **alto** 3:9,10 **amanda** 1:18 |
| **advocacy** 44:9 | **agree** 40:19 41:4,12 45:2 | **algorithm** 262:3,17 | 13:4 395:10 |
| **advocate** 41:16 42:6 98:3 | 73:2 166:22 195:13,16 | **algorithms** 35:8,10 175:8 | **ameliorating** 323:21 |
| **advocated** 43:17 98:12 99:12,23 | 196:8 202:4,8 203:23 204:3 | 262:1,15 **align** 259:14,19 | **amend** 111:11 **america's** 94:7 |
| **advocating** 95:8 | 212:14 213:14 216:1,7 223:24 | 259:22 **alleged** 114:3 | **american** 86:23 90:15,22 91:2 |
| **affect** 16:7 188:12 378:10 | 224:22 259:11 259:16 260:6 | 115:7,13 **allegedly** | 98:13 **ample** 71:21 |
| **affected** 79:1 322:13 327:7 372:3,14 | 295:19,23 309:19 311:8 | 183:22 **allocate** 156:12 | **amplified** 53:7 53:9 138:2 |
| **affecting** 64:3 71:2 117:2 190:24 327:19 377:5 378:1 | 313:9 319:8,12 319:15,18,23 322:9 325:20 328:8,23 341:14 348:3 348:10 | 157:14 **allocation** 72:22 156:15 | **amplify** 174:16 185:8 187:3 **analyses** 258:5 **analysis** 203:15 203:24 204:6,9 |

CONFIDENTIAL

**[analysis - area]**                                              Page 6

258:9,11 291:8
305:14 321:2
321:21 365:10
365:13 366:24
**anders** 76:8
77:11 78:3
**anecdotal**
255:4,10,12
**anecdote** 52:12
57:3 65:21
251:2
**anecdotes** 65:4
249:24 250:16
252:1,21 253:6
253:24 254:7,9
255:5,6
**angeles** 4:6
**angeli** 389:2
**animals** 305:13
**anjali** 9:19
388:15
**annual** 108:13
**annually**
257:20
**answer** 11:5
16:24 17:16
24:5 27:19
39:14 68:5,9
72:7 73:24
120:9 145:6
148:21,22
151:15 152:13
264:22 267:14
267:17 326:9

346:15 347:12
357:2 367:16
368:2,6,17
375:6 376:2
377:8 381:13
**answerable**
376:18
**answered**
54:14 56:19
57:17 63:6
64:16 67:11,24
68:2 70:11
117:12 130:16
134:19 145:4
148:20 192:14
242:6 244:22
245:1 246:13
246:24 247:3,8
247:15 266:20
317:22 326:1
333:5
**answering** 17:3
254:16 370:24
**answers** 16:13
360:7 381:15
398:4
**anticipating**
30:3 303:8
**anxiety** 51:17
55:19,21 62:14
66:19 151:4
180:24 184:19
190:21 240:1
251:13 281:24

282:9 325:3
346:11 372:5
**anxious** 273:20
324:18
**anybody**
195:18
**anymore** 263:2
**apa** 309:3
310:12,20
314:14
**apart** 251:1,24
252:22 253:7
**apologies** 122:1
**apologize**
254:22 301:12
**apology** 255:1
**app** 74:8 353:2
355:13 358:14
358:18 361:16
361:17 362:20
**appear** 16:15
51:18 185:15
291:2 304:6
308:13
**appearances**
2:1 3:1 4:1 5:1
6:1
**appeared**
198:24 310:15
328:14
**appears** 109:21
130:23 206:4
335:4

**application**
206:9
**applies** 213:16
227:18
**apply** 169:2
395:18
**appreciate**
57:19 254:24
383:8
**apprehensive**
251:13
**approach**
122:9 125:19
127:7,16
197:17 198:5
199:5 228:4,12
228:15 237:5
**approached**
79:17
**approaching**
79:18,21
**appropriate**
290:15 396:6
**approximate**
243:10
**approximately**
83:8 85:9,18
86:1 196:9
263:8 370:1
**apps** 181:18
354:5
**april** 196:10
**area** 29:7,9
48:24 53:23

CONFIDENTIAL

85:23 214:7
233:14,21
258:6 265:19
267:10 277:6
278:8 367:19
**areas**  99:8
217:22 229:20
235:3 259:23
**argue**  215:4
**argues**  226:11
**argument**
254:12 312:24
**argumentative**
244:23 246:14
254:3
**arguments**
315:6
**arrives**  53:14
**article**  89:12,16
90:7,11,13
91:1,22 92:9
92:15,23 93:3
93:7,17,24
94:6,12,16,21
95:16 97:21
98:2,18 99:5
99:20 198:13
199:12,22
200:12 201:8
203:14 214:14
214:16 217:18
219:6,10,16,19
220:8,13 221:2
221:8,17 222:7

223:17 224:2,6
224:13,23
225:16 226:1
226:11,15,23
227:7 229:1,7
229:11,15
230:2,23
287:14 291:16
292:3 293:16
293:17 295:20
296:3,5,8,11,21
297:5,9,12
298:19 299:16
300:1,21 301:2
302:3,6,17,21
304:5,22 305:6
305:11,19
306:2,11,16
307:2,6,9,13,17
308:20 309:20
311:9,12,13,16
311:18 312:2
328:13 353:21
369:20 370:3
371:18,19,20
377:23 384:6
385:3,19 386:5
387:5,12,16,21
387:24 388:21
389:14 390:4
391:13,20
**articles**  88:10
88:14 95:22
120:23 198:9

198:23 199:19
200:4,8 222:16
222:21 227:14
228:17 230:22
287:1,7,11,17
287:22 288:1,4
290:6,8 293:21
293:22 294:5
297:7 301:5,15
301:20,21
306:18 308:1,4
308:5,11
310:13,14
313:11,20
314:7,13,18
352:14 353:9
369:17 370:1
370:11 371:5
373:12 389:7
**artificial**  311:4
311:8
**arts**  33:16
**asked**  30:13,16
54:13 56:18
57:16 63:5
64:16 67:10,23
70:10 78:13,14
78:16,17 79:3
109:4 117:11
120:20 130:16
134:18 145:4
148:20 151:24
155:23 183:17
192:14 196:4

197:4 207:21
234:19 242:6
244:22 246:13
246:16 247:8
250:7 257:13
277:8 285:16
297:7,22
317:22 326:1
328:22 332:22
342:6 368:3
380:19
**asking**  56:11,13
59:1 60:20
67:21 72:3,6
85:19 116:24
117:7 134:16
134:22 152:8
156:5 171:23
174:24 182:16
197:3 225:15
226:6 229:8
234:13 243:2
249:20 250:9
252:6 255:4
275:13,19
276:22 278:20
279:1 321:10
325:20 326:3
338:5 346:13
358:1 373:23
377:15,20
**aspect**  348:15
**aspects**  47:1
336:18 345:21

CONFIDENTIAL

**[aspects - attorney]**                                              Page 8

| | | | |
|---|---|---|---|
| 346:3 355:19 | associate 86:23 | 69:9 72:12 | 56:10,18 57:8 |
| **aspiring** 47:23 | 87:21 | 133:10,13 | 57:16 58:21 |
| 65:19 68:21 | **associated** 9:22 | 151:3 175:21 | 59:8 60:17 |
| 119:1 122:11 | 66:17 149:16 | 177:23 178:4,7 | 63:5 64:11,15 |
| 140:20 142:6 | 212:19 282:8 | 183:10 186:6 | 66:2,5 67:5,10 |
| 143:20 147:24 | 389:21 | 186:24 187:24 | 67:16,23 68:4 |
| 153:15,16 | **association** | 188:2 190:16 | 68:7,10 69:23 |
| 161:10 163:6 | 86:24 88:8 | 190:18,18 | 70:7,10 71:14 |
| 165:7 207:3 | **assume** 17:11 | 193:14 217:23 | 71:19 72:2 |
| 208:13 211:21 | **assumption** | 218:1,24 234:9 | 73:22 74:6,15 |
| 228:3 233:17 | 85:2 166:20 | 235:3 239:24 | 75:4,8,24 |
| 236:12 238:23 | **assumptions** | 257:12 272:12 | 80:24 81:8,11 |
| 247:19 248:20 | 168:15 | 273:6,18,23 | 81:15 82:1,15 |
| 248:23 256:11 | **attached** | 275:5,17,18,23 | 84:7,10,12,24 |
| 257:17 376:23 | 396:12 398:6 | 282:5,6,11,11 | 85:4 88:16,23 |
| 378:19 | **attaches** 224:20 | 291:1 324:3,17 | 89:8 92:12 |
| **assert** 282:23 | **attempt** 65:13 | 325:23 326:18 | 93:4,18,22 |
| **assertion** 198:4 | 212:23 251:2 | 343:4 346:9 | 94:10 95:6,13 |
| **assertions** | 340:19 366:12 | 350:15 351:3 | 96:11,20 97:6 |
| 313:4 319:5 | 366:16 | 371:13,15 | 97:10,13,19 |
| **assess** 341:15 | **attempted** | 372:20 373:2,4 | 98:15 99:11 |
| **assessment** | 366:18 | 387:17 389:11 | 100:5,8,16 |
| 9:13 386:20 | **attempting** | **attested** 256:19 | 102:18,21 |
| **assignment** | 80:12 92:5 | **attesting** 250:3 | 107:24 108:3,7 |
| 115:13 | 280:17 340:23 | **attorney** 7:6,6 | 108:11 109:8 |
| **assignments** | 341:10 | 7:7,7,8 13:13 | 109:16 110:23 |
| 64:1 | **attend** 215:13 | 13:17 20:14,24 | 114:19 115:4 |
| **assist** 29:19 | 226:18 | 24:16,20 28:7 | 115:17,24 |
| 41:17 111:17 | **attending** | 28:9 31:14 | 116:4 117:6,11 |
| **assistance** | 325:15 | 32:1 40:22 | 117:17 120:15 |
| 358:10 | **attention** 36:22 | 41:3,7,11 42:8 | 121:22 123:1 |
| **assisting** | 36:24 52:20 | 42:11 46:15 | 124:6,12 |
| 255:18 | 58:16 62:6 | 47:10 51:1 | 125:16,22 |
| | 63:22 66:13 | 52:6 54:13 | 127:4 128:19 |

CONFIDENTIAL

**[attorney - austin]**                                                    Page 9

| | | | |
|---|---|---|---|
| 128:21 130:15 | 201:2,4,6 | 292:24 294:3,6 | 356:20 357:20 |
| 131:15,21 | 205:22,24 | 294:19 295:3 | 358:4 359:8,10 |
| 132:9,13,17 | 206:17 207:12 | 299:21 300:4 | 360:1 365:17 |
| 133:7,23 134:4 | 209:9 210:24 | 300:16,20,23 | 365:20 370:22 |
| 134:14,24 | 213:18 214:12 | 301:13 302:12 | 371:3 373:7,14 |
| 135:5,10 | 220:3,7,9,11 | 302:14,15 | 373:18,21 |
| 136:12,16,22 | 223:19,23 | 303:14,23 | 374:1,7,11,16 |
| 137:5,11,23 | 225:8,22 | 304:8,11,15,18 | 375:5,12 382:9 |
| 138:5,18,23 | 228:19 229:23 | 305:1,5,9 | 382:14,16 |
| 139:7 140:11 | 230:17 231:5 | 306:20 307:1,4 | 383:7,17 384:5 |
| 140:22 141:5 | 232:7,10 233:6 | 307:15 312:9 | 385:7,17 |
| 141:10 143:9 | 234:10 238:8 | 312:18 313:13 | 386:15 387:3 |
| 144:21 145:3,8 | 238:11 240:14 | 313:15,17 | 388:6,19 390:2 |
| 146:14 147:2,9 | 241:5,7 242:5 | 314:5,11,24 | 391:1,11 392:4 |
| 148:12,19,24 | 242:23 243:6 | 315:10,12,14 | 392:10,19 |
| 151:14,18 | 243:15,20 | 315:20 316:4 | 393:16 394:2 |
| 153:5 154:16 | 244:14,16,21 | 316:24 317:15 | 396:16 |
| 154:20,23 | 245:3 246:7,9 | 317:21 318:3 | **attorneys** 81:17 |
| 155:6,19 | 246:12,19 | 318:19 319:1,7 | **attributable** |
| 157:11 158:6,9 | 247:7,12,23 | 319:11 322:7 | 73:15 119:6 |
| 158:21 160:21 | 248:1,4,6,8,10 | 322:21 325:24 | 147:17 154:2 |
| 162:9 166:17 | 248:11 252:5 | 326:13 330:16 | 366:15,21 |
| 166:23 168:1 | 252:14,23 | 330:24 331:6,9 | **attribute** |
| 169:12 173:1 | 253:4,8,21 | 331:17 333:22 | 185:13,20 |
| 173:10,22,24 | 254:2,8,11,20 | 334:3,14 | 186:1 |
| 174:1,4 176:14 | 260:1,7 264:24 | 336:24 337:4,7 | **attuned** 255:22 |
| 178:13 183:24 | 265:3,4 267:11 | 337:16,20 | **audience** 88:13 |
| 184:24 188:21 | 267:16,19 | 338:24 339:5 | 212:20 |
| 188:24 189:3 | 278:2,10,17 | 339:11 341:1 | **auerbach** |
| 189:17,21 | 279:2,11 | 341:13 347:9 | 282:22 |
| 190:2 191:10 | 280:19 281:1 | 347:10 348:8 | **august** 194:16 |
| 192:6,13 | 282:15 285:24 | 349:5 351:13 | 196:11 |
| 193:17,20 | 286:17 288:12 | 351:15 352:6 | **austin** 6:4 |
| 194:9 200:22 | 289:14 292:20 | 352:19 356:11 | |

CONFIDENTIAL

**[author - bates]**                                                Page 10

**author**  111:14 298:9,21 302:2 318:24 384:9 385:21 387:9 387:10 389:1 391:15
**author's** 110:11 220:18 222:12 224:12
**authored**  292:3 301:3
**authors**  90:10 172:12 212:16 213:21 216:8 218:23 219:2 226:15 291:24 292:8 293:17 293:24 296:4,6 306:10 307:7 307:14 385:24
**auto**  265:11
**autoplay**  264:9 264:18,20 265:6,8,12,15 265:17
**available** 125:21 127:8 316:23 317:3 343:11 366:9
**avenue**  2:16 4:5 6:5
**avenues**  346:1
**average**  355:12

**avoid**  340:9
**aware**  34:12 108:12 128:22 129:3 292:12 294:13 319:3 330:5 331:1 354:4 355:1,7 355:17 357:9 358:13 380:8

**b**

**b**  7:11 8:2 9:2 10:2 302:19
**bachelor's** 21:10
**back**  31:23 72:24 82:12 85:15 90:20 97:8 103:13 107:1 112:4 123:7 129:9 133:6 145:9 172:13 185:1 194:8,11 214:18 222:18 223:12 224:16 230:16 268:9 272:1 282:16 286:16 299:7 300:6 309:4,13 314:15 352:5 359:20 374:8 383:2

**background** 21:4,6 179:16 181:1 245:11 292:7
**backstory** 371:5
**bad**  306:9 309:4,10 314:15 343:22
**baked**  179:23 181:4 373:5
**baker**  10:7 391:8,15
**balanced** 340:24 341:11 341:12
**baltimore**  2:11 4:18 34:17
**ban**  42:18
**banes**  92:4
**banned**  359:5
**banning**  41:13 42:2,6
**bans**  41:4 42:13
**base**  103:23 124:15 206:23 228:7
**based**  50:16 80:15,15 90:14 112:11 124:15 126:7 129:17 129:23 130:5 130:12 143:18

147:22 153:9 157:19 160:18 165:3 211:14 233:4,8 234:20 234:23,24 235:6,13 250:17 252:2 317:2 367:19 380:13
**baseline**  102:1
**basic**  201:22 202:5
**basically**  104:1 119:24 136:6 349:15
**basis**  47:11,14 50:1 65:15 71:3 95:19 103:12 105:7 143:5 148:1 154:18 157:6 157:12 160:22 161:16 163:3 167:9 234:2 239:10 240:17 240:23 242:11 250:3 254:1 255:9 256:3,6 258:12 272:18 342:23 381:6
**bates**  7:14,16 7:18,20,22 8:5 8:7,9,11,15,17 8:19,21,23 9:5

CONFIDENTIAL

9:9,12,16,21
10:5 20:20
81:4 84:4 89:3
96:15 97:16
100:12 109:12
110:18 200:15
219:22 294:23
303:18 331:13
334:9 383:22
385:11 386:19
388:10 389:19
391:5
**bathroom**
188:20 286:3
**baton** 373:17
**bear** 124:10
178:23 199:18
206:11 214:2
237:3
**beat** 189:19
**beaudoin** 6:4
**becker** 302:18
384:11,24
**becoming** 54:5
62:19
**beg** 93:20
150:9 347:14
**beginning**
82:14 123:3
133:5 194:7
230:15 254:15
286:15 352:4
**begins** 206:2

**behalf** 13:20
360:13
**behavior** 36:14
36:16,18,20
116:17 145:16
187:24 324:5
338:11
**behavioral**
37:20 117:19
117:24 118:2,9
**behaviors**
186:6 210:12
216:15 219:12
221:2 224:24
226:9 324:17
371:13,15
**behaviours**
8:15 219:23
**belief** 253:10
**believe** 98:21
175:6 196:17
207:8 214:18
224:7 274:15
291:13 359:4
361:4
**bellwether**
19:15 128:23
129:24 130:7
159:24 316:7
319:4 332:4
**bellwethers**
331:3
**belonging**
345:22 346:21

**beneficial**
341:24 343:21
345:4 350:12
**benefit** 213:10
217:23 218:1
349:24
**benefits** 92:4
98:22 214:10
229:21 341:16
347:2 348:24
349:9,17
350:17 351:10
**berman** 5:3
**bernstein** 5:17
**best** 16:22
91:12 101:15
255:20 283:21
284:14 332:7
**better** 80:2
102:12 103:3
281:18 340:8
367:18
**beyond** 242:2
291:24 324:8
**big** 105:5
314:17
**biggest** 61:14
**bilingual** 33:4
**biobehavioral**
8:20 303:4,19
304:2,7
**biscayne** 3:17
**bit** 39:12 122:8
173:17 196:21

222:15 261:10
276:19 320:3
320:16 325:13
338:18 349:13
**bits** 40:9
**blah** 336:3,3,3
**blame** 251:3
**board** 44:6
87:7,23 89:19
89:23 90:3,5
95:21 259:9
331:19
**boards** 29:11
**body** 54:7
55:22 65:10
69:1 119:22
247:22 327:9
**boil** 70:14
**bonnin** 5:10,11
**boston** 32:15
**bottom** 203:20
205:19 206:1
335:17,18
385:1 386:12
387:20 388:3
391:21
**boulevard** 3:17
**brain** 178:2
274:24
**brands** 339:16
**break** 17:15,18
50:3 82:2
132:18 229:24
230:19 286:1

CONFIDENTIAL

351:14 353:19
382:15
**breathitt** 19:23
**brian** 1:13 7:4
7:15 8:8,10
12:24 13:7
14:3 20:21
109:13 110:19
398:8
**brief** 31:19
82:8 132:24
230:10 286:10
351:23 359:16
369:1 382:22
393:7
**briefly** 21:3
**briefs** 312:23
**bring** 199:18
200:3 237:3
256:14 297:17
302:9 359:1
**bringing** 58:5
124:10 206:10
327:3
**broad** 231:22
**broadcasting**
268:21
**broader** 326:10
**broadly** 277:16
**brockstedt** 2:9
4:16
**broken** 303:11
**brooks** 198:19
199:22 200:12

**brought** 214:2
302:8
**browse** 45:14
45:17
**browser** 361:19
**bruce** 10:7
391:7,15
**budget** 216:19
217:15,15
218:5,14,16
259:6,18,21
260:14
**budgeting**
108:14 259:3
259:12,18
260:9
**budgets** 258:17
258:21 259:1
316:12
**build** 174:15
185:7
**building** 6:5
91:13
**built** 248:14
**bulk** 256:1
**bully** 188:1
**bullying** 137:7
137:9 138:2
174:17 185:8
187:12,14,21
188:4,16 189:2
189:6,7,15,20
189:24 190:4,6
190:7,11 192:8

192:17,18,23
193:6,8 340:14
**bunch** 64:21
73:7 186:5
**burden** 178:23
178:24 280:6
**burdens** 184:19
**burling** 3:3 6:4
13:18 81:17
**burnout** 37:6,8
149:17 150:24
152:7,10 153:2
155:3
**bytedance** 3:20
3:20

**c**

**c** 302:18,18
**cabraser** 5:17
**calculate** 83:17
**calculator** 45:7
195:8,23
**calendar** 46:5
85:11 86:7
**calendaring**
46:7
**california** 1:1
3:10 4:6 12:24
**call** 77:12,16
91:18 126:14
209:24 212:11
232:24 254:6
255:3 258:23
260:16,21

290:21 294:4
327:5 351:9
**called** 21:24
23:17 76:8
218:23 254:9
263:24 267:6
269:21 292:13
294:14 379:15
384:6
**calling** 126:12
**camera** 358:19
**camino** 3:9
**candidate**
261:19,21
**capacity** 23:12
71:11 122:10
125:1 129:16
130:11 162:16
165:9 166:6,16
**capture** 65:21
175:20 272:11
273:5 275:5,22
343:3 350:15
**captures**
289:23
**capturing**
183:9
**career** 121:17
256:2
**career's** 257:14
**carefully** 104:8
309:15 396:4
**carolyn** 9:19
388:16

CONFIDENTIAL

**case** 1:3 15:3,8
15:11 19:15
50:9 74:24
76:3 82:20
109:20 113:15
113:23 118:14
124:11 125:7
128:24 131:19
132:5 169:14
190:12 202:18
204:7,11 205:2
205:8 216:22
217:8 238:15
241:13 291:9
291:10 312:20
313:1 315:19
347:6 353:1
359:2 368:18
373:19
**cases** 76:15
79:20 332:5
369:7
**catch** 370:14
**categories** 50:4
205:1,7 206:11
341:24
**category** 345:1
345:12
**caught** 370:19
372:20 373:1
**causal** 287:12
287:15 319:17
**causality** 285:7

**cause** 46:13
319:13,16
321:4
**caused** 118:11
129:14 190:10
277:22,23
**causes** 114:3,17
118:2 120:13
178:9 184:20
283:2 284:11
284:22 285:8
**causing** 46:19
117:24
**caution** 267:12
341:2
**caveat** 392:16
**cdc** 49:17
**ceiland** 5:14
**celebrate**
329:14,17
**celebrities**
339:17
**cell** 42:18 44:11
45:4,16,20
46:3,6,10
160:1
**center** 3:17
49:17 113:6
**central** 23:7,13
29:2
**certain** 182:21
189:7 201:12
312:5,11 334:4
379:21

**certainly** 41:2
53:18 187:3
189:15 314:6
328:1 372:16
378:13
**certainty** 367:3
367:9,14,22
**certificate**
395:1
**certification**
12:4 395:17
**certified** 1:20
395:11
**certify** 395:4
398:3
**certifying**
395:21
**challenge** 280:7
323:11 370:10
**challenged**
282:2
**challenges**
88:15 123:13
210:3,21
231:23 232:22
240:9 255:23
319:14 323:9
327:6 336:11
345:17 369:17
**challenging**
54:5
**chance** 92:14
201:7 348:2
382:15 383:13

392:14
**chancellor** 23:1
23:5
**change** 54:4
127:23 156:3,7
277:3 279:20
397:3
**changed** 54:4
250:20
**changes** 156:1
323:1 396:11
398:5
**changing** 29:20
184:8
**channel** 330:15
330:20
**channels**
333:13
**characterize**
166:19,24
167:2 215:14
226:20 277:13
337:9 340:5
**characterized**
255:12 368:14
**charge** 259:2
**charleston**
19:20
**chat** 269:9
**check** 1:15 4:10
45:15,17 46:2
46:4 52:21
97:18 222:18
275:6 307:23

CONFIDENTIAL

309:14,23
310:7 311:13
314:16
**checked** 298:4
310:2
**checking** 60:7
309:16 360:9
**cherry** 315:5
316:21 317:17
318:5
**chief** 22:20
**child** 9:16
388:11
**childhood**
289:2
**children** 62:16
62:16 177:19
182:6 273:11
273:19 280:6
350:19 351:11
356:10 357:3
357:17 358:6
374:24 375:3
375:17 376:4,6
**choose** 174:15
185:6
**chose** 316:16
349:9
**chris** 13:16
97:6 248:5
352:6
**christian** 3:4
384:10

**chromebook**
370:14 371:9
**chromebooks**
369:18
**circulate** 74:1
**circulating**
74:21 75:3
**circumstance**
372:9
**circumstances**
210:22 236:17
322:16 345:5
361:8 378:24
**citation** 110:5
220:18 221:11
221:21 222:3,5
222:20 227:6
229:3,13
293:11 296:2
296:19 297:4,9
297:13 298:10
298:22,22
299:1 300:2,14
301:8 303:10
306:2,9,19
307:11 310:6
310:22 311:20
313:23 314:21
314:21 383:12
**citations**
101:10 230:21
292:17,19
293:2,7 297:23
298:4,6 299:7

299:10 303:13
306:15 307:23
308:1,5 309:3
309:4 310:3,12
310:19 313:1,2
313:21 387:20
392:9
**cite** 197:23
220:14 221:1
228:14 291:16
297:12,15
302:17 304:2,5
304:22 384:18
384:23 385:4
386:11 388:1
389:14 390:14
390:21 391:20
**cited** 134:11
198:17 199:22
214:16 228:17
293:6 296:13
296:15,16,20
298:1 305:20
307:3 308:10
308:12,14
309:20 311:9
311:21 312:6
313:10 314:8
314:10 390:13
**citing** 219:11
223:17
**city** 14:16 22:5
22:11,14,17
23:11 24:1,15

25:7,9
**citycenter** 3:4
**citywide** 23:19
**ckennedy** 3:11
**claim** 121:5
143:14 144:23
148:11 154:14
155:14 158:11
158:19 159:8
161:17 164:4
165:2 199:17
258:10 284:18
368:1
**claimant** 149:5
**claims** 141:23
165:15,23
167:13 168:8
**clarify** 17:9
231:4
**clark** 229:2,15
230:23
**class** 33:21
39:15 46:14
73:18 75:23
326:18 369:4
369:11
**classes** 39:23
40:1,3 47:24
239:1 324:6
**classifier**
261:24 262:3
**classroom** 26:6
30:21,23 31:1
31:4 32:4,23

CONFIDENTIAL

33:7,12 73:21
98:4 327:21,21
328:2 331:5
343:19 382:5,8
**classrooms**
27:21 74:18
75:16 98:13
**clear**   49:8
105:10 106:14
119:3 122:21
131:17 144:23
150:14 199:21
211:1 228:13
234:22 370:9
**clearly**   131:12
169:17 342:15
**clerk**   6:4
**click**   223:20
224:1 300:18
304:16 305:2
306:21 361:20
**client**   209:13
**clients**   239:1
363:14,19
**climate**   116:20
145:18 147:5
147:15 148:15
**clinical**   9:16
283:16 285:22
388:10
**cmehri**   2:6
**coach**   28:24
48:5 122:13
125:2 231:18

363:10
**coaching**   43:22
126:17 197:20
199:6 208:11
211:19 217:21
223:10 228:2
236:23 244:4
257:18 363:14
363:19
**code**   338:14
340:13
**coded**   176:3
177:5 182:4
183:15 265:14
277:1 281:9
**coding**   264:13
**cognitive**   37:10
37:12 305:12
**cohort**   378:2
**colgate**   21:10
**colleagues**
239:1,3 249:13
**collect**   128:2
**collecting**
128:9
**collection**
201:17
**collectively**
13:22
**college**   14:6
82:21 83:3
266:6
**combination**
50:17 112:10

**come**   53:18
57:23 80:5
83:9 85:15
172:13 207:9
272:23 325:1
343:12 350:18
**comes**   47:16,17
51:12 52:1
63:17,19 74:5
121:14 173:16
207:1,1,5,6
211:15 272:21
346:22 349:1
376:21 378:5
**comfortable**
168:11 356:16
357:23 375:8
**coming**   53:3
64:1
**commencing**
1:17
**comment**   92:16
271:4
**commenting**
336:14 345:18
**comments**
185:15,22
271:6
**commission**
398:12
**commodotized**
178:8
**common**   74:20
130:19,19

204:17 208:19
345:22 346:20
349:21
**communicate**
93:11 95:10
344:7
**communicating**
30:4 353:12,19
**communication**
41:22 94:9
95:2 328:18
329:9 330:22
338:13 347:19
**communicati...**
96:6
**communities**
94:19 212:5
234:7 320:21
322:15 330:1,4
330:23 372:2
**community**
68:24 91:24
128:1 209:23
210:14 327:19
329:11 344:7
**companies**
13:22 174:14
174:15 185:6
**company**   1:22
364:14,19,20
365:7
**compare**   91:7
350:22

