# Exhibit 2

E-Served: Nov 5 2025  4:11PM PST  Via Case Anywhere

FILED
Superior Court of California
County of Los Angeles

11/05/2025

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
                L. Ennis

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

### *R.Q.U., et al. v. Meta Platforms, Inc., et al.*
### 23STCV31501

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: October 28, 2025**

**Meta's Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication (Moore)**

Court's Ruling: The Motion is denied.


Meta moves for summary judgment as to Moore.  Alternatively, Meta moves for summary adjudication of each of Moore's remaining claims against Meta, which are for (1) negligence, (2) non-product negligent failure to warn, and (3) fraudulent concealment.  After filing the Motion, Meta filed a "First Supplemental Memorandum of Points and Authorities" (Meta's Supp. Mem.) on September 8, 2025.  Herein, the court relies on and (where necessary) cites this supplemental memorandum.

Before addressing Meta's request for summary judgment/adjudication as to entire causes of action, the court must first reject Meta's improper attempt to have this court adjudicate issues regarding particular "injuries," particular "features," or particular "warnings."  Meta has requested adjudication as to 22 different injuries, features or warnings.  For example, Meta seeks a ruling that "Plaintiff's claims of harm from 'follows' are inextricably tied to third-party content and Meta's publishing activities, and are therefore barred by Section 230 of the Communications Decency Act or the First Amendment to the U.S. Constitution."  (See Defs' Not. Mot., at p. iii.)  Meta's request is improper under California procedural law.  A party

1

cannot move for summary adjudication of an *issue* within a cause of action when adjudication of that issue would not completely dispose of that cause of action.  (See, e.g., *Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1103.)  As the Code of Civil Procedure makes clear, "[a] motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."  (Code Civ. Proc., § 437c, subd. (f)(1).)

Meta raises five main arguments in support of its claim that Moore's claims fail.  First, Meta argues that Moore's claims are time-barred.  Meta notes that there is a two-year statute of limitations for the negligence-based claims, and a three-year statute of limitations for the fraudulent concealment claim.  Moore's suit was filed on December 26, 2023, but Meta argues that Moore's claims accrued, at the latest, by 2019.

"Generally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements. … An important exception to the general rule of accrual is the discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citation.] Under the discovery rule, the statute of limitations does not begin to run until the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Medina v. St. George Auto Sales, Inc.* (2024) 103 Cal.App.5th 1194, 1203-1204, internal citations and quotation marks omitted.)  "Application of the discovery rule is typically a question of fact. As our high court has observed, there are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. … It is a question for the trier of fact. … However, whenever reasonable minds can draw only one conclusion from the evidence, the question becomes one of law." (*Id.* at p. 1204, internal citations, quotation marks, and brackets omitted.)

"The discovery rule . . . sets forth two alternate tests for triggering the limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing.  The first to occur under these two tests begins the limitations period." (*Kernan v. Regents of University of California* (2022) 83 Cal.App.5th 675, 681 (*Kernan*), internal quotation marks and citation omitted.)

Here, the evidence before the court does not allow reasonable minds to draw *only one* conclusion as to when Moore *should have* determined that her injuries arose from her use of Meta's platforms or as to when Moore

2

*actually suspected* that her injury was caused by wrongdoing.  Moore has testified that, although she knew she had a "problem" with her social media use, she "couldn't identify what the problem was" until she spoke with her attorneys in 2023.  (Autry Decl., Ex. 3, at 26:1-10.)  Moreover, there is evidence in the record to support Moore's claim that the "general public was not aware of the risk of harm posed by social media until on or after May 23, 2023, when the U.S. Surgeon General first warned that social media can have a profound risk of harm to the mental health and well-being of children and adolescents."  (Pl's Resp. Meta's Sep. St., at p. 74, Pl's Fact No. 158.)  This fact supports a factual finding that a "reasonable person" in Moore's position would not have been on notice of the link between social media use and mental health harms before having seen the advertisement.  (See *Kernan, supra,* 83 Cal.App.5th at p. 681.)

