UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Filing Relates to:<br>*People of the State of California et al. v. Meta Platforms, Inc., et al.* | Case No. 22-md-03047-YGR   (PHK)<br><br>**ORDER RESOLVING DISPUTE RE: META WITNESSES' PREPAREDNESS FOR STATE AGS' 30(b)(6) DEPOSITION TOPICS AND RELATED DISCOVERY REQUESTS**<br><br>Re: Dkt. 2218 |

This MDL has been referred to the undersigned for all discovery purposes. *See* Dkt. 426. Now pending before the Court is a joint letter brief regarding a dispute between the State Plaintiffs ("Plaintiffs," or "the States") and Meta arising from the Rule 30(b)(6) depositions of three Meta witnesses. [Dkt. 2218]. Plaintiffs argue that Meta failed to properly prepare and present corporate designees for their 30(b)(6) depositions on certain topics and, as relief, specifically request an order compelling Meta to produce additional documents and respond to certain written deposition questions. Meta opposes and, as discussed below, has agreed to produce certain material. The Court finds the dispute suitable for resolution without oral argument. *See* Civil L.R. 7-1(b).

**LEGAL STANDARD**

Based on the course of discovery practice in this MDL, the Parties here are familiar with the generally applicable legal standards for discovery. The Court has broad discretion and authority to manage discovery. *U.S. Fidelity & Guar. Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude in controlling discovery, and their rulings

1 will not be overturned in the absence of a clear abuse of discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003). The Court's discretion extends to crafting discovery orders that may expand, limit, or differ from the relief requested. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery"). For example, the Court may limit the scope of any discovery method if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Information need not be admissible to be discoverable. *Id.* Relevancy for purposes of discovery is broadly defined to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal. Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes of discovery is broader than relevancy for purposes of trial.") (alteration omitted).

While the scope of relevance is broad, discovery is not unlimited. *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries."). Information, even if relevant, must be "proportional to the needs of the case" to fall within the scope of permissible discovery. Fed. R. Civ. P. 26(b)(1). The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the commonsense concept of proportionality: "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry. The [proportionality requirement] is intended to encourage judges to be more aggressive in identifying and

discouraging discovery overuse." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. In evaluating the proportionality of a discovery request, the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The party seeking discovery bears the burden of establishing that its request satisfies the relevancy requirements under Rule 26(b)(1). *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012). The resisting party, in turn, has the burden to show that the discovery should not be allowed. *Id.* The resisting party must specifically explain the reasons why the request at issue is objectionable and may not rely on boilerplate, conclusory, or speculative arguments. *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied.").

As part of its inherent discretion and authority, the Court has broad discretion in determining relevancy for discovery purposes. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)). Similarly, a district court's determination as to proportionality of discovery is within the district court's discretion. *See Jones v. Riot Hospitality Grp. LLC*, 95 F.4th 730, 737-38 (9th Cir. 2024) (finding district court did not abuse discretion on proportionality ruling). Ultimately, "the timing, sequencing and proportionality of discovery is left to the discretion of the Court." *Toro v. Centene Corp.*, No. 19-cv-05163 LHK (NC), 2020 WL 6108643, at *1 (N.D. Cal. Oct. 14, 2020).

## ANALYSIS

As an initial matter, the Court notes that this is yet another dispute between the Parties regarding whether discovery should continue past a deadline set by the Court. As the Court has noted in previous Orders, at this stage of the MDL, these Parties should be (and are likely) focusing on pretrial matters and trial preparation. It is hoped that, if there exist any additional disputes of this nature, the Parties are either resolving them informally or withdrawing them, so

that they can focus on pretrial and trial preparation going forward.

## I.     "Nido: Canonical Rollout Plan" Document

Plaintiffs first argue that a Meta 30(b)(6) witness testified about a document referred to as a Canonical Rollout Plan for Meta's Project Nido (which was apparently the development code name for Teen Accounts). [Dkt. 2218 at 5]. This document was not produced during discovery. Plaintiffs request an order directing Meta to produce this document and "the document it presumably hyperlinks to." *Id.*

There appears to be no actual dispute here. Meta has agreed to "collect and produce the current version of that document." *Id.* at 12. As of the date of this Order, it is entirely possible Meta has already produced the document at issue. Because the Court does not have a copy of that document, there is nothing in the record (beyond supposition from Plaintiffs) showing that the document hyperlinks to any other documents at all. Accordingly, the Court **ORDERS** the Parties to file a joint status report (no longer than two pages in length, evenly divided between each side to this dispute) by **November 21, 2025** reporting on the status of the production of the Canonical Rollout Plan document and any hyperlinked documents, if any. If there are any disputes as to any hyperlinked documents (or if the document at issue has not yet been produced), the Parties are **ORDERED** to meet and confer promptly to finalize a schedule for the production of that document and resolve any disputes as to hyperlinked documents, and **SHALL** report on any such meet and confers in the joint status report. If that document has already been produced and if there are no disputes as to any documents hyperlinked by that document, then the Parties need not file this joint status report and may simply send a joint email to the Court's Courtroom Deputy confirming that there is nothing to report and that (per this Order) the Parties agree that no joint status report is required.

