# EXHIBIT A

# In the Matter Of:

SOCIAL MEDIA CASES,

JCCP5255

---

MOTION

November 10, 2025

---



SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT SSC 12                    HON. CAROLYN B. KUHL, JUDGE

-oOo-

COORDINATION PROCEEDING SPECIAL    )
TITLE [RULE 3.400]                 ) CASE NO. JCCP5255
                                   )
SOCIAL MEDIA CASES                 )
                                   ) **CERTIFIED COPY**
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

NOVEMBER 10, 2025

APPEARANCES:

FOR PLAINTIFFS:            KIESEL LAW LLP
                          BY:  MARIANA A. MCCONNELL, ESQ.
                          8648 WILSHIRE BOULEVARD
                          BEVERLY HILLS, CALIFORNIA  90211

                          MORGAN & MORGAN
                          BY:  JOSH AUTRY, ESQ.
                          199 WATER STREET
                          SUITE 1500
                          NEW YORK, NEW YORK  10038

                          MORGAN & MORGAN
                          BY:  EMILY JEFFCOTT, ESQ.
                          220 WEST GARDEN STREET
                          9TH FLOOR
                          PENSACOLA, FLORIDA  32502

                          SOUTHERN MED LAW
                          BY:  MARC J. MANDICH, ESQ.
                          2762 BM MONTGOMERY STREET
                          SUITE 101
                          BIRMINGHAM, ALABAMA  35209


        (APPEARANCES CONTINUED ON NEXT PAGE.)


REPORTED BY:              ESTRELLA HERMAN, CSR NO. 13865
                          OFFICIAL COURT REPORTER PRO TEM
                          JOB NO. 216262

```
 1    APPEARANCES (CONTINUED):
      FOR PLAINTIFFS:            BEASLEY ALLEN LAW FIRM
 2                               BY:  JOSEPH G. VANZANDT, ESQ.
                                      DAVIS S. VAUGHN, ESQ.
 3                               218 COMMERCE STREET
                                 PO BOX 4160
 4                               MONTGOMERY, ALABAMA  36103

 5                               WAGSTAFF & CARTMELL LLP
                                 BY:  ADAM S. DAVIS, ESQ.
 6                                    JONATHAN KIEFER, ESQ.
                                 4740 GRAND AVENUE
 7                               SUITE 300
                                 KANSAS CITY, MISSOURI  64112
 8
                                 THE LANIER LAW FIRM
 9                               BY:  RACHEL LANIER, ESQ.
                                 2829 TOWNSGATE ROAD
10                               SUITE 100
                                 WESTLAKE VILLAGE, CALIFORNIA  91361
11
                                 SOCIAL MEDIA VICTIMS LAW CENTER
12                               BY:  GLENN DRAPER, ESQ.
                                 600 1ST AVENUE
13                               SUITE 102-PMB 2383
                                 SEATTLE, WASHINGTON  98104
14
      FOR DEFENDANT META:        COVINGTON & BURLING LLP
15                               BY:  ASHLEY M. SIMONSEN, ESQ.
                                 1999 AVENUE OF THE STARS
16                               SUITE 3500
                                 LOS ANGELES, CALIFORNIA  90067
17
                                 COVINGTON & BURLING LLP
18                               BY:  AMBER M. CHARLES, ESQ.
                                 ONE CITY CENTER
19                               850 TENTH STREET NW
                                 WASHINGTON, D.C.  20001
20
      FOR DEFENDANT SNAP INC.:   MUNGER, TOLLES & OLSON LLP
21                               BY:  FAYE PAUL TELLER, ESQ.
                                 350 SOUTH GRAND AVENUE
22                               50TH FLOOR
                                 LOS ANGELES, CALIFORNIA  90071
23
      FOR DEFENDANT TIKTOK:      KING & SPALDING
24                               BY:  MARK A. SENTENAC, ESQ.
                                 1180 PEACHTREE STREET NE
25                               SUITE 1600
                                 ATLANTA, GEORGIA  30309
26

27            (APPEARANCES CONTINUED ON NEXT PAGE.)

28
```

```
1    APPEARANCES (CONTINUED):

2    FOR DEFENDANT TIKTOK:      KING & SPALDING
                               BY:  RACHEL YEUNG, ESQ.
3                              633 WEST FIFTH STREET
                               SUITE 1600
4                              LOS ANGELES, CALIFORNIA  90071

5    FOR DEFENDANTS GOOGLE      WILSON SONSINI
     AND YOUTUBE:              BY:  LUIS LI, ESQ.
6                                   CHRISTOPHER CHIOU, ESQ.
                               953 EAST THIRD STREET
7                              SUITE 100
                               LOS ANGELES, CALIFORNIA  90013

8

9              (ADDITIONAL COUNSEL OBSERVING VIA LACOURTCONNECT.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1                           INDEX

2

3                          SESSIONS

4    MONDAY, NOVEMBER 10, 2025                         PAGE

5         P.M. SESSION                                    5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1   CASE NUMBER:              JCCP5255

 2   CASE NAME:                SOCIAL MEDIA CASES

 3   LOS ANGELES, CALIFORNIA  MONDAY, NOVEMBER 10, 2025

 4   DEPARTMENT SSC 12         HON. CAROLYN B. KUHL

 5   REPORTER:                 ESTRELLA HERMAN, CSR NO. 13865

 6   TIME:                     P.M. SESSION

 7

 8                             -oOo-

 9

10       THE COURT:  We have the Social Media JCCP.  The clerk has

11   taken the appearances of counsel appearing by LACC.  I'll take

12   appearances in the courtroom, please.

13       MS. MCCONNELL:  Good afternoon, Your Honor.  Mariana

14   McConnell, liaison counsel for plaintiffs.

15       MR. AUTRY:  Good afternoon.  Josh Autry for plaintiffs.

16       MS. JEFFCOTT:  Good afternoon.  Emily Jeffcott for

17   plaintiffs.

18       MR. VANZANDT:  Joseph VanZandt for plaintiffs.

19       MR. MANDICH:  Good afternoon, Your Honor.  Marc Mandich

20   for plaintiffs.

21       MS. LANIER:  Rachel Lanier for plaintiffs.

22       MR. DRAPER:  Glenn Draper for plaintiffs.

23       MR. VAUGHN:  Davis Vaughn for plaintiffs.

24       THE COURT:  All right.  We've got -- go ahead.

25       MR. KIEFFER:  Jon Kieffer for plaintiffs.

26       THE COURT:  I'm sorry?

27       MR. KIEFFER:  Jon Kieffer for plaintiffs.

28       MR. DAVIS:  And Adam Davis for plaintiffs.
```

1          MS. SIMONSEN:  Good afternoon, Your Honor.  Ashley

2    Simonsen of Covington & Burling for the Meda defendants.  And

3    we do have a representative from Meta here today.

4          MS. CHARLES:  Good afternoon.  Amber Charles also on

5    behalf of the Meta defendants from Covington & Burling.

6          MS. TELLER:  Faye Paul Teller from Munger, Tolles & Olson

7    for defendant Snap Inc.  And we also have a representative here

8    today.

9          MR. SENTENAC:  Mark Sentenac on behalf of the TikTok

10   defendant.

11         MR. LI:  Good afternoon, Your Honor.  Luis Li on behalf

12   of Google and YouTube.

13         THE COURT:  Okay.  All right.  You can all be seated.

14              There are a couple of matters raised in postings

15   I'm prepared to discuss with you, but my preference would be to

16   proceed with argument on the motions as agreed first unless

17   there's a beg to do otherwise.

18              Okay.  We'll start with the motions.  So we have

19   14 motions on calendar today.  They are motions to exclude

20   expert opinions on various bases.  In a Case Anywhere posting

21   on November 5, the parties have agreed to argue motions

22   pertaining to two experts and two plaintiffs and then present

23   brief argument with regard to one aspect of Expert McCarron's

24   report.

25              So we will proceed -- I'm assuming that you

26   would -- well, let me just ask.  It's defendants' motions.  How

27   would you proceed?  You've indicated 25 minutes per side on the

28   motions regarding Bagot and Murray.  How do you want to proceed

 1 | with that?
 2 |     MS. CHARLES:  Your Honor, we would suggest proceeding
 3 | together on those three motions because they have overlapping
 4 | issues.  I would intend to argue for approximately 20 minutes,
 5 | and then Ms. Teller would argue for the additional five.
 6 |     THE COURT:  Okay.  Is there any objection to that?
 7 |     MS. JEFFCOTT:  No, Your Honor.
 8 |     THE COURT:  Okay.  Very good.  You may proceed.
 9 |     MS. CHARLES:  Your Honor, with your permission, I do have
10 | some slides.  I'd like to project those.
11 |     THE COURT:  Okay.  Make sure you don't have any -- either
12 | of the plaintiffs identified except by their initials.
13 |     MS. CHARLES:  I do not have either identified by name
14 | given their age.  I have initials.
15 |     THE COURT:  Okay.  Good.
16 |     THE COURTROOM ASSISTANT:  Which side are you hooked up
17 | to?  Oh, the podium.
18 |     MS. CHARLES:  Yes.  There's only one.
19 |     THE COURT:  All right.  We have now figured out how to
20 | display a PowerPoint.  You may proceed.
21 |     MS. CHARLES:  Thank you.
22 |         Good afternoon, Your Honor.  Amber Charles on
23 | behalf of the Meta defendants.  And thank you for your time
24 | here today.  We know you're dealing with a lot of motions in
25 | this case, and we appreciate the opportunity to be heard on
26 | these specific cause motions given their importance to the case
27 | and the critical nature of the mental health harms at issue.
28 |         I will be discussing defendants' motion to

```
 1  exclude Stuart Murray, Dr. Stuart Murray, in the R.K.C. matter
 2  as well as Dr. Kara Bagot in both the R.K.C. and
 3  K.G.M. matters.  As I mentioned earlier, my colleague
 4  representing Snapchat will have additional argument related to
 5  Dr. Bagot.
 6            Plaintiffs offer Dr. Bagot and Dr. Murray for the
 7  opinion that each plaintiff suffers from various diagnosable
 8  medical conditions, many conditions that are not present in any
 9  medical records produced in this case and have never been
10  diagnosed by any treating physician but, instead, are diagnosed
11  for the first time in these expert opinions.  You can see these
12  diagnoses here for R.K.C., in addition, in the case of
13  Dr. Bagot, who is the sole specific cause expert in K.G.M. a
14  similar diagnosis.
15            We've moved to exclude these opinions as
16  unreliable on a number of bases that are laid out in our
17  papers.  Given time here today, we will stand on the papers for
18  several of those arguments, of course, subject to any questions
19  the Court may ask.
20            In particular, we have made certain
21  Section 230-related arguments, effectively, that Drs. Murray
22  and Dr. Bagot failed to distinguish between features and
23  content in her arguments.  We have also made the point that
24  Drs. Murray and Dr. Bagot failed to conduct any independent,
25  specific analysis and instead analyzed social media as a whole.
26  Those are critical issues, but given I know Your Honor has
27  heard them in a number of contexts, we will stand on the papers
28  there subject to any questions and focus our argument elsewhere
```

 1    today.

 2         MS. MCCONNELL:  Your Honor, I apologize, but the name is

 3    on the screen.  The last name is on the screen on the left.

 4         THE COURT:  Okay.  You'll have to take that slide down.

 5    Move on to the next.

 6              Thank you, Ms. McConnell.

 7         MS. CHARLES:  Thank you for that.  I apologize.

 8              Turning to the substance of Dr. Murray's and

 9    Dr. Bagot's reports, there are four main points to address

10    today.  The first that runs through both reports is a

11    fundamental methodological shortcoming that's common to

12    Dr. Murray and Dr. Bagot.  And that is that Drs. Murray and

13    Bagot rely merely exclusively on their own report of

14    recollected statements made to them by plaintiffs in the course

15    of unrecorded, private interviews which no contemporaneous

16    notes or transcript were provided.  And what this creates,

17    which is prohibited under California law, is effectively a

18    black box analysis where Dr. Murray and Dr. Bagot are offering

19    opinions that cannot be tested because the basis for their

20    opinions is only their own recollection of what plaintiffs said

21    to them.

22              And, critically, our argument is not that

23    clinical interviews are per se improper, and our argument is

24    not that there's any legal requirement for a verbatim

25    transcript.  Rather, as established by Onglyza and reflected in

26    Smith, there's a fundamental principle underlying Sargon that

27    in order to test liability, there has to be a common

28    understanding of the inputs and the facts that are considered

1  by an expert.  And that is necessary to determine whether the

2  analysis of those experts' opinion are reasonable or whether

3  there's too large a analytical gap.  And it's also necessary to

4  determine the reliability of their methodologies in terms of

5  understanding whether they have cherry-picked data as opposed

6  to offer a complete presentation of data.

7            For example, in the context of quantitative

8  model, unless you understand what numbers were input and what

9  numbers were excluded, you can't test the formulas.  Now,

10  plaintiffs say here, of course, that psychiatry is more

11  qualitative, but that does not lessen the rigor that is

12  required under Sargon.  And so this sort of black box analysis

13  fundamentally hides the bases for the opinions and prevents

14  adequate testing.  Both plaintiffs -- or both plaintiffs'

15  experts acknowledge that they have proceeded in this manner.

16      THE COURT:  So how would you proceed in a mental health

17  case if there's not a requirement to record an interview?

18      MS. CHARLES:  Well, certainly, you would --

19      THE COURT:  More particularly, the question is what does

20  the standard of practice for mental health practitioners

21  require?

22      MS. CHARLES:  Certainly, we believe at least

23  comprehensive notes that provide a full assessment of all of

24  the information asked and provided.  Now, in a clinical

25  setting, of course, practitioners typically take notes.  But,

26  here, in addition -- this is a forensic setting that's asking a

27  slightly different question than in a clinical setting.

28  Clinical experts may also be qualified to answer this; but, in

 1  a clinical setting, you're asked to evaluate a treatment -- and

 2  establish a treatment plan.  Here, they are purporting to opine

 3  on causation, and when purporting to opine on causation,

 4  understanding the inputs is critical.

 5            So we -- our experts proceeded in a manner where

 6  we provided a verbatim transcript of our evaluations.  Even if

 7  that is not required, certainly, comprehensive notes and all of

 8  the underlying testing data itself -- the raw data, not the

 9  expert's analysis of it -- is required.

10            Dr. Murray, for instance, he performed certain

11  tests.  And we asked, "Do you actually have the numerical

12  scores of those tests?"  And he said, "Well, I evaluated them;

13  and, effectively, my report summarizes them.  They became my

14  report."  But that's not the same as actually providing the

15  underlying information.

16            Dr. Bagot is similar.  We asked her, "Did you

17  record?"

18            "No, I didn't record."

19            "Do you know if there's a transcript?"

20            "No."

21            "Do you have a list of the questions you asked?"

22            And she said, "Well, they're sort of reflected in

23  the responses."

24            But her report also doesn't contain a list of

25  responses.  Her report contains, effectively, her opinions.  So

26  she took these inputs; she analyzed them; and then she provided

27  an assessment of what she believed was important.  But that's

28  different than providing the underlying data as a whole.  And

 1   this effectively sets an opinion that is built on shifting

 2   sands.  We cannot know the basis, so we cannot test the

 3   liability.

 4             Now, one of plaintiffs' responses is that their

 5   reports are comprehensive, that anything in the report is

 6   effectively -- or anything discussed in this interview is

 7   effectively in their report.  But we were able to identify in

 8   deposition multiple instances where that was not true, where

 9   there are instances where topics of all the key alternative

10   cause topics such as K.G.M.'s experience with parental

11   bullying, K.G.M.'s experience with siblings who underwent

12   health issues, R.K.C.'s mother's disruption from the family due

13   to an imprisonment -- we asked, "Did you discuss those?"  And

14   the expert said, "Yes, we did."

15             And we have reviewed their reports, and each time

16   there's no reference to discussion of those potential

17   alternative causes in the report.  And that underscores here

18   what we believe is indicative of cherry-picking that we cannot

19   fully test given the black box nature.

20             The second issue I want to discuss is Dr. Murray

21   and Dr. Bagot both use unreliable criteria to assess social

22   media addiction.  Now, we recognize, Your Honor, that you have

23   already ruled that an expert who diagnoses a plaintiff with a

24   disorder not recognized in the DSM-5, that is not sufficient

25   basis alone for exclusion.  And we do not intend to reargue

26   that here, and we preserved that issue.

27             But what we would -- we don't read your order as

28   indicating there's any sort of end run around the reliability

1  metric that underscores Sargon.  Rather, when any expert

2  diagnoses a medical condition, whether recognized in the DSM or

3  not, it is critical that they use a reliable methodology to do

4  so.  And, here, both experts have failed to identify such a

5  reliable methodology.

6            They indicated that they utilized scales and

7  assessments that considered and borrowed from other substance

8  use disorders such as gaming -- internet gaming disorder.

9  Well, internet gaming disorder, as I'm sure Your Honor has

10 heard, is not in the DSM-5.  It's in an area of conditions for

11 further study that specifically notes these proposed criteria

12 should not be intended for clinical use.  And so borrowing

13 criteria that are not intended for clinical use and

14 extrapolating them to diagnose an unrecognized disorder is not

15 reliable.  It's taking something that's not recognized as

16 reliable and extrapolating it further.

17            This is indicative of the scales that plaintiffs'

18 experts state they used.  Dr. Murray used something called the

19 Social Media Disorder Scale, the SMD Scale.  But the SMD Scale

20 itself is built on that same cross-reference to internet gaming

21 disorder and other criteria that are not intended for clinical

22 use.

23            Moreover, the manner in which these tests were

24 applied is unreliable.  They were completed outside of

25 Dr. Murray's presence.  You can see in the instructions social

26 media is defined very broadly to include things like web blogs,

27 forums, Twitter.

28            And, moreover, plaintiffs' response says, "Well,

 1  there's also a second questionnaire that R.K.C. filled out

 2  about social media use."  But that questionnaire is not

 3  diagnostic and does not purport to be diagnostic.  It's a

 4  collection of self-reported symptoms.

 5          Dr. Bagot's use of scales is similar.  We asked

 6  for the testing instrument she applied.  This on the screen is

 7  what we were provided.  Now, there's four pages of this.  It's

 8  a six-question test and then, for R.K.C.'s father, a

 9  90-question test.  These tests, again, were completed outside

10  of Dr. Bagot's presence.  She did not offer any common

11  understanding to the plaintiff about how to define social media

12  addiction.

13          Moreover, nowhere in her report is there any

14  explanation of any methodology she utilized to validate or

15  assess these results.  In fact, when asked, "What scale should

16  you use, and how many positive or negative answers do you need

17  for a diagnosis?" she said, "I can't give you a specific number

18  because there's many different scales that people utilize."

19          Remaining on testing instruments, there is a

20  Dr. Murray-specific issue that I do want to raise to the Court,

21  which is that he also misused testing instruments.  And this is

22  specific to Dr. Murray because he utilized additional tests

23  that Dr. Bagot did not use.  He utilized, for instance, an

24  eating disorder examination questionnaire, the EDE-Q; the

25  Social Media Use Scale, which is the self-report I referenced

26  earlier; and at the bottom is a panic scale, what you use to

27  diagnose anxiety.

28          Now, on the face of these instruments, they are

1  validated for a limited time period.  When they were designed,

2  the individuals who designed them put a limitation on their

3  reliable use.  You can see here, for instance, the EDE-Q is

4  only intended to be used for 28 days; the Social Media Use

5  Scale only for seven days.

6        Well, Dr. Murray appended a cover page when he

7  provided these to plaintiffs, and that cover page told them

8  expressly to disregard the intended validated use.  He said,

9  "Instead of basing your answers for symptoms over the last week

10  or month, base them at the time of your maximum symptoms."  In

11  R.K.C.'s case, that was over a year prior.  And this, again,

12  violates Sargon because you are taking tests, and you are

13  applying them in an unreliable manner contrary to expressly how

14  they were designed to be used.

15        Compounding this is that although R.K.C. is 14,

16  Dr. Murray applied, for example, an adult EDE-Q.  And the

17  response in plaintiffs' opposition is, "Well, he modified that

18  adult test."  But that doesn't solve the issue; it compounds

19  it.  So we have a test that was improperly applied

20  retrospectively, improperly applied to an age group it wasn't

21  validated for.  And then we have on top of that this same black

22  box issue of Sargon modifications that we don't know, that we

23  cannot assess, and that there is no basis in the report for us

24  or you to determine the reliability of it.

25        Plaintiffs' other argument is, "Well, these were

26  only confirmatory.  The tests were used to strengthen and

27  confirm opinions.  They were not -- there was also a clinical

28  therapy done."  Well, respectfully, again, Sargon doesn't

 1   create an exception where you can use an unreliable methodology

 2   to support your opinions as long as there's something else.

 3   Presenting these test results to the Court would violate

 4   Sargon.  They would give the imprimatur of expert reliability

 5   to tests that are used improperly and directly contrary to the

 6   instructions.

 7              The final point specific to Dr. Bagot, in her

 8   reports, she expressly stated that she conducted a differential

 9   diagnosis.  At her deposition when we asked, "How did you

10   conduct that differential diagnosis?" she corrected herself and

11   said, "I did not."  She did something she called a mechanistic

12   analysis, which, as far as we could tell in the deposition,

13   effectively meant a clinical interview where she looked at the

14   plaintiffs and she reached conclusions.

15              Now, in her deposition, Dr. Bagot said, "I

16   recognize all of these alternative causes -- bullying, learning

17   disabilities, familial strife, familial disruption -- I

18   recognize that those have a role."

19              And so we asked her, "Can you tell us what is the

20   breakdown?  How do you quantify?  How do you determine

21   causation as opposed to something else, something short of

22   that?"  And she replied, "Well, in a clinical perspective, we

23   don't give anyone breakdowns of how much anything caused the

24   diagnosis."

