# EXHIBIT C

| | |
|---|---|
| 1 | ROB BONTA<br>Attorney General of California |
| 2 | NICKLAS A. AKERS<br>Senior Assistant Attorney General |
| 3 | STACEY D. SCHESSER<br>BERNARD A. ESKANDARI |
| 4 | Supervising Deputy Attorneys General<br>PETER H. CHANG |
| 5 | Deputy Attorney General<br>  455 Golden Gate Ave. Suite 11000 |
| 6 |   San Francisco, CA 94102<br>  Telephone: (415) 510-3776 |
| 7 |   Email: Peter.Chang@doj.ca.gov |

BEFORE THE DEPARTMENT OF JUSTICE

OFFICE OF THE ATTORNEY GENERAL

STATE OF CALIFORNIA

| | |
|---|---|
| **In the Matter of the Investigation of:**<br><br>**Meta Platforms, Inc.** | **INVESTIGATIVE SUBPOENA**<br><br>(GOV. CODE, § 11180 *et seq.*) |

NOTICE TO THE PERSON SERVED: **CORPORATION SERVICE COMPANY**

You are served on behalf of **META PLATFORMS, INC.**

1

1 | Pursuant to the powers conferred by Article 2 of Chapter 2 of Division 3 of Title 2 of the Government Code of California (Gov. Code, § 11180 *et seq*.) on the Attorney General, as head of the California Department of Justice, which powers and authority to conduct the above-entitled investigation have been delegated to the undersigned, an officer of that Department, **META PLATFORMS, INC. ("Meta"), formerly known as FACEBOOK, Inc.,** shall produce the Documents, Communications, and other items (collectively, "Items") identified in Attachment A to this Investigative Subpoena. Meta shall produce such responsive Items that are in its custody, possession, or control. Meta shall produce such Items at the California Department of Justice, Office of the Attorney General, 455 Golden Gate Ave. Suite 11000, San Francisco, CA 94102, ATTN: Deputy Attorney General Peter H. Chang, within twenty-one days of service of this subpoena.

**INSTRUCTIONS FOR COMPLIANCE**

1. Meta's production shall be accompanied by a completed declaration of custodian of records in compliance with Evidence Code sections 1560, 1561, 1562, and 1271.

2. All responsive Items created, maintained, or altered during the Relevant Period must be produced unless otherwise expressly stated in Attachment A to this subpoena.

3. If Meta claims that an Item or a portion of an Item is privileged and Meta withholds it from production for that reason, Meta must create and submit a privilege log which lists: (1) the authors and their capacities; (2) the recipients (including cc's and bcc's) and their capacities; (3) other individuals with access to the document and their capacities; (4) the type of document; (5) the subject matter of the document; (6) the purpose(s) for the creation of the document; (7) the date on the document; and (8) a detailed explanation setting forth the factual and legal basis for your claim that the document is privileged or otherwise immune from production.

4. To the extent responsive Items exist in an electronic or computerized format, the information shall be provided in accordance with the California Attorney General's Office Production Format as set forth in Attachment B, unless expressly agreed otherwise.

5.   This Investigative Subpoena has been issued in connection with an investigation within the scope of section 131 of the California Penal Code.

6.   No Item requested herein shall be destroyed or discarded by Meta until the Attorney General has made a written determination that the Item in question is not necessary for furtherance of this investigation.

7.   When producing an Item, identify by number the request(s) in Attachment A to which the Item is responsive.

**DEFINITIONS**

As used herein:

1.   All definitions shall be construed to extend to all forms, tenses, capitalizations, and conjugations of the defined word.

2.   The use of the singular form of any word includes the plural and vice versa.

3.   The terms "and" and "or" are terms of inclusion and not of exclusion and shall be construed either disjunctively or conjunctively as necessary to obtain the broadest meaning possible and bring within the scope of this CID any document or information that might otherwise be construed to be outside its scope.

4.   The term "any" shall be construed as "any and all."

5.   "Communication" means any oral or written communication of any kind, including but not limited to face-to-face communications, telephone communications (including voice mail, text messages, or any other means of communication utilizing a telephone), letters, memoranda; emails, instant messages, internet relay chat logs, enterprise communication tools (such as, but not limited to, Workplace), dashboards, or other transmittal of documents or data through the use of a computer, and includes any document that digests, memorializes, or records a communication.

