# EXHIBIT M

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
10/15/2025 2:12 PM
KATHLEEN VIGIL CLERK OF THE COURT
Esmeralda Miramontes

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

STATE OF NEW MEXICO, EX REL.,
RAÚL TORREZ, ATTORNEY GENERAL,

     Plaintiff,

v.

     NO. D-101-CV-2023-02838

META PLATFORMS, INC.; INSTAGRAM, LLC;
META PAYMENTS, INC.; and META PLATFORMS
TECHNOLOGIES, LLC,

     Defendants.

**PLAINTIFF'S MOTION TO COMPEL DEPOSITIONS OF**
**<u>KRISTIN ZOBEL AND ELAINE DAI</u>**

Plaintiff State of New Mexico (the "State") respectfully requests that this Court enter an Order compelling Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC (collectively "Defendants" or "Meta") to produce for deposition Meta in-house counsel Kristin Zobel and Elaine Dai.[1]

## I.      INTRODUCTION

Whistleblower accounts and documents produced in discovery reveal that Meta's legal team shaped, influenced, and altered internal Meta research concerning youth use of Meta products.  The State seeks to take the depositions of Ms. Zobel and Ms. Dai on these topics. Although Ms. Zobel and Ms. Dai are Meta in-house counsel, this testimony is not protected by the attorney-client privilege for two reasons. First, their role in shaping Meta research was predominantly business-related, not legal, and thus is not protected by attorney-client privilege. Second, even if attorney-client privilege applied, the crime-fraud exception, which covers shielding information for an improper purpose, vitiates the privilege.

## II.     FACTUAL BACKGROUND

On May 14, 2025, six current and former Meta employees made a Protected Whistleblower Disclosure to the United States House of Representatives and the United States Senate ("Disclosure") (**Exhibit 1**). The Disclosure details the whistleblowers' firsthand knowledge of Meta's harmful and deceptive business practices and its efforts to avoid liability for those practices. The facts in this Disclosure, along with documents produced by Meta and third parties in this

---

[1] On October 1, 2025, counsel for the State informed Meta's counsel that the State intended to seek the depositions of attorneys Zobel and Dai based on the facts explained herein. Counsel for the State and for Meta met and conferred but, notwithstanding the State's explanation of its basis, Meta claimed they possessed no discoverable information. When informed of the State's intention to file this Motion, Meta counsel confirmed Meta's opposition.

litigation, show that Meta in-house counsel led Meta's efforts to conceal, misrepresent, and turn a blind eye to evidence of harms to youth caused by Meta platforms.

The Disclosure shows that inside Meta, Meta's legal team reviewed, constrained, and even shut down research projects that it deemed likely to yield results adverse to Meta's interests. In November 2021—two months after a *Wall Street Journal* exposé detailed Meta's awareness of user harm from Facebook—Meta Legal Director Elaine Dai began disseminating "Best practices for sensitive research and A/C privilege" to Meta researchers. Ex. 1 at 74. These "best practices" included a statement from Mark Zuckerberg that the September 2021 leaks were "disheartening" and "taken out of context and used to construct a false narrative." *Id.* In the next several months, Meta made changes, executed by its legal team, to how employees shared information, including by restricting the extent to which internal research was shared across the company. *Id.*

The legal team's influence over research continued:

- In March 2022, Whistleblower Alpha[2] was designing a research study regarding the safety tools Meta made available in its virtual reality ("VR") platform.[3] *Id.* at 78. Ms. Zobel reviewed the study design and instructed Alpha to "alter the design of the research so [Alpha didn't] learn about any harms that Meta VR users may have faced." *Id.* Moreover, if study participants discussed harms they faced on Meta's platform, "Legal instructed [Alpha] to not record that data, delete it if it was captured and abort that line of questioning, or eject that research participant from the study entirely." *Id.*

- Later in 2022, Alpha was asked to assist with an "Age Assurance" study to improve age verification systems and support child safety measures like parental supervision

---

[2] The Disclosure used aliases to protect whistleblowers' identities. "Alpha" is Jason Sattizahn. The State has moved the Court for leave to depose Mr. Sattizahn. Meta's opposition to that motion argues that Mr. Sattizahn cannot testify as to "legal advice provided by Meta's in-house counsel," because "[i]t is a conventional role of counsel to advise on the methodology and documentation of research to address legal risks." (Opp. at 2, 9). The State's arguments herein also apply to Mr. Sattizahn's testimony.

