# EXHIBIT B

CONFIDENTIAL

```
                                                              Page 1

 1                 UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3
 4    IN RE: SOCIAL MEDIA              )
      ADOLESCENT ADDICTION/            )
 5    PERSONAL INJURY PRODUCTS         )   MDL No. 3047
      LIABILITY LITIGATION             )
 6                                     )
                                       )
 7
 8     SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
        COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE
 9
10    COORDINATION PROCEEDING          )
      SPECIAL TITLE [RULE 3.400]       )
11                                     )
      SOCIAL MEDIA CASES               )   Lead Case No.
12    _____)   22STCV21355
      This Document Relates To         )
13                                     )
      STATE OF TENNESSEE, ex rel.)
14    JONATHAN SKRMETTI,               )
      ATTORNEY GENERAL and             )
15    REPORTER,                        )
      v.                               )
16    META PLATFORMS, INC., and        )
      INSTAGRAM, LLC.                  )
17    _____)
18
                CONFIDENTIAL - ATTORNEYS' EYES ONLY
19                 PURSUANT TO PROTECTIVE ORDER
                        VIDEO-RECORDED
20              DEPOSITION OF  ███████████  Ph.D.
                        (Pages 1 - 465)
21                    Covington & Burling
         415 Mission Street, San Francisco, California
22          Thursday, February 6, 2025, 9:19 a.m.
                           - - - -
23
      REPORTED BY:   ELAINA BULDA-JONES, CSR 11720
24
25
```

Page 259

1  explicit and extreme version of that content type.
2  It represents the most explicit and harsh versions
3  of bullying and harassment.  It does not depict the
4  full spectrum of what those categories are.
5  BY MR. DUNBAR:
6        Q.   Do you -- do you think that by publicizing
7  community standards and enforcement reports and not
8  the BEEF survey or some derivative thereof or other
9  internal information, the company creates the
10 impression that Instagram is less risky than it
11 really is?
12            MS. BARNHART:  Object to the form.
13 Foundation.
14            THE WITNESS:  I think it's presenting an
15 incomplete picture of the risks on the platform by
16 using a very rich and powerful but imperfect
17 dataset.  And that imperfect dataset is one that
18 tells a story in Meta's favor.
19 BY MR. DUNBAR:
20      Q.   Okay.  You can set those exhibits to the
21 side.  All right.
22            ▮▮▮▮▮▮  I'm going to hand you another
23 exhibit, which will be Exhibit 28.
24            (Whereupon, Meta-▮▮ Exhibit 28 was marked
25 for identification.)

Page 260

1  BY MR. DUNBAR:
2      Q.   Take a moment to familiarize yourself with
3  the document and let me know when you're ready.
4      A.   I do remember this, yeah.
5      Q.   Okay.  What is this document?
6      A.   This is a proposal for a research plan for
7  a diary study that would look specifically at a
8  phenomenon called rabbitholing.
9      Q.   Okay.  And were you the author of this
10 document?
11     A.   Yes, I was.
12     Q.   Okay.  Do you see the research title at
13 the top of the page?  It reads, quote, "Cold Start
14 Experiences as a Catalyst for Rabbitholing? [AC
15 priv]."
16          Do you see that?
17     A.   Yes, I do.
18     Q.   Does AC priv stand for attorney-client
19 privilege in this context?
20     A.   I would think so.
21     Q.   Okay.  Without disclosing any privileged
22 information, during your tenure at Instagram, did
23 you receive training about when to apply an AC priv
24 label to your work?
25          MS. BARNHART:  Object to the form.  Just

Page 261

1  to be clear, when counsel says don't disclose
2  attorney-client privileged information, don't share
3  any communications between you and Meta's counsel,
4  in-house or outside.
5         THE WITNESS:  Okay.  Got it.
6         The ways that we applied AC priv was
7  directions from my manager.  That was essentially --
8  we work in really sensitive areas, so we need to add
9  this label, AC priv, for any of the research that
10 we -- either research plan or research materials,
11 any of those sorts of materials and artifacts, we
12 have to put AC priv on those documents.
13 BY MR. DUNBAR:
14     Q.   Okay.  And just to be clear, did you
15 receive that instruction from a non-lawyer?
16     A.   Yes.
17     Q.   You said it was your manager?
18     A.   That's right.
19     Q.   And your manager explained that you should
20 apply that label to research that was sensitive,
21 correct?
22     A.   Any artifact that was being produced,
23 yeah.
24     Q.   Any artifact that was produced?
25     A.   Yeah.  So any artifact that outlines

Page 262

1    research plans, materials, data, outputs, reports.
2         Q.   Okay.
3         A.   Unless they were explicitly approved for
4    sharing.
5         Q.   Were you told to apply an AC priv label to
6    research you conducted even before a lawyer was
7    involved in that work?
8              MS. BARNHART:  Object to the form.
9              THE WITNESS:  They were applied probably
10   as soon as a draft was created, so before a lawyer
11   was involved in the loop.  Legal was involved after
12   I submitted it into SRT as a reviewer.
13   BY MR. DUNBAR:
14        Q.   Were there occasions where you applied the
15   AC priv label to research you conducted even where a
16   lawyer was never involved in that work?
17             MS. BARNHART:  Object to the form.
18   Foundation.
19             THE WITNESS:  A legal representative, a
20   member of the legal team was always involved in the
21   research cycle at some point or another.  If you
22   recall earlier, within the research structure,
23   there's something called SRT, which is where we
24   submit all of our research plans and reports for
25   approval.  We are always assigned a legal reviewer

```
                                                      Page 263
 1    as part of that.
 2    BY MR. DUNBAR:
 3        Q.   Okay.  But just to be clear, that label
 4    was applied before an attorney was ever involved,
 5    right?
 6        A.   Yes.
 7        Q.   Okay.
 8        A.   Upon drafting that.
 9        Q.   Do you know if your fellow researchers at
10    Meta received the same training?
11             MS. BARNHART:  Object to the form.
12    Foundation.
13             THE WITNESS:  I believe that was advice or
14    a recommendation given to folks working in sensitive
15    topic areas specifically.  Researchers working in
16    sensitive topic areas.
17             MR. DUNBAR:  Okay.  I think we may take a
18    break to discuss among ourselves, but may be the
19    conclusion of my questioning for now.
20             Thank you for your time, ▮▮▮▮.  And
21    we'll be back in just a minute.
22             THE WITNESS:  Great.  Thank you.
23             THE VIDEOGRAPHER:  Time is now 4:13.
24    Going off the record.
25             (Whereupon, a brief recess was taken.)
```