# EXHIBIT G

KIESEL LAW LLP
MARIANA A. MCCONNELL, State Bar No. 273225
  mcconnell@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel.: 310-854-4444/ Fax: 310-854-0812

BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.
JOSEPH VANZANDT (*pro hac vice*)
  joseph.vanzandt@beasleyallen.com
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343

THE LANIER LAW FIRM, P.C.
RACHEL LANIER, State Bar No. 343171
  rachel.lanier@lanierlawfirm.com
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Tel.: 713-659-5200
*Co-Lead and Co-Liaison Counsel for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| **COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.400]**<br><br>**SOCIAL MEDIA CASES**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*All Cases* | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255<br><br>Lead Case No. For Filing Purposes: 22STCV21355<br><br>Judge: Hon. Carolyn B. Kuhl<br>Dept.: SSC-12<br><br>**[May not be examined without court order - contains material and discussion of conditionally sealed records]**<br><br>**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF UNREDACTED DOCUMENTS**<br><br>*[Concurrently lodged with Declaration of Mariana McConnell, Index of Evidence and Separate Statement]*<br><br>Date: TBD<br>Time: TBD |

# NOTICE OF MOTION

Please take notice that on a date to be determined in Department 12 of this Court located at 312 North Spring Street, Los Angeles, California, 90012, Plaintiffs will and hereby do move the Court for an order granting Plaintiffs' Motion to Compel the Production of Unredacted Documents.

This Motion is based on this Notice of Motion, Memorandum of Points and Authorities, the Separate Statement, the Declaration of Mariana McConnell, and all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court in its ruling.

**Dated:** November 7, 2025

**KIESEL LAW LLP**

By: /s/Mariana A. McConnell
Paul R. Kiesel
Mariana A. McConnell
Cherisse H. Cleofe
KIESEL LAW LLP
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel.: 310-854-4444
Fax: 310-854-0812
kiesel@kiesel.law
mcconnell@kiesel.law
cleofe@kiesel.law

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Since the inception of this litigation, the Meta Defendants ("Meta") have used their internal research to defend against Plaintiffs' claims. When the results are favorable to its position, Meta characterizes that research as reliable and the product of its honest desire to understand its platforms.[1] Whether offered to undermine the causal link between social media addiction and harm, or to show its purported commitment to teen well-being, Meta telegraphs its intent to use both its research and researchers as a sword at trial. At the same time, Meta hopes to protect attorney communications about that research using the shield of the attorney-client privilege.

But the truth has emerged. Far from an honest appraisal, Meta's research was altered through the intervention of attorneys concerned about how the truth would impact the company in this litigation. So Meta lawyers cajoled researchers into making changes, and even into deleting research data deemed unhelpful to the company—for, as one researcher framed it, "legal and policy reasons." Meta hopes to conceal this damning evidence from trial, behind the curtain of the attorney-client privilege.

California law, however, forbids Meta from wielding both sword and shield. The attorney-client privilege is inapplicable to "services of the lawyer [ ] sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud" (Evid. Code § 956(a).) In seeking unredacted production of four documents, Plaintiffs easily make the *prima facie* showing required to trigger the crime-fraud exception to the privilege. Meta witnesses have testified that they were told to delete data from the BEEF study "for legal/policy reasons." Sworn congressional testimony from former Meta researchers outlines the calculated effort to improperly invoke the privilege—by involving lawyers in sensitive discussions and by using threats to force researchers to destroy unfavorable data. The redacted copies of the four documents support this testimony. The unredacted portions show Meta researchers reacting to the (redacted) legal advice and questioning it. Likewise, after reviewing unredacted copies of those documents

---

[1] (See Atkins, *Social Media Apps Must Face Jury After Section 230 Loss*, Law360, November 6, 2025, available at https://www.law360.com/productliability/articles/2408475?cn_pk=41b28f03-7a28-4811-a333-d237ae71bf98&utm_source=newsletter&utm_medium=email&utm_campaign=custom&utm_content=2025-11-07&read_main=1&nlsidx=0&nlaidx=0.)

1  *in camera*, the D.C. Superior Court determined that there was "probable cause"—a higher standard than
2  Plaintiffs' *prima facie* burden—that the crime-fraud exception to the privilege applied. Plaintiffs do not
3  just meet the *prima facie* burden; they sail well over it.

