WILLIAMS & CONNOLLY LLP
Joseph G. Petrosinelli, *pro hac vice*
Ashley W. Hardin, *pro hac vice*
680 Maine Avenue SW
Washington, DC 20024
Tel.: (202) 434-5000
jpetrosinelli@wc.com
ahardin@wc.com

*Attorney for Defendants YouTube, LLC
and Google LLC*

*[Additional parties and counsel listed on
signature pages]*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION,<br><br>THIS DOCUMENT RELATES TO:<br><br>*Charleston County School District v. Meta Platforms Inc., et al.* | MDL No. 3047<br><br>Case No.: 4:23-cv-04659-YGR<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CHARLESTON) (SD MSJ No. 3)**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: January 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT ..............................................................................................................1

    A.    Charleston Has No Evidence of Specific Cause. .....................................................1

        1.    Charleston Misrepresents Its Burden on Causation. ....................................1

        2.    Charleston's Cited Evidence Is Irrelevant and Inadmissible. ......................2

    B.    Charleston's Failure-to-Warn Claim Should Be Dismissed. ..................................6

        1.    Defendants Have No Duty to Warn Charleston Directly............................7

        2.    Charleston Has No Claim for Failure to Warn Students and Parents.........7

        3.    Charleston Lacks Evidence to Support Its Failure-to-Warn Claim. ...........8

    C.    Charleston's Past Damages Claim Lacks Support..................................................12

        1.    Charleston Is Not Entitled to Lost Time Damages. ..................................12

        2.    Charleston Is Not Entitled to Out-of-Pocket Expenses............................15

    D.    Charleston Lacks Legal and Factual Support for Future Damages. .....................16

        1.    Charleston's Future Damages Claim Is Not Cognizable. ..........................16

        2.    Charleston Lacks Sufficient Proof of Future Damages. ...........................17

III.  CONCLUSION ..........................................................................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

## **CASES**

*Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354 (S.C. Ct. App. 1998) .......................................8

*Austin v. Specialty Transp. Servs., Inc.*, 594 S.E.2d 867 (S.C. Ct. App. 2004) ....................13

*Branham v. Ford Motor Co.*, 701 S.E.2d 5 (S.C. 2010) ..........................................................8

*Burnett v. Fam. Kingdom, Inc.*, 691 S.E.2d 170 (S.C. Ct. App. 2010)....................................6

*Charleston Lumber Co. v. Miller Housing Corp.*, 458 S.E.2d 431

   (S.C. Ct. App. 1995) ......................................................................................................12, 13

*Chestnut v. AVX Corp.*, 776 S.E.2d 82 (S.C. 2015) ..........................................................13, 14

*Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924 (N.D. Cal. 2016).................9, 10

*Doremus v. Atl. Coast Line R. Co.*, 130 S.E.2d 370 (S.C. 1963)...........................................16

*Faile v. South Carolina Dept. of Juvenile Justice*, 566 S.E.2d 536 (S.C. 2002) ....................7

*Hall v. Palmetto Enters. II, Inc.*, 317 S.E.2d 140 (S.C. Ct. App. 1984) ...............................16

*Haltiwanger v. Barr*, 186 S.E.2d 819 (S.C. 1972) .................................................................16

*Hardee v. Bio-Medical Applications Inc.*, 636 S.E.2d 629 (2006) ..........................................8

*In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667

   (D.S.C. 2021).........................................................................................................................13

*J.T. Baggerly v. CSX Transportation, Inc.*, 635 S.E.2d 97 (S.C. 2006)..............................1, 2

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866 (9th Cir. 2002)...............9, 10

*Jones v. Duke Energy Corp.*, 2025 WL 2243769 (D.S.C. Aug. 6, 2025) ................................7

*Kelly v. Brazell*, 172 S.E.2d 304 (S.C. 1970) ........................................................................16

*Mack v. Wal-Mart Stores*, 2007 WL 3177000 (D.S.C. Oct. 26, 2007)................................7, 8

*Moore v. Thomas*, 653 F. Supp. 2d 984 (N.D. Cal. 2009) ................................................3, 14

*Mouradian v. City of Los Angeles*, 2023 WL 2558398 (C.D. Cal. Jan. 25, 2023) .................5

*Odom v. G.D. Searle & Co.*, 979 F.2d 1001 (4th Cir. 1992) ...................................................8

*Pearson v. Bridges*, 544 S.E.2d 617 (S.C. 2001) ..................................................................16

*Social Media Cases, Nos.* JCCP 5255, 23STCV31485 (Cal. Super. Ct. Nov. 5, 2025) .......12

*Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852 (9th Cir. 2019).............................................14

*Wagnon v. Rocklin Unified Sch. Dist.*, 2024 WL 4654239 (E.D. Cal. Nov. 1, 2024) .............5

*Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 286 (S.C. 1964).............................................6

*Whisenant v. James Island Corp.*, 281 S.E.2d 794 (S.C. 1981).............................................14

*Wilder v. Blue Ribbon Taxicab Corp.*, 719 S.E.2d 703 (S.C. Ct. App. 2011) .................16, 17

**OTHER AUTHORITIES**

Restatement (Third) of Torts: Products Liability § 2 .................................................................8

## I.     INTRODUCTION

Charleston claims it has presented evidence that Defendants' conduct caused mental health harms to its students, disrupted the learning environment, and caused the District to divert its resources.  Charleston Opp. (ECF No. 2373) 1.[1]  But Charleston has failed to present any competent evidence linking any at-issue feature of Defendants' platforms to any of those alleged harms.  The District's other arguments mischaracterize what Defendants argued.  Charleston claims that Defendants misstate South Carolina's law on proximate cause by insisting that Charleston must tie its negligence claim to specific "at issue features." *Id.*  But it is Charleston that overlooks the Court's motion to dismiss Order, which clearly set limits on the permissible bases for the District's claims.  Lacking evidence that the at-issue features caused its alleged injuries, Charleston now attempts to circumvent the Court's limitations by claiming that its failure-to-warn theory allows it to challenge even the protected features of the platforms.  That argument is legally incorrect under Section 230, but Charleston's claim fails because Defendants had no duty to warn Charleston in the first place; nor can Charleston recover for any alleged failure to warn students and parents.

