Joseph G. Petrosinelli, *pro hac vice*
Ashley W. Hardin, *pro hac vice*
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Email:  jpetrosinelli@wc.com
Email: ahardin@wc.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

[Additional parties and counsel listed on signature pages]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*ALL ACTIONS* | MDL No. 3047<br><br>Case No.: 4:22-md-03047-YGR<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: January 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

## TABLE OF CONTENTS

I.   The Opposition Fails to Rescue the SD Experts' Improperly Tangled Opinions. ........................... 1

A.   Plaintiffs' Experts Fail to Disentangle Conduct Protected by Section 230 and the First Amendment from Actionable Conduct. ................................................................. 2

B.   Plaintiffs' Experts Fail to Offer Platform-Specific Opinions. .............................................. 3

C.   Plaintiffs' Experts Fail to Disentangle Third-Party Wrongdoing from Defendants' Actionable Conduct. ....................................................................................... 4

D.   Plaintiffs' Remaining Arguments in Favor of Admission Fail. ........................................... 6

II.   Plaintiffs' Opposition Confirms That Each Challenged Expert Should Be Excluded. ................... 8

A.   Plaintiffs' Survey Expert Robert Klein Should Be Excluded. ............................................. 8

1.   Mr. Klein's Surveys Fail to Link Defendants' Actionable Conduct to Alleged District Harm. ...................................................................................... 8

2.   Mr. Klein's Survey Methodology Is Unsupported and Unreliable. ........................ 9

B.   The Court Should Exclude Bryce Ward's Lost-Time Damages Opinions. ....................... 13

C.   The Court Should Exclude Jeffrey Meyers's "Out-of-Pocket" Damages Opinions. .......... 15

D.   The Court Should Exclude Sharon Hoover's Specific Causation and "Strategic Plan" Opinions. ...................................................................................... 15

1.   Dr. Hoover's Opinions Are Not Tied to Defendants' Actionable Conduct. .......... 15

2.   Dr. Hoover's Specific Causation Opinions Should Be Excluded. ........................ 17

3.   Dr. Hoover Lacks a Reliable Basis for Her Opinions About the Staffing and Training Levels and Timeframe in Her Strategic Plans. ....................................... 19

E.   The Court Should Exclude Plaintiffs' Expert Brian Osborne. ........................................... 22

1.   Dr. Osborne's Opinions About Other School Districts Are Inadmissible. ............ 22

2.   The Opposition's Attempt to Paper Over Dr. Osborne's Use of AI-Hallucinated Citations Misstates the Record. ....................................................... 24

3.   The Opposition Concedes That Dr. Osborne Cannot Opine About Scientific Medical Literature or Offer Impermissible Legal Conclusions. ........................... 25

## **TABLE OF AUTHORITIES**

*Alcantar v. Hobart Serv.*, 2013 WL 156530 (C.D. Cal. Jan. 15, 2013)..................................................11

*Asetek Danmark A/S v. CoolIT Sys. Inc*, 2022 WL 21306657 (N.D. Cal. Oct. 4, 2022).........................22

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308 (S.D. Cal. 2020) ................................................................................................................................................15, 25

*BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269 (9th Cir. 2024) ....................................................10

*Boca Raton Community Hospital, Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009).......5

*Briscoe v. White*, 2004 WL 5488228 (M.D. Fla. May 24, 2004) ...........................................................24

*C.N. v. Wolf*, 2006 WL 5105270 (C.D. Cal. Nov. 13, 2006) ................................................................24

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024 (N.D. Cal. 1999)..................10

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ...............................................24

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ......................................19

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022) ...........................................................18

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025).................................................................4, 7

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997) ...................................................................................10

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, 2017 WL 8948975, at *11 (D. Del. May 30, 2017)...12

*Greer v. T.F. Thompson & Sons, Inc.*, 2011 WL 5290154 (D. Ariz. Nov. 3, 2011) ...............................24

*Hays v. Park City Sch. Dist.*, 214 F. Supp. 3d 1162 (D. Utah 2016).....................................................24

*Hollander v. Sandoz Pharmaceuticals. Corp.*, 289 F.3d 1193 (10th Cir. 2002) .......................................4

*In re Apple iPhone Antitrust Litig.*, 2024 WL 5701895 (N.D. Cal. Feb. 2, 2024) ............................13, 14

*In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160 ......................................................................14

*In re JUUL Labs, Inc.*, 2022 WL 1814440 (N.D. Cal. June 2, 2022)..............................................22, 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020)...........................................................................................................................................5

*Jimenez v. Allstate Ins. Co.,* 2019 WL 13088814 (C.D. Cal. May 13, 2019)........................................9, 13

*Kim v. Benihana, Inc.*, 2024 WL 3550390 (C.D. Cal. May 20, 2024) ...............................................14, 15

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, 2006 WL 6505346, at *2, (W.D. Tex. Aug. 11, 2006)....13

*Lemmon v. Snap Inc.*, 995 F.3d 1085 (9th Cir. 2021)................................................................2

*Litton Systems, Inc. v. Honeywell, Inc.*, 1996 WL 634213 (C.D. Cal. July 24, 1996)..............6

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594 (9th Cir. 1996)..........................24

*Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476 (C.D. Cal. 2008) ....................................12

*Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194 (11th Cir. 2002)................................4

*Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426 (9th Cir. 1991).............................................22

*Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981 (C.D. Cal. 1996) ............3, 4

*Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523 (N.D. Cal. 2016).....................11

*Social Media Cases*, 2025 WL 2807828, at *12 (Cal. Super. Sep. 22, 2025) .......................3, 5

*Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856 (N.D. Cal. May 22, 2008).................18

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142 (N.D. Cal. 2017).............................................................22

*Walker v. Ellensburg Sch. Dist.*, 2018 WL 11468666 (E.D. Wash. Nov. 5, 2018) ..................24

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 2352016 (E.D. Pa. June 9, 2021)........17

*Zucchella v. Olympusat, Inc.*, 2023 WL 2628107 (C.D. Cal. Jan. 10, 2023) ...........................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

Plaintiffs repackage Defendants' Rule 702 objections as a quarrel with "fit," *see* Pls.' Opp. to

2

Defs.' Mot. to Exclude Testimony of School District Experts ("Opp.") 3–4 (ECF No. 2406), but their

3

experts' defects run deeper.  Plaintiffs' Opposition fails to rebut the dispositive Rule 702 defects identified

4

in Defendants' Motion.  Plaintiffs concede their experts fail to apply any methodology to reliably opine

5

on harms or damages caused by Defendants' actionable conduct (rather than other platforms, third-party

6

actors, or protected content or publishing activity)—insisting that it is proper for their experts to opine on

7

"problems caused by Defendants' platforms *as a whole*."  *Id.* at 8 (emphasis added).  But that approach is

8

flatly inconsistent with this Court's prior orders and caselaw that requires experts to isolate the harms and

9

damages caused by Defendants' actionable conduct.  *See* SD Order (ECF No. 1267) 12–13; Defs.' Mot.

10

to Exclude Testimony of School District Experts ("Mot.") (ECF No. 2291) 8–9.  Each of Plaintiffs' experts

11

suffers from those fundamental flaws and other expert-specific flaws.

12

13

14

- **Mr. Klein**'s teacher survey is unreliable because its questions are about social media generally—thus shedding no light on the effects of Defendants' actionable conduct.  To compound matters, Mr. Klein strayed far beyond the contours of any defensible methodology by asking respondents to recall specific durations, down to the minute, of events that took place up to 10 years ago.  The Opposition points to no academic literature supporting that approach.

15

16

17

- **Dr. Ward**'s "lost time" opportunity cost damages estimates are based on Mr. Klein's flawed teacher survey results and declarants' estimates of how much time non-teachers spent on issues relating to social media.  Dr. Ward's damages testimony includes "lost time" attributable to platforms other than Defendants', protected features, and third-party conduct.

18

- **Mr. Meyers** lacks any factual basis for opining that the "out-of-pocket" damages he attributes to Defendants actually reflect expenses incurred due to Defendants' actionable conduct.

19

20

21

- **Dr. Hoover**'s specific causation opinions are unreliable because they are not tied to Defendants' actionable conduct and are improperly based on Plaintiffs' own say-so.  Her 15-year recommended strategic plans are similarly not tied to Defendants' actionable conduct and call for massive staffing and training efforts based entirely on her unsubstantiated *ipse dixit*.

22

23

- **Dr. Osborne** is offered as a mere hearsay conduit for what is allegedly happening at *other school districts*.  Worse yet, he relied on AI-hallucinated sources, is unqualified to render medical opinions, and cannot opine on legal conclusions.

