GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, *pro hac vice*
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania, NW, Suite 900
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd.,*
*ByteDance Ltd., and TikTok LLC*

[*Additional parties and counsel listed on signature pages*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL: 3047 |
| | Case No. 4:22-md-3047-YGR |
| This Document Relates to: | **DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT** |
| *Breathitt County Board of Education v. Meta Platforms, Inc., et al.* | |
| *Charleston County School District v. Meta Platforms, Inc., et al.* | Judge: Hon. Yvonne Gonzalez Rogers |
| *DeKalb County School District v. Meta Platforms, Inc., et al.* | Magistrate Judge: Hon. Peter H. Kang |
| *Board of Education of Harford County v. Meta Platforms Inc., et al.,* | Date:      January 26, 2026 |
| *Irvington Public Schools v. Meta Platforms, Inc., et al.* | Time:      8:00 a.m. |
| *Tucson Unified School District v. Meta Platforms Inc., et al.* | Place:     Courtroom 1, 4th Floor |

1

2

<u>**TABLE OF CONTENTS**</u>

I.    INTRODUCTION .................................................................................................... 1

II.   Argument .............................................................................................................. 3

      A.   The District's Causation Arguments Are Unavailing ..................................... 3

           1.   The Districts Ignore this Court's Prior Rulings on Section 230 and the First
                Amendment .................................................................................... 4

           2.   The Districts Cannot Establish a Material Dispute of Fact on Causation as to Any
                Defendant or Any District. ............................................................... 7

           3.   The Districts' Warnings Theory Cannot Save Them from Summary Judgment on
                Causation Grounds. ...................................................................... 11

      B.   Defendants Are Entitled to Summary Judgment on School Districts' Failure to Warn
           Theory. ...................................................................................... 14

           1.   Defendants Do Not Owe School Districts a Duty to Warn Them Directly. ......... 14

           2.   The Districts Cannot Recover as a Result of Defendants' Alleged Failure to Warn
                Students and Parents. ................................................................... 18

      C.   The Districts' Claims for Damages Fail. ................................................... 19

           1.   The Districts Are Not Entitled to "Lost Time" Damages. ............................. 20

      D.   The Hoover Plan is Not Available as Equitable Relief or Future Damages. .............. 21

           1.   The Districts Admit that They Have an Adequate Remedy at Law...................... 22

           2.   The Hoover Plan Is Not a Proper Abatement Remedy. ............................... 24

           3.   The Strategic Plan is Impermissibly Derivative....................................... 28

           4.   The Districts Cannot Recover the Hoover Plan as Future Damages. ................. 30

III.  Conclusion .......................................................................................... 31

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Cases:**

3

*Adams v. Comm'rs of Town of Trappe,*
102 A.2d 830(Md. Ct. App. 1954) ................................................................................. 27

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096(9th Cir. 2009) ......................................................................................... 7

*Blackshire v. County of Yuba,*
648 F. Supp. 3d 1221(E.D. Cal. 2023) ........................................................................ 11

*Brooke Grp. Ltd. V. Brown & Williamson Tobacco Corp.,*
509 U.S. 209(1993) ....................................................................................................... 21

*Brown v. Arch Wood Prot., Inc.,*
265 F. Supp. 3d 700(E.D. Ky. 2017) ............................................................................ 9

*Brown v. City of Phoenix,*
557 P.3d 321(Ariz. Ct. App. 2024) .............................................................................. 27

*Bullock v. Volkswagen Grp. of Am., Inc.,*
107 F.Supp.3d 1305(M.D. Ga. 2015) .......................................................................... 12

*Calise v. Meta Platforms, Inc.,*
103 F.4th 732 (9th Cir. 2024) ........................................................................................ 7

*Cepelak v. HP Inc.,*
2021 WL 5298022 (N.D. Cal. Nov. 15, 2021) ............................................................. 23

*CertainTeed Corp. v. Fletcher,*
794 S.E.2d 641 (Ga. 2016) ............................................................................................ 17

*In re Citric Acid Litig.,*
191 F.3d 1090 (9th Cir. 1999) ....................................................................................... 21

*City of Huntington v. Amerisource Bergen Drug Corp.,*
157 F.4th 547, 574 (4th Cir. 2025) .......................................................................... 27, 28

*Clark Equip. Co. v. Armstrong Equip. Co.,*
431 F.2d 54(5th Cir. 1970) ........................................................................................... 26

*Coleman v. Mondelez Int'l, Inc.,*
554 F. Supp. 3d 1055(C.D. Cal. 2021) ........................................................................ 22

*Davilla v. Enable Midstream Partners L.P.,*
913 F.3d 959(10th Cir. 2019) ....................................................................................... 26

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

*Dawson v. Bristol Labs.*,
1988 WL 123929 (W.D. Ky. 1988) ........................................................................ 9

*Doe 1 v. Twitter*,
148 F.4th 1168 (9th Cir. 2024) ............................................................................ 6

*Doe v. Grindr Inc.*,
128 F.4th 1148(9th Cir. 2025) .............................................................. 4, 6, 7, 15

*Dozier Crane & Mach., Inc. v. Gibson*,
644 S.E.2d 333(Ga. App. 2007) ....................................................................... 16

*Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*,
687 F.2d 877 (6th Cir. 1982) ............................................................................ 20

*Estate of Bride by and through Bride v. Yolo Tech., Inc.*,
112 F.4th 1168 (2024) .................................................................................. 7, 15

*Gourdine v. Crews*,
955 A.2d 769(Md. 2008) .................................................................................. 17

*Guaranty Trust Co. of N.Y. v. York*,
326 U.S. 99(1945) ........................................................................................... 26

*Guthrie v. Transamerica Life Ins. Co.*,
561 F. Supp. 3d 869 (N.D. Cal. 2021) ............................................................... 26

*Haltiwanger v. Barr*,
186 S.E.2d 819(S.C. 1972) .............................................................................. 30

*Hanna v. Ward Mfg.*,
2016 WL 3196467 (M.D. Fla. June 9, 2016) ..................................................... 12

*In re Hanford Nuclear Rsrv. Litig.*,
292 F.3d 1124 (9th Cir. 2002) ............................................................................ 8

*Holley v. Gilead Scis., Inc.*,
379 F. Supp. 3d 809 (N.D. Cal. 2019) ................................................................. 3

*J.N. Legacy Grp., Inc. v. City of Dallas*,
745 S.E.2d 721 (2013) ..................................................................................... 30

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) .......................................................... 27, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90(1991) ........................................................................................... 27

iii

*Kennedy Krieger Inst. v. Partlow*,
191 A.3d 425(Md. 2018) ........................................................................ 18

*Kuciemba v. Victory Woodworks*,
531 P.3d 924 (Cal. 2023) ....................................................................... 17

*Lemmon v. Snap, Inc.*,
995 F.3d 1085(9th Cir. 2021) .................................................................. 6

*Lopez-Camou v. I-Flow Corporation*,
2010 WL 11515204 (D. Ariz. April 15, 2010) ......................................... 9

*M.P. v. Meta Platforms*,
127 F.4th 516(4th Cir. 2024) ................................................................... 7

*Mauro v. Raymark Indus., Inc.*,
561 A.2d 257(N.J. 1989) ........................................................................ 30

*May v. Holzknecht*,
320 S.W.3d 123(Ky. Ct. App. 2010) ...................................................... 30

*Mayor & City Council of Baltimore v. Purdue Pharma, L.P.*,
No. 24-C-18-000515 (Md. Cir. Ct. Aug 8, 2025) ................................... 27

*MCI Comms. Servs. v. CMES, Inc.*,
728, S.E.2d 649 (Ga. 2012) .................................................................... 20

*Mobile Conversions, Inc. v. Allegheny Ford Truck Sales*,
2014 WL 7369898 (W.D. Pa. Dec. 29, 2014) ......................................... 20

*Mullins v. Appalachian Regional Healthcare, Inc.*,
707 S.W.3d 1(Ky. Ct. App. 2025) ............................................................ 8

*N.C. v. Hain Celestial Grp., Inc.*,
2023 WL 8261722 (Cal. Super. Sep. 1, 2023) ........................................ 8

*Nelson v. Matrixx Initiatives*,
2012 WL 3627399 (N.D. Cal. Aug. 21, 2012) ....................................... 10

*New Jersey Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.*,
2021 WL 6144081 (D.N.J. Dec. 30, 2021) ............................................. 17

*Orr v. Bank of Am. NT & SA*,
285 F.3d 764(9th Cir. 2002) .................................................................. 21

*Ostrovskaya v. St. John Knits, Inc.*,
2022 WL 2102895 (C.D. Cal. Mar. 31, 2022) ................................. 22, 26

iv

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.,*
2007 WL 1576120 (D. Minn. May 31, 2007) ............................................. 28

*Paddack v. Dave Christensen, Inc.,*
745 F.2d 1254(9th Cir. 1984).......................................................... 11, 21

*Parris v. 3M Co.,*
595 F. Supp. 3d 1288(N.D. Ga. 2022) ........................................... 15, 18, 19

*Quiroz v. ALCOA Inc.,*
416 P.3d 824(Ariz. 2018)..................................................................... 17

*Rhynes v. Stryker Corp.,*
2011 WL 2149095 (N.D. Cal. May 31, 2011) ....................................... 24

*Roper v. Big Heart Pet Brands, Inc.,*
510 F.Supp.3d 903(E.D. Cal. 2020)..................................................... 22

*Ruggiero v. Yamaha Motor Corp., USA,*
2017 WL 1197755 (D.N.J. Mar. 31, 2017)............................................ 12

*Sanderson v. Int'l Flavors & Fragrances, Inc.,*
950 F. Supp. 981(C.D. Cal. 1996) ........................................................ 8, 9

*Setliff v. E. I. Du Pont de Nemours & Co.,*
32 Cal. App. 4th 1525(1995) ................................................................ 9

*In re Silicone Gel Breast Implants Prods. Liab. Litig.,*
318 F. Supp. 2d 879(C.D. Cal. 2004)..................................................... 10

*Sims Snowboards, Inc. v. Kelly,*
863 F.2d 643(9th Cir. 1988).................................................................. 26

*Sonner v. Premier Nutrition Corp.,*
971 F.3d 834(9th Cir. 2020)....................................................... 23, 25, 26

*Spaw, LLC v. City of Annapolis,*
156 A.3d 906(Md. Ct. App. 2017) ........................................................ 27

*Stafford v. Seale,*
2009 WL 3390172 (Ariz. Ct. App. Oct. 21, 2009) ................................ 27

*State of Maryland v. Exxon Mobil Corp.,*
406 F. Supp. 3d 420(D. Md. 2019) ...................................................... 17

*Stringer v. Nat'l Football League,*
749 F.Supp.2d 680 (S.D. Ohio 2009) ................................................... 19

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

*Sullivan v. Daimler Trucks N. Am., LLC*,
2019 WL 13563633 (D.S.C. Aug. 28, 2019) .................................................................. 12

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016) .......................................................................................... 23

*United States v. Kimbell Foods, Inc.*,
440 U.S. 715(1979) ........................................................................................................ 26

*United States v. Price*,
688 F.2d 204 (3d Cir. 1982) ........................................................................................... 26

*United States v. Raines*,
189 F. Supp. 121(M.D. Ga. 1960) ................................................................................. 28

*USA Truck, Inc. v. Sullair, LLC*,
2020 WL 12656229 (M.D. Ga. Dec. 7, 2020) ............................................................... 18

*Weinberger v. Romero-Barcelo*,
456 U.S. 305(1982) ........................................................................................................ 22

*White v. Celotex Corp.*,
907 F.2d 104(9th Cir. 1990) ............................................................................................ 9

