# Exhibit 1

E-Served: Dec 3 2025 4:31PM PST Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

DEC 03 2025

David W. Slayton, Executive Officer/Clerk of Court
By O. Guerrero, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

LANDON R.

        Plaintiff,

vs.

HAIN CELESTIAL GROUP, INC., et al.,

        Defendants

Case No. 23STCV24844

COMBINED ORDER ON DEFENDANTS' SARGON CHALLENGES TO PLAINTIFF'S EXPERTS JEREMY JOHNSON AND KEVIN SHAPIRO, M.D., AND DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION:

The centrality of exposure and dose assessment in this collection of related cases cannot be overstated. Nor the scientific, technical and practical challenges confronting the parties in performing that assessment. From the many pretrial C.C.P. 437c and in limine motions filed by the parties, the Court elected first to confront three on the theory that if any are meritorious, it would resolve the lawsuit. Those three motions are a Sargon challenge to plaintiff's dose assessor Jeremy Johnson's expert witness opinions, a Sargon challenge to plaintiff's specific causation medical expert Kevin Shapiro, M.D.'s expert witness's opinions, and defendants' combined motion for summary judgment. As to the latter motion, the Court elected to take up two of the defense arguments, namely, that "plaintiff did not proffer any actual defendant-specific exposure doses" and that Dr. Shapiro is offering no "but for" causation opinion.

The Court will not recount here the details of the extensive briefing, evidentiary hearings under Evidence Code section 402, or the hearings in which counsel were permitted to argue. It is enough to say that there is a very extensive briefing and evidentiary record on the point raised by these motions. As explained below, the Court finds that the

1

defendants' Sargon challenge to Mr. Johnson's exposure and dose opinions is meritorious and the motion is granted; that their Sargon challenge to Dr. Shapiro's specific causation opinions is not meritorious and the motion is denied; that the motion for summary judgment on the ground that plaintiff did not proffer any actual defendant-specific exposure doses is meritorious and the motion is granted on that ground; and that the motion for summary judgment on the ground that Dr. Shapiro did not offer a but for causation opinion is not meritorious and is denied on that ground.

THE SARGON CHALLENGE TO MR. JOHNSON'S

EXPOSURE AND DOSE OPINIONS

Mr. Johnson is a well-qualified toxicologist with special expertise in risk assessment, a discipline that incorporates exposure and dose assessment. He performed his analysis in this case, presenting his methodology and conclusions in a comprehensive expert report. The Court, counsel and Mr. Johnson then expended hours dissecting and probing Mr. Johnson's methodology. The Court finds that Mr. Johnson's analysis employed a two-step process. First, he calculated Landon's average daily dose to lead and arsenic from Landon's consumption of the original six defendants' baby foods  per "product category" for various time periods. The categories he utilized were cereal, tubs/jars, pouches, teethers, yogis, cookies, applesauce mashup, puffs, toddler snacks, lil [sic] crunchies, snack bars, toddler meals, snackers, rice snacks and yogurt. To be clear, he utilized consumption data from former defendants Gerber, Beech-Nut and Sprout, as well as current defendants Hain Celestial, Nurture and Plum. Amalgamating all six companies' data, Mr. Johnson then averaged those heavy metal data points across the product categories to calculate an average daily total dose.

Then, in step two, Mr. Johnson purported to allocate from that average daily total dose a portion to each of the six companies' products. He did so via the assumption that Landon's consumption of each defendant's products per product category was proportionate to the number of "flavors" from that defendant that Landon's mother, Mrs. Reiss, listed in discovery responses for that product category.

Upon first studying the defense motion, the Court was puzzled why Mr. Johnson utilized the methodology in step one. It appeared to the Court that the amalgamation of the companies' data to ascertain an average daily dose was a problem *ab initio* in that it not

2

only permitted, but required, the conclusion that one company's products heavy metal concentrations would be attributed to other companies' products via the averaging. The Court referred to this as a potential crossing of a "tort law red line," meaning that it appeared to countermand a basic premise of California product liability law, namely, that a defendant's liability turns on whether that defendant's product, and not another person's product, was defective and a cause of harm. And it appeared to the Court that the step two allocation methodology did not solve the problem.

But recognizing the challenges of the exposure and dose assessment, and the complexity of Mr. Johnson's work, the Court kept an open mind and offered plaintiff (1) the opportunity to have Mr. Johnson explain why he used that methodology and (2) to explain whether a methodology that was truly defendant specific (with no averaging among company products) would result in *de minimis* variances from Mr. Johnson's amalgamation/averaging methodology. In making that offer, the Court was entertaining the thought that perhaps there was no other method Mr. Johnson could have used that would be truly defendant specific given data limitations or for some other reason. That is, perhaps Mr. Johnson's chosen method was necessary under the circumstances presented, and if so, perhaps Mr. Johnson's methodology might prove to be Sargon compliant notwithstanding the amalgamation of the company data. If so, that would leave for another day the question whether such a Sargon-compliant opinion would pass legal muster under C.C.P. 437c.

