**Exhibit 4**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE: SOCIAL MEDIA ADOLESCENT   )
     ADDICTION/PERSONAL INJURY        ) MDL No.
4    PRODUCTS LIABILITY LITIGATION    ) 4:22-md-3047-YGR
     _____)
5

     THIS DOCUMENT RELATES TO:        )
6                                     )
     BOARD OF EDUCATION OF HARFORD    )
7    COUNTY V. META PLATFORMS INC.,   )
     ET AL.                           )
8                                     )
     CASE NO.: 4:23-CV-03065          )
9

10

11       30(b)(6) VIDEOTAPED DEPOSITION OF BOARD OF
12    EDUCATION OF HARFORD COUNTY, BY AND THROUGH THEIR
13         CORPORATE DESIGNEE, BERNARD HENNIGAN
14       Harford County Public Schools Central
15              Administration Building
16          102 South Hickory Avenue,
17               Bell Air, Maryland
18        Wednesday, May 7, 2025, 9:01 a.m.
19

20

21

22

23

24

25

```
                                                    Page 2
1    APPEARANCES:
2    For Plaintiff:
3               BY: MATTHEW P. LEGG, ESQ. (VIA ZOOM)
                Brockstedt Mandalas Federico LLC
4               2850 Quarry Lake Drive - Suite 220
                Baltimore, Maryland 21209
5               410.421.7777
                mlegg@lawbmf.com
6
7    For Plaintiff:
8               BY:  KENNETH S. BYRD, ESQ.
                BY:  KELLY McNABB, ESQ. (VIA ZOOM)
9               Lieff Cabraser Heimann & Bernstein
                250 Hudson Street, 8th Floor
10              New York, New York 10013
                212.355.9500
11              kbyrd@lchb.com
                kmcnabb@lchb.com
12
13   For the Defendants Meta Platforms, Inc., f/k/a
     Facebook, Inc.; Facebook Holdings, LLC; Facebook
14   Operations, LLC; Facebook Payments, Inc.; Facebook
     Technologies, LLC; Instagram, LLC; Siculus, Inc.;
15   and Mark Elliot Zuckerberg:
16              BY:  SCOTT JAMES, ESQ.
                BY:  EBEN S. FLASTER, ESQ. (Philadelphia)
17              BY:  RANA FREEMAN, ESQ. (VIA ZOOM)
                Shook, Hardy & Bacon LLP
18              JPMorgan Chase Tower
                600 Travis Street, Suite 3400
19              Houston, Texas 77002
                713.227.8008
20              sjames@shb.com
                eflaster@shb.com
21              rfreeman@shb.com
22
            (Appearance continued on next page.)
23
24
25
```

Page 3

```
 1              APPEARANCES CONTINUED:
 2
      For the Defendant Snap:
 3
                BY:  ALEX INGOGLIA, ESQ. (VIA ZOOM)
 4              Kirkland & Ellis LLP
                333 West Wolf Point Plaza
 5              Chicago, Illinois 60654
                312.862.1083
 6              alex.ingoglia@kirkland.com
 7
      For the Defendants Alphabet Inc., Google LLC, and
 8    YouTube LLC:
 9              BY:  J. ANDREW KEYES, ESQ.
                BY:  LYDIA WEIANT, ESQ.
10              Williams & Connolly LLP
                680 Maine Street SW
11              Washington, DC 20024
                202.434.5584
12              akeyes@wc.com
                lweiant@wc.com
13
14    For the Defendants TikTok, Ltd.; TikTok, LLC;
      TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
15
                BY:  ADAM REINKE, ESQ. (VIA ZOOM)
16              King & Spalding LLP
                1180 Peachtree Street, NE
17              Suite 1600
                Atlanta, Georgia 30309
18              404.572.2774
                areinke@kslaw.com
19
20    Also Present:  Bradley Loy, Videographer
                     Jacob Arndt, Exhibit Technician
21                   Lauren R. Drive, Deputy General Counsel
                     Harford County Public Schools
22
23
24
25
```

Page 4

```
 1                   I N D E X
 2                                            PAGE
 3   EXAMINATION BY MR. KEYES                    6
 4   EXAMINATION BY MR. BYRD                    144
 5   EXAMINATION BY MR. KEYES                   163
 6   EXAMINATION BY MR. BYRD                    175
 7
 8                 E X H I B I T S
 9
10   NUMBER              DESCRIPTION          PAGE
11   EXHIBIT 1   Defendants' Third Amended      9
                 Notice of Oral and Videotaped
12               Deposition of Bernard
                 Hennigan; Request for
13               Production of Documents
14   EXHIBIT 2   Defendants' Amended            9
                 Supplemental Notice of Oral
15               and Videotaped 30(b)(6)
                 Deposition of Plaintiff Board
16               of Education of Harford County
17   EXHIBIT 4   Wellness Needs Assessment     61
                 Analysis 2023-2024 School Year
18               Final Research Report, Bates
                 HCPS_00046480-504
19
     EXHIBIT 5   Emails dated 9/19/19, Subject: 81
20               Back to School, Bates
                 HCPS_00188517-518
21
     EXHIBIT 6   Emails dated 1/28/21, Subject: 86
22               Mental Health & COVID, Bates
                 HCPS_00199872-874
23
     EXHIBIT 7   Policy Title:  Portable        94
24               Communication Devices,
                 Effective 6/11/1990, Most
25               Recently Amended 3/18/2024
```

Page 5

1    EXHIBIT 8    2023-2024 Parent-Student         168
                  Handbook Calendar, Bates
2                 HCPS_00114511-545

3

4         (Exhibit 3 was marked but clawed back by
5    Mr. Byrd.)

6

7         (The agreed-upon redacted portions were
8    removed from the transcript and bound under
9    separate cover not to be produced pending
10   resolution of dispute.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 6
 1                   P R O C E E D I N G S
 2                          *  *  *
 3               THE VIDEOGRAPHER:  We are now on the
 4    record.
 5               My name is Bradley Loy.  I am a
 6    videographer for Golkow, a Veritext division.
 7               Today's date is May 7th, 2025.  The
 8    time is 9:01.
 9               This video deposition is being held in
10    Bel Air, Maryland, in the matter of Social Media
11    Adolescent Addiction/Personal Injury Products
12    Litigation for the U.S. District Court, Northern
13    District of California.
14               The deponent is Bernard Hennigan --
15    Hennigan.
16               Counsel will be noted on the
17    stenographic record.
18               The court reporter is Cindy Hayden and
19    will now swear in the witness.
20                          *  *  *
21                   BERNARD HENNIGAN,
22      having been first duly sworn, was examined and
23                  testified as follows:
24                          *  *  *
25                   EXAMINATION
```

Page 7

```
 1  BY MR. KEYES:
 2        Q.   Good morning, Mr. Hennigan.  My name is
 3  Andrew Keyes.  I'm an attorney with the law firm of
 4  Williams & Connolly, and we represent the Google
 5  and YouTube defendants in this case.
 6             Would you please state your full name
 7  for the record?
 8        A.   Bernard Paul Hennigan.
 9             THE REPORTER:  I'm sorry.
10             THE WITNESS:  Bernard Paul Hennigan.
11  BY MR. KEYES:
12        Q.   What is your home address?
13        A.   1542 Swearingen Drive, Bel Air,
14  Maryland 21014.
15        Q.   What is your current work address?
16        A.   102 South Hickory Avenue, Bel Air,
17  Maryland 21014.
18        Q.   You are employed by Harford County
19  Public Schools?
20        A.   Yes.
21        Q.   What is your current title?
22        A.   Executive director of student support
23  services.
24        Q.   And how long have you been the
25  executive director of student support services for
```

1    Harford County Public Schools?

2         A.    Since January of 2017.

3         Q.    Have you had other positions with

4    Harford County Public Schools?

5         A.    Well -- okay.  Yes.  Let me clarify.

6              January 2017 I came here as the

7    director.  And then that title was altered in

8    April -- July 1st, 2019.

9         Q.    Okay.  So you were first --

10        A.    Sorry.  Yeah.  There's, like, a little

11   bit of a nuance change.

12        Q.    Sure.  You were first employed by

13   Harford County Public Schools in January of 2017?

14        A.    Correct.

15        Q.    As the director of student support

16   services?

17        A.    Student services.

18        Q.    Student services.  And then in July of

19   2019, you became the executive director of student

20   support services?

21        A.    Correct.

22        Q.    Have you had any other positions with

23   Harford County Public Schools?

24        A.    No.

25        Q.    Do you understand that you are under

```
                                      Page 9
 1   oath today?
 2          A.   Yes.
 3          Q.   Do you understand that you are under
 4   oath and giving testimony as if you were in a
 5   courtroom before a judge and a jury?
 6          A.   Yes.
 7          Q.   And do you understand that you are
 8   testifying as a corporate representative of Harford
 9   County Public Schools on a number of listed topics?
10          A.   Yes.
11               (HCPS MD HENNIGAN EXHIBIT 1,
12   Defendants' Third Amended Notice of Oral and
13   Videotaped Deposition of Bernard Hennigan; Request
14   for Production of Documents, was marked for
15   identification.)
16   BY MR. KEYES:
17          Q.   I'm showing you what has been marked as
18   HCPS Exhibit 1.
19               (HCPS MD HENNIGAN EXHIBIT 2,
20   Defendants' Amended Supplemental Notice of Oral and
21   Videotaped 30(b)(6) Deposition of Plaintiff Board
22   of Education of Harford County, was marked for
23   identification.)
24   BY MR. KEYES:
25          Q.   And now I'm handing you what has been
```

Page 10

1    marked as HCPS Exhibit 2.

2              Have you seen either of these notices

3    before today?

4         A.   Yes.

5         Q.   Okay.  Exhibit 1 is a notice for your

6    deposition.  And if you look at the first page,

7    Lines 17 through 20 say that you will be the Board

8    of Education of Harford County's designated

9    corporate representative on a long list of topics

10   that are set forth in a separate notice.

11             Do you see that?

12        A.   Yes.

13        Q.   The separate notice is Exhibit 2.

14        A.   Okay.

15        Q.   And if you turn to Page 7 of Exhibit 2,

16   you'll see the list of topics.

17        A.   Yes.

18        Q.   So I just want to confirm that you are

19   prepared to testify as Harford County Public

20   Schools' corporate representative on the topics

21   listed on Lines 18 and 19 of Exhibit 1.

22        A.   Oh.  Yes.

23        Q.   Lines -- yeah.  Yes?

24        A.   Yeah.

25        Q.   And you are prepared to testify on

Page 11

```
 1   those topics based on the information known to and
 2   reasonably available to Harford County Public
 3   Schools?
 4          A.   Yes.
 5          Q.   Okay.  Did you do anything to prepare
 6   for today's deposition?
 7          A.   Yes.
 8          Q.   What did you do?
 9          A.   Had a series of meetings with outside
10   legal counsel as well as our legal counsel.
11          Q.   Did you do anything else to prepare?
12          A.   No.
13          Q.   You said you had a series of meetings.
14   How many different meetings did you have with the
15   lawyers to prepare for today's deposition?
16          A.   Three, including today.
17          Q.   Okay.  So when was the first one?
18          A.   Last week, I believe, Wednesday or
19   Thursday.
20          Q.   When was the second one?
21          A.   Yesterday.
22          Q.   And you said the third one was this
23   morning?
24          A.   Correct.
25          Q.   In your first prep session with the
```

```
                                          Page 12
 1    lawyers last week, who participated?
 2           A.   Myself, Kimberly Neal and Matt Legg.
 3           Q.   Did anyone else participate in that
 4    prep session?
 5           A.   No.
 6           Q.   How long was it?
 7           A.   Roughly an hour.  An hour and a half,
 8    maybe.
 9           Q.   Did you review any documents during
10    that prep session?
11           A.   Yes.
12           Q.   What documents did you review?
13           A.   Exhibit 2.
14           Q.   The list of topics?
15           A.   Yes.
16           Q.   Did you review any other documents in
17    that first prep session?
18           A.   Not that I recall.
19           Q.   How long was your meeting yesterday
20    with the lawyers?
21           A.   I'd say roughly an hour.
22           Q.   And who did you meet with?
23           A.   Myself, Ms. Driver, Kenny.
24                THE WITNESS:  I'm sorry.  I don't know
25    your last name.
```

```
                                                      Page 13

 1                MR. BYRD:  Mr. Byrd.

 2                THE WITNESS:  Mr. Byrd.

 3                And Matt Legg and Nick -- well, I don't

 4     know Nick's last name either -- were on the phone.

 5                MR. BYRD:  Lee.

 6                THE WITNESS:  Lee.  Sorry.  Yeah, Lee.

 7     BY MR. KEYES:

 8          Q.   You said Nick Lee was on the phone?

 9          A.   Matt Legg or Nick Lee.

10                THE WITNESS:  Oh, sorry.  I thought you

11     were correcting me on "Legg."

12                Nick Lee, Matt Legg were on the phone.

13     BY MR. KEYES:

14          Q.   Okay.  And then were Mr. Byrd and

15     Ms. Driver in person?

16          A.   Yes.

17          Q.   Did anyone else participate in that

18     meeting with the lawyers?

19          A.   No.

20          Q.   Did you review any documents during

21     yesterday's prep session with the lawyers?

22          A.   Correct.  Yes.

23          Q.   What did you review?

24          A.   The complaint.  Interrogatories, I

25     think, Number 3 and Number 5.  And the questions
```

Page 14

1    or -- I'm not sure what you're referring to these
2    as again.
3         Q.   Are you referring to Exhibit 2?
4         A.   Yes.
5         Q.   It's a list of topics.
6         A.   List of topics.
7         Q.   That's one of the four documents you
8    reviewed yesterday?
9         A.   I think I -- I don't know if I -- the
10   interrogatories is either Number 3 or Number 5.
11   I'm not sure which one it was.  So it's only three
12   topics.
13        Q.   Oh, I see.  Okay.
14             So you reviewed the complaint.  You
15   reviewed an interrogatory answer, either the answer
16   to Number 3 or the answer to Number 5.  And you
17   reviewed Exhibit 2, the list of topics?
18        A.   Correct.
19        Q.   Okay.  Anything else that you reviewed
20   in the prep session yesterday?
21        A.   Not that I recall.
22        Q.   Okay.  And then who participated in
23   this morning's prep session?
24        A.   Myself, Ms. Driver, Mr. Byrd.
25        Q.   Anyone else participate?

Page 15

1         A.    No.

2         Q.    How long was that prep session?

3         A.    25 minutes, 20 minutes.

4         Q.    Did you review any documents this

5    morning with the lawyers?

6         A.    No.

7         Q.    Did you review the transcript of any

8    testimony given by someone else in this case?

9         A.    No.

10         Q.    Did you review any documents on your

11    own outside these three prep sessions with the

12    lawyers?

13         A.    No.

14         Q.    And you understand that the lawyers

15    you've mentioned -- Ms. Neal, Ms. Driver, Mr. Legg,

16    Mr. Byrd and Mr. Lee -- are all lawyers for Harford

17    County Public Schools?

18         A.    Is that accurate?  I'm not sure.  I

19    know Ms. Driver and Ms. Neal are.

20         Q.    Okay.  You're not sure about the

21    others?

22         A.    Yes.

23         Q.    Okay.  Did you speak with anyone in

24    Harford County Public Schools to prepare for

25    today's deposition?

Page 16

1           A.    No.
2           Q.    Did you speak with anyone outside
3    Harford County Public Schools to prepare for
4    today's deposition?
5           A.    I mean, other than the people I've
6    already noted, no.
7           Q.    Okay.  So is it fair to say that the --
8    the prep you've done was meeting with the people
9    you've listed -- which include Harford County
10   Public Schools' in-house lawyers and then Mr. Legg,
11   Mr. Lee and Mr. Byrd -- for three hours or so; and
12   you reviewed the complaint, one interrogatory
13   answer and Exhibit 2?
14          A.    Correct.
15          Q.    Did you do anything else to prepare?
16          A.    Not that I recall.
17          Q.    Is there any reason you cannot testify
18   truthfully and accurately today?
19          A.    No.
20          Q.    Did you take any notes during your
21   preparation?
22          A.    No.
23          Q.    Did you bring any documents with you to
24   today's deposition?
25          A.    No.

Page 17

```
 1         Q.   Would you turn to Exhibit 2, Page 7,
 2    Topic 1, which is:  The amount of time and the
 3    frequency of the use by students of, one, cell
 4    phones, smartphones, laptops, tablets or other
 5    electronic devices; two, any of the defendants'
 6    platforms; or, three, any other online media and
 7    communications services.
 8              Do you see that?
 9         A.   Yes.
10         Q.   Okay.  Does Harford County Public
11    Schools have any quantitative data reflecting the
12    amount of time students spend on cell phones or
13    other electronic devices?
14              MR. BYRD:  Object to form.
15              I'm going to object sometimes, I think
16    I told you.  You can still just answer the question
17    unless I instruct you not to.
18              THE WITNESS:  Uh-huh.
19              MR. BYRD:  But object to form.  I'm
20    getting it on the record.  Go ahead.
21              THE WITNESS:  Yes.
22    BY MR. KEYES:
23         Q.   Okay.  What data?
24         A.   We conduct a wellness needs assessment
25    that specifically asks students about their use.
```

Page 18

```
 1          Q.    How many wellness needs assessment have
 2    you performed?
 3          A.    Well, we do it every year.   We roughly
 4    get about twenty-five to 30,000 students
 5    responding.
 6          Q.    And does that include high school
 7    students?
 8          A.    Correct.   Yes.
 9          Q.    Does that include middle school
10    students?
11          A.    Yes.
12          Q.    Does it include elementary students?
13          A.    Third, fourth and fifth grade.
14          Q.    And who actually conducts this needs
15    assessment?
16          A.    It has changed over the years.   It used
17    to be the school counselors.   And then it morphed
18    into doing it in the classroom, having teachers
19    initiate it.   But it's really a self-guided
20    assessment.
21          Q.    When did it switch from school
22    counselors conducting this needs assessment to
23    teachers conducting it?
24          A.    This school year.
25          Q.    Okay.   So this year is the first time
```

Page 19

