**Exhibit 5**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE: SOCIAL MEDIA ADOLESCENT   )
     ADDICTION/PERSONAL INJURY        ) MDL No.
4    PRODUCTS LIABILITY LITIGATION    ) 4:22-md-3047-YGR
     _____ )

5

     THIS DOCUMENT RELATES TO:        )
6                                     )
     BOARD OF EDUCATION OF HARFORD    )
7    COUNTY V. META PLATFORMS INC.,   )
     ET AL.                           )
8                                     )
     CASE NO.: 4:23-CV-03065          )

9

10        Confidential - Pursuant to Protective Order
11              VIDEOTAPED DEPOSITION OF
12                SEAN W. BULSON, Ed.D.
13        Harford County Public Schools Central
14               Administration Building
15             102 South Hickory Avenue,
16                 Bell Air, Maryland
17            Friday, May 9, 2025, 11:25 a.m.
18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 2

```
 1    APPEARANCES:
 2    For Plaintiff:
 3              BY:  KENNETH S. BYRD, ESQ.
                BY:  NICK W. LEE, ESQ. (VIA ZOOM)
 4              Lieff Cabraser Heimann & Bernstein
                250 Hudson Street, 8th Floor
 5              New York, New York 10013
                212.355.9500
 6              kbyrd@lchb.com
                nlee@lchb.com
 7
 8    For Plaintiff:
 9              BY: MATTHEW P. LEGG, ESQ. (VIA ZOOM)
                Brockstedt Mandalas Federico LLC
10              2850 Quarry Lake Drive - Suite 220
                Baltimore, Maryland 21209
11              410.421.7777
                mlegg@lawbmf.com
12
13    For the Defendants Meta Platforms, Inc., f/k/a
      Facebook, Inc.; Facebook Holdings, LLC; Facebook
14    Operations, LLC; Facebook Payments, Inc.; Facebook
      Technologies, LLC; Instagram, LLC; Siculus, Inc.;
15    and Mark Elliot Zuckerberg:
16              BY:  EBEN S. FLASTER, ESQ.
                BY:  WILLIAM S. WALBERG (VIA ZOOM)
17              Shook, Hardy & Bacon LLP
                Two Commerce Square
18              2001 Market Street, Suite 3000
                Philadelphia, Pennsylvania 19103-7014
19              215.278.2555
                eflaster@shb.com
20              wwalberg@shb.com
21
      For the Defendant Snap:
22
                BY:  PAUL A. COTLER, ESQ. (VIA ZOOM)
23              Kirkland & Ellis LLP
                2005 Market Street, Suite 1000
24              Philadelphia, Pennsylvania 19103
                215.268.5002
25              paul.cotler@kirkland.com
```

CONFIDENTIAL

Page 3

1            APPEARANCES CONTINUED:
2
   For the Defendants Alphabet Inc., Google LLC, and
3  YouTube LLC:
4            BY:  J. ANDREW KEYES, ESQ.
             BY:  LYDIA WEIANT, ESQ.
5            Williams & Connolly LLP
             680 Maine Street SW
6            Washington, DC 20024
             202.434.5584
7            akeyes@wc.com
             lweiant@wc.com
8
9  For the Defendants TikTok, Ltd.; TikTok, LLC;
   TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
10
             BY:  DANIEL C. SALE, ESQ. (VIA ZOOM)
11           King & Spalding LLP
             1700 Pennsylvania Avenue, NW
12           Suite 900
             Washington, D.C. 20006
13           202.626.2640
             dsale@KSLAW.com
14
15  Also Present:  Ryan Sohmer, Videographer
                   Jacob Arndt, Exhibit Technician
16                 Kimberly Neal, General Counsel
                   Harford County Public Schools
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

```
                                                    Page 4
 1                        I N D E X
 2                                                    PAGE
 3    EXAMINATION BY MR. KEYES                           6
 4
 5                      E X H I B I T S
 6
 7    NUMBER              DESCRIPTION               PAGE
 8    EXHIBIT 1    Plaintiff Fact Sheet - School       8
                   Districts
 9
      EXHIBIT 2    Plaintiff Fact Sheet - School      14
10                 Districts (Supplemental)
11    EXHIBIT 3    Plaintiff Board of Education        18
                   of Harford County's
12                 Supplemental Answer to
                   Defendants' Interrogatory No.
13                 3
14    EXHIBIT 4    Plaintiff Board of Education        32
                   of Harford County's Amended
15                 Objections and Responses to
                   Defendants' Interrogatories
16                 (Set 3)
17    EXHIBIT 5    Emails dated 2/22/21, Subject:      60
                   MCAP, Bates HCPS_00557536-538
18
      EXHIBIT 6    Emails, top one dated 1/7/19,      108
19                 Subject:  Mental Health
                   Initiatives, HCPS_00164400
20
      EXHIBIT 7    Harford County Public Schools      113
21                 Proposed Mental Health
                   Initiatives, Education and
22                 Raising Awareness, Bates
                   HCPS_00164401-02
23
      EXHIBIT 8    Emails, top one dated 4/29/22,     123
24                 Subject:  Safety Feedback,
                   Bates HCPS_00339224-226
25
```

CONFIDENTIAL

Page 5

1    EXHIBIT 9     Document titled Mental Health     142
                   Initiative, Bates
2                  HCPS_00000158-159
3    EXHIBIT 10    Executive Leadership Team         148
                   Agenda - 3/16/23, Bates
4                  HCPS_00009831-835
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 6

1                P R O C E E D I N G S

2                         * * *

3              THE VIDEOGRAPHER:  We are now going on

4     the record.  My name is Ryan Sohmer.  I'm a

5     videographer for Golkow, a Veritext division.

6     Today's date is May 9th, 2025.  The time now is

7     11:25 a.m.  This deposition is being held at

8     102 South Hickory Avenue, Bel Air, Maryland.

9              We're here in the matter of Social

10    Media Adolescent Addiction/Personal Injury Products

11    Liability Litigation filed in the United States

12    District Court, Northern District of California.

13    Our deponent is Sean Bulson.

14              Counsel will be noted on the

15    stenographic record.  Our court reporter is

16    Cindy Hayden, and will now swear in the witness.

17    You may proceed.

18                         * * *

19              SEAN W. BULSON, Ed.D.,

20      having been first duly sworn, was examined and

21                testified as follows:

22                         * * *

23                     EXAMINATION

24    BY MR. KEYES:

25          Q.   Good morning, Dr. Bulson.  We've met

CONFIDENTIAL

```
                                            Page 7
```

1    before, but for the record, my name is Andrew

2    Keyes.  I'm with the law firm of Williams &

3    Connolly, and we represent the Google and YouTube

4    defendants.

5            Would you please state your full name.

6        A.   Sean Bulson.

7        Q.   Do you understand that you are still

8    under oath?

9        A.   Yes.

10        Q.   Do you understand that you are still

11    under oath and giving testimony as if you were in a

12    courtroom before a judge and a jury?

13        A.   Yes.

14        Q.   I took your deposition earlier today as

15    a corporate representative of Harford County Public

16    Schools on a number of topics, and you told me in

17    that deposition that you had met with the lawyers

18    for Harford County Public Schools three times, and

19    you had reviewed documents that we've marked as

20    Exhibits 1, 2 and 3.

21        A.   Correct.

22        Q.   Did you do anything else to prepare for

23    this deposition of you as a fact witness?

24            MR. BYRD:  Object to form.

25            You can answer.

CONFIDENTIAL

Page 8

1              THE WITNESS:  No.

2    BY MR. KEYES:

3         Q.   Okay.

4              (BULSON EXHIBIT 1, Plaintiff Fact Sheet

5    - School Districts, was marked for identification.)

6    BY MR. KEYES:

7         Q.   I'm handing you what has been marked as

8    Bulson Exhibit 1.  This is titled "Plaintiff Fact

9    Sheet - School Districts."  If you'd turn to the

10   final page.  It's Page 40.

11             Are you there?

12        A.   Yes.

13        Q.   There is a certification.  And do you

14   see the certification says:  I have made reasonable

15   inquiries to answer the foregoing questions.  Based

16   on my personal knowledge and the information

17   provided by other district employees, I declare

18   under penalty of perjury that the information

19   provided in this plaintiff fact sheet is complete,

20   true and correct to the best of my knowledge and

21   information, and that I have provided all of the

22   requested documents that are reasonably accessible

23   to me and/or my attorneys, to the best of my

24   knowledge?

25             Did I read that certification

CONFIDENTIAL

Page 9

1    correctly?

2         A.    Yes.

3         Q.    There is a signature on here that

4    purports to be your electronic signature.  Do you

5    see that?

6         A.    Yes.

7         Q.    And it's associated with the date

8    March 25th, 2024.  Do you see that?

9         A.    Yes.

10         Q.    Did you either affix or authorize

11    someone to affix your electronic signature to this

12    certification on March 25th, 2024?

13         A.    I authorized someone.

14         Q.    Prior to authorizing someone to affix

15    your signature to this certification, what, if

16    anything, did you do to verify the accuracy of the

17    answers on the prior 39 pages?

18         A.    It was a very perfunctory review, I

19    would say.  This was something I delegated.  I

20    didn't go beyond that to verify this information.

21         Q.    Okay.  So when you say "a perfunctory

22    review," what did you do?

23         A.    This -- this would have come in as an

24    electronic document.  So, literally, I believe I

25    was -- I believe I was out of town when this came

CONFIDENTIAL

Page 10

1    through.  So it would have been a quick review on

2    my phone, just sort of scrolling through, but to

3    get an understanding of basically what we were

4    providing.

5              But otherwise, I didn't confirm any of

6    the numbers.  I trust the team to produce pretty

7    straightforward stuff like this.

8         Q.   Okay.  Did you make any reasonable

9    inquiries to answer the questions in this?

10        A.   No.

11        Q.   Did you make any reasonable inquiries

12   to check on whether the answers are accurate?

13             MR. BYRD:  Hold on.  Object to form.

14             You can't disclose communications with

15   your counsel or directions from your counsel.  So

16   you can answer beyond anything -- you're able to

17   answer if it's anything beyond the conversations

18   you had with your counsel is the best way to

19   describe it.  You can go ahead.

20   BY MR. KEYES:

21        Q.   Yeah.  The question is:  Did you --

22        A.   So, I mean, the -- the answer is no.  I

23   mean, I -- this would have come from counsel.  So

24   any discussion of what it was and why I was doing

25   it, you know, would have been -- so, short answer:

CONFIDENTIAL

Page 11

```
 1   No.
 2        Q.   Has it ever come to your attention that
 3   any of the answers completed by Harford County
 4   Public Schools are not accurate?
 5        A.   No.
 6        Q.   Has it ever come to your attention that
 7   any of the information supplied by Harford County
 8   Public Schools in Exhibit 3 [sic] is not accurate?
 9             MR. BYRD:  Objection.
10             Hold on.  I get you want to ask this,
11   and it's fine that you want to -- if you want to go
12   through one by one and do it, that's fine.  But if
13   it came to his attention, it would be from counsel.
14             So you can't answer that question
15   either yes or no, really, because it is disclosing
16   communication or noncommunication from your
17   counsel.  So I have to instruct you not to answer
18   the way you phrased it.  Now, you -- you can ask
19   other stuff about this fact sheet but not that.
20             THE WITNESS:  But you also just said
21   "Exhibit 3."  This is Exhibit 1, correct?
22   BY MR. KEYES:
23        Q.   You're right.
24             MR. BYRD:  Yeah.
25   BY MR. KEYES:
```

CONFIDENTIAL

Page 12

1          Q.   Let me rephrase it.

2          A.   Let me just --

3               MR. BYRD:  Yeah.

4    BY MR. KEYES:

5          Q.   Yeah.

6               Has it ever come to your attention that

7    any of the information supplied by Harford County

8    Public Schools in Exhibit 1 is not accurate?

9               MR. BYRD:  Okay.  Objection.

10              Don't answer the question if any

11   information came from your counsel.

12              And you can ask a better question is

13   what I want to put on the record.  Like, I'm not

14   denying your ability to find what you need but

15   not -- not with that question.

16              MR. KEYES:  It's a yes-or-no question.

17              MR. BYRD:  No.

18   BY MR. KEYES:

19         Q.   Has it ever come to your attention that

20   any of the information supplied by Harford County

21   Public Schools in Exhibit 1 is not accurate?

22              MR. BYRD:  First of all, object to

23   form.  Foundation.  The only way it comes to his

24   attention is through counsel.  You know that.  So

25   you're asking -- you're --

CONFIDENTIAL

Page 13

1           MR. KEYES:  I don't know that.

2           MR. BYRD:  Well, you are.

3           MR. KEYES:  And you don't know that

4    either.

5           MR. BYRD:  If you want to ask him if

6    anybody other --

7           MR. KEYES:  Mr. Byrd --

8           MR. BYRD:  -- than his counsel, you can

9    ask that.

10           MR. KEYES:  Well, that's not my

11    question.  And if you want to instruct him not to

12    answer --

13           MR. BYRD:  Yeah, I'm going to

14    instruct --

15           MR. KEYES:  -- that's your prerogative.

16           MR. BYRD:  -- you not to answer,

17    because you know you're just directly asking for

18    attorney-client communications.  And if I did that

19    to your client, y'all would be out of the seats.

20           MR. KEYES:  There -- there's a lot of

21    speculation on your part.  I'd ask you to limit

22    yourself to objections or instructions so the

23    record is clear.

24           MR. BYRD:  I'm telling you --

25           MR. KEYES:  For --

CONFIDENTIAL

Page 14

1          MR. BYRD:  I'm making the record clear

2     about why I'm instructing him not to answer.

3          MR. KEYES:  Mr. Byrd, I'm going to make

4     a standing request that for the rest of this

5     deposition you stop interrupting me.  I have not

6     interrupted you, so please don't interrupt me.

7          MR. BYRD:  We'll let you have a

8     standing request.

9          MR. KEYES:  Thank you.

10    BY MR. KEYES:

11         Q.   Dr. Bulson, has it ever come to your

12    attention that any of the information supplied by

13    Harford County Public Schools in Exhibit 1 is not

14    accurate?

15         MR. BYRD:  Don't answer that question

16    if any information came to you from counsel, inside

17    or outside counsel.  But you can answer otherwise.

18         THE WITNESS:  No.

19         (BULSON EXHIBIT 2, Plaintiff Fact Sheet

20    - School Districts (Supplemental), was marked for

21    identification.)

22    BY MR. KEYES:

23         Q.   I'm showing you what has been marked as

24    Bulson Exhibit 2.  This is titled "Plaintiff Fact

25    Sheet - School Districts (Supplemental)."  And if

CONFIDENTIAL

Page 15

1    you turn to the last page, there's a certification.

2    Do you see that?

3           A.    I do.

4           Q.    That certification says, quote:  I have

5    made reasonable inquiries to answer the foregoing

6    questions.  Based on my personal knowledge and the

7    information provided by other district employees, I

8    declare under penalty of perjury that the

9    information provided in this plaintiff fact sheet

10   is complete, true and correct to the best of my

11   knowledge and information, and that I have provided

12   all of the requested documents that are reasonably

13   accessible to me and/or my attorneys, to the best

14   of my knowledge, end quote.

15           Did I read that correctly?

16           A.    Yes.

17           Q.    And there purports to be an electronic

18   signature for you affixed to the certification.  Is

19   that your electronic signature?

20           A.    Yes.

21           Q.    And did you either affix that signature

22   or authorize someone else to affix your electronic

23   signature to this certification on June 3rd, 2024?

24           A.    Yes.

25           Q.    What, if anything, did you do to review

CONFIDENTIAL

Page 16

1    the content in Bulson Exhibit 2 before your

2    electronic signature was affixed to the

3    certification?

4                    MR. BYRD:  So, object to form.

5                    And instruct you not to answer anything

6    that you did or -- I mean, that an attorney said to

7    you or that you did at their direction.  You can

8    answer otherwise.

9                    THE WITNESS:  This was last year.  I

10   don't recall since the date it was signed.  That

11   was --

12   BY MR. KEYES:

13        Q.   I don't understand what you mean,

14   "I don't recall since" --

15        A.   In other words --

16        Q.   -- "the date it was signed."

17        A.   In other words, it -- it was signed a

18   year ago.  I don't recall how I interacted with

19   this prior to signing it.

20        Q.   Okay.  You don't have a recollection of

21   reviewing it?

22        A.   Correct.

23                    MR. BYRD:  Object to form.

24                    THE WITNESS:  Correct.

25   BY MR. KEYES:

CONFIDENTIAL

Page 17

1          Q.    Since you affixed or authorized someone

2      to affix your electronic signature to the

3      certification, has it come to your attention that

4      any of these answers that were completed by

5      Harford County Public Schools are inaccurate?

6                      MR. BYRD:  Okay.  So the same objection

7      I had for the other document.

8                      Don't answer that question if any

9      communications came from attorneys.

10                     THE WITNESS:  No.

11     BY MR. KEYES:

12         Q.    And since you affixed or authorized

13     someone to affix your electronic signature to the

14     certification, has it come to your attention that

15     any of the information that was filled out by

16     Harford County Public Schools in this exhibit is

17     inaccurate?

18                     MR. BYRD:  Same instruction.

19                     THE WITNESS:  No.

20     BY MR. KEYES:

21         Q.    Did you review either Bulson Exhibit 1

22     or Bulson Exhibit 2 in preparation for your

23     deposition?

24         A.    No.

25         Q.    Have you reviewed either Bulson

CONFIDENTIAL

Page 18

1   Exhibit 1 or Bulson Exhibit 2 since the time your
2   signature was applied?
3           A.    No.
4                 (BULSON EXHIBIT 3, Plaintiff Board of
5   Education of Harford County's Supplemental Answer
6   to Defendants' Interrogatory No. 3, was marked for
7   identification.)
8   BY MR. KEYES:
9           Q.    I'm showing you what has been marked as
10  Bulson Exhibit 3.  This is "Plaintiff Board of
11  Education of Harford County Supplemental Answer to
12  Defendants' Interrogatory Number 3."
13                And if you'd turn to Page 5, there's
14  another verification.  Do you see that?
15          A.    I do.
16          Q.    There purports to be an electronic
17  signature from you dated December 17th of 2024.  Is
18  that your signature?
19          A.    Yes.
20          Q.    Did you apply it or authorize someone
21  to apply it on or about December 17th, 2024?
22          A.    Yes.
23          Q.    Before you did that, did you review the
24  document?
25                MR. BYRD:  Well, object to form.

Page 19

```
 1              Again, if you did something at the
 2    direction of your counsel, you don't need to get
 3    into that.  But I guess you can answer if you
 4    were -- if you recall reviewing it or not.
 5              THE WITNESS:  Again, I don't recall
 6    specifically.
 7    BY MR. KEYES:
 8         Q.   Okay.  Do you recall reviewing any
 9    answer to an interrogatory relating to any
10    instances of vandalism or property damage?
11              MR. BYRD:  Object to form.
12              And don't answer that question to any
13    extent that it involves communications from your
14    attorneys.  But you can answer otherwise.
15              THE WITNESS:  Yeah, no.
16    BY MR. KEYES:
17         Q.   Are you able to identify for me any
18    specific instance of vandalism or property damage
19    that Harford County Public Schools attributes to
20    any of the defendants?
21              MR. BYRD:  Well, object to form.  This
22    is an individual depo.  He's not speaking on behalf
23    of Harford County Public Schools.
24              But you can answer it in your
25    individual capacity.
```

CONFIDENTIAL

Page 20

1            THE WITNESS:  Well, I shared in my

2    earlier testimony a specific example I gave about

3    Havre de Grace Middle-High School and the damage

4    they sustained as a result of a TikTok challenge.

5    I contend -- I mean, as I said, that was happening

6    at other schools, other high schools, in

7    particular, but it was more of an acute concern at

8    Havre de Grace.

9            So I don't recall exactly which other

10   schools I heard, but I -- I specifically remember

11   having that conversation with a principal at

12   C. Milton Wright.  I don't know how many others.

13   But challenges with restrooms in particular related

14   to that particular TikTok challenge.  I'd have to

15   think more about other examples.

16   BY MR. KEYES:

17       Q.   Okay.  You mentioned that one TikTok

18   challenge.  Are you able to identify for me any

19   other specific instance of vandalism or property

20   damage that Harford County Public Schools

21   attributes to any of the defendants?

22            MR. BYRD:  Object to form.  And same

23   condition, that he's not speaking on behalf of the

24   school.  And he said --

25            But you can answer.

CONFIDENTIAL

Page 21

1            THE WITNESS:  Offhand, other specific

2    instances aren't coming to mind right now.  But I

3    may be able to think of others later.  But, yeah,

4    nothing is coming to mind at the moment.

5    BY MR. KEYES:

6            Q.   Okay.  And with respect to the one

7    TikTok challenge you mentioned, you did testify

8    earlier that that involved damage to bathrooms at

9    various schools, correct?

10           A.   Mostly bathrooms.  I don't recall --

11   because it wasn't so specific just to bathrooms --

12   bathroom fixtures, but I think that's where we saw

13   most of the damage.

14           Q.   Are you able to identify for me any

15   schools besides Havre de Grace where as a result of

16   that challenge students vandalized school property?

17           A.   As I said, I heard it from other

18   principals.  Specifically, I recall a conversation

19   with a principal at C. Milton Wright.  I don't

20   remember specific conversations elsewhere.

21           But bathrooms and -- and -- at the

22   time -- I mean, we've had challenges with bathrooms

23   for a variety of reasons.  That's also where fights

24   would happen and those sorts of things.

25           And so I don't recall others that had

CONFIDENTIAL

Page 22

1  the same vandalism.  But knowing that it was

2  something I was discussing with -- as I heard about

3  it in one place, I would -- I would ask other

4  principals if they had that.  I just don't recall

5  specifically --

6          Q.   Are you able to --

7          A.   -- who I spoke to.

8          Q.   Are you able to identify the dollars

9  that Harford County Public Schools spent either

10 repairing or replacing property at any of its

11 schools as a result of that challenge?

12         A.   Not personally.  That's not something

13 I've -- I've reviewed.  That's something I sort of

14 leave to our facilities folks.

15         Q.   And with respect to that -- that

16 challenge, what is your understanding of the reason

17 for attributing the damage to any of the defendants

18 as opposed to the students that committed the

19 vandalism?

20              MR. BYRD:  Object to form.

21              So, again, if your knowledge of how

22 this gets attributed to the defendants through the

23 lawsuit comes from counsel, you can't disclose

24 that.  If you have some independent knowledge of

25 why you think or believe that, you know, YouTube,

CONFIDENTIAL

Page 23

1    Instagram, Facebook, TikTok, you know, are driving
2    the cause of this, you can speak to that.
3    BY MR. KEYES:
4         Q.    Yeah.
5              My question is:  What is your
6    understanding of the reason for attributing the
7    damage for that challenge to any of the defendants
8    as opposed to the students that committed the
9    vandalism?
10             MR. BYRD:  Yeah, but that doesn't
11   change my objection because --
12             MR. KEYES:  It doesn't.  It's the same
13   question.  I want him to understand the question
14   posed.
15             THE WITNESS:  Okay.
16             MR. BYRD:  So I have the same
17   objection, if you want me to state it again.
18             But you can answer with my instruction
19   that, obviously, your understanding about how
20   things get attributed to defendants includes
21   conversations with counsel.  So don't disclose that
22   part.
23             THE WITNESS:  Yeah.  Without going into
24   the mechanics of how it got into the documentation,
25   I mean, the attribution for that is really, I mean,

Page 24

1    the platform it exists on and the fact that we're

2    not aware of any efforts by the companies to do

3    anything to limit or contain those types of

4    challenges that cause harm.

