**Exhibit 15**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3   IN RE: SOCIAL MEDIA ADOLESCENT  )
    ADDICTION/PERSONAL INJURY       ) MDL No.
4   PRODUCTS LIABILITY LITIGATION   ) 4:22-md-3047-YGR
    _____)

5

    THIS DOCUMENT RELATES TO:       )
6                                   )
    BOARD OF EDUCATION OF HARFORD   )
7   COUNTY V. META PLATFORMS INC.,  )
    ET AL.                          )
8                                   )
    CASE NO.: 4:23-CV-03065         )

9

10

11        VIDEOTAPED DEPOSITION BERNARD HENNIGAN

12        Harford County Public Schools Central

13             Administration Building

14          102 South Hickory Avenue,

15              Bell Air, Maryland

16         Wednesday, May 7, 2025, 2:21 p.m.

17

18

19

20

21

22

23

24

25

Page 2

```
 1    APPEARANCES:
 2    For Plaintiff:
 3              BY: MATTHEW P. LEGG, ESQ. (VIA ZOOM)
              Brockstedt Mandalas Federico LLC
 4              2850 Quarry Lake Drive - Suite 220
              Baltimore, Maryland 21209
 5              410.421.7777
              mlegg@lawbmf.com
 6
 7    For Plaintiff:
 8              BY:  KENNETH S. BYRD, ESQ.
              BY:  KELLY McNABB, ESQ. (VIA ZOOM)
 9              Lieff Cabraser Heimann & Bernstein
              250 Hudson Street, 8th Floor
10              New York, New York 10013
              212.355.9500
11              kbyrd@lchb.com
              kmcnabb@lchb.com
12
13    For the Defendants Meta Platforms, Inc., f/k/a
      Facebook, Inc.; Facebook Holdings, LLC; Facebook
14    Operations, LLC; Facebook Payments, Inc.; Facebook
      Technologies, LLC; Instagram, LLC; Siculus, Inc.;
15    and Mark Elliot Zuckerberg:
16              BY:  SCOTT JAMES, ESQ.
              BY:  EBEN S. FLASTER, ESQ. (Philadelphia)
17              BY:  RANA FREEMAN, ESQ. (VIA ZOOM)
              Shook, Hardy & Bacon LLP
18              JPMorgan Chase Tower
              600 Travis Street, Suite 3400
19              Houston, Texas 77002
              713.227.8008
20              sjames@shb.com
              eflaster@shb.com
21              rfreeman@shb.com
22
              (Appearance continued on next page.)
23
24
25
```

```
 1              APPEARANCES CONTINUED:
 2
     For the Defendant Snap:
 3
               BY:  ALEX INGOGLIA, ESQ. (VIA ZOOM)
 4             Kirkland & Ellis LLP
               333 West Wolf Point Plaza
 5             Chicago, Illinois 60654
               312.862.1083
 6             alex.ingoglia@kirkland.com
 7
     For the Defendants Alphabet Inc., Google LLC, and
 8   YouTube LLC:
 9             BY:  J. ANDREW KEYES, ESQ.
               BY:  LYDIA WEIANT, ESQ.
10             Williams & Connolly LLP
               680 Maine Street SW
11             Washington, DC 20024
               202.434.5584
12             akeyes@wc.com
               lweiant@wc.com
13
14   For the Defendants TikTok, Ltd.; TikTok, LLC;
     TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
15
               BY:  ADAM REINKE, ESQ. (VIA ZOOM)
16             King & Spalding LLP
               1180 Peachtree Street, NE
17             Suite 1600
               Atlanta, Georgia 30309
18             404.572.2774
               areinke@kslaw.com
19
20   Also Present:  Bradley Loy, Videographer
                    Jacob Arndt, Exhibit Technician
21                  Lauren R. Drive, Deputy General Counsel
                    Harford County Public Schools
22
23
24
25
```

Page 4

```
1                    I N D E X
2                                              PAGE
3   EXAMINATION BY MR. KEYES                      5
4   EXAMINATION BY MR. BYRD                      126
5   EXAMINATION BY MR. KEYES                     141
6
7                  E X H I B I T S
8
9   NUMBER              DESCRIPTION            PAGE
10
    EXHIBIT 1    Resume of Bernard Hennigan       8
11
    EXHIBIT 2    Plaintiff Board of Education     47
12               of Harford County's Amended
                 Objections and Responses to
13               Defendants' Interrogatories
                 (Set 3)
14
    EXHIBIT 3    2021-2022 Maryland YRBS/YTS      64
15               Adverse Childhood Experiences
                 Overview, July 17, 2023
16
    EXHIBIT 4    Emails dated 4/21/21, Subject:  102
17               MSDE Report, Bates
                 HCPS_00199774-777
18
    EXHIBIT 5    Document titled Mental Health   106
19               Statistics and Initiatives in
                 HCPS
20
21
22
23
24
25
```

```
                                                 Page 5
 1                P R O C E E D I N G S
 2                        * * *
 3              THE VIDEOGRAPHER:  We are now on the
 4   record.
 5              My name is Bradley Loy.  I'm a
 6   videographer for Golkow, a Veritext division.
 7              Today's date is May 7th, 2025.  The
 8   time is 1421.
 9              This video deposition is being held in
10   Bel Air, Maryland, in the matter of Social Media
11   Adolescent Addiction/Personal Injury Products
12   Litigation for the U.S. District Court, Northern
13   District of California.
14              The deponent is Bernard Hennigan.
15              Counsel will be noted on the
16   stenographic record.
17              The court reporter is Cindy Hayden and
18   will now swear in the witness.
19                        * * *
20                BERNARD HENNIGAN,
21     having been first duly sworn, was examined and
22                testified as follows:
23                        * * *
24                EXAMINATION
25   BY MR. KEYES:
```

```
                                            Page 6
 1          Q.   Good afternoon, Mr. Hennigan.  We've
 2     met before.  But for the record, my name is Andrew
 3     Keyes.  I'm an attorney with the law firm of
 4     Williams & Connolly, and we represent the Google
 5     and YouTube defendants.
 6               Well, would you please state your full
 7     name for the record?
 8          A.   Bernard Paul Hennigan.
 9          Q.   And do you understand that you are
10     still under oath?
11          A.   Yes.
12          Q.   Do you understand that you are still
13     under oath and giving testimony as if you were in a
14     courtroom before a judge and a jury?
15          A.   Yes.
16          Q.   Have you ever given a deposition before
17     today?
18          A.   No.
19          Q.   Have you ever given testimony under
20     oath before today?
21          A.   Yes.
22          Q.   How many times?
23          A.   Many.
24          Q.   In what setting or settings?
25          A.   As a pupil personnel worker in
```

Page 7

1    Baltimore County Public Schools, I would charge
2    parents with failure to send child to school and
3    have to represent the district in court for those
4    cases.
5        Q.    How many times did you do that?
6        A.    Hundreds.
7        Q.    Separate from those occasions where you
8    testified in a court as a pupil personnel worker,
9    have there been other circumstances where you've
10    testified under oath?
11        A.    I don't think so.
12        Q.    I took your deposition earlier today as
13    Harford County Public Schools' corporate
14    representative on a number of topics.
15            And you told me that to prepare for
16    that deposition, you met with counsel three times
17    for roughly three hours and you reviewed three
18    documents:  the complaint, the list of topics for
19    which you were the designated corporate
20    representative and an interrogatory answer.
21            I understand you reviewed that before
22    today.  Did you review anything else to prepare for
23    your deposition as a fact witness, where you're
24    testifying as Mr. Hennigan as opposed to testifying
25    as Harford County Public Schools?

Page 8

```
 1          A.    No.
 2          Q.    Have you ever asked any of the
 3   defendants in this case to modify any feature or
 4   function of any of their platforms?
 5          A.    Me personally?
 6          Q.    Yes.
 7                MR. BYRD:  Object to form.
 8                You can answer.
 9                THE WITNESS:  No.
10   BY MR. KEYES:
11          Q.    Have you asked anyone else to do so?
12          A.    No.
13          Q.    Have you ever asked any of the
14   defendants to discontinue any of the features or
15   functions of their platforms?
16          A.    No.
17          Q.    Have you asked anyone else to do so?
18          A.    No.
19          Q.    Have you ever spoken with any
20   representative of any of the defendants about any
21   of their features or functions on their platforms?
22          A.    No.
23          Q.    Have you ever spoken with any
24   representative of any of the defendants about
25   anything?
```

Page 9

1          A.    I don't believe so.

2                (HENNIGAN EXHIBIT 1, Resume of Bernard

3      Hennigan, was marked for identification.)

4      BY MR. KEYES:

5          Q.    I'm showing you what has been marked as

6      Hennigan Exhibit 1.  What is this?

7          A.    It looks like my resume.

8          Q.    Is this something you prepared?

9          A.    Yes.

10         Q.    When did you last update it?

11         A.    Well, based on the title change, it

12     would have been within the last month.  My current

13     title has recently changed.

14         Q.    Your current title is assistant

15     superintendent of student support services?

16         A.    Yeah.  It -- it's just -- just because

17     I said earlier I was the executive director, it's

18     kind of weird.  I don't even know if this is in

19     effect now or till July 1st.  But I think this is

20     official.

21                We've had a reorganization.  Our --

22     nothing has changed about my job or my pay.  Just

23     the title.

24         Q.    Okay.

25         A.    But we had a -- we did a whole

Page 10

1    reorganization, and some positions are, quote,
2    unquote, effective.  So I think this is my current
3    title.
4         Q.   You've been employed by Harford County
5    Public Schools since January of 2017?
6         A.   Yes, sir.
7         Q.   And your first position was as the
8    executive director of student services?
9         A.   The director of student services?
10        Q.   I'm sorry.  The director of student
11   services?
12        A.   Yes.  And then --
13        Q.   And then you became the executive
14   director of student support services?
15        A.   Correct.
16        Q.   And then, at some point, you became the
17   assistant superintendent of student support
18   services; is that right?
19        A.   Yes.  I think it's official now.
20        Q.   When you got the new title assistant
21   superintendent of student support services, did you
22   get any added responsibilities compared to the
23   responsibilities you had with the prior title?
24        A.   No.
25        Q.   When you got the title of executive

Page 11

1  director of student support services back in

2  July of 2019, did you get any added

3  responsibilities compared to the responsibilities

4  you had when you were the director of student

5  services?

6          A.   Yes.

7          Q.   And what was the difference, then, in

8  responsibilities?

9          A.   So as a director of student services, I

10 oversaw our student services department, which is

11 our counselors, nurses, psychologists, PPWs, social

12 workers.

13          When I became the executive director,

14 Title I and special education came under my purview

15 and then, eventually, community schools.

16          Q.   When you were the director of student

17 services, to whom did you report?

18          A.   The superintendent.  No.  Sorry.  When

19 I first started here, I reported to the executive

20 director of ed services.

21          Q.   Who was that when you first --

22          A.   Joe Schmitz.

23          Q.   And did you report to him throughout

24 the time you were the director of student services?

25          A.   Yes.

Page 12

```
 1          Q.    When you became the executive director
 2    of student support services, who did you report to?
 3          A.    The superintendent.
 4          Q.    And do you still report to the
 5    superintendent as an assistant superintendent of
 6    student support services?
 7          A.    Yes.  For the time being.
 8          Q.    Do you anticipate that changing?
 9          A.    I believe July 1st part of the
10    reorganization is I will report to a deputy
11    superintendent.
12          Q.    Who will that be?
13          A.    Dyann Mack, Dr. Dyann Mack.
14          Q.    And what position will she have?
15          A.    The deputy superintendent.
16          Q.    What will be within her portfolio as
17    deputy superintendent?
18          A.    She will oversee my office, the office
19    of education services and the office of curriculum.
20    I don't think that's official until July 1st.
21          Q.    Have you ever worked as a teacher in
22    Harford County Public Schools?
23          A.    No.
24          Q.    Have you ever been an assistant
25    principal in Harford County Public Schools?
```

Page 13

1          A.    No.

2          Q.    Have you ever been a principal in

3    Harford County Public Schools?

4          A.    No.

5          Q.    Have you ever worked in the IT

6    department of the Harford County Public Schools?

7          A.    No.

8          Q.    Have you ever worked in the finance or

9    budget departments of Harford County Public

10   Schools?

11         A.    No.

12         Q.    Your resume shows that you have a

13   bachelor's of science in secondary education in

14   English?

15         A.    Yes.

16         Q.    From Towson University?

17         A.    Correct.

18         Q.    And you have a master's of education in

19   school counseling from the Loyola College of

20   Maryland?

21         A.    Yes.

22         Q.    Do you have any other professional

23   degrees?

24         A.    Degrees, no.

25         Q.    Okay.  You do have certifications?

Page 14

1          A.    Yes.  And I'm also a licensed clinical
2     professional counselor.
3          Q.    Okay.  And I believe that's listed here
4     as one of your certifications.
5          A.    Yeah.  Oh, yes.  Okay.
6          Q.    Okay.  When did you first become a
7     licensed clinical professional counselor?
8          A.    I believe that was in 2010.
9          Q.    And where were you licensed?
10         A.    In Maryland.
11         Q.    Have you kept that license active since
12    2010?
13         A.    Yes.
14         Q.    Do you have continuing education
15    requirements in order to keep your license in good
16    standing?
17         A.    Yes.  40 hours every two years.
18         Q.    And have you fulfilled those continuing
19    education requirements such that you've kept your
20    license in good standing?
21         A.    Yes.
22         Q.    Do you have a license to be a clinical
23    professional counselor anywhere outside Maryland?
24         A.    No.
25         Q.    You list a number of certifications on

1  your resume.  Do you have any certifications that

2  aren't listed here?

3          A.    I don't believe so.

4          Q.    And what entity or entities give these

5  certifications?

6          A.    So the Superintendent -- it's not --

7  well, Superintendent endorsement is just a matter

8  of classes.  There wasn't a specific track that I

9  went.  I just have what I need to qualify for that.

10  So I received that endorsement by virtue of the

11  classes I took.

12          The Supervisor of Pupil Personnel is

13  through Maryland State Department of Education.

14  The same with Administrator I.  Same with Pupil

15  Personnel Worker.  Same with Professional School

16  Counselor.

17          Certified Youth Mental Health First Aid

18  Instructor is through the Mental Health First Aid

19  organization.

20          Q.    Did you get any degree in psychology?

21          A.    No.

22          Q.    Did you get any degree in psychiatry?

23          A.    No.

24          Q.    Have you ever practiced as a

25  psychologist?

1          A.   As a LCPC, but not as a psychologist.

2          Q.   Okay.  So have you ever practiced as a

3   psychologist?

4          A.   No.

5          Q.   Have you ever practiced as a

6   psychiatrist?

7          A.   No.

8          Q.   Have you ever worked as a clinical

9   professional counselor or a licensed clinical

10  professional counselor in Harford County Public

11  Schools?

12         A.   Oh, for the school system?  No.

13         Q.   When you say "for the school system,"

14  you -- you have not worked as a licensed clinical

15  professional counselor in Harford County Public

16  Schools, correct?

17         A.   Correct.  It's not really a position we

18  have.

19         Q.   Have you worked as a licensed clinical

20  professional counselor in any other school

21  district?

22         A.   No.

23         Q.   Have you ever practiced as a licensed

24  clinical professional counselor outside a school

25  district?

Page 17

1          A.    Yes.

2          Q.    When was the last time you did that?

3          A.    I currently do.

4          Q.    And tell me about how you have a

5     practice as a licensed clinical professional

6     counselor outside Harford County Public Schools?

7          A.    So 2010 I started working with an

8     organization, the Human Development Center, as a

9     practicing LCPC, and then eventually went out on my

10    own, and then eventually opened my own practice,

11    which I still operate today.

12         Q.    For how long did you serve as a

13    licensed clinical professional counselor with the

14    Human Development Center?  From 2010 until when?

15         A.    I stopped when I came here.  So until

16    2017.

17         Q.    And did you see clients then through

18    the Human Development Center?

19         A.    Yes.

20         Q.    Was the Human Development Center a

21    nonprofit organization or a for-profit entity?

22         A.    For profit.

23         Q.    And was that a full-time job or a

24    part-time job?

25         A.    Part-time.

Page 18

1          Q.    And so for each year from 2010 to 2017,
2    roughly how many patients or clients did you see?
3          A.    It might be easier to say hours per
4    week than people.  I worked about 15, 20 hours a
5    week.
6          Q.    Okay.  And if you worked 15 to 20 hours
7    per week, roughly how many patients or clients
8    would you see during -- during a week?
9          A.    I was running groups at the time, so --
10   actually, let me rephrase that, because I was
11   probably getting 15 to 20 billable hours.  So I was
12   probably seeing 15 to 20 people a week, but some of
13   that was in groups.  So one hour may have been five
14   children.
15         Q.    And what was the age range of the
16   patients or clients you were seeing through the
17   Human Development Center?
18         A.    I would say roughly probably from
19   8 years old to adults in their 40s.
20         Q.    Are you able to give me an estimate of
21   how many clients or patients you saw per year
22   during your time at Human Development Center?
23         A.    Different, you mean?
24         Q.    Different.
25         A.    30 maybe would be an estimate.

