**Exhibit 19**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE: SOCIAL MEDIA ADOLESCENT     |
     ADDICTION/PERSONAL INJURY          | MDL NO.
4    PRODUCTS LIABILITY LITIGATION      | 4:22-md-3047-YGR
     _____|

5

     This Document Relates to:          |

6                                        |

     Board of Education of              |
7    Harford County v.                  |
     Meta Inc., et al.                  |

8                                        |

     Case No. 4:23-cv-03065             |

9

10

11    * CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER *

12

13        VIDEOTAPED DEPOSITION OF JILLIAN LADER,

14    a witness herein, called by the defendants for

15    examination, taken by and before Ann Medis, RPR,

16    CLR, CSR-WA, and Notary Public in and for the

17    Commonwealth of Pennsylvania, at the Harford

18    County Public Schools Central Administration

19    Building, 102 South Hickory Avenue, Bel Air,

20    Maryland 21014, on Monday, May 12, 2025,

21    commencing at 10:04 a.m.

22

23

24

25

CONFIDENTIAL

```
                                              Page 2

 1                  A P P E A R A N C E S
 2    On behalf of Plaintiff Harford County Public Schools
 3              BROCKSTEDT MANDALES FEDERICO LLC
              BY: MATTHEW P. LEGG, ESQUIRE
 4              2850 Quarry Lake drive - Suite 220
              Baltimore, Maryland  21209
 5              410.421.7777
              mlegg@lawbmf.com
 6
 7    On behalf of Defendants Meta Platforms, Inc. f/k/a
      Facebook, Inc.; Facebook Holdings, LLC, Facebook
 8    Operations, LLC; Facebook Payments, Inc.; Facebook
      Technologies, LLC; Instagram, LLC; Siculus, Inc.; and
 9    Mark Elliot Zuckerberg
10              SHOOK HARDY AND BACON LLP
              BY:  BRIAN M. LANDS,ESQUIRE
11              Two Commerce Square
              2001 Market Street, Suite 3000
12              Philadelphia, Pennsylvania  19103-7014
              215.278.2555
13              blands@shb.com
14              (via Zoom)
              SHOOK HARDY AND BACON LLP
15              BY:  RANA L. FREEMAN, ESQUIRE
              2555 Grand Boulevard
16              Kansas City, Missouri  64108
              816.474.6550
17              rfreeman@shb.com
18
      On behalf of Defendant Snap, Inc.
19
              (via Zoom)
20              KIRKLAND & ELLIS LLP
              BY:  MARK HOUSTON BROWN, JR., ESQUIRE
21              1301 Pennsylvania Avenue, NW
              Washington, DC 20004
22              202.389.3042
              houston.brown@kirkland.com
23
24
25
```

CONFIDENTIAL

```
                                              Page  3

 1          A P P E A R A N C E S (Continued)
 2    On behalf of Defendants TikTok TikTok, Ltd.; TikTok,
      LLC; TikTok, Inc.; and ByteDance Inc.
 3
                 (via Zoom)
 4               KING & SPALDING LLP
                 BY:  ISABEL KING, ESQUIRE
 5               110 North Wacker Drive, Suite 3800
                 Chicago, Illinois  60606
 6               312.764.6921
                 iking@kslaw.com
 7
 8    On behalf of Defendants Alphabet Inc.; Google LLC and
      YouTube LLC
 9
                 WILLIAMS & CONNELLY
10               BY:  DANIEL WHITELEY, ESQUIRE
                 680 Maine Avenue SW
11               Washington, DC 20024
                 202.434.5405
12               daniel.whiteley@wc.com
13
      Also present
14
      Lauren L. Drive, Deputy General Counsel, Harford County
15    Public Schools
16    Nick Lee (via Zoom)
17    Bradley Loy, videographer
18    Jacob Arndt, trial tech
19
20
21
22
23
24
25
```

CONFIDENTIAL

```
                                          Page 4
 1                 * I N D E X *
 2   JILLIAN LADER                              PAGE
 3      EXAMINATION BY MR. WHITELEY                6
 4
 5        * INDEX OF HCPS/LADER EXHIBITS *
 6   NO.              DESCRIPTION              PAGE
 7   Exhibit 1  Jillian Lader resume              9
 8   Exhibit 2  Email chain, 7/12/18, from R.    38
                Villareal to J. Lader, subject:
 9              RE:  Wednesday Learning Camps 2018
                HCPS_0051736 - 0051769
10
     Exhibit 3  Student/parent handbook for the  40
11              '18/19 school year
                HCPS_00264167 - 00264188
12
     Exhibit 4  Email chain, 8/15/23, from J. Lader  44
13              to Board of Education, et al.,
                subject: Links to "Welcome Back to
14              School" Video Messages from
                Dr. Bulson and Dr. Poynton/Mrs. Hahn
15              HCPS_00048089 - 00048091
16   Exhibit 5  2024-2025 Parent-Student Handbook  47
                Calendar
17
     Exhibit 6  Email chain, 4/15/19, from S. Wall  50
18              to J. Lader, subject: RE: Social Media
                HCPS_00539771
19
     Exhibit 7  HCPS Analytics, March 2019          51
20              HCPS_00539772
21   Exhibit 8  Email chain, 6/22/21, from J. Lader  56
                to S. Wall, subject: FW: Final
22              Reminder: Facebook Analytics is
                going away soon
23              HCPS_00538420 - 00538422
24
25
```

CONFIDENTIAL

```
1      * INDEX OF HCPS/LADER EXHIBITS (Continued) *
2    NO.                  DESCRIPTION                    PAGE
3    Exhibit 9  HCPS Social Media Guide                   57
                HCPS_00324925 - 00324934
4
     Exhibit 10 Communications section of the             73
5               budget document
                HCPS_00347775 - 00347776
6
     Exhibit 11 Fiscal 2020 Communications section        75
7               of the budget document
                HCPS_00345353 - 00345354
8
     Exhibit 12 Email chain, 10/4/21, from J. Lader       81
9               to D. Merlock, subject: RE: Two
                Things :)
10              HCPS_00538342 - 00538345
11   Exhibit 13 Screen capture of a post on HCPS's        85
                Instagram account
12
     Exhibit 14 Email chain, 2/27/23, from K.             90
13              Andersen to J. Berends, re video
                related to music that HCPS posted
14              HCPS_00467611 - 00467612
15   Exhibit 15 Plaintiff Board of Education of           91
                Harford County's Amended
16              Objections and Responses to
                Defendants' Interrogatories (Set 3)
17
     Exhibit 16 Email chain, 10/19/21, from M.            97
18              Stapleton to J. Lader, subject: RE:
                Parent Academy Social Media 101
19              HCPS_00465458 - 00465460
20                        - - - -
21
22
23
24
25
```

CONFIDENTIAL

Page 6

1                    P R O C E E D I N G S

2                         - - - -

3            THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Bradley Loy.  I'm a

5    videographer for Golkow.  Today's date is May 12,

6    2025.  The time is 10:04.

7            This video deposition is being held at

8    102 South Hickory Avenue, Bel Air, Maryland.

9    We're here in the matter of Social Media CA MDL

10   3047, Board of Education of Harford County versus

11   Meta for the United States District Court,

12   Northern District of California.

13           The deponent is Jillian Lader.

14           Counsel will be noted on the

15   stenographic record.  The court reporter is Ann

16   Medis and will now swear in the witness.

17                    JILLIAN LADER,

18      having been first duly sworn, was examined

19             and testified as follows:

20                    EXAMINATION

21   BY MR. WHITELEY:

22      Q.    Good morning.

23      A.    Good morning.

24      Q.    Could you please state your full name

25   for the record.

```
                                      Page 7
 1       A.    Jillian Lader.
 2       Q.    Ms. Lader, have you ever been deposed
 3   before?
 4       A.    No, I have not.
 5       Q.    I'm going to cover a few ground rules so
 6   we're on the same page.
 7             Do you understand that you are under
 8   oath today?
 9       A.    Yes.
10       Q.    And you understand that you have to give
11   truthful testimony as if you were in front of a
12   court?
13       A.    Yes.
14       Q.    Because the court reporter is going to
15   be taking down everything that we say today, I ask
16   that you pause a little bit before answering the
17   question, and I will pause to make sure that you
18   answered the question before I ask my next
19   question.  Okay?
20       A.    Yes.
21       Q.    Another reason to pause is your counsel
22   may make objections at various points throughout
23   the deposition.  And you can still continue to
24   answer the question so long as your counsel does
25   not instruct you to not answer the question.
```

CONFIDENTIAL

Page 8

1          Does that make sense?

2     A.    Understood.

3     Q.    I'll also ask if one of my questions is

4  unclear or you didn't hear part of it, just ask me

5  to repeat it or clarify, and I'm happy to do so.

6          If you answer the question, we'll assume

7  that you've understood the question.

8     A.    Yes.

9     Q.    We talked about this a little bit

10 already, but if you ever need a break, that's

11 okay.  Just let us know.  But the only exception

12 to that rule is if I've asked the question, you

13 need to give an answer on the record before we go

14 on a break.  Understood?

15    A.    Understood.

16    Q.    Is there any reason you can't give

17 truthful and accurate testimony today, such as

18 being on medication?

19    A.    No.

20    Q.    Where are you employed, Ms. Lader?

21    A.    Harford County Public Schools.

22    Q.    What is your title or role at Harford

23 County Public Schools?

24    A.    My official title is manager of

25 communications.  That means that I'm directing all

CONFIDENTIAL

```
                                            Page 9
 1   communications for the school system.
 2        Q.   If I refer to Harford County Public
 3   Schools as Harford or HCPS today, you'll
 4   understood that refers to the school district?
 5        A.   Yes.
 6             (HCPS/Lader Exhibit 1 was marked.)
 7   BY MR. WHITELEY:
 8        Q.   I'm going to mark Exhibit 1 Tab 35.
 9   This is a copy of your resume that counsel
10   provided to us.
11        A.   Can I -- Daniel, when you refer to --
12   can you refer to Harford or HCPS, will you use
13   HCPS.  Harford, just in my capacity, sometimes I
14   think of government.  So I just want to make sure
15   I'm clear on that.
16        Q.   I'll try to use HCPS.
17             Do you have a copy of Exhibit 1 in front
18   of you?
19        A.   Yes.
20        Q.   Is this your resume?
21        A.   Yes.
22        Q.   Does this look like an up-to-date and
23   current copy?
24        A.   Yes.
25        Q.   You have been the manager of
```

CONFIDENTIAL

Page 10

1    communications at HCPS since 2014; correct?

2        A.    Correct.

3        Q.    What are your responsibilities as the

4    manager of communications?

5        A.    As the manager of communications, I'm

6    overseeing internal and external comms in order to

7    insure that our community is kept up to date, is

8    informed and is aware of any pertinent information

9    to the school system and to the instruction of

10   their children.

11       Q.    You said internal and external

12   communications.  What do you mean by that?

13       A.    Correct.  So internally we're ensuring

14   that we're keeping our staff informed of

15   information.  Externally we're ensuring that we

16   are keeping parents and guardians and the

17   community aware of what's going on in Harford

18   County Public School.

19       Q.    Do internal communications also include

20   communications to students?

21       A.    Not from my office.  I do not

22   communicate directly with students proactively in

23   my office.

24       Q.    Is there somebody in HCPS or a

25   department in HCPS that does so?

CONFIDENTIAL

Page 11

1        A.    I'm hesitating because many departments

2    have to communicate with students for different

3    purposes.  However, there is not one specific

4    department that handles all communications with

5    students.

6        Q.    So if there's an inclement weather delay

7    at HCPS, how would that get communicated to

8    students?

9        A.    I communicate an inclement weather delay

10   out to our community, our staff and our parents

11   and guardians.  That information would be relayed

12   to students via their families and/or they could

13   see that information posted in multiple places

14   that are public facing, such as our website,

15   social media, different places like that.  News

16   outlets share our inclement weather information.

17   I do communicate directly with the press.

18       Q.    Do you have any direct reports as the

19   manager of communications?

20       A.    Yes.

21       Q.    Who are they?

22       A.    I have a public information specialist

23   who reports directly to me as well as a

24   videographer.  And then peripherally the

25   switchboard at central office reports directly to

CONFIDENTIAL

Page 12

1  me.   That has one full-time staff member and

2  multiple substitutes who support that position.

3        Q.    And what is the switchboard position?

4        A.    The switchboard is the desk at the lobby

5  of Central Office, so the individual greeting and

6  admitting people into Central Office.

7        Q.    And who is that public information

8  specialist?

9        A.    His actual name?

10       Q.    Yes.

11       A.    Kyle Andersen.   And that's Andersen

12  S-E-N at the end.

13       Q.    Can you give me the name of the

14  videographer who reports to you?

15       A.    Jay Berends, B-E-R-E-N-D-S.

16       Q.    What are Mr. Andersen's responsibilities

17  as a public information specialist?

18       A.    Supporting all efforts in the

19  communications office.   Up until a year and a half

20  ago, I was doing all of those responsibilities by

21  myself.   So now, fortunately, we have two

22  individuals, himself and myself, who support any

23  kind of emergency situation in the schools, those

24  day-to-day communications to keep families and

25  staff informed, anything that comes out of the

CONFIDENTIAL

Page 13

1    communications office, when we celebrate things,

2    when we're following up and making sure that

3    people are aware of any changes, anything that

4    would be pertinent to ensuring that connection

5    remains in place between families and their

6    students' instruction.

7         Q.   So other than those individuals you've

8    listed so far, does anybody else fall under the

9    communications office for HCPS?

10        A.   No.

11        Q.   You've been at HCPS for about 20 years

12   now?

13        A.   Correct.

14        Q.   Looking at your resume, you were the

15   staffing specialist from 2012 to 2014; correct?

16        A.   Correct.

17        Q.   What were your responsibilities as the

18   staffing specialist?

19        A.   It has been several years, but in human

20   resources, I had several different

21   responsibilities, as you'll see.  But as the

22   staffing specialist, that's when primarily I was

23   supporting all middle schools to ensure that they

24   had all of their teaching positions filled and, in

25   addition, supporting the -- it was called Smart

CONFIDENTIAL

Page 14

1  Find Express, which was the system used to staff

2  all substitutes for the school system,

3  instructional substitutes.

4          And in that staffing specialist

5  capacity, I also designed and ran the entire

6  recruitment program, and that was for the entire

7  system, not just middle school.

