**Exhibit 20**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1                 UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2
3    IN RE: SOCIAL MEDIA        )
     ADOLESCENT ADDICTION/      )
4    PERSONAL INJURY PRODUCTS )
     LIABILITY LITIGATION       ) MDL No. 3047
5    _____) Case No. 4:22-md-03047-YGR
                                )
6    This Document Relates To:)
                                )
7    ALL ACTIONS                )
     _____)
8
9
10                 VIDEOTAPED DEPOSITION OF
                  JACKIE RAY SMITH, Ph.D.
11                 SEPTEMBER 12, 2025
                 9:35 a.m. to 2:20 p.m.
12                         at
                 Covington & Burling
13         850 10th St NW, Washington, DC 20001
14
15
16
17
     Reported By: Amanda Blomstrom, RMR, CRR,
18   CSR TX #8785/CA #12681/IL #84-3634
19
20
          _____
21              GOLKOW - VERITEXT
             877.370.DEPS | fax 917.591.5672
22                 deps@golkow.com
23
24
25

CONFIDENTIAL

Page 2

FOR THE PLAINTIFFS:

      LIEFF CABRASER HAMILTON & BERNSTEIN
      BY: NICK W. LEE, ESQ.
      One Corporate Center
      275 Battery Street, Suite 2900
      San Francisco, CA 94111
      415.956.1000
      nlee@lchb.com

FOR THE DEFENDANTS META PLATFORMS, INC., F/K/A
FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC; FACEBOOK
OPERATIONS, LLC; FACEBOOK PAYMENTS, INC.; FACEBOOK
TECHNOLOGIES, LLC; INSTAGRAM, LLC; SICULUS, INC.;
AND MARK ELLIOT ZUCKERBERG:
      COVINGTON BURLING LLP
      BY: CHRISTIAN J. PISTILLI, ESQ.
      One CityCenter
      850 10th Street, NW
      Washington, D.C. 20001
      202.662.6000
      cpistilli@cov.com

FOR THE DEFENDANT SNAP:

      KIRKLAND & ELLIS LLP
      BY: PATRICK G. MAROUN, ESQ. (Via Zoom)
      333 West Wolf Point Plaza
      Chicago, Illinois  60654
      312.862.0460
      patrick.maroun@kirkland.com

CONFIDENTIAL

```
                                                Page 3
 1                    APPEARANCES (Cont'd)
 2    FOR THE DEFENDANTS TIKTOK INC. AND BYTEDANCE INC.:
 3         KING & SPALDING LLP
           BY: YELENA KOTLARSKY, ESQ. (Via Zoom)
 4         1185 Avenue of the Americas
           34th Floor
 5         New York, NY 10036
           212.556.2100
 6         ykotlarsky@kslaw.com
 7
 8
 9
                        ZOOM APPEARANCES
10
      Dominic Booth
11    Ricardo Chirinos
      Matt Legg
12    Lydia Weiant
13
14    LITIGATION TECHNICIAN:
15         JUSTIN BILY, Novak
16
      VIDEOGRAPHER:
17
           JON RASSON, Golkow
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 4

```
 1                    INDEX OF EXAMINATION
 2    EXAMINATIONS                          PAGE
 3      BY MR. LEE                            7
        BY MR. PISTILLI                     182
 4
 5
                      INDEX OF EXHIBITS
 6
      NO.              DESCRIPTION                 PAGE
 7
      Meta-Smith-1     Plaintiffs' Notice of        7
 8                     Videotaped Deposition of
                       Defendants' Retained Expert
 9                     Witness Jack Smith, PhD, and
                       Request for Production of
10                     Documents
11    Meta-Smith-2     Expert Report of Jack Smith,  8
                       PhD
12
      Meta-Smith-3     Memorandum from Jack R. Smith, 18
13                     Superintendent of Schools,
                       dated March 27, 2019
14
      Meta-Smith-4     Document titled "The Sneaky   33
15                     Science behind your child's
                       tech obsession," November 9,
16                     2018, by Caroline Knorr
17    Meta-Smith-5     Video titled "Topic: Addictive 51
                       Design"
18
      Meta-Smith-6     Petition from change.org       70
19                     Titled "Dr. Smith: Resign
                       Dr. Smith as MCPS Superintendent"
20
      Meta-Smith-7     Baltimore Sun article "Sheriff 77
21                     says 33 threats to Harford schools
                       in a month is reaction to fatal
22                     Joppa shooting," by Matt Hubbard
23
24
25
```

CONFIDENTIAL

Page 5

```
 1                      INDEX OF EXHIBITS (Cont'd)
 2     NO.              DESCRIPTION                    PAGE
 3     Meta-Smith-8     National Center for Education    87
                        Statistics, ACS-ED, District
 4                      Demographic, Harford County Public
                        Schools, Maryland
 5
       Meta-Smith-9     Responses and Objections to      92
 6                      the Notice of Videotaped
                        Deposition of Defendants' Retained
 7                      Expert Dr. Jack Smith and Requests
                        for Production of Documents
 8
       Meta-Smith-10     Board of Education of Harford 107
 9                      County, Strategic Plan, Approved
                        June 26, 2017
10
       Meta-Smith-11    MCPS Be Well 365 printout        116
11
       Meta-Smith-12    Printout titled "Cybersafety"    116
12                      from MCPS Be Well 365 website
13     Meta-Smith-13    Document titled "House           126
                        Committee on Energy and
14                      Commerce, Testimony of
                        Tim Kendall"
15
       Meta-Smith-14    Harford County Public Schools    150
16                      Real Talk video
17     Meta-Smith-15    MAEC, MCPS Antiracist System     154
                        Audit, Executive Summary
18
       Meta-Smith-16    Selected Financial Data for      160
19                      Maryland Public Schools 2020-2021
20     Meta-Smith-17    Blog by Matt Evans:  Social      181
                        Media in Education, 13 Ideas
21                      for the Classroom
22
23
24
25
```

CONFIDENTIAL

Page 6

1              THE VIDEOGRAPHER:  We are now on the
2    record.
3              My name is Jon Rasson.  I am a
4    videographer for Golkow, a Veritext division.
5              Today's date is Friday, September
6    12th, 2025, and the time is 9:35 a.m. Eastern
7    Daylight Time.
8              This video deposition is being held
9    at 850 Tenth Street, Northwest, Washington, D.C.,
10   In the Matter of Social Media Adolescents
11   Addiction/Personal Injury Products Liability
12   Litigation, for the United States District Court,
13   Northern District of California.
14              The deponent is Dr. Jack Smith.
15              Will counsel please identify
16   themselves.
17              MR. LEE:  Yeah, this is Nick Lee for
18   the Plaintiffs.
19              MR. PISTILLI:  Christian Pistilli,
20   Covington & Burling.
21              THE VIDEOGRAPHER:  The court reporter
22   is Amanda Blomstrom and will now swear in the
23   witness.
24   //
25   //

CONFIDENTIAL

Page 7

1           JACKIE RAY SMITH Ph.D.,

2    having been first duly sworn, testified as

3    follows:

4                    EXAMINATION

5    BY MR. LEE:

6        Q.    So can you state your full name for the

7    record.

8        A.    My name is Dr. Jack R. Smith.

9        Q.    Okay.

10        A.    Actually, my legal name on my passport is

11    Jackie Ray Smith.

12        Q.    All right.  So I'm Nick Lee.  I'm one of

13    the attorneys for the Plaintiffs, as you just

14    heard, and I'll be taking your deposition today

15    regarding the report you submitted in this case.

16                Can we pull up Tab 0 and mark it as

17    Exhibit 1.

18                (Meta-Smith-1 marked.)

19                MR. LEE:  And there you go.

20    BY MR. LEE:

21        Q.    Okay.  Dr. Smith, do you recognize this

22    document?

23        A.    Yes.  This document was shared with me.

24        Q.    Okay.  And then this was just the Notice

25    of Deposition for you to appear today; is that

CONFIDENTIAL

Page 8

1   correct?

2        A.    That's my understanding.

3        Q.    Okay.  Great.

4              All right.  So let's pull up Tab A and

5   mark it as Exhibit 2.

6              (Meta-Smith-2 marked.)

7   BY MR. LEE:

8        Q.    Dr. Smith, do you recognize this

9   document?

10       A.    Yes, I do.

11       Q.    Okay.  And is this document a copy of the

12  report you submitted in this matter on July 11th,

13  2025?

14       A.    Yes, it appears to be my report.

15       Q.    Okay.  And are you aware that Harford

16  County Board of Education on behalf of Harford

17  County Public Schools is one of many plaintiffs in

18  this litigation?

19       A.    I am aware of that.

20       Q.    Okay.  And Harford County Board of

21  Education on behalf of Harford County Public

22  Schools is a mouthful, so can we agree that if I

23  say "Harford" or HCPS, you'll know that I'm

24  talking about the plaintiff?

25       A.    I can agree.

CONFIDENTIAL

Page 9

1       Q.    Okay.  Great.

2             And you were retained by counsel for

3    defendants in this litigation; is that correct?

4       A.    That is correct.

5       Q.    Okay.  Do you know who the defendants in

6    this litigation are?

7       A.    I believe I know all of them.

8       Q.    Okay.  Well, the defendants include

9    Google, which owns a platform YouTube; ByteDance

10   Inc., which owns the platform TikTok; Meta, which

11   owns the platform Facebook and Instagram; and Snap

12   Inc., which owns the platform called Snapchat.  So

13   if I say "defendants," you'll know that I'm

14   referring to all the defendants in the case?

15      A.    Yes, I would understand that.

16      Q.    Okay.  And if I say "YouTube," you'll

17   know that I am also referring to Google?

18      A.    Yes.

19      Q.    Okay.  And "TikTok," also ByteDance?

20      A.    That makes sense.

21      Q.    Yep.

22            And "Facebook" or "Instagram," and I'm

23   referring to Meta?

24      A.    Okay --

25      Q.    Yeah.

CONFIDENTIAL

```
                                        Page 10

 1      A.     -- I understand.

 2      Q.     All right.  And "Snapchat," I'm also

 3   referring to Snap Inc., okay?

 4      A.     Okay.

 5      Q.     All right.  Great.

 6             Okay.  So your report considers the

 7   opinions of Dr. Brian G. Osborne and Dr. Sharon

 8   Hoover, correct?

 9      A.     I did review those reports and use them

10   in this report.

11      Q.     Okay.  And then so you were specifically

12   responding to their opinions; is that correct?

13      A.     I did respond to their opinions.

14      Q.     Okay.  And then, did you respond to the

15   opinions of any other experts?

16      A.     No.

17      Q.     Okay.

18      A.     Only in a general sense.

19      Q.     What do you mean by that?

20      A.     Well, I read a great number of documents

21   for this.  So if you want to call that a response,

22   I responded to them.  Otherwise, it just informed

23   my opinions.

24      Q.     Oh, okay.  So other than reviewing them.

25             But you're not specifically disputing
```

Page 11

1    anything in those reports; you just reviewed them?

2        A.    I just used them, yes.

3        Q.    Okay.  All right.

4              So you also considered certain

5    documents produced by HCPS as well?

6        A.    Yes.

7        Q.    Do any of your opinions relate to any

8    other school district in this litigation besides

9    Harford?

10       A.    It was my understanding that it was a

11   collective and that they -- my report could be

12   used by the group.

13       Q.    Okay.  But your materials considered, you

14   only considered Harford records; is that right?

15       A.    That is correct.

16       Q.    Okay.  So would it be accurate to say

17   that, as far as your case-specific opinions,

18   they're limited to Harford?

19       A.    For this, the purposes of this report, it

20   was specific to Harford.

21       Q.    Okay.  So do you have general opinions

22   outside of those expressed to Harford that would

23   apply to all school districts?

24       A.    Well, after 45 years of being involved in

25   public education, I have a lot of opinions.

CONFIDENTIAL

Page 12

1  Specific to what I was asked to do, none beyond

2  this report.

3      Q.    Okay.

4      A.    I would say, just to be accurate, I also

5  reviewed material about Baltimore City, and that

6  could have informed this report, at least in a

7  very general sense in the way operations were

8  done.

9      Q.    Sure.

10         Okay.  But Baltimore City isn't -- you

11  do understand that Baltimore City isn't currently

12  in the pool of bellwether cases that's moving

13  forward?

14     A.    I do understand that.

15     Q.    Okay.  All right.

16         So is this your first time being

17  deposed as an expert?

18     A.    It is my first time being deposed as an

19  expert.

20     Q.    Okay.  So have you been told sort of the

21  ground rules for an expert deposition?

22     A.    I did spend time with the attorneys from

23  Covington discussing the process and procedures,

24  et cetera.

25     Q.    Okay.  Great.

CONFIDENTIAL

Page 13

```
 1          So just to kind of refresh -- I'm sure
 2   they did a great job, but just to refresh, all
 3   your testimony today is under oath, under penalty
 4   of perjury, as if you were testifying in the court
 5   of law.
 6          Do you understand that?
 7      A.    I do understand that.
 8      Q.    Okay.  And please let me know if you
 9   can't hear or understand the question.  If you
10   answer, we're going to assume that you could hear
11   the question and that you're answering the
12   question.  Okay?
13      A.    I understand that, yes.
14      Q.    All right.  And, for the sake of the
15   record, your answers should be out loud; so don't
16   nod, shrug, or gesture.
17      A.    Okay.
18      Q.    You're laughing because I'm doing it as
19   I'm talking right now?
20      A.    Yes.
21      Q.    But, you know, I guess that's my
22   prerogative, right?
23      A.    Absolutely.
24      Q.    Okay.  But you understand that we need a
25   verbal answer, right?
```

CONFIDENTIAL

Page 14

1    A.    I do understand that.

2    Q.    Yeah, okay, great.

3         And then -- so also, just for the sake

4    of the record and our court reporter, you should

5    try and answer after I've had an opportunity to

6    finish my question, so, you know, and then your

7    attorney will have a chance to respond and object

8    if he wants to.  Okay?

9    A.    That makes sense.  I understand that.

10   Q.    All right.  Great.

11        And I'm happy to take a break and go

12   off the record if you need one.  I like taking

13   breaks too.  Very fine with me.  But, you know,

14   we're working with some limited time here and I'm

15   entitled to an answer to my questions before we go

16   off.

17        You understand that?

18   A.    I do understand that.

19   Q.    Okay.  Great.

20        And then, last thing is, objections

21   are for the record.  So unless your attorney

22   instructs you not to answer, you should answer.

23   The judge will determine whether your answers are

24   admissible.  Okay?

25   A.    I do understand that.

CONFIDENTIAL

Page 15

1      Q.    Okay.  Great.

2            Dr. Smith, did social media exist

3    before COVID-19?

4      A.    Social media existed prior to COVID-19 in

5    different forms, yes.

6      Q.    Did YouTube exist prior to COVID-19?

7      A.    I don't actually know the answer to that

8    question.  I believe it did --

9      Q.    Okay.

10     A.    -- but I wouldn't want to go on -- you

11   know, I wouldn't bet any money on that.  I just --

12   I believe it did.

13     Q.    Okay.  Did Facebook exist before

14   COVID-19?

15     A.    Yes, I believe it did; although, once

16   again, I don't know specifically when Facebook

17   entered our world.

18     Q.    Okay.  Did Instagram exist before

19   COVID-19?

20     A.    I think so.  I believe it did.

21     Q.    Okay.  And then, did Snapchat exist

22   before COVID-19?

23     A.    I don't have any idea.

24     Q.    Okay.  What about TikTok?

25     A.    I once again don't have any idea.

CONFIDENTIAL

Page 16

1      Q.    Okay.  So while you were the

2  superintendent of Montgomery County Public

3  Schools, it sounds like you weren't aware of

4  whether Snapchat or TikTok were in existence at

5  that time?

6      A.    I don't remember.  I may have, you know,

7  had some interaction with something about one of

8  them, but I just, I actually don't remember.

9  Those two names are not as prevalent in my world

10 or my memory as the others are.

11     Q.    Yeah, and to be clear, the others are

12 YouTube, Facebook, Instagram, as opposed to

13 Snapchat and TikTok?

14     A.    That would be accurate.

15     Q.    Okay.  And while you were superintendent

16 of Montgomery County Public Schools, were you at

17 all concerned by social media addiction?

18     A.    That was not a topic that ever came up

19 while I was superintendent of Montgomery County

20 Public Schools, in my memory.

21     Q.    Okay.  What about problematic student use

22 of social media?

23     A.    There has been use of student -- there

24 has been involvement with students in social media

25 since I was a principal in the early 2000s in

Page 17

1    Calvert County Public Schools.  So it has been a
2    part of that reality since the early 2000s.
3        Q.    And you -- you agree that some of it is
4    problematic?
5                MR. PISTILLI:  Objection; misstates
6    prior testimony.
7                THE WITNESS:  I have dealt with
8    incidents.
9    BY MR. LEE:
10       Q.    Okay.  And then, have you ever been
11   concerned about excessive use of social media?
12               MR. PISTILLI:  Objection; vague.
13               THE WITNESS:  I can't say that it's
14   been something that's been on the top of my mind
15   as a professional focused on student learning and
16   student well-being.
17   BY MR. LEE:
18       Q.    Okay.  Well, what about compulsive use of
19   social media?
20       A.    Once again, I would provide the same
21   response.  It has not been in the forefront of the
22   issues and topics that I've dealt with on a
23   regular basis.
24       Q.    Okay.
25               So can we pull up Tab YY and mark it

CONFIDENTIAL

Page 18

```
 1   as Exhibit No. 3.
 2              (Meta-Smith-3 marked.)
 3              MR. LEE:  I'm sorry.
 4   BY MR. LEE:
 5       Q.    All right.  Dr. Smith, do you recognize
 6   this document?
 7       A.    I do recognize this document.
 8       Q.    Okay.  This is a memorandum from you in
 9   your role as Superintendent of Montgomery County
10   Public Schools to the members of the Montgomery
11   County Board of Education; is that correct?
12       A.    That is correct.
13       Q.    Okay.  And then, this one is dated
14   March 27th, 2019; is that correct?
15       A.    That is correct.
16       Q.    Okay.  And then the subject is:  Student
17   Screen Time; is that correct?
18       A.    Yes.
19       Q.    Okay.  So I'm going to read a little bit
20   of this, and then we'll -- we'll talk about it.
21   But -- okay.  So, "Question.  "During public,
22   comments, Ms. Silvestre requested information
23   regarding strategies for reducing the amount of
24   student screen time as referenced in the testimony
25   of Dr. Spector."
```

```
                                             Page 19

 1                 "Response.  In 2016, Montgomery County

 2     Public Schools partnered with Common Sense

 3     Education to deliver a digital citizenship

 4     curriculum to MCPS students."  The "partnership

 5     was established upon the recommendation of a

 6     spring 2014 task force that addressed the growing

 7     need for students and adults to interact

 8     positively when using online platforms with skills

 9     that empower students to think critically, behave

10     safely, and participate responsibly with

11     technology."

12                 Did I read that correctly?

13          A.     I wasn't following, but I assume so.

14          Q.     Okay.  All right.  That's fair enough.

15                 All right.  So I'm going to pick up

16     with the word "Beginning."  And, you know, there

17     is a screen in front of you that might be easier

18     to follow along.

19          A.     Okay.

20          Q.     Just letting you know.

21                 So "Beginning in 2016-2017 school year

22     with Grades 6-8, this program has been implemented

23     in stages among elementary, middle, and high

24     school students who receive instruction through

25     age- appropriate curricula."
```

CONFIDENTIAL

Page 20

1              So did I read that correctly?

2       A.    Yes.

3       Q.    Okay.  So, Dr. Smith, do you recall

4   partnering with Common Sense Education to provide

5   digital citizenship training to all students in

6   Montgomery County?

7       A.    I do actually recall this.  It was

8   shortly after I joined Montgomery County, July 1st

9   of 2016.  I don't remember exactly when.  Sometime

10  in the -- there was students involved, so it had

11  to be after Labor Day when school had begun, and

12  we partnered with them.  It's something that had

13  been in the works when I got there.  And we had a

14  ceremony at a middle school about it, actually,

15  with students in the room.

16      Q.    Okay.  So you said this was in the works

17  before.  So presumably your predecessor had kind

18  of initiated this partnership?

19      A.    That would be my assumption, absolutely.

20      Q.    Okay.  Did you think this training was

21  needed at the time?

22      A.    I thought it had value across all aspects

23  of the digital world.  We were also simultaneously

24  implementing a lot of -- of use of Chromebooks,

25  and so just to use the digital world, and I had

Page 21

1    talked with people when this event happened at
2    Common Sense Education, and they made sense, and
3    about the entire digital world, it made sense, I
4    thought, so ...

5        Q.    Okay.  And then, do you know if Harford
6    implemented a digital citizenship program prior to
7    the pandemic?

8        A.    I do not know if it was prior to the
9    pandemic.  I know there are references in
10   Harford's material that they use it; although, I
11   couldn't find it in a pervasive or systematic way,
12   because that was something I was looking for as I
13   reviewed their materials.

14       Q.    Okay.  And why did you feel that it was
15   important to address, you know, the public
16   comments by Dr. Spector in this memo?

17       A.    So this was a public comment.  And prior
18   to being in Montgomery County Public Schools,
19   there had been public comment at the State Board
20   of Education meeting when I was the chief academic
21   officer and deputy superintendent there and the
22   interim superintendent, mostly about the impact of
23   the digital world on students' neurological
24   development; I mean, the idea of use -- cell
25   phones and using all of the wires in this room.

CONFIDENTIAL

Page 22

1    And I know I'm being very simplistic, but that --

2    I don't have a great understanding of what the

3    speakers were referencing or the accuracy or

4    validity of it.  But it was something that was

5    emerging with public speakers during that time in

6    my career.

7              And so, when I saw Common Sense

8    Education, as part of Common Sense Media coming to

9    Montgomery County, it certainly didn't appear that

10   it would have any negative effects to give kids as

11   much information as we could about the digital

12   world that was emerging exponentially at that

13   time.

14       Q.    Okay.  So is Common Sense Media a

15   trustworthy organization then?

16       A.    As far as I know.  I have no reason to

17   believe it's not.

18       Q.    Okay.  And you mentioned that you had

19   seen some presentations about the neurological

20   impacts of social -- or I guess, really, screen

21   time is what this is about, and then -- sorry, let

22   me start over because that wasn't clear.

23              You said that you had seen some

24   presentations about the neurological impact of

25   technology.  Would you consider yourself an expert

CONFIDENTIAL

Page 23

1    in neurological science?

2        A.    I would not consider myself an expert in

3    neurological science; although, I do have some

4    background in that.  More importantly, what I

5    think I said or what I should have said is that,

6    there were public comments about it at the State

7    Board of Education and then in Montgomery County,

8    including things like cell phone towers and the

9    use of cell phones, the use of wireless Internet

10   in school buildings, the use of the digital

11   equipment, as I said, on this table.  There were

12   lots of -- of public comments about that for

13   people who would sign up and come.  "Lots" may be

14   an exaggeration.  There were enough that I

15   remember them.

16       Q.    Okay.

17       A.    And this was one of them.

18       Q.    Okay.  So but do you have a general

19   understanding of the impact of technology on

20   neurological development?

21       A.    I -- I have not seen anything conclusive

22   about that.  In my career, I've seen a lot of

23   different writings about it, but I -- and I -- as

24   I've said, I'm not an expert in that area, but --

25       Q.    Okay.

Page 24

1      A.    -- nothing that said, We have figured out
2   that this does this for sure.
3      Q.    So you'd agree that this public comment
4   raised concerns, and more education about
5   technology and screen time was needed?
6               MR. PISTILLI:  Object to the form.
7               THE WITNESS:  Well, the way a public
8   comment works is, the school board or the state
9   board listens to the public comment, and usually,
10  there are anywhere from zero -- often there are,
11  almost every meeting there are, public comments;
12  rarely ever is there a time without them.  And
13  they range from a few to maybe 15 or 20, or if
14  there is something going on in the system or the
15  state, might be, you know, 50 or a whole meeting
16  of public comments.
17               And then the board members, the policy
18  is not to respond to a public comment, but at the
19  end of all the public comments, they typically
20  direct the superintendent on any of the ones they
21  want to know about, to bring that information or
22  look at it or, you know, whatever.
23               Or the superintendent can say, I want
24  to study this because this is interesting.  And
25  this was Karla Silvestre, who is a new member of

CONFIDENTIAL

Page 25

1    the board, and she asked for information about

2    this person's statements.

3    BY MR. LEE:

4        Q.    Okay.  So would it be accurate to say

5    that a member of your Board of Education wanted to

6    know more about this subject back in 2019?

7        A.    That would be accurate.

8        Q.    Okay.

9             All right.  If we can just keep going

10   down toward the bottom of Page 1, there is a list,

11   starting with, "Following are resources available

12   via Common Sense Education to help address

13   students' use of screen time."

14            Do you see that?

15       A.    I do see that.

16       Q.    Okay.  All right.  So, let me see.  So,

17   No. 4, that one says, "Tools to use your device

18   less that includes screen time features for iPhone

19   and Android."

20            Do you think that limiting screen time

21   in children and teenagers is important?

22            MR. PISTILLI:  Objection; outside the

23   scope.

24            MR. LEE:  Outside the scope of what?

25            MR. PISTILLI:  His expert opinions.

CONFIDENTIAL

