**Exhibit 26**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2

 3   IN RE: SOCIAL MEDIA ADOLESCENT  )
     ADDICTION/PERSONAL INJURY       ) MDL No.
 4   PRODUCTS LIABILITY LITIGATION   ) 4:22-md-3047-YGR
     _____)
 5

     THIS DOCUMENT RELATES TO:       )
 6                                   )
     BOARD OF EDUCATION OF HARFORD   )
 7   COUNTY V. META PLATFORMS INC.,  )
     ET AL.                          )
 8                                   )
     CASE NO.: 4:23-CV-03065         )
 9

10

11    VIDEOTAPED DEPOSITION OF DWAYNE EDWARD WILLIAMS
12        Harford County Public Schools Central
13              Administration Building
14            102 South Hickory Avenue,
15                Bell Air, Maryland
16          Monday, May 5, 2025, 1:36 p.m.
17

18

19

20

21

22

23

24

25
```

```
                                              Page 2
 1   APPEARANCES:
 2   For Plaintiff Harford County Public Schools:
 3             BY: MATTHEW P. LEGG, ESQ.
                  A. WRAY FITCH, ESQ.
 4             Brockstedt Mandalas Federico LLC
               2850 Quarry Lake Drive - Suite 220
 5             Baltimore, Maryland 21209
               410.421.7777
 6             mlegg@lawbmf.com
               wfitch@lawbmf.com
 7
 8   For the MDL Plaintiffs:
 9             BY:  KELLY McNABB, ESQ. (VIA ZOOM)
                   KENNETH S. BYRD, ESQ. (VIA ZOOM)
10             Lieff Cabraser Heimann & Bernstein
               250 Hudson Street, 8th Floor
11             New York, New York 10013
               212.355.9500
12             kmcnabb@lchb.com
               kbyrd@lchb.com
13
14   For the Defendants Meta Platforms, Inc., f/k/a
     Facebook, Inc.; Facebook Holdings, LLC; Facebook
15   Operations, LLC; Facebook Payments, Inc.; Facebook
     Technologies, LLC; Instagram, LLC; Siculus, Inc.;
16   and Mark Elliot Zuckerberg:
17             BY:  SCOTT JAMES, ESQ.
               BY:  RANA FREEMAN, ESQ. (VIA ZOOM)
18             Shook, Hardy & Bacon LLP
               JPMorgan Chase Tower
19             600 Travis Street, Suite 3400
               Houston, Texas 77002
20             713.227.8008
               sjames@shb.com
21             rfreeman@shb.com
22
23          (Appearance continued on next page.)
24
25
```

```
 1              APPEARANCES CONTINUED:
 2
     For the Defendant Snap:
 3
                BY:  JACK NOLAN, ESQ. (VIA ZOOM)
 4              Kirkland & Ellis LLP
                601 Lexington Avenue
 5              New York, New York 10022
                212.341.7591
 6              jack.nolan@kirkland.com
 7
     For the Defendants Alphabet Inc., Google LLC, and
 8   YouTube LLC:
 9              BY:  J. ANDREW KEYES, ESQ.
                BY:  LYDIA WEIANT, ESQ.
10              Williams & Connolly LLP
                680 Maine Street SW
11              Washington, DC 20024
                202.434.5584
12              akeyes@wc.com
                lweiant@wc.com
13
14   For the Defendants TikTok, Ltd.; TikTok, LLC;
     TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
15
                BY:  DANIEL C. SALE, ESQ. (VIA ZOOM)
16              King & Spalding LLP
                1700 Pennsylvania Avenue, NW
17              Suite 900
                Washington, D.C. 20006
18              202.626.2640
                dsale@KSLAW.com
19
20   Also Present:  Bradley Loy, Videographer
                   Jacob Arndt, Exhibit Technician
21                 Lauren R. Drive, Deputy General Counsel
                   Harford County Public Schools
22
23
24
25
```

Page 4

1                           I N D E X
2                                                    PAGE
3      EXAMINATION BY MR. KEYES                         5
4
5                        E X H I B I T S
6
7      NUMBER                  DESCRIPTION            PAGE
8      EXHIBIT 1     Resume for Dwayne (Buzz)           7
                     Williams
9
       EXHIBIT 2     2023-2024 Parent-Student          53
10                   Handbook Calendar
11     EXHIBIT 3     2022-2023 Parent-Student          63
                     Handbook Calendar
12
       EXHIBIT 4     Email dated 11/17/22, Subject:    65
13                   Work Log, Bates
                     HCPS_00530898-900
14
       EXHIBIT 5     Emails, top one dated 4/27/21,    76
15                   Subject:  Buzz's You Tube
                     Video Link, Bates
16                   HCPS_00246650-651
17     EXHIBIT 6     Plaintiff Board of Education       86
                     of Harford County's Amended
18                   Objections and Responses to
                     Defendants' Interrogatories
19                   (Set 3)
20
21
22
23
24
25

Page 5

1                    P R O C E E D I N G S

2                           *  *  *

3                    THE VIDEOGRAPHER:  We are now on the

4    record.

5                    My name is Bradley Loy.  I'm a

6    videographer for Golkow, a Veritext division.

7                    Today's date is May 25 [sic], 2025.

8    The time is 1335.

9                    This video deposition is being held in

10   Bel Air, Maryland, in the matter of Social Media

11   Adolescent Addiction/Personal Injury Products

12   Litigation for the U.S. District Court of Northern

13   District of California.

14                   The deponent is Dwayne Williams.

15                   Counsel will be noted on the

16   stenographic record.

17                   The court reporter is Cindy Hayden and

18   will now swear in the witness.

19                           *  *  *

20                 DWAYNE EDWARD WILLIAMS,

21     having been first duly sworn, was examined and

22                  testified as follows:

23                           *  *  *

24                      EXAMINATION

25   BY MR. KEYES:

Page 6

1          Q.   Good afternoon, Mr. Williams.  We've
2    met before.  My name is Andrew Keyes.  I'm an
3    attorney with the law firm of Williams & Connolly,
4    and we represent the Google and YouTube defendants.
5               Would you please state your full name
6    for the record?
7          A.   Dwayne Edward Williams.
8          Q.   You gave a testimony -- a deposition
9    earlier today as a corporate representative of
10   Harford County Public Schools, correct?
11         A.   I did.
12         Q.   Do you understand that you are still
13   under oath?
14         A.   Yes, I do.
15         Q.   And you are still under oath and giving
16   testimony as if you were in a courtroom before a
17   judge and a jury?
18         A.   I do.
19         Q.   You testified earlier about the
20   preparation you did before your deposition as a
21   corporate representative of Harford County Public
22   Schools.
23              Did you do any other prep for this
24   deposition of you as a fact witness?
25         A.   No, I did not.

```
                                        Page 7
 1              (WILLIAMS EXHIBIT 1, Resume for Dwayne
 2     (Buzz) Williams, was marked for identification.)
 3     BY MR. KEYES:
 4          Q.   I'm showing you what has been marked as
 5     Williams Exhibit 1.
 6               What is this exhibit?
 7          A.   That is a resume that I created and
 8     submitted to our legal counsel for this procedure.
 9          Q.   When did you prepare this resume?
10          A.   Recently.  April, maybe.  April 2025.
11          Q.   And you prepared it in connection with
12     today's deposition?
13          A.   Yes.
14          Q.   This has a section for your education.
15     It says you have a bachelor's degree in physical
16     education from Towson University?
17          A.   Yes.
18          Q.   When did you get that degree?
19          A.   1992.
20          Q.   And then it says you got a master's
21     degree in school counseling from Johns Hopkins
22     University?
23          A.   2000.
24          Q.   This resume also lists certifications.
25               Before we get to certifications, do you
```

Page 8

1    have any other degrees besides your master's degree

2    and your bachelor's degree?

3           A.   No.

4           Q.   In the Certifications section, you say

5    you are a nationally certified hearing official.

6                What is that?

7           A.   That is a credential provided by the

8    National Association of Hearing Officers, which has

9    two subclassifications:  an administrative law

10   judge, which I do not qualify for, and an

11   administrative hearing officer, which I do.

12          Q.   And what does getting this

13   certification make you eligible to do?

14          A.   To conduct administrative hearings for

15   any administrative body.  But, in this case, as the

16   superintendent's designee for student discipline.

17          Q.   When did you obtain your national

18   certified hearing official certification?

19          A.   This is an -- an educated guess.  At

20   about 2018.  I really don't remember.

21          Q.   Okay.  And what did you have to do in

22   order to get this certification from the National

23   Association of Hearing Officers?

24          A.   Document that I conduct administrative

25   hearings for at least three years and had

Page 9

1    satisfactory performance evaluations, completed 120

2    clock hours of instruction in specific coursework,

3    complete an interview with somebody on the National

4    Association of Hearing Officers certification

5    committee, and be a member in good standing for at

6    least one year.

7         Q.   Are there any continuing education

8    requirements for being a nationally certified

9    hearing official?

10        A.   Yes.

11        Q.   What are those?

12        A.   I want to say every four years, if I'm

13   not mistaken, there is an additional number of

14   hours.  And I believe the number is 40 clock hours.

15             And most of us simply attend the

16   national conference, which is a four-day

17   conference, which satisfies almost all of the

18   recertification requirements.

19        Q.   Do you attend the conference every

20   year?

21        A.   I try to.  Last year, I did not.  But

22   I'm -- I am still a member in good standing and

23   certified, I think, through '26.

24        Q.   If you attend the four-day conference

25   in one year, does that essentially give you enough

Page 10

