**Exhibit 29**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

```
                                        Page 1
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3      ---------------------------
        IN RE: SOCIAL MEDIA          ) Case No.
 4      ADOLESCENT ADDICTION/         ) 4:22-MD-03047-YGR
        PERSONAL INJURY PRODUCTS     )
 5      LIABILITY LITIGATION,        ) MDL No. 3045
        ---------------------------
 6      This Document Relates to:    )
                                     )
 7      Board of Education of        )
        Harford County v. Meta       )
 8      Platforms Inc., et al.       )
                                     )
 9      Case No.: 4:23-cv-03065      )
        Platforms Inc., et al.       )
10      ---------------------------
11
12
13       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
14                   May 29, 2025
15                   2:03 p.m. EDT
16
17
18
19          Deposition of ANDREW MOORE, held remotely,
20      before Suzanne J. Stotz, a Certified Shorthand
21      Reporter License No. 14565, Certified Realtime
22      Reporter, Registered Professional Reporter, and
23      a Notary Public of the State of California.
24
25
```

CONFIDENTIAL

Page 2

```
1    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:

4         (Via Videoconference)
          BROCKSTEDT MANDALAS FEDERICO LLC
5             2850 Quarry Lake Drive, Suite 220
              Baltimore, Maryland 21209
6             (410) 881-8418
              mlegg@bmbfclaw.com
7         BY:  MATTHEW P. LEGG, ESQ.
8         (Via Videoconference)
          LIEFF CABRASER HEIMANN & BERNSTEIN LLP
9             275 Battery Street, 29th Floor
              San Francisco, California 94111
10            (415) 956-1000
              nlee@lchb.com
11        BY:  NICHOLAS LEE, ESQ.

12

13   FOR THE DEFENDANTS META PLATFORMS, INC. f/k/a
     FACEBOOK, INC.; INSTAGRAM, LLC; FACEBOOK
14   PAYMENTS, INC.; FACEBOOK OPERATIONS, LLC; and
     SICULUS, INC.:

15

          (Via Videoconference)
16        SHOOK, HARDY & BACON L.L.P.
              2555 Grand Boulevard
17            Kansas City, Missouri 64108
              (816) 474-6550
18            wwalberg@shb.com
          BY:  WILLIAM S. WALBERG, ESQ.
19

          (Via Videoconference)
20        SHOOK, HARDY & BACON L.L.P.
              2001 Market Street, Suite 3000
21            Philadelphia, Pennsylvania 19103
              (215) 278-2555
22            eflaster@shb.com
          BY:  EBEN S. FLASTER, ESQ.

23

24

25
```

CONFIDENTIAL

Page 3

```
1    A P P E A R A N C E S:  (Continued)
2
3    FOR THE DEFENDANT SNAP, INC.:
4         (Via Videoconference)
          KIRKLAND & ELLIS LLP
5              200 Market Street, Suite 1000
               Philadelphia, Pennsylvania 19103
6              (215) 268-5002
               teddy.murphy@kirkland.com
7         BY:  TEDDY MURPHY, ESQ.
8
9    FOR THE DEFENDANTS YOUTUBE, LLC, GOOGLE LLC,
     and ALPHABET INC.:
10
          (Via Videoconference)
11        WILLIAMS & CONNOLLY LLP
               680 Maine Avenue, SW
12             Washington, DC 2024
               (202) 434-5000
13             akeyes@wc.com
               lweiant@wc.com
14        BY:  J. ANDREW KEYES, ESQ.
          BY:  LYDIA A. WEIANT, ESQ.
15
16
     FOR THE DEFENDANTS TIKTOK INC., BYTEDANCE INC.,
17   BYTEDANCE LTD., TIKTOK LTD., and TIKTOK, LLC:
18        (Via Videoconference)
          KING & SPALDING LLP
19             621 Capitol Mall, Suite 1500
               Sacramento, California 95814
20             (916) 321-4800
               mrowan@kslaw.com
21        BY:  MATTHEW ROWAN, ESQ.
22
23
24
25
```

