**Exhibit 30**

**PLAINTIFF HARFORD COUNTY BOARD OF EDUCATION OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
Member Case No.: 4:23-cv-03065-YGR
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1                UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA

2

3    _____
                               :
4    IN RE: SOCIAL MEDIA       : Case No.
     ADOLESCENT ADDICTION/      : 4:22-MD-03047-YGR
5    PERSONAL INJURY PRODUCTS   :
     LIABILITY LITIGATION,      : MDL No. 3047
6    _____:
                               :
7    This Document Relates to: :
     Board of Education of      :
8    Harford County v. Meta     :
     Platforms Inc., et al.     :
9                              :
     Case No. 4:23-cv-03065     :
10   _____:

11

12                Friday, March 14, 2025

13

14          30(b)(1) video deposition of ANDREW

15   MOORE, taken at the Offices of the Harford County

16   Public Schools Central Administration Building,

17   located at 102 South Hickory Avenue, Bel Air,

18   Maryland, beginning at 9:37 a.m., EST, before

19   Ryan K. Black, Registered Professional Reporter,

20   Certified Livenote Reporter and Notary Public

21   in and for the State of Maryland.

22

23

24

25

```
 1   A P P E A R A N C E S:
 2
     BROCKSTEDT MANDALAS FEDERICO LLC
 3   BY:  MATTHEW P. LEGG, ESQ.
          A. WRAY FITCH, ESQ.
 4   2850 Quarry Lake Drive - Suite 220
     Baltimore, Maryland 21209
 5   410.421.7777
     mlegg@lawbmf.com
 6   wfitch@lawbmf.com
 7   Representing - Harford County Public Schools and
                    Andrew Moore
 8
     WILLIAMS & CONNOLLY LLP
 9   BY:  J. ANDREW KEYES, ESQ.
          ARMANI MADISON, ESQ.
10   680 Maine Ave SW
     Washington, DC 2002
11   202.434.5000
     akeyes@wc.com
12   amadison@wc.com
13   Representing - Google and YouTube defendants
14
     SHOOK HARDY & BACON LLP
15   BY:  SCOTT JAMES, ESQ. - Via Zoom
     JPMorgan Chase Tower
16   600 Travis Street - Suite 3400
     Houston, Texas 77002
17   713.227.8008
     sjames@shb.com
18
     Representing - Meta defendants
19
20   KIRKLAND & ELLIS LLP
     BY:  ANDREW KARP, ESQ. - Via Zoom
21   601 Lexington Avenue
     New York, New York 10022
22   212.341.7593
     andrew.karp@kirkland.com
23
     Representing - Snap Inc., defendants
24
     ALSO PRESENT:
25    Brad Loy - Legal Videographer
```

```
                                          Page 3
 1                    I N D E X
 2  TESTIMONY OF:  ANDREW MOORE                    PAGE
 3  By Mr. Keyes...................................4
 4
 5                 E X H I B I T S
 6  EXHIBIT              DESCRIPTION              PAGE
 7  Moore 30(b)(1) 1    a document Bates-stamped
                        HCPS_00122261 through
 8                      122266......................15
 9  Moore 30(b)(1) 2    a document Bates-stamped
                        HCPS_00132081 through
10                      132085......................18
11  Moore 30(b)(1) 3    a document Bates-stamped
                        HCPS_00412083 through
12                      412087......................29
13  Moore 30(b)(1) 4    Mr. Moore's résumé..........30
14  Moore 30(b)(1) 5    a document Bates-stamped
                        HCPS_00411565 through
15                      411566......................32
16  Moore 30(b)(1) 6    a document Bates-stamped
                        HCPS_00464285 and
17                      HCPS_00464285-001 through
                        HCPS_00464285-004...........37
18
19
20
21
22
23
24
25
```

```
                                          Page 4
 1          THE  VIDEOGRAPHER:   We  are  on  the  record
 2    at 9:37.
 3                        *       *       *
 4    Whereupon --
 5                        ANDREW  MOORE,
 6    called  to  testify,  having  been  previously  first
 7    duly  sworn  affirmed,  was  examined  and  testified
 8    as  follows:
 9                        *       *       *
10                    30(b)(1) EXAMINATION
11    BY MR. KEYES:
12        Q.    Good  morning,  Mr.  Moore.   Would  you
13    please  introduce  yourself  to  the  jury?
14        A.    Andrew  Moore,  Director  of  Technology
15    Harford  County  Public  Schools.
16        Q.    Are  you  currently  employed?
17        A.    Yes,  sir.
18        Q.    For  how  long  have  you  been  employed  by
19    Harford  County  Public  Schools?
20        A.    Since  February  of  2000.
21        Q.    And  have  you  held  any  other  positions
22    with  Harford  County  Public  Schools  since  2000?
23        A.    I  have  not.
24        Q.    Are  you  aware  that  you're  under  oath
25    today?
```

```
                                    Page 5
 1       A.    Yes, sir.
 2       Q.    Have you ever given testimony under oath
 3   before?
 4       A.    No, sir.
 5       Q.    Either in a deposition or a trial or
 6   some other proceeding?
 7       A.    No, sir.
 8       Q.    Have you ever served as a teacher either
 9   in Harford County Public Schools or elsewhere?
10       A.    No, sir.
11       Q.    Have you ever served as a school
12   counselor either in Harford County Public Schools
13   or elsewhere?
14       A.    No, sir.
15       Q.    Have you ever served as a mental health
16   counselor either for Harford County Public
17   Schools or elsewhere?
18       A.    No, sir.
19       Q.    Have you ever worked in school finance
20   either in Harford County Public Schools or
21   elsewhere?
22       A.    No, sir.
23       Q.    Have you ever served as an administrator
24   outside the IT space for Harford County Public
25   Schools or elsewhere?
```

```
                                        Page 6
 1        A.    No, sir.

 2        Q.    Does Harford County Public Schools have

 3   a social media account of any type?

 4        A.    Yes, sir.

 5        Q.    What social media account or accounts

 6   does it have?

 7        A.    I believe Facebook, Twitter, are the two

 8   that come to mind.

 9        Q.    Are -- are you aware of any other social

10   media account that Harford County Public Schools

11   has?

12        A.    I do not recall.

13        Q.    Okay.  Are you involved in any way in

14   creating content for posting to Facebook, Twitter

15   or any other social media accounts?

16        A.    I am not.

17        Q.    Are you involved at all in posting

18   content on Harford County Public Schools'

19   Facebook, Twitter or other social media account?

20        A.    I am not.

21        Q.    Are you involved at all in managing

22   Harford County Public Schools' Facebook, Twitter

23   or other social media accounts?

24        A.    I am not.

25        Q.    For how long has Harford County Public
```

```
                                           Page 7
 1   Schools had a Facebook account?
 2        A.    I do not recall.
 3        Q.    Were you involved at all in the decision
 4   whether to launch such an account?
 5        A.    No, sir.
 6        Q.    For how long has Harford County Public
 7   Schools had a Twitter account?
 8        A.    I do not recall.
 9        Q.    Were you involved at all in the decision
10   whether to launch such an account on Twitter?
11        A.    No, sir.
12        Q.    Are you involved in any way in any
13   social media account for any specific school in
14   Harford County?
15        A.    No, sir.
16        Q.    Are you involved in any way in any
17   social media account for any particular club,
18   team, affinity group or organization at any
19   Harford County Public School?
20            MR. LEGG:  Objection to form.
21            THE WITNESS:  No, sir.
22   BY MR. KEYES:
23        Q.    Have you ever communicated with any of
24   the defendants -- Google, YouTube, Meta, Snap or
25   TikTok -- to request that any feature on their
```

```
                                            Page 8
 1   platform be modified?

 2           MR. LEGG:  Objection to form.

 3           THE WITNESS:  No, sir.

 4   BY MR. KEYES:

 5       Q.   Have you ever communicated with any of

 6   these companies to request that any feature on

 7   their platform be discontinued?

 8           MR. LEGG:  Objection to form.

 9           THE WITNESS:  No, sir.

10   BY MR. KEYES:

11       Q.   Do you have any data on students' use of

12   social media in Harford County Public Schools?

13       A.   I do not.

14       Q.   Do you have any data on the mental

15   health condition of students in Harford County

16   Public Schools?

17       A.   I do not.

18       Q.   Do you have any data on counseling or

19   treatment of the mental health of students in

20   Harford County Public Schools?

21       A.   I do not.

22       Q.   Do you have any data on Harford's

23   expenditures on student use of social media?

24       A.   I do not.

25       Q.   Or the mentality health condition of any
```

