**Exhibit 1**

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
2               FOR THE COUNTY OF LOS ANGELES
3

COORDINATION PROCEEDINGS SPECIAL    JUDICIAL COUNCIL
4    TITLE [RULE 3.400]                  COORDINATION
                                         PROCEEDINGS NO.
5    5255
     SOCIAL MEDIA CASES
6    --------------------------------/
     THIS DOCUMENT RELATES TO:          For Filing
7                                       Purposes:
     Cristina Arlington Smith, et al.,  22STCV21355
8    v. TikTok, Inc., et al.,
9    Los Angeles Superior Court
     --------------------------------/
10
11
12

13        VIDEO-RECORDED DEPOSITION OF ANNA LEMBKE, MD
                 Wednesday, June 18, 2025
              Morgan, Lewis & Bockius, LLP
14         1 Market Street, Spear Street Tower
                 San Francisco, CA 94147
15
16
17
18   Stenographically reported by:
     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
19   California CSR No. 10523
     Washington CSR No. 3318
20   Oregon CSR No. 19-0458
     Texas CSR No. 11318
21
     Job No.:  MDLG 7396506
22   California Firm Registration No.:  48
23
24              GOLKOW - VERITEXT
          877.370.DEPS | fax 917.591.5672
25                 deps@golkow.com

CONFIDENTIAL

Page 2

1    A P P E A R A N C E S
2
3  Attorneys for the JCCP Plaintiffs:
4        LIEFF CABRASER HEIMANN & BERNSTEIN
           BY:  KELLY K. McNABB, ESQ.
5            LIVIA JARAMILLO, ESQ.
           250 Hudson Street, 8th Floor
6          New York, NY 10013
           (212) 355-9500
7          kmcnabb@lchb.com
           BY:  DONALD C. ARBITBLIT, ESQ.
8            MATIAS BUSTAMANTE, ESQ.
             LEXI J. HAZAM, ESQ. (via Zoom)
9          275 Battery Street, 29th Floor
           San Francisco, CA 94111
10         (415) 956-1000
           darbitblit@lchb.com
11         mbustamante@lchb.com
           lhazam@lchb.com
12
   Attorneys for the Defendants TikTok Inc., and
13  ByteDance, Inc.:
14
           KING & SPALDING LLP
15           BY:  KATHRYN LEHMAN, ESQ.
           1180 Peachtree Street
16         Atlanta, GA 30306
           (404) 572-2716
17         klehman@kslaw.com
18
   Attorneys for Defendant Snap, Inc.:
19
           MUNGER, TOLLES & OLSON, LLP
20           BY:  JONATHAN H. BLAVIN, ESQ.
           560 Mission Street, 27th Floor
21         San Francisco, CA 94105
           (415) 512-4011
22         jonathan.blavin@mto.com
           BY:  PRISCILA E. CORONADO, ESQ. (via Zoom)
23         350 S. Grand Ave, Floor 50
           Los Angeles, CA 90071
24         (213) 683-9100
           priscila.coronado@mto.com
25
     (Continued)

Page 3

1    A P P E A R A N C E S
2
3  Attorneys for Defendants Meta Platforms, Inc. f/k/a
     Facebook, Inc.; Instagram, LLC; Facebook Payments,
4  Inc.; Facebook Operations, LLC; and Siculus, Inc.:
5        COVINGTON & BURLING LLP
           BY:  LINDSEY BARNHART, ESQ.
6          3000 El Camino Real, Building 5
           Suite 1000
7          Palo Alto, CA 94306
           (650) 632-4700
8          lbarnhart@cov.com
9
   Attorneys for Defendants YouTube, LLC and
10  Google LLC:
11         MORGAN, LEWIS & BOCKIUS LLP
           BY:  BRIAN ERCOLE, ESQ.
12         600 Brickell Avenue, Suite 1600
           Miami, FL 33131-3075
13         (305) 415-3416
           brian.ercole@morganlewis.com
14         BY:  KATHERINE A. VAKY, ESQ.
           One Oxford Centre, 32nd Floor
15         Pittsburg, PA 15219
           (412) 560-7474
16         katherine.vaky@morganlewis.com
17  Also present:
18         James VonWiegen, Videographer
           Dan Lawlor, Trial Tech
19
20  (Continued)
21
22
23
24
25

Page 4

1    A P P E A R A N C E S
2
   Unidentified participants via Zoom:
3  (Participants did not e-mail reporter their
     appearance information)
4
5        Isaac LaGrand
           Clinton Richardson
           Patrick Andrews
6        Rob Chambers
           Lindsay Stevens (Baron & Budd)
7        Patrick Nutter
           Yale Fu
8        Marcela Interiano
           Callie Davidson (WSGR)
9        Jennifer Emmel
10
11         ---oOo---
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    I N D E X
2    INDEX OF EXAMINATION
3  EXAMINATION BY                    PAGE
4  MR. ERCOLE                          7
     MS. BARNHART                     331
5  MR. BLAVIN                        358
     MS. LEHMAN                       381
6  MS. McNABB                        411
     MR. ERCOLE                       412
7
8        ---oOo---
9    INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
10  EXHIBIT    DESCRIPTION            PAGE
11  Lembke
     Exhibit 1  Defendants' Joint Notice of      20
12            Deposition of Plaintiff's
             Retained Expert Anna Lembke and
13            Request for Production of
             Documents
14  Lembke
     Exhibit 2  Invoice, date 2/1/2023           32
15            (LEMBKE000001 - LEMBKE000008)
   Lembke
16  Exhibit 3  Expert Report, Anna Lembke, MD,   34
             dated 4/18/2025
17  Lembke
     Exhibit 4  Curriculum Vitae of Anna Lembke,  55
18            MD (LEMBKE000009 - LEMBKE000096)
   Lembke
19  Exhibit 5  New York Times article           73
   Lembke
20  Exhibit 6  American Psychiatric Association  167
             article entitled "From Planning
21            to Publication:  Developing
             DSM-5-TR"
22  Lembke
     Exhibit 7  Declaration of Anna Lembke, MD   171
23
24  (Continued)
25

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

I N D E X
1
INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
2
EXHIBIT     DESCRIPTION          PAGE
3
Lembke
4
Exhibit 8   American Psychological     263
5       Association article entitled
        "Limiting Social Media Use
6       Decreases Depression, Anxiety,
        and Fear of Missing Out in Youth
7       with Emotional Distress:  A
        Randomized Controlled Trial"
8
Lembke
Exhibit 9   ResearchGate article entitled   266
9       "Social media reduction or
        abstinence interventions are
10      providing mental health benefits
        - reanalysis of a published
11      meta-analysis"
Lembke
12
Exhibit 10  Article entitled "Understanding   332
        Perceptions of Problematic
13      Facebook Use"
        (META3047MDL-020-00093973 -
14      META3047MDL-020-00093985)
Lembke
15
Exhibit 11  Document entitled "Young     374
        consumers and social media,"
16      dated February 2025
Lembke
17
Exhibit 12  Document entitled "TikTok    399
        History 101 - US"
18      (TIKTOK3047MDL-056-00965196 -
        TIKTOK3047MDL-056-00965332)
19
                ---oOo---
20
21  QUESTIONS THE WITNESS WAS INSTRUCTED NOT TO ANSWER:
22          Page     Line
23          40       24
24              ---oOo---
25

Page 7

1           WEDNESDAY, JUNE 18, 2025
2           SAN FRANCISCO, CALIFORNIA
3               8:44 a.m. PDT
4       THE VIDEOGRAPHER:  We're now on the record.
5   My name is James VonWiegen.
6       The time is 8:44 a.m., June 18th, 2025.
7       The deponent is Anna Lembke in the
8   deposition of social media.
9       The court reporter is Lorrie Marchant and
10  will now swear in the witness.
11      THE STENOGRAPHER:  My name is
12  Lorrie Marchant.  I'm a California Certified
13  Shorthand Reporter.  My CSR license number is 10523.
14      I will go ahead and swear in the witness
15  now.
16              ANNA LEMBKE,
17  FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:
18      EXAMINATION BY MR. ERCOLE
19      BY MR. ERCOLE:
20  Q.  Good morning, Dr. Lembke.  How are you
21  doing?
22  A.  I'm doing well.
23  Q.  Good.
24      My name is Brian Ercole.  We met a little
25  bit earlier.

Page 8

1       Do you remember that?
2   A.  Yes.
3   Q.  We'll get into some specifics a little bit
4   later, but is it fair to say that you've been
5   deposed as a expert witness before?
6   A.  Yes.
7   Q.  Okay.  And how many depositions as an
8   expert have you sat for in the past?
9   A.  I don't remember.
10  Q.  More than 50?
11  A.  No.
12  Q.  More than -- more than 25?
13  A.  No.
14  Q.  More than 20?
15  A.  No.
16  Q.  More than ten?
17  A.  I think I have it here in one of my
18  appendices of my report.
19      Well, I can't tell from here whether this
20  prior testimony was in deposition or in court, but
21  here there are 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,
22  12, 13 prior testimonies listed.  Some of those are
23  depositions; some of them are not.
24      So it's probably less than ten.
25  Q.  Okay.  And even though you've been through,

Page 9

1   you know, maybe -- maybe ten, maybe less than ten
2   depositions, I just want to talk a -- about a couple
3   of the ground rules for today if that's okay.
4   A.  Sure.
5   Q.  You understand that you have to tell the
6   truth here today?
7   A.  I do.
8   Q.  And if I ask a question and you don't
9   understand it, will you ask me to repeat it or
10  rephrase it?
11  A.  I will.
12  Q.  And if you answer a question, I'm going to
13  assume that you heard and understood it; is that
14  fair?
15  A.  That's fair.
16  Q.  And this is sort of a routine question that
17  I'm sure you've been asked before, but is there
18  anything that would prevent you from giving
19  truthful, accurate, and honest testimony here today?
20  A.  No.
21  Q.  If you do need a break during the course of
22  today's deposition, just let us know and we can
23  pause and take a break as long as there's not a
24  question that's pending; is that fair?
25  A.  I will do that.  I'd like to say that I'd

CONFIDENTIAL

Page 10

1 like to minimize the breaks and take a short lunch,
2 if needed, because I'd like to get done as quickly
3 as possible.
4    Q.  Sure.  That's fair.  And we'll do our best
5 to accommodate you.  We may -- probably will need to
6 take some breaks just because there's a lot of
7 people involved and the court reporter is sort of
8 nodding her head right now.  Other than you, she's
9 the second most important person here today.
10       Before we start, it looks like you have
11 some binders in front of you; is that right?
12    A.  Yes.
13    Q.  And how many binders do you have in front
14 of you?
15    A.  Three.
16    Q.  Okay.  And what are they?
17    A.  I have my report from April 18th, 2025.
18 That's the JCCP report.
19       I have my report from May 16th, 2025.
20 That's the federal report.
21       And I have a document of things like
22 materials considered.
23    Q.  And so -- and the document with the
24 materials considered is in -- is in a third binder;
25 is that correct?

Page 11

1    A.  Yes.
2    Q.  Okay.  And at a break, when we take a
3 break, are you comfortable if we copy those and mark
4 those as exhibits for this deposition?
5    A.  Sure.
6    Q.  But at least, just so I understand, what
7 are in those binders are your JCCP expert report
8 that you submitted; is that correct?
9    A.  One binder is my JCCP report.  One binder
10 is my federal report.  And one binder is the list of
11 materials considered.
12    Q.  Thank you.
13       We may use some jargon today, but I want to
14 make sure we're kind of on the same page about the
15 definitions of some of those terms and concepts.
16       Today I'm going to use sort of psychiatric
17 disorders and mental health disorders to mean the
18 same thing.
19       Is that okay with you?
20    A.  I'm comfortable with that.
21    Q.  Do you know who the defendants are in this
22 case?  And by "this case," I mean the JCCP
23 litigation.
24    A.  Yes, I do.
25    Q.  Who are they?

Page 12

1    A.  TikTok, Snapchat, Meta, YouTube.
2    Q.  How do you define, Dr. Lembke, social
3 media?
4    A.  Social media is an online interactive
5 platform that allows people to exchange messages,
6 videos, photos, or other forms of digital media in a
7 realtime interactive way and/or respond to what
8 other people have posted.
9    Q.  Anything else in your definition?
10    A.  That may not be a complete definition.  I
11 would probably need a more specific example.  You
12 could ask me, "Do you think this is social media?"
13 And I could say yea or nay.
14    Q.  Do you consider the defendants in this case
15 to be social media platforms?
16    A.  Yes, I do.
17    Q.  Do those social media platforms have
18 different features?
19    A.  What do you mean by "different features"?
20    Q.  Well, you -- there are, I think you
21 mentioned, four or five different platforms that are
22 at issue in this case; correct?
23    A.  Yes.
24    Q.  And do those platforms have different
25 features?

Page 13

1    A.  Those platforms are more alike than
2 different.
3    Q.  Well, that wasn't my question; right?
4       Do they have different features; yes or no?
5    MS. McNABB:  Objection.
6    THE WITNESS:  Those platforms are more
7 alike than different.  They do have differences, but
8 they're more alike than different.
9    BY MR. ERCOLE:
10    Q.  Are there social media platforms -- strike
11 that.
12       Are there other platforms that fall within
13 your definition of social media other than the
14 defendants who have been sued here today?
15    A.  Yes.
16    Q.  And can you -- what platforms are those?
17 Can you list them for me or name them for me?
18    A.  Reddit, X, various e-mail platforms.
19 There's a long list.
20    Q.  When you say "various e-mail platforms,"
21 what do you mean by that?
22    A.  People exchanging e-mails is a form of
23 social media.
24       What's distinct about the defendants'
25 platforms is that they are addictive by design.

CONFIDENTIAL

Page 14

1 They have certain distinctive features that make
2 them addictive.
3    Q.  We'll get into those -- those issues a
4 little bit later.  I'm just trying to understand
5 your concept of social media.
6       Are there -- what other -- you mentioned
7 there's a long list of platforms that would fall
8 within your definition of social media.
9       Any others come to mind right now?
10       MS. McNABB:  Sorry.  Objection.  Misstates.
11       THE WITNESS:  I feel like I answered the
12 question.  I don't have memorized the exhaustive
13 list of different types of social media platforms
14 that are out there.
15       BY MR. ERCOLE:
16    Q.  Any others besides the ones that you
17 identified that come to mind right now?
18    A.  No.
19    Q.  If I use the term "social media platforms"
20 today, I'm going to be referring to all of the
21 social media platforms, not just the defendants'
22 platforms that are at issue in this case.
23       Is that okay with you?
24    A.  Not really.
25       MS. McNABB:  Object.

Page 15

1       BY MR. ERCOLE:
2    Q.  That's not okay with you?
3    A.  No, that's not okay with me.
4    Q.  Okay.
5       MS. McNABB:  And just for the record, I
6 would object to doing so.  It may depend on the
7 question.
8       MR. ERCOLE:  Okay.  Well, you can object
9 all you want.
10       BY MR. ERCOLE:
11    Q.  If I ask you about defendants' -- I will be
12 specific about the defendants' platforms if I'm
13 asking you questions about defendants' platforms.
14       Do you understand that?
15    A.  I do.
16    Q.  Okay.  And if I'm asking you questions
17 about social media platforms, I will be referring to
18 social media in general as you defined it.
19       Do you understand that?
20    A.  To me that's problematic.
21    Q.  Okay.  Can be problematic, but that's going
22 to be the definition I'm using in my question.
23       Do you understand that?
24       MS. McNABB:  Objection.
25       THE WITNESS:  I understand that that may be

Page 16

1 the definition that you're using, but I might not be
2 able to answer your question --
3       BY MR. ERCOLE:
4    Q.  Okay.
5    A.  -- if you phrase it in that way.
6    Q.  Okay.  You gave a definition of social
7 media; correct?
8    A.  I attempted to give a definition of social
9 media, but I qualified it by saying that it wasn't
10 an exhaustive definition and that I really would
11 be -- need to be presented with the specific
12 platform and look at the features to be able to say
13 whether or not I thought it was a form of social
14 media.
15       I also think that there's a distinction
16 between addictive social media and social media
17 platforms that don't have the same design features
18 that make them addictive.
19    Q.  Sure.
20       We're not even talking about any of this.
21 I'm just trying to get a baseline understanding of
22 the concepts we're going to use today; okay?
23       I'm just going to let you know, when I'm
24 asking you a question about social media platforms,
25 I'm going to be referring to any platforms that

Page 17

1 would fall within the definition of social media
2 that you gave; okay?
3       MS. McNABB:  Objection.
4       BY MR. ERCOLE:
5    Q.  Do you understand that?
6    A.  I understand that you're saying that.  But
7 I'm also telling you that if you ask me a question
8 and just use the generic term "social media," I will
9 likely not be able to answer that question.
10    Q.  Okay.  Did you use the generic term "social
11 media" in your report?
12    A.  I didn't use a generic term of social
13 media, no.  I was talking about the defendants'
14 platforms.
15    Q.  Okay.  How does your definition of social
16 media compare to the definition of digital media?
17       Is there a difference between the two?
18    A.  Yes.
19    Q.  What's the difference?
20    A.  Digital media is the broad umbrella
21 category, and social media is a subtype of digital
22 media.
23    Q.  And when you say "subtype of digital
24 media" -- well, when you say "broad umbrella
25 category," what do you mean by that?

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1    A.   It's the superset.
2    Q.   What would fall within the definition of
3   digital media but not social media?
4    A.   Online pornography, online gambling, online
5   shopping, video games.
6    Q.   How does -- is social media use different
7   than smartphone use?
8    A.   Yes.
9    Q.   Okay.  And what's the difference?
10    A.   Smartphone use refers to the device.  And
11   social media refers to a digital media platform that
12   can be accessed from the device.
13    Q.   And is social media use different from
14   Internet use?
15    A.   Social media use is something that people
16   can do on the Internet, but it's not the only thing
17   that people can do on the Internet.  Like, given
18   that people spend -- especially teens spend so much
19   time on social media, I can infer that when they're
20   using the Internet, they're on social media for a
21   good portion of that time.
22    Q.   Just to get back to my question, Internet
23   use is a broader concept than social media use;
24   correct?
25    A.   Yes.

Page 19

1    Q.   Okay.  Have you done -- have you conducted
2   your own study to understand how much time teens
3   spend on social media?
4    A.   I've not conducted my own formal study.
5   But I see -- in clinical care, I've done informal
6   assessments of how much time people are spending on
7   social media.
8    Q.   And when you say "clinical care," what are
9   you referring to?
10    A.   My psychiatric practice.
11    Q.   So the patients you see?
12    A.   Yes.
13    Q.   Okay.  So anecdotally based upon treating
14   patients you see, you have a sense of how much time
15   teens spend on the Internet; is that correct?
16    A.   No.  I wouldn't say that that -- that's my
17   answer to that question.
18    Q.   Okay.  So anecdotally based on the
19   treatment of patients in your practice, you have an
20   understanding of how much time teens spend on social
21   media; is that correct?
22        MS. McNABB:  Objection.  Misstates.
23        THE WITNESS:  Given my clinical experience
24   working with people of all ages who get addicted to
25   social media, I have a sense of how much time people

Page 20

1   are spending in the context of addictive or
2   problematic use.
3        But you're correct, it's not a formal
4   study, so if you want to use the term "anecdotal,"
5   that's okay.
6        BY MR. ERCOLE:
7    Q.   Are you aware of any studies that have
8   looked at how much time minors spend on social
9   media?
10    A.   Yes.
11    Q.   And what studies are those?
12    A.   Most recently I looked at a Pew report of
13   what teenagers are doing online, what social media
14   and what media in general they're using most
15   frequently.
16    Q.   We'll get into -- I'll probably ask you
17   some questions later about your practice and some of
18   the folks you treat, so we'll put a placeholder
19   there.
20        Let's mark this as Exhibit 1.
21        (Marked for identification purposes,
22         Lembke Exhibit 1.)
23        (Discussion off the stenographic record.)
24        BY MR. ERCOLE:
25    Q.   Dr. Lembke, have you seen this document

Page 21

1   before?
2    A.   I'm not recalling it if I have.
3    Q.   Do you see that it's a notice of your
4   deposition, which is taking place today?
5        Do you see that on the first page?
6    A.   Yes, I see that.
7    Q.   Okay.  And if you turn to page 3 of this
8   notice, there's a category entitled "Documents
9   Requested."
10        Do you see that?
11    A.   Yes.
12    Q.   Have you seen these document requests
13   before?
14    A.   I don't understand your question.
15    Q.   Have you seen this list of documents
16   requested before?
17    A.   A copy of my curriculum vitae,
18   publications, et cetera?
19    Q.   Now, I'm asking you -- well, have you ever
20   seen this document before?
21    A.   If it's in my materials considered or you
22   know for a fact that I have been given this, then I
23   will take you at your word.  I don't remember this
24   specific document.
25    Q.   Okay.  Do you -- were you -- were you asked

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1 to collect the documents that have been requested
2 here?
3        MS. McNABB: Objection.
4        Just to the extent it's getting into
5 attorney-expert privilege, you don't have to ask --
6 answer the question.
7        THE WITNESS: Okay. Then I won't answer
8 it.
9        BY MR. ERCOLE:
10    Q.   Okay. Have you collected the documents
11 requested here?
12    A.   Yes, I believe so.
13    Q.   And that includes the documents that run
14 from Nos. 1 through 8 on the following page?
15    A.   So Nos. 5 and 6, I did not reference any
16 patients in my report, so that was not relevant.
17        And I -- we don't use a patient -- I
18 actually don't know what you mean by "patient intake
19 form or questionnaire." I'm not sure what that's
20 referring to.
21    Q.   So other than Categories 5 and 6, have you
22 collected the other documents responsive to these
23 requests?
24    A.   I believe so, yes.
25    Q.   And did you provide those to your counsel?

Page 23

1    A.   Yes.
2    Q.   And with respect to Request No. 5, do you
3 have -- so it says (as read):
4        "Any and all documents related to any
5        opinions based on clinical experience,
6        including notes and records from patients
7        referencing your April 18th, 2025, expert
8        report."
9        Do you see that?
10    A.   I do see that, yes.
11    Q.   And do you have notes and records from
12 patients that you treated for what you refer to as
13 "social media addiction"?
14        MS. McNABB: Objection to scope.
15        THE WITNESS: I don't reference any
16 individual patients in my report, so to me that is
17 not relevant.
18        BY MR. ERCOLE:
19    Q.   Okay. Do you recall my question,
20 Dr. Lembke?
21    A.   I think I do, yeah.
22    Q.   Okay. Do you have -- I'll repeat it.
23        Do you have notes and records from patients
24 that you have treated for what you refer to as
25 "social media addiction"?

Page 24

1        MS. McNABB: Objection to scope.
2        THE WITNESS: Are you asking me if I
3 possess notes and records from patients that I've
4 treated with social media addiction?
5        BY MR. ERCOLE:
6    Q.   Yes.
7    A.   I have individual HIPAA-protected notes and
8 records, yes.
9    Q.   And you haven't collected those and
10 provided those to your counsel; correct?
11    A.   Of course not.
12    Q.   You also -- Request No. 6 refers to a
13 current patient intake form or questionnaire for the
14 last three years.
15        Do you see that?
16    A.   I do see that.
17    Q.   And I think you said you don't have a --
18 you don't use a patient intake form or
19 questionnaire; is that right?
20        MS. McNABB: Objection to scope.
21        THE WITNESS: No, I didn't say that. I
22 began to say that, and then I realized that I don't
23 know what -- what you mean here by "patient intake
24 form or questionnaire." That can have many
25 different meanings.

Page 25

1        So you really have to be more specific --
2        BY MR. ERCOLE:
3    Q.   Okay.
4    A.   -- for me to be able to answer that
5 question.
6    Q.   So if a patient comes in to be treated by
7 you, is there an intake form or questionnaire that
8 that patient has to fill out?
9        MS. McNABB: Objection to scope.
10        THE WITNESS: There is a multilayered
11 process to be seen in our clinic. It begins with a
12 call to an intake coordinator who does an initial
13 screening about their mental health condition and
14 what kind of help they're looking for and then uses
15 that to triage them to the correct clinic as well as
16 exploring their insurance and how they're going to
17 pay for that.
18        Recently, the Department of Psychiatry at
19 Stanford University has implemented a PHQ-9, patient
20 survey questionnaire, given to all new patients to
21 assess baseline characteristics regarding mood and
22 suicidal ideation.
23        And then my clinic, which I -- in which I
24 see patients but also which I oversee other
25 physicians seeing patients, some of those physicians

7 (Pages 22 - 25)

Page 26

1 will use various survey instruments, scales, as they
2 prefer for their particular mode of practice.  It's
3 quite common to use survey scales to assess
4 different patient symptomatology.
5       I personally don't use survey scales, and
6 I -- and I say that in my report.
7       BY MR. ERCOLE:
8    Q.  So for the -- for the patients that come to
9 see you, you do not use survey scales; is that
10 correct?
11   A.  I'm not one to use -- typically to use
12 survey scales.  But the questions that I ask are
13 very similar and in some cases identical to the --
14 to the questions on, for example, the Bergen social
15 media survey or the social media disorder survey.
16   Q.  So for any patients that come to you and
17 that -- sorry.
18       Any patients that you treat specifically,
19 there is no written documentation responding to a
20 social media scale or a questionnaire; is that fair?
21       MS. McNABB:  Objection.  Scope.
22       THE WITNESS:  I'm sorry.  Can you repeat
23 the question?
24       BY MR. ERCOLE:
25   Q.  Sure.

Page 27

1       For patients who you treat, there's no
2 written response or to -- strike that.
3       For patients that you treat, there's no
4 written response or documentation where they filled
5 out some type of social media addiction scale; is
6 that correct?
7       MS. McNABB:  Same objection.
8       THE WITNESS:  Your question is compound.
9 I'm not quite sure how to answer it yes or no.  But
10 I will say that I do not use a social media
11 addiction scale in my practice.
12       BY MR. ERCOLE:
13   Q.  Okay.  And as a result, there's no
14 documents for -- there would be no documents for you
15 to collect in response to this particular request
16 with respect to social media addiction scales filled
17 out by your patients; right?
18       MS. McNABB:  Same objection.
19       THE WITNESS:  We have lots of
20 documentation.  They're HIPAA protected.  We don't
21 practice in the absence of documentation.
22       So there's lots of documentation about
23 social media addiction in a given individual
24 patient, which is part of their private healthcare
25 file.

Page 28

1       BY MR. ERCOLE:
2    Q.  And in this -- in this litigation for the
3 JCP [sic], you are not giving opinions about any
4 particular individuals; is that correct?
5       MS. McNABB:  Objection.
6       THE WITNESS:  I'm not talking about any
7 individual patients.  I'm talking about general
8 causation.
9       But my opinion is informed by my experience
10 of seeing many individual patients over many years.
11       BY MR. ERCOLE:
12   Q.  Exactly.
13       And you reference that clinical experience
14 in your report; correct?
15   A.  Yes, I do.
16   Q.  And we'll show you some of those pages
17 later.
18       But even though you -- and even though
19 you're relying upon your clinical experience and
20 what you've gathered from the patients you've
21 treated, you haven't produced any documents
22 reflecting any of the records or notes of those
23 patients; right?
24       MS. McNABB:  Objection.  Scope.
25       THE WITNESS:  That's because I'm relying on

Page 29

1 my clinical experience in aggregate.
2       BY MR. ERCOLE:
3    Q.  Other than the three binders of documents
4 that we talked about, did you bring any other
5 documents with you here today?
6    A.  No.
7    Q.  You're providing testimony here today in
8 connection with your JCCP expert report; right?
9    A.  That is correct.
10   Q.  Are you aware of any of the names of the
11 JCC bellwether plaintiffs?
12   A.  Are you asking me if I'm aware of any of
13 the individuals who are plaintiffs in this case?
14   Q.  Yes.
15   A.  No, I am not.
16   Q.  So do you -- have you ever spoken with any
17 individuals who are plaintiffs in this case?
18       MS. McNABB:  Objection to scope.
19       THE WITNESS:  I have not spoken to any
20 individual plaintiffs in this case.
21       BY MR. ERCOLE:
22   Q.  Have you ever evaluated any of the
23 individual plaintiffs in this case?
24       MS. McNABB:  Objection to scope.
25       THE WITNESS:  I have not evaluated any

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1 individual patients in this case.
2        BY MR. ERCOLE:
3    Q.   Have you ever reviewed any of their medical
4 records?
5        MS. McNABB:  Objection to scope.
6        THE WITNESS:  I have not reviewed their
7 medical records.
8        BY MR. ERCOLE:
9    Q.   Are you planning to give trial testimony in
10 this case?
11       MS. McNABB:  Objection.  Scope.
12 Speculation.
13       THE WITNESS:  I'm giving trial testimony on
14 general causation, not on any one individual case.
15       BY MR. ERCOLE:
16    Q.  Right.
17       But you understand that if you're in trial,
18 it's in connection with an individual case; right?
19       MS. McNABB:  Objection.  Speculation.
20       THE WITNESS:  My understanding is that
21 there are individual plaintiffs in this case.
22       BY MR. ERCOLE:
23    Q.   And you plan to give trial testimony in
24 this case; right?
25    A.   Yes, I do.

Page 31

1    Q.   And you plan to give trial testimony in
2 this case even though you -- sitting here today, you
3 can't identify the name of a single plaintiff?
4        MS. McNABB:  Objection.  Scope.
5        THE WITNESS:  My role in this case does not
6 require me to evaluate a single individual
7 plaintiff.
8        BY MR. ERCOLE:
9    Q.   Or know their names; right?
10       MS. McNABB:  Objection.  Badgering.
11       BY MR. ERCOLE:
12    Q.   Dr. Lembke, when were you first contacted
13 about serving as an expert in the social media
14 litigation at large, whether this case or the MDL
15 case?
16       MS. McNABB:  Objection.  Form.
17       THE WITNESS:  Fall of 2023, I believe.
18       BY MR. ERCOLE:
19    Q.   Who contacted you?
20    A.   The lawyers of Lieff Cabraser Heimann
21 & Bernstein, Lexi Hazam and Don Arbitblit.
22       (Stenographer interrupted for clarification
23        of the record.)
24       BY MR. ERCOLE:
25    Q.   And when you say "fall of 2023," can you

Page 32

1 give -- be any more precise there?
2    A.   Probably not.
3        MR. ERCOLE:  Can we mark this as Exhibit 2?
4        (Marked for identification purposes,
5        Lembke Exhibit 2.)
6        BY MR. ERCOLE:
7    Q.   Dr. Lembke, have you seen these documents
8 before?
9    A.   I created these documents.  So, yes.
10    Q.   All right.  What are they?
11    A.   They're my invoices.
12    Q.   And are they invoices for the
13 JCCP -- strike that.
14       Are these invoices for the JCCP case or for
15 the MDL case or both?
16    A.   It's hard for me to say for sure.  I'm not
17 recalling whether I was initially retained for the
18 MDL or the JCC.  But my reports in both cases are
19 quite similar, so probably the best answer is to say
20 for both.
21    Q.   And, sorry, I should have been more precise
22 too.
23       But when we're talking about MDL, I'm -- I
24 will be referring to the federal MDL case.
25       Is that okay with you?

Page 33

1    A.   Yes.
2    Q.   Okay.  And so that we're on the same page
3 with respect to that definition; right?
4    A.   Yes.
5    Q.   Okay.  And so if you look on -- and are
6 these all of the invoices that you have created and
7 submitted to date?
8    A.   Yes, I believe so.
9    Q.   And it looks like from this document the
10 first recorded entry is from February 8, 2023; is
11 that correct?  On the first page?
12    A.   Yes.  That's correct.
13    Q.   Okay.
14    A.   Yeah.  So clearly I was wrong about it
15 being the fall.  It was February.
16    Q.   Would you have been contacted before you
17 first started reviewing records in this case?
18    A.   I don't remember the exact sequence of
19 events.  Typically, I would get a call asking
20 whether or not I was interested and then records
21 would follow.
22    Q.   Do you know when you first learned that
23 there were individuals planning to sue social media
24 companies over addiction issues?
25       MS. McNABB:  Objection.  Scope.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1    THE WITNESS:  I believe my first awareness
2  was when Lieff Cabraser reached out to me and asked
3  me if I would be an expert witness.  So
4  February 2023 or thereabouts, but I'm not sure.
5       BY MR. ERCOLE:
6    Q.  We may come back to this document, but we
7  can put it aside for -- for the moment.
8       You submitted a expert report on
9  April 18th, 2025, in the JCCP cases; correct?
10   A.  Correct.
11      MR. ERCOLE:  Let's mark this as Exhibit 3.
12      (Marked for identification purposes,
13      Lembke Exhibit 3.)
14      BY MR. ERCOLE:
15   Q.  Dr. Lembke, is this a copy of the report
16  that you submitted in the JCCP case?  If you mind
17  just taking a quick look.
18   A.  Yes.
19   Q.  I'm not trying to trick you on anything
20  here.  That's my understanding, this is what you
21  were -- that was served on your behalf there.
22      And is this the only report that you've
23  submitted in the JCCP cases?
24   A.  Correct.
25   Q.  You have not submitted a rebuttal report in

Page 35

1  the JCCP cases; is that correct?
2   A.  Correct.
3   Q.  You also submitted an expert report in the
4  MDL litigation on May 16th; is that right?
5   A.  Correct.
6   Q.  And what is your -- did anything in the MDL
7  report contradict or change any of the opinions in
8  your JCCP report?
9   A.  No.
10   Q.  Did anything in your MDL report cite to or
11  discuss any of the defense expert reports that were
12  issued in the JCCP?
13   A.  Yes.
14   Q.  What did your MDL report --
15   A.  I'm sorry.  Can you ask that question
16  again?
17   Q.  Yeah, sure.  No problem.
18   A.  I think I misunderstood it.
19   Q.  Did anything in your MDL report contra- ...
20      Did anything in your MDL report cite to or
21  discuss any of the defense expert reports that were
22  submitted in the JCCP?
23   A.  Not specifically.
24   Q.  Did you make any new opinions in your MDL
25  report that were not in your JCCP report?

Page 36

1   A.  No.
2   Q.  What was the difference between the two
3  reports?
4   A.  I added a brief description of one study.
5  I added a quote from one TikTok employee.  And I
6  made a slight reordering of the paragraphs in
7  Opinion 5 for better flow.
8   Q.  Any changes beyond the ones that you just
9  identified?
10   A.  No, I don't believe so.
11   Q.  So if you look to -- on page 2 of your JCCP
12  report -- and for today we're probably -- since it's
13  the JCCP case, I'm going to focus on your JCCP
14  report.  So probably ask a lot of questions about
15  what's in the -- what's Exhibit 3 and -- what my
16  understanding would be, in the binder that you're
17  looking at; okay?
18   A.  Yes.  That's okay.
19   Q.  So if you turn to page 2, there's a caption
20  that says "Opinions."
21      Do you see that?
22   A.  Yes.
23   Q.  And it says (as read):
24      "For the reasons set forth in detail
25      in this report, I hold the following

Page 37

1      opinions."
2      Is that right?
3   A.  Yes.
4   Q.  And does this section encapsulate the
5  opinions that you're giving in this litigation?
6   A.  Yes.
7   Q.  You have not offered any other opinions
8  beyond the five that are listed there; correct?
9   A.  I mean, the report is interspersed with
10  opinions, but this is the summary of those opinions.
11   Q.  Fair enough.
12      All the interspersed language sort of fall
13  within the five bucketed opinions that are laid out
14  in the summary; correct?
15   A.  I think that's fair.  But I am here with
16  the entirety of my report.  I wouldn't want just
17  these five opinions to be all that there is to
18  represent my opinion.
19   Q.  Fair enough.
20      Anything -- you're not giving any other
21  opinions than what's encapsulated in Exhibit 3 and
22  your JCCP report; right?
23   A.  That's correct.
24      MS. McNABB:  Object.  I -- I'll just lay my
25  objection to that.

Golkow Technologies,
A Veritext Division

877-370-3377                                        www.veritext.com

CONFIDENTIAL

Page 38

1      THE WITNESS:  Okay.
2      I could add to that that I have read some
3  of defendants' experts' reports, and I do have
4  opinions in response to their reports.  I did not
5  write or submit a rebuttal report, but I do have
6  opinions with regards to their opinions.
7      BY MR. ERCOLE:
8      Q.  Those -- the opinions you're referencing
9  right now with respect to defendants' experts, those
10 are not contained in the -- what's Exhibit 3;
11 correct?
12     I'll rephrase that question.
13     A.  Yeah.
14     Q.  Those -- the opinions that you're
15 referencing right now with respect to defendants'
16 experts are not contained in your JCCP expert
17 report, which is Exhibit 3; right?
18     A.  I wouldn't quite phrase it like that.  My
19 rebuttal to their opinions is expressed in myriad
20 ways in the report that I've already issued in this
21 case.  But I do have other responses and
22 clarifications, if -- if asked, in -- you know, with
23 regards to their reports and also their rebuttal of
24 my reports.
25     Q.  There's -- in your -- and I'm -- your JCCP

Page 39

1  report is Exhibit 3.
2      So in Exhibit 3, there's no section that
3  addresses defendants' experts; right?
4      A.  That is correct.
5      Q.  Okay.  Which defendant expert reports did
6  you look at?
7      A.  I looked at Tucker, Kishida, Auerbach, and
8  one other starting with an M that I'm not recalling
9  right now.
10     I -- let me -- let me take a look at my
11 materials considered.
12     Okay.  So Douglas Tucker, Randy Auerbach,
13 Adriana Galván, Kenneth Kishida.
14     Q.  And what -- you were looking at a binder, a
15 document in a binder that you brought in with you
16 today?
17     A.  Yes.
18     Q.  And has that document in that binder been
19 produced in this case?
20     A.  Yes, it has.
21     Q.  Okay.  Have you written any type of
22 rebuttal analysis to those experts you just
23 identified?
24     MS. McNABB:  Objection.
25     Just for the record, to the extent that it

Page 40

1  is part of any draft report or attorney-expert
2  communication, you don't need to answer that.
3      MR. ERCOLE:  You're instructing her not to
4  answer whether she's -- whether she's written any
5  rebuttal report?
6      MS. McNABB:  To the extent it's part of a
7  draft report or attorney-expert privilege.
8      MR. ERCOLE:  Okay.
9      MS. McNABB:  So she can answer "yes" or
10 "no," but to go into if it was part of anything that
11 could potentially be for the MDL.  I'm going to
12 instruct her not to answer that as protected under
13 Rule 26.
14     BY MR. ERCOLE:
15     Q.  Okay.  Is there anything -- well, I'm going
16 to ask the question, and then you can figure out
17 whether you want to answer it or not.
18     Do you have -- have you written any -- have
19 you done any -- strike that.
20     Have you written any analysis of the
21 defense expert reports that you've -- you just
22 referenced?
23     A.  I've not written a rebuttal report.
24     Q.  Have you written anything -- any -- strike
25 that.

Page 41

1      Have you written any type of analysis with
2  respect to those defense expert reports that you
3  just identified?
4      MS. McNABB:  Same objection.
5      THE WITNESS:  Yeah, I think that's -- I
6  don't have to answer that because of confidential
7  privilege discussions with my lawyers.
8      BY MR. ERCOLE:
9      Q.  All right.  Well, we may disagree on that.
10     So I just want to know, are you -- you're
11 not going to answer that question?
12     A.  I'm not going to answer that question.
13     Q.  Okay.  All right.  So we'll get into, I
14 guess, some of the -- some of your analysis of the
15 defense experts a little bit later.
16     For the JCCP case, are you aware of whether
17 any -- strike that.
18     Are you aware of how much any bellwether
19 plaintiff in the JCCP used social media?
20     MS. McNABB:  Objection.  Scope.
21     THE WITNESS:  Again, I have not evaluated
22 any individual plaintiffs.  I'm looking at general
23 causation.
24     BY MR. ERCOLE:
25     Q.  Okay.  So with respect to any individual

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1 plaintiffs, you can't -- there's nothing that you
2 could tell me about them; is that correct?
3    A.  I could tell you a lot if you wanted to
4 provide me with the information, but that was not
5 what I was asked to do.
6    Q.  Right.
7        But sitting here today, because I am the
8 one that gets to ask you the questions, you can't
9 give me any information about any bellwether
10 plaintiff in the JCCP; is that right?
11       MS. McNABB:  Objection.  Scope.
12       THE WITNESS:  I can give you information
13 about them based on my knowledge of social media
14 use, social media addiction, but I have not looked
15 at any documents related to any individual
16 plaintiffs.  I have not looked at their personal
17 histories or diagnoses or medical documentation.  I
18 have not evaluated those documents.
19       BY MR. ERCOLE:
20    Q.  You don't know what was going on in their
21 lives --
22       MS. McNABB:  Objection.  Scope.
23       BY MR. ERCOLE:
24    Q.  -- whatsoever; right?
25    A.  I disagree with that.  I don't know on an

Page 43

1 individual level, but mental illness is based on
2 phenomenology, patterns of behavior that repeat
3 themselves over time.  And I can --
4       (Stenographer interrupted for clarification
5        of the record.)
6       THE WITNESS:  Behavior that repeat
7 themselves over time.
8       And I can speak to the phenomenology of
9 these various mental illnesses in question,
10 including social media addiction.
11       BY MR. ERCOLE:
12    Q.  Okay.  But at least sitting here today,
13 right, because this is my chance to get to depose
14 you in advance of trial in the JCCP, you -- you
15 can't -- can you -- can you give me any information
16 about what was going on in the lives of any of the
17 particular JCCP plaintiffs?
18       MS. McNABB:  Objection.  Scope.
19       THE WITNESS:  Sure.  I can give you a lot
20 of information about that.
21       BY MR. ERCOLE:
22    Q.  Okay.  So why don't we -- why don't you
23 identify one of the JCCP plaintiffs, and then tell
24 me what was going on in his or her life.
25       MS. McNABB:  Objection.  Scope.

Page 44

1       THE WITNESS:  I can give you information
2 based on my knowledge of the phenomenology of these
3 various mental illnesses.  But I can't speak to
4 their individual cases because I was not asked to do
5 that.
6       BY MR. ERCOLE:
7    Q.  You don't know whether, for instance, any
8 of the JCCP plaintiffs had difficult home life
9 experiences, for instance?
10       MS. McNABB:  Objection.  Scope.
11       THE WITNESS:  I have general knowledge
12 that -- that some of them had difficult home life
13 experiences.  I have some general knowledge of the
14 types of mental health disorders and adverse mental
15 health consequences they suffered as a result of
16 their use of social media.
17       BY MR. ERCOLE:
18    Q.  Can you tell me -- can you tell me how much
19 any JCCP plaintiff was using any particular social
20 media platform?
21       MS. McNABB:  Objection.  Scope and asked
22 and answered.
23       THE WITNESS:  Yeah.  I -- not at that level
24 of detail, no.
25 ///

Page 45

1       BY MR. ERCOLE:
2    Q.  Did you write the entirety of your JCCP
3 report?
4    A.  Yes.
5    Q.  Did you have support in preparing your
6 report?
7    A.  What do you mean by "support"?
8    Q.  Did anyone help you in preparing your
9 report?
10       MS. McNABB:  Brian, I will object to the
11 extent that you are asking for attorney-expert
12 privilege or draft report information, which is
13 protected under Rule 26 that was adopted in the
14 JCCP.
15       BY MR. ERCOLE:
16    Q.  My question just asked if you -- it's a
17 "yes/no" question.
18       Did you have support in preparing your
19 report?
20       MS. McNABB:  So, Anna, you can -- you can
21 answer "yes" or "no," but don't go into detail.
22       THE WITNESS:  Okay.
23       Can you say the question again?
24       BY MR. ERCOLE:
25    Q.  Yeah.

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1    Did you have support in preparing your JCCP
2  report?
3    A.  Yes.
4    Q.  And from whom did you have support?
5    A.  From the team of lawyers that I've been
6  working with, from their reference librarians.  When
7  I asked for documents or articles that I couldn't
8  find on my own through Lane Library or other
9  Stanford resources.
10    Q.  Have you ever heard the name Fred Gilbert
11 before, Dr. Lembke?
12    A.  I'm not good with names, but it doesn't
13 ring a bell.
14    Q.  So Exhibit B to your report is a list of
15 the materials that -- I just want to make sure I get
16 this right -- that you considered; is that correct?
17    A.  Yes.
18    Q.  And if you go to -- let's make sure I get
19 there.
20    So Exhibit -- it says B -- I'm sorry.
21    The Exhibit B to your report, I guess B1,
22 references "Materials Considered."
23    Do you see that?
24    A.  Exhibit B, Materials Considered.
25    Q.  Yeah.

Page 47

1    A.  Yes, I see that.
2    Q.  Okay.  And it starts with, like, 195 listed
3  materials; is that right?
4    A.  Yes.
5    Q.  And this list includes scientific and
6  academic studies; right?
7    A.  Yes.
8    Q.  And how did you choose what went on when --
9  excuse me.  How did -- strike that.
10    How did you choose what went into this
11 list?
12    A.  Well, first of all, what's in this list
13 includes material that I have been gathering and
14 researching predating my involvement in social media
15 litigation.
16    And I have a systematic approach for
17 reviewing literature.  I use keywords to find
18 articles.
19    I then screen titles and abstracts to
20 choose the most relevant articles.
21    I then read the articles that seem most
22 relevant to what I'm trying to figure out, including
23 relevant articles that ultimately agreed with my
24 opinion, as well as articles that ultimately didn't
25 support my opinion.

Page 48

1    Q.  And did you choose the studies listed here
2  because, in your view, they capture the strengths
3  and limitations of the -- of the -- of the data?
4    A.  Yes.
5    Q.  Were there any scholarly publications or
6  studies that you reviewed in creating your report
7  but that you omitted from your Materials Considered
8  list?
9    A.  I tried to include everything that I
10 considered.
11    Q.  Sitting here today, there's nothing that
12 you can identify to me that you omitted from
13 inclusion in this list; right?
14    A.  That's correct.
15    Q.  What percentage of the -- of the 195 listed
16 materials were provided to you by counsel?
17    A.  I don't know the exact percentage.  I would
18 say it's a small percentage.  And this is literature
19 that I've been reviewing for a long time.
20    Q.  The next section of Exhibit B, then, talks
21 about -- once you get through the 195 articles,
22 there's a title that says, I think it's B15,
23 "Deposition Testimony and Exhibits."
24    Do you see that?
25    A.  Yes.

Page 49

1    Q.  How did you select which depositions from
2  the litigation that you would review?
3    A.  I asked for depositions that had any
4  content related to social media addiction,
5  problematic social media use, or any other synonym
6  of those.
7    I asked for depositions that specifically
8  referenced the sort of addictive design elements
9  related to access, quantity, potency, novelty, and
10 certainty.
11    I asked for documents that related to what
12 I call in my report the four Cs of addiction:
13 control, compulsions, cravings, and consequences, as
14 well as tolerance and withdrawal.
15    And when I read something that left me with
16 more questions, I -- I followed up asking for more
17 relevant documents or more specific documents
18 related to those documents.
19    Q.  And there are approximately 40 or 41
20 depositions that are listed on this list.
21    Did you -- were you given the full
22 transcript for every deposition?
23    A.  Yes.
24    Q.  Did you read every page of that -- of those
25 transcripts?

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    A.   It depended on the deposition.  Sometimes I
2 read every page; sometimes I didn't.
3    Q.   Do you know which ones you read in full?
4    A.   I can't now recall, but I read in full the
5 ones that were most relevant.
6    Q.   Were you given every exhibit for each
7 deposition?
8    A.   Yes.
9    Q.   So you received the depositions and then
10 all of the exhibits referenced in that deposition;
11 is that correct?
12    A.   Yes, typically.
13    Q.   Did you review every exhibit for each
14 deposition?
15    A.   No.
16    Q.   Did you ask to see any of the plaintiffs'
17 deposition?
18    A.   The plaintiffs' depositions have just
19 started.
20    Q.   Is that your understanding?
21    A.   That's my understanding, yeah.
22    Q.   Did you ask to see any of those
23 depositions?
24    A.   So just to make sure I'm understanding your
25 question, in this case the plaintiffs' experts have

Page 51

1 been deposed, like I'm being deposed now, and you're
2 asking me if I asked to see their depositions?
3    Q.   No.  My -- sorry.  My question is a little
4 bit different --
5    A.   Okay.
6    Q.   -- which is there are depositions of the
7 plaintiffs; correct?
8        Strike that.
9        There are plaintiffs and there's
10 plaintiffs' experts --
11    A.   Right.
12    Q.   -- right?
13        And then there's defendants and defendants'
14 experts; right?
15    A.   Right.
16    Q.   So how about for the plaintiffs themselves,
17 did you ask to see any of their depositions?
18    A.   I did not.
19    Q.   And there are about 400, it looks like,
20 company documents produced from the defendants and
21 third parties in this case that are on your
22 Materials Considered list; is that fair?
23    A.   Yes.
24    Q.   Do you know how many -- and those documents
25 cover all of the defendants in this case; right?

Page 52

1    A.   Yes.
2    Q.   Do you know how many documents were
3 produced in this litigation?
4    A.   In terms of defendants' documents?
5    Q.   Yes.
6    A.   No.
7    Q.   Do you know whether more than a million
8 documents have been produced in this case?
9    A.   I don't know, but that wouldn't surprise
10 me.
11    Q.   And you reviewed 400 of them; is that
12 right?
13    A.   I believe it's 600.  642.
14    Q.   There's 642.  But if you go to page B19,
15 production Bates number documents.
16        Do you see that?
17    A.   Yes.
18    Q.   And so it looks like for internal
19 documents, you reviewed -- you reviewed the
20 documents that run from No. 255 to 642; right?
21    A.   Oh, yes.  You're correct.
22    Q.   And that's a little under 400; right?
23    A.   I believe you on the math.
24    Q.   I'm terrible with math, but I think -- I
25 think that's right.

Page 53

1    A.   You did it before.
2    Q.   How did you select which document -- how
3 did you select which documents to review?
4    A.   I used the same criteria that I told you
5 before about which depositions I selected.  I can go
6 through it again.  Would you like me to?
7    Q.   Yeah.  Just for these particular --
8    A.   Sure.
9    Q.   -- on the -- on the --
10    A.   Yeah.
11    Q.   -- documents in --
12    A.   Yeah.
13    Q.   -- company documents, in particular, what
14 did you ask for?
15    A.   I asked for any documents relating to
16 social media addiction, problematic social media
17 use, or any synonyms for those terms.
18        I asked for documents that spoke to the
19 addictive design elements, which I identify in my
20 report as "access, quantity, potency, novelty,
21 uncertainty."
22        I asked for any documents that spoke to the
23 criteria on which we base the diagnosis of
24 addiction, which I summarize as the four Cs:
25 control use, impulsive use, craving, and continued

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  use despite consequences, as well as tolerance and
2  withdrawal.
3      Q.   And in response to those requests, all of
4  the documents that are listed on your -- on your
5  Materials Considered list that are internal company
6  documents, those were all provided by your counsel,
7  right, in response to your request?
8      A.   That is correct.
9      Q.   Did you have access to a database that
10 would allow you to search for documents with key
11 terms that you wanted to use?
12     A.   I might have had access.  But I didn't ask
13 for that.
14     Q.   Are there any company documents that you
15 looked at or considered that are not listed on your
16 Materials Considered list, to the best of your
17 knowledge?
18     A.   No.
19     Q.   Did you review every document on this list?
20     A.   Yes.
21     Q.   Did you read every document -- strike that.
22         Did you read every page of each document?
23     A.   I tried to.  Some of these documents are
24 very short.
25     Q.   Any updates that you'd like to make to your

Page 55

1  Materials Considered list sitting here today?
2         MS. McNABB:  Objection.
3         I'll let the witness answer, but we did
4  produce what we produced on Friday, so you all have
5  that.
6         THE WITNESS:  I'm sorry.  Can you repeat
7  your question?
8         BY MR. ERCOLE:
9      Q.   Yeah, sure.
10         Any updates to the -- your Materials
11 Considered list that you would like to make today?
12     A.   I would like my Materials Considered list
13 to include my materials that were added for the
14 federal case, which were just a few things, but that
15 should be in my Materials Considered list.
16         MR. ERCOLE:  Let's mark this as 4.
17         (Marked for identification purposes,
18         Lembke Exhibit 4.).
19         BY MR. ERCOLE:
20     Q.   Dr. Lembke, I'm showing you what's marked
21 as Exhibit 4.  And this is an updated version of
22 what looks like your résumé and the Materials
23 Considered list that was produced to us last Friday.
24     A.   M-hm.
25     Q.   And it's Bates-marked Lembke 009 through

Page 56

1  Lembke 0095.
2         (Stenographer interrupted for clarification
3         of the record.)
4         BY MR. ERCOLE:
5      Q.   Dr. Lembke, I'll represent to you this is
6  a -- this is a printout of what was provided to us
7  last -- on Friday of last week with respect to your
8  Materials Considered list.
9         With that representation, is there anything
10 on this -- anything on your -- that you've omitted
11 from your Materials Considered list that you
12 produced last Friday?
13     A.   I'm sorry.  Could you ask the question
14 again?
15     Q.   Yeah.
16         Is there anything that is not included on
17 this Materials Considered list that you produced
18 last Friday that should be included?
19     A.   Not that I'm aware of.
20     Q.   Thank you.
21         You charge -- am I correct that you charge,
22 in terms of compensation, a thousand dollars an hour
23 for time spent in depositions and appearing in
24 court?
25     A.   Correct.

Page 57

1      Q.   And you charge $800 an hour for time spent
2  writing your report and reviewing documents?
3      A.   Correct.
4      Q.   And you do also get paid to travel to
5  depositions?
6      A.   That hasn't come up.  I don't know the
7  answer.
8      Q.   Will you get paid -- do you get paid to --
9  would you get paid if you have to travel to court?
10     A.   You mean paid for my travel time?
11     Q.   Yes.
12     A.   I don't believe so, no.
13     Q.   So you -- your understanding is you don't
14 get paid at all for your travel time; is that right?
15     A.   That's my understanding.
16     Q.   So if we turn back to Exhibit 2, which are
17 your invoices, if you look at the first page,
18 there's a -- all of the entries are from February of
19 2023.
20         Do you see that?
21     A.   Yeah.
22     Q.   And then it looks like the next invoice
23 begins April of 2024.
24         Do you see that?
25     A.   Yes.

15 (Pages 54 - 57)

Page 58

1    Q.   And so that's over a year later; is that
2  right?
3    A.   Yes.
4    Q.   Okay.  Were you doing any work on this case
5  between then?
6        MS. McNABB:  I will object just to the
7  extent that it gets into attorney-client -- or,
8  excuse me, attorney-expert privilege.
9        So if there were communications about why
10  and what, you don't have to answer that.  But his
11  direct question right now, you --
12        And, Brian, you can reask it.
13        You can answer "yes" or "no."
14        THE WITNESS:  Okay.
15        BY MR. ERCOLE:
16    Q.   Were you doing any work on this case
17  between February 12th, 2023, and April 11th, 2024?
18    A.   If I didn't bill for it, I wasn't doing
19  work specifically on this case.  But all along, I am
20  reading the literature related to this case.  I am
21  doing my own work.
22    Q.   Have you been paid for all of these
23  invoices?
24    A.   I think so, yes.
25    Q.   Do you know how much you've been paid to

Page 59

1  date for your work in this litigation?
2    A.   Oh, we can add it up.
3    Q.   Do you know how much that is?
4    A.   I haven't added it up.
5    Q.   I added it up.  I got about $177,000.
6    A.   M-hm.
7    Q.   Does that sound right?
8    A.   That sounds about right.
9    Q.   Are you getting paid for your time here
10  today?
11    A.   Yes, I am.
12    Q.   Dr. Lembke, did you testify in a string of
13  cases against companies involved with the
14  manufacturing, distribution, and dispensing of
15  opioid medications?
16    A.   Yes.
17    Q.   Did you testify on behalf of plaintiffs in
18  that litigation?
19    A.   Yes.
20    Q.   And you were retained in that litigation
21  shortly after you released a book about how you
22  believe doctors were duped into prescribing opioid
23  medications to patients; is that right?
24        MS. McNABB:  Objection.  Speculation.
25        THE WITNESS:  The publication of my book

Page 60

1  Drug Dealer, MD, preceded, or came before, my being
2  retained in opioid litigation.
3        BY MR. ERCOLE:
4    Q.   And if I could -- for purposes of just
5  making this easy, if I refer to the opioid
6  litigation, would you understand I'm referring to
7  sort of all the various cases that were brought
8  against the companies involved with the
9  manufacturing, distribution, and dispensing of
10  opioid medication?
11    A.   Yes.
12    Q.   You earned -- and the title of your book
13  was Drug Dealer, MD; is that correct?
14    A.   That's right.
15    Q.   And you earned money on that book; right?
16    A.   Yes.
17    Q.   And you charged -- with respect to your
18  expert opinions in the opioid litigation, you
19  charged for your time preparing reports and
20  testifying; correct?
21    A.   Yes.
22    Q.   You made over a million dollars as an
23  expert in the opioid litigation; right?
24        MS. McNABB:  Objection.  Speculation.
25        THE WITNESS:  I'm not sure how much it was.

Page 61

1        BY MR. ERCOLE:
2    Q.   You don't know how much money you made in
3  the opioid litigation as an expert?
4    A.   I never sat down and added it up, no.  It
5  was over many years.
6    Q.   How many years?
7    A.   I believe my involvement started in 2019
8  and is ongoing to this day.
9    Q.   There was a federal MDL case in the opioid
10  litigation; right?
11    A.   Yes.
12    Q.   And that was in Ohio?
13    A.   There were various bellwether trials.  Ohio
14  was the first bellwether.
15    Q.   And do you recall testifying in that case
16  that you were paid a couple hundred thousand dollars
17  to prepare a report and testify as a witness in the
18  MDL litigation?
19    A.   I wasn't paid to prepare the report.  I was
20  paid for my time and my expertise, and I did prepare
21  a report.  And I don't remember testifying to that.
22        I remember being asked similar questions to
23  what you're asking me now in terms of how much money
24  I made.  And I remember answering those questions.
25  But I don't remember the specific amounts.

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1   Q.  Could it have been over $2 million?
2   A.  Doubtful.
3   Q.  Might have been, though; right?
4   A.  I don't think so.
5   Q.  How many -- how many reports -- strike
6   that.
7       In how many cases in the opioid litigation
8   did you prepare reports?
9       MS. McNABB:  Objection.  Scope.
10      I'm going to have -- I'm going object to
11  the line of questioning on -- on litigations outside
12  of opioid -- or outside of the social media
13  litigation to the extent it's outside of the scope
14  of this litigation.
15      MR. ERCOLE:  Okay.
16      BY MR. ERCOLE:
17  Q.  You can answer the question.
18  A.  Can you say it again?
19  Q.  Sure.
20      How many cases in the opioid litigation did
21  you prepare reports for?
22  A.  I prepared reports for federal MDL
23  litigation and then some state litigation that was
24  related but separate.  And I have my prior testimony
25  listed here on this page.  Happy to read through it.

Page 63

1   Q.  But your prior testimony doesn't identify
2   the cases where you prepared expert reports; right?
3   A.  Essentially I prepared one very large
4   report for this case and then made modifications to
5   the report, depending upon what the bellwether case
6   was, where it was, and changes over time in terms of
7   who the defendants were, because that did change
8   over time.
9   Q.  Okay.  So, at least sitting here today, are
10  you aware of the number of cases where you submitted
11  a report in the opioid litigation?
12  A.  I'm not sure what you mean by the "number
13  of cases."  To me, they were all related.
14  Q.  Okay.  But you understand that there was an
15  Ohio case.
16      Then you also testified in New York; is
17  that correct?
18  A.  Yes.
19  Q.  And you provided testimony in
20  San Francisco?
21  A.  Yes.
22  Q.  And there was other litigation throughout
23  the United States over opioid litigation; right?
24  A.  Yes.
25  Q.  Okay.  And you understand that each of

Page 64

1   those are -- they may be related, but each of those
2   were separate cases; right?
3       MS. McNABB:  Objection.  Speculation.
4       THE WITNESS:  You're a lawyer.  I'm a
5   physician.  You know, I don't -- I'm not as familiar
6   with your language.
7       To me, it was one big case with a variety
8   of different bellwether trials that happened over a
9   sequence of time.
10      BY MR. ERCOLE:
11  Q.  Right.
12      And so given that there were different
13  trials in different cases, my question is, how many
14  expert reports on the plaintiffs' side did you
15  prepare and submit in the various cases that
16  comprised the opioid litigation?
17      MS. McNABB:  Objection.  Asked and
18  answered.
19      THE WITNESS:  I did -- I do feel like I
20  answered this question.  I can try to answer it
21  again.
22      BY MR. ERCOLE:
23  Q.  I mean, with all due respect, I don't think
24  you -- you've answered.
25      Do you know the number of expert reports

Page 65

1   that you prepared and submitted in connection with
2   the opioid litigation?
3   A.  If you were to look at my expert report for
4   these various trials, you would see that they are
5   very similar.  So in my mind, I essentially created
6   one expert report that contained my opinions.  And
7   then there were iterations or slight changes made to
8   that report with no change in my opinions depending
9   upon the bellwether trial.
10  Q.  And -- fair enough.
11      But each time that a report got submitted
12  in a case, you had to sign it; right?
13  A.  Yes.
14  Q.  Do you know how many signed expert reports
15  you submitted on behalf of the plaintiffs in the
16  opioid litigation?
17  A.  I don't remember.
18  Q.  In about -- for the opioid litigation,
19  your -- you charged $500 an hour for reports; is
20  that right?
21      MS. McNABB:  Objection.  Scope.
22      THE WITNESS:  I charged $500 an hour for
23  record review and report preparation.
24      BY MR. ERCOLE:
25  Q.  And you charged $800 an hour for testifying

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1 in opioids; right?
2      MS. McNABB: Objection. Scope.
3      THE WITNESS: Yes.
4      BY MR. ERCOLE:
5      Q. Okay. And your rates as an expert have now
6 increased; right?
7      A. Yes.
8      Q. Four years ago, in 2021, you published a
9 book entitled Dopamine Nation; is that right?
10      A. That's right.
11      Q. When did you start writing Dopamine Nation?
12      A. And in a way Dopamine Nation, I was working
13 on it starting in the early 2000s on and off. It
14 took me a long time to put those ideas together.
15      Q. Did any of the lawyers in the social media
16 litigation, the current case that we have, provide
17 any feedback or suggestions in connection with the
18 writing of that book?
19      MS. McNABB: Objection. Scope.
20      THE WITNESS: That book was written and
21 published before I had any communication with any
22 lawyers about social media litigation.
23      BY MR. ERCOLE:
24      Q. And in Dopamine Nation, you wrote that the
25 smartphone is the modern-day hypodermic needle; is

Page 67

1 that right?
2      MS. McNABB: Objection. Speculation.
3      BY MR. ERCOLE:
4      Q. It's your words. I mean, do you remember
5 writing that or not?
6      A. Actually, you didn't -- you didn't get the
7 quote quite right.
8      Q. Well --
9      A. It's close, but it's not quite --
10      Q. Okay. Give me the right quote, then.
11      A. The modern-day hypodermic syringe.
12      Q. Oh, okay. Thank you.
13      A. You're welcome.
14      Q. And the modern-day hypodermic syringe was a
15 metaphor for sort of illegal drugs or heroin that's
16 often administered through a hypodermic syringe;
17 right?
18      A. Yes.
19      Q. And in your view, is a cell phone the same
20 as a needle full of heroin?
21      A. That was the metaphor, m-hm.
22      Q. Is that your -- is that your view?
23      A. I believe a smartphone can be used in that
24 way. As I've said many times, you know, it's a --
25 both a powerful tool and a potent drug. When it's

Page 68

1 used as a tool, it can be for good. And when it's
2 used as a drug, it can be for harm.
3      Q. You've made some money off of
4 Dopamine Nation; right?
5      A. Yes.
6      Q. How much money have you made off of that
7 book?
8      A. I don't know.
9      MS. McNABB: Objection. Scope.
10      BY MR. ERCOLE:
11      Q. Are you a full-time member of the Stanford
12 University School of Medicine faculty?
13      A. Yes.
14      Q. What percentage of your income this year
15 will be from expert witness work?
16      A. About 15 percent.
17      Q. What -- will you make this year more money
18 as an expert or in connection with -- do you --
19 strike that.
20      Do you get a salary as a -- as a full-time
21 faculty member at Stanford University?
22      A. Yes, I do.
23      Q. And what is your salary?
24      A. It depends how you look at it. I have a
25 base salary. I have bonuses.

Page 69

1      Q. How much?
2      A. My base salary is approximately 300,000.
3      Q. And you said you also have bonuses; is that
4 right?
5      A. (Nonverbal response.)
6      Q. And how much are those?
7      A. It depends. And I don't know.
8      Q. More than $50,000 in bonuses?
9      A. I don't know. It's -- I don't know the
10 answer.
11      Q. What are the bonuses -- how are they
12 derived?
13      A. Based on performance metrics.
14      Q. Is it fair to say that sort of as an annual
15 salary as a full-time faculty member at Stanford
16 University School of Medicine, you're making about
17 $400,000 or less?
18      MS. McNABB: Objection. Speculation.
19      THE WITNESS: No.
20      BY MR. ERCOLE:
21      Q. More than that?
22      A. No. Less than that.
23      Q. Okay. $350,000 or --
24      A. I'm making approximately $300,000.
25      Q. Okay.

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    A.  Yeah.
2    Q.  Do you expect to be paid more than $300,000
3 as an expert witness this year?
4        MS. McNABB:  Objection.  Speculation.
5        THE WITNESS:  I don't know.  I doubt it.
6        BY MR. ERCOLE:
7    Q.  Are you being paid -- are you continuing to
8 serve as an expert for the opioid litigation?
9    A.  Yes.
10   Q.  How much have you made as an expert in the
11 opioid litigation this year?
12       MS. McNABB:  Objection.  Scope.
13       THE WITNESS:  Very little.
14       BY MR. ERCOLE:
15   Q.  How much is "very little"?
16   A.  I don't know exactly.  If I had to guess,
17 $500.  I don't -- I don't remember.
18   Q.  In 2024 was -- did the amount of -- how did
19 the amount of money you got as an expert witness
20 compare to what you were paid as a salary at
21 Stanford?
22       MS. McNABB:  Objection.  Speculation.
23       THE WITNESS:  What do you mean, how did it
24 compare?
25 ///

Page 71

1        BY MR. ERCOLE:
2    Q.  Yeah.
3        Did you make more, less?  What's the --
4    A.  I made less.
5    Q.  Okay.  How much less?
6        MS. McNABB:  Same objection.
7        THE WITNESS:  I don't remember exactly.
8 Maybe a third.  I made a third of what I make in my
9 salary.
10       And you -- you have the invoices.  You can
11 add it up.
12       BY MR. ERCOLE:
13   Q.  You were also serving as an expert witness
14 in the opioid litigation in 2024?
15   A.  Yes.
16       MS. McNABB:  Objection.  Scope.
17       BY MR. ERCOLE:
18   Q.  How about 2023?  How did the amount you got
19 as an expert, both opioids and this litigation,
20 compare to what you were earning as a salary at
21 Stanford?
22       MS. McNABB:  Objection.  Scope and
23 speculation.
24       THE WITNESS:  Well, in 2023 you have it
25 here that I made $5,200 in social media litigation.

Page 72

1        BY MR. ERCOLE:
2    Q.  But that wasn't the only case you were
3 serving as an expert in; right?
4    A.  I was still serving in opioid litigation.
5 But all of that litigation has slowed way down.
6    Q.  How much -- I apologize.  I didn't mean to
7 interrupt you.
8        If I do interrupt you, just let me know
9 because that is not -- that is not my intent.
10   A.  Yeah.
11   Q.  So I apologize for that.
12   A.  I don't remember what I made in 2023 in
13 opioid litigation.  I really don't.
14   Q.  How about 2022?  Do you remember?
15   A.  No.
16   Q.  Dr. Lembke, when do you think social media
17 addiction, sort of as you've defined it, first arose
18 in the population?
19   A.  I think it arose in approximately the
20 five-year period between 2010 and 2015.  I mean, it
21 was probably already present.  But in terms of
22 coming to greater awareness and clinical awareness,
23 I would peg it starting around 2010 to 2015.
24   Q.  When did you see the earliest signal of
25 social media addiction?

Page 73

1    A.  Probably around 2010.
2        MR. ERCOLE:  Mark this as Exhibit 5.
3        (Marked for identification purposes,
4        Lembke Exhibit 5.)
5        BY MR. ERCOLE:
6    Q.  Dr. Lembke, are you -- are you familiar
7 with this document?
8    A.  Yes.
9    Q.  And this is an interview you gave to the
10 New York Times just a few months ago; right?
11   A.  That is correct.
12   Q.  So I want to refer you to -- it looks like
13 it's the third page where it has -- starts with you
14 published Dopamine Nation in 2021.
15       Do you see that?
16   A.  M-hm.
17   Q.  And then a question is posed.  And then you
18 answer that question.  And if you look down at the
19 bottom of the page --
20   A.  M-hm.
21   Q.  -- it says -- the answer you gave was
22 (as read):
23       "Then roughly 2015, 2016 we started
24       to see the earliest signal of social
25       media addiction, online shopping, a huge

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    increase in online gambling addiction."
2        Is that correct?
3    A.  Yeah.
4    Q.  At least, according to the Times interview,
5 then, you identified 2015 and 2016 as the time when
6 you started to see the earliest signal of social
7 media addiction; right?
8    A.  So I was speaking about when social media
9 addiction presented in clinical care.  And there's
10 naturally a delay between the onset of a disease in
11 a population with exposure to a toxin and when
12 people actually go and seek help.
13       So my opinion is that social media
14 addiction began to arise around 2010, but we didn't
15 start seeing people coming into clinic until a
16 little bit later.
17    Q.  Do you know when the first social media
18 platform was created?
19    A.  It probably depends on how you're defining
20 "social media," but I don't.
21    Q.  How about the first defendants' platform?
22 Do you know when that --
23    A.  I don't, no.
24    Q.  Do you have any social media accounts of
25 your own?

Page 75

1    A.  I have e-mail.
2    Q.  What type of e-mail platform do you use?
3    A.  Stanford.edu.
4    Q.  Do you think e-mail is addictive?
5    A.  Not generally.
6    Q.  Can be, though?
7    A.  I think that it's possible to engage in
8 compulsive fixation on e-mail or zero inbox, but
9 it's generally not meeting threshold criteria for
10 the kinds of harm that we're talking about when
11 we're talking about addiction.
12    Q.  How about Outlook?  Do you have Outlook?
13    A.  Yes.
14    Q.  Would you consider that a form of social
15 media?
16    A.  No.
17    Q.  Do you have any accounts with respect to
18 the defendants' platforms in this case?
19    A.  No.
20    Q.  Have you ever been on any of the
21 defendants' platforms?
22    A.  Yes.
23    Q.  Which platforms have you been on?
24    A.  When you say "been on the platform" ...
25    Q.  Yeah.  Strike that.  That's a good

Page 76

1 question.
2        Have you ever used any of the defendants'
3 platforms in this case?
4    A.  Yes.  I have personally used YouTube.
5    Q.  Any other platforms?
6    A.  I have looked over the shoulders and had
7 patients show me their usage on defendants'
8 platforms.  I've seen my kids usage when they show
9 me on defendants' platforms.  But I have not
10 personally used the platforms of other defendants.
11    Q.  So other than YouTube, you haven't used any
12 of the other defendants' platforms; correct?
13    A.  That's correct.  If you're defining "use"
14 as I personally got on there and was posting,
15 commenting, liking, I have not done that.
16    Q.  Do you still use YouTube?
17    A.  Yes.
18    Q.  What do you use YouTube for?
19    A.  Basically entertainment, some news.
20    Q.  Anything else?
21    A.  Generally not.
22    Q.  Have you ever used YouTube Shorts?
23    A.  No.
24    Q.  Do you know what YouTube Shorts is?
25    A.  Yes.  I've seen -- I've seen YouTube

Page 77

1 Shorts, but I don't -- I try not to consume YouTube
2 Shorts because they're so addictive.  And I know
3 that once I would start watching them, it would be
4 difficult to stop.
5    Q.  So in your view, if you, Dr. Lembke, start
6 watching YouTube Shorts, you will quickly become
7 addicted to YouTube Shorts; is that your testimony?
8    A.  Not in a deterministic way.  But I think
9 the platform is addictive, and I find that I
10 personally -- when I start to watch YouTube Shorts,
11 it's difficult for me to maintain a sense of how
12 much time I've spent there.  And it's generally not
13 good for my well-being.
14    Q.  How many times have you watched YouTube
15 Shorts?
16    A.  A handful of times.  Especially when it's
17 interspersed with -- they intersperse it now with
18 the regular YouTube.  So, you know, they're trying
19 to get you to click on it, or at least that's what
20 it feels like.
21    Q.  You've never used YouTube Shorts, though;
22 right?
23    A.  What do you mean by "used"?
24    Q.  I think it's pretty self -- self-evident.
25       How would you define "used," Dr. Lembke?

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1    A.   Okay.  Well, as you know, YouTube is a
2  platform that you don't need to have an account in
3  order to view YouTube.  So without an account, I
4  have gone onto the YouTube platform and I have
5  watched videos.
6    Q.   And have you watched videos on YouTube
7  Shorts before?
8    A.   Yes.
9    Q.   What videos did you watch on YouTube
10 Shorts?
11   A.   I don't remember.  The content was not
12 memorable.
13   Q.   You've spoken publicly about your addiction
14 to romance novels; is that right?
15   A.   Yes.
16   Q.   And I think you also linked an increase in
17 your reading of romance novels to when you got a
18 Kindle; is that right?
19   A.   Yes.
20   Q.   And you classified your addiction to a
21 particular genre of literature, not to the Kindle;
22 right?
23   A.   I specifically talk about how it was the
24 Kindle that allowed me the kind of access that
25 created the addiction.

Page 79

1    Q.   So you were addicted to the Kindle or to
2  the genre of literature or both?
3        MS. McNABB:  Objection.  Speculation.
4        THE WITNESS:  The Kindle is essentially a
5  technological device that allowed me easy access to
6  the genre, thereby increasing my vulnerability to
7  compulsive overconsumption of that genre.
8        BY MR. ERCOLE:
9    Q.   You wanted to read content about that
10 genre; right?
11   A.   Well, I wanted to read romance novels --
12   Q.   Right.
13   A.   -- yes.
14   Q.   And were there particular sections of
15 romance novels that you felt like you were addicted
16 to?
17       MS. McNABB:  Objection.  Speculation.
18       THE WITNESS:  It was the whole frame and
19 design of those novels that I was addicted to.
20       The content was fairly irrelevant as long
21 as it followed a specific pattern that I had -- that
22 had become habituated for me and was reinforcing.
23       BY MR. ERCOLE:
24   Q.   You write in your book about your addiction
25 to scenes in those novels regarding sexual tension;

Page 80

1  right?
2        MS. McNABB:  Objection.  Scope.
3        THE WITNESS:  Can you read me a quote?  I'm
4  not -- I think it would help to know what you're
5  specifically referring to.
6        BY MR. ERCOLE:
7    Q.   Sure.
8        On page 16 of your -- your book -- sorry,
9  page 15 of your book Dopamine Nation, you write
10 (as read):
11           "I wanted to indulge in that moment
12        of mounting sexual tension that finally
13        gets resolved when the hero and heroine
14        hook up."
15        Right?
16   A.   Okay.  Yes.
17   Q.   Right.
18        And so is that -- like, my understanding
19 from your book, and tell me if this is wrong, is
20 that you felt like you were getting addicted to this
21 erotic genre of romance novels; right?
22   A.   Yes.
23       MS. McNABB:  Objection.  Scope.
24       THE WITNESS:  Yes.
25 ///

Page 81

1        BY MR. ERCOLE:
2    Q.   And you were reading them for this sort of
3  moment of -- of sexual tension and when that gets
4  resolved between the hero and heroine; is that
5  correct?
6        MS. McNABB:  Objection.  Scope.
7        THE WITNESS:  The whole thing was -- it
8  wasn't just that one moment.  It's all the buildup
9  to that moment.
10       BY MR. ERCOLE:
11   Q.   And you enjoyed reading those novels;
12 right?
13       MS. McNABB:  Objection.  Scope.
14       THE WITNESS:  Initially I enjoyed them.
15 And then even when I wasn't enjoying them later on,
16 I still felt a compulsion to read them.
17       BY MR. ERCOLE:
18   Q.   And you believed that those romance novels
19 were designed to hook you; right?
20       MS. McNABB:  Objection.  Scope.
21       THE WITNESS:  I believe that they're
22 written according to a certain standardized formula
23 that's meant to be highly reinforcing.  And it was
24 certainly for me.
25 ///

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1    BY MR. ERCOLE:
2    Q.   Right.
3         And, in fact, on page -- I mean, you wrote
4  on page 15 of your book (as read):
5         "I just wanted my fix, and these
6         books written according to a formula were
7         designed to hook me."
8         Right?
9         MS. McNABB:  Objection.  Scope.
10        THE WITNESS:  Yes, I agree with what I
11 wrote there.
12        BY MR. ERCOLE:
13   Q.   Aren't all books designed to hook the
14 reader?
15        MS. McNABB:  Objection.  Scope.
16        THE WITNESS:  Not necessarily, no.
17        BY MR. ERCOLE:
18   Q.   What books are not designed to keep their
19 readers engaged?
20        MS. McNABB:  Objection.  Scope.
21        THE WITNESS:  Textbooks, dictionaries,
22 various how-to manuals.  I mean, there are a
23 gazillion different types of books that are not
24 written for compulsive page turning.
25 ///

Page 83

1    BY MR. ERCOLE:
2    Q.   What books are written for compulsive page
3  turning?
4         MS. McNABB:  Objection.  Scope.
5         THE WITNESS:  Generally the kinds of books
6  that are based on a sort of formulaic plot
7  structure, fast-paced, chapters that end on a cliff
8  hanger so that you feel compelled to continue
9  reading to find out what happens.
10        It's the same narrative formula that's used
11 for highly reinforcing TV shows or serials, these
12 types of things.
13        BY MR. ERCOLE:
14   Q.   And in your view, those types of books are
15 designed to be addictive; right?
16        MS. McNABB:  Objection.  Scope.
17        THE WITNESS:  They're designed to pull the
18 reader in and to make it difficult for the reader to
19 put them down.  I -- I wouldn't use -- when I use
20 the word "addictive," I'm really referring to a form
21 of psychopathology.  Addiction is itself a brain
22 disease with documentable harms related to it.
23        So I don't usually use that word casually.
24        BY MR. ERCOLE:
25   Q.   Right.

Page 84

1         But you've written and you've given lots of
2  interviews about how you were addicted to this genre
3  of erotic romance novels; right?
4         MS. McNABB:  Objection.  Scope.
5         THE WITNESS:  I do believe that I developed
6  a mild addiction to erotica.  But I always qualify
7  that by saying my mild addiction is not the same as
8  a severe addiction.  Addiction is a spectrum
9  disorder.
10        I wouldn't want to trivialize somebody's
11 more severe addiction by comparing it to my
12 addiction.  Every person is different in terms of
13 the degree of psychopathology.
14        BY MR. ERCOLE:
15   Q.   And you would agree that other books
16 written with the formula that we've been talking
17 about also can be addictive to readers; right?
18        MS. McNABB:  Objection.  Scope.
19        THE WITNESS:  It depends on that person's
20 vulnerability to that particular medium.  Not
21 everybody is a reader.  Not everybody is going to be
22 reinforced by a certain type of storytelling.
23        But, yes, I believe that I'm not the only
24 one out there who's developed a mild addiction or
25 even a more severe addiction to books, to certain

Page 85

1  genres of books.
2         BY MR. ERCOLE:
3    Q.   So let me -- sticking with that -- with
4  that theme, let me ask you some questions about in
5  your view what people can become addicted to.
6         Can people become addicted to phones?
7    A.   The actual device itself?
8    Q.   Use -- phone use.
9    A.   Use of a smartphone?
10   Q.   Sure.
11   A.   Yes.
12   Q.   Can people become addicted to the Internet?
13   A.   Both the phone and the Internet are a
14 portal to various forms of digital media that people
15 can get addicted to.
16   Q.   Can people become addicted to Netflix?
17        MS. McNABB:  Objection.  Speculation.
18        THE WITNESS:  I think it's possible for
19 people to watch too much Netflix such that it can
20 cause harm in their lives.
21        BY MR. ERCOLE:
22   Q.   Can people become addicted to Victorian
23 fiction novels?
24        MS. McNABB:  Objection.  Speculation.
25        THE WITNESS:  What's a Victorian fiction

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1 novel?
2        BY MR. ERCOLE:
3    Q.  Do you know any Victorian fiction novel?
4    A.  Do you know any Victorian --
5    Q.  How about Pride and Prejudice, books like
6 that?
7    A.  Uh-huh.  Those older novels were written in
8 a very different way that I think is -- has more
9 friction, requires more -- heavier cognitive lift to
10 engage with them.
11       It's possible, but it's less likely than
12 the modern novels that we have now.
13    Q.  Can people become addicted to listening to
14 rap music?
15       MS. McNABB:  Objection.  Speculation.
16       THE WITNESS:  It's possible, I suppose, if
17 rap music is very reinforcing to them, and they
18 continue to consume in an out-of-control, compulsive
19 way that leads to consequences.
20       BY MR. ERCOLE:
21    Q.  Can people become addicted to praying?
22       MS. McNABB:  Objection.  Speculation.
23       THE WITNESS:  I don't think so.
24       BY MR. ERCOLE:
25    Q.  You don't think people can become addicted

Page 87

1 to praying?
2    A.  I don't think so.
3    Q.  Even if it's -- if people derive pleasure
4 from it and it's reinforcing and they spend lots of
5 time praying, taking away from other aspects of your
6 life, wouldn't that be something that you would
7 consider to be addictive?
8       MS. McNABB:  Objection --
9       (Simultaneous speakers - unclear.)
10       THE WITNESS:  Those are not the criteria
11 for diagnosing addiction.
12       BY MR. ERCOLE:
13    Q.  Can people become addicted to outtakes of
14 American Idol?
15       MS. McNABB:  Objection.  Speculation.
16       (Stenographer interrupted for clarification
17         of the record.)
18       THE WITNESS:  Again, it would matter on the
19 individual.  It would matter on whether or not they
20 were meeting criteria, the four Cs, tolerance,
21 withdrawal.  That's what I would look at for every
22 individual in every individual situation.
23       BY MR. ERCOLE:
24    Q.  Right.  And I'm just asking right now if
25 it's possible.

Page 88

1        Is it possible for someone to become
2 addicted to outtakes of American Idol?
3        MS. McNABB:  Objection.  Speculation.
4        THE WITNESS:  It's possible.
5        BY MR. ERCOLE:
6    Q.  Is it possible for someone to become
7 addicted to Three Stooges episodes?
8        MS. McNABB:  Objection.  Speculation.
9        THE WITNESS:  Unlikely.  There aren't
10 enough of them.
11       BY MR. ERCOLE:
12    Q.  Could someone become addicted to something
13 called Mr. Pimple Popper?
14       MS. McNABB:  Objection.  Speculation.
15       THE WITNESS:  Any kind of video for which
16 there's a medium by which they can be delivered with
17 these design features that make them addictive, so
18 easy, frictionless access in almost infinite
19 quantity, the kind of interactive elements that
20 increase the potency, an algorithm that tailors the
21 delivery of those videos for the individual and what
22 they have watched before, some degree of, you know,
23 uncertainty, all of that creates a highly addictive
24 medium.
25       You are listing a lot of different forms of

Page 89

1 content.  And the content really doesn't matter as
2 much as the design features and the recursive
3 feedback loop that's created that gets people into
4 these rabbit holes where they're watching many
5 different types of videos on a platform that
6 promotes that kind of addictive feed.
7        BY MR. ERCOLE:
8    Q.  Do you remember my question, Dr. Lembke?
9    A.  I feel like I answered your question.
10    Q.  Do you remember what it was?
11       MS. McNABB:  Objection.
12       BY MR. ERCOLE:
13    Q.  Do you remember my question?
14       MS. McNABB:  Objection.  Badgering.
15       THE WITNESS:  Do you want to repeat the
16 question?
17       BY MR. ERCOLE:
18    Q.  Sure.
19       Could someone become addicted to something
20 called Mr. Pimple Popper?
21    A.  I feel like I --
22       MS. McNABB:  Objection.  Speculation.
23       THE WITNESS:  -- I answered.  I answered
24 that question, that the content is less important
25 than the medium through which it is delivered.

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1      BY MR. ERCOLE:
2      Q.  Okay.  But someone could -- is it -- I'm
3  just asking, is it possible?
4          Is it possible that someone could become
5  addicted to watching Mr. Pimple Popper videos?
6          MS. McNABB:  Objection.  Speculation.
7          THE WITNESS:  People can certainly get
8  addicted to watching videos that are delivered on a
9  platform that's designed to be addictive.
10         BY MR. ERCOLE:
11     Q.  So --
12     A.  So people can get addicted to watching
13  videos on YouTube.
14     Q.  Can they get addicted to particular types
15  of videos?
16     A.  The content is not as important.
17     Q.  So in your -- your testimony is you can't
18  get addicted to watching one particular type of
19  video; is that right?
20         MS. McNABB:  Objection.  Misstates and
21  speculation.
22         THE WITNESS:  Yeah, that's not what I said.
23         BY MR. ERCOLE:
24     Q.  Can you get addicted to watching one
25  particular type of video on YouTube, for instance?

Page 91

1          MS. McNABB:  Objection.  Speculation.
2          THE WITNESS:  Typically what happens when
3  people get addicted to YouTube is they'll get drawn
4  in by a certain type of video, but very quickly the
5  medium will overtake the significance of the content
6  itself.  And they'll find themselves down a rabbit
7  hole where they're watching a video that they never
8  planned or intended to watch, because the content is
9  less important than the recursive feedback loop and
10  the design features that engage them on that
11  platform.
12         BY MR. ERCOLE:
13     Q.  So my question is a little bit different;
14  right?
15         And my question -- you're here giving
16  testimony as a general causation expert; is that
17  right?
18     A.  Yes.
19     Q.  And you haven't looked at any of the facts
20  of any of the individual plaintiffs in this case;
21  right?
22         MS. McNABB:  Objection.
23         BY MR. ERCOLE:
24     Q.  So my question now -- I'm trying to
25  understand your theory of addiction.  My question is

Page 92

1  fairly simple.
2          Can someone get addicted to watching a
3  particular type of video on a platform?
4          MS. McNABB:  Objection.  Speculation.
5          THE WITNESS:  I feel that I've answered
6  that question.
7          BY MR. ERCOLE:
8      Q.  So the answer is, no, they can't?
9      A.  It's not a "yes" or "no" answer.
10     Q.  Okay.  Can someone get addicted to work?
11         MS. McNABB:  Objection.  Speculation.
12         THE WITNESS:  We do occasionally see people
13  who are, quote-unquote, workaholics, yes.
14         BY MR. ERCOLE:
15     Q.  Can someone get addicted to playing
16  basketball?
17         MS. McNABB:  Objection.  Speculation.
18         THE WITNESS:  It would sort of depend.
19         BY MR. ERCOLE:
20     Q.  They could, someone could; right?
21  Possible?
22     A.  Unlikely.
23     Q.  Is it possible?
24     A.  Unlikely.
25     Q.  Unlikely doesn't rule something out, does

Page 93

1  it?
2      A.  I mean, I'd rather not speculate on, you
3  know, a long list of scenarios.  I can tell you that
4  I have never seen a patient who's been addicted to
5  basketball.
6      Q.  How about addicted to exercise?
7      A.  Yes, we do see that.
8      Q.  How about addicted to learning?
9          MS. McNABB:  Objection.  Speculation.
10         THE WITNESS:  No.
11         BY MR. ERCOLE:
12     Q.  You can't get addicted to learning?
13     A.  Learning is, by definition, a positive
14  pursuit that humans would generally agree is good
15  for us.
16         So unless learning is taken and drugified
17  in some way by, again, as I talk about in my report,
18  being made more accessible and more potent or
19  bountiful, more novel, more uncertain, if that
20  happens, then it's really not learning anymore.
21  It's something else happening through the
22  application of technology.
23     Q.  And when you say "drugify," what are you
24  referring to?
25     A.  As I talk about in my report, the design

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 elements on the defendants' platforms include making
2 these digital media more accessible, especially more
3 accessible to kids, more bountiful, more of it.
4 Quantity and frequency do matter.
5        More potent because of the recursive
6 feedback loops with the posts, comments, shares,
7 likes, et cetera.
8        More uncertain in terms of intermittent
9 positive feedback. I talk about that in my report.
10    Q.   Right.
11        I'm just trying to understand what you mean
12 by "drugify."
13    A.   Yeah.
14    Q.   What -- so you're using "drug" as a verb;
15 right?
16    A.   M-hm.
17    Q.   Okay. And what does that mean? Does that
18 mean take something and make it more like a drug?
19    A.   Through the application of technology, in
20 the modern age, we have taken drugs that have been
21 around for centuries and drugified them by making
22 them more accessible, more potent, more bountiful in
23 terms of the overall supply, more novel. And
24 technology and digital devices and digital media
25 have done the same thing with even behaviors that we

Page 95

1 typically think of as good for us, like learning or
2 human connection.
3    Q.   Right.
4        So learning can then become addictive; is
5 that right?
6    A.   Your question was, can learning be
7 addictive?
8        And I would say learning in the spirit of
9 the way that most people think about it is not
10 addictive because learning is healthy.
11        But if we create a, quote-unquote, learning
12 platform and we essentially turn it into a video
13 game, then you're not really dealing with learning
14 anymore. You're dealing with a medium that promotes
15 compulsive overuse.
16    Q.   But if you're -- if you're using a platform
17 to learn about math or science, isn't that a good
18 thing?
19        MS. McNABB: Objection. Speculation.
20        THE WITNESS: It depends.
21        BY MR. ERCOLE:
22    Q.   Can be a bad thing?
23    A.   If the platform is not really geared toward
24 learning and instead geared toward optimizing watch
25 time, you know, getting kids to stay up all night

Page 96

1 and not sleep because they're on the platform, that
2 would not be a good thing.
3    Q.   Can you become addicted to playing with
4 cats?
5        MS. McNABB: Objection. Speculation.
6        THE WITNESS: I don't think so.
7        BY MR. ERCOLE:
8    Q.   Do you know one way or the other?
9    A.   I've not seen that clinically and I -- that
10 doesn't make sense to me.
11    Q.   Can you become addicted to water?
12    A.   I did have a patient who got addicted to
13 water. She was an alcoholic in recovery who
14 realized that if she drank enough, she could become
15 hyponatremic and be altered.
16    Q.   Can you become addicted to listening to
17 podcasts?
18        MS. McNABB: Objection. Speculation.
19        THE WITNESS: It would depend on the
20 person. It would depend on the medium. Really, in
21 each case, you would really have to look at whether
22 or not they were meeting addiction criteria.
23        BY MR. ERCOLE:
24    Q.   It is possible, though, correct, in your
25 view?

Page 97

1        MS. McNABB: Objection. Speculation.
2        THE WITNESS: It's possible.
3        BY MR. ERCOLE:
4    Q.   Would you agree that people overuse and
5 trivialize the term "addiction"?
6    A.   I think that that can happen.
7    Q.   You've said that in interviews; right?
8    A.   Probably.
9        MR. ERCOLE: How about we stop here and
10 take a break, if that works?
11        I want to give -- I think we've probably
12 been going for an hour and a half at least.
13        THE VIDEOGRAPHER: The time is 10:32.
14 We're off the record.
15        (Recess taken from 10:32 to 10:46.)
16        THE COURT: The time is 10:46. We're back
17 on the record.
18        BY MR. ERCOLE:
19    Q.   Dr. Lembke, a couple of follow-up questions
20 from some of the matters we talked about before the
21 break.
22        How much money have you made from
23 Dopamine Nation?
24        MS. McNABB: Objection. Scope.
25        THE WITNESS: I don't know.

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1       BY MR. ERCOLE:
2    Q.  More than a million dollars?
3    A.  I don't know.
4       MS. McNABB:  Objection.
5       BY MR. ERCOLE:
6    Q.  More than $2 million?
7    (Stenographer interrupted for clarification
8     of the record.)
9       THE STENOGRAPHER:  "More than a million
10 dollars?"
11      And you objected.
12      MS. McNABB:  Object to scope.
13      THE STENOGRAPHER:  And, I'm sorry, your
14 answer was, Doctor?
15      THE WITNESS:  I don't know.
16      THE STENOGRAPHER:  Thank you.
17      BY MR. ERCOLE:
18   Q.  More than $2 million?
19      MS. McNABB:  Objection to scope.
20      THE WITNESS:  I don't know.
21      BY MR. ERCOLE:
22   Q.  More than $3 million?
23      MS. McNABB:  Same objection.
24      THE WITNESS:  I don't know.
25 ///

Page 99

1       BY MR. ERCOLE:
2    Q.  Dr. Lembke, could you have made more than
3 $5 million off of Dopamine Nation?
4       MS. McNABB:  Objection.  Scope.
5       THE WITNESS:  I don't think so.
6       BY MR. ERCOLE:
7    Q.  Do you know for sure?
8    A.  I don't know.
9    Q.  You also mentioned -- I think that your
10 kids had used some of the social media platforms
11 we've been talking about; is that right?
12      MS. McNABB:  Objection.  Scope.
13      THE WITNESS:  Yes.
14      BY MR. ERCOLE:
15   Q.  What -- do your -- how old are your
16 children?
17   A.  I'm sorry?
18   Q.  How -- sorry.  How old are your children?
19      MS. McNABB:  Same objection.
20      THE WITNESS:  My children are 18, 20, 22,
21 and 23.
22      BY MR. ERCOLE:
23   Q.  Do they currently use social media
24 platforms?
25      MS. McNABB:  Same objection.

Page 100

1       THE WITNESS:  Two of them do.
2       BY MR. ERCOLE:
3    Q.  Which ones use them of the age group that
4 you identified?
5       MS. McNABB:  Same objection.
6       THE WITNESS:  The 18 year old and the
7 22 year old.
8       BY MR. ERCOLE:
9    Q.  And do your children have smartphones?
10      MS. McNABB:  Objection.
11      THE WITNESS:  Yes.
12      BY MR. ERCOLE:
13   Q.  And with respect to the -- and the 22 year
14 old -- sorry, the 20 year old and the 23 year old,
15 they don't use social media at all; is that correct?
16      MS. McNABB:  Objection.  Scope.
17      THE WITNESS:  I'm sorry.  Could you say
18 that again?
19      BY MR. ERCOLE:
20   Q.  Sure.
21      The 20 year old and the 23 year old, they
22 don't use social media at all?
23   A.  Not to my knowledge.
24   Q.  With respect to your children who are 18
25 and 22 respectively, what social media platforms do

Page 101

1 they use?
2       MS. McNABB:  Objection.  Scope.
3       THE WITNESS:  I believe they're both -- I
4 believe the older one is on Instagram.  And they
5 both use YouTube.  And the younger one is on
6 Instagram, YouTube, and Snapchat, and looks at
7 TikTok.
8       BY MR. ERCOLE:
9    Q.  Do you know when they started using social
10 media?
11      MS. McNABB:  Objection.  Scope.
12      THE WITNESS:  Yes.  When they started high
13 school.
14      BY MR. ERCOLE:
15   Q.  Did they use social media before then?
16      MS. McNABB:  Objection.  Scope.
17      THE WITNESS:  They didn't personally have
18 digital devices before then.  They might have used
19 their friends' phones.  It's very likely that they
20 did, but not on their own personal devices.
21      BY MR. ERCOLE:
22   Q.  When they started in -- when your children
23 started in high school, did you get them
24 smartphones?
25      MS. McNABB:  Objection.  Scope.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1    THE WITNESS: No, I did not.
2    BY MR. ERCOLE:
3    Q. Did they have personal devices when they
4 started in high school?
5    MS. McNABB: Objection. Scope.
6    THE WITNESS: I already answered that
7 question.
8    BY MR. ERCOLE:
9    Q. Did you allow them to use social media when
10 they were in high school?
11    MS. McNABB: Objection. Scope.
12    THE WITNESS: I essentially had no more
13 control over them at that point.
14    BY MR. ERCOLE:
15    Q. When they were in high school?
16    A. M-hm.
17    Q. Did they have smartphones when they were in
18 high school?
19    MS. McNABB: Objection. Scope.
20    THE WITNESS: Yes. They purchased their
21 own smartphones, got their own smartphone plans with
22 their own money.
23    BY MR. ERCOLE:
24    Q. As their parent, did you tell them you
25 shouldn't be obtaining these smartphones because

Page 103

1 it's like a syringe with heroin?
2    MS. McNABB: Objection. Scope.
3    THE WITNESS: I didn't use that exact
4 language, but I did express my concern, in
5 particular, about the defendants' platforms.
6    BY MR. ERCOLE:
7    Q. About smartphones generally?
8    MS. McNABB: Objection.
9    THE WITNESS: Mostly about the defendants'
10 platforms and the smartphones as a portal to those
11 platforms. But primarily about social media, the
12 defendants' platforms.
13    BY MR. ERCOLE:
14    Q. Did you ever tell your kids that they can't
15 bring their smartphones into the -- into your home
16 because you viewed smartphones as a syringe with
17 heroin?
18    MS. McNABB: Objection. Scope.
19    THE WITNESS: Three of my children seemed
20 able to moderate their consumption. One of my
21 children had more trouble, and so we took his
22 smartphone away.
23    BY MR. ERCOLE:
24    Q. Was -- which -- and I'm not asking for
25 particular names, but which of the -- the four

Page 104

1 children that you've identified had the trouble?
2    A. The youngest one.
3    MS. McNABB: Objection. Scope.
4    BY MR. ERCOLE:
5    Q. The one who's currently 18?
6    A. Yes.
7    Q. Was he addicted to something?
8    MS. McNABB: Objection. Scope.
9    THE WITNESS: I believe he was using
10 defendants' platforms in an addictive way.
11    BY MR. ERCOLE:
12    Q. Which platforms was he using in an
13 addictive way?
14    MS. McNABB: Objection. Scope.
15    THE WITNESS: Instagram, Snapchat, YouTube,
16 TikTok.
17    BY MR. ERCOLE:
18    Q. Did he also have a video game addiction?
19    MS. McNABB: Objection. Scope.
20    THE WITNESS: He also struggled with
21 managing his video game consumption.
22    BY MR. ERCOLE:
23    Q. In your view, did he have a video game
24 addiction?
25    MS. McNABB: Objection. Scope.

Page 105

1    THE WITNESS: It was heading in that
2 direction.
3    BY MR. ERCOLE:
4    Q. In your view, was he addicted to social
5 media?
6    MS. McNABB: Objection. Scope.
7    THE WITNESS: It was heading in that
8 direction.
9    BY MR. ERCOLE:
10    Q. What did you do to address that issue?
11    MS. McNABB: Objection. Scope.
12    THE WITNESS: We took his smartphone away
13 from him.
14    BY MR. ERCOLE:
15    Q. How long did you take it away from him?
16    MS. McNABB: Objection. Scope.
17    THE WITNESS: One year.
18    BY MR. ERCOLE:
19    Q. Does he now have a smartphone?
20    MS. McNABB: Objection. Scope.
21    THE WITNESS: Yes.
22    BY MR. ERCOLE:
23    Q. Is he addicted to social media now?
24    MS. McNABB: Objection. Scope.
25    THE WITNESS: It's a constant struggle.

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1    BY MR. ERCOLE:
2    Q.  Is he addicted to video games now?
3        MS. McNABB:  Objection.  Scope.
4        THE WITNESS:  It's an ongoing struggle.
5    BY MR. ERCOLE:
6    Q.   Anything else that you believe he's
7 addicted to?
8        MS. McNABB:  Objection.  Scope.
9        THE WITNESS:  No.
10    BY MR. ERCOLE:
11    Q.   When did you first get Internet in your
12 house?
13        MS. McNABB:  Objection.  Scope.
14    BY MR. ERCOLE:
15    Q.   I was -- I was reading some article about
16 that, and I just wanted to ask a follow-up question.
17    A.   Yeah.  So when our eldest started high
18 school, we got Internet to the house.
19    Q.   Do you remember when that was?  Like, 2017?
20    A.   Let's see.  She's 23 now.  So she would
21 have been 16 then.
22        That sounds about right.
23    Q.   So 2017 was the first time that you ever
24 had Internet in your -- in your house?
25    A.   Yes, that sounds about right.  I can't give

Page 107

1 you an exact date, but that's approximately correct.
2    Q.   Have you -- with respect to your -- your
3 18-year-old son, or son who's now 18 years old, you
4 mentioned you took his smartphone away for a -- for
5 a year and then you gave it back to them -- him; is
6 that correct?
7    A.   (Nonverbal response.)
8        MS. McNABB:  Objection.  Scope.
9        BY MR. ERCOLE:
10    Q.   Have you ever blocked his access to social
11 media platforms?
12    A.   No.  Those parental controls are far too
13 complicated.  I can't figure them out.
14    Q.   Did you ever try and do it?
15    A.   I think I tried at one point and couldn't
16 figure it out.
17    Q.   What platform did you try and do it with?
18    A.   I don't remember.
19    Q.   Did you ever -- did you ever use any
20 parental controls applications separate from the
21 parental control features on the defendants'
22 application to monitor or limit your son's usage?
23        MS. McNABB:  Objection.  Scope.
24        THE WITNESS:  What do you mean by "parental
25 control"?  Could you say the question again?

Page 108

1    BY MR. ERCOLE:
2    Q.  Sure.
3        Parental control -- are you aware there's
4 applications that you can download onto your phone
5 as a parent and limit the access and usage that
6 children have to the Internet or other Internet
7 sites and platforms?
8        MS. McNABB:  Objection.  Scope.
9        THE WITNESS:  I never -- I never used any
10 of those.
11        BY MR. ERCOLE:
12    Q.   Dr. Lembke, with respect to your clinical
13 practice, in 2024, how many -- approximately --
14 again, approximately how many hours a week did you
15 spend seeing patients?
16    A.   I see patients about one to two days per
17 week.
18    Q.   And on those days, how many hour -- like,
19 how many hours during that time will you spend with
20 patients?
21    A.   So it's a full day on Tuesdays and a half
22 day on Mondays.
23    Q.   When you say "full day," what does that
24 mean?
25    A.   8:00 to 5:00, 8:00 to 4:00.

Page 109

1    Q.   And a half day is like 8:00 to 12:00 or so?
2    A.   Yeah.
3    Q.   And that's currently; is that right?
4    A.   (Nonverbal response.)
5    Q.   How about in 2024?  How about last year?
6 Was that the same, similar, increased, decreased?
7    A.   The same.
8    Q.   And on a -- on an average day where you're
9 there for the full day, approximately -- again, not
10 holding you to this, but approximately how many
11 patients will you see?
12    A.   It averages between 10 and 20.
13    Q.   You're -- and what is the -- is there a
14 specific name for the -- I should know this, but I
15 don't.
16        Is there a specific name for the clinic or
17 practice that you work at?
18    A.   It's called the Stanford Addiction Medicine
19 Dual Diagnosis Clinic.
20    Q.   What does "dual diagnosis" mean?
21    A.   Dual diagnosis means that the patients who
22 are seen in our clinic have a psychiatric disorder
23 of any kind, as well as a co-occurring addictive
24 disorder of any kind.
25    Q.   Your -- am I correct that your clinic

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  refers patients who are -- can I say "clinic"?  Is
2  that okay?
3        What word should I use for that?
4    A.  It is a clinic.
5    Q.  Okay.
6    A.  Yes.
7    Q.  I want to make sure I get that right.
8        My understanding -- and tell me if I'm
9  wrong, but my understanding is your clinic refers
10 patients under 18 to a child psychiatry practice; is
11 that right?
12   A.  So I am the TOBI director of our recovery
13 clinic, which is an adolescent Addiction Medicine
14 Dual Diagnosis Clinic.
15       So 18 and over goes to the adult clinic,
16 and anybody under 18 goes to the youth recovery
17 clinic.
18   Q.  Do you personally treat individuals under
19 18?
20   A.  Very rarely.
21   Q.  When you say "very rarely," what does that
22 mean?
23   A.  Typically, I see patients in the adult
24 clinic, but many of those patients began using and
25 got addicted to defendants' social media platforms

Page 111

1  in their teens.
2    Q.  And just sticking with the patients that
3  you treat, when was the last time you treated
4  someone who was under 18?
5    A.  I can't remember.  It's been some time.
6    Q.  And in order for a patient to come in to
7  your clinic, he or she must already have an
8  addiction or be diagnosed with an addiction; is that
9  correct?
10   A.  No.
11   Q.  Do you treat mental disorders occurring in
12 the absence of an addiction?
13   A.  Occasionally, we will have a patient who is
14 there because they are wondering if they are
15 struggling with addiction, and we might make the
16 determination that they're not.  And then we might
17 provide some assessment for them.  But generally
18 they wouldn't remain in our clinic without a
19 diagnosis of some degree of either addictive use or
20 misuse or risky use or physiologic dependence
21 without a use disorder.
22       So there -- it's a -- it's a spectrum
23 disorder, and there are many different types of use
24 disorders that don't necessarily meet a threshold
25 criteria for an active addiction.

Page 112

1        We also have many patients who are in
2  long-term recovery from addiction.  And most of our
3  treatment is focused on their co-occurring
4  psychiatric disorders.
5        So we're managing their schizophrenia,
6  their eating disorder, their bipolar disorder, their
7  depression.  And their addictive disorder is more
8  remote; certainly a point of attention and regular
9  consultation, but not active for them.
10   Q.  Would you agree that the majority of
11 patients you treat have either a substance abuse
12 disorder or a chemical dependency problem?
13   A.  No.
14   Q.  Has that ever been true?
15   A.  Yes.  It was true in the past.
16   Q.  When was that true?
17   A.  I would say that was true when I began in
18 practice in the late 1990s.  But with the advent of
19 digital media, social media, other forms of
20 addictive media, we began seeing more and more
21 patients with behavioral addictions to gambling, to
22 pornography, to social media, to gaming.  And those
23 patients now make up a significant portion of our
24 practice.
25   Q.  How about in 2021?  Would you agree that

Page 113

1  the majority of patients that you treated either had
2  a substance abuse disorder or a chemical dependency
3  problem?
4    A.  The majority, yes.
5    Q.  How about in 2022?
6    A.  You know, I don't -- I don't have numbers
7  on this.  I -- I can't tell you what the percentage
8  is of one type of addiction versus another.
9        My overall sense is that the number of
10 people presenting with what we call behavioral
11 addictions -- that is, addictions to a behavior, a
12 process, rather than to something they ingest -- has
13 steadily been increasing over the last two decades,
14 corresponding with the advent of the Internet and
15 various forms of addictive digital media, including
16 the defendants' platforms.
17       So we're just seeing more and more over
18 time.  I think there was a real acceleration of this
19 problem during COVID, understandably, with more and
20 more people spending more time online.  So we saw
21 many more since COVID in terms of people addicted to
22 social media and other forms of digital media.
23   Q.  For social media, is -- would you consider
24 WhatsApp to be social media?
25   A.  I'm not that familiar with the WhatsApp

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 platform. I've not studied it. But it sounds like
2 a form of social media, yeah.
3    Q.   How about LinkedIn?
4    A.   Yes.
5    Q.   How about Pinterest?
6    A.   I haven't really studied Pinterest, but I
7 would think so.
8    Q.   Discord?
9    A.   Yes, I think so.
10    Q.   Tumblr?
11    A.   Not familiar with Tumblr.
12    Q.   Prime Video?
13    A.   Not familiar with Prime Video.
14    Q.   Have you treated patients suffering from an
15 addiction to television?
16    A.   No. And I wouldn't really expect to.
17 Television is not interactive and tailored for the
18 individual consumer the way that social media is.
19    Q.   How about -- I'm just going to throw out an
20 example.
21       How about Netflix? Is that -- is that --
22    A.   I've certainly seen patients who consume
23 far too much Netflix in combination with other
24 digital media platforms. Many of our patients
25 consume more than one social media platform or

Page 115

1 one -- more than one digital media platform.
2    Q.   How do you go about determining whether or
3 not a patient's use disorder or, in your view,
4 addiction is specific to social media versus their
5 phone?
6    A.   It's very clear to me that the phone is
7 simply the portal. If the phone didn't give them
8 access to defendants' social media platforms, the
9 phone would have no salience for them.
10    Q.   How about -- how do you go about
11 determining whether use disorder addiction is due to
12 social media versus the Internet generally?
13    A.   Social media is one of the forms of digital
14 media that people can access through the Internet.
15 Without the Internet, social media would not be
16 possible.
17       But it's the addictive social media
18 platforms that create the pathology. If the
19 Internet gave people access to things that weren't
20 designed to be addictive, they wouldn't spend time
21 on the Internet.
22    Q.   Well, haven't you ever, you know, heard the
23 phrase "surfing the Internet"?
24    A.   M-hm.
25    Q.   Have you -- do you think people can get

Page 116

1 addicted to looking at things on the Internet that
2 are not social media?
3    A.   Absolutely. But it's not the Internet,
4 per se, that they're addicted to. It's not the ones
5 and zero that allow for the medium itself. It's the
6 platforms. And when people are compulsively surfing
7 the Internet, they're typically doing so on
8 defendants' platforms or other addictive digital
9 media.
10    Q.   Okay. When you say people are
11 compulsive -- like, I'm trying to understand this.
12 Like, what basis do you have to suggest that when
13 people are compulsively surfing the Internet, they
14 are typically doing so on defendants' platforms?
15    A.   Survey studies done in adolescence, in kids
16 and minors, and that's the focus of this litigation,
17 show that much of the time, if not most of the time,
18 kids are on the Internet, they are on defendants'
19 platforms.
20    Q.   What studies?
21    A.   As I mentioned, there are Pew surveys out
22 there asking teens where they're spending their time
23 and then ranking them. I think that defendants'
24 platforms appear in the first ten and certainly some
25 of the defendants here in the first five. I think

Page 117

1 TikTok is number one. And then Insta, Snapchat, and
2 YouTube are both in there as among the most popular
3 platforms that minors will use when they're on the
4 Internet.
5    Q.   Any other studies?
6    A.   I'm not recalling any other specific
7 studies, but I believe that that's well-established.
8    Q.   If you -- in your -- in your practice, have
9 you diagnosed someone with social media -- is it
10 social media addiction, or what do you call -- what
11 do you call sort of a -- someone who compulsively
12 uses social media? What is -- what language do you
13 use for that?
14    A.   I use "social media use disorder" just to
15 be consistent with the DSM, which uses the term "use
16 disorder" to describe addiction to various
17 substances. If it's alcohol, then it's called
18 alcohol use disorder. If it's nicotine, it's
19 nicotine use disorder. Gambling disorder and social
20 media use disorder.
21    Q.   And we'll get into the, sort of, DSM
22 language and what that recognizes or doesn't
23 recognize in a little bit, but ...
24       But you use -- so if you're -- if someone
25 presents to you and you believe that person has

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1 social media use disorder, that's what you would
2 write in your records; is that correct?
3     A.  Yes, or something equivalent.  I might -- I
4 might write "social" -- if I felt it met threshold
5 criteria for addiction, I would write "social media
6 use disorder" or "social media disorder" or "social
7 media addiction."
8        If I felt that it was harmful use but not
9 meeting full criteria for addiction, because this is
10 a spectrum disorder, I might -- I might write
11 "compulsive over-engagement with social media, risky
12 social media use, harmful or problematic social
13 media use."
14        To me, these are all getting at the same
15 basic construct which is that this individual is
16 using social media in a way that's ultimately
17 harmful for their physical and/or mental health or
18 harmful in their lives in some other way.
19     Q.  It sounds like, though, that there's a --
20 in your view, a distinction between compulsive or
21 even harmful use of social media and addiction to
22 social media; is that right?
23     A.  It's a spectrum and it's a judgment call
24 when your compulsive overuse or risky use
25 transitions into a use disorder.

Page 119

1        When we're dealing with a severe social
2 media use disorder, it's quite obvious to all.
3 Pretty much anybody could identify it as
4 problematic.
5        When you get down into the more milder
6 forms, you know, it can be a judgment call.  Whether
7 this has really crossed over into addiction, as you
8 know or you may know, there is no brain scan or
9 blood test to diagnose addiction.  We base it on
10 phenomenology, which is these patterns of behavior
11 that are highly recognizable and highly consistent
12 with the same patterns of behavior that we see when
13 people get addicted to drugs and alcohol.
14     Q.  Like opioids; right?
15     A.  Like opioids, yeah.
16     Q.  And so, in your view, social media
17 addiction, to use your term, is the same as opioid
18 addiction; right?
19        MS. McNABB:  Objection.  Misstates.
20        THE WITNESS:  There are many similarities.
21 I didn't say they're exactly the same.  There are
22 many similarities.  And then the overall gestalt is
23 centrally the same disease process.
24        BY MR. ERCOLE:
25     Q.  When you say "judgment," who makes that

Page 120

1 judgment?
2     A.  It can be made in various ways.  If it's in
3 a clinical setting, it will be the mental healthcare
4 provider making that judgment.  If it's in a
5 population study, it will be one of the scales
6 making that judgment.
7        In my opinion, parents are pretty good at
8 making that judgment.  And often parent concern is
9 what will drive a youth coming into our clinic to be
10 evaluated.
11     Q.  And when you say scales are driving that --
12 that judgment, what do -- what do you mean?  What
13 are you referring to when you say "scales"?
14     A.  The various validated scales out there to
15 assess for social media addiction.
16     Q.  Of your patients that suffer from an
17 addiction, what percentage have you diagnosed with
18 either social media addiction or social media use
19 disorder?
20     A.  I haven't counted exactly how many, but if
21 I had to estimate, I would say it's probably in our
22 clinic population -- well, in the adult population
23 that we see, it's probably about 5 to 10 percent, if
24 I had to guess.
25        In our youth population, especially

Page 121

1 post-COVID, we're seeing very high rates of kids
2 coming in with social media addiction.  I don't know
3 the exact number.  Again, if I had to guess, I would
4 put it maybe somewhere around 20 to 30 percent.
5     Q.  And those -- the youth clinic that you're
6 referring to, in terms of assessing whether someone
7 has addiction or not, they're using your definition
8 of addiction; right?
9     A.  Who are -- who are you referring to?
10     Q.  Whoever is making the diagnosis in the
11 youth clinic that you're referring to --
12     A.  Right.
13     Q.  -- right?
14        So you talked about how you are involved
15 with the youth clinic --
16     A.  Right.
17     Q.  -- is that correct?
18     A.  Yes.
19     Q.  Okay.  You don't see patients in the youth
20 clinic, though; right?
21     A.  No.
22     Q.  Okay.  But presumably, whoever is
23 diagnosing kids who come in for youth clinic is
24 using a particular definition of "social media use
25 disorder" or "social media addiction"; correct?

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1    A.   They're using the validated, standard
2  definition which I summarize in my report with the
3  four Cs, tolerance and withdrawal.  That's not my
4  definition.  That definition mirrors definitions
5  that you will find in the DSM, in -- you know,
6  definitions put forward by the World Health
7  Organization, the EPA, in the medical literature, in
8  the various scales.
9    Q.   We may disagree about that, but we'll get
10 to that in a second.
11       But for whatever it's -- whatever it's
12 worth, they're using the definition laid out in your
13 report; correct?
14   A.   Yes.
15   Q.   Okay.  I think in the -- do you -- when you
16 diagnose patients with social media addiction or
17 social media use disorder, do you diagnose them with
18 an addiction to a particular type of platform or to
19 social media generally?
20   A.   We always ask them what platforms they're
21 using, how much they're using those platforms.  So
22 we look at the specific platform, and we look at use
23 more broadly.
24   Q.   Would you -- you'd have to write something
25 in the records; right?

Page 123

1    A.   M-hm.
2    Q.   Do you write "social media use disorder
3  addiction," or do you specify addiction to a
4  particular platform?
5    A.   We'll often write both.
6    Q.   Does -- if you -- does insurance cover
7  patients who come to your clinic for treatment?
8    A.   Most of the time.
9    Q.   Does insurance cover treatment for social
10 media use disorder or addiction?
11   A.   Typically they will cover those visits.
12   Q.   If you write in your records that someone
13 needs treatment for social media use disorder or
14 social media addiction, will insurance cover that?
15   A.   Yes, they'll cover it, at least to my
16 knowledge.
17   Q.   Have you diagnosed any of your patients
18 with an addiction to online shopping?
19   A.   Yes.
20   Q.   Online gambling?
21   A.   Yes.
22   Q.   Pornography?
23   A.   Yes.
24   Q.   Dating apps?
25   A.   Yes.

Page 124

1    Q.   Video gaming?
2    A.   Yes.
3    Q.   Texting?
4    A.   No.
5    Q.   Working too much?
6    A.   So we do see that.  It really depends,
7  though, on the particular person and their
8  circumstance.  It's usually not the primary
9  diagnosis.
10   Q.   Have you diagnosed someone with that, being
11 addicted to their job?
12   A.   I don't believe I've diagnosed that.
13   Q.   Have you ever given interviews where you've
14 said you've been addicted to work?
15   A.   I don't remember.
16   Q.   Too many interviews?
17       MS. McNABB:  Objection.  Argumentative.
18       BY MR. ERCOLE:
19   Q.   How about addicted to exercising?  Diagnose
20 people with that?
21   A.   Yes.
22   Q.   Diagnose people -- how about diagnosing
23 patients with being addicted to reading books?
24   A.   No.  Actually, that's not true.  I had one
25 patient who I'm recalling now was addicted to

Page 125

1  romance novels.
2    Q.   What types of romance novels?
3    A.   It doesn't matter.  It's the -- the overall
4  genre, the easy accessibility, the voluminous
5  quantity that's available now.
6    Q.   How about any other -- we've talked about
7  social media -- you've diagnosed people with
8  social -- sorry, strike that.
9        Excuse me.  You've diagnosed patients with
10 social media use disorder or addiction, and we've
11 talked about a bunch of other behavioral addictions
12 that you've also diagnosed people with.
13       What other ones have you diagnosed
14 patient -- what other behavioral addictions have you
15 diagnosed patients with?
16   A.   Those are the main ones.
17   Q.   You also diagnosed someone as being
18 addicted to water; correct?
19   A.   I did not formally diagnose that.  Again,
20 that was a very particular circumstance of an
21 individual who had a very severe alcohol addiction,
22 wasn't drinking alcohol, and then used water as a
23 replacement.  I have not encountered any other
24 person who used water in that way.
25       In my using that example, I was really

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  trying to highlight that once people develop the
2  disease of addiction, they're very vulnerable to
3  getting addicted to other things outside of their
4  specific drug of choice.
5     Q.  Is there any type of behavior that someone
6  couldn't get addicted to?
7     A.  Sure.
8     Q.  Can you give me an example?
9     A.  I think a better way for me to answer that
10 than giving specific examples is to just emphasize
11 that the medium is really what matters.  And the
12 application of technology and the creation of design
13 features that make these various reinforcing
14 behaviors more potent, more accessible, more
15 bountiful, more novel, more uncertain, can turn
16 something that isn't necessarily that inherently
17 addictive into something that is very addictive,
18 including behaviors that we typically think of as
19 healthy, like human connection.
20       So, you know, friendship in the spirit --
21 in -- in the ways in which we mean that term,
22 friendship is not addictive; right?  Friendship is
23 healthy.  It's positive.
24       But if you take friendship and create a
25 medium whereby human connection has now become a

Page 127

1  drug, then all of a sudden you've got an addiction
2  because we are evolved to make human connections.
3  And the way -- the way that our brain gets us to
4  making the connections is to make it pleasurable or
5  reinforcing so that we want to do it again.
6     Q.  So your testimony is that social media has
7  taken friendship and made it addictive; right?
8       MS. McNABB:  Objection.
9     A.  That's right, or at least defendants'
10 platforms.
11    Q.  Thank you.  Defendants' platforms.
12      But there could be other social media that
13 has done the same thing; right?
14    A.  There could be, sure.
15    Q.  Yeah.
16      With respect to gambling, right, gambling
17 can be on -- people can be addicted to gambling
18 online, but they also can be addicted to gambling,
19 in your view, outside of the Internet; right?
20    A.  Yes.
21    Q.  And in that instance, that's an example of
22 someone actually being addicted to the -- sort of
23 the aspect of gambling itself without any sort of
24 enhancement from media; correct?
25    A.  Well, you need to have a place where people

Page 128

1  are gambling in order to get addicted to gambling.
2  You need other people.  You need the platform on
3  which gambling happens.  You need, for example,
4  casinos or slot machines, right, or lottery tickets.
5       The digital medium has just expanded and
6  made more potent and more accessible many different
7  forms of gambling.  And I would even argue that
8  social media has gambllification or gamification in
9  it so that it's in many ways very similar to
10 gambling.  But you're gambling on, you know, what is
11 the next social reward that might be coming your
12 way.
13    Q.  With respect to social media addiction or
14 social media use disorder, have any of your patients
15 ever committed a crime in order to access social
16 media?
17    A.  I'm not sure I know the law well enough to
18 comment on that.
19    Q.  How about any of your patients ever stolen
20 a car in order to be able to access social media?
21    A.  I don't know of anyone who's stolen a car
22 to access social media.
23    Q.  How about any of your patients ever winding
24 up in a dangerous neighborhood in order to access
25 social media?

Page 129

1     A.  I'm not aware of that, no.
2     Q.  Any of your --
3     A.  Because, really, why would you have to --
4  it's -- it's available everywhere.  No need to go to
5  a specific geographic location to access it.
6     Q.  How about any of your patients ever
7  physically assaulted someone in person in order to
8  access social media?
9     A.  Yes.
10    Q.  What happened there?
11    A.  Frequently kids will become highly
12 disregulated if their parents try to restrict their
13 access to social media, including trying to assault
14 the parents or hurt themselves.
15    Q.  And when you say that, you're speaking
16 about what you've learned from your work in the
17 child clinic; is that right?
18    A.  Yes.  So we're -- we have a team-based
19 approach to care.  We discuss cases.
20    Q.  In your view, you would consider the
21 United States to be an addicted nation; right?
22    A.  I'm -- have I said that in an interview
23 before?  Is that why you're asking me that?
24    Q.  Yes.
25    A.  Okay.  I think that -- that it's clear that

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1  the rates of addiction are increasing in the
2  United States, again, because of our increased
3  access to highly potent, reinforcing drugs and
4  behaviors of all sorts.
5      Q.  And you've also opined that "We've always
6  been addicted to something for as long as our
7  species has been on the planet"; correct?
8      A.  Yes.  But the number of people who are
9  getting addicted is increasing because of the
10 increased -- increased access and the number of
11 addictive products that are available today.
12     Q.  Do you stand by that statement, that "We've
13 always been addicted to something for as long as our
14 species has been on the planet"?
15     A.  Yes.
16     Q.  Do you agree that our brains have -- in
17 your view, our brains have been wired to be
18 addicted?
19     A.  I would phrase it a little bit differently.
20 I would say our brains evolve to reflexively
21 approach pleasure and avoid pain.  And that ancient
22 wiring makes us very vulnerable to addiction if we
23 are in an ecosystem where we don't have to work very
24 hard to get highly reinforcing substances and
25 behaviors that never run out.

Page 131

1      Q.  If you turn to page -- let's go to your
2  report, the JCCP report.
3      A.  Yeah.
4      Q.  I think it's Exhibit 3.
5          If you turn to page 6.  And it's the first
6  opinion where you say (as read):
7          "Addiction is a chronic, relapsing,
8          and remitting brain disease, as evidenced
9          by continued, compulsive" --
10     Or excuse me.  I apologize.  I think it's
11 page 5 --
12     A.  Okay.
13     Q.  -- of your report.  It's the first opinion.
14     A.  Yeah.
15     Q.  And it says (as read):
16         "Addiction is a chronic, relapsing,
17         and remitting brain disease, as evidenced
18         by continued, compulsive use of a
19         substance or engagement in a behavior,
20         despite harmful consequences."
21         Do you see that?
22     A.  Yes, I do see that.
23     Q.  And then if you go to, like, the 1a
24 there --
25     A.  M-hm.

Page 132

1      Q.  -- there's a sentence that states, if you
2  turn over to the next page (as read):
3          "If the behavior is rewarding or
4          problem-solving, the individual will
5          continue to engage in it, especially
6          given unlimited access, abundant
7          quantity, high potency, novelty, and
8          uncertainty."
9          Do you see that?
10     A.  Yes, I do see that.
11     Q.  And it says (as read):
12         "Over time, the individual finds it
13         difficult to stop even when they want to,
14         eventually resulting in continued
15         compulsive use despite harm."
16         Do you see that?
17     A.  Yes, I see that.
18     Q.  And you stand by those opinions; correct?
19     A.  Yes, I do.
20     Q.  Wouldn't this definition cover spending
21 time with friends?
22     A.  No.
23     Q.  Why not?
24     A.  Because there -- we are social creatures.
25 We are evolved to make connections with other

Page 133

1  humans.  That's fundamental to our survival.  And
2  when we do that, in a healthy way, then that is good
3  for us.
4          But if then we take that natural reward and
5  we adulterate it in some way, like through
6  defendants' platforms, then we've turned a healthy
7  human behavior into a potentially addictive drug.
8      Q.  But who's making this decision -- this
9  distinction between what's healthy and what's not
10 healthy?
11     A.  Well, I mean, we as a society are making
12 those distinctions.
13     Q.  Okay.  But if we look here, like, just
14 focus on the language, "if the behavior is rewarding
15 or problem-solving" -- do you see that?
16     A.  M-hm.
17     Q.  Isn't spending time with friends rewarding?
18     A.  Yes.  I mean, it's -- it's what we call a
19 natural reward.
20     Q.  Okay.  And then "the individual will
21 continue to engage in it," right?
22         People like spending time with friends, so
23 they want to spend time with friends; correct?
24     A.  M-hm.
25     Q.  (As read):

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1    "Over time, the individual finds it
2    difficult to stop even when they want to,
3    eventually resulting in continued,
4    compulsive use despite harm."
5        Why wouldn't spending time with friends,
6    which is rewarding -- why wouldn't that then become
7    something that some people find difficult to stop
8    even when they want to?
9        MS. McNABB: Objection. Speculation.
10        THE WITNESS: Well, you've skipped over the
11    most important distinction, which is "especially
12    given unlimited access, abundant quantity, high
13    potency, novelty, and uncertainty."
14        So friendship is typically not unlimited.
15    You have to go outside and find the people. And
16    there are only physically so many people you can
17    find and encounter.
18        Furthermore, friendship takes work.
19    There's give and take. There's disagreements.
20    There's frustration. You have to negotiate. You
21    have to tolerate differences. You can't just swipe
22    right or swipe left and find a prettier face or
23    someone who's more interesting or somebody who
24    agrees with you.
25        Our friendships with real people, in real

Page 135

1    life, are not necessarily novel. In order to deepen
2    those relationships over time, you're going to have
3    to tolerate and encounter boredom and sameness.
4    You're not always get to get newness if you really
5    want to maintain a quality friendship through time.
6        You're not going to be able to get
7    intermittent, positive reinforcement every time you
8    go talk to your friend. Maybe they'll give you some
9    negative constructive criticism that you'll have to
10    take to heart that will be difficult to hear.
11        So the essential difference here between
12    friendship, healthy friendship, is that it has not
13    been adulterated through the digital platform and
14    the specific design features that make it easy to
15    access hundreds, if not millions, of people who are
16    going to tell us exactly what we want to hear,
17    exactly when we want to hear it. And if we don't
18    like what they say, we can just get rid of them and
19    find somebody else, et cetera, et cetera.
20        So there's a real difference between
21    healthy friendship and what is happening online on
22    defendants' platforms.
23        BY MR. ERCOLE:
24    Q. Aren't all of those positive and negative
25    things you just described also taking place online?

Page 136

1    A. They're not taking place as much as the
2    negative is taking place.
3    Q. Have you -- but you've never actually used
4    any of the defendants' platforms except YouTube;
5    right?
6    A. I have studied these platforms. I don't
7    need to be a regular consumer of these platforms.
8        Furthermore, in my report itself, speaking
9    of YouTube, they do their own comparison of good
10    things about using YouTube and bad things about
11    using YouTube. YouTube has both positive and
12    negative well-being effects, and they list them.
13    And it looks to me like the negative effects that
14    YouTube itself has found outweigh the positive
15    effects.
16        So it's always going to be a risk-benefit
17    analysis in a given population of users. And
18    children are a vulnerable population. And it is my
19    opinion that the negatives outweigh the positives.
20    Q. And who does that risk-benefit analysis?
21    A. We're doing it right now as part of this
22    litigation. You know, parents are doing it every
23    day, trying to raise their kids in this environment.
24    Clinicians are doing it. People who are doing
25    research are doing it.

Page 137

1    Q. We'll look at some of the documents that
2    you selectively decided to use in your report a
3    little bit later, but --
4        MS. McNABB: Objection. Argumentative.
5        BY MR. ERCOLE:
6    Q. We talked about the -- that -- you know,
7    things that you've been addicted to. You mentioned
8    romance novels in the past.
9        Anything else that you've been addicted to?
10    A. Not to that extent, no.
11    Q. The release of dopamine is how we perceive
12    pleasure; is that right?
13    A. It's intimately involved in the experience
14    of pleasure, reward, and motivation, yes.
15    Q. And pleasure can come from just about
16    anything; right?
17        MS. McNABB: Objection.
18        THE WITNESS: Pleasure can come from many
19    different sources, yes.
20        BY MR. ERCOLE:
21    Q. Every form of communication, digital or
22    nondigital, can potentially give someone a dopamine
23    release; right?
24    A. Potentially, yes.
25    Q. Even anticipating something pleasurable can

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1  give you a dopamine release; right?
2      A.  Yes.
3      Q.  Like listening to classical music, for
4  instance?
5      A.  Yes.
6      Q.  Playing with your pet?
7      A.  Yes.
8      Q.  Successfully building a shelf in your
9  house?
10     A.  Sure.
11     Q.  And what makes something addictive is the
12  amount of dopamine the behavior releases in your
13  view; right?
14         MS. McNABB:  Objection.  Misstates.
15         THE WITNESS:  I'm sorry.  Could you say the
16  question again?
17         BY MR. ERCOLE:
18     Q.  Yeah, sure.
19         In your view what makes something addictive
20  is the amount of dopamine that the behavior
21  releases; right?
22     A.  Well, we don't diagnose or assess addiction
23  based on dopamine release; right?
24         We're not at that state yet where we can
25  put somebody in a brain scan and say, "Aha, they

Page 139

1  have addiction."
2         But addiction is a brain disease.  And we
3  do know that when something is pleasurable or
4  reinforcing, it will release dopamine.  The more
5  dopamine that's released, the faster that it's
6  released, the more likely is that substance or
7  behavior to be reinforcing for a given individual.
8      Q.  Right.
9         In your book you write (as read):
10        "Dopamine is used to measure the
11         addictive potential of any behavior or
12         drug."
13         Right?
14     A.  That's qualified as that's how
15  neuroscientists use it.  It's kind of a common
16  currency for measuring the addictive potential of a
17  behavior or -- yes, uh-huh.  And that's in --
18  usually in rodent studies.
19     Q.  Okay.  And you stand by that statement,
20  right --
21     A.  Yes, I do.
22     Q.  -- that you wrote in your book?
23         Okay.
24         (Stenographer admonishment.)
25         (Discussion off the stenographic record.)

Page 140

1         BY MR. ERCOLE:
2      Q.  I will do better to make sure that you
3  finish your response before I -- I respond.  And if
4  I step on your toes, I apologize for that.  And your
5  counsel can yell at me, and I will -- I will, again,
6  say I will try to do better.  So I apologize for
7  that.
8         Are you aware of any study that has
9  determined how much dopamine is released by the use
10  of social media?
11     A.  I'm not aware of any study that quantifies
12  the absolute levels of dopamine, no.
13     Q.  And by "social media," I mean the
14  defendants' platforms here; right?
15     A.  Yeah.
16     Q.  Will the amount of dopamine released depend
17  on what content is being viewed on social media?
18     A.  I mean, the amount dopamine released is
19  going to depend on the affinity that a given
20  individual has for that particular medium.  Some
21  people are more responsive to social media and
22  social cues than others.  It will depend on the
23  stage of their development.  We know that teens are
24  more sensitive to social cues than adults in
25  general.

Page 141

1         So it's going to depend on a number of
2  different factors.
3      Q.  Are you -- are you aware of any study that
4  shows that the release of dopamine is -- is more
5  from -- sorry.  Strike that.  That's a terribly
6  phrased question.
7         Are you aware of any study showing that
8  more dopamine is released from using social media
9  than any other form of communication?
10     A.  I am aware of studies showing that the
11  addictive design elements on defendants' platforms
12  release more dopamine than social media without
13  those addictive design elements; that is to say, I
14  am inferring that more activation in the nucleus
15  accumbens reward circuitry is consistent with
16  dopamine release.  I think it's reasonable to infer
17  that.
18         There are studies that I have cited showing
19  that the design elements like the "likes" or the
20  "tailored for you" are more reinforcing, that is,
21  release more dopamine, than the same image with
22  fewer likes or for a general audience.
23     Q.  So my question is a little bit different
24  than that.
25     A.  Okay.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1    Q.   Are you aware of any study that shows that
2  the -- that more dopamine released -- sorry.  Strike
3  that.
4         Are you aware of any study showing that
5  more dopamine is released by virtue of social
6  interaction through social media versus social
7  media -- social interaction in person?
8    A.   No.  And that would be a very difficult
9  study to design because I don't know how you would
10  interact with a person in an fMRI machine.
11    Q.   Are you aware of any study showing that
12  the -- that more dopamine is released from the use
13  of social media than other behaviors like exercise?
14    MS. McNABB:  Objection.  Speculation.
15    THE WITNESS:  I'm not aware of any study
16  comparing dopamine release between social media and
17  exercise.
18    BY MR. ERCOLE:
19    Q.   How about -- are you aware of any study
20  comparing dopamine release on social media to
21  dopamine released through any other behavior outside
22  of social media?
23    MS. McNABB:  Objection.  Speculation.
24    THE WITNESS:  Give me one second to look at
25  my report here.

Page 143

1         So on page 16 of my report, I cite to a
2  study by Izuma, et al., which is basically I'm
3  looking at or comparing brain stimulation involved
4  in a task related to acquiring a good reputation and
5  comparing that to the part of the brain that gets
6  activated during monetary reward.
7         So essentially that you have a social
8  reward being compared to a monetary reward and
9  finding that a good reputation activated
10  reward-related brain areas and overlapped with the
11  areas activated by monetary rewards.
12    BY MR. ERCOLE:
13    Q.   Okay.  Any other studies?
14    A.   Not that I'm aware of right now.
15    Q.   Okay.  And the study that you just
16  referenced was a study involving what happens to the
17  brain when someone acquires a good reputation;
18  right?
19    A.   Yes, which is very relevant to social media
20  because a lot of what people are going for on social
21  media is social validation, enhanced reputation.
22  And the medium allows for that through the addictive
23  design elements, like the likes and the rankings,
24  the shares, the comments.
25    Q.   Are you aware of any study that has looked

Page 144

1  at whether or not more dopamine released -- strike
2  that.
3         Whether more dopamine is released from a
4  like on social media versus a compliment from
5  someone in real life?
6    A.   No.  But I do cite to studies showing that
7  more activation in the reward pathway, a/k/a more
8  dopamine release, occurs when a picture is liked by
9  others than a picture that is not liked by others.
10    Q.   Sure.
11         But I guess my question is a little bit
12  more basic.  And I -- look, I just don't have the
13  scientific background here, so I'm still trying to
14  get all this up to speed.
15         But my understanding is, like, the -- sort
16  of the key here is dopamine release; right?  That's
17  an important part of the addiction equation?
18    A.   Dopamine is a way to study the brain
19  changes that occur when people go from adaptive
20  recreational use to maladaptive addictive use.
21    Q.   Okay.
22    A.   So it's a way to try to get at what is
23  going on in the brain.  It's not the only way to do
24  that, but it's -- it's, again, become a -- kind of a
25  common currency for researchers to study that

Page 145

1  phenomenon in the brain's reward pathway.
2    Q.   If I pay my brother, for instance,
3  hypothetically --
4    A.   Yes.
5    Q.   -- pay my brother a compliment and say,
6  "Hey, surprisingly, you look nice today," and
7  "surprisingly" is the key adjective in that
8  particular phrase --
9    A.   Okay.
10    Q.   -- there -- his brain is going to release
11  some dopamine, right, because that's a pleasurable
12  response, I would think?
13    A.   We can infer that, yes, his brain is
14  releasing dopamine in response to that compliment
15  if -- if it felt good to him and it wasn't delivered
16  in some kind of sarcastic way or, you know, a
17  million times or what have you.
18    Q.   Is the -- is the -- which is a good
19  clarification, given my relationship with my
20  brother.
21         But is the same -- if someone goes online
22  and they -- someone pays them a compliment on one of
23  the -- one of the defendants' social media
24  platforms, based upon what you're saying,
25  inferentially there will be some release of dopamine

37 (Pages 142 - 145)

Page 146

1 as well in response to that compliment; correct?
2    A.   Yeah.  That's why -- that's why it feels
3 good.
4    Q.   Yeah.
5        Is more dopamine released when I pay my
6 brother a compliment in person versus online, or is
7 more released online versus when I pay my brother a
8 compliment in person?
9    A.   So based on the behaviors that we see when
10 people engage in interactions online, I believe that
11 we can infer, although there are no studies showing
12 this specifically, that there's more dopamine
13 released on those online interactions in general
14 because of the medium itself.
15    Q.   Okay.  You can't point me to a study saying
16 that?
17    A.   No.
18    Q.   Okay.  You've opined in various -- strike
19 that.
20        You've done a lot of podcasts; right,
21 Mrs. Lembke?
22    A.   Yes.
23    Q.   I apologize.  Dr. Lembke.
24    A.   Yes.
25    Q.   You've opined in those podcasts that you

Page 147

1 believe someone can be addicted to pain too; is that
2 correct?
3    A.   We do see that, yes.
4    Q.   And in your clinical practice, you view
5 your job as not to take away all of your patient's
6 pain and suffering, but to make that suffering
7 tolerable so that they can still find a life worth
8 living; is that right?
9        MS. McNABB:  Objection.  Form.  Foundation.
10       THE WITNESS:  I'd like to see the -- the
11 context in which I said that.  I think that would be
12 important.
13       BY MR. ERCOLE:
14    Q.   Do you believe that we as a society have a
15 phobia of pain?
16       MS. McNABB:  Same objection.
17       THE WITNESS:  I have said that, yes.
18       BY MR. ERCOLE:
19    Q.   Do you believe that people should seek out
20 and invite pain into our lives, physical pain and
21 emotional pain?
22       MS. McNABB:  Same objection.
23       THE WITNESS:  I say that in the broader
24 context of the unique challenges that I think we
25 modern humans face living in a world where almost

Page 148

1 everything has become drugified in some way.  Again,
2 I use that word to address the characteristics that
3 make something addictive or accessible, more potent,
4 more novel, more bountiful, et cetera.
5       BY MR. ERCOLE:
6    Q.   Let's turn to your CV.
7        Let's turn to your CV, which is Exhibit 1
8 to your report, which I believe is Exhibit 3 for
9 purposes of the record.
10       MS. McNABB:  Exhibit 4 is the updated CV.
11       MR. ERCOLE:  Oh, okay.  We can use that
12 one.
13       Thank you.
14       BY MR. ERCOLE:
15    Q.   Let's turn to page 4 of this document,
16 which is on the bottom LEMBKE -0012.
17       This, I think, is Exhibit 4, Dr. Lembke.
18    A.   I think I'm looking at Exhibit 4, the
19 federal report, the May report.
20    Q.   It's -- it's not.  I would use --
21    A.   Okay.
22    Q.   Please use the -- the exhibit that we gave
23 you, just for consistency here.
24    A.   Okay.
25    Q.   Thank you.

Page 149

1    A.   Yeah, you're welcome.
2    Q.   So on page 4 there's something that says
3 "Medical Licensure and Specialty Board
4 Certification."
5        Do you see that?
6    A.   Yeah.
7    Q.   Okay.  What is the American Board of
8 Addiction Medicine?
9    A.   The American Board of Addiction Medicine is
10 a subspecialty certification board that was created
11 before addiction medicine was recognized as a
12 medical specialty in order to certify a level of
13 expertise in that area.
14    Q.   You are no longer board certified in
15 addiction medicine; correct?
16    A.   That is incorrect.
17    Q.   Okay.
18    A.   That -- the American Board of Addiction
19 Medicine no longer exists because it's been
20 preempted by the American Board of Preventive
21 Medicine, which took under its umbrella the
22 addiction medicine boards once addiction medicine
23 became recognized as a medical subspecialty.
24    Q.   Does the American Board of Addiction
25 Medicine still have a website?

38 (Pages 146 - 149)

Page 150
1    A. It may well do. I think it now continues
2 to serve as a certification for individuals who did
3 not go on to get their American Board of Preventive
4 Medicine boards.
5        But today, for example, when fellows
6 graduate from our addiction medicine fellowship,
7 they will sit for their addiction medicine boards as
8 sponsored by the American Board of Preventive
9 Medicine within the broader house of medical
10 subspecialties.
11    Q. So if I type your name into the website,
12 look out for the American Board of Addiction
13 Medicine, it won't appear then; correct?
14    A. I don't know. I didn't know they still had
15 a website. If you contact them and ask them what --
16 was I certified between these dates, they will
17 certainly affirm that that is the case.
18    Q. And how about for the American Board of
19 Psychiatry and Neurology? Do you -- are you -- do
20 you remain board certified there?
21    A. Yes.
22    Q. When did you get your -- it says you were
23 recertified February 18th, 2013.
24        Do you see that?
25    A. Yes.

Page 151
1    Q. And that usually lasts ten years, I think?
2    A. Yes.
3    Q. Okay. When did you recertify?
4    A. I recertified in 2013.
5    Q. And then how -- right. It usually lasts
6 ten years.
7    A. M-hm.
8    Q. So have you recertified since then?
9    A. I recertified this past year, yes.
10    Q. Did you recertify a couple of days ago?
11    A. I've done -- I don't remember when -- yeah,
12 I guess I probably haven't updated this. I probably
13 need to update this.
14    Q. Okay.
15    A. Thank you.
16    Q. But you would have recertified a couple of
17 days before this deposition; right?
18    A. No. I recertified last year.
19        I think that there was -- because of COVID,
20 they delayed the year in which you had to recertify.
21 So they -- there was a grace period, and I did it
22 last year.
23    Q. Okay. You are not board certified in child
24 or adolescent psychiatry; correct?
25    A. That is correct.

Page 152
1    Q. If you go to page 11 of this document. I
2 think it's 11.
3        So it's LEMBKE 0- -- LEMBKE -19 on the
4 bottom right.
5    A. Yes.
6    Q. It says, "Current Funding."
7        Do you see that?
8    A. Yes.
9    Q. And the -- the first entry is for funding
10 by the Stanford Institute for Human Centered
11 Artificial Intelligence?
12    A. Yes.
13    Q. And it's something with the title "Addicted
14 by Design"?
15    A. M-hm.
16    Q. What's the status of this project?
17    A. It's ongoing.
18    Q. What are you studying?
19    A. Exactly what it says. Trying to contribute
20 to the literature on addictive media -- media
21 platforms.
22    Q. And does that include the defendants'
23 platforms in this case?
24    A. It would include the defendants' platforms.
25    Q. And when did funding begin in this case?

Page 153
1    A. Funding began in February 2023. But it's
2 been greatly delayed because of personnel changes,
3 not in my department, but over in the Human Centered
4 Artificial Intelligence side of things.
5    Q. And when did you start work in this case?
6    A. I started work February of 2023.
7    Q. Same -- same month you started your work
8 for this grant; right?
9    A. The work on this grant hasn't really begun.
10 We were -- we got the grant on February 2023, but
11 we've really not begun this particular project.
12    Q. What's the objective?
13    A. The objective was to better understand the
14 addictive design elements of various forms of
15 digital media.
16    Q. You understand that documents produced in
17 this case that you've reviewed are confidential;
18 right?
19    A. Yes, I do.
20    Q. How will you be able to separate what you
21 learn in this case that's confidential from your
22 work in connection with this project?
23    A. Well, your question suggests and implies
24 that what I've learned from confidential documents
25 would help me understand the addictive design

CONFIDENTIAL

Page 154

1 elements. So I appreciate that question.
2      I will have no problem differentiating
3 that.
4      Q.  Let's go to your peer-reviewed information.
5 I think it's page 14, which I think is LEMBKE -22 on
6 the bottom.
7      Your book Dopamine Nation was not peer
8 reviewed; correct?
9      A.  That is correct.
10     Q.  The peer reviewed -- you then follow a
11 category called "Peer-Reviewed Online Stanford CME
12 Courses."
13     Do you see that?
14     A.  Yes.
15     Q.  None of those courses are specific to
16 social media; right?
17     A.  That is correct.
18     Q.  You then have something saying -- category
19 called "Peer-Reviewed Original Research Articles."
20     A.  Yes.
21     Q.  Do you see that?
22     A.  Yes.
23     Q.  None of your peer-reviewed original
24 research articles focus on social or digital media;
25 correct?

Page 155

1      A.  That is incorrect.
2      Q.  Okay.  Which one does?
3      A.  So if you go to page -- page 18, No. 38,
4 this is a study that we did looking at social media
5 platforms as a way to monitor the opioid crisis,
6 looking specifically at which social media platforms
7 could be surveilled in order to see the harms caused
8 by opioids.
9      Q.  Okay.  None of your peer-reviewed original
10 research articles focused on addiction to social or
11 digital media; correct?
12     A.  That is correct.
13     Q.  None of your -- and if you go to -- like,
14 there's something that says below that
15 "Peer-Reviewed Perspectives, Case Reports, and
16 Reviews."
17     Do you see that?
18     A.  Yes, I do.
19     Q.  None of your Peer-Reviewed Perspectives,
20 Case Reports, and Reviews have focused on social or
21 digital media; correct?
22     A.  Correct.
23     Q.  None of your peer-reviewed book chapters
24 have focused on social or digital media; correct?
25     A.  Correct.

Page 156

1      Q.  You have not generated any peer-reviewed
2 scholarship that has analyzed the effect of social
3 media on adolescent mental health; correct?
4      A.  I think that's correct, yes.
5      Q.  You have not generated any peer-reviewed
6 scholarship that analyzes the effect of social media
7 on anyone; correct?
8      A.  That is correct.
9      Q.  Have you been involved in any longitudinal
10 study or experimental study that's attempted to
11 assess mental health outcomes from social media use?
12     A.  I'm currently at the beginning stages of a
13 study in our recovery clinic, but it's just getting
14 underway.  We're still getting IRB approval.
15     (Stenographer interrupted for clarification
16     of the record.)
17     BY MR. ERCOLE:
18     Q.  You haven't started that study yet;
19 correct?
20     A.  No.
21     Q.  You also list on page, I think it's 41 a
22 number of media appearances that you've done from
23 2015 to the present.
24     Do you see that?
25     A.  Yes.  This is an incomplete list, just

Page 157

1 because I stopped tracking.
2      Q.  So many media appearances you couldn't
3 track them?
4      A.  Yes.
5      MS. McNABB:  Objection.  Argumentative.
6      BY MR. ERCOLE:
7      Q.  There are -- were some of these
8 appearances, these media appearances, coordinated as
9 part of a media tour to promote your book
10 Dopamine Nation?
11     A.  Some of them, yes.
12     Q.  Did -- as part of that media tour, did you
13 go on podcasts to talk about your book?
14     A.  That was mostly organic, people reaching
15 out to me directly, not coordinated by my publisher.
16     Q.  Are you aware that many, if not all, of
17 your video podcast appearances were uploaded to and
18 through YouTube?
19     A.  Yes.
20     Q.  Did you do that?
21     A.  No.
22     Q.  Did you give them permission to do that?
23     A.  That's -- yes.
24     Q.  Was -- did YouTube play a role in your
25 ability to promote your book?

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1    A.   Yes.
2    Q.   Did you put any warning on the podcasts,
3 that watching them could be addictive?
4    A.   No.
5    Q.   Do you think you should ask for those
6 videos to be pulled down from YouTube?
7    A.   No.  Because, again, it's not really the
8 content.  It's the medium itself.  And we're talking
9 about kids, not adults.
10   Q.   Kids can't watch your podcast?
11   A.   I don't -- I'm not saying that.  But I'm
12 saying in general, when we think about the harms of
13 YouTube, I think we need to focus specifically on
14 the vulnerable subset, which is kids and teens.
15   Q.   Do you think social media should be banned?
16   A.   No.
17   Q.   Do you think social media should be banned
18 for children under -- strike that.
19        Do you think social media should be banned
20 for individuals under 18?
21   A.   No, not necessarily.  I mean, I think we
22 need to look at each platform individually.
23   Q.   Do you think any platforms -- strike that.
24        Do you think any of the defendants'
25 platforms should be banned for individuals under 18?

Page 159

1    A.   What do you mean by "banned"?  You mean
2 them not allowed to access it?
3    Q.   Yes.
4    A.   Yes, I -- but I wouldn't put the age
5 necessarily at 18.
6    Q.   Where would you put the age?
7    A.   I'm not sure.  I would certainly put it at
8 least at 13 and possibly at 16.
9    Q.   And for which platforms would you do that?
10   A.   For all of the defendants' platforms,
11 certainly.
12   Q.   So for all of the defendants' platforms,
13 you -- your view would be that no one under 16
14 should be able to access them; is that fair?
15   A.   I didn't say that.  I said I'm considering
16 16, but certainly 13.
17   Q.   Okay.  So you're considering 16, but you
18 haven't formed a view on whether or not someone
19 who's under 16 should be able to access the
20 defendants' platforms?
21   A.   I have formed a view that kids under the
22 age of 13, that they probably shouldn't be able to
23 access the platforms because the harms outweigh the
24 goods.
25   Q.   And you're still making that decision for

Page 160

1 minors between the ages of, I guess, 13 and 16 --
2    A.   Yeah.
3    Q.   -- is that fair?
4        MS. McNABB:  Objection.  Scope.
5        BY MR. ERCOLE:
6    Q.   Do you hold yourself out as an expert in
7 digital technology?
8    A.   It depends what you mean by "expert in
9 digital technology."
10        I do hold myself out as an expert in the
11 phenomenology of social media use, social media
12 addiction, problematic use, and other mental health
13 and physical health harms related to social media
14 use.
15   Q.   How about, do you hold yourself or consider
16 yourself to be an expert in product design?
17   A.   I do when it comes to social media because
18 I have expertise in the specific design elements
19 that go into making the medium addictive.
20   Q.   What expertise do you have into the design
21 elements of social media?
22   A.   I've been studying them for going on
23 15 years.  And as I talk about in my report, there
24 are many different design features that contribute
25 to the addictive nature of defendants' platforms.

Page 161

1    Q.   Do you have -- do you hold yourself out as
2 an expert in the design of any other product beyond
3 social media?
4    A.   I'm an expert in the design of various
5 opioids and other drugs.
6    Q.   So, you know, about any other product
7 beyond opioids or social media platforms?
8    A.   No.  I -- I guess maybe I would say digital
9 media.  I would expand it to digital media
10 platforms.
11   Q.   You're an expert on the design of them?
12   A.   Again, it depends what you mean by
13 "design."
14        I do feel I have expertise specifically in
15 what makes a platform addictive or not.
16   Q.   Do you have expertise in algorithms?
17   A.   Only to the extent that I believe that the
18 algorithms contribute to the addictive design of
19 defendants' platforms.
20   Q.   Do you -- are you an expert in how
21 algorithms are designed and created?
22   A.   No.
23   Q.   Do you have any engineering background or
24 training or specialization?
25   A.   No.

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1    Q.  Do you hold yourself out as an expert as to
2 what designs -- strike that.
3         Do you hold yourself out as an expert for
4 what platform designs may be feasible or not
5 feasible?
6    A.  I don't understand the question.
7    Q.  Sure.
8         Do you understand that when you're
9 designing a platform, some -- some features and
10 designs may be feasible and some features may not be
11 feasible?
12    A.  I understand that.
13    Q.  Do you hold yourself out as an expert in
14 that space?
15    A.  No.
16    Q.  Do you hold yourself out as an expert as to
17 the features of social media platforms?
18    A.  Yes.
19    Q.  And that's based upon you studying it?
20    A.  Yes.
21    Q.  And you hold yourself out as an expert as
22 to the effects of social media usage; is that right?
23    A.  Yes.
24    Q.  Do you hold yourself out as an expert in
25 sleep disorders?

Page 163

1    A.  Yes.
2    Q.  Eating disorders?
3    A.  Yes.
4    Q.  Body dysmorphia?
5    A.  Yes.
6    Q.  Self-harm?
7    A.  Yes.
8    Q.  ADHD?
9    A.  Yes.
10    Q.  Autism?
11    A.  Yes.
12    Q.  Bipolar disorder?
13    A.  Yes.
14    Q.  Do you know what a -- Dr. Lembke, do you
15 know what a Bradford Hill analysis is?
16    A.  Yes.
17    Q.  What is it?
18    A.  It's a way of looking at causality.  It's a
19 method for assessing causality.
20    Q.  And how do you do that?
21    A.  There are multiple criteria within
22 Bradford Hill that you evaluate to determine whether
23 the relationship between exposure to a toxin is
24 causing a given disease process.
25    Q.  Did you -- strike that.

Page 164

1         You didn't -- you did not do a
2 Bradford Hill analysis in your JCCP report; correct?
3    A.  That is correct.
4    Q.  You are not offering any opinions in this
5 case on what warnings, if any, should accompany the
6 use of social -- a social media platform; right?
7    A.  No, that's incorrect.
8    Q.  You are offering an opinion on warnings in
9 this case?
10    A.  Yes.
11    Q.  Okay.  Well, where in your report do you
12 offer any opinion on -- on what warnings, if any,
13 should accompany social media platforms?
14    A.  Well, I don't discuss that in my report,
15 but I have opinions on warnings.  I thought that was
16 your question.
17    Q.  You're not -- my question was more, in this
18 particular case, are you offering an opinion on
19 that?
20    A.  I mean, if I'm asked my opinion on that,
21 I'm happy to discuss my opinion.
22    Q.  In your report itself, you don't offer any
23 opinions on that; right?
24    A.  I don't believe so.  I think I do reference
25 the Surgeon General's report recommending warnings

Page 165

1 on social media for kids, and I agree with that
2 recommendation.  But I don't think I explicitly say
3 in my report that I agree with that recommendation.
4 But I might.  If you give me a moment, I'll take a
5 look.
6         Actually, I think it will take me too much
7 time to find it now.  I'm happy to go do that at the
8 break.
9    Q.  You're not giving an opinion on whether or
10 not defendants' social media platforms did or did
11 not meet industry standards; right?
12    A.  That's correct.
13    Q.  You're not giving any opinion on whether
14 there's some safer or alternative design to
15 defendants' platforms; right?
16    A.  That's incorrect.
17    Q.  What safer or alternative design opinion
18 are you giving in this case?
19    A.  I specifically address the design elements
20 that make defendants' platforms addictive.  And so
21 the natural conclusion from there is that a safer
22 design would eliminate or greatly reduce those
23 elements.
24    Q.  So what safer design are you advocating
25 for?

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1    A.   Well, let's start with access.  I think it
2  probably best if we go to my report on this section.
3        Again, to clarify, I don't specifically
4  have a section where I'm talking about "These are
5  the safer design elements that I recommend."
6    Q.   Well, how about this:  Are you -- is there
7  a particular design that you articulate in your
8  report that defendants should be using going
9  forward?
10   A.   I don't specifically address that in the
11 report.  I have opinions about that.  I think my
12 report strongly implies what my recommendations
13 would be.  I'm happy to answer questions about
14 those.  But it's not in my report.
15       MR. ERCOLE:  Okay.  Do you -- it's 12 --
16 12:15.  Do you want to stop and take a break, or
17 would you prefer to keep going?
18       THE WITNESS:  I'm happy to keep going.
19       (Discussion off the stenographic record.)
20       BY MR. ERCOLE:
21   Q.   Are you familiar with the Diagnostic and
22 Statistical Manual published by the American
23 Psychiatric Association?
24   A.   Yes.
25   Q.   And that currently is, I guess,

Page 167

1  colloquially referred to as "DSM-5"; is that right?
2    A.   Yes.
3    Q.   Okay.  And is DSM-5 the authoritative guide
4  to the diagnosis of mental disorders for healthcare
5  professionals around the world?
6    A.   No.
7    Q.   Are you a member of the American
8  Psychiatric Association?
9    A.   I think so.  I might have let my most
10 recent membership lapse, but I have been a member
11 for many years.
12       MR. ERCOLE:  Sorry.
13       THE STENOGRAPHER:  Is this an exhibit?
14       MR. ERCOLE:  Yeah, let's mark this as
15 Exhibit --
16       THE STENOGRAPHER:  Six.
17       MR. ERCOLE:  -- 6.
18       (Marked for identification purposes,
19       Lembke Exhibit 6.)
20       BY MR. ERCOLE:
21   Q.   So this is a document from the American
22 Psychiatric Association, Dr. Lembke.
23       Do you see that?
24   A.   Yeah, I do.
25   Q.   And it refers to "DSM-5-TR."

Page 168

1    A.   M-hm.
2    Q.   Do you see that?
3        What does "TR" mean?
4    A.   Text revision.
5    Q.   Okay.  And so the DSM-5 was published in
6  2013, I think; is that right?
7    A.   I believe so, yes.
8    Q.   And then it was updated at various times
9  since then; correct?
10   A.   I think just once since then in 2021 or
11 2022 -- March 2022.
12   Q.   And can you read -- this is the -- what the
13 American Psychiatric Association says.  Can you read
14 what the first sentence says?
15   A.   (As read):
16       "The Diagnostic and Statistical
17       Manual of Mental Disorders is the
18       authoritative guide to the diagnosis of
19       mental disorders for health care
20       professionals around the world."
21   Q.   And you disagree with that?
22   A.   It is one of, you know, several documents
23 that we use.  But I think most psychiatrists take
24 the DSM with a grain of salt, knowing that it's
25 highly flawed, that it's liable to be influenced by

Page 169

1  industry, that at one point one of the diagnoses was
2  homosexuality.  That's no longer included.
3        So, you know, it's sort of the best we
4  have, but it's by no means the end all and be all of
5  how to diagnose mental disorders.
6    Q.   It goes -- this is the American
7  Psychiatrics Association.  It also goes on to say
8  (as read):
9        "Clinicians use DSM to accurately and
10       consistently diagnose disorders affecting
11       mood, personality, identity, cognition,
12       and more."
13       Do you see that?
14   A.   Yes, I see that.
15   Q.   Is that accurate in your view?
16   A.   I mean, I think it's a common language that
17 we use.  Whether or not, you know, what the DSM is
18 getting at is the most accurate representation of
19 what's happening in terms of mental health in a
20 given time and place, I think -- again, it's a
21 highly flawed document but sort of what we are
22 using.
23       And if you were going to interview a
24 psychiatrist and they were going to be totally
25 honest with you about that, they would admit that

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1  that is true.
2    Q.  And you -- do you use the DSM-5 in your
3  practice?
4    A.  Yes, we do.  It's not the only thing we
5  use, but we -- we do use it.
6    Q.  DSM-5 and its various updates do not use
7  the term "addiction" at all; right?
8    A.  That is correct.
9    Q.  Instead, they use the term "substance use
10  disorder" or "use disorder"; right?
11    A.  Correct.
12    Q.  And you use -- at least before this
13  litigation, you used the word "addiction" as
14  synonymous with the DSM's language for substance use
15  disorder; right?
16    A.  Yes.  I still do.
17    Q.  And the DSM-5 has nothing in it that
18  officially recognizes a condition called "social
19  media addiction" or "use disorder"; right?
20    A.  That's correct.
21    MR. ERCOLE:  Sorry.  Just give me one
22  second.
23    THE WITNESS:  It's okay.  Take your time.
24    BY MR. ERCOLE:
25    Q.  You've -- in expert reports that you've

Page 171

1  submitted, Dr. Lembke, you've defined "addiction" in
2  a way that does not include any behavioral
3  addiction; right?
4    A.  Can you show me specifically what you're
5  referring to?
6    Q.  Sure.
7    Let's do this:  Let's mark this as
8  Exhibit 7.
9    (Marked for identification purposes,
10    Lembke Exhibit 7.)
11    BY MR. ERCOLE:
12    Q.  Dr. Lembke, is this a declaration that you
13  submitted in one of the opioid litigation cases?
14    A.  It looks like it, yes.
15    Q.  Okay.  And you would have signed this
16  document at the end; is that right?
17    A.  Yes, I did.
18    Q.  And it was dated April 24th, 2022; right?
19  If you look at the -- the last page.
20    A.  Ah.  Yes.
21    Q.  And this was in connection with this report
22  that you gave a definition of -- of "addiction" in
23  this litigation case; right?
24    A.  Yes, I did.
25    Q.  Okay.  And Opinion 1 states (as read):

Page 172

1    "Addiction is a chronic, relapsing
2    and remitting disease with a behavioral
3    component characterized by neuroadaptive
4    brain changes resulting from exposure to
5    addictive drugs."
6    Correct?
7    A.  Yes.
8    Q.  Okay.  There's nothing in there about
9  exposure to particular behavior or anything like
10  that; right?  You refer to addictive drugs?
11    A.  Yes.  But that's because this was pursuant
12  to opioid litigation.
13    Q.  Okay.
14    A.  It wasn't relevant to this case.
15    Q.  But you were trying to give a complete
16  definition of what addiction is; right?
17    A.  I was giving an almost identical definition
18  to what I have in the social media litigation
19  report.  But because this wasn't pertaining to
20  behaviors, which we know can be addictive, I didn't
21  include it here.
22    But I include reference to DSM as a source,
23  which includes gambling disorder and Internet gaming
24  provisionally.  I included reference to the ASAM
25  definition, which makes it very clear that you can

Page 173

1  get addicted to behaviors as well as to substances.
2    So my definition of addiction hasn't
3  changed between the two reports.
4    Q.  So your testimony, just to be clear, is
5  that your definition of addiction as stated here is
6  the same as your definition of addiction in the
7  report that you've offered in this case?
8    A.  Substantively they're almost identical,
9  yes.
10    Q.  Well, one allows for the concept of a
11  behavioral addiction, this case.  But the one that
12  you submitted in the opioid litigation doesn't
13  address that at all.
14    MS. McNABB:  Objection.  Misstates document
15  and prior testimony.
16    THE WITNESS:  Is there a question?
17    BY MR. ERCOLE:
18    Q.  Yeah.
19    I mean, isn't that correct?  Is there --
20  where -- so let's turn to paragraph 2.  (As read):
21    "Addiction is the continued use of a
22    substance despite harm to self and others
23    and a desire to quit or cut back."
24    Do you see that?
25    A.  Yes, I do.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    Q.   Okay.  And there's -- here you're referring
2 to continued use of a substance; right?
3    A.   Because this was pursuant to opioid
4 litigation.  So the behavioral addictions were not
5 relevant to this case.
6    Q.   And in the report that you're giving here
7 in this particular case, you've -- your definition
8 is (as read):
9         "Addiction is a chronic, relapsing
10        and remitting brain disease, as evidenced
11        by continued, compulsive use of a
12        substance or engagement in a behavior,
13        despite harmful consequences."
14        Right?
15   A.   Yes.
16   Q.   There's no reference "or engagement in a
17 behavior" whatsoever in the definition of
18 "addiction" you gave throughout the opioid
19 litigation; right?
20        MS. McNABB:  Objection.  Misstates prior --
21        (Simultaneous speakers - unclear.)
22        THE WITNESS:  Again, because it wasn't
23 relevant.
24        If you had -- if you had asked me at the
25 time that I wrote the opioid litigation, do I

Page 175

1 believe people can get addicted to behaviors?  I
2 certainly would have said, yes.
3        So by admitting it here, I was not changing
4 my definition.  It was just a different emphasis
5 because this is a different case.
6        BY MR. ERCOLE:
7    Q.   And you go on in that paragraph to
8 reference the DSM-5; right?
9    A.   Yes, I do.  Yes.
10   Q.   And, again, DSM-5 contains no reference to
11 social media addiction or social media use disorder;
12 right?
13        MS. McNABB:  Objection.  Asked and
14 answered.
15        BY MR. ERCOLE:
16   Q.   Correct?
17   A.   Correct.
18   Q.   Okay.  In your report you attribute that to
19 the fact that the DSM-5 was issued in 2013; right?
20   A.   I don't think that's a fair
21 characterization of why it's not included.
22   Q.   DSM-5-TR was published in March of 2022;
23 right?
24   A.   Yes.
25   Q.   Okay.  Do you know, did that involve the

Page 176

1 work of over 200 subject-matter experts?
2    A.   I don't know.
3    Q.   If the American Psychiatric Association was
4 recognizing that over 200 subject-matter experts
5 were involved in the development of DSM-5-TR per the
6 exhibit we just looked at, any reason to dispute
7 that?
8    A.   I'm sorry.  Where is that 200
9 subject-matter experts?  I'm not seeing that.
10   Q.   It says, "The development of DSM-5-TR."
11 It's the second sentence underneath that category.
12   A.   Oh, yes.  I see that now.
13   Q.   Any reason to dispute that?
14   A.   No.
15   Q.   And even after 200 subject-matter experts
16 were evaluating these issues in connection with that
17 publication, there was no recognition of social
18 media addiction or social media use disorder; right?
19   A.   So just to be clear, I highly doubt that
20 the 200 subject-matter experts were debating the
21 inclusion or exclusion of social media use disorder.
22 Typically when the DSM is being revised, they will
23 break off into work groups that have subject-matter
24 expertise.
25        So it wouldn't be that 200 people were

Page 177

1 thinking about social media.  It would be that --
2 the subset of individuals who might have been
3 thinking about social media.
4        But I would also say that the text revision
5 is just that, primarily an opportunity to revise the
6 2013 edition, although there can be space to
7 introduce new diagnoses.  Typically it's a time to
8 revise the existing text.
9    Q.   Well, there was another update in September
10 of 2022; right?
11   A.   There may have been.  And I'm aware of one
12 text revision in 2022 globally.
13        But the point -- my point still stands that
14 the text revision is primarily for clarifying and
15 updating the existing text.
16   Q.   There was another update of the DSM-5-TR in
17 September of 2023, too; right?
18        Do you know one way or the other?
19   A.   I don't know.
20   Q.   Do you know whether there was another
21 update in September of 2024?
22   A.   I don't know.
23   Q.   Do you know whether in connection with all
24 of those updates there were new diagnoses that were
25 added?

45 (Pages 174 - 177)

CONFIDENTIAL

1      MS. McNABB:  Objection.  Foundation.
2      THE WITNESS:  I believe that there were
3  some new diagnoses added, yes.
4      BY MR. ERCOLE:
5      Q.  And one was considered prolonged -- one was
6  prolonged grief disorder was added; right?
7      A.  Yes, I am aware of that.
8      Q.  Social media addiction, social media use
9  disorder was never added as a recognized disorder by
10  the DSM-5 and the experts investigating that issue;
11  right?
12      A.  That is true.  But there's been a surge in
13  research and evidence since that date.
14      Q.  Since September of 2024?
15      A.  Well, certainly since 2022.
16      Q.  Have you submitted a proposal to make
17  changes to the DSM-5?
18      A.  No.
19      Q.  Could you do that?
20      A.  There's certainly a process to petition.
21      Q.  Does the international classification of
22  diseases by the World Health Organization recognize
23  a condition called "social media addiction"?
24      A.  Not yet.
25      Q.  Or it also doesn't recognize any condition

1  called "social media use disorder"; right?
2      A.  Not yet.
3      Q.  Are you aware of any colleagues who have
4  submitted a proposal to the American Psychiatric
5  Association to change the DSM-5 to include social
6  media use disorder or social media addiction?
7      A.  No.
8      MR. ERCOLE:  Why don't we pause.  Why don't
9  we take a break now.
10      THE VIDEOGRAPHER:  The time is 12:28.
11  We're off the record.
12      (Recess taken from 12:28 to 1:04.)
13      THE VIDEOGRAPHER:  The time is 1:04.  We're
14  back on the record.
15      BY MR. ERCOLE:
16      Q.  Good afternoon, Dr. Lembke.
17      Dr. Lembke, what percentage in your view --
18  strike that.
19      In your view, what percentage of daily
20  social media users are addicted to social media?
21      A.  I don't know.  I mean, if we go by
22  defendants' data, you know, it's somewhere between 3
23  and 50 percent.
24      Q.  That's based upon the defendants' data; is
25  that correct?

1      A.  Yeah.
2      Q.  Based -- sorry.  Based upon your
3  interpretation of the defendants' data; is that
4  correct?
5      A.  Yes.
6      Q.  Okay.  Any other source that you have for
7  what percentage of daily social media users are
8  addicted to social media, in your view?
9      A.  Yes.  If we look at the WHO study that was
10  done, the WHO study found that --
11      Q.  I hate to interrupt you --
12      A.  Oh, sorry.
13      Q.  -- but what page are you on?
14      A.  This is page 10 of my report.
15      So the WHO study using the Social Media
16  Disorder Scale found that problematic social media
17  use, a/k/a addictive social media or social media
18  addiction, increased from 7 percent in 2018 to
19  11 percent in 2022.  Those are just two potential
20  sources.
21      Q.  So I think the numbers you've given are
22  3 percent, 7 percent, 11 percent, or 50 percent;
23  right?
24      A.  It's a wide range, clearly.
25      Q.  Any other sources for the percent -- in

1  your view, the percentage of daily users of social
2  media who are allegedly -- (inaudible)
3      (Stenographer interrupted for clarification
4      of the record.)
5      BY MR. ERCOLE:
6      Q.  Any other sources in your view of -- that
7  would reflect the percentage of daily users of
8  social media who are allegedly addicted to social
9  media?
10      A.  So TikTok internal documents found that
11  approximately 7 percent of active minors at
12  nighttime were excessive users.  Excessive users
13  isn't exactly the same thing as addicted users, but
14  it's certainly a strong indicator of risk for
15  addictive use.
16      And 4.8 percent of active minors at daytime
17  are excessive users, which, as I say in my report,
18  translates to 900,000 teens using TikTok excessively
19  at nighttime and 500,000 during the day.
20      Q.  So apart from the company documents you're
21  looking at and the WHO study you referenced, any
22  other sources that inform your understanding of this
23  percentage question?
24      A.  I mean, there are other documents I
25  reviewed that address this.  I'm not specifically

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  recalling them now.  But in general, my reading of
2  the literature is that the amount is a fairly wide
3  range depending upon the source, but it's certainly
4  not an insignificant percentage.
5      Q.  The WHO study that you referenced did not
6  look at any usage in the United States; right?
7      A.  WHO study ...
8          I'm not remembering whether or not that
9  included the United States.  They relied on the
10 Social Media Disorder Scale.
11     Q.  Well, just the title of the article itself
12 says, right (as read):
13          "Focus on adolescent social media use
14          and gaming in Europe, Central Asia, and
15          Canada"?
16     A.  Okay.
17          I don't recall if they included the
18 United States.
19     Q.  You referenced a lot of different terms in
20 your answer.  I think "excessive use."  You used --
21 you also referenced "problematic use."  And then you
22 referenced "addiction."
23          Do you recall just doing that now --
24     A.  Yes.
25     Q.  -- in your answer?

Page 183

1      A.  Yes.
2      Q.  So what's the difference between excessive
3  use and problematic use?
4      A.  Well, first of all, all of these different
5  terms refer to a range of harms that can happen.  I
6  think it's important to recognize that even if an
7  individual is not meeting threshold criteria for
8  addiction, they still may be engaging in a way that
9  causes harms.
10         Excessive use is based on time alone,
11 whereas problematic use is based on out-of-control
12 use that leads to consequences.
13         So Meta actually in their internal
14 documents provides a -- the nice definition of
15 "problematic use"; that is to say, it must include
16 perceived lack of control over social media use,
17 both control over time spent and control over
18 experiences, that are then perceived to contribute
19 to negative life impacts.
20         That's a pretty good definition of
21 addiction, social media addiction.  It's not
22 identical to the definition that I'm using, but
23 it's -- it's a pretty strong definition.
24     Q.  So I want to just be, like, very specific
25 and we can boil down -- like -- like, drill down

Page 184

1  into these terms.
2          So I think you -- you referenced -- and
3  tell me if I get this wrong.  I want to make sure
4  I'm not misquoting you -- but, like, excessive use,
5  problematic use, and addiction, three separate
6  concepts; correct?
7      A.  No, they're not separate.  They're related.
8  And different sources will use these terms in
9  different ways, so it really depends on what source
10 we're looking at.
11         So when you're talking about problematic
12 use, specifically Meta defines problematic use.  And
13 I reference that on page 25 of my report.  And their
14 definition of problematic use has significant
15 overlap with the diagnostic criteria for social
16 media addiction or social media use disorder.  It's
17 not identical, but it's quite similar.
18     Q.  So the -- so problematic use, though, you
19 said is not identical but similar to how you define
20 social media addiction; right?
21     A.  The way that I use "problematic use" is
22 more similar than not to how I define social media
23 addiction.  But other sources may use it differently
24 in different contexts.
25     Q.  Okay.  And what's the difference between

Page 185

1  how Meta defines "problematic use" in at least some
2  of the documents you looked at and how you define
3  "addiction"?
4      A.  What is the difference?
5      Q.  Yeah.
6      A.  The main difference, I would say, is that
7  if you look at the four C's out of control use,
8  compulsive use, craving, continued use despite
9  consequences, plus tolerance and withdrawal; Meta's
10 definition of "problematic use" encompasses loss of
11 control over time spent, loss of agency, which is
12 typical in addictive disorders, as well as the
13 consequences that result from that.
14         But the broader definition of addiction,
15 which maps onto the DSM, also involves craving.  It
16 also involves compulsions It involves tolerance.  It
17 involves withdrawal.
18         So I would say that there are more symptoms
19 included in the diagnostic criteria for social
20 media addiction than are included in problematic use.  But
21 I think their definition of problematic use gets at
22 the heart of addiction and the heart of really any
23 diagnosis for any mental health disorder, which is
24 that it has to cause harm to the individual's life.
25     Q.  And we'll talk about that in a -- in a

47 (Pages 182 - 185)

Page 186

1 little bit. But to go back to, then, the excessive
2 use point --
3    A. Yeah.
4    Q. -- what is the amount of use on a platform
5 that takes it from non-excessive to excessive?
6    A. It depends on the source. People define it
7 in different ways. Sometimes in the literature
8 people define it as four hours a day, five hours a
9 day. Some of the sources, especially the internal
10 documents, talk openly about binge use. That's
11 where there's heavy consumption in one discrete time
12 period.
13       When we talk about "binge" in the field of
14 addiction, we're usually talking about within one
15 24-hour period.
16       In this particular TikTok document, they
17 have their own definition for excessive use.
18    Q. What's your -- putting aside what TikTok
19 has to say, do you have a definition of "excessive
20 use" for social media?
21    A. I don't have a specific quantity of time
22 because it's not a diagnosis that's based on time.
23 Time is an important indicator. The more time, the
24 more likely they are to meet criteria for addiction.
25 But time alone is not how the diagnosis is made.

Page 187

1    Q. But as a -- someone who treats people who
2 have addiction, do you have a -- do you have a
3 baseline amount of time that you -- you find to be
4 excessive versus non-excessive on social media?
5    A. No.
6    Q. For your criteria of social media
7 addiction, where can I go, what source can I go to,
8 that uses your specific criteria and says "Social
9 media addiction are these diagnostic criteria"?
10    A. You can go to the medical literature. You
11 can go to -- you can get more broad descriptions at
12 the American Psychiatric Association. You can go to
13 ASAM's definition. You can -- those are three good
14 sources right there.
15    Q. So you said --
16    A. Even the DSM is a reasonable source because
17 the DSM criteria for gambling disorder or substance
18 use disorder or Internet gaming are basically more
19 similar than not and also are similar to the
20 diagnostic criteria for social media addiction.
21    Q. Right. But we've talked about the DSM a
22 bit already.
23       If I'm looking for -- like, here you've
24 spelled out the criteria that you believe meets the
25 definition of social media addiction in your report;

Page 188

1 correct?
2    A. Yes.
3    Q. If I want to go somewhere and plug in
4 "social media addiction" to get that criteria that
5 you identify in your report, where specifically do I
6 go to understand the criteria for social media
7 addiction?
8       MS. McNABB: Objection. Asked and
9 answered.
10       THE WITNESS: I do think I -- I answered
11 it. If you want me to be a little bit more specific
12 about the medical literature, you can go to the
13 various validated social media disorder scales.
14    BY MR. ERCOLE:
15    Q. So the scales lay out the specific criteria
16 for when someone meets the definition of social
17 media addiction and when they don't?
18    A. Yes. Those -- and those criteria are very
19 similar to the criteria in the DSM, the criteria for
20 digital gaming disorder at the ICD, a coding for
21 what ASAM describes about the nature of behavioral
22 addictions.
23    Q. Right.
24       I'm not asking about behavioral addictions
25 in general. I'm asking specifically about social

Page 189

1 media addiction and the defining criteria for that
2 specific diagnosis.
3       That -- I can't go to the DSM and look at a
4 specific diagnosis for social media addiction;
5 right?
6    A. What I'm trying to tell you is that the
7 diagnostic criteria for a substance use disorder or
8 gambling disorder or social media addiction or
9 social media use disorder are all more similar than
10 not. We're looking at the same basic phenomenology.
11 It's just that the drug of choice is different.
12    Q. And I know that's -- that's your testimony.
13 But if I'm a practicing physician in Kansas and I
14 look at the -- go to the DSM to understand what --
15 whether there's something called "social media
16 addiction disorder" or "social media use disorder"
17 and what the criteria are, DSM is not going to give
18 me an answer to that; right?
19    A. Well --
20       MS. McNABB: Objection. Asked and
21 answered.
22       THE WITNESS: Yeah.
23       I mean, you could go to the DSM and replace
24 "substance use" with "social media," and you would
25 capture the phenomenon.

48 (Pages 186 - 189)

Page 190

1    BY MR. ERCOLE:
2    Q.  So putting aside, like, the replacing --
3 replacing various disorders with existing disorders,
4 where, as a practicing physician in Kansas, would I
5 go to understand what specifically social media use
6 disorder criteria are for -- to understand, like,
7 whether someone has that?
8    A.  I think as a practicing physician in
9 Kansas, you could Google the Social Media Disorder
10 Scale, and you would have a good scale to measure
11 that with.
12    Q.  And the Social Media Disorder Scale, do you
13 know when that was invented?
14    A.  Take a look at my report.
15    I don't know when it was invented.  I cite
16 to Eijnden, et al., where they have a published
17 study showing that the scale is a valid measure for
18 social media addiction.  But I don't know if that is
19 the origin of Social Media Disorder Scale or if it
20 came from someone else earlier.
21    Q.  And I think you testified before, you don't
22 use that particular scale in your practice; correct?
23    A.  I use interview questions that are very
24 similar to that scale, but I don't pull out a piece
25 of paper and sort of go through the checklist.

Page 191

1    Some clinicians do work that way.  I -- I
2 don't.  But I ask very similar, if not identical,
3 questions as the questions on the Social Media
4 Disorder Scale.
5    Q.  What questions do you ask your patients
6 with respect to social media usage?
7    A.  Again, the four Cs, tolerance, withdrawal.
8    The Social Media Disorder Scale also adds
9 a -- a question about deception, and I do almost
10 always ask my patients about that too.
11    Deception is not in the DSM, but it's
12 well-known to be part and parcel of the disease of
13 addiction, that is to say, lying about use.  So I --
14 (inaudible)
15    (Stenographer interrupted for clarification
16     of the record.)
17    THE WITNESS:  Sorry.  That is to say, lying
18 about use.
19    THE STENOGRAPHER:  Thank you.
20    BY MR. ERCOLE:
21    Q.  And I guess my question is a little bit --
22 so walk me through the process.  Someone comes in --
23 well, let me ask this:  You mentioned there are --
24 there are two clinics that you work at.  There's an
25 adult clinic and a -- and a child clinic that you

Page 192

1 oversee; right?
2    A.  Yes.
3    Q.  Okay.  In the adult clinic, how many
4 doctors work there?
5    A.  We have a lot of doctors who work in that
6 clinic, if you include trainees, on the order of 12
7 or 13.
8    Q.  How about actual, like, non-trainee medical
9 professionals?
10    A.  Well, our fellows are highly trained
11 medical professionals.  They all have their MDs.
12 They've completed full residencies.  It's a
13 fellowship, so it's a very advanced subspecialty
14 training.
15    But in terms of supervising attendings, we
16 have six MDs.  We have a PA.  We have social
17 workers.  We have PhD and PsyD psychologists.
18    (Stenographer admonishment.)
19    THE WITNESS:  Louder?
20    Okay.
21    Q.  And then how about in the -- the child
22 clinic?  How many doctors do you have working?
23    A.  The child clinic has one MD, one social
24 worker, and then two trainees.
25    Q.  And in the -- in the child clinic -- which

Page 193

1 is the one that's treating adolescents; right?
2    A.  Yeah.
3    Q.  -- what questions are asked there about
4 social media usage?
5    A.  The same -- the same questions I've already
6 described in terms of questions about agency or
7 control, loss of control, questions about -- excuse
8 me -- consequences related to use.  Indeed,
9 questions about quantity and frequency, although we
10 don't use that to make the diagnosis.  Questions
11 about tolerance, needing more potent forms over time
12 to get the same effect.  Questions about withdrawal.
13 What happens when people try to stop using?  Are
14 they able to stop using even when they want to?
15 Questions about deception.  Are they hiding their
16 use?
17    Q.  Is there a list of questions that exist
18 somewhere?
19    Because you're giving me some broad
20 answers, but --
21    A.  Yeah.
22    Q.  -- if I'm interested in understanding the
23 specific questions that get asked, where do I go to
24 find that?
25    A.  Yeah.  So a trained psychiatrist doesn't

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1 need a list. We know the criteria. We do this all
2 day, every day.
3    Q.  And who was the name of the -- you said
4 there's one MD at the --
5    A.  M-hm.
6    Q.  -- child clinic. Who is -- what's that
7 person's name?
8    A.  Brad Zicherman.
9       And, by the way, he may well use one of the
10 scales. I don't know.
11    Q.  You would agree, right, that where the line
12 is drawn between a healthy use of a platform and
13 unhealthy use of a platform is culturally informed;
14 correct?
15       MS. McNABB: Objection. Speculation.
16       THE WITNESS: I mean, I think every mental
17 health diagnosis is culturally informed.
18       As I mentioned earlier, homosexuality used
19 to be in the DSM as a mental disorder. It's no
20 longer in there.
21       So any complex biopsychosocial disease,
22 which all mental illnesses are, will have some form
23 of cultural influence.
24       BY MR. ERCOLE:
25    Q.  And whether something is -- whether a

Page 195

1 particular -- whether use of a -- of a substance or
2 whether -- a particular behavior in one culture may
3 be healthy, but in another culture it may not be; is
4 that fair?
5    A.  Typically -- typically cultures at the same
6 given time in human history will recognize the same
7 unhealthy behaviors, so I don't think that, you
8 know, at a given time in history, culture to
9 culture, you're going to see that much difference in
10 what people recognize as mental illness. I think
11 it's more an attribute of the ecosystem, you know,
12 what's available to people in terms of reinforcing
13 goods and behaviors.
14       So I -- I would argue against sort of like
15 a pure cultural relativism. Culture plays a role,
16 but it's not completely random, like, "Oh, your
17 culture is going to see this as healthy and my
18 culture isn't."
19       It's not like that. I think humans know
20 harm when they see it and will generally agree on
21 that.
22    Q.  And that's regardless of -- of culture in
23 your view?
24    A.  I think my answer was more nuanced than
25 that.

Page 196

1    Q.  You've given an example of workaholism --
2    A.  M-hm.
3    Q.  -- I think --
4    A.  Yeah.
5    Q.  -- as something that is culturally
6 informed.
7       Do you agree with that?
8    A.  I think my point there is that we now as a
9 culture celebrate people who work all the time to
10 the exclusion of other activities that they could be
11 doing. And I don't think that that's a healthy
12 trend.
13    Q.  Have you ever diagnosed a patient under the
14 age of 18 with social media addiction?
15    A.  Yes.
16    Q.  When did you do that?
17    A.  I have adult patients who have social media
18 addiction who have developed their addiction when
19 they were teenagers. So the onset of their disorder
20 was in their teens.
21    Q.  Okay. I know -- right. But my question is
22 a little different.
23       How about someone under the age of 18 that
24 you've diagnosed at that time with social media
25 addiction while they were under the age of 18?

Page 197

1    A.  I don't believe so. Because -- again,
2 because I don't typically see people under the age
3 of 18, not because I haven't diagnosed that.
4    Q.  Have you ever treated a patient solely for
5 social media addiction and not any other diagnosis?
6    A.  Yes.
7    Q.  How often do you do that?
8    A.  I would say that's fairly infrequent.
9 Typically, the patients that I see who have social
10 media addiction are also struggling with other
11 mental health issues.
12    Q.  Do you evaluate when you're treating those
13 patients whether or not the other psychiatric
14 conditions preceded the social media use or whether
15 the social media use preceded the other psychiatric
16 conditions?
17    A.  Yes.
18    Q.  If someone uses social media infrequently,
19 would you agree that he or she is unlikely to suffer
20 an addiction to social media?
21       MS. McNABB: Objection to speculation.
22       THE WITNESS: I think the risk is quite a
23 bit lower if the use is infrequent.
24       BY MR. ERCOLE:
25    Q.  And what -- what is the line, then, between

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 198

1 frequent and infrequent or infrequent and not
2 infrequent such that the risk increases?
3    A.   Yeah.  I mean, I don't have a specific
4 number in mind.  In general, we are more concerned
5 with daily use when it comes to any addictive
6 substance or behavior.  But for a very vulnerable
7 individual, even less frequent use could put them at
8 risk.
9    Q.   So what would be -- would someone who uses,
10 for instance, social media once a week be at risk
11 for social media addiction disorder or use disorder
12 in your view?
13       MS. McNABB: Objection.  Speculation.
14       THE WITNESS:  It really depends on the
15 person and depends on what stage they are in their
16 illness.
17       BY MR. ERCOLE:
18    Q.   And when you say "illness," what are you
19 referring to?
20    A.   Their disease of social media addiction.
21       So if you had somebody who had gotten
22 addicted to social media and was trying to get in
23 recovery or had been in recovery for some period of
24 time, even very infrequent exposure could put them
25 at risk for relapse.

Page 199

1    Q.   Well, how about a patient who uses social
2 media every other day, so not every day but every
3 other day?  Would that -- in your view, would that
4 person be addicted to social media?
5       MS. McNABB: Objection.  Speculation.
6       THE WITNESS:  We don't base our diagnosis
7 on quantity or frequency of use.  And you'll note
8 that the DSM doesn't use quantity and frequency
9 either for diagnosing substance use disorders.  It's
10 based on the four Cs, tolerance, withdrawal.
11       BY MR. ERCOLE:
12    Q.   Have you ever referred a patient to some
13 type of -- some type of clinic to address or treat
14 social media addiction?
15    A.   Yes.
16    Q.   How many times have you done that?
17    A.   Scores of times, when I felt they needed a
18 higher level of care than what we could provide in
19 our clinic.
20    Q.   Where have you referred them?
21    A.   The Meadows, reSTART Life.  Those are two
22 places I've referred before.
23    Q.   Have you referred -- are those outpatient?
24    A.   Those are residential facilities.  Yeah.
25    Q.   Have you ever referred patients to

Page 200

1 outpatient treatment programs for a social media use
2 disorder or addiction?
3    A.   Well, we're an outpatient treatment
4 program.
5       I've referred patients to 12-step groups.
6 That's not treatment, per se, but it is a support.
7    Q.   So let's look at page 5 of your report.
8       And this is where you have the definition
9 of addiction; correct?
10       So part of the definition is (as read):
11       "Addiction is the continued,
12       compulsive use of a substance or
13       engagement in a behavior despite harm to
14       self and/or others."
15       Do you see that?
16    A.   Yes, I do.
17    Q.   And there's a harm component to your
18 definition; correct?
19    A.   Well, this is a broad definition.  I go on
20 to describe in more detail the specific diagnostic
21 criteria.
22       But, yes, the harm piece is critical.
23    Q.   And can harm be minor?
24    A.   Yeah.
25    Q.   And can harm include sort of being

Page 201

1 irritable?
2    A.   Mood changes as a result of social media
3 addiction are common, and irritability is a mood
4 state.  So, yes.
5       (Stenographer interrupted for clarification
6        of the record.)
7       BY MR. ERCOLE:
8    Q.   How about be -- feeling cranky?  Is that --
9 could that be a harm?
10    A.   Cranky and irritable are synonyms to me.
11    Q.   How about feeling anxious?  Could that be
12 harm?
13    A.   Yes.
14    Q.   Being in a less positive mood, could that
15 be a harm?
16    A.   Yes.
17    Q.   Arguing with your parents, could that be a
18 harm?
19    A.   Potentially, yes.
20    Q.   Spending time away from your friends, could
21 that be a harm?
22    A.   Potentially, yes.
23    Q.   Who makes the decision as to whether or not
24 the behavior is causing some type of harm?
25    A.   That determination can be made by different

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1 people in different contexts.
2    Q.   So can I give you a hypothetical, and you
3 let me know what you think of it?
4        Say I run 3 miles a day every other day for
5 several months. I run on Monday. But due to work,
6 I can't run on Wednesday. I would really like to
7 run, but I just can't do it. I then get irritable
8 at the start of -- of work because I didn't get to
9 run on that Wednesday.
10       Am I addicted to running?
11    MS. McNABB: Objection. Speculation.
12    THE WITNESS: I would not make the
13 diagnosis of addiction based on what you've told me.
14    BY MR. ERCOLE:
15    Q.   Okay. Why not?
16    A.   Lots and lots of reasons. There's no
17 evidence of compulsive, out-of-control use. You
18 haven't told me anything about harmful consequences
19 as a result of your running.
20    Q.   Irritability can be a harmful consequence;
21 right?
22    A.   It can be. But it's -- it's not in and of
23 itself sufficient; right?
24       It's the constellation of these symptoms.
25       I also need a sense of how pervasive and

Page 203

1 how severe the irritability would be.
2    Q.   Okay. And so in your report itself, you
3 discuss a shorthand description of addiction; right?
4 That's the four Cs?
5    A.   Yes.
6    Q.   If you turn to page --
7    A.   M-hm.
8    Q.   -- I guess, 6, little letter E; is that
9 right?
10    A.   Yeah.
11    Q.   Okay. And you also add -- and the four Cs
12 are control, compulsion, craving, consequences; is
13 that right?
14    A.   Yes.
15    Q.   Okay. And then you also include tolerance
16 and withdrawal as part of that; right?
17    A.   Yes.
18    Q.   And if I wanted to go to a treatise and
19 find something identical to what you have here that
20 says compulsion, craving, consequences, tolerance,
21 withdrawal as a definition of addiction, where do I
22 go to find that?
23    MS. McNABB: Objection. Asked and
24 answered.
25    THE WITNESS: There are multiple sources.

Page 204

1 You could go to the DSM. You could go to the
2 International Classification of Diseases. You could
3 go to the ASAM definition.
4    BY MR. ERCOLE:
5    Q.   And that's going to have the -- the
6 specific language that you have here?
7    A.   I say here this is a shorthand way to
8 remember the criteria. The DSM has 11 criteria.
9 It's a lot to remember. This is a shorthand way to
10 recall those criteria.
11    Q.   Okay. And you don't believe that all of
12 these criteria need to be present; right?
13    A.   It's not a matter of what I believe. It's
14 understood that these are many different aspects of
15 the disease of addiction, and not all-comers will
16 exhibit all of these symptoms.
17    Q.   In your view, you only need two of the
18 criteria; right?
19    A.   Again, it's not my view. It's the
20 generally accepted criteria.
21       And specifically the No. 2 criteria is from
22 the DSM. You need 2 to 3 criteria of that list of
23 11 to be diagnosed with a mild use disorder, 4 to 5
24 to be diagnosed with a moderate use disorder, and 6
25 or more to be diagnosed with a severe use disorder.

Page 205

1    Q.   Okay. So I'm just focused on your report
2 right here; right?
3       So you say in paragraph F (as read):
4       "At least two criteria must be met to
5       support a diagnosis of a use disorder."
6       Right?
7    A.   I am referencing the DSM, 11 criteria. So
8 of those 11 criteria, 2 must be met to make a
9 diagnosis of a use disorder in the DSM.
10    Q.   Well, you -- there's no mention here in
11 your report of any of the 11 criteria; right?
12       You -- you've identified in Section E the
13 six criteria, right, that you've -- you've created
14 for a definition of addiction?
15    MS. McNABB: Objection.
16    THE WITNESS: That is --
17    MS. McNABB: Form and misstates.
18    THE WITNESS: That is incorrect.
19       If you look at page 6 of my report --
20    BY MR. ERCOLE:
21    Q.   M-hm.
22    A.   -- subsection small D, I will just read it
23 for clarification for the record.
24       I state (as read):
25       "The DSM denotes 11 different

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1  criteria to capture the patterns of
2  behavior that are used to diagnose
3  addiction.  The DSM itself does not use
4  the term 'addiction.'  Instead, it uses
5  the term 'use disorder,' as in alcohol
6  use disorder, opioid use disorder,
7  nicotine use disorder, et cetera.  Such
8  terminology aligns with current views of
9  the condition as a brain disease, while
10  minimizing labels that stigmatize
11  patients and create barriers to seeking
12  treatment.  Other sources may identify a
13  different number of criteria or may be
14  worded differently, but such standards
15  generally include the central aspects of
16  addiction/use disorder."
17  Then I go on to say (as read):
18      "A shorthand way to remember these
19  criteria," which is an obvious reference
20  back to the DSM 11 criteria, "is the four
21  Cs."
22  Which I then describe and then qualify by
23  saying (as read):
24      "Addiction is a spectrum
25  disorder ..."

Page 207

1      And that you need at least 2 of those
2  11 criteria in order to meet threshold criteria in
3  the DSM.
4      BY MR. ERCOLE:
5      Q.  Okay.  But the -- the -- the five -- sorry,
6  the six factors that you've identified, the four Cs,
7  coupled with tolerance and withdrawal, those are the
8  sort of short -- your shorthand for those
9  11 criteria; right?
10      A.  Yes.
11      Q.  Okay.  And do those -- in order to have
12  addiction based upon the shorthand that you use, do
13  you -- you need at least two of those criteria;
14  right?
15      A.  You need at least 2 of the 11.
16      Q.  How many of the -- of the six that you've
17  identified shorthand do you need?
18      A.  Because the four Cs refer to nine of the
19  criteria, it's not possible to say that from my
20  shorthand list you need X number.  But you need at
21  least two.
22      Q.  Okay.  I'm just -- you need two of the four
23  Cs; is that correct?
24      A.  No.  You need 2 of the 11.  And you've got
25  tolerance and withdrawal, which are -- so the DSM

Page 208

1  has tolerance, it has withdrawal, and then it has 9
2  other criteria that are encompassed by the four Cs.
3      Q.  Okay.  How about with respect to your
4  shorthand because that's -- that's what's written
5  here?  How many of these -- of the six criteria
6  would you need?
7      A.  You need at least two.
8      MS. McNABB:  Objection.  Asked and
9  answered.
10      BY MR. ERCOLE:
11      Q.  You need at least two of your six criteria;
12  right?
13      A.  Of this shorthand version, yes --
14      Q.  Yeah.
15      A.  -- that maps onto it.
16      Q.  Okay.  That's all I was asking.  I
17  appreciate that.
18      A.  I did -- I did answer that before.
19      Q.  Oh, okay.  Sorry.  I missed that.
20      A.  That's okay.
21      Q.  All right.  So you need two of the six.
22      So let's go for the -- to the first one.
23  You have "control," is first one, which is
24  (as read):
25      "Out-of-control use, for example,

Page 209

1      using more than intended."
2      Right?
3      A.  Yes.
4      Q.  So that would be if someone uses, for
5  instance, social media more than they wanted to; is
6  that right?
7      A.  I mean, that's one way to describe it,
8  yeah.
9      Q.  Okay.  And then you have "compulsion" --
10  well, strike that.
11      How would you define "control," then?
12      A.  As I say here, it's when using more than
13  intended or planned or an inability to cut back use
14  when necessary.
15      Q.  And then "compulsion" is (as read):
16      "Mental preoccupation with using
17      against a conscious desire to abstain."
18      What does that mean?
19      A.  That means a lot of mental real estate
20  taken up with thinking about using the drug and a
21  certain level of automaticity around using the drug,
22  using it even when an individual didn't intend to
23  use it.
24      So it's a kind of -- a lot of time spent
25  thinking about and wanting to use the drug.

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1    Q.   And then (as read):
2         "Craving:  Physiologic and/or mental
3     states of wanting."
4         And that -- when you say "mental states of
5    wanting," what do you mean by that?
6    A.   Thinking about using, making plans to use,
7 sometimes coming up with rationalizations for why
8 it's okay to use even though I told myself I
9 wouldn't use.  Sometimes craving can manifest as a
10 physical sign or symptom, so cramping or sweating or
11 something along those lines.
12    Q.   Have you -- the physical signs that you
13 just articulated, have you ever seen physical signs
14 in the context of someone using social media?
15    A.   Yes.
16    Q.   Is there a difference between compulsion
17 and craving?
18    A.   There's a slight difference.  Again,
19 compulsion has to do with a lot of mental
20 preoccupation with using the drug.
21       And craving is often intrusive thoughts or
22 images of needing to use and feeling like the world
23 is going to come to an end if I don't use right now.
24    Q.   And then you have a definition of
25 "consequences"; right?

Page 211

1    A.   Yeah.
2    Q.   And that includes (as read):
3         "Opportunity costs, other things not
4      being done as a result of addictive
5      behaviors."
6      Do you see that?
7    A.   M-hm.
8    Q.   If you're engaging in behavior, aren't you
9 always not doing some other type of behavior?
10    A.   I guess that's true.
11    Q.   Okay.  And so let me go back to the -- oh.
12       And then -- sorry.  And then you have (as
13 read):
14         "Tolerance:  Needing more time to get
15      the same effect or finding -- or finding
16      that a given dose" --
17    A.   This is a typo here --
18    Q.   Yeah.
19    A.   -- unfortunately.
20    Q.   -- does not -- basically does not have the
21 same effect?
22    A.   That's right.
23    Q.   Okay.  And what -- what does that mean?
24    A.   It means that finding over time you're not
25 getting the same bang for your buck, that you need a

Page 212

1 more potent form to get that rewarding or
2 reinforcing feeling, or even finding -- yeah, that
3 at a given dose, it's just not working as well as it
4 used to either give pleasure or take away pain.
5    Q.   And then there's "withdrawal," right, is
6 the last one?
7    A.   Yes.
8    Q.   And (as read):
9         "Experiencing physical and mental
10      distress in the absence of use."
11       And is -- that's how you define
12 "withdrawal"?
13    A.   Either in the absence of use or when trying
14 to cut back.
15    Q.   Okay.  And so let me go back to my running
16 example that --
17    A.   Okay.
18    Q.   -- that I gave.
19       If you -- in that example, wasn't -- I
20 would have been in the mental state of wanting to
21 run and really, in my view, needing to run, but
22 because I wasn't able to, I became irritable; right?
23 And I, you know, became annoyed at work.
24    A.   M-hm.
25    Q.   Doesn't that meet both the "craving" and

Page 213

1 "consequences" definition?
2       MS. McNABB:  Objection.  Speculation.
3       THE WITNESS:  No.  No, it doesn't alone
4 meet either of those because of the pervasiveness
5 and severity.
6       So you just being a little bit cranky
7 because you couldn't run would not meet threshold
8 criteria for -- for addiction.  It would have to be
9 much more significant than that.
10       BY MR. ERCOLE:
11    Q.   How much more significant?
12    A.   There would have to be consequences that
13 either you or others appreciated as adversely
14 impacting your life.
15    Q.   Okay.  Like, can you give me -- give me --
16 give me an example?
17       MS. McNABB:  Objection.  Speculation.
18       THE WITNESS:  I mean, I can't really.
19 It's -- it's quite an artificial scenario that
20 you've concocted there, and I would actually need a
21 lot more information to be able to --
22       BY MR. ERCOLE:
23    Q.   Okay.  Well, how about your addiction to
24 erotic romance novels?  What were the consequences
25 there?

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1     A.   So the consequences were that I was
2  spending less time with my kids, so less time
3  invested in my family, which is an important value
4  to me.  I became progressively more depressed and
5  anxious.  I was spending time all through the night
6  reading erotica, and so I wasn't sleeping and I was
7  going to work the next day sleep-deprived.
8          Over time, my ability to take pleasure in
9  other more modest rewards was waning, which is a
10  very common manifestation of addiction, a kind of
11  narrowing of our focus on this one reward, less
12  ability to take pleasure in other more modest
13  rewards.
14          You know, I never got to a point where I
15  needed to be hospitalized or I needed professional
16  treatment or, you know, I considered hurting myself
17  or anything like that.  But there was a slow drift
18  toward the kinds of consequences that we typically
19  see in addiction.
20     Q.   In -- on -- for, I guess, the letter G,
21  there's a reference to (as read):
22          "Quantity and frequency of
23          consumption are not included in the
24          criteria for addiction, although they are
25          correlated with addictive use."

Page 215

1          Do you see that?
2     A.   Yes.
3     Q.   Is that the same in your view for substance
4  use disorder?
5     A.   Substance use disorder, also -- quantity
6  and frequency also matter a great deal.
7     Q.   Well, for substance use disorders, are
8  quantity and frequency of consumption --
9          (Stenographer interrupted for clarification
10          of the record.)
11          BY MR. ERCOLE:
12     Q.   For substance use disorders, are quantity
13  and frequency of consumption included in the
14  criteria for addiction?
15     A.   As I state right here, they are not.
16     Q.   Is it possible, in your view, for someone
17  to have social media addiction if they are only
18  using social media one time a day for ten minutes a
19  day?
20          MS. McNABB:  Objection.  Speculation.
21          THE WITNESS:  Again, we don't base the
22  diagnosis on quantity or frequency of use.
23          BY MR. ERCOLE:
24     Q.   But it might be possible; correct?
25          MS. McNABB:  Objection.

Page 216

1          THE WITNESS:  I'd rather not speculate.
2          BY MR. ERCOLE:
3     Q.   How about if someone was using social media
4  for one minute a day?
5          MS. McNABB:  Objection.
6          BY MR. ERCOLE:
7     Q.   Is that possible they could be addicted to
8  it?
9          MS. McNABB:  Objection.  Speculation.
10          THE WITNESS:  I'd rather not speculate.
11          BY MR. ERCOLE:
12     Q.   You'd need to actually see the facts;
13  correct?
14          Strike that.
15          You'd actually need to see and understand
16  the factual circumstances of that particular
17  plaintiff to under- -- or that particular individual
18  to understand; right?
19          MS. McNABB:  Objection.  Speculation.
20          THE WITNESS:  The diagnosis isn't based on
21  quantity or frequency.  I would have to do an
22  assessment based on the four Cs, tolerance,
23  withdrawal.
24          BY MR. ERCOLE:
25     Q.   And assessment of a particular individual;

Page 217

1  right?
2     A.   Well, we're talking about individuals and
3  groups of individuals.  So if we're talking about
4  general causation of the population level, then my
5  opinion about that would be informed by my knowledge
6  about individuals as well as large groups of
7  individuals.
8     Q.   Okay.  So maybe my question wasn't clear or
9  I'm just asking it in a poor way.  But I thought you
10  were saying -- when I asked, "Can someone who uses
11  social media for a few minutes a day be addicted to
12  social media?" you said you would need to know more;
13  is that fair?
14     A.   M-hm.  Yes.
15     Q.   Okay.  And you would need to know more
16  based upon the facts of that particular person's
17  circumstances; right?
18     A.   Yes.
19     Q.   Okay.  From a -- but your testimony is
20  you're testifying about general causation at a
21  population level; right?
22     A.   That's right.
23     Q.   Okay.  So at a population level, can
24  someone -- can people who use social media one time
25  a day be addicted to social -- sorry.  Strike that.

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1    Can people who use social media a few
2 minutes a day be addicted to social media?
3        MS. McNABB: Objection. Speculation.
4        THE WITNESS: And my answer here is the
5 same. Time spent is relevant. The more time spent,
6 the higher the risk of addiction, the more likely
7 they are to be diagnosed with a social media
8 addiction.
9        But we don't base the diagnosis on time
10 spent because we recognize that some people can
11 spend a lot of time on social media and not
12 necessarily be addicted, and some people can spent
13 shorter amounts of time on social media and be
14 addicted. So ...
15        BY MR. ERCOLE:
16    Q.  In your practice, what was the shortest
17 amount of time someone was using social media on a
18 daily basis that you -- or for whom you affixed the
19 "social media addiction" diagnosis to?
20    A.  I can't answer that. I didn't quantify
21 that. I don't base the diagnosis on time spent.
22    Q.  Do you ask about how much time you're on
23 social media?
24    A.  Yes.
25    Q.  Okay. And based upon that question that

Page 219

1 you've asked your patients, what was the -- I guess,
2 the shortest amount of time on a daily basis that
3 someone you diagnosed with social media was using
4 social media?
5    A.  Again, I can't answer that. It's not the
6 most important aspect of diagnosing social media
7 addiction. I don't keep a running tab of how much
8 time different patients have spent.
9    Q.  Okay. But -- so you can't answer it
10 because you -- just sitting here today, you don't
11 recall the shortest time period someone was daily --
12 using social media on a daily basis where you
13 diagnosed them with social media addiction?
14    A.  Well, I both don't recall, wasn't focused
15 on that; and although it's relevant, it's not a
16 diagnostic criterion.
17    Q.  You -- on letter H of your report, you talk
18 about (as read):
19        "Risky use substance and behaviors,
20        sometimes called 'misuse,' includes
21        behaviors associated with harm that may
22        or may not be coincident with addiction."
23        Did I read that right, hopefully?
24    A.  Yes.
25    Q.  Okay. How do you distinguish between

Page 220

1 social media addiction and risky social media use?
2    A.  Typically you would ask about use. You
3 would ask about harms related to use.
4        And then you would go through the
5 diagnostic criteria for social media addiction. And
6 if they met the diagnostic criteria for social media
7 addiction, you would diagnose that.
8        If they did not meet those criteria but
9 there were still harms related to use, then you
10 would address those harms and characterize those as
11 occurring outside of having a social media
12 addiction.
13    Q.  And so risky behavior would be someone that
14 experienced harms related to use but just did not
15 meet all the other criteria?
16    A.  Right. Experienced harms related to use
17 but didn't manifest the phenomenology that we
18 recognize as addiction characterized by these
19 patterns of behavior that repeat themselves across
20 individuals, time periods, and drugs of choice,
21 whether it's a substance or a behavior.
22    Q.  Can someone engage in risky social media
23 use without experiencing harm, in your view?
24    A.  I mean, definitionally risky use means that
25 they're experiencing harm.

Page 221

1    Q.  Would you agree that the literature
2 analyzing the effects of social media use sort of
3 suffers a bit from inconsistent methods of testing
4 for social media addiction or defining social media
5 addiction?
6        MS. McNABB: Objection. Form.
7        THE WITNESS: Not really.
8        BY MR. ERCOLE:
9    Q.  So in your view, there's a consistent
10 definition of social media addiction throughout all
11 of the medical literature?
12    A.  I wouldn't go that far, but I would say
13 that the various definitions have enough overlap to
14 suit me in terms of capturing the phenomenology.
15        And again, I would just emphasize that all
16 mental health disorders are diagnosed based on
17 patterns of behavior or phenomenology, and these
18 patterns are clearly recognizable when you see them.
19 And whether you call it one thing or another, use
20 these four criteria or two of those criteria and two
21 others, there's a point at which the overall gestalt
22 is the same and you're capturing that pattern of
23 behavior, which is clearly recognizable as an
24 addictive pattern.
25    Q.  Is there -- for the medical literature, is

56 (Pages 218 - 221)

Page 222

1 there a standard definition of social media
2 addiction that is carried throughout the literature?
3        MS. McNABB: Objection. Asked and
4 answered.
5        THE WITNESS: Yeah, I feel like I have the
6 same answer that I gave.
7        BY MR. ERCOLE:
8    Q.  That there's overlapping definitions?
9    A.  That wasn't my answer.
10   Q.  Is there a standard definition of
11 "problematic social media use" that exists in the
12 medical literature?
13   A.  Problematic social media use is often used
14 synonymously with social media addiction, and that's
15 generally how I use it.  It is how I use it in my
16 report.  It's how Meta uses it.
17       But some of the literature equates -- I
18 think is using "problematic social media use"
19 with -- more like risky use; but, again, most of the
20 literature I reviewed and that I've included is
21 really focused on the addiction phenomenon.
22   Q.  And do all of the medical literature that
23 you've cited in your report, which we'll -- we'll
24 get into in a little bit, does that -- do each of
25 those -- do those studies provide a -- strike that.

Page 223

1       Do each of those studies that you reference
2 in your report provide a definition of social media
3 addiction in those studies?
4        MS. McNABB: Objection. Form.
5 Speculation. Foundation.
6        THE WITNESS: I would really need you to
7 cite to it.  I mean, there are so many different
8 types of studies.
9        BY MR. ERCOLE:
10   Q.  Sure.
11       Are you aware of anyone who has -- are you
12 aware of anyone for whom you've diagnosed social
13 media addiction who has suffered a -- strike that.
14       Let me go to footnote 12 of your report.
15       One of the statements in the -- for social
16 media -- one of the -- the statement in the -- the
17 sentence at the end reads (as read):
18            "Without treatment or engagement in
19            recovery activities, addiction is
20            progressive and can result in disability
21            or premature death."
22       Do you see that?
23   A.  Yes.
24   Q.  Okay.  Are you aware of anyone who you've
25 diagnosed with social media addiction who has died

Page 224

1 as a result of social media addiction?
2    A.  I am aware of individuals who have almost
3 died, yes.
4    Q.  You're not aware of anyone that has passed
5 away as a result of social media addiction; correct?
6    A.  No.  But I have patients who have gotten
7 pretty close to dying as a result of social media
8 addiction.
9    Q.  And what were the -- what were the
10 circumstances there?
11   A.  Body dysmorphia and anorexia, depression,
12 self-harm, suicidality.
13   Q.  So for body dysmorphia, how in your view
14 does social media lead to body dysmorphia?
15   A.  M-hm.  What we see with body dysmorphia as
16 a sequelae of social media addiction is a repeated
17 pattern of use with a recursive feedback loop that
18 pushes content related to images, body images, that
19 then give that individual a distorted sense through
20 negative social comparison.  As well as just an
21 enormous amount of time spent looking at themselves
22 on social media and then fixating on various parts
23 of their face or what have you, feeling that their
24 face isn't right, that their nose is too big or
25 their lips are too small or -- or what have you.

Page 225

1    Q.  And are you aware of any studies,
2 scientific studies, that have evaluated whether
3 social media -- strike that.
4       Are you aware of any medical studies that
5 have evaluated whether the features of social media,
6 independent of the content of social media, can lead
7 to or cause body dysmorphia?
8        MS. McNABB: Objection to form.
9        THE WITNESS: I am aware of studies showing
10 that the design elements of social media are what
11 substantially contribute to its addictive potential,
12 but I'm not aware of anything specifically looking
13 at body dysmorphia.  But then I also didn't search
14 for that literature specifically.
15       BY MR. ERCOLE:
16   Q.  How about -- you mentioned anorexia.
17       How does social media, in -- in your
18 view -- how does that lead to anorexia?
19   A.  The addictive design/nature of the platform
20 creates recursive feedback loops that optimize for
21 time spent and also push increasingly potent images
22 to the consumer.  And in the case of eating
23 disorders, typically this will end up pushing the
24 user toward extreme anorexia-related content.
25       And although the content is relevant,

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1  what's really most relevant is the platform design
2  features that promoted the individual to consuming
3  that kind of extreme content and then rewarded them
4  in that social community for, you know, social
5  validation on that platform.
6      Q.  You mentioned images.  What images were you
7  referring to?
8      A.  Well, it could be images or it could be a
9  social media influencer who's encouraging consumers
10 and followers to lose weight, to post their weight,
11 to try to get progressively thinner, to get social
12 validation through those means.
13     Q.  And how about images for body dysmorphia?
14     A.  M-hm.
15     Q.  What types of images are you referring to?
16     A.  Again, my experience and knowledge of body
17 dysmorphia is based primarily on my clinical work.
18 And what I see in patients who develop social media
19 addiction and then develop body dysmorphia is just
20 that they're spending a lot of time looking at
21 themselves, looking at other people, and begin to
22 then get a very distorted view of their -- their own
23 bodies.
24     They also have reported getting a lot of
25 positive feedback for, you know, getting thinner or

Page 227

1  using a filter, you know, changing their looks in
2  some way.
3      Q.  When you say "positive feedback," you mean,
4  like, third-party comments on platforms, that --
5      A.  Likes, comments --
6      Q.  Hold on.  Let me -- let me -- sorry.
7  Let --
8      A.  -- followers, shares.  It's all those
9  things.
10     Q.  Okay.
11     A.  All those addictive design elements.
12     Q.  Okay.  So sorry.  Let me just finish my
13 question.
14     A.  Okay.
15     Q.  You're referring to -- when you're talking
16 about positive feedback, you're referring to
17 third-party comments made to a user on social media;
18 is that fair?
19     MS. McNABB:  Objection.  Misstates
20 testimony.
21     THE WITNESS:  I'm not sure what you mean by
22 "third-party comments."  I'm ...
23     BY MR. ERCOLE:
24     Q.  Sure.
25     Comments by not the social media platform

Page 228

1  and not the user; right?
2      MS. McNABB:  Objection.  Misstates prior
3  testimony.
4      THE WITNESS:  So the likes, the shares, the
5  comments, the followers, that's all intrinsic to the
6  platform and actually a key part of what keeps
7  people engaged, is to try to get up their metrics,
8  to get social validation, to, you know, get streaks
9  and then keep streaks, get likes, get comments.  All
10 of that is part of that recursive feedback loop.
11     You know, the content is relevant, but the
12 content is not the most important thing.  It's the
13 design features that make the medium much more
14 reinforcing than a natural reward would be.
15     BY MR. ERCOLE:
16     Q.  Isn't liking something content?
17     MS. McNABB:  Objection.  Speculation.
18     THE WITNESS:  I don't believe so, no.
19     BY MR. ERCOLE:
20     Q.  How about commenting on something?
21     MS. McNABB:  Same objection.
22     BY MR. ERCOLE:
23     Q.  Isn't that content?
24     A.  I think that the interactive nature of the
25 platform is what contributes to its highly

Page 229

1  reinforcing potential.
2      So I guess to some extent, you know,
3  comments are content.  I could agree with that to
4  some extent.
5      Q.  And -- and when you say "social
6  validation," what are you -- you've used that word a
7  couple time- -- phrase.
8      What are you referring to?
9      A.  One of the main reasons that people go onto
10 social media is to feel better about themselves, you
11 know, get people to say positive things about them,
12 to feel that they're, you know, part of a community
13 or part of a tribe or included or in the know.
14     Q.  Doesn't that all involve content, for
15 instance, social validation being derived from
16 positive things that someone is saying to the user?
17     A.  I mean, content can be a part of it.  But
18 you can have no comments and just have likes and
19 followers and number of shares that are really
20 primary to that social validation piece.
21     I would also add that many individuals
22 who -- who get addicted to social media are going on
23 to sort of manage negative emotions and hear
24 positive affirmations.
25     And there are a lot of videos out there

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1 that are consumed by kids that deliver a lot of
2 affirmations and accolades and compliments and this
3 kind of thing sometimes through a social media
4 influencer, sometimes through, you know, some kind
5 of AI bot. But here we're mainly talking about, you
6 know, social media, people who are -- other people
7 who are on the platform.
8    Q.   And that's a bad thing in your view?
9    A.   I believe that it can be a bad thing,
10 especially for a vulnerable subset of users.
11    Q.   Are you aware of any study out there that
12 has evaluated whether or not the features of social
13 media, independent of content, can lead to anorexia?
14    A.   There are studies out there evaluating
15 features, independent of content, showing that these
16 features make social media or that -- or similar
17 media more reinforcing. But I am not aware of
18 any -- any studies looking directly at that and
19 anorexia.
20    Q.   Okay.
21    A.   And, again, that was also not -- not my --
22 my ask; right?
23        My understanding is the judge did not want
24 duplication here, and so I didn't focus on that
25 specifically. I focused on addiction.

Page 231

1    Q.   Okay. Fair enough.
2        With respect to suicide -- with respect to
3 suicide or -- yeah, let's start with suicide.
4        Can social media lead to suicide in your
5 view?
6    A.   Yes.
7    Q.   Okay. And how does that happen?
8    A.   Well, it happens in different ways for
9 different consumers. But a typical trajectory would
10 be someone who's on social media a lot, let's say
11 addicted to the platform, comes to rely on the
12 platform in an addictive way for their identity and
13 their social validation, and then gets bullied on
14 the platform or gets extorted on the platform or,
15 even if it's separate from that, just eventually
16 gets so depressed and anxious and not sleeping and
17 not caring for themself that they're essentially
18 suicidal because they're depressed from excessive
19 social media use.
20        So there are different mechanisms. Since
21 I'm looking specifically at addiction, the mechanism
22 is primarily the same mechanism that we see when
23 people get suicidal from using drugs and alcohol,
24 that eventually with heavy, prolonged use, they
25 become depressed, anxious, unable to stop even when

Page 232

1 they want to, and become despondent and -- and
2 hopeless and take their own lives.
3    Q.   And I think you testified earlier, you're
4 not aware of anyone that has taken their own life as
5 a result of social media usage based upon the -- the
6 patients you treated; right?
7    A.   Based upon the patients that I've treated
8 in my clinical practice, that is correct. But I am
9 very aware of kids who have gotten, you know,
10 suicidal as a result of their involvement in social
11 media.
12    Q.   Okay. And that's based upon people you've
13 treated?
14    A.   Yes.
15    Q.   Have you looked at -- strike that.
16        Are there any studies that you can identify
17 where it shows -- strike that.
18        Are you aware of any studies that have
19 evaluated whether or not the features of social
20 media, independent of content, causes or contributes
21 to suicidality?
22    A.   Give me a moment to look --
23    Q.   Sure.
24    A.   -- at my report.
25        Almost there. Let me check one more thing.

Page 233

1        Yeah, I'm not finding anything directly
2 related to suicide.
3    Q.   Are you aware of any studies that have
4 evaluated whether or not the features of social
5 media cause or contribute to anxiety or depression,
6 independent of and stripping out content?
7        MS. McNABB: Objection to form.
8        THE WITNESS: I am aware of studies showing
9 that the addictive design features contribute to
10 depression, and I described some of those in my
11 report.
12        BY MR. ERCOLE:
13    Q.   What study, in particular, can you point me
14 to that did an evaluation of -- of the impact, if
15 any, of social media features, independent of social
16 media content, on anxiety or depression?
17        MS. McNABB: Objection to form.
18        THE WITNESS: Let me just reference my
19 report.
20        So on page 27 of my report, I review a
21 study by Shakya and Christakis that looked at time
22 spent on Facebook and worsened mental health
23 outcomes. And they specifically looked at
24 interactive features, such as the number of Facebook
25 friends they had or the friend count, the number of

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

Page 234

1 times they clicked on the "like" button, including
2 lifetime "like" count, the number of links they had
3 clicked in the past 30 days, the number of times
4 they updated their status in the past 30 days.
5      And they concluded that it was content --
6 not content, but the sheer amount of time and the
7 interactive engagement that creates the harm. They
8 said, quote (as read):
9          "Our models cannot identify the
10      mechanism by which Facebook use may lead
11      to reduced well-being."
12 THE STENOGRAPHER: I --
13 THE WITNESS: Oh, sorry.  A little slower?
14 THE STENOGRAPHER: Yeah.  And speak up a
15 little bit for me, if you would, please.
16 THE WITNESS: That's basically what I
17 wanted to say there.
18      Also, there's a study by Cheng and Davis,
19 page 28 of my report, where they surveyed 20,000
20 Facebook users in the U.S., measuring perceived
21 problematic Facebook use, using server logs of
22 aggregated behavioral data for previous four weeks,
23 such as the amount of time respondents spent on the
24 site and the counts of interactions with close
25 friend, finding that 3 percent of Facebook users

Page 235

1 developed a severe social media addiction and
2 55 percent a mild social media addiction.  That was
3 independent content.
4      Importantly, they found things like that
5 people experiencing problematic use sent
6 62.7 percent more messages than those who are not
7 experiencing problematic use, despite spending only
8 21.6 percent more time overall on Facebook.
9      And by normalizing the amount of time spent
10 on the site, people with problematic use sent
11 38.7 percent more messages per hour.  They were also
12 36.7 percent more likely to have sent more messages
13 than they received.
14      Qualitative studies make it very clear that
15 the design features separate from the content are
16 what promote addictive use.
17      In a Meta qualitative study, one user said
18 (as read):
19          "'Red dots are toxic on the home
20      screen.' Red dots are a form of
21      notification.
22          "Instagram internal documents
23      described frequent checking, including
24      clearing of notifications as a key aspect
25      of Instagram problematic use."

Page 236

1      Instagram's own documents stated that
2 (as read):
3          "Notifications make it harder for
4      them to manage the amount of time they
5      spend on the app, and 32 percent say the
6      number of notifications they receive can
7      be overwhelming.
8          "People with reported problematic use
9      of Facebook received 27.4 percent more
10      notifications than people who did not
11      report problematic use and responded to a
12      greater fraction of these notifications.
13      And they were more likely to respond to
14      notifications when they were about
15      replies to comments they had made."
16 People who deactivated their Facebook
17 accounts, which can be a proxy for those struggling
18 with addictive or compulsive use, were -- received
19 more notifications than the average user and
20 responded to them faster.
21 BY MR. ERCOLE:
22 Q.  Dr. Lembke, do you remember my original
23 question?
24 A.  Yeah.
25 Q.  What was it?

Page 237

1 A.  You said am I aware of any studies showing
2 that the features of the social media platforms
3 contributed to harms, I think you said anxiety,
4 depression, or contributed to harms separate from
5 content?
6      And so I'm trying to tell you what that
7 evidence is.  There's lots of it.  I can --
8 Q.  Yeah.
9 A.  -- keep going here.
10 Q.  Well, how about this:  How about sitting
11 here right now, how about any -- any
12 peer-reviewed -- let's focus on peer reviewed --
13 experimental studies that have evaluated whether or
14 not social media -- strike that.
15      Any peer-reviewed experimental studies that
16 you can identify showing whether or not social media
17 features, independent of content, lead to anxiety or
18 depression?
19 MS. McNABB: Objection to form.
20 THE WITNESS: What do you mean by
21 "experimental studies"?
22 BY MR. ERCOLE:
23 Q.  How do you -- how would you define an
24 "experimental study"?
25 A.  Well, typically, experimental studies are

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1 randomized controlled trials. You have two groups
2 of people. You do an intervention. You see the
3 outcome.
4    Q.  Anything like that?
5       Yes. Let's use that definition.
6       Any studies that you can identify that are
7 experimental studies where the authors evaluated
8 whether or not the features of social media,
9 independent of content, lead to anxiety or
10 depression?
11       MS. McNABB:  Objection to form.
12       THE WITNESS:  Yeah. So experimental
13 studies are a high bar. I'm not aware of any
14 experimental studies like that.
15       But there are studies, as I've already
16 mentioned, that do show that features -- design
17 features, independent of content, contribute to
18 worsened mental health. I mentioned the Shakya and
19 Christakis study. I mentioned the Meta, Cheng and
20 Davis study. Those are two examples, and those are
21 both peer reviewed.
22       I mean, the Facebook study was presented at
23 a -- the conference on human factors in computing
24 systems. Typically to present a study at a
25 conference proceeding, there's some kind of

Page 239

1 peer-review process.
2       BY MR. ERCOLE:
3    Q.  I think we may have a different
4 understanding of what those studies show or -- or
5 don't show.
6       But just so that the answer to my question
7 is clear, you're not aware of any peer-reviewed
8 experimental study that has evaluated whether or not
9 social media features, independent of content, cause
10 or contribute to anxiety or depression; correct?
11       MS. McNABB:  Objection to form and
12 argumentative.
13       THE WITNESS:  I feel like I already
14 answered that. And if you'll give me one moment, I
15 can take another look here to see if my answer is
16 different or if I can add to my answer.
17       Yeah, sorry. So there's more. If you look
18 at page 81, my report, summarize some experimental
19 studies where they asked individuals to reduce their
20 social media use for a period of time and then
21 analyzed the impact on mental health.
22       BY MR. ERCOLE:
23    Q.  Did those studies separate features from
24 content?
25    A.  So those studies included the features

Page 240

1 because, essentially, they had people either reduce
2 or stop use of social media for a period of time.
3    Q.  Yeah, right.
4       My question is different; right?
5       I'm asking whether or not any -- whether
6 there's any peer-reviewed experimental studies that
7 have separated out the impact of features versus the
8 impact of content with respect to social media?
9    A.  Yeah.
10       MS. McNABB:  Objection to form.
11       THE WITNESS:  So I've described that there
12 are peer-reviewed studies that do that. I'm not
13 aware of any experimental randomized controlled
14 trials that do that.
15       BY MR. ERCOLE:
16    Q.  And the studies -- the peer-reviewed
17 studies you refer -- like, you're aware of are the
18 Facebook studies that you've referenced?
19    A.  I also talked about the Shakya and
20 Christakis studies. There's also the NASEM report,
21 which is -- which states -- and I'll just turn to
22 that in my report.
23    Q.  What page are you on?
24    A.  Yeah, let me get there.
25       So this is page 22. In the NASEM report, I

Page 241

1 quote (as read):
2       "In a larger sense, algorithms, which
3       are generally proprietary, serve the end
4       goals of keeping users engaged for as
5       long as possible and generating revenue,"
6       unquote.
7       And then, quote (as read):
8       "While an algorithm may be innocuous,
9       the way it presents content can be
10       harmful, with more sensational and
11       provocative posts given higher priority
12       in users' feeds, especially if the user
13       has responded to a similar type of post
14       in the past. This practice has the
15       potential to create distortions and give
16       rise to recursive feedback loops.
17       Recursive feedback can, in turn,
18       exacerbate problems with harmful content
19       and misinformation. Recursive feedback
20       can also promote any number of fringe
21       views, from unscientific health
22       treatments to conspiracy theories."
23    Q.  And the NASEM report that you're referring
24 to is the National Academy of Sciences, Engineering,
25 and -- what's the M stand for?

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1    A.  Medicine.
2    Q.  Medicine.
3        That's the report you're referring to?
4    A.  Yes.
5    Q.  Okay.  Any -- anything -- any other ones?
6    A.  Not that I can recall at this time.
7    Q.  Okay.  Can I call it the "NASEM report"?
8    A.  Sure.
9    Q.  Because I think that's the language you
10  used; right?
11   A.  Yes.
12   Q.  Okay.  The National Academies of Sciences,
13  Engineering, and Medicine; right?
14   A.  Yes.  I think so, yeah.
15   Q.  Okay.  Three separate academies; right?
16   A.  I believe so -- well, it's one academy.
17   Q.  I think it's academies; right?  There are
18  three separate ones; no?
19   A.  Okay.
20   Q.  I don't know.  Do you know one way or the
21  other?
22   A.  I don't know for sure.  I thought it was
23  one body.
24   Q.  They created a committee to study this
25  issue of social media and adolescent mental health;

Page 243

1  right?
2    A.  Yes.
3    Q.  And they crafted or the committee created a
4  report; right?
5    A.  (Nonverbal response.)
6    Q.  And you're familiar with that report?
7    A.  Yes.
8    Q.  And the committee from that report found
9  that, quote -- that its, quote (as read):
10        "Review of the literature did not
11       support the conclusion that social media
12       causes changes in adolescent health at
13       the population level."
14       Right?
15   A.  M-hm.
16   Q.  That's a "yes"?
17   A.  That's what it says, yes.
18   Q.  Okay.  And you disagree with that
19  conclusion; right?
20   A.  I disagree, yes.
21   Q.  Okay.  Did the committee have
22  epidemiologists on it?
23   A.  I don't know.
24   Q.  Are you an epidemiologist?
25   A.  I have expertise in that area.

Page 244

1    Q.  Do you hold yourself out as an expert in
2  epidemiology?
3    A.  I hold myself out as having expertise in
4  epidemiology.
5    Q.  And product design too when it comes to
6  social media; right?
7    A.  When it comes to social media, yes.  And
8  other addictive products.
9    Q.  Who was the -- let me ask this:  Would you
10  hold yourself out as an expert in the design of
11  romance novels?
12       MS. McNABB:  Objection.  Argumentative.
13       THE WITNESS:  No.
14       BY MR. ERCOLE:
15   Q.  Who was the -- do you know who the chair of
16  the committee was?
17   A.  I don't.
18   Q.  Do you know -- have you ever -- I'll
19  probably mispronounce -- Sandro Galea, who's the
20  dean of the School of Health at Boston University.
21       Are you familiar with him?
22   A.  No.
23   Q.  Do you agree that the direction of the
24  relationship between social media and health is
25  difficult to determine because social media may

Page 245

1  influence a health outcome and a health outcome may
2  influence social media use?
3        MS. McNABB:  Objection.  Form.  And
4  foundation.
5        THE WITNESS:  What's your question?
6        BY MR. ERCOLE:
7    Q.  Do you agree that the -- well, let me ask
8  this:  Do you agree that the relationship between
9  social media and health is complex?
10       MS. McNABB:  Objection to form.
11       THE WITNESS:  Well, what do you mean by
12  "complex"?
13       BY MR. ERCOLE:
14   Q.  I mean how would you define "complex"?
15   A.  I -- I can't answer that question "yes" or
16  "no."
17   Q.  Okay.  Do you agree that the direction of
18  the relationship between social media and health is
19  difficult to determine because social media may
20  influence a health outcome and a health outcome may
21  influence social media use?
22   A.  Well, I don't think it's difficult to
23  determine.  I've done a systematic review of the
24  evidence, and I think it's clear that social media
25  adversely impacts mental health of kids.

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 246

1    Q.   Okay.  And so -- and, again, you disagree
2  with the conclusion of the committee from the
3  National Academies of Sciences, Engineering, and
4  Medicine on that issue; right?
5    A.   I believe that the statement that you read
6  is undermined by other statements in the report
7  which do not support that conclusion.
8    Q.   Okay.  And, in fact, I think you put in
9  your report that you believe the -- that the
10  National Academies of Sciences, Engineering, and
11  Medicine may be biased because it has members with
12  ties to industry; is that right?
13    A.   I mean, each NASEM report is created by a
14  unique body of individuals, and how those
15  individuals are vetted changes from report to
16  report.
17        So I don't just take each report as equally
18  robust to a report that came from the same
19  organization but addresses a different issue.  I
20  think that each report needs to be taken on its own
21  terms.
22        And as I've stated in my report, the 2024
23  NASEM report has been criticized for inadequate
24  representation of public health expertise as well as
25  inclusion of individuals with financial ties to

Page 247

1  industry.
2    Q.   Wasn't the chair of the committee the dean
3  of the School of Health at Boston University?
4        MS. McNABB:  Objection.  Foundation.
5        BY MR. ERCOLE:
6    Q.   Who -- do you know how many people were on
7  the committee?
8    A.   I do not.
9    Q.   Do you know which individuals, in your
10  view, were tainted by industry?
11    A.   I do not.
12    Q.   Do you know any of the names of any of the
13  individuals around that committee?
14    A.   Not by memory.
15    Q.   Can you identify a single individual who
16  had a conflict of interest who was on the committee
17  that authorized the report?
18    A.   I don't recall their names.
19    Q.   Do you know whether or not the committee
20  sought advice from lots of other scholars and
21  experts in the field in crafting the report?
22        MS. McNABB:  Objection.  Speculation.
23        THE WITNESS:  I don't know.
24        BY MR. ERCOLE:
25    Q.   Is it important, in your view, to disclose

Page 248

1  conflicts of interest?
2    A.   Yes.
3        MS. McNABB:  Objection.
4        BY MR. ERCOLE:
5    Q.   And it can be misleading if you don't?
6        MS. McNABB:  Objection.
7        THE WITNESS:  It depends on what the
8  context is.  I think it varies.
9        BY MR. ERCOLE:
10    Q.   Do you think it's important to do that in
11  academic literature?
12    A.   Yes.
13        MR. ERCOLE:  Can we take a -- can we take a
14  pause, maybe like a five-minute break?
15        THE VIDEOGRAPHER:  The time is 2:41.  We're
16  off the record.
17        (Recess taken from 2:41 to 3:05.)
18        THE VIDEOGRAPHER:  The time is 3:05.  We're
19  back on the record.
20        BY MR. ERCOLE:
21    Q.   Dr. Lembke, before we broke, you mentioned
22  the study by Shakya and Christakis.
23    A.   M-hm.
24    Q.   Do you recall that?
25    A.   Yes.

Page 249

1    Q.   And it was on, I think, page 27 of your
2  report.
3        Is that where you referenced that?
4        Do you mind turning to that?
5    A.   Yes.
6    Q.   And this is where you -- you used this as
7  an example, I think, of a peer-reviewed study that
8  looked at the impact of social media features,
9  independent of content; is that right?
10    A.   Yes.
11    Q.   And looked at what was causing or not
12  causing mental health outcomes; is that right?
13    A.   Yes.
14    Q.   Okay.  Just in your description of this
15  particular study -- actually, let me -- yeah, let me
16  go back.
17        One of the -- the -- the nature and target
18  of this study was whether or not users were clicking
19  on a like; is that right?
20    A.   That was one of the points that was
21  examined, yes.
22    Q.   And when they clicked on a -- on a like, it
23  would take them to some other content; right?
24    A.   I don't think that's necessarily true.
25    Q.   Okay.  Well, there's a reference here to --

Golkow Technologies,
A Veritext Division
877-370-3377                                              www.veritext.com

CONFIDENTIAL

Page 250

1 how about the number of links that they had clicked
2 on in the past 30 days, right, was one of the things
3 that was evaluated?
4    A.  Yeah.  That's different from the likes on
5 someone else's content.
6    Q.  That's fair.  And I apologize for the
7 question.
8        So you had an evaluation of the likes --
9    A.  M-hm.
10    Q.  -- correct?
11    A.  Yes.
12    Q.  You also had an evaluation on clicking on
13 links that would take you to some other content;
14 right?
15    A.  Yes.
16    Q.  Okay.  And the conclusion of that study you
17 actually reference in your report, right, where you
18 say (as read):
19        "Our models cannot identify the
20        mechanisms by which Facebook use may lead
21        to reduced well-being"?
22        Right?
23    A.  Right.
24    Q.  So they weren't able to determine whether
25 or not features, independent of content, was

Page 251

1 actually leading to reduced well-being?
2        MS. McNABB:  Objection.  Misstates.
3        THE WITNESS:  My read of this article is
4 that their interpretation of their results is that
5 the content is less important than the way that
6 people are interacting on the platform.
7        BY MR. ERCOLE:
8    Q.  But you -- you quote from the authors
9 themselves where they said they can't identify the
10 mechanism by which Facebook use may lead to reduced
11 well-being; right?
12    A.  Yeah.  But it's always the case in
13 peer-reviewed academic articles that they'll qualify
14 their conclusions and be hesitant at the same time,
15 that they will say what they really think about
16 their interpretation which then follows, which is,
17 quote (as read):
18        "Our results are in contrast to those
19        from previous research asserting that the
20        quantity of social media interaction is
21        irrelevant and that only the quality of
22        those interactions matters."
23    What they conclude is (as read):
24        "Large quantities of social media
25        interaction ..."

Page 252

1        Which they measure, by the way, not just as
2 time spent but the number of likes, the number of
3 status updates, the number of links, that the
4 quantities of social media interaction (as read):
5        ... "may indeed detract from more
6        meaningful real-life experiences."
7    Q.  Right.
8        They don't say large quantities of social
9 media interaction independent of content may detract
10 from more meaningful life experiences; right?
11    A.  Listen, they say in that same paragraph
12 that it's the level of interaction.  And they're
13 clearly making a distinction between content and
14 what people are doing on the platform, and they're
15 identifying those modes of interacting on the
16 platform as the key feature of continued engagement
17 contributing to worsened mental health.
18    Q.  Does interaction involve content?
19        MS. McNABB:  Objection.  Speculation.
20        THE WITNESS:  Interaction can involve
21 content, but it's its own beast.
22        BY MR. ERCOLE:
23    Q.  Okay.  Have you spoken with either of the
24 authors?
25    A.  No.

Page 253

1    Q.  Do you know whether either of the authors
2 are experts in this case?
3    A.  I don't believe they are.
4    Q.  Okay.  If they were experts, would you have
5 wanted to speak with them to find out what they --
6 what conclusions they reached from their study?
7    A.  Yeah, if you're referring to Christakis, I
8 believe that's not the same person that's
9 coauthoring this article.
10    Q.  Okay.  You haven't spoken with either of
11 those authors about what -- about their findings or
12 what they meant by "our models cannot identify the
13 mechanisms by which Facebook use may lead to reduced
14 well-being"; right?
15    A.  No.
16    Q.  Okay.  If social media were just a blank
17 page with no content, do you think that could be
18 addictive or cause harm?
19        MS. McNABB:  Objection.  Speculation.
20        THE WITNESS:  Unlikely.
21        BY MR. ERCOLE:
22    Q.  With respect to risk factors -- well,
23 actually, let me ask this:  Are you aware of any
24 peer-reviewed experimental study that has evaluated
25 whether or not the features of social media,

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1 independent of content, can cause addiction?
2        MS. McNABB: Objection. Asked and
3 answered.
4        THE WITNESS: So we talked about this
5 before the break; right?
6        BY MR. ERCOLE:
7    Q. I didn't ask you this question, because I
8 double-checked.
9    A. Oh, okay. Then ask me again --
10   Q. Sure.
11   A. -- because it sounds so much like the
12 question you asked me before.
13   Q. That's fair.
14        Are you aware of any peer-reviewed
15 experimental study that has evaluated whether or not
16 the features of social media, independent of
17 content, can cause addiction?
18        MS. McNABB: Objection. Asked and
19 answered.
20        THE WITNESS: This strikes me as so similar
21 to the question that you asked me before that I'm
22 struggling to understand it.
23        BY MR. ERCOLE:
24   Q. You don't understand my question?
25   A. It seems very similar to the question that

Page 255

1 you already asked me that I feel I already answered.
2 So maybe we can go back to the question you asked me
3 before that's very similar to this, the one just
4 before the break. I don't see a difference between
5 them.
6    Q. Okay. I appreciate you didn't -- you don't
7 see a difference, but I'm asking this question now.
8        So are you aware of any peer-reviewed
9 experimental study that has evaluated whether or not
10 the features of social media, independent of and
11 isolated from content, can cause addiction?
12   A. Okay.
13        MS. McNABB: Objection.
14        THE WITNESS: So we talked about Shakya and
15 Christakis --
16        BY MR. ERCOLE:
17   Q. Yes.
18   A. -- which is a peer-reviewed study which
19 examines features of social media --
20   Q. And --
21   A. -- independent of content.
22   Q. I'm sorry to interrupt you. Can I -- can I
23 ask a quick -- but that didn't evaluate addiction;
24 right?
25   A. Well, it wasn't directly looking at

Page 256

1 addiction, but it certainly is looking at the level
2 and types of engagement that we would care about
3 when we're trying to evaluate social media
4 addiction. So it's relevant to social media
5 addiction.
6    Q. Okay. But how about specifically designed
7 to evaluate this question of addiction? Any
8 peer-reviewed experimental study that looks at
9 whether or not the -- the features of social media,
10 independent and isolated from content, can cause
11 addiction or social media use disorder?
12   A. M-hm. Yeah.
13        MS. McNABB: Just lay an objection for
14 asked and answered.
15        THE WITNESS: Sorry, I'm looking for an
16 area in my report, and then I will answer your
17 question.
18        BY MR. ERCOLE:
19   Q. Thank you.
20   A. Okay. So if you go to page 16 of my
21 report, there is a brain imaging study by Izuma,
22 et al., which we discussed before.
23   Q. So can you just tell me where you are?
24   A. Sure. Page 16 of my report.
25   Q. Okay. Like, what paragraph?

Page 257

1    A. This is Romanette ii.
2    Q. Okay. Is that what that's called,
3 Romanette?
4    A. I think so.
5    Q. Well-done.
6    A. Okay.
7        MR. ARBITBLIT: We heard a defense lawyer
8 use that term. We had never heard it.
9        MR. ERCOLE: Okay.
10        THE WITNESS: All right. So this is an
11 imaging study that looked at -- it was a task design
12 related to acquiring a good reputation. So these
13 individuals, like, looked at images. And then the
14 design was related to whether or not other people
15 liked them or something similar.
16        And that, to my mind, is akin to likes,
17 which is an addictive design feature, independent of
18 content, showing activation, quote, robustly
19 activated reward-related brain areas and overlapped
20 with areas activated by monetary rewards.
21        Then on page 17, Romanette iii (as read):
22        "Sherman and colleagues found that
23        adolescents are more inclined to like
24        Instagram-like photos that have been
25        liked by others, and viewing these photos

CONFIDENTIAL

Page 258

1    compared with photos that have been less
2    liked, was associated with greater
3    activity in neural regions implicated in
4    reward processing, social cognition, and
5    imitation [sic]."
6    And as I say (as read):
7        "This study highlights that the
8    crowd-sourced, interactive, reciprocal
9    nature of social media through likes and
10   other similar design features increases
11   the potency of the medium."
12   And increased potency is one of the
13 mechanisms by which -- I'm sorry, let me finish --
14   Q.  Yeah.
15   A.  -- by which people get addicted to social
16 media.
17   Likewise, Romanette iv (as read):
18       "Davey and colleagues found that
19   being liked in a mode akin to social
20   media activates the brain's reward
21   pathway."
22   Which is, again, further biological
23 plausibility that social media can be addictive
24 because it activates the same reward pathway as
25 drugs and alcohol.

Page 259

1    Kim, et al., is not looking specifically at
2 social media addiction, but they are looking at
3 people with Internet addiction.  And to my mind,
4 that's very relevant to the discussion that we are
5 having here because many adolescents spend lots of
6 time on social media when they're on the Internet.
7    And what they find it's down-regulation of
8 postsynaptic D2 receptors in striatal regions, which
9 is consistent with the path of physiology that we
10 see --
11   BY MR. ERCOLE:
12   Q.  Dr. Lembke, I'm really -- my question was
13 specific to the issue of social media addiction,
14 which you said is defined in the medical literature.
15   Which -- just, can you identify -- I just
16 need the name of a -- of a -- of a peer-reviewed
17 study that -- experimental study that has looked at
18 features of social media, independent of content,
19 and whether or not they cause social media addiction
20 as defined in the literature?
21   MS. McNABB:  Objection.  Asked and
22 answered.
23   THE WITNESS:  Yeah.  So I -- I think I'm
24 doing a pretty good job answering your question, and
25 I'm only about halfway through.

Page 260

1    I am showing you experimental studies that
2 are specifically looking at addictive design
3 features that activate the brain's reward pathway,
4 which is important to our argument for causality
5 because they're showing that the brain reward
6 pathway is activated by -- (inaudible)
7    (Stenographer interrupted for clarification
8    of the record.)
9    THE WITNESS:  -- social -- yeah, social
10 rewards and addictive design features, which is
11 fundamental to the argument that these design
12 features specifically contribute to the addictive
13 nature of social media.
14   I'd love to keep going.
15   If you look at page 18, Romanette vi, this
16 is the work of Eva Telzer.
17   BY MR. ERCOLE:
18   Q.  I don't think there's a question pending,
19 Dr. Lembke.  I know you want to filibust for the
20 next three hours, but --
21   A.  No, it's not filibusting [sic], I --
22 because I have more here.
23   Q.  Okay.
24   MS. McNABB:  Yeah, and --
25 ///

Page 261

1    BY MR. ERCOLE:
2    Q.  So --
3    MS. McNABB:  -- Brian, just -- just I'm
4 going to lay an objection --
5    MR. ERCOLE:  Okay.
6    MS. McNABB:  -- that it's argumentative.
7    And you interrupted Dr. Lembke while she
8 was trying to answer your question which is why
9 she's going back to finish her answer.  She's
10 allowed to finish her answer.
11   MR. ERCOLE:  Okay.  I don't -- well,
12 there's no question pending.  So ...
13   MS. McNABB:  You --
14   BY MR. ERCOLE:
15   Q.  So, Dr. Lembke, let me ask --
16   MS. McNABB:  The question is withdrawn
17 then?
18   BY MR. ERCOLE:
19   Q.  Let me ask this question --
20   MR. ERCOLE:  You can object.
21   BY MR. ERCOLE:
22   Q.  Let me ask this question:  With respect
23 to -- actually, let's go to this:  You cite studies
24 in -- I think, in Section -- the last section of
25 your report, right, which starts at -- let's go to

66 (Pages 258 - 261)

Page 262

1 that.
2     Sorry.
3     So if you turn to the Section 5 of your
4 report, I guess, Opinion 5 of your report, it is on
5 page 79.
6     Do you see that?
7  A.  Yes.
8  Q.  Okay.  And it says (as read):
9     "Addiction to social media can
10     adversely affect youth mental health,
11     particularly among those with
12     co-occurring psychiatric disorders."
13     Do you see that?
14  A.  Yes.
15  Q.  And in that -- in that section of your
16 report, you cite a number of -- of different
17 studies; right?
18  A.  Yes.
19  Q.  I am not ensteeped in the literature, as
20 others are, but I want to just look at a couple of
21 those studies, if that's okay with you.
22  A.  Sure.
23  Q.  And I'd actually like to start with some of
24 the early -- like, sorry, the most recent studies
25 that you cite in that -- in that section to take a

Page 263

1 look at what they say about the -- the literature
2 itself.
3     So let's ...
4     This is ...
5     MR. ERCOLE:  What number -- exhibit are we?
6     THE STENOGRAPHER:  Eight.
7     MR. ERCOLE:  Eight.
8     Let me show you what's -- we're marking as
9 Exhibit 8.
10     Thanks.
11     (Marked for identification purposes,
12     Lembke Exhibit 8.)
13     BY MR. ERCOLE:
14  Q.  Dr. Lembke, this was a -- is a study that
15 you cite from Davis and Goldfield.
16     Do you see that?
17  A.  Yeah.
18  Q.  And it says -- and it says (as read):
19     "Limiting Social Media Use Decreases
20     Depression, Anxiety, and Fear of Missing
21     Out in Youth with Emotional Distress: A
22     Randomized Controlled Trial."
23     Do you see that?
24  A.  Yes.
25  Q.  Sorry.

Page 264

1     And this article was published in, it looks
2 like, 2025, at the top at least, in Psychology of
3 Popular Media; is that right?
4  A.  Yes.
5  Q.  Okay.  And so I actually just want to go to
6 the -- if you turn to the second page of this
7 document.  And if you go down to the second full
8 paragraph.
9     And this is part of the section that is
10 sort of describing the state of the literature;
11 right?
12  A.  M-hm.
13  Q.  And it says -- the first sentence there
14 says (as read):
15     "To date, the evidence for the
16     harmful effects of heavy SMU has not been
17     compelling."
18     Do you see that?
19  A.  Yes, I see that.
20  Q.  Okay.  And SMU refers to social media use?
21  A.  That's correct.
22  Q.  Okay.  And so these authors were stating as
23 of 2025 that the evidence for the harmful effects of
24 heavy social media use has not been compelling;
25 right?

Page 265

1  A.  That's what it says, yes.
2  Q.  Okay.  And you disagree with that
3 conclusion; is that right?
4  A.  I mean, "compelling" is quite a vague and
5 qualitative term.  I'm not sure exactly what they
6 mean by that.
7  Q.  Do you think that the -- do you think for
8 litigation the evidence should be compelling?
9  A.  I think --
10     MS. McNABB:  Objection.  Argumentative.
11     THE WITNESS:  I think that the totality of
12 the evidence is convincing that social media and the
13 defendants' platforms specifically cause mental
14 health harms in youth.
15     BY MR. ERCOLE:
16  Q.  Let's look at another article that you rely
17 upon.
18     And I'm trying to focus on the most recent
19 ones because I think they sort of summarize where
20 the literature is or where it's not.
21     MS. McNABB:  Objection.  Speculation.
22     THE WITNESS:  Okay.  Just -- sorry.  Before
23 we go on to --
24     BY MR. ERCOLE:
25  Q.  There's no question pending, Dr. Lembke.

Page 266

1   A.  Okay.
2   Q.  Your counsel can ask any questions they
3   want to.
4       MR. ERCOLE:  What exhibit -- 9.
5       (Marked for identification purposes,
6        Lembke Exhibit 9.)
7       BY MR. ERCOLE:
8   Q.  Exhibit 9 is an article by Johannes Thrul
9   and some other folks; is that right?
10      And you rely upon this article in your
11  report; correct?
12  A.  Yes.
13  Q.  Okay.  And this was a meta-analysis of
14  another meta-analysis; is that correct?
15      MS. McNABB:  Objection.  It misstates.
16      THE WITNESS:  This was a reanalysis of the
17  same data that was used in a paper by Ferguson,
18  et al.
19      BY MR. ERCOLE:
20  Q.  Okay.  And Ferguson, et al., was published
21  in 2024; is that right?
22  A.  Yes.
23  Q.  Okay.  And if you turn to this -- the
24  abstract of this document.
25      Do you see that?

Page 267

1   A.  Yes.
2   Q.  It says (as read):
3       "A recent meta-analysis published in
4       this journal included 27 studies that
5       experimently -- experimentally
6       manipulated social media use and
7       investigated their impact on mental
8       health outcomes."
9       Correct?
10  A.  That's what it says.
11  Q.  And that meta-analysis author concluded
12  that social media effects were statistically no
13  different from zero; right?
14  A.  Well, that's what it says.  But the whole
15  point of this article is to refute that claim.
16  Q.  Right.
17      So as of 2024, though, there were articles
18  being published showing that -- that for
19  meta-analyses the social media effects were
20  statistically no different from zero; right?
21  A.  No.
22      MS. McNABB:  Objection.  Misstates.
23      BY MR. ERCOLE:
24  Q.  Was Ferguson's article published in 2024?
25  A.  I feel like you're mischaracterizing what

Page 268

1   is written here and the state of the evidence.
2   There are lots of different analyses, some are
3   well-done, some are not well-done.
4       The whole point of the Thrul article is to
5   show that Ferguson's meta-analysis and the claims
6   that he made were not well-done and to redo the
7   analysis and show what it shows when that analysis
8   is well-done.
9       And their findings were that social media
10  reduction or abstinence interventions should have a
11  minimum length of one week or longer to confer
12  mental health benefits.
13      What Ferguson, et al., did was included
14  studies that had interventions that were too short
15  to be able to see the positive effects of reducing
16  or stopping use.
17      So their conclusions, the Ferguson, et al.,
18  conclusions, are not reliable for that reason.
19  Q.  Right.
20      So just focusing on Ferguson, that study
21  was published in 2024 in a peer-reviewed journal;
22  correct?
23  A.  Yes, it was.
24  Q.  Okay.  And that finding for Ferguson was
25  that the social media effects were statistically no

Page 269

1   different from zero; right?
2       MS. McNABB:  Objection.
3       THE WITNESS:  It was a poorly done study.
4   And the Thrul, et al., study shows why and does a
5   reanalysis.
6       BY MR. ERCOLE:
7   Q.  Okay.  And so if you look at the results
8   here, they did a reanalysis of the same studies;
9   correct?
10  A.  They did a reanalysis where they separated
11  the studies that were short-term reductions, like a
12  week or less than a week, and then studies that were
13  longer-term reductions in use.
14      And I'm happy to explain to you if you'd
15  like to understand why that's so important to do.
16  Q.  Well --
17  A.  To lump those two types of studies together
18  will lead to spurious conclusions.
19  Q.  So let's look at the results.
20      So first, in the first sentence, Thrul
21  initially conducted a reanalysis of all studies;
22  right?  And found the same effect size as reported
23  in the original meta-analysis; correct?
24  A.  Yes.
25  Q.  And it was nonsignificant; right?

Page 270

1    A.    What they're saying there is when they do
2 the same thing that Ferguson did, not surprisingly,
3 they get the same results.  They're setting up the
4 important distinction between what Ferguson did and
5 what they did.
6    Q.    And then -- they then excluded seven
7 studies, right, that were not reduction/abstinence
8 interventions?  And what was the overall effect?
9    A.    They say here that was also nonsignificant.
10    Q.    Okay.
11    A.    But when, importantly, they used studies
12 that were longer, they did see an effect.
13    Q.    And one of the conclusions of this article
14 as of 2025 was that, quote (as read):
15        "More studies of various intervention
16        lengths are needed to confirm these
17        findings and strengthen the evidence in
18        this area of research, and studies need
19        to balance intervention efficacy with
20        feasibility and participant
21        acceptability."
22        Right?
23    A.    Every scientific clinical study with --
24 will conclude with a need for more studies.
25    Q.    With respect to, Dr. Lembke, the risk

Page 271

1 factors for addiction, you've talked about -- you
2 talked about social media addiction and -- at length
3 here today.
4        What are the -- what are the risk factors
5 for addiction?
6    A.    Risk factors for addiction, I generally
7 divide them into three large buckets:  Nature,
8 nurture, and neighborhood.
9        So nature are inherited risk factors,
10 including co-occurring psychiatric disorders.
11        Nurturous factors are things like trauma or
12 what is modeled in the home in terms of how
13 caregivers either explicitly or implicitly condone
14 use of a certain substance or behavior or model
15 maladaptive addictive use.
16        And then neighborhood has to do with the
17 environment, the ecosystem.  This is essentially
18 what I discuss at length in my book Dopamine Nation,
19 this idea that we're living in a drugified world
20 where we've made everything more accessible, more
21 bountiful, more potently reinforcing, more novel,
22 and in some cases more gamblified or gamified such
23 that even healthy behaviors can now be addictive
24 depending upon the medium.
25    Q.    And what is -- when you say "modeled in the

Page 272

1 home," what are some of the factors that fall within
2 the "modeled in the home" bucket, then, that can
3 cause or contribute to addiction?
4    A.    Caregivers who are themselves addicted to
5 the substance or behavior.  Caregivers who are not
6 paying sufficient attention to their children,
7 neglecting -- you know, not aware of what their kids
8 are -- where their kids are or what their kids are
9 doing.  All of these are risk factors for addiction.
10    Q.    And how about school-related issues?  Can
11 school-related issues be a cause or contributed to
12 addiction?
13        MS. McNABB: Objection.  Speculation.
14        THE WITNESS: I'm not exactly sure what you
15 mean by "school-related issues."
16        BY MR. ERCOLE:
17    Q.    Sure.
18        Doing well in school, not doing well in
19 school, being bullied in school, not being bullied
20 in school.  Are there any school-related factors
21 that can cause or contribute to addiction?
22        MS. McNABB: Objection.  Compound.
23        THE WITNESS: I think trauma more broadly
24 is a known risk factor for addiction.  So if trauma
25 is happening, you know, in schools, that could put

Page 273

1 someone at risk.
2        Generally school performance can be an
3 indicator of a potential addiction problem.  But we
4 also see lots of kids who are doing well in school
5 and still struggling with an addiction that is
6 covert and not identified in part because they are
7 doing well in school.
8        BY MR. ERCOLE:
9    Q.    How about genetic factors?  How do they
10 cause or contribute to addiction?
11    A.    So the family studies and the twin studies,
12 which are mainly based on alcohol use disorder, show
13 an increased risk of addiction if you have a
14 biological parent or grandparent who is addicted,
15 even if you are raised out of that substance-using
16 or addictive home.
17    Q.    And so what -- meaning if -- if -- if --
18 when you say "raised out of that substance-using or
19 addictive home," what do you mean by that?
20    A.    For example, if you have a biological
21 parent who has an alcohol use disorder and you're
22 adopted at birth and raised in a family of
23 teetotalers, you are still at increased risk of
24 addiction compared to people who don't have a
25 biological parent or grandparent --

69 (Pages 270 - 273)

Page 274

1  Q.  And --
2  A.  -- with addiction.
3  Q.  -- apart from social media, what are some
4 of the other -- I think you mentioned -- sorry.
5 Strike that.
6      The last bucket I think you said was
7 ecological factors?
8  A.  Environmental, ecological, right.
9  Q.  And apart from social media use, what are
10 some of the other ecological factors that can cause
11 or contribute to addiction?
12  A.  Well, access is the most important one,
13 simple access to a drug.  A behavior increases
14 exposure and hence the risk of getting addicted to
15 that behavior.
16      But other ecological factors are things
17 like poverty, unemployment, social dislocation.
18  Q.  How about abuse?
19  A.  That would be in the nurture bucket, part
20 of the developmental history of that child.
21  Q.  How about divorce, parental divorce?  Is
22 that a risk factor?
23  A.  Potentially if it was traumatic for the
24 child.
25  Q.  How about if one of the child's parents has

Page 275

1 been imprisoned for some reason?
2  A.  I think I would need to know the specifics
3 of that circumstance.  I wouldn't want to make a
4 broad statement about our criminal justice system.
5  Q.  How about learning disabilities?  Is that a
6 risk factor?
7  A.  Not necessarily.
8  Q.  Can learning disabilities cause or
9 contribute to addiction in -- in some way, depending
10 on the circumstances?
11  A.  I'm not --
12      MS. McNABB:  Objection.  Asked and
13 answered.
14      THE WITNESS:  Yeah.
15      I'm not aware of any evidence to support
16 that.  There may be some studies that I'm not aware
17 of, but I don't think a learning disability per se
18 is necessarily a risk factor.
19      Now, if you're categorizing attention
20 deficit disorder into the bucket of learning
21 disabilities, which you might do, then, yes, that is
22 certainly a risk factor.  But we typically
23 categorize that as a psychiatric disorder, not as a
24 learning disorder.
25 ///

Page 276

1      BY MR. ERCOLE:
2  Q.  So attention deficit disorder can be a
3 contributing factor for addiction?
4  A.  Yes.
5  Q.  Has the -- in your view, has there been an
6 increased use of psychiatric medication across the
7 country?
8      MS. McNABB:  Objection.  Scope.
9      THE WITNESS:  Yes.
10      BY MR. ERCOLE:
11  Q.  And has this increased usage or
12 prescription of psychiatric medication led to people
13 becoming more depressed, in your view?
14      MS. McNABB:  Objection.  Scope.
15      THE WITNESS:  I wouldn't say that, no.
16      BY MR. ERCOLE:
17  Q.  So are you -- have you ever talked about
18 whether or not the increase of psychiatric
19 medication in the United States has created a
20 correlation in increase in depression in the
21 United States?
22      MS. McNABB:  Objection.  Scope and
23 foundation.
24      THE WITNESS:  I don't think that accurately
25 characterizes my views on that matter.  I have

Page 277

1 written a book, as you mentioned and noted earlier,
2 called Drug Dealer, MD, which talks about increased
3 rates of prescribing of opioids and psychotropics,
4 including antidepressants, mood stabilizers,
5 antipsychotics --
6      (Stenographer interrupted for clarification
7       of the record.)
8      THE WITNESS:  -- anxiolytics.
9      And I think that's problematic for a bunch
10 of different reasons, which isn't to say that those
11 medications should never be used.  Obviously, I
12 prescribe them in my professional life on a regular
13 basis.
14      But I don't think I've ever made the claim
15 that increased prescribing of psychotropics causes
16 depression.  Sometimes they don't work.  Sometimes
17 there can be a neuroadaptation where in rare cases
18 they might contribute to dysphoria in an individual
19 as part of the varied reactions that people will get
20 to different psychotropics.
21      BY MR. ERCOLE:
22  Q.  Do you think they're -- opioid-related
23 issues have caused an increase in anxiety and
24 depression on a population level?
25      MS. McNABB:  Objection.  Scope.

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1    THE WITNESS: It is well-documented that
2  people who take opioids for long periods of time,
3  especially at higher doses, are at increased risk
4  for multiple mental healthcare disorders, including
5  depression and anxiety.
6    BY MR. ERCOLE:
7    Q.  With respect to -- there are -- let me
8  strike that.
9        There are different types of study designs;
10  is that fair to say?
11    A.  Yes.
12    Q.  And would you agree that there's like a
13  hierarchy of -- of quality study designs?
14    A.  Sure.  I could agree with that, yes.
15    Q.  And would you agree that sort of case
16  reports and case series are on the low end of the
17  hierarchy of evidence, at least with respect to the
18  issue of causation?
19    A.  I think when -- when we conceptualize the
20  scientific method, we would say that a case report
21  or a case series is trumped by other study designs.
22  But I, nonetheless, think that case reports and case
23  series are really important because they're often
24  the sentinel events when you're dealing with a new
25  disorder, including social media addiction.

Page 279

1        The first place that a new disease like
2  social media addiction will present is in people's
3  homes, in doctor's offices.  There always is going
4  to be a delay between those sentinel events and the
5  PhD-type researchers who then put together clinical
6  trials, you know, correlational studies, case cohort
7  studies, experimental studies.  There will always be
8  a delay.
9    Q.  Are you aware of any peer-reviewed -- just
10  off the top of your head -- any peer-reviewed case
11  reports or case series that have looked at the issue
12  of specifically causation and social media?
13    A.  I'm not aware of any as I sit here today.
14    Q.  How about ecological studies?  Those
15  studies track groups of people over time; is that
16  correct?
17    A.  M-hm.
18    Q.  And is it fair to say that ecological
19  studies can be useful for identifying associations,
20  but they don't necessarily provide causal answers?
21    MS. McNABB: Objection.  Misstates.
22    THE WITNESS: I think I would disagree with
23  that.  I mean, any one ecological study probably
24  isn't definitive, but if you get enough ecological
25  studies showing the same thing, then that's

Page 280

1  convincing.
2    BY MR. ERCOLE:
3    Q.  How many ecological studies would you need
4  to say the same thing in order for there to be that
5  type of causal finding?
6    MS. McNABB: Objection.  Speculation.
7    THE WITNESS: I couldn't put a number on
8  it.
9    BY MR. ERCOLE:
10    Q.  How about cross-sectional studies,
11  cross-sectional -- let me know if you agree with
12  this:  Cross-sectional studies assess the
13  association between variables at one point in time?
14    A.  Yes.
15    Q.  And would you agree cross-sectional studies
16  can only establish correlation, not causation?
17    MS. McNABB: Objection.
18    THE WITNESS: My answer is the same.  If
19  you only have one cross-sectional study, it's
20  insufficient.  But if you look at the totality of
21  the evidence, you know, multiple cross-sectional
22  studies combined with longitudinal studies combined
23  with experimental studies combined with cohort
24  studies and case series and case reports and
25  clinical knowledge and defendants' internal

Page 281

1  documents, the totality of the evidence can -- can
2  provide evidence for causation.
3    BY MR. ERCOLE:
4    Q.  And you would agree that the concept of
5  correlation is different from the concept of
6  causation; right?
7    MS. McNABB: Objection.
8    THE WITNESS: Yes.
9    MS. McNABB: Speculation.
10    BY MR. ERCOLE:
11    Q.  And meta-analyses are another category of
12  study; is that right?
13    A.  Yes.
14    Q.  And would you agree that meta-analyses
15  are -- are only as good as the underlying studies
16  that are included in the meta-analysis?
17    MS. McNABB: Objection.  Form.  Foundation.
18    Go ahead.
19    THE WITNESS: I would say that it's not
20  just a matter of the underlying studies included.
21  It's also a matter of the way that the meta-analysis
22  was designed.
23    BY MR. ERCOLE:
24    Q.  Right.
25        And so it's how the meta-analysis was

71 (Pages 278 - 281)

Page 282

1 designed, and then also how the underlying studies
2 being meta-analyzed were designed; correct?
3    A.  Yes.
4        MS. McNABB:  Objection.
5        BY MR. ERCOLE:
6    Q.  Okay.  And --
7        THE WITNESS:  Sorry.
8        MS. McNABB:  No, that's okay.
9        BY MR. ERCOLE:
10    Q.  In the -- just to go back to the -- the
11 meta-analysis in the Thrul article that we looked
12 at -- do you remember that?
13    A.  Yes.
14    Q.  They didn't reach any causation
15 determination in that article; right?
16        MS. McNABB:  Objection.  Foundation.
17        THE WITNESS:  Their main contribution was
18 to show that the Ferguson meta-analysis was poorly
19 designed and hence unreliable.
20        BY MR. ERCOLE:
21    Q.  They didn't reach any causation
22 determination in that article; right?
23    A.  I don't believe so, no.
24    Q.  Dr. Lembke, you mentioned before that you
25 have rebuttal opinions to Dr. Tucker, Dr. Kishida,

Page 283

1 Dr. Galván, and Dr. Auerbach; is that correct?
2    A.  Yes.
3    Q.  I get that list right?  Is that the correct
4 list?
5    A.  Yes.
6    Q.  That's the correct list of experts for whom
7 you have rebuttal opinions?
8    A.  Yes.
9    Q.  Okay.  And these opinions are opinions you
10 formulated in your head, but you haven't actually
11 submitted any type of written report that reflects
12 those rebuttal opinions; right?
13    A.  That's correct.
14    Q.  Okay.  So let's walk through what opinions
15 you have in your head with respect to each of these
16 experts; okay?
17        How about Dr. Tucker?  What rebuttal
18 opinions do you have with respect to Dr. Tucker's
19 affirmative report in the JCCP case?
20    A.  I would need to see Dr. Tucker's report and
21 to go through that with you one by one to answer
22 that.
23    Q.  Okay.  Sitting -- sitting here now, can you
24 tell me what opinions you have as to Dr. Tucker?
25    A.  Dr. Tucker has a long report, and I really

Page 284

1 would need to go see the report.  I'm happy to do
2 that.  If you want to give me the report now, I can
3 walk through it with you and give you my rebuttal
4 opinions.
5    Q.  Okay.  Well, I'm asking for you -- you came
6 in here -- I didn't even know you had these rebuttal
7 opinions.  So now I'm -- I'm coming in and I'm
8 asking you to articulate them for me.
9        So sitting here today, without actually
10 looking at his report, can you articulate to me what
11 rebuttal opinions you have as to Dr. Tucker?
12    A.  It's difficult for me to be specific
13 without looking at the actual report.  So I would
14 just like to qualify my response with that, first of
15 all.
16    Q.  Sure.
17    A.  And I'd be really happy to look at the
18 report and go through it in more detail.
19        But in general, all of the defendants'
20 experts' reports tried to undermine the validity of
21 the social media addiction disorder criteria.  And I
22 rebut that claim based on what I've written in my
23 report.
24        In general, the defendants' experts, in my
25 opinion, are talking outside of both sides of their

Page 285

1 mouths when they say that behavioral addictions and
2 substance-related addictions are different things,
3 but then establish the validity of the DSM, which
4 has gambling disorder and Internet gaming disorder
5 it in, as well as highlighting that dopamine can be
6 released in response to all kinds of rewarding
7 behaviors.
8        For example, Dr. Galván, I think, talks
9 about how dopamine can release -- be released in
10 response to getting a compliment from somebody, with
11 which I would agree.
12        So you can't on the one hand say that these
13 behaviors are associated with dopamine release, and
14 then, on the other hand say but you can't possibly
15 get addicted to behaviors and behaviors are wildly
16 different from substances.
17        In general, I rebut defendants' claims that
18 the scientific literature doesn't support causation
19 or that the concept of reverse causation can't be
20 eliminated.  I've considered causation.  I've
21 considered reverse causation.  And I've concluded
22 that social media use, defendants' platforms, in
23 particular, are addictive by design, and that
24 minors, youth, who use those platforms and
25 especially those who get addicted to those platforms

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

1  will have adverse mental health consequences as a
2  result.
3       So, again, rebutting their claim that
4  social media cannot cause mental health harms.
5       I have other rebuttals, but I -- you know,
6  in broad brushstrokes, that's the essence, I
7  believe, of -- of their reports.  And my report
8  clearly contradicts those claims.
9       So what I'm trying to say is that although
10  I haven't issued a rebuttal report, nothing in a
11  rebuttal report that I would issue would contradict
12  what I've written in my report here.  And the
13  essence of any rebuttal report will be -- is
14  captured in my existing report.  You're not going to
15  find something wildly different in a rebuttal report
16  from me.
17     Q.  With respect to Dr. Tucker, any other
18  opinions that -- rebuttal opinions that you have
19  other than the ones that you've just identified?
20     A.  Yes, I do.  I mean, I can speak to many
21  different claims that he made, but I really need to
22  look at the report and we'd have to go through it.
23     Q.  So you'd need -- for each of the defense
24  experts that you've identified, the four that you've
25  identified, you would need to understand the full --

Page 287

1  in order -- in order to understand the full extent
2  of your rebuttal opinions, we'd need to walk through
3  each of those reports; is that right?
4     A.  I feel like I answered that question
5  already.  Again, my -- I think the report that I
6  have written and submitted, you won't find anything
7  that deviates from my opinion herein in a rebuttal
8  report.
9       But in terms of the specific minutia of
10  various statements they make in their reports, I'd
11  really have to go through it.  I wouldn't want you
12  at some later date -- I wouldn't want to say now
13  "that's all I would rebut," and then have you come
14  later and say, "Oh, but they said this and you
15  didn't rebut it."  Right?
16       Does that make sense?
17     Q.  Can you think of anything, sitting here
18  right now, that -- any other sort of -- at least
19  with respect to Dr. Tucker -- any other rebuttal
20  report opinions that you'd like to give?
21     A.  In Auerbach's reports and in -- and in the
22  other reports, too, they make the claim that survey
23  studies or subjective readings are insufficient to
24  make a diagnosis of social media addiction.  I
25  refute that.

Page 288

1       The subjective experience of individuals is
2  one of the main ways that we diagnose any mental
3  health disorder.  We ask people a series of
4  questions, and the way that they answer those
5  questions largely determines our diagnosis.
6       We also have objective criteria, but those
7  subjective reports are very important and I would
8  say even central when it comes to a mental health
9  disorder.  And I think anybody who has been to see a
10  psychiatrist or a therapist or mental health
11  specialist could relate to the experience of getting
12  asked a series of questions that is then filtered by
13  the clinician or getting a scale and answering
14  questions on a scale that has been added up on
15  numbers and getting that interpreted as the way that
16  mental health diagnoses occur.
17       Auerbach also, interestingly to me,
18  makes -- actually has a whole paragraph talking
19  about the kinds of objective data that would be
20  important and necessary, specifically, you know,
21  objective numbers of people who are using the actual
22  defendants' platforms.
23       And when I read that, I thought to myself,
24  well, that's great that he thinks that because
25  defendants' internal documents have that data, which

Page 289

1  is why those documents are such a powerful
2  indictment of the addictive nature of the
3  defendants' platforms.
4     Q.  So -- and you've been talking about
5  Auerbach.  My question was a little bit different.
6       Was on --
7     A.  Was it really, though?
8     Q.  Yeah.
9     A.  Was it?
10     Q.  I can read it back to you.
11     A.  All right.  Yeah, please.
12     Q.  Can you think of anything, sitting here
13  right now, that any other -- any other rebuttal
14  opinions with respect to Dr. Tucker?
15     A.  Oh, okay.  That's fair.
16       Let me think about Dr. Tucker's report.
17       I think -- I can't recall anything specific
18  sitting here now about Dr. Tucker's report that I
19  haven't already addressed.
20       But, again, I reserve the right to say
21  that, you know, there probably is more in there that
22  I would rebut.  But, you know, I can't recall his
23  entire report from memory sitting here now.
24     Q.  Doctor, you mentioned, then -- the last
25  answer you gave was as to Dr. Auerbach; correct?

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

1    A.  Yes.
2    Q.  Okay.  Anything else besides what you've
3  articulated that you can think of now that would
4  serve as a rebuttal opinion to Dr. Auerbach?
5    A.  Not sitting here right now, no.
6    Q.  How about Dr. Galván?  Anything other than
7  what you've talked about already that
8  would -- strike that.
9       Any other -- any opinions that you have
10  other than what you've articulated already as --
11  that would serve as rebuttal opinions to Dr. Galván?
12    A.  I think my impression of Dr. Galván's
13  report was that she doesn't have expertise in
14  addiction, doesn't really know much about addiction.
15  And like I said, I think she contradicted herself in
16  validating that things like compliments and other
17  positive interactions can release dopamine, and then
18  saying that there's no biological plausibility for
19  social media addiction.  I think that was an
20  internal contradiction.
21       But I can't remember anything else right
22  now, sitting here.
23    Q.  And then, lastly, how about Dr. Kishida?
24  Any rebuttal opinions beyond what you've articulated
25  already with respect to Dr. Kishida's?

Page 291

1    A.  No.  I -- I think that Dr. Kishida
2  willfully misunderstood what I was doing with some
3  simplification of language and an extended metaphor
4  to explain to a lay audience how dopamine works in
5  the brain.  I think that his description of the
6  circuitry for addiction and my description are more
7  similar than not.
8       And I also am recalling that he made,
9  again, I think, you know, an arbitrary and unfounded
10  distinction between substances and behaviors when it
11  comes to addiction.
12    Q.  Anything else?
13    A.  Not that I can remember, sitting here now.
14    Q.  With respect to Dr. Kishida, do you view
15  Dr. Kishida as a qualified expert?
16    A.  Yeah.
17    MS. McNABB:  Object --
18    THE WITNESS:  You know -- okay.
19    MS. McNABB:  Objection.  And speculation.
20       And also, she's told you she needs to see
21  the reports.
22    BY MR. ERCOLE:
23    Q.  I think you answered the question.
24       How about Dr. Auerbach?  You read his --
25  you read that report, right, Dr. Auerbach's report?

Page 292

1    MS. McNABB:  Same objection.
2    THE WITNESS:  Yeah.  I mean, I'm -- sitting
3  here now, I'm not specifically recalling their
4  qualifications.  So hard for me to speak to that.
5    BY MR. ERCOLE:
6    Q.  But you -- I think you talked about
7  Dr. Galván --
8    A.  I did.
9    Q.  -- and you think Dr. Galván was qualified
10  to opine on addiction; right?
11    MS. McNABB:  And also --
12    THE WITNESS:  Those weren't my words
13  exactly.
14    MS. McNABB:  Just --
15    THE WITNESS:  Sorry.
16    MS. McNABB:  Just another objection as
17  calling for a legal conclusion, which is not
18  appropriate expert testimony.
19       But you can go ahead and answer.
20    BY MR. ERCOLE:
21    Q.  You can answer.
22    A.  I won't answer.  I mean, I don't have an
23  answer.
24    Q.  You don't have an answer one way or the
25  other as to whether Dr. Galván is qualified to talk

Page 293

1  about addiction issues?
2    A.  I don't think that I'm in a position to
3  make judgments about your defendants' experts and
4  whether or not they're qualified.  I mean, I can
5  make some -- I can give some impressions on where
6  they have less expertise in my opinion, you know,
7  when it comes to addiction.  But beyond that, no,
8  I'm not going to --
9    Q.  Do you believe --
10    A.  -- opine on that.
11    Q.  Okay.  Are any -- based upon your
12  knowledge, expertise, are any of the defendants'
13  experts in your view not qualified to opine on
14  addiction issues?
15    A.  I mean, I'd rather not answer that.  I
16  don't really want to cast judgment on, you know,
17  other experts.  I -- I have had limited exposure.
18  All I've read of their work is their reports and
19  then in some cases some of the papers they've
20  authored.
21    Q.  Okay.  Unfortunately, we're at a
22  deposition, so you can't just decline to answer a
23  question.
24    A.  Okay.
25    Q.  So let me ask the --

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

1    MS. McNABB: Objection. She did answer.
2 She told you what she thinks.
3    MR. ERCOLE: No.
4    MS. McNABB: She also has asked for the
5 reports.
6    MR. ERCOLE: In fact --
7    MS. McNABB: She's answered to the best of
8 her ability.
9    MR. ERCOLE: The answer was --
10    MS. McNABB: That's all she's required to
11 do in a deposition.
12    MR. ERCOLE: I didn't mean to talk over
13 you.
14    The answer was, "I mean, I would rather not
15 answer that," was -- was the answer.
16    MS. McNABB: And then she said, "And I
17 don't" -- okay. And then she said, "I have limited
18 exposure. All -- all the reading of their work is
19 their reports and then some of -- cases -- some of
20 the papers they've authored."
21    So she's, again, saying "I've had limited
22 exposure."
23    She's asked you for the reports, and you
24 haven't provided them to her. So she can answer to
25 the best of her ability, but she's answered your

Page 295

1 question.
2    MR. ERCOLE: Okay. She hasn't, so let me
3 ask it again.
4    BY MR. ERCOLE:
5    Q. One way or the other, sitting here today,
6 do you -- in your view, are any of the defendants'
7 experts, who -- reports that you looked at, are any
8 of those experts not qualified to opine on addiction
9 issues?
10    MS. McNABB: Objection. Calls for legal
11 opinion. And asked and answered.
12    THE WITNESS: Yeah, I don't believe that
13 I'm in a position to make those judgments.
14    BY MR. ERCOLE:
15    Q. Okay. Fair enough.
16    Dr. Lembke, I know you've testified before
17 that the social media platforms in this case have
18 similar features; is that correct?
19    A. Yes.
20    Q. They also have different features too;
21 right?
22    A. Yes.
23    Q. And they also offer different content to
24 users; correct?
25    MS. McNABB: Objection. Scope.

Page 296

1    THE WITNESS: I think the content is more
2 similar than not, especially as all of defendants'
3 platforms are progressing to infinite scroll of
4 short-form video.
5    BY MR. ERCOLE:
6    Q. The content -- so, Dr. Lembke, just so I
7 understand, so I can -- my notes are clear, your
8 testimony is that the content of all of the
9 defendants' social media platforms is the same?
10    MS. McNABB: Objection. Misstates prior
11 testimony.
12    THE WITNESS: That's not what I said.
13    BY MR. ERCOLE:
14    Q. Is it the same?
15    MS. McNABB: Objection. Form.
16    THE WITNESS: There's overlap in terms of
17 the medium. The media between the four defendants'
18 platforms are looking more and more similar. They
19 have very similar addictive design features.
20 They're competing and adapting with each other,
21 going to the sort of vertical, phone-based,
22 short-form video, which is so addictive. And
23 they're doing that presumably to get market share.
24    So they're different, but I would say
25 they're more similar than not.

Page 297

1    BY MR. ERCOLE:
2    Q. Do you recall my question, Dr. Lembke?
3    MS. McNABB: Objection. Argumentative.
4    THE WITNESS: Can you ask it again?
5    BY MR. ERCOLE:
6    Q. Sure.
7    Is the -- the content available on social
8 media platforms the same or does it differ?
9    MS. McNABB: Objection. Scope.
10    THE WITNESS: I mean, in many ways, as I've
11 said, the content is irrelevant because the medium
12 is what makes it addictive, and the medium is
13 similar.
14    If you're asking me, can you see the same
15 videos on TikTok as you can see on YouTube -- is
16 that what you're asking me?
17    BY MR. ERCOLE:
18    Q. My question, I thought, was fairly simple,
19 which is, if a user goes on YouTube, is that user
20 going to see the same content as that user is going
21 to interact with on Facebook?
22    MS. McNABB: Objection. Scope.
23    THE WITNESS: When it comes to Instagram
24 reels, YouTube Shorts, TikTok, Snapchat Spotlight,
25 my understanding is that there's a lot of spillage

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

1 in content that people can post, will post that
2 similar or same content on all of those platforms or
3 on multiple platforms.
4        So it's not identical content, but there's
5 a lot of similar content.
6        BY MR. ERCOLE:
7        Q. Dr. Lembke, the various defendants'
8 platforms provide different content; right?
9        MS. McNABB: Objection. Asked and
10 answered. She just gave you the answer.
11        MR. ERCOLE: She didn't, actually.
12        MR. ARBITBLIT: She did, actually.
13        MR. ERCOLE: First of all, there's one
14 person that's allowed to respond.
15        MR. ARBITBLIT: Comment withdrawn.
16        MR. ERCOLE: Thank you.
17        BY MR. ERCOLE:
18        Q. So let me ask my question. If you want to
19 say it's the same answer, fine, and we'll just deal
20 with the record as it is.
21        But would you agree, yes or no, the various
22 defendants' platforms provide different content?
23        MS. McNABB: Objection. Asked and
24 answered.
25        THE WITNESS: I already answered that

Page 299

1 question.
2        BY MR. ERCOLE:
3        Q. You can't answer that "yes" or "no"?
4        MS. McNABB: Objection. Asked and
5 answered.
6        THE WITNESS: I answered the question.
7        BY MR. ERCOLE:
8        Q. Can you -- all right. I'll ask another
9 question.
10        Can you answer the question I just asked
11 "yes" or "no"?
12        MS. McNABB: Same objection.
13        THE WITNESS: I think I answered it "yes"
14 or "no." I can't remember the exact phrasing.
15        BY MR. ERCOLE:
16        Q. Okay. Let's focus on YouTube.
17        YouTube has educational content; correct?
18        A. I mean, how are you defining "educational"?
19        Q. How about this: Does YouTube have
20 educational content, in your view?
21        A. YouTube has a lot of information on it.
22 Whether or not people are getting educated with that
23 information, I think it depends on the specific
24 whatever it is and how they're using it.
25        Q. YouTube has content that allows kids to

Page 300

1 learn how to do math problems, for instance; right?
2        MS. McNABB: Objection.
3        THE WITNESS: It does have content like
4 that, but I think that the jury is out on whether or
5 not that's really an optimal way for kids to learn.
6        It is the way that kids are getting
7 information, but I haven't seen any evidence that
8 kids are actually learning in that way.
9        BY MR. ERCOLE:
10        Q. Do schools across the country use YouTube
11 to help teach kids?
12        MS. McNABB: Objection. Speculation. And
13 foundation.
14        THE WITNESS: Let me reference my report
15 here.
16        If you go to ...
17        So YouTube's own internal documents --
18 sorry, this is page 65 of my report. I cite to
19 YouTube's own internal documents highlighting how
20 watching YouTube can contribute to, quote, decreased
21 attention span, unquote.
22        These internal documents hypothesize that
23 inattention are -- or cognitive deficits -- are
24 related to the fact that, quote (as read):
25        "Electronic media exposure is

Page 301

1        fast-paced; changes focus rapidly and
2        grabs viewer's attention; makes it
3        difficult to pay attention in less
4        stimulating settings (work, school)."
5        Pointing to the problematic YouTube among
6 kids and its negative impact on school performance.
7        YouTube's internal documents acknowledge
8 that blue light from screens and sleep deprivation
9 can result in lower academic performance in
10 student/teens.
11        And then to directly address your question
12 (as read):
13        "YouTube internal documents describe
14        how YouTube can lead to impulsive
15        behaviors, distraction, procrastination,
16        and problematic -- and is problematic for
17        self-learning. YouTube documents admit
18        that, quote, schools block Facebook
19        because it's not educational, unquote.
20        Nonetheless, the YouTube EDU project is
21        geared toward increasing, quote-unquote,
22        watch time, quote, more EDU content
23        equals more watch time per user."
24        And, again, I have not seen any evidence
25 that YouTube EDU promotes learning. In fact,

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

1  according to YouTube's own internal documents,
2  quote, More than 70 percent of schools in the U.S.
3  block YouTube, unquote. And that was in 2012.
4       BY MR. ERCOLE:
5       Q.  Is it your testimony that as a matter of
6  fact 70 percent of schools in the country block
7  YouTube?
8       A.  Well, that's what it says in this document
9  that I've cited.
10      Q.  Who created that document?
11      A.  That's a Google document.
12      Q.  Right.
13          Who authored it?
14      A.  I'd have to look at the document again.
15      Q.  Do you understand -- was it a draft
16  document?
17      A.  I don't believe so, no. It was an internal
18  document and YouTube's own analysis of its impact on
19  education and its own strategizing to try to get
20  YouTube into schools and noting that schools
21  blocking YouTube is an obstacle to doing that.
22      Q.  Are you aware that some internal documents
23  can be draft documents?
24      A.  Yes.
25          MS. McNABB: Objection.

Page 303

1       BY MR. ERCOLE:
2       Q.  Do you know who that document was shared
3  with at YouTube?
4       A.  I'd have to look at it again to answer that
5  question.
6       Q.  Do you know whether any steps were taken
7  based upon that document?
8          MS. McNABB: Objection. Form.
9          THE WITNESS: I'd have to look again at the
10  document to answer that question.
11         BY MR. ERCOLE:
12      Q.  Did you -- did you review any deposition
13  testimony about that document?
14      A.  I can't recall, sitting here now.
15      Q.  Sitting here now, can you identify a single
16  YouTube deposition that you reviewed?
17         MS. McNABB: Objection. Form.
18         THE WITNESS: Yes.
19         BY MR. ERCOLE:
20      Q.  Who? What deposition?
21      A.  I reviewed Mark Zuckerberg's deposition. I
22  reviewed Elena Davis's deposition. I believe I
23  reviewed other YouTube depositions as well.
24      Q.  And your understanding is Mark Zuckerberg
25  works for YouTube?

Page 304

1          MS. McNABB: Objection. Misstates
2  testimony.
3          THE WITNESS: Oh, sorry. Sorry. I take
4  that back. Right.
5          He works for Meta, obviously.
6          Who am I thinking of for YouTube?
7          Give me a second.
8          Okay. So it looks like I reviewed the
9  deposition of Fred Gilbert, the name that you
10  mentioned at the beginning of the deposition today
11  that I didn't recognize.
12         I don't have anything more to say.
13         Is there a question pending?
14         BY MR. ERCOLE:
15      Q.  You were skimming through your report and
16  offering stuff.
17         So is Fred Gilbert the only YouTube
18  deposition that you looked at in forming your
19  opinion?
20      A.  I don't recall sitting here right now.
21      Q.  Who is Fred Gilbert?
22      A.  I don't remember.
23      Q.  And in forming your opinions, I'll
24  represent to you that you cited 41 YouTube documents
25  on your Materials Considered list.

Page 305

1          Does that sound correct?
2       A.  I believe you. I didn't count them.
3       Q.  Do you know how many documents YouTube has
4  produced in this case?
5       A.  No.
6       Q.  Do you know how many pages of documents
7  YouTube has produced in this case?
8       A.  No.
9       Q.  In your report itself, you cite to 18
10  internal YouTube documents.
11         Does that sound right?
12      A.  I didn't count them.
13      Q.  With respect to those documents, are you
14  aware of any of the circumstances behind the
15  creation of those documents?
16      A.  Whenever I review a document, I look at
17  where it came from, who authored it, the date. I
18  try to find out the circumstance in which it was
19  used, if it cites data. I try to get ahold of, you
20  know, more information.
21         So I do my due diligence, but many times
22  these documents don't come contextualized. So it's
23  hard to know.
24      Q.  The contextualization comes with the
25  deposition testimony, right, oftentimes?

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

1      MS. McNABB:  Objection.  Speculation.
2      THE WITNESS:  Possibly.
3      BY MR. ERCOLE:
4      Q.   Is it helpful -- you asked for
5   depositions --
6      A.   Yes.
7      Q.   -- in this case; right?
8      A.   M-hm.
9      Q.   And you asked for depositions to help
10   understand the context of documents; is that right?
11      MS. McNABB:  Objection.  Misstates prior
12   testimony.
13      (Stenographer interrupted for clarification
14       of the record.)
15      THE WITNESS:  Depositions can be helpful in
16   understanding the context.
17      BY MR. ERCOLE:
18      Q.   And with respect to the YouTube documents,
19   the only deposition that you recall looking at is
20   Fred Gilbert, whose title you don't know sitting
21   here today; right?
22      A.   I don't recall.  That's right.
23      And I didn't feel I needed to -- to me,
24   the -- the YouTube documents I -- I reviewed spoke
25   for themselves.  I didn't feel like they needed to

Page 307

1   be further contextualized.
2      Q.   With respect to the documents, do you know
3   when the documents were created for YouTube
4   documents?
5      A.   Each YouTube document was created at a
6   different date and time, and I often looked at the
7   dates and times.  Sometimes I include dates in my
8   report.  Sometimes I don't.
9      Q.   Do you know -- did you review any
10   deposition testimony to understand what the authors
11   intended with respect to any of those YouTube
12   documents?
13      MS. McNABB:  Objection.  Asked and
14   answered.
15      THE WITNESS:  I feel like I -- I answered
16   that.
17      BY MR. ERCOLE:
18      Q.   You can -- I don't think you -- we may have
19   a disagreement about that.  So if you don't mind
20   answering again.
21      A.   Can you ask it again?
22      Q.   Sure.
23      With respect to those YouTube documents
24   that you reference in your report, did you review
25   any deposition testimony to understand what the

Page 308

1   authors intended or meant in those documents?
2      MS. McNABB:  Same objection.
3      THE WITNESS:  I only ask for deposition
4   testimony if it warrants it.  I don't feel I need
5   more information, then I don't ask for it.
6      BY MR. ERCOLE:
7      Q.   Did you evaluate who within YouTube saw the
8   various documents you cited in your report?
9      A.   Sometimes the individuals are listed who
10   are involved on a given committee, for example.  But
11   sometimes they're not.
12      Q.   Did you evaluate whether there were other
13   groups within YouTube that agreed with or disagreed
14   with what was being said in those documents?
15      MS. McNABB:  Objection.  Form.
16      THE WITNESS:  I mean, I did my best to
17   evaluate those various contingencies when that
18   information was available or when I think it was
19   warranted.
20      BY MR. ERCOLE:
21      Q.   Did you ask for information from counsel as
22   to whether there were groups within YouTube that
23   agreed with or disagreed with the documents that you
24   were citing here?
25      MS. McNABB:  Objection.  Objection to form

Page 309

1   and to the extent it would call for attorney-client
2   privilege.
3      But you can answer the question "yes" or
4   "no" or to the extent you know.
5      THE WITNESS:  Again, I would just answer by
6   saying, I try my best to do my due diligence to
7   evaluate the documents.
8      BY MR. ERCOLE:
9      Q.   For the documents that are identified as
10   YouTube documents in your report, do you have a list
11   somewhere of all the people within YouTube that saw
12   those documents?
13      A.   I don't have a list, and I'm not really
14   sure a list is relevant.  What's relevant is that
15   these are official YouTube documents making claims
16   about YouTube's product which are very important to
17   this case.
18      Q.   With respect to any of the documents that
19   you've referenced as to YouTube, are you aware of
20   whether or not any of the statements or findings in
21   those documents were implemented in some way, shape,
22   or form?
23      A.   Most of these documents are discussing
24   design features that are already part of the
25   platform.

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

1    Q.  With respect to the documents that are
2  YouTube documents in your report, if I were to ask
3  you about a -- well, let me rephrase that.
4        If I were to ask you about a specific --
5  point you to a specific document that you reference
6  in your report that's a YouTube document, would you
7  be able to tell me about the circumstances by which
8  that document was created?
9        MS. McNABB:  Objection.  Speculation.
10        If you want to point her to a document,
11  just show her the document, and she can give you her
12  analysis of it.
13        THE WITNESS:  What she said.
14        MS. McNABB:  You can answer if you want.
15        THE WITNESS:  Yeah, can you -- if you show
16  me a specific document.
17        BY MR. ERCOLE:
18    Q.  Well, I'm just asking any of the documents.
19    A.  M-hm.
20    Q.  If I were -- can you identify for me one
21  document that's a YouTube document where you could
22  explain to me the circumstances behind its creation?
23    A.  Well, the documents are varied; right?
24  Some of the documents are e-mail exchanges and --
25  and in that context, you can say clearly it came

Page 311

1  from this person and it went to those people on that
2  date.
3        Some of the documents are PowerPoint
4  presentations or other presentations that are put
5  together by individuals employed by YouTube and
6  communicated with other individuals at YouTube.
7  Sometimes it's possible to tell, you know, who it
8  was communicated to, other times not.
9        I actually don't think that that's
10  particularly important.  To me, what is of essence
11  here is what the documents say about YouTube
12  internal knowledge of the harms caused by their
13  social media platform, especially to kids.  And
14  frankly, it's shocking and horrific.
15    Q.  Dr. Lembke, let me ask you this:  Do you
16  think that in -- by -- in formulating your opinions
17  that -- I'll strike that.
18        Given that you only reviewed 41 YouTube
19  documents out of hundreds of thousands of documents
20  that have been produced and only looked at one
21  deposition of one YouTube person whose name -- whose
22  title you don't -- can't remember, do you think you
23  cherry-picked the documents and -- and information
24  in formulating your YouTube opinions here?
25        MS. McNABB:  Objection to form.

Page 312

1  Foundation.  Argumentative.
2        THE WITNESS:  No, I don't.
3        MS. McNABB:  Brian, can we take a break?
4        MR. ERCOLE:  Yeah, sure.
5        THE VIDEOGRAPHER:  The time is 4:26.  We're
6  off the record.
7        (Recess taken from 4:26 to 4:49.)
8        THE VIDEOGRAPHER:  The time is 4:49.  We're
9  back on the record.
10        BY MR. ERCOLE:
11    Q.  Dr. Lembke, we were talking a bit about
12  YouTube.
13        Are you aware of whether therapists
14  recommend to patients use of YouTube to help with
15  mental health issues?
16    A.  When you say "are you aware," do you mean
17  do I think that that generally might happen or do
18  you --
19    Q.  Yeah, sure.
20        Do you know whether therapists recommend
21  YouTube videos to patients to help with mental
22  health issues?
23        MS. McNABB:  Objection.  Speculation.
24        THE WITNESS:  I think it's possible, yeah.
25  ///

Page 313

1        BY MR. ERCOLE:
2    Q.  Have you ever done that?
3    A.  I might have done, yeah, if there's a
4  YouTube video that sort of summarizes a bit of
5  knowledge that I think would be helpful for them.
6    Q.  Do you recall what the video was that you
7  recommended to one of your patients?
8    A.  No.
9    Q.  Do you know whether other treaters within
10  the clinics you work at recommend YouTube videos to
11  patients to help with mental health issues?
12        MS. McNABB:  Objection.  Speculation.
13        THE WITNESS:  I don't know.
14        (Discussion off the stenographic record.)
15        BY MR. ERCOLE:
16    Q.  Do you use YouTube for any educational
17  purposes?
18    A.  Sometimes.
19    Q.  What educational --
20    A.  I mean --
21    Q.  -- purposes?
22    A.  -- we were talking earlier about education
23  and learning and whether what's happening when
24  people watch YouTube is really learning or whether
25  it's just sort of information without the necessary

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 314

1 processing for learning.
2      So given that, you know, I -- as I said at
3 the beginning, I watch YouTube videos for
4 entertainment. I watch YouTube videos for some
5 news.
6      I try -- I really try hard to limit my
7 YouTube use.
8      Q. How about how-to videos? Do you ever use
9 YouTube for how-to videos?
10     A. Yes.
11     Q. And how often do you watch YouTube?
12     A. Probably two to three times a week.
13     Q. And when you go on YouTube, do you search
14 for particular types of content?
15     A. So, yes, I've recently discovered that
16 there's a default mode where instead of
17 recommending -- or I don't know if it's a default
18 mode. There's a mode on YouTube where it doesn't
19 recommend any videos. You have to search for what
20 you want, which is much better, I found, for
21 preventing mindless viewing, which I am also
22 vulnerable to.
23     Q. And you don't -- you -- I think you
24 testified you don't have a YouTube account; is that
25 correct?

Page 315

1      A. I do not have a YouTube account, that's
2 correct.
3      Q. And so if you go -- go to YouTube in a
4 logged-out state and want to watch a video, you have
5 to provide some information about the content of the
6 video you want to watch; right?
7      A. Yeah, I have to do a search for a -- for a
8 particular type of video. That's right.
9      Q. And when you watch YouTube on the instances
10 where -- strike that.
11     On the days where you watch YouTube, how
12 often will you watch YouTube?
13     A. Just once typically at the end of the day.
14     Q. And for how long?
15     A. It varies. My intention is to watch no
16 more than about half an hour, but sometimes I get
17 caught in the addictive design features. And I can
18 watch up to three or four hours sometimes, which I
19 almost always regret.
20     Q. Do you think you're addicted to YouTube?
21     A. No. But I think that I use too much
22 YouTube, and I -- I could become addicted to
23 YouTube.
24     Q. You've used YouTube to help share your
25 research with the public; right?

Page 316

1      A. My interviews -- many of my interviews are
2 broadcast on YouTube. I'm not posting those, but
3 they are being posted by others.
4      Q. And I think your CV cites 17 media
5 appearances of you speaking about addiction for
6 which you cited YouTube as the means for someone to
7 watch it; right?
8      A. I believe you. I didn't count it.
9      Q. And do you think by -- by giving you a
10 platform for your interviews to be -- interviews
11 about addiction to be shared, would you agree that
12 YouTube has allowed you to help others battling
13 addiction?
14     MS. McNABB: Objection.
15     THE WITNESS: I hope so. And as I've made
16 clear before, you know, medium can have benefits.
17 It's the question of whether or not the harms
18 outweigh the benefits, especially when we're talking
19 about kids.
20     BY MR. ERCOLE:
21     Q. Have you ever uploaded any videos to
22 YouTube?
23     A. No.
24     Q. You are -- do you know that you're featured
25 in videos on YouTube Shorts?

Page 317

1      A. I was not aware of that.
2      Q. Do you know that Stanford University made a
3 YouTube Short of your role at the Stanford School of
4 Medicine?
5      A. I know that they made a video recently on
6 the faculty profile, but I did not know they posted
7 it on YouTube Shorts.
8      Q. Are you going to ask them to take that
9 down?
10     A. No.
11     Q. Do you know -- are you aware that there are
12 over 50 YouTube Shorts of you available on YouTube?
13     A. I wasn't --
14     MS. McNABB: Objection. Foundation.
15     THE WITNESS: Yeah. I wasn't aware. And
16 frankly, I think it's irrelevant to the discussion
17 here, because as I've said before, it's not the
18 content. It's the addictive design features.
19     BY MR. ERCOLE:
20     Q. Right.
21     So even though you believe that YouTube is
22 addictive and even though you have videos of
23 lectures and other content on YouTube, you don't
24 believe you need to take any steps to remove those
25 videos from YouTube?

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 318

1    A.  I've been very public about my opinions
2  regarding kids and that we do need guardrails to
3  prevent kids from accessing addictive social media
4  platforms, especially when you're talking about
5  under 13 and even, you know, older in some cases.
6        The way I think about addictive social
7  media is the way I think about any other legal drug.
8  So I'm not out there advocating that, you know, we
9  ban sales of alcohol.  Alcohol is a highly addictive
10  drug.  Most people who consume alcohol will not get
11  addicted to alcohol, and there are some benefits to
12  consuming alcohol.  Alcohol is a social lubricant.
13  Alcohol is recreational fun.
14        But it's very clear that a subset of
15  individuals who use alcohol will be harmed by
16  alcohol use and will get addicted to alcohol.  And
17  the same thing is true for YouTube.
18    Q.  And could someone get addicted to and be
19  harmed, in part, by watching your podcasts and other
20  content on YouTube?
21    A.  It's theoretically possible because, again,
22  the harm is not primarily the content.  The harm is
23  the recursive feedback loop that gets people caught
24  in the out-of-control use, the compulsive use, the
25  craving, and the use -- continued use despite

Page 319

1  consequences.
2    Q.  You haven't taken any steps to prevent
3  content that you created from being uploaded to
4  YouTube; correct?
5    A.  That is correct.
6    Q.  And, in fact, you haven't taken any steps
7  to prevent content that you have created from being
8  uploaded or shared on any other social media
9  platform; correct?
10        MS. McNABB: Objection.  Foundation.
11        THE WITNESS: That is correct.
12        BY MR. ERCOLE:
13    Q.  And some of the content that has been
14  uploaded on -- and strike that.
15        Some of the content that has been uploaded
16  or shared on social media involves the
17  Dopamine Nation book that you authored; correct?
18        MS. McNABB: Objection.  Foundation.
19        THE WITNESS: Yes.
20        BY MR. ERCOLE:
21    Q.  And you benefit from the publicity you get
22  by having content about Dopamine Nation displayed or
23  shared on social media; correct?
24        MS. McNABB: Objection.  Foundation.
25  Speculation.

Page 320

1        THE WITNESS:  I mean, I benefit in the
2  sense that my mission is to help people by educating
3  them about addiction.  And in doing that, in being
4  able to do that, yes, I benefit from that.
5        BY MR. ERCOLE:
6    Q.  You get publicity from that, right, too?
7        MS. McNABB: Objection.
8        THE WITNESS:  That's not my goal; but, yes,
9  that has also happened.
10        BY MR. ERCOLE:
11    Q.  And with respect to any videos or content
12  involving you that has been uploaded or shared on
13  social media, have you ever requested that there be
14  some disclosure associated with that content?
15        MS. McNABB: Objection to foundation -- or
16  form.
17        THE WITNESS:  I'm not really, you know, in
18  a position to do that, so I haven't done that.
19        BY MR. ERCOLE:
20    Q.  Right.
21    A.  But the content --
22    Q.  Sorry.
23    A.  -- of what I talk about in some of these
24  appearances is the harms of social media.  So
25  indirectly I am warning people about the dangers of

Page 321

1  social media.
2    Q.  But have you ever reached out, for
3  instance, to YouTube to say, "Hey, there's lots of
4  Shorts of me on YouTube.  There's lots of videos for
5  me on YouTube.  You should put some disclosure in
6  connection with those videos that say 'Warning, you
7  know, watching these videos may lead to addiction'"?
8    A.  No, I haven't done that.
9    Q.  And you haven't asked for YouTube to take
10  down any of those videos; right?
11        MS. McNABB: Objection.  Asked and
12  answered.
13        THE WITNESS:  I haven't -- I haven't done
14  that.
15        I do think it's YouTube's responsibility as
16  the owner and operator of YouTube platform to warn
17  people about the addictive nature of YouTube.  I
18  don't really think that's primarily my
19  responsibility.  And I feel that a lot of the work
20  that I do and the speaking and the writing that I do
21  is advocating for those kinds of warnings.
22        So there are many different ways to get at,
23  you know, what you're describing.
24        BY MR. ERCOLE:
25    Q.  Sure.

81 (Pages 318 - 321)

Page 322

1      Social media addiction is treatable;
2 correct?
3    A.   Yes.
4    Q.   And in your -- in your clinical experience,
5 psychiatric improvements occur within three to
6 four weeks of abstinence from social media; is that
7 correct?
8    A.   In about 80 percent of individuals who
9 abstain from social media for three to four weeks,
10 we see significant improvements, yes.
11    Q.   And is the solution pretty straightforward
12 that you have to limit your dopamine intake?
13    MS. McNABB:  Objection.  Vague.
14    THE WITNESS:  I mean, dopamine used in that
15 way is really metaphorical, you know, where that's
16 an oversimplification, as I've often said.  Dopamine
17 has become a sort of meme for describing an
18 addictive drug.  Dopamine is not itself addictive.
19 It's a chemical we make in our brain that signals a
20 "go, approach" response to a stimulus as opposed to
21 a "stop, withdraw" response.
22      So, you know, if I used that language, I
23 used it in a metaphorical, colloquial way.
24    BY MR. ERCOLE:
25    Q.   Well, you've actually repeatedly used

Page 323

1 the -- the phrase "dopamine fast"; correct?
2    A.   That's true.  Again, as a colloquial term.
3    Q.   And the "dopamine fast" is what you've
4 talked about as a way of -- of treating social media
5 addiction; correct?
6    A.   Right.  But I'm just emphasizing that when
7 asked to talk about the neuroscience and talk about
8 dopamine, I try to clarify that it's not that
9 dopamine is good or bad or that we get addicted to
10 dopamine per se.
11      And the dopamine fast is just a commonly
12 understood lingo for an abstinence trial.
13    Q.   And -- and when you say -- so when you
14 recommend a dopamine fast, what does that entail for
15 someone who has social media addiction in your view?
16    A.   That entails giving up social media for
17 four weeks.
18    Q.   And then what happens after that four-week
19 period?
20    A.   We do an assessment of how the individual
21 is feeling, how they felt initially.  Most often
22 people feel worse before they feel better as they go
23 into some degree of withdrawal from social media.
24      But the longer they can abstain, the more
25 likely they are to get to a place where they're

Page 324

1 feeling better, feeling less craving, less FOMO, and
2 less anxious, less depressed, getting more sleep,
3 having more time to do other things.
4      And then we assess how they're doing.  And
5 then we talk about, you know, what to do going
6 forward.  If it's a child or a teen, we almost
7 always involve family in that discussion and we try
8 to talk about, you know, whether it makes sense to
9 try to go back to using social media in moderation,
10 obviously, or whether the individual should continue
11 to abstain.
12    Q.   And you've reported on podcasts and other
13 places that approximately 80 percent of people will
14 be improved or completely freed of their symptoms of
15 depression and anxiety by engaging in this type of
16 dopamine fast; is that correct?
17    MS. McNABB:  Objection.  Foundation.
18    THE WITNESS:  What we see clinically is
19 that individuals who are willing and able to abstain
20 from their drug of choice, including social media
21 for 4 weeks, about 80 percent of them feel
22 significantly better.
23      It's not like their addiction is cured.  As
24 I state, addiction is a chronic, relapsing and
25 remitting disorder.  But that period of abstinence

Page 325

1 is the amount of time typically that people need in
2 order to see what they feel like when they're not
3 constantly on social media.
4      So when we're caught in those addictive
5 behaviors, it's really hard to see cause and effect
6 because it can feel like social media is
7 self-medicating anxiety and depression when, in
8 fact, in many instances it's actually making those
9 symptoms worse.
10      So by abstaining for long enough, going
11 through the withdrawal phase, resetting reward
12 pathways, individuals often feel much better not
13 using.  And then they have the motivation either to
14 continue to abstain, or if they're going to go back
15 to using, to go back to using with guardrails and
16 trying to use less.
17    BY MR. ERCOLE:
18    Q.   And just so that, you know, my notes and
19 the record is clear, you said it's about 80 percent
20 of people fall within that bucket of getting better
21 after the 30-day dopamine fast?
22    A.   Yeah, in my clinical experience, that's
23 right.
24    Q.   And are there -- after this 30-day dopamine
25 fast for your patients who you believe have social

CONFIDENTIAL

Page 326

1 media addiction, are there -- is there a specific
2 uniform set of guardrails that you establish for how
3 and when they can use social media again?
4      A.   If after the 30 days of abstinence they
5 decide that they want to go back to using social
6 media, or if it's a child or a youth, the -- they
7 together with their parents or whatever, you know,
8 the circumstance is, then we try to set up
9 guardrails to help them stay within those limits.
10 Typically the more specific the plan for using, the
11 better.
12      But it's -- it's difficult because the
13 social media platforms are so reinforcing that once
14 people go back to using them, they can quickly slide
15 back into overuse and addictive use.  So it's very
16 challenging.
17      Q.   What guardrails do you recommend?
18      A.   Specifying the specific platform that
19 they'll use; time constraints; what days of the week
20 that they'll use; how it will be monitored; how
21 they'll remain accountable; efforts to limit the
22 addictive design features, which isn't easy to do,
23 but includes things like turning off notifications
24 when possible, having the default be something like
25 what I just described to you where if you open up

Page 327

1 YouTube, you don't automatically get suggested "for
2 you" videos but instead get a blank screen where you
3 then have to enter what you're looking for.  If
4 there's any default modes, you know, try to limit
5 access, quantity, potency, novelty, uncertainty.
6      I'm not saying that those are effective
7 because, frankly, I haven't seen them be
8 particularly effective.  For most people, the design
9 features are so reinforcing that once folks go back
10 to using, it's -- it's very hard to stay within
11 those boundaries.  But, you know, we keep trying.
12      Q.   Just a couple more questions.
13      With respect to YouTube, Dr. Lembke, are
14 you aware of any peer-reviewed study that has
15 focused specifically on the impact of YouTube
16 features independent of or controlling for content
17 on adolescent mental health?
18      MS. McNABB:  Objection.  Form.
19      BY MR. ERCOLE:
20      Q.   Did you understand my question?  I'm happy
21 to repeat it if you --
22      A.   Yes.
23      Q.   Okay.
24      A.   I believe I did understand your question.
25      And there is a study that I think is

Page 328

1 important that looked specifically at YouTube and
2 how -- YouTube videos that are specifically designed
3 for that individual based on past viewing versus
4 general YouTube videos.  This study compared those
5 two in a brain imaging design.  This was Su,
6 et al -- S-U, et al.  And showed that when viewing
7 YouTube, that the -- the brain's reward pathway
8 lights up or -- or activates more strongly when
9 they're specifically designed for that individual
10 versus for general consumption.
11      Q.   And that's Su, et al.?
12      A.   Yeah.
13      Q.   Okay.  Any other peer-reviewed studies that
14 have looked at, in particular, YouTube features
15 independent of content or controlling for content to
16 evaluate whether YouTube features, in particular,
17 have an impact on mental -- adolescent mental
18 health?
19      A.   Well, YouTube itself has done a lot of
20 internal studies, as I mentioned, both quantitative
21 and qualitative, showing how their specific design
22 features are reinforcing and make it difficult for
23 people to stop using them.
24      Their internal documents also show how they
25 specifically augment and leverage those design

Page 329

1 features to increase watch time and the number of
2 users.  To me, that's -- that's compelling evidence.
3      Q.   How about peer -- I'm asking peer-reviewed
4 studies.  Yeah.
5      A.   I'm not aware of any other peer-reviewed
6 studies along those lines, although I will say that
7 many of the design features on YouTube are similar
8 to the design features on other platforms.
9      So I think those studies that don't
10 specifically involve YouTube also speak to YouTube's
11 addictive nature because of the similarities in the
12 design features.
13      Q.   Dr. Lembke, do you have any substantive
14 opinions about the defense experts that you've
15 reviewed that are not reflected in your affirmative
16 report or contained in what we've already talked
17 about today?
18      A.   Again, I think in order to answer that to
19 the best of my abilities, I would really have to see
20 the report again and have it right in front of me
21 right now.  If you want to do that, we can do that.
22      Q.   Just, did you -- coming in here today, did
23 you -- why didn't you review the reports and come in
24 with sort of a list of rebuttal opinions that you
25 could articulate on the record?

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

1      MS. McNABB: Objection. Scope.
2      THE WITNESS: I was not asked to produce a
3  formal rebuttal report, so what I offered to you
4  today from memory is sort of what I can do today.
5      BY MR. ERCOLE:
6   Q.  Fair enough.
7      But sort of -- this is the opportunity that
8  kind of we get to ask you some questions about --
9  about this. And I know there's been a fight over
10 the amount of time that we get for your -- for your
11 deposition.
12     And so if you were going to come in today
13 and offer rebuttal opinions to the defense experts,
14 is there a reason you didn't come in with a series
15 of notes that you could just articulate what those
16 rebuttal opinions are?
17     MS. McNABB: Objection to scope.
18     THE WITNESS: I was specifically asked to
19 not bring anything to this deposition but my report.
20     MR. ERCOLE: Okay. I may have some
21 additional questions after the defendants go. And
22 then if your counsel has some follow-up questions, I
23 may have some -- some other questions as well, but I
24 think that's it for me at the moment.
25     I do want to thank you for your -- for your

Page 331

1  time. And to the extent I was talking over you at
2  times, I apologize for that.
3      THE WITNESS: That's okay.
4      THE VIDEOGRAPHER: Do you want to go off?
5      MS. BARNHART: Yeah, let's go off the
6  record.
7      THE VIDEOGRAPHER: The time is 5:15. We're
8  off the record.
9      (Recess taken from 5:15 to 5:16.)
10     THE VIDEOGRAPHER: The time is 5:16. We're
11 back on the record.
12     EXAMINATION BY MS. BARNHART
13     BY MS. BARNHART:
14  Q.  Good afternoon, Dr. Lembke. I don't know
15 if we've formally met yet. I'm Lindsey Barnhart. I
16 represent Meta.
17     And thanks, again, for your time today.
18     In preparing your report in the JCCP, you
19 reviewed over 170 Meta documents; correct?
20  A.  I didn't count them, but I accept your
21 number.
22  Q.  I can represent to you there's over 170 on
23 your Materials Considered list.
24     Is it fair to say you reviewed all of the
25 materials on your Materials Considered list?

Page 332

1   A.  Yes.
2   Q.  Okay. You only cite 16 Meta documents in
3  your report, though; correct?
4   A.  If you say so. Again, I didn't count them.
5   Q.  Okay. One Meta document that you cite
6  repeatedly in your report is a research paper titled
7  "Understanding Perceptions of Problematic Facebook
8  Use"; correct?
9   A.  Yes.
10  Q.  And you cited to this paper earlier today?
11  A.  Yes.
12     MS. BARNHART: All right. I'm going to ask
13 the court reporter to mark as Exhibit 10 that paper.
14     (Marked for identification purposes,
15     Lembke Exhibit 10.)
16     BY MS. BARNHART:
17  Q.  So, Dr. Lembke, is Exhibit 10 a copy of the
18 paper titled "Understanding Perceptions of
19 Problematic Facebook Use" that you cite in your
20 report?
21  A.  Yes, it is.
22  Q.  This is a paper authored by
23 Dr. Moira Burke, Dr. Justin Cheng, and
24 Dr. Elena Davis; correct?
25  A.  Yes.

Page 333

1   Q.  Did you review the deposition testimony of
2  these authors?
3   A.  I'd have to check my Materials Considered.
4   Q.  Sitting here today, do you recall reviewing
5  the deposition testimony of these authors about this
6  paper that they wrote?
7   A.  I believe that I did. But to be sure, I'd
8  have to check my Materials Considered.
9      Would you like me to do that?
10  Q.  I don't think that's necessary. If you --
11 if you recall reviewing it, that's fine.
12     My next question is, did you cite the
13 deposition testimony of any of these employees in
14 your report?
15  A.  I don't remember.
16  Q.  You didn't. I'll represent to you that
17 there -- there are no citations to the deposition
18 transcripts of any of these authors in your report.
19  A.  M-hm.
20  Q.  Is there a reason why you didn't cite their
21 testimony about this paper in your report?
22  A.  I must have found it not essential.
23     So there's a lot of things that I reviewed
24 that I didn't cite in this report. Had I cited
25 everything that was relevant, that I reviewed, it

CONFIDENTIAL

Page 334

1 would be hundreds and hundreds of pages.
2        So when certain themes reached saturation,
3 I didn't continue to cite along the same lines. I
4 just used representative examples.
5    Q.   You didn't think it was essential to cite
6 these authors' description of their findings in this
7 paper in your discussion about the findings of this
8 paper?
9    A.   Well, I -- I reviewed what they said about
10 it, but I -- I didn't cite it in the report. I
11 didn't describe it in the report.
12    Q.   Because you didn't find it essential;
13 right?
14        MS. McNABB: Objection. Misstates.
15        THE WITNESS: I didn't feel it was
16 necessary to put it in the report.
17        BY MS. BARNHART:
18    Q.   Okay. And am I correct the Meta
19 researchers here set out to conduct this research
20 because they felt (as read):
21        "A better understanding of
22        problematic Facebook use can inform the
23        design context -- the design of
24        context-appropriate and supportive tools
25        to help people become more in control"?

Page 335

1    A.   That's what it says in the Abstract, yes.
2    Q.   Do you agree that that's a good thing?
3    A.   Yes.
4    Q.   It's good, it's -- you agree it's a good
5 thing for Meta to conduct research on user's
6 experience and then make product design changes in
7 response to that --
8        MS. McNABB: Objection. Asked --
9        BY MS. BARNHART:
10    Q.   -- research; correct?
11        MS. McNABB: Objection. Asked and
12 answered.
13        THE WITNESS: I believe it's important for
14 defendants, including Meta, to analyze the harms of
15 their products. I believe that they shouldn't be
16 the only ones doing that. They should make that
17 data available widely, publicly available to
18 researchers, because it's the best data there is.
19 And them not making it available is in and of itself
20 problematic.
21        I also am skeptical based on what I have
22 read and seen that they have -- they will use what
23 they find for good, that I -- Facebook has gathered
24 more than enough data to show the harms of Facebook
25 and Instagram, and yet their response has been

Page 336

1 anemic in terms of acting on their findings.
2        BY MS. BARNHART:
3    Q.   Okay. Well, we'll talk more about that in
4 a little bit.
5        But fair to say your report does not
6 mention the stated purpose of this research paper at
7 all; correct?
8    A.   I'll have to go back to where I mention the
9 report. Give me a moment.
10    Q.   Yeah. I can direct you to page 28 of your
11 report.
12        What your report says is simply that --
13        MS. McNABB: Hold on. She --
14        BY MS. BARNHART:
15    Q.   -- this paper found --
16        MS. McNABB: She's not --
17        (Simultaneous speakers - unclear.)
18        MS. BARNHART: I'm directing her to the
19 language.
20        BY MS. BARNHART:
21    Q.   So page 28 --
22        MS. McNABB: If you're going to read --
23        BY MS. BARNHART:
24    Q.   Are you on page 28?
25        MS. McNABB: -- she needs to turn --

Page 337

1        MS. BARNHART: Okay.
2        MS. McNABB: -- and give her a chance to
3 turn to the page.
4        MS. BARNHART: Right.
5        BY MS. BARNHART:
6    Q.   So I'm at Section 8, Romanette -- as you
7 taught me -- Romanette viii, subsection B. And what
8 you've observed about this study is simply that
9 (as read):
10        "3.1 percent of Facebook users
11        developed severe social media addiction."
12        Do you see that?
13        MS. McNABB: Objection. Misstates the
14 report.
15        THE WITNESS: It does say here that
16 (as read):
17        "They found that 3.1 percent of
18        Facebook users developed severe social
19        media addiction."
20        Yes.
21        BY MS. BARNHART:
22    Q.   Okay. Nowhere in Exhibit 10 do the authors
23 of this paper use the term "severe social media
24 addiction"; correct?
25    A.   So the -- the authors here use a Likert

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

1  scale on their survey items measuring problematic
2  use, a/k/a addiction, and based on the standard
3  interpretation of a Likert scale, "very often and
4  always" corresponds to severe. "Sometimes" would be
5  mild. And "never, rarely" would be -- "never,
6  rarely," would be mild, but sometimes would be
7  moderate.
8       So I would have to read it again to say --
9  to see whether or not they used the language
10  "severe" or some equivalent. I'm happy to do that.
11     Q. Yeah. Well, as -- as we go through this
12  study together, you can let me know if you ever see
13  any discussion of severe social media addiction.
14     A. M-hm.
15     Q. And you just testified just now that
16  problematic use is also known as addiction.
17       Did I hear you correctly?
18     A. The Meta definition of "problematic social
19  media use," which I've talked about previously, is a
20  pretty good definition of social media addiction.
21     Q. Okay. Earlier you testified that
22  problematic use and social media addiction are
23  different things as a definitional matter; correct?
24       MS. McNABB: Objection. Misstates
25  testimony.

Page 339

1       THE WITNESS: I believe I testified that --
2  that they weren't identical, but there was enough
3  overlap for me to view them as equivalent, and
4  that's how I used the terms. I used "problematic
5  social media use" as equivalent to "social media
6  addiction," and I believe I testified that way.
7       BY MS. BARNHART:
8     Q. Actually, what you testified earlier is
9  that Meta's definition of perceived problematic use,
10  as used in this paper, does not consider criteria
11  such as craving, compulsion, tolerance, or
12  withdrawal; correct?
13       MS. McNABB: Objection. Misstates
14  testimony.
15       BY MS. BARNHART:
16     Q. Is that correct?
17     A. Give me one second.
18       Can you say it again?
19     Q. You testified today that Meta's
20  definition of "perceived problematic use," which is
21  the definition used in Exhibit 10, does not consider
22  criteria such as craving, compulsion, tolerance, or
23  withdrawal.
24       MS. McNABB: Same objection.
25       THE WITNESS: It does include compulsion.

Page 340

1  So if I testified to that earlier, I misspoke.
2  Compulsion does relate to low control over
3  experiences.
4       BY MS. BARNHART:
5     Q. Control is a separate component of your
6  definition of addiction; correct?
7     A. Control over time spent is one criteria.
8  But control over experiences is broader and could
9  include mental preoccupation with the drug.
10       So I think that compulsion could be
11  included. But I would agree with you that craving,
12  tolerance, and withdrawal are not specifically in
13  the Meta definition or the Facebook definition.
14     Q. Okay. So three of the six components of
15  your definition of "social media addiction" are not
16  actually reflected in the definition of "perceived
17  problematic use" that's used in this paper; correct?
18     A. As I said earlier, I am summarizing 11 DSM
19  criteria into an easier shorthand way to remember
20  them into 6 criteria.
21       But it's not as if, like, there are
22  six criteria now and you need two of them, because
23  the four Cs encompass nine criteria.
24       So you can have multiple consequences
25  criteria, which means that the "negative life

Page 341

1  impacts" part of their definition, probably -- not
2  probably, does encompass multiple criteria
3  overlapping with the DSM criteria.
4     Q. My question, Dr. Lembke, was, isn't it true
5  that the definition of "perceived problematic use"
6  used in the paper that we've marked as Exhibit 10
7  does not include three of the six components -
8  craving, tolerance, or withdrawal -- that are part
9  of your definition of "social media addiction"?
10     A. That's fair.
11       BY MS. McNABB: Objection.
12       BY MS. BARNHART:
13     Q. Okay.
14     A. Yeah.
15     Q. And, in fact, the authors of this paper --
16  excuse me -- explicitly state that they are not
17  measuring addiction; correct?
18     A. Can you point me to that?
19     Q. Sure.
20       So if you look at the second paragraph
21  under the first section, the Introduction section,
22  the authors write (as read):
23       "We do not use the term 'addiction'
24       because there is no agreed-upon criteria
25       for diagnosis and because diagnoses of

86 (Pages 338 - 341)

CONFIDENTIAL

Page 342

1    clinical-level concerns would require
2    more formal assessment (i.e., by a mental
3    health professional)."
4        Do you see that?
5    A.  Let me just read it.
6        So that's what it says here.  I disagree
7 with that statement, but that is what it says here.
8    Q.  This statement is the authors stating what
9 terms they plan to use in the paper; correct?
10   A.  No.  This statement is making broader
11 assumptions about diagnostic criteria for the
12 diagnosis of social media addiction, which, as I've
13 said in my testimony today and as I say in my
14 report, I don't agree with.
15       I do feel that there is -- there are
16 agreed-upon criteria, not every definition is
17 identical.  But the overall gestalt describing
18 addictive behaviors is similar enough that I think
19 we're talking about the same construct.
20       They, furthermore, say (as read):
21       "Because diagnoses of clinical-level
22       concerns would require more formal
23       assessment (i.e., by a mental health
24       professional)."
25       I disagree with that statement.  I think a

Page 343

1 formal assessment by a mental health professional is
2 only one way to get at clinical-level concerns.  I
3 think there are other ways to do that.
4        The defendants' own documents get at those
5 clinical-level concerns.  The medical literature
6 looking at populations using survey scales on social
7 media addiction get at those clinical concerns.
8    Q.  Do you disagree with the statement that
9 these authors do not use the term "addiction" in
10 this paper?
11   A.  I can agree with the statement that they do
12 not use the term "addiction."  But that's the only
13 part of that statement that I agree with.
14   Q.  And leaving that aside, you, nevertheless,
15 interpreted this paper, in which the term
16 "addiction" is never used, to demonstrate that
17 3.1 percent of Facebook users developed severe
18 social media addiction; correct?
19       MS. McNABB:  Objection.
20       THE WITNESS:  As I made clear in my
21 testimony today and also specifically state in my
22 report, addiction is a commonly understood term that
23 is synonymous with use disorder in the DSM and
24 other -- and other definitions of social media
25 addiction.

Page 344

1        So, you know, we can argue about the
2 language and who's using what term, you know, when.
3 The bottom line is, it's the same disease process,
4 whatever you call it.
5        BY MS. BARNHART:
6    Q.  I understand your position on that.
7        Can we agree, then, that this paper,
8 Exhibit 10, does not ever in it state that
9 3.1 percent of Facebook users developed severe
10 social media addiction?
11       MS. McNABB:  Objection.  Asked and
12 answered.
13       THE WITNESS:  I think all I can agree on
14 with that is that they don't use the word
15 "addiction," but --
16       BY MS. BARNHART:
17    Q.  Or the word "severe"; correct?
18    A.  Well, let me look a little --
19       MS. McNABB:  Objection.  Asked and
20 answered.
21       THE WITNESS:  -- more closely.
22       BY MS. BARNHART:
23    Q.  And if you need to review this whole paper
24 to answer my question, I'd suggest we go off the
25 record.

Page 345

1        MS. McNABB:  She has only taken a minute to
2 look at it this far.  If she needs a few minutes,
3 she can review it on the record.  If she needs
4 ten minutes or half an hour, then we can go off the
5 record.  But she can give her a couple of minutes.
6        BY MS. BARNHART:
7    Q.  Can you answer the question?
8    A.  I am not seeing their use of the word
9 "severe" in here.  But I don't think that undermines
10 the point that I'm making by referencing this
11 article, which is that they found that 3.1 percent
12 developed a social media addiction, even though they
13 didn't use that language.
14    Q.  So are you, then, changing your language in
15 your report to drop the word "severe"?
16       MS. McNABB:  Objection.
17       BY MS. BARNHART:
18    Q.  Do you think that's a misstatement in your
19 report?
20       MS. McNABB:  Objection.  Argumentative.
21       BY MS. BARNHART:
22    Q.  And I'm still on that same page, 28.
23    A.  Right.  I had gone to another page.
24       I'd like to see -- I think in order to
25 answer this question, I have to look at footnote 90,

87 (Pages 342 - 345)

Page 346

1 the Meta document footnote 90, to refresh my memory.
2 Because I'm recalling that I saw a document that was
3 an internal Facebook document that said that they
4 found that 3.1 percent developed severe problematic
5 use, or if they didn't use the word "severe," they
6 used some equivalent term, and that 55 percent
7 developed a, actually, moderate use disorder.
8        So -- and I believe that is footnote 90.
9 So it would be great if I could see that and I could
10 better answer your question.
11     Q.  Well, unfortunately, your counsel has given
12 me very limited time with you today.  So I don't
13 have time to show you documents other than the one
14 that you cited to support this statement.
15        MS. McNABB:  Objection.  Argumentative.
16 We've given counsel --
17        MS. BARNHART:  There's no question to
18 object to.
19        MS. McNABB:  -- extra time.
20        MS. BARNHART:  So ...
21        MS. McNABB:  I'm objecting to your comment
22 that was argumentative.
23        MS. BARNHART:  Well, let me finish my
24 question then.  And then you can object to a
25 question if you have an objection.

Page 347

1        BY MS. BARNHART:
2     Q.  So I want to look into -- to the definition
3 that these authors used for problematic use.  If you
4 look at the page ending in -78, at the bottom of
5 this under "Results."
6     A.  Sorry, I'm not -- oh, yeah.
7        Yeah.
8     Q.  These authors state that they've actually
9 used a broader definition of problematic use than is
10 articulated in the literature, and they find that
11 their estimate of 3.1 percent is an upper bound
12 compared with other definitions with stricter
13 criteria.
14        Do you see that?
15     A.  I'm sorry.  I don't know where that is.
16 Can you point to it?
17     Q.  It's in the paragraph under "Who
18 experiences problematic use?"
19     A.  M-hm.
20     Q.  And then if you read down into that
21 paragraph, it says (as read):
22        "Because of a lack of consensus in
23        prior literature about how to define
24        problematic use, we include the two most
25        common criteria.  This is less

Page 348

1        restrictive than some models.  Therefore,
2        our estimate of 3.1 percent is an upper
3        bound compared to other definitions with
4        stricter criteria."
5        Do you see that?
6     A.  Okay.  Yeah, I see that.
7     Q.  You agree with me that "upper bound" means
8 a conservative estimate of perceived problematic
9 use?
10        MS. McNABB:  Objection.  Speculation.
11        THE WITNESS:  I agree with you that that's
12 what they're claiming here.
13        BY MS. BARNHART:
14     Q.  Okay.  Earlier today you testified that
15 this paper measured mental health -- mental health
16 outcomes, including depression and anxiety.
17        Do you recall that testimony?
18     A.  I'm not specifically recalling that.
19     Q.  Do you agree with me that this paper does
20 not, in fact, measure mental health outcomes,
21 including depression and anxiety?
22     A.  Well, this -- this paper looks at
23 consequences defined as "negative life impact
24 attributed to Facebook."
25        But you are correct, it doesn't

Page 349

1 specifically ask about depression or anxiety.
2     Q.  Okay.  So you do not believe that this
3 paper is one that made any findings relating to any
4 relationship between Facebook use and the
5 development of depression or anxiety?
6        MS. McNABB:  Objection.  Misstates
7 testimony.
8        THE WITNESS:  That's fair.
9        BY MS. BARNHART:
10     Q.  In your report, I'm looking at pages -- the
11 bottom of page 25 going to the top of page 26.  This
12 is another place where you cite Exhibit 10.  And you
13 say that this study used the Bergen Social Media
14 Addiction Scale.
15        Do you see that?
16     A.  Yes, I do.
17     Q.  And in your words, that scale measures
18 addiction through six core components: salience,
19 tolerance, mood modification, relapse, withdrawal,
20 and conflict; correct?
21     A.  Yes.
22     Q.  And the definition of "perceived
23 problematic use" that was used in Exhibit 10 does
24 not attempt to measure those six components, does
25 it?

88 (Pages 346 - 349)

Page 350

1    MS. McNABB: Objection. Vague.
2    THE WITNESS: It attempts to measure some
3 of those components but not all of those components.
4    BY MS. BARNHART:
5    Q. Correct.
6    And so it is not a true statement that the
7 Meta researchers who wrote this paper that is
8 Exhibit 10 used the Bergen Social Media Addiction
9 Scale; correct?
10    MS. McNABB: Objection. Misstates.
11    THE WITNESS: Well, if you go to the paper
12 itself and look at their Method section,
13 specifically under "Problematic use survey," it
14 states here (as read):
15    "The survey contained questions about
16    control and negative life impact adapted
17    from the Internet Addiction Test, the
18    Generalized Problematic Internet Use
19    Scale, and the Bergen Facebook Addiction
20    Scale."
21    So I believe that that's an accurate
22 statement to say that they used at least some of the
23 questions from the Bergen Facebook Addiction Scale.
24    BY MS. BARNHART:
25    Q. And that's -- that's not what you said in

Page 351

1 your report; right?
2    So are you modifying your report now to say
3 that these Meta researchers adapted some questions
4 from a scale as opposed to using the Bergen media --
5 social media addiction scale?
6    MS. McNABB: Objection. Misstates report
7 and argumentative.
8    THE WITNESS: So it looks like they adapted
9 these scales to create this scale. It's -- it's a
10 little hard to know exactly what they did.
11    But I would agree with you that they
12 didn't -- it doesn't appear that they used the
13 Bergen Facebook Addiction Scale in its entirety,
14 that they used some of the questions related to
15 out-of-control use and especially consequences.
16    BY MS. BARNHART:
17    Q. So they did not, in fact, employ the Bergen
18 social media addiction scale in conducting this
19 research; correct?
20    A. I disagree with that statement. It's clear
21 that they used the Bergen Facebook Addiction Scale
22 to inform their study, which still lends credibility
23 to the scale itself.
24    Q. They did not attempt to measure tolerance
25 or mood modification; correct? That was not part of

Page 352

1 the definition of "perceived problematic use" in
2 this paper?
3    A. I mean, I disagree with that because their
4 questions about consequences are vague, including
5 whether or not Facebook has a, quote, very negative
6 impact on their lives. And that very negative
7 impact can take many different forms including,
8 frankly, depression and anxiety.
9    So I want to kind of reverse what I said
10 earlier. I think you persuaded me to say something
11 that I don't think is true, looking at this more
12 closely, which I stated earlier that this study is
13 evidence that problematic social media use, social
14 media addiction, can contribute to a myriad of
15 negative consequences, including depression and
16 anxiety.
17    And looking, again, here, I think it's
18 perfectly possible, if not probable, that the very
19 negative impacts on their lives could have included
20 mood impacts.
21    Q. There's no specific finding in here about
22 depression or anxiety, correct, and no specific
23 question to the respondents about that topic?
24    MS. McNABB: Objection. Vague and
25 compound.

Page 353

1    THE WITNESS: I'm not seeing specific
2 questions asking about anxiety and depression. But
3 the question, Has Facebook had a very negative
4 impact on your life? Even the other questions, Has
5 it hurt school or work performance? You know, Does
6 it get involved with sleep? I mean, I think there
7 could -- embedded in that could be mood
8 consequences.
9    BY MS. BARNHART:
10    Q. And you're speculating about that; right?
11    A. I wouldn't say I'm --
12    MS. McNABB: Objection.
13    THE WITNESS: I don't think I'm
14 speculating, especially about the statement
15 "Facebook has a very negative impact on their
16 lives," because if you look at Facebook's own
17 qualitative studies --
18    BY MS. BARNHART:
19    Q. I'm just asking you about Exhibit 10?
20    A. Sure.
21    Q. -- Dr. Lembke. I'm not asking about any
22 other studies.
23    A. Yeah. But --
24    MS. McNABB: Just for the record to be
25 clean, please don't interrupt her answer. She's

89 (Pages 350 - 353)

CONFIDENTIAL

Page 354

1  giving you an answer.  You can ask your question
2  when she's done.
3       THE WITNESS:  Yeah.
4       So this -- you know, this work by Facebook
5  is clearly building on a larger body of work within
6  Facebook that I evaluated, including qualitative
7  studies that they did, one of which specifically
8  identified problematic outcomes.
9       BY MS. BARNHART:
10  Q.  Okay.  Well, if you need to find it, we can
11  go off the record and find that.
12  A.  That's fine.
13  Q.  But, again, I have very limited time with
14  you today.
15  A.  I think I -- I've said mainly what I need
16  to say, which is that I do feel that this represents
17  a piece of evidence that has broad-based negative
18  consequences that could include mood consequences,
19  for example, depression and anxiety.
20  Q.  If you look at the page ending in -81.
21  A.  -81.
22  Q.  The second paragraph on that page.
23  A.  Oh, in the study?
24  Q.  Yes.  M-hm.
25       The authors have a finding on this page.

Page 355

1       Are you there?
2  A.  I'm there.
3  Q.  I'm looking at the paragraph starting
4  "Despite feeling."
5       (As read):
6          "Despite feeling like there were
7       areas of their lives that were negatively
8       impacted by Facebook use, people in the
9       problematic use group also rated Facebook
10      as more valuable in their lives than did
11      people in the nonproblematic use group."
12      Do you see that?
13  A.  I do see that.
14  Q.  So even those users who reported perceived
15  problematic use received value and benefit from
16  using Facebook?
17      MS. McNABB:  Objection.  Misstates.  And
18  also misstates the full sentence in the -- in the
19  study.
20      THE WITNESS:  It's not at all surprising to
21  me that people in the problematic use group rated
22  Facebook as more valuable in their lives.  We know
23  very well that people who are vulnerable to a
24  certain addictive behavior find that addictive
25  behavior more salient or reinforcing.  And that's

Page 356

1  how I would understand this finding, that those
2  individuals that find Facebook reinforcing and
3  valuable are also the very same people who are more
4  likely to get addicted to Facebook.
5       I would also say that as people become
6  addicted to social media, they have what's called
7  "delayed discounting" where they tend to value
8  short-term rewards over longer-term rewards.
9       So the disease progression itself would
10  entail finding Facebook stimuli, you know, more
11  reinforcing than other reinforcers.  So there's a
12  loss of salience in other activities and narrowing
13  of focus on the drug of choice.
14       BY MS. BARNHART:
15  Q.  Dr. Lembke, do you have any understanding
16  of Meta's Teen Accounts feature?
17  A.  I am somewhat familiar with that, yes.
18  I've read about that.
19  Q.  And you understand that the Teen Accounts
20  feature makes a number of time management tools
21  defaults for teen users?
22       MS. McNABB:  Objection.  Foundation.
23       THE WITNESS:  Yes, I am aware of that.
24       BY MS. BARNHART:
25  Q.  And do you understand that 13- to

Page 357

1  15-year-old users of Instagram cannot opt out of
2  those defaults without parental approval?
3       MS. McNABB:  Objection.  Foundation.
4       THE WITNESS:  If -- I'd be curious when
5  that was implemented.  My sense of all of these,
6  quote-unquote, well-being interventions is that
7  they're quite recent and that it is possible to opt
8  out of them.
9       BY MS. BARNHART:
10  Q.  So it's not -- you're not aware that 13- to
11  15-year-old Instagram users cannot opt out of the
12  Teen Account defaults without parental approval?
13       MS. McNABB:  Objection.  Foundation.
14       BY MR. ERCOLE:
15  Q.  Is that information your counsel did not
16  provide to you in connection with your report?
17       MS. McNABB:  Objection.  Foundation.
18  Argumentative.  And also calls for attorney-expert
19  privilege.
20       So you can answer it "yes" or "no," but --
21  if you -- if you know.  But don't go into details
22  about what we've discussed.
23       THE WITNESS:  Yeah, I'm not specifically
24  recalling that.
25       MS. BARNHART:  Let's go off the record.

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 358

1      THE VIDEOGRAPHER:  The time is 5:46.  We're
2  off the record.
3      (Recess taken from 5:46 to 5:53.)
4      THE VIDEOGRAPHER:  The time is 5:53.  We're
5  back on the record.
6      EXAMINATION BY MR. BLAVIN
7  BY MR. BLAVIN:
8  Q.  Good evening, Dr. Lembke.  My name is
9  Jonathan Blavin.  I'm an attorney at Munger,
10  Tolles & Olson.  We represent Snap in the case.
11      And I'm just going to ask you a few
12  questions relating to Snapchat, and if anything is
13  unclear, please let me know.
14      Sitting here today, are you offering any
15  opinions regarding Snapchat that are not disclosed
16  in your report?
17  A.  No.
18  Q.  Okay.  So if your report is silent, doesn't
19  address a particular feature of Snapchat, it's fair
20  to say that you do not intend to offer at trial any
21  opinions relating to that feature?
22      MS. McNABB:  Objection.  Speculation.
23      THE WITNESS:  That might be an overreach.
24  If I'm presented with a feature and asked to
25  evaluate it in realtime, I may well offer an

Page 359

1  opinion.
2  BY MR. BLAVIN:
3  Q.  But other than that circumstance, in which
4  it could be presented to you in the context of your
5  testimony, you don't anticipate offering any
6  testimony relating to features which are not
7  specifically addressed in your report?
8  A.  That's correct.
9  Q.  Okay.  Now, I believe earlier you testified
10  that you reviewed four of the defendants' experts'
11  reports: reports from Drs. Tucker, Kishida,
12  Auerbach, and Galvàn; is that correct?
13  A.  Yes.
14  Q.  It's fair to say, then, that you did not
15  review the report from Dr. Nick Allen?
16  A.  I did not.
17  Q.  Okay.  And it's fair to say that, sitting
18  here today, you don't have any rebuttal opinions
19  relating to Dr. Allen's report?
20  A.  That's correct.
21  Q.  I believe you testified before, Dr. Lembke,
22  that you do not have any accounts for the
23  defendants' platforms; is that right?
24  A.  That's correct.
25  Q.  So you don't have a Snapchat account?

Page 360

1  A.  No, I do not.
2  Q.  And I believe you testified before that
3  other than YouTube, you don't presently use any of
4  the defendants' platforms; is that right?
5  A.  That is correct.
6  Q.  Okay.  Have you ever used Snapchat?
7  A.  I have seen it used by others, my patients
8  and my kids.  And they've described to me their
9  usage.  But I personally have not used it to
10  communicate with others.
11  Q.  Okay.  So other than observing maybe your
12  children or hearing feedback who are using Snapchat
13  or others or hearing feedback from your patients,
14  would it be fair to say that that's the extent of
15  where you've received your knowledge about how
16  Snapchat functions?
17  A.  I would add to that list my review of
18  Snapchat's internal documents.
19  Q.  Okay.
20  A.  Yeah.
21  Q.  Dr. Lembke, when a user opens Snapchat,
22  what part of the app do they initially see?
23  A.  I believe there's a home page.  I don't
24  know if it's called that, but it's something like a
25  home page that they will see.

Page 361

1  Q.  That's your opinion, that they see a home
2  page when they open the app?
3  A.  It like their profile page or the page that
4  has their friends on it.
5  Q.  Okay.  Dr. Lembke, would it surprise you
6  that when a user opens the Snapchat app, they don't
7  see a home page but they see a camera?
8  A.  Oh.  I guess that would surprise me a
9  little bit, yes.
10  Q.  Okay.  So it's fair to say that it's news
11  to you that when a user opens the Snapchat app, it
12  actually opens to a camera?
13  A.  That's news to me, yeah.
14      I know that -- I am aware that Snapchat
15  identifies itself as a -- a photography company.  I
16  don't think they use that exact language, but that
17  they see themselves as a photo-exchanging platform
18  and that that's an important distinction to them.  I
19  don't see it as an important distinction.
20      But thank you for clarifying for me that
21  when they first open it, they see a camera.
22  Q.  Okay.  And given that that's the way that
23  the app opens, it opens to a camera, why wouldn't
24  that be an important distinction in your opinion?
25  A.  Because whatever comes after the camera

91 (Pages 358 - 361)

CONFIDENTIAL

Page 362

1 looks very similar to other defendants' platforms
2 with similar addictive design features, like the
3 endless scroll, the autoplay, the notifications, the
4 posts, comments, shares, likes, and then the
5 addition of other Snapchat-specific features, like
6 the Streaks, the BFFs, the trophies, things like
7 that. The filters, the Bit emojis.
8    Q.  Okay.  Do you know what comes after a user
9 uses a camera -- the camera function on the app?
10    A.  I've explored many of the different pages.
11 I can't say I know the specific sequence in which
12 they appear.
13    Q.  Do you know that when a user uses the
14 Snapchat app and takes a picture, the app then
15 prompts them to see if they want to send that image
16 to one of their friends?
17    A.  Yes, I'm aware of that.
18    Q.  Okay.  Can you explain to me your
19 understanding of how Streaks works on the Snapchat
20 app?
21    A.  My understanding is that Streaks functions
22 like a reward in and of itself for the number of
23 times you message someone else.  And I believe that
24 Streaks specifically relies on daily messaging, so
25 there's a 24-hour cycle that you have to message

Page 363

1 them at least once a day to maintain your streak.
2    Q.  Yeah.
3       And do you understand that a user must
4 choose to initiate and pursue a streak with another
5 user on the app?
6    A.  Yes.
7    Q.  And is it fair to say that if a user wanted
8 to maintain a streak on the Snapchat app, like you
9 said, it could just -- they need to do it once a
10 day -- that it would only take a few minutes for
11 them to continue that streak each day?
12    A.  Yes, I am aware of that.
13    Q.  Are you aware that other apps besides
14 Snapchat use a similar Streaks functionality?
15    A.  I didn't know that, but I'm not surprised.
16    Q.  Would it surprise you that the Duolingo
17 app, which teaches people how to use foreign
18 languages, has a Streak functionality to it?
19       MS. McNABB:  Objection.  Foundation.
20       THE WITNESS:  It doesn't surprise me, no.
21       BY MR. BLAVIN:
22    Q.  Do you think Streaks used in other apps,
23 such as Duolingo, are inherently harmful?
24       MS. McNABB:  Objection.  Foundation and
25 scope.

Page 364

1       THE WITNESS:  I think Streaks are one of
2 the design features that create this compulsive way
3 of interacting on a platform.  And given enough of
4 those features, especially in a vulnerable youth
5 population, can contribute to the addictive
6 potential.
7       I don't think I would stand here and say
8 that a streak by itself would make an app addictive.
9 But it's all of those different design features in
10 concert.
11       BY MR. BLAVIN:
12    Q.  Okay.  So a streak in -- just so I
13 understand your testimony --
14    A.  Yeah.
15    Q.  -- a streak in isolation on an app, in your
16 opinion, wouldn't necessarily make the app
17 addictive, but it's the streak in combination with
18 other features or functionalities on the app; is
19 that right?
20    A.  Yeah.  I think the emphasis is on not
21 necessarily.  So it might, you know, in a vulnerable
22 user.  But it's really the combination of these
23 various addictive design features that ultimately
24 makes them highly reinforcing.
25       Streaks is one of many features on Snapchat

Page 365

1 that makes it reinforcing.
2    Q.  What other features in conjunction with
3 Streaks would reinforce the addictive nature of the
4 app, in your opinion?
5    A.  So I do talk about this in detail in my
6 report, and I'm happy to go to that section.
7    Q.  Well, I guess -- you don't need to do that.
8    A.  Okay.
9    Q.  My question really is, is there any feature
10 that you identify that is specifically tied to
11 communicating via Streak which adds to the addictive
12 nature of the Streak in your opinion, or are these
13 just other features of Snapchat unrelated to the
14 Streak which in your opinion makes the app generally
15 more addictive?
16       MS. McNABB:  Objection.  Compound.  And
17 vague.
18       BY MR. BLAVIN:
19    Q.  And if you don't know, it's fine to say
20 that you don't know.
21    A.  I'm just trying to see --
22    Q.  Yeah.
23    A.  -- see if there are features on Snapchat
24 that are in combination with Streaks or whether
25 these are separate features.  Your question ...

92 (Pages 362 - 365)

CONFIDENTIAL

Page 366

1    Q.  Well, I'll let you think about that
2  further.  If something comes to mind, you can answer
3  the question.
4    A.  Thank you.
5    Q.  Are you familiar with what sort of
6  information is displayed on a Snapchat user's
7  profile?
8    A.  Yes.
9    Q.  What information is displayed?
10   A.  Photographs, videos, Streaks, friends,
11  people who might be friends, tailored videos,
12  endless scroll videos that are not tailored but that
13  other people have liked, maps, geolocation.
14       Did I say --
15   Q.  On a user's profile?
16       So --
17   A.  Oh, on a user's profile.
18   Q.  -- is it -- do you -- is it your testimony
19  that a user's friends list are displayed on their
20  public profile on Snapchat?
21   A.  I'm actually not sure what's on the public
22  profile.
23   Q.  Okay.  Do you know if Snap has likes,
24  Snapchat has likes?
25   A.  I don't believe so.

Page 367

1    Q.  Okay.  So the testimony that you've given
2  today about likes being an addictive feature of apps
3  would not apply to Snapchat; is that fair?
4    A.  I don't think it's quite fair just because
5  Snapchat has other features that are akin to likes,
6  and in a way Streaks serve that role.  Somebody that
7  you're Streaking with, that you bother to do that
8  every day, that's positive re-enforcement.  So it
9  works in a similar type of way.
10       Certainly the BFF functions are strongly
11  socially reinforcing, and so akin to the likes.
12   Q.  M-hm.
13   A.  Friend emojis.
14   Q.  When a user posts a public story on
15  Snapchat, do you know if the number of times the
16  story has been viewed is publicly available?
17   A.  I don't know.
18   Q.  Okay.
19   A.  I do believe, though, that Spotlight
20  specifically highlights popular content.  And
21  Snapchat internal documents make it clear that the
22  algorithm has been designed to, quote-unquote,
23  surface popular videos.
24   Q.  Let's talk a little bit about the uses of
25  Snapchat.

Page 368

1       Do you know generally how much time
2  Snapchat users on average spend using different
3  features on the app?
4    A.  Let me just look at my report quickly.
5    Q.  It's fair to say I didn't see that in your
6  report?
7    A.  I do not.
8    Q.  Okay.  So you don't know, for example, if
9  users spend -- adult users or minor users, if they
10  spend most of their time on the app messaging with
11  friends versus, for example, viewing content on
12  Spotlight?
13   A.  Yeah.  I don't know the answer to that.
14   Q.  Did you ask anyone for that data?
15   A.  I did not.
16   Q.  Did you think it wasn't important to your
17  opinions?
18   A.  I think --
19       MS. McNABB:  Hold on.  Sorry.
20       Objection.  Foundation.
21       THE WITNESS:  I think it's a great idea.  I
22  didn't think about it.  But if I had, I would have
23  asked for it.
24       BY MR. BLAVIN:
25   Q.  Okay.  Are you aware that Snapchat is

Page 369

1  primarily used by its users as a communications
2  tool?
3       MS. McNABB:  Objection.  Foundation.
4       THE WITNESS:  Then I kind of wonder what
5  you mean by that.
6       BY MR. BLAVIN:
7    Q.  Well, for example, we talked about
8  examining usage of various features on the app.  As
9  I've talked about before, the app opens to a camera
10  which then allows someone to share video image with
11  a friend.
12       My question to you is, are you aware that
13  Snapchat users primarily use Snapchat as a method of
14  communication with one another as opposed to using
15  other features on the app?
16   A.  I wasn't aware that that was how people
17  were primarily using it.
18   Q.  Okay.  You testified before that you've
19  studied these apps.  You consider yourself an expert
20  in the features of the app.
21       So with respect to Snapchat's messaging
22  functionality, would you agree that it's similar to
23  texting messages to a friend using the iMessage
24  feature on an iPhone?
25       MS. McNABB:  Objection.  Foundation.

93 (Pages 366 - 369)

Page 370

1    THE WITNESS: I would agree that it has
2 texting capabilities, but there are many other
3 additional features that make it really different
4 from just texting on an iPhone.
5    BY MR. BLAVIN:
6    Q.  Right.
7    But you haven't yourself studied, in terms
8 of time spent on the app, whether users primarily
9 use the app for these texting functionalities versus
10 these other features; correct?
11    A.  That's correct.
12    Q.  And would that be a relevant -- I think you
13 said before that it would be a great idea to look at
14 that data?
15    A.  M-hm.
16    Q.  So you think that would be relevant to your
17 opinions relating to Snapchat?
18    MS. McNABB: Objection. Misstates
19 testimony.
20    THE WITNESS: It would be relevant, but the
21 finding that they're spending most of their time
22 texting wouldn't change my opinion about the
23 addictive nature of Snapchat.
24    BY MR. BLAVIN:
25    Q.  Okay.  But I believe you testified earlier

Page 371

1 in this deposition -- you were asked various
2 questions about activities which could be addictive.
3 You were asked, is texting an addictive behavior?
4 And I believe you testified, no, that texting is not
5 addictive.
6    MS. McNABB: Objection. Misstates and
7 vague.
8    THE WITNESS: I should have qualified that
9 answer with it depends on the platform on which the
10 texting is occurring.
11    BY MR. BLAVIN:
12    Q.  So is texting on iMessage addictive?
13    MS. McNABB: Objection. Scope.
14    THE WITNESS: I mean, it could be
15 potentially.
16    But if I look at Snapchat, you know, you
17 say that they're using it as a communication tool.
18 But my analysis is that a lot of the exchanges that
19 are occurring on Snapchat, even if they're occurring
20 via texting, is in order to maintain some kind of
21 social status or be in an in group or maintain
22 Streaks or BFFs.
23    BY MR. BLAVIN:
24    Q.  Where is that in your report?
25    In terms of the specific thing you just

Page 372

1 said, that texting on Snapchat is used to maintain
2 some type of social status, I did not see that in
3 your report.
4    A.  M-hm.
5    Well, on page 52 of my report, I mention a
6 qualitative study that was done by Snapchat, which
7 specifically calls out Streaks, for example, as
8 addictive, and then quotes from users saying that
9 Streaks are stressful, that they feel obligated to
10 maintain Streaks because of friends' reactions if
11 they don't.
12    Q.  I'm sorry, Dr. Lembke.  I wasn't asking
13 about Streaks specifically.  I understand that some
14 users can opt in to use Streaks.
15    I was just talking about the basic
16 functionality of messaging on Snapchat back and
17 forth with your friends.
18    A.  M-hm.
19    Q.  And are -- I did not see an opinion, other
20 than this paragraph on Streaks which you've
21 referenced, which talks about social status or
22 anything like that relating to Snapchat's use as a
23 communications tool.
24    A.  I'm sorry.  Can you repeat your question?
25    Q.  I'm just asking, can you -- I -- my

Page 373

1 question was focused not on Streaks, just using
2 Snapchat as a communications tool, back-and-forth
3 messaging with your friends.  I didn't see any
4 opinion in your report which tied it to social
5 status.
6    A.  So my assessment of Snapchat is that it's
7 not simply an innocuous communication tool between
8 friends; that a lot of the kids who use Snapchat,
9 especially those who get addicted to it, spend a lot
10 of time there trying to maintain this kind of social
11 validation and social status which the Snapchat
12 features have created.
13    Q.  Okay.  Do you cite any studies or other
14 types of evidence to support that conclusion?
15    I'm not sure where that conclusion is
16 actually in your report itself.
17    MS. McNABB: Objection. Compound.
18    BY MR. BLAVIN:
19    Q.  Okay.  Have you been able to find the part
20 of your report which establishes that?
21    A.  I mean, my report focuses more on the
22 features, like the endless scroll --
23    Q.  Okay.
24    A.  -- the video platforms.
25    Q.  And that's, like, the Spotlight feature?

CONFIDENTIAL

Page 374

1    A.   Yeah.  The posts, the favorite shares, the
2  comments, the maps, the BFFs.
3    Q.   So not specifically the messaging
4  functionality of Snapchat?
5    A.   And to me, those are a part of the
6  messaging functionality.  But if you're specifically
7  talking about the texting feature, yeah, it's not
8  focusing on the texting feature.
9        MR. BLAVIN:  I'd like to introduce an
10 exhibit.  I believe this is Tab 1 in our set of
11 documents.  I apologize.  It's not stapled.  It's a
12 big document.
13       (Discussion off the stenographic record.)
14       (Marked for identification purposes,
15         Lembke Exhibit 11.)
16       BY MR. BLAVIN:
17   Q.   Dr. Lembke, if you look at page 10 of your
18 report, in subpoint D, it says (as read):
19       "A February 2025 study 'Young
20       Consumers and Social Media.'"
21       Do you see that?
22   A.   Yes.
23   Q.   And that's -- if you go to page 8, that's
24 under the heading of your report (as read):
25       "Social media addiction has been

Page 375

1        accepted and validated as a psychiatric
2        condition by recognized authorities and
3        peer-reviewed literature."
4        Do you see that?
5    A.   I'm sorry.
6    Q.   And this is just -- I'm sorry, I was
7  reading the heading on page 8 under which this
8  report falls.
9    A.   Oh, okay.  Yes.
10   Q.   Okay.  So this is an example of, in your
11 opinion, a study which has established that social
12 media addiction is accepted and validated as a
13 psychiatric condition by recognized authorities in
14 peer-reviewed literature; is that right?
15   A.   Well, the report acknowledges an absence of
16 a diagnosis of social media addiction in the DSM and
17 the ICD-11.  But it really uses the term "social
18 media addiction" --
19   Q.   M-hm.
20   A.   -- as measured by the various scales.
21   Q.   Okay.  And if you could go to page 7 of
22 this report, and you'll see from the bottom of the
23 page, the third paragraph up --
24   A.   M-hm.
25   Q.   -- it starts with (as read):

Page 376

1        "A model of time spent on social
2        media ... "
3        Do you see that?
4    A.   Third paragraph from -- yes, I do.
5    Q.   Okay.  And it says (as read):
6        "A model of time spent on social
7        media reveals that consumers spend
8        significantly more time on content media
9        than on chat media (e.g., Snapchat and
10       Messenger)."
11       Do you see that?
12   A.   M-hm.
13   Q.   Do you have any reason to disagree with
14 that opinion?
15       MS. McNABB:  Objection.
16       THE WITNESS:  I mean --
17       MS. McNABB:  Speculation.  Foundation.
18       THE WITNESS:  -- no.
19       BY MR. BLAVIN:
20   Q.   Okay.  This is one of the studies that you
21 relied upon in your report; correct?
22   A.   M-hm.
23   Q.   Okay.  Go to page 32 of this document.  And
24 if you go four paragraphs up from the bottom, it
25 says (as read):

Page 377

1        "Content-based platforms such as
2        video-sharing and entertainment-focused
3        social media such as TikTok and Instagram
4        were associated with significantly more
5        overuse than chat-based media such as
6        Snapchat and Messenger."
7        Do you see that?
8    A.   I'm sorry.  Which paragraph?  I'm at the
9  page, but I'd like --
10   Q.   Sorry.  It's the fourth paragraph from the
11 bottom.  It starts "Content-based platforms" on
12 page 32.
13   A.   Yes, I do see that.
14   Q.   Yes.
15   A.   M-hm.
16   Q.   And, again, it says (as read):
17       "Content-based platforms such as
18       video-sharing and entertainment-focused
19       social media such as TikTok and Instagram
20       were associated with significantly more
21       overuse than chat-based media such as
22       Snapchat and Messenger."
23       Do you see that?
24   A.   I do see that.
25   Q.   And do you have any reason to disagree with

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

1 that opinion?
2    A.   No.
3    Q.   Okay.  In page 48 of your report, that's
4 when you begin your Snapchat-specific analysis; is
5 that correct?
6       MS. McNABB:  Objection.  Misstates report.
7       THE WITNESS:  That's where I take a deeper
8 dive into specific --
9       BY MR. BLAVIN:
10    Q.   Right.
11    A.   -- Snapchat documents.
12    Q.   The prior parts of your report discuss your
13 own methodology and your overview of the literature
14 of social media addiction at large; is that correct?
15    A.   That's correct.
16    Q.   And this part of your report discusses
17 Snapchat specifically.
18       And this part of your report is based
19 entirely on Snap's internal documents; is that
20 right?
21    A.   Yes.
22    Q.   And were any of these Snap documents that
23 you relied on published in peer-reviewed scientific
24 journals?
25    A.   I don't believe so, no.

Page 379

1    Q.   And were any of them reviewed or validated
2 by independent experts?
3    A.   I don't --
4       MS. McNABB:  Objection.  Vague.
5       THE WITNESS:  Not to my knowledge.
6       BY MR. BLAVIN:
7    Q.   Okay.  Did any of them involve clinical or
8 diagnostic tools used in psychiatry or psychology?
9       MS. McNABB:  Objection.  Vague.  And
10 speculation.
11       THE WITNESS:  Yes.
12       BY MR. BLAVIN:
13    Q.   Which one?
14    A.   So this is Nir Eyal's hook analysis of how
15 to get people addicted to things, and that was
16 referenced in Snapchat's internal documents.
17    Q.   Are you -- are you refer -- what page are
18 you on?  I'm sorry.
19    A.   I'm on page 54.
20    Q.   Oh, this is "The Hook" image.
21    A.   Yes.
22    Q.   Is that what you're referencing?
23    A.   Yeah.  M-hm.
24    Q.   Okay.  And --
25    A.   The habit -- the habit-forming flywheel.

Page 380

1    Q.   Got it.
2    A.   Yeah.
3    Q.   And that, in your opinion, is a clinical or
4 diagnostic tool used in psychiatry?
5    A.   It's similar to frameworks for
6 understanding how and why people get triggered to
7 engage in the behaviors to get rewards which then
8 lead to habit formation and in severe cases
9 addiction.
10    Q.   I believe before you said that you didn't
11 request any data relating to time spent on the
12 Snapchat app.
13       Did you request any outside datasets or
14 research on user experience or well-being from Snap?
15       MS. McNABB:  Objection.  Misstates prior
16 testimony.
17       THE WITNESS:  I did not request any outside
18 analysis.  I based my review on materials
19 considered.
20       MR. BLAVIN:  Thank you very much,
21 Dr. Lembke.
22       THE WITNESS:  You're welcome.
23       MR. BLAVIN:  No further questions.
24       MS. LEHMAN:  Can we go off the record while
25 we switch?

Page 381

1       MR. BLAVIN:  Yeah.
2       THE VIDEOGRAPHER:  The time is 6:20.  We're
3 off the record.
4       (Recess taken from 6:20 to 6:22.)
5       THE VIDEOGRAPHER:  The time is 6:21.  We're
6 back on the record.
7       EXAMINATION BY MS. LEHMAN
8       BY MS. LEHMAN:
9    Q.   Good afternoon, Doctor.  My name is
10 Katie Lehman.  We haven't met before today.  I
11 represent TikTok.
12       Are you prepared to continue and finish up
13 your deposition today?
14    A.   I am.
15    Q.   Okay.  And are you prepared to give your
16 final opinions as they relate to TikTok today?
17    A.   What do you mean by "final opinions"?
18    Q.   I mean do you anticipate doing any
19 additional work to develop any additional opinions
20 related to TikTok?
21       MS. McNABB:  Objection.  Speculation.
22       THE WITNESS:  I mean, I continue to review
23 the literature.  But at this time, you know, the
24 discovery is closed, so this is my report.
25 ///

96 (Pages 378 - 381)

CONFIDENTIAL

Page 382

1     BY MS. LEHMAN:
2     Q.  And are all of your opinions as they relate
3  to TikTok reflected in your report?
4         MS. McNABB:  Objection.
5         (Simultaneous speakers - unclear.)
6         THE WITNESS:  Again, the same answer as
7  before.  If I'm asked to opine on a new document
8  presented to me, I'm happy to offer that opinion.
9  But these are my opinions.
10        THE STENOGRAPHER:  I wasn't able to get
11  your full objection.
12        MS. McNABB:  I just said objection.
13  Misstates prior testimony.
14        THE STENOGRAPHER:  Thank you.
15        BY MS. LEHMAN:
16     Q.  Is it correct that you do not currently
17  have a TikTok account?
18     A.  That is correct.
19     Q.  Have you ever had a TikTok account?
20     A.  No.
21     Q.  Have any of your children ever had TikTok
22  accounts?
23     A.  Yes.  I believe so.
24     Q.  How many?
25     A.  I'm not sure.

Page 383

1     Q.  And is it correct that the only time that
2  you have personally engaged with TikTok was looking
3  over the shoulder of someone, either your child or
4  an acquaintance, who was using TikTok?
5     A.  No, that's not entirely correct.
6     Q.  Okay.  When was the other occasions when
7  you engaged with TikTok?
8     A.  My patients showing me the kinds of
9  behaviors that they're struggling with on TikTok and
10  also TikTok's own internal documents as well as some
11  studies in the medical literature researching
12  TikTok.
13     Q.  Okay.  And is it -- is it correct that -- I
14  want to make sure that I have the full universe --
15  the only time that you have engaged with TikTok
16  would be the internal documents that you reviewed,
17  medical literature that you reviewed, looking over
18  the shoulder of your child or someone else that
19  you're friends with, or when your patients have
20  described their own use of TikTok; is that correct?
21     A.  That's right.
22     Q.  Now, have you previously said during
23  interviews that the first time you said TikTok you
24  were on it for three hours and that time passed
25  without you realizing it?

Page 384

1     A.  So, you know, I -- I did say that, but I
2  think that I was on YouTube Shorts.  And so I think
3  I misspoke.  Because I don't think I was on TikTok.
4  I think I was on YouTube Shorts.
5     Q.  Okay.  But it's -- it would be inaccurate
6  to say that you had ever spent three hours on
7  TikTok; correct?
8     A.  I think that's inaccurate.  I think I
9  misspoke.
10     Q.  And are you able to estimate how many times
11  you've actually looked over the shoulder of someone
12  who's using TikTok or showing you something on
13  TikTok?
14     A.  No.
15     Q.  Are you able to estimate how much time in
16  total you spent looking over the shoulder of someone
17  who's showing you something on TikTok?
18     A.  No.
19     Q.  Then do you -- strike that.
20        Do you have any information about how
21  users, when they are on TikTok -- how they use that
22  time, like, what they are doing to engage with the
23  app?
24     A.  I have not seen any data on the breakdown
25  of what users are doing on that time.

Page 385

1        Wait a second.  Let me look at my report
2  for one second.
3        I've looked at broad usage, not a breakdown
4  of what they've been doing on the platform.
5     Q.  And when you say "broad usage," what do you
6  mean by that?
7     A.  Time spent, the time of day that it was
8  spent, as well as qualitative research on how it was
9  affecting them.
10     Q.  But you have not looked at any data that
11  attempts to analyze how users use the time that
12  they're on TikTok; correct?
13     A.  When you say "how they use the time," I'm
14  not sure I'm --
15        (Simultaneous speakers - unclear.)
16        BY MS. LEHMAN:
17     Q.  Right.
18        So whether they're posting something,
19  whether they're adding to content posted by someone
20  else, whether they're -- how exactly they're using
21  the app once they're on the app.
22     A.  I've not looked at a breakdown of the
23  specifics of how they're -- where they're spending
24  their time when they're on the app.
25     Q.  Okay.  And have you ever personally

97 (Pages 382 - 385)

CONFIDENTIAL

Page 386

1 conducted any study of TikTok?
2     A.   No.
3     Q.   Do you cite in your report any scientific
4 peer-reviewed literature that specifically studies
5 TikTok and determines that TikTok, the app, so the
6 specific app, is addictive?
7     A.   Can you say your question again?  Sorry.
8     Q.   Of course.
9         Do you cite in your report any scientific
10 peer-reviewed literature that specifically studies
11 TikTok and determines that the TikTok app, that
12 specific app, is addictive?
13     A.   Well, there is the study by Su, et al.,
14 that I talked about earlier that looks at whether a
15 tailored video -- TikTok videos are more reinforcing
16 than general videos, and finds that they are.
17         But nothing beyond that.
18     Q.   Did you conduct a Bradford Hill analysis
19 specific to TikTok?
20     A.   I mean, I'm always doing a Bradford Hill
21 analysis in my study of this.  I didn't write one up
22 for this report because my understanding is that --
23 and I know that another expert has done that, and
24 the judge didn't want duplicative reports.
25         And in my analysis, I include TikTok in

Page 387

1 that.  But I didn't do a separate one just for
2 TikTok.
3     Q.   Well, your report doesn't include a
4 Bradford Hill analysis for any -- for either social
5 media generally or for any individual platform;
6 correct?
7     A.   Not in my report, no.
8     Q.   Now, you have said previously -- you've
9 previously made comments comparing TikTok to crack
10 cocaine; correct?
11     A.   I believe it.  I'm not remembering the
12 specific comment.
13     Q.   Okay.  Well, a comment like that, do you
14 agree, would be hyperbolic or exaggerated for
15 effect?
16         MS. McNABB:  Object.
17         THE WITNESS:  I'm not sure it's
18 exaggerated.  I think that TikTok is especially
19 pernicious when it comes to safety and kids.
20         BY MS. LEHMAN:
21     Q.   So you believe that TikTok is the
22 equivalent of crack cocaine?
23     A.   I believe that TikTok is a highly addictive
24 medium and harmful for kids.
25     Q.   Okay.  Well, let's talk about that.  And

Page 388

1 what I want to specifically talk to you about is I
2 want to specifically talk to you about withdrawal;
3 okay?
4         So when someone goes into withdrawal from
5 crack cocaine, what do they experience?
6     A.   Crack cocaine is a stimulant, so withdrawal
7 symptoms are usually in the category of sedation
8 because withdrawal is usually the opposite of
9 whatever the drug does, although that's not
10 universally the case.  So they'll feel sedated,
11 lethargic, depressed, anxious, irritable, unable to
12 sleep.
13     Q.   Okay.  Can it interfere with their ability
14 to go to work and perform normal functions of their
15 everyday life?
16     A.   Yes.
17     Q.   Okay.  And if somebody goes into withdrawal
18 from social media, what symptoms do they experience?
19     A.   In severe cases of social media addiction,
20 they can be quite similar to that.  People can have
21 the psychological symptoms of withdrawal from any
22 addictive substance, which are anxiety,
23 irritability, insomnia, depression, craving.
24         And I've also seen kids, in particular, get
25 physiologic symptoms from withdrawal with social

Page 389

1 media, nausea, headache, flu-like symptoms, as well
2 as severe emotion dysregulation, temper tantrums,
3 you know, screaming, flinging themselves against the
4 wall, things like that.
5     Q.   How many patients have you seen fling
6 themselves against the wall while they're in social
7 media withdrawal?
8     A.   Well, I don't --
9         MS. McNABB:  Objection.  Misstates
10 testimony.
11         THE WITNESS:  Yeah.  So I've not -- I don't
12 see them do that.  This is their parents describing
13 these problems.
14         BY MS. LEHMAN:
15     Q.   So that's not something you've ever
16 personally observed?
17     A.   Well, how could I?  I mean, I'm not in
18 these people's homes.
19         It's, you know, when they bring their
20 children in or my adult patients describing their
21 experiences in the past.
22     Q.   And you would agree that there are other
23 substances that can be quite dangerous when a user
24 goes into detox or stops using them; correct?
25     A.   Yes.

98 (Pages 386 - 389)

CONFIDENTIAL

1    Q.   So, for example, when someone stops
2  drinking alcohol, they can -- they can go into very
3  serious withdrawal, can't they?
4    A.   Yes.
5    Q.   And someone who is an alcoholic and who is
6  going into detox for alcohol, you would recommend
7  that they be under the care of a medical
8  professional to ensure that they do so safely,
9  wouldn't you?
10   A.   The vast majority of people with alcohol
11 use disorder can withdraw from alcohol, stop using
12 alcohol without having serious medical sequelae.
13 It's a minority of individuals who needs a medically
14 monitored detox.
15   Q.   And -- but for -- there are people who are
16 severe alcoholics who could even be at risk of death
17 going into detox from alcohol; correct?
18   A.   That's correct.  But most substances that
19 people get addicted to do not have life-threatening
20 withdrawal.
21       So the exceptions are alcohol,
22 benzodiazepines, and in some cases opioids.  But,
23 for example, crack cocaine, although very
24 uncomfortable and painful, is usually not associated
25 with a life-threatening withdrawal.

1    Q.   Okay.  And what are the withdrawal symptoms
2  that someone can experience if they are an IV opiate
3  user?
4    A.   So opioid withdrawal has classic symptoms,
5  like nausea, vomiting, diarrhea, piloerection,
6  irritability, anxiety, dysphoria, craving, autonomic
7  instability, flu-like symptoms.
8    Q.   So I think you said -- you said it quite
9  nicely, but someone who's in detox from IV heroin, I
10 mean, these are people who can lose control of their
11 bowels; correct?
12   A.   That's correct.
13   Q.   Okay.  And would you agree that when
14 someone is going into withdrawal, that that is
15 really just a physical manifestation of the desire
16 or the longing for that substance?
17   A.   I'm not quite sure of your use of the words
18 a "desire" or a "longing for that substance."  I'm
19 not quite sure what you -- you mean by that.
20   Q.   Sure.
21       How would you describe what withdrawal is
22 to -- to a layman on the street if they asked you to
23 describe withdrawal?  What would you tell them?
24   A.   I would describe the process of
25 neuroadaptation, which I often do using that

1  metaphor of the balance and the -- (inaudible)
2       (Stenographer interrupted for clarification
3        of the record.)
4       THE WITNESS:  -- the balance and the
5  gremlins, talking about how with repeated exposure
6  to any reinforcing substance or behavior, our brain
7  adapts to that stimulus such that over time we need
8  more and more to get the same effect, or it just
9  stops working as well as it used to.
10      And then when we try to cut back or stop,
11 our brain has a built-in response that makes us feel
12 very uncomfortable as a way to try to get us to use
13 again to restore the new baseline homeostasis.
14      So I wouldn't use -- you know, with a
15 layperson on the street, it would take more time to
16 go through that.  But that's the basic idea.
17      BY MS. LEHMAN:
18   Q.   And for someone who is -- has been using
19 social media, you talked at length today about how
20 long it takes for them to recover and detox.
21      We don't need to go over that again, but is
22 it correct that their brain returns to baseline
23 after they stop using social media?
24      MS. McNABB:  Objection.  Speculation.
25      THE WITNESS:  We don't really know.  You

1  know, again, we are sort of observing phenomenology,
2  patterns of behavior over many different patients.
3  And typically what we see is that by about Week 3 to
4  4 in most people, the symptoms related to their
5  addiction are largely improved or improving.  But
6  that's not true in every case.
7       But we do suspect that once someone has
8  been addicted to a substance or behavior, that their
9  brain is probably permanently changed in some way
10 such that even with sustained abstinence, with a
11 single exposure to their addictive substance, they
12 can, you know, be plummeted right back into those
13 addictive behaviors without the same kind of ramp-up
14 period that was required to initially get them into
15 that addicted state.
16      BY MS. LEHMAN:
17   Q.   And can you cite me to any peer-reviewed
18 study that establishes that point for social media?
19      MS. McNABB:  Objection.  Vague.
20      THE WITNESS:  Which point exactly?
21      BY MS. LEHMAN:
22   Q.   The point that once someone has sustained
23 abstinence to the exposures, their addictive
24 substance, it can plummet, but they can go right
25 back to their addictive behaviors without the same

99 (Pages 390 - 393)

CONFIDENTIAL

Page 394

1 kind of ramp-up period?
2    A.  I mean, work by Telzer shows that there is
3 neuroadaptation or tolerance to social media, and
4 other studies that I cite show that there are very
5 similar brain changes, as we see with drug and
6 alcohol addiction.
7        But my, you know, explanation of what
8 happens with withdrawal and then returning to
9 addictive behaviors with exposure are primarily
10 based on my clinical experience.
11    Q.  Now, in your report on page 68, you state
12 that TikTok has no age verification process.
13        What is the basis for that statement?
14    A.  That's internal documents from TikTok that
15 I reviewed.
16    Q.  Okay.  So you're not -- you're not familiar
17 with TikTok's multi-step age assurance program?
18        MS. McNABB:  Objection.  Foundation.
19        THE WITNESS:  I believe, and I -- I say
20 here, too, that although they have a process -- so
21 maybe I should have stated this a little bit
22 differently -- although they have a process, it's
23 not verified, it's not authenticated.  Kids can go
24 on TikTok and say that they're 18 even if they're
25 not or say that they're 13 even if they're not.

Page 395

1        BY MS. LEHMAN:
2    Q.  And what is your understanding about the
3 process that happens after someone gives their age
4 once they're using TikTok?
5        MS. McNABB:  Objection.  Vague.
6        THE WITNESS:  My understanding is that if
7 they give the age of 13 or higher, then they can
8 create an account.
9        BY MS. LEHMAN:
10    Q.  Okay.  And do you have an understanding
11 about the age assurance steps that TikTok has in
12 place after someone provides their date of birth?
13        MS. McNABB:  Objection.  Foundation.
14        THE WITNESS:  No, I don't.
15        BY MS. LEHMAN:
16    Q.  Have you requested any information about
17 that from plaintiffs' counsel?
18    A.  I didn't specifically request that.
19    Q.  Have you requested to review any of the
20 expert reports that specifically outline the
21 multi-steps in TikTok's age assurance program?
22        MS. McNABB:  Objection.  Foundation.
23        THE WITNESS:  I didn't specifically ask for
24 that.
25 ///

Page 396

1        BY MS. LEHMAN:
2    Q.  You mentioned TikTok's internal documents.
3        Were any of the internal documents that you
4 reviewed from TikTok, were they published in any
5 peer-reviewed journals?
6    A.  I don't believe so, no.
7    Q.  Were any of the TikTok internal documents
8 that you reviewed -- did they include data of a
9 review from third-party sources or validation of
10 data from third-party sources or experts?
11        MS. McNABB:  Objection.  Vague.  And
12 compound.
13        THE WITNESS:  Can I ask what you mean by
14 "validation of sources from third-party experts"?
15        BY MS. LEHMAN:
16    Q.  Sure.
17        Did any of them include validated data that
18 had been reviewed by any expert or anyone outside of
19 TikTok?
20    A.  Not that I know of.
21    Q.  Okay.  Have you ever told a patient that it
22 would be impossible for them to stop using social
23 media?
24    A.  I don't think so.
25    Q.  Would you ever tell them that?

Page 397

1        MS. McNABB:  Objection.  Speculation.
2        THE WITNESS:  I mean -- I mean, I don't
3 think so.  There's always hope for recovery.  I
4 don't think I would say that to a patient.
5        BY MS. LEHMAN:
6    Q.  You've talked about the four expert
7 reports.
8        Do you know Dr. Tucker?
9    A.  What do you mean by "know" him?
10    Q.  Are you personally acquainted with
11 Dr. Tucker?
12    A.  I mean, I've encountered him in opioid
13 litigation and in other -- and one other case, but I
14 don't personally know him.  I've only ever met him
15 in the context of litigation.
16    Q.  Have you ever met or worked with
17 Dr. Kishida?
18    A.  No.
19    Q.  Have you ever met or worked with
20 Dr. Auerbach?
21    A.  No.
22    Q.  Have you ever met or worked with
23 Dr. Galván?
24    A.  No.
25    Q.  Have you reviewed any peer-reviewed article

100 (Pages 394 - 397)

CONFIDENTIAL

Page 398

1  written by Dr. Galván?
2      A.  No.
3      Q.  Have you reviewed any peer-reviewed article
4  written by Dr. Auerbach?
5      A.  No.
6      Q.  Have you reviewed any peer-reviewed article
7  written by Dr. Kishida?
8      A.  Yes.
9      Q.  What article is that?
10     A.  I'm not recalling the name, but it was an
11  article he coauthored on the impact of social
12  context on dopamine release.  And it was a very
13  quick review, just to try to get a sense of what the
14  article was about.
15     Q.  And when did you review that article by
16  Dr. Kishida?
17     A.  Sometime after I read his report.
18     Q.  Is that the only peer-reviewed article by
19  Dr. Kishida that you've read?
20     A.  I believe so, yes.
21     Q.  And have you reviewed any peer-reviewed
22  articles written by Dr. Tucker?
23     A.  No.
24     Q.  Do you agree that companies across
25  different industries, so not just focusing on social

Page 399

1  media, that they study the people who use their
2  products?
3      A.  Yes.
4      Q.  And do you have any criticism of the fact
5  that companies study the people who use their
6  products?
7      A.  I mean, I don't have criticism of the fact
8  that they study the people.  But I have criticism
9  that when they find that their products cause harm,
10  they don't issue a warning about the product, they
11  don't try to change the product to make it safer.
12         And specifically with the defendants, I
13  also would criticize that they're not making their
14  data publicly available to researchers so that we
15  can have better data to understand the harm that
16  their products are causing.
17     MS. LEHMAN:  I'm going to respectfully move
18  to strike as non-responsive starting with "But I
19  have criticism."
20         All right.  I want to show you a document.
21  We'll mark this as Exhibit No. 12.
22         (Marked for identification purposes,
23         Lembke Exhibit 12.)
24     BY MS. LEHMAN:
25     Q.  All right.  And can you confirm the title

Page 400

1  on this is "TikTok History 101 - U.S."?
2      A.  Yes.
3      Q.  Okay.  Now, in your review of TikTok
4  internal company documents, did you see that TikTok
5  categorizes its user demographics into five
6  different categories, L1 through L5?
7      A.  Yes.
8      Q.  Okay.  And those relate to different age
9  ranges?
10     A.  Yes.
11     Q.  And so L1 is those who are 13 to 15?
12     A.  I believe so.  I think I reference that in
13  my report.  I'm not remembering the exact label.
14     Q.  Okay.  Well, I will -- I will tell you that
15  I -- I believe that to be the correct age range.  So
16  please do tell me if you think that's wrong, but I
17  think that that's correct.
18     A.  Yeah, I accept your representation of that.
19     Q.  All right.  And then is it your
20  understanding that L2 is 15 to 17 year olds?
21     A.  Sure.
22     Q.  Okay.  L3 is 18 to 24 year olds?
23     A.  Okay.
24     Q.  And L5 is 35 plus?
25     A.  Okay.

Page 401

1      Q.  Okay.  And L4 is 24 to 34?
2      A.  Okay.
3      Q.  All right.  So then if you'll turn in the
4  document that I've given to you -- well, first off,
5  do you remember reviewing this document?
6      A.  I've reviewed a lot of documents.  I'm not
7  specifically recalling this document.
8      Q.  Okay.  Well, I will represent to you that
9  you cite this document in footnote 300 --
10     A.  Okay.
11     Q.  -- on page 68 of your report.
12         And within the document itself, I'd like to
13  direct you to the page ending -17.
14     A.  M-hm.
15     Q.  And just let me know when you're there.
16     A.  Okay.  Yeah.
17     Q.  All right.  And do you see over on the
18  right side of the page there are some -- some
19  comments?
20     A.  Yes, I do see that.
21     Q.  All right.  And do you see that the
22  comments are -- they're commenting on some text, and
23  the text says (as read):
24         "The goal of our first taste cluster
25         analysis was to size the meme gamer

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

1     change taste cluster and get an idea for
2     our main L34 user segments."
3        Do you see that?
4     A.  I do see that.
5     Q.  Okay.  And do you understand "L34" to
6  reference the groups for L3 and L4?
7     A.  Sure.
8     Q.  Okay.  Have you seen that nomenclature in
9  other TikTok internal documents that you have
10 reviewed?
11    A.  Yes.
12    Q.  Okay.  And if you look over to the right in
13 the comments, do you see that actually Comment 15
14 asks (as read):
15       "For my own learning, what does 'L34'
16       refer to?"
17    A.  I do see that, yes.
18    Q.  Okay.  And the response, it says (as read):
19       "L12345 refers to the age of users.
20       We usually focus on L345, 18 plus."
21       Do you see that?
22    A.  I do see that.
23    Q.  Okay.  And then do you see over to the
24 right, then there's the breakdown of the different
25 age groups between L3, L4, and L5?

Page 403

1     A.  Where exactly is that?
2     Q.  It's in Comment 16.
3     A.  Okay.  Yes, I do see that.
4     Q.  Okay.  And according to this internal
5  document from TikTok, TikTok is focusing on users
6  who are 18 and older; correct?
7     A.  Well, I mean, this is one small, little
8  comment in a wealth of documentation that makes it
9  very clear that TikTok is focusing on kids.
10    Q.  Okay.  Well, looking -- I'm looking at --
11 this is an internal company document; correct?
12    A.  Yeah.
13    Q.  All right.  And what the commenter says is
14 (as read):
15       "We usually focus on L345."
16       Do you see that?
17    A.  Well, that particular individual may be
18 focusing on L345, but it's very clear, if you look
19 at the totality of the evidence, that TikTok is
20 focusing on kids.
21    Q.  Okay.
22       MS. LEHMAN:  And I respectfully move to
23 strike as nonresponsive starting with "but it's very
24 clear."
25 ///

Page 404

1        BY MS. LEHMAN:
2     Q.  Now, is it your opinion that aspects of
3  social media that make -- or strike that.
4        Is it your opinion that aspects of social
5  media that reduce or make the material available
6  less voluminous would decrease the addictive
7  potential of social media?
8        MS. McNABB:  Objection.  Compound.  Vague.
9        THE WITNESS:  It's my opinion that anything
10 that reduces the friction to access or increases the
11 quantity increases the addictive potential.  So it
12 makes logical sense that if you reduced that, that
13 it would be less addictive.  That's the hope,
14 anyway.
15       BY MS. LEHMAN:
16    Q.  And then to unpack that a little bit
17 further, would it also be your opinion that anything
18 that increases the friction to access would decrease
19 the addictive potential?
20    A.  I think it would, yes.
21    Q.  Would you agree that an effort to increase
22 friction to watching videos would be a good thing
23 for TikTok to do?
24    A.  I mean, you'd have to tell me what the
25 specific methodology was.  In general, I can agree

Page 405

1  with that, but I'd really want to know what specific
2  intervention you're talking about.
3     Q.  Okay.  Would you agree that an effort to
4  allow TikTok users to have more control over what
5  they see on TikTok is a good thing to do?
6     A.  I'm sorry.  Say that again.
7     Q.  It's okay.  I see -- I see you're counting
8  time.  So don't worry.  We're still in time.
9        Would you agree that an effort to allow
10 TikTok users to have increased control over what
11 they see on TikTok is a good thing to do?
12    A.  Not necessarily.
13    Q.  You think it's better for users to have
14 less control?
15    A.  I think this is a complicated issue.  A lot
16 of times, you know, the companies talk about
17 increasing user control, but what that really
18 amounts to is more tailored -- more tailored
19 content, which I believe increases the addictive
20 potential.
21       If we're talking about user control in the
22 sense of user agency so that they can decrease their
23 risk of out-of-control, compulsive use, that would
24 be good.  I have not seen, you know, any evidence
25 that TikTok has effectively created those kinds of

102 (Pages 402 - 405)

CONFIDENTIAL

Page 406

1 controls for its users.
2    Q.   Would you agree that reminding users how
3 long they have been on TikTok would be a good thing
4 to do?
5    A.   I think I was really hopeful that by
6 telling users about time spent that it would help
7 them reduce their compulsive overconsumption. But
8 I'm not seeing that that's effective, and TikTok's
9 own internal documents as well as the documents of
10 other defendants shows that very few people are
11 using those, quote-unquote, well-being measures and
12 it's all opt in and they often use them for a time
13 and then opt out.
14    Q.   You would agree, even -- even if a small
15 percentage of users avail themselves of something
16 like that, you would agree that's still a good thing
17 to have available to users; correct?
18    A.   I've not seen evidence that tracking time
19 actually helps people who are addicted reduce their
20 use.
21    Q.   Would you agree that turning off push
22 notifications at night is a good thing for TikTok to
23 do?
24    A.   I do agree with that, yeah.
25    Q.   Okay.  Now, we talked about the reports,

Page 407

1 and you've said several times that if you had copies
2 of the reports from Drs. Galván, Auerbach, Tucker,
3 and Kishida -- I have copies of those reports.  I'm
4 happy to go off the record, and let you review those
5 at whatever length you need to because my question
6 to you is, do you have any other opinions about
7 their reports that you have not already discussed
8 with us today?
9        MS. McNABB:  Counsel, if you want to go on
10 the record and she reviews it, which you have
11 six minutes to do, and I don't think that's
12 sufficient time to do that -- we're not going off
13 the record for you to ask questions about their
14 reports.
15        MS. LEHMAN:  Well, if she needs more than a
16 minute or two, that's absolutely what we're going to
17 do, because she came here today and this is our
18 opportunity to ask her about that.
19        And so if you're saying "I'm not going to
20 allow you all," the defense, "the opportunity to do
21 that," then that's fine.  That's -- you can give
22 that instruction.
23        But I am making them available to her.
24 This is her opportunity to tell us what their
25 opinions are.

Page 408

1        And so I'm just -- I'm just telling you
2 that she's given us what the opinions are, and so
3 she's now having the opportunity to review them.
4 And if you're not allowing her to -- to answer
5 questions, that's your decision.
6        MS. McNABB:  I'm not not allowing her to
7 answer the questions.  What I'm saying is, if you
8 want her to review the reports, she has the
9 opportunity to do that on the record.  You all have
10 had more than sufficient time.  You have asked
11 duplicative questions over and over.  If you wanted
12 to use the time to get into the rebuttal reports,
13 you all could have done that when you had time.
14        MS. LEHMAN:  No, it is not our job to give
15 her time on the record to review the things that she
16 wants to have opinions about; otherwise, we could
17 ask one question today.
18        So she can either review them off the
19 record and give us her opinions or she can tell us
20 that she doesn't have any new opinions, that she has
21 exhausted them.  It's one or the other.  It's a
22 binary choice.
23        So please do let us know.
24        MS. McNABB:  We are in disagreement on
25 that, so ...

Page 409

1        MS. LEHMAN:  Okay.
2        BY MS. LEHMAN:
3    Q.   Well, Doctor, do you have any other
4 opinions about them?
5        I am going to offer you the opportunity to
6 review them off -- off the record, as much as time
7 as you'd like, to review the records and give us any
8 additional opinions that you have.
9    A.   I would be happy to go through each of
10 those together with you on the record and tell you
11 what my opinions are, but we only have five minutes
12 left.
13    Q.   Okay.  Well, I'll tell you what, do you
14 have any opinions about the defendants' platforms
15 that you have not disclosed to us today or that are
16 not included in your report?
17        MS. McNABB:  Objection.  Speculation.
18        BY MS. LEHMAN:
19    Q.   Oh, and I don't want you to speculate about
20 what your opinions are.  I want you to just tell me
21 what they are.
22    A.   Can you repeat the question?
23    Q.   Absolutely.
24        Without speculating, do you have any
25 opinions today about the defendants' platforms or

103 (Pages 406 - 409)

CONFIDENTIAL

Page 410

1 social media that are either not included in your
2 report or that you have not discussed with us and
3 shared with us today?
4    A.  No.
5        MS. McNABB:  Objection.  Calls for
6 speculation.
7        MS. LEHMAN:  All right.  Then I think let's
8 go off the record because it sounds like we have
9 five minutes.  So we'll just take a quick break and
10 make sure that we're done; okay?
11       THE VIDEOGRAPHER:  The time is 6:54.  We're
12 off the record.
13       (Recess taken from 6:54 to 7:03.)
14       THE VIDEOGRAPHER:  The time is 7:03.  We're
15 on the record.
16       MS. LEHMAN:  I got excited.
17       That's all the questions I have.  Thank
18 you.
19       THE WITNESS:  You're welcome.
20       MR. ERCOLE:  I think for -- for the --
21 subject to any, I guess, direct that -- that you do,
22 those are the questions that the defendants have.
23       MS. McNABB:  Okay.  Thank you.
24       I only have a few questions.  So I can sit
25 here and do that if you want to look at the camera,

Page 411

1 or I can -- Brian and I can switch spots, whatever
2 you prefer.
3        THE WITNESS:  Why don't you switch if you
4 want me to look over there.
5        MS. McNABB:  Okay.  So let's go off the
6 record just so we can start and --
7        THE VIDEOGRAPHER:  The time is 7:04.  We're
8 off the record.
9        (Recess taken from 7:04 to 7:05.)
10       THE VIDEOGRAPHER:  The time is 7:05.  We're
11 back on the record.
12       EXAMINATION BY MS. McNABB
13    BY MS. McNABB:
14    Q.  Dr. Lembke, is it your opinion that the
15 social media companies at issue here should have
16 warned about the addictive nature of their
17 platforms?
18       MR. ERCOLE:  Objection to the form.
19       THE WITNESS:  Yes.
20       BY MS. McNABB:
21    Q.  And, Dr. Lembke, is it your opinion that
22 the social media companies at issue here should have
23 warned about the mental health harms to adolescents
24 by using of their platforms?
25       MR. ERCOLE:  Objection to form.

Page 412

1        THE WITNESS:  Yes.
2        BY MS. McNABB:
3    Q.  And do you agree that the companies'
4 internal documents you have read form a sufficient
5 basis for your opinions in conjunction with your
6 training, experience, and literature review?
7        MR. ERCOLE:  Objection to form.
8        THE WITNESS:  Yes.
9        MS. McNABB:  Thank you, Dr. Lembke.  That
10 is all I have for you today.
11       MR. ERCOLE:  Can we go off the record?
12       THE VIDEOGRAPHER:  The time is 7:05.  We're
13 off the record.
14       (Recess taken from 7:05 to 7:09.)
15       THE VIDEOGRAPHER:  The time is 7:09.  We're
16 back on the record.
17       EXAMINATION BY MR. ERCOLE
18    BY MR. ERCOLE:
19    Q.  Dr. Lembke, you just -- in response to your
20 counsel's questions, you just provided testimony
21 about warnings.
22       Do you recall that?
23    A.  Yes.
24    Q.  Where in your -- strike that.
25       Your report does not provide any opinion

Page 413

1 with respect to warnings; correct?
2        MS. McNABB:  Objection.  Misstates report.
3        THE WITNESS:  I believe that in my report I
4 do, first of all, cite the Surgeon General's report
5 on the need for warnings for social media.
6        I'm sorry.  I'm just trying to find that
7 place in my report.
8        BY MR. ERCOLE:
9    Q.  Other than a reference to this --
10       MS. McNABB:  Counsel, you're out of time.
11 There are no more questions.
12       MR. ERCOLE:  No.  We're going to object
13 if -- if you -- if you don't -- if you don't allow
14 us to ask a couple of questions in response to the
15 direct question you asked, which seems to provide
16 entirely new opinions, we'll have to take this up
17 with Judge Kuhl, which I don't think she's going to
18 be super happy about if we have, like, a minute or
19 two of additional questions to ask about this.
20       MS. McNABB:  We can take it up with
21 Judge Kuhl.
22       MR. ERCOLE:  Okay.
23       MS. McNABB:  But that is -- you are out of
24 time.  There are no additional questions.
25       MR. ERCOLE:  We --

104 (Pages 410 - 413)

CONFIDENTIAL

Page 414

1    MR. BLAVIN: You have a pending question.
2    MR. ERCOLE: One, we have a pending
3 question. But two, beyond that --
4    MS. McNABB: You cut off your prior
5 question.
6    MR. ERCOLE: I didn't withdraw the question
7 at all.
8    So you are -- I mean, your client is taking
9 some period of time to look for some opinion on
10 warnings that's not even detailed in the -- the
11 Opinions section.
12    BY MR. ERCOLE:
13    Q.  But you can respond to the question,
14 Dr. Lembke.
15    MS. McNABB: Dr. Lembke, if you have
16 anything additional to say than you already did --
17    (Simultaneous speakers - unclear.)
18    THE WITNESS: I do believe I talk about
19 warnings in my report. I can't find it right now.
20    MS. McNABB: That's --
21    BY MR. ERCOLE:
22    Q.  Have you --
23    MS. McNABB: That's it for the questioning.
24    MR. ERCOLE: I'm going to ask -- I'm going
25 to ask another question. If you can -- if you want

Page 415

1 to instruct her --
2    MS. McNABB: And I will instruct her not to
3 answer.
4    MR. ERCOLE: That's fine.
5    BY MR. ERCOLE:
6    Q.  Dr. Lembke, have you ever crafted a warning
7 for any product whatsoever?
8    MS. McNABB: Dr. Lembke, do not answer the
9 questions. This deposition is over. They are out
10 of time.
11    MR. ERCOLE: Okay. Well, I'll put on
12 the -- on the record, just as a -- as a statement,
13 we have not even taken the full eight and a half
14 hours. In fact, you've cut us off before finishing
15 asking those questions.
16    In addition, we were -- have not been able
17 to fully address the questions that you raised on a
18 direct examination. So if you're going to cut off
19 the deposition, that's fine. We'll hold it open,
20 and we'll take it up with Judge Kuhl as appropriate.
21    So you may be coming back here, Dr. Lembke,
22 when all you would have to do is sit for basically a
23 minute or two to answer three or four more
24 questions.
25    But is that your -- your --

Page 416

1    MS. McNABB: That is --
2    MR. ERCOLE: -- position?
3    MS. McNABB: -- my instruction.
4    MR. ERCOLE: Okay.
5    MS. McNABB: And that is my position.
6    MR. ERCOLE: Okay.
7    MS. McNABB: And you have used your time
8 completely. You have asked duplicative and
9 repetitive questions throughout the day. You have
10 asked questions that were not relevant to what
11 Dr. Lembke is opining on.
12    So you used your time as Judge Kuhl said
13 that you could. And you are out of time now. And
14 so, yes, the deposition is over.
15    BY MR. ERCOLE:
16    Q.  Okay. So you're not going to answer my
17 question?
18    A.  (Shaking head.)
19    Q.  I can't -- you have to give it for the
20 record, "yes" or "no"?
21    MS. McNABB: Are you going to follow the
22 advice of your counsel is what he is asking?
23    BY MR. ERCOLE:
24    Q.  Are you going to answer my question?
25    A.  We're out of time.

Page 417

1    Q.  Are you -- Dr. Lembke, are you going to --
2 the record is still open.
3    So are you going to answer my question or
4 not?
5    MS. McNABB: You can ask the -- you can
6 tell him -- you can respond to his question, or are
7 you going to follow advice from counsel?
8    THE WITNESS: I'm going to follow counsel's
9 advice.
10    THE VIDEOGRAPHER: Total time for defense
11 is 8 hours, 31 minutes.
12    Plaintiffs, 1 minute.
13    Time: 7:13.
14    We're off the record.
15    (Proceedings concluded at 7:14 p.m. PDT.)
16    ---oOo---
17
18
19
20
21
22
23
24
25

105 (Pages 414 - 417)

CONFIDENTIAL

Page 418

1     DECLARATION UNDER PENALTY OF PERJURY

2

3          I declare under penalty of perjury under

4     the laws of the State of California that the

5     foregoing is true and correct.

6

7     Executed at _____ on _____.
               (Place)          (Date)

8

9

10

11     _____

12          ANNA LEMBKE, MD

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 419

1          STENOGRAPHER'S CERTIFICATE

2          I, LORRIE L. MARCHANT, Certified Shorthand

3     Reporter, Certificate No. 10523, for the State of

4     California, hereby certify that ANNA LEMBKE, MD  was

5     by me duly sworn/affirmed to testify to the truth,

6     the whole truth and nothing but the truth in the

7     within-entitled cause; that said deposition was

8     taken at the time and place herein named; that the

9     deposition is a true record of the witness's

10     testimony as reported to the best of my ability by

11     me, a duly certified shorthand reporter and a

12     disinterested person, and was thereafter transcribed

13     under my direction into typewriting by computer;

14     that request [  ] was [ X ] was not made to read and

15     correct said deposition.

16          I further certify that I am not interested

17     in the outcome of said action, nor connected with,

18     nor related to any of the parties in said action,

19     nor to their respective counsel.

20          IN WITNESS WHEREOF, I have hereunto set my

21     hand this 20th day of June, 2025.

22

23     _Lorrie L. Marchant_

24     _____

          LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC

25     Stenographic Certified Shorthand Reporter #10523

106 (Pages 418 - 419)