CONFIDENTIAL

**[compel - confronting]**                                                   Page 16

| | | | |
|---|---|---|---|
| **compel** 349:3 | 47:6 53:5 65:9 | **concept** 72:15 | 284:1 285:12 |
| **compelled** | 67:4 105:3,23 | 168:6 169:1 | 338:14 340:13 |
| 186:7 346:6 | 114:24 115:20 | 205:20 209:15 | **conducted** |
| 350:21 | 116:10,15 | 225:16,18 | 49:13 165:11 |
| **compensation** | 118:17 119:6 | 229:21 235:1 | 207:15 211:22 |
| 85:17 | 120:6 121:6 | 237:6 342:17 | 286:20 |
| **complete** 16:1 | 131:13 138:12 | 350:24 380:9 | **conducting** |
| 69:13 97:11 | 140:14 141:18 | **concepts** | 8:13 200:19 |
| 101:12 112:20 | 144:4 145:14 | 227:21 | 212:18 344:22 |
| 360:6 | 146:3,5 147:18 | **conceptually** | **confer** 392:20 |
| **completing** | 150:20 154:3 | 237:5 | **conference** |
| 63:24 | 180:5,7 181:19 | **concern** 51:19 | 77:12,16 |
| **complex** | 181:21 186:3 | 255:17 259:23 | 236:18 |
| 159:18 160:17 | 186:22 187:11 | 327:2 | **conferences** |
| 161:3,19 | 188:13 190:13 | **concerned** | 239:4 249:15 |
| **complexities** | 190:22 191:18 | 55:23 58:4 | **conferencing** |
| 41:20 44:1 | 191:22 193:1 | 273:21 | 61:16 126:19 |
| 215:14 226:19 | 193:15 212:3 | **concerns** 54:23 | **confidentiality** |
| **complexity** | 234:5 237:24 | 56:17 58:6 | 63:13 |
| 58:11 | 244:11 245:20 | 99:1 237:23 | **confirm** 40:11 |
| **complies** | 251:15 256:20 | 287:20 | 304:4,10 |
| 223:22 305:8 | 272:15 273:13 | **concluded** | **confirmed** |
| 306:24 | 280:2,4 320:4 | 394:7 | 113:6 |
| **comport** 96:8,9 | 323:12,24 | **concludes** | **conflated** |
| **comported** | 343:1 346:5 | 393:4 | 347:20 |
| 310:20 | 347:20 349:4 | **conclusion** | **conflict** 55:14 |
| **composite** | 379:4 | 92:20 252:7 | 69:5,6 72:13 |
| 295:5,14,19 | **compulsively** | **conclusions** | 139:14 141:13 |
| **compromised** | 49:3 72:16 | 80:13 252:4 | 141:20 159:19 |
| 69:15 | 350:22 | **conditions** | 160:18 161:4 |
| **compulsion** | **computer** | 272:14 | **confront** 320:8 |
| 154:4 186:18 | 301:23 | **conduct** 44:17 | **confronting** |
| **compulsive** | **concentration** | 202:16,21 | 128:16 |
| 36:18,20 43:3 | 21:16,20 | 209:4 283:17 | |

CONFIDENTIAL

**[confused - contradicts]**                                                Page 17

**confused**
  222:16,21
**connect**  339:3
**connected**
  274:1
**connectedness**
  9:15 386:24
  387:8
**connection**
  287:12 289:19
  333:13 345:23
  350:8 352:24
**connections**
  178:5 239:5
**connolly**  2:15
**connor**  3:8
**consequence**
  179:2
**consequences**
  30:4 41:21
  161:21
**consider**  8:13
  114:16 118:8
  119:12 200:18
  242:18 271:11
  348:21
**consideration**
  167:5 171:8
**considered**  8:6
  100:13,22
  101:13 104:6
  107:2 151:11
  157:20 167:20
  170:4 189:24

190:4 296:14
301:18 311:24
369:16 370:3
370:11 379:9
**considering**
  41:24 44:3
  120:12 127:23
  144:10 278:12
  380:4
**considers**  92:1
  92:10
**consistent**
  211:7 236:22
  237:4,5 238:5
**constant**  51:11
  327:13
**constituency**
  41:21
**constituents**
  30:5
**constraints**
  71:9 260:5
**consult**  236:3
**consultant**  28:4
  28:15,18,20
  29:8,23 30:13
  30:17 43:16
  48:4 124:24
  125:18 142:3
  161:9 165:9
  208:10 211:18
  223:9 231:17
  249:1

**consulted**
  113:1
**consulting**
  29:18 39:17,24
  42:5 50:16
  82:22 83:5
  86:2 122:24
  128:18 153:11
  196:24 197:8
  209:4 228:1
  244:4
**consumer**
  284:4
**contact**  77:24
**contacted**  76:7
  76:9,19,20
  78:9
**contain**  312:24
**contained**
  57:21 112:2
**content**  176:11
  261:15,17
  271:4
**context**  9:10
  42:4 61:19
  93:16 119:9
  121:12 126:16
  127:18,20
  189:10,24
  198:15 206:21
  210:6,20 215:3
  216:17 217:11
  218:4 223:4
  225:19 229:22

237:7 242:2
261:24 262:3
272:8 316:17
317:6 326:5
335:11 385:14
385:21
**contexts**  153:18
  163:7 231:21
  233:18 236:14
  237:16 238:19
**contextual**
  215:12 216:2,6
  223:3 224:15
  226:17 320:7
**contextualiza...**
  227:22
**contextualized**
  113:7
**continue**  133:8
  392:11
**continued**  3:1
  4:1 5:1 6:1
  177:8
**continues**  54:4
**continuing**
  33:2
**continuously**
  274:1
**contracted**
  48:3 249:12
**contradicted**
  287:22 288:1
**contradicts**
  319:5

CONFIDENTIAL

**[contrast - counsel]**

| | | | |
|---|---|---|---|
| **contrast** 91:7 | 232:5 234:15 | 138:4,22,24 | 301:18 305:15 |
| **contribute** | 235:5,12,18 | 139:18,22 | 308:14 316:8 |
| 276:15 | 236:4,8 237:19 | 140:10 141:4 | 316:23 317:20 |
| **contributes** | 238:2,6 239:9 | 141:15 142:23 | 319:6,17 337:1 |
| 149:18 178:21 | 239:14 240:4,6 | 143:8 145:2 | 347:8 349:11 |
| **contributive** | 240:11,17 | 146:13 147:8 | 353:7 354:12 |
| 321:21 | 242:4,9 249:15 | 148:18 149:6 | 355:20 356:1,5 |
| **control** 323:22 | 250:10 256:4,8 | 150:17 152:17 | 361:5,6 371:10 |
| 340:8 395:20 | **convey** 232:16 | 153:4 154:19 | 371:22 372:13 |
| **controlled** | **conveyed** | 155:5 156:4,20 | 383:15 391:20 |
| 283:18 | 232:13,17 | 157:10 158:24 | 398:4 |
| **converged** 49:6 | **cool** 230:3 | 160:20 164:20 | **corrected** |
| 125:11 157:21 | **coordinating** | 166:7,16 | 297:17,19 |
| 165:19 274:8 | 22:13 | 167:24 169:15 | 302:8 392:23 |
| **convergence** | **copy** 21:1 | 169:20 171:14 | **corrections** |
| 65:7 80:16 | 109:19 331:24 | 172:16,19,24 | 396:5,7 398:5 |
| 103:9 104:4 | **copying** 299:10 | 173:13 176:13 | **correctly** |
| 105:6 107:17 | **core** 62:6 | 194:21,22 | 195:20 335:15 |
| 124:17 143:24 | 123:19 322:23 | 196:24 202:13 | 335:20 |
| 161:6 165:3 | **correct** 40:14 | 203:12 207:19 | **cortex** 55:2 |
| 211:15 233:8 | 40:18 45:8 | 207:20 208:2 | 177:21 182:8 |
| 234:3 235:1 | 50:18 57:12 | 209:8 211:5,6 | 273:12 274:22 |
| 251:7 281:21 | 64:14 81:18 | 222:1,10 | **cost** 162:14 |
| **converging** | 85:8 90:5,16 | 228:18 230:20 | **costs** 162:22 |
| 104:17 240:20 | 98:4 103:1 | 231:12 232:6 | 166:14 |
| **conversation** | 105:15 110:2 | 232:14 233:5 | **council** 249:5 |
| 63:14 73:9 | 111:12 113:23 | 234:18 238:7 | 257:22 |
| 77:11 243:1 | 114:5,17 122:7 | 238:15 239:11 | **counsel** 12:3 |
| 277:9 | 122:24 125:21 | 243:19 244:20 | 13:2 18:16 |
| **conversational** | 127:9,14 | 247:14 258:18 | 19:12 107:4 |
| 236:20 | 128:18 130:7 | 260:10 277:19 | 312:21 352:7 |
| **conversations** | 130:14 134:7 | 278:1 293:2 | 352:11,21 |
| 53:19 60:14 | 134:13 136:11 | 297:22 299:2 | 373:15 392:7 |
| 61:16 210:1 | 136:21 137:10 | 299:24 301:1 | |

CONFIDENTIAL

**counselors** 53:21 58:6

**counterfactual** 316:17 318:9

**country** 158:5 163:15 231:21 249:16 377:6 378:3

**county** 8:23 331:20 334:10 335:5

**couple** 61:15 110:4,9,9 176:6 247:1 257:18 285:17 292:16 309:5 347:3

**couples** 48:8

**coupling** 126:21 227:23

**course** 38:11,23 39:7 53:19 118:13 119:2 186:19 191:3 192:18 193:8 210:7 227:14 287:9 320:11 322:13 323:16 324:12 326:23 335:3 341:21 360:19 367:7 377:12

**courses** 38:15 38:17,19

**court** 1:1,19 12:21,23 13:3 16:11,19 312:6 312:22 368:10 368:14 369:1 396:20

**cov.com** 3:6,11

**covered** 202:19

**covid** 40:16,23

**covington** 3:3 6:4 13:18 81:17

**cpistilli** 3:6

**craig** 5:11

**create** 120:3 188:6 343:3 346:7,10 372:18

**created** 144:3 190:17 272:14 281:23 323:11 324:21 371:21 372:11

**creates** 187:19 188:14 320:12

**creating** 66:18 72:21 121:7 186:17 190:24 218:14 280:6 310:19 369:21

**credibility** 228:6

**credible** 290:14

**criminal** 340:14

**crises** 282:8

**crow** 215:3 219:3,8 224:6

**cruelty** 187:4

**culmination** 377:12

**culprits** 184:11

**culture** 62:9 178:20 192:5

**cultures** 215:13 226:18

**cumulative** 62:13 68:16 149:14 162:12 163:14 184:14 281:22 347:1

**curated** 94:23 190:19 342:19

**current** 14:5 82:17,18 112:12 211:19 259:15 272:7 306:5

**currently** 38:6 87:10 112:1

**curriculum** 7:15 20:20 23:21 332:24 333:9,11,14 342:13 344:10

**cv** 21:1 32:8 86:22 87:3

89:24

**cyberbullying** 185:14,21 338:8 340:11

**cyrus** 2:3 18:20 195:19

**d**

**d** 7:2 10:7 224:2 296:21 299:16 387:11 391:7,15

**daily** 9:21 353:16 389:20 390:4,22

**dance** 336:10 345:17 349:22

**dangers** 338:8

**daniel** 2:16 374:18

**data** 35:11,13 91:2,4 125:20 126:6,7,10,12 126:14 127:7 128:10 133:20 135:9,20 136:9 136:14 139:19 139:24 142:21 145:23 146:4 149:2,7,23 150:2,11,13,16 150:18 151:20 152:2,9,15,18 154:7 155:23

**[data - depends]**

156:6,17,21
158:15,23
159:2,6 160:9
162:1,21,24
164:1,10,14,19
164:22 165:13
166:5,8 167:14
167:23 168:15
168:19 169:11
201:17,22
202:6 212:9,11
213:11,12
233:9 285:21
315:5,6,17,22
316:2,6,16,22
317:3,3,5,7,11
318:8,11,13,15
318:18,23
319:3 355:11
367:15 379:22
**date** 1:18 12:14
85:11 86:7
97:14 396:9
398:8
**dated** 395:11
**david** 5:11
**day** 32:21,21
78:3 139:12
141:19 186:11
211:8 353:14
353:18,19
398:11
**days** 47:21,22
396:16

**dbonnin** 5:14
**dc** 2:5,17 3:5
**deal** 48:23 67:1
177:11
**dealing** 104:21
115:8 216:20
274:11
**decennial**
90:16,22 91:3
91:6
**decent** 245:15
**deciding**
101:18
**decision** 44:9
215:1 218:12
**decisions** 179:3
179:10 180:17
180:22
**declarations**
251:7
**dedicated**
39:20
**dee** 1:19
**deemed** 396:19
**deeply** 215:11
224:15 226:17
283:23
**default** 365:24
**defendant** 3:12
4:7
**defendants**
2:18 3:19
13:22 174:22
175:4,9 185:15

185:22 275:4
275:21 319:6
332:24 359:2
360:14 368:5
373:16 374:19
**defense** 315:4
373:15 392:7
**deficiencies**
133:14
**deficit** 36:22,24
**deficits** 37:10
37:12
**define** 170:8
**defined** 170:10
172:12
**definitely**
338:22
**definition**
170:15 189:8
**deflect** 251:3
**degree** 21:10
21:12,13,18
213:8,9 237:21
260:15,20
367:3,9
**degrees** 21:22
**dekalb** 8:23
19:23 334:9
335:5,13,22
345:15
**deliver** 253:16
255:19
**demand** 139:15
141:21 142:18

143:1,1,7,15
144:1,14,24
**demands** 40:10
142:21 162:13
319:21,24
**demeaning**
191:8
**democracy**
322:12
**demographic**
241:23
**demonstrate**
132:8 227:15
**demonstrates**
144:1 234:4
**demonstrating**
240:6
**department**
22:6,12,17
24:1,15 25:7
25:10
**depend** 38:12
210:19 216:23
217:2
**dependent**
123:18
**depending** 39:6
40:5
**depends** 42:3
125:24 189:10
210:16 212:16
216:21 266:2
380:3

CONFIDENTIAL

**deponent** 12:24 398:1

**deposed** 14:8 71:24

**deposing** 13:19 396:16

**deposition** 1:12 11:2 12:16 17:21 18:11,14 18:17 19:12 20:9 50:8 57:24 79:24 108:4 173:5 352:12 356:4 365:3,6 373:10 382:13 392:12 394:6 395:6 396:3,13,17,19

**depositions** 17:23,24 18:4 18:9 49:5 64:24 104:6 107:6 172:16

**depression** 9:22 389:22

**deprivation** 66:15

**deprived** 53:4 64:2

**deps** 1:23

**deputy** 23:1,5

**derived** 258:3

**derives** 165:4

**derogatory** 192:10

**describe** 21:4 28:10,17 46:21 52:11 54:11 56:13 60:24 61:3,21 63:2 64:21 65:3,24 68:17 69:3 71:24 91:5 94:21 112:18 127:17 240:8 253:12 286:21 342:4

**described** 72:11 79:10 80:17 124:14 196:22 205:13 211:8 253:18 276:20 298:19 347:3 353:21 354:18

**describes** 122:8 122:19,22 243:22

**describing** 48:14 78:23,24 99:4,5 122:6 212:17 214:1 235:23 255:4,5

**description** 7:13 8:4 9:4 10:4 127:12 227:1

**descriptions** 57:23

**design** 34:24 35:2,4,6 47:4 103:4,24 105:14 106:10 106:15,18 120:7 144:7 147:19 173:12 174:6,21 175:3 175:10,13,23 176:21 178:20 179:3,9,17,24 180:10,16 181:4,15,21 183:1,3,4,22 186:1 187:9 190:17 232:1 261:5,8 262:9 262:11 273:4,8 274:16,18 275:16 280:11 284:16 323:23 343:2

**designed** 175:19 178:6 181:16 183:12 272:11 275:4 275:22 277:1 350:14

**designing** 8:13 200:18

**designs** 154:6 179:15 182:3

**desire** 57:20

**despite** 240:10

**destabilized** 282:1

**destabilizing** 53:13 66:19 116:8,13 145:12 234:6 325:13

**detail** 176:4

**details** 281:7 306:14 307:10

**determine** 101:1 117:22 252:2 321:2,13 366:12,19

**determined** 222:24

**detract** 224:19

**develop** 30:7,14 30:18 103:21 350:23

**developed** 55:3 103:20 177:22 182:9

**developing** 29:19 38:23 259:18 273:12 341:22

**development** 9:10 29:15 122:14 126:5 178:2 186:20 191:21 199:7

CONFIDENTIAL

**[development - disorders]**

217:6,24 259:5
275:1 350:7
385:13,20
**developmental**
306:4
**developments**
323:1
**device** 42:13
43:10,14,19
46:19 58:13
**devices** 24:4,22
26:2,10,16
27:17 28:1
41:5,13 42:7
75:2 159:17
160:3,7,16
161:2
**diagnose** 37:14
37:17,19,21
53:24
**diagnosis**
357:17
**difference**
175:17 199:10
264:3,5
**differences**
179:20 183:15
281:10
**different** 22:16
28:21 44:12
48:16,17,23
51:9 56:12
58:23 61:2
64:22 73:11,12

82:23 83:6
97:14 112:24
119:8,17
122:17 124:18
142:4 179:20
186:5 214:8
220:8 222:13
222:14 232:13
235:2 236:10
236:14 238:19
238:20 241:11
241:22 246:1
246:24 255:15
255:16 256:9
263:24,24
270:16 289:21
320:6,16,24
321:22 323:13
324:14 325:18
327:17 339:3
341:24 342:20
355:12 367:5
367:11,23
370:17 378:21
379:1
**differently**
151:24 276:19
**difficult** 141:8
148:7 156:14
157:17 161:19
251:20 323:6
377:7
**difficulty**
345:24

**digital** 9:10
24:3,22 26:1,9
26:9,16 27:17
28:1 34:23
35:2 46:18,19
99:2 338:12
385:13,21
**diligence**
312:15
**diminishes**
149:16
**direct** 29:24
48:8,19 50:18
59:7 61:3
107:12 122:12
126:15,22
137:1 146:18
330:8 395:20
**direction** 11:5
**directions**
45:24 306:6
**directly** 23:1
52:8 54:9
57:10,15 60:21
63:3 67:8,18
75:5,19 123:10
124:1 362:20
372:3
**director** 22:3
**disciplinary**
135:21,23
136:20 324:7,8
**discipline**
127:2 135:14

136:10 213:1
216:10 227:16
316:11
**discord** 171:1
**discourse**
260:12
**discover** 270:6
**discovered**
301:2
**discrete** 66:4
362:4
**discrimination**
15:11
**discuss** 44:6
91:11 113:18
114:2 197:12
237:10
**discussed** 20:8
20:11 38:5
197:6 308:9
352:14 358:21
366:14,20
**discussion** 91:7
171:17 230:20
276:17 326:12
**discussions**
276:13
**dismay** 298:8
301:1,9
**disorder**
302:24
**disorders** 36:22
36:24 37:10,12
37:15,20,21

CONFIDENTIAL

[disparate - districts]                                    Page 23

| | | | |
|---|---|---|---|
| **disparate** 238:6 | 61:8 62:1,18 | 345:11 364:6 | 148:10,17 |
| **disposal** 345:8 | 65:2 66:20 | 381:24 | 149:3,8,9 |
| **disproportion...** | 69:19,20 72:23 | **district's** 209:8 | 150:1,4 152:3 |
| 178:23 | 104:11 107:8 | 218:6 259:14 | 152:11,17,21 |
| **disrupt** 116:19 | 108:24 115:23 | 260:14 | 153:4,23 154:9 |
| 145:17 | 117:2 118:18 | **districts** 19:15 | 154:15 155:5 |
| **disrupted** | 118:23 119:2,5 | 20:5 34:5,7,10 | 155:15,24 |
| 147:7 | 121:8,16 | 34:12 48:17,17 | 156:6,20 157:1 |
| **disruption** | 123:11,12,17 | 49:5 65:1 | 157:9,23 |
| 147:14 | 125:10 126:1,3 | 71:23 79:13 | 158:13,16 |
| **disruptions** | 127:9,21 | 80:9 82:23 | 159:7,24 160:5 |
| 67:2 148:16 | 128:14,16,23 | 83:6 91:15 | 160:11 161:24 |
| 149:4 | 135:9 138:16 | 107:23 108:6 | 162:3,17,23 |
| **disruptive** | 151:22 153:15 | 108:13 113:22 | 163:2,15 164:2 |
| 325:9 338:9 | 153:17 160:20 | 115:8,15 | 164:3,5,12,16 |
| **distinct** 343:7 | 161:11 165:8 | 118:11 120:4 | 164:24 165:2 |
| **distinction** | 172:15 178:10 | 124:9 125:19 | 165:14,16,20 |
| 345:7 | 178:12 180:20 | 127:14 129:24 | 166:7,10,13 |
| **distracted** | 181:22,24 | 130:7,13 | 167:15 168:9 |
| 63:19 | 184:21,23 | 133:22 134:2,7 | 168:17,20 |
| **distraction** | 191:1,2 209:5 | 134:17 135:3 | 169:5 175:5 |
| 46:13,20 | 209:7 211:17 | 135:19,22 | 202:18,23 |
| **distractions** | 212:1 218:14 | 136:15,17,24 | 203:5,8 204:7 |
| 239:24 | 231:15,20 | 137:2,10,18,20 | 204:10 205:9 |
| **distress** 9:13 | 233:2,16 237:1 | 138:4,8,20,22 | 205:12 207:15 |
| 386:21 387:5 | 244:5 245:16 | 139:2,4,22 | 207:17,18 |
| **district** 1:1,1 | 246:2 251:19 | 140:2,5,9 | 211:5 216:3 |
| 12:22,23 23:17 | 257:10,20 | 141:2 142:11 | 233:19 234:16 |
| 23:17 24:13,21 | 259:6,23 260:8 | 142:15,23 | 234:17 244:13 |
| 25:18,20 26:14 | 317:11,13 | 143:3,8,12,13 | 245:19 248:19 |
| 27:9,24 29:2 | 329:20 330:19 | 143:17 144:13 | 248:24 249:6,9 |
| 29:20 30:1 | 331:2 332:22 | 145:1 146:1,6 | 256:22 257:21 |
| 37:24 38:3 | 335:5 342:9 | 146:13,17,21 | 260:23 277:18 |
| 48:2 59:16 | 343:24 344:18 | 147:8,12 148:4 | 278:13 280:21 |

CONFIDENTIAL

315:18,24
316:8,11,12,14
319:4,14 321:8
323:18,20
329:3 330:6
334:19 348:6
364:2,8
**diversion** 62:20
**divert** 234:8
280:8
**diverted**
162:14 164:13
166:14 180:21
184:17 237:22
282:4
**diverting** 62:5
**divide** 99:2
**doctoral** 21:17
200:9 212:21
213:5
**document** 1:6
64:21 97:12
100:17,20
203:15,23
204:6,8 212:10
334:15 339:7
339:22 342:7
383:18 385:8
385:19 388:21
390:6,9
**documentation**
260:13 261:1
**documented**
260:10,19,21

**documents**
11:10 101:2,3
101:7,18,21
102:4,6,7
107:4,23 108:2
108:5,15,20
109:3 113:3
127:9 128:4,15
129:1,3 130:5
133:20 134:1
134:16,21
135:20,23
136:3,9,14
137:20 139:3
139:19 142:21
142:24 143:11
145:23 146:5
146:17 149:2
149:23 150:8
150:13,16,19
150:22 151:6
151:20 152:2,9
152:15,19
154:8 155:24
156:7,17,22
158:15,23
159:2,6 160:10
162:1,21 163:1
164:1,10,15,19
164:23 165:14
166:5,9 167:14
167:22 168:16
168:19 173:5
202:1 203:12

203:17 204:1,9
204:21 205:1,7
205:13 206:14
207:14,24
209:8 210:16
210:17 211:4
217:15,15
218:16 312:24
315:17,23
334:20 355:24
364:14,19
365:1
**doing** 47:13,15
63:10 73:19
74:5 75:7,18
75:23 76:17
82:19 104:24
105:19 106:8
120:19 154:13
154:17 159:4
166:1 168:11
169:13 191:3
211:10 236:22
255:14,24
256:17 273:2
288:15 307:22
310:4 337:24
344:14,14,18
348:16 353:18
379:15 396:8
**donahue**
230:23
**dopamine**
182:5

**double** 222:18
298:4 309:15
309:23 310:2,7
311:13 314:16
**downloaded**
287:6 293:22
298:3 301:22
308:2,22
310:16
**dozen** 249:9
257:19
**dr** 13:14 82:16
97:20 286:18
304:19 374:17
383:8 385:18
387:4 388:20
390:3 391:12
**drafting** 101:19
101:20 111:18
111:21
**drains** 184:16
**draw** 92:19
124:2 133:10
**drawing**
224:13
**draws** 125:20
127:7 134:9
231:14
**drew** 199:3
296:22 299:17
**drive** 2:10 4:17
**driven** 147:19
154:5 324:23
324:24

CONFIDENTIAL

**[driving - educator]** Page 25

**driving** 321:14
321:17
**drop** 373:19
**drove** 321:6
**due** 14:16
182:17 231:24
312:15
**duly** 13:8 395:5
**duplicate** 296:3
308:17 309:11
**duplicates**
312:3
**duties** 71:13
79:16 210:8
280:18 288:17
379:7
**dwhiteley** 2:18
**dynamic** 215:5
225:5 226:13
**dynamics** 8:13
200:17
**dysregulation**
37:2,4 139:14
141:14,21

**e**

**e** 7:2,11,17 8:2
9:2 10:2 45:10
45:12 81:5,10
81:14,16,21,24
385:22 387:10
397:1
**e.h.** 305:22
307:18

**earlier** 73:1
196:21 197:6
220:19 250:8
261:4 276:12
285:17 320:4
352:14 358:21
374:23
**early** 78:1,1
191:20
**earned** 21:9
**earnings** 83:5,9
86:13
**easy** 154:12
155:16 158:18
165:18
**ed.d.** 1:13 7:4
7:15 20:21
398:8
**editing** 111:23
**editor** 86:23
87:3,4,10,13,21
**editorial** 87:7
87:23 89:19,23
90:2,5 95:20
**educate** 320:9
**educating**
322:23
**education** 14:6
21:7,8,15,19
22:6,12,17
23:18 24:2,15
25:8,10 29:11
40:20 41:1
44:7 82:21

83:3 88:20
98:24 119:10
121:12 147:13
158:4 162:17
165:6 180:2
181:7 192:4
229:18 245:12
255:20 288:20
289:17 331:19
343:13 378:11
**educational**
8:12,16 21:4,5
28:19,20 29:8
29:23 30:17
41:18 43:16
48:4 78:21,23
95:1 98:21
103:11 112:13
112:13 116:21
121:18 123:13
123:20 124:5
124:24 127:3
142:2 145:19
147:6,16
148:16 149:5
153:10,11
161:9 163:21
165:5,9 178:21
197:19 198:13
198:15 199:2
199:14 200:10
200:16 201:18
208:9,10,20
209:16 211:18

213:24 214:7
214:23 215:11
216:11,13
219:1,13,24
221:3,12,18,24
222:9 223:7,9
223:10 224:14
225:1,17,20
226:10,16
227:17 228:1
229:20 231:18
233:13 236:19
237:8,11
238:22,23
239:18,19
244:4 249:1
283:3 284:13
284:24 288:21
289:17 319:20
320:9 325:14
330:2,11
343:11,18
344:9 345:10
376:16 377:2
379:14 380:16
**educator**
124:21 149:17
149:23 150:3
150:16,24
151:21 152:2
153:1 155:3
165:5 193:7
326:17

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

**educators**
88:15 328:9,23
329:2,20 330:2
342:11,17
343:10 344:13
348:6
**edwards** 32:10
**effect** 62:13
68:16,23
119:21 162:13
163:14 184:14
187:8 191:23
**effective** 215:1
255:18 327:24
344:22
**effectiveness**
103:21 199:14
**effects** 65:8
78:20 116:8,13
138:7 139:11
141:17 145:12
180:8 186:9
256:19 274:9
281:23 320:20
341:18 347:1
**efficient** 226:5
**effort** 117:22
293:1
**efforts** 293:4
**eighth** 6:5
**eiland** 5:10,11
**eilandlaw.com**
5:14,14

**either** 15:15
37:20 53:8
80:20,21,23
150:8 217:8
218:12 225:11
248:19 348:5
**el** 3:9
**electronic** 41:5
41:13 42:6,13
43:10 159:17
160:2,7,16
161:1 204:2
**element** 63:12
96:9
**elementary**
48:15
**elements** 61:23
**eleven** 393:22
**emanate**
245:20
**embedded**
192:15
**emerge** 322:6
379:2
**emerging**
210:22 239:16
291:18 322:14
**emotional** 37:2
37:4 58:5
116:13 129:15
139:14 141:14
141:21 149:16
162:15 164:18
164:22 165:17

166:15 178:22
**emotionally**
62:4 116:7
145:12
**emphasize**
215:21 226:16
**employ** 125:20
196:23 227:24
**employed**
33:24 34:9,11
34:16
**employee** 365:3
365:6
**employees**
356:4
**employer** 14:5
**employment**
28:11
**enable** 284:17
289:9 340:7
**enabled** 239:15
**enables** 361:20
**encapsulated**
52:17
**encounter**
249:14
**encourage** 96:4
273:13 328:17
**encouragement**
337:10
**encouraging**
337:5 371:7
**endeavor** 91:1

**endeavored**
103:20
**endeavoring**
208:17
**endeavors**
214:6
**ends** 51:23
193:23 265:16
**enforcement**
161:18
**enforcing**
159:16 160:15
160:24
**engage** 125:6
128:3 146:2
181:18 187:23
193:13 231:19
275:17 324:16
327:21
**engaged** 40:6
186:8 283:23
**engagement**
40:10 73:13
104:3 120:5
126:9 175:9,24
176:11,23
179:4 180:1
181:5 183:5,8
183:23 187:10
235:21 236:2
242:20 273:14
280:13 327:12
343:3 350:16

CONFIDENTIAL

**[engaging - exacerbating]**                                    Page 27

**engaging** 355:19

**engineered** 104:2 175:14 175:19 176:3 182:4

**engineering** 182:17

**enjoyment** 346:22

**ensure** 32:19

**ensured** 290:11

**entail** 22:8,23

**entailed** 22:9 22:24

**entails** 28:18

**entered** 287:2

**enters** 63:13

**entertained** 349:22

**entertainment** 349:20

**entire** 52:13 128:1

**entirely** 272:24 342:20

**entities** 136:5

**entitled** 97:21 219:11 221:2 224:24 251:24 252:13 296:22 299:17 302:22 305:11 306:3 385:19,20

387:5 388:22

**entry** 196:1

**environment** 152:16,20 153:3 155:4 184:20 191:24 215:7 225:6 226:14 251:11 251:17 280:14 319:20 321:6 325:12 326:8 327:6,7