Meta's second argument is that Section 230 bars Moore's claims.  Meta essentially re-litigates questions that were decided by this court when it ruled on Defendants' pleading challenges.  The court directs the reader to this court's rulings as to Section 230.  (See Ruling on Defendants' Demurrer to Master Complaint and Three Short Form Complaints, Oct. 13, 2023 [an 89-page order addressing, *inter alia*, Defendants' argument that Section 230 bars Plaintiffs' claims in their entirety]; see also Court Ruling on Defendants' Motion to Strike Third-Party Misconduct and Online Challenge Allegations from Identified Short-Form Complaints, July 19, 2024 [order addressing which types of features on the platforms cannot, as a result of Section 230, serve as a basis for Defendants' liability].)  Here, Meta has failed to present new argument or new authority persuading this court that it should revise its prior conclusions.

Meta argues that K.G.M.'s claims impermissibly seek to hold Meta liable as a "publisher" for harms stemming from the third-party content on Meta's platforms.  For example, Meta argues that Moore cannot assert liability based on the "infinite scroll" design feature because this feature merely led Plaintiff to watch content.  (See Meta's Supp. Mem, at pp. 11-12.)  However, the fact that a design feature like "infinite scroll" led a user to harmful content does not mean that there can be no liability for harm arising from the design feature itself.  (See Ruling on Defendants' Demurrer to Master Complaint and Three Short Form Complaints, Oct. 13, 2023, at p. 59 [harm from "infinite scroll" feature may give rise to a cause of action that is not barred by Section 230].)  Here, there is evidence that the infinite scroll feature *itself* caused some harm to Moore.  For example, Plaintiffs' general causation experts have presented evidence tending to show as follows:

> Defendants employ infinite scroll and autoplay which exploit adolescents' less developed self-regulation and desire for novelty by providing users with continuous new content with no stopping point, making it difficult to look away. These features keep adolescents engaged for extended periods, losing track of time and displacing time that otherwise could be spent over healthy activities such as sleep, schoolwork, or in-person interactions.

(Pl's Resp. Meta's Sep. St., at p. 62, Pl's Fact No. 124, internal bolding omitted.)  And Moore has testified that the "endless scroll" feature has caused her to use Defendants' applications much more than she would have without that feature.  (See Pl's Rep. Meta's Sep. St., at p. 67, Pl's Fact No. 143.)  Such evidence is sufficient here to prevent this court from concluding that there is no disputed question of fact as to whether K.G.M.'s claims are based on harm stemming from third-party content.  Meta's Section 230 argument does not justify an order granting the Motion.

Meta's third argument is that the First Amendment bars Moore's claims because those claims "directly target Meta's protected expressive activity— its choices about how to organize and present third-party speech—and would force Meta to alter the ways in which it curates and organizes content." (Meta's Supp. Mem., at p. 14.)  This court has already explained that "the allegedly addictive features of Defendants' platforms (such as endless scroll) cannot be analogized to how a publisher chooses to make a compilation of information, but rather are based on harm allegedly caused by design features that affect how Plaintiffs interact with the platforms regardless of the nature of the third-party content viewed."  (Ruling, Jan. 8. 2025, at p. 15, internal citations and quotation marks omitted.)  As with the Section 230 argument, Meta claims that the First Amendment bars Moore's claims because it is the third-party content that caused Moore's harms.  But, again, there is evidence in the record that Moore was harmed by design features. The cause of Moore's harms is a disputed factual question that must be resolved by the jury.  Finally, given that there is evidence that Meta's design and operation of its platforms was done in a way that would cause mental health harms to minor users, this court cannot conclude that a requirement that Meta provide accurate warnings regarding those harms would improperly violate Meta's free speech rights.  (See Ruling of Jan. 8, 2025, addressing Plaintiffs' negligent failure to warn claims, at pp. 14-16.)

Meta's third argument that Moore cannot prove the elements of her claim is, in reality, a restatement of its prior arguments.  Meta's argument is based, in part, on the claim that "none of Plaintiff's general causation experts can survive gatekeeping scrutiny under Sargon."  (Meta's Supp.