## II.     "Meaningful Adoption Metric/Honor Rate" Information

Plaintiffs next argue that, in a 30(b)(6) deposition as well as in response to Interrogatory No. 12 and at other individual witness depositions, Meta failed to provide "what percentage of users actually stop using Facebook and Instagram after receiving a nudge to stop using the app," which Plaintiffs refer to as the "Meaningful Adoption" metric or the "honor rate." [Dkt. 2218 at

4

5]. Plaintiffs argue that Meta's response to Interrogatory No. 12 should be supplemented to provide this Meaningful Adoption/honor rate information. *Id.*

Meta argues that the 30(b)(6) notice does not include a topic that covers "honor rates" and that the interrogatory at issue does not request "honor rate" information. *Id.* at 12. There is no dispute that the Parties agreed that Meta would disclose the "percentage of teen users in the U.S. who have used each safety tool for which data is available" in response to Interrogatory No. 12. *Id.* at 5, 12. Meta argues that Interrogatory No. 12 thus seeks information on *usage* and not on *cessation of usage after a nudge*, which is the information now sought by Plaintiffs. *Id.* at 12.

In response to Meta's argument, Plaintiffs do not quote any noticed 30(b)(6) topic which covers the Meaningful Adoption metric or honor rate. *Id.* at 10-12. Nor do Plaintiffs dispute the scope of the agreed-upon response to Interrogatory No. 12. *Id.*

Plaintiffs have failed to demonstrate why the requested relief is justified. The fact that the response to Interrogatory No. 12 did not include "honor rate" or Meaningful Adoption information should not be a surprise to Plaintiffs, because the Parties apparently agreed that the response would be limited to usage of safety tools, not cessation of usage of the Facebook or Instagram app entirely after a nudge. Further, as the moving party, Plaintiffs have not demonstrated that the 30(b)(6) notice included a topic that called for a witness to be prepared specifically on Meaningful Adoption information or honor rates.

Accordingly, the Court **DENIES** the Plaintiffs request for further discovery on this topic.

### III. "Company Critical Metrics"

Plaintiffs next argue that a Meta 30(b)(6) witness was "unable to identify the set of metrics Meta monitors as 'Company Critical Metrics,'" or to describe those metrics or measurements. [Dkt. 2218 at 5].

Meta argues that the 30(b)(6) topic that allegedly covered this topic sought a witness to testify on the "monitoring" of "policies and initiatives for protecting Teen Users." *Id.* at 13. Meta further argues that its 30(b)(6) witness did, in fact, testify on this issue. *Id.*

Plaintiffs have failed to demonstrate why the requested relief is justified. It is unclear from the record presented as to the origin of the phrase "Company Critical Metrics." If that was a

5

phrase used in documents produced by Meta, then presumably Plaintiffs followed this Court's prior directive and provided such documents as exhibits prior to the 30(b)(6) deposition—a procedure the Court implemented to avoid situations in which a 30(b)(6) designee was presented with a document (and its contents) for the first time at deposition with no meaningful opportunity to prepare. There is no allegation that the term "Company Critical Metrics" appeared in any exhibits, nor is there any allegation that the witness was unprepared to testify about any exhibits which included that phrase (if any such exhibits exist). It appears from the record presented that this phrase may have been coined by Plaintiffs, and in any event, it appears from the record presented that the 30(b)(6) witness was, in fact, able to provide some testimony on this issue. Thus, this does not appear to be a situation where a litigant was provided reasonable notice of a topic for a 30(b)(6) deposition (either through the notice itself or exhibits exchanged prior to the deposition) and then failed to prepare a witness to testify.

Accordingly, the Court **DENIES** Plaintiffs' request to compel Meta to provide written answers to unspecified 30(b)(6) questions on this topic.

### IV.    "Monitoring of Teen Accounts" Information

Plaintiffs next argue that Meta's 30(b)(6) witness was unable to answer questions relating to monitoring of teen accounts, including questions such as: "'what percent of under 16s successfully edited DOB to be over 16' after teen accounts rollout, what was the 'number of new second accounts associated with existing U16 accounts' after teen accounts rollout, and what was the 'percentage of new supervisions with under 16 accounts on the same device' after teen accounts rollout?" [Dkt. 2218 at 5-6]. Plaintiffs argue that this information was called for by the 30(b)(6) notice which sought a witness designated to testify on "implementation and monitoring" of Teen Accounts. *Id.* at 5. Plaintiffs seek to compel Meta to provide written answers to these deposition questions.