25              In a clinical setting, that may well be

26   appropriate.  But, here, the question that Dr. Bagot intends to

27   opine on to the jury is one of causation.  And California law

28   is clear that it is not enough to identify a slate of potential

 1  causes and simply choose one.  There has to be a reliable
 2  method, a differential diagnosis to rule out the other causes.
 3  And that's what's missing here.
 4              We also asked her similarly, "How do you tell
 5  what is significant?  You say social media had a significant
 6  impact, not, you know, short -- the other ones have a short
 7  list of impact, but there are alternative causes.  Where is the
 8  dividing line?  How do you reach that test?"  And her answer is
 9  telling because she said, "What we think is a significant
10  impact or what the person we're meeting with thinks has a
11  significant impact, then I would say significantly contributes
12  to something."
13              Well, that is fundamentally ipse dixit.  That is,
14  if I believe it to be significant or somebody tells me it's
15  significant, then it is significant.  And People v. Gonzalez,
16  59 Cal.App.5th 643 tells us that's not enough.  Even a
17  qualified expert cannot offer an opinion simply based on their
18  ipse dixit, simply based on their say-so.  And that is what's
19  done here behind the -- in the absence of any differential
20  diagnosis.
21              I do want to save some time for my colleague, so
22  I'll stop here unless the Court has questions.
23       THE COURT:  Okay.  Thank you very much.
24       MS. CHARLES:  Thank you.
25       MS. TELLER:  Should I need to do anything to get that
26  working?  There it goes.
27              There's a little bit of depo testimony.  That's
28  the only thing I'm going to show you today, Your Honor.  If it

 1   doesn't work, that's fine.  We'll just move on in terms of

 2   audio.

 3            Good afternoon.  Faye Paul Teller from Munger,

 4   Tolles & Olson for defendant Snap Inc.  In addition to the

 5   arguments that Ms. Charles raised on behalf of all defendants,

 6   we wanted to spend just a couple of minutes on Dr. Bagot's

 7   opinions regarding Snapchat because we believe they should be

 8   excluded as improper speculation.

 9            As the Court may recall, the objective data for

10   the plaintiff R.K.C. is that he used Snapchat for 3.8 minutes

11   total prior to filing a suit.  Plaintiffs' expert Dr. McCarron

12   validated that number, and Dr. Bagot conceded in her deposition

13   that five minutes of lifetime usage is not sufficient to cause

14   R.K.C. the injuries he alleges -- compulsive use, depression,

15   anxiety, and binge eating disorder.

16            (Video recording played.)

17       MS. TELLER:  Dr. Bagot did not consider that data in

18   forming her opinions.  That is the case even though she had to

19   concede the duration of access to the platforms is at least a

20   factor in assessing addiction.  You'll see that at page 607 of

21   her deposition.

22            So what evidence did Dr. Bagot rely on about

23   duration of usage to make her diagnosis?  In her report, she

24   stated that R.K.C. reported Snapchat usage of eight hours a

25   day.  That's in paragraph 30 of her report.  But when shown

26   that report -- the deposition testimony that was cited there,

27   which was to R.K.C.'s deposition, she conceded that she had

28   miscited that information and was not able to offer any other

1   evidence that plaintiff had used Snapchat for eight hours a day

2   at any point.

3               Instead, Dr. Bagot apparently relies on vague

4   statements from R.K.C., for example, that he used friend's

5   phone at lunchtime and that accounts for sufficient usage to

6   make her diagnosis.  That's at page 649 of her deposition.

7               This isn't just a black box as it refers to

8   Snapchat.  There's just zero information we have from Dr. Bagot

9   demonstrating the usage that is alleged to have caused his

10  injuries here.  The notion that she could conclude that

11  R.K.C. became addicted to Snapchat based on this, on these

12  nonspecific statements such as his friend's phone, is pure

13  speculation; and we do not believe it is a valid basis for an

14  expert opinion about addiction.

15              Instead, these opinions are result-driven --

16  results-driven.  Dr. Bagot ignores all objective evidence about

17  plaintiff's usage that is contrary to her conclusion and relies

18  entirely on plaintiff's own self-serving vague statements

19  during an interview that was not recorded, not transcribed, and

20  for which there are no notes.  Dr. Bagot's refusal to consider

21  the objective data and disavow her opinions that Snapchat

22  caused or exacerbated plaintiff's injuries only proves her

23  opinions are nothing more than seeking to support the results

24  that she is looking for.

25              For these reasons, Snapchat asks that the Court

26  exclude her opinion as to R.K.C.  Thank you.

27       THE COURT:  Thank you.

28              All right.  I'll hear from plaintiffs now.

1          MS. JEFFCOTT:  May it please the Court, Your Honor, my

2    name is Emily Jeffcott, and I'm here on behalf of plaintiffs

3    R.K.C. and K.G.M.

4               In denying defendants' motions for summary

5    judgment last week, Your Honor found a triable issue of fact as

6    to specific causation among other things.  And in doing so,

7    Your Honor relied on the plaintiffs' own testimony and, in some

8    instances, tied it to general causation opinions that this

9    Court had previously deemed reliable.

10              Now, the issue today is whether the specific

11   causation opinions of Dr. Bagot and Dr. Murray meet the Sargon

12   standard.  And we respectfully submit that they do.

13              So what is the Sargon standard?  And I think it's

14   important to point out that, under Sargon, an expert must

15   employ the same level of intellectual rigor, use the same

16   methods that are accepted in their professional discipline.

17   And, here, Dr. Murray and Dr. Bagot are both qualified --

18   extensively qualified in the field of adolescent psychiatry,

19   and they followed the same approach that they use in their

20   normal clinical practice.

21              Now, Dr. Bagot evaluated R.K.C. and K.G.M.,

22   whereas, Dr. Murray only evaluated R.K.C.  And as part of this

23   evaluation, they interviewed the plaintiff and the plaintiff's

24   caregiver.  They also reviewed their depositions.  They

25   reviewed the depositions of their mental health providers,

26   other treaters, and family members.  They also reviewed

27   records -- medical records, school records, and certain other

28   records ordered by defendants -- and they applied diagnostic

```
 1   tools.
 2              Now, drawing on all of that information, they
 3   assessed the plaintiffs' symptoms, identified and ruled out
 4   potential diagnoses, and then evaluated the causes and
 5   contributing factors underlying the plaintiffs' condition.
 6              Now, from this, both Dr. Murray and Dr. Bagot
 7   concluded that R.K.C.'s usage of defendants' platforms, and
 8   specifically his usage of certain features of defendants'
 9   platforms, caused him to become addicted to social media.  And,
10   from this addiction, he began to suffer other mental health
11   harms like sleep disturbances, anxiety, depression,
12   body -- binge eating, and suicidal ideations.
13              Now, with respect to K.G.M., Dr. Bagot similarly
14   concluded that K.G.M.'s usage of certain features on
15   defendants' platforms caused her to become addicted to
16   defendants' platforms, and that also caused her other mental
17   issues -- sleep disturbances, anxiety, depression, and body
18   dysmorphia.
19              Now, defendants raise a number of criticisms of
20   these opinions, and I'm going to start with the black box.
21   Despite what defendants say, the black box theory is
22   essentially that these experts needed to record or transcribe
23   their interviews, otherwise they're deemed unreliable.  But,
24   again, Sargon only requires that experts follow a methodology
25   accepted by the professional discipline.
26              And, here, defendants don't dispute that these
27   experts followed their standard clinical practice in how they
28   conducted these interviews.  And so defendants argue that, in
```

 1  litigation, these clinicians must deviate from how they
 2  normally do things from their accepted practice and transcribe
 3  these sessions with plaintiffs.  But that is not what Sargon
 4  requires.  And none of the cases that defendants cite support
 5  imposing this new elevated standard.
 6          All but one of these cases are, on their face,
 7  easily distinguishable.  In Gonzalez, the gang expert had no
 8  evidence tying the robberies to gang affiliations besides his
 9  own say-so.  Onglyza is a general causation case.  Hutchinson
10  involved an expert who tried to calculate a person's height
11  based on video stills using a process nobody had ever
12  evaluated.  That's a black box.
13          Now, the only case that's marginally relevant is
14  Amos v. Rent-A-Center, which is a nonbinding Florida decision.
15  But the problem wasn't just the absence of a transcript.  It
16  was the expert's wholesale lack of a methodology, which she
17  acknowledged.  She took no notes of her interviews with the
18  plaintiffs, failed to interview other family members about
19  whether or not the plaintiffs had harm, didn't review any
20  collateral records, ignored alternative causes, and wasn't
21  really even qualified to render the expert opinion in the case.
22  That's nothing like what we have here.
23          Dr. Murray and Bagot follow the same methodology
24  they used in seeing patients.  Furthermore, their reports are
25  detailed and specific.  They're filled with symptom histories.
26  There's a timeline; there are summaries of interviews; there's
27  quotes from the interviews.
28          Defendants' claim that they can't tell what

 1  questions were asked is simply not credible.  The reports make

 2  the scope and substance of these evaluations unmistakably

 3  clear.  And defendants also had hours upon hours to question

 4  these experts about the opinions and about what was said in

 5  these interviews.

 6          Now, moving to expert-specific issues, I'm going

 7  to start with Dr. Bagot.  The primary argument raised by

 8  defendants is that she disclaimed doing a differential

 9  diagnosis.  This is incorrect and really a matter of semantics.

10  And regardless of what you call it, it was reliable.

11          So let's go back to what she said in her

12  deposition.  What Dr. Bagot explained is that the differential

13  diagnosis represents the outcome of that diagnosis.  It's the

14  sheet of paper that has the diagnosis listed on it.  It's the

15  psychiatric conditions that best fit the plaintiffs'

16  presentation after others have been ruled out.

17          And she specifically noted that causation is not

18  addressed on the differential diagnosis.  It's that sheet of

19  paper that lists out the diagnosis.  The causation is addressed

20  through what she refers to as a mechanistic analysis that

21  evaluates the mechanism of the disease by looking at the

22  interviews with the plaintiff -- or the patient, the patient's

23  caregivers, reviewing the records, and assessing the

24  contributing factors.

25          Now, at the end of the day, it doesn't matter

26  whether you call this a differential diagnosis or a mechanistic

27  analysis.  What matters is that she applied a reliable,

28  accepted approach to evaluating plaintiffs, and she did that

 1   here.

 2          Now, defendants also argue that her differential

 3   diagnosis was flawed because she failed to identify in her

 4   report certain alternative causes, that she didn't take them

 5   from the -- excuse me -- that she didn't take them from the

 6   interview.  But that too is incorrect.  They reference the

 7   alleged domestic abuse in the home.  They also reference her

 8   sister's psychiatric issues.  Those are discussed and

 9   identified in the report.  She also, for both K.G.M. and

10   R.K.C., say that she used a circular logic to identify what the

11   contributing factors were and what was substantial.

12          But I think context is important in that

13   circumstance.  And what defendants were asking of her in her

14   deposition wasn't about substantial contributing factor and how

15   it applies across the spectrum of factors.  What they were

16   asking her was to quantify.  They were saying, "Can you look at

17   any one of these factors and tell me what percent applied to a

18   diagnosis?"

19          But there's nothing under Sargon or its progeny

20   that requires her to do that.  That's not what psychiatrists

21   do.  They don't say a learning disability is 2 percent of the

22   reason a patient has depression.  And as Dr. Bagot put it,

23   "That's just not what we do in psychiatry."

24          Defendants next argue that Dr. Bagot's opinions

25   are unreliable because social media addiction is not listed in

26   the DSM, and the bases for her criteria were derived from the

27   DSM, and that that is clinically unreliable.  Your Honor

28   previously addressed this.  And in finding that with respect to

1  general causation opinions that her reliance on the DSM was

2  appropriate, or the lack of a DSM diagnosis of a social media

3  addiction was appropriate, Your Honor pointed out that there is

4  not a single case that says that for there to be causation, it

5  has to be identified in the DSM.

6          Now, defendants have had another opportunity to

7  identify such a case, and they haven't.  And that's because one

8  doesn't exist.  And that's because the DSM and the ICD are

9  guides.  They're not the end all, be all on how to diagnose a

10 patient.

11         Now, opposing counsel referenced other scales

12 that Dr. Bagot used, and that's referencing the Bergen Facebook

13 Addiction Scale.  And the way that she applied it -- she did it

14 verbally.  She didn't hand out a checklist -- and applied

15 those -- she gave those slides to opposing counsel as an

16 example.  And she did it verbally and incorporated the answers

17 into her report as she was going through each factor of

18 addiction.

19         Now, Snap's counsel brings up data usage, and

20 they say that Dr. Bagot's opinion is unreliable because she

21 acknowledges that five minutes of total usage of Snapchat is

22 not sufficient.  But, again, Dr. Bagot did not rely on

23 defendants' data for a reason.  And there's two reasons.  One,

24 she's not a data expert, and she acknowledged that and that she

25 relied on plaintiffs' own data expert who said their data is

26 incomplete.  It's not -- it's not the totality of what we look

27 at.

28         And the second and equally important thing is

1  that that's not what she does in her standard practice.  She

2  doesn't rely on data from defendants.  That's not what she has

3  access to.  And, more importantly, she doesn't rely on it

4  because it's not important to her.  She relies on what the

5  patient, their family, their records, and their treating

6  patients say about usage patterns and effects.

7            And she explained this at her deposition.  She

8  testified that quantitative data doesn't add much because what

9  clinically matters is how and when the platforms are being

10  used.  And how she gets about that with a patient is that she

11  asks them, "What time of day are you using it?  Are you using

12  it at night?  Before you get up in the morning?  At school?

13  When you get home from school?  Right before bed?"

14            That's the type of information that matters to

15  her because that assesses the impact on life.  So raw data

16  numbers, they don't provide her the information that helps her

17  diagnose and treat patients.  And she did the same for

18  plaintiffs here.

19            Now, defendants argue that, essentially,

20  Dr. Bagot just paired what R.K.C. and his father said about his

21  usage, that the number they stated in the interview,

22  eight hours, is somehow unreliable.  But, again, she evaluated

23  R.K.C. and his father for malingering.  That was part of her

24  analysis.  And Dr. Bagot also corroborated her findings.

25            In their brief, defendants imply that Dr. Bagot

26  didn't review the testimony of Makayla Fedd.  Well, in her

27  report, she identified that she did review the deposition

28  testimony of treatment providers, and on her materials review

 1   list is included the testimony of Ms. Fedd.  And Ms. Fedd is

 2   R.K.C.'s treating therapist.  And she also cites to exhibits

 3   from Ms. Fedd's deposition in her report.  That is something

 4   she considered and she used to corroborate her findings.

 5            Now, turning to Dr. Murray whose opinions only

 6   relate to R.K.C.  They also take issue with his differential

 7   diagnosis saying that he failed to consider alternative causes.

 8   But he did so.  He looked at each and every one and identified

 9   the basis for which and how they apply to his overall

10   psychological well-being, and he weighed them.  And, here, the

11   issue is that defendants are simply unhappy with his

12   conclusions.  But that's not a proper Sargon challenge.  That

13   goes to weight, not to reliability.

14            Now, defendants also claim that Dr. Murray's

15   opinion is unreliable because he didn't rely on plaintiff's

16   data usage.  But just like Dr. Bagot, he's not a data expert;

17   and he acknowledges such.  He relies on what he typically does

18   in his practice.  He uses the interviews, the records, the

19   collateral information, not defendants' data.

20            In their briefing, they imply that Dr. Murray did

21   not evaluate R.K.C. for malingering.  But he did, and he said,

22   "I'm trained to do this.  I'm trained to assess malingering."

23   He explained that R.K.C. was difficult to draw symptoms from.

24   He was not somebody that was eager to exaggerate or dramatize

25   his condition and that, to the contrary, he was worried and

26   concerned about not wanting to burden his family with his

27   condition.  He too also corroborated what he saw with evidence

28   from the record and Ms. Fedd's testimony.

 1          Now, diagnostic tools -- defendants raise the

 2    same argument as they do with Bagot with respect to DSM and

 3    ICD.  And I won't repeat the argument that I raised earlier,

 4    but I will acknowledge that Dr. Murray at his deposition

 5    testified that he regularly diagnoses and treats conditions

 6    that are not formally listed in the DSM, and he does so when

 7    the clinical presentation and the research literature support

 8    doing so.

 9          An example of a DSM diagnosis that didn't occur

10    until much later is PTSD.  That wasn't added to the DSM until

11    years ago, but nobody disputes that PTSD has been around for

12    decades and decades.

13          Now, with respect to other social media scales

14    that he used, defendants claim he overrelied on them.  And I

15    want to be clear -- and he explained this -- these tools served

16    as adjuncts to his interviews, a way to cross-check and

17    contextualize what R.K.C. and his father reported.  He would

18    conduct the interview and look at the scales and see if there

19    were any discrepancies.  He did not diagnose R.K.C. based on

20    the scales.  He also didn't misuse these scales.

21          Defendants claim that certain scales were not

22    appropriate to use with R.K.C. because he's not an adult.  But

23    the literature says you can use them with someone that's

24    R.K.C.'s age, and Dr. Murray would have said the same had

25    defendants asked.  There is a dispute here, and this is the

26    type of dispute that defendants can raise during their

27    cross-examination of Dr. Murray.

28          And, Your Honor, with that, the issues raised by

 1  defendants are not true methodological challenges.  Dr. Bagot

 2  and Dr. Murray followed standard methods and did so at the same

 3  level of intellectual rigor demanded in their field of

 4  psychiatry.  Thank you.

 5        THE COURT:  Thank you.

 6        MS. CHARLES:  May I respond briefly?

 7        THE COURT:  Three minutes.

 8        MS. CHARLES:  Thank you, Your Honor.  First, on the point

 9  about the same methodology and clinical practice, Sargon does

10  require that an expert offer a candid assessment of the facts

11  considered and a way to test their opinions.  What the analysis

12  that was done by Drs. Murray and Dr. Bagot here consist of is

13  offering a causation opinion, which is not something they do in

14  their normal practice.  Dr. Bagot said as much.

15        And so, here, where they are answering a

16  different question, utilizing the fact that they may not record

17  clinical interviews does not answer the question as to whether

18  they have provided a sufficient basis for this Court to assess

19  whether they candidly made the evidence.  And the cases that we

20  cited found when there was a lack of that testable data, that

21  reliable data, you could not let an expert offer that opinion

22  under Sargon.

23        The black box here prevents us from knowing

24  whether the experts have cherry-picked.  They certainly say in

25  their reports and in their depositions, "I didn't cherry-pick,"

26  but there's no way for us to know because we have no basis to

27  go back to and look at the full picture.  And Sargon certainly

28  requires that you cannot simply ignore data that you don't

```
 1   like.  You cannot simply choose to not put it in your final
 2   report.
 3              And opposing counsel indicated things like
 4   familial bullying, the sister's suicide attempt, the mother's
 5   incarceration are in the reports.  Respectfully, I have not
 6   found them in any of the reports.  I've looked several times.
 7   We cited this in our papers.  I don't believe counsel provided
 8   any paragraph that references them, so I do not think that's
 9   correct.  I think those are examples of places where
10   plaintiffs' experts acknowledge that they talked about things
11   with these plaintiffs but did not provide a comprehensive
12   assessment.
13              Specific to Dr. Murray --
14       THE COURT:  Ms. Jeffcott did offer paragraphs of the
15   report.  Ms. Jeffcott did offer paragraphs of the report for
16   both -- for the analysis of both plaintiffs.
17       MS. CHARLES:  Correct.  There are paragraphs that purport
18   to discuss alternative cause.  I'm sorry if I was nonspecific.
19              I believe Dr. Murray does not reference in his
20   report specifically the incarceration that he says he spoke
21   about, and Dr. Bagot does not reference the sister's suicide
22   attempt.  So that -- those are examples.
23              But, yes, Dr. Murray, for example, does have
24   three paragraphs, paragraphs 127 through 129, that comprise his
25   entire section on purported analysis of alternative causes.  He
26   does identify some alternative causes there.  He doesn't
27   provide any assessment of why he chooses to disregard them
28   other than his saying, "I don't think they had an impact."  But
```

```
 1   you are correct, they are there.
 2              Briefly on his scales, there is an adolescent
 3   version of the EDE-Q.  The EDE-Q used is not validated for
 4   individuals under 16.  Dr. -- R.K.C. is 14, and Dr. Murray had
 5   him apply it retroactively to an earlier age.  I don't believe
 6   Ms. Jeffcott said that that is a way that he utilizes that test
 7   in clinical practice.  And if that is a way that he utilizes
 8   that test in clinical practice, I don't believe that makes it
 9   acceptable where the study -- as it's designed, the tool is not
10   intended for that sort of use.
11              And Ms. Jeffcott also said those scales were used
12   to corroborate.  Well, "used to corroborate" means they were
13   part of his methodology and their unreliability.  It means they
14   should not be presented to the jury in that manner.
15              We would ask that you exclude Dr. Bagot and
16   Dr. Murray's opinions on specific causation in R.K.C. and, in
17   the case of Dr. Bagot, K.G.M.  Thank you for your time.
18         THE COURT:  All right.  Thanks very much.
19              Okay.  Let's move on, then, to the specific
20   TikTok argument with regard to expert Meredith McCarron.
21         MR. SENTENAC:  I also have a handful of slides.  May I
22   approach, Your Honor?
23         THE COURT:  Not in the well.
24         MR. SENTENAC:  I'm sorry?
25         THE COURT:  Not in the well.  Go that way.  Give it to
26   Ms. Miro.
27              Okay.  I have them.  And if you can plug in,
28   that's fine.  Otherwise, I have it in front of me.
```

 1          MR. SENTENAC:  And if -- is it okay to post the slides,
 2   Your Honor?
 3          THE COURT:  Yes, you may.
 4          MR. SENTENAC:  Thank you.
 5          THE COURTROOM ASSISTANT:  I don't think you're plugged
 6   in.
 7          MR. SENTENAC:  I'm sorry?
 8          THE COURTROOM ASSISTANT:  There you go.
 9          MR. SENTENAC:  Sorry about the technical difficulty.
10          THE COURT:  It's okay.
11          MR. SENTENAC:  Mark Sentenac on behalf of the TikTok
12   defendants.  Thank you for the time to be here today,
13   Your Honor.  We wanted to appear even briefly to emphasize a
14   very important issue specific to TikTok.
15              And this is why we are here.  In particular, this
16   is a slide plaintiff showed you at the October 28 motion for
17   summary judgment hearing.  And they would like Ms. McCarron,
18   plaintiffs' data analysis expert, to offer opinions supporting
19   this slide regarding the number of interactions that plaintiffs
20   had on the TikTok platform.
21              But these numbers are fundamentally wrong.  And
22   it's not a matter of cross-examination or a difference of
23   opinion or a battle of the experts.  These numbers resulted
24   from fundamental errors in Ms. McCarron's processes, and it
25   would be deeply, deeply prejudicial to allow plaintiffs to
26   display them in an opening argument or to allow Ms. McCarron to
27   offer those opinions to the jury at trial.
28              As you can see -- let's just take a brief step

 1    back.  Ms. McCarron would like to offer the opinions that
 2    TikTok's time spent data, separately produced data is
 3    inaccurate because it doesn't track the number of interactions
 4    the plaintiff had on the platform and offer raw totals like we
 5    saw in the last slide regarding the number of interactions that
 6    plaintiff had on the TikTok platform.
 7                  But Ms. McCarron made massive error in
 8    calculating the number of interactions underlying this.  As you
 9    can see here, she counted -- double counted data related to the
10    very same interaction type.  For example, a video view --
11         THE COURT:  You say, "as you can see here."  I don't --
12    walk me through this.
13         MR. SENTENAC:  What's displayed here are interactions
14    data that were produced to the plaintiffs in this litigation.
15    And there are a number of different categories of data that
16    were produced, including a number of data related to video
17    views, interactions that Ms. McCarron calculates in coming up
18    with that total number on the first slide -- likes, messages,
19    shares, and, in this case, a video view.
20         THE COURT:  It's Greek to me.  If you want me to
21    understand it, you need to walk through line by line:  "Okay,
22    let's look at the IP session history.  What this is trying to
23    show is X."  I --
24         MR. SENTENAC:  Thank you, Your Honor.
25         THE COURT:  I've never seen -- okay.
26         MR. SENTENAC:  Yes.  No, no, no.  Thank you very much.
27                  The very top of this screenshot is a copy of
28    Ms. McCarron's backup data that was produced to us prior to her

 1  deposition, and it identifies the snapshot data that she used

 2  to calculate the number of interactions by plaintiffs on the

 3  TikTok platform.  And as you can see here, there's IP session

 4  history which shows a date stamp related to the date in which

 5  the interaction occurred, an IP address, and the country.  And

 6  you can see at the exact same time on the exact same day to the

 7  second, there's also metadata produced related to a video.