6.   "Document" includes, without limitation, any written, printed or graphic matter of any kind, including writings, drawings, graphs, charts, calendars, photographs, sound recordings, images; and any electronic data transmission or compilation, including documents stored in personal computers, portable computers, tablets, smartphones, workstations, minicomputers,

3

1  mainframes, servers, cloud computing servers, backup disks and tapes, archive disks and tapes,
2  and other forms of offline storage, whether on or off Your premises. "Document" includes copies
3  if the copy bears any other marking or notation of any kind, and each such document shall include
4  all attachments, enclosures, appendices, exhibits, and drafts of each such document, that are in
5  Your actual or constructive possession, custody, or control.

6      7.    "Identify" (with respect to Persons) means to state, to the extent known, the full
7  name, job title, affiliation, last known mailing address, telephone numbers and email address.

8      8.    "Identify" (with respect to third-party entities) means to state, to the extent known,
9  the name and any D/B/As, the mailing and physical addresses of the entity's headquarters or
10 primary location, web address, an individual point of contact, and the telephone numbers and
11 email address of that individual.

12     9.    "Minor" means a Person that You know or have reason to know is under the age of
13 18 years of age.

14     10.    "Person" means a natural person and includes Minors.

15     11.    "Product" means the online or mobile features, platforms, or services referred to as
16 Instagram and Instagram for Kids and includes all related features or functions.

17     12.    "Relating To" means in whole or in part constituting, containing, concerning,
18 discussing, commenting upon, describing, analyzing, identifying, stating, regarding, pertaining to,
19 referring to, or forming the basis of.

20     13.    "Relevant Period" refers to January 1, 2015 to the present, except where otherwise
21 indicated.

22     14.    "User" means a Person that has one or more account(s) with Your Product.

23     15.    "You" "Your," "Meta" refers to Meta Platforms, Inc. and any D/B/As, affiliated
24 entities, predecessor entities, successor entities, entities owned or controlled directly or indirectly
25 by You, including but without limitation Instagram and Facebook, Inc. "You" and "Your" also
26 encompasses agents and all other business entities acting, or purporting to act, on Your behalf.

27     16.    "Young User" refers to Users that are either Minors or Young Adults.
28

Meta Platforms, Inc.                                                              Investigative Subpoena

17. "Young Adult" means a Person that You know or have reason to know is 18 years of age or older but under the age of 24.

Dated:  November 18, 2021

                Rob Bonta
                Attorney General of California
                Nicklas A. Akers
                Senior Assistant Attorney General
                Stacey D. Schesser
                Bernard A. Eskandari
                Supervising Deputy Attorneys General

*/s/ Peter H. Chang*

Peter H. Chang
Deputy Attorney General

SF2021401219
42964497.docx

# ATTACHMENT A

The Items requested are as follows:

1. Any Documents that show, for each month of the Relevant Period, the number and state of residence for: (1) all Users, (2) Minor Users, and (3) Young Adult Users, and the number of Minor Users and Young Adult Users that engage with Your Product at least once a month and at least once a day.

2. Any Documents constituting or sufficient to identify all processes, policies, methods, procedures, training, technologies, and parameters for identifying the ages of Users of the Product, including whether a User or prospective User is under the age of 13, under the age of 18, or under the age of 24.

3. Any Documents constituting or Relating To investigations, reports, analyses, or presentations Relating To the number of Users under the age of 13.

4. Any Documents showing Your efforts to grow or retain the number of Young Users.

5. Any Documents showing Your efforts to increase engagement or interaction with, or use of, Your Product by Young Users.

6. Any Documents showing on a periodic basis over the Relevant Period aggregate metrics for engagements with Your Product by Young Users, such as, for example and without limitation, likes, comments, shares, views, time spent online, content created, or advertisement click-through-rates.

7. Any Documents showing Your projections of the market for use of Your Products by Young Users.

8. Any Documents that Identify all Persons, teams, groups, or divisions responsible for maintaining or increasing the number or activity of Young Users on Your Product during the Relevant Time Period, including but not limited to Your "Marketing Insights," "Product Marketing," and "Core Data Science" teams, groups, or divisions.