[3] While much of the conduct described relates to Meta VR, youth safety is not a platform-specific issue. As Mr. Sattizahn has explained, "there are no hard walls between 'Facebook,' 'Instagram,' or 'Reality Labs'" at Meta, meaning that "employees or researchers in areas like Virtual Reality . . . have direct-hands-on knowledge and impact on other Meta products such as Instagram." Suppl. Decl. of Jason Sattizahn ¶ 3 (**Exhibit 2**).

and age gating. *Id.* at 85. But Meta Legal Director Dai intervened to "minimize gathering data showing that kids/teens are at-risk in Meta VR." *Id.* A vendor was hired, but the entire project was later abruptly and permanently shut down. *Id.*

- In 2023, Ms. Zobel "directly edited or removed language, insights or conclusions" of Alpha's report regarding user harm before publication because some of the findings were "too risky." *Id.* Later, as Alpha tried to expand the survey, Ms. Zobel ordered the removal of "all existing survey questions that ask about emotion, well-being, or any psychological harm" or sexual harm. *Id.*

Whistleblower Beta explained that Meta's legal team, specifically Ms. Zobel, had authority to review all projects to "decrease risk to research"—meaning risk to Meta, not users.

- Zobel and the legal team could—and did—"unilaterally prevent or alter [Beta's] research for any reason—or without giving [Beta] a reason at all." *Id.* at 129.

- Several times, Ms. Zobel instructed Beta to make changes or omissions—for example, using ellipses to delete mentions of users under the age of 13, a violation of Meta's public commitment, consistent with the State's allegations. *Id.* at 128–29; Am. Compl. ¶¶ 423–29, 464–65, 471.

- In early 2023, Beta attempted a study to understand why teenagers misrepresent their age on Instagram and Meta VR. Ms. Zobel required that the research be conducted "by a third party vendor," be "unbranded," and be framed as perceptions rather than literal truths. *Id.* at 159. Ms. Zobel gave instructions to "steer the conversation away" from any teen disclosures about harm, review all findings before Meta could see them, and control which product insights were shared internally. *Id.*

- Ms. Zobel also instructed Beta that "any research conducted with individuals under the age of 18 must be done by a third party vendor" so that "we could instruct them to . . . not document certain kinds of 'sensitive' data so that Meta would 'have no knowledge' of it." *Id.* at 136. These "sensitive" topics included use of Meta VR by children under the age of 13 and youth participation in mature experiences, age misrepresentation, and addiction or habitual overuse of Meta products. *Id.*

- Ms. Zobel also deleted quotes from a report on the use of Meta VR for exercise that she felt showed that teens might have negative feelings about their bodies. *Id.* at 147.

Similarly, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

3

████████████████████████████████████    METANMAG-002-00572892

(**Exhibit 3**). But ███████████████████████████████████████████

████████████████████████████████████    METANMAG-010-00246282

(**Exhibit 4**). It recommended ████████████████████████████

████████████████████████████████████████████████████ *Id.* The

authors further recommended ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████    *Id.*

████████████████████████████████████████████████

████████████████████████████████████████████████

METANMAG-005-00348291 (**Exhibit 5**). One employee wrote that ████████

████████████████████████████████████████████████████

████ Demonstrating careful coaching, the employee added: ████████████

████████████████████████ The other employee responded: ████

████████████████████████████    *Id.*

Meta leadership recognized the outsized role the legal team played in research decisions.

In November 2023, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    METANMAG-127-00006815 (**Exhibit 6**).