4        Additionally, Meta has not indicated that they intend to claim work product privilege, but if they
5  do, there is no reasonable argument that it applies. At most, any work product privilege would be
6  "qualified," and the interests of justice strongly support disclosure of these documents.

7        Plaintiffs, therefore, respectfully request the Court order immediate production of the four
8  documents without any redactions or further confidentiality claims.

9  **II.    BACKGROUND**

10       In Plaintiffs' Sixth Set of Requests for Production of Documents served upon the Meta Defendants
11 on December 23, 2023, Plaintiffs made the following requests, among many others:

- All literature reviews or syntheses You performed concerning the topics of addiction, compulsive use, problematic use, Safety, or Youth Users on social media platforms, including on Your Platform, and all of Your Communications concerning the same.

- All Documents concerning any actual or proposed analyses by You concerning the topics of addiction, compulsive use, problematic use, or Safety of Youth users on Your Platform or any other social media platform, and all Documents referenced in or Communications concerning the same.

- All Communications by or with You concerning investigations, lawsuits, media inquiries, or government inquiries related to the Safey of Children, Teens, and Youth who use Your Platform.

- All analyses, or Documents reflecting proposed analyses, of the actual or potential impact of use of Your Platform or any other social media platform on the Safety of Children, Teens, and Youth, and any Documents referenced in or Communications concerning the same.

(*Meta Defendants' Responses and Objections to Plaintiffs' Sixth Set of Requests for Production of Documents*, at ¶¶ 108, 112, 115, 118, McConnell Decl. Ex. A.)

      Meta produced four documents (among others) that begin with these Bates numbers: META3047MDL-047-00396577, META3047MDL-047-00706694, META3047MDL-050-00353504,

and META3047MDL-111-000468706. The operative versions of these documents (together the "Documents") are in redacted form.[2] Meta did not claim a specific privilege for any particular document, nor did it serve a privilege log in conjunction with these productions. (McConnell Decl., ¶ 8.)

The unredacted portions provide the following:

- In META3047MDL-047-00706694 (Document 1), ▮▮▮▮ and ▮▮▮▮, part of Meta's Central Youth Team and health team, discussed something that "outside counsel" said or did. Mr. ▮▮▮▮ responded: "fairly sad state of affairs, but familiar territory" and "[i]t's also why XI don't like us saying things cause harm and then do not whether they do [sic]… ." (McConnell Decl. Ex. B; see also ▮▮▮▮ Dep. Tr. in *Dist. Of Columbia v. Meta Platforms, Inc.*, 3/11/25, at 16:22-17:10, McConnell Decl. Ex. F.)

- In META3047MDL-047-00396577 (Document 2), ▮▮▮▮ messaged ▮▮▮▮, part of Meta's social impact research team, related to something "OC" or outside counsel did or said, which she called a "ridiculous moment of the day." This exchange ended with ▮▮▮▮ stating: "so exciting on the data coming in from the suuuuuurvey!!!" (McConnell Decl. Ex. C; see also ▮▮▮▮ Dep. Tr., 3/5/25, at 31:22-32:22, McConnell Decl. Ex. G.)

- In META3047MDL-050-00353504 (Document 3), ▮▮▮▮ and others discuss research related to Meta & Youth Social Emotional Trends ("MYST") and other well-being research. "Legal" did or said something that caused an "escalation" to ▮▮▮▮ because of "fundamental[] disagree[ments] with that logic and the legal team's approach." This approach apparently related to "not doing [] research," that had the "primary purpose" of "help[ing] Meta make evidence-based product decisions for its youngest users." The response of research manager ▮▮▮▮ is entirely redacted, ▮▮▮▮ asks who wants to work with the "legal team," and then the rest of the sentence is redacted. (McConnell Decl. Ex. D.)