Charleston's other arguments are likewise insufficient.  Charleston misinterprets state law to prop up its claim for lost time damages, and its evidence in support of that claim (the unsound Klein survey and speculative, hearsay-filled employee affidavits) fail as a matter of law.  Charleston also lacks competent evidence that ties its claimed out-of-pocket expenses to Defendants' actionable conduct.  The District's claim for future damages is even more tenuous, with no basis in South Carolina law.  Defendants are therefore entitled to summary judgment.

## II.     ARGUMENT

### A.     Charleston Has No Evidence of Specific Cause.

#### 1.     Charleston Misrepresents Its Burden on Causation.

Charleston misrepresents its burden to prove causation.  In the Omnibus Opposition, it cites *J.T. Baggerly v. CSX Transportation, Inc.*, 635 S.E.2d 97, 101 (S.C. 2006), for the proposition that

---

[1] The ECF numbers provided are from the MDL case docket (Case No. 4:22-md-03047-YGR), except for citations to exhibits to Defendants' Charleston Motion, which are from the case-specific docket (Case No. 4:23-cv-04659-YGR).

it can "aggregate evidence showing that each Defendant's conduct was a substantial, concurring, or contributing factor in causing the Districts' harm" because "causation is satisfied where the evidence establishes that the defendant's negligence is 'a concurring or a contributing proximate cause.'" Om. Opp. (ECF No. 2414-1) 190 (quoting *J.T. Baggerly*, 635 S.E.2d at 101). But *J.T. Baggerly* is clear that South Carolina law requires proof that *each* Defendant's conduct was a "but-for" cause of the alleged injury, and Charleston cannot merely aggregate evidence to prove causation without showing that each cause was a but-for cause of the injury. *See J.T. Baggerly*, 635 S.E.2d at 101 ("[C]oncurring causes operate contemporaneously to produce the injury, so that it would not have happened in the absence of either." (alteration in original) (emphasis and citation omitted)). Charleston has made no showing of but-for or proximate cause as to any individual defendant. Charleston offers only anecdotal testimony and inadmissible lay opinions about social media in general, not about any Defendant's specific at-issue features or any specific actionable conduct by each Defendant.

## 2.     Charleston's Cited Evidence Is Irrelevant and Inadmissible.

Contrary to Charleston's claim that it has "adduced evidence that [Defendants'] conduct caused mental health harms to Charleston's students," Charleston Opp. 1, none of the cited evidence shows that Defendants' platforms caused mental health harms, let alone that those harms resulted in financial injury to the District.

Charleston offers only general, anecdotal, and inadmissible lay opinion testimony about the alleged harm resulting from *content* posted on "social media" in general. The sum total of Charleston's cited evidence is below:

- Testimony from the Director of Nursing that purportedly "links Defendants' platforms to serious mental and physical effects such as lost sleep, heightened anxiety and depression, and body dysmorphia." Charleston Opp. 3 (citing Charleston Opp. Ex. 7 (Nitz Dep.) (ECF No. 2385-10) 95:13–96:16, 99:19–101:2). But what that witness, who does not diagnose students with mental health conditions as part of her job, testified was that she thinks "excessive use of social media . . . has a negative impact on [students'] mental health"

because "many of them don't sleep well," and they cannot "live up to the standards that they see [from] other people that are posting."  Charleston Opp. Ex. 7 (Nitz Dep.) (ECF No. 2385-10) 99:19–100:12, 83:2–11.   She also testified that more students—"normally females"—are cutting themselves, and she thinks kids learn "through social media" and "word of mouth" that cutting "will help you gain control of your life."  *Id.* at 100:2–101:23.  Defendants cannot be held liable for allegedly harmful messages or content posted by third parties.  *See* Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Master Complaint ("First SD Order") (ECF No. 1267) 26 ("As to any alleged injuries to the school districts stemming from dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms caused by deteriorated youth mental health, those allegations fail proximate causation for a lack of particularized allegations."); Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("PI Order") (ECF No. 430) 18 ("[P]rivate messaging functions do fall within the publishing umbrella.").

- Testimony from the CFO that more "interventionists," which are neither certified teachers nor counselors, were needed to "pull students" to work one-on-one with them "to handle learning loss and distraction," in part because of "cell phones and social media use in schools in general."  Charleston Opp. Ex. 3 (Prentice 30(b)(6) Dep.) (ECF No. 2385-05) 63:19–64:12, 66:22–68:2.  There is nothing in that testimony about Defendants' specific platforms or a link between Defendants and any financial harm to Charleston.

- Testimony from the Superintendent that when she was the principal at a middle school that had a cell phone ban that kids were "hooked" on social media and *parents told her* that their kids were using it all night, which impacted the students' "academic performance."  Charleston Opp. Ex. 1 (May 13, 2025 Huggins Dep.) (ECF No. 2385-03) 72:9–73:5.[2]  She also testified that "social media" leads to "significant disruption" in schools, which she

---

[2]  This testimony constitutes inadmissible hearsay and cannot be considered by the Court on summary judgment, in any event.  *See Moore v. Thomas*, 653 F. Supp. 2d 984, 991 (N.D. Cal. 2009) ("A district court may only consider admissible evidence in ruling on a motion for summary judgment.  Unauthenticated documents and hearsay evidence are inadmissible, and consequently, may not be considered on summary judgment." (internal citations omitted)).

attributed to, among other things, "a student posting inappropriate photos or threatening other students," and "brawls among students who have said—use a litany of profanity to incite an eruption on school campus over something that's often misunderstood." *Id*. at 57:6–58:16. She believes that "social media[] . . . has created a divide among students, among communities" and has exacerbated racism. Charleston Opp. Ex. 21 (May 19, 2025 Huggins Dep.) (ECF No. 2385-24) 202:15–203:9. Additionally, she testified that "when kids start driving" and "start going to other—going more places with their families . . . there's this desire among all to create a life on social media that things are perfect. And we see a lot of anxiety and depression, particularly in more affluent communities related to this." Charleston Opp. Ex. 1 (May 13, 2025 Huggins Dep.) (ECF No. 2385-03) 122:18–24. Her testimony is not based on personal knowledge about students' use of Defendants' specific platforms, provides no linkage to financial harm to the District, and is all about content, for which Defendants cannot be held liable in any event.