24

## I.     The Opposition Fails to Rescue the SD Experts' Improperly Tangled Opinions.

25

Plaintiffs' experts fail to disentangle each Defendant's actionable conduct from (i) protected

26

publishing activity, (ii) other online platforms, and (iii) third-party bad acts.  *See* Mot. 6–10 ("Mot.").  The

27

experts' opinions are therefore methodologically unreliable and unhelpful to a jury charged with

28

determining liability based only on actionable conduct because the opinions "lack[] a valid scientific

connection to the pertinent inquiry." *Id.* at 4 (quoting *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 1004 (C.D. Cal. 1996)).

Plaintiffs' Opposition makes a fatal concession: that their experts "present evidence showing that schools expended significant time and resources to address problems caused by Defendants' platforms *as a whole*." Opp. 8 (emphasis added). Thus, Plaintiffs admit that their experts seek to impose liability on all Defendants collectively, rather than establishing each platform's individual misconduct. Worse, Plaintiffs acknowledge that they are seeking to base liability on both Defendants' alleged actionable conduct *and* conduct or features of Defendants' platforms that this Court has held are protected by Section 230 or otherwise cannot form a basis for liability. *See* SD Order 12–13 (rejecting "all or nothing" approach and limiting recovery to the features not protected by Section 230 or the First Amendment); Mot. 8–9 (citing cases holding similarly in closely analogous contexts). That admission is reason alone to grant Defendants' Motion. The remainder of Plaintiffs' Opposition dodges the core of this argument, instead seeking to reframe the inquiry and recharacterize the experts' opinions—all while ignoring the law.

### A.   Plaintiffs' Experts Fail to Disentangle Conduct Protected by Section 230 and the First Amendment from Actionable Conduct.

The Ninth Circuit has been unequivocal that claims against online platforms like Defendants' must be "fully independent of [their] role in monitoring or publishing third-party content." *Lemmon v. Snap Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021). Consistent with this standard, this Court rejected an "all or nothing" approach and employed a "conduct-specific, feature-by-feature assessment of defendants' platforms" to determine which allegations are barred by Section 230 and cannot be the basis of liability. SD Order 12–13. Utterly ignoring these authorities, Plaintiffs' entire case—including their experts' opinions—is addressed, in Plaintiffs' own words, to problems allegedly "caused by Defendants' platforms *as a whole*." Opp. 8 (emphasis added). They assert that they need not analyze the impact of Defendants' nonprotected features—even though these are the only features on which liability may be based—and can instead focus on harm flowing from third-party content and conduct or protected publishing activity. *See id.* For the reasons explained in Defendants' Reply in Support of Motion to Exclude Experts on the Basis of Section 230 and the First Amendment, Plaintiffs are wrong. Their experts' failure to show that Defendants' actionable conduct, as opposed to Defendants' platforms "as a whole," caused the harms at

1    issue—and to calculate the damages caused only by such actionable conduct—is disqualifying.

2    **B.    Plaintiffs' Experts Fail to Offer Platform-Specific Opinions.**

3    Plaintiffs' assertion that their experts should not be excluded for failing to "apportion liability

4    among Defendants," Opp. 5, misses the point.   The issue is not whether Plaintiffs' experts have

5    apportioned liability among Defendants.  Rather, the issue is that the experts have not employed a reliable

6    methodology to opine that *any* Defendant's actionable conduct caused Plaintiffs harm.  Just as an expert

7    could not render opinions about harms or damages caused by the entire "automobile industry" to impose

8    liability on Ford for a design defect, Plaintiffs' experts cannot opine about harms or damages caused by

9    all "social media" (or all the platforms at issue) to impose liability on any single platform.  *See* Mot. 3–5.

10   Plaintiffs' counterargument relies entirely on the JCCP Court's general causation ruling.  *See* Opp.

11   5–6.  Defendants disagree with that ruling and respectfully submit that it was in error.  But regardless, that

12   court's articulation of California law is markedly different from the federal standards that govern this

13   motion.  *See* Defs.' Reply ISO Mot. to Exclude General Causation Testimony of Pls.' Experts § II.A.1.

14   *First,* the JCCP Court's ruling fails to address the ample federal authority cited in Defendants'

15   motion, which holds that an expert "fails *Daubert*'s reliability standard" when she considers products

16   other than the defendant's in forming her opinions about whether the defendant's products caused the

17   plaintiff's injury.  *Sanderson*, 950 F. Supp. at 998 (collecting cases); *see also* Mot. 4.  The JCCP Court

18   cited no authority—let alone federal authority—for disregarding that principle in the portion of the opinion

19   that Plaintiffs cite, and a subsequent decision has reaffirmed that principle as a "tort law red line."  *See*

20   *Social Media Cases*, 2025 WL 2807828, at *12 (Cal. Super. Sep. 22, 2025); Defs.' Reply ISO Mot. to

21   Exclude General Causation Testimony of Pls.' Experts Ex. 1 (Dec. 3, 2025 *Landon R.* order) at 2–5

22   (methodology crossed "tort law red line" where expert's causation opinions rested on "amalgamation" of

23   defendants).

24   *Second*, the JCCP Court's ruling flips the burden that applies in federal court on its head.  The

25   JCCP Court held that "Defendants have failed to demonstrate that their social platforms are so different

26   from each other that it would be scientifically unreliable to investigate their mental health effects as a

27   group," *id.*, but the relevant inquiry in federal court is whether *Plaintiffs* have demonstrated that their

28   experts' opinions *are* reliable, *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

1    *Third*, the JCCP Court's conclusion regarding general causation expert methodology cannot

2    possibly be applied to opinions of the entirely different experts subject to this motion.  For example, survey

3    results about time spent addressing "social media" do not shed light on time spent addressing, *e.g.*,

4    Instagram, TikTok, or some other platform.  That *some* students in *some* classrooms used *some* platforms

5    and allegedly caused *some* unspecified degree of distraction does not address that deficiency.

6    *Fourth*, the JCCP Court did not address experts' reliance on non-party platforms, a cardinal

7    recurring defect that distinguishes this case from that one.  Nor did the JCCP Court address any experts

8    offering specific causation and damages opinions like those offered by the experts at issue here.

9    Seeking to minimize Defendants' authorities, Plaintiffs raise a litany of distinctions without

10    differences.  Take *Sanderson*.  Plaintiffs excerpt a single passage noting that the experts in that action

11    failed to rely on published literature addressing specific causation.  But prior to the passage they cite, the

12    court devoted nine exhaustive paragraphs to explaining that the opinions must be excluded on the

13    *independent* ground that the experts failed "to express an opinion that [the] injuries were caused by any

14    particular [Defendant's] product."  950 F. Supp. at 986–88.  Plaintiffs have no way around that holding.

15    And *Sanderson* is far from alone: the unrebutted caselaw confirms what common sense already says:

16    experts must opine about a defendant's actionable conduct.  *See* Mot. 3–4, 5–6, 8–9 (citing cases).[1]

17
18    **C.    Plaintiffs' Experts Fail to Disentangle Third-Party Wrongdoing from Defendants' Actionable Conduct.**

19    Plaintiffs barely contest that their experts' opinions are based in part on third-party conduct.  *See*

20    Opp. 6–8.  Plaintiffs never cite or respond to this Court's ruling that "non-foreseeable third-party

21    conduct"—such as "dangerous challenges, threats, and crimes disseminated or perpetrated on defendants'

22    platforms"—*cannot be attribut*[ed] *to defendants*."  SD Order 25–26.

23    Plaintiffs repeat across their Rule 702 and summary judgment oppositions the bare idea that they

24
25    ─────────────────────
[1] Plaintiffs' attempt to distinguish additional cases also falls flat.  The courts in *Hollander v. Sandoz*
26    *Pharmaceuticals. Corp.*, 289 F.3d 1193, 1207–09 (10th Cir. 2002), and *Rider v. Sandoz Pharmaceuticals*
       *Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002), excluded expert testimony because it failed to reliably link
27    a defendant's product with a plaintiff's symptoms.  That baseline rationale is what matters here.  Plaintiffs
       provide no basis to treat alleged mental health harms from social media differently from health harms
28    from pharmaceuticals when it comes to this core issue of causation and expert reliability.

need only establish that a Defendant's conduct was a "substantial factor" in causing their harm. *See* Opp. 6. Regardless of whether that is an accurate statement of the causation standard in any jurisdiction, it does not establish whether an expert has rendered a reliable opinion. This is not a situation where the experts reliably opine that each Defendant's actionable conduct was a substantial factor, and Defendants have other alternative evidence. In that case, it would be for the jury to determine whether the actionable conduct truly was a substantial factor. Here, the experts have *not* reliably opined that Defendants' actionable conduct, standing alone, was a substantial factor. Instead, they skip the step of demonstrating that Defendants' actionable conduct is independently harmful—which is the height of methodological unreliability. An expert who blends Defendants' conduct with third-party misconduct and then assigns harm to the mixture offers an unreliable opinion under Rule 702 because the method cannot isolate the effect of actionable conduct. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949–50 (N.D. Cal. 2020) (excluding opinion that failed to "isolate" effect of allegedly wrongful conduct), *aff'd*, 2022 WL 187841 (9th Cir. Jan. 20, 2022).