*Wilder v. Blue Ribbon Taxicab Corp.*,
719 S.E.2d 703(S.C. Ct. App. 2011) ............................................................................. 30

*Williams v. Schneider Elec. USA, Inc.*,
2023 WL 4374514 (Ky. Ct. App. July 7, 2023) ...................................................... 16, 17

*Wood v. Marathon Refining Logistics Serv. LLC*,
2024 WL 2242688 (N.D. Cal. Mar. 21, 2024) ............................................................... 23

*Zayo Grp, LLC v. Solutions Fiber Optic, Inc.*,
2025 WL 2157902 (E.D. Va. July 11, 2025) ................................................................. 20

**Other Authorities:**

Restatement (Second) of Torts § 431 (1965) ....................................................................... 5
Fed. R. Civ. 56(c)(1)(A) ....................................................................................................... 5
Fed. R. Evid. 703 .......................................................................................................... 11, 21
Fed. R. Evid. 801 ................................................................................................................ 21
Fed. R. Evid. 802 ................................................................................................................ 11

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1    **I.      INTRODUCTION**

2            The school district plaintiffs (the "Districts") previously told this Court that they incurred

3    substantial out-of-pocket expenses as "the first responders in the health crisis caused by

4    Defendants' social media platforms." Opp. to Motion to Dismiss (ECF 668).[1]  They also told this

5    Court that their claims are not based on content or third-party conduct, but rather on specific

6    features of Defendants' platforms.   The Districts' Omnibus Opposition and district-specific

7    oppositions confirm that both are untrue.   None of the six bellwether plaintiffs incurred any

8    expenses or suffered other compensable harms because of Defendants' platforms, let alone

9    Defendants' actionable conduct.  None hired any new personnel because of Defendants' platforms.

10   Four of the six bellwether districts (Breathitt, Charleston, DeKalb, Harford) now admit that they

11   have not incurred any out-of-pocket expenses for "new and increased mental health resources"

12   related to Defendants' platforms.[2]  Om. Opp. (ECF 2354) 198.   That stunning admission alone

13   requires summary judgment on those Districts' claims for increased mental health expenditures.

14           To distract from the absence of evidence tying Defendants' actionable conduct to concrete

15   harm suffered by these six specific plaintiffs, the Districts needlessly and inappropriately devoted

16   more than two-thirds of their 217-page omnibus briefing (146 pages) to an irrelevant parade of

17   cherry-picked snippets from over 1,000 company documents and deposition transcripts that do not

18   address the arguments Defendants raised in their motions. And as for the issues Defendants'

19   motions actually put at issue, the Districts have no admissible evidence:

20           **(1) The Districts failed to establish specific causation.**  The Districts have no competent

21   evidence establishing a causal connection between Defendants' actionable conduct and demonstrated

22   harms to these six specific Districts.  Instead, they overwhelmingly rely on evidence of third-party

23   content and protected publishing activity, which ignores the Court's rulings that Section 230 and the

24   First Amendment limit the type of conduct for which Defendants may be held liable.  The Districts

---

[1] Cited ECF numbers are from the MDL case docket (4:22-md-03047-YGR), except for citations to exhibits to Defendants' district-specific motions, which are from the case-specific dockets.

[2] The other two bellwether plaintiffs (Tucson, Irvington) have not provided any admissible evidence to link Defendants' actionable conduct to their claims for minimal damages from mental health expenditures.

try, but fail, to sweep aside their evidentiary failures by arguing that they can recover based on Defendants' platforms as a whole under their failure-to-warn theory. But that claim fails for the independent reason that the Districts have no admissible evidence that a warning would have made a difference in preventing their injuries.[3]

**(2) There is no duty to warn running to and enforceable by school districts**. The Districts cannot show that Defendants owed a duty to warn the Districts or a duty to warn their students and parents that is enforceable by the Districts. The cases cited in the Districts' oppositions are inapposite and, for Breathitt and Tucson, the Districts cite *no cases* to support their novel claim.

**(3) The Districts' theories of recovery are legally and factually deficient.** The state law applicable to each District does not permit the recovery of "lost time" damages here, and the Districts' citation to federal case law interpreting other states' laws do not save their claims. Nor can the Districts recover as future damages expenses relating to the "strategic plans" created by their expert, Dr. Sharon Hoover, because (1) they cannot show a reasonable certainty they will incur those expenses, and (2) state law does not support this novel attempt recover for future injuries that have not yet occurred, as opposed to damages tied to an existing injury. The Districts brazenly suggest that, if not as future damages, they should be awarded the plan as an equitable "abatement" remedy. Such a claim is foreclosed by binding Ninth Circuit authority, which conditions equitable relief on the lack of an adequate remedy at law. And even if these past or future expenses were recoverable as a matter of law, the Districts adduced only inadmissible and speculative hearsay evidence to support their claims.

In short, if these six specific Districts had evidence that they suffered concrete harms resulting from Defendants' actionable conduct, they could and should have come forward with it in opposition to Defendants' motions. Rather than do so, they devoted the vast majority of their brief to sensationalist mischaracterizations of company documents and testimony on irrelevant issues. While Defendants vigorously dispute the Districts' slanted characterization of those materials, a point-by-point response is unnecessary because the factual disputes are about issues

---

[3] Defendants also pointed out that, if the Districts' general causation experts are excluded, that would be an independent basis to grant summary judgment. *E.g.*, Breathitt Mot. (ECF 2288) 17.

1   not raised in Defendants' Motions.[4]  Regardless, none of Plaintiffs' efforts refute Defendants'

2   arguments or show that genuine disputes of fact exist on the relevant issues.  As such, summary

3   judgment is warranted in Defendants' favor.

4   **II.    ARGUMENT**

5       **A.    The District's Causation Arguments Are Unavailing**

6       In 217 pages of omnibus briefing, the Districts do not identify *any* competent evidence—

7   whether fact or expert testimony—that any specific Defendant's actionable conduct caused any

8   specific District's alleged harms.[5]  Instead, the Districts spend the vast majority of their Omnibus

9   Opposition describing and criticizing the various features and designs of Defendants' platforms and

10  Defendants' alleged motives, Om. Opp. 12–185, but never explain how Defendants' internal

11  documents and witness testimony meet their burden to show specific causation—that is, that a

12  particular Defendant's actionable conduct caused a particular District's alleged harm.

13      Beyond those irrelevant materials, the Districts rely on three groups of evidence and

14  argument that do not create a genuine dispute of material fact.

15      *First*, the Districts point to evidence of harms flowing from third-party content or protected

16  publishing activity, despite the fact that the Court already held that Defendants cannot be liable for

17  injuries flowing from such conduct.

18      *Second*, the Districts argue that Defendants' platforms, "social media," and cellphones as a

19  whole are capable of causing harms, but this ignores their burden to show that *each* Defendant's

20  *actionable* conduct caused *each* specific District's harms.  Even assuming the Districts' experts can

21

22  _____

    [4] Defendants' motions sought summary judgment on the Districts' claims against Instagram, LLC
23  on the ground that Meta Platforms, Inc.—and not Instagram, LCC—is the owner and operator of
    the Instagram platform.  Because the Districts' opposition to the argument concerning Instagram,
24  LLC is made only in a footnote, the Districts' argument is waived. *Holley v. Gilead Scis., Inc.*, 379
    F. Supp. 3d 809 (N.D. Cal. 2019) (argument "raised only in footnotes … are generally deemed
25  waived).  In any event, the Districts' evidence does not contradict Defendants' showing, based on
    a 30(b)(6) deposition by written question that specifically addressed issues of Meta's corporate
26  structure, that only MPI is responsible for operating Instagram and that Instagram, LLC merely
    "hold[s] certain Instagram intellectual property."  Breathitt Mot. Ex. 35 (Meta Objs. To Rule
27  30(b)(6) Written Questions) (ECF 2297-38) 21–22, 25.  The Court should therefore grant summary
    judgment in favor of Instagram, LLC.

28  [5] As explained in Defendant's motions, "actionable conduct" means "(1) Defendants' use of the at-
    issue features and (2) Defendants' alleged failure to warn."  *E.g.*, Breathitt Mot. 9–11.

3

1    create a triable issue of fact as to general causation based on "social media" or cellphones writ large,

2    the Districts' experts offer no opinions on whether a Defendant's actionable conduct caused any

3    specific Districts' harms.  The Districts thus cannot create a triable issue of fact on specific causation.

4        *Third*, while the Districts point to their failure-to-warn allegations in an attempt to save their

5    claims, they present no evidence that Defendants' alleged lack of warning would have made any

6    difference to the economic injuries they allege.

### 1.    The Districts Ignore this Court's Prior Rulings on Section 230 and the First Amendment

7

8        The Districts' assertion that they can establish causation merely by showing that "each

9    Defendant's platform contributed to their alleged harm," Om. Opp. 194, ignores this Court's prior

10   ruling that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs'

11   theories of recovery," First SD Order (ECF 1267) 2.  Under the Court's prior ruling, the Districts

12   must show that (1) Defendants' use of the non-protected features—or, potentially, failure to provide

13   warnings[6]—caused the Districts' students to engage in "compulsive use" of Defendants' platforms,

14   and (2) their students' "compulsive use *itself*, irrespective of third-party content, [of] defendants'

15   protected publishing activity and defendants' protected first-party speech," caused the Districts to

16   "expend resources."  *Id.* at 972, 975 & n.25.  Tellingly, the Districts do not claim to be able to meet

17   this standard, but instead seek to evade it.  The Court should reject the Districts' efforts: as the

18   Districts themselves point out, the Court's prior rulings are the "law of the case."  Om. Opp. 9.

19       The Districts repeatedly emphasize that the Restatement's "substantial factor" test applies

20   in each of the relevant jurisdictions.  *Id.* at 190, 193–94.  Even assuming that is true, the test

21   demonstrates exactly why the Districts cannot prevail.  Under that test, a defendant's "negligent

22   conduct" cannot be a "legal cause of harm" where a "rule of law reliev[es] the [defendant] from

23

---

24   [6] Defendants respectfully submit that they do not owe (i) any duty to warn school districts directly, and (ii) even assuming that Defendants owe a duty to warn student users or their parents, school
25   districts cannot recover for that alleged failure.  *See infra* Section II.B.2.  In light of an appeal by Meta and TikTok pending before the Ninth Circuit, this Court deferred briefing on this issue at
26   summary judgment.  Defendants reserve their right to argue that that they are entitled to summary judgment on the Districts' failure-to-warn claim that arises from third-party content or protected
27   publishing activities for the threshold reason that they are barred by Section 230 pending resolution of that appeal.  *See, e.g.*, Breathitt Mot. 34–35, 37; *see also Doe v. Grindr Inc.*, 128 F.4th 1148,
28   1154 (9th Cir. 2025) ("Grindr's role as a publisher of third-party content does not give it a duty to warn users of 'a general possibility of harm' resulting from the App.").

4

liability because of the manner in which [its alleged] negligence has resulted in the harm"—a prong that the Districts conspicuously ignore. Restatement (Second) of Torts § 431 (1965). Section 230 and the First Amendment are such rules of law: liability can be imposed on Defendants only by virtue of their *actionable conduct*. *See* First SD Order 13–14. Accordingly, to satisfy their burden on summary judgment, the Districts needed to come forward (at a minimum) with evidence that each Defendant's actionable conduct—as opposed to students' exposure to Defendants' platforms generally—contributed to the Districts' alleged injuries.