Plaintiff accepted the court's offer and, in addition to producing Mr. Johnson for an evidentiary 402 hearing, filed and served a "sensitivity analysis." A sensitivity analysis is a method for determining how different variables in a model impact the outcome by changing one variable at a time and keeping the others constant. It is a form of "what-if" analysis. The Court agreed to consider the sensitivity analysis in evaluating Mr. Johnson's original analysis—the analysis challenged by the defendants—and permitted Mr. Johnson's formal expert opinion to be augmented to include the sensitivity analysis for that same purpose.

The sensitivity analysis re-analyzed the product metal data on a defendant specific basis (under the heading of a "weighted average" approach) and showed, overall, minor (<10%) variances from Mr. Johnson's original amalgamation/averaging analysis.

It bears repeating here, as the Court has explained on multiple occasions on the record, that the Court by considering the sensitivity analysis on this Sargon challenge was not permitting a "do-over" of Mr. Johnson's exposure and dose opinion. Nor was plaintiff seeking such a do-over. Mr. Johnson's original analysis remained his opinion on exposure and dose, and the sensitivity analysis was to be used to "pressure test" that opinion in the context of defendants' Sargon challenge to Mr. Johnson's original methodology. For that reason, the Court denied plaintiff's requests to augment the opinion of Dr. Shapiro to permit him to opine on medical causation based on the defendant-specific (non-amalgamated/non-averaged) weighted average, and also denied plaintiff's request to permit additional briefing on defendants' long-earlier-filed summary judgment motion to include new arguments based on the defendant specific weighted average analysis.

At the 402 hearing, Mr. Johnson made clear in response to a question by the Court that he could indeed have in the first instance undertaken a defendant specific exposure and dose assessment, but affirmatively chose not to do so. He testified that he looked at such an approach as a "back of the envelope" proposition but pursued it no further.

The Court finds that Mr. Johnson's two step methodology is not Sargon compliant. The relevant legal inquiry in this case whether a defendant's own conduct (here, its marketing its own products later consumed by Landon) was a substantial factor in bringing about Landon's harm. Mr. Johnson's methodology does not permit that inquiry to be answered because the exposure and dose assessment attributable to a defendant necessarily includes the conduct (that is, the heavy metal product characteristics) of other companies. That is an essential, inescapable feature of the averaging technique Mr. Johnson employed. The Court further finds that the step two allocation method does not rectify this problem. The allocation by number of a company's "flavors" still results in an exposure and dose assessment based on averages of six companies' products. Finally, that the differences between the results of Mr. Johnson's original amalgamation/averaging methodology and subsequent defendant specific weighted average approach were minimal also does not solve the problem. Sargon requires the court to look at the methodology, not the results, of an inquiry. The bottom line is that Mr. Johnson's methodology was fatally flawed in light of the relevant legal inquiry.

4

Defendants also challenged Mr. Johnson's opinion on the ground that he utilized a one-half the limit of detection ("LOD") value for arsenic and lead for defendants' product or ingredient metal testing results reported as below the LOD. Mr. Johnson's use of one-half the LOD is generally a scientifically acceptable "substitution" method of dealing with so-called "left-censored data" provided doing so is reasonable under all the relevant circumstances. That is clearly so in the realm of regulatory toxicology where the policy-based goal is to set reasonable but conservative health-protective standards, the realm in which Mr. Johnson normally works. The law is far less clear when the goal shifts from regulatory policy-based analysis to a tort case where the question to is a particular individual's *actual* exposure and dose to an agent. There is a paucity of law in California and nationwide for this latter circumstance. But the Court here is, as stated, of the view that the use of a one-half the LOD as proxy data can sustain a Sargon challenge where doing so is reasonable under the relevant circumstances.

That said, the Court expressed concern that Mr. Johnson's use of that default data here might be problematic because it appeared the values he was utilizing were not a laboratory method LOD but a company or industry "specification" untethered to a laboratory method LOD. But that is not what the evidence ultimately showed; the LOD data he used were based upon laboratory method limits of detection. Mr. Johnson thus satisfied the Court that on this record, his use of this substitution method was, overall, reasonable. Defendants' Sargon challenge on this ground is denied.

### THE SARGON CHALLENGE TO DR. SHAPIRO'S OPINIONS

Dr. Shapiro is a highly qualified medical expert with relevant experience in the subject of autism and ADHD in children. Dr. Shapiro opines that the heavy metals contained in defendants' products were a substantial factor in bringing about Landon's harms. Ultimately, Dr. Shapiro will not be permitted to so testify because he cannot rely on the inadmissible exposure and dose opinion testimony of Mr. Johnson. Nonetheless, the Court will address the two key Sargon challenges to Dr. Shapiro's methodology asserted by defendants.