```
1    teachers have done it in the classrooms?
2            A.    Well, it's always done in the
3    classroom, but it's the first time that the
4    counselor wasn't the lead.
5            Q.    Okay.  And is this done in writing by
6    the students where they fill out something?
7            A.    It's electronic.
8            Q.    Okay.  And where are the results of the
9    survey compiled?
10           A.    Stored on a dashboard.
11           Q.    What is the dashboard called?
12           A.    Wellness Needs Assessment.
13           Q.    And where is that dashboard accessible
14   to Harford County Public Schools' employees?
15           A.    Depends on your role.
16           Q.    Okay.  How do you access it?
17           A.    I have a link.
18           Q.    On your laptop or desktop or --
19           A.    Through --
20           Q.    -- whenever you're on the network?
21           A.    I honestly just have it saved through
22   an email through our research and evaluation
23   person.
24           Q.    And what -- what does that assessment
25   ask about regarding students' use of cell phones or
```

Page 20

1    other electronic devices?

2           A.   So I can't remember the specific --

3               MR. BYRD:  By the way, just -- I'm

4    going to object to any material that's beyond the

5    relevant time period in the notice as far as on

6    behalf of the school district.

7               But you can go ahead and answer.

8               THE WITNESS:  I don't remember the

9    specific questions, but it does ask about the

10   amount of time they use electronic devices outside

11   of the school day, what social media platforms they

12   engage with.  And then because we know the

13   detriment of social media platforms, we ask about

14   their sleep and other mental health-related

15   questions.

16   BY MR. KEYES:

17          Q.   Anything else that you remember the

18   assessment collects data on regarding students' use

19   of cell phones or other electronic devices?

20          A.   How much time they're on it before they

21   go to sleep, how much time they don't go to sleep

22   on time because of the electronic device.  That may

23   be it.

24          Q.   And how far back do these annual

25   wellness needs assessments go in the records that

Page 21

1    you have access to?
2          A.    I believe we -- I believe '21 --
3    '22-'23, I think, was our first year, I believe.
4          Q.    Okay.  And has it been done already for
5    this school year?
6          A.    Yes.
7          Q.    So is it fair to say you've got the
8    data from three wellness needs assessments?
9          A.    Yes.
10          Q.    I asked you before whether Harford
11    County Public Schools has any quantitative data
12    about the amount of time students spend on cell
13    phones or other electronic devices.  Beyond what
14    you've already described, does Harford County
15    Public Schools have any quantitative data about the
16    amount of time students spend on the defendants'
17    platforms or other online media and communication
18    services?
19          A.    We may.  There is a youth risk behavior
20    survey that's done.  I don't know if that has
21    specific questions in it about social media use,
22    but it may.
23          Q.    And who conducts the youth risk
24    behavior survey?
25          A.    That's done in the classroom.  It's

Page 22

1   random choice of schools, random choice of grade
2   levels, I believe.  It's -- I don't know if it's
3   federal- or state-mandated survey.  It's not a --
4   it's not a Harford County-grown survey.
5          Q.   Do you know who designs the survey each
6   year?
7          A.   I don't.
8          Q.   Is the data that is filled out by
9   Harford County Public Schools made available to you
10  or others?
11         A.   Eventually.
12         Q.   Is it made available as part of the
13  final report on that survey?
14         A.   What do you mean by that?
15         Q.   Well, do you understand that the report
16  is published of the results from the youth risk
17  behavior survey?
18         A.   Yeah.
19         Q.   Okay.  Before you get that final
20  report, do you have access to the data for the
21  Harford County Public School students who
22  participated in the survey?
23         A.   No.
24         Q.   Okay.  So you cooperate with the state
25  in having the randomly selected schools and grades

Page 23

1    fill out the survey.  That data is submitted to the
2    state, and then at some point you get the report
3    back?
4          A.    Correct.
5          Q.    Okay.  Is there any other quantitative
6    data that Harford County Public Schools has about
7    the amount of time students spend on the
8    defendants' platforms or other online media and
9    communications services?
10                MR. BYRD:  Object to form.  Vague as to
11    quantitative data.
12                You can answer.
13                THE WITNESS:  I don't know.
14    BY MR. KEYES:
15          Q.    And beyond what you've told me, does
16    Harford County Public Schools have any quantitative
17    data on the frequency of the use by students of
18    cell phones, other electronic devices, the
19    defendants' platforms or any online media and
20    communication services?
21          A.    Beyond --
22                MR. BYRD:  Object to form.
23                THE WITNESS:  Beyond what I've already
24    stated?
25    BY MR. KEYES:

Page 24

1          Q.    Yes.

2          A.    No.  I mean, I should say I don't know.

3          Q.    You're not aware of any other data --

4          A.    No.

5          Q.    -- is that correct?

6          A.    Correct.

7          Q.    Does Harford County Public Schools have

8    any quantitative data about the impact of students'

9    use of cell phones, other electronic devices,

10   defendants' platforms or other online media and

11   communication services on students' mental,

12   emotional, social or behavioral health?

13         A.    Yes.

14         Q.    What?

15         A.    Several pieces.  One would be our

16   suicide ideation report data dashboard, which shows

17   every student who has had thoughts of committing

18   suicide and the reason for that, which in some

19   cases would include social media, bullying,

20   teasing, feelings of depression, anxiety based on

21   their social media use, impact of -- on their life

22   of not feeling adequate because of the social media

23   use and the things that they're seeing on there.

24   That would be one example.

25              We also have threat assessment data.

Page 25

1    Every time a student indicates that they want to

2    harm others, either individually or en masse, we do

3    a threat assessment.  And that data would show the

4    impact of their use of social media, either the

5    impact on their decision to do the threat or the

6    use of social media to carry out the threat.

7                We also do risk-of-harm assessments

8    when students we believe doesn't meet the level of

9    a threat assessment but meets the level of

10   identifying their risk to harm other people when

11   they come back from a suspension.

12               We have the wellness needs assessment,

13   which shows varying levels of change in anxiety,

14   depression and other mental health concerns, which

15   may or may not tie back to social media use.

16               We have dashboards for discipline as

17   well as attendance, and have information from

18   students regarding their either lack of attendance

19   or discipline incidents that have occurred, which

20   in some cases would be tied back to the use of cell

21   phones, the use of social media platforms or the

22   impact of the social media platform on them.

23        Q.    Have you given me a complete list?

24               MR. BYRD:  Object to form.  A complete

25   list of your original question?

Page 26

1                  MR. KEYES:  Yeah.

2       BY MR. KEYES:

3            Q.    Have you given me a complete list of --

4                  MR. BYRD:  The quantitative data.

5       BY MR. KEYES:

6            Q.    -- the sources of quantitative data?

7                  MR. BYRD:  Okay.

8                  MR. KEYES:  Yeah.

9                  THE WITNESS:  Let me think for a few

10      minutes on that.  We have bullying and harassment

11      reports that are submitted by staff, students and

12      the community, which in some cases tie back to the

13      use of social media to carry out the bullying or

14      harassment or the victim's report of the impact of

15      the harassment through social media.

16      BY MR. KEYES:

17           Q.    Anything else?

18           A.    We conduct reintegration meetings every

19      time a child comes back from a mental health

20      hospitalization.  And in that meeting, a form is

21      completed that asks a lot of questions of the

22      student to try to help them upon their return to

23      school.  And in some of those cases, that would

24      reflect the impact of social media on their mental

25      health, which then led to the hospitalization.

1          We have psychological testing that's
2    done by our school psychologists, which in some
3    cases would indicate issues caused by phone use and
4    social media and tablet use.  And we also get data
5    from our health department about the wellness of
6    our children and adults countywide which may have
7    information about cell phone use in that and social
8    media use.
9          Q.    Okay.  You referenced data from the
10   health department.  Is that from the Harford County
11   Health Department?
12         A.    Yes.
13         Q.    Is that data compiled by the health
14   department?
15         A.    Yes.  And shared with us.
16         Q.    Okay.  And when Harford County sends
17   this data to Harford County Public Schools, to whom
18   is it addressed?
19         A.    I don't know that we've ever had it
20   directly addressed to us.  It's been shared with us
21   in meetings.
22         Q.    Okay.  Have you ever gotten a written
23   report from the Harford County Health Department
24   that provides this data?
25         A.    Likely it would be in the way of a

Page 28

```
 1   PowerPoint that has data embedded in it.
 2         Q.    Okay.  Separate from any PowerPoint
 3   that may have data and which PowerPoint is used
 4   during a meeting, does the Harford County Health
 5   Department send any report to you or anyone else at
 6   Harford County Public Schools with this data?
 7         A.    Possibly.  But not to my knowledge that
 8   I can recall right now.
 9         Q.    You referenced psychological testing by
10   psychologists.  Is this testing done on an
11   individual level?
12         A.    If needed.
13         Q.    Okay.
14               THE REPORTER:  I'm sorry.
15               THE WITNESS:  If needed.
16   BY MR. KEYES:
17         Q.    And is there any document that
18   aggregates any data from the reports of
19   psychological testing of individual students?
20         A.    Not to my knowledge.
21         Q.    So if you wanted to look at
22   quantitative data based on the psychological
23   testing by psychologists, you'd have to go look at
24   each of the reports; is that correct?
25         A.    Correct.
```

1          Q.    You mentioned these reintegration
2    meetings.  These are meetings to facilitate a
3    student returning to the school environment after a
4    mental health hospitalization?  Yes?
5          A.    Correct.
6          Q.    And who conducts these reintegration
7    meetings?
8          A.    It's done at the school level.  The
9    staff could vary.  But it's likely going to
10   involve --
11              THE REPORTER:  You have to slow that
12   down.
13              "It's likely going to involve"?
14              THE WITNESS:  Someone from student
15   services, like a counselor, a psychologist, a
16   social worker and an administrator.
17   BY MR. KEYES:
18         Q.    Is there any document that aggregates
19   any data from any reports on these reintegration
20   meetings with individual students?
21         A.    No.
22         Q.    So if you wanted to look at
23   quantitative data based on these reintegration
24   meetings, you'd have to go look at each of the
25   reports of each of those meetings?

Page 30

1          A.    Correct.

2          Q.    You mentioned bullying and harassment

3    reports.  Is that one report or are there two

4    different reports, one for bullying and one for

5    harassment?

6          A.    It's one report.

7          Q.    What is it called?

8          A.    Bullying, harassment and intimidation,

9    maybe, just, report.

10         Q.    And who within Harford County Public

11   Schools fills out a bullying, harassment and

12   intimidation report?

13         A.    That could be a student, a staff

14   member, or a community member or parent.

15         Q.    And once it's filled out, to whom is it

16   submitted?

17         A.    The school where the -- where the

18   victim goes to school.

19         Q.    And who is -- who is -- at the school

20   is supposed to receive that report?

21         A.    An administrator.

22         Q.    Is there a particular administrator or

23   just an administrator at the school?

24         A.    I'm sure it varies by school.

25         Q.    Who, if anyone, within Harford County

Page 31

1    Public Schools is tasked with acting on the
2    bullying, harassment and intimidation report?
3              A.    An --
4                    MR. BYRD:   Object.
5                    Sorry.
6                    Object to form.
7                    You can answer.
8                    THE WITNESS:   An administrator.
9    BY MR. KEYES:
10             Q.    Is there a document that memorializes
11   what action the Harford County Public Schools
12   administrator took on the bullying, harassment and
13   intimidation report?
14             A.    Yes.
15             Q.    What is that document?
16             A.    It's part of the database that shows
17   the event, the accusation, and the response from
18   the administration.
19             Q.    What is that database called?
20             A.    I don't know.
21             Q.    Who maintains that database at Harford
22   County Public Schools?
23             A.    My office.
24             Q.    Who in your office?
25             A.    Kim Noll.

Page 32

1          Q.    And then does Ms. Noll or anyone else
2    generate reports that provide any kind of
3    quantitative data about incidents of bullying,
4    harassment or intimidation?
5          A.    Yes.
6          Q.    What is that report called?
7          A.    I don't know.
8          Q.    Does that database have a field for a
9    narrative about either the -- the reported
10   allegations or any action taken on those
11   allegations?
12         A.    Yes.
13         Q.    And so if you wanted to see whether an
14   incident of bullying or harassment or intimidation
15   involved social media, would you have to go through
16   each of those narratives?
17         A.    Possibly not because we generate a
18   report to MSDE every year.
19               So I'm not sure exactly what data is
20   aggregated and whether it's going to be broken down
21   by field to the type of harassment.
22               But I believe the report does indicate
23   the type of harassment and would have a field for
24   social media or electronic use, but I can't say
25   specifically if it does or not.

Page 33

1          Q.   Okay.  You -- you mentioned dashboards
2     for discipline and attendance.  What are those
3     dashboards called?
4          A.   I think the attendance dashboard is
5     just called an attendance dashboard.  I don't know
6     the exact name of it.
7               And then the discipline dashboard
8     reflects -- it's probably entitled
9     "Disproportionality Dashboard" or "Discipline
10    Dashboard."  I don't know the exact name.
11         Q.   Who maintains the data for the
12    attendance dashboard?
13         A.   Ousmanou Yakoubou.
14              THE REPORTER:  Say that again.
15              THE WITNESS:  I don't know how to spell
16    it, so...  Ousmanou Yakoubou.
17              He's our -- I don't know his exact
18    title, but research analyst, research evaluation
19    person.
20    BY MR. KEYES:
21         Q.   And who maintains the -- the discipline
22    or disproportionality dashboard?
23         A.   The same person.
24         Q.   Have you looked at either of those
25    dashboards yourself?

```
                                             Page 34

 1          A.    Yes.

 2          Q.    Do the dashboards talk about student

 3     use of social media?

 4          A.    The attendance dashboard does not.  The

 5     discipline dashboard may.

 6          Q.    And is there a particular field in the

 7     discipline dashboard that allows someone to report

 8     whether or not the discipline incident involved

 9     social media?

10          A.    It may.  There's definitely fields for

11     cell phone.  Whether it's then moved to social

12     media or not, I'm not sure.  But definitely for

13     cell phone.

14          Q.    Okay.  So your -- your knowledge is

15     that within this discipline database, there is a

16     field where someone can note whether the discipline

17     incident involved a cell phone?

18          A.    If that's an offense code that --

19     that's noted, yes.  Because you can look it up by

20     offense code, like fighting or disruption or cell

21     phone use.

22          Q.    Is there an offense code that mentions

23     social media?

24          A.    No.

25          Q.    Other than looking to see whether
```

Page 35

1    discipline incidents involving cell phones also

2    involve social media, is there any other way within

3    the discipline dashboard to identify which

4    incidents involved social media in some way?

5            A.   In that dashboard, I don't believe so.

6    But in our eSchoolPLUS, which is our student

7    information system, each incident has a narrative.

8    And that narrative would allude to if social media

9    was involved.

10           Q.   So you could go to a separate database

11   called eSchool, and you could look at the narrative

12   for any particular incident to see if there's a

13   mention of social media?

14           A.   Correct.

15           Q.   Okay.  You also mentioned a wellness

16   needs assessment when you were giving me a list of

17   the sources of quantitative data.

18                Is that the same as the wellness needs

19   assessment you described earlier?

20           A.   Yes.

21           Q.   Okay.  You also mentioned risk

22   assessments.

23                If I understood you correctly, you said

24   a risk assessment is conducted when there's not a

25   threat because if it were a threat, you'd fill out

Page 36

1     a threat assessment.

2                    Therefore, a risk assessment is filled

3     out to assess the risk of harm when a student

4     returns to the school environment from a

5     suspension.

6                    Did I get that right?

7          A.    So I think there are -- I have to try

8     to remember the terminology.  I think there's

9     two -- two different types of harms to report.

10                   So risk assessment is going to evaluate

11    a student's risk to themselves.  I have to remember

12    the name of the assessment that was completed.  I

13    believe it's risk for harm assessment.  I can't

14    remember the exact title.

15                   But that's a separate assessment that's

16    done after a suspension -- or prior to -- prior to

17    the determination of the length of the suspension

18    to determine if the child -- we feel a child is at

19    risk to do that harm again when they come back.

20         Q.    Okay.

21         A.    If that makes sense.

22         Q.    So is there one risk assessment or

23    there are two?

24         A.    There's two.  I think there's -- but

25    the other one has a different title.  I think it's

Page 37

1    "Risk for Harm."

2           Q.    Okay.

3           A.    So, just to elaborate, a threat

4    assessment is assessing what happened and how we're

5    going to respond to that.

6                The risk assessment -- "Risk for Harm,"

7    I believe, is the title of it -- is saying:  This

8    happened.  We know it happened.  We need to

9    determine if it's going to happen again.  And, if

10   so, that may change the consequence.

11          Q.    And the threat assessment is about a

12   particular incident involving a threat.  Yes?

13          A.    Yes.

14          Q.    And a risk assessment is focused on a

15   particular person and whether they pose some kind

16   of risk of harm?

17          A.    Correct.  So if a person sexually

18   assaults somebody in a stairwell, we would do that

19   assessment to determine do we think that could

20   happen again when they come back.  And then that

21   would determine their length of suspension.

22          Q.    Is there any document that aggregates

23   data across all of the risk assessments?

24          A.    Possibly.  I don't know.

25          Q.    You don't know.  You've not seen a

Page 38

```
1   report that aggregates data from all the risk
2   assessments; is that correct?
3        A.   Correct.
4        Q.   And if you wanted to know how many risk
5   assessments involved social media in some way,
6   you'd have to go through each of the risk
7   assessments themselves?
8        A.   I don't know.
9        Q.   You've never done that?
10       A.   No.
11       Q.   Is there any document that aggregates
12  data across all of the threat assessments?
13       A.   No.
14       Q.   So if you wanted to know how many
15  threat assessments involve social media in some
16  way, you'd have to go through each of those threat
17  assessments?
18       A.   Yes.
19       Q.   Have you ever done that?
20       A.   No.
21       Q.   And you also mentioned the suicide
22  ideation report and a data dashboard.  Are those
23  one thing or two separate things?
24       A.   I don't remember saying data dashboard,
25  but the suicide ideation report is one separate
```

Page 39

1   thing.
2          Q.   And who fills out a suicide ideation
3   report?
4          A.   It will typically be somebody in
5   student services, such as a school counselor,
6   nurse, psychologist.
7          Q.   And when are the Harford County Public
8   School employees and student services supposed to
9   fill out a suicide ideation report?
10         A.   Fairly immediately following a
11  student's iteration or ideation.
12         Q.   And then once they filled out the
13  suicide ideation report, who is supposed to take
14  action on that report?
15         A.   The staff member that's completing it.
16         Q.   Okay.  So is the suicide ideation
17  report not only reporting that a student expressed
18  some thoughts about suicide, but it also reports
19  what the school staff did in response to the
20  suicidal ideation?
21         A.   Absolutely.  Yes.
22         Q.   Okay.  Is there -- where are these
23  suicide ideation reports kept?
24         A.   In a separate dashboard.
25         Q.   Okay.  And do you have access to that

Page 40

1    dashboard?

2              A.    I do.

3              Q.    Where are the threat assessments kept?

4              A.    They are still on paper and kept at the

5    schools.

6              Q.    And where are the risk assessments

7    kept?

8              A.    I believe they're also paper and at the

9    schools.

10             Q.    Okay.  So for threat assessments and

11   risk assessments, both of them are still on paper

12   and they are stored at the school level?

13             A.    Definitely for the threat assessment.

14   I'm not sure about the risk assessment.  But I

15   believe that's the case.

16             Q.    Okay.  For the suicide ideation

17   reports, can you see individual reports on your

18   dashboard?

19             A.    Yes.

20             Q.    And so you can actually access the

21   report itself?

22             A.    Yes.

23             Q.    Does the dashboard aggregate

24   information across individual suicide ideation

25   reports?

Page 41

1          A.    Yes.

2          Q.    What data does it aggregate?

3          A.    I don't know if this will be a

4     comprehensive list.  But it will say dates.  It

5     will show trends in -- in time of years.  It will

6     show numbers based on grade level, numbers based on

7     school, numbers based on level of severity.

8               It will show data based on reason for

9     the feelings is the best way I can put that.  It

10    will show the number of students who have

11    attempted, number of students who -- the -- the

12    types of act they were planning to do for those

13    that had a plan.  That may be it, but I'm sure I'm

14    missing something.

15         Q.    Does that report that aggregates the

16    data you listed also report anything about whether

17    social media was involved?

18         A.    In the aggregate report?

19         Q.    Yes.

20         A.    I don't know.

21         Q.    Is there something in the suicide

22    ideation report that has a box that someone checks

23    to note whether social media was involved in any

24    way?

25         A.    I'm not sure.

Page 42

1          Q.    If you wanted to know how many of the
2     suicide ideation reports involved social media in
3     some way, would you have to go look through the
4     individual suicide ideation reports?
5          A.    I'm not sure.
6          Q.    How many students in the 2017-2018 year
7     were either treated or counseled by Harford County
8     Public Schools for anxiety?
9          A.    I don't know.
10         Q.    Is there a document you could check?
11         A.    No.
12         Q.    Is there a document you could check to
13    tell me how many students in the -- any of the
14    subsequent school years were either treated or
15    counseled by Harford County Public Schools for
16    anxiety?
17         A.    So let me rephrase my answer to that.
18    So I can't give a -- an exact answer, but I could
19    give a answer that would be at least at minimum,
20    because we would be able to access these dashboards
21    and these databases and other pieces of data that
22    would tell us a number, but it wouldn't be accurate
23    because we know there'd be more that weren't
24    captured.
25              So we could get a number.  It would

Page 43

1    just be a inaccurate low number.

2         Q.    Okay.  So -- well, where would you go

3    to get the number to show how many students in the

4    2017-2018 year were either treated or counseled by

5    Harford County Public Schools for anxiety?

6         A.    So, a few places.  I would start

7    with -- I have what's called school-based mental

8    health, which is outside mental health providers

9    that we have been forced to bring into our

10   buildings to treat students who couldn't get their

11   mental health therapy after the school day because

12   of inability to access it.

13          We get reports from them on how many

14   students they've seen in addition to the reasons

15   for the -- reasons for a student's accessing the

16   mental health.  That is something that has grown

17   exponentially over the last eight years due to the

18   myriad of issues, most notably being social media

19   impact on our children.  So we've had to increase

20   that therapy.

21          Second, we have -- also had to spend

22   money on a database called Care Solace, which is --

23   I shouldn't say -- it's not a database.  It's an

24   organization that is a third-party vendor that --

25   well, it takes all the legwork out of finding

Page 44

1    therapists, psychologists, psychiatrists for
2    children or adults.  And that dashboard shows the
3    reason for the need for therapy from the
4    individuals, and that's aggregated by the request
5    but also by age.
6           Q.   Okay.  So if you wanted to know how
7    many Harford County Public School students were
8    treated or counseled for anxiety during the
9    2017-2018 school year, you could go get that number
10   by just looking at the dashboard?
11          A.   So -- you asked in subsequent years,
12   too, so we didn't leave it at '17-'18.  So are you
13   going just to '17-'18 now?
14          Q.   Well, let's take it one year at a time.
15   2017-2018 year, how many students were treated or
16   counseled for anxiety?
17               MR. BYRD:  Object to form.
18               THE WITNESS:  So I'll start with the
19   school-based mental health data.  That would be one
20   data point.  Most of the other things that we've
21   talked about so far were not in existence in
22   '17-'18 and have been forced to be come into
23   existence due to the prevalence of cell phones and
24   social media with our children.
25               So, in '17-'18, that would be probably

Page 45

1    the only data piece that I probably could get.
2    BY MR. KEYES:
3         Q.    Okay.  And would that -- when you say
4    the "school-based mental health data," what -- what
5    data are you talking about?
6         A.    So we have outside mental health
7    providers that come into our school buildings and
8    deliver therapy just like they would in their
9    office, but they do it during the school day.  And
10   they give us a report on the number of children
11   they've seen and the reasons for the visits, I
12   believe.
13        Q.    Okay.  And so do you -- is there a
14   document you believe that -- that gives the total
15   number, or would you have to go to each report from
16   each of the psychologists and add them up?
17        A.    No.  We get a total -- we get a total
18   number provided.  I don't know what occurred in
19   '17-'18 as far as that data, but currently, we get
20   that data from all the providers and then have a
21   report on the total number of children seen and
22   reasons for being seen.
23        Q.    Okay.  Still focusing on the 2017-2018
24   school year, would your answer be the same if we
25   wanted to know how many students were treated or

```
                                          Page 46
 1   counseled for depression?
 2           A.    Yes.
 3           Q.    Would the same be true for eating
 4   disorders?
 5           A.    Yes.
 6           Q.    Would the same be true for body
 7   dysmorphia?
 8           A.    Yes.
 9           Q.    Would the same be true for self-harm?
10           A.    So with regards to self-harm, we did,
11   before we created this dashboard -- well, we still
12   do -- report for MSDE every year on our suicide
13   ideation reports.
14                 So we would have an end-of-year report
15   on how many suicide ideation reports were done in
16   the '17-'18 school year that we sent to MSDE, and I
17   would imagine that report has it broken down by the
18   presenting concern.
19           Q.    So you -- you think that would include
20   self-harm --
21           A.    Well, that --
22           Q.    -- in addition --
23           A.    -- that's all self-harm.  Yeah.
24           Q.    Okay.
25           A.    Well, are you talking about self-harm
```

Page 47

1    like cutting, or are you talking about --

2         Q.    That's an example.  Yeah.  So I was

3    trying to identify self-harm separate from suicidal

4    ideation.

5         A.    Only if the self-harm was a part of the

6    suicide ideation report.

7         Q.    Okay.  If the self-harm was not part of

8    the suicidal ideation report, would you be able to

9    tell me how many students were treated or counseled

10   for self-harm in the 2017-2018 school year?

11        A.    Harford County Public Schools data?

12        Q.    Yes.

13        A.    I don't believe so.

14        Q.    Okay.  For 2017-2018 school year, are

15   you able to tell me the number of students who were

16   treated or counseled because of social media

17   addiction?

18        A.    It would be the same, the school-based

19   mental health report.

20        Q.    For 2017-2018 school year, are you able

21   to tell me the number of students who were treated

22   or counseled because of something arising from

23   their use of cell phones or electronic devices?

24        A.    The same.

25        Q.    And for 2017-2018 school year, are you

Page 48