5                  And -- and as I said, I have -- between

6    my administrators and my head of communications, I

7    have people who are definitely much more versed in

8    the interactions with social media than I am.  And

9    so I would expect that they could produce many more

10   specific examples.

11                 But at the same time, the fact that

12   these -- you know, it's very clear in this case,

13   for example, which platform that was -- that

14   particular challenge was occurring on and -- so

15   that's one that, again, has jumped out to me.

16                 But, again, I'm sure with my team's

17   help, I could think of more.  But at the same time,

18   like I said, I mean, this isn't just a thing that

19   happens.  I mean, it was called a "TikTok

20   challenge" for a reason.

21   BY MR. KEYES:

22        Q.   Your understanding is, it was a

23   challenge that some users posted on TikTok that was

24   then widely disseminated to other users who copied

25   it.  Is that fair?

CONFIDENTIAL

Page 25

1       A.    That appears to be the manner in which
2    this spreads.
3       Q.    Other than the fact that TikTok was the
4    platform by which this user challenge was
5    disseminated to other users, are you able to
6    identify anything that gives cause to blame TikTok
7    for the challenge?
8       A.    I guess, frankly, I can't understand --
9             MR. BYRD:  Object to form.  Hold on one
10   second.
11            THE WITNESS:  Okay.
12            MR. BYRD:  Again, other than
13   conversations with counsel, you can answer that.
14            THE WITNESS:  Okay.  I -- I guess my
15   feelings on the matter, I -- I -- I'm not a
16   technology expert.  I don't run these companies.  I
17   don't know how it works.  But, I mean, the
18   destructive nature of some of these challenges, I
19   don't understand why they can't be addressed,
20   stopped, somehow removed from the platforms before
21   they're causing harm.
22   BY MR. KEYES:
23       Q.   Do you know whether TikTok took steps
24   to stop the spread of this challenge when it came
25   to TikTok's attention?

CONFIDENTIAL

Page 26

1            MR. BYRD:  Object to form.
2            You can answer, other than
3    conversations with counsel.
4            THE WITNESS:  I do not.
5    BY MR. KEYES:
6       Q.   Did you reach out to TikTok when this
7    challenge came to your attention to ask TikTok to
8    do something about it?
9       A.   When this came to our attention?
10      Q.   Your attention.
11      A.   My attention.  I did not.
12      Q.   Did you reach out to TikTok when this
13    challenge came to the attention of someone else in
14    Harford County Public Schools?
15      A.   I did not.
16      Q.   Are you aware of anyone in
17    Harford County Public Schools' administration
18    reaching out to TikTok when the challenge came to
19    its attention to ask TikTok to do something about
20    it?
21            MR. BYRD:  Object to form.
22            And, again, if there's any
23    conversations with counsel with you regarding their
24    reaching out, don't discuss that.  You can go
25    ahead.

CONFIDENTIAL

Page 27

1           THE WITNESS:  At that time, I don't

2    recall.  Any outreach that would happen in the

3    course of an investigation around these things most

4    likely would have happened through my -- through

5    Donoven Brooks, our security manager.  And he would

6    be working in collaboration with the sheriff's

7    office or whoever -- I mean, we also have three

8    municipalities' police departments we work with.

9           So when there are investigations that

10   involve social media, any outreach directly to

11   social media normally would go through law

12   enforcement.  So if -- if there was any of that

13   that occurred -- I don't recall specifically in

14   these cases if that did occur during the

15   investigations, but -- well, I'll stop there.

16   BY MR. KEYES:

17       Q.    Yeah.

18           So you are not aware of anyone in

19   Harford County Public Schools' administration

20   reaching out to TikTok when the challenge came to

21   its attention to ask TikTok to do something about

22   it, correct?

23           THE WITNESS:  Specifically, at the

24   time, I'm not aware of it.

25   BY MR. KEYES:

CONFIDENTIAL

Page 28

1          Q.    Okay.  Do you agree that the property

2    damage that these schools sustained in connection

3    with this TikTok challenge was committed by

4    students?

5          A.    I believe that.

6          Q.    Do you agree that the property damage

7    that these schools sustained was vandalism by those

8    students?

9          A.    For this particular challenge, yes.

10         Q.    Did Harford County Public Schools press

11   charges against any of the students who engaged in

12   that vandalism?

13              MR. BYRD:  Object to form.

14              You can answer that, but just -- we're

15   getting close to where you would have had

16   conversations with counsel.

17              THE WITNESS:  Yeah.

18              MR. BYRD:  So don't disclose those.

19              THE WITNESS:  Well, in this case, I

20   don't recall how many -- if or when students were

21   caught and identified for this.

22   BY MR. KEYES:

23         Q.    Did Harford County Public Schools seek

24   restitution from any of the students who engaged in

25   that vandalism?

CONFIDENTIAL

Page 29

1          A.    I don't recall.  That would have most
2     likely happened at the local school level or risen
3     maybe as high as my ed services team, but that
4     wouldn't necessarily come to me.
5          Q.    Did Harford County Public Schools
6     receive any restitution from any of the students
7     who engaged in that vandalism?
8          A.    I don't know the answer to that.
9          Q.    Since we've been talking about this
10    challenge for a few minutes, are you aware of any
11    other challenge involving social media that
12    resulted in damage to any Harford County Public
13    Schools property?
14               MR. BYRD:  Object to form.
15               You can answer.
16               THE WITNESS:  So, yes.  There -- like I
17    said, there was a challenge that came to my
18    attention yesterday, which I understand -- I think
19    we have a time frame for this lawsuit.
20               But that challenge was very concerning
21    also because it's a -- it's a -- one I hadn't heard
22    of before where it's being recommended to people
23    who take this challenge to either use paper clips
24    or pencil lead or something to insert into various
25    ports in their school-distributed devices to make

CONFIDENTIAL

Page 30

1   them inoperable, which, you know, we have millions

2   of dollars invested in those.

3           And, I mean, it would be unclear what

4   the cost to the district versus the cost to the

5   families and the kids might be.  But it's a -- kind

6   of a senseless challenge, and we haven't yet

7   realized, you know, what that might lead to.

8   BY MR. KEYES:

9       Q.   Are you --

10          MR. BYRD:  Hold up.

11          THE WITNESS:  So other specific

12  examples, I'm -- I -- I don't recall others off the

13  top of my head.  But like I said, if -- you know,

14  to the degree that they're out there, I think

15  between Jillian Lader and Donoven Brooks, they

16  probably could produce many more.

17  BY MR. KEYES:

18      Q.   Okay.  So with respect to challenges

19  involving social media that resulted in damage to

20  any Harford County Public Schools property, you

21  would point to the TikTok challenge that

22  involved --

23      A.   Those are the most specific.

24      Q.   -- the damage --

25      A.   Yeah.

CONFIDENTIAL

Page 31

1          Q.   And the TikTok challenge yesterday,
2    correct?
3          A.   As an -- again, as a new one that I've
4    become aware of, but yes.
5          Q.   And are you aware of any property
6    damage that's been sustained as a result of the
7    challenge yesterday?
8          A.   Not yet.
9          Q.   If students follow the challenge
10   yesterday, do you agree that would be vandalism?
11         A.   Yes.
12         Q.   And would -- would you seek to --
13   restitution from the students who vandalize school
14   property --
15              MR. BYRD:  Object --
16   BY MR. KEYES:
17         Q.   -- as a result of that challenge --
18              MR. BYRD:  I'm sorry.  Object to form.
19   Hypothetical.  Assumes facts not in evidence.
20              Also, don't disclose any conversations
21   with counsel.
22              THE WITNESS:  We communicated the
23   presence of this challenge to families, and in that
24   communication, indicated that, you know, such
25   deliberate behavior would void the warranties that

Page 32

1    some of our families -- the insurance policies that

2    some of our families purchased for those devices.

3                So if -- it was to avoid -- if -- if

4    those warranties were voided as a result of student

5    action in this case, our practice would be to

6    pursue restitution for the -- for the cost to

7    repair the device.  That would be our practice.

8                Again, it hasn't -- to my knowledge,

9    nothing in the communication I read indicated that

10   this had happened yet.  So I don't know where we

11   stand with that.  But maybe there were examples

12   that just weren't included in the message that went

13   out.

14               (BULSON EXHIBIT 4, Plaintiff Board of

15   Education of Harford County's Amended Objections

16   and Responses to Defendants' Interrogatories

17   (Set 3), was marked for identification.)

18   BY MR. KEYES:

19        Q.   I'm showing you what has been marked as

20   Bulson Exhibit 4.  And I'm returning to you a copy

21   of HCPS Exhibit 3.

22        A.   Oh, okay.  That's this guy.  Yes.  All

23   right.

24        Q.   Okay.  Have you seen Bulson Exhibit 4

25   before?

Page 33

1          MR. BYRD:  So, object to form.  And

2     just noting for these questions, I'll have a

3     standing objection that it's in his individual

4     capacity, of course, and beyond the scope of his

5     individual capacity, perhaps, not in a 30(b)(6)

6     capacity.

7          THE WITNESS:  Again, I've signed this,

8     but -- I can't find the date when I signed it.

9     But, no, I -- I don't recall reviewing this in this

10    form.

11    BY MR. KEYES:

12         Q.   Okay.  Turning your attention to

13    HCPS Exhibit 3.

14         A.   This one?

15         Q.   Yes.  Do you have that in front of you?

16         A.   I do.

17         Q.   Okay.  This is something you previously

18    testified you had seen in preparation for your

19    deposition?

20         A.   Correct.

21         Q.   Okay.  Would you turn to the --

22         MR. BYRD:  Hold on a minute.  Object to

23    the form.  That misstates the testimony from

24    before.  But go ahead.

25         MR. KEYES:  How does it misstate the

CONFIDENTIAL

Page 34

1    testimony?

2              MR. BYRD:  Well, because when you asked

3    earlier, you said, "Did you take any notes?"

4              And he said, "Yeah, I took notes."

5              And we said we'd turned them over.

6              I don't know if he said, "This is some

7    document that was given to me and I saw in the

8    preparation."

9              MR. KEYES:  You asked him that very

10   question, "Is this something that you reviewed" --

11             MR. BYRD:  Yeah.

12             MR. KEYES:  -- "in preparation for your

13   deposition?"

14             And my question a moment ago was, "This

15   is something you previously testified you had seen

16   in your preparation for your deposition?"

17             And he said, "Correct."

18             MR. BYRD:  Yeah.

19             MR. KEYES:  Let's move on.

20             MR. BYRD:  Yeah, I think you're being

21   silly as well.  Go ahead.

22   BY MR. KEYES:

23        Q.   Do you have the program/department

24   worksheet in front of you?

25        A.   I do.

CONFIDENTIAL

Page 35

1        Q.   There's handwriting on it, correct?

2        A.   Yes.

3        Q.   Is that your handwriting?

4        A.   Yes.

5        Q.   When did you put this handwriting on

6   this worksheet?

7        A.   Yesterday.

8        Q.   Did you put this handwriting on this

9   worksheet yesterday during your prep session with

10  counsel?

11       A.   Yes.

12       Q.   Do you see that this worksheet is also

13  included in Bulson Exhibit 4?

14       A.   Yes.

15       Q.   So you've seen the worksheet, but you

16  don't recall seeing the larger document that is

17  Exhibit 4; is that correct?

18       A.   I don't recall reviewing it, yeah.

19       Q.   Okay.  Before your prep session with

20  the lawyers yesterday, had you seen this

21  program/department worksheet?

22       A.   Yes.  I saw it in the other two prep

23  sessions.

24       Q.   Had you --

25       A.   I haven't spent much time on it, but it

Page 36

1   was included.

2        Q.   Okay.  Before any of your three prep

3   sessions with the lawyers, had you seen this

4   program/department worksheet?

5             MR. BYRD:  Object to form.

6             Again, don't disclose conversations

7   with your general counsel.  But go ahead.

8             THE WITNESS:  I don't recall seeing

9   anything in this format.

10  BY MR. KEYES:

11       Q.   Okay.  There are a number of

12  departments and programs listed on this worksheet,

13  yes?

14       A.   Yes.

15       Q.   Did you decide what programs or

16  departments to include in this worksheet?

17            MR. BYRD:  Sorry.  Object to form.

18            Again, you can't disclose directions or

19  communications with counsel.  You can answer it,

20  like, without doing that somehow.

21            THE WITNESS:  All right.

22  BY MR. KEYES:

23       Q.   Sir, none of my questions have asked

24  for any of your communications with counsel, and --

25            MR. BYRD:  You just --

CONFIDENTIAL

Page 37

```
 1              MR. KEYES:  Please don't interrupt me
 2    again.  Mr. Byrd, we have limited time here --
 3              MR. BYRD:  I get it.
 4              MR. KEYES:  -- because of the witness's
 5    hard stop and because we got a late start.  And I
 6    haven't complained about the late start, but I am
 7    noting for the record that you are including lots
 8    and lots of objections that don't apply.
 9              MR. BYRD:  We'll be here --
10    BY MR. KEYES:
11        Q.   So, Dr. Bulson, to speed things up, I
12    just want to make clear, I am not asking in any of
13    my questions about your communications with
14    counsel.  I'm asking about other facts.
15              So my pending question is:  Did you
16    decide what programs or departments to include in
17    this worksheet?
18              MR. BYRD:  Okay.  Same objection about
19    counsel.  I won't respond to your comments.  We did
20    start late because of me and traffic, and I
21    apologize for that.  But we're happy to stay here
22    as long as you need.  And I would just ask that you
23    probably -- you can ask more precise questions that
24    avoid these objections.  Go ahead.
25    BY MR. KEYES:
```

CONFIDENTIAL

Page 38

```
 1          Q.   It's a very simple question.  Did --
 2     did you decide --
 3          A.   I delegated this.  I did not make the
 4     individual decisions about these but delegated
 5     this.
 6          Q.   Did you delegate it to someone on your
 7     staff?
 8          A.   I delegated it through counsel, so I
 9     probably should stop there.
10          Q.   Okay.  Then do you have an
11     understanding of what the weight percentage column
12     is?
13          A.   Yes.
14          Q.   What is your understanding of what the
15     weight percentage column is?
16          A.   Time and effort that could reasonably
17     be attributed to resources we commit to addressing
18     what we view as challenges related to social
19     media -- challenges related to, you know, the
20     effect social media has on students, staff, our
21     operations.
22          Q.   Did you decide what weight percentage
23     to assign to any of the departments or programs
24     listed here?
25          A.   No.
```

CONFIDENTIAL

Page 39

1          Q.    Did you delegate to others on your

2    staff the task of picking a weight percentage to

3    assign for particular departments or programs?

4          A.    Yes.

5          Q.    Does your handwriting on this page

6    indicate which department or member of your staff

7    you tasked with assigning a weight percentage for

8    particular departments or programs?

9          A.    Not exactly, because I didn't task them

10   with that.  It was more, this is kind of my thought

11   exercise around who would be the right people to --

12   to do that based on my understanding.  But like I

13   said, this was delegated.

14         Q.    Okay.  Well, when you saw the

15   program/department worksheet, it already had weight

16   percentages?

17         A.    Correct.

18         Q.    And had you, prior to seeing that

19   worksheet, asked anyone on your staff to go

20   identify the weight percentage that would reflect

21   the time and effort that could reasonably be

22   attributed to resources that Harford County Public

23   Schools addresses to what they view as challenges

24   regarding the effects of social media?

25              MR. BYRD:  Object to form.  Don't --

Page 40

1              THE WITNESS:  Again --

2              MR. BYRD:  I'm sorry.  Don't disclose

3    communications from counsel.

4              THE WITNESS:  My answer is the same.

5    I -- I delegated this.  So I was not the person who

6    asked any of these individuals on here.

7    BY MR. KEYES:

8         Q.   Okay.  Well, the first line is

9    "Instructional Salaries."

10        A.   Uh-huh.

11        Q.   And you've written "ed services,"

12   right?

13        A.   Correct.

14        Q.   Ed services is a department?

15        A.   It is.

16        Q.   So when you wrote "ed services," were

17   you noting that you had delegated to ed services

18   the task of coming up with the weight percentage

19   or --

20        A.   No.  Okay.  Sorry.

21        Q.   -- or when you wrote "ed services,"

22   were you identifying the department that you think

23   is best positioned to pick a weight?

24             MR. BYRD:  Object to form.

25             THE WITNESS:  Well, again, I -- again,

CONFIDENTIAL

Page 41

1    my exercise here would be, who is responsible for

2    these areas, thus who would be the right person --

3    not to produce numbers.  All the numbers are going

4    to come from our budget team.

5            But when it comes to thinking about how

6    much time is impacted by this, yes, these are -- so

7    ed services, when it comes to instructional

8    salaries, you know, they're the ones who work most

9    specifically with our schools, thus our school

10   leaders and teachers.  And so they're the ones who

11   are most attuned to the day-to-day experiences of

12   our teachers and our school leaders.

13   BY MR. KEYES:

14           Q.    Okay.  So I take your point that

15   ed services is best attuned when it comes --

16           A.    Uh-huh.

17           Q.    -- to the instructional salaries

18   department or program.  Did --

19           A.    Their time.  Salaries -- again,

20   anything numbers, budget team.  Does that make

21   sense?

22           Q.    Yeah.  I'm not asking about the

23   subtotal column with dollars.

24           A.    Got it.

25           Q.    I'm not asking about the weighted total

CONFIDENTIAL

Page 42

1    column with dollars.  I'm asking about the weight

2    percentage column.  And so what I'm trying to

3    figure out is --

4            A.   Yeah.  Well, you just said "salaries,"

5    I think.  So when -- so, for me, I was thinking

6    more about the time they spend.

7                 So, yes, ed services would be the one

8    to make the best estimates about the amount of --

9    of our -- of our time that our instructional

10   employees are spending.

11           Q.   Okay.

12           A.   They would be the ones to identify

13   the -- the weights.

14           Q.   And then for other instructional costs,

15   the retirement pension system, the retirement and

16   pension system, unemployment compensation, health

17   insurance, dental insurance, life insurance and

18   other post-employment benefits, are they --

19           A.   Most of that runs through our HR

20   department.  But, again, I wrote budget because the

21   budget team has to figure out the cost of all these

22   things.  But most of that runs through HR.

23           Q.   Okay.  And then for office of the

24   principal services, you believe ed services or

25   budget is in the best position?

Page 43

```
 1        A.    Yeah.  Ed services.  Again, they
 2   supervise principals.
 3        Q.    College credit reimbursement, it's
 4   unclear to me --
 5        A.    Yeah, I didn't answer that one.  I
 6   think I might have just skipped that line.
 7        Q.    Looking at --
 8        A.    There's --
 9        Q.    -- it now --
10        A.    There would be a --
11        Q.    -- who would you put?
12        A.    There would be a mix because our -- our
13   college credits work kind of sits in two places.
14   The reimbursements flow through ed services and our
15   office of counseling, which sit -- which sits in
16   student services under Mr. Hennigan.
17        Q.    So who would you list for college
18   credit reimbursement?
19        A.    I would probably expect an answer
20   either from ed services -- well, again, I think we
21   could ask both to get them to agree to that.  It's
22   one of the smaller percentages, but --
23        Q.    When you say "both," you mean
24   ed services or student services?
25        A.    Or counseling.  Yes.
```

CONFIDENTIAL

Page 44

1          Q.   Okay.  Office of the principal
2     salaries, you list ed services as budget as being
3     most knowledgeable?
4          A.   Uh-huh.
5          Q.   Is that a "yes"?
6          A.   Yes.
7          Q.   Legal services, you list Kimberly and
8     Lauren as being most knowledgeable?
9          A.   Yeah.
10         Q.   Who are Lauren and Kimberly, for the
11    record?
12         A.   Our legal office.  Our attorneys.
13         Q.   For career and technology programs, you
14    believe that CIA is most knowledgeable?
15         A.   Curriculum instruction.  And it's
16    office of curriculum instruction assessment.  So
17    our curriculum office where the current technology
18    education department rests.
19         Q.   For the office of elementary and middle
20    and high schools, you believe ed services --
21         A.   Yes.
22         Q.   -- would be most knowledgeable?
23         A.   Yes.
24         Q.   For communications, you believe Jillian
25    would be most knowledgeable?

Page 45

1          A.    Manager of communications, yes.

2          Q.    For family and community partnerships,

3    you believe Mary Beth would be most knowledgeable?

4          A.    Mary Beth Stapleton.  Again, manager of

5    family and community partnerships.

6          Q.    For safety and security, you believe

7    Donoven would be most knowledgeable?

8          A.    Donoven Brooks.

9          Q.    For psychological services, you believe

10   Buck or Steve R. would be most knowledgeable?

11         A.    Yeah.  Bernard Hennigan, Buck, is the

12   supervisor -- is the assistant superintendent over

13   student services.  Psychological services report to

14   him.  Steve Richard [sic] is currently the

15   supervisor of psychological services.  So the two

16   of them would have come up with an answer related

17   to that.

18         Q.    For pupil personnel services, you

19   believe Buck or Buzz would be most knowledgeable?

20         A.    Yeah.  Bernard Hennigan, again,

21   superintendent for student support services.

22   And -- and Buzz Williams is the -- I forget his

23   exact title -- supervisor who pupil personnel

24   services report to him.

25         Q.    For school counseling services, you

Page 46

1  believe Buck or someone else?

2       A.   LaWanda.

3       Q.   LaWanda.   Okay.

4       A.   You're doing pretty good with my

5  handwriting.  Bernard Hennigan, assistant

6  superintendent of student support services.

7  Counseling reports to him and our head of

8  counseling, LaWanda Brown.

9       Q.   And for office of technology and

10 information, you believe Drew would be most

11 knowledgeable?

12      A.   Drew Moore, director of the office of

13 technology information.

14      Q.   Okay.  So you've identified, then, in

15 your handwriting, with one addition for college

16 credit reimbursement, the person or department you

17 believe would be most knowledgeable in that area,

18 correct?

19      A.   Yes.

20      Q.   Did the departments or people you've

21 listed in handwriting on this page pick the weights

22 in the weight percentage column?

23           MR. BYRD:  Object to form.

24           THE WITNESS:  This is where I would

25 kind of stop --

CONFIDENTIAL

Page 47

1              MR. BYRD:  Again, no conversations

2    with --

3              THE WITNESS:  Right.

4              MR. BYRD:  -- attorneys.  But you

5    can --

6              THE WITNESS:  There you go.

7              MR. BYRD:  -- discuss --

8              THE WITNESS:  This is -- this is where

9    I -- I mean, again, I did not discuss this with

10   those individuals.  This was a conversation with my

11   attorney.