Page 19

1          Q.    Okay.  And -- and of the 30 or so

2     patients you saw per year through the Human

3     Development Center, what percentage were adults?

4          A.    Probably 15 percent, 10 percent.

5          Q.    10 to 15 percent?

6          A.    Yes.

7          Q.    And what percentage were teens?

8          A.    80 percent.  75 percent, let me say.

9          Q.    And what percentage were preteens?

10         A.    The other 10 to 15.

11         Q.    What prompted you to move from the

12    Human Development Center to starting your own

13    practice?

14         A.    I was approached by another therapist

15    in town who did not see children, and she was

16    seeing a patient who told her that I was doing good

17    work with her child.  And so she asked if someone

18    were to ask her to see children, could she refer

19    them to me, at which time she said that I could see

20    them in her office, and she wouldn't charge me,

21    which means I could keep the full amount of money.

22    Because currently, at the Human Development Center,

23    I was only keeping a partial amount of the money.

24              So I began to work in her office.  And

25    then eventually she moved to Virginia, at which

Page 20

1    time I kept the office and opened my own practice.

2          Q.    When did she move to Virginia and you

3    opened your own practice?

4          A.    Probably around 2017, possibly.  2015,

5    maybe.

6          Q.    So did you work as a licensed clinical

7    professional counselor in her office for a year or

8    under a year?

9          A.    2010 -- I would say two years.

10          Q.    And does your practice have a name?

11          A.    Guided Wellness Counseling.

12          Q.    Are there other clinicians in your

13    practice?

14          A.    No.

15          Q.    Has it always just been you as the only

16    clinician in Guided Wellness Counseling?

17          A.    Yes.

18          Q.    And from the time you started the

19    practice in 2017 until the present, roughly how

20    many patients do you see each year through

21    Guided Wellness Counseling?

22          A.    Currently, now?  Because --

23          Q.    Well, we can start currently.

24          A.    -- it's drastically changed.  I would

25    say five.

Page 21

1          Q.    Five patients per year?

2          A.    Yes.

3          Q.    And how was that number per year in

4    prior years?

5          A.    Probably closer to 10.  10 or 12.

6          Q.    And for the years when you had 10 to 12

7    patients per year, what percentage of them were

8    adults?

9          A.    80 percent, 90 percent.

10          Q.    What percentage were teens?

11          A.    10 percent.

12          Q.    And what percentage were preteens?

13          A.    None.

14          Q.    Okay.  And then when it changed to

15    around five patients a year, what is the breakdown

16    of those roughly five patients across adults, teens

17    or preteens?

18          A.    All adults.

19          Q.    All adults?

20                So when was the last time you had a

21    preteen who was a client when you worked as a

22    licensed clinical professional counselor?

23          A.    I would say over four years ago.  I

24    couldn't be specific, though.

25          Q.    And when was the last time you had a

Page 22

1  teen who was a client when you worked as a licensed
2  clinical professional counselor?
3        A.    Probably a year -- probably two years
4  ago.
5        Q.    Have you practiced as a licensed
6  clinical professional counselor anywhere outside
7  the Human Development Center and Guided Wellness
8  Counseling?
9        A.    No.
10       Q.    When you were at the Human Development
11 Center, you said you were running groups.  Did you
12 also see clients on an individual basis?
13       A.    I did.
14       Q.    So of the 30 patients or so you saw per
15 year, how many did you see on an individual basis?
16       A.    I would say probably about half, 15.
17       Q.    So roughly 15 patients you saw in
18 groups and roughly 15 you saw on an individual
19 basis?
20       A.    Roughly, yeah.
21       Q.    Okay.  Have you run groups during your
22 time at Guided Wellness Counseling?
23       A.    Yes.
24       Q.    And so during the time when you had 10
25 to 12 patients per year, how many of those did you

Page 23

1    see on an individual basis?

2           A.   I'd say about four -- oh, about eight

3    individual, four group -- four in group.

4           Q.   And during the time when you've had

5    roughly five patients a year, how many of those did

6    you see on an individual basis?

7           A.   All individual.

8           Q.   So -- okay.

9           A.   I haven't done groups in years.

10          Q.   When was the last time you ran a group

11   or did counseling as a licensed clinical

12   professional counselor in a group setting?

13          A.   Maybe 2018.

14          Q.   Have you ever worked as a counselor of

15   any sort in Harford County Public Schools?

16          A.   No.

17          Q.   You were asked earlier about a

18   presentation you heard from Leonard Sax?

19          A.   Yes.

20          Q.   Do you recall those questions from

21   plaintiff's counsel?

22          A.   Yes.

23          Q.   How many times did you hear a

24   presentation from Mr. Sax?

25               MR. BYRD:  Object to form.  It was in a

Page 24

1    prior depo.  But, yes.

2               THE WITNESS:  I saw it in person once,

3    and I remember watching it again in video form

4    maybe one other time.

5    BY MR. KEYES:

6         Q.    Was it the same presentation?

7         A.    Yes.

8         Q.    So you saw it once in person and later

9    you watched a recording of it?

10        A.    Yes.

11        Q.    And when did you see the presentation

12   in person?

13        A.    I honestly don't recall.

14        Q.    When did you see the video of the

15   presentation?

16        A.    I honestly don't recall.  It was soon

17   after.

18        Q.    Who is Leonard Sax?

19        A.    I believe he's a psychologist.

20        Q.    And what was his presentation on?

21        A.    The negative impacts of social media

22   and video games on children.

23        Q.    Did he have any handouts that he gave

24   to participants or attendees?

25        A.    I don't recall.

Page 25

1      Q.   Did he have a slide deck that he used?

2      A.   Yes.

3      Q.   Did you follow up with Leonard Sax

4  after the presentation and speak with him?

5      A.   No.

6      Q.   Did you ever follow up with Leonard

7  Sax?

8      A.   No.

9      Q.   Have you ever had any communications

10  with Leonard Sax other than attending his

11  presentation?

12      A.   Not that I recall.

13      Q.   Are you able to estimate for me when

14  you saw the presentation?  Was it two years ago?

15  Five years ago?  Ten years ago?

16      A.   I would say 2019 would be best guess.

17      Q.   And how did his presentation come to

18  your attention?

19      A.   It was advertised through -- I believe

20  it was our office of mental health in Harford

21  County.

22      Q.   Who went with you to see the

23  presentation?

24      A.   I believe my daughter -- my oldest

25  daughter and wife at the time.  Well, my oldest

Page 26

1    daughter and wife.

2         Q.    How -- how old was your daughter at the

3    time she went with you to see Leonard Sax'

4    presentation?

5         A.    She would have been about 14.

6         Q.    Is that an 8th grader?  9th grader?

7         A.    She was -- she's older because of her

8    birthday.  Probably 7th or 8th grade.

9         Q.    Do you use YouTube?

10        A.    Sometimes.

11        Q.    Do you have a YouTube account?

12        A.    I may.  I tried to share a video, as I

13   said earlier, of a celebration we did for one of

14   our staff members with everybody who was there, and

15   the link was too big.

16             And so I think somehow I was taken to

17   some ability to create it on YouTube, and then I

18   shared it.

19             So I -- I think I may have, but that

20   would be -- that would be the only time I actually

21   had an account.  So I -- I may currently have one.

22   I don't know how that works.

23        Q.    When was the last time that you used

24   YouTube?

25        A.    I don't know.

Page 27

```
 1          Q.   Well, how often have you used it in the
 2   last six months?
 3               MR. BYRD:  Object to form.
 4               THE WITNESS:  I don't know.  Five, ten
 5   times.
 6   BY MR. KEYES:
 7          Q.   When you've used YouTube, in what
 8   context?
 9          A.   Sometimes I'll use it for music.
10   Sometimes I'll use it for DIY information.  That's
11   typically.
12          Q.   "DIY," "do-it-yourself"?
13          A.   Yeah.
14          Q.   Okay.  Do you have a Facebook account?
15          A.   I do not.
16          Q.   Do you have an Instagram account?
17          A.   I do not.
18          Q.   Do you have a TikTok account?
19          A.   I do.
20          Q.   You do?
21          A.   Well, I have the app.  I don't know if
22   that means I have an account.
23          Q.   Okay.
24          A.   I'm not sure if you automatically have
25   an account by default.
```

Page 28

```
 1          Q.    Do you have a Snapchat account?
 2          A.    I do not.
 3          Q.    For how long have you had a TikTok app?
 4          A.    I had it and then I got rid of it, and
 5    then I got it again.  I don't remember when.
 6    Probably four or five months ago.
 7          Q.    You got it again four to five months
 8    ago?
 9          A.    Yes.
10          Q.    Why?
11          A.    I was getting videos sent to me that I
12    couldn't see.  And then -- so I downloaded it to
13    see a video that someone sent me, and then I just
14    kept it.
15          Q.    You said you had it, you got rid of it,
16    then you got it again?
17          A.    Uh-huh.
18          Q.    When you got rid it, why did you get
19    rid of it?
20          A.    It was Lent, so I was using that as my
21    reason to get off of it.  It was causing problems
22    with me just getting sucked into it and not being
23    able to get off it.  So I used Lent as the catalyst
24    to get off it and stayed off it for about a year.
25          Q.    You said "Lent," L-E-N-T?
```

Page 29

1          A.    Uh-huh.

2          Q.    The season before Easter?

3          A.    Yes.

4          Q.    Okay.  When -- during the period when

5    you had TikTok, how often have you used it?

6          A.    When I had it or now?

7          Q.    Well, let's start with -- you got it

8    again four to five months ago?

9          A.    Yeah.

10         Q.    Since then, how often do you use it?

11         A.    I probably look at it once every other

12   day.

13         Q.    And during your first stint, before you

14   got rid of it during Lent, how often did you use

15   it?

16         A.    Daily.

17         Q.    Have you ever posted anything to

18   Harford County Public Schools' YouTube channel?

19         A.    I was in a video that was posted, but

20   I -- I never posted personally.

21         Q.    Have you posted any content to Harford

22   County Public Schools' Facebook or Instagram

23   accounts?

24         A.    No.

25         Q.    You testified earlier you have three

Page 30

1   daughters?

2           A.    Yes.

3           Q.    And are they at middle school age or

4   above?

5           A.    7th, 8th and a freshman in college.

6           Q.    So is it the freshman in college who

7   went with you to the Leonard Sax presentation?

8           A.    Correct.

9           Q.    Does your 7th grade daughter have a

10  YouTube account?

11          A.    Not to my knowledge.

12          Q.    Does she have a Facebook account?

13          A.    Not to my knowledge.

14          Q.    How about an Instagram account?

15          A.    Not to my knowledge.

16          Q.    How about a TikTok account?

17          A.    Not to my knowledge.

18          Q.    How about a Snapchat account?

19          A.    Not to my knowledge.

20          Q.    How about your 8th grade daughter?

21  Does she have a YouTube account?

22          A.    Not to my knowledge.

23          Q.    Does she have a Facebook, Instagram,

24  TikTok or Snapchat account?

25          A.    Not to my knowledge.

Page 31

```
 1          Q.   Have -- have your 7th grade or
 2    8th grade daughters asked you for any of those
 3    accounts?
 4               MR. BYRD:  Object to the form.
 5    Relevance.
 6               But go ahead.
 7               THE WITNESS:  Yes.  Regularly.
 8    BY MR. KEYES:
 9          Q.   And have you said no?
10          A.   Yes.
11          Q.   Your oldest daughter, who's a freshman
12    in college, has she ever had a YouTube account?
13          A.   I don't know.
14          Q.   Has -- did she ever have a YouTube
15    account when she was in high school or middle
16    school?
17          A.   I don't know.  I don't think so.
18          Q.   Did she ever have a Facebook,
19    Instagram, TikTok or Snapchat account when she was
20    in high school or in middle school?
21          A.   She may -- I think -- yeah.  She had a
22    Snapchat account in high school -- later high
23    school years.
24          Q.   When she was in high school, did she
25    have a Facebook, Instagram or TikTok account?
```

Page 32

```
 1          A.    She took herself off Snapchat and moved
 2     to Facebook on her own.  I think that may have been
 3     her senior year of high school.  And I think she
 4     currently has a TikTok account.
 5          Q.    When she was in middle school, did she
 6     have any Facebook, Instagram, TikTok or Snapchat
 7     accounts?
 8          A.    No.
 9          Q.    Did she have a YouTube account in
10     middle school?
11          A.    No, not to my knowledge.
12          Q.    Did she get the Snapchat account in her
13     senior year of high school with your permission?
14          A.    I believe it was maybe junior year, and
15     yes.
16          Q.    When she had a Snapchat account in her
17     junior year and senior years of high school, did
18     you impose any limits on her use of Snapchat?
19          A.    Sort of.  There was limits on access
20     because the phone was charged in our bedroom, so
21     she didn't have access to it at night.
22                And I had an app, which I can't
23     remember the name of now, which sort of monitored
24     the activity on her phone.
25          Q.    Was that an app that was part of the
```

Page 33

```
 1   phone, or is this a separate app?
 2          A.    Separate.   A separate app that I
 3   purchased.
 4          Q.    And that allowed you to set limits on
 5   her use of Snapchat?
 6          A.    No.
 7          Q.    Or the phone in general?
 8          A.    It would alert me if there was
 9   problematic content.
10          Q.    So it was like a content filter for her
11   phone?
12          A.    Not a filter.  It would just tell me --
13   well, maybe it filtered it.  I don't know.  But I
14   would get an alert if there was, you know, nudity
15   or explicit language or something.
16          Q.    Okay.  So in her junior and senior year
17   of high school, your daughter had a Snapchat
18   account.  You imposed limits on her access to her
19   cell phone by requiring her to charge it in your
20   bedroom at night.
21                Were there other limits on when she
22   could access the phone before she checked it in for
23   the night, either time of day or the amount of
24   time?
25          A.    I feel like at some point we had
```

Page 34

```
 1   time -- time constraints on it.  But it, frankly,
 2   wasn't an issue that we needed to deal with with
 3   her.  She wasn't succumbing to, really -- by it as
 4   much as the younger two are now.
 5        Q.   And then separate from any time limits,
 6   you -- you downloaded an app that would monitor the
 7   content on her cell phone and alert you?
 8        A.   Correct.
 9        Q.   Were there any --
10        A.   And my wife.
11        Q.   Sorry.  What?
12        A.   And my wife.
13        Q.   Okay.  Were there any other limits or
14   controls that you used for her use of her cell
15   phone when she was a junior or a senior in high
16   school?
17             MR. BYRD:  Object to form.
18             THE WITNESS:  I mean, I think what
19   might fall under the word "control" is me looking
20   through her phone regularly to see, you know, what
21   the activity was in there.
22   BY MR. KEYES:
23        Q.   Anything else that you would view as a
24   limit or a control regarding her access to or her
25   use of her cell phone when she was a junior or
```

Page 35

```
 1   senior in high school?
 2           A.   Well, it definitely has become the best
 3   consequence for a child.
 4           Q.   I'm not sure I follow.  When you say,
 5   "it definitely has become the best" --
 6           A.   So removing the phone because of some
 7   other poor behavior --
 8           Q.   Okay.
 9           A.   -- instead of --
10           Q.   You confiscated the phone at some
11   point?
12           A.   Yes.
13           Q.   For some period of time?
14           A.   Yes.
15           Q.   Did you at some point restore it?
16           A.   Yes.
17           Q.   That was independent of the phone
18   itself; that was a consequence for some other
19   behavior?
20           A.   Sure.  Yeah.
21           Q.   Okay.  Were there other controls that
22   you were aware of that you elected not to use, such
23   as controls on the device itself?
24           A.   I don't know if "elected."  I don't
25   know that I was as savvy back then as to what we
```

Page 36

```
 1   could or could not do.  So we -- we didn't impose

 2   any, but there may have been something that we

 3   didn't know about.

 4         Q.   Okay.  When you say "back then," she's

 5   a freshman in college, right?

 6         A.   (Nods head.)

 7         Q.   Yes?

 8         A.   Yeah.

 9         Q.   And we're talking about her junior and

10   senior year, assuming a year or two ago?

11         A.   Yeah.  I guess I'm kind of thinking the

12   full complement of when she had her phone.  So I

13   guess the answer is no.

14         Q.   Okay.  Were there other limits you

15   imposed on her access to or use of her phone before

16   she was a junior?

17         A.   The same.  Charging it in our room,

18   having the app on it to regulate content.

19         Q.   When did she get a cell phone?

20         A.   I believe it was 7th grade.

21         Q.   When did your 8th grade daughter get a

22   cell phone?

23         A.   I think that was middle of her 6th

24   grade year.

25         Q.   And when did your 7th grade daughter
```

Page 37

1    get a cell phone?
2         A.    I think that's about the same, middle
3    of 6th grade year.
4         Q.    Okay.  So for your 7th grade daughter
5    and your 8th grade daughter, they each got a cell
6    phone at some point during their 6th grade year,
7    yes?
8         A.    For my youngest two?
9         Q.    Yes.
10        A.    Yes.
11        Q.    And then for your oldest, she got her
12   cell phone sometime in 7th grade?
13        A.    If I recall correctly, yes.
14        Q.    And you've described for me the
15   controls you had in place or the limits you had in
16   place for your oldest daughter.  Are those the same
17   controls or limits you put in place on your
18   7th grade and 8th grade daughters' use of their
19   cell phones?
20        A.    No.  So we do -- we still don't allow
21   for it to be charged in their rooms, but I do not
22   any longer use the app to monitor the activity.
23        Q.    Why did you stop using the app to
24   monitor activity?
25        A.    I didn't find it to be incredibly

Page 38

1    useful.  I would see things on their phone that

2    didn't come through on the app, so it was -- I felt

3    like I was paying for something that only gave

4    me -- that gave me inadequate data.