8      Q.   Was that a recruitment program for all

9  types of employees for HCPS, or was it

10  specifically like teachers?

11      A.   Primarily instructional.

12      Q.   And so when you were recruitment

13  specialist from 2008 to 2012, did you have similar

14  responsibilities to what you just described?

15      A.   Correct, minus the staffing for all

16  middle schools.

17      Q.   And you were investigations specialist

18  from 2006 to 2008?

19      A.   Correct.

20      Q.   And what were your responsibilities as

21  an investigations specialist?

22      A.   That was overseeing all background and

23  criminal checks of any staff member coming in, so

24  conducting fingerprinting, maintaining those

25  files, following up with any additional

CONFIDENTIAL

Page 15

1    information that would come back as those

2    fingerprinting checks went in and then following

3    up with my supervisor, head of investigations, so

4    that they could then proceed with any action that

5    may be necessary.

6         Q.    Prior to that, from 2005 to 2006, you

7    were a paraeducator; right?

8         A.    Yes.

9         Q.    What is a paraeducator?

10        A.    Paraeducator is one of the best jobs I

11   believe in the school system where I got to be in

12   the classroom working with pre-K students on the

13   daily and ensuring that I was supporting the

14   teacher and the students directly with any needs

15   they had.  That could be anything from supporting

16   an individual student who had a specific learning

17   need that needed additional support, to supporting

18   the teacher in making bulletin boards if she so

19   desired, whatever she needed in the classroom.

20        Q.    Were you stationed at a particular

21   school in the district?

22        A.    Yes.

23        Q.    Which school was that?

24        A.    Falls Crossroads Elementary School.

25        Q.    Setting aside the paraeducator role, for

Page 16

1    every other role you've had at Harford, have you

2    been stationed in the main administrative building

3    for HCPS, or were you stationed at a particular

4    school?

5         A.    In Central Office, A.A. Roberty

6    Building.

7         Q.    What is the address of that office?

8         A.    102 South Hickory Avenue.

9         Q.    Are there any classes for students held

10   at that building?

11        A.    Not that I'm aware of.

12        Q.    In your role as manager of

13   communications from 2014 to present, how often do

14   you visit schools and districts?

15        A.    As often as I can.  I have the privilege

16   of attending events to either cover those events

17   to share them on, for example, our website, or it

18   may be that they are asking me to come speak with

19   students about a career in communications.

20   Another example is I have the privilege of running

21   the Littles University program with the Harford

22   County Education Foundation.

23             That is a program where I have the -- I

24   get to give away books to students and children

25   who have not joined the school system yet, so

CONFIDENTIAL

Page 17

1    birth through age five.  We have special programs

2    out in the schools called the Judy Centers, and

3    that's where the school system supports families

4    prior to entering school.  So I get to go and read

5    to those groups occasionally and give them

6    additional free books as a resource.

7        Q.   How often are you in high schools in the

8    district during instruction time compared to a

9    normal school day?

10       A.   I wouldn't say that I am in the high

11   schools during instructional time often.  That is

12   on the rare occasion that there's like a specific

13   event they've asked me to attend.  So I wouldn't

14   consider that during instruction.

15       Q.   What about just during the normal school

16   day?

17       A.   During the normal school day, I wouldn't

18   say that I'm in the buildings often.  I'm dealing

19   with the high schools often, but that's usually

20   via phone and email and communicating that way to

21   support the schools when they're -- when they need

22   communication support.

23       Q.   Understood.  If you could estimate,

24   would it be more often than once a month that

25   you're in high schools during the school day?

CONFIDENTIAL

Page 18

1          A.    Yes.

2          Q.    More often than once a week?

3          A.    Maybe two or three times a month.

4          Q.    Same question for being at middle

5    schools during the school day in the district, how

6    often is that?

7          A.    I'd say the same, about two or three

8    times a month.  And the same thing with

9    elementary.  My support is typically constant and

10   via phone and email.

11         Q.    What about Mr. Andersen, do you know how

12   often he is at high schools or middle schools in

13   the district during the school day?

14         A.    I try to utilize his time more often to

15   be in the building.  In my capacity, I have to be

16   available for all 54, and I hate when I have to

17   leave an event in order to support one of the

18   other schools with an emergency, which with 54

19   schools and 40,000 students, more often than not,

20   I'm dealing with some emergency somewhere.

21              So I do have the privilege of sending

22   Mr. Andersen and Mr. Berends into the buildings

23   much more frequently.  Mr. Andersen, I would say

24   probably two or three times a week would be a more

25   accurate statement.  Mr. Berends is more often

CONFIDENTIAL

Page 19

1    than that, because our goal with our videographer

2    position is to capture as much as we can on video.

3              So 90 percent of his time is in the

4    buildings, and then the other 10 percent -- we are

5    lucky enough to have a studio here in Central

6    Office that he can utilize.  So while we try to

7    get out to the schools more frequently, for the

8    convenience of staff and students and, of course,

9    the visual representation of what's actually

10   happening versus utilizing the studio for things

11   like speeches and direct communications that have

12   been scripted.

13       Q.   So what does this video footage that

14   Mr. Berends prepares get used for?

15       A.   For promoting any positive event that's

16   happened, to share that with the rest of the

17   community.  It's also used to share examples of

18   messaging and information that we need parents and

19   guardians to be aware of.

20             For example, one of the more recent

21   safety and security videos where we were sharing

22   images of what our new safety -- I'm sorry --

23   weapons detection materials look like so that we

24   could inform parents and guardians what they would

25   see when they're entering places like a stadium or

CONFIDENTIAL

Page 20

1    a school for an event after hours since now we

2    have to ensure that we have those additional

3    security measures in place.

4         Q.   These security measures that you're

5    describing, when did the district implement them?

6         A.   After September of 2024 when there was a

7    shooting at Joppatowne High School.  That is when

8    communications and action really got into full

9    force.  The security measures, the stanchions that

10   you walk through as you go into places like the

11   stadiums for events, those really came into full

12   force within the last couple months.  I apologize

13   I don't have the exact date in mind.

14        Q.   But safe to say within the '24/25 school

15   year?

16        A.   Yes.

17        Q.   Are those metal detectors?

18        A.   Weapons detection systems, not metal

19   detectors.  Sorry I cut you off, but I want to

20   make sure.

21        Q.   Are those weapons detection systems

22   installed at all high schools in the district?

23        A.   Not installed.  They are portable.  Yes,

24   there is one at each high school so that then it

25   can also be moved to a middle or elementary school

Page 21

1    if needed.  We have not expanded to elementary
2    school yet.
3         Q.   And do all high school students in the
4    district have to walk through one of these every
5    day when they're entering the school building?
6         A.   No.  There is a permanent one at
7    Joppatowne High School, which again is where we
8    had a shooting in the school.
9         Q.   Do you know how often the portable ones
10   are used at other high schools in the district?
11        A.   I do not know.  Let me share that I do
12   know that they are being used and they are being
13   seen.  I've had a few comments on the Facebook
14   page come through on the post where we were
15   sharing the information about the new safety
16   equipment.
17             And the comments -- there were some
18   individuals who commented about why weren't we
19   seeing them everywhere.  That's where we were
20   getting some of that feedback as well.
21        Q.   Prior to joining HCPS, were you working
22   somewhere prior to that in 2005?
23        A.   Yes.  For approximately six months, I
24   was employed in Montana with the Missoula
25   Children's Theater.

Page 22

1      Q.    Was your first position at HCPS your
2   first position at a school district?
3      A.    Yes.
4      Q.    Prior to HCPS, had you ever worked in a
5   school?
6      A.    Yes.
7      Q.    When was that?
8      A.    In college when I was on breaks, I would
9   worked as a substitute teacher.
10      Q.    And where were you substitute teacher?
11      A.    In Harford County Public Schools.
12      Q.    Do you have any idea of how many times
13   you served as a substitute?
14      A.    No, I do not.
15      Q.    More or less than 20, if you had to
16   guess?
17      A.    Probably less.  As a college student, I
18   was typically doing it on breaks and probably kept
19   it to a minimum.
20      Q.    Do you have an understanding of what the
21   district is alleging in this lawsuit?
22      A.    I believe so.
23      Q.    And what is your understanding?
24             MR. LEGG:  Objection.  Form.
25             THE WITNESS:  So I would say that my

CONFIDENTIAL

Page 23

1    understanding of the lawsuit is bringing to light

2    the detriments and the dangers of social media to

3    children.

4    BY MR. WHITELEY:

5        Q.    And where did you get that understanding

6    of the lawsuit?  Did you read the Complaint?

7            MR. LEGG:  Objection.  Form.  Also to

8    the extent it calls for any discussions you may

9    have had with counsel.

10            But you can answer.

11            THE WITNESS:  I was made aware that HCPS

12    had been selected as a plaintiff in a case about

13    social media use among adolescents.

14    BY MR. WHITELEY:

15        Q.    I want to know the time period.  When

16    were you made aware of that?

17            MR. LEGG:  Same objection.

18            You can answer to the extent it doesn't

19    include any communications with counsel.

20            MR. WHITELEY:  I'm asking about a fact.

21    That's not privileged.

22            MR. LEGG:  She can answer.

23            THE WITNESS:  I'm trying to recall when

24    the first time was.  In my capacity, I also read

25    the news on a regular basis as part of my job, be

CONFIDENTIAL

Page 24

1    aware.  So I understood that there was a national

2    look at the damages and implications of social

3    media with adolescents.  I don't recall when I

4    first saw that.

5              Within the last few months is when I was

6    informed that HCPS would be participating as well.

7    BY MR. WHITELEY:

8         Q.   Were you involved at all in the decision

9    on behalf of HCPS to file this lawsuit?

10        A.   No.

11        Q.   Have you ever reviewed the Complaint

12   that HCPS has filed?

13        A.   I do not believe I read the entire

14   Complaint, no.

15        Q.   Have you read part of the Complaint?

16        A.   I feel like I may have seen parts of it,

17   but I truly -- like I said, because I read so much

18   about education in general and any implications

19   such as social media use, I do not know if I am

20   blending that memory with articles I read in

21   general about suits against us or HCPS.  I

22   apologize.

23        Q.   Understood.  Have you been asked to

24   prepare or assist in preparing discovery responses

25   on behalf of the district?

CONFIDENTIAL

Page 25

1          MR. LEGG:  Object to the form.

2          THE WITNESS:  I don't believe so.  I was

3    asked to provide my resume.

4    BY MR. WHITELEY:

5       Q.   What did you do to prepare for your

6    deposition today?

7       A.   I didn't really do much to prepare.

8    This is my day to day.  I deal with social media

9    on a regular basis in my capacity.  So this is

10   kind of my normal everyday discussion,

11   conversation, job essentially.

12      Q.   Did you meet with any employees of HCPS

13   to prepare?

14      A.   I did meet with Ms. Drive on Friday as

15   she was aware I had never done a deposition

16   either.  It sounded like the same ground rules

17   that you shared.

18      Q.   Who is Ms. Drive?

19      A.   Ms. Drive is in our General Counsel

20   Office.  I don't know the title.  I'm so sorry.

21      Q.   She's a lawyer for HCPS?

22      A.   Yes.

23      Q.   How long was your meeting with

24   Ms. Drive?

25      A.   Less than an hour.

CONFIDENTIAL

Page 26

1        Q.    Other than your meeting with Ms. Drive,
2    did you have any meetings with any other HCPS
3    employees?
4        A.    No.
5        Q.    Did you review any documents to prepare
6    for your deposition today?
7        A.    The only document I looked at again was
8    my resume when asked for it.
9        Q.    Have you reviewed any deposition
10   transcripts of any other HCPS employees who have
11   been deposed in this case?
12       A.    No.
13       Q.    Other than HCPS employees, have you
14   talked with anybody else about your deposition
15   today?
16       A.    No.
17       Q.    And you said that talks about social
18   media is a part of your normal day to day.
19            Can you explain what you mean by that?
20       A.    What I mean by that is that we are using
21   social media daily, whether it is to share
22   information from the school system or to share,
23   for example, an event that happened at a school or
24   if I am dealing with the repercussions of a
25   comment or a post made by someone and then having

CONFIDENTIAL

Page 27

1  to solve -- address that issue.

2      Q.   Could you talk a little bit about what

3  you mean by dealing with the repercussions of a

4  comment or post on social media?

5      A.   For example, on Friday when Bel Air High

6  School -- I received a call from the chief of

7  police of Bel Air stating that they received a

8  call with an individual who was claiming to be in

9  the school claiming to be prepared to self harm.

10         As a result of that, I was working on

11  communications to inform the families and staff at

12  the school of the current situation before I was

13  able to proactively put information out.  Comments

14  were being made on prior Harford County Public

15  Schools' posts that had nothing to do with the

16  event.  And they were stating things like naming

17  specific weapons.  They were saying that it was a

18  student at the school.  They were providing all

19  kinds of false information that then while in the

20  thick of trying to get the accurate information

21  out, I was having to address the fact that that

22  information was inaccurate while also walking that

23  fine line between free speech, which I find very

24  challenging and detrimental when it comes to

25  social media, that individuals will try to use

CONFIDENTIAL

Page 28

1    that as an excuse to write whatever they want in

2    the comment section.

3            So while dealing with that, that's the

4    most recent example of an issue of someone writing

5    something on social media that then makes it

6    extremely difficult to get through and navigate

7    the actual communications that need to be made.

8        Q.   This incident you described, that

9    happened last Friday, May 9?

10       A.   Yes.  Friday was May 9.

11       Q.   Somebody had conveyed a threat either to

12   themselves or others over the phone?

13       A.   An individual called the suicide

14   hotline.  That was routed to Bel Air Police

15   Department when the individual claimed to be

16   inside Bel Air High School making the call.  And

17   they very clearly stated that it was a threat of

18   personal harm.

19           I am getting call from the chief of

20   police.

21           MR. WHITELEY:  Take a break?

22           MR. LEGG:  Sure.

23           THE VIDEOGRAPHER:  We are off the record

24   at 10:32.

25           (Recess from 10:32 a.m. to 10:48 a.m.)

Page 29

1          THE VIDEOGRAPHER:  We are on the record

2     at 10:48.

3     BY MR. WHITELEY:

4          Q.    Ms. Lader, did you bring any documents

5     with you to your deposition today?

6          A.    No.

7          Q.    Did you take any notes in your

8     preparation for this deposition?

9          A.    No.

10         Q.    Have you ever received any training from

11    HCPS about how to approach public statements and

12    interviews on behalf of the district?