```
 1              MR. LEE:  Is that outside of the scope
 2    of his expert opinions?  I -- I don't believe so.
 3    He says he's an expert on education, and he says
 4    that, you know, that these social media platforms
 5    are not having an impact on these school
 6    districts.  I think it's well within the scope of
 7    his opinion, especially since he's written a
 8    report.
 9              MR. PISTILLI:  I don't know who you're
10    talking to.  The judge isn't here.
11              MR. LEE:  Yeah, I'm telling you
12    because I don't want this to come up again.
13              MR. PISTILLI:  I'm going to continue
14    to make my objections as I deem them appropriate.
15              MR. LEE:  Can you read back the
16    question.
17              (Record read.)
18              THE WITNESS:  That's a complex
19    question because every single student is
20    different.  There are 165,000 students in
21    Montgomery County Public Schools and 1 million
22    students in Maryland that I was responsible for.
23    And so, setting that is kind of like the
24    conversation about eliminating AP courses.  Some
25    people really want to limit them because of the
```

CONFIDENTIAL

Page 27

1    stress that some students feel about that.  And

2    it's very difficult to say because perhaps you'll

3    be able to take ten AP courses and be fine and Mr.

4    Pistilli will only be able to take two and feel

5    stressed.

6              So I don't really have a firm opinion

7    on that, and I don't -- really haven't seen any

8    information in my review that's conclusive about

9    that.

10   BY MR. LEE:

11      Q.    Okay.  Would it be accurate to say that

12   some students have issues with the -- too much

13   screen time?

14      A.    I can't imagine that there isn't a

15   student somewhere who doesn't use it too much or

16   too little or in the best way or the worst way.

17   Extremes are -- are very difficult in my world to

18   deal with.

19      Q.    Okay.  Fair enough.

20              So let's go to No. 5 that's on the

21   next page.  So this resource is titled, "Ways to

22   Outsmart the Sneaky Science that keeps us on our

23   devices for longer than intended."

24              So do you know what they're referring

25   to when they say "sneaky science"?

CONFIDENTIAL

Page 28

1      A.    I don't.

2      Q.    Do you think that it has anything to do

3  with how the platform is designed?

4           MR. PISTILLI:   Objection; asked and

5  answered.

6           THE WITNESS:   I don't know what this

7  is referring to --

8  BY MR. LEE:

9      Q.    Okay.

10     A.    -- no.

11     Q.    Can we go to No. 7, and that's "How to

12  turn off autoplay to reduce screen time."

13          Sir, do you know what autoplay is?

14     A.    I have no idea.

15     Q.    Okay.  Do you know if Harford alleges

16  that autoplay is one of the addictive features of

17  social media platforms?

18     A.    In my recollection of all the documents I

19  looked at in Harford, I don't remember seeing the

20  term "autoplay."

21     Q.    Okay.

22     A.    I could have, but I don't remember that

23  specifically.

24     Q.    Okay.  So No. 8, which is just below

25  there, it says, "Five Ways to Save Yourself From

Page 29

1    Device Addiction."

2              So -- did I read that correctly?

3        A.    Yes.

4        Q.    So, Dr. Smith, given that you've referred

5    your Board of Education to some of these

6    resources, and one of these resources refers to

7    "device addiction," is it fair to say by 2019 you

8    had some indication that social media addiction

9    could exist?

10             MR. PISTILLI:  Objection; foundation.

11             THE WITNESS:  I had certainly seen

12   this memo and signed it.  Obviously, as you can

13   imagine, as the superintendent of Montgomery

14   County Public Schools, I did not write the memos,

15   but I had certainly seen it and signed it.  And so

16   I saw the -- that phrase, and, you know, I

17   don't -- as I said, it wasn't something that came

18   up very often or rarely ever came up.  I don't

19   know that I ever saw anything else about device

20   addiction at that time, but I might have, but it

21   was rare.

22   BY MR. LEE:

23       Q.    Okay.  But this was, you said, one of

24   your first board meetings after you came to

25   Montgomery County; is that correct?

CONFIDENTIAL

Page 30

1     A.     No, I'm sorry, what I said is this was
2  2019.  I arrived in Montgomery County in 2016,
3  just when this initiative was coming into the
4  schools.  And I went to a kickoff at a middle
5  school.  This was three years later, and a new
6  board member was asking about something that a
7  public comment referenced.
8     Q.     Okay.
9     A.     So this was three years after I arrived
10  there.
11     Q.     Okay.  Thanks for clarifying that.
12     A.     Yeah.
13     Q.     So, Dr. Smith, did you read all the
14  articles hyperlinked in this memo prior to sending
15  them to the Board of Education?
16     A.     I would say I didn't read any of them,
17  frankly, because that -- that's not even possible.
18  This is a program that we had partnered with,
19  Common Sense Education, and so we were sharing
20  with our board, because we want them to know
21  everything, that these are resources that are
22  available to help students.  That's ...
23     Q.     So, in some sense, you were relying on
24  the fact that Common Sense Education was your
25  partner in this to put out accurate information?

CONFIDENTIAL

Page 31

```
 1              MR. PISTILLI:  Object to the form.
 2              THE WITNESS:  More specifically, I
 3     would have been relying on Dr. Maria Navarro, the
 4     chief academic officer, as it says at the end of
 5     the memo, refer questions to her.
 6              And so she was there before I arrived
 7     there as the chief academic officer, so I would
 8     assume she was involved in this initiative when it
 9     started before the fall of 2016.
10     BY MR. LEE:
11         Q.   Okay.  And does Dr. Maria Navarro still
12     work at Montgomery County?
13         A.   To the best of my -- to the best of my
14     knowledge, Maria Navarro is still the
15     superintendent in Charles County, Maryland, where
16     she has been since 2021 or '22.
17              Prior to that, she was in Montgomery
18     County.  Then she was a consultant for a year.
19     And then she went to Charles County.  That's my
20     memory.
21         Q.   Okay.
22              Counsel, it appears that I have
23     forgotten to print one of these documents.  Is it
24     okay if we have it displayed on the screen
25     instead?
```

CONFIDENTIAL

Page 32

1              MR. PISTILLI:  As long as you give the

2     witness the time to, you know, look at it as much

3     as he needs to.

4              MR. LEE:  Of course, yeah.

5     BY MR. LEE:

6         Q.    So just let me know if you want to look

7     at more of it, and we can -- and our tech can

8     handle that.  Okay?

9         A.    I will do that.

10        Q.    All right.

11               Can we pull up Tab, I guess, GGGG.

12               So Resource 5 in the memorandum we

13     were just looking that was marked as Exhibit 3,

14     that referred to an article about the "sneaky

15     science that keeps us on our devices."  And this

16     exhibit, or this document, the title is, "The

17     sneaky science behind your child's tech

18     obsession."

19               Do you see that?

20        A.    I do see that.

21        Q.    Okay.  And you see the date it was

22     published is November 9th, 2018?

23        A.    Yes.

24        Q.    Okay.

25               So I'd like to make this exhibit, I

CONFIDENTIAL

Page 33

1    believe, 4?  Okay.  All right.  No. 4.
2                   (Meta-Smith-4 marked.)
3                   MR. LEE:  And then, so let's -- can we
4    scroll down to the bottom, all the way to the
5    bottom.  Okay.  One page up.
6                   All right.  Can we zoom in on the
7    author bio.  It's that part that's in italics.
8    BY MR. LEE:
9        Q.    Okay.  So "Caroline Knorr is Common Sense
10   Media's parenting editor.  This piece first ran at
11   CommonSenseMedia.org."
12                  Okay.  So that's the same Common Sense
13   Media that Montgomery County Public Schools
14   partnered with for its digital citizenship
15   program?
16       A.    Well, actually, specifically we partnered
17   with Common Sense Education, which is, I think, a
18   part or a division of Common Sense Media, so ...
19       Q.    Okay.  So you partnered with a
20   subdivision of Common Sense Media?
21       A.    I think that would be correct, yes.
22       Q.    Okay.  Can we go back to the top.
23                  So if we could zoom in on that first
24   paragraph.
25                  "Son" -- I'm going to read a little

CONFIDENTIAL

Page 34

1    bit.  "Son won't turn off his video game?
2    Daughter obsessed with 'likes' on Instagram?  It
3    may not be entirely their fault.  Like the
4    high-octane sugar in a pint of ice cream and the
5    irresistible salt in their favorite snack, the
6    ingredients in social media, video games, apps and
7    other digital products are carefully engineered to
8    keep you coming back for more.  While researchers
9    are still trying to discover whether kids (and
10   parents) can be addicted to technology, some
11   computer scientists are revealing their secrets
12   for keeping us hooked."
13             Okay.  So this article is from 2018,
14   as we discussed; is that correct?
15        A.    Yes, November 9th, 2018.
16        Q.    Okay.  So already in 2018 there were some
17   folks who were concerned that social media could
18   be addictive based on how computer scientists have
19   engineered products?
20        A.    That clearly was being discussed at that
21   point.
22        Q.    Okay.  But, as the article says, it
23   wasn't understood at that point whether kids could
24   be addicted to technology?
25        A.    "While researchers are still trying to

CONFIDENTIAL

Page 35

1   discover whether kids (and parents) can be

2   addicted to technology ..."  Yes, that's what it

3   says.

4        Q.    Okay.  Do you think there's more

5   information on the potentially addictive nature of

6   social media now than there was in 2018?

7             MR. PISTILLI:  Objection; scope.

8             THE WITNESS:  I -- that wasn't part of

9   what I was asked to look at, and so I don't really

10  have an opinion on that.  I think it's

11  inconclusive at this point.

12  BY MR. LEE:

13       Q.    Okay.  When you say "I think it's

14  inclusive," what is "it"?

15       A.    I'm sorry, I think that it is

16  inconclusive in terms of -- of responding to your

17  question.

18       Q.    Okay.  And so what would be inconclusive

19  would be the research showing that kids can get

20  addicted to social media?

21       A.    That is my understanding from what I've

22  seen.

23       Q.    Okay.  And what is that understanding

24  based on?

25       A.    It's my understanding, across the

CONFIDENTIAL

Page 36

1   literature, there is a lot of conflicting

2   information and conflicting research.

3       Q.    Okay.  Do you think the Surgeon General's

4   publication "Social Media and Youth Mental Health"

5   from 2023 has added to understanding of this

6   topic?

7       A.    Actually, I do not think it has added to

8   understanding.  It posed some questions, but I

9   don't think it added to the understanding.

10      Q.    So I take it you did review this

11  document?

12      A.    I did review that document, yes.

13      Q.    Okay.  Let's see.

14              Okay.  Can we go to the third

15  paragraph in this article.

16              So "Behind the apps, games and social

17  media is a whole crew of folks whose job is to

18  make these products feel essential.  Many of the

19  techniques they use are ones outlined by experts

20  in human behavior, including Nir Eyal, author of

21  'Hooked:  How to Build Habit-Forming Products,'

22  and BJ Fogg of Stanford University's Persuasive

23  Technology Lab.  Harris argues that these methods

24  'hijack' our own good judgment.  Most teens care

25  deeply about peer validation, for example.  So it

CONFIDENTIAL

1   makes sense that friends' feedback on social media

2   - both the positive and negative - would tug

3   at you until you satisfy your curiosity.  You have

4   a phone in your pocket, so why not check it now?

5   And now.  And now?"

6                So did I read all that correctly?

7        A.    Yes, that's what I see.

8        Q.    Okay.  Dr. Smith, do you agree that

9   children and teenagers are more curious than

10  adults?

11       A.    I don't think I could say that I agree or

12  disagree with that.  I -- once again, the

13  variability among human beings is profound, and so

14  I couldn't judge that.

15       Q.    So I guess if one adult is more curious

16  than one child, then that would mean you wouldn't

17  be able to answer yes or no?

18       A.    No, what it means is, when we talk about

19  averages, or on average, there is no such thing as

20  the average person.  And so it's a difficult thing

21  to -- it's not something that I know enough about

22  or have researched enough, and I haven't seen

23  anything that's added to my understanding of it to

24  form any stronger opinions or beliefs around it.

25       Q.    Okay.  In your experience, do you think

Page 38