```
 1    hours to satisfy the 40-clock-hour requirement for
 2    every four-year period?
 3          A.    I'm -- I'm -- I want to change that to
 4    20 because your question prompted me to remember
 5    you get 16 for the conference and then you have to
 6    add 4.
 7               So instead of 40, I believe it's 20.
 8    And I think it's 16 for the conference and 4
 9    additional clock hours beyond that.
10          Q.    You also list some education
11    certifications on your resume.
12               What is the physical education
13    certification?
14          A.    That's a credential offered by the
15    Maryland State Department of Education that allows
16    me to teach kindergarten through 12th grade
17    physical education for public school.
18          Q.    How did you get that credential?
19          A.    By completing the bachelor's degree and
20    passing the national teachers exam in '92.
21          Q.    Are there any continuing education
22    requirements for that?
23          A.    You do have to maintain your
24    certification and -- and provide a certain number
25    of hours in professional development, and I did
```

Page 11

1    that for many years.

2              But I am 32 years into my career now,

3    and I qualify for some sort of a waiver that says:

4    You've been doing this long enough.  You know, you

5    don't have to do it anymore.

6         Q.    Did you teach physical education for

7    any period of time to K through 12 students?

8         A.    Seven years, not in the public school

9    system.  It was for the Kennedy Krieger School

10   System, which is a nonprofit in Baltimore City.

11        Q.    What was that seven-year period?

12        A.    '92 to '99.

13        Q.    And what grade or grades did you teach?

14        A.    Elementary school and middle school, K

15   through 8.

16        Q.    What is the special education

17   certification?

18        A.    That's a credential on my certificate

19   which states that I have years of experience and --

20   and qualifications to be able to work as a special

21   education teacher and participate in IEP meetings

22   and know what I'm talking about when it comes to

23   special education.

24        Q.    This is distinct from being a physical

25   education teacher?

Page 12

1          A.    It's an additional credential, if you
2     will.
3          Q.    Okay.  And how did you get the special
4     education credential?
5          A.    By working in the intensive environment
6     of the Kennedy Krieger Institute and then providing
7     my transcripts to Baltimore -- or to Harford County
8     Public Schools and having, I believe, one or two
9     graduate credits in special education, that was
10    awarded.
11         Q.    Are there any continuing education
12    requirements for that credential?
13         A.    It's -- it's all lumped in the same
14    state certification.  So as long as I maintain my
15    state certification, those continue.
16         Q.    As long as you maintain which
17    certification?
18         A.    It's just a general Maryland State
19    Department of Education teaching certificate.  So
20    physical education -- all -- all of those
21    automatically go along with it.
22         Q.    Okay.  Is that the same for the other
23    two education certifications listed here?
24         A.    Yes.  And -- and there's one that I did
25    not include, which is school counselor.  So it

Page 13

1   should be on there, but it's not.

2       Q.   Did you teach special education for any

3   period of time?

4       A.   Seven years at Kennedy Krieger School

5   System.

6       Q.   Was it the same seven-year period when

7   you were a physical education teacher?

8       A.   Correct.

9       Q.   So '92 to '99?

10      A.   Correct.  Everybody there is involved

11  in teaching students with special needs.

12      Q.   Are all of the students in the Kennedy

13  Krieger School System students with special needs?

14      A.   Correct.

15      Q.   All right.

16      A.   It's a nonpublic special education

17  facility.

18      Q.   Have you taught special education since

19  1999?

20      A.   No.

21      Q.   Have you taught physical education

22  since 1999?

23      A.   No.

24      Q.   Okay.  What is the pupil personnel

25  worker certification?

Page 14

1           A.    In layperson's terms, it's a modern-day
2    combination of social worker and truant officer.
3           Q.    And is this a certification you also
4    got from the Maryland State Department of
5    Education?
6           A.    Correct.
7           Q.    And then have you worked as a pupil
8    personnel worker?
9           A.    I supervise pupil personnel -- 14 pupil
10   personnel workers at this time.
11              In terms of -- of being an actual
12   employee of Harford County Public Schools as a
13   pupil personnel worker, I went straight into
14   supervising the department.
15          Q.    So did you ever work as a pupil
16   personnel worker yourself?
17          A.    No, I have not.
18          Q.    Okay.  So did you ever work as a social
19   worker in Harford County Public Schools or any
20   other school system?
21          A.    No, I have not.
22          Q.    Did you ever work as a truant officer
23   in Harford County Public Schools or any other
24   school system?
25          A.    No.

Page 15

```
1         Q.   For how long have you supervised pupil
2    personnel workers?
3         A.   Again, I'm giving you an estimate
4    because I'm just not real good with time.  I
5    believe it was around 2017 when I added -- that
6    responsibility was added to my existing student
7    discipline responsibilities.
8         Q.   And so have you then supervised pupil
9    personnel workers since roughly 2017 always in
10   Harford County Public Schools?
11        A.   Yes, that's correct.
12        Q.   Have you always supervised 14 public
13   personnel workers, or has that number changed over
14   time?
15        A.   It changed.  It started as 9 and has
16   gradually increased to 14.
17        Q.   And of the 9 pupil personnel workers
18   that you first supervised roughly in 2017, how many
19   of those were social workers and how many of those
20   were truant officers?
21        A.   Neither.  And maybe I wasn't clear.
22   That was just my way of explaining what a pupil
23   personnel worker does to somebody who might not be
24   familiar with -- with the school system.
25                  I can give you a more detailed view of
```

Page 16

```
 1   what they do.  But, in reality, if you know what a
 2   social worker and a truant officer does, you know
 3   what a PPW does.
 4          Q.   Okay.  In your own words, what does a
 5   PPW do?
 6          A.   They provide support to our students
 7   and our families and our administrators in four
 8   core areas.  I remember it like the person's name
 9   CARL, C-A-R-L.  And that's:  consultant, advocate,
10   resource provider and liaison to community
11   agencies.
12               Practically speaking, they work with
13   parents to improve student attendance.
14               And they are unofficially gatekeepers,
15   so to speak.  They -- they manage all students
16   coming into and out of the school system for what
17   are called "special enrollments."
18               A student who enrolls in a school under
19   normal conditions with all the appropriate birth
20   certificate, documentation, transcript from another
21   school just enrolls into a counselor's office.
22               But if anything is out of the ordinary,
23   it becomes a special enrollment, and pupil
24   personnel workers manage that.
25               They're in charge of providing
```

```
                                            Page 17
 1   educational services for students who are homeless,
 2   for students who are on home and hospital
 3   instruction.  And they manage the home school
 4   program for Harford County Public Schools.
 5        Q.   Do you know how many homeless students
 6   there are in Harford County Public Schools
 7   currently?
 8        A.   I do not.  And I wouldn't want to make
 9   an educated guess because that's a -- that's a very
10   specific question.
11             I have an expert in that field who
12   works as the liaison.  Her name is Pamela Smith.
13             It's important to -- to recognize that
14   the definition of "homeless" is maybe different
15   than what most people recognize.
16             Most people would think somebody who's
17   on the street or in a tent or some -- someplace
18   like that.
19             Students who don't have a fixed
20   permanent address -- maybe they're living with an
21   uncle in transition because something is going on
22   with their family -- would also be considered
23   homeless.
24             So you -- you have to recognize that
25   there is a continuum of homelessness.
```

Page 18

1      Q.   Do you know how many homeless students
2  there are -- there were in Harford County Public
3  Schools in any prior year?
4      A.   I can get that number for you, but I
5  don't.  If I had to make an educated guess, I would
6  say somewhere between 4- and 500 students.
7           And -- and the -- I know that the free
8  and reduced meals is often an indicator of income.
9  And I know that the what we call "FARMS," free and
10  reduced meals, indicator has shown that students --
11  we've had an increase in that.  That correlates to
12  homelessness.
13     Q.   You know there's an increase in the
14  numbers of students in Harford County Public
15  Schools who receive or are entitled to receive free
16  and reduced meals?
17     A.   It is -- yes.  The answer is yes.
18           Somewhere in the last five years,
19  between roughly 30 percent to about 40 percent are
20  just over of the students attending our school
21  system.
22     Q.   And what was that equivalent percentage
23  before COVID?
24     A.   Around the 30.  So the increase was
25  about 30 percent to 40 percent.  And I could be off

1   one or two numbers there, but that's a pretty close

2   approximation.

3        Q.   So your best estimate is that roughly

4   30 percent of the Harford County Public School

5   students were -- were eligible for free and reduced

6   meals before COVID.  Yes?

7        A.   Yes.

8        Q.   And that number has increased

9   post-COVID to roughly 40 percent of the Harford

10  County Public School students?

11       A.   Yes.

12       Q.   And is it your belief that there was a

13  similar increase in the number of students in

14  Harford County Public Schools who were homeless

15  between pre-COVID and post-COVID?

16       A.   There was an increase.  And -- and I

17  just -- I can't recollect the numbers well enough

18  under oath to be able to give you an estimate.

19       Q.   Is there a database that tracks the

20  number of students who are homeless?

21       A.   Ms. Smith keeps those numbers, as we

22  do, on Excel spreadsheets.  It's not something

23  that's kept in our database.

24       Q.   Is there a database that tracks the

25  number of students who are eligible for free and

Page 20

1    reduced meals?

2          A.    I believe that's a field in eSchool

3    that could generate a report.  And it's possible

4    that homelessness is a field also.  I'm just not

5    familiar with it.

6          Q.    Has the work of the pupil personnel

7    workers you've overseen changed since roughly 2017?

8          A.    Yes.

9          Q.    How so?

10         A.    The effort -- increased effort and

11   energy and time spent on getting students to attend

12   school more regularly is the bottom line.

13         Q.    And is that more pronounced after COVID

14   than it was before COVID?

15         A.    Yes.

16         Q.    Is it your belief that COVID

17   exacerbated that problem?

18               MR. LEGG:  Objection to form and

19   foundation.

20               THE WITNESS:  It got exacerbated during

21   COVID.  The effect of COVID, I can't really answer.

22   But it was certainly a lot worse when we returned

23   to school in 2021.

24   BY MR. KEYES:

25         Q.    I want to make sure I understand.

Page 21

1            You're saying the -- the problem of
2    nonattendance at school is worse post-COVID than it
3    was pre-COVID, but you -- you can't necessarily
4    attribute it to COVID; is that accurate?
5            A.    That's what I'm saying.
6            Q.    Okay.  Are you aware of any study or
7    report or analysis by Harford County Public Schools
8    into either quantifying the problem of
9    nonattendance or the reasons for nonattendance?
10           A.    Not a study or an analysis.  We have a
11   new attendance procedure which has been piloted in
12   six schools, and I manage that -- that process.
13           So what that does is indicates where
14   the problems may be and how we might address them
15   better so we can improve attendance.
16           Q.    Separate from the problem of
17   nonattendance getting worse since 2017, has the
18   work of the pupil personnel workers you've overseen
19   changed since roughly 2017?
20           A.    Yes.
21           Q.    How so?
22           A.    We have two types of pupil personnel
23   workers.  Categories, if you will.  One is called a
24   community school pupil personnel worker.  I'll call
25   it PPW, if that's okay.

Page 22