CONFIDENTIAL

Page 4

1    A  P  P  E  A  R  A  N  C  E  S:   (Continued)

2

3    ALSO  PRESENT:

4          LAUREN  R.  DRIVE,  Deputy  General  Counsel
           Harford  County  Public  Schools

5
           WILLIAM  CHAN,  Videographer

6
           BRIAN  FRONZAGLIA,  Trial  Technician

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

1                     I N D E X

2

3            EXAMINATION                    Page No.

4    ANDREW MOORE

5         BY MR. KEYES                          7

6

7

8                  E X H I B I T S

9

10    Exhibit            Description           Page No.

11    Moore            Defendants' Notice of      11
      Exhibit 1        Continued Oral and
12                     Videotaped Deposition
                       of Drew Moore
13
      Moore            Plaintiff Board of         12
14    Exhibit 2        Education of Harford
                       County's Amended
15                     Objections and
                       Responses to
16                     Defendants'
                       Interrogatories (Set
17                     3)
18    Moore            Expert report of          29
      Exhibit 3        Jeffrey E. Meyers
19                     dated May 19, 2025
20

21

22         (Exhibits attached to transcript.)

23

24

25

CONFIDENTIAL

Page 6

1              THE VIDEOGRAPHER:  We are now on
2        the record.  My name is William Chan, I am
3        a videographer for Golkow.  A Veritext
4        division.
5              Today's date is Thursday, May 29,
6        2025.  The time is 2:03 p.m. Eastern.
7              This remote video deposition is
8        being held in the matter of Board of
9        Education of Harford County versus Meta
10       Platforms, Inc., et al. for the United
11       States District Court, Northern District
12       of California.  The deponent is Andrew
13       Moore.
14             All parties to this deposition are
15       appearing remotely and have agreed to the
16       witness being sworn in remotely.  Due to
17       the nature of remote reporting, please
18       pause briefly before speaking to ensure
19       all parties are heard completely.
20             Counsel will be noted on the
21       stenographic record.
22             The court reporter is Suzanne Stotz
23       and will now swear in the witness.
24                        ///
25                        ///

CONFIDENTIAL

Page 7

```
 1            A N D R E W   M O O R E,
 2    having first been duly sworn by a Notary
 3    Public, was examined and testified as follows:
 4                      EXAMINATION
 5    BY MR. KEYES:
 6        Q.    Good afternoon, Mr. Moore.  We've
 7    met before.  As you know, my name is Andrew
 8    Keyes.  I am with the law firm of Williams &
 9    Connolly.  And we represent the Google and
10    YouTube defendants in this case.
11              Would you please state your name
12    for the record?
13        A.    Andrew Moore.
14        Q.    And do you understand that you are
15    under oath today?
16        A.    I do.
17        Q.    Do you understand that you are
18    under oath in giving testimony as if you were
19    in a courtroom before a judge and a jury?
20        A.    I do.
21        Q.    And do you understand that you are
22    testifying as a corporate representative of
23    Harford County Public Schools on a particular
24    topic?
25        A.    I do.
```

CONFIDENTIAL

Page 8

1      Q.     Is there any reason you cannot
2   testify truthfully and accurately today?
3      A.     No, sir.
4      Q.     This deposition is being conducted
5   remotely by Zoom.
6             Where are you physically located
7   now?
8      A.     Bel Air, Maryland.
9      Q.     And where in Bel Air, Maryland are
10   you?
11      A.     102 South Hickory Avenue in our
12   central office location.
13      Q.     Is there anyone in the room with
14   you?
15      A.     No, sir.
16      Q.     Do you have any notes with you?
17      A.     Not on this topic that we're about
18   to discuss.
19      Q.     And are you connected to any
20   communications device such that you can speak
21   with anyone electronically during this
22   deposition?
23      A.     There is nothing live.  I do have a
24   cell phone and a landline in my office.
25      Q.     Okay.  Do you have any other

CONFIDENTIAL

Page 9

1    electronic device turned on and accessible to

2    you such that you could receive messages during

3    the course of the deposition?

4         A.    Only the computer in which this

5    Zoom call is being conducted.

6         Q.    Did you do anything to prepare for

7    today's deposition?

8         A.    I spoke briefly to our legal

9    counsel yesterday.

10        Q.    Did you do anything else?

11        A.    No, sir.

12        Q.    Who is the legal counsel you spoke

13   with briefly yesterday?

14        A.    Matt Legg.

15        Q.    Anyone else?

16        A.    Mr. Nick Lee.

17        Q.    Anyone else?

18        A.    Lauren Driver, who is our internal

19   legal counsel.

20        Q.    Did anyone participate in your prep

21   session yesterday besides you, Mr. Legg, Mr.