Page 9

```
 1   students?
 2        A.   I do not.
 3        Q.   Or any counseling or treatment of
 4   students' mental health in Harford County?
 5        A.   I do not.
 6        Q.   Has Harford County Public Schools ever
 7   purchased Yondr pouches?
 8        A.   I'm not aware of any.
 9        Q.   Do you know what Yondr pouches are?
10        A.   I do not.
11        Q.   Have you ever heard of magnetic pouches
12   that can be used for students to put their phone
13   in the pouch, seal it up, so they can't use it
14   during the instructional school day?
15        A.   No.
16        Q.   Okay.  Have you ever had any
17   conversation with anyone in Harford County
18   Public Schools about using any such pouch?
19        A.   No, sir.
20        Q.   Okay.  Harford County Public Schools has
21   used different services as its internet content
22   filter over the years; is that correct?
23        A.   Yes.
24        Q.   And that filter may have changed between
25   whether it's for students or staff?
```

Page 10

1      A.   Yes.

2      Q.   Am I correct in understanding that the

3  two internet content filters that Harford County

4  Public Schools has used for staff over the years

5  are Check Point and Palo Alto?

6      A.   Correct.

7      Q.   And am I correct in understanding that

8  the internet content filters that Harford County

9  Public Schools has used for students have been

10  Palo Alto, Umbrella and Cisco Securely?

11      A.   Yes.

12      Q.   Okay.  Currently, does Harford County

13  Public Schools block social media using its

14  internet content filter?

15           MR. LEGG:  Objection; form.

16           THE WITNESS:  To which Harford County

17  School community are you referring to?

18  BY MR. KEYES:

19      Q.   Well, tell me what the different

20  communities are.

21      A.   Well, students or staff.

22      Q.   Students or staff?

23           Okay.  When you refer to "Harford

24  communities," is there any other community

25  besides staff or student?

Page 11

```
 1       A.    No.
 2             I just wanted the clarification of who
 3    you're referring to.
 4       Q.    Okay.  So does Harford County Public
 5    Schools currently block social media for staff?
 6       A.    No.
 7       Q.    Has it blocked social media for staff in
 8    the past?
 9       A.    Yes.
10       Q.    What has it blocked in the past?
11       A.    All social media except Facebook,
12    Twitter.  School administrators -- that would be
13    principals and assistant principals -- have
14    access to Instagram.
15       Q.    Anything else?
16       A.    No, sir.
17       Q.    Okay.  So in the past, principals have
18    had access to Instagram, Facebook and Twitter?
19       A.    Yes.
20       Q.    And in the past, other staff have had
21    access to Facebook and Twitter?
22       A.    Correct.
23       Q.    But, otherwise, social media has been
24    blocked for principals and staff?
25       A.    Correct.
```

```
                                    Page 12
 1        Q.   But did I understand you to say that,
 2   currently, no social media is blocked?
 3        A.   I did not say that.
 4        Q.   Okay.  I must have misunderstood.
 5             Okay.  So has it always been the
 6   case, then, that principals have had access to
 7   Instagram, Facebook and Twitter, --
 8             MR. LEGG:  Objection to form.
 9   BY MR. KEYES:
10        Q.   -- at least during your tenure?
11        A.   Since 2013.
12        Q.   Okay.  Since 2013, principals in
13   Harford County Public Schools have had access
14   to Instagram, Facebook and Twitter?
15        A.   To my knowledge.
16        Q.   And since 2013, other staff besides
17   principals in Har -- Harford County Public
18   Schools have had access to Facebook and Twitter?
19        A.   Correct.
20        Q.   Okay.  So since 2013, have any staff,
21   including principals, had access to TikTok?
22        A.   No.
23        Q.   At any time since 2013 have staff,
24   including principals, had access to Snap?
25        A.   No.
```