**environments** 142:7 149:19 154:1 180:23 212:4 256:21 282:1

**epidemiologist** 36:3,4

**equitable** 91:14

**equity** 7:20 89:4 91:4,13 91:22 92:3,11 94:18 99:1

**errata** 396:6,9 396:12,15 398:6

**erroneous** 298:23 299:1 300:3

**error** 222:20 229:12 293:12 309:2,15 310:1

**errors** 293:8,9 296:8 298:6 311:20 313:23

**escalated** 135:14

**escalating** 139:13 141:13 141:20

**especially** 125:1 280:16 349:1

**esquire** 2:3,10 2:16 3:4,8,16 4:4,11 5:4,4,11 5:11,17

**essential** 8:13 200:17 379:7

**essentially** 50:22 124:17 243:2

**establish** 102:1

**established** 124:4 163:20 199:8 279:21

**esteem** 72:15

**estimate** 360:16,22

**ethics** 369:4,13

**evaluated** 55:24

**evaluates** 209:21

**evaluating** 203:16 204:1

**evening** 360:2

**event** 344:3

**events** 329:19 329:22

**everybody** 394:4

**evidence** 65:7 80:16 107:19 124:15 134:10 143:24 144:9 157:20 161:6 163:16 165:4 165:19 167:9 167:20 206:23 211:15 213:7 214:9,11 228:7 233:9 234:3 251:6,7 253:17 253:22 281:22 282:24 283:20 283:21 284:10 284:21 287:18 288:5

**evident** 131:1

**exacerbated** 55:16 58:9 69:6 72:14 320:13

**exacerbates** 119:23 187:20 188:15 324:15

**exacerbating** 121:10 280:15

CONFIDENTIAL

**[exact - experience]** Page 28

**exact** 38:10 39:5 85:22 285:7

**exactly** 15:5 26:4,4 73:9 74:5 76:13 77:17,22 83:17 87:2 110:8 170:13 176:1 182:6 196:3 200:5,6 285:8 287:4 293:14 363:1

**examination** 13:11 118:21 326:6 352:17 359:23 374:14 383:5

**examine** 95:18 163:24 229:7

**examined** 13:8 317:8

**examining** 94:12

**example** 52:8 64:13,18 102:6 173:18 186:23 188:16 236:18 316:10 343:15 343:17 344:2 371:12

**examples** 64:22 187:22 278:5 370:8

**exceeds** 253:17

**except** 12:6 165:17 312:12 398:5

**exclude** 278:14 279:16

**excluding** 279:6 318:11 318:14

**exclusion** 116:16 145:15 146:11,20

**excuse** 208:11

**executing** 320:8

**executive** 28:24 48:5 122:13 125:2 126:17 197:20 199:6 208:11 211:19 217:21 223:10 228:2 236:22 244:3 257:18 363:10,13,19

**exercise** 218:22

**exhibit** 20:17 20:19 81:3,12 84:3,9,11,13 89:2,10 96:14 96:22,24 97:3 100:11,18 109:11,18,19 110:17 111:1 112:5 122:3

129:9 133:9 194:11 196:17 200:14,24 201:3,5 214:19 219:21 220:5 220:10 221:8 221:17 223:13 226:24 231:8 272:2 282:17 291:14 294:22 295:5,9,11,14 295:19 298:12 298:13 300:7 303:17 304:13 331:12 334:6,8 334:16 383:19 383:21 385:3,8 385:10 386:16 386:18 388:7,9 389:18 390:20 391:2,4,14

**exist** 99:14 100:2 121:11 181:15 294:17 300:21 303:9 306:10 307:3 308:11,12,16 308:22 309:10 309:12,21 311:10 313:16 313:22 314:9 314:18 322:10 367:5,11,24

**existed** 106:6 188:4 320:12 326:19

**existent** 245:24

**existing** 187:20 280:15 317:10

**exists** 224:8 262:24 294:14 307:6,13 316:7 317:19 378:13

**expansive** 23:4

**expectation** 223:6 323:19

**expenditure** 22:11

**expenditures** 218:6 321:7,15 321:18

**experience** 46:17 47:18 102:10,17,24 103:10 104:13 105:12 113:7 116:21 121:15 123:9 124:9,19 136:6 142:1,9 143:19 145:19 147:6,16,22 148:16 149:5 153:9 158:1 161:7 163:4 165:4 177:12 177:14 207:1 211:16 231:15

CONFIDENTIAL

**[experience - facebook]**                                      Page 29

233:11 240:22
250:4 256:14
263:12 267:21
267:24 268:1
269:5,8,11,17
270:22,24
271:15,18,21
279:23 362:4,9
**experiences**
79:24 247:20
**experiencing**
51:6 115:15
147:13 151:2
186:10
**experiment**
311:1
**expert** 8:8,10
14:19 15:15
34:19,23 35:3
35:7,11,15,19
36:6,8,9,11,13
36:15,17,19,21
36:23 37:1,3,5
37:7,9,11 47:7
68:18 73:14
76:15 78:18
79:4,9,11
98:12 99:24
106:14,17,21
109:13 110:19
168:12 175:12
175:14 176:5
177:5 179:14
181:12 189:6

190:6 207:10
261:5,7 272:18
274:16,19
275:3,20
279:18 283:17
284:9,20
285:15,19
305:20 326:16
354:10
**expertise** 34:21
35:1,5,9,13,17
35:21 53:24
105:17 112:10
182:11,14
183:19 258:12
263:23 265:19
267:10 276:2
277:7 278:9
282:14 367:20
380:16
**experts** 135:8
146:24 159:12
162:7 164:8
166:3 167:19
169:10 182:13
182:15 204:14
205:18 211:13
246:5 258:16
276:10 281:17
283:5 284:15
285:10 315:4
319:6
**expires** 398:12

**explain** 208:16
264:9,20 296:2
317:6
**explains** 203:14
**explanation**
112:21 208:8
**explanations**
318:12
**exploits** 273:9
**exploration**
9:13 386:22
387:6
**explore** 201:24
264:4,6
**exploring** 9:17
388:11,22
**expose** 56:3
342:24,24
350:2
**exposed** 60:10
**exposes** 346:4
**exposure**
116:16 145:14
146:10,19
187:5 327:18
346:2
**extend** 273:14
**extent** 92:1
136:7 145:24
260:3 321:3,13
356:13,15
357:23 371:13
375:7 376:15

**external** 186:22
346:12
**extra** 29:5,6
**extrapolate**
144:12 165:18
188:11
**extrapolation**
141:8 148:8
154:12 155:10
155:14,16,21
158:14,18
159:3 161:23
163:24 166:19
167:3,8,24
168:3,6 169:2
**extrapolations**
168:14
**extremely**
320:19

**f**

**fabric** 53:1,12
55:21 62:15
71:1 177:12
324:19
**face** 64:6,6
120:3 231:24
255:23
**facebook**
169:22 170:6
170:20 171:10
172:7 183:2
193:3 265:20
265:22 266:1,4

CONFIDENTIAL

**[facebook - feeling]**                                                 Page 30

| | | | |
|---|---|---|---|
| 266:12,16 | **factors** 119:12 | **family** 339:15 | 179:23 180:17 |
| 267:21 268:3 | 119:13,18 | **far** 83:13,14 | 181:3,8,11,21 |
| 268:11,14,19 | 187:19 321:17 | 86:13 284:3 | 182:20,22 |
| 333:20 344:2 | 321:22 | 285:6 309:8,8 | 183:4,12,13,22 |
| 350:4 | **faculty** 212:22 | 347:1 | 184:7 185:5 |
| **facebook's** | **fail** 333:17 | **fast** 55:10 | 186:1,2 190:17 |
| 267:1 | 396:18 | **fat** 189:18 | 263:12 269:6 |
| **faced** 319:14 | **failure** 179:1 | **fault** 70:18 | 269:12,17,19 |
| 321:8 | **fair** 16:16 17:4 | **faulty** 292:17 | 269:21 270:22 |
| **facetime** | 17:12 30:24 | 292:19 298:10 | 273:4 276:14 |
| 263:20 | 183:23 184:3 | 300:3 303:10 | 276:23,24 |
| **facilitate** | 206:19 218:8,9 | **favorite** 336:14 | 277:2,3,10 |
| 174:16 185:7 | 290:17 319:9 | 339:16 345:18 | 278:7 279:8,17 |
| **facilitated** | 343:20 358:16 | **fax** 1:23 | 279:19 280:1 |
| 138:2 | **fairly** 245:15 | **fear** 66:15 | 280:12,20 |
| **facing** 29:17 | 312:10 | 116:15 145:14 | 281:12,15 |
| 42:3 88:15 | **fake** 369:21 | 146:10,19 | 343:2 354:10 |
| 210:4,23 | **fall** 89:12 | 177:13 240:2 | 355:13 366:8 |
| 259:24 261:1 | **false** 246:22 | 325:1,2 350:24 | **federation** |
| **fact** 8:22 15:13 | 254:1 256:5 | **fearful** 187:5 | 14:15 |
| 49:1 95:7 | **familiar** 101:24 | **fears** 325:1 | **federico** 2:9 |
| 117:23 118:9 | 294:16 334:24 | **feature** 267:2 | 4:16 |
| 118:11 154:18 | 353:6 354:11 | 267:22 271:5 | **feed** 267:2,7 |
| 157:7 177:20 | 354:16 355:10 | 271:11 | 269:24 270:3,6 |
| 190:15 221:18 | 384:12 | **features** 47:4 | **feedback** 127:8 |
| 239:20 292:3 | **familiarity** | 73:14,15 103:4 | 128:2 |
| 304:6 305:10 | 268:10 | 103:24 104:1 | **feeds** 272:12 |
| 311:10 313:4 | **familiarize** | 105:2,21 | 277:24 278:14 |
| 323:16 331:14 | 92:18 | 106:10 144:7 | 279:9 280:23 |
| 331:19 332:3 | **familiarizing** | 147:20 154:5 | **feel** 55:7,11 |
| 337:5 339:2 | 89:20 90:8 | 173:12 174:13 | 57:1 168:10 |
| 342:9,11 | **families** 159:20 | 174:14,21 | 273:24 |
| 343:16 | 161:5 329:7,11 | 175:4,10,13,23 | **feeling** 60:8,10 |
| | 337:15 | 177:1 179:17 | 62:2 69:8 |

CONFIDENTIAL

**[feeling - fourth]**                                    Page 31

273:19
**feet** 253:14
**felt** 289:6
**fictitious** 313:2
   313:11
**field** 112:11
   113:8 123:19
   124:4 197:19
   208:20 212:21
   213:17 216:2
   228:17 239:18
   376:12 377:23
   379:11
**fifth** 33:4
**fighting** 63:16
**file** 301:24
   310:15 312:21
**filing** 12:4
**financial** 3:17
**find** 45:24
   76:15 86:19
   114:7 230:1
   286:24 349:21
**finding** 289:6
   345:22 346:20
   348:17
**findings** 91:5
**findjustice.com**
   2:6
**finds** 361:12
**fine** 374:12
**finish** 16:24
   17:2 254:17

**fire** 370:14
**fires** 369:18
**firm** 5:10 13:17
   76:11,12 81:18
**first** 19:3 76:5
   76:7,16 90:18
   97:5,15,24
   116:22 202:12
   202:14 204:16
   212:7 298:9,20
   299:13 308:18
   332:8 334:23
   384:9 385:21
   387:9 389:1
**firsthand**
   241:17 263:11
   267:20 269:4,8
   269:10,16
   270:21 271:14
   279:22
**five** 93:8 95:8
   170:1 171:18
   172:3,24 361:1
   361:3 370:1
   393:12,21
**fixed** 392:9
**flawed** 297:4
**flonger** 5:7
**floor** 3:10 4:5
   5:18
**florida** 3:18
**flow** 279:7
**flows** 191:5

**focus** 47:2,2,8
   69:12 139:13
   139:21 140:1,8
   140:16 141:1
   141:13,20
   142:17 234:12
   237:16
**focuses** 91:22
**folder** 293:23
   298:3 301:23
   308:7,23
**follow** 236:9
   242:17 368:21
**following** 270:3
   305:19 338:16
   340:20
**follows** 13:9
**footnote** 199:23
   200:1 214:17
   220:22 221:1
   223:14 229:4
   282:20 291:15
   299:11 302:11
   302:13,17
   311:12
**footnotes**
   228:18
**foregoing**
   395:17 398:3
**forget** 235:24
   242:16
**form** 12:6
   113:14 119:9
   189:14 213:6

239:9 240:17
   246:24 253:24
   398:5
**format** 309:3
   310:20
**formatting**
   310:12 314:15
**formed** 105:7
   347:5
**forming** 101:14
   114:14 118:13
   124:10 171:13
   205:2,8 364:14
**forms** 161:16
   240:23
**formulating**
   355:24
**foster** 329:24
   330:3
**found** 101:21
   104:12 106:24
   110:4 120:20
   268:3,7 298:5
   309:6 311:18
   389:8
**founded** 290:12
   290:22,23
   291:5
**founder** 33:18
**four** 19:9 27:4
   27:5 50:7
   124:17
**fourth** 125:8
   233:24

CONFIDENTIAL

**fragment** 346:8
**fragmentation**
  66:14 239:24
**fragmented**
  52:20 151:3
**framework** 9:7
  91:11 302:23
  383:24 384:7
**frederick** 5:4
**frequency**
  135:15 136:19
**frequent**
  342:23
**frequently**
  60:23 74:19
  351:3
**friends** 58:8
  339:15 355:18
**front** 73:20
  74:13,23 75:19
  219:6,16
  391:13
**frontal** 55:2
  177:21 182:8
  273:12 274:22
**frontiers** 9:6
  383:22
**frustrated**
  58:15
**frustrating**
  63:23 72:12
**frustrations**
  103:16

**fueled** 69:9
**fulfill** 65:13
  71:12 79:16
  280:17 323:6
**full** 14:2 31:6
  204:16 335:11
  339:7 360:6
**fuller** 126:21
**fully** 177:22
  182:8 322:9
**fun** 335:24
  336:2,6,10,13
  338:20 345:15
  346:21 349:20
**function** 269:9
**functionality**
  268:23
**functions** 46:18
  119:10
**fund** 345:16
**fundamentally**
  116:19 145:17
**funding** 156:12
  156:17,23
  157:8,14
**funds** 46:11
**funny** 361:13
**further** 15:18
  92:1 159:10
  192:4 229:1
  345:9 352:9
  359:8 382:10
  392:5,18

**g**

**g** 8:8,10 109:13
  110:19 387:11
**gain** 216:15
**gained** 244:8
**galveston** 5:13
**games** 45:19,21
**garden** 77:18
  77:19
**gateway** 346:1
**geared** 212:20
**gears** 261:3
**gemini** 309:2
  310:10 311:4
**general** 104:16
  113:18 131:18
  134:9 135:18
  157:14 228:11
  240:24 241:3
  251:8
**general's** 49:16
**generalized**
  51:16 55:19
  62:13,23 66:18
  131:7 137:14
  140:4 180:24
  184:18 190:21
  240:1 250:2
  251:12 281:24
  325:3 346:10
  372:4
**generally** 28:17
  29:21 113:17

  138:17 153:9
  165:3 169:20
  235:19 240:19
  242:8,19
  334:24 365:11
  365:16
**generate** 78:18
**generated**
  100:23,24
  201:23
**generating**
  101:8
**generation**
  261:20,22
**generett** 91:9
**genesis** 51:14
**getting** 60:12
  72:17 83:19,23
  85:6 93:13
  107:1 254:12
  268:4 331:23
  345:14 350:6
  376:8 377:16
**giordano**
  387:11
**give** 52:7 78:18
  89:15,15 92:16
  93:3 98:5
  109:5 220:15
  226:4 228:20
  334:15 335:10
  360:6 382:14
  383:13

CONFIDENTIAL

**[given - guess]**                                                      Page 33

**given** 155:1
  160:12 167:4
  203:10 211:12
  258:14 289:10
  322:2 395:7
  398:4
**gives** 49:1
  187:22 381:5
**giving** 230:18
**gleaned** 256:8
**go** 15:18,19
  24:17 31:12
  41:10 48:6
  57:18 59:10
  64:19 72:24
  84:10 90:20
  91:12,12 93:24
  95:14 100:6,8
  101:17 108:8
  112:4 114:20
  129:9 153:6
  194:11 197:16
  209:11 214:18
  215:10 218:13
  222:18 223:12
  224:15 232:8
  238:4 242:1
  245:4 246:10
  250:24 260:2
  272:1 282:16
  286:3 291:14
  295:8 298:11
  299:22 300:6
  306:20 307:9

  309:13,17
  350:10 359:10
  365:18 374:8
  374:10 382:17
  383:14 393:16
**goes** 18:3
**going** 13:19
  16:11 17:10
  31:16,23 51:15
  52:12,22,24
  54:20 55:7
  56:3 59:23
  69:3 70:17
  72:24 80:4,10
  82:4,12 110:24
  132:21 133:6
  180:4,12
  186:19 189:19
  193:22 194:8
  216:7 230:7,16
  249:20 250:21
  250:24 251:1
  252:10 257:9
  274:13 286:7
  286:16 295:8
  299:7 303:9
  318:13 327:14
  337:11 340:21
  341:6 343:10
  343:13 345:9
  348:11 349:19
  350:21 351:16
  351:20 352:5
  352:10,12

  357:21 359:13
  359:20 373:1
  382:19 383:2
  383:10,18
  385:7 386:15
  388:6 391:1
  392:11 393:3
**goings** 344:8
**golkow** 1:22
  12:13
**golkow.com**
  1:23
**good** 13:14,15
  39:14 82:2
  98:20 107:7
  175:15 193:18
  285:24 299:3
  307:24 311:3
  352:20 360:2
  381:6,7
**gooden** 91:9
**google** 2:19
  101:22 102:14
  120:22 286:24
  290:5 301:22
  308:3 374:19
  393:13,23
**gotlib** 282:22
**gotten** 101:10
**governance**
  29:12,12
**grade** 33:4
**graden** 4:11

**graduate** 21:15
  21:18 32:16
  47:24 122:11
  140:19 207:4
  238:24 239:5
  248:19 257:15
**grand** 4:5
**granted** 312:14
**grapple** 187:16
**grappling**
  126:2
**great** 86:20
  119:20 177:11
  346:22
**greater** 282:3
**ground** 15:19
**grounded**
  199:8 215:2
**group** 266:5,20
**grow** 217:6
**growing** 156:11
  157:13
**guardrails**
  327:11
**guess** 63:7,8
  87:3,5 91:17
  105:16 126:12
  155:9 244:24
  258:23 267:6
  273:22 274:4
  292:14 307:8
  327:5 335:21
  340:20 353:11
  354:6 370:20

CONFIDENTIAL

**[guess - health]**                                                    Page 34

375:22 380:3
**guidance**
212:23 213:22
340:7,19
**guidelines** 8:24
334:10 335:2,6
336:17 337:13
**guiding** 200:8
**gun** 319:22,24
320:15
**guys** 81:22
230:24 231:1

**h**

**h** 7:11 8:2 9:2
10:2
**half** 19:5 38:15
39:16 97:8
**hallucinated**
313:1
**hand** 110:24
304:12
**handed** 221:17
222:7 295:10
**handful** 255:11
**handing** 84:8
96:21 100:17
109:17 200:23
220:4
**handle** 51:8
**hang** 93:13
97:1,4
**haphazard**
123:17 228:5

**happen** 51:19
180:12 250:24
322:15 337:12
371:9 372:8
**happened**
51:20 63:18,20
71:17 236:12
314:4 324:24
327:16
**happening**
54:16,21 55:15
58:8,18 64:9
64:13 65:15
148:9 240:18
268:21 351:8
373:22 381:7
**happens**
218:19 320:17
320:18,18
372:5
**happy** 17:17
117:14 173:8
225:13 392:19
**harassment**
340:15
**hard** 144:11
326:8 351:4
375:20
**harford** 19:24
331:20 332:15
332:16,22
333:4 342:10
343:15

**harm** 114:3
178:22 190:9
190:12,13,24
191:5 192:8,16
192:19,22,24
193:7,8 245:19
276:16 278:14
**harmed** 277:18
357:13
**harmful** 176:12
185:12,19,24
256:19 325:10
**harms** 103:6
115:7,14 116:2
117:10 119:4
121:8 178:9
184:20 188:14
188:15 277:22
277:23 279:6,7
280:15,16,21
287:13 323:21
347:1 348:23
350:3
**harness** 99:13
**harnessing**
100:1
**harvard** 21:15
21:18
**harvard's**
32:17
**hate** 340:15
**head** 171:9
**health** 9:18
36:5,7,10,12

37:14,18 67:1
71:2 115:7,14
116:2,18 117:1
117:10,19,24
118:2,9 119:4
120:13,24
129:13,17,19
129:23 130:6
130:12 131:9
131:11 139:15
141:22 142:18
142:22 143:2
143:16 144:2
144:14 145:1
145:16 156:13
156:18,23
157:8,15 180:8
184:15,16
190:21 237:23
239:23 251:9
273:17 282:4
283:2,17
284:12,23
285:9,15,20
287:2,5,13,20
288:11 289:3
289:19 291:18
296:24 299:19
306:4 321:4,7
321:15,18
346:8 357:14
379:5 388:13
388:24

CONFIDENTIAL

**[hear - impact]**                                      Page 35

**hear** 77:13,14 258:19
**hearing** 210:9 234:20
**heavily** 105:22
**heightened** 62:5 162:14 164:18,21 165:17 166:15
**heimann** 5:17
**held** 1:14 12:17 98:19
**hello** 374:17
**help** 44:1 92:2 92:2 93:5 118:5 123:24 210:17 217:5,6 217:9 242:13 278:24 289:9
**helpful** 57:3 378:12
**helping** 44:3 79:19
**helps** 92:10
**hey** 362:23
**high** 39:9 48:16 251:8
**higher** 40:7 248:23
**highlight** 329:16
**highlighted** 93:15 96:2 328:16 338:20

**highlighting** 336:18 337:18 338:1,7 339:2 339:14 340:1
**highly** 243:12
**hinder** 133:14
**hired** 37:22 38:1 98:11 99:24
**hits** 182:5
**hold** 272:11 275:5,22 382:12 392:11
**holder** 362:21
**holding** 352:12
**home** 204:20 271:15,17
**hoover** 18:2,8
**hopefully** 229:2
**hour** 19:4,5 83:20 84:1,16 84:22 85:6
**hourly** 195:24
**hours** 19:7,8,9 42:19 85:10,13 194:24 195:1 195:14 360:4 361:1,3 383:10 393:11,20
**hudson** 5:18
**huh** 46:1 50:10 371:23 376:10
**humming** 55:20

**hums** 181:1
**hundreds** 48:12 173:4 237:15 238:18 248:15,16
**hyperlink** 223:16 224:1
**hypothetical** 349:24 350:18 351:10

**i**

**ian** 282:22
**idea** 18:2 163:19 206:9 263:10 266:13 332:12 335:1 353:15,17
**ideas** 213:22 274:11
**identifiable** 323:14 376:14
**identification** 20:16,22 65:17 81:6 84:5 89:6 96:18 100:14 109:14 110:21 200:20 220:1 228:9 295:1 303:21 331:15 334:12 376:21 377:4,13,24 378:15,17 379:10,12,16

384:3 385:15 387:1 388:17 389:24 391:9
**identify** 119:20 239:15 250:10 287:10 290:5 293:7,10 312:1 376:19 377:1,4 378:1
**identifying** 376:9,11
**identity** 338:15
**ignoring** 315:6
**iid** 22:10
**ills** 120:3
**illustrative** 52:13 278:4 370:8 371:12 373:3
**imagine** 375:21
**imbalance** 212:8 213:4
**immediately** 97:1 206:5 305:19
**impact** 40:20 40:24 43:4,7 46:22 57:7 60:2 67:7 103:4,16 105:5 105:14 114:24 115:21 118:16 119:4 127:24 133:15 138:12

CONFIDENTIAL

149:15 150:19 175:5 180:20 181:22 185:12 185:20,24 192:2,12 212:2 244:10 280:13 288:10 289:11 296:23 299:17 321:5 324:16 325:12 326:7 380:20

**impacted** 116:3 117:9 372:10

**impacting** 79:14 118:10 162:16 251:16 379:6

**impacts** 66:12 102:12 150:23 176:12 182:21 323:17 341:16 366:13,19 367:4,10,22

**impairment** 305:13

**imperative** 62:2 396:14

**impersonating** 372:19

**impersonation** 340:14

**implemented** 258:17,21,24

**implications** 30:2 291:19

**import** 222:24

**importance** 55:5 178:1 225:18 240:10 288:16,23 338:2,15

**important** 86:19 217:12 218:21 239:10 341:15,20 342:17 345:6

**impose** 280:20

**imposing** 65:11 65:12 66:20 71:9

**impositions** 71:10

**impressions** 379:3

**improve** 192:4 208:17,24 210:18 343:13

**improvement** 199:13 204:18

**improves** 305:12

**improving** 29:12 62:7 66:23 121:18 209:14

**inappropriate** 338:12 340:16

**incentives** 373:4

**incident** 52:8 54:12 62:12,23 63:2 69:4

**incidents** 52:10 54:10 325:7

**include** 67:19 101:2 115:13 142:10 183:20 217:13 221:11 277:23 278:22 279:8,16 280:21 370:3 372:6

**included** 67:14 101:4,6 153:13 197:1 223:16 257:8 267:5

**includes** 88:14 88:18 127:18 186:4 221:21 249:6

**including** 30:19 43:18 163:8 231:16

**inclusion** 240:2 291:3

**inclusive** 8:16 219:12,24 221:3 225:1 226:10

**income** 82:17 82:18,22 83:1

83:2

**incorporated** 332:23

**incorrect** 110:6 224:12 307:11

**incorrectly** 296:16 335:21

**increase** 321:15 327:11

**increased** 99:6 151:3 162:13 162:22 166:14 184:15 282:9

**increases** 149:17 251:9 251:10,12 321:6 379:5

**increasingly** 99:15 100:3

**incumbent** 62:22

**incursion** 61:23

**independent** 79:4

**independently** 243:4,9 380:23

**index** 11:2

**indicate** 342:5

**indicated** 333:7

**indicates** 257:8

**indicative** 232:21

**individual** 54:1 210:18 325:11

CONFIDENTIAL

368:4
**individuals**
  59:3 234:16
**inequity**  91:8
**inevitably**
  54:16
**infer**  291:3
**infinite**  272:12
  277:24 278:14
  279:9 280:23
**influence**
  210:13 285:2
**inform**  59:17
  121:4 301:7
  379:2
**informal**
  249:12
**informant**
  241:15
**informants**
  210:10
**information**
  16:9 130:3
  136:19 137:1,9
  137:16 141:3
  160:19 206:12
  232:12 234:14
  266:22 329:7
  329:10 355:15
  355:22
**informative**
  250:1
**informed**  105:1
  126:6 284:6

312:19
**informs**  223:8
**ingram**  224:3
  229:11
**inherently**
  155:11
**initial**  77:11
  299:9 390:17
  391:21
**initially**  76:21
  288:15 358:14
**initiatives**
  23:14,23
  259:20
**injury**  1:4
  12:20
**inquiring**  238:4
**inquiry**  9:9
  215:12 216:2,6
  226:17 385:12
**ins**  182:2
**insecure**  69:9
**inside**  186:11
**insight**  49:1
  75:22 103:23
**insights**  248:13
**insistence**
  70:13
**insofar**  136:4
  151:1 165:18
  213:2 227:18
  364:22
**instability**
  149:19 152:19

153:24
**instagram**  3:12
  6:7 169:23
  170:6,20
  171:11 172:7
  183:2 193:3
  262:19,21,22
  263:4,6,9
  264:10 350:5
**instagram's**
  263:12
**instance**  56:14
  67:7 70:15,17
  71:17 108:13
  190:10 330:13
  355:16 375:23
  379:23
**instances**  53:6
  54:1 57:10
  58:2 59:2,17
  63:15 66:4
  67:13 68:12,16
  70:20 72:1,10
  104:10 137:17
  308:10
**institute**  10:6
  391:6,15 392:1
**instituted**
  160:1,5
**institutional**
  94:23
**institutions**
  322:11

**instruct**  151:2
  356:12 357:21
  375:6
**instructed**
  376:3,5
**instruction**
  23:7,22 58:3
  58:14 327:24
  331:5 344:11
**instructional**
  22:3,13 23:9
  23:13,16 324:3
  325:23
**instructions**
  396:1
**integrate**  331:4
**integrated**
  342:12
**integrating**
  98:3,12
**intelligence**
  311:5,8
**intend**  275:14
  284:8 384:18
**intended**  97:18
  175:24 176:22
  179:24 181:5
  183:5 220:13
  229:10 273:5
  297:12,15
  327:11 388:1
  389:14 390:13
  390:21