Mem., at p. 17.)  But this court has already denied the majority of Defendants' general causation *Sargon* motions.  The expert testimony that Meta's platforms' design features cause the type of mental harms allegedly suffered by Moore is thus admissible and prevents summary judgment/adjudication.  As explained above, there is a factual dispute as to whether the design features were a substantial factor in causing Moore's harm.  As for the claims for failure to warn and fraudulent concealment, Meta argues that these claims fail because Moore cannot show that a warning about the dangers of Meta's platforms would have prevented Moore's harms.  But there is evidence in the record that disputes Meta's factual claim.  Moore offered testimony suggesting that she did not receive any warnings about the dangers of Meta's platforms, but that if she had received a warning about the dangers of social media platforms, she would have taken "certain precautions" to avoid social media addiction.  (Autry Decl., Ex. 6, at 454:17—455:16.)  The fact that Moore did not read Meta's terms of service does not support a ruling granting summary adjudication. Moore argues here that a warning buried in terms of service would not be sufficient to alert users of the dangers associated with Meta's platforms.

Meta's fourth argument is that certain Meta-affiliated Defendants should be dismissed from this litigation because they had no involvement in Moore's injuries.  Meta claims:

> Only Meta Platforms, Inc. operates Facebook and Instagram. SS ¶ 65. The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments Inc., Siculus LLC f/k/a Siculus, Inc., Facebook Operations, LLC, Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC, Facebook Holdings, LLC, and Instagram LLC (the "Non-Operating Defendants")—do not. SS ¶¶ 66–68.

(Meta's Supp. Mem., at p. 20.)  In support of this argument, Meta cites to its own Responses and Objections to Plaintiffs' Rule 30(b)(6) Written Questions to Meta Defendants.  (Simonsen Decl. Ex. 8.)  Plaintiff objects to this proffered evidence on the grounds that the person who verified the responses for Meta does not claim to have personal knowledge of the facts set forth in the Rule 30(b)(6) responses, and that Plaintiff has not had an opportunity to test the responses by cross examination in a deposition.

The court sustains the Plaintiff's objection.  Under California law, a party may not offer its own interrogatory responses as evidence – those responses only may be used to impeach the party that answered the interrogatories.

> At the trial or any other hearing in the action, so far as admissible under the rules of evidence, the propounding party or *any party other than the responding party* may use any answer or part of an answer to an interrogatory *only against the responding party.*" (Code Civ. Proc., § 2030.410, italics added.)  Thus, the responding party may not use its own interrogatory responses in its own favor. The trial court did not abuse its discretion in sustaining plaintiff's objection to defendant's use of its own interrogatory responses as evidence supporting its statement of undisputed facts.

(*Great American Ins. Cos. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 450.)

At oral argument, Meta's counsel argued that responses to a deposition by written questions conducted under Federal Rule of Civil Procedure section 31 should be treated like testimony given in a deposition rather than like interrogatory responses.  Counsel cited in support of this proposition *United States v. Salim* (1988) 855 F.2d 944 (*Salim*).  In that case, the court considered whether Federal Rule of Civil Procedure 15 allowed the submission in a criminal proceeding of a deposition conducted by French authorities.  The court described the deposition taken in France as similar to a deposition on written questions conducted pursuant to Federal Rule of Civil Procedure 31.  The court further noted that Rule 31 allows the submission of both direct and cross-examination questions in writing.  (*Id.* at p. 951.)  It was important to the court's determination that the foreign deposition testimony was admissible in the criminal trial that the party who opposed admission of the evidence had had "ample opportunity to pose new questions to the witness after reviewing her responses to the earlier ones." (*Id.* at p. 954.)