Meta argues that "[n]o witness could have anticipated (and memorized the answers to) these specific, data-driven questions, especially since the data can morph over time." *Id.* at 10. Meta argues that "[a] 30(b)(6) deposition is not a memory test, and the questions posed by the State AGs were better suited for interrogatories[.]" *Id.* Meta faults Plaintiffs for failing to disclose

1  these specific questions in advance, which (had they done so) would have allowed the witness to
2  prepare at the level of granularity now sought.  *Id.*

3        Plaintiffs have failed to demonstrate why the requested relief is justified.  It appears from
4  the record presented that the 30(b)(6) topic was more broadly phrased so that it could thereby
5  encompass these specific percentages and requests for data on number of new second accounts,
6  but Plaintiffs did not provide specific sub-topics in the 30(b)(6) notice and did not raise these
7  specific data points during negotiations preceding the 30(b)(6) notice.  This does not appear to be
8  a situation where a litigant was provided reasonable notice that the deposing party would seek
9  testimony on these specific percentages and numbers for a 30(b)(6) deposition (either through the
10 notice itself or exhibits exchanged prior to the deposition) and then failed to prepare a witness to
11 testify.

12       Accordingly, the Court **DENIES** Plaintiffs' request to compel Meta to provide written
13 answers to these 30(b)(6) questions on this topic.

14     **V.**     **Study re: "Hard-Linked Accounts"**

15       Plaintiffs next argue that a Meta 30(b)(6) witness was deposed on the topic of users who
16 have multiple accounts and who "hard link" those accounts (apparently by informing Meta that the
17 same user has all the multiple accounts at issue).  Plaintiffs argue that Meta's 30(b)(6) designee
18 "could not answer how often hard-linked accounts belong to the same person, instead pointing to
19 an unproduced study." *Id.* at 6.  Plaintiffs request an order compelling Meta to produce that study
20 on hard-linked accounts, as well as "documents describing the study and its results." *Id.*

21       Conceding that its 30(b)(6) witness at issue was unable to answer specific questions
22 concerning "hard-link techniques," Meta argues that the witness "was able to answer many other
23 questions concerning both hard-link techniques and scripting attacks." *Id.* at 9.  Meta argues that
24 the witness's "inability to answer certain other questions on those issues does not render her
25 overall testimony deficient." *Id.*  Meta does not expressly dispute the witness's reference to the
26 "hard-linked" study document discussed by the witness at the deposition.

27       Plaintiffs have demonstrated that the 30(b)(6) witness relied on and referred to the
28 unproduced hard-linked accounts study document.  Unlike the "Canonical Rollout Plan" discussed

7

above, Meta does not explain here why it has apparently refused to simply produce the document which its own 30(b)(6) designee testified about. Accordingly, there can be no real dispute (and there is none) that the study itself is within the scope of relevance and proportionality for purposes of discovery.

The Court **GRANTS-IN-PART** this portion of Plaintiffs' request and **ORDERS** Meta to produce the study on hard-linked accounts referenced by the 30(b)(6) witness, as well as any other documents hyperlinked or other documents explicitly referenced by that study, by **November 24, 2025**.

Plaintiffs' request for production of other unspecified documents "describing the study and its results" is **DENIED**. Based on the record presented, the 30(b)(6) witness did not refer to other such documents in her testimony, and therefore, did not inject them as relevant for purposes of her testimony. Documents which "describe" the study or its results are, at best, redundant of the study itself and therefore not proportional to the needs of the case. Pursuant to the legal standards for relevance and proportionality discussed above, and based on the record presented, Plaintiffs' request is overreaching, and the Court finds that Plaintiffs have not established that this additional relief requested (which potentially covers a much broader, renewed search of multiple custodians long after fact discovery closed) is justified, particularly at this stage of the litigation.

### VI. COPPA-Related Deposition Questions

Plaintiffs' final argument is that two different Meta 30(b)(6) witnesses failed to answer numerous questions relating to the States' COPPA claims against Meta. [Dkt. 2218 at 6-7]. Plaintiffs seek an order compelling Meta to provide written answers to seven written deposition questions, some of which have multiple sub-questions. *Id.*

Meta argues that its designees were adequately prepared to testify on COPPA issues and that the law does not require a party to anticipate every single possible question that could arise when preparing witnesses to testify under Rule 30(b)(6). *Id.* at 7-10. As to these specific 30(b)(6) designees and the topics now disputed, Meta argues that its witnesses did, in fact, provide testimony on the topics and many others. *Id.* at 8-10. Meta argues that, as to most of the questions now at issue, a 30(b)(6) deposition is not a memory test. *Id.* at 9-10. Meta argues that it

cannot be faulted for not having its witnesses prepared for a handful of specific questions. *Id.* at 8-10.