 8            That's the public, private, and deleted videos.

 9  And it identifies a video by a serial number, a unique

10  identifier related to a video at the exact same -- on the exact

11  same day at the exact same time at the exact same second.  And

12  then below that is the video IP again, a related video

13  interaction data related to the exact same video with the exact

14  same video ID, unique identifier, happening at the exact same

15  time on the exact same day at the exact same second.

16            And you can see that the IP session history,

17  which is data reflecting metadata related to the user's section

18  on the platform, matches exactly the video IP for the exact

19  same time ending.  And in calculating her interactions, as

20  Ms. McCarron testified at her deposition, she counted all three

21  of these as separate interactions in calculating the number of

22  interactions plaintiffs had on the platform.

23            And the same is true next.  There's a different

24  type of video interaction data.  This is video browsing

25  history.  At the top is Ms. McCarron's backup data reflecting

26  what she included in calculating the number of interactions on

27  the platform.  And below it, you see the same date time stamps

28  at the exact same time for a video play.

1        Does that help clarify things or --

2    THE COURT:  What does IP stand for?

3    MR. SENTENAC:  Internet protocol.

4    THE COURT:  Internet --

5    MR. SENTENAC:  Protocol.  Protocol.

6    THE COURT:  Protocol.  What does that mean, internet

7  protocol session history?

8    MR. SENTENAC:  This is data -- this is metadata related

9  to an interaction on the platform.  This is the data we're

10  talking about.  I know it's been discussed at very ambiguous

11  high levels about what it is that the user data --

12    THE COURT:  I'm asking you to explain it to me.

13    MR. SENTENAC:  That's right.  But in the nitty-gritty for

14  the interaction data --

15    THE COURT:  That's what you're asking me to look at here

16  is the nitty-gritty to see that there's double counting, so you

17  have to help me understand what these things are.

18    MR. SENTENAC:  Absolutely.  And so this is -- this is

19  metadata related to an individual user's session on the

20  platform, metadata related to the public, private -- this is a

21  user's video, and then video IP is what -- an IP address that

22  is an identifier for a device that is -- or the internet

23  protocol's an identifier related to the user that used the

24  device.  So that's why they match.  The IP session history and

25  the video IP match.

26        And I think the most telling thing about all of

27  this, besides the exact same video identifier matching and

28  the -- is the date and time stamps.  These are -- this is the

1  same account for the same user with something being counted

2  three times despite happening at the exact same second.

3            And perhaps I can simplify this even more,

4  Your Honor, which is we asked Ms. McCarron at her deposition if

5  she knew what IP session history was; what public, private,

6  deleted videos -- what these interactions are and whether she

7  knows if what these three events are showing are the same

8  interactions by a single plaintiff.  And if you'll excuse me,

9  I'll skip ahead one slide.

10            She doesn't know.  She doesn't know.  She

11  included everything after, perhaps, looking at some exemplar

12  data deduplicating it only based on the title of the document

13  that was given to her, according to her testimony, and she

14  doesn't know what was actually disclosed in the documents that

15  were provided her.  She's not an expert in device data as you

16  can see next to her.  She doesn't understand the details of

17  these things either.

18            And notwithstanding that, she was -- they would

19  like plaintiffs -- plaintiffs would like her to be able to come

20  to the jury and explain how many times plaintiffs interacted

21  with the platform.  And I submit to Your Honor that the events

22  we showed in the previous slide all happening at the exact same

23  second, at a minimum, are highly indicative of duplication or

24  triplication.  But it doesn't really matter because the reality

25  is Ms. McCarron's speculating.

26            And this is important.  It fundamentally impacts

27  her opinions, Your Honor.  She would like to offer the opinion,

28  like I said, that the time spent on the data is inaccurate

 1   because it -- the interactions doesn't track the time spent
 2   data that TikTok produced and the raw -- the raw numbers of
 3   course.  Of course, if she is double and triple counting those
 4   things, it will massively impact how the time spent data the
 5   TikTok defendants produced relate to the interactions and, of
 6   course, it would substantially inflate the number of
 7   interactions a plaintiff had on the TikTok platform.
 8                As you can see in the next slide here, we roughly
 9   estimate that Ms. McCarron's numbers -- although we've never
10   been produced the details of all of how she arrived at some of
11   these things, we roughly estimate at least a 40 percent error
12   rate, that she's inflated her numbers by almost 40 percent just
13   considering this duplication issue, which again, of course,
14   would be substantially -- it would be very prejudicial to allow
15   her to produce such incorrect numbers.
16        THE COURT:  What's the correct number?
17        MR. SENTENAC:  It -- I don't have that here today for
18   you, and I'm sorry.  But Ms. McCarron hasn't presented how she
19   arrived at those numbers to us, and I don't -- so I don't
20   have -- I don't have a basis to say what the exact right number
21   is according to her methodology.
22                The last thing I think is important to understand
23   is this doesn't -- this number doesn't reflect the number of
24   other errors we highlight in our briefing, including -- not
25   including certain time spent data, double counting certain time
26   spent data, including messages received that didn't include,
27   you know, an interaction by the plaintiffs themselves with the
28   platform.  There's a number of other foot faults that

 1 | Ms. McCarron made that also leave her opinions unsupported.
 2 |           And just to go back to the -- skip ahead to this
 3 | slide again, I do think it's important to emphasize the fact
 4 | that she doesn't -- she admits she's not an expert in device
 5 | data.  So Ms. McCarron does not have the requisite foundation
 6 | or the requisite expertise.
 7 |      THE COURT:  If I may.  Again, excuse me if I'm off base
 8 | on this, but the slides that you presented with the charts on
 9 | it, that's not device data; right?  Device data is -- you're
10 | using that to mean iPhone data; right?
11 |      MR. SENTENAC:  Well, to be clear, I -- this is all device
12 | data.  This is an application on someone's phone that is
13 | transmitting data back to TikTok.  And the interactions between
14 | TikTok servers and someone's device is device data.
15 |           That's -- I don't understand -- but, plainly,
16 | Ms. McCarron is not an expert in that, and I think the errors
17 | that -- the really significant, fundamental, and prejudicial
18 | errors reflect that.  And we would respectively request that
19 | Your Honor exclude her opinions, grant defendants' motion,
20 | particularly as to TikTok defendants.
21 |           And that's all I have unless you have any other
22 | further questions.
23 |      THE COURT:  Thank you.
24 |      MR. MANDICH:  Good afternoon, Your Honor.  Marc Mandich
25 | for the plaintiffs.  And I would also like permission to
26 | publish some slides, although in light of my targeted time, I
27 | don't know that I need them; but in the event I do and have
28 | time for them, do I have the Court's permission?

```
 1          THE COURT:  Sure.
 2          MR. MANDICH:  Thank you, Your Honor.
 3              So with all due respect to my opposing counsel,
 4   he's very confused on the points he's arguing.  Your Honor was
 5   correct, device data is a separate subject entirely, and -- oh,
 6   I haven't plugged it in yet.  Sorry.  Device data and her
 7   admission she's not an expert in device data is entirely
 8   unrelated to the interactions, and the defendant produced data
 9   that she analyzed primarily.  So Your Honor was entirely
10   correct about that.
11              Another thing I'd like to point out is the two
12   arguments that TikTok had indicated they wanted to argue today,
13   only one of them was argued to you.  Conspicuously absent from
14   their argument was their point about her supposed error in
15   using UTC instead of the plaintiff user's local time zone.  You
16   didn't hear about any of that for a reason.
17              I don't know if TikTok looked into this before
18   they made the argument or if they were just trying to play
19   gotcha, but Ms. McCarron did go back after they made that
20   representation to this Court, and the number of errors jumped
21   from 15 percent -- over 15 percent to over 20 percent when she
22   put in the plaintiff user local time zones.
23              The other points my opposing counsel made --
24          THE COURT:  What error rate?
25          MR. MANDICH:  The number -- the number of actions outside
26   of sessions.  So if -- I'll use the slide for this.  I'll skip
27   ahead a little bit.  Give me a second.
28          THE COURT:  So the number of actions that she identified
```

1  outside of session increased when she put in the correct time

2  zone?

3       MR. MANDICH:  Yes.

4       THE COURT:  What your representation is, is that in the

5  opposition to the motion?

6       MR. MANDICH:  Your Honor, in the opposition, we didn't

7  have that in there because TikTok had never clarified that the

8  proper time zone used was plaintiffs' user local time.  We had

9  gotten contradictory information from TikTok on that.

10           Through months and months of meet-and-confers, as

11  this Court is well aware, the data analysis has been a mess

12  because defendants have not been forthcoming with information.

13  In this case, it was contradictory information we got from

14  TikTok earlier which was -- as the other defendants, UTC is the

15  appropriate time zone to use.

16           On the first point on the double counting,

17  Ms. McCarron asked and participated in meet-and-confers -- and

18  my slides aren't coming up, but that's no matter -- for a data

19  dictionary for definitions of what their categories are.

20  Because much like it was to Your Honor, TikTok's categories are

21  not just readily apparent and including data analysis.  The

22  data dictionary was required to interpret another data

23  company's definitions and terms for what they use.  They were

24  not forthcoming with that information, and then they played

25  this gotcha game over double counting.

26           Events IP data was also not duplicative of video

27  browsing history, which is the two categories they talk about.

28  I do not know why this is not working.  But in the case of

1  R.K.C. --

2       THE COURT:  Well, I have -- I have your slide if you want

3  to reference.

4       MR. MANDICH:  Yeah.  The second slide, Your Honor.  In

5  their brief, they suggest these data points are identical.  For

6  R.K.C., we had video views totaling 115, and his events data

7  was over 18,000 events.  And if you -- if you then take that

8  argument and surmise, "Okay.  Well, they meant that events is

9  inclusive of video use," you need to define that.

10      THE COURT:  Okay.  I get that.  But defendants are

11  talking about total time spent on the -- on TikTok; right?

12  That's the argument that was presented today.

13      MR. MANDICH:  I apologize.  I'm not following.  Could you

14  ask me again, Your Honor?  What was your question?

15      THE COURT:  So as I understood defendants' argument, they

16  were arguing that Ms. McCarron had counted the number of

17  interactions --

18      MR. MANDICH:  That's right.

19      THE COURT:  -- and had said that there were 385,000 plus

20  interactions and that she had double counted; right?  When you

21  address her information that she provides -- or her opinion

22  that she provides about events that took place outside of the

23  time when TikTok's data showed that she was in a session,

24  that's a different issue.

25      MR. MANDICH:  That is, Your Honor.  She has multiple --

26      THE COURT:  Thank you.  I'm not -- I'm not a total idiot.

27      MR. MANDICH:  No, not at all, Your Honor.  I promise you,

28  I am more of an idiot about data than probably anyone else in

 1  this room.  That's why we have experts for it.

 2           But the point I wanted to make about the

 3  double-counting issue, which --

 4      THE COURT:  What is the double-counting issue in your

 5  lexicon?

 6      MR. MANDICH:  So they claim that the events IP data is

 7  duplicative of the video browsing history data that they

 8  provided.

 9      THE COURT:  Okay.

10      MR. MANDICH:  All right.  And in R.K.C.'s case, as you

11  see on that second slide, that's clearly not the case.  He has

12  115 video views, as I've highlighted there, and over 18,000

13  events IP data.

14           And so if we were to assume then that events IP

15  is inclusive of video use, it includes other events, other

16  interactions besides those and she double counted 115 for

17  R.K.C., well, still, we're scratching our heads and saying,

18  "TikTok, explain this," as we did in meet-and-confers because

19  if you look at K.G.M.'s it's the reverse.  If video views are

20  included within events IP, then video views should be less than

21  events IP as it is for R.K.C.  In K.G.M.'s case, you have

22  substantially more video views than events.

23           So this is just another factor pointing to the

24  unreliability of defendants' data -- of TikTok's data,

25  specifically in this case.  It's inconsistent across the

26  plaintiffs.  And it doesn't make logical sense, which is

27  ultimately what Ms. McCarron's point is.  There are very

28  logical, provable inconsistencies in their data that call into

 1  question the reliability of their data gathering at the
 2  individual user level.  Also, the initial slide my opposing
 3  counsel shared was not Ms. McCarron's math.  That was -- that
 4  was counsel's math, but that's neither here nor there.
 5            They also criticize -- I think I heard my
 6  opposing counsel criticize her for having too few examples.
 7  The cherry-picking -- in the argument you just heard, they
 8  cherry-picked two or three examples that I think my opposing
 9  counsel kind of struggled to explain to Your Honor.  They don't
10  show the tens of thousands of errors.
11            But even if they had, if we looked at Slide
12  No. 3 -- and then I'll point you to one more after that --
13  there are multiple factors in Ms. McCarron's analysis that
14  their arguments here do no violence to.
15            On Slide No. 3, the video views are the little
16  blue piece.  And if you were to ignore that, you still have
17  portions where there's zero time spent with interactions,
18  portions where there's very high time spent with no video views
19  or events, increasing interactions with falling time spent, and
20  principally many interactions with videos with apparently no
21  videos viewed, a logical and provable impossibility since
22  TikTok's a video-viewing platform.  It opens to a video when
23  you open the app.
24            If you look also at my Slide No. 9, another
25  opinion that their arguments here do no violence to, this is
26  within one data set.  There's no cross-comparison here.  This
27  is TikTok's session data.  And in all of these you see -- if
28  you're looking at it and you look to the left where I've

 1 | highlighted "Session End Action Type," that other highlighted
 2 | column next to "Action," it says "Session End," the only thing
 3 | you should see there is "Session Start."  You can't end the
 4 | session you didn't start.
 5 |         There were also, she pointed out in her report,
 6 | hundreds of thousands of times you had session end and then
 7 | activity on the platform -- likes, comments, shares, other
 8 | interactions -- long before another session started.  All of
 9 | those are provable errors that make the data fundamentally
10 | unreliable, as Ms. McCarron testified.
11 |         So in addition to that, if you look at Slide 7,
12 | another opinion that they haven't touched on here, TikTok more
13 | so than any of the other defendants, have very short retention
14 | periods for their time spent in sessions data and
15 | notifications, all starting for R.K.C., K.G.M. and plenty more,
16 | in 2022, '23, and '24.  K.G.M.'s use started in 2016 --
17 | what? -- eight years before the earliest event -- six years
18 | before the earliest event.  R.K.C., five years before the
19 | earliest event.
20 |         And these are not just missing -- these are large
21 | chunks of missing time from their usage that make their data
22 | unreliable to give a picture of their usage over their relevant
23 | time periods.  It's also the critical time periods when they
24 | were young and when they were injured by the platform.
25 |         So for all of those reasons that they don't touch
26 | here, Ms. McCarron's opinions are reliable; and matters that my
27 | opposing counsel brings up are matters for cross-examination.
28 | They want to cherry-pick and play gotcha with supposed errors

1  in her analysis that do not affect the reliability of her

2  methodology.  Her methodology was endorsed, actually.  They

3  don't like to, and they try to skate out of it, but all of

4  defendants' experts endorse that data validation is a critical

5  part of data analysis.  It's a necessity first step.

6          That cross-comparison of complementary data sets

7  is a valid and reliable methodology for doing data validation.

8  One of them actually did the same kind of analysis comparing

9  the DFCs to the snapshots.  The others use the comparison that

10 defendants argue is inapt; they compared DFS to device data.

11 They weren't experts in device data either.  You don't hear

12 them arguing that they should be excluded on that.

13     THE COURT:  Okay.  Let's go back to defense counsel's

14 second substantive slide, the -- the third slide in their deck.

15 Do you have a copy of that?

16     MR. MANDICH:  Yes.  Are you talking about the 145,000

17 duplicated interactions?

18     THE COURT:  No, sir.  I'm talking about the one before

19 that.

20     MR. MANDICH:  Okay.

21     THE COURT:  It says, "Ms. McCarron double counted tens of

22 thousands of interaction."

23          Okay.  Is IP session history and video IP the

24 same thing?

25     MR. MANDICH:  I don't know the answer to that,

26 Your Honor.  What I -- what I do understand them to be saying

27 in their brief is that either video browsing history -- you see

28 browsing history and events IP data are identical or

1  duplicative categories or that events IP data is inclusive of

2  all of the video browsing history and that was duplicative.

3  That's what they argue in their brief.  And the second part of

4  that is an implication I'm taking from it because it's not

5  entirely clear.

6              And much like -- it's understandable Your Honor

7  has questions about what these categories are because they were

8  not defined to us either, and opposing counsel can't define

9  them here today.  So someone looking at this, you can't -- a

10 data analyst expert looking at this -- you can't assume that

11 the producer of the data is producing duplicative data to you.

12 That's why she asked questions, and she didn't get answers to

13 it over months and months of meet-and-confers over this, and

14 now we're here playing gotcha about it.

15             But even if we put that aside, Your Honor, as I

16 noted, this is a matter for cross-examination.  Supposed errors

17 in her analysis do not touch the reliability of her

18 methodology, which is what the Sargon issue is.  They don't

19 approach that.  They can't because their defendants endorsed

20 it -- I mean their experts endorsed it, Your Honor.

21             And so that's all I've got to say.

22        THE COURT:  Okay.  Very good.  Let me ask defense counsel

23 a question here if I may.  Okay.  So if you would look at

24 slide -- plaintiffs' Slide 3.  Okay?  So this -- as I

25 understand it, this purports to be activity on the device at a

26 time when the sessions data would show the person was not on

27 the device.  Is that how you understand it?

28        MR. SENTENAC:  My understanding is this is what -- Mark

1  Sentenac on behalf of the TikTok defendants.  My understanding,

2  this is one of Ms. McCarron's images or charts perhaps from her

3  report.  I believe she's amended it at least once.  But

4  the -- this reflects one of her attempts to compare two

5  different, frankly, not comparable data sets -- the time spent

6  data, which is the line on the graph, and then the separate

7  interactions data, which is the likes, comments, video views,

8  et cetera, that Ms. McCarron -- that TikTok separately

9  produced.

10          And the reason why this is a process issue and

11  her opinions are unreliable under Sargon is because her entire

12  opinion on the inconsistencies in the data is based on how

13  these graphs look to her; right?  This is her -- her sanding

14  test.

15          THE COURT:  I wanted to ask you a question.  Okay?  So I

16  think you've answered my question.

17          MR. SENTENAC:  My apologies.

18          THE COURT:  That's what this purports to be, is a --

19          MR. SENTENAC:  Is a comparison, yes.  But it --

20          THE COURT:  If I may -- if I may ask the next question,

21  which is assuming that is accurate, which you may not say it is

22  accurate, it is affected by your Slide No. 3?

23          MR. SENTENAC:  Yes, absolutely.

24          THE COURT:  Why?  Why?

25          MR. SENTENAC:  There's a couple reasons.

26          THE COURT:  Okay.

27          MR. SENTENAC:  One, the interactions are not tabulated

28  correctly; right?  She's double counted the number on here.