9. Any Communication between, by, or with the teams, groups, or divisions (or any members thereof) identified in Request 8 Relating To efforts to maintain or increase the number and activity of Young Users on Your Product.

10. Any Documents constituting or reflecting employee payment or salary schedules or structures, bonus or other incentive payments, or promotions Relating To an employee's efforts to maintain or increase the number and activity of Young Users on Your Product.

11. Any Documents Relating To Your development and testing of techniques, strategies, or features designed to increase the use of Your Products by Young Users, including, but not limited to, the age-up strategy identified in the document titled "Teens & Young Adults on IG & FB." This Request includes but is not limited to Documents reflecting the design, methodology, running of, and results of all testing (including without limitation, diary studies, A/B or multivariate testing, or experiments) of Your Products and any Product features concerning Young Users, and expenditures for such testing.

12. Any Documents that Identify all Persons, teams, groups, or divisions that during the Relevant Period were involved in designing, running, or interpreting tests of the Product or Product features Relating To Young Users.

13. Any Communication sent or received by the Persons and members of the teams, groups, or divisions identified in Request 12 Relating To the evaluation of current or future use of Your Products by Young Users.

14. Any Documents Relating To studies, testing, research, risk analyses, or investigations (including without limitation "Proactive Risk Investigations") into mental or physical health impacts or effects Relating To the use of Your Products by Young Users, including all draft, annotated, and final reports, research papers, analyses, white papers, slide decks, presentations, synopses, blog posts, talking points, or memoranda reflecting the results of such testing, studies, risk analyses, or investigations. Such studies include, but are not limited to:

   a. "Problematic Facebook use: When people feel like Facebook negatively affects their life";

b. "Beyond the Individual User: Understanding our Products through the Household Ecosystem";

c. "Expanding Messenger Kids to More Countries and Adding New Features";

d. "Eating Disorders PRI Analysis Document";

e. "Teen Mental Health Deep Dive";

f. "Hard Life Moments-Mental Health Deep Dive";

g. "Prioritization – Which issues come on top and what should we care about?";

h. "The Role of the Teen in Shaping a Household's Experience of Instagram";

i. "Sizing Negative Social Comparison on IG: Baseline Data from Daisy Controls Wave 1";

j. "Appearance-based social comparison on Instagram";

k. "How the topics people see are linked to appearance comparison on IG";

l. "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US";

m. "Social comparison on Instagram – Results from a 100k person survey + behavioral data";

n. "The Power of Identities: Why Teens and Young Adults Choose Instagram";

o. "What We Know About Body Image (Literature Review)";

p. "Mental Health Findings – Deep Dive into the Reach, Intensity, IG Impact, Expectation, Self Reported Usage and Support of mental health issues. Overall analyses and analysis split by age when relevant";

q. "Expression and Authenticity – Marketing Insights, Instagram Public Policy";

r. "Teen Communication – Jobs To Be Done – 13 Year Old Analysis";

s. "Defining Body Image Issues";

t. "Hard Life Moments - Subjective Well-being on Instagram";

u. "Likes and social comparison on Instagram";

v. "Social Comparison, like counts, and Project Daisy";

w. "Selfies, filters, and social comparison on Instagram";

      x. "Social comparison on Facebook, Feedback, positivity, and opportunities for comparison";

      y. "Country differences in social comparison on social media"; and

      z. Household Ecosystem project.

15. Any Documents and Communications Relating To "soft interventions," "soft options," interventions, or Product changes discussed or implemented in response to indicators or concerns of harm that may result from Young Users' use of Your Product, including the issues identified in the Documents responsive to Request No. 14. This request includes, but is not limited to, Documents and Communications Relating To "Project Daisy."

16. Any Documents identifying, and Communications to or from, all Persons that designed, conducted, researched, studied, advised, analyzed, received, commented on, or authored the tests, studies, research, risk analyses, or investigations identified in Request 14.

17. Any Documents showing Your overall expenditures during the Relevant Period for researching or studying mental or physical health impacts or effects Relating To the use of Your Products by Young Users.

18. Any Documents sufficient to show all Persons, teams, divisions, or groups that, during the Relevant Period, studied, researched, or responded to mental or physical health impacts or effects Relating To the use of Your Products by Young Users.