Meta's inclusion of Ms. Zobel and Ms. Dai in Meta research processes, and its insistence

that Ms. Zobel and Ms. Dai possess no non-privileged information, are consistent with its misuse

of privilege to shield information from disclosure. Deposition testimony from Meta employees

4

reveals that ███████████████████████████████████████████████

███████████████████████████████████████████████ *See* George

Volichenko Dep. (Dec. 16, 2024) 123:2-124:16 (**Exhibit 7**); *see also* Alison Lee Dep. (Feb. 6,

2025) 260:12-262:12 (**Exhibit 8**). This conduct reinforces the State's concerns regarding Meta's

gamesmanship and abuse of attorney-client privilege—practices that at least one other court has

recognized. *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 655 F. Supp. 3d 899,

923 (N.D. Cal. 2023) (finding that "Facebook employees are taught to improperly 'privilege'

documents based on their perceived sensitivity," which supported bad faith sanctions). Notably,

Meta's privilege log currently includes approximately 2,500 documents that explicitly reference

research, 500 that reference children under 13, and 200 that reference underage children. [4]

### III.        LEGAL STANDARD

#### A.  Attorney-Client Privilege

The party claiming attorney-client privilege bears the burden to show that withheld

communications fall within the scope of that privilege. *Bhandari v. Artesia Gen. Hosp.*, 2014-

NMCA-018, ¶ 9, 317 P.3d 856. A party withholding documents must show that the documents

involve "(1) a communication (2) made in confidence (3) between privileged persons (4) for the

purpose of facilitating the attorney's rendition of professional legal services to the client." *Santa*

*Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007–NMCA–133, ¶ 14, 143 N.M. 215 (citing Rule

11-503 NMRA). Moreover, attorney-client privilege is narrowly construed, *United States v.*

---

[4] In a similar vein, on October 9, 2025, following "re-review" of privilege redactions, Meta advised State counsel that Meta would produce another "60,000 or more additional documents . . . by early November"—after virtually all affirmative depositions have been completed and expert reports submitted (**Exhibit 9**). This is in addition to another 22,000 documents produced since August in response to the State's challenges. *Id.* Many documents involving Ms. Zobel (~50) and Ms. Dai (~441) also remain on Meta's privilege log.

*Merida*, 828 F.3d 1203, 1209 (10th Cir. 2016), consistent with New Mexico's liberal discovery with a "presumption is in favor of discovery." *Marchiondo v. Brown*, 1982-NMSC-076, ¶ 13, 98 N.M. 394; *Carter v. Burn Const. Co., Inc.*, 1973-NMCA-156, ¶ 10, 85 N.M. 27 (discovery rules "are designed to enable parties to easily discover all of the relevant facts," and thus, the rules should be given "as liberal an interpretation as possible in order to effectuate this design.").

"The privilege protects communications generated or received by an attorney giving *legal advice* but does not protect communications derived from an attorney giving *business advice* or acting in some other capacity." *Santa Fe Pac. Gold,* 2007-NMCA-133, ¶ 23 (emphasis added). The attorney-client privilege does not attach where an in-house attorney is "giving technical or business, as opposed to legal, advice." *Bhandari,* 2014-NMCA-018, ¶ 13. To determine whether in-house counsel provided legal or business advice, New Mexico courts apply the "primary or predominate purpose" test. *Id.* ¶¶ 17–18 ("in-house counsel's communications regarding business matters, management decisions, and business advice, which neither solicit or predominantly deliver legal advice, are not privileged."). The Court of Appeals has recognized that "an in-house attorney is frequently presumed to be providing business advice, while outside counsel is presumed to provide legal advice." *Id*. ¶ 18. A court should consider the nature of the advice, as well as the context, content, and purpose of the communication to determine whether the in-house attorney was providing legal advice. *Id*. "If the communication involves both business and legal issues, the court must determine the *'primary* or *predominate purpose'* of the communication" and only if the primary purpose is legal is the communication privileged. If the court cannot determine the primary purpose, or if "the legal and business purposes are 'inextricably intertwined,'" then it "should conclude the communication is for a business purpose, unless evidence clearly shows that the legal purpose outweighs the business purpose." *Id*. (quoting *Lindley*, 267 F.R.D. at 392).