- In META3047MDL-111-00468706 (Document 4), the messages revolve around a presentation related to impacts of Instagram on teen audiences. At one point an employee on

---

[2] The four redacted documents are attached to the Declaration of Mariana McConnell as **Ex. B**: META3047MDL-047-00706694; **Ex. C:** META3047MDL-047-00396577; **Ex. D:** META3047MDL-050-00353504; and **Ex. E:** META3047MDL-111-000468706.

the chat notes that "▇▇▇ [an attorney] is leaving more legal comments" that apparently confuse the employees, leading them to ask what certain text means (the text itself and the employee's explanation of the text is redacted). They call other actions "slightly weird because we talk about [redacted]." They then accuse ▇▇▇ of "tearing apart some of our stronger slides," and reveal that she is just one of "three different lawyers" involved. During the chat that number balloons to "a total of 5 lawyers" editing the deck, and then more lawyers request access.  (McConnell Decl. Ex. E.)

In litigation involving the District of Columbia Attorney General, Meta produced the four documents at issue here without redactions. (See *Dist. of Columbia's Opposed Mot. for an Order Finding No Privilege Over Clawed-Back Documents and for In-Camera Review*, Public/Redacted, at pp. 2-5 [describing "Documents 1-4"], McConnell Decl. Ex. H; see also McConnell Decl., ¶ 13 [explaining how counsel know that the D.C. motion addresses the same four documents at issue here].) Meta then clawed back those productions. (*Id.*) The D.C. Attorney General filed a motion asking the Court to hold that the documents were not privileged, either because Meta's privilege log was inadequate to establish privilege, or because the crime-fraud exception applied to vitiate any claim of attorney-client privilege. (*Id.* at 1-2.) After full briefing, the D.C. court agreed that the crime-fraud exception applied. In an order issued on October 23, 2025, the court described the District's position as there being "probable cause … to believe that Meta engaged in a crime, fraud, and/or misconduct by acting on advice of its counsel to 'block[] research and instruct[] researchers to alter research to stymie law enforcement investigations." (*Order Granting The District's Opposed Motion for an Order Finding No Privilege Over Clawed-Back Documents* ("D.C. Order") at 8, McConnell Decl. Ex. I.)

In September 2025, after the D.C. Motion but before the order, two former Meta employees—Ms. Cayce Savage and Dr. Jason Sattizahn—testified before Congress about Meta's efforts to conceal information concerning research showing harms to children. That testimony is discussed in more detail in the Argument below. But notably, Ms. Savage testified that Meta looped in lawyers when doing research about the effects of their platforms, seeking to protect their communications from "adverse parties"—including children and their parents—through sham claims of attorney-client privilege. (*Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research Before*

*the Subcomm. on Priv., Tech., & the L. of the S. Judiciary Comm.*, 119th Cong. ("Congressional Testimony"), video available at https://www.judiciary.senate.gov/committee-activity/hearings/hidden-harms-examining-whistleblower-allegations-that-meta-buried-child-safety-research (last accessed Nov. 7, 2025); Sattizahn QFR Responses, McConnell Decl. Ex. J; see also TechPolicy.Press Transcript, McConnell Decl. Ex. K.)

Meanwhile, the Tennessee Attorney General has filed a motion seeking access to the same four documents at issue here with a hearing date on November 14, 2025. (*Mot. Requesting In Camera Review and for an Order Finding No Privilege Over Documents*, filed Oct. 31, 2025, at p. 4, 8, McConnell Decl. Ex. L.)

This Court has expressed an interest in how Magistrate Judge Kang would rule on the documents at issue. Judge Kang gave Meta permission to depose Dr. Sattizhan, a witness on both the MDL and JCCP Plaintiffs' Witness Lists. (McConnell Decl. ¶ 20.) Meta has not yet served a deposition subpoena on Dr. Sattizhan, but stated that it intends to bring a motion for protective order preventing Dr. Sattizhan from expressing what they deem to be privileged material, including the substance of his testimony that was already made to Congress. (McConnell Decl. ¶ 20.) At the time of the filing of this instant motion, no motion in the MDL has been filed. (McConnell Decl. ¶ 20.) Recognizing the urgency of the issue with trial approaching in January, the Court also gave Plaintiffs permission to file this motion and "ask[] for whatever relief you contemplate and want from this Court regarding that issue." (10/28/25 Hearing Tr. at 8:6-22, McConnell Decl. Ex. M.) Plaintiffs met and conferred with Meta regarding this motion on November 4, 2025, and were unable to reach a resolution. (McConnell Decl., ¶ 21.)