- Testimony from the Associate Superintendent of High Schools that kids "can't get past not sitting there looking at what's going on on social media." Charleston Opp. Ex. 4 (Eppelsheimer Dep.) (ECF No. 2385-07) 166:20–167:16. But when asked about the disruptions of social media, she testified only about content—things like cyberbullying, fights posted on social media, and "TikTok challenges" regarding slapping teachers and vandalizing school property. *Id.* at 45:11–16, 64:5–16, 106:6–110:2, 112:10–113:23. The Court held that "alleged injury stemming from non-foreseeable third-party conduct cannot be attributable to defendants," and that Defendants cannot be liable for the "promotion" or "mere publication of . . . third-party content," absent evidence (which Charleston lacks) that Defendants engaged in "conduct like providing cash prizes to challenge participants." First SD Order 25 (ECF No. 1267).

- Testimony from the Associate Superintendent of School Support and Community Engagement that "a lot of manpower" has been spent by the District in "investigating" incidents that "*occurred through* the social media platforms of TikTok, Instagram,

1   Snapchat, YouTube because students are using those platforms really more for their social

2   media access."  Charleston Opp. Ex. 8 (Coakley Dep.) (ECF No. 2385-11) 119:19–120:11

3   (emphasis added).  Again, the Court has held Defendants cannot be held liable for third-

4   party conduct.  First SD Order 26 (ECF No. 1267).

5   • Testimony from the Executive Associate of IT that some parents have complained that their

6   children have access to certain *content* on YouTube on District-issued devices where

7   Charleston has made—and continues to make—YouTube available to students on those

8   devices.[3]  Charleston Opp. Ex. 9 (Buckheister 30(B)(6) Dep.) (ECF No. 2385-12) 41:23–

9   42:20, 46:19–47:22, 86:21–87:25; Charleston Opp. Ex. 10 (MR_CCSD_573851) (ECF No.

10   2385-13) -3852–53.

11   The totality of Charleston's evidence is insufficient to create a dispute of material fact.  None

12   of the testimony is about the at-issue features of Defendants' platforms.  Every witness's testimony

13   is about content or third-party conduct.  And, even considering content, there is no competent

14   evidence that any student suffered actual mental health harm from Defendants' platforms, as

15   opposed to momentary (and normal) feelings of anxiety, sadness, or inadequacy, or that any student

16   harms led to financial harm to Charleston.

17   Moreover, testimony from lay witnesses that "social media" can cause anxiety and

18   depression and did so in any particular individual is inadmissible lay opinion testimony.  *See, e.g.*,

19   *Mouradian v. City of Los Angeles*, 2023 WL 2558398, at *3 (C.D. Cal. Jan. 25, 2023) ("[O]pinions

20   regarding the basis for a PTSD diagnosis and the symptoms of such a diagnosis would likely require

21   'scientific, technical, or other specialized knowledge' that would bring such testimony within the

22   scope of Rule 702."); *Wagnon v. Rocklin Unified Sch. Dist.*, 2024 WL 4654239, at *3 (E.D. Cal.

23   Nov. 1, 2024) (plaintiff's mother could testify to her observations of the nonverbal plaintiff's

24   ───────────────
[3] Not only is this testimony from the Executive Associate of IT clearly all about content, it is based
25   on inadmissible hearsay.  *See supra* n. 2.  And there is no evidence that these isolated incidents of
viewing allegedly inappropriate content caused any harm to the students, much less the
26   District.  *See, e.g.*, Charleston Opp. Ex. 9 (Buckheister 30(B)(6) Dep.) (ECF No. 2385-12) 46:19–
47:9 ("[T]he parent reported that his daughter said that she and her friends had been watching
27   Sabrina Carpenter's—or listening to it at least—it was on YouTube; I don't know if it was a video
or just a static, you know, album page—at school, and he came upon her listening to it at home on
28   her Google Chromebook as well.").

1    reactions to the defendant's conduct, but not as to a "diagnosis, opinion, or the cause of [the

2    plaintiff's] alleged injuries").

3        As Defendants pointed out in their Charleston Motion, there is no actual data that any student

4    in Charleston received treatment or was referred for treatment for social media addiction or any

5    other aspect of social media use.  Charleston Mot. (ECF No. 2293) 21.  Defendants are not

6    "ma[king] up an evidentiary standard" to insist upon this evidence—it is what is required to prove

7    Charleston's claims.  Charleston Opp. 4; Charleston Mot. 14, 20–21.  And there is no evidence at

8    all tying any of these episodic events to actual additional expenditures by the District that are

9    recoverable in this lawsuit.

10       Because Charleston has no competent evidence of causation, its remaining argument that

11   issues like poverty, violence, and racism are not "intervening causes" is aimed at a strawman.

12   Charleson Opp. 3–4.[4]  Defendants did not argue that they are entitled to summary judgment because

13   those issues are intervening or alternative causes, but rather because Charleston lacks competent

14   evidence that the at-issue features (or a failure to warn) are a cause at all.[5]

15       **B.    Charleston's Failure-to-Warn Claim Should Be Dismissed.**

16       As discussed in Defendants' Charleston Motion and Defendants' Omnibus Reply, there is

17   no legal or evidentiary support for Charleston's failure-to-warn claim.

18

19

---

20   [4] Charleston's assertion that "the record demonstrates [Defendants] did know that students'
21   compulsive use of their platforms would have especially severe effects in school communities
     burdened by longstanding social problems," Charleston Opp. 3 (cleaned up), is without any support.
22   Charleston includes a cite to Section III.A.2 of Districts' Omnibus Opposition, which is 173 pages
     long, but cites no individual pieces of evidence.  Nevertheless, there is no document cited in that
23   lengthy section that says anything about Defendants knowing that their conduct was having any
     deleterious effects for schools or school districts.