Plaintiffs cite no authority for their view other than the JCCP Court's opinion. But that opinion says nothing about third-party bad acts. The JCCP Court did not previously rule, as this Court has, that liability may not be based upon third-party conduct such as crimes or threats. Nor did it mandate a feature-by-feature analysis that expressly excluded liability based on particular features used to publish speech on Defendants' platforms. In the portion Plaintiffs cite, Judge Kuhl held only that personal injury plaintiffs' *general causation* experts need not "opine as to the cause of a particular, individual plaintiff's injury" because that "is the role of a specific causation expert." *Social Media Cases*, 2025 WL 2807828, at *7. But none of Plaintiffs' experts can opine that Defendants' actionable conduct caused Plaintiffs' injuries because they utterly failed to analyze the effects of Defendants' actionable conduct. Moreover, Judge Kuhl did not address damages experts at all. As the law makes clear, damages experts must calculate damages caused by a defendant's at-issue conduct and may not include damages caused by other conduct.

Plaintiffs' strained attempts to distinguish Defendants' authorities confirm their misguided approach. For example, Plaintiffs purport to distinguish *Boca Raton Community Hospital, Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009), on the ground that the expert there "counted payments the plaintiff admitted were lawful in his damages calculation." Opp. 7–8. But that is no

distinction, not least because Plaintiffs' experts indisputably seek to impose liability and obtain damages based on third-party conduct (and content), notwithstanding this Court's prior rulings that the mere publication of third-party content is lawful. Similarly, Plaintiffs dismiss *Litton Systems, Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996), by pointing to the portion of the opinion stating that "[d]isaggregation is required because the antitrust laws are only intended to compensate plaintiffs for losses fairly caused by a defendant's unlawful anticompetitive behavior." Opp. 7. It is equally true, however, that tort law is intended to compensate plaintiffs only for losses fairly caused by a defendant's unlawful behavior—which shows that *Honeywell* is directly on point. Plaintiffs similarly fail to show that any of their purported distinctions—such as that a case "involved a flawed overpayment theory" or "concerned trade secrets," *id.* at 8—undermine the fundamental point for which the cases were cited. The key point that each case makes is consistent and indisputable: across contexts and bodies of law, courts require that experts offer opinions about each individual Defendants' actionable conduct.

### D.    Plaintiffs' Remaining Arguments in Favor of Admission Fail.

Seeking to redeem their experts' failures to opine about Defendants' actionable conduct, Plaintiffs offer three "critical" points in their Opposition. Opp. 4. None is persuasive.

Plaintiffs claim that only Drs. Hoover and Osborne opine on causation, so only their opinions would fail on this ground, *id.*, but that misconstrues Defendants' argument: *all* of their experts fail to disentangle Defendants' actionable conduct when forming opinions, whether those opinions relate to causation or to damages. And that matters because every expert who relies on non-Defendant platforms, third-party acts, or protected publishing activity fails Rule 702 because those opinions do not tie losses to any Defendant's actionable conduct. For example, Mr. Klein's survey did not measure time diverted due to each of Defendants' platforms, nor is it limited in any way to Defendants' actionable conduct. Instead, it purports to measure time diverted due to all social media use with no distinction between Defendants and other social media platforms or between use related to protected conduct and actionable conduct. Mr. Meyers purports to opine that Plaintiffs "ha[ve] sustained . . . certain out-of-pocket costs . . . *as a result* of the alleged improper actions *of the named Defendants*." Opp. Ex. 63 (Meyers Rep.) (ECF No. 2407-71) ¶ 1 (emphases added). But he measures costs due to all social media use—making his estimates unreliable. *See* Mot. 25–27. Regardless of whether a Plaintiff's expert is a "causation" expert, they *must*

base their opinions on, and estimate losses flowing from, Defendants' actionable conduct—not use of all social media platforms writ large, third parties' actions, or Defendants' conduct protected by law. *See* Mot. 6–10. After all, an opinion that measures the wrong thing cannot become admissible for the right thing based on advocacy alone.

Plaintiffs next argue that there is "other evidence of causation," including other experts and unspecified "non-expert evidence." Opp. 4. But that is beside the point. Plaintiffs bear the burden to show each of their experts' opinions are admissible—and admissibility cannot be bootstrapped from other evidence. *See Engilis*, 151 F.4th at 1048–49 ("[T]he proponent of expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." (cleaned up)). What is more, Defendants *did* address Plaintiffs' other causation experts in their general causation Rule 702 motion and reply and address Plaintiffs' other "evidence" in their summary judgment replies. For present purposes, however, this argument is irrelevant: Plaintiffs must prove that *each* of their experts offers admissible opinions, and the supposed existence of other evidence does not allow these particular experts to testify.

Plaintiffs also claim, in a single sentence, that whether the experts have ultimately "shown" causation is a question for the jury. Opp. 4. But whether a jury could ultimately find causation does not relax Rule 702's gatekeeping function. Unless Plaintiffs show that each opinion rests on a sufficient factual basis and applies reliable methods to the facts, the opinion is inadmissible. It is for the Court to determine whether an expert has rendered an admissible and reliable causation opinion in the first place. *See, e.g.*, *Engilis*, 151 F.4th at 1049 ("[C]hallenges to an expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion."). It is fundamentally unreliable—not just factually unpersuasive—for these experts base their opinions on (i) sweeping generalizations about the harms of "social media" in general, (ii) third-party content or third parties' actions, or (iii) conduct protected by law. *See* Mot. 6–10.

## II.    Plaintiffs' Opposition Confirms That Each Challenged Expert Should Be Excluded.

### A.    Plaintiffs' Survey Expert Robert Klein Should Be Excluded.

#### 1.    Mr. Klein's Surveys Fail to Link Defendants' Actionable Conduct to Alleged District Harm.

Plaintiffs did not and cannot establish that the foundation of Mr. Klein's opinions—surveys sent to teachers asking them to recall, down to the minute, how much teacher time was diverted due to student device use over the past ten years—were specific to Defendants' platforms.  Plaintiffs do not dispute that the surveys asked about "social media" generally and referred to Defendants' platforms only as *examples*. *See, e.g.*, Mot. Ex. 16 (Klein Rep. DeKalb) (ECF No. 2297-19) D-10.  Plaintiffs take the absurd position that Defendants "overstate the significance of the survey's use of 'e.g.' and 'etc.'"  Opp. 10.  It is not overstating when the survey's plain language asked the survey respondents to consider platforms other than Defendants'.  If people were asked how much time they spent watching "sports (e.g., football, baseball, basketball, hockey, etc.)," they would surely include tennis, golf, soccer, and more in calculating their responses; the same is true here.

Beyond the plain language of the survey Mr. Klein crafted, Plaintiffs attempt to flip the burden by claiming that Defendants are "speculating—without citing any supporting expert testimony—that these terms captured platforms beyond those at issue."  *Id.*  Not true.  Mr. Klein's deposition testimony about the pretesting process confirms that teachers considered other social media in responding to the surveys: "But my understanding, based on the pre-test, is that Facebook, Instagram, Snapchat, TikTok and YouTube are the, you know, huge percentage of the social media usage.  *And there may be some outside that*."  Mot. Ex. 66 (Klein Dep.) (ECF No. 2297-69) 252:9–15 (emphasis added).  Mr. Klein therefore did not and could not say that teachers considered *only* Defendants' platforms.

Plaintiffs' bald statement that Mr. Klein's pretesting confirmed that teachers provided "information about Defendants platforms," Opp. 10, falls flat and is belied by his testimony.  Mr. Klein drafted this survey for this litigation, and he could have written it however he chose.  Plaintiffs cannot now turn around and blame Defendants for his choice to draft overbroad questions that rendered it impossible for Defendants and the Court to verify what the teachers were considering when they responded.

Even if survey respondents understood the question to refer solely to Defendants' platforms,

8

1   Plaintiffs do not contest that there was no effort to distinguish among the various platforms or to focus

2   only on Defendants' actionable conduct.  Opp. 10–11.  That failure is fatal.  Plaintiffs attempt to cast the

3   surveys' errors as "linguistic challenges," *id*. at 11, but these are not mere wording criticisms.  These

4   failures make it impossible for the factfinder to assess whether and to what extent each Defendants'

5   actionable conduct caused the Plaintiffs to suffer the alleged injuries, rendering the surveys unreliable and

6   unhelpful to a jury.