The Districts have no such evidence. Although they blithely assert that "the record contains ample evidence trying [*sic*] particular platform features to the harms suffered," the only record support they provide is a cross-reference to Section "III.A.2"—which is 176 pages and cites hundreds of exhibits across all four Defendants. Om. Opp. 190. As an initial matter, the Districts cannot create a genuine dispute of material fact by merely pointing to a document dump. *See* Fed. R. Civ. P. 56(c)(1)(A) (party asserting that a fact is genuinely disputed must support the assertion by "citing to *particular parts* of materials in the record" (emphasis added)); *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("A party opposing summary judgment must direct our attention to specific, triable facts."). This is particularly true because most of the features discussed in that Section—including algorithms, infinite scroll, notifications, and autoplay—are the very features that the Court held are protected by Section 230 and/or the First Amendment. *Compare* Om. Opp. 12–185, *with* First SD Order 13–14. Moreover, nothing in that lengthy section even purports to show harm *to the six bellwether plaintiffs* arising from any particular at-issue features (or even generally).

Indeed, the record is devoid of evidence that Defendants' alleged failures to implement "robust age verification processes" or "effective parental controls [or] notifications"—or any of the other "at-issue features"—caused harm to any of the Districts. Rather, as outlined in Defendants' briefs, any competent evidence of injury flowing to the Districts from student use of Defendants' platforms specifically or even social media generally is inextricably linked to third-party content and bad acts. *See, e.g.*, Breathitt Mot. 12–16; Harford Mot. (ECF 2296) 13–20.

Contrary to the Districts' assertions, Om. Opp. 190–91, Section 230 case law—and this Court's prior rulings—confirm that they may not rely upon the effects of Defendants' publication of content in trying to prove that Defendants caused their injuries. Holding the Districts to the Court's prior rulings and established case law is not an attempt to "graft a 'but-for' test onto Section 230," but simply to require the Districts to show that their harms are caused by the actionable features and not just caused by content or third-party content. Om. Opp. 190. The Ninth Circuit recently rejected a plaintiff's similar "but-for" argument. It held that, unlike in *Lemmon*—where the alleged design flaw (a speedometer filter that allegedly encouraged dangerous driving) was "fully independent of [defendant's] role in monitoring or publishing third-party content"—the challenged platform features were "not independent of [the platform's] role as a facilitator and publisher of third-party content." *Grindr*, 128 F.4th at 1153 (internal quotations omitted). In such a case, it was "analytically insignificant whether Doe's injuries would not have occurred 'but for' Grindr's role as a publisher." *Id.* at 1153 n.3; *see also Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021) (where claims, "at bottom, depend[] on a third party's content," no "liability . . . exist[s]"). That is also the case here where the Court has already analyzed each of the features at issue, identified those protected publishing features that meet this test on the record then before the Court, and held that the Districts cannot assert claims on the theory that those features are defective or otherwise harmful.[7] First SD Order 13–14; PI Order (ECF 430) 14–16. The Court likewise found that the Districts cannot base liability on "non-foreseeable third-party conduct." First SD

---

[7] Contrary to the District's suggestion (Opp, 192), the Ninth Circuit's decision in *Doe 1 v. Twitter*, 148 F.4th 635 (9th Cir. 2025) is in accord. In *Doe 1*, the court held that Section 230 barred product liability claims that Twitter "designed an unreasonably dangerous product" by failing to block CSAM while it was being investigated and using "search features and hashtags" that amplified CSAM on the platform. *Id.* at 643, 645–47. Section 230 applied even though those claims were framed as challenging design choices because, at bottom, they sought to hold the company "liable for developing content-neutral tools used to facilitate communications." *Id.* at 646 (quoting *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). In contrast, the court permitted only narrow allegations that Twitter should have offered certain additional features to allow users to report CSAM, which "relate[d] *solely* to product design" and would not require any "monitoring, removing, or in any way engaging with third-party content." *Id.* at 645 (emphasis added). Therefore, *Doe 1* confirms this Court's rulings that Section 230 protects all features of Defendants' platforms that involve their "roles as publishers of third-party content." PI Order 16.

1  Order 25–26.  The Districts now invite the jury to premise liability on those same protected features

2  and third-party content.

3      The Districts' related assertion that "Section 230 was never intended to bar claims simply

4  because content exists in the background," Om. Opp. 192, is a red herring.  The issue is not that the

5  Districts have not "rule[d] out" content—it is that they have not ruled in Defendants' actionable

6  conduct as a potential substantial causative factor, standing alone.[8]  Instead, the only injuries to the

7  six Districts even arguably supported by competent record evidence are "inextricably intertwined"

8  with the "publication of third-party speech."  *M.P. v. Meta Platforms, Inc.*, 127 F.4th 516, 525 (4th

9  Cir. 2024).  Because the Districts cannot recover for such injuries as a matter of law, summary

10  judgment is warranted.[9]

### 2.   The Districts Cannot Establish a Material Dispute of Fact on Causation as to Any Defendant or Any District.

12      The Districts' claims fail for the independent reason that they lack evidence establishing

13  causation as to any specific Defendant or particular bellwether district.  Generalized evidence that

14  purportedly shows that the use of Defendants' platforms is capable of causing harm to students (or

15  schools)—or even that Defendants allegedly knew that their platforms could cause harm—is

16  insufficient to create a triable issue of material fact on specific causation.   Rather, the Districts

[8] The Districts' citation to *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), Om. Opp. 192, is inapposite.  The portion of the Ninth Circuit's holding in that case finding Section 230 inapplicable was expressly based on the fact that it involved *contract* claims; in fact, the court held that Section 230 barred all of the case's non-contractual claims.  *Id.* at 743, 746.  The Ninth Circuit has held that Section 230 analysis is simply "different" for contract claims than for tort claims.  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009).  *Calise*'s reasoning thus has no bearing on this *tort* case, which includes no contract-based claims, and certainly does not allow the Districts to circumvent this Court's ruling that Plaintiffs' challenges to certain features are barred by Section 230 and the First Amendment.  Further, *Grindr* and *Bride* make clear that, notwithstanding the *dicta* from *Calise* cited by the Districts, if a claim requires the service provider to consider the nature of the content in order to determine whether a warning is needed, that claim is barred.  *See Est. of Bride by and through Bride v. Yolo Tech., Inc.*, 112 F.4th 1168, 1180–82 (9th Cir. 2024); *Grindr*, 128 F.4th at 1154.

[9] The Districts' cryptic assertion that "evidence concerning features shielded by Section 230 remains relevant for context," Om. Opp. 195, likewise fails to rescue their claims.  The question now before the Court is not what evidence the jury should be permitted to hear, but whether the Districts have satisfied their burden.  Whether or not evidence regarding the protected features is "relevant for context," each District cannot satisfy its burden on summary judgment without coming forward with evidence that each Defendant's actionable conduct—which necessarily excludes the features "shielded by Section 230"—caused it harm.

need admissible evidence that each Defendant's actionable conduct caused each individual District harm. *See In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1134 (9th Cir. 2002) ("[P]laintiffs must establish both generic *and* individual causation. This means that they must establish not only that the toxic substances released from Hanford are capable of causing the conditions complained of, but in addition, that Hanford emissions were the cause-in-fact of their specific conditions.") (emphasis in original). The Omnibus Opposition fails to cite any competent evidence establishing specific causation.

     ***The Districts Cannot Show Causation as to Each Defendant.*** As Defendants explained in their Motions, under each jurisdiction's state law, the Districts must show that *each Defendant*'s actionable conduct caused them harm. *See, e.g.*, *Mullins v. Appalachian Reg'l Healthcare, Inc.*, 707 S.W.3d 1, 8 (Ky. Ct. App. 2025) (to survive summary judgment, a plaintiff must come forward with evidence "that *each defendant* both violated the standard of care and that the *violation caused* [*the plaintiff's*] *injuries*" (emphasis added)). Evidence (purportedly) establishing harm flowing from "social media" or cellphone use generally cannot satisfy the Districts' burden of proving that each Defendant's actionable conduct caused or contributed to the Districts' alleged harms as a matter of law.

     *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 985 (C.D. Cal. 1996), is instructive. There, plaintiff sued various fragrance manufacturers, alleging that exposure to their products caused her personal injuries. The court found that there was sufficient evidence from which a jury could "find that defendants' products, *as a whole*, were a substantial factor in causing her injuries." *Id.* at 985 (emphasis in original). The Court nevertheless granted summary judgment because there was "no evidence whatever from which a jury could find that any particular defendant's products were" a cause of plaintiffs' injuries. *Id.* The same is true here: even assuming that there is evidence that social media or electronic device use "as a whole" caused injuries to the Districts, there is no evidence that any particular Defendant's actionable conduct injured any particular bellwether plaintiff. *See also N.C. v. Hain Celestial Grp., Inc.*, 2023 WL 8261722, at *4–5 (Cal. Super. Sep. 1, 2023) (applying *Sanderson* and granting summary judgment where "Plaintiff simply has no evidence, quantitative or qualitative, that would permit a factfinder to

1    determine that any defendant's conduct was itself [a] substantial factor contributing to an

2    indivisible harm"); *Setliff v. E. I. Du Pont de Nemours & Co.*, 32 Cal. App. 4th 1525, 1536 (1995)

3    (affirming summary judgment where plaintiff could not "identify 'the specific chemicals or toxics

4    involved in his injury'" and failed to join all potential tortfeasors).

5            Contrary to the Districts' arguments, the jury cannot reasonably "infer" liability from

6    evidence regarding "social media" generally simply because Defendants' platforms are the "most

7    popular social media platforms used by American youth." Om. Opp. 188–90.  Such an "inference"

8    is not supported in the record and would ignore the need for each District to prove that its injury

9    was caused by each Defendant's actionable conduct.  *Id.*  In effect, the Districts invite the Court to

10   impose "market share liability" on Defendants.  But that unpled theory is not available in most

11   jurisdictions.  *See, e.g.*, *Brown v. Arch Wood Prot., Inc.*, 265 F. Supp. 3d 700, 707 n.10 (E.D. Ky.

12   2017) ("Kentucky law does not recognize a market share liability theory to bridge the causation

13   gap." (citing *Dawson v. Bristol Labs.*, 1988 WL 123929, at *1 (W.D. Ky. 1988)); *Lopez-Camou v.*

14   *I-Flow Corporation*, 2010 WL 11515204, at *4 n.2 (D. Ariz. April 15, 2010) ("the market share

15   theory of liability has never been recognized in Arizona." (citing *White v. Celotex Corp.*, 907 F.2d

16   104, 106 (9th Cir. 1990)).  And it only applies to "fungible goods made from an identical formula"

17   or in cases where *all* potential tortfeasors are named, which is not the case here.  *E.g.*, *Sanderson*,

18   950 F. Supp. at 990–91.  In short, the Court should reject the Districts' request to bypass individual

19   proof and infer liability simply because Defendants' platforms collectively represent a significant

20   portion of the overall market.