First, they assert that Dr. Shapiro's opinion is premised upon his conclusion that Landon had an unusual susceptibility to the toxic effects of lead and arsenic, and that such susceptibility is evident because Landon in fact has exhibited the symptoms that permit the

5

diagnoses of autism and ADHD. Defendants assert this is a rank circular and unscientific conclusion: he has autism and ADHD because he is unusually susceptible and he is unusually susceptible because he has autism and ADHD. If that is what Dr. Shapiro actually opined, defendants would be correct. But the Court does not find that Dr. Shapiro has so opined. Instead, he explained that Landon, like everyone else, has "a susceptibility" to the toxic effects of lead and arsenic—as do all persons to, say, the triggers to the onset of diabetes. Such susceptibilities vary among persons to some degree. To be sure, Dr. Shapiro concludes that the heavy metals in the defendants' products were imposed upon Landon's susceptibility, whatever it was, but he never opines that Landon is unusually susceptible.

At the end of the day, Dr. Shapiro's methodology of differential etiology is well-accepted in the law, provided it is employed correctly. That method is a process of elimination following the "ruling in" of the alleged cause followed by the "ruling out" of other causes. This gets to the heart of defendants' second key challenge: that Dr. Shapiro did not rule in "baby food" but instead ruled in lead and arsenic. According to defendants, Dr. Shapiro ruled in as the alleged cause the wrong substance. In support of that argument, the defense confronted Dr. Shapiro with numerous studies purporting to show that the nutrients in the whole of the baby foods in question are neuro-beneficial and they contend Dr. Shapiro did not consider this scientific evidence. The Court disagrees; he did. He concluded, however, that the studies do not show that the presence of such beneficial components "neutralizes" or counteracts the toxic effects of lead and arsenic found in the products, at least in other than nutrient-deficient children of which Landon was not one. As a matter of Sargon jurisprudence, the defense challenge is not sufficient to show that Dr. Shapiro's methodology is fatally flawed in this regard.

The defense asserts that the Court, in furtherance of its substantial gatekeeping responsibilities, is obligated to parse for itself the various studies Dr. Shapiro considered and independently to determine if they do or do not rationally permit his conclusions. The Court acknowledges that there are circumstances in which a court must examine underlying studies to see if they provide a coherent and reliably basis for an opinion purportedly based upon those studies. This is especially so where there appears to be a significant gap in the "fit" between the subject of the study and the proffered opinion. In this

6

case, Dr. Shapiro considered the studies he cites in his report and the studies with which he was confronted at the 402 hearing, and others on his "reading list." He testified at length on cross-examination at the 402 hearing as to that body of literature. The Court finds that, to some degree, the studies provide support for both Dr. Shapiro's opinions and the position urged by the defense. That is, the proper interpretation of that body of scientific literature is debatable a matter of professional opinion. Dr. Shapiro applied his training and experience in evaluating the literature. That is what Sargon requires. The Court finds that it is not obligated on this record to independently parse the studies.

## THE SUMMARY JUDGMENT MOTION

Defendant reprise their key Sargon argument in their summary judgment motion. They contend that defendants are entitled to summary judgment because plaintiff may not offer the exposure and dose opinion of Mr. Johnson. Without that opinion, Dr. Shapiro may not testify to medical causation and plaintiff's case necessarily fails. They are correct and the motion is granted on this ground.

As mentioned above, the relevant legal inquiry is whether a defendant's conduct (here, the manufacturing and marketing of their products) was a substantial factor in bringing about Landon's harm. As a basic proposition of California tort law, a defendant is liable if at all for its own conduct, not the conduct of others (with exceptions not applicable here.) *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 985 (C.D. Cal. 1996) is a clean expression of the law on this point although many others could be cited as well. In that case the court granted summary judgment because, "[w]hile a jury could probably find that Defendants' products, as a whole, were a substantial factor in causing her injuries, plaintiff has no evidence whatever from which a jury could find that any particular Defendants' products were."

The Court will address a second argument asserted by defendants. They assert that they are entitled to summary judgment because while Dr. Shapiro affirmatively offered his "substantial factor" opinion, he testified that he had no opinion on "but for" causation. That is, defendants say, he was obligated affirmatively to opine that, in addition to his substantial factor causation opinion, *but for* the exposure to each of the defendants' products, Landon would not have contracted autism and ADHD.

7

The Court disagrees. The Court concludes that the "but for" parenthetical found in CACI 430 would not be properly given in this case because plaintiff's theory is that each of the defendant's conduct constitutes an independent concurrent cause of Landon's harm. That is, plaintiff asserts that each defendant's conduct is a separate and independent act that operated simultaneously, and each was sufficient to have caused Landon's harm. Put still another way, each defendant's conduct would have produced the autism and ADHD even if the other defendants' conduct had not occurred. On that theory, the but for instruction would not be given and plaintiff would have no obligation to provide expert testimony to that effect. *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1240; *Major v. R.J. Reynolds Tobacco Co.* (2017) 14 Cal.App.5th 1179, 1198.

CONCLUSION

Defendant's Sargon motion to exclude Mr. Johnson's exposure and dose opinion is granted, and defendants' summary judgment motion based on that same ground is also granted. Defendants' Sargon motion to exclude Dr. Shapiro's medical causation opinion is denied. Defendant's summary judgment motion based on Dr. Shapiro's offering no but for causation opinion is denied.

Dated:   12/3/2025

Lawrence P. Riff
Judge of the Superior Court