```
 1  able to tell me the number of students who were
 2  treated or counseled because of something arising
 3  from their use of social media?
 4             MR. BYRD:  Object to form.
 5             THE WITNESS:  Same data point.
 6  BY MR. KEYES:
 7        Q.   For any subsequent school year, after
 8  2017-2018 school year, are you able to tell me the
 9  number of students who were treated or counseled
10  because of social media addiction?
11             MR. BYRD:  Object to form.  I think I
12  need to lodge a beyond-the-scope a little bit
13  because of the way your topic is worded.  But it's
14  a beyond-the-scope objection.
15             Go ahead.
16             THE WITNESS:  Yes.
17  BY MR. KEYES:
18        Q.   Okay.  How many?
19        A.   How many what?
20        Q.   How many students in any year since
21  2017-2018 school year were treated or counseled
22  because of social media addiction?
23        A.   I don't know that number.
24        Q.   And where would you go to get that
25  number?
```

Page 49

1          A.     Which school year are we talking about
2     again?
3          Q.     Take any year since the 2017-2018
4     school year.
5          A.     So I'd go back to all the information
6     we just covered depending on when those databases
7     came into play.
8                 So it would be the school-based mental
9     health report.  It would be the suicide ideation
10    report database.  It would be reintegration
11    meetings.
12                I mean, do you want me to go through
13    this list again?
14         Q.     No.  I don't want you to go through --
15         A.     Okay.
16         Q.     -- the list.
17         A.     So the same -- the same data --
18         Q.     But you would -- you would go to all
19    those sources to try to review them to compile that
20    number?
21         A.     Correct.
22         Q.     Okay.  There is no document that exists
23    today that reports that number; is that correct?
24         A.     Accurately, no.
25         Q.     Okay.  Is there a document that reports

Page 50

1    for any year since the 2017-2018 school year the
2    number of students who were treated or counseled
3    because of their use of cell phones?
4                MR. BYRD:  Object to form.
5                THE WITNESS:  It would be the same data
6    points I would look at.
7    BY MR. KEYES:
8        Q.    Okay.  So is it fair to say there is no
9    document that exists today that shows that number?
10   You would have to go through all of the various
11   sources you've listed and try to compile it?
12       A.    Correct.
13       Q.    Okay.  And is the same true if you
14   wanted to know for any year since 2017-2018 school
15   year the number of students who were treated or
16   counseled because of their use of social media?
17       A.    Yes.
18       Q.    Okay.  Are you aware of any written
19   analysis or report that Harford County Public
20   Schools prepared or commissioned that discusses the
21   impacts of the use of cell phones or electronic
22   devices by students?
23       A.    Yes.
24       Q.    What?
25       A.    So at a recent Board of Education

Page 51

```
 1    meeting, I, along with others, did a presentation
 2    on our discipline data and, in the course of that
 3    presentation, documented the reduction in many of
 4    our in-school violations, most notably fighting, as
 5    a result of our ban on phone and social media use
 6    during the school day.
 7              MR. BYRD:  You can ask him about this.
 8    I'm going to object if it's anything beyond after
 9    April 1st, 2024, the relevant time period of this
10    30(b)(6) notice, as beyond the scope.
11              But you can ask, I guess.  It's just
12    beyond the scope.  You won't be able to use it or
13    I'll object.
14    BY MR. KEYES:
15         Q.   When was the Board of Education
16    meeting?
17         A.   April -- I don't know the exact date.
18    A few Mondays ago.  Probably three -- two Mondays
19    ago.
20         Q.   And who prepared this presentation?
21         A.   Myself, Buzz Williams, Natalie Holloway
22    and Tom Smith.
23         Q.   And you gave the presentation to the
24    Board of Education?
25         A.   The four of us did.
```

Page 52

1          Q.   And do I understand --

2               MR. BYRD:   Again, I'll object as beyond

3     the scope of the notice times as far as him

4     speaking on behalf of the school district.

5               But you're free to use your 30(b)(6)

6     time to do it, if you want to.

7     BY MR. KEYES:

8          Q.   Separate from the presentation that you

9     gave to the Board of Education in April of this

10    year, are you aware of any written analysis or

11    report that Harford County Public Schools prepared

12    or commissioned that discusses the impact of the

13    use of cell phones or electronic devices by

14    students?

15              MR. BYRD:   Objection.

16              THE WITNESS:   So I guess it depends how

17    you define "report" or "analysis."

18              But recently, this school year, I

19    started a zero-to-eight work group to convene

20    internal and external stakeholders to address the

21    concerns that we're seeing in our children and our

22    county from zero to eight years old.

23              And part of that initial analysis and

24    report from several agencies, including ours, was

25    that the increased severe behavior of our youngest

1    children is impacted by their and their parents'
2    cell phone, tablet and social media use.
3    BY MR. KEYES:
4         Q.   And has that working group prepared any
5    written report?
6         A.   Minutes, but no written report yet.
7    We're still in the discovery phase.
8         Q.   Is this a Harford County Public
9    Schools-only group, or does it involve stakeholders
10   from around Harford County?
11        A.   Stakeholders from around Harford County
12   as well as Harford County Public Schools employees.
13        Q.   Are you aware of any written analysis
14   or report that Harford County Public Schools
15   prepared or commissioned that discusses the impact
16   of the use of cell phones or electronic devices by
17   students beyond what you've already said?
18        A.   How would you define "commissioned"?
19        Q.   Where Harford County Public Schools
20   hires or engages a third party to do a study and
21   prepare a report.
22        A.   So Harford County Public Schools was
23   part of an initiative to bring an expert to Harford
24   County to impart his knowledge to parents about the
25   dangers of cell phone use and social media.

Page 54

1              I don't remember his name.  I don't
2    remember the year.  It was in the last five, six
3    years.
4              And the title was something to the
5    effect of "Instagram is Killing My Daughter and
6    Minecraft is Killing My Son" or something.  I
7    forget the exact title.
8         Q.   Anything else?
9         A.   The -- during the '23-'24 school year,
10   maybe even prior, a work group convened to evaluate
11   the impact of cell phones and social media on our
12   students and the impact that that is having on our
13   staff and our budget.
14             And part of that work group was to
15   develop a policy around cell phone use during the
16   school day.  Part of that was engaging in a book
17   study of "The Anxious Generation."
18             And out of that then came the current
19   policy we have regarding cell phone use during the
20   school day from middle and high school students.
21   Well, all students.
22        Q.   That led to the current cell phone
23   policy?
24        A.   Correct.
25        Q.   Okay.  Anything else?

Page 55

1          A.    Last school year, we engaged -- or two
2    school years ago, we had several staff members
3    trained in something called HOPE, which is Healthy
4    Outcomes from Positive Experiences.
5               We then last year trained all of our
6    staff across the system on this initiative, this
7    program.  Part of that was informing staff and
8    families about the sort of building blocks that are
9    important to raising healthy children.
10              And part of that was the discussion
11   around not allowing children access to phones or
12   social media and the importance of the things that
13   have been taken away from them through social
14   media, like outdoor play, socialization, engaging
15   in extracurricular activities.
16         Q.    Beyond what you've said, are you able
17   to identify any written analysis or report prepared
18   or commissioned by Harford County Public Schools
19   regarding the impact of students' use of either the
20   defendants' platforms or social media?
21              MR. BYRD:  Object to form.
22              Are you talking about a specific topic
23   number when you say "commissioned"?  I just want to
24   make sure.
25              MR. KEYES:  Topic 8.

Page 56

1                    MR. BYRD:  8.
2      BY MR. KEYES:
3             Q.    You can answer.
4             A.    Not that I can currently recall.
5             Q.    Are you aware of any written analysis
6      or report prepared or commissioned by Harford
7      County Public Schools that discusses an alleged
8      causal link between the use of cell phones or other
9      electronic devices and students' mental, emotional,
10     social or behavioral health?
11            A.    Outside of what we've already
12     discussed?
13            Q.    Yes.
14            A.    No.
15            Q.    Are you aware of any written analysis
16     or report prepared or commissioned by Harford
17     County Public Schools that discusses an alleged
18     causal link between the use of defendants'
19     platforms or social media and students' mental,
20     emotional, social or behavioral health?
21                   MR. BYRD:  I'll object to form.
22                   And to the extent that there's any work
23     product being done here on reports that aren't --
24     that the timing is wrong, you don't need to get
25     into that.

Page 57

```
 1              But if there's any other reports
 2    outside of what your counsel has --
 3              THE WITNESS:  Are you speaking in
 4    general or specific instances?
 5              Because if we're talking about specific
 6    instances where there's a causal link between
 7    social media and mental health, we have thousands
 8    of them, as I've already alluded to, in those
 9    reports.
10    BY MR. KEYES:
11         Q.   Well, I'm -- I'm asking whether you're
12    aware of any written analysis or report prepared or
13    commissioned by Harford County Public Schools that
14    discusses an alleged causal link between the use of
15    defendants' platforms or social media and
16    students', plural, mental, emotional, social or
17    behavioral health.
18              MR. BYRD:  Object.  Object to form.
19    Asked and answered.  He just said.
20              MR. KEYES:  He asked me to clarify it.
21    I'm trying to clarify it.
22    BY MR. KEYES:
23         Q.   And I'm not asking about what happened
24    to a particular student.  I'm asking whether you're
25    aware of any report that -- that discusses the
```

Page 58

```
 1   problem generally or -- or purports to conduct or
 2   describe any kind of scientific literature.
 3              MR. BYRD:  Okay.  Object to form,
 4   because you're changing your question now.  Because
 5   according to your question, he said there are
 6   thousands of them.
 7   BY MR. KEYES:
 8        Q.   You can answer.
 9              MR. BYRD:  Are you changing the
10   question?  Can you rephrase the question?  Or,
11   objection.
12   BY MR. KEYES:
13        Q.   I'll read it back to you.
14              Are you aware of any written analysis
15   or report prepared or commissioned by Harford
16   County Public Schools that discusses an alleged
17   causal link between the use of defendants'
18   platforms of social media and students' mental,
19   social or behavioral health?
20              And I'm not asking about what happened
21   to a particular student.  I'm asking, are you aware
22   of a report that purports to conduct or describe
23   any kind of scientific literature?
24              MR. BYRD:  Object to form to that
25   question.  And asked and answered.
```

1              Go ahead.

2              THE WITNESS:  You asked me two

3    questions, so I'm not sure -- you -- you keep

4    adding scientific literature to the end.

5    BY MR. KEYES:

6         Q.   Well, I asked you a question.  You

7    asked me for a clarification.

8         A.   Uh-huh.

9         Q.   And so I'm giving you that

10   clarification.  I'm not asking about what happened

11   to a particular student.

12        A.   Uh-huh.

13        Q.   I'm asking, are you aware of such a

14   report that purports to either conduct scientific

15   literature or describe what the scientific

16   literature shows?

17             MR. BYRD:  Object to form.

18             THE WITNESS:  So do we have reports

19   that cites scientific literature in instances?  Is

20   that the question?

21   BY MR. KEYES:

22        Q.   No.  I'm not asking about particular

23   instances.  Are you willing to tell me about any

24   particular instance where you've given me all the

25   details, including the student's name and personal

Page 60

1    identifying -- identifying information?

2          A.   No.  Why would I do that?

3          Q.   I didn't think so.  So I'm not here to

4    talk about particular instances; therefore, my

5    questions are not about particular students or

6    particular incidents.

7              I'm asking about whether Harford County

8    Public Schools has prepared, itself, or

9    commissioned someone else to prepare a study that

10   discusses an alleged causal link between students'

11   use of the defendants' platforms or social media

12   and students' mental, emotional or social health.

13             MR. BYRD:  Objection.  And beyond the

14   scope of the way the topic is worded.

15             But you can answer.

16             THE WITNESS:  I would believe that the

17   report that was done using the book study to then

18   generate the policy would satisfy what you're

19   asking.

20   BY MR. KEYES:

21         Q.   Okay.  Anything else?

22         A.   With that level of specificity, no.

23

24

25

Page 61

1              (The following portions of the

2    transcript were redacted pursuant to agreement of

3    counsel pending resolution of dispute.)

4

5

6              (Whereupon, there was a recess in the

7    proceedings from 10:08 a.m. to 10:27 a.m.)

8                              * * *

9              THE VIDEOGRAPHER:  We are on the record

10   at 10:27.

11

12             (The following portions of the

13   transcript were redacted pursuant to agreement of

14   counsel pending resolution of dispute.)

15

16             (HCPS MD HENNIGAN EXHIBIT 4, Wellness

17   Needs Assessment Analysis 2023-2024 School Year

18   Final Research Report, Bates HCPS_00046480-504, was

19   marked for identification.)

20   BY MR. KEYES:

21        Q.   Mr. Hennigan, I'm showing you what has

22   been marked as HCPS Exhibit 4.  This is a document

23   that was produced with the Bates Numbers

24   HCPS_00046480 through 46504.  This is titled a

25   "Wellness Needs Assessment Analysis for the

Page 62

1    2023-2024 School Year Final Research Report."

2              You mentioned earlier a wellness needs

3    assessment that has been conducted for the last

4    three school years.  Is this a final report for the

5    wellness needs assessment for the 2023-2024 school

6    year?

7         A.   It's a final summary analysis, yeah.

8         Q.   Okay.  And is this the report for the

9    wellness needs survey or assessment that you

10   described earlier in the deposition?

11        A.   Yes.

12        Q.   Has a final research report been issued

13   for the 2024-2025 school year?

14        A.   I don't believe so.

15        Q.   This Exhibit 4 says that it was

16   prepared by Yakoubou Ousmanou?

17        A.   Correct.

18        Q.   Is that the gentleman whose name you

19   mentioned earlier today?

20        A.   Yes.

21              MR. BYRD:  I'll note it has the

22   spelling as well for the court reporter.

23   BY MR. KEYES:

24        Q.   And did -- is -- is Yakoubou Ousmanou a

25   man or a woman?

Page 63

1           A.    A man.

2           Q.    Did Mr. Ousmanou also prepare a final

3    research report for the 2023-2024 school year

4    wellness needs assessment?

5           A.    That's what you've just handed me.

6           Q.    I'm sorry.  Did Mr. Ousmanou also

7    prepare a final research report for the 2022-2023

8    school year?

9           A.    I believe so.

10          Q.    Okay.  Who decides what questions to

11    ask in these wellness needs assessments?

12          A.    It started with an initial work group

13    for the original, '22-'23.

14                And then we had several iterations of

15    it since then, with members of my team crafting

16    various iterations of the questions, adding

17    questions, removing questions.

18          Q.    Do any people who are not affiliated

19    with Harford County Public Schools participate in

20    that work group?

21          A.    No.

22          Q.    So this is an entirely a Harford County

23    Public Schools work group that decides what goes

24    into the assessments?

25          A.    Yes.

```
 1         Q.   I'll ask you to turn your attention to
 2    Page 7, which is part of the key findings.
 3              Are you there?
 4         A.   Yes.
 5         Q.   There are a number of magnifying
 6    glasses as icons.  If you'd go to the fourth one.
 7              Are you there?
 8         A.   Yes.
 9         Q.   This reports that:  86 percent of
10    secondary students do not have any concerns over
11    their mental health or emotional well-being.
12              Do you see that?
13         A.   Yes.
14         Q.   And this is the report of what
15    secondary students said in response to the
16    questions in this wellness needs assessment,
17    correct?
18         A.   Correct.
19         Q.   Does Harford County Public Schools have
20    any basis for disputing this key finding that
21    86 percent of secondary students in Harford County
22    Public Schools do not have any concerns over their
23    mental health or emotional well-being?
24         A.   So the dispute could be that not every
25    student answered this survey.  Also that the
```

Page 65

1    questions in the survey are only allowed to be
2    phrased with certain specificity to avoid us having
3    parents sign off on their ability to take this.
4              So the questions are general in nature,
5    not as specific as the youth risk behavior survey.
6              So it's -- it's a data point.  But it
7    doesn't necessarily tell the whole story because
8    you're not asking every student the question.
9         Q.   Does Harford County Public Schools have
10   any basis for disputing that 86 percent of
11   secondary students in Harford County Public Schools
12   said they do not have any concerns over their
13   mental health or emotional well-being in response
14   to the wellness needs assessment questions that
15   Harford County Public Schools asked?
16             MR. BYRD:  Object to form.
17             THE WITNESS:  The dispute would be that
18   not every student answered this survey.  So it's
19   not accurate.
20   BY MR. KEYES:
21        Q.   You don't think this is accurate?
22        A.   I don't think that the 86 percent is a
23   full representation of every student in our
24   district.
25        Q.   Do you think the statement in this

Page 66

1    report is inaccurate?

2            A.    I'm not sure.  I'd have to talk to

3    Mr. Ousmanou about his basis for that decision.

4            Q.    Well, prior to today, did you at any

5    point go back to Mr. Ousmanou and say, "We can't

6    put in this report a key finding that 86 percent of

7    surveyed students don't have concerns over their

8    mental health and emotional well-being"?

9                 MR. BYRD:  Object to form.

10                THE WITNESS:  No.

11   BY MR. KEYES:

12           Q.    Did you at any point prior to today go

13   to anyone in Harford County Public Schools and say,

14   "We can't put in this report a key finding that

15   86 percent of surveyed students don't have concerns

16   over their mental health and emotional well-being"?

17           A.    No, because it doesn't say that.  I

18   wouldn't have said that.

19           Q.    You say, "No, because it doesn't say

20   that"?

21           A.    It doesn't say 86 percent of surveyed

22   students, which is what you just said.

23           Q.    Okay.  Do you at any point prior to

24   today go to anyone in Harford County Public Schools

25   and say, "We can't put in this report a key finding

Page 67

1    that 86 percent of secondary students do not have

2    any concerns over their mental health or emotional

3    well-being"?

4          A.    No.

5          Q.    Does Harford County Public Schools

6    admit that bullying, including cyberbullying, can

7    have a negative effect on students' mental,

8    emotional, social or behavioral health?

9          A.    I think it's a pretty universally

10   accepted conclusion, yes.

11         Q.    Does Harford County Public Schools

12   admit that bullying, including cyberbullying, can

13   have a negative effect on students' attention

14   during class or other school activities?

15         A.    Again, a pretty universally accepted

16   conclusion, yes.

17         Q.    Does Harford County Public Schools

18   admit that bullying, including cyberbullying, can

19   have a negative effect on students' behavior during

20   class or other school activities?

21         A.    Same answer, yes.

22         Q.    Does Harford County Public Schools

23   admit that bullying, including cyberbullying, can

24   have a negative effect on students' academic

25   performance?

Page 68

```
 1          A.    Yes.
 2          Q.    Does Harford County Public Schools
 3   admit that bullying, including cyberbullying, can
 4   have a negative effect on students' treatment of
 5   school property?
 6               MR. BYRD:  Object to form.
 7               THE WITNESS:  I don't know that to be
 8   true.
 9   BY MR. KEYES:
10          Q.    Does Harford County Public Schools
11   admit that bullying, including cyberbullying, can
12   lead some students to damage school property?
13               MR. BYRD:  Object to form.
14               What topic are we here if you're asking
15   him to talk on behalf of this?
16               MR. KEYES:  Topic 37.
17               MR. BYRD:  Okay.
18               THE WITNESS:  Can you repeat that
19   question?
20   BY MR. KEYES:
21          Q.    Sure.
22               Does Harford County Public Schools
23   admit that bullying, including cyberbullying, can
24   lead some students to damage school property?
25          A.    I don't know that that's a universally
```