12   BY MR. KEYES:

13        Q.   Okay.  And, again, recognizing that you

14   put in handwriting the department or staff members

15   you think would be most knowledgeable for that

16   department or program, I want to know who actually

17   picked the weights that are listed in the weight

18   percentage column.

19              MR. BYRD:  Object to form.  Asked and

20   answered.

21              And then you can answer to the extent

22   you don't disclose communications with counsel.

23   BY MR. KEYES:

24        Q.   I don't want to know about your

25   conversations with counsel.  I just want to know,

Page 48

1    who picked the weight for each department or
2    program?
3              MR. BYRD:  Same objection and
4    instruction.
5              Go ahead.
6              THE WITNESS:  Yeah.  I guess what I
7    would say is, because this conversation was -- was
8    all mediated through counsel, I can't confirm it
9    was these people, if that makes sense, only that
10   these would be the people I would choose.
11   BY MR. KEYES:
12        Q.   Okay.  So is it accurate to say that
13   either you don't know who picked the weight
14   percentages, or if you know, you only know from
15   conversations with counsel?
16        A.   Yeah, I would argue that's an accurate
17   statement.  I'm sorry.  That's an accurate
18   statement.
19        Q.   That is accurate?
20        A.   To the best of my understanding of your
21   question, yeah.
22        Q.   Okay.  Yeah.  Again, I'm not trying to
23   get into your conversations --
24        A.   Right.
25        Q.   -- with counsel.  I'm trying to figure

1    out who picked the weights.  And I take it that you

2    said, "I didn't have any conversation with any of

3    these people about picking the weights."

4            A.    Correct.

5            Q.    And, therefore, either you don't know

6    who picked the weights or what you do know comes

7    from conversation with counsel?

8                  MR. BYRD:  Object to form.  The way

9    you're asking it --

10                 THE WITNESS:  I guess I feel like I

11   just answered that question.

12                 MR. BYRD:  To the extent you know

13   anything -- you know anything from counsel,

14   don't -- don't answer, and then you can ask

15   beyond -- you can answer beyond what.

16   BY MR. KEYES:

17           Q.    Is that a correct statement?

18   Therefore, you either don't know who picked the

19   weights or what you do know comes from conversation

20   with counsel?

21                 MR. BYRD:  Well, yeah, but then that's

22   telling what you know from counsel.  So --

23                 MR. KEYES:  No, it's not.  It's an "or"

24   statement.  I asked it precisely this way to

25   address your purported concern about somehow

CONFIDENTIAL

1    invading privilege.

2            MR. BYRD:  You're literally are [sic]

3    making -- the "or" says, "or you know something

4    from counsel," which, obviously, explicitly asks

5    for communications from counsel.

6            MR. KEYES:  It doesn't.

7            MR. BYRD:  So don't ask -- answer that

8    part of the question.  But go ahead.

9    BY MR. KEYES:

10        Q.    You can answer.

11            MR. BYRD:  Beyond -- beyond any

12    discussions.

13            THE WITNESS:  Like I said, I have

14    shared that -- I didn't speak specifically with

15    these people.  I have discussed with counsel

16    information related to this.

17    BY MR. KEYES:

18        Q.    Okay.  And separate from conversations

19    with counsel, did you speak with any of your staff

20    about the process by which --

21        A.    No.

22        Q.    -- the weight percentages were

23    assigned?

24            Okay.  Are you able to tell me, then,

25    how the people in a particular listed department or

CONFIDENTIAL

Page 51

1   program spent their time on something having to do

2   with the effects of social media --

3                    MR. BYRD:  Object to form.

4   BY MR. KEYES:

5         Q.    -- for the listed percentage of time?

6                    MR. BYRD:  Object to form.

7                    THE WITNESS:  So you're not asking

8   about how they spent their time preparing this but

9   just in general how their work might connect to

10  percentages like this?

11  BY MR. KEYES:

12        Q.    Yeah.  You didn't pick the percentages?

13        A.    Correct.

14        Q.    And you haven't talked to the people

15  who did pick the percentages.  So are you able to

16  tell me what people in a particular department or

17  program were doing for the -- for the time that

18  falls within the percentage weight listed here, or

19  do we need to go talk to the people in the

20  departments --

21        A.    I think in most cases you would need to

22  talk to them specifically to justify the

23  percentages that have been chosen.

24              Again, I have anecdotes.  I can also

25  point to kind of bigger-picture issues we're

Page 52

1    dealing with related to social media.  And I can

2    see, you know, just my assessment of what's here,

3    how it might be -- again, I could --

4         Q.    You can give me big -- big picture --

5         A.    I -- I --

6         Q.    -- and you can give me an educated

7    guess, but it's still a guess?

8         A.    Exactly.

9         Q.    Okay.  That's for how the time was

10    spent?

11         A.    Correct.

12         Q.    My sister question is:  Are you able to

13    tell me what the people in these departments or

14    programs would do with the time that falls within

15    this weight percentage if they hadn't spent that --

16    that percentage of time on issues relating to the

17    effects of social media?

18              MR. BYRD:  Object to form.

19              Don't disclose any conversations with

20    counsel, but you can otherwise.

21              THE WITNESS:  Again, I mean, everything

22    would be conjecture -- I mean -- conjecture.  I

23    can -- I mean, you start at the bottom, the office

24    of technology and information.  I think it's not

25    surprising that they're constantly trying to keep

CONFIDENTIAL

Page 53

1   up with the changes going on in all areas of

2   technology.  And -- and one of the challenges we

3   confront is the degree to which we manage or deal

4   with specific social media -- like, again, some of

5   the types of issues we've talked about.

6           So for technology to indicate

7   20 percent makes a great deal of sense to me,

8   because, you know, just the idea of how to regulate

9   what students can access during a school day is --

10  there's -- there's a lot of work that goes into

11  that and -- and staying ahead of the students, who

12  are constantly finding ways around things.

13          And one of the things that we have

14  tried to restrict access to for a variety of

15  reasons is various social media platforms.  And so

16  that's -- I mean, from the office of technology,

17  that's significant.

18          Again, school counseling --

19  BY MR. KEYES:

20      Q.   Sir, just let me --

21      A.   I know you wanted to go through them.

22  That's one example --

23          MR. BYRD:  That's fair.  Hey, we need

24  to take a quick break.

25          MR. KEYES:  Okay.  Hold on a second.

CONFIDENTIAL

```
 1  BY MR. KEYES:

 2        Q.   You just said at the beginning,

 3  "everything would be conjecture."

 4            MR. BYRD:  Andy, I'm not going to talk

 5  to the witness about the deposition at all, but we

 6  need to take a quick break, okay?

 7            MS. NEAL:  It's an emergency.

 8            MR. BYRD:  Yeah.

 9            MR. KEYES:  Off the record.

10            (Discussion off the record.)

11            THE VIDEOGRAPHER:  We're now going off

12  the record.  It's 12:18 p.m.

13                      *  *  *

14            (Whereupon, there was a recess in the

15  proceedings from 12:18 p.m. to 12:25 p.m.)

16                      *  *  *

17            THE VIDEOGRAPHER:  We are now going

18  back on the record at 12:25 p.m.

19  BY MR. KEYES:

20        Q.   Dr. Bulson, we're back on the record.

21  We took a break for an emergency.  That emergency

22  had nothing to do with the deposition.  It involved

23  students in a school, correct?

24        A.   Correct.

25        Q.   Okay.  And if as a result of that
```

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 55

```
1    emergency you need to take another break, let us
2    know.
3              A.    Thank you.
4              Q.    Okay.  Do you have HCPS Exhibit 3 in
5    front of you?
6              A.    Yes.
7              Q.    In your prior answer, when I was asking
8    you about what people in a particular department or
9    program would spend that percentage of time on if
10   they didn't spend it on issues relating to the
11   effects of social media, you said, "I mean,
12   everything would be conjecture."
13             A.    Oh, if they didn't spend it.  I think I
14   misunderstood your question.
15             Q.    Yes.  Yes.
16             So -- so for instructional salaries,
17   there's a 5 percent weight.  5 percent of their
18   time, according to this document, people in that
19   department, is spent on challenges relating to the
20   effects of social media, correct?
21             A.    Correct.
22             Q.    Okay.  And I asked you before how they
23   were spending their time for that 5 percent.  And
24   you said you could give me an educated guess, but
25   you'd really have to talk to people in that
```

CONFIDENTIAL

Page 56

```
 1    department.
 2          A.   Right.  So when you say spending that
 3    time addressing the social media concerns --
 4          Q.   Yeah, the -- the time --
 5          A.   -- that's the --
 6          Q.   -- within this --
 7          A.   Okay.
 8          Q.   -- weighted percentage.
 9          A.   So the question I think I -- I think
10    I --
11          Q.   Now it's the flip side, right?
12          A.   Understood.
13          Q.   I was asking the sister question, which
14    is:  Okay.  If they had not spent that 5 percent of
15    their time on challenges regarding the effects of
16    social media, do you know how that block of time
17    would be spent, other than an educated guess?
18          A.   Other than an educated guess -- because
19    it's all conjecture, right?
20          Q.   Okay.  So to understand how they spend
21    that percentage of time and how they would have
22    spent it if it weren't for challenges relating to
23    the effects of social media, best to talk to people
24    in those departments?
25          A.   Yes.  I mean, one example I feel pretty
```

CONFIDENTIAL

Page 57

1   confident in is, if you look at our safety and

2   security, because I -- that's not just time.

3   That's also the number of resources.  We've

4   added -- we've gone from 1 employee in safety and

5   security to nearly 30.

6           And so we -- so it's not just time and

7   effort.  There would probably be fewer employees

8   there if they weren't dealing so frequently with

9   things related to social media.

10          Q.   So would --

11          A.   But --

12          Q.   So would you defer to --

13          MR. BYRD:  Hold on.  Let him finish,

14   please.

15          THE WITNESS:  Well, no, I -- I was

16   finished.  And -- and I would defer to Mr. Brooks

17   to be clearer about that.

18   BY MR. KEYES:

19          Q.   Okay.  Would you turn to the next

20   worksheet in this exhibit.

21          A.   Page 3?

22          Q.   Yes.

23          Did you review this worksheet in any of

24   your prep sessions with the lawyers?

25          A.   "Review" is a strong word.

Page 58

1          Q.   Did you see it?

2          A.   I -- I saw it.

3          Q.   Okay.

4          A.   I reviewed the one before, but this one

5     I really did not spend time on.

6          Q.   Okay.  So you put eyeballs on it but

7     didn't spend time sort of reflecting on it.  Is

8     that fair?

9          A.   Exactly.

10          Q.   Okay.  And do you know who prepared

11     this worksheet?

12               MR. BYRD:  Object to form.

13               Again, to the extent you know that from

14     communications with counsel, then you can't answer.

15     But otherwise, you can.

16               THE WITNESS:  Not a lot to answer

17     there, then.

18     BY MR. KEYES:

19          Q.   Okay.

20          A.   Yeah.

21          Q.   Have you spoken with anyone besides

22     Harford County Public Schools' lawyers about the

23     worksheet titled "Full-Time Equivalent Worksheet"?

24          A.   No.

25          Q.   You testified earlier today that you

CONFIDENTIAL

1    regularly meet with other superintendents in

2    Maryland?

3         A.    Correct.

4         Q.    There are 24 of you?

5         A.    In total, yes, including me.

6         Q.    Because there are 24 school districts

7    in Maryland?

8         A.    Yes.

9         Q.    And you said you speak to a few of them

10   more than the others.

11        A.    Closer colleagues, ones I've become

12   more friendly with.

13        Q.    Who are the closer colleagues you speak

14   with more frequently?

15        A.    Superintendent of Cecil County,

16   Jeff Lawson; superintendent of Anne Arundel

17   County --

18              THE REPORTER:  So --

19              THE WITNESS:  Sorry.

20              THE REPORTER:  Superintendent of what

21   county?

22              THE WITNESS:  Cecil County, Jeff

23   Lawson; superintendent of Anne Arundel County,

24   Mark Bedell; superintendent of Washington County,

25   David Sovine.  These relationships change over

CONFIDENTIAL

Page 60

1    time, the number of people I -- I talk to.
2    BY MR. KEYES:
3         Q.    Okay.
4         A.    Some more than others.
5         Q.    Sure.
6              And did you talk to any of the
7    superintendents you just listed about the idea of
8    Harford County Public Schools filing this lawsuit?
9              MR. BYRD:  Object to form.
10             THE WITNESS:  Never in any detail.
11   The -- the only conversation -- I'm trying to
12   recall when we were starting this if -- you know, I
13   was asking who else might be joining in.
14             I don't often -- I mean, I understand
15   the City of Baltimore is also a plaintiff in this,
16   but that's not a superintendent I talk to very
17   often.  So I don't recall having a conversation
18   with her about it.  But -- you know, so if -- if I
19   did, it was very much a conversation in passing,
20   not in any great depth.
21             (BULSON EXHIBIT 5, Emails dated
22   2/22/21, Subject:  MCAP, Bates HCPS_00557536-538,
23   was marked for identification.)
24   BY MR. KEYES:
25             Q.   I'm showing you what has been marked as

CONFIDENTIAL

Page 61

1    Bulson Exhibit 5.  This was produced to us with the
2    Bates Numbers HCPS_00557536 through 557538.
3                    MR. BYRD:  So just a note:  I don't
4    know if -- you all did receive an email that we had
5    about clawbacks, I think, last night; is that
6    right?
7                    MR. KEYES:  Yes.
8                    MR. BYRD:  But I don't think this is
9    one that -- I just want to make sure that y'all --
10                   MR. KEYES:  Correct.
11                   MR. BYRD:  -- y'all have that and
12   saw --
13                   MR. KEYES:  We have that clawback,
14   yeah.  It doesn't cover this document --
15                   MR. BYRD:  Gotcha.
16                   MR. KEYES:  -- or any of the documents
17   I intend to use today.
18                   MR. BYRD:  Got it.  Okay.
19                   MR. KEYES:  If -- if we're mistaken,
20   please let us know.
21                   MR. BYRD:  Yeah, I'm just making sure
22   we're on the same page.
23                   MR. KEYES:  Sure.
24                   THE WITNESS:  Okay.
25   BY MR. KEYES:

Page 62

1          Q.    Have you read the emails?

2          A.    I haven't finished, but I'm pretty sure

3     I would have at the time.

4          Q.    Well, the email on the first page --

5          A.    Uh-huh.

6          Q.    -- the latest in time in this string is

7     from you to Phillip Snyder, copying Susan Brown, on

8     February 22nd, 2021.  Do you see that?

9          A.    Uh-huh.

10         Q.    Is that a "yes"?

11         A.    Yes.  Sorry.

12         Q.    And do you remember this email?

13         A.    No.

14         Q.    What is MCAP?

15         A.    That's the Maryland state assessment.

16         Q.    And do you see that there were other

17    superintendents from other districts that were

18    going to address concerns about MCAP with the

19    Maryland State Department of Education?

20         A.    Yes.

21         Q.    Did you share those concerns?

22                MR. BYRD:  Object to form.

23                THE WITNESS:  Again, I'm trying to

24    recall what specifically we were raising concerns

25    about at the time.  So this is 2021.  It could have

CONFIDENTIAL

Page 63

1   been a wide range of things.  Those two
2   superintendents are now retired.
3   BY MR. KEYES:
4        Q.    Which -- which superintendents are you
5   referring to?
6        A.    Griffith and Smith, the two in the
7   first email.
8        Q.    Do you know Kelly Griffith from
9   Talbot County?
10       A.    I do.
11       Q.    Was she one of your closer colleagues
12  when she was a superintendent?
13       A.    You could say that.  I think at the
14  time she was the president of our organization,
15  such as -- by virtue of the fact that she led most
16  of our meetings, I would have had more interaction
17  with her.
18       Q.    And what organization are you referring
19  to?
20       A.    Public School Superintendents'
21  Association of Maryland.  PSSAM is the acronym
22  here.
23       Q.    Do you know Jack Smith from MCPS?
24       A.    Yes.
25       Q.    What is MCPS?

CONFIDENTIAL

Page 64

```
 1          A.    Montgomery County Public Schools.
 2          Q.    Was -- was he one of your closer
 3    colleagues when --
 4          A.    Prior --
 5          Q.    -- he was a superintendent?
 6          A.    Prior to his retirement, he would have
 7    been.  We were close.  This might be the year he
 8    retired.
 9          Q.    You believe that Mr. Smith retired?
10          A.    He did retire.
11          Q.    Okay.  And did Ms. Griffith retire?
12          A.    She did.
13          Q.    What were your impressions of
14    Ms. Griffith in terms of honesty, competency,
15    expertise?
16          A.    I had no reason to challenge any of
17    those with her.
18          Q.    What were your impressions of Mr. Smith
19    in terms of honesty, competency and expertise?
20          A.    The same.  They were two of the most
21    experienced superintendents in the state.
22    Mr. Smith was someone who many of my colleagues
23    deferred to as an expert and someone to pay
24    attention to.
25          Q.    Did you get a report back from
```

Page 65

1    Ms. Griffith or Mr. Smith on how this meeting went

2    with the Maryland State Department of Education?

3         A.    Well, they -- they testified in person

4    is what this appears to be speaking to.

5         Q.    Did you attend that meeting?

6         A.    I didn't attend the state board

7    meeting.

8         Q.    So did you get a report --

9         A.    I -- I --

10        Q.    I'm sorry.  Go ahead.

11        A.    -- at times watch them, the recording.

12   I either could have watched it or watched the

13   recording of it.  I don't recall if I watched this

14   one or not.  I mean, it's pretty -- I mean, nearly

15   every month we have superintendents bringing

16   comments to the state board.  I've done it myself.

17           So this is the case where they were

18   doing it.  It appears to be connected to the

19   release of the state testing data and -- you know,

20   again, I haven't kind of read the whole thing to

21   see what the details are and why we were so keyed

22   in on this, but there's always things changing

23   around that.  So that's -- so I can -- I'll wait --

24        Q.    So --

25        A.    -- and see where your questions are

CONFIDENTIAL

Page 66

1   going.

2          Q.    Yeah.

3                So did you get a report back from

4   Ms. Griffith or Mr. Smith on how this meeting went

5   with the Maryland State Department of Education?

6   You said they attended and testified --

7          A.    I don't know what you mean by

8   "report back."  The degree that I didn't -- you

9   know, I would have seen it, our executive director

10  would have shared feedback about it.

11               I was in the executive committee at the

12  time, so we might have discussed how it went in --

13  in the -- in PSSAM's executive committee meetings.

14  We also probably would have discussed how it went

15  at our next full meeting of the 24 superintendents.

16               But in terms of there being a report

17  back, I'm -- I don't -- I -- I would suspect there

18  wasn't a specific report in that regard.

19         Q.    Do you understand from the email from

20  Phillip Snyder at the top of the second page that

21  there were concerns regarding the implementation of

22  MCAP assessments --

23         A.    Uh-huh.

24         Q.    -- in the spring of 2021?

25         A.    Yeah.  Sorry.  It's taking me a second

1    to kind of put myself back into what we were

2    dealing with in the timing.  So, yes.

3          Q.   Were these concerns related to the

4    impacts of COVID, the shutdown of in-person

5    learning and the focus on virtual learning?

6               MR. BYRD:  Object to form.

7               THE WITNESS:  The answer to the

8    question is in part, because compounding the impact

9    that the pandemic and the changes we were going

10   through was also the fact that the state testing

11   program and format were also being modified at the

12   time.

13              I don't know how much of the detail you

14   want, but the fact is -- so some of the concerns

15   arose from the pandemic.  Other concerns arose from

16   the fact that the state was in the process of

17   changing tests from PARCC to MCAP.  MCAP had not

18   been administered yet.  It was due to be piloted.

19              I can't recall whether it was due to be

20   piloted in '20 or '21.  But the point is, testing

21   was interrupted in '20.  So the ability to pilot

22   items and things like that -- so we had concerns

23   about what the state board was presenting,

24   basically saying that the fact that these students

25   took these tests when the items that were used on

CONFIDENTIAL

Page 68

```
 1  it hadn't had a chance to be -- I mean, there's a
 2  lot of other things that were going on in addition
 3  to the pandemic here.
 4  BY MR. KEYES:
 5       Q.   Okay.  And this list of concerns is in
 6  Phil Snyder's email?
 7       A.   Yeah.  Yeah, he --
 8            MR. BYRD:  Object to form.
 9            Go ahead.
10            THE WITNESS:  Yes, but he -- yeah.
11  According to what's on here, he delineated what he
12  viewed as concerns and what he might consider
13  including in a letter that we sent separately.
14  So --
15  BY MR. KEYES:
16       Q.   Right.
17       A.   -- it appears as though Dr. Griffith
18  and Dr. Smith were intending to share similar
19  things.
20       Q.   And so --
21       A.   Mr. Snyder was delineating, like, how
22  he would organize thinking from Harford County.
23       Q.   And according to your email, you then
24  forwarded Mr. Snyder's articulated concerns to
25  Kelly Griffith and Jack Smith for them to consider
```

Page 69

```
 1    in advance of testifying at this meeting?
 2           A.    This is what I sent to Phil -- I'm not
 3    seeing how that follows, but it wouldn't --
 4           Q.    Yeah.  You said --
 5           A.    -- be surprising if I had.  Where am I
 6    here?
 7           Q.    Yeah.  Let -- let's make sure you're at
 8    the top of the first page.
 9           A.    Uh-huh.  So that, too, is to Phil.
10           Q.    Right.
11                 Hi, Phil.  I just spoke to Kelly
12    Griffith from Talbot County.  She and Jack Smith
13    will be testifying on behalf of PSSAM tomorrow.
14    She indicated many districts had sent their own
15    letters, so feel free to submit what you have
16    proposed.  I also forwarded what you prepared for
17    Drs. Smith and Griffith to see --
18           A.    Oh, yeah.
19           Q.    -- in case there were any ideas they
20    hadn't considered.
21                 Do you see that?
22           A.    Yes, finally.  Okay.
23           Q.    So Mr. Snyder has listed these
24    concerns, sent them to you.  You then tell
25    Mr. Snyder, I forwarded what you prepared to
```

CONFIDENTIAL

Page 70

```
 1   Drs. Smith and Griffith to see if you had ideas
 2   they hadn't considered that they might incorporate
 3   into --
 4           A.   Uh-huh.
 5           Q.   -- their testimony?
 6           A.   Yes.
 7           Q.   Is that fair?
 8           A.   Uh-huh.
 9           Q.   Is that a "yes"?
10           A.   Yes.
11           Q.   Okay.  Mr. Snyder lists the concerns on
12   the second page of this exhibit.
13           A.   Yes.
14           Q.   Numbers 1 through 10?
15           A.   Uh-huh.
16           Q.   Are you on that page?
17           A.   Yes.
18           Q.   The second concern he lists is titled
19   "Mental Health."  He says:  Many of our students
20   have not been in the buildings for a length of
21   time.  We know that state assessments can be
22   stressful for both teachers and students.  With our
23   transition back to in-person learning, the focus
24   should be on meeting students' instructional needs
25   as well as support their mental health concerns.
```

CONFIDENTIAL

Page 71

1          Did I read that correctly?

2     A.   Yes.

3     Q.   This was one of the concerns about the

4  testing approach at this point in dealing with the

5  pandemic, correct?