5             Q.    Did you explore other apps to either

6    block or monitor content on any of your daughters'

7    phones?

8             A.    Yes.  So, currently, my 8th grade

9    daughter, which this is perplexing to me, but she

10   needs to get me to sign into the -- I guess it's

11   called the Apple cloud and put my password in to

12   approve her getting an app.  But for some

13   confounding reason, I can't get that same to sync

14   with my 7th grade daughter, so... I'm trying.

15            Q.    If the 8th grader wants to download an

16   app, she needs to go through you and get your

17   permission?

18            A.    I get an alert.  I have to put a

19   password in and approve it.

20            Q.    But for some reason, it doesn't apply

21   to your 7th grader's phone?

22            A.    Yeah.  I just keep trying to figure it

23   out, and I'm not smart enough to figure out why.

24            Q.    So then you periodically check your

25   7th grade daughter's phone on your own to see what

Page 39

1    apps are on there?

2           A.    Both, yeah.

3           Q.    Okay.  Middle school kids use their

4    phones for all sorts of reasons, correct?

5           A.    Correct.

6                 MR. BYRD:  Object to form.

7    BY MR. KEYES:

8           Q.    I know you've said before students use

9    social media apps.  Besides the defendants'

10   platforms, are you aware of other social media apps

11   that students use on their phones?

12          A.    I don't know if Minecraft is considered

13   an app.  Did you say "app"?  Social media --

14          Q.    I said social media apps.

15          A.    Yeah, I don't know if Minecraft is

16   considered social media.  That seems to be a big

17   one, but I don't know if that's more of a game.

18          Q.    Okay.  Are you able to identify any

19   other social media apps that students use on their

20   cell phones?

21                MR. BYRD:  Object to form.

22                THE WITNESS:  Where is that list?  Oh,

23   here it is.  Not offhand.  I can't think of any

24   that aren't listed.

25                MR. BYRD:  I'm sorry.  What are you

Page 40

1    referring to?

2            THE WITNESS:  Oh, sorry.  Under the

3    "Online Media & Communications Services"

4    definition.

5    BY MR. KEYES:

6        Q.    Okay.  So are you on Exhibit 2?

7        A.    Sorry.  Yes.  Exhibit 2, Page 6.

8        Q.    Definition 3?

9        A.    Yes.

10       Q.    Okay.  So the defendants as you flagged

11   before are Facebook, Instagram, Snapchat, TikTok

12   and YouTube, which are on this list.  Do you see

13   that?

14       A.    Okay.  Yeah.

15       Q.    What other social media platforms do

16   students use on their cell phones?

17       A.    I feel like the other ones in this list

18   are probably a full complement of that.  BeReal,

19   Discord, GroupMe, Kik, Omegle, Pinterest, Reddit,

20   Twitch, Tumblr, WhatsApp, Twitter and Yik Yak.

21       Q.    And then you mention students also use

22   Minecraft on their phones?

23       A.    That's a game.  I don't know if it's

24   necessarily social media.

25       Q.    Right.  I wasn't asking about social

Page 41

1   media.  I just -- you mentioned students also use
2   Minecraft on their phones?
3           A.    Correct.
4                 MR. BYRD:  Object to form.
5                 Yeah, you did mention social media.
6   That was your question, but okay.
7   BY MR. KEYES:
8           Q.    What other video games do students use
9   on their cell phones?
10                MR. BYRD:  Object to form.
11                And, also, just to be clear, he's only
12  speaking in his individual capacity here, and I
13  don't know what students you're talking about.
14                MR. KEYES:  Students in general.  And
15  you're right.
16  BY MR. KEYES:
17          Q.    You're just testifying as Mr. Hennigan.
18                But based on your experience and your
19  interactions, what other video games besides
20  Minecraft do students use on their cell phones?
21          A.    I've seen them play a pool game when
22  they're playing pool against each other.  I can't
23  think of any other games I've seen them play.
24          Q.    Fortnite?
25                MR. BYRD:  Object to form.

Page 42

```
 1              THE WITNESS:  I suppose that's a thing,
 2    yeah.  I don't -- they don't play that as far as I
 3    know, but --
 4    BY MR. KEYES:
 5         Q.   Clash of Clans?
 6         A.   Never heard of that.
 7         Q.   Brawl Stars?
 8         A.   Never heard of that.  You must have
 9    boys.
10         Q.   I have four kids.  Three boys, one
11    girl.
12              Do kids also use their cell phones to
13    listen to music?
14         A.   Absolutely.
15              MR. BYRD:  Object to form.
16    BY MR. KEYES:
17         Q.   And do they use Spotify?
18              MR. BYRD:  Objection.
19              THE WITNESS:  Some do.
20    BY MR. KEYES:
21         Q.   What other services have you seen
22    students use to listen to music on their cell
23    phones?
24         A.   YouTube, Pandora, Apple Music.
25         Q.   What else?
```

Page 43

```
 1          A.    That's all I can think of.
 2          Q.    And do students also use their cell
 3    phones to access sports apps like ESPN?
 4                MR. BYRD:  Objection.  Foundation.
 5                THE WITNESS:  Yes, I suppose.
 6    BY MR. KEYES:
 7          Q.    Well, have you seen students who use
 8    their phones to access ESPN?
 9                MR. BYRD:  Objection.
10                THE WITNESS:  I haven't.
11    BY MR. KEYES:
12          Q.    Have you seen --
13                MR. KEYES:  What's the objection?
14                MR. BYRD:  Well, he's testified that
15    they don't have phones -- there's phones that are
16    not out in school.  So I don't -- I don't know
17    about the time -- timing of when you're talking
18    about.  And I don't know -- when you say
19    "students," are you talking about students outside
20    Harford, his own kids who could also be students?
21                He's testified that, you know, there
22    was a new school policy or whatever, so I don't
23    know about the foundation of being able to see
24    stuff within the school.
25    BY MR. KEYES:
```

Page 44

```
 1          Q.    Have you --
 2                MR. BYRD:  I have a lot of objections.
 3    BY MR. KEYES:
 4          Q.    Have you seen Harford County Public
 5    Schools' students use their phones to access ESPN
 6    or any sports app?
 7          A.    No.
 8          Q.    Do students use their cell phones to --
 9    to watch content on streaming services like
10    Netflix?
11                MR. BYRD:  Same objection --
12                THE WITNESS:  Yes.
13    BY MR. KEYES:
14          Q.    Are you able to identify --
15                MR. BYRD:  -- as to time.
16                Hold on.
17                -- as to time.  Vague.
18    BY MR. KEYES:
19          Q.    Are you able to identify for me any
20    streaming services that students use their cell
21    phones to watch besides Netflix?
22                MR. BYRD:  Same objection.
23                THE WITNESS:  Hulu.
24    BY MR. KEYES:
25          Q.    What else?
```

Page 45

```
 1          A.    Disney+.
 2          Q.    What else?
 3          A.    YouTube TV.  That's all I can think of.
 4          Q.    And in your observations, do students
 5     also use their cell phones to text each other?
 6                MR. BYRD:  Objection.  Vague as to
 7     time.
 8                THE WITNESS:  Yes.
 9     BY MR. KEYES:
10          Q.    Are you able to identify for me other
11     ways that students use their cell phones in your
12     experience?
13                You've listed social media.  You've
14     listed video games.  You've listed music platforms.
15     You've listed streaming services.  And you've
16     listed texting.
17                Any other ways that, in your experience
18     and your observation, Harford County Public
19     Schools' students have used their cell phones?
20                MR. BYRD:  Objection.
21                THE WITNESS:  Yeah.  I mean, when I
22     think about when I look at my daughters' phones,
23     the first place I go is the -- is the camera app
24     and to see the pictures that they're taking of
25     themselves and of other people.
```

Page 46

```
 1            And I think that's probably one of the
 2   most widely used app on their phone is the camera.
 3   BY MR. KEYES:
 4        Q.   And are you referring to a particular
 5   camera app?
 6        A.   No, just the standard -- well, I always
 7   assume everyone has an iPhone.  The standard iPhone
 8   camera app.
 9        Q.   Okay.  So you're referring to the
10   camera itself in the phone?
11        A.   Correct.
12        Q.   Okay.
13        A.   Taking pictures of themselves and
14   others.
15        Q.   And then are you -- have you seen
16   students in Harford County Public Schools not only
17   take the pictures but then transmit them to other
18   people?
19        A.   Yes.
20             MR. BYRD:  Object to form.
21   BY MR. KEYES:
22        Q.   In your experience, how do they do
23   that?  What platform or platforms do they use?
24        A.   Social media, typically.
25        Q.   Are there other ways they also transmit
```

1    photos?

2         A.    Through WhatsApp or text messaging.

3         Q.    Are there any other ways that, in your

4    experience and your observations, students have

5    transmitted photos on their cell phones?

6         A.    Other than social media apps or

7    texting?

8         Q.    Other -- other than social media apps,

9    WhatsApp and text messaging?

10        A.    They show it to people directly.

11        Q.    Any other ways?

12        A.    They have -- they can screenshot it and

13   show it during a FaceTime phone call.

14        Q.    Any other ways?

15        A.    Not that I can think of.

16             (HENNIGAN EXHIBIT 2, Plaintiff Board of

17   Education of Harford County's Amended Objections

18   and Responses to Defendants' Interrogatories

19   (Set 3), was marked for identification.)

20   BY MR. KEYES:

21        Q.    Let me show you what has been marked as

22   Hennigan Exhibit 2.  This is titled "Plaintiff

23   Board of Education of Harford County's Amended

24   Objections and Responses to Defendants'

25   Interrogatories (Set 3)."

Page 48

1              MR. BYRD:  And, again, you had an

2     opportunity to ask about this in the 30(b)(6).  So,

3     just to be clear, you're asking him only in his

4     individual capacity.

5              And, you know, to the extent you try to

6     use this in a 30(b)(6) use down the road, that will

7     be impermissible and we'll object to that.

8     BY MR. KEYES:

9         Q.   Have you seen -- have you seen Hennigan

10    Exhibit 2 before?

11        A.   I have.

12        Q.   Did you review it in your prep sessions

13    with the lawyers?

14        A.   Not necessarily the whole exhibit, but

15    the category of damages chart.

16        Q.   Are you referring to the chart on

17    Page 3?

18        A.   Yes.

19        Q.   That continues onto Page 4?

20        A.   Yes.

21        Q.   So did you see that chart in your prep

22    sessions with the lawyers?

23        A.   Yes.

24        Q.   Had you seen that chart before your

25    prep sessions with the lawyers?

```
                                           Page 49
 1          A.   Yes.
 2          Q.   When did you first see that chart?
 3          A.   In an email.  I was asked to --
 4               MR. BYRD:  Yeah, and hold on.
 5               If -- if -- to the extent that those
 6     were emails from lawyers or with lawyers on it
 7     directing you to do stuff, then don't discuss that.
 8               If you -- if you say you've seen it
 9     before, I think that's enough.  But don't discuss
10     anything that was discussed with the lawyers.
11     BY MR. KEYES:
12          Q.   My question was just:  When?
13          A.   Yeah.
14          Q.   When did you first see the chart in
15     terms of time?
16          A.   I don't know.  I'd say within the last
17     three months.
18          Q.   That was the first time you saw the
19     chart?
20          A.   (Nods head.)
21          Q.   Is that a "yes"?
22          A.   Yes.
23          Q.   Okay.  There is also an Attachment A in
24     this document.  And Attachment A actually has two
25     worksheets.  The first one is titled
```

Page 50

```
 1    "Program/Department Worksheet."
 2              Do you see that?
 3         A.   Yes.
 4         Q.   Have you seen that worksheet before?
 5         A.   Yes.
 6         Q.   Did you review that worksheet with the
 7    lawyers in the prep sessions?
 8         A.   Yes.
 9         Q.   Had you seen that worksheet before your
10    prep sessions with the lawyers?
11         A.   Yes.
12         Q.   When did you first see this worksheet?
13         A.   At the same time, about three months
14    ago.
15         Q.   Okay.
16         A.   Within the last three months.
17         Q.   And then there's a second chart called
18    a Full-Time Equivalent Worksheet.
19              Do you see that?
20         A.   Yes.
21         Q.   Have you seen that worksheet before?
22         A.   Yes.
23         Q.   Did you review that worksheet with the
24    lawyers in the prep sessions?
25         A.   Yes.
```

Page 51

```
 1          Q.   And had you seen that worksheet before
 2    your prep sessions with the lawyers?
 3          A.   I'm not sure.
 4          Q.   When did you first see this worksheet?
 5          A.   Either at the same time I saw the other
 6    one or just yesterday.
 7          Q.   Okay.  Did you have any role in the
 8    preparation of the full-time equivalent worksheet?
 9               MR. BYRD:  Well, object to form.
10               You can answer what contributions you
11    had, but just don't disclose any conversations with
12    counsel.
13               THE WITNESS:  I did not.  But I
14    contributed to the program/department worksheet.
15    BY MR. KEYES:
16          Q.   Okay.  What role did you play in the
17    preparation of the program/department worksheet?
18          A.   I provided percentages for the
19    psychological services as well as the school
20    counseling services.
21          Q.   Did you play any role in -- in deciding
22    what department/programs to list on the worksheet?
23          A.   I don't recall.  I don't believe so.
24          Q.   Did you provide any of the weight
25    percentages for any of the other departments or
```

Page 52

```
 1   programs listed here besides psychological services
 2   and school counseling services?
 3          A.    I may have been a part of the pupil
 4   personnel services, but I don't recall specifically
 5   if I left that to Mr. Williams.
 6          Q.    Who is Mr. Williams?
 7          A.    He is the supervisor of the pupil
 8   personnel services.
 9          Q.    Does he report to you?
10          A.    Yes.
11          Q.    For how long has he reported to you?
12          A.    Since I got here in January of '17.
13          Q.    Do you have any recollection of
14   speaking with Mr. Williams about pupil personnel
15   services and a weight percentage?
16          A.    I don't.
17          Q.    Did you have a conversation with anyone
18   else, including Buzz Williams, about any weight
19   percentage for any of the other departments or
20   programs besides psychological services and school
21   counseling services?
22          A.    No.
23          Q.    Did anyone work with you to prepare the
24   5 percent weight that is listed here for
25   psychological services?
```

Page 53

1              MR. BYRD:  Object to form.

2              Wait.  Hold on.  Okay.  Yeah.

3              Obviously, you can answer that to the

4    extent that it does not include your conversations

5    with counsel or the work product directed by

6    counsel.

7              You can answer it.

8              THE WITNESS:  I don't believe so.

9    BY MR. KEYES:

10         Q.   Did anyone work with you to prepare the

11   10 percent weight that is listed here for school

12   counseling services?

13             MR. BYRD:  Same instruction.  Just

14   don't disclose any communications or direction of

15   counsel.  But you can answer that otherwise.

16             THE WITNESS:  I don't believe so.

17   BY MR. KEYES:

18         Q.   Okay.  Why -- why did you choose a

19   5 percent weight for the psychological services

20   department or program?

21         A.   So --

22             MR. BYRD:  Same objection.

23             But go ahead.

24             THE WITNESS:  Sure.

25             When I look at the role of a school

Page 54

1    psychologist and the amount of time they spend in

2    the various activities they're doing, I then begin

3    to think about how often those activities would

4    involve issues concerning social media and their

5    impacts, and determined that, based on all the

6    other activities that they would be doing outside

7    of that, there would be a -- 5 percent of their

8    time dedicated or involving issues concerning

9    social media.

10   BY MR. KEYES:

11        Q.   You believe that 5 percent of the time

12   of people in the psychological services department

13   or program is spent on issues concerning social

14   media?

15        A.   Correct.

16        Q.   Why did you choose a 10 percent weight

17   for the school counseling services department or

18   program?

19        A.   For the same reason.  But our school

20   counselors have a lot more face time with students

21   and get involved at a -- well, our school

22   counselors deal with all the students in the

23   building, whereas psychological services do not.