13         A.    No.

14         Q.    Do you provide training to other HCPS

15    employees on how to approach public statements or

16    interviews?

17         A.    I'm sorry.  Can you repeat that?

18         Q.    Do you provide training to other HCPS

19    employees on how to handle public statements or

20    interviews?

21         A.    I will coach.  For example, if you have

22    a media inquiry and we're addressing a specific

23    situation in the media, I will prep the individual

24    who is the expert in order to be prepared to speak

25    clearly to the media.  That is more based around

Page 30

1  how to answer a media question because, as we all

2  know, media has changed.  And so sound bites are

3  key.  And so ensuring that they get to the point

4  that they want to be heard on the news broadcast

5  is my goal.

6       Q.   When you say prep the expert, do you

7  mean the individual who has the relevant knowledge

8  about a particular topic or incident?

9       A.   Correct.  For example, if we get an

10  inquiry about a situation and we need Mr. Brooks,

11  our chief of security, to speak to it directly, we

12  would just go over what we anticipate the

13  questions will be and what points he wants to get

14  across.

15       Q.   How do you prepare them how to respond

16  to questions?

17       A.   By asking example questions, talking

18  through what we think may be asked based on the

19  situation, and then having them run through sample

20  answers.

21       Q.   You said sound bites are key.  What did

22  you mean by that?

23       A.   Correct.  When you're dealing with the

24  media -- and like I said before, with media these

25  days, everyone wants a quick 30 seconds.  They

CONFIDENTIAL

Page 31

1    don't want a long drawn-out response.  They're not

2    going to -- the attention span has shrunk

3    drastically.  We see that, for example, with

4    students on TikTok, students on SnapChat, that

5    that attention span is very short, and that has

6    leaked into things like main stream media, in my

7    opinion.

8              So in order to ensure that the key

9    information that we need to share in any given

10   situation makes that news clip, makes that sound

11   bite, I will do my best to prepare that individual

12   who is going on camera to ensure that that

13   information is in that 30 seconds so that it can't

14   be cut up into something else and then our message

15   gets lost.

16       Q.    You referenced students on TikTok and

17   students on SnapChat.

18              Do you have any data showing changes in

19   the attention span of HCPS students over the last

20   few years?

21       A.    Absolutely.  I would say that we have

22   had to adjust our process for how long we make a

23   video.  And actually let me clarify, because you

24   said students, and most of my communications, I

25   cannot say that I'm going directly to students.

Page 32

1  My communication is to parents, guardians, staff,

2  community, and that includes students and HCPS.

3           For example, the video that I referenced

4  earlier about the safety and security measures,

5  obviously students I'm sure saw that video even

6  though I didn't necessarily send it directly to

7  them.  But I would say that we have learned over

8  time because you can check the analytics on

9  videos.  You can see how long someone continued

10  watching.  And we could see over time when we

11  first started making videos, they may be five

12  minutes long.

13           Now it is a rule of thumb you do not go

14  over a minute 30 seconds.  That's just within my

15  ten years.  I would say it's less than 10 years

16  because we really didn't start making videos until

17  probably about five to six years ago, and that was

18  prior to me having a videographer full time on

19  staff.  He was previously in the technology

20  department.  And I was able to utilize his skills

21  and resources through collaboration with our

22  technology department.

23       Q.   Other than the analytics you referenced

24  in your answer, what other data are you aware of

25  about the attention spans of HCPS students?

CONFIDENTIAL

Page 33

1      A.    I do not have additional data about HCPS
2    student attention spans.
3      Q.    When you're looking at those analytics,
4    does it tell you who is watching a video, a parent
5    versus a student?
6      A.    The issue with social media is you never
7    know who is behind that handle.  So, no, I could
8    not specifically say whether it was an adult or a
9    child.
10           Now, I will say that there are instances
11    where I can make an educated guess.  For example,
12    on a snow day, say one of our neighboring counties
13    closes schools and we don't.  When I get a message
14    that says something like "Hey, nah, bruh," I'm
15    pretty sure that's not an adult.  I'm pretty sure
16    that's a child commenting their displeasure with
17    our decision not to close school.
18      Q.    Are you aware of any data that HCPS has
19    that tracks how many of its students use TikTok?
20      A.    Not that I'm aware of.
21      Q.    Same question, but for SnapChat, are you
22    aware of any such data?
23      A.    No.  I do not track students' uses of
24    social media.
25      Q.    That also goes for Facebook and

CONFIDENTIAL

Page 34

1    Instagram?

2        A.    Again, I would reiterate we can't know

3    who is on the other side of that handle.  So while

4    it may appear to be a student, while I may be able

5    to -- for example, when I've had issues where

6    students were either using extremely little foul

7    language on social media and I can say it was

8    students because I was able to click onto that

9    profile name, go to that profile, a lot of times

10   it would be something as simple as identifying a

11   jersey, a high school jersey, and then going to

12   that school with the photo because the names

13   usually aren't -- like I said, it's not the

14   student's actual name at their handle.

15              But by identifying their jersey, I was

16   able to go to the school and say, do you recognize

17   this student?  If they did, I was able to share

18   with them, for example, some of the offensive

19   language that I personally have been called or

20   that the school system had been called, because to

21   me, that's an opportunity to educate that child as

22   to the fact that when they do put something on

23   social media, there is another human being on the

24   other side of it, and also that that's then out

25   there in the world forever.  It will follow them.

CONFIDENTIAL

Page 35

1     Q.   My question was:  Are you aware of any

2   data that HCPS has that tracks how many of its

3   students use Facebook?

4     A.   Correct.  And I shared that there is no

5   data because you can't be certain who's behind

6   each of those handles, but wanted to give an

7   example of how sometimes I am able to identify

8   that it's a student.

9     Q.   Well, since you do have a hard stop

10  today, I'll ask that you save your examples for

11  opposing counsel's questioning, if he has them.

12  But I'll try to make my questions "yes" or "no."

13         Are you aware of any data that HCPS has

14  that tracks how many of its students use

15  Instagram?

16    A.   No.

17    Q.   Are you aware of any data that HCPS has

18  of how many of its students use YouTube?

19    A.   No.

20    Q.   HCPS has accounts on YouTube, Facebook,

21  Instagram and also Twitter; correct?

22    A.   Correct.

23    Q.   Does it have a SnapChat account?

24    A.   Absolutely not.

25    Q.   Did it have a TikTok account?

CONFIDENTIAL

Page 36

1      A.    Absolutely not.

2      Q.    How often does HCPS post to its Facebook

3  account?

4      A.    Daily.

5      Q.    How often does HCPS post to its

6  Instagram account?

7      A.    Typically if it is going on Facebook, we

8  are also sharing it on Instagram, but not in every

9  instance because of the different parameters

10  around each social media platform, for example,

11  Instagram always requiring an image.

12          So if it's information that does not

13  have an image that goes along with it, it may not

14  be on Instagram.  But for the most part, it is a

15  daily process.

16      Q.    About how often does HCPS post to its

17  YouTube account?

18      A.    That is less frequent given the amount

19  of time it that takes to create videos.  Maybe

20  once or twice a week tops, two times a week.  That

21  would be an extremely busy time of year with video

22  messaging.

23      Q.    Are you the person at HCPS who decides

24  when the district will post content to one of

25  these accounts?

CONFIDENTIAL

Page 37

1          A.    Correct.   Now, for YouTube, absolutely

2     it's 100 percent my decision.   Facebook and

3     Instagram, the public information specialist may

4     have some leeway there, especially if I am not

5     available for an immediate decision.

6          Q.    Mr. Andersen could decide on his own to

7     make a post on those platforms?

8          A.    Correct, yes.

9          Q.    Who drafts or creates the content that

10    HCPS uses to post to its Facebook and Instagram

11    accounts?

12         A.    That would be myself or Mr. Andersen or

13    we may be sharing content from another school.

14         Q.    For YouTube, is that review of

15    Mr. Andersen with the involvement with

16    Mr. Berends?

17         A.    No.   Mr. Berends would be primarily

18    posting on there, but the timing of that is a

19    conversation with me.

20         Q.    HCPS provides links to its YouTube

21    account on its webpage; right?

22         A.    Correct.

23         Q.    The same is true for its Facebook and

24    Instagram accounts?

25         A.    Correct.

CONFIDENTIAL

Page 38

1           MR. WHITELEY:  If you could pull up link

2    1 and display it for the witness.  For the record,

3    this is the HCPS website HCPS.org.

4    BY MR. WHITELEY:

5        Q.    You can see it?

6        A.    Correct.

7        Q.    Does this look like the HCPS website to

8    you?

9        A.    Yes.

10        Q.    And that blue banner at the bottom,

11    those are those links to the platforms we just

12    talked about that are in there on the left-hand

13    side of the banner?

14        A.    Correct.

15        Q.    This banner is present at the bottom of

16    every page on HCPS' website; right?

17        A.    I imagine it is, yes.  I believe that

18    does stay on every additional page.  But unless

19    you want to click through hundreds, I can't say

20    for sure.

21        Q.    If you click on one of these, it will

22    take you to those accounts of HCPS; correct?

23        A.    Correct.

24             (HCPS/Lader Exhibit 2 was marked.)

25

CONFIDENTIAL

Page 39

1          MR. WHITELEY:  I'm going to mark Tab 10

2     as Exhibit 2.  For the record, this is a document

3     produced by the District with the Bates-stamp

4     517365.

5     BY MR. WHITELEY:

6          Q.    Do you have Exhibit 2 in front of you?

7          A.    Yes.

8          Q.    And this is an email chain between you

9     and Renee Villareal; is that correct?

10         A.    Yes.

11         Q.    On the first page of this document, the

12    email on the bottom half of the page is from you

13    to Ms. Villareal?

14         A.    Correct.

15         Q.    It has your signature block at the

16    bottom?

17         A.    Yes.

18         Q.    And your signature block also has these

19    links to Harford County Public Schools' social

20    media accounts; right?

21         A.    Yes.

22         Q.    HCPS encourages students and parents to

23    follow it on these accounts; correct?

24         A.    Correct.  I encourage parents and

25    guardians.  I don't encourage students.

CONFIDENTIAL

Page 40

1            (HCPS/Lader Exhibit 3 was marked.)

2            MR. WHITELEY:  I'm going to mark Tab 11

3       as Exhibit 3.  For the record, this is a document

4       produced by the District bearing Bates number

5       264167.

6       BY MR. WHITELEY:

7            Q.   Do you have Exhibit 3 in front of you?

8            A.   Yes.

9            Q.   If you could turn to page ending in 170,

10      the numbers in the bottom right hand of the page.

11            Actually, before we do that, this is the

12      handbook, the student/parent handbook for the

13      '18/19 school year.

14            Do you know what the student/parent

15      handbooks are as a general matter?

16            A.   Yes.

17            Q.   What are they?

18            A.   A tool to provide information to parents

19      and guardians about practices within the system

20      that they should be aware of.

21            Q.   It also provide information to the

22      students; correct?

23            A.   If a student chose to access it, yes.

24            Q.   Is it given to students in the district?

25            A.   No.

CONFIDENTIAL

Page 41

```
 1        Q.   Students don't receive copies of this at
 2   the start of school years?
 3        A.   They receive an abbreviated version if
 4   the school produces a -- what do they call it --
 5   not a cap, not a journal.  What do they call that
 6   at the beginning of the year?  It has a calendar,
 7   and it has pieces of the handbook that are
 8   directly related to students.  I can't recall what
 9   the name of it is.
10        Q.   If you could turn to page 170.  Let me
11   know when you're there.
12        A.   I'm there.
13        Q.   Do you see about in the middle of the
14   page the paragraph that's titled Website & Social
15   Media?
16        A.   Yes.
17        Q.   It says, "The school system's website
18   HCPS.org offers information and meets the needs of
19   parents, guardians, students, staff, and the
20   general community."  Correct?
21        A.   Correct.
22        Q.   And the last sentence of this paragraph
23   says, "Android and iPhone users should check out
24   the school system's mobile site for announcements,
25   a downloadable calendar and quick links."
```

Page 42

1    Correct?

2         A.    Correct.

3         Q.    Below that, it says, "Follow us on

4    Facebook, Twitter, Instagram and YouTube."

5    Correct?

6         A.    Correct.

7         Q.    It doesn't say only parents should

8    follow us on Facebook, Twitter, Instagram and

9    YouTube; correct?

10        A.    It does not say "only"; correct.

11        Q.    Why does the district want individuals

12   to follow it on social media accounts?

13        A.    Because with appropriate parent and

14   guardian use of social media, we can provide

15   information in a fast and easily accessible way so

16   that a parent doesn't have to be connected to

17   email or searching out a website.

18             We understand that many people use

19   social media to get information.  And so if it

20   is -- it makes it easier for us to connect with

21   parents and guardians, we're going to try to take

22   advantage of that opportunity.

23        Q.    So it can be an effective way for the

24   district to communicate; right?

25             MR. LEGG:  Object to the form.

Page 43

1    Foundation.

2              THE WITNESS:  With responsible adult

3    use, yes.  I agree with that statement.

4    BY MR. WHITELEY:

5         Q.   You say responsible adult use.  What do

6    you mean by that?

7         A.   So what I mean by that is adults who are

8    educated about social media and who utilize it

9    appropriately.  For example, I have -- I even have

10   some adults who utilize social media in a negative

11   format.  And so that can be detrimental to the

12   system when a parent gets a text message from a

13   student who is in a school claiming information

14   that they've heard from friends and then the

15   parent goes and comments on one of our posts on

16   social media and then, as I shared earlier, having

17   to then go back and try to clean that up and try

18   to correct that information.

19              That's what I mean by appropriate and

20   professional use by adults who are aware of the

21   damage they can do if they put inaccurate

22   information on social media.

23        Q.   So if I understand the example you just

24   gave, you're talking about sort of getting on the

25   telephone where students convey information to

Page 44

1    each other that trickles up to an adult who then

2    repeats the misinformation in a comment or

3    something else on social media?

4         A.    It's not even that.  It's that in

5    addition to students doing the same thing.

6    They'll go straight to our social media pages and

7    ask questions or write what they claim is

8    happening in their classroom or with another

9    student.  They'll put names on there.  They'll

10   write it.

11            We've had people accuse staff members of

12   having affairs with other staff members that was

13   not accurate information.  And through research

14   and investigation with multiple departments,

15   sometimes external law enforcement, not in the

16   case of the adultering, but in other situations,

17   we are typically able to find out the source of it

18   and determine that it was not credible.