```
 1    that teens care more deeply about peer validation
 2    than adults?
 3              MR. PISTILLI:  Objection; scope.
 4              THE WITNESS:  Once again, that's
 5    certainly something that people say.  But having
 6    spent a good share of my career in schools, I -- I
 7    can't attest to that for certain.  I don't know.
 8    BY MR. LEE:
 9       Q.    Okay.  So based on your experience, teens
10    do not care more deeply about peer validation than
11    adults?
12              MR. PISTILLI:  Objection; misstates
13    prior testimony and scope.
14              THE WITNESS:  I think what I said is I
15    don't know.  I can't attest to it and make any
16    sort of affirmative statement about it.
17    BY MR. LEE:
18       Q.    Do you think that teens are more
19    susceptible to peer pressure?
20              MR. PISTILLI:  Same objection.
21              THE WITNESS:  It's certainly part of
22    the discussion around adolescence.  Peer pressure
23    is very strong, depending on how you respond to it
24    as a human being.  That's my understanding of it.
25    And so I'm not willing to say on average teenagers
```

CONFIDENTIAL

Page 39

1  are more susceptible than 20-year-olds or
2  30-year-olds.  They might be more susceptible than
3  someone who is 68, which I turned two days ago.
4  So that is what I could say, is -- but maybe not,
5  actually.  I don't know.
6  BY MR. LEE:
7     Q.    Do you know if social media can be
8  addictive in teens?
9            MR. PISTILLI:  Objection; scope.
10            THE WITNESS:  Once again, I -- it's
11  not something that I have seen, that I could
12  confirm and affirm that it's what is the case.
13  BY MR. LEE:
14     Q.    Dr. Smith, when did your tenure with
15  Montgomery County end?
16     A.    In the summer of 2021, I left Montgomery
17  County to move to Maine.  My wife had been there
18  for two years with a very sick grandchild.  And I
19  only tell you that part because it was very hard
20  to leave my job.  I loved my job.
21     Q.    And was that during the COVID-19
22  pandemic?
23     A.    It was nearing the end of it; although,
24  it went on for -- the remnants of it went on for
25  another six, eight months in some places.  Once

Page 40

1   again, very complex situation when you look at the
2   COVID pandemic impact on schools.
3       Q.    Okay.  So when did Montgomery County
4   schools reopen for in-person learning?
5       A.    We returned the first students to school
6   in February of 2021.  We had everyone back in by
7   April 1st of 2021 who chose to return.  And then
8   we were prepared, when I left in the summer of
9   '21, for all students to return in the fall
10  of -- of '21.
11      Q.    Okay.  So of the students that chose to
12  return, do you recall about how many that was or
13  what the proportion was?
14      A.    In that spring of '21, I believe it was
15  about 70 percent chose to return and 30 percent
16  stayed online.  And then in the fall it was in the
17  mid to upper 90s returned to school after I left.
18              One of the things I was very clear
19  about is that I wanted everything ready and
20  well-prepared for kids to go back to school.  So
21  that's why I remember that so clearly.
22      Q.    Okay.  So is it accurate to say that your
23  experience with partial in-person learning, the
24  voluntary in-person during the pandemic, was
25  limited to the first half of 2021?

CONFIDENTIAL

Page 41

1    A.    That experience was from March 16th,
2    2020, until June of 2021, we had kids online.
3    Q.    Okay.  And you said that it was not until
4    the fall of 2021 when 90 percent of the students
5    came back to school?
6              MR. PISTILLI:  Objection; misstates
7    prior testimony.
8              THE WITNESS:  I think it was more than
9    90 percent.  It was well over 90 percent came back
10   in the fall of -- of '21.
11   BY MR. LEE:
12   Q.    Okay.  So is it possible that you may not
13   have observed what it was like in the school with
14   the -- with all the kids after the pandemic?
15   A.    Well, actually, by October of '21, I was
16   being recruited to join a variety of projects
17   across the country involving school systems.  So
18   while I was not in Montgomery County Public
19   Schools on a regular basis as I had been for the
20   previous five years, I was engaged in schools from
21   that fall going forward.
22   Q.    Okay.  And which schools are those?
23   A.    Well, there were -- I was involved with a
24   project with Arizona State University that
25   involved dozens of schools; I was on Zoom meetings

CONFIDENTIAL

Page 42

1    with superintendents and other individuals; I was

2    involved with some other consulting and project

3    work across the country.  So not one particular

4    school.

5        Q.    Okay.  Do you recall the names of any of

6    those school systems?

7        A.    Do I recall the names of any of them?

8    There were lots of them that -- with Arizona

9    State, there were a number of schools in Arizona.

10   I talked to school systems across the country

11   about joining an initiative with teacher teaming,

12   and I went to the meetings on a regular basis when

13   they would talk about Arizona State's initiative,

14   The Next Education Workforce, and hear -- we would

15   hear from teachers; worked with a lot of different

16   school systems.

17       Q.    Did you ever work with the Tucson Unified

18   School District?

19       A.    Tucson.  I don't believe so.

20             Mesa was heavily involved in the

21   project.  There were charter schools in Phoenix.

22   What's the school?  Prescott had a number of

23   meetings and discussions with us.  There were a

24   number of different school systems in Arizona.

25             Then I talked to people in school

Page 43

1  systems in Kansas and Hawaii and California.  I
2  mean, all over the country.  There were a lot of
3  school systems involved in the Next Education
4  Workforce for the next two-plus years.
5      Q.    Okay.  And did social media ever come
6  up any point while you were consulting for those
7  districts?
8      A.    I do not remember any conversations
9  about social media when we were talking with teams
10  of teachers about how they worked together to
11  collaborate in their school buildings.
12      Q.    Okay.  What about in your conversations
13  superintendents?
14      A.    I do not remember any conversation about
15  social media in any of those conversations either.
16      Q.    Okay.  How about conversations with
17  midlevel administrators?
18      A.    I do not.  And you're asking about the
19  consulting work, right?  Just want --
20      Q.    Yeah.
21      A.    -- to be clear.
22            Yeah.  No, I don't remember during
23  that time.
24      Q.    Okay.  Dr. Smith, are you familiar with
25  the Montgomery County Public Schools Summer RISE

CONFIDENTIAL

Page 44

1    program?

2         A.    I am familiar with that program, yes.

3         Q.    Okay.  Did you start that program?

4         A.    I did not start the program, but we did

5    introduce the Lavinia Group to one school, East

6    Silver Spring Elementary School, while I was

7    there, and then I believe they started the Summer

8    RISE program after I left.

9         Q.    Okay.

10        A.    I'm sure they did, because we only had

11   East Silver Spring involved when I was there.

12        Q.    So has it expanded since, or is that ...

13        A.    I do not know.  It's my recollection that

14   they left Montgomery County in the '22-'23, school

15   year maybe, or sometime after I left.  And then, I

16   don't know if they've returned or not.

17        Q.    Okay.  Is this program for high school

18   seniors and juniors?

19        A.    The Summer RISE program?

20        Q.    Yeah.

21        A.    No.  To my knowledge, it's for

22   elementary, middle, and early high school students

23   in some cases.  I know they did a lot of work in

24   and around algebra.

25        Q.    Okay.

CONFIDENTIAL

Page 45

1           I'd like to pull up a video, which
2    would be Tab TTT.  So we don't have to press Play
3    yet.
4           But, so, Dr. Smith, this is video I
5    pulled off of Montgomery County Public School
6    YouTube.  It was published on September 17th,
7    2024.  That would have been about four -- or
8    three years after you were superintendent,
9    correct?
10       A.    Yes.
11       Q.    Okay.  And it would have been after the
12   pandemic, correct?
13       A.    That would be correct.
14       Q.    Okay.  So we're going to do some play-
15   pause.
16           But if you could play the first few
17   seconds, and I'll tell you when to pause.
18               (Video played.)
19               MR. LEE:  Okay.  Pause.
20   BY MR. LEE:
21       Q.    All right.  So this opening slide says,
22   "Digital Citizenship Week.  Presented by MCPS
23   SLMP."
24           Did I read that correctly?
25       A.    You did.

CONFIDENTIAL

Page 46

1        Q.    What is MCPS SLMP?

2        A.    I have no idea what SLMP is.  MCPS is

3    Montgomery County Public Schools.

4        Q.    Okay.  Could SLMP mean School Library

5    Media Project?

6              MR. PISTILLI:  Objection; foundation.

7              THE WITNESS:  Yeah, potentially.  I

8    have no idea what it means.

9              MR. LEE:  Yeah, that's fair enough.

10             Okay.  Could we continue.

11             (Video played.)

12             MR. LEE:  Okay.  Pause.

13   BY MR. LEE:

14       Q.    Dr. Smith, what does this slide say?

15       A.    "Topic:  Addictive Design."

16       Q.    Okay.  Have you seen this video before?

17       A.    No, I have not.

18       Q.    Okay.

19             Can we skip ahead to 4 minutes and

20   48 seconds.

21             All right.  Let's press Play.

22             (Video played.)

23             MR. LEE:  Okay.  Pause.  All right.

24   BY MR. LEE:

25       Q.    Okay.  So, Dr. Smith, do you recognize

CONFIDENTIAL

Page 47

1    any of those students?

2         A.    No, I do not recognize any of those

3    students.

4         Q.    Okay.  Given that this video was produced

5    by MCPS, can we assume that some of these students

6    are from Montgomery County Public Schools?

7         A.    I think that it's a safe assumption.

8         Q.    Okay.  Do you think these students are

9    describing their experiences accurately?

10        A.    I would have no basis to answer that

11   question.

12        Q.    Do you think that they're not describing

13   their experience accurately?

14        A.    I would have no basis to answer that

15   question.  I have no idea about anything about

16   them except what I just saw.

17        Q.    Okay.  So you have -- okay.

18              Did you hear one of the students say

19   that she is definitely hooked on and dependent on

20   her phone?

21        A.    Yes, I heard something to that effect.

22        Q.    Okay.  Did you hear one of the students

23   say that they sometimes wish that social media

24   didn't have as much of an impact on my life?

25        A.    I heard something to that effect, yes.

Page 48

1      Q.     Okay.  Did you hear one of the students
2   say that she would waste a bunch of time checking
3   her phone while working?
4      A.     I believe so.
5      Q.     Did you hear one of the students say that
6   social media makes them feel less whole?
7      A.     Yes, I think I saw that.
8      Q.     Okay.  And did you hear that one of the
9   students said, There's always something new to
10  attract your attention and that definitely
11  contributes to the amount of time people spend on
12  it?
13     A.     I believe I heard that.
14     Q.     Okay.  So, Dr. Smith, do you have any
15  reason to doubt these students' credibility?
16           MR. PISTILLI:  Objection; scope and
17  foundation.
18           THE WITNESS:  I have no reason to
19  accept it or reject it, you know --
20  BY MR. LEE:
21     Q.     Okay.
22     A.     -- statements by a group of students.
23     Q.     So is it possible that the effects of
24  social media may have transformed since you were
25  superintendent of MCPS?

CONFIDENTIAL

Page 49

1          MR. PISTILLI:  Objection; scope.

2          THE WITNESS:  I would have no way to

3   answer that question.  I have no -- I've seen

4   nothing that's informed my understanding of that,

5   that it's transformed.

6   BY MR. LEE:

7      Q.    Okay.  Have you seen anything that would

8   indicate that circumstances have changed in the

9   school districts with regard to social media since

10  you were superintendent?

11     A.    Well, what I -- I think the most

12  prevalent thing I've seen is that social media was

13  widely used and widely appreciated during the

14  2019-20 school year as students were isolated from

15  school, from teachers, from peers, and for most of

16  the next year, because even though we returned in

17  the spring of '21, it was still a very chaotic and

18  difficult time.  And then, that they've continued,

19  the effects of that experience has continued.  And

20  I don't know how social media plays into that, but

21  I did see that it went from being widely

22  appreciated, to the effects of COVID, to the

23  conversation we're having now.

24     Q.    Okay.  Do you have any opinion about why

25  social media has gone from widely appreciated to

Page 50

1    the conversation we're having now?

2         A.    Well, it's my understanding in this case

3    that a set of school systems have claimed that

4    they have had to expend more resources and more

5    time, which equates to resources, because of the

6    impact of social media on student mental health.

7         Q.    Okay.  But you don't have an opinion on

8    whether circumstances have changed in schools with

9    regard to social media?

10        A.    Nothing in my review for -- for this

11   report was conclusive about that.

12        Q.    Okay.  Was anything conclusive the

13   other way, meaning that circumstances have

14   changed -- I'm sorry, that was a bad question.

15   Let me try again.

16             So, okay, well, you know what, why

17   don't we just continuing playing this video.

18             (Video played.)

19             MR. LEE:  Okay.  Can we pause real

20   quick.

21   BY MR. LEE:

22        Q.    So "Common Sense Education," do you see

23   that here?

24        A.    I do see that.

25        Q.    So that would have been the organization

CONFIDENTIAL

Page 51

1    that Montgomery County partnered with for its

2    digital citizenship program?

3        A.    Yes.

4        Q.    Okay.  And that was while you were

5    superintendent?

6        A.    That did occur while I was

7    superintendent.

8        Q.    Okay.

9              You could continue playing.

10             (Video played.)

11             MR. LEE:  Okay.  Pause.

12             All right.  You could pull that down.

13             LITIGATION TECH:  Counsel, did you

14    want to mark that as Exhibit 5?

15             MR. LEE:  Yes, I would like to mark

16    that as Exhibit 5.  Thank you very much.

17             (Meta-Smith-5 marked.)

18             MR. LEE:  Sometimes I need a little

19    reminder, so I appreciate that.

20             Let's see.

21    BY MR. LEE:

22        Q.    Okay.  So, Dr. Smith, did you hear in

23    this video that the narrator said that the job of

24    the people who make these devices and apps is to

25    get you to use their devices or tools as a habit

CONFIDENTIAL

Page 52

1    without even thinking about it?

2         A.    I did hear them say something to that

3    effect, yes.

4         Q.    Okay.  And did you hear this video say

5    that this makes these companies successful and

6    makes them more money?

7         A.    I believe so.  I don't specifically

8    remember "money," but I do -- something to that

9    effect, yes.

10        Q.    Okay.  And did you hear it define

11   "addictive design" refers to the features or

12   aspects of a device or app that are intended to

13   hook the user into frequent use; did you hear

14   that?

15        A.    I believe there was something to that

16   effect in there, yes.

17        Q.    Okay.  And then the video says that

18   addictive design creates a temporary but definite

19   feeling of pleasure.  Did you hear that?

20        A.    I think so.

21        Q.    And then, that feeling of pleasure makes

22   you want to do it again and again.  Did you hear

23   that?

24        A.    Something to that effect.

25        Q.    Okay.  And you saw earlier that this was

CONFIDENTIAL

Page 53

1    branded by Common Sense Education, correct?

2         A.    I did see that.

3         Q.    Yeah.  And you felt that you could rely

4    upon them while you were superintendent to produce

5    accurate information regarding kids and their

6    relationship with media?

7              MR. PISTILLI:  Objection; misstates

8    prior testimony, outside the scope.

9              THE WITNESS:  I actually said we

10   partnered with them in early two -- early in the

11   school year of 2016-17 right after I had arrived

12   at Montgomery County Public Schools.  And we -- we

13   had a kickoff, and they provided content to us

14   about a range of digital safety.  I think that's a

15   good summary of what I said before.

16   BY MR. LEE:

17        Q.    Okay.  And then, so the content they

18   provided, did you feel it was accurate at the

19   time?

20             MR. PISTILLI:  Objection; foundation.

21             THE WITNESS:  And I -- I wouldn't have

22   any basis for that because I didn't closely review

23   it or teach it or administer a school where it was

24   being used.  It was brought in.  But generally I

25   had a positive view of the work they had done so

CONFIDENTIAL

Page 54

1   far when I arrived in 2016 in Montgomery County

2   Public Schools.

3   BY MR. LEE:

4       Q.    Okay.  Did you often make partnerships

5   with organizations where you did not read the

6   materials?

7       A.    That is not the way school systems work.

8       Q.    Okay.

9       A.    I didn't read all of the curriculum that

10  we taught.  If I -- if something came across my

11  desk in a memo like that to go to the Board, or in

12  other -- in another way, in a meeting, that I was

13  concerned about, then I proactively responded to

14  it.  But I think it's not the way a school system

15  works at all, that the superintendent, even a

16  small school system, reads all of the material

17  that is used in the school system.

18      Q.    Okay.  Fair enough.

19            So, but that memo did come across your

20  desk, and that memo included resources from Common

21  Sense Education, including reference to social

22  media addiction; is that correct?

23      A.    Yes.  No. 8 says "Device Addiction."

24      Q.    Okay.  Dr. Smith, in your work as a

25  superintendent, you know, and at the state, did

CONFIDENTIAL

Page 55

1    you gain a general understanding of how addiction

2    is caused by neurochemical reactions in the brain?

3         A.    I would say I have a very general

4    understanding of that as a layperson.  Wasn't part

5    of my official responsibilities or my background

6    and experience, specific to addiction.

7         Q.    Okay.  And do you understand that

8    children whose brains are still developing are

9    uniquely susceptible to addiction?

10              MR. PISTILLI:  Objection; outside the

11   scope.

12              THE WITNESS:  Once again, I certainly

13   have heard that and read it.  I don't know to what

14   degree that I understand the validity of it, the

15   scope of it, any of those things.

16   BY MR. LEE:

17        Q.    Are children more likely to be addicted

18   to nicotine than adults?

19              MR. PISTILLI:  Objection; outside the

20   scope.

21              THE WITNESS:  Once again, it was not

22   part of what I was asked to look at and it's not

23   part of something I've been thinking about.

24   BY MR. LEE:

25        Q.    Have you reviewed plaintiffs' expert

Page 56

1    opinions that show that social media activates the
2    same neural pathways as addictive drugs?
3         A.    I did read some of the plaintiffs' expert
4    opinions that referenced that, yes.
5         Q.    Okay.  And I'm -- after reading those,
6    did it change your opinion in the case?
7         A.    Well --
8              MR. PISTILLI:  Objection; outside the
9    scope.
10              THE WITNESS:  Sorry.
11              MR. LEE:  How was -- yeah, okay, one
12    second.
13              So I'm asking him whether something
14    that he admitted that he just reviewed would
15    change his opinion.  That is definitely within the
16    scope, and we will continue to do this.  I would
17    not like to spend my record time doing this, but
18    we will.
19              Can you read back my question.
20              (Record read.)
21              THE WITNESS:  I also read the defense
22    experts, and some of them disagreed with that.  So
23    I was left with uncertainty about what the case
24    is, what the situation is with all of that.
25    //

CONFIDENTIAL

Page 57

1    BY MR. LEE:
2        Q.    Did any expert say that -- or dis- -- I'm
3    sorry, let me start over.
4              Did any expert disagree with the
5    premise that children are more susceptible to
6    addiction than adults?
7        A.    I do not specifically remember that.
8        Q.    Is -- did -- so would it be accurate to
9    say that if children were more likely to be
10   addicted to behaviors or substances, that would
11   not have been a part of your opinion?
12       A.    I'm sorry, I don't understand the
13   question.
14              MR. PISTILLI:  Object to the form.
15              THE WITNESS:  I'm sorry.
16              MR. LEE:  Yeah, I would object to that
17   one too.
18   BY MR. LEE:
19       Q.    Now -- okay.  So -- well, why don't we
20   just move on.
21              So, Dr. Smith, you understand you're
22   retained by counsel for Defendant Social Media
23   Companies, not the attorneys representing
24   Plaintiffs School Districts?
25       A.    Well, actually, I can't speak deeply

CONFIDENTIAL

Page 58

1   about that.  What I know is that I was asked by

2   Covington to talk with him about this case, and

3   then I signed a letter of agreement with him.

4        Q.   Okay.  And who does Covington work for?

5        A.   They work for the social media companies

6   that you are referencing, some of them at least.

7        Q.   Okay.  So you work for Covington, and

8   Covington works for the social media companies.

9   Do you understand that?

10            MR. PISTILLI:  Object to the form;

11   misstates prior testimony.

12            THE WITNESS:  I do understand there is

13   a relationship among all of that, yes.

14   BY MR. LEE:

15        Q.   A relationship in which you were hired by

16   Covington, and Covington was hired by the social

17   media companies?

18        A.   I do understand that.

19        Q.   Okay.  Great.

20            Dr. Smith, do you know the

21   superintendent of Harford County Public Schools,

22   Dr. Bulson, either personally or professionally?

23        A.   I know him professionally.

24        Q.   Okay.  Can you describe the -- your

25   professional relationship with him?

CONFIDENTIAL

Page 59

1      A.    Dr. Bulson arrived in Harford County,
2   to my recollection, while I was superintendent in
3   Montgomery County.  Maryland is a relatively small
4   number of countywide school systems, plus
5   Baltimore City, which is not part of any county,
6   and so the 24 superintendents in Maryland meet
7   regularly, unlike many other states.
8              And so Dr. Bulson would be in meetings
9   from when he arrived, I don't know when that was,
10  '17, '18, because I did know his predecessors
11  during my longer tenure as a superintendent, and
12  we would be in meetings together.  And then when
13  COVID hit, we met on a very regular basis, as
14  superintendents, on Zoom.  And then those meetings
15  ended for me when I left in the summer of '21.
16     Q.    Okay.  Are you aware that Dr. Bulson was
17  appointed by Maryland governor Wes Moore to serve
18  on the Professional Standards and Teacher
19  Education Board?
20     A.    I was not aware of that.  I --
21     Q.    Do you --
22     A.    -- did not know that.
23     Q.    Is that a prestigious appointment?
24     A.    Well, I don't know.  I served on
25  that board myself, so.  It's one of the many

CONFIDENTIAL

Page 60

1  responsibilities that a superintendent can have in

2  the state, and it's -- it's -- you know, it has

3  some weighty decisions to make.

4      Q.    Okay.  So are you aware that Dr. Bulson

5  was named the Maryland "Superintendent of the

6  Year" by the Public School Superintendents

7  Association of Maryland on November 2023?

8      A.    I was not aware of that.

9      Q.    Okay.  And you won this award ten years

10 earlier, in 2019, while you were superintendent of

11 Calvert County; is that correct?

12     A.    That is accurate.

13     Q.    Okay.  And are you aware that Dr. Bulson

14 is currently serving a three-year term as an

15 elected member of the executive committee of AASA,

16 the school superintendents association?

17     A.    I -- yeah, I don't recall ever knowing

18 that.

19     Q.    Okay.  And has Dr. Bulson been a member

20 of the AASA governing board since 2022?

21     A.    Not aware of that.

22     Q.    Okay.  Were you a member of the AASA

23 governing board?

24     A.    I was a member of the AASA governing

25 board back in the teens sometime.

CONFIDENTIAL

Page 61

1    Q.    Okay.  Were you ever on the executive

2    committee?

3    A.    No, I was never on the executive

4    committee of AASA.

5    Q.    Do you think that AASA promotes

6    ineffective members to serve on the executive

7    committee or governing board?

8         MR. PISTILLI:  Object to the form.

9         THE WITNESS:  Let's say I have a lot

10   of thoughts about the variability among the people

11   who are promoted to the governing board, the

12   governing committee -- the governing board and the

13   executive committee.

14   BY MR. LEE:

15   Q.    Okay.  Do you have any thoughts on

16   Dr. Bulson?

17   A.    No.  Generally I worked with him as

18   needed and when necessary as part of a collective

19   of 24 people.

20   Q.    Okay.  Is it your opinion that Dr. Bulson

21   has been ineffective as a leader of Harford County

22   public schools?

23   A.    Specifically, I would have no way to

24   respond to that.  So I can't imagine that I could

25   come up with any sort of specific information

Page 62

```
 1   about that.
 2        Q.    Okay.  Do you think Dr. Bulson has not
 3   been truthful by filing this lawsuit?
 4        A.    I would have no way to know that, in
 5   terms of thinking about what he knows,
 6   understands.  I just can't know those sorts of
 7   things about what he thinks.
 8        Q.    So if you don't know something, is it not
 9   a part of your opinion?
10        A.    I'm sorry, I don't understand the
11   question.
12        Q.    Okay.  So your opinion is based on what
13   you know, your personal knowledge.  So if your
14   personal knowledge does not include whether
15   Dr. Bulson has been ineffective, would it be
16   accurate to say that it's not a part of your
17   opinion --
18              MR. PISTILLI:  Object to the form.
19   BY MR. LEE:
20        Q.    -- in this case?
21        A.    Well, ineffective, once again, is a very
22   complex idea.  There is a whole range of things.
23   So you can be highly effective in one area,
24   ineffective in another area, meets standard in
25   another area.  So when we talk about those
```

CONFIDENTIAL

Page 63

1    questions, it just, those are not -- while they're

2    not hypotheticals, they're very abstract, and so I

3    hesitate to give a really strong, affirmative

4    answer to something like that.

5         Q.    Okay.

6              Can we pull up Tab A.  That's the

7    report.  I guess that would be Exhibit 1.  Or is

8    it 2?

9              LITIGATION TECHNICIAN:  2.

10             MR. LEE:  Exhibit 2.  Thank you.

11             And then let's go to Page 68,

12   Paragraph -- or, Page 61, Paragraph 210.

13             THE WITNESS:  61.  Paragraph 210.

14   BY MR. LEE:

15        Q.    Okay.  So did you locate it?  It's also,

16   on the screen --

17        A.    Yes --

18        Q.    -- it's available.

19        A.    -- I have it.

20        Q.    Okay.  So here you wrote, "To conclude, I

21   have not seen evidence in the Harford County

22   documents that social media has been the cause of

23   the system spending significantly more money.  The

24   places where the system has asserted it has been

25   spending money as a result of social media (e.g.

CONFIDENTIAL

Page 64

```
 1    adding staff to support student mental health)
 2    appeared to have not originally been linked in any
 3    way to social media and were only linked after
 4    this lawsuit was filed."
 5              Did you write that?
 6        A.    I did write that.
 7        Q.    Okay.  So do you think that Dr. Bulson
 8    was not being truthful when he filed this lawsuit?
 9        A.    I can't speak to being truthful.  What I
10    can speak to is that there is a way of doing
11    business in school systems, a very clear way.  And
12    the methodology of this report was to look at the
13    way of doing business.  And even though, as I
14    indicated in the report, there is vast variability
15    in many things in school systems across the
16    country, this way of doing business is standard.
17    That's why I was able to go from Washington state
18    as a principal to Maryland as a principal and be
19    successful.  It's why I understood when the -- my
20    boss would say, Well, there's a board policy about
21    that when I arrived in Maryland, I wasn't
22    confused.  Why I would understand when they said,
23    You have to come to the superintendent's office
24    and present your school budget requests, I wasn't
25    confused.
```

Page 65

1            So there's a way of doing business
2    around the administration of school systems and
3    school buildings.  And I'm sorry this is a long
4    answer, but it's -- it goes very much to what I
5    wrote here.  When you look at that way of doing
6    business -- policies, procedures, planning, public
7    comment, like our friend in the earlier Common
8    Sense conversation, from the community, from
9    activists, from politicians, from anyone, parents
10   who are concerned or worried about something --
11   then you see that as a through-line in the record
12   of a school system.
13            And when I reviewed the documents for
14   Harford County Public Schools, I did not see the
15   through-line of the impact of social media on
16   student mental health costing Harford County
17   specifically a lot of resources or -- or money.
18       Q.    Okay.  So what would it take for you to
19   be able to make that link, in your mind, in your
20   way of doing business?
21       A.    Well, first of all, it's not my way of
22   doing business.  It's the way the business is
23   done.  And I don't mean to be disrespectful at
24   all, but that's just -- it's the way I did my
25   business and it's the way all of my colleagues

CONFIDENTIAL

Page 66

1    that I've ever known do their business, and so I

2    think that's important for me to say.

3              What I would want to -- what I would

4    expect to see, not what I'd want, what I would

5    expect to see would be lengthy discussions about

6    large amounts of money.  While the budget line

7    might not say the words "social media" or it might

8    not say "digital costs" or any of those things,

9    there should be a through-line in terms of what's

10   discussed at board meetings, what's discussed at

11   administrative meetings, public presentations,

12   newsletters, comments from the public, that you

13   see all of those things.

14             And so I went into this project

15   looking, first of all, at that framework, and then

16   looking, as I said earlier, first of all, at

17   Baltimore City extensively, and then I was asked

18   to switch gears and look at Harford County

19   extensively.  And that's what I did.

20        Q.    Okay.  So are surveys and reports, is

21   that one of the kind of categories of things that

22   would make the through-line from social media to

23   spending?

24        A.    That certainly could be part of what you

25   see, yes.

CONFIDENTIAL

Page 67

1      Q.    Okay.  And in your report, you were --
2  you know, you pointed out that there were not
3  surveys and reports conducted by Harford
4  specifically about social media?
5      A.    I don't know what specifically you're
6  talking about in the report.  I'd have to see --
7      Q.    Okay.
8      A.    -- that.
9            MR. LEE:  Can we go to his report --
10  actually, it's on the same page.
11           THE WITNESS:  Okay.
12 BY MR. LEE:
13     Q.    Paragraph 208.
14           Okay.  So "Again, in my experience in
15 school administration, it is not plausible that
16 Harford Public Schools would not have at least
17 some reports or analyses of the effects of social
18 media on its students and schools if social media
19 were having widespread effects on the schools."
20           So you wrote that, correct?
21     A.    I did write that, yes.
22     Q.    And the meaning of that is that you
23 believe that there should have been surveys and
24 reports?
25           MR. PISTILLI:  Objection; misstates

CONFIDENTIAL

Page 68

1    the document and the prior testimony.

2              THE WITNESS:  Actually, what that is a

3    response to is Question 53 above.  "Do you possess

4    any existing report, survey, analysis, study or

5    other document that provides an overview ... or

6    describes interventions, discipline, or other

7    consequences imposed on students for using social

8    media on school premises?"

9    BY MR. LEE:

10        Q.    So --

11        A.    So that's what it was a direct response

12   to.

13        Q.    So the absence of those reports or

14   analyses is part of your opinion about why there

15   is not a link between social media and the harms

16   alleged?

17        A.    That would be one part.

18        Q.    Okay.  Let's see.

19              Do you think Dr. Bulson has not been

20   truthful about the link between social media and

21   the harms alleged?

22              MR. PISTILLI:  Objection; asked and

23   answered.

24              THE WITNESS:  Well, as -- as I said

25   before, I can't speak to the veracity of his

CONFIDENTIAL

Page 69

1   statements.  What I can say is that I haven't seen

2   evidence in the record of Harford County Public

3   Schools that they have experienced the level of

4   financial or resource impact that the claim

5   involves.

6   BY MR. LEE:

7       Q.    Okay.  Do you think that Dr. Bulson is

8   responsible for poor school climate?

9       A.    I would have no way to judge that.

10      Q.    Okay.  In your report, you note that

11  Dr. Bulson was called upon to resign from his role

12  as superintendent following an on-campus shooting

13  at a high school.

14            Do you agree that he should have

15  resigned following that shooting?

16      A.    Once again, I would no way to judge that.

17  What I would say is that superintendents are often

18  called upon to resign.

19      Q.    Have you been called upon to resign?

20      A.    I absolutely have been called upon to

21  resign.

22      Q.    Why were you called upon to resign?

23      A.    I don't actually remember.  I'm -- I'm

24  trying to think of a time that it happened, but I

25  know it's happened.  You don't forget that.

Page 70