```
 1              Those community school PPWs are funded
 2    by federal funds known as community schools funds,
 3    which are awarded to schools who have populations
 4    with low income or schools with more need.  So
 5    their individuals and their time is devoted and
 6    dedicated to that one school and the needs of that
 7    school.
 8              The other category is called a regional
 9    PPW, and they serve multiple schools.
10              So the position of community school PPW
11    didn't exist when I started supervising the program
12    and has recently evolved, and that's how we went
13    from 9 to 14.  We still have nine regions in the
14    county.  The additional five are community schools
15    PPWs.
16         Q.   So when you started supervising PPWs in
17    2017, each region in the county had its own PPW?
18         A.   Correct.  And they still do.
19         Q.   Okay.  And that remains today.
20              And then since 2017, in addition to
21    keeping those nine PPWs, Harford County Public
22    Schools has -- has hired five more PPWs --
23         A.   Correct.
24         Q.   -- to be community school PPWs?
25         A.   That's correct.
```

Page 23

1           Q.   Which means each of those PPWs is
2      assigned to a particular school and only that
3      school?
4           A.   Correct.
5           Q.   And you said the community school PPWs
6      are funded by federal dollars?
7           A.   There may be some state money.  That's
8      beyond my pay grade to figure out.  But I know that
9      it's -- it's not our operating budget.  It comes
10     from -- it's a grant source.
11          Q.   And is that driven by formulas that
12     measure the income of the student -- or the
13     families attending those schools?
14          A.   There is a formula, and I know that
15     income is a big part of it.  But there may be
16     other -- other components that I don't know.
17          Q.   Before these five community school PPWs
18     were hired, was there just not federal funding for
19     that position?  Or there was funding, but there
20     were no Harford County Public Schools that
21     qualified for it?
22               MR. LEGG:  Objection to form and
23     foundation.
24               Go ahead.
25               THE WITNESS:  It's the latter.  As

Page 24

1    money became available, our senior leadership were
2    asking principals, "What would you like to do with
3    this additional income or -- or money, spend --
4    money that you could spend?"
5            And several principals said, "We really
6    need help getting students to attend school and
7    changing the -- the mindset of the parents and the
8    students."
9            And that's why they chose PPWs.  Mostly
10   to improve attendance, but what the state calls
11   "reducing chronic absence."
12   BY MR. KEYES:
13       Q.   So was there federal funding available
14   for community school PPWs before 2017?
15       A.   Not to my knowledge.  And if there was,
16   I wouldn't have known about it.  I only know about
17   it once my supervisor says, "Hey, a principal is
18   asking for a PPW with their additional money."
19       Q.   Okay.  And when you say "their
20   additional money," you're talking about the
21   additional federal funds that are available through
22   this particular program?
23       A.   Correct.
24       Q.   If the community school PPWs are funded
25   by federal dollars, how are the regional PPWs

Page 25

1  funded?
2        A.    Through our regular school budget.
3        Q.    And that hasn't changed since 2017?
4        A.    It has not, no.  There was a -- there
5  was a period where our board did employ a tenth,
6  but that position was cut maybe two years ago.
7        Q.    Why was that position cut?
8        A.    Budgetary constraints.
9        Q.    And where did that tenth PPW work, if
10  not in one of the nine regions?
11        A.    In our Edgewood High School region,
12  which -- they're based out of the middle school,
13  but they serve several schools in that area.
14        Q.    So were there -- so were there two --
15  two community --
16        A.    Two regionals at that point.
17        Q.    Gotcha.  Okay.  Two regional PPWs for
18  that one region?
19        A.    That's correct.
20        Q.    What is the School Administrator II
21  certification?
22        A.    That allows me to be a principal
23  whereas I allows you to be an assistant principal.
24  Just a little bit more graduate work and some legal
25  stuff.

Page 26

1          Q.   If you're a School Administrator I, you
2     can be an assistant principal.  And if you're a
3     School Administrator II, you can be a principal?
4          A.   Correct.
5          Q.   And when did you get the School
6     Administrator II credential?
7          A.   In two -- in 1999, 2000, right in that
8     era, I became the principal of the Kennedy Krieger
9     High School for four years and required that
10    credential.
11         Q.   Before 1999, did you have the School
12    Administrator I credential?
13         A.   Yes.  But it's a bit of a blur, to be
14    honest, Mr. Keyes.
15         Q.   Did you ever work as an assistant
16    principal before you worked as a principal at
17    Kennedy Krieger High School?
18         A.   Technically, yes.  I was titled an
19    assistant principal and became principal all in the
20    same year because the school was growing.  It was a
21    start-up school for Kennedy Krieger.
22         Q.   Okay.  So when Kennedy Krieger High
23    School was starting up, you started the school year
24    as an assistant principal and then later, during
25    that same school year, became a principal?

Page 27

1          A.    Right.

2          Q.    And for how many years were you a

3    principal at Kennedy Krieger High School?

4          A.    Four years, through 2003.

5          Q.    Have you worked as a principal since

6    2003?

7          A.    No.

8          Q.    Have you worked as an assistant

9    principal since 2003?

10         A.    Yes.  Beginning 2004 with Harford

11   County Public Schools.

12         Q.    And where were you an assistant

13   principal?

14         A.    In multiple schools.  I'll -- I'll list

15   them, if you'd like.

16         Q.    Well, your resume shows that you were

17   an assistant principal from 2003 to 2009.  How many

18   different schools did you work in as an assistant

19   principal?

20         A.    I'm going to have to list them.

21   Aberdeen, Bel Air, C. Milton Wright, Edgewood

22   Middle School.  Is that four?

23               Aberdeen, Bel Air, C. Milton Wright,

24   Edgewood Middle School.  Four.

25         Q.    Was there any point in time where you

Page 28

```
 1   were an assistant principal for more than one
 2   school at the same time?
 3        A.   No.
 4        Q.   Okay.  So you moved from school to
 5   school to school to school?
 6        A.   Correct.
 7        Q.   Okay.  Have you served as an assistant
 8   principal in any Harford County Public Schools
 9   since 2009?
10        A.   No.  I -- I became the administrative
11   superintendent's designee for student discipline at
12   that point, and I've been in that role since.
13             And I see that earlier, when we were
14   talking about 2017, I acknowledged that I'm not
15   real good with dates.  I actually did look it up
16   when I put my resume together.  It says 2015 to
17   present.
18        Q.   Okay.
19        A.   So, for the record, it was probably
20   2015.
21        Q.   2015 to the present when you've been a
22   pupil personnel supervisor?
23        A.   Supervisor.  So --
24        Q.   So were there roughly nine PPWs in
25   2015, when you started?
```

Page 29

1          A.     That's correct.

2          Q.     And that's grown over the years to 14?

3          A.     Correct.

4          Q.     Okay.  And when you worked as a pupil

5    personnel supervisor, that was in addition to your

6    work as the superintendent's student discipline

7    hearing official, correct?

8          A.     Yes.  In addition.

9          Q.     Okay.  Are there other superintendent

10   student discipline hearing officials for Harford

11   County Public Schools?

12         A.     Yes.  There's a two-part answer to my

13   question.

14                Anyone who is an administrator in the

15   central office can fulfill that role.  But since

16   two thousand, I want to say, eighteen, a second

17   hearing officer, Joseph DiBasilio, has worked under

18   my supervision in that role.

19         Q.     Okay.  So since 2018 there have only

20   been two discipline hearing officials?

21         A.     Yes.  And an additional nuance is our

22   executive directors can act in that capacity and,

23   at times, have acted in that capacity to make

24   disciplinary decisions either in my absence or in

25   addition to my decisions.

Page 30

```
 1        Q.   And then your assistant could be the
 2   discipline hearing official for a particular
 3   disciplinary hearing and make the decision about
 4   discipline?
 5        A.   That's correct.  Mr. DiBasilio.
 6        Q.   And then can the discipline hearing
 7   official's decisions be appealed?
 8        A.   Yes.
 9        Q.   To whom or what?
10        A.   For student discipline, the appeals go
11   straight to the Board of Education for a majority
12   vote, which is either a five-, seven-, or a
13   nine-person panel.
14        Q.   And when is it a five-person versus a
15   seven-person versus a nine-person panel?
16        A.   Based on availability of our somewhat
17   volunteer -- quasi-volunteer board.
18        Q.   When there is an appeal to the Board of
19   Education, is there a separate hearing before the
20   board?
21        A.   Two-part answer.  If it involves the
22   laws related to extended suspension and expulsion,
23   there's an in-person hearing.  And if it's related
24   to an administrative transfer, there is a
25   documentation-based hearing.
```

Page 31

1          Q.   So a documentation-based hearing is

2     someone reviews the record and makes a decision,

3     but they may not take testimony or hear from people

4     directly?

5          A.   That is correct.

6          Q.   Okay.  And is there an appeal from the

7     Board of Education's ruling of a disciplinary

8     hearing official's decision?

9          A.   Yes.  To the Maryland State Board --

10    Department of Education's Board of Education,

11    typically called the State Board.

12         Q.   Are there statistics that are publicly

13    reported about the number of decisions by a

14    discipline hearing official that are appealed to

15    the Harford County Public Schools Board of

16    Education?

17         A.   I'm not aware of it.  But if it was, I

18    would love it because they have a great record.

19         Q.   Do you have documents that you maintain

20    regarding those appeals?

21         A.   Not an official report that I could

22    press a button and create.  But I -- I do keep a

23    file --

24         Q.   What's that file --

25         A.   -- that includes --

Page 32

1          Q.    Sorry to interrupt.

2          A.    Just an appeals file in my computer.

3          Q.    Are there statistics that are publicly

4    reported about the number of decisions by the

5    Harford County Public Schools Board of Education

6    that are appealed to the state Board of Education?

7          A.    It's researchable because that

8    information is published online, but it's not in a

9    report format.  You would have to somehow figure

10   out how to go through the database and figure out

11   all the Harford County Public Schools cases.

12         Q.    Do you have any documents that you

13   maintain regarding those appeals?

14         A.    Only one.  Because it was an

15   aggravating case for me, so I kept it so I could

16   learn from it.

17         Q.    Okay.  So did you work as a teacher

18   after 1999?

19         A.    I have not taught since 1999.  That was

20   my -- the beginning of my administrative career.

21         Q.    So from 1992 to 1999, you were a

22   teacher in physical education and special

23   education.  Then you were a principal -- assistant

24   principal and a principal.  And then you held the

25   other positions listed on your resume?

Page 33

1           A.    In Harford County, an assistant
2       principal at four different schools before this
3       current position.
4           Q.    Okay.  Gotcha.
5                 When you were the assistant principal
6       at those schools between 2003 and 2009, were
7       students given access, either on a district-issued
8       device or on the district's network, to YouTube?
9           A.    I do not recall YouTube being used
10      during my time as an assistant principal.  It could
11      have been, but I...
12                Part of my responsibility was to
13      supervise teachers, and I do not recall teachers
14      using YouTube in any of my informal or formal
15      observations.  It could have happened.
16          Q.    Okay.
17          A.    It wasn't --
18          Q.    You don't have a recollection one way
19      or the other?
20          A.    No, I do not.
21          Q.    Is that fair?
22          A.    That's fair.
23          Q.    Okay.  I've seen documents referring to
24      bullying forms.  What are bullying forms?
25          A.    An online fillable form that comes in

Page 34

1   two formats.  One is a complaint form that a parent
2   completes and hits submit and it goes into a
3   database -- an internally managed database.
4           The principal or whoever is listed as
5   the principal for the school that shows on a
6   drop-down gets that via an email.  They are then
7   responsible for addressing or assigning a designee
8   to complete the investigation.
9           The investigation is the second online
10  form that is kept in that database.  So there is a
11  complaint form which should have a matching
12  investigative form.
13          And the reason those exist is because
14  we're required to provide that data to the Maryland
15  State Department of Education.
16      Q.   Is there some database that aggregates
17  the information on those forms?
18      A.   It is not.  You would get -- you would
19  get individual reports, but you can't say how many
20  of the bullying reports included X, Y or Z
21  criteria.
22      Q.   And how do these bullying forms match
23  up with the data in eSchool, if at all?
24      A.   It -- it's not going to be a one-to-one
25  because we train principals that if you get an

Page 35

1    electronic complaint form, you have to have an
2    electronic investigative form.
3              But if you get it written on, you know,
4    a piece of paper or a Post-it Note that's handed to
5    you in the morning, still take it seriously, just
6    as seriously as the complaint form, but you don't
7    have to go through the extra steps of completing
8    the complaint and investigative form.  Just address
9    it as a hard copy matter.
10              And, of course, it still gets listed in
11    the eSchool database if the student is found
12    responsible.
13              So there, in theory, should be more
14    actual bullying reports in the eSchool database
15    than there would be in the online bullying and
16    harassment file.
17        Q.    So where -- where would you go to find
18    all of the bullying forms that have been filled
19    out?
20        A.    I would click on a link that I have
21    available on my computer that's listed literally as
22    Bullying Harassment Reporting.  And then I can
23    toggle back and forth between the complaint forms
24    and the investigative forms.
25        Q.    Okay.  I was going to ask you about

Page 36

1    harassment forms.  Are those different than the
2    bullying forms?
3           A.   They're all -- they're all considered
4    one.
5                Typically, bullying is -- the way I
6    trained principals is that's mean behavior.  But if
7    you attach a label to it -- you're being mean and
8    you're calling somebody a name or a derogatory term
9    based on race, religion, gender, ethnicity -- now
10   it's harassment.
11          Q.   Okay.
12          A.   Knocking books out of hand is bullying.
13   Knocking books out of hand while calling someone a
14   disparaging term is harassment.
15          Q.   Okay.  And so for complaint forms or
16   incident forms that talk about harassment, that's
17   why you'd go to the same place.
18                You'd go to the place you said is
19   listed literally as Bullying Harassment Reporting?
20   And you can look at the complaint forms and you can
21   look at the investigative forms?
22          A.   Correct.
23          Q.   Does Harford County Public Schools have
24   a policy currently regarding students' use to --
25   I'm sorry -- access to or use of cell phones or

Page 37

1    personal electronic devices at school?
2         A.    There is a recently updated cell phone
3    policy sometime this spring.  I -- I couldn't tell
4    you if it was exactly which month, but recently.
5         Q.    Did you have any role in drafting that
6    policy?
7         A.    I did not.
8         Q.    Did you have any role in reviewing it
9    or commenting on it before it was submitted to the
10   Board of Education for approval?
11        A.    I did not.
12        Q.    Did you have any role in the Board of
13   Education adopting that policy?
14        A.    No role.
15        Q.    Did you have any role in drafting the
16   prior policy?
17        A.    That is possible, but I don't recall.
18        Q.    Did you have any role in reviewing or
19   commenting on the prior policy before that policy
20   was submitted to the Board of Education for
21   approval?
22        A.    It's -- I would remember if I was
23   involved in that.  There are certain policies and
24   procedures that I have more vested interest in or
25   I'm even invited to be a part of.  Cell phones

Page 38

1    isn't one of them.
2          Q.    Okay.  So is it your belief that you
3    did not have any role, then, in reviewing or
4    commenting on the prior policy before it was
5    adopted by the Board of Education?
6          A.    I am saying that.  It's just under
7    oath.  I'm trying really hard to make sure I don't
8    say the wrong thing.
9                There's a possibility somebody may have
10   asked me something along the line, but it's not
11   something that I recall.
12         Q.    Did you have any role in drafting the
13   prior policy?
14         A.    I don't believe so, no.
15         Q.    Do you know what the current policy
16   says about when students are permitted to access or
17   use cell phones or personal electronic devices at
18   school?
19         A.    In general terms, I do.
20         Q.    What are its general terms, as you
21   understand it?
22         A.    It's differentiated for elementary,
23   middle and high.
24                At the elementary level, you should
25   have your cell phones in a book bag and turned off

Page 39