22   Lee, and Ms. Driver?

23        A.    No, sir.

24        Q.    How long was that prep session with

25   the lawyers?

CONFIDENTIAL

Page 10

1        A.      Maybe 40 minutes.

2        Q.      Was it in person?

3        A.      No, sir.

4        Q.      Was it by Zoom?

5        A.      Yes, sir.

6        Q.      Okay.  Did you review any documents

7    during that prep session with the lawyers?

8        A.      No, sir.

9        Q.      Did you review any documents to

10   prepare for today's deposition outside of your

11   prep session with the lawyers?

12       A.      No, sir.

13       Q.      Did you speak with anybody besides

14   the lawyers to prepare for today's deposition?

15       A.      No, sir.

16       Q.      Did you review the transcript of

17   deposition testimony that you gave earlier in

18   the case?

19       A.      No, sir.

20       Q.      Did you review the transcript of

21   any deposition testimony given by anyone else

22   in this case?

23       A.      No, sir.

24       Q.      You joined Harford County Public

25   Schools in 2000?

CONFIDENTIAL

Page 11

1          A.     Correct.

2          Q.     And since 2000 you served as the

3     director of technology?

4          A.     Yes, sir.

5          Q.     And you've worked continuously for

6     Harford County Public Schools since 2000 as the

7     director of technology?

8          A.     Yes, sir.

9               MR. KEYES:  Brian, would you pull

10          up Tab 1, which we'll mark as Moore

11          Exhibit 1?

12               (Whereupon, Moore Exhibit 1,

13          Defendants' Notice of Continued Oral and

14          Videotaped Deposition of Drew Moore, was

15          marked for identification.)

16     BY MR. REYES:

17          Q.     Mr. Moore, do you see that on your

18     screen?

19          A.     I do.

20          Q.     Have you seen this Notice of

21     Continued Oral and Videotaped Deposition of

22     Drew Moore before?

23          A.     Yes.

24          Q.     Okay.  And if you'd look on the

25     first page, which is on the screen, lines 15

CONFIDENTIAL

Page 12

1    through 18, do you see that you have been

2    designated as the Board of Education of Harford

3    County's corporate representative on the weight

4    percentage that was selected for the Office of

5    Technology & Information and used as the

6    allocation percent in plaintiffs' expert

7    Jeffrey Meyers' calculations?

8          A.     I do see that, sir.

9          Q.     And are you prepared to answer

10   questions on that topic?

11         A.     Yes.

12         Q.     Okay.

13         A.     To the best of my ability.

14         Q.     Great.

15               MR. KEYES:  Brian, would you pull

16         up Tab 6?  And we'll mark this as Moore

17         Exhibit 2.

18               (Whereupon, Moore Exhibit 2,

19         Plaintiff Board of Education of Harford

20         County's Amended Objections and Responses

21         to Defendants' Interrogatories (Set 3),

22         was marked for identification.)

23   BY MR. KEYES:

24         Q.     Do you see Moore Exhibit 2 on the

25   screen?

CONFIDENTIAL

Page 13

```
 1        A.     Yes, sir.
 2        Q.      This is a document titled Plaintiff
 3   Board of Education of Harford County's Amended
 4   Objections and Responses to Defendants'
 5   Interrogatories (Set 3).
 6              And if you'd like, Mr. Moore, we
 7   can scroll through it slowly.  My question is,
 8   have you seen this document before today's
 9   deposition?
10        A.     I don't recall this one.  I think
11   the only document I reviewed was the one that
12   was the notice that I would be deposed.
13        Q.     Okay.
14              MR. KEYES:  So, Brian, would you
15         just slowly scroll through this.
16              THE WITNESS:  I have definitely not
17         seen this.
18   BY MR. KEYES:
19        Q.     Okay.  This exhibit includes an
20   Attachment A on page 7.  And the first part of
21   Attachment A is this worksheet titled
22   Program/Department Worksheet.  Do you see that?
23        A.     Yes.
24        Q.     Have you seen this worksheet before
25   today?
```

CONFIDENTIAL

Page 14

1        A.      No, sir.

2        Q.      Okay.  If you look to the left-hand

3   column, it's titled Relevant

4   Department/Program.  Do you see that?

5        A.      Yes, sir.

6        Q.      And there are 21 departments or

7   programs listed.  And the last one listed is

8   the Office of Technology & Information?