1      Q.   Okay.  So when TikTok, Snap, or other
2  social media -- besides Twitter, Facebook or
3  Instagram -- have been blocked, has that been
4  blocked using Harford County Public Schools
5  internet content filter?
6      A.   Yes.
7      Q.   Okay.  Whether that be Check Point,
8  Palo Alto, Umbrella or Cisco Securely?
9      A.   Yes.
10     Q.   That's for staff.
11          Currently, does Harford County Public
12  Schools block social media for students?
13     A.   Yes.
14     Q.   Are there any exceptions?
15     A.   Do you consider YouTube social media?
16     Q.   I do not.  But for purposes of my
17  question, why don't I -- why don't I focus on
18  particular companies.
19          Okay.  For students, does Harford County
20  Public Schools internet content filter block
21  access to Facebook?
22     A.   Yes.
23     Q.   Instagram?
24     A.   Yes.
25     Q.   TikTok?

```
                                          Page 14
 1       A.    Yes.
 2       Q.    Snap?
 3       A.    Yes.
 4       Q.    Okay.
 5       A.    For students.
 6       Q.    For students?
 7       A.    Yeah.
 8       Q.    Has Harford County Public Schools always
 9   blocked student access to Facebook, Instagram,
10   TikTok and Snap?
11       A.    Yes.
12       Q.    And is that student access blocked by
13   the internet content filter?
14       A.    Yes.
15       Q.    Separate from the internet content
16   filter that Harford County Public Schools uses,
17   is there any other mechanism that the sys -- the
18   system uses to block access to social media?
19       A.    No.
20       Q.    Or any other internet -- internet
21   content besides social media?
22       A.    Restate your question again, please.
23       Q.    Sure.  We've -- I've asked you about
24   internet content filter and what it blocks.
25       A.    Mm-hmm.
```

```
 1      Q.   I'm trying to understand -- separate
 2   from that internet content filter -- is there
 3   any other mechanism that Harford County Public
 4   Schools uses to block student access to content
 5   on the internet?
 6      A.   No.
 7      Q.   What is your understanding of Harford
 8   County Public Schools' current policy regarding
 9   use of personal devices on school grounds?
10      A.   Students --
11           MR. LEGG:  Objection; form.
12           THE WITNESS:  Students or staff?
13   BY MR. KEYES:
14      Q.   Students.
15      A.   There is a recent policy -- I could
16   not state it verbatim -- of when students are
17   permitted to have a personal device.
18      Q.   Were -- were you involved in adopting
19   that policy?
20      A.   I was not.
21      Q.   Were you involved in drafting it?
22      A.   I was not.
23           (Moore 30(b)(1) Exhibit No. 1, a
24   document Bates-stamped HCPS_00122261 through
25   122266, was introduced.)
```

Page 16

1   BY MR. KEYES:

2       Q.   I'm handing you what has been marked as

3   Moore Exhibit 1.

4        This was produced with the Bates Numbers

5   HCPS_00122261 through 122266.

6            Tell me when you've read Moore

7   Exhibit 1.

8       A.   (Reviews document.)

9       Q.   Okay.  You've reviewed Moore Exhibit 1?

10      A.   Yes, sir.

11      Q.   Is this the policy you were just

12  referencing?  You said there was a recent policy?

13      A.   There is a cell phone policy, I

14  believe, --

15      Q.   Oh.

16      A.   -- that is separate from this.

17      Q.   Okay.  What is Moore Exhibit 1?

18      A.   This is a policy entitled Portable

19  Communication Devices.

20      Q.   Okay.  And it -- it reflects that it was

21  recently amended starting in March 18th, 2024?

22      A.   Correct.

23      Q.   Have you seen Moore Exhibit 1 before?

24      A.   I have.

25      Q.   Okay.  Were you involved in drafting

Page 17

1    this policy?

2        A.    No.

3        Q.    Were you involved in discussions within

4    Harford County Public Schools whether to adopt

5    this policy?

6        A.    No.

7        Q.    Does this document indicate that it was

8    adopted?

9        A.    It does.

10       Q.    It was adopted by the Board?

11       A.    Yes, sir.

12       Q.    And that's the Board of Education of

13   Harford County, as reflected on Page 506?

14       A.    Correct.

15       Q.    Okay.  What was the policy regarding

16   students for portable communication devices

17   before Moore Exhibit 1 was adopted?

18       A.    I have no recollection.

19       Q.    Okay.  Does this policy, as you

20   understand it, apply to just students, or does

21   it also apply to staff?

22       A.    As I read it, just students.

23       Q.    Okay.  What is your understanding of

24   the current policy for staff regarding the

25   use of personal devices on school grounds?

Page 18

1      A.    I do not believe there is one.

2      Q.    Okay.  There's no written policy?

3      A.    Correct.

4      Q.    Are you aware of any unwritten policy

5   regarding staff use of personal devices on school

6   grounds?

7            MR. LEGG:  Objection to form.

8            THE WITNESS:  No.

9            (Moore 30(b)(1) Exhibit No. 2, a

10  document Bates-stamped HCPS_00132081 through

11  132085, was introduced.)

12  BY MR. KEYES:

13     Q.    I'm showing you what has been marked as

14  Moore Exhibit 2.

15            This was produced with the Bates Numbers

16  HCPS_00132081 through 132085.  Could you tell me

17  when you've reviewed this exhibit?

18     A.    (Reviews document.)

19            I have completed.

20     Q.    Okay.  You've reviewed Moore Exhibit 2?

21     A.    Yes, sir.

22     Q.    And this is the Responsible Use Policy

23  for Harford County Public Schools?

24     A.    It is not.

25     Q.    It is not?  What is it?

1      A.    It's a Responsible Use Procedure.

2      Q.    Okay.  What's the difference between

3  policy and procedure?