CONFIDENTIAL

**[intending - isolation]**                                    Page 38

| | | | |
|---|---|---|---|
| **intending** 341:7 | 238:22 255:16 | **interesting** 380:2 | **interviewing** 209:19 218:17 |
| **intensified** 382:2 | **interaction** 61:9 103:19 | **interests** 345:22 346:20 | **interviews** 48:9 50:17,21 61:17 |
| **intensifying** 156:14 157:17 | 121:2 177:24 247:17 | 349:21 | 202:1,12,15,17 202:22 206:14 |
| **intensity** 135:15 136:20 | **interactions** 48:19 55:3 | **interface** 262:6 262:6,7 | 207:16,23 209:5,24 211:3 |
| **intent** 183:10 275:7 279:15 | 58:19 59:22 60:4,6 61:23 | **interference** 262:6,8 | 227:23 |
| 279:17,24 281:16 391:19 | 64:4 69:7,18 74:4 80:3 | **intern** 32:10,13 32:24 | **introduction** 91:18 |
| **intention** 193:13 276:4,9 | 106:3 107:11 118:24 130:21 | **internal** 355:24 364:18 | **investigation** 165:23 |
| 278:6,12,21 280:12 306:17 | 143:19 147:23 153:14 163:5 | **interned** 32:14 | **invite** 354:23 |
| 371:24 | 165:6 186:15 188:8 207:2 | **internet** 9:7 45:14,17 99:7 | **invoice** 85:3 194:12 |
| **intentional** 94:22 106:10 | 210:1 231:22 232:21,24 | 302:24 384:1,8 | **invoices** 7:19 84:4 |
| 275:15 342:19 346:19 | 233:4,15 234:15 236:11 | **interpretation** 241:18 | **involve** 115:6 120:12 206:10 |
| **intentionally** 104:1 181:16 | 241:20 242:9 244:2,7 245:18 | **interpreted** 78:6 | **involved** 23:20 55:12 76:6 |
| **interact** 68:21 179:19 183:14 | 248:14 249:11 250:4 256:1 | **interrupt** 254:18 346:9 | 77:9,15 256:2 368:12 |
| 239:4 277:4 281:12 | 258:1 279:8 324:11 378:18 | **interrupting** 58:3,13 72:20 | **involves** 51:13 209:19 216:2 |
| **interacted** 48:13 103:11 | 378:22 | **interruptions** 251:11 | **involving** 14:14 54:10 57:10 |
| 376:24 | **interest** 88:12 240:7 266:5,20 | **intervene** 48:22 56:9 | 63:3 |
| **interacting** 64:5 121:15 | **interested** 76:10 268:4 | **intervening** 72:20 282:7 | **irvington** 19:20 330:13,19 |
| 127:19 142:5 161:9 180:19 | 271:9 | 325:15 | **isolate** 251:3 |
| | | **interview** 143:12 212:9 | **isolation** 206:16 208:1 |

**[isolation - kind]**                                                                Page 39

250:13 326:10
**issue**  56:8
  94:18 146:2
  172:3 227:7
  251:4 283:9
  319:17 330:6
  335:1 349:18
**issued**  368:10
**issues**  29:11
  52:4 54:6
  58:11 59:5
  61:13 67:1
  72:22 91:23
  92:2 117:20
  118:1,3,10
  120:4,14
  122:17 128:15
  131:11 135:14
  135:21,24
  136:10,20
  184:16 190:21
  239:20,23
  273:17,18
  284:7 289:19
  295:6,15
  319:19 320:12
  320:13,14
  321:3 322:5,14
  324:5 325:15
  326:23 340:13

**j**

**j**  3:4 4:4 302:19
  305:21 307:17

**jacquelyn**
  385:22
**january**  77:13
  77:24 78:2
  81:21
**jccp**  4:13
**jersey**  25:12
  249:9
**job**  14:5 31:6
**join**  373:9
**joined**  89:22
**joins**  382:12
**joshua**  387:8
**journal**  8:18
  9:12 87:16,24
  88:3,5,9,22
  89:13,17 90:14
  199:13 208:23
  221:12,18,24
  222:8 291:20
  292:13,13
  293:12 294:8
  294:13,14,14
  294:23 295:6
  295:15,22
  296:24 304:21
  308:13 314:9
  328:14 386:19
**journals**
  161:14 198:24
  227:20 291:3,4
  294:17
**judge**  15:4

**july**  87:5,13,15
  87:20 111:9
  194:20 282:21
  384:20 386:9
  387:18 389:12
**jury**  71:16
  131:17 144:23
  175:3 191:5
  240:12 241:9
  241:11 243:3
  247:5 251:23
  252:12,17,20
  253:6 275:3,20
  284:9 304:4
  312:7 326:15
**justin**  4:17
**jweathers**  4:19

**k**

**k**  2:4 31:1,3
  40:20,24
  233:12 296:21
  299:16 378:2
  378:11 387:10
**kathryn**  3:16
**katie**  360:11
**keep**  134:22
  235:20,20
  242:8 249:20
  264:1 353:17
  373:10,24
**kelly**  5:17
**kennedy**  3:8
  7:17 81:5

**kessler**  1:15
  4:10
**keywords**
  101:22 287:3
  289:5,21 290:4
**kid**  74:4 75:7
  191:6
**kids**  24:8,11
  50:23 51:16
  62:3 73:3
  186:7 188:8,12
  188:18,19
  189:11 255:21
  324:1 325:11
  325:22 326:17
  326:24 345:14
  345:14 356:14
  356:24 357:24
  358:2
**kind**  41:23 44:8
  46:20 49:18,24
  55:11 57:22
  61:16 78:22
  104:10,16
  123:4,5 126:24
  161:18 189:9
  212:24 218:19
  224:16 261:1
  277:4 282:12
  283:21 291:10
  310:4 323:24
  346:10 349:23
  372:24 375:6
  380:10

CONFIDENTIAL

**[kinds - lawbmf.com]**

**kinds** 61:13 214:8 239:16 243:23,24 325:5 327:4

**king** 1:16 3:16 4:11

**klehman** 3:19

**kmcnabb** 5:20

**knew** 101:23 105:4 106:6

**know** 17:9,15 19:14,17,19,22 24:7,11 26:3 38:21 40:6 42:23 49:10,20 51:24 53:15 55:15 57:20 70:1 73:19 74:17 75:6,17 75:21 76:17 78:4,7 83:11 83:16 85:12,22 86:8,17,19 90:10 93:2 102:9,19 103:5 108:14 120:10 129:22 130:2 138:1,19 140:7 140:12 147:4 147:10 148:14 157:6 159:23 160:4 161:23 171:4 173:9 177:7,17

179:22 181:3 181:14 182:19 184:12 188:10 189:18 195:4 195:13,15 198:22 219:7,9 220:16 222:23 224:9 227:2 229:14 230:4 232:15 235:14 239:4 242:20 243:11,17 244:18 245:6 245:13 246:21 247:5 249:13 252:12 258:24 261:11,13,15 261:17,19,21 261:23 262:2,5 262:7,9,11 263:1,15,16 264:3,12,13,17 265:5,7,11,12 265:13,18 266:23 267:1 267:14 268:12 268:14 269:20 269:23 270:2,5 270:8 271:16 273:22 274:3 276:10 277:5 278:3 284:6 287:16 291:1 291:22 292:4

292:15 294:10 294:18 307:8 308:4,24 309:9 310:19 316:10 316:18 317:10 317:16,23,24 318:12,16 333:17 337:8 339:16 340:4 340:21 341:7 341:10 344:1 344:12,14 346:15 348:19 351:9 354:3,15 354:24 355:9 356:21 357:5,6 357:15 358:20 365:24 366:4,8 367:13 368:11 368:13 375:2 375:11,13,16 375:17,19 379:19 380:21 380:23 381:2 381:10,19 382:3,6 392:17

**knowing** 175:16 243:1 245:4,6 246:10 327:13

**knowledge** 34:2 101:16 103:23 106:22 107:19 112:11

113:24 142:10 262:14,17 299:15 308:21 316:5 330:9 341:4 356:2 357:16 358:5,9 364:17

**known** 120:7 180:10

**kslaw.com** 3:19

**ktmc.com** 4:13

**l**

**lack** 58:15 240:1

**lake** 2:10 4:17

**language** 219:15 276:5,7

**lapsed** 254:21

**large** 23:3 27:20 147:11 241:21 247:18 247:22 258:1 376:22 380:14

**largely** 121:14

**lastly** 210:15

**late** 77:2

**law** 1:14 5:10 6:4 13:17 15:4 30:6 76:12 81:18 313:1 369:4,12

**lawbmf.com** 2:12 4:19

CONFIDENTIAL

**[lawsuit - leadership]**                                   Page 41

| | | | |
|---|---|---|---|
| **lawsuit** 359:1 | 62:2,18 63:11 | 212:2 217:7 | 71:8,10,11 |
| **lawyer** 252:11 | 65:2,12,19,20 | 223:5,11 228:3 | 103:21 112:13 |
| **lawyer's** 399:1 | 66:21 68:21,22 | 228:3 231:18 | 122:9 123:4,6 |
| **lawyers** 109:4 | 69:1,19,20 | 233:2,2,5,16,17 | 123:20 124:5 |
| 111:20 313:5 | 71:6 72:21 | 233:17 234:21 | 126:23 127:3 |
| **lchb.com** 5:20 | 78:21,23 79:12 | 236:8,11,12,19 | 162:15 163:21 |
| **lead** 47:5 80:9 | 95:1 102:13 | 237:12,15 | 166:6,16 |
| 180:4 186:3 | 103:11,18 | 238:23,23 | 180:21 184:18 |
| 249:5 280:2 | 104:20 106:4,8 | 239:19 240:8 | 192:2 197:9,20 |
| **leader** 30:1,9 | 107:8,11 | 241:21 245:16 | 198:13,15 |
| 42:3 56:15 | 115:22,23 | 245:17 246:2 | 199:2,7 200:10 |
| 102:2 123:24 | 116:3 117:3 | 247:19,19 | 200:17 201:18 |
| 126:1,4,16,19 | 118:19,23 | 248:15,17,18 | 208:18,21 |
| 127:20 128:3 | 119:1,1,2 | 248:20,22,24 | 209:14,16 |
| 153:10 165:5 | 121:10,17 | 249:2,18,21 | 210:8,19,21 |
| 210:4,6,10,13 | 122:12,15,15 | 250:1 251:18 | 212:19 213:24 |
| 211:17 216:13 | 123:12,17 | 251:19 255:17 | 214:7,24 215:4 |
| 216:17,20 | 125:10 127:13 | 256:5,10,11 | 215:11 216:11 |
| 217:5,10,22 | 130:22 138:15 | 257:17,17,20 | 216:14,14 |
| 231:16 233:12 | 140:20 142:5,6 | 274:10 280:16 | 217:5,9,24 |
| 235:22 236:23 | 143:20,21 | 288:16,22 | 219:1,11,22 |
| 236:24 242:14 | 147:24 148:1 | 289:13 325:7 | 221:2 223:3 |
| 256:15 | 153:14,16,17 | 325:14 329:2 | 224:14,24 |
| **leader's** 60:3 | 153:18 161:10 | 329:21,21 | 225:3,20 226:9 |
| 210:12 217:24 | 161:11,11 | 330:3 342:18 | 226:12,16 |
| **leaders** 29:3,15 | 163:6,7 165:7 | 343:24 344:17 | 227:17 229:20 |
| 30:9 41:18 | 165:8,8 178:11 | 344:18 376:23 | 232:22 234:9 |
| 42:24 43:22 | 178:12 181:24 | 376:23 378:19 | 237:9 239:18 |
| 46:24 47:19,23 | 182:1 184:22 | 378:20 379:6 | 240:9 249:7 |
| 48:3,9 50:18 | 184:23 191:2,2 | 380:20 381:4 | 280:8,18 282:5 |
| 50:21 54:3,9 | 192:3 199:6,14 | **leadership** 8:12 | 289:18 328:15 |
| 58:20,24 59:15 | 207:3,4 208:12 | 8:15 28:20 | 330:11 376:17 |
| 59:16 60:15 | 208:12,13,17 | 48:10 51:7 | 377:3 379:14 |
| 61:8,8,24 62:1 | 211:19,21 | 61:10,18 65:11 | 380:16 |

CONFIDENTIAL

**[leading - listening]**                                       Page 42

**leading** 120:5
  184:14 187:10
  193:15 216:17
  323:24 327:12
**leads** 124:15
  125:12 181:19
  190:15,20
  191:22
**learn** 102:10
  103:1 245:17
  292:18 330:13
  330:18 353:2
**learned** 103:7,8
  234:14
**learning** 10:6
  22:21 23:2,7
  23:23 32:20
  62:8 66:24
  98:23 99:14
  100:2 133:14
  180:3 181:7
  232:23 251:22
  272:20 274:7
  311:2 329:24
  330:4 351:6
  391:5,14,24
**leave** 25:6
  26:19 182:14
  276:9 281:17
  285:10
**leaving** 47:20
  237:14 257:24
**led** 23:12
  107:20 133:13

274:13
**lee** 18:21
**left** 25:9 26:22
  60:9 283:21
  284:14 374:6
  381:23
**legal** 252:6
  313:2
**legg** 2:10
**lehigh** 14:6
  28:5,14 38:9
  83:3 85:18,20
  86:10
**lehigh's** 82:20
**lehman** 3:16
  7:7 359:10
  360:1,11
  365:20 371:3
  373:7
**lends** 228:5
**length** 381:10
**lens** 91:4
**lenses** 354:12
  354:13,14
**leslie** 18:6,8
**lesson** 311:2
**lessons** 69:13
**letters** 204:20
**letting** 114:11
**level** 55:20
  72:23 73:12
  176:4 208:18
  251:8 327:17
  379:24 381:12

**levels** 91:8
  324:21
**levin** 5:3
**lfsblaw.com**
  5:7,7
**liability** 1:5
  12:21
**lieff** 5:17
**lies** 282:14
**life** 186:11
  238:21 360:20
**lifetime** 326:16
**light** 43:2
  111:22 128:15
  245:8
**likely** 120:1
  144:12 188:1
  243:13 299:13
**limit** 159:16
  160:6,15,24
**limitations**
  58:12
**limited** 51:4
  171:17 172:2,6
  172:23 267:23
  288:10
**limiting** 160:2
  378:6
**limits** 366:4
**line** 11:6,6,6,11
  11:11,11,16,16
  11:16,21,21,21
  200:5 297:11
  342:6 397:3

399:2
**link** 140:13
  280:11 287:15
  300:13,18
  301:11 303:10
  304:17,20
  305:2,11
  306:21 307:8
  361:18
**linkages** 105:2
  106:23 287:19
**linked** 69:11
  72:16 105:22
  131:12 144:6
  224:23 237:23
  273:16
**links** 305:17
**list** 8:6 100:13
  100:22,23,24
  101:2,4,6,12
  104:6 107:2
  112:24 151:12
  179:18 181:10
  297:17,20
  298:15 301:4
  301:15,18
  302:8 310:17
  311:24 313:24
  369:16 370:3
  370:12
**listed** 33:11
  84:15
**listening** 48:20

CONFIDENTIAL

**[literature - looked]**                                              Page 43

| | | | |
|---|---|---|---|
| **literature** 9:19 | **literature's** | 148:2 153:19 | 162:1,11,20,24 |
| 49:13 50:11 | 171:16 | 187:13,15 | 164:10,14,19 |
| 80:1 103:3,8,9 | **litigation** 1:5 | 233:20 239:14 | 164:22 165:13 |
| 103:22 104:14 | 12:21 34:1,14 | 241:23 255:15 | 166:4,8 167:22 |
| 104:23,24 | 76:6 83:10,21 | 256:9 266:11 | 172:10 173:7 |
| 105:11,19,20 | 84:19,23 85:10 | 266:13 320:12 | 173:17 174:10 |
| 106:12,19 | 86:4 100:1 | 321:9 322:24 | 179:16 194:11 |
| 107:14 118:21 | 111:5 129:1 | 325:21 346:15 | 200:11 201:8 |
| 120:19,21 | 172:4 211:3 | 381:4 | 201:14 206:13 |
| 125:4 130:24 | 330:6 331:3 | **longer** 5:4 19:7 | 207:23 209:7 |
| 141:24 144:6 | 368:5,9,23 | 40:15 311:24 | 219:19 220:21 |
| 148:5 161:13 | 369:2 | **look** 32:7 33:3 | 223:14 225:23 |
| 163:9 165:11 | **little** 27:4 39:12 | 64:18 67:14 | 229:6 231:7 |
| 171:12 172:1,6 | 196:12,21 | 74:2 79:24 | 248:2 270:17 |
| 198:4 207:6 | 260:22 261:10 | 88:24 89:23 | 272:3 275:11 |
| 208:22 211:22 | 263:19 276:19 | 91:2 93:6 | 282:17 289:11 |
| 229:17 233:22 | 320:3,16 | 96:12 100:9 | 291:6,12 292:6 |
| 237:8 240:21 | 325:18 338:18 | 101:10 109:9 | 294:18,20 |
| 246:3 250:5 | **live** 268:15,19 | 112:6,23 | 296:19 298:12 |
| 256:17 272:21 | 268:21 270:8 | 114:12 121:23 | 302:10 303:15 |
| 274:8 281:3 | **lived** 215:6 | 122:3 128:3 | 305:19 314:2,2 |
| 284:3 285:1 | 225:5 226:13 | 129:10 133:19 | 318:17 328:4 |
| 286:19,22,23 | **lives** 53:2 | 134:1,20 | 331:10 332:10 |
| 287:10 288:9 | **living** 322:17 | 135:11 139:9 | 332:17 333:23 |
| 288:14 289:7 | **llc** 2:9,19,19 | 139:19,23 | 334:19 335:8 |
| 289:15 291:8 | 3:21 4:16 | 142:20,24 | 337:23 362:23 |
| 292:6 296:12 | **llp** 1:15 2:15 | 145:10,22 | 377:10 378:9 |
| 301:6,16 | 3:3,16 4:4,10 | 146:4,12,15 | 384:21 386:8 |
| 306:12 308:8 | 5:3,17 6:4 | 149:1,7,13,22 | 390:16 392:15 |
| 308:24 348:22 | **local** 23:15 | 150:2,7,10,15 | **looked** 49:16 |
| 349:7 387:15 | **logic** 278:19 | 151:20 152:1 | 101:8 104:9 |
| 388:15 389:1,9 | **long** 19:1 27:2 | 152:15,18 | 117:5 118:16 |
| 390:10 | 97:2 104:6 | 154:7 155:23 | 120:22 131:20 |
| | 118:4 142:4 | 156:9 160:9 | 131:24 134:16 |

CONFIDENTIAL

**[looked - marked]** Page 44

135:9 136:14
138:11 141:3
144:17 150:18
150:23 151:5,5
155:2 156:16
156:21 158:22
159:1,5 163:17
169:10 207:13
270:15 293:5
365:10 378:24
**looking** 54:2
75:6 85:2
91:19 94:16
99:18 114:22
114:23 115:13
133:8 138:6
140:5 156:5
203:19 220:24
224:3 226:24
231:2 266:9
271:9 295:18
299:7 304:14
350:9
**looks** 89:11
196:13,13
222:14 224:4
**los** 4:6
**lost** 328:20
**lot** 20:12 51:23
51:24 52:2
65:3 73:4
104:7 106:2
129:2 136:6
150:18,19

235:15 255:15
255:16 279:20
344:20 372:15
381:2,3
**lots** 52:10 58:1
65:19,20 73:3
75:15 118:24
118:24 246:1
378:8
**low** 55:20
**lower** 39:12
40:7
**lunch** 202:20
**luncheon** 194:2

**m**

**m** 5:4
**m.j.** 305:21
307:18
**machine**
310:22
**made** 66:3 86:2
86:10 117:22
167:23 196:9
227:5 299:8
303:13 309:1
323:5 344:1
364:12 378:24
381:20 396:7
**mail** 7:17 81:5
81:10,14,16,21
81:24
**mails** 45:10,12

**main** 289:23
**maine** 2:16
**maintain** 93:10
135:20,23
136:3 353:23
**maintaining**
62:8
**major** 259:17
**majority** 94:7
211:7
**make** 41:23
106:21,22
126:20 131:16
141:9,9 148:11
150:14 154:12
155:14,17,20
158:18 159:3
163:23 165:1
165:15 168:5,8
177:10 182:23
187:4 210:2,5
213:13 242:16
257:7 280:11
284:17 293:1
297:8 325:6
343:1 360:3,5
366:23 368:1
396:4
**makes** 17:5
187:22
**making** 154:14
155:17 158:19
167:12 168:3
214:4 215:1

218:12 241:14
251:20 259:12
**management**
324:6 327:22
**managing**
328:2
**mandalas** 2:9
4:16
**manifest**
139:12 141:18
**manipulation**
178:3
**manipulative**
272:10 346:2
**manufacture**
175:20 273:6
**manufactured**
190:19
**maplewood**
15:7 25:12,15
26:20,23
**march** 9:21
77:3,5,14
78:10 80:19
389:20 390:4
**mark** 20:15
81:12 84:11
89:10 97:8
295:9 383:18
385:8 386:16
388:7 391:2
**marked** 11:20
20:22 81:6
84:5,9 89:5

CONFIDENTIAL

**[marked - media]** Page 45

96:18,22
100:13,18
109:14 110:20
111:1 200:19
200:24 220:1,5
295:1 303:20
304:13 331:14
334:5,11,16
384:2 385:14
386:24 388:16
389:23 391:8
391:13
**market** 5:12
**marketplace**
268:3
**marking**
109:18
**maryland** 2:11
4:18
**maslynsky** 1:19
395:10
**master's** 21:11
21:13
**match** 196:3
297:9,11
298:21 301:8
308:3 312:1
**matched** 298:5
308:1
**matches** 298:9
**material** 204:2
283:24
**materials** 8:6
100:12,21

101:13 107:2
108:23 112:12
151:11 293:5
296:14 298:1
301:18 311:24
312:6,23
343:11 344:9
369:5,16 370:2
370:11
**math** 45:7
333:17
**mathematics**
21:12 333:14
**matt** 18:20
**matter** 12:18
14:13,14,20
15:1 194:16,19
196:10
**mattering** 9:14
386:22 387:7
**matters** 10:6
15:16 77:9
391:7,16
**matthew** 2:10
**maxed** 131:10
**mcnabb** 5:17
**md** 1:3
**mdl** 1:4 4:13
**mean** 13:23
21:6 24:24
30:22 31:4
34:4 41:9
54:15,24 58:17
74:7 79:6 86:5

97:7 101:23
102:20 108:10
117:13 119:12
154:22 173:3
188:19 216:5
232:15 235:7
235:14 237:13
238:17 257:1
258:24 264:14
264:18 265:6
265:17 277:23
283:14 290:13
317:24 318:4,6
323:18 331:8
360:19 362:22
367:13 379:13
**meaning** 210:2
213:3 294:7
**meaningfully**
215:5 225:4
226:12
**means** 15:24
16:13 176:8
187:5 267:9
291:4 325:13
395:19
**meant** 105:16
227:8 257:2
370:7 385:4
386:11
**media** 1:3 8:23
9:10,14,17,22
12:19 30:15,19
34:13 35:4,6

43:3,18 47:3
50:24 51:15,18
52:9,24 53:5,7
53:8,9 54:10
56:16 57:11
58:10 59:4
63:4 65:10
66:17 67:4
69:8,11,15
70:23 72:18
73:11 78:20
79:2,14 80:11
82:6,14 91:24
92:10 93:10
94:8,24 95:9
96:5 102:12
105:4,22,24
115:1,21 116:9
116:14 117:23
118:12,18
119:7,15,17
120:6,11 121:1
121:7 129:14
131:14 132:21
133:5,13 138:1
138:7,13
140:15 141:18
144:5 145:13
147:19 149:15
150:21 154:3
159:16 160:6
160:15 161:1
169:19,21
170:1,6,9,15,19

CONFIDENTIAL

**[media - mehri]** Page 46

| | | | |
|---|---|---|---|
| 170:22 171:1,7 | 319:13 320:5 | 388:13,23 | 131:21 132:13 |
| 171:14,17 | 320:13,23 | 389:21 | 133:23 134:14 |
| 172:2,19 | 321:14 323:12 | **medical** 357:18 | 135:5 136:12 |
| 173:13 174:6 | 324:13,15,20 | 358:6,10 | 136:22 137:11 |
| 174:13,14 | 325:16,21 | **meet** 18:16,19 | 138:5,23 |
| 176:21,22 | 326:6,19,24 | 18:23 62:21 | 140:11 141:5 |
| 177:10 183:2 | 327:8,10 | 144:2 213:1 | 143:9 145:3 |
| 183:21 185:6 | 328:10,17,24 | 392:20 | 146:14 147:9 |
| 185:13,20 | 329:4,8,13,15 | **meeting** 204:18 | 148:19 151:14 |
| 186:2,14 | 329:19,22,24 | **meetings** | 153:5 154:20 |
| 187:13,15,19 | 330:3,7 331:4 | 218:20 | 155:6 157:11 |
| 188:13,14 | 334:10 335:6 | **mehri** 2:3,3 7:8 | 158:9 160:21 |
| 190:14 191:7 | 335:14,23 | 24:16 28:7 | 166:17 168:1 |
| 191:19 193:2 | 336:9,19,22 | 40:22 41:7 | 173:1,22 174:1 |
| 193:12,16,23 | 337:6,19 339:2 | 42:8 46:15 | 176:14 183:24 |
| 194:7 212:3 | 339:14 340:1,8 | 51:1 54:13 | 188:21 189:3 |
| 230:7,15 | 340:22 341:17 | 56:18 57:16 | 189:21 191:10 |
| 231:24 232:1 | 342:1,12,18 | 59:8 63:5 | 192:13 193:20 |
| 234:6 237:24 | 344:16,21 | 64:15 66:5 | 201:2 205:22 |
| 239:21,22 | 346:3 347:21 | 67:10,23 68:7 | 206:17 209:9 |
| 244:11 245:21 | 348:5 349:8 | 69:23 70:10 | 213:18 220:7 |
| 245:22 256:21 | 350:21,23 | 71:19 73:22 | 225:8 228:19 |
| 272:9 273:9 | 351:11,20 | 74:15 75:8 | 230:17 232:7 |
| 276:16 277:19 | 352:4 359:4 | 84:24 88:16 | 233:6 238:8 |
| 277:22 278:14 | 363:20 364:10 | 92:12 93:18 | 240:14 242:5 |
| 279:5 280:5 | 364:19 365:7 | 94:10 95:13 | 243:6,20 |
| 282:7 283:1 | 365:10,16 | 97:6,13 98:15 | 244:21 246:12 |
| 284:11,22 | 366:14,20,22 | 100:5 102:18 | 247:7 248:4,8 |
| 286:7,15 287:1 | 367:4,10,23 | 107:24 108:7 | 252:5,23 253:8 |
| 287:4,12 | 369:11 371:16 | 114:19 115:17 | 254:2,11 260:1 |
| 288:11 289:2 | 372:8 373:6 | 116:4 117:11 | 264:24 265:3 |
| 289:12,18 | 379:4 380:19 | 120:15 123:1 | 267:11,16 |
| 291:17 296:23 | 385:13,21 | 124:12 125:22 | 278:2,17 |
| 299:18 306:3 | 386:23 387:7 | 128:19 130:15 | 279:11 281:1 |

CONFIDENTIAL

**[mehri - minutes]** Page 47

| | | | |
|---|---|---|---|
| 288:12 292:20 | 71:2 115:7,14 | **mentions** | 226:21 227:1 |
| 299:21 300:23 | 116:2,18 117:1 | 386:13 389:13 | 227:24 228:16 |
| 302:12 304:8 | 117:10,19,24 | **merit** 253:14 | 236:9,15,21 |
| 307:4 312:9 | 118:2,9 119:4 | **mess** 229:3 | 243:11,22 |
| 313:13,17 | 120:13,24 | **message** 353:17 | 244:2 247:17 |
| 314:11 315:10 | 129:13,17,19 | **messaged** | 253:12 257:6 |
| 315:20 316:24 | 129:23 130:6 | 268:8,9 | 290:23 291:7 |
| 317:21 318:19 | 130:12 131:8 | **messaging** | 376:12,15,18 |
| 319:7 322:7 | 131:11 139:15 | 355:18 372:24 | **methods** |
| 325:24 330:16 | 142:18,22 | **messed** 222:15 | 208:24 212:17 |
| 331:6 336:24 | 143:2,16 144:2 | **messenger** | 214:1 215:12 |
| 337:7,20 339:5 | 144:14,24 | 267:21 | 218:24 226:18 |
| 341:1 347:9 | 145:16 156:12 | **met** 19:4 | 238:5 257:7 |
| 348:8 351:15 | 156:18,23 | 360:10 | 380:11 |
| 356:11 357:20 | 157:8,15 | **meta** 3:12 6:7 | **miami** 3:18 |
| 365:17 370:22 | 184:15,15 | 13:18,20 291:8 | **michael** 5:4 |
| 373:14,21 | 190:20 237:22 | 305:14 352:7 | **middle** 32:10 |
| 375:5 382:14 | 239:23 251:9 | 393:10,19 | 48:16 371:20 |
| 383:7,17 384:5 | 273:17 282:4 | **metal** 370:13 | **miller** 1:19 |
| 385:7,17 | 283:2,16 | 371:8 | 13:4 395:10 |
| 386:15 387:3 | 284:12,22 | **methodologist** | **million** 24:8 |
| 388:6,19 390:2 | 285:9,15,19 | 290:19 | **mind** 42:16 |
| 391:1,11 392:4 | 287:2,5,13,19 | **methodology** | 175:11 343:7 |
| 392:19 393:16 | 288:11 289:3 | 48:7 112:18,21 | 378:5 393:18 |
| 394:2 | 289:19 291:18 | 120:11,17,18 | **minor** 339:21 |
| **melissa** 77:19 | 296:24 299:18 | 121:4,14 122:7 | **minute** 90:19 |
| **meltzer** 1:15 | 306:4 321:4,6 | 122:20,22 | 92:17 93:3 |
| 4:10 | 321:15,18 | 123:18 124:3,7 | 98:5 114:7 |
| **members** 95:20 | 346:7 357:13 | 124:9 196:23 | 142:17 220:15 |
| 249:7 | 379:5 388:13 | 197:7,19 198:6 | 223:13 |
| **memory** 225:11 | 388:23 | 199:4,9,17 | **minutes** 204:19 |
| **mental** 9:18 | **mentioned** 50:7 | 202:6 206:10 | 346:16 374:5 |
| 36:9,11 37:14 | 220:19 348:21 | 208:5,8 216:22 | 393:20,21,22 |
| 37:17 67:1 | 363:9 | 223:7 224:20 | 393:24 394:1 |