In the current posture of this case, this court did not supervise the discovery that Plaintiffs were allowed to take of Meta (the MDL court supervised that discovery), and the court is unaware of whether Plaintiffs had the opportunity to follow-up on the responses to the deposition by written questions in order to pose additional questions and to probe the reliability of Meta's written responses.  Further, unlike the circumstances in *Salim*, where the foreign deposition involved an identified individual, the testimony at issue here was taken pursuant to Federal Rule of Civil Procedure section 31(a)(4) – questions directed to an organization in accordance with Rule 30(b)(6) – and Meta was required to designate a person to testify about information known or reasonably available to the organization.  Plaintiff objects that the person who verified the interrogatory

responses did not claim personal knowledge.  The Declaration verifying the responses was signed by Nicole Lopez, but nothing in the excerpt provided with Meta's Motion indicates the title of the witness or gives any assurance that she possessed the requisite information necessary to qualify as a witness pursuant to Rule 30(b)(6), as required by Rule 31(a)(4).  The court sustains Plaintiff's objection to Exhibit 8 to the Simonsen Declaration.  Meta's Motion for Summary Judgment as to the Meta-affiliated Defendants is therefore denied.

**Defendant Snap Inc.'s Motion for Summary Judgment, or, in the Alternative, Summary Adjudication**

Court's Ruling:  The Motion is denied.

Snap moves for summary judgment or adjudication of Moore's claims on the following seven grounds:

> (1) Ms. Moore's claims are stale under California's two-year statute of limitations;
> (2) Ms. Moore had minimal use of Snapchat, foreclosing her claim that she was addicted to Snapchat and that any such usage caused her injuries;
> (3) Ms. Moore's specific causation experts do not tie her alleged injuries to Snapchat;
> (4) Ms. Moore's specific causation experts' opinions are inadmissible because they do not meaningfully account for Plaintiff's other risk factors for her claimed injuries;
> (5) Even if admissible, Ms. Moore's specific causation experts' opinions cannot support Plaintiff's burden of proof in light of the documented, alternative explanations for her claimed injuries;
> (6) Ms. Moore's claims otherwise fail for lack of general causation; and
> (7) Ms. Moore's claims are preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and barred by the First Amendment.

(Snap's Not. Mot., at p. 2.)  For the purposes of a motion for summary adjudication, which can only be granted (as relevant here) to an entire cause of action, and given the way in which this court has interpreted the relevant law, Snap's Motion is more properly viewed as being based on the following

two relevant factual and legal arguments: (1) there is no triable issue of material fact that Moore's claims are time-barred; and (2) there is no triable issue of material fact that Snap's design features were not a substantial cause of Plaintiff's alleged harms.

Before addressing these two main arguments, the court must again make clear that it can only grant summary adjudication as to an entire cause of action. The court must therefore reject Snap's invitation to adjudicate certain "aspects of Moore's claims." (Snap's Not. Mot., at p. 2.) As explained above, such a request is procedurally improper. There is no support for Snap's argument that these individual "aspects" of Moore's claims should be treated as "separate and distinct cause[s] of action." (Snap's Not. Mot., at p. 2.)

As for the first relevant argument raised by Snap, Snap argues—like Meta—that Moore's claims accrued no later than 2019. This argument is based on the fact that, in 2016, Moore began using Snapchat and became addicted to social media. Snap points to evidence that Moore's mother was aware in 2019 that Moore was addicted to social media.

The fact that Moore's mother knew she was addicted to social media does not indisputably show that Moore or her mother discovered or should have discovered her cause of action against Snap. As noted above, "the statute of limitations does not begin to run until the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Medina v. St. George Auto Sales, Inc.* (2024) 103 Cal.App.5th 1194, 1204, internal citations and quotation marks omitted.) Being addicted to a product or service does not necessarily mean that the company responsible for creating that product or service has engaged in wrongdoing.

Here, because the evidence before the court does not allow reasonable minds to draw *only one* conclusion as to when Moore *actually suspected* that her injury was caused by wrongdoing or when Moore *should have* determined that her injuries arose from her use of Snapchat, the Motion must be denied. (*Id.* at p. 1204.) Moore has testified that, although she knew she had a "problem" with her social media use, she "couldn't identify what the problem was" until she spoke with her attorneys in 2023. (Autry Decl., Ex. 3, at 26:1-10.) Moreover, there is evidence in the record to support Moore's claim that the "general public was not aware of the risk of harm posed by social media until on or after May 23, 2023, when the U.S. Surgeon General first warned that social media can 'have a profound risk of harm to the mental health and well-being of children and adolescents.' " (Pl's Resp. Snap's Sep. St., at p. 74, Pl's Fact No. 136.) These facts could

support a finding that a "reasonable person" in Moore's position would not have been on notice of the link between social media platforms' design features and mental health harms before having seen the advertisement. (See *Kernan, supra,* 83 Cal.App.5th at p. 681.)