As to one topic (listed as topic 6 in the instant briefing), Meta argues that the real dispute is that Plaintiffs do not like the testimony provided, allegedly because there is a single document produced in discovery which is apparently inconsistent with the sworn testimony, and Plaintiffs are effectively trying to get a second chance to ask about this purported inconsistency. *Id.* at 9.

Finally, as to one of Meta's 30(b)(6) designees, Mr. Backstrom, Meta argues that Plaintiffs only identified a single question which he was unable to answer. *Id.* at 10, 13. Meta argues that this is not sufficient grounds to afford Plaintiffs any relief, where this witness was apparently able to testify for hours otherwise. *Id.*

There is no dispute that these COPPA-related questions are within the scope of relevance for purposes of discovery. As with the other issues discussed above, the fundamental issue here appropriately analyzed as to whether any followup discovery (in the form of written answers to written deposition questions) is proportional to the needs of the case, particularly in light of the fact that the Meta witnesses did testify for hours (and cumulatively, days) on multiple 30(b)(6) topics and (except to a handful of questions) were apparently able to provide testimony without cause for further dispute at this time. The Court is also sensitive to the timing here, given the close of the fact discovery period and the need for the Parties to finalize expert discovery and pretrial preparations.

According to the record presented, in response to a number of questions, one of Meta's 30(b)(6) designees, Ms. Harnett, testified that, while she herself did not know the answer to that specific question, she knew who at Meta to ask and even asked (or commented) that she would like to followup on that specific question. [Dkt. 2218 at 6-7]. Also, Plaintiffs set forth the specific written deposition questions for which they now seek written answers—a number of those questions are fairly direct, yes/no questions for which preparing the responses would be expected to be less onerous, while others are open-ended questions which call for a narrative and would thus be expected to be more burdensome to respond to.

In light of the legal standards discussed above and balancing the factors for

proportionality, the Court **GRANTS-IN-PART** Plaintiffs' request here. The fact that the Meta corporate designee testified that she wanted to, or was able to, "get back to" Plaintiffs on a specific question (or that she knew who to ask to get the information) justifies granting relief as to those questions which are straightforward, yes/no questions. For this limited number of written yes/no questions, the burden of providing written answers is not expected to outweigh the burden of responding, considering Meta's witness's testimony concerning access to relevant information. The Court further notes that, as to question 4 below, Plaintiffs indicate that Meta offered to respond to that question during the meet and confer process (which Meta does not dispute).

The Court therefore **ORDERS** Meta to provide written responses and answers to the following written deposition questions pursuant to Federal Rule of Civil Procedure 31 by no later than **December 12, 2025**:

1) Does Meta's "no media/no bio" policy for automatically ignoring underage reports on Facebook and Instagram include ignoring reports where the reported user has (i) made comments on other users' posts?; and (ii) sent direct messages to other users? (At Meta's option, Meta may opt to respond to this question phrased as follows: Does Meta automatically ignore underage reports if the reported user has made comments on other people's posts or sent direct messages?).

2) Does Meta use contact information associated with a user's account that has been disabled for being underage to prevent the user from creating a new account?

3) When examining an account on Facebook or Instagram that has been reported as underage, Meta's human reviewers do not examine media or profiles associated with accounts that are hard-linked to the reported account, at least as of April 1, 2024, correct?

4) Does Meta's heuristic look at users' captions on photographs to detect underage users?

The Court **DENIES-IN-PART** Plaintiffs' request for an order compelling Meta to provide written responses to any of the proposed written deposition questions presented in briefing here. Most of those other questions are not questions for which a Meta 30(b)(6) witness testified that they knew who to ask to obtain additional information, and some of those other questions are

open-ended questions for which the burden of responding would outweigh the benefit. Nothing in this Order prevents the Parties from negotiating and reaching agreement on Meta including in its written responses (ordered herein) any additional responses to any of these other proposed written deposition questions for which relief is denied herein (and certainly nothing prevents Meta from voluntarily responding to any of these other written deposition questions, should Meta choose to do so).

This **RESOLVES** Dkt. 2218.

**IT IS SO ORDERED.**

Dated: November 13, 2025

_____
PETER H. KANG
United States Magistrate Judge