1   And as our motion also explained, she has -- she has at times

2   double counted or not counted all the time spent data.

3            And I jumped the gun, but this is a question I

4   was getting to next, which is her entire opinion is based on a

5   visual analysis of these charts.  But if you shrink the number

6   of interactions or grow the number of -- the line on the time

7   spent, then that changes.  And she hasn't redone these

8   calculations to eliminate duplication, and so these should

9   change.  And we don't think they should, and we think that to

10  offer them as they currently exist would be fundamentally

11  unfair and prejudicial.

12           And I just want to make sure -- well, let me just

13  make sure that answers your question.

14       THE COURT:  Your answer is you need to redo the

15  calculations to eliminate the duplication, and that that is

16  what is wrong in her slide -- in Slide 3; is that correct?

17       MR. SENTENAC:  Correct.

18       THE COURT:  Thank you.

19       MR. SENTENAC:  If I may just briefly respond to a couple

20  things that opposing counsel mentioned.  And I want to make

21  sure that my attempt to explain the -- what was shown on our

22  Slide 2 is very clear.  It -- it's very simple.  It's just

23  data -- user account data that would be logged when --

24       THE COURT:  It's -- it's not clear.  So thank you.

25       MR. SENTENAC:  So when a user logs in --

26       THE COURT:  You haven't explained to me how IP session

27  history is the same as video IP and public, private, and

28  deleted videos.

1          MR. SENTENAC:  So opposing counsel tried to characterize
2    this as there should be an exact same number of different types
3    of entries.  These are different data types collected, and when
4    a user logs in and views content, certain information is
5    logged.  And one of those might be their IP address, for
6    example, which is a unique internet identifier.  One of them --
7    additional information is the video that they saw would be
8    logged, the video ID; right?

9               And these are different data types that track
10   different information, but they all relate to the exact same
11   interaction, which is the playing of a video.  The IP session
12   history is arguably duplicative in and of itself because it --
13   all it is reflecting is some data, all IP session history.  It
14   just is -- it is someone opened the app, someone logged into
15   the app; right?  It's no different.  And as counsel just
16   represented to you, when you open the app, you automatically
17   see videos.  So it's also in and of itself duplicative.

18               And I think what -- I think what you heard a lot
19   of from my opposing counsel was a lot of speculation and
20   complaints about gotcha games.  I'd like to remind the Court
21   and opposing counsel that they sat down with TikTok's PMQ
22   witness for a full day and got to ask them questions about
23   TikTok defendant's user data, and he stated under oath the time
24   zone issue which plaintiff said was never clarified.  It's
25   frankly a little bit surprising to hear that argument given the
26   testimony and full day of questioning they had.  They had a
27   right to clarify this information.

28               The last thing I wanted to point out, Your Honor,

1  is they spent a lot of time comparing the number of

2  interactions during this period of time.  This particular

3  chart, since you focused on it, is a good example.  This data

4  has -- is different data sources.  It covers different time

5  periods.  It doesn't always necessarily relate.

6           And Ms. McCarron did a very apples-and-oranges

7  comparison by saying you have zero time spent but a bunch of

8  time watching videos according to this different data set;

9  right?  But that doesn't mean anything given this

10  apples-and-oranges comparison if data wasn't produced for the

11  same time period that other data was produced.  They're not

12  making a valid comparison, which is what they would like to do

13  and Ms. McCarron is doing.

14           So with that, unless you have any further

15  questions, Your Honor.

16      THE COURT:  I have lots of questions.  I'm not getting an

17  answer.  Thank you very much.  It hasn't been explained.  I'm

18  sorry.  It hasn't been explained.

19      MR. MANDICH:  Your Honor, I could --

20      THE COURT:  I mean, I could perhaps say what I gathered

21  from all of this, which was would you look, please, at -- at

22  the segment that is called "IP Session History."  It has a

23  date.  Do you see the date?  Yes, I see the date.

24           The date is the time the IP session history

25  began; correct?  Defense counsel?

26      MR. SENTENAC:  This is -- that is the time stamp, the

27  start of the session -- the IP session history, yes,

28  Your Honor.

1    THE COURT:  That is the time that the user started a

2    session; correct?

3    MR. SENTENAC:  According to the IP session history, that

4    is -- yes, that is the time stamp for a session.

5    THE COURT:  Stop right there.

6         All right.  It does not indicate the length of

7    the session.  It indicates the start of the session; correct?

8    MR. SENTENAC:  Correct.  It only includes certain

9    metadata for the session.

10   THE COURT:  Then when it says "public, private, and

11   deleted videos," that is indicative of the identity of the

12   video that was being used at that time; is that correct?

13   MR. SENTENAC:  The public, private, and -- is account

14   data related to a video, correct, a user's video.  And it also

15   identifies certain information, including the video, and it

16   provides a link to the video.

17   THE COURT:  Okay.  And the video IP -- I don't have an

18   idea what that is or how it's different from public, private,

19   deleted videos.  I mean, presumably, the company is interested

20   in how many times a video is viewed, yes?

21   MR. SENTENAC:  Sure.

22   THE COURT:  Okay.  So which -- which of these tells the

23   company that?  Video IP, public, private, and deleted videos?

24   MR. SENTENAC:  None of these will explain how many times

25   a particular video was played.  This is -- this is account data

26   for a particular user, right, a particular plaintiff and is

27   logging a particular user's specific interactions at a very

28   specific time on the TikTok platform; right?

1              This is a -- this is a user account data as
2    opposed to consolidated or platform-wide data or data about
3    specific videos which plaintiffs have taken discovery on in a
4    different context.  This all was produced in the context of
5    plaintiffs' requests for individualized account user data for
6    specific users and specific accounts.
7         THE COURT:  Please, please, if I may.  I'm trying to
8    understand your slide.  All right?  I think I understand what
9    IP session history is.
10             You're saying that public, private, and deleted
11   videos gives the same time stamp.  And what is it -- what
12   information is it providing to your company?
13        MR. SENTENAC:  The public, private, and deleted videos
14   identifies the specific video that a user used, the date and
15   time -- or viewed, the specific data and time of that view and
16   a link.
17        THE COURT:  Good.  Okay.  What does video IP record?
18        MR. SENTENAC:  It is in connection with the same video,
19   identifies the video, the date, time, and stamp -- the date and
20   time of that video accessed by this particular user and the IP
21   address and country, location.  So it's different data related
22   to the same user.
23        THE COURT:  It identifies the video differently.
24        MR. SENTENAC:  Correct.
25        THE COURT:  Okay.
26        MR. SENTENAC:  Yes, correct.
27        THE COURT:  Different identification.
28             Let's look at video browsing history.  Video

 1  browsing history has a date and time.  Actually, it has two

 2  dates and times; correct?

 3        MR. SENTENAC:  So that is two different -- it may

 4  have -- the picture above is Ms. McCarron's backup data.

 5  There's two examples of browsing history and two events of IP

 6  data.  So that would be two different videos with a link

 7  identifying the video and the date and time for both.

 8        THE COURT:  So it has -- those dates and times, are they

 9  the same or different?  They're the same; correct?  You've got

10  them in red.

11        MR. SENTENAC:  They are the same with respect to the

12  video browsing history, the first video browsing history and

13  the first events IP.

14        THE COURT:  I'm trying to understand.  Video browsing

15  history consists of four lines, yes?  The first two of the

16  lines are in red boxes, and that is -- those are exactly the

17  same; correct?

18        MR. SENTENAC:  No.  If you're looking at just the video

19  browsing history box --

20        THE COURT:  And I'm sorry.  I'll be honest.  I've been

21  having trouble with my eyes, and I -- I can't see that they're

22  the same.  Are they the same?

23        MR. SENTENAC:  They are not the same.  These are two

24  different video views -- video browsing history events for a

25  particular user on a particular date and time.  And the first

26  one is 6:49:13 a.m. UTC on November 20, 2023; the second one is

27  the same day, November 20, 2023 at 6:49:35 a.m. UTC.

28        THE COURT:  Okay.  So those are two different times.

```
 1    Thank you.
 2              And then underneath each red box is something.
 3    And what is that?
 4         MR. SENTENAC:  That's a hyperlink to the video, the video
 5    view.
 6         THE COURT:  To the video that they were viewing.  Okay.
 7    So those are two different -- are they related in any way, just
 8    those two?  They're not related in any way; right?
 9         MR. SENTENAC:  In this example, we provided two.
10         THE COURT:  So then when you go to events IP, the first
11    one in the red box relates to the first one in the red box
12    under video browsing history; correct?
13         MR. SENTENAC:  Exactly.
14         THE COURT:  The second one in the red box under events IP
15    relates to the second one in the video browsing history;
16    correct?
17         MR. SENTENAC:  Exactly.
18         THE COURT:  Okay.  Very good.  So what information
19    is -- and just to confirm in -- under video browsing history,
20    the red box at the top is the same as the red box at the top in
21    events IP; is that correct?
22         MR. SENTENAC:  Correct.
23         THE COURT:  And, again, I'm sorry.  I can't read it.
24    It's small, and I've literally been to two eye doctors in the
25    last ten days.
26         MR. SENTENAC:  I'm sorry.
27         THE COURT:  And the second red box under video browsing
28    history is the same as the events IP second box.  Is that the
```

 1    same?

 2         MR. SENTENAC:  Correct.

 3         THE COURT:  Okay.  So what is the difference between

 4    video browsing history definitionally?  What is that providing

 5    to your company?

 6         MR. SENTENAC:  So, again, this is two different data

 7    types, tracks two different sources that identify slightly

 8    different information.  The first one identifies --

 9         THE COURT:  What does the first one identify, please, the

10    browsing history?

11         MR. SENTENAC:  The video that was viewed, a link to the

12    video.

13         THE COURT:  A link to the video.  Thank you.

14              Events IP, what information is provided with

15    regard to the red box there?

16         MR. SENTENAC:  The IP address for the event, the event

17    type, which says video play, and country, location.  So it's

18    different information related to a video play.

19         THE COURT:  Okay.  Okay.  Thank you.

20         MS. MCCONNELL:  Your Honor, may I?  We would be happy to

21    make Ms. McCarron available for Your Honor's purposes.

22         THE COURT:  Look, I can't take all the depositions that

23    you -- that plaintiffs took of the data PMQs for the companies.

24    Counsel has to come and tell me and represent what -- what

25    these entries are.  Because you want me to keep out their

26    expert's interpretation of it, and so I need to know that it's

27    absolutely wrong.  Okay?  Okay.  Thank you.

28         MS. MCCONNELL:  Thank you, Your Honor.

```
 1         MR. SENTENAC:  May I just also offer to submit
 2   supplemental briefing?
 3         THE COURT:  I don't know.  I'll take a look at it in
 4   light of these arguments and see what I need to decide.  Thank
 5   you.
 6         MR. SENTENAC:  Thank you.
 7         THE COURT:  And I'm sorry.  I'm probably more upset about
 8   this because of the situation with my eyes.  Hopefully, I'll
 9   take care of that soon.
10              Okay.  Let's talk about the status conference
11   issues that we have.  So we had a posting of September 7 --
12   well, okay.  So this is the issue about the additional material
13   facts and the errata with respect to the issue -- with respect
14   to the additional material facts going back to those summary
15   judgment motions and defendants' desire to bring a motion to
16   strike some part of it or the entire notice of errata or
17   something like that.
18              Let me just say that having looked at this,
19   everybody having explained as best they can what happened, I am
20   not convinced that -- that defendants did not -- well, that's a
21   double negative.  It seems to me that the deadline for
22   objection with respect to those motions was the deadline, and I
23   don't think that defendants were misled sufficiently for me to
24   extend that deadline.  If with that tentative you still want to
25   bring a motion, I'll hear it.
26         MS. SIMONSEN:  Thank you, Your Honor.  Ashley Simonsen
27   for the Meta defendants.
28              And this is a motion specific to Meta.  There was
```

 1  nothing in the record to object to, Your Honor, because the
 2  plaintiffs failed to put it in the record.  And the notion that
 3  we were to guess as to what excerpts of these documents they
 4  intended to put in the record or the entirety of the documents
 5  which was, of course, what they did actually intend to put in
 6  the record, and then object and move to seal, I think, is
 7  placing the blame on us for an error that really was committed
 8  by the plaintiffs.
 9      THE COURT:  Well, defendants -- excuse me -- plaintiffs
10  clearly committed an error, it's true.  The question is whether
11  you were prejudiced to the extent that you were excused from
12  the deadline.  Figure out a briefing schedule for the motion,
13  and I'll hear it.
14          Okay.  Next we have scheduling issues that have
15  been hanging out there.  This was a posting of November 6.  So
16  you've agreed that Meta's motion to seal as to the proper forum
17  motion for summary judgment errata filings is to be filed
18  November 24, and I'm fine with that.
19      MS. SIMONSEN:  Thank you, Your Honor.  That was a date we
20  agreed to, of course, if we are permitted to file a motion to
21  strike and Your Honor's willing to consider that.  It
22  does -- the issue is that then we suffer the prejudice from the
23  plaintiffs' filing of voluminous -- you know, 4,000 pages of
24  hard documents.
25      THE COURT:  It was -- they're going to use them at trial
26  anyway, so let's figure out what I'm going to seal.  That's my
27  opinion.
28      MS. SIMONSEN:  And I understand that's your view,

1  Your Honor.  Respectfully, the volume of material I don't think

2  would be possible to present at trial.  And this is a problem

3  we're facing now in the MDL as well with plaintiffs having

4  filed thousands of our documents in full on the record that

5  could never be presented at trial.  And this is precisely the

6  scenario that Overstock says is improper and --

7       THE COURT:  Hang on.  180 -- no -- 209 documents and a

8  bunch of them were depo -- a bunch of them were depos.  Okay.

9       MS. SIMONSEN:  Your Honor, it was 4,000 pages, and the

10  vast majority of these documents, all of them were attached in

11  their entirety, not specific excerpts of the relevant material,

12  which is what Overstock says parties are supposed to do on a

13  motion for summary judgment.  They're not relevant to the

14  issues we raised on summary judgment, which we can explain in

15  our motion to strike.

16            The fact that they were late is really not even

17  the issue.  It's the fact that this is a clear violation of

18  Overstock, and we'd like the ability to show you --

19       THE COURT:  Okay.  You can do that.

20            I also need to rule on -- I don't think you all

21  understand the volume that we're facing here.

22       MS. SIMONSEN:  I do, Your Honor, and that's why

23  we -- Your Honor should not have to deal with motions to seal

24  4,000 pages of material, nor should Meta have to incur the

25  burden while we're also trying to move to seal the hundreds of

26  documents filed in connection with the other motions.  I assure

27  you, Your Honor, we are trying to be reasonable here.

28       THE COURT:  200 documents is not many.

 1      MS. SIMONSEN:  It's 4,000 pages, Your Honor.  And we've
 2  got to go line by line to ensure that, for instance, specific
 3  employees' names that should be redacted get redacted.
 4      THE COURT:  But I've given you the general ruling with
 5  regard to employees' name.
 6      MS. SIMONSEN:  Understood, Your Honor.  But it's still
 7  4,000 pages of material, and we do still have to make sure that
 8  there are not trade secrets in those materials.
 9      THE COURT:  Well, when are you going to move to seal
10  them?
11      MS. SIMONSEN:  We can move to seal tomorrow, Your Honor.
12  I'm sorry.  We can move to strike tomorrow.  The motion to
13  seal --
14      THE COURT:  When are you going to move to seal if they
15  stay in?
16      MS. SIMONSEN:  Well, the agreement we reached with
17  plaintiffs was November 24.  But if Your Honor cannot rule
18  before then, which I assume you cannot, we would like to move
19  to seal within -- I think we could do it within ten days after
20  Your Honor rules on the motion to strike as to the specific
21  materials Your Honor allows to remain in the record.
22      THE COURT:  Well, at the same time, you're asking me --
23  everybody's asking me to rule on more motions in limine, which
24  I understand.  Okay?  So -- to say nothing of the 14 motions on
25  for today, only three of which were argued.  I don't know what
26  to say.
27      MS. SIMONSEN:  Your Honor, the motion to seal has to be
28  filed only because plaintiffs put forth 4,000 pages of --

1    THE COURT:  I understand that.  But when are we going

2    to -- assume I agree with you -- assume I disagree with you

3    after the motion is heard.  When are we going to do the motion

4    to seal?

5       MS. SIMONSEN:  We can file it within ten days after

6    Your Honor rules on the motion to strike.

7       MR. AUTRY:  Your Honor, we oppose that schedule.  We

8    think the 24th of November was a generous offer.  We don't

9    think that 200 exhibits is outrageous.  The other defendants

10   were able to do their motions to seal, and we think Meta should

11   be able to as well.

12          We would also say that, procedurally, these

13   documents were identified.  And even though there was the error

14   with the attachment, Meta made objections to the documents in

15   their response to our summary judgment filing indicating --

16      THE COURT:  You know, I understand the merits of what

17   you're arguing.

18      MR. AUTRY:  But -- but those reasons --

19      THE COURT:  I get it.  I'm going to have to let them.

20   We're not in federal court where, you know, Judge Gonzalez

21   Rogers can say, "You're not filing that document.  You're not

22   filing that motion."  I don't get to do that.  You can file it.

23   We'll figure out about the sealing later.

24      MS. SIMONSEN:  Thank you, Your Honor.

25      THE COURT:  But let me tell you, you guys are going to be

26   redacting documents two minutes before trial.

27      MS. SIMONSEN:  Understood completely, Your Honor.  Thank

28   you.

```
 1          THE COURT:  We ought to get it done now.  Okay?  And
 2   confer about a briefing schedule.  I don't know when I'll be
 3   able to hear it.
 4          MS. SIMONSEN:  Thank you.
 5          THE COURT:  Okay.  So you had -- and, again, I'm going on
 6   the November 6 filing -- the November 6 posting.  So you have a
 7   discussion there about the schedule for briefing I.P.'s
 8   motions.  So, first of all, I do want the motions to seal as to
 9   the I.P. motion for summary judgment to be handled according to
10   the Rules of Court -- our California Rules of Court.  Okay?
11          MS. SIMONSEN:  Your Honor, I'm sorry.  May I?
12          THE COURT:  Yes.
13          MS. SIMONSEN:  We learned from plaintiffs last week that
14   they are intending to file full expert reports with their
15   oppositions to our I.P. motions for summary judgment even
16   though Your Honor specifically directed that this motion for
17   summary judgment be filed early, originally in August, without
18   the need for expert discovery.  And so the other thing I
19   want --
20          THE COURT:  Remind me what the issue is on the
21   I.P. motion for summary judgment.  I forgot.
22          MS. SIMONSEN:  It is an issue that relates to Section 230
23   because the case resolves around a photo that was taken of
24   I.P. in the bathroom at school and then distributed, and the
25   harm was allegedly caused by that content and distribution.
26          THE COURT:  Thank you.
27          MS. SIMONSEN:  And, Your Honor, I also just want to say
28   that when we were negotiating with plaintiffs about the
```

 1  deadline to seal the errata exhibits, they shared with me that

 2  they're planning to file nearly all of those 200 documents with

 3  their I.P. opposition for motion for summary judgment, and so

 4  we're going to have to move to seal all of them.

 5       THE COURT:  Figure it out, folks, because I'm not going

 6  to hear it until January.  Okay?  It's -- it's -- you know,

 7  it's a priority, but it's not on the critical path, so I'm not

 8  going to hear it until January.  So if you guys want to -- "you

 9  guys" -- I'm sorry.  If you all want to renegotiate your

10  schedule, I'm okay with that.

11       MS. SIMONSEN:  And, Your Honor, I think one issue is that

12  we would like to have this motion heard.  What the parties have

13  agreed to do is to put off the remainder of fact discovery

14  until after Your Honor rules on the motion.  And if we push the

15  hearing date out, that shortens the amount of time left to

16  complete fact discovery.

17       THE COURT:  I can't do it.

18       MS. SIMONSEN:  Understood.  Well, I --

19       THE COURT:  I would -- so, look, throughout this

20  litigation, my goal has been to decide as early as possible the

21  issues that you need me to decide.  I'm not able to keep up

22  now.  I've got you -- your summary judgments ruled on last

23  week.  Okay?  All ten of those and then I did -- what? -- four

24  previously.

25            Anyway, just trust me.  I would do it if I could.

26  I think it is an important issue.  We're going to have to hear

27  it in January if possible.

28       MR. AUTRY:  And on that note, Your Honor, we have some

1  discovery issues with three of the four defendants.  As to

2  I.P., targeted discovery requests related to the summary

3  judgment motions that were filed and related to the photo

4  issue, we have a meet-and-confer with defendants this week.

5       THE COURT:  What do you mean three plaintiffs?

6       MR. AUTRY:  Three defendants.

7       THE COURT:  Three defendants.  Okay.

8       MR. AUTRY:  So YouTube fully responded to the discovery

9  requests.  The other three responded either -- zero for Meta or

10  partially for TikTok and Snap, and so we need to meet and

11  confer with defendants about that discovery before we can

12  respond to the summary judgment motions.  And we're going to

13  meet and confer with them this week, hopefully, today or

14  tomorrow.

15       THE COURT:  So --

16       MS. SIMONSEN:  Your Honor --

17       THE COURT:  Yes?

18       MS. SIMONSEN:  If I may, Your Honor.  This is another

19  issue where I don't want to have to take Your Honor through

20  this procedural history, but we had an agreement with

21  plaintiffs about a certain number of discovery requests that

22  they could serve for these plaintiffs, and we believe that this

23  discovery is not proper.  It's out of time.