19. Any Documents and Communications Relating To the Research fund announced in December 2017 at https://about.fb.com/news/2017/12/hard-questions-kids-online/ (last visited Nov. 12, 2021), including documents and communications Relating To the scope and purposes of the fund.

20. Any Communications with Persons acting on behalf of the below entities and groups:

      a. AAKOMA Project (including but not limited to Dr. Alfiee M. Breland-Noble);

      b. Blue Star Families;

      c. Center for Digital Media Innovation and Diversity (including but not limited to Dr. Kevin Clark);

   d. Center on Media and Child Health (including but not limited to Dr. Michael Rich and Kristelle Lavallee);

   e. Child Mind Institute (including but not limited to Dr. Dave Anderson);

   f. Connect Safely (including but not limited to Larry Magid);

   g. Cyberbullying Research Center (including but not limited to Dr. Sameer Hinduja);

   h. Digital Wellness Lab;

   i. Duke Center for Eating Disorders (including but not limited to Nancy Zucker);

   j. Family Online Safety Institute (including but not limited to Stephen Balkam and Jennifer Hanley);

   k. Future of Privacy Forum (including but not limited to Amelia Vance);

   l. Fred Rogers Center (including but not limited to Rick Fernandes);

   m. Jed Foundation;

   n. Lewis J. Bernstein and Associates LLC;

   o. MediaSmarts (including but not limited to Cathy Wing Jane Tallim);

   p. National Eating Disorders Association;

   q. National PTA;

   r. New Mexico State University Learning Games Lab;

   s. Project Rockit (including but not limited to Lucy Thomas);

   t. Rachel Rodgers (Northeastern University);

   u. Sesame Workshop (including but not limited to Dr. Lewis Bernstein);

   v. Janis Whitlock (Cornell University); and

   w. Yale Center for Emotional Intelligence (including but not limited to Dr. Robin Stern).

21. Any Documents Relating To Your provision of funding, data, or any goods or services to any of the individuals, groups, or entities identified in Request 20.

22. Any Documents constituting agreements or contracts with any of the individuals, groups, or entities identified in Request 20.

23. Any Documents including meeting minutes, preparatory materials, agendas, presentations, or otherwise, and Communications Relating To the "Youth Advisors" group described in https://www.facebook.com/fbsafety/posts/1446426198728547 (last visited Nov. 12, 2021) and https://about.fb.com/news/2021/07/age-verification/ (last visited Nov. 12, 2021), including but not limited to Documents that Identify the members of such group, and all meeting minutes, notes, preparatory materials, agendas, reports, presentations, or otherwise.

24. Any Documents and Communications with members of Your "Safety Advisory Board, as referenced at https://www.facebook.com/help/222332597793306 (last visited Nov. 12, 2021), Relating To the use of Your Product by Young Users, including but not limited to Documents that Identify the members of such board and all meeting minutes, notes, preparatory materials, reports, agendas, presentations, or otherwise.

25. Any Documents sufficient to show all representations to Users, potential Users or the public, Relating To the safety or benefits of Your Product to Users or Young Users, including without limitation, representations made in Your privacy policy, terms and conditions, advertising, marketing, videos, blog posts, press releases, email, pop-up screens, government testimony, public speaking, and Product menus or controls.

26. Any Documents sufficient to show all representations to investors, potential investors, advertisers, academics, researchers or the government Relating To the safety or benefits of Your Product to Users or Young Users.

27. Any Communications with Persons affiliated with any media entity Relating To the safety or benefits of Your Product to Young Users.

28. Any Communications by and between senior executives Relating To the use of Your Products by Young Users.

29. Any Document comprising all meeting preparatory materials, agendas, and minutes of Your Board of Directors Relating To the use of Your Products by Young Users.

## Attachment B

## California Attorney General's Office

## PRODUCTION FORMAT

**I. PRODUCTION OF ELECTRONICALLY STORED INFORMATION (ESI)**

**A. Load files.** Except where noted in section (K) below, all ESI is to be produced in electronic format, with file suitable for loading into a Concordance compatible litigation support review database. All productions will include both image and metadata load files, as described in Appendix A: Load File Format.