6

### B. Crime-Fraud Exception

Even if a communication satisfies the elements of the attorney-client privilege, the privilege does not attach "[i]f the professional legal services were sought or obtained to enable or assist anyone in committing or planning to commit what the client knew or reasonably should have known to be a crime or fraud." Rule 11-503(D)(1) NMRA. "The party claiming that the crime-fraud exception applies must present prima facie evidence that the allegation of attorney participation in crime or fraud has some foundation in fact." *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995). A party may rely on evidence that would not otherwise be admissible, including hearsay evidence. *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989) (collecting cases).

"Courts have applied the exception to a wide variety of criminal and fraudulent activity." Restatement (Third) of the Law Governing Lawyers § 82, cmt. d (2000); *see also Volcanic Gardens Mgmt. Co. v. Paxson*, 847 S.W.2d 343, 347 (Tex. App. 1993) ("fraud" is "much broader" than common law or criminal fraud and can include "false suggestions" and "suppression of truth"); *Centr. Constr. Co. v. Home Indemnity Co.*, 794 P.2d 595, 598 (Alaska 1990) ("Public policy demands that the 'fraud' exception to the attorney-client privilege . . . be given the broadest interpretation"). "All that is necessary is that the client misuse or intend to misuse the attorney's advice in furtherance of an *improper purpose*. When this occurs, the purpose of the privilege, to promote the fair administrative of justice, has been undermined and the privilege no longer applies." *In re Abbott Labs.*, 96 F.4th 371, 381 (3d Cir. 2024) (quoting *In re Grand Jury*, 705 F.3d 133, 157 (3d Cir. 2012)). The principles governing the crime-fraud exception are equally applicable to the work product doctrine. *See, e.g.*, *In re Grand Jury Proceedings*, 102 F.3d 748, 751 (4th Cir. 1996).

7

## IV.       ARGUMENT

### A. The Deposition Testimony the State Seeks Is Not Privileged

The depositions of Ms. Zobel and Ms. Dai on the requested topics are not attorney-client privileged because Meta cannot establish that legal advice was the "primary or predominate purpose" for Ms. Zobel's and Ms. Dai's interference with Meta research. The "nature of the advice given," as well as "the context, content, and purpose of the communication[s]," *Bhandari*, ¶ 18, demonstrate that the communications were primarily business-related rather than legal.

First, the policies that Ms. Dai implemented starting in 2021 regarding information sharing are business activities that fall outside the scope of the privilege. Even when a corporation implements policies based on legal advice, the policies are "not . . . protected by the attorney client privilege because their implementation and dissemination would destroy the confidential nature of the communication and arguably transform advice of a legal nature into that which is business-related." *Bhasker v. Financial Indemnity Company*, 2018 WL 4773363, *5 (D.N.M. 2018).

In *In re Domestic Drywall Antitrust Litigation*, 2014 WL 5090032 (E.D. Pa. Oct. 9, 2014), the court held that a company's antitrust compliance policy, "although . . . based on legal advice," was "more akin to a reference or instructional guide" and "primarily a business policy." *Id.* at *4. The company "distributed the policy to more than 120 employees who attended a training session and made it available to numerous employees on an internal site," which rendered it more business-related and thus nonprivileged. *Id.* The same is true with regard to the instructional "best practices" on information sharing that Ms. Dai distributed to employees via presentations. Ex. 1 at 74.

Likewise, Ms. Dai's and Ms. Zobel's exercise of editorial control over Meta research studies and reports is primarily business-related. Ms. Dai's and Ms. Zobel's shaping of and edits to Meta research were not made for legal purposes. On the contrary, they were concerned with

8

Meta's public image—its ability to counter public "false narratives," plead ignorance to youth harms, and "refute" evidence of those harms. *See State v. Am. Tobacco Co.*, 1997 WL 728262, at *9 (Wash. Super. Ct. Nov. 21, 1997) ("[A]ttorneys' oversight of [certain projects] did not involve the exercise of legal judgment or the rendering of legal advice, but rather the evaluation of business, scientific, and public relations issues to reach a conclusion as to the advisability of undertaking or continuing each project" and thus "generally not entitled to the protection of the attorney-client privilege.").[5]

As in *American Tobacco Co.*, Ms. Dai and Ms. Zobel, by shaping and editing the work of Meta researchers, were fulfilling primarily business-related aims: ensuring that research did not undermine Meta's public image or profits. Attorney-client privilege does not shield such conduct, and thus the depositions the State seeks are not within the ambit of attorney-client privilege.