**III.    ARGUMENT**

Plaintiffs request that this Court compel Meta to produce unredacted versions of the Documents to Plaintiffs immediately. Plaintiffs have prima facie evidence that the Documents are subject to the crime-fraud exception to privilege, and the documents are not "work product."

**A.    The crime-fraud exception applies to the Documents.**

Under California law, the privilege protecting confidential attorney-client communications is lost if the client seeks legal assistance to plan or perpetrate a crime or fraud. (*BP Alaska Exploration, Inc. v. Superior Ct.* (1988) 199 Cal.App.3d 1240, 1249 [citing Cal. Evid. Code § 956].) "To invoke the crime-

7

fraud exception, the proponent must make a prima facie showing that the services of the attorney were sought or obtained to aid someone in committing a crime or fraud." (*Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 220 [citing *BP Alaska*, 199 Cal.App.3d at 1262].) "Evidence Code section 956 does not require a completed crime or fraud. It applies to attorney communications sought to enable the client to *plan to commit* a fraud, whether the fraud is successful or not." (*Id.* [emphasis in original].)

Courts have recognized that "fraud" in the crime-fraud exception to the attorney-client privilege[3] "includes civil fraud." (*Action Performance Companies, Inc. v. Bohbot* (C.D. Cal. 2006) 420 F. Supp. 2d 1115, 1118-19.) And under appropriate circumstances, nondisclosure or concealment can constitute actionable civil fraud. (See, e.g., *Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094, 1130-31 [303 Cal.Rptr.3d 162, 196], *as modified* (Jan. 23, 2023) [listing "four circumstances in which nondisclosure or concealment may constitute actionable fraud[,]" the first of which involves a fiduciary relationship between the parties, while the others are as follows: "(2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."]; see also *People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 325 [292 Cal.Rptr.3d 424, 448], *as modified* (Apr. 27, 2022) [using same four circumstances to assess whether an omission is fraudulent under California's Unfair Competition Law and False Advertising Law].)

The crime-fraud exception also extends to intentional spoliation of evidence. In California, a person commits a misdemeanor if "knowing that…any instrument in writing…is about to be produced in evidence upon a trial, inquiry, or investigation, authorized by law, willfully destroys, erases, or conceals the same, with the intent to prevent it or its content from being produced." Cal. Penal Code § 135 (West). A party loses the client-attorney privilege where a prima facie showing of violation of Section 135 is made. (See *Hynix Semiconductor Inc. v. Rambus Inc.* (Fed. Cir. 2011) 645 F.3d 1336, 1347 [affirming the

---

[3] There is also a crime-fraud exception to the privilege for confidential marital communications (see Evid. Code, § 981), and in that context, privileged status was lost under the crime-fraud exception where the communications at issue "constituted a plan to conceal evidence and obstruct justice[.]" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 232 [15 Cal.Rptr.2d 112, 146], *as modified* (Dec. 15, 1992).)

district court's piercing of the "attorney-client privilege on the basis of the crime-fraud exception, relying on California Penal Code § 135."]; see also *Micron Technology, Inc. v. Rambus* Inc. (Fed. Cir. 2011) 645 F.3d 1311, 1329-31 [companion case, explaining reasoning and affirming "the district court's use of the crime-fraud exception to pierce the attorney-client privilege."].)

Establishing a prima facie case of fraud or crime is not an onerous burden. It merely requires enough evidence to support a reasonable inference of fraud or crime. (*BP Alaska*, 199 Cal.App.3d at 1262 [describing prima facie showing as "one which will suffice for proof of a particular fact unless contradicted and overcome by other evidence"]; *Jasmine Networks, Inc. v. Marvell Semiconductor, Inc.* (2004) 117 Cal.App.4th 794, 131 [describing evidence for prima facie case as a "slender reed" requiring the trial court determine whether "inferences of a crime or fraud … could be drawn"].) For example, in *State Farm Fire & Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 648, evidence that the defendant's former employee had been pressured not to reveal the existence of certain documents during her deposition established a prima facie case of fraud. Upon showing a prima facie case of fraud, Plaintiffs can compel the production of any documents that reasonably relate to the fraud. (See *Cunningham v. Connecticut Mut. Life Ins.* (S.D. Cal. 1994) 845 F. Supp. 1403, 1413 ["Even assuming that the October 4, 1991, letter remains privileged, Connecticut Mutual has shown sufficient nonprivileged evidence, independent of the letter, to establish a prima facie case for finding that the letter is reasonably related to a future or on-going fraud."].)