24   [5] Charleston's suggestion that the eggshell plaintiff doctrine can be used to prove causation is bizarre
25   and unfounded.  Charleston Opp. 3.  That is a rule about damages, which, in any event, applies only
     in the context of physical injuries.  *E.g.*, *Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 286, 291
26   (S.C. 1964) (holding in personal injury case that "plaintiff was entitled to recover all *damages*
     proximately resulting from the negligent acts of the defendant, including the aggravation of his pre-
27   existing condition" (emphasis added)); *Burnett v. Fam. Kingdom, Inc.*, 691 S.E.2d 170, 175 (S.C.
     Ct. App. 2010) (applying rule in personal injury case).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Defendants Have No Duty to Warn Charleston Directly.

Charleston relies on two cases that fail to support its argument that Defendants owed it a duty to warn it "of the known risks their platforms posed."  Charleston Opp. 6.  Both are irrelevant to Charleston's claim.  First, in *Faile v. South Carolina Dept. of Juvenile Justice*, 566 S.E.2d 536 (S.C. 2002), the court addressed whether the Department of Juvenile Justice ("DJJ") had a duty to control a dangerous juvenile, and not whether DJJ had any duty to warn.  *Id.* at 547–48 ("In the present case, Respondents do not assert DJJ had a duty to warn potential victims.   Instead, Respondents assert a breach of the duty to supervise and control a dangerous juvenile by the custodial entity.").  *Faile* therefore did not, as Charleston claims, hold that there exists a freestanding duty to warn foreseeable third parties.  Second, in *Jones v. Duke Energy Corp.*, 2025 WL 2243769 (D.S.C. Aug. 6, 2025), the court imposed a duty to warn the plaintiff waterfront property owners only because the defendant voluntarily undertook responsibility for the property at issue—a circumstance wholly absent here.[6]  *Id.* at *6.  Neither case supports finding that Defendants owed Charleston a duty to warn.

### 2.    Charleston Has No Claim for Failure to Warn Students and Parents.

Lacking any South Carolina law supporting a duty to warn the District directly, Charleston resorts to claiming that it can recover for Defendants' alleged failure to warn students and their parents (third parties to this action).  Charleston Opp. 8.  But there is no legal support for that argument, either.  Charleston cites *Mack v. Wal-Mart Stores*, 2007 WL 3177000 (D.S.C. Oct. 26, 2007), but that case did not involve warnings to third parties at all.  *Mack*, decided on a motion to remand, instead analyzed whether a car owner was fraudulently joined in a negligence action after a plaintiff tripped over a protruding jack.  *Id.* at *1.  The court denied the motion to remand, holding that the plaintiff may be able to establish a negligence action against the car owner for failing to

---

[6] Charleston erroneously asserts that Defendants do not dispute that they failed to warn school districts, students, or parents.  Charleston Opp. 6.  That is untrue.  Defendants moved for summary judgment because they have no duty to warn Charleston in the first place.  Defendants strongly dispute any factual assertion that they failed to adequately warn minor users or their parents, but that issue is not before the Court.

1    warn her.  *Id.* at *3.  Thus the case involved only direct warnings and not the third-party warnings

2    suggested by Charleston.

3    Charleston also mischaracterizes *Hardee v. Bio-Medical Applications Inc.*, 636 S.E.2d 629

4    (2006).  There, the South Carolina Supreme Court recognized, in a "very narrow holding . . . an

5    exception to the general rule that medical providers do not owe a duty to third party non-patients,"

6    holding that "a medical provider who provides treatment which it knows may have detrimental

7    effects on a patient's capacities and abilities owes a duty to prevent harm to patients and to

8    reasonably foreseeable third parties by warning the patient of the attendant risks and effects before

9    administering the treatment."  *Id.* at 631–32 (emphasis added).  This exception, which does not

10   apply outside of the doctor-patient relationship, does not support Charleston's broad contention that

11   it can recover for Defendants' alleged failure to warn students and parents because it is a "reasonably

12   foreseeable third part[y] at risk of harm."  Charleston Opp. 8; *see also* Om. Reply Section II.B.2.

13                    **3.    Charleston Lacks Evidence to Support Its Failure-to-Warn Claim.**

14   Even if Defendants had a duty to warn, the District failed to meet its "burden of showing

15   that a warning would have made a difference in the conduct of the person warned."  *Allen v. Long*

16   *Mfg. NC, Inc.*, 505 S.E.2d 354, 359 (S.C. Ct. App. 1998).  South Carolina does not recognize a

17   heeding presumption.  *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (applying

18   South Carolina law).[7]  Thus, Charleston must come forth with evidence establishing that warnings

19   to either the District or students and their parents would have been read, followed, and led to a

20   reduction in Charleston's alleged injuries.  It has not done that.

21   Charleston's reliance on the affidavit of Superintendent Huggins—signed the same day as

22   Charleston's Opposition—is unavailing.  Huggins' speculative assertions that, if warned, the

23   District (i) would have itself warned students and parents of the "negative effects" of Defendants'

24   platforms through additional education, programs, and training, and (ii) "likely" would have had

25   _____

26   [7] Additionally, South Carolina favors the Third Restatement of Torts on products issues, which
     disapproves of the heeding presumption.  *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 14–16 (S.C.
27   2010) (adopting Third Restatement approach for the risk-utility test in design defect cases);
     Restatement (Third) of Torts: Products Liability § 2, reporters notes to comment l (A.L.I. 1998)
28   (disapproving of heeding presumption).

support to institute a school-day cell phone ban "earlier" are unsupported by any actual record of action or communication. Charleston Opp. Ex. 23 (Huggins Aff.) (ECF No. 2385-27) ¶¶ 11, 16. Ms. Huggins' self-serving, *ipse dixit* affidavit is entitled to no weight.