7                    **2.     Mr. Klein's Survey Methodology Is Unsupported and Unreliable.**

8       **Retrospective Survey.**  Defendants' Motion detailed the strong scientific consensus against the

9   type of retroactive reporting methodology used by Mr. Klein: calling on teachers to report from memory

10  the number of minutes of instructional time lost on a typical day during specific school years spanning a

11  period of 11 years.[2]  Plaintiffs have no answer.

12      The Opposition offers no sound support for this patently unreliable method and fails to identify

13  any analogous survey supporting a recall exercise like Mr. Klein's.  Mr. Klein himself has never performed

14  a study like this before.  Mot. Ex. 66 (Klein Dep.) (ECF No. 2297-69) 319:3–16.  Plaintiffs state that

15  "[r]etrospective reporting has been a standard market research tool for decades."  Opp. 14.  But the only

16  support that they provide is an unproduced marketing book published in 1966 that discusses collecting

17  retrospective data on consumer habits such as whether an individual previously purchased a particular

18  product or recalls seeing a particular advertisement.  That source does not provide support for the type of

19  questioning techniques employed by Mr. Klein.  And the subsequent edition of the book even cautions

20  that "questions that ask respondents to reconstruct past experiences also run a high risk of response bias."

21

22

23  _____
    [2] *See* Mot. Ex. 73 (Belli, R. F. (2005) Improving the Quality of Retrospective Reports) (ECF No. 2297-
    76) ("[R]esearch on human memory suggests that the quality of data obtained through retrospective

24  reporting is seriously compromised by the limitations of respondent memory"); *see also* Reply Ex. 1 (te
    Braak, et. al.  (2022) Teachers' Working Time From Time-use Data) (stating that "recall bias is especially

25  problematic when recalling activities that are fragmented, often interrupted and scattered over a certain
    time period" and that "questions on working time are much more difficult to answer for teachers than for

26  employees with a regular work schedule"); *Jimenez v. Allstate Ins. Co.,* 2019 WL 13088814, at *22 (C.D.
    Cal. May 13, 2019) ("T[h]ere are serious concerns in the academic community associated with relying on

27  a survey respondent's own subjective recollections, particularly ones as to estimates of the time spent
    working.").

28

1   Reply Ex. 2 (Green, et al. (1988) Research for Marketing Decisions) 172.[3]

2       Plaintiffs further point to "economists, including Nobel laureate Claudia Goldin" who have relied

3   on retrospective data.  The cited work by Dr. Goldin involved a study about women's family and career

4   transitions and asked retrospective biographical questions on "marriage, children, childcare, employment,

5   occupations, and nonemployment spells," but did not ask respondents to estimate the amount of time they

6   spent per day on a given issue.  Opp. Ex. 31 (ECF No. 2407-39) at 1-2.  Neither the 1966 book nor Dr.

7   Goldin's work supports soliciting granular recall like the average number of minutes associated with a

8   highly variable task over more than ten years.

9       It is Plaintiffs' burden to "point to some objective source—a learned treatise, the policy statement

10  of a professional association, a published article in a reputable scientific journal or the like—to show that

11  [the expert] has followed the scientific method, as it is practiced by (at least) a recognized minority of

12  scientists in his field."  *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1030

13  (N.D. Cal. 1999).  They have not done so, and Mr. Klein's surveys should be excluded as a result.

14      Instead of offering supporting studies, Plaintiffs argue that because Mr. Klein pretested the survey,

15  his retrospective reporting methodology is unassailable.  *See* Opp. 10.  Mr. Klein provides no records of

16  his pretesting process or any changes made to the surveys as a result of the pretesting.  All that he offers

17  is that he listened to a handful of teachers complete the survey and concluded that they could accurately

18  complete it.  Mot. Ex. 66 (Klein Dep.) (ECF No. 2297-69) 155:5-156:10 (admitting that Klein himself

19  only listened to approximately 6 pretests).  In other words, he is asking the Court to take his word for it.

20  This is not sufficient.  *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or

21  the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

22  existing data only by the *ipse dixit* of the expert.").

23      Plaintiffs' caselaw on this point is similarly unhelpful.  Plaintiff's Opposition states that "Mr.

24  Klein's methodology rests on well-established principles that the Ninth Circuit has repeatedly upheld as

---

[3] Plaintiffs also point to a 2018 study that Defendants' expert Mr. Stern advised on that asked respondents various questions about their video game playing habits.  Opp. 14-15.  That study involved asking respondents to pick the relevant range of hours that represented time spent gaming over the past *week*, a materially different exercise than asking respondents to write into a text box a precise number of minutes lost on an average day going back *over ten years*.

reliable," but cites *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1275 (9th Cir. 2024), as the only example. In that case, the defendants engaged an expert to conduct a likelihood of confusion survey, which had nothing to do with retrospective reporting the amount of time spent on a task or issue.

Finding no support for Mr. Klein's methodology, Plaintiffs continue to hang their hat on the event history calendar questioning technique, a method that Klein *did not even know about* when he administered his survey. Mot. Ex. 66 (Klein Dep.) (ECF No. 2297-69) 207:13–23. An event history calendar technique is a *qualitative* interviewing technique that anchors questions to significant life milestones or public events. Mot. 14–15. The type of information elicited by event history calendars include major life events like job changes, household moves, and illness episodes. Plaintiffs claim that tethering the questions in Mr. Klein's surveys to events such as COVID-19 allowed teachers to "reconstruct experiences accurately and minimize recall error." Opp. 23. But the only support they provide is a study cited by Defendants' expert that explains event history calendars as an interview questioning style, not a survey methodology, that can improve traditional retrospective reporting, which "is seriously compromised by the limitations of respondent memory." Ex. Mot. Ex. 73 (Belli, Improving the Quality of Retrospective Reports) (ECF No. 2297-76).

The case that Plaintiffs cite is unpersuasive. In *Alcantar v. Hobart Serv.*, 2013 WL 156530, at *2 (C.D. Cal. Jan. 15, 2013), employees were surveyed and asked how many meal and rest breaks they missed on average over a 5-year time period. Defendants in that case did not move to exclude the survey based on its retrospective reporting methods, and in any event, those respondents were asked about regularly scheduled events. Asking respondents how many of these objective, clearly delineated events they missed is not the same as requiring respondents to quantify the number of *minutes* associated with events that were highly variable and subjective, an entirely different and unsupported task. *See Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 590 (N.D. Cal. 2016) (excluding survey as unreliable where, among other things, it called on respondents to recall "irregular" and "mundane" events from several years ago), *aff'd in part, rev'd in part on other grounds and remanded,* 934 F.3d 918 (9th Cir. 2019).

**Representativeness.** Plaintiffs do not (and cannot) rebut Defendants' evidence that Mr. Klein made no effort at all to examine whether the teachers who answered his surveys constituted a representative sample. *See* Mot. 15–18. Instead, they seek to reverse the relevant standard, suggesting

1   that it is Defendants' burden to prove a lack of representativeness.  Opp. 11.  But Mr. Klein, as the

2   administrator of the survey, had the obligation to affirmatively ensure that his survey was representative.

3   Mot. Ex. 72 (Federal Judicial Center, Reference Manual on Scientific Evidence) (ECF No. 2297-75) 383

4   ("It is incumbent on the expert presenting the survey results to analyze the level and sources of

5   nonresponse, and to assess how that nonresponse is likely to have affected the results.").  Mr. Klein's

6   failure to do so is fatal.

7       The Opposition's only response conflates two distinct flaws that can render a survey unreliable.

8   Plaintiffs argue that, because the invitations to participate did not mention social media and the surveys

9   were sent to all current teachers, Opp. 16–17, the survey was "representative."[4]  But as the Reference

10  Manual makes clear, "[e]ven when a sample is drawn randomly from a complete list of elements in the

11  target population," a survey can still lack representativeness if "nonrespondents differ from the

12  respondents" in a systematic way.  Mot. Ex. 72 at 383.  In other words, the mere fact that those eligible to

13  participate in the survey mirrored the target population (addressed in Parts III.B & C of the Reference

14  Manual) does not ensure that those who *actually responded* to the survey were representative of the

15  population surveyed (separately addressed in Part III.D).  *Id.*[5]  That is why it is incumbent on the survey

16  expert "to assess how [such] nonresponse is likely to have affected the results," even where the overall

17  survey population was representative.  *Id.*  Mr. Klein's wholesale failure to address or rule out this distinct

18  source of bias requires exclusion.  *See Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 (C.D. Cal.

19  2008) (excluding survey expert where the expert "did not know whether the survey sample was

20  representative" and "did not do anything to evaluate whether the sample was representative"), *aff'd*, 639

21  F.3d 942 (9th Cir. 2011).

22      Plaintiffs' other cited cases prove this point: the experts in those cases took steps to examine the

---

[4] That the invitation to participate in the survey did not include any facially biasing information (such as referencing social media or this litigation) in no way establishes that the respondents were representative. At best, it excludes one of many possible reasons that the responses might not have been representative.