21           ***The Districts Cannot Show Causation as to Each District.***  Contrary to their claims, the

22   Districts cannot identify evidence "showing that each District was foreseeably harmed by

23   widespread, problematic use of Defendants' platforms." Om. Opp. 188. The Omnibus Opposition

24   does not cite any District documentary evidence or even fact witness testimony in support of this

25   assertion that they suffered harm—let alone that they suffered harm as a result of Defendants'

26   actionable conduct.  Instead, they gesture to the entirety of their "breach" argument section by

27

28

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

including an unadorned cross-reference to Section "III.A.2." As discussed above, however, nothing in that section purports to establish actionable harm to any of the six bellwether plaintiffs.[10]

Beyond that cross-reference, the Districts' only cited evidence are six expert reports. Four of those experts (Christakis, Goldfield, Lembke, and Telzer) are general causation experts who do not offer any opinions whatsoever about actual harm to specific school districts (or specific students). *See* Motion to Exclude GC Experts (ECF 2295) 7–14, 21–35, 51–58 (summarizing experts' opinions). The fifth expert, former school superintendent Brian Osborne, testified unequivocally at his deposition that he was not offering any opinions about harms to the six bellwether plaintiffs. *See* SD Daubert Ex. 110 (Sept. 4, 2025 Osborne Dep.) (ECF 2407-119) 138:6–10 ("Looking at the effects of social media and its use on the six districts in particular was not within the scope of my task."), 166:11, 167:12–17 (he "didn't review any data or documents related to the six specific districts"). Even assuming these expert reports create a triable issue of fact on general causation, they do not create a triable issue as to *specific* causation because they say nothing about whether or how Defendants' actionable conduct (or protected conduct, for that matter) harmed any of the six bellwether school districts. *See Nelson v. Matrixx Initiatives*, 2012 WL 3627399, at *13 (N.D. Cal. Aug. 21, 2012), *aff'd sub nom. Nelson v. Matrixx Initiatives, Inc.*, 592 F. App'x 591 (9th Cir. 2015) ("Even assuming there is a triable issue on general causation, this does not create a genuine issue on specific causation. This is because there is a difference between determining whether scientific evidence supports an inference that the alleged exposure is capable of causing the type of injury in humans versus whether it was the most likely cause of the alleged injury in plaintiff."); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 922 (C.D. Cal. 2004) (granting summary judgment where plaintiff failed to offer admissible expert testimony of specific causation).

Lastly, the Districts cite the reports of Dr. Sharon Hoover, which in relevant part report the results of interviews she conducted with unidentified "key informant[s]" for each of the six

---

[10] The Districts also cite evidence in the oppositions for the individual Districts, but for the reasons explained in Defendants' individual replies, none of that evidence carries the Districts' burden.

bellwether plaintiffs.[11]  As an initial matter, the Districts may not rely on the interviews summarized in the reports—as they clearly try to do—for the truth of the matters asserted therein.  *E.g.*, *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984) ("An expert is permitted to disclose hearsay for the limited purpose of explaining the basis for his expert opinion, Fed. R. Evid. 703, but not as general proof of the truth of the underlying matter, Fed. R. Evid. 802." (citation and internal quotation marks omitted)).  This is especially so because the hearsay statements in question do not even identify the declarant or his/her role in the District, much less the basis for the statements.  *See Blackshire v. Cnty. of Yuba*, 648 F. Supp. 3d 1221, 1232 (E.D. Cal. 2023) (declining to consider hearsay at summary judgment because "no individual [was] identified as the declarant").  In any event, none of the cited portions of Dr. Hoover's reports establishes that the Districts expended resources in response to the student harms she purports to catalog.[12]

> ### 3.    The Districts' Warnings Theory Cannot Save Them from Summary Judgment on Causation Grounds.

Even if Defendants had a duty to warn school districts directly about potential risks to students from use of the platforms (they do not, *see infra* Section II.B.1), the Districts have no admissible evidence showing Defendants' alleged failure to warn caused their injuries.

*First*, the Districts have no fact or expert evidence on what type of warning would have prevented the Districts' alleged harm.  The Districts refer to the expert reports of Dr. Noar and Tim Estes, but neither of them opined that Defendants should give warnings directly to school districts.  *See* Om. Opp. 12 (citing Om. Opp. Ex. 997 (Noar Rep.) (ECF 2394-47) ¶¶ 214–64; Om. Opp. Ex. 989 (Estes Opp.) (ECF 2394-39) ¶ 316).  And no witness—fact or expert—testified as to what a warning directly to the Districts should have said, to whom it should have been given, or how, where, or when it should have been communicated.  *E.g.*, Breathitt Mot. 36.  The Districts insist that they do not need expert testimony on the "adequacy" of the warnings to school districts because

---

[11] *E.g.*, Om. Opp. Ex. 1093 (Hoover DeKalb Rep.) (ECF 2397-43) ¶¶ 47, 53-55.

[12] The Districts also cite paragraph 30 of Dr. Hoover's general report.  Om. Opp. 188.  That paragraph stands for the proposition that "[t]oday's youth are frequently on social media."  Om. Opp. Ex. 1000 (Hoover General Rep.) (ECF 2394-50) ¶ 30. That proposition self-evidently says nothing about harm to the six bellwether school districts.

Defendants did not provide any such warnings, Om. Opp. 11,[13] but the adequacy of any warnings is not at issue. The point is that, without any evidence in the record at all of what a warning should have said, or to whom or when it should have been given, the Districts' claim that a warning would have prevented the alleged harm is mere speculation.

The cases cited by the Districts on this point, Om. Opp. 11, are inapposite. Those cases involved a jury determining whether a manufacturer should have placed a warning of a known danger directly on a product for the benefit of direct users. *See Bullock v. Volkswagen Grp. of Am., Inc.*, 107 F.Supp.3d 1305, 1316 (M.D. Ga. 2015) (warnings expert not necessary in case involving whether automobile manufacturer should have warned driver); *Ruggiero v. Yamaha Motor Corp., USA*, 2017 WL 1197755, at *10 (D.N.J. Mar. 31, 2017) (expert testimony not needed where only issue as to warnings was whether warnings on a jet ski were reasonably visible to a user); *Hanna v. Ward Mfg. Inc.*, 2016 WL 3196467, at *2 (M.D. Fla. June 9, 2016) (expert testimony not required to prove if manufacturer of steel tubing should have warned homeowner of risk of fire).[14] Here, by contrast, school districts themselves may not be users of or have any direct interaction with Defendants (and at the very least are not seeking damages based on their own use); the issue of what warning might have made a causal difference and what it should have said and to whom and when it should have been given is therefore not a matter for a lay jury to determine on its own.

*Second*, the Districts attempt to plug the hole in their evidence by relying on the heeding presumption. As discussed in more detail in the individual District replies, that presumption is not available in all the Districts (e.g., South Carolina), and even where it is available, the presumption is rebutted by undisputed record evidence that the Districts still have not taken the steps they say would have taken in the face of an adequate warning, even years after filing their lawsuits. And

---

[13] The Districts assert that Defendants "do not dispute that they provided no warnings about the risks [of] their platforms" and "present no evidence that they warned the Districts' students and their parents [or schools] about the risks associated with Defendants' platforms." Om. Opp. 9, 11. Not true. Defendants' position is that they provided more than adequate information about their platforms and tools to adequately manage screentime and content viewed. But that factual dispute is not relevant to Defendants' motion for summary judgment.

[14] One case cited by the Districts is about the *type* of expert needed, not whether any expert testimony was needed. *See Sullivan v. Daimler Trucks N. Am., LLC*, 2019 WL 13563633, at *7 (D.S.C. Aug. 28, 2019) (expert testimony from door-latch expert, rather than a "human factors" expert, was sufficient to support driver's failure to warn claim against truck manufacturer).

even if there were a factual dispute about what the Districts would have done in the face of an adequate warning, there is no legal authority for applying a *second level* of heeding and presuming what *students* and *parents* would have done differently had the Districts been warned. Without that evidence, the Districts cannot show that even had they taken action in response to warnings, *see* Om. Opp. 10–12, that those actions would have caused any students to use the platforms less, experience fewer mental health harms, or cause fewer classroom disruptions. And while some Districts blithely assert that they might have instituted a school-day cell phone ban earlier, the Districts themselves claim that cell phone bans would not necessarily reduce their injuries. *See, e.g.*, Harford Opp. (ECF 2395) 10–11.

For similar reasons, the Districts cannot recover for Defendants' alleged failure to warn *students* and *parents*. They have no evidence that the thousands of unidentified students and parents in each District would have heeded a warning and thereby reduced harm to the Districts. They do not cite any evidence that an allegedly adequate warning would have caused even a single student in a District to use Defendants' platforms less or to suffer fewer mental health harms or cause fewer classroom disruptions, much less that such a significant number of students would have done so, resulting in materially fewer resources expended by the Districts. At this stage, that is fatal to any claim predicated on a failure to warn students or parents. *See infra* Section II.B.2.

\*     \*     \*

The Districts' remaining causation arguments attack straw men. Defendants do not argue that the Districts must produce evidence "apportioning a precise percentage of liability to each Defendant" or "measuring their students' use by platform, duration, and even feature." Om. Opp. 187, 189. Nor do Defendants argue that the Districts must "perfectly isolate the harm caused by each platform" or that Defendants are entitled to summary judgment on the basis of evidence of alternative causes. *Id.* at 193, 200. To be sure, it is highly relevant that the Districts cannot differentiate their students' use of technology generally from use of Defendants' platforms and lack competent evidence that a significant number of their students have used one or more of Defendants' platforms in a way that harmed the student's mental health or caused classroom

distractions.[15]  Defendants, however, do not seek "to dictate the form" that the Districts' causation evidence must take.  *Id.* at 187.  Rather, Defendants' point is simply that the Districts bear the burden of coming forward with some admissible evidence that each Defendant's "actionable conduct"—as opposed to social media or cellphone use generally, third-party content, third-party conduct, or Defendants' protected publishing activities—caused the Districts' alleged harms.  Because they have failed to do so, Defendants are entitled to summary judgment on causation.

**B.    Defendants Are Entitled to Summary Judgment on School Districts' Failure to Warn Theory.**

**1.    Defendants Do Not Owe School Districts a Duty to Warn Them Directly.**

As Defendants established in their motions, there is no authority in any of the six jurisdictions that has imposed a duty to warn a plaintiff who is a non-user of a defendants' product that a third-party's use of the product might cause financial injury to the plaintiff.  Faced with this total lack of authority, the Districts now shift and focus primarily on the contention that Defendants should have warned them more generally about the alleged serious mental health risks to their students.  But they have no authority for that contention, either.  Nor can the Districts recover for Defendants' alleged failure to warn parents or students of those alleged risks.

**a)    The Court's Motion to Dismiss Ruling Does Not Support Finding a Duty of Defendants to Warn the Districts.**

The Opposition rests on the mistaken assertion that the Court's motion to dismiss ruling established that Defendants owe school districts a duty to warn them of alleged mental health risks to students from use of their platforms.  Om. Opp. 4.  But the Court's prior orders addressed solely whether Section 230 bars a failure-to-warn claim.  *See* First SD Order at 13–14.[16]  Defendants'

---

[15] Breathitt Mot. 12–20; Tucson Mot. (ECF 2290) 14–25; Charleston Mot. (ECF 2293) 13–23; Irvington Mot. (ECF 2294) 13–21; DeKalb Mot. (ECF 2289) 12–22; Harford Mot.13–23.

[16] While the Court can resolve Defendants' motion on the ground that Defendants do not owe school districts a duty in tort to warn, Defendants also maintain that Section 230 and the First Amendment bar the Districts' failure to warn claims.  The Court has indicated it will defer resolution of that issue pending the appeal by Meta and TikTok, but if this issue is to be considered at this time, controlling Ninth Circuit law makes clear that failure to warn claims are barred by Section 230 to the same extent as product defect, negligence, and consumer protection claims premised on the same underlying publishing activity.  *See* Defendants' Reply in Support of their Motion to Exclude

14

current argument is that, regardless of whether Section 230 independently bars the Districts' claims, the Districts' warning theory independently fails because Defendants have no tort duty to warn school districts of alleged harms to their students resulting from the students' use of Defendants' platforms. None of the Court's prior rulings addressed that question.[17]

Nor does the Court's prior analysis of whether Defendants owe a general duty of care control the present question of whether Defendants owe a separate duty to warn school districts about alleged mental health harms that could result for some students. Breathitt Mot. 35. None of the cases relied on by the Court in its prior analysis found a duty to warn a plaintiff in the circumstances at issue here, *id.*, and even the cases cited by the Districts establish that the general duty analysis is separate from whether a duty to warn exists. *See, e.g.*, *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1327, 1335 (N.D. Ga. 2022) (analyzing whether defendants owed a general negligence duty separately from whether they owed a duty to warn).