```
                                        Page 69
 1   accepted truth --
 2           Q.   Does --
 3           A.   -- among the school system.
 4           Q.   Does Harford County Public Schools
 5   admit that alcohol use can have a negative effect
 6   on students' mental, emotional, social or
 7   behavioral health?
 8               MR. BYRD:  Object to form.
 9               You can answer.
10               THE WITNESS:  Yes.
11   BY MR. KEYES:
12           Q.   Does Harford County Public Schools
13   admit that alcohol use can have a negative effect
14   on students' attention during class or other school
15   activities?
16               MR. BYRD:  Object to form.
17               THE WITNESS:  Not unless it's being
18   used during the school day.
19   BY MR. KEYES:
20           Q.   Does Harford County Public Schools
21   admit that alcohol abuse by a student can have a
22   negative effect on that student's attention during
23   class or other school activities?
24               MR. BYRD:  Object to form.
25               THE WITNESS:  Is that different from
```

Page 70

1    what you just asked me?

2    BY MR. KEYES:

3         Q.    Yes.    I asked about alcohol use.    Now

4    I'm asking about alcohol abuse.

5         A.    Abuse, yes.

6         Q.    Okay.    So does Harford County Public

7    Schools admit that alcohol abuse by a student can

8    have a negative effect on that student's attention

9    during class or other school activities?

10              MR. BYRD:  Object to form.

11              THE WITNESS:  Are you talking about

12   abuse in a single incident or someone who is

13   addicted?  Because I can abuse one night, or I can

14   be an abuser who is addicted.

15   BY MR. KEYES:

16        Q.    Well, why don't we take it one step at

17   a time.  Does Harford County Public Schools admit

18   that alcoholism can have a negative effect on that

19   student's attention during class or other school

20   activities?

21              MR. BYRD:  Object to form.  Vague as to

22   definition.

23              THE WITNESS:  I agree; I don't know

24   what you mean by "alcoholism."

25   BY MR. KEYES:

Page 71

1          Q.    You don't know what "alcoholism" means?
2          A.    Does it mean someone who is addicted to
3    alcohol?
4          Q.    Sure.
5          A.    So if you had a student that was
6    addicted to alcohol, they probably would have a
7    problem with paying attention during class.
8          Q.    Okay.  So does Harford County Public
9    Schools admit that a student's addiction to alcohol
10   can have a negative effect on that student's
11   attention during class or -- or other school
12   activities?
13         A.    Yes.  Likely.
14         Q.    Does Harford County Public Schools
15   admit that a student's regular abuse of alcohol can
16   have a negative effect on that student's attention
17   during class or other school activities?
18         A.    Likely.
19         Q.    Does Harford County Public Schools
20   admit that a student's addiction to alcohol can
21   have a negative effect on a student's behavior
22   during class or other school activities?
23         A.    If we had students addicted to alcohol,
24   yes.
25         Q.    Does Harford County Public Schools

Page 72

1  admit that a student's regular abuse of alcohol can
2  have a negative effect on a student's behavior
3  during class or other school activities?
4       A.   Yes.
5       Q.   Does Harford County Public Schools
6  admit that a student's addiction to alcohol can
7  have a negative effect on the student's academic
8  performance?
9       A.   Maybe.  Maybe not.
10      Q.   Does Harford County Public Schools
11 admit that a student's regular abuse of alcohol can
12 have a negative effect on the student's academic
13 performance?
14      A.   Maybe.  Maybe not.
15      Q.   In some cases, it can?
16      A.   Possibly.
17      Q.   Does Harford County Public Schools
18 admit that poverty can have a negative effect on a
19 student's mental, emotional, social or behavioral
20 health?
21           MR. BYRD:  Object to form.  Vague.
22 Poverty in the community -- okay.  Never mind.
23 Just vague.
24           THE WITNESS:  Situational.  Some cases,
25 yes.  Some cases, no.

Page 73

1    BY MR. KEYES:
2         Q.    Does Harford County Public Schools
3    admit that poverty can have a negative effect on a
4    student's attention during class or other school
5    activities?
6         A.    In some cases, yes.  In some cases, no.
7         Q.    Does Harford County Public Schools
8    admit that poverty can have a negative effect on a
9    student's behavior during class or other school
10   activities?
11        A.    In some cases, yes.  Some cases, no.
12        Q.    Does Harford County Public Schools
13   admit that poverty can have a negative effect on a
14   student's academic performance?
15        A.    In some cases.
16        Q.    Does Harford County Public Schools
17   admit that a student being homeless can have a
18   negative effect on a student's attention during
19   class or other school activities?
20        A.    In some cases.
21        Q.    Does Harford County Public Schools
22   admit that being homeless can have a negative
23   effect on a student's mental, emotional, social or
24   behavioral health?
25        A.    In some cases.

1          Q.    Does Harford County Public Schools
2     admit that being homeless can have a negative
3     effect on a student's behavior during class or
4     other school activities?
5          A.    In some cases.
6          Q.    Does Harford County Public Schools
7     admit that being homeless can have a negative
8     effect on a student's academic performance?
9          A.    In some cases.
10          Q.    Does Harford County Public Schools
11     admit that being the victim of abuse can have a
12     negative effect on students' mental, emotional,
13     social or behavioral health?
14          A.    In some cases.
15          Q.    Does Harford County Public Schools
16     admit that being a victim of abuse can have a
17     negative effect on students' attention during class
18     or other school activities?
19          A.    In some cases.
20          Q.    Does Harford County Public Schools
21     admit that being a victim of abuse can have a
22     negative effect on a student's behavior during
23     class or other school activities?
24          A.    In some cases.
25          Q.    Does Harford County Public Schools

Page 75

```
1   admit that being a victim of abuse can have a
2   negative effect on a student's academic
3   performance?
4           A.    In some cases.
5           Q.    Does Harford County Public Schools
6   admit that COVID-19 had a negative effect on
7   students' mental, emotional, social and behavioral
8   health?
9               MR. BYRD:  Object to form.
10              You can answer.
11              THE WITNESS:  In general, COVID-19, the
12  disease?
13  BY MR. KEYES:
14          Q.    We'll take them one step at a time.
15  Sure, COVID-19?
16          A.    Yeah.  I mean, some students died.
17          Q.    Okay.  Does Harford County Public
18  Schools admit that the shutdown of in-person
19  learning and the resulting isolation had a negative
20  effect on students' mental, emotional, social and
21  behavioral health?
22              MR. BYRD:  Object to form.
23              You can answer.
24              THE WITNESS:  So both the shutdown and
25  the isolation combined?
```

Page 76

1    BY MR. KEYES:

2         Q.    Yes.

3         A.    Yeah.  And primarily, the biggest

4    concern we had was, during that time, we had a

5    70 percent drop in abuse and neglect reports.  So

6    we knew students were not being seen by the people

7    who would normally report the abuse and neglect

8    that were happening from their family members, in

9    addition to the isolation creating a situation

10   where people were more apt to be online and using

11   devices and computers and trying to communicate not

12   with face-to-face interaction, but through social

13   media and other platforms.

14        Q.    Does Harford County Public Schools

15   admit that COVID-19, the shutdown of in-person

16   learning and the commencement of virtual school,

17   had a negative effect on students' mental,

18   emotional, social and behavioral health?

19             MR. BYRD:  Object to form.  Asked and

20   answered.

21             You can answer.

22             THE WITNESS:  Well, you entered virtual

23   school in there, so I don't know.  It's hard to

24   answer because you're asking about three different

25   things:  the shutdown, the isolation and virtual

Page 77

1   school.

2          And I don't think all three of them had

3   an impact on children's -- whatever you -- you said

4   behavioral health?

5   BY MR. KEYES:

6          Q.   Do you think virtual schooling had a

7   negative effect on students' mental, emotional,

8   social and behavioral health?

9          A.   Social health.  I can't speak directly

10  to mental and -- and emotional.

11         Q.   But you would say that virtual

12  schooling had a negative effect on students' social

13  health?

14         A.   Absolutely.

15         Q.   Does Harford --

16         A.   By virtue of the fact that it had to be

17  virtual because it couldn't be in person.  Not

18  because the virtual platforms were a problem.

19         Q.   Does Harford County Public Schools

20  admit that COVID-19, the shutdown of in-person

21  learning and the commencement of virtual school had

22  a negative effect on students' behavior?

23         A.   Again, I can't attribute the changes to

24  behavior on all three of those things.

25              So I believe a lot of the behavioral

Page 78

1    issues we're seeing were due to what -- awful
2    things that were happening in those houses during
3    the time we were shut down, which is not to blame
4    for the virtual school.
5              Q.    So you're not putting blame on the
6    virtual schooling.  You're saying that because of
7    COVID and the resulting shutdown of in-person
8    learning, students were at home.
9              They were subject to whatever abuse may
10   have been occurring in the home.  They couldn't be
11   seen by school professionals during that period of
12   time, which allowed the abuse to continue?
13             A.    In many cases, yes.
14             Q.    Okay.  Does Harford County Public
15   Schools admit that COVID-19, the shutdown of
16   in-person learning and the commencement of virtual
17   school had a negative effect on students'
18   attention -- attention span?
19             MR. BYRD:  Object to form.
20             THE WITNESS:  It's hard to create that
21   direct link because that is the same time period
22   where a lot of changes happened with technology and
23   social media, which also contributed.
24             So it's hard to say which one created
25   attention issues in which child.  And for some

Page 79

1    children, their attention issues -- there were no

2    attention issues created.  So it all -- it's just

3    situational.

4    BY MR. KEYES:

5            Q.   Well, does Harford County Public

6    Schools admit that COVID-19, the shutdown of

7    in-person learning and the commencement of virtual

8    school played a part in reduced students'

9    attention?

10           A.   Long-term or during that time period?

11           Q.   During that time period.

12           A.   Potentially.

13           Q.   How about long-term?

14           A.   I don't know that there's any research

15   about long-term impact on attention.

16           Q.   Do you agree that gun violence can have

17   a negative effect on students' mental, emotional,

18   social or behavioral health?

19               MR. BYRD:  Object to form.

20               THE WITNESS:  Seeing it?  Knowing about

21   it?  I'm not sure.  Being a victim of it?

22   BY MR. KEYES:

23           Q.   All right.  Why don't we take them one

24   at a time.

25               Do you agree that being a victim of gun

Page 80

```
 1    violence can have a negative effect on students'
 2    mental, emotional, social or behavioral health?
 3           A.   Absolutely.
 4           Q.   Do you agree that seeing gun violence
 5    firsthand can have a negative effect on students'
 6    mental, emotional, social or behavioral health?
 7           A.   Absolutely.
 8           Q.   Do you agree that being aware of gun
 9    violence in your community can have a negative
10    effect on students' mental, emotional, social or
11    behavioral health?
12                MR. BYRD:  Object to form.
13                THE WITNESS:  Potentially.
14    BY MR. KEYES:
15           Q.   Do you agree that active assailant
16    drills or training for students can make them more
17    stressed?
18                MR. BYRD:  Object to form.
19                THE WITNESS:  It depends on the
20    student.
21    BY MR. KEYES:
22           Q.   Do you agree that active assailant
23    drills or training can make some students more
24    stressed who are -- who are focused on the risk of
25    an active shooter?
```

Page 81

```
 1          A.   If they're focused on the risk of
 2     active shooter, then yes.
 3          Q.   Okay.
 4               (HCPS MD HENNIGAN EXHIBIT 5, Emails
 5     dated 9/19/19, Subject:  Back to School, Bates
 6     HCPS_00188517-518, was marked for identification.)
 7     BY MR. KEYES:
 8          Q.   I'm showing you what has been marked as
 9     HCPS Exhibit 5.  This was produced with the Bates
10     Number HCPS_00188517 through 518.  It's a series of
11     three emails.
12               I'll ask you to focus on the email at
13     the top.  It's from Steve Richards to you on
14     September 19th of 2019.
15               Have you read that email?
16          A.   No.  I'll read it now.
17          Q.   Okay.
18          A.   Okay.
19          Q.   Have you read the email you received
20     from Steve Richards?
21          A.   Yes.
22          Q.   He's the supervisor of psychological
23     services for Harford County Public Schools?
24          A.   Yes.
25          Q.   How long has he had that position?
```

Page 82

```
 1           A.    About 28 years.
 2           Q.    And he forwarded you a video that was
 3     produced by the Sandy Hook Promise Foundation,
 4     correct?
 5           A.    Correct.
 6           Q.    And he says:  Food for thought as we
 7     set out to train our students on ACRT.
 8                 Do you know what ACRT is?
 9           A.    I do.  I don't know if I can say the
10     acronym appropriately.
11           Q.    Is it training for students on what to
12     do in the event of an active assailant, including a
13     shooter?
14           A.    Active assailant critical response
15     training, maybe.  Yes.
16           Q.    Okay.  And you --
17                 MR. BYRD:  I'm sorry.  I just object to
18     this as, I think, beyond the scope of his topics.
19                 But go ahead.
20     BY MR. KEYES:
21           Q.    You -- you responded:  Wow.  I
22     understand the point, but I found it disturbing.
23                 What did you find disturbing about the
24     video that Mr. Richards forwarded?
25                 MR. BYRD:  Object to form again and
```

Page 83

```
 1    beyond the scope.  I don't think he's handling 41.
 2              But go ahead.
 3              THE WITNESS:  I, frankly, don't
 4    remember the video.
 5    BY MR. KEYES:
 6        Q.    Okay.  And then Mr. Richards responded
 7    to your email.
 8              He said:  My -- my even greater concern
 9    is the impact all of this active assailant stuff is
10    having on our kids, their loss of
11    innocence/childhood, and is likely correlated with
12    the rising numbers of school-age kids who are
13    suffering from anxiety (anticipatory or real)
14    depression, and other mental health issues.
15              Did I read that correctly?
16        A.    Correct.
17        Q.    Okay.
18              MR. BYRD:  Objection.  And, again,
19    beyond the scope of his topics.
20    BY MR. KEYES:
21        Q.    So did you disagree with Mr. Richards
22    that the impact of all this active assailant stuff
23    is kids having a loss of innocence or childhood?
24              MR. BYRD:  Objection.  Again, this is
25    beyond his -- the scope of the topics he's
```

                                                    Page 84

1    covering.
2                    THE WITNESS:  I don't remember if I
3    agreed at the time.
4    BY MR. KEYES:
5         Q.   Do you agree with it now?
6                    MR. BYRD:  Again, objection.  Beyond
7    the scope of the topics.
8                    You're asking him to talk on behalf of
9    the school district on something that he wasn't
10   designated for.
11                   THE WITNESS:  So do I think that active
12   assailant training is having an impact on students'
13   loss of their childhood and innocence?
14   BY MR. KEYES:
15        Q.   Yes.
16                   MR. BYRD:  You can -- you can ask --
17   you can ask -- you can answer in your individual
18   capacity, not on behalf of the school district on
19   that.
20                   THE WITNESS:  Okay.
21                   I -- I can't say I agree with that
22   wholeheartedly.
23   BY MR. KEYES:
24        Q.   Well, do you agree with it in part?
25        A.   It depends on every child.

Page 85

1          Q.    Okay.  So some -- some kids may
2    experience a loss of innocence in childhood because
3    of all the active assailant awareness and training?
4          A.    I don't know.  We have 38,000 students.
5    I'd have to ask each one of them to know what their
6    answer would be.
7          Q.    Did you agree with Mr. Richards that
8    the "active assailant stuff" is correlated with the
9    rising numbers of kids who are suffering from
10   anxiety?
11         A.    I don't agree with that wholeheartedly.
12         Q.    Do you agree with it in part?
13         A.    It's hard to say.  Many people,
14   including myself and my department, are clinicians.
15   Mr. Richards is not.  So this is just a layperson's
16   assumption and -- and opinion.
17         Q.    You said he's been the supervisor of
18   psychological services?
19         A.    Correct.
20         Q.    For how many years?
21         A.    Twenty-eight.
22         Q.    And so you don't credit his view?
23         A.    I didn't say I don't credit his view.
24         Q.    You just think it's his layperson's
25   assumption and opinion?

Page 86

1           A.   He's not a clinician.  So anybody who
2     talks about a mental health diagnosis that hasn't
3     been trained is not a clinician and is just stating
4     their opinion.
5           Q.   Do you agree with Mr. Richards that the
6     "active assailant stuff," that is, the awareness
7     and the training, is correlated with a rising
8     number of kids suffering from depression?
9           A.   Same answer.
10          Q.   Do you agree with Mr. Richards that the
11    "active assailant stuff," that is, the awareness
12    and the training for active assailants, is
13    correlated with a rising number of kids suffering
14    from other mental health issues?
15          A.   Same answer.
16               (HCPS MD HENNIGAN EXHIBIT 6, Emails
17    dated 1/28/21, Subject:  Mental Health & COVID,
18    Bates HCPS_00199872-874, was marked for
19    identification.)
20    BY MR. KEYES:
21          Q.   I'm showing you what has been marked as
22    HCPS Exhibit 6.  This was produced to us with the
23    Bates Numbers HCPS_00199872 through 199874.
24               This is an email from Kathryn Jenkins
25    on January 28th, 2021, to a number of people in

Page 87

```
 1   Harford County Public Schools, including you.  The
 2   subject is:  Re:  Mental Health & COVID.
 3               MR. BYRD:  Which topic are we on here?
 4               MR. KEYES:  Topic 45.
 5               MR. BYRD:  45.  Okay.
 6   BY MR. KEYES:
 7        Q.    Have you read it?
 8        A.    Yes.
 9        Q.    Okay.  Do you know who Kathryn Jenkins
10   is in Harford County Public Schools?
11        A.    Yes.  I believe she's one of our school
12   psychologists.
13        Q.    Do you know what schools she worked in
14   back in 2021?
15        A.    I don't.
16        Q.    Do you know what school she works in
17   now?
18        A.    I don't.
19        Q.    She appears to be forwarding -- or
20   responding to an article that Steve sent around,
21   Steve Richards, correct?
22        A.    Yeah.  I'm sorry.  I was just confused
23   by something she wrote.
24               He forwarded an article to, it looks
25   like, all the school psychologists, and she
```

Page 88

1    responded.
2          Q.    It was an article in "The Washington
3    Post" on the mental health impact of the pandemic
4    on schoolchildren?
5          A.    Correct.
6          Q.    And then she responds to it.  Did you
7    click on the link to read the article?
8          A.    Are you asking me?
9          Q.    Yes.
10         A.    I don't remember.
11         Q.    Okay.  She says:  I am seeing this
12    every time I go to work... almost every day/night,
13    we have at least one (but often more than one) new
14    patient coming into the emergency department with
15    suicidal ideation and/or attempts.  Kids as young
16    as eight to nine years old who are hopeless, sad
17    and unable to cope with the isolation, so they want
18    to die... and older kids/teens who are
19    self-medicating, actively overdosing, standing in
20    traffic, and trying to find any way to end their
21    lives.
22              They say they miss being in school,
23    seeing their friends and teachers, interacting with
24    peers, participating in sports, and having a reason
25    to get up each day.

Page 89

1              Do you see that language?
2         A.    Yes.
3         Q.    Is her observation consistent or
4    inconsistent with your observations during the
5    pandemic?
6              MR. BYRD:  Object to form.
7              You can answer.
8              THE WITNESS:  Well, frankly, I'm
9    confused on why she's in an emergency department
10   unless she's working nights because she's a
11   full-time school psychologist.  So I'm a little
12   confused by this whole email.
13             If she's a full-time employee of ours,
14   how is she working in an emergency department?  So
15   I -- this is confusing to me from the outset.
16   BY MR. KEYES:
17        Q.    Okay.  Is her observation that she's
18   seeing, every day, kids who are hopeless, sad and
19   unable to cope with the isolation consistent or
20   inconsistent with your observations during the
21   pandemic?
22             MR. BYRD:  Objection to form.  This
23   is -- what's the date?  Object to form.  Vague as
24   to time.
25             THE WITNESS:  I mean, it's completely

Page 90

1    inconsistent what I saw in my house, so...

2    BY MR. KEYES:

3         Q.    Okay.  Well, if we expand it beyond

4    your household to the student population in

5    Harford County Public Schools, were you getting

6    reports of students who were hopeless, sad and

7    unable to cope with the isolation during the

8    pandemic?

9         A.    I think I recall some reports of that.

10        Q.    And were you also, during the pandemic,

11   getting reports that Harford County Public School

12   students said they miss being in school, they miss

13   seeing their friends and teachers, they miss

14   interacting with peers, participating in sports and

15   having a reason to get up each day?

16        A.    Yes.  And some of that we still see

17   today, so...

18        Q.    So when she says that kids were saying

19   they missed being in school, seeing their friends

20   and teachers, interacting with peers, participating

21   in sports and having a reason to get up each day

22   consistent with your overall experience during the

23   pandemic?

24        A.    Well, not consistent among all

25   students, but it's consistent in the fact that some

Page 91

1  students felt this way.

2         Q.    And are you able to quantify in any way

3  the number of students who felt that way during the

4  pandemic?

5         A.    No.

6         Q.    Have you seen any quantitative data or

7  studies or reports that quantified the feelings of

8  students being isolated during the pandemic?

9         A.    Yes, I've read reports about the

10 various positive and negative impacts of the

11 pandemic.

12        Q.    And what -- what do the reports about

13 the various negative impacts of the pandemic say

14 that you read?

15        A.    There was concerns with students having

16 too much screen time; spending most of their day

17 online, on their phones, on social media;

18 students -- children not interacting with peers the

19 way they did prior to the advent of cell phones and

20 pandemic; concerns about students' physical

21 activity the way we were seeing prepandemic, that

22 being reduced by phones and social media, that it

23 was then also happening during the pandemic because

24 of the social isolation.

25        Q.    What is an ACE?

Page 92

1          A.    An adverse childhood experience.

2          Q.    What is an adverse childhood

3    experience?

4          A.    So this is an acronym or term that came

5    out of a study that was done in California

6    regarding ten childhood experiences that have been

7    directly linked to physical and mental health

8    outcomes in adulthood.

9          Q.    Are you able to identify for me any of

10   the ten childhood experiences that are directly

11   linked to physical and mental health outcomes in

12   adulthood?

13         A.    Yes.

14         Q.    What are they?

15         A.    Death of a parent, divorce, substance

16   abuse by a parent, abuse and neglect.  That's all I

17   can recall now, but I should know these by heart.

18         Q.    You believe there are ten of them?

19         A.    Yes.

20         Q.    Okay.  Does Harford County Public

21   Schools collect data on what adverse childhood

22   experiences its students have experienced?

23         A.    The school system does not, but the

24   county does.

25         Q.    When you say "the county," are you

Page 93

1  referring to the Harford County Health Department?

2       A.   I believe it's the health department

3  that would have gathered that data, but I'm not

4  sure.

5       Q.   Does the Harford County Health

6  Department share that data with Harford County

7  Public Schools?

8       A.   Yes.

9       Q.   How?

10      A.   Through reports, PowerPoints.  We have

11  a school health advisory committee that meets

12  regularly throughout the school year.

13      Q.   And do you get these reports from the

14  Harford County Health Department?

15      A.   I have.

16      Q.   What, if anything, do you do with them?

17      A.   We've shared them with our team.  We've

18  used them in our presentations to the Board of

19  Education and various other presentations at

20  conferences, to parents and such.

21           Incarceration of a parent was another

22  one.  Sorry.

23      Q.   You testified earlier that you were

24  part of a working group that studied students' use

25  of cell phones or personal devices at school and

Page 94

1    then that work translated into a policy that the
2    Board of Education adopted.  Did I get that right?
3          A.   That all occurred except I was not a
4    part of it.
5          Q.   You were not a part of it?
6          A.   Correct.
7          Q.   Okay.  And what does that current
8    policy say about students' access to or use of cell
9    phones or personal electronic devices at school?
10          A.   I'm not particularly sure what the
11    elementary piece is, but middle school students
12    need to put it in their locker when they get to
13    school and can't have it until they leave school.
14               High school students are not allowed to
15    have it out and access it during academic time, but
16    they can have it in the hallways and at lunch for
17    now.
18          Q.   Is the policy reflected in writing?
19          A.   Yes.
20               (HCPS MD HENNIGAN EXHIBIT 7, Policy
21    Title:  Portable Communication Devices, Effective
22    6/11/1990, Most Recently Amended 3/18/2024, was
23    marked for identification.)
24    BY MR. KEYES:
25          Q.   I'm showing you what has been marked as

Page 95

1    HCPS Exhibit 7.
2                MR. KEYES:  That will be 22.
3    BY MR. KEYES:
4          Q.   Is this the policy?
5          A.   I assume it's the final version that
6    went into effect the start of this school year.  So
7    this would make sense that the last amendment was
8    last March.
9          Q.   Have you read this policy before today?
10         A.   Yes.
11         Q.   When did you first read it?
12         A.   I believe I was sent a copy for my
13    review and any potential edits probably last
14    spring.
15         Q.   Before this policy was adopted by the
16    Board of Education, did you suggest any changes to
17    it?
18         A.   I may have.  I don't recall specifics.
19         Q.   Did you advocate for or against it
20    being adopted by the Board of Education?
21         A.   For.
22         Q.   Why?
23         A.   We are seeing a high usage of -- well,
24    several reasons.  One, I have three daughters and
25    wasn't really happy about any unfettered access for

Page 96