6     A.   Yes.

7     Q.   And what were the students' mental

8  health concerns, from your perspective?

9     A.   I mean, we had been dealing with sort

10  of growing -- I mean, concerns about students' sort

11  of sense of efficacy.  I think at the time there

12  were still concerns about even being in school

13  because there was fear that would have -- you know,

14  because this is a time frame when we still had many

15  families who didn't believe it was safe to be in

16  person in school.  So that would be part of this.

17          I mean, testing in general is

18  anxiety-inducing, and we -- and I think that's

19  something that we've seen in some cases grow.

20  Other students have taken a different approach and

21  move more toward apathy.

22          I'm sure with a little more time I

23  could reflect on this further.  But there was a

24  whole range of mental health concerns that we were

25  confronting in those days.  And the fact that,

CONFIDENTIAL

Page 72

1    again, this was a new assessment they hadn't seen,

2    that, you know, doing things in person, at least

3    according to this date, was still relatively new.

4    And February of 2021 was the kind of place where we

5    were just getting back to being in person.  So

6    there's -- there's a lot that could contribute to

7    that.

8         Q.   Are -- do you have any data regarding

9    Harford County Public Schools' students' use of

10   cell phones and other electronic devices?

11              MR. BYRD:  Object to form.

12              You can answer.

13              THE WITNESS:  Data?  Maybe I'm being

14   too literal on that front.  Take -- take, for

15   example, this year, we greatly restricted access to

16   cell phones in schools.

17              This year's data following that, we're

18   on target to see significant -- now, we're not at

19   the end of the year.  We're comparing end-of-year

20   data to March data.  But we're on target to see

21   between 30 and 50 percent decreases in fights,

22   assaults on students, you know, other disruptions.

23              We recently presented those data to the

24   Board of Education.  And we believe it's -- it's a

25   mixture of a number of things we've done.

CONFIDENTIAL

Page 73

1            But I think -- you know, we can't draw
2    a clear straight line.  But I do believe a big part
3    of what we're seeing in improvements in those other
4    behaviors are attributable, to some degree, to the
5    fact that our students have had less access to
6    their phones during the day.  It's specific to
7    their phone.  They still have their school-supplied
8    devices.  But what we've -- the benefits we've seen
9    from taking the phones out of their hands have been
10   striking in terms of improvements.
11            And so when you speak to data -- you
12   know, I can't tell you exactly how many students
13   have a phone.  I mean, we're pretty confident that
14   the answer is really close to 100 percent, but I
15   don't know exactly where that lands.
16            You know, again, anecdotally, you know,
17   I've had principals independently say to me, you
18   know, not having the phones has been amazing.  They
19   can't schedule the fights.  They can't -- you know,
20   the -- the disruptions that occur -- and I'll go
21   back to the -- sort of the daily life of a school
22   administrator.
23            You know, I was a school administrator
24   outside the window of this case.  But the number of
25   times I was dealing with personal conflicts between

CONFIDENTIAL

Page 74

1    students -- you know, I was a principal from 2004
2    to 2008.  I was assistant principal from, I guess,
3    about 2000-2004.  You know, so then it was more
4    Facebook, because that was a more prominent social
5    media platform students were using.  The number of
6    conflicts I was dealing with in school that started
7    out of school on a social media platform was -- I
8    was dealing with something daily trying to sort out
9    those conflicts.
10           I don't know as intimately the
11   day-to-day of our school-based administrators now,
12   but they're frequently dealing with conflicts that
13   are happening on social media.  And during the day,
14   those are getting elevated.  And what I've
15   experienced listening to them talk about this one
16   year's data is that there's been far less of that.
17           You know, they indicate that there are
18   still concerns going on outside of school.  But
19   because the students don't have access to their
20   phones or as much access -- and they're working.  I
21   mean, this is one of the things our technology
22   department is spending time on, is they're trying
23   to find ways to interact with each other through,
24   you know, platforms that they can kind of work
25   around on our school-provided devices.

CONFIDENTIAL

Page 75

1          So, again, that's our technology

2     department trying to stay ahead of them so they're

3     not circumventing, you know, the technology that

4     we're trying to keep them off of during the day

5     that's contributing to these conflicts between

6     students.

7          And so we do have data -- it was

8     provided in -- gosh, within the last month to our

9     board -- about reductions in a variety of -- well,

10    we've talked about chronic absenteeism, but the

11    other behaviors, fights, attacks.  So that, we do

12    have more recently.

13         And so, again, the improvement has been

14    pretty amazing how quickly it turned around after

15    taking devices out of the kids' hands.

16    BY MR. KEYES:

17         Q.   And when you --

18              MR. BYRD:  Sorry.  Quick break.

19              MR. KEYES:  Okay.  Off the record.

20              THE VIDEOGRAPHER:  We're now going off

21    the record at 12:49 p.m.

22                        * * *

23              (Whereupon, there was a luncheon recess

24    in the proceedings from 12:49 p.m. to 1:35 p.m.)

25                        * * *

CONFIDENTIAL

Page 76

1          THE VIDEOGRAPHER:  We are now going
2    back on the record at 1:35 p.m.
3    BY MR. KEYES:
4          Q.   Dr. Bulson, prior to the break, you
5    were discussing the impact of a policy greatly
6    restricting students' access to cell phones during
7    the day.
8          A.   Uh-huh.
9          Q.   Is that a policy that the Board of
10   Education adopted?
11         A.   Yes.
12         Q.   Is that a policy that went into effect
13   in January of 2025?
14         A.   No.  August of '24.
15         Q.   So that policy went into effect for
16   this school year?
17         A.   Correct.
18         Q.   Is that a policy that was mandated by
19   the state?
20         A.   No.
21         Q.   Is that a policy that Harford County
22   Public Schools developed on its own?
23         A.   Yes.
24         Q.   Did you support adopting that policy?
25         A.   Yes.

CONFIDENTIAL

Page 77

1       Q.    Did you participate in the drafting of

2    the policy?

3       A.    A little bit.  Not greatly.

4       Q.    What was your role in the drafting of

5    the policy?

6       A.    Again, the policy actually was mostly

7    drafted, if I recall this one, by our board

8    president.  But all drafting of policies normally

9    goes through our policy review committee, which is

10   a combination of school system administrators, our

11   attorneys and board members.

12          So the drafting would have happened

13   there.  So I -- I would have given anecdotal

14   feedback along the way, but I wasn't sitting and

15   writing.

16      Q.    Did you advocate for adoption of that

17   policy by the Board of Education?

18      A.    I supported it.  Actually, the -- the

19   movement toward that policy originated with the

20   board.

21      Q.    And you mentioned that the board

22   president did most of the drafting.  What is the

23   board president's name?

24      A.    Aaron Poynton.

25      Q.    And can you explain to me how the

CONFIDENTIAL

Page 78

1    policy originated with the Board of Education?

2             MR. BYRD:  Object to form.

3             You can answer.

4             THE WITNESS:  How it originated.  I

5    think it emerged sort of organically.  I mean,

6    throughout the year, we -- we've been talking about

7    concerns with student behavior.  One thing -- the

8    board does listening sessions almost monthly where

9    they hold open forum for -- for people to come

10   and -- and speak with them.

11            And I think, you know, some of the

12   input they receive during the listening sessions

13   would be about concerns with enforcing cell phone

14   policies in the schools and the range of -- of

15   challenges with students having access to the

16   phones and what's on them and the distraction they

17   provided, as well as some of the other things I've

18   given examples about.

19            So through the context of their

20   listening sessions, through, you know, them gaining

21   understanding of the -- the discipline challenges

22   that we've continued to confront, this was an idea.

23   Like I said, I believe this was an idea that

24   emerged primarily with Dr. Poynton, even though,

25   again, it was based on feedback coming to him from

CONFIDENTIAL

Page 79

```
 1   community and other places.
 2              And then so he and I talked regularly.
 3   It was a conversation.  I shared some of the
 4   challenges with -- I actually had some concerns,
 5   because having been an administrator, I know how
 6   hard it is to prohibit things with students.
 7              So I was actually the devil's advocate
 8   through most of it.  But in the end, I supported
 9   the form in which it came out, and we've enforced
10   it to the best of our ability.  And, again, we've
11   seen positive results.
12   BY MR. KEYES:
13        Q.   What does the current policy provide
14   regarding middle school students' access to or use
15   of cell phones or personal electronic devices at
16   school?
17        A.   So middle school students' phones or
18   any personal devices are required to be in their
19   lockers during the school day and off.  But they
20   still have access to their school-issued
21   Chromebooks.
22        Q.   And what does the current policy
23   provide regarding high school students' access to
24   or use of cell phones or personal electronic
25   devices at school?
```

CONFIDENTIAL

Page 80

1          A.   As of today, the policy reads that the
2     students can have them on their person.  They're
3     supposed to be off and out of sight.  But, again,
4     they still have access to their school-provided
5     devices, which in some cases are Chromebooks; in
6     other cases, laptops.
7               But there's actually a policy out for
8     public comment right now changing the high school
9     policy to be consistent with the middle school
10    students.  In other words, they'll have to be in
11    the lockers.
12         Q.   And could not be on the student's
13    person?
14         A.   Correct.
15         Q.   And when middle school students are not
16    permitted to have possession of their cell phones
17    during the school day because the cell phone has to
18    be in their locker, are they allowed to take it out
19    at lunch and use it?
20         A.   No.
21         Q.   Are they allowed to take it out in
22    between classes and use it?
23         A.   Middle school, no.
24         Q.   Okay.  Are high school students allowed
25    to use their cell phones during lunch?

CONFIDENTIAL

Page 81

```
 1          A.    There's some variance.  I believe the
 2    policy reads that, yes.  Different schools have
 3    chosen to enforce it differently.  And so some
 4    schools allow more access at lunch; others, less
 5    so.
 6          Q.    So it varies by school based on the
 7    discretion of the principal?
 8          A.    Yeah, to a certain degree.
 9          Q.    Are high school students allowed to use
10    their cell phones in between classes in the
11    hallway?
12          A.    They're allowed to.  Our current
13    proposal would eliminate that so that they don't --
14    they'd have to be in the locker also.
15          Q.    Because the -- the proposal is to make
16    Harford County Public Schools' high school students
17    subject to the same rules as the middle school
18    students?
19          A.    Yes.
20          Q.    Did you advocate for any changes to the
21    current policy that were not adopted?
22          A.    No.
23          Q.    Have you advocated for changes to the
24    current policy?
25                MR. BYRD:  Object to form.
```

CONFIDENTIAL

Page 82

1             THE WITNESS:  We're -- again, we're
2    still talking about current.  I mean, the policy --
3    the one that went in place in August?
4    BY MR. KEYES:
5         Q.   Yes.
6         A.   Again, even the advocacy for the
7    changes that are out for discussion right now, that
8    really initiated with the board.  I support their
9    decision, but -- so if you're looking at me as the
10   advocate of the source of that, that wasn't me.
11   But, again, I support the board's position on this.
12        Q.   Okay.  So you -- you support the
13   Board of Education's adoption of the current policy
14   that's been in effect since --
15        A.   Uh-huh.
16        Q.   -- August of 2024 --
17        A.   Uh-huh.
18        Q.   -- yes?
19        A.   Yes.  Sorry.
20        Q.   You -- you played devil's advocate to
21   sort of test the merits of that policy before it
22   was adopted, but you support the board's adoption
23   of it, yes?
24        A.   Yes.
25        Q.   You understand that there is a new

CONFIDENTIAL

Page 83

1   policy being considered --

2          A.    Uh-huh.  Yes.

3          Q.    -- for high school students.  That's

4   not something you're driving?

5          A.    Correct.

6          Q.    But it's -- and as you understand, it's

7   being driven by -- by board members?

8          A.    Correct.

9          Q.    But you support the board's pushing and

10  consideration of this new policy?

11         A.    Again --

12                MR. BYRD:  Object to form.

13                You can answer.

14                THE WITNESS:  Yeah, but these are the

15  things I work closely with the board on.  You know,

16  they continue to get feedback.  And so, yeah, I --

17  I support where they're going with this.

18                This is always a difficult topic

19  because, again, my original concerns about it

20  reflect back to when I was administrator and the

21  huge distraction it is to -- the -- the challenge

22  with -- with implementing or enforcing cell phone

23  policies, because our students are so closely

24  connected to those devices that I think at times

25  they may not even realize when they're pulling them

CONFIDENTIAL

Page 84

1    out and looking at them because they're so

2    connected to them.

3            And so I've -- I've had concern --

4    because, you know, trying to take a phone from a

5    student who is noncomplying, essentially that cuts

6    into instructional time.  A teacher has to decide

7    every minute they're in the building whether

8    they're going to take a minute to address a student

9    about cell phones or whether they're going to spend

10   that minute teaching.

11           And so there's a -- you know, there's

12   an increasing challenge, and we just have

13   different -- different ideas about how best to deal

14   with the -- our students' addiction and connection

15   to their devices.

16   BY MR. KEYES:

17        Q.   Before the Board of Education adopted

18   the current policy that went into effect in

19   August of 2024 --

20        A.   Uh-huh.

21        Q.   -- was there some other policy that you

22   were advocating for regarding student access to or

23   use of cell phones or personal electronic devices

24   at the school?

25               MR. BYRD:  Object to form.

CONFIDENTIAL

Page 85

```
 1              THE WITNESS:  Something else we were
 2    advocating for?
 3    BY MR. KEYES:
 4         Q.   Well, not "we."  You, personally.
 5         A.   Yeah -- me, personally?
 6         Q.   Yeah.
 7         A.    Not specific to this.  Not at the time,
 8    no.
 9         Q.    Okay.  So there was the prior policy,
10    and now there's the current policy.  There's no
11    third draft policy that you were advocating for,
12    correct?
13         A.    Correct.
14              MR. BYRD:  Object to form.
15    BY MR. KEYES:
16         Q.    Do you have any quantitative data on
17    how frequently Harford County Public School
18    students use their cell phones at school?
19         A.    Use them?
20              MR. BYRD:  Object -- sorry.
21    BY MR. KEYES:
22         Q.    Yes.
23              MR. BYRD:  Object to form.
24              THE WITNESS:  No.
25              MR. BYRD:  You can answer.
```

Page 86

1          THE WITNESS:  Sorry.  No, I don't have
2    specific data on how often they use them.
3    BY MR. KEYES:
4          Q.   Do you have any quantitative data on
5    how much time Harford County Public School students
6    use their cell phones at school?
7          A.   I don't have quantitative data on that,
8    no.
9          Q.   Do you have quantitative data on how
10   frequently Harford County Public School students
11   use social media at school?
12         A.   Again, I -- I don't have a way of
13   measuring that.
14         Q.   Do you have any quantitative data on
15   how much time Harford County Public School students
16   use their cell phones at school -- I'm sorry.
17   Strike that.
18          Do you have any quantitative data on
19   how much time Harford County Public School students
20   use social media at school?
21         A.   How is that -- no.  I think -- I
22   thought that was the question I just answered.
23   But, okay.  No.  Did I -- if I misunderstood.
24         Q.   No.  Well, I asked two questions about
25   cell phones.  Now I'm asking about social media.

CONFIDENTIAL

Page 87

1          A.    Okay.

2          Q.    The first question was:  Do you have

3    any quantitative data about how frequently they use

4    social media?

5          A.    Or how much time?

6          Q.    And this one is how much time they

7    spend --

8          A.    No.

9          Q.    -- on social media.

10         A.    No quantitative on either.

11         Q.    Do you have any quantitative data on

12    either how frequently students use the defendants'

13    platforms or how much time they spend using

14    defendants' platforms at school?

15              MR. BYRD:  Object to form.

16              THE WITNESS:  Again, not quantitative

17    data.

18    BY MR. KEYES:

19         Q.    Okay.  What you have may be

20    qualitative, anecdotal, observational?

21         A.    Of course.  And, again, I personally

22    have some that would be shared with me.  But it's

23    also anecdotal from talking to principals, talking

24    to teachers, you know, the degree to which I do

25    that.  But I'm sure I don't have a full picture.

CONFIDENTIAL

Page 88

1          Q.    Have you given any presentation to any
2    audience regarding Harford County Public School
3    students' use of social media?
4          A.    No.
5          Q.    Have you given any presentation to any
6    audience regarding Harford County Public School
7    students' use of the defendants' platforms?
8          A.    I have not.
9          Q.    Have you given any presentation to any
10   audience regarding Harford County Public School
11   students' use of cell phones or personal electronic
12   devices?
13         A.    I have not.
14         Q.    Have you attended any presentation
15   on --
16         A.    Specific to Harford County?
17         Q.    Yes, on Harford County Public School
18   students' use of social media, use of the
19   defendants' platforms or use of cell phones or
20   personal electronic devices?
21              MR. BYRD:  Object to form.
22              THE WITNESS:  To my recollection, not
23   specific to Harford County.
24   BY MR. KEYES:
25         Q.    Okay.  Have you attended any

CONFIDENTIAL

Page 89

1    presentation about teenagers' use of cell phones or

2    personal electronic devices, use of social media or

3    use of defendants' platforms that's not specific to

4    Harford County Public School students?

5            A.    Understood.    Probably the cases

6    where -- the situations where I would encounter

7    discussions of use of social media has more to do

8    with legal updates.

9                And I'm not talking specific to my

10   attorney but, you know, through association

11   meetings where attorneys will come in and talk

12   about various cases and often talk about the role

13   that social media plays in those cases or might

14   have been mentioned in those cases.    And, you know,

15   for example, you know, nationwide cases that are

16   precedent-setting or something like that.

17               So between the Maryland Association of

18   Boards of Education conference where we meet each

19   year with all of our in-house attorneys -- or many

20   of the attorneys that our school systems use, they

21   make presentations on various cases and -- you

22   know.    So I'd hear it there.

23               I attend the Association of School

24   Administrators conferences where they often provide

25   legal updates on various cases that are happening

CONFIDENTIAL

Page 90

1    around the country.  And, again, in -- in many of

2    those cases, you know, social media is -- is

3    somewhere a part of it.

4         Q.   In those presentations that you've just

5    described where social media comes up, it's in the

6    context of particular cases?

7         A.   Generally, yes.

8         Q.   Okay.  Have you attended any

9    presentations about quantitative data or statistics

10   about teenagers' use of cell phones or personal

11   electronic devices, use of social media or use of

12   the defendants' platforms?

13        A.   I'm --

14             MR. BYRD:  Object to form.

15             THE WITNESS:  Yeah, I guess I'm not

16   entirely sure I can answer that.  I mean, I'm

17   thinking through presentations where I've heard it,

18   but I don't know that they were ever specific to

19   that topic.  But it's not uncommon to be mentioned.

20             You know, for example, if I attend a

21   presentation on student mental health, it's always

22   referenced.  But I don't know that we're talking

23   quantitative data or anything like that.  I just --

24   those are the situations where the topic is always

25   touched upon.

CONFIDENTIAL

Page 91

1    BY MR. KEYES:

2         Q.    How often are you in the classroom?

3         A.    I'm in a classroom at least weekly,

4    sometimes multiple times a week.  I visit schools,

5    55 schools.  I have visited at least four times a

6    year with each of my principals.  Many of those

7    visits I go to the school and walk through classes.

8    So it's not an uncommon thing for me to -- to be in

9    classrooms.

10         Q.    Have you spoken with any teacher

11    regarding the amount of time he or she spends in

12    the classroom on issues related to social media?

13         A.    Not specific just to that.  I mean,

14    again, when they share the stories of things that

15    they're -- they are concerned with, it's always --

16    it's often something that is part of the

17    conversation, but we don't usually speak

18    specifically about social media.

19         Q.    Have you spoken with any teacher

20    regarding the amount of time he or she spends in

21    the classroom on issues related to cell phone use

22    by students?

23         A.    Oh, I've certainly had, again,

24    incidental conversations with people about that,

25    particularly, you know, as we've talked about,

CONFIDENTIAL

Page 92

1    enforcement of cell phones and that sort of thing,
2    because --
3            You know, the -- I mean, the challenge
4    we see with schools is -- you know, I -- I try to
5    get a sense from them -- it's like, you know,
6    what's -- what do you see as the best way to
7    approach dealing with cell phones?
8            And in my experience, their answer is
9    split down the middle.  Half would rather tell the
10   kid to put something away.  The other half is going
11   to try to intervene and -- and take something --
12           So it's -- it's a constant discussion,
13   and there's not a lot of agreement about how to
14   address them.  But I've certainly talked to --
15   talked to teachers about that particular topic,
16   about how to enforce, because I know it's a
17   challenge.
18           Q.   I'm not sure I followed your answer
19   where you said, when you talk to teachers, their
20   answer is split down the middle.  You say half the
21   teachers would intervene with a student who is
22   using a cell phone in violation of the policy by
23   taking something away --
24           A.   The --
25           Q.   -- the phone --

CONFIDENTIAL

Page 93

1          A.    If the policy says that -- let me put

2     it this way:  Half of your teachers are going to

3     move on and keep teaching.  They may say something

4     to a student; they may not.  But they're going to

5     focus on the teaching.

6               Others are going to go out of the way.

7     They're going to stop their teaching, and they're

8     going to, you know, interrupt their teaching and

9     take the time to address the violation.

10              And then there's the whole range of

11    behaviors in between.  One might say, "Just put it

12    away."  Others might say, "Give me the phone."

13              I mean -- I mean -- so, again, there's

14    a whole range, but there isn't agreement in terms

15    of practice in how teachers respond.  Some are very

16    strict.  Some are less so.

17         Q.    So have you had a conversation with any

18    teacher where they've quantified the amount of

19    time, the percentage of time they spend dealing

20    with students using cell phones or personal

21    electronic devices in violation of policy?

22         A.    Not that explicitly, no.

23         Q.    Have you spoken with any principal or

24    assistant principal about the amount of time they

25    spend on issues related to social media?

CONFIDENTIAL

Page 94

1          A.    Again, not that explicitly.  To some

2     degree, I'm drawing on my own experience from when

3     I was a principal.  But, you know, that's changed,

4     and I think it's actually gotten worse since then.

5          Q.    Have you spoken with any principal or

6     assistant principal about the amount of time they

7     spend on students' use of cell phones or personal

8     electronic devices?

9          A.    Again, explicit conversations just on

10    that topic, no.  I mean, when we talk about

11    discipline challenges, it always comes up.  When we

12    talk about students' ability to focus in classroom,

13    it always comes up.

14              But I've -- we've never talked about a

15    specific amount of time or frequency or things like

16    that.  Just knowing that it's a -- it's something

17    that's constantly present in our classrooms and,

18    you know, a challenge that the teachers every day

19    struggle with how to address.

20          Q.    I asked you about conversations with

21    principals or assistant principals.