24             So school counseling staff has more

25   face time with students during the day but also

Page 55

1  have face time with all students, not just a select
2  group.
3          Q.   So did you estimate that 10 percent of
4  the staff who work in the school counseling
5  services department or program spend 10 percent of
6  their issues -- spend 10 percent of their time on
7  issues concerning social media?
8          A.   No.   I concluded that all school
9  counseling services spend 10 percent of their time.
10         Q.   Fair enough.
11              Did you estimate that the staff who
12  worked in the school counseling services department
13  or program spent 10 percent of their time on issues
14  concerning social media?
15         A.   Yes.
16         Q.   So, first, for psychological services,
17  what did you look at, if anything, to arrive at
18  that 5 percent estimate they spend 5 percent of
19  their time on issues concerning social media?
20              MR. BYRD:   Objection.
21              Again, only in your individual
22  capacity.   Go ahead.
23              THE WITNESS:   So I took into account
24  the number of students that they would be working
25  with, the amount of time they would be involved in

Page 56

1    testing, the amount of time they would be involved
2    in meetings with families, the amount of time they
3    would be involved in crisis response coupled with
4    the amount of those issues which then tie back to
5    issues concerning phones and social media and
6    arrived at 5 percent of their time being dedicated
7    to dealing with issues that were impacted by social
8    media.
9    BY MR. KEYES:
10        Q.    Did you look at any documents when you
11   arrived at the 5 percent weight?
12        A.    I believe I looked at our special
13   education data because they're primarily working
14   with special education students.  I don't recall if
15   I had availability to look at testing data.
16        Q.    And did you -- were you finished?
17        A.    Yes.
18        Q.    Did you speak with any nonlawyers about
19   what information or factors to consider in
20   assigning this 5 percent weight to psychological
21   services?
22        A.    I don't recall if I consulted with
23   Mr. Richards or not.  I'm, frankly, not sure.
24        Q.    Okay.  Same questions for the
25   10 percent weight on school counseling services.

Page 57

1   What did you consider in arriving at that weight?

2          A.    So taking into account the caseloads of

3   our counselors, that they're working with anywhere

4   from three to five hundred students each and also

5   taking into account the number of students that

6   they're meeting with daily, the number of groups

7   they're running, the number of classroom sessions

8   they're doing based on social media and responsible

9   use in addition to their response to crisis

10  concerns that would be drawn back to social media

11  and then arrived at that 10 percent of their time

12  being impacted by the social media concerns.

13         Q.    Did you look at any documents when you

14  arrived at this 10 percent weight?

15             MR. BYRD:  Object to form.

16             You can answer that literally, I guess.

17             THE WITNESS:  I believe I remember

18  looking at our wellness needs assessment data to

19  get some -- some data regarding what our students

20  are reporting as far as social media and phone use

21  and sleep and things of this nature, which then end

22  up on the school counselors' doorstep with --

23  impacting students in several different ways.

24  BY MR. KEYES:

25             Q.    Did you speak with any nonlawyers about

Page 58

```
 1   what information or factors to consider in
 2   assigning this 10 percent weight to school
 3   counseling services?
 4        A.    I don't think in this instance I did
 5   consult with the supervisor.  I don't believe I
 6   did.
 7        Q.    Did you consult with anyone else?
 8        A.    I don't believe so.
 9        Q.    For the 5 percent weight that you
10   assigned to psychological services, when you say
11   that you believe that 5 percent of their time is
12   spent on issues concerning social media, would that
13   include work that they spend with students dealing
14   with the consequences of cyberbullying?
15        A.    For -- for psychological services, it
16   wouldn't be necessarily directly linked to the
17   bullying, but indirectly.  So things that may have
18   occurred as a result of the bullying that then
19   required the psychologist to meet with the student,
20   whether that be risk assessment, suicide ideation
21   report, threat assessment, IEP, counseling as a
22   related service, things of that nature.
23              So not directly because they were
24   bullied, but because of things that occurred
25   because they were bullied, if that makes sense.
```

Page 59

```
 1          Q.   Let me make sure I understand.  So when
 2     you're looking at staff in the psychological
 3     services department and you're concluding that they
 4     spend 5 percent of their time on issues concerning
 5     social media, that 5 percent includes time that
 6     they spent helping the student with things that
 7     were the result of the bullying?
 8          A.   Correct.
 9          Q.   Does that 5 percent also include time
10     they spent helping the student with things that are
11     the result of fighting that was publicized on
12     social media?
13          A.   For the psychologist, probably not.
14          Q.   What about for the school counseling
15     services?
16          A.   There's higher potential there, but
17     less so this year because there hasn't been as much
18     of that.
19          Q.   Does the 5 percent for psychological
20     services include time that's spent -- staff spent
21     helping the student with mental health issues
22     attributable to content they watched, including on
23     social media?
24               MR. BYRD:  Object to form.
25               THE WITNESS:  Indirectly, yes.
```

Page 60

1    BY MR. KEYES:

2         Q.    Does the 10 percent for school

3    counseling services include time that that staff

4    spent helping students with -- who have mental

5    health issues that are attributable to content they

6    watched, including on social media?

7         A.    Yes.

8         Q.    Can you give me some other examples of

9    what the psychological services staff were spending

10   their time on when they were spending time on what

11   you say are issues concerning social media?

12        A.    So you could have students who are not

13   performing well academically because of social

14   media, because they're not getting the proper

15   sleep, because they are feeling depressed based on

16   their interactions on there.

17             They could also be students who are

18   dysregulated, and they are seen in a counseling

19   capacity or in a testing capacity or in a crisis

20   capacity.  And that dysregulation being a result

21   of, in some cases, things that they've seen, done,

22   posted, been posted about them on social media.

23        Q.    Okay.  And is the same true for what

24   the school counseling services staff were spending

25   their time on when they were spending time on what

Page 61

1    you say are issues concerning social media?

2          A.   It would be more so for the school

3    counseling staff because they have a more -- a

4    closer relationship with students that they see on

5    a regular basis.  Again, they're also seeing every

6    student and not just some students like the

7    psychologists see.

8               In addition to that, they're running

9    groups which have content that is sometimes

10   indirectly the result of social media; in addition

11   to, they oftentimes are a link between the student

12   and the parent, so parents reporting to them

13   concerns they have with their child's sleep, mood,

14   overall mental health that they would like the

15   counselor to look into.

16              So the counselor tends to be more the

17   frontline staff and the psychologist more of the

18   higher-incident staff.

19         Q.   You referenced the school counseling

20   staff running groups which have content that is

21   sometimes indirectly the result of social media.

22   What content are you referring to?

23         A.   So some of our school counselors are

24   running groups for children with poor self-esteem,

25   for children who are suffering with anxiety and

Page 62

1    depression, for children who have had issues with

2    self-harm, with issues struggling with their own

3    sexuality.

4              And these are all things that have

5    just -- we've seen in recent years been exacerbated

6    by social media, which has then caused us to --

7    like I said, I think, earlier today, my staff and

8    my department has exponentially grown because of

9    that.

10        Q.   And for these children you referenced

11   who have poor self-esteem, who are suffering with

12   anxiety and self-harm, who are struggling with

13   their own sexuality, you attribute that at least

14   indirectly to social media because of what the

15   children are -- are seeing or posting on social

16   media?

17        A.   Not everyone, but in -- in part, yeah.

18        Q.   But some of the children who have poor

19   self-esteem, who are suffering with anxiety and

20   depression, who have had issues with self-harm are

21   experiencing those issues with no connection to

22   social media --

23              MR. BYRD:  Object to form.

24   BY MR. KEYES:

25        Q.   -- right?

Page 63

1          MR. BYRD:  Object to form.

2          THE WITNESS:  Correct.

3    BY MR. KEYES:

4          Q.   Okay.  For the ones where they -- they

5    are, in your view, experiencing poor self-esteem or

6    suffering with anxiety and depression or who have

7    issues with self-harm or struggling with their

8    sexuality because of social media, is that because

9    of what they're -- they're seeing, what messages

10   they're receiving, and -- and what they're posting

11   on social media?

12         A.   In addition to what's being posted

13   about them.

14         Q.   Okay.  Thank you.

15         A.   We had the most extreme case.  We've

16   had children kill themselves because someone posted

17   pictures about them on social media.

18         MR. KEYES:  Off the record?

19         MR. BYRD:  Yeah.

20         THE VIDEOGRAPHER:  Stand by.

21         MR. KEYES:  Take a break?

22         MR. BYRD:  Yeah.

23         THE VIDEOGRAPHER:  We are off the

24   record at 1527.

25                          * * *

Page 64

1           (Whereupon, there was a recess in the

2    proceedings from 3:27 p.m. to 3:50 p.m.)

3                     *  *  *

4           THE VIDEOGRAPHER:  We are on the record

5    at 1550.

6           (HENNIGAN EXHIBIT 3, 2021-2022 Maryland

7    YRBS/YTS Adverse Childhood Experiences Overview,

8    July 17, 2023, was marked for identification.)

9    BY MR. KEYES:

10      Q.   Mr. Hennigan, I'm showing you what has

11   been marked as Hennigan Exhibit 3.  This is a

12   document that was produced by the Maryland

13   Department of Health with the Bates Number

14   F12936-000065843.

15           MR. BYRD:  I don't see any Bates

16   numbers on here, but you're -- that's --

17           MR. KEYES:  It was produced in native.

18           MR. BYRD:  -- probably a native file.

19   BY MR. KEYES:

20      Q.   Have you seen this document before,

21   Mr. Hennigan?

22      A.   I don't know.  I'm not sure.

23      Q.   Do you know what it is?

24           MR. BYRD:  Well, objection.

25           Take your time and look at it if you

Page 65

1    don't know what it is.

2              THE WITNESS:   I mean, it seems like the

3    results of YRBS and ACEs and youth tobacco survey

4    data from '21-'22.

5    BY MR. KEYES:

6         Q.    "YRBS" stands for "Youth Risk

7    Behavioral Survey"?

8         A.    Yes.

9         Q.    "YTS" stands for "Youth Tobacco

10   Survey"?

11        A.    Yes.

12        Q.    And are you aware that the Maryland

13   Department of Health conducts a periodic youth risk

14   behavioral survey?

15        A.    Yes.

16        Q.    And does that survey include students

17   in Harford County Public Schools?

18        A.    Periodically, yes.

19        Q.    Are there any documents that reflect

20   how particular Harford County Public Schools are

21   selected for participation in the youth risk

22   behavioral survey?

23        A.    I'm pretty sure we find out from them

24   and it's at random.

25        Q.    Do they randomly choose the grades?

Page 66

```
 1          A.    They definitely randomly choose the
 2     schools.  I'm not sure about the grades.
 3          Q.    And then who administers the survey
 4     within Harford County Public Schools that are
 5     selected?
 6               MR. BYRD:  Objection.  Foundation.
 7               THE WITNESS:  I'm not sure.  I'm
 8     assuming it probably happens in the classroom with
 9     teachers, but it could be administered by --
10     actually, I think -- yeah.  It either happens in a
11     general classroom or in a health classroom.
12     BY MR. KEYES:
13          Q.    And how often does the department of
14     health conduct this youth risk behavioral survey?
15          A.    I don't know.  I'm not sure if it's
16     annually or not.  I feel like it's not annually,
17     like, maybe more like biannually, but...
18          Q.    When the results of this survey are
19     released, do they send you or anyone else in
20     Harford County Public Schools a summary of what the
21     survey shows?
22               MR. BYRD:  Objection.  Foundation.
23               You can answer as it relates to you or
24     what you know.
25               THE WITNESS:  I've received copies in
```

Page 67

```
 1   the past.  I don't know who from, but I'm assuming
 2   it's from them or from MSDE.
 3   BY MR. KEYES:
 4        Q.   And do you understand this to be a
 5   survey of Maryland students', including Harford
 6   County students', experiences with ACEs or --
 7             MR. BYRD:  Object.
 8   BY MR. KEYES:
 9        Q.   -- adverse childhood experiences?
10             MR. BYRD:  Sorry.  Object to form.
11   Foundation as to which students.
12             THE WITNESS:  It appears as though they
13   do, yes.
14   BY MR. KEYES:
15        Q.   Okay.  And does this report also show
16   that the more ACEs a student experiences, the
17   greater the risk of poor health outcomes for them?
18             MR. BYRD:  Object to form and
19   foundation.
20             THE WITNESS:  Yes.
21   BY MR. KEYES:
22        Q.   And do those poor health outcomes
23   include both physical, mental and emotional health?
24        A.   Yes.
25        Q.   Can you turn to Slide 14?
```

```
 1          A.    Yes.
 2          Q.    Are you on Slide 14?  It's titled
 3    "Emotional Abuse"?
 4          A.    Yes.
 5          Q.    And then in parentheses it says
 6    "(MAP)," M-A-P.
 7                Do you know what "MAP" stands for?
 8          A.    I don't.
 9          Q.    And this slide says that in 2021-2022,
10    12.1 percent of students exposed to emotional
11    abuse.
12                Do you see that?
13          A.    Yes.
14          Q.    Emotional abuse or exposure to
15    emotional abuse is an ACE, correct?
16          A.    Abuse in general.  So I'm assuming
17    emotional would be a part of that.
18          Q.    And this chart also shows that
19    12.3 percent of high school students in Harford
20    County are exposed to emotional abuse.
21                Do you see that?
22          A.    Correct.
23          Q.    Do you have any reason to challenge
24    that 12.3 percent of high school students in
25    Harford County are exposed to emotional abuse?
```

Page 69

1              MR. BYRD:  Object to form.  Foundation.

2     Hypothetical.  He didn't put this together.

3              But you can answer if you know.

4              THE WITNESS:  Personally, because I'm

5     speaking from my own personal perspective, I would

6     challenge it, yes.

7     BY MR. KEYES:

8         Q.   Why would you challenge it or on what

9     basis?

10        A.   Because I think the stigma is so great

11    that some children, even though it's anonymous,

12    would feel uncomfortable answering in the

13    affirmative to that question.

14        Q.   So do you think the 12.3 percent

15    understates the percentage of high school students

16    who are exposed to emotional abuse?

17        A.   I do.

18        Q.   Do you have a basis for offering what

19    you think is the correct higher percentage of high

20    school students who are exposed to emotional abuse

21    in Harford County?

22        A.   No.  It's just a inclination on my

23    part.  I don't have an exact response to that.

24        Q.   Would you turn to Slide 16?  Are you

25    there?

Page 70

1          A.    Yes.

2          Q.    And this slide says that in 2021-2022,

3    25.3 percent of students were exposed to substance

4    abuse.

5                Do you see that?

6          A.    Yes.

7          Q.    And exposure to substance use in the

8    household is another ACE, adverse childhood

9    experience?

10         A.    Yes.

11         Q.    And this chart also shows that

12   27.9 percent of high school students in Harford

13   County were exposed to substance use in the

14   household, correct?

15         A.    Yes.

16         Q.    Do you believe that that percentage is

17   underreporting the problem of high school students

18   in Harford County being exposed to substance use in

19   the household?

20         A.    I think that's hard to say.

21         Q.    Do --

22         A.    I think -- unless they've defined a

23   "problem drinker," a student could think that

24   their -- their parent having any alcohol makes them

25   a problem drinker.  So they may answer in the

Page 71

1    affirmative to that.

2              So it's -- it's hard to say how kids

3    are interpreting the term "problem drinker."

4              The other ones pretty -- seem pretty

5    clear.

6              So I might say, "Yeah, my parent is a

7    problem drinker," but maybe, by definition, they're

8    not.

9         Q.   Do you have any reason to identify a

10   different percentage for high school students in

11   Harford County who are exposed to substance use in

12   the household?

13             MR. BYRD:   Object to form.   Asked and

14   answered.

15             THE WITNESS:   I don't know what that

16   difference would be.   I just know it's hard to say

17   if this is accurate or not.

18   BY MR. KEYES:

19        Q.   Would you turn to Slide 18?

20             Are you there?

21        A.   Yes.

22        Q.   This slide says that in 2021 to 2022,

23   33.5 percent of students were exposed to mental

24   illness in the household.

25             Do you see that?

```
                                              Page 72
 1          A.    Yes.
 2          Q.    And exposure to mental illness in the
 3    household is another ACE, adverse childhood
 4    experience?
 5          A.    Yes.
 6          Q.    This chart shows that 38.7 percent of
 7    high school students in Harford County were exposed
 8    to mental illness in the household, correct?
 9          A.    Yes.
10          Q.    Do you believe that that percentage is
11    underreporting the problem of high school students
12    in Harford County being exposed to mental illness
13    in the household?
14          A.    Underreporting, no.
15          Q.    Okay.  Do you have a reason to identify
16    a different percentage for high school students in
17    Harford County who are exposed to mental illness in
18    the household?
19               MR. BYRD:  Object to form.  Foundation.
20               THE WITNESS:  I, again, think this is a
21    hard one to really get a clear answer on,
22    especially when we're dealing with adolescents who
23    often are at odds with their parents and may think
24    they're, quote, unquote, crazy because of their
25    philosophy on things.
```

Page 73

1            And so how a teenager views their
2    parent being mentally ill or -- I mean, suicidal is
3    pretty clear-cut.
4            But I think a lot of teenagers think
5    their parents are way off base.  And so then would
6    they put that in the category of mentally ill?
7    It's hard to say.
8            So I -- I just -- you know, I don't
9    know if these surveys really spell out what these
10   words mean for kids.
11           So when you're sitting in class and you
12   want to get this over with, you might just check
13   "yes" because you had a fight with your mom that
14   morning and you think she's crazy.
15           And so -- because 38.7 percent seems
16   extremely high to me of households with a mentally
17   ill, depressed or suicidal parent in the home.
18           But it could be accurate.  I just --
19   it's -- I would -- I'd have to see whether they've
20   truly defined these words for the kids who are
21   taking the survey.
22   BY MR. KEYES:
23       Q.   Would you turn to Slide 20.  Are you
24   there?
25       A.   Yes.

Page 74

1          Q.    This slide says that in 2021-2022,

2    14.8 percent of students were exposed to household

3    incarceration.  Do you see that?