19            (HCPS/Lader Exhibit 4 was marked.)

20            MR. WHITELEY:  I'm going to mark Tab 13

21   as Exhibit 4.  For the record, this is a document

22   produced by the district bearing Bates No. 48085.

23   BY MR. WHITELEY:

24        Q.    Do you have Exhibit 4 in front of you?

25        A.    Yes.

Case 4:22-md-03047-YGR    Document 2534-20    Filed 12/11/25    Page 46 of 120

CONFIDENTIAL

Page 45

1      Q.    This is an email from you to a lot of
2  what looks like listservs and other recipients
3  within HCPS; correct?
4      A.    Correct.  I have a list of groups like
5  this.  This is a group that I will send a weekly
6  communications plan to.  So if there's something
7  going out systemwide, I'll send it to them first
8  as leaders in the system.  You'll see it's Board
9  of Education principals, assistant principals,
10  lead secretaries and PBWs.
11      Q.    What do you mean by PBWs?
12      A.    People/personnel workers.
13      Q.    What is their role in the district?
14      A.    I don't think I'm the best person to
15  speak to their specific role, but they are a
16  leadership role, and that's way I include them as
17  an alert of anything going out systemwide.
18      Q.    This was an August 2023 email about a
19  back to school video message from Dr. Bulson and
20  other individuals?
21      A.    Dr. Poynton and Melissa Hahn, the
22  president and vice president of the Board of
23  Education are also in the video, yes.
24      Q.    And Dr. Bulson is the superintendent?
25      A.    Correct.

Golkow Technologies,
A Veritext Division
877-370-3377                                      www.veritext.com

CONFIDENTIAL

Page 46

1          Q.    Looking at the third paragraph from the
2     bottom on the first page of this document, it
3     starts with, "We hope you'll follow..."
4               Do you see that paragraph?
5          A.    Yes.
6          Q.    You wrote, "We hope you'll follow HCPS
7     in your individual school on social media,
8     (Facebook, Instagram, Twitter, and YouTube) for
9     updates throughout the year.  After you review the
10    back to school information on HCPS.org, use our
11    new email, AskHCPS@hcps.org, for any questions.
12              So this communication -- strike that.
13    Let me ask it this way.
14              Do you see where it says Email Content
15    towards the top of the page?
16         A.    Yes.
17         Q.    That reflects that this, the message
18    from there down, was sent out to the community,
19    correct, the HCPS community?
20         A.    Staff and family.  That's in the first
21    paragraph.
22         Q.    So in August of 2023, HCPS was still
23    encouraging families to follow it on social media;
24    correct?
25         A.    Correct.

CONFIDENTIAL

Page 47

1      Q.   Do you know if that was before or after
2  this lawsuit was filed?
3      A.   I do not know.
4           (HCPS/Lader Exhibit 5 was marked.)
5  BY MR. WHITELEY:
6      Q.   I'm going to mark Tab 14 as Exhibit 5.
7  I will represent to you that I pulled this
8  document from the HCPS website last week.  It is
9  the 2024/2025 Parent-Student Handbook Calendar.
10          Do you have Exhibit 5 in front of you?
11     A.   Yes.
12     Q.   Do you recognize this document?
13     A.   Yes.
14     Q.   Were you involved in preparing this
15  document?
16     A.   The only section that I prepared are a
17  review of the communications portion.  So I was
18  not involved in preparing the rest of the
19  document.
20     Q.   You said earlier that the versions that
21  are given to students may have a calendar attached
22  to them?
23     A.   It's like a school planner.  So the
24  school provides as a resource a planner where a
25  student would, for example, write down their

CONFIDENTIAL

Page 48

1   homework on a certain day of the calendar.

2          But the portion of this, of Exhibit 5

3   that would be in that would be specific sections

4   of the handbook piece that are specific to

5   students.  I do not develop that.  That comes out

6   of the chief of administration's office.  So I do

7   not know which portions they choose to include in

8   that planner.

9       Q.   If you wanted to figure out what

10  portions are included, who would you talk to in

11  that office?

12      A.   Stephanie Wall.

13      Q.   How do you spell her last name?

14      A.   W-A-L-L.

15      Q.   If you could turn to page 2 of this

16  document, you see the portion in the top right

17  with the photo of what I believe is Dr. Bulson,

18  and it's titled Superintendent's Pen?

19      A.   Yes.

20      Q.   It says, "Welcome to the 2024/2025

21  school year.  Whether you are a student, parent,

22  guardian or staff member, this calendar is one of

23  the many resources we use to ensure you have

24  access to the information you need."

25          Did I read that correctly?

CONFIDENTIAL

Page 49

1          A.    Yes.
2          Q.    If you could turn to the next page, page
3    3, do you see in the top right section titled
4    Website & Social Media?
5          A.    Yes.
6          Q.    Then there's blue text after the first
7    paragraph that says "Follow us on Facebook, X,
8    Instagram and YouTube."  Correct?
9          A.    Correct.
10         Q.    X was formerly known as Twitter?
11         A.    Correct.
12         Q.    HCPS tracks metrics related to use and
13    engagement of its social media accounts; right?
14         A.    Correct.
15         Q.    Do you know how long HCPS has been
16    tracking those metrics?
17         A.    I do not.
18         Q.    Did it predate your start as
19    communications officer -- I'm sorry -- manager of
20    communications?
21         A.    I cannot say for certain that it was
22    done prior to me being in the role.  I know it has
23    been done since I started in the communications
24    office.
25         Q.    So at least since 2024?

CONFIDENTIAL

Page 50

1     A.    Correct.

2     Q.    Is HCPS still tracking those metrics

3   today?

4     A.    No.  With several -- not in the same

5   capacity.  We can always pull the information if

6   we need it, but we don't track at the same level.

7   After some reorganizations have taken place

8   throughout the years, we just don't have the

9   resources in our office to continue to do that on

10   a regular basis.

11     Q.    Do you know when those reorgs happened?

12     A.    No.

13     Q.    Do you recall if it was before or after

14   the COVID-19 pandemic?

15     A.    Before.

16     Q.    So if you wanted to pull that

17   information today, how would you do that?

18     A.    By going in through the analytics piece

19   of each of those platforms and pulling that

20   information that way.

21     Q.    There's no like centralized place that

22   HCPS maintains and puts them all together?

23     A.    No, not for social media.

24            (HCPS/Lader Exhibit 6 was marked.)

25

CONFIDENTIAL

Page 51

1          MR. WHITELEY:  I'm going to mark Tab 14
2   as Exhibit 6.
3   BY MR. WHITELEY:
4       Q.   Do you have Exhibit 6 in front of you?
5       A.   Yes.
6       Q.   For the record, this is a document
7   produced by the direct bearing Bates number
8   359771.
9          This is an email chain between you and
10  Stephanie Wall, who I believe you referenced
11  earlier; correct?
12      A.   Yes.
13      Q.   On April 15, 2019, you wrote to
14  Ms. Wall, "Stephanie, can you get me a copy of the
15  latest month's social media stats?  Thank you."
16  Correct?
17      A.   Correct.
18      Q.   As of this time in 2019, was HCPS still
19  tracking those stats?
20      A.   That's an example of me asking for an
21  immediate pull of those stats.
22          (HCPS/Lader Exhibit 7 was marked.)
23          MR. WHITELEY:  I'm going to mark Tab 15
24  as Exhibit 7.
25

CONFIDENTIAL

Page 52

1    BY MR. WHITELEY:

2        Q.    Do you have Exhibit 7 in front of you?

3        A.    Yes.

4            MR. WHITELEY:  For the record, this is a

5    document produced the district bearing Bates

6    number 539772 and was an attachment to the email,

7    Exhibit 6.

8    BY MR. WHITELEY:

9        Q.    Do you recognize this document?

10       A.    Yes.

11       Q.    And is this a pretty typical way that

12   using analytics for the social media accounts for

13   the district would be generated in a single

14   document?

15       A.    Correct.

16       Q.    This shows analytics for the month of

17   March 2019?

18       A.    Correct.

19       Q.    How did HCPS decide which particular

20   metrics to track?

21       A.     It was more of a question of what

22   information was available to us.  So if this was

23   the information available to us in the analytical

24   process at that time, that's what we were trying

25   to pull and try to look at to evaluate each of

CONFIDENTIAL

Page 53

1   those platforms.

2        Q.    And why was HCPS tracking these metrics?

3        A.    To see if the tools were useful, if it

4   was something that our parents and guardians and

5   community members were actually using as a

6   resource.

7        Q.    This particular document shows analytics

8   for the HCPS website, its Facebook account, its

9   YouTube account, its Instagram account and its

10  Twitter accounts; correct?

11       A.    Correct.

12       Q.    Did HCPS track metrics for any other

13  website or online account to your knowledge?

14       A.    Not that I know of.

15       Q.    There's also arrows by some of these

16  numbers on here.

17             Do you know what those represent?

18       A.    Whether it went up and down, that

19  particular number.

20       Q.    Compared to a previous time period?

21       A.    Yes.

22       Q.    And why did HCPS track the change over

23  time of these metrics?

24             MR. LEGG:   Objection to form.

25

CONFIDENTIAL

Page 54

1    BY MR. WHITELEY:

2        Q.    Why did HCPS track the change over time

3    of these metrics?

4            MR. LEGG:    Same objection.

5            THE WITNESS:    Because that evaluation

6    will determine whether or not the resource

7    continues to be used by community members.

8    BY MR. WHITELEY:

9        Q.    If it was used by community members,

10   that's a good thing; right?

11       A.    Used appropriately, yes.

12       Q.    What do you mean by "used

13   appropriately"?

14       A.    Used to read, absorb, utilize the

15   information being provided versus using it to

16   perpetuate inaccurate information or comment

17   information that is not true about things that

18   were not related to that post.

19       Q.    Does HCPS moderate the comments on its

20   accounts on these platforms?

21       A.    What's your definition of moderate?

22       Q.    Well, let me ask it this way.

23            Does HCPS ever attempt to remove

24   comments from posts on these accounts?

25       A.    Absolutely, but only after consultation

CONFIDENTIAL

Page 55

1    with general counsel.

2         Q.    How would HCPS go about attempting to

3    remove a comment from a post on one of these

4    accounts?

5         A.    So, for example, I was -- can I be very

6    frank with my language?  I don't know if you want

7    me to be quite that frank.

8         Q.    We need your honest testimony.

9         A.    It's just not a word I typically use.

10   So, for example, on an inclement weather day,

11   another school district closed.  We did not.  I

12   was called a whore.  So because of free speech,

13   I'm not going to just delete it myself because I

14   don't like it, but did refer to general counsel,

15   reached out.  This was, obviously, at about 4:30,

16   5:00 a.m. that this occurred because we put that

17   information out as early as we can.

18              So other school systems had already put

19   that information out.  We had not.  The individual

20   commented referring to us being a whore.  I

21   reached to general counsel, shared that

22   information with them, asked if because of it

23   being -- the nature of the comment, if I could

24   hide it, and was granted permission at that time

25   to do that.

CONFIDENTIAL

Page 56

1      Q.    Sorry to hear that.

2            (HCPS/Lader Exhibit 8 was marked.)

3            MR. WHITELEY:  I'm going to mark Tab 16

4   as Exhibit 8.  For the record, this is a document

5   produced by the district bearing Bates number

6   538420.

7   BY MR. WHITELEY:

8      Q.    Do you have Exhibit 8 in front of you?

9      A.    Yes.

10     Q.    This is an email chain from June of 2021

11  between you, Ms. Wall and also Christina Paquette.

12           Do you recognize this document?

13     A.    I don't recall this specific chain, but

14  I recognize my name, Christina's and Stephanie's,

15  and I'm sure it took place.

16     Q.    If you look to the second page of this

17  document, ending in Bates 421, it appears to be an

18  automated message providing an update about

19  Facebook analytics.

20           Do you see that?

21     A.    Yes.

22     Q.    Do you recall if the district was able

23  to keep track of analytics related to its Facebook

24  account after June of 2021?

25     A.    I believe that this is when I was made

CONFIDENTIAL

Page 57

1    aware that because of those departmental changes,

2    that this process was no longer taking place

3    because Ms. Wall was in a different department at

4    that point in time.

5            Maybe we got a phone call after this.

6    She may have picked up the phone to call me

7    instead if there's not an additional email chain.

8    But I think that was when she shared that that was

9    no longer happening.

10           (HCPS/Lader Exhibit 9 was marked.)

11           MR. WHITELEY:  I'm going to mark Tab 17

12   as Exhibit 9.  This is another document produced

13   by the district, bearing Bates number 324925.

14   BY MR. WHITELEY:

15       Q.    Do you have Exhibit 9 in front of you?

16       A.    Yes.

17       Q.    This is an HCPS Social Media Guide;

18   correct?

19       A.    Correct.

20       Q.    Did you prepare this document?

21       A.    Not personally.

22       Q.    Do you know who prepared this document?

23       A.    Ms. Wall.

24       Q.    Did you oversee or have any input in the

25   creation of this document?

CONFIDENTIAL

Page 58

1        A.    Yes.

2        Q.    What was your role?

3        A.    Most of the content I would have

4   reviewed and/or utilized resources to help

5   develop.

6        Q.    At this point in time, did Ms. Wall

7   report you to?  Did you report to Ms. Wall?  What

8   was the relationship there?

9        A.    When this was originally created,

10  Ms. Wall would have reported to me.

11       Q.    So you ultimately had to sign off on

12  everything in here; correct?

13       A.    Correct.  But this is the caveat with

14  that.  I'm not sure which rendition of this this

15  is because once Ms. Wall was no longer reporting

16  to me, edits could have been made to this that I

17  would not be privy to.

18       Q.    I'll represent that the metadata from

19  this document indicates it was made

20  September 2017.

21            Would she still have reported to you at

22  that time?

23       A.    I do not recall the dates that that

24  department change occurred.

25       Q.    Earlier we were looking at the email

CONFIDENTIAL

Page 59

1    chain about Facebook analytics from 2021.

2             By that point, was Ms. Wall already not

3    reporting you to?

4        A.    Correct.

5        Q.    Other than yourself and Ms. Wall, are

6    you aware of anybody else who was involved in

7    preparing this document?