```
 1      Q.    Okay.
 2            Can we bring up Tab CCCC.  Okay.  So
 3   I'd like to mark this as Exhibit 6, I believe.
 4            (Meta-Smith-6 marked.)
 5            MR. PISTILLI:  Do you have copies for
 6   myself to look at?
 7            MR. LEE:  Oh, yes, sorry.  One second.
 8   BY MR. LEE:
 9      Q.    So, Dr. Smith, do you recall this
10   petition?
11      A.    I don't recall this petition exactly, but
12   I have no doubt that it was out there and that I
13   probably saw it at the time.
14      Q.    Okay.  And this was signed by 2,000 --
15   over 2,000 people?
16      A.    Yes --
17      Q.    Do you see that?
18      A.    -- I do see that.
19      Q.    Okay.  Do you recall the incident?
20      A.    Without a doubt.
21      Q.    Can you describe the incident?
22      A.    In March, I believe it was March 16th,
23   2017, a girl went to the restroom.  She had a
24   prearranged meeting with a boy.  He was in P.E.
25   downstairs from the bathroom where they met.
```

CONFIDENTIAL

Page 71

1    Another boy joined him.  And they were in the

2    bathroom for about 20 minutes, 25 minutes.  She

3    was out of class.  They were involved in sexual

4    activity in the bathroom.

5             She left the bathroom with the two

6    boys.  They went downstairs to the gymnasium.  She

7    went back down the hall to the other end of the

8    building to her English class.  An assistant was

9    out in the hall searching for her at this point

10   because she had been gone for, like I said, I

11   don't know, 20, 25 minutes, or maybe -- I just

12   don't know.  It was about that range.  It was in

13   the half hour.  It wasn't five minutes.  And the

14   assistant saw her, and she became emotional and

15   said she had been raped.

16       Q.    Okay.  Do you -- did you think you should

17   have resigned after this incident?

18       A.    Absolutely not.  And, in fact, The

19   Washington Post ended up writing a statement to

20   the community and said, "How many have you

21   apologized to Jack Smith for your words?"  You can

22   find it in the record of the The Washington Post.

23       Q.    Okay.  But there is still 2,000 people

24   that called for your resignation despite this not

25   being your fault?

CONFIDENTIAL

Page 72

1       A.      Well, we can't even term it my fault or

2   not my fault, because what was alleged didn't

3   happen and was proven not to happen.  And the

4   state's attorney and chief of police had to stand

5   up next to me and say no charges were brought.

6   Ultimately dropped every charge.

7               And the governor of Maryland, the

8   press office of the White House, the people of

9   Montgomery County and across the state, across the

10  nation, and around the world -- you've kind of hit

11  a hot button with me here -- all of their

12  assumptions were wrong.  What they did basically

13  is said, because these two boys were from another

14  country, because they weren't documented, that

15  they were automatically guilty of something.  And

16  I said, I don't know if they're guilty or not.

17  But what I do know is we live in a country where

18  people are innocent -- they're presumed innocent

19  until found guilty.  And that created a firestorm,

20  and yet ultimately every charge was dropped.  And

21  whatever happened in that bathroom was consensual.

22              And so these 2,118 people were wrong.

23  All the people that wrote me emails and sent me

24  hate mail and threatened my life were wrong.  It

25  was a tough situation, and there was no way to

CONFIDENTIAL

Page 73

1   make it better except to live through it.  So, you

2   know, and the principal, to this day I feel

3   terrible about what she had to deal with.

4          Q.    Okay.

5          A.    And so ...

6          Q.    So I gather that you feel that you were

7   unfairly treated by the public about this issue?

8          A.    I feel like the students were unfairly

9   treated in the situation and that a lot of people

10  who say they believe in the rule of law in

11  Montgomery County, in the state of Maryland, in

12  the nation don't really believe in it, at least

13  not in this situation.  That's how I feel.

14         Q.    Do you feel that public school leaders

15  are often unfairly treated by the public?

16         A.    I think public school leaders often get

17  criticized, both fairly and unfairly, and you'd

18  have to know the circumstances in every case to

19  know what happened.

20         Q.    Okay.  Do you think it was unfair to call

21  on Dr. Bulson to resign following a shooting on

22  one of his campuses?

23         A.    I don't have any idea.  As I told you

24  before, it may have been unfair, it may have been

25  fair.  I don't know the circumstances beyond what

Page 74

```
 1    I read in that newspaper article.
 2              My point was that, in the report, that
 3    violence is an ongoing issue in schools that
 4    affects school systems, their resources, their
 5    students, their adults, that was my point in the
 6    report.
 7        Q.   Okay.  Do you know if that shooting had
 8    a -- was -- involved social media in any respect
 9    in the -- yeah, did it?
10        A.   I believe in one of the depositions, one
11    of the people from Harford County said it did not.
12    But I cannot swear to that.  You know, I just --
13    that's my recollection of reading that.
14        Q.   Okay.  Dr. Smith, were you aware that
15    there were school shooting threats made in Harford
16    in the days and weeks after this shooting
17    incident?
18        A.   I don't remember seeing that, but it
19    would not surprise me.
20        Q.   Do you know how many shooting threats
21    were made?
22        A.   I have no idea.
23        Q.   And do you know if they were made on
24    social media?
25        A.   I have no idea.
```

CONFIDENTIAL

Page 75

1          Q.     Okay.

2                 I'd like to pull up Tab EE.

3                 Okay.  So this is an article by the

4    Baltimore Sun.  Are you familiar with that

5    publication?

6          A.     I am familiar with the Baltimore Sun,

7    yes.

8          Q.     And this was published on October 3rd,

9    2024.

10                Do you see that?

11         A.     I do see that.

12         Q.     Okay.  And then the title of this article

13   is "Sheriff says 33 threats to Harford schools in

14   a month is reaction to fatal Joppa shooting."

15                Do you see that?

16         A.     I do see that.

17         Q.     Do you understand that to refer to the

18   same shooting that you described in your report?

19         A.     That would be my assumption, yes.

20         Q.     Okay.  So I'm going to read just these

21   first two paragraphs.

22                "Less than a month into the new school

23   year Harford County sheriffs deputies say they

24   have investigated 33 threats made to public

25   schools.  It's something police say can be

CONFIDENTIAL

Page 76

1   expected after incidents such as the fatal

2   shooting at Joppatowne High School last month.

3   'When you see the shooting incidents around the

4   country and then, unfortunately, the shooting

5   incident we had, you can expect a reaction and

6   more things to be shared on social media and more

7   concerns,' Harford County sheriff" Jerry "Gahler

8   said in an interview this week.

9            "The majority of the threats made to

10  Harford schools, Gahler said, are posts on social

11  media that are reported by parents, students, and

12  educators.  Gahler explained that he and his

13  deputies take all threats seriously and thoroughly

14  investigate each of them."

15           Did I read that correctly?

16           My apologies to Mr. Gahler if that's

17  not how you pronounce his name.

18       A.    Yes, I think you did.

19       Q.    Okay.  Would you consider the 33 threats

20  made on social media following the shooting in

21  Harford County to be an improper use of social

22  media?

23       A.    I think any threat anywhere, anytime is

24  improper, without -- without question.

25       Q.    Okay.  And do you think that addressing

CONFIDENTIAL

Page 77

1    these 33 threats cost any time from administrators

2    and teachers?

3        A.    I would need more information about that

4    in terms of where they came from, because if they

5    were from outside of Harford County, outside of

6    Maryland, outside of -- you know, I just don't

7    know what would have been committed in terms of

8    resources to following up on 33 threats.  But I

9    think you follow up on threats in newspapers, in

10   emails, in face-to-face conversations.  I mean,

11   it's a part of the work since I became a principal

12   in 1986, an assistant principal.

13               MR. LEE:  Can we mark this as

14   Exhibit 7, before I forget.

15               (Meta-Smith-7 marked.)

16   BY MR. LEE:

17       Q.    And then, can you recall a time when you

18   were superintendent where you had 33 threats made

19   in less than a month into the new school year?

20       A.    Can I recall a time when I had 33 threats

21   made in a month in the beginning of a school year?

22       Q.    Yeah, let's -- okay.  So have you ever

23   received -- or, in your experience as

24   superintendent, have you ever received 33 school

25   shooting threats within one month?

CONFIDENTIAL

Page 78

1             MR. PISTILLI:  Objection; foundation.

2             THE WITNESS:  Not to my recollection;

3    although, it's hard to say.  I -- there were a

4    mass number of threats around this other

5    circumstance we were talking about at Rockville

6    High School.  Actually received a tremendous

7    number of threats when we were working to open

8    schools in July of 2020, many of them from my own

9    employees.

10   BY MR. LEE:

11       Q.    Do you think -- well, were they school

12   shooting threats?

13       A.    No, but --

14       Q.    Okay.

15       A.    -- just threats.

16       Q.    We're talking about school shooting

17   threats.

18             MR. PISTILLI:  Objection; foundation.

19   BY MR. LEE:

20       Q.    There are 33 school shooting threats in

21   one month, according to this article; is that

22   correct?

23             MR. PISTILLI:  Objection; foundation.

24             THE WITNESS:  Yes, "... investigated

25   33 threats ..."

Page 79

BY MR. LEE:

Q.    Okay.  Do you think that social media has
made it -- made these threats more common?

A.    I'm thinking about that.  In the '90s, I
went through a series for several years of bomb
threats in the late '90s, early 2000s.  So I -- I
don't know.  But social media is certainly
pervasive, so I wouldn't disagree with that.

Q.    So, in being pervasive, it's more likely
to spread?

A.    Well, I think it spreads differently,
and, you know, in the use of it.  It's a lot of
content, though.  That's what -- that's what's
changed in the world.  I'm really trying to answer
your question from my own way of thinking.  That
what's changed in the world is the profound amount
of content that is available since the
introduction of, first, computers and then the
Internet.  And that's the biggest change I see in
public schools is that shift.

Q.    So when you say "content," can you
explain that a little bit more for me?

A.    Certainly.  The availability of
information and the availability of misinformation
that's pervasive.  Every -- you know, it's just so

CONFIDENTIAL

Page 80

1    available.

2              I -- when I was a kid, I had to go to

3    the Encyclopedia Britannica in a library, because

4    we didn't have any encyclopedias at home, to find

5    out the -- September 1st, 1939 was the first day

6    of World War II.  Now you can find that out in

7    seconds on your computer, your laptop, your phone,

8    your smartboard.  It's just, it's pervasive.

9    Content is everywhere.  And so that's why it's

10   hard to judge those sorts of things.

11       Q.    So would you agree that social media has

12   increased the availability and pervasiveness of

13   misinformation?

14       A.    I would agree that it's both,

15   misinformation and information; content.

16       Q.    Okay.  Does "content" mean -- can you

17   define that word for me?

18       A.    It's information, factual information,

19   opinions, entertainment.  It's whatever people

20   create to share with other people, just like we

21   always have since the beginning of time, and now

22   it's available in the digital world, and that

23   makes it more available if you have access to that

24   digital world.

25       Q.    Okay.  And when students are on social

CONFIDENTIAL

Page 81

1   media, they have near constant access to that

2   information; is that correct?

3        A.    I think when anyone is on any sort of

4   digital device they have information to the whole

5   range of digital information.  It's all out there.

6        Q.    Okay.  Positive and negative information?

7        A.    Yes.

8        Q.    Okay.  Dr. Smith, do you know if 2024 was

9   the first time that shooting threats trended on

10  social media in Harford County?

11       A.    I don't know the answer, but I can't

12  imagine it was the first time at a ...

13       Q.    Okay.  In your long experience as a

14  superintendent, do you feel that these kinds of

15  incidents have become more common?

16       A.    Have they become more common?  My gut is

17  that there's more information out there in all of

18  these realms of the digital world, and so it's --

19  but there's no way I can quantify it, but it

20  seems, that's my perception, that it's more common

21  across the entire digital world.

22       Q.    Okay.  So as a superintendent, how did

23  you sort out which threats, school shooting

24  threats, were real and which were not?

25       A.    We would use a process of threat

Page 82

```
 1   assessment where we'd gather all of the available
 2   information, and then look at it, review it,
 3   respond to it, if possible, as appropriate, and
 4   then act accordingly beyond that.
 5             MR. PISTILLI:  Counsel, I don't know
 6   if you're reaching a natural stopping point, but
 7   we've been going over an hour and a half.
 8             MR. LEE:  Oh, okay.  I'm -- I'm real
 9   close to the end --
10             MR. PISTILLI:  Sure.
11             MR. LEE:  -- of where I'm at.  Okay.
12   Thank you.
13   BY MR. LEE:
14     Q.   So -- okay.  So, and did you conduct this
15   threat assessment on social media threats?
16     A.   At times, yes.  I didn't actually usually
17   conduct them.  It was brought to me in all of my
18   positions:  Calvert, the state, and the state
19   didn't -- was a secondary player in it, and then
20   Montgomery.
21     Q.   And that threat -- threat assessment
22   takes time?
23     A.   It does take time.
24     Q.   And it takes time whether it's a real
25   threat or a joke?
```

CONFIDENTIAL

Page 83

1    A.    Well, yes, it depends.  As I said
2    earlier, we had a lot of bomb threats in the
3    late '90s, early 2000s, at the school where I
4    was principal in Maryland, and they took time
5    and -- but they might take two minutes and they
6    might take an hour.  It just depended on all of
7    the facts around that threat, but it does take
8    some time.
9        Q.    Okay.
10            All right.  We can stop right there,
11   take a little break.
12            THE VIDEOGRAPHER:  The time is 11:09,
13   and we are off the record.
14            (Recess taken.)
15            THE VIDEOGRAPHER:  The time is 11:24,
16   and we are back on the record.
17   BY MR. LEE:
18       Q.    Okay.  So, Dr. Smith, we were talking
19   about a shooting incident at Joppa High School --
20   or Joppatowne High School.  Do you recall that?
21       A.    I do recall that.
22       Q.    Okay.  So do you think that the
23   administration responded well to that situation?
24            MR. PISTILLI:  Object to the form.
25            THE WITNESS:  I would have no way to

CONFIDENTIAL

Page 84

1    determine that without a lot more information and

2    understanding of what happened.

3    BY MR. LEE:

4        Q.    Do you consider Harford a particularly

5    violent school district?

6        A.    As I reviewed the record, I did find that

7    there is a lot of concern about violence in that.

8        Q.    Do you know if it's -- there are more

9    crimes that occur in that district than -- I mean

10   in that school system than other school systems in

11   Maryland?

12                MR. PISTILLI:  Object to the form.

13                THE WITNESS:  I do not know the answer

14   to that.  I just, as it was -- as I reviewed the

15   record, I saw indications that there is a lot of

16   concern in the community about school violence.

17   BY MR. LEE:

18       Q.    Okay.  So other than the statements in

19   the record regarding violence, do you have a basis

20   for saying that violence was a long-term issue in

21   Harford County?

22       A.    I don't know how I would define "long

23   term," and, in my report, there is information

24   where students indicate concern about feeling

25   safe at school; and there was -- there was

CONFIDENTIAL

Page 85

1    indications in the record about concern about
2    school safety.  It's a concern across the nation.
3    It's a concern in every school.
4        Q.    Okay.  Dr. Smith, what are some of the
5    statistics used to measure poverty in schools?
6        A.    Typically, it has been the number of
7    students receiving free and reduced meals;
8    although, there was a change in the late 2000s
9    about community eligibility so that you suddenly
10   went from 80 percent of the students to
11   essentially a hundred percent.  So it became a
12   little bit messy at that time.
13             And then there are also other factors:
14   the number of students who receive homeless
15   designation, the number of students who have other
16   indicators can be used.  But primarily it's free
17   and reduced meals.  And I think it's now free
18   meals.  I think they've eliminated the "reduced"
19   designation.
20       Q.    Now, how about the proportion of students
21   with food stamps and/or -- or, slash, SNAP
22   benefits?
23       A.    I think that has been in the community,
24   eligibility, part of that consideration.
25       Q.    Okay.  And then the proportion of

CONFIDENTIAL

Page 86

1   students in poverty, I presume below the federal

2   poverty line?

3       A.    And that's typically, in school

4   experience, that's typically how it's -- the

5   result of that is free and reduced meals.

6       Q.    Okay.  Is median household income of

7   families used to measure poverty in schools?

8       A.    Yes, the poverty line is used.  The

9   federal poverty designation is used to receive

10  free meals.

11      Q.    Okay.  By any of the metrics that we just

12  talked about, do you think Harford is relatively

13  worse off than the national average?

14      A.    I don't know at this point what the

15  national average is.  My memory is Harford is

16  about a quarter, about in the 20 percent,

17  25 percent range from -- it's in my report, I

18  think, actually, if we look at it.  I have to find

19  the page.

20      Q.    It's okay.

21            Can you pull up Tab R.

22            MR. PISTILLI:  Were you done answering

23  the question?

24            THE WITNESS:  Yes.

25            MR. LEE:  So this is a web page, so if

CONFIDENTIAL

Page 87

```
 1   we could scroll in.  Yep, you got it.
 2   BY MR. LEE:
 3        Q.    So I would -- I can give you a printed
 4   copy, but it doesn't look very good printed so
 5   hopefully we can just kind of look at this.
 6                 Do you know if Harford is --
 7                 MR. PISTILLI:  I'd actually, I'd like
 8   a printed copy, please.
 9                 MR. LEE:  Oh, sure.  It's very small.
10                 So this is -- let's mark this as
11   Exhibit 8.
12                 (Meta-Smith-8 marked.)
13   BY MR. LEE:
14        Q.    And then, so this is -- have you seen
15   this website before?
16        A.    Yes, I believe so.
17        Q.    Okay.  This is the National Center for
18   Education Statistics?
19        A.    Um-hmm.
20        Q.    Are you familiar with that, I guess,
21   agency?
22        A.    I am familiar with the National Center.
23        Q.    Okay.  And they publish accurate data?
24        A.    To the best of my knowledge, they do.
25        Q.    Okay.
```

CONFIDENTIAL

Page 88

1              So can we scroll down a little bit.

2              So -- okay.  So you see up here it

3    says the median household income is $106,417; is

4    that correct?

5        A.    I do see that.

6        Q.    Do you think that that median household

7    income is above or below the national average?

8        A.    I -- I would guess that it's above the

9    average somewhat.

10       Q.    Okay.

11       A.    I don't believe it's above the Maryland

12   average, however.  I'd have to see that to know.

13       Q.    That's okay.  I'm not trying to make you

14   guess.

15       A.    Okay.

16       Q.    Let's just scroll all the way to the

17   bottom.

18       A.    Okay.  That's fine.

19       Q.    So scroll up a little bit.  Okay.  Stop.

20              All right.  So do you see "Median

21   household income" in the upper left over here?

22       A.    I do see that.

23       Q.    Okay.  And you see the -- there is a

24   sort -- it's a bar chart, but that -- it also has

25   a dot for some reason.  And do you see that the

CONFIDENTIAL

Page 89

1   district appears to be higher than the national

2   average?

3        A.    I do see that.

4        Q.    Does it appear higher than the state

5   average?

6        A.    Slightly.

7        Q.    Yeah, slightly.

8        A.    Um-hmm.

9        Q.    Okay.  And then, so to the right of that

10  you see "Families with food stamp/SNAP benefits."

11              You see the district is lower than the

12  state.  Do you see that?

13       A.    I do see that.

14       Q.    And it's lower than the national?

15       A.    Yes, I do see that.

16       Q.    Okay.  So that means that there are

17  relatively less students -- or families with food

18  stamp/SNAP benefits in Harford County; is that

19  correct?

20       A.    I'm sorry, could you repeat that

21  question?  There are relatively fewer ...

22       Q.    Families who -- with food stamp/SNAP

23  benefits in Harford County than the state average

24  and the national average.

25       A.    That's what this indicates.

Page 90