```
 1   during the school period.
 2              And then it starts to get a little
 3   looser in middle school, where you can have your
 4   phone off.
 5              There's some difference between middle
 6   school and high school that I forget.  There's a
 7   nuance.  So I'm going to skip to high school and
 8   say you can have it on your person.
 9              Ah.  At the middle school, you can't
10   wear devices that connect to the Internet.
11              At the high school, you can.  They just
12   need to be off.  And your phone can be on your
13   person as well.  It just needs to be off during
14   instructional times.
15        Q.   Have you advocated for or against the
16   current policy?
17        A.   Neither for nor against.
18        Q.   Do you have a view on whether the
19   current policy should be changed?
20        A.   I believe the current policy is good in
21   theory.  As an administrator with years of
22   experience of having to enforce policies, that
23   would feel like holding back a tsunami wave with
24   your hand standing on the shore.  It's not
25   something that I would want to do.
```

Page 40

```
 1              Our students are so vested in cell
 2    phones and cell phone use and being on them during
 3    instructional times, it is nearly impossible to
 4    manage the policy.
 5              And I've spoken with most of our
 6    principals.  They accept it and they are compliant
 7    with it because that's what our Board of Education
 8    wants.  But it doesn't mean that it's easy or even
 9    working very well.
10         Q.   What -- what are the consequences for a
11    student who uses a cell phone or a personal
12    electronic device in violation of the current
13    policy?
14         A.   It would definitely be a disciplinary
15    removal, ten days or less.  That's the category.
16              So they can't come to me for a cell
17    phone violation unless they -- they punch the
18    teacher as a result of being disciplined or -- or
19    corrected.
20              It is almost always, "Go to the office
21    and wait for your parent to come pick you up.
22    We're going to have a conference before you go home
23    with your parent."
24              It sometimes evolves into suspension
25    between one and ten days depending on the history
```

Page 41

1    or the pattern and how cooperative the student is.
2          Q.   Is there a written document that spells
3    out what the consequences should be for a student
4    who uses a cell phone or a personal electronic
5    device in violation of the current policy?
6          A.   Not one that gives specific guidance.
7    Simply, between one and ten days is the maximum
8    suspension.
9               There is a document that provides that
10   level of guidance so that principals understand if
11   a student is refusing to give you a cell phone or
12   continues to use it in an insubordinate way, you
13   can't be expelled for that.  So don't send them to
14   my office.
15         Q.   Okay.  Beyond that, it's up to the
16   principal to decide what the consequences are?
17         A.   That is true.
18         Q.   So it could be a -- a suspension of ten
19   days or less or something less severe than a
20   suspension?
21         A.   Yes.  Depending on the individual
22   circumstances.
23         Q.   Regardless of the number of times a
24   student uses their cell phone or personal
25   electronic device in violation of the policy?

Page 42

1           A.    That's correct.  At its -- at its worst
2     or most severe, I should say, a student could be
3     put on a ten-day contract that says:  Listen, you
4     are so pervasive and -- and, you know, you violate
5     this in such a chronic way, every time there's a
6     problem with your cell phone, you're out for ten
7     days.  And that would be the most that you could
8     do.
9           Q.    If you wanted to find the number of
10    times a student was suspended for violating this
11    policy, where would you go to get that number?
12          A.    It would be difficult to -- to
13    determine.  I would have to pull disruption,
14    disrespect and electronic -- there's a code for
15    inappropriate use of electronics.
16                It's almost always the inappropriate
17    use of electronics parlays and escalates into a
18    disruption or a disrespect violation.  That
19    typically goes in as the primary violation.
20          Q.    And you would pull these codes within
21    eSchool?
22          A.    Correct.
23          Q.    Prior to the adoption of the current
24    policy, was there a document that articulated what
25    the consequences were for a student who used their

Page 43

```
 1    cell phone or personal electronic device in
 2    violation of the prior policy?
 3         A.    No, because we're talking about 2014
 4    and above.  Prior to 2014 is a different -- I would
 5    have more to say.  But not from 2014 on.
 6         Q.    Okay.  So for the prior policy that was
 7    in effect from 2014 up until this spring, you're
 8    not aware of a document that spells out the
 9    consequences?
10         A.    I'm not.  And I'm -- I'm involved with
11    most of the discipline documents.  So I -- I don't
12    think it exists.
13         Q.    Prior to the adoption of the new policy
14    this spring, was it still the case that a ten-day
15    suspension was the maximum punishment that could be
16    imposed on a student for violating the policy?
17         A.    Yes.
18         Q.    So at least --
19         A.    I'm sorry to interrupt --
20         Q.    Go ahead.
21         A.    -- Mr. Keyes.  As long as that's the
22    extent of the violation.
23         Q.    Right.  It doesn't reach --
24         A.    It's really rare.
25         Q.    It doesn't reach insubordination or --
```

Page 44

1          A.    Right.

2          Q.    -- some kind of physical contact with

3    the teacher or something like that.

4          A.    Correct.

5          Q.    Okay.  So under the prior policy since

6    2014 and under the current policy, the maximum

7    punishment for a student violating the policy on

8    the use of cell phones or personal electronic

9    devices is a ten-day suspension.  And that's up to

10   the discretion of the principal?

11         A.    Unless another violation came into

12   play, as we discussed earlier.

13              I would have to say I can -- I cannot

14   remember or recall a time where a student just

15   complied and said, "Okay, you caught me.  I'm

16   sorry."  Which is really what it would amount to.

17   It's almost always a power struggle that escalates.

18         Q.    Have you advocated for principals to

19   have the authority to impose greater punishment

20   than the ten-day suspension for violation of the

21   cell phone policy?

22         A.    I have actually advocated to the Board

23   of Education, not specifically citing cell phones,

24   but to -- in general asking for the Board of

25   Education's support to give us -- to help us get

Page 45