9        A.      Yes, sir.

10       Q.      Do you work in that office?

11       A.      Yes, sir.

12       Q.      Are you the head of that office?

13       A.      I am the director of technology.

14       Q.      Okay.

15       A.      Which would -- yes, for all

16   intents --

17       Q.      As the director of technology, are

18   you the head of the Office of Technology &

19   Information?

20       A.      Yes, sir.

21       Q.      And then if you look to the right,

22   there is another column titled Weight

23   Percentage.  Do you see that?

24       A.      Yes, sir.

25       Q.      And there is a 20 percent weight

CONFIDENTIAL

Page 15

1    percentage listed on the same line as the

2    Office of Technology & Information.  Do you see

3    that?

4         A.    Yes, sir.

5         Q.    Have you seen an excerpt of this

6    worksheet that lists a 20 percent weight

7    percentage for the Office of Technology &

8    Information before today's deposition?

9         A.    No, sir.

10        Q.    In the past have you picked a 20

11   percent weight percentage for the Office of

12   Technology & Information?

13        A.    Relative to what, sir?

14        Q.    Well, relative to this case?

15        A.    You would have to be more specific,

16   sir.

17        Q.    Well, do you know how this 20

18   percent weight percentage was selected for the

19   Office of Technology & Information?

20        A.    I can share that I provided a

21   weight based on the amount of time that was

22   asked that we spend on social media-related

23   events that come to our attention.  I was not

24   informed of it being applied to a dollar value.

25        Q.    Okay.  So have you seen any

CONFIDENTIAL

Page 16

1    document, besides the page on this screen, that

2    lists a 20 percent weight percentage for the

3    Office of Technology & Information?

4         A.     No, sir.

5         Q.     Okay.  When did you provide the 20

6    percent weight percentage based on the amount

7    of time your office spends on social

8    media-related events that come to your

9    attention?

10        A.     Six, eight weeks ago.

11        Q.     And who did you supply that weight

12   percentage to?

13        A.     Lauren Driver, our internal legal

14   counsel.

15        Q.     Why did you provide that percentage

16   to Ms. Driver?

17        A.     She requested it.

18        Q.     Okay.  And then can you explain to

19   me how you arrived at that 20 percent weight

20   percentage?

21        A.     Sure.  I have two individuals that

22   are the primary contact for such events.  I

23   went to them and I said on an average could you

24   tell me how many events in a given week you are

25   contacted with to investigate or deal with

CONFIDENTIAL

Page 17

```
 1    issues related to social media and students
 2    based on their number, and then I asked them
 3    how much time would you spend on a given event.
 4    And that's how I came to about 20 percent of
 5    their workweek.
 6         Q.    Were you finished with your
 7    explanation of how you arrived at the 20
 8    percent weight percentage?
 9         A.    Yes, sir.
10         Q.    Okay.  You mentioned two
11    individuals who work for you who deal with such
12    events.  Who are those individuals?
13         A.    I have a network security engineer
14    and a desktop administrator.
15         Q.    And what is the name of the network
16    security engineer?
17         A.    Mark Schoen, S-C-H-O-E-N.
18         Q.    And what is the name of the
19    desktop -- what is the title you gave me,
20    desktop?
21         A.    Desktop administrator.
22         Q.    Administrator.  What is the name of
23    the desktop administrator?
24         A.    Christopher Long.
25         Q.    Okay.  What does Mark Schoen do as
```

Page 18

1    the network security engineer?

2        A.    He is responsible for all network

3    security-related responsibilities, firewall,

4    content filter, ensure security of our network.

5        Q.    You mentioned the firewall and a

6    content filter.  What is the difference between

7    those two?

8        A.    So firewall is typically a hardware

9    device that allows you to block certain

10   communications through our hardwired network or

11   our wifi network.  A content filter is looking

12   at all content and then filtering out URLs or

13   websites.

14       Q.    And what does Christopher Long do

15   as the desktop administrator?

16       A.    He is responsible for all desktop

17   operations, all software that is to be loaded

18   onto student or staff devices, and maintains

19   those environments from a central office

20   administration control.

21       Q.    And when you said that these are

22   the two individuals who handle such events,

23   what events are you referring to?