4      A.    Policy is Board-adopted.  Procedures are

5  the underlying document typically in support of a

6  policy.

7      Q.    Okay.  So is this the Harford County

8  Public Schools' procedure for implementing a

9  policy regarding the use of -- of devices or

10  resources?

11      A.    It is not.

12      Q.    Okay.  What is it?

13      A.    It is a procedure to outline the

14  responsible use of a device.

15      Q.    Okay.  What devices does it govern

16  regarding responsible use?

17      A.    HCPS-owned devices.

18      Q.    Okay.  So would that include the --

19  the Dell Chromebooks that are distributed to

20  students?

21      A.    Correct.

22      Q.    Okay.  Does it -- are you familiar

23  with how Harford County Public Schools' staff

24  implements or enforces the procedures in this

25  exhibit?

Page 20

1          A.    I am aware of how we track the
2     professional development associated with this
3     procedure.
4          Q.    Okay.  And can you tell me what that is?
5          A.    Yes.  So we have a training module that
6     is built to reflect this procedure.  We require
7     all staff to take the training module every year.
8     If they do not complete the module by the
9     specified time, their network account is
10    disabled.
11         Q.    What is that specified time?
12         A.    I believe we give them 60 days.
13         Q.    Okay.  Were you involved in the drafting
14    of this procedure?
15         A.    I may have had some input to this.
16         Q.    Could you turn to Page 5 of 5 in Moore
17    Exhibit 2?
18              There's a section titled "Responsibility
19    for Procedure, Maintenance and References."  And
20    then there's a box for "Last Editor/Drafter
21    Name."  It lists you.  Do you see that?
22         A.    Yes.
23         Q.    And it lists your position as Director
24    of Information and Technology.
25         A.    Yes.

Page 21

1      Q.    Does this indicate to you whether you
2   had any role in drafting or editing --
3      A.    Yes.
4      Q.    -- this procedure?
5            Okay.  What was your role, then, in
6   drafting or editing this procedure?
7      A.    I do not recall specifics other than I
8   was probably asked to give certain input where
9   there was more technical terms used.
10     Q.    Anything else?
11     A.    I don't recall, sir.
12     Q.    Did you approve of Harford County Public
13  Schools adopting this procedure?
14     A.    I most likely did.
15     Q.    Do you recall having any objection to
16  the procedure or any of its contents?
17     A.    Oh, no.  None at all.
18     Q.    Okay.  Would you turn to Page 3 of 5 in
19  this exhibit?
20           It shows there's a Section B.  Do you
21  see Section B's heading?
22     A.    Yes, sir.
23     Q.    It says, "HCPS community use of personal
24  telecommunication devices."  Do you see that?
25     A.    Yes.

1      Q.    And if you look at the prior page,
2   Section A is, "HCPS community use of HCPS
3   telecommunications devices or resources."
4      A.    Yes, sir.
5      Q.    Does this refresh your recollection
6   that this procedure applies both to Harford
7   County Public Schools-issued devices as well as
8   Harford County Public Schools community use of
9   personal devices?
10     A.    There -- it -- it does cover the use of
11  personal devices.
12     Q.    Okay.  So this procedure is not just for
13  school-issued devices.  It's also for personal
14  devices that are used by staff or students on
15  school grounds?
16     A.    As a responsible use.
17     Q.    As a responsible use; is that correct?
18     A.    Yes.
19     Q.    Okay.  So regarding Section B, which
20  is addressing the use by Harford County Public
21  Schools community of personal telecommunications
22  devices, that reference to the community is both
23  staff and students, --
24     A.    Yes.
25     Q.    -- correct?

Page 23

1          Okay.  And it says, "The use of personal
2    telecommunications devices to support education
3    is a privilege."  Do you see that language?
4         A.   Yes, sir.
5         Q.   Does -- what does that mean to you as
6    the person involved in drafting and editing and
7    supervising the training of people in this
8    procedure?
9               MR. LEGG:  Objection to form and
10   foundation.
11   BY MR. KEYES:
12        Q.   You can answer.
13        A.   I do not recall writing that specific
14   statement.  I mean, it -- I think it speaks to
15   exactly how it's said -- that it's not a right;
16   it's a privilege.
17        Q.   Not a right, a privilege.
18             And use of personal telecommunications
19   devices on school grounds is not -- is not -- is
20   not essential.  It's a choice by -- to -- to
21   allow that by Harford County Public Schools.
22        A.   Within para --
23             MR. LEGG:  Objection to form.
24             THE WITNESS:  Within parameters.
25   BY MR. KEYES:

Page 24

1          Q.    What do you mean "within parameters"?
2          A.    Well, if you refer back to Moore
3    Exhibit 1, there -- there is reference to the
4    use of portable communication devices in proper
5    places of the educational environment.
6          Q.    So you're referring to the parameters or
7    restrictions that Harford County Public Schools
8    has imposed on the use of personal devices?
9          A.    Yes.
10         Q.    Okay.
11               But the decision to allow personal
12   devices on school property in the first place
13   was a Harford County Public Schools decision?
14         A.    Correct.
15         Q.    And it was a decision recognizing that
16   allowing personal devices is a privilege, not a
17   right, on the students' part, right?
18         A.    Yes.
19         Q.    And it's not an essential necessity,
20   but a choice, on Harford County Public Schools'
21   part, --
22               MR. LEGG:   Objection to form and
23   foundation.
24   BY MR. KEYES:
25         Q.    -- right?

Page 25

1        A.    Yes.
2        Q.    Okay.  There's a number of paragraphs
3   stating what members of the Harford County Public
4   Schools community agreed to follow with respect
5   to the use of personal telecommunications devices
6   on school grounds, correct?
7        A.    Correct.
8        Q.    I'd ask you to look at Number 6.
9              It says, "Use the HCPS wireless (Wi-Fi)
10  connection in order to comply with the use of
11  content filters.  The HCPS will not bypass the
12  network restriction by using an external
13  network."
14             Did I read that correctly?
15       A.    Yes, sir.
16       Q.    Okay.  Does Harford County Public
17  Schools take any steps to monitor whether
18  students and staff are complying with this
19  particular requirement?
20       A.    We do not monitor compliance.
21       Q.    Okay.  Does Harford County Public
22  Schools take any steps to enforce this particular
23  requirement when violations come to its
24  attention?
25       A.    Could you restate that again, please?