CONFIDENTIAL

**mirrors** 72:9
**misbehaved**
　324:2 325:22
**misbehavior**
　324:22 325:8
　327:1
**misbehaviors**
　327:16
**mischaracteri...**
　70:2 254:6
　255:3
**mischaracteri...**
　59:9 68:9
　69:24 120:17
　131:22 141:6
　155:7 176:15
　184:1 191:11
　191:13 209:10
　213:19 240:15
　252:24 254:4
　313:14,18
**mischaracteri...**
　339:6
**misheard** 253:2
**miskel** 215:3
　219:3,8 224:6
**mismatch**
　220:17
**missing** 66:15
　177:13 240:3
　325:2 351:1
**mission** 66:23
　320:9 322:23
　323:7 345:10

**mistake** 227:5
　227:12 314:17
**mistaken** 296:3
**mistakes**
　220:20 303:13
**mitigate** 43:6
**mix** 274:6
**mixed** 288:5
**mlegg** 2:12
**modern** 7:20
　89:4
**molecular** 9:7
　302:23 384:1,8
**moment** 89:15
**moments**
　214:15
**monetizing**
　183:9
**money** 10:6
　46:9 391:6,16
**mono** 319:17
**montag** 9:8
　302:18 305:6
　308:20 309:7
　311:18 384:2
　384:10,23
**moore** 6:12
**morale** 133:16
　133:21 134:6,9
　135:2 149:17
　149:24 150:3
　150:17,24
　151:21 152:3
　153:2 155:3

**morning** 13:14
　13:15 250:19
　276:17 328:14
　360:13 383:11
**motion** 368:24
**motions** 369:6
**move** 241:5
　244:14 246:7
　247:23
**movie** 268:18
**movies** 45:22
**mto.com** 4:7
**multifaceted**
　50:1 52:16
**multiple**
　127:19 163:8
　176:24 177:1
　206:11 233:18
　354:22
**multiply**
　195:23
**munger** 4:4
**mweinkowitz**
　5:7
**myriad** 175:13

**n**

**n** 7:2 385:22
　387:11 389:3
**name** 12:11
　13:16 14:2
　77:18 110:11
　120:1 220:18
　222:12 224:12

　297:14 298:8
　298:20 301:24
　301:24 302:1
　308:12 310:16
　314:9 352:21
　360:11 374:17
　378:11 389:3
**named** 73:6
　301:23 302:1
　319:22 368:5
　387:10
**names** 249:17
　249:20 293:23
　293:24
**naming** 175:15
　281:15
**narrow** 70:14
　326:9
**narrower**
　325:19 326:3
**nation** 378:10
**nation's** 255:21
　322:12
**national** 88:7
　102:7 113:2,18
**nationwide**
　377:4,10,11
**native** 300:6
**natural** 193:18
**nature** 66:9
　70:16 188:6
　272:10 275:16
　285:7

CONFIDENTIAL

**[navigate - northern]** Page 49

| | | | |
|---|---|---|---|
| **navigate** | 177:15 186:7 | 188:12 | 121:7 122:15 |
| 123:12 | 190:21 192:3 | **neither** 283:7 | 187:19 188:14 |
| **near** 387:19 | 195:7,12 | **nesi** 9:11 | 208:12 211:20 |
| **nearly** 128:24 | 201:10,12 | 305:21 385:14 | 237:1,2 246:18 |
| **necessarily** | 216:18 218:4 | 385:22 386:13 | 249:8 253:16 |
| 63:8 92:20 | 218:15 222:17 | **nessi** 307:17 | 280:14 310:23 |
| 188:6 345:3 | 224:15 225:10 | **network** 239:8 | 322:5 324:21 |
| **necessary** | 226:2,2 251:15 | 249:8 257:23 | 368:12 371:19 |
| 109:2 129:6 | 253:16 264:24 | **networks** 239:2 | 381:22 385:8 |
| 130:9 134:3 | 266:19 273:24 | **neuroscience** | **news** 45:15 |
| 137:3,21 139:5 | 274:5 282:3 | 8:20 9:6 | 267:2,5 369:16 |
| 140:6 143:4 | 288:5 311:12 | 302:22 303:4 | **newsletters** |
| 144:19 146:8 | 312:16 314:21 | 303:18 304:1,6 | 204:19 |
| 146:23 149:10 | 316:21 322:19 | 306:5 383:24 | **nice** 189:16 |
| 150:6 152:5,23 | 325:3,14 | 384:7 | **nick** 18:20 |
| 154:10 157:4 | 327:12 349:12 | **never** 38:1 43:9 | **night** 51:21 |
| 159:10 160:12 | 350:8 379:22 | 141:3 345:1 | **nine** 25:22 |
| 162:5 164:6 | **needed** 158:23 | 363:16 364:4,4 | 383:10 393:14 |
| 166:1 167:17 | **needing** 69:2 | 364:11,11 | 393:23 |
| 169:8 203:9 | 105:10 126:4 | 376:5 | **non** 39:2 |
| 204:12 205:15 | 151:1 346:11 | **nevertheless** | **nonexistent** |
| 211:11 258:14 | **needs** 29:5 56:9 | 124:2 | 313:3 |
| 292:10 322:1 | 62:21 129:15 | **new** 5:19,19 6:5 | **nonresponsive** |
| 367:1 396:4 | 144:3 | 6:6,6 7:23 | 241:6 244:15 |
| **need** 16:14 | **negative** 30:4 | 14:15 15:10,11 | 246:8 247:24 |
| 17:14 29:6 | 41:21 43:4 | 21:13 22:5,11 | **nonstop** 60:5 |
| 42:24 55:9 | 66:12 67:7 | 22:16 24:1,15 | **normalized** |
| 69:10 78:7 | 68:12,15 | 25:7,9,12 | 178:19 |
| 83:17 90:19 | 161:20 180:7 | 26:10,24 27:1 | **normore** |
| 110:2 111:11 | 181:22 244:10 | 27:3,3,10,15 | 198:20 199:22 |
| 156:11,22 | 340:10 341:18 | 29:1,1,2,5 | 200:12 |
| 157:7,14 | 350:24 | 33:15 38:23 | **northern** 1:1 |
| 167:22 168:12 | **negatively** | 78:2 96:17 | 12:23 |
| 172:10 177:8 | 133:15 162:16 | 97:23 103:14 | |

CONFIDENTIAL

**[notary - observed]**

**notary** 398:14
**note** 73:10
**noted** 13:2
334:4 396:11
398:6
**notes** 44:21
86:22 235:7,17
235:20 236:1,3
242:3,8,13,13
242:21,24
399:1
**noteworthy**
349:18
**notice** 1:14
**noticed** 314:1
**notifications**
58:2 272:13
278:1,15
279:10 280:24
**noting** 242:15
**notions** 80:6
**nuances** 184:7
**number** 28:21
63:9 85:23
194:24 201:3
208:5 221:19
221:23 222:10
232:12 238:18
247:18 258:1
260:4 276:22
298:6 308:9
326:22 338:1
340:18 355:3,5
360:4 371:6

377:9 378:21
379:22
**numbers** 97:17
393:17
**numerous**
163:5 256:8
378:18
**nw** 2:4 3:5

**o**

**o** 387:10,11,11
**o'clock** 230:14
**o'donahue**
229:2,15 231:1
**oath** 15:22
252:16
**obfuscate** 92:2
92:3
**object** 183:24
**objection** 24:16
28:7 40:22
41:7 42:8
46:15 51:1
59:8 64:15
66:5 68:7
69:23 71:19
73:22 74:15
75:8 84:24
88:16 92:12
94:10 95:13
98:15 100:5
102:18 107:24
108:7 114:19
115:17 116:4

120:15 123:1
124:12 125:22
128:19 130:15
131:21 132:13
133:23 134:14
135:5 136:12
136:22 137:11
138:5,23
140:11 141:5
143:9 145:3
146:14 147:9
148:19 153:5
154:20 155:6
157:11 160:21
166:17 168:1
173:1 176:14
188:21 189:3
189:21 191:10
192:13 206:17
209:9 213:18
225:8 228:19
232:7 233:6
238:8 240:14
242:5 243:6,20
244:21 246:12
247:7 252:5,23
253:8 254:2
260:1 278:2,17
279:11 281:1
288:12 292:20
299:21 300:23
304:8 307:4
312:9 313:13
313:17 314:11

315:20 316:24
317:21 318:19
319:7 322:7
325:24 330:16
331:6 336:24
337:7,20 339:5
341:1 347:9
348:8 365:17
**objections** 12:6
**objective** 80:13
**objectives**
133:15
**observation**
48:8 50:18
59:21 146:18
212:10 213:11
**observations**
48:18 59:7
61:4,17 107:12
126:15,22
137:13 202:1
203:1,4,7
206:14 207:18
207:24 209:6
211:4 227:23
241:18 250:9
378:23 381:19
**observe** 210:5
318:21
**observed** 49:9
52:9 54:9
56:15 57:10,15
59:2,14 60:21
60:22 63:3

CONFIDENTIAL

**[observed - operationally]**

67:8,18 71:18
281:20
**observing**  51:8
218:18
**obstacles**  323:5
**obvious**  340:10
**obviously**
74:10 82:20
314:17 392:13
**occasion**
254:22
**occasionally**
29:4 242:12
266:2,18 271:2
**occasions**  18:22
232:12 361:9
362:1
**occur**  67:2
381:11
**occurring**
46:14
**occurs**  185:14
185:21 192:9
**offer**  15:24
79:11 112:1
116:23,24
137:14 155:2
206:24 207:10
213:22 232:20
240:24 253:11
274:14 275:8
275:14 279:4
284:9,20
326:21 337:12

340:6
**offered**  105:8
114:15 125:14
172:18,23
283:6
**offering**  65:6
116:1 117:8
130:11,18
141:11,16
153:1,7 160:14
324:9 327:4
349:10 365:14
**offers**  65:5
**office**  22:3
23:13 29:2
52:1 54:19
**offices**  1:14
23:8
**official**  233:1
237:2
**officials**  232:6
232:14 233:1
251:21
**oftentimes**  75:2
75:16
**oh**  21:9 28:12
60:22 83:11
88:2 93:20
97:16 101:4
106:4,17
108:17 116:10
151:23 215:18
266:13 299:23
308:19 336:1

339:20 354:2
363:8 373:21
380:1
**okay**  16:19
17:13,18 20:1
21:9 33:2,18
45:1 50:14
67:21 70:8
87:22 90:1
97:13,17 98:8
101:3 112:7
114:8,11 174:2
179:9 185:4
190:5 193:20
194:13 195:15
195:17 196:19
201:11 203:21
214:22 215:24
226:6 230:3
231:10 254:23
265:3 267:3,15
295:12,17
300:11 328:7
332:13 333:18
335:12,19
351:17 356:17
360:10 361:22
362:18 363:12
367:17 368:2,8
368:20 370:16
371:17 373:15
374:21 375:13
376:19 379:21
380:15,24

383:16 385:6
386:8 388:5
389:16 390:19
390:24 392:3
392:24 394:2
**old**  188:15
**olivia**  6:11
12:12
**olson**  4:4
**once**  14:12
362:11
**ones**  102:8
184:10 280:22
298:2 314:19
**ongoing**  319:21
**online**  60:12
188:2 192:9
324:24 327:14
**open**  352:13
361:15,16
373:11 382:12
392:12
**opened**  262:23
263:8
**opening**  112:5
114:15 347:4
348:6 349:11
**opens**  358:12
358:18,18
**operates**  91:23
**operationally**
159:18 160:17
161:3

CONFIDENTIAL

**[operations - outside]**                                      Page 52

| | | | |
|---|---|---|---|
| **operations** | 284:20 321:14 | 380:18 | 13:1,7,14 14:3 |
| 23:21 46:23 | 326:16 349:16 | **opportunities** | 20:20,21 81:4 |
| 66:20 112:14 | 359:6 379:3 | 61:15 | 81:5 82:16 |
| 116:20 117:3 | **opinions** 76:2 | **opportunity** | 84:4 89:3 |
| 118:18 119:5 | 78:12,15,19 | 383:15 | 96:15 97:20 |
| 119:23 121:9 | 101:14 105:8 | **opposed** 118:1 | 100:12 109:12 |
| 138:16 145:18 | 107:20 110:14 | 122:19 365:16 | 109:13 110:18 |
| 147:5,14 | 113:15 114:14 | **orange** 15:7 | 110:20 200:15 |
| 148:15 149:4 | 116:2 118:13 | 25:12,14 26:20 | 219:22 286:18 |
| 178:10 180:20 | 124:11,16 | 26:22 | 294:23 303:18 |
| 181:23 184:21 | 125:14 129:8 | **order** 66:24 | 304:20 331:13 |
| 191:1 251:18 | 135:1 137:13 | 164:2,3 201:23 | 334:9 352:20 |
| **opine** 282:23 | 144:10 153:1 | 208:24 210:2 | 356:8 359:5 |
| **opining** 176:13 | 155:2 169:19 | 210:17 275:17 | 374:17 383:8 |
| 176:17,19 | 171:14 183:21 | 310:15 312:20 | 383:22 385:11 |
| **opinion** 75:11 | 205:2,8 206:24 | 317:16 318:8 | 385:18 386:19 |
| 79:12 111:24 | 207:10 211:14 | 318:16 322:22 | 387:4 388:10 |
| 116:7,22,24 | 232:19 233:3,7 | 368:10 | 388:20 389:19 |
| 117:8,15,18 | 234:20 235:6 | **orders** 368:15 | 390:3 391:5,12 |
| 121:5 130:11 | 235:13 239:11 | **organization** | 398:8 |
| 130:18 141:12 | 240:24 241:2 | 87:15 294:1 | **ought** 214:8 |
| 145:10 147:21 | 243:13 244:9 | 302:2 | **outcomes** |
| 149:13 153:8 | 247:16 250:16 | **organizations** | 121:18 283:2 |
| 156:10 157:13 | 252:1 253:11 | 28:22 113:5 | 284:12,23 |
| 159:14 160:13 | 256:4,7 258:2 | **organize** 46:5 | 285:9 |
| 160:23 162:11 | 274:13 275:8 | **original** 114:1 | **outs** 182:2 |
| 163:3,13 164:4 | 275:12 276:1,5 | 272:2 396:15 | **outside** 102:9 |
| 165:1 170:24 | 283:6 285:4 | **osborne** 1:13 | 102:23 105:11 |
| 171:2,6 179:5 | 301:7 324:9 | 7:4,14,15,16,17 | 105:17 144:16 |
| 182:20 238:15 | 326:21 327:3 | 7:18,20,22 8:5 | 183:17,18 |
| 240:11 254:1 | 341:22 347:5 | 8:7,8,9,10,11 | 186:11 217:16 |
| 255:10 275:3 | 349:11 353:1 | 8:15,17,19,21 | 249:3 276:1,1 |
| 275:11,15,21 | 356:1 364:15 | 8:23 9:5,9,12 | 277:6 278:8 |
| 276:14 284:9 | 365:15 380:13 | 9:16,21 10:5 | 368:8,23 |

CONFIDENTIAL

**[outweigh - part]**                                      Page 53

| | | | |
|---|---|---|---|
| **outweigh** 347:2 348:24 | 93:6 97:5 112:6 129:11 133:9 139:9 | **pains** 119:20 | **pardon** 93:21 150:9 347:14 |
| **overall** 123:8 187:8 227:13 325:11 | 145:10 149:13 156:10 159:14 | **palo** 3:9,10 **pandemic** 40:17 | **parent** 356:7 **parents** 93:11 95:2,10 204:20 |
| **overexposure** 325:2 | 162:10 201:15 203:20 204:15 | **panksepp** 302:19 384:11 | 266:5 344:20 **part** 32:15 |
| **oversaw** 23:8 | 205:20 206:1 214:19,20,21 | 384:24 **paper** 331:23 | 47:22,22 53:1 53:12 56:24 |
| **overwhelm** 129:16 | 225:24 229:5 231:8 271:15 | **paragraph** 91:16 113:9,11 | 95:24 96:1 103:18 115:18 |
| **overwhelmed** 130:14 | 271:17,19 272:4 282:18 | 121:24 122:4 123:3,8 127:5 | 120:18 121:13 124:13,21 |
| **overwhelming** 68:22 | 291:14 298:12 298:14,17 | 129:10 133:11 135:12 137:6 | 127:2,15 135:4 140:24 155:1 |
| **owe** 46:9 | 300:9 302:10 302:12 303:5 | 139:9 173:18 173:23 174:11 | 166:12 170:4 171:15 173:15 |
| **own** 118:24 142:1 240:22 | 305:4,5 315:1 328:5 332:10 | 174:12 178:15 179:11 185:2 | 176:12 181:20 185:12,19 |
| 253:13,14 372:13 | 332:19 335:9 335:17 342:1 | 197:17 198:2 204:16 212:7 | 192:7 218:16 218:22 223:6 |
| **p** | 384:21 385:1 386:9,12 | 215:19 226:8 229:8 231:9 | 232:9,20 234:23 235:6 |
| **p** 2:10 387:10 | 387:18 388:3 389:12 390:17 | 248:3,8,12 256:23 272:5 | 239:10 240:4,5 242:10 249:4 |
| **p.m.** 193:22 194:6 230:6,14 | 390:21 391:21 397:3 399:2 | 275:9 280:22 315:2,13 328:6 | 250:17 256:6 256:12 258:3 |
| 286:6,14 351:19 352:3 | **pages** 97:15,24 173:4 222:4,8 | 339:21 342:2 348:13,13 | 259:12,17 280:2 283:14 |
| 359:13,20 382:19 383:2 | 398:3 | **paragraphs** 174:24 197:2 | 285:4 288:14 292:5 296:11 |
| 393:3 394:7 | **paid** 76:1 83:19 83:24 85:20 | 197:13 | 301:5,15 306:12 327:20 |
| **page** 7:13 8:4 9:4 10:4 11:6,6 | 324:2 | **paralegal** 4:17 **parallel** 381:14 | 328:2 332:18 |
| 11:6,11,11,11 11:16,16,16,21 11:21,21 32:8 | | | |

CONFIDENTIAL

342:13 344:9
344:15 358:13
369:5,6 378:6
384:15 386:6
387:14 389:8
390:10
**partially** 51:3
**participate**
239:3 249:8
257:22
**participating**
336:3,7,10
345:16
**particular** 30:2
41:16 42:16
49:2 52:12,17
53:23 55:1
57:2,2 59:17
62:11,23 65:4
68:17 69:4
70:15,20
128:11 131:4
133:10 137:2
138:9 146:21
168:22 187:7
208:15 209:13
210:4 214:2
217:10 235:22
236:23 241:14
242:14 251:2
251:24 252:20
253:6 255:6
266:6 268:5
278:7 279:13

279:13,16
281:15 285:12
316:16 317:7
317:11 318:8
323:10 372:3
377:23 378:5
380:6 381:20
**particularities**
292:7
**particularly**
116:9,14
145:13 272:15
**particulars**
281:10
**parties** 312:21
**parts** 121:3
186:6 201:13
**party** 369:1
**pass** 373:16
**passing** 352:10
**past** 327:17
**pasting** 299:10
**patience** 383:9
393:1
**patients** 305:13
**patreese** 224:2
**pattern** 52:13
52:14 57:4
62:24 65:16
66:3,6 131:7
228:8 376:20
377:3,5,13,24
378:1,15,16
379:9,12,16,24

381:12
**patterns** 49:8
57:5 59:13,18
66:10 68:22
80:7 104:13
167:9 232:22
239:16 241:4
245:18 250:2
256:7 376:9,11
376:19 378:9
379:2
**pay** 46:8
325:22 326:18
**paying** 84:22
257:11 282:6
290:24
**peer** 88:9
105:20 113:2
139:13 141:13
141:20 161:13
230:21 386:4
387:5 388:21
**peers** 55:4 64:7
177:24
**pen** 195:8,18
**pending** 17:16
93:19 352:13
373:11
**pennsylvania**
1:17 4:12 5:6
12:18
**people** 48:12
53:17 77:20
88:19 106:20

128:6 129:13
143:13 177:17
191:20 202:22
223:1 235:16
238:13,18,19
240:8 243:2,23
245:14 267:5
273:10 274:21
280:3 283:22
283:24 291:18
339:3 344:21
346:4 353:11
354:23 370:18
371:6
**percent** 40:2,8
382:3,6
**percentage**
38:8,11 39:2,5
39:8,22 83:8
83:14 366:13
366:19
**perchance**
294:7
**perfect** 188:16
**perform** 194:18
379:7
**performance**
64:4 208:18
209:1 210:19
**performed**
365:9,12
**performing**
210:7

CONFIDENTIAL

**[period - pistilli]**                                    Page 55

**period**  25:13 142:4 148:2 153:19 233:20 239:14 241:24 256:9 381:4
**permanence** 372:24
**permanent** 188:7
**permeating** 56:7
**permission** 338:6 340:12
**perseverance** 383:9
**persist**  351:4
**persisted**  382:1
**person**  192:9 209:1,19,21,22 210:23 242:17 268:8
**personal**  1:4 12:20 26:9 46:18 58:12 65:9 105:3 114:24 115:20 118:17 121:6 131:14 138:12 140:15 141:17 147:18,22 150:20 154:3 159:17 160:7 160:16 161:1 191:18 193:1

193:15 212:3 234:5 237:24 244:11 245:20 256:20 280:4 320:5 323:11 347:21 356:13
**personally**  59:2 67:17 69:22 71:18 85:5
**personnel** 172:15 207:16 209:5
**perspective** 78:19 306:5
**perspectives** 9:17 128:10 388:12,23
**pertaining** 134:1
**pertains**  169:22
**pervade**  59:21
**pervasive**  52:5 64:8 65:8 68:23 71:15 149:18 153:24 158:3 320:23 327:9 350:3
**pervasiveness** 70:22
**peterson**  215:3 219:4,8 224:6
**pew**  49:16 113:5

**ph**  1:23
**phenomena** 212:18
**phenomenon** 379:23 381:11 381:21
**philadelphia** 5:6
**philosophy** 21:11
**phone**  73:4,7 73:18,19 74:7 74:11,14 160:1 269:22 358:13 362:23
**phone's**  268:22
**phones**  42:18 44:12 45:4,16 45:20 46:3,6 46:10 47:13,16 74:3
**photos**  97:9 340:16
**phrasing** 279:14
**physically**  62:4
**pick**  251:1,24
**picked**  252:22 253:7 315:5 316:21 317:17 318:5
**picture**  126:21 354:1

**pictures**  44:24 45:3,5
**piece**  172:11 198:20 208:15 208:22 229:17
**pieces**  267:5
**pioneering** 7:22 96:15 97:21
**pistilli**  3:4 7:6 13:13,16 20:14 20:24 24:20 28:9 31:14 32:1 41:3,11 42:11 47:10 52:6 56:10 57:8 58:21 60:17 64:11 66:2 67:5,16 68:4,10 70:7 71:14 72:2 74:6 75:4,24 80:24 81:8,11 81:15 82:1,15 84:7,10,12 85:4 88:23 89:8 93:4,22 95:6 96:11,20 97:10,19 99:11 100:8,16 102:21 108:3 108:11 109:8 109:16 110:23 115:4,24 117:6

Golkow Technologies,

[pistilli - platforms]                                    Page 56

| | | | |
|---|---|---|---|
| 117:17 121:22 | 246:19 247:12 | **place**  24:10,10 | 5:8,15,20 8:22 |
| 124:6 125:16 | 247:23 248:1,6 | 26:12 27:24 | 34:1,4,13 76:2 |
| 127:4 128:21 | 248:10,11 | 188:9 228:22 | 78:4 79:19 |
| 131:15 132:9 | 252:14 253:4 | 319:21,24 | 83:20 84:22 |
| 132:17 133:7 | 253:21 254:8 | 324:18 | 98:11 107:4 |
| 134:4,24 | 254:20 260:7 | **placed**  366:5 | 108:24 109:4 |
| 135:10 136:16 | 265:4 267:19 | **places**  24:12 | 128:23 131:19 |
| 137:5,23 | 278:10 279:2 | 47:16 110:4,10 | 134:13 135:8 |
| 138:18 139:7 | 280:19 282:15 | 157:24 238:20 | 136:3,10 |
| 140:22 141:10 | 285:24 286:17 | 255:15 264:1 | 141:15 151:22 |
| 144:21 145:8 | 289:14 292:24 | 292:16 | 160:20 164:20 |
| 147:2 148:12 | 294:3,6,19 | **plaintiff**  49:5 | 331:13 332:5 |
| 148:24 151:18 | 295:3 300:4,16 | 65:1 113:22 | 393:14,24 |
| 154:16,23 | 300:20 301:13 | 115:14 130:7 | **plan**  37:23 38:2 |
| 155:19 158:6 | 302:14,15 | 130:13 133:21 | 112:1 126:4 |
| 158:21 162:9 | 303:14,23 | 134:17 137:10 | 155:20,22 |
| 166:23 169:12 | 304:11,15,18 | 138:3,21 | 275:2,19 |
| 173:10,24 | 305:1,5,9 | 139:22 140:9 | **planning**  21:23 |
| 174:4 178:13 | 306:20 307:1 | 142:15,23 | 22:10 38:22 |
| 184:24 188:24 | 307:15 312:18 | 143:8 146:24 | **plans**  204:18 |
| 189:17 190:2 | 313:15 314:5 | 149:24 153:3 | 259:13 |
| 192:6 193:17 | 314:24 315:12 | 156:19 159:11 | **platform**  35:4,6 |
| 194:9 200:22 | 315:14 316:4 | 162:7,23 164:8 | 63:18,21 73:11 |
| 201:4,6 205:24 | 317:15 318:3 | 164:12 166:3,7 | 105:2,14 |
| 207:12 210:24 | 319:1,11 | 167:19 169:10 | 106:15,18 |
| 214:12 220:3,9 | 322:21 326:13 | 182:13 202:17 | 179:2,9,15 |
| 220:11 223:19 | 330:24 331:9 | 204:7,14 | 185:7 187:7 |
| 223:23 225:22 | 331:17 333:22 | 205:17 211:5 | 261:5,8 274:16 |
| 229:23 231:5 | 334:3,14 337:4 | 211:12 234:17 | 274:18 276:14 |
| 232:10 234:10 | 337:16 338:24 | 315:18 331:2 | 355:20 362:20 |
| 238:11 241:5,7 | 339:11 341:13 | 331:18 332:3 | 363:21 364:10 |
| 242:23 243:15 | 347:10 349:5 | 334:19 | 366:22 370:18 |
| 244:14,16 | 351:13 352:6,7 | **plaintiffs**  2:6 | **platforms**  3:12 |
| 245:3 246:7,9 | 392:10 | 2:13 4:14,20 | 6:7 47:5 49:3 |

**[platforms - posted]**                                                    Page 57

49:22 72:18
73:16 103:5
104:3 105:22
144:7 147:20
154:6 170:2
171:18 172:3
172:24 173:13
174:7,16,22
175:4,9,17,22
176:22 177:10
178:19 179:21
180:10,19
181:18 183:2
183:16 185:16
185:23 186:2,9
186:16,17,23
187:8 190:14
190:22 193:2
193:13 232:1
251:16 272:9
272:14 273:9
273:15,24
274:6 275:4,16
275:21 277:2
281:11 323:23
327:14 332:24
342:12,21
344:6 346:3,6
347:22 350:4
350:11,13,14
356:14 368:4
373:6
**platt** 282:22

**play** 45:19,21
111:20 263:20
362:12
**plays** 362:11
**pleadings**
312:23
**please** 14:1,4
17:8 54:11
60:24 61:3
68:11 81:1
93:24 133:9
149:12 159:13
162:10 173:23
178:15 185:18
194:10 201:15
223:13,20
231:7 234:12
253:3 282:18
286:21 294:20
300:17 303:15
304:4 305:2
328:20 347:11
358:3 396:3,8
**pllc** 2:3
**plus** 383:10
**point** 17:6
56:23 66:8
70:21 92:22,24
142:14 193:9
193:19 214:4
223:2 224:19
227:13 262:23
360:7 377:22
380:5 381:9

**pointed** 275:10
276:6 341:23
**pointing** 96:3
**points** 258:2
286:19 299:8
306:15 315:7
379:22
**policies** 24:14
24:21 25:2,4
26:5,14,18
27:24 29:20
30:14,18 41:12
42:22 44:2
160:1,6
**policy** 10:6
21:14,19,24
29:22 30:3,8,8
30:11 41:15,16
43:1,9,17 44:4
44:8 108:19
127:23 128:5
391:6,14 392:1
**pool** 249:3
**poor** 283:2
284:11,22
338:11
**popat** 9:19
291:16,22
293:11,19
295:20 296:10
308:17 309:7
388:15 389:2
389:13

**port** 370:13
371:8
**portable** 26:9
**portfolio** 23:4
**portion** 39:19
122:6 238:14
**posing** 280:14
**posted** 91:9
**position** 22:7,9
22:16,19,22,24
26:20 32:23
33:8,17 42:1
83:4 95:23
248:23 283:1,7
284:11,21
**positions** 33:11
33:12 255:19
**positive** 62:8
328:10,24
329:4 336:18
337:18 340:3
341:16 343:23
344:4,6 345:13
345:21 346:14
347:2,7 348:4
350:12
**possible** 246:20
255:20 260:4
**post** 191:7
266:15,21
270:18
**posted** 263:3,6
271:5 370:17
371:6

CONFIDENTIAL

**[posting - priorities]**                                                     Page 58

posting 340:11
posts 185:14,22
  333:13 338:5
  354:22 355:2
  372:12
potential 114:2
  114:16 118:1
  120:13 321:17
  338:9 341:16
  341:17 349:24
  351:10
potentially
  318:11
poverty 319:19
  319:22,23
  320:11
power 321:21
powerful 99:13
  100:1 335:15
  335:20 338:21
  338:22
practice 14:7
  29:17 39:20
  48:10 61:12
  74:19 82:22
  83:4 87:17,24
  88:4,6 89:13
  89:18 126:23
  128:12 163:20
  215:15 223:8
  226:20 328:15
  330:11 382:1
practiced
  197:18 198:6