As for Snap's arguments regarding causation (including Section 230 and the First Amendment), Snap's Motion must be denied because Moore has submitted evidence to dispute Snap's factual claims. Snap claims that Moore's daily use of Snapchat over a six-year period averages around 13 minutes. Moore presents evidence to cast doubt on the reliability of the dataset upon which Snap relies. For example, Plaintiffs' expert witness Merredith McCarron, who offers testimony regarding analysis of large datasets, user behavior metrics, and digital evidence forensics, has concluded that "Snap's time spent and sessions data can now be considered to represent a reliable floor (*but not ceiling*) for the group one trial bellwethers' usage (a) for the accounts produced and (b) over the time periods covered by the data." (McConnell Decl., Ex. 9, ¶ 3, emphasis added.) The reliability of Snap's data is thus a disputed question of fact. Moreover, Moore has offered testimony tending to support the conclusion that she used Snapchat for far more time than 13 minutes per day. (See Pl's Sep. St., Pl's Fact No. 111.)

Furthermore, there is evidence in the record suggesting that Moore was harmed by social media design features that are present on Snapchat. (See, e.g., Pl's Fact No. 114.) Plaintiffs' expert witness Dr. Bagot, whose general causation testimony is admissible at trial, has concluded that Snapchat's *features* cause the types of harms allegedly suffered by Moore. (See, e.g., Pl's Sep. St., at p. 71, Pl's Fact No. 131.) There is testimony by Moore suggesting that the feature "Snapstreaks" caused Moore to use Snapchat. (Autry Decl., Ex. 3, at 313:14-18.) Moore's testimony could lead a trier of fact to conclude that that design features such as endless scroll, notifications, and "Snapstreaks" caused Moore to engage in excessively harmful use of Snapchat. (Autry Decl., Ex. 3, at 301, 10-23.) Moore cites evidence suggesting that Snap's own employees thought that Snapchat's "endless scrolling design" was addictive. (Pl's Sep. St., at p. 55, Pl's Fact No. 41 [See Ayers Decl., Ex. 74 at SNAP1393050.) Moore has also testified that, at one point, she was using Snapchat for approximately 180 minutes per night. (Autry Decl., Ex. 6, at 378:20—379:3.) Because there is evidence that (1) Moore used Snapchat and its design features, and (2) Snapchat's design features caused harms allegedly suffered by Moore, a trier of fact could conclude that Snapchat's design features caused Moore's alleged harms. Snap's causation arguments (including its arguments under Section 230 and the First Amendment, which the court has addressed in prior opinions) therefore do not support granting summary judgment.

Snap argues that a design feature like "Snapstreaks" could not serve as the basis of liability because it constitutes Snap's protected speech. This argument, even if correct, would not require the court to grant Snap's Motion, given that "Snapstreaks" is not the only design feature upon which Moore's claims against Snap rest. Moreover, this court has previously explained that "the allegedly addictive features of Defendants' platforms (such as endless scroll) cannot be analogized to how a publisher chooses to make a compilation of information, but rather are based on harm allegedly caused by design features that affect how Plaintiffs interact with the platforms … ." (Ruling, Jan. 8, 2025, at p. 15, internal citations and quotation marks omitted.) This court has also rejected the legal underpinnings of Snap's argument at length in a prior order (see Ruling on Defendants' Demurrer to Master Complaint and Three Short Form Complaints, Oct. 13, 2023, at pp. 66-74) and in a concurrent ruling denying Snap's Motion for Summary Judgment as to Plaintiff K.G.M.

Date:11/05/2025

Carolyn B. Kuhl / Judge

The Honorable Carolyn Kuhl
Judge of the Superior Court

10