24            I'll set that to the side.  We've agreed to

25  confer with plaintiffs about the discovery.  I think that the

26  issues that they're raising are very inconsequential and can

27  probably be resolved within a week and are relevant to the

28  summary judgment motions.  But I'm not even sure why Mr. Autry

1  is raising it because the whole reason we agreed to defer their

2  opposition brief deadline for a week was so that we could

3  confer with them.  So I think we can set that --

4        THE COURT:  It's set for November 14.  The opposition was

5  set for November, and it was agreed to.

6        MS. SIMONSEN:  That was agreed to.

7        THE COURT:  That was agreed to.  Okay.  So you know what,

8  here's what we'll do:  At your request, the hearing on

9  I.P.'s -- these are plural motions for summary judgment;

10 correct?

11       MS. MCCONNELL:  Yes.

12       MR. AUTRY:  Four motions.

13       THE COURT:  Four motions for summary judgment by

14 defendants as to I.P. currently set on calendar for December 12

15 are continued to December 16 at the same time as the motions in

16 limine -- at the same time as the motions in limine.  We will

17 put it in the minute order.  All right?

18       MS. SIMONSEN:  Thank you, Your Honor.

19       THE COURT:  The hearing on the I.P. motions will be

20 December 16.

21       MS. SIMONSEN:  And I hate to bring you back to this, but

22 I believe we started talking about the motion to seal in

23 connection with I.P.  We would very much appreciate,

24 Your Honor -- plaintiffs have agreed to follow the sealing

25 stipulation for this motion, and I know Your Honor was

26 frustrated that we did not include page numbers with our first

27 omnibus motion to seal, and that was an oversight for which we

28 deeply apologize because I think it gave Your Honor the

 1  appearance that we were proposing a process that actually is
 2  less smooth than the rules.  And I assure you it is much
 3  easier --
 4        THE COURT:  No.  I thought you guys -- I thought
 5  defendants were seriously disadvantaged by that procedure
 6  because I didn't think that you presented your argument -- if
 7  you had arguments to seal, I didn't think it presented them
 8  very well.  And I felt a little bit bad ruling the way I did
 9  across the board, but I didn't have the evidence.
10        MS. SIMONSEN:  Well, I appreciate that feedback,
11  Your Honor, and I think we'll take that into account going
12  forward.
13              I do, with Your Honor having raised that, need to
14  point out one issue that I know Snap's counsel was planning to
15  raise, which is that it appears that there were a couple of
16  motions to seal with that first round of omnibus briefing that
17  did not make their way to Your Honor.  And I think we should
18  follow up with Your Honor by a Case Anywhere posting.  We're
19  prepared to not move to seal the substantive issues because
20  Your Honor didn't receive them, but that may be why you had the
21  impression that the issues were not advocated --
22        THE COURT:  You mentioned some motions -- a motion to
23  seal filed on a particular date.  We looked for them; we didn't
24  find them.  And I could have said that to you back in a
25  posting, and I didn't because it was just too much.  So if
26  there are things you left behind or you think we missed,
27  particularly -- and let me be honest.  If there's something you
28  think we missed, let us know.  Okay?

```
 1        MS. TELLER:  You Honor, if I could speak to that just
 2   really quickly.  Because we're trying to figure out and to do
 3   this in a way that inconveniences you the least possible.
 4   There was a motion to seal that included some of Snap's
 5   information, I think some of YouTube's as well, that was
 6   rejected; but we were not notified by the vendor at the time.
 7   And when your order came out noting that you did not find, for
 8   example, Ms. Lopez's declaration, that's why.
 9             As Ms. Simonsen previewed, we're not seeking to
10   seal the parts that I know that you will not allow to be
11   sealed.  But there are employee names in there that I think you
12   would allow us to seal, and so we're trying to figure out the
13   least burdensome way to collect that.
14        THE COURT:  Well, you know, here -- again, we're trying
15   to hold up our end here --
16        MS. TELLER:  Yeah.
17        THE COURT:  -- with two staff and one law clerk, not four
18   like federal court, one.  Okay?  We're trying to hold up our
19   end.  And, you know, when you all have problems with your
20   vendor and ask me to fix it, I would ordinarily try to do that,
21   but it's tough.
22        MS. TELLER:  Understood, Your Honor.  Understood.
23        THE COURT:  It's tough.  So if you need to try to fix
24   something, confer with opposing counsel, post it on Case
25   Anywhere.  Explain the whole thing.  I'll -- you know, I'll
26   look at it.  I've always looked at stuff that you want me to
27   do.
28        MS. TELLER:  Will do, Your Honor.
```

1        THE COURT:  I can't do everything.

2        MS. TELLER:  Understood.

3        MS. SIMONSEN:  And we appreciate that, Your Honor.

4              I do just want to come back to the point that I

5   think that the omnibus sealing procedure is simpler for

6   Your Honor and both sides, which is why, presumably, plaintiffs

7   agreed to it.

8        THE COURT:  Well, but we walked -- but the frustrating

9   thing was we walked through it.  I had my staff spend time on

10  it.  I had my courtroom staff spend time on it.  I had my law

11  clerk spend time on it.  The three of us drafted it together,

12  and that wasn't followed.

13       MS. SIMONSEN:  Well, I think there was an issue,

14  Your Honor.  And I know we didn't get a chance to talk to

15  Your Honor about this at the last hearing, but what happened

16  was because we were moving to redact employee names that

17  appeared throughout the documents, listing every single page

18  number, we didn't understand that to be something Your Honor

19  would find valuable or useful, knowing especially that under

20  the sealing protocol, once you granted or denied our request,

21  we would --

22       THE COURT:  Let me do this rather than arguing about it.

23  If both sides want the sealing protocol in place again, tell me

24  and tell me how you propose to do it this time.

25       MS. SIMONSEN:  Yes, Your Honor.  We propose that within

26  14 days after the final paper associated with the motion --

27       THE COURT:  If you could put it in a --

28       MS. SIMONSEN:  Oh, yes.  Very good.  We'll do that,

1  Your Honor.  I apologize.

2      THE COURT:  No, if you could put it in a posting.  Please

3  pull out the order that we did last time, and if there is

4  something that you want about it or a summary, let me know.

5      MS. SIMONSEN:  Will do, Your Honor.  We'll try to make it

6  even easier.  We are trying our hardest.  We know we have

7  overwhelmed you, and we're trying, and we will continue to try.

8      MS. MCCONNELL:  Your Honor, from plaintiffs' perspective,

9  I mean, we have now pushed off most of these sealing issues now

10 until, let's call it, December with a January trial date.  And

11 we're really reaching a point where the volume of filings that

12 are still currently under seal is massive, and it's only

13 growing larger, especially if we do file this I.P. --

14     THE COURT:  It's a problem, but I will say this,

15 defendants cut it down.  I mean --

16     MS. MCCONNELL:  We haven't seen Meta's filing yet.

17     THE COURT:  But with respect to the omnibus -- the

18 omnibus Sargon general causation motions, they definitely cut

19 it back, and I want to empower that.  Okay?

20     MS. MCCONNELL:  We do as well.  But I don't think that

21 pushing off a decision on those for too long is really the

22 right --

23     THE COURT:  I understand.  But, you know, what do you

24 want me to do?  Sit down with the calendar right here and say,

25 "Okay.  We'll do it here?"

26          So, look, you know what motions you filed.  When

27 do I get the motions to seal on the 14 motions we're hearing

28 today?

1    MS. SIMONSEN:  Those were filed last Friday as were all
2  of the motions to seal regarding the motions in limine.  So --
3  and Your Honor did, of course, already rule on the sealing
4  motions as to the general causation Sargon motions.
5    THE COURT:  Correct.
6    MS. SIMONSEN:  And I believe today is the day that we
7  inform you which documents come unsealed on the public docket.
8  So I don't think it's the case to say that everything's getting
9  pushed off.
10    We -- Your Honor, unfortunately, you have a lot
11  more now sealing motions before you to decide.  And once again,
12  I can assure you we have taken a very limited approach to
13  sealing across the board on those motions.
14    THE COURT:  Well, I credit you -- for the one I saw, I
15  credit you for that, and I don't want to discourage that from
16  happening.
17    I don't know.  Figure something out.  Post
18  something.  Okay?
19    MS. SIMONSEN:  Thank you.
20    THE COURT:  I'm trying to read these motions for
21  substance.  And try to figure out the sealing part.  But I
22  would start with the very carefully considered on our part
23  order that we got out after hearing from all of you after we
24  did it and, you know, see if it still works.  But you can see
25  from the ruling we made last -- I made last time what we
26  thought was missing.  All right?
27    So assure us that you're going to do that or ask
28  for, specifically, an amendment to those stipulation and orders

1   so that we know what -- so that we know what we're doing.  And,

2   yes, we're getting backed up; but, you know, I haven't set

3   anything for the week after Christmas yet.

4               So okay.  So it's important -- we have a

5   different clerk here today.  It's important to say all of the

6   14 motions on calendar today are under submission.

7               The motion to seal with respect to these Sargon

8   motions was filed last Friday; is that correct?

9        MS. SIMONSEN:  Yes, Your Honor.

10       THE COURT:  Okay.  And do we have a hearing date for

11  that?

12       MS. SIMONSEN:  We do not.

13       THE COURT:  Okay.

14       MS. SIMONSEN:  As far as I know.  Unless anyone corrects

15  me, I don't think we have a hearing date for that.

16       MS. MCCONNELL:  And we don't have a hearing date for the

17  motions to seal related to the motions for summary judgement

18  filings for all the other defendants except for Meta.  Those

19  motions to seal were filed, I believe, on Tuesday the 4th.

20       MS. SIMONSEN:  In any event, yes, we did file motions to

21  seal as to the summary judgment motions last week as well.  It

22  was either Tuesday or Wednesday.  So there are three sets of

23  omnibus motions before Your Honor to seal on the motions for

24  summary judgment -- the nongeneral causation Sargon motions and

25  the motions in limine.

26       MS. MCCONNELL:  Yes.

27       THE COURT:  Okay.  I'm not going to worry about the

28  motions in limine until we hear them.  So -- and, indeed, you

 1   need the backup.  And notice those for the date when the

 2   motions in limine are heard.  Okay?

 3        MS. SIMONSEN:  We will.

 4        THE COURT:  Take care of that.

 5             So let me ask this:  Are the motions to seal with

 6   regard to the MSJs that I've decided, are those going to be

 7   argued -- submitted without argument?

 8        MS. MCCONNELL:  Presumably, yes.  We haven't filed our

 9   oppositions yet.  Our deadline has not past.  We do intend to

10   oppose some of what defendants have asked for.

11        THE COURT:  Okay.  Well, figure out when you want to have

12   it heard, then.  I mean, I need -- for now, file things with a

13   hearing date.

14        MS. SIMONSEN:  Understood, Your Honor.  I believe

15   defendants would be prepared to submit our argument sealing

16   motions on the papers and without argument.  The sealing --

17        THE COURT:  Well, that's fine.  But as long as I've

18   got -- I mean, unless everybody was agreeing, I would set a

19   hearing date even if everybody submits without argument.  There

20   should always be a hearing date on a motion.

21        MS. MCCONNELL:  Understood.

22        THE COURT:  So --

23        MS. MCCONNELL:  I think we would also be prepared to

24   submit without argument, but we should have a date.

25        THE COURT:  Okay.  Well, let's have stip and proposed

26   order that says, "Okay.  Here's these motions to seal.  Here's

27   when the oppositions are coming in; and, you know, they're set

28   for the same date as the motions in limine," perhaps, or "Both

 1    sides waive argument, and they're deemed under submission when

 2    the opposition is filed."  We need something like that.

 3                    Ms. Miro, do you want to weigh in?

 4         THE COURTROOM ASSISTANT:  I'm sorry?

 5         THE COURT:  Do you want to weigh in on this?  No?

 6         THE COURTROOM ASSISTANT:  Well, first of all, don't leave

 7    when we're done.

 8                    Regarding the December 12 date, we also have an

 9    OSC re dismissal why plaintiffs' claims should not be dismissed

10    and a hearing regarding Trial Pool No. 1 jury instructions.

11    Are we keeping that on the 12th, or do you want to move it to

12    the 16th?

13         MS. SIMONSEN:  I would keep on the 12th what we have on

14    the 12th.  I think we moved the I.P. summary judgment hearing

15    date to the 16th just to allow for the adjustment to the

16    briefing schedule, but we think it makes sense to still hear --

17         THE COURT:  And those are all the motions in limine date.

18         MS. SIMONSEN:  The 16th, correct.

19         THE COURT:  Everything on the 12th stays on the 12th.

20         THE COURTROOM ASSISTANT:  Other than the MSJs?

21         MS. MCCONNELL:  Right.

22         THE COURT:  Correct, yeah.

23                    John, did you have something?

24         THE CLERK:  No.  I'm just taking it in, Your Honor.

25                    I do have a question.  The four MSJs on the 12th,

26    all four we're moving to the 16th?

27         THE COURT:  Yes.  Thank you.  Very good question.  Okay.

28         MR. AUTRY:  Your Honor, on the I.P. which we've set for

1  the 16th -- and the only reason I brought up the

2  meet-and-confer that's forthcoming on the discovery issues is

3  it could potentially affect when we can file our opposition.

4  So if we can meet and confer and resolve those discovery issues

5  like --

6       THE COURT:  You agreed to the 14th.  I'm leaving it

7  there.  Okay?  You agreed to the 14th.  I'm leaving it there.

8       MR. AUTRY:  Your Honor, we --

9       THE COURT:  I heard what you said, and I've set it when I

10 set it because that's what you all agreed to.  Hopefully, you

11 can take care of everything.

12            Okay.  Very good.  Plaintiffs' liaison counsel to

13 give notice.  All right.  Thank you very much.

14            (Proceedings concluded at 4:17 p.m.)

15

16                          -oOo-

17

18

19

20

21

22

23

24

25

26

27

28

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3

 4  DEPARTMENT SSC 12              HON. CAROLYN B. KUHL, JUDGE

 5

 6  COORDINATION PROCEEDING SPECIAL    )
    TITLE [RULE 3.400]                 )  CASE NO. JCCP5255
 7                                     )
    SOCIAL MEDIA CASES                 )  REPORTER'S CERTIFICATE
 8                                     )
    _____)
 9