**B. Metadata Fields and Processing.** Each of the metadata and coding fields set forth in Appendix B that can be extracted from a document shall be produced for that document. The parties are not obligated to populate manually any of the fields in Appendix B if such fields cannot be extracted from a document.

**C. System Files.** Common system and program files need not be processed, reviewed or produced. The producing party shall keep an inventory of the system files not being produced and the criteria *(e.g.,* non-human readable file, etc.) for not processing the files.

**D. Email.** Whenever possible, email shall be collected from the producing party's email store or server *(e.g.,* MS Exchange, Lotus Notes) because this is the most reliable source from which to produce and maintain email metadata and structure. Metadata and "header fields" shall be extracted from email messages. Email messages, meeting notices, calendar items, contacts and tasks shall all be extracted from the email archives.

**E. De-Duplication.** Removal of duplicate documents shall only be done on exact duplicate documents (based on MD5 or SHA-1 hash values at the document level) *across all custodians* (global), and the Custodian field will list each Custodian, separated by a semicolon, who was a source of that document prior to deduplication. If a party is unable to provide such information within the Custodian field, or if global deduplication could otherwise limit the ability to provide that a particular document was possessed by a custodian, then removal of duplicate documents shall only be done on exact duplicate documents (based on MD5 or SHA-1 hash values at the document level) *within a source* (custodian).

**F. TIFFs/JPGs.** Single-page Group IV TIFF images shall be provided using at least 300 DPI print setting. Each image shall have a unique file name, which is the Bates number of the document. Original document orientation shall be maintained *(i.e.,* portrait to portrait and landscape to landscape). TIFFs will show any and all text and images which would be visible to the reader using the native software that created the document. Documents containing color need not be produced initially in color. However, if an original document contains color necessary to understand the meaning or content of the document, the producing party will honor reasonable requests for a color image of the document. If color images are to be produced, they will be provided in JPG format.

**G. Embedded Objects.** Objects embedded in Microsoft Word and .RTF documents, which have been embedded with the "Display as Icon" feature, will be extracted as separate documents and treated like attachments to the document. Other objects embedded in documents shall be produced as native files.

**H. Compressed files.** Compression file types *(e.g.,* .CAB, .GZ, .TAR, .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

**I. Text Files.** For each document, a single text file shall be provided along with the image files and metadata. The text file name shall be the same as the page Bates/control number of the first page of the document. File names shall not have any special characters or embedded spaces. Electronic text must be extracted directly from the native electronic file unless the document was redacted, an image file, or a physical file. In these instances a text file created using OCR will be produced in lieu of extracted text. See Section II.C for OCR requirements. Under no circumstances shall the receiving party be required to rely upon a less accurate version of the text than the producing party. For example, if the producing party has access to extracted text from electronic document files, the receiving party shall receive extracted text instead of OCR'd text generated from an image file.

**J**. **Redaction**. If a file that originates in ESI needs to be redacted before production, the file will be rendered in TIFF, and the TIFF will be redacted and produced. However, to the extent that the text is searchable in the native format, the producing party will still provide searchable text for those portions of the document that have not been redacted.

**K. Spreadsheets and Presentations.** Various types of files, including but not limited to MS Excel spreadsheets, MS PowerPoint presentations, media files, etc., lose significant information and meaning when produced as an image. Any native files that are produced shall be produced with a Bates-numbered TIFF image slip-sheet stating the document has been produced in native format. Any native files that are produced shall be produced with the Source File Path provided, as well as all extracted text and applicable metadata fields set forth in Appendix B.

- **Spreadsheets.** Excel spreadsheets shall be produced as a native document file along with the extracted text and relevant metadata identified in Appendix B for the entire spreadsheet, plus a Bates-numbered TIFF image slip-sheet stating the document has been produced in native format.

- **Presentations.** PowerPoint presentations shall be produced as a native document file along with the extracted text and relevant metadata identified in Appendix B for the entire presentation, plus a Bates-numbered TIFF image slip-sheet stating the document has been produced in native format.

**L. Other ESI that is Impractical to Produce in Traditional Formats.** The parties understand and acknowledge that certain categories of ESI are structurally complex and do not lend themselves to production as native format or other traditional formats. To the extent a response to discovery requires production of discoverable electronic information contained in a database, the producing party shall consider methods of production best providing all relevant information, including but not limited to duplication of databases or limited access for the purpose of generating reports. Parties should consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file (*e.g.,* Excel, CSV or SQL format). The parties agree to confer to obtain an appropriate resolution to such requests.