**B.  Even If the Testimony Were Privileged, the Crime Fraud Exception Applies**

The facts set forth above fully satisfy the State's burden to present prime facie evidence of fraudulent conduct. The whistleblower testimony and other documents show that the research Meta produced in this case—on key issues such as youth use of its products and resulting harms—was limited, obfuscated, and altered. The "failure to conduct appropriate research into the safety of [a company's] products and failure to warn their products' consumers if the research supported negative conclusions" falls "within 'criminal or fraudulent conduct.'" *State v. Philip Morris Inc.*,

---

[5] *See also United States v. Cohn*, 303 F. Supp. 2d 672, 684 (D. Md. 2003) (in-house counsel, in furtherance of defendant's unlawful telemarketing program, "regularly received e-mails concerning different aspects of the telemarketing program, reviewed and drafted contracts, and reviewed telemarketing scripts"—actions the court deemed primarily business-related rather than legal, so the attorney-client privilege did not bar the attorney's testimony); *Lindley v. Life Investors Ins. Co. of Am.*, 267 F.R.D. 382, 391 n.11 (N.D. Okla. 2010) ("Where in-house counsel is acting as business negotiator, general business agent, preparer of tax returns, lobbyist, public relations strategist, or press agent, the privilege does not apply.").

1998 WL 257214, at *8 (Minn. Dist. Ct. Mar. 7, 1998); *see also State v. Am. Tobacco Co.*, 1997 WL 728262, at *9 (Wash. Super. Ct. Nov. 21, 1997) (counsel's advice about the "advisability of undertaking or continuing" research projects that showed smoking causes health harms satisfied Washington's fraud exception to the attorney-client privilege).

Similarly, it is well established that efforts of in-house attorneys to alter or misrepresent documents or testimony in anticipation of litigation amount to fraud on the court, warranting application of the crime-fraud exception. Meta's attempts to avoid or undermine litigation here included instructing employees not to document or to delete evidence of harm, limiting what research could be conducted, altering research designs, misleadingly editing research findings, and directing that sensitive research findings not be shared. This manipulation of the facts amounts to "misuse or inten[t] to misuse the attorney's advice in furtherance of an *improper purpose*." *In re Abbott Labs.*, 96 F.4th at 381 (quoting *In re Grand Jury*, 705 F.3d 133, 157 (3d Cir. 2012)). Indeed, the actions of Meta's counsel were designed to avoid creating or sharing evidence that could be used against the company. Accordingly, "the purpose of the privilege, to promote the fair administration of justice, has been undermined and the privilege no longer applies." *Id.*

## V.        CONCLUSION

For the foregoing reasons, the State respectfully requests that the Court enter an Order requiring Meta to produce in-house counsel Kristin Zobel and Elaine Dai for depositions to be conducted no later than November 26, 2025.

**RAÚL TORREZ**
**ATTORNEY GENERAL OF NEW MEXICO**

JAMES W. GRAYSON
Chief Deputy Attorney General
MARK NOFERI
Senior Litigation Counsel
New Mexico Department of Justice

10

408 Galisteo St.
Santa Fe, New Mexico 87501
Phone: (505) 490-4060
jgrayson@nmdoj.gov
mnoferi@nmdoj.gov

*/s/ Linda Singer*
LINDA SINGER *(Pro Hac Vice)*
DAVID I. ACKERMAN *(Pro Hac Vice)*
WESLEY DUNKIRK *(Pro Hac Vice)*
BRENDAN AUSTIN *(Pro Hac Vice)*
Motley Rice LLC
401 9th St., NW, Suite 630
Washington, D.C. 20004
Phone: (202) 232-5504
lsinger@motleyrice.com
dackerman@motleyrice.com
wdunkirk@motleyrice.com
baustin@motleyrice.com

*Counsel for Plaintiff State of New Mexico*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was submitted through the Court's Odyssey E-File and Serve System for filing and service to all counsel of record this 15th day of October 2025.

*/s/ Linda Singer*
Linda Singer

11