Here, each of the Documents relate Meta's efforts to prevent, limit, alter, or hide the results of research regarding teen users' developmental vulnerability. As shown by congressional testimony, a court order, and other discovery, Meta intended its actions to keep bad information away from adverse parties and limit its litigation risk. It therefore perpetuated a fraud upon the Court and the Court should compel it to produce unredacted versions of the Documents.

### 1. Congressional testimony supports a prima facie case of crime-fraud.

Recent reporting and congressional testimony provide a strong prima facie case that these documents are not privileged under the crime-fraud exception.

On September 9, 2025, Dr. Sattizahn and Ms. Savage testified at a Senate Judiciary subcommittee hearing titled "Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety

Research." (Congressional Testimony; Sattizahn QFR Responses; see also TechPolicy.Press Transcript.) Mr. Sattizahn testified that Meta attorneys coached researchers to have the reports covered by attorney-client privilege and therefore protected from litigation discovery. They also instructed researchers to bury results that would be unflattering to Meta. Dr. Sattizahn and Ms. Savage explicitly agreed that Meta's attorneys acted to avoid outside disclosure and to make researchers' reports appear privileged and threatened researchers to get them to comply:

**Sen. Ashley Moody (R-FL):**

And did you find in your research, and is there documentation at Meta and do employees know that children under 13 or let's say children under 18 are being propositioned and harmed by [] predators?

**Cayce Savage:**

Yes.

**Jason Sattizahn:**

Yes.

**Sen. Ashley Moody (R-FL):**

And you're saying that Meta knew this and a way to deal with that is they brought in a team of lawyers to **tell their researchers what language to use in reports** so that it could qualify as attorney-client privilege?

**Cayce Savage:**

Yes.

**Jason Sattizahn:**

Correct.

\*\*\*

**Sen. Ashley Moody (R-FL):**

I believe there was a report that said Meta proposed two ways that researchers could limit the risk of conducting sensitive research. One suggestion was to **loop lawyers into their research, protecting their communications from "adverse parties" … assuming the adverse parties mean parents and kids, due to attorney-client privilege.** Researchers could also write about their findings more vaguely avoiding terms like "noncompliant" or "illegal". Is that correct?

**Cayce Savage:**

Yes.

**Sen. Ashley Moody (R-FL):**

Is that correct?

**Jason Sattizahn:**

It is correct.

**Sen. Ashley Moody (R-FL):**

I've been a lawyer, I've been a judge, I don't know if attorney-client privilege covers lawyers that are complicit and help with facilitating an ongoing violation of law, especially when it relates to harming children. But yet **you as researchers, were instructed to use different language and include lawyers so that this could all be shielded**.

**Cayce Savage:**

Yes.

\*\*\*

**Jason Sattizahn:**

**We were also threatened by lawyers.** I want to make that clear. It wasn't a suggestion. It wasn't research guidance. Meta's already claimed that in the Washington Post. It wasn't legal being able to make the research better. We, both of us, had met with legal and they threatened our own jobs if we did not do this. One of the quotes they said was, "You wouldn't want to have to testify publicly if this research was to get out, would you?" And we're here, so clearly we didn't mind that.

(Congressional Testimony, at 1:14-17 [emphasis added]; see also TechPolicy.Press Transcript, at pp. 23-24.)

Dr. Sattizahn also testified that attorneys instructed him to erase harmful results:

**Sen. Adam Schiff (D-CA):**

I wanted to ask you in some of your prepared remarks or things you've said in the past, you identified information essentially that Meta's legal department or others willfully erased, removed. Can you tell us specifically what you're referring to there?

**Jason Sattizahn:**

For sure. So, I would like to contextualize this with an example. I was running a survey, for instance, that I discussed a little bit in my disclosure where we found explicit information showing that women were being emotionally and psychologically harmed. After that survey was released, [] a legal team came to me and said, "The survey will not run in the future no matter what unless you take those questions out." That would be something along the funnel that they are preventing any additional data from being collected around that topic.