**Additional Warnings.** *Two years after filing this lawsuit*, there is no evidence that Charleston has provided the "additional education," programming, or training that Ms. Huggins describes. *Id.* at ¶ 11. Charleston cannot point to any attempt to implement any of the measures identified in Ms. Huggins' declaration—*i.e.*, communication with parents regarding how they can "manage or limit student access to Defendants' platforms," professional development or training for staff on "social media risks and student well-being," or expanded "digital literacy programs" it provided to staff, students, and parents. *Id.* at ¶ 11. The only specific initiative Ms. Huggins mentions is that, in 2024, Charleston licensed the movie *Screenagers* and hosted expert panels in conjunction with screenings. *Id.* at ¶ 13. But *Screenagers* was released *in 2016*, yet Charleston did not offer it until 2024, well after litigation began. *See Screenagers Release Info*, IMDB, https://www.imdb.com/title/tt5095798/releaseinfo.

Given these gaps, the Court should disregard the Huggins affidavit as courts routinely do with self-serving, conclusory affidavits at summary judgment. *See Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 937 (N.D. Cal. 2016) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 874 n.1 (9th Cir. 2002) (noting that declarant "statements [that] lack foundation and constitute hearsay" are accorded "no weight" when considering a motion for summary judgment, and affirming the trial court's grant of summary judgment in favor of defendants).

Even if the Huggins Affidavit could be credited, it would not save Charleston's claims. There is no evidence in the record that any additional warnings to the District, parents, or students would have caused a single student to curtail their use of Defendants' platforms—much less that enough students would have changed their use in a manner that would have affected Charleston's expenditures. Indeed, the record shows that parental willingness to act is limited and variable,

further undermining Charleston's speculative claims that any additional warnings might have made a difference.  As Ms. Huggins testified, even when she talked to parents about confiscating students' devices altogether, "there are a lot of parents that don't want to do that," Charleston Opp. Ex. 1 (May 13, 2025 Huggins Dep.) (ECF No. 2385-03) 88:13–18, and that even with "support for parents so that they could find ways to mitigate the challenges associated with" purportedly excessive screen time, "people's ability to parent . . . differs," *id.* at 86:4–87:3.

**Cell Phone Bans.**  Ms. Huggins' assertion that an adequate warning "likely" would have enabled Charleston to overcome community opposition and institute a school-day cell phone ban earlier is pure speculation that also cannot save Charleston's claims.  Charleston Opp. Ex. 23 (Huggins Aff.) (ECF No. 2385-27) ¶¶ 14–16.  Indeed, Charleston instituted its cell phone ban only after it was mandated by the State of South Carolina, long after this lawsuit was filed.  Charleston Mot. 42 & n.11.  And the claim that the South Carolina legislature required that ban because "Defendants' own research and its implications became public," Charleston Opp. 7, has no factual basis.  The Act does not mention social media or Defendants at all.[8]  The claim that warnings would have "hastened" the legislature to pass such a ban, Charleston Opp. 7–8, is further speculation unsupported by any evidence.  Ms. Huggins' unsupported theorizing that certain unidentified "stakeholders" would have supported a Charleston-only ban is also without any basis in fact and is entitled to no weight at summary judgment.  *See Groceryworks.com, LLC*, 200 F. Supp. 3d at 937; *Japan Telecom*, 287 F.3d at 874 n.1.

What is more, to this day, Charleston *still encourages* students and teachers to use YouTube for educational purposes, and it does not block access to YouTube.  Charleston began allowing students to access YouTube on school networks and school-issued devices in 2019.  Charleston Mot. Ex. 10 (Nawrocki Dep.) (ECF No. 24-12) 43:11–44:19; Charleston Mot. Ex. 12 (May 13, 2025 Huggins Dep.) (ECF No. 24-14) 147:24–148:10.  As of 2025—approximately two years after

---

[8] Charleston Opp. Ex. 18 (ECF No. 2385-21) 54 ("1.103. (SDE: Anti-Bullying/School Safety) To receive state funds allocated for State Aid to Classrooms, a school district shall implement a policy adopted by the State Board of Education that prohibits access to personal electronic communication devices by students during the school day.  For purposes of this provision, a personal electronic communication device is considered to be a device not authorized for classroom use by a student, utilized to access the Internet, wi-fi, or cellular telephone signals.").

1   Charleston filed its lawsuit—Charleston continues to permit the use of YouTube as an instructional
2   tool at school. *See* Charleston Mot. Ex. 10 (Nawrocki Dep.) (ECF No. 24-12) 44:5–19, 45:15–25;
3   Charleston Mot. Ex. 11 (Buckheister 30(b)(6) Dep.) (ECF No. 24-13) 41:13–15 (confirming that
4   YouTube access is still enabled today). Though Charleston implemented a cell phone ban in
5   January 2025—and only after the state required it to do so, *see* Charleston Mot. Ex. 36 (May 13,
6   2025 Huggins 30(b)(6) Dep.) (ECF No. 24-38) 38:20–40:15—no witness has testified (nor could
7   they) that this ban is anticipated to impact school-approved use of YouTube either in class or after
8   hours as part of homework.

9         Nor does Charleston dispute that it continues to operate Facebook, Instagram, and YouTube
10  accounts. Charleston Mot. Ex. 12 (May 13, 2025 Huggins Dep.) (ECF No. 24-14) 132:21–133:8.
11  In fact, Charleston *continues to post* student-facing content on its YouTube channel including test
12  taking tips for elementary students (*see* https://www.youtube.com/watch?v=QYiqnb4XlHU) and
13  middle/high school students (*see* https://www.youtube.com/watch?v=Q_3k7Cgao6o), and
14  *continues to use* Facebook, Instagram, YouTube, and other social media platforms to interact with
15  community members (including students and parents), *see* Charleston Mot. Ex. 13 (April 3, 2025
16  Allison Dep.) (ECF No. 24-15) 113:17–115:4 ("[Charleston] has the social media pages. So if we
17  are creating content that we do want a large number of people to see, we know, because it's there,
18  that it's a good medium for them to be able to do that."); Charleson Opp. Ex. 21 (May 19, 2025
19  Huggins Dep.) (ECF No. 2385-24) 237:1–244:20 (recognizing that Charleston has posted multiple
20  videos on its YouTube channel directed toward students). And Ms. Huggins, Charleston's
21  superintendent, testified that she finds it "appropriate" for certain videos to be posted on its
22  YouTube channel if they are relevant. *Id*. at 243:16–244:20. Specifically, Ms. Huggins opined that
23  if Charleston's YouTube videos are "vetted [and] properly screened, [they] could be posted there
24  for student consumption." *Id*. In fact, Ms. Huggins has acknowledged that she herself has
25  participated in Charleston's social media postings. *See* Charleston Mot. Ex. 12 (May 13, 2025
26  Huggins Dep.) (ECF No. 24-14) 132:21–135:12 (explaining that the District has a YouTube,
27  Instagram, and Facebook account, that the Associate of Communications is responsible for
28

"manag[ing] the social media platforms," and that Ms. Huggins "forward[s] photos or content that might be appropriate" to post).