[5] The Reference Manual includes many examples of techniques that researchers can use to ensure representativeness, including "weighting obtained responses in proportion to known demographic characteristics of the target population" or "imputing estimated responses to nonrespondents based on known characteristics of those who have responded." Mot. Ex. 72 at 384.  It is undisputed that Mr. Klein failed to use these or any other techniques.

determinants of nonresponse, including in instances where response rates were low, to confirm the validity of the surveys. For example, in *GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, the survey expert took steps to assess for nonresponse bias, including employing a technique specifically mentioned in the Reference Manual on Scientific Evidence. 2017 WL 8948975, at *11 (D. Del. May 30, 2017) (expert compared the pattern of responses from early and late responders to mail surveys to determine if there were any differences). Similarly, in *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, also cited by Plaintiffs, the expert "took additional precautions, ensuring that the distribution of physician participants correlated with the percentage of users of the technology by specialty." 2006 WL 6505346, at *2, *5-6 (W.D. Tex. Aug. 11, 2006). Mr. Klein did nothing comparable here, and no amount of pretesting or survey design changes that fact. *See Jimenez*, 2019 WL 13088814, at *18 (survey deemed inadmissible where the expert failed to ensure that the sample was representative and the survey suffered from recall bias).

Finally, Plaintiffs misapprehend Defendants' argument about sample size. While the sample size Mr. Klein obtained in many jurisdictions was quite low, Defendants' principal point is not that the survey should be excluded based on sample size alone. Rather, the point is that—where, as here, the response rate is relatively low—it is all the more important that the expert take steps to ensure that the small fraction of respondents truly was representative of the large fraction of nonrespondents. It is that failure that provides a further reason that Mr. Klein's surveys are unreliable.

## B. The Court Should Exclude Bryce Ward's Lost-Time Damages Opinions.

Contrary to the Opposition, Opp. 18–22, Defendants did not challenge Dr. Ward's reliance on sources on the grounds that they constitute hearsay or are data prepared by others. Nor did Defendants challenge his opinions because he could not vouch for the accuracy of his inputs. Rather, Defendants challenge his reliance on sources that did not address the relevant injury (*i.e.*, the injury allegedly caused by Defendants' actionable conduct), resulting in misleading damages opinions. Therefore, his opinions cannot help the trier of fact to determine a fact in issue, are not based on "sufficient facts or data," and do not reliably apply principles and methods to the facts of the case. Fed. R. Evid. 702; Mot. 20–23.

Plaintiffs begin by "quoting" this Court as saying: "Objections to an expert's inputs may be raised on cross-examination." Opp. 18 ("quoting" *In re Apple iPhone Antitrust Litig.*, 2024 WL 5701895, at *11–13 (N.D. Cal. Feb. 2, 2024) (Gonzalez Rogers, J.)). But that "quotation" does not appear anywhere

in *In re Apple* (or in any other opinion). In reality, the opinion dedicated three paragraphs to addressing Apple's challenge to an expert's inputs and evaluating the expert's bases for using those inputs. *In re Apple iPhone Antitrust Litig.*, 2024 WL 5701895, at *13. After rejecting Apple's challenge, this Court stated, "Apple's objection may be reraised on cross-examination." *Id.* This Court did not announce a general rule that objections relating to an expert's inputs are for cross-examination rather than a basis for exclusion. Indeed, the Court's detailed analysis of the expert's inputs reflects the opposite: the soundness of an expert's inputs *is* part of the Rule 702 inquiry. *See id.*; *see also* Fed. R. Evid. 702(b), (d) (proponent of expert must demonstrate "testimony is based on sufficient facts or data" and "reflects a reliable application of the principles and methods to the facts of the case").

In a later opinion in that same case, this Court concluded that another expert's testimony should be excluded because (among other reasons) the expert's reliance on a source resulted in an irrelevant analysis. The Court found that, while the challenged expert needed to identify payors, the data the expert relied upon did not consistently identify actual payors. *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *12–13. The Court noted that "[e]xpert testimony, of course, must be 'relevant to the task at hand,'" *id.* at *12 (quoting *Daubert*, 509 U.S. at 597), concluded that expert's "analysis is not relevant to this case because it does not identify payors," and excluded the expert, *id.* at *13–14. Similarly here, Dr. Ward's inputs include percentages of time spent addressing the effects of third-party content on "social media," not the effects of Defendants' actionable conduct. Mot. 21–23 (quoting affidavits and testimony relied upon by Dr. Ward for damages calculations); *see also id.* at 24. Like the *In re Apple* expert's reliance on data that included individuals other than payors, Dr. Ward uses data that includes sources of "lost time" other than Defendants' actionable conduct. His opinions are therefore unreliable.

Plaintiffs argue that concerns that an expert took a source "at face value" "is a basis for . . . cross examination, not a basis for striking [the expert's testimony] altogether." Opp. 21 (quoting *Kawasaki*, 2025 WL 1836331, at *4 (alterations in Opp.)). But the issue here is not a failure to validate the accuracy of inputs, but rather the reliance on inputs that, *on their face*, are the wrong inputs. *See* Mot. 21–24.[6]

---

[6] Dr. Ward's failing is not cured by Judge Kuhl's recognition that "determining whether the substance or instrumentality upon which liability is premised caused a particular plaintiff's harm is . . . the role of the

(continued…)

1

Plaintiffs fail to point to any evidence that Dr. Ward's damages opinions are based on relevant inputs and

2

produce relevant damages calculations requires exclusion of his opinions. *See In re Apple iPhone Antitrust*

3

*Litig.*, 2025 WL 3124160, at \*12–13; *Kim v. Benihana, Inc.*, 2024 WL 3550390, at \*6 (C.D. Cal. May 20,

4

2024) (excluding opinion that relied on irrelevant percentages from a survey).[7]

5

### C.    The Court Should Exclude Jeffrey Meyers's "Out-of-Pocket" Damages Opinions.

6

Mr. Meyers' fundamental failing is he did not identify *any* basis for his claim that his "Allocation

7

Percents" identify costs attributable to Defendants' actionable conduct. Plaintiffs' Opposition, arguing

8

that challenges to his sources go to weight rather than admissibility, Opp. 24, skirts the issue. Like Mr.

9

Meyers himself, the Opposition does not identify *any* such basis, leaving this critique uncontested. *See*

10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1323 (S.D. Cal. 2020)

11

("[Plaintiff's] failure to oppose the *Daubert* motion on this issue constitutes a waiver or abandonment in

12

regard to this uncontested issue."); Mot. 25–26 (demonstrating that Mr. Meyers' sources do not identify

13

vendor costs attributable to Defendants' actionable conduct). Rule 702 requires Plaintiffs to show "it is

14

more likely than not" that Mr. Meyers' "testimony is based on *sufficient* facts or data." Fed. R. Evid.

15

702(b) (emphasis added). Lacking any facts or data to support his claim that he calculated costs

16

attributable to Defendants' actionable conduct, Mr. Meyers' opinions should be excluded.

17

### D.    The Court Should Exclude Sharon Hoover's Specific Causation and "Strategic
18
Plan" Opinions.

19

#### 1.    Dr. Hoover's Opinions Are Not Tied to Defendants' Actionable Conduct.

20

Plaintiffs do not cite any evidence supporting their contention that "Dr. Hoover's Opinions Are

21

Directly Tied to Defendants' Actionable Conduct," Opp. 33–36, and fail to address the overwhelming

22

evidence showing otherwise—including Dr. Hoover's admissions that she did not "look[] at all of the

23

24

jury." Opp. 21 (quoting *Social Media Cases*, 2025 WL 2807828, at \*7). This statement cannot be read

25

as holding that an expert is excused from the requirements of Rule 702 if his opinion relates to a topic that
a jury will decide. Nor does the jury's role permit a damages expert to offer opinions that are not tied to
Defendants' actionable conduct. *See supra* § I.D.

26

[7] Plaintiffs attempt to distinguish *Kim* by conclusorily asserting—without any cited support—that "Dr.

27

Ward relied on data directly tied to Defendants' conduct." Opp. 21 n.8. But as Defendants' Motion
demonstrated with detailed citation to the affidavits and testimony, the inputs Dr. Ward relied upon are

28

not time estimates "directly tied to Defendants' conduct." *See* Mot. 21–23.

specific features across every platform and the distinctions between them" and did not consider "the details of each of the defendant platforms' features," Mot. 30–31 (quoting Mot. Ex. 64 (Aug. 12 Hoover Dep.) (ECF No. 2297-67) 153:14–154:1).