Moreover, related to its finding of a generalized duty, the Court relied heavily on "particularized allegations of defendants' awareness of the consequences to school districts of their students' compulsive media use" to conclude that recognizing a duty in this circumstance would not allow "theoretically limitless classes of plaintiffs." First SD Order 30, 32–33; *see also id.* at 32–33 ("Here, defendants' [alleged] concrete and particularized awareness of potential and actual harms to these plaintiffs appropriately tailors the scope of duty."). But none of the Districts' so-called "evidence" that Defendants "targeted" schools, Om. Opp. 6, shows that Defendants were aware of "consequences to *school districts* of their students' compulsive media use." First SD Order 30 (emphasis added). Nor does it show that Defendants "were aware of potential or actual harms to" school districts, or schools, generally.

---

Plaintiffs' General Causation Opinions for Failure to Account for Section 230 and the First Amendment, Section I.A (discussing *Bride*, 112 F.4th at 1180, *Grindr*, 128 F.4th at 1154).

[17] In any event, the Districts' assertion that this is a "settled determination" is incorrect. The Court plainly noted that these are "*novel theories* [*that*] *test the boundaries of an area of law in some flux*," and that "the Court declines to foreclose the States' (and personal injury plaintiffs') failure-to-warn theories as to known risks of addiction attendant to any platform features or platform construction in general as barred by Section 230. The Court's skepticism of these claims is noted, but *for now*, the claims proceed." PI Order 36–37 (emphasis added).

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

And even if the evidence demonstrated that Defendants "targeted" students, it is irrelevant to Defendants' motion.[18]  The Districts cited no cases that promoting a product or service for school-age children to use generally, or even during school hours, is sufficient to find a duty to warn running to schools.  If that were the law, then a school district could sue Yoplait for failing to warn school districts that the sugar or food dyes in GoGurt—a product marketed to kids and parents for use in school lunches—makes kids hyperactive and distracted in schools.  No such case exists.

b)  **The Districts Do Not Cite Any Authority Imposing a Duty to Warn in the Circumstances at Bar.**

The Districts do not dispute Defendants' showing that there is no case in any jurisdiction finding a duty to warn a non-user of a product or service that a third party's use of that product or service may cause financial injury to the non-user plaintiff.  Nor do they cite any cases requiring a duty to warn a plaintiff more generally that use by others might cause harm to those users.  Instead, they rely on two groups of cases, both inapposite.

First, the Districts cite cases from Georgia and Kentucky in which courts imposed duties on manufacturers to warn those who may be *physically* harmed by *their own use* or direct exposure to a product.  Om. Opp. 6–7 (citing *Dozier Crane & Mach., Inc. v. Gibson*, 644 S.E.2d 333, 336 (Ga. App. 2007) (seller of refurbished crane owed duty to warn end-users of crane about risk of electrocution to themselves from use near power lines) and *Williams v. Schneider Elec. USA, Inc.*, 2023 WL 4374514, at *4 (Ky. Ct. App. July 7, 2023) (asbestos manufacturer owed duty to warn employee's daughter about risks of physical injury to her from "take-home" asbestos exposure)).

These cases do not support the Districts' attempt to impose a duty to warn about potential downstream financial injuries or to warn the Districts that students might be harmed by use of Defendants' platforms.  As Defendants noted in their opening brief, the Georgia and Arizona

---

[18] The evidence cited by the Districts shows Defendants' awareness that some of their users were teenagers or students who sometimes used Defendants' platforms during the school day, that some Defendants provided back-to-school campaigns for advertisers, that some Defendants partnered with respected organizations like the national PTA (not local PTAs) to engage *parents* on issues like responsible use, or that some platforms included features that allowed students to communicate with classmates.  Whatever that evidence shows about "targeting" students—and Defendants dispute Plaintiffs' characterizations—such evidence does not show that Defendants "targeted" *schools* or *school districts* in a way that supports finding a duty to warn.

Supreme Courts (as well as the California Supreme Court) have held that there is no duty to warn third parties even of potential physical injuries. The Districts' attempt to distinguish these cases as being about "'take-home exposure claims—arising from asbestos and the coronavirus—where the plaintiffs were physically and relationally distant from defendants' conduct," Om. Opp. 7, fails. The unpublished *Williams* case on which they rely involves the exact same type of "take-home exposure" claim. In addition, in each of the cases, the purported connection between the plaintiff and the direct user of the allegedly defective product was closer than the connection between the school districts and their students—each of the cited cases involved immediate family members living in the same home or direct physical contact with the product user. *See Quiroz v. ALCOA Inc.*, 416 P.3d 824, 843 (Ariz. 2018) (no duty to warn plaintiffs' father of dangers of secondary asbestos exposure); *CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641, 645–46 (Ga. 2016) (no duty to warn plaintiff of dangers of asbestos on father's clothing); *Kuciemba v. Victory Woodworks*, 531 P.3d 924, 951 (Cal. 2023) (no duty to employee's wife to prevent spread of coronavirus); *Gourdine v. Crews*, 955 A.2d 769, 789 (Md. 2008) (no duty running to plaintiff to warn third party who suffered adverse effects from defendant's medication and struck and killed plaintiff's husband while driving even assuming accident was foreseeable result of inadequate warnings). By contrast, the Districts have no evidence of any relevant "contact or connection," Om. Opp. 7, between them and Defendants.

Second, the Districts cite cases (from Maryland and New Jersey) about duties to warn a state of environmental pollution harms where the state brought its claim in a representative capacity and claimed that its natural resources were directly harmed by exposure to pollution. *See* Om. Opp. 6–7 (citing *State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 463 (D. Md. 2019) (gasoline marketers, manufacturers, and distributors owed duty to state, suing in *parens patriae* as trustee of the state's natural resources, to warn where MTBE "posed unique, substantial harms to [the state's] resources") and *New Jersey Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.*, 2021 WL 6144081, at *7 (D.N.J. Dec. 30, 2021) (manufacturer had duty to warn state suing in *parens patriae* and as trustee of the state's natural resources about chemicals that "allegedly polluted the State of New Jersey's environment and endangered its people")). Neither factor is present here: the Districts do not have *parens patriae* authority and are not suing for harm done to

collective resources for which they are the "trustee." *See, e.g.*, First SD Order 44 ("the school districts' alleged injuries (i.e., resource expenditures) are borne exclusively by them").[19]

### 2.    The Districts Cannot Recover as a Result of Defendants' Alleged Failure to Warn Students and Parents.

The Districts have no basis to pursue a claim against Defendants for "failing to warn a non-plaintiff when that failure leads to a plaintiff's injury." Om. Opp. 9.  While the Districts contend that "[c]ourts have long recognized" this type of liability, *id.*, the Omnibus Opposition cites only two cases, both from a single bellwether state (Georgia) and both decided at the motion to dismiss stage.  *Parris*, 595 F. Supp. 3d at 1336; *USA Truck, Inc. v. Sullair, LLC*, 2020 WL 12656229, at *2–3 (M.D. Ga. Dec. 7, 2020).   Each case rested on the court's conclusion that the specific, sophisticated third parties at issue were "in a position such that" had they received the warning they "may reasonably be expected to act so as to prevent the danger from manifesting itself."  *Parris*, 595 F. Supp. 3d at 1336 (internal quotation marks and citation omitted).  For example, in *Parris*, a homeowner sued a PFAS manufacturer and textile mill for allegedly contaminating the water supply.  *Id.* at 1306–08.  The court held that PFAS manufacturers had a duty to warn the textile mill (their customer), about the risk of PFAS; the manufacturers and the mill had "maintained a continuous commercial relationship…over multiple decades, making it more probable that [the mill] would receive and act in accordance with product warnings…. [S]ophisticated companies like [the mill] should be expected to take action, when adequately warned, to reduce the potential harms from their operations to humans and the environment." *Id.* at 1338.  Likewise, *Sullair* held that the plaintiff trucking company whose driver was killed in an accident when he collided with a box truck pulling an overweight, brakeless trailer could maintain a claim against the trailer manufacturer for failing to warn the box truck owner of the dangers of operating the trailer.  2020 WL 12656229, at *2–3.  The plaintiff did not contend that the trailer manufacturer owed a duty to

---

[19] The Districts' second Maryland case is completely irrelevant to their claims.  In *Kennedy Krieger Inst. v. Partlow*, 191 A.3d 425, 457 (Md. 2018), the court found a narrow duty in very specific circumstances on the part of a research organization to a child physically harmed by lead paint exposure where the organization knew that child was being exposed to lead in property that was part of the organization's research project.  *See id.* at 450 n.9 ("Our holding is limited to the circumstances of this case and, specifically, to the circumstance that the record demonstrates that KKI knew that Ashley resided in the Property with a participant of the R & M Study.").

1    warn the plaintiff, but claimed that the manufacturer had a duty to warn the box truck owner

2    allegedly responsible for the collision that its operation of the trailer at the weight and speed it was

3    using before the accident violated federal regulations. *Id.* at *3. The court held that the

4    manufacturer might theoretically have a duty to warn the box truck driver, but, even if so, the

5    "causation elements of the failure to warn cause of action will be heavy burdens that [the plaintiff]

6    must prove." *Id.* at *3.[20]

7         The rationale of The Districts' cited cases does not apply here. Unlike in *Parris and USA*

8    *Truck*, where the duty to warn ran to a single known entity—specifically identified commercial

9    entities who could be expected to heed warnings from other commercial entities and to take action

10   to reduce harms to the environment (*Parris*) or innocent bystanders (*USA Truck*)—here, there are

11   tens of thousands of unidentified students and parents. Further, *Parris* and *USA Truck* were decided

12   at the motion to dismiss stage, where it was sufficient for the plaintiffs to *allege* that third parties

13   would have heeded a warning for the benefit of plaintiffs. At summary judgment, the Districts

14   must present admissible *evidence* to support their claims. As demonstrated above, *see supra*

15   Section II.A, and in Defendants' district-specific replies, the Districts have no such evidence.

16        **C.    The Districts' Claims for Damages Fail.**

17        Contrary to the Districts' assertions, Defendants' challenges to their damages do not require

18   the Court to weigh the evidence. The Districts' requests for damages are either legally incognizable

19   or they lack  requisite evidence to establish a genuine dispute on a triable issue of fact.[21]

20

21   ─────────────────────────

     [20] The Districts also cite an Ohio case applying Minnesota law, *Stringer v. Nat'l Football League*,
22   749 F.Supp.2d 680 (S.D. Ohio 2009), but that is of no help to the Districts. *Stringer* is a
     straightforward case about whether a manufacturer had a duty to warn the plaintiff's decedent, an
23   NFL football player, of a risk of heat stroke from use of helmets and shoulder pads. *Id.* at 690. The
     defendants argued that they had no duty to warn the end user, the player, because the team trainers
24   and coaches were "sophisticated intermediaries" who already knew the risks. *Id.* The court held
     there was a genuine dispute of material fact about this defense, namely, whether a warning of heat
25   stroke on the pads and helmets would have altered the trainers' and coaches' behavior. The court
     did not hold that there was a duty to warn the third-party trainers and coaches, but only that their
26   behavior was relevant to the proximate causation analysis. *Id.* at 703 ("the duty to warn extends
     only to reasonably foreseeable *users* of the product." (emphasis added)).
27
     [21] Defendants' response to the Districts' assertions that there is a genuine dispute of fact regarding
28   out-of-pocket costs is set forth in their District-specific replies.