```
1    them to use their phones during the school day.
2              Secondly, the increase in bullying,
3    harassment that was occurring as a result of social
4    media access was something we wanted to curb.
5              In addition to that, we were finding
6    that the landscape was changing in that a lot of
7    our fights were being orchestrated through social
8    media and set up through social media.
9              We were also finding that a lot of the
10   fallout from fights were coming because students
11   were filming the fights and posting them on social
12   media and then causing another incident that had to
13   be investigated, in addition to the fact that I had
14   read a study -- and I don't know the exact numbers
15   on it, but on the number of notifications a child
16   gets in a one-hour period from their social media
17   and how that is distracting them from paying
18   attention in class.
19             So those, among other things, led me to
20   believe that students not having access to the
21   phones would be helpful.
22        Q.   You said, "those, among other things."
23   What are the other things that led you to advocate
24   for Exhibit 7 being adopted by the Board of
25   Education?
```

Page 97

1      A.    Going into schools and seeing children

2    not socializing with each other, especially during

3    lunch, and being on their social media apps rather

4    than having face-to-face interactions.

5            We had an incident last year where our

6    seniors play a game called Senior Assassin, where

7    they shoot each other with water guns and there's

8    all these fun rules around it.

9            And a child was waiting outside the

10   house of another girl, and the parents didn't know

11   this was a game and called the police.  And the

12   police all came with their guns drawn, which could

13   have been fatal for this child.

14           Again, all of that occurred because of

15   they had the social media platform to share who the

16   winners were and who shot who.

17           So it was getting to be dangerous.

18           Seeing in my own personal life, as the

19   kids in my neighborhood get older and get social

20   media, they stop coming out of their houses.

21           And so I realized that there is a real

22   negative impact on their need to have the phones

23   continually with them and to be able to access the

24   social media.

25           In addition to that, just so many other

Page 98

1   things that I've learned.  You know, when I think
2   about the suicide ideation and how, when Apple came
3   out with the forward-facing camera, that really is
4   when anxiety, depression and suicide for girls
5   skyrocketed.
6            Because they were now taking pictures
7   of themselves, posting them on social media,
8   knowing they're imperfect but thinking everybody
9   else was perfect.  And then that leading to them
10  not feeling very good about themselves.
11           So I really -- when I think about these
12  policies, I think about all the kids.  But I really
13  think about my children.
14           And when you realize the impact -- I
15  mean, I don't have boys.  They're equally impacted.
16           But the impact that social media is
17  having on the self-esteem and happiness of our --
18  of our children, especially our daughters, I
19  just -- I felt as if they could go through six
20  hours a day without the device, they might start to
21  learn that they didn't have to have it at all
22  times.
23       Q.   Has the Board of Education's adoption
24  of the policy, HCPS Exhibit 7, had an impact on
25  students' use of cell phones or other personal

Page 99

1    electronic devices at school?
2               MR. BYRD:  Object to form.
3               THE WITNESS:  Absolutely.
4               MR. BYRD:  Object to form.
5               You can answer.
6               THE WITNESS:  Absolutely.
7    BY MR. KEYES:
8          Q.   What is that impact?
9          A.   So there's a few data points I could
10   speak to anecdotally.
11              I could say on school visits not seeing
12   phones like I used to.  Speaking to people in my
13   personal life knowing that their children are not
14   having their phones during the day.
15              But in that board presentation I
16   alluded to in April, we have seen a drastic,
17   probably a 30 to 40 percent drop in fights this
18   school year.  And a lot of that can be attributed
19   to the fact that children don't have access to the
20   social media platforms to orchestrate the fights.
21              And we know that they typically will
22   fight in school because they know someone will stop
23   it.  It's too dangerous to fight outside of school.
24   So their inability to orchestrate those fights
25   through social media and having the phones, we've

Page 100

1    seen a major drop in that data point.
2            Q.    Are there other data points you can
3    identify besides the 30 to 40 percent decrease in
4    fights that you identify as a positive impact of
5    the new cell phone policy?
6            A.    So there's other data points, such as
7    disruption.  And that might be the only one that
8    comes to mind readily that I was seeing a major
9    drop in disruption as well.
10           Because there was a lot of a power
11   struggle between teachers, staff members and
12   students due to the addiction they had and not
13   wanting to give -- give up the cell phone when
14   asked for it.
15           And that was causing serious -- serious
16   issues and disruptions, which we have seen a major
17   decline in this school year to the point that our
18   Board of Education is now considering the high
19   school students have the same policy as the middle
20   school students next year in that they can't even
21   have it outside of their locker.
22           Q.    You said there was a major drop or a
23   major decline in disruption.  Are you able to put
24   numbers on it?
25           A.    I can't.  Sorry.

Page 101

1      Q.   Okay.  But if -- if you were asked to

2   identify data points separate from anecdotes that

3   show the positive impact of the new cell phone

4   policy, you would identify, number one, a 30 to

5   40 percent decrease in fights; and, number two, a

6   major decline in disruption.  Is that fair?

7      A.   That's the only quantitative data I can

8   think of currently.

9      Q.   Okay.  Do you wish the Board of

10  Education had adopted this policy earlier in time?

11           MR. BYRD:  Object to form.

12           THE WITNESS:  I don't know if I "wish."

13  I don't think it would have been a negative thing.

14  BY MR. KEYES:

15     Q.   Okay.  Why -- if you're seeing positive

16  results from adoption of the cell phone policy,

17  why -- why don't you wish the policy had gone into

18  effect earlier in time?

19           MR. BYRD:  Object to form.

20           THE WITNESS:  Well, I don't "not wish."

21  I'm just saying I have to think about all the

22  factors.

23           I mean, it -- it took a long time to

24  get parents on board.  It took a long time to get

25  staff prepared for it.

Page 102

1            So it -- it's just hard.  It's hard to
2    guess what would have been the difference if we did
3    this two years ago, three years ago.
4            I -- I -- I think, in the end, it
5    likely would have been mostly positive.
6    BY MR. KEYES:
7        Q.    Were parents resistant to the adoption
8    of this policy?
9            MR. BYRD:  Object to form and beyond
10   the scope.
11           But go ahead and answer.
12           THE WITNESS:  Some parents are not --
13   some parents were resistant to their children not
14   having access to the phone because the problem that
15   has been created is that the phone has become what
16   parents see as a necessary thing for their children
17   to have with regards to accessing them through text
18   and phone; but then also, equally, having the
19   fragmented opinion about what they can access
20   through the phone.
21           So, for instance, YouTube is on most --
22   in our wellness needs assessment, YouTube is our
23   most accessed -- what's the word I'm looking for?
24   Not database but --
25   BY MR. KEYES:

Page 103

1          Q.    Platform?

2          A.    -- platform because children don't have

3    to ask for permission to get on it.

4              And so parents have got this torn

5    feeling that, I need my child -- which I don't

6    agree they do.  -- need my child to have a phone so

7    I can access them, but yet I don't want them to

8    access the things that are, you know, deleterious

9    to their mental health.

10             So then they're torn with that:  Which

11   is a greater pull for me, the keeping them off the

12   things they shouldn't be seeing or having access?

13             And a lot of parents are deferring to

14   the access piece and thinking they can do their

15   best to keep them from the negative side of it.

16             So some parents were resistant to it

17   because they felt, I need to get to my child in an

18   emergency.

19         Q.    Did you have any role in the

20   development of the policy that preceded the current

21   policy?

22         A.    I don't think so.  I don't even know if

23   we had one before this.  I'm sure we did, but...

24         Q.    Do you know what the policy, written or

25   not written, was on cell phones within the district

Page 104

1   before the current policy was adopted?

2          A.    I don't.

3          Q.    Are you aware of any alternative

4   policies that were considered by Harford County

5   Public Schools but rejected before the current

6   policy was adopted?

7          A.    Well -- well, all I'd say is that this

8   policy was based on the policy of other counties.

9   But whether we brought one forward which was

10  rejected, revised, and then approved, I don't

11  remember.

12         Q.    Okay.  So do you have any knowledge of,

13  at any point, Harford County Public Schools

14  developing an -- an alternative policy that was

15  then considered and rejected before it adopted the

16  current policy?

17              MR. BYRD:  Object to form.

18              THE WITNESS:  It sounds familiar that

19  we may have had multiple versions which we had to

20  make a decision on.  But I don't really

21  specifically remember.

22  BY MR. KEYES:

23         Q.    Has Harford County Public Schools ever

24  adopted a policy that requires students to submit

25  or deposit their cell phones or personal electronic

Page 105

1    devices with a teacher or the school before classes
2    start at the beginning of the school day?
3              A.   We had a practice.  I don't know that
4    we had a policy.
5                   So I've seen those caddies in some
6    schools that I've gone to, so that tells me there
7    was a practice of doing that.
8                   But I don't know that we -- we
9    definitely didn't have a systemwide policy that
10   children had to do that.
11             Q.   Have any schools used Yondr pouches?
12             A.   I believe we have one school currently
13   who does, I believe.
14             Q.   What is that school?
15             A.   Swan Creek School.  I think.
16             Q.   Have any other Harford County Public
17   Schools schools used something Yondr-like, even if
18   it's not a Yondr pouch?
19                  MR. BYRD:  Object to form.
20                  THE WITNESS:  I don't believe so, but I
21   don't know.
22   BY MR. KEYES:
23             Q.   Were you a part of any discussion over
24   whether Harford County Public Schools as a district
25   should require students in all schools to submit

Page 106

1    or -- or deposit their cell phones or personal
2    electronic devices with a teacher of the school
3    before classes start?
4         A.   Sounds familiar that that may have been
5    one of the iterations of the final policy.  But I
6    don't really remember if that was put forth to the
7    board.
8         Q.   What do you remember about discussions
9    about that idea of a policy?
10        A.   I just -- it sounds like a familiar
11   conversation.  I -- I don't -- I don't know how far
12   it got.  But it sounds like we talked about that as
13   being a potential solution, likely not a
14   financially possible solution for us.
15        Q.   Well, do you -- do you remember hearing
16   anyone articulate reasons why Harford County Public
17   Schools should not adopt that as a policy, should
18   not require that all students deposit or submit
19   their cell phones or personal electronic devices to
20   a teacher or a school before class starts?
21        A.   Yeah.  I mean, I think there's obvious
22   concerns people would have about that.
23        Q.   What are the obvious concerns about
24   that approach?
25        A.   Things going missing and things getting

Page 107

1    broken.  Things being stolen.  Power struggles
2    between teachers, student and staff.
3         Q.    Any other reasons you remember people
4    articulating?
5         A.    Those are the big ones that stand out.
6         Q.    Under the current policy, do school
7    administrators confiscate phones for violations of
8    the policy?
9         A.    Yes.
10        Q.    Is that a required consequence?
11        A.    I don't know if it's required.  But I
12   believe there was a step process that was put out
13   to staff about what to do in the first instance,
14   second instance and so forth.
15        Q.    Where is that reflected in writing?
16        A.    I don't know.  I remember seeing a
17   document or an email that spelled out that --
18   spelled that out.
19             I don't know if it's in this policy.  I
20   don't think it is.  But I feel like there was a
21   training, if you will, provided to schools for them
22   to -- you know, how to treat.
23             We didn't want to say, "If a student
24   has their phone out, you take it and suspend them
25   right away."  So it was a sort of a tiered

Page 108

1    approach.

2         Q.    Before the current policy was adopted

3    by the Board of Education, did administrators

4    confiscate students' phones for using them during

5    class?

6         A.    Yes.  Absolutely.

7         Q.    Was there any discussion within Harford

8    County Public Schools about not confiscating phones

9    because of a concern that the district would have

10   some kind of liability if the phones went missing

11   or the phones were damaged when in the school's

12   possession and not the student's possession?

13             MR. BYRD:  Object to form.

14             THE WITNESS:  There was definitely

15   conversation about that with regards to collecting

16   them at the start and end of every class.  Whether

17   there was conversation about that with regards to a

18   student being completely obstinate and not -- and

19   refusing to give the phone up, I don't know if

20   anybody ever took the stance to say, "Never take

21   it."

22             While we identify the power struggle

23   and the potential that could happen with loss or

24   breakage, I don't know that we would ever get to

25   the point where we say, "Never touch a phone."

Page 109

1   But -- there's definitely issues buried into that
2   conversation that would occur between the student
3   and the staff.
4   BY MR. KEYES:
5         Q.   What do you mean there's definitely
6   issues buried in the conversation that would occur
7   between the student and the staff?
8         A.   Well, what I've seen over the years is
9   that students have become so addicted to getting
10  onto their social media on their phone that
11  someone's desire to take that from them is
12  equivalent to taking a drug from a drug addict,
13  that they would rather do anything than give that
14  up, including fighting and cursing and pushing and
15  shoving or running.
16        Q.   Has Harford County Public Schools filed
17  a lawsuit against anyone, besides the defendants in
18  this lawsuit, where they've alleged that those
19  parties are responsible for injury to students'
20  mental, social, emotional or behavioral health?
21        A.   I don't know.
22        Q.   Has Harford County Public Schools filed
23  a lawsuit against anyone, besides the defendants in
24  this lawsuit, where they've alleged that those
25  parties are responsible for injury to Harford

```
                                         Page 110
 1    County Public Schools arising from or in connection
 2    with students' mental, social --
 3                    MR. BYRD:  Object --
 4    BY MR. KEYES:
 5          Q.    -- emotional or behavioral health?
 6                    MR. BYRD:  Object to form.  What's the
 7    topic number here?
 8                    MR. KEYES:  Forty --
 9                    MR. BYRD:  And also --
10                    MR. KEYES:  47.
11                    MR. BYRD:  Okay.  Just let me make sure
12    because -- okay.
13                    MR. KEYES:  Yeah.
14                    MR. BYRD:  Thank you.  Got it.
15    BY MR. KEYES:
16          Q.    Let me repeat the question.
17                    Has Harford County Public Schools filed
18    a lawsuit against anyone, besides the defendants in
19    this lawsuit, where they've alleged that those
20    parties are responsible for injury to Harford
21    County Public Schools arising from or in connection
22    with students' mental, social, emotional or
23    behavioral health?
24                    MR. BYRD:  So, objection.
25                    You -- you can answer to the extent
```

Page 111

1    that there's anything filed.  Don't disclose any
2    discussions you ever had with counsel regarding any
3    potential lawsuits, okay?
4                    THE WITNESS:  Got it.
5                    Yes, I believe with regards to
6    behavioral health, there was a lawsuit against
7    JUUL.
8    BY MR. KEYES:
9         Q.   Any others?
10        A.    Not to my knowledge, but I'm not always
11   privy to all that.
12        Q.    Are the defendants in this case the
13   only parties that Harford County Public Schools
14   believes are responsible for the decline in
15   students' mental, emotional, social or behavioral
16   health?
17                   MR. BYRD:  Object to form.
18                   Hold on.  And same instruction.  You
19   cannot disclose any information that you have
20   received from general counsel or us or your outside
21   counsel as it relates to this question.
22                   "Believes are responsible"?  But you
23   can answer it beyond any -- you know, your own
24   understanding without attorneys revealing
25   attorneys' communications.

```
                                           Page 112
 1              THE WITNESS:  Okay.  Could you rephrase
 2      it, please?
 3      BY MR. KEYES:
 4          Q.   Yeah.  It's Topic 48.
 5              Are the defendants in this case the
 6      only parties that Harford County Public Schools
 7      believes are responsible for the decline in
 8      students' mental, emotional, social or behavioral
 9      health?
10              MR. BYRD:  Same instruction.  So you
11      can answer with -- with the instruction about don't
12      revealing [sic] any communications with attorneys.
13              THE WITNESS:  I can't answer that for
14      the system.
15      BY MR. KEYES:
16          Q.   Well, you're the designated
17      representative on Topic 48, right?
18          A.   I am.  So --
19          Q.   Okay.  So as the corporate
20      representative of Harford County Public Schools,
21      are the defendants in this case the only parties
22      that Harford County Public Schools believes are
23      responsible for contributing to students' mental,
24      emotional, social or behavioral health problems?
25              MR. BYRD:  Object to form.
```

```
                                        Page 113
 1            But you can answer to the extent you
 2    don't reveal communications with counsel that --
 3    and don't reveal communications about any potential
 4    lawsuits.  But go ahead.
 5            THE WITNESS:  That's a hard question to
 6    answer.  I can't speak for the whole system when
 7    you're saying that there's -- these are the only
 8    people responsible for issues with students' mental
 9    health.
10    BY MR. KEYES:
11        Q.   But you are the system here, sir.  You
12    are --
13        A.   I am.  This --
14        Q.   -- the corporate representative for
15    Harford --
16        A.   Number 48 doesn't say excluding anybody
17    else.  So you're asking me to exclude everybody
18    else who could be contributing to a student's
19    behavioral health, mental health, physical health,
20    but 48 doesn't say that.
21        Q.   To -- to the contrary.  I'm not asking
22    to exclude anyone.
23        A.   Well, you're saying you're the only
24    people responsible -- that we find responsible.  I
25    believe that's what your question said.
```

Page 114

1          Q.   Yeah.   So does Harford County Public
2     Schools believe that others besides the defendants
3     in this case are responsible for contributing to
4     students' mental, emotional, social or behavioral
5     health problems?
6                    MR. BYRD:   Object to form.
7                    And you can answer to the extent you
8     don't reveal any communications with counsel.
9                    THE WITNESS:   Yes.
10    BY MR. KEYES:
11         Q.   Okay.   Who?
12         A.   For one, we spoke about JUUL.
13         Q.   Anyone else?
14         A.   Are you talking about organizations?
15         Q.   Any individuals or entities?
16         A.   Sure.   Community members, parents.
17         Q.   Who else?
18         A.   Other students.
19         Q.   Who else?
20         A.   I can't think of any off the top of my
21    head.
22         Q.   Okay.   And -- and why does Harford
23    County Public Schools believe that community
24    members are responsible for contributing to
25    students' mental, emotional, social or behavioral

Page 115