22          A.    Principals.  Sorry.  Or assistant

23    principals.  Again, I've talked to -- I mean,

24    generally, if I'm talking to them, it's more about

25    the discipline that -- that they're confronting

CONFIDENTIAL

Page 95

```
 1    every day.  And it's not uncommon for things to
 2    start with something that -- again, a lot of the
 3    disputes we see in schools which -- and at times,
 4    these disputes end up in the administrator's
 5    purview.
 6              Q.   Okay.  But -- but I asked you about
 7    principals and assistant principals.
 8              Now I'm asking about any other
 9    administrators in Harford County Public Schools.
10    Have you spoken with any of them about the amount
11    of time they spend on student use of social media?
12              A.   Specific time, no.
13              Q.   Okay.  And other than principals and
14    assistant principals, have you spoken with any
15    other administrators of Harford County Public
16    Schools about the amount of time they spend on
17    student use of cell phones or personal electronic
18    devices?
19              A.   Again, not -- not about the specific
20    amount of time.  Just, you know, over on our
21    student services side, when we're talking about
22    mental health, again, it's always part of the
23    conversation, so people like Mr. Hennigan and those
24    who report to him on the mental health side.  So
25    the administrators on his team are people that I
```

CONFIDENTIAL

Page 96

1    would have conversations related to this topic but

2    not specifically in the way you asked.

3            Q.    Are you familiar with the Youth Risk

4    Behavior Survey?

5            A.    Yes.

6            Q.    What is it?

7            A.    It's a survey given every other year.

8    I can't remember the last time we reviewed it.

9    It's something we've used in the past.  I think

10   we've -- to my understanding, we've kind of focused

11   on it less because we've done our own student

12   wellness survey.

13            And you've asked about quantitative

14   data, and I realized I was not thinking of either

15   of those.  But the degree to which we have

16   quantitative data about it, it would be in either

17   the Youth Risk Behavior Survey or our -- the

18   student wellness survey, which we did in the last

19   couple of years.  That would be something I'd ask

20   Mr. Hennigan about because that all rests with him.

21            Q.    When the Youth Risk Behavior Survey

22   results are released, do you review them?

23            A.    Not necessarily, unless Mr. Hennigan

24   brings something to my attention.  In the -- in the

25   past, he has done presentations related to elements

CONFIDENTIAL

Page 97

1    from the Youth Risk Behavior Survey.  And when we

2    chose to design our own wellness survey, some of

3    the thinking there was modeled on the Youth Risk

4    Behavior Survey.

5           Q.   So you have had experiences where

6    Mr. Hennigan has presented data to you based on the

7    Youth Risk Behavior Survey results?

8           A.   Yeah.  I mean, to be fair, he presents

9    it to senior staff, which I attend, and then

10   usually that's in preparation for presentation to

11   the board.

12           I can't remember the last time we

13   presented on the YRBS in our last -- I know we have

14   an updated version of the mental health data.  We

15   have a dashboard for our mental health data.  But I

16   don't recall what's in there specific to social

17   media or cell phone use.

18           Q.   Have you made any specific decision

19   based on data presented to you from the Youth Risk

20   Behavior Survey?

21           A.   Specifically drawn to that?  Again, I

22   mean, the things I've tended to focus on there,

23   we've looked at other settings related to health

24   and wellness for a while -- a group that's no

25   longer in operation.  But we had a Harford County

Page 98

1    sort of health gathering of leaders, hospital,
2    social services, health department -- and so we've
3    gone through the context there.
4              But in terms of specific
5    decision-making, I mean, that was the source of our
6    significant concerns I talked about in 2018 and '19
7    where we made a decision to focus on mental health.
8    Well, I say "we."  The student advisory chose that
9    as their initiative, and their work kicked off a
10   great deal more work related to mental health.
11             But, again, I -- there's so much that
12   Mr. Hennigan and his team do around mental health
13   that I -- I kind of would refer -- I know you've
14   already spoken with him, but he really is the
15   expert on the details related to this.
16        Q.   You mentioned that Harford County
17   Public Schools has conducted its own wellness
18   survey.
19        A.   Uh-huh.
20        Q.   Is that the Wellness Needs Assessment?
21        A.   Yes.
22        Q.   For how many years has Harford County
23   Public Schools been conducting that assessment?
24        A.   I'm pretty sure it's now three.  We
25   developed it.  We've modified it.  But I think

CONFIDENTIAL

Page 99

```
 1   we've given the third version of it in this last
 2   year.
 3         Q.   So each of the last three years?  Two
 4   prior years --
 5         A.   I --
 6         Q.   -- and the current year?
 7         A.   I believe so.
 8         Q.   Who conducts the Wellness Needs
 9   Assessment?
10         A.   The students take it.  The students
11   support services, so Mr. Hennigan's office, drives
12   it.  And it's -- it's something that they do in
13   class across the school system.  We get a pretty
14   high response rate.
15         Q.   Who decides what questions will be
16   asked in that Wellness Needs Assessment?
17         A.   We have a couple of groups that do work
18   in that area.  For example, we have a mental
19   health -- I think the title is "mental health
20   coordinator," Christina Alton, who works for
21   Mr. Hennigan.
22             And so whether it comes out of
23   Mr. Hennigan's student support services' staff
24   meetings -- but I also believe there's an advisory
25   that does work around this.  So they would be
```

CONFIDENTIAL

Page 100

1   coming together, seeking strategies to employ to

2   help address student mental health needs or

3   wellness needs in general.

4           They also -- the Blueprint for

5   Maryland's Future was a big educational initiative

6   we worked through.  One of the pillars in that is

7   about -- has a lot to do with student services and

8   the services they get outside of the classroom.

9           And that's an active group with a

10  number of stakeholders from around the county,

11  including health department and places like that.

12  And so they're constantly working, coming up with

13  strategies of things to do to address the overall

14  wellness needs.

15          So there's a degree to which they spend

16  on this.  Since I don't attend those meetings, I

17  get the high-level summaries of their work, but we

18  have a lot of groups working in this realm or close

19  to it.

20      Q.   Who is the final decision-maker about

21  what questions will be asked in that Wellness Needs

22  Assessment?

23      A.   I would argue Mr. Hennigan would be the

24  one signing off on what's fully in there.  He

25  would -- he would talk to me about it, but

CONFIDENTIAL

Page 101

1   decision-making is really sitting at his level.

2           Q.   In the Wellness Needs Assessment that

3   was conducted two school years ago, that is, the

4   first Wellness Needs Assessment, were there any

5   questions about social media?

6           A.   I don't remember.  I don't remember.

7           Q.   Okay.  In the Wellness Needs Assessment

8   that was conducted the prior school year, was there

9   any questions about social media?

10          A.   I don't remember.  I mean, I believe

11  we've had those, I know, because we've had to add

12  social media to our bullying report, for example,

13  and things like that.  And I believe that would be

14  the place it would have come from.  But I honestly

15  don't remember.  You'd have to talk to him.

16          Q.   Are there questions about social media

17  in this school year's Wellness Needs Assessment?

18          A.   Again, I don't remember.

19          Q.   Who compiles the survey data for the

20  Wellness Needs Assessment?

21          A.   The compiling of the data, I mean, we

22  do it through a platform.  I believe the person

23  who, for example, builds the dashboard that we

24  create around this is our manager of program

25  evaluation, who is Yakoubou Ousmanou.  So he's the

CONFIDENTIAL

Page 102

1  person who would have built the dashboard.  So if

2  you're talking about compiling the data, most

3  likely it's flowing through him.

4           But, again, Mr. Hennigan and his team

5  would have a big part of it.  And anyone who is

6  sort of looking at results, that sort of thing

7  would be in Mr. Hennigan's team.  So he'd be

8  working with Mr. Ousmanou to do that.

9       Q.   For the Wellness Needs Assessment two

10 years ago, in the first year, was a final report

11 prepared to summarize what was learned from that

12 assessment?

13      A.   To my recollection, yes.  I believe

14 it's posted on our website.

15      Q.   And is that the only report, or are

16 there different versions where one is public and

17 one isn't public?

18      A.   I can't recall specifically what's

19 public right now.  We have a dashboard that

20 internally we look at.  I don't know if we've

21 updated a report that actually was made public to

22 the board.  A little bit would have to do if the

23 board had an interest in seeing it again, but I

24 don't recall.

25      Q.   Okay.  The same question for the

CONFIDENTIAL

Page 103

1    Wellness Needs Assessment last year.  Was a final

2    report prepared to summarize what was learned in

3    that assessment?

4            A.    I don't recall.  I mean -- I -- I --

5    for a different reason, I was looking at the

6    reports that we've done through the -- the program

7    evaluation team, and I -- I vaguely remember at

8    least two different wellness reports being posted

9    there.  But I can't tell you was it this year's or

10   last year's or what time.  I -- I recall having two

11   of them out and floating around.

12           Q.    Okay.  Well, my -- my -- you

13   anticipated my next question, which is:  Is there

14   a -- is there a report of the results from this

15   year's Wellness Needs Assessment?

16           A.    I don't recall what's on the -- again,

17   I can tell you where to look --

18           Q.    Okay.

19           A.    -- but I don't -- I don't know off the

20   top of my head specifically what's there.

21           Q.    Your best recollection is, there have

22   been three Wellness Needs Assessments, each of the

23   last three years, and you've seen two reports?

24           A.    That's my recollection up to this

25   point.  But, again, that team is busy.  There's a

CONFIDENTIAL

Page 104

1   lot of reports.

2          Q.   And do you have an understanding about

3   anything that has been reported on from any of

4   these Wellness Needs Assessments about students'

5   use of social media?

6          MR. BYRD:  Object to form.

7          THE WITNESS:  Not the specific details.

8   Again, with -- with social media, it's the type of

9   thing that's, for us, always kind of hanging as an

10  underlying -- you know, we're -- tend to be looking

11  at more of what's presenting, like the suicide

12  ideation reports, the -- you know -- the visits to

13  counselors for anxiety and these things like that,

14  which are more the presenting -- you know, so the

15  degree to which we attribute any of those concerns

16  to things that they're grappling with as a result

17  of social media.  But that's a slightly different

18  issue.  More on what we look at is the -- I would

19  say the -- a lot of the other indicators.

20  BY MR. KEYES:

21         Q.   Have you ever counseled or treated any

22  Harford County Public School student?

23         A.   Counseled?

24         Q.   Yeah, as -- as in being a counselor.

25         A.   No, I've never been in a counselor

CONFIDENTIAL

Page 105

1   role.

2        Q.   So have you ever counseled or treated

3   any Harford County Public School students?

4             MR. BYRD:  Object to form.

5             Go ahead.

6             THE WITNESS:  I have not.

7   BY MR. KEYES:

8        Q.   Has any Harford County Public School

9   student come to you and said that they believe

10  they're addicted to social media?

11            MR. BYRD:  Object to form.

12            THE WITNESS:  Come to me specifically

13  to say that?

14  BY MR. KEYES:

15       Q.   Yes.

16       A.   Not in that form.  To the degree which

17  I've heard students raise concerns about social

18  media most likely would have been in the context of

19  the superintendent student advisory, because,

20  again, that's a group that touches on a number of

21  topics.

22            But in -- and there's -- there's often

23  a mental health theme that they focus on, that the

24  first year that was exclusively what they did, and

25  other years it's been sort of one of many projects.

CONFIDENTIAL

Page 106

1    And so it would come up in a small way, but it

2    wasn't -- again, the topic was more mental health.

3        Q.   When you say it came up, it came up in

4    that some people talked about students using social

5    media too much?

6        A.   Using it too much or it being the

7    source of anxiety or the source of sort of school

8    avoidance or source of, you know, the sort of

9    unhelpful academic impacts and social impacts.

10       Q.   Are you able to identify for me the

11   number of Harford County Public School students who

12   have been diagnosed with social media addiction?

13           MR. BYRD:  Object to form.

14           THE WITNESS:  I am not able to answer

15   that.

16   BY MR. KEYES:

17       Q.   Are you able to identify for me the

18   number of Harford County Public School students who

19   have received counseling or treatment in connection

20   with their use of social media?

21       A.   I am not able to do that.

22       Q.   Are you able to identify for me the

23   number of Harford County Public School students who

24   have received counseling or treatment in connection

25   with problems arising from their use of social

Page 107

```
 1   media?
 2              MR. BYRD:  Object to form.
 3              THE WITNESS:  Again, no.
 4   BY MR. KEYES:
 5        Q.   Are you able to identify for me the
 6   number of Harford County Public School students who
 7   received counseling or treatment in connection with
 8   the time they spend on social media?
 9              MR. BYRD:  Object to form.
10              THE WITNESS:  No.
11   BY MR. KEYES:
12        Q.   You mentioned a superintendent
13   advisory.  What is that?
14        A.   So each year students apply to be
15   members of the superintendent's student advisory.
16   We usually select -- I think it's 16 to 20 members.
17   We might have a few more.  I'm not sure of the
18   count now.
19              They're a combination of middle and
20   high school students.  They -- the day-to-day work
21   with the team is managed by Dr. Paula Stanton.  Her
22   current title, I believe, is -- I want to say -- we
23   just changed it.  So I apologize; I don't remember
24   her exact title.  Manager of climate and culture.
25   Her -- the specialist who works in her office,
```

CONFIDENTIAL

Page 108

1    Meredith Heidt, also helps.

2              But that group meets multiple times a

3    year.  I think we have four formal meetings a year.

4    But they -- they occasionally have, you know, other

5    less formal meetings in between.

6              And they discuss issues related to

7    students.  They discuss issues related to, you

8    know, the challenges in the students' lives.

9    They -- they discuss --

10             But, normally, how we start the year is

11   we ask them, what are the things students are

12   talking about and students are, you know, focused

13   on that -- that this group may be able to work on

14   to help improve students' experiences.  And so they

15   choose -- they choose a variety of topics.

16        Q.   Is that the superintendent's student

17   advisory council?

18        A.   Uh-huh.

19        Q.   Is that a "yes"?

20        A.   Yes.  Sorry.

21             (BULSON EXHIBIT 6, Emails, top one

22   dated 1/7/19, Subject:  Mental Health Initiatives,

23   HCPS_00164400, was marked for identification.)

24   BY MR. KEYES:

25        Q.   Okay.  I'm showing you what has been

CONFIDENTIAL

Page 109

1  marked as Bulson Exhibit 6.

2          A.   Yours is 19.  It's from Christian.

3          Q.   This was produced to us with the

4  Bates Numbers HCPS_00164400.  Single page.  It's a

5  series of two emails.  One is from Christian Walker

6  to you and then a second email from you to Laurie

7  Namey; do you see that?

8          A.   Yes.

9          Q.   Who -- who is Christian Walker?

10          A.   Christian Walker, in 2019 -- let me

11  see.  When is this?  January 2019.  He was a high

12  school junior then.  He was a member of the

13  superintendent's student advisory.

14               At that time, Laurie Namey was the

15  person who was responsible for the student

16  advisory.  She since changed positions.  And so

17  when I mentioned Dr. Stanton, that's who runs it

18  now.

19               So Christian was a member that year.

20  The subsequent year, Christian became a student

21  member of the Board of Education.

22          Q.   Okay.  What -- what was Laurie Namey's

23  position at the time?

24          A.   What was the title?  Again, it's the

25  same position held by Dr. Stanton now, but we've

CONFIDENTIAL

Page 110

1    changed the title.  The title would have been -- it
2    was like "supervisor of diversity initiatives" or
3    something to that effect.
4         Q.    And you said Christian Walker at the
5    time was a junior but later became --
6         A.    -- a student member of the Board of
7    Education.
8         Q.    That's the Harford County Public
9    Schools Board of Education?
10        A.    Harford County Board of Education,
11   yeah, during his senior year in high school.
12        Q.    And is the student member a voting
13   member of the board?
14        A.    Of the board?  In -- it's mixed.  They
15   vote on many things, not everything.
16        Q.    Okay.  In this email from Christian
17   Walker to you, it's titled "Mental Health
18   Initiatives."  Do you see that?
19        A.    Uh-huh.
20        Q.    Is that a "yes"?
21        A.    Yes.  Sorry.
22        Q.    It says:  Dr. Bulson, happy new year.
23   At the last superintendent's student advisory
24   council meeting, I recall you tasked students with
25   gathering information to report back on mental

CONFIDENTIAL

Page 111

1   health.

2           He says:  Back --

3       A.    Yeah.  Yeah.

4       Q.    -- back in November, I held meetings

5   with students at my school and some students from

6   other schools across the country, mainly at the

7   high school level.  Based on the information I

8   gathered, and in cooperation with the current

9   student board member and the HCRASC president, I

10  compiled an outline of proposed mental health

11  initiatives that I presented to Mr. Hennigan last

12  month.

13          Do you see that?

14      A.    Uh-huh.

15      Q.    Was that a "yes"?

16      A.    Yes.

17      Q.    What is HCRASC?

18      A.    Harford County Regional Association of

19  Student Councils.

20      Q.    Is that a --

21      A.    It's a -- it's a school system student

22  governance group.

23      Q.    Okay.  So is it made up entirely of

24  students?

25      A.    Yes, with a faculty advisor.

CONFIDENTIAL

Page 112

1          Q.   Okay.  And then two paragraphs later,
2     he says:  The highlight of the meeting was
3     increasing social media promotion with the help of
4     students, who are already so deeply entrenched on
5     social media platforms, and to feature you and
6     other students in videos promoting crisis
7     resources.
8          A.   Yes.
9          Q.   Did I read that correctly?
10         A.   Yes.
11         Q.   Do you remember this email from
12    Christian Walker?
13         A.   I don't remember the specific email.
14    Christian emailed a lot.  You can just tell from
15    this he's a pretty resourceful kid.
16              The topic of discussion at the time --
17    because in 2018-19 discussions about mental health
18    were nowhere near as common or present in school
19    system settings.  And so this group's focus that
20    year and what I think they ultimately decided on
21    for their project for the year was to work on
22    normalizing conversations related to mental health
23    to -- so that students who were suffering could
24    have a space -- could feel more comfortable
25    bringing forward their concerns with the hope of

CONFIDENTIAL

Page 113

1  being able to address them.  This is something

2  Christian was immensely focused on.

3              Again, he wasn't the student board

4  member that year.  That year's student board

5  member, Josh Oltarzewski, was also in the

6  superintendent's student advisory, and he and

7  Christian worked closely really leading the -- this

8  particular initiative from the student advisory.

9              So the fact that Christian was going

10  out and gathering information and those sorts of

11  things is consistent with what was going on then

12  and their work to, again, elevate conversations

13  related to mental health.

14              (BULSON EXHIBIT 7, Harford County

15  Public Schools Proposed Mental Health Initiatives,

16  Education and Raising Awareness, Bates

17  HCPS_00164401-02, was marked for identification.)

18  BY MR. KEYES:

19       Q.   I'm showing you what has been marked as

20  Bulson Exhibit 7.  This was produced with the

21  Bates Number HCPS_00164401 through 164402.

22              This document was attached to

23  Mr. Walker's email, which we just saw was

24  Bulson Exhibit 6.  Tell me when you've read this

25  document.

CONFIDENTIAL

Page 114

1          A.    Okay.

2          Q.    Did you read the exhibit?

3          A.    I did.

4          Q.    Okay.  Is it your understanding that

5     this is the description of the proposed components

6     of a mental health initiative that Christian Walker

7     sent to you?

8          A.    That would make sense.  I mean, I can't

9     say that for sure.  Again, there's -- we've

10    produced a lot around this topic in different

11    settings.  But, I mean, it -- this seems consistent

12    with Christian's work and the way he approached

13    things, and there's nothing to suggest this

14    isn't --

15         Q.    It's --

16         A.    -- the attachment that was here.

17         Q.    It's titled "Harford County Public

18    Schools Proposed Mental Health Initiatives," and

19    then it says "Education and Raising Awareness."  Do

20    you see this?

21         A.    Uh-huh.  Yes.

22         Q.    And then there are a bunch of bullet

23    points underneath it?

24         A.    Yes.

25         Q.    And if you go down to the fifth bullet

CONFIDENTIAL

Page 115

1    point, it says:  Social media campaign raising

2    awareness for available resources featuring

3    students via HCPS and school outlets.

4              Do you see that?

5         A.   Yes, I do.

6         Q.   And if you go back to the prior

7    exhibit, Exhibit 6, the cover email has an

8    attachment titled "HCPS Mental Health Initiatives."

9              So do you have any reason to think

10   Exhibit 7 is not --

11        A.   No, I don't.

12        Q.   -- the attachment to Exhibit 6?

13        A.   I do not have any reason to think it's

14   not.

15        Q.   Did you express any objection to

16   Christian Walker to the idea of having a social

17   media campaign to raise awareness for available

18   mental health resources featuring students at

19   Harford County Public Schools?

20              MR. BYRD:  Object to form.

21              THE WITNESS:  To my recollection, not

22   at all.  I mean, it's certainly something I would

23   have supported.

24   BY MR. KEYES:

25        Q.   And you -- you forwarded his proposal

CONFIDENTIAL

Page 116

1  to Laurie Namey.  Did she express any objection to
2  you to Christian Walker's idea of having a social
3  media campaign to raise awareness for available
4  mental health resources featuring students of
5  Harford County Public Schools?
6              MR. BYRD:  Object to form.
7              THE WITNESS:  Again, to my
8  recollection, there was no concern raised about
9  such a campaign.
10  BY MR. KEYES:
11      Q.    Did this campaign go forward?
12      A.    I don't remember the form in which it
13  did.  I know there was some work that happened.
14  Again, Christian never left anything undone.  I
15  can't tell you how much or how extensive it was.
16      Q.    Well, do you recall participating in
17  advancing that social media campaign?
18      A.    I know there's suggestion here that
19  there were going to be videos from the
20  superintendent.  I don't recall doing any --
21  recording any videos for that myself.  So whether
22  that's not something we got to on the to-do list,
23  but I don't recall doing that.
24      Q.    Did Harford County Public Schools
25  provide resources to this group to facilitate the

Page 117

1    social media campaign?

2            A.    I don't believe we did in this case.  I

3    think much of what would've happened here is -- is

4    Christian and colleagues -- send the information --

5    well, to the degree to which we would, for example,

6    advertise the QPR training, I mean, we would've

7    advertised that through varying online platforms.

8            So other opportunities related to this,

9    I -- but I don't know what specific messaging on --

10   on -- I don't recall exactly what happened.

11   There's a lot that's happened over the last few

12   years, but this was the first big year of that.

13           Q.    Did you express to anyone any concern

14   about using social media for this campaign because

15   of a concern about affirmatively drawing students'

16   attention to social media platforms?

17           A.    No.  In a way, I mean, I think we had

18   all fully accepted and recognized that that's where

19   students were getting their information.  And I

20   mean, it speaks to why we use social media in other

21   settings also.

22           But I don't think that -- well, I mean,

23   to me, that -- that doesn't change the conversation

24   we're having, because, I mean, social media is

25   still a place where a lot of people get their

CONFIDENTIAL

Page 118

1    information.

2                And this is -- you know, and this is --

3    again, looking through the students' eyes, I mean,

4    he acknowledged in the email, you know, how

5    involved students are with social media and, you

6    know, recognize that that was a way to try to

7    change the information some of them were getting.

8           Q.    I asked you before whether you

9    objected; you said no.

10          A.    No.

11          Q.    I asked if you had any reservations;

12   you said no.  What did you think of the idea?  Were

13   you neutral on it --

14                MR. BYRD:  Objection.

15   BY MR. KEYES:

16          Q.    -- or a proponent of it?

17                MR. BYRD:  Objection to misstating

18   testimony.