4          A.    Yes.

5          Q.    And having someone in the household

6    incarcerated is another ACE, adverse childhood

7    experience?

8          A.    Yes.

9          Q.    Yes?

10         A.    Yes.

11         Q.    This chart shows that 16.4 percent of

12   high school students in Harford County were exposed

13   to household incarceration, correct?

14         A.    Yes.

15         Q.    Do you have any reason to believe that

16   number is underreporting the problem?

17               MR. BYRD:  Object to form.  Foundation.

18               THE WITNESS:  Underreporting?  No.

19   BY MR. KEYES:

20         Q.    Do you have a reason to identify a

21   different percentage for high school students in

22   Harford County who are exposed to incarceration of

23   someone in the household?

24               MR. BYRD:  Objection.

25               THE WITNESS:  This is a much more

Page 75

```
 1   concrete question.  So I don't think there would be
 2   any issues with definition here.  I only think
 3   there could be issues with, again, the stigma
 4   associated with it and people not answering in the
 5   affirmative because they're embarrassed by it.
 6   Even though we know no one else is going to see it,
 7   some people don't believe that.
 8              So the other only piece about this that
 9   I have had concerns with the YRBS in general is,
10   are kids just going through and answering quickly
11   to get it over with, so...
12              But as far as definitionwise, this is
13   pretty clear on what they're asking, so...
14   BY MR. KEYES:
15        Q.   Would you turn to Slide 26.  This slide
16   shows the relationship between the number of ACEs
17   reported by students and the percentage of the time
18   they claim their mental health is either most of
19   the time or always not good, correct?
20        A.   26?
21        Q.   Yes, sir.
22        A.   Oh, you're looking on the right.  I'm
23   sorry.  I was looking at the physical fights.
24        Q.   Sure.  Do you want me to repeat the
25   question?
```

Page 76

1          A.    No.   So one of the charts -- I'm not --
2     I just -- I just saw these two as well.
3                "Mental health most of the time/always
4     not good."  That's an odd way to phrase that.
5     Yeah, so it's showing that the more ACEs you have,
6     the poorer mental health you have.
7          Q.   And here, it reports that for students
8     in the survey who reported zero adverse childhood
9     experiences, 17.7 percent of them said their mental
10    health is not good most of the time or always?
11         A.    Correct.
12         Q.   And it also reports that for students
13    in the survey who reported more than four adverse
14    childhood experiences, 70.8 percent of them said
15    their mental health is not good most of the time or
16    always?
17               MR. BYRD:  Object to form.
18               THE WITNESS:  Correct.
19               MR. BYRD:  Foundation.
20    BY MR. KEYES:
21         Q.   Is that consistent with your training
22    and experience about the relationship between the
23    number of adverse childhood experiences a student
24    has and how they view their mental health?
25               MR. BYRD:  Object to form.  Foundation.

Page 77

1              THE WITNESS:  Yes.

2    BY MR. KEYES:

3         Q.   The more adverse childhood experiences

4    a student experiences, the worse their mental

5    health is, in general?

6         A.   Not necessarily.  The higher the

7    likelihood, because on the next page, which you'll

8    see is what we talked about this morning of

9    positive childhood experiences, which research has

10   shown that -- this is a little off topic.  But

11   research has shown that the absence of the positive

12   is actually more detrimental than the presence of

13   the negative.

14              And the same researcher shows that

15   students with four or more ACEs, the more of the

16   positive that they have, it dramatically drops

17   that.

18              So you could take a child with zero

19   ACEs and a child with four ACEs; the child with

20   four ACEs has all seven of these PCEs, and they

21   have a much better mental state than a child with

22   zero ACEs but none of these PCEs.

23        Q.   The positive childhood experiences can

24   reduce or negate the effect of --

25        A.   Absolutely.

1          Q.    -- adverse childhood experiences?

2          A.    Yes.  So you have to kind of look at

3     both -- the whole picture of the child.

4          Q.    And this is also sort of

5     child-specific?

6          A.    Absolutely, yeah.  Resilience is the

7     big factor.  So for those of you with kids, ask

8     your children these seven questions.

9          Q.    Will do.

10          How many school psychologists does

11     Harford County Public Schools employ now?

12          A.    Roughly, I think somewhere in the

13     neighborhood of 43 plus 3 or 4 -- 4 interns.

14          Q.    And how many school psychologists did

15     Harford County Public Schools employ in the

16     2016-2017 school year?

17          A.    '16-'17?  That's the year I got here?

18     I would say mid-30s.

19          Q.    And does Harford County Public Schools

20     employ counselors?

21          A.    Correct.

22          Q.    How many counselors does it employ now?

23          A.    Approximately 110.

24          Q.    How many counselors did it employ in

25     the 2016-2017 school year?

Page 79

```
 1          A.   I would say approximately 100.
 2          Q.   Does Harford County Public Schools
 3   employ other people besides school psychologists
 4   and counselors to provide counseling or mental
 5   health treatment?
 6          A.   Yes.
 7          Q.   What are those positions?
 8          A.   Social workers.
 9          Q.   Any other positions?
10          A.   Pupil personnel workers.
11          Q.   Okay.  Any others?
12          A.   Behavior coaches.
13          Q.   Any others?
14          A.   To some degree, nurses.  I'm going
15   through -- going through the offices in my suite.
16               Social workers, psychologists,
17   counselors, nurses, behavior coaches, pupil
18   personnel workers.
19               And you said that -- I'm sorry.  What's
20   the -- what's the -- they're -- what are they
21   providing?
22          Q.   Counseling or mental health treatment.
23          A.   We have one LCPC.  We have two LCPCs.
24   Sorry.  And this is just that we employ?
25          Q.   Yes.
```

```
                                         Page 80
 1          A.    I think that's it.
 2          Q.    Okay.  So how many social workers does
 3     Harford County Public Schools employ now?
 4          A.    Approximately 20.
 5          Q.    And how many did it employ back in the
 6     2016-2017 school year?
 7          A.    Probably seven.
 8          Q.    How many behavior coaches does Harford
 9     County Public Schools employ now?
10          A.    Approximately 20.
11          Q.    And how many did it employ in 2016-2017
12     school year?
13          A.    Zero.
14          Q.    How many pupil personnel workers does
15     Harford County Public Schools employ now?
16          A.    I would say 15.
17          Q.    How many did it employ in the 2016-2017
18     school year?
19               MR. BYRD:  Object to form.  Foundation.
20               THE WITNESS:  Seven, I believe.  Seven
21     or eight.
22     BY MR. KEYES:
23          Q.    And did Harford County Public Schools
24     have licensed clinical professional counselors in
25     the 2016-2017 school year?
```

Page 81

1          A.    No.

2          Q.    How many nurses does Harford County

3     Public Schools employ now?

4          A.    I would say roughly 62.

5          Q.    How many did it employ in the 2016-2017

6     school year?

7          A.    That has not grown as high.  I don't

8     know.  Say 57, roughly.

9          Q.    And what are the counseling or mental

10    health services that nurses provide to students?

11         A.    So some of them provide help with

12    students, mostly with anxiety, because students

13    will present to them with physical ailments that

14    they are sometimes able to determine aren't

15    really -- well, they're somatic complaints that

16    they know aren't related to anything physical but

17    more mental health related.

18              Some participate in something called

19    the Calm Study, which I think is an acronym that

20    helps work with students with anxiety.  But that's

21    the primary -- primary role, that, and it's not

22    really therapy, but providing medication to address

23    those issues.

24         Q.    Does the federal government provide

25    funding for any of these positions?

Page 82

```
1           A.    The -- I think one social worker is on
2     our Title I grant, which is federal dollars, not
3     the PPWs, not the psychs' nurses.  I think just one
4     social worker as of today.  The LC -- one of the
5     LCPCs until this year.
6           Q.    One of the LCPCs was funded with
7     federal --
8           A.    Title I, yeah.
9           Q.    Title I, until this year?
10          A.    Yeah.  We moved it.
11          Q.    And you moved it to what?
12          A.    Medical assistance funding, which I'm
13    not sure if that's federal or state.
14          Q.    For -- for psychologists, was there a
15    steady increase in the number of psychologists from
16    2016-2017 school year to now?
17          A.    Yes.  I think we went to two interns.
18    Then we went to four, went to six, back down to
19    four.  So that's been sort of up and down.  I don't
20    know that we had a large growth year.  It's sort of
21    been a steady growth to reduce caseloads based on
22    the duties that are becoming unmanageable with the
23    caseloads they have.
24          Q.    Was there a big jump in the need for
25    school psychologists during or after COVID?
```

Page 83

```
 1          A.   I don't think we grew any more
 2    post-COVID than we did from '16 to '20.  At a great
 3    of a rate, rather.
 4          Q.   COVID had a negative effect on
 5    students' mental health, correct?
 6          A.   Well, again, as we talked about this
 7    morning, "COVID" is a very ambiguous term.  I mean,
 8    people say "COVID," but there's a lot of detail
 9    wrapped up in that.
10               So I guess, generally speaking, all the
11    things that happened during COVID impacted
12    children.
13          Q.   Well, let's try to unpack it.  There
14    was a fear of the health consequences of COVID,
15    correct?
16               MR. BYRD:  Object to form.
17               THE WITNESS:  For some, yeah.
18    BY MR. KEYES:
19          Q.   Some people were afraid of getting
20    COVID.  Yes?
21          A.   Of course.
22          Q.   Getting sick and possibly dying.  Yes?
23          A.   Yeah.
24          Q.   Some people were afraid of loved ones
25    getting sick and possibly dying.  Yes?
```

Page 84

1          A.    Yes.

2          Q.    So in that sense, do you agree that the

3    COVID pandemic was a stressor on students' mental

4    health?

5               MR. BYRD:  Object to form.

6               THE WITNESS:  Yes.

7    BY MR. KEYES:

8          Q.    You've said before that one of the

9    issues during COVID was undetected abuse in the

10   home, correct?

11         A.    Correct.

12         Q.    That before COVID and after COVID, if

13   students were coming into school, there would be

14   more oversight.  People could see the warning

15   signs, maybe report the abuse and try to tackle the

16   abuse.  Is that fair?

17         A.    Correct.

18         Q.    But during COVID, when people weren't

19   coming into school, they were at home and it was

20   easier for that abuse to go undetected.

21         A.    Correct.

22         Q.    Yes?

23         A.    Correct.

24         Q.    So do you agree that for students who

25   were exposed to abuse -- they were either abused or

Page 85

1   there was abuse going on around them in the home
2   that was undetected -- that was a stressor on
3   students' mental health?
4          A.   Well, again, when I -- when I talk
5   about those reports, it's not just abuse.  It's
6   abuse and neglect.  And I think we need to talk
7   about them equally.
8               Because I think part of it was the
9   physical, sexual, emotional abuse that was
10  occurring, but also some of it was the neglect that
11  was occurring.
12              You had babies who are now in our
13  classrooms being born into a world where they
14  weren't being paid attention to because the parents
15  were engaged on their phones or computers or
16  tablets working and not able to do the typical
17  childrearing or get them to a day care to get the
18  typical childrearing.
19              So it's really, probably, equal parts
20  of abuse and neglect.
21         Q.   I should expand my question.
22              Do you agree, then, for -- for students
23  who were exposed to abuse -- either they were
24  abused themselves or there was abuse going on
25  around them in the home that was undetected -- and

Page 86

1   students who were neglected in the home, all of
2   that were stressors on students' mental health?
3                   MR. BYRD:  Object to form.
4                   THE WITNESS:  Yes.
5   BY MR. KEYES:
6           Q.   Do you agree that many students felt
7   isolated during COVID because they couldn't be in
8   close personal contact with people, they couldn't
9   go to school, and they felt isolated as a result?
10          A.   Some, yes.
11          Q.   And do you agree that for those
12  students, COVID and the consequences of COVID and
13  the isolation was a stressor on their mental
14  health?
15                  MR. BYRD:  Object to form.
16                  THE WITNESS:  Yes.
17  BY MR. KEYES:
18          Q.   Okay.  So do you agree, then, that
19  given the fear of getting sick or dying from COVID,
20  the fear of loved ones getting sick or dying from
21  COVID, the risk of being exposed to abuse that went
22  undetected, the neglect that went on in the home,
23  the inability to be in close contact with people,
24  and the isolation -- for all of those reasons,
25  COVID-19 had a negative effect on students' mental

Page 87

```
 1   health?
 2              MR. BYRD:  Object to form.
 3              THE WITNESS:  But not exclusively those
 4   reasons.
 5   BY MR. KEYES:
 6        Q.   Okay.  But do you agree that for all of
 7   those reasons, COVID-19 had a negative effect on
 8   students' mental health?
 9              MR. BYRD:  Object to form.  It's asked
10   and answered.
11              THE WITNESS:  That's part of the
12   reason.
13   BY MR. KEYES:
14        Q.   Okay.  You believe there are other
15   reasons why COVID had a negative effect on
16   students' mental health?
17        A.   I do.
18        Q.   But what I just listed, those also
19   caused or -- or were reasons why COVID-19 had a
20   negative effect on students' mental health.
21              MR. BYRD:  Object to form.  Asked and
22   answered.
23   BY MR. KEYES:
24        Q.   Is that correct?
25        A.   Yes.
```

Page 88

1          Q.   Okay.  Can you go back to Exhibit 2,

2     please.  And I just want you to pull out the two

3     worksheets and focus on the program/department

4     worksheet.

5          A.   Yeah.

6          Q.   Okay.  And I want to focus on the two

7     percentage weights that you gave, the 5 percent for

8     psychological services and the 10 percent of school

9     counseling services.

10          A.   And I may have weighed in on the pupil

11     personnel.  I just don't want to be -- I don't want

12     to misrepresent whether I did or not.

13          Q.   Sure.  You said you may have spoken

14     with Mr. Williams, but you can't recall?

15          A.   Correct.

16          Q.   Okay.  For the two that you do recall,

17     if -- for the 5 percent of time that staff in the

18     psychological services department spent on issues

19     concerning social media, if they hadn't spent that

20     5 percent of their time on issues concerning social

21     media, what would they have been doing with the

22     freed-up time?

23          A.   So that -- that's a great question.

24               The -- the issue we have with both of

25     these groups of staff members is they are forced

Page 89

1    because of their caseloads and because of the drain
2    of these percentages to be reactive.
3                And they all -- "they all."  Most of
4    the staff members in these two groups would love to
5    spend a lot more of their time being proactive and
6    trying to heed off the issues that lead to crisis
7    that they then have to deal with.
8                So if these percentages were taken away
9    and this social media issue was no longer present,
10   they would be able to be a lot more proactive in
11   working with students to reduce the issues that
12   then cause the crisis response.
13        Q.   Does that mean that they would get to
14   see other students or more students?
15        A.   In some cases, depending on the size of
16   their caseload.
17                But it really would mean that they
18   would be able to work with students on developing
19   skills that they can't spend on time with them now
20   that that skill deficit leads to behavioral,
21   academic, social and emotional issues.
22        Q.   So for the psychological services staff
23   and the school counseling services staff, if they
24   didn't spend the 5 percent or the 10 percent that
25   you estimate they spent on issues concerning social

Page 90

1    media, they could have spent that freed-up time

2    either seeing more students, seeing existing

3    students for more time, and they could have worked

4    with those students on developing skills; is that

5    correct?

6              MR. BYRD:  Object to form.

7              THE WITNESS:  Yeah.  I -- I think --

8    and even if that isn't 100 percent accurate, what

9    they're working with students on is probably the

10   more apt issue on the table in working with

11   students on college planning or career exploration

12   rather than, "Why did you feel like you wanted to

13   kill yourself?" or, "Why did you get in that fight

14   yesterday?" or, "What's going on with you failing

15   your classes?" or, "Why aren't you coming to

16   school?"

17              So those are the -- a lot of the

18   reactive issues that they have to work on with,

19   based on this percentage, stemming from social

20   media.

21              Like, for instance, if we look at

22   attendance and a lot of students not coming to

23   school because they're not getting the proper sleep

24   because they're up all night on their phones.

25              Or they've been bullied on social

Page 91

```
 1   media.  Or they, you know, put something on there
 2   that now they're embarrassed about and they don't
 3   want to come in.
 4            So these are the things that prompt
 5   them to have to work on things.
 6            They would much rather sit with a
 7   student on the positive.  But, instead, they're
 8   sitting there working with trying to recover from
 9   the things that they've done that they shouldn't
10   have done.
11            And I think the -- you know, the
12   community, in essence, is paying the salaries of
13   these people who now have to work on addressing the
14   societal issues that have been thrust upon them.
15            And that's just -- it's an
16   unfortunate -- it's not why a lot of these people
17   got into these roles.
18   BY MR. KEYES:
19        Q.   Are you able to identify for me the
20   number of students who are not getting proper
21   sleep?
22        A.   I would have to consult the wellness
23   needs assessment data on that.  We had students
24   respond to questions about the sleep they get.
25            And I don't believe it's in the
```

Page 92

1   wellness needs assessment you have in front of you.

2   I think that was this year's iteration that asked

3   them about their sleep, why they're not going to

4   sleep, if they have a bedtime, how much sleep they

5   get, if they're up on their phones and that is a

6   barrier to sleep.

7           So we have the data.  I just don't have

8   it at recall.