8        A.    Yes.

9        Q.    Who?

10       A.    Lindsay Bilodeau.

11       Q.    Could you spell that last name for me?

12       A.    B-I-L-O-D-E-A-U.

13       Q.    Anyone else?

14       A.    At that time, not in the creation, but

15   we would have had several departments review it,

16   such as education services, to ensure that those

17   in charge of elementary and secondary were

18   comfortable with the content.

19            But this was created several years ago

20   initially.  Again, I'm not sure if this is a

21   revisit or not without having them side by side to

22   compare.

23       Q.    Do you know if the district has prepared

24   subsequent versions of this document?

25       A.    Not that I was part of.  And at this

CONFIDENTIAL

Page 60

1    point, I don't utilize this as a resource.  I
2    don't actively provide it to schools.  You'll see
3    even in my email to Ms.Villareal that you
4    referenced earlier, Exhibit 2 from 2018, you'll
5    see that my last paragraph says, "And, of course,
6    assuring them that they don't need to set up or
7    monitor social media.  We have the HCPS pages in
8    order to share their good news.  They just need to
9    make sure they share it with us."
10           I always share with our administrators
11   that I don't encourage them to start their own
12   because of the 24/7 monitoring, to use your words,
13   that has to take place.
14        Q.   Do you know if anybody in district still
15   provides this to schools?
16        A.   It may be posted somewhere in the pits
17   of some type of repository of documents that
18   someone could potentially access on their own.
19        Q.   If you could turn to -- we'll start on
20   the first page.  The first page says, "Social
21   media allows us to share an inside look at our
22   schools and day-to-day curriculum.  There are so
23   many great things happening at our schools, and
24   social media helps us engage with our community,
25   increase public support and build community

 1   partnerships."

 2          Do you agree with that statement?

 3      A.   When this document was created, yes.  I

 4   would say I agreed with that statement.

 5      Q.   Do you still agree with that statement?

 6      A.   I know that I've said it several times

 7   with.  Appropriate adult use, yes, I would still

 8   agree with this statement.  However, we have

 9   additional resources now.  We're currently in the

10   process of adopting useful websites and the

11   features that are on those.  I will continue to

12   advocate that social media is not necessary and

13   these good news and these stories could simply be

14   shared on school websites in order to alleviate

15   the issues that occur when we open things up to

16   social medias and involve comment and places where

17   people can write or say whatever they choose

18   without verification.

19      Q.   And what are these additional or new

20   websites that you've mentioned?

21      A.   So we are starting use with a -- our

22   current platform is called Final Site, and that's

23   where we do our phone calls, emails and text

24   messages, that mass notification product.  And

25   then school websites are through a separate

Page 62

1   platform through our technology department.

2           With the new program that we just

3   purchased and are in the process of implementing,

4   it's through a company called Apptegy.  And with

5   this platform, I can now control the phone calls,

6   emails, text messages and the school websites from

7   one platform, so making it much easier to share

8   information, much faster to streamline that

9   distribution process.

10          And my advocacy is always for

11  streamlining and, of course, expediting because

12  parents and guardians want the information at

13  their fingertips as quickly as possible.  So if I

14  can narrow it down to one platform that I'm

15  posting versus right now where once I post the

16  information, once I share the information via

17  phone, email, text, post it on our website, share

18  it with the news media, the next step that is

19  currently expected in our community is social

20  media.

21          But if I can eliminate that step because

22  then social media is the only platform that I have

23  to continue to monitor once a post is made because

24  of those comments and the information that might

25  be shared in the comments that I then have to

CONFIDENTIAL

Page 63

1  correct and/or discuss removing.

2       Q.    This new system you're describing, has

3  the district already adopted and implemented

4  those?

5       A.    No.  We're in the process of

6  implementing it.  It already went through the RFP.

7  The board approved it.  It has been purchased.

8  Now we are in the process of setting everything up

9  and transitioning from our current mass

10  information system to this one.

11       Q.    Is the plan for it to be the mass

12  notification system next school year?

13       A.    Effective July 1.

14       Q.    Have there been any discussions at the

15  board or in the district about whether to continue

16  posting this information on the district's social

17  media accounts?

18       A.    No.  This is my personal opinion and my

19  personal advocacy will be once we have these

20  websites established, to have that conversation.

21            However, in the past when I've had that

22  conversation, I have received pushback because

23  there are several community members who claim that

24  the social media is the best resource option for

25  them.  And in a customer service-based industry

CONFIDENTIAL

Page 64

1   like education where our goal is that relationship

2   and that communication with parents and guardians

3   and community, it can be challenging to remove

4   something that a family refers to as a resource.

5        Q.   What do you recall about those

6   conversations?

7        A.   Which conversations?

8        Q.   That you were mentioning about with

9   community members where you received pushback

10  about no longer -- potentially no longer using the

11  district's social media accounts.

12       A.   I have not received pushback from

13  community.  That is internal conversations with

14  other members of senior-level staff who feel as

15  though the community would be disappointed to have

16  those things removed.

17            However, that has been over the years

18  and so especially given things that have happened

19  in the past.  For example, most recently we have

20  bomb threats in our schools.  We have shooting

21  threats in our schools.  Those things are

22  perpetuated on social media.  I do think that it

23  might be ripe for the conversation again, that I

24  may be able to persuade more members of

25  senior-level staff that it would be an appropriate

CONFIDENTIAL

Page 65

1    move to remove it.

2         Q.    Going back to Exhibit 9, the Social

3    Media Guide, this would be something that was

4    provided to schools in the district about

5    potentially creating their own pages on these

6    platforms; correct?

7         A.    Not proactively provided, only if a

8    school reached out and asked my office how to set

9    up social media.  And we would have a conversation

10   first where again I would advocate that they did

11   not and that, instead, they provided whatever good

12   news and stories they wanted to share with my

13   office, that we could post it on the HCPS platform

14   and then be the ones in charge of the moderating

15   and maintaining eyes on those posts.

16              But if the school insisted that they

17   wanted to pursue their own, we would provide this

18   resource as they needed help setting those things

19   up.

20        Q.    Do you know how many individual schools

21   in the district have a Facebook account?

22        A.    I do not.

23        Q.    Do you know how many individual schools

24   in the district have an Instagram account?

25        A.    I do not.

CONFIDENTIAL

Page 66

1          Q.   Do you know how many individual schools

2     in the district from a YouTube account?

3          A.   I do not.

4          Q.   Do you know any individual schools in

5     the district have a SnapChat account?

6          A.   I do not.

7          Q.   Do you know if any individual schools in

8     the district have a TikTok account?

9          A.   I do not.

10         Q.   If you could go to the fourth page of

11    this document.  This is ending Bates 928.  At the

12    top it says Facebook Tips.

13              Do you see that?

14         A.   Yes.

15         Q.   The first paragraph reads, "Keep

16    messages short and meaningful.  Be sure to include

17    the who, what, when, where and why for each post.

18    You want your posts to be attention grabbing as

19    your followers are scrolling through their news

20    feeds."

21              Did you write that language yourself, or

22    do you know if someone else did?

23         A.   I cannot recall.  It's been several

24    years, like I shared, since this was created.

25    That is most likely my language.

CONFIDENTIAL

Page 67

```
 1       Q.   Either way, you would have reviewed it
 2   before the final product was made?
 3       A.   Yes.
 4       Q.   Why would a school in HCPS want its
 5   posts to be attention grabbing?
 6       A.   Because there's a lot of information on
 7   social media, and in order to ensure parents and
 8   guardians see their particular information, they
 9   want it to be attention grabbing.
10       Q.   Then a couple paragraphs down, it says
11   Post Regularly.
12            Do you see that?
13       A.   Yes.
14       Q.   The paragraphs says, "We recommend at
15   least two or three posts per week, if not more.
16   Create or share content that is educational,
17   school based and relevant to your school
18   community.  Share positive news stories, athletic
19   team victories and spotlight your student and
20   staff achievements."
21            Do you know if you wrote that language?
22       A.   I do not know specifically, but I would
23   have reviewed it.
24       Q.   And why did the district tell schools to
25   post on Facebook two or three times per week?
```

CONFIDENTIAL

Page 68

1          MR. LEGG:  Objection to form.

2          You can answer.

3          THE WITNESS:  Once you've established a

4    social media account, my conversation with each

5    administrator prior to that establishment was you

6    are choosing to establish a social media account.

7    So you need to utilize it as a resource because,

8    occasionally, what will happen is someone will

9    start a page, or say, for example, the Harford

10   County Public Schools page, if we don't post

11   something about a specific school or a community

12   member feels we've posted about one school too

13   many times, they will reach out.

14          And so this paragraph would be

15   specifically to don't set yourself up for failure

16   or criticism.  If you're going to start this, you

17   need to be committed to it, and that means making

18   sure you stay consistent.  Two or three times a

19   week you might be able to cover each of the

20   classrooms in your school by the end of the year.

21   You might be able to cover each of your students.

22   Because if you don't, you will be criticized for

23   leaving someone or some group or some staff member

24   out.

25

CONFIDENTIAL

Page 69

1    BY MR. WHITELEY:

2        Q.   At the bottom of this paragraph, it says

3    to post photos as often as you can.  Creating

4    photo albums is a great way to share photos, but

5    video slide shows are also an option.

6    Parents/guardians respond well to classroom and

7    fun student photos.  Before posing any photos of

8    students, be sure they have signed photo release

9    forms on file.

10           Do you know if you wrote that language?

11       A.   I do not recall if I specifically wrote

12   that, but again, I would have reviewed it.

13       Q.   At the bottom, do you see the paragraph

14   that says, "Engage with your followers..."?

15       A.   Yes.

16       Q.   It says, "Engage with your followers by

17   answering any reasonable question that is asked

18   through a comment or direct message."

19           So I think this goes back to what you

20   were talking about earlier, that you have to be

21   responsive on those posts for them to be

22   successful?

23       A.   If it is a reasonable question, yes, you

24   must engage and respond in order for social media

25   to be used appropriately.

CONFIDENTIAL

Page 70

```
 1        Q.   Then a couple lines down, there's a
 2   sentence that says, "Followers will be more likely
 3   to engage with your page if you engage with them.
 4   If you find" -- I'm sorry.  That's the end of the
 5   sentence.
 6             "Followers will be more likely to engage
 7   with your page if you engage with them," do you
 8   see that?
 9        A.   Yes.
10        Q.   Was it a goal of the district for its
11   schools to get more engagement on its school
12   Facebook pages?
13             MR. LEGG:  Objection to form.
14   BY MR. WHITELEY:
15        Q.   You can answer.
16        A.   The goal of social media innately is
17   two-way communication.  That's the difference
18   between posting on a website or a posting on a
19   stagnant object or sending an email with the
20   information.  At the time that this was created
21   initially, it was still new.  It was still
22   something that had not developed into what I
23   believe it's developed into now.
24             So at the time, yes, you did want to
25   engage.  You wanted parents to be able to say --
```

CONFIDENTIAL

Page 71

```
 1   for example, we do a monthly limelight where we
 2   congratulate staff members.  You want those
 3   comments where parents can say and students can
 4   say, yes, Ms. Smith was my favorite teacher.  She
 5   deserves this award.  She deserves this.  She's
 6   wonderful.  She's fabulous.
 7           So at the time, yes, that engagement was
 8   extremely encouraged, and when it remains
 9   positive, currently we also appreciate that.
10       Q.   When you say what social media has
11   developed into now, are you referring to those
12   issues we talked about earlier, about
13   misinformation and other issues and comments?
14       A.   I was going to say in addition to many
15   more.  For example, there's a Facebook group that
16   claims to be a media outlet, but, for example, one
17   of the videos he made was in reference to me,
18   claiming to be having an affair with me because I
19   call him all the time.  But it was in reference to
20   the automated calls that I send out.
21           But that type of abuse of this platform
22   is what can be extremely detrimental to the school
23   system.
24       Q.   I've seen you check your Apple watch a
25   few times throughout the day.  Are you checking
```

CONFIDENTIAL

Page 72

1   for emergencies that you need to respond to?

2       A.   Yes.   When I see the same subject line

3   that came through initially that I needed to step

4   out for just to make sure that it's not something

5   that I'm being asked for assistance.  But we are

6   good to keep moving forward.  And I believe it is

7   almost handled.

8       Q.   Do you know whether this guide is still

9   published on Harford's websites, Harford County

10  Public Schools' website, that Social Media Guide?

11      A.   He will comment on our Facebook pages.

12  He will comment on our posts, but this is his own

13  page that he had created and then gets shared

14  amongst community members in the school system.

15      Q.   Drawing your attention back to

16  Exhibit 9, this guide, do you know if this is

17  still --

18      A.   I thought you said this guy.  I

19  apologize.

20      Q.   Do you know if this guide is still

21  posted on HCPS' website?

22      A.   I think I shared earlier that it is

23  probably still in a repository of documents, not

24  on our website.  It's not on HCPS.org.  So it

25  would be an internal platform.  I believe it's

CONFIDENTIAL

Page 73

1    called SharePoint.

2         Q.    If you could go back to Exhibit 1, which

3    was your resume, and the first page of this

4    document, you see the bullet points under the

5    Manager of Communications section?

6         A.    Yes.

7         Q.    That reads, "Oversee the district's

8    social media platforms including Facebook, X,

9    YouTube and Instagram, achieving consistent growth

10   in engagement 6/20/14."

11             Did I read that correctly?

12        A.    "Since 2014;" correct.

13        Q.    Why did you include this bullet point on

14   your resume?

15        A.    To illustrate how it can be utilized as

16   a resource and how you can in growing that

17   engagement and those followers, that if used

18   appropriately, it can be helpful and something

19   that I could integrate in other positions as a

20   resume selling point.  The resume is the selling

21   point.  That's just one of the factors that I

22   think contributes to our success in sharing

23   information.

24        Q.    Understood.

25             (HCPS/Lader Exhibit 10 was marked.)

CONFIDENTIAL

Page 74

1          MR. WHITELEY:  I'm going to mark Tab 18.
2    This will be Exhibit 10.
3    BY MR. WHITELEY:
4          Q.   Do you have Exhibit 10 in front of you?
5          A.   Yes.
6          MR. WHITELEY:  For the record, this is a
7    document produced by the district bearing Bates
8    number 347775.
9    BY MR. WHITELEY:
10         Q.   Do you recognize this document?
11         A.   I believe this is part of the budget
12   document.
13         Q.   And do you know what part of the budget
14   document this is?
15         A.   I'm looking at the year of
16   accomplishments of 2013.  So I believe that in
17   that year, each department had a summary of
18   achievements and then goals prior to the sections
19   about where our budgets are allocated.
20         Q.   And did you prepare this on behalf of
21   the communications department?
22         A.   Yes, with support of staff.  I don't
23   want to take full credit.
24         Q.   And then on the first page, it lists
25   accomplishments for fiscal year 2013.