```
 1      Q.    Okay.  All right.
 2            And then, let's see, and then right
 3   below that it says "Families with Income Below the
 4   Poverty Level."
 5            This one is a little bit harder to
 6   read.  I'm sure, as you know, the federal poverty
 7   line is fairly low, and -- but do you see that the
 8   district is lower than both the state and the
 9   national average?
10      A.    I do see that.
11      Q.    Okay.  And then, yeah, because I'm a
12   little bit of an educational statistics nerd, to
13   the right, the "Bachelor's Degree or Higher,"
14   which is a common indicator of success for
15   students, you see that the district is slightly
16   higher than the state and higher than national,
17   correct?
18      A.    Well, I'm not certain if that's students
19   or if that's --
20      Q.    Oh, well, that would be the parents --
21      A.    Yeah.
22      Q.    -- I presume, yeah.
23      A.    Yeah, there are measures --
24      Q.    Okay.
25      A.    -- of students achieving a bachelor's
```

Page 91

1  degree after high school from a school system, and
2  I wasn't -- that's what I wasn't sure about.
3      Q.    Oh, yeah, fair enough.  Yeah, I guess I
4  can't be a hundred percent sure about that one
5  either.
6            But so these are common statistics
7  used to measure, you know, you say in your report
8  "poverty," but really kind of socioeconomic status
9  effects on students, which, as you describe in
10 your report, are fairly significant; is that
11 right?
12           MR. PISTILLI:  Object to the form.
13           THE WITNESS:  So typically in school
14 systems, the word "poverty" and "socio-" -- the
15 words "poverty" and "socioeconomic status" are
16 interchangeable.
17 BY MR. LEE:
18     Q.    Okay.  So would you describe Harford as a
19 high poverty system?
20     A.    High poverty -- relative to some other
21 places in Maryland, no.
22     Q.    And relative to the United States?
23     A.    Depends on where you're talking about in
24 general, which I don't like to do, as I shared
25 with you before, but no.

CONFIDENTIAL

Page 92

1      Q.    Okay.  And then, so would you expect the

2   effects of poverty to be higher in a high poverty

3   district or a district like Harford?

4      A.    Once again, a very complex question,

5   because the effects of poverty are different than

6   the impact of poverty on individual students, and

7   so that's a difficult question to answer.

8      Q.    Okay.

9            All right.  So I would like to pull up

10  Tab J -- sorry, JJJJ.  These are the responses and

11  objections and accompanying document production

12  that Plaintiffs received.

13     A.    Thank you.

14     Q.    So in particular --

15           Well, I guess, first of all, can we

16  mark this as Exhibit 9.  Is that what we're on?

17           (Meta-Smith-9 marked.)

18  BY MR. LEE:

19     Q.    And then -- do you recognize this

20  document, Dr. Smith?

21     A.    Yes.  I believe I have seen this

22  document, yes.

23     Q.    Okay.  Did you review this document

24  before it was submitted?

25     A.    Yes.  The attorneys shared the document

CONFIDENTIAL

Page 93

1    with me, and we did review it.

2        Q.    Okay.  Can we go to Page 15 of this

3    document.

4              All right.  And then, so this is your

5    invoice for this -- or, one of your invoices for

6    this litigation; is that correct?

7        A.    I'm looking for the page numbers.

8        Q.    Oh, so the page number -- the Bates

9    number is SMITH-MDL-000005.

10       A.    Okay.  So it's the first one in the

11   packet, I --

12       Q.    Yes.

13       A.    Yes, okay.

14       Q.    So this is January 2025?

15       A.    This is.

16       Q.    Okay.  And then, I see here that your

17   total hours is 22.25 and your hourly rate is 500;

18   is that correct?

19       A.    That is correct.

20       Q.    And the total for this month is 11,125?

21       A.    That would be accurate.

22       Q.    Okay.  And then, the next one, which is

23   February, I see here that your total hours are 22,

24   and then your hourly rate is $500.  Then you have

25   a mileage, looks like you drove 1262 miles.

Page 94

1    What -- where did you drive?

2        A.    I drove from Maine to Washington, D.C.,

3    and then I drove back to Maine.

4        Q.    Ah, okay.  All right.

5              And then -- and then that was the only

6    time that you did that drive, it seems like?

7        A.    For this purpose, yes.

8        Q.    Yes.  For -- for the purpose of billing.

9    We're talking about your gas.

10       A.    Now, my personal life, I've done it a

11   number of times.

12       Q.    I'm sure you have.

13       A.    Yes.

14       Q.    All right.  And then there is a parking

15   charge for $19 and copying for 76.64.

16              Is that correct?

17       A.    That is correct.

18       Q.    Okay.  Then the total was 11,979.04; is

19   that correct?

20       A.    (Nodding head.)

21       Q.    Okay.  So to avoid having to go through

22   every single one of these, I, you know, basically

23   did a little bit of addition.  Do you think, is it

24   accurate -- do you think 390 hours and .25 is

25   about how many hours you've worked on this

CONFIDENTIAL

Page 95

1   litigation?

2       A.    It would seem accurate.

3       Q.    Okay.  And then your rate has been $500

4   from January until July of 2025.  And then in

5   August of 2025, it was $700; is that correct?

6       A.    Yes, that's accurate.

7       Q.    Okay.  And then, was that increase tied

8   to any specific reason or ...

9       A.    It was tied to shifting from the creation

10  of the report to preparation for a deposition.

11      Q.    Okay.  So you have a rate that is for the

12  report, and then you have a rate that is for the

13  deposition; does that sound accurate?

14      A.    That does sound accurate.

15      Q.    And would that rate to prepare for the

16  deposition and -- is that different from the rate

17  for the deposition itself?

18      A.    No.

19      Q.    Okay.  Would that rate be different from

20  work that you may do in this case moving forward?

21      A.    No.

22      Q.    Okay.  So the $700 rate would cover

23  essentially all pretrial activities; is that

24  accurate?

25      A.    If I do any future work, it would all be

CONFIDENTIAL

Page 96

1    the same.

2        Q.    Okay.  And then, so in terms of other

3    costs, I think we talked about them already in

4    that one month, they add up to 979.02.  Does that

5    sound right; that would be for the mileage,

6    parking, copying in February?

7        A.    That would be correct.

8        Q.    Okay.  And then the total I have for all

9    of your billing, that means hours and rates and

10   costs, is -- well, that would be about 2200 and

11   $1,000.  Does that sound about right?

12            MR. PISTILLI:  Object to the form.

13            THE WITNESS:  I'm sorry, I'm not sure

14   I understand.

15   BY MR. LEE:

16       Q.    The total amount of money you've been

17   paid for your work in this litigation is about

18   $200,000?

19       A.    That would sound correct.

20            MR. PISTILLI:  Object to the form.

21   BY MR. LEE:

22       Q.    Okay.  Great.

23            Let's see.  Okay.  So according to the

24   January invoice, the first date that you billed

25   was for January 9th, 2025.  Is that correct?

CONFIDENTIAL

Page 97

1      A.    Yes.

2      Q.    Is that the date of your retention?

3      A.    I -- I don't know.  It was about that

4  date.  I don't know when I actually agreed.

5      Q.    Okay.

6      A.    It should have been that date or before

7  that date.

8      Q.    So did you have a conversation with a

9  lawyer or law firm about the case before you

10  agreed to do it?

11      A.    I had a conversation with John DeBoy

12  about the possibility of doing this work.

13      Q.    Okay.  Do you mind spelling his last

14  name?

15      A.    It's the name on the thing, D-e-B-O-Y.

16      Q.    Okay.  Oh, DeBoy.  Okay.  I see it up at

17  the top here.

18            Okay.  And then does Mr. DeBoy work

19  for Meta, or does he work for Covington?

20      A.    He works for Covington.

21      Q.    Okay.  Did you know Mr. DeBoy prior to

22  the litigation?

23      A.    I did not.

24      Q.    Okay.  So how did you come to be

25  introduced to Mr. DeBoy?

CONFIDENTIAL

Page 98

1      A.    Someone from Covington contacted me and
2    asked if I would have a conversation with them --
3      Q.    Okay.
4      A.    -- about potential work.
5      Q.    Okay.  Were you referred by anybody?
6      A.    Not to my knowledge.
7      Q.    Did Covington reach out to you directly
8    or you in your capacity as an -- as a consultant
9    for Hazard Attea Young?
10     A.    This work is aside from Hazard Attea
11   Young.  I --
12     Q.    Okay.
13     A.    -- informed them I was doing other work
14   that was not related to the work they do, and
15   Covington reached out to me directly.
16     Q.    Okay.  So earlier I believe you said that
17   this was your first time being an expert in a
18   litigation; is that correct?
19     A.    Yes.  Very strictly speaking.  I
20   certainly, during three years at the Maryland
21   State Department of Education, testified in front
22   of the general assembly many, many, many times,
23   which felt very much like a deposition but wasn't.
24     Q.    So -- okay.  So other than your testimony
25   before the Maryland State Board of Education and

Page 99

1    today's deposition, have you testified in any

2    other settings?

3         A.    Not as an expert.  I have given

4    depositions and testified in court for other

5    reasons.

6         Q.    Yeah.  Were they reasons tied to your job

7    as a superintendent?

8         A.    Or a principal, yes.

9         Q.    And they were only in -- these -- this

10   testimony was only given because of your job, not

11   personally?

12        A.    That is correct.

13        Q.    Okay.  Great.

14             So I notice that there is not a

15   September invoice in this production.  I know

16   the month is not done.  So are -- are we

17   going -- should we expect to get a September

18   invoice at some point?

19        A.    At the end of September, I would submit

20   an invoice.

21        Q.    Okay.

22             So I'm just going to note for the

23   record that we're going to seek those invoices

24   and --

25             MR. PISTILLI:  Yeah, you can feel free

CONFIDENTIAL

Page 100

1  to follow up in writing.  Thanks.

2          MR. LEE:  Okay, yeah, I'm happy to do

3  that.

4  BY MR. LEE:

5      Q.    All right.  And then, so how did you

6  prepare for today's deposition, Dr. Smith?

7      A.    I met with attorneys from Covington via

8  Zoom and then yesterday; I reread materials and

9  looked at those things; I spent a lot of time

10  thinking about what I had written, why I had

11  written it, how I had written it, and the

12  conclusions that I had come to.

13      Q.    Okay.  How long do you think you spent

14  preparing for the deposition?

15      A.    I'm not sure what you're asking me.  Are

16  you asking me like --

17      Q.    Like the number of hours you spent of

18  prep.

19      A.    Actual hours engaged with either reading

20  or talking with the attorneys --

21      Q.    Yeah, well, let's start with the -- the

22  reading.  How long do you think you spent reading?

23      A.    Oh, probably eight to ten hours I've done

24  this month.

25      Q.    Okay.  And then -- and then how long did

CONFIDENTIAL

Page 101

1    you spend meeting with counsel?  To be clear, I
2    don't want you to reveal what you discussed with
3    counsel, just how long.
4        A.    In the month of September, maybe six or
5    eight.
6        Q.    Okay.  Do you have any staff or
7    assistance to help you write your report?
8        A.    I do not.
9        Q.    Okay.  And you wrote the report yourself
10   then, every word?
11       A.    I wrote entirely myself.  There are a
12   couple of things the attorneys told me they would
13   need, like the last couple of statements, things
14   like that, where I signed my name, where I said I
15   have the right to go back and amend the report,
16   you know.
17       Q.    And by "statements," you mean kind of the
18   verification that what you said was true and --
19       A.    Right.
20       Q.    -- I know there's a cor- --
21       A.    The legal things.
22       Q.    Yeah.  Yeah, that, that stuff.
23       A.    Yeah.
24       Q.    Okay.  So which documents did you review
25   to prepare for your deposition?

Page 102

1      A.     I reread my own report; I looked again at

2   the depositions; a lot of the stuff that came,

3   some of it even came after the report was

4   submitted, like the, I believe the Osborne and

5   Hoover rebuttals came at the end of July, and so I

6   looked those in -- in August and looked at things

7   like that in September.

8      Q.     Okay.  And then, did the Osborne rebuttal

9   or Hoover rebuttal change your opinions in any

10   respect?

11      A.     Actually, if anything, they strengthened

12   my opinion.

13      Q.     Okay.  So is -- are all the opinions that

14   are contained in your report, are those -- do you

15   intend to offer any new ones?

16      A.     Well, I don't know what the future holds,

17   but at this time I haven't seen anything to change

18   my understanding or my professional opinion.

19      Q.     Okay.  So -- so in terms of documents,

20   you only reviewed the depositions and the rebuttal

21   reports; is that an accurate --

22          MR. PISTILLI:  Objection; misstates

23   prior testimony.

24          THE WITNESS:  I also looked at various

25   reports.

CONFIDENTIAL

Page 103

1    BY MR. LEE:

2        Q.    Expert reports or ...

3        A.    No.  Just things that I had either

4    originally used or had come up since then.

5        Q.    Okay.  Anything that's not on your

6    Materials Considered List?

7        A.    I do not believe so, no.

8        Q.    Okay.  Did you take any notes on those

9    documents when you reviewed them?

10       A.    No.  I -- I typically don't take notes,

11    and I didn't take any in this case.

12       Q.    Okay.  Did you look anything up on the

13    Internet?

14       A.    I looked a great deal up on the Internet.

15       Q.    Oh, yeah?  What did you lookup?

16       A.    Much of what's on my Works Considered

17    came off the Internet.

18       Q.    Okay.  But nothing outside of your

19    Materials Considered List?

20       A.    No.

21       Q.    Okay.  So prior to this litigation, have

22    you ever done any research on social media?

23       A.    No.

24       Q.    Have you ever written any publications on

25    social media?

Page 104

1      A.     Nothing past maybe a passing reference to

2   something, but nothing ever on social media in any

3   meaningful way.

4      Q.     Okay.  And then, have you ever used

5   social media?

6      A.     Very, very rarely and very little.

7      Q.     Okay.  So have you used LinkedIn?

8      A.     Yes.

9      Q.     Okay.  Have you used Facebook?

10     A.     No.

11     Q.     Have you used Instagram?

12     A.     Very limited way --

13     Q.     Okay.

14     A.     -- occasionally.

15     Q.     What is your Instagram handle?

16     A.     It's a personal handle that is only for

17  my friends and family.  I'm not really comfortable

18  putting it in this record where it will become

19  public knowledge.

20     Q.     Well, there's a confidentiality order,

21  but that's fine.

22            Have you ever used Snapchat?

23     A.     No.

24     Q.     What about TikTok?

25     A.     No.

CONFIDENTIAL

Page 105

1     Q.    Okay.  Do you consider yourself an expert
2    in psychology or psychiatry?
3     A.    I do not.
4     Q.    Okay.  Do you consider yourself an expert
5    in mental health?
6     A.    I do not consider myself an expert in
7    mental health, but I do consider myself a person
8    who has worked extensively with large
9    organizations and many, many staff members,
10   organi- -- you know, and policies and procedures
11   and budgets around the staffing that provides
12   services for the well-being and mental health of
13   students.
14    Q.    Okay.  Do you consider yourself an expert
15   on social media platform design?
16    A.    I do not.
17    Q.    Do you consider yourself an expert on
18   addiction?
19    A.    No, I do not.
20    Q.    Okay.  All right.  Dr. Smith, what is the
21   mission of education?
22    A.    Well, I think the core mission -- there
23   is multiple missions.  The core mission, as I
24   indicated in my report, is student learning and
25   the preparation of students to walk off the

CONFIDENTIAL

Page 106

1    stage at graduation with a diploma, which doesn't

2    always happen, but it should happen, and then that

3    diploma should provide options and choices.

4            "Options" means I can look at an array

5    of possibilities in my life.  "Choices" mean that

6    I actually can legitimately choose one of them

7    because I'm well prepared to do that.

8       Q.    Okay.  Do you think school safety and

9    security is important to meet that core mission?

10      A.    School safety and security are an

11   undergirding part of the -- of the mission.  They

12   make the mission more possible when we pay

13   attention to the security and safety of students

14   and the adults who work in schools with them.

15      Q.    Okay.  And then do you think that --

16   well, that's okay.

17            Dr. Smith, do you know if Harford has

18   a Mission Statement?

19      A.    I'm sure I came across it during my

20   review of the materials, but I do not remember it.

21   I predict they do; that's what I would say.

22      Q.    Did Montgomery County have a Mission

23   Statement?

24      A.    Yes.

25      Q.    Did that Mission Statement include safety

CONFIDENTIAL

Page 107

1    and security?

2        A.    I cannot recall.

3        Q.    Do you know if Harford's Mission

4    Statement includes safety and security?

5        A.    I do not know.

6        Q.    Okay.

7            Okay.  I'd like to pull up Tab MMM.

8    So this is Exhibit No. 10.

9            (Meta-Smith-10 marked.)

10   BY MR. LEE:

11       Q.    Do you think you've seen this document

12   before, Dr. Smith?

13       A.    I do believe I have seen this document.

14       Q.    Okay.  So -- okay.  And in that top left

15   paragraph, it states "Mission," right?  And then

16   it says, "Each student will attain academic and

17   personal success in a safe and caring environment

18   that honors the diversity of our students and

19   staff."

20            Did I read that correctly?

21       A.    Yes, I believe so.

22       Q.    Okay.  And this means a part of Harford's

23   mission is to install a safe and caring

24   environment; is that correct?

25       A.    Yes.

CONFIDENTIAL

Page 108

1      Q.    Do you think that part of maintaining
2   that safe and caring environment is protecting
3   student mental health?
4            MR. PISTILLI:  Objection; scope.
5            THE WITNESS:  I think there is a
6   limited role in school systems in student mental
7   health.
8   BY MR. LEE:
9      Q.    What about social emotional health?
10     A.    Well, when we look at mental health and
11  social-emotional health, I think the easiest way
12  for me to consider it is as physical, social, and
13  psychological well-being, and the school has a
14  limited role in that circumstance.
15     Q.    Why do you see that role as limited?
16     A.    Because the core mission is student
17  learning and a first good step into the adult
18  world after high school, and so everything beyond
19  that has to be more limited.
20     Q.    Do you think that student mental health
21  is essential to learning?
22            MR. PISTILLI:  Objection; scope.
23            THE WITNESS:  That's an interesting
24  question.  I was not asked to consider that per
25  se; although, it's part of what this report is

CONFIDENTIAL

Page 109

1    about.  In my personal opinion, if I look at the
2    history of U.S. education, it's very hard to
3    understand how this all fits together.
4              I mean, between 1860 and the beginning
5    of World War I in 1914, this country doubled in --
6    or, I think it increased by 50 percent.  Went from
7    60 million people to 90 million, I believe.  You
8    could check my facts.  Those people came and went
9    to school, and then they lived through World War
10   I.  They lived through the Great Depression.  They
11   lived through World War II.  They lived through
12   the Civil Rights Movement and the upheaval of the
13   '60s.  They lived through the nuclear threat of
14   the Cold War.
15             I often question -- you asked me as a
16   professional; I'm telling you personally what I
17   think -- Can we be responsible for every child's
18   mental health?  I don't believe so.  Can we pay
19   attention to it as part of the overall culture and
20   climate of a school?  Yes, to the degree that we
21   can and should.  And then we go forward.
22             But ultimately when I send a kid out
23   of school -- and I'm being a little preachy here,
24   and I'm sorry, but you hit on something I think
25   about and I have thought about for almost

CONFIDENTIAL

Page 110

1   50 years -- there is nothing, I think, more

2   damaging to a person than to walk out into the

3   world and realize that he or she has no skills to

4   get a decent job and a good opportunity in this

5   society.  That's what deeply concerns me.

6   BY MR. LEE:

7       Q.    Do you think that student mental health

8   can limit the opportunities that are presented for

9   graduating students?

10              MR. PISTILLI:  Objection; scope.

11              THE WITNESS:  Once again, not what I

12  was asked to specifically look at, and at the same

13  time, I think anyone's mental health can limit or

14  expand opportunities depending on the specific

15  circumstance, the person.

16  BY MR. LEE:

17      Q.    Okay.  Dr. Smith, do you agree that

18  Harford's Mission Statement includes safety as

19  part of its mission?

20              MR. PISTILLI:  Objection; asked and

21  answered.

22              THE WITNESS:  I -- as I said, it's

23  clearly their -- how they define that.  I don't

24  know.

25  //

Page 111

1    BY MR. LEE:

2        Q.    Okay.  So in this document, you can see

3    there is a list of goals on the right side.  And I

4    want to zoom in on Goal No. 4.  Goal No. 4 says,

5    "Provide safe, secure, and healthy learning

6    environments that are conducive to effective

7    teaching and learning, creativity and innovation."

8              Did I read that correctly?

9        A.    Yes, that's what I see here.

10       Q.    Okay.  So there is only four goals on

11   here.  Do -- do you see that?

12       A.    I do see that.

13       Q.    And so the fact that -- or -- and it's

14   clear that one of the goals is to provide safe,

15   secure, and healthy learning environments; is that

16   correct?

17       A.    That's what I see.

18       Q.    Is protecting students' mental health,

19   would that contribute to that goal?

20       A.    I think mental health would be included

21   overall in that goal.

22       Q.    Okay.  So do you agree based on, you

23   know, this goal in Harford's mission that Harford

24   should seek to protect students' mental health?

25       A.    I think to the degree that it's

Page 112

1  appropriate for a school to be involved in that
2  conversation, they should.  And that really goes
3  to the -- first and foremost, it's going to go to
4  the culture and climate.  While school violence is
5  a terrible thing, and I would never dismiss it,
6  the daily experience of students in school is much
7  more pervasive than school violence.
8       Q.    Given the pervasiveness of social media,
9  do you think students' daily experience in school
10  is informed by social media?
11            MR. PISTILLI:  Objection; scope.
12            THE WITNESS:  Informed by social
13  media?  I don't know that I can answer that.  I
14  think their interactions with adults in school
15  buildings are the most powerful part of that.
16  BY MR. LEE:
17       Q.    Do you think that students' daily
18  experience in school is affected by social media
19  given its pervasiveness?
20            MR. PISTILLI:  Objection; scope.
21            THE WITNESS:  Seems reasonable that it
22  would have an impact on -- on individual, some
23  students, depending on the individual.
24  BY MR. LEE:
25       Q.    Okay.  You created a program as

CONFIDENTIAL

```
                                           Page 113
 1    superintendent of Montgomery County Public Schools
 2    called "Be Well 365" to promote social and
 3    emotional health; is that correct?
 4         A.    Yes.
 5         Q.    You can pull that down.
 6               Okay.  So why did you do that?
 7         A.    One of the considerations, as we were
 8    looking at our schools, was the variability in
 9    schools, and I just referenced culture and
10    climate.  And we were concerned that, while a
11    school might have a tremendous amount of social
12    activity like peer helpers and best buddies, they
13    weren't doing anything necessarily to support
14    physical well-being and -- outside of the school
15    day especially, and, you know -- or they might
16    have a program to support physical well-being, but
17    they weren't doing anything to have a systematic
18    way to respond to students who were having
19    psychological challenges; and that especially
20    involved part -- partnering with mental health
21    agencies and the county health department.  While
22    it might be a small number of students, it's a --
23    critically important for that student who needs
24    it.
25               And so what we did is an assessment of
```

Page 114

1    the entire school system to see what the

2    circumstance was across 208 schools, and then set

3    about to create a lot of information for families

4    and community members and students about these

5    areas of support we could provide to students or

6    that could be provided in the community apart from

7    us.

8        Q.    Okay.  So part of what Be Well 365 did

9    was support emotional health also?

10       A.    That was part of the -- the goal.

11       Q.    Do you think emotional health and mental

12   health are fairly similar concepts?

13       A.    Yes, in general.

14       Q.    Okay.  Do you know if the current

15   leadership of Montgomery County Public Schools has

16   continued your work with Be Well 365?

17       A.    I don't know.  I did look.  It's still on

18   the website.  But I don't know to what degree

19   they're continuing to do it.

20       Q.    Okay.  Do you know if Montgomery County

21   Public Schools considers cybersafety to be a

22   component of Be Well 365?

23       A.    It was not part of the discussion during

24   the formation of Be Well 365 necessarily.  I mean,

25   it certainly could have been a subtopic in an

CONFIDENTIAL

Page 115

1   area, certainly bullying was, and so I don't know.

2   But Be Well 365 was profoundly interrupted by the

3   COVID 19 situation we all faced, the pandemic, and

4   so I don't know what's happened with it beyond

5   that.

6        Q.   Can we pull up Tab T.

7             I'm happy to give you -- again, it's a

8   very long image.

9             But so this is the Montgomery County

10  Public Schools --

11            MR. PISTILLI:  Would you like to see a

12  paper copy?

13            THE WITNESS:  I'm okay with this.  I

14  don't think I could read the paper copy.

15  BY MR. LEE:

16       Q.   Yeah, it's tough with web pages.  They

17  don't always print correctly.

18            Anyways, this is the Be Well 365

19  landing page for Montgomery, so -- is that right?

20       A.   I'm sorry, are you asking me if-

21       Q.   Yeah, is -- does --

22       A.   Yeah, as far as I can tell from this,

23  that's exactly what it is.

24       Q.   Okay.  Can we -- let's see.  Now I'm

25  trying to read this.

CONFIDENTIAL

                                                    Page 116

1              So can we scroll down to -- just keep

2      going, keep going, keep going, and then, it's all

3      the way, yeah, a little bit further, a little bit

4      further.  It's the "Character Education and

5      Empathy."

6              So -- so do you see that this is

7      apparently a part of Be Well 365, "Character

8      Education and Empathy"?

9          A.    I do see that.

10         Q.    Okay.  And then do you see that the third

11     piece here is, "Social Media Digital Citizenship/

12     Common Sense Education"?

13         A.    I do see that.

14         Q.    Okay.  Do you know where that goes if you

15     click on that hyperlink?

16         A.    I do not know.

17         Q.    Okay.

18             All right.  Can we mark -- did we mark

19     that?  I think we need to mark that as Exhibit 12.

20             LITIGATION TECHNICIAN:  Should be 11.

21             MR. LEE:  11.  Okay.

22             (Meta-Smith-11 marked.)

23             MR. LEE:  And then can we pull up

24     Tab U.  And let's mark that as 12.

25             (Meta-Smith-12 marked.)

CONFIDENTIAL

Page 117