```
 1   the laws -- the statute changed to give principals
 2   greater discretion.  But that's not just for cell
 3   phones.  That's for everything.
 4        Q.   When you say "to give principals
 5   greater discretion," you need the law changed,
 6   what -- what law or laws are you referring to?
 7        A.   The Maryland Annotated Code would be
 8   7-305.  And the regulation that correlates to that
 9   would be 13A.08.01.11.
10             And those limit suspension to ten days
11   except for two pathways.  One is chronic
12   disruption, which has four criteria that have to be
13   met, and one is an imminent threat of serious harm,
14   which is a very high bar.
15             So a student with a cell phone who was
16   asked to put it away or turn it over, go to the
17   office, who doesn't want to do that, can escalate
18   to the point of saying to a teacher, "I'll kill
19   you.  You don't know me.  I'll kill you.  You
20   better watch your back."
21             And then a threat assessment is done,
22   and it turns out to be, well, it's not really
23   imminent.  He was just venting.  That student can't
24   be expelled.
25             And the principal discretion that I
```

Page 46

1  speak to said the principal should be able to

2  decide whether that case comes forward to my

3  office.

4         Q.    Have you advocated for other changes to

5  the law regarding students' access to or use of

6  cell phones?

7         A.    No, I have not.

8         Q.    Are Harford County Public School

9  students given access to YouTube on district-issued

10 devices?

11        A.    My understanding is that Harford County

12 tells its teachers and principals you have to make

13 sure that it's a restricted mode, and -- and then

14 there is access on student-issued devices and --

15 and teachers' computers they're using.  But I'm not

16 an expert in what "restricted mode" means.

17        Q.    Okay.  And are students also able to

18 access YouTube on the Harford County Public Schools

19 network?

20        A.    Well, officially and technically on the

21 record, no.  But I -- I do have -- I've spoken with

22 a lot of students, including my own children, who

23 are now 22 and 26, who say it's really easy to get

24 a VPN or a virtual private network, work your way

25 around the system.

Page 47

1           There are certain places you can click
2    links, open applications, and put those links in to
3    watch the videos.  So as early as sixth grade, our
4    students know how to get around the system.
5           Q.   So is it your belief that students are
6    not able to access YouTube on the Harford County
7    Public Schools network?
8           A.   I -- I don't know how to answer your
9    question other than to say I believe they can
10   because the network is set up for this restricted
11   mode, which means it's a safer place for them.
12          I mean, it's obviously -- you all are
13   the experts in that area.  But I do believe a
14   student can access it because the network is
15   connected to a restricted mode-type process.
16          Q.   Okay.  To your knowledge, is -- is
17   access to YouTube blocked on Harford County Public
18   Schools' Internet content filter?
19          A.   I believe if it -- if it -- the answer
20   to your question is sometimes.  If they're trying
21   to access something that has whatever inappropriate
22   comment is as determined by our office of
23   technology, they can't access it.
24          And if it is considered appropriate and
25   it fits within the restricted mode filter, then

Page 48

1    they could access it.
2         Q.   And is -- is your understanding the
3    same, then, for whether students can get access to
4    YouTube on their personal electronic devices when
5    those are connected to the Harford County Public
6    Schools network?
7         A.   I'm -- I'm making an assumption that
8    that is -- that is correct.  But I don't have
9    personal experience with it.
10        Q.   Have you advocated at any point for a
11   change to Harford County Public Schools giving
12   students access to YouTube on district-issued
13   devices?
14        A.   I have not advocated.  I typically
15   defer to my colleagues who are more in the
16   curriculum and instruction area on those matters.
17        Q.   Have you advocated at any point for a
18   change to Harford County Public Schools giving
19   students access to YouTube on personal electronic
20   devices when connected to the district's network?
21        A.   I have not advocated one way or the
22   other.
23        Q.   Are Harford County Public Schools'
24   students blocked from accessing social media on
25   district-issued devices?

Page 49

1          A.    I don't know the answer to your
2    question.
3          Q.    Are Harford County Public School
4    students blocked from accessing social media on
5    their personal electronic devices when connected to
6    the district's network?
7          A.    I understand the question.  I -- I --
8    I'm under the impression, based on the evidence
9    that I'm seeing on a daily basis, that they're
10   using their personal devices to access.  But I -- I
11   don't know all the fancy ways children have of
12   getting access to this stuff.
13              Again, I don't -- I'm pretty sure they
14   have ways of getting around any blockages that are
15   part of the Harford County restrictions.
16         Q.    Okay.  Well, you're -- you're stating a
17   belief that they can evade blocks if blocks are in
18   place.
19         A.    Right.
20         Q.    My question is whether you know whether
21   Harford County Public Schools has blocked student
22   access to social media either on their
23   school-issued devices or on their personal
24   electronic devices when connected to the district's
25   network.

Page 50

1          A.    Right.

2          Q.    And you don't know the answer to that

3    question?

4          A.    I do understand the question, and I

5    don't know the answer.

6          Q.    Okay.  Have you ever advocated for a

7    change to Harford County Public Schools' decision

8    whether to block or not block students' access to

9    social media?

10         A.    No.  Again, I would defer to my

11   colleagues who work in that area for curriculum and

12   instruction.  I'm more on the end of what happens

13   when you violate the rules.

14         Q.    From your perspective, have you seen

15   any change in students' use of cell phones or

16   personal electronic devices at school since the new

17   policy was adopted?

18         A.    I have not seen a change.  I have

19   spoken to several principals about the cell phone

20   policy, not related to this proceeding, just in

21   general how's it going.

22               And the general consensus is it's a lot

23   of work and the cost is sometimes not worth the

24   benefit.  Students are still on their phones.  It's

25   pretty disruptive.

Page 51

1          Q.   So in those conversations with
2     principals, have they offered to you any suggestion
3     for how to address the cell phone problem?
4          A.   They are -- they're pretty frustrated
5     and -- and overwhelmed by the problem.  You know,
6     we're -- we're all looking for answers.
7          Q.   Does -- does Harford County Public
8     Schools have a YouTube channel?
9          A.   If they do, I'm not aware of it.
10         Q.   Does Harford County Public Schools have
11    a Facebook account?
12         A.   I've seen the little symbol on the HCPS
13    website, but I'm not familiar with it.  I don't
14    access it.
15         Q.   Does Harford County Public Schools have
16    an Instagram account?
17         A.   Same answer.  I -- I believe the --
18    that's somehow linked to the website, but I'm not
19    familiar with it.
20         Q.   Okay.  So Harford County Public Schools
21    has a website.  Yes?
22         A.   That's true.
23         Q.   And you've seen on the website the
24    Facebook logo?
25         A.   The little logos.

Page 52

1          Q.    And you've seen the Instagram logo on
2     the website?
3          A.    Yes.
4          Q.    And have you clicked on either of those
5     logos to get linked to the Harford County Public
6     Schools Facebook or Instagram account?
7          A.    No.  With all due respect to my social
8     media experts here, I'm pretty analog kind of a
9     guy.
10          Q.    Okay.  But it -- is it your belief,
11     even if you haven't clicked on them, that those two
12     logos, one for Facebook and one for Instagram on
13     the website, allow someone to get to the Harford
14     County Public Schools Facebook or Instagram --
15          A.    I mean, that's my assumption of how it
16     works.
17          Q.    Okay.  What's the basis for your
18     assumption?
19          A.    Because I've clicked on links.  I know
20     what hyperlinks are.
21          Q.    Okay.  Does Harford County Public
22     Schools have any social media account at all?
23          A.    Possibly, Mr. Keyes.  I'm not aware of
24     it.
25          Q.    Okay.  So have you ever created any

Page 53

```
 1   content to be posted to a Harford County Public
 2   Schools social media page?
 3        A.    All of my postings were previously --
 4   the answer is no.  Previously -- I'm forgetting
 5   what it's called -- the SharePoint and now Teams,
 6   Microsoft Teams.
 7             And if somebody could get -- because I
 8   do produce a lot of information.  Somebody could
 9   get something that I produced and post it without
10   my knowledge to a site.  That could happen.
11        Q.    But you've not created any content
12   for -- with the purpose of posting it to a Harford
13   County Public Schools social media page.
14        A.    No.
15        Q.    Is that correct?
16        A.    That's correct.
17        Q.    And you've never posted to the social
18   media pages either?
19        A.    No.  I wouldn't even know how.
20        Q.    And has anyone asked you to review or
21   comment on content they had created to be posted on
22   a Harford County Public School social media page?
23        A.    Not to my recollection, no.
24             (WILLIAMS EXHIBIT 2, 2023-2024
25   Parent-Student Handbook Calendar, was marked for
```

Page 54

1    identification.)

2    BY MR. KEYES:

3            Q.    I'm showing you what has been marked as

4    Williams Exhibit 2.

5            A.    Thank you.

6            Q.    This document was produced to us with

7    the Bates numbers HCPS_00019338 through 19372.

8    This is titled the "2023-2024 Parent-Student

9    Handbook Calendar."

10                 I'll give you a chance to take a look

11    at that document.

12            A.    I am familiar with it, Mr. Keyes, and I

13    know that there's a lot of text in here.  It's the

14    closest thing we have to a -- in terms of my

15    responsibilities in the school system, a code of

16    conduct.

17            Q.    Okay.  So is this a handbook?

18            A.    It is a handbook that's provided to

19    students and parents.

20            Q.    And how is it distributed to parents

21    and students, at least for the 2023-2024 school

22    year?

23            A.    Principal discretion is my

24    understanding.  It can be shared electronically.

25                 I do believe students are expected --

Page 55

1   or parents are expected to actually sign off --

2   it's on a school-by-school basis -- to show that

3   they have been provided as a due process procedure

4   for us so that later, when we say, "You didn't

5   follow the rules," and they say, "I didn't know the

6   rules," we say, "Well, you signed that you did."

7            And this is the handbook that we use to

8   share the rules.

9        Q.   And is there a particular section or

10  sections that you consider to be the code of

11  conduct, or do you consider the entire document to

12  be a code of conduct?

13       A.   Not the entire document.  There would

14  be specific things.  And if you'll give me a moment

15  here, I'll --

16       Q.   Sure.

17       A.   -- let you know where -- where it

18  begins.  But it's the student discipline stuff.

19            And I also am responsible for other

20  areas of this unrelated to student discipline.

21  That's under my pupil personnel worker supervisor.

22            For example, on Page 9, in the upper

23  left corner you'll see Boundary Exceptions.  School

24  Assignment.  That's an area for which I am

25  responsible.

Page 56

1          Now I'm just -- and anything that has
2    to do with attendance, I'm responsible for that.
3    And it looks like maybe Rights and Responsibilities
4    of Students starts on Page 11 in the middle column
5    halfway down.  Dress code is there.
6          Now I'm continuing -- yeah.  Then it
7    gets into search, arrests, safe schools.
8          So that's really where I begin for
9    discipline purposes, on Page 11.  And then it goes
10   through 13, 14, 15, and ends -- ends on 15, it
11   looks like.
12        Q.   So in the event that a student is the
13   subject of a disciplinary hearing before you for
14   conduct during the 2023-2024 school year, if the
15   student or the student's parents say, "We didn't
16   know that was a rule," you would refer them to this
17   exhibit or portions of this exhibit.  Yes?
18        A.   I could, yes.
19        Q.   You could.  Have you done that?
20        A.   Yes.
21        Q.   And if a student or the parents of the
22   student say, "We didn't agree to these terms," is
23   there some other document you have access to to
24   show the student and the parents of the student
25   that they did agree to these terms?

Page 57

```
 1          A.    I would then defer my decision because
 2     the parent's saying, "Hey, you didn't give me
 3     proper due process."
 4               I would go back to the principal either
 5     through a temporary delay, maybe a 15-minute
 6     recess, or have to reschedule for another day, and
 7     let the principal know, "Hey, I hope you have
 8     something that the parents signed off on that they
 9     received this.  Because if not, the student is
10     coming back."
11          Q.    And there's no -- strike that.
12               Principals are given some discretion
13     about the way in which they communicate this
14     parent-student handbook to students and families?
15          A.    Yes.  For example, at the high school
16     level, you pick a course that is -- everybody
17     cycles through, like English.  And everybody in
18     English class on the first or second day of school
19     gets it.
20               And I have a recommended signature form
21     so that there's some uniformity -- they can use it
22     or they don't have to use it -- and that typically
23     goes home to parents.  Parents sign it, and it
24     comes back.
25               And the front office monitors all of
```

1   the forms that need to be signed, and it's part of

2   a whole package.  Sign if you want -- if you're

3   giving permission for your child to be

4   photographed, for example.  It's part of that

5   package.

6        Q.   And then do the principals typically

7   keep those records to show that the student and the

8   parents of the student acknowledge receipt of the

9   handbook and agree to abide by its terms?

10       A.   In most cases, I am able to get that

11  from principals.  There are occasions when it

12  doesn't happen.  And then the student usually

13  returns and I end the suspension, making sure that

14  I document that the parent now understands the --

15  the rules.

16       Q.   Would you turn to Page 4 of this

17  exhibit.

18       A.   Okay.  I'm on Page 4.

19       Q.   And you'll see three columns of text.

20  If you look on the upper right hand, the third

21  column, do you see a section titled "Website and

22  Social Media"?

23       A.   Yes.

24       Q.   And so the student handbook says:  The

25  school system's website, www.hcps.org, offers

```
                                        Page 59
1    information to meet the needs of parents and
2    guardians, students, staff, and the general
3    community.
4              Do you see that?
5         A.   Yes.
6         Q.   Then it says:  The website and app
7    serve as quick resources to the most requested
8    information.
9              Do you see that?
10        A.   I do.
11        Q.   And then it says:  Follow us on
12   Facebook, Twitter and YouTube.
13             Do you see that?
14        A.   I do.
15        Q.   Does that refresh your recollection
16   that Harford County Public Schools has a YouTube
17   channel?
18        A.   I believe -- I believe it, sure.
19        Q.   Okay.  Does that jog any memory of you
20   at any point going onto the Harford County Public
21   Schools YouTube channel?
22        A.   No.  Unless I was required to watch
23   a -- maybe a training video or something, and
24   that's where it was housed.  But I don't recall
25   intentionally clicking on YouTube to watch
```