24       A.    A typical event would be a

25   principal would contact one of them and state

CONFIDENTIAL

Page 19

1    that an individual has been able to access a

2    social media site; and with the understanding

3    that these sites are blocked, how is this

4    possible.  And then we would go in and then we

5    would ask who was the student, what time, what

6    day.  And then we would go back and we would

7    look through logs.  They would verify that that

8    student was on that particular device at that

9    particular moment.  And then the investigation

10   could go beyond that, depending on what the

11   event is.  But that would be typically the

12   beginning of such action.

13        Q.    Okay.  And then you said you asked

14   each of them, Mr. Schoen and Mr. Long, how many

15   events in a given week they had where they

16   investigated or dealt with something related to

17   social media issues; did I get that right?

18        A.    That's correct.

19        Q.    And are you then referring to

20   instances where someone in the school system

21   reports that someone is doing some kind of end

22   run around either the firewall or the internet

23   content filter to get access to a site?

24        A.    That could be one event.

25        Q.    Okay.  And so what did Mr. Schoen

Page 20

1    report back to you in terms of how many such

2    events he handles per week?

3           A.      Approximately four.

4           Q.      And what did Mr. Long report to you

5    about how many such events he handles per week?

6           A.      A similar number.

7           Q.      Okay.  What did Mr. Schoen tell you

8    about how much time they spend per event?

9           A.      60 to 120 -- well, yeah, an hour to

10   two hours per event on average.  On average,

11   sir.

12          Q.      On average, okay.

13                  And what did Mr. Long report to you

14   about how much time is spent per event?

15          A.      A similar amount.

16          Q.      Okay.  So if I understand you

17   correctly, you reached out to Mr. Schoen and

18   Mr. Long, you said, hey, how much time per week

19   on average do you spend investigating or

20   dealing with issues relating to student access

21   to social media; they each then provided an

22   estimate of roughly four events per week on

23   average, and they each said that they spend 60

24   to 120 minutes on average per event; did I get

25   that right?

CONFIDENTIAL

Page 21

1          A.      Yes, sir.

2          Q.      Okay.  And then you figured out

3    that if they're spending 60 to 120 minutes per

4    event and there are roughly four events for

5    each of them per week, that 20 percent of their

6    time was spent on this topic?

7          A.      Yes, sir.

8          Q.      Okay.  Did you create any documents

9    over the course of this work, reached out to

10   them or getting their answers or running

11   calculations to arrive at this 20 percent

12   weight percentage?

13         A.      No, sir.

14         Q.      After you arrived at the 20 percent

15   weight percentage, did you run that by either

16   Mr. Schoen or Mr. Long for a gut check on

17   whether that seemed right?

18         A.      No, sir.

19         Q.      Did you run it by anyone else to

20   get their input on whether this 20 percent

21   weight percentage seemed right?

22         A.      No, sir.

23         Q.      Did you consult any other documents

24   to evaluate whether the 20 percent weight

25   percentage that you had estimated seemed right?

Page 22

```
 1         A.      No, sir.
 2         Q.      Okay.  They work in the Office of
 3    Technology & Information; is that correct?
 4         A.      Who are "they"?
 5         Q.      Mr. Schoen and Mr. Long.
 6         A.      Yes, sir.
 7         Q.      Okay.  And do they report directly
 8    to you?
 9         A.      No, sir.
10         Q.      Who do they report to?
11         A.      Each of them report to a separate
12    team leader that reports to me.
13         Q.      Okay.  And who is the team leader
14    that Mr. Schoen reports to?
15         A.      William Waldrup, W-A-L-D-R-U-P.
16         Q.      And Mr. Waldrup reports to you?
17         A.      Correct.
18         Q.      And to whom does Mr. Long report?
19         A.      Jason Wilkinson.
20         Q.      And does Mr. Wilkinson report to
21    you?
22         A.      Yes, sir.
23         Q.      Are there other people who work in
24    the Office of Technology & Information?
25         A.      Yes, sir.
```