Page 26

1      Q.   Sure.  Sure.  Does Harford County Public

2   Schools take any steps to enforce this particular

3   requirement when violations come to its

4   attention.

5      A.   Not --

6           MR. LEGG:  Objection to form and

7   foundation.

8           THE WITNESS:  Not -- not that I'm aware

9   of the -- the enforcement of it.

10  BY MR. KEYES:

11     Q.   Okay.  So if -- if a teacher, or

12  some other staff member, learns of a student

13  attempting to bypass the Harford County Public

14  Schools' network, one way or another, what are

15  they supposed to do under this procedure that's

16  adopted by Harford County Public Schools?

17          MR. LEGG:  Objection to form.

18          THE WITNESS:  I would say what they do

19  is outside of what this procedure's telling them.

20  BY MR. KEYES:

21     Q.   Okay.  How so?

22     A.   Well, I don't see anything in here that

23  states an action that should be taken by someone

24  that's trying to, as you used the term,

25  "circumvent."

Page 27

1        Q.    Okay.  Well, I'm trying to understand,
2   from -- from your perspective, there is a
3   requirement that the community not bypass the
4   Harford County Public Schools network by using
5   an external network, correct?
6        A.    Correct.
7        Q.    Okay.  That requirement is reflected in
8   Moore Exhibit 2?
9        A.    Yes.
10       Q.    So I want to understand, from your
11  perspective, if a teacher finds a student
12  violating that requirement, what are they
13  supposed to do?
14           MR. LEGG:  Objection; form.
15           THE WITNESS:  I'm not on the discipline
16  side, sir.  I do not what their protocol is.
17  BY MR. KEYES:
18       Q.    Okay.  And so you -- you've not been
19  involved in the past in instances of teachers
20  reporting that a student has violated this
21  requirement by trying to circumvent the
22  Harford County Public Schools network?
23       A.    We have been notified of a potential
24  incident --
25       Q.    Okay.

Page 28

1      A.    -- for us to investigate.

2      Q.    How many times has that happened in your

3   tenure?

4      A.    I have no recollection, sir.

5      Q.    Can you give me an estimate?

6      A.    No.

7      Q.    Okay.  When those have come to your

8   attention, have you done anything?

9      A.    Yes.

10     Q.    What have you or your staff done in

11  response?

12     A.    We will review our logs to see if, in

13  fact, that we can place an individual by their

14  network login accessing a certain site.

15     Q.    Okay.  And how do you do that?

16     A.    We re -- review our firewall logs.

17     Q.    Okay.  And if you find that a student

18  has attempted to circumvent the Harford County

19  Public Schools network based on your review of

20  the firewall log, do you take any action?

21     A.    I report back to what we found.

22     Q.    And to whom do you report that?

23     A.    Generally, it's the principal of the

24  building that's requested it.

25     Q.    Okay.  And are you familiar with what

Page 29

```
 1   steps, if any, the principal has taken regarding
 2   the student's violation of the requirement?
 3        A.   No.
 4             (Moore 30(b)(1) Exhibit No. 3, a
 5   document Bates-stamped HCPS_00412083 through
 6   412087, was introduced.)
 7   BY MR. MOORE:
 8        Q.   I'm showing you what has been marked as
 9   Moore Exhibit 3.
10             This was produced to us with the Bates
11   Numbers HCPS_00412083 through 412087.
12        A.   (Reviews document.)
13        Q.   Tell me when you've reviewed this
14   exhibit.
15        A.   I've reviewed it.
16        Q.   Okay.  What is Moore Exhibit 3?
17        A.   It appears to be a first draft of the
18   Responsible Use Procedure.
19        Q.   And what indicates to you that this is a
20   draft?
21        A.   Well, it is -- it appears that it was
22   never adopt -- well, it does say "adopted" here
23   on Page 5; however, I do not see a signature of
24   the then-superintendent, so I would question
25   that.
```

Page 30

1          Q.    Okay.  And then you see that Exhibit 2,

2     which was the adopted policy, is also dated

3     February 2nd, 2015?

4          A.    Yes, sir.

5          Q.    Okay.  So is it your understanding that

6     Exhibit 3 is the draft that was not adopted and

7     Exhibit 2 is the final version that was adopted?

8          A.    I believe so.

9          Q.    Okay.  And do you know, sitting here,

10    what the differences are between the draft and

11    the final?

12         A.    This is more of a declaration of what

13    you will and not do.  And I believe the final

14    decision -- and I do not recall the -- the

15    specifics of that decision -- was to put it in

16    the form of what was adopted.

17         Q.    Do you have any other recollection of

18    differences between the draft that's Exhibit 3

19    and the final that's Exhibit 2?

20         A.    Other than what I can read here, sir.

21               (Moore 30(b)(1) Exhibit No. 4, Mr.

22    Moore's résumé, was introduced.)

23    BY MR. KEYES:

24         Q.    Okay.  Showing you what has been marked

25    as Moore Exhibit 4.

Page 31

```
 1              MR. LEGG:  Thank you.
 2    BY MR. KEYES:
 3        Q.   This appears to be a résumé for you?
 4        A.   Yes, sir.
 5        Q.   Can you confirm this is your résumé?
 6        A.   Yes, sir.
 7        Q.   Did you prepare it?
 8        A.   Yes, sir.
 9        Q.   Is it accurate?
10        A.   Yes, sir.
11        Q.   Is it complete?
12        A.   Well, in 25 -- or 40 years, it would be
13    a lot longer, but, yes, it was -- it is complete.
14        Q.   Anything that you would flag for
15    something that is important that should be
16    added to the résumé, if you had the chance?
17        A.   Not necessarily, no.
18        Q.   Okay.
19              MR. KEYES:  Can we take a five-minute
20    break?
21              MR. LEGG:  Sure.
22              THE VIDEOGRAPHER:  Stand by.
23              We are off the record at 10:12.
24              (Recess taken.)
25              THE VIDEOGRAPHER:  We are on the record
```

Page 32

1    at 10:24.