199:17 228:16
practices 24:9
  29:13 91:14
  324:7,8
practitioner
  123:21 211:16
  233:12 256:15
preceded
  324:12 326:23
preceding
  336:1
precise 170:15
preconceived
  80:6
predictability
  180:9
predictable
  66:8,11 120:7
  179:2 180:4,6
predominantly
  49:22
preoccupation
  53:10 56:6
preoccupied
  52:23 53:15,16
  60:11 324:18
prepare 17:21
  18:13,17 20:9
prepared
  148:11 181:12
preparing
  64:20 112:9
  236:4 292:22

preponderance
  287:18
present 6:11
  48:22 68:24
  126:6 140:17
  163:14 259:8
  312:22
pressing 61:12
  61:14 237:18
  239:17 240:7
pretending
  371:21
pretty 26:10
  52:5 58:20
  74:20 193:18
  242:21 291:5
  335:19 342:15
  362:5,8 367:15
  380:13 381:6
prevalence
  132:2
prevalent 54:7
  59:19
previously
  51:20 87:6
  102:16 167:5
  315:15
primarily 28:4
  62:15 212:9
  266:3 329:10
primary 28:23
  31:3 33:22
  55:5 71:12
  99:1 107:22

108:2 129:18
  178:1 255:17
princeton
  386:13
principal 32:10
  32:13,15 33:1
  56:9
principal's
  32:21 52:1
  54:19
principals 8:16
  23:10 29:1
  32:19 48:1,20
  51:13 52:2
  58:7 62:17
  93:9 96:5
  219:12,23
  221:3 225:1
  226:10 231:19
  328:17 358:22
  358:24
principles
  262:10,12
prinstein
  305:21 307:18
  385:23
printed 97:12
  204:2
prior 87:15,20
  123:7 206:5
  229:7 253:2
priorities
  259:15,20

CONFIDENTIAL

**[prioritize - provide]**                                                      Page 59

**prioritize**  179:3 180:1 181:5
**privacy**  338:11 338:16
**private**  39:17 39:24 86:2
**probably**  97:11 167:10 169:2 189:13,13 193:18 229:24 262:23 281:4 289:20 351:8 369:3
**probationary**  14:17
**probe**  261:10
**probiotics**  305:12
**problem**  29:17 106:5,6 119:8 128:11
**problematic**  324:11 345:3
**problems**  37:14 37:18,20 61:12 119:24 121:11 187:20,21 239:17 257:12 324:22 327:5 338:17 346:8 373:3
**procedure**  108:20 203:16 203:24

**proceeding**  15:4
**process**  14:16 52:22 111:21 218:12,13,19 241:15 259:3 259:12,18
**processes**  108:14 260:9 260:10,19
**produce**  123:23 217:9
**produced**  108:5 128:24 217:18 315:17
**producer**  217:2
**producing**  129:7
**product**  35:19 35:22 175:22 179:1 190:20 199:11 208:21 273:6 343:4
**production**  11:10 227:19 294:4 352:13 373:11
**productive**  328:10 329:1,4
**products**  1:4 12:20 88:19
**professional**  29:15 38:6 112:10 113:3

113:19 122:14 122:23 126:5 196:22 197:8 209:4 238:21 239:7 329:24 330:4 357:18
**professionally**  242:11 249:14
**professor**  14:7 28:5,14 39:19 82:21 83:4 381:24
**profiles**  241:23
**profound**  40:20 40:24
**program**  21:17 21:21 32:16,18 239:5
**project**  217:19 218:3
**prolong**  104:2 175:24 176:23 178:6 183:5 187:9 190:17 275:18 280:12 350:15
**prolonged**  120:5 183:8,23 193:14 343:3 351:5
**promo**  340:5
**promote**  92:11 175:8 176:11 183:22 329:19

329:22 344:3
**promoting**  7:20 89:3 91:13 92:3 339:24
**prompted**  125:5
**promulgate**  41:15
**promulgated**  43:1 44:4
**promulgating**  30:11 159:15 160:14,23
**promulgation**  29:22
**proposition**  197:24 225:3 228:15
**propounded**  398:5
**prosek**  387:10
**protect**  62:3
**protecting**  338:15
**prove**  318:9
**provide**  28:21 29:14 62:3 64:12 76:2 78:13,14 122:13 126:8 212:23 228:2 244:3 252:16 255:7 257:3 297:8 298:16

CONFIDENTIAL

**[provide - quarterly]**

300:13,18
306:18 340:19
340:24 341:11
**provided**
104:18 224:1
231:22 304:20
305:11 306:22
**provider**
122:14
**providers**
129:17,18,23
130:6,12 131:9
**providing** 29:9
208:10,11
211:18 223:9
352:24
**prussia** 1:16
4:11
**psel** 113:4
**psychiatrist**
36:1,2 37:17
274:21,24
**psychoeducat...**
9:12 386:20
**psychological**
9:9 306:6
385:12
**psychologica...**
272:10
**psychologist**
35:23,24 37:16
274:20,23
283:16 285:22

**psychology** 9:6
9:16 182:5
383:23 388:11
**public** 21:14,19
26:21,23 36:5
36:7 113:4,13
116:16 119:10
121:12 136:5
137:15 145:15
146:11,20
147:12 158:4
162:17 165:6
245:12 257:16
260:9,11,12,18
261:1 288:20
289:17 322:4
322:10,11
330:14 344:23
355:2,4,6
398:14
**publication**
88:6,12
**publish** 108:15
**published**
88:21 89:17
90:4,14 295:21
377:2
**publishes** 88:10
**publishing**
176:10
**pull** 20:15
52:21 55:11
81:1 384:20

**pulled** 198:10
339:19
**pulse** 381:7
**purport** 302:17
304:5
**purported**
304:22
**purportedly**
305:21
**purports**
304:21
**purpose** 42:13
42:22 61:9
66:23 217:4
238:10 288:20
289:17 310:11
380:4
**purposeful**
342:20
**purposes** 42:17
44:13 101:19
101:20 102:11
235:21 236:13
312:17 328:18
330:21 347:19
**pursuant** 1:13
**put** 27:24 81:23
101:22 123:8
139:17 145:21
149:21 159:22
174:18 179:7
184:4 268:19
277:20 278:3
290:5 293:23

310:7 347:17
361:17 371:7
**putting** 107:9
187:1 370:12

**q**

**qualified** 37:13
284:19
**qualitative**
8:12 9:18
198:14 199:1
200:15 201:17
201:22 202:5
204:21 205:1,7
205:13 257:7
291:9 380:12
388:14,24
**qualitatively**
119:8
**quality** 73:12
119:18 212:12
213:23 320:6
320:24 323:13
**quantified**
273:22
**quantitative**
258:5,8,11
317:4
**quantitatively**
248:13 256:24
**quarry** 2:10
4:17
**quarterly** 88:6

CONFIDENTIAL

**[question - really]**                                         Page 61

**question**  11:20
  12:7 17:1,2,8
  17:11,16 27:19
  42:20 56:12
  58:23 61:22
  68:2 72:7
  93:19 97:7
  99:22 117:21
  118:5,6 119:11
  120:9 145:6
  150:12 151:10
  151:13,15
  167:5 185:18
  192:7,16 205:4
  206:22 207:22
  212:11 214:6
  217:17 218:5
  218:10 220:12
  226:22 234:13
  244:17 245:2
  246:16,23
  253:2 254:16
  255:8 264:23
  265:7 266:19
  272:17 278:20
  279:14 285:13
  299:3 321:10
  322:20 325:18
  326:4,9 328:20
  333:5 339:10
  347:12 358:3
  367:6,18
  368:22 371:2,4
  375:2 376:17

  377:7,18 378:7
  380:2
**questions**  16:8
  16:14 94:3
  174:21 197:4
  201:24 213:7
  216:24 254:13
  289:8 316:18
  326:10 342:6
  352:9,22 359:9
  360:7,15
  370:24 373:8
  374:20 375:7
  382:10 392:5
  398:4
**quick**  97:7
  132:18 298:12
  332:10 348:18
**quickly**  185:1
  201:9,12
**quite**  173:16
  238:17 260:4
  267:9
**quote**  81:22
  146:2
**quoted**  345:15

**r**

**r**  387:10,11
  389:3,3 397:1
  397:1
**radd**  91:9
**radically**  272:8

**radnor**  1:16
  4:12 12:17
**raised**  213:7
**raises**  316:18
**randy**  282:22
**ranked**  56:1
**ranking**  261:16
  261:18
**rate**  84:15,18
  195:24 196:2
**rather**  49:3
  51:11 94:2
  108:4 123:24
  138:11 199:13
  206:15,15
  207:24 208:23
**ray**  6:12 304:16
**reach**  80:13
  144:10 210:16
  344:20
**reached**  147:21
**reaches**  66:7
**read**  17:22 18:5
  18:13 45:12,15
  49:4,14,15,15
  92:7,14,21
  94:13,14 95:17
  95:21 104:8
  105:20 106:19
  117:14 141:24
  142:8 173:3
  201:11,12
  211:24 215:20
  215:23 220:15

  224:7 225:10
  233:23 250:5
  285:1 287:7
  290:6,7 301:7
  306:11 308:6,7
  310:13 316:1
  348:11 349:13
  353:9 354:7
  396:3 398:3
**reading**  95:24
  118:20 121:20
  143:22 148:5
  163:10 201:9
  222:22 227:2
  273:3 281:3
  284:3 318:22
**readings**  63:24
**real**  3:9 39:14
  123:13 298:12
  312:7,12,12
  350:18
**realities**  215:6
  225:5 226:14
  320:7
**reality**  140:17
  157:22
**realize**  249:19
  309:1
**realized**  310:1
  311:20
**realizing**
  307:24
**really**  41:17
  43:16,20,23

CONFIDENTIAL

**[really - record]** Page 62

| | | | |
|---|---|---|---|
| 44:10 47:3 | 167:7,23 168:3 | 293:14 294:11 | **recommendat...** |
| 52:20 53:23 | 168:5,13 367:2 | 297:3,16 298:7 | 262:4,18 |
| 54:24 55:10 | 367:8 392:21 | 307:20 308:6 | **recommended** |
| 62:4 71:6 72:6 | 392:21 | 313:7 332:6 | 43:9,17 358:23 |
| 76:17 92:15 | **rebuttal** 8:10 | 348:16 363:8 | 363:13,16,18 |
| 104:18 105:1 | 110:19 111:4,7 | 368:15 369:9 | **record** 12:11 |
| 105:18 106:11 | 119:19 122:4 | 375:23 | 13:3 14:2 |
| 118:4 124:16 | 127:6 196:17 | **receipt** 396:17 | 16:15 31:13,17 |
| 170:23 176:4 | 197:14 214:17 | **received** 21:7 | 31:24 32:3 |
| 177:4 180:11 | 220:22 248:7 | 337:14 392:13 | 49:11 71:22 |
| 180:13 181:11 | 282:17 283:8 | **recess** 31:19 | 72:9 82:5,13 |
| 224:19 236:2 | 283:13 291:13 | 82:8 132:24 | 104:17 107:9 |
| 263:13,22 | 300:7,9 314:8 | 194:3 230:10 | 118:22 121:21 |
| 265:14,19 | 315:2 316:1 | 286:10 351:23 | 125:9 131:2 |
| 267:3 273:3 | 317:13 328:5 | 359:16 382:22 | 132:6,22 133:6 |
| 274:11,12 | 342:3,16 | 393:7 | 143:23 148:6 |
| 278:6 279:12 | 347:16 | **recognize** 81:9 | 150:14 153:22 |
| 279:18 294:16 | **rebuttals** 208:7 | 81:14 84:13 | 158:2 161:15 |
| 321:9 348:18 | 253:20 299:6 | 89:9 90:6 | 163:11 165:12 |
| 349:18 356:23 | 342:5 | 96:24 97:3,4 | 188:7 193:23 |
| 376:21 381:14 | **recall** 16:8 | 98:1 100:19 | 194:8 207:7 |
| 381:23 | 19:18 20:3,11 | 326:2 | 212:1 230:8,16 |
| **realm** 44:10 | 24:24 25:1,3 | **recognized** | 234:1 240:21 |
| 182:10 | 26:4,13,17 | 104:14 214:24 | 246:1 247:21 |
| **realtime** 1:20 | 28:2 43:12 | 376:12 379:11 | 250:6 256:18 |
| 177:16 268:22 | 73:8 89:22 | **recognizing** | 272:23 286:8 |
| 272:13 277:24 | 109:7 142:13 | 196:7 | 286:16 334:5 |
| 278:15 279:9 | 170:13 171:19 | **recollection** | 351:21 352:5 |
| 280:24 395:11 | 172:5,10 173:3 | 171:24 332:7 | 359:11,14,21 |
| **reason** 16:3 | 173:6 197:5 | **recommend** | 373:13 374:8 |
| 53:16 98:20 | 220:16 227:9 | 363:24 | 382:17,20 |
| 350:11 396:5 | 276:12,16,22 | **recommendat...** | 383:3 393:4,11 |
| **reasonable** | 287:21,24 | 262:1,14 | 395:6 |
| 159:3 166:20 | 290:1 292:22 | 364:12 | |

CONFIDENTIAL

**[records - relied]** Page 63

**records** 235:4
235:11,15
**recount** 250:8
**recreate** 224:16
**recreated** 293:7
**recruited** 25:11
26:24
**reduced** 139:13
139:20 140:1,8
140:16 141:1
141:12,19
162:15 166:6
166:15
**reel** 264:15
265:16
**reels** 263:15,16
263:18,19
264:4,5,10,21
265:8,12
**reexamine** 91:4
**refer** 13:21
56:16 174:5
294:8
**reference** 90:21
123:7 137:7
172:24 173:12
208:14 229:10
280:22 298:16
306:13 390:22
**referenced**
214:14 353:8
364:22 370:10
371:18

**references**
110:5 205:20
297:10 298:15
**referencing**
173:14
**referred** 102:22
105:10 286:18
293:18
**referring**
105:13 179:10
181:9 182:23
219:3 227:8
232:4 301:17
301:19
**refers** 117:18
206:8
**refining** 38:22
**reflect** 79:23
194:14 199:4
232:20 247:17
**reflected**
199:19 247:21
**reflection**
104:19
**reflective** 241:3
244:9
**reflects** 195:1
197:18 198:5
208:18 226:21
228:15 257:15
349:15
**reframe** 253:3
**refresh** 201:10
225:11

**regard** 29:22
164:21
**regarding**
133:20 135:2
135:20,23
136:19 137:17
139:24 146:5
146:19 172:2
260:13 355:11
387:21
**regional** 22:13
23:8,14
**regular** 103:12
148:1 186:19
240:4,5 242:11
**regularly**
231:18
**regulation** 30:6
41:22
**reinforcing**
99:13
**relate** 134:12
169:19,21
185:13,21
**related** 51:16
59:4 125:3
143:1 150:3,19
151:6 152:2,9
152:19 156:22
164:1 167:14
187:6 199:1
218:5 239:21
276:16 287:1
351:5 358:10

371:16
**relates** 1:6
**relating** 24:22
26:15 28:1
30:14 52:9
130:5 136:10
139:20 142:21
145:23 149:3
149:23 150:16
151:20 152:15
156:17 162:21
164:11,20
166:5 204:6
207:14 211:4
358:7
**relation** 43:21
**relations** 91:24
344:23
**relationships**
55:4 215:13
226:19
**relatively** 325:7
**relay** 232:12
**relevant** 112:11
125:24 128:17
141:3 161:12
163:9 287:8
318:11
**reliability**
125:12
**reliance** 233:14
256:13
**relied** 112:9
172:14 241:24

CONFIDENTIAL

**[relied - request]**                                    Page 64

290:8 307:19
386:5 389:8
**relies** 228:7
257:6
**religion** 21:11
**reluctant** 56:21
**rely** 124:8
171:12 206:15
208:1 241:14
247:16 253:23
256:3,6,13
290:16 384:15
**relying** 202:7
213:6 234:12
**remember** 15:5
110:8 200:6
276:18 277:13
287:4,17 289:4
290:3 342:10
**reminded**
322:19
**render** 206:24
**rendering**
380:18
**repeat** 179:12
258:7
**repeatedly**
169:17
**reply** 111:6
114:13 119:16
208:7 228:18
253:19 299:6
342:2 347:15
348:1

**replying**
276:23
**report** 8:8,10
46:21 47:9
56:24 57:22
59:13 64:20
65:5 67:13,20
78:18 96:10
101:9,19,21
105:8 107:21
109:13,20,22
110:2,14,19
111:4,12 112:5
112:9 114:1,5
114:9,15
121:24 122:4,6
122:20 125:15
127:6 140:3
159:14 169:18
170:9,11,16
171:10 173:11
173:17,20
178:15 184:5
192:20 196:18
197:24 198:18
199:18 211:2,9
214:17 220:14
220:22 221:11
223:16 231:11
231:14 232:11
236:5 242:1,2
243:21 248:3,7
249:23 250:3
250:13 253:13

253:19,23
258:10 272:3
274:14 280:23
282:17,24
283:7,8,13
290:9 291:13
293:6 296:17
296:19 298:2
299:9 300:7,10
300:13 302:11
305:20 310:3
311:10,22
312:7 313:11
313:22 314:8
314:20,23
315:2 318:22
328:5 342:16
347:4 348:7,12
349:11 364:23
384:18,21
386:6,9 387:18
389:12 390:14
390:17 391:22
**reported** 94:8
103:18 232:18
**reporter** 1:19
1:20 13:4
16:11,20
395:11,21
**reporting**
59:12 94:6
95:16 107:13
113:4 338:17

**reports** 17:22
18:12 49:14,19
104:15 111:7
111:14,18
112:2,19
119:19,19
146:18 207:11
227:19 282:21
284:5,5 299:2
311:23 316:2
316:10,12,13
317:5,14 319:6
342:3 343:8
376:7 384:15
392:8
**represent**
13:18 295:4,13
374:18 392:6
**representation**
307:16
**representative**
317:19 318:1
**representatives**
104:11
**representing**
2:6,13,18 3:12
3:19 4:7,13,20
5:8,15,20 6:7
**reproduction**
395:19
**request** 11:10
107:3,22
108:22 223:22
305:8 306:24

373:10 382:12
**requested**
  107:5
**required**  159:8
**requires**
  216:16 317:9
**requiring**
  215:12 226:17
**reread**  348:18
**research**  8:12
  44:18 49:17,18
  49:20 68:18
  88:19 106:24
  112:12 113:5
  118:21 120:23
  123:23 131:12
  142:8 143:22
  151:8 153:20
  158:2 165:10
  172:11 184:17
  198:14 199:1
  199:12 200:16
  201:24 208:22
  211:21,23
  212:22 213:23
  214:3,5 215:1
  216:22,23
  217:2,17,18,19
  218:2,5,10
  223:7 227:19
  229:19 233:23
  250:5 256:16
  284:1,16
  285:12 288:6

289:7 291:19
  376:17 377:2
**researched**
  106:20
**researcher**
  218:15 290:19
**researchers**
  88:11 200:9
  212:21
**researching**
  88:20 376:16
**reserved**  12:7
**resides**  308:7
**resounding**
  238:1
**resource**  62:20
  72:22 156:15
  157:18 180:21
  192:1 237:21
  259:19 280:7
  282:2
**resources**
  99:14 100:2
  113:6 162:14
  164:13 166:14
  184:17 234:8
**respect**  182:18
  284:3
**respectful**
  338:3 340:9
**respectfully**
  325:17
**respects**  208:4
  249:3

**respond**  69:2
  177:16 274:5
  322:24
**responded**
  297:23
**responding**
  54:9 55:10
  56:15 59:4
  115:16
**response**  61:21
  178:24 208:3
  250:19 255:8
**responsibilities**
  23:3 51:7 62:7
  65:14 79:15
  102:3 249:4
  288:18 328:3
**responsibility**
  22:10 33:22
  38:21 41:19
  180:13 322:4
  338:5
**responsible**
  23:6 323:20
  339:24
**responsibly**
  340:2
**responsive**  94:3
  377:17
**rest**  98:1 298:9
  298:22 300:2
  310:6
**result**  67:3
  117:9 161:6

163:13 181:1
  184:13 186:13
  217:3 243:14
  251:6 255:24
  256:16 277:18
  301:20 310:10
  311:7 371:14
  371:14 378:17
**resulted**  125:13
  129:14 310:9
**results**  90:14
  126:6 183:4
  314:16
**resume**  21:2
  33:3,11
**retained**  77:1,4
  80:19
**retrievable**
  86:18
**return**  396:15
**review**  9:19
  49:14 50:11
  80:1 87:7,23
  95:21 101:18
  103:3,22
  104:23,24
  105:11,19
  112:11 120:19
  125:4 131:5
  137:19 139:3
  143:11,21
  148:4 158:15
  161:12 163:9
  165:11 167:14

CONFIDENTIAL

**[review - rochelle]**                                                  Page 66

| | | | |
|---|---|---|---|
| 168:18 173:8 | 368:16,24 | 105:9 106:13 | 324:4 327:22 |
| 204:9,24 205:6 | 369:6 386:4,5 | 106:15 108:16 | 332:5 333:9,14 |
| 205:12 207:5 | 387:5 388:21 | 113:19 128:14 | 334:22 335:24 |
| 211:22 217:14 | 390:10 | 129:5 130:1 | 336:2,7,11,15 |
| 218:16 226:3 | **reviewing** | 139:23 144:22 | 336:19,23 |
| 233:22 256:17 | 170:12 203:16 | 150:8 156:2 | 337:6,19 |
| 272:21 286:20 | 204:1 | 164:9,18 170:2 | 338:10 339:4 |
| 286:22,23 | **reviews** 8:20 | 171:22 187:13 | 339:17 340:24 |
| 287:10 288:10 | 303:4,19 304:2 | 188:18,20 | 355:21 361:2,7 |
| 288:14 289:16 | 304:7 | 189:20 195:2 | 369:23 370:15 |
| 292:6 296:12 | **reward** 353:11 | 196:14,20 | 371:23 374:3 |
| 296:24 299:19 | **rice** 4:4 7:6 | 197:14 203:1,2 | 376:8,9 |
| 301:6,16 | 352:19,21 | 206:8,16 | **rights** 14:17 |
| 305:14 306:12 | 356:20 358:4 | 215:15 219:4 | **rigor** 125:13 |
| 308:8,24 | 359:8 | 219:13 222:4 | 208:19 212:12 |
| 315:17,22 | **rich** 99:15 | 222:13 225:21 | **rigorous** 206:9 |
| 328:13 332:3 | 100:3 | 233:3 240:13 | 213:16 228:5 |
| 348:3 355:23 | **right** 15:22 | 242:4 252:17 | **ripple** 320:20 |
| 356:3 364:13 | 22:6 28:6 32:6 | 252:19,22 | **rise** 143:15 |
| 364:18 365:2,5 | 32:11 33:5 | 253:7 259:24 | 144:24 379:23 |
| 384:14 387:15 | 38:19 40:13 | 261:6 271:7 | 381:12 |
| 388:15 389:1,9 | 43:11 44:13 | 274:17,22 | **rising** 139:15 |
| 390:11 | 45:3,7 46:14 | 277:8 278:16 | 141:21 142:18 |
| **reviewed** 88:9 | 50:9,13,24 | 280:23 284:24 | 143:1,7 144:1 |
| 105:20 113:2 | 55:1 65:24 | 285:14,15 | 144:14 273:17 |
| 113:14 129:4 | 66:4 68:6 73:4 | 296:18 298:17 | **risk** 327:18 |
| 130:4 136:8 | 73:20 74:8,9 | 300:22 305:18 | 350:18,20 |
| 142:1,13,14 | 74:14 76:3 | 307:3,21 | **risks** 346:4,23 |
| 152:9 153:21 | 79:4 80:14,18 | 309:21,23 | **road** 1:16 4:11 |
| 161:13 165:10 | 80:20 81:22 | 311:5 312:8 | **robert** 282:21 |
| 171:13 172:1 | 87:1 88:1 | 313:12,16 | **robustness** |
| 230:21 240:22 | 89:19 95:11 | 314:10 315:16 | 257:4 |
| 256:16 287:22 | 97:23 98:10,14 | 315:19 318:18 | **rochelle** 15:11 |
| 365:21 368:9 | 99:16 100:4 | 322:6 323:2,7 | 27:1,3,10,15 |

CONFIDENTIAL

**[rochelle - school]**                                                    Page 67

103:14 381:22
**role** 30:7,8,13
  30:17 33:15
  41:15 43:21,23
  79:8 82:20
  87:14 95:22
  111:21 123:21
  129:7 259:5
  288:21 363:23
**roles** 29:19
  38:6 98:18
**room** 74:23
**rooting** 80:20
  80:21,23 81:22
**roughly** 38:16
**routine** 135:13
  325:7 327:15
**row** 363:7
**rowley** 4:4
  352:21
**rowley.rice** 4:7
**rubin** 76:8
  77:11 78:3
**rubric** 290:20
  379:14
**rules** 15:19
  26:11 159:16
  160:2,6,15,24
  161:18 338:16
  340:20
**run** 239:2
  373:22
**running** 239:3

**rural** 231:21

**s**

**s** 3:16,17 4:11
  5:4 7:11 8:2
  9:2 10:2
  291:16,22
  293:11,19
  295:20 296:22
  299:17 385:22
  387:10
**safe** 394:3
**safety** 35:20,22
  62:3
**salient** 59:20
  176:7 381:23
**sample** 241:21
  245:15 257:4
  376:22 380:14
  380:24
**sattan** 6:11
  12:12
**saturation**
  70:23 149:15
  186:14
**saw** 268:18
  375:24
**saying** 16:21
  47:12,14 50:22
  51:3 69:14
  72:10 122:22
  128:6 165:21
  168:21 190:11
  216:7,9 218:3

251:5 336:21
337:2 338:3
383:12
**says** 32:9 90:20
  90:24 91:21
  93:8 123:3
  201:21 204:16
  303:6 312:20
  333:20 336:16
  376:19 391:24
**scale** 71:3
  151:4
**scarce** 237:21
**scene** 26:10
**scheduling**
  46:7
**scholar** 101:22
  102:14 120:22
  286:24 290:5
  301:22 308:3
**scholarly** 291:2
  301:21
**scholars** 201:23
  204:17
**scholarship**
  87:17,24 88:4
  88:5 89:13,18
  208:15 229:19
  290:15
**school** 9:14
  15:6 19:15
  21:15,18 26:6
  29:24 30:1
  32:11 33:16,19

37:23 38:2
42:19 43:10
46:23,23 47:18
48:1,2 50:17
50:21 53:4
54:3 56:15
58:19,24 59:15
59:16 61:7,8
61:19,24 62:1
62:9 63:4,10
63:11 64:3
65:20 66:19,21
67:18 68:21,24
69:18,19,20
71:6,23 79:13
80:8 82:23
83:6 86:24
94:19 99:10
102:2 103:18
104:10,20
106:3,8 107:8
107:8,11,23
108:6,13,23
113:22 115:7
115:15,22,23
116:3,19,20
117:2,3 118:10
118:18,22,23
119:1,1,5,22
120:4 121:8,9
121:16,16
123:10,11,11
123:16 124:8
125:9,9,18

CONFIDENTIAL

**[school - schools]**                                                    Page 68

| | | | |
|---|---|---|---|
| 126:1,3 127:13 | 168:9,16 169:5 | 251:18,19,20 | 381:23 386:23 |
| 127:13,20 | 172:15 175:5 | 255:17 256:5 | 387:8 |
| 128:16,23 | 178:9,11,11 | 256:10,11,15 | **school's**   324:7 |
| 129:17,23,24 | 179:1 180:20 | 256:21,22 | **schools**   7:23 |
| 130:5,12,21 | 180:22 181:22 | 257:9,17,19,19 | 10:7 23:11,19 |
| 131:9 133:22 | 181:23,24,24 | 259:5 260:8,13 | 24:9 25:21,22 |
| 135:19 136:5 | 184:16,19,21 | 272:8 274:10 | 26:21,23 27:12 |
| 136:15 137:10 | 184:22,22 | 277:17 278:13 | 27:13,21 41:5 |
| 137:18 138:3 | 186:10,12 | 280:5,14,21 | 41:13 42:7,14 |
| 138:14,15,15 | 191:1,1,2,23 | 282:1 288:16 | 43:5 47:18,19 |
| 138:20,22 | 192:5 202:18 | 289:12 315:18 | 47:21 48:6,15 |
| 139:22 142:6 | 202:23 203:4,7 | 315:23 316:11 | 48:15,16,16 |
| 142:23 143:8 | 204:7,10,17,19 | 316:12,13 | 53:13 55:23 |
| 143:20,21 | 205:9,12 207:2 | 319:4,14,19 | 57:7,12 59:3 |
| 145:17,18 | 207:3,14,16,18 | 320:19,20 | 61:2,24 64:10 |
| 146:1 147:4,5 | 209:22 210:14 | 321:5 322:15 | 65:18 70:6 |
| 147:8,12,14,15 | 211:5,16 212:1 | 323:17,19 | 71:4 72:4,8 |
| 147:24 148:1,3 | 212:1,4,4,19 | 325:6,12 326:7 | 79:13 80:8 |
| 148:14,15 | 215:6 216:3 | 327:6,7,19 | 88:15 96:17 |
| 149:4,4,19,24 | 218:14 225:5 | 328:9,23 329:3 | 97:23 99:7,9 |
| 150:4 151:21 | 226:14 228:2,3 | 329:19,21,22 | 102:13 103:17 |
| 152:16,20 | 231:15 232:5 | 330:14,19,22 | 105:5 107:12 |
| 153:2,4,14,15 | 232:14 233:1,1 | 331:2 333:1 | 114:4 116:3 |
| 153:16,17,22 | 233:2,4,16,16 | 335:5 342:8,8 | 117:8 120:4 |
| 154:1 155:4,5 | 233:19 234:7 | 342:9,18 | 128:7 129:16 |
| 156:20 157:22 | 234:16,17,21 | 343:24 344:7,8 | 130:19,20,22 |
| 159:7,19,24 | 236:8,11,12,23 | 344:13,17,18 | 131:4 132:3 |
| 160:20 161:4 | 237:1,15 244:5 | 345:11 348:5 | 135:22 137:15 |
| 161:10,11 | 244:5,12 | 364:2,5,5,8 | 138:14,20 |
| 162:16,23 | 245:16,16,19 | 369:4,12 | 139:12 140:13 |
| 163:1,6,6,15 | 246:1,2 247:18 | 371:20 372:2 | 140:18,19 |
| 164:1,3,12,15 | 247:19 248:18 | 372:13 378:19 | 141:19 142:3 |
| 164:16 165:2,7 | 248:24 249:5 | 378:19 379:6 | 147:11 148:3 |
| 165:7 166:7,9 | 251:11,17,17 | 380:20 381:3 | 153:8 157:22 |