10

11          I, ESTRELLA HERMAN, OFFICIAL PRO TEM REPORTER OF THE

12  SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF

13  LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING PAGES, 5

14  THROUGH 73, COMPRISE A TRUE AND CORRECT TRANSCRIPT OF THE

15  PROCEEDINGS TAKEN IN THE ABOVE-ENTITLED MATTER REPORTED BY ME

16  ON NOVEMBER 10, 2025.

17

18  DATED:  NOVEMBER 13, 2025

19

20

21

22  _____
              ESTRELLA HERMAN, CSR
23       OFFICIAL PRO TEM COURT REPORTER
              CSR NO. 13865
24

25

26

27

28
```

**-**

**-ooo-** 5:8 73:16

**1**

**1** 72:10

**10** 5:3

**115** 41:6 42:12,16

**12** 5:4 64:14 72:8

**127** 30:24

**129** 30:24

**12th** 72:11,13,14,19,25

**13865** 5:5

**14** 6:19 15:15 31:4 59:24 64:4
  67:26 68:27 70:6

**145,000** 45:16

**14th** 73:6,7

**15** 39:21

**16** 31:4 64:15,20

**16th** 72:12,15,18,26 73:1

**18,000** 41:7 42:12

**180** 58:7

**2**

**2** 24:21 48:22

**20** 7:4 39:21 53:26,27

**200** 58:28 60:9 62:2

**2016** 44:16

**2022** 44:16

**2023** 53:26,27

**2025** 5:3

**209** 58:7

**23** 44:16

**230** 61:22

**230-related** 8:21

**24** 44:16 57:18 59:17

**24th** 60:8

**25** 6:27

**28** 15:4 32:16

**3**

**3** 43:12,15 46:24 47:22 48:16

**3.8** 18:10

**30** 18:25

**385,000** 41:19

**4**

**4,000** 57:23 58:9,24 59:1,7,28

**40** 37:11,12

**4:17** 73:14

**4th** 70:19

**5**

**5** 6:21

**59** 17:16

**6**

**6** 57:15 61:6

**607** 18:20

**643** 17:16

**649** 19:6

**6:49:13** 53:26

**6:49:35** 53:27

**7**

**7** 44:11 56:11

**9**

**9** 43:24

**90-question** 14:9

**A**

**a.m.** 53:26,27

**ability** 58:18

**absence** 17:19 22:15

**absent** 39:13

**absolutely** 35:18 47:23 55:27

**abuse** 24:7

**acceptable** 31:9

**accepted** 20:16 21:25 22:2 23:28

**access** 18:19 26:3

**accessed** 52:20

**account** 36:1 48:23 51:13,25
  52:1,5 65:11

**accounts** 19:5 52:6

**accurate** 47:21,22

**acknowledge** 10:15 28:4 30:10

**acknowledged** 22:17 25:24

**acknowledges** 25:21 27:17

**Action** 44:1,2

**actions** 39:25,28

**activity** 44:7 46:25

**Adam** 5:28

**add** 26:8

**added** 28:10

**addicted** 19:11 21:9,15

**addiction** 12:22 14:12 18:20
  19:14 21:10 24:25 25:3,13,18

**addition** 8:12 10:26 18:4 44:11

**additional** 7:5 8:4 14:22 49:7
  56:12,14

**address** 9:9 34:5 35:21 41:21
  49:5 52:21 55:16

**addressed** 23:18,19 24:28

**adequate** 10:14

**adjuncts** 28:16

**adjustment** 72:15

**admission** 39:7

**admits** 38:4

**adolescent** 20:18 31:2

**adult** 15:16,18 28:22

advocated 65:21

affect 45:1 73:3

affected 47:22

affiliations 22:8

afternoon 5:13,15,16,19 6:1,4,11 7:22 18:3 38:24

age 7:14 15:20 28:24 31:5

agree 60:2

agreed 6:16,21 57:16,20 62:13 63:24 64:1,5,6,7,24 67:7 73:6,7,10

agreeing 71:18

agreement 59:16 63:20

ahead 5:24 36:9 38:2 39:27

alleged 19:9 24:7

allegedly 61:25

alleges 18:14

alternative 12:9,17 16:16 17:7 22:20 24:4 27:7 30:18,25,26

Amber 6:4 7:22

ambiguous 35:10

amended 47:3

amendment 69:28

Amos 22:14

amount 62:15

analysis 8:25 9:18 10:2,12 11:9 16:12 23:20,27 26:24 29:11 30:16,25 32:18 40:11,21 43:13 45:1,5,8 46:17 48:5

analyst 46:10

analytical 10:3

analyzed 8:25 11:26 39:9

ANGELES 5:3

answering 29:15

answers 14:16 15:9 25:16 46:12 48:13

anxiety 14:27 18:15 21:11,17

apologies 47:17

apologize 9:2,7 41:13 64:28 68:1

app 43:23 49:14,15,16

apparent 40:21

apparently 19:3 43:20

appearance 65:1

appearances 5:11,12

appeared 67:17

appearing 5:11

appears 65:15

appended 15:6

apples-and-oranges 50:6,10

application 38:12

applied 13:24 14:6 15:16,19,20 20:28 23:27 24:17 25:13,14

applies 24:15

apply 27:9 31:5

applying 15:13

approach 20:19 23:28 31:22 46:19 69:12

approximately 7:4

area 13:10

arguably 49:12

argue 6:21 7:4,5 21:28 24:2,24 26:19 39:12 45:10 46:3

argued 39:13 59:25 71:7

arguing 39:4 41:16 45:12 60:17 67:22

argument 6:16,23 8:4,28 9:22,23 15:25 23:7 28:2,3 31:20 32:26 39:14,18 41:8,12,15 43:7 49:25 65:6 71:7,15,16,19,24 72:1

arguments 8:18,21,23 18:5 39:12 43:14,25 56:4 65:7

arrived 37:10,19

Ashley 6:1 56:26

asks 19:25 26:11

aspect 6:23

assess 12:21 14:15 15:23 27:22 29:18

assessed 21:3

assesses 26:15

assessing 18:20 23:23

assessment 10:23 11:27 29:10 30:12,27

assessments 13:7

ASSISTANT 7:16 32:5,8 72:4,6,20

assume 42:14 46:10 59:18 60:2

assuming 6:25 47:21

assure 58:26 65:2 69:12,27

attached 58:10

attachment 60:14

attempt 30:4,22 48:21

attempts 47:4

audio 18:2

August 61:17

automatically 49:16

Autry 5:15 60:7,18 62:28 63:6,8,28 64:12 72:28 73:8

aware 40:11

**B**

back 23:11 29:27 33:1 38:2,13 39:19 45:13 56:14 64:21 65:24 67:4 68:19

backed 70:2

backup 33:28 34:25 53:4 71:1

bad 65:8

Bagot 6:28 8:2,5,6,13,22,24 9:12,13,18 11:16 12:21 14:23 16:7,15,26 18:12,17,22 19:3,8,16 20:11,17,21 21:6,13 22:23 23:7,12 24:22 25:12,22 26:20,24,25 27:16 28:2 29:1,12,14 30:21 31:15,17

Bagot's 9:9 14:5,10 18:6 19:20 24:24 25:20

base 15:10 38:7

based 17:17,18 19:11 22:11 28:19 36:12 47:12 48:4

bases 6:20 8:16 10:13 24:26

basing 15:9

basis 9:19 12:2,25 15:23 19:13

27:9 29:18,26 37:20

**bathroom** 61:24

**battle** 32:23

**bed** 26:13

**beg** 6:17

**began** 21:10 50:25

**behalf** 6:5,9,11 7:23 18:5 20:2
32:11 47:1

**believed** 11:27

**Bergen** 25:12

**binge** 18:15 21:12

**bit** 17:27 39:27 49:25 65:8

**black** 9:18 10:12 12:19 15:21
19:7 21:20,21 22:12 29:23

**blame** 57:7

**blogs** 13:26

**blue** 43:16

**board** 65:9 69:13

**body** 21:12,17

**borrowed** 13:7

**borrowing** 13:12

**bottom** 14:26

**box** 9:18 10:12 12:19 15:22 19:7
21:20,21 22:12 29:23 53:19 54:2,
11,14,20,27,28 55:15

**boxes** 53:16

**breakdown** 16:20

**breakdowns** 16:23

**briefing** 27:20 37:24 56:2 57:12
61:2,7 65:16 72:16

**briefly** 29:6 31:2 32:13 48:19

**bring** 56:15,25 64:21

**brings** 25:19 44:27

**broadly** 13:26

**brought** 73:1

**browsing** 34:24 40:27 42:7
45:27,28 46:2 52:28 53:1,5,12,14,
19,24 54:12,15,19,27 55:4,10

**built** 12:1 13:20

**bullying** 12:11 16:16 30:4

**bunch** 50:7 58:8

**burden** 27:26 58:25

**burdensome** 66:13

**Burling** 6:2,5

---

**C**

**Cal.app.5th** 17:16

**calculate** 22:10 34:2

**calculates** 33:17

**calculating** 33:8 34:19,21,26

**calculations** 48:8,15

**calendar** 6:19 64:14 68:24 70:6

**California** 5:3 9:17 16:27 61:10

**call** 23:10,26 42:28 68:10

**called** 13:18 16:11 50:22

**candid** 29:10

**candidly** 29:19

**care** 56:9 71:4 73:11

**carefully** 69:22

**caregiver** 20:24

**caregivers** 23:23

**CAROLYN** 5:4

**case** 5:1,2 6:20 7:25,26 8:9,12
10:17 15:11 18:18 22:9,13,21
25:4,7 31:17 33:19 40:13,28
42:10,11,21,25 61:23 65:18 66:24
69:8

**cases** 5:2 22:4,6 29:19

**categories** 33:15 40:19,20,27
46:1,7

**causation** 11:3 16:21,27 20:6,8,
11 22:9 23:17,19 25:1,4 29:13
31:16 68:18 69:4 70:24

**caused** 16:23 19:9,22 21:9,15,16
61:25

**cetera** 47:8

**challenge** 27:12

**challenges** 29:1

**chance** 67:14

**change** 48:9

**characterize** 49:1

**Charles** 6:4 7:2,9,13,18,21,22
9:7 10:18,22 17:24 18:5 29:6,8
30:17

**chart** 50:3

**charts** 38:8 47:2 48:5

**checklist** 25:14

**cherry-pick** 29:25 44:28

**cherry-picked** 10:5 29:24 43:8

**cherry-picking** 12:18 43:7

**choose** 17:1 30:1

**chooses** 30:27

**Christmas** 70:3

**chunks** 44:21

**circular** 24:10

**circumstance** 24:13

**cite** 22:4

**cited** 18:26 29:20 30:7

**cites** 27:2

**claim** 22:28 27:14 28:14,21 42:6

**claims** 72:9

**clarified** 40:7 49:24

**clarify** 35:1 49:27

**clear** 16:28 23:3 28:15 38:11 46:5
48:22,24 58:17

**clerk** 5:10 66:17 67:11 70:5 72:24

**clinical** 9:23 10:24,27,28 11:1
13:12,13,21 15:27 16:13,22,25
20:20 21:27 28:7 29:9,17 31:7,8

**clinically** 24:27 26:9

**clinicians** 22:1

**collateral** 22:20 27:19

**colleague** 8:3 17:21

**collect** 66:13

**collected** 49:3

**collection** 14:4

**column** 44:2

**comments** 44:7 47:7

**committed** 57:7,10

**common** 9:11,27 14:10

**companies** 55:23

**company** 51:19,23 52:12 55:5

**company's** 40:23

**comparable** 47:5

**compare** 47:4

**compared** 45:10

**comparing** 45:8 50:1

**comparison** 45:9 47:19 50:7,10, 12

**complaints** 49:20

**complementary** 45:6

**complete** 10:6 62:16

**completed** 13:24 14:9

**completely** 60:27

**Compounding** 15:15

**compounds** 15:18

**comprehensive** 10:23 11:7 12:5 30:11

**comprise** 30:24

**compulsive** 18:14

**concede** 18:19

**conceded** 18:12,27

**concerned** 27:26

**conclude** 19:10

**concluded** 21:7,14 73:14

**conclusion** 19:17

**conclusions** 16:14 27:12

**condition** 13:2 21:5 27:25,27

**conditions** 8:8 13:10 23:15 28:5

**conduct** 8:24 16:10 28:18

**conducted** 16:8 21:28

**confer** 61:2 63:11,13,25 64:3 66:24 73:4

**conference** 56:10

**confirm** 15:27 54:19

**confirmatory** 15:26

**confused** 39:4

**connection** 52:18 58:26 64:23

**considered** 9:28 13:7 27:4 29:11 69:22

**consist** 29:12

**consists** 53:15

**consolidated** 52:2

**Conspicuously** 39:13

**contemporaneous** 9:15

**content** 8:23 49:4 61:25

**context** 10:7 24:12 52:4

**contexts** 8:27

**contextualize** 28:17

**continue** 68:7

**continued** 64:15

**contradictory** 40:9,13

**contrary** 15:13 16:5 19:17 27:25

**contributes** 17:11

**contributing** 21:5 23:24 24:11, 14

**convinced** 56:20

**copy** 33:27 45:15

**correct** 30:9,17 31:1 37:16 39:5, 10 40:1 48:16,17 50:25 51:2,7,8, 12,14 52:24,26 53:2,9,17 54:12, 16,21,22 55:2 64:10 69:5 70:8 72:18,22

**corrected** 16:10

**correctly** 47:28

**corrects** 70:14

**corroborate** 27:4 31:12

**corroborated** 26:24 27:27

**counsel** 5:11,14 25:11,15,19 30:3,7 39:3,23 43:3,6,9 44:27 46:8,22 48:20 49:1,15,19,21 50:25 55:24 65:14 66:24 73:12

**counsel's** 43:4 45:13

**counted** 33:9 34:20 36:1 41:16,

20 42:16 45:21 47:28 48:2

**counting** 35:16 37:3,25 40:16,25

**country** 34:5 52:21 55:17

**couple** 6:14 18:6 47:25 48:19 65:15

**court** 5:10,24,26 6:13 7:6,8,11, 15,19 8:19 9:4 10:16,19 14:20 16:3 17:22,23 18:9 19:25,27 20:1, 9 29:5,7,18 30:14 31:18,23,25 32:3,10 33:11,20,25 35:2,4,6,12, 15 37:16 38:7,23 39:1,20,24,28 40:4,11 41:2,10,15,19,26 42:4,9 45:13,18,21 46:22 47:15,18,20, 24,26 48:14,18,24,26 49:20 50:16,20 51:1,5,10,17,22 52:7,17, 23,25,27 53:8,14,20,28 54:6,10, 14,18,23,27 55:3,9,13,19,22 56:3, 7 57:9,25 58:7,19,28 59:4,9,14,22 60:1,16,19,20,25 61:1,5,10,12,20, 26 62:5,17,19 63:5,7,15,17 64:4, 7,13,19 65:4,22 66:14,17,18,23 67:1,8,22,27 68:2,14,17,23 69:5, 14,20 70:10,13,27 71:4,11,17,22, 25 72:5,17,19,22,27 73:6,9

**Court's** 38:28

**courtroom** 5:12 7:16 32:5,8 67:10 72:4,6,20

**cover** 15:6,7

**covers** 50:4

**Covington** 6:2,5

**create** 16:1

**creates** 9:16

**credible** 23:1

**credit** 69:14,15

**criteria** 12:21 13:11,13,21 24:26

**critical** 7:27 8:26 11:4 13:3 44:23 45:4 62:7

**critically** 9:22

**criticisms** 21:19

**criticize** 43:5,6

**cross-check** 28:16

**cross-comparison** 43:26 45:6

**cross-examination** 28:27 32:22 44:27 46:16

**cross-reference** 13:20

**CSR** 5:5

**cut** 68:15,18

---

**D**

**data** 10:5,6 11:8,28 18:9,17 19:21 25:19,23,24,25 26:2,8,15 27:16, 19 29:20,21,28 32:18 33:2,9,14, 15,16,28 34:1,13,17,24,25 35:8,9, 11,14 36:12,15,28 37:2,4,25,26 38:5,9,10,12,13,14 39:5,6,7,8 40:11,18,21,22,26 41:5,6,23,28 42:6,7,13,24,28 43:1,26,27 44:9, 14,21 45:4,5,6,7,10,11,28 46:1, 10,11,26 47:5,6,7,12 48:2,23 49:3,9,13,23 50:3,4,8,10,11 51:14,25 52:1,2,5,15,21 53:4,6 55:6,23

**date** 34:4,27 35:28 50:23,24 52:14,19 53:1,7,25 57:19 62:15 65:23 68:10 70:10,15,16 71:1,13, 19,20,24,28 72:8,15,17

**dates** 53:2,8

**Davis** 5:23,28

**day** 18:25 19:1 23:25 26:11 34:6, 11,15 49:22,26 53:27 69:6

**days** 15:4,5 54:25 59:19 60:5 67:26

**deadline** 56:21,22,24 57:12 62:1 64:2 71:9

**deal** 58:23

**dealing** 7:24

**decades** 28:12

**December** 64:14,15,20 68:10 72:8

**decide** 56:4 62:20,21 69:11

**decided** 71:6

**decision** 22:14 68:21

**deck** 45:14

**declaration** 66:8

**deduplicating** 36:12

**deemed** 20:9 21:23 72:1

**deeply** 32:25 64:28

**defendant** 6:7,10 18:4 39:8

**defendant's** 49:23

**defendants** 6:2,5 7:23 18:5 20:28 21:19,21,26,28 22:4 23:3,8 24:2,13,24 25:6 26:2,19,25 27:11, 14 28:1,14,21,25,26 29:1 32:12 37:5 38:20 40:12,14 41:10 44:13 45:10 46:19 47:1 56:20,23,27 57:9 60:9 63:1,4,6,7,11 64:14 65:5 68:15 70:18 71:10,15

**defendants'** 6:26 7:28 20:4 21:7, 8,15,16 22:28 25:23 27:19 38:19 41:15 42:24 45:4 56:15

**defense** 45:13 46:22 50:25

**defer** 64:1

**define** 14:11 41:9 46:8

**defined** 13:26 46:8

**definitionally** 55:4

**definitions** 40:19,23

**deleted** 34:8 36:6 48:28 51:11, 19,23 52:10,13

**demanded** 29:3

**demonstrating** 19:9

**denied** 67:20

**denying** 20:4

**DEPARTMENT** 5:4

**depo** 17:27 58:8

**depos** 58:8

**deposition** 12:8 16:9,12,15 18:12,21,26,27 19:6 23:12 24:14 26:7,27 27:3 28:4 34:1,20 36:4

**depositions** 20:24,25 29:25 55:22

**depression** 18:14 21:11,17 24:22

**derived** 24:26

**designed** 15:1,2,14 31:9

**desire** 56:15

**detailed** 22:25

**details** 36:16 37:10

**determine** 10:1,4 15:24 16:20

**deviate** 22:1

**device** 35:22,24 36:15 38:4,9,11, 14 39:5,6,7 45:10,11 46:25,27

**DFCS** 45:9

**DFS** 45:10

**diagnosable** 8:7

**diagnose** 13:14 14:27 25:9 26:17 28:19

**diagnosed** 8:10

**diagnoses** 8:12 12:23 13:2 21:4 28:5

**diagnosis** 8:14 14:17 16:9,10,24 17:2,20 18:23 19:6 23:9,13,14,18, 19,26 24:3,18 25:2 27:7 28:9

**diagnostic** 14:3 20:28 28:1

**dictionary** 40:19,22

**difference** 32:22 55:3

**differential** 16:8,10 17:2,19 23:8, 12,18,26 24:2 27:6

**differently** 52:23

**difficult** 27:23

**difficulty** 32:9

**directed** 61:16

**directly** 16:5

**disabilities** 16:17

**disability** 24:21

**disadvantaged** 65:5

**disagree** 60:2

**disavow** 19:21

**discipline** 20:16 21:25

**disclaimed** 23:8

**disclosed** 36:14

**discourage** 69:15

**discovery** 52:3 61:18 62:13,16 63:1,2,8,11,21,23,25 73:2,4

**discrepancies** 28:19

**discuss** 6:15 12:13,20 30:18

**discussed** 12:6 24:8 35:10

**discussing** 7:28

SOCIAL MEDIA CASES,
JCCP5255,  11/10/2025

CERTIFIED COPY

MOTION
Index: discussion..exclusion

**discussion** 12:16 61:7

**disease** 23:21

**dismissal** 72:9

**dismissed** 72:9

**disorder** 12:24 13:8,9,14,19,21 14:24 18:15

**disorders** 13:8

**display** 7:20 32:26

**displayed** 33:13

**dispute** 21:26 28:25,26

**disputes** 28:11

**disregard** 15:8 30:27

**disruption** 12:12 16:17

**distinguish** 8:22

**distinguishable** 22:7

**distributed** 61:24

**distribution** 61:25

**disturbances** 21:11,17

**dividing** 17:8

**dixit** 17:13,18

**docket** 69:7

**doctors** 54:24

**document** 36:12 60:21

**documents** 36:14 57:3,4,24 58:4,7,10,26,28 60:13,14,26 62:2 67:17 69:7

**domestic** 24:7

**double** 33:9 35:16 37:3,25 40:16, 25 41:20 42:16 45:21 47:28 48:2 56:21

**double-counting** 42:3,4

**drafted** 67:11

**dramatize** 27:24

**Draper** 5:22

**draw** 27:23

**drawing** 21:2

**Drs** 8:21,24 9:12 29:12

**DSM** 13:2 24:26,27 25:1,2,5,8 28:2,6,9,10

**DSM-5** 12:24 13:10

**due** 12:12 39:3

**duplicated** 45:17

**duplication** 36:23 37:13 48:8,15

**duplicative** 40:26 42:7 46:1,2,11 49:12,17

**duration** 18:19,23

**dysmorphia** 21:18

---

**E**

**eager** 27:24

**earlier** 8:3 14:26 28:3 31:5 40:14

**earliest** 44:17,18,19

**early** 61:17 62:20

**easier** 65:3 68:6

**easily** 22:7

**eating** 14:24 18:15 21:12

**EDE-Q** 14:24 15:3,16 31:3

**effectively** 8:21 9:17 11:13,25 12:1,6,7 16:13

**effects** 26:6

**elevated** 22:5

**eliminate** 48:8,15

**Emily** 5:16 20:2

**emphasize** 32:13 38:3

**employ** 20:15

**employee** 66:11 67:16

**employees'** 59:3,5

**empower** 68:19

**end** 12:28 23:25 25:9 44:1,2,3,6 66:15,19

**ending** 34:19

**endorse** 45:4

**endorsed** 45:2 46:19,20

**ensure** 59:2

**entire** 30:25 47:11 48:4 56:16

**entirety** 57:4 58:11

**entries** 49:3 55:25

**equally** 25:28

**errata** 56:13,16 57:17 62:1

**error** 33:7 37:11 39:14,24 57:7,10 60:13

**errors** 32:24 37:24 38:16,18 39:20 43:10 44:9,28 46:16

**essentially** 21:22 26:19

**establish** 11:2

**established** 9:25

**estimate** 37:9,11

**ESTRELLA** 5:5

**evaluate** 11:1 27:21

**evaluated** 11:12 20:21,22 21:4 22:12 26:22

**evaluates** 23:21

**evaluating** 23:28

**evaluation** 20:23

**evaluations** 11:6 23:2

**event** 38:27 44:17,18,19 55:16 70:20

**events** 36:7,21 40:26 41:6,7,8,22 42:6,13,14,15,20,21,22 43:19 45:28 46:1 53:5,13,24 54:10,14, 21,28 55:14

**everybody's** 59:23

**everything's** 69:8

**evidence** 18:22 19:1,16 22:8 27:27 29:19 65:9

**exacerbated** 19:22

**exact** 34:6,10,11,13,14,15,18,28 35:27 36:2,22 37:20 49:2,10

**exaggerate** 27:24

**examination** 14:24

**examples** 30:9,22 43:6,8 53:5

**exception** 16:1

**excerpts** 57:3 58:11

**exclude** 6:19 8:1,15 19:26 31:15 38:19

**excluded** 10:9 18:8 45:12

**exclusion** 12:25

**exclusively** 9:13

**excuse** 24:5 36:8 38:7 57:9

**excused** 57:11

**exemplar** 36:11

**exhibits** 27:2 60:9 62:1

**exist** 25:8 48:10

**experience** 12:10,11

**expert** 6:20,23 8:11,13 10:1 12:14,23 13:1 16:4 17:17 18:11 19:14 20:14 22:7,10,21 25:24,25 27:16 29:10,21 31:20 32:18 36:15 38:4,16 39:7 46:10 61:14,18

**expert's** 11:9 22:16 55:26

**expert-specific** 23:6

**expertise** 38:6

**experts** 6:22 10:15,28 11:5 13:4, 18 21:22,24,27 23:4 29:24 30:10 32:23 42:1 45:4,11 46:20

**experts'** 10:2

**explain** 35:12 36:20 42:18 43:9 48:21 51:24 58:14 66:25

**explained** 23:12 26:7 27:23 28:15 48:1,26 50:17,18 56:19

**explanation** 14:14

**expressly** 15:8,13 16:8

**extend** 56:24

**extensively** 20:18

**extent** 57:11

**extrapolating** 13:14,16

**eye** 54:24

**eyes** 53:21 56:8

---