**M. Endorsements.** The producing party will brand all TIFF images in the lower right-hand corner with its corresponding bates number, using a consistent font type and size. The bates number must not obscure any part of the underlying data. The producing party will brand all TIFF images in the lower left-hand corner with all confidentiality designations, as needed, in accordance with confidentiality definitions as agreed to by the parties.

**N. Exception Report.** The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

**O. Clawback procedure.** Any documents recalled due to a mutually-agreed upon clawback provision shall have a specific protocol followed to ensure all copies of each such document are appropriately removed from the review database, backup and disaster recovery systems maintained by the opposing party.

**II. PRODUCTION OF PHYSICALLY STORED INFORMATION (HARD COPY DOCUMENTS)**

**A**. **TIFFs.** Hard copy paper documents shall be scanned as single-page, Group IV compression TIFF images using a print setting of at least 300 dots per inch (DPI). Each image shall have a unique file name, which is the Bates number of the document. Original document orientation shall be maintained (*i.e.,* portrait to portrait and landscape to landscape).

**B. Metadata Fields.** The following information shall be produced for hard copy documents and provided in the data load file at the same time that the TIFF images and the Optical Character Recognition (OCR) acquired text files are produced. Each metadata field shall be labeled as listed below:

| Field Name | Example / Format | Description |
|---|---|---|
| **PARENTDOCID** | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of a parent document (this field will only be populated in child records). |
| **GROUPID** | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document (in most cases, this will be data in the BEGATTACH field). |
| **BEGBATES** | ABC0000001 (Unique ID) | The Document ID number associated with the first page of a document. |
| **ENDBATES** | ABC0000003 (Unique ID) | The Document ID number associated with the last page of a document. |
| **BEGATTACH** | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document (if applicable). |
| **ENDATTACH** | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment (if applicable). |
| **PGCOUNT** | 3 (Numeric) | The number of pages for a document. |
| **VOLUME** | VOL001 | The name of CD, DVD or Hard Drive (vendor assigns). |
| **CUSTODIAN** |  | The custodian / source of a document. **Note:** If the documents are de-duped on a global level, this field will contain the name of each custodian from which the document originated. |

**C. OCR Acquired Text Files.** When subjecting physical documents to an OCR process, the settings of the OCR software shall maximize text quality over process speed. Any settings such as "auto-skewing", "auto-rotation" and the like should be turned on when documents are run through the process.

**D. Database Load Files/Cross-Reference Files.** Documents shall be provided with (a) a delimited metadata file (.dat or .txt) and (b) an image load file (.opt), as detailed in Appendix A.

**F. Unitizing of Documents.** In scanning paper documents, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records *(e.g.,* paper documents should be logically unitized). In the case of an organized compilation of separate documents - for example, a binder containing several separate documents behind numbered tabs - the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the beginning and ending document and attachment fields. The parties will make their best efforts to unitize documents correctly.

**APPENDIX A: REQUESTED LOAD FILE FORMAT FOR ESI**

**1. Image File Format:**  All images, paper documents scanned to images or rendered ESI, shall be produced as 300 dpi single-page, CCITT Group IV TIFF images (for black/white) or JPG images (for color).  Documents should be uniquely and sequentially Bates numbered with an endorsement burned into each image.

- All TIFF/JPG image file names shall include the unique Bates number burned into the image.
- Each Bates number shall be a standard length, include leading zeros in the number and be unique for each produced page.
- All TIFF/JPG image files shall be named with a ".tif" or ".jpg" extension.
- Images should be able to be OCR'd using standard COTS products, such as LexisNexis LAW PreDiscovery, Ipro, etc.

**2**.  **Concordance Image Cross-Reference file:**  Images shall be accompanied by a Concordance Image Cross-Reference file that associates each Bates number with its corresponding single-page TIFF/JPG image file.  The Cross-Reference file should also contain the image file path for each Bates numbered page.