In other instances where I saw emotional or psychological harm as one example, and I had already written the report, **legal actually opened the report with me and said, "You have to take out these slides, you have to take out these lines."** And for context, in research, all data on the back end needs to be deleted in 90 days. So if legal is going into report and taking out lines or slides, they're effectively simply erasing the data anyway because it's our ethical duty as researchers to erase everyone's other private data before we analyze it as well. So those are just a couple examples of things, ways that they would remove that information.

**Sen. Adam Schiff (D-CA):**

> And what kind of justification, if any, did they give you for deleting that data or instructing you not to ask those questions? How overt were they about concerns that this would expand their exposure or these were answers they didn't want to know or they just wanted to purge the record of anything that didn't reflect well? I mean, what's the point of doing research if you're going to so bias the result, but what did they articulate as their justification?
>
> **Jason Sattizahn:**
>
> Legal's repeated explicit statements to me was that **we did not want this data because it was too risky for us to have because if there was an outside audit, it would be discovered that Meta knew about these harms**. That was said to me dozens of times by my direct legal partners that I was forced to work with from Meta.

(Congressional Testimony, at 1:26-28; see also TechPolicy.Press Transcript, at p. 27.)

In each of the four documents at issue here, the non-redacted portions portray the same situations as those described by the above testimony. (See META3047MDL-047-00706694 [discussing outside counsel's statements or edits of statements about Meta causing harm]; META3047MDL-047-00396577 [referencing outside counsel statements related to data coming in from a survey]; META3047MDL-050-00353504 [referencing the legal department's approach of not doing well-being research]; META3047MDL-111-000468706 [referencing the legal department "tearing apart" presentation slides prior to leadership seeing them].) Specifically, Meta's employees describe lawyer actions as "tearing apart some of our stronger slides," "softening the voice," "dilut[ing]" the narrative, "water[ing] down" the deck, and making the headlines "weaker" and "pretty weak." An employee concludes that "they don't [sic] want a paper trail tracing this back to information visually presented to leaders that may have to testify." (META3047MDL-111-000468706 at -709-14.)

The testimony above, therefore, provides a prima facie case that the crime-fraud exception applies to the communications in these documents.

### 2. The D.C. Court supports a prima facie case of crime-fraud.

Further support for applying the crime-fraud exception here is found in an order by the D.C. Superior Court, which found sufficient evidence to support this exception to attorney-client privilege. On the District's motion, the court conducted an *in camera* review of the four documents in question. The court then held, under that under the more exacting "probable cause" standard, that the District had produced sufficient evidence to apply the crime-fraud exception. The facts supporting the court's determination included:

- That the documents are dated between November 12, 2022, and July 7, 2023, and therefore were dated after the MDL litigation had begun.
- That "Meta's counsel provide the advice so referenced in the Documents while Meta's conduct—*vis a vis* the mental health of teen users of its platforms—was the subject of a related multidistrict litigation."
- That Documents 1 and 2 "contain communications between Meta researchers relaying advice form Meta's counsel that researchers should remove portion of research showing Meta's knowledge of teen users' developmental vulnerability because the research could be used by government enforcers investigating Meta."
- That Document 3 contains communications between Meta researchers about "efforts of Meta's counsel to block or redesign research about teen mental health harms due to litigations risks in lawsuits against Meta."
- That Document 4 contains communications between Meta researchers recounting legal advice "related to a presentation about teens' exposure to harmful content on Meta's platforms that the researchers had planned to provide to Meta's executives."
- That "Meta's counsel explicitly advised Meta researchers to 'remove,' 'block,' 'button[] up,' 'limit,' and 'update' their research."
- And that "Meta's counsel offered such legal advice to specifically limit Meta's potential liability, while Meta was already the subject of a related multidistrict litigation."