In light of this evidence of Charleston's ongoing encouragement of students to use Defendants' platforms, years after filing this lawsuit, there is no basis for a jury to presume that Charleston would have provided more warnings about the services had Defendants warned Charleston of the alleged harms. *See Social Media Cases*, Nos. JCCP 5255, 23STCV31485, at 5, 7–8 (Cal. Super. Ct. Nov. 5, 2025) (granting motion for summary judgment as to plaintiffs' negligent failure to warn claim where plaintiff continued to use YouTube even after filing the lawsuit).

### C.    Charleston's Past Damages Claim Lacks Support.

Even if Charleston could get past the legal and evidentiary hurdles and establish that it has sufficient evidence to get to a jury on its substantive claims, it still lacks legal support for the damages it seeks. As an initial matter, Charleston's Opposition disclaims most of the types of out-of-pocket damages it previously claimed—hiring mental health personnel, repairing property damage, diverting and increasing financial resources—and now claims only relatively minimal costs for purchasing Yondr pouches and implementing some social emotional programming and training. *See* First SD Order (ECF No. 1267) 5–6; Charleston Opp. 10. Instead, the vast majority of Charleston's now-claimed damages are speculative, made-up costs: "lost time" damages that cost the District nothing in terms of actual additional expenditures and a billion-dollar "future damages" plan that is not tied to actual expenses the District will ever be forced to make.

#### 1.    Charleston Is Not Entitled to Lost Time Damages.

The majority of Charleston's claimed past damages ($93.5 million) are the purported "lost time" of its teachers and staff. Charleston Mot. 24. These lost time damages are not cognizable in this case, and in any event, Charleston failed to put forth sufficient facts to support these damages.

First, Charleston cites a single South Carolina state case—*Charleston Lumber Co. v. Miller Housing Corp.*, 458 S.E.2d 431, 437 (S.C. Ct. App. 1995)—for the proposition that lost time damages are compensable. That was a fraud case, and the court held that the employer could recover

for efforts spent checking and correcting deliberate, fraudulent overbills by the other party. *Id.* No South Carolina case has applied the outcome of *Charleston Lumber* in the 30 years since it was decided, nor has any court extended it beyond the narrow factual and legal context of that case.[9] Moreover, the rationale of that case does not apply here. In *Charleston Lumber*, the court held that "if an employee's time is diverted from pursuit of the employer's business due to the fault of another, that party is responsible for those costs" because the employees were not engaged in the profit-making endeavors for which they were hired. *Id.* A school district is not a profit-making business, and when teachers spend time addressing student distractions, they are doing what they have been paid to do, which includes teaching but also managing student behaviors in class.

Thus, Charleston has no basis for arguing that the fundamental rule—that is, that damages should ensure that "the plaintiff will be in the same position he would have been in if there had been no wrongful injury"—would allow the recovery of "lost time" here. Charleston Mot. 25 (quoting *Austin v. Specialty Transp. Servs., Inc.*, 594 S.E.2d 867, 874 (S.C. Ct. App. 2004)). Permitting damages for "lost time" would not restore Charleston to its prior position. Charleston paid the salaries of these employees regardless of how they spent their time.

Second, Charleston devotes substantial space to attacking an argument that Defendants did not make: that the economic loss doctrine bars its financial damages. Charleston Opp. 10–11. Rather, Defendants argued that South Carolina law places important limitations on claims for financial damages that are not damages to person or property. Charleston Mot. 24–25. The District fails to rebut that point. Charleston cites *Chestnut v. AVX Corp.*, 776 S.E.2d 82, 84 (S.C. 2015), but that case affirms the principle of South Carolina tort law that financial damages are typically tied to injury to property. In *Chestnut*, the court vacated the lower court decision because there was a "novel question whether South Carolina will recognize 'stigma damages'" resulting in the

---

[9] In the Omnibus Opposition, the Districts cite a single federal data breach case and claim that it shows that "courts routinely recognize lost-time damages in negligence actions." Om. Opp. 203 (citing *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 687 (D.S.C. 2021)). *Blackbaud* notably does not cite or apply *Charleston Lumber*. *See generally Blackbaud*, 567 F. Supp. 3d 667. It held that the plaintiffs had sufficiently pled injury at the motion to dismiss stage by claiming unauthorized disclosure of personal information and mitigation expenses that included time and money spent reducing risk of identity fraud or theft. *Id.* at 686–87.

13

diminution of property value.  *See id.* at 84 (footnote omitted).  Charleston's claim for lost time damages has no ties to injury to property and should be dismissed.

Third, Charleston offers insufficient evidence to support its claim for lost time damages.  As explained in Defendants' Omnibus Reply, the survey performed by the Districts' expert Mr. Klein is insufficient to establish "lost time" damages for teachers within the District.  Om. Reply Section II.C.1.  As for the claimed lost time of psychologists, counselors, social workers, principals, and assistant principals, Charleston's two employee affidavits are not reliable or competent evidence.  The Opposition admits that these affidavits are based entirely on hearsay: "the affidavits in question are based on consultations with multiple Charleston personnel."  Charleston Opp. 12.  Hearsay cannot be considered at summary judgment.  *E.g.*, *Moore*, 653 F. Supp. 2d at 991.