**Specific Causation.**  Plaintiffs' Opposition proves that Dr. Hoover's specific causation opinions are not directly tied to Defendants' actionable conduct.  Plaintiffs point to quotations from the "Key Informant" interviews that Dr. Hoover relied upon, Opp. 34, but none of those quotations relate to conduct this Court held is actionable.  They relate instead to protected features that are not at issue, *see, e.g.*, Opp. 34 ("A teacher can't compete with scrolling."), or "social media" writ large, *see id.* ("increased suicidal ideation because of being on social media").  Indeed, Plaintiffs admit that "[t]he statements describe harms caused by Defendants' platforms *as a whole*."  Opp. 34 (emphasis added).  Plaintiffs then point to Dr. Hoover's general causation opinions, which they say are based on scientific literature and the reports of Plaintiffs' general causation experts.  *See id.*  But even assuming that these sources show general causation (*i.e.*, Defendants' actionable conduct *can* harm school districts), the sources do not show, or even purport to show, specific causation (*i.e.*, Defendants' actionable conduct *in fact* harmed *these Plaintiffs*).

**Strategic Plans.**  Plaintiffs assert that "Dr. Hoover made clear in both her reports and testimony that her opinions concern Defendants' platforms."  Opp. 34.  They do not attempt to argue that her strategic plans are designed to address Defendants' *actionable* conduct.  *See* Opp. 34–36.  Instead, Plaintiffs attempt to demonstrate that Dr. Hoover's plans relate to Defendants' platforms as a whole, but they fail to clear even this hurdle.  The best they can do is point to one reference in Dr. Hoover's report to Pew Research Center data on teen use of "the top five online platforms (YouTube, TikTok, Instagram, Snapchat and Facebook)."  Opp. 34 (quoting Opp. Ex. 79 ¶ 30).  That stray reference is in a section addressing general causation, not her strategic plans.  *See* Opp. Ex. 79 (ECF No. 2407-87) ¶ 30.  Plaintiffs also point to her testimony that "When I speak about social media, it's talking about the platforms that young people are using, and those happen to be the defendants' platforms."  *See* Opp. 34 (citing Opp. Ex. 93 (ECF No. 2407-101) at 203:7-24).  But even accepting this as a post-hoc declaration that every reference to "social media" in her reports means "Defendants' platforms only," neither Plaintiffs nor Dr. Hoover claim that she tailored her strategic plans to Defendants' *actionable* conduct rather than the platforms as a whole.

Plaintiffs further try to defend Dr. Hoover by asserting that she "designed her plans to prevent and

mitigate the pervasive, schoolwide harms caused by Defendants' platforms" and that she has designed "a comprehensive, universal plan . . . to restore school climate and functioning." Opp. 35. This reveals how far Dr. Hoover's strategic plans stray from the relevant issues in these cases. As this Court recognized, Plaintiffs' theory in these cases is that "[D]efendants deliberately designed their social media platforms to foster compulsive use and addiction in minors" and that Plaintiffs "expended substantial financial resources to mitigate the mental health and consequent behavioral issues their students suffer as a result of social media addiction." SD Order 3. Plaintiffs did not bring a claim for relief for vague harm to amorphous "school climate and functioning," and this Court did not allow such a theory to proceed. Rule 702 prohibits Dr. Hoover from testifying about a strategic plan to address this unpled theory. *See Zucchella v. Olympusat, Inc.*, 2023 WL 2628107, at *9 (C.D. Cal. Jan. 10, 2023) (excluding expert testimony on unpled damages theory); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 2352016, at *11 (E.D. Pa. June 9, 2021) (excluding damages estimates on unpled "theory of liability").

### 2.     Dr. Hoover's Specific Causation Opinions Should Be Excluded.

Dr. Hoover's specific causation opinions are based on "Plaintiffs' self-serving allegations for litigation purposes, unattributed statements by District officials in undocumented conversations, and depositions of District personnel." Mot. 32–33. Plaintiffs offer two responses, both of which fail.

*First*, Plaintiffs assert that Dr. Hoover relied on other sources, saying that, in addition to the Plaintiffs' own say-so, she "dr[e]w on her experience, literature review, Plaintiffs' other expert reports, [and] District data . . . to conclude that Defendants' platforms have directly negatively impacted each District." Opp. 27. While the first three ("experience, literature review, Plaintiffs' other expert reports") may have informed some of Dr. Hoover's opinions, those sources do not address whether Defendants' platforms specifically caused harm to the bellwether Plaintiffs. And neither Dr. Hoover nor Plaintiffs identify *any* "District data" that she purportedly relied on for her specific causation opinions. *See id.*

*Second*, Plaintiffs argue that Dr. Hoover's reliance on Plaintiffs' say-so—anonymous interviews, depositions of Plaintiff employees, and Plaintiff-prepared litigation documents (SHAPE profiles and fact sheets)—is proper. Opp. 28–33. This argument fails on multiple levels. As a threshold matter, Plaintiffs do not defend Dr. Hoover's reliance on her "Key Informant" interviews as a basis for her specific causation opinions, instead defending them as sources for her strategic plan opinions. *See id.* 28 ("key informant

interviews are a standard, scientifically valid method for assessing District needs"); *id.* at 29 ("key informant interviews were not only appropriate but essential to Dr. Hoover's process for developing strategic plans for each District"). Next, Plaintiffs' contention that reliance on interested parties' statements is "standard, accepted practice in [Dr. Hoover's] field" and therefore passes muster under Rule 702, Opp. 29, is inaccurate. Plaintiffs have no support for their brazen suggestion that the field of public health allows findings of specific causation based solely on interested-party statements. Nor does Plaintiffs' citation to *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1028 (9th Cir. 2022), support their position. Opp. 29. The *Elosu* expert considered interested-party statements as just one of *numerous* sources underpinning his opinion on the cause of a fire.[8] Dr. Hoover's specific causation opinions, by contrast, are based *entirely* on Plaintiffs' own statements. *See, e.g.*, Mot. Ex. 4 (Hoover DeKalb Rep.) (ECF No. 2297-7) ¶¶ 27, 47–53. Dr. Hoover did not even visit the Districts; she spoke to District employees on video calls lasting one to two hours. *See* Mot. Ex. 64 (Aug. 12 Hoover Dep.) (ECF No. 2297-67) 29:4–17; Mot Ex. 65 (Aug. 13 Hoover Dep.) (ECF No. 2297-68) 668:17–670:16. Conversations with school employees may be a sufficient basis for Dr. Hoover's consulting work, *see* Opp. 28, but a plaintiff's say-so is not sufficient in a court of law to support an expert's causation opinion. Mot. 34–35.

Plaintiffs defend Dr. Hoover's reliance on anonymous "Key Informant" interviews, but do not cite a single case permitting an expert to rely upon anonymous interested-party interviews as the basis for an opinion, much less a specific causation opinion. Opp. 28–32. Their attempt to distinguish *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856 (N.D. Cal. May 22, 2008), falls flat. Plaintiffs note that the *Therasense* expert relied on "experiments conducted by unidentified company employees— experiments the expert 'did not participate in, observe, or supervise.'" Opp. 30 (quoting *Therasense*, 2008 WL 2323856, at *3). But Dr. Hoover similarly relied on what Plaintiff employees told her about matters that Dr. Hoover did not observe, and Dr. Hoover has not identified (and cannot identify) which Plaintiff employee told her what. *See* Mot. 33–34. Plaintiffs' suggestion that they disclosed the list of individuals

---

[8] The *Elosu* expert also "conduct[ed] an analysis of the fire scene," "studied the remains of the cabin, examined evidence of fire movement and oxidation patterns, and reviewed . . . video footage," "examined the propane refrigerator and interviewed homeowners who were present near the cabin," and "used before-and-after photographs to calculate flame lengths and mass loss." 26 F.4th at 1026.

Dr. Hoover spoke to "during discovery," Opp. 30, is misleading. Plaintiffs provided the list on June 6, *see* Mot. Ex. 80, long after the conclusion of school district depositions on May 15. And Plaintiffs' assertion that they did not invoke privilege to prevent Defendants from inquiring into Dr. Hoover's conversation with a "Key Informant" during fact discovery, Opp. 30 n.11, is flatly contradicted by the deposition transcript they cite.[9]

### 3. Dr. Hoover Lacks a Reliable Basis for Her Opinions About the Staffing and Training Levels and Timeframe in Her Strategic Plans.