─────────────────────────

19

**1.      The Districts Are Not Entitled to "Lost Time" Damages.**

Whether the Districts are entitled to "lost time" damages is governed by state law.  As set forth in the District-specific replies, under the state laws of the relevant jurisdictions, this category of damage is not recoverable.  Accordingly, the federal cases cited by the Districts, Om. Opp. 201–202, that interpret other jurisdictions' laws on this issue are not relevant.  *See Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) (Oregon law on breach of contract); *State v. Rouse*, 647 N.W.2d 286 (Wis. Ct. App. 2002)  (Wisconsin law in the context of restitution in a criminal case); *Zayo Grp, LLC v. Solutions Fiber Optic, Inc.*, 2025 WL 2157902 (E.D. Va. July 11, 2025) (Virginia law in a default judgment context, awarding damages for "internal labor costs" to repair cables broken by defendants); *Mobile Conversions, Inc. v. Allegheny Ford Truck Sales*, 2014 WL 7369898 (W.D. Pa. Dec. 29, 2014) (stating that in the absence of Pennsylvania law, that it would rely on *Convoy*, *Rouse*, and *Dunn* in a breach of contract case); *Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877 (6th Cir. 1982) (Ohio law on fraud and breach of contract).[22]

At most, the cases cited by the Districts confirm that this is a state-by-state inquiry, and in the states relevant, here, the Districts' "lost time" damages are not recoverable.

Defendants are also entitled to summary judgment on the Districts' claims for "lost time" damages for two additional reasons: *first*, that the Klein surveys on which the claim is predicated lack a reliable methodology and should be excluded, *see* SD Daubert Mot. 10–, and *second*, the Districts lack admissible evidence to establish any time actually "lost."  The first argument is addressed below and the second is addressed in Defendants' District-specific replies.

The Districts are incorrect that Mr. Klein's surveys are sufficient to raise a triable issue of fact as to the amount of instructional time allegedly lost. Om. Opp. 204–205.  Setting aside the many issues with Mr. Klein's survey and opinion, the Districts' only evidence of actual instructional time purportedly diverted to deal with Defendants' platforms are the out-of-court statements (indeed, estimates) supplied by the unidentified teachers who provided time estimates

---

[22] Many of the cases cited by the Districts are also distinguishable because they involved breach of contract claims, where the underlying policy is to award the benefit of the breached bargain; this contrasts with tort damages where the underlying policy is to place the plaintiff in the same position it would have been without the defendant's tortious conduct.  *MCI Comms. Servs. v. CMES, Inc.*, 728, S.E.2d 649 (Ga. 2012).

1    in response to Klein's survey.  The Districts do not and cannot dispute that it is offering those

2    estimates for the truth of the matter asserted, *see* Fed. R. Evid. 801, *Orr v. Bank of Am. NT & SA*,

3    285 F.3d 764, 778 (9th Cir. 2002) (excluding hearsay evidence when examining summary

4    judgment), and it does not and cannot dispute that those estimates are not in the record except

5    through Klein's report.  "The law is clear, however, that an expert report cannot be used to prove

6    the existence of the facts set forth therein."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir.

7    1999) (holding that "because there is no evidence in the record…any inference founded upon that

8    factual assertion—even one drawn by an economic expert—is necessarily unreasonable");

9    *Paddack*, 745 F.2d at 1261–62 ("Rule 703 merely permits such hearsay, or other inadmissible

10   evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's

11   opinion.  It does not allow the admission of the reports to establish the truth of what they assert.")

12   (internal citations omitted); *Brooke Grp. Ltd. V. Brown & Williamson Tobacco Corp.*, 509 U.S.

13   209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a

14   substitute for them.").  The Districts cannot properly rely on these inadmissible hearsay statements

15   to establish the truth of the matter asserted—that time (and how much time) was actually lost.

16       **D.    The Hoover Plan is Not Available as Equitable Relief or Future Damages.**

17       The Districts each seek millions or billions of dollars so that each may implement a

18   "strategic plan" drafted by Dr. Sharon Hoover (the "Hoover Plan(s)") in their respective districts.[23]

19   In doing so, the Districts impermissibly request this Court to review their request under either (i) a

20   so-called "monetary abatement" theory for their nuisance claims or (ii) as future damages for their

21   negligence claims.  Om. Opp. 212–13.  Both fail.  The Hoover Plan is not recoverable as equitable

22   relief for nuisance in the four Districts with nuisance claims (Breathitt, Tucson, DeKalb, and

23   Harford) because the Districts have an adequate remedy at law and the Plan cannot be properly

24   characterized—either procedurally or substantively—as abatement.  Further, the Districts cannot

25   save the Hoover Plan by framing it as future damages under a negligence theory because they have

26

27   ---
[23] Breathitt seeks $60 million in future damages based on the Hoover Plan; Irvington seeks between
     $296 and $417 million; Charleston, Harford, and Tucson each seek at least $1 billion; DeKalb seeks
28   between $2 to $4 billion.

1   not provided evidence of future damages with reasonable certainty.

2                    **1.      The Districts Admit that They Have an Adequate Remedy at Law.**

3           In federal court, regardless of the state law that governs the claim, a plaintiff is not entitled to

4   equitable relief unless it shows that it does not have an adequate remedy at law.  *See, e.g.*, Breathitt

5   Mot.28–29; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("the basis for injunctive relief

6   in the federal courts has always been irreparable injury and the inadequacy of legal remedies") (cited

7   at Om. Opp. 212).  The Districts effectively admit that the Hoover Plan is an adequate remedy at law

8   by claiming that it is recoverable as *either* future legal damages *or* as an equitable "abatement"

9   remedy.  Om. Opp. 205–11.  That duality is fatal to their claim for equitable relief.[24]

10          The Districts say they can "pursue both" equitable relief and damages "at trial," citing a

11  handful of cases that were decided at the motion to dismiss stage where (1) plaintiffs were allowed

12  to *plead* both legal damages and injunctive relief where each form of relief addressed different

13  issues, or (2) damages were *pled* to be insufficient to address future harm.  *See* Om. Opp. 210–11

14  (citing *Coleman v. Mondelez Int'l, Inc.*, 554 F. Supp. 3d 1055, 1065 (C.D. Cal. 2021) (plaintiff

15  could plead both damages and injunctive relief where she had sufficiently alleged that she lacked

16  adequate legal remedy because she claimed that "injunctive relief in the form of packaging or label

17  modifications was necessary to dispel public misperception about [the products that had resulted]

18  from years of [defendant's unlawful] marketing efforts"); *Ostrovskaya v. St. John Knits, Inc.*, 2022

19  WL 2102895, at *5 (C.D. Cal. Mar. 31, 2022) (plaintiff can seek equitable relief for one cause of

20  action where money damages unavailable even though money damages were available for a

21  different cause of action); *Andino v. Apple, Inc.*, 2021 WL 1549667, at *5 (E.D. Cal. Apr. 20, 2021)

22  (claim for injunction to "restrain Defendant from engaging in these practices in the future" not

23  barred because that is different relief than past money damages); *Roper v. Big Heart Pet Brands,*

24  *Inc.*, 510 F.Supp.3d 903, 917 (E.D. Cal. 2020) (plaintiff could request injunctive relief in addition

25

26  _____
    [24] The fact that the Hoover Plan is not a *proper* measure of future damages does not change this
27  result.  As discussed below, a plaintiff may recover future damages if it can show, with reasonable
    certainty, that Defendants' alleged wrongdoing will cause it to incur future expenses.  Because
    there is no reason that the Districts could not have attempted to do that here, they have an adequate
28  remedy at law.  It is of no moment that they instead made a tactical decision to try to quantify their
    "future damages" in an impermissible manner.

                                                    22

1    to legal remedies because they "lack[ed] an adequate legal remedy for future harm"); *Cepelak v.*

2    *HP Inc.*, 2021 WL 5298022, at *3 (N.D. Cal. Nov. 15, 2021) (holding there is no categorical bar to

3    *pleading* alternative damages theories but dismissing claim for "equitable monetary relief" where

4    plaintiffs "have not alleged the inadequacy of a remedy at law" and "[a]ll of the plaintiffs' claims

5    for such relief are 'rooted in the same theory and factual allegations' as their claims for damages").

6          These cases are inapposite for two reasons.  First, the Districts do not seek two different

7    *alternative* forms of relief.  As their Opposition makes clear, the Districts seek only *one thing* as

8    both future damages and as "monetary" abatement:  funding for the Hoover Plan.  Second, by

9    putting forward the Hoover Plan as future damages for their negligence claims, which are based on

10   the same facts and circumstances as the nuisance claims, the Districts admit that the strategic plan

11   *is* sufficient legal relief for their "future" harms.  Thus, the "equitable relief sought [i]s wholly

12   duplicative of the damages requested," Om. Opp. 211, because the Districts are seeking "the same

13   amount of money for the exact same harm." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844

14   (9th Cir. 2020).  The Districts admit that this Court "barr[ed] [a] plaintiff from seeking equitable

15   restitution that merely duplicated past damages." *Id.* (quoting *Wood v. Marathon Refining Logistics*

16   *Serv. LLC*, 2024 WL 2242688, at *10 (N.D. Cal. Mar. 21, 2024) (Gonzalez-Rogers, J.).

17         The Districts claim this can all be sorted out after trial but that is also incorrect.  Om. Opp.

18   211.  What they seek is two bites at the apple—first,  for the Court to allow them to seek the Hoover

19   Plan as future damages at trial, and if they do not recover that relief from the jury, *then* to let them

20   slap a different label on the *same relief*, call it "equitable," and seek it from the Court.  No case

21   allows that, and a case cited by the Districts, *Teutscher v. Woodson*, 835 F.3d 936 (9th Cir. 2016),

22   Om. Opp. 211, prevents exactly what the Districts are trying to do here.  There, the Ninth Circuit

23   held that, under the Seventh Amendment, the plaintiff could not seek front pay as a legal remedy

24   from the jury under his state law claim and then seek front pay as equitable relief from the court on

25   his federal claim.  *Id.* at 948–49.  Nor under the doctrine of double recovery could the plaintiff

26   submit the issue of front pay to the jury and then "take a second bite at the apple" by seeking the

27   alternative and overlapping equitable relief of reinstatement from the court because "front pay is

28   the 'monetary equivalent' of reinstatement." *Id.* at 954.  While the plaintiff could have sought only

1    back pay from the jury and reinstatement from the court, such that the relief would not be

2    overlapping, once he "elected to seek a make-whole remedy from the jury," he waived any right to

3    equitable relief. *Id.* at 956.

4         The same is true here: by seeking legal damages in the exact same completely overlapping

5    form that they seek equitable abatement, the Districts admit their legal remedy is adequate. They

6    cannot seek the same forward-looking remedy from *both* the jury and this Court. And case law is

7    clear that it does not matter whether the Districts are successful in actually recovering all or some

8    of the relief requested as damages. Where a plaintiff has an adequate legal remedy, equitable

9    relief—whether in the form of injunction or "monetary" abatement—is foreclosed. *See, e.g.,*

10   *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Where the claims

11   pleaded by a plaintiff may entitle her to an adequate remedy at law, equitable relief is unavailable.").

12                    **2.    The Hoover Plan Is Not a Proper Abatement Remedy.**

13        The Hoover Plan fails the requirements of an abatement remedy because it is not designed

14   to "abate" any conduct of Defendants and is not tailored to remedying the alleged harms resulting

15   from the alleged nuisance. The Districts offer two arguments in response, both meritless.