```
 1   health problems?
 2                MR. BYRD:  I'm going to object.
 3                And you've also said that he's
 4   designated on this topic, but that means you need
 5   to keep the question to the topic.  And the topic
 6   says "has claimed in writing."  Okay?  And -- and
 7   he is prepared to answer, and he did about JUUL,
 8   about people in writing.  He's not prepared to talk
 9   about all categories of people, nor is he going to.
10                It says:  All categories of persons,
11   entities, issues that the school district has
12   claimed in writing or has reason to believe.
13                And so I just -- I don't know if he's
14   prepared to answer this.  And maybe we need to
15   talk about it, but he is prepared to answer the
16   "in writing" question.
17                MR. KEYES:  Well, as you just flagged,
18   this topic is not limited to claims in writing.  It
19   also includes "has reason to believe."
20   BY MR. KEYES:
21        Q.   So, again, sir, as Harford County
22   Public Schools' corporate representative who just
23   said that they believe that community members are
24   responsible for contributing to students' mental,
25   emotional, social or behavioral health problems,
```

Page 116

1    I'm asking you why?
2                MR. BYRD:  Object to form of the
3    same -- wait.
4                You can go ahead and answer.
5                THE WITNESS:  Because there are times
6    that community members have abused children.
7    BY MR. KEYES:
8        Q.    Any other reason?
9        A.    For community members?
10       Q.    Yes.
11       A.    Things that are impactful to their
12   social, emotional, mental health that they witness.
13       Q.    Any other reason?
14       A.    Not that I can think of.
15       Q.    Okay.  And why does Harford County
16   Public Schools believe that parents are responsible
17   for contributing to students' mental, emotional,
18   social or behavioral health problems?
19               MR. BYRD:  Object to form.
20               THE WITNESS:  So part of the reason for
21   me creating the zero-to-eight work group is that we
22   have seen with the advent of phones and social
23   media a complete decline in -- I shouldn't say
24   "complete."  Let me retract that -- a decline in
25   some parents taking the responsibility for raising

Page 117

1   their children in a way that would prepare them for
2   school.
3           So starting with the moment the baby is
4   born and parents being on their phone and on their
5   social media apps instead of engaging with their
6   children; on their social media apps when they're
7   breast-feeding instead of making eye contact with
8   their child and building that trust with them; and
9   allowing their children to, during their downtime,
10  engage with social media apps on phones and
11  tablets, which then presents a problem when they
12  come to pre-K and kindergarten and are expected to
13  attend to school.
14          So what we find is that many parents
15  will claim that the things we're seeing in the
16  building, like urinating, spitting, biting,
17  punching, kicking, slapping, cursing, running, from
18  a three- and four-year-old don't happen in their
19  home.
20          And a lot of times, we find it doesn't
21  happen in the home because their child is never
22  challenged, never asked to do anything that's hard,
23  never asked to attend, but yet is provided with a
24  tablet or a phone to engage in behavior on that
25  while the parent simultaneously is engaging with

Page 118

1    social media apps on their phone.

2            So we have children showing up to

3    kindergarten that are not potty-trained, children

4    showing up to kindergarten that have no ability to

5    attend to anything longer than 30 seconds because

6    they've spent five years of their life watching

7    30-second videos on YouTube and other platforms.

8            So until parents begin to understand

9    the serious consequences their children will suffer

10   when they show up to school having spent five years

11   on a tablet, we're going to continue to see this go

12   across the country.

13           And earlier you asked about poverty.

14   And ten years ago, we would have said that our

15   highest problematic behaviors were in our most

16   impoverished school.

17           But now it's everywhere, and it's

18   pervasive with our four-, five- and six-year-olds

19   in every school.  And the one thing that is common

20   among all of them, regardless of their income, is

21   their access to technology.

22   BY MR. KEYES:

23       Q.   Why does Harford County Public Schools

24   believe that students are responsible for

25   contributing to other students' mental, emotional,

Page 119

1    social or behavioral problems?

2         A.   So the discipline dashboards, the

3    bullying and harassment dashboards and attendance

4    dashboards, all of those pieces of data tell a

5    story about how children are treating other

6    children and that impact on them wanting to attend

7    school or that impact on their behavior during the

8    school day.

9              And what we're finding is that while

10   children are socializing in person less and

11   gathering in groups less, they are communicating

12   through social media even more.

13             So it's not the interactions.  It's how

14   they're interacting, which has changed, and

15   completely changed the landscape of what schools

16   look like.

17        Q.   You've identified community members,

18   parents and other students.

19             Does Harford County Public Schools

20   believe that any companies besides the defendants

21   in this case are responsible for contributing to

22   students' mental, emotional, social or behavioral

23   health problems?

24             MR. BYRD:  Object to form.  Asked and

25   answered.

                                          Page 120

1              THE WITNESS:  Yes.  I answered that.

2    JUUL was one.  But JUUL is not exclusive.  I would

3    say any vaping product.

4    BY MR. KEYES:

5         Q.   Okay.  Does Harford County Public

6    Schools believe that any companies besides the

7    defendants in this case and the makers of any

8    vaping product are responsible for contributing to

9    students' mental, emotional, social or behavioral

10   problems?

11              MR. BYRD:  Object to form.

12              THE WITNESS:  I mean, I suppose -- I'm

13   sorry.  The -- the -- the noun you're using, you're

14   saying "companies"?

15   BY MR. KEYES:

16        Q.   Yes.

17        A.   So I can't point to specific companies.

18   But you alluded to things earlier like alcohol.

19   And you didn't mention it, but tobacco.

20        Q.   Okay.  So you would list the defendants

21   in this case, JUUL, the makers of other vaping

22   products, alcohol companies and tobacco companies?

23              MR. BYRD:  Object to form.

24   BY MR. KEYES:

25        Q.   Is that correct?

Page 121

1           A.   As well as the -- we talked about
2    students, parents and community members, yes.
3           Q.   Okay.  Does Harford County Public
4    Schools believe that the companies that run other
5    social media platforms bear any responsibility for
6    contributing to students' mental, emotional, social
7    or behavioral health problems?
8                MR. BYRD:  Object to form.
9                And, also, don't reveal any
10   communications with counsel.
11               THE WITNESS:  Can I have examples?
12   Because I'm -- I'm not really sure which -- which
13   ones would be excluded or not included in here that
14   we'd be talking about.
15   BY MR. KEYES:
16          Q.   Well, yeah.  Sure.  If you go to Page 6
17   of Exhibit 2?
18               MR. BYRD:  If we're going to change
19   topics pretty soon, let's --
20               MR. KEYES:  It's the same.  It's the
21   same topic.
22               MR. BYRD:  Okay.  I'm just saying.
23   BY MR. KEYES:
24          Q.   Are you on Page 6?
25          A.   Yes.

Page 122

1           Q.    Definition 3 is:  Online Media &
2     Communications Services.
3                 I don't know if you've read this
4     definition before.
5           A.    I have.
6           Q.    You have.  Okay?
7           A.    But I just don't recall the exact --
8           Q.    Yeah.  So it --
9           A.    -- folks that were in here.
10          Q.    It gives a list of other companies
11    besides the defendants in this case that fall
12    within the definition of "Online Media &
13    Communications Services."
14                So does Harford County Public Schools
15    believe that any of the companies listed in
16    Paragraph 3 on Page 6 are responsible for
17    contributing to students' mental, emotional, social
18    or behavioral health problems?
19                MR. BYRD:  Object to form.  Asked and
20    answered.
21                THE WITNESS:  Yes.
22    BY MR. KEYES:
23          Q.    Which ones?  All of them?
24          A.    Some of them, I don't know.  So I --
25    I --

Page 123

1          Q.    Okay.  Well, which ones --
2          A.    But I guess if I'm speaking on behalf
3    of the system and we're in this lawsuit, then I'd
4    say yes.
5          Q.    Excuse me?
6          A.    I would say yes if I'm speaking on
7    behalf of the system and not me personally.
8          Q.    Okay.  You are speaking on behalf of
9    the system, Harford County Public Schools.
10         A.    Then I would say yes.
11         Q.    All of them?
12         A.    Yes.
13         Q.    Okay.  So just because there was some
14   back-and-forth, does Harford County Public Schools
15   believe that BeReal, Discord, GroupMe, Kik, Omegle,
16   Pinterest, Reddit, Twitch, Tumblr, WhatsApp, X
17   (formerly known as Twitter) and Yik Yak are
18   responsible for contributing to students' mental,
19   emotional, social or behavioral health problems?
20              MR. BYRD:  Object to form.  Foundation.
21              THE WITNESS:  Yes.
22   BY MR. KEYES:
23         Q.    Okay.  So you've listed community
24   members, parents, other students, JUUL, other
25   makers of vaping products, alcohol companies,

Page 124

1    tobacco companies, and all of the companies listed
2    as "Online Media & Communications Services" on
3    Page 6 of Exhibit 2.
4          A.    Is there a reason --
5                MR. BYRD:  I'm sorry.
6                Object to form.
7                THE WITNESS:  Is that the question?
8    BY MR. KEYES:
9          Q.    That's what you've listed so far.
10          A.    Is there a reason you didn't say the
11    first four:  Facebook, Instagram, Snapchat, TikTok
12    and YouTube?  The first five?
13          Q.    Yes.  Because this line of questioning
14    is does Harford County Public Schools believe that
15    there are any parties besides the defendants in
16    this case --
17          A.    Got it.
18          Q.    -- who are responsible for contributing
19    to students' mental health, emotional, social,
20    behavioral health problems.
21                So you've given me a list, right?
22                You've said:  Community members,
23    parents, other students, JUUL, other makers of
24    vaping products, alcohol companies, tobacco
25    companies and the companies listed as "Online Media

Page 125

1   & Communication Services" on Page 6 of Exhibit 2.
2                   Are there any other parties,
3   individuals, entities, companies that Harford
4   County Public Schools believes are responsible for
5   contributing to students' mental, emotional, social
6   or behavioral health problems?
7                   MR. BYRD:  Object to form.
8                   You can answer.
9                   THE WITNESS:  Not that I can think of
10  right now.
11                  MR. KEYES:  Off the record.
12                  MR. BYRD:  Well, let's don't go off the
13  record yet.
14                  We can -- let's finish off real quickly
15  with this 502(d) issue I need to get on the record.
16                  So we have -- Ms. McNabb has sent an
17  email to you all clawing back the document that we
18  discussed.
19                  I've told you all I thought you should
20  take a look at the 502(d) order, and I do.  I want
21  to point to two things in the 502(d) order.
22                  First, I want to go to Section 5 of the
23  502(d) order that says:  If during a deposition a
24  producing party claims that documents being used in
25  the deposition, e.g., marked as an exhibit shown to

Page 126

1    the witness or made the subject of the examination,
2    are or contain protected material, the producing
3    party shall state such claim on the record and --
4    which I did -- and may, in its sole discretion, do
5    one or more of the following.
6              And B in that is:  Object to the use of
7    the protected material at the deposition, in which
8    case no questions may be asked, no testimony may be
9    given relating to the privilege or protected
10   portions of the protected material until the matter
11   has been resolved by agreement.
12             So, number one, I would say that we're
13   going to need to redact, once I claim the clawback
14   and we have this 502(d) order and you -- whatever
15   you said.
16             If you quoted any of the material,
17   we're going to need to redact that out and claw
18   that back in your question that you tried to get
19   out before we discussed it right before I
20   instructed not to answer.
21             Secondly, it says:  In the event the
22   Court resolves in dispute -- let's see.  Okay.
23             In all events, once the protected
24   material is no longer in use at the deposition, the
25   receiving party -- that's you all -- shall

Page 127

1    immediately sequester all copies of the protected

2    material.

3              Okay?  So I want that done.  We don't

4    leave anything with the court reporter.

5              As to any testimony subject to a claim

6    of privilege, the producing party shall serve a

7    clawback notice in seven days.

8              Well, we've done that.

9              The second matter I want to raise is, I

10   think, a little bit more disturbing, which is

11   Section 4:  Procedure upon discovery by a receiving

12   party of produced or otherwise disclosed protected

13   documents.

14             And I want to read this.

15             In the event that a receiving party

16   discovers that it has received or examined

17   documents that are or reasonably objectively appear

18   to be subject to a claim of privilege or protection

19   by a producing party, the receiving party promptly

20   shall sequester the document and within ten

21   calendar days of such discovery notify the

22   producing party of the production by identifying

23   the Bates ranges.

24             I don't know how you all looked at this

25   document and saw, like, questions about exactly

Page 128

1    the -- proving the claims in this litigation about

2    this lawsuit, the person going directly to the

3    general counsel's office, and didn't think that

4    that section didn't apply to you all.

5              So I'd love to know your best -- you

6    know, why you -- why you didn't follow 502(d).

7              MR. KEYES:  Are you finished?

8              MR. BYRD:  Yeah.

9              MR. KEYES:  Okay.  We don't think the

10   document is privileged, so we don't think

11   Paragraph 4 is triggered.

12             You disagree.  You have claimed

13   privilege for the first time for a document that we

14   believe was produced probably five or six months

15   ago.

16             You read language that says the

17   document must be sequestered upon a claim of

18   privilege.  I already told you we would put it to

19   the side and not look at it until we can brief the

20   issue for the Court.

21             And I don't think it's inconsistent

22   with the sequestering requirement to say that the

23   court reporter should keep the original of the

24   exhibit that's in question.

25             In any event, I don't have the order in

                                        Page 129

1    front of me, and I'm not going to spend my valuable
2    time debating the provisions without having a copy.
3                If Ms. McNabb has sent an email, we'll
4    respond.  But right now I'm in a deposition.  I'm
5    not using the document at issue.  So, with
6    respect --
7                MR. BYRD:  But this was a -- this -- I
8    guess my point is --
9                MR. KEYES:  -- let's return to the
10   questioning --
11               MR. BYRD:  This is --
12               MR. KEYES:  -- of Mr. Hennigan.
13               MR. BYRD:  This is an -- and I'm not
14   going to count this time against you, as I've told
15   you, but we need to have this on the record.
16               This is a -- 502(d) is something that
17   you're supposed to follow as counsel in the case.
18   And you already --
19               MR. KEYES:  We have --
20               MR. BYRD:  -- should know your
21   obligations under 502(d).
22               MR. KEYES:  We --
23               MR. BYRD:  And so what I'm asking you
24   about is something that -- not that arose today but
25   something that should have arisen days ago whenever

```
                                          Page 130
 1    you first saw this document.  And I want to know
 2    why you didn't think this was reasonably
 3    objectively appeared to be protected material.
 4
 5              (The following portions of the
 6    transcript were redacted pursuant to agreement of
 7    counsel pending resolution of dispute.)
 8
 9              MR. KEYES:  I've -- I've already stated
10    our position.  We disagree.  And it seems like
11    we'll have to brief this for Judge Kang.  We'll
12    take that up.  Right now, while Mr. Hennigan is
13    sitting here, let's return to questioning.
14              MR. BYRD:  Well, we'll take our break
15    now and --
16              MR. KEYES:  Okay.  Off the record.
17              THE VIDEOGRAPHER:  Stand by.  We are
18    off the record at 11:55.
19                         * * *
20              (Whereupon, there was a luncheon recess
21    in the proceedings from 11:55 a.m. to 1:04 p.m.)
22                         * * *
23              THE VIDEOGRAPHER:  We are on the record
24    at 1304.
25    BY MR. KEYES:
```

1      Q.   Mr. Hennigan, would you pull out
2  Exhibit 2, which is the list of topics.  Go to
3  Page 18.  Are you on Page 18?
4      A.   Yes.
5      Q.   Topic 63.  All efforts that the school
6  district has taken to date to abate the public
7  nuisance alleged in your complaint.
8           What is the public nuisance that
9  Harford County Public Schools alleges here?
10     A.   So the basis is that our students have
11  increased access to phones and social media, and as
12  a result, are bringing problems into the school
13  system for which we then need to seek partnerships
14  and increased staffing to address the issues and
15  concerns they are displaying, bring in with them as
16  a result of their access to social media.
17     Q.   Okay.  So you said "the basis is."  I
18  guess I'm asking you to explain what the public
19  nuisance is.  Is it the fact that students are
20  accessing their phones and using social media at
21  school?
22           MR. BYRD:  Object to form.  Calls for
23  legal conclusions as well addressed in the
24  complaint.
25           THE WITNESS:  Is there a definition of

Page 132

1    "public nuisance," or am I to conclude it on my

2    own?

3    BY MR. KEYES:

4         Q.   There is not a definition of "public

5    nuisance" in Exhibit 2.  Harford County Public

6    Schools has alleged a public nuisance.  You are the

7    corporate rep on --

8         A.   Okay.

9         Q.   -- all efforts that Harford County

10   Public Schools has taken to date to abate the

11   public nuisance alleged in the complaint.  So --

12        A.   So the public nuisance is the -- the

13   behaviors, mental health concerns, actions of our

14   students within our school buildings as a result of

15   their use of social media in and out of our school

16   system.

17        Q.   Is Harford County Public Schools taking

18   any action to abate that public nuisance now?

19             MR. BYRD:  Object to form.

20             THE WITNESS:  Yeah.  I mean, we filed a

21   complaint with you to try to address this.

22   BY MR. KEYES:

23        Q.   Has Harford County Public Schools done

24   anything to abate the public nuisance you described

25   other than file the complaint in this lawsuit?

1          A.    Yeah.   I mean, we have had a drastic

2     increase, especially in my department, of staffing

3     in our school system, partnerships with outside

4     school districts, partnerships with -- not --

5     sorry, not outside school districts -- outside

6     partnerships, other organizations, a lot of

7     man-hours put into applying for grants and

8     complying with the results -- with the pieces of

9     those grants that -- where there are expectations

10    of us showing data, which are going towards

11    funding, which is going toward addressing the

12    behavioral, mental health, social, emotional health

13    of our children.

14          Q.    Anything else that Harford County

15    Public Schools has done to abate the public

16    nuisance you described other than file the

17    complaint and lawsuit?

18          A.    Created a policy to try to further

19    restrict access to social media during the school

20    day; creating the zero-to-eight work group that I

21    spoke about earlier today; doing a lot of parent

22    workshops at schools regarding social media.

23               We created, which took a lot of

24    man-hours and -- and time and money, creating the

25    wellness needs assessment; and then, furthermore,

Page 134

1    meeting with administrators and staff to tell them
2    best practices of what they could do with the data
3    from their wellness needs assessment.
4        Q.   You referenced in your answer creating
5    a policy to try to further restrict access to
6    social media during the school day.  Are you
7    referring to HCPS Exhibit 7?
8        A.   I don't have that in front of me, I
9    don't think, do I?  Yes.
10       Q.   Okay.  Earlier in the deposition, you
11   used the phrase "myriad of issues," which you said
12   include the impact of social media, a myriad of
13   issues that have led to the need for more students
14   to get therapy.
15            What -- what are you referring to when
16   you say the "myriad of issues"?
17            MR. BYRD:  Object to form.  I'm
18   confused as to exactly what part in the deposition
19   before you're referring to.  But object to form.
20            You can answer, if you know.
21            THE WITNESS:  Oh.  So various issues
22   that are being manifested within the school day --
23   well, not even within the school day, because some
24   of this comes from parents requesting it, with
25   regards to depression, eating disorders, anxiety,

Page 135

```
 1   ADHD, a host of mental health diagnoses.
 2   BY MR. KEYES:
 3         Q.    Anything else that you were referring
 4   to when you used the phrase "myriad of issues"?
 5         A.    I don't recall.
 6         Q.    Would you turn to Topic 14, which is on
 7   Page 10.  Does Harford County Public Schools have
 8   any districtwide policies for rules regarding the
 9   use of defendants' platforms in the classroom as a
10   part of the curriculum or otherwise to educate
11   students?
12              MR. BYRD:  Object to form.  Which
13   topic -- you're on 10.  I'm sorry.  Which topic?
14   Number 14?
15              MR. KEYES:  Uh-huh.
16              MR. BYRD:  Sorry.
17              MR. KEYES:  Page 10, Topic 14.
18              MR. BYRD:  Got it.
19              MR. KEYES:  Yeah.
20   BY MR. KEYES:
21         Q.    Do you want me to repeat the question?
22         A.    No.  I'm just trying to figure out --
23   so you're basically saying our use of it or the
24   students' use of it?  Like, the teachers using it
25   or --
```

Page 136

1          Q.    Well, Topic 14 says policies regarding
2     use of defendants' platforms in the classroom, as
3     part of the curriculum or otherwise to educate
4     students.
5               Are you aware of Harford County Public
6     Schools having any such policies?
7          A.    I know there's rules.  I don't know
8     about policies in the -- because there's
9     restrictions on what can be accessed on the
10    school's Wi-Fi.
11              So teachers may use a platform, or
12    students may try to access a platform, but there's
13    restrictions on what they can access based on --
14    when they're on our Wi-Fi.
15         Q.    Do you know if those rules or
16    restrictions are reflected in writing anywhere?
17         A.    I don't.
18         Q.    Under those rules or restrictions, are
19    teachers permitted to use YouTube in the classroom
20    as part of the curriculum or otherwise to educate
21    students?
22              MR. BYRD:  Object to form.
23              THE WITNESS:  I think they are but only
24    because I know that issues have come up with
25    teachers pulling up YouTube for a lesson and then

```
                                    Page 137
 1    really inappropriate ads popping up on the side.
 2    So --
 3    BY MR. KEYES:
 4         Q.    Inappropriate ads?
 5         A.    Yeah.  So I know that obviously it has
 6    been done.  I don't know the current status of
 7    whether they're allowed to use YouTube in the
 8    classroom or not.
 9         Q.    Under the rules and restrictions you
10    referenced, are teachers permitted to use other
11    defendants' platforms in the classroom as part of
12    the curriculum or otherwise to educate students?
13         A.    I don't believe so.
14         Q.    Does Harford County Public Schools have
15    any policies or rules regarding the use of any of
16    the defendants' platforms to advertise or promote
17    the school district's or the district schools'
18    policies or events?
19         A.    I don't think policies or rules, but it
20    occurs.
21         Q.    Okay.  You know that Harford County
22    Public Schools does use social media?
23         A.    Yes.
24         Q.    Do you know what social media platforms
25    Harford County Public Schools uses?
```

Page 138

1        A.    I only know about Twitter and Facebook.
2    And there's YouTube videos.
3        Q.    Does Harford County Public Schools have
4    a YouTube channel?
5        A.    I think that's where all our videos are
6    housed, yeah.
7        Q.    Okay.  Does Harford County Public
8    Schools have an Instagram account?
9        A.    I don't know.
10        Q.    Does Harford County Public Schools have
11    a TikTok or a Snapchat account?
12        A.    I doubt that, but I don't know.
13        Q.    So does Harford County Public Schools
14    have any policies or rules regarding the use of its
15    YouTube channel to advertise or promote school
16    district's or the district schools' policies or
17    events?
18            MR. BYRD:  Object to form.
19            THE WITNESS:  Again, I don't know if
20    there's policies or rules.  But I do -- I do know
21    that our videos go out, and I think that's the
22    platform they go out on.
23    BY MR. KEYES:
24        Q.    Do you have any involvement in creating
25    any content for videos that are posted to the

Page 139

1    YouTube channel?

2         A.   I have been a part of talks --

3    interview kind of talks that end up posted on

4    YouTube.

5         Q.   Anything else?

6         A.   I know that we had a recognition given

7    to one of our school psychologists.  And the video

8    was too big for me to share in an email, so it

9    ended up having to go to a YouTube account.

10        Q.   Anything else?

11        A.   That I've been a part of?  Not that I

12   can recall.

13        Q.   Yeah.  So have you told me all of your

14   involvement in creating any content or videos that

15   are posted on the Harford County Public Schools

16   YouTube channel?

17        A.   Yeah.  I think it's been the interviews

18   or parent talks, and then I may have been in the

19   background of videos that were shot that are posted

20   on there.

21        Q.   Okay.  So what are the interviews

22   you've referenced that end up being posted to the

23   Harford County Public Schools YouTube channel?

24        A.   I can't remember the exact name, but

25   they're called "Parent" -- not "Parent Cafes."

Page 140

1           It's a series of videos for parents
2    that our manager of communications -- not our
3    "manager of communications."  I don't even know her
4    exact title, but Mary Beth Stapleton does with
5    staff members on topics that she feels are relevant
6    to parents.
7           Q.   You've mentioned parents talks.  Are
8    those separate from the interviews you mentioned?
9           A.   No.  Those are the interviews.
10          Q.   Okay.  And how many different
11   interviews or parent talks have you participated in
12   that have ended up being posted on Harford County
13   Public Schools' YouTube channel?
14               MR. BYRD:  Object to form.
15               THE WITNESS:  Maybe two or three.
16   BY MR. KEYES:
17          Q.   And then have you advertised or
18   promoted to anyone you know that those videos are
19   available on the YouTube channel?
20          A.   Not that I recall specifically.
21          Q.   Does Harford County Public Schools have
22   any rules or policies regarding the use of either
23   its Facebook or Twitter accounts to advertise or
24   promote the school districts or the district
25   schools' policies or events?

Page 141

1          A.    Again, I don't know what the rules or
2     policies might be, but I know it occurs.
3          Q.    And does Harford County Public Schools
4     have any rules or policies regarding the use of its
5     YouTube channel or its Facebook or Twitter accounts
6     to communicate with students?
7          A.    I'm sure there's something in the
8     handbook about teachers not communicating with
9     students through these platforms.
10          Q.    You're referring to the Parent-Student
11     Handbook?
12          A.    No.  I'm sorry.  Employee handbook.
13          Q.    Okay.  Separate from the employee
14     handbook, does Harford County Public Schools have
15     any rules or policies regarding the use of its
16     YouTube channel or its Facebook or Twitter accounts
17     to communicate with students?
18          A.    Outside of the employee handbook, I
19     don't know of any.
20          Q.    Okay.  And just to make sure, I'm
21     referring to students as a population --
22          A.    Uh-huh.
23          Q.    -- as opposed to individual students.
24              So are you aware of any rules or
25     policies that Harford County Public Schools has