19                Go ahead.

20                THE WITNESS:  Let me just say, I

21   supported the idea.  I would continue to support

22   the idea.  But I also -- I mean, this was their

23   plan.  So, you know, did I facilitate it happening

24   personally?  No.  But I didn't facilitate any of

25   this.  They did most of this work themselves.  But

CONFIDENTIAL

Page 119

1   did I support everything that was in here?  Yes.
2   BY MR. KEYES:
3          Q.    Including the idea of using a social
4   media campaign --
5          A.    Yes.
6          Q.    -- to promote these mental health
7   initiatives?
8          A.    Yes.
9          Q.    You said a moment ago, "It speaks to
10  why we use social media in other settings."  What
11  other social media does Harford County Public
12  Schools use?
13         A.    The ones I believe we use the most are
14  still -- we have -- I'm familiar with our Facebook
15  page, our Instagram site as well as a -- as a
16  YouTube page that we employ for sharing school
17  system information.
18         Q.    With?
19         A.    Students, parents, staff, community.
20         Q.    And have you ever advocated for
21  Harford County Public Schools to stop using a
22  Facebook page?
23         A.    No, because it's -- I mean, for
24  example, one of the priorities for the board, both
25  in our strategic plan and a specific priority that

CONFIDENTIAL

Page 120

1    was laid out to -- it was the board's priorities

2    for the superintendent -- was improving relations

3    with parents, greater transparency with parents and

4    those sorts of things.  So, again, in -- I think

5    in -- in all of these situations we're -- we are

6    still using the tools where they're getting the

7    information.

8            Q.    Have you ever advocated for

9    Harford County Public Schools to stop using an

10   Instagram page?

11           A.    No.

12           Q.    Have you ever advocated for

13   Harford County Public Schools to stop using a

14   YouTube channel?

15           A.    No.

16           Q.    Have you created content for

17   Harford County Public Schools' Facebook page,

18   Instagram page or YouTube channel?

19           A.    I've contributed to content.  I mean,

20   I'm sometimes the content.  But in terms of

21   creating, others are posting.

22           Q.    Do you have any role in reviewing

23   content for approval before it's posted to the

24   Facebook page, Instagram page or YouTube channel?

25           A.    Instagram and Facebook are almost

CONFIDENTIAL

Page 121

1   exclusively run by Jillian Lader.  I don't do
2   anything to approve.
3            Some of the video -- normally, if I --
4   if I'm in an approving situation, it's because
5   normally that's with the YouTube channel, with the
6   videos, often the videos that are featuring a
7   speech from me or a message from me; or in some
8   cases, I'll be the approver if we have a larger
9   message that, you know, we're trying to
10  disseminate, you know.
11           So there's times when I'll be an
12  approver.  But more often, it's for YouTube, and
13  it's kind of for bigger-picture messages.  The
14  day-to-day use of Instagram and Facebook would
15  mostly be Jillian.
16           Now, I believe we also have a
17  Facebook -- no.  I don't recall.  Facebook or
18  Instagram.  Our HR team also has a page.  A number
19  of our schools have individual pages.  And, again,
20  I don't -- while I occasionally visit some of
21  those, I -- I don't have any role in approving or
22  editing what they put out.
23       Q.   Do any of the schools have an
24  independent YouTube channel?
25       A.   I don't specifically know.  I wouldn't

CONFIDENTIAL

Page 122

1   be surprised to know that, but I don't specifically
2   know of any of them using that.
3            Q.   Is there some policy within
4   Harford County Public Schools such that someone
5   within the central offices -- Jillian Lader, you,
6   someone else -- has to review content that's posted
7   to a school's Facebook or Instagram page?
8            A.   I don't believe we have -- no,
9   there's -- there's no specific expectation that
10  something that's posted is reviewed by anyone here.
11           I mean, there may be situations where
12  people have questions.  They would go to someone
13  like Jillian or possibly -- or general counsel or
14  to one of their supervisors in ed services.  But
15  there's no expectation that people review content
16  particularly at the school level before it's
17  posted.
18           Q.   You said that Harford County Public
19  Schools' Instagram and Facebook pages are almost
20  exclusively run by Jillian Lader.  Who besides
21  Ms. Lader runs those pages?
22           A.   Runs them?  Again, she has -- I don't
23  know what Kyle's title is, assistant manager of
24  communications, something like that.  So
25  Kyle Andersen might also post to it, particularly

CONFIDENTIAL

Page 123

1    if Jillian is on leave or something like that.

2         I mean, so it's still Jillian's direct

3    report, but, you know, he -- I'm sure he posts

4    things independent of her without her review.

5         Q.   And who runs the Harford County Public

6    Schools YouTube channel?

7         A.   I'm pretty sure it's also Jillian, but

8    Jay Behrens is our videographer.  So I suspect he's

9    uploading directly to YouTube most of the case when

10   he's producing videos for the school system page --

11        Q.   Is he --

12        A.   -- channel.

13        Q.   Is he an employee of Harford County

14   Public Schools?

15        A.   Yes.

16        Q.   Are there other videographers employed

17   by Harford County Public Schools?

18        A.   He's the only videographer, yeah.

19        Q.   And is that his full-time job, being a

20   videographer for Harford County Public Schools?

21        A.   He contributes to working

22   communications in other ways, and he contributes to

23   work for the department of technology in other

24   ways, but that's his primary work.

25             (BULSON EXHIBIT 8, Emails, top one

Page 124

1    dated 4/29/22, Subject:  Safety Feedback, Bates

2    HCPS_00339224-226, was marked for identification.)

3    BY MR. KEYES:

4          Q.   I'm showing you what has been marked as

5    Bulson Exhibit 8.

6               MR. KEYES:  Tab 31.

7    BY MR. KEYES:

8          Q.   This was produced to us with the

9    Bates Numbers HCPS_00339224 through 339226.

10              You tell me when you've read these

11   three emails -- two emails.

12         A.   Oh, okay.  Now I get it.  Okay.

13         Q.   Have you read the two emails in

14   Bulson Exhibit 8?

15         A.   Yes.

16         Q.   The first one in time is in the lower

17   half of the first page.

18         A.   Uh-huh.

19         Q.   It's an email from you on April 28th,

20   2022.  Subject:  Safety Feedback.

21         A.   Uh-huh.

22         Q.   Do you see that?

23         A.   Yes.

24         Q.   And you say:  These are the responses

25   from last month's survey in my presentation.

                                        Page 125

1            And then you say:  As we continue

2    working to create a safer environment for everyone,

3    what else should we consider?

4            And then there's a long list of bullet

5    points.

6         A.    Uh-huh.

7         Q.    So did you conduct a survey, and the

8    list of bullet points are feedback that was

9    provided in the survey?

10        A.    Yes.  I can give you more details.

11        Q.    You -- you said at last month's survey.

12   Were you doing a survey every month at that point?

13        A.    Pretty much.  So this was in the

14   context -- normally, monthly -- we don't do it

15   every month but close.  We have our leadership

16   meetings, which includes all system administrators,

17   including principals from all the schools.

18            At this time, Stacey Gerringer,

19   who's -- who is one of the people I sent the email

20   to, she is a principal in one of our elementary

21   schools.  She and Donoven Brooks were leading kind

22   of a districtwide assessment of what we need to do

23   to create a safer environment in our schools.

24            Eric Davis is copied here.  He at the

25   time was chief of administration.  He's now deputy

CONFIDENTIAL

Page 126

1    of operations.  Donoven reports to him.

2              So I would -- I would give a

3    presentation on a range of leadership issues

4    affecting the school system.  It wasn't uncommon at

5    the time for me to put two or three questions into

6    my presentation that provided a space for the

7    administrators in the room just to give us their

8    feedback on.  And so these -- all of these

9    responses came from -- we have about 125 people who

10   attend those meetings.  And so this is a range of

11   responses.

12             I -- I believe this -- I don't

13   recall -- so Donoven and Stacey made a presentation

14   to that group.  I don't recall if this was prior to

15   them presenting to the group and this is to help

16   them prepare for the presentation.  Because they

17   were gathering data to identify strategies that the

18   school system should pursue to create a safer

19   environment.

20             So I don't know if this was

21   specifically connected to their presentation at one

22   of those meetings, but I had made a point of

23   putting a question.  And I probably had some

24   talking points related to safety.

25             I'm not remembering what was happening

CONFIDENTIAL

Page 127

1    in April of '22.  But, you know, I touched on
2    safety during my presentation to all of leadership.
3    And then these were the answers that our mix of
4    school-based and non-school-based administrators
5    provided.
6           Q.    You said, "We needed to create a safer
7    environment in our schools."  Why in -- in April of
8    2022 did you need to create a safer environment in
9    the schools?
10          A.    We had been seeing an increase in what
11   once upon a time might have felt like more
12   anomalous behaviors.  I think we are seeing an
13   increase in fights.  We are seeing an increase in
14   general disruptions from students.  And so there
15   was a growing concern in the community and among
16   the school leadership that student behavior was
17   becoming increasingly challenging to confront.
18          Q.    Do you believe that was a stressor for
19   others in the student body?
20          A.    Oh, certainly.
21          Q.    If you go to the second page of this
22   exhibit, about halfway down there's a bullet point
23   that says "SROs."
24          A.    Uh-huh.
25          Q.    Are you there?

CONFIDENTIAL

Page 128

```
 1          A.    Uh-huh.
 2          Q.    Okay.  Can you go to the next bullet
 3    point that says --
 4          A.    I thought that might be where you're
 5    going.
 6          Q.    -- should we continue to embrace social
 7    media?
 8                Do you see that bullet point?
 9          A.    I do.
10          Q.    That was one of the pieces of feedback
11    that someone in --
12          A.    Someone gave.
13          Q.    -- that someone in the --
14          A.    Raised a question.
15          Q.    -- attendees provided, right?  Yes?
16          A.    Yes.
17          Q.    And what action, if any, was taken on
18    this suggestion to reconsider whether
19    Harford County Public Schools should continue to
20    embrace social media?
21          A.    I can't answer specifically.  I can
22    tell you what would have happened with this
23    information, because Dr. Gerringer, Mr. Brooks
24    were -- they had a group they were meeting with.
25    They were co-leading the group.  They were doing
```

CONFIDENTIAL

Page 129

1    things like focus groups and -- and interviewing
2    people about safety.
3                So to the degree that that particular
4    suggestion was touched on, it probably would have
5    come up in the broader context of -- of their
6    conversations.  I don't recall a recommendation
7    coming from that group to modify how we --
8         Q.    Embrace social media?
9         A.    -- embrace social media.
10               But, again, I'm sure if I asked
11   Mr. Brooks, he'd have an opinion.  But I -- I don't
12   know specifically what that group discussed on that
13   particular suggestion from a -- from one of our
14   leaders.
15        Q.    This email and the report of the survey
16   results is in April of 2022, right?
17        A.    That's the date of the email, yeah.
18        Q.    Okay.  Since April of 2022, did
19   Harford County Public Schools stop embracing social
20   media?
21        A.    Stop embracing social media?  No.
22        Q.    Since April of 2022, did Harford County
23   Public Schools reduce how it embraced social media?
24               MR. BYRD:  Object to form.
25               THE WITNESS:  I honestly don't know the

CONFIDENTIAL

Page 130

1    specific answers to that, because, as I said, our

2    technology team, their responses to what we're

3    dealing with online, what we allow students access

4    to, what we allow teachers access to is constantly

5    changing.

6              And so I can't say specifically if any

7    of our protocols for working with any of these

8    entities has changed.  But the degree to which we

9    may have blocked something or something along those

10   lines, I mean, that -- that's sort of a constant,

11   moving target for our technology team.

12             And I would -- so the overall spirit of

13   embracing social media, that's not a conversation

14   we've had.  But kind of one-off activities, if

15   we're seeing, you know, increasing threats from any

16   particular area, it's -- it's quite possible that

17   more could have happened there.

18   BY MR. KEYES:

19        Q.   Since April of 2022, did Harford County

20   Public Schools reduce the way it affirmatively used

21   social media?

22        A.   Not to my knowledge.

23        Q.   Since April of 2022, did Harford County

24   Public Schools change the way it affirmatively used

25   social media?

Page 131

1          MR. BYRD:  Object to form.

2          THE WITNESS:  Again, not to my

3    knowledge.

4    BY MR. KEYES:

5          Q.    Since April of 2022, has Harford Public

6    Schools' use of social media increased?

7          A.    Again, not to my knowledge either.  I

8    mean, the one conversation that we continue to go

9    back to is:  Should we continue to allow comments,

10   for example, on the Facebook page?  Because it's

11   one thing for people to write things that are

12   critical.  It's another thing to post false

13   information.  We've had a number of situations

14   where that page or others like it have increased

15   challenges for us.

16          So I think there's some ongoing

17   thinking.  I mean, I think within the security

18   protocol space, we don't know exactly what to do.

19   But whenever we have a school incident, even like

20   the one we paused for today, inevitably, one part

21   of the debrief is:  Here's when we heard what

22   happened.  Here's when something hit social media.

23   Here's when the narrative started that created this

24   big response of parents that became a problem for

25   us to manage.  And here's how much of that was

CONFIDENTIAL

Page 132

1    untrue or inaccurate and how much it contributed to
2    the challenge we have confronting an incident in
3    one of our schools.
4           I could probably point to any major
5    crisis that occurred in a school and show how
6    social media involvement -- and so whenever we
7    do -- show how social media involvement has created
8    additional challenges for law enforcement and
9    school system leaders to contain and manage those
10   crises.
11          And so at any debrief we have on
12   particularly big incidents, I suspect it will be an
13   ongoing consideration or is -- is there something
14   we can do.  I'm not sure there is, because if
15   they're not using the school system social media
16   sites, I mean, families have some of their own that
17   they create that we have really no ability to even
18   engage in and -- and try to provide accurate
19   information.
20          But, you know, we've had -- we had a
21   situation earlier in the week where students had to
22   evacuate for an unsubstantiated threat of harm to
23   the school.  And the message went out to the
24   community on Facebook that, oh, the poor kids are
25   outside; they need water.

                                        Page 133

1              And all of a sudden, we have a very
2    nice thing, people showing up with cases of water
3    to give to the kids.  But, of course, that creates
4    a logistical mess for administrators who are trying
5    to keep the kids in a certain place, and they'll
6    be --
7              I mean, so these -- I mean, this is
8    something that we -- that's part of our review of
9    every major incident, is like how do we deal with
10   the misinformation, the --
11             So in terms of considering how we
12   embrace social media, I think we run into problems.
13   I don't know that we've come up with solutions
14   about what it means to embrace and -- but we
15   certainly keep coming across places where it makes
16   the work harder.
17        Q.    Word spreads fast on social media?
18        A.    It certainly does.
19        Q.    And so if it's a good word such as --
20        A.    It doesn't spread as fast, it seems --
21        Q.    -- such as a --
22        A.    -- anyway.
23        Q.    -- such as a mental health initiative,
24   it's worth doing, but if it's misinformation, it's
25   a negative?

CONFIDENTIAL

Page 134

1          A.    Yes.

2          Q.    You mentioned earlier there's a

3    conversation about whether to allow people to post

4    comments on the Harford County Public Schools

5    Facebook page.  What is the current practice?  Are

6    people allowed to comment?

7          A.    Yes.

8          Q.    Who -- who's involved in the

9    conversation about whether to change that practice?

10         A.    Well, the person who has to manage, who

11   has to monitor the comments or respond to comments

12   when they're inaccurate is Jillian, Jillian Lader,

13   again, with the help of her number two,

14   Mr. Andersen.

15              So conversations would sometimes come

16   from her.  But the, you know, suggestions to

17   possibly limit comments in some cases have been

18   made by board members, in some cases made by

19   administrators.  I think we have a number of

20   administrators with opinions who would like to

21   have -- you know.

22              And I know I have -- I can't state

23   specifically.  I've heard superintendents say to

24   me -- I don't remember who -- that, you know, we

25   stopped allowing comments on our social media

CONFIDENTIAL

Page 135

1    pages.  I mean --

2         Q.   A big part of Jillian Lader's job is

3    responding to misinformation that spreads on social

4    media?

5         A.   Correct.

6         Q.   Does Harford County Public Schools

7    allow students to access YouTube on district-issued

8    devices?

9         A.   Yes, for instructional purposes and I

10   think under a -- kind of a monitored -- I don't

11   know the specifics of how it's done, but it's --

12   it's something --

13        Q.   But it does allow it?

14        A.   It does allow it.

15        Q.   Does Harford County Public Schools

16   allow students to access YouTube on personal

17   devices that are connected to the district's

18   network?

19        A.   I don't know the specific answer to

20   that.  I -- I -- I'd like to say, no, we don't.

21   But I can't say that for certain.

22        Q.   Why would you like to say that?

23        A.   Only because I -- I know in the past

24   we -- so we've gone back and forth.  In the past,

25   we've limited access to YouTube and -- so I know

CONFIDENTIAL

Page 136

1   there was a time at which we did that.  I don't

2   recall if that's changed, because I do know that

3   it's used for instructional purposes.  I do know

4   that we have our own channel, as -- as we've

5   discussed.

6           So I don't know where it currently

7   stands, the difference between what the students

8   can access on their own devices versus school

9   system-distributed ones.  So I just -- I -- I just

10  don't know the specific details of where that line

11  is drawn.

12      Q.  Okay.  As of today, you don't know

13  whether Harford County Public Schools allows

14  students to access YouTube on personal devices that

15  are connected to the district's network, correct?

16      A.  Correct.  Because we do allow it on

17  their school system devices.

18      Q.  Does Harford County Public Schools

19  allow teachers to use YouTube in the classroom?

20      A.  Yes.

21      Q.  Does Harford County Public Schools

22  encourage teachers to use YouTube in the classroom

23  because it's a valuable instructional tool?

24          MR. BYRD:  Object to form.

25          THE WITNESS:  I would argue -- I mean,

CONFIDENTIAL

1   we encourage to the degree that -- that there are

2   YouTube videos that come up as potential resources

3   for them to use connected to our curriculum.

4   BY MR. KEYES:

5          Q.   So there are instances where

6   Harford County Public Schools encourages teachers

7   to use YouTube in the classroom as part of the

8   curriculum?

9               MR. BYRD:  Object to form.

10  BY MR. KEYES:

11         Q.   Yes?

12         A.   Allows them to use it as part of the

13  curriculum, yes.

14         Q.   Well, my question said "encourages."

15         A.   "Encourages"?

16         Q.   Yes.  So --

17         A.   Well, again, if it's -- if it's listed

18  as a -- as a either recommended or approved

19  resource -- if -- if listing something as approved

20  resource equals encourage, sure.

21         Q.   Okay.  So there -- there are parts of

22  the curriculum where YouTube is an approved

23  resource?

24         A.   Yes.

25         Q.   There are parts of the curriculum where

Page 138

1   YouTube is a recommended resource?

2          A.   I believe so.  I'm not sure I can split

3   those hairs, but I believe so.

4          Q.   And where YouTube is an approved or

5   recommended resource, Harford County Public Schools

6   encourages teachers to use YouTube?

7          A.   I think that's a fair conclusion.

8          Q.   And is that true for both using YouTube

9   in the classroom and also to use YouTube for

10  homework assignments?

11              MR. BYRD:  Object to form.

12              THE WITNESS:  I believe so, that --

13  obviously, approved videos identified by teachers,

14  identified by the curriculum department for at

15  least the ones that might be listed in the

16  curriculum.

17  BY MR. KEYES:

18         Q.   Have you ever advocated against

19  Harford County Public Schools allowing students to

20  access YouTube on district-issued devices?

21         A.   No.

22         Q.   Have you ever advocated against

23  Harford County Public Schools allowing students to

24  access YouTube on personal devices that are

25  connected to the district's network?

CONFIDENTIAL

Page 139

1              MR. BYRD:  Object to form.

2              THE WITNESS:  I haven't specifically,

3      no.

4      BY MR. KEYES:

5          Q.    Have you ever advocated for YouTube to

6      be removed as an approved resource in the

7      curriculum?

8          A.    No.

9          Q.    Have you ever advocated for YouTube to

10     be removed as a recommended resource in the

11     curriculum?

12         A.    No.

13             MR. BYRD:  Object to form.

14     BY MR. KEYES:

15         Q.    Have you ever advocated for teachers

16     to -- to not be allowed to assign YouTube for

17     homework?

18             MR. BYRD:  Object to form.

19             THE WITNESS:  No.

20     BY MR. KEYES:

21         Q.    Have you ever advocated for teachers to

22     not be allowed to use YouTube in the classroom?

23             MR. BYRD:  Object to form.

24             THE WITNESS:  No.

25     BY MR. KEYES:

CONFIDENTIAL

Page 140

```
 1          Q.   Have you ever advocated for
 2   Harford County Public Schools to stop using the
 3   YouTube channel?
 4          A.   No.
 5          Q.   Have you ever advocated for
 6   Harford County Public Schools to not include
 7   content on the YouTube channel that is targeted at
 8   students?
 9               MR. BYRD:  Object to form.
10               THE WITNESS:  No.
11   BY MR. KEYES:
12          Q.   Has the Board of Education encouraged
13   you to broaden Harford County Public Schools' use
14   of Facebook?
15               MR. BYRD:  Object to form.
16               THE WITNESS:  Not specifically, no.
17   BY MR. KEYES:
18          Q.   Has the Board of Education encouraged
19   you to broaden Harford County Public Schools' use
20   of Instagram?
21          A.   No.
22          Q.   Has the Board of Education encouraged
23   you to broaden Harford County Public Schools' use
24   of the YouTube channel?
25          A.   No.
```

CONFIDENTIAL

                                                    Page 141

1          Q.   Are you able to tell me, for the
2     current school year, the number of discipline
3     incidents that involve student use of social media?
4          A.   No.
5          Q.   Are you able to tell me the number of
6     discipline incidents that involve student use of
7     social media for any prior school year?
8          A.   Not specifically, no.
9          Q.   Are you able to tell me the -- for the
10    current school year, the number of discipline
11    incidents that involve student use of the
12    defendants' platforms?
13         A.   No.
14         Q.   Are you able to tell me the number of
15    discipline incidents that involve students' use of
16    defendants' platforms for any prior school year?
17              MR. BYRD:  Object to form.
18              THE WITNESS:  Defendants' platform for
19    any prior -- no.
20    BY MR. KEYES:
21         Q.   Are you able to tell me the number of
22    discipline incidents for any year that involve
23    students' use of cell phones or personal electronic
24    devices?
25              MR. BYRD:  Object to form.

                                              Page 142

 1              THE WITNESS:  No.

 2    BY MR. KEYES:

 3         Q.   Where would you go to get numbers about

 4    discipline incidents for students?

 5         A.   We maintain a database of discipline

 6    incidents for students.  The challenge for the

 7    questions you ask is they wouldn't all include

 8    information about the role social media might have

 9    played or devices might have played in those

10    incidents.

11         Q.   Meaning, there's no way to just run a

12    query of the database of discipline incidents for

13    students to identify which ones or how many

14    involved social media use in some way; is that

15    correct?

16         A.   Correct.  It wouldn't be that simple.

17              (BULSON EXHIBIT 9, Document titled

18    Mental Health Initiative, Bates HCPS_00000158-159,

19    was marked for identification.)