9       Q.   And when you say it's "this year's

10  iteration," are you talking about for the 2024-2025

11  school year?

12      A.   Correct.  I don't believe -- I could be

13  wrong.  I don't believe we asked that in last

14  year's survey.

15      Q.   And has the 2024-2025 wellness needs

16  assessment survey results been put into a final

17  report?

18      A.   Not a final report.

19      Q.   Has it been put into a draft report?

20      A.   Not in report form.  But certain people

21  such as myself can go in and pull the data, but not

22  in an officially -- see, the report you have has

23  been made clear to the public whereas, depending on

24  permissions, we can go in and look by school and by

25  grade.

Page 93

```
 1          Q.    Is -- is there any schedule for
 2    converting the 2024-2025 wellness needs assessment
 3    survey results into a final report?
 4          A.    I'm sure there is, yes.
 5          Q.    What is the schedule?
 6          A.    I don't know.  That's something that
 7    Mr. Yakoubou works on, so...
 8          Q.    Okay.
 9          A.    In fact, maybe it's published and I'm
10    not even aware of it.
11          Q.    But you're not aware of a final report
12    and you're not aware of a draft report at this
13    point?
14          A.    Correct.
15          Q.    And are you able to identify for me the
16    number of students who are not coming to school
17    because they're not getting proper sleep?
18                MR. BYRD:  Object to form.
19                THE WITNESS:  I don't have a report on
20    that, no.
21    BY MR. KEYES:
22          Q.    Do you have any --
23          A.    That's -- that's anecdotal.
24          Q.    Do you have any quantitative data that
25    you can point to?
```

Page 94

1        A.    Anecdotal.

2        Q.    And are you able to identify for me the

3   number of students who are not getting proper sleep

4   because they're on their phones all night?

5        A.    I don't know about all night, but based

6   on self-reporting of students who didn't go to

7   sleep at the time they normally would because of

8   their phone, yes.

9        Q.    Where is that data?

10       A.    In the wellness needs assessment.

11       Q.    For this current year?

12       A.    Correct.

13       Q.    The one that hasn't been put in a draft

14   or final report yet?

15       A.    Correct.

16       Q.    And are you able to identify for me

17   what the students are doing on their phones when

18   they aren't getting proper sleep because of their

19   phone?

20       A.    So, again, from -- because you're

21   asking me personally, it would be anecdotal of what

22   they're doing.

23       Q.    Is that addressed in the data that was

24   collected in the 2024-2025 wellness needs

25   assessment?

Page 95

1              MR. BYRD:  Object to form.
2              You can answer.
3              THE WITNESS:  I don't remember.  I'm
4    not sure if -- if we just asked them is their phone
5    the issue or what they're doing on their phone.  I
6    feel like we may have asked them what they're doing
7    on their phone, but I'd need to look at it.
8    BY MR. KEYES:
9         Q.   Are you able to point me to any
10   instance where you made a request that Harford
11   County Public Schools hire more psychologists and
12   attributed that need to students' use of social
13   media?
14              MR. BYRD:  Object to form.
15              THE WITNESS:  So every year except this
16   year I've made that request.  Whether I've
17   indicated the need is due to social media, I don't
18   remember.
19   BY MR. KEYES:
20        Q.   Okay.  So you said every year you made
21   a request for more psychologists, yes?
22        A.   Except for this year.
23        Q.   Except for this year.
24             And -- but you don't know whether in
25   making that request for more psychologists you've

Page 96

```
 1   ever attributed that need to students' use of
 2   social media in your funding request?
 3                 MR. BYRD:  Object to form.
 4   BY MR. KEYES:
 5         Q.   Is that fair?
 6         A.   I don't know.  Yes --
 7         Q.   Okay.
 8         A.   -- that is correct.
 9         Q.   Are you able to point me to any
10   instance where you made a request that Harford
11   County Public Schools hire more counselors where
12   you attributed that need to students' use of social
13   media?  Same answer?
14         A.   Same answer.
15         Q.   Are you able to point me to any
16   instance where you made a request that Harford
17   County Public Schools hire more social workers
18   where you attributed that need to students' use of
19   social media in your funding request?
20                 MR. BYRD:  Object to form.
21   BY MR. KEYES:
22         Q.   Same answer?
23         A.   Same answer.
24         Q.   Would the same be true for PPWs?
25         A.   Correct.
```

Page 97

```
 1          Q.    Would the same be true for behavior
 2   coaches?
 3                MR. BYRD:  Object to form.
 4                THE WITNESS:  Not -- not the same.
 5   BY MR. KEYES:
 6          Q.    Why not?
 7          A.    Because they came into existence
 8   through funding sources where principals were
 9   choosing to have that position.  It wasn't my
10   request as a system.  It was more principals
11   requesting to use funding they were provided for
12   those positions.
13          Q.    So let's --
14          A.    It's actually probably true for social
15   workers, too.
16          Q.    Okay.  So let's make sure we're clear.
17   For social workers and behavior coaches, that
18   wasn't a request that you made?
19          A.    Correct.
20          Q.    That's a request that principals may
21   have made for how to spend a certain pot of money?
22          A.    Correct.
23          Q.    And are you aware of any principals
24   requesting funding for more social workers or for
25   more behavior coaches where they attributed that
```

Page 98

```
1    need to students' use of social media in their
2    funding request?
3                    MR. BYRD:  Object to form.
4                    THE WITNESS:  I can't say either way.
5    BY MR. KEYES:
6            Q.    Okay.  You know they made a request --
7            A.    Yeah.
8            Q.    -- for the position?
9            A.    I don't remember the conversations of
10   why.
11           Q.    You don't remember anyone saying, "I
12   need these positions because of the way students
13   are using social media."
14           A.    No.
15           Q.    Fair?
16           A.    Correct.  Yes.
17           Q.    When were the two licensed clinical
18   professional counselor positions created?
19           A.    So the second one started last year.
20   And the first one has probably been about three or
21   four years.
22           Q.    And are these positions where you
23   requested funding to create the position?
24           A.    No.  These were similar to those last
25   two.  Funding was provided.  Principals had
```

Page 99

1    discretion on what they needed.  This came into

2    existence.

3         Q.   Okay.  So are you able to point me to

4    any instance where principals requested the

5    creation of a licensed clinical professional

6    counselor position where they attributed that need

7    to students' use of social media?

8         A.   Not directly, no.

9         Q.   And are you able to point me to any

10   instance where you made a request that Harford

11   County Public Schools hire more nurses where you

12   attributed the need for more nurses to students'

13   use of social media in your funding request?

14             MR. BYRD:  Object to form.

15             THE WITNESS:  No.

16   BY MR. KEYES:

17        Q.   Are you able to identify for me any

18   funding request you made for a new position where

19   you attributed the need for that position to

20   students' use of social media in your funding

21   request?

22             MR. BYRD:  Object to form.

23             THE WITNESS:  I guess it depends if

24   you're asking directly or not directly because the

25   need is based on behaviors and mental health

Page 100

```
 1   concerns, which in some part is related to social

 2   media.

 3             But my exact words weren't, "We need

 4   this because of social media."  We need it because

 5   of the behavior and mental health, the suicide

 6   ideation reports, the depression, anxiety that's on

 7   the rise, knowing, in my professional opinion, that

 8   that, in part, is due to social media use.

 9             So it's a -- it's an indirect yes, but

10   not a verbatim literal that's what I asked for and

11   why.

12   BY MR. KEYES:

13        Q.   Now, separate from professionals who

14   are employed by Harford County Public Schools, you

15   also engage third-party vendors to provide

16   counseling and treatment services?

17        A.   Correct.

18        Q.   Who are the vendors that Harford County

19   Public Schools currently uses?

20        A.   I don't know the names -- all the names

21   off the top of my head.

22        Q.   Well, how many are there?

23        A.   Probably 5 to 8 providers covering all

24   55 schools.

25        Q.   And how many were there in 2016-2017
```

Page 101

1   school year?

2          A.    I think we probably had 2 to 3 covering

3   16 schools when I first got here.

4          Q.    And so these are third-party

5   professionals, either individuals or organizations,

6   that will provide counselors to provide counseling

7   or treatment services to students in the school --

8          A.    Correct.

9          Q.    -- during the school day?

10         A.    Correct.

11         Q.    And where would someone find a list of

12  the vendors that provided these services in any

13  particular year since 2016-2017 school year?

14         A.    We have a mental health specialist, and

15  she manages all those contracts.  So she would -- I

16  don't know if she has a year-by-year summary of who

17  was in what buildings, but she would know the

18  history of it.

19         Q.    What's her name?

20         A.    Christina Alton.

21         Q.    Does she do other things besides that,

22  or is that the --

23         A.    For the first --

24         Q.    -- extent of her work?

25         A.    Oh, yeah.  So from 2019 until last

Page 102

1    year, that was not -- not that duty, but the title

2    of mental health specialist was her entire role.

3              But because of the exponential growth

4    of the social workers, she's also now the

5    supervisor of the social workers in addition to the

6    mental health specialists.

7              And in 2018, Maryland mandated that

8    every school system -- because of the mental health

9    concerns that were being manifested in the school

10   buildings, they mandated that every school system

11   has a mental health specialist and provided state

12   funding to every school system to pay for that

13   position in part, which is why she came to be.

14              (HENNIGAN EXHIBIT 4, Emails dated

15   4/21/21, Subject:  MSDE Report, Bates

16   HCPS_00199774-777, was marked for identification.)

17   BY MR. KEYES:

18        Q.   I'm showing you what has been marked as

19   Hennigan Exhibit 4.  This was produced with the

20   Bates Numbers HCPS_00199774 through 199777.  It's a

21   series of emails between you and Stephen Richards,

22   the supervisor of psychological services.  Tell me

23   when you've read this exchange.

24        A.   All of it?

25        Q.   Sure.

Page 103

1           A.    Because there's --

2           Q.    I think there are only --

3           A.    There's others on the original email.

4           Q.    Yeah.  You can read as much of it as

5      you want.  I'm going to ask you about your email at

6      the bottom of the first page.

7           A.    Oh, this is COVID-related?

8           Q.    This is what?

9           A.    The first part is COVID-related?

10          Q.    Yes.

11          A.    Okay.

12          Q.    Okay.  Would you focus on your email on

13     the bottom, the first page of Exhibit 4.  It's an

14     email from you to Steve Richards on April 21st,

15     2021.  Do you see that?

16          A.    Yes.

17          Q.    And you said a moment ago this exchange

18     is "COVID-related."  What makes you say that?

19          A.    Well, what I meant was the first email

20     because MSDE was asking us how many students we

21     haven't had contact with.

22                But, as I read on, the whole thing

23     seems to be related to students returning to school

24     following the shutdown.

25          Q.    Okay.  And in your email to

Page 104

1   Mr. Richards, you say:  My guess is the academic
2   frustration will lead to mental health issues in
3   the fall, unfortunately.  The first time they are
4   given homework after a year and a half may have to
5   be approached carefully by teachers.
6                Do you see that?
7        A.   Yeah.
8        Q.   So are you looking at a scenario where
9   virtual learning is ending and in-person schooling
10  is resuming?
11       A.   April of '21?  We had -- well, in the
12  fall of -- in the fall of '20, we had some students
13  in.  And then from the fall of '20 through May of
14  '21, students were brought back incrementally based
15  on grade level.
16       Q.   And you said:  My guess is the academic
17  frustration will lead to mental health issues in
18  the fall.
19                Are you referring to frustration from
20  students who have fallen behind academically during
21  the shutdown of in-person learning for whatever
22  reason?
23                MR. BYRD:  Object.  Object to form.
24                THE WITNESS:  Yes.  But we're only
25  talking about a small portion of our population.

Page 105

1    BY MR. KEYES:

2         Q.   And can you tell me what your guess was

3    about academic frustration leading to mental health

4    issues?

5         A.   Well, again, let me just direct you to

6    Steve Richards' email because the -- the group may

7    not understand what he meant by "the bulk of SE

8    concern."  He meant special education, which is

9    only 15 percent of our student body.  So this email

10   is just about the 15 percent of our students who

11   have IEPs.

12        Q.   Okay.

13        A.   So my concern was those students who

14   have IEPs, they'll be more frustrated academically,

15   which may -- some of them also have mental health

16   diagnoses as well, which would be exacerbated by

17   the academic deficits they have and coming back and

18   being forced to do some things they hadn't done in

19   a while.

20        Q.   Well, what is the academic frustration

21   you're talking about?

22             MR. BYRD:  Object to form.

23             Go ahead.

24             THE WITNESS:  The academic frustration

25   would be more rigor than they'd had in the last few

Page 106

1   months.

2   BY MR. KEYES:

3        Q.   And then feeling stressed about not

4   being able to keep up or having to work harder to

5   keep up?

6        A.   Well, again, we're talking about a very

7   small part of our population who struggle to keep

8   up regularly.  So, yeah.  Even pre-COVID.

9        Q.   You said in April of 2021 that this was

10  your guess.  Did your guess prove to be right?

11       A.   I don't know.  I don't know that our

12  special education students presented mental health

13  concerns more so than the rest of the population.

14  I can't say that clearly.

15       Q.   You have not studied that issue?

16       A.   No.

17            (HENNIGAN EXHIBIT 5, Document titled

18  Mental Health Statistics and Initiatives in HCPS,

19  was marked for identification.)

20  BY MR. KEYES:

21       Q.   I'm showing you what has been marked as

22  Hennigan Exhibit 6.

23            MR. BYRD:  5.

24            MR. KEYES:  I'm sorry.  Strike that.

25  BY MR. KEYES:

Page 107

1          Q.    I'm showing you what has been marked as
2     Hennigan Exhibit 5.
3               THE WITNESS:   Thank you.
4     BY MR. KEYES:
5          Q.    Sure.
6               This was produced with the Bates Number
7     HCPS_00039108 in native format.
8               What -- what is Hennigan Exhibit 5?
9          A.    So this appears to be a presentation
10    that my team and I delivered to the Board of
11    Education.
12         Q.    And do you know when you delivered this
13    presentation?
14         A.    So based on my title, it would have
15    been somewhere between January of '17 and June of
16    '19.
17              My guess is probably in 2018.  I don't
18    think I would have taken this on in my first year.
19    '18 or '19.  '18 or the first half of '19.
20         Q.    These pages don't seem to be numbered,
21    but could you go to the page that has Mental Health
22    Initiatives?  It's got your -- Buzz Williams' name
23    and "Superintendent's Designee"?
24         A.    Uh-huh.  Yes.
25         Q.    Do you see the page that -- that says:

Page 108

1    Reduced Suspensions For Counseling?

2         A.    Yes.

3         Q.    And then it lists:  Drugs, Alcohol,

4    Tobacco, Conflict resolution, Fire setting and

5    Bullying?

6         A.    Yeah.

7         Q.    What was this telling the board about

8    reduced suspensions for counseling on these issues?

9         A.    So Mr. Williams became pretty adept at

10   finding ways to try to help children learn from

11   their mistakes rather than punishing them for their

12   mistakes.

13              So, for instance, students caught

14   smoking or vaping may have to complete a class,

15   which would reduce their suspensions.

16              Students caught pulling the fire alarm

17   might have to meet with the fire chief.  Students

18   caught in possession of or use of drugs or alcohol

19   may end up going through a class.

20              So all things that may help -- one,

21   help them to learn from their mistakes; and, two,

22   reduce their suspension.

23         Q.    Would you turn a few pages later, and

24   you'll see a slide that says:  Mental Health

25   Initiatives School Psychologists/Pupil Personnel

Page 109

1    Workers, and it lists Steve Richards?

2         A.   Yes.

3         Q.   Okay.  Does that indicate that the next

4    few slides were presented by Mr. Richards?

5         A.   Yes.  At that time, Mr. Richards also

6    oversaw the pupil personnel workers that

7    Mr. Williams currently now oversees.

8         Q.   And is this a slide presentation where

9    you would have reviewed it in advance of it being

10   presented to the Board of Education?

11        A.   Yes.

12        Q.   The very first slide in the deck

13   associated with Mr. Richards is a list of suicide

14   risk factors.

15             Do you see that?

16        A.   Yes.

17        Q.   Do you think that is an accurate list

18   of suicide risk factors?

19        A.   I believe at the time it was.

20        Q.   Okay.  There's no mention of social

21   media use here, correct?

22        A.   Correct.  It's sort of embedded

23   throughout.