CONFIDENTIAL

Page 75

1      A.   Yes.  I see that.

2      Q.   If you could go to page 2 of the

3  document ending in Bates 776, the last bullet

4  point before the goals section says, "Established

5  an HCPS YouTube channel for promotion of video

6  messaging regarding the school system's key

7  initiatives."

8           Do you see that?

9      A.   Yes.

10     Q.   So why was this an accomplishment for

11  this year for the communications department?

12     A.   It provided another way to communicate

13  with our community.

14     Q.   Above that, the preceding bullet points,

15  it says, "Continued to promote and enhance the use

16  of HCPS Facebook/Twitter."  Correct?

17     A.   Yes.

18     Q.   And that was another accomplishment for

19  the communications department?

20     A.   Yes.

21           (HCPS/Lader Exhibit 11 was marked.)

22           MR. WHITELEY:  I'm going to mark Tab 19.

23  This will be Exhibit 11.

24  BY MR. WHITELEY:

25     Q.   Do you have Exhibit 11 in front of you?

CONFIDENTIAL

Page 76

1           A.    Yes.

2           Q.    This is a document produced by the

3     district bearing Bates number 345353.

4                 Is this another one of those budget

5     documents, but for a later year?

6           A.    Yes.

7           Q.    And this provides information about the

8     communications department?

9           A.    Correct.

10          Q.    It lists overall goals for the Board of

11    Education for Harford County and also specific

12    department objectives for the communications

13    department?

14          A.    Yes.

15          Q.    Did you prepare this document?

16          A.    Yes, along with staff.

17          Q.    This would have ultimately been included

18    in the overall budget for the HCPS system?

19          A.    That's my understanding, yes.

20          Q.    On the first page of this document, do

21    you see the Board of Education Goals section?

22          A.    Yes.

23          Q.    And board goal two says, "Engage

24    families in the community to be partners in

25    education of our students."

CONFIDENTIAL

Page 77

1          Do you see that?

2     A.    Yes.

3     Q.    So who sets these goals for the board?

4     A.    The board.

5     Q.    That was an easy question.

6          If you could turn to page 2, Bates

7     ending 354, in the third bullet point from the

8     bottom, it says, "Continue to enhance and promote

9     HCPS' positive image and credibility in the

10    community with the use of Facebook, Twitter,

11    YouTube, Instagram and HCPS.org News and Events."

12          Do you see that?

13    A.    Yes.

14    Q.    This is an example of how HCPS can use

15    these platforms for its benefit; right?

16    A.    Correct.

17    Q.    And the next bullet point says, "Between

18    July 2017 and June 2018, the Facebook total page

19    likes increased to 19,635.  Twitter followers

20    increased to 12,300, YouTube channel had 21,805

21    total views, and Instagram increased to 1,917

22    followers."

23          Did I read that correctly?

24    A.    Yes.

25    Q.    And so HCPS included these metrics -- go

CONFIDENTIAL

Page 78

1   back to the first page.  You can see there's a

2   section entitled accomplishments for fiscal year

3   2018?

4        A.   Yes.

5        Q.   And this bullet point is listed under

6   those accomplishments; correct?

7        A.   Correct.  Because our goal is to try to

8   reach all our families in any manner that we can.

9   And so to keep track of those numbers and to be

10  able to illustrate the increase in those numbers

11  would be an accomplishment.

12       Q.   Because you've got to reach families

13  where they're at.  They might be on social media.

14  They might be looking at the webpage; correct?

15       A.   Correct.

16       Q.   Earlier you mentioned something called

17  Littles University.  Could you explain what that

18  is?

19       A.   I would love to.  The Harford County

20  Education Foundation, they are our foundation for

21  the school system, and they had approached me

22  about doing a program as an outreach for families

23  prior to students coming into the school system

24  because that can be a missed group.  When it comes

25  time for parents to register for kindergarten, we

CONFIDENTIAL

Page 79

1   want them to already have an established

2   relationship with us.

3            So not only that they are familiar with

4   Harford County Public Schools, but also that

5   they're aware of key and important dates, such as

6   pre-K and kindergarten registration and

7   application windows.

8            So that was the initial conversation.

9   And one of the tools and ways that we came up with

10  was a program that I called Littles University.

11  And so each month I put out a post on Facebook and

12  Instagram letting families know that the Harford

13  County Education Foundation has an active link

14  where a book that I selected is posted for those

15  parents to register for a free copy if they have a

16  child anywhere from birth through age five.

17           If they register, that book is sent

18  directly to their doorstep.  And then two weeks

19  after that, I will record a video message helping

20  parents learn how to walk through a book with

21  their child, the importance of reading.  I try to

22  pick books that have certain themes or certain

23  things that we can address with parents about what

24  they can do with their children in order to

25  increase their verbal acumen, in order to increase

CONFIDENTIAL

Page 80

```
 1   their exposure to language, to illustration, to
 2   different cultures.
 3            And so that video message, I walk those
 4   things with them and then do that every month with
 5   foundation partners.
 6        Q.   So this is for pre-K and the entire
 7   pre-K group of students or potential students?
 8        A.   This is birth through age five, zero to
 9   five.
10        Q.   The videos that you post, these are
11   posted to the district YouTube account; correct?
12        A.   They are created and posted on YouTube
13   to make them accessible, yes.
14        Q.   Are these made to be played by parents,
15   by parents sitting there with their children
16   watching along?  What is the audience?
17        A.   Correct.  The intended audience is an
18   adult figure in that child zero to five life and
19   then to walk through that book with me leading
20   that conversation, but the parent is with the
21   child.
22        Q.   How long has this program been in place?
23        A.   I believe this is my seventh year.  No.
24   That's not true.
25            I don't know exactly.  I think we're
```

CONFIDENTIAL

Page 81

1    maybe at year five.

2        Q.   Did it start before or after the COVID

3    pandemic?

4        A.   It started during COVID.  And the reason

5    that I know that for a fact is because when I

6    started, I was able to actually read the book on

7    the video because those copyright laws were

8    suspended for a time during that.  That's the only

9    reason that I can say for sure it started during

10   that time.

11            We have been fortunate enough that the

12   foundation has continued to support it after

13   COVID.

14            (HCPS/Lader Exhibit 12 was marked.)

15            MR. WHITELEY:  I'm going to mark Tab 21.

16   This will be Exhibit 12.  For the record, this is

17   a document produced by the district bearing Bates

18   number 538342.

19   BY MR. WHITELEY:

20       Q.   Do you have Exhibit 12 in front of you?

21       A.   Yes.

22       Q.   This is an email chain from 2021 between

23   yourself and Deb Merlock.

24            Who is Ms. Merlock?

25       A.   The president of the foundation.

Page 82

1      Q.    What foundation are you referring to?

2      A.    The Harford County Education Foundation.

3      Q.    AND what does the foundation do to your

4    knowledge?

5      A.    The foundation provides resources for

6    schools, such as a Tools for Schools space where

7    teachers can go and take whatever supplies they

8    need.  Most recently we held a golf tournament to

9    raise funds that are then put back in the

10   classrooms in different formats.

11          Littles University is part of the

12   foundation.  We just started a program at the

13   hospitals where they give a bag to new parents,

14   and that bag has HCPS 1Z.  It's all kind of tools

15   to try to connect and provide resources.  They

16   have a book in that bag.  They encourage them to

17   start learning and following the foundation, the

18   school system so that we're preparing kids as

19   early as we can.

20     Q.    And do you know how much the Harford --

21   sorry.  It's the Harford Education Foundation?

22     A.    Harford County Education Foundation,

23   also referred to as HCEF.

24     Q.    Do you know how much money HCEF has

25   spent providing these sorts of things for either

CONFIDENTIAL

Page 83

1    HCPS or HCPS students?

2         A.    I would not even be able to begin to

3    imagine.

4         Q.    Is that a high number, or you just don't

5    know?

6         A.    I think it's a fabulous resource that

7    was established many years ago.  It started as the

8    Greater Excellence in Education Foundation or

9    GEEF.  And it focused on specific schools at that

10   time but then expanded that support to all

11   schools.

12        Q.    Has the relationship between HCEF or its

13   predecessor name and HCPS existed the entire time

14   you've worked at HCPS?

15        A.    In this role as manager of

16   communications, yes.  Prior to that, I wouldn't

17   have had firsthand experience with them.

18        Q.    If you could look at Exhibit 12 and turn

19   to the last page, the top of the email with the

20   date is on the previous page, but here Ms. Merlock

21   writes, "We would like to include the video

22   'Welcome to First Grade, Tristan' during the Tools

23   for Schools breakfast.  Would this be okay?  It's

24   a great video showing the day in the life of an

25   elementary student."

CONFIDENTIAL

Page 84

1         What do you recall about this video?  Is
2    this something HCPS ended up posting?  Is this
3    something HCEF made and posted?
4         A.   Harford County Public Schools created
5    this video.  This was a video at -- it was filmed
6    at -- at the time the school was called William
7    Paka Old Post Road where Tristan was a student.
8    With his parents' permission, we took a video
9    camera and followed him from his time getting on
10   the bus, traveling to school, going into the
11   school, in order to personalize that experience,
12   to help families visualize what it's like for a
13   child to enter the school, what they see, who they
14   interact with, as an example.
15        Q.   Did HCPS post this to its YouTube page?
16        A.   Yes.
17        Q.   It can be reassuring for parents to see
18   what their kids are doing during the day?
19        A.   Absolutely.
20        Q.   It can be reassuring for children to see
21   the type of environment they're going to be in?
22        A.   Correct.
23             MR. WHITELEY:  Let's go off the record.
24             THE VIDEOGRAPHER:  We are off the record
25   at 11:59.

CONFIDENTIAL

Page 85

1          (Recess from 11:59 p.m. to 12:34 p.m.)

2          THE VIDEOGRAPHER:  We are on the record

3     at 12:33.

4          (HCPS/Lader Exhibit 13 was marked.)

5          MR. WHITELEY:  If we could mark Tab 42

6     and this will be Exhibit 13.

7     BY MR. WHITELEY:

8        Q.   And we do not have a paper copy of this

9     one, but it should be displayed on the screen in

10    front of you.

11       A.   Yes.

12       Q.   This is a post from the district's

13    Instagram account that we captured.

14            Do you see that in front of you?

15       A.   Yes.

16       Q.   Do you see the name HCPS Schools?

17       A.   Yes.

18       Q.   And that's the name of the district's

19    Instagram's account?

20       A.   Correct.

21       Q.   If you could scroll down to the text

22    accompanying the post.  Well, stop there.  It

23    says, "Who will be the next student member of the

24    board?"

25            Do you see that?

Page 86

```
 1       A.   Yes.
 2       Q.   And those are HCPS students that are
 3  listed there?
 4       A.   Correct.
 5       Q.   If you could scroll down to the text.
 6  It reads, "11th graders, make your voice heard.
 7  Want to make a difference in decisions made about
 8  HCPS education?  Now is your chance."
 9            Did I read that correctly?
10       A.   Yes.
11       Q.   So the district does post content for
12  students in the district on its accounts; right?
13       A.   Specifically because this is a student
14  member of the board.  So that is a public-facing
15  position.  So that is the reason why this was
16  shared on the HCPS account.
17       Q.   The audience of this post would be
18  students within the district?
19       A.   Really my audience when I do this is --
20  well, it says 11th graders.  I completely admit
21  that.  The goal is for the parents and guardians
22  that we know are on here to see it and tell their
23  11th grader, to ask them, do you know anything
24  about this?  Did you see this?  Are you aware of
25  this?
```

CONFIDENTIAL

Page 87

1          And so that's something we definitely
2    will utilize seldomly, but again for this one,
3    because it's a public-facing position, the student
4    member of the board, we want to make sure that
5    even the parents and guardians can encourage their
6    kids to be involved and aware.  It's even better
7    if it's an actual student who reads it and sees
8    it, because we know grass roots-wise, they'll talk
9    to each other hopefully and encourage each other
10   to be involved in that decision because the
11   student member of the board does represent all
12   40,000 students.
13        Q.   "Make your voice heard," your voice
14   there is referring to students; right?
15        A.   Yes.
16        Q.   Thank you.
17             MR. WHITELEY:  We can take down Tab 42.
18   BY MR. WHITELEY:
19        Q.   HCPS has a mobile app; right?
20        A.   Correct.
21        Q.   It has it for iPhones and iPads;
22   correct?
23        A.   I don't know about iPads, but iPhones
24   and Androids, yes.
25        Q.   It's available to download on the Apple

CONFIDENTIAL

Page 88

1    app store?

2         A.    Yes.

3         Q.    And Google Play store for Android

4    phones?

5         A.    Correct.

6         Q.    And what sort of content is featured on

7    the HCPS app?

8         A.    It's essentially what you can find on

9    the websites, but more streamlined.

10        Q.    It also allows users of the app to look

11   at content from HCPS' Facebook, Instagram, YouTube

12   and Twitter accounts?

13        A.    Correct.  It's a pull from that live

14   feed so that those news and stories are there as

15   well.

16        Q.    So if I understand correctly, it will

17   compile those feeds from those platforms or posts

18   from those platforms and put them all into one

19   feed on the app, the HCPS app?

20        A.    It's been a while since I've looked at

21   the exact logistics.  I don't believe that it

22   pulls from all of them, but the ones that the

23   platform could handle pulling from, yes.  I do not

24   recall, off the top of my head, exactly which

25   ones.

CONFIDENTIAL

Page 89

1          Q.    Do you know who maintains and updates

2     the app for the district?

3          A.    The app essentially lives on its own

4     because it's pulling that live information and

5     because most of it links to webpages.  So if

6     information changes and you click on the tab in

7     the app, you're still going to the webpage with

8     the accurate information.

9          Q.    Do you know who created the app

10    initially for the district?

11         A.    That was under my supervision.  That has

12    been in the last few years.

13         Q.    And did district employees write the

14    code and build it, or did you contract out?