```
 1   BY MR. LEE:
 2       Q.    Okay.  So --
 3                MR. PISTILLI:  Do you have paper
 4   copies for us?
 5                MR. LEE:  Yeah.
 6   BY MR. LEE:
 7       Q.    Okay.  So let us --
 8                MR. PISTILLI:  I think you ...
 9                MR. LEE:  Yeah.
10   BY MR. LEE:
11       Q.    So you see this page says "Cybersafety"?
12       A.    I do see that.
13       Q.    Do you know if this is one of the landing
14   pages from the Be Well 365 website?
15       A.    I -- I assume it is.
16       Q.    Okay.  And this says, "MCPS is dedicated
17   to ensuring the safety of all students and staff."
18                Is that correct?
19       A.    Yes.
20       Q.    Okay.
21                Can we scroll down just a little bit
22   so we can see the top part and then get the -- the
23   statistics in there.  Yeah, that's great.
24                Okay.  So I'm just going to read a
25   little bit of this.  It says, "According to the
```

CONFIDENTIAL

Page 118

1    U.S. Surgeon General's Advisory on Social Media

2    and Youth Mental Health, the number of teens who

3    are 'almost constantly' online has roughly doubled

4    since 2014.  In today's digital world, educating

5    students about online safety is crucial."

6                    Did I read that correctly?

7         A.    Yes.

8         Q.    Okay.  So the -- this refers to the U.S.

9    Surgeon General's "Advisory on Social Media and

10   Youth Mental Health."  Is that the document that

11   we spoke about earlier, the Surgeon General

12   advisory?

13        A.    Yes.

14        Q.    Okay.  And that's the document that you

15   said did not change your opinion?

16        A.    That document did not change my opinion

17   or my understanding.

18        Q.    Okay.  And were you aware of the

19   statistic that the number of teens who were almost

20   constantly online has roughly doubled since 2014?

21        A.    I have seen that statistic.

22        Q.    Okay.  And that doesn't change your

23   opinion either?

24        A.    No, it has not changed my opinion.

25        Q.    Do you agree with the statement, "In

Page 119

1    today's digital world, educating students about

2    online safety is crucial"?

3        A.    I think it's an important part of the

4    overall experience students have in school because

5    the digital world is pervasive.

6        Q.    Okay.

7            Let's see.  So in that first statist-

8    -- or, percentage, really, over there it says,

9    "95% of teens have access to a smartphone, while

10   90% have access to a computer."

11           Have you seen that statistic before?

12       A.    Yes, I have seen that statistic before.

13       Q.    Okay.  And that doesn't change anything

14   about your opinion?

15       A.    Does not change my understanding of

16   anything that I've looked.

17       Q.    Okay.  And then the statistic to the

18   right, it says, "95% of children ages 13-17 report

19   using a social media platform."  I'll note that

20   the source is Pew Research Center.

21           So have you -- are you familiar with

22   that statistic?

23       A.    I believe I have seen that before, yes.

24       Q.    Okay.  And so that's generally consistent

25   with what you described as pervasive social media

CONFIDENTIAL

Page 120

1    use?

2              MR. PISTILLI:  Objection; misstates

3    prior testimony.

4              THE WITNESS:  Yes.

5    BY MR. LEE:

6        Q.    Okay.  And then, this third statistic is

7    "50% of teens say they use the Internet 'almost

8    constantly.'"

9              I'm -- you've probably seen this

10   statistic before?

11       A.    I think so.

12       Q.    Yeah, okay.

13              And you considered it when you drafted

14   your report?

15       A.    I did.  It was out -- these things are

16   outside the scope of the report and what I was

17   asked to do, but I believe I came across all of

18   them when I was looking at the information.

19       Q.    Okay.  I don't know if I agree with that,

20   but that's okay.

21              So this is -- this must have been

22   published after you were no longer superintendent

23   of Montgomery County; is that correct?

24       A.    2023.  That would be correct.

25       Q.    Right.

CONFIDENTIAL

Page 121

1          And that's because it includes the

2    U.S. Surgeon General report -- or, advisory and a

3    number of 2023 statistics; is that correct?

4        A.    That appears to be what is here, yes.

5        Q.    So do you know if Montgomery County

6    Public Schools is a part of this litigation?

7        A.    I believe I have heard that they are.

8        Q.    Okay.  If you were in charge of

9    Montgomery County Public Schools, would you advise

10    them not to participate in this litigation?

11        A.    I would advise them not to participate in

12    this litigation.

13        Q.    Okay.  Have you ever participated in any

14    other litigation based on an elected -- have you

15    ever been a part of a litigation based on an

16    addictive product on behalf of Montgomery County

17    Public Schools?

18        A.    Not to any recollection I have, no.

19        Q.    Were you aware of Montgomery County's

20    participation in the Juul class action lawsuit?

21        A.    If Montgomery County participated in the

22    Juul class action lawsuit, then that means the

23    general counsel directly defied what I said to him

24    prior to the COVID -- and what he told me is that

25    we -- he didn't think we should.  And I said,

CONFIDENTIAL

Page 122

1    Good, I agree with you.  And that was the end of

2    the conversation.

3         Q.    Who was general counsel?

4         A.    Josh, what's his last name?  Just left

5    me.  I worked with him for four years.  Josh

6    Civin.

7         Q.    Okay.  And so why did you tell him to not

8    participate in the litigation?

9         A.    I started working in schools in 1980, and

10   we had a smoking area in 1980.  In 1986 or '87,

11   Washington state, as a principal, I think, I was

12   asked to -- to chair a citywide in Richland,

13   Washington, committee on whether or not we should

14   get rid of the smoking area at our high schools.

15            Virtually all high schools, the vast

16   majority, had a smoking area at that time.

17   Smoking has been a part of schools since the very

18   first day I walked into a school.  And I could see

19   no reason why we would get involved in the issue

20   of smoking with a company.  It's not part of the

21   core mission.  It's not part of what you do as a

22   school system.

23         Q.    So were you in favor of removing the

24   smoking area or ...

25         A.    Well, actually, it's an interesting

```
                                        Page 123
 1   question.  The state of Washington outlawed
 2   smoking on public property in the middle of the
 3   study, so it took the question away.
 4        Q.    Well, what was your opinion on it at the
 5   time?
 6        A.    I had mixed emotions.  Smoking in a
 7   school was a management problem, not a health
 8   problem.  Because the school sat in a suburban
 9   area, and I am not exaggerating, I had many, many
10   disruptions to my day as an assistant principal
11   and then a principal from kids smoking in people's
12   shrubbery in the suburban houses surrounding this
13   large high school and -- middle of the high
14   school.
15             So it was -- it's a health problem;
16   it's a management problem; it's a lot of things,
17   so ...
18        Q.    So did -- that management problem led to
19   loss of time?
20        A.    Yes, it led to a loss of time.  It also
21   led to problems for the neighbors.  That was the
22   bigger issue is their concern.
23        Q.    Okay.  And then, did you experience any
24   of these issues with Juul?
25        A.    I don't -- I can't speak to that.  What
```

Page 124

1    we had were, we'd have kids occasionally smoke in

2    restrooms or other areas they didn't think they

3    would be identified in schools.

4         Q.    Okay.  Are you aware that Montgomery

5    County claimed that it was forced to expend

6    operational costs to step up its efforts in

7    tobacco control as a result of Juul?

8         A.    I wasn't aware that Montgomery County was

9    included in the lawsuit, so I wasn't aware of any

10   of it.

11        Q.    Did you ever conduct any antismoking or

12   vaping programs?

13        A.    I'm sure there were some part of our

14   health program from the state and from each of the

15   school systems I've worked in since my earliest

16   career days.

17        Q.    Okay.  And where did the funding for

18   those come from?

19        A.    They came -- I suppose there were some

20   grants at different times, but primarily they came

21   from the operating budget, the funding we were

22   given from the state and -- and local governments.

23        Q.    Okay.  Do you know if any of them came

24   from litigation?

25        A.    I don't know whatever happened to this

CONFIDENTIAL

Page 125

1    particular litigation, so I can't speak to that.

2        Q.    Are you aware that big tobacco companies

3    were alleged to have committed fraud because they

4    hid the dangers of smoking from the public?

5        A.    That wasn't really part of what I

6    looked at for this report.  I'll tell you,

7    personally, I did hear that over the years.

8        Q.    Are you aware that plaintiffs in this

9    case allege that social media companies committed

10   fraud by hiding the dangers of their addictive

11   products from the public?

12       A.    I have --

13           MR. PISTILLI:  Objection; foundation.

14           THE WITNESS:  -- I have seen that in

15   materials I reviewed.

16   BY MR. LEE:

17       Q.    Okay.  Are you aware that former Facebook

18   employees testified to Congress in 2020 that "We

19   took a page from Big Tobacco's playbook, working

20   to make our offering," meaning Facebook,

21   "addictive at the outset"?

22           MR. PISTILLI:  Objection; scope.

23           THE WITNESS:  Yeah, I don't -- I don't

24   know that I've ever seen that.  I did see, in the

25   document you shared with me earlier,

CONFIDENTIAL

Page 126

1    whistleblowers in that document, so ...

2    BY MR. LEE:

3         Q.    Okay.  Were you aware that the

4    whistleblowers were -- testified to Congress under

5    penalty of perjury, as you are today?

6                   MR. PISTILLI:  Objection; scope.

7                   THE WITNESS:  I'm thinking if I had

8    ever heard that before, and I don't -- I don't

9    know.  I didn't -- it wasn't part of what I looked

10   at.

11        Q.    Okay.

12                  Can we pull up Tab NNN.  Okay.  So

13   this is Exhibit 14.

14                  VIDEO TECH BILY:  13.

15                  MR. LEE:  13.  Ahead of myself again.

16                  (Meta-Smith-13 marked.)

17   BY MR. LEE:

18        Q.    So this is testimony by Tim Kendall to

19   the House Committee on Energy and Commerce.

20                  Do you see that?

21        A.    I do see that.

22        Q.    Okay.  And then, let's look at -- can we

23   go to the fifth paragraph, "My path ..."

24                  So I'm going to read a little bit.

25                  It says, "My path in technology

CONFIDENTIAL

Page 127

1    started at Facebook where I was the first Director

2    of Monetization.  I thought my job was to figure

3    out the business model for the company, and

4    presumably one that sought to balance the needs of

5    its stakeholders - its users, its advertisers, and

6    its employees.  Instead, we sought to mine as much

7    human attention as possible and turn into

8    historically unprecedented profits."

9              Did I read that right?

10   A.    Yes.

11   Q.    Okay.  And, continuing, "To do this, we

12   didn't simply create something useful and fun.  We

13   took a page from Big Tobacco's playbook, working

14   to make our offering addictive at the outset."

15             Did I read that correctly?

16   A.    That is correct.

17   Q.    Okay.  Do you think that the director of

18   monetization at Facebook, the first one, would

19   presumably have some insider knowledge about

20   Facebook?

21             MR. PISTILLI:  Objection; foundation,

22   scope.

23             THE WITNESS:  It's totally outside the

24   range of what I was asked to think about, look at,

25   write about, so I don't -- I don't have an opinion

CONFIDENTIAL

Page 128

1    about what this person said; that it has any

2    bearing on what I came here to talk about today.

3    BY MR. LEE:

4        Q.    Okay.  So if a person tells you that

5    they're going to do something, is that

6    demonstrative that they intended to do that thing?

7            MR. PISTILLI:  Object to the form.

8            THE WITNESS:  Well, hypothetically

9    speaking, I would need to have a lot more

10   information to really know what the circumstance

11   is here.

12   BY MR. LEE:

13       Q.    Okay.  Is it fair to say that you didn't

14   consider this information in forming your report?

15       A.    This information was not part of my

16   report.

17       Q.    Okay.  Do you agree that addictive

18   products should be carefully marketed to youth?

19            MR. PISTILLI:  Objection; scope.

20            THE WITNESS:  My question would be:

21   Do I agree that addictive products should be

22   marketed and to what degree and how addictive and

23   to whom?  And I -- it just has a myriad of

24   questions.  And we know there are a lot of

25   addictive products on the market.  So it's -- it's

CONFIDENTIAL

Page 129

1  not part of the range of what I was asked to talk
2  about, write about, think about it.  It's a big
3  question.
4  BY MR. LEE:
5      Q.    Well, in your experience as a school
6  administrator, surely you dealt with addiction
7  crises at some point or another, didn't -- did you
8  not?
9              MR. PISTILLI:  Objection; foundation.
10             THE WITNESS:  Students being addicted,
11 adults being addicted, I've experienced that as a
12 school administrator.
13 BY MR. LEE:
14     Q.    Okay.  Like what about cigarette
15 addiction, we spoke a little bit about that
16 earlier, did you feel that cigarettes should be
17 marketed carefully to youth?
18     A.    It's very far outside the range of what
19 I was asked to talk about today, so I don't really
20 have opinions formulated right now about that that
21 I would -- could share with you.
22     Q.    Do you think the marketing of cigarettes
23 affected schools, in your experience as a
24 superintendent?
25             MR. PISTILLI:  Objection; scope.

CONFIDENTIAL

1          THE WITNESS:  It's not something I've
2    ever actually thought about, the marketing of
3    cigarettes, I truly haven't.
4    BY MR. LEE:
5         Q.    Did you discourage students in your
6    school systems to not smoke cigarettes?
7         A.    We strongly discouraged them from smoking
8    cigarettes on campus, and we offered health
9    curricula to promote good lifestyle habits that
10   would include not smoking.
11        Q.    Okay.  And why did you offer that health
12   curricula?
13        A.    For a number of reasons.  It's mandated
14   by the state you live in typically, like it is in
15   Maryland.  Typically, we want students to make
16   good choices, and at the same time, ultimately
17   those are their choices as they grow older; and
18   they can still make those choices.  And so we just
19   give them the information, and it's up to them.
20        Q.    Dr. Smith, do you have any children?
21        A.    I have five children.
22        Q.    How old are they?
23        A.    They range from 35 to 43.
24        Q.    Okay.  So they -- social media probably
25   was not a large part of their life, given the age?

CONFIDENTIAL

Page 131

1        A.        ▮▮▮▮    graduated in 2009, and he was the

2    last one.  So it was less available by the time he

3    graduated from high school, although ...

4        Q.    Do you have any grandchildren?

5        A.    I have eight grandchildren.

6        Q.    Congratulations.

7        A.    Thank you.  It's a good thing.

8        Q.    Yeah.

9            Do your grandchildren use social

10    media?

11        A.    The oldest one, who is -- just turned 16,

12    on a very limited basis.

13        Q.    Why on a limited basis?

14        A.    Well, without getting deeply into my

15    family, her parents are divorced.  My daughter is

16    married to her father.  And the parents, the

17    mother and the father, have different views.  So

18    they have different requirements for phones.

19    That's really all it is.

20        Q.    Do you have an opinion on whether that's

21    a good thing or a bad thing?

22        A.    What thing?

23        Q.    Limiting the use of a phone.

24        A.    I think that I have an opinion that you

25    are very aware and limit everything your children

CONFIDENTIAL

Page 132

1    do if necessary.

2        Q.    Do you think limiting the amount of

3    social media children consume is appropriate?

4            MR. PISTILLI:  Objection; scope.

5            THE WITNESS:  Once again, it's not

6    what I was asked to write about.  Personally, I

7    would say it depends on the child.

8    BY MR. LEE:

9        Q.    "Depends on the child," meaning -- what

10   do you mean by that?

11       A.    Their activities, their interests, what

12   they naturally are inclined to do.

13       Q.    What kind of social media do your

14   grandchildren use?

15       A.    I have no idea.

16       Q.    Fair enough.

17            Okay.  Do you limit screen time when

18   you're with your grandchildren?

19       A.    For them or for myself?

20       Q.    I guess both.

21       A.    No, I don't use screens a lot, and

22   usually we're doing something else.

23       Q.    Okay.  All right.

24            Can we pull up the report, Exhibit 2,

25   Page 51, Paragraph 182.

CONFIDENTIAL

```
                                              Page 133
 1              Okay.  So in this paragraph, in -- are
 2      you -- are you on 182?
 3          A.    I am.  Thank you.
 4          Q.    Yeah.  So you talk a little bit about an
 5      email exchange from October 19th, 2021; is that
 6      right?
 7          A.    I see that, yes.
 8          Q.    Okay.  And then it's -- I'll -- just let
 9      me read that last paragraph, because I'm sure
10      you're aware of what you wrote in your report, but
11      "The implied concern about where Mr. Spence might
12      'go with the narrative' suggests that the system
13      wanted to provide parents with a particular
14      viewpoint, rather than provide them with accurate
15      information from a person who spends every day
16      with students, understands what is actually
17      happening in schools, and who will say, 'it's the
18      minority of students who don't use social media
19      properly...'  While offering a parent information
20      session on any topic can be worthwhile, it is
21      critical that school systems give accurate
22      information that reflects the complexity and
23      nuance inherent in a topic rather than a preferred
24      narrative."
25              Did I read that correctly?
```

CONFIDENTIAL

Page 134

1      A.    You did.

2      Q.    So are you -- it -- are you implying that

3  Harford tried to suppress what Mr. Spence had to

4  say about social media?

5      A.    It says here "Brad" Spence "is an

6  advocate of social media, though - he will say

7  it's the minority of students who don't use social

8  media properly...  just so you know where I think

9  he'll go with the narrative.  Other administrators

10  who come to mind in terms of social media, only

11  come to mind because they're active on social

12  media; not that they are using it strategically."

13           I was reacting purely to what the

14  content of the email said --

15      Q.    Okay.

16      A.    -- which is "I may not choose this person

17  to speak because we may not like what he says."

18      Q.    So do you know if Harford ended up

19  creating the video that's --

20      A.    I have no --

21      Q.    -- referenced?

22      A.    -- idea.  I don't -- I don't know.

23      Q.    Okay.  Can we go to the report at 57,

24  Paragraph 198.

25      A.    Paragraph 198?

CONFIDENTIAL

Page 135

1          Q.    Yeah.

2                If we could just scroll down.

3     Actually, there is, I think it's a screenshot, on

4     Page 58.  You see it starts with "The HCPS Parent

5     Academy"?

6          A.    Yes.

7          Q.    Yeah.  So you reviewed this statement.

8     And I believe this was from the Harford Plaintiff

9     Fact Sheet.

10               Does that sound right?

11         A.    That sounds correct.

12         Q.    Okay.  And then you can see the third one

13    says, "Parent Academy Real Talk: Social Media ..."

14    and it has a YouTube link; is that correct?

15         A.    That is correct.

16         Q.    Okay.  Did you watch that YouTube video?

17         A.    I did not watch that YouTube video.

18         Q.    Okay.

19               So let's pull up the video, which I

20    pulled off of YouTube from that link.  This is

21    Tab VVV.  And I'll represent to you it was posted

22    on November 18th, 2021, so about a month after the

23    email that we discussed earlier.

24               So we can just start playing it.

25               (Video played.)

CONFIDENTIAL

Page 136

1          MR. LEE:  Can we pause.

2    BY MR. LEE:

3        Q.    Okay.  So did you see that Mr. Brad

4    Spence is introduced here as a speaker on this, I

5    guess, panel?

6        A.    Yes, I do see that.

7        Q.    Okay.  And Mr. Spence is the gentleman

8    who is referred to as the -- in the email from

9    Jillian Lader to Mary Beth Stapleton?

10       A.    I do see that.

11       Q.    Okay.  And then -- and then you saw that

12   Mary Beth Stapleton is the moderator of this

13   panel?

14       A.    Yes, I do see that.

15       Q.    Okay.  So would it be accurate to say

16   that Mr. Spence was, in fact, allowed to give his

17   opinion on social media, it appears?

18          MR. PISTILLI:  Objection; foundation.

19          THE WITNESS:  It would be accurate to

20   say he was allowed to give his opinion, but what I

21   was reacting to here is the other staff members,

22   not him at all.  I had no interest in him.  I was

23   reacting to two staff members discussing whether

24   or not they would like what he would say.  That's

25   a particularly important point in a school system.

CONFIDENTIAL

Page 137

1   BY MR. LEE:

2       Q.    Okay.  So -- so those two staff members,

3   you know, were considering whether they liked what

4   he would say, but they ultimately allowed him to

5   say what he wanted to say?

6              MR. PISTILLI:  Objection; foundation.

7              THE WITNESS:  I -- there's no way for

8   me to know why he's on the panel.  Either they

9   could have allowed it or someone else could have

10  allowed it or -- I have no way of knowing that.

11  BY MR. LEE:

12      Q.    Well, you don't think that the email

13  implies that because he's knowledgeable about

14  social media that is why he is on the panel?

15      A.    I think the email implies that he's the

16  most in touch, or whatever word/phrase you want to

17  use, but that they have concerns about what he

18  might say; and then, later on, we see four

19  activities between 2017 and 2025, and he's engaged

20  to one of them.

21      Q.    Okay.  And are assistant principals

22  generally the primary speaker for a school

23  district or for a school system?

24      A.    Depends --

25              MR. PISTILLI:  Object to form.

Page 138

1          THE WITNESS:  -- entirely on the
2    circumstance.  They might be.  It's not unusual to
3    have assistant principals present in meetings,
4    public community forums, school board meetings.
5    BY MR. LEE:
6        Q.    Did you gather from this video that
7    Harford is attempting to portray social media in
8    an entirely negative light?
9        A.    I -- I didn't see much of the video, but
10   I didn't hear anything that would cause me to
11   think that.
12       Q.    Okay.  And was this before, during, or
13   after the pandemic?
14       A.    This Parent Academy was August 17th,
15   2022, so typically you would think it's after the
16   pandemic; although, people are still wearing masks
17   in this video.  20 -- that would be the '22-'23
18   school year that was starting, so depends on what
19   each individual thinks if the pandemic was over or
20   not.
21       Q.    No, that's fair.
22       A.    Yeah.
23       Q.    Okay.
24            Can we go to the 2 minute and 39
25   second mark and then press Play.

CONFIDENTIAL

Page 139