```
                                              Page 60
 1    something.
 2            Q.    Could you turn to Page 6 of Williams
 3    Exhibit 2?
 4            A.    All right.  This is the calendar,
 5    right?  The handbook, Page 6?
 6            Q.    Yes.  It looks like you're on the right
 7    page.
 8            A.    Okay.  I'm there.
 9            Q.    In the -- in the lower left of this
10    page, do you see a section titled "Responsible Use
11    of Technology"?
12            A.    Yes.
13            Q.    And that has three separate paragraphs?
14            A.    Yes.
15            Q.    The second paragraph says:  Harford
16    County Public Schools utilizes an outside Internet
17    filtering company to ensure the safety of our
18    students while they access the Internet.  The use
19    of its filter system also allows Harford County
20    Public Schools to comply with the Child Internet
21    Protection Act.  Students are expected to
22    demonstrate responsible and ethical behavior in the
23    use of the resources as outlined in the RUP.
24                 Do you see that?
25            A.    Yes.
```

Page 61

1           Q.   Do you understand the RUP --

2           A.   Responsible use procedure?

3           Q.   Yes.  Do you know what Internet

4    filtering company Harford County Public Schools

5    is -- used during the 2023-2024 school year?

6           A.   No, I do not.

7           Q.   Have you heard of the Child Internet

8    Protection Act before?

9           A.   Yes.

10          Q.   Do you understand that the Child

11   Internet Protection Act requires public schools to

12   use a Internet filter on its devices and network?

13          A.   I believe that's the case.  I'm really

14   not fully schooled up on the -- on the nuances of

15   it, the specifics.

16          Q.   Okay.  Then there's another paragraph

17   that's captioned "YouTube."

18               Do you see that?

19          A.   Yes.

20          Q.   It says:  YouTube is utilized as an

21   instructional tool for HCPS students.  YouTube is

22   set to restricted mode on HCPS-issued devices and

23   through the HCPS network.  Restricted mode is a

24   setting controlled by YouTube algorithms to hide

25   potentially objectionable content.  HCPS continues

Page 62

1    to monitor, evaluate and update YouTube settings to
2    minimize access to inappropriate content.
3                Did I read that correctly?
4        A.   Yes.
5        Q.   Okay.  Does this refresh your
6    recollection that YouTube is accessible to Harford
7    County Public School students on their issued
8    devices and through the district network in
9    restricted mode?
10               MR. LEGG:  Objection to form and
11   foundation.
12               THE WITNESS:  That's the way I read it.
13   BY MR. KEYES:
14       Q.   Okay.  Have you ever advocated for a
15   change to the practice that is described here?
16       A.   No.
17       Q.   Have you ever talked to teachers about
18   how they use YouTube in the classroom?
19       A.   I have not.
20       Q.   Have you ever talked to teachers about
21   whether and how they use YouTube for homework?
22       A.   No, I have not.
23       Q.   Have you talked to any assistant
24   principals or principals about how teachers in
25   their school use YouTube in the classroom?

Page 63

1          A.    No.

2          Q.    Have you ever talked to any assistant

3    principals or principals about how teachers in

4    their school use YouTube for homework?

5          A.    No.

6          Q.    Do you have any knowledge one way or

7    the other about how Harford County Public School

8    teachers use YouTube as an instructional tool as

9    described here?

10         A.    No, sir.  It's just not part of the

11   scope of what I do in the school system.

12         Q.    Okay.

13               (WILLIAMS EXHIBIT 3, 2022-2023

14   Parent-Student Handbook Calendar, was marked for

15   identification.)

16   BY MR. KEYES:

17         Q.    Let me show you what has been marked as

18   Williams Exhibit 3.

19               Is this the parent-student handbook and

20   calendar for the 2022-2023 school year?

21         A.    It appears that way, yes.

22         Q.    And is it your understanding that each

23   principal was tasked with making sure that this was

24   distributed to every school family and they had

25   some way of documenting that the family received it

Page 64

```
 1   and was agreeing to its terms and provisions?
 2         A.    Yes.
 3         Q.    Would you turn to Page 6 of this
 4   exhibit.
 5               Are you there?
 6         A.    Yes.  I'm on Page 6.
 7         Q.    Okay.  And it -- it appears to have the
 8   exact same language regarding responsible use of
 9   technology.  I'm not expecting you to do a
10   word-for-word comparison.  And it also appears to
11   have the exact same language regarding YouTube.
12               Do you know how long Harford County
13   Public Schools has been including this kind of
14   language in its student or parent-student handbook?
15         A.    I don't.  I didn't even know it was in
16   there.
17         Q.    Okay.  Have -- have you discussed in
18   the past how YouTube can be used for student
19   discipline?  Strike that.
20               Have you discussed in the past how
21   social media in general can be used for student
22   discipline?
23               MR. LEGG:  Objection to form.
24               THE WITNESS:  I'm trying -- I'm trying
25   to respond to that.  I'm not sure that I
```

Page 65

1    understand.  The answer is no as -- as asked.

2    BY MR. KEYES:

3         Q.   Okay.  What do you mean "as asked"?  Is

4    there a --

5         A.   I just don't --

6         Q.   -- qualifier?

7         A.   I just don't understand, Mr. Keyes.

8    Like, I -- it doesn't seem to be something that

9    would come up where I would say, "Hey, as a --

10   maybe a part of the disciplinary process, we're

11   going to somehow use social media."  It's not

12   something that I would normally use or talk about.

13        Q.   Okay.

14             (WILLIAMS EXHIBIT 4, Email dated

15   11/17/22, Subject:  Work Log, Bates

16   HCPS_00530898-900, was marked for identification.)

17   BY MR. KEYES:

18        Q.   Let me show you what's been marked as

19   Williams Exhibit 4.

20             MR. KEYES:  Tab 28.

21   BY MR. KEYES:

22        Q.   This was produced with the Bates number

23   HCPS_00530898 through 530900.  It's a series of

24   emails.

25             So tell me when you've reviewed.

Page 66

```
 1          A.    Does it start on the back, or how does
 2    it work?  Does it start on -- are they all
 3    connected?
 4          Q.    I think this is an email chain that
 5    starts with the email on the bottom of the second
 6    page.
 7          A.    Okay.  Let me just --
 8          Q.    And then the next email is above that,
 9    and the most recent email is on the first page.  So
10    you might want to read them in chronological order.
11          A.    Okay.  Thank you.
12                Okay.  I've reviewed it.
13          Q.    Okay.  So this appears to involve an
14    issue of two students involved in an incident that
15    required discipline, correct?
16          A.    Yes.
17          Q.    Okay.  And the email on the first page
18    is from you to Bernard Hennigan on November 17th,
19    2022?
20          A.    That's true.
21          Q.    Who is Bernard Hennigan?
22          A.    My supervisor.  And his title is
23    executive director of student services.
24          Q.    For how long has Mr. Hennigan been your
25    supervisor?
```

Page 67

```
 1          A.    I'm going to say 2015 because that's
 2     when I picked up the new responsibilities.
 3          Q.    Since 2015, have you reported to anyone
 4     besides Mr. Hennigan?
 5          A.    I mean, he's the first person in the
 6     chain of command.  There are other people above him
 7     who I occasionally consult with, but he's my
 8     supervisor.
 9          Q.    He's your direct boss?
10          A.    Correct.
11          Q.    Okay.  And he's the only direct boss
12     you've had since at least 2015?
13          A.    Correct.
14          Q.    Okay.  You say in your email to
15     Mr. Hennigan, quote:  And another creative
16     intervention for older students is to offer them
17     the option of creating and publishing a public
18     service announcement/apology to the student body
19     via social media platform.  It's the modern-day
20     version of wearing a sandwich board outside the
21     school.  "I'm sorry I disrupted your day and
22     destroyed the bathroom with a TikTok challenge."
23     Both parents were grateful for the option and
24     agreed to it.
25               Did I read that correctly?
```

Page 68

1          A.    You did.

2          Q.    Okay.  So did you suggest to the

3    parents of the students named in this email chain

4    that the students could, as -- as one consequence,

5    create an apology and then publish that apology to

6    the student body via social media?

7          A.    I did.  I would classify that as an

8    alternative to suspension or for a reduced

9    suspension.

10         Q.    Okay.  So you -- you said to the -- the

11   students and their parents, "I'm entitled to

12   suspend you for what you did.  As an alternative,

13   you can agree to write an apology and then publish

14   it via social media to the student body."  Yes?

15         A.    That's the gist of it, yes.

16         Q.    Okay.  And this says the parents were

17   grateful for the option and agreed to it.

18               Does that mean that they went through

19   with this alternative to suspension?

20         A.    I remember this case, but it's vague.

21               The way that I think this played out is

22   Mr. Hennigan agreed to it, and I let the principal

23   know, "Hey, I'm going to reduce the suspension.

24   Make sure that this happens."

25               And then I trust that the principal is

Page 69

1    going to review and that whatever the alternative
2    is, whether it's an essay or, in this case, a
3    social media post, make sure it's sincere and it
4    meets your criteria for "did a good job."
5              Q.    Had you suggested this alternative to
6    suspension to other families?
7              A.    I had not.  In fact, when we talked
8    earlier, I said, "I can't recall ever doing that."
9              I do remember this, but it's not
10   something that happens regularly.  We try to be
11   creative and add as many alternatives as we can to
12   give principals ideas.
13             Q.    In this case, why did you think it was
14   appropriate for the students to publish their
15   apology to the student body via social media
16   platform?
17             A.    I believe the students were very vested
18   in social media and their platforms.  And I wanted
19   to give them an opportunity to prove that they were
20   sincere by using something that I thought they
21   would buy into.
22             So instead of a written essay, go ahead
23   and use whatever platform it is that you think is
24   valuable and important and your friends are going
25   to pay attention to it.

Page 70

1          Q.   So you thought it was an effective way
2     of getting the apology out to the student body?
3          A.   Correct.
4          Q.   Have you ever requested that any
5     defendant in this case modify any feature or
6     function of their platform?
7          A.   I don't believe so.
8          Q.   Have you ever requested that any
9     defendant in this case discontinue any feature or
10    function of their platform?
11         A.   There have been cases where I've
12    asked -- I think so.  So I'm going to answer that
13    and then you can guide.
14              I have asked for parents to verify that
15    certain -- what's it called?  Like when they're --
16    they're part of something, they're -- if they're
17    part of, like, an Instagram site, profile, if you
18    will, "Hey, I need to know that that profile that
19    you had up is gone."
20              And then I'll work with the parents or
21    I'll work with the principal to make sure that that
22    has been discontinued.
23              That's really the extent of it.  "You
24    did something bad with this profile.  I need to
25    make sure that profile is not around anymore."

Page 71