CONFIDENTIAL

Page 23

```
 1        Q.    Okay.  Obviously there is you,
 2   there is Mr. Waldrup, Mr. Wilkinson, Mr.
 3   Schoen, and Mr. Long, that's five people.  How
 4   many other people work in the Office of
 5   Technology & Information?
 6        A.    I think we have 53 in our
 7   department.
 8        Q.    And do the other 52 all report up
 9   to you directly or indirectly?
10        A.    Directly or indirectly.
11        Q.    That's a yes?
12        A.    Yes.
13        Q.    Okay.  How many of the other 52
14   report up to Mr. Waldrup roughly?
15        A.    Ten.
16        Q.    And how many of the 52 report up to
17   Mr. Wilkinson?
18        A.    20, 21.
19        Q.    And then are there other people,
20   besides Mr. Waldrup and Mr. Wilkinson, who are
21   your direct reports?
22        A.    Direct reports, yes.
23        Q.    How many other direct reports do
24   you have?
25        A.    Two.
```

CONFIDENTIAL

Page 24

1          Q.     Who are they?
2          A.     My admin assistant and another team
3     leader.
4          Q.     When you say "another team leader,"
5     are you referring to Mr. Waldrup and Mr.
6     Wilkinson as team leaders?
7          A.     Yes, sir.
8          Q.     Okay.  Who is the third team
9     leader, besides Mr. Waldrup and Mr. Wilkinson?
10         A.     Matthew Payne.
11         Q.     And how many of the other 52 people
12    in this department report up to Mr. Payne?
13         A.     Give me a second.  I'm counting
14    through my department.
15         Q.     Sure.
16         A.     11.
17         Q.     So there are roughly ten people who
18    report up to Mr. Waldrup, roughly 20 people who
19    report up to Mr. Wilkinson, roughly 11 people
20    who report up to Mr. Payne, and you have an
21    administrative assistant.  Does that account
22    for everybody in your department or are there
23    others who fall somewhere else in the
24    department?
25         A.     That accounts for everyone.  My

CONFIDENTIAL

Page 25

```
1    numbers are probably slightly off.
2         Q.      Okay.
3         A.      But I'm just going by --
4         Q.      Is it fair to say that the
5    department is comprised of you, your
6    administrative assistant, the three team
7    leaders, and then the people who report to the
8    three team leaders?
9         A.      Yes, sir.
10        Q.      Okay.  So you gave me an example of
11   how Mr. Schoen or Mr. Long spends time that
12   counted as an event for purposes of your 20
13   percent weight percentage calculation, right?
14        A.      Yes, sir.
15        Q.      Can you give me the others that
16   would fall within that event category?
17        A.      I could not give you specifics.
18        Q.      Okay.  But generally you have this
19   20 percent weight percentage that is an
20   approximation or the time that Mr. Schoen and
21   Mr. Long spent on events related to social
22   media used by students?
23        A.      Correct.
24        Q.      And you've explained that one
25   instance is where someone will complain to Mr.
```

CONFIDENTIAL

Page 26

```
 1    Schoen or Mr. Long that a student is on some
 2    kind of end run around the firewall, the
 3    internet content filter to get access to social
 4    media.  Are there other kinds of events that
 5    fall within this 20 percent weight percentage?
 6         A.    There would be other variants of
 7    such event.
 8         Q.    What are those variants?
 9         A.    It's generally social media
10    site-related, but it could be someone -- there
11    was a rumor that someone posted personal
12    information, can you verify that for us, that
13    would be maybe another event.  There are a
14    multitude of events that we are asked to look
15    into over the course of a week.
16         Q.    Okay.  So that the 20 percent
17    weight percentage includes time that they may
18    spend taking additional steps based on some
19    kind of content posted by a student on social
20    media?
21         A.    It could be.
22         Q.    Okay.  So one is investigating how
23    a student is doing some kind of end run around
24    the internet content filter, another one is to
25    taking steps to look into content that a
```

CONFIDENTIAL

Page 27

1    student has posted on social media.  Is there
2    another category of social media-related events
3    that you are capturing in this 20 percent
4    weight percentage?
5              MR. LEGG:  Objection to form and
6         foundation.
7              Go ahead.
8              THE WITNESS:  So going back to my
9         first deposition that I referred to
10        actions as walkables and that would be the
11        various variants.  So you are putting out
12        one and another one pop up.  It might be
13        slightly different or it could be very
14        similar.  It could be that we have found
15        proxy sites that students have found and
16        we have to go in and we have to block that
17        site.  Most of it centers around items
18        that disrupt the instructional
19        environment.
20   BY MR. KEYES:
21        Q.    Okay.  So if a student had used a
22   proxy website to do an end run around Harford
23   County Public Schools' internet content filter
24   and they were using that to access, let's say,
25   a video gaming website, and someone in the

CONFIDENTIAL

Page 28

1    administration brought that to Mr. Schoen or

2    Mr. Long's attention and they spent time on

3    that, would that be captured in your 20 percent

4    weight percentage calculations?