2            (Moore 30(b)(1) Exhibit No. 5, a

3    document Bates-stamped HCPS_00411565 through

4    411566, was introduced.)

5    BY MR. KEYES:

6        Q.   Mr. Moore, I'm handing you what has been

7    marked as Moore Exhibit 5.

8            This was produced to us with the Bates

9    Numbers HCPS_00411565 through 411566.  It's a

10   series of two emails between you and Jean [sic]

11   Seashole on June 6th and June 7th of 2022.

12           Tell me when you've read the -- the

13   emails in this exhibit.

14       A.   (Reviews document.)

15           I have.

16       Q.   Okay.  The first email is from

17   Jean -- Jenn Seashole.

18       A.   Mm-hmm.

19       Q.   Do you know what her position is?

20       A.   I do not.  So this email -- the -- the

21   originating email from Jenn -- is asking all of

22   the CIOs across the State of Maryland a question.

23   She is posing the question -- she -- well,

24   her title is right there, Supervisor of

25   Information Services Carroll County Public

```
 1   Schools.  And, quite frankly, this was her
 2   collecting information as to what other
 3   districts are doing.
 4        Q.   Regarding YouTube?
 5        A.   It appears so, yes.
 6        Q.   Okay.  And separate from the fact that
 7   her title is listed in -- in the signature block
 8   of her email, do you know who --
 9        A.   No.
10        Q.   -- she is?
11        A.   No.
12        Q.   Okay.  Do you remember this email
13   exchange?
14        A.   No.
15        Q.   You respond to her email on June 7th,
16   2022, correct?
17        A.   I do.
18        Q.   And you say, quote, "Harford opened
19   YouTube for all grades.  We forced restricted
20   mode for both Google and YouTube."
21             Did I read that correctly?
22        A.   You did.
23        Q.   Okay.
24        A.   It was an error.
25        Q.   Okay.  What's the error there?
```

Page 34

1       A.    Oh, I misspoke.

2       Q.    How so?

3       A.    We do not open YouTube for all grades.

4       Q.    Okay.  You open it only for grade 3 --

5       A.    Through 12.

6       Q.    -- through grade 12?

7       A.    That's correct.

8       Q.    Okay.  And is it accurate to say

9   that, at least in June of 2022, Harford County

10  Public Schools put all grades 3 through 12 in

11  restricted mode?

12      A.    That's what I'm stating here.  That may

13  not have been the case.

14      Q.    Okay.

15      A.    I'm -- I'm -- I mean, obviously, I

16  was -- I was wrong in my statement here.

17      Q.    Well, you te -- I believe you had

18  testified earlier that there were different modes

19  of restriction.

20      A.    That is correct.

21      Q.    And that there was a different mode of

22  restriction for grades 6 through 12.

23      A.    That's correct.

24      Q.    Did I get that right?

25      A.    Yeah.  That's correct.

1     Q.    And I believe you described that

2     restricted mode as being Modified Mode.

3         A.    There is the Strict Restricted

4     -- there's Strict Restriction and Modified

5     Restriction.  So, yes, Modified is grades six

6     through 12.

7         Q.    And Strict Restriction is grades 3

8     through 5?

9         A.    That's correct.

10        Q.    Okay.  And so here when you say we

11    re -- forced Restricted Mode, that is describing

12    both Modified Restricted and Strict Restricted?

13        A.    Yeah.  I was just summarizing it, yes.

14        Q.    Okay.  So do you view this document as

15    consistent with your other testimony that YouTube

16    was made available to Harford County Public

17    Schools on its devices and on its network for

18    grades 3 through 12 -- grades 3, 4 and 5 in

19    Strict Restricted Mode, and grades 6 through 12

20    in Moderate Restricted Mode?

21        A.    Yes.

22            MR. LEGG:  Objection to form.

23    BY MR. KEYES:

24        Q.    Okay.  Turning your attention to

25    Moore Exhibit 5, you then say, quote, "We have a

Page 36

```
1   parent consent/release document we collect at the
2   beginning of each school year."
3            Did I read that correctly?
4       A.   Yes, sir.
5       Q.   Is that something you have done each
6   year since Harford County Public Schools decided
7   to make YouTube available to students?
8       A.   Yes.  I could not tell you when we
9   started actually implementing a parent consent
10  form.
11      Q.   Okay.  Was there a period of time
12  when Harford County Public Schools made YouTube
13  available to students before it had obtained
14  parental consent or release in a -- in a
15  document?
16      A.   Not that I'm aware of.
17      Q.   Okay.  Is it your best understanding
18  that ever since Harford County Public Schools
19  decided to make YouTube available to students,
20  either on school grounds or on the school
21  network, that it obtained parental consent?
22      A.   Yes.
23            MR. LEGG:  Objection to form.
24  BY MR. KEYES:
25      Q.   And did any parents complain to you
```

```
 1   about Harford County Public Schools making
 2   YouTube available to students?
 3        A.   I can't recall.
 4        Q.   Okay.  Are you aware of any parents
 5   complaining to anyone else in Harford County
 6   Public Schools about making YouTube available to
 7   students?
 8        A.   I can't recall.  That would not -- I
 9   mean, it could and never reach me.
10        Q.   Right.  You're saying it -- it's
11   possible it happened.  My question is are you
12   aware of that ever happening?
13        A.   I'm not aware of it.
14             (Moore 30(b)(1) Exhibit No. 6, a
15   document Bates-stamped HCPS_00464285 and
16   HCPS_00464285-001 through HCPS_00464285-004, was
17   introduced.)
18   BY MR. KEYES:
19        Q.   Okay.  Showing you what has been marked
20   as Moore Exhibit 6.
21             This was produced to us with the Bates
22   Numbers HCPS_00464285 through sub-one through
23   sub-four.
24             It's a series of emails.  I just had a
25   question for you about the email at the top of
```

Page 38

1   the first page.