CONFIDENTIAL

**[schools - see]**                                                                Page 69

| | | | |
|---|---|---|---|
| 159:17 160:3,8 | **sciences** 33:16 | **second** 15:9 | 202:2,3 203:21 |
| 160:17 161:2 | **scientific** | 31:13 124:23 | 204:15,22,23 |
| 161:17 162:17 | 282:24 283:20 | 185:3 202:24 | 205:10,19 |
| 163:9,14,18 | 283:21 284:10 | 220:23 227:7 | 206:6 211:10 |
| 165:2 169:4 | 284:21 367:3,9 | 228:21 230:18 | 212:6,13 215:8 |
| 178:22 180:11 | 367:14 | 233:14 299:14 | 215:9,24 |
| 187:16 188:12 | **scientist** 285:21 | 308:16 334:1 | 220:17 221:5,7 |
| 190:1 216:3 | 367:15 | 335:10 389:2 | 221:9,10,14,16 |
| 228:8,9 231:24 | **scientists** | **seconds** 353:24 | 221:20 222:2 |
| 233:19 234:6 | 283:23 285:11 | **section** 201:16 | 223:15,18 |
| 240:19 241:22 | **scope** 78:22 | 271:4 276:7 | 224:11,11 |
| 243:24 244:1 | 102:9,16,24 | **sedran** 5:3 | 225:12 228:22 |
| 244:12 245:7 | 105:12 115:2,5 | **see** 21:22 33:3 | 230:1 231:9 |
| 245:12,19 | 115:12,19 | 51:10 71:5,8 | 232:2 248:12 |
| 248:21 249:24 | 119:14 132:15 | 72:8 74:10,14 | 258:13 267:5,6 |
| 251:22 256:10 | 138:10 144:9 | 75:1,19 84:15 | 271:3 272:5 |
| 274:10 276:15 | 144:17 156:1,3 | 90:20 91:21 | 281:21 283:10 |
| 277:17 280:7 | 156:8 167:16 | 92:6 93:7,14 | 291:15 296:20 |
| 287:5 289:12 | 169:14 171:7 | 93:17 94:11 | 297:2 298:5,14 |
| 319:21,24 | 183:17,18 | 95:4,4 101:5 | 300:12 302:16 |
| 320:7 321:16 | 217:17,22 | 106:7 107:7 | 303:1 304:19 |
| 321:18 322:4 | 288:17 367:20 | 112:8,15 113:9 | 304:23,24 |
| 322:10,24 | **screen** 74:11,14 | 113:12 118:15 | 305:16,23 |
| 323:6,17,19 | 75:6 93:6 | 129:6,12,20 | 306:7 310:24 |
| 329:3 335:1 | 304:14 | 130:8 133:17 | 311:13 312:2 |
| 342:5 344:13 | **scrolling** | 135:16 137:3 | 314:3 315:3,8 |
| 378:20 380:20 | 272:13 277:24 | 139:10,16 | 316:15 317:12 |
| 381:3,8 391:7 | 278:15 279:9 | 143:3 145:11 | 331:21 332:21 |
| 391:16 | 280:24 | 145:20 149:20 | 333:2,3,4,15,21 |
| **science** 9:21 | **sealing** 12:4 | 151:23 159:21 | 333:24 335:13 |
| 35:12,14 306:6 | **search** 76:11 | 162:18 172:11 | 336:5,8,12 |
| 333:8,10 | 102:13 301:21 | 174:12 179:5 | 337:22 348:14 |
| 389:19 390:4 | 308:3 | 185:9,10 | 354:23 358:14 |
| 390:22 | | 197:21 201:20 | 361:21 371:9 |

CONFIDENTIAL

**[see - show]**                                                    Page 70

384:23 387:19
387:22 391:17
**seeing** 49:7,11
  52:14,18,19
  66:11 80:8
  89:11 90:18
  96:1 103:17
  104:20 107:10
  210:11 251:9
  251:10,12
  274:9 332:7
  334:23 380:17
**seek** 186:20
**seeking** 186:6
  187:24 190:16
  324:17 371:13
  371:15 373:4
**seeks** 187:9
**seem** 165:24
  169:7 193:5
  203:9
**seemed** 176:7
  287:7 316:3
**seems** 94:21
  97:14 213:4
  287:18 318:6
  320:5 380:14
**seen** 130:20
  269:22 271:6
  271:12,13
  334:21 361:9
  386:1 387:12
  389:4 390:6

**sees** 73:17
**segment** 374:4
**selection** 44:9
**selective** 316:3
  317:12
**selectivity**
  316:19 318:7
  318:10,22
**self** 72:15,15
  350:24
**selling** 268:8
**semesters**
  38:14
**send** 354:1
  361:11,14
  392:8
**sending** 353:16
**sense** 17:5 55:8
  149:18 153:24
  345:21 346:21
  349:20 350:9
**sent** 362:3
**sentence** 99:19
  99:21 201:21
  203:21 205:14
  205:23 206:5
  212:6 215:18
  215:20 336:1
**sentences** 347:3
**separate** 343:7
  379:8
**separated**
  215:5 225:4
  226:13

**september** 1:9
  12:14 266:8
  395:11
**series** 209:23
**serious** 178:9
  178:21
**seriously** 52:23
**serve** 28:24
  129:18 322:22
  363:9
**service** 231:16
**services** 28:21
  129:19 139:15
  141:22 142:19
  142:22 143:2
  143:16 144:2
  144:15 145:1
  156:13,19,24
  157:9,16 282:4
**serving** 125:18
**session** 38:15
  38:18,20 39:2
  39:16,23 40:1
  40:4
**set** 23:3 78:5
  91:5 169:11
  210:20 318:8
  318:13 349:3
**settings** 8:16
  157:24 158:4
  167:10 168:8
  168:23 219:13
  219:24 221:4
  225:2 226:11

283:3 284:13
284:24 366:1
**several** 47:16
  134:18 313:10
  314:7 315:4
  369:16
**shaming**
  116:17 145:15
  146:11,20
**shape** 319:20
**shaping** 116:17
  145:16
**share** 56:21
  67:8,15 93:23
  329:7,10
  339:15
**she'll** 361:14
**shed** 128:15
  245:8
**sheet** 8:22
  331:14,19
  342:10,11
  343:16 396:7,9
  396:12,15
  398:6
**sheets** 332:3
**shoot** 196:5
**short** 19:3,5
  40:9 168:21
  351:8 382:15
**shorts** 271:22
  271:23
**show** 49:21
  157:21 336:15

**[show - snapchat]**

345:19 372:1

**showed** 342:7

**showing** 107:15

**shows** 65:7
69:17 105:21
131:12 343:17

**siculus** 3:13 6:7

**side** 78:4 80:20
80:22,23 271:7

**sign** 396:8

**signature**
395:10

**significance**
380:10

**significant**
259:22 288:7

**signing** 396:10

**similar** 246:5
250:7 299:8

**similarities**
169:4

**similarly** 74:13
152:14 174:9

**simple** 377:21

**sindermann**
302:18 308:20
384:11,24

**single** 62:12
64:13,18 67:6
71:17 212:18
255:11 257:10
291:9 369:20
371:19

**sir** 56:12 81:10
151:13 181:2
220:12 226:23
247:2 253:22
254:10 272:17
325:17 346:17
347:5 360:21

**sit** 290:1,2
378:4

**sites** 163:18
379:1

**sits** 302:6

**sitting** 63:1
66:1 137:24
143:6 147:3
157:5 224:5,9
238:12 276:3
307:21 312:4
319:2 341:8

**situations**
48:23 51:9

**six** 34:5,6,9
49:9 65:17
103:12 119:3
128:22 129:24
130:6,13
131:18 133:21
134:2,7,13,17
135:2 136:3,9
136:15,17,23
137:10,18
138:3,8,21
139:2,4,21
140:1,9 141:2

141:14 142:11
142:16,23
143:3,7,11,13
143:16 144:13
145:1 146:1,6
146:12,16,21
147:7 148:9,17
149:2,8,9,24
150:3 151:21
152:3,10,16,21
153:3 154:8
155:4,15,24
156:6,19 157:1
157:9 158:12
158:16 159:6
160:5,10,19
161:8,24 162:3
162:23 163:1
164:11,16,20
164:23 165:14
166:6,9,13
167:15 168:9
202:17,23
203:4,7 204:6
204:10 205:9
205:11 207:14
207:16,18
211:5 234:17
245:14 315:18
316:7 319:4
346:16 393:11
393:20

**size** 241:21
245:15 257:4

376:22 380:14
380:24

**skalet** 2:3

**skim** 226:4
228:21

**skimmed** 18:1
18:5 101:7
104:7 173:4
287:7

**skimming**
348:13

**sleep** 53:4 64:2
66:14 240:1
346:9

**sleeping** 351:2

**smartphone**
302:24

**snap** 4:8 13:20
352:22 355:24
356:4 393:12

**snapchat**
169:23 170:7
170:20 171:11
172:7 183:3
193:3 268:24
269:2 350:5
353:2,7,13,24
354:8,12,17
355:3,11,13,17
356:22 357:3,7
357:10,13,19
358:8,11,12,18
375:1 393:21

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **snapchat's** 269:5,11 | 144:4 145:13 147:18 149:15 | 284:11,22 287:1,4,12 | 366:13,20,21 367:4,10,22 |
| **social** 1:3 8:23 9:14,17,22 | 150:21 154:3 159:16 160:6 | 288:11 289:1,2 289:12,18 | 369:11 371:16 372:8 373:5,6 |
| 12:19 21:23 | 160:15,24 | 291:17 296:23 | 379:4 380:19 |
| 30:14,19 34:13 | 169:19,21 | 299:18 306:3 | 386:22 387:7 |
| 35:3,6 43:3,18 | 170:1,5,8,15,19 | 319:13 320:5 | 388:13,23 |
| 47:3 50:24 | 170:22 171:1,7 | 320:13,23 | 389:20 |
| 51:15,18 52:9 | 171:14,17 | 321:14 323:12 | **socially** 273:20 |
| 52:24 53:1,5,7 | 172:2,19 | 324:13,15,19 | **society** 322:5 |
| 53:8,9,11 | 173:12 174:6 | 324:19 325:16 | 323:1 |
| 54:10,22 55:8 | 174:13,14 | 325:21 326:6 | **sold** 273:7 |
| 56:16 57:11 | 176:20,21 | 326:19,23 | **sole** 256:13 |
| 58:9 59:4 | 177:10,11,14 | 327:8,10 | 319:13,16 |
| 62:14 63:3 | 178:5 183:1,21 | 328:10,17,24 | **somebody** 56:3 |
| 65:10 66:17 | 185:6,13,20 | 329:4,8,13,15 | 236:24 237:1 |
| 67:4 69:7,11 | 186:2,11,14 | 329:18,21,23 | 268:19,19 |
| 69:15 70:23,24 | 187:13,15,19 | 330:3,7 331:4 | 340:11 364:22 |
| 72:18 73:11 | 188:13,14 | 334:10 335:5 | **sorry** 41:10 |
| 78:20 79:1,14 | 190:14 191:7 | 335:14,23 | 68:11 90:17 |
| 80:10 91:24 | 191:19 193:2 | 336:9,19,22 | 99:17 114:9,21 |
| 92:10 93:10 | 193:12,16 | 337:6,18 339:2 | 115:9 122:1 |
| 94:8,24 95:9 | 212:3 231:24 | 339:14,24 | 132:14 195:15 |
| 96:5 102:12 | 232:1 234:5 | 340:8,22 | 203:19 215:16 |
| 105:4,22,23 | 237:24 239:21 | 341:17,24 | 220:9,23 |
| 115:1,21 116:8 | 239:22 240:2,2 | 342:12,18 | 258:19,20 |
| 116:14 117:23 | 244:11 245:21 | 344:16,21 | 266:18 299:23 |
| 118:12,17 | 245:21 251:14 | 346:3 347:21 | 300:8 305:4 |
| 119:7,14,17 | 256:20 272:9 | 348:5 349:8 | 335:16 339:18 |
| 120:6,10 121:1 | 273:9,21 274:3 | 350:8,21,23 | **sort** 41:20 43:4 |
| 121:6 129:14 | 276:15 277:19 | 351:11 359:4 | 49:6 50:1,20 |
| 131:14 133:12 | 277:22 278:13 | 363:20 364:9 | 53:12 72:14 |
| 138:1,7,13 | 279:5 280:5 | 364:19 365:6 | 103:23 104:18 |
| 140:15 141:18 | 282:7 283:1 | 365:10,16 | 105:7 107:9,13 |

CONFIDENTIAL

**[sort - spoke]**                                                      Page 73

| | | | |
|---|---|---|---|
| 107:18 115:2 | **space**  396:6 | 155:5,24 156:6 | 145:23 148:17 |
| 127:18 180:17 | **spalding**  3:16 | 158:13,15 | 151:19 159:7 |
| 180:24 184:13 | **spam**  340:16 | 159:6 160:5,10 | 165:15 169:22 |
| 186:14 234:24 | **span**  58:16 | 160:19 162:3 | 170:11 171:21 |
| 237:3 268:16 | 133:13 273:18 | 163:1 164:2,5 | 172:6 176:9 |
| 274:1 278:4,8 | **speak**  16:22 | 164:15,23 | 187:6 206:22 |
| 279:14 323:14 | 19:11 20:4 | 165:16 166:9 | 275:1,14 290:3 |
| 327:12 342:22 | 170:18 253:15 | 166:13 167:15 | 313:8 365:11 |
| 348:12 351:2 | 263:14 281:6 | 167:22 168:9 | 366:15 |
| 362:3 371:5,12 | **speaking** | 168:16,20 | **specifics**  131:3 |
| 372:1,4 | 192:21 242:19 | 169:11 172:3 | 131:6 182:9,17 |
| **sorts**  48:15 | 277:16 | 172:11 173:15 | 245:7 |
| 108:23 188:11 | **special**  23:18 | 179:17 181:10 | **speculate** |
| **sought**  357:17 | **specialists** | 182:3,13 | 267:13 268:17 |
| 358:2,6,10 | 22:14 | 184:10 188:8 | 341:3 354:20 |
| **sound**  195:2 | **specific**  23:18 | 190:10 191:16 | 362:15 370:23 |
| **sounds**  189:14 | 26:17 32:16 | 202:23 204:10 | **speculation** |
| 361:2 | 56:14 59:2,3 | 205:9,11 | 375:22 |
| **source**  102:5 | 63:2 71:24 | 217:14,14 | **speech**  340:15 |
| 159:18 160:18 | 72:10 78:12,15 | 232:17 236:16 | **spend**  39:24 |
| 161:4 175:15 | 104:9 106:10 | 249:23,24 | 181:17 355:12 |
| 316:16 323:13 | 113:21 119:7 | 250:1,9,10,16 | 355:18 |
| **sources**  82:17 | 130:2 131:19 | 266:19 276:24 | **spending** |
| 82:18,24 83:2 | 134:7,13 135:3 | 287:24 312:2 | 259:13 |
| 112:22,24 | 135:9 136:24 | 315:23 317:13 | **spends**  245:10 |
| 113:14,17 | 137:16 138:3 | 332:4 354:7 | **spent**  38:9 |
| 134:10 157:19 | 139:21 140:2,5 | 366:21 369:8 | 39:17 57:11 |
| 167:20 228:14 | 140:9 141:15 | 370:4 381:10 | 194:15 238:22 |
| 233:9 234:11 | 143:7 146:1,6 | **specifically** | 360:17 381:2 |
| **south**  4:5 15:7 | 146:12,16 | 24:24 38:2 | **split**  351:3 |
| 25:12,14 26:20 | 147:7 149:8 | 43:14 114:23 | **spoke**  227:7 |
| 26:22 | 150:4 152:3,10 | 136:18 138:21 | 241:9 243:17 |
| **southeast**  3:17 | 152:17,20 | 141:1 142:10 | 244:18 245:5 |
| | 153:3 154:8 | 143:14 144:18 | 246:11,21 |

CONFIDENTIAL

247:5 266:21

**spread**  372:23

**sprinkling** 212:10

**square**  3:9

**staff**  22:20 52:3 60:1 149:17 150:24 152:7 152:10 153:2 155:3 159:19 161:5 372:6,6 372:10

**staffing**  316:13

**stages**  191:20

**stance**  226:21

**stand**  65:22 110:15 179:7 283:12

**standard** 208:19 223:6 380:6

**standards** 102:7 113:3,19 212:24

**standing**  53:11 53:11 73:20 74:12 251:14

**stands**  253:13 253:14 261:12 261:14

**start**  17:2 34:6 361:17 379:17

**started**  53:8 90:1,2 208:7

381:21,24 383:11

**starting**  87:4 87:13

**starts**  201:17 264:16 265:16

**state**  14:1,4 55:17 396:5

**stated**  70:4 81:20 139:1

**statement** 49:16 182:24 189:22 206:19 212:15 213:15 272:19 283:13 319:10

**states**  1:1 12:22 40:21 41:1

**statistical** 321:2,20 380:9

**statistically** 288:6

**statistician** 283:15 285:20 321:23 380:8 381:18

**statisticians** 283:22 285:11

**statistics**  35:16 35:18 284:16

**status**  240:2 273:21

**stay**  186:8 266:4 326:20

**stemming** 325:16

**stenographic** 13:3

**steps**  378:14,16 379:9,11

**stipulated**  12:2

**stipulations** 11:15

**stool**  345:10

**stop**  168:20 266:9

**stopped**  310:4

**stopping** 193:19

**stories**  56:22 255:7,11 268:11,13 354:17,21

**story**  52:17 57:2 255:11 355:2,3,6

**strain**  62:20 149:16 162:15 164:18,22 165:17 166:15 192:1 234:8

**strains**  321:4

**strand**  228:6

**strands**  228:10

**strategies** 94:20

**strategy**  216:14

**streak**  353:10 353:16,18,23

**streaks**  353:6 354:5

**stream**  45:22 51:11

**streams**  107:18

**street**  2:4 3:5 5:5,12,18

**strengthen** 61:10 71:7 213:23

**stress**  251:10

**strictly**  39:20

**strike**  15:14 87:10 241:6 244:15 246:8 247:24

**strong**  167:9

**stronger** 167:10 217:7

**structural** 174:6 178:20

**structure** 310:21

**structured** 125:19 127:7 127:16

**struggles** 255:23 282:10

**struggling**  29:6 122:16 208:13 211:20 236:24

CONFIDENTIAL

**[student - submit]**                                        Page 75

| | | | |
|---|---|---|---|
| **student** 48:19 | 55:17 58:4,15 | 239:22 244:10 | 293:12 294:9 |
| 53:14 54:7 | 59:24,24 60:1 | 248:20 251:13 | 294:12,15,24 |
| 55:22 65:10 | 60:6,8,9,10,16 | 257:16 273:18 | 295:7,16,22 |
| 69:1 73:17 | 63:16,18,21 | 277:19 282:9 | 377:9 378:9 |
| 74:13 75:2 | 64:1,5 66:13 | 283:3 284:12 | **study** 9:7 90:16 |
| 80:10 112:14 | 67:3 69:6,8,12 | 284:23 320:4 | 90:23 91:3,6 |
| 116:2 117:9 | 72:12,13,14 | 320:10 321:5 | 123:20 124:5 |
| 119:22 120:13 | 75:17,22 78:20 | 322:16,23 | 127:2 199:2 |
| 120:24 129:15 | 93:12 95:3,10 | 323:7,11 | 200:10 208:20 |
| 133:12 139:13 | 104:2 105:3,15 | 324:16,22 | 209:15 212:12 |
| 139:21 140:1,8 | 105:23 114:4 | 329:14 334:11 | 212:18,24 |
| 140:16 141:1 | 115:1,20 116:9 | 335:6,14,23 | 213:10 214:5,6 |
| 141:12,19 | 116:15 118:17 | 336:22 337:14 | 214:9 215:4 |
| 156:13,18,24 | 119:6 120:3 | 338:10 340:7 | 216:11,12 |
| 157:8,15 | 121:7,19 | 340:20,21 | 217:9 225:3,19 |
| 175:20 176:23 | 122:11 131:13 | 342:21 343:4 | 226:11 227:16 |
| 183:6 192:11 | 138:13 140:14 | 343:14 346:19 | 249:5 257:22 |
| 192:12 193:1 | 140:20 141:17 | 347:20 348:5 | 291:9,10,10 |
| 241:23 245:21 | 144:4 145:13 | 349:2,19 350:2 | 302:23 384:1,8 |
| 256:20 275:17 | 145:24 146:5 | 350:6,19 | **studying** 216:4 |
| 282:11 287:2 | 147:17 150:20 | 369:21 370:12 | **stuff** 41:23 |
| 288:11 324:6 | 151:2 154:2 | 371:7,15,20 | 49:17,17 60:13 |
| 327:9 329:16 | 159:19 161:5 | 372:12,18 | 66:16 69:17 |
| 329:17 338:14 | 175:21 176:2 | 373:5 377:5 | 177:6 235:8 |
| 344:3 349:8 | 177:8,12 180:1 | 378:2,7,10 | 240:3 264:12 |
| **student's** 213:5 | 180:18 181:6 | **studies** 8:14,18 | 265:13 281:18 |
| **students** 8:24 | 181:17,20 | 49:21 113:2 | **subject** 238:5 |
| 24:2 25:17,20 | 186:13,15,18 | 123:23 200:19 | 396:10 |
| 25:24 27:8,11 | 187:4,22,23,23 | 201:18 214:3 | **subjective** |
| 27:16 32:17 | 190:14 191:9 | 219:1 223:8 | 260:22 |
| 43:4 47:12,15 | 193:16 200:9 | 233:23 237:8 | **submission** |
| 47:24 49:2,22 | 207:4 212:2,22 | 274:22,24 | 199:12 |
| 52:4,19,23 | 234:4 237:23 | 283:18 285:2 | **submit** 243:12 |
| 53:3,10 54:17 | 238:24,24 | 291:20 292:13 | |

CONFIDENTIAL

**[submitted - sure]**                                                    Page 76

| submitted | suite  2:4,11 | 94:17 95:8 | supposition |
|---|---|---|---|
| 88:11,21 | 3:18 4:18 5:5 | 96:4 102:3 | 132:1,4,11 |
| 109:20,22 | 5:12 | 231:19 257:23 | 135:3 140:23 |
| 111:5,8 208:23 | **sum**  346:14 | 328:16 358:22 | 154:24 155:11 |
| 227:20 369:1 | **summer**  76:20 | 358:24 | 155:12 161:22 |
| submitting | 76:21,22 77:7 | supervision | 166:12,21 |
| 380:12 | superintende... | 395:21 | 167:1,4,11 |
| subscribed | 7:21 47:20 | **support**  11:2 | **sure**  21:5 24:9 |
| 398:10 | 89:5 237:14 | 23:13 29:5,7 | 26:4,11 28:19 |
| subscriptions | 257:24 | 29:10 30:9 | 31:14 38:10 |
| 271:19 | superintendent | 41:17 43:24 | 41:23 44:14 |
| substance | 15:7,12 25:11 | 48:3 91:14 | 45:5,21 50:5 |
| 218:13 398:6 | 25:14,24 26:15 | 122:12 126:8 | 60:24 76:14 |
| substantial | 26:24 27:3,15 | 156:13,18,24 | 77:22 83:18 |
| 123:9 | 27:23 29:16 | 157:9,16 | 86:14,20 91:19 |
| substantially | 40:12,16 43:13 | 197:24 199:6 | 94:4 95:15 |
| 325:19 | 44:5 88:13 | 209:20 225:2 | 115:11 118:7 |
| suburban | 90:15,22 91:3 | 242:14 252:3 | 125:17 126:20 |
| 231:20 | 99:3,6 103:13 | 283:6 315:5 | 131:16 139:8 |
| successes | 124:20,22 | supporting | 150:14 154:21 |
| 329:14,17 | 127:22 142:2 | 23:1,20 29:24 | 167:6 185:3 |
| **suffered**  278:13 | 218:18 231:17 | 43:23 47:18 | 188:22 196:1 |
| **suffices**  318:21 | 240:23 258:18 | 59:15 123:16 | 200:4 201:14 |
| sufficient | 258:22 259:4 | 275:10 276:7 | 205:5 210:5 |
| 380:15 | 381:22 | **supports**  198:4 | 213:13 216:5 |
| **suggest**  30:8 | superintende... | 225:16,17 | 219:7,18 |
| 163:17 168:24 | 218:11 | 226:24 283:1 | 222:17,22 |
| suggested | superintende... | 284:10,21 | 224:10,17 |
| 287:11,15 | 21:17,21 23:9 | **suppose**  24:23 | 242:16 257:8 |
| suggesting | 23:15,16 29:1 | 44:22 46:16 | 259:13 261:9 |
| 49:19 163:22 | 29:10 32:18 | 70:18 74:24 | 263:23 267:9 |
| **suggests**  158:3 | 48:2 62:18 | 125:23 148:8 | 273:1 277:15 |
| 163:12 229:18 | 88:8 91:12 | 369:5 | 279:3 282:19 |
|  | 92:4 93:9 94:7 |  | 286:23 297:8 |

CONFIDENTIAL

**[sure - tarrant]**

298:13 300:5
313:20 322:8
323:3 332:9,11
332:19 335:3
339:8 340:5
341:9,19
346:19 360:3,5
360:8 362:13
362:14 367:15
369:3 370:20
374:22 375:9
375:19 377:14
377:20 379:18
381:16 382:16
392:10
**surgeon** 49:15
104:15 251:8
**surprise** 330:10
330:12,18
354:9
**surprising**
132:5 301:10
**surrounding**
99:8
**survey** 127:8
128:2,6
**surveys** 113:2
**survive** 236:2
**sustained**
248:14
**sustaining**
63:22
**sw** 2:16

**swear** 13:5
**sweeping** 252:3
**switch** 122:2
**switching**
261:3
**sworn** 13:8
395:5 398:10
**syllabi** 38:22
**system** 24:6
27:20 330:14
353:11
**systematic**
203:15,24
296:24 299:19
305:14
**systematically**
238:4
**systemic** 91:8
231:23
**systems** 233:13
328:9,23

**t**

**t** 7:11 8:2 9:2
10:2 389:3,3
397:1
**tab** 20:15 81:1
84:9 88:24
89:9 96:12
100:9 109:9
111:2 112:5
200:12 294:20
303:15 331:10
333:23

**table** 326:11
**take** 17:14
44:20,23 45:3
45:5 88:24
90:19 91:1
93:6 96:12
100:9 109:9
112:6,23 114:9
121:23 122:3
129:10 130:10
132:18 135:11
145:10 146:9
147:3 149:13
152:24 155:13
156:9 174:10
182:6 194:11
200:11 201:14
219:18 223:13
225:23 228:12
231:7 242:12
243:3 248:2
250:14 264:19
272:3 289:10
291:12 292:10
294:20 296:18
302:10 303:15
304:21 305:18
328:4 331:10
332:2,10
333:23 334:18
335:8 347:6
351:14 353:5
**taken** 1:13
31:20 66:22

82:9 133:1
180:13 194:3
230:11 286:11
351:24 359:17
382:23 393:8
**takes** 224:2
353:24 354:3
**talk** 42:24 48:1
70:16 139:1
149:8 171:9
174:20 181:12
190:6 202:10
214:13 243:23
277:21 278:6
327:23 356:24
**talked** 47:22
73:4 77:20
196:21 227:18
235:15 237:14
238:17 245:8
374:23 376:9
**talking** 54:20
65:18 73:1
192:22,24
193:10,11
208:6 236:19
257:5 277:11
340:17
**talks** 245:13
**tarrant** 9:20
291:17,23
293:11,19
295:21 296:11
308:17 388:16