**F**

**face** 14:28 22:6

**Facebook** 25:12

**facing** 58:3,21

**fact** 14:15 20:5 29:16 38:3 58:16, 17 62:13,16

**factor** 18:20 24:14 25:17 42:23

**factors** 21:5 23:24 24:11,15,17

---

43:13

**facts** 9:28 29:10 56:13,14

**failed** 8:22,24 13:4 22:18 24:3 27:7 57:2

**falling** 43:19

**familial** 16:17 30:4

**family** 12:12 20:26 22:18 26:5 27:26

**father** 14:8 26:20,23 28:17

**faults** 37:28

**Faye** 6:6 18:3

**features** 8:22 21:8,14

**Fedd** 26:26 27:1

**Fedd's** 27:3,28

**federal** 60:20 66:18

**feedback** 65:10

**felt** 65:8

**field** 20:18 29:3

**figure** 57:12,26 60:23 62:5 66:2, 12 69:17,21 71:11

**figured** 7:19

**file** 57:20 60:5,22 61:14 62:2 68:13 70:20 71:12 73:3

**filed** 57:17 58:4,26 59:28 61:17 63:3 65:23 68:26 69:1 70:8,19 71:8 72:2

**filing** 18:11 57:23 60:15,21,22 61:6 68:16

**filings** 57:17 68:11 70:18

**filled** 14:1 22:25

**final** 16:7 30:1 67:26

**find** 65:24 66:7 67:19

**finding** 24:28

**findings** 26:24 27:4

**fine** 18:1 31:28 57:18 71:17

**fit** 23:15

**fix** 66:20,23

**flawed** 24:3

**Florida** 22:14

---

**focus** 8:28

**focused** 50:3

**folks** 62:5

**follow** 21:24 22:23 64:24 65:18

**foot** 37:28

**forensic** 10:26

**forgot** 61:21

**formally** 28:6

**forming** 18:18

**formulas** 10:9

**forthcoming** 40:12,24 73:2

**forum** 57:16

**forums** 13:27

**forward** 65:12

**found** 20:5 29:20 30:6

**foundation** 38:5

**frankly** 47:5 49:25

**Friday** 69:1 70:8

**friend's** 19:4,12

**front** 31:28

**frustrated** 64:26

**frustrating** 67:8

**full** 10:23 29:27 49:22,26 58:4 61:14

**fully** 12:19 63:8

**fundamental** 9:11,26 32:24 38:17

**fundamentally** 10:13 17:13 32:21 36:26 44:9 48:10

---

**G**

**game** 40:25

**games** 49:20

**gaming** 13:8,9,20

**gang** 22:7,8

**gap** 10:3

**gathered** 50:20

**gathering** 43:1

**gave** 25:15 64:28

**general** 20:8 22:9 25:1 59:4 68:18 69:4

**generous** 60:8

**give** 14:17 16:4,23 31:25 39:27 44:22 73:13

**Glenn** 5:22

**goal** 62:20

**Gonzalez** 17:15 22:7 60:20

**good** 5:13,15,16,19 6:1,4,11 7:8, 15,22 18:3 38:24 46:22 50:3 52:17 54:18 67:28 72:27 73:12

**Google** 6:12

**gotcha** 39:19 40:25 44:28 46:14 49:20

**grant** 38:19

**granted** 67:20

**graph** 47:6

**graphs** 47:13

**Greek** 33:20

**group** 15:20

**grow** 48:6

**growing** 68:13

**guess** 57:3

**guides** 25:9

**gun** 48:3

**guys** 60:25 62:8,9 65:4

---

**H**

**hand** 25:14

**handful** 31:21

**handled** 61:9

**Hang** 58:7

**hanging** 57:15

**happened** 56:19 67:15

**happening** 34:14 36:2,22 69:16

**happy** 55:20

**hard** 57:24

**hardest** 68:6

**harm** 22:19 61:25

**harms** 7:27 21:11

**hate** 64:21

**heads** 42:17

**health** 7:27 10:16,20 12:12 20:25 21:10

**hear** 19:28 39:16 45:11 49:25 56:25 57:13 61:3 62:6,8,26 70:28 72:16

**heard** 7:25 8:27 13:10 43:5,7 49:18 60:3 62:12 71:2,12 73:9

**hearing** 32:17 62:15 64:8,19 67:15 68:27 69:23 70:10,15,16 71:13,19,20 72:10,14

**height** 22:10

**helps** 26:16

**HERMAN** 5:5

**hides** 10:13

**high** 35:11 43:18

**highlight** 37:24

**highlighted** 42:12 44:1

**highly** 36:23

**histories** 22:25

**history** 33:22 34:4,16,25 35:7,24 36:5 40:27 42:7 45:23,27,28 46:2 48:27 49:12,13 50:22,24,27 51:3 52:9,28 53:1,5,12,15,19,24 54:12, 15,19,28 55:4,10 63:20

**hold** 66:15,18

**home** 24:7 26:13

**HON** 5:4

**honest** 53:20 65:27

**Honor** 5:13,19 6:1,11 7:2,7,9,22 8:26 9:2 12:22 13:9 17:28 20:1,5, 7 24:27 25:3 28:28 29:8 31:22 32:2,13 33:24 36:4,21,27 38:19, 24 39:2,4,9 40:6,20 41:4,14,25,27 43:9 45:26 46:6,15,20 49:28 50:15,19,28 55:20,28 56:26 57:1, 19 58:1,9,22,23,27 59:1,6,11,17, 20,21,27 60:6,7,24,27 61:11,16, 27 62:11,14,28 63:16,18,19 64:18,24,25,28 65:11,13,17,18,20

66:1,22,28 67:3,6,14,15,18,25 68:1,5,8 69:3,10 70:9,23 71:14 72:24,28 73:8

**Honor's** 55:21 57:21

**hooked** 7:16

**hours** 18:24 19:1 23:3 26:22

**hundreds** 44:6 58:25

**Hutchinson** 22:9

**hyperlink** 54:4

---

**I**

**I.P.** 61:9,15,21,24 62:3 63:2 64:14,19,23 68:13 72:14,28

**I.p.'s** 61:7 64:9

**ICD** 25:8 28:3

**ID** 34:14 49:8

**idea** 51:18

**ideations** 21:12

**identical** 41:5 45:28

**identification** 52:27

**identified** 7:12,13 21:3 24:9 25:5 26:27 27:8 39:28 60:13

**identifier** 34:10,14 35:22,23,27 49:6

**identifies** 34:1,9 51:15 52:14,19, 23 55:8

**identify** 12:7 13:4 16:28 24:3,10 25:7 30:26 55:7,9

**identifying** 53:7

**identity** 51:11

**idiot** 41:26,28

**ignore** 29:28 43:16

**ignores** 19:16

**images** 47:2

**impact** 17:6,7,10,11 26:15 30:28 37:4

**impacts** 36:26

**implication** 46:4

**imply** 26:25 27:20

importance 7:26

important 11:27 20:14 24:12
  25:28 26:4 32:14 36:26 37:22
  38:3 62:26 70:4,5

importantly 26:3

imposing 22:5

impossibility 43:21

impression 65:21

imprimatur 16:4

imprisonment 12:13

improper 9:23 18:8 58:6

improperly 15:19,20 16:5

inaccurate 33:3 36:28

inapt 45:10

incarceration 30:5,20

include 13:26 37:26 64:26

included 27:1 34:26 36:11 42:20
  66:4

includes 42:15 51:8

including 33:16 37:24,25,26
  40:21 51:15

inclusive 41:9 42:15 46:1

incomplete 25:26

inconsequential 63:26

inconsistencies 42:28 47:12

inconsistent 42:25

inconveniences 66:3

incorporated 25:16

incorrect 23:9 24:6 37:15

increased 40:1

increasing 43:19

incur 58:24

independent 8:24

indicating 12:28 60:15

indicative 12:18 13:17 36:23
  51:11

individual 35:19 43:2

individualized 52:5

individuals 15:2 31:4

inflate 37:6

inflated 37:12

inform 69:7

information 10:24 11:15 18:28
  19:8 21:2 26:14,16 27:19 40:9,12,
  13,24 41:21 49:4,7,10,27 51:15
  52:12 54:18 55:8,14,18 66:5

initial 43:2

initials 7:12,14

injured 44:24

injuries 18:14 19:10,22

input 10:8

inputs 9:28 11:4,26

instance 11:10 14:23 15:3 59:2

instances 12:8,9 20:8

instructions 13:25 16:6 72:10

instrument 14:6

instruments 14:19,21,28

intellectual 20:15 29:3

intend 7:4 12:25 57:5 71:9

intended 13:12,13,21 15:4,8
  31:10 57:4

intending 61:14

intends 16:26

interacted 36:20

interaction 33:10 34:5,13,24
  35:9,14 37:27 45:22 49:11

interactions 32:19 33:3,5,8,13,
  17 34:2,19,21,22,26 36:6,8 37:1,
  5,7 38:13 39:8 41:17,20 42:16
  43:17,19,20 44:8 45:17 47:7,27
  48:6 50:2 51:27

interested 51:19

internet 13:8,9,20 35:3,4,6,22
  49:6

interpret 40:22

interpretation 55:26

interview 10:17 12:6 16:13 19:19
  22:18 24:6 26:21 28:18

interviewed 20:23

interviews 9:15,23 21:23,28
  22:17,26,27 23:5,22 27:18 28:16
  29:17

involved 22:10

IP 33:22 34:3,5,12,16,18 35:2,21,
  24,25 36:5 40:26 42:6,13,14,20,
  21 45:23,28 46:1 48:26,27 49:5,
  11,13 50:22,24,27 51:3,17,23
  52:9,17,20 53:5,13 54:10,14,21,
  28 55:14,16

iphone 38:10

ipse 17:13,18

issue 7:27 12:20,26 14:20 15:18,
  22 20:5,10 27:6,11 32:14 37:13
  41:24 42:3,4 46:18 47:10 49:24
  56:12,13 57:22 58:17 61:20,22
  62:11,26 63:4,19 65:14 67:13

issues 7:4 8:26 12:12 21:17 23:6
  24:8 28:28 56:11 57:14 58:14
  62:21 63:1,26 65:19,21 68:9 73:2,
  4

─────────────────────

**J**

January 62:6,8,27 68:10

JCCP 5:10

JCCP5255 5:1

Jeffcott 5:16 7:7 20:1,2 30:14,15
  31:6,11

John 72:23

Jon 5:25,27

Joseph 5:18

Josh 5:15

Judge 60:20

judgement 70:17

judgment 20:5 32:17 56:15
  57:17 58:13,14 60:15 61:9,15,17,
  21 62:3 63:3,12,28 64:9,13 70:21,
  24 72:14

judgments 62:22

jumped 39:20 48:3

jury 16:27 31:14 32:27 36:20
  72:10

## K

**K.G.M.** 8:3,13 20:3,21 21:13 24:9 31:17 44:15

**K.g.m.'s** 12:10,11 21:14 42:19, 21 44:16

**Kara** 8:2

**keeping** 72:11

**key** 12:9

**Kieffer** 5:25,27

**kind** 43:9 45:8

**knew** 36:5

**knowing** 29:23 67:19

**KUHL** 5:4

## L

**LACC** 5:11

**lack** 22:16 25:2 29:20

**laid** 8:16

**Lanier** 5:21

**large** 10:3 44:20

**larger** 68:13

**late** 58:16

**law** 9:17 16:27 66:17 67:10

**learned** 61:13

**learning** 16:16 24:21

**leave** 38:1 72:6

**leaving** 73:6,7

**left** 9:3 43:28 62:15 65:26

**legal** 9:24

**length** 51:6

**lessen** 10:11

**level** 20:15 29:3 43:2

**levels** 35:11

**lexicon** 42:5

**Li** 6:11

**liability** 9:27 12:3

**liaison** 5:14 73:12

**life** 26:15

**lifetime** 18:13

**light** 38:26 56:4

**likes** 33:18 44:7 47:7

**limine** 59:23 64:16 69:2 70:25,28 71:2,28 72:17

**limitation** 15:2

**limited** 15:1 69:12

**lines** 53:15,16

**link** 51:16 52:16 53:6 55:11,13

**list** 11:21,24 17:7 27:1

**listed** 23:14 24:25 28:6

**listing** 67:17

**lists** 23:19

**literally** 54:24

**literature** 28:7,23

**litigation** 22:1 33:14 62:20

**local** 39:15,22 40:8

**location** 52:21 55:17

**logged** 48:23 49:5,8,14

**logging** 51:27

**logic** 24:10

**logical** 42:26,28 43:21

**logs** 48:25 49:4

**long** 16:2 44:8 68:21 71:17

**looked** 16:13 27:8 30:6 39:17 43:11 56:18 65:23 66:26

**Lopez's** 66:8

**LOS** 5:3

**lot** 7:24 49:18,19 50:1 69:10

**lots** 50:16

**Luis** 6:11

**lunchtime** 19:5

## M

**made** 8:20,23 9:14 29:19 33:7 38:1 39:18,19,23 60:14 69:25

**main** 9:9

**majority** 58:10

**Makayla** 26:26

**make** 7:11 18:23 19:6 23:1 42:2, 26 44:9,21 48:12,13,20 55:21 59:7 65:17 68:5

**makes** 31:8 72:16

**making** 50:12

**malingering** 26:23 27:21,22

**Mandich** 5:19 38:24 39:2,25 40:3,6 41:4,13,18,25,27 42:6,10 45:16,20,25 50:19

**manner** 10:15 11:5 13:23 15:13 31:14

**Marc** 5:19 38:24

**marginally** 22:13

**Mariana** 5:13

**Mark** 6:9 32:11 46:28

**massive** 33:7 68:12

**massively** 37:4

**match** 35:24,25

**matches** 34:18

**matching** 35:27

**material** 56:12,14 58:1,11,24 59:7

**materials** 26:28 59:8,21

**math** 43:3,4

**matter** 8:1 23:9,25 32:22 36:24 40:18 46:16

**matters** 6:14 8:3 23:27 26:9,14 44:26,27

**maximum** 15:10

**Mccarron** 18:11 31:20 32:17,26 33:1,7,17 34:20 36:4 37:18 38:1, 5,16 39:19 40:17 41:16 44:10 45:21 47:8 50:6,13 55:21

**Mccarron's** 6:23 32:24 33:28 34:25 36:25 37:9 42:27 43:3,13 44:26 47:2 53:4

**Mcconnell** 5:13,14 9:2,6 55:20, 28 64:11 68:8,16,20 70:16,26 71:8,21,23 72:21

**MDL** 58:3

**means** 31:12,13

**meant** 16:13 41:8

**mechanism** 23:21

**mechanistic** 16:11 23:20,26

**Meda** 6:2

**media** 5:2,10 8:25 12:22 13:19, 26 14:2,11,25 15:4 17:5 21:9 24:25 25:2 28:13

**medical** 8:8,9 13:2 20:27

**meet** 20:11 63:10,13 73:4

**meet-and-confer** 63:4 73:2

**meet-and-confers** 40:10,17 42:18 46:13

**meeting** 17:10

**members** 20:26 22:18

**mental** 7:27 10:16,20 20:25 21:10,16

**mentioned** 8:3 48:20 65:22

**Meredith** 31:20

**merits** 60:16

**mess** 40:11

**messages** 33:18 37:26

**Meta** 6:3,5 7:23 56:27,28 58:24 60:10,14 63:9 70:18

**Meta's** 57:16 68:16

**metadata** 34:7,17 35:8,19,20 51:9

**method** 17:2

**methodological** 9:11 29:1

**methodologies** 10:4

**methodology** 13:3,5 14:14 16:1 21:24 22:16,23 29:9 31:13 37:21 45:2,7 46:18

**methods** 20:16 29:2

**metric** 13:1

**minimum** 36:23

**minute** 64:17

**minutes** 6:27 7:4 18:6,10,13 25:21 29:7 60:26

**Miro** 31:26 72:3

**miscited** 18:28

**misled** 56:23

**missed** 65:26,28

**missing** 17:3 44:20,21 69:26

**misuse** 28:20

**misused** 14:21

**model** 10:8

**modifications** 15:22

**modified** 15:17

**MONDAY** 5:3

**month** 15:10

**months** 40:10 46:13

**morning** 26:12

**mother's** 12:12 30:4

**motion** 7:28 32:16 38:19 40:5 48:1 56:15,25,28 57:12,16,17,20 58:13,15 59:12,20,27 60:3,6,22 61:9,16,21 62:3,12,14 64:22,25, 27 65:22 66:4 67:26 70:7 71:20

**motions** 6:16,18,19,21,26,28 7:3,24,26 20:4 56:15,22 58:23,26 59:23,24 60:10 61:8,15 63:3,12, 28 64:9,12,13,15,16,19 65:16,22 68:18,26,27 69:2,4,11,13,20 70:6, 8,17,19,20,21,23,24,25,28 71:2,5, 16,26,28 72:17

**move** 9:5 18:1 31:19 57:6 58:25 59:9,11,12,14,18 62:4 65:19 72:11

**moved** 8:15 72:14

**moving** 23:6 67:16 72:26

**MSJS** 71:6 72:20,25

**multiple** 12:8 41:25 43:13

**Munger** 6:6 18:3

**Murray** 6:28 8:1,6,21,24 9:12,18 11:10 12:20 13:18 14:22 15:6,16 20:11,17,22 21:6 22:23 27:5,20 28:4,24,27 29:2,12 30:13,19,23 31:4

**Murray's** 9:8 13:25 27:14 31:16

**Murray-specific** 14:20

### N

**names** 59:3 66:11 67:16

**nature** 7:27 12:19

**necessarily** 50:5

**necessity** 45:5

**needed** 21:22

**negative** 14:16 56:21

**negotiating** 61:28

**night** 26:12

**nitty-gritty** 35:13,16

**nonbinding** 22:14

**nongeneral** 70:24

**nonspecific** 19:12 30:18

**normal** 20:20 29:14

**note** 62:28

**noted** 23:17 46:16

**notes** 9:16 10:23,25 11:7 13:11 19:20 22:17

**notice** 56:16 71:1 73:13

**notifications** 44:15

**notified** 66:6

**noting** 66:7

**notion** 19:10 57:2

**notwithstanding** 36:18

**November** 5:3 6:21 53:26,27 57:15,18 59:17 60:8 61:6 64:4,5

**number** 5:1 8:16,27 14:17 18:12 21:19 26:21 32:19 33:3,5,8,15,16, 18 34:2,9,21,26 37:6,16,20,23,28 39:20,25,28 41:16 47:28 48:5,6 49:2 50:1 63:21 67:18

**numbers** 10:8,9 26:16 32:21,23 37:2,9,12,15,19 64:26

**numerical** 11:11

### O

**oath** 49:23

**object** 57:1,6

SOCIAL MEDIA CASES,
JCCP5255, 11/10/2025

CERTIFIED COPY

MOTION
Index: objection..platform-wide

**objection** 7:6 56:22

**objections** 60:14

**objective** 18:9 19:16,21

**occur** 28:9

**occurred** 34:5

**October** 32:16

**offer** 8:6 10:6 14:10 17:17 18:28
29:10,21 30:14,15 32:18,27 33:1,
4 36:27 48:10 56:1 60:8

**offering** 9:18 29:13

**Olson** 6:6 18:4

**omnibus** 64:27 65:16 67:5
68:17,18 70:23

**Onglyza** 9:25 22:9

**open** 43:23 49:16

**opened** 49:14

**opening** 32:26

**opens** 43:22

**opine** 11:2,3 16:27

**opinion** 8:7 10:2 12:1 17:17
19:14,26 22:21 25:20 27:15
29:13,21 32:23 36:27 41:21 43:25
44:12 47:12 48:4 57:27

**opinions** 6:20 8:11,15 9:19,20
10:13 11:25 15:27 16:2 18:7,18
19:15,21,23 20:8,11 21:20 23:4
24:24 25:1 27:5 29:11 31:16
32:18,27 33:1 36:27 38:1,19
44:26 47:11

**opportunity** 7:25 25:6

**oppose** 60:7 71:10

**opposed** 10:5 16:21 52:2

**opposing** 25:11,15 30:3 39:3,23
43:2,6,8 44:27 46:8 48:20 49:1,
19,21 66:24

**opposition** 15:17 40:5,6 62:3
64:2,4 72:2 73:3

**oppositions** 61:15 71:9,27

**order** 9:27 12:27 64:17 66:7 68:3
69:23 71:26

**ordered** 20:28

**orders** 69:28

**ordinarily** 66:20

**originally** 61:17

**OSC** 72:9

**outcome** 23:13

**outrageous** 60:9

**overlapping** 7:3

**overrelied** 28:14

**oversight** 64:27

**Overstock** 58:6,12,18

**overwhelmed** 68:7

**P**

**p.m.** 5:6 73:14

**pages** 14:7 57:23 58:9,24 59:1,7,
28

**paired** 26:20

**panic** 14:26

**paper** 23:14,19 67:26

**papers** 8:17,27 30:7 71:16

**paragraph** 18:25 30:8

**paragraphs** 30:14,15,17,24

**parental** 12:10

**part** 20:22 26:23 31:13 45:5 46:3
56:16 69:21,22

**partially** 63:10

**participated** 40:17

**parties** 6:21 58:12 62:12

**parts** 66:10

**past** 71:9

**path** 62:7

**patient** 23:22 24:22 25:10 26:5,
10

**patient's** 23:22

**patients** 22:24 26:6,17

**patterns** 26:6

**Paul** 6:6 18:3

**people** 14:18 17:15

**percent** 24:17,21 37:11,12 39:21

**performed** 11:10

**period** 15:1 50:2,11

**periods** 44:14,23 50:5

**permission** 7:9 38:25,28

**permitted** 57:20

**person** 17:10 46:26

**person's** 22:10

**perspective** 16:22 68:8

**pertaining** 6:22

**phone** 19:5,12 38:12

**photo** 61:23 63:3

**physician** 8:10

**picture** 29:27 44:22 53:4

**piece** 43:16

**place** 41:22 67:23

**places** 30:9

**placing** 57:7

**plainly** 38:15

**plaintiff** 8:7 12:23 14:11 18:10
19:1 20:23 23:22 32:16 33:4,6
36:8 37:7 39:15,22 49:24 51:26

**plaintiff's** 19:17,18,22 20:23
27:15

**plaintiffs** 5:14,15,17,18,20,21,
22,23,25,27,28 6:22 7:12 8:6
9:14,20 10:10,14 15:7 16:14
19:28 20:2 22:3,18,19 23:28
26:18 30:11,16 32:19,25 33:14
34:2,22 36:19,20 37:27 38:25
42:26 52:3 55:23 57:2,8,9 58:3
59:17,28 61:13,28 63:5,21,22,25
64:24 67:6

**plaintiffs'** 10:14 12:4 13:17,28
15:17,25 18:11 20:7 21:3,5 23:15
25:25 30:10 32:18 40:8 46:24
52:5 57:23 68:8 72:9 73:12

**plan** 11:2

**planning** 62:2 65:14

**platform** 32:20 33:4,6 34:3,18,
22,27 35:9,20 36:21 37:7,28
43:22 44:7,24 51:28