- Image Cross-Reference Sample Format:
  ABC000001,OLS,D:\DatabaseName\Image\001\ABC000001.TIF,Y,,,
  ABC000002,OLS,D:\DatabaseName\Image\001\ABC000002.TIF,,,,
  ABC000003,OLS,D:\DatabaseName\Image\001\ABC000003.TIF,,,,
  ABC000004,OLS,D:\DatabaseName\Image\001\ABC000004.TIF,Y,,,

**3. Concordance Load File:**  Images shall also be accompanied by a "text load file" containing delimited text (DAT file) that will populate fields in a searchable, flat database environment.  The delimiters for the load file should be Concordance defaults.

- Comma :    ¶  ASCII character (020)
- Quote:      þ  ASCII character (254)
- Newline:   ®  ASCII character (174)

## APPENDIX B: REQUESTED METADATA FIELDS FOR ESI

| Field Name | Example / Format | Description |
|---|---|---|
| **PARENTDOCID** | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of a parent document (this field will <u>only</u> be populated in child records). |
| **GROUPID** | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document (in most cases, this will be data in the BEGATTACH field). |
| **BEGBATES** | ABC0000001 (Unique ID) | The Document ID number associated with the first page of a document. |
| **ENDBATES** | ABC0000003 (Unique ID) | The Document ID number associated with the last page of a document. |
| **BEGATTACH** | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| **ENDATTACH** | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| **PGCOUNT** | 3 (Numeric) | The number of pages for a document. |
| **VOLUME** | VOL001 | The name of CD, DVD or Hard Drive (vendor assigns). |
| **SENTDATE** | MM/DD/YYYY | The date the email was sent. **NOTE:** For attachments to e-mails, this field should be populated with the date sent of the email transmitting the attachment. |
| **SENTTIME** | HH:MM:SS | The time the email was sent. |
| **CREATEDATE** | MM/DD/YYYY | The date the document was created. |
| **CREATETIME** | HH:MM:SS | The time the document was created. |
| **LASTMODDATE** | MM/DD/YYYY | The date the document was last modified. |
| **LASTMODTIME** | HH:MM:SS | The time the document was last modified |
| **RECEIVEDDATE** | MM/DD/YYYY | The date the document was received. |
| **RECEIVEDTIME** | HH:MM:SS | The time the document was received. |
| **FILEPATH** | i.e. Joe Smith/E-mail/Inbox<br>Joe Smith/E-mail/Deleted Items<br>Joe Smith/Loose Files/Accounting/...<br>Joe Smith/Loose Files/Documents and Settings/... | Location of the original document. The source should be the start of the full path. |
| **APPLICATION** | MS Word, MS Excel, etc. | Type of document by application. |
| **HIDDENTYPE** | Options: Track Changes, Hidden Spreadsheet, Very Hidden Spreadsheet, etc. | The type of hidden modification of the document (e.g. Track Changes, Hidden Spreadsheet, Very Hidden Spreadsheet, etc) |
| **AUTHOR** | jsmith | The author of a document from entered metadata. |

| Field Name | Example / Format | Description |
|---|---|---|
| **FROM** | Joe Smith <jsmith@email.com> | The display name and e-mail of the author of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| **TO** | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the recipient(s) of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| **CC** | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the copyee(s) of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| **BCC** | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the blind copyee(s) of an e-mail. If only e-mail is given, then just list the e-mail address. An e-mail address should always be provided for every document. |
| **ESUBJECT** | Re: Scheduling Meet and Confer | The email subject line. |
| **DOCTITLE** | | The extracted document title or subject of a document. |
| **CUSTODIAN** | | The custodian / source of a document. **Note:** If the documents are de-duped on a global level, this field will contain the name of each custodian from which the document originated. |
| **ATTACH COUNT** | Numeric | The number of attachments to a document. |
| **FILEEXT** | XLS | The file extension of a document. |
| **FILENAME** | Document Name.xls | The file name of a document. |
| **HASH** | | The MD5 or SHA-1 Hash value. |
| **NATIVELINK** | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| **FULLTEXT** | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document. There should be a folder on the deliverable, containing a separate Unicode text file per document. These text files should be named with their bates numbers. **Note**: E-mails should include header information: author, recipient, cc, bcc, date, subject, etc. If the attachment or e-file does not extract any text, then OCR for the document should be provided. |