(D.C. Order, at 9-10.) The court concluded that "[b]y any interpretation, the communications in the Documents would, 'warrant a reasonable and prudent person in the belief that the attorney-client communications in question were in furtherance of an ongoing or future crime, fraud, or misconduct,' *i.e.*, obfuscating the adjudication of Meta's liability in the related multidistrict litigation. (*Id.* [citing *In re Public Defender Serv.* (D.C. 2003) 831 A.2d 890, 904].) While the Court stayed the Order to consider a motion for reconsideration, its findings provide "enough evidence to support a reasonable inference of fraud" under California's more lenient "prima facie" standard. (See *BP Alaska*, 199 Cal.App.3d at 1262.)

13
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF UNREDACTED DOCUMENTS

### 3. Meta's documents support a prima facie case of crime-fraud.

Evidence gathered in this case also provides a prima facie case for the crime-fraud exception to apply. As discussed above, the redacted versions of the four documents provide enough information to glean that lawyers are influencing Meta's research work. And additional Meta documents provide further support. For example, Meta documents revealed that in 2021, after Meta conducted its "Bad Experiences and Encounters" or "BEEF" study—a survey of almost 250,000 Instagram users about various bad platform experiences like unwanted sexual advances and recommended suicide-related content—it changed the survey to soften the bad results. The survey's author revealed that he was told "we need to delete the data and not analyze" for "legal/policy reasons." (META3047MDL-034-00504889, McConnell Decl. Ex. N.) The survey's author testified that she was told to label potentially damaging research results as attorney-client privileged:

> The ways that we applied AC priv was directions from my manager. That was essentially—we work in really sensitive areas, so we need to add this label, AC priv, for any of the research that we—either research plan or research materials, any of those sorts of materials and artifacts, we have to put AC priv on those documents.

(Deposition of ▓▓▓▓, 261:6-12, McConnell Decl. Ex. O.)

These discovery revelations further support a prima facie case that the crime-fraud exception applies. (See *Cunningham v. Connecticut Mut. Life Ins.* (S.D. Cal. 1994) 845 F. Supp. 1403, 1413 ["Even assuming that the October 4, 1991, letter remains privileged, Connecticut Mutual has shown sufficient nonprivileged evidence, independent of the letter, to establish a prima facie case for finding that the letter is reasonably related to a future or on-going fraud."].) As in the Documents, Meta had a pattern of using attorneys to erase bad research results or otherwise hide them under the guise of attorney-client privilege.

The Court should draw a reasonable inference of crime, fraud, or other misconduct from the above evidence and find that the crime-fraud exception applies to the Documents.

### B. Work product protection does not apply.

There is also no reasonable argument that the work product privilege would save Meta from disclosing the Documents. First, the documents at issue are not work product at all. They all appear to reflect internal discussions among Meta employees, with no attorneys involved. Courts have described attorney "work product" as "the product of the attorney's effort, research, and thought in the preparation

of his client's case." (*S. California Edison Co. v. Superior Ct.* (2024) 102 Cal.App.5th 573, 585.) The privilege applies to "[w]ork produced by an attorney's agents and consultants, as well as the attorney's own work product." (*Citizens for Ceres v. Superior Ct.* (2013) 217 Cal.App.4th 889, 911.) The documents at issue do not reflect "work" by any attorney or agent, as they appear to be discussions among non-lawyer employees about how to proceed, referencing at times comments made by legal counsel. Thus, Meta's counsel will not be able to meet their burden to show that work product privilege applies at all. (See *S. California Edison Co.*, 102 Cal.App.4th at 585 ["An attorney seeking to invoke work product protection has the burden to show that materials are either absolute or qualified work product."].)

Regardless, even if the work product doctrine applied, the materials at issue would be **qualified** work product, subject to a fairness analysis. (See CCP § 2018.030(b) [allowing for discovery of work product where "the court determines that denial of discovery will unfairly prejudice the party seeking discovery"]; see also *State Farm Fire & Cas. Co. v. Superior Ct.* (1997) 54 Cal.App.4th 625, 649–50, *as modified* (May 1, 1997).) In *State Farm*, the plaintiff provided the declaration of a former State Farm employee, Amy Zuniga. Ms. Zuniga had worked on the relevant case, and she disclosed that State Farm had not been fully compliant with discovery requests, based on conversations with in-house and outside counsel. (*Id.* at 635-36.) The court first held that the crime-fraud exception to attorney-client privilege applied. The court noted Ms. Zuniga's description of a strategy not to pay claims related to an earthquake unless a client raised the issue of agents forging denials of earthquake coverage—which was a known problem. (*Id.* at 647-48.) Ms. Zuniga also testified that counsel instructed her not to reveal certain documents during her deposition that would have been harmful to State Farm's defense. (*Id.* at 648.) And, she testified that she was trained to be as evasive as possible at her deposition, but to take a completely different approach if called at trial. (*Id.* at 648-49.)