These affidavits also contain inadmissible speculation.  The District claims that *Whisenant v. James Island Corp.*, 281 S.E.2d 794 (S.C. 1981), "makes clear" that estimates of damages by District employees "based on their professional experience and personal knowledge" are permissible bases for damages even if those estimates do not allow for "mathematical certainty."  Charleston Opp. 9.  But *Whisenant* stands for the proposition that a property owner familiar with the property can estimate its value, not that one or two District employees can speculate about the percentage of time spent by 300+ other employees about whom they do not have personal knowledge.  Charleston Mot. 28–29.  This also fails to grapple with what Defendants actually argued.  What is at issue is not whether Charleston estimated its damages with "mathematical certainty," but whether there is any reliable basis for these estimates in the first place.  The fact that these affidavits were used by experts does not cure the issue.  *See* Charleston Opp. 12.  "A party's own speculation is insufficient to create a genuine issue of material fact, and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) (citation omitted).  The Court should dismiss Charleston's request for lost time damages.

**2.    Charleston Is Not Entitled to Out-of-Pocket Expenses.**

Charleston concedes that it does not seek past damages for "expanded mental health resources," costs of "internet filtering systems or monitoring software," personnel costs beyond the alleged "lost time" damages, or property damage.  Om. Opp. 197–98; Charleston Opp. 8–12.  All that remains is the $1,003,400 Charleston seeks for out-of-pocket costs for (i) Yondr pouches to hold students' phones during class and (ii) third-party training and mental health programming.  *See* Charleston Mot. Ex. 21 (Meyers Rep.) (ECF No. 24-23) ¶¶ 1, 23, App. C.  Charleston does not tie these out-of-pocket expenses to student use of Defendants' platforms.

For Yondr pouches, the District relies solely on a single page of testimony from Charleston's CFO.  However, that testimony establishes only that he heard from two schools that Yondr pouches improved "students being able to disengage with social media and apply focus to classroom activities during the day."  Charleston Opp. Ex. 3 (Prentice 30(b)(6) Dep.) (ECF No. 2385-05) 58:1–58:22.  This testimony about the effectiveness of the pouches after they were implemented does not establish that Charleston purchased the pouches because of Defendants' platforms in the first place.  Instead, it pertains to general "social media" concerns untethered to Defendants' platforms or the at-issue features, further diminishing its relevance.

For the remaining out-of-pocket costs for training and programming, Charleston's Opposition merely recounts the insufficient, speculative evidence that Defendants already addressed in their opening Motion.  Charleston Opp. 10; Charleston Mot. 31–34.  Defendants' arguments as to why those costs cannot be awarded as damages stand unchallenged, and the Court should dismiss these damages.  Charleston's Opposition also makes clear that, even if these expenses were tied to Defendants' platforms, they are tied to content on those platforms, not the at-issue features.  *See* Charleston Opp. 10 (*Screenagers* is designed to help students and parents navigate "substance abuse in a digital age"; Second Step costs include "bullying kits," and restorative practice programs help kids "build relationships and interact positively in real life").

Instead of addressing Defendants' arguments, Charleston states in a single sentence that "[n]one of these expenses would have been incurred but for the negligent actions and inactions of

Defendants." Charleston Opp. 10. The only evidence cited in support of that sentence is (1) the expert report of Jeffrey Meyers, and (2) the affidavit of Charleston CFO Daniel Prentice, on which Meyers relied. But Meyers testified at his deposition that he was not offering an opinion that the Defendants' conduct *caused* the District's alleged injuries. Defs.' Mot. to Exclude Testimony of School District Experts Ex. 68 (Meyers Dep.) (ECF No. 2297-71) 94:8–21. And the Prentice Affidavit merely authenticates a spreadsheet that lists expenditures. *See* Charleston Opp. Ex. 12 (Prentice Aff.) (ECF No. 2385-15). Neither establishes why Charleston decided to make these purchases, let alone that Defendants' actionable conduct caused Charleston to incur these expenses.

### D. Charleston Lacks Legal and Factual Support for Future Damages.

Charleston's request for $1.3 to $1.8 billion in future damages is unprecedented and unsupported by South Carolina law. Future damages must be based on ongoing costs resulting from a past injury, not speculative future harms from ongoing conduct.

#### 1. Charleston's Future Damages Claim Is Not Cognizable.

The Districts misrepresent the standard for future damages in South Carolina. In their Omnibus Opposition, they claim: "In each bellwether jurisdiction, a plaintiff may obtain an award of future damages if it proves ongoing injury and the costs of remediation." Om. Opp. 205 (citing *Haltiwanger v. Barr*, 186 S.E.2d 819, 820 (S.C. 1972) and *Wilder v. Blue Ribbon Taxicab Corp.*, 719 S.E.2d 703, 708 (S.C. Ct. App. 2011) (per curiam) for South Carolina). Neither case stands for that proposition. The standard under South Carolina law is that a plaintiff can receive potential future damages based on an already sustained injury. *E.g.*, *Wilder*, 719 S.E.2d at 708.

The province of future damages is ongoing costs caused by the past "injury." *See, e.g.*, *Wilder*, 719 S.E.2d at 708 (damages for permanent back pain caused by car accident).[10] Charleston

---

[10] The cases cited by Charleston confirm this rule. *Haltiwanger*, 186 S.E.2d at 820–21 (damages sought for permanent spine injuries resulting from past car accident); *Pearson v. Bridges*, 544 S.E.2d 617, 619 (S.C. 2001) (damages for future medical costs after patient was injured during surgery); *Doremus v. Atl. Coast Line R. Co.*, 130 S.E.2d 370, 380 (S.C. 1963) (damages sought for physical injuries suffered when train struck car); *Kelly v. Brazell*, 172 S.E.2d 304, 306 (S.C. 1970) (damages sought for future medical treatment for neck and back injuries resulting from car collision); *Hall v. Palmetto Enters. II, Inc.*, 317 S.E.2d 140, 144 (S.C. Ct. App. 1984) (damages sought related to permanent loss of fingertip caused by hydraulic lift accident). Charleston does not cite any case awarding future damages based on a purported likelihood of a future injury.