Plaintiffs' defense of the three essential components of Dr. Hoover's "strategic plan"—staffing ratios for building out new positions, training levels, and a 15-year timeframe—perpetuates the essential problem: like Dr. Hoover, they assert, in conclusory *ipse dixit* fashion, that her recommendations are appropriate because she is an expert and she says so. Again, a school district may be willing to accept a strategic plan drafted by Dr. Hoover based only on her expert say-so, but that does not make it sufficient for her to testify in court to legally unreliable opinions. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

**Staffing Ratios.** Defendants' Motion explained that, for 15 of 17 positions in Dr. Hoover's plan, she used ratios that were apparently plucked from thin air. Mot. 36. Plaintiffs respond by saying that "Dr. Hoover extrapolated from comparable roles with established ratios and supplemented that data with her qualitative assessment of each District's existing resources, size, and service needs as well as the impact of Defendants' platforms." Opp. 38 (citing similar paragraphs across six Hoover rebuttal reports). But Plaintiffs' description bears no relationship to what Dr. Hoover actually did. Plaintiffs do not point to any support for their claim that Dr. Hoover identified "comparable roles" for any of the 15 positions, nor have they identified anything showing how she "extrapolated" from "established ratios" to her

---

[9] Plaintiffs' argument that they only "objected to discussing the contents of deposition preparation," Opp. 30 n.11, is incorrect. At the deposition, Plaintiffs' counsel allowed Defendants to inquire into the witness's deposition preparation, including conversations with district employees. Opp. Ex. 95 (ECF No. 2407-13 at 15:14–19:9. But when Defendants inquired about the witness's meeting with Dr. Hoover, Plaintiffs' counsel stated, "I'm going to object that it's *not* part of deposition preparation. And I'll instruct you not to answer." *Id.* at 20:21–21:3 (emphasis added); *see also id.* at 21:5–17 (witness and Plaintiffs' counsel both stating that meeting with Dr. Hoover was not part of deposition preparation).

recommendations.  *See* Mot. 36 (explaining that Dr. Hoover "simply states—without any explanation whatsoever—that there should be one 'Digital Literacy Specialist' per 500 students, one 'School-Based Mental Health Clinician' per 500 students, one new IT staff hire per school, etc." (citing Mot. Ex. 4 (Hoover DeKalb Rep.) (ECF No. 2297-7) ¶¶ 80–97)).  And any claim that Dr. Hoover's recommendations are "responsive to" each District's "unique needs," *e.g.*, Opp. Ex. 87 (Hoover Breathitt Reb. Rep.) (ECF No. 2407-95) ¶ 43, is belied by her use of *identical* ratios for *each* position across *every* District and failure to consider District-specific circumstances in crafting these uniform recommended ratios.  Mot. 35.

For the two remaining positions, counselors and psychologists, Plaintiffs have no response to Defendants' argument that Dr. Hoover failed to "provide any methodology (much less a reliable one) for concluding that" national associations' "ratios designed to provide services to *all students* should be used to address only Defendants' actionable conduct."  Mot. 37 (emphasis in original).  Instead, they assert in a conclusory manner that it is "accepted" to use existing ratios to estimate additional staffing needs.  Opp. 37–38.  But it is baseless and illogical to suggest that one can simply adopt a ratio designed to address *all* needs for the limited purpose of creating *additional* capacity to address only a *subset* of those needs.[10]

**Training Levels.**  Plaintiffs again rely on pure *ipse dixit* to support Dr. Hoover's training recommendations.  They say that she relied on "best practice estimates" to estimate the number of hours of training for each position, and refer to her reliance on a report titled *Effective Teacher Professional Development*.  Opp. 38 (quoting Opp. Ex. 86 (Hoover Reb. Rep.) (ECF No. 2407-94) ¶ 124).  But while a footnote in her rebuttal report cites that report, Dr. Hoover does not explain how she arrived at the training levels she recommends.  This lack of explanation is exacerbated by the fact that the report that Dr. Hoover and Plaintiffs point to does not include any hours-based "best practice" recommendations at all.  *See generally* Reply Ex. 3 (*Effective Teacher Professional Development*).  At bottom, Dr. Hoover's training recommendations—like her staffing recommendations—are based on nothing more than her

---

[10] Dr. Hoover's analogy to "public health systems us[ing] hospital bed capacity metrics to prepare for emerging epidemics," Opp. 38 (quoting Opp. Ex. 86 (Hoover Reb. Rep.) ¶ 52), underscores the lack of basis for her use of the national association recommendations.  It would obviously be illogical for an expert to reason that because a community generally requires one hospital bed per 500 people for all purposes, the community therefore needs an *additional* one bed per 500 people to address only an emerging bird flu epidemic.  But that is precisely the logic that Dr. Hoover has deployed here.

unexplained say-so.  *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

**15-Year Timeline.**  Plaintiffs' opposition confirms that Dr. Hoover has not employed a reliable methodology for opining that a massive, 15-year-long hiring and training program is required to address Plaintiffs' claimed injuries.  Plaintiffs assert it is not necessary for Dr. Hoover to "model *precisely* how many students will use the [plan's] services" throughout its 15-year duration.  Opp. 40 (emphasis added). But the reality is that she has not modeled how many students will use her plan's services *at all*.

Plaintiffs attempt to defend the 15-year timeline by pointing to articles by Durlak et al. and Fixsen et al. that Dr. Hoover cited to support her assertion that "high-fidelity implementation of comprehensive programs, especially across large and variable systems like school districts, requires 10-15 years."  Opp. 39 (quoting Opp. Ex. 86 (Hoover Reb. Rep.) (ECF No. 2407-94) ¶ 74).  But those articles do not support her 15-year timeline.  As the Durlak article explains, "How much time to allot for effective implementation varies with the complexity of the intervention.  Fixsen et al. (2005) recommend at least *1 year*, whereas Felner et al. (2001) suggest that at least *3 years* are required for major school-wide reforms."  Reply Ex. 4 (Durlak et al., *Implementation Matters: A Review of Research on the Influence of Implementation on Program Outcomes and the Factors Affecting Implementation*) at 343 (emphasis added); *see also* Reply Ex. 5 (Fixsen et al., *Implementation Research: A Synthesis of the Literature*).

Plaintiffs also point to Dr. Hoover's analogy to youth tobacco programs.  But Dr. Hoover identifies only facile similarities (for example, "both relate to 'health education'") and makes no attempt to account for the significant differences between her proposed plan and the youth tobacco response (for example, Dr. Hoover identifies nothing suggesting school districts hired massive tobacco-specific workforces or provided students with tobacco-specific services).  Opp. 39.  Plaintiffs' Opposition ultimately underscores that Dr. Hoover's strategic plan opinions are *ipse dixit* adorned with citations to articles that do not support her assertions.  Her strategic plan opinions should therefore be excluded.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E.     The Court Should Exclude Plaintiffs' Expert Brian Osborne.**

**1.     Dr. Osborne's Opinions About Other School Districts Are Inadmissible.**

**Dr. Osborne's Causation Opinions Are Not Relevant or Helpful.**  Plaintiffs concede that Dr. Osborne is not a "case-specific expert" offering opinions about causation as to any of the six trial districts. *Id.* at 43.  Instead, he purports to offer general causation opinions.  Opp. 4.  Those opinions are irrelevant and unhelpful to the jury.  Dr. Osborne does not even purport to offer testimony establishing that, as a general matter, at-issue features of social media platforms are capable of causing the type of harm Plaintiffs allege.  Instead, he surmises based on hearsay and anecdotal (not epidemiological) evidence that general causation exists because other, non-plaintiff school districts have experienced similar harms.  Plaintiffs' claim that there is a "framework" under Ninth Circuit law that allows this type of expert testimony is false, and none of their cited cases comes close to supporting that novel proposition.

The *JUUL* decision has no bearing here.  The "logical connection" inquiry in *JUUL* concerned whether the experts in *JUUL* had enough expertise in the general electronic vape market (compared to the market for traditional tobacco products).  *In re JUUL Labs, Inc.*, 2022 WL 1814440, at *4 (N.D. Cal. June 2, 2022).  *JUUL* does not support Plaintiffs' attempt to take irrelevant hearsay testimony specific to other, non-plaintiff school districts and make it relevant to these cases.  Plaintiffs also misread *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426 (9th Cir. 1991), where the Ninth Circuit *upheld the district court's exclusion* of the expert's opinions because they had minimal probative value—they were only tangentially related to the facts of the case.  *Id.* at 1430–31.  The court held that "[a] person qualified to give an opinion on one subject is not necessarily qualified to opine on others."  *Id.*  That rule holds true here—Dr. Osborne's professional development work with education leaders does not make him an expert on how social media impacts these Plaintiff Districts.  And *United Food* does not support Plaintiffs' argument because the expert there (unlike Dr. Osborne) reviewed pertinent documents from the case and applied expertise in analyzing whether "a reasonable company in [that] position would have launched a generic version of a drug."  *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1181 (N.D. Cal. 2017); *see also* Mot. Ex. 69 (Osborne Dep.) (ECF No. 2297-72) 315:22–24 ("I did not review any data or documents from the [bellwether] school districts.").