16        *First*, the Districts attack a strawman argument by asserting that abatement can include

17   monetary relief. Om. Opp. 212. But that is not the issue. Defendants argued that the Hoover Plan is

18   not a proper abatement remedy because it does not seek to abate Defendants' allegedly nuisance-

19   causing conduct. *See, e.g.*, Breathitt Mot. 29–31. Instead, the Hoover Plan proposes sweeping

20   recommendations to address student mental health *generally*, rather than to specifically address harms

21   allegedly caused by Defendants' platforms, much less any of the narrow at-issue platform features.

22   Regardless of the merits of the Hoover Plan with respect to overall student mental health, it is not

23   tailored to remedying Defendants' actionable conduct and is therefore not proper abatement.

24        *Second*, the Districts give lip service to the requirements for abatement by arguing that

25   Hoover's plan is "directly link[ed]" to "Defendants' misconduct," Om. Opp. 215, but a review of

26   the plan shows they have no basis for that contention. The Districts concede that the plan has

27   nothing to do with abating, or even changing, any Defendant's conduct. *Id.* at 210–12. And their

28   own citations demonstrate that Hoover's plan is not tailored to addressing just the harms from

Defendants' alleged tortious conduct. *Id.* at 212 (the plan "provid[es] comprehensive, district-wide interventions, including *universal* policies for *all students, staff, and families*"); *id.* (citing Hoover testimony that her plan provides services "for those students who may not have yet used a platform directly themselves"). The Districts' assertion that the plan's "comprehensive mental health services" are "require[d] by "national school mental health standards," *Id.* at 215, proves the point: they are not advocating a judicial remedy narrowly tailored to address Defendants' alleged nuisance-causing conduct; they are implementing comprehensive school services that will apply to all students in the future regardless of Defendants' conduct.

The 15-year timeline for Dr. Hoover's plan further proves that the plan is not directly linked to Defendants' conduct. The Districts' response that the plan is designed "to prevent and mitigate systemic harm," *Id.*, is unavailing. The alleged harm involves mental health of individual students who purportedly used Defendants' platforms. *Id.* at 1 (arguing that "harms to student mental health" cause "the resulting burdens on school systems"). But the plan does not target those students because the vast majority of the students who the Districts claim have been most adversely affected by Defendants' platforms—those who are current middle and high school students—will age out before the plan could be implemented. Nor do the Districts deny that the plan would treat individuals not yet born and who may never use Defendants' platforms at all, or who may do so many years into the future when the platforms may be very different than they are now.

Defendants' motions identified numerous cases holding that the six jurisdictions' state laws (and tort law generally) do not permit an abatement plan that is not tailored to remedying the nuisance-causing conduct. *See, e.g.*, Breathitt Mot. 29–30. The most the Districts could muster about Defendants' cited cases was to say that they do not *forbid* a remedy other than an injunction. Om. Opp. 214–15. Because the Districts cannot distinguish Defendants' cases, they argue that a federal court sitting in diversity can award any equitable remedy it wishes regardless of whether the Districts can show entitlement to that remedy under state law. Om. Opp. 214. But their cited authorities squarely foreclose that claim. *Sonner* confirmed "[t]he general equitable powers of federal courts should not enable a party suing in diversity to obtain an injunction if state law clearly rejects the availability of that remedy." 971 F.3d at 842 (quoting *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643,

25

647 (9th Cir. 1988)). The court also noted that "[a]s to consequences that so intimately affect recovery or non-recovery" such as the availability of relief, "a federal court in a diversity case should follow State law." *Id.* (quoting *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945)); *see also Ostrovskaya*, 2022 WL 2102895, at *5 n.7 ("In a diversity action, state law governs whether harms may be remedied at all, and what specific remedies are available.").[25] The Districts' citation to *United States v. Price*, 688 F.2d 204 (3d Cir. 1982), and *Guthrie v. Transamerica Life Ins. Co.*, 561 F. Supp. 3d 869 (N.D. Cal. 2021), Om. Opp. 214, likewise provide no support for such a power, and *the quoted language the Districts attribute to them does not appear in either case.*

Further, the type of equitable relief the Districts seek should be governed by state law here because the Districts failed to show that there is well-established federal common law regarding the scope of appropriate remedies in public nuisance actions and also failed to establish any of the factors to undermine the presumption that state law should apply. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979).[26] Under well-established precedent, federal courts should only employ "*[w]ell-recognized equitable remedies*" under federal common law if a particular type of equitable remedy is unavailable in state court. *Clark Equip. Co. v. Armstrong Equip. Co.*, 431 F.2d 54, 57 (5th Cir. 1970) (emphasis added). Where, however, the federal common law lacks a uniform standard on the type of equitable remedy to apply, there is a "'presumption that state law should be incorporated into federal common law,'" even where an issue could be governed by federal common law. *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 973 (10th Cir. 2019) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991)).

---

[25] In the passage of *Sonner* cited by the Districts, the court held that "even if a state authorizes its courts to provide equitable relief when an adequate legal remedy exists, such relief may be unavailable in federal court because equitable remedies are subject to traditional equitable principles" barring relief in that circumstance. 971 F.3d at 841. In other words, *Sonner* recognized that federal courts sitting in diversity are subject to both traditional equitable limitations and also the limitations of relief available under state law. Nothing in *Sonner* permits a federal court considering a state cause of action to grant relief unavailable under the relevant state law.

[26] The factors include: (1) "whether application of state law would frustrate specific" federal interests, (2) whether there is a "need for a nationally uniform body of law," and (3) other considerations such as whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods, Inc.*, 440 U.S. at 728.

1    Indeed, the cases cited by the Districts confirm that state law should apply here—each

2    expressly relied on *state law*, not federal remedies law, in analyzing whether the plaintiffs could

3    pursue an abatement remedy.  *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,

4    497 F. Supp. 3d 552, 653 (N.D. Cal. 2020) (citing two state court cases); *City of Huntington v.*

5    *Amerisource Bergen Drug Corp.*, 157 F.4th 547, 574 (4th Cir. 2025) ("based on our review of West

6    Virginia law, we predict that the State Supreme Court would allow the remedy of abatement"

7    sought).  Moreover, the state law cases the Districts cite also prove Defendants' point —they all

8    involved classic nuisance cases where abatement meant an injunction to remove the instrumentality

9    of the nuisance, not paying to treat downstream injuries.[27]

10    The Districts' cited authorities are unavailing.  Two of the cases cited by the Districts did

11    not approve any abatement plan at all, but merely recognized in theory that an abatement plan might

12    allow for a defendant to pay money to eliminate the resulting harm.  *See Huntington*, 157 F.4th at

13    575 (remanding to the district to, "if the district court reaches the issue of abatement, … analyze

14    the plaintiffs' proposed abatement plan on its merits to determine whether all aspects of the plan

15    are reasonably calculated to abate the public nuisance"); *Juul*, 497 F. Supp. 3d at 653 (permitting

16    the theory to proceed at the pleading stage).  As a result, the Districts are left with only two cases

17    where an abatement fund to treat downstream injuries from alleged nuisance-causing conduct was

18    awarded.  First, the Districts cite the federal opioid MDL court that awarded a similar-type plan,

19    but which was later vacated because the Ohio Supreme Court held the court got it wrong from the

20    start in permitting a nuisance claim to go forward under Ohio law.  Breathitt Mot. 31 n.10.  Second,

21    the Districts cite a recent Maryland state trial court award in another opioid case, *Mayor & City*

22    *Council of Baltimore v. Purdue Pharma, L.P.*, No. 24-C-18-000515 (Md. Cir. Ct. Aug 8, 2025).

23

---

24  [27] *See, e.g.*, *Adams v. Comm'rs of Town of Trappe*, 102 A.2d 830, 837 (Md. Ct. App. 1954)
(defendant ordered to remove gas pump that was blocking public sidewalk and was in violation of
25  a municipal ordinance); *Spaw, LLC v. City of Annapolis*, 156 A.3d 906, 931 (Md. Ct. App. 2017)
(property owner in violation of municipal historic preservation zoning ordinance could be required
26  to file a certificate of approval prior to a building rehab); *City of Stafford v. Seale*, 2009 WL
3390172, at *1 (Ariz. Ct. App. Oct. 21, 2009) (vacating trial court's authorization to demolish
27  plaintiff's house where offensive odor due to cat feces and urine had caused extensive damage to
house and there were violations of city building, fire, plumbing, mechanical, and electrical code);
28  *Brown v. City of Phoenix*, 557 P.3d 321, 324 (Ariz. Ct. App. 2024) (affirming permanent injunction
requiring city to remove homeless encampments on city land).

As Defendants noted in their opening briefs, *Baltimore* is only marginally helpful to the Districts because the court refused to award "all of the proposed costs for treatment services" for those suffering from opioid use disorder (OUD).  Breathitt Mot.31, n.11.  In addition, the court awarded money for certain programs only for those city residents with existing OUD allegedly caused by the defendants' wrongful *past* conduct.  The court also reiterated the principles that any programs should be funded by the defendants only if they were "directly related to [d]efendants' conduct," and that an abatement remedy "should go no further than is absolutely necessary to protect the rights of the parties seeking such injunction."  *Baltimore*, at 23.

Further, every decision but *JUUL* (which did not order an abatement plan) involved a local government suing on behalf of the broader public—not a school district suing on its own behalf to remedy an alleged diversion of its own financial resources.  *See, e.g.*, *Huntington*, 157 F.4th at 573 ("In the present case, the local governments seek as a remedy for their public nuisance claims abatement of the widespread addiction, diversion, and related effects of the opioid epidemic that have impacted their communities for more than a decade.").  The extent of an abatement remedy permitted in such representative suits has little bearing on the remedy available for a plaintiff suing in a private capacity, as the school districts do here.  *Cf. Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 2007 WL 1576120, at *5 (D. Minn. May 31, 2007) ("Courts have been more willing to allow broader equitable remedies when the government brings an action because the government is presumed to be more interested in the public good and furtherance of the statutory purpose than is a private plaintiff."); *United States v. Raines*, 189 F. Supp. 121, 134 (M.D. Ga. 1960) ("Where a sovereign state or nation is party plaintiff, it is sometimes more certainly entitled to specific relief than a private party might be…. Courts of equity frequently go much further both in giving and in withholding relief in furtherance of the public interest than they are accustomed to go where only private interests are involved.").

### 3.    The Strategic Plan is Impermissibly Derivative.

The Districts' Opposition makes Defendants' point for them.  The Districts refer to the strategic plan as a "public health initiative" and admit that it provides services for students, staff, and families, and "more intensive programs for those [students] with greater needs."  Om. Opp.

212.  The plan is allegedly modeled after "national school mental health standards" and is meant to address the "distinct behavioral, emotional, and cognitive risks introduced by social media." *Id*. at 215.  The Districts' bald assertion that the "plans target harm to the Districts, not individual students" is therefore patently incorrect.  *Id*.  The Districts also walk right into the derivative injury problem when they claim that "mental health challenges [for students] triggered and exacerbated by social media use have direct implication for schools, as they affect students' academic performance, social skills, and over-all well-being." *Id.* at 216.  The Districts thereby describe a classic derivative injury—harm to the students has a downstream implication for schools.  *Id.*  And the Districts' assertion that they are "legally and financially responsible for providing [the] services" set forth in the plan is flat wrong.  *Id.*  The Districts have no obligation to institute these plans.  They have not done so; they will not do so if they do not recover money in these lawsuits; and no district in the country has ever done so.  *E.g.*, Breathitt Mot.33.