```
                                            Page 142
 1   regarding the use of its YouTube channel or its
 2   Facebook or Twitter accounts to communicate with
 3   the student population?
 4        A.   I'm not aware of any.
 5        Q.   Are you aware of any training or
 6   education that Harford County Public Schools gives
 7   to its staff regarding any policies or rules
 8   regarding how to use Harford County Public Schools'
 9   YouTube channel or its Facebook or Twitter
10   accounts?
11        A.   So that would be through the employee
12   handbook and through an annual responsibility use
13   training.
14        Q.   And what do you remember the training
15   covering when it comes to how to use Harford County
16   Public Schools' YouTube channel or its Facebook or
17   Twitter accounts?
18        A.   I don't recall the specifics.  And they
19   may not speak specifically to those three things.
20        Q.   Do you look at the youth risk behavior
21   survey results when they come out?
22        A.   I do.
23        Q.   How often do those survey results get
24   released?
25        A.   I don't -- I don't know if it's annual
```

```
                                            Page 143
 1    or -- I feel like I want to say every three years,
 2    but I don't know.  I'm not sure.
 3              It's definitely not more than once a
 4    year, but it may not -- I don't think it is even
 5    once a year.  I think it's once every two or three
 6    years.
 7         Q.   And do you understand that survey is
 8    for high schools?
 9         A.   I'm sorry.  Say that again.
10         Q.   Do you understand that the survey is
11    for high schools?
12         A.   It may be.  I'm not sure if it does
13    middle school or not.  I feel like it does.  No, I
14    believe it's middle and high.
15         Q.   You believe that the survey covers both
16    middle school students and high school students?
17         A.   I think so.
18         Q.   Do you know how the questions are
19    selected for that survey?
20         A.   No idea.
21         Q.   Do you understand that the questions
22    that are asked in that survey are based on risk
23    behaviors that the Maryland Department of Health
24    has selected?
25         A.   I did not know that, no.  I thought it
```

Page 144

1    was a national survey.

2         Q.   Okay.  You're not aware that there is a

3    youth risk behavior survey conducted by the

4    Maryland Department of Health?

5         A.   I know we conduct it.  I didn't know

6    who sent it to us.

7         Q.   Okay.  Have you ever weighed in with

8    the Maryland Department of Health or any other

9    department of health to disagree with the risk

10   behaviors they've decided to include in the youth

11   risk behavior survey?

12        A.   No.

13             MR. KEYES:  Thank you, Mr. Hennigan.  I

14   have no further questions at this time.

15             Does anyone on the Zoom have questions

16   for the witness?

17             MR. FLASTER:  Nothing from me.  I don't

18   have a mic, but no questions from Meta.

19             MR. BYRD:  Okay.  I have a few

20   questions.

21                      *  *  *

22                   EXAMINATION

23   BY MR. BYRD:

24        Q.   Let's look at your -- let's look at the

25   exhibit -- the policy, the --

Page 145

```
 1              MR. KEYES:  Exhibit 7?
 2    BY MR. BYRD:
 3         Q.   -- portable communications device,
 4    Exhibit 7.
 5              You know, you were asked questions
 6    about this today from Mr. Keyes, right?
 7         A.   Uh-huh, yes.
 8         Q.   You talked about that there were some
 9    improvements that you saw with fighting.
10              Do you remember being asked about the
11    improvements with fighting?
12         A.   Yes.
13         Q.   Were you asked about the impact,
14    though, on cyberbullying?
15         A.   I don't believe so.
16         Q.   Were there -- were there any impacts on
17    cyberbullying from this policy?
18         A.   So, interestingly enough, the -- the
19    bullying data has been pretty static.
20              So there was a -- a hope just for our
21    kids' sake that the bullying and harassment has
22    gone down, but it had not.
23              Which leads me to conclude that the --
24    a lot of it is happening once the students have
25    access after they leave school.  So it's continuing
```

Page 146

1    after hours.

2         Q.   Okay.  So you're -- you're seeing

3    problems that are now happening after school; is

4    that right?

5         A.   Yeah.  So the big difference is when I

6    talk about discipline incidents, they all occur in

7    the building.

8              Bullying and harassment data is 24/7.

9    So it could happen at 2:00 in the morning, it could

10   happen in the school building, it could happen on

11   the weekend.

12             So that data didn't move at all because

13   we're including everything that happens throughout

14   a year, not just a school day.

15        Q.   So if the defense counsel who asked you

16   questions seemed to imply or want the jury to

17   believe that a simple policy like this could have

18   fixed everything, is -- is that true?

19        A.   Oh, absolutely not.  Because even

20   though we are able to do our best to mitigate it,

21   as I spoke to earlier, the intense addiction that

22   some of our students have, they -- they still will

23   find work-arounds.

24        Q.   Can you compare -- I mean, can you

25   compare the power of -- or, I guess, compare the

Page 147

1    abilities of a policy like this to be effective
2    versus what the defendants are able to do with
3    their platforms?
4              Can you compare how effective you're
5    able to be versus what they're doing to get social
6    media into the hands of the students that you see?
7              MR. KEYES:  Objection to form.
8    Foundation.
9              THE WITNESS:  So I think everybody has
10   seen over the last couple decades an increasing
11   expectation that the school is going to solve all
12   societal issues with children from bullying to cell
13   phones to parenting to feeding to breast-feeding to
14   toileting -- all those things that are expected to
15   be addressed within the school system now.
16              So the issue we have is we can only do
17   our best to address what happens while they're with
18   us.
19              And we've had to increasingly hire more
20   and more staff to not address what happens when
21   they're with us, but -- well, to address what
22   happens when they're with us because of what's
23   happening when they're not with us.
24              So things that are happening on the
25   weekends, things that are happening at night then

```
                                          Page 148
 1   find their way into the school.
 2              So when we see that our children's
 3   brains that are developing are being completely
 4   rewired by these algorithms that they're watching,
 5   30-second videos of a clip, and then they're coming
 6   into our school building...
 7              I just sat in an auditorium in a middle
 8   school two weeks ago and sat in the back to watch a
 9   lesson one of our counselors was doing.
10              And as I looked down the row, almost
11   every kid's knee was just bopping up and down.
12   Their ability to sustain their attention on a
13   lesson is impaired.  And all of our teachers are
14   seeing that.
15              And it's not impaired by their social
16   media use just during the six hours they're with
17   us.  It's 24/7.
18              So we are really fighting a battle of
19   our teachers trying to engage students when,
20   90 percent of their time, they're engaging social
21   media that has basically rewired their brain to
22   only be able to fixate on something for 30 seconds
23   or -- or less.  So --
24   BY MR. BYRD:
25         Q.   Do you feel like you're almost -- I
```

Page 149

1   mean, have you ever heard that phrase "you're
2   bringing, like, a knife to a gunfight"?  Have you
3   ever heard that?
4        A.    Absolutely.
5        Q.    Like, what do you feel compared to
6   these defendants that you're dealing with and the
7   school -- trying to handle it in the school system
8   with everything else going on?
9             MR. KEYES:  Objection to form.
10            THE WITNESS:  So, yeah.  I mean, it is
11  a constant battle.  It's a constant battle for our
12  staff.  It's a constant battle for our parents.
13  The amount of energy that is expended by our staff
14  and our parents to try to get their children away
15  from the device is exorbitant and exhausting.  And
16  the reason we won't quit the fight is because we
17  know that they are being completely rewired in
18  their brains.
19             And, you know, another example of
20  funding that we've had to set aside is this has
21  gotten so out of control that we are now providing
22  welcome bags to the hospital.  So every time a
23  mother gives birth in Harford County, they get a
24  welcome bag from the school system with information
25  on what they can do for the next five years to try

Page 150

1    to prepare their child for school.
2              So we have not just expanded pre-K to
3    get to them a year earlier.  We know we have to get
4    to the parents the moment they have that child
5    because -- you know, my children will say they hate
6    that I'm in education because I know what I know.
7    And most of my friends and family members and
8    neighbors, there's -- you know, they're just in
9    different professions, and they don't see what I
10   see every day.
11             So they don't understand the impact of
12   their child staring at a screen for hours or their
13   child, you know, that's sitting up in their room
14   feeling terrible about themselves because they're
15   watching everybody else on social media showing
16   their perfect life.
17             So it's -- it's a constant battle on a
18   professional and a -- and a personal level of just
19   trying to not allow that takeover, not just
20   their -- their life, but take over their brains.
21   BY MR. BYRD:
22        Q.   You were asked several questions today
23   about -- by Google's counsel about what the
24   school -- what -- what the -- what you all have
25   done to try to curb the social media's -- the

Page 151

```
 1   students' abilities to use social media --
 2          A.   Yeah.
 3          Q.   -- right?
 4               Do you recall those questions?
 5          A.   Yes.
 6          Q.   Has anybody from Google or YouTube ever
 7   offered to come in and try to help you all figure
 8   out technology-wise how they could restrict that
 9   and help you?
10               MR. KEYES:  Objection to form.
11   Foundation.
12               THE WITNESS:  No.  Absolutely not.
13   BY MR. BYRD:
14          Q.   Well, you -- wouldn't you be made aware
15   of that if they did?
16          A.   100 percent.
17               MR. KEYES:  Objection to form.
18   BY MR. BYRD:
19          Q.   Huh?
20               MR. KEYES:  Foundation.
21               THE WITNESS:  100 percent.
22   BY MR. BYRD:
23          Q.   Has anybody from Facebook ever offered
24   to come in and share their data with you or to
25   share their technology of how you could restrict
```

Page 152

1  the use of children of social media apps?

2              MR. KEYES:  Objection to form.

3  Foundation.

4              THE WITNESS:  No.  And in my opinion,

5  you know, they have a business to run, and they're

6  trying to make money, and they're making money off

7  our children's brains, and it -- it's really

8  unfortunate.

9              I -- I don't look at the social media

10 companies any different than I look at a drug

11 dealer.  They're injecting poison, creating a

12 totally different environment for our children, and

13 making it so that, you know, they -- they are

14 experiencing mental health crises at a level that

15 we've never seen before.

16 BY MR. BYRD:

17        Q.   What about -- same question for

18 Instagram or TikTok or Snapchat:  Have any of their

19 corporate folks tried to come in and -- and work

20 with you to try to help you address the things that

21 counsel asked you about to prevent social media

22 being used so much by these kids?

23        A.   No.  I mean, there's enough research

24 out there, they know what they're doing.  It's sad

25 to me, it's sad that they would know that this is

```
                                          Page 153
 1   happening and continue to perpetuate it to make
 2   money off of our children.  It's really -- it's --
 3   I don't know.  "Sad" is the only word I have for
 4   it.
 5          Q.   I think that you were asked -- you have
 6   the list of topics, and you were asked about this
 7   Topic 48 where you listed other -- you've
 8   acknowledged -- you acknowledged to this jury,
 9   didn't you, that parents and community and there's
10   other companies and JUUL and vaping that also play
11   a role in the mental health arena, right?  You
12   acknowledge that?
13          A.   Yes.
14          Q.   I don't know if you were asked.  Can
15   you compare -- the defendants that were chosen here
16   in this case, though, can you compare the role --
17   the amount of the role that you understand the
18   parents, community, students versus these
19   defendants right here that you're dealing with --
20          A.   Uh-huh.
21          Q.   -- can you compare sort of, I guess,
22   the culpability, if you will, in your mind since
23   you were asked that question?
24               MR. KEYES:  Objection to form.
25   Foundation.
```

Page 154

1          THE WITNESS:  It is -- the social media

2     companies have the ability to change the way they

3     deliver, to change access for children.  It's the

4     same -- it's no different than with pornography.

5          So the access is there.  They know it's

6     there.  They don't care that it's there.  They're

7     making money off the fact it's there.

8          Parents, who are trying to provide a

9     physical device to their children so that they can

10    access them, are torn with giving them the device

11    for that access but also exposing them to these

12    social media platforms because there are so many

13    different work-arounds that even the best parent

14    who tries to prevent it is -- it's an uphill battle

15    for them.

16    BY MR. BYRD:

17         Q.   Turn to this Topic 48, which is Page 16

18    on your Exhibit 2.  I mean, you were being asked

19    about the all categories of persons, entities or

20    issues that the school district has claimed in

21    writing or has reason to believe are responsible.

22    Do you remember that?

23         A.   Yes.

24         Q.   And I guess I'm just trying to make

25    sure the jury understands here, that I think you

Page 155

1    mentioned some things about -- like there may be

2    abuse in the community that happens and that can

3    play a role.  There may be an abuse in the

4    family -- you -- you listed some sort of unique

5    sort of incidences.  But how does that compare to

6    the role of these defendants on a daily basis that

7    are in this case?

8              MR. KEYES:  Objection to form.

9    Foundation.  Mischaracterizes testimony.

10             THE WITNESS:  So all the things that I

11   mentioned have always existed.  To the degree they

12   existed, have changed.  They change by the

13   community you're in.  They change by the

14   neighborhood you live in.  But we have not seen

15   this drastic change in the mental health of our

16   children in their inability to attend to school by

17   any of those factors over the last hundred years

18   that we have seen in this very short window since

19   social media came on the rise.

20             And I spoke a lot today about the --

21   our girls and our females, and when the

22   forward-facing camera came out, depression,

23   anxiety, the suicides skyrocketed.

24             A different story is told about our

25   boys because our boys are not engaging in risky

Page 156

1    behavior, and you -- you might look at this and say
2    it's great; you know, boys going to the hospital
3    for broken limbs is a good thing, but it's also
4    because they're not going outside.  They're not
5    getting their driver's license.  They're not -- to
6    the level.  Not every kid, obviously, when I say
7    "all."
8                So the amount of boys getting their
9    driver's license, getting jobs, going outside and
10   playing and having, you know, slightly risky
11   behavior and result in slight injuries, dating, all
12   those things have dramatically dropped in the last
13   several years when social media came on the rise,
14   exponentially more so than they have over the last
15   hundred years when poverty and homelessness and gun
16   violence and all those things existed.  They didn't
17   prevent people from socializing; from getting their
18   license; from wanting to, you know, go out and
19   play; all those things.
20               So we in the school system are dealing
21   with a completely different -- and I'll just -- for
22   lack of a better term -- product that's coming in
23   that we're starting with, completely different.
24   BY MR. BYRD:
25          Q.   And -- and -- okay.  Continue.  Sorry.

Page 157

1          A.   In the past, we would have four or
2     five --
3               MR. KEYES:  Objection.  I mean, I think
4     you were finished with your answer.  If -- this is
5     not a --
6               MR. BYRD:  I mean, I think he was
7     talking, and I interrupted him.
8               MR. KEYES:  -- narrative.  It's
9     supposed to be question and answer.
10               MR. BYRD:  Have your objection.  That's
11     fine.
12               Continue on, if I interrupted you.
13               MR. KEYES:  Objection.
14               THE WITNESS:  In past years, we may
15     have four or five children show up to kindergarten
16     not potty-trained.  This year, I think we had
17     almost 70.
18               Parents are not taking the initiative.
19     Parents don't have the ability, just like their own
20     children, to attend to a task, which is why they're
21     not potty training their children, which is why
22     they're not teaching them their letters.
23               So children are showing up, and we are
24     getting a much different product now and being
25     expected as a school system to do all these things

Page 158

1    to attend to their physical and mental health.  And
2    I truly believe a lot of it is not just the social
3    media exposure to the children.  It's to the
4    parents.
5                 And, you know, something as simple --
6    and you may think this is a little thing -- as
7    looking your child in the eyes when you breast-feed
8    them, that is the trust that gets built, and that
9    trust turns into bigger trust and bigger trust.
10   And we have kids who come in who have no trust of
11   any adult in their life.
12                And I'm not saying it's because there
13   was no breast-feeding.  But that's just a simple
14   thing.  If you're going to look at your phone
15   instead of look at your child, they will be
16   permanently impacted.
17   BY MR. BYRD:
18        Q.   So just to wrap this up, it's -- it's
19   your understanding that the social media use of the
20   parents is even having an impact, yes?
21        A.   Just as much, yes.
22        Q.   Okay.  Now, let's look at this
23   Exhibit -- this Exhibit 2, and start at the
24   beginning of the topics.  I think you were going to
25   cover 1.  Do you remember that?

```
 1          A.    I'm sorry.  Exhibit 2?
 2          Q.    I'm sorry.  Page 7.  And it's Topic
 3    1 --
 4          A.    Yeah.
 5          Q.    -- up there.
 6                Now, counsel asked you questions about
 7    this Topic 1.  And -- and what Counsel said was --
 8    I wrote it down here, or part of it, that he
 9    said -- he only asked you about, do you have any
10    quantitative data to show the amount of time?  Do
11    you remember that question?
12          A.    Uh-huh.
13          Q.    Do you remember that question?
14          A.    I do.
15          Q.    And you answered it, right?
16          A.    I did.
17          Q.    Were you prepared today to talk about
18    the -- the full topic here, which is -- it doesn't
19    just restrict it to quantitative data.  Were you
20    prepared to talk about that today?
21          A.    Yes.
22          Q.    Okay.  The same question for Number 2.
23    Counsel asked you about the quantitative data or
24    documents that you might have that relate to the
25    impact.
```

```
                                            Page 160
 1              Do you remember that?
 2         A.   I do.
 3         Q.   And that's all he asked you about,
 4    right?
 5         A.   Correct.
 6         Q.   Were you --
 7              MR. KEYES:  Objection.  Form.
 8    BY MR. BYRD:
 9         Q.   Were you prepared to talk about the
10    entirety of Topic 2 that you prepared for today?
11         A.   Absolutely, yes.
12         Q.   And were you prepared -- is that true
13    for basically every topic that you were set to
14    cover today that was -- is listed in Exhibit 1 that
15    Counsel put --
16         A.   Yes.
17         Q.   Okay.  Did -- I think you mentioned
18    that you -- you were talking about abatement on
19    Topic 63 and things that you did.  And you
20    mentioned, you know, that you all had to hire more
21    people.
22              Do you remember that?
23         A.   I do.
24         Q.   And you said that you reviewed
25    Interrogatory Number 5 in preparation for today?
```

1          A.    Yes.

2          Q.    And were you prepared to talk about

3    your contributions to the chart of damages there?

4          A.    Yes.

5          Q.    Okay.  You were asked about this

6    exhibit.  I don't know which exhibit number it is.

7          A.    I think it was 4.  4.

8          Q.    4.  You know, this 86 percent number.

9                Do you remember that?

10          A.    I do.

11          Q.    This is taken from students that are

12    supposed to -- from children, really, right?  That

13    are supposed to answer accurately about their

14    understanding about their mental health?

15          A.    Yes.

16          Q.    Is that right?

17          A.    Correct.

18          Q.    I mean, you've been around students a

19    lot as your time in Harford, right?

20          A.    Yes.

21          Q.    Do they necessarily always answer

22    accurately about their -- their own mental health?

23          A.    No.

24          Q.    Okay.

25          A.    It's getting better.  But, no.

1        Q.    This is just a study about their own
2    self-reporting, right?
3        A.    Correct.  That's all self-report.
4        Q.    It's not necessarily conclusive of what
5    you see from your own experience, right?
6        A.    What do you mean by that?
7        Q.    I mean, it's not necessarily -- it
8    doesn't necessarily match up with what you see as
9    far as the mental health problems going up in
10   numbers that you see from your own perspective?
11              MR. KEYES:  Objection to form.
12              THE WITNESS:  Yeah.  Not exactly.
13   BY MR. BYRD:
14       Q.    I think you talked about some abatement
15   programs, and you mentioned some -- some people you
16   brought in to talk to parents and students.
17              Do you remember that?
18       A.    Yes.
19       Q.    Do you remember you all brought in a
20   Dr. Leonard Sax?
21       A.    That's his name, yeah.  Yes.
22       Q.    Is that something that you recall?
23       A.    I do.  I attended it --
24       Q.    Okay.
25       A.    -- with one of my daughters.

Page 163

1          Q.    And are you able to discuss that?

2          A.    To some degree, yes.

3          Q.    Okay.  Are you -- let's see.

4                MR. BYRD:  I think -- let me just

5    check.  Give me one second.

6                MR. KEYES:  Sure.

7                MR. BYRD:  Yeah.  I'll pass the

8    witness.  That's all I have for him.

9                MR. FLASTER:  Andy, before you go,

10   could I just make a housekeeping before we finish?

11               On Line 159, 10, I made an objection on

12   form and foundation.  I just wasn't caught because

13   I wasn't on a mic.

14               I assume there's no objection if I make

15   that now?

16               MR. BYRD:  That's fine.  You're fine.

17               MR. FLASTER:  Okay.  Thank you.

18               I just -- before you proceeded, Andy.

19   Thanks.

20               MR. KEYES:  Sure.

21                         * * *

22                    EXAMINATION

23   BY MR. KEYES:

24         Q.   Mr. Hennigan, you testified a moment

25   ago about your view that students having access to

Page 164

1   social media is like injecting poison?

2           A.    No.  I said the people who allow it and

3   don't realize that what they're doing -- I don't

4   know if these are my exact words.  But I -- I

5   parallel that to providing something that's really

6   awful to a child with unfettered access like a drug

7   dealer would do.

8           Q.    Okay.  So let me make sure I

9   understand.  The people who allow students to have

10  access to social media are injecting poison?

11          A.    The people who create the programs that

12  allow children to get in without any parental

13  consent are allowing that to happen, yes.

14          Q.    Okay.

15          A.    And if they would somehow create

16  restrictions, just like states do, some states do

17  with pornography, then children wouldn't have as

18  much access.

19                Which is why YouTube is our most

20  accessed database or platform because students

21  don't have to get any permission or pay money to

22  get into it.

23          Q.    Given your view, have you ever asked

24  anyone in Harford County Public Schools to

25  discontinue its YouTube channel?

Page 165

1                A.    I have not.

2                Q.    Given your view, have you ever asked

3       anyone in Harford County Public Schools to

4       discontinue its Facebook account?

5                A.    I have not.

6                Q.    Given your view, have you ever asked

7       anyone in Harford County Public Schools to

8       discontinue its Instagram account?

9                A.    No.  Well, I don't -- I didn't even

10      know if we have one or not, so...  If you say we

11      did, then, no.

12               Q.    You've never inquired?

13               A.    No.

14               Q.    Given your view, have you ever asked

15      anyone in Harford County Public Schools to block

16      students' access to YouTube on district-issued

17      devices?

18               A.    I think I actually have, yes.

19               Q.    Who did you ask?

20               A.    So we had a conversation.  I don't

21      remember when.  I believe it was some sort of

22      leadership meeting, and there was the concern about

23      the ads popping up.

24                     And we talked about whether we were

25      going to allow YouTube to be accessed by students

Page 166

1    or even allow teachers to use it.

2            Q.    And the decision was made to allow

3    students to continue accessing YouTube on

4    district-issued devices?

5            A.    I don't know.  I don't know if they can

6    or can't, to be honest with you.

7            Q.    All right.  Well, did you follow up

8    after that to see whether Harford County Public

9    Schools had changed its position on whether

10   students would have access to YouTube on

11   district-issued devices?

12           A.    I don't recall.

13           Q.    Given your view, did you have a

14   conversation with anyone in Harford County Public

15   Schools where you asked that student access to

16   YouTube be blocked on the district's network?

17           A.    Is that different from what you just

18   asked me?

19           Q.    Yeah.  Before, I asked about accessing

20   YouTube on district-issued devices.

21           A.    Oh.  Okay.

22           Q.    Now I'm asking did you have a

23   conversation with anyone at Harford County Public

24   Schools where you asked that student access to

25   YouTube be blocked even on personal devices when

```
                                        Page 167
 1   those devices were connected to the district's
 2   network.
 3           A.   I believe that was part of the same
 4   conversation.
 5           Q.   The same conversation where you raised
 6   an issue; but others expressed a competing concern
 7   and, as far as you know, the rule never changed.
 8   Is that fair?
 9           A.   I don't know that to be true, no.  Like
10   I said --
11           Q.   You don't know one way or the other?
12           A.   No.
13           Q.   Did you follow up?
14           A.   No.
15           Q.   Given your view, did you have a
16   conversation with anyone in Harford County Public
17   Schools to say that teachers should not be allowed
18   to use YouTube in the classroom?
19           A.   That, again, was part of the same
20   conversation, whether we were going to have YouTube
21   allowed from teachers, from students.
22           Q.   Okay.  And, again, that's the
23   conversation where others expressed competing
24   concerns, and you don't know how that conversation
25   turned out and you don't know whether the rules
```

Page 168

1    changed?

2         A.    Correct.

3         Q.    Okay.  And given your view, did you

4    have a conversation with anyone at Harford County

5    Public Schools to say that teachers should not be

6    allowed to assign YouTube as homework to students?

7         A.    I don't know if that was part of the

8    conversation.  I'm sure it was because if we were

9    talking about whether they can access or not, we'd

10   have to talk about assignments.

11        Q.    Okay.  So if you've had a conversation

12   regarding students' access to YouTube or teachers

13   using YouTube, it was this one conversation you've

14   mentioned with leadership where others expressed

15   competing concerns, and you don't know how that

16   turned out and you don't know whether students have

17   access currently?

18        A.    Correct.

19        Q.    And you don't know whether teachers are

20   allowed to use YouTube in the classroom or assign

21   it as homework currently?

22        A.    Correct.

23              (HCPS MD HENNIGAN EXHIBIT 8, 2023-2024

24   Parent-Student Handbook Calendar, Bates

25   HCPS_00114511-545, was marked for identification.)

Page 169

1    BY MR. KEYES:
2           Q.   I'm showing you what has been marked as
3    HCPS Exhibit 8.  This was produced with the Bates
4    Numbers HCPS_00114511 through 114545.
5                Do you recognize this document?
6           A.   Yes.
7           Q.   This is the 2023-2024 Parent-Student
8    Handbook Calendar?
9           A.   Yes.
10          Q.   Okay.  Would you turn to the fourth
11   page.
12          A.   Fourth physical page or --
13          Q.   Yes, sir.  And it has a page number in
14   the lower right-hand corner.
15          A.   1117.
16          Q.   No.  114514.
17          A.   Okay.
18               MR. BYRD:  Yeah.
19   BY MR. KEYES:
20          Q.   This -- this is the Parent-Student
21   Handbook that is distributed to every Harford
22   County Public School family?
23          A.   Not anymore.  I think it's just
24   available online.
25          Q.   Okay.  Do you see at the top right

Page 170

```
 1    there's a section called "Website & Social Media"?
 2            A.    Yes.
 3            Q.    And do you see that it says:  Follow us
 4    on Facebook (@HCPS Schools) [sic] --
 5            A.    Yes.
 6            Q.    -- Twitter (@HCPS Schools) [sic] --
 7            A.    Yes.
 8            Q.    -- Instagram (@HCPS Schools) [sic] --
 9            A.    Yes.
10            Q.    -- and YouTube (@HCPS Schools) [sic]?
11            A.    Yes.
12            Q.    Were you aware before today that this
13    paragraph was in the Parent-Student Handbook?
14            A.    I review it every year, but I -- you
15    know, I may have saw it, but I don't recall, like,
16    noting it.
17            Q.    Okay.  When -- whenever you reviewed
18    the Parent-Student Handbook, did you ever go to
19    anyone and say, "Why in the world are we
20    encouraging our community to follow us on Facebook,
21    Twitter, Instagram and YouTube?" when your view was
22    that giving access to students was injecting
23    poison?
24                    MR. BYRD:  Object to form.
25                    THE WITNESS:  Because it's a different
```

Page 171

1    audience.
2    BY MR. KEYES:
3        Q.    And you say that because?
4        A.    Because this is the -- well, it's the
5    Parent-Student Handbook, but the point of this is
6    for parents to follow, not necessarily for
7    students.
8        Q.    You don't think this is for students as
9    well even though it's called the "Parent-Student
10   Handbook"?
11       A.    I don't think students are following us
12   on Facebook, to be honest with you, or Twitter or
13   Instagram or YouTube.
14       Q.    That's your view?  Have you --
15       A.    Yes.
16       Q.    -- looked into that?
17       A.    I have not.
18       Q.    Okay.  And then if you turn to
19   Page 114516.
20       A.    Okay.
21       Q.    In the lower left, you see a section
22   called "Responsible Use of Technology"?
23       A.    Yes.
24       Q.    And have you seen this before?
25       A.    Yes.

Page 172

1      Q.   Okay.  You see that there's a
2  subsection called "YouTube"?
3      A.   Yeah.
4      Q.   Do you see that it says:  YouTube is
5  utilized as an instructional tool for HCPS
6  students.  YouTube is set to restricted mode on
7  HCPS-issued devices and through the HCPS network.
8  Restricted mode is set -- is a setting controlled
9  by YouTube algorithms to hide potentially
10 objectionable content.  HCPS continues to monitor,
11 evaluate and update YouTube settings to minimize
12 access to inappropriate content.
13           Did I read that correctly?
14     A.   Yes.
15     Q.   Okay.  Were you aware before today that
16 that language was in the Parent-Student Handbook?
17     A.   No.
18     Q.   Did you at any point have a
19 conversation with anyone in Harford County Public
20 Schools that said, "I think that giving students
21 access to YouTube is injecting poison; and,
22 therefore, I think we should take this section out
23 of the handbook, and YouTube should not be utilized
24 as an instructional tool for HCPS students"?
25     A.   No, and for good reason.

Page 173

1          Q.    What's the good reason?

2          A.    So YouTube has recently, in recent

3     years, completely changed to keep up with the other

4     social media apps to create these short, quick

5     videos.  And the short, quick videos more so than

6     the content is just really rewiring the brains of

7     our children.

8                So there's plenty on YouTube that is

9     not detrimental.  But the things that the students

10    for the most part are watching for recreation are

11    the videos that are rewiring their brains.

12                The videos that teachers are showing

13    are not those quick 30-second clips.  They're more

14    educational videos, I would assume, that are longer

15    in length.

16          Q.    Do you know that when teachers assign

17    YouTube videos, that makes YouTube available to the

18    students, and they can run their own queries on

19    YouTube?

20          A.    They can do that anyway.

21          Q.    So do you think it's inconsistent for

22    Harford County Public Schools to say that providing

23    access or giving access to students is injecting

24    poison and then turn around and have a YouTube

25    channel, have teachers use YouTube, assign YouTube

Page 174

1    for homework and give students access to YouTube on
2    their devices and on the network -- do you see any
3    inconsistency there?
4                MR. BYRD:  Object to form.
5                THE WITNESS:  Well, again, I think
6    you've got a platform that has multiple uses, some
7    of it detrimental, some of it not.
8                The goal of the school system is to use
9    the part of the platform that is not detrimental
10   while recognizing that there are detrimental sides
11   to it.  It's the same as buying a TV back in the
12   day and not having the network on it where you
13   could find pornography, but yet you still have the
14   television.  So if you then give access to the
15   pornography, now you're a part of the problem.
16               So if we were to be sharing videos on
17   YouTube with students that are part of this
18   triggering problem, then that would be
19   inconsistent.  But I don't believe we're doing
20   that.
21   BY MR. KEYES:
22        Q.   And what inquiry have you made on that
23   front?
24        A.   I haven't made any because I wasn't
25   aware we were doing it.

Page 175

1              MR. KEYES:  I have no further questions

2    at this time.  Thank you, Mr. Hennigan.

3              THE WITNESS:  Thank you.

4              MR. BYRD:  Other defendants?  No?

5              A couple follow-ups.  Do you guys have

6    any more questions, then?

7              MR. FLASTER:  I don't have any

8    questions.  Sorry.  Thank you for that.

9              MR. BYRD:  Okay.  A couple of quick

10    follow-ups.

11                          *  *  *

12                    EXAMINATION

13    BY MR. BYRD:

14         Q.   You were asked about this

15    Parent-Student Handbook in here, right?

16         A.   Yes.

17         Q.   I mean, is there -- do you -- I mean,

18    there's not a problem with kids -- I mean, kids

19    aren't walking around getting on the Harford County

20    School District Instagram and bullying each other,

21    are they?

22         A.   No.  That's monitored.

23              MR. KEYES:  Objection to form.  Lack of

24    foundation.

25    BY MR. BYRD:

Page 176

1          Q.   Huh?

2          A.   That's monitored.  And -- and anytime

3     there's -- anybody puts content on there that's

4     problematic, it gets taken down.

5          Q.   I mean, the school district isn't

6     body-shaming women, are they?

7          A.   No.

8          Q.   And -- I mean, counsel laughs, but, you

9     know --

10              MR. KEYES:  I hope the county is not

11    body-shaming anyone --

12              MR. BYRD:  Right.

13              MR. KEYES:  -- of course.

14    BY MR. BYRD:

15         Q.   The problem isn't people getting on the

16    school's use of these apps, right?

17         A.   Correct.  The things that -- on there

18    are going to be appropriate for viewing by the

19    general public.

20         Q.   If -- if the solution was as simply as

21    these defendants could put -- with -- with the

22    touch of a bunch of buttons and code, could just

23    change the whole Harford School District system to

24    where the access and spreading and -- and pushing

25    of all this material that's leading to all this

Page 177

1    stuff wouldn't happen to kids that you're trying to
2    teach, if it's as simple as just pushing a bunch of
3    buttons, wouldn't you expect these defendants to do
4    it?
5            A.    I would hope so.
6                  MR. KEYES:   Objection to form.   It
7    calls for rampant speculation.
8                  THE WITNESS:   I -- well, it's a hard
9    question to answer because they do know it, and
10   they haven't done it, but --
11   BY MR. BYRD:
12           Q.    Yeah.
13           A.    -- it would be nice if somebody did
14   something.
15                 MR. BYRD:   Okay.   I think that's --
16   that's all the questions I have.
17                 THE VIDEOGRAPHER:   Stand by.   We are
18   off the record.
19                 MR. BYRD:   Well, hold on, hold on, hold
20   on.   We -- we need to finish what -- put on the
21   record, though, about what we're doing about
22   redacting and all that.   So --
23                 MR. KEYES:   Well, I think we've agreed
24   that your team will keep the marked copy of
25   Exhibit 3 --

Page 178

1          MR. BYRD:  Yeah.

2          MR. KEYES:  -- the original.  The court

3   reporter will identify the section of the

4   transcript where I first introduced the exhibit

5   where I read from it up to the point where we took

6   a break.  She'll put that in a separate document so

7   that part is redacted from the transcript, both the

8   rough and the final that gets circulated to anyone.

9          MR. BYRD:  Yeah.

10         MR. KEYES:  And then the -- she'll hold

11  the -- the redacted portion to the side until this

12  issue is resolved either by agreement or with the

13  court.

14         MR. BYRD:  But it's going to need to be

15  more than just your question, because prior to

16  introducing that document and the question, you

17  read from the document and said, "Have you ever

18  said this?  Have you ever said that?"  You're

19  reading from the protected document.  That -- that

20  section also needs to be clawed back.

21         You wouldn't have that document to be

22  reading from it.  So those sections also -- and

23  that's why we need to go through it.  Those will

24  also need to be removed because you don't get to --

25         MR. KEYES:  That's -- that's fine.

Page 179

1            MR. BYRD:  Yeah.

2            MR. KEYES:  I'm happy to work with you

3   to identify the portions, but I don't think we can

4   do that right now.

5            MR. BYRD:  No, no, no, no.  But we will

6   do that, understanding that those parts need to be

7   clawed back to earlier.

8            And then we're going to look at the

9   argument we have which -- about -- for 502(d),

10  which I don't think is problematic, but we just

11  want to double-check to make sure there isn't

12  anything improper that we quoted in there that

13  would be a problem that we might need to redact as

14  well.  And I think that's all it is.

15           I do -- you know, I'll give one more

16  shot here on the record to -- to know if you have

17  any 502(d) response for not flagging this document

18  when y'all prepared for this.

19           MR. KEYES:  I think we've already had a

20  conversation in the hallway.  We already had a

21  prior exchange.  I'm happy to follow up with you.

22  I haven't even seen Ms. McNabb's email.  We'll take

23  steps to comply with the 502(d) order.  I believe

24  we're fully compliant right now, and we'll continue

25  to comply.

1            MR. BYRD:  Well, one of the compliances
2    if -- is if people have copies here today that are
3    on the other side, as well as whoever is helping
4    put the documents up online, those need to be
5    sequestered right away.
6            I would ask --
7            MR. KEYES:  I already said --
8            MR. BYRD:  Yeah.  I know.
9            MR. KEYES:  -- we have put it to the
10   side --
11           MR. BYRD:  Have we done it?
12           MR. KEYES:  -- and we are sequestering
13   it.
14           MR. BYRD:  Have we done it?  Or do you
15   want --
16           MR. KEYES:  Yes.  Yes.
17           MR. BYRD:  I would prefer --
18           MR. KEYES:  I mean, at least in my
19   case, I put it in a --
20           MR. BYRD:  Well, I'd prefer --
21           MR. KEYES:  -- a bright orange
22   envelope.
23           MR. BYRD:  -- that you all gather them
24   all and hand them to me and then we will hold it
25   here with this exhibit.

Page 181

```
 1                MR. KEYES:  That's not what
 2   sequestering requires.
 3                I'm not giving you documents that have
 4   my highlighting or my --
 5                MR. BYRD:  That's fair.
 6                MR. KEYES:  -- or my --
 7                MR. BYRD:  I don't want your work
 8   product.
 9                MR. KEYES:  -- or my writing or
10   anything like that.
11                I'm telling you as an officer of the
12   court we will sequester it.  We will put it to the
13   side.  We will not look at it until we have
14   follow-up discussion.
15                MR. BYRD:  Well, it says you can
16   destroy -- it says destroy or get rid of them
17   and/or sequester.
18                I think sequestering is appropriate for
19   anything you have notes on.  I would destroy the
20   other ones and then go through the proper process.
21                I'm just putting that on the record so
22   you all know that.
23                And, frankly, I would transfer your
24   notes somewhere else and then destroy those.
25                So I don't know if sequestration is --
```

Page 182

1   is enough, but look at your 502(d) order.  All
2   right?
3                   MR. KEYES:  Off the record.
4                   THE VIDEOGRAPHER:  Stand by.
5                   We are off the record at 1357.
6                   MR. BYRD:  And what are the times,
7   then?
8                   THE VIDEOGRAPHER:  Stand by.
9                   MR. KEYES:  Would you like a break
10  before Part 2?
11                  THE VIDEOGRAPHER:  I need a little bit
12  more math.  All right.
13                  So Mr. Keyes has been on the record
14  for -- I just want to make sure.
15                  MR. BYRD:  That's all right.  Take your
16  time.
17                  THE VIDEOGRAPHER:  -- 2 hours and
18  44 minutes.
19                  And the other time where y'all were
20  discussing the documents.
21                  MR. BYRD:  We were at 2, 39 before.  So
22  I find that hard to believe before lunch.
23                  THE VIDEOGRAPHER:  3, 44.
24                  MR. BYRD:  3, 44?  Yeah.
25                  THE VIDEOGRAPHER:  So I'm adding things

Page 183

1  in right now.

2            MR. BYRD:  No problem.

3            THE REPORTER:  I think the other ones

4  would be 34 minutes.

5            MR. BYRD:  Okay.  And does the

6  34 minutes include our back-and-forth on the

7  502(d)?

8            THE VIDEOGRAPHER:  Yes.  That's what

9  I'm talking about.

10            MR. BYRD:  Okay.

11            THE VIDEOGRAPHER:  Yeah.

12            MR. BYRD:  So we've already taken out

13  the time we talked about 502(d) from Mr. Keyes'

14  time?

15            Okay.  So 3 hours 44 minutes; is that

16  right?

17            THE VIDEOGRAPHER:  Yes.

18            MR. BYRD:  Okay.

19            THE VIDEOGRAPHER:  3 hours --

20            THE REPORTER:  I'm sorry.  I can't hear

21  you.

22            "3 hours"?

23            THE VIDEOGRAPHER:  3 hours and

24  44 minutes total, fully, on the record.

25            And then minus what I just told you.

Page 184

```
 1              MR. BYRD:  Minus the 34 minutes of my
 2    time?
 3              THE VIDEOGRAPHER:  Minus the
 4    34 minutes, yes.
 5              MR. BYRD:  Okay.  Sounds like that
 6    means it's 3 hours and 10 minutes.
 7              THE VIDEOGRAPHER:  Sounds about right.
 8              MR. BYRD:  We'll double --
 9              THE VIDEOGRAPHER:  Sorry.  I had to go
10    back and forth.
11              MR. BYRD:  That's all right.
12              THE VIDEOGRAPHER:  It's on the sheet.
13    It's just, you know, all the mental math.
14              MR. BYRD:  We're just supposed to put
15    it on the record, and that's fine.
16              THE VIDEOGRAPHER:  Yeah, sorry.
17              MR. BYRD:  And then we can check it
18    later before tomorrow, but that's fine.  Okay.
19              THE VIDEOGRAPHER:  Right.
20              (WHEREUPON, the deposition was
21    concluded at 2:01 p.m.)
22              (Signature Reserved.)
23
24
25
```

1                    DEPOSITION ERRATA SHEET

2

     Case Caption:  In Re:  Social Media Adolescent

3    Addition/Personal Injury Liability Litigation

4            DECLARATION UNDER PENALTY OF PERJURY

5

6                 I declare under penalty of perjury that

7    I have read the entire transcript of my deposition

8    taken in the captioned matter or the same has been

9    read to me, and the same is true and accurate, save

10   and except for changes and/or corrections, if any,

11   as indicated by me on the DEPOSITION ERRATA SHEET

12   hereof, with the understanding that I offer these

13   changes as if still under oath.

14

15

16                 Signed on the _____ day of

17                 _____, 20___.

18

19

20                 _____

21                      BERNARD HENNIGAN

22

23

24

25

Page 186

1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24              BERNARD HENNIGAN

25

Page 187

1                    DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                    BERNARD HENNIGAN

25

Page 188

1                    CERTIFICATE OF REPORTER
2
            I, Cindy A. Hayden, Registered Merit
3    Reporter and Notary Public for the State of
     Maryland, do hereby certify:
4
            That the foregoing deposition was taken
5    before me on the date and at the time and location
     stated on Page 1 of this transcript; that the
6    deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the
7    testimony of the deponent and all objections made
     at the time of the examination were recorded
8    stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed
9    is a true, accurate and complete record of the
     testimony of the deponent and of all objections
10   made at the time of the examination to the best of
     my ability.
11
            I further certify that I am neither related
12   to nor counsel for any party to the cause pending
     or interested in the events thereof.  Witness my
13   hand, this 8th of May, 2025.
14
15
16           _____
17           Cindy A. Hayden,
             Registered Merit Reporter
18           Notary Public
             State of Maryland
19           My Commission expires:
             April 26, 2029
20
21
22
23
24
25