20    BY MR. KEYES:

21         Q.   I'm showing you what has been marked as

22    Bulson Exhibit 9.  This was produced to us with the

23    Bates Numbers HCPS_158 and 159.  Tell me when

24    you've at least familiarized yourself with this

25    document.

CONFIDENTIAL

1              (Discussion off the record.)

2              MR. BYRD:  Are we taking a break, or he

3      said just five more minutes?

4              MR. KEYES:  He said five more minutes.

5              MR. BYRD:  I gotcha.

6              MR. KEYES:  So I'll try to finish this

7      up, and then we can take a break.

8              MR. BYRD:  Okay.

9              THE WITNESS:  Okay.

10     BY MR. KEYES:

11         Q.   Have you read Bulson Exhibit 9?

12         A.   Yes, I have.

13         Q.   Okay.  Do you recognize it?

14         A.   Not specifically, no.

15         Q.   It's titled "Mental Health Initiative."

16         A.   Uh-huh.

17         Q.   It has a number of bullet points,

18     correct?

19         A.   Uh-huh.

20         Q.   Is that a "yes"?

21         A.   Yes.

22         Q.   And part of the bullet points is using

23     a social media campaign as part of this mental

24     health initiative?

25         A.   Yes.

Page 144

1          Q.    And the social media campaign can

2    highlight what mental health looks like, yes?

3          A.    Yes.

4          Q.    And talk about wellness?

5          A.    Yes.

6          Q.    And one of the bullet points is -- is

7    focused on social media, a different message on

8    each platform.  Do you see that?

9          A.    That's -- yes.

10          Q.    And then another bullet point is

11    "Snapchat, best way to reach students."  Do you see

12    that?

13          A.    I do.

14          Q.    Do you agree that Snapchat is the best

15    way to reach students?

16          A.    I honestly don't know.  That's -- I

17    don't know if this was produced by Christina -- I

18    saw her name in here somewhere -- or if this was

19    input from one of the students.  But I'm not an

20    expert on that, so I don't know.

21               But I would, to some degree, trust the

22    suggestions of the -- if it's the people I'm

23    thinking of who produced this, that would make

24    sense.

25          Q.    I'll represent it came from

CONFIDENTIAL

Page 145

1    Christina Alton's custodial file.

2           A.    Okay.  That makes sense.

3           Q.    You mentioned Christina?

4           A.    Yes, I did.

5           Q.    And who is Christina Alton?

6           A.    Christina Alton is our -- again, her

7    title?  Supervisor, mental health initiatives, I

8    think, is what she is.  Coordinator of -- I think

9    it's coordinator of mental health initiatives.  She

10   works in student support services.  She reports

11   ultimately to Bernard Hennigan.  And her entire

12   focus is mental health.

13          Q.    Did you have any conversation with

14   Christina Alton at any point about how social media

15   should not be used for a campaign about mental

16   health initiatives?

17          A.    No.

18          Q.    Did you have any conversation with

19   Christina Alton at any point about not using a

20   social media campaign for any initiative?

21          A.    No.

22          Q.    Do you have any recollection of this

23   social media campaign for this mental health

24   initiative?

25          A.    I don't recall specifically.  I

CONFIDENTIAL

Page 146

1    interact with Ms. Alton from time to time.  So I --
2    I honestly don't know what year this was.  There's
3    not a date.  But I -- I mean, I can tell you I have
4    not discouraged the use of social media for things
5    like this.
6              Q.    Based on the content of Bulson
7    Exhibit 9, do you recognize this to be a different
8    mental health initiative from the mental health
9    initiative we looked at before?
10             A.    Yeah, by nature of the fact that
11   Ms. Alton wasn't employed with us in this role when
12   this happened.
13             Q.    And when you say "this," you're
14   referring to --
15             A.    Sorry.
16             Q.    Yeah.
17             A.    Exhibit 7.  Is this what it was?  Yeah,
18   Bulson Exhibit 7.
19                   It was the initiative that was produced
20   by Christian Walker.  Ms. Alton joined our team
21   after Mr. Walker was -- well, after this year.  He
22   was a junior.  I don't remember exactly which year.
23   It's been a few years since she joined our team.
24             Q.    Okay.  So between Exhibit 7 and
25   Exhibit 9, we have documents talking about two

CONFIDENTIAL

Page 147

1    different mental health initiatives, yes?

2         A.   Yeah -- or -- I mean, different or

3    continuation, expansion on.  I mean, the work was

4    continuous.  It evolved.

5         Q.   All including as a component a social

6    media campaign?

7         A.   At least these two, yeah.  So that's

8    been a consistent element.

9         Q.   To get the message out about the

10   important components of mental health to students?

11             MR. BYRD:  Object to form.

12             THE WITNESS:  Yeah.  I mean, that

13   appears to be the intent, the idea that mental

14   health is an important topic for students to be

15   aware of, again, wanting to normalize conversations

16   around mental health and knowing that we -- we

17   needed to reach the students on the media where --

18   that they are consuming.

19             MR. KEYES:  I've been told we need to

20   change the tape.  So we'll take a break.  Off the

21   record.

22             THE VIDEOGRAPHER:  We are now going off

23   the record at 3:01 p.m.

24                       * * *

25             (Whereupon, there was a recess in the

CONFIDENTIAL

Page 148

1    proceedings from 3:01 p.m. to 3:14 p.m.)

2                        * * *

3           THE VIDEOGRAPHER:  We're now going back

4    on the record at 3:14 p.m.

5           (BULSON EXHIBIT 10, Executive

6    Leadership Team Agenda - 3/16/23, Bates

7    HCPS_00009831-835, was marked for identification.)

8    BY MR. KEYES:

9        Q.   Dr. Bulson, I'm handing you what has

10   been marked as Bulson Exhibit 10.  This document

11   was produced with the Bates Numbers HCPS_9831

12   through 9835.  This appears to be an agenda and

13   notes on an executive leadership team meeting on

14   March 16th, 2023.  I'll give you a chance to read

15   it.  Tell me when you're ready.

16       A.   Okay.  I think I've read it.  I've

17   scanned most of it, but I focused on some parts

18   more carefully than others.

19       Q.   Okay.  Do you recognize this document?

20       A.   I recognize the format of the document.

21   These are -- this is a pretty common version of our

22   executive leadership team notes.

23       Q.   How often do you meet with the

24   executive leadership?

25       A.   They meet every other week.  My

CONFIDENTIAL

Page 149

1   attendance is sporadic, just for other commitments.
2   And so, often, they'll meet without me.  But looks
3   like I was there that day.
4        Q.   If you attend, do you chair the meeting
5   or do you --
6        A.   No --
7        Q.   -- observe?
8        A.   -- I do not.  These were normally
9   chaired by Cornell Brown, who was there that day.
10  So he would have chaired this one.
11       Q.   What position did Cornell Brown have at
12  the time?
13       A.   He was assistant superintendent of
14  operations.
15       Q.   And who typically prepares notes of the
16  meetings?
17       A.   Cornell and his assistant, they --
18  he -- he actually keeps these -- this running notes
19  during the meetings.
20       Q.   And then does he distribute those notes
21  after the fact --
22       A.   Yes.
23       Q.   -- to attendees?
24       A.   Yes.
25       Q.   Does he include you as one of those

CONFIDENTIAL

Page 150

1  recipients when you've attended the meeting?

2        A.   Yes.

3        Q.   Does he include you as one of the

4  recipients when you don't attend the meeting?

5        A.   Yes.

6        Q.   When you get the -- the notes, do you

7  read them?

8        A.   Generally review them if I attended the

9  meeting or maybe scanned them if I attended the

10  meeting.  I'm more likely to read them if I did not

11  attend the meeting.

12        Q.   And if you read the notes and you see

13  something incorrect, do you follow up with

14  Mr. Brown?

15        A.   I haven't found that to be a problem,

16  so I don't recall an instance where I've done that.

17        Q.   Okay.  And this Exhibit 10 lists the

18  attendees.

19        A.   Yes.

20        Q.   Who is Patti Jo Beard?

21        A.   She is executive director of

22  facilities.  So she reports to -- or she --

23  Mr. Brown is no longer here, but she reports to the

24  current assistant superintendent of -- of

25  operations.

CONFIDENTIAL

Page 151

1          Q.    Who is Eric Davis?

2          A.    Eric Davis, at the time, chief of

3    administration.  He's been reclassified to deputy

4    of operations.  So he's deputy superintendent for

5    operations.

6          Q.    Who is Heather Kutcher?

7          A.    She is assistant superintendent,

8    curriculum, instruction and assessment.

9          Q.    What is that position?

10         A.    She oversees, essentially, all of our

11   curriculum and helps provide training for anyone

12   who -- anything related to curriculum and

13   instruction.  And the accountability team

14   Mr. Snyder is on currently reports to her as well.

15         Q.    And when there is a question of what

16   should be included or will be included in the

17   curriculum, who is the final decider?  Is it

18   Ms. Kutcher or you or someone else?

19         A.    Technically, the board approves all

20   curriculum based on the recommendation of the

21   superintendent.  In practice, the person most

22   responsible for bringing proposals, suggestions,

23   actions related to the curriculum are Ms. Kutcher.

24         Q.    Who is Michael O'Brien?

25         A.    Michael O'Brien is an executive

CONFIDENTIAL

Page 152

1    director of secondary schools in the office of

2    ed services.

3            Q.    Who is Benjamin Richardson?

4            A.    Assistant -- assistant superintendent

5    of human resources.

6            Q.    And finally, who is Renee Vaught?

7            A.    Renee Vaught is retired now.  She was

8    Mr. O'Brien's counterpart.  She's the executive

9    director of elementary instruction.

10           Q.    This appears to have an agenda of old

11   topics and new topics.

12           A.    Yes.

13           Q.    Do you see that?

14                 What is the difference between old

15   topics and new topics?

16           A.    Mr. Brown always maintained the -- the

17   topics, and often they'd be ongoing discussions.

18   So we would review each of the old topics, see if

19   there was anything new to add.

20                 Usually, his notes -- these aren't in

21   color, but usually his notes -- he color-codes the

22   new information that would have arisen in this

23   particular meeting's -- this particular meeting.

24                 So he'd update, usually, in red what

25   was new to the notes in that one.  And then, again,

CONFIDENTIAL

Page 153

1  new topics would be offered to him prior to the

2  meeting by any of the executive leadership team

3  members.

4          Q.    So old topics are topics that have been

5  discussed in a prior meeting, and they are

6  scheduled for a continued session?

7          A.    They tend to be ongoing.  Some -- he

8  will occasionally clear things out that we're no

9  longer discussing, but -- so most anything that's

10 considered an old topic has been discussed before

11 but is still an ongoing thing to discuss.

12         Q.    And if something is listed as a new

13 topic, that's a topic that someone has told

14 Mr. Brown in advance of the meeting I would like to

15 discuss?

16         A.    Correct.

17         Q.    Because it's the first time it's being

18 discussed, it's a new topic?

19              MR. BYRD:  Object to form.

20 BY MR. KEYES:

21         Q.    Is that fair?

22         A.    That's my -- yeah.  Yeah, it's the

23 first time being brought to executive leadership

24 team.

25         Q.    Okay.  One of the new topics listed

CONFIDENTIAL

Page 154

1    here is "YouTube/Student Device Use."  And in
2    parentheses, it says "(HK)."  Do you see that?
3          A.    Yes.
4          Q.    That's the initials for Heather
5    Kutcher?
6          A.    Yes.
7          Q.    And does that indicate, as you
8    understand his practice regarding note-taking, that
9    Ms. Kutcher is the one who requested that this
10   topic be added --
11         A.    Yes.
12         Q.    -- for discussion?
13               Okay.  If you turn to the page with the
14   Bates Numbers 9835 in the lower right-hand
15   corner --
16         A.    Uh-huh.
17         Q.    -- do you see the new topics on that
18   page?
19         A.    Yes.
20         Q.    And what is listed as New Topic Number
21   10 is titled "YouTube/Student Device Use."  Do you
22   see that?
23         A.    Uh-huh.  Yes, I do.
24         Q.    The -- the second bullet point --
25   actually, the first bullet point says:  Recent

CONFIDENTIAL

Page 155

1   position/action taken by YouTube concerning

2   accessibility to certain content by children under

3   13 have resulted in technology discussions

4   surrounding the acceptable access to YouTube and

5   devices at the elementary level.

6              Did I read that correctly?

7        A.   Yes.

8        Q.   Do you remember that issue coming up?

9        A.   Vaguely.  Vaguely.

10       Q.   What do you remember vaguely about that

11  issue?

12       A.   Well, again, just with a change and --

13  you know, again, these are the -- I think this

14  was -- it was kind of similar to many cases where

15  small changes in technology cause us to relook at

16  policy or practice -- I think it's probably more

17  practice than policy -- to understand how best

18  to -- you know, how much to use certain things

19  within the curriculum.  Do we need to make -- do we

20  need to change to different material?

21              And so, I mean, again, not a lot of

22  specifics about why we engage in this particular

23  conversation other than, you know, we were -- we

24  were dealing with a new -- with a change to how

25  YouTube, you know, provided access to certain

CONFIDENTIAL

Page 156

1    things.

2         Q.   The second bullet point says:

3    Discussion was had around best practice --

4         A.   Uh-huh.

5         Q.   -- and potential impact to teachers if

6    filters were put in place at all elementary

7    schools.

8              Did I read that correctly?

9         A.   Yes.

10        Q.   Was this a discussion about the impact

11   on teachers' ability to use YouTube if some kind of

12   additional filters were put in place at elementary

13   schools?

14        A.   Yeah, if it made it harder for them to

15   access material that they had identified as, you

16   know, helpful to the curriculum.  Let me put it

17   that way.

18        Q.   The -- the third bullet point says:

19   Schools are asking for guidance, and pushback has

20   been received by stakeholders around this topic.

21             Do you see that?

22        A.   Yes.

23        Q.   Is this reflecting the discussion at

24   this meeting that stakeholders were pushing back on

25   the idea of adding some kind of additional filters

CONFIDENTIAL

Page 157

1   for YouTube at the elementary schools?

2        A.   Yeah.  Again, not recalling the

3   specifics of the conversation, but, you know, from

4   the notes, gleaning that -- in this particular

5   case, "stakeholders" would be teachers, possibly

6   administrators speaking on behalf of teachers.

7             And to -- I mean, the best of my

8   understanding, it would have -- again, it would

9   have made it harder for them to access materials,

10  maybe materials that they'd used in the past that

11  they knew to be sort of acceptable and appropriate.

12  But knowing that filters are sometimes blunt

13  instruments, that makes it a little hard for them

14  to identify the materials they'd want to use.

15       Q.   You understand the reference to

16  "stakeholders" in this note to be to teachers?

17       A.   That's my understanding.  I can't think

18  of who else we would have heard from in this

19  particular setting.  I mean, there's a possibility

20  that Ms. Kutcher might have been referring to

21  others on her curriculum team who would be helping

22  create curriculum, but I suspect this -- in this

23  case it's more teachers, based on context here.

24       Q.   And so the reference to pushback by

25  stakeholders is a pushback by teachers in your --

Page 158

1      A.   Yeah, frustration that these changes
2  could make their job harder.
3      Q.   We want access to certain YouTube
4  content, and if you actually go forward with
5  additional filters, that's going to block content
6  that we want to use?
7           MR. BYRD:   Object to form.
8  BY MR. KEYES:
9      Q.   Is that your understanding?
10      A.   That's my understanding.
11      Q.   Okay.   The fourth bullet point says:
12  The discussion ended by reaching consensus that
13  teachers and other key stakeholders should be
14  engaged to obtain feedback before any change in
15  practice is made.   The need to, quote, "strike the
16  right balance," end quote, is the goal.   A plan of
17  action is TBD.
18           Did I read that correctly?
19      A.   Yes.
20      Q.   Okay.   Here, there's a reference to
21  "teachers and other key stakeholders."   What is
22  your understanding of who the other key
23  stakeholders are besides teachers?
24      A.   I would argue, most likely, folks from
25  our technology team.

CONFIDENTIAL

Page 159

1          Q.    Ms. Kutcher's staff?

2          A.    No, no, no.  Drew Moore's staff.

3          Q.    Oh, okay.

4          A.    And -- yeah, I don't think Drew would

5     have been in this meeting.  Drew reports to

6     Eric Davis.  So, you know, any action item related

7     to that would have gone out through Dr. Davis.

8               And, again, possibly the people who do

9     curriculum writing or curriculum development or

10    those who do PD around curriculum might have a --

11    might provide useful input here also.

12              But, again, in most cases, this is --

13    this is teachers with a handful of others.  But

14    probably that's the technology side.

15         Q.    It says:  A plan of action is TBD.

16              Is that "to be determined"?

17         A.    That would be my understanding.

18         Q.    Was this issue discussed at subsequent

19    meetings of the --

20         A.    I don't recall.

21         Q.    -- executive leadership team?

22         A.    I don't recall.  If it was, it would

23    have shown up on additional agenda, which probably

24    would have gone to you; or if there was a -- if

25    they sort of worked out a decision, that's

CONFIDENTIAL

Page 160

1    something that she might have recommended we not
2    include in other meetings.
3          Q.   This meeting took place in March of
4    2023.
5          A.   Yeah.
6          Q.   Are you aware of -- of Harford County
7    Public Schools making any change regarding
8    elementary-level students' access to YouTube since
9    March of 2023?
10          A.   I don't recall the specifics.  Again,
11    it's one of the many kind of moving targets in the
12    technology world for us.
13          Q.   Are you able to identify incremental
14    costs that Harford County Public Schools incurred
15    because of students' use of social media?
16                MR. BYRD:  Object to form.
17                THE WITNESS:  "Incremental costs"?
18    Again, I can speak to examples of why things would
19    have gotten more costly, but I'm not sure that
20    that's specifically what you're asking.
21                I mean, we provided the estimates
22    through the earlier exhibit.  But in terms of -- so
23    I guess I'm not clear what you're asking about,
24    beyond what's been provided in those exhibits.
25    BY MR. KEYES:

CONFIDENTIAL

Page 161

1    Q.    Sure.  Are you able to give me --

2    strike that.

3            Are you able to identify expenditures

4    of money by Harford County Public Schools because

5    of students' use of social media that it had not

6    incurred before?

7    A.    Let me suggest, I would -- I would know

8    where to look.  But, again, a lot of it would be

9    consistent with things that we shared in Exhibit,

10   whatever it was, Number 5 with the numbers on it.

11           You know, for example, purchasing

12   technology tools to help with filtering, you know,

13   I know that we've upgraded and changed, you know,

14   the tools we use there, you know, a handful of

15   times while I've been here trying to keep up with

16   the changing technology.

17           You know, I -- I think I've already

18   addressed a little bit the expenditures we've made

19   in safety and security, partly because of, you

20   know, increases in the amount of time we're dealing

21   with issues, some portion of which is connected to

22   social media.

23           So, again, I can -- I can anecdotally,

24   I think, produce some of that.  But in terms of the

25   specific numbers or amounts, I would definitely

CONFIDENTIAL

Page 162

1  defer to my teams who work most closely with that.

2      Q.   You identified technology tools and

3  safety and security measures.  Is there another

4  category you would add to the list?

5      A.   I mean, generally, I mean, as we talked

6  about, administrator time.  I think a big part of

7  the cost there is opportunity costs for them to be

8  able to do things related to focus on -- focusing

9  on instruction rather than on discipline and

10  student management.

11          It would probably be a similar cost

12  when we're talking about any educators.  The time

13  they're spending addressing conflicts that -- that

14  initiate on social media is -- is cutting into time

15  they're spending either providing instruction or

16  preparing for instruction.

17          So there's a lot of opportunity costs

18  that the dollar is hard to pin down, so it's more

19  lost productivity.  But -- and then regard to

20  specific costs, you know, purchasing things to help

21  with that, I would say that probably lives more in

22  the technology realm.

23      Q.   So you've identified what you call

24  "lost productivity," and you've identified lost

25  time.  My question, though, was:  Are you able to

CONFIDENTIAL

Page 163

1    identify expenditures of money by Harford County

2    Public Schools because of students' use of social

3    media that it had not incurred before?

4              And you identified technology tools and

5    safety and security measures.

6         A.    Yeah.  Earlier, we talked about

7    vandalism.  That was another cost.

8         Q.    Any other bucket?

9         A.    We've dramatically grown our mental

10   health resources to the degree to which we're

11   pushing -- that we're dealing with that.

12             Again, off the top of my head, you

13   know, the degree to which we're dealing with mental

14   health in our -- and the benefits we provide, to

15   the degree to which that's increasing our -- our,

16   you know, insurance costs, whether it's the stress

17   placed on teachers for some of the things they're

18   dealing with or -- you know, we also -- many of our

19   teachers have children in our schools, and we pay

20   for those costs.

21             So, I mean, I think it would show up in

22   a lot of different places.  And I think you could

23   speak to various expenditures.  I mean, I could

24   probably go down the list from that earlier exhibit

25   and identify things that I think would be

CONFIDENTIAL

Page 164

1    contributing in those areas.  But also in every

2    case, the -- the person responsible for filling

3    that out would probably have better specifics than

4    I would or at least a more comprehensive list.

5         Q.   Okay.  On the first bucket you

6    identify, technology tools, are you able to

7    identify any technology tool by -- by name?

8         A.   That's -- that's not a world where I

9    spend a lot of time.

10        Q.   Okay.

11        A.   You know, for example, I know, for -- I

12   mean, for me, it's more generic.  I, you know,

13   spoke to my head of technology recently about a

14   product I wasn't aware we were using.  But it was a

15   filtering product.  And he said, "Oh, yeah, we've

16   been using that one for four years."  Because I'll

17   occasionally meet and hear about various products

18   that are out there.

19              So, I mean, I can state confidently

20   that these expenditures have occurred, but down to

21   the -- the names and specifics, that is kind of

22   left to those experts.

23        Q.   Okay.  On the first bucket of

24   technology tools, are you able to identify any of

25   the technology tools by function?  You mentioned

CONFIDENTIAL

Page 165

1    filtering.

2                A.    I mentioned filtering.

3                Q.    Any other?

4                A.    Not that's jumping to mind right now.

5                Q.    Okay.

6                A.    I -- I -- because I don't believe

7    we're -- you know, I'm aware of tools that are out

8    there for monitoring students online.  I don't

9    believe we're using any of those.

10                I think one of the tools is actually

11   sort of one of those ones that looks for keywords

12   that appear in posts and things like that.  I

13   believe we're using something like that.  So I

14   don't know if that's the same as a filtering.  It's

15   a -- it's a different type of tool.

16                Q.    Were you finished?

17                A.    I think so.

18                Q.    Does Harford County Public Schools use

19   a filtering product now?

20                A.    Yes.

21                Q.    Do you know what the name is?

22                A.    I do not.

23                Q.    Do you know what the filtering product

24   does?

25                A.    Specifically?  Only generally.  No.  I

CONFIDENTIAL

Page 166

1    mean --
2              Q.    What's your general understanding --
3              A.    The --
4              Q.    -- of what the filtering product does?
5              A.    The idea --
6              Q.    Not -- not the one that you're [sic]
7    may purchase down the road.  The one you use now.
8              A.    Yeah.  No.  I mean, my understanding,
9    it's -- it's always looking for harmful content.
10   It's also looking for, you know, malicious content
11   that could do harm to the system.
12             Q.    And so --
13             A.    And it's trying to protect our sort of
14   network, data security from -- from sort of
15   malicious content but also filtering for
16   inappropriate content for the workplace and the
17   classroom.
18             Q.    And so is this filtering product then
19   restricting student access to websites and content
20   on the Internet?
21             A.    Students and staff.  And it's mostly
22   successful.
23             Q.    And do you know whether Harford County
24   Public Schools has a filtering product because it's
25   required by federal law to do so?

Page 167

1         A.    I don't know that I can speak to whose

2    laws we're complying with on that particular one.

3    But, you know, I -- I do know we have extensive

4    filtering products.  I just don't know the

5    authority for that specifically.

6         Q.    Isn't it true that even if social media

7    did not exist, Harford County Public Schools would

8    still need a filtering product to restrict

9    students' access to the rest of the Internet?

10             MR. BYRD:  Object to form.

11             THE WITNESS:  I'm not sure I'm the

12   expert who could speak to that.

13   BY MR. KEYES:

14        Q.    What is your understanding of what the

15   monitoring software monitors?  Did you say it

16   monitors students' online activity?

17        A.    I don't believe what we're using is

18   that -- I don't believe we're using one that does

19   students' sort of outside online activity.  I think

20   what we're using is something that's more internal

21   to our system.  But, again, on the specifics, I am

22   not the guy to answer those.

23        Q.    But is it monitoring what students

24   are -- are accessing or writing on their

25   district-issued devices?

CONFIDENTIAL

Page 168

1          MR. BYRD:  Object to form.  Foundation.
2    He's answered.
3          THE WITNESS:  Yeah, I -- I don't know
4    the answer to that question.
5    BY MR. KEYES:
6          Q.   Okay.
7          A.   I believe there is some monitoring of
8    what's happening on the district-issued because
9    they're running through our network.
10         Q.   Isn't it true that even if social media
11   did not exist, Harford County Public Schools would
12   still need some type of monitoring --
13         MR. BYRD:  Object --
14   BY MR. KEYES:
15         Q.   -- software --
16         MR. BYRD:  Object --
17   BY MR. KEYES:
18         Q.   -- to -- to monitor students' activity
19   online or using their district-issued device?
20         MR. BYRD:  Object to form.  You asked,
21   literally, that same question a few minutes ago.
22         THE WITNESS:  Well, and I just --
23         MR. KEYES:  No.
24         THE WITNESS:  I'm not sure I
25   understand --

Page 169

1          MR. KEYES:  Before I asked about a
2    filtering product.  Now I'm asking about the
3    monitoring.
4          MR. BYRD:  Okay.  Well --
5          MR. KEYES:  So it's literally not the
6    same question.
7    BY MR. KEYES:
8        Q.   Let me ask the question again.
9             Isn't it true that even if social media
10   did not exist, Harford County Public Schools would
11   still need some type of monitoring software to
12   monitor students' activity online using their
13   district-issued device?
14          MR. BYRD:  Object to form.  Foundation.
15          THE WITNESS:  I -- I honestly don't
16   know that I can answer the specifics.  I -- I -- we
17   would probably need some form of monitoring, but I
18   can't -- it -- it's hard to envision a world
19   without any social media.
20   BY MR. KEYES:
21       Q.   Okay.  The second bucket you mentioned
22   are safety and security measures?
23       A.   Uh-huh.
24       Q.   You said, "some portion of which is
25   connected to social media."

CONFIDENTIAL

Page 170

```
 1        A.   Because, yes, we've -- we've increased
 2   our safety and security staff significantly in the
 3   last two years.
 4        Q.   What portion of Harford County Public
 5   Schools' expenditures on safety and security
 6   measures are attributable to social media?
 7        A.   For me, it's hard to calculate that
 8   portion because I said -- you know, when we're
 9   dealing with, I mean, fights, any sort of
10   disciplinary infractions, anything, there is very
11   often a social media component where a conflict
12   might start on social media.
13             So the fact that we have experienced an
14   increase in those areas, it's hard to specifically
15   attribute it, at least for me in my experience to
16   specifically attribute it.  Again, I would rely on
17   my experts who are closer to the field on that in
18   their day-to-day experiences.
19             But, again, historically, my experience
20   as an administrator, you know, many of our
21   conflicts start outside of school, very frequently
22   through a social media interaction, and then they
23   turn into incidents in school.
24             And so as we're seeing increased
25   incidents, you know, there's some percentage.  It's
```

CONFIDENTIAL

Page 171

1    just hard to -- for me personally to calculate

2    that.

3            Q.    Separate from students promoting fights

4    on social media or engaging in some kind of

5    conflict through posts on social media, do you see

6    a basis for attributing any of Harford County

7    Public Schools' expenditures on safety and security

8    measures to social media?

9            MR. BYRD:  Object to form.

10            THE WITNESS:  Again, I think it's hard

11    to tease out.  I feel like I've kind of said this

12    in a bunch of different ways.

13            You know, we hire safety and security

14    to -- to address the varying safety and security

15    threats we have.  Some are very much connected to

16    social media.  Some are, you know, other things

17    that don't involve it, but -- again, but I feel

18    like I've sort of said this a bunch of different

19    ways.  So I'm not quite sure what nuance you're

20    seeking here.

21    BY MR. KEYES:

22            Q.    Well, I -- I get that there are some

23    security threats that are not connected to social

24    media.  I get that there are some security threats

25    that are connected to social media because social

CONFIDENTIAL

Page 172

1    media is the vehicle by which students are
2    promoting fights or escalating conflict in some
3    way.
4            A.   Uh-huh.
5            Q.   Okay.  I'm asking whether -- separate
6    from students using social media as the vehicle to
7    promote fights or escalate conflicts, is there some
8    other reason you would attribute safety and
9    security measures to social media?
10              MR. BYRD:  Object to form.
11              THE WITNESS:  Not offhand in this
12   moment.
13   BY MR. KEYES:
14           Q.   Okay.  You -- you mentioned vandalism.
15           A.   Uh-huh.
16           Q.   I did ask you about vandalism before.
17           A.   Uh-huh.
18           Q.   I just wanted to make sure, since we
19   talked about it earlier today, you've not thought
20   of some other vandalism that you understand is
21   attributable to social media; is that correct?
22           A.   No, I haven't gone -- yeah, reflecting
23   on this.  There hasn't been a lot of time.
24           Q.   Okay.  And you talked about the growing
25   resources for addressing mental health issues?

CONFIDENTIAL

Page 173

1          A.    Correct.

2          Q.    You acknowledge that lots of students

3    have mental health issues that aren't connected to

4    social media, correct?

5               MR. BYRD:  Object to form.

6               THE WITNESS:  I think it's hard for me

7    to determine where the connection to social media

8    might -- I don't -- we know that the social -- that

9    the mental health issues exist.  I think it's --

10   it -- it's challenging to know how much to

11   attribute to social media.

12               I think it -- and I'm not a mental

13   health expert/clinician in that area.  So I'm

14   certain some mental health issues are in no way

15   connected to social media, but I couldn't -- I

16   couldn't find the line.

17               MR. KEYES:  I'm keeping my eye on the

18   clock here.

19   BY MR. KEYES:

20          Q.    Do you use YouTube?

21          A.    Yes.

22          Q.    Do you have a YouTube account?

23          A.    Yes, I think so.

24          Q.    When did you first set up the YouTube

25   account?

CONFIDENTIAL

Page 174

1            A.    Oh, I have no idea.

2            Q.    Months ago?  Years ago?

3            A.    Years.

4            Q.    How often do you use YouTube?

5            A.    Probably, now, weekly.  Sometimes more

6      than weekly.

7            Q.    When was the last time you used it?

8            A.    Last week maybe.

9            Q.    And --

10           A.    Last -- best of my recollection.

11           Q.    What -- what are the ways you use

12     YouTube?

13           A.    One of my favorite ways is, you know,

14     related to music, concerts, musicians, that sort of

15     thing.

16           Q.    Okay.

17           A.    Watching, you know -- searching for

18     videos related to that personally.

19           Q.    What else?

20           A.    That's really the biggest.  I mean, I

21     also do use it, occasionally, professionally.  I

22     always review the school system YouTube.

23                 There are some situations where I'll

24     consume YouTube in the context of a conference or a

25     training.  So it has instructional value in

CONFIDENTIAL

Page 175

1   addition to just straight-up entertainment value.

2           Q.   When you say you review the school

3   system YouTube, you mean you go to the Harford

4   County Public Schools --

5           A.   Yeah.  When we produce --

6           Q.   -- YouTube --

7           A.   -- a video, you know, if it's -- you

8   know, for example, I -- every Thursday we send out

9   kind of a system update to all staff.  Every Friday

10  we send out a -- a similar system update to our

11  board and some community members.  We often embed

12  videos.

13          You know, today I reviewed the -- the

14  system message to the board.  It included a video

15  that we produced last week for Teacher Appreciation

16  Week.

17          Q.   That's a video that Harford County

18  Public Schools' staff produced --

19          A.   Produced.

20          Q.   -- and then posts to the YouTube

21  channel?

22          A.   Yes.

23          Q.   And to draw attention to it among

24  staff, the Board of Education, others, you send an

25  email that embeds the video or a link to the video?

CONFIDENTIAL

Page 176

1          A.    Yeah.  I mean, specifically, what we do
2     is we produce a Smore and then include YouTube
3     videos in that format.
4               So it's -- we essentially provide a web
5     link where people get updates on a wide variety of
6     topics.  And in some cases, they include videos
7     that, you know, take -- take you to the YouTube
8     channel.
9          Q.    Is there any other way you typically
10    consume content on YouTube?
11         A.    Not necessarily.
12         Q.    Do you have a Facebook account?
13         A.    I do.
14         Q.    Do you have an Instagram account?
15         A.    I do.
16         Q.    Do you have a TikTok account?
17         A.    I think technically I do.  I think I've
18    been in it twice.
19         Q.    Do you have a Snapchat account?
20         A.    No.
21         Q.    When did you set up the TikTok account?
22         A.    Within the last two years.  Like I
23    said, I -- I don't recall the reason, whether
24    someone sent me a link that I wanted to view;
25    because I didn't have the account, I had to set up

CONFIDENTIAL

Page 177

1    the account to view it.  I don't recall
2    specifically why.
3            Q.   When was the last time you looked at
4    your TikTok account?
5            A.   It's been months.  I couldn't tell you
6    for sure.
7            Q.   Okay.  When did you set up your
8    Facebook account?
9            A.   That's been much longer.  I've had a
10   Facebook account -- I couldn't begin to tell you.
11   It's been quite some time.
12           Q.   More than five years ago?
13           A.   More than five years ago.
14           Q.   More than ten years ago?
15           A.   Yes.
16           Q.   More than 15 years ago?
17           A.   Probably more than 20 years ago, but
18   after that I'm not sure.
19           Q.   And why did you set it up?
20           A.   Again, at the time, it was -- it was a
21   place where a lot of people were consuming
22   information.  I think I was a little bit late to
23   join.
24                I was a school system administrator,
25   and, you know, school systems were kind of getting

CONFIDENTIAL

Page 178

1  in the business of having Facebook accounts.  I've

2  never been a particularly active participant or

3  poster there, but, you know, occasionally, I'll

4  look.

5          Q.    So -- so how often do you view your

6  Facebook account?

7          A.    I'll occasion -- you know, every couple

8  of weeks because I -- I still occasionally will get

9  updates when friends or -- you know, people who

10  I've friended on Facebook, when they post, I'll

11  occasionally get updates.  Every now and then, I'll

12  look at it.  More often than not, I don't.

13          Q.    When was the last time you looked at

14  your Facebook account?

15          A.    Two weeks.

16              MR. BYRD:  Object to form.

17  BY MR. KEYES:

18          Q.    And do you post on your Facebook

19  account?

20          A.    I can't recall the last time I posted.

21          Q.    Have you ever?

22          A.    Yes.  There's a limited number of posts

23  there, but over the years it's very, very few.

24          Q.    And when did you set up your Instagram

25  account?

Page 179

1          MR. BYRD:  Object to form.

2          Don't defendants already have the

3    ability to get all this information you're asking?

4    You know, it's Instagram.  As well as --

5          MR. KEYES:  I don't -- I don't think

6    so.

7          THE WITNESS:  Anyway --

8          MR. KEYES:  I -- I can't just go to --

9          MR. BYRD:  All right.

10         MR. KEYES:  -- one of these companies

11   and say, "Give me the information on Ken Byrd."

12   BY MR. KEYES:

13        Q.   When did you set up your Instagram

14   account?

15        A.   I'm trying to think how far back.  It's

16   probably in the 20-years-ago range, too.  Not

17   knowing when they started, I probably joined

18   Instagram sooner after it was founded than

19   Facebook, but I wasn't an early adopter.

20        Q.   Why did you set up this account with

21   Instagram?

22        A.   Again, it's an opportunity to engage in

23   the sharing that was in that network.  Again, in

24   all those years, I probably have 30 or 40 posts.

25        Q.   And how often do you view your

CONFIDENTIAL

Page 180

1    Instagram account?

2              MR. BYRD:  Object to form.

3              THE WITNESS:  Lately, very rarely.

4    That's -- I mean, I might have looked at it two or

5    three times in the last few months.

6    BY MR. KEYES:

7         Q.   When was the last time you looked at

8    it?

9         A.   I can't recall.  Maybe last week,

10   although I'm not sure.

11        Q.   Do you have kids?

12        A.   Yes.

13        Q.   How -- how old are your kids now?

14        A.   My daughter -- I have one child.  She's

15   about to turn 21.

16        Q.   When she was in middle school, did she

17   have a cell phone?

18        A.   In middle school, yes.

19             MR. BYRD:  Object to form.  Relevance.

20   I know you've done this in all the cases.  But

21   that's my objection.  You can go on.

22   BY MR. KEYES:

23        Q.   And did she continue using a cell phone

24   in high school?

25        A.   Yes.

CONFIDENTIAL

Page 181

1          Q.    Has she had a YouTube account?

2          A.    I presume so.  I don't know if she had

3     a specific account.  At first, she shared most of

4     her accounts with my wife originally, and I assume

5     she has one now.

6          Q.    Did she have one in high school?

7          A.    Again, I don't know when it would have

8     switched from my wife to my daughter.

9          Q.    Okay.

10         A.    My wife managed most of that.

11         Q.    Did your daughter have a Facebook

12    account in high school?

13         A.    I believe so.

14         Q.    Did she have a Facebook account in

15    middle school?

16         A.    I don't think so, but I don't recall.

17         Q.    Did your daughter have an Instagram

18    account in high school?

19         A.    Yes.

20         Q.    Did she have an Instagram account in

21    middle school?

22         A.    Again, I don't recall.  I don't know

23    when what started.  It didn't start right away.

24         Q.    Did your daughter have a TikTok account

25    in high school?

CONFIDENTIAL

Page 182

1          A.    Yes.

2          Q.    Did she have a TikTok account in middle

3     school?

4          A.    Again, I don't know when that started.

5          Q.    Did your daughter have a Snapchat

6     account in high school?

7          A.    I believe so, yes.

8          Q.    Did she have a Snapchat account in

9     middle school?

10          A.    Again, don't know.

11          Q.    So do you know when she first started

12    having a Facebook account, an Instagram account,

13    TikTok account or a Snapchat account?

14          A.    Again, as I've said, just completely to

15    herself that wasn't shared with my wife, I know

16    she's had those through high school.  I -- I don't

17    know when that transitioned over.

18          Q.    When she had a cell phone in middle

19    school, did you or your wife impose limits on how

20    she could use it?

21               MR. BYRD:  Object to form.

22               THE WITNESS:  Yes.

23    BY MR. KEYES:

24          Q.    What were the limits you imposed on her

25    use of her cell phone in middle school?

Page 183

1        A.    I believe she got her phone in

2   7th grade.  And the first requirement for having a

3   phone is that we could review it at any time with

4   no -- you know, no arguments.  She has always

5   shared an account with my wife.  So my wife could

6   see her texts, her call logs and --

7        Q.    And her --

8        A.    Well --

9        Q.    -- social media activity?

10        A.    She didn't -- she would be -- there was

11   an expectation that -- for example, Instagram, she

12   was always a friend on Instagram so she could

13   always see the social media activity in Instagram

14   also.  So the degree -- how that was managed in the

15   others -- but the short answer is yes.

16        Q.    Okay.  Did you impose any limits on

17   when she could use her cell phone during the day,

18   either such that there were times when the phone

19   couldn't be accessed or limits on how much time she

20   could spend on her phone?

21        A.    We never specified that.

22        Q.    Okay.  And so was that the case

23   throughout her time in middle school and high

24   school, is there were no time limits?

25        A.    Correct.

CONFIDENTIAL

Page 184

1          Q.    Why not?  Why not impose time limits on

2    her use of her cell phone?

3          A.    If we sensed there were concerns, we

4    would have addressed it.  Early on, she had limits

5    on the amount of data she could use.  It wasn't

6    until later that we, you know, allowed that to be

7    more available, because we would monitor that as

8    well.

9               But I don't -- again, don't know when

10   that switched over.  Again, at the time, we -- we

11   felt like we had enough visibility in -- to -- to

12   see what she was doing and monitor what she was

13   doing.

14         Q.    Were there any parental controls that

15   you considered using but then decided not to?

16              MR. BYRD:  Object to form.

17              THE WITNESS:  Yeah, again, not that I

18   recall.  I mean, we used a number of parental

19   controls early on, if I recall.  But, again, I

20   can't speak to specifically platforms, because,

21   again, much of that negotiation happened between my

22   wife and my daughter.

23   BY MR. KEYES:

24         Q.    So when you refer to the parental

25   controls you used, were those controls at the

CONFIDENTIAL

Page 185

1    device level on the cell phone or were they within

2    the social media accounts?

3            A.    Again, I don't have the details related

4    to that.

5            Q.    Okay.  So -- but you said before,

6    "We used a number of parental controls early on."

7    Do you -- do you --

8            A.    It was -- it was --

9            Q.    Can you identify any of those for me

10   now?

11           A.    Well, when I think of parental

12   controls, I think about, you know, when you have a

13   TV account, there was a children's account, and she

14   could only use the children's account.

15                 Like I said, my wife had the controls

16   of being able to access -- like, the texts appear

17   in both places, those sorts of things.  So those,

18   to me, were parental controls.

19                 Specific to the platforms, I know we

20   restricted her ability to get accounts for some

21   time.  I know some of the accounts started in high

22   school.  But I don't know the degree that we went

23   in and required specific controls used within

24   those.

25                 I mean, at first, we did limit even

CONFIDENTIAL

Page 186

1   what she was able to add to her phone.  So, to a

2   degree, that's a control in its own right.

3        Q.   Okay.  So do you recall imposing any

4   content restrictions on her cell phone when she was

5   in middle school?

6        A.   Again, the only place I recall -- I

7   don't recall having specific conversations about

8   that.  I remember doing it with her access to TV,

9   like Netflix and those sorts of things.  But that's

10  not part of this conversation.

11            So, specific to the social media, I --

12  I don't know the answer to that.

13  BY MR. KEYES:

14       Q.   Let me show you what has been marked as

15  Exhibit Bulson 11.

16            MR. KEYES:  I've been handed a note

17  it's 4 p.m.  You said you had a hard stop --

18            THE WITNESS:  Yeah, I -- I --

19            MR. KEYES:  -- at 4 p.m., and so how

20  hard a hard --

21            THE WITNESS:  Pretty --

22            MR. KEYES:  -- stop is this?

23            THE WITNESS:  It depends on what we're

24  looking at.  It's a pretty hard stop I have.

25            MR. BYRD:  How long do you think you

CONFIDENTIAL

Page 187

1   have?

2                  THE WITNESS:  I just --

3                  MR. KEYES:  With -- with the proviso

4   that I'm terrible at time estimates -- and I've

5   said that in --

6                  MR. BYRD:  Yeah.

7                  MR. KEYES:  -- every deposition -- my

8   guess is an hour to an hour and a half.

9                  THE WITNESS:  Yeah, that's not

10  possible.

11                 MR. KEYES:  Okay.  I want to respect

12  your time.

13                 Can we go off the record?

14                 MR. BYRD:  Yeah.

15                 MR. KEYES:  Okay.

16                 MR. BYRD:  Well, I mean, are we --

17  don't -- huh?

18                 THE VIDEOGRAPHER:  I've got to read us

19  off.

20                 We're now going off the record at

21  3:59 p.m.

22                           * * *

23                 (Whereupon, there was a recess in the

24  proceedings from 3:59 p.m. to 4:05 p.m.)

25                           * * *

CONFIDENTIAL

Page 188

1              (Exhibit 11 was not marked at this

2      time.)

3              MR. KEYES:  We're back on the

4      stenographic record.  Dr. Bulson has a hard stop at

5      4 p.m.  We're respecting the hard stop.  We've

6      agreed to resume and finish the deposition on

7      Thursday, May 15th, at 1:30 here at the same

8      location.  We'll finish in 90 minutes or less, and

9      I'll do my best to make it shorter.  Is that fair?

10              MR. BYRD:  That's fair.  Thank you.

11              MR. KEYES:  Thank you.

12              (WHEREUPON, the deposition was

13      concluded at 4:05 p.m.)

14              (Signature Reserved.)

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 189

1              DEPOSITION ERRATA SHEET

2

Case Caption:  In Re:  Social Media Adolescent

3    Addition/Personal Injury Liability Litigation

4         DECLARATION UNDER PENALTY OF PERJURY

5

6              I declare under penalty of perjury that

7    I have read the entire transcript of my deposition

8    taken in the captioned matter or the same has been

9    read to me, and the same is true and accurate, save

10   and except for changes and/or corrections, if any,

11   as indicated by me on the DEPOSITION ERRATA SHEET

12   hereof, with the understanding that I offer these

13   changes as if still under oath.

14

15

16              Signed on the _____ day of

17          _____, 20___.

18

19

20          _____

21              SEAN W. BULSON, Ed.D.

22

23

24

25

CONFIDENTIAL

Page 190

1                DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24            SEAN W. BULSON, Ed.D.

25

CONFIDENTIAL

Page 191

1                DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24            SEAN W. BULSON, Ed.D.

25

CONFIDENTIAL

Page 192

1                    CERTIFICATE OF REPORTER
2
          I, Cindy A. Hayden, Registered Merit
3    Reporter and Notary Public for the State of
     Maryland, do hereby certify:
4
          That the foregoing deposition was taken
5    before me on the date and at the time and location
     stated on Page 1 of this transcript; that the
6    deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the
7    testimony of the deponent and all objections made
     at the time of the examination were recorded
8    stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed
9    is a true, accurate and complete record of the
     testimony of the deponent and of all objections
10   made at the time of the examination to the best of
     my ability.
11
          I further certify that I am neither related
12   to nor counsel for any party to the cause pending
     or interested in the events thereof.  Witness my
13   hand, this 12th of May, 2025.
14
15
16   _____
17   Cindy A. Hayden,
     Registered Merit Reporter
18   Notary Public
     State of Maryland
19   My Commission expires:
     April 26, 2029
20
21
22
23
24
25