24        Q.   How so?

25        A.   Well, we know that social media is

```
                                      Page 110
 1   directly tied to increase in depression.  So you
 2   have depression, but you don't have the factor
 3   which created it listed.
 4              The same thing with suicide attempts.
 5   The same thing with substance abuse.  Family
 6   histories of depression.  Poor adaptability.
 7              So all those things have been adversely
 8   impacted by social media as -- but this is sort of
 9   the end result of what was caused.
10        Q.   And what is your basis for saying
11   social media is directly tied to an increase in
12   depression?  What are you relying on?
13              MR. BYRD:  Object to form.  Asked and
14   answered.
15              But go ahead.
16              THE WITNESS:  Research that I've read.
17   BY MR. KEYES:
18        Q.   What research can you point me to?
19        A.   So starting with something we've
20   already discussed, which is "The Anxious
21   Generation."
22        Q.   Mr. Haidt's book?
23        A.   Yeah.
24        Q.   Okay.  Anything else?
25        A.   Other reports that I can't cite by name
```

Page 111

1    but just, in my position -- in my position, I end
2    up reading a lot of information about mental health
3    concerns and causation in addition to my work with
4    our partners in the health department.
5              And so I can't speak to any specific
6    article or research, but I anecdotally can report
7    that I've read a lot about it and heard a lot about
8    it.
9         Q.   And -- and Mr. Haidt's book and this
10   other reports that you can't cite by name talk
11   about how the content that a student can -- can
12   read or comments about the student that are posted
13   on social media can tie to depression and these
14   other adverse consequences you list?
15             MR. BYRD:  Object to form.
16             You can answer.
17             THE WITNESS:  It's not just the
18   content.  It's the format.  It's the way it's
19   delivered.  It's the addictive nature of it.  It's
20   all those things.  So it's not just the content.
21   BY MR. KEYES:
22        Q.   But the content is part of it?
23        A.   Part of it.
24        Q.   And would you say a minor part?
25             MR. BYRD:  Object to form.

Page 112

```
 1              THE WITNESS:  I can't -- I can't
 2   quantitatively answer that.
 3   BY MR. KEYES:
 4        Q.    You can't speak to what -- --
 5        A.    What percentage content plays.
 6        Q.    -- percentage of the -- of the causal
 7   force is attributable to content as opposed to
 8   something else?
 9        A.    No.  I don't know that the kids could
10   either.
11        Q.    And are you able -- even with a bit of
12   reflection able to identify any of these reports
13   that you mentioned before other than Mr. Haidt's
14   book?
15        A.    Not off the top of my head, no.
16        Q.    Okay.  Either the -- the names of the
17   author or the names of the reports or the names --
18        A.    I know your question.  I don't know the
19   answer.
20        Q.    Okay.
21              MR. KEYES:  Off the record.
22              Let's take a break.
23              THE VIDEOGRAPHER:  We are off the
24   record at 1649.
25                         * * *
```

Page 113

```
 1              (Whereupon, there was a recess in the
 2   proceedings from 4:49 p.m. to 5:08 p.m.)
 3                        *  *  *
 4              THE VIDEOGRAPHER:  We are on the record
 5   at 1708.
 6   BY MR. KEYES:
 7        Q.    Mr. Hennigan, when you treated clients
 8   at the Human Development Center, were any of your
 9   clients students of Harford County Public Schools?
10        A.    Yes.
11        Q.    How many?
12        A.    I'll have to ballpark that.  Ten.
13        Q.    And did you treat any of those ten for
14   social media addiction?
15        A.    No.
16        Q.    Did you treat any of them for addiction
17   issues in general?
18        A.    No.
19        Q.    When you saw patients or clients at
20   Guided Wellness Counseling, were any of your
21   clients students of Harford County Public Schools?
22        A.    No.  Part of my -- that transition was
23   I wasn't going to see students anymore because of
24   my role here.  So I stopped seeing any Harford
25   County Public School students.  I only saw either
```

Page 114

```
 1   private school or adults.
 2        Q.   And did you treat any of the clients
 3   you did see at Guided Wellness Counseling for
 4   social media addiction?
 5        A.   No.
 6        Q.   Did you treat any of those clients for
 7   addiction issues in general?
 8        A.   Yes.
 9        Q.   What types of addictions did you treat
10   them for?
11        A.   Opioid use.  I think that's probably
12   the only clinical addiction that I dealt with as
13   far as people that I saw.
14        Q.   And what training do you have in
15   treatment of patients for addiction?
16        A.   I don't have specific training in that.
17        Q.   But do you -- do you have any training
18   in the treatment of patients for addiction?
19        A.   Just in my regular clinical training,
20   not specifically with an addiction.
21        Q.   What do you mean just in your regular
22   clinical training?
23        A.   So when you get trained to be a
24   clinician, you get trained in a myriad of areas,
25   but you don't necessarily become an addictions
```

Page 115

1    counselor, a family marriage counselor, unless you
2    do additional training and then market yourself as
3    such.
4           Q.    Have you ever marketed yourself as
5    being a counselor who provides addiction treatment?
6           A.    No.
7           Q.    Have you ever published any articles on
8    addiction treatment?
9           A.    No.
10          Q.    Have you ever lectured on addiction
11   treatment?
12          A.    No.
13          Q.    Have you ever researched addiction
14   treatment?
15               MR. BYRD:  Object to form.
16               THE WITNESS:  Probably.
17   BY MR. KEYES:
18          Q.    What research did you do in the area of
19   addiction treatment?
20          A.    I don't know.  I'm just thinking, over
21   these past 15 years, I'm sure I've -- many times
22   when I'm working with patients that have issues
23   that I maybe don't have expertise -- direct
24   expertise on, I'll do research.
25               So I imagine that I've come across

Page 116

1   research on that.  But I can't remember a specific

2   instance or specific research.

3        Q.   Have you diagnosed any Harford County

4   Public Schools' student with social media

5   addiction?

6        A.   That's not my role; so, no.

7        Q.   So you've never done it?

8        A.   No.

9        Q.   Have you diagnosed any Harford County

10  Public School student with any addiction?

11       A.   Not my role.

12       Q.   So you haven't done it?

13       A.   No.

14       Q.   Have you done any clinical research

15  into addiction?

16       A.   I think you already asked me that.

17  Yeah, I -- I think I have.

18       Q.   Okay.  What is the clinical research

19  you've done regarding addiction?

20       A.   To restate what I said a minute ago, I

21  don't know that I have or what I have.  I just

22  would assume that probably over the years I have

23  had some -- come across some research on addiction.

24       Q.   By Googling it or something else?

25       A.   Or in -- yeah, I don't know if it's

Page 117

1    through Googling or not.  I'm not sure.  I'm

2    just -- I'm sure I've come across research on

3    addiction in my years of working in this field.

4    How I came across it, I don't know, but it seems

5    like a logical conclusion that I would have.

6        Q.   Okay.  I was asking about clinical

7    research.  You're saying you -- you may have come

8    across research on addiction that you read,

9    correct?

10       A.   Uh-huh.

11       Q.   Is that -- is that a "yes"?

12       A.   Yes.

13       Q.   But you're not able to identify any of

14   the research that you may have come across,

15   correct?

16       A.   Correct.  Correct.

17       Q.   Have you done any clinical research

18   into addiction, that is, working with patients who

19   participate in any kind of clinical study?

20       A.   Oh, no.

21       Q.   Has any Harford County Public student

22   come to you to say they were diagnosed with social

23   media addiction?

24       A.   No.  I don't -- no.

25       Q.   Has any Harford County Public School

Page 118

```
 1   student come to you to say they think they have
 2   social media addiction?
 3          A.    Would you define pornography as social
 4   media?
 5          Q.    No.
 6          A.    Clinical diagnosed addiction or their
 7   own -- in their own verbiage?
 8          Q.    Well, I already asked, has any Harford
 9   County Public School student come to you to say
10   they were diagnosed with social media addiction.
11          A.    Uh-huh.
12          Q.    You said no.
13                So now I'm asking, has any Harford
14   County Public School student come to you to say,
15   "I think I have social media addiction"?
16          A.    Potentially.
17                MR. BYRD:  Object to form.
18   BY MR. KEYES:
19          Q.    Potentially.
20                Can you -- can you identify any for a
21   specific instance where that happened?
22          A.    So --
23                MR. BYRD:  And -- and, obviously,
24   objection.  And as far as revealing some student's
25   name, we're not going to do that.  But if there's
```

Page 119

```
 1   an instance that's specific, he can talk about it
 2   generically.
 3             THE WITNESS:  So since this portion is
 4   to do with my personal life, I've had a lot of
 5   discussions with my children and their friends, and
 6   they've had a lot of discussion about having issues
 7   with getting off social media.
 8             So whether they've used the word
 9   "addiction" or not, I can't say.  But I've had
10   conversations with Harford County Public School
11   students who have discussed their concern with
12   their inability to stop accessing social media.
13   BY MR. KEYES:
14        Q.   And are these Harford County Public
15   School students, you're identifying your children
16   and their friends?
17        A.   My children's friends, not my children.
18        Q.   Okay.  So you've had discussions with
19   your children's friends where they say they have
20   issues with getting off social media?
21        A.   Yes.
22        Q.   But you don't know whether they've ever
23   used the word "addiction" or not?
24        A.   Correct.
25        Q.   Have you had discussions with any
```

Page 120

1  Harford County Public students, other than your
2  children's friends, where those students have said,
3  "I think I have social media addiction"?
4        A.    Not that I recall.
5        Q.    And have you had any discussions with
6  any Harford County Public School students, other
7  than your children's friends, where they've said
8  they have issues with getting off social media?
9        A.    Possibly.
10       Q.    Can you recall any specific instance?
11       A.    No.  But I spend a lot of time hearing
12  students, being in classrooms, being in buildings,
13  and that possibly could have been a discussion.
14       Q.    So you'd say it's possible.  You just
15  don't remember any specific instance?
16       A.    Correct.
17       Q.    Have you discussed with any teachers
18  the percentage of time they spend on issues related
19  to social media in the classroom?
20       A.    Yes.
21       Q.    What teachers?
22       A.    By name?
23       Q.    Yes.
24       A.    I'm thinking of faces.  Ms. Ackley,
25  Kelly Ackley.

Page 121

1          Q.    Anyone else?

2          A.    Ms. Jester.

3          Q.    Anyone else?

4                MR. BYRD:  Give him a second here.

5   He's said he's thinking.

6                THE WITNESS:  Kelly -- Kelly Jester,

7   same as Kelly Ackley.  I can't think of other

8   people's names --

9   BY MR. KEYES:

10         Q.    Okay.

11         A.    -- at the moment.

12         Q.    Have you given me two names?

13         A.    I have.

14         Q.    Kelly Ackley and Ms. Jester?

15         A.    Kelly Jester, yeah.

16         Q.    Kelly Ackley and Kelly Jester?

17         A.    Correct.

18         Q.    Okay.  And where does Kelly Ackley

19   teach?

20         A.    South Hampton Middle School.

21         Q.    What grade or grades?

22         A.    She's a special educator.

23         Q.    And where does Kelly Jester work?

24         A.    Bel Air Middle School.

25         Q.    What grade or grades does she teach?

Page 122

```
 1          A.    Either 7th or 8th.  There's also a
 2    Ms. Forbes, F-O-R-B-E-S.  I don't know her first
 3    name.
 4          Q.    Where does she teach?
 5          A.    Bel Air Middle School.
 6          Q.    What grade or grades?
 7          A.    At the time -- well, sorry.  She's
 8    Bel Air High School now.  At the time that we
 9    talked about this, she was at Bel Air Middle
10    School.  And we had some lengthy discussion about
11    it as I was there for a group response following a
12    suicide of one of their children.
13          Q.    What grade or grades did she teach?
14          A.    8th grade at the time.
15          Q.    Okay.  Anyone else?
16          A.    Mindy Durante, D-U-R-A-N-T-E.  She is
17    an art teacher at Edgewood High School.
18          Q.    Anyone else?
19          A.    Not that I can think of.
20          Q.    Okay.  What did Ms. Ackley say about
21    the percentage of time she spent on issues related
22    to social media?
23          A.    She didn't give me a percentage.
24          Q.    What -- what did she say in terms of
25    characterizing it?
```

Page 123

```
 1        A.    We just spoke about the policy that was
 2   coming out this year and her being excited about it
 3   because of the issues they have trying to get kids
 4   to put their phones away and the issues they're
 5   having with inattention due to students preferring
 6   to be on social media apps rather than attend to
 7   the teacher.
 8        Q.    So she was pleased that the Board of
 9   Education was adopting the current policy?
10        A.    Correct.
11        Q.    Have you talked to her since the policy
12   was adopted about the percentage of time she spends
13   on issues related to social media?
14        A.    No.
15        Q.    What did Ms. Jester say about the
16   percentage of time she spent on issues related to
17   social media?
18        A.    She did not indicate percentages.
19        Q.    What did she say in terms of
20   characterizing it?
21        A.    Similar to Ms. Ackley in that it was a
22   struggle to keep the attention of the students in
23   part because of wanting to access their phones
24   during the day and in part because of their
25   rewiring of their brain due to social media outside
```

Page 124

1    of the school day.

2         Q.   Anything else?

3         A.   Nothing that I can recall.

4         Q.   What did Ms. Forbes say about the

5    percentage of time she spent on issues related to

6    social media?

7         A.   Did not indicate a percentage.

8         Q.   What did she say about the time she

9    spent on issues related to social media in terms of

10   quantity of time?

11        A.   Quantity of time, she didn't indicate

12   the quantity of time.

13        Q.   What did Ms. Durante say about the

14   percentage of time she spent on issues related to

15   social media?

16        A.   She didn't indicate a quantity of time

17   or a percentage.

18        Q.   Okay.  So have you spoken with any

19   teacher in Harford County Public Schools who has

20   described for you the quantity of time they spent

21   on issues related to social media?

22             MR. BYRD:  Object to form.

23             THE WITNESS:  Possibly, but not that I

24   can recall clearly enough to state.

25   BY MR. KEYES:

Page 125

1      Q.   Okay.  Have you spoken with any
2  administrator in Harford County Public Schools who
3  has described for you the quantity of time they
4  spend on issues related to social media?
5           MR. BYRD:  Object to form.  Asked and
6  answered on whatever exhibit number we are in now.
7           THE WITNESS:  It is a conversation that
8  I have with administrators, but I don't have
9  detailed information about quantity of time.
10 BY MR. KEYES:
11     Q.   Are you able to identify for me any
12 administrator in Harford County Public Schools who
13 describe for you the quantity of time they spend on
14 issues related to social media?
15     A.   No.
16          MR. BYRD:  Object to form.
17 BY MR. KEYES:
18     Q.   Are you able to identify for me any
19 quantitative data that shows how many Harford
20 County Public School students are -- have social
21 media addiction?
22          MR. BYRD:  Object to form.
23          THE WITNESS:  No, because I'm not privy
24 to their clinical diagnoses.
25 BY MR. KEYES:

Page 126

1          Q.    Are you able to identify for me any
2     quantitative data that shows how many Harford
3     County Public School students are addicted to the
4     use of cell phones?
5          A.    No, because I don't have access to that
6     data.
7          Q.    Are you able to identify for me any
8     quantitative data that shows how many Harford
9     County Public School students are addicted to cell
10    phones or social media because of the defendants'
11    platforms?
12         A.    No.
13              MR. KEYES:  Okay.  I have no questions
14    at this time.
15              Does anyone else on the Zoom have
16    questions for Mr. Hennigan?
17              MR. FLASTER:  No questions from Meta.
18              MR. BYRD:  Okay.  Just a couple
19    follow-ups here.
20                          * * *
21                      EXAMINATION
22    BY MR. BYRD:
23         Q.    You were asked about this PowerPoint
24    here, this State of Maryland YRBS PowerPoint.  I
25    think it's Exhibit Number --

```
                                          Page 127
 1          A.    3.
 2          Q.    -- 3.  Do you recall those questions?
 3          A.    I believe so, yes.
 4          Q.    If you can turn to Page 7 of the
 5    PowerPoint.  It's titled -- it says:  Overall
 6    trends from the most recent YRBS/YTS.
 7                Do you see that?
 8          A.    Yes.
 9          Q.    And it looks like the trend is up.  The
10    trend is up for mental health indicators, which
11    are:  sad or -- well, can you read what those are?
12          A.    Sad or hopeless, suicide ideation,
13    suicide attempt.
14          Q.    And the trends, according to this
15    document, say that those are going up, right?
16          A.    Yes.
17          Q.    Is that consistent with what you were
18    discussing as it relates to social media?
19                MR. KEYES:  Objection to form.
20                THE WITNESS:  Absolutely.  I think
21    the -- a lot of what we talked about today are
22    societal factors that have existed for decades and
23    have not spiked this data and with any comparison
24    to the spike in the data once social media became
25    prevalent and accessible to students.
```

Page 128

```
 1   BY MR. BYRD:
 2          Q.    And Mr. -- the defense counsel asked
 3   you -- Mr. Keyes asked you about some of these
 4   other things all throughout today and earlier today
 5   about tobacco and alcohol and other things.
 6               And then what does it say the trend is
 7   for that in this document that he -- that he showed
 8   you?
 9               MR. KEYES:  Objection to form.
10               THE WITNESS:  So substance
11   indicators -- substance use indicators are on a
12   downward trend.
13   BY MR. BYRD:
14          Q.    So for the ACEs, the substance
15   indicators that form some of these ACEs are going
16   down, right?
17               MR. KEYES:  Objection to form.
18               THE WITNESS:  So the -- yeah.  So
19   for -- as far as substances, yes.
20   BY MR. BYRD:
21          Q.    While the mental health indicators are
22   going up, right?
23          A.    Correct.  Yes.
24          Q.    And this is in 2021.  This -- this
25   is -- this report covered 2021 to '22, right?
```

Page 129

1          A.    Yes.

2          Q.    It talks on that same page about female

3    students more likely to report mental health.

4                Is that consistent with what you've

5    been saying about social media?

6          A.    Yes.  And -- and if I can expound.

7                These two data points, the mental

8    health indicators going up and substance use going

9    down, are more directly linked than you might

10   think.

11               The alcohol, tobacco, marijuana use is

12   down in part because kids are not going out and

13   leaving their houses and socializing.

14               And, as a result, they're in their

15   homes alone or without socialization, without

16   friends, which is then leading to hopelessness and

17   sadness and suicidal ideation.

18               And in part because, as I said earlier,

19   a lot of our -- and especially females know that

20   they are imperfect.  But yet on social media, it

21   appears to them that everybody else is perfect.

22               So when you don't go out of your house

23   to socialize with others the way children have in

24   past years, you're not going to engage in risky

25   behavior because you're not going to smoke a

Page 130

1   cigarette in your bedroom the same way you might in

2   a woods somewhere or something.  So you're going to

3   see those go down.

4         But yet we've -- now we've got these

5   socially isolated children who are comparing

6   themselves to people based on filters and based on

7   inaccurate portrayals that people are putting of

8   themselves on social media.

9         So then it kind of makes sense why it's

10  happening.

11        Q.   So turn to Page 14.  You were asked

12  about this emotional abuse map by county.

13        Do you see that?

14        A.   Good thing you said that because I

15  thought that was an acronym.

16        Q.   Oh.  I don't know.

17        A.   No, I don't think it is.

18        Q.   It is a map.

19        A.   I think you're right.  It's a map.

20        Q.   I don't know if I'm referring to the

21  acronym "MAP," but who knows.

22        A.   No, it's a map.

23        Q.   But you were asked questions about

24  this, right?

25        A.   Yes.

Page 131

1          Q.   Well, now, is -- from your observations

2    and expertise and time in this field with students,

3    is social media leading to emotional abuse?

4               MR. KEYES:  Objection to form.

5    Foundation.

6               THE WITNESS:  I definitely -- I

7    definitely think there's -- there's some

8    correlation.

9               I -- we have seen, as I said, a

10   generalized deterioration of parenting.  And so

11   when parents are themselves addicted to social

12   media, they are annoyed by a child who needs

13   attention --

14   BY MR. BYRD:

15          Q.   Can it lead --

16          A.   -- which can lead to emotional abuse.

17          Q.   So can it -- can it exacerbate

18   emotional abuse that's already occurring?

19          A.   I believe so.

20               MR. KEYES:  Objection to form.

21   BY MR. BYRD:

22          Q.   Huh?

23          A.   I believe so.

24          Q.   What about household mental illness

25   that you were asked about on 18?  Can social media

Page 132

1  exacerbate or even cause household mental illness
2  problems?
3              MR. KEYES:  Objection to form.
4              THE WITNESS:  Well, social media has
5  created a new diagnosis of mental illness that
6  didn't exist in prior years.  So you now have a new
7  addiction on the streets that wasn't there prior.
8  So, yes.
9  BY MR. BYRD:
10         Q.   And if you turn to Page 27, I think
11  we've talked about it.
12              The idea is that you have these ACEs,
13  right?
14         A.   Yes.
15         Q.   We listed all of them.
16              Are -- are -- are kids that have ACEs
17  or multiple ACEs, are they more vulnerable to
18  social media -- to -- to problems from social media
19  use?
20              MR. KEYES:  Objection to form.
21              THE WITNESS:  They can be.  Because the
22  impact of an ACE is all dependent on the presence
23  or absence of protective factors, the presence or
24  absence of resilience.
25              So a child who is already down and out

Page 133

1    is going to be more adversely affected by an ACE

2    and by negative inferences that are drawn from

3    social media than a child who, let's say, has a

4    very sound home life, who maybe can write off a

5    fleeting feeling of sadness or depression or -- I

6    won't call it "depression."

7                  -- of sadness or inadequacy because

8    they then can look around at the rest of their life

9    and see, Okay, I can deal with that small blip.

10                 But other students who have a lot of

11   ACEs can then just see those feelings of inadequacy

12   and sadness and hopelessness as just one more straw

13   in the pile, which is why we have seen an increase

14   in -- in suicides.

15   BY MR. BYRD:

16        Q.   If you -- it's Page 27.  And so as I

17   understand what you said, you have these ACEs.

18                 And to mitigate the -- it says to

19   mitigate the effects of ACEs, communities can focus

20   on these, like -- on positive experiences.  And

21   they list these seven things right here, right?

22        A.   Uh-huh.  Yeah.

23        Q.   Just -- just looking at some of these,

24   does social media help or hurt these childhood

25   positive experiences?

Page 134

1              MR. KEYES:  Objection to form.  Lack of

2      foundation.

3              THE WITNESS:  I think it hurts several

4      of them.  I think children are not -- are not

5      engaging in community traditions and volunteerism

6      as much as they were, because they don't want to

7      engage in those things because they're -- would

8      rather sit in their room and stare at videos all

9      day.  And, frankly, that was one that surprised me

10     as a parent.  I didn't know how important it was to

11     have my children involved in community events and

12     volunteerism.

13              I would also say feeling safe and

14     protected by an adult in your home, a lot of our

15     children have grown up with -- with adults who they

16     don't feel safe around because they're not paying

17     attention to them because they're more interested

18     in what's happening in their phone.

19              Feeling supported by friends, we know

20     by research that children are not socializing and

21     don't have the friendships to the degree they did

22     pre-social media.  So that's an absolute impact.

23              Feeling a sense of belonging in high

24     school, again, social media has created more of a

25     feeling of isolation than of belonging.

Page 135

```
 1              Those are the -- those are the big ones
 2    I would say that have been negatively impacted by
 3    social media.
 4    BY MR. BYRD:
 5        Q.   You were asked by counsel about COVID
 6    several times, and you remember he -- he asked you
 7    questions but wanted you to exclude any -- any
 8    relationship that COVID had to -- to social media
 9    use, right?
10              So I think you started to say that
11    there were other reasons, and he said, "I don't
12    want to hear about the other reasons."
13              Can you tell the jury about, how
14    does -- how is COVID and social media related?
15              MR. KEYES:  Objection to form.  Totally
16    mischaracterizes the record.  If you're going to
17    characterize the record, let's be accurate.
18              MR. BYRD:  Yeah, we can read it.
19              Go ahead.
20              THE WITNESS:  So part of the -- part of
21    the problem, again, when people use the word
22    "COVID," it's too general because there's a million
23    things associated with COVID; that some of it was
24    positive, to be honest with you.
25              But part of the issue with COVID is
```

Page 136

1    people -- a lot of parents wanted to find a way to

2    connect their children because they weren't able to

3    connect in person.  They thought using social media

4    or phones would be a good avenue to do that and

5    then were hoodwinked into believing that that was

6    going to be a positive thing, and then it turned

7    into the crisis we're in today.

8              So I think if not for COVID, the

9    statistics on when children are introduced to

10   phones and social media would probably -- that sort

11   of bell curve probably would be moved because it's

12   now become socially acceptable to do those things

13   at a much younger age.

14   BY MR. BYRD:

15        Q.   So social media made the isolation

16   problems from COVID worse, right?

17              MR. KEYES:  Objection to form.

18              THE WITNESS:  In the long run, I think.

19   In the short term, maybe not.  But in the long

20   term, it absolutely created an environment where

21   children felt that they were making friends with

22   people they never met.  They were socializing and

23   talking, quote, unquote, to people when they

24   weren't even opening their mouth.

25              And, frankly, it had -- has opened the

1    doors for a lot of sexual predators and child
2    trafficking.  The average age of an online gamer is
3    30, and most of our kids probably think it's 12.
4    So a lot of our ten-year-olds are playing games
5    with 50-year-olds who they think are 12.
6                And child sex trafficking has become
7    the Number 2 highest crime in our country.  And I
8    think social media has allowed for people to enter
9    the lives of children, who in person those children
10   would have been savvy enough to never let that
11   happen, and parents wouldn't have let them in.
12                But the issue is, all those places and
13   people that my parents wouldn't let me go be and
14   see, my child doesn't have to leave her bedroom to
15   go see them.  So they're all right there inside
16   that phone preying on them, where I had to leave my
17   house and go find those things.
18                So the problem with social media that
19   has been exacerbated through COVID is all those
20   demons are right there inside your child's bedroom.
21   BY MR. BYRD:
22        Q.   Let me just ask you a couple of quick
23   follow-up things.  You were asked about hiring --
24   hiring more professionals to deal with social media
25   and whether you put that on the form or not.

Page 138

1           Just to confirm, you did hire more
2    professionals because of the social media issues
3    you've been dealing with, correct?
4                MR. KEYES:  Objection to form.
5    Mischaracterizes the testimony.
6                THE WITNESS:  We hired more individuals
7    because the mental health crisis spiked so sharply
8    in -- in response to increased social media access.
9    BY MR. BYRD:
10          Q.   And that's true even though you didn't
11   write it down somewhere in the funding request,
12   right?
13          A.   Correct.
14          Q.   You were asked about this
15   Interrogatory 5 --
16          A.   Yes.
17          Q.   -- that I think is Exhibit Number 2.
18          A.   Yes.
19          Q.   You were asked about two of the
20   categories, and I think you said you may have
21   contributed to the pupil personnel services was
22   one.  You couldn't recall.  Do you remember those
23   questions?
24          A.   I do.
25          Q.   Let me just ask you.  From what I

Page 139

1    understand what pupil personnel services do, well,

2    explain what that is, and how could that relate to

3    social media?  Even if you gave the weight or

4    didn't give the weight, how can that relate to

5    social media?

6                    MR. KEYES:  Objection to form.

7                    THE WITNESS:  So pupil personnel

8    workers do a lot of things, but a large part of

9    their job is managing attendance at the most

10   egregious levels.  So working with families when

11   children's attendance has become unresolved by

12   letters and phone calls.

13                    So the pupil personnel workers will do

14   a lot of home visits, taking families to court,

15   taking them to truancy court for children who are

16   missing a lot of school.

17                    And one of the things that we've seen

18   in my presentation to the Board of Education is we

19   have seen, you know, changes in our attendance.

20   And part of that, anecdotally speaking, we have

21   children not wanting to come to school either

22   because of how they feel about themselves, how

23   they've been made to feel by other people, bullying

24   and harassment that's occurred on social media, all

25   these things.

Page 140

1          So when you look at a caseload of

2    children not coming to school, every single one of

3    them has a different reason.  But a lot of what our

4    pupil personnel workers are seeing is students

5    wanting to be isolated for two reasons.

6              One, they've become uncomfortable being

7    in social situations because social media has

8    stripped that away from them.  But they also don't

9    feel as though they can get up and go a lot of

10   times because of the lack of sleep.

11             And I know that in California and

12   Florida, they're looking at changing school times

13   because of -- there's a recognition that school

14   starts too early because kids are not going to

15   sleep on time.  And some of that is because parents

16   are allowing them to have their phones in their

17   bedrooms at night.  And they can't figure out why

18   their child is so tired and looks depressed when

19   they're not monitoring the fact that their child

20   may have been on the phone until 4:00 in the

21   morning and then getting up at 6:00 for school.

22             So the PPWs are spending a lot of their

23   time trying to address attendance issues that would

24   not be issues if it not for some social media.

25   BY MR. BYRD:

1          Q.    Okay.  And finally, at the beginning of
2     this deposition, you were asked about whether you
3     had done anything -- you had done anything to ask
4     the defendants to change their conduct or change
5     their platforms.  Do you recall that question?
6          A.    I do.
7          Q.    And you asked, do you mean me
8     personally; is that right?
9          A.    In this part.  I believe this morning I
10    was asked if the system had, but, yes, me
11    personally --
12         Q.    Yeah.  Has the district done anything
13    to ask the social media companies about --
14         A.    Absolutely, yeah, in this complaint,
15    because they recognize that they have all the power
16    in changing how -- in how this information is
17    delivered to children and, frankly, the impact that
18    that's having on them, so...
19              MR. BYRD:  Okay.  That's all I have.
20                        *  *  *
21                     EXAMINATION
22    BY MR. KEYES:
23         Q.    For Exhibit 2, the program/department
24    worksheet, where it says:  Pupil personnel
25    services, 5 percent.

Page 142

1          A.    Uh-huh.

2          Q.    Are you there?

3          A.    I am.

4          Q.    You said you may have spoken with

5     Buzz Williams?

6          A.    Yes.  I just remember getting this and

7     debating if I was going to look into it and answer

8     it or if he was.  I don't remember where that shook

9     out.

10         Q.    If Mr. Williams testified that he

11    picked the 5 percent weight for pupil personnel

12    services, would you defer to his testimony on how

13    he arrived at that 5 percent?

14              MR. BYRD:  Object to form.

15              THE WITNESS:  I'd say in part.  The

16    PowerPoint that you noticed earlier had

17    Mr. Richards as the supervisor of pupil personnel

18    services, so it's -- you know, he understands the

19    job and works with those -- with that staff and has

20    for years but doesn't have the historical knowledge

21    that I have having been a pupil personnel worker

22    for 12 years of my career.

23    BY MR. KEYES:

24         Q.    Well, but if Mr. Williams testified

25    that he picked the 5 percent weight for pupil

Page 143

1   personnel services --

2           A.    Uh-huh.

3           Q.    -- without consulting you --

4           A.    Uh-huh.

5           Q.    -- would you defer to his testimony on

6   how he arrived at the 5 percent weight?

7                 MR. BYRD:  Objection.  And speculation

8   and vague.  And he doesn't know about what the

9   testimony was to be able to tell you whether he --

10                MR. KEYES:  Well, it's a --

11                MR. BYRD:  -- defers to it or not.

12                MR. KEYES:  Well, it's a speaking

13  objection.

14  BY MR. KEYES:

15          Q.    But if someone else said, "I picked the

16  5 percent," and you don't have any recollection of

17  picking the 5 percent, would you defer to his

18  testimony on how he picked the 5 percent?

19                MR. BYRD:  Object to form.

20                THE WITNESS:  I suppose I would have

21  to.

22  BY MR. KEYES:

23          Q.    You testified earlier that without

24  COVID, families, parents and students would not

25  have allowed students access to phones or social

```
                                                 Page 144
 1   media as early as they did.  Did I get that right?
 2           A.   I said I don't think they would have.
 3   I think the --
 4           Q.   Do you -- do you have any -- any --
 5           A.   -- the trajectory would be different.
 6           Q.   Do you have any data or research --
 7           A.   No.
 8           Q.   -- to support that opinion?
 9           A.   No.
10           Q.   That's your impression?
11           A.   Yeah.
12                MR. KEYES:  Okay.  I have no further
13   questions.  Thank you, Mr. Hennigan.
14                MR. BYRD:  Okay.  We're done.
15                MR. KEYES:  Does anyone else?
16                MR. FLASTER:  None from Meta.
17                MR. KEYES:  Anyone else on Zoom have
18   any questions for Mr. Hennigan?
19                MR. KEYES:  Okay.
20                MR. BYRD:  I think we're done.  I will
21   say, for the court reporter, that I believe our
22   side has looked at your redact- -- they've proposed
23   redactions and are going to send it.  And you all
24   please chime in or do whatever.  And that's that
25   we -- we either have sent it or are soon sending it
```

Page 145

1  to you, to the court reporter.

2            THE VIDEOGRAPHER:  Stand by.  We are

3  off the record at 1743.

4            MR. KEYES:  Can you offer our times?

5            THE VIDEOGRAPHER:  Yes.  Mr. Keyes is

6  at 2 hours and 22 minutes.  And Mr. Byrd is at

7  16 minutes.

8            (WHEREUPON, the deposition was

9  concluded at 5:44 p.m.)

10           (Signature Reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 146

1                 DEPOSITION ERRATA SHEET

2

Case Caption:  In Re:  Social Media Adolescent

3   Addition/Personal Injury Liability Litigation

4         DECLARATION UNDER PENALTY OF PERJURY

5

6              I declare under penalty of perjury that

7   I have read the entire transcript of my deposition

8   taken in the captioned matter or the same has been

9   read to me, and the same is true and accurate, save

10  and except for changes and/or corrections, if any,

11  as indicated by me on the DEPOSITION ERRATA SHEET

12  hereof, with the understanding that I offer these

13  changes as if still under oath.

14

15

16              Signed on the _____ day of

17  _____, 20___.

18

19

20         _____

21              BERNARD HENNIGAN

22

23

24

25

Page 147

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24              BERNARD HENNIGAN
25
```

Page 148

1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24              BERNARD HENNIGAN

25

Page 149

1                    CERTIFICATE OF REPORTER
2
          I, Cindy A. Hayden, Registered Merit
3    Reporter and Notary Public for the State of
     Maryland, do hereby certify:
4
          That the foregoing deposition was taken
5    before me on the date and at the time and location
     stated on Page 1 of this transcript; that the
6    deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the
7    testimony of the deponent and all objections made
     at the time of the examination were recorded
8    stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed
9    is a true, accurate and complete record of the
     testimony of the deponent and of all objections
10   made at the time of the examination to the best of
     my ability.
11
          I further certify that I am neither related
12   to nor counsel for any party to the cause pending
     or interested in the events thereof.  Witness my
13   hand, this 8th of May, 2025.
14
15
16   _____
17   Cindy A. Hayden,
     Registered Merit Reporter
18   Notary Public
     State of Maryland
19   My Commission expires:
     April 26, 2029
20
21
22
23
24
25