15         A.    Correct.  This is through the Final

16    Site, the mass notification system that we utilize

17    currently.  So when we switch to Apptegy effective

18    July 1, it will be through Apptegy.

19         Q.    And why did the district make this app?

20         A.    It was through feedback from staff, from

21    families saying that they wanted that resource,

22    that an app would be easier to utilize than going

23    to the website.

24         Q.    Another example of you got to meet

25    people where they are?

Page 90

1          A.    Exactly.

2          Q.    Does the HCPS app allow for users to

3    turn on notifications for the app?

4          A.    Yes.

5          Q.    Both the Android and IOS apps are still

6    available today?

7          A.    Yes.

8                (HCPS/Lader Exhibit 14 was marked.)

9                MR. WHITELEY:  I am I'm going to mark

10   Tab 29.  This will be Exhibit 14.  For the record,

11   this is a document produced by the district

12   bearing Bates number 467611.

13   BY MR. WHITELEY:

14         Q.    Do you have Exhibit 14 in front of you?

15         A.    Yes.

16         Q.    This is an email chain between you, Kyle

17   Andersen and Jason Berends; correct?

18         A.    Correct.

19         Q.    In the top email Mr. Andersen writes,

20   Missed "this on Friday.  If you haven't yet, go

21   ahead and do it.  The Facebook stats are great.

22   8,200 views."

23                Do you see that?

24         A.    Yes.

25         Q.    Going to the second page of this

CONFIDENTIAL

Page 91

1    document, he's talking about a video related to

2    music that HCPS posted; correct?

3        A.    Let me read through it very quickly.

4        Q.    Sure.

5        A.    Go ahead.  Repeat the question.

6        Q.    This email chain is about a video that

7    the district posted to its YouTube and Facebook

8    accounts?

9        A.    Yes.  It appears those were the two

10   places it was posted.

11       Q.    Mr. Andersen's email at the top, he says

12   this video got 8,200 views on Facebook; correct?

13       A.    At the top on the first page, yes.

14       Q.    Do you know if the district was still

15   tracking Facebook-related data at this point in

16   2023?

17       A.    I do not know.

18       Q.    Do you know where Mr. Andersen got this

19   information about the view count?

20       A.    On the post, you can see how many views.

21       Q.    Do you know if he looked at it there

22   versus somewhere else to obtain this information?

23       A.    I do not.

24            (HCPS/Lader Exhibit 15 was marked.)

25            MR. WHITELEY:  I'm going to mark Tab 5.

Page 92

1   This will be Exhibit 15.  For the record, these

2   are discovery responses from HCPS that were

3   provided to us in April of this year.

4   BY MR. WHITELEY:

5       Q.   Do you have Exhibit 15 in front of you?

6       A.   Yes.

7       Q.   Have you ever seen this document before?

8       A.   I don't know.

9       Q.   If you could turn to about halfway

10  through the total document, there's an attachment

11  A.  If you could look at these two pages.  They're

12  called Worksheets.

13          Have you seen any of these worksheets

14  before?

15      A.   No.

16      Q.   If you look at the first worksheet

17  titled Program/Department Worksheet, do you see

18  about two-thirds of the way on the list there's a

19  line item for communications?

20      A.   Yes.

21      Q.   And then -- well, first let me ask, did

22  you provide any information related to these

23  figures that you see here on the worksheets?

24      A.   I was asked to give an estimate amount

25  of the amount of that I spend on social media in

CONFIDENTIAL

Page 93

1    my professional capacity.

2         Q.   What do you mean by the amount of time

3    you spend on social media in your professional

4    capacity?

5         A.   The amount of time that I spend

6    addressing communications issues on social media

7    or posting original information on social media.

8         Q.   And so this next column over to the

9    right under the heading Subtotal Fiscal Year 2016

10   to 2024, I take this to mean that the

11   communications budget for all of those years

12   combined together is about $4.2 million.

13            Does that seem correct to you based on

14   your experience in the communications department

15   at Harford County Public Schools?

16        A.   Yes.

17        Q.   And then the 60 percent weight, is that

18   what you were discussing when you said the

19   estimate of time that you spent?

20        A.   Correct.

21        Q.   Did you provide any other estimates or

22   information for these other departments or

23   programs?

24        A.   No, I did not.

25        Q.   If we could go to the written part of

CONFIDENTIAL

Page 94

1    the document, page 3, it's a little earlier in the

2    document.  Let me know when you're there.

3        A.    I'm there.

4        Q.    Do you see this is table that starts on

5    the bottom of page 3?

6        A.    Yes.

7        Q.    Have you seen that before?

8        A.    No.

9        Q.    Other than counsel for HCPS, did you

10    talk to anybody about this estimate of time or

11    budget that you provided later in the worksheet?

12        A.    The estimate of the 60 percent of my

13    time, I did not speak with anyone else about that.

14    It really is conservative given the amount of time

15    that I deal with social media issues.  But I came

16    to that number on my own.

17        Q.    Did you look back at any documents or

18    records when you were coming up with that

19    percentage?

20        A.    No.  I didn't need to because it's my

21    daily experience.

22        Q.    Do you have to bill your time or

23    otherwise keep time records at HCPS?

24        A.    No.  I'm exempt, and I'm on call 24/7.

25        Q.    Do Mr. Andersen or Mr. Berends have to

CONFIDENTIAL

Page 95

1    keep time logs or bill their time in any way?

2        A.    No.

3        Q.    And you said you've spent this time on

4    social media issues.

5              What of your responsibilities and

6    activities are you including in that 60 percent?

7        A.    So that's dealing with -- unfortunately,

8    the smallest part of that is dealing with putting

9    information out.  The largest portion of that

10   percentage and, like I said, it really is more

11   than that -- I was being conservative -- but it's

12   dealing with, for example, when someone forwards

13   me a screenshot from a TikTok or a SnapChat and

14   I'm being asked to address it and it doesn't say

15   what school.  It just has come to a student.

16   Students are passing it around.

17              Then I have to follow up with safety and

18   security, with law enforcement, do that

19   investigation to figure out where it's coming

20   from, because again, it's on social media and it's

21   been shared.  So that comes under my purview.  I'm

22   following up with that, trying to figure that out.

23   Same thing when something is said about a staff

24   member.

25              Right now we have a particular

CONFIDENTIAL

Page 96

1    individual on our Facebook page who is repeatedly

2    writing negative comments about one of our

3    administrators unsolicited on unrelated posts.  It

4    is becoming quite detrimental for her and her

5    mental health, and so following up on those as

6    quickly as we can, whether it's at 5:00 a.m. or

7    9:00 p.m. or 11:00 p.m.

8              So that's why I say at least 60 percent

9    of my day, unfortunately, is spent facilitating

10   those conversations and trying to figure out where

11   those things are originating and then following up

12   with students, with staff, with whoever it may be

13   impacting.

14             Bullying is another example.  We will

15   have parents send us snapshots of things that

16   other children said to their child and then asking

17   us as a school system to follow up, whether it

18   happened during the school day or not, because, of

19   course, then they're put in the environment

20   together.  So you have to navigate that and ensure

21   the safety of all the students involved.

22        Q.   I know that was a long answer, but

23   anything else that you were including in that

24   60 percent estimate?

25             MR. LEGG:  Objection.  Form.

CONFIDENTIAL

Page 97

1          You can answer.

2          THE WITNESS:  I'm trying to think what

3   else we do on social media.  I think that might be

4   sufficient for now.

5   BY MR. WHITELEY:

6          Q.   Do you know when you provided that

7   estimate?

8          A.   When asked for it.

9          Q.   Was that in the last few months?  Was

10  that last year?

11         A.   Yeah, last few months.

12         Q.   Have you ever had conversations --

13  separate from in-house or outside counsel for the

14  district, have you had conversations with other

15  HCPS employees about this lawsuit?

16         A.   No.

17         Q.   Have you prepared any public statements

18  on behalf of HCPS related to this lawsuit?

19         A.   No.

20         Q.   Has the district engaged any PR firms

21  or -- I'll call them PR firms -- to handle

22  communications related to this lawsuit?

23         A.   Not that I'm aware of.

24              (HCPS/Lader Exhibit 16 was marked.)

25

CONFIDENTIAL

1          MR. WHITELEY:  I'm going to mark Tab 32.

2     This should be Exhibit 16.  For the record, this

3     is a document produced by the district bearing

4     Bates number 465458.

5     BY MR. WHITELEY:

6          Q.    Do you have Exhibit 16 in front of you?

7          A.    Yes.

8          Q.    This is an email chain between you and

9     Mary Beth Stapleton and then Lindsay Bilodeau;

10    correct?

11         A.    Bilodeau, yes.

12         Q.    Bilodeau.  From October 2021; correct?

13         A.    Yes.

14         Q.    And who is Mary Beth Stapleton?

15         A.    The manager of family and community

16    partnerships.

17         Q.    And what's your understanding of that

18    role in the district?

19         A.    She works with parents to ensure a

20    successful connection between the school system

21    and the parent, make sure -- like you said before,

22    meet them where they are, make sure that the

23    resources are available and that questions that

24    are predominant among parents are addressed.

25         Q.    Is she in a separate department from

Page 99

1    you?

2         A.    Yes.   There's an overall department

3    title, if you look at the actual organization

4    chart, that's called communications and family

5    partnerships, but then underneath of that is

6    communications, and it's family partnerships.  So

7    we do not work together daily.   It is two separate

8    departments.

9         Q.    So neither one of you reports up to the

10   other; is that right?

11        A.    No; correct.

12        Q.    Do you both report up to the same

13   person?

14        A.    I'm not sure if she still reports to

15   Dr. Davis, but I do.

16        Q.    And who is Dr. Davis?

17        A.    Chief of administration.  I believe on

18   human resources records, I report directly to

19   Dr. Davis and Dr. Bulson.  But that has changed

20   throughout the years.  That could be different.

21   It could just be Dr. Davis at this point.  But my

22   most recent knowledge is Dr. Bulson and Dr. Davis.

23        Q.    If you could go to the second page of

24   this document ending in Bates 459, Ms. Stapleton

25   emailed you October 19, 2021.  She wrote, "Hi,

CONFIDENTIAL

Page 100

1    Jillian.  Can you offer a suggestion of an

2    administrator that is savvy on social media, what

3    students are doing on social media (the

4    challenges, et cetera)?"

5            And she said, "I'd like it if we could

6    offer a Parent Academy Real Talk on Social Media

7    101 for parents."

8            Did I read that correctly?

9        A.    Yes.

10       Q.    And then you respond.  It starts on the

11   previous page and continues onto this page.  But

12   looking at the previous page, you wrote, "Hi, Mary

13   Beth.  I think Brad is asked for a lot in this

14   arena, but Brad Spence is the only one that comes

15   to mind.  He researches and stays up to date on

16   the newest social media platforms, et cetera."

17           Who is Brad Spence?

18       A.    He is the principal of Havre de Grace

19   Middle/High School.

20       Q.    Why was Mr. Spence the only one who came

21   to mind for you?

22       A.    Because he's the only one that utilizes

23   additional social media platforms beyond what the

24   school system does to my knowledge at that date.

25       Q.    Do you know what platforms he or the

CONFIDENTIAL

Page 101

1   school used at this time?

2        A.    Beyond Facebook and Instagram and what

3   was Twitter at the time, I believe looking at the

4   date, I do know that he was utilizing additional

5   platforms, but I don't know the specifics.

6        Q.    Do you know if that school used TikTok?

7        A.    I do not know for sure.

8        Q.    Do you know if they used SnapChat?

9        A.    I do not know for sure.

10       Q.    Have you had conversations with

11  Mr. Spence about his specific school's social

12  media presence or accounts?

13       A.    Yes.

14       Q.    How many times did you talk with him

15  about that?

16       A.    I couldn't say.

17       Q.    What do you recall about these

18  conversations with Mr. Spence?

19       A.    I used Mr. Spence as a resource to

20  understand where he saw value in utilizing

21  additional social media platforms because I did

22  not from a system perspective.  And so I was

23  asking what his feedback was as to how he felt it

24  was a resource.  And in his community, he felt as

25  though it was.

CONFIDENTIAL

Page 102

1          And he was able to connect directly with

2    his students through those platforms as well as

3    his parents and guardians and community members,

4    whereas here at the district level, it did not

5    seem an appropriate fit for my department given

6    our lack of resources to moderate and oversee and

7    produce content for all of those different

8    platforms as well as the concerns that I was

9    seeing on these platforms is why this whole string

10   came about.

11          Ms. Stapleton was attempting to address

12   safety issue with social media and addressing how

13   students could be better guided to utilize it

14   appropriately versus, for example, at that time I

15   do believe, given the fact that there's a

16   reference to having a state police member

17   representative on that Parent Academy Real Talk,

18   which is a video, this most likely was around the

19   time where we had received screenshots or

20   forwarding of videos and things where students

21   were making threats, whether bombs or personal or

22   whatever it may be.  But that would have been the

23   impetus behind this conversation.

24       Q.    Did Mr. Spence tell you why he thought

25   he was able to connect with students through those

Page 103

1  platforms as well as parents and guardians and

2  community members?

3      A.   I'm sorry.  Can you repeat that?  That

4  was long and I want to make sure I comment.

5      Q.   Did Mr. Spence in these conversations

6  tell you why he thought he was able to connect

7  with students on these platforms as well as

8  parents, guardians and community members?

9      A.   I think that in the school environment,

10  it's much smaller than the district level.  And so

11  while on the run, while moving through his

12  building, he could quickly create content that was

13  appropriate to share on those platforms.  And so

14  that was why it was efficient for him.

15      Q.   Is he still principal?

16      A.   Yes.

17      Q.   Do you know if he or the school still

18  maintain those accounts?

19      A.   I do not know.

20      Q.   Did you or anybody else at HCPS tell him

21  to stop using those accounts?

22      A.   No.  He was not told to stop.  I always

23  caution about the moderation and staying on top

24  of, watching and being aware and addressing any

25  issues promptly when they do come up.  But he has

CONFIDENTIAL

Page 104

1    been successful at doing that to the best of my

2    knowledge.

3          Q.    In the last email in this chain

4    Ms. Stapleton says at the end, "I think I will

5    start with Brad."

6                Do you know if they ever discussed on

7    this issue?

8          A.    I do not.

9          Q.    Safe to say they had a conversation.

10   You were not a part of it?

11         A.    Correct.  I do believe that it occurred

12   and it would be easy to look at the YouTube video

13   of the Parent Academy that was produced.

14         Q.    Since your role as a parent educator,

15   have you worked at HCPS as a teacher?

16         A.    No.

17         Q.    Since your role as a parent educator,

18   have you worked anywhere else as a teacher?

19         A.    No.

20         Q.    Have you ever worked at HCPS or any

21   other school or district as a school counselor?

22         A.    No.

23         Q.    Have you ever worked as a mental health

24   professional?

25         A.    No.

CONFIDENTIAL

Page 105

1          Q.    Have you ever worked in a school
2     district or school budget department?
3          A.    No.
4          Q.    Have you ever worked at HCPS or
5     elsewhere as a principal or similar school level
6     administrator?
7          A.    No.
8          Q.    We walked a little bit today about how
9     you may see posts or comments from students on
10    social media.
11             Are you responsible for any discipline
12    of HCPS students?
13         A.    No.  I would share the information with
14    the appropriate administrators who could determine
15    any appropriate disciplinary action.
16         Q.    Do you have any responsibilities
17    tracking data or metrics about student discipline
18    in the district?
19         A.    No.
20         Q.    And you're not aware of any data that
21    you or HCPS has that tracks how much HCPS students
22    use any of defendants' platforms; correct?
23         A.    Correct.
24         Q.    I should clarify.  Do you know who the
25    defendants are in this case?

CONFIDENTIAL

Page 106

1        A.    I'm sorry?

2        Q.    Do you know who the defendants are in

3    this case?

4        A.    The social media platforms.

5        Q.    So that includes Facebook, Instagram,

6    TikTok, SnapChat and YouTube?

7        A.    Yes.

8        Q.    Other than the 60 percent estimate of

9    your time we were discussing earlier, do you have

10   any data related to school or district level

11   expenditures related to students' social media

12   use?

13       A.    No.

14       Q.    Do you have any data for HCPS students

15   related to their mental health condition?

16       A.    No.  I do not personally.

17       Q.    Do you have any data or information

18   about HCPS counseling students on mental

19   health-related issues?

20       A.    Not in the communications office.  I

21   just want to clarify, because I'm not speaking for

22   the system.  I'm just speaking for me.  I know

23   this happens in other departments.  I just want to

24   be clear.

25       Q.    I'm asking what you know and what you're

Page 107

1    aware of.

2         A.    No.

3         Q.    Do you track or have any knowledge about

4    HCPS' expenditures for school counseling or

5    school-provided mental health resources?

6         A.    No, I do not.

7         Q.    Have you ever requested that any of the

8    defendant platforms that we discussed change or

9    modify any particular feature on their platform?

10        A.    We have reached out when there has been

11   an issue of aggression or inappropriate behavior,

12   like reporting things as spam, reporting things as

13   inappropriate in an attempt to get that user

14   removed.  We have not been successful.

15        Q.    Other than that, have you ever requested

16   that any defendant modify any feature on their

17   platform?

18        A.    No.

19        Q.    Have you ever requested that any of the

20   defendant platforms stop or discontinue a certain

21   feature of their platform?

22        A.    No.

23        Q.    And separate from the reach out you just

24   described about potentially getting posts or

25   content removed, have you ever spoken with anyone

Page 108

1    from the defendants about their platforms?

2        A.    Spoken to an actual person?

3        Q.    Yes.

4        A.    No.

5        Q.    Have you spoken to not a person about

6    the defendant platforms?

7        A.    I just wanted to clarify who the

8    intended recipient was.

9            No, we have not spoken with someone,

10   whether AI or person.

11       Q.    Does HCPS allow students to use cell

12   phones during the school day?

13           MR. LEGG:  Objection to form.

14           THE WITNESS:  I think that in the new

15   policy, it's clarified as to when and where that

16   can be used.  Because I'm not intricately involved

17   in that use, I don't know that policy word for

18   word.

19   BY MR. WHITELEY:

20       Q.    So you weren't involved in drafting that

21   policy?

22       A.    No.  I would have distributed it to

23   families via our mass communication tool, but it

24   was not necessary for me to review that data or

25   that actual policy because I wasn't going to make

CONFIDENTIAL

Page 109

1  edits to a board policy.

2       Q.   So the board is part of the organization

3  that adopts this?

4       A.   Correct, the Board of Education of

5  Harford County.

6       Q.   Have you ever used YouTube?

7       A.   Yes.

8       Q.   Do you have a YouTube account?

9       A.   I have a YouTube account set up, yes.

10      Q.   Do you know when you set it up?

11      A.   It was within the last year.

12      Q.   Is this a personal account or a

13  professional account?

14      A.   This is a professional account for my

15  daughter who has started a film and commercial

16  acting career.

17      Q.   That's exciting.

18           You say you started that within the last

19  year?

20      A.   Yes.  It was -- I know for a fact that

21  the career started in February of 2024.  And so it

22  was after that fact.  It was established when one

23  of her auditions required that I submit a link, a

24  YouTube link.  Otherwise, I would not have

25  established a YouTube channel for her.

CONFIDENTIAL

Page 110

1          Q.    And separate from that account for your

2     daughter, do you have your own personal YouTube

3     account?

4          A.    No.

5          Q.    Do you have a Facebook account?

6          A.    Yes.

7          Q.    How long have you had a Facebook

8     account?

9          A.    Since I was in college.

10         Q.    Do you have an Instagram account?

11         A.    Yes.

12         Q.    Also since college?

13         A.    No.  I'm that old that I don't know that

14    it was around in college.  So I can't say exactly

15    when.

16         Q.    Do you have a SnapChat account?

17         A.    No.

18         Q.    Do you have a TikTok account?

19         A.    Absolutely not.

20         Q.    Why do you say "absolutely not"?

21         A.    Because in my professional capacity, I

22    see the dangers, the vitriol and the damage that

23    can be done on those platforms.

24         Q.    And what do you mean by that, the

25    damage?

CONFIDENTIAL

Page 111

1          A.    I mean the fact that I see regularly
2     children bullying one another because I'm being
3     sent those images and then being asked to navigate
4     that at the school level with administrators.    I
5     see the bomb threats.    I see the violence, gun
6     violence.    I see the racism.
7               We have students who as part of a
8     Scrabble day at school found the letters amongst
9     their peers and went into the library and took a
10    picture of themselves lined up spelling the word
11    N-I-G-G-E-R.    That vent viral.    Dealing with that
12    and the fallout, I will not voluntarily
13    participate in any of those platforms.
14         Q.    Other than your daughters's YouTube
15    account that was made within the last year, do you
16    know if your daughter has any other social media
17    accounts?
18         A.    My daughter does not have any social
19    media accounts.    I run an Instagram account for
20    her same professional capacity.    That is private
21    though.    Even in a professional capacity, I am not
22    willing to make that public.
23         Q.    When you say private, you mean the
24    account setting on the platform?
25         A.    The account setting is private, and

CONFIDENTIAL

Page 112

1    someone must request to follow the page that I

2    have set up for my daughter's professional

3    experience.

4        Q.   Are there any other accounts you've set

5    up for your daughter other than the YouTube and

6    Instagram accounts?

7        A.   No.

8        Q.   Do you have any other children?

9        A.   No.

10       Q.   And how old is your daughter?

11       A.   She is seven.

12       Q.   Have you ever used YouTube Music?

13       A.   No.

14       Q.   Have you ever used YouTube Kids?

15       A.   No.  I don't trust that because of the

16   commercials.  You never know what's going to pop

17   up.

18       Q.   What do you mean by that?

19       A.   I mean that we've had parents reach out

20   to share that when their child was directed to a

21   YouTube link to watch something in particular for

22   like a school assignment or something and then an

23   ad popped up, and they claim that it had

24   certain -- it could be content that has -- the one

25   that's popping into mind, I believe they claimed

CONFIDENTIAL

Page 113

1    that it had some kind of sexual connotation on the

2    kid's platform.

3            Now, I can't speak to the validity of

4    that because, of course, there's no video or photo

5    of it, but a parent calling and complaining about

6    that is, obviously, something we're going to take

7    very seriously as a school system.  Consequently,

8    just from that knowledge, I won't allow my

9    daughter to watch that.

10       Q.   And the district to your knowledge does

11   allow YouTube to be used in a classroom; correct?

12       A.   I do believe that they use it as a

13   resource.

14       Q.   And it can also be assigned as a part of

15   homework; right?

16       A.   I can't speak to that.

17       Q.   Other than -- strike that.

18            Do you recall any other parent

19   complaints specific to YouTube that you've

20   received?

21       A.   Specific to YouTube, no.  YouTube

22   doesn't have the same format of comments.  It's

23   not something that's used as much as on, for

24   example, Facebook.  So I personally believe that

25   that's why we don't see as much interaction on

CONFIDENTIAL

Page 114

1    there or as many issues with the content.  It's

2    more that in-between video piece, those

3    advertisements and things that pop up

4    uncontrollably.

5        Q.    Have you provided your daughter with a

6    smartphone or a tablet?

7        A.    Absolutely not.

8              MR. WHITELEY:  Go off the record?

9              MR. LEGG:  Yes.

10             THE VIDEOGRAPHER:  We are off the record

11    at 1311.

12             (Recess from 1:11 p.m. to 1:20 p.m.)

13             THE VIDEOGRAPHER:  We are on the record

14    at 1320.

15    BY MR. WHITELEY:

16        Q.    Ms. Lader, I understand your job has

17    required you to be checking your phone and devices

18    throughout the day.  But I just want to confirm

19    you have not discussed the substance of your

20    testimony with anybody?

21        A.    No.

22        Q.    Thank you.  Earlier we were talking

23    about a video called Social Media 101 or something

24    similar.

25             Do you recall that discussion?

CONFIDENTIAL

Page 115

1      A.    Part of Ms. Stapleton's Parent Academy
2   Real Talk series, yes.
3      Q.    Do you know if that video was ever
4   published on YouTube or some of the other accounts
5   run by HCPS?
6      A.    I could not confirm positively.
7      Q.    Do you know if that video was published
8   and later taken down?
9      A.    That would surprise me.  We don't
10  typically take down things that we have posted as
11  resources of information for our community.
12     Q.    And why is that?  Why do you not
13  typically take things down?
14     A.    Once it's posted, if we were to take it
15  down, what can typically happen is then we get the
16  deluge of there was this resource.  Now we can't
17  find it.  Where is it?
18           And typically it's information that we
19  do like for historic purposes.  We would want to
20  have that out there to illustrate, okay, at this
21  time we shared this information.
22     Q.    If it was taken down, do you know who
23  would have made that decision to take it down?
24     A.    It could have been one of several
25  people.  In that case, it probably would have come

CONFIDENTIAL

Page 116

1    from someone like Ms. Stapleton if she said that

2    she wanted it removed, or if it had some type of

3    sensitive information that safety and security

4    wanted removed, just thinking about who was on

5    that email chain referenced as additional guests.

6    I would assume it would be someone from one of

7    those departments.

8               And I remember seeing Donoven's name and

9    State Police.  So that's why.

10       Q.    Thank you for your time, Ms. Lader.

11   Pending questions from counsel, I have no further

12   questions for you.

13              MR. LANDS:  I have no questions.

14              MR. WHITELEY:  Any questions from any

15   defendants who are attending on Zoom?

16              Can we hear them if they are speaking?

17              THE VIDEOGRAPHER:  Yes.

18              MR. WHITELEY:  There's usually not, but

19   I just wanted to check.

20              MR. LEGG:  I'll reserve my questions for

21   trial.

22              THE VIDEOGRAPHER:  We are off the record

23   at 1322.

24              (Whereupon, at 1:22 p.m., the taking of

25   the instant deposition ceased.)

CONFIDENTIAL

Page 117

1   COMMONWEALTH OF PENNSYLVANIA  )
2   COUNTY OF ALLEGHENY              )      SS:
3                C E R T I F I C A T E
4          I, Ann Medis, RPR, CLR, CSR-WA and
5   Notary Public within and for the Commonwealth of
6   Pennsylvania, do hereby certify:
7          That JILLIAN LADER, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11         I further certify the inspection,
12  reading and signing of said deposition were not
13  waived by counsel for the respective parties and
14  by the witness.
15         I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage and that I am in no way interested in the
18  outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20  my hand this 13th day of May, 2025.
21
22
       _____
23                 Notary Public
24
25

CONFIDENTIAL

Page 118

1   COMMONWEALTH OF PENNSYLVANIA    )    E R R A T A
    COUNTY OF ALLEGHENY             )     S H E E T

2

3   I, JILLIAN LADER, have read the foregoing pages of
    my deposition given on May 12, 2025, and wish to

4   make the following, if any, amendments, additions,
    deletions or corrections:

5

6   Page   Line    Change and reason for change:

7   ____   ____    _____

8   ____   ____    _____

9   ____   ____    _____

10  ____   ____    _____

11  ____   ____    _____

12  ____   ____    _____

13  ____   ____    _____

14  ____   ____    _____

15  ____   ____    _____

16  ____   ____    _____

17  ____   ____    _____

18

    In all other respects, the transcript is true and

19  correct.

20

                    _____

21                  JILLIAN LADER

22

    _____ day of _____, 2025.

23

    _____

24          Notary Public

25

CONFIDENTIAL

```
                                                   Page 119

  1                GOLKOW, a Veritext Division
                        One Liberty Place
  2              1650 Market Street, Suite 5150
                 Philadelphia, Pennsylvania  19103
  3                      877.370.3377
  4
           May 13, 2025
  5
  6
           Matthew P. Legg, Esquire
  7        Brockstedt Mandales Federico LLC
           2850 Quarry Lake drive - Suite 220
  8        Baltimore, Maryland  21209
  9        Re:  Deposition of JILLIAN LADER
                Notice of Non-Waiver of Signature
 10
           Dear Mr. Legg:
 11
           Please have the deponent read her deposition
 12        transcript.  All corrections are to be noted on
           the Errata Sheet.
 13
           Upon completion of the above, the Deponent must
 14        affix her signature on the Errata Sheet, and it is
           to then be notarized.
 15
           Please forward the signed original of the Errata
 16        Sheet to Daniel Whiteley, Esquire for attachment
           to the original transcript, which is in his
 17        possession.  Send a copy of same to all counsel.
 18        Please return the completed Errata Sheet within 30
           days of receipt hereof.
 19
           Sincerely,
 20
 21
           Ann Medis, RPR, CLR, CSR-WA
 22
           cc:
 23
           Daniel Whiteley, Esquire
 24        Brian M. Lands, Esquire
           Mark Houston Brown, Esquire
 25        Isabel King, Esquire
```