```
 1              (Video played.)
 2              MR. LEE:  Okay.  Hit Pause.
 3  BY MR. LEE:
 4      Q.    So, Dr. Smith, did you hear Mr. Spence
 5  discuss both the benefits and the drawbacks of
 6  social media in this snippet?
 7      A.    Yeah, I don't really understand what he's
 8  saying, but I think that is accurate.  It's -- you
 9  know, there's both positive and negative, he's
10  saying.  But it's, once again, well outside the
11  scope of what I was asked to look at or know
12  about, frankly.
13      Q.    Well, Dr. Smith, this YouTube link was
14  not only included in the Plaintiff Fact Sheet but
15  it was included in your report.  You took a
16  screenshot of it.  So I think it's well within the
17  scope of your opinion.  I think this is the kind
18  of internal document that, you know, you were
19  asked to look at, and it appears that you
20  didn't --
21              MR. PISTILLI:  Is that a question?
22  BY MR. LEE:
23      Q.    -- is that correct?  Did you look at this
24  document?  Yes or no.
25      A.    I did not look at this video, but what I
```

CONFIDENTIAL

Page 140

1    was clearly stating, if you look in response to

2    the question, there were four activities between

3    2017 and 2025.  Part of how I developed my

4    understanding of Harford County's reaction was to

5    look at the activities that were done.  That was

6    my point here.  And I -- and I even say, it was a

7    list of four events between 2017 and 2025.

8                    What those events and the content of

9    those events is not part of the scope of what I

10   was asked to look at.  It was like, Is this

11   something a school system is spending a tremendous

12   amount of time on and costing them resource, four

13   activities in eight years?

14                   And -- and maybe 2025 isn't fair.  I'd

15   have to go back and look and see when this

16   document was signed, this Plaintiff Fact Sheet.

17   But in six years, in seven years, in the life of a

18   school system, that's not a lot of information to

19   put out.

20       Q.    Do you agree that this information was

21   directly presented to parents?

22                   MR. PISTILLI:  Objection --

23                   THE WITNESS:  Anyone who --

24                   MR. PISTILLI:  -- to foundation.

25                   THE WITNESS:  -- watched this would

CONFIDENTIAL

Page 141

1    have seen this, yes.

2    BY MR. LEE:

3         Q.    Okay.

4         A.    But it wasn't part of the scope of what I

5    was asked to do is to evaluate what the panelists

6    said about this.

7         Q.    I -- so I don't - I don't want to do

8    this, but we are in a deposition.  You cannot make

9    your own scope objections.  You cannot define the

10   scope of what's in there.  I get to ask the

11   questions.  You answer them.  That's what we're

12   here to do today.

13              Do you understand that?

14              MR. PISTILLI:  No, he does not

15   understand that because you've misstated the

16   exercise.  The witness is fully entitled to tell

17   you what he was and was not asked to look at as an

18   expert, and that is what he is doing.

19              MR. LEE:  I understand that, but this

20   is a video that was in his report.  And if you

21   want to argue about it, we'll do it off the

22   record.

23   BY MR. LEE:

24        Q.    But I am here to tell you, Dr. Smith,

25   that this video was in your report.  I can ask you

Page 142

1    questions about it.  Okay?

2        A.    I do understand that.

3        Q.    Okay.  Thank you.

4        A.    And my response is, there were four

5    activities between 2017 and whenever the document

6    was signed.  If I misstated 2025, I apologize.  It

7    was purely in error.  But it was -- it's in here

8    somewhere when it was signed.

9        Q.    Did you hear Mr. Spence say that direct

10   messaging is where some of the more seedy things

11   are happening?

12       A.    I wasn't sure what he was talking about

13   specifically.  He said something about

14   front-facing.  I'm not familiar with this platform

15   at all, so there's no way for me to talk about it

16   in any meaningful way.

17       Q.    Okay.  Did you ever have any issues as a

18   school superintendent with students sending direct

19   messages to each other?

20       A.    Like Instant Messaging on your phone; is

21   that what you mean?

22       Q.    I mean direct messaging via social media.

23   It's -- yeah.

24       A.    I wouldn't know how to separate those

25   from a text message or direct message because I

Page 143

1    wouldn't have thought about it that way.  If it's

2    a message, I wouldn't necessarily have asked what

3    the vehicle was if someone sent something to

4    someone else, but I would have known it was a

5    message from one person to another.

6        Q.    Okay.  So you wouldn't have known if it

7    was sent via social media?

8        A.    Or text messaging, right.  I might have

9    known at the moment, but I don't remember that.

10        Q.    Okay.  And even though those issues don't

11    have to do with learning how to read, write, or do

12    math, the school still has to address those

13    issues, right?

14        A.    If it's something that comes up involving

15    a student or a group of students, the school has

16    to address it.

17        Q.    And that takes time?

18        A.    Depends on what the issue is.

19        Q.    Okay.

20            Let's continue the video.

21            (Video played.)

22            MR. LEE:  Okay.  Pause.

23    BY MR. LEE:

24        Q.    Okay.  So did you hear Mr. Spence say

25    that it took a lot of time to educate students on

CONFIDENTIAL

Page 144

1    these social media challenges?

2        A.    I did hear him say that.

3        Q.    Okay.  And do you have any reason to

4    dispute that it took a lot of time?

5        A.    I think my reaction to that is, as an

6    assistant principal for three years, a principal

7    for, I think, 17, that's what you do is you talk

8    to kids about whatever is current, whatever is

9    happening in the world at that moment.  You teach

10   them all the time about the world.

11           And so what he's doing, as far as I'm

12   concerned, sitting here, is he's being a -- a good

13   teacher, and I really appreciated what he said.

14   The more we taught them and worked with them, the

15   more they pulled back, realized -- and this isn't

16   specific to social media, the digital world, this

17   is what happens and is what -- no, what should

18   happen in a school every single day --

19       Q.    Okay.

20       A.    -- is what he was doing.

21       Q.    Yeah.

22           So it takes time, and it takes time

23   beyond the four videos that you mentioned?

24           MR. PISTILLI:  Object to the form.

25           THE WITNESS:  Well, I didn't mention

CONFIDENTIAL

Page 145

1  four videos.  They mentioned four videos.  All I
2  did was show what I found in the record.  You
3  know, if you look at the -- I'm sorry, what page
4  was that on?  It was one nine -- 198.  Yeah, he
5  said, "Does your district use or provide any
6  materials to students, parents, teachers, or
7  staff regarding the potential risks or adverse
8  effects of using electronic devices" --
9              (Reporter clarification.)
10             THE WITNESS:  -- "the Internet and/or
11 social media?  Choose your answer (Yes/No).  If
12 yes, provide a copy and identify the document(s)
13 responsive to this question.  Harford responded
14 'Yes' and provided a list of four events between
15 2017 and 2025."
16             That's what I was doing, is just
17 simply reciting what they said about their own
18 school system.
19 BY MR. LEE:
20    Q.    Okay.  So would you agree that, you know,
21 these conversations that Mr. Spence was having
22 with his students are not apparent from the
23 records?
24    A.    Would I agree that the conversa- -- I'm
25 trying to formulate, I mean --

Page 146

1      Q.     Yeah.

2      A.     -- your question in my head.

3             The work of the assistant principals,

4    principals, teachers would not necessarily be in

5    the record of all the many conversations they

6    have --

7      Q.     Okay.

8      A.     -- in a day.

9      Q.     Okay.  And that includes conversations

10    regarding social media, like the ones he was

11    discussing in this video?

12     A.     All of the records and every kind of

13    content you could think about would be discussed

14    between kids and adults and --

15     Q.     Yeah.  And not necessarily discussed in

16    an email or written down or recorded?

17             MR. PISTILLI:  Object to the form.

18             THE WITNESS:  Well, they certainly

19    could be in all those things.  They could be in

20    public comments to the school board, to the

21    administrators.  They could be in union

22    statements, that you would find, to the school

23    system about perceptions or experiences.  They

24    could be lots of places.

25    //

CONFIDENTIAL

Page 147

1    BY MR. LEE:
2         Q.    Dr. Smith, you heard them referring to
3    some social media challenges; is that correct?
4         A.    Did hear that, yes.
5         Q.    Do you know what those social media
6    challenges they're referring to are?
7         A.    In the record, there were conversations
8    about doing damage to bathrooms.
9         Q.    Is that the Devious Licks TikTok
10   challenge?
11        A.    I'm sorry?
12        Q.    Is that challenge called the Devious
13   Licks challenge?
14        A.    Perhaps.  I don't remember the name of
15   the challenge.
16        Q.    Okay.  Do you know if this -- did you
17   encounter this challenge when you were
18   superintendent in Montgomery County?
19        A.    I did not encounter it from -- in any way
20   intersecting with social media.  I certainly
21   encountered damage to bathrooms --
22        Q.    Okay.
23        A.    -- without a doubt.
24        Q.    But not damage to bathrooms that's
25   specifically attributed or -- I'm trying to use

                                        Page 148

1    the right words here --

2         A.    Right.

3         Q.    -- you've to a social media challenge?

4         A.    No.

5         Q.    Okay.

6                All right.  So do you know if this

7    TikTok challenge was popular before or after you

8    were superintendent?

9         A.    I do not know the answer to that

10   question.

11        Q.    Do you know if Montgomery County Public

12   Schools released a statement on this challenge?

13        A.    I do not know the answer to that

14   question.

15        Q.    Okay.  And there is a -- did you hear

16   Ms. Stanton mention that she thinks some of these

17   challenges violate the bullying and harassment

18   policy?

19        A.    Yes, I did hear her say that.

20        Q.    Did you review the bullying and

21   harassment policy?

22        A.    I did read the bullying and harassment

23   policy for Harford County Public Schools.

24        Q.    Okay.  Do you know what the policy was

25   updated?

Page 149

1     A.     I cannot remember off the top of my head.
2     Q.     Okay.  Would you be surprised to know
3  that the bullying policy was updated in 2022?
4     A.     No, I would not be surprised.  I think
5  that might be referenced in my report.  I know I
6  read it.
7     Q.     Would you be surprised to know that the
8  updates to this policy added specific reference to
9  electronic communications and cyberbullying?
10     A.     That would be typical of my experience
11  over the last 15 years.
12     Q.     Okay.
13          So can we go to the report at Page 76,
14  Paragraph 253.
15          VIDEO TECH BILY:  Counsel, did you
16  want to mark the video as 14?
17          MR. LEE:  Yes, please.  Thank you.
18          MR. PISTILLI:  Are we done with the
19  video or -- I just, it's -- we've been going a
20  while.  It's lunchtime.  I don't want to cut you
21  off if you're in the middle of something, but I
22  can't really tell if you're in the middle of
23  something or not.
24          MR. LEE:  I am in the middle of
25  something, and we can come back to the video after

CONFIDENTIAL

Page 150

1    lunch if that's --

2            MR. PISTILLI:  If you want to --

3            MR. LEE:  -- if we need to.

4            MR. PISTILLI:  -- if you want to

5    finish the video, that's fine.

6            MR. LEE:  Okay.  All right.  I'm -- I

7    am pro breaking.  Okay.

8            So can you go to the -- pull the video

9    down, and then pull -- and then mark it as

10   Exhibit 16 --

11           VIDEO TECH BILY:  14.

12           MR. LEE:  -- 14.

13           (Meta-Smith-14 marked.)

14           MR. LEE:  Numbers are really tough

15   today for me.

16           And then pull up the report, Page 76,

17   Paragraph 253.

18   BY MR. LEE:

19      Q.    Okay.  So I'm going to read a little bit.

20           It says, "Dr. Hoover also makes the

21   claim that Harford County Public Schools 'adjusted

22   student handbooks and school policies to reflect

23   the challenges posed by digital platforms.'

24   However, the only policy appearing to address

25   digital media was not updated for over a decade

Page 151

1    during the exact period the school district claims
2    social media was causing problems."
3                Did I read that correctly?
4        A.    You did.
5        Q.    And we just discussed the bullying and
6    harassment policy, and, you know, I represented
7    that was updated in 2022, and you said you
8    reviewed it.  Is that a pretty accurate summary?
9        A.    That is accurate.
10       Q.    Okay.  Do you think that the addition of
11   cyberbullying to that policy addresses digital
12   media?
13       A.    The addition -- the cyberbullying to the
14   bullying and harassment policy?
15       Q.    Yeah.
16       A.    Yes.
17       Q.    Okay.  So is it accurate that there was
18   "'the only policy appearing to address digital
19   media was not updated for over a decade'"?
20       A.    I think you could make the argument that
21   the bullying and harassment did reference digital
22   media and cyberbullying, yes.
23       Q.    Okay.  Thanks.
24                All right.  Why don't we take lunch.
25       A.    Okay.

CONFIDENTIAL

Page 152

```
 1              THE VIDEOGRAPHER:  The time is 12:52,
 2    and we are off the record.
 3              (Recess taken.)
 4              THE VIDEOGRAPHER:  The time is 1330,
 5    and we are back on the record.
 6              MR. LEE:  Okay.  So before we get
 7    started here, I just want to read from Judge Kohn
 8    -- Kong's standing order:  Deposition objections
 9    shall be as to privilege or form only.  Speaking
10    objections or those calculated to coach a deponent
11    are prohibited.
12              We've had a few conversations on the
13    record about this.  I don't think we need to talk
14    about it, but I'm stating that for the record.
15    BY MR. LEE:
16       Q.   Dr. Smith, you conducted an Antiracist
17    System Audit as superintendent of Montgomery
18    County Public Schools; is that correct?
19       A.   Yes.  We started one in the winter, right
20    before COVID is my memory, and then it was
21    disrupted by COVID, and I think it was completed
22    after I left.
23       Q.   Okay.  Would you describe that as a
24    report or analysis?
25       A.   My memory is we receive -- we had a board
```

CONFIDENTIAL

1    presentation, and then I, frankly, don't remember

2    if there was a written document before I left or

3    not.

4        Q.    Okay.  Why did you think it was important

5    to study that issue at the time?

6        A.    Actually, my deputy superintendent, who

7    was responsible to work with the chiefs, came and

8    proposed it to me and said she would like to look

9    at policies and procedures and practices across

10   the system to see if we had anything that was

11   causing systemic harm to any students based on

12   race.

13              An example of that would be that was

14   not based on race but was based on perceptions of

15   students, was we had kids who were passing the

16   high school assessment for algebra with high

17   scores, which was a graduation requirement, the

18   standalone assessment in algebra, and yet they

19   were getting a C or a D or even an F in the

20   course, and then being required to retake it.

21              So they were showing high levels of

22   proficiency, but they weren't doing well in the

23   course.  And so they were -- we were looking at

24   policies, procedures, practices, you know, all

25   activities in schools just to say, Are there

CONFIDENTIAL

Page 154

1    things like that that are systemic ways of doing

2    business that we should rethink?

3        Q.    Okay.  And so -- so that report studied

4    racism, or antiracism --

5        A.    Yes.

6        Q.    -- so it wasn't the case that racism

7    didn't exist before the report; it's just the

8    report was additional study of that issue?

9        A.    Yes.  Specific to the school system.

10       Q.    Okay.  And how much did that report cost

11   the school district?

12       A.    I'm thinking.  I believe it was in the

13   $300,000 range, I think, for that particular

14   report.  I don't remember.

15       Q.    Okay.

16             Can we pull up Tab EEE, and then I

17   guess this will be Exhibit No. 16?

18             VIDEO TECHNICIAN:  15.

19             MR. LEE:  15.

20             (Meta-Smith-15 marked.)

21   BY MR. LEE:

22       Q.    Okay.  So do you recognize this as the

23   document that ultimately came of that study?

24       A.    Well, I don't actually, because it came

25   in 2022, but I accept that it is --

CONFIDENTIAL

Page 155

1     Q.    Okay.

2     A.    -- without any problem.

3     Q.    Did you approve the funds to conduct this

4  study?

5     A.    Actually, the school board had to approve

6  the funds.

7     Q.    Okay.

8     A.    That's the way it works.

9     Q.    Did you object to approving the funds?

10    A.    No.

11    Q.    Okay.

12    A.    My deputy superintendent, as my designee,

13  made the res- -- the recommendation.

14    Q.    And you accepted that recommendation?

15    A.    I did.

16    Q.    Okay.

17          All right.  I just want to flip to the

18  second page.  Let's go to the disclaimer at the

19  bottom here.

20          Okay.  And so in the last sentence of

21  that first paragraph it says, "MCPS paid $454,680

22  to MAEC to conduct the" antiracism -- "Antiracist

23  System Audit through a board-approved

24  expenditure."

25          Did I read that correctly?

CONFIDENTIAL

Page 156

1        A.    I'm sorry, what page are you on?

2        Q.    Oh, it's the second page, the disclaimer.

3    If you just flip --

4        A.    Oh, okay --

5        Q.    -- over.

6        A.    -- I'm on the wrong page.

7        Q.    Yeah.  It might be easier to see on the

8    screen.

9        A.    I'm sure it will be.  Thank you.

10            Now I see it, yes.

11       Q.    Yeah.

12       A.    Okay.  Got it.

13       Q.    Yeah.  So you said -- you know, you gave

14   an estimate, and it's fine that you didn't

15   remember --

16       A.    Yeah.

17       Q.    -- but this is a little bit higher than

18   that.  It's about $450,000.  That's close to half

19   a million dollars.  Does that sound right?

20       A.    That is what it says it was paid, yes.

21       Q.    Okay.  Did you also commission a report

22   from --

23            MR. LEE:  You can pull that down.

24   BY MR. LEE:

25       Q.    -- from WilmerHale entitled:  Addressing

CONFIDENTIAL

Page 157

```
 1    Supervision Structures for Athletics and
 2    Extracurricular Activities, Including Reporting
 3    Protocols for Bullying and Hazing?
 4        A.    We did have a report --
 5        Q.    Okay.
 6        A.    -- from WilmerHale on that topic, yes.
 7        Q.    Okay.  And what was the incident that
 8    caused you to commission that report?
 9        A.    There was an incident in a high school
10    locker room where some students said that they
11    were sexually assaulted by other students and
12    there was no adult in the locker room for almost a
13    half hour.
14        Q.    Okay.  And we talked about an alleged
15    sexual assault earlier.  Was -- did this one
16    actually happen, or do you know?
17        A.    I -- I do not know because it was
18    reported to the police the next morning after it
19    allegedly happened during football practice or
20    preparation for football practice, and the police
21    never shared any medical reports with me, any
22    police reports with me, as is the custom.  That's
23    how it's typically done.  And so I never saw any
24    of the evidence.
25              So I certainly am not debating that
```

Page 158

```
 1   it -- it did or didn't happen.  It just, I wasn't
 2   involved.
 3        Q.    Okay.  Do you believe bullying and hazing
 4   are elements of school culture?
 5        A.    I believe they are often present in
 6   schools, as well as lots of other things and lots
 7   of other places.
 8        Q.    Would you describe the alleged sexual
 9   assault as negative for school culture?
10        A.    I think it's very negative, yes.
11        Q.    Okay.  And is that why you commissioned
12   this report?
13        A.    I was particularly concerned that we had
14   25 high schools, and suddenly we had a locker room
15   that was not covered.  My -- my interest was
16   supervision.  It's extremely serious when adults
17   don't do what they're supposed to do.
18        Q.    And how much did this report cost?
19        A.    I don't remember, but I'm sure in the
20   same range as this one.
21        Q.    Okay.
22        A.    I don't --
23        Q.    So about a half a million dollars?
24        A.    I -- I would expect so.  I don't
25   remember.
```

CONFIDENTIAL

Page 159

1    Q.    Okay.  Do you think it was more or less?

2    A.    I don't --

3    Q.    Okay.  That's fine.

4    A.    -- I really don't know.

5    Q.    That's fine.

6    A.    Yeah.

7    Q.    Okay.  Dr. Smith, proportionally how much

8    larger is the Montgomery County Public Schools'

9    budget than the Harford County Public Schools'

10   budget; do you know?

11   A.    At the time I left, the Montgomery County

12   Public Schools' budget was 2 point -- between 2.7

13   and $2.8 billion.  I don't remember what the

14   Harford budget was in the 2021 school year.  I'd

15   have to look at that.

16          If you look at another way to measure

17   it, there are 165,000 students, when I was in

18   Montgomery County, it dropped to under 160 during

19   COVID.  Harford had about 39,000 students, I

20   think.  It goes up 40 -- 40 and a half, 39, 38 or

21   so, in that range, so four times by the number of

22   students.

23   Q.    Yeah.

24          Well, let's pull up Tab LL.

25   A.    Okay.

CONFIDENTIAL

Page 160

1      Q.     And mark as Exhibit 16.

2             (Meta-Smith-16 marked.)

3   BY MR. LEE:

4      Q.     There you go.

5             So this is -- we are on Page 18 of

6   the PDF, which is actually, I'm trying to find

7   the -- the correct number, but it's Table 10, so I

8   believe in the internal pagination that's Page 12.

9             Okay.  So have you seen one of these

10  documents before?

11     A.     Yes, many times.

12     Q.     Okay.  And this was published by MSDE; is

13  that correct?

14     A.     That is correct.

15     Q.     Okay.  And they're an accurate source of

16  data about schools?

17     A.     Yes, within reason.

18     Q.     Yeah.

19     A.     I mean, they're always updated, but, yes,

20  they're not -- there's never any effort to not be

21  accurate with --

22     Q.     I understand.

23     A.     -- with the State Department of

24  Education.

25     Q.     Okay.  So do we see Harford -- it's in

CONFIDENTIAL

Page 161

1    that third grouping, yeah, right there.

2              So the current total expenditures,

3    that's $534,585,939; is that correct?

4        A.    That's correct.

5        Q.    Okay.  And then Montgomery is in the next

6    grouping at the top, and that's 2,804,198,964.

7    So, you know, that's -- proportionally how -- how

8    much larger is that?

9        A.    It's about five times the money, is a

10   little over five times greater.

11       Q.    Okay.  And you said earlier, or your best

12   recollection is that Montgomery had about four

13   times as many students as Harford?

14       A.    Yes --

15       Q.    Okay.

16       A.    -- because Montgomery gets more per

17   student than Harford.  That's how that's

18   figured --

19       Q.    Okay.

20       A.    -- from the local government.

21       Q.    Okay.  Do you think it's -- so the -- or,

22   sorry, there's a couple of places in your report

23   where you state there's a lack of data regarding

24   Harford and social media; is that correct?

25       A.    I think what I state is there is a lack

CONFIDENTIAL

Page 162

1    of information regarding the impact of social
2    media on student mental health, therefore
3    increasing costs.  That's the point of my report.
4        Q.    So -- so you're saying that there's --
5    and, you know, feel free to help me out here, but
6    it's just, you're saying that there was a lack of
7    a study or something of that nature to link social
8    media to higher costs?
9               MR. PISTILLI:  Objection.
10   BY MR. LEE:
11       Q.    Is that accurate?
12       A.    What I'm saying is that there is not
13   very -- not very much information in Harford's
14   record about their work around social media and
15   how that -- and student mental health and how that
16   increased the cost to the system to do that work.
17   That's what their case is, is my understanding.
18       Q.    Do you think that for smaller school
19   districts with smaller budgets it's more difficult
20   financially to study issues as they arise?
21       A.    That is another complex question, because
22   on one hand you may have -- even if you have a
23   smaller per-pupil allocation, you have overall
24   larger budget.  On the other hand, if you have a
25   smaller number of students, you have greater

CONFIDENTIAL

Page 163

1  access and the ability to gather information is

2  significantly less cumbersome to do.  And,

3  actually, a lot of the things that can be done

4  don't add any significant amount of money to do

5  research.

6       Q.    Can you give me some examples?

7       A.    Sure.  Seating a committee on the

8  impact of -- of the smoking area on a high school,

9  that -- it costs one of your administrators or a

10 teacher/leader or whoever you -- one of

11 your -- head of your health program, nursing

12 program, some time to do meetings, to do

13 activities with a group of people, to sit, discuss

14 it, come out with some recommendations, and then

15 implement those recommendations.

16            It may have a cost, which you go to

17 your school budget and you start adding those and

18 you start justifying to your school board and

19 funders why you need the additional funds to do

20 it.  So it just depends on what --

21      Q.    Did Harford --

22      A.    -- it is.

23      Q.    Sorry, I didn't mean to cut you off.

24            Did Harford create a committee to

25 study cell phone use?

CONFIDENTIAL

Page 164

1       A.    It was my understanding they created a
2   committee to study cell phone use in anticipation
3   of looking at their policy.
4       Q.    Okay.  Was that before or after the
5   litigation?
6       A.    I think it was pretty simultaneous.
7   They -- I think they changed the policy in '24, is
8   my memory.
9       Q.    But when did the committee start?
10      A.    The -- I think it was the year before.
11      Q.    Okay.
12      A.    I probably have it listed.  It was all
13  kind of simultaneous and -- and could have even
14  started in early '22.  School boards work very,
15  very slowly, so ...
16      Q.    Okay.  So is it possible that if Harford
17  received funding to study the social media issue
18  more closely, that it could find data?
19               MR. PISTILLI:  Objection.
20               THE WITNESS:  I'm not really sure how
21  to answer that question.  I do think it's worth
22  noting that both Harford, Montgomery, and every
23  other school system in this country had tremendous
24  amounts of additional funding at the time because
25  of the COVID Relief Acts.  I think there were four

CONFIDENTIAL

Page 165

1   of them that passed.

2            And so there was money to look at lots

3   of different things around facilities and student,

4   they called it, learning loss, I say you can't

5   lose something you didn't get, and student -- the

6   effects of COVID on student mental health.  All of

7   those things were allowable, in one way or

8   another, with all of that money.

9   BY MR. LEE:

10      Q.    Was there money allocated to study the

11  effect of social media on student mental health in

12  the COVID Relief funds?

13      A.    Was -- it was money to support student

14  mental health.  It wasn't -- you know, you could

15  use it about mental health, and then you might ask

16  the question, What's the precipitating factor here

17  with mental health?  So that we can get the best

18  solution.  And -- because it was widely believed

19  that COVID was the precipitating factor in all of

20  this discussion about mental health.

21      Q.    And social media existed before COVID?

22      A.    Yes.

23      Q.    Okay.  And given that you commissioned an

24  Antiracist System Audit in 2022, you know, and, as

25  you said, racism did exist before then, is it

```
                                              Page 166
 1   possible that social media addiction existed prior
 2   to any study --
 3                 MR. PISTILLI:  Object to the form.
 4   BY MR. LEE:
 5        Q.    -- of it?
 6        A.    Well, actually, I didn't commission the
 7   study in 2022.  We started it in, I think, 2019.
 8   I'd have to go back and look.  It was shortly --
 9   it was within the year before COVID.
10        Q.    Okay.
11        A.    And that was completed in 2020 -- 2022,
12   excuse me, according to the document you shared
13   with me.
14               And while racism existed before this
15   study and social media existed before COVID, I
16   cannot say that social media addiction existed,
17   because I still am not clear on if it does exist,
18   and it was not in the scope of what I was asked to
19   do here.
20        Q.    Yeah.
21        A.    So those are just my opinions.
22        Q.    Well, it could have existed, I mean, just
23   in a practical sense.
24        A.    I --
25                 MR. PISTILLI:  Object to the form.
```

CONFIDENTIAL

Page 167

1          THE WITNESS:  -- I won't disagree

2    with you on that or agree with you on that.  I'll

3    just -- that, you know ...

4    BY MR. LEE:

5        Q.    Okay.  Can we go back to Exhibit -- or,

6    wait, hold on.  Let me ask some questions.

7             So, Dr. Smith, in your report, you

8    note the expansion of administration in school

9    districts across the country; is that right?

10       A.    I did note that, yes.

11       Q.    And do you feel that money spent on

12   administration is poorly spent?

13       A.    I would not say that it was either a poor

14   expenditure or a beneficial expenditure, because

15   it would be very specific to how it was spent,

16   where it was spent, why it was spent, because the

17   variability under -- of all 13,800, or whatever

18   number there is right this minute, school systems,

19   the number of administrators they have varies

20   widely across the state, across the nation.  It's

21   an amazing level of variability, or at least there

22   was -- it was throughout my whole career.  I can't

23   speak to the last couple of years.

24       Q.    Is it your opinion that Harford has

25   overspent on administration?

CONFIDENTIAL

Page 168

1        A.    I would have to look at information to

2    know or understand --

3        Q.    Do you --

4        A.    -- a lot more information that I've seen

5    about what their administrative load is and what

6    they do and how they code things, you know.

7        Q.    So sitting here today, you don't have an

8    opinion on whether Harford has overspent on

9    administration?

10        A.    What I shared in my report, and I think

11    it is salient, is overall administration has

12    increased in schools.  And I think much of what I

13    wrote was in response or in thinking about

14    Dr. Osborne's assertion that administrators

15    couldn't do their jobs because they were

16    overwhelmed by issues of social media in schools.

17        Q.    So that would apply generally to schools

18    but not specifically to Harford?

19        A.    Well, it would depend on what Harford

20    terms an administrator, how that person does their

21    job, and what they actually do each day.

22        Q.    Right.  But sitting here today, you

23    don't -- you aren't expressing the opinion that

24    Harford overspent on administration?

25        A.    I am not expressing that opinion --

CONFIDENTIAL

Page 169

1      Q.    Okay.  Thank --

2      A.    -- today.

3      Q.    -- you.

4            Do you know if proportionally
5    Montgomery County spent more on administration per
6    pupil than Harford and in 2020 to 2021?

7      A.    I would predict that we did; although,
8    that's hard to know because of scale.  But
9    Montgomery has a history of spending a lot of
10   money on administration.  But you have a very
11   large system, so it's hard to know, and -- and
12   historically a high level of money per student in
13   Montgomery.

14     Q.    Okay.  So would a per-pupil amount
15   of spending be a pretty accurate depiction of
16   proportionally how much money is spent on
17   administration?

18     A.    Well, that -- that could inform you.  If
19   you looked -- there should be a percentage of the
20   amount spent on administration in each school
21   system, and then there is an amount per-pupil
22   allocation.  And if, you know, I mean -- if you
23   look at the number of students, and then you look
24   at how administrators are defined, and over time
25   the best way to look at that is to the trend line

```
                                        Page 170
 1   of that and what -- what's gone up and how much
 2   it's gone up and why it's gone up.  Could be
 3   because it's very low.
 4              I mean, I know I'm talking a lot, but
 5   it's -- it's a massive conversation that we're
 6   having right now in terms of -- and talking about
 7   it without real numbers in front of me is ...
 8       Q.   Okay.  Well, let's get you some real
 9   numbers.
10       A.   Okay.
11       Q.   All right.
12              Page 9 of Tab LL, if we could go to
13   that.  That's Table 3.
14              So this table is titled "Cost Per
15   Pupil Belonging by Category:  Maryland Public
16   Schools:  2020-2021."
17       A.   Yeah.
18       Q.   Is -- did I read that correctly?
19       A.   Yes.
20       Q.   Have you looked this kind of chart
21   before?
22       A.   Many times.
23       Q.   Yes.  Okay.
24              So again, like, let's identify
25   Harford, and then could you identify Montgomery
```

CONFIDENTIAL

Page 171

1    too.  Highlight that.  Maybe we can zoom in a
2    little so Dr. Smith can see it.
3         A.    I can see it.
4         Q.    Yeah, okay.
5              So -- so that first statistic is the
6    "Total Cost per Pupil" of spending.  Montgomery is
7    higher than Harford; is that correct?
8         A.    Yeah, as I said --
9         Q.    Yeah.
10        A.    -- I expected it to be.
11        Q.    Okay.  And then the cost per pupil for
12   "Administration," Montgomery is higher than
13   Harford?
14        A.    Yes.
15        Q.    And then for "Mid-level Administration,"
16   same thing?
17        A.    Yes.
18        Q.    "Instructional Salaries and Wages," same
19   thing?
20        A.    Right.
21        Q.    "Textbooks and Instructional Supplies,"
22   same thing?
23        A.    That's correct.
24        Q.    Yeah.
25              And "Other Instructional Costs,"

CONFIDENTIAL

```
                                        Page 172

 1   that's significantly higher?

 2        A.    Yes.

 3        Q.    Okay.  So from this comparison, does

 4   it appear to you that Harford is overspending on

 5   administration?

 6        A.    Relative to other school systems in

 7   Maryland?

 8        Q.    Yes.

 9        A.    I would say it doesn't look likely.  But

10   without specific information, I wouldn't know.

11        Q.    Okay.

12              All right.  You can pull that down.

13              So, Dr. Smith, in 2019, you wrote an

14   editorial in The Washington Post regarding the

15   achievement gap for racial minorities and students

16   in poverty; is that right?

17        A.    I do remember doing that.

18        Q.    And it -- this was specifically about the

19   issue of aggregated and disaggregated data and how

20   aggregated data can hide issues that are affecting

21   certain populations within the larger population;

22   is that right?

23        A.    That, I -- yes, I do remember that.

24        Q.    Okay.  And you noted that in Montgomery

25   County the school system has been seen as
```

CONFIDENTIAL

Page 173

1   successful, while these achievement gaps persist

2   for over 50 years.

3            Does that sound right?

4        A.    That's consistent with what I've seen,

5   yes --

6        Q.    Okay.

7        A.    -- across the board.

8        Q.    And then, so you introduced the Equity

9   Accountability Model in Montgomery County Public

10  Schools specifically to take on this data

11  disaggregation project; is that right?

12       A.    That would be accurate.

13       Q.    Okay.  And you studied a few groups,

14  black students affected by poverty, black students

15  not affected by poverty, Hispanic or Latino

16  students affected by poverty, and it goes on for a

17  little bit.  Is that correct?

18       A.    That would be accurate.

19            MR. PISTILLI:  Object to the form.

20  BY MR. LEE:

21       Q.    All right.

22            Okay.  So were any of the groups that

23  were studied majority groups in the district?

24       A.    I'm not sure I understand the question.

25       Q.    Were they a majority or plurality of the

Page 174

1  population of students in your district?

2              MR. PISTILLI:  Object to the form.

3              THE WITNESS:  We looked all of the

4  student populations in the district.  They were

5  all in the accountability model.

6  BY MR. LEE:

7      Q.    But the focus was on minor -- minority

8  students?

9      A.    No.  The focus was on all students.  And

10  one of the things we saw is that a majority of

11  students who were white and Asian not in poverty

12  were meeting or exceeding almost all of the

13  standards.  When you looked at white and Asian

14  students in poverty, they were often not meeting

15  the standards, but they were small percentages of

16  those students.

17     Q.    Would you say --

18     A.    And that's not okay.  Sorry.

19     Q.    No, you're okay.

20     A.    Yeah.

21     Q.    So would you say white or Asian students

22  not in poverty, was that a majority or plurality

23  of students in Montgomery County at the time?

24             MR. PISTILLI:  Object to the form.

25             THE WITNESS:  Well, I can tell you the

CONFIDENTIAL

Page 175

1   percentage of students at the time, if that's --
2   will answer your question.
3            In -- right before the pandemic, the
4   percentage of students would have been about
5   27 percent white, both poverty and nonpoverty, but
6   only about 5 percent of the white kids were in
7   poverty at that time.
8            I'm confident of these numbers.
9            Asian students made up about
10  15 percent of the -- the students in the system,
11  and that was a very small percentage -- I can't
12  give you the number off the top of my head -- who
13  were in poverty.
14           And, interestingly enough, and, you
15  know, as a person with an Asian background, you'll
16  understand this quickly, that's a -- kind of a
17  ridiculous way to lump kids together, because
18  there are a lot of different Asian cultural and
19  ethnic backgrounds.  And we had many conversations
20  in our community about that.
21           And then, when you looked at African-
22  American students, they were about 22 percent, and
23  Hispanic Latino students were about 32 percent.
24  So I don't know if I hit a hundred there or not.
25  And then there was a small number of kids, about 5

```
                                         Page 176
```

1    percent I think it was, who didn't identify.

2         Q.    Okay.

3         A.    And so when you look at those, in poverty

4    and nonpoverty, the African-American and Hispanic

5    students made up the vast majority of students who

6    were in poverty.  It was about 50 percent of the

7    Hispanic student -- or the African-American

8    students and even more of the Hispanic students

9    made up that number.

10              So everyone was included.  And it was

11   very much, as you used the term, a plurality when

12   you looked at how it was distributed across the

13   system.

14   BY MR. LEE:

15        Q.    Yeah.  So, I mean, to take your example

16   of you know, Asian American students, certainly

17   there is a lot of both economic and nationality

18   diversity in that group; is that correct?

19        A.    That is accurate.

20        Q.    Yeah.  And it's important to look at

21   smaller populations within that, really that

22   subpopulation.  You know, for -- for instance, I

23   don't -- I guess it would be, you know, Vietnamese

24   students in, perhaps in your area or -- versus

25   Chinese students; and even among Chinese students,

CONFIDENTIAL

Page 177

1    there's probably differences between low income

2    and high income.  Does that -- does that all sound

3    correct to you?

4        A.    That all sounds accurate.

5            MR. PISTILLI:  Object to the form.

6    BY MR. LEE:

7        Q.    Okay.  All right.

8            So do you agree that it's important to

9    take into account even smaller populations of

10   students; are there -- is it important to address

11   their needs?

12           MR. PISTILLI:  Object to the form.

13           THE WITNESS:  I believe that we should

14   pay attention to populations of students in any

15   way, and I use this term with all due respect,

16   with great respect, but when you take the data,

17   you're talking about real people, you're talking

18   about percentages that become raw numbers; raw

19   numbers become names; names become faces of kids.

20   And so you have to look at student populations to

21   see if there are discrepancies.

22           Then you look at each student and say,

23   What do you need and how can we help you, to the

24   degree it's part of our mission that we will do

25   this.

CONFIDENTIAL

```
                                          Page 178

 1   BY MR. LEE:

 2       Q.    So there are smaller groups of students,

 3   and paying attention to their needs is important,

 4   even -- actually, let me start over.

 5             You know, Dr. Smith, I think you

 6   mentioned school missions being informed only by

 7   population- level issues.  And can you explain

 8   why, you know, you embarked on this very, I think,

 9   morally right decision to disaggregate data, and

10   you are now claiming that we should only focus on

11   population-wide issues?

12       A.    Well, population-wide issues would

13   involve all populations in your school system.

14   And, like I said, when you slice and dice, you

15   want to pay attention to that.  And then, the way

16   you determine or define a population is important

17   to what services you can and should provide in

18   that area, so if it's -- if it's based on

19   students' race or ethnicity, if it's based on

20   their income level, if it's based on their -- I

21   mean, parent background is an important student

22   population marker.

23             If you look at the old PSAT and

24   National Merit, that was an important thing they

25   looked at was students' educational background.
```

CONFIDENTIAL

Page 179

1    They created a population of kids whose parents
2    didn't go to college, so that becomes a
3    population.  So you look at all those populations.
4              And when I say "population level," I'm
5    talking about, What are the issues that schools
6    need to focus on and why, and what's the evidence?
7    Because you have so many competing priorities for
8    your money.  So you've got to be confident that
9    what you're spending it on is really bringing
10   about solutions that are actually consistent with
11   the problem that you're trying to identify, and
12   that's a tough part of the whole thing.
13       Q.   Yeah.  So do you agree that social
14   emotional health is one of those priorities?
15       A.   It would depend entirely on how that's
16   defined, in terms of -- for example, in special
17   education, one of the federal categorizations in
18   special education involves social and
19   psychological well-being.  Then that's absolutely
20   a population that you're -- you're going to
21   respond to and work hard to meet their -- their
22   needs.
23       Q.   Okay.
24            Let's see.  Can we take a quick break
25   actually?

CONFIDENTIAL

Page 180

1               MR. PISTILLI:  Sure.

2               THE VIDEOGRAPHER:  The time is 1404,

3      and we are off the record.

4               (Recess taken.)

5               THE VIDEOGRAPHER:  The time is 1414,

6      and  we are back on the record.

7               MR. LEE:  Okay.  Can we just pull up

8      Exhibit 9.  And then, this was the responses and

9      objections.  And I know there was a CV produced in

10     that document.  If you just scroll past this, and,

11     I'm sorry, I don't know which page -- yeah, keep

12     going.  That, there, yeah.

13     BY MR. LEE:

14         Q.    So, Dr. Smith, do you recognize this

15     document?

16         A.    I do.

17         Q.    Okay.  And then this is your CV that --

18     or résumé that you sent or that your counsel sent

19     to us?

20         A.    Yes.

21         Q.    Okay.  And is this updated; is there

22     anything that needs to be added?

23         A.    No, I don't believe so.  I think this is

24     the most recent one I have.

25         Q.    Okay.  Just want to confirm that.

CONFIDENTIAL

Page 181

1          Okay.  You can pull that down.

2          Okay.  Let's see.  So I want to pull

3    up Tab V, which would be Exhibit 16.

4          VIDEO TECHNICIAN:  17.

5          MR. LEE:  17.

6          (Meta-Smith-17 marked.)

7    BY MR. LEE:

8      Q.    And just real quick.

9          Is this the -- did you cite this blog

10   in your report, Dr. Smith?

11     A.    I believe so.  I did cite Matt Evans --

12     Q.    Okay.

13     A.    -- I know, and so I assume this would be

14   one of the documents I looked at for Matt Evans.

15   I think he's out of San Diego State, if I remember

16   correctly, or somewhere in San Diego.

17     Q.    Are you aware of any biases that he may

18   have held based on what you know about him?

19     A.    I am not aware of any.

20     Q.    Okay.

21          We can pull that down.

22          And then, okay, do you recall citing a

23   document published by Internet Safety Labs in your

24   report?

25     A.    I would have to look at it to remember.

CONFIDENTIAL

Page 182

1    I looked at a tremendous amount of material.

2        Q.    Okay.  Do you know if Internet Safety

3    Labs is funded by any technology companies?

4        A.    I do not know that, and I certainly would

5    not have used something if it had come to my

6    attention.  I don't know if that's accurate or

7    not, but if it is ...

8        Q.    Okay.  All right.

9              Okay.  I think that's -- that's all I

10   have.

11                    EXAMINATION

12   BY MR. PISTILLI:

13       Q.    I have just a very few questions for you,

14   Doctor.

15             First, could you take a look at your

16   report, which is Exhibit 2, and turn to

17   Paragraph 253.

18       A.    253?

19       Q.    Yes.

20             Do you recall you were asked some

21   questions earlier about Paragraph 253?

22       A.    I do.

23       Q.    And at the time you were drafting your

24   report, were you aware of the 2022 update to

25   Harford's cyberbullying policy?

CONFIDENTIAL

```
                                          Page 183
 1       A.    I believe I was, yes.  I believe I had
 2   come across it in the drafting of the report, yes.
 3       Q.    Sure.
 4              And could you just explain why you
 5   didn't mention that update in Paragraph 253?
 6              MR. LEE:  Object to form.
 7              THE WITNESS:  I -- when I looked at
 8   the policy on bullying and harassment and they
 9   talked about cyberbullying, I was thinking about
10   bullying and harassment, not about digital -- the
11   digital world.  But clearly, "adjusted student
12   handbooks and school policies to reflect the
13   challenges posed by digital platforms,"
14   cyberbullying can take many forms, but it is still
15   part of the digital world.  So I -- it could have
16   been referenced here and identified.
17   BY MR. PISTILLI:
18       Q.    But the existence of the 2022 update to
19   that policy, did it -- does your knowledge of that
20   update in any way alter your opinion that
21   Harford's contemporaneous records reveal minimal
22   discussion of social media and do not support its
23   claim that social media has been a significant
24   problem requiring significant expenditures?
25              MR. LEE:  Object to form.
```

```
                                          Page 184

 1            THE WITNESS:  No.  And -- Mr. Lee,
 2    right?  Okay.  In my conversation with Mr. Lee,
 3    that had been a regular part of my experience for
 4    15 years, the updating of policies to represent
 5    the digital world, and so it -- it was routine.
 6    It did not change anything I believed or found or
 7    viewed in that circumstance.
 8    BY MR. PISTILLI:
 9       Q.    And are you offering any expert opinions
10    in this matter regarding whether social media use
11    is capable of causing mental health harms?
12       A.    No, I'm not at all offering that because
13    I think it's inconclusive and I don't know.
14       Q.    And it's not part of your expert work in
15    this matter?
16       A.    It is not part of my expert work in this
17    area, this field.
18            MR. PISTILLI:  No further questions.
19            MR. LEE:  Okay.  All right.  I'm all
20    good here too.
21            MR. PISTILLI:  Okay.
22            THE VIDEOGRAPHER:  Here marks the end
23    of the video deposition.  The total time for the
24    taking attorney was 3 hours and 39 minutes, and
25    total time by defending has been 3 minutes.
```

CONFIDENTIAL

Page 185

1              The time is 1420, and we are off the

2    record.

3              (End of proceedings at 2:20 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 186

1                    CHANGES AND SIGNATURE

2      WITNESS: JACKIE RAY SMITH, Ph.D.

3      DEPOSITION DATE: 9/12/2025

4      PAGELINE        CHANGE              REASON

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25

CONFIDENTIAL

```
                                              Page 187

1          I, JACKIE RAY SMITH, Ph.D., have read the
    foregoing deposition and hereby affix my signature
2   that same is true and correct, except as noted
    above.

3

4

5                 _____
                       JACKIE RAY SMITH, Ph.D.
6

7   THE STATE OF _____)
    COUNTY OF _____)
8

9

           Before me, _____,
10  on this day personally appeared JACKIE RAY SMITH,
    Ph.D., known to me (or proved to me under oath or
11  through _____) (description
    of identity card or other document) to be the
12  person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they
13  executed the same for the purposes and
    consideration therein expressed.
14          Given under my hand and seal of office
    this _____ day of _____,
15  _____.

16

17

                   _____
18                     NOTARY PUBLIC IN AND FOR
19                     THE STATE OF _____
                       COMMISSION EXPIRES: _____
20

21

22

23

24

25
```

CONFIDENTIAL

Page 188

1            REPORTER'S CERTIFICATION
        DEPOSITION OF JACKIE RAY SMITH, Ph.D.
2              SEPTEMBER 12, 2025
3      I, Amanda Blomstrom, a Notary Public in and
4  for the District of Columbia, hereby certify to
5  the following:
6      That the witness, JACKIE RAY SMITH, Ph.D., was
7  duly sworn by the officer and that the transcript
8  of the oral deposition is a true record of the
9  testimony given by the witness;
10     That the deposition transcript was submitted
11 to the witness or to the attorney for the witness
12 for examination and signature;
13     I further certify that I am neither counsel
14 for, related to, nor employed by any of the
15 parties or attorneys in the action in which this
16 proceeding was taken, and further that I am not
17 financially or otherwise interested in the outcome
18 of the action.
19     Certified to by me this 15th day of September,
20 2025.
21
                _____
22              Amanda Blomstrom, CRR, RMR, CLR
                Texas CSR No. 8785
23              California CSR No. 12681
                Illinois CSR No. 84-3634
24
25