```
 1          Q.    So that involves some kind of content,
 2    whether it be a profile or a posting by a student
 3    that you want taken down or changed?
 4          A.    In -- in that example, yes.
 5          Q.    And that's a request you make to the
 6    student or the student's parents or both?
 7          A.    Yes.  It's not something that I can
 8    require, obviously.  But I can certainly factor it
 9    into my discipline decision about how serious they
10    are about being remorseful and making a change.
11          Q.    So have you ever made any request to a
12    defendant in this case that they discontinue any
13    feature or function of their platform?
14          A.    Meaning the social -- TikTok and
15    Instagram, et cetera?  No.
16          Q.    Have you had a communication of any
17    sort with any of the defendants in this case about
18    their features or functions?
19          A.    No.
20          Q.    Have you had any communication of any
21    sort with any of the defendants in this case about
22    anything?
23          A.    No.
24          Q.    Who are the defendants in this case, as
25    you understand it?
```

Page 72

1           A.    I believe there are four.  Let me go
2     through a mental list here.  We've got Meta, which
3     I believe is Facebook and Instagram.  And TikTok
4     stands alone and Snapchat stands alone.  And then
5     there's Google and YouTube.
6           Q.    And so knowing that list, have you had
7     any communication of any sort with any of those
8     companies about anything?
9           A.    No.
10          Q.    Do you have any personal knowledge
11    about Harford's policies and procedures concerning
12    social media use by students?
13          A.    I don't recall anything specific about
14    it.
15          Q.    You do have some familiarity with how a
16    discipline incident would be coded if a student
17    violated a policy regarding use of a cell phone or
18    a personal electronic device, correct?
19          A.    Yes.  It would almost always be some
20    other code in association with inappropriate use of
21    electronics.
22          Q.    Okay.  So are you aware of Harford
23    County Public Schools having any policies or
24    procedures concerning social media use by students?
25          A.    I'm not aware.

Page 73

1          Q.   And you testified before that students
2    use social media to instigate conflict, promote
3    or -- or advertise fights before and after they
4    occur, and to escalate conflict after the fights?
5          A.   That's correct.
6          Q.   And you've testified that students
7    really like to have their cell phones with them and
8    use their cell phones, including to stay abreast of
9    what's being posted about fights.
10              Are you able to -- do you have any
11   personal knowledge about social media use by
12   Harford students beyond that?
13              MR. LEGG:  Objection to form and
14   foundation.
15              THE WITNESS:  Outside of the
16   disciplinary realm and the criminal reportable
17   offenses that I deal with, I know it's important to
18   young people just because I'm connected to young
19   people, but not specifically what they do with them
20   or how they connect.
21              I usually work with videos and
22   snapshots that are part of evidence exhibits
23   labeled as -- as your exhibits are.
24   BY MR. KEYES:
25          Q.   And outside of what you describe as the

Page 74

1   disciplinary realm and the reporting of criminal
2   offenses, do you have any personal knowledge about
3   safety and security policies within the district?
4                MR. LEGG:  Objection to form and
5   foundation.
6                THE WITNESS:  No, I don't.
7   BY MR. KEYES:
8        Q.   And outside of what you describe as the
9   disciplinary realm and the reporting of criminal
10  offenses, do you have any personal knowledge about
11  safety and security measures within the district?
12               MR. LEGG:  Objection to form and
13  foundation.
14               THE WITNESS:  No, I don't.
15  BY MR. KEYES:
16       Q.   Do you use YouTube?
17       A.   Yes.
18       Q.   Do you have a YouTube account?
19       A.   I'm pretty sure you have to make an
20  account at some point to -- to use it.  I'm -- I'm
21  not really sure.  It's not something that I use
22  regularly.  It's possible that there's an account
23  out there somewhere.
24       Q.   So when you use YouTube, how do you
25  access it?

Page 75

```
 1            A.    I just Google search how to fix the air
 2    cleaner on my Harley-Davidson.  And if that's one
 3    of the videos that comes up, I watch it.
 4            Q.    Okay.  So when you use or watch YouTube
 5    content, one of the categories is sort of how-to
 6    videos?
 7            A.    That's -- that's mainly when I'm
 8    interested in fixing things.
 9            Q.    Are there other categories of videos
10    that you use or watch on YouTube?
11            A.    In the past, when I created
12    professional development for administrators, I'll
13    try to find a clever humorous clip here and there
14    and use those.  But that's really about the extent
15    of it.
16            Q.    When was the last time you used
17    YouTube?
18            A.    Probably within the month.
19            Q.    Within the past month, you mean?
20            A.    Within the past month.
21            Q.    And for how long have you been using
22    YouTube?
23            A.    I'm going to estimate about ten years.
24    When it became a thing when you were trying to fix
25    something and your neighbor said, "Have you looked
```

Page 76

1    on YouTube?"

2          Q.    Have you posted content to YouTube?

3          A.    I have attempted to post some things.

4    There may be some things out there.  I'm not

5    exactly sure what it is.

6          Q.    Well, what -- what kind of content have

7    you tried to post to YouTube?

8          A.    I -- I think it falls into the category

9    of, maybe, professional development clips that I

10   just want to make sure I don't lose.

11               So if I click on, like, an Internet or

12   the Wi-Fi is down during a presentation, I seem to

13   remember that's what I was trying to do at the

14   time.

15               (WILLIAMS EXHIBIT 5, Emails, top one

16   dated 4/27/21, Subject:  Buzz's You Tube Video

17   Link, Bates HCPS_00246650-651, was marked for

18   identification.)

19   BY MR. KEYES:

20         Q.    I'll show you what has been marked as

21   Williams Exhibit 5.  This is a document that was

22   produced with the Bates number HCPS_00246650

23   through 651.  It's a series of emails.

24               Tell me when you've reviewed this

25   series of emails.

Page 77

```
 1          A.    Okay.  Thank you.  Just give me a
 2    moment.
 3                Okay.  I've reviewed it.
 4          Q.    You have.  Okay.
 5                On the first page, bottom half, there's
 6    an email from you to Jason Berends, B-E-R-E-N-D-S,
 7    dated April 16th, 2021.
 8                Do you see that?
 9          A.    Yes.
10          Q.    Who is Jason Berends?
11          A.    A person who works in our office of
12    technology.  Typically, I'll go to if I have video
13    questions.
14          Q.    Okay.  And you say:  Jay, here's my
15    video uploaded to my personal YouTube channel.
16                Does that jog a memory that you had
17    a --
18          A.    Yeah.  That's the thing --
19          Q.    -- personal YouTube channel?
20          A.    I'm sorry to interrupt.
21          Q.    Okay.
22          A.    That's what I'm referring to earlier
23    when I said I'm pretty sure there's one out there.
24    I've dabbled with it.  I tried to get stuff
25    uploaded.  I'm not an expert.
```

Page 78

1          Q.    Okay.  And he's -- he's listed here as

2     a videographer in the office of communications.

3               Were you sending the video to

4     Mr. Berends so it could be posted to Harford's

5     YouTube channel?

6          A.    I'm going to look at it a little more

7     carefully so I can --

8          Q.    Sure.

9          A.    -- answer you.  It doesn't sound like

10    something I would even know how to do.

11              I know my intent here was to get the

12    pupil personnel workers to look at the routes on

13    these particular hiking paths.  So let's see.

14              To the best of my recollection, I -- I

15    would not have asked for this to be uploaded to a

16    Harford County YouTube site.  I'm pretty sure I was

17    trying to make it available as a link that I could

18    email to the PPWs.

19         Q.    So were you asking for Mr. Berends'

20    technical help on a way of giving access to the

21    PPWs who worked for you access to this YouTube

22    video?

23         A.    Yes.  And I recall the thought process

24    of, I don't want to get myself in trouble by

25    providing some link to something that I'm not

Page 79

```
 1   supposed to -- to use, and can you help me do it
 2   the right way?  That seems to be what I remember.
 3        Q.   Were there other occasions where you
 4   posted content to your own personal YouTube
 5   channel?
 6        A.   Just in that category that I told you
 7   earlier where I didn't want to lose a video because
 8   of a -- maybe a Internet's down or a bad Wi-Fi.
 9   And I wanted to be able to -- to click it and --
10   and open it.
11             There was a time where I was able to
12   actually isolate the video, but I don't remember
13   how to do it.  And I don't think the software is
14   available anymore.
15        Q.   Do you have any social media accounts
16   yourself?
17        A.   Facebook for Marketplace.
18        Q.   Anything else?
19        A.   None, no.  Especially the ones that we
20   just talked about.  I mean, I'm aware of them.  I
21   know what they are.  I see the screenshots.  But I
22   don't personally have accounts.
23        Q.   Do you have kids?
24        A.   22 and 26.
25        Q.   Did they have cell phones when they
```

Page 80

1    were in high school?

2         A.    They did.  I think they might have been

3    starting in the flip category and then moving into

4    smartphones.  They were part of that transition.

5         Q.    So did they have cell phones when they

6    were in middle school?

7         A.    They did.

8         Q.    Okay.  So they had cell phones in

9    middle school, high school and thereafter?

10        A.    Correct.

11        Q.    Okay.  When they had cell phones in

12   middle school, did they have access to YouTube?

13              MR. LEGG:  Objection to form,

14   foundation and relevance.

15              THE WITNESS:  I -- I -- I am fairly

16   confident that they watched YouTube videos in --

17   while they were in school or in their school-age

18   years.

19   BY MR. KEYES:

20        Q.    Did they have a YouTube account when

21   they were in middle school?

22              MR. LEGG:  Objection to form,

23   foundation and relevance.

24              THE WITNESS:  I don't recall whether

25   they had a YouTube account.

Page 81

```
 1   BY MR. KEYES:
 2        Q.   When they had cell phones in high
 3   school, did they have access to YouTube on their
 4   cell phones?
 5             MR. LEGG:  Objection to form.
 6   Foundation.  Relevance.
 7             THE WITNESS:  I'm making an assumption,
 8   yes.  But it's not something that I can clearly
 9   recall working with them on.
10   BY MR. KEYES:
11        Q.   Did they have a YouTube account when
12   they were in high school?  Either of them?
13             MR. LEGG:  Objection to form.
14   Foundation.  Relevance.
15             THE WITNESS:  I don't recall them
16   routinely accessing a YouTube channel.
17             I think my children have been honest
18   with me that they've had social media accounts that
19   Mom and I did not know about, because typically
20   students will try to get around their parents
21   knowing about things.  They probably did, but I
22   just don't know for sure.
23   BY MR. KEYES:
24        Q.   When they had cell phones in middle
25   school or high school, did you use any of the
```

Page 82

```
 1   parental controls on the device to block their
 2   access to YouTube?
 3              MR. LEGG:  Objection to form.
 4   Foundation.  Relevance.
 5              THE WITNESS:  My wife and I researched
 6   as best we could every kind of parental control.
 7   So I would say yes, although I couldn't walk you
 8   through the steps of doing it.
 9              And we also required the phones to be
10   on the kitchen counter when they went to bed so we
11   could get into their phones.
12              The problem is, as many students will
13   have, other accounts.
14              So we're saying, "Mom and I are looking
15   at your accounts to check what you have," and they
16   have other accounts that we don't know about, as
17   many students do.  And that's a workaround that not
18   a lot of parents know.
19   BY MR. KEYES:
20        Q.   Separate -- separate from what they
21   had, when they had cell phones in middle school and
22   high school, did you use any of the parental
23   controls on their cell phones to block their access
24   to YouTube?
25              MR. LEGG:  Objection to form,
```

Page 83

```
 1   foundation and relevance.
 2              THE WITNESS:  I'm fairly confident we
 3   did, Mr. Keyes.  I just don't recall for sure.
 4   BY MR. KEYES:
 5        Q.   How did you block their access to
 6   YouTube on their cell phones?
 7              MR. LEGG:  Same objection.
 8              THE WITNESS:  I can tell how I would
 9   have done it.  My wife and I would have said,
10   "Okay, the kids look like they're getting into
11   YouTube.  Let's Google search how to operate these
12   parental controls."
13              And then, if the instructions were
14   listed, we would have followed them and hoped that
15   it helped in some way.
16   BY MR. KEYES:
17        Q.   That's how you think you would have
18   done it sitting here today?
19        A.   I think we would have done it back
20   then.  I -- I just -- again, under oath, I'd like
21   to be able to tell you the absolute truth.  I'm
22   pretty sure we did.  I'm just not 100 percent sure.
23        Q.   When they had cell phones in middle
24   school and high school, did you use any of the
25   parental controls on their cell phones to block
```

Page 84

1   their access to social media?

2            MR. LEGG:  Objection to form,

3   foundation and relevance.

4            THE WITNESS:  Everything that they --

5   that we knew about, we did try our best to put

6   those parental controls in place.

7   BY MR. KEYES:

8        Q.   But did that include blocking their

9   ability to access social media on their cell

10  phones?

11           MR. LEGG:  Objection to form,

12  foundation and relevance.

13           THE WITNESS:  I perceived it that way

14  at the time that I was trying to put the

15  protections in place.

16  BY MR. KEYES:

17       Q.   And why, when they were in middle

18  school or high school, did you want to block their

19  access to YouTube --

20           MR. LEGG:  Objection to form.

21  BY MR. KEYES:

22       Q.   -- on their cell phones?

23           MR. LEGG:  Objection to form,

24  foundation and relevance.

25           THE WITNESS:  Oftentimes, in the role

Page 85

1    that I'm in, I would see inappropriate content that

2    was both of a violent nature and of a sexual

3    nature.  And I wanted to protect them from that

4    content.

5    BY MR. KEYES:

6        Q.    So you were worried about what content

7    they might be able to access on YouTube?

8        A.    I was.

9        Q.    Was that what drove your decision to

10   use parental controls to block their access to

11   YouTube?

12            MR. LEGG:  Objection to form,

13   foundation and relevance.

14            THE WITNESS:  Part of it was the

15   content.

16            Even back then, my wife and I were very

17   in tune to the amount of screen time the kids had.

18   And left unsupervised, they would spend too much

19   time watching and scrolling and going through

20   various sites, and we were trying to limit that --

21   that time.

22            So beyond content, there was also our

23   concern about the amount of screen time they had.

24   BY MR. KEYES:

25        Q.    Have you participated in any way in an

Page 86

1  effort to compute the -- the damages that Harford
2  County Public Schools claims it suffered as a
3  result of defendants' platforms?
4            MR. LEGG:  I'm just going to object to
5  the extent it calls for information subject to the
6  work product doctrine and was prepared in
7  anticipation of litigation.
8            But you can answer to the extent it
9  doesn't fall under that protection.
10           THE WITNESS:  I believe what you're
11 referring to is a list of percentages of amount of
12 time that employees may have spent addressing
13 social media issues.
14           And if that's what you're referring to,
15 I do recall assigning 5 percent to the pupil
16 personnel worker group.
17      Q.   Okay.
18           (HCPS MD WILLIAMS EXHIBIT 6, Plaintiff
19 Board of Education of Harford County's Amended
20 Objections and Responses to Defendants'
21 Interrogatories (Set 3), was marked for
22 identification.)
23 BY MR. KEYES:
24      Q.   I'm showing you what has been marked as
25 Williams Exhibit 6.  This document is titled

Page 87

1    "Plaintiff Board of Education of Harford County's

2    Amended Objections and Responses to Defendants'

3    Interrogatories, Set 3," and then it has an

4    attachment.

5                Have you seen this document before?

6        A.    I have only seen the chart on Page 2.

7        Q.    Are you talking about the chart that is

8    titled "Program/Department Worksheet"?

9        A.    Correct.

10       Q.    Have you seen the other chart that's

11   titled "Full-Time Equivalent Worksheet"?

12       A.    It looks like something that I would

13   typically see if I was on a human resources site,

14   but I'm not familiar with it specifically.

15       Q.    Okay.  You don't remember seeing this

16   particular worksheet?

17       A.    No.

18       Q.    Okay.  Going back to the rest of

19   Exhibit 6, have you seen the rest of Exhibit 6

20   besides the program/department worksheet?

21       A.    No.  My only involvement was one --

22   entry into one field on the chart on Page 2.

23       Q.    And is that the field that's third from

24   the bottom titled "Pupil Personnel Services"?

25       A.    Yes.  That's another expression for PPW

Page 88

1    or pupil personnel worker.

2         Q.    Okay.   And are you the one that

3    assigned this 5 percent weight?

4         A.    I did.

5              MR. LEGG:   I'm -- well, never mind.

6    BY MR. KEYES:

7         Q.    And how did you select 5 percent as the

8    weight to be used in this program/department

9    worksheet?

10             MR. LEGG:   I'm just going to object to

11   the extent it calls for information subject to the

12   work product doctrine and was prepared in

13   anticipation of litigation.

14             But you can answer to the extent it

15   doesn't fall under that protection.

16             THE WITNESS:   I'm very aware of and in

17   tune with the way that our PPWs spend their time

18   and visit them on a regular basis and have

19   conversations with them.

20             And when it comes to social media, a

21   lot of their involvement would -- would be with

22   investigations, for example, of residency.

23             "I need to figure out where this parent

24   lives, so I'll see if I can find some information

25   on social media about an address."

Page 89

1          And there may be some other examples
2    like that that I could come up with.
3          But I feel -- I feel very good that
4    5 percent -- I feel very good that 5 percent is an
5    accurate reflection, fair and accurate.
6    BY MR. KEYES:
7          Q.   Okay.  So you picked the 5 percent
8    based on what you believe is your familiarity with
9    the way PPWs spend their time?
10          A.   That's correct.
11          Q.   Did you rely on any documents in your
12    decision to select 5 percent as the weight?
13          MR. LEGG:  I just object to the extent
14    it calls for information subject to the work
15    product doctrine and was prepared in anticipation
16    of litigation.
17          But go ahead and answer to the extent
18    it doesn't fall under those protections.
19          THE WITNESS:  I did not use documents.
20          I have a liaison pupil personnel
21    worker.  Her name is Mariah Bachman.  And when it
22    comes to this kind of what I call "central office
23    business," I will typically reach out to her as a
24    representative and say, "What do you think of this?
25    Is this accurate?"

Page 90

1              Not really understanding the full scope
2    of the deposition process, it was just another
3    thing that showed up on my computer one day that
4    said, "What do you think about this?"
5              So I called and we had a discussion
6    about it.  And I said, "You don't spend a lot of
7    time on social media, but about how much do you
8    spend?  Because I'm thinking about it's 5 percent."
9              We went through a couple of scenarios
10   and together agreed that was fair and accurate.
11   BY MR. KEYES:
12        Q.   Okay.  I think you said you would
13   typically reach out to her as a representative.
14             Did you reach out to her specifically
15   about picking this 5 percent weight?
16             MR. LEGG:  I'm just going to object to
17   the extent this calls for information subject to
18   the work product doctrine and was prepared in
19   anticipation of litigation.
20             But go ahead and answer it to the
21   extent it does not fall under those protections.
22             THE WITNESS:  The answer is yes.
23   BY MR. KEYES:
24        Q.   Did you speak with anyone besides
25   Mariah as part of your work to pick the 5 percent?

Page 91

1              MR. LEGG:  Same objections.
2              THE WITNESS:  Nobody else.
3    BY MR. KEYES:
4         Q.   So was there any other source of
5    information that you consulted as part of your work
6    to pick the 5 percent?
7              MR. LEGG:  Objection to the extent it
8    calls for information subject to the work product
9    doctrine and prepared in anticipation of
10   litigation.
11             But go ahead and answer to the extent
12   it doesn't fall under those protections.
13             THE WITNESS:  No.  My personal
14   experience and my conversation with Ms. Bachman.
15   BY MR. KEYES:
16        Q.   Okay.  So this number was derived from
17   your personal experience thinking 5 percent was
18   the -- the correct weight percentage, reaching out
19   to Mariah, asking her for her input, and her
20   agreeing that 5 percent seemed right?
21             MR. LEGG:  Same objections.
22             Go ahead.
23             THE WITNESS:  That's correct.
24   BY MR. KEYES:
25        Q.   And did Mariah explain what she or PPWs

Page 92

 1  are doing during that 5 percent of their time that
 2  has some connection to social media?
 3          A.   The whole conversation was based around
 4  and my experience with this is investigations of
 5  residency, sometimes to do with boundary exceptions
 6  and parents saying, "Hey, I want my child to be in
 7  School X, but we're living in Area Y."
 8               And they can use social media to
 9  determine, you know, a picture of a family standing
10  outside their house on Halloween next to 708 Bel
11  Air Court is an indication of where they actually
12  live.
13               And that's the way we typically use it
14  for investigations, and that's a big part of their
15  job.
16          Q.   Okay.  So if I understand you
17  correctly, based on your experience and your
18  conversation with Mariah, you reached the 5 percent
19  weight by estimating that 5 percent of PPW's time
20  is spent using social media to investigate things,
21  including residency of a family or a student.  Yes?
22          A.   Correct.
23          Q.   Okay.  Does that 5 percent weight
24  include time that PPWs spend in connection with
25  social media for any other purpose?

```
                                        Page 93
 1              MR. LEGG:  Objection to form and
 2   foundation.
 3              THE WITNESS:  I couldn't come up with
 4   another way that they use it and neither could
 5   Mariah.
 6   BY MR. KEYES:
 7        Q.   Okay.
 8              MR. KEYES:  We've been going a while.
 9   Let's take a break.  Thank you.
10              THE VIDEOGRAPHER:  Stand by.
11              We are off the record at 1620.
12                        * * *
13              (Whereupon, there was a recess in the
14   proceedings from 3:20 p.m. to 3:36 p.m.)
15                        * * *
16              THE VIDEOGRAPHER:  We are on the record
17   at 1536.
18              MR. KEYES:  Thank you, Mr. Williams.  I
19   have no further questions.
20              Does anyone on Zoom have any questions
21   for the witness?
22              MR. LEGG:  I have no questions.
23              MR. KEYES:  Mr. Williams, thank you for
24   your time.  We appreciate it.
25              THE WITNESS:  All right.  I'm a little
```

Page 94

1    gun shy.  When -- when do I need to be back?

2                   MR. KEYES:  Off the record.

3                   THE VIDEOGRAPHER:  This concludes

4    Mr. Williams' deposition.  The time was 1 hour and

5    45 minutes.

6                   (WHEREUPON, the deposition was

7    concluded at 3:37 p.m.)

8                   (Signature Reserved.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1              DEPOSITION ERRATA SHEET

2

  Case Caption:  In Re:  Social Media Adolescent

3  Addition/Personal Injury Liability Litigation

4        DECLARATION UNDER PENALTY OF PERJURY

5

6              I declare under penalty of perjury that

7  I have read the entire transcript of my deposition

8  taken in the captioned matter or the same has been

9  read to me, and the same is true and accurate, save

10  and except for changes and/or corrections, if any,

11  as indicated by me on the DEPOSITION ERRATA SHEET

12  hereof, with the understanding that I offer these

13  changes as if still under oath.

14

15

16              Signed on the _____ day of

17              _____, 20___.

18

19

20        _____

21           DWAYNE EDWARD WILLIAMS

22

23

24

25

Page 96

1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                    DWAYNE EDWARD WILLIAMS

25

Page 97

1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24           DWAYNE EDWARD WILLIAMS

25

Page 98

```
 1              CERTIFICATE OF REPORTER
 2
        I, Cindy A. Hayden, Registered Merit
 3   Reporter and Notary Public for the State of
     Maryland, do hereby certify:
 4
        That the foregoing deposition was taken
 5   before me on the date and at the time and location
     stated on Page 1 of this transcript; that the
 6   deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the
 7   testimony of the deponent and all objections made
     at the time of the examination were recorded
 8   stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed
 9   is a true, accurate and complete record of the
     testimony of the deponent and of all objections
10   made at the time of the examination to the best of
     my ability.
11
        I further certify that I am neither related
12   to nor counsel for any party to the cause pending
     or interested in the events thereof.  Witness my
13   hand, this 6th of May, 2025.
14
15
```



```
16   _____
17   Cindy A. Hayden,
     Registered Merit Reporter
18   Notary Public
     State of Maryland
19   My Commission expires:
     April 26, 2029
20
21
22
23
24
25
```