5         A.    It could be.

6         Q.    Okay.  And if students used a proxy

7    to do an end run around the internet content

8    filter to reach other websites that are not

9    video gaming, not social media, and that was

10   brought to Mr. Schoen or Mr. Long's attention,

11   those events would also be included in the 20

12   percent weight calculation?

13        A.    I could not say that for certain.

14        Q.    Why not?

15        A.    My direct question to them was

16   items that had social media focused event.  So

17   we're not -- I was not asking them to give me

18   how much time you spend blocking, you know, a

19   weapons site let's say, that would be something

20   that we would block as well.  I was --

21        Q.    Well --

22        A.    -- items that -- the time that you

23   spent on social media-related events.

24        Q.    When you got the estimates from Mr.

25   Schoen and Mr. Long where they said about four

CONFIDENTIAL

Page 29

1    events per person per week, did you ask them
2    again are you only including events that relate
3    to social media?
4         A.    I did not ask that follow-up
5    question.
6              MR. KEYES:  Brian, would you pull
7         up Tab 7?  And we'll mark this as Moore
8         Exhibit 3.
9              (Whereupon, Moore Exhibit 3, Expert
10        report of Jeffrey E. Meyers dated May 19,
11        2025, was marked for identification.)
12   BY MR. KEYES:
13        Q.    This is the expert report of
14   Jeffrey E. Meyers dated May 19, 2025 in this
15   case.  Mr. Moore, have you seen this expert
16   report?
17        A.    No.
18        Q.    Okay.
19              MR. KEYES:  Brian, if you go to the
20        last page of Moore Exhibit 3.
21   BY MR. KEYES:
22        Q.    This is Appendix C to Mr. Meyers'
23   report.  And it lists here some third-party
24   vendors.  Do you see that?
25        A.    Yes, sir.

CONFIDENTIAL

Page 30

1      Q.     It lists two of them, it lists
2  Skyline Network and then CDW Government, Inc.
3  Do you see that?
4      A.     Yes, sir.
5      Q.     Is Skyline Network the vendor that
6  provides Palo Alto internet content filtering
7  software?
8      A.     It is the vendor in which we
9  procure the Palo Alto through.
10     Q.     So you get the Palo Alto internet
11  content filtering software from Skyline
12  Network?
13     A.     We receive the device through a
14  contract which Skyline Network has with the
15  State of Maryland.
16     Q.     And then Cisco Umbrella is also an
17  internet content filter?
18     A.     It is an end point filtering piece
19  of software.
20     Q.     And do you get that through from
21  CDW Government, Inc.?
22     A.     We purchased it through CDW.  They
23  also had a contract vehicle in the State of
24  Maryland which we could purchase it.
25     Q.     Okay.  And then when Harford County

CONFIDENTIAL

```
 1    Public Schools spends money on Palo Alto, are
 2    those dollars that are funded in whole or in
 3    part by the State of Maryland?
 4         A.    Restate your question please.
 5         Q.    Yeah.  So this lists two vendors.
 6    I understand that the vendors have some
 7    contract with the State of Maryland through
 8    which Harford County Public Schools can get
 9    this software or filtering equipment; is that
10    correct?
11         A.    Yes.
12         Q.    Okay.  When Harford County Public
13    Schools has paid money to Skyline Network for
14    Palo Alto, are those dollars dollars that are
15    covered by the State of Maryland?
16         A.    No.  They're covered by my budget,
17    which is funded from Harford County.
18         Q.    Okay.  And then the same
19    question --
20         A.    So --
21         Q.    Sorry, did I interrupt?
22              MR. LEGG:  I don't want to disrupt
23         your flow.  We're about 29 minutes in, so
24         a few more questions.
25              MR. KEYES:  Okay.
```

CONFIDENTIAL

Page 32

```
 1    BY MR. KEYES:
 2          A.       So, Mr. Keyes, I just wanted to
 3    state that Skyline and CDW is a contract
 4    vehicle.  There is -- the money that is coming
 5    is coming from my budget.
 6          Q.       Okay.
 7          A.       They are not subsidized by the
 8    State, if that's what you were asking.
 9          Q.       Okay.  And are you familiar with
10    CIPA, C-I-P-A?
11          A.       Children's Internet Protection Act?
12          Q.       Yes.  That is a federal law?
13          A.       Yes, sir.
14          Q.       And do you understand that that
15    federal law requires school districts to have
16    technology measures and policies that protect
17    students from information or materials
18    considered to be obscene and harmful?
19          A.       Yes, sir.
20          Q.       And is one of the things that
21    Harford County Public Schools does to meet the
22    requirements of CIPA is to have an internet
23    content filter?
24          A.       Yes, sir.
25          Q.       So has Harford County Public
```

CONFIDENTIAL

Page 33

1    Schools had an internet content filter ever
2    since you arrived in 2000?
3          A.    Yes, sir.
4          Q.    And since 2000 each year has
5    Harford County Public Schools paid for an
6    internet content filter for the purpose of
7    meeting its obligations under CIPA?
8          A.    Yes, sir.
9          Q.    And does that include the Palo Alto
10   software?
11              MR. LEGG:  We're past 30, so one
12        more question.
13              MR. KEYES:  Okay.
14   BY MR. KEYES:
15        Q.    Well, does that include the Harford
16   County Public Schools' purchases of Palo Alto
17   from Skyline Network and its purchases of Cisco
18   Umbrella from CDW Government, Inc.?
19              MR. LEGG:  Objection to form.
20              THE WITNESS:  Mr. Keyes, since Mr.
21        Legg interrupted, could you restate your
22        question in whole?
23   BY MR. KEYES:
24        Q.    Sure.
25              I had just asked you whether

CONFIDENTIAL

Page 34

```
 1    Harford County Public Schools every year during
 2    your tenure has purchased internet content
 3    filters to meet its obligations under CIPA; and
 4    I believe you said yes; is that correct?
 5          A.     Yes, sir.
 6          Q.     And do those purchases of an
 7    internet content filter to meet CIPA's
 8    requirements include Harford County Public
 9    Schools' purchases of Palo Alto and Cisco
10    Umbrella?
11          A.     Yes.
12                 MR. LEGG:  We're 31 in, so I'm
13          going to call it.
14                 MR. KEYES:   Okay.
15    BY MR. KEYES:
16          Q.     Mr. Moore, thank you for your time.
17                 Off the record.  My best to your
18    family and good luck with the new grandson.
19                 THE WITNESS:  Thank you, sir.  I
20          appreciate it.
21                 MR. KEYES:  Thank you.
22                 THE VIDEOGRAPHER:  Anything else
23          for the record from counsel?
24                 MR. LEGG:  I will reserve my
25          questions for trial.
```

CONFIDENTIAL

Page 35

1              THE VIDEOGRAPHER:  Please stand by.

2              This is the videographer stating

3       total run time by party for the record,

4       Andrew Keyes for Google is 31 minutes.

5              This concludes today's video

6       deposition.  We are going off video record

7       at 2:36 p.m.

8              (The witness is excused.)

9              (Deposition of Andrew Moore

10       concluded at 2:36 p.m. EDT.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 36

1                    C E R T I F I C A T E

2

3

4              I, SUZANNE J. STOTZ, a Certified

5     Shorthand Reporter, Registered Professional

6     Reporter, Certified Realtime Reporter, and

7     Notary Public in and for the State of

8     California, do hereby certify that the

9     foregoing is a true and accurate transcript of

10    the stenographic above-captioned matter.

11

12

13    _____

14    SUZANNE J. STOTZ, CSR, RPR, CRR

15    CA CSR License No. 14565

16

17

18    DATED:  May 30, 2025

19

20

21    NOTE:  THE CERTIFICATE APPENDED TO THIS

22    TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

23    OF THE SAME BY ANY MEANS, UNLESS UNDER THE

24    DIRECT CONTROL AND/OR DIRECTION OF THE

25    CERTIFYING COURT REPORTER.

CONFIDENTIAL

Page 37

1              E R R A T A   S H E E T

2        I have read my testimony in the foregoing

3    transcript and believe it to be true and

4    correct to the best of my knowledge and belief

5    with the following changes:

6    PAGE     LINE         CHANGE

7    _____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17

18   _____  _____

19   WITNESS SIGNATURE                DATE

20

21   Sworn and subscribed to before me this

22   _____ day of _____ , 2025.

23

24   Notary Public of the

25   State of _____.