2           There's an email dated March 15th, 2021.

3   Do you see that?

4       A.   Yes, sir.

5       Q.   And you say, quote, "As with our

6   firewall and content filter on the enterprise

7   network, the filtering app on the student device

8   reports the sites they visit to the filter's

9   cloud service so appropriate URL blocks can be

10  utilized."

11          Did I read that correctly?

12      A.   Yes, sir.

13      Q.   And a URL is a website?

14      A.   Yes, sir.

15      Q.   And when it refers to your firewall

16  and content filter on the enterprise network,

17  "enterprise network" is the Harford County Public

18  Schools network that provides internet access?

19      A.   That's correct.

20      Q.   And the firewall and content filter is

21  what you described before as being Check Point,

22  Palo Alto, Umbrella or Cisco Securely?

23      A.   It would have not included Check Point

24  at the time of this email.

25      Q.   I see.  That would have been earlier.

```
                                              Page 39
 1           But -- but the concept of a firewall and
 2    content filter would include it?
 3        A.    That's correct.
 4        Q.    Okay.  Are you drawing a distinction,
 5    then, between a filtering app and the internet
 6    content filter service?
 7        A.    No, sir.
 8        Q.    It's one and the same?
 9        A.    Correct.
10        Q.    Are you describing the mechanism by
11    which it works when you say, "the filtering app
12    on the student device"?
13        A.    Say -- say the question one more time.
14        Q.    Sure.  I'm just trying to understand
15    what you're explaining here.  You say, "As with
16    our firewall and content filter on the enterprise
17    network, the filtering app on the student
18    device . . ."
19        A.    So --
20        Q.    Am I correct in understanding that the
21    filtering app on the student device is part of
22    the internet content filter?
23        A.    It is a component of.
24        Q.    It's what helps make the filter work?
25        A.    It works in tandem --
```

Page 40

```
 1        Q.    Okay.
 2        A.    -- with the -- the -- the Palo Alto.
 3        Q.    Because there there's something on
 4   the device that directs the device through the
 5   internet content filter; is that correct?
 6        A.    Let me think about your question.
 7              I cannot recall sitting here how
 8   Securely does their filtering for us.  I do not
 9   recall if it's an app or if it's actually -- it
10   must be an app.
11        Q.    Okay.  What is "BYOT"?
12        A.    Bring Your Own Technology.  It's our
13   designation for one of our Wi-Fi networks.
14        Q.    Are there other Wi-Fi networks that you
15   use?
16        A.    Yes.
17        Q.    What are the other ones?
18        A.    Well, there's -- there's a host of them.
19   There's a --
20        Q.    What -- what are the other ones that
21   students can use?
22        A.    They have one -- I think it's called
23   HCPS one-to-one.
24        Q.    Okay.  And was this a program that was
25   used by Harford County Public Schools prior to
```

Page 41

1    becoming a one-to-one jurisdiction in October of

2    2020?

3         A.    Clarify "program."

4         Q.    Was it a -- was it a Wi-Fi network made

5    available to students before October of 2020?

6         A.    Which one?

7         Q.    The BYOT program.

8         A.    Yes.

9         Q.    Okay.  And so the BYOT program, as

10   I understand it, was a program that allowed or

11   encouraged students to bring their own devices to

12   Harford County Public Schools before they may

13   have had their own school-issued device?

14        A.    That is correct.

15        Q.    And that's a device that they could then

16   use on school grounds for school purposes?

17        A.    That is correct.

18        Q.    But in order to use it, it needed

19   network access?

20        A.    That's correct.

21        Q.    And so there was a BYOT program/network

22   that made that possible?

23        A.    Correct.

24        Q.    Why did Harford County Public Schools

25   allow or encourage students to bring their own

Page 42

1  device to school during the school day?

2          MR. LEGG:  Objection to form.

3          THE WITNESS:  It's my understanding

4  that we were moving to a digital -- digital

5  curriculum.  We did not have one-to-one.  So,

6  with parameters, we said if the student has a

7  personal device, that they could bring it to the

8  school.

9          We stood up the one -- the BYOT to

10  segment them for security reasons.

11  BY MR. KEYES:

12      Q.  Okay.  When you say, "to segment them,"

13  you -- you wanted, essentially, a -- a guest

14  network for students to use on their own personal

15  devices rather than the -- the network that was

16  for the school- --

17      A.  Production.

18      Q.  -- issued devices?

19      A.  Yes.

20      Q.  And you referred to "production."

21  That's the production network?

22      A.  Yeah.

23      Q.  And the production network is for

24  internet connectivity for all school-issued

25  devices?

Page 43

```
 1        A.    Yes.
 2        Q.    Okay.
 3              Are you aware of ways in which students
 4   can circumvent the BYOT network using their
 5   personal devices?
 6        A.    Yes.
 7        Q.    One way is just to use cellular, --
 8        A.    Yes.
 9        Q.    -- right, so they can get access to the
10   internet without using any internet at all?
11        A.    Without any Harford County Public
12   Schools network.
13        Q.    Okay.  Fair enough.
14              And are there ways where students can
15   circumvent the network on Harford County Public
16   Schools-issued devices?
17        A.    Yes.
18        Q.    What are those ways?
19        A.    So it's a -- a technology called Proxy.
20        Q.    Okay.  And what is that technology?
21        A.    The technology is, basically, a website
22   -- Proxy is a website that allows a individual to
23   go to a website that we've blocked.  But it puts,
24   for lack of a better tem, a wrapper around so
25   that the URL passes through our filter.  And it's
```

Page 44

```
 1   -- it's -- it's, typically, a site that has been
 2   uncategorized in the filter which allows that to
 3   pass through.
 4        Q.   Are you able to quantify how many times
 5   that's happened?
 6        A.   No.
 7        Q.   Do you have any estimate at all how many
 8   times it's happened?
 9        A.   No.
10        Q.   How many times has it been reported to
11   you?
12        A.   I -- I have no recollection of the
13   number --
14        Q.   Okay.
15        A.   -- of times.
16        Q.   Okay.
17        A.   For the -- for the record, this is like
18   a Whac-A-Mole.
19        Q.   What do you mean?
20        A.   They pop up; we block them.  Students
21   find other ones; they might use them.  We find
22   it; we block it.  It -- it's an ongoing --
23        Q.   And so whenever one of these proxies
24   or -- or circumvention methods comes to your
25   attention, you and your staff then block it?
```

Page 45

```
 1      A.    Correct.
 2      Q.    But then students find another way?
 3      A.    Correct.
 4      Q.    And if that comes to your attention, you
 5   block that?
 6      A.    Correct.
 7      Q.    And you're blocking these by using the
 8   internet content filter?
 9      A.    Correct.
10      Q.    That --
11      A.    Well, firewall.
12      Q.    Firewall that will then block that
13   proxy?
14      A.    Yes.
15      Q.    And are there any other steps you think
16   Harford County Public Schools could take to
17   prevent students from using proxies in the
18   first place?
19            MR. LEGG:  Objection to form and
20   foundation.
21            THE WITNESS:  I am not a -- a firewall
22   designer, so I -- I -- I'm not aware of any.
23   BY MR. KEYES:
24      Q.    Have you made any recommendations or
25   suggestions to Harford County Public Schools
```

Page 46

```
 1   about other steps the school system could take to
 2   block students from using this proxy technology?
 3       A.   No.
 4       Q.   Okay.  And have you made any
 5   recommendations or suggestions to Harford County
 6   Public Schools about keeping personal devices out
 7   of the schools entirely because students could
 8   either use cellular or use proxies to evade the
 9   internet content filter?
10       A.   I have not made those statements.
11       Q.   Have other people, to your knowledge?
12       A.   Not to my knowledge.
13       Q.   Okay.  And so are you able to quantify
14   how often students use cellular when they -- on
15   their personal devices when on school grounds?
16       A.   No.
17            MR. KEYES:  Okay.  Thank you for your
18   time.  I don't have any more questions.
19            MR. JAMES:  No questions.
20            MR. KEYES:  Do -- can they hear me?
21   I hope so.
22            THE VIDEOGRAPHER:  You've been on.
23            MR. KEYES:  Yeah.
24            Does anyone on the phone have -- or on
25   Zoom have any questions?
```

Page 47

1          MR. LEGG:  We're gonna take just, like,

2    a two-minute break, and then we'll come back.

3          MR. KEYES:  Sure.

4          THE VIDEOGRAPHER:  All right.  Stand by.

5          We are off the record at 10:39.

6          (Recess taken.)

7          THE VIDEOGRAPHER:  We are on the record

8    at 10:42.

9          MR. LEGG:  I have no questions.

10          MR. KEYES:  Thank you, Mr. Moore.

11    Appreciate your time today.

12          THE WITNESS:  You're welcome.

13          THE VIDEOGRAPHER:  All right.  Stand by.

14          We are off the record at 10:42.  This

15    concludes today's deposition.

16          (Deposition concluded -- 10:42 a.m.)

17

18

19

20

21

22

23

24

25

Page 48

1                  C E R T I F I C A T E

2

3          I do hereby certify that I am a Notary

4    Public in good standing, that the aforesaid

5    testimony was taken before me, pursuant to

6    notice, at the time and place indicated; that

7    said deponent was by me duly sworn to tell the

8    truth, the whole truth, and nothing but the

9    truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition

13   is a true and correct record of the testimony

14   given by the witness; and that I am neither of

15   counsel nor kin to any party in said action, nor

16   interested in the outcome thereof.

17          WITNESS my hand and official seal this

18   _____ day of _____, 2025

19

20

                     _____

21

22                        Notary Public

23

24

25

Page 49

1                    INSTRUCTIONS TO WITNESS

2

3        Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8        After doing so, please sign the errata sheet

9    and date it.

10        You are signing same subject to the changes

11   you have noted on the errata sheet, which will be

12   attached to your deposition.

13        It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the

16   deposition transcript by you.   If you

17   fail to do so, the deposition transcript may be

18   deemed to be accurate and may be used in court.

19

20

21

22

23

24

25

```
                                                    Page 50

 1                        _ _ _ _ _

 2                      E  R  R  A  T  A

 3                        _ _ _ _ _

 4   PAGE      LINE      CHANGE

 5   _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _

 6   Reason for

 7   Change:_____

 8   PAGE      LINE      CHANGE

 9   _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _

10   Reason for

11   Change:_____

12   PAGE      LINE      CHANGE

13   _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _

14   Reason for

15   Change:_____

16   PAGE      LINE      CHANGE

17   _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _

18   Reason for

19   Change:_____

20   PAGE      LINE      CHANGE

21   _ _ _    _ _ _    _ _ _ _ _ _ _ _ _ _ _ _ _ _

22   Reason for

23   Change:_____

24

25
```

Page 51

```
1    PAGE       LINE       CHANGE

2    _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

3    Reason for

4    Change:_____

5    PAGE       LINE       CHANGE

6    _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

7    Reason for

8    Change:_____

9    PAGE       LINE       CHANGE

10   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

11   Reason for

12   Change:_____

13   PAGE       LINE       CHANGE

14   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

15   Reason for

16   Change:_____

17   PAGE       LINE       CHANGE

18   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

19   Reason for

20   Change:_____

21   PAGE       LINE       CHANGE

22   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

23   Reason for

24   Change:_____

25
```

Page 52

1          ACKNOWLEDGMENT OF DEPONENT

2               I, _____, do

3    hereby certify that I have read the foregoing

4    pages __ to ____ and that the same is a

5    correct transcription of the answers given by

6    me to the questions therein propounded,

7    except for the corrections or changes in form

8    or substance, if any, noted in the attached

9    Errata Sheet.

10

11   _____        _____

12   DATE                SIGNATURE

13

14               Subscribed and sworn to before

15   me this _____ day of _____, 2025.

16

17               My commission expires:

18               _____

19

20               _____

21               Notary Public

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.