CONFIDENTIAL

**[tarrant - testimony]**  Page 78

| | | | |
|---|---|---|---|
| 389:3,13 | **teachers**  14:15 | 286:13 305:3,7 | 386:13 |
| **task**  66:22 | 14:17 53:20 | 306:23 351:18 | **template** |
| 79:18,22 80:5 | 58:14 60:7 | 352:2 359:12 | 379:14 381:17 |
| 115:3,5 125:6 | 63:23 69:14 | 359:19 374:3,9 | **temporal**  188:5 |
| 130:9 132:16 | 72:13 74:1,18 | 382:18 383:1 | **ten**  23:14 98:6 |
| 134:3 137:4,22 | 74:22 75:17,21 | 393:2,10,19 | 295:5,15 |
| 138:10 139:6 | 93:10 128:8,8 | **technologist** | 393:15 394:1 |
| 140:6 143:4 | 151:1 251:21 | 34:22 | **tend**  75:21 |
| 144:20 146:8 | 282:10 327:21 | **technology** | **tenth**  3:5 |
| 146:23 149:11 | 328:1 371:22 | 7:22 22:4,14 | **tenure**  15:3,8 |
| 150:6 152:5,23 | 372:19 382:4,7 | 34:20 96:16 | **terms**  66:13 |
| 154:10 156:1,3 | **teaching**  7:23 | 97:22 98:3,13 | 72:11 80:10,22 |
| 156:8 157:4 | 21:12 22:20 | 99:15 100:3 | 146:17 200:8 |
| 159:10 160:12 | 23:2,6,22 | **teenagers** | 210:15 281:14 |
| 162:5 164:7 | 32:23 33:8,12 | 357:8,11,13 | **territory** |
| 166:1 167:16 | 33:17 38:9,20 | **teens**  71:1 | 250:19 |
| 169:8 203:10 | 39:7,10,21 | 177:20 273:11 | **test**  243:4,9 |
| 204:13 205:16 | 62:7 66:24 | **television** | **testable**  243:8 |
| 211:11 258:14 | 74:20 96:17 | 336:15 345:18 | **testified**  13:9 |
| 289:10 322:1 | 97:22 251:22 | **tell**  48:21 58:24 | 14:22 15:2 |
| 367:1 | 257:15 323:7 | 68:11 69:4 | 181:2 |
| **tasks**  351:5 | **teams**  231:20 | 70:8 71:16 | **testify**  14:19 |
| **taught**  30:21 | 249:7 | 74:8 194:23 | 75:14 275:7 |
| 33:21 39:7,11 | **tech**  305:8 | 238:13 240:12 | 356:15 357:22 |
| 369:10 | 306:24 | 241:8,11 247:4 | 368:18 |
| **teach**  47:24 | **technical** | 250:15 252:20 | **testifying** |
| 239:1 369:3,12 | 262:13,16 | 253:5 275:2,20 | 104:11 249:22 |
| **teacher**  31:3,7 | **technician**  6:12 | 303:9 313:5 | 360:3 |
| 31:11 32:4 | 12:10 31:12,15 | 326:14 | **testimonies** |
| 33:5,23 73:17 | 31:22 82:3,11 | **telling**  62:19 | 68:19 |
| 74:12 122:10 | 132:19 133:3 | 68:20 70:19 | **testimony**  7:4 |
| 133:15,20 | 193:21 194:5 | **tells**  335:14 | 16:1 49:10 |
| 134:6,8 135:2 | 223:21,22 | **telzer**  305:22 | 57:24 59:9 |
| 343:17 369:22 | 230:5,13 286:5 | 307:18 385:23 | 64:23 68:19 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 69:24 71:22 | **tgraden** 4:13 | 105:7 117:4 | 144:11,19 |
| 72:9 80:1 85:7 | **thank** 17:19 | 124:18 125:11 | 145:5 146:7,22 |
| 104:17 108:5 | 70:2 86:21 | 176:6 187:16 | 149:10 150:5 |
| 118:22 121:20 | 96:23 111:3 | 188:11,19 | 151:23 152:4 |
| 125:8 131:1,22 | 151:17 174:2 | 200:5 216:19 | 152:22 154:9 |
| 132:6 141:6,24 | 195:19 201:1 | 237:17 246:6 | 154:11 155:15 |
| 142:12,15 | 201:11 220:6 | 263:24 266:15 | 157:3 158:17 |
| 143:23 148:6 | 230:17 252:9 | 270:18 271:8 | 159:2,9 160:11 |
| 153:21 155:8 | 267:18 286:4 | 285:3,23 | 163:16 164:6 |
| 158:2 161:14 | 295:12 332:1 | 322:14 325:5,8 | 167:7,17 168:4 |
| 163:10 165:12 | 332:20 334:6 | 329:6 338:1 | 169:16 170:14 |
| 172:14,18,22 | 334:17 335:12 | 340:10,18 | 177:17,19 |
| 175:3 176:15 | 356:17 360:8 | 341:3 372:7,11 | 178:8 184:3,3 |
| 184:1 187:6 | 375:9 382:10 | 372:15 377:10 | 186:4 188:17 |
| 191:4,11,14,16 | 392:24 | **think** 15:5 18:6 | 190:8 191:13 |
| 191:17 207:7 | **thanks** 114:11 | 18:24 19:17,21 | 191:15,17 |
| 209:10 211:24 | 196:15 332:13 | 21:24 30:10 | 198:20 200:2 |
| 213:19 234:1 | 341:5 | 39:5,18 41:19 | 201:20 206:18 |
| 240:20 245:24 | **theme** 238:1 | 42:2,9,16 43:5 | 206:20 207:21 |
| 247:21 250:6 | **theoharris** | 53:17 61:5 | 211:12 213:3 |
| 252:17,24 | 91:10 | 68:2 71:20,21 | 213:20,21 |
| 254:4 256:18 | **thing** 22:1 | 76:8 77:2,17 | 216:6,21 218:9 |
| 272:23 277:17 | 49:12 94:14,15 | 77:19 79:10 | 218:15 219:5 |
| 279:4 310:8 | 95:18 104:16 | 80:22 85:24 | 223:2 224:18 |
| 313:14,18 | 226:3 268:6 | 88:17 90:12 | 225:12 226:3 |
| 339:6 356:4 | 270:16 277:5 | 92:23 96:2 | 227:3,4,4,12 |
| 367:21 393:5 | 277:12 282:12 | 97:10 109:1,6 | 228:23 229:9 |
| 395:7 | 343:22,23 | 111:13 114:6 | 229:12,16 |
| **texas** 5:13 | 372:4,20 | 114:12 116:5 | 230:22 232:16 |
| **text** 110:5,14 | 380:10 | 116:12,23 | 232:19 234:19 |
| 117:16 297:11 | **things** 26:8 | 120:16 124:14 | 236:17 239:7 |
| 306:14 361:15 | 46:12 50:7 | 132:7 134:2 | 239:12 243:7,8 |
| **texting** 44:15 | 58:7 60:19,21 | 137:21 139:5 | 243:9 245:1,9 |
| | 67:17 73:3,7 | 140:4 142:14 | 246:15 250:18 |

CONFIDENTIAL

**[think - time]**                                                    Page 80

| | | | |
|---|---|---|---|
| 251:23 254:24 | 347:13,13 | 93:8 95:7 | 38:9,11,12,14 |
| 260:17 262:23 | 348:9 349:13 | 97:24 201:21 | 38:15 39:16,19 |
| 263:5,16,19,20 | 350:3 351:7 | 202:5,14 | 39:22 40:9 |
| 264:11,14,16 | 353:13,20 | 203:11 246:16 | 46:2,4 48:13 |
| 265:9,15,17 | 354:7,19,21,24 | **threshold** | 57:11 58:20 |
| 267:4,8 268:20 | 356:6 357:12 | 380:6,22 | 61:24 62:20 |
| 270:13,15 | 361:18 362:10 | **thrift** 351:9 | 64:9 66:22 |
| 271:4,10,24 | 362:10,16 | **tiktok** 3:20,20 | 70:5,9 71:11 |
| 272:22 275:13 | 364:16,21,24 | 3:21 13:20 | 76:16 82:2,3 |
| 275:24 276:9 | 365:8,23 | 169:23 170:7 | 82:11 84:23 |
| 276:18,21 | 366:24 367:12 | 170:20 171:11 | 90:18 94:14 |
| 279:20 281:14 | 368:6,17 370:1 | 172:7 183:3 | 95:17 97:2 |
| 282:14 284:6 | 370:5,6 372:17 | 193:4 269:13 | 114:10 132:19 |
| 284:14 285:3 | 376:13 377:18 | 270:8 350:5 | 133:3 134:20 |
| 285:16,18 | 381:5,13,16 | 360:14,18 | 142:5 148:2 |
| 289:22 290:17 | **thinking** 30:1 | 361:5,9 362:20 | 153:19 155:21 |
| 292:9 293:13 | 43:24 114:13 | 363:3,7,15 | 163:8 175:21 |
| 293:15 296:1,7 | 171:21 176:2 | 364:3,13 365:3 | 177:18 180:21 |
| 297:6 299:4 | **thinks** 361:13 | 365:11,15 | 181:17 184:18 |
| 306:8,13,19 | **third** 19:6 | 366:1,5,9,15 | 188:3,9 192:2 |
| 308:15 309:12 | 125:4 135:13 | 367:5,11,23 | 193:21 194:5 |
| 309:22 311:17 | 201:21 233:21 | 369:17 370:4 | 194:15 196:13 |
| 313:9,20 | **thirty** 396:16 | 370:18 371:6 | 226:5 229:24 |
| 314:12 317:9 | **thought** 20:12 | 393:12,22 | 230:5,13 |
| 318:1,20 319:9 | 32:3 52:22 | **tiktok's** 269:17 | 233:20 237:20 |
| 320:3 321:24 | 107:6 114:10 | 269:23 270:2,5 | 237:20 239:15 |
| 322:10,18,18 | 170:5,6 254:15 | 365:22 | 241:24 245:10 |
| 323:10 326:20 | 347:17,23 | **time** 12:8,15 | 248:15 255:15 |
| 327:18 334:22 | 373:2 | 15:8,9 16:21 | 256:9 263:7 |
| 341:19,20,20 | **threat** 327:18 | 19:2,6 23:24 | 266:3,14 274:6 |
| 342:8,14,16 | **threatening** | 24:14 25:13,23 | 280:9 286:1,5 |
| 343:12,19 | 191:8 192:10 | 26:7,14 27:11 | 286:13 292:10 |
| 344:1,12 345:2 | **three** 18:24 | 30:20 31:2,6 | 324:2,2,3 |
| 345:3,20 | 19:8,9,9,21,24 | 31:15,22 32:4 | 325:23 332:8 |

CONFIDENTIAL

334:23 351:18 352:2,9 355:11 355:17 359:12 359:19 360:12 360:17 361:3 363:5 373:9,23 374:2 376:22 381:2,5,9,11 382:11,18 383:1 392:18 392:22 393:2

**times** 6:5 14:11 18:24 39:3 134:19 196:6 246:17 247:1 285:17 355:3,5 371:19

**tired** 53:14,16

**title** 14:5 22:10 221:8 314:9

**today** 13:19 15:22 16:4,9 16:12 17:21 18:14 20:9 63:1 67:9 106:14 137:24 143:6 147:4 148:11 154:13 155:18 157:5 158:20 163:23 167:13 168:4 170:18 171:9 224:5,10 238:12 252:16

286:19 290:1,2 312:4 319:2 352:15 358:17 360:4 376:8 378:4 386:2 387:13 389:5

**today's** 12:13 393:4

**together** 107:19 274:12 304:14 360:12

**told** 50:23 54:8 120:21 243:18 244:19 245:5 246:11,21 247:6 335:22

**toll** 129:13

**tolles** 4:4

**ton** 279:22

**took** 119:19 132:16 310:12

**tool** 94:9 95:2 96:6 310:23 314:14 335:15 335:20 338:21 338:23

**tools** 345:8

**topaz** 1:15 4:10

**topic** 102:23 172:21

**topics** 237:11 289:16 335:2 336:7 345:17 370:2

**topping** 296:21 299:16

**toss** 242:22

**total** 194:24 195:5 361:3

**totals** 85:13

**touch** 114:6 258:2 266:4

**toward** 79:19

**towards** 79:22 212:20

**track** 264:1 328:20

**tradeoffs** 156:14 157:18

**tradition** 124:3

**train** 47:23

**transcript** 395:18 396:17 396:19

**transcription** 398:4

**transcripts** 18:12 50:8

**transfer** 46:11

**transferability** 163:19 166:21 167:3,8 168:7 168:14 169:1

**transferable** 163:18 165:22

**transformative** 98:23

**transforms** 7:23 96:16 97:22

**traumatic** 320:17,19

**travel** 196:2,8

**travels** 394:4

**treatment** 305:12 357:18 358:7

**trend** 131:18

**trending** 336:7 345:17

**trends** 113:18 377:11,11 378:9

**trial** 6:12 12:8 14:23 112:1 223:21,21 305:3,7,7 306:23,23 368:10,14

**trials** 15:2,14

**triangulate** 107:10 210:9

**triangulated** 207:9

**triangulating** 213:9

**triangulation** 107:17 127:1 205:21 206:3 209:17,18 214:10 218:17

CONFIDENTIAL

**[triangulation - understanding]**                    Page 82

218:22 227:22 235:2 237:7
**triggered** 324:23
**trouble** 278:19
**true** 131:18 146:10 152:6 158:12 161:24 162:2 164:4,17 228:23 246:22 254:1 256:5 279:19 303:12 349:14 355:8 395:6
**trust** 63:12
**truthful** 16:1
**try** 16:23 43:24 61:10 70:13 123:24 210:2 226:4 265:10 266:22 318:8 321:13 350:14 353:13 377:20
**trying** 43:6 58:22 61:5,21 62:21 64:20 71:7 72:7 90:17 127:17 128:12 190:9 193:5 213:21 227:15 296:1 309:2 337:12 340:6

**tucson** 19:19
**turn** 139:8 145:9 149:12 159:13 162:10 178:14 185:1 196:16 202:11 231:8 295:9 315:1 387:17
**turning** 389:11
**twitter** 170:22 333:19
**two** 15:2 50:15 71:3 77:20 112:2 198:9,23 198:23 208:4 227:14 249:3 253:14 257:10 308:15 309:9 341:23 343:6 353:11 363:6 370:2
**tyler** 4:11 77:18
**tyler's** 77:18
**types** 48:17 142:4 201:22 202:5 213:12 214:11 241:22 256:10 378:21
**typically** 259:7 259:10 260:9 260:11,18,24
**typos** 383:13 392:8,22

**u**

**u.s.** 9:22 382:4 382:7 389:22
**ubiquitous** 344:16
**ugly** 189:19
**uh** 46:1 50:10 371:23 376:10
**ui** 261:12,14
**unable** 64:12
**unaware** 358:17
**unbiased** 80:13
**unclear** 17:7
**uncorraborati...** 313:3
**undeniable** 132:2 326:24
**under** 15:21 252:16 366:2,6 366:10 375:4 395:20
**underlie** 238:14
**underlying** 56:5 72:19
**understand** 13:23 15:21 16:8,17,18 17:8,11 42:12 42:21 44:1,3 44:11 48:10 50:6 57:15

59:6 70:13 72:5 73:14 79:8 80:2 84:21 94:5 103:3 115:6 118:6 121:2 144:5 146:24 169:24 174:23 176:8 177:4 179:18 182:12 184:6 213:14 216:19 218:4 247:9 252:15 252:18 257:3 273:4 279:1 281:8,18 284:15 289:9 317:18 353:22 377:19
**understanding** 16:2 30:6 57:4 76:14 102:1,11 106:2,9 115:6 127:20 134:6,8 135:7,19 136:2 159:11 162:6 164:7 166:2 167:18 169:9 170:19 175:16 177:3 180:15 204:13 205:17 215:2 216:10 216:15,16 217:10 223:4

CONFIDENTIAL

**[understanding - use]**                                    Page 83

| | | | |
|---|---|---|---|
| 225:21 231:23 | **unregulated** | 116:10,15 | 277:19 280:2,5 |
| 240:18 241:19 | 272:9 327:10 | 118:18 119:7 | 283:20 287:13 |
| 246:4 258:15 | 342:22 | 119:15,17 | 289:2,18 |
| 283:5,19 316:6 | **unsettled** | 120:6 121:6 | 296:23 299:18 |
| 316:22 317:2 | 180:23 | 122:23 127:6 | 301:4 302:24 |
| 353:10 | **unsupervised** | 129:14 131:14 | 306:3 307:7 |
| **understood** | 342:23 | 133:13 138:8 | 309:2 310:9,10 |
| 102:5 178:24 | **untangled** | 138:13 140:15 | 311:7 313:21 |
| **undertake** | 60:14 | 141:18 144:4 | 316:2 317:12 |
| 203:3,6 204:5 | **unwilling** 71:16 | 145:14 146:3,6 | 320:5,23 |
| **undertaken** | 241:10 357:1 | 147:18 150:20 | 323:12,24 |
| 207:17 217:19 | **update** 87:3 | 154:4 160:2 | 324:12,20 |
| **unfettered** 24:3 | **upset** 54:18 | 175:7,7 180:5 | 325:16 327:8 |
| 24:12 26:1 | **urban** 21:16,21 | 180:7 181:19 | 327:10 328:17 |
| 27:16 | 32:17 231:20 | 181:21 186:3 | 329:3,6,8,13,15 |
| **unfortunate** | **urged** 93:9 | 186:15 187:7 | 329:18,21,23 |
| 309:2 | **url** 300:13 | 187:11 188:13 | 330:3,7,20 |
| **unintended** | **usage** 342:20 | 188:14 190:13 | 332:23 333:8 |
| 30:3 41:20 | **usb** 370:13 | 190:22 191:19 | 333:12,19 |
| 161:20 | 371:8 | 191:22 193:1 | 336:9,22 337:6 |
| **union** 128:9 | **use** 7:22 9:22 | 193:16 197:6,7 | 339:24 340:8 |
| **unique** 119:7 | 24:22 26:16 | 204:17 208:9 | 342:1,18 343:1 |
| 119:21 120:11 | 28:1 43:3,10 | 208:23 209:14 | 343:10,21 |
| 365:15 | 43:14 46:19 | 209:18 212:3 | 344:4,9 345:1 |
| **unit** 193:24 | 47:3,6 48:19 | 213:10 227:21 | 345:13 346:5 |
| **united** 1:1 | 53:5 58:13 | 227:22 231:24 | 346:18 347:18 |
| 12:22 14:15 | 65:9 66:18 | 234:5 237:20 | 347:21 348:14 |
| 40:21 41:1 | 67:4 69:11,16 | 237:24 239:21 | 349:4,8 350:21 |
| **university** | 73:11 74:19 | 239:22 244:3 | 351:11 354:5 |
| 21:10,13 28:5 | 78:20 79:2 | 244:12 245:20 | 354:12 356:14 |
| **unmistakable** | 80:11 94:23 | 245:21 256:20 | 357:12,19 |
| 131:8 | 95:9 96:5,16 | 256:23 263:2 | 358:7,11 |
| **unquote** 146:2 | 97:22 105:3,23 | 265:24 266:1,3 | 363:14,20 |
| | 115:1,20 | 272:15 273:13 | 364:3,9 371:11 |

CONFIDENTIAL

**[use - videos]**                                                                    Page 84

371:16 373:5
376:4,6 379:4
382:4,7 389:21
**used** 44:12,15
44:17,20,23
45:3,4,6,9,16
45:20 46:3,6,8
46:11 73:8
112:18,22
120:22 126:13
177:2 199:5
202:6 206:23
260:17 286:24
289:5,20
293:18 296:11
297:6 306:11
306:19 307:14
308:8,23
310:22,23
314:14 318:23
335:15,20
339:3,15 340:2
375:14,18,20
377:24 396:20
**useful** 344:15
**user** 272:11
275:5,22 350:1
353:23 354:22
355:2 358:12
358:18 365:22
**users** 355:12,17
366:1,5,9
**uses** 43:19
191:6 330:14

337:18 343:6
345:4 346:7,14
347:8 348:4
377:3
**using** 42:18
48:7 49:2,23
50:23 74:9
91:3,10 101:21
102:14 168:15
238:5 301:21
308:3 310:15
310:21 342:11
342:22 344:2,5
345:8 349:2
351:1 355:12
372:1
**usually** 28:24
122:13 216:12
227:17 236:1
361:12
**utilize** 328:9,24
**ux** 262:9,11

**v**

**validate** 106:2
**validated**
346:20
**validation** 56:2
60:11 69:10
72:17 104:19
177:9 186:20
186:21 251:15
325:4 327:13
345:14,23

346:12 349:21
350:10
**valuable** 94:8
**value** 237:6
238:16
**variation** 27:20
**varied** 24:9
**varies** 39:5
40:5 257:20
**variety** 128:10
148:3 153:18
157:23,24
163:7 233:15
236:13 237:16
243:24 289:21
377:10 378:20
**various** 30:5
108:15 233:18
241:22 286:19
287:3 322:14
335:2
**vary** 42:17
127:18 237:19
260:22
**vast** 24:7
**vehicle** 329:9
**verbal** 16:14
**verbatim**
148:22
**verifiable**
380:23
**verification**
312:16

**verified** 168:22
**verify** 159:8
162:2 164:3
165:23 168:13
219:16
**veritext** 1:22
**version** 300:6
**versus** 321:16
355:18
**victims** 188:2
**video** 12:10,16
31:12,15,22
45:19,21 82:3
82:11 132:19
133:3 193:21
194:5 230:5,13
268:22 286:5
286:13 343:18
351:18 352:2
359:12,19
361:21 362:2
362:17 374:3,9
382:18 383:1
393:2,5,10,19
**videographer**
6:11 12:13
373:24
**videos** 263:20
269:22 270:17
271:2 333:8,11
343:16 349:23
360:17 361:10
363:6 371:7

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **videotaped** 1:12 | **wait** 16:23 116:10 | **wanting** 186:23 | 266:22 268:20 273:13,20,23 |
| **view** 79:18,22 244:8 279:5 287:23 288:2 340:24 341:11 341:12 361:19 | **waiting** 195:16 **waived** 12:5 **walk** 360:12 **walls** 188:20 **walnut** 5:5 | **warned** 180:11 180:12 **washington** 2:5 2:17 3:5 **watch** 271:2 362:2,16 | 277:13 326:15 335:23 337:13 340:3 342:19 344:6,19,22 346:6 347:7 |
| **viewed** 355:4,6 **views** 339:4 **violate** 338:13 **violating** 340:12 | **want** 17:15 56:1 59:6 67:15 68:17 69:9 98:6 117:15 126:8 | **watched** 363:6 **watching** 360:17 375:24 **water** 265:1 | 349:2 354:21 355:7 357:2 372:23 377:21 392:21 |
| **violence** 319:19 319:23,24 320:15 340:16 | 126:20 134:23 150:13 173:7 177:17 189:5 | **watson** 9:15 296:21 297:5 297:10,15 | **ways** 48:14 94:17 99:13 104:18 116:18 |
| **virtually** 58:18 **visiting** 31:7 **visits** 130:22 **vitae** 7:15 20:21 | 195:7,10 206:13 207:23 235:23 242:1 242:15 252:21 253:7 255:7 | 298:16,20,21 299:16 300:1 301:3 309:7 386:24 387:8 387:21 | 127:19 145:17 234:7 245:10 251:16 328:11 329:1,5 330:7 340:1 342:23 |
| **volume** 8:18,20 221:19,23 222:9 294:24 295:6 303:19 304:1 | 259:21 261:9 268:17 285:10 322:9 326:20 332:17 354:19 356:23 360:2,5 361:16 373:20 | **way** 32:19 39:14 54:3 57:5 70:22 77:8 107:9,18 125:12 126:11 134:19 145:7 | 345:9 **wc.com** 2:18 **we've** 20:7 38:4 194:24 224:3 254:21 258:7 304:13 308:9 |
| **vulnerabilities** 273:10 | 377:17 383:13 **wanted** 93:23 | 149:3 171:4 172:12 175:19 | 351:15 383:9 392:13 |
| **vulnerable** 182:7 343:1 372:7 | 97:17 101:24 102:10,24 103:2 234:22 | 180:18 183:9 183:11,11 184:8 186:9 | **weather** 45:15 45:17 **weathers** 4:17 |
| **w** | 257:3,7 268:5 277:12 352:8 | 191:21 193:14 199:3 224:20 237:5 243:16 244:18 257:3 | **week** 392:7 **weight** 250:12 **weinkowitz** 5:4 |
| **w** 282:21 | | | |

CONFIDENTIAL

**[went - work]**                                                    Page 86

| | | | |
|---|---|---|---|
| **went**  32:2 | 56:20 57:19 | 191:12 192:15 | **witnessed** |
| 102:4 245:7 | 59:11 63:7 | 206:18 209:12 | 69:22 70:9 |
| 250:18 298:2 | 64:17 66:6 | 213:20 225:9 | 72:4 |
| 311:21 314:20 | 67:12 68:1,8 | 228:20 230:3 | **witnesses**  76:15 |
| 320:3 | 70:1,5,12 | 231:3 232:9 | **wonder**  80:9 |
| **whiteley**  2:16 | 71:20 73:23 | 233:7 238:9 | 106:4 |
| 7:7 373:18 | 74:16 75:9 | 240:16 242:7 | **word**  243:3,19 |
| 374:1,7,11,16 | 81:13 85:1 | 243:7,21 | 244:20 245:23 |
| 374:18 375:12 | 88:17 92:13 | 244:24 246:15 | 256:24 348:12 |
| 382:9,16 | 93:20 94:11 | 247:9 252:8 | **words**  191:6,17 |
| **wide**  24:13,21 | 95:15 98:16 | 253:1,9 254:5 | 192:11,12 |
| 26:14 27:24 | 100:7 102:19 | 254:14 260:3 | **work**  28:18 |
| 29:20 239:7 | 108:1,9 114:21 | 265:2 267:12 | 29:7,21 30:10 |
| **widely**  197:18 | 115:18 116:5 | 267:15,18 | 32:21 39:17,24 |
| 198:5 214:24 | 117:13 120:16 | 278:3,18 | 42:5 48:7 |
| 228:16 | 123:2 124:13 | 279:12 281:2 | 50:16 54:3 |
| **wider**  329:11 | 125:23 128:20 | 286:2 288:13 | 59:14 60:3 |
| **widespread** | 130:17 131:23 | 292:21 299:23 | 61:7 63:9 |
| 46:20 65:15 | 132:14 133:24 | 300:24 304:9 | 69:13 71:6 |
| 325:10 330:10 | 134:15 135:6 | 307:5 312:10 | 72:21 79:12 |
| **wife**  361:12 | 136:13,23 | 313:19 314:12 | 82:19 83:9,20 |
| 362:2 | 137:12 138:6 | 315:21 317:1 | 86:3,3 102:12 |
| **williams**  2:15 | 138:24 140:12 | 317:23 318:20 | 106:7 115:22 |
| **willing**  240:12 | 141:7 143:10 | 319:8 322:8 | 118:19 119:13 |
| 241:8 247:13 | 145:5 146:15 | 326:2 330:17 | 121:9 122:24 |
| 250:15 252:20 | 147:10 148:21 | 331:7 334:2 | 123:15 124:23 |
| 253:5 326:14 | 151:16 153:7 | 337:1,8,21 | 125:3 127:12 |
| **wish**  302:7 | 154:21 155:9 | 339:8 341:2,5 | 128:17 138:14 |
| **witness**  11:5 | 157:12 158:10 | 348:9 352:11 | 138:19 140:21 |
| 13:5 15:13 | 160:22 166:18 | 356:12,17 | 148:13 153:11 |
| 24:18 28:8 | 168:2,12 173:2 | 357:21 358:1 | 161:7 165:19 |
| 40:23 41:8 | 174:2 176:16 | 365:19 371:1 | 169:14 178:11 |
| 42:9 46:16 | 184:2 188:22 | 375:9 395:5,7 | 181:23 182:3 |
| 51:2 54:15 | 189:4,22 | 396:1 | 184:22 191:3 |

CONFIDENTIAL

192:3 194:19 196:24 197:6,8 199:11 208:9 208:16 209:4 209:12 211:17 213:5,16 217:3 217:4,20 224:21 228:7 235:3 238:10 245:12 248:21 251:18,19 255:24 256:2 257:15 262:15 262:18 288:24 301:11 310:4 310:24 311:3 311:21 321:12 346:7 354:17 358:22 359:1

**worked** 28:4,13 85:10 103:20 140:18 249:1 276:24 294:1 302:4,5 310:17

**working** 52:3 78:8 121:17 123:10 124:1,8 126:17 142:3 170:17 194:15 196:9 199:15 209:2,6 217:11 235:22 257:21 299:5 310:13 364:2,8

**workload** 51:12

**works** 76:18 176:1,9 264:10 264:12,13,21 265:8,12,14 285:8 353:3

**world** 99:15 100:3 123:13 187:2 339:4

**worn** 64:2

**worth** 257:14

**woven** 62:14 70:24

**write** 16:20 37:23 38:2 45:9 145:11 149:14 188:19 214:23 231:14 235:24 248:13

**writing** 16:12 75:12

**wrong** 22:1 110:10,11 297:13 299:12 299:13 306:15

**wrote** 17:23 97:21 98:9 112:8 119:16 127:6 129:12 133:12 135:13 139:10 171:10 179:6 315:3

| x |
|---|
| **x** 7:2,11 8:2 9:2 10:2 |

| y |
|---|

**yeah** 18:10 19:10 31:11 38:24 40:18 42:9 45:5 54:15 56:20 57:13 59:11 67:12 68:1 70:12,12 72:5 73:6,23 74:22 76:23 77:6 78:1 80:17 81:24 86:15 88:17 90:1 101:16 105:16 107:5 117:13 120:8 123:2 176:16 181:10 189:1 190:1 198:19 200:2 224:16 227:11 230:4 234:19 239:12 244:24 246:15 249:19 254:14 260:20 263:17 266:24 281:4 283:11 285:16 290:10 290:17 293:20 293:20,21

297:21 299:24 300:15,24 303:6 304:24 306:8 307:20 309:22 322:17 327:23 331:22 333:6,10,15 336:6 337:21 339:20,22 341:5 342:10 345:20 349:12 351:15,16 354:3 356:23 357:9 361:11 362:5,7 369:19 370:20,21 371:1,11 376:1 376:1 379:19

**year** 15:6 37:23 38:12 47:21 83:1,3,7,13 85:11,18 86:3 86:6,7,14 99:10 110:10 196:11 221:22 249:10 257:11 257:16,21 259:14 266:3 333:1

**year's** 78:2

**years** 25:4 27:4 27:5 49:9 65:17 98:6 103:12 119:3

CONFIDENTIAL

**[years - zoom]**                                     Page 88

161:8 163:8
245:15 263:10
378:21
**yeates** 77:19
**yep** 203:22
336:17
**ygr** 1:3
**york** 5:19,19
6:5,6,6 7:23
14:16 15:10
21:13 22:5,11
22:17 24:1,15
25:7,9 27:1,3
96:17 97:23
368:13 371:19
**young** 9:23
129:13 191:19
273:10 280:3
291:18 346:4
357:4 389:22
**youth** 8:18
129:19 178:19
182:7 291:19
292:13 293:12
294:8,12,15,24
295:7,15,22
**youtube** 2:19
13:20 169:23
170:7,21
171:11 172:8
183:3 193:4
270:11,14,15
270:19 271:2
271:17,21,23

330:15,20
333:8,11,12,16
333:16 343:16
343:17 350:5
374:19 375:3
375:14,15,18
375:20,24
376:4,6 382:4
382:7,11
393:13,23
**youtube's**
270:22 271:15

**z**

**zero** 129:4
**zoom** 4:2 5:2
6:2