**platform-wide** 52:2

**platforms**  18:19 21:7,9,15,16 26:9

**play**  34:28 39:18 44:28 55:17,18

**played**  18:16 40:24 51:25

**playing**  46:14 49:11

**plenty**  44:15

**plug**  31:27

**plugged**  32:5 39:6

**plural**  64:9

**PMQ**  49:21

**PMQS**  55:23

**podium**  7:17

**point**  8:23 16:7 19:2 20:14 29:8 39:11,14 40:16 42:2,27 43:12 49:28 65:14 67:4 68:11

**pointed**  25:3 44:5

**pointing**  42:23

**points**  9:9 39:4,23 41:5

**Pool**  72:10

**portions**  43:17,18

**positive**  14:16

**post**  32:1 66:24 69:17

**posting**  6:20 56:11 57:15 61:6 65:18,25 68:2

**postings**  6:14

**potential**  12:16 16:28 21:4

**potentially**  73:3

**Powerpoint**  7:20

**practice**  10:20 20:20 21:27 22:2 26:1 27:18 29:9,14 31:7,8

**practitioners**  10:20,25

**precisely**  58:5

**preference**  6:15

**prejudice**  57:22

**prejudiced**  57:11

**prejudicial**  32:25 37:14 38:17 48:11

**prepared**  6:15 65:19 71:15,23

**presence**  13:25 14:10

**present**  6:22 8:8 58:2

**presentation**  10:6 23:16 28:7

**presented**  31:14 37:18 38:8 41:12 58:5 65:6,7

**Presenting**  16:3

**preserved**  12:26

**prevents**  10:13 29:23

**previewed**  66:9

**previous**  36:22

**previously**  20:9 24:28 62:24

**primarily**  39:9

**primary**  23:7

**principally**  43:20

**principle**  9:26

**prior**  15:11 18:11 33:28

**priority**  62:7

**private**  9:15 34:8 35:20 36:5 48:27 51:10,13,18,23 52:10,13

**problem**  22:15 58:2 68:14

**problems**  66:19

**procedural**  63:20

**procedurally**  60:12

**procedure**  65:5 67:5

**proceed**  6:16,25,27,28 7:8,20 10:16

**proceeded**  10:15 11:5

**proceeding**  7:2

**proceedings**  73:14

**process**  22:11 47:10 65:1

**processes**  32:24

**produce**  37:15

**produced**  8:9 33:2,14,16,28 34:7 37:2,5,10 39:8 47:9 50:10,11 52:4

**producer**  46:11

**producing**  46:11

**professional**  20:16 21:25

**progeny**  24:19

**prohibited**  9:17

**project**  7:10

**promise**  41:27

**proper**  27:12 40:8 57:16 63:23

**propose**  67:24,25

**proposed**  13:11 71:25

**proposing**  65:1

**protocol**  35:3,5,6,7 67:20,23

**protocol's**  35:23

**provable**  42:28 43:21 44:9

**proves**  19:22

**provide**  10:23 26:16 30:11,27

**provided**  9:16 10:24 11:6,26 14:7 15:7 29:18 30:7 36:15 42:8 54:9 55:14

**providers**  20:25 26:28

**providing**  11:14,28 52:12 55:4

**psychiatric**  23:15 24:8

**psychiatrists**  24:20

**psychiatry**  10:10 20:18 24:23 29:4

**psychological**  27:10

**PTSD**  28:10,11

**public**  34:8 35:20 36:5 48:27 51:10,13,18,23 52:10,13 69:7

**publish**  38:26

**pull**  68:3

**pure**  19:12

**purport**  14:3 30:17

**purported**  30:25

**purporting**  11:2,3

**purports**  46:25 47:18

**purposes**  55:21

**push**  62:14

**pushed**  68:9 69:9

**pushing**  68:21

**put**  15:2 24:22 30:1 39:22 40:1 46:15 57:2,4,5 59:28 62:13 64:17 67:27 68:2

## Q

**qualified** 10:28 17:17 20:17,18 22:21

**qualitative** 10:11

**quantify** 16:20 24:16

**quantitative** 10:7 26:8

**question** 10:19,27 16:26 23:3 29:16,17 41:14 43:1 46:23 47:15, 16,20 48:3,13 57:10 72:25,27

**questioning** 49:26

**questionnaire** 14:1,2,24

**questions** 8:18,28 11:21 17:22 23:1 38:22 46:7,12 49:22 50:15, 16

**quickly** 66:2

**quotes** 22:27

## R

**R.K.C.** 8:1,2,12 14:1 15:15 18:10, 14,24 19:4,11,26 20:3,21,22 24:10 26:20,23 27:6,21,23 28:17, 19,22 31:4,16 41:1,6 42:17,21 44:15,18

**R.k.c.'s** 12:12 14:8 15:11 18:27 21:7 27:2 28:24 42:10

**Rachel** 5:21

**raise** 14:20 21:19 28:1,26 65:15

**raised** 6:14 18:5 23:7 28:3,28 58:14 65:13

**raising** 63:26 64:1

**rate** 37:12 39:24

**raw** 11:8 26:15 33:4 37:2

**reach** 17:8

**reached** 16:14 59:16

**reaching** 68:11

**read** 12:27 54:23 69:20

**readily** 40:21

**reality** 36:24

**reargue** 12:25

**reason** 24:22 25:23 39:16 47:10 64:1 73:1

**reasonable** 10:2 58:27

**reasons** 19:25 25:23 44:25 47:25 60:18

**recall** 18:9

**receive** 65:20

**received** 37:26

**recognize** 12:22 16:16,18

**recognized** 12:24 13:2,15

**recollected** 9:14

**recollection** 9:20

**record** 10:17 11:17,18 21:22 27:28 29:16 52:17 57:1,2,4,6 58:4 59:21

**recorded** 19:19

**recording** 18:16

**records** 8:9 20:27,28 22:20 23:23 26:5 27:18

**red** 53:10,16 54:2,11,14,20,27 55:15

**redact** 67:16

**redacted** 59:3

**redacting** 60:26

**redo** 48:14

**redone** 48:7

**reference** 12:16 24:6,7 30:19,21 41:3

**referenced** 14:25 25:11

**references** 30:8

**referencing** 25:12

**refers** 19:7 23:20

**reflect** 37:23 38:18

**reflected** 9:25 11:22

**reflecting** 34:17,25 49:13

**reflects** 47:4

**refusal** 19:20

**regard** 6:23 31:20 55:15 59:5 71:6

**regularly** 28:5

**rejected** 66:6

**relate** 27:6 37:5 49:10 50:5

**related** 8:4 33:9,16 34:4,7,10,12, 13,17 35:8,19,20,23 51:14 52:21 54:7,8 55:18 63:2,3 70:17

**relates** 54:11,15 61:22

**relevant** 22:13 44:22 58:11,13 63:27

**reliability** 10:4 12:28 15:24 16:4 27:13 43:1 45:1 46:17

**reliable** 13:3,5,15,16 15:3 17:1 20:9 23:10,27 29:21 44:26 45:7

**reliance** 25:1

**relied** 20:7 25:25

**relies** 19:3,17 26:4 27:17

**rely** 9:13 18:22 25:22 26:2,3 27:15

**remain** 59:21

**remainder** 62:13

**Remaining** 14:19

**remind** 49:20 61:20

**render** 22:21

**renegotiate** 62:9

**Rent-a-center** 22:14

**repeat** 28:3

**replied** 16:22

**report** 6:24 9:13 11:13,14,24,25 12:5,7,17 14:13 15:23 18:23,25, 26 24:4,9 25:17 26:27 27:3 30:2, 15,20 44:5 47:3

**reported** 18:24 28:17

**REPORTER** 5:5

**reports** 9:9,10 12:5,15 16:8 22:24 23:1 29:25 30:5,6 61:14

**represent** 55:24

**representation** 39:20 40:4

**representative** 6:3,7

**represented** 49:16

**representing** 8:4

**represents** 23:13

**request** 38:18 64:8 67:20

**requests** 52:5 63:2,9,21

**require** 10:21 29:10

**required** 10:12 11:7,9 40:22

**requirement** 9:24 10:17

**requires** 21:24 22:4 24:20 29:28

**requisite** 38:5,6

**research** 28:7

**resolve** 73:4

**resolved** 63:27

**resolves** 61:23

**respect** 21:13 24:28 28:2,13 39:3 53:11 56:13,22 68:17 70:7

**respectfully** 15:28 30:5 58:1

**respond** 29:6 48:19 63:12

**responded** 63:8,9

**response** 13:28 15:17 60:15

**responses** 11:23,25 12:4

**result-driven** 19:15

**resulted** 32:23

**results** 14:15 16:3 19:23

**results-driven** 19:16

**retention** 44:13

**retroactively** 31:5

**retrospectively** 15:20

**reverse** 42:19

**review** 22:19 26:26,27,28

**reviewed** 12:15 20:24,25,26

**reviewing** 23:23

**rigor** 10:11 20:15 29:3

**robberies** 22:8

**Rogers** 60:21

**role** 16:18

**room** 42:1

**roughly** 37:8,11

**round** 65:16

**rule** 17:2 58:20 59:17,23 69:3

**ruled** 12:23 21:3 23:16 62:22

**rules** 59:20 60:6 61:10 62:14 65:2

**ruling** 59:4 65:8 69:25

**run** 12:28

**runs** 9:10

---

**S**

**sanding** 47:13

**sands** 12:2

**Sargon** 9:26 10:12 13:1 15:12, 22,28 16:4 20:11,13,14 21:24 22:3 24:19 27:12 29:9,22,27 46:18 47:11 68:18 69:4 70:7,24

**sat** 49:21

**save** 17:21

**say-so** 17:18 22:9

**scale** 13:19 14:15,25,26 15:5 25:13

**scales** 13:6,17 14:5,18 25:11 28:13,18,20,21 31:2,11

**scenario** 58:6

**schedule** 57:12 60:7 61:2,7 62:10 72:16

**scheduling** 57:14

**school** 20:27 26:12,13 61:24

**scope** 23:2

**scores** 11:12

**scratching** 42:17

**screen** 9:3 14:6

**screenshot** 33:27

**seal** 57:6,16,26 58:23,25 59:9,11, 13,14,19,27 60:4,10 61:8 62:1,4 64:22,27 65:7,16,19,23 66:4,10, 12 68:12,27 69:2 70:7,17,19,21, 23 71:5,26

**sealed** 66:11

**sealing** 60:23 64:24 67:5,20,23 68:9 69:3,11,13,21 71:15,16

**seated** 6:13

**secrets** 59:8

**section** 8:21 30:25 34:17 61:22

**seeking** 19:23 66:9

**segment** 50:22

**self-report** 14:25

**self-reported** 14:4

**self-serving** 19:18

**semantics** 23:9

**sense** 42:26 72:16

**Sentenac** 6:9 31:21,24 32:1,4,7, 9,11 33:13,24,26 35:3,5,8,13,18 37:17 38:11 46:28 47:1,17,19,23, 25,27 48:17,19,25 49:1 50:26 51:3,8,13,21,24 52:13,18,24,26 53:3,11,18,23 54:4,9,13,17,22,26 55:2,6,11,16 56:1,6

**separate** 34:21 39:5 47:6

**separately** 33:2 47:8

**September** 56:11

**serial** 34:9

**serve** 63:22

**served** 28:15

**servers** 38:14

**session** 5:6 33:22 34:3,16 35:7, 19,24 36:5 40:1 41:23 43:27 44:1, 2,3,4,6,8 45:23 48:26 49:11,13 50:22,24,27 51:2,3,4,7,9 52:9

**sessions** 22:3 39:26 44:14 46:26

**set** 43:26 50:8 63:24 64:3,4,5,14 70:2 71:18,27 72:28 73:9,10

**sets** 12:1 45:6 47:5 70:22

**setting** 10:25,26,27 11:1 16:25

**shared** 43:3 62:1

**shares** 33:19 44:7

**sheet** 23:14,18

**shifting** 12:1

**short** 16:21 17:6 44:13

**shortcoming** 9:11

**shortens** 62:15

**show** 17:28 33:23 43:10 46:26 58:18

**showed** 32:16 36:22 41:23

**showing** 36:7

**shown** 18:25 48:21

**shows** 34:4

**shrink** 48:5

**siblings** 12:11

**side** 6:27 7:16 63:24

**sides** 67:6,23 72:1

**significant** 17:5,9,11,14,15 38:17

**significantly** 17:11

**similar** 8:14 11:16 14:5

**similarly** 17:4 21:13

**Simonsen** 6:1,2 56:26 57:19,28 58:9,22 59:1,6,11,16,27 60:5,24, 27 61:4,11,13,22,27 62:11,18 63:16,18 64:6,18,21 65:10 66:9 67:3,13,25,28 68:5 69:1,6,19 70:9,12,14,20 71:3,14 72:13,18

**simple** 48:22

**simpler** 67:5

**simplify** 36:3

**simply** 17:1,17,18 23:1 27:11 29:28 30:1

**single** 25:4 36:8 67:17

**sir** 45:18

**sister's** 24:8 30:4,21

**Sit** 68:24

**situation** 56:8

**six-question** 14:8

**skate** 45:3

**skip** 36:9 38:2 39:26

**slate** 16:28

**sleep** 21:11,17

**slide** 9:4 32:16,19 33:5,18 36:9, 22 37:8 38:3 39:26 41:2,4 42:11 43:2,11,15,24 44:11 45:14 46:24 47:22 48:16,22 52:8

**slides** 7:10 25:15 31:21 32:1 38:8,26 40:18

**slightly** 10:27 55:7

**small** 54:24

**SMD** 13:19

**Smith** 9:26

**smooth** 65:2

**Snap** 6:7 18:4 63:10

**Snap's** 25:19 65:14 66:4

**Snapchat** 8:4 18:7,10,24 19:1,8, 11,21,25 25:21

**snapshot** 34:1

**snapshots** 45:9

**social** 5:2,10 8:25 12:21 13:19,25 14:2,11,25 15:4 17:5 21:9 24:25 25:2 28:13

**sole** 8:13

**solve** 15:18

**someone's** 38:12,14

**sort** 10:12 11:22 12:28 31:10

**sources** 50:4 55:7

**speak** 66:1

**specific** 7:26 8:13,25 14:17,22 16:7 20:6,10 22:25 30:13 31:16, 19 32:14 51:27,28 52:3,6,14,15 56:28 58:11 59:2,20

**specifically** 13:11 21:8 23:17 30:20 42:25 61:16 69:28

**spectrum** 24:15

**speculating** 36:25

**speculation** 18:8 19:13 49:19

**spend** 18:6 67:9,10,11

**spent** 33:2 36:28 37:1,4,25,26 41:11 43:17,18,19 44:14 47:5 48:2,7 50:1,7

**spoke** 30:20

**SSC** 5:4

**staff** 66:17 67:9,10

**stamp** 34:4 50:26 51:4 52:11,19

**stamps** 34:27 35:28

**stand** 8:17,27 35:2

**standard** 10:20 20:12,13 21:27

22:5 26:1 29:2

**start** 6:18 21:20 23:7 44:3,4 50:27 51:7 69:22

**started** 44:8,16 51:1 64:22

**starting** 44:15

**state** 13:18

**stated** 16:8 18:24 26:21 49:23

**statements** 9:14 19:4,12,18

**status** 56:10

**stay** 59:15

**stays** 72:19

**step** 32:28 45:5

**stills** 22:11

**stip** 71:25

**stipulation** 64:25 69:28

**stop** 17:22 51:5

**strengthen** 15:26

**strife** 16:17

**strike** 56:16 57:21 58:15 59:12, 20 60:6

**struggled** 43:9

**Stuart** 8:1

**study** 13:11 31:9

**stuff** 66:26

**subject** 8:18,28 39:5

**submission** 70:6 72:1

**submit** 20:12 36:21 56:1 71:15, 24

**submits** 71:19

**submitted** 71:7

**substance** 9:8 13:7 23:2 69:21

**substantial** 24:11,14

**substantially** 37:6,14 42:22

**substantive** 45:14 65:19

**suffer** 21:10 57:22

**suffers** 8:7

**sufficient** 12:24 18:13 19:5 25:22 29:18

**sufficiently** 56:23

**suggest** 7:2 41:5

**suicidal** 21:12

**suicide** 30:4,21

**suit** 18:11

**summaries** 22:26

**summarizes** 11:13

**summary** 20:4 32:17 56:14 57:17 58:13,14 60:15 61:9,15,17, 21 62:3,22 63:2,12,28 64:9,13 68:4 70:17,21,24 72:14

**supplemental** 56:2

**support** 16:2 19:23 22:4 28:7

**supporting** 32:18

**supposed** 39:14 44:28 46:16 58:12

**surmise** 41:8

**surprising** 49:25

**symptom** 22:25

**symptoms** 14:4 15:9,10 21:3 27:23

---

**T**

**tabulated** 47:27

**taking** 13:15 15:12 46:4 72:24

**talk** 40:27 56:10 67:14

**talked** 30:10

**talking** 35:10 41:11 45:16,18 64:22

**targeted** 38:26 63:2

**technical** 32:9

**Teller** 6:6 7:5 17:25 18:3,17 66:1, 16,22,28 67:2

**telling** 17:9 35:26

**tells** 17:14,16 51:22

**ten** 54:25 59:19 60:5 62:23

**tens** 43:10 45:21

**tentative** 56:24

**terms** 10:4 18:1 40:23

**test** 9:27 10:9 12:2,19 14:8,9 15:18,19 16:3 17:8 29:11 31:6,8 47:14

**testable** 29:20

**tested** 9:19

**testified** 26:8 28:5 34:20 44:10

**testimony** 17:27 18:26 20:7 26:26,28 27:1,28 36:13 49:26

**testing** 10:14 11:8 14:6,19,21

**tests** 11:11,12 13:23 14:9,22 15:12,26 16:5

**theory** 21:21

**therapist** 27:2

**therapy** 15:28

**thing** 17:28 25:28 35:26 37:22 39:11 44:2 45:24 49:28 61:18 66:25 67:9

**things** 13:26 20:6 22:2 30:3,10 35:1,17 36:17 37:4,11 48:20 65:26 71:12

**thinks** 17:10

**thought** 65:4 69:26

**thousands** 43:10 44:6 45:22 58:4

**tied** 20:8

**Tiktok** 6:9 31:20 32:11,14,20 33:6 34:3 37:2,5,7 38:13,14,20 39:12,17 40:7,9,14 41:11 42:18 44:12 47:1,8 49:23 51:28 63:10

**Tiktok's** 33:2 40:20 41:23 42:24 43:22,27 49:21

**time** 5:6 7:23 8:11,17 12:15 15:1, 10 17:21 26:11 31:17 32:12 33:2 34:6,11,15,19,27,28 35:28 36:28 37:1,4,25 38:26,28 39:15,22 40:1, 8,15 41:11,23 43:17,18,19 44:14, 21,23 46:26 47:5 48:2,6 49:23 50:1,2,4,7,8,11,24,26 51:1,4,12, 28 52:11,15,19,20 53:1,7,25 59:22 62:15 63:23 64:15,16 66:6 67:9,10,11,24 68:3 69:25

**timeline** 22:26

**times** 30:6 36:2,20 44:6 48:1 51:20,24 53:2,8,28

**title** 36:12

**today** 6:3,8,19 7:24 8:17 9:1,10 17:28 20:10 32:12 37:17 39:12 41:12 46:9 59:25 63:13 68:28 69:6 70:5,6

**told** 15:7

**Tolles** 6:6 18:4

**tomorrow** 59:11,12 63:14

**tool** 31:9

**tools** 21:1 28:1,15

**top** 15:21 33:27 34:25 54:20

**topics** 12:9,10

**total** 18:11 25:21 33:18 41:11,26

**totaling** 41:6

**totality** 25:26

**totals** 33:4

**touch** 44:25 46:17

**touched** 44:12

**tough** 66:21,23

**track** 33:3 37:1 49:9

**tracks** 55:7

**trade** 59:8

**trained** 27:22

**transcribe** 21:22 22:2

**transcribed** 19:19

**transcript** 9:16,25 11:6,19 22:15

**transmitting** 38:13

**treat** 26:17

**treaters** 20:26

**treating** 8:10 26:5 27:2

**treatment** 11:1,2 26:28

**treats** 28:5

**triable** 20:5

**trial** 32:27 57:25 58:2,5 60:26 68:10 72:10

**triple** 37:3

**triplication** 36:24

**trouble** 53:21

**true** 12:8 29:1 34:23 57:10

**trust**  62:25

**Tuesday**  70:19,22

**turning**  9:8 27:5

**Twitter**  13:27

**tying**  22:8

**type**  26:14 28:26 33:10 34:24 44:1 55:17

**types**  49:2,3,9 55:7

**typically**  10:25 27:17

---

**U**

---

**ultimately**  42:27

**underlying**  9:26 11:8,15,28 21:5 33:8

**underneath**  54:2

**underscores**  12:17 13:1

**understand**  10:8 33:21 35:17 36:16 37:22 38:15 45:26 46:25,27 52:8 53:14 57:28 58:21 59:24 60:1,16 67:18 68:23

**understandable**  46:6

**understanding**  9:28 10:5 11:4 14:11 46:28 47:1

**understood**  41:15 59:6 60:27 62:18 66:22 67:2 71:14,21

**underwent**  12:11

**unfair**  48:11

**unhappy**  27:11

**unique**  34:9,14 49:6

**unmistakably**  23:2

**unrecognized**  13:14

**unrecorded**  9:15

**unrelated**  39:8

**unreliability**  31:13 42:24

**unreliable**  8:16 12:21 13:24 15:13 16:1 21:23 24:25,27 25:20 26:22 27:15 44:10,22 47:11

**unsealed**  69:7

**unsupported**  38:1

**upset**  56:7

**usage**  18:13,23,24 19:5,9,17 21:7,8,14 25:19,21 26:6,21 27:16 44:21,22

**user**  35:11,23 36:1 39:22 40:8 43:2 48:23,25 49:4,23 51:1,26 52:1,5,14,20,22 53:25

**user's**  34:17 35:19,21 39:15 51:14,27

**users**  52:6

**UTC**  39:15 40:14 53:26,27

**utilize**  14:18

**utilized**  13:6 14:14,22,23

**utilizes**  31:6,7

**utilizing**  29:16

---

**V**

---

**vague**  19:3,18

**valid**  19:13 45:7 50:12

**validate**  14:14

**validated**  15:1,8,21 18:12 31:3

**validation**  45:4,7

**valuable**  67:19

**Vanzandt**  5:18

**vast**  58:10

**Vaughn**  5:23

**vendor**  66:6,20

**verbally**  25:14,16

**verbatim**  9:24 11:6

**version**  31:3

**video**  18:16 22:11 33:10,16,19 34:7,9,10,12,13,14,18,24,28 35:21,25,27 40:26 41:6,9 42:7,12, 15,19,20,22 43:15,18,22 45:23,27 46:2 47:7 48:27 49:7,8,11 51:12, 14,15,16,17,20,23,25 52:14,17, 18,19,20,23,28 53:7,12,14,18,24 54:4,6,12,15,19,27 55:4,11,12,13, 17,18

**video-viewing**  43:22

**videos**  34:8 36:6 43:20,21 48:28 49:17 50:8 51:11,19,23 52:3,11, 13 53:6

**view**  33:10,19 52:15 54:5 57:28

**viewed**  43:21 51:20 52:15 55:11

**viewing**  54:6

**views**  33:17 41:6 42:12,19,20,22 43:15,18 47:7 49:4 53:24

**violate**  16:3

**violates**  15:12

**violation**  58:17

**violence**  43:14,25

**visual**  48:5

**volume**  58:1,21 68:11

**voluminous**  57:23

---

**W**

---

**waive**  72:1

**walk**  33:12,21

**walked**  67:8,9

**wanted**  18:6 32:13 39:12 42:2 47:15 49:28

**wanting**  27:26

**watching**  50:8

**web**  13:26

**Wednesday**  70:22

**week**  15:9 20:5 61:13 62:23 63:4, 13,27 64:2 70:3,21

**weigh**  72:3,5

**weighed**  27:10

**weight**  27:13

**well-being**  27:10

**wholesale**  22:16

**work**  18:1

**working**  17:26 40:28

**works**  69:24

**worried**  27:25

**worry**  70:27

**wrong**  32:21 48:16 55:27

CERTIFIED COPY

## Y

**year**  15:11
**years**  28:11 44:17,18
**young**  44:24
**Youtube**  6:12 63:8
**Youtube's**  66:5

## Z

**zone**  39:15 40:2,8,15 49:24
**zones**  39:22