As to work product, the court's analysis was straight-forward. Though Ms. Zuniga participated in responding to discovery requests and had frequent discussions with State Farm's lawyers, the court concluded that only the **qualified** work product privilege applied to her testimony. (*Id.* at 650.) As here, she did not "disclose, or attempt to disclose, any writings which qualify for treatment within the absolute work product privilege." (*Id.*; see also CCP § 2018.030(a) [limiting absolute work product privilege to "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories"].)

Addressing the qualified privilege, the court held that "the same analysis we utilized for the crime/fraud exception leads to the inevitable conclusion that refusal to allow disclosure of the information contained in the Zuniga declarations would not only unfairly prejudice real parties, it would also result in an injustice." (*Id.* at 650.) The argument is even stronger here. First, the link between the documents at issue and attorney strategy is far more tenuous, so it is unlikely that the documents constitute work product in the first instance. But even if they do, they are subject only to qualified privilege. And as in *State Farm*, it would be a severe injustice to these Plaintiffs for Meta to be able to hide its internal communications based on a strategy to involve lawyers for the purpose of invoking the privilege. (See *Costco Wholesale Corp. v. Superior Ct.* (2009) 47 Cal.4th 725, 735 ["Knowledge which is not otherwise privileged does not become so merely by being communicated to an attorney."].)

This Court, therefore, should order that the four documents at issue be disclosed immediately.

## IV.   CONCLUSION

This Court should grant Plaintiffs' Motion and hold that the crime-fraud exception applies, such that the documents at issue are not privileged. The Court should further order that Meta must produce unredacted copies of these documents within 24 hours of this Court's Order, and that the documents are to be considered public for filing purposes and use at trial.

DATED: November 7, 2025                         **KIESEL LAW LLP**

By:   */s/ Mariana A. McConnell*
    Paul R. Kiesel
    Mariana A. McConnell
    Cherisse H. Cleofe
    KIESEL LAW LLP
    8648 Wilshire Boulevard
    Beverly Hills, CA 90211
    Tel.: 310-854-4444
    Fax: 310-854-0812
    kiesel@kiesel.law
    mcconnell@kiesel.law
    cleofe@kiesel.law

    Rachel Lanier
    THE LANIER LAW FIRM, P.C.
    2829 Townsgate Road, Suite 100
    Westlake Village, CA 91361
    Tel.: 713-659-5200
    Rachel.Lanier@LanierLawFirm.com

    Joseph G. VanZandt
    Davis Vaughn
    BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.
    234 Commerce Street
    Montgomery, AL 36103
    Tel.: 334-269-2343
    Joseph.VanZandt@BeasleyAllen.com
    Davis.Vaughn@ BeasleyAllen.com

    Brian J. Panish
    Rahul Ravipudi
    Jesse Creed
    PANISH | SHEA | RAVIPUDI LLP
    11111 Santa Monica Boulevard, Suite 700
    Los Angeles, California 90025
    Tel: (310) 477-1700
    Fax: (310) 477-1699
    panish@panish.law
    ravipudi@panish.law
    jcreed@panish.law

PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF UNREDACTED DOCUMENTS

**PROOF OF SERVICE**

**COUNTY OF HARRIS, STATE OF TEXAS**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Harris, State of Texas. My business address is 10940 W Sam Houston Pkwy N, Ste 100, Houston, Texas 77064.

On November 7, 2025, I served true copies of the following document(s) described as **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF UNREDACTED DOCUMENTS** on the interested parties in this action as follows:

**BY ELECTRONIC SERVICE VIA CASE ANYWHERE:** In accordance with the Court's Order Authorizing Electronic Service requiring all documents to be served upon interested parties via the Case Anywhere System.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 7, 2025, at Houston, Texas.

*/s/ Megan Strange*
Megan Strange