16

does not claim damages in the future as a result of its past injury—and it would not make any sense if it did. Charleston's alleged past injury is minimal out-of-pocket costs and "lost" teacher and staff time, which categories of alleged harm bear no relation to the future damages that Charleston is seeking. That alleged harm in the past will not cause it to spend more money in the future, let alone on something entirely different (*i.e.*, the staffing and training that Dr. Hoover recommends). Nor does Charleston offer any evidence of what lost time or out-of-pocket expenses it may incur in the future. Instead, Charleston is essentially arguing that it will be injured repeatedly for the next 15 years because of Defendants' ongoing conduct and that it should receive money now to *prevent* these different, as-yet-not-happened injuries in the future. Omnibus Opp. 206 (arguing that the future damages in the form of Dr. Hoover's strategic plans "are necessary to prevent these future injuries"). This is not permitted under South Carolina law. *See, e.g.*, *Wilder*, 719 S.E.2d at 708. Hoover's strategic plan does not recommend any changes to any aspect of Defendants' platforms so as to prevent future harm. Charleston's claim for $1.3 to 1.8 billion in "future damages" is therefore not legally cognizable.

### 2.    Charleston Lacks Sufficient Proof of Future Damages.

Charleston's claim for future damages independently fails for lack of proof that the damages will be incurred with reasonable certainty. Charleston's Opposition confirms that the District lacks proof that it is reasonably certain to incur $86.6 to $120 million in alleged damages per year from now until 2040 as a result of its claimed injuries (lost employee time and out-of-pocket expenditures). *See* Charleston Mot. 37. The Opposition offers only a single paragraph to support its request for $1.3 to $1.8 billion in future damages, which consists of unsupported attorney argument and a citation to a single paragraph of Dr. Hoover's report. Opp. 13–14 (citing Charleston Opp. Ex. 14 (Am. Hoover Rep.) (ECF No. 2385-17) ¶ 4). However, that paragraph merely describes what the District has purportedly done in the past, not the likelihood of future costs. Charleston Opp. Ex. 14 (Am. Hoover Rep.) (ECF No. 2385-17) ¶ 4 (arguing that social media impacts "have required school districts and schools, including Charleston County School District, to expend and redirect already limited resources" and listing what the District "is increasingly tasked with"). The

1    Districts repeatedly claim that Dr. Hoover opines that these injuries are likely to recur in the future,

2    but do not explain what evidence supports that bold assertion.  *See* Om. Opp. 206–08.  The only

3    citations provided on this point are to paragraphs in Dr. Hoover's Amended Reports, but those

4    paragraphs either describe current purported injuries in the District (without offering any evidence

5    or analysis that they will continue into the future), or simply list recommendations for staffing and

6    training costs that the District is encouraged to incur *voluntarily*.  Charleston Opp. 206.  Charleston

7    fails to establish with any certainty, let alone reasonable certainty, that it will incur these costs in

8    the future.  It cannot sustain a claim for future damages.

9    **III.    CONCLUSION**

10        For the foregoing reasons, as well as the reasons stated in Defendants' Opening Motion for

11   Summary Judgment and Omnibus Reply In Support of Its Motions for Summary Judgment,

12   Defendants are entitled to summary judgment on Charleston's claim.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: December 5, 2025

**WILLIAMS & CONNOLLY LLP**

/s/ *Ashley W. Hardin*
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and Google LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COVINGTON & BURLING LLP**

*/s/ Christian J. Pistilli*
ASHLEY M. SIMONSEN (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

PHYLLIS A. JONES (*pro hac vice*)
PAUL W. SCHMIDT (*pro hac vice*)
CHRISTIAN J. PISTILLI (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com
Email: cpistilli@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc. f/k/a Facebook Payments Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CHARLESTON) (SD MSJ NO. 3)
4:22-md-03047-YGR

KING & SPALDING LLP

/s/ *David P. Mattern*
GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, pro hac vice
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

BAILEY J. LANGNER (SBN 307753)
*blangner@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

*Attorneys for Defendants TikTok Inc., ByteDance*
*Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KIRKLAND & ELLIS LLP**

/s/ *Andrew Karp*
ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
ANDREW KARP, *pro hac vice*
andrew.karp@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

**MUNGER, TOLLES & OLSON LLP**

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CHARLESTON) (SD MSJ NO. 3)
4:22-md-03047-YGR

## <u>ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27</u>

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED:  December 5, 2025

By:  */s/ J. Andrew Keyes*
J. Andrew Keyes
*Attorney for Defendants YouTube, LLC and Google, LLC.*

By:  */s/ Christian J. Pistilli*
Christian J. Pistilli
*Attorney for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc. f/k/a Facebook Payments Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

By:  */s/ David P. Mattern*
David P. Mattern
*Attorney for Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*

By:  */s/ Andrew Karp*
Andrew Karp
*Attorney for Defendant Snap Inc.*

1

## <u>ATTESTATION PURSUANT TO LOCAL RULE 5-1</u>

2

     I, Ashley W. Hardin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

3

4

DATED:  December 5, 2025          By:    */s/ Ashley W. Hardin*
                            Ashley W. Hardin

5

6

                            *Attorney for Defendants YouTube, LLC and Google, LLC*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with ECF No. 341, on December 5, 2025, this motion and all attachments thereto were served to the following email addresses:

PSCServiceMDL3047@motleyrice.com
MetaNoticeofService@cov.com
SnapNoticeofService@mto.com
TikTokNoticeofService@faegredrinker.com
YouTubeServiceConfidentialDocs@wsgr.com
MWeinkowitz@lfsblaw.com
pwarren@motleyrice.com
lhazam@lchb.com
amm@classlawgroup.com
TShrack@lfsblaw.com
coanderson@lchb.com
scouch@motleyrice.com
gpanek@lchb.com
kmcnabb@lchb.com
myeates@ktmc.com
jjacobson@ktmc.com
pdandrea@lfsblaw.com
jruff@motleyrice.com
jhaileselassie@motleyrice.com
eberezofsky@motleyrice.com

Dated:  December 5, 2025          By:  */s/ Ashley W. Hardin*
                                       Ashley W. Hardin, *pro hac vice*

                                       *Attorney for Defendants YouTube, LLC*
                                       *and Google LLC*