**Dr. Osborne Cannot Be a Conduit for Hearsay.**  Plaintiffs do not dispute what is obvious from

the face of Dr. Osborne's report: he merely repeats what he claims to have been told by unnamed employees at non-plaintiff school districts, which is hearsay. This case is on all fours with *Asetek Danmark A/S v. CoolIT Sys. Inc*, 2022 WL 21306657, at *20 (N.D. Cal. Oct. 4, 2022), where the court excluded an expert who did what Dr. Osborne did here: "attempt to adopt the hearsay . . . itself as expert opinion." *Id.* Plaintiffs try to recast this hearsay from unknown school employees elsewhere in the country as "knowledge," or "experience and research itself." Opp. 44. But Dr. Osborne did not apply any expertise from his field, or any recognizable field, *see infra* (discussing purported "pattern recognition"), to "analyze" this hearsay. He simply repeats it. Dr. Osborne should not be allowed to pass off as expert opinion a recitation of the *undocumented* statements about *other school districts* by an *unknown* number of *unidentified* declarants.[11] Given Dr. Osborne's refusal to identify the declarants, Mot. Ex. 69 (Osborne Dep.) (ECF No. 2297-72) 240:10–247:22, there is no one Defendants can question about what Dr. Osborne claims to have been told or what those statements are based on so that the jury can evaluate the weight those statements should be given. That fundamental inability to test the veracity of evidence is why the bar on hearsay exists. Plaintiffs offer no other defense of Dr. Osborne's parroting of deposition testimony from this case. This too should be excluded. Mot. 46–47.

**Dr. Osborne's Opinions Are Inadmissible *Ipse Dixit*.** Dr. Osborne's purported approach of "pattern identification" is just his say-so, not a methodology—let alone a generally accepted, reliable, objective, and replicable methodology. Even if his methods were "well-documented and widely accepted in [the field of] educational leadership," Opp. 43, that field is irrelevant here. Dr. Osborne is not offering opinions about educational leadership—for example, how to improve educational practices for a school or district. He is serving as a quasi-fact witness, attempting to shoehorn a wide swath of hearsay into a purported causation opinion.

Dr. Osborne did not engage in sound "qualitative data collection" by listening to individuals from other school districts. Opp. 42. There was no methodology for these conversations. Mot. Ex. 50 (Osborne Rep.) (ECF No. 2297-53) ¶ 24 (referencing his "discussions with school and district leaders" as "formal

---

[11] Dr. Osborne cannot inoculate hearsay by making it more vague and refusing to identify specific statements or speakers. None of the cases Plaintiffs cite concern a *Daubert* challenge on these grounds. Each concerned motions *in limine* or objections to summary judgment evidence. Opp. 44–45.

and informal"); Mot. Ex. 69 (Osborne Dep.) (ECF No. 2297-72) 236:7–238:10 (admitting he did not follow a consistent methodology for conversing with school leaders, nor did he discuss the same topics across conversations). Dr. Osborne's work in these cases is neither objective nor replicable, as he conceded there is no "rubric" by which he would evaluate statements and there was no minimum number of data points he needed. *Id.* at 379:8–382:2.

Plaintiffs have failed to show that Dr. Osborne followed methods that are "published in peer-reviewed literature" and "generally accepted in the field." Opp. 43 (citing *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)).[12] An expert cannot unilaterally declare that he or she followed accepted principles to have his/her opinions admitted—it must be shown. *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) (proponent of expert "has the burden of proving admissibility"); *Greer v. T.F. Thompson & Sons, Inc.*, 2011 WL 5290154, at *5 (D. Ariz. Nov. 3, 2011) (excluding expert who "fail[ed] to demonstrate that the methods employed in this case are generally accepted in the relevant expert community"). Nor does Plaintiffs' citation to *JUUL* save Dr. Osborne. The experts there opined on industry marketing practices and the defendant's marketing practices, and analyzed the at-issue products (including scientific analysis). *In re JUUL Labs, Inc.*, 2022 WL 1814440, at *2–4. Dr. Osborne does no equivalent analysis here.[13]

## 2. The Opposition's Attempt to Paper Over Dr. Osborne's Use of AI-Hallucinated Citations Misstates the Record.

Plaintiffs concede that Dr. Osborne used artificial intelligence in drafting his reports, Opp. 45, and it is clear this resulted in fake citations. Plaintiffs' attempt to recast Dr. Osborne's use of AI as resulting

---

[12] The language from *City of Pomona* that Plaintiffs purport to quote ("published in peer-reviewed literature" and "generally accepted in the field"), *see* Opp. 43, does not appear anywhere in that decision.

[13] Plaintiffs' cited cases on expert testimony from superintendents delineate the permissible scope of such testimony—school district standards and practices, not causation. *See C.N. v. Wolf*, 2006 WL 5105270, at *1 (C.D. Cal. Nov. 13, 2006) (testimony about "school district practices and procedures"); *Walker v. Ellensburg Sch. Dist.*, 2018 WL 11468666, at *1 (E.D. Wash. Nov. 5, 2018) (testimony on industry standards for hiring in public school systems); *Hays v. Park City Sch. Dist.*, 214 F. Supp. 3d 1162, 1189 (D. Utah 2016) (testimony about administrative procedures for terminating employees); *Briscoe v. White*, 2004 WL 5488228, at *1 (M.D. Fla. May 24, 2004) (testimony about reputational harm for a teacher and the prospects of future employment). Dr. Osborne's testimony is not about school district standards but rather is an impermissible causation opinion.

in mere "formatting errors" is disingenuous at best. Opp. 47. It is flatly untrue that when this issue "came to light, he immediately acknowledged and corrected" the citations. Opp. 47. Dr. Osborne did not correct them until questioned at his deposition, when he testified he had identified incorrect citations, but had not yet corrected "a couple of places where *I found* that the references, the citation text itself is—is incorrect." Mot. Ex. 69 (Osborne Dep.) (ECF No. 2297-72) 109:22–110:15 (emphasis added).

Plaintiffs' chart detailing Dr. Osborne's fake citations, Opp. 45–46, only highlights that his original citations (in the first entry on page 45 and each entry on page 46) included erroneous information, such as the incorrect title, year, journal, author, and broken, incorrect, or missing hyperlinks. *Id.* Moreover, the Opposition's chart entirely omits perhaps the most egregious example. Dr. Osborne included in his initial rebuttal report an article that does not exist, purportedly authored by Crow, G., Miskel, C. G., & Peterson, R. L. from 1997. Mot. Ex. 51 (Osborne Am. Rep.) (2297-54) at 7 n.5. His amended rebuttal report swapped in an entirely different article with a different title, completely different authors, and a publication date two decades later, from a different journal. Opp. Ex. 109 (ECF No. 2407-117) (Osborne Am. Reb. Rep.) at 7 n.5 (now citing Clarke, S., & O'Donoghue, T. (2016)).

### 3.    The Opposition Concedes That Dr. Osborne Cannot Opine About Scientific Medical Literature or Offer Impermissible Legal Conclusions.

Plaintiffs do not respond to Defendants' argument that Dr. Osborne cannot opine about scientific medical literature. Mot. 47–48 (Defendants' challenge); *see generally* Opp. 41–47 (no response by Plaintiffs); *see also* Mot. Ex. 69 (Osborne Dep.) (ECF No. 2297-72) 284:8–18 (testifying that interpreting scientific evidence is "*best left to other experts*" (emphasis added)). They also fail to respond to the argument that Dr. Osborne is unqualified to opine about the design and engineering of online platforms. Mot. 47–48; *see generally* Opp. 41–47; Mot. Ex. 69 (Osborne Dep.) (ECF No. 2297-72) 106:13–25 ("I'm not an expert in the platform design. . . . I read literature from people who researched this. That would not make me an expert."). Plaintiffs have thus conceded that these opinions should be excluded. *See Aya Healthcare Servs.*, 613 F. Supp. 3d at 1323.

Plaintiffs similarly fail to contest that Dr. Osborne's opinion that public education is a public right is an impermissible legal conclusion. Mot. 48. This opinion should be excluded. *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1323.

DATED:  December 5, 2025

Respectfully submitted,

By:    */s/ Ashley W. Hardin*

JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
hardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and Google LLC*


*/s/ Christian J. Pistilli*
Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones (*pro hac vice*)
Paul W. Schmidt (*pro hac vice*)
Christian J. Pistilli (pro hac vice)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com
Email: cpistilli@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc. f/k/a Facebook Payments Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

/s/ John J. Nolan
ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000
VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*


/s/ David P. Mattern
GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, *pro hac vice*
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-md-03047-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (202) 737-0500
Facsimile: (202) 626-3737

BAILEY J. LANGNER (SBN 307753)
blangner@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

*Attorneys for Defendants TikTok Inc.,
ByteDance Inc., ByteDance Ltd., TikTok Ltd.,
and TikTok, LLC*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-md-03047-YGR

## **FILER'S ATTESTATION**

I, Ashley W. Hardin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:   December 5, 2025                    By: */s/ Ashley W. Hardin*