Contrary to the Districts' arguments, the plan is a far cry from the issues faced in the Court's motion to dismiss order, in which the Court held that certain alleged *past* expenses, including "hiring mental health personnel and developing mental health resources, implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms," were not derivative.  First SD Order 20.  The Court had no occasion to consider whether a strategic plan focused on providing *future* mental health services to students generally is derivative.  And while the Districts claim that the plan falls within the scope of the Court's prior order because it "directly addresses the District's own operational and financial injuries," Om. Opp. 216, the Districts do not, in fact, seek *past* damages for the types of staffing needs and mental health services contemplated by the plan.  None of the six districts seek past damages for hiring additional personnel. Om. Opp. 198.  And four (Breathitt, Charleston, Harford, DeKalb) do not seek compensation for *any* "expanded mental health resources beyond the lost time for staff." *Id.*  Even the two that do (Tucson and Irvington) seek only minimal compensation for a handful of online therapy platforms.  *Id.*

1

**4.    The Districts Cannot Recover the Hoover Plan as Future Damages.**

2    In seeming recognition of the flaws of their "monetary abatement" theory—and to save the

3    Hoover Plan in Charleston and Irvington, where there are no viable nuisance claims—the Districts

4    also attempt to characterize the Hoover Plan as future damages for their negligence claims. But the

5    Districts have not met their burden of proof, and thus the Districts' request for future damages

6    should be rejected for two independent reasons.

7    *First*, future damages are available for *future consequences* of a *past injury* if a plaintiff

8    proves that those consequences are reasonably certain to occur.[28]  *See, e.g.*, Harford Mot.39.  The

9    Districts' Opposition makes clear that they are not seeking reimbursement for costs they are

10    reasonably certain to have to expend in the future as a result of their existing injuries.  Om. Opp.

11    205–09.  The Districts do not claim that their past injuries (i.e., their alleged past expenditures on

12    out-of-pocket costs or time spent addressing past classroom distractions) will cause them to spend

13    more money in the future.  Instead, the Districts assert that they are entitled to damages in the future

14    because they expect to be injured *again* in the future.  The Districts claim that they "have presented

15    testimony from Dr. Hoover explaining that the Defendants have caused numerous *ongoing harms*

16    that are reasonably *certain to recur*" and that "Dr. Hoover … opines that her detailed, 15-year

17    strategic plans are necessary to prevent these *future injuries*."  Om. Opp. 206 (emphases added).

18    But the Districts concede—as did Dr. Hoover—that her plans do not make any recommendations

19    for Defendants' conduct and do not recommend that Defendants start or stop any conduct or make

20    any changes to their platforms.  *Id.* at 210–12.

21    *Second*, even if the Districts were seeking proper future damages, their Opposition does not

22    sufficiently show that the Hoover Plans are reasonably certain and not too speculative to recover.

23    *See e.g.*, Breathitt Mot. 32–33; Tucson Mot. 43; Charleston Mot. 35; Irvington Mot. 29–30; DeKalb

24

---

[28] *See also May v. Holzknecht*, 320 S.W.3d 123, 128 (Ky. Ct. App. 2010) (future damages must be
25    "reasonably certain"); *Wilder v. Blue Ribbon Taxicab Corp.*, 719 S.E.2d 703, 708 (S.C. Ct. App.
2011) (future damages must be "reasonably certain to result in the future from *the injury*")
26    (emphasis added) (citing *Haltiwanger v. Barr*, 186 S.E.2d 819, 821 (S.C. 1972); *Mauro v. Raymark
Indus., Inc.*, 561 A.2d 257, 261 (N.J. 1989) ("The long-standing rule in New Jersey is that
27    prospective damages are not recoverable unless they are reasonably probable to occur."); *J.N.
Legacy Grp., Inc. v. City of Dallas*, 745 S.E.2d 721, 729 (2013) ("If the damage incurred by the
28    plaintiff is only the imaginary or possible result of a tortious act, such damage is too remote to be
the basis of recovery against the wrongdoer.").

30

Mot. 37–38; and Harford Mot. 39–40.  For starters, the Districts have no answer to the fact that the Hoover Plans are *recommended* expenses that no District is obligated to undertake.  The Districts state that the "measures [Dr. Hoover] proposes are evidence-based requirements, not flexible suggestions," Om. Op. 208, but that is plainly incorrect.  These Districts have not implemented the Hoover Plan, nor has any school district in the United States, and no Plaintiff will implement the Hoover Plan absent a monetary award.  The Districts assert that no school district has implemented the plans because they do not have the necessary funding, *id.* 208–09, but that proves the point.  No District is required to do so, and implementing the plan is entirely discretionary and not a reasonably certain cost that any District will incur as a result of past injury.

The Districts similarly have no answer to the fact that each Hoover Plan is too speculative because they have not shown that they are reasonably likely to need a multi-million or -billion dollar program extending 15 years into the future.  The Districts do not dispute that the Plans purport to address alleged harms to students who may never use Defendants' platforms or alleged harms from features of Defendants' platforms that may not exist in the future.  As Defendants explained in their motions—and the Districts ignored in their opposition—Dr. Hoover admitted that "it would be hard … to predict" whether adolescents will still be using social media ten years from now and further admitted that she had not studied anticipated changes in how students use social media.  *See, e.g.,* DeKalb Mot. 9 (citing Ex. DD (Aug. 13, 2025 Hoover Dep.) (4:25-cv-02310-YGR, ECF 31-32) 803:10–20, 803:21–804:1).  Even putting that aside, the Districts lack any evidence about the necessity and propriety of the Hoover Plans other than Dr. Hoover's say-so.  And, even then, the only support the Districts provide for the necessity of the Plans are the paragraphs from each Hoover Plan that detail the number of personnel that Dr. Hoover recommends hiring and the focus of future professional development, but which are silent on any supposed necessity.  Om. Opp. 206 (citing Ex. 1091 ¶¶ 106, 110; Ex. 1093 ¶¶ 97, 101; Ex. 1094 ¶¶ 100, 104; Ex. 1095 ¶¶107, 111).  In short, the Districts have no evidence for any District establishing why the plan is needed to prevent future injuries.

## III.    CONCLUSION

The Court should grant Defendants' motions for summary judgment or, in the alternative, partial summary judgment.

1    Dated: December 5, 2025            Respectfully Submitted,

2

3                               By: */s/ David P. Mattern*

4                                 GEOFFREY M. DRAKE, *pro hac vice*
                                gdrake@kslaw.com

5                                 TACARA D. HARRIS, *pro hac vice*
                                tharris@kslaw.com

6                                 KING & SPALDING LLP
                                1180 Peachtree Street, NE, Suite 1600

7                                 Atlanta, GA 30309
                                Tel.: (404) 572-4600

8                                 Facsimile: (404) 572-5100

9                                 DAVID P. MATTERN, *pro hac vice*
                                dmattern@kslaw.com

10                               KING & SPALDING LLP
                              1700 Pennsylvania Avenue, NW
                              Suite 900

11                               Telephone: (202) 737-0500

12                               Facsimile: (202) 626-3737

13                               BAILEY J. LANGNER (SBN 307753)
                              blangner@kslaw.com

14                               KING & SPALDING LLP
                              50 California Street, Suite 3300

15                               San Francisco, CA 94111
                              Telephone: (415) 318-1200

16                               Facsimile: (415) 318-1300

17                               *Attorneys for Defendants*
                              *TikTok Inc., ByteDance Inc., TikTok Ltd.,*

18                               *ByteDance Ltd., and TikTok LLC*

19

20                           By: */s/ Christian J. Pistilli*
                              ASHLEY M. SIMONSEN (SBN 275203)

21                               COVINGTON & BURLING LLP
                              1999 Avenue of the Stars

22                               Los Angeles, CA 90067
                              Telephone: (424) 332-4800

23                               Facsimile: (424) 332-4749
                              asimonsen@cov.com

24                               Phyllis A. Jones (*pro hac vice*)

25                               Paul W. Schmidt (*pro hac vice*)
                              Christian J. Pistilli (*pro hac vice*)

26                               COVINGTON & BURLING LLP
                              One City Center

27                               850 Tenth Street, NW
                              Washington, DC 20001

28                               Telephone: (202) 662-6000
                              Facsimile: (202) 662-6291

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1                                        pajones@cov.com
                                            pschmidt@cov.com

2                                          cpistilli@cov.com

3                                          *Attorneys for Defendants Meta Platforms,*

4    *Inc. f/k/a Facebook, Inc.; Facebook*
*Holdings, LLC; Facebook Operations,*

5    *LLC; Meta Payments Inc. f/k/a Facebook*
*Payments Inc.; Meta Platforms*

6    *Technologies, LLC; f/k/a Facebook*
*Technologies, LLC; Instagram, LLC; and*

7    *Siculus LLC f/k/a Siculus, Inc.*

8

    By: */s/ Victoria A. Degtyareva*

9        ALISON BROWN *pro hac vice*
        alli.brown@kirkland.com

10   KIRKLAND & ELLIS LLP
        2005 Market Street, Suite 1000

11   Philadelphia, PA 19103
        Tel.: (215) 268-5000

12

        JESSICA DAVIDSON, *pro hac vice*

13   jessica.davidson@kirkland.com
        JOHN J. NOLAN, *pro hac vice*

14   jack.nolan@kirkland.com
        601 Lexington Avenue

15   New York, NY 10022
        Tel.: (212) 446-4800

16

        JONATHAN H. BLAVIN (SBN 230269)

17   jonathan.blavin@mto.com
        MUNGER, TOLLES & OLSON LLP

18   560 Mission Street, 27th Floor
        San Francisco, CA 94105

19   Tel.: (415) 512-4000

20   VICTORIA A. DEGTYAREVA
        (SBN 284199)

21   victoria.degtyareva@mto.com
        MUNGER, TOLLES & OLSON LLP

22   350 South Grand Avenue, 50th Floor
        Los Angeles, CA 90071

23   Tel.: (213) 683-9100

24   *Attorneys for Defendant Snap Inc.*

25

26

    By:*/s/ Ashley W. Hardin*

27   JOSEPH G. PETROSINELLI,
        *pro hac vice*

28   jpetrosinelli@wc.com

---

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC
and Google LLC*

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1

## **ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

2

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

4

DATED: December 5, 2025

5

By:*/s/ David P. Mattern*
DAVID P. MATTERN

6

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd.,*

7

*ByteDance Ltd., and TikTok LLC*

8

9

By: */s/ Christian J. Pistilli*
CHRISTIAN J. PISTELLI

10

*Attorneys for Defendants Meta Platforms,*

11

*Inc. f/k/a Facebook, Inc.; Facebook*
*Holdings, LLC; Facebook Operations,*

12

*LLC; Meta Payments Inc. f/k/a Facebook*
*Payments Inc.; Meta Platforms*

13

*Technologies, LLC; f/k/a Facebook*
*Technologies, LLC; Instagram, LLC; and*

14

*Siculus LLC f/k/a Siculus, Inc.*

15

16

By: */s/ Victoria A. Degtyareva*
VICTORIA A. DEGTYAREVA

17

*Attorneys for Defendant Snap Inc.*

18

19

By:*/s/ Ashley W. Hardin*

20

ASHLEY W. HARDIN

21

*Attorneys for Defendants YouTube, LLC*
*and Google LLC*

22

23

24

25

26

27

28

35

1

## **ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

2       I, David P. Mattern, hereby attest, pursuant to N.D. Cal Civil L.R. 5-1, that the

3 concurrence to the filing of this document has been obtained from each signatory hereto.

4

5                                        By: */s/ David P. Mattern